**IN THE UNITED STATES DISTRICT COURT**
**FOR THE EASTERN DISTRICT OF LOUISIANA**

| | | |
|---|---|---|
| In Re: Oil Spill by the Oil Rig *"Deepwater Horizon"* in the Gulf of Mexico, on April 20, 2010 | * * * * | MDL NO. 2179 |
| | | SECTION J |
| This Document Relates To: 10-4536 | * * | |
| | * | Honorable CARL J. BARBIER |
| | * * | |
| | * | Magistrate Judge SHUSHAN |

---

**BPXP'S PROPOSED**
**FINDINGS OF FACT AND CONCLUSIONS OF LAW**
**FOR THE PENALTY PHASE**

Richard C. Godfrey, P.C.
J. Andrew Langan, P.C.
Hariklia Karis, P.C.
Matthew Regan, P.C.
Scott W. Fowkes, P.C.
Mark J. Nomellini
A. Katrine Jakola
Emily R. Dempsey
Kirkland & Ellis LLP
300 North LaSalle Street
Chicago, IL 60654
Telephone: (312) 862-2000
Facsimile: (312) 862-2200

R. Keith Jarrett (Bar #16984)
Don K. Haycraft (Bar #14361)
Liskow & Lewis
701 Poydras Street, Suite 5000
New Orleans, Louisiana 70139-5099
Telephone: (504) 581-7979
Facsimile: (504) 556-4108

Robert C. "Mike" Brock
Jeffrey Bossert Clark
Karen M. DeSantis
Kimberly O. Branscome
Kirkland & Ellis LLP
655 15th Street, NW
Washington, DC 20005
Telephone: (202) 879-5000
Facsimile: (202) 879-5200

Brian D. Israel
Joel M. Gross
ARNOLD & PORTER LLP
555 12th St., N.W.
Washington, DC 20004
Telephone: (202) 942-5000

*Attorneys for BP Exploration & Production Inc.*

## <u>TABLE OF CONTENTS</u>

<u>Page</u>

PROPOSED FINDINGS OF FACT ............................................................................... 1

I.     THE PARTIES AND THE NATURE OF THE PROCEEDINGS ................................. 1

    A.    The Parties ............................................................................. 1

        1.    United States of America ........................................... 1

        2.    BPXP ........................................................................... 1

        3.    Anadarko .................................................................... 2

    B.    Prior and Current Proceedings ................................................... 3

II.    THE NATURE, EXTENT, AND DEGREE OF SUCCESS OF BPXP'S
    EFFORTS TO MINIMIZE OR MITIGATE THE EFFECTS OF THE SPILL ................. 4

    A.    There Is No Dispute That BPXP's Unprecedented Response Efforts
        Successfully Mitigated Impacts of the *Deepwater Horizon* Spill .......................... 4

        1.    United States and BPXP Witnesses Agreed that the *Deepwater
            Horizon* Response Mitigated the Impacts of the Spill. ............................. 4

        2.    Multiple Government Reports Confirm the Nature, Extent and
            Success of BPXP's Efforts To Respond to the *Deepwater Horizon*
            Spill. ........................................................................ 6

            a.    The Federal On-Scene Coordinator's Report ................................. 7

            b.    The Incident Specific Preparedness Review ................................. 8

    B.    BPXP Responded to the Spill in Accordance with an Established and
        Comprehensive Federal Framework. ................................................ 9

        1.    BPXP Responded Within the Unified Command Structure. ..................... 9

        2.    BPXP Conducted Its Response in Accordance with its MMS-
            Approved Oil Spill Response Plan. .......................................... 13

    C.    Working Within the Unified Command, BPXP Rapidly Mobilized the
        Resources Needed for this Unprecedented Response. ............................... 15

        1.    BPXP Rapidly Mobilized Critical Response Resources. ....................... 15

i

2.   BPXP Committed Massive Resources That Were Critical to the Response Effort..................................................................... 17

3.   BPXP Was Proactive and Spared No Expense in Responding to the Spill. .............................................................................. 20

D.   BPXP's Response Efforts Were Extraordinarily Effective in Mitigating Environmental Impacts of the *Deepwater Horizon* Spill..................................... 22

1.   There Is No Dispute That the Unified Command Achieved Its Objective of Limiting Shoreline Impacts.................................... 22

2.   The *Deepwater Horizon* Response Effectively Mitigated Environmental Impacts of the Spill. ........................................ 24

3.   The Unified Command Used Complementary Response Tools To Remove Substantial Amounts of Oil from the Gulf of Mexico............... 26

4.   Offshore Response Measures Prevented at Least 1.2 Million Barrels of Oil from Reaching the Shoreline. ............................. 27

   a.   The Unified Command Aggressively Skimmed Oil from the Water's Surface.................................................... 28

   b.   In Situ Burning Removed Substantial Volumes of Oil from the Gulf of Mexico........................................ 30

   c.   Dispersant Operations Were Carried Out Safely and Effectively................................................ 34

5.   The Unified Command Deployed Nearshore Measures to Keep Oil from Reaching the Shoreline. .................................... 37

6.   The Unified Command Implemented a Robust Shoreline Response Program.................................................... 39

   a.   BPXP and Others in the Unified Command Conducted Extensive Shoreline Surveys and Assessments. .......................... 40

   b.   SCAT Teams Made Scientifically Based Shoreline Treatment Recommendations. ...................................... 43

   c.   The Unified Command Effectively Cleaned Up the Shoreline. .................................................. 44

   d.   Based on the Success of Cleanup Activities, the Unified Command Concluded the Active Shoreline Response. ............... 45

ii

7.      BPXP and Others in the Unified Command Proactively Protected Wildlife and Other Resources During the Response. .............................. 46

8.      BPXP Worked Collaboratively with the Coast Guard and Others in Responding to the Spill. ........................................................................... 47

        a.      BPXP and the Coast Guard Responded with a Unity of Effort. ......................................................................................... 47

        b.      BPXP and the Coast Guard Worked Together to Meet Challenges from Outside the Response. ....................................... 48

E.      BPXP Took Steps To Protect the Health and Safety of Responders and the Public. .................................................................................................................. 50

1.      The *Deepwater Horizon* Response Was Conducted Safely. .................... 51

        a.      The *Deepwater Horizon* Response Included a Robust Safety Organization. .................................................................... 51

        b.      BPXP Collaborated with OSHA and Others To Provide Comprehensive Safety Training to Responders. ......................... 51

        c.      Detailed Operational Guidelines Protected the Safety of Workers. ..................................................................................... 52

        d.      BPXP Provided Personal Protective Equipment to Responders. ................................................................................. 53

        e.      The *Deepwater Horizon* Response Produced an Exceptional Safety Record. ......................................................... 53

2.      BPXP Helped To Ensure the Health and Safety of the Public. ............... 54

        a.      BPXP and Others in the Unified Command Conducted Extensive Air Monitoring. ......................................................... 54

        b.      BPXP Funded Seafood Testing to Ensure the Safety of Gulf Seafood. ................................................................................ 55

        c.      BPXP Funded Several Public Health Initiatives in Communities Across the Gulf Coast. ............................................. 55

F.      BPXP Supported the Community and Mitigated Economic Impacts of the Spill. .................................................................................................................... 56

1.      BPXP Actively Engaged with the Community during the Response. ............................................................................................... 56

iii

2. BPXP Mitigated the Economic Impacts of the Spill. .............................. 59

   a. BPXP Acted Quickly To Address Economic Impacts of the Spill. ........................................................................................ 60

   b. BPXP's Proactive Funding of the Response Was Key to Its Success. ......................................................................................... 61

   c. BPXP Voluntarily Provided Grants to State and Local Governments To Promote Tourism. ............................................. 63

   d. BPXP's Claims Payments Mitigated Economic Harm. ................. 64

   e. BPXP Mitigated Harm to Commercial Fishermen Through the Vessels of Opportunity Program and the Seafood Compensation Program. ................................................................. 66

   f. BPXP Voluntarily Funded Other Important Initiatives. .............. 68

   g. BPXP's Spill Response Spending Had Positive Economic Effects on the Gulf Region. ........................................................... 69

G. BPXP Has Remained Committed to the Response. ................................................. 71

III. THE SERIOUSNESS OF THE VIOLATION ..................................................................... 74

A. The Environmental Impact of the Spill Was Limited in Space and in Time. ........ 74

1. Using the Government's Own Toxicity Benchmarks, the Extensive Environmental Data Demonstrate that the Potential Harm to Aquatic Life in the Gulf of Mexico Was Limited. ..................................... 74

   a. A Massive Quantity of High-Quality Environmental Data Was Collected To Help Understand the Environmental Impact of the *Deepwater Horizon* Oil Spill. ................................. 75

   b. The EPA's Toxicity Benchmarks Are Scientifically Rigorous and Protective Standards for Determining Potential Harm Resulting from the Presence of Oil or Dispersants in the Water and Sediments in the Gulf of Mexico. ........................................................................................ 76

   c. The Vast Majority of Water and Sediment Samples Were Safe for Aquatic Life. ................................................................. 80

   d. Where Elevated Levels of PAHs Occurred, They Were Limited in Both Space and Time. ................................................. 82

e.      OSAT-1 Analyzed a Subset of the Water and Sediment Samples Collected and Found that Exceedances of EPA Benchmarks Were Limited in Space and Time. ........................... 83

f.      The United States Experts Ignored Extensive Amounts of Available Environmental Data. ...................................................... 85

g.      The United States Expert's Proposed Toxicity Thresholds Rely on Inappropriate Extrapolations from a Few Deeply Flawed Laboratory Experiments. ................................................. 86

2.      There is No Evidence of Impacts to Fish, Shellfish, Bird, Dolphin, Turtle or Coral Populations as a Result of the *Deepwater Horizon* Oil Spill. ...................................................................................... 91

a.      Fish and Shellfish ........................................................ 91

b.      Birds ............................................................................. 97

c.      Sea Turtles ................................................................. 100

d.      Dolphins ..................................................................... 101

e.      Deep Sea Corals and Other Bottom-Dwelling Organisms ......... 102

f.      Other Aquatic Resources ........................................... 103

3.      The Gulf of Mexico is a Resilient Ecosystem that Includes Thousands of Naturally Occurring Oil Seeps and Oil-Consuming Bacteria. .................................................................................... 104

4.      The Robust Shoreline Response Program Limited the Impact to the Shoreline. ................................................................................. 107

a.      The Shoreline Response Program Dramatically Reduced the Level of Oiling on the Gulf Coast. ....................................... 107

b.      Residual Oiling is Non-Toxic and Will be Limited and Discreet in the Future. .................................................... 108

c.      The Marshes Have Experienced a Rapid and Substantial Recovery. .................................................................... 112

d.      There Is No Evidence that Oiling Resulted in Accelerated Marsh Erosion .......................................................... 113

B.      There Is No Evidence of Significant Adverse Human Health Effects Resulting from the *Deepwater Horizon* Incident and Future Adverse Health Effects Are Highly Unlikely. ............................................... 114

1.      There Is No Evidence of Significant Adverse Health Effects
        Resulting from Potential Inhalational Exposures. ................................. 115

2.      There Is No Evidence of Significant Adverse Health Effects
        Resulting from Potential Dermal Exposures............................................ 118

3.      There Is No Evidence of Significant Adverse Health Effects
        Resulting from Potential Oral Exposure. ................................................ 119

        a.      CDC Health Surveillance............................................................ 120

        b.      CDC & EPA Independent Analysis of Environmental
                Sampling Data............................................................................. 120

        c.      EPA Community Air Monitoring .............................................. 121

        d.      FDA Seafood Safety Analysis ................................................... 121

        e.      OSHA Independent Air Monitoring .......................................... 122

        f.      OSAT Reports.............................................................................. 122

        g.      Reports by Louisiana Department of Health and Hospitals
                and Louisiana Department of Environmental Quality ............... 123

        h.      Mississippi State Department of Health Surveillance ............... 124

        i.      Florida Department of Environmental Protection Air
                Quality Status............................................................................. 124

5.      The United States Has Failed To Establish Any Significant
        Adverse Human Health Effects. ............................................................. 124

6.      Any Mental Health Impact in Gulf Coast Communities Is Limited
        and Not Attributable Solely to the *Deepwater Horizon* Incident. .......... 127

C.      Economic Effects of the Spill Were Not Uniform or Evenly Distributed
        Across the Gulf Coast and Were Followed by Swift Recovery......................... 129

1.      The Spill's Effects on Tourism Businesses in the Gulf were Short-
        Lived and Followed by Robust Tourism Growth. ................................... 130

2.      Gulf Commercial Fishing Recovered by 2011-2012. ............................. 132

3.      Dr. Austin's Opinions on the Spill's Social Effects Are Limited to
        Short-Term Qualitative Effects in Only Five Communities. ................... 134

IV.     THE ECONOMIC IMPACT OF THE PENALTY ON THE VIOLATOR. .................. 135

A.      BPXP Is the Violator. ........................................................................ 135

B.      The *Deepwater Horizon* Accident Has Had a Substantial Negative
        Economic Impact on BPXP. ............................................................. 137

        1.      BPXP's Spill-Related Costs and Liabilities............................ 137

                a.      BPXP Has Incurred $40+ Billion in Gross Spill-Related
                        Liabilities. ................................................................. 138

                b.      BPXP's Spill-Related Contingent Liabilities.............................. 141

        2.      Injections of Capital into BPXP............................................. 143

                a.      BPXP IFA with NAFCO ........................................... 143

                b.      2012 Equity Injection from BP America Production
                        Company ................................................................... 144

                c.      $3.1 Billion Loan from NAFCO................................. 145

                d.      Outstanding Debt ....................................................... 145

        3.      BPXP's Recent Financial Performance. ................................. 145

C.      An Additional CWA Penalty in Excess of $2.3 Billion Would Absorb All
        of BPXP's Available Cash in 2015 and Threaten Future Operations................. 146

D.      Analysis of BPXP's Credit Metrics Indicates That BPXP Would Likely Be
        Rated Below Investment Grade Even Prior to the Imposition of a CWA
        Penalty.......................................................................................... 150

E.      BPXP's Equity Value at the Time of Trial Was Approximately $5 Billion,
        Excluding Consideration of a CWA Penalty or BPXP's Contingent
        Liabilities. ..................................................................................... 152

        1.      Wood Mackenzie's GOM Valuation. ..................................... 153

                a.      BPXP's Value: Wood Mackenzie's Base Case and Low
                        Case............................................................................ 159

        2.      Calculating the Equity Value of BPXP from Wood Mackenzie's
                GOM Asset Valuation............................................................ 160

        3.      Operating Expense Adjustment. ............................................ 163

        4.      Equity Value of BPXP............................................................ 168

        5.      SMOG Is Not an Indicator of Fair Value................................ 170

| | 6. | A Prospective Investor Would Weigh BPXP's Value Against Its CWA and Contingent Liabilities. | 172 |
|---|---|---|---|
| | 7. | BPXP's Ability to Sell Assets to Satisfy a Penalty Is Limited. | 172 |
| F. | | A CWA Penalty Would Have a Negative Impact on BPXP, and the United States' Expert Has Modeled No Set of Possible Funding Mechanisms That Would Not Have a Significant Negative Impact on BPXP. | 172 |
| G. | | The Price of Oil Has Declined Significantly. | 175 |
| | 1. | Oil Prices Are an Indispensable Input in Valuing an Oil Company and Assessing Its Future Cash Flows. | 176 |
| | 2. | Market Future Prices Should Be Given More Weight Than a Handful of Analyst Assessments. | 177 |
| H. | | The Macondo Incident Has Had a Significant Impact on BPXP's Ultimate Parent Company, and a CWA Penalty Would Have a Further Significant Negative Impact on BP p.l.c. | 179 |
| I. | | The Government's Attempt to Shift the Penalty to a Non-Violator Is Unfounded. | 180 |
| V. | | THE ECONOMIC BENEFIT TO THE VIOLATOR, IF ANY, RESULTING FROM THE VIOLATIONS | 187 |
| VI. | | THE DEGREE OF CULPABILITY INVOLVED. | 189 |
| A. | | Phase 1 Ruling | 189 |
| B. | | Phase 2 Ruling | 190 |
| VII. | | ANY OTHER PENALTY FOR THE SAME INCIDENT. | 192 |
| A. | | BPXP. | 192 |
| B. | | Transocean Consent Decree. | 193 |
| C. | | Transocean Criminal Plea. | 194 |
| VIII. | | ANY HISTORY OF PRIOR VIOLATIONS. | 194 |
| A. | | The Record Reflects No Prior CWA Violations by BPXP. | 194 |
| B. | | The Record Includes Evidence Only of Unrelated Prior Violations Involving Other BP Entities. | 195 |

    C.     Prior Incidents Involving Other BP Entities Were Not Related to the *Deepwater Horizon* Incident............................................................................... 198

IX.    ANY OTHER MATTERS AS JUSTICE MAY REQUIRE............................................ 199

    A.     BPXP's Important Role in the United States and Gulf Coast Economies.......... 199

         1.     BPXP's Important Role in the Gulf of Mexico Oil and Gas Industry. ........................................................................................ 199

         2.     BPXP is a Major Contributor to the National and Gulf Coast and Economies and Communities. ................................................. 201

    B.     BPXP's Substantial Monetary Commitments to the Gulf Coast. ...................... 206

         1.     BPXP Committed $500 Million To Support Gulf of Mexico Research Initiative (GoMRI). ................................................. 206

         2.     BPXP Voluntarily Committed $1 Billion To Fund Early Restoration Projects. ......................................................... 207

         3.     BPXP Funded Seafood Testing, Tourism, and Other Initiatives............ 208

         4.     BPXP Spent Over $14 Billion To Support Spill Response Efforts. ....... 208

    C.     BPXP's Technological Achievements and Industry Leading Safety Advancements. ................................................................................ 209

         1.     BPXP Contributed to Advancements in Spill Response Technology. ..................................................................... 209

         2.     BPXP Shared Learnings about Spill Response Technology and Capability Worldwide. ............................................................ 211

         3.     BPXP Has Improved Drilling Safety at BP and Shared Learnings with the Industry. ..................................................... 213

PROPOSED CONCLUSIONS OF LAW ................................................................ 213

X.    GIVEN THE PURPOSES OF THE CLEAN WATER ACT, ANY SECTION 311(B)(7)(D) PENALTY MUST BE SET IN LIGHT OF BPXP'S CUMULATIVE LIABILITY UNDER OPA, FEDERAL MARITIME LAW, AND THE CRIMINAL PROVISIONS OF THE ACT................................................. 213

XI.    REEXAMINATION OF THE MAXIMUM PENALTY PER BARREL ISSUE NOW PROMPTS THE RULING THAT THE CEILING ON PER-BARREL LIABILITY IS $3,000 PER BARREL. ........................................................... 222

XII.    THE UNITED STATES BEARS THE BURDEN OF PROOF ON EACH OF
        THE PENALTY FACTORS.......................................................................... 223

XIII.   BPXP HAS MADE STRONG SHOWINGS UNDER EACH OF THE CLEAN
        WATER ACT SECTION 311(B)(8) PENALTY FACTORS. ...................................... 228

        A.    The Nature, Extent, and Degree of Success of Any Efforts of the Violator
              to Minimize or Mitigate the Effects of the Discharge. ....................................... 229

        B.    The Seriousness of the Violation ......................................................... 238

        C.    The Economic Impact of the Penalty on the Violator........................................ 240

        D.    The Economic Benefit to the Violator, If Any, Resulting from the
              Violation. ............................................................................. 251

        E.    The Degree of Culpability Involved .................................................... 253

        F.    Any Other Penalty for the Same Incident ........................................... 256

        G.    Any History of Prior Violations........................................................ 257

        H.    Any Other Matters as Justice May Require. ....................................... 261

XIV.    CLEAN WATER ACT SECTION 311(B)(7) PROVIDES FOR INHERENTLY
        PROPORTIONAL PENALTIES AND PENALTY CONSISTENCY ACROSS
        CASES. ............................................................................................... 265

XV.     ON BALANCE OF ALL FACTORS AND LEGAL CONSIDERATIONS, BPXP
        SHOULD BE SUBJECTED TO A PENALTY AT THE LOW END OF THE
        RANGE.............................................................................................. 272

## PROPOSED FINDINGS OF FACT

## I.      THE PARTIES AND THE NATURE OF THE PROCEEDINGS

1.       This complex, multidistrict litigation arises from the April 20, 2010 explosion and fire aboard the mobile offshore drilling unit *Deepwater Horizon* in the Gulf of Mexico, the loss of that vessel two days later, and the resulting release of hydrocarbons from the *Deepwater Horizon's* appurtenances, located on the Mississippi Canyon Block 252 well in the Macondo Prospect (the "Macondo well").  The parties previously litigated Phase 1 and Phase 2 of the Limitation and Liability Trial in MDL 2179, and BP Exploration & Production Inc. ("BPXP") hereby incorporates its previously filed Proposed Findings of Fact and Conclusions of Law from Phase 1 and Phase 2.  Rec. Doc. 10467; Rec. Doc. 12047.

### A.      The Parties

#### 1.      United States of America

2.       The U.S. Department of Justice filed a civil complaint in December 2010 against BPXP, Transocean, Anadarko, and MOEX seeking a declaration of liability under the Oil Pollution Act of 1990 ("OPA"), 33 U.S.C. § 2701 *et seq*, and civil penalties under the Clean Water Act ("CWA"), 33 U.S.C. § 1251.  *See* Civ. A. No. 10-04536 (hereinafter Rec. Doc. 1). The United States has settled its claims against Transocean and MOEX.  Rec. Doc. 8608; Rec. Doc. 6698.

#### 2.      BPXP

3.       BPXP is a Delaware corporation with its principal place of business in Texas. BPXP Answer, Rec. Doc. 1858.

4.       BPXP is the BP entity that bid for and was awarded the right to lease Mississippi Canyon Block 252 ("MC-252") in March 2008.  Agreed Stipulations ¶ 96, Rec. Doc. 5927; Statement of BP Exploration & Production Inc. re Applicability of Limit of Liability Under Oil

Pollution Act of 1990, Rec. Doc. 559.

5.      BPXP originally leased 100% of the MC-252 prospect leasehold from the United States, but through lease exchange agreements and assignments had reduced its leasehold interest to 65% at the time of the *Deepwater Horizon* incident.   Agreed Stipulations ¶ 100, Rec. Doc. 5927; BP Parties' Answer to the First Amended Master Complaint, Cross-Claim, and Third-Party Complaint for Private Economic Losses in Accordance with PTO No. 11 [CMO No. 1] Section III(B1), ¶ 247, Rec. Doc. 4130.

6.      BPXP is the sole BP Group entity named as a defendant in the complaint filed by the United States in this proceeding and is the only BP Group entity that could be held liable for a discharge.  Rec. Doc. 1; *see also* 2/14/14 Memorandum in Support of Plaintiff United States' Motion in Limine to Permit Relevant Evidence Concerning BP P.L.C. and other BP Affiliates at 1, Rec. Doc. 12335-1 (BPXP is alleged to be "the liable party in this proceeding"); BPXP Answer, Rec. Doc. 1858.

7.      The United States has stated on the record that it does not intend to pursue any veil piercing theories with respect to its claim against BPXP.  Jan. 7, 2015 Hr'g Tr. 32.  The Court granted BPXP's Motion in Limine to Preclude the United States from Introducing Evidence for the Purpose of Establishing the Liability of the BP Group entities other than BPXP. Rec. Doc. 13822; Minute Entry Order (Jan. 7, 2015), Rec. Doc. 13994.

### 3.      Anadarko

8.      Anadarko Petroleum Corporation ("Anadarko") is a defendant in the Penalty Phase trial.  As of April 20, 2010, Anadarko owned a 25% interest in the MC-252 prospect leasehold.  Anadarko E&P Company LP had no ownership interest in the MC-252 prospect leasehold at the time of the *Deepwater Horizon* incident.

2

**B.      Prior and Current Proceedings**

9.      The Penalty Phase proceedings arise under Section 311 of the CWA, 33 U.S.C. § 1251.

10.      On February 22, 2012, the Court granted partial summary judgment in favor of the United States and against BPXP and Anadarko, holding that BPXP and Anadarko are liable for civil penalties under the CWA because they co-owned an offshore facility—the Macondo well—from which oil was discharged.  Rec. Doc. 5809.  BPXP and Anadarko appealed this ruling, but a panel of the Fifth Circuit affirmed on June 4, 2014, *In re Deepwater Horizon*, 753 F.3d 570 (5th Cir. 2014), and the same Panel issued a supplemental opinion on November 5, 2014, *In re Deepwater Horizon*, 772 F.3d 350 (5th Cir. 2014).  On January 9, 2015, on a 7-6 vote (with a written dissent), the Fifth Circuit denied the petitions for rehearing en banc filed by BPXP and Anadarko.  *In re Deepwater Horizon*, 775 F.3d 741 (5th Cir. 2015); *see also* Phase 2 Ruling ¶ 252 & n.42, Rec. Doc. 14021.  Anadarko has filed a petition for writ of certiorari with the Supreme Court.  No. 14-1167.

11.      The Limitation and Liability Trial has proceeded in three phases: the Phase 1 and Phase 2 trials, for which this Court has previously issued its findings of fact and conclusions of law, and the recently completed Penalty Phase trial, which is the subject of these proposed findings and conclusions.

12.      Phase 1 of the Limitation and Liability Trial ran from February 25, 2013 to April 17, 2013 and primarily addressed the allocation of fault for the loss of well control and the ensuing sinking of the *Deepwater Horizon* and release of oil.  This Court issued its findings on those topics on September 9, 2014.  *In re Oil Spill by Oil Rig Deepwater Horizon in Gulf of Mexico, on April 20, 2010*, 21 F. Supp. 3d 657 (E.D. La. 2014); Rec. Doc. 13381.  BPXP filed a motion to amend the Phase 1 findings or for a new trial, which this Court denied on November

13, 2014.  Rec. Doc. 13644.

13.     Phase 2 of the Limitation and Liability Trial ran from September 30, 2013 to October 18, 2013 and concerned the quantification of how much oil was spilled and what the parties did to control the flow of oil following the blowout at the Macondo well.  This Court issued its findings of fact and conclusions of law regarding Phase 2 on January 15, 2015.  The Court concluded that "4.0 million barrels of oil released from the reservoir."  Phase 2 Ruling ¶ 273, Rec. Doc. 14021.  After deducting the 810,000 barrels that were collected during the spill response before contacting any ambient sea water, the Court found that for "purposes of calculating the maximum possible civil penalty under the CWA, 3.19 million barrels of oil discharged into the Gulf of Mexico."  TREX 145373; Phase 2 Ruling ¶¶ 255, 277, Rec. Doc. 14021.

## II.   THE NATURE, EXTENT, AND DEGREE OF SUCCESS OF BPXP'S EFFORTS TO MINIMIZE OR MITIGATE THE EFFECTS OF THE SPILL

### A.     There Is No Dispute That BPXP's Unprecedented Response Efforts Successfully Mitigated Impacts of the *Deepwater Horizon* Spill.

14.     There is no dispute in this case that BPXP mounted a massive and unprecedented response to the *Deepwater Horizon* spill that mitigated the impacts of the spill.

15.     In its opening statement, the United States conceded that BPXP carried out a "good response" to the spill, explaining:  "We are not here to say that BP did a bad job in the response action.  They didn't…. they did a good response action…."  Tr. 22-23 (DOJ Opening Statement); *see also* Rec. Doc. 13901 at 7 (conceding that the United States did "not intend to put on an affirmative case that BP's actions were inadequate.").

#### 1.     United States and BPXP Witnesses Agreed that the *Deepwater Horizon* Response Mitigated the Impacts of the Spill.

16.     Trial witnesses for the United States and BPXP agreed that the *Deepwater*

*Horizon* response mitigated the environmental, economic, and health impacts of the spill.  Tr. 649, 654-55, 659 (VanHaverbeke); Tr. 106, 113-14 (M. Austin); Tr. 1238 (Paskewich); Tr. 1404, 1413 (Utsler); Tr. 1789-90 (Taylor); Tr. 1485 (Cox); Tr. 210-19 (D. Austin); Tr. 738-39 (Mason); Tr. 2034-35 (Scott).

17.     Witnesses for both parties likewise agreed that BPXP made large-scale contributions to the response that were critical to the success of the operation.  Tr. 655-56 (VanHaverbeke); Tr. 1255-56 (Paskewich); Tr. 1391 (Utsler); Tr. 2034-35 (Scott); Tr. 738-39 (Mason); Laferriere Dep. 259.

18.     Admiral Meredith Austin, the United States' Incident Commander at the Houma Incident Command Post ("ICP"), testified that the *Deepwater Horizon* response "helped minimize the environmental impacts of oiling along the Gulf Coast."  Tr. 113-14 (M. Austin); TREX 009105.79.1 (FOSC Rpt.).  She praised BPXP's response efforts, stating:  "I think BP did a pretty good job, I give it a B plus or an A."  Tr. 101 (M. Austin).

19.     The United States' spill response expert, Captain Mark VanHaverbeke, agreed that the *Deepwater Horizon* response was "successful" and "very effective" at achieving the Unified Command's goal of "keeping oil off of the sensitive shoreline."  Tr. 649, 655 (VanHaverbeke).

20.     BPXP's spill response expert, Captain Frank Paskewich, testified that "BP conducted an extraordinarily effective response…. The range of measures they used were effective at mitigating environmental impact."  Tr. 1238 (Paskewich).

21.     Mr. Mike Utsler, BPXP's Incident Commander at the Houma ICP, testified that offshore tools such as mechanical skimming and dispersants were "effective tools" that prevented oil from impacting Gulf shorelines.  Tr. 1404, 1413 (Utsler); *see also* Tr. 117 (M.

Austin) (Admiral Austin gave Mr. Utsler an "A" grade for his leadership during the response).

22.     Dr. Elliott Taylor, BPXP's shoreline expert, similarly testified that shoreline assessment and cleanup efforts during the *Deepwater Horizon* response were "extremely effective." Tr. 1789-90 (Taylor).

23.     Dr. Loren Scott, BPXP's economic expert testified that BPXP's mitigation spending "had a significant economic impact" and mitigated the "adverse economic impacts" of the spill. Tr. 2034-35 (Scott).

24.     The United States' economist, Dr. Charles Mason, agreed with Dr. Scott, testifying that BPXP's post-spill spending quickly mitigated the spill's impact on individuals and businesses. Tr. 738-39 (Mason).

25.     BPXP's health expert, Dr. Robert Cox, opined that BPXP's mitigation efforts were "successful in minimizing adverse health effects" of the spill. Tr. 1485 (Cox).

26.     No witness — fact or expert — testified that BPXP's response efforts were inadequate or did not mitigate impacts of the spill.

### 2.     Multiple Government Reports Confirm the Nature, Extent and Success of BPXP's Efforts To Respond to the *Deepwater Horizon* Spill.

27.     The United States government has prepared or commissioned several official reports that document the nature, extent and degree of success of BPXP's efforts to respond to, and mitigate the impacts of, the *Deepwater Horizon* spill. TREX 009105 (FOSC Rpt.); TREX 009124 (ISPR); TREX 012237, 012238, 011826 (OSAT Rpts.).

28.     Two of these reports, the Federal On-Scene Coordinator's Report ("FOSC Report") and the Incident Specific Preparedness Review ("ISPR") assess the performance of the Responsible Party in its participation within the Unified Command. Tr. 1235-36 (Paskewich).

29.     Both the FOSC Report and ISPR confirm that BPXP's response efforts effectively

mitigated the impacts of the *Deepwater Horizon* spill.  TREX 009105.0014 (FOSC Rpt.); TREX 009124.0049, .0052-53, .0055, .0058 (ISPR).

30.     In its FOSC Report, the Coast Guard determined that:  "The *Deepwater Horizon* response was ultimately successful due to the unity of effort and perseverance of the more than 1,000 organizations that contributed to this unprecedented response."  TREX 009105.0014 (FOSC Rpt.).

31.     Similarly, the ISPR concluded that "BP was very proactive and placed no limits on what was needed to make this response successful."  TREX 009124.0111 (ISPR).

### a.     The Federal On-Scene Coordinator's Report

32.     The FOSC Report is an official report that the U.S. Coast Guard prepared at the request of the National Response Team to document the *Deepwater Horizon* response.  TREX 009105.0005 (FOSC Rpt.); McCleary Dep. 53-54, 57-58.

33.     The purpose of the FOSC Report was to record "the situation as it developed, the actions taken, the resources committed and the challenges encountered" during the response. TREX 009105.0005 (FOSC Rpt.); McCleary Dep. 78.

34.     The Coast Guard prepared the FOSC Report based on a substantial documentary record and with the input of more than 200 "senior Coast Guard officials, admirals, captains," and other responders from the National Oceanic and Atmospheric Association ("NOAA"), the Environmental Protection Agency ("EPA"), the U.S. Geological Survey, the U.S. Fish and Wildlife Service, and the Bureau of Ocean Energy Management, Regulation and Enforcement ("BOEMRE").  Tr. 1235 (Paskewich); Tr. 648 (VanHaverbeke); McCleary Dep. 89-90, 136-37; TREX 241529.0022 (Paskewich Expert Rpt.).

35.     After undergoing extensive review by high-ranking officials of the U.S. Coast Guard, the Department of Homeland Security and NOAA's Office of General Counsel, the Coast

Guard issued the FOSC Report in September 2011.  McCleary Dep. 113-17.

36.     The FOSC Report provides a thorough overview of response efforts, and the United States has not identified any inaccuracies in the report.  McCleary Dep. 94; Tr. 649 (VanHaverbeke) (the FOSC Report is "a reliable source of information" about the response).

37.     In its FOSC Report, the Coast Guard concluded that the *Deepwater Horizon* response was "successful" and described the many ways in which BPXP's contributions to the response were critical to that success.     TREX 009105.0014 (FOSC Rpt.); Tr. 649 (VanHaverbeke).

### b.     The Incident Specific Preparedness Review

38.     The Commandant of the Coast Guard chartered the ISPR to assess best practices and lessons learned during the *Deepwater Horizon* response.  TREX 009124.0010-13 (ISPR); Tr. 1235 (Paskewich); Casey Dep. 47-48, 52-53; Hanzalik Dep. 26.   The ISPR was released on March 18, 2011.  TREX 009124.0002 (ISPR); Casey Dep. 46.

39.     The ISPR was a fact-finding mission, and the report represents the independent and objective findings that the ISPR team collected over a nine-month period.   The team consisted of representatives from the Department of the Interior, the EPA, the Department of Homeland Security, BOEMRE, NOAA, various state agencies, and industry.  Casey Dep. 67-73; TREX 009124.0006-07, .0157-64 (ISPR).

40.     The ISPR team interviewed more than 90 individuals who held key positions in the *Deepwater Horizon* response.  Casey Dep. 103-04, 110-11; TREX 009124.0166-67 (ISPR). The ISPR team members took notes during the interviews and prepared summary forms documenting the input they received.  Casey Dep. 115, 129-30, 138-39.  The ISPR team also reviewed documentation, including incident action plans, situation reports, and regional area contingency plans.  Casey Dep. 97.

41.     The ISPR is a true and accurate record of the *Deepwater Horizon* response, and the United States has not identified inaccuracies in the report.   Casey Dep. 24-27; Tr. 645 (VanHaverbeke) (the ISPR is a "reliable source of information" about the response).

42.     As with the FOSC Report, the ISPR concluded that the *Deepwater Horizon* response was effective in mitigating and minimizing environmental impacts of the spill.   TREX 009124.0049, .0052-53, .0055, .0058 (ISPR).

43.     The ISPR likewise determined that response "personnel provided by the RP [BP] and Coast Guard personnel worked effectively together, and that there was 'unity of effort' throughout the response organization."   TREX 009124.0013 (ISPR).

**B.     BPXP Responded to the Spill in Accordance with an Established and Comprehensive Federal Framework.**

**1.     BPXP Responded Within the Unified Command Structure.**

44.     The Oil Pollution Act ("OPA"), 33 U.S.C. § 2701 *et seq.*; Federal Water Pollution Control Act, 33 U.S.C. § 1251 *et seq.*; and the National Contingency Plan ("NCP"), 40 C.F.R. §300 *et seq.* provided the legal framework for the coordination of efforts to respond to the *Deepwater Horizon* spill.   TREX 241529.0013 (Paskewich Expert Rpt.); *see* Phase 2 Ruling ¶ 48, Rec. Doc. 14021.

45.     The Incident Command System ("ICS") was the organizational structure used to implement efforts to respond to the *Deepwater Horizon* spill.   The ICS provides for the establishment of a Unified Command to respond to an incident.   TREX 241529.0013 (Paskewich Expert Rpt.); TREX 009105.0023 (FOSC Rpt.); *see* Phase 2 Ruling ¶ 48, Rec. Doc. 14021.

46.     The Unified Command system "brings together the functions of the Federal Government, the state government, and the [OPA] responsible party to achieve an effective and efficient response…."   40 C.F.R. §300.105; TREX 241529.0013 (Paskewich Expert Rpt.);

Hanzalik Dep. 21-22; TREX 013513.000013 (VanHaverbeke Expert Rpt.).

47.     The Unified Command established in response to the *Deepwater Horizon* spill included representatives of the federal government; the States of Louisiana, Alabama, Mississippi, and Florida; and BPXP, as the "Responsible Party" under OPA.    TREX 241529.0013 (Paskewich Expert Rpt.); *see* Phase 2 Ruling ¶ 47-48, Rec. Doc. 14021.

48.     The Unified Command oversaw the management of the *Deepwater Horizon* response and had the authority to set overall strategy and priorities, allocate critical resources, manage response operations, and ensure that objectives were met and strategies followed.  TREX 241529.0013 (Paskewich Expert Rpt.); *see* Phase 2 Ruling ¶ 47, Rec. Doc. 14021.

49.     The NCP authorizes the Federal On Scene Coordinator ("FOSC") to direct and monitor all federal, state and private response actions through the Unified Command.  TREX 241529.0013 (Paskewich Expert Rpt.); Hanzalik Dep. 22; *see* Phase 2 Ruling ¶ 48, Rec. Doc. 14021.  Because the *Deepwater Horizon* incident involved a maritime spill, the FOSC was at all times a representative of the United States Coast Guard.  TREX 241529.0013 (Paskewich Expert Rpt.); *see* Phase 2 Ruling ¶ 49, Rec. Doc. 14021.

50.     Captain Joseph Paradis, as Captain of the Marine Safety Unit in Morgan City, Louisiana, was the first designated FOSC in the *Deepwater Horizon* response.  Because Captain Paradis was on leave at the time of the explosion, CDR Patrick Ropp was Acting FOSC for the first 24 hours.  *See* Phase 2 Ruling ¶ 51, Rec. Doc. 14021.

51.     By April 21, 2010, before a subsea leak had even been discovered, BPXP had mobilized spill response resources and established a command post at its Houston offices.  Tr. 1540 (Morrison); TREX 241529.0015, .0017 (Paskewich Expert Rpt.).

52.     On April 23, 2010, the commander of Coast Guard District 8, Rear Admiral Mary

Landry, became the FOSC for the *Deepwater Horizon* response.  *See* Phase 2 Ruling ¶ 52, Rec. Doc. 14021.

53.     On April 23, 2010, Admiral Landry established a Unified Area Command in Robert, Louisiana.  The Unified Area Command served as the headquarters for the response and directed activities across the response area.  TREX 241529.0015 (Paskewich Expert Rpt.); Tr. 1543-45 (Morrison); D34601; *see* Phase 2 Ruling ¶ 53, Rec. Doc. 14021.

54.     On April 23, 2010, the Unified Command recognized BP's Houston offices as an Incident Command Post ("ICP") working on source control.  TREX 241529.0015 (Paskewich Expert Rpt.); *see* Phase 2 Ruling ¶ 54, Rec. Doc. 14021.

55.     On April 23, 2010, the Unified Command established an ICP at BPXP's Offshore Learning Center in Houma, Louisiana.  The Houma ICP managed offshore surface response operations, as well as nearshore and shoreline operations for Louisiana.  TREX 241529.0015 (Paskewich Expert Rpt.); D35003; TREX 241918; D34683 (video of operations at Houma ICP).

56.     On April 26, 2010, the Unified Command established an ICP in Mobile, Alabama. The Mobile ICP managed nearshore and shoreline operations for Alabama, Mississippi, and the Florida panhandle.  TREX 241529.0015 (Paskewich Expert Rpt.).

57.     ICPs were also set up in Miami, Florida and Galveston, Texas to manage nearshore and shoreline operations in those states.  TREX 241529.0015 (Paskewich Expert Rpt.).

58.     Local branch offices (or forward operating bases) and staging areas were also established.  TREX 241529.0015 (Paskewich Expert Rpt.).

59.     BPXP provided the facilities for all of these operations, which spanned the entire Gulf Coast.  TREX 009105.0011, .0164-.0166 (FOSC Rpt.); TREX 241529.0015 (Paskewich Expert Rpt.).

60.     On April 29, 2010, the *Deepwater Horizon* incident was declared a Spill of National Significance ("SONS").  *See* Phase 2 Ruling ¶ 55, Rec. Doc. 14021.

61.     On May 1, 2010, Coast Guard Commandant Admiral Thad Allen was designated as the National Incident Commander ("NIC").  *See* Phase 2 Ruling ¶ 56, Rec. Doc. 14021.

62.     On June 1, Rear Admiral James Watson succeeded Admiral Landry as the FOSC. *See* Phase 2 Ruling ¶ 57, Rec. Doc. 14021.  On July 12, 2010, Rear Admiral Paul Zukunft succeeded Admiral Watson as the FOSC.  *See* Phase 2 Ruling ¶ 59, Rec. Doc. 14021.  Other FOSCs who served over the course of the *Deepwater Horizon* response included Captain James Hanzalik and Captain Julia Hein, among other Coast Guard officials.  Hanzalik Dep. 19; Hein Dep. 23.

63.     Consistent with the NCP framework, BPXP actively participated in the Unified Command-led response to the *Deepwater Horizon* incident.  BPXP personnel were embedded throughout the Unified Command in leadership and support positions across the response organization.  For example, a BPXP Area Commander worked alongside the FOSC at the Unified Area Command in Robert, and BPXP Incident Commanders worked alongside U.S. Incident Commanders at the ICPs.   TREX 241529.0016 (Paskewich Expert Rpt.); TREX 009105.0021, .0029, .0164 (FOSC Rpt.); Tr. 1546 (Morrison); D34601.1; Tr. 107 (M. Austin).

64.     In this way, the NCP framework allowed BPXP to participate actively in the response organization and encouraged collaboration between BPXP, the Coast Guard, and other Unified Command partners, while at the same time vesting ultimate authority with the FOSC. TREX 241529.0016 (Paskewich Expert Rpt.).

65.     BPXP met its obligations to respond to the *Deepwater Horizon* spill under the NCP, OPA, and the CWA. Tr. 641 (VanHaverbeke).  It met those obligations "by participating

in the Unified Command and working collectively with others in the Unified Command to meet the objectives of the response organization."  Tr. 641-42 (VanHaverbeke).

### 2.   BPXP Conducted Its Response in Accordance with its MMS-Approved Oil Spill Response Plan.

66.     Federal regulations required that BPXP, as the leaseholder and designated operator of the Macondo well, submit an oil spill response plan ("OSRP") to the Minerals Management Service ("MMS") for approval.  The plan had to demonstrate that BPXP could "respond quickly and effectively whenever oil is discharged from [its] facility."   30 C.F.R. § 254.1; *see* Phase 2 Ruling ¶ 218, Rec. Doc. 14021.

67.     The MMS had to approve BPXP's OSRP before drilling operations could commence.  30 C.F.R. § 254.2; *see* Phase 2 Ruling ¶ 218, Rec. Doc. 14021.

68.     At the time of the *Deepwater Horizon* incident, BPXP had an OSRP that had been approved by the MMS.   In accordance with MMS regulations, BPXP's OSRP contained all information necessary to mount a large-scale response to a worst-case discharge in the Gulf of Mexico, including identifying individuals for key organizational roles, locations for response sites, pre-contracted oil spill response organizations ("OSROs"), and strategies for response actions, such as mechanical recovery, in situ burning, and the use of dispersants.  Tr. 1241 (Paskewich); TREX 241529.0020 (Paskewich Expert Rpt.); TREX 000769 (BPXP's OSRP); D34682.

69.     There is no dispute that BPXP's OSRP complied with federal regulations and industry practice at the time of the *Deepwater Horizon* incident.  *See* Phase 2 Ruling ¶ 227, Rec. Doc. 14021.

70.     Both the United States' and BPXP's spill response experts agreed that BPXP was adequately prepared to respond to the *Deepwater Horizon* spill.

71.     BPXP's expert, Captain Frank Paskewich, evaluated the company's efforts to respond to the *Deepwater Horizon* spill.  Captain Paskewich has over 33 years of experience in marine safety, environmental protection, and oil spill response.  D34677; Tr. 1223 (Paskewich); Tr. 128-29 (M. Austin) (Captain Paskewich is "very experienced in oil spill response" and Admiral Austin "would rely on his judgment about issues that come up in oil spill response").  He has responded to hundreds of oil spills over the course of his career.   Tr. 1224-25 (Paskewich).  Captain Paskewich served as acting Captain of the Port of New Orleans during the response to September 11, and as FOSC during the response to Hurricane Katrina.  D34677; Tr. 1226-28 (Paskewich).

72.     Captain Paskewich testified that BPXP was "very prepared.   They had an approved Oil Spill Response Plan.  They had an organization that was in place at the ready in the event of the incident, and they pulled the trigger on that plan."  Tr. 1240 (Paskewich); TREX 012212.0006 (Captain Joseph Paradis ISPR Interview Summary) (FOSC stated that "BP personnel were trained in ICS, knew what information was needed, built the organization quickly, and there was a spirit of cooperation.").

73.     The United States' expert, Captain VanHaverbeke, agreed, testifying that with respect to the response "organization as a whole . . .  frankly, I'm amazed at how well it went."  Tr. 677-78 (VanHaverbeke).  BPXP personnel "had to go through a bunch of the exercises.  All of the work that went into being prepared for the next major spill paid off in this event."  Tr. 678 (VanHaverbeke).  "[A]ll that effort that people have undergone to be ready, it really showed in this spill."  Tr. 678 (VanHaverbeke).

74.     It is also undisputed that BPXP mobilized resources and conducted operations throughout the response in accordance with its MMS-approved OSRP.  Tr. 1242 (Paskewich)

(BPXP "followed their plan quite well"); TREX 241529.0020-21 (Paskewich Expert Rpt.).

**C.    Working Within the Unified Command, BPXP Rapidly Mobilized the Resources Needed for this Unprecedented Response.**

75.    Rapid mobilization of resources is critical to the success of a spill response.  Tr. 1239 (Paskewich) ("I call it symbolically the golden hour, which means that an incident has occurred, and do you know what to do as a company?  Do you know what actions you're going to take and how you're going to organize?").

76.    Working with the Unified Command, BPXP quickly mobilized personnel and other resources to respond to the *Deepwater Horizon* spill in what became the largest environmental response operation in the history of the United States.  TREX 241529.0021 (Paskewich Expert Rpt.); TREX 013514.000011 (VanHaverbeke Expert Rpt.); Hanzalik Dep. 31; Tr. 1238 (Paskewich); Tr. 651 (VanHaverbeke).  In parallel with surface response efforts, BPXP engaged in source control efforts, which were a "massive and complex undertaking." Phase 2 Ruling ¶ 213, Rec. Doc. 14021.

**1.    BPXP Rapidly Mobilized Critical Response Resources.**

77.    Immediately following the explosion on the *Deepwater Horizon* on April 20, 2010, BPXP began to work with the Coast Guard to respond to the spill.  TREX 241529.0017 (Paskewich Expert Rpt.).

78.    Even though the fact or size of any ensuing spill was unknown at that time, BPXP quickly activated its OSRP, launching a massive and unprecedented spill response effort.  Tr. 1239 (Paskewich); TREX 241529.0007 (Paskewich Expert Rpt.).  The *Deepwater Horizon* response was successful in part because BPXP "immediately put into action its oil spill response plan and started mobilizing resources [and] planning for the worst, as soon as the event occurred."  Tr. 656 (VanHaverbeke).

79.     In responding to the spill, BPXP "came out of the gate quick."  Tr. 1247
(Paskewich).  BPXP immediately mobilized its pre-designated OSROs and additional resources.
Tr. 1242, 1254-55 (Paskewich); Tr. 1540 (Morrison); TREX 009124.0119 (ISPR).  For example,
Captain Paskewich received a call from BPXP's spill management team at approximately 12:00-
1:00 a.m. on April 21, 2010, within 2-3 hours of the explosion, requesting skimming resources
from Clean Gulf Associates.  Tr. 1231-32 (Paskewich).

80.     By 5:00 p.m. on April 21, 2010 — less than 24 hours after the explosion — 105
responders working on behalf of BPXP had mobilized to the Gulf; by noon the following day,
that number had increased to 266.  TREX 241529.0017 (Paskewich Expert Rpt.); Tr. 1247-49
(Paskewich); D34003.

81.     BPXP continued to marshal personnel and resources and adapt as needed to
support critical operations as the response quickly grew and circumstances changed.  Tr. 1248-49
(Paskewich); TREX 241529.0018 (Paskewich Expert Rpt.); D34003.   The ramp up in the
number of personnel, the number of vessels, and the amount of boom deployed in the response
was exponential and continuous:



D34003; Tr. 1248-49 (Paskewich) (noting that the deployment of personnel, vessels, and boom "are good indicators of … the expansiveness of the overall response.").

82.     On the single most demanding day of the response, over 6,000 vessels, 82 helicopters and 20 fixed-wing aircraft, and approximately 47,000 personnel were assigned to the response.  TREX 241529.0008 (Paskewich Expert Rpt.).

> **2.     BPXP Committed Massive Resources That Were Critical to the Response Effort.**

83.     The scope and scale of the response was unprecedented.  The response involved, over time, a cumulative total of more than 100,000 responders, 9,700 vessels, 127 aircraft, and 13.5 million feet of boom.  TREX 241529.0008, .0021 (Paskewich Expert Rpt.).  One of the "high points" of the response was "the overwhelming mobilization of people and resources for the response effort."  Tr. 651 (VanHaverbeke).

84.     BPXP proactively made substantial contributions to the response that were critical to sustaining this unparalleled effort.  TREX 009105.0181 (FOSC Rpt.); TREX 009124.0111

(ISPR); TREX 241529.0022 (Paskewich Expert Rpt.).

85.     Witnesses for BPXP and the United States alike agreed that BPXP made large-scale contributions to the response that were essential to the success of the operation.  Tr. 102 (M. Austin) (testifying on direct examination by the United States that BPXP "dedicated significant resources to the response"); Tr. 655 (VanHaverbeke) (United States' expert testified that the response "would not have been successful without" BPXP); Tr. 1255-56 (Paskewich); Tr. 1547-49 (Morrison).

86.     BPXP has spent a total of more than $14.1 billion on response and cleanup activities.  Tr. 2037-42; D34782.  TREX 013067.0013 (Scott Expert Rpt.).

87.     While "the federal government, the states, and many other organizations participated in the response," "BP provided most of the response personnel," either directly or through contractors.  Tr. 657 (VanHaverbeke); TREX 247590.1.2.BP.

88.     Approximately 85% of *Deepwater Horizon* responders were working on behalf of BPXP, either as BP employees or contractors, and devoted a total of more than 70 million hours to the response.  Tr. 1250-51 (Paskewich); D34684; TREX 241529.0021 (Paskewich Expert Rpt.).

89.     BPXP called upon resources within the global company and sought out key spill response contractors to provide guidance and support.  Tr. 1551-52 (Morrison).

90.     BPXP retained the world's leading experts to help with the response — it was "a who's who of spill response."  Tr. 1251 (Paskewich) ("Everybody who I had ever worked with in my past responses were all there in one single setting.  So it was very powerful to see that assemblance of talent"); TREX 009124.0110 (ISPR) ("In all cases, Incident Commanders ("ICs") from BPXP, the Coast Guard, and the States praised the workforce that was present and

18

were impressed with the talent and effort individuals invested to develop a network of quality personnel"); Laferriere Dep. 264 (BPXP "brought the right people in Houma to the fight. The best people in the world.").

91.     It is "common practice" for companies to bring in and rely on experts and professional responders from contractors outside of the company when responding to an oil spill. Tr. 1242 (Paskewich).  This practice is consistent with expectations in the response community and companies' government-approved oil spill response plans, and helps to achieve the best response possible.  Tr. 1242 (Paskewich); TREX 000769 (BPXP's OSRP).

92.     The United States' spill response expert, Captain VanHaverbeke, agreed that the contributions of BPXP responders were "important to achieving the success of the response." Tr. 656 (VanHaverbeke).

93.     In addition to providing personnel, BPXP contributed other critical resources to the response.  As the Coast Guard concluded in its FOSC Report, "During the *Deepwater Horizon* response, most logistics requirements for response operations were provided by the Responsible Party [BP], which had the necessary resources to identify, obtain, and deploy private sector response capabilities."  TREX 009105.0131 (FOSC Rpt.); Tr. 656 (VanHaverbeke); Tr. 1249-50 (Paskewich).

94.     The Coast Guard further observed that BPXP "made large-scale and significant contributions to logistics, procuring much-needed resources, such as boom, skimmers, and decontamination equipment, and providing food, housing, and transportation for more than 47,000 response personnel."   TREX 009105.0131 (FOSC Rpt.); Tr. 657 (VanHaverbeke) (agreeing that these "were significant contributions to the response"); Tr. 1249 (Paskewich); Tr. 1391-92, 1416-18 (Utsler) (testifying that BPXP commissioned the world's largest cargo plane,

19

the *Antonov*, to transport boom from around the world).

95.     BPXP's contributions facilitated implementation of a fully functional Unified Command organization.  TREX 241529.0018 (Paskewich Expert Rpt.); Tr. 678 (VanHaverbeke) ("I think in this event, contrary to the *Exxon Valdez* response organization, all of the logistics, all of that stuff worked really well."); TREX 009114.0004 (Hanzalik ISPR Interview Summary) (the "setup of the response organization went well").

96.     BPXP provided all of the logistical support, infrastructure, and "everything" else that was needed to set up the organization.  Tr. 1243 (Paskewich); Hanzalik Dep. 40-41 (FOSC testified that BPXP made "substantial contributions to logistics," including renting facilities, procuring equipment, providing transportation, and hiring thousands of contractors); TREX 150031.0007 (Admiral Watson ISPR Interview Summary) (the "UAC and structure below, even down to the branches was successfully set up.  They had probably the most challenging external atmosphere that you could imagine, and they kept it together and moved forward.").

97.     The Coast Guard "did a tremendous job, an awesome job" coordinating the *Deepwater Horizon* response and also made significant contributions that were critical to the success of the effort.  Tr. 1250 (Paskewich); Tr. 655 (VanHaverbeke); Tr. 1394 (Utsler) ("I came away incredibly impressed by the U.S. Coast Guard, the Men and Women in Blue."); TREX 009105.0014 (FOSC Rpt.).

### 3.     BPXP Was Proactive and Spared No Expense in Responding to the Spill.

98.     BPXP willingly and proactively participated in the *Deepwater Horizon* response from the very beginning.  Tr. 112-13 (M. Austin); Tr. 1239-40, 1286 (Paskewich) (Even though the FOSC has ultimate authority to direct response operations, "it's much easier to ride the back of a thoroughbred, [an RP] who is taking the proper actions, than to have it go the other way —

than to haul the mule ….”); TREX 150022.0010.

99.    Admiral Austin testified that BPXP did not come “kicking and screaming” into the response, like some responsible parties that she has dealt with in the past.  Tr. 112 (M. Austin).  BPXP came into the response “willingly,” “with their resources” and was “committed to obtaining the best result possible.”  Tr. 112-13 (M. Austin).

100.    BPXP placed “no limits” on what was needed for the response.    TREX 009124.0111 (ISPR); Tr. 1391, 1418 (Utsler) (“we were charged with sparing no expense to find the resources, capabilities, and services that we needed to meet this response, and we made every effort to do so”); Tr. 1547-49 (Morrison) (BPXP moved “heaven and earth” to respond to the spill and placed “no limit” on securing resources); Tr. 1255-56 (Paskewich) (BPXP “didn’t hesitate” and “put a hundred percent of [its] efforts toward this event”).

101.    Government responders shared this view.  For example, in August 2010, while serving as FOSC, Admiral Zukunft, the current Commandant of the Coast Guard, identified the fact that BPXP “was committed” and “living up to its responsibility” as one of the top two “best practices” during the response.    TREX 150022.0010 (Zukunft ISPR Summary); Tr. 101 (M. Austin); Tr. 655 (VanHaverbeke); Hanzalik Dep. 32, 41 (FOSC testified that BPXP “spared no expense in trying to secure the resources that were needed to respond to the spill” and that there was no resource that BPXP refused to provide); TREX 009124.0111 (ISPR).

102.    Additionally, when the ISPR team asked him what “went well” during the response, Rusty Wright, the BOEMRE official responsible for approving OSRPs in the Gulf of Mexico, said that “BP put 100% of their effort towards this event.  Their senior management was involved, they had unlimited resources, and they didn’t hesitate.”  TREX 150027.0004 (Wright ISPR Interview Summary); *see also* Tr. 1255-56 (Paskewich).

103.     While the *Deepwater Horizon* spill was large and therefore required a large response, the proactive nature and high quality of BPXP's efforts were important to achieving a successful response.   Tr. 1252 (Paskewich) ("[T]here was no doubt this was a large unprecedented event, and BP had to mount a very large response; but, I think what needs to be understood is [that] there's a degree of that quality of response, the effort that you put into that response that allows you to help mitigate something of this size, of this nature.  So they did all that.").

104.     As Captain Paskewich testified, "[T]he record is overwhelmingly clear and supportive that BP did what it needed to do, stepped up to the plate and handled things . . . in a very stressful environment, and collectively met the objectives" set by the Unified Command. Tr. 1286-87 (Paskewich).

105.     Without BP's logistical and financial support, the federal government could not have accomplished a similar mobilization on the same scale and timeline as that achieved in the *Deepwater Horizon* response.  Tr. 1290-91 (Paskewich); TREX 241529.0022 (Paskewich Expert Rpt.); TREX 012535.0001; TREX 009105.0181 (FOSC Rpt.).

### D.     BPXP's Response Efforts Were Extraordinarily Effective in Mitigating Environmental Impacts of the *Deepwater Horizon* Spill.

#### 1.     There Is No Dispute That the Unified Command Achieved Its Objective of Limiting Shoreline Impacts.

106.     There is no dispute that BPXP and others in the Unified Command successfully achieved one of the principal goals of the *Deepwater Horizon* response: to minimize the spill's impact on sensitive Gulf shorelines.  *See, e.g.*, TREX 009105.79.4.BP (FOSC Rpt.); Tr. 114 (M. Austin); Tr. 1389-90, 1406, 1411, 1413 (Utsler); Tr. 652-55 (VanHaverbeke).

107.     The Unified Command identified limiting shoreline impacts of the spill as a key response objective.  Tr. 652 (VanHaverbeke); Tr. 120 (M. Austin).

108.     The Unified Command used a "layered" or a "cone of response" approach that employed several techniques to minimize the amount of oil that reached the shoreline.  Tr. 1257-58 (Paskewich); Tr. 1399-1403 (Utsler); TREX 241529.0023 (Paskewich Expert Rpt.); D35005.

109.     Using this layered approach, the Unified Command employed response measures in four different zones: (1) at the source of the spill; (2) offshore (in the area above the spill source to three nautical miles from the shoreline); (3) nearshore (within three nautical miles of the shoreline); and (4) on the shoreline.  TREX 241529.0023 (Paskewich Expert Rpt.); Tr. 1257-58 (Paskewich); Tr. 1399-1403 (Utsler); D35005.

110.     The Unified Command implemented the response tools best suited to each of these zones.  At the source, vessels worked to secure, disperse and recover oil directly at the wellhead, utilizing subsea containment and dispersant systems.  Offshore operations focused on removing oil from the surface of the water primarily using three methods: (1) high-volume skimming, (2) controlled in situ burning ("ISB"), and (3) aerial dispersant applications.  Nearshore operations included skimming with shallow water oil spill recovery vessels (including Vessels of Opportunity) and deploying boom to protect sensitive areas.  Shoreline operations focused on shoreline assessment and cleanup.  TREX 241529.0023 (Paskewich Expert Rpt.); Tr. 1257-58 (Paskewich); Tr. 1399-1403 (Utsler); D35005.

111.     Utilizing various collection techniques, BPXP successfully collected 810,000 barrels of oil from the source of the spill.  TREX 145373.

112.     Offshore and nearshore operations prevented substantial volumes of oil from hitting the beach.  *See* BPXP Proposed Findings of Fact, Sections II.D.4-.5.

113.     When oil did hit the beach, the Unified Command implemented a comprehensive Shoreline Response Program.  *See* BPXP Proposed Findings of Fact, Section II.D.6.

114.   All of these measures effectively limited the impacts of the spill on the Gulf shoreline and contributed to the success of the response.   TREX 009105.0079 (FOSC Rpt.); TREX 009124.0030 (ISPR); Tr. 655 (VanHaverbeke) (agreeing that response tools such as in situ burning and dispersants were "very effective" at achieving the goal set by the Unified Command of "keeping oil off of the sensitive shoreline"); Tr. 106 (M. Austin) (the response "limited the effects of the spill" and "less oil hit the beach because of [those] actions"); Tr. 1238-39 (Paskewich); Michel Dep. 96-97 (NOAA SCAT Coordinator testified that a "very big effort" was made to minimize the amount of oil that came ashore and "it was a phenomenal response").

115.   Every spill response witness — for both the United States and BPXP — testified that the Unified Command succeeded in meeting its objective of limiting shoreline impacts.  Tr. 106 (M. Austin); Tr. 655 (VanHaverbeke); Tr. 1238-39 (Paskewich); Tr. 1400, 1405-06 (Utsler); Tr. 1777, 1789-90 (Taylor); *see also* TREX 009105.0014 (FOSC Rpt.); TREX 009124.0056 (ISPR).

### 2.   The *Deepwater Horizon* Response Effectively Mitigated Environmental Impacts of the Spill.

116.   Captain Paskewich evaluated the effectiveness of response operations during the *Deepwater Horizon* response.  TREX 241529.0006 (Paskewich Expert Rpt.).  Using government estimates, Captain Paskewich determined that BPXP and others in the Unified Command skimmed, burned, and chemically dispersed approximately 37% of the oil that was spilled in the *Deepwater Horizon* incident[1]—roughly **three times** the rate achieved in a typical open ocean spill response and significantly more than in other large spill responses.  These results are exceptional and dwarf the percentages of oil that was skimmed, burned and chemically dispersed

---

[1]   The 37% total is based upon the Court's ruling in Phase 2 and does not account for oil removed through shoreline cleanup or subject to natural processes such as evaporation, dispersion, and dissolution—processes that all reduce the impact on the environment. Tr. 1277–78 (Paskewich).

in other spill responses such as the *Erika* (3%), the *Exxon Valdez* (8%), the *Ixtoc* (9%), the *Montara* (17%), and the *Sea Empress* (26%).  Tr. 1271-78 (Paskewich); D34006A.1.

117.   Moreover, after accounting for government estimates of the amount of oil subjected to natural processes such as evaporation, dispersion, and dissolution, the Unified Command skimmed, burned, and chemically dispersed an even more impressive 67% of the oil that was available for recovery:



TREX 247638.0001 (Paskewich Expert Rpt.); D34006A.1; 34006A.3; TREX 241529.0024 (Paskewich Expert Rpt.); Tr. 1273-77 (Paskewich); Tr. 667-70 (VanHaverbeke); TREX 013522.0005 (US Third Supp. Interrog. Resp.).

118.   The United States agrees that Captain Paskewich accurately calculated the effectiveness of skimming, in situ burning, and dispersant operations during the *Deepwater Horizon* and other spill responses, as shown above.  Tr. 674-75 (VanHaverbeke).

### 3. The Unified Command Used Complementary Response Tools To Remove Substantial Amounts of Oil from the Gulf of Mexico.

119. The United States argued at trial that the response was not effective because "only" 5% of the spilled oil was "removed" from the environment through the use of skimming.

120. Captain VanHaverbeke's position is contrary to the Coast Guard's conclusion in its FOSC Report that skimming "was a key component of the success of this response." TREX 009105.0068 (FOSC Rpt.); Tr. 1262 (Paskewich).

121. In addition, skimming is not the only response tool that removes oil from the environment. For example, in situ burning and shoreline cleanup — neither of which Captain VanHaverbeke considers in his analysis — remove oil from the environment. *See* BPXP Proposed Findings of Fact, Sections II.D.4.b, II.D.6. And chemical dispersants accelerate the natural biodegradation of oil. Lubchenco Dep. 160; *see* BPXP Proposed Findings of Fact, Section II.D.4.c.

122. Furthermore, established spill response doctrine, area contingency response plans, government-approved OSRPs, and multiple government reports recognize that a successful spill response calls for the use of complementary response tools. Tr. 1279 (Paskewich); TREX 000769.0270, .0316, .0358; TREX 247662.0068-.0069; TREX 9105.0079 (FOSC Rpt.); TREX 009124.0030 (ISPR).

123. BPXP's MMS-approved OSRP and the New Orleans Area Contingency Plan provide for the use of a range of measures including skimming, dispersants, and in situ burning. TREX 000769.0270, .0316, .0358; TREX 247662.0068-.0069.

124. Spill response doctrine also provides for the use of complementary response measures. As Captain Paskewich testified: "You have to use all the tools in the toolbox. You have to use mechanical recovery, dispersants, and burning. That is what we've trained for our

26

entire careers.  That's what's out there in the plans.  That's what we have in the inventories.
That's what's required by doctrine, governmental doctrine."  Tr. 1279 (Paskewich); TREX
247662.0068-.0069; *see* 33 U.S.C. §1321(a)(8) (CWA defines "remove" broadly to include
"actions as may be necessary to prevent, minimize, or mitigate damage" from a spill).  Captain
Paskewich explained that "it would set spill response back decades" if the notion that
"mechanical recovery is the only effective means for removing oil" "actually gained traction."
Tr. 1279 (Paskewich).

125.    The United States has considered the effectiveness of ***all of the tools*** used during
the *Deepwater Horizon* response, including skimming, dispersants, in situ burning, and shoreline
cleanup, in assessing the success of the effort as a whole.  For example, in its FOSC Report, the
Coast Guard concluded:

> The shoreline protection tactics, techniques, and procedures … across the
> response area ensured a layered defense beyond sub-sea dispersant, skimming at
> the source, in situ burning, aerial dispersant use, and VOOs skimming.  ***All those
> measures helped minimize the environmental impacts of oiling along the Gulf
> Coast.***  The protection plans and actions were made possible through cooperation
> between federal, state, and local officials, the RP [BP], and environmental
> experts.  These plans and actions minimized not only the threat, but also the actual
> impact of oil in the marshes and on the beaches.

TREX 009105.0079 (FOSC Rpt.) (emphasis added); *see also* TREX 009124.0030 (ISPR).

### 4.    Offshore Response Measures Prevented at Least 1.2 Million Barrels of Oil from Reaching the Shoreline.

126.    The Unified Command utilized high-volume skimming, in situ burning, and
dispersants offshore as a first line of defense in responding to the spill.  Tr. 1401-03 (Utsler); Tr.
1258-70 (Paskewich); TREX 241529.0023 (Paskewich Expert Rpt.).

127.    According to official government estimates, BPXP and others in the Unified
Command skimmed, burned and chemically dispersed approximately 1.2 million barrels of oil
during the *Deepwater Horizon* response, preventing that oil from ever reaching the coast.  TREX

013522.0005 (US Third Supp. Interrog. Resp.); Tr. 1271 (Paskewich); D35401; Tr. 652-55, 668, 674-75 (VanHaverbeke); TREX 241529.0009 (Paskewich Expert Rpt.); Hanzalik Dep. 28, 48.

> **a.**     **The Unified Command Aggressively Skimmed Oil from the Water's Surface.**

128.    During the *Deepwater Horizon* response, skimming was a key measure used to contain, capture, and remove oil from the environment.  A skimmer is a mechanical device attached to a vessel that is designed to remove oil from the surface of the water.  Tr. 1260-62 (Paskewich); Tr. 1403-06 (Utsler); TREX 241529.0026 (Paskewich Expert Rpt.); TREX 009105.0068 (FOSC Rpt.); D35007.

129.    In the *Deepwater Horizon* response, the Unified Command conducted skimming operations in the offshore and the nearshore environments.  *See* BPXP Proposed Findings of Fact ¶¶ 168-173.  Offshore skimming operations utilized a fleet of large, dedicated oil spill recovery vessels and commercial vessels outfitted with high-volume skimming equipment and covered a wide geographic area.  TREX 241529.0026 (Paskewich Expert Rpt.).

130.    BPXP began mobilizing skimming resources immediately following the explosion on the *Deepwater Horizon*.  Tr. 1239 (Paskewich); D34688; TREX 241529.0017 (Paskewich Expert Rpt.).

131.    By July 2010, approximately 76 large, offshore skimmers were operating on a single day.  More than 800 skimmers of all types were responding to the spill at the peak of operations.   Tr. 1258-59 (Paskewich); D34689; TREX 009124.0121 (ISPR); TREX 012493.3.1.BP.

132.    The offshore skimmers that BPXP deployed represented "the best available mechanical offshore skimming response technology in the United States and the best hope for successfully corralling and removing the oil spewing from the Macondo well before it could

impact sensitive shorelines."  TREX 009124.0118-19 (ISPR); Tr. 1258-59 (Paskewich); TREX 241529.0027 (Paskewich Expert Rpt.).

133.    Skimmers were designated as "critical resources" during the response, and as a result, procurement was managed out of the Unified Area Command in Robert.  Tr. 1407 (Utsler).

134.    BPXP worked diligently with others in the Unified Command to procure all available skimmers for the response.  Tr. 1409-10 (Utsler).

135.    The Coast Guard recognized these extensive efforts in its FOSC Report, concluding that BPXP and others in the Unified Command "aggressively pursued additional resource requests for skimmers from manufacturing sources, oil spill response organizations (OSROs) and potentially from international sources if the equipment and application was appropriate.  The RP procurement system purchased skimmers from manufacturers and maintained ongoing research into skimmer purchasing."  TREX 009105.0131 (FOSC Rpt.); *see* TREX 013043.1.2.BP; Tr. 1409-10 (Utsler).

136.    Skimmer effectiveness during the *Deepwater Horizon* response "could vary dramatically" on any given day based on a number of factors, including:  (1) the condition or maturity of the oil; (2) oil viscosity; (3) oil slick thickness; and (4) environmental conditions including weather, sea state, and temperature.  TREX 009105.0068 (FOSC Rpt.); Tr. 1260-61 (Paskewich);  TREX 241529.0026 (Paskewich Expert Rpt.); Tr. 1404 (Utsler); TREX 150022.0009 (Admiral Zukunft ISPR Summary) (skimming operations were "weather and sea dependent"; on "some days we were skimming in excess of 60%).

137.    The United States has also concluded that the "indeterminate" nature of the *Deepwater Horizon* spill itself made offshore skimming challenging.   TREX 009105.0068

(FOSC Rpt.).  Oil emanated from 5,000 feet below the surface of the water and did not come to the surface in a single location.  Rather, oil surfaced as individual bands and disparate streamers, making complete containment of the oil at the surface directly above the source through the use of skimmers unfeasible.   Tr. 1260-61 (Paskewich);  TREX 241529.0026 (Paskewich Expert Rpt.); *see also* TREX 009105.0068 (FOSC Rpt.); TREX 009124.0119-.0121 (ISPR).

138.    Despite these challenges, skimming operations during the *Deepwater Horizon* response effectively removed a substantial amount of oil from the Gulf of Mexico.  Based on official government estimates, the Unified Command skimmed approximately 160,000 barrels of oil during the response.  TREX 013522 (US Third Supp. Interrog. Resp.); TREX 009105.0068-.0072 (FOSC Rpt.); Tr. 1259 (Paskewich); D34689; TREX 241529.0028 (Paskewich Expert Rpt.).

> **b.**    **In Situ Burning Removed Substantial Volumes of Oil from the Gulf of Mexico.**

139.    During the *Deepwater Horizon* response, the Unified Command used controlled in situ burning as a "safe and effective" tool to remove large volumes of oil from the water's surface.  Tr. 119 (M. Austin); TREX 009105.0065 (FOSC Rpt.); TREX 009124.0055-56 (ISPR).

140.    In situ burning involves deploying vessels to corral oil using fire boom and then igniting the oil to burn it in place.  TREX 241529.0028 (Paskewich Expert Rpt.).  In situ burning operations during the *Deepwater Horizon* response were conducted in accordance with Regional Response Team VI's pre-approved ISB Plan.  TREX 011834; TREX 241529.0029 (Paskewich Expert Rpt.); TREX 009124.0056 (ISPR); Hanzalik Dep. 56-57, 59-60, 71-72.

141.    The scale and success of in situ burning operations during the response were unprecedented and "demonstrated the capability of this important response tool."   TREX 009124.0055 (ISPR); TREX 009105.0067.

142.    In situ burning operations were complex and "well-orchestrated."   Tr. 1269 (Paskewich); Tr. 119 (M. Austin); Hanzalik Dep. 44, 71-72 (in situ burn operation was "an operation within an operation"); Laferriere Dep. 116.

143.    The In Situ Burn Group established at the Houma ICP included over 264 people, including representatives of BP, the Coast Guard, EPA, NOAA, and other organizations, as well as specialists in the field.   D34695; Tr. 1269 (Paskewich); TREX 241529.0029 (Paskewich Expert Rpt.).

144.    At the peak of operations, the In Situ Burn Group had three task forces, which utilized 43 vessels and two spotter aircraft.   Spotter planes provided continuous air observation for offshore ISB operations.   More than 23,000 feet of specialized fire boom was deployed during the response.   TREX 241529.0029 (Paskewich Expert Rpt.).

145.    Air monitoring was a key component of in situ burning operations.   Coast Guard-directed burn teams used Special Monitoring of Applied Response Technologies ("SMART") monitoring protocols to collect and report real-time, scientifically based information to assist the Unified Command with decision making during in situ burning operations.   TREX 009105.0007, .0065-68 (FOSC Rpt.); TREX 009124.0055-60 (ISPR); TREX 012489.

146.    According to the Coast Guard's FOSC Report, air "monitoring results indicated no health impacts to the burn group members."   TREX 009105.0066 (FOSC Rpt.).   The results of extensive additional sampling by BPXP, the EPA, and others indicated "no dioxin threat to workers" or Gulf residents.   TREX 009105.0066 (FOSC Rpt.).

147.    As the Coast Guard has recognized, "Attention to safety was always paramount. There were no injuries or illnesses resulting from the burning operations."   TREX 009105.0066 (FOSC Rpt.); Tr. 120 (M. Austin); *see also* TREX 009124.0055 (ISPR); Hanzalik Dep. 72-74

(agreeing that in situ burn operations were conducted safely, and did not result in illness or injury to any response workers).

148.    Wildlife monitoring was another key aspect of burning operations.  BPXP helped to secure trained and qualified wildlife observers, who joined burn teams at sea and monitored for sea turtles or other wildlife within the fire boom area prior to ignition.  These observers saw no sea turtles in the vicinity of burn operations.  Tr. 121-22 (M. Austin); TREX 009105.0066 (FOSC Rpt.); TREX 012489.000006; Hanzalik Dep. 74.

149.    All told, 411 in situ burns were conducted during the *Deepwater Horizon* response, making it the largest in situ burning operation in history.  Hanzalik Dep. 42-43; TREX 241529.0029 (Paskewich Expert Rpt.); TREX 009105.0067 (FOSC Rpt.); TREX 012489.000008.

150.    BPXP provided critical personnel and resources to support this unprecedented in situ burning operation.  As FOSC Captain James Hanzalik testified, BPXP "procured all the equipment, all the personnel, all the boats to go offshore and burn.  Experts, whatever they needed to oversee the operation."  Hanzalik Dep. 43-44.  BPXP "coordinated with the Coast Guard to make sure that they had wildlife people…to make sure there was no wildlife that may have been affected."  Hanzalik Dep. 44.

151.    The United States has acknowledged that in situ burning removes oil from the environment and effectively reduces environmental impacts of a spill.  Tr. 1281 (Paskewich); D34710; TREX 013523.0018 (National Response Team, Science & Technology Committee publication); TREX 230883.000004 (RRT VI In-Situ Burn Plan); TREX 230990.000062 (U.S. Coast Guard In-Situ Burn Manual).  In situ burning removes 90-99% of the oil from the environment through a combustion process.  TREX 013523.0018; Tr. 1281, 1327  (Paskewich);

*see also* TREX 247534.0002 ("Analyses conducted to date have shown that the high temperatures reached during efficient in situ combustion results in relatively complete destruction of the oil."). The United States presented no publication or other documentary evidence at trial supporting its contention that in situ burning does not remove any oil from the environment.

152. The Unified Command implemented in situ burning in the *Deepwater Horizon* response based on its assessment that burning would effectively achieve the organization's goal of protecting the Gulf shorelines. As Captain Paskewich explained, burning minimizes "the effect of the oil on the surface of the water from migrating into marshes and the beach and on the wildlife … those are the objectives that I use when I am dealing with spill response. So if I can convert the oil on the water to a combustion process, that's a trade-off I would take a hundred percent of the time." Tr. 1306 (Paskewich).

153. It is undisputed that in situ burning succeeded in removing large quantities of oil from the water's surface and reducing impact on the shoreline. Tr. 652-53, 655 (VanHaverbeke) (agreeing that in situ burning and dispersants were "very effective" at "removing large volumes of oil from the surface of the water" and "achieving the goal of protecting the sensitive shorelines of the Gulf"); TREX 009124.0055 (ISPR) ("ISB [in situ burning] proved to be an effective tool for removing large volumes of oil from the water's surface, preventing impact to environmentally and economically sensitive areas."); Laferriere Dep. 229, 235-36; Hanzalik Dep. 42-43; Tr. 119 (M. Austin); TREX 009105.65.1 (FOSC Rpt.); Tr. 1270 (Paskewich); D34696; TREX 241529.0031 (Paskewich Expert Rpt.); Tr. 1402 (Utsler).

154. According to government estimates, the Unified Command burned approximately 260,000 barrels of oil during the *Deepwater Horizon* response. TREX 013522 (U.S. Third Supp.

Interrog. Resp.); Tr. 1269-70 (Paskewich); D34696 (showing locations and removal of oil through in situ burning); TREX 241529.0031 (Paskewich Expert Rpt.).

155.     The In Situ Burn Group determined that the Unified Command may have successfully burned an even greater amount:  as much as 309,000 barrels.  TREX 241730.0028; Tr. 1270 (Paskewich).

156.     In situ burning during the *Deepwater Horizon* response was "a huge success." Hanzalik Dep. 42; TREX 009114.0004 (Hanzalik ISPR Interview Summary).

### c.     Dispersant Operations Were Carried Out Safely and Effectively.

157.     Dispersants are specially designed oil spill products that are composed of detergent-like surfactants in low toxicity solvents.  Dispersants break an oil slick into small droplets that allow the oil to be more rapidly broken down by natural processes, such as biodegradation.  Tr. 1262-63 (Paskewich); Tr. 1685-88 (Shea); TREX 241529.0031 (Paskewich Expert Rpt.).

158.     Under the right circumstances, dispersant use is an effective and environmentally appropriate response method.  Dispersants provide an important alternative to mechanical recovery and other methods when weather and other conditions may limit the effectiveness of those measures.  Dispersants promote biodegradation of oil in the water column.  TREX 013444.0059-.0060 (Shea Expert Rpt.); Lubchenco Dep. 90.  They are also used to reduce the impact of oil on the shoreline and on birds and mammals.  TREX 241529.0031-32 (Paskewich Expert Rpt.).

159.     The two dispersants used in the *Deepwater Horizon* spill—Corexit 9527A and Corexit 9500A—were included on the EPA's accepted Product Schedule at the time of the *Deepwater Horizon* spill and are still on the Product Schedule today.  Both dispersants have been

included on the NCP Product Schedule continuously for decades.   TREX 241529.0032 (Paskewich Expert Rpt.); Tr. 623, 664-65 (VanHaverbeke) (by 2010, the application of aerial dispersants during a spill response had become accepted practice); Hanzalik Dep. 61-62, 76-77. *See also In re Oil Spill by Oil Rig Deepwater Horizon in Gulf of Mexico*, MDL 2179, 2012 WL 5960192, at *14 (E.D. La. Nov. 28, 2012) (Barbier, J.).

160.    In the *Deepwater Horizon* response, the Unified Command applied dispersants in two main ways:  (1) subsea, at the source of the spill, and (2) aerially, to disperse surface oil slicks more than three, and later five, nautical miles from the source control effort.  Dispersants were not applied within three miles of the shoreline.  Tr. 1263-64 (Paskewich); D34694; TREX 241529.0033 (Paskewich Expert Rpt.); Tr. 1402 (Utsler); D35009.

161.    The FOSC, in consultation with the EPA, authorized dispersant applications during the *Deepwater Horizon* response.  Aerial applications of dispersants were conducted in accordance with RRT VI's Dispersant Pre-Approval Guidelines, which set forth processes and guidance for aerial dispersant use.  Tr. 665 (VanHaverbeke); Tr. 1263-64 (Paskewich); TREX 241529.0033 (Paskewich Expert Rpt.); TREX 011835; Hanzalik Dep. 87-90.  *See also In re Oil Spill by Oil Rig Deepwater Horizon in Gulf of Mexico*, MDL 2179, 2012 WL 5960192, at *14 (E.D. La. Nov. 28, 2012) (Barbier, J.).

162.    Dispersant operations during the response were "incredibly complex" and "very well orchestrated."  Tr. 1264-65, 1267-68 (Paskewich); Tr. 1410-13 (Utsler).  Aerial dispersant operations were coordinated through the Aerial Dispersant Operations Group at the Houma ICP.  Roughly 170 dedicated personnel managed a fleet of spotter and spraying aircraft operating from two separate bases.  Tr. 1266-68 (Paskewich); TREX 241529.0033 (Paskewich Expert Rpt.).  The group flew approximately 412 sorties over the course of the response.   Tr. 1268

(Paskewich); D34694 (showing locations of sprays conducted and effectiveness of dispersant operations); Tr. 1412 (Utsler).

163.    Subsea operations were equally complex.  Tr. 1410-11 (Utsler).  The Unified Command implemented a robust subsea monitoring program to collect and analyze data on dispersant efficacy and effectiveness using SMART protocols.  Tr. 1412-13 (Utsler); Tr. 665 (VanHaverbeke).   A Subsea Monitoring Unit at the Unified Area Command in Robert coordinated these efforts.  TREX 241529.0036 (Paskewich Expert Rpt.).

164.    BPXP provided personnel and resources that were critical to dispersant operations during the *Deepwater Horizon* response.  As FOSC Captain James Hanzalik testified, BPXP "procured all the people, all the planes that actually sprayed dispersants, all the experts that monitored the dispersant operations.  That's just for the aerial part of it.  And then for subsea, which was [an] unprecedented operation, they procured all the dispersant, the boats, the monitoring, the equipment to actually inject the dispersants, they did all of that."  Hanzalik Dep. 47-49.    These contributions were essential to the success of the operation.    Tr. 666 (VanHaverbeke); Tr. 1411-13 (Utsler).

165.    According to official government estimates, the Unified Command chemically dispersed approximately 770,000 barrels of oil during the response.  TREX 013522.0005 (US Third Supp. Interrog. Resp.); Tr. 1267-68 (Paskewich); D34694.

166.    It is undisputed that "dispersants were an effective response tool, and prevented millions of gallons of oil from impacting the sensitive shorelines of the [Gulf] States."  TREX 009105.0064 (FOSC Rpt.); TREX 009124.0056 (ISPR) ("The use of ISB [in situ burning] for this incident, coupled with dispersant applications, significantly reduced the amount of oil that might otherwise have impacted near-shore habitats and environmentally sensitive areas

("ESAs")."); Tr. 1257 (Paskewich); D34693; D34694; D34718; Tr. 652-55, 666 (VanHaverbeke); Tr. 1402, 1413 (Utsler) (dispersant use "was one of our most effective response tools at preventing oil from impacting our shorelines"); Tr. 123 (M. Austin); Hanzalik Dep. 46-47 (dispersant use was "a big win" because it prevented "a substantial amount of oil from reaching the shoreline"); TREX 009114.0004 (Hanzalik ISPR Interview Summary); Laferriere Dep. 169.

167.    United States and BPXP witnesses agree that dispersant operations in the response were carried out "safely and effectively."   Tr. 666 (VanHaverbeke); Tr. 1265 (Paskewich); Tr. 122-23 (M. Austin); Tr. 1413 (Utsler).

### 5.    The Unified Command Deployed Nearshore Measures to Keep Oil from Reaching the Shoreline.

168.    Nearshore operations focused on (1) the use of small, agile skimming vessels, including Vessels of Opportunity ("VOO"), and (2) the use of boom to protect sensitive shoreline areas.  Tr. 1404-05, 1413-15 (Utsler); D35013; TREX 241529.0037 (Paskewich Expert Rpt.).

169.    BPXP procured and deployed thousands of small, agile skimming vessels that could move quickly in the nearshore.  Tr. 1406-07 (Utsler); TREX 241529.0038 (Paskewich Expert Rpt.).   The vessels included an established network of OSROs and a navy of locally contracted VOO.  TREX 241529.0039 (Paskewich Expert Rpt.).

170.    BPXP voluntarily initiated the VOO program to complement and supplement existing OSRO capabilities.    TREX 241529.0038-39 (Paskewich Expert Rpt.); TREX 009105.131.2.BP (FOSC Rpt.) (BPXP managed logistics and finances of the VOO program); Hein Dep. 259 (the VOO program was not required by Unified Command); Tr. 215 (D. Austin); Tr. 734 (Mason).

171. The VOO program sought to develop a core fleet of local professional mariners who could conduct on-water oil recovery and removal operations, boom deployment and tending, wildlife recovery, and logistical support operations while capitalizing on local knowledge and professional seamanship.  TREX 241529.0039 (Paskewich Expert Rpt.).

172. The VOO program ultimately mobilized more than 9,000 local vessels in service of the response, a fleet larger than the D-Day landing forces during World War II.  TREX 241529.0039 (Paskewich Expert Rpt.).

173. As the Coast Guard has recognized, the VOO program contributed to the effectiveness of the response.  Tr. 131 (M. Austin); Tr. 1406 (Utsler); TREX 009124.0130 (ISPR) ("The use of VOOs was an important and critical element of the response.").

174. Closer to shore, shoreline protection was accomplished through the placement of boom at cuts or along the shoreline to serve as a barrier from encroaching oil.  Boom is a "floating, physical barrier" that is placed on the water to "contain, divert, deflect, or exclude oil." TREX 241529.0041 (Paskewich Expert Rpt.) (describing features of hard or "containment" and sorbent boom); Tr. 1414-15 (Utsler); D35015.

175. To respond to the spill, Unified Command deployed containment and sorbent boom along shorelines in the response area, as needed.  TREX 241529.0041 (Paskewich Expert Rpt.); D35015.  The VOO supported these efforts by placing and tending boom along the shoreline.  TREX 241529.0039 (Paskewich Expert Rpt.).

176. BPXP, the Coast Guard, and others in Unified Command developed and executed a strategy to deploy boom where it was needed.  Tr. 126 (M. Austin); Tr. 1414-15 (Utsler); D35015.

177. To meet the demand for boom—another "critical resource" during the response—

BPXP "identified, purchased, or rented, and relocated all available large stocks of boom as necessary" and contracted with manufacturers to immediately begin producing more.   TREX 009105.0133 (FOSC Rpt.); TREX 241529.0042 (Paskewich Expert Rpt.).

178.    The Coast Guard has acknowledged that the boom deployment strategy minimized the effects of the spill.  Tr. 126 (M. Austin).

### 6.    The Unified Command Implemented a Robust Shoreline Response Program.

179.    The offshore and nearshore methods used in the *Deepwater Horizon* response described above prevented a substantial amount of oil from reaching the Gulf Coast.   TREX 009105.0079 (FOSC Rpt.); TREX 013246.0008 (Taylor Expert Rpt.); TREX 247638 (Paskewich Expert Rpt.).

180.    As Houma Incident Commander Rear Admiral Austin observed, "[W]e've managed to keep over 90% of the oil from hitting the shore, which is amazing."   TREX 012484.0001; *see also* TREX 12486.2.1.BP (Rear Admiral Austin observed that "we're keeping the vast majority of the oil off of the beaches.").

181.    Despite these efforts, some oil did reach the Gulf shorelines.  For the oil that did reach shore, the Unified Command deployed a massive and comprehensive Shoreline Response Program within days of the *Deepwater Horizon* accident and weeks before any oil came ashore. Tr. 1761 (Taylor); TREX 013246.0012 (Taylor Expert Rpt.).

182.    BPXP worked with the Coast Guard, NOAA, and others to survey, assess, and make treatment recommendations based on the well-established Shoreline Cleanup and Assessment Technique ("SCAT"), and to implement subsequent cleanup operations.   TREX 013246.0012 (Taylor Expert Rpt.); TREX 241529.0043 (Paskewich Expert Rpt.); Hanzalik Dep. 219.

183.   BPXP provided critical support to the SCAT program and cleanup operations, which minimized the impacts of the oil on the shoreline and accelerated natural recovery.  TREX 013246.0006 (Taylor Expert Rpt.); TREX 241529.0043 (Paskewich Expert Rpt.); Hein Dep. 67-68, 253, 255; Michel Dep. 30-33, 35.

184.   The Shoreline Response Program was "exemplary," "a very hard-fought effort," and "something to be proud of."  Tr. 1804 (Taylor); *see also* Tr. 124-25 (M. Austin).  The Program accomplished its goal, which was "to speed up the natural recovery process" of the shoreline.  Tr. 1760-61 (Taylor).

185.   The Shoreline Response Program had three key components: (i) surveying and assessing shoreline oiling; (ii) making recommendations for treating oiled shorelines; and (iii) implementing treatment.  BPXP helped to successfully execute each component.  Tr. 1759-60, 1778 (Taylor); Tr. 124-25 (M. Austin); D34324; D34304.

> **a.   BPXP and Others in the Unified Command Conducted Extensive Shoreline Surveys and Assessments.**

186.   The first component of a Shoreline Response Program is surveying and assessing the nature and extent of shoreline oiling using the SCAT process.  Tr. 1759, 1762 (Taylor); TREX 013246.0013-14 (Taylor Expert Rpt.).

187.   SCAT is a multi-step, systematic approach to assessing shoreline oiling and developing cleanup treatment recommendations.  SCAT is the accepted standard worldwide for evaluating shoreline oiling to guide response activities.  Tr. 1754 (Taylor); TREX 013246.0013-14 (Taylor Expert Rpt.); Tr. 460 (Boesch); Tr. 124 (M. Austin); TREX 012199.0001.

188.   SCAT teams included representatives of BPXP, the Coast Guard, and the state in which the survey was performed.  Tr. 1764 (Taylor); Michel Dep. 68.

189.   The *Deepwater Horizon* SCAT program was "very, very comprehensive" and

"very effective in defining the oiling conditions."  Tr. 1758, 1803 (Taylor); *see also* Hanzalik Dep. 223-24 (FOSC testified that SCAT was effective); Michel Dep. 266 (NOAA SCAT Coordinator testified that the SCAT program was a "particularly valuable and effective process for responding to the *Deepwater Horizon* spill."); TREX 013004.

190.    SCAT teams engaged in extensive efforts to survey and assess the extent and degree of shoreline oiling.  TREX 013246.0014 (Taylor Expert Rpt.); Michel Dep. 150-51, 156-58 (NOAA SCAT Coordinator testified that SCAT teams made every effort to survey every shoreline that was at risk of oiling).

191.    SCAT teams systemically and repeatedly surveyed shoreline segments primarily on foot, although they also utilized boats and aerial reconnaissance to help guide the SCAT teams to shoreline oil.  Tr. 1762-64 (Taylor); D34325; TREX 013246.0016 (Taylor Expert Rpt.); Michel Dep. 93, 267.

192.    SCAT teams made efforts to ensure that they identified all shoreline oiling—by sending teams to areas where oil was nearing shorelines, by extending surveys to include areas adjacent to locations where oil had been located, and by responding to reports of oil made to a call center.  Tr. 1768-69 (Taylor); TREX 013246.0016 (Taylor Expert Rpt.); Hein Dep. 23, 56, 58-59 (FOSC confirmed that the SCAT process was comprehensive and extended beyond areas where MC-252 oil had been observed).

193.    SCAT teams began conducting surveys even before MC-252 oil reached the shoreline.  These pre-landfall surveys confirmed that oiling has long occurred on the Gulf shores unrelated to the *Deepwater Horizon* oil spill, including from naturally occurring oil seeps, commercial shipping and other activities.  In May 2010, before MC-252 oil arrived on shore, SCAT team surveys found that there were as many as 309 tarballs per mile of sand beach and

over 2,100 tarballs along 390 miles of the Gulf Coast.  TREX 013246.0015 (Taylor Expert Rpt.).

194.    SCAT teams searched for both surface and subsurface oil on the shorelines.  Tr. 1764-65 (Taylor).  The SCAT teams used Snorkel SCAT to search for oil in the nearshore area. Snorkel SCAT was an innovative technique that had never been used before to respond to an oil spill.  Tr. 1766-67 (Taylor); D34309; Michel Dep. 249-250.

195.    In total, the SCAT teams surveyed 4,380 miles of shoreline as part of the *Deepwater Horizon* response and, after accounting for repeat surveys, surveyed a cumulative total of approximately 28,374 miles.   Tr. 1767-68 (Taylor); D34306; D34308; TREX 013246.0018, .0022 (Taylor Expert Rpt.).

196.    Where SCAT teams located oiling, they gathered data about the width, length, and distribution of oil along the shoreline.  Tr. 1770-73, 1792 (Taylor); Michel Dep. 106; TREX 012199.0002; TREX 013246.0013, .0019 (Taylor Expert Rpt.).

197.    The SCAT data was subject to rigorous automated and visual review to confirm quality.  Michel Dep. 70; TREX 013246.0019 (Taylor Expert Rpt.).  According to NOAA's SCAT Coordinator, the SCAT data on shoreline oiling is the most reliable source of information for decision-making about shoreline treatment options.  Michel Dep. 70-71, 78-79, 81-83.

198.    Under objective criteria that was agreed upon by the Coast Guard, NOAA, BPXP, and States, and approved by Unified Command, each segment was assigned an oiling category based on the data (*e.g.*, Trace, Very Light, Light, Moderate, Heavy).  Tr. 1769-74, 1792 (Taylor); D34326; TREX 013246.0020 (Taylor Expert Rpt.); Michel Dep. 106.

199.    Of the shoreline surveyed as part of the SCAT process, approximately 25% or 1,100 miles had any degree of oiling, and that oiling was not contiguous and ranged in severity (*e.g.*, some areas only experienced trace oiling).   TREX 012199.0004-.0005; Tr. 1774-76

42

(Taylor); Tr. 1364 (Folse); TREX 012484.1.2.BP (according to Admiral Austin, "the shoreline damage is actually not as bad as is being portrayed" in the media); TREX 012486.2.2 (in June 2010 Admiral Austin complained that the media kept "showing the same small area of impacted shoreline/marsh, because that's all that they can show."); D34327.

200.    There was less shoreline oiling than responders anticipated because of offshore response efforts—which included capturing oil, disbursing oil, burning oil, skimming oil, and using booms along the shoreline—which "were all extremely important in reducing the amount of oil that was actually available to reach the shoreline."  Tr. 1776-77 (Taylor); D34327; TREX 013246.0004 (Taylor Expert Rpt.).

201.    Despite the extraordinary efforts of the SCAT teams to locate and record all shoreline oiling, the United States' expert, Dr. Donald Boesch, alleges that the SCAT teams may have missed oil and attempts to artificially enlarge the tally of oiled miles.  For example, he claims that trace oiling was found along 36 miles of the Texas coast and that those miles should be added to the tally of oiled miles identified by the SCAT teams (*i.e.*, 1,100 miles).  Notably, the miles in Texas have never been included in the federal government's official tally of shoreline oiling.  TREX 009105.0088 (FOSC Rpt.).  The shoreline visits and data collection lacked the rigor, repeatability, and comprehensiveness of a SCAT survey.  TREX 013247.0003-.0004 (Taylor Expert Rpt.).

> **b.    SCAT Teams Made Scientifically Based Shoreline Treatment Recommendations.**

202.    After surveying and assessing the extent of oiling, the second step in the Shoreline Response Program was recommending treatment for oiled shorelines.  Tr. 1758-59, 1778, 1803-04 (Taylor) (the Shoreline Response Program "was very effective at choosing, selecting, and defining the type of techniques to be used that were most appropriate to the different

shorelines"); D34324.2.

203.    Shoreline Treatment Recommendations ("STRs") addressed the areas for treatment, appropriate cleanup techniques, cleanup goals and endpoints, precautions for sensitive lands, safety concerns and constraints, and best management practices.  Tr. 1778-80, 1804 (Taylor); TREX 242768; D34329.

204.    STRs were carefully tailored to achieve a net environmental benefit for affected shorelines.  TREX 013246.0023 (Taylor Expert Rpt.); TREX 013247.0007 (Taylor Expert Rpt.); Tr. 1783-84 (Taylor).  The concept of net environmental benefit requires shoreline treatment to benefit the environment and accelerate natural recovery, while ensuring that cleanup operations do not cause more damage than the oil itself.  TREX 013246.0028 (Taylor Expert Rpt.).

205.    The process for making STRs "was extremely thorough" and SCAT teams were "very protective of the techniques that were going to be used so that they would be appropriate to each part of the shoreline."  Tr. 1781 (Taylor).

### c.    The Unified Command Effectively Cleaned Up the Shoreline.

206.    The third step of the shoreline response was implementing treatment recommendations.  Tr. 1760, 1781 (Taylor); D34324.3

207.    The operations teams tailored the cleanup techniques to the type of shoreline at issue.  Tr. 1781-82 (Taylor); D34331.  Most beach-cleaning techniques involved manually or mechanically sifting to remove oiled sand from beaches.  Tr. 1782-83 (Taylor).

208.    A massive effort was made to remove stranded oil from the beaches and marshes. Tr. 461 (Boesch); TREX 013183.0031 (Boesch Expert Rpt.); Tr. 1337-40 (Folse).  The goal of such efforts was to accelerate the removal and natural weathering of stranded oil so that the ecosystem could return to pre-spill conditions. As discussed, pre-spill conditions included oiling from natural seeps and commercial activities unrelated to the *Deepwater Horizon* spill.  Michel

Dep. 159-60; TREX 013005; TREX 013246.0022 (Taylor Expert Rpt.); *see* BPXP Proposed Findings of Fact ¶¶ 532-533.

209.     Consistent with the goal of returning to pre-spill oiling conditions and the net environmental benefit concept, a beach could reach cleanup endpoints even if there were some amount of oil remaining on the beach.  The Unified Command determined that leaving small amounts of non-toxic residual oil that did not present a threat to humans or wildlife was preferable to overly aggressive beach cleaning, which can cause damage.  TREX 013246.0029 (Taylor Expert Rpt.); TREX 012238 (OSAT-2); Hein Dep. 161; TREX 012187 (the FOSC informed the Gulf States that residual oil "poses a minimal toxicity threat, if any, to human health" or "to aquatic invertebrates and fish.").

210.     Similarly, a marsh could reach cleanup endpoints even if there were some amount of oil remaining in the marsh.  For most marshes, natural recovery was the preferred approach because it is the least intrusive technique.  Tr. 1787-88 (Taylor); TREX 013246.0025 (Taylor Expert Rpt.); TREX 013015.   For certain heavily oiled marshes, the Unified Command determined that cleanup activities would have a net environmental benefit.  TREX 013246.0026 (Taylor Expert Rpt.).

211.     The shoreline treatment program "was extremely effective" and the degree of oiling dropped rapidly during the response.  Tr. 1790 (Taylor); TREX 013246.0043-44 (Taylor Expert Rpt.); Tr. 461 (Boesch); TREX 013183.0031 (Boesch Expert Rpt.).  *See generally* BPXP Proposed Findings of Fact, Section III.A.4.

>        **d.**     **Based on the Success of Cleanup Activities, the Unified Command Concluded the Active Shoreline Response.**

212.     On November 2, 2011, the Unified Command issued the Shoreline Cleanup Completion Plan ("SCCP").  TREX 012184; TREX 013246.0032 (Taylor Expert Rpt.).   The

SCCP defined the process for determining that a shoreline segment met cleanup criteria and could be moved out of the active response. Hein Dep. 93-95; TREX 012184. The standards to move a segment out of the response were rigorous and challenging to meet. TREX 013246.0055 (Taylor Expert Rpt.).

213.    Pursuant to the terms of the SCCP, the Unified Command began moving the first shoreline segments out of the response in November 2011 and continued to do so throughout 2012. TREX 013246.0054-0055 (Taylor Expert Rpt.).

214.    The FOSC determined that BPXP and others in the Unified Command had met the cleanup criteria set forth in the SCCP and concluded the active shoreline response in the eastern states of Mississippi, Alabama, and Florida in June 2013, and in Louisiana in April 2014. Tr. 1335, 1346 (Folse); TREX 013246.0055 (Taylor Expert Rpt.).

215.    The shoreline cleanup lasted approximately four years because of the rigorous and stringent endpoints specified in the SCCP. TREX 013246.0032, .0055 (Taylor Expert Rpt.) (a shoreline segment could be prevented from moving out of the response and subject to additional cleanup if a "tarball the size of a tic-tac was found on it"); TREX 012184.

### 7.    BPXP and Others in the Unified Command Proactively Protected Wildlife and Other Resources During the Response.

216.    During the *Deepwater Horizon* response, BPXP and others in the Unified Command took proactive measures to protect wildlife and other natural resources from adverse impacts of the spill and response activities. The massive effort to protect birds, mammals, turtles, and endangered species was one of the largest ever undertaken. TREX 009105.0183-0198 (FOSC Rpt.); TREX 241529.0049 (Paskewich Expert Rpt.).

217.    A Wildlife Branch—including trained biologists and other wildlife specialists— was embedded within the Operations Section at the Houma ICP to coordinate wildlife protection

and rehabilitation efforts. TREX 009105.0183 (FOSC Rpt.); Huston Dep. 43.

218.    BPXP provided personnel and resources to support the Unified Command's efforts to protect wildlife and other natural resources.  BPXP contracted with biologists to staff the Natural Resource Advisor (NRA) Program to assist with protecting wildlife and environmentally sensitive areas.  TREX 241529.0050 (Paskewich Expert Rpt.); Hein Dep. 73-75.

219.    BPXP also supported additional measures to protect and rehabilitate (1) marine mammals and sea turtles, (2) migratory birds, (3) other endangered species, and (4) historic and cultural properties that were potentially impacted by the spill.  TREX 009105.0183 (FOSC Rpt.); TREX 241529.0050 (Paskewich Expert Rpt.).

### 8.    BPXP Worked Collaboratively with the Coast Guard and Others in Responding to the Spill.

#### a.    BPXP and the Coast Guard Responded with a Unity of Effort.

220.    Unity of effort is a core tenet of the Unified Command structure.   TREX 241529.0059 (Paskewich Expert Rpt.); Tr. 642 (VanHaverbeke).

221.    The NCP provides that unity of effort within the Unified Command ensures the best and most efficient response possible.  40 C.F.R. §300.105 (2007); TREX 241529.0013 (Paskewich Expert Rpt.); TREX 013513.000013 (VanHaverbeke Expert Rpt.); Hanzalik Dep. 21-22.

222.    The Coast Guard and BPXP worked with a unity of effort throughout the *Deepwater Horizon* response.  TREX 009124.0013 (ISPR) ("[P]ersonnel provided by the RP [BPXP] and Coast Guard personnel worked effectively together, and … there was 'unity of effort' throughout the response organization."); TREX 009105.14.1.BP (FOSC Rpt.); Tr. 1288 (Paskewich); Hanzalik Dep. 28, 35.

223.    Spill response witnesses for the United States and BPXP consistently testified that

47

BPXP and the Coast Guard worked collaboratively and with a unity of effort during the response. Tr. 107, 124-25 (M. Austin); Tr. 641-42, 645-47 (VanHaverbeke); Tr. 1238-39 (Paskewich); Tr. 1385, 1394-95, 1415-16 (Utsler); Tr. 1544, 1547 (Morrison); Tr. 1764, 1770-71 (Taylor); Allen Dep. 102, 190-92; Hanzalik Dep. 14-16, 19, 223-25; Hein Dep. 37-39, 40, 250-52; Hewett Dep. 54-55; Laferriere Dep. 109; McCleary Dep. 37, 222; Kulesa Dep. 72-73, 121-22, 134, 223-24, 267.

> **b.    BPXP and the Coast Guard Worked Together to Meet Challenges from Outside the Response.**

224.    BPXP collaborated with the Coast Guard to overcome challenges from outside the Unified Command. TREX 241529.0060 (Paskewich Expert Rpt.). These challenges included: (1) EPA-imposed limitations on the use of dispersants; (2) the State of Louisiana's diversions of the Mississippi River; (3) the State of Louisiana's construction of berms; and (4) resource allocation issues. TREX 241529.0060-.0075 (Paskewich Expert Rpt.). None of these challenges was attributable to BPXP. Hanzalik Dep. 50-53.

225.    As described in Section II.D.4.c, dispersants proved effective at limiting shoreline impacts throughout the response. TREX 241529.0065-.0066 (Paskewich Expert Rpt.). A group of more than 50 government and other scientists, engineers, and spill response experts gathered on May 26-27, 2010 in Baton Rouge, Louisiana to review information about the effectiveness, fate and transport, and biological effects of dispersants used during the response. The group determined that dispersant use up to that point in time had been "appropriate" and that dispersants "should continue to be used" and were "needed." TREX 011839R; Hanzalik Dep. 93-94.

226.    Nonetheless, on May 26, 2010, the EPA issued a dispersant directive ("Addendum 3") that limited subsea and surface dispersant applications. TREX 241529.0066

(Paskewich Expert Rpt).  Addendum 3 called for an overall reduction of dispersants by 75% and mandated that (1) BPXP eliminate the surface application of dispersants entirely, except in rare cases where the FOSC approved an exemption, and (2) BPXP could not apply more than 15,000 gallons of dispersants subsea in a day.  TREX 011844.

227.    The United States' response expert, Captain VanHaverbeke, offered no opinion on whether the limitations placed on dispersant use by Addendum 3 were appropriate or hindered the response.  TREX 013514.000009 (VanHaverbeke Expert Rpt.) ("Whether limiting the use of aerial dispersants after May 26th was the proper tradeoff is beyond the scope of this report.").

228.    The issuance of Addendum 3 negatively impacted the response.  By imposing arbitrary, burdensome, and evolving requirements to secure exemptions and limiting the overall amount of dispersants that could be applied, Addendum 3 led to delayed and sometimes missed opportunities to apply dispersants.  Tr. 90-91 (M. Austin); Hanzalik Dep. 172-74; TREX 012495; TREX 241529.0068 (Paskewich Expert Rpt.).

229.    The dispersant limitations imposed in Addendum 3 led to increased shoreline oiling.  TREX 009105.0057-.0058 (FOSC Report concluded that there was a "strong correlation between decreased dispersant use and increased shoreline oiling during the period of reduced application"); TREX 011847 (According to FOSC Captain Hanzalik, "It would be a travesty if the oil hits the beach because we did not use the tools available to fight this offshore.  This responsibility needs to be placed squarely in EPA's court if it does hit the shoreline.").

230.    In addition to dispersant limitations, BPXP and the Coast Guard worked to overcome challenges associated with the State of Louisiana's diversions of the Mississippi River.  In the summer of 2010, the State of Louisiana unilaterally ordered diversions of the Mississippi River.  The FOSC and Unified Command did not approve the diversions.  Hanzalik Dep. 197,

202-03.

231.   As Mr. Dwight Bradshaw, a representative of the Louisiana Department of Environmental Quality, acknowledged in 2010, the diversions were not an effective response tool and would "probably kill some oysters."   Hanzalik Dep. 201-02.   Neither BPXP nor the Coast Guard supported or endorsed the diversions.   TREX 241529.0073 (Paskewich Expert Rpt.).

232.   BPXP and the Coast Guard worked together to address all of these challenges during the response.  Hanzalik Dep. 218-19.

**E.     BPXP Took Steps To Protect the Health and Safety of Responders and the Public.**

233.   The United States has recognized that health and safety "was the number one strategic goal throughout this response," and it "was a focus of the entire response organization." TREX 009105.0009, .0099 (FOSC Rpt.); Tr. 1390 (Utsler) (safety of responders was the "[f]irst and foremost" objective of the response); Tr. 1282-85 (Paskewich).

234.   BPXP and its Unified Command partners "made safety a priority" and "took action to prevent injuries, illnesses, and exposure to hazardous substances among response personnel and the public."   TREX 009105.0099, .0110 (FOSC Rpt.); Howard Dep. 51-67 (BPXP made "very strong efforts" to protect worker health and minimize the effect of the spill on worker health); Hanzalik Dep. 232-33; Laferriere Dep. 93, 130, 138.

235.   These efforts paid off: As the Coast Guard's FOSC Report concluded, "The aggressive safety program throughout the entire *Deepwater Horizon* response proved effective." TREX 009105.0099; *see also* Hanzalik Dep. 233.

236.   Despite the sheer size, scope and complexity of the operations, the "response produced an exceptional safety record," with relatively few injuries reported.   TREX

50

009105.0009, .0099, .0110 (FOSC Rpt.).

237.   "The efforts and commitment to ensure the safety of those who worked on the spill, and that of the public, is one of the single most notable accomplishments of the *Deepwater Horizon* response."   TREX 009105.0110 (FOSC Rpt.); TREX 012527R.000002; Hanzalik Dep. 233.

### 1.   The *Deepwater Horizon* Response Was Conducted Safely.

238.   Protecting response workers was a top priority throughout the response organization.   BPXP and others in the Unified Command implemented a comprehensive safety program to protect responders.   D34701 (summarizing safety measures employed during the response); TREX 009105.0099 (FOSC Rpt.); Tr. 1390 (Utsler); Tr. 1282-85 (Paskewich).

### a.   The *Deepwater Horizon* Response Included a Robust Safety Organization.

239.   BPXP collaborated with the Occupational Safety and Health Administration ("OSHA"), the National Institute for Occupational Safety and Health ("NIOSH"), and other federal and state agencies to recruit a robust safety organization staffed with safety and industrial health experts to oversee and examine broad aspects of worker safety during the response.   Tr. 1284-85 (Paskewich); TREX 241529.0055 (Paskewich Expert Rpt.); TREX 240310; TREX 012221; D35279; Howard Dep. 247-48 (NIOSH "worked … collaboratively" with BPXP "from the early stages of the response"); D35266.

240.   Responders attended daily meetings where they were reminded that first and foremost, the response was aimed at protecting their safety and well-being.   Tr. 1383, 1390 (Utsler).

### b.   BPXP Collaborated with OSHA and Others To Provide Comprehensive Safety Training to Responders.

241.   BPXP likewise worked with OSHA, the Coast Guard, and other agencies to

develop a thorough and comprehensive training program for response workers.  BPXP created a series of courses, including a one-hour orientation, a four-hour shoreline course, and a four-hour marine cleanup course.  Tr. 1282-85 (Paskewich); TREX 245129.0055; TREX 012240.0014.

242.     BPXP delivered safety training in multiple languages and levels appropriate for the responders being trained.  TREX 241529.0055-.0056.  Training was provided in English, Spanish, and Vietnamese.  TREX 241529.0056.

243.     BPXP-contracted personnel who might come into contact with oil-contaminated materials were required to attend a four-hour OSHA-approved safety course.    TREX 241529.0056.  Crew supervisors were required to have at least 40 hours of Hazardous Waste Operations and Emergency Response ("HAZWOPER") training.  TREX 241529.0056.

244.     BPXP provided responder safety training courses on recognizing and managing risks such as heat stress, fatigue, inclement weather, and environmental hazards.    TREX 241529.0056.

245.     OSHA and other agencies reviewed BPXP's training protocols to ensure that all training met OSHA and other standards.  TREX 241529.0056.

246.     BPXP devoted considerable cost and time to training responders.  By May 21, 2010, around the time the first MC-252 oil reached the shoreline, BPXP had trained approximately 10,000 cleanup responders.  Over the course of the response, BPXP trained more than 100,000 responders.  TREX 241529.0056.

<blockquote>
<strong>c.      Detailed Operational Guidelines Protected the Safety of Workers.</strong>
</blockquote>

247.     The Unified Command implemented site safety plans and guidelines to ensure the safety operations for each response measure.  Tr. 1282-83 (Paskewich).  For example, during burning operations, the Unified Command required that response workers maintain a specified

distance from burns and conducted air monitoring at the sites to ensure that workers were not exposed to harmful levels of particulate matter.  D34701; Tr. 1283 (Paskewich).

> **d.      BPXP Provided Personal Protective Equipment to Responders.**

248.    To protect workers from potential exposure to hazardous materials, BPXP procured Personal Protective Equipment ("PPE") and established numerous staging areas to deliver the equipment to responders in the field.  D34701; Tr. 1284 (Paskewich) (BPXP "provided whatever was needed in the way of personal protective equipment."); TREX 241529.0056 (Paskewich Expert Rpt.).

249.    In consultation with OSHA, the Coast Guard and NIOSH, BPXP developed PPE requirements for all categories of workers involved in the response.  These requirements were based on hazard assessments that OSHA conducted for each job task.  With guidance from OSHA and NIOSH, BPXP documented these requirements in a "PPE Matrix."   TREX 012240.0013-.0014; TREX 009124.0113 (ISPR) ("Safety of the [cleanup] crews was a major issue addressed by BP's management team . . . . Great care was taken to assure worker safety, including re-evaluation of personal protective equipment requirements, as well as the work-to-rest ratio."); Howard Dep. 125-26.

> **e.      The *Deepwater Horizon* Response Produced an Exceptional Safety Record.**

250.    "The aggressive safety program throughout the entire *Deepwater Horizon* response proved effective."  TREX 009105.0099 (FOSC Rpt.).

251.    As the Coast Guard concluded in its FOSC Report, there was a "remarkably low injury rate for responders across the operation."   TREX 009105.0009 (FOSC Rpt.); *see also* TREX 009105.0110 (the "response produced an exceptional safety record").

252.    Other federal agencies have reached the same conclusion as the Coast Guard.  For

example, in a publication titled "Review of the OSHA-NIOSH Response to the Deepwater Horizon Oil Spill: Protecting the Health and Safety of Cleanup Workers," dated July 18, 2012, Dr. David Michaels, Director of OSHA, and Dr. John Howard, Director of NIOSH, concluded that: "Overall, the efforts to ensure the safety and health of these cleanup workers were very effective."  TREX 012221.0005; D35281; Howard Dep. 117 ("NIOSH successfully partnered with BP and with other governmental entities within the Unified Command in successfully mitigating most acute health effects on DWH response workers.").

### 2. BPXP Helped To Ensure the Health and Safety of the Public.

253.    In addition to taking steps to protect response workers, BPXP and its Unified Command partners also took measures to monitor and protect public health and safety.

254.    The Unified Command took actions to "ensure the safety of seafood from areas of the Gulf of Mexico affected by the oil spill, to monitor the potential health impacts of the oil spill in the short and long term, and to facilitate access to care to those impacted by the spill."  TREX 009105.0099 (FOSC Rpt.).

### a. BPXP and Others in the Unified Command Conducted Extensive Air Monitoring.

255.    BPXP, the EPA, and other agencies conducted extensive air monitoring to ensure the safety of Gulf residents.  TREX 009105.0099 (FOSC Rpt.); Tr. 130 (M. Austin); TREX 241736.2.1 (as of July 30, 2010, all of the sampling performed to date showed no air emissions of concern across the Area of Responsibility).

256.    "The air-monitoring program had several facets.  There were stationary air-monitoring locations.  EPA used its Trace Atmospheric Gas Analyzer bus and Airborne Spectral Photometric Environmental Collection Technology aircraft to monitor air quality levels.  The air monitoring did not indicate harmful exposure levels."  TREX 009105.0099 (FOSC Rpt.).

54

b.      **BPXP Funded Seafood Testing to Ensure the Safety of Gulf Seafood.**

257.    Sampling for seafood safety began on April 28, 2010.  TREX 009105.0101.

258.    As a precautionary measure, NOAA Fisheries Service closed certain federal waters to fishing in May 2010 to ensure public health and assure consumers of the safety of Gulf seafood.  TREX 009105.0100 (FOSC Rpt.).

259.    Both chemical and sensory testing for dispersants and oil constituents was conducted on all seafood samples for reopening fishing areas.  TREX 009105.0100.  All specimens collected within a closed fishing area had to pass both chemical and sensory testing before an area could be reopened.  TREX 009105.0102 (FOSC Rpt.).

260.    By April 2011, all federal fisheries had been reopened. TREX 241529.0058.

261.    BPXP has contributed $71 million for state-led seafood testing and marketing programs designed to restore the public's confidence in the safety of Gulf seafood.  Tr. 1284 (Paskewich); TREX 241529.0058 (Paskewich Expert Rpt.).

c.      **BPXP Funded Several Public Health Initiatives in Communities Across the Gulf Coast.**

262.    BPXP also made substantial financial contributions to support multiple public health initiatives, including several aimed at promoting mental health, for people living in communities across the Gulf Coast, including:

- $42 million to the following state agencies and non-governmental organizations to provide behavioral health services:

  - $15 million to the Louisiana Department of Health and Hospitals, and the Catholic Charities Archdiocese of New Orleans;

  - $12 million to the Alabama Department of Mental Health;

  - $12 million to the Mississippi Department of Mental Health; and

  - $3 million to the Florida Department of Children and Families.

55

- $10 million to the U.S. Department of Health and Human Service's Substance Abuse and Mental Health Services Administration, which provided first-year funding for the development of enhanced media outreach materials and the establishment of a toll-free behavioral health hotline.

- $105 million will be paid over five years to four Gulf Region Health Outreach Projects ("GRHOP"), under the terms of the Medical Settlement as follows:

  - $50 million under the Primary Care Capacity Project to expand and improve access to health care in certain underserved Gulf Coast communities in Louisiana, Mississippi, Alabama, and the Florida Panhandle;

  - $36 million under the Mental and Behavioral Health Capacity Project to address behavioral and mental health needs, expertise, capacity, and literacy in certain Gulf Coast communities in Louisiana, Mississippi, Alabama, and the Florida Panhandle;

  - $4 million under the Community Health Workers Training Project to train community health workers on peer listening, community resiliency, and other related issues in certain Gulf Coast communities in Louisiana, Mississippi, Alabama, and the Florida Panhandle; and

  - $15 million under the Environmental Health Capacity and Literacy Project to expand and improve environmental health expertise, capacity, and literacy in certain Gulf Coast communities in Louisiana, Mississippi, Alabama, and the Florida Panhandle.

TREX 240110.0073-.0074.

### F. BPXP Supported the Community and Mitigated Economic Impacts of the Spill.

#### 1. BPXP Actively Engaged with the Community during the Response.

263.    Throughout the *Deepwater Horizon* response, BPXP and others in the Unified Command engaged and supported local communities.  Tr. 1418-19 (Utsler); Cross Dep. 203-04; TREX 241529.0075 (Paskewich Expert Rpt.).

264.    Effective communication with the public was a "critical component" of the response.  Tr. 1418 (Utsler).  Communication was important to "address the fears and concerns of the public," and to be better equipped and prepared to "meet the needs and demands of local communities."  Tr. 1418-19 (Utsler).

265.     On April 21, 2010, the day after the *Deepwater Horizon* incident, BPXP began developing a community outreach plan in anticipation of potential impacts to shoreline communities.  Cross Dep. 40; TREX 241529.0075 (Paskewich Expert Rpt.).

266.     There were two primary purposes of BPXP's community outreach efforts:  (1) provide information about BPXP's spill response efforts, and (2) hear the concerns of the communities so that BPXP could provide those impacted with the resources and help they needed.  Cross Dep. 203-04; Tr. 676 (VanHaverbeke).  BPXP felt it was "very important for people to have a point person that they [could] go to."  Cross Dep. 203.

267.     BPXP quickly mobilized community outreach personnel to the Gulf, deploying the first group on April 27, 2010.  Cross Dep. 206.  By April 28, 2010, BPXP's community outreach personnel had deployed to five communities in Louisiana, Mississippi, Florida, and Alabama.  Cross Dep. 206-07; TREX 241529.0075 (Paskewich Expert Rpt.)  BP employees, spouses, and retirees volunteered to help community outreach efforts.  Cross Dep. 234.

268.     BPXP collaborated with others in the Unified Command to reach out to affected communities through discussions with federal, state, and local officials, the media, and direct communications with communities.  Tr. 1419, 1424 (Utsler).

269.     The Unified Command held daily phone calls with representatives from state and parish government, and often representatives for the governor.  Tr. 1419-20 (Utsler).  The Coast Guard and BPXP also appointed community liaisons to work with each of the parishes, parish presidents, and governors.  Tr. 1420-21 (Utsler).  The job of the community liaison was to "be available to those key officials 24 hours a day 7 days a week, and be a direct conduit of information between the Unified Command in Houma and the Unified Command in Robert" and the other ICPs in the Gulf.  Tr. 1420-21 (Utsler).

270.     In addition, BPXP worked with the Coast Guard and other Unified Command partners to provide the public with information about the response through community outreach meetings.   TREX 241529.0076 (Paskewich Expert Rpt.); Tr. 1423-24 (Utsler).   BPXP participated in town hall meetings in communities, which later evolved into "expo[]" type meetings.   Tr. 1422-23 (Utsler); Tr. 675-77 (VanHaverbeke) (BPXP had participated in more than 100 such meetings by May, 2010).   These efforts made a "definite difference" in the public's level of understanding of the response activities.   Tr. 1423 (Utsler).

271.     BPXP took several steps to communicate with and support Gulf communities that were independent from its work within the Unified Command.   For example, BPXP established community outreach centers around the Gulf of Mexico.   Tr. 1423-24 (Utsler).

272.     By May 4, 2010, BPXP had established outreach centers in Louisiana, Alabama, Florida, and Mississippi.   TREX 241529.0075 (Paskewich Expert Rpt.); Cross Dep. 207.   These centers were designed to ensure that BPXP was "helping to answer some of the questions that [were] being raised" and to listen to the community concerns.   Tr. 1423-24 (Utsler).   They allowed BPXP to provide information and resources residents needed to help mitigate the effects of the spill.   Cross Dep. 221.

273.     BPXP ultimately established 36 community outreach centers across the Gulf, from Louisiana to Florida.   TREX 241529.0075; Cross Dep. 207.   The centers were staffed by a rotation of thousands of BP employees, spouses, and retirees who volunteered to go out into affected communities.   TREX 241529.0075 (Paskewich Expert Rpt.); Cross Dep. 233-34.   BPXP placed Vietnamese translators in its community outreach centers to assist the Vietnamese community with accessing services and filing claims.   Cross Dep. 210; Tr. 676 (VanHaverbeke).   Some community outreach centers remained open through 2013.   Tr. 1425 (Utsler).

274.   BPXP also used the internet, social media, and other methods to communicate information about the response.  Days after the incident, BPXP set up an incident website to disseminate information about the incident and the response.  In May 2010, BPXP launched state-specific informational websites for Louisiana, Alabama, Mississippi, and Florida to provide public updates on local response activities.   TREX 241529.0076 (Paskewich Expert Rpt.). BPXP established a call center as an additional means of communication.  Cross Dep. 112-13; Tr. 676 (VanHaverbeke).

275.   Another primary focus of BPXP's outreach efforts was helping those affected by the spill to submit claims.  Cross Dep. 220; TREX 241529.0076 (Paskewich Expert Rpt.).

276.   BPXP established claims centers throughout the Gulf States, and its outreach teams proactively provided the public with information about how to file claims.  Cross Dep. 208-09, 220; TREX 012366; TREX 241529.0076 (Paskewich Expert Rpt.).

277.   BPXP's community outreach program was ultimately successful, receiving positive feedback from community leaders, state and local officials, business people, private citizens, and others.  TREX 241529.0077 (Paskewich Expert Rpt.); Cross Dep. 212-19; TREX 012365; TREX 012366; TREX 012367; TREX 012368.

### 2.        BPXP Mitigated the Economic Impacts of the Spill.

278.   BPXP took several steps to minimize and mitigate adverse economic impacts of the spill.  Since the spill, BPXP has spent approximately $25.7 billion on initiatives that have mitigated the spill's economic effects.  Tr. 2038-39 (Scott).  This amount includes: (1) $14.1 billion in spending on spill response and cleanup activities (including nearly $600 million on the VOO program); (b) $11.2 billion in claims payments; (c) $230 million in tourism grants; (d) $71 million in seafood testing and marketing; and (e) $100 million for the Baton Rouge Area Foundation Rig Workers Compensation Fund.  Tr. 2037-39 (Scott); TREX 013067 (Scott Expert

Rpt.); D34782; TREX 241529.0078 (Paskewich Expert Rpt.).

### a.   BPXP Acted Quickly To Address Economic Impacts of the Spill.

279.   Of the $25.7 billion that BPXP spent on activities that minimized the economic impacts of the spill, approximately $16.3 billion was spent in 2010 alone, which is an average of $68 million per day during the approximately eight-month period following the spill.  Tr. 2040-41 (Scott); TREX 013067.0016 (Scott Expert Rpt.); D34784.

280.   BPXP's payments for clean-up efforts, the initial claims process, and emergency claim payments mitigated economic harm by providing money to Gulf Coast communities quickly and thereby reducing the immediate economic effects of the spill.  Tr. 2041 (Scott) (BPXP did the "civically responsible thing," which was "to get the money in the people's hands as quickly as possible.  And it wasn't just a little bit of money.  It was a lot of money."); Tr. 236 (D. Austin) (Individuals who received payments from any of BP's programs were "[b]y and large" benefited.); Tr. 210-11 (D. Austin); Luton Dep. 77; TREX 013067.0005 (Scott Expert Rpt.); Tr. 738-39 (Mason).

281.   BPXP's spill-related spending in 2010-2014 played an "important role" in preventing and avoiding potentially harmful economic effects of the spill or limiting harm to a relatively short period of time.   TREX 013067.0004-.0005, .0016-.0017 (Scott Expert Rpt.). Because of the money that BPXP provided soon after the spill, the initial economic impacts of the spill were not as significant as expected.   Luton Dep. 80; TREX 011922.0204; TREX 013067.0005 (Scott Expert Rpt.); Tr. 2083-84 (Scott) (BPXP's mitigation spending "helped lead to a robust and very quick recovery in the tourism area" and "has really helped mitigate" losses in tourism and other areas.)

### b.     BPXP's Proactive Funding of the Response Was Key to Its Success.

282.    BPXP took many proactive steps to fund the unprecedented response to the *Deepwater Horizon* spill.  TREX 009105.0010-.0012, .0099, .0169-.0173, .0181, .0216 (FOSC Rpt.); Tr. 659-60 (VanHaverbeke).  BPXP was able and willing to provide the massive funding that was needed to mobilize and sustain response operations.  TREX 009105.0181 (FOSC Rpt.).

283.    In 2010, BPXP voluntarily advanced block grants to Gulf States and local communities to help them cover response costs.  Hanzalik Dep. 266.

284.    In May 2010, BPXP advanced $25 million grants to each of the States of Louisiana, Mississippi, Florida, and Alabama to help them cover anticipated response costs. BPXP later advanced another $25 million to the States of Alabama and Florida, $5 million to the State of Texas, and $1 million grants to each of the Louisiana Parishes of St. Bernard, Terrebonne, Jefferson, Lafourche, and Plaquemines, as well as a $500,000 grant to St. Tammany Parish.  The state and local governments retained discretion as to how to use the funds to respond to the spill.  TREX 009105.0225; TREX 241529.0082 (Paskewich Expert Rpt.).

285.    The Oil Spill Liability Trust Fund ("OSLTF") is administered by the Coast Guard's National Pollution Funds Center and provides funding for the federal response and reimburses claimants for oil removal costs and certain damages under OPA.  Tr. 1288-89 (Paskewich); TREX 241529.0082 (Paskewich Expert Rpt.).

286.    The OSLTF is subject to a $1 billion statutory cap on disbursements for any one incident.  TREX 009105.0171 (FOSC Rpt.).

287.    BPXP took steps to protect the OSLTF by paying response costs and claims directly, rather than requiring that contractors and claimants seek reimbursement of costs through the OSLTF.  TREX 241529.0083 (Paskewich Expert Rpt.); Hanzalik Dep. 242; McCleary Dep.

161-62.

288.    By taking all of these voluntary steps, BPXP (1) provided response funding and other payments to individuals and businesses more quickly, promptly securing needed resources, (2) advanced the states funds to cover response costs rather than requiring them to strain their own budgets, and (3) critically, avoided having the OSLTF run short of funding needed to support the federal response.  Tr. 1289-90 (Paskewich); TREX 241529.0083 (Paskewich Expert Rpt.); McCleary Dep. 161-62 (BP's payment of response costs directly to OSLTF, rather than through reimbursements, provided a "significant benefit" to the response in that it allowed for "things that needed to be acquired to happen very quickly, because BP was able to provide the funds and do it promptly.").

289.    BPXP's proactive funding of the response in these ways was not required by the NCP or the Unified Command.  McCleary Dep. 162, 204 (there is no "requirement that BP, as a responsible party, had to receive and pay for the funding requests as they came in").

290.    BPXP's funding approach was a "novel" undertaking without which the scale and magnitude of the response could not have been maintained.  TREX 012535 (Admiral Landry writes that "RP reimbursing [OSLTF] fund as we go was brand new and novel solution").

291.    As the Coast Guard concluded in its FOSC Report:  "The outcome of the response to this spill could have been very different had the RP not been able to fund the extraordinary expenses involved. . . . If any RP proved unable to pay for a major spill, the ability of the government to organize a response of this nature and complexity . . . would be severely strained," and "the strains may have become overwhelming."  TREX 009105.0181 (FOSC Rpt.); D34047; McCleary Dep. 203 ("[T]he responsible party, BP, had the means to fund a response of this size," and "there wasn't enough money in the OSLTF to fund the response if the Coast

Guard had had to federalize the spill."); Tr. 1289-90 (Paskewich).

292.     Admiral Zukunft similarly noted in 2011:  "*The claims process alone would have eaten our lunch had BP and eventually the GCCF not stepped up to the plate*.  Response costs to date have blown through the $12b ceiling with no end in sight and our [Oil Spill Liability Trust Fund] constraints are not going to answer the mail in a 21st century [Spill of National Significance] absent a solvent and cooperative [Responsible Party]."  TREX 012535 (emphasis added); Tr. 1290-91 (Paskewich).

### c.     BPXP Voluntarily Provided Grants to State and Local Governments To Promote Tourism.

293.     In May 2010, BPXP voluntarily committed to provide grants to the governments of Florida ($25 million), Alabama ($15 million), Mississippi ($15 million), and Louisiana ($15 million) to promote tourism in those states.  TREX 013067.0006-.0007 (Scott Expert Rpt.); Tr. 2042 (Scott); Tr. 730 (Mason).  By the end of 2010, BPXP's tourism grants to those four states totaled $87 million, and BPXP committed and paid an additional $92 million in grants to these states in 2011-2013.  TREX 013067.0006-.0007, .0021 (Scott Expert Rpt.); Tr. 2042 (Scott); Tr. 731 (Mason); TREX 011873; TREX 011877; TREX 011878.  (The tourism grants were on top of the response cost grants described in paragraphs 283 to 284).

294.     In total, BPXP has provided $230 million in tourism grants to state and local governments since the spill.  TREX 013067.0006-.0007, .0021 (Scott Expert Rpt.); Tr. 731 (Mason).

295.     The $87 million in tourism grants that BPXP provided in 2010 alone significantly increased the size of the tourism budgets of Louisiana, Mississippi, Alabama, and Florida.  Tr. 2042 (Scott); D34025 (showing that BPXP's tourism grants resulted in tourism budget increases of 79% for Louisiana; 273% for Mississippi; 234% for Alabama; and 139% for Florida); TREX

013067.0021-.0023 (Scott Expert Rpt.).   These large budget increases had significant positive effects on tourism in the region.  TREX 013067.0021-.0023 (Scott Expert Rpt.); D34025.

296.   BPXP's grants to promote tourism (a) helped to prevent harm to tourism that might have otherwise occurred, (b) helped to drive the quick recovery of Gulf Coast tourism in those areas that were negatively impacted by the spill, and (c) contributed to strong growth in Louisiana, Mississippi, Alabama, and Florida Panhandle tourism in 2011-2013.  Tr. 2056, 2062-63 (Scott); D34025; D34792; TREX 013067.0021-.0039 (Scott Expert Rpt.); D34786.1; D34787.1-.2; D34788.  *See also* BPXP Proposed Findings of Fact ¶¶ 645-646, 648-659 (detailing the limited harm to and recovery of tourism in various areas of the Gulf Coast region).

297.   United States and local officials agree that BPXP's efforts to promote Gulf Coast tourism had a positive effect and contributed to the recovery of tourism after the spill.  Luton Dep. 107-08, 161-62; D34813; D35343; D34793; TREX 011873; TREX 011877; TREX 011878; TREX 244105; Tr. 230, 234, 236 (D. Austin); TREX 011923.92.1.BP; D35323; D35324; Tr. 733 (Mason); Tr. 2063-64 (Scott); TREX 013067.0026-.0038 (Scott).  Alabama, Mississippi and Louisiana all reported benefits from the BPXP tourism grants. Tr. 236 (D. Austin).  *See also* BPXP Proposed Findings of Fact ¶¶ 645-646, 648-659 (detailing the lack of harm to and recovery of tourism in various areas of the Gulf Coast region).

### d.    BPXP's Claims Payments Mitigated Economic Harm.

298.   BPXP quickly established a claims process to compensate individuals and businesses and mitigate harm resulting from the spill.  TREX 013067.0009-.0010 (Scott Expert Rpt.).  As discussed, BPXP voluntarily paid claims directly, without requiring that claims go through the OSLTF.   Tr. 659-60 (VanHaverbeke); TREX 011923.0161; Tr. 1289-91 (Paskewich); TREX 012535.1.4.BP.

299.   BPXP's claims program handed out checks of $5,000 to individuals starting in

May 2010, without requiring a release of claims or substantial documentation of loss.  TREX 013069.0030 (Scott Rebuttal Rpt.); TREX 011923.0161-.0162.  *See also* Tr. 223-24 (D. Austin) (BPXP's claims offices paid $5,000 claims checks to local fishermen or individuals during this early period).

300.    In just the first four months after the start of the spill from May to August 23, 2010, BPXP paid almost $400 million in claims.  TREX 013067.0009 (Scott Expert Rpt.); TREX 013069.0030 (Scott Expert Rpt.); TREX 011923.0161-.0162 ($399 million to 127,000 claimants).

301.    In addition to these early payments, BPXP has paid out billions of dollars in claims to individuals and businesses in the Gulf States through the Gulf Coast Claims Facility (GCCF) and the Economic & Property Damages Settlement.  Tr. 2065 (Scott); Tr. 225 (D. Austin).

302.    By the end of 2010, BPXP had paid more than $3.7 billion to claimants in just Louisiana, Mississippi, Alabama, and Florida, a significant amount of money that quickly mitigated economic losses.  TREX 013067.0011 (Scott Expert Rpt.); TREX 013069.0030 (Scott Expert Rpt.).

303.    As of June 30, 2014, BPXP had made approximately $11.2 billion in payments to individuals and businesses for economic loss claims.  Tr. 2065 (Scott); TREX 013067.0009-.0010 (Scott Expert Rpt.).

304.    These claims payments had a positive effect on the economies of the Gulf States. Tr. 2065-68 (Scott); TREX 013067.0009-.0011 (Scott Expert Rpt.); TREX 013069.0029-.0030 (Scott Expert Rpt.) ("Such early, quick, and substantial compensation would have prevented further or ongoing losses, and is a result of BPXP's robust claims program and commitment to

establish and fund the GCCF and later agree to the E&PD Settlement only two years after the spill.").

305.   United States' expert, Dr. Diane Austin, and its Rule 30(b)(6) representative, Dr. Luton, agreed that BPXP's claims payments had a substantial positive impact and helped to minimize the economic impacts of the spill in the Gulf region.  Luton Dep. 96, 102-03; Tr. 227-28 (D. Austin); D34810; D35341; *see also* TREX 013069.0029-.0031 (Scott Expert Rpt.) ("I found that getting money into people's hands quickly had a positive effect economically, and the data show that to have been the case."); Tr. 2067-68 (Scott).

306.   The claims payments helped those who received the money and helped the local economy, as households and businesses that received the early payments were able to use the income to address the effects of the spill.  Tr. 211-12, 217-18 (D. Austin).

> **e.   BPXP Mitigated Harm to Commercial Fishermen Through the Vessels of Opportunity Program and the Seafood Compensation Program.**

307.   BPXP voluntarily created the VOO program, which both supported the response efforts and mitigated the economic impact of the spill on commercial and charter fisherman. BPXP also compensated commercial fishermen through the Seafood Compensation Fund.  Tr. 2070-71 (Scott); TREX 013067.0014-.0021 (Scott Expert Rpt.); Tr. 734 (Mason); Hein Dep. 252, 259.

308.   BPXP spent a total of $594,400,000 on the VOO program in 2010.  Tr. 733 (Mason); TREX 013067.0014-.0021 (Scott Expert Rpt.); Tr. 2037-38, 2070-71 (Scott); Tr. 214-15 (D. Austin).

309.   The VOO program benefited those who participated in the program, including fishermen and non-fishermen, as well as those who served as suppliers to the program.  Tr. 212, 215, 220-22 (D. Austin); D35310; Luton Dep. 87-88; D35342; TREX 011923.0050 (BOEM

Social Effects Study) ("Fishermen who worked for VOO for a significant amount of time built up a financial reserve they used to maintain their vessels, do repairs, or pay down debts, helping some return to fishing while others took the rest of 2010 off.").  The VOO program was lucrative for many participants, and some local companies made "huge profits" from the program.  Tr. 220-22 (D. Austin).  United States expert Dr. Mason agreed that the VOO program mitigated losses from the spill and blunted the spill's adverse effects for program participants.  Tr. 734-35 (Mason).

310.    The VOO program also benefited the shipbuilding industry through the record amounts of repair work done to shrimp boats, which vessel owners funded using VOO payments and claims money.  Tr. 222-23 (D. Austin); D35339.

311.    Similarly, through the Economic and Property Damages Settlement, BPXP committed to fund a fixed $2.3 billion Seafood Compensation Program to commercial fishermen and certain seafood industry participants who filed claims.  TREX 013067.0019-.0020 (Scott Expert Rpt.); Tr. 2071 (Scott).

312.    The money that BPXP paid out, or committed to pay, for the VOO Program and Seafood Compensation Program—$594.4 million and $2.3 billion, respectively—"way more than compensated" for the losses experienced by commercial fishermen after the spill, because commercial fishing revenues only declined $111.8 million in 2010 and revenues went up in 2011 and 2012, not down.  Tr. 2072, 2082-83 (Scott); D34795.1; D34798.1; TREX 013067.0016-.0021 (Scott Expert Rpt.).  *See also* Proposed Findings of Fact ¶¶ 660-664.  For participants in the VOO Program who also filed claims under the Seafood Compensation Program, none of their VOO earnings were deducted from their seafood claims.  TREX 013067.0020.

313.    Publicly available federal NOAA data shows that there were not Gulf commercial

fishing revenue losses in the aggregate after 2010: commercial fishing revenue for most species rose in 2011 and 2012 above pre-spill levels and volumes recovered to, or exceeded, long-term pre-spill trends.   Tr. 2074-83 (Scott); D34795.1; D34798.1; TREX 013067.0016-.0021 (Scott Expert Rpt.); TREX 013073.0007-.0011 (Scott Expert Rpt.); D34804.1; D34805.  *See also* BPXP Proposed Findings of Fact ¶ 664.

314.    As a result, BPXP's VOO spending in 2010 alone was more than five times the loss of Gulf commercial fishing revenue following the spill.  In addition, the $2.3 billion Seafood Compensation Program payments, once fully paid, represent roughly 20.5 times the decline in Gulf commercial fishing revenue.   Tr. 2070-71 (Scott); D34795.1; D34798.1; TREX 013067.0018-.0020 (Scott Expert Rpt.) (commercial fishing recovered in 2011 and 2012).

### f.    BPXP Voluntarily Funded Other Important Initiatives.

315.    On July 30, 2010, BPXP announced that it was establishing a $100 million charitable fund through the Gulf Coast Restoration and Protection Foundation, a supporting organization of the Baton Rouge Area Foundation ("BRAF"), for the purpose of compensating unemployed rig workers.  TREX 013073.0008 (Scott Expert Rpt.); Tr. 2037-38 (Scott); D34782; TREX 011922.0038.

316.    There were fewer layoffs of rig workers following the spill than expected, and so the BRAF ultimately distributed only about $11.4 million of BPXP's total donation to qualified applicants.   TREX 013073.0008 (Scott Expert Rpt.); TREX 011923.0021 ("Despite dire warnings from industry leaders and estimates that up to 9,000 people worked on deepwater rigs at that time, the fund was little used . . . ."); TREX 011923.0025 ("Within the industry, the fear of large-scale layoffs was never realized").

317.    BPXP agreed that the uncommitted $82.1 million remaining in the BRAF fund could be distributed as grants to universities, healthcare organizations, conservation groups, and

other non-profit organizations in the region. TREX 013073.0003-.0004, .0008-.0009 (Scott Expert Rpt.). Through May 14, 2014, just over $79.3 million of the $82.1 million had been distributed or approved for distribution. Among the recipients were Catholic Charities Archdiocese of New Orleans, the Audubon Nature Institute, the Water Institute of the Gulf, Tulane University, the Community Foundation of South Alabama, and the Nature Conservancy. *Id.*

318. BPXP made donations to support other nonprofit and community organizations throughout the Gulf States. Cross Dep. 225; TREX 012370; TREX 012371; TREX 012372; 012373; TREX 012374. For example, BPXP provided $1 million to Catholic Charities shortly after the incident. Cross Dep. 192-94.

319. In addition, in response to concerns about the quality of seafood harvested from the Gulf, BPXP committed $82 million in grants to Louisiana, Alabama, Mississippi, and Florida for the testing and marketing of seafood harvested from the Gulf. TREX 013073.0003, .0007 (Scott Expert Rpt.), D34782. This $82 million included $48.5 million paid over three years to the states to develop programs for the promotion of Gulf seafood. TREX 013073.0007-.0008.

320. BPXP also sponsored events and activities to promote tourism and Gulf seafood. Cross Dep. 224. For example, in Alabama, BPXP sponsored BayFest, an event that provides music and activities for families. Cross Dep. 224.

> **g.** **BPXP's Spill Response Spending Had Positive Economic Effects on the Gulf Region.**

321. Through 2014, BPXP had spent $14.1 billion on spill response and cleanup activities. Tr. 735-36 (Mason); Tr. 2038-39 (Scott); TREX 013067 (Scott Expert Rpt.); D34782. In 2010 alone, BPXP spent almost $12.5 billion on the response and cleanup. Tr. 736 (Mason); Tr. 2040-41 (Scott); TREX 013067.0016 (Scott Expert Rpt.); D34784.

322.    BP's response activities and spending mitigated the economic impact of the spill, as response workers stayed in hotels and patronized local businesses in various areas along the Gulf Coast.  Tr. 2041-42, 2045-46 (Scott); D34601; TREX 013067.0029 (Scott Expert Rpt.); TREX 013069.0031 (Scott Expert Rpt.); *see also* TREX 013067.0013, .0029-.0038 (Scott Expert Rpt.); TREX 244105 (AL.com May 6, 2010 news report) ("Downtown hotels are filled by hundreds of out-of-town workers helping to respond to the spill.  Restaurants and bars are hopping at a time when much of their clientele normally heads to the beach.  Car rental companies are bringing in truckloads of automobiles from other cities to meet demand.").

323.    Independent analysis has concluded that certain areas experienced net positive gains in employment as a result of spill response and clean up spending and workers.  TREX 013118 (National Bureau of Economic Research and Harvard Kennedy School of Government 2014 study by Dr. Joseph Aldy analyzing labor market impacts of the spill, spill response, and moratorium); *see also* TREX 013069.0008-.0009 (Scott Expert Rpt.).

324.    "Despite predictions of major job losses in Louisiana . . . [the state's] coastal parishes . . . experienced a net increase in employment and wages" following the spill as a result of spill response spending.  TREX 013118.0003 (Aldy Study).  *See also* Tr. 2066-67 (Scott) ("[A]s we got into November and December [of 2010], I noticed that the employment numbers were not behaving the way I thought they were going to behave."); TREX 013069.0008-.0009 (Scott Expert Rpt.).

325.    In Alabama coastal counties, employment increased 1.3% and wages increased 4-6% in the [time period] following the spill, indicating complete mitigation of the spill's harm and a positive impact of spill response and clean up spending.  TREX 013118.0005; TREX 013069.0008-.0009 (Scott Expert Rpt.).

326.    In Florida Panhandle and Mississippi coastal counties, there were no net employment effects that could be statistically distinguished from zero.  TREX 013118.0005 ("In particular, the coastal counties of Texas, Mississippi, and the Florida Panhandle all experienced net job impacts that cannot be statistically distinguished from zero."); TREX 013069.0008-.0009 (Scott Expert Rpt.).

327.    As a result of BPXP's spill response and cleanup spending, there was no loss of employment on a net basis in 2010 in the Gulf States in the aggregate, meaning that BPXP's response spending mitigated negative spill-related employment impacts.  Tr. 737, 739 (Mason); TREX 013118.0005 (Aldy Study) ("In statistical analysis based on 2010 data, I find that the net employment effect of the spill, spill response, and moratorium is a fairly precise zero for most parts of the Gulf Coast during 2010"); D34803; Tr. 2121 (Scott); TREX 013069.0009-.0010 (Scott Expert Rpt.).

### G.    BPXP Has Remained Committed to the Response.

328.    In the five years since the *Deepwater Horizon* incident, BPXP has remained committed to response efforts in the Gulf.   TREX 241529.0083 (Paskewich Expert Rpt.); Hanzalik Dep. 226.

329.    In June 2010, BPXP created the Gulf Coast Restoration Organization ("GCRO") to ensure that there is a group of people dedicated to fulfilling the company's responsibilities stemming from the accident.   GCRO is responsible for completing the response under the direction of the Coast Guard, and facilitating environmental restoration and enhancement of the Gulf region's resources, tourism, seafood, and way of life.  Tr. 1328-29 (Folse).

330.    Even though the active cleanup operations ended in 2014, BPXP continues to keep resources in place to respond quickly at the Coast Guard's direction if MC-252 oil is identified and requires removal.  TREX 241529.0084 (Paskewich Expert Rpt.).

331.     After active cleanup ended, BPXP continued to participate in the response through a transitional program for residual oil management known as "Middle R."  Tr. 1335, 1351 (Folse); TREX 013246.0056 (Taylor Expert Rpt.); TREX 241529.0084 (Paskewich Expert Rpt.).

332.     Under the Middle R process, the Coast Guard investigated calls made to the National Response Center that report oiling in the area of the *Deepwater Horizon* response.  Tr. 1351 (Folse); TREX 241529.0084 (Paskewich Expert Rpt.).

333.     If the Coast Guard determined that the reported oil was more likely than not MC-252 oil and it was a small quantity, then the Coast Guard would remove it.  If it was a large quantity, the Coast Guard would contact BPXP, which would mobilize Rapid Response Teams to remove the oil.  Tr. 1351-52 (Folse); D34537.

334.     Under the provisions of Middle R, BPXP was required to respond to NRC calls relating to possible MC-252 oil within a specified period of time—usually within one day of being notified by the Coast Guard.  TREX 241529.0085.

335.     To ensure that it could meet the performance expectations of the Coast Guard, BPXP established "firehouses" along the Gulf Coast where Rapid Response Teams, equipment, and vessels are on duty and ready to respond to reports of MC-252 oil.  Tr. 1352 (Folse).  BPXP currently has firehouses in Grand Isle, Louisiana, and Gulf Shores, Alabama, which handles the Eastern States.  Tr. 1352-53 (Folse); D34538.

336.     BPXP's firehouses are staffed 7 days per week with trained oil spill response personnel and oil mitigation equipment ready to provide rapid response capabilities anywhere within the four Gulf States.  TREX 241529.0085.  BPXP maintains 16 full-time responders, 14 pieces of response equipment, and 8 vessels at the Louisiana firehouse, and 12 full-time

responders, 13 pieces of equipment, and 2 vessels at the Alabama firehouse.  Tr. 1352-53 (Folse); D34538; TREX 241529.0085 (Paskewich Expert Rpt.).  The full-time staff is further augmented by BPXP-contracted on-call resources to ensure additional response capabilities are available if needed.  Tr. 1342-43 (Folse); TREX 241529.0085 (Paskewich Expert Rpt.).

337.    In late 2014, BPXP's Rapid Response Teams were called on to respond to MC-252 oiling reports only one to two times each month.  Tr. 1353 (Folse).

338.    Under the Middle R process, BPXP never missed a deadline to respond to a report of potential MC-252 oiling.  In most cases, BPXP expeditiously responded within four hours of being contacted by the Coast Guard despite the low risk that residual oiling poses to humans and wildlife.   TREX 013246.0056 (Taylor Expert Rpt.); TREX 241529.0085 (Paskewich Expert Rpt.); TREX 012187.000002; Tr. 1786 (Taylor).

339.    BPXP's Rapid Response Teams have cleaned up material on the shoreline that was not MC-252 oil.  In certain instances where BPXP was called upon to remove potential MC-252 oil, subsequent sampling and chemical fingerprinting determined that the material was not MC-252 oil.  Tr. 1353-54 (Folse); TREX 241529.0085-.0086 (Paskewich Expert Rpt.).

340.    BP's Executive Vice-President of Response and Environmental Restoration, Laura Folse, testified that, based on the extensive work and data collection performed under the direction of the Coast Guard, she has "no concern about oil washing in from the offshore to the shoreline." Tr. 1354 (Folse).

341.    While it is possible that there may be some buried oil deposits in certain areas close to shore, the deposits are likely to be small in size and heavily weathered.  Tr. 1354 (Folse).  In the event that such a deposit is exposed and reaches the shoreline, BPXP "stands ready and resourced to respond very quickly at the direction of the Coast Guard."  Tr. 1354 (Folse).

342.     In addition to its ongoing commitment to complete the response, BPXP has also remained committed to supporting the Gulf community, funding research and other initiatives, and sharing and advancing spill response capabilities in the years following the spill.  *See* BPXP Proposed Findings of Fact ¶¶ 955-958, 971-986.

## III.     THE SERIOUSNESS OF THE VIOLATION

343.     BPXP acknowledges that the *Deepwater Horizon* blowout, explosion and oil spill was a serious event that was declared a Spill of National Significance pursuant to the NCP.  As has been repeatedly stated, BPXP deeply regrets the tragic loss of life caused by the incident as well as the impact of the spill on the Gulf Region.  *See, e.g.,* Tr. 1616 (Morrison).

344.     BPXP acknowledges that there were adverse environmental impacts that arose in parts of the Gulf of Mexico, particularly in the summer of 2010, as a result of the incident.  Tr. 1863-64 (Tunnell); Tr. 2083 (Scott); TREX 013444.0003 (Shea Expert Rpt.).  At the same time, due in part to the response and mitigation efforts of the Unified Command and BPXP, as well as natural processes, the environmental impacts of the oil spill were much less significant than initially feared.

345.     BPXP also acknowledges there were some adverse economic impacts to the Gulf Coast as a result of the spill.  But, the economic effects of the spill varied significantly across the Gulf region.  For both commercial fishing and tourism, the data shows that the effects were short-lived and there was a strong, quick recovery from the effects of the spill.  Tr. 2034-35, 2083 (Scott).

### A.     The Environmental Impact of the Spill Was Limited in Space and in Time.

#### 1.     Using the Government's Own Toxicity Benchmarks, the Extensive Environmental Data Demonstrate that the Potential Harm to Aquatic Life in the Gulf of Mexico Was Limited.

346.     Nearly 18,000 water samples and over 8,000 sediment samples were collected in

the Gulf of Mexico following the *Deepwater Horizon* incident.  D34883; Tr. 1644, 1710-11 (Shea); TREX 013444.0012-.0015.

347.    Dr. Damian Shea, a renowned environmental chemist, eco-toxicologist and expert in the field of environmental risk assessment, analyzed all of these samples to determine the extent of potential harm in the water column and sediments.  Tr. 1630-35 (Shea); TREX 013444.0004-.0005, .0069-.0073.

348.    Using the EPA's toxicity benchmarks, Dr. Shea found that based on the samples collected and analyzed following the spill, the extent of potential toxic harm to aquatic life was limited in space and time.  Tr. 1639; TREX 013444.0003.

> **a.    A Massive Quantity of High-Quality Environmental Data Was Collected To Help Understand the Environmental Impact of the *Deepwater Horizon* Oil Spill.**

349.    There is a sufficient quantity of water and sediment sampling data to determine where and when harmful concentrations of chemicals existed following the incident.  Tr. 1648, 1650 (Shea).

350.    These data, which include nearly 18,000 water samples and over 8,000 sediment samples, are part of the largest ever environmental investigation of any single incident.  D34883; Tr. 1644, 1710-11 (Shea); TREX 013444.0012-.0015.  The United States' toxicology expert, Dr. Stanley Rice, acknowledged that the dataset available here is more extensive than any he has seen collected in connection with any other spill.  Tr. 526 (Rice).

351.    Samples were collected by the United States government and BPXP contractors.  Tr. 1642 (Shea); TREX 013444.0016.  Samples were taken at various locations, depths and times.  D34859A; Tr. 1644-47 (Shea); TREX 013444.0012-.0013.

352.    The data are of an extremely high quality.  Tr. 1648-50 (Shea); TREX 013444.0019-.0020, .0085-.0088; Tr. 527 (Rice).  The samples were collected under quality

assurance protocols.  Tr. 1648-49 (Shea); TREX 013444.0086; Tr. 526-27 (Rice).  Every single sample has quality control data and information associated with it.  Tr. 1649 (Shea).

353.    The data meet the EPA's quality assurance guidelines, are scientifically defensible, and utilize well-established, standardized methods.  TREX 013444.0086.

354.    Most of the samples were collected as part of the spill response or environmental investigation, often with the purpose of locating actionable oil in the water column, predominantly from areas where oil was expected or known to be.  Tr. 1644-47, 1731 (Shea); D34115; TREX 013444.0015.

355.    For example, if surface oil was observed, sampling teams would collect a sample adjacent to or underneath that oil where the concentration of dissolved oil chemicals was likely to be highest.  Tr. 1645 (Shea).

356.    As such, the collected samples provide a maximum, "worst-case scenario" estimate of exposure to oil-related chemicals. Tr. 1645 (Shea); TREX 013444.0015.

357.    Dr. Shea performed data validation to ensure completeness, correctness, and compliance with applicable analytical method requirements and concluded that this is "without a doubt, the largest and highest quality data set of its type" that he has ever encountered in his 30-year career. Tr. 1648-50 (Shea); TREX 013444.0021, .0085-.0088.

358.    The United States' toxicology expert Dr. Rice agreed that the sampling data is reliable, and he had no reason to disagree with any of the water chemistry data.  Tr. 527 (Rice).

              **b.**    **The EPA's Toxicity Benchmarks Are Scientifically Rigorous and Protective Standards for Determining Potential Harm Resulting from the Presence of Oil or Dispersants in the Water and Sediments in the Gulf of Mexico.**

                         i.    EPA benchmarks are the "gold-standard" approach for measuring potential toxicity.

359.    To determine whether samples have the potential to be harmful, it is necessary to

compare concentrations of chemicals in these samples to toxicity thresholds for those chemicals. D34856; Tr. 1640-42 (Shea); TREX 013444.0007.

360.    Thresholds are values below which the concentration of a chemical is considered safe and above which the concentration of a chemical could potentially cause harm to aquatic life. D34887; Tr. 1641-42 (Shea).

361.    The EPA benchmarks, including the benchmark for polycyclic aromatic hydrocarbons ("PAHs"), are toxicity thresholds developed as part of EPA's mandate to ensure compliance with the CWA.   D34864A; Tr. 1651 (Shea); TREX 240142.0004; TREX 013340.0004 (EPA document noting that the benchmark for PAHs was developed "[u]nder the Clean Water Act").

362.    These benchmarks, including the benchmark for PAHs, were in place before the *Deepwater Horizon* incident.  Lubchenco Dep. 198; TREX 013340 (EPA document establishing the benchmark for PAHs).

363.    The EPA benchmarks are "the gold standard that the United States uses and the world looks toward" for evaluating potential harm from oil-related chemicals in the water and sediment. Tr. 1655, 1680 (Shea).

364.    The EPA benchmarks are designed to be conservative—*i.e.*, to be protective of aquatic life under all the conditions that those organisms would experience. Tr. 1719 (Shea).

365.    The EPA benchmark for PAHs incorporates over 200 individual toxicity studies that have undergone rigorous quality assurance.  These toxicity studies account for short-term and long-term toxicity, different toxic effects (both lethal and sublethal effects such as diminished growth), multiple organisms, and multiple ages and sensitivities of organisms. Tr. 1652-53, 1655 (Shea); TREX 013444.0007-.0009; TREX 013446.0002, .0007-.0012; TREX

246032.0003-.0004.

366.    The EPA benchmarks are protective of aquatic life.  Tr. 1653, 1655 (Shea); TREX 240142.0004 ("EPA compares data to criterion to assess both acute and chronic aquatic toxicity."); TREX 013340.0025 (noting that the benchmark document "presents an analysis of acute and chronic water-only toxicity data for freshwater and saltwater aquatic organisms exposed to individual PAHs").

367.    The EPA benchmarks are used as screening tools, meaning that samples above the benchmark value "'stimulate a site or species-specific investigation'" into potential harm, while samples below the benchmark value are considered safe for aquatic life.  D34887; Tr. 517 (Rice); Tr. 1660 (Shea).

        ii.    The EPA toxicity benchmarks were used by the Government and government scientists in connection with this incident.

368.    The United States and scientists working on behalf of the United States have applied the EPA benchmark for PAHs to the *Deepwater Horizon* incident to evaluate potential harm resulting from the incident in at least four separate instances.  D34865; Tr. 1655-57 (Shea); TREX 242578.0013 (OSAT-1 Rpt.); TREX 242625.0021 (USGS Rpt.); TREX 242576 (study authored by NOAA scientists); TREX 246032 (EPA); TREX 013444.0007-.0008.

369.    The EPA lists these benchmarks on its website as the relevant toxicity thresholds to be applied in understanding the effect of the *Deepwater Horizon* incident on aquatic life. TREX 246032 (EPA *Deepwater Horizon* website listing benchmarks and citing TREX 013340 as the source of benchmarks for the PAH chemicals and for PAH mixtures).

370.    On its *Deepwater Horizon* website, the EPA states that these benchmarks are provided "to aid in the assessment of potential risk to fish and other marine life that may come into contact with oil spill associated chemicals in the water column or sediment."  TREX

246032.0003; Tr. 1656 (Shea).

371.     The Unified Command applied these benchmarks in the Operational Science Advisory Team's first report (OSAT-1).  Tr. 1656 (Shea); TREX 242578.  According to NOAA Administrator Jane Lubchenco, the OSAT-1 report was based on the best available science. Lubchenco Dep. 198.  The results of the OSAT-1 analysis are discussed at paragraphs 394 to 408.

372.     The United States Geological Survey applied these benchmarks in an Open-File Report intended to evaluate potential harm near the shorelines of the Gulf of Mexico resulting from the *Deepwater Horizon* incident.  Tr. 1656-57 (Shea); TREX 242625.

373.     Two NOAA scientists applied these benchmarks in a peer-reviewed paper, using *Deepwater Horizon* data, and looking at how dispersants and oil mixtures may harm the environment.  Tr. 1657 (Shea); TREX 242576.

>                  iii.     The EPA benchmarks have been confirmed by over 900 toxicity tests performed as part of the site-specific *Deepwater Horizon* environmental investigation.

374.     In addition to the collection of chemistry data, the *Deepwater Horizon* environmental investigation has included nearly 1,100 site-specific toxicity tests conducted by the United States, including NOAA and EPA, and by BPXP.  Tr. 1682-83 (Shea); TREX 013444.0009-.0010.

375.     To conduct these site-specific toxicity tests, samples are collected from sites that are believed to be harmed and then used to conduct a toxicity test on organisms in a laboratory. Tr. 1681 (Shea); TREX 013444.0040.

376.     These tests were performed on at least 20 different species that are resident in the Gulf of Mexico, including vertebrates, invertebrates, and plants.  D34873A; Tr. 1683-84 (Shea); TREX 013444.0019, .0101-.0134.

377.    These tests were also performed on a number of different life stages (or ages) of these species and looked at multiple types of toxic effects.  D34874; Tr. 1683 (Shea); TREX 013444.0101-.0134.

378.    Dr. Shea reviewed all of these site-specific toxicity tests.  D34914.1; Tr. 1681-83 (Shea).  He screened out approximately 200 tests based on principles the U.S. EPA uses to validate toxicity tests.  Tr. 1683 (Shea); TREX 013444.0087-.0088, .0095-.0100.  The remaining 900 tests are high-quality.  Tr. 1682 (Shea); TREX 013444.0017-.0018, .0087-.0088.

379.    The results of these remaining 900 site-specific toxicity tests are consistent with the EPA benchmarks, meaning that the test results confirm that the benchmarks are protective of aquatic life.  D34874; Tr. 1683-85, 1740 (Shea); TREX 013444.0040-.0041.

> ### c.    The Vast Majority of Water and Sediment Samples Were Safe for Aquatic Life.

380.    For the oil-related chemicals, Dr. Shea focused on EPA's benchmark for PAHs but also looked at EPA's benchmarks for other oil-related chemicals like benzene, toluene, ethylbenzene, and xylenes ("BTEX").  Tr. 1657-58 (Shea); TREX 013444.0027-.0029.

381.    Over 16,000 water samples collected as part of the *Deepwater Horizon* environmental investigation were analyzed for BTEX.  Not a single one of those samples exceeded the EPA benchmarks for BTEX.  Tr. 1657-58 (Shea); TREX 013444.0028.

382.    Of the almost 18,000 water samples collected in the Gulf of Mexico as part of the *Deepwater Horizon* environmental investigation and analyzed for PAHs, 98.05% were safe for aquatic life.  D34052A; D34887; Tr. 1657-60 (Shea); TREX 013444.0020-.0026.  Only 1.95% (or 349) of the water samples were even potentially harmful to aquatic life.  D34052A; D34887; Tr. 1657-60 (Shea); TREX 013444.0020-.0026.

383.    Of the more than 8,000 sediment samples collected in the Gulf of Mexico as part

of the *Deepwater Horizon* environmental investigation and analyzed for PAHs, 98.08% were safe for aquatic life.  D34869A; Tr. 1668 (Shea); TREX 013444.0035-.0039.  Only 1.92% (or 157 samples) were potentially harmful to aquatic life.  D34869A; Tr. 1668 (Shea); TREX 013444.0035-.0039.

384.    Of the more than 5,600 water samples collected in the Gulf of Mexico as part of the *Deepwater Horizon* environmental investigation and analyzed for the dispersants-related chemical known as dioctyl sodium sulfosuccinate (DOSS), 99.72% were safe for aquatic life and 0.28% (or 16 samples) were potentially harmful to aquatic life.  D34876; Tr. 1671-72 (Shea); TREX 013444.0031-.0033.

385.    No samples that were analyzed for dispersant-related chemicals other than DOSS contained potentially harmful concentrations of these chemicals.  D34876; Tr. 1671-72 (Shea); TREX 013444.0031.

386.    The United States' expert Dr. Donald Boesch testified that the chemical dispersant injected at the wellhead and sprayed at the surface "had little toxicity in itself." TREX 013183.0008.

387.    Initially, Dr. Shea looked at all the samples collected as part of the *Deepwater Horizon* environmental investigation.  Tr. 1661-62 (Shea); TREX 013444.0021.  Dr. Shea then performed a second analysis removing from the calculation samples collected in areas that, in his opinion, clearly had not been impacted by oil, such as on the coast of Texas and the West Coast of Florida.  Tr. 1661-62 (Shea); TREX 013444.0021.

388.    In this more targeted analysis, the percentage of water samples that contained potentially harmful concentrations of oil-related chemicals rose to 2.06% (up from 1.95% in the analysis which include all samples collected).    D34918; Tr. 1661-64 (Shea); TREX

013444.0021.  The area considered in Dr. Shea's more targeted analysis is similar to the area Dr. Boesch indicated is potentially of concern.  D34916; D34918; Tr. 1662-63 (Shea).

389.    Dr. Shea also analyzed the potential for harm at various depths, including the surface water.  Nearly all of the samples collected in the surface 200 meters were considered safe; only approximately 2.6% were potentially harmful to aquatic life.  D34868B; Tr. 1668 (Shea); TREX 013444.0026.

> **d.    Where Elevated Levels of PAHs Occurred, They Were Limited in Both Space and Time.**

390.    Dr. Shea performed a statistical analysis of the sampling data to determine the locations, depths and time periods where potentially harmful concentrations of oil-related chemicals were likely to have occurred.  D34891; Tr. 1664-67 (Shea); TREX 013444.0034-.0035, .0135-.0138.

391.    In completing this analysis, Dr. Shea relied upon an approach called kriging. D34891; Tr. 1664-67 (Shea); TREX 013444.0135-.0138.  Kriging is a standard statistical tool used to understand a total area of potential impact.  Tr. 1665-66 (Shea).

392.    The results of this statistical analysis show that potentially harmful concentrations of oil-related chemicals were largely limited to a small area surrounding the wellhead during the time oil was released (the spring and summer of 2010).  D34891; Tr. 1664-67 (Shea); TREX 013444.0023, .0034-.0035, .0135-.0138.

393.    In short, a review of the enormous quantity of high-quality data reveals that the few instances where there was potentially harmful exposure to chemicals were limited in space and time, and occurred mostly in the area close to the wellhead in the summer of 2010.  Tr. 1711 (Shea); TREX 013444.

> **e.      OSAT-1 Analyzed a Subset of the Water and Sediment Samples Collected and Found that Exceedances of EPA Benchmarks Were Limited in Space and Time.**

394.    On August 18, 2010, FOSC Admiral Paul Zukunft chartered the first Operational Scientific Advisory Team ("OSAT") to provide situational scientific data and analysis for use in directing ongoing response operations. TREX 012237.0002 (OSAT-1).

395.    OSAT was a government-led, multi-agency team that included representatives of BOEMRE, EPA, NOAA, the Coast Guard, the U.S. Geological Survey, and BPXP.  TREX 012237.0130-.0131 (OSAT-1).

396.    OSAT included a group of more than 20 scientists from numerous specialties, including oceanography, general environmental science, coastal science and oil/contaminant chemistry, sedimentary geology, microbiology, and chemistry/toxicology.  TREX 012237.0130-.0131 (OSAT-1).

397.    On December 17, 2010, the FOSC released the "Summary Report for Sub-Sea and Sub-Surface Oil and Dispersant Detection: Sampling and Monitoring" Report ("OSAT-1"). OSAT-1 assessed data from tens of thousands of water and sediment samples collected in the *Deepwater Horizon* environmental investigation.  TREX 012237.0001-.0002 (OSAT-1).

398.    One of the purposes of this sample collection and analysis was to "[m]onitor and assess the distribution, concentration, and degradation of the portion of the oil that remains in the water column and/or bottom sediment[]."  TREX 012237.0002 (OSAT-1).  OSAT-1 analyzed a subset of the data analyzed by Dr. Shea; Dr. Shea's analysis included additional samples that were not available to the Unified Command at the time of the OSAT-1 report.  Tr. 1670 (Shea).

399.    OSAT-1 reported that after August 3, 2010, there were no exceedances of the aquatic life benchmark for polycyclic aromatic hydrocarbons (PAHs) in water, or in sediments beyond 3 km of the wellhead, that were consistent with MC-252 oil. TREX 012237.0006

(OSAT-1).  In reaching these determinations, OSAT-1 applied the U.S. EPA's benchmarks for aquatic life to the samples it analyzed.  TREX 012237.0016-.0018 (OSAT-1).

400.    OSAT-1 found that, out of 5,773 water samples taken in the nearshore, only 22 samples consistent with MC-252 oil, or that were of indeterminate origin, exceeded aquatic life benchmarks.  TREX 012237.0028 (OSAT-1); Tr. 531 (Rice).

401.    OSAT-1 found that, out of 1,136 sediment samples taken in the nearshore, only 13 samples consistent with MC-252 oil, or that were of indeterminate oil, exceeded aquatic life benchmarks. TREX 012237.0028 (OSAT-1).

402.    Further, out of 3,621 water samples taken in the deepwater region, only 63 samples consistent with MC-252 oil, or that were of indeterminate oil, exceeded aquatic life benchmarks.  TREX 012237.0043 (OSAT-1); Tr. 532 (Rice).

403.    OSAT-1 also found that, out of 127 sediment samples taken in the deepwater region, only 7 samples consistent with MC-252 oil, or that were of indeterminate oil, exceeded aquatic life benchmarks.  TREX 012237.0043 (OSAT-1).

404.    As it relates to dispersants, OSAT-1 found that "[n]o exceedances of EPA's dispersant benchmarks were observed."   TREX 012237.0006 (OSAT-1); Tr. 534 (Rice). Consistent with OSAT-1, Jane Lubchenco, Administrator for NOAA, testified that of the tens of thousands of sediment and water samples collected after the spill, there were no exceedances of EPA's benchmarks for aquatic life.  Lubchenco Dep. 198.

405.    On December 17, 2010, based on the OSAT-1 sampling effort and expert analysis of the data, FOSC Admiral Zukunft determined that there was no actionable oil in the water or sediments of the deepwater or offshore zones.  TREX 012237.0004 (OSAT-1).

406.    According to the Unified Command, "The last overflight observation of

potentially recoverable oil on the ocean surface was made on 3 August." TREX 012237.0010 (OSAT-1).

407.     OSAT-1 found that of the water samples collected after August 3, 2010, less than 1% exceeded the EPA benchmark for PAHs.  TREX 012237.0006 (OSAT-1); Tr. 534-35 (Rice); D34870; D34871; Tr. 1669-70 (Shea).  A chemical fingerprinting analysis of these post-August 3, 2010 water exceedances showed that none were from Macondo oil.  TREX 012237.0006 (OSAT-1); Tr. 535 (Rice); D34870; D34871; Tr. 1670-71 (Shea).

408.     Further, OSAT-1 found that of the sediment samples collected after August 3, 2010, approximately 1% exceeded the EPA benchmark for PAHs.  TREX 012237.0006 (OSAT-1); Tr. 534-35 (Rice); D34870; D34871; Tr. 1669 (Shea).  A chemical fingerprinting analysis of these post-August 3, 2010 sediment exceedances showed that only those within 3 kilometers of the wellhead were consistent with Macondo oil.  TREX 012237.0006 (OSAT-1); Tr. 535 (Rice); D34870; Tr. 1670-71 (Shea).

### f.     The United States Experts Ignored Extensive Amounts of Available Environmental Data.

409.     At no point did the United States' toxicology expert Dr. Rice analyze the sediment samples collected as part of the *Deepwater Horizon* environmental investigation.  Tr. 532 (Rice)

410.     Dr. Rice similarly chose not to analyze the water samples collected as part of the investigation in forming his initial conclusions, only looking at water chemistry samples after receiving Dr. Shea's expert report.  Tr. 526, 535-36 (Rice).

411.     The United States' other environmental impact expert, Dr. Boesch, relied primarily on a few scientific publications, not the extensive samples collected in the Gulf of Mexico by the United States and others.  TREX 013183.000006.  Dr. Boesch did not review the

water chemistry samples or sediment samples himself, but instead relied on Dr. Rice's analysis

and summary of those samples.  Tr. 423-24 (Boesch).

> g.    **The United States Expert's Proposed Toxicity Thresholds Rely on Inappropriate Extrapolations from a Few Deeply Flawed Laboratory Experiments.**

412.    The United States' experts do not rely on the EPA benchmark for their primary

analysis of potential harm.  D34890A; Tr. 534-35 (Rice) ("I did not pay attention to the

benchmarks."); Tr. 1651, 1691 (Shea).

413.    Instead, Dr. Rice, the United States' toxicology expert, proposed a toxicity

threshold of 0.3 parts per billion (ppb) as the appropriate PAH toxicity threshold to evaluate

potential harm.  Tr. 514-15 (Rice).

414.    The only support for the threshold value proposed by the United States' expert is

a single toxicity test reported in a scientific paper by Incardona et al. (the Incardona paper).  Tr.

514-15 (Rice) ("I was using the toxicity threshold that was derived specifically from Incardona .

. . .").

415.    There are many serious limitations to the methodologies used in the Incardona

paper and as adopted by Dr. Rice.  Tr. 1698 (Shea); TREX 013445.0010-.0015.

416.    Dr. Rice's expert reports made several mistakes in his interpretation of the

Incardona paper.[2]  Dr. Rice's expert report mistakenly stated that Incardona tested all Gulf

species when two of the three species Incardona tested are from Australia and do not reside in

Gulf waters.  Tr. 543-44 (Rice).  The Incardona study was performed using southern bluefin

tuna, which lives near Australia and is not found in the Gulf of Mexico. Tr. 544, 547-48 (Rice).

This is relevant because, within a range, different species can respond differently to the same

---

[2]    After the close of discovery and after his expert deposition, Dr. Rice did file an errata correcting some of these errors.  TREX 013332E.

chemicals in the same dose.  Tr. 544-45 (Rice).

417.    Because southern bluefin tuna do not live in the Gulf, Dr. Rice admitted that he did not know the precise dose that would cause the same effect on Atlantic bluefin tuna, which do live in the Gulf, as was observed in the Incardona study.  Tr. 547 (Rice).

418.    The Incardona paper reported no information about the severity of edema observed; it therefore is impossible to know whether the effect observed at 0.3 ppb was meaningful or trivial to the organism.   Tr. 1698-99 (Shea); Tr. 552-53 (Rice); TREX 013445.0016.  This failure to report severity is a violation of basic toxicological principles; in order to understand toxicity, you need to know the severity of the effect observed.  Tr. 1699 (Shea).

419.    The Incardona paper also reported unusual and unacceptably high mortality rates in the control organisms (those organisms exposed to no contamination).  D34881; Tr. 1699-1700 (Shea); TREX 013445.0017.

420.    When toxicity tests are conducted, it is normal to observe 10-20% mortality in the controls.  Tr. 1700 (Shea).  Incardona reported up to 40% mortality in the controls for some of the species tested in the Incardona paper.  Tr. 1700 (Shea); TREX 013282.000003.

421.    Specifically, Incardona reported 40% mortality in the controls with respect to the southern bluefin tuna that were a subject of his experiments.  Tr. 547-48 (Rice).  A 40% mortality rate in the control is not common, and Dr. Rice has never published a paper with a control mortality rate that high.  Tr. 548 (Rice).

422.    The authors of the Incardona paper also lost in transit some of the samples from its tests before the chemistry from these samples could be analyzed.  Tr. 564-65 (Rice).  This loss of samples is of particular importance because, as discussed in paragraph 425, the Incardona

toxicity tests were utilizing non-standard mixing methodologies.  Dr. Rice, the United States toxicology expert, contends that standard mixing methods are no longer as important as they once were "because the composition and concentration of individual PAH can be determined with high quality analytical chemistries (not available in the past)."  TREX 013332.0010.  But because these samples were lost, Dr. Incardona had to estimate (rather than measure) the analytical chemistry for these tests.  Tr. 564-65 (Rice) ("That's part of the imperfectness of this study.").

423.    Dr. Rice admitted that he did not have several pieces of information that would be necessary "for a detailed, precise evaluation" of the Incardona study.  Tr. 563 (Rice).

424.    Furthermore, the Incardona paper used a high-powered commercial food blender to mix oil and water before testing the toxicity of this mixture.  Tr. 559-60 (Rice); Tr. 1701 (Shea); TREX 013282.000007; TREX 013445.0010-.0015.  This method is called a high energy water accommodated fraction ("HEWAF").  Tr. 510 (Rice).

425.    HEWAF is non-standard and has not been relied upon by the EPA.  Tr. 563 (Rice); D34881; Tr. 1700-01 (Shea); TREX 013445.0010-.0011.

426.    HEWAF is specifically designed to increase the toxicity of the mixture because it increases the amount of the more toxic compounds that will dissolve in water.  TREX 013332.0010 ("high energy mixing has the energy to entrain dispersed small dispersed droplets into the water which promotes some of the heavier (and more toxic compounds) into solution.").

427.    The blender does not match conditions that were observed in the Gulf of Mexico following the incident.   D34881; Tr. 1701-02 (Shea); TREX 013332.000010; TREX 013445.0011-.0015.  A comparison of the chemistry of oil after it has undergone the blender method to the chemistry of actual oil samples from the Gulf demonstrates that there is a

significant difference between the two.  Tr. 1745 (Shea); TREX 013445.0012-.0015.

428.     Dr. Rice does not know how much energy was generated using the blender method used in Dr. Incardona's experiment or whether the energy at the surface of the Gulf of Mexico is similar to the energy in the blender.  Tr. 560-62 (Rice).

429.     Toxicity was observed at a value of 0.3 ppb, the value Dr. Rice argues should be used as a threshold in this case, in only a single toxicity test reported in the Incardona paper.  Tr. 514-15, 549, 552 (Rice).   This test was performed using the non-standard HEWAF blender method.  Tr. 559-60 (Rice).

430.     The Incardona paper included photographs of fish embryo deformities observed in its toxicity test.  TREX 013282.000003.  Dr. Rice relied upon these photographs in his direct examination at trial.  D32618A.  The deformities shown in these pictures were observed at concentrations of 3.4 ppb, 8.5 ppb and 13.8 ppb.  Tr. 1702 (Shea); Tr. 549-50 (Rice); TREX 013282.000003.

431.     Fewer than 2% of the water samples collected in the Gulf of Mexico exceeded a PAH concentration of 3.4 ppb, fewer than 1% exceeded a PAH concentration of 8.5 ppb, and approximately 0.5% exceeded a PAH concentration of 13.8ppb.  Tr. 1705 (Shea).  This is comparable to the 1.95% of water samples that exceed the EPA benchmark used in Dr. Shea's analysis.  D34052A.

432.     In his direct testimony, Dr. Rice also showed a video of heart deformities in embryos.  D32617; Tr. 494-96 (Rice).  On cross examination, he admitted that he did not know the dose at which the types of deformities pictured in the video would occur and that he suspects they would occur at a dose higher than 0.3 ppb.  Tr. 551 (Rice).

433.     With regard to Dr. Mager's study on mahi-mahi, upon which Dr. Rice relies, Dr.

89

Incardona was a co-author to this publication, and it used the same non-standard blender method as was used in the Incardona study and which is discussed at paragraph 425. Tr. 574 (Rice); Tr. 1706 (Shea).

434. Dr. Mager's study on mahi-mahi looked at swimming performance. TREX 013338.0001; Tr. 577-78 (Rice). Whether the changes in swimming performance observed in Dr. Mager's study would impact a fish's chances is unknown, and estimation of such an impact would be "educated surmising." Tr. 577-78 (Rice). The Mager study also found that "the lack of an effect on aerobic scope strongly indicates that cardiac output was maintained," not decreased, despite the exposure to oil. TREX 13338.0006; Tr. 575-76 (Rice).

435. Neither the Incardona nor the Mager study has been replicated by any other scientists. Tr. 574-75 (Rice).

436. Dr. Rice also relied on the Carls study of Pacific herring, which Dr. Rice co-authored. Tr. 566-67 (Rice). Pacific herring do not live in the Gulf of Mexico. Tr. 567 (Rice).

437. The Carls study used the ORC (oil, rock, column) method for exposing test organisms to PAHs, which is not a widely used method and which is not ecologically relevant to this spill. Tr. 567-68 (Rice).

438. The Carls study has also been the subject of peer-reviewed criticism. Tr. 569 (Rice); TREX 013336.0001-.0002. A paper by Dr. David Page and others found that the Carls study "did not establish consistent dose (concentration) response or causality and thus do[es] not demonstrate that dissolved PAH alone from the weathered oil resulted in the claimed effects." Tr. 569 (Rice); TREX 013336.0001.

439. The paper by Dr. Page and others also concluded that the Carls study "should not be relied on for management decision-making, when assessing the risk of very low-level PAH

90

exposures to early life stages of fish." TREX 013336.0001. The paper by Dr. Page and others further stated that the Carls study's conclusion was "contradicted by their own exposure water chemistry data." TREX 013336.0018.

440. The paper by Dr. Page and others concluded that the Carls study's conclusion that "toxicity occurs at about 1 microgram per liter dissolved TPAH [is] not supported by the data." Tr. 570 (Rice); TREX 013336.0024-.0025.

### 2. There is No Evidence of Impacts to Fish, Shellfish, Bird, Dolphin, Turtle or Coral Populations as a Result of the *Deepwater Horizon* Oil Spill.

441. From an ecological and biological perspective, it is important to look at populations of species and whether there are effects at the population level. Tr. 1909 (Tunnell); TREX 013164.0012; Tr. 431 (Boesch); TREX 013277. The question of harm to populations (rather than individuals) is the critical question for understanding whether there is long-lasting harm to the environment. TREX 013163.0004.

442. An effect on the individual level is not necessarily an effect at the population level. TREX 013164.0012; TREX 231543.

443. BPXP experts acknowledge that some limited areas, individual organisms, and wildlife were impacted by the spill. Tr. 1863-64 (Tunnell).

#### a. Fish and Shellfish

444. The *Deepwater Horizon* oil spill did not cause significant adverse impact to fish or shellfish populations in the Gulf of Mexico. Tr. 1861 (Tunnell); TREX 013163; TREX 013165.

445. Based upon extensive government data (collected over several decades), post-spill population levels are within historical ranges for fish and shellfish in the northern Gulf of Mexico. Tr. 1888 (Tunnell); TREX 013163; TREX 013165.

446.    To evaluate impact to fish and shellfish populations, Dr. Tunnell reviewed five lines of evidence: (1) long-term and (2) short-term population trends evidenced by government data collected independent of fisheries for the purpose of evaluating populations, (3) commercial and recreational fisheries catch data, (4) water and tissue data evidencing exposure to harmful contaminants, and (5) government and/or academic findings from over 400 pieces of literature. D34939; Tr. 1877, 1896 (Tunnell); TREX 013163.0015-.0016.

447.    Dr. Tunnell reviewed independent data from two sources to analyze long-term and short-term population trends: data from the Southeast Area Monitoring and Assessment Program ("SEAMAP"), collected by the federal government, and data from the Louisiana Department of Wildlife and Fisheries ("LDWF").  Tr. 1878 (Tunnell); TREX 013163.0017.

448.    Both the SEAMAP and LDWF data sets are collected by government biologists for the purpose of monitoring populations and managing the fisheries and are relied upon by environmental scientists.  Tr. 1879-81 (Tunnell); TREX 013163.0017.

449.    The LDWF data has been collected for over 45 years, and the SEAMAP data has been collected over 30 years. Tr. 1879 (Tunnell); TREX 013163.0017; TREX 013165.0011-.0015.

450.    Dr. Tunnell incorporated over 400,000 individual observations of fish and shellfish populations as part of his analysis.  D34938.1; Tr. 1879-80 (Tunnell).

451.    Field observations are critical when looking at the effects from an oil spill.  Tr. 432 (Boesch).

452.    Dr. Tunnell focused his analysis on 10 species, which he chose because they are representative of three key categories of species: those that are commercially, recreationally and ecologically important.  D34936; Tr. 1868 (Tunnell); TREX 013163.0013-.0015.  The following

10 representative species were included in Dr. Tunnell's analysis: brown shrimp, white shrimp, blue crab, Eastern oyster, red drum, red snapper, sand seatrout, Atlantic croaker, bay anchovy and Gulf menhaden.  D34948.6; TREX 013163.0013; TREX 013165.0005.

453.    To ensure the proper scope of analysis, Dr. Tunnell also reviewed fisheries data within different geographic bounds.  Tr. 1873-76 (Tunnell); TREX 013163.0017-.0018; TREX 013165.0005.

454.    Initially, Dr. Tunnell analyzed data from within the northern Gulf of Mexico to evaluate possible widespread impact.  Tr. 1873 (Tunnell).  He then looked at data from the waters off the coast of Louisiana.  D34966; Tr. 1873 (Tunnell); TREX 013163.0017-.0018.  Finally, he looked at data only from off the coasts of southeastern Louisiana, Mississippi and Alabama, which are the areas Dr. Boesch suggested were most heavily oiled.  D34966; Tr. 1873-74 (Tunnell); TREX 013165.0022.

455.    SEAMAP and LDWF population data, in all the geographic areas considered by Dr. Tunnell, show that post-spill levels of all species of fish and shellfish Dr. Tunnell analyzed are within the range of historical trends and variations for these populations.  D34948.6; D34948.1; Tr. 1886-87 (Tunnell); TREX 013163.0007; TREX 013165.0005.

456.    There is no data, peer-reviewed publication, or government report that indicates that there has been a significant impact on populations of any fish or shellfish species in the northern Gulf of Mexico attributed to the *Deepwater Horizon* spill.  TREX 013163.0021-.0022.

457.    The United States expert, Dr. Rice, had no opinion regarding any population effect on any species.  Tr. 578-79 (Rice).

458.    For all species of fish and shellfish for which data were available and which Dr. Tunnell analyzed, post-spill commercial and recreational fisheries catch data are consistent with

93

pre-spill levels.  D34948.1; Tr. 1894 (Tunnell); TREX 013163.0007.

459.  Fish and shellfish chemistry and tissue data reviewed by Dr. Tunnell indicate that there has not been widespread exposure of fish and shellfish to potentially harmful concentrations of spill-related contaminants.  D34948.4; Tr. 1895 (Tunnell); TREX 013163.0020-.0021.

460.  Sampling conducted for the purpose of determining seafood safety following the spill showed that, for the approximately 8,000 samples taken, results were orders of magnitude below the benchmark established to ensure seafood is safe.  D34976; Tr. 1895 (Tunnell); TREX 013163.0020-.0021.

461.  Furthermore, the OSAT reports showed that after August 3, 2010, fish and shellfish would not have been exposed to contaminants at levels that would cause concern. D34976; Tr. 1895 (Tunnell); TREX 240210; TREX 013163.0019.

462.  Of the over 400 government documents and peer-reviewed publications reviewed by Dr. Tunnell, 25-30 contained information on species, populations and habitats in the northern Gulf of Mexico, and none indicate population impacts to any species.  Tr. 1896-99 (Tunnell); D34948.6.

463.  A 2014 study by Fodrie et al., *Integrating Organismal and Population Responses of Estuarine Fishes in Macondo Spill Research*, found that there was an "absence of measurable negative impacts among populations" of estuarine fish resulting from the spill.  TREX 231543.000001; Tr. 440-41 (Boesch).

464.  Fodrie et al. (2014) also reported that surveys of fishes residing in seagrass and salt-marsh habitats after the Macondo spill showed no measurable impacts on the integrated survival of eggs, larvae, and juveniles.  TREX 231543.000006.

465.     Fodrie et al. (2014) reported that 12 of the 20 most commonly encountered fishes were characterized by significantly higher catch rates in 2010 than in 2006-2009, while the remaining 8 taxa (groups of fish populations) had pre-spill catch rates that were statistically indistinguishable from post-spill catch rates. TREX 231543.000006.   Further, species composition and diversity of juvenile fishes were unaltered following the spill.   TREX 231543.000006.

466.     A 2014 peer-reviewed scientific paper by Professors Szedlmayer and Mudrak, *Influence of Age-1 Conspecifics, Sediment Type, Dissolved Oxygen, and the Deepwater Horizon Oil Spill on Recruitment of Age-0 Red Snapper in the Northeast Gulf of Mexico during 2010 and 2011*, included studies designed to test impacts of the spill on red snapper populations and found no impacts and stated that in 2011, "[r]ed snapper . . . were abundant on all reefs."  D34951; Tr. 1896-97; TREX 244054; TREX 013163.0040.

467.     Another 2014 peer-reviewed scientific paper by Rozas et al., *Abundance and Size of Gulf Shrimp in Louisiana's Coastal Estuaries following the Deepwater Horizon Oil Spill*, included a study comparing shrimp in oiled areas to shrimp in un-oiled areas and found "no direct evidence of changes in shrimp abundance or mortality."  D34951; Tr. 1897-98 (Tunnell); Tr. 449-50 (Boesch); TREX 013176; TREX 013163.0022.

468.     A 2014 study by Professors van der Ham and de Mutsert, *Abundance and Size of Gulf Shrimp in Louisiana's Coastal Estuaries following the Deepwater Horizon Oil Spill*, looked at LDWF fisheries data and found that the spill had no impact on shrimp population abundances. Tr. 450-51 (Boesch); TREX 013289.

469.     The van der Ham and de Mutsert study conducted both a small-scale and large-scale study, involving over two million shrimp, and concluded that "[a] consistent pattern

95

emerges from our two analyses: the abundance of both brown and white shrimp was significantly higher after the spill occurred." TREX 013289.0007; Tr. 450-51 (Boesch).

470.    The authors of Rozas et al. (2014), the single study relied on by Dr. Boesch for claims of injury to shrimp, acknowledged that they had no direct evidence of changes in shrimp abundance or morality from their experiments.  Tr. 449-50 (Boesch)

471.    A 2010 report issued by the Louisiana Department of Wildlife and Fisheries found "no direct oiling of sampled [oyster] reefs was noted."  D34951, TREX 230585.000008; TREX 013163.0035.

472.    Dr. Boesch is not aware of any reports, scientific or otherwise, of Macondo oil killing oysters.  TREX 013183.000036.  There is no evidence of elevated PAH concentrations in oyster tissues in the Mississippi Sound during and after the spills.  Tr. 451-52 (Boesch); TREX 013183.000036.

473.    Dr. Boesch testified that the cause of decline in oyster and oyster spat populations was a mystery, and could have been due to factors such as natural causes, diseases, and harvest pressure.  Tr. 412 (Boesch).  Other causes could have included climate variations, Hurricane Isaac, and habitat quality.  TREX 013183.000037.  The causes of oyster population declines in the Gulf are not resolved.  Tr. 451 (Boesch).

474.    To the extent that any oysters were damaged because of diversions from the Mississippi River, that fault lies with the State of Louisiana—not with BPXP.  Hanzalik Dep. 197; *see generally* BPXP Proposed Findings of Fact ¶¶ 230-231.

475.    The fisheries closures that accompanied the spill also had positive impacts on fish populations by reducing harvest pressure, with potentially equal or larger positive effects on the abundance of some fish populations as compared to the effects of the spill.    TREX

231543.000007.

476.   The United States has not made any allegation that there were actual impacts to fish and shellfish populations.  D32152; Tr. 343 (Boesch).  United States' expert Dr. Boesch admitted that he was not able to demonstrate any actual harm to fish populations.  Tr. 438 (Boesch).  Dr. Boesch did no independent analysis of any population change for any fish species, and conducted no independent analysis of fishery landing data.  Tr. 441, 429 (Boesch).

477.   Dr. Boesch alleges only *potential*, not *actual*, harm to oceanic fish embryos and larvae and admits that he does not know whether, in the real world, any sublethal effects actually impacted the survival of the larvae.  Tr. 377 (Boesch).

478.   The only article Dr. Boesch cites for his allegation that bottom fishes on the continental shelf potentially experienced lesions as a result of the oil spill is a paper by Murawski et al. Tr. 442 (Boesch).  This paper explicitly states that it has not established that the fish lesions observed were caused by exposure to oil from the spill. Tr. 441-42 (Boesch); TREX 231516.000011.

479.   A study of fish in the nearshore environment, performed primarily after the spill, found that out of 3,100 fish sampled, only a single fish had any kind of external sore or lesion. Tr. 442 (Boesch); TREX 244055.0002-.0003.  Dr. Boesch acknowledged the results of this study, pointing out that fish were not exposed to fresh oil in the nearshore.  Tr. 442 (Boesch).

480.   A 2014 study of fish in Louisiana salt marshes found that "[c]omparisons across representative oiled and unoiled sites […] did not reflect any consistent differences in species composition, abundance, and size as a function of oiling 2-3 years after the oil spill reached Louisiana marshes."  TREX 013182.0001.

### b.   Birds

481.   The *Deepwater Horizon* oil spill did not cause significant adverse impact to bird

populations in the Gulf of Mexico.  Tr. 1911 (Tunnell); TREX 013163; TREX 013164; TREX 013165.

482.    The vast majority of birds were not oiled as a result of the spill.  During the spill response, the United States scientists observed over 440,000 birds, only 0.67% of which were oiled.  D34956; Tr. 1908 (Tunnell); TREX 012625; TREX 013163.0065; Higgins Dep. 169-174.

483.    Birds with some degree of oiling can survive.  Higgins Dep. 182.

484.    BPXP funded rehabilitation centers to rehabilitate birds potentially affected by the spill, including birds that were not oiled but were injured.  Tr. 462 (Boesch).  During the course of this rehabilitation program, around 1,200 birds were rehabilitated and released into the environment.  Tr. 462 (Boesch).

485.    To evaluate potential impact to bird populations, Dr. Tunnell reviewed two types of bird population data: (i) Audubon Christmas Bird Count data, and (ii) Breeding Bird Survey data collected from the areas of the Gulf that Dr. Tunnell expected to have been most heavily oiled.  D34953; Tr. 1901-02; TREX 013163.0062-.0064; TREX 013165.0005-.0006.

486.    These bird population surveys are the type of data environmental scientists ordinarily rely upon to track populations through time.  Tr. 1903-04 (Tunnell).

487.    Dr. Tunnell reviewed each of these types of data for 23 species.  Tr. 1900 (Tunnell); TREX 013163.0060-.0061.  These included all of the following bird species, which include estuarine birds as well as beach, nearshore and offshore birds: brown pelican, great egret, great blue heron, snowy egret, black skimmer, laughing gull, sandwich tern, least tern, foster's tern, royal tern, and northern gannet.  D34952; Tr. 1900 (Tunnell); TREX 013163.0106.

488.    Dr. Tunnell selected these 23 bird species for his population analysis based on which bird species were oiled and or died following the spill and adding additional species to

98

ensure representativeness of the analysis.  Tr. 1900-01 (Tunnell); TREX 013163.0060-.0061.

489.   For all 23 bird species Dr. Tunnell analyzed, the Christmas Bird Count and the Breeding Bird Survey data show that the *Deepwater Horizon* incident caused no significant impact to bird populations in the northern Gulf of Mexico.  D34933; Tr. 1911 (Tunnell); TREX 013163.0061.

490.   Dr. Tunnell's finding of no population impacts to birds from the *Deepwater Horizon* incident is consistent with government findings and reports.  Tr. 1907 (Tunnell).

491.   For example, Jack Bohannan, Refuge Manager for the Breton Sound National Wildlife Refuge stated that "2011 will go down as 'the most productive [year] since Katrina' for nesting. . . .'" D34955; Tr. 1907 (Tunnell); TREX 012628.

492.   A 2011 study comparing bird nests in oiled areas of Louisiana to bird nests areas in Louisiana with no oil found no differences in either the number of chicks or the size of chicks in these nests.  TREX 244053.0001.

493.   Dr. Boesch relied on papers authored by Haney et al. for his opinion that a substantial number of carcasses would not have been recovered as part of the response and NRDA processes.  Tr. 398 (Boesch); TREX 013183.0038 (citing Haney et al. 2014 and a New York Times article that mentions a second, forthcoming, Haney article).

494.   These papers are based on a beached bird model that relies on a number of assumptions which, if not accurate, would call into question the output of the model.  TREX 013165.0004.

495.   Assumptions in the Haney papers are based on data not specific to the Gulf of Mexico.  TREX 013165.0004.

496.   Dr. Boesch testified that he was not opining on the accuracy of the Haney study,

and that he could not "attest to all of the details" in the study.  Tr. 398 (Boesch).

497.    This failure to use data from the *Deepwater Horizon* spill results in the Haney model being fatally flawed.  Tr. 1910-11 (Tunnell).

498.    The conclusions of the Haney model are incompatible with the population data (which do not show significant adverse population impacts).  TREX 013164.0007.  Had the Haney model used site-specific data to model actual bird mortality, the results necessarily would have been significantly lower, in line with the population data.  TREX 013164.0008.

499.    Dr. Boesch admitted that he could not quantify the number of birds harmed as a result of the spill.  Tr. 462-63 (Boesch).

500.    Dr. Boesch did not perform an independent analysis of the Audubon Christmas Bird Count data, the North American Breeding Survey Data, or publicly-available NRDA bird oiling data.  Tr. 427 (Boesch).

### c.      Sea Turtles

501.    There is no evidence of population-level impacts to sea turtles as a result of the spill.  Tr. 1915-16 (Tunnell); TREX 013164.0012.

502.    Out of 536 sea turtles collected alive following the spill, 469 were rehabilitated and released back into the wild.  Tr. 456 (Boesch).

503.    Prior to a turtle's release into the wild, an assessment was made as to the health of the turtle and its ability to survive in the wild.  McNulty Dep. 76-77.  According to NOAA Administrator Jane Lubchenco, over 96% of these rehabilitated sea turtles have survived.  TREX 012080.0001; Tr. 1916 (Tunnell).

504.    Of the 613 sea turtles carcasses collected following the spill, only 18 were visibly oiled.  Tr. 458 (Boesch); Tr. 1916 (Tunnell); TREX 012078.

505.    A number of possible causes of sea turtle deaths are being investigated, including

fishing activities that resulted in turtle by-catch and harmful algal blooms.  Tr. 458 (Boesch);
TREX 013183.000019.  According to NOAA Administrator Jane Lubchenco, necropsies on sea
turtle carcasses indicate that a majority may have died in fishing gear, not from the spill.  TREX
012080.0001; Tr. 1916 (Tunnell).

506.    Administrator Lubchenco testified that "to our surprise, most of the dead stranded
sea turtles had no observable oil on their bodies and were in good health prior to their death."
TREX 012080.0001.  NOAA has also stated that sea turtle necropsy results indicate that a
significant number of stranded turtles in 2010 and 2011 likely perished due to forced
submergence (i.e., drowning), which is commonly associated with fisheries interactions.  TREX
012083.0002; TREX 012087.

507.    Dr. Boesch performed no analysis to quantify the number of sea turtles
supposedly oiled but not rescued.  Tr. 428 (Boesch).

### d.    Dolphins

508.    There is no evidence of significant adverse impacts to dolphin populations as a
result of the *Deepwater Horizon* incident.  Tr. 1915 (Tunnell); TREX 013164.0012.

509.    An unusual mortality event relating to marine mammals in the Gulf of Mexico
preceded the spill.  Tr. 391, 453 (Boesch); Tr. 1912-13 (Tunnell); TREX 013164.0009.

510.    No determination has been made that Macondo oil caused or contributed to the
deaths of any dolphins.  Tr. 454 (Boesch).

511.    Of the 157 dolphin carcasses collected following the spill, only 10 were visibly
oiled.  Tr. 452 (Boesch).

512.    Dr. Boesch did not review dolphin necropsy data even though it would be relevant
to assessing potential impact from the spill.  Tr. 392 (Boesch).  None of the 130 dolphin
necropsy records indicated that oil was the cause of death.  Tr. 1914 (Tunnell); TREX

013164.0009-.0010.

513.    The authors of the study relied upon by Dr. Boesch to allege actual impacts to dolphins in Barataria Bay (Schwacke et al.) could not rule out the possibility that other environmental stressors affected dolphins in that bay system.   Tr. 1913 (Tunnell); TREX 231481.000008.

514.    The authors of the study relied upon by Dr. Boesch to allege actual impacts to dolphins in Barataria Bay (Schwacke et al.) admitted that they "do not have health measures from before the spill to document whether or not there were preexisting disease conditions in Barataria Bay dolphins."  Tr. 1974 (Tunnell); TREX 231482.000002.

### e.    Deep Sea Corals and Other Bottom-Dwelling Organisms

515.    There is no evidence of significant adverse impacts to deep sea coral populations as a result of the *Deepwater Horizon* incident.  Tr. 1917 (Tunnell); TREX 013164.0012

516.    A 2012 study found that healthy coral communities were observed at all sites greater than 20 kilometers from the wellhead, including seven sites visited in September 2009 that appeared unchanged after the spill.   TREX 013195.0001; Tr. 447 (Boesch); Tr. 580 (Rice). Accordingly, the vast majority of coral communities in the region of the spill were not affected. Tr. 1917 (Tunnell); TREX 013164.0004.

517.    Dr. Boesch only claims injury to three coral sites resulting from the spill.  Tr. 445-46 (Boesch).  These sites at which injury to coral was observed were located relatively near the wellhead.  Tr. 1917 (Tunnell).

518.    As to one of these sites, in Lease Block 344, the authors of the study characterized the potential impact as "largely minor."  Tr. 448 (Boesch).  The authors also found that these colonies had potential impacts in only small areas.  Tr. 581 (Rice).

519.    A follow-up article regarding that site found that colonies with low levels of

flocculent material (an alleged indication of oil exposure) on their surface in 2010 were likely to exhibit complete recovery by March 2012.  TREX 231547.000003; Tr. 585 (Rice); Tr. 1918 (Tunnell).

520.    To the extent the phenomenon referred to as "marine snow" transported oil from the water column to the sea floor, this oil would be detected in the more than 8,000 sediment samples collected in the Gulf of Mexico as part of the *Deepwater Horizon* environmental investigation.  TREX 013445.0026-.0028.  The actual data show that the extent of potentially harmful levels of oil-related contamination on the sea floor was limited.  D34869A; Tr. 1668 (Shea); TREX 013444.0035-.0039.

521.    Furthermore, the same scientists Dr. Boesch relies upon for his marine snow theory found that Corexit 9500A, the dispersant applied during the spill response, "impeded the formation of microbial marine snow."  TREX 013193.0003 (authored by Passow et al.); TREX 013183.0017 (citing a paper by Passow et al. in support of marine snow theory).

### f.    Other Aquatic Resources

522.    Dr. Boesch acknowledges that sargassum, or floating seaweed, quickly recovered from any spill-related impacts.  Tr. 455-56 (Boesch); TREX 013183.0019.

523.    "Follow-up aerial surveys in 2011 and 2012 documented a four-fold increase in sargassum abundance over 2010 levels."  TREX 013183.0019.

524.    In September 2010, Dr. Brian Stacey, a NOAA veterinarian, was quoted as stating that "since mid-July, however, rescuers have found the sargassum mats not blackened but clean and teeming with food, and with them, turtles free of oil or so lightly oiled that they could be cleaned and released on the spot."  TREX 013276.0003.

525.    Dr. Boesch admits that to the extent there was any spill-related impact to plankton, "[p]lankton populations no doubt recovered within months, if not sooner."  Tr. 443

(Boesch); TREX 013183.0044.

### 3. The Gulf of Mexico is a Resilient Ecosystem that Includes Thousands of Naturally Occurring Oil Seeps and Oil-Consuming Bacteria.

526.   Based on an understanding of the type of oil spilled, the location of the spill, and the environment into which the oil was spilled, the fact that there was limited potential harm to the aquatic environment is not surprising.  Tr. 1639, 1661, 1685-90 (Shea).

527.   The Gulf of Mexico is well known to be a large, diverse and resilient ecosystem. D34934; Tr. 1865 (Tunnell); TREX 012485.1.1.BP (Admiral Austin stated that "[t]here is incredible resiliency to our environment.").

528.   The Gulf of Mexico has proven to be a resilient ecosystem that can quickly rebound after a disturbance.   Tr. 1866-67 (Tunnell).   This resiliency was shown when populations rebounded after the *Ixtoc* oil spill occurred in the Gulf of Mexico.   Tr. 1867 (Tunnell); TREX 13164.0011.

529.   This resiliency helps explain why no significant population impacts have been observed in the Gulf of Mexico following the *Deepwater Horizon* incident.  Tr. 1867 (Tunnell).

530.   The type of oil released from the Macondo well was a light Louisiana crude oil that contains a smaller proportion of the heavy chemical compounds that would be expected to persist in the Gulf environment.  Tr. 421-22 (Boesch).

531.   Natural processes transformed, diluted, degraded, and evaporated the oil compounds.  Tr. 421 (Boesch); Tr. 484 (Rice).

532.   There are somewhere between 600 and a few thousand naturally occurring oil seeps that have been leaking oil into the Gulf of Mexico for millions of years.  D34011.1; Tr. 1686 (Shea); Tr. 369 (Boesch).  It has been estimated that 1,500 and 3,800 barrels of oil seep into the Gulf of Mexico on a daily basis.  Tr. 413 (Boesch).  Up to 1.387 million barrels of oil flow

into the Gulf every year from natural seeps.  Tr. 413 (Boesch).  *See* BPXP Proposed Findings of Fact ¶¶ 193, 208.

533.    These natural seeps have created a hydrocarbon ecosystem in which bacteria have evolved to consume this oil through a process known as biodegradation. Tr. 371 (Boesch); D34011.1; D34879; Tr. 1686 (Shea).

534.    These hydrocarbon-consuming bacteria exist throughout the Gulf of Mexico and at all water depths.  Tr. 415-416 (Boesch); Tr. 1686 (Shea).  These bacteria consume both the oil and the oil-related chemicals, including PAHs.  D34011.1; D34879; Tr. 1686 (Shea).  The by-products of that consumption are carbon dioxide and water.  D34879; TREX 013444.0059.  As such, the biodegradation process not only removes oil from the environment, but it also reduces the toxicity of the remaining oil.  D34879; Tr. 1687 (Shea).  These bacterial colonies proliferated quickly following the spill.  Tr. 414 (Boesch).

535.    The conditions under which the oil was released from the Macondo wellhead resulted in the formation of smaller droplets of oil.  Tr. 414 (Boesch).

536.    Smaller droplets of oil have a larger surface area, providing such bacteria a greater opportunity to consume hydrocarbons and increasing the rate of biodegradation.  Tr. 415 (Boesch).

537.    The Gulf of Mexico is a temperate and tropical warm water habitat.  D34934; Tr. 1865-66 (Tunnell).  Warm water temperatures, like those found in the Gulf of Mexico, allow biodegradation to happen more rapidly.  Tr. 1866 (Tunnell).

538.    Dilution particularly occurs in an open and dynamic system like the Gulf of Mexico.  D34011.1; Tr. 1688 (Shea).  Dilution is one of the natural processes that helped reduce the concentration of oil-related chemicals to levels that were below EPA aquatic toxicity

thresholds in most of the Gulf.  D34011.1; Tr. 1687-88 (Shea).

539.    As the oil traveled toward the shoreline it continued to be subject to biodegradation.  Tr. 415 (Boesch).  Oil on the surface was also subject to photodegradation, a natural process that can break down certain compounds into small compounds.   Tr. 419 (Boesch).

540.    These natural processes, which are collectively referred to as weathering, transformed, diluted, degraded, and evaporated components of the hydrocarbons. Tr. 421 (Boesch).  Biodegradation, dilution and weathering all remove oil from the environment.  Tr. 1688-89 (Shea).

541.    The toxicity of weathered oil is significantly less than fresh oil because weathering drastically reduces the concentration of potentially toxic chemicals in the oil. D34011.1; Tr. 1689 (Shea).

542.    The United States' experts, Dr. Boesch and Dr. Rice, have alluded to comparisons between environmental impacts observed after the *Exxon Valdez* oil spill and potential environmental harm resulting from the *Deepwater Horizon* incident, including through discussion of the crash of Pacific herring populations that occurred in Prince William Sound four years after the *Exxon Valdez* oil spill.  Tr. 344 (Boesch); TREX 013330.0017, .0022, .0030; TREX 013183.0008, .0041, .0042, .0044.

543.    However, Dr. Rice admitted that "we don't know one way or the other" whether this crash of Pacific herring populations was oil-related.   Tr. 586-87 (Rice); TREX 013332.000016.

544.    Furthermore, there are many important differences between the circumstances of the *Deepwater Horizon* incident and the *Exxon Valdez* oil spill that are relevant to the extent of

potential environmental harm.  TREX 246024.

545.    For example, Dr. Boesch admitted that a smaller portion of the components in *Deepwater Horizon* oil (as compared to *Exxon Valdez* oil) would be expected to persist in the environment.  Tr.  422 (Boesch).

546.    A recent study found that the impacts from the *Deepwater Horizon* oil spill to birds, turtles, and marine mammals were "considerably less" than from the *Exxon Valdez* oil spill.  TREX 246024.0005.   In addition, the authors found that "commercial landings data suggest that a majority of its fisheries [in the Gulf of Mexico] were on the way to recovery just one year after the spill, if not earlier."  TREX 246024.0009.

547.    The *Exxon Valdez* oil spill resulted in more miles of shoreline oiling (approximately 1,300 miles) than did the *Deepwater Horizon* incident (approximately 1,100 miles).  TREX 013183.0013.

548.    During and after the *Exxon Valdez* spill, over 35,000 bird carcasses were collected, but during and after the *Deepwater Horizon* spill, roughly an order of magnitude fewer bird carcasses were collected: 2,600 oiled bird carcasses, and another 1,300 with no indication of oiling were collected.  TREX 013163.000059.

### 4.    The Robust Shoreline Response Program Limited the Impact to the Shoreline.

#### a.    The Shoreline Response Program Dramatically Reduced the Level of Oiling on the Gulf Coast.

549.    The level of shoreline oiling dropped precipitously by fall 2010 and continued to decline, and the marshes experienced substantial recovery.  *See generally* TREX 013246 (Taylor Expert Rpt.).

550.    By October 2010, areas of "Heavy" oiling had dropped to almost 1% of the shorelines surveyed.  Tr. 1792-93 (Taylor).  By December 2010 there were only 26.2 miles of

heavily or moderately oiled beach shoreline.  Tr. 1797 (Taylor); D34336; TREX 013246.0044.

551.   One year after the spill, 88% of the shoreline surveyed was categorized as "No Oil Observed" and most of the shoreline with some degree of oiling fell into the "Trace" category.  D34320; Tr. 1793-96 (Taylor).

552.   By May 2012, approximately two years after the spill, over 90% of the shoreline surveyed was categorized as "No Oil Observed," only .1% was categorized as "Heavy," and most shoreline that still had some degree of oiling fell into the "Trace" oiling category.  Tr. 1793 (Taylor).

553.   Much of the oil remaining two years after the spill was located in areas where additional cleanup would not result in a net environmental benefit or where the shoreline cleanup endpoints had been met.  TREX 012199.0005; Michel Dep. 116.

554.   By May 2014, the degree of oiling on the Gulf shoreline was "very, very sparse" and in the "Trace" oiling category.  Tr. 1794-95 (Taylor).  By the summer of 2014, the Gulf shoreline was "very comparable" to "pre-spill conditions in the Gulf"—"[f]or all intents and purposes, the shorelines are back at pre-spill use and pre-spill conditions."  Tr. 1795 (Taylor); D34338; D34336.

> **b.      Residual Oiling is Non-Toxic and Will be Limited and Discreet in the Future.**

555.   The Unified Command, with BPXP's support and participation, implemented comprehensive programs to effectively locate and, where feasible, remove residual oil.  TREX 013246.0033-.0042 (Taylor Expert Rpt.); Michel Dep. 89-90.  Nonetheless, there may be limited and discreet instances in which residual oil is remobilized onto the Gulf Coast shoreline.  Tr. 1354 (Folse).  In those instances, there is a plan in place to remove the oil.  Tr. 1354 (Folse).

i.      Government reports have determined that residual oil is non-toxic and presents a low level of risk to wildlife and humans.

556.    On February 10, 2011, the FOSC released the "Summary Report for Fate and Effects of Remnant Oil in the Beach Environment" ("OSAT-2").  OSAT-2 was chartered to provide the FOSC with a risk-based net environmental benefits analysis associated with removing remnant oil from the nearshore, surf zone, and shoreline sandy beach areas.  TREX 012238.0002 ("OSAT-2").  According to NOAA Administrator Jane Lubchenco, OSAT-2 was based on the best available science.  Lubchenco Dep. 203.

557.    OSAT-2 reported that short and long-term exposure to petroleum residues on sand beaches in the Gulf of Mexico would not result in unacceptable human health risks and that calculated potential cancer and non-cancer health effects from such exposure were below acceptable health-based risk and hazard levels set by the EPA.  TREX 012238.0003-.0022 (OSAT-2).

558.    OSAT-2 also concluded that the environmental effects of the residual oil remaining on sand beaches in the Gulf of Mexico are relatively minor, especially when considering the pre-spill background of shoreline oiling, and that continued cleanup to a higher degree would be expected to result in an increasingly greater extent of negative impact to habitats and associated resources.  TREX 012238.0033-.0035 (OSAT-2).

559.    The U.S. Coast Guard represented to the public that residual oil was non-toxic. Hein Dep. 161-62.  For example, in July 2011, the FOSC informed the Attorneys General for the Gulf States that submerged oil mats "pose a minimal toxicity threat, if any, to human health" or "to aquatic invertebrates and fish."  TREX 012187.000002; Tr. 1786 (Taylor); *see also* TREX 013330.0021 (Dr. Rice also admitted that "heavily weathered tar balls are nearly inert.").

ii.      Residual oil deposits are isolated, discreet, and limited.

560.   Starting in July 2010, SCAT and Operations teams successfully worked to locate and mitigate residual oil, including Subtidal Oil Mats, Small Surface Residue Balls, and Supratidal Buried Oil.  TREX 013246.0037.  By the end of 2012, over 180,000 pits, trenches, and auger holes had been used to search for buried oil for removal.  TREX 013246.0037.

561.   As cleanup operations progressed in 2011 and 2012, shoreline responders found that certain shorelines experienced chronic remobilization of residual oil (*i.e.*, a beach would be clean one week and have tar balls on it the next).  BPXP proactively proposed an integrated, scientific investigation of the source of the residual oil deposits.  Tr. 1339-40 (Folse).  BPXP proposed this effort in order to expedite cleanup of residual oil.  Tr. 1341 (Folse).

562.   BPXP's proposal resulted in the third Operational Science Advisory Team ("OSAT-3").  Tr. 1340 (Folse); D34531; D34533A; D34536A.  The FOSC chartered OSAT-3 in May 2012 to evaluate the presence of residual oil along the Gulf Coast, including oil that might remain buried in discrete locations.  Tr. 1335 (Folse); TREX 011826.0005 (OSAT-3).

563.   The OSAT-3 team used advanced technology to identify areas of interest where oil might be buried and took steps to remove deposits, where appropriate.  Tr. 1342-44, 1347-1348 (Folse).  The Buried Oil Project was established to recover, where practicable, potential buried oil deposits identified by OSAT-3.  In Louisiana, the Buried Oil Project team dug 1,594 auger holes and 6,477 Snorkel SCAT pits to investigate.   TREX 013016.0034.   Another subsurface effort—the Louisiana Augering and Sequential Recovery program—involved drilling 14,459 auger holes at specific shoreline locations in Louisiana to locate and remove mixed materials that were potentially buried under sand.  TREX 013016.0034.  At sites where oil exceeded cleanup endpoints, the material was recovered and removed.  TREX 013246.0041.

564.   BPXP supported the OSAT-3 investigation by providing experts, response

110

personnel, and specialized computer equipment.  Tr. 1341-42 (Folse).

565.   Two OSAT-3 reports were issued, one for the Eastern States (Mississippi, Alabama and Florida), and one for Louisiana.  Tr. 1340 (Folse); TREX 11826.0001, .0073 (OSAT-3).

566.   On January 15, 2014, the FOSC released the "Investigation of Recurring Residual Oil in Discrete Shoreline Areas in the Eastern Area of Responsibility" (OSAT-3, Eastern States). OSAT-3 Eastern States reported that there were only "isolated and identifiable areas where submerged or buried oil deposits may remain" and the frequency and intensity of residual oil remobilization will dissipate over time.  TREX 011826.0008, .0067 (OSAT-3).

567.   In February 2014, the FOSC released the "Investigation of Recurring Residual Oil in Discrete Shoreline Areas in Louisiana" (OSAT-3, Louisiana).  OSAT-3 Louisiana documents the extensive activities undertaken to locate, delineate, and remove residual oil from the Louisiana shoreline.  TREX 011826 (OSAT-3, Louisiana).

568.   OSAT-3 Louisiana likewise found that there were only "isolated and identifiable areas in segments evaluated by OSAT-3 where submerged or buried oil deposits may remain." TREX 011826.0082 (OSAT-3).

569.   Based on the extensive work and data collection performed under the direction of the U.S. Coast Guard, BP's Executive Vice-President of Response and Environmental Restoration, Laura Folse, has no concern about oil washing in from the offshore to the shoreline. Tr. 1354 (Folse).

570.   While there may be some buried oil deposits in the nearshore that have not been fully eroded, they are likely to be small in size and heavily weathered.  Tr. 1354 (Folse).  In the event that such a deposit is exposed and reaches the shore, BPXP stands "ready and resourced to

respond very quickly at the direction of the Coast Guard."  Tr. 1354 (Folse).

### c.     The Marshes Have Experienced a Rapid and Substantial Recovery.

571.    Due to mitigation efforts and natural processes, a vast majority of marshes in the Gulf were not impacted by the oil spill.  A maximum of 86 miles of marsh shoreline was characterized as having some heavy oiling.  Tr. 1798 (Taylor); D34338.  By October 2010, that figure was down to 24.1 miles, and by May 2012 there were only 1.2 miles of marsh shoreline that were heavily oiled.  Tr. 1798 (Taylor); TREX 013251.0011; D34338.

572.    Along most marshes, oil typically spread into the marsh no more than about 10 or 15 meters and "[i]n marshes, the emulsified oil pooled on the surface with little penetration into the marsh soils."  TREX 012199.0008; Michel Dep. 223, 226-27, 235; TREX 013004; Tr. 1824, 1831-32 (Taylor); Tr. 1364 (Folse).

573.    Dr. Taylor, BPXP's shoreline expert, analyzed a substantial amount of data in order to assess the impacts to and recovery of the marsh habitat where oil reached the shoreline.  TREX 013246.0047 (Taylor Expert Rpt.).  Dr. Taylor reviewed the SCAT data, the data from a cooperative work plan developed by the NRD trustees and BP, as well as data collected by researchers from LSU.  TREX 013246.0047-.0048.  In contrast, Dr. Boesch did not conduct any independent analysis of the impacts to or recovery of the marshes.

574.    The vast majority of the oiled wetland shoreline (83%) had a maximum oiling level of Moderate, Light, Very Light, or Trace.  Dr. Taylor determined that for oiled wetlands in these categories, the vegetation was generally undistinguishable from non-oiled areas within a year.  Tr. 1800 (Taylor); TREX 013246.0048, .0052; TREX 012484.1.3.BP (according to Admiral Austin, "The marshes will recover . . . [a]fter a year or so, you can't even tell there was

112

ever any oil there.")

575.     Dr. Boesch agrees that marsh grass vegetation largely recovered within 18 months under low to moderate oiling.  TREX 013183.0033.

576.     The marsh shoreline that was initially categorized as "Heavy" oiling decreased rapidly from a maximum of 86.1 miles to less than 15 miles by October 2010.   TREX 013246.0052 (Taylor Expert Rpt.)   For wetlands with a maximum oiling level of Heavy, the vegetation at most of those sites appears to be recovering over time and, with the exception of a few of the more persistently heavily oiled sites, appear to be comparable or near the vegetation level of background sites.  TREX 013246.0052-53 (Taylor Expert Rpt.).

> ### d.     There Is No Evidence that Oiling Resulted in Accelerated Marsh Erosion

577.     Dr. Taylor assessed data on marsh erosion to determine whether oiled marsh sites had eroded more quickly than unoiled sites.  TREX 013247.0010 (Taylor Expert Rpt.).

578.     Dr. Taylor's analysis did not reveal any clear relationship between oiling and erosion.  Tr. 1801 (Taylor); TREX 013247.0010-.0012 (Taylor Expert Rpt.).  According to Dr. Taylor, "the available data indicate that lightly, moderately, and the majority of heavily oiled sites do not differ from unoiled sites with regard to erosion."   TREX 013247.0011 (Taylor Expert Rpt.).

579.     A 2013 study of 10 sites found that there was no statistically significant difference in erosion rates at heavily oiled and non-heavily-oiled sites, at least for the first two years following the spill.  TREX 231455.000005, .000007.

580.     Any erosion that may have resulted directly from the spill is of very limited extent relative to background erosion rates.  TREX 013247.0012 (Taylor Expert Rpt.).

**B.      There Is No Evidence of Significant Adverse Human Health Effects Resulting from the *Deepwater Horizon* Incident and Future Adverse Health Effects Are Highly Unlikely.**

581.    Dr. Robert Cox, BPXP's human health expert, analyzed publicly available data and information to reach conclusions regarding potential human health effects following the *Deepwater Horizon* oil spill.  TREX 013085.0008-.0009.  Dr. Cox, a board-certified medical doctor and toxicologist, has decades of experience evaluating the health of and potential health effects on Gulf residents through his work as an emergency room physician, the Director of Mississippi's Poison Control Center, and the Director of Medical Toxicology Service at the University of Mississippi Medical Center.  TREX 013085.0005.

582.    Dr. Cox found no compelling evidence of any significant adverse effects either in cleanup workers or in Gulf Coast residents as a result of potential inhalational, dermal, or oral exposures to chemicals of concern associated with the *Deepwater Horizon* incident.  D35105; Tr. 1437 (Cox); TREX 240110.0007.  Dr. Cox also concluded that it is "highly unlikely that any adverse health effects will become manifest . . . in the future."  D35105; Tr. 1437 (Cox); TREX 240110.0007.  "There is no scientific evidence relevant to this oil spill to support concerns that either Clean-Up Workers or Gulf Coast Residents will suffer any future adverse health effects resulting from any exposures associated with the DWH oil spill."  TREX 240110.0007.

583.    Dr. Cox conducted extensive analysis to reach his conclusions.  He reviewed and analyzed publicly available human exposure and environmental sampling and monitoring data.  D35108; Tr. 1449 (Cox).  His work involved the evaluation of over 1.4 million data analyses.  D35270; Tr. 1452 (Cox); TREX 240110.0027-.0028.  Dr. Cox reviewed hundreds of publicly available reports and other information from state and federal government agencies, officials, and entities, and from other scientists and scientific organizations.  TREX 240110.0079-.0091.  He also reviewed health surveillance monitoring results, which monitored for various types of

health complaints or illnesses along the Gulf Coast, to corroborate his opinions regarding potential health effects.  D35108; Tr. 1446-47, 1449 (Cox).

584.    Dr. Cox also performed a toxicological risk assessment to evaluate potential health effects from inhalational exposures.  D35108; Tr. 1449; TREX 240110.0009-.0010.  A toxicological risk assessment is necessary to analyze potential health risks resulting from any inhalational exposures.  Tr. 1454 (Cox).  Dr. Cox is the only expert in this case who conducted a toxicological risk assessment to evaluate potential human health risks.  Tr. 1454 (Cox).

### 1.    There Is No Evidence of Significant Adverse Health Effects Resulting from Potential Inhalational Exposures.

585.    Regarding inhalational exposures, Gulf Coast residents and cleanup workers were not exposed to oil or dispersant constituents or other *Deepwater Horizon*-associated chemicals of concern at levels that would be expected to result in any significant adverse health effects. D35113; Tr. 1465 (Cox); TREX 240110.0007.  If Gulf Coast residents were exposed to any such chemical airborne concentrations, it was only at or below levels typical of outdoor ambient air concentrations and less than indoor air concentrations found throughout the United States. TREX 240110.0007.

586.    In evaluating inhalational exposures, Dr. Cox followed the standard approach to toxicological risk assessment that is used in the United States.  Tr. 1455-56 (Cox).  This approach was developed by the National Research Council 30 years ago and is still used by the Environmental Protection Agency today.  TREX 240110.0009.

587.    Dr. Cox's work accounted for the four steps to toxicological risk assessment: (1) hazard identification; (2) dose-response assessment; (3) exposure assessment; and (4) risk characterization.  D35109; TREX 240110.0009.

588.    At the beginning of the *Deepwater Horizon* response, federal agencies and BPXP

performed the hazard identification step when designing programs to monitor potential exposures of cleanup workers and Gulf Coast residents to specific chemicals of concern. TREX 240110.0009.

589.    Prior to the *Deepwater Horizon* spill, various scientific organizations and federal agencies had already performed the dose-response assessment in developing toxicology benchmarks for chemicals of concern in both oil and dispersants. D35109; TREX 240110.0009. Benchmarks are health-protective screening levels developed by federal agencies and scientific organizations, below which no adverse health effects are expected. D35140; Tr. 1502 (Cox); TREX 240110.0020-.0024.   Occupational benchmarks are set at levels protective of worker health, assuming exposures to chemicals of concern 40 hours a week, over a 30- to 40-year working lifetime, and community benchmarks assume exposures to chemicals of concern for at least 1 year. Tr. 1456, 1462 (Cox). Dr. Cox relied on these benchmarks in conducting his risk assessment. D35109; TREX 240110.0020-.0021.

590.    Risk characterization, the final and critical step of a risk assessment, characterizes the potential for exposure-related health risks by considering the toxicity of chemical constituents and the level of exposure to those constituents. TREX 240110.0009.  Dr. Cox compared *Deepwater Horizon* exposure data to existing inhalational benchmarks. Tr. 1457-58 (Cox).   Measured chemical levels in the air following the *Deepwater Horizon* spill were significantly lower than established benchmark values. D35111A; D35112; Tr. 1460-64 (Cox). Median exposure levels were "almost uniformly . . . below the benchmarks" by a substantial amount. Tr. 1459 (Cox); D35110; TREX 240110.0027-.0048.

591.    Regarding Gulf Coast community air concentrations of chemicals of concern, compounds measured by EPA and BPXP "were extremely low—far below levels at which any

significant adverse health effects might be expected." TREX 240110.0042; D35111A; D35112. Many of these compounds were also two to three orders of magnitude below the benchmark levels. Tr. 1461 (Cox). For example, the median value for benzene for the EPA dataset was over 30 times lower than the toxicology benchmark. TREX 240110.0039; D35112. Using the ATSDR's conservative Chronic Minimum Risk Level (MRL) benchmark, the median results for toluene were more than 375 times lower than the benchmark. TREX 240110.0042. Of the eight different PAHs monitored and analyzed by the EPA, the median value for naphthalene was 1,000 times below EPA's benchmark, and the maximum values for each of the seven other PAHs were over 5,000 times lower than the EPA's benchmark Screening Levels. TREX 240110.0042; D35111A.

592.     Regarding air monitoring pertaining to potential occupational (response worker) exposures to chemicals of concern, Dr. Cox's evaluation of the NIOSH dataset revealed that "100% of the results for 11 compounds of interest and 1 mixture were all below OELs." TREX 240110.0033. As to dispersants, "analyses for 2-butoxyethanol in each of the three datasets showed that no sample exceeded any of the OELs for 2-butoxyethanol." TREX 240110.0034. Both BPXP and NIOSH monitoring data indicate that dispersant components were not present in the air at levels that might be expected to cause significant adverse health effects. TREX 240110.0034.

593.     Additionally, Gulf Coast residents and cleanup workers were potentially exposed to spill-associated chemicals of concern only for a matter of days, weeks, or months. Tr. 1462 (Cox). Thus, "[p]otential exposure levels were non-existent or extremely low, and any potential exposures would not have occurred over sufficient lengths of time, to have resulted in any injury." TREX 240110.0007.

594.    Given the limited duration of potential exposures, and because the data were far below benchmarks, there is not cause for concern about health effects from potential inhalational exposures.  Tr. 1462 (Cox).

### 2.    There Is No Evidence of Significant Adverse Health Effects Resulting from Potential Dermal Exposures.

595.    Regarding potential dermal exposures, "[t]he potential for significant dermal exposures to the components of crude oil and dispersants for Clean-Up Workers was small, and would be highly unlikely to result in any significant adverse health effects, especially given requirements for use of appropriate [personal protective equipment]."   TREX 240110.0007; D35146; Tr. 1480-81 (Cox).

596.    The risk to Gulf Coast residents was "small to non-existent because of the low concentrations of potentially toxic compounds in oil or dispersants that reached the Gulf Coast and the low probability for prolonged human skin contact with those compounds."   TREX 240110.0007; D35146; Tr. 1481 (Cox).   Intermittent dermal contact with weathered oil is unlikely to result in significant adverse health effects, particularly when good hygiene practices are utilized.   TREX 240110.0051.   Furthermore, cleanup workers were required to wear appropriate PPE in performing response-related work.   TREX 240110.0051.   Proper use of PPE "likely would have prevented any significant dermal exposures to the components of crude oil."   TREX 240110.0051.

597.    The oil from the Macondo well was Louisiana "sweet" crude, which is of low toxicity and which should cause no harm through short periods of dermal exposure.  D35115; Tr. 1472-73 (Cox).  As oil comes to the surface, volatile BTEX compounds are removed.  Tr. 1473 (Cox).  Additionally, the oil experienced weathering over the weeks to a month that it took to get to where the cleanup workers encountered it.  The weathering of this oil removed up to 88-96%

of the PAHs, which are the primary constituents of toxicological concern after the BTEX compounds have been removed.  Tr. 1473 (Cox).  By the time any oil finally reached the shore, the concentration of PAHs in the weathered oil was less than the concentration of PAHs allowed by the FDA in dandruff medications and shampoos for treating psoriasis.  Tr. 1473-74 (Cox).

### 3. There Is No Evidence of Significant Adverse Health Effects Resulting from Potential Oral Exposure.

598.    Regarding potential oral exposures, the potential for exposures in Gulf Coast residents was low to non-existent because of the low concentrations of potentially toxic chemical compounds in Gulf waters and because people do not drink seawater.  TREX 240110.0007. There is no evidence of long-term contamination of Gulf seafood given federal efforts with respect to seafood safety.  Following the spill, testing of seafood samples from areas open to fishing "showed no residual levels of oil contaminants, dispersants, or metals resulting from the DWH oil spill."  TREX 240110.0007.

### 4. The Findings of Federal and State Agencies, Entities, and Officials Corroborate Dr. Cox's Opinion Regarding Lack of Significant Human Health Effects.

599.    Several federal government agencies examined potential adverse health effects from the spill, including the United States Centers for Disease Control and Prevention ("CDC"), EPA, and FDA.  D35106; Tr. 1439-40, 1452 (Cox).

600.    These agencies' findings were consistent with Dr. Cox's findings.  D35106; Tr. 1439-40, 1452 (Cox).  For example, like Cox, both the EPA and the CDC concluded that there was no direct exposure to substances emitted from oil or dispersants at levels high enough to be expected to cause harm.  D35106.1; Tr. 1441 (Cox); Tr. 1480-82 (Cox).

601.    In addition to the federal agencies, each of the health departments from the four Gulf States, as well as their environmental departments, examined the health effects of the spill.

D35107; Tr. 1444-45 (Cox).  Like the federal agencies' findings, these state agencies' findings are consistent with Dr. Cox's findings.  Tr. 1445 (Cox).

### a.      CDC Health Surveillance

602.    For several months following the spill, the CDC, along with the Gulf States, conducted health surveillance across the Gulf region to track potential short-term health effects related to the *Deepwater Horizon* spill in the affected communities.  TREX 240306.0001; TREX 240227.0001.  "No trends in illnesses were identified by the multiple surveillance systems used." TREX 240227.0001.

603.    The CDC determined that the levels of VOCs in air sampled after the spill by environmental agencies were very low and not likely to result in any increased cancer risk or long-term health effects.  D35106.2; Tr. 1443-44 (Cox).  "[A]nalyses of environmental air samples for VOCs along the Gulf shore found air concentrations that would not likely result in long term health effects to residents of Gulf coast communities."  TREX 240227.0001.

604.    Health surveillance conducted by the CDC as well as the Louisiana and Mississippi Health Departments revealed no trends of public health concern related to the spill. D35117; Tr. 1448 (Cox).

### b.      CDC & EPA Independent Analysis of Environmental Sampling Data

605.    CDC's Environmental Health Team reviewed nearly 400 packages of data taken from environmental samples collected on the Gulf Coast at the request of the EPA.  CDC reviewed this sampling data to determine whether exposure to oil, oil constituents, or dispersants might cause short-term or long-term health effects.  The data included sampling results for air, water, soil/sediment, and waste oil samples (material actually reaching the beach or the marsh). CDC's review was one of multiple independent reviews of this EPA data.  TREX 012235;

D35257.

606.   CDC wrote: "[T]he samples collected in places where non-response workers would spend time showed none of those substances at levels high enough to cause long-term health effects."  TREX 012235; D35258.

607.   "Working separately, EPA and CDC came to the same conclusion—the agencies found no direct exposures to these substances at levels high enough to be expected to cause harm" to the public.  TREX 012235; D35258.

### c.      EPA Community Air Monitoring

608.   EPA monitored air quality at multiple sites along the Gulf Coast to see if spill-related pollutants were present in the air at levels that might cause health problems for people onshore in the Gulf region.  TREX 240159; D35282; D35283; Tr. 317-18 (Clapp).  These spill-related pollutants included those that can evaporate from fresh crude oil, those that can evaporate from weathered oil, those that could come ashore from burning oil out at sea, as well as chemicals in the dispersants used offshore.  TREX 240159; D35283.  EPA published the results of its findings online (last updated Thursday, February 14, 2013).  TREX 240159; D35282.

609.   EPA concluded: "Based on monitoring to date, EPA has not seen onshore levels of pollutants that are of significant concern for long-term health effects."  TREX 240159; D35284.

### d.      FDA Seafood Safety Analysis

610.   On January 20, 2012, the FDA Deputy Commissioner for Foods noted, "Yes, Gulf seafood is safe to eat, and it is safe to eat for everyone."  TREX 232432.0002; D35106.  He further acknowledged: "Given the low levels of PAHs we found, . . . someone could eat . . . 1,575 jumbo shrimp . . . 130 individual oysters . . . 18 8-ounce fish filets . . . every day for five years and still not reach the levels of concern."  TREX 232432.0001-.0002; D35106.  Deputy

121

Commissioner Taylor stated that the levels of concern established for seafood safety during the spill "are safe and protect the health of anyone who eats seafood, including children and pregnant women." TREX 232432.0002. Any PAHs detected during the second round of seafood testing were "100 to 1000 times below the levels of concern." TREX 232432.0001.

611.    A report issued by NOAA, the FDA, and the Louisiana State Health Officer also concluded that Gulf seafood was safe. D35141; Tr. 1478 (Cox); D35137; Tr. 1480 (Cox). This conclusion was based on extensive sampling and testing that allowed fishing areas to open only when every piece of seafood sampled passed both sensory and chemical testing. D35141; Tr. 1478 (Cox). The study found that seafood consistently tested 100 to 1,000 times lower than the safety thresholds established by the FDA for residues of oil contamination. D35141; Tr. 1478-79 (Cox).

### e.    OSHA Independent Air Monitoring

612.    OSHA is a federal government agency within the Department of Labor responsible for regulating workplace safety and health. Tr. 302-03 (Clapp).

613.    To determine whether workers were exposed to dangerous levels of toxic chemicals, OSHA conducted its own independent air monitoring, both onshore and on the cleanup vessels, and reviewed data from BP, EPA, and NOAA. TREX 012236; D35255. OSHA found: "No air sampling by OSHA detected any hazardous chemicals at levels of concern." TREX 012236; D35256.

### f.    OSAT Reports

614.    OSAT-1 noted that none of the 6,090 near-shore water samples collected during the response and considered for comparison to the EPA human health benchmarks exceeded the EPA benchmark for human health under the child swimmer scenario. TREX 012237.0023 (OSAT-1).

615.     The OSAT also noted that, in its testing of 508 offshore water samples and 4,121 deepwater water samples, none of specified offshore and deepwater water samples showed exceedances of the EPA benchmark for human health.  Tr. 1475-77 (Cox); TREX 012237.0028, .0035, .0043 (OSAT-1).

616.     OSAT-2 evaluated whether there were potential human health risks associated with residual supratidal buried oil, small surface residual balls, or submerged oil mats following the *Deepwater Horizon* incident.  TREX 012238.0002 (OSAT-2).

617.     OSAT-2 concluded that the calculated potential cancer and non-cancer health risks from short and long-term exposures to weathered MC-252 oil were below the EPA's acceptable health-based risk and hazard levels.  TREX 012238.0003 (OSAT-2).

618.     OSAT-2 noted that the procedures used in the screening risk assessment likely overestimated the risk rather than underestimated any public health threat.  TREX 012238.0022-.0023 (OSAT-2).

> **g.**     **Reports by Louisiana Department of Health and Hospitals and Louisiana Department of Environmental Quality**

619.     The Louisiana Department of Health and Hospitals' surveillance, which monitored seven New Orleans hospitals, revealed no increase in asthma and upper respiratory symptoms compared to the three prior years.  D35117; Tr. 1448 (Cox).

620.     As to inhalational exposures, the Louisiana Department of Environmental Quality ("LDEQ") conducted daily ambient air monitoring for chemicals of concern.  TREX 2240362.0001; D35107.

621.     As of July 13, 2010, LDEQ found, "Monitoring data has not shown any exceedances of any state or federal air quality standards since the oil spill began."  TREX 240362.0001; D35107; Tr. 1445-46 (Cox).

622.    In evaluating seafood safety, the Louisiana Department of Health and Hospitals found: "Of 1550 seafood samples . . . any chemicals detected were below levels that could potentially threaten the public's health."  TREX 232452.0001; D35107.

### h.    Mississippi State Department of Health Surveillance

623.    In September 2011, health surveillance results reported by the Mississippi State Department of Health found "no increases attributable to oil in the monitored illnesses in the coastal area over the time of the spill."  D35107.2; Tr. 1446 (Cox).

### i.    Florida Department of Environmental Protection Air Quality Status

624.    The Florida Department of Environmental Protection published an Air Quality Status Report on July 16, 2010, in which it reported results from air monitoring along the Gulf Coast.  FDEP found that "[o]zone and particle data are consistent with typical values that occur during this time of year and no obvious influence due to the oil spill is evident."  TREX 240124.0001.  FDEP also found: "None of our monitoring data would indicate that they pose a significant health threat.  Data from the DEP monitoring network are not showing any abnormal results at this time."  TREX 240124.0001.

### 5.    The United States Has Failed To Establish Any Significant Adverse Human Health Effects.

625.    The United States has failed to establish any significant adverse health effects in either response workers or Gulf Coast community members as a result of the *Deepwater Horizon* incident or response.  Tr. 1437 (Cox); Tr. 301, 324 (Clapp).

626.    Dr. Richard Clapp, the United States' expert on the health impact of the *Deepwater Horizon* incident, acknowledges that he has ***no information or data*** that ***any*** short-term or long-term health effects for ***any*** population were actually "caused by exposure to any toxins or chemicals associated with the *Deepwater Horizon* incident."  Tr. 301, 324 (Clapp).

124

627.   Although Dr. Clapp testified that he saw evidence of short-term "acute respiratory effects," such as coughing or wheezing, he acknowledged that these symptoms could be caused by factors other than exposure to oil and oil constituents.  Tr. 300 (Clapp).  Similarly, although Dr. Clapp testified that he saw a reference in materials that he reviewed to "acute dermatological effects," such as skin rashes, he acknowledged that such effects could likewise be caused by factors other than oil and oil constituents.  Tr. 301 (Clapp).  In making these acknowledgments, Dr. Clapp again conceded that he "did not look at what caused those specific illnesses or effects."  Tr. 301 (Clapp).

628.   Dr. Clapp testified that he was not opining "that we will see long-term human health effects as a result of exposure to chemicals or toxins associated with the *Deepwater Horizon* spill."  Tr. 324 (Clapp).  Dr. Clapp's position is that we ***may*** see long-term human health effects.  Tr. 324 (Clapp); TREX 013346.000003.  Dr. Clapp also testified, however, that it was "[c]orrect" that, "four and a half years after the incident," there is so far no evidence of any long-term effects in any population as a result of chemical exposures associated with the *Deepwater Horizon* incident  Tr. 324 (Clapp).

629.   Although Dr. Clapp points to a recordable injury and illness report and other injury rosters as evidence of the number of injuries and illnesses that occurred during the *Deepwater Horizon* response (TREX 013346.0007-0008; TREX 012020), Dr. Clapp acknowledged that he was not offering any causal opinions in this case "[w]ith respect to individuals and individual symptoms."  Tr. 295-96 (Clapp); TREX 013348.000005.  Specifically, Dr. Clapp acknowledged that he is not offering any opinions concerning any "causal link" between symptoms reported by cleanup workers or Gulf Coast residents and potential exposures to oil, dispersants, or their constituents.  Tr. 295-96 (Clapp).  Furthermore, injury rosters like

those relied upon by Dr. Clapp do not attempt to diagnose any injuries or illnesses as being related to chemical exposures, nor do they contain numbers of injuries or illnesses that would be unexpected in any occupational environment of the size of the *Deepwater Horizon* response. TREX 012241.0002.

630.    Dr. Clapp placed undue reliance on the results of a "convenience survey" of reported health effects discussed in NIOSH HHE Interim Report #9.  Tr. 1467-69 (Cox).  This questionnaire passed out to a number of response workers only discusses certain "irritant symptoms," and cannot speak to the cause of any irritant symptoms reported.  Tr. 1468-70 (Cox); D35145.  Further, this convenience survey suffers from a number of serious flaws; for instance, it purports to catalog certain acute respiratory effects, but does not control for cigarette smoking. Tr. 1470-71 (Cox).

631.    Dr. Clapp acknowledged that the measured air concentrations of specific chemicals sampled during the response were "relatively low."  Tr. 296 (Clapp).  Even with the measured air concentrations being relatively low, he acknowledged that steps were taken to limit the human health impact on response workers.  Tr. 296-97 (Clapp).

632.    Unlike Dr. Cox, Dr. Clapp is not a medical doctor, is not licensed to evaluate or treat patients for medical conditions, and is not board-certified in any medical specialty.  Tr. 276 (Clapp).  Also unlike Dr. Cox, Dr. Clapp is not a toxicologist.  Tr. 276 (Clapp).

633.    During the response, over 1.4 million data analyses regarding potential exposures to chemicals of concern were collected by BPXP and federal agencies and made public. D35270.  Despite the existence of this extensive sampling and monitoring dataset, Dr. Clapp did not conduct a toxicological risk assessment using any of this data.  Tr. 281-85 (Clapp).  Dr. Cox, by contrast, performed a comprehensive risk assessment based on his review of these 1.4 million

data analyses.  Tr. 1452 (Cox).

634.    Instead of relying on the *Deepwater Horizon* sampling and monitoring dataset, Dr. Clapp's opinions, as set out in his initial report, are based on his review of "documents provided to me by attorneys of the U.S. Department of Justice and my review of a summary of a June 2010 workshop at the Institute of Medicine."  Tr. 289 (Clapp); TREX 013346.000006.

635.    The studies of prior oil spills discussed in the Institute of Medicine summary were all surface spills, not underwater spills.  Tr. 294 (Clapp).  Dr. Clapp fails to recognize the differences between these other spills and the *Deepwater Horizon* oil spill with respect to the potential for human exposures and the weathering of the oil.  TREX 240111.0006.  He also does not consider that these spills involved vastly different types of oils.  TREX 240111.0006.  Dr. Clapp did not study what effect weathering of MC-252 oil had on the potential for harm or impact to human health.  Tr. 295 (Clapp).

### 6.    Any Mental Health Impact in Gulf Coast Communities Is Limited and Not Attributable Solely to the *Deepwater Horizon* Incident.

636.    The term "disasters" refers to a broad category of events, and that broad category refers to large-scale events with a potential for harm.  TREX 233241R.000004.  The *Deepwater Horizon* incident fits the broad definition of disaster.  TREX 233241R.000005.  However, the term "disaster" does not imply impact.  The term is not diagnostic and does not indicate judgment about the impact of the event.  TREX 233241R.000057-.000058.

637.    Studies showing an association between increased depression, anxiety, and post-traumatic stress disorder among populations that experienced natural disasters such as hurricanes and earthquakes or manmade disasters such as the 9/11 terrorist attacks have overstated a disaster's psychological cost.  TREX 013365.0001.

638.    Among the relatively clear conclusions about the psychological parameters of

disasters are that disasters cause serious psychological harm in a minority of exposed individuals, and disasters produce multiple patterns of outcome, including psychological resilience.  TREX 013365.0001.

639.   Psychological resilience in the aftermath of disasters describes a stable pattern of positive adjustment and health over time and is typically the most common outcome trajectory observed.  TREX 013370.0004.

640.   Patterns of psychological adjustment, including not only resilience but also delayed symptoms, elevations, and chronicity should be measured in oil spills, but patterns found in studies of other disasters indicate only that we should look for these patterns in oil spills.  The previous studies do not offer a concrete prediction of what might happen in oil spills but rather that these patterns can happen in the aftermath of disasters and should be looked for in studies of other disasters.  TREX 233241R.000045-.000047

641.   Common psychological outcome trajectories that have been found in other disasters do not predict outcome trajectories for any particular event, and there is enough variability across events that every event needs to be studied in its own right.   TREX 233241R.0061.  The *Deepwater Horizon* incident needs to be studied in its own right in order to draw conclusions about outcome trajectories following that event.   TREX 233241R.000062-.000063.

642.   There are a number of socioeconomic factors, including primarily loss of income and support systems, that affect public health, and specifically the mental health of community members in the aftermath of any event affecting the stability of a given community.  TREX 240110.0007.

643.   The *Deepwater Horizon* oil spill occurred only five years after Hurricanes Katrina

and Rita and on the heels of the financial/housing crisis of 2008-2009.  TREX 240110.0007.

Many communities in the Gulf region had not fully recovered by 2010 when the *Deepwater Horizon* oil spill occurred.  There is no direct and exclusive causal relationship between the socioeconomic conditions following the *Deepwater Horizon* oil spill and adverse public and mental health effects within a population of Gulf Coast residents.  TREX 240110.0072.

### C.  Economic Effects of the Spill Were Not Uniform or Evenly Distributed Across the Gulf Coast and Were Followed by Swift Recovery.

644.  The economic effects of the spill on the Gulf Coast region varied significantly. Tr. 2035 (Scott); TREX 013067.0003-.0005, .0023, .0029-.0038 (Scott Expert Rpt.); TREX 013069.0007-.0010 (Scott Expert Rpt.); TREX 013118 (National Bureau of Economic Research and Harvard Kennedy School of Government 2014 study by Dr. Joseph Aldy analyzing labor market impacts of the spill, spill response, and moratorium).

645.  In some places, the spill response spending and influx of response and cleanup workers resulted in net positive effects for tourism-related businesses, such as hotels.  Tr. 2035, 2066-67 (Scott); TREX 013067.0023, .0029-.0038 (Scott Expert Rpt.); TREX 013069.0007-.0010 (Scott Expert Rpt.); TREX 013118 (Aldy Study); *see also* BPXP Proposed Findings of Fact ¶¶ 321-327.

646.  In other places, there were negative economic effects of the spill in both tourism and commercial fishing, but in those areas, for both industries, the effects were short-lived and recovery was robust.  Tr. 2035-37 (Scott); TREX 013067.0004-.0005, .0023, .0029-.0038 (Scott Expert Rpt.); *see also* BPXP Proposed Findings of Fact ¶¶ 295-297, 312-313.

647.  Independent analysis of the impact of the spill, spill response, and moratorium on Gulf Coast labor markets concluded that, while some places experienced net positive employment and wage increases and some places experienced net declines, there was no net loss

of employment in 2010 in the Gulf States in the aggregate.  Tr. 737, 739 (Mason); TREX 013118.0005 (Aldy Study); D34803; TREX 013069.0009-.0010 (Scott Expert Rpt.); *see also* BPXP Proposed Findings of Fact ¶¶ 321-327.

### 1. The Spill's Effects on Tourism Businesses in the Gulf were Short-Lived and Followed by Robust Tourism Growth.

648.    Due largely to a large influx of response and cleanup workers, there was a significant 15% increase in Revenue Per Available Room ("RevPAR") in coastal parishes of Louisiana in 2010 compared to the same months of 2009.  Tr. 2045-48 (Scott); D34786.1; TREX 013067.0035-.0038 (Scott Expert Rpt.) (containing analysis of Smith Travel Research RevPAR data, the "gold standard" for measuring tourism activity).

649.    There was no net loss in tourism industry revenues in the New Orleans area, as hotel RevPAR in 2010 was 17% higher than in 2009 and by 2013 RevPAR exceeded the pre-spill 2009 level by 52%.  TREX 013067.0036 (Scott Expert Rpt.).

650.    In Louisiana's coastal parishes, RevPAR continued to grow robustly every year through 2013 such that 2013 RevPAR was 44% higher than the pre-spill 2009 level.  Tr. 2048 (Scott); D34786.1; D34793; TREX 011877 (describing 2011 as a "banner year" for New Orleans); TREX 013067.0035-.0038 (Scott Expert Rpt.); *see also* BPXP Proposed Findings of Fact ¶¶ 293-297 (describing the mitigating impact of BPXP tourism promotion grants on recovery and growth of Gulf Coast tourism).

651.    The results in Louisiana are consistent with those of Mississippi and Alabama coastal counties.  Tr. 2050 (Scott).  In coastal Mississippi counties, 2010 RevPAR was higher than its 2009 level, and there was an increase in tourism-related expenditures in 2011.  Tr. 2047-50 (Scott); TREX 013067.0033-.0035 (Scott Expert Rpt.).  In the coastal counties of Alabama (Mobile and Baldwin Counties), RevPAR for hotels was more than 37% higher in May-October

2010 than in the same months of 2009, reflecting the mitigating impact of spill response workers. Tr. 2054-56 (Scott); D34789.1; TREX 013067.0029-.0032 (Scott Expert Rpt.).

652.    The Florida Panhandle and the Orange Beach, Gulf Shores, and Fort Morgan areas of coastal Alabama experienced short-term decreases in RevPAR during the summer of 2010, indicating losses of tourism activity, but the declines in RevPAR lasted only until September 2010, when RevPAR exceeded pre-spill 2009 levels.  Tr. 2050-54 (Scott); D34787.1; D34787.2; TREX 013067.0024-.0025, .0028-.0029 (Scott Expert Rpt.).

653.    The short term losses in the summer of 2010 for the Florida Panhandle and Orange Beach, Gulf Shores, and Fort Morgan, Alabama are reflected in lower average annual RevPAR for these areas in 2010 compared to 2009, but RevPAR grew significantly in 2011, 2012, and 2013, demonstrating "very strong, robust recovery."  Tr. 2057-58 (Scott); D34788; TREX 013067.0025, .0028-.0029 (Scott Expert Rpt.).  The 2013 hotel RevPAR in the Florida Panhandle coastal counties was 27% higher than in 2009.  TREX 013067.0025 (Scott Expert Rpt.); D34788.

654.    These RevPAR results are consistent with other economic data showing an almost identical pattern of short-term losses in the summer of 2010 followed by rapid growth above 2009 levels and continued growth after 2010.  Tr. 2111-13 (Scott); TREX 013067.0031-.0032 (Scott Expert Rpt.) (citing a 6% increase in average annual visitation to the Alabama Gulf Coast in 2011 over the 2005-2009 average and a 16% increase in visitor spending over 2009, in addition to a 16% increase in taxable lodging revenue in Gulf Shores and Orange Beach in 2012 over 2011 and a 27% increase in taxable retail sales in 2013 over 2009).

655.    Dr. Scott's econometric analysis of RevPAR demonstrates that RevPAR was significantly higher in the Louisiana, Alabama, and Mississippi coastal counties in the months of

2010 following the spill, consistent with the influx of spill response and cleanup workers in many areas. TREX 013073.0022-.0023 (Scott Expert Rpt.). There was no systematic or statistically-significant impact on RevPAR in the Florida Panhandle either negatively or positively in 2010. *Id.*

656. This econometric analysis of the RevPAR data also proved that tourism in coastal Alabama, Louisiana, Florida Panhandle, and Florida non-Panhandle Gulf counties did not experience a statistically significant long term impact due to the spill. TREX 013073.0022-.0023 (Scott Expert Rpt.).

657. United States' expert Dr. Mason does not dispute the RevPAR data presented by Dr. Scott. Tr. 755-56 (Mason).

658. Similarly, these conclusions by Dr. Scott are corroborated by the United States' 30(b)(6) witness Dr. Harry Luton, who testified that "[t]he [tourism] industry across the Gulf was doing very well in 2011 and, in some places, it was their best year," and this continued into 2012. Luton Dep. 156-57; Tr. 2061-62 (Scott); D34812.

659. In addition, the BOEM Social Effects Report commissioned by the United States government documented that tourism figures at the end of 2011 were up 51% in Alabama and 7% in Mississippi over 2010 and that individuals interviewed for the report believed this improvement was due to BPXP's tourism grants and the other money BPXP had given to the states that had been passed on to the local communities. Tr. 234-36 (D. Austin); TREX 011923.0092; D35323; D35324.

## 2. Gulf Commercial Fishing Recovered by 2011-2012.

660. Federal data publicly available from NOAA shows that the average annual commercial fishing revenue for the period 2007-2009 for Gulf landings in Louisiana, Alabama, Mississippi, and Florida was $430.7 million. TREX 013067.0018-.0019 (Scott Expert Rpt.); Tr.

2068-69 (Scott); D34795.1.

661.    By comparing this average annual commercial fishing revenue from the period before the spill ($430.7 million) to the total 2010 industry revenue for the same states and species, the NOAA data shows that commercial fishermen incurred a gross revenue decline in 2010 of $111.8 million.  TREX 013067.0018-.0019 (Scott Expert Rpt.); Tr. 2069-70, 2073-74 (Scott); D34795.1; Tr. 760-61 (Mason).

662.    Publicly available data from NOAA shows that in 2011 and 2012 the volume of seafood caught by commercial fishermen recovered.  Tr. 2071-84 (Scott); TREX 013067.0018-.0020, .0039-.0041 (Scott Expert Rpt.); D34802.  In the case of shrimp and blue crab, the volume in 2012 was almost back to where it was prior to the spill.  *Id*.  In the case of finfish, the volume caught in 2012 was *higher* than the average annual volume caught in the 2007-2009 period, while oyster volumes were below the 2007-2009 average annual volume.  *Id*.

663.    When compared to the long-term pre-spill trend from 1999 to 2009, commercial fishing volumes in 2011 and 2012 show that there was no long-term decline in Gulf seafood harvesting after 2010.  Tr. 2074 (Scott).  Shrimp, blue crab, and oyster volumes in 2011 and 2012 were not statistically different from the long-term trend for each of those species.  Tr. 2074-80 (Scott); TREX 013073.0007-.0011 (Scott Expert Rpt.); D34804.2; D34805.  Finfish volumes in 2011 and 2012 were statistically significantly higher than the long-term trend.  Tr. 2074-80 (Scott); TREX 013073.0007-.0011 (Scott Expert Rpt.); D34804.1; D34805.

664.    NOAA data on commercial fishing revenues also confirms that Gulf commercial fishing had recovered fully by 2011-2012.  Tr. 2081 (Scott); TREX 013067.0040-.0041 (Scott Expert Rpt.); D34806.  In 2011, the total values of shrimp, blue crab, and finfish landings were *higher* than the 2007-2009 average annual values for those species by 8.9%, 11.4%, and 12.4%,

respectively.   Tr. 2081-82 (Scott);  TREX 013067.0040-.0041 (Scott Expert Rpt.); D34806. Shrimp, blue crab, and finfish revenues continued to grow in 2012, exceeding 2011 revenue levels.   Although the value of oyster landings was lower in 2011 than the average during the 2007-2009 period, oyster revenues were only 5.2% less. TREX 013067.0041 (Scott Expert Rpt.); D34806.

### 3.   Dr. Austin's Opinions on the Spill's Social Effects Are Limited to Short-Term Qualitative Effects in Only Five Communities.

665.   Dr. Diane Austin's reports and the Bureau of Ocean Energy Management (BOEM) Social Effects Report look only at the range of short-term effects of the spill and response. Tr. 195, 199 (D. Austin).  Dr. Austin and her researchers were only in the field from April 2010 to January 2012.  Tr. 195, 199-200 (D. Austin).  March 2012 was the last time Dr. Austin collected any data used in forming her opinions about the spill's effects.  Tr. 199-200 (D. Austin).  She has not conducted any interviews nor analyzed any data since early 2012.  Tr. 200 (D. Austin).

666.   For some topics, Dr. Austin stopped collecting data even earlier.  Tr. 201 (D. Austin) (acknowledging that the data on which she based her opinions on tourism went through September 2011 only).

667.   Dr. Diane Austin's opinions are based on a qualitative approach, not quantitative research.  Tr. 162, 197-98 (D. Austin).  Her report is not an econometric study of the spill's effect on Gulf Coast communities.  Tr. 196-97 (D. Austin).  Nor was the study designed to collect quantitative data.  Tr. 162-63, 198 (D. Austin).  At no time did Dr. Austin quantify how many people were affected by the spill.  Tr. 199 (D. Austin).

668.   While Dr. Austin testified that qualitative research data is generalizable across places and time as long as conditions are the same, she acknowledged that conditions in the

tourism industry, seafood industry, oil and gas industry and the shipyard industry change on an annual basis and that she did not look at any data beyond 2012 to determine how these industries changed.  Tr. 202-05 (D. Austin).

669.    Dr. Austin's opinions rely on a study that was conducted in only five small case study communities.  Tr. 163-64, 205-08 (D. Austin) (Bayou La Batre, Alabama; East Biloxi, Mississippi; Central Plaquemines Parish, Louisiana; Larose, Louisiana; and Dulac, Louisiana). The study did not address the impacts of the spill in large inland areas or on large corporations whose offices and decision makers are located outside of the region but which operate in the Gulf of Mexico.  Tr. 205-08 (D. Austin).

670.    Dr. Austin has no opinions about the impact of the spill on the State of Florida. Tr. 203 (D. Austin).

671.    While Dr. Austin agreed that income-level was a relevant consideration for her study, she acknowledged that the study did not collect individual household income level data. Tr. 209 (D. Austin).  Although Dr. Austin's study also interviewed some individuals more than once, it is impossible to decipher how many people were interviewed more than once.  Tr. 210 (Dr. Austin).

## IV.    THE ECONOMIC IMPACT OF THE PENALTY ON THE VIOLATOR.

### A.    BPXP Is the Violator.

672.    This Court is required to consider "the economic impact of the penalty on the violator" when assessing a CWA penalty against a defendant.  33 U.S.C. § 1321(b)(8).  As the United States has stated, under the "economic impact" factor, the CWA penalty should be reduced if it would have a "significant impact" on BPXP.  U.S. Mem. on the Burden of Proof for the Penalty Factors In Section 311(b) of the Clean Water Act at 8-9 (Mar. 10, 2014), Rec. Doc. 12479 ("The burden of proof is on a violator who seeks a reduction of its penalty based on the

economic impact of the penalty on its operations, and the Defendant must show a significant impact.") (summarizing cases).

673.     It is undisputed that the only alleged "violator" within the BP Group in this CWA proceeding is BPXP.  The United States' expert has acknowledged that BPXP is the sole BP entity named as a CWA defendant, the entity that leased the Macondo well, and the entity named as the OPA Responsible Party by the Coast Guard.  Tr. 950-51 (Quivik).

674.     Further, the United States has acknowledged that it is seeking to hold liable only BPXP—and is not seeking to hold liable any other BP Group entity, either directly as a named defendant or indirectly through a veil-piercing theory.  With respect to direct liability, the United States has stated that BPXP is "the liable party in this proceeding."  U.S. Mem. In Support of Plaintiff U.S.' Motion in Limine to Permit Relevant Evidence Concerning BP PLC and other BP Affiliates at 1 (Feb. 14, 2014), Rec. Doc. 12355-1; *see also* Tr. 1998 (Gladstein) ("And, Your Honor, the United States is not seeking to pierce the corporate veil here.  We've repeatedly said that.").

675.     BPXP is a wholly-owned indirect subsidiary of BP p.l.c.  TREX 012303A.0004, .0197.  It is the BP Group company that conducts exploration and production operations in the Gulf of Mexico.  TREX 012303A.0043.  BPXP holds approximately 85% of the BP Group's Gulf of Mexico assets.  TREX 013153.0012; TREX 013153.0096; TREX 246898.0006.

676.     BPXP cannot compel its parent companies to assist BPXP in paying a CWA penalty.  Tr. 1158 (Ratner); 1607-08 (Morrison).

677.     Regardless of the relationship between BP p.l.c. and BPXP, if a CWA penalty is levied upon BPXP beyond BPXP's own ability to pay (which is limited), and BPXP requests additional funding from its parent companies as a source of funds to pay such a penalty, BP p.l.c.

136

would have to consider whether an investment in BPXP to fund any CWA penalty levied against BPXP made economic sense.  TREX 013160.0005-.0006.

678.   Such an analysis would consider factors such as BPXP's projected financial performance, net present value, liabilities and its credit worthiness.  TREX 013160.0006.  A potential investor, such as BP p.l.c., would examine these factors, taking into account existing and contingent liabilities, before making a decision whether to invest in BPXP.   TREX 013160.0006.  An investor would want to understand whether sufficient cash flows or assets exist in BPXP in order to satisfy the existing and potential future liabilities of BPXP and still operate the business and its future plan (the source of those future cash flows); otherwise the loan or investment would fail to yield an adequate return, or any return at all.  TREX 013160.0006.  A potential investor (such as BPXP's parent companies) has fiduciary duties to its shareholders and so may therefore choose not to make a loan or other investment if it determined it was likely to yield a negative or otherwise subpar return.  Den Uyl Dep. 104-05.

679.   If the value of a CWA penalty plus such contingent liabilities (such as for NRD and OPA claims) exceeds the value of BPXP, a potential investor in BPXP (such as BP p.l.c.) would face a negative return on its potential investment.  TREX 013161.0008-.0009.

B.   The *Deepwater Horizon* Accident Has Had a Substantial Negative Economic Impact on BPXP.

1.   BPXP's Spill-Related Costs and Liabilities.

680.   BPXP was designated the responsible party by the United States on April 28, 2010.  TREX 241460.  BPXP accepted the designation on May 3, 2010.  TREX 240400.  As the Responsible Party, BPXP bore the vast majority of the costs arising from the *Deepwater Horizon* accident and oil spill.  Robertson Dep. 243, 245-46.

681.   Costs and activities associated with the response efforts were charged to BPXP as

137

"the specific entity that's accountable for that activity set."  Tr. 1388 (Utsler).  All of the costs incurred out of the Houma ICP were "captured and accounted for such that they could be charged back to BPXP."  Tr. 1388 (Utsler).  Response costs associated with "contractors, the federal government or state components of costs that were attributable to the response" were also tracked and accounted for to be "charged back" to BPXP.  Tr. 1388-89 (Utsler); *see also* Robertson Dep. 149-55.

> **a.     BPXP Has Incurred $40+ Billion in Gross Spill-Related Liabilities.**

682.    Excluding the provision for the CWA penalty, the liabilities incurred by BPXP fall into four general categories:  response costs, environmental costs, legal claims, and functional costs.  TREX 246896.

683.    To date, BPXP has paid $14.2 billion for relief wells, tourism grants, vessels, boom, contractor labor, sampling and testing associated with the spill response.  D34605; Tr. 1601-02 (Morrison).  The vast majority of that amount was paid in 2010.  Tr. 1602 (Morrison).

684.    To date, BPXP has paid $1.5 billion and incurred $3.2 billion in environmental costs associated with natural resource damage assessment, the Gulf of Mexico Research Initiative, and early natural resource restoration.  Tr. 1602 (Morrison).

685.    To date, $16.7 billion has been paid by BPXP for legal claims, and including provisions and scheduled payables for amounts not yet paid, the total liabilities recorded have been $23 billion.  Tr. 1602 (Morrison).

686.    Additionally, BPXP has paid approximately $1.2 billion in functional costs, which include the labor, contract, and overhead costs for the GCRO organization.  Tr. 1602-03 (Morrison).  The costs associated with the GCRO are paid by BPXP, not by another member of the BP Group.  Tr. 1613 (Morrison).

687.     Considering these four categories of Macondo-related costs, BPXP has already spent a gross amount of more than $33 billion arising from the Macondo accident.  Tr. 1145 (Ratner); TREX 246896.

688.     In addition to the amount already spent, in accordance with accounting standards, BPXP has also recorded approximately $8.7 billion in provisions for future expenditures (of which $3.51 billion is for CWA civil penalties) and $3 billion in scheduled payables.  TREX 246896.  Provisions are known liabilities for payments that will have to be made in the future. Tr. 1596 (Morrison).  Examples of such provisions include a portion of the amounts for the PSC class settlements.  TREX 246896.

689.     Including both amounts spent and amounts provisioned or scheduled as payables for future expenditures (but excluding contingent liabilities and the provision for CWA penalties, which are discussed below), BPXP's gross Macondo liabilities total approximately $42 billion. Tr. 1145 (Ratner); TREX 246896.

690.     BPXP's approximately $42 billion in gross Macondo-related liabilities are recorded on a schedule prepared by Mike Robertson, an accountant whose time is charged to BPXP.  Robertson Dep. 23-24, 244; TREX 246896.  The $42 billion total and the information underlying it are derived from a financial system (SAP), and it has been verified by a control process to make sure it ties back to a ledger.  Robertson Dep. 244.  As the United States' expert stated, "The amount spent is a significant number, under any measure."  Tr. 1145 (Ratner).

691.     These approximately $42 billion in gross liabilities were charged to BPXP because BPXP was the BP entity that owned the Macondo lease and was named as a Responsible Party related to the incident.  Robertson Dep. 244-45.

692.     BPXP has recovered approximately $6.3 billion through insurance and settlement

recoveries from Anadarko, MOEX, and others.  Tr. 1594-95 (Morrison); TREX 246896.  After subtracting the $6.3 billion in insurance and settlement recoveries from $42 billion, the total amount of net liabilities incurred by BPXP without including contingent liabilities or BPXP's provision for a CWA penalty ("BPXP's Net Incurred Liabilities") is $35.7 billion.  Tr. 1596 (Morrison).

693.    Under its November 15, 2012 plea agreement with the United States, BPXP agreed to "payment of criminal recoveries totaling $4 billion."  TREX 011422.0004.  Those payments include (1) "criminal fines" of $1.256 billion; (2) $350 million payable to the National Academy of Sciences ("NAS"); and (3) $2.394 billion to the National Fish and Wildlife Foundation ("NFWF").  TREX 011422.0004, .0035-.0038.

694.    Per the terms of the plea agreement, the $350 million payable to the NAS (of which $20 million had been paid through 3Q 2014) and the $2.394 billion to NFWF (of which $400 million had been paid through 3Q 2014) shall have no effect on and are not argued by BPXP to reduce in any way the amount of CWA penalties.  TREX 011422.0007.  Excluding the NAS and NFWF obligations, BPXP's Macondo gross liabilities total approximately $39.3 billion, including $33.3 billion paid to date, and its liabilities net of recoveries total approximately $33 billion, including approximately $27 billion paid to date.

695.    BPXP's Net Incurred Liabilities of $35.7 billion are pre-tax.  BPXP receives certain tax benefits from its Macondo payments.

696.    BPXP has recognized income resulting from tax benefits for spill-related spending, including $79 million for 2012, $35 million for 2013, and $182 million for the first nine months of 2014.  TREX 012678.0007; TREX 011965.0007; TREX 246898.0003.  The effective tax rate for BP p.l.c. is 35%.  TREX 012303A.0028.

**b.      BPXP's Spill-Related Contingent Liabilities.**

697.    There is a difference between provisions and contingent liabilities.  Provisions are liabilities of uncertain value and timing which are nonetheless probable and estimable.  Bucknall Dep. 291-92.  Contingent liabilities, by contrast, can be liabilities that are probable but that are not reliably estimable.  Bucknall Dep. 291-92.  Unlike in the case of provisions, for contingent liabilities (such as NRD claims and certain OPA claims) no amount of liability has been recorded on BPXP's balance sheet, because while it may be probable that BPXP will incur such a contingent liability, the amount of liability is not presently estimable.  TREX 246898.0006.

698.    BPXP faces the following spill-related contingent liabilities:

    a.  Natural Resource Damages claims that result from, amongst other items, the impact of the spill on the wildlife, shoreline, nearshore and deepwater habitats and recreational uses.  TREX 013153.0014.

    b.  Future business economic loss claims under the Economic and Property Damages Settlement Agreement that have not yet been received, processed, paid or otherwise provided for.  TREX 013153.0015.

    c.  Claims by the States of Alabama, Mississippi, Florida, Louisiana, and Texas, as well as hundreds of local government entities, for alleged losses under the Oil Pollution Act of 1990, including economic losses and property damage as a result of the *Deepwater Horizon* spill.  TREX 013153.0016-.0017.

    d.  Other *Deepwater Horizon*-related civil litigation against BPXP included among the approximately 2,950 civil lawsuits and possible further actions. These lawsuits assert claims for personal injury or wrongful death in connection with the accident and the spill response, commercial and

economic injury, damage to real and personal property, breach of contract and violations of statutes, including, but not limited to, alleged violations of U.S. environmental statutes.  TREX 013153.0017.

e.   Possible indemnity obligations that may arise under BPXP's various settlement agreements for claims related to the *Deepwater Horizon* spill, including those with MOEX Offshore 2007 LLC, Anadarko Petroleum Company, and Cameron International Corporation.  TREX 013153.0017- .0018.

f.   Other possible obligations that may arise in the future.   TREX 013153.0018.

699.    While the timing and/or amounts of these contingent liabilities are uncertain, they would be considered substantial risks to BPXP and its future financial condition by any future investors in BPXP.  TREX 013153.0018-.0019.  Those investors would weigh those contingent liabilities plus any CWA penalties against the value of BPXP.  These contingent liabilities, when they occur, will further undermine BPXP's financial condition and ability to pay its obligations to current and future creditors.  TREX 013153.0019.

700.    The costs incurred by BPXP to date have had a significant impact on BPXP's business.  Tr. 1604 (Morrison).  Before the incident, BPXP had free cash remaining after spending for its operations and capital expenditures.  Tr. 1604 (Morrison).

701.    BPXP paid dividends of $3.32 billion in 2007, $480 million in 2008, and $12.48 billion in 2009.  TREX 012792.  However, BPXP has paid no dividends since the 2010 incident. TREX 012792.

702.    After the spill, BPXP required infusions of capital to pay for Macondo-related

items plus liabilities incurred in the ordinary course of business.  Tr. 1604 (Morrison).  BPXP also has had to use cash from operations to pay spill-related costs.  Tr. 1605 (Morrison). Additionally, BPXP sold assets (thus reducing its hubs from eight to four), making it a smaller company.  Tr. 1604-05 (Morrison).

703.    BPXP does not have any plans for any new BPXP production centers to come online in the next three to four years.  Tr. 1585-86 (Morrison).

704.    BPXP's sale of assets is one factor contributing to the decline in BPXP's production since the incident.  BPXP's annual production of oil was 431,229 barrels of oil equivalent per day in 2009 and decreased to 378,960 barrels of oil equivalent per day in 2010. TREX 013162.0003-.0004.  BPXP's barrels of oil equivalent per day production of oil was 260,133 in 2011, 216,362 in 2012, 189,286 in 2013, and 259,519 in the second quarter of 2014. TREX 013162.0007-.0008.

### 2.    Injections of Capital into BPXP.

705.    There have been three main instances since 2010 when BPXP needed to raise equity or debt to satisfy its Macondo-related liabilities and other obligations incurred in the ordinary course of business.  D34606A; Tr. 1605-06 (Morrison).

### a.    BPXP IFA with NAFCO

706.    The first such instance was when, after incurring significant costs associated with the response, BPXP entered into an agreement in June 2010 with its affiliate North America Funding Company ("NAFCO") for a $5 billion line of credit.  Tr. 1606 (Morrison).  At the time BPXP entered into its credit agreement with NAFCO, the price of oil was approximately $75/bbl (WTI).  TREX 247625.

707.    BPXP does not have external bank accounts, but rather uses an internal bank account (also known as an Internal Funding Account ("IFA")) with NAFCO for both deposits

and interest-bearing borrowing.  TREX 13153.0009.  BPXP is obligated to repay its borrowings

from NAFCO with interest, Tr. 1607 (Morrison), and has been doing so since the incident.

708.    BPXP's borrowing from NAFCO at times exceeded $5 billion.  Under the terms

of the IFA agreement between BPXP and NAFCO, by permitting BPXP to borrow more than $5

billion, NAFCO did not waive its right to limit BPXP's borrowings in the future or to demand

repayment from BPXP.  Indeed, the agreement made clear that there would be no waiver of any

provision of the agreement unless made expressly and confirmed in writing.    TREX

012730.0018.  NAFCO presently has the right to limit BPXP's borrowings to $5 billion.  TREX

012730.0002 (§ 5, Borrowings Maximum).  NAFCO also currently has the right to terminate the

IFA agreement with three business days' notice.  TREX 012730.0004; Bamfield Dep. 35-36.

### b.        2012 Equity Injection from BP America Production Company

709.    The second instance since 2010 when BPXP needed to raise equity or debt was in

February 2012, when BP America Production Company provided an equity injection into BPXP

of nearly $14 billion.  Tr. 1606 (Morrison).  BP America Production Company was BPXP's

parent and sole common shareholder at the time of the equity injection.  TREX 013214.0009;

TREX 013214.0015.

710.    The fact that a shareholder has made equity injections in the past does not compel

it to do so in the future. TREX 013214.0023.  As explained by Professor Daines, if injecting

equity meant that a shareholder was compelled or expected to provide more equity in the future,

shareholders would be less likely to provide equity in the first place.  TREX 013214.0023.

711.    Instead, shareholders generally provide equity where the expected returns to the

shareholder at the time the investment is being considered outweigh the expected costs (*i.e.*,

where the investment has a positive net present value ("NPV")).  TREX 013214.0023.

712.    In February 2012, when BP America Production Company provided an equity

injection of nearly $14 billion to BPXP, the price of oil was over $100/bbl.  TREX 247625.

### c.    $3.1 Billion Loan from NAFCO

713.    The third instance since 2010 when BPXP needed to raise equity or debt was in January 2014 when BPXP took out an additional loan from NAFCO for approximately $3.1 billion.  Tr. 1606 (Morrison).  As part of its analysis before NAFCO provided this loan, BP Treasury assigned BPXP an indicative credit rating of BB / BB+, which is a sub-investment grade rating.  TREX 012439.0001.

714.    At the time of this January 2014 loan, the price of oil was approximately $95/bbl (WTI).  TREX 247625.

### d.    Outstanding Debt

715.    As of 3Q 2014, BPXP had outstanding debt owed to BP affiliates of approximately $4.7 billion.  TREX 246898.0004 (noting $1.289 billion in net Group funding to BPXP and $3.4 billion in Group finance debt).

### 3.    BPXP's Recent Financial Performance.

716.    As of 3Q 2014, BPXP's net cash provided by operating activities for 2014 was approximately $2.548 billion, without taking into account capital expenditures or any Macondo-related expenditures.  TREX 246898.7.4.BP; Tr. 1613-14 (Morrison).

717.    At that same time, BPXP's capital expenditures for 2014 were approximately $2.525 billion.  TREX 246898.7.4.BP; Tr. 1613-14 (Morrison).

718.    Since deepwater drilling is a capital intensive business, capital expenditures are necessary, and cutting back on capital expenditures would quickly cause reductions in production and operating revenue.  Tr. 1614 (Morrison).

719.    At the end of 3Q 2014, BPXP's net cash flow for the calendar year (defined as net cash provided by operating activities, minus capital expenditures, plus proceeds from disposals)

to date from BPXP's business was only $305 million, not counting Macondo-related expenditures.  TREX 246898.0007.

720.    Sales of BPXP assets during 2014 accounted for $282 million of that net cash flow.  TREX 246898.0007.

721.    Without sales of BPXP assets, BPXP's net cash flow for the first three quarters of 2014 would have been approximately $23 million, even without including Macondo-related expenditures.  TREX 246898.0007.

722.    If Macondo-related expenditures were included, BPXP's net cash flow for the first three quarters of 2014 would have been $87 million, and *negative* $195 million without sales of BPXP assets.  TREX 246898.0007.

### C.    An Additional CWA Penalty in Excess of $2.3 Billion Would Absorb All of BPXP's Available Cash in 2015 and Threaten Future Operations.

723.    R. Bruce Den Uyl is an expert in financial consulting and has been qualified as an expert in federal, state, and bankruptcy courts throughout the United States, where he has offered expert testimony relating to valuation.  TREX 013153.0002.  Mr. Den Uyl is a Managing Director with the professional services firm AlixPartners, LLP and has over 30 years of experience providing valuation and financial consulting to a diverse range of industries.  TREX 013153.0002.

724.    Mr. Den Uyl has analyzed companies' solvency for bankruptcy courts, including providing balance sheet solvency and analyses of companies' ability to pay and capital adequacy.  TREX 013153.0002.  He has acted as a consultant to companies for the purpose of establishing values for acquisitions and divestitures, including alternative transaction structures, and has participated in purchase price negotiations.  TREX 013153.0002.

725.    Based on his analysis, Mr. Den Uyl concluded that BPXP's ability to pay a CWA

penalty and other obligations related to the *Deepwater Horizon* incident is limited based on BPXP's existing access to capital and ability to generate additional capital from its operations. TREX 013153.0009.

726.    As of the third quarter of 2014, only about $3-4 billion was available to BPXP through its line of credit with NAFCO.  Tr. 1607 (Morrison).  As of the time of trial (January 27, 2015), Mr. Morrison testified that the amount available to BPXP through its line of credit was approximately $3 billion.  Tr. 1607 (Morrison).

727.    Other than its line of credit with NAFCO, BPXP does not hold any cash that is available to pay a CWA penalty.  Tr. 1117 (Ratner).

728.    Using cash flow projections for the BP Group's Gulf of Mexico operations that were prepared in the ordinary course of business, Mr. Den Uyl examined BPXP's projected cash flows and other resources available for paying a penalty.  TREX 013153.0010-.0012.  In his consideration of cash outflows relating to the incident, Mr. Den Uyl included only actual future environmental settlements and penalties which had been agreed to or settled to date in definitive agreements, while assuming no future CWA penalty or other contingent future liabilities.  TREX 013153.0011.  The Upstream Segment's Gulf of Mexico cash flow projections include forecasted results from 2014 to 2018.  TREX 013153.0011.  While those projections include estimates of future capital expenditures, the projected capital expenditures conservatively do not include substantial additional capital expenditures that may be incurred for future exploration and development of new resources as future discoveries are made.  TREX 013153.0011.

729.    Mr. Den Uyl's analysis of BPXP's available funds to pay a penalty is set forth in Table 5 to his initial expert report (TREX 013153.0013):

| BPXP Ability to Pay Analysis - $0 CWA Penalty | | | | | | | | | |
|---|---|---|---|---|---|---|---|---|---|
| ($millions) | | | | | | | | | |
| | | 2nd Half 2014 | | 2015 | | 2016 | | 2017 | 2018 |
| GOM Adjusted Operating Cash Flow | $ | 1,617 | $ | 3,735 | $ | 4,739 | $ | 5,193 | $ 5,500 |
| BPXP Ownership of GOM | | 85.9% | | 85.9% | | 85.9% | | 85.9% | 85.9% |
| BPXP Adjusted Operating Cash Flow | $ | 1,389 | $ | 3,206 | $ | 4,068 | $ | 4,458 | $ 4,722 |
| Incremental Interest Expense | | (48) | | (105) | | (106) | | (95) | (76) |
| Incremental Interest Expense Tax Benefit | | 18 | | 41 | | 30 | | 23 | 20 |
| BPXP Cash Flow from Operations | | 1,358 | | 3,142 | | 3,992 | | 4,386 | 4,665 |
| Investing Cash Flow (Capital Expenditures) | | (1,380) | | (3,116) | | (2,903) | | (2,117) | (2,216) |
| **Cash Flow Before Environmental Payments** | $ | **(22)** | $ | **26** | $ | **1,089** | $ | **2,268** | $ **2,449** |
| *Environmental & Penalty Payments* | | *(595)* | | *(530)* | | *(740)* | | *(1,209)* | *-* |
| **Net Change in Cash** | $ | **(617)** | $ | **(504)** | $ | **349** | $ | **1,059** | $ **2,449** |
| Cash Balance | $ | - | $ | - | $ | - | $ | - | $ 1,135 |
| IFA Availability | | 2,781 | | 2,277 | | 2,626 | | 3,686 | 5,000 |
| **Total Available Funds** | $ | **2,781** | $ | **2,277** | $ | **2,626** | $ | **3,686** | $ **6,135** |

730.    As shown in the "net change in cash" line in the table, BPXP is not expected to generate positive cash flow until 2016.  TREX 013153.0013.  In light of these projections, BPXP would have to draw an additional $1.1 billion on its line of credit with NAFCO by the end of 2015 (leaving it with a remaining $2.3 billion in available funds) to fund its operations and pay the fines and environmental penalties which have already been assessed, even without considering any CWA penalty or any contingent liabilities.  TREX 013153.0013.  Based on Mr. Den Uyl's analysis, a CWA penalty assessed in 2015 in excess of $2.3 billion would exhaust all of BPXP's available cash resources and result in a funding shortfall.  TREX 013153.0014.

731.    Mr. Den Uyl's $2.3 billion calculation utilized projections for 2015 cash flows that were based on $100 per barrel oil prices, and thus will be negatively impacted by lower revenue from lower oil prices in 2015, holding all else constant.  TREX 247596.0003.  At the time of Mr. Den Uyl's analysis resulting in the $2.3 billion calculation, the spot price of crude oil (WTI) was $97.30 per barrel, which is approximately twice today's closing price of $49 (WTI).

148

TREX 247625.

732.    In assessing BPXP's total available funds in 2015 ($2.3 billion), Mr. Den Uyl utilized the adjusted Gulf of Mexico projection prepared in the ordinary course of business, which underpinned information presented publicly to investors.  TREX 013161.0013.

733.    As part of the planning process of the Gulf of Mexico business, the projections prepared by regional management are reviewed at the Upstream level and adjusted as part of the evaluation and consolidation of the various Upstream operations worldwide.    TREX 013161.0013.

734.    Within the Upstream segment, the reservoir development function is responsible for the stewardship of the BP Group's resource portfolio.  TREX 013161.0013.  This function applies its technical analysis and judgment to the regional projections of production and adjusts those projections accordingly.  TREX 013161.0013.

735.    The cash flow projections from the Gulf of Mexico business were reduced by the Upstream to reflect the Upstream's view, based on the Upstream Segment's technical assessment regarding production, that the Gulf of Mexico business's forecasted increases in production may not be feasible.  TREX 013161.0013.

736.    Even if Mr. Den Uyl had utilized the unadjusted projections, BPXP would be projected to have $2.5 billion in available funds at the end of 2015, rather than $2.3 billion as included in Mr. Den Uyl's Initial Report.  TREX 013161.0014.

737.    Mr. Ratner agreed that, if the GOM cash flow projections were adjusted to reflect BPXP's portion of the GOM, the Segment overview adjustment in 2018, and BPXP's known liabilities to the United States under the criminal plea and to NAFCO for its term loan (due January 2016), then BPXP's actual net cash flow would be -$577 million in 2014, -$184 million

in 2015, and -$1.817 billion in 2016 – see table below showing Mr. Ratner's projections reflecting these payments.  Tr. 1174-77 (Ratner); D35460.



**United States of America v. BP Exploration & Production, et al.**
**Gulf of Mexico Cash Flow Projections**

Table 17
Gulf of Mexico Cash Flow Projections 2014-2018 [1] (Dollars in Millions)

| Description | 2014 | % | 2015 | % | 2016 | % | 2017 | % | 2018 | % |
|---|---|---|---|---|---|---|---|---|---|---|
| Total Production (mboed) [2] | 211 | | 240 | | 287 | | 302 | | 322 | |
| Gross Margin (Segment Revenues) | $ 6,196 | 100.00% | $ 7,239 | 100.00% | $ 8,860 | 100.00% | $ 9,556 | 100.00% | $ 10,449 | 100.00% |
| Operating Costs | (2,225) | -35.91% | (2,041) | -28.19% | (2,113) | -23.85% | (2,140) | -22.39% | (2,396) | -22.93% |
| Interest Paid | (27) | -0.44% | (27) | -0.37% | (27) | -0.30% | (27) | -0.28% | (27) | -0.26% |
| Change in Working Capital | (181) | -2.92% | 3 | 0.04% | 3 | 0.03% | 3 | 0.03% | 3 | 0.03% |
| Corporation Taxes Paid | (529) | -8.54% | (1,155) | -15.96% | (1,130) | -12.75% | (1,088) | -11.39% | (1,243) | -11.90% |
| Operating Cash (Post Tax) | 3,235 | 52.21% | 4,019 | 55.52% | 5,593 | 63.13% | 6,305 | 65.98% | 6,787 | 64.95% |
| Investing Cash Flow (CAPEX) | (3,215) | -51.89% | (3,630) | -50.15% | (3,381) | -38.16% | (2,466) | -25.81% | (2,581) | -24.70% |
| Net Cash Flow | $ 20 | 0.32% | $ 389 | 5.37% | $ 2,212 | 24.97% | $ 3,839 | 40.17% | $ 4,206 | 40.25% |

*Handwritten annotations: "11% PLEA LOAN SEGMONT", "-2", "-595", "-577", "-43", "-530", "-184", "-243", "-740", "-3100", "-1817", "-422", "-1209", "2208", "-463", "-1287", "2496", "D35460"*

Notes
[1] Source: Gulf of Mexico Segment Operating Projections; Bates # BP-HZN-2179MDL08942839-08942843. The underlying information associated with this table was produced in connection with the deposition of Mr. Bucknall taken on July 2, 2014.

[2] mboed = thousand barrels of oil equivalent per day.

738.    While Mr. Ratner testified that BPXP could fund or finance and pay a CWA penalty up to the maximum amount, Mr. Ratner acknowledges that he did not "do anything to determine whether doing so would allow BPXP to still remain solvent."  Tr. 1204 (Ratner).

739.    Mr. Ratner also acknowledged that he had conducted solvency analyses in other cases and that these analyses typically require a valuation of other prospective contingent liabilities faced by the company.  Tr. 1204 (Ratner).

> **D.    Analysis of BPXP's Credit Metrics Indicates That BPXP Would Likely Be Rated Below Investment Grade Even Prior to the Imposition of a CWA Penalty.**

740.    As explained in Mr. Den Uyl's report, prudent investors would analyze the impact of any CWA penalty or existing or potential contingencies on the financial health of BPXP before providing capital to BPXP to enable it to satisfy a CWA penalty.  TREX 013153.0020.

741.    A credit rating analysis is a well-accepted form of such financial analysis and, in the case of BPXP, demonstrates BPXP's already-weakened financial position, as well as the significant negative financial impact that such future penalties and other contingencies would have on BPXP. TREX 013153.0020.

742.    Credit ratings such as those issued by Moody's Investor Service ("Moody's") and Standard & Poor's Ratings Services ("S&P") are used by investors to judge the credit worthiness of a debt issuer. TREX 013153.0020.

743.    Credit ratings fall into one of two categories: (1) investment grade or (2) speculative or below-investment grade. TREX 013153.0020. As shown in Table 7 to Mr. Den Uyl's expert report, BPXP's projected 2015 credit metrics are consistent with a below-investment grade (or "junk") rating (TREX 013153.0022):

| BPXP Credit Analysis - Assuming a $0B CWA Penalty | | | | |
|---|---|---|---|---|
| | Return on Capital | EBIT Interest Coverage | FFO to Debt | Debt to Capital |
| **BPXP Credit Statistic** | 10.7% | 4.5x | 26.2% | 61.5% |
| **Industry Medians:** | | | | |
| A | 13.3% | 7.8x | 68.8% | 33.8% |
| BBB | 11.0% | 4.5x | 42.8% | 38.6% |
| BB | 9.7% | 3.8x | 49.4% | 45.0% |
| B | 8.3% | 2.5x | 23.8% | 51.9% |
| CCC | 8.4% | 1.3x | 12.7% | 84.0% |

744.    S&P and Moody's view the "Funds from Operations to Debt" or "FFO to Debt" ratio as the most important ratio in terms of looking at the financial risk of a company because it looks at not only the level of indebtedness of the company but also at the cash generation that a company has to enable it to repay debt. Bamfield Dep. 240. BP p.l.c. regards it as "the most critical financial ratio used by the rating agencies." TREX 013002.0001. As shown above, BPXP's financial health, as measured by this metric, places it nearest to a B rating.

745.    A prudent potential investor in BPXP would also consider that oil companies are

exposed to a range of risks, including oil price volatility.  TREX 013153.0023.  A significant decline in oil price, such as the one that took place after Mr. Den Uyl's initial report, results in additional downward pressure on the credit rating of oil companies.  At the time of Mr. Den Uyl's August 2014 credit analysis, the spot price of crude oil (WTI) was $97.30 per barrel, which was 111% higher than it was just before trial on January 12, 2015.  TREX 247625.

746.    As discussed above at paragraph 713, BPXP was assigned a "speculative" grade credit rating at the time of its January 2014 term loan from NAFCO.

747.    The decrease in oil prices in the second half of 2014 reduced investors' appetite for energy investments, including high-yield energy company bonds, and speculative-grade-energy interest rates have expanded dramatically in recent months.   TREX 247596.0003.  Between August 15, 2014 and the end of 2014, the U.S. Energy High Yield Index spread over U.S. Swap rates increased from 4.35% to 9.23%, an increase of well over 100% in such speculative-grade-bond spreads.  TREX 247596.0003.

748.    Mr. Ratner testified that the recent decline in oil prices has made it more difficult for BPXP to get a loan from a third party than it would have been in July 2014.  Tr. 1128 (Ratner).

749.    In addition, Mr. Den Uyl's August 2014 credit analysis excludes the impact of a CWA penalty as well as the spill-related contingent liabilities discussed above.   TREX 013153.0023.  Such liabilities would further deteriorate BPXP's financial condition and its resulting credit metrics.  TREX 013153.0023.

### E.    BPXP's Equity Value at the Time of Trial Was Approximately $5 Billion, Excluding Consideration of a CWA Penalty or BPXP's Contingent Liabilities.

750.    As discussed above, BPXP's equity value is highly relevant to the economic impact factor.  If BPXP needs equity or debt to fund a judgment, potential investors will weigh

(1) BPXP's value against (2) the size of the CWA judgment plus contingent liabilities (such as NRD and various OPA claims) to be borne by BPXP.  If the size of the CWA judgment plus such contingent liabilities exceeds BPXP's equity value, such a potential investment would yield a negative return.  TREX 013161.0009-.0010.

## 1.    Wood Mackenzie's GOM Valuation.

751.    Wood Mackenzie is a well-established research and valuation firm in the oil and gas field.  TREX 013153.0024.  Its research includes a valuation of the BP Group's Gulf of Mexico ("GOM") business.  TREX 013153.0024.

752.    As Mr. Ratner testified, before making an investment decision of the magnitude required to fund a CWA penalty, a creditor or investor would likely obtain Wood Mackenzie's research and analysis or that of a similar third party market research firm to assist in its own evaluation of the BPXP business.  TREX 013153.0024; Tr. 1184 (Ratner).

753.    Mr. Ratner admitted that the Wood Mackenzie material upon which Mr. Den Uyl relied in making his valuation of BPXP is one of the due diligence items that an investor or lender would use.  Tr. 1184 (Ratner).

754.    Mr. Ratner further agreed that members of the industry rely on Wood Mackenzie in evaluating the value of assets in the oil and gas industry.  Tr. 1184 (Ratner).

755.    Mr. Ratner does not disagree with any of the valuations presented in the Wood Mackenzie materials regarding individual assets in the Gulf of Mexico.  Tr. 1184 (Ratner).

756.    Wood Mackenzie examined the value of the BP Group's GOM region by aggregating individual values for each of the GOM's significant business assets, which are oil fields.  TREX 013153.0024.

757.    Each individual valuation by Wood Mackenzie projected the oil field's production, revenue (based on Wood Mackenzie oil price estimates), capital expenditures,

certain operating expenses, and taxes in order to arrive at cash flow.  TREX 013153.0024.

758.   The key facts for Wood Mackenzie's analysis of the Kaskida field are shown below.  TREX 240841; D35454.  As shown below, Kaskida is not projected to begin producing until 2019,  but Wood Mackenzie nevertheless included it in its analysis:



| Year | Production | | Gross | Op | Capital | Royalty | State | Federal | Total Field |
|---|---|---|---|---|---|---|---|---|---|
| | Liquids 000b/d | Gas mmcfd | Revenue US$M | Costs US$M | Costs US$M | US$M | Taxes US$M | Tax US$M | Cash Flow US$M |
| 2016 | 0.0 | 0.0 | 0.0 | 0.0 | 572.2 | 0.0 | 0.0 | 0.0 | -572.2 |
| 2017 | 0.0 | 0.0 | 0.0 | 0.0 | 1,305.3 | 0.0 | 0.0 | 0.0 | -1,305.3 |
| 2018 | 0.0 | 0.0 | 0.0 | 0.0 | 1,147.4 | 0.0 | 0.0 | 0.0 | -1,147.4 |
| 2019 | 4.8 | 2.4 | 168.1 | 26.7 | 783.9 | 0.0 | 0.0 | 0.0 | -642.4 |
| 2020 | 27.8 | 13.9 | 985.1 | 87.2 | 641.9 | 0.0 | 0.0 | 0.0 | 255.9 |
| 2021 | 32.1 | 16.1 | 1,160.2 | 98.3 | 516.9 | 0.0 | 0.0 | 0.0 | 545.0 |
| 2022 | 35.1 | 17.5 | 1,293.6 | 106.9 | 445.2 | 0.0 | 0.0 | 0.0 | 741.5 |
| 2023 | 38.3 | 19.1 | 1,438.7 | 116.2 | 454.1 | 0.0 | 0.0 | 0.0 | 868.4 |
| 2024 | 39.7 | 19.9 | 1,522.7 | 121.8 | 633.9 | 0.0 | 0.0 | 28.8 | 738.2 |
| 2025 | 40.4 | 20.2 | 1,580.9 | 125.9 | 621.7 | 0.0 | 0.0 | 281.5 | 551.9 |
| 2026 | 41.7 | 20.8 | 1,663.3 | 131.5 | 811.7 | 0.0 | 0.0 | 261.2 | 459.0 |
| 2027 | 41.7 | 20.8 | 1,695.7 | 134.1 | 827.9 | 0.0 | 0.0 | 266.4 | 467.3 |
| 2028 | 39.4 | 19.7 | 1,635.4 | 131.1 | 475.0 | 0.0 | 0.0 | 347.4 | 681.9 |
| 2029 | 37.7 | 18.8 | 1,594.4 | 129.3 | 269.2 | 0.0 | 0.0 | 390.8 | 805.1 |
| 2030 | 36.3 | 18.2 | 1,568.8 | 128.4 | 260.8 | 0.0 | 0.0 | 389.1 | 790.5 |
| 2031 | 34.8 | 17.4 | 1,533.7 | 127.0 | 266.1 | 0.0 | 0.0 | 382.5 | 758.2 |
| 2052 | 1.4 | 0.7 | 96.2 | 37.6 | 0.0 | 0.0 | 0.0 | 20.5 | 38.1 |
| 2053 | 0.0 | 0.0 | 0.0 | 0.0 | 1,623.6 | 0.0 | 0.0 | 0.0 | -1,623.6 |
| Totals: | 303.3 | 151.6 | 37,463.3 | 3,407.7 | 14,527.2 | 0.0 | 0.0 | 7,403.2 | 12,125.2 |
| PVs | | Total PV | 7,689.6 | 655.5 | 5,127.9 | 0.0 | 0.0 | 1,062.4 | 843.8 |
| | | Rem PV | 7,689.6 | 655.5 | 5,127.9 | 0.0 | 0.0 | 1,062.4 | 843.8 |

Source: Wood Mackenzie
Discounted at 10.0% from 01/01/2014

759.   These cash flows were then discounted at 10% in order to arrive at a net present value for the BP Group's GOM assets.  TREX 013153.0024.  A discount rate is a rate of return used to discount projected cash flows to a present value, and it is necessary to convert the

streams of production revenue analyzed by Wood Mackenzie, which stretch decades into the future, into a present value as of the valuation date.

760.    In conducting its valuation of the GOM assets, Wood Mackenzie examined the BP Group's GOM reserves, producing commercial discoveries, non-producing commercial discoveries, sub-commercial discoveries, and exploration acreage.  TREX 013161.0017-.0018.  Wood Mackenzie assigned value to both producing assets and not-yet-producing assets, such as Kaskida.  Tr. 1186 (Ratner).

761.    Mr. Ratner incorrectly criticizes the Wood Mackenzie analysis for not including "sub-commercial" reserves.  In fact, Wood Mackenzie considered "sub-commercial reserves," but did not assign value to them.  TREX 013161.0018.  For example, the Wood Mackenzie materials reference the Gila discovery as a "sub-commercial discovery" and therefore do not ascribe a value to it.  Tr. 1188 (Ratner); TREX 240835 ("Exploration_Analysis" tab):

| Sub-commercial Reserves Discovered | | | | | | |
|---|---|---|---|---|---|---|
| Year | Country | Field | Oil mmbbl | Gas bcf | Operator | % Interest |
| 1996 | Australia | Capella | - | 8 | Woodside Petroleum | 17 |
| 1996 | Australia | Lambert Deep | 0 | 44 | Woodside Petroleum | 17 |
| 1996 | Australia | Lynx | - | 3 | Woodside Petroleum | 17 |
| 1996 | Egypt | Asfour | - | 5 | Eni | 50 |
| 1996 | Gabon | Walt Whitman | 4 | - | Amoco | 100 |
| 2013 | US (GoM Deepwater) | Gila (KC 93) | 216 | 136 | BP | 80 |

762.    Sub-commercial assets do not necessarily develop into commercial assets.  As set forth in the table above, certain assets have been sub-commercial since 1996.

763.    Mr. Ratner incorrectly claims that the Wood Mackenzie analysis does not consider the value of unexplored leases.  After considering all of the "GOM" assets, Wood Mackenzie arrived at a value for "US Deep GOM" of $38.3 billion, which includes unexplored

155

leases in the deepwater Gulf of Mexico.  TREX 240835 ("Value_Country" tab):



| **Wood Mackenzie** | |
| Back to Index | |
| **Value Country** | |
| **Global Upstream Asset Valuation** | |
| **Country** | **Value (US$M)** |
| US Deep GOM | 38,259 |
| Russia | 31,958 |
| Angola | 20,031 |
| Azerbaijan | 14,877 |
| US Alaska | 11,239 |
| UK | 9,784 |
| Australia | 9,165 |
| Argentina | 7,062 |
| T&T | 5,385 |
| Others | 33,620 |
| **Total** | **181,379** |
| *Source: Wood Mackenzie* | |

764.    Mr. Ratner testified about the overall number of unexplored leases (covering approximately 14,000 km$^2$), as compared to the number of leases included in Wood Mackenzie's analysis (covering 1,450 km$^2$).

765.    The exploration leaseholds held by BPXP constitute a relatively small portion of the value of its assets.  BPXP spent less than $600 million from 2009 to 2013 acquiring new exploration acreage leases.  TREX 011968 ("Capital" tab, "Exploration Licenses - Additions).

766.    In addition, BOEM lease offerings in the Gulf of Mexico since 2009 have averaged approximately $476 per acre.   http://www.boem.gov/OCS-Lease-Sale-Statistics-All-Lease-Offerings/.  Even assuming that per-acre value for the 12,726 km$^2$ (3,502,965 acres) of GOM exploration acreage that Mr. Ratner states were not included in the GOM assets assigned value by Wood Mackenzie, TREX 013125.000026 (tbl. 4) (Ratner Expert Rpt.), the exploration acreage would be valued at approximately $1.67 billion.  Such amounts are already included in

the $38.3 billion that Wood Mackenzie assigned to the Gulf of Mexico.  But even if the lease amounts were incorrectly double counted, the total amount would be only $39.97 billion, without making the adjustments for BPXP's liabilities described below.[3]

767.    The fact that Wood Mackenzie's analysis does not omit Gulf of Mexico assets (such as subcommercial assets and unexplored leases) is also shown by the fact that Wood Mackenzie reconciled its valuation findings for the BP Group's Upstream Segment to BP p.l.c.'s publicly-traded market value.

768.    Based on this reconciliation, Wood Mackenzie determined that the Wood Mackenzie value for the BP Group's Upstream assets was 20% **_greater_** than the market value of the BP Group's upstream assets, showing that Wood Mackenzie has not excluded the value of sub-commercial assets or unexplored leases.  TREX 240835 ("Executive_Summary" tab):

---

[3]    To be clear, BPXP does not agree that this $1.67 billion should be added to the $38.3 billion, but instead includes these numbers for illustrative purposes only.



### a.      BPXP's Value: Wood Mackenzie's Base Case and Low Case.

769.    Wood Mackenzie's analysis contains a section on "price assumptions," including a "base case," a "high case," and a "low case."  TREX 240835; TREX 247596.0002.

770.    Wood Mackenzie's "base case" analysis forecasted an oil price of $93.1/bbl. (WTI) for 2015, far higher than today's actual oil price.  TREX 240835 ("Price_Assumptions" tab).

771.    Wood Mackenzie's "low case" analysis assesses asset values using projected oil prices approximately 20% lower than those forecasted in its base case.  TREX 247596.0002. Thus, Wood Mackenzie's "low case" assumes an oil price of $74/bbl (WTI) for 2015, again far higher than today's oil price.  TREX 240835 ("Price_Assumptions" tab).

772.    In mid-2014, Wood Mackenzie's base case price assumptions were reasonably similar to actual and forecasted oil prices.  TREX 247596.0002.  Using the "base case" price assumptions, "Wood Mackenzie arrived at a total value of these collective assets for the GOM in the amount of $38.3 billion as of April 2014."  TREX 013153.0024; TREX 247596.0002, .0007.

773.    In the weeks prior to trial, the CME crude oil futures prices (WTI) were generally lower than the Wood Mackenzie "low case" (TREX 247596.0007; TREX 247621):

|                  | 2015   | 2016   | 2017   | 2018   |
|------------------|--------|--------|--------|--------|
| WoodMac Low Case | $74.04 | $70.10 | $66.50 | $66.79 |
| CME - 12/29/14   | $56.48 | $61.96 | $66.20 | $68.61 |
| CME  - 1/15/15   | $49.69 | $56.69 | $61.83 | $64.89 |

774.    Under Wood Mackenzie's "low case" analysis, asset values decline approximately 34% from the base case, resulting in a total value of the GOM assets of $25.4

billion.  TREX 247596.0002; TREX 247596.0007.

775.    Using Wood Mackenzie's "low case" analysis to value BPXP is conservative because both current oil prices and futures market prices are below the Wood Mackenzie "low case."  In particular, as shown in paragraph 773, the actual market futures prices for 2015, 2016, and 2017 are significantly lower than the Wood Mackenzie "low case."  Using the low case thus results in a conservative adjustment from the base case valuation.   Based on market prices, BPXP will generate significantly less revenue in 2015, 2016, and 2017 than predicted by Wood Mackenzie's low case. *See* TREX 247596.0003 (noting that the drop in the price of Brent crude even to $60/bbl would result in a loss of profit for BP p.l.c. equal to 31% of BP p.l.c.'s 2013 profits and 65% of BP p.l.c.'s 2012 profits).

### 2.    Calculating the Equity Value of BPXP from Wood Mackenzie's GOM Asset Valuation.

776.    The equity value of BPXP can be calculated by starting with the $25.4 billion value of the GOM assets and making three adjustments for BPXP ownership, for BPXP operating expenses, and for BPXP's existing liabilities tied to Macondo:

   a. **BPXP Ownership Adjustment**.  "In order to estimate BPXP's value from the Wood Mackenzie GOM asset values, it is necessary to account for the fact that BPXP is not the sole owner of the GOM assets."   TREX 013153.0024-.0025.   Considering BPXP's various ownership shares in each of the component assets within the GOM, BPXP owns 85.9% of the GOM assets.  TREX 013153.0012; TREX 013153.0096.

   b. **Operating Expense Adjustment.**   Wood Mackenzie analyzed the operating expenses associated with BP Group assets in the Gulf of Mexico.  It did not analyze the operating expenses associated with BPXP.

As Mr. Den Uyl explained, the operating expenses of BPXP are different from the operating expenses for the Gulf of Mexico business, because BPXP is "85.9 percent of GoM, plus it has its own, you know, liabilities and so forth it has to deal with."  Den Uyl Dep. 273.

Wood Mackenzie's estimate of the operating expenses associated with the GOM assets does not include all of BPXP's costs of operation.  TREX 013153.0025.  In addition to personnel costs, BPXP contracts with roughly 4,000 vendors that provide, for example, aviation services, maintenance, chemicals, supplies, and insurance in support BPXP's Gulf of Mexico operations.  Tr. 1581-84 (Morrison).  These expenses total about $2 billion per year.  Tr. 1581 (Morrison).  It is therefore necessary to adjust Wood Mackenzie's forecasted operating costs to reflect BPXP's projected costs in future years.  TREX 013153.0025.  The impact of including these expenses moving forward on a net present value basis decreases Wood Mackenzie's valuation by approximately $7.8 billion, net of taxes.  TREX 013153.0025-.0026.

c. **Existing Liability Adjustment.**  To arrive at BPXP's equity value, it is also necessary to subtract BPXP's existing liabilities, other than the CWA provision, CWA liabilities, or other future contingent liabilities.  TREX 013153.0026.

  i. These liabilities include debt in the form of BPXP's $3.1 billion debt facility with NAFCO, an additional $300 million term loan, and  BPXP's  intercompany  payables  with  BP  Company  North

161

America Inc. and NAFCO, which totaled $1.6 billion as of June 30, 2014.  TREX 013153.0026.

ii.  Mr. Ratner did not dispute that $3.4 billion of this adjustment (including the $3.1 billion debt facility and additional $300 million term loan) is appropriate, though he did take issue with the $1.6 billion adjustment for intercompany payables, on the ground that a portion of that amount may include "working capital" or trade payables.  Tr. 1193-94 (Ratner).

iii.  Mr. Ratner admitted that the $1.6 billion liability would properly be deducted from the asset value of BPXP if it were "true debt."  Tr. 1193 (Ratner).  The intercompany payables to NAFCO are amounts owed under BPXP's IFA agreement which BPXP is obligated to repay with interest, Tr. 1607 (Morrison), and therefore are true debt.  The remaining intercompany payables balance owed to BP Company North America Inc. is akin to a revolving credit facility and therefore is also appropriately treated as debt.

iv.  BPXP's existing liabilities also include existing provisions and payables for *Deepwater Horizon* incident-related liabilities (other than the CWA penalty), which will require future payments totaling approximately $4.0 billion.  TREX 013153.0026.  The largest of these provisioned items relates to BPXP's criminal settlement with the Department of Justice, and they also include BPXP's payables for incident-related legal fees.  TREX

013153.0026.  Mr. Ratner report did not dispute this $4.0 billion adjustment.  Tr. 1194 (Ratner).

### 3. Operating Expense Adjustment.

777.   Wood Mackenzie estimated that 2013 operating expenses for the GOM business were approximately $428 million, which equates to $368 million for BPXP based on BPXP's 85.9% ownership.  TREX 013153.0025; TREX 240835.

778.   For 2015, 2016, 2017, and 2018, Wood Mackenzie projected GOM operating expenses to be $508 million, $561 million, $603 million, $599 million, and $590 million, respectively, which equate to $436 million, $482 million, $518 million, $515 million, and $507 million for BPXP.  TREX 013153.0100; TREX 240835; TREX 013123R.000029 (tbl. 6) (Ratner Expert Rpt.).

779.   As noted by Mr. Ratner in his September 12, 2014 report, those numbers are identified in the "Opex_WM" tab to the Wood Mackenzie Corporate Report.   TREX 013123R.000029 (tbl. 6).

780.   Each of the fourteen individual asset valuation files included in the Wood Mackenzie valuation includes Wood Mackenzie's projected operating expenses associated with that asset.  TREX 240835; D35454.1 (identifying projected operating expenses for Kaskida).

781.   The sum of the projected operating expenses in the fourteen individual asset reports are approximately equal to Wood Mackenzie's projected operating expenses for GOM as reported on the "Opex_WM" tab, TREX 240835 ($428 million for 2014, $508 for 2015, $561 for 2016, $603 for 2016, $599 for 2017, $590 for 2018).  In his second report, dated September 12, 2014, Mr. Ratner characterized these and identified them to be ***Wood Mackenzie's*** operating expense numbers for GOM.  TREX 013125.000029 (tbl. 6):

| Table 6 | | | | | | |
|---|---|---|---|---|---|---|
| Comparison of Adjusted Base Projected Operating Expense Cash Flows to Wood Mackenzie Projected Operating Expense ($ in millions) | | | | | | |
| Description | 2014 | 2015 | 2016 | 2017 | 2018 | Total |
| Operating Expense - Base Projected Cash Flows [1] | $2,225 | $2,041 | $2,113 | $2,140 | $2,396 | $ 10,915 |
| Den Uyl Operating Expense Adjustment [2] | - | (102) | (306) | (399) | (462) | (1,269) |
| Adjusted Operating Expense $\quad$ a | 2,225 | 1,939 | 1,807 | 1,741 | 1,934 | 9,646 |
| Wood Mackenzie Projected Operating Expense [3] $\quad$ b | 508 | 561 | 603 | 599 | 590 | 2,861 |
| Adjusted Base Projected Operating Expenses as a Multiple of Wood Mackenzie Projected Operating Expenses $\quad$ c=a/b | 4.38 | 3.46 | 3.00 | 2.91 | 3.28 | 3.37 |

[1] See Exhibit 12430.
[2] See Exhibit 9A to Den Uyl Report.
[3] See BP-HZN-2179MDL09216019, Opex_WM tab.  The amounts reported here differ from the summation of the Op Costs recorded in the 14 separate asset reports (BP-HZN-2179MDL09216020 - 09216032 and BP-HZN-2179MDL09216039).  The costs reported above are roughly 3% greater than those recorded in the individual asset reports.

782.    Indeed, Mr. Ratner conducted a reconciliation of the operating expense projections as reflected in the individual asset reports and in the "Opex_WM" tab and noted that the total GOM number was "roughly 3% greater than those recorded in the individual asset reports."  TREX 013125.000029 (tbl. 6); Tr. 1198 (Ratner).

783.    The purported Wood Mackenzie projected operating expense amounts discussed by Mr. Ratner at trial – *i.e.*, $2280 million in 2014, $2335 million in 2015, $2471 in 2016, $3644 in 2017, and $4070 in 2018 – were not discussed in his second report dated September 12, 2014. They were discussed for the first time in Mr. Ratner's fourth report dated January 6, 2015. TREX 233888.000007 (schedule 4):

**United States of America v. BP Exploration & Production, et al.**
Analysis of GoM Operating Cost Estimates

| Description | | Operating Expenses ($ in millions unless otherwise indicated) | | | | | |
|---|---|---|---|---|---|---|---|
| | | 2014 | 2015 | 2016 | 2017 | 2018 | |
| **Per BP Group Plan Template** | | | | | | | |
| Operating Costs As Projected in BP Group Plan Template | [1] $ | 2,225 $ | 2,041 $ | 2,113 $ | 2,140 $ | 2,396 | a |
| **Per Wood Mackenzie** | | | | | | | |
| Operating Costs (US$/BOE) | [2] $ | 26 $ | 24 $ | 23 $ | 35 $ | 40 | b |
| Daily Production Volume ('000 BOE/day) | [3] | 241 | 267 | 290 | 287 | 278 | c |
| Days per Year | | 365 | 365 | 365 | 365 | 365 | d |
| **Total Operating Costs per Wood Mackenzie** | [4] $ | 2,280 $ | 2,335 $ | 2,471 $ | 3,644 $ | 4,070 | e=b*c*d |
| **Per Mr. Den Uyl** | | | | | | | |
| Projected Wood Mackenzie Operating Costs per Mr. Den Uyl | [5] $ | 508 $ | 561 $ | 603 $ | 599 $ | 590 | f |

784.   Mr. Ratner did not reconcile the Wood Mackenzie operating expenses used in his fourth report with those used in his second report.  Tr. 1199-1200 (Ratner).

785.   In fact, the numbers listed in Mr. Ratner's second report as Wood Mackenzie operating expenditures are the actual Wood Mackenzie operating expense projections for GOM. The numbers listed in Mr. Ratner's fourth report as Wood Mackenzie operating expenditures are not operating expenditures.  Instead, they are the ***capital expenditure*** numbers included in the "Cost_WM" tab of the Wood Mackenzie report titled "Wood Mackenzie Capital Expenditure Forecast" (D35461; TREX 240835):



786.    A potential investor in BPXP would be faced with the actual costs incurred by BPXP, and as such it is appropriate to examine BPXP's actual cost structure as a potential investor would.  TREX 013161.0019.

787.    Wood Mackenzie's estimate of GOM operating expense for 2013 ($428 million), even when adjusted for BPXP's ownership interest, is significantly below BPXP's actual production and other operating expenses of $1885 million in 2013 (excluding any GCRO or *Deepwater Horizon* incident-related expenses).  TREX 013153.0025, as shown in the following chart (TREX 013153.0099):

| BPXP Production Expense Analysis Excluding GCRO | | | |
| --- | --- | --- | --- |
| | 2012 | 2013 | 1st Half 2014 (Annualized) |
| Production & Other Operating Expenses | $    1,956 | $    1,885 | $    1,904 |
| Less: Other (Unusual) Expenses | (66) | (94) | (30) |
| | | | |
| Total Adjusted Production & Other Operating Expenses (Ex-Insurance) | 1,890 | 1,791 | 1,874 |
| | | | |
| Less: Wood Mackenzie Costs (85.9% for BPXP Portion) | (418) | (368) | (437) |
| | | | |
| BPXP Additional Costs | $    1,472 | $    1,423 | $    1,438 |

788.    Based on Mr. Den Uyl's analysis of BPXP's actual 2012 to June 30, 2014 expenses and discussions with BPXP's management including Richard Morrison, Mr. Den Uyl determined that Wood Mackenzie's cost structure does not include all of BPXP's costs of operation.  TREX 013153.0025, .0099; TREX 013161.0018-.0019.

789.    Based on examination of the trial balance detail associated with BPXP's incurred expenses for 2012 to June 30, 2014, BPXP's projected operating costs, and discussions with management, Mr. Den Uyl determined that BPXP's operating costs will continue to exceed those projected by Wood Mackenzie in future years consistent with actual experience from 2012 to June 30, 2014.  TREX 013153.0025.

790.    To account for this operating expense variance, Mr. Den Uyl adjusted Wood Mackenzie's forecasted operating costs to reflect BPXP's projected costs in future years.  Mr. Den Uyl did that by taking (1) the Upstream Segment's GOM projections for operating expense; (2) adjusting them to apply reductions implied by the Segment overview adjustment; and (3) calculating the BPXP (*i.e.*, 85.9%) portion of the amount by which those projected GOM operating expenses exceeded the Wood Mackenzie operating expense projections.   TREX 013153.0100; Den Uyl Dep. 242-45.

791.    Mr. Den Uyl accounted (at 35%) for tax benefits resulting from these

167

expenditures in each year.  TREX 013153.0101.  He then discounted the post-tax additional costs at 10%, showing that the impact of including these expenses moving forward decreases Wood Mackenzie's valuation by approximately $7.8 billion net of taxes.  TREX 013153.0101.

### 4. Equity Value of BPXP.

792.    Based on the Wood Mackenzie analysis and the adjustments for BPXP ownership ($3.6 billion) (*see* ¶ 776(a)), operating expenses ($7.8 billion) (*see* ¶¶ 776(b), 777-791), and existing liabilities ($9 billion) (*see* ¶ 776(c)), the equity value of BPXP was approximately $5 billion on December 30, 2014 as shown in the following table (TREX 247596.0007):

| Wood Mackenzie Low Case Applied to BPXP | |
| --- | --- |
| Base GOM Value | $ 38,259 |
| Impact of the 33.53% Low Case Scenario | (12,827) |
| | |
| New GOM Value | 25,432 |
| BPXP Ownership | 85.9% |
| BPXP Value | 21,834 |
| | |
| Less: BPXP Cost Adjustment | (7,815) |
| BPXP Intercompany Debt | (3,400) |
| BPXP Intercompany Payables, net | (1,602) |
| Remaining Incident Provisions and Payables (Ex-CWA) | (3,954) |
| | |
| New BPXP Equity | $ 5,063 |

793.    BPXP's equity value under the base case oil price scenario ("Aug 15, 2014") and under a low case oil price scenario ("Dec 30, 2014") are illustrated in the following demonstrative (D34017A):



794.   "[U]sing Wood Mackenzie's sensitivity analysis and [Mr. Den Uyl's] assessment of BPXP's equity value, every incremental $1 change in oil prices would change BPXP's equity value by approximately $550 million, holding all other input assumptions constant."   TREX 247596.0002.  As shown in paragraphs 823 to 824, oil prices have further declined since the time of Mr. Den Uyl's December 30, 2014 report.

795.   Mr. Ratner had no criticism of the Wood Mackenzie oil price sensitivity analysis. Tr. 1189-90 (Ratner).

796.   The decline in value of BPXP resulting from the significant downturn in oil prices is corroborated by public market data.  Public equity valuations of companies engaged in the exploration and production industry have declined significantly following the drop in oil prices. TREX 247596.0003.

169

797.    For example, on a broad market basis, the SPDR S&P Oil & Gas Exploration & Production ETF, which includes 81 different holdings in the oil and gas exploration industry, declined by 35% between August 15, 2014 and the end of 2014.  TREX 247596.0003; TREX 247605.  That percentage decline is roughly equivalent to the approximately 34% decline in value of BPXP's assets based on an oil price environment consistent with Wood Mackenzie's "low case."

798.    Mr. Ratner agreed that, if BPXP has a higher proportion of oil amongst its assets as opposed to gas, it would be more exposed to drops in oil prices.  Tr. 1190 (Ratner).  Ratner did not conduct any kind of analysis to assess the ratio of oil to gas assets of BP Upstream's assets to assess the Wood Mackenzie oil price sensitivity analysis.  Tr. 1189-91 (Ratner).

799.    Despite acknowledging that BPXP's value might be relevant to potential future funding or financing, Mr. Ratner did not prepare a valuation of BPXP or of its equity, nor does he provide any opinion about the value of BPXP.  Tr. 1181-82 (Ratner).  Ratner did not conduct any valuation of BPXP's intangible assets, brand value, or the actual financial value of leveraging BPXP's efforts.  Tr. 1194-95 (Ratner).

### 5.    SMOG Is Not an Indicator of Fair Value.

800.    SMOG (standardized measure of oil and gas) does not provide a fair market value.  Tr. 1138-39 (Ratner).  SMOG is based on highly arbitrary assumptions and lacks comparability with historical cost information presented in financial statements.  Tr. 1143 (Ratner); TREX 012303A.0224.

801.     The SEC has stated, "The objective of reserves estimation is to provide the public with comparable information about volumes, not fair value, of a company's reserves available to enable investors to compare the business prospects of different companies."    TREX 013153.0024.

802.    Regarding SMOG, the SEC has also stated: "Although oil and gas prices themselves are subject to market-based volatility, the estimation of reserves quantities based on any historical price assumption determines those reserves quantities as if the oil or gas already has been produced, even though they have not, and *these measures do not attempt to portray a reflection of their fair value*.  If the objective of reserve disclosures were to provide fair value information, we believe a pricing system that incorporates assumptions about estimated future market prices and costs related to extraction could be a more appropriate basis for estimation." TREX 240928.0005 (emphasis added).

803.    The SEC has further stated: "The reserves estimates in our disclosure rules, however, are not designed to be, nor are they intended to represent, an estimation of the fair market value of the reserves."  TREX 240928.0006.

804.    The SMOG data discussed by Mr. Ratner at trial is based upon an assumed oil price of $104 per barrel.  TREX 244133.  Given that the oil price has declined over 50%, the SMOG values used by Mr. Ratner would similarly need to be adjusted downward.  Tr. 1140-41 (Ratner).

805.    The SMOG estimates for BPXP are also overstated insofar as they did not include exploration costs.

806.    SEC regulations, in conjunction with accounting guidance, require that the SMOG analysis use a discount rate of 10%.  TREX 013123R.000043.  Using a discount rate of 10%, the SMOG value of BPXP's assets calculated in 2013 was $24.2 billion, assuming an oil price of $104/bbl.  TREX 244133.  This SMOG value does not consider BPXP's Macondo liabilities and other liabilities.

6. **A Prospective Investor Would Weigh BPXP's Value Against Its CWA and Contingent Liabilities.**

807.   "Looking forward, any future CWA penalty will reduce BPXP's existing equity value."  TREX 013153.0027.  This in turn would directly impact BPXP's financial viability, given that BPXP has a limited ability to pay a penalty in 2015 from current funding sources ($2.3 billion in 2015 even assuming $100/bbl).  TREX 013153.0027.

808.   A potential investor would weigh BPXP's current equity value of approximately $5 billion or less (or approximately $7 billion or less if unexplored leases are added as Mr. Ratner incorrectly claims) against the value of a CWA penalty and other contingent liabilities such as NRD and OPA.  TREX 013153.0023, .0027.

7. **BPXP's Ability to Sell Assets to Satisfy a Penalty Is Limited.**

809.   BPXP's equity value is also relevant to examining what impact future asset sales would have if such sales were proposed as a means to fund a future CWA penalty.  TREX 013153.0028.  "If BPXP were required to dispose of assets to fund a CWA penalty, those asset dispositions would destroy value and have a significant negative financial impact in the following ways: (1) asset disposals would diminish the calculated equity value of BPXP, as in this scenario the cash generated from such sales would not be retained but rather would go to fund a new liability in the form of a penalty; and (2) asset disposals would decrease the future cash flows BPXP could generate from the remaining business operations, thereby limiting BPXP's ability to pay any other potential spill-related obligations or fund its operational needs."  TREX 013153.0028.

F. **A CWA Penalty Would Have a Negative Impact on BPXP, and the United States' Expert Has Modeled No Set of Possible Funding Mechanisms That Would Not Have a Significant Negative Impact on BPXP.**

810.   Even the United States' expert Ratner agrees that there will be, at the very least, a

172

short-term negative impact for some unknown duration from a CWA penalty rendered on BPXP. Tr. 1120 (Ratner).

811.    Ratner did not model the possibilities he identified for how BPXP could fund or finance a CWA penalty in 2015.  Tr. 1121 (Ratner).  Ratner did not model the terms of any debt, equity, or divestitures of assets that may be available to BPXP.  Tr. 1121 (Ratner).  Because Ratner has not modeled any of these possibilities, he cannot opine on the specific impact of any of them on BPXP.  Tr. 1121 (Ratner).  Ratner also did not analyze the interrelationship between what he believes could be BPXP's options for financing a CWA penalty.  Tr. 1125 (Ratner).  Even Ratner agrees, though, that depending on the term and the mix of the techniques used to finance a CWA penalty, there could be long-term economic impacts on BPXP.  Tr. 1123-24 (Ratner).

812.    Ratner has no opinion about the cash flow BPXP could raise by selling interests in its assets.  Tr. 1125 (Ratner).  Ratner did no analysis to determine how large a loan BPXP could obtain in 2015.  Tr. 1127 (Ratner).  Ratner did not create a loan profile or determine the length of a loan, the interest rate, the covenants, or the security.  Tr. 1127 (Ratner).  Likewise, Ratner did not conduct a rate study as part of his work for this case.  Tr. 1128 (Ratner).

813.    If BPXP were required to use debt to finance the CWA penalty, the impact on BPXP's business would not only be the face amount of the loan, but also the interest costs.  Tr. 1130 (Ratner).  If BPXP were required to defer capital expenditures in order to repay debt, that would have a negative impact on BPXP's operations because "it would change the amount of investment that they would be making in their current and future exploration activity."  Tr. 1130 (Ratner).  In addition, BPXP has long-term contracts with many of its suppliers and vendors, which can range from three to five years in duration, and there are significant penalties for not

finishing a contract.  Tr. 1582 (Morrison).

814.    Deepwater exploration and production is a capital intensive business.  Tr. 1614 (Morrison).  A reduction of BPXP's capital expenditures by a significant amount that stopped bringing on new wells into BPXP's portfolio, would result in a decline in production and a loss of BPXP's operating revenue.  Tr. 1614 (Morrison).

815.    If the amount BPXP needs to finance through a loan is billions of dollars, the interest costs will be in the hundreds of millions, if not billions, of dollars.  Tr. 1130-31 (Ratner).

816.    Ratner admits that his assumption that BPXP will be able to borrow more than $5 billion from NAFCO in the future is "somewhat arbitrary" and is not based on analysis.  Tr. 1154 (Ratner).

817.    Mr. Ratner did not model any potential divestures of assets that he suggested BPXP might use to fund the penalty and agreed that he therefore could not testify as to what the specific impact of any of those asset sale possibilities would be on BPXP.  Tr. 1121 (Ratner). Mr. Ratner believes that BPXP could sell maybe $1 billion to $3 billion of assets without creating a long-term negative impact.  Tr. 1127 (Ratner).

818.    The imposition of a CWA penalty up to the maximum amount would represent a significant financial change to BPXP given its current capital structure.  Tr. 1156 (Ratner).

819.    While Mr. Ratner's assessment of BPXP's ability to pay a CWA penalty in 2015 assumes an amount of money coming from BPXP's parents, Ratner has not done any analysis to determine how much money would be needed from the parents.  Tr. 1159 (Ratner).

820.     Mr. Ratner also agreed that BP p.l.c. would act as a rational actor with respect to a request for funding or financing from BPXP and that if he were advising BP p.l.c., he would advise it to take into account the risks that are present of potential future contingent liabilities.

174

Tr. 1204 (Ratner).

821.   Mr. Ratner acknowledged that BPXP faces NRD, OPA, state and local claims, and other contingent liabilities that must be taken into account.  Tr. 1203 (Ratner).

822.   Mr. Ratner agrees that BPXP cannot require its parent companies to fund or finance BPXP's penalty.  Tr. 1158 (Ratner).

### G.     The Price of Oil Has Declined Significantly.

823.   Since the summer of 2014, oil prices have declined significantly: *e.g.*, from $97.30 per barrel (WTI) on August 15, 2014 to $46.06 on January 12, 2015.   TREX 247596.0002; TREX 247625.



824.   Since the beginning of 2015 to present (March 27, 2015), oil prices have been relatively stable.  They have remained in a range from $43/bbl to $54/bbl (WTI) and closed today at $49/bbl (WTI).  This $43/bbl-$54/bbl price range is lower than the price of oil at any time from the April 20, 2010 incident to 2014.  TREX 247625.

825.    In addition to those "spot" prices, there are different oil futures prices for different time periods (e.g., December 31, 2015 delivery, December 31, 2018 delivery, January 11, 2015, etc.).  TREX 247596.0002-.0003.

826.    Since January 1, 2015, futures prices for delivery of oil in 2018 have remained relatively stable but have decreased slightly overall.  The futures price for delivery of oil in 2018 is approximately $63.50, below the $66.80 price used in Mr. Den Uyl's December 30, 2014 analysis which resulted in an approximately $5 billion equity value for BPXP.   Based on Wood Mackenzie's sensitivity analysis as explained in Mr. Den Uyl's report, each dollar drop in the 2018 futures price results in a $550 million drop in BPXP's equity value.  TREX 247596.0002.

827.    Prices in the $50-$60/bbl range are in keeping with long-term historical real average prices, as the United States government data in the following diagram shows (TREX 247624; TREX 247601B; TREX 240835):



1.    **Oil Prices Are an Indispensable Input in Valuing an Oil Company and Assessing Its Future Cash Flows.**

828.    "BPXP is in a commodity-based industry, and its financial condition today and in

the future is directly impacted by commodity prices." TREX 247596.0003.

829.   Oil price is a necessary input for determining an oil company's value because it directly affects the revenues the company is able to generate from its production and therefore the present value of its assets. The United States' expert Ian Ratner did not dispute that, as oil prices decline, and all else being equal, cash flows at BPXP will also decline, as will the value of BPXP's oil reserves. Tr. 1162 (Ratner).

830.   There is no way to determine an oil company's value without making assumptions about the price of oil. For example, the analyses cited by Mr. Ratner in his testimony also rely on an assumed oil price. TREX 233888.000006.

831.   Mr. Ratner cites the SMOG analysis (TREX 244133, discussed above in paragraphs 800 to 806), which assumes an oil price of over $104 (over twice the current oil price).

## 2.   Market Future Prices Should Be Given More Weight Than a Handful of Analyst Assessments.

832.   Any prediction regarding the future price of oil may be wrong. However, because oil price is an unavoidable input in determining the value of an oil company, it is necessary for any oil company valuation to assume some oil prices in future years.

833.   Mr. Ratner advocated using analyst projections for oil prices, selecting a handful of analysts' projections for his January 6, 2015 report. TREX 233888.000002; TREX 233888.000006 (Schedule 3). Mr. Den Uyl's analysis uses market future prices, which are determined by the actual buying and selling of millions of market participants. TREX 247596.0002, .0005.

834.   In his testimony, Mr. Ratner criticized market future prices, suggesting that certain documents show a limited number of oil futures transactions. The documents cited by

Mr. Ratner show the transactions for only a brief portion of the trading day.  Light Sweet Crude Oil (WTI) futures and options are the world's most actively traded energy product.  TREX 247601B.0002.

835.    Instead of using market futures prices, Mr. Ratner relies on the estimates for future oil prices made or reported by a small number of analysts and media outlets:  IMF Commodity Forecast, Morningstar Equity, Morgan Stanley, Bank of America, World Bank, Trefis, Goldman Sachs, Bloomberg, Reuters/Business Insider, S&P Ratings Services, Forbes, and BMA Capital.  TREX 233888.000006 (Schedule 3).

836.    Mr. Ratner cited the views of certain analysts from 2014, when the price of oil was significantly higher than it is today.  Since then, analysts have significantly decreased their oil price projections.  For example, Mr. Ratner cites Goldman Sachs's projection in December 2014 that the price of oil in 2015 would be $85/bbl (Brent).  TREX 233888.000006.  However, on January 11, 2015, Goldman Sachs published "The New Oil Order."  TREX 247631.  In that document, Goldman Sachs revised and lowered its guidance on future oil prices in January 2015, with predictions of $47.15/bbl in 2015 and $65/bbl in 2016.  Tr. 1168-69 (Ratner); TREX 247631.0003.  Goldman Sachs's New Oil Order analysis also states that Goldman Sachs "now see[s] prices staying lower for longer," and indicates that a "new industry will likely be born out of this environment," as "[c]apital rebalancing includes the need . . . to discard high-cost deepwater, oil sands assets and other alternative technologies to make the industry more efficient."  TREX 247631.0003.

837.    Mr. Ratner also cited a BP presentation from 2014 that states that it has "historically[] taken up to two years for prices to undergo a recovery following periods of steep price declines."  Tr. 1067 (Ratner); TREX 233856.000009.  The following sentence in that

presentation states that "[i]n all the instances [of oil price decline and recovery] shown [in BP's presentation]—with the exception of the period between 1985 and 1986—the recovery was triggered by one or more OPEC production cuts." TREX 233856.000009. There has been no evidence cited by the United States that OPEC has cut production or has any plans to do so.

### H.    The Macondo Incident Has Had a Significant Impact on BPXP's Ultimate Parent Company, and a CWA Penalty Would Have a Further Significant Negative Impact on BP p.l.c.

838.    Though BP p.l.c. is not a defendant in this CWA proceeding, the impacts of the spill have also been felt by BPXP's ultimate parent company.  Enterprise value for a publicly traded company like BP p.l.c. is defined as the cumulative value of its outstanding equity shares (*i.e.*, its market capitalization) plus its net debt.  TREX 013123R.000041.

839.    Since March 2010, the enterprise value of BP p.l.c. has dropped approximately $60 billion, from $203 billion to $143.8 billion.  Tr. 1134 (Ratner).  As of the time of trial, BP p.l.c.'s enterprise value was the lowest it had been since June 2010.  Tr. 1134 (Ratner).  At the same time, BP p.l.c.'s net debt from 2007 through 2014 has remained largely unchanged.  Tr. 1136 (Ratner).

840.    BP p.l.c. estimates in its public information for investors that every $1 decline in oil prices reduces BP p.l.c.'s annual replacement cost operating profit by approximately $275 million.  TREX 247596.0003.  As a point of reference, BP p.l.c. has assumed $100/bbl oil prices in its recent investor presentations.  TREX 247596.0003.  Applying the rule of thumb for the drop in Brent crude oil prices to $60/bbl as of December 26, 2014 (and assuming tax rates remain constant), this price drop alone results in an estimated $7.2 billion annual impact on BP p.l.c.'s profit.  TREX 247596.0003.  "This represents 31% of BP p.l.c.'s 2013 profits, and 65% of BP p.l.c.'s 2012 profits."  TREX 247596.0003.

841.    The impact of the oil price declines on credit ratings is evidenced by Standard &

Poor's December 2014 revision of BP p.l.c.'s ratings outlook to negative, citing the "dramatic deterioration in the oil price outlook."  TREX 013153.0023; TREX 247596.0003.  In addition to an 18% decline in BP p.l.c.'s market capitalization between August 15, 2014 and the end of 2014, BP p.l.c. saw an approximate 50% increase in its 10-year bond spreads.  TREX 247596.0003.

### I.   The Government's Attempt to Shift the Penalty to a <u>Non-Violator</u> Is Unfounded.

842.   Professor Robert Daines is an expert in corporate governance and the economic analysis of complex transactions with 20 years' experience.  D34452; Tr. 1992-97 (Daines).  Professor Daines has a J.D. from Yale Law School, a B.S. in economics and a B.A. in American Studies from Brigham Young University.  D34452; Tr. 1992 (Daines).  Professor Daines is the Pritzker Professor of Law and Business and co-Director of the Rock Center on Corporate Governance at Stanford University.  D34452; Tr. 1994 (Daines).  Professor Daines routinely lectures and provides guidance to corporate directors.  Tr. 1996 (Daines).

843.   BPXP is a direct wholly-owned subsidiary of BP Company North America Inc., and is an indirect wholly-owned subsidiary of BP p.l.c.  TREX 011963.  BP Company North America Inc. is BPXP's sole common shareholder.  TREX 013214.0010.  This line of ownership is shown in the following diagram (TREX 011963).



844.    Counsel for the United States conceded in response to questions from the Court at trial that the corporate structure of the BP Group is not improper, illegal, or unusual.  Tr. 2000-01, 2017 (Gladstein).  The United States also conceded that it is neither uncommon nor improper for a subsidiary like BPXP to be operated as it was.  Tr. 31 (US Opening Statement).

845.    The financial and corporate governance relationships between BPXP and the BP Group were appropriate and consistent with ordinary parent-subsidiary relationships.  Tr. 2000-01 (Gladstein).  Counsel for the Department of Justice (Richard Gladstein), the United States expert Professor Quivik, and Professor Daines agreed at trial that the financial and other relationships between BPXP and the BP Group set forth in paragraphs 846 to 861 are normal and appropriate for a wholly-owned subsidiary.  Tr. 2000-01 (Gladstein); Tr. 941-42 (Quivik).

846.    It is both common and appropriate for a parent shareholder to control a subsidiary and its board.  D34469; Tr. 943 (Quivik); TREX 013214.0034-.0036; Tr. 2000-01 (Gladstein).

847.    It is both common and appropriate for a parent shareholder to exercise control over a subsidiary's operations.  D34469; Tr. 943 (Quivik); TREX 013214.0034-.0036; Tr. 2000-01 (Gladstein).

848.    It is both common and appropriate for a parent shareholder to exercise control over a response to an incident.  D34469; Tr. 943 (Quivik); TREX 013214.0034-.0036; Tr. 2000-01 (Gladstein).

849.    It is both common and appropriate from a corporate governance perspective for subsidiary boards to be less active than the boards of publicly-owned corporations.  D34469; Tr. 944-45 (Quivik); Tr. 2002-03 (Daines); Tr. 2000-01 (Gladstein).

850.    It is both common and appropriate from a corporate governance perspective for a parent shareholder to inject capital into subsidiaries on a discretionary basis.  D34469; TREX 013214.0021-.0022.

851.    The capital flows between BPXP and the BP Group are common and appropriate for a wholly-owned subsidiary.   D34469; TREX 013214.0014-.0016, .0032-.0033.   These common and appropriate capital flows include: (1) a $5 billion internal financing account between BPXP and NAFCO in 2010 (TREX 012730); (2) a $3.1 billion loan from NAFCO to BPXP in 2014 (TREX 012439); (3) a $13.9 billion capital injection into BPXP by BPAPC in February 2012 (TREX 012438; TREX 012437); and (4) NAFCO and BP Company North America Inc. making payments on BPXP's behalf and BPXP reimbursing those entities.  TREX 013214.0015.

852.    The intercompany balances between BPXP and other BP entities (shown below) are common and appropriate for a wholly-owned subsidiary.  D34469; TREX 013214.0014-.0016, .0032-.0033; D32321.

| Table 19 | | | | | | | | |
| --- | --- | --- | --- | --- | --- | --- | --- | --- |
| Schedule of Intercompany Receivables/(Payables) Between 2009 and 2013 [1][2] *(Dollars in Millions)* | | | | | | | | |
| Net Intercompany Financing Activities with BPXP: Net Intercompany Receivables / (Payables) Balances | | | | | | | | |
| | BP P.L.C. | BP America Inc. | BP America Production Company | BP Company North America Inc. | BP Corporation North America Inc. | BP Products North America Inc. | NAFCO | Other BP Group Entity | Grand Total |
| Ending Balance 2009 | $ - | $ - | $ (271) | $ (1,029) | $ (7) | $ 1,014 | $ 600 | $ (431) | $ (125) |
| Ending Balance 2010 | - | 4,248 | (372) | (9,502) | (53) | 1,131 | (10,990) | (9) | (15,546) |
| Ending Balance 2011 | - | - | 572 | (9,483) | (3) | 1,172 | (11,178) | 19 | (18,901) |
| Ending Balance 2012 | 158 | - | 1,229 | (9,215) | (6) | 943 | 4,733 | (141) | (2,299) |
| Ending Balance 2013 | 158 | (89) | (73) | (4,659) | (28) | 580 | 183 | (134) | (4,063) |

Notes
[1] Source: BPXP Trial Balances_BP-HZN-2179MDL07817645.
[2] Excludes activity between BP Exploration & Production and its subsidiaries.

853.     As referenced in paragraphs 710 to 711, the fact that a shareholder has injected capital into a subsidiary in the past does not mean it is obligated to inject more capital in the future.  TREX 013214.0022-.0023.  Whether a shareholder injects capital does not depend on past decisions, but rather on whether the investment has a positive net present value.  TREX 013214.0022-.0023.

854.     It is both common and appropriate from a corporate governance perspective for a subsidiary to pay dividends to its parent shareholder.  D34469; Tr. 948 (Quivik); TREX 013214.0023-.0024.  United States expert Professor Quivik testified that BPXP's payment of dividends to its parent shareholder before the incident was appropriate.  Tr. 948 (Quivik).  BPXP has not paid dividends since the April 2010 incident.  Tr. 948 (Quivik).  BPXP is not undercapitalized.  Tr. 1144 (Ratner).

855.     It is both common and appropriate from a corporate governance perspective for a firm to use business segments.  D34469; Tr. 963-64 (Quivik); TREX 013214.0037-.0038.

856.     It is both common and appropriate from a corporate governance perspective to have segments that do not perfectly align with subsidiaries.  Tr. 2005 (Daines); TREX 240672.34.1.BP.  It is also common amongst multinational oil and gas companies to have a small number of business segments with a large number of majority-owned subsidiaries.  D34460; Tr. 963-64 (Quivik); Tr. 2006-07 (Daines).  For example, while the BP Group has three reportable

business segments and 191 majority-owned subsidiaries, Royal Dutch Shell PLC has two reportable business segments and 381 majority-owned subsidiaries, and Exxon Mobil Corporation has three reportable business segments and 229 majority-owned subsidiaries. D34460.



858.   It is also common and appropriate from a corporate governance perspective for a subsidiary to reimburse affiliates for employee services.  D34469; Tr. 966-67 (Quivik); Tr. 2008-09 (Daines); TREX 013215.23.1.BP.

857.   It also common and appropriate from a corporate governance perspective for multinational corporations to use centralized support functions such as legal and treasury departments.  This allows for economies of scale.  D34469; Tr. 966 (Quivik); Tr. 2007-08 (Daines).

858.   It is also common and appropriate from a corporate governance perspective for a subsidiary to reimburse affiliates for employee services.  D34469; Tr. 966-67 (Quivik); Tr. 2008-09 (Daines); TREX 013215.23.1.BP.

859.   BPXP's bylaws are neither improper nor unusual, and the bylaws were followed. Tr. 943 (Quivik); TREX 012904.

860.     According to Professor Quivik, there is nothing inappropriate about an individual signing a document on behalf of two legal entities or individuals not knowing the legal entity for whom they were working.  Tr. 967-68 (Quivik).

861.     United States expert Mr. Ratner agrees that BPXP did not fail to follow any corporate formalities.  Tr. 1144 (Ratner).

862.     There are several differences between a publicly-owned corporation and a wholly-owned subsidiary.  D34458.   One of the fundamental differences is that a publicly-owned corporation typically has thousands of passive shareholders who cannot act directly.  D34458; Tr. 2002 (Daines).  In a public corporation, managers who control the firm can seek their own interests over the shareholders' interests.  D34458; Tr. 2002 (Daines).  Because of this separation between ownership and control, the shareholders elect a board of directors to oversee the managers and to act in the interest of the shareholders.  D34458; Tr. 2002 (Daines).  A wholly-owned subsidiary, however, only has one shareholder who can directly monitor what is going on within the corporation.  D34458; Tr. 2003 (Daines).  In that situation, the shareholder does not need to rely on a board or act through a board in the same way as a public corporation.  D34458; Tr. 2003 (Daines).

863.     A subsidiary can be created for a number of reasons, including to allocate pools of assets for particular business ventures, to limit the cost of monitoring the health of each subsidiary for creditors, or for tax or regulatory reasons.  Tr. 2003-04 (Daines).

864.     A business segment is created to organize related business functions and to manage personnel.  Tr. 2004 (Daines).

865.     Work performed on BPXP assets is charged to BPXP.  Tr. 954 (Quivik).  In 2014, the time of 2,300 employees was charged to BPXP.  TREX 240459; Tr. 956 (Quivik).

866.    If penalties on a subsidiary are higher when a parent company aids in a response, parents will be less likely to assist in a response in the future.  D34471; Tr. 2010-11 (Daines); TREX 013215.0029-.0030.

867.    If a subsidiary is penalized because its parent is well-capitalized, there would be less investment from well-capitalized parents.  D34471; Tr. 2011 (Daines); TREX 013215.0028.

868.    If penalties on a subsidiary are higher because it engages in normal and appropriate corporate governance practices, there would be undesirable consequences.  D34471; D34469; Tr. 2011-12 (Daines); TREX 013215.0028-.0029.

869.    All of the normal and appropriate practices described in paragraphs 846 to 858 — discretionary capital flows between a parent and a subsidiary, dividends paid by a subsidiary to a parent, control by a parent-shareholder, centralized services and payrolls — describe every wholly-owned subsidiary.  Tr. 2012 (Daines).  As Professor Daines testified, describing a wholly-owned subsidiary as having the practices listed in paragraphs 846 to 858 would be the economic equivalent of describing someone as speaking "using a combination of consonants and vowels."  Tr. 2012 (Daines).

870.    If BPXP's penalty is increased based on the normal and appropriate practices described in paragraphs 846 to 858, then every wholly-owned subsidiary's penalty would be increased based on these factors.  Tr. 2012 (Daines).

871.     There is no reason to penalize a company for being a wholly-owned subsidiary (a subsidiary owned by one shareholder), as opposed to being a subsidiary owned by many shareholders.  Tr. 2012 (Daines); TREX 013215.0025-.0029.  There is no reason to favor multiple shareholders over a single shareholder, or to favor corporations with multiple shareholders over corporations with a single shareholder.  Tr. 2012 (Daines).

872.    Limited liability for shareholders is fundamental to corporate governance.  TREX 013214.0025.  Limited liability means that an investor who invests $100 risks only $100 and is not obligated to make future investments unless the parent is named as a defendant.  TREX 013214.0025-.0026.  Limited liability encourages investment.  TREX 013214.0026.  Limited liability applies equally regardless of whether there is a single shareholder (as in the case of a wholly-owned subsidiary) or multiple shareholders.  TREX 013214.0006.  Limited liability applies equally regardless of whether the shareholder is an individual or a corporation.  TREX 013214.0006.

## V.    THE ECONOMIC BENEFIT TO THE VIOLATOR, IF ANY, RESULTING FROM THE VIOLATIONS

873.    As part of the Penalty Phase, the parties did not present new evidence relating to the CWA factor of "economic benefit to the violator, if any, resulting from the violation."  This was consistent with the parties' pre-trial proposals regarding the Court's consideration of evidence relevant to this factor.  Specifically, in March 2014, the United States took the position that "evidence of the economic benefit is already in the record from Phase 1, if there were delays[] that saved [BP] money and so on."  Mar. 21, 2014 Hr'g Tr. 26:23-27:3.  The United States also informed the Court that "compared to the size of this case, [any economic benefit is] background noise, and we're not going to waste your time with new evidence" on this factor.  *Id.*

874.    Likewise, BPXP did not propose presentation of additional evidence relating to the economic benefit factor.  Rec. Doc. 12340 at 8.  As a result, the Court ordered in March 2014 that "there will be no further discovery on this factor" in the Penalty Phase.  Rec. Doc. 12592 at 2.  As Judge Shushan commented during a status hearing just after the Court's decision, "[w]e all agree that there was no economic benefit to either BP or Anadarko."  Apr. 17, 2014 Hr'g Tr. 4.

875.    During the Penalty Phase trial, the United States reminded the Court that when

187

compared to other penalty factors, "the economic benefit is not a driving factor in the Court's analysis of this penalty."  Tr. 34 (US Opening Statement).

876.   The United States also argued during the trial that "cost cutting, that is the definition of economic benefit" and noted that the "Court has made finding[s] in…Phase I about cost cutting."  Tr. 34 (US Opening Statement).  In its Phase 1 findings, the Court found that BP made three "profit driven" decisions which also "caused the blowout, explosion, and oil spill": (1) the decision to "use the LCM as a spacer to avoid the cost of transporting and disposing of the LCM, as well as the cost of creating an entirely new spacer from scratch"; (2) the decision to drill the final 100 feet of the Macondo well; and (3) the decision not to conduct a cement bond log (CBL) prior to temporary abandonment.  Rec. Doc. 13355 ¶¶ 65, 195, 298, 519, 551.

877.   The record evidence for each of these decisions shows that, to the extent they could even be quantified, any cost savings were minimal and, in the words of the United States, "background noise."  Mar. 21, 2014 Hr'g Tr. 26-27.

878.   The cost associated with not running a Cement Bond Log ("CBL") is part of the Phase 1 record.  According to Schlumberger (the company responsible for performing the CBL if it had been ordered), the estimated cost of equipment and labor to perform the CBL at the Macondo well would have been $128,258.77.  TREX 001690.  The cost of Schlumberger's time associated with running a CBL would have been approximately $400,000.  Rec. Doc. 13355 ¶ 195 n.74.  The amount BP paid when it canceled the CBL totaled $10,165.43.  TREX 001690. The net savings realized by BP not running a CBL, therefore, was approximately $518,093.34.

879.   In its Phase 1 findings, the Court found that "BP decided to use the LCM as a spacer to avoid the cost of transporting and disposing of the LCM, as well as the cost of creating an entirely new spacer from scratch."  Rec. Doc. 13355 ¶ 298.  There is no clear evidence in the

record quantifying the cost savings from using LCM as a spacer and avoiding transportation and disposal costs.  To attempt now to quantify those cost savings would be imprecise at best.[4]  Even if any cost savings could be quantified, it would have been relatively minimal.

880.    The Court has held that drilling the extra 100 feet in the wellbore was risky and motivated by profit because doing so was designed to "ensure that the well was through the entire primary reservoir package and to be able to conduct wireline evaluation operations and completion procedures."  Rec. Doc. 13355 ¶ 64.  There is no evidence in the record, however, that would permit the Court to quantify any purported economic benefit realized as a result of drilling the last 100 feet.

## VI.    THE DEGREE OF CULPABILITY INVOLVED.

### A.    Phase 1 Ruling

881.    In the Phase 1 Ruling, the Court held that BPXP and BP America Production Company acted with gross negligence and/or willful misconduct during events leading to the Macondo incident and the discharge of oil resulting from the incident.  BPXP and BP America Production Company filed a post-trial motion for amended findings and/or a new trial, Rec. Doc. 13457, which the Court denied on November 13, 2014, Rec. Doc. 13644.

882.    On December 11, 2014, BPXP and BP America Production Company filed a notice of appeal from the Phase 1 Ruling to the United States Court of Appeals for the Fifth Circuit.  Rec. Doc. 13823.  That appeal remains pending.

---

[4]    To illustrate the challenges associated with quantifying costs saved by using the LCM as a spacer, consider that there were 424 barrels of LCM used as a spacer in the April 20, 2010 displacement.  TREX 000001 at 24.  The LCM spacer was comprised of proprietary materials supplied to the rig by MI Swaco, but an exact composition could not be determined because of incomplete inventory records available from the rig.  TREX 000002, Appx. Q at 4-5.  BP's post-incident investigation team's best estimate was a ratio of 62/38 FORM-A-SET AK to FORM A SQUEEZE to which Barite and DUO VIS (in unspecified volumes) were also added.  TREX 000002, Appx. Q at 4-5.  According to MI Swaco's April 14, 2010 daily inventory report, a 25-lb bag of FORM-A-SET AK cost $520.47 while a 40-lb bag of FORM A SQUEEZE cost $222.82.  TREX 002813 at M-I-000016021.

883.    In the Phase 1 Ruling, the Court found other parties had acted with negligence and shared responsibility for causing the Macondo blowout, explosion and oil spill as a matter of general maritime law.   The Court found that Transocean was negligent with respect to well control and blowout preventer maintenance and operation and that Halliburton was negligent with respect to cement testing, among other things.[5]  Rec. Doc. 13355 ¶¶ 229, 321, 334-336, 591, 593.   In allocating nearly one third of culpability to other parties, the Court's Phase 1 ruling confirms that the Macondo accident was the result of the actions of multiple parties and due to multiple causes.   Transocean, Halliburton and other parties also have filed notices of appeal of the Phase 1 Ruing to the Fifth Circuit.   Rec. Docs. 13831, 13941.

### B.    Phase 2 Ruling

884.    In the Phase 2 Ruling, Rec. Doc. 14021, the Court made additional findings and reached conclusions of law relevant to the culpability factor, including regarding BPXP's conduct to control the source of the oil spill following the blowout.

885.    The Court addressed the disputed source control issues, which it identified as: (1) whether BP consciously disregarded the need to prepare for a subsea blowout in deepwater, despite the foreseeability of such an event; and (2) whether BP intentionally misrepresented the flow rate at which hydrocarbons flowed from the well, causing decision makers to attempt source control methods that had no chance of success, namely Top Kill, while abandoning other methods that were viable, namely BOP-on-BOP.

886.    As to the first issue, the Court concluded that BP's pre-spill plans for responding to a deepwater blowout complied with then-extant federal regulations and had been approved by

---

[5]    "Transocean" means Transocean Holdings LLC, Transocean Deepwater Inc., and Transocean Offshore Deepwater Drilling Inc.).   "Halliburton" means Halliburton Energy Service, Inc. and Halliburton's Sperry division.

MMS.  Rec. Doc. 14021 ¶ 244.  The Court further found that federal regulations at the time of the blowout did not require exploration companies to have access to a prebuilt capping stack and that it was not industry practice to have such a device.  Rec. Doc. 14021 ¶¶ 225-227.

887.    As to the second issue, the Court concluded that it had not been shown that BP's flow rate representations had impeded the source control effort.  Specifically, the Court held that the "weight of the evidence" did not show that the Government decision-makers had relied on BP's flow rate misrepresentations to approve a Top Kill procedure (the first effort to shut in the well after the BOP could not be closed to seal the well).  Rec. Doc. 14021 ¶¶ 232-233.

888.    Additionally, the Court held that BP's flow rate statements did not result in Unified Command abandoning the BOP-on-BOP procedure after Top Kill concluded.  While it was alleged that the BOP-on-BOP could have sealed the well if implemented, the Court found that, based on the information known at the time, there were "genuine concerns" that accounted for not progressing the BOP-on-BOP procedure.  The Court thus rejected Halliburton's and Transocean's claims that BP's conduct was a superseding cause of the oil spill that would warrant a reallocation of the comparative fault under maritime law that the Court had assigned in its Phase 1 Ruling.  Rec. Doc. 14021 ¶¶ 228-241.

889.    The Court concluded, among other things, that punitive damages arising from BP's source control activities "were not warranted" (*id.* ¶ 248); BP "was not grossly negligent, reckless, willful or wanton in its source control planning" (*id.*); and BP's conduct did not amount to "a superseding cause of the oil spill, nor does BP's conduct warrant a reallocation of comparative fault among BP, Transocean, and Halliburton" (*id.* ¶ 249).

890.    On February 23, 2015, BPXP filed a notice of appeal from the Phase 2 Ruling to the United States Court of Appeals for the Fifth Circuit.  Rec. Doc. 14208.  That appeal remains

pending.  Other parties also filed notices of appeal.  *See* Rec. Docs. 14208, 14170, 14207, 14252.

## VII.   ANY OTHER PENALTY FOR THE SAME INCIDENT.

### A.   BPXP

891.    The United States, BPXP and Anadarko have entered into a "[Stipulation] and Order Related to the 'Any Other Penalty for the Same Incident' Factor Concerning Prior Settlements and Criminal Pleas in Connection with the Penalty Phase of United States v. BPXP, et al."  The Court entered the Stipulation on November 26, 2014, Rec. Doc. 13725 and admitted the Stipulation into evidence during the Penalty Phase trial, Rec. Doc. 14077.  According to that Stipulation:

892.    On or about November 15, 2012, the United States and BPXP entered into a Plea Agreement in the United States' criminal case filed against BPXP in connection with the *Deepwater Horizon* incident (*United States v. BP Exploration & Production Inc.*, E.D. La. Docket No. 12-cr-292).  Pursuant to that Plea Agreement and the subsequent judgment entered by Judge Vance on January 29, 2013, BPXP agreed to pay criminal fines of $1.25 billion, including $1.15 billion for Count 12 (Clean Water Act) and $100 million for Count 13 (Migratory Bird Treaty Act) to the North American Wetlands Conservation Fund.  In addition to those criminal fines, BPXP agreed to make payments of $350 million to the National Academy of Sciences for the purposes of oil spill prevention and response in the Gulf of Mexico and $2.394 billion to the National Fish and Wildlife Foundation.  Rec. Doc. 13725.

893.    The Plea Agreement provides that "payments made pursuant to paragraph 4(c)(viii) [providing for entry of the order that was agreed to in connection with the Plea Agreement and that was subsequently entered on January 29, 2013] above shall have no effect on, and shall not be argued by the defendant, BP plc, or any other BP plc entity, to reduce in any way, any civil claims by any party arising out of the *Deepwater Horizon* blowout, explosion, oil

spill and response, including but not limited to natural resource damage claims." The United States has stipulated that "[t]he payments made pursuant to paragraph 4(c)(viii) of the Plea Agreement" are the above-mentioned $350 million to the National Academy of Sciences and $2.394 billion to the National Fish and Wildlife Foundation.  Rec. Doc. 13725.

894.    BPXP does not seek any credit, offset or reduction of the civil CWA penalty in this proceeding for the $350 million payment to the National Academy of Sciences or for the $2.94 billion payment to the National Fish and Wildlife Foundation.

895.    The United States has further stipulated that "BPXP's payment of criminal fines totaling $1.256 billion ($1,256,000,000) under the terms of the Plea Agreement is not a payment made pursuant to paragraph 4(c)(viii) of the Plea Agreement."  Rec. Doc. 13725 ¶ 3.  This amount includes the $1.25 billion that BPXP agreed to pay for Count 12 (Clean Water Act) and Count 13 (Migratory Bird Treaty Act).  Accordingly, it is appropriate under this penalty factor for the Court to consider BPXP's payment of criminal fines totaling $1.25 billion in assessing BPXP's civil liability under the CWA.  Rec. Doc. 13725.

**B.    Transocean Consent Decree.**

896.    On or around January 3, 2013, the United States reached an agreement with Transocean Deepwater Inc., Transocean Offshore Deepwater Drilling Inc., Transocean Holdings LLC, and Triton Asset Leasing GmbH (collectively, "Transocean") to resolve the United States' claims against Transocean for civil penalties under the CWA arising from the *Deepwater Horizon* accident, oil spill, and response.  According to the terms of the settlement, Transocean agreed to pay $1 billion in civil penalties to resolve alleged violations of the CWA resulting from the spill.  On February 19, 2013, this Court approved the settlement in a partial consent decree. Rec. Doc. 13725.

C.    **Transocean Criminal Plea.**

897.    "On or about January 3, 2013, the United States and Transocean Deepwater Inc. entered into a Plea Agreement in the United States' criminal case filed against Transocean Deepwater, Inc. in connection with the *Deepwater Horizon* incident (*United States v. Transocean Deepwater Inc.*, E.D. La. No. 13-cr-1). Pursuant to that Plea Agreement and the subsequent judgment entered by Judge Milazzo on February 14, 2013, Transocean will pay a fine of $100 million as to Count 1 (Clean Water Act) of the Bill of Information. Transocean also will pay an additional $150 million to the National Academy of Sciences for the purpose of oil spill prevention and response in the Gulf of Mexico and $150 million to the National Fish and Wildlife Foundation. The settlement includes various court-enforceable strictures regarding Transocean's drilling operations." Rec. Doc. 13725 ¶ 7.[6]

## VIII.  ANY HISTORY OF PRIOR VIOLATIONS.

A.    **The Record Reflects No Prior CWA Violations by BPXP.**

898.    On February 14, 2014, BPXP filed a Motion in Limine to Exclude Evidence Relating to Prior Incidents. Rec. Doc. 12347. In its February 21, 2014 order, the Court ordered the United States to identify any other statutory violations the United States believed were pertinent to the "other violations" factor, along with a listing of the dates and nature of the violations, by March 12, 2014. Rec. Doc. 12392.

899.    On March 21, 2014, at a Penalty Phase status conference, the Court stated "that the United States is limited to presenting evidence on the 4 prior incidents it has identified (Texas City, Prudhoe Bay, Endicott Island, and Grangemouth)." Rec. Doc. 12592. In allowing

---

[6]    As summarized in the Stipulation, MOEX and Halliburton also agreed to make payments to resolve government claims arising from the *Deepwater Horizon* incident: (a) MOEX agreed to pay $70 million in civil penalties and to implement supplemental environmental projects at a cost of at least $20 million; and (b) HESI agreed to pay a $200,000 criminal fine. Rec. Doc. 13725 ¶¶ 5, 8.

certain discovery on those incidents to proceed, however, the Court stated that it was not deciding "whether any of those four specifically are admissible or not" and noted that BPXP could revisit the issue again later, including through a motion to strike the United States' expert report(s).  Mar. 21, 2014 Hr'g Tr. 25-26, 43-44 (Court stating that "we'll have a chance to make the final decision before trial as to whether any or all of those are admissible or not").

900.    On October 7, 2014, BPXP filed a Motion to Strike the Expert Reports of Walter H. Cantrell and Renewed Motion in Limine Relating to Prior Unrelated Incidents.  Rec. Doc. 13475.  In its Order dated December 16, 2014, the Court granted the motion to strike the reports of Admiral Cantrell, but allowed the United States to introduce into evidence the factual basis and guilty plea for the four previously identified prior incidents.  Rec. Doc. 13867; *see also* Rec. Doc. 13994 (confirming that Rec. Doc. 13867 permitted "only the introduction of the plea agreement and factual basis for the four prior incidents").

901.    In light of the Court's pre-trial orders relating to this factor, the evidence in the trial record is limited to the guilty pleas for the four prior incidents identified by the United States:  Endicott Island, Grangemouth, Texas City and Prudhoe Bay.  None of these four prior incidents involved BPXP and only one of these incidents even involved a violation of the CWA. TREX 022394; TREX 233863; TREX 233864; TREX 233876.  As a result, the trial record does not reveal any prior CWA violations by BPXP.  The United States' pre-trial statement also suggests that it has no such evidence.  Rec. Doc. 13901 at 6.

**B.    The Record Includes Evidence Only of Unrelated Prior Violations Involving Other BP Entities.**

902.    In Phase 1 of this proceeding, this Court held that the incidents at Grangemouth, Texas City, and Prudhoe Bay were "remote in time," "all land-based," and that "the circumstances of oil refinery disasters and a MODU exploratory drilling disaster [we]re vastly

195

different."  Rec. Doc. 5634 at 3-5.  The plea agreements admitted into evidence during the Penalty Phase confirm that the prior incidents span a period of approximately fifteen years and occurred in vastly different geographic regions, operations and circumstances.  *See generally* TREX 022394; TREX 233863; TREX 233864; TREX 233876.

903.  **Endicott Island.**  Endicott consists of two man-made islands located in the Beaufort Sea, off the North Slope of Alaska.  In the 1990s, BP Exploration (Alaska) Inc. was the majority owner of Endicott Island and employed a drilling rig provided and operated by a contractor, Doyon Drilling, Inc.  TREX 022394.0021-.0022.  Beginning in early 1993 and lasting until September 1995, Doyon Drilling discharged hazardous substances by injecting waste materials down the outer annuli of wells at Endicott.  TREX 022394.0023.

904.  BP Exploration (Alaska) Inc. first received allegations of Doyon Drilling's conduct on August 31, 1995.  TREX 022394.0025.  Before reporting the release, BP Exploration (Alaska) Inc. conducted an investigation to confirm the allegations.  TREX 022394.0025.  Two weeks later, on September 13, 1995, BP Exploration (Alaska) Inc. notified government authorities.  TREX 022394.0025.  In 1999, BP Exploration (Alaska) Inc. pled guilty to one count of failing to immediately report the release in violation of the Comprehensive Environmental Response Compensation and Liability Act (CERCLA).  TREX 022394.

905.  **Grangemouth.**  During a two-week period in May and June 2000, the Grangemouth refinery and chemical plant in Scotland experienced a fracture to a steam line pipe at the complex and a hydrocarbon fire from a pipe in the fluidized catalytic cracking unit.  TREX 233876.000001-.000003.  A pedestrian walking in the vicinity of the Grangemouth complex was injured by the steam line fracture and no injuries were reported as a result of the fire.  TREX 233876.000001-.000003.

906.     In 2002, BP Chemicals Ltd. and BP Oil Grangemouth Refinery Ltd. pled guilty to violating the UK Health and Safety at Work Etc Act of 1974 and paid fines totaling £1 million to the UK government.  TREX 233876.000005-.000006.

907.     **Texas City.**  On March 23, 2005, an explosion and fire at the BP Products North America refinery located in Texas City, Texas resulted in 15 casualties and numerous injuries. TREX 233864.000015, .000056.   The explosion and fire occurred during the restart of an isomerization unit when hydrocarbons were released into the atmosphere and ignited.  TREX 233864.000060-.000063.

908.     BP Products North America Inc. pled guilty to one knowing violation of the Clean Air Act and agreed to pay a $50 million fine.  TREX 233864.000002.

909.     **Prudhoe Bay.**  The Greater Prudhoe Bay exploration and production area in Alaska includes over 1,500 miles of pipeline located 200 miles north of the Arctic Circle.  TREX 233863.000007-.000008.  In March and August 2006, pipeline corrosion caused two leaks from oil transit lines, releasing approximately 5,800 barrels of crude oil.   TREX 233863.000008-.000010.   The corrosion was caused by Microbial Induced Corrosion, a process by which bacterial colonies form inside a pipeline causing internal corrosion.  TREX 233863.000010.

910.     BP Exploration (Alaska) Inc. pled guilty to one count of violating the CWA and paid a $20 million penalty.   TREX 233863.000006, .000014.   During the government's investigation, BP Exploration (Alaska) Inc. "cooperated as requested by state and federal authorities" and "made witnesses available and voluntarily shared technical information regarding the incident with federal investigators," which "made the timely resolution of this complex case possible."  TREX 233863.000013.

### C. Prior Incidents Involving Other BP Entities Were Not Related to the *Deepwater Horizon* Incident.

911.   The United States has contended that these prior incidents and the *Deepwater Horizon* incident were each the result of similar process safety management system failures. *E.g.*, Rec. Doc. 12460 at 10.   The *Deepwater Horizon* incident, however, was not the result of a process safety management system failure.   As this Court determined in its Phase 1 ruling, BP had a process safety management system in place for the Macondo well and the *Deepwater Horizon*, and that system was neither defective nor causal of the *Deepwater Horizon* incident: "It may not have been perfect, but the evidence has not shown that it was defective or a cause of the blowout, explosion, and fire."   Rec. Doc. 13381 ¶¶ 467-469.

912.   The United States also has contended that BP made "no change" to its safety and risk management practices after the four prior incidents.   Tr. 36 (US Opening Statement).   This contention is refuted by extensive evidence introduced during Phase 1 demonstrating that BP took significant steps to enhance its process safety management system in the years preceding the *Deepwater Horizon* incident.   Rec. Doc. 10467 ¶¶ 2407-54.   These enhancements included the development and implementation of a new safety management system (known as OMS), additional process safety training programs, increased oversight of process safety matters by BP's senior leadership, and improved metrics to monitor and track process safety performance. Rec. Doc. 10467 ¶¶ 2407-54.

913.   BP's safety enhancements worked—the government's own data shows that BP had a superior and improving safety record in the Gulf of Mexico in the years leading up to the *Deepwater Horizon* incident.   Rec. Doc. 10467 ¶¶ 2640-67.

## IX.    ANY OTHER MATTERS AS JUSTICE MAY REQUIRE.

### A.    BPXP's Important Role in the United States and Gulf Coast Economies.

#### 1.    BPXP's Important Role in the Gulf of Mexico Oil and Gas Industry.

914.    BPXP has played a significant role in the Gulf of Mexico's oil and gas industry for decades.  Specifically, BPXP has operated in the Gulf of Mexico for over 50 years and has operated in deepwater in the Gulf of Mexico for approximately 25 years.  Tr. 1569 (Morrison).

915.    BPXP is known for its exploration capability and success in the Gulf of Mexico. In the course of deepwater exploration, BPXP has made significant discoveries including fields at Thunder Horse, Mad Dog, and Na Kika, among others.  Tr. 1569-70 (Morrison).

916.    In terms of the nature of its business, BPXP conducts exploration activities in deepwater in the Gulf of Mexico and operates production facilities.  Tr. 1568, 1571 (Morrison). BPXP currently operates four "core facilities: Thunder Horse, Mad Dog, Na Kika and Atlantis." Tr. 1568, 1571 (Morrison).

917.    BPXP is currently the operator of over 500 leases in the Gulf of Mexico and partners with companies on other leases.  In total, BPXP currently holds over 600 leases for the Gulf of Mexico.  Tr. 1571-72 (Morrison); TREX 013067.0055 (Scott Expert Rpt.).

918.    BPXP is an active operator of its leases, with over 8,000 drilling days from 2009-2013, including over 4,000 drilling days in 2013 alone.  TREX 013067.0056 (Scott Expert Rpt.).

919.    BPXP operates ten deepwater drillings rigs in the Gulf of Mexico.  Tr. 1572 (Morrison).

920.    When United States expert Dr. Mason applies the Herfindahl-Hirschman Index (HHI) to suggest that the Gulf of Mexico oil and gas industry is unconcentrated and BPXP's role in oil production could be replicated, he fails to appreciate the distinction between exploration and production in deepwater versus non-deepwater.  TREX 013073.0031 (Scott Expert Rpt.).

199

Although definitions differ, deepwater can be described as 1800 feet of water or deeper.  Tr. 1570-71 (Morrison).

921.    There are serious barriers to entry in deepwater drilling in the Gulf of Mexico. Tr. 2097-98 (Scott).  Deepwater drilling involves a different risk profile and requires substantially more investment than shallow water drilling.   Tr. 1568-69 (Morrison); TREX 011923.0020 (BOEM Social Effects Rpt.); Tr. 772-776 (Mason).  For example, it costs approximately $1 million daily to operate a deepwater drilling rig whereas a shallow water rig may cost a "couple hundred thousand."  Tr. 1569 (Morrison).

922.    Consistent with these barriers to entry, deepwater oil production in the Gulf of Mexico has fewer industry participants than in the Gulf of Mexico oil and gas industry as a whole.  TREX 013073.0032 (Scott Expert Rpt.).

923.    In 2013, for depths greater than 1,000 meters, BPXP's share of oil production was 24.1%, when only four competitors had over 10% of deepwater production.    TREX 013073.0032-.0033 (Scott Expert Rpt.).

924.    BPXP is currently producing approximately 254,000 barrels of oil per day (net). Tr. 1573 (Morrison); TREX 013162.1.1.BP.  For the past four to five years, BPXP has been a top producer of oil in the Gulf of Mexico.  Tr. 1573 (Morrison) ("So, between Shell and BP, it varies from one to two.")  BPXP from 2009-2013 has been either the No. 1 or No. 2 producer of oil in the Gulf of Mexico.  Tr. 768 (Mason); TREX 013327.

925.    BPXP's share of Gulf of Mexico oil production during the 2009-2013 period was 24%, which was more than 150% of the next highest peer's share of oil production.  D35374; Tr. 768-769 (Mason); Tr. 2095-96 (Scott); TREX 013067.0056-.0058 (Scott Expert Rpt.).

926.    Onshore operations in Louisiana and Texas support BPXP's deepwater Gulf of

Mexico business.  In Houma, Louisiana, BPXP's offshore operations are supported by an Operations Learning Center, a Preservation and Maintenance Facility, and an aviation base. BPXP moves approximately 10,000 people monthly in and out of operations from Houma.  Tr. 1573-75 (Morrison).

927.    In Port Fourchon, Louisiana, BPXP has four slips that support about 35 deepwater vessels and supply vessels used in offshore operations.  BPXP spends approximately $620 million annually on the supply base operations in Port Fourchon.  Tr. 1574 (Morrison).

928.    In Houston, Texas, BPXP occupies a 20-story building on the Westlake campus where engineers, geoscientists, geologists, supply chain, finance, and other functions support BPXP's production operations.  Tr. 1574-75 (Morrison).

### 2.    BPXP is a Major Contributor to the National and Gulf Coast and Economies and Communities.

929.    To support its Gulf of Mexico business, BPXP makes capital and operational expenditures.  Tr. 1575-81 (Morrison).  On an annual basis, BPXP spends approximately $5 billion on capital and operational expenditures.   Tr. 1575-81, 1584 (Morrison); TREX 013067.0045-.0048 (Scott Expert Rpt.); D34612; D34613; D34818.

930.    BPXP makes capital expenditures on new wells, new facilities, and new pipelines, among other things.  Tr. 1575 (Morrison); D34612.  From 2009 to 2013, BPXP spent over $13 billion on capital expenditures for its Gulf of Mexico business.   TREX 240462; TREX 013067.0045-.0047 (Scott Expert Rpt.); Tr. 2085-86 (Scott); D34612; D34818.

931.    BPXP's $13.2 billion in capital expenditures over a five-year period is a significant amount that is higher than all but one capital project in 10 states in the Southeastern United States, including the Gulf Coast states.  Tr. 2085-87 (Scott); TREX 013067.0046 (Scott Expert Rpt.).  In over 100 economic studies conducted by Dr. Scott, only two recent capital

projects involved expenditures expected to exceed $13.2 billion.  TREX 013067.0047 (Scott Expert Rpt.); Tr. 2087 (Scott).

932.   BPXP makes operational expenditures to maintain and operate the four core production hubs and to engage in exploration activities to locate new sources of oil and gas. Compensating those searching for oil and gas, including geologists and geophysicists, is part of operating expenditures.  Tr. 1575 (Morrison).  From 2009 to 2013, BPXP spent over $8.8 billion on operational expenditures for its Gulf of Mexico business.   TREX 240461; TREX 013067.0048-.0049 (Scott Expert Rpt.); D34613; D34818.

933.   BPXP's operational expenditures averaged almost $1.8 billion per year from 2009-2013, which is a very significant amount that is larger than all but one other firm's operational spending in the Gulf Coast region.  Tr. 2086 (Scott); TREX 013067.0049 (Scott Expert Rpt.).

934.   Certain of BPXP's operational and capital expenditures are fixed costs, such as BPXP's long-term contracts with many of its suppliers and vendors.  These are costs that BPXP cannot ratchet up or down, depending on the environment.  Tr. 1581-82 (Morrison) ("The capital cost side contracts tend to be very, very long term in nature.")

935.   If BPXP were to walk away from its long-term contracts with suppliers and vendors, there would be "significant penalties for not finishing a contract."  Tr. 1582 (Morrison).

936.   Deepwater drilling requires significant capital investment.  Tr. 1569 (Morrison). The productivity of deepwater wells tends to decline "almost immediately."   Tr. 1585 (Morrison).   Therefore, it is essential to reinvest in deepwater exploration to keep overall production volumes up.  Tr. 1569, 1585 (Morrison) ("you really have to invest here to keep your production levels flat or slightly declining.")

937.    The annual combined capital and operational spending by BPXP has a "way, way big impact compared to anything else I have ever run into before." Tr. 2084 (Scott); TREX 013067.0062 (Scott Expert Rpt.) ("In at least three decades of conducting economic studies, I have never encountered a firm that injected this much money into the economy, much less into the Gulf Coast Region economy, in one year."); TREX 013069.0038 (Scott Expert Rpt.); *see also* Tr. 2098 (Scott) ("And I think all the data that I put together has shown that it's not a small; it is a big impact on the economy.").  Dr. Scott has been studying the Louisiana economy since 1970 and the economies of Mississippi, Alabama, and the Florida Panhandle for two and a half decades.  Tr. 2027-2028 (Scott).  He has co-authored the Louisiana Economic Outlook since 1984.  Tr. 2029 (Scott).

938.    The United States' expert economist agreed with Dr. Scott that BPXP benefits the Gulf Coast: "Yes, I agree that the capital expenditures would deliver benefits to the Gulf Coast area."  Tr. 779-80 (Mason).

939.    The sum of BPXP's 2013 capital and operational expenditures ($5.6 billion) is equal to the total of all earnings of all workers in Louisiana's durable goods manufacturing sector.  Tr. 2087 (Scott); TREX 013067.0061 (Scott Expert Rpt.); D34808.

940.    According to United States expert Dr. Mason, based on BPXP's share of hydrocarbon production and the oil and gas industry's role in the Louisiana economy, BPXP's spending accounts for 4% of the Louisiana economy, which equals approximately $8-9 billion per year, assuming Louisiana's GDP is close to $216 billion.  Tr. 727, 780-81 (Mason).

941.    There are approximately 2,300 employees working on behalf of BPXP for Gulf of Mexico operations.  Tr. 1572 (Morrison); TREX 013067.0049-.0050 (Scott Expert Rpt.).  For the employees who support BPXP's Gulf of Mexico operations, BPXP pays for their time.  Tr. 1572-

73 (Morrison).

942.   From 2009 to 2013, BPXP spent over $2 billion on employment costs including salaries and benefits.  Tr. 1582-83 (Morrison); D34614; TREX 011968; TREX 013067.0051 (Scott Expert Rpt.).

943.   The average employee salary, wage, and overtime of these BPXP-supported jobs is $115,000 per year.  Tr. 2091-92 (Scott); TREX 013067.0051 (Scott Expert Rpt.); D34022A. This is significantly higher than the average annual wage compensation in Louisiana ($43,316), Alabama ($43,276), Mississippi ($35,880), Florida ($43,212), and Texas ($51,168).  *Id.*

944.   These approximately 2,300 jobs supported by BPXP at $115,000 per year are high-paying jobs that are important to the Gulf Coast economy.  Tr. 2091-92, 2096 (Scott); TREX 013067.0051 (Scott Expert Rpt.); D34022A; TREX 013073.0029 (Scott Expert Rpt.) ("Based on my decades of experience, the high-paying jobs a new firm brings to a region is an important consideration when evaluating BPXP's impact on the Gulf Coast economy…").

945.   Approximately 4,000 vendors support BPXP's Gulf of Mexico operations by providing services and equipment, such as supply vessels and helicopters.  Tr. 1583-84 (Morrison); Tr. 2093 (Scott); TREX 013067.0052 (Scott Expert Rpt.).  The jobs supported by these vendors do not include the more than 2,300 BP jobs directly paid for by BPXP.  Tr. 2093 (Scott); TREX 013067.0051-.0052 (Scott Expert Rpt.).

946.   From 2009 to 2013, BPXP paid its vendors over $16.5 billion.  Tr. 1583-84 (Morrison); D34622; TREX 240461; TREX 240462; Tr. 2093 (Scott); TREX 013067.0052 (Scott Expert Rpt.).

947.   Sixty-six point six percent of BPXP's 4,000 vendors from 2009-2013 were located in the Gulf of Mexico region.  Tr. 2104 (Scott); TREX 013067.0052-.0053 (Scott Expert

Rpt.); D34023.

948.    United States expert Dr. Mason estimated that, based on BPXP's responsibility for hiring 20% of the vendor employees in the Gulf of Mexico oil and gas industry, BPXP is responsible for the wages of 40,000 individuals in the region.  Tr. 786 (Mason).  Dr. Mason did not identify any other private employer in the Gulf state region that is responsible for the labor earnings of so many people.  Tr. 787 (Mason).

949.    BPXP spends money from its operations to pay for royalties, rentals, and bonus payments to the federal government.  From 2009 to 2013, these payments totaled more than $5.4 billion.  TREX 013067.0054 (Scott Expert Rpt.); Tr. 2089 (Scott); D34024.  The royalties alone totaled approximately $4.8 billion.   Tr. 1586 (Morrison); D34615; TREX 011970; TREX 013067.0054 (Scott Expert Rpt.).

950.    BPXP's regional investments and expenditures in the Gulf of Mexico benefit the United States economy through its royalty, rental, and bonus payments to the United States government.  TREX 013067.0004 (Scott Expert Rpt.); Tr. 2090-91 (Scott).

951.    "BPXP's activity is important to the Gulf economies."  Tr. 2098 (Scott).  Its expenditures have had and continue to have a "significant positive effect" on the economies of the Gulf Coast region and the United States and make a positive contribution to these economies. TREX 013067.0062 (Scott Expert Rpt.); Tr. 2095-96 (Scott); *see also* Tr. 2091 (Scott) (concluding that "you can't look at numbers like this without saying this [company] is really important" and has a "major impact" on the area); TREX 013073.0030 (Scott Expert Rpt.).

952.    BPXP's market share is not the right metric for determining BPXP's importance to the economy.  Tr. 2095, 2092 (Scott); TREX 013069.0036-.0037 (Scott Expert Rpt.); TREX 013073.0028 (Scott Expert Rpt.) ("The question is not how important BPXP is to the oil and gas

industry in the Gulf, but rather how important it is to the economy in which it operates." (emphasis omitted)).

953.    From an economist's perspective, it is more relevant economically to determine how much economic value BPXP brings to the economies of the region and country through its expenditures, investments, and jobs, than to refer to its market share of various activities in the Gulf of Mexico oil and gas industry.  TREX 013073.0028, .0030 (Scott Expert Rpt.).  *See also* TREX 013069.0034-.0036 (Scott Expert Rpt.) (comparing BPXP's market shares, including its 15.36% of Gulf of Mexico oil production, to Wal-Mart's 13.4% share of retail trade and Bank of America's 10.9% share of U.S. deposits.).

954.    The economic development departments of states like Louisiana attempt to attract firms to their states based on a firm's capital and operational spending, how many jobs it will support, and how much the firm will pay its workers, not the firm's market share.  Tr. 2091-92 (Scott); TREX 013069.0036-.0037 (Scott Expert Rpt.).

**B.      BPXP's Substantial Monetary Commitments to the Gulf Coast.**

**1.      BPXP Committed $500 Million To Support Gulf of Mexico Research Initiative (GoMRI).**

955.    In 2010, BPXP committed $500 million over a 10-year period to create an independent research program to study the Gulf ecosystem, including the potential impact associated with the *Deepwater Horizon* accident on the environment.  The research program is referred to as the Gulf of Mexico Research Initiative ("GoMRI").  Tr. 1358 (Folse); TREX 011829; Tr. 659 (VanHaverbeke); Hanzalik Dep. 260-62.

956.    GoMRI distributes funds to academic and research institutions primarily in the Gulf Coast.  These institutions conduct research on various topics relating to oil spills and the ecosystem, including dispersion and dilution of petroleum in the ecosystem, the environmental

effects of petroleum and dispersants on the sea floor, water column, and wetlands, and the impact of oil spills on public health, among other topics.  TREX 011829.

957.    BPXP provides funding to GoMRI but does not evaluate research proposals or the publication of any of the science that comes out of the funding.  Tr. 1359 (Folse); TREX 013513.000011 (VanHaverbeke Expert Rpt.).

958.    BPXP's agreement to fund GoMRI is beneficial because it represents a sustained source of funding for research, which did not exist before the spill, and it promotes a better understanding of the Gulf of Mexico ecosystem.  Further, it provides significant funding for the Gulf States and their academic institutions.  Tr. 1362 (Folse).

## 2.    BPXP Voluntarily Committed $1 Billion To Fund Early Restoration Projects.

959.    In April 2011, BPXP entered into an early environmental restoration agreement with the Trustees, which are federal and state agencies tasked with stewardship of natural resources on behalf of the public.  Under the agreement, BPXP provided $1 billion toward early restoration projects. Tr. 1355 (Folse); TREX 245780; Tr. 659 (VanHaverbeke).

960.    Early restoration efforts are those that occur prior to the completion of the Natural Resources Damages Assessment.  Tr. 1355 (Folse) (testifying that early restoration "jump-start[s] restoration").

961.    The Trustees have agreed that BPXP's "commitment to fund early restoration projects . . . is voluntary."  TREX 245780.0005.

962.    Early restoration is beneficial to the environment because it takes place much earlier than would be the case if BPXP and the Trustees waited until the NRD process concluded before beginning restoration.  Tr. 1356 (Folse).

963.    As of January 2015, BPXP and the Trustees had designated $698 million for 54

specific projects in Louisiana, Mississippi, Alabama, Florida, and Texas.  Tr. 1356 (Folse); D34541.

964.    As one example of an early restoration project, BPXP is funding the restoration of four barrier islands off the coast of Louisiana, which furthers Louisiana's comprehensive master plan for sustaining the coastline and will provide critical habitat for a number of bird species.  Tr. 1358 (Folse); D34542.

### 3.    BPXP Funded Seafood Testing, Tourism, and Other Initiatives.

965.    BPXP supported the seafood industry with state-led seafood testing and marketing programs.  *See* BPXP Proposed Findings of Fact ¶¶ 261, 278-279, 319 (describing BPXP's commitment of $82 million and payment as of August 15, 2014 of $71 million in grants for the testing and marketing of Gulf seafood).

966.    BPXP supported the Gulf tourism industry with direct payments to state and local communities for tourism promotion.  *See* BPXP Proposed Findings of Fact ¶¶ 278-279, 293-297 (describing BPXP's commitment of $230 million in grants to Louisiana, Alabama, Mississippi, and Florida for the promotion of Gulf Coast tourism).

967.    BPXP established a $100 Million Rig Worker Assistance Fund.  *See* BPXP Proposed Findings of Fact ¶¶ 278-279, 315-318 (describing BPXP's commitment of $100 million to the Gulf Coast Restoration and Protection Foundation and Baton Rouge Area Foundation to compensate unemployed rig workers).

968.    BPXP provided initiatives and grants to monitor and treat health concerns.  *See generally* BPXP Proposed Findings of Fact, Section II.E.

### 4.    BPXP Spent Over $14 Billion To Support Spill Response Efforts.

969.    BPXP spent over $14 billion on spill response efforts and a significant amount of this funding went directly to Gulf Coast states, communities, and individuals.  *See generally*

BPXP Proposed Findings of Fact ¶¶ 86, 278-281, 321-327, 645, 647-648.

970.    The over $14 billion in spill response spending included providing block grants to the Gulf States to help them respond to the spill; committing $360 Million to the Coastal Protection and Restoration Authority of Louisiana for the construction of berms in May 2010; the massive and complex source control efforts to cap the well; and creating the VOO Program, which employed thousands of vessel owners and crews.  *See* BPXP Proposed Findings of Fact ¶¶ 86, 168-175, 283-284; Rec. Doc. 14021 ¶ 213.

**C.     BPXP's Technological Achievements and Industry Leading Safety Advancements.**

**1.     BPXP Contributed to Advancements in Spill Response Technology.**

971.    At the time of the *Deepwater Horizon* accident, the toolkit that was available for responding to spills was of a "certain vintage and a certain capability."  Spill responders collaborated and advanced those tools during the response.  Tr. 1558-59 (Morrison); TREX 231104 (Harnessing Capabilities Rpt.); TREX 011987; TREX 247272.

972.    Captain VanHaverbeke, an expert for the United States, admitted: "[D]uring the *Deepwater Horizon*'s response, the Unified Command, including the Coast Guard and BP, adapted proven spill response technologies and employed new or innovative technologies to fight the spill."  Tr. 660-62 (VanHaverbeke) (agreeing that "BP and the Coast Guard worked together to explore and develop new technologies during the response").

973.    BPXP "welcomed, developed, implemented, and shared innovative concepts designed to improve oil containment and recovery."  TREX 241529.0079 (Paskewich Expert Rpt.); Tr. 662 (VanHaverbeke) (admitting that BPXP made contributions to the effort to explore and develop new technologies during the response).

974.    There were numerous technological advancements achieved during the response,

209

including advancements relating to in situ burning, booming, dispersant application, skimming, shoreline cleanup, and communications infrastructure. Tr. 1300-01 (Paskewich); TREX 241529.0080-.0081 (Paskewich Expert Rpt.) (describing the innovative Big Gulp large-capacity skimmer and innovative boom cleaning tools); Tr. 1398 (Utsler) (describing advancements in the "Common Operating Picture"); D35040; Tr. 1766 (Taylor) (the Snorkel SCAT program was an innovative method of locating subtidal oil); D34309; Tr. 1782-83 (Taylor) (the Sand Shark beach cleaner effectively removed oil from beaches); TREX 231104.24.1.BP; Tr. 1562-64 (Morrison) (describing enormous advancements in simultaneous operations (SIMOPs).)

975.    These advancements accelerated the pace at which oil could be removed from the water and shoreline, among other benefits. *See, e.g.*, TREX 009105 (FOSC Rpt.) (the Sand Shark accelerated the beach-cleaning process); TREX 241529.0080-81 (Paskewich Expert Rpt.) (the *Big Gulp* skimmer could skim much more oil than traditional skimming technologies before having to return to port to unload its cargo); *id*. (snorkel SCAT was an innovative way of locating residual oil in the intertidal zone); *id*. (the Boom Blaster could clean boom at a rate far exceeding the rate at which boom can be cleaned using traditional methods).

976.    The Alternative Response Technology ("ART") Program, formed in May 2010, was a Unified Command effort that was managed by BPXP out of the Houston ICP. Tr. 626 (VanHaverbeke); TREX 013513.000015 (VanHaverbeke Expert Rpt.).

977.    The ART Program's purpose was to evaluate and test new and improved response technologies to make response and cleanup operations more efficient and effective. TREX 013513.000015 (VanHaverbeke Expert Rpt.); TREX 013515.000006-.000008 (VanHaverbeke Expert Rpt.) (the ART program was "a significant effort to identify better response solutions.")

978.    The ART Program received ideas submitted by the public and ultimately

recommended approximately 45 for use in response operations.  TREX 241529.0079 (Paskewich Expert Rpt.).  As the United States' expert has recognized, the ART Program delivered improvements in response technologies that will aid spill response for years to come.  Tr. 663-64 (VanHaverbeke).

979.   After the spill, BPXP approached Director Bromwich and other federal regulators to share learnings about advancements in spill response tools that were achieved during the *Deepwater Horizon* spill response.  Tr. 1548, 1557-59 (Morrison).

980.   No one in the federal government ever indicated to BPXP that the spill response tools and technologies that BPXP presented were not advancements but had actually been on the shelf and ready to be deployed at the time of the *Deepwater Horizon* spill.  Tr. 1557-59 (Morrison).  *See also* TREX 012500 (Lubchenco concluded that "[r]esponse to future deep spills globally will benefit from the many scientific breakthroughs applied to DWH.").

## 2.   BPXP Shared Learnings about Spill Response Technology and Capability Worldwide.

981.   After the spill, BP created a Global Deepwater Response Group that captured the learnings from the *Deepwater Horizon* accident and spill response and shared them worldwide with industry, regulators, and governments engaged in drilling.  Tr. 1534, 1559-60 (Morrison) (the Vice-President of Global Deepwater Response and his colleagues traveled to over 30 countries worldwide to share the lessons learned); Tr. 661-62 (VanHaverbeke); TREX 231104 (Harnessing Capabilities Rpt.); TREX 011987; TREX 247272.  The Group is staffed with full-time employees, including experienced engineers and other leaders.  Tr. 1554-55 (Morrison).

982.   The Group has given over 150 presentations worldwide and led workshops with various companies, bringing in responders to highlight learnings in spill response and source control and helping companies to improve their spill response plans.  Tr. 1554, 1560 (Morrison).

These presentations and workshops accelerated the rate at which learnings spread through the industry and provided industry members an opportunity to speak with responders first-hand.  Tr. 1560 (Morrison).

983.    The Global Deepwater Response Group shared learnings from the *Deepwater Horizon* accident and spill response in five key areas: spill response, prevention and drilling, containment, crisis management, and relief well.  D34603; Tr. 1561 (Morrison).  To illustrate, on the topic of containment, the Group shared information about capping stacks, collection devices, and operations and logistics.  On the topic of relief wells, the Group shared lessons learned from drilling two relief wells in parallel and addressed the importance of preparing a conceptual relief well design for future well drilling.  TREX 011987.0007-.0008; Rec. Doc. 12047 ¶¶ 329-336. As it relates to spill response advancements, the Group shared advancements relating to skimming, booming, and in situ burning, among others.  Tr. 1564 (Morrison).

984.    During all of the presentations that the Group gave worldwide to regulators and industry members relating to spill response advancements, no one ever claimed that the spill response technologies pre-dated the spill and that no improvements were made during the spill. Instead, there was "[a] lot of recognition for what the teams had done to advance those capabilities."  Tr. 1564-65 (Morrison).

985.    Today, the Global Deepwater Response Group remains committed to sharing the lessons learned and continues to collaborate with organizations, regulators, and industry groups to ensure that the learnings from the accident and spill are embedded in industry practice and preparedness.  Tr. 1555, 1559 (Morrison).

986.    After the spill response, BPXP provided its spill response equipment, including vessels and a capping stack, to the Marine Well Containment Company in support of

preparedness for a deepwater blowout.  Tr. 1538 (Morrison); Rec. Doc. 12047 ¶ 233.

### 3.   BPXP Has Improved Drilling Safety at BP and Shared Learnings with the Industry.

987.   After the *Deepwater Horizon* accident, BPXP took several steps to improve the safety of drilling operations.  Tr. 1567 (Morrison).  These include building the Houston Monitoring Center with input from NASA.  Tr. 1566-67 (Morrison); D34604.

988.   The Houston Monitoring Center provides a third layer of oversight and protection for BP's drilling operations in the Gulf of Mexico.  Tr. 1565 (Morrison).  It is staffed by approximately 30 drilling specialists, including mudloggers, well site leaders, and cementing experts, whose sole purpose is to focus on well control and monitoring the health of every wellbore.  Tr. 1565 (Morrison); D34604.  If they detect anomalies during drilling, they have an escalation protocol and a process for contacting the rig.  Tr. 1566-67 (Morrison).

989.   BPXP has brought the industry and regulators to see the Houston Monitoring Center and learn about its capabilities.  Nonetheless, this monitoring center is still unique in the industry and one-of-a-kind.  Tr. 1566-67 (Morrison).

990.   BPXP has engaged in additional efforts to improve drilling safety.  After the *Deepwater Horizon* accident, the Global Deepwater Response Group worked with BP's deepwater regions worldwide to ensure they were familiar and compliant with BP's revised guidelines for drilling deepwater wells.  The Global Deepwater Response Group also oversaw construction of a global capping stack for deepwater drilling operations.  Tr. 1534 (Morrison).

### PROPOSED CONCLUSIONS OF LAW

### X.   GIVEN THE PURPOSES OF THE CLEAN WATER ACT, ANY SECTION 311(B)(7)(D) PENALTY MUST BE SET IN LIGHT OF BPXP'S CUMULATIVE LIABILITY UNDER OPA, FEDERAL MARITIME LAW, AND THE CRIMINAL PROVISIONS OF THE ACT.

991.   The CWA penalty system for oil spills embodies two complementary purposes—

to deter behavior that might lead to environmental harm and to incentivize the most effective response possible should a violation and thus environmental harm occur.  CWA Section 311(b)(7)(A) and (D) per-barrel penalties trace back to violations of CWA Section 311(b)(3) and make clear the core purpose of deterring spills.  *See* CWA Section 311(b)(1), 33 U.S.C. § 1321(b)(1) (expressing the purpose of the entirety of CWA Section 311(b) as follows:  "The Congress hereby declares that it is the policy of the United States that there should be no discharges of oil or hazardous substances into or upon the navigable waters of the United States, adjoining shorelines ….").

992.    CWA Section 311 seeks to maximize the cleanup of spills, as well as their mitigation, and to avoid interference with such efforts.  "A fundamental objective of the [Clean Water Act] is to 'ensure effective and immediate removal of a discharge . . .  of oil....'" *In re Deepwater Horizon*, 2012 WL 5960192, at \*13, *quoting* CWA Section 311(c)(1)(A), 33 U.S.C. § 1321(c)(1)(A).  "Likewise, a goal of the NCP is to 'provide for efficient, coordinated, and effective action to minimize damage from oil....'" *Id.*, *quoting* CWA Section 311(d)(2), 33 U.S.C. § 1321(d)(2).

993.    The cleanup and remediation purposes of the Act are also evident from CWA Section 311(b)(7)'s enforcement structure and the two key subsections of CWA Section 311 that CWA Section 311(b)(7) ties to closely.  Specifically, CWA Section 311(b)(7)(A) through (C) describe **three different types of potential violations** that carry either per-barrel, per-day, or other types of civil penalties.  Thus, these provisions are appropriately summarized and categorized as follows:

> **(1) *Discharge Penalties.***   CWA Section 311(b)(7)(**A**) (and its counterpart in CWA Section 311(b)(7)(**D**) concerning gross negligence and willful misconduct) carry per-barrel or per-day civil penalties for the discharge of oil or hazardous substances.

The next two subsections focus on the importance of assuring that remediation efforts are

maximized:[7]

> **(2) Penalties for Failure to Comply with Removal Orders.**  CWA Section 311(b)(7)(**B**) provides penalties for failing to comply with removal orders issued under ***CWA Section 311(c)***.  And

> **(3) Penalties for Failure to Comply with Removal Regulations.**  CWA Section 311(b)(7)(**C**) provides for penalties for failing to comply with regulations issued pursuant to ***CWA Section 311(j)'s*** removal authority.

CWA Sections 311(c) and 311(j) are the two main provisions of CWA Section 311 dealing with oil/hazardous substance removal and mitigation authority.

994.    As a result, CWA Sections 311(b)(7)(A)/(D) (the most relevant provisions here) must be interpreted structurally in light of CWA Sections 311(c) and (j) to accord with Congress's purposes to promote and not impede oil removal and mitigation efforts.  *See K Mart Corp. v. Cartier, Inc.*, 486 U.S. 281, 291 (1988) ("In ascertaining the plain meaning of the statute, the court must look to the particular statutory language at issue, as well as the language and design of the statute as a whole."); *Elgin Nursing & Rehab. Ctr. v. United States Dep't. Health & Human Servs.*, 718 F.3d 488, 494 (5th Cir. 2013) (citing *United States Nat'l Bank of Or. v. Indep. Ins. Agents of Am., Inc.*, 508 U.S. 439, 454–55 (1993)) ("We consider the text holistically, accounting for the 'full text, language as well as punctuation, structure, and subject matter.'").

995.    Moreover, no environmental enforcement regime should be interpreted in a fashion that would be counterproductive to its basic environment-protecting role.  *See, e.g., La. Envtl. Action Network v. EPA*, 172 F.3d 65, 67 (D.C. Cir. 1999) ("treatment regulations could in some circumstances discourage excavation—and thus prevent any treatment at all.").  This is a

---

[7]    The United States does not contend that either of these provisions have been violated, since the record reflects that BPXP cooperated fully with the Unified Command and indeed participated in response efforts that went beyond the bare minimum of BPXP's legal requirements.

commonplace of environmental law applicable to multiple statutory regimes, such as CERCLA

(the Comprehensive Environmental Response, Compensation, and Liability Act),[8] the Clean Air

Act,[9] the CWA,[10] and RCRA (the Resource Conservation and Recovery Act).[11]

996.    Case law sometimes refers to the twin purposes of punishment and deterrence and

that is entirely consistent with recognizing that the Act seeks to both avoid spills in the first place

and to contain such damage once it occurs.  *See, e.g., United States v. CITGO Petroleum Corp*.,

723 F.3d 547, 554 (5th Cir. 2013) (noting "the purpose of civil penalties under the CWA—

---

[8]    *See W.R. Grace & Co.-Conn. v. Zotos Int'l, Inc.*, 559 F.3d 85, 95 (2d Cir. 2009) ("While potentially liable parties might still attempt to clean up a contaminated site, *we see no practical or statutory purpose in discouraging parties from remediating contaminated sites in a manner that provides agency oversight of the remediation.*") (emphasis added).

[9]    *See National Emission Standards for Hazardous Air Pollutants: Site Remediation*, 67 Fed. Reg. 49,398, 49,406 (July 30, 2002) ("We believe that requiring remediation activities at Superfund NPL [National Priorities List] sites and at permitted or Federal Order RCRA corrective action sites to meet the requirements of this proposed rule *could either create incentives to avoid cleanup, or result in the selection of a remediation approach that is less desirable, protective or permanent* (e.g., capping or containing the contaminated media instead of permanently removing or treating the contaminants). (Cf. Louisiana Environmental Action Network v. EPA, 172 F. 3d 65, 67, 70 (D.C. Cir. 1999) ….") (emphasis added).

[10]    *See Compensatory Mitigation for Losses of Aquatic Resources*, 73 Fed. Reg. 19,594, 19,651-52 (Apr. 10, 2008) (changing regulatory timelines to promote mitigation program's proper operation) (joint EPA and Army Corps of Engineers CWA rulemaking); *National Oil and Hazardous Substances Pollution Contingency Plan*, 59 Fed. Reg. 47,384, 47,394 (Sept. 15, 1994) (making regulatory revisions to planning activities to avoid "*discourag*[*ing*] *and imped*[*ing*] *decisions on the use of dispersants and other spill mitigating chemical agents and devices*") (emphasis added).

[11]    *See Amendments to the Corrective Action Management Unit Rule*, 67 Fed. Reg. 2,962, 2,970 (Jan. 22, 2002) ("As discussed throughout the proposal and today's rulemaking, the *primary purpose* [*of this rule*] *is to remove these disincentives* . . . to excavation (or aggressive remediation) that application of RCRA Subtitle C requirements for as-generated wastes can impose on cleanup") (emphasis added); *Deferral of Phase IV Standards for PCB's as a Constituent Subject to Treatment in Soil*, 65 Fed. Reg. 81,373, 81,375 (Dec. 26, 2000) ("Thus, this aspect of the Phase IV rule appears at least potentially to be having an *environmentally counterproductive effect of delaying cleanups and discouraging aggressive remediation*.") (emphasis added); *Hazardous Remediation Waste Management Requirements (HWIR-media)*, 63 Fed. Reg. 65,874, 65,877 (Nov. 30, 1998) ("By not allowing temporary storage and accumulation in land-based units, the LDRs can be a *strong disincentive to excavating and managing remediation waste*. The staging pile provisions of today's final rule address this issue by allowing temporary storage and accumulation.") (emphasis added); *Hazardous Waste Management System; Identification and Listing of Hazardous Waste*, 57 Fed. Reg. 21,450, 21,464 (May 20, 1992) ("In addition, EPA has found that subtitle C requirements, when applied to contaminated media generated during cleanups (and indeed, more broadly, to remediation wastes), can *act as a disincentive to more protective remedies*, and can limit the flexibility of a regulatory decisionmaker in choosing the most practicable remedy at a specific site.") (emphasis added).

punishment and deterrence"); *In re Oil Spill by Oil Rig Deepwater Horizon in Gulf of Mexico*, MDL No. 2179, 2012 WL 5960192, at \*13 (E.D. La. Nov. 28, 2012).

997.    The Fifth Circuit's reminder in *CITGO* as to these interrelated purposes to maximize spill avoidance, which are two sides of the same coin, and their coexistence with the purpose of promoting mitigation even if spills occur act as guiding principles that impact all of the subsidiary analysis required under CWA Section 311, 33 U.S.C. § 1321.  *See CITGO*, 723 F.3d at 553-54.  Courts must bear both the deterrence/punishment and the remediation-protection purposes in mind while balancing the eight penalty factors.  And both sets of purposes are complementary.

998.    As Justice Breyer explained in the analytically similar context of punitive damages, which are closely akin to statutory penalties,[12] the goal is to set the disincentives associated with penal liability in such a way that "[s]maller damages would not sufficiently discourage firms from engaging in the harmful conduct, while larger damages would 'over-deter' by leading potential defendants to spend more to prevent the activity that causes the economic harm, say, through employee training, than the cost of the harm itself."  *BMW of N. Am., Inc. v. Gore*, 517 U.S. 559, 593 (1996) (Breyer, J., concurring).  Remediation efforts are a form of productive activity that it is important not to discourage.  In the same way, the original productive activities that created the unfortunate by-product of a particular accident now triggering civil penalties must also not be unduly discouraged.

999.    In other words, the overarching goal of CWA Section 311(b)(7) is to find the

---

[12]    The Supreme Court's decision in *Exxon Shipping Co. v. Baker*, 554 U.S. 471 (2008), also analyzes punitive damages and CWA statutory penalties as having similar purposes.  *See id.* at 514 (concluding that the presumptive ratio of 1:1 that the Court established for punitive damages in an oil-spill maritime case fits perfectly with Congress's purpose in a CWA provision of doubling the per-day penalties applicable to violative acts when acts going beyond negligence are involved).  *See also id.* at 502 ("[A] penalty should be reasonably predictable in its severity ....").

level of penalties that neither under- nor over-deters.  The Ninth Circuit's analysis in one of its

*Exxon Valdez* spill decisions is highly instructive on this point:

> Exxon's casualty losses for the [*Valdez*] vessel and cargo (approximately $46
> million), the costs of clean up (approximately $2.1 billion), the fine and restitution
> (approximately $125 million), settlement with the government entities [under the Clean
> Water Act] (approximately $900 million), settlements with private parties (approximately
> $300 million), and the net compensatory damages (approximately $19.6 million) totaled
> over $3.4 billion.  Whether cost of cleanup and compensatory damages, damage to the
> vessel, and lost oil deters bad future acts depends on whether it greatly exceeds the
> expense of avoiding such accidents, ***not whether the amounts are compensatory or
> punitive***.  A company hauling a cargo worth around $25.7 million has a large incentive to
> avoid a $3.4 billion expense for the trip ….  Just the expense, without any punishment, is
> too large for a prudent transporter to take much of a chance …. ***Because the costs and
> settlements in this case are so large, a lesser amount is necessary to deter future acts.***
> *BMW*['s analysis] helps avoid overdeterrence ….  It is hard to deter bad conduct without
> also deterring some good conduct that risks being misunderstood as bad, or that will look
> bad in retrospect.  Every large company knows that it cannot exercise absolute control
> over all its employees, so ***if there is too much risk in performing some activity, the
> entire activity may be avoided as a preferable alternative to bearing potentially infinite
> costs of avoiding the harm, and society would lose the benefit of the productive activity.***

*In re Exxon Valdez*, 270 F.3d 1215, 1244 (9th Cir. 2001) (emphasis added).  In short, a holistic

analysis of all monetary amounts paid by and monetized cleanup activities performed by the

party to be penalized must be considered by this Court as it formulates the CWA Section

311(b)(7)(D) penalty amount applicable to BPXP.  The prospect of counterproductive over-

deterrence must be kept in sight during this analysis.

1000.  Over-deterrence—the concept of going beyond properly incentivizing the

avoidance of harmful conduct in a manner that goes too far, over into the realm of discouraging

positive conduct—is well known in many other areas of the law.  The issue is not confined to oil

spills or even to environmental cases more broadly.  *See, e.g., Pac. Inv. Mgmt. Co. LLC v. Mayer

Brown LLP*, 603 F.3d 144, 157 (2d Cir. 2010) ("[O]verdeterrence in regulating capital markets

… will deter activity that we wish to encourage.") (quoting Ralph K. Winter, *Paying Lawyers,

Empowering Prosecutors, and Protecting Managers: Raising the Cost of Capital in America*, 42

DUKE L.J. 945, 962 (1993)); *Johnson v. Cenac Towing, Inc.*, 544 F.3d 296, 304 (5th Cir. 2008) (explaining that one purpose of tort doctrine's collateral source rule is to "prevent[] tortfeasors from paying twice for the same injury—a result that would achieve both overdeterrence and overcompensation."); *Greater Rockford Energy & Tech. Corp. v. Shell Oil Co.*, 998 F.2d 391, 394 (7th Cir. 1993) ("Given the potential scope of antitrust violations and the availability of treble damages, an over-broad reading of § 4 [of the Clayton Act] could result in 'overdeterrence,' imposing ruinous costs on antitrust defendants, severely burdening the judicial system, and possibly chilling economically efficient behavior."). *See also* RESTATEMENT (SECOND) OF TORTS § 901(c) (1979) (noting that any tort-like remedy includes pursuing the purposes of deterrence and punishment, the very same goals to be pursued in the CWA Section 311 context).

1001. As BPXP first noted in its Answer to the U.S. Complaint (Tenth Affirmative Defense), a penalty in the amount sought by the United States would be (i) so disproportionate to the overall facts and circumstances of this case, (ii) so punitive when considered in combination with all of the other payments that BPXP has had to make or may be required to make, and (iii) so enormously greater by orders of magnitude than any other penalty ever assessed under the environmental laws, that to assess such a penalty would violate the constitutional prohibition of excessive fines and/or the requirement for due process. *See, e.g., United States v. Bajakajian*, 524 U.S. 321, 334 (1998) (a sanction is excessive under the Eighth Amendment if "it is grossly disproportionate to the gravity of a defendant's offense"); *TXO Prod. Corp. v. Alliance Res. Corp.*, 509 U.S. 443, 454-55 (1993) (due process "imposes substantive limits beyond which penalties may not go") (internal quotations omitted); *Austin v. United States*, 509 U.S. 602, 609-10 (1993) (the Eighth Amendment applies to civil sanctions that constitute "punishment").

Moreover, the Court should interpret the CWA in a fashion that would avoid these constitutional difficulties.  *See, e.g., Ashwander v. TVA*, 297 U.S. 288, 346-49 (1936) (Brandeis, J., concurring).

1002.   The record shows that BPXP has been subject to numerous sources of deterrence even before any CWA Section 311 penalties might be imposed.  As the Ninth Circuit explained in *In re Exxon Valdez*, the key deterrence question for any economic actor or firm such as BPXP are the ***total monetary consequences*** it will face for its liability-creating conduct, not necessarily whether particular forms of such liability are labeled compensatory or penal or both.  Substance controls over form.

1003. ***First,*** BPXP has paid or will pay full compensatory remedies under OPA and under the two class action settlements entered into pursuant to OPA and/or maritime law.  *See, e.g., In re Oil Spill by Oil Rig Deepwater Horizon in Gulf of Mexico*, 910 F. Supp. 2d 891, 916 (E.D. La. 2012) (describing the economic class settlement as a "very favorable and generous settlement agreement"); *id.* at 917 (holding that the agreement satisfied the "critical goal [of] generous immediate payments" (citing *Amchem Prods., Inc. v. Windsor*, 521 U.S. 591, 626 (1997)).  These payments cover all injuries encompassed by OPA's and maritime law's broad reach and create deterrent effects because there is no prospect of being able to benefit from a violation.  Even if the gain from a violation is exactly equal to the costs of compensatory damages (and here they are not remotely in such balance, *see* discussion of the economic benefit factor in Section XIII.D), the settlement payments BPXP has faced would remain a strong deterrent both on their own terms and due to the significant administrative costs involved in funding the claims facilities that operate the economic and medical class action settlements.

1004. ***Second,*** BPXP has already agreed to pay in excess of $1 billion in criminal

220

penalties under Section 309 of the CWA (in a manner that can lawfully be considered here given certain limitations in BPXP's criminal plea agreement).  Those penalties, like any criminal remediation, serve overlapping punishment and deterrent goals just like the civil penalties authorized under CWA Section 311.  Any additional need for deterrence should be seen in this light and must account for the amount already paid in the form of criminal penalties.

1005.   Assessing the cumulative deterrent effect of all other federal statutes and maritime law causes of action on point is relevant to the achievement of CWA Section 311's purposes.  In particular, where an oil spill is involved, Section 311 functions alongside the provisions of OPA: the latter requires the payment of compensatory damages, while the former imposes penalties for conduct that has a high degree of overlap.  This coordination is no accident, as the Oil Pollution Act of 1990 is the overarching session-law statute that refashioned CWA Section 311 in its current form by the process of amendment, along with the newly created and separately codified OPA statute.  Nevertheless, the oil-spill context is different than all or most other types of CWA violation, which does not normally trigger any form of *federal* compensatory liability.  In the ordinary case in which Clean Water Act civil penalties would be sought under CWA Section 309, 33 U.S.C. § 1319, liability for compensatory damages would instead depend purely on any state law compensatory remedies that might happen to exist (typically under the common law).  Hence, ensuring full deterrence and punishment may require ordering higher CWA penalties in non-oil spill situations where state law-based compensatory remedies are not guaranteed to provide full compensation and/or may differ wildly from state to state.  Yet in oil spill cases under CWA Section 311, courts adjudicating civil penalties sought by the government against a party such as BPXP can already be assured that they start from a significant baseline of deterrence firmly in place because of the compensatory damages that must be paid by a

responsible party like BPXP under the federal OPA regime and uniform maritime law.

1006.   The government's own economic expert, Dr. Mason, recognizes that payments of OPA damages have a similar deterrent effect as those associated with paying CWA civil penalties.  "On the economic interpretation, you could think of each of these things as offering a deterring role."  Tr. at 743 (Mason).  Mason's economic conclusion mirrors the point made by the Ninth Circuit in *In re Exxon Valdez*—deterrence effects arise whether a particular dollar paid is labeled as a penalty or as damages.

1007.   The combination of significant criminal penalties already imposed under CWA Section 309, 33 U.S.C. § 1319 and the compensatory payments that this Court has described as "generous" contribute substantially to the accomplishment of the punitive and deterrent purposes behind CWA Section 311.  Additionally, BPXP will later be called on to pay natural resource damages ("NRD") under OPA, and those future NRD payments are themselves a deterrent that must be anticipated in some fashion here so that any CWA Section 311 penalty selected does not cross the line into over-deterrence.

1008.   For all of the reasons stated above, consideration of the CWA purposes of deterrence as well as incentivizing prompt and effective mitigation efforts, even before the specific penalty factors in CWA Section 311(b)(8), 33 U.S.C. § 1321(b)(8), have been analyzed, militate in favor of setting a civil penalty for BPXP at the low end of the statutory range.

## XI.   REEXAMINATION OF THE MAXIMUM PENALTY PER BARREL ISSUE NOW PROMPTS THE RULING THAT THE CEILING ON PER-BARREL LIABILITY IS $3,000 PER BARREL.[13]

1009.   CWA Section 311(b)(7)(D), 33 U.S.C. § 1321(b)(7)(D), provides that if gross

---

[13]   BPXP acknowledges that on February 19, 2015, the Court held that the maximum per barrel penalty was $4,300 under EPA inflation regulations held to be valid and also made certain related rulings adverse to BPXP's positions on the issue of the proper penalty ceiling.  *See* Rec. Doc. 14206.  BPXP submits the Proposed Conclusions of Law in this section to preserve and facilitate its appellate rights.

negligence or willful misconduct by a liable party is found, the Court may set a maximum penalty of $3,000 per barrel. EPA and the Coast Guard have promulgated regulations attempting to inflate the maximum penalty.

1010. BPXP contends that the maximum per-barrel penalty to which BPXP can be exposed should be $3,000—the amount Congress adopted on the face of the statute and which has never been inflated by an agency regulation that is both substantively and procedurally valid. BPXP incorporates the following briefing on these issues: Rec. Docs. 13666 (Nov. 14, 2014), 13798 (Dec. 8, 2014), and 13905 (Dec. 19, 2014).

## XII.  THE UNITED STATES BEARS THE BURDEN OF PROOF ON EACH OF THE PENALTY FACTORS.

1011.  The CWA directs the district court to assess civil penalties from within a range of possible penalty amounts.  *See* CWA Section 311(b)(7), 33 U.S.C. § 1321(b)(7).  As is well known, the statute provides eight factors to guide this determination.

1012.  One CWA legal issue previously briefed is whether the Court should calculate the penalty starting from the bottom of the available range and working upward as the factors indicate more culpable conduct (the "bottom-up" approach) or start from the maximum penalty amount and work down as the factors suggest reasons for a lesser penalty (the "top-down" approach).  The United States has filed a motion requesting the top-down approach Rec. Doc. 12479, while BPXP has requested the bottom-up method Rec. Doc. 12533.

1013.  BPXP incorporates by reference its legal arguments regarding the burden of proof and method of calculating penalties.  *See* Rec. Doc. 12533; *see also* Anadarko Br. Rec. Doc. 12532.  In short, BPXP contends that the plaintiff bears the burden of proof, absent some deviation from this default rule established by Congress.  *See* Rec. Doc. 12533 at 2-5.  There is no such departure in the CWA, *id.* at 5-7, and the Fifth Circuit has recognized that the eight

factors in Section 1321(b)(8) are "penalty factors," which further counsels in favor of a narrow construction that resolves uncertainty in favor of the defendant.  *CITGO*, 723 F.3d at 551; *see also Tull*, 481 U.S. at 422-23 & n.7 (explaining the penal nature of CWA civil fines).

1014.   The bottom-up method amounts to placing the burden of proof on the government as plaintiffs, while the top-down method places the burden on the defendants.  *See* Rec. Doc. 12533 at 11-13.  It is not BPXP's burden to advocate for lesser penalties—the CWA neither authorizes nor requires such a shift of the burden of proof.  Accordingly, the Court must assess civil penalties under the CWA using the "bottom up" approach.

1015.   Using the "top down" approach would place the burden on defendants BPXP instead of on the United States, thereby transforming all of the penalty factors into mere "mitigating factors."  *United States v. Egan Marine Corp.*, No. 08C3160, 2011 WL 8144393, at *6 (N.D. Ill. Oct. 13, 2011).  This would disrupt the text and purpose of Section 1321(b)(8).  The statute indicates that the eight penalty factors propel ***creation*** of a CWA penalty—they drive up the penalty from a starting point of $0—rather than the ***mitigation*** of a CWA penalty from predetermined maximal starting point.  *See* 33 U.S.C. § 1321(b)(8) ("***In determining*** the amount of a civil penalty under paragraphs (6) and (7), the Administrator, Secretary, or the court, as the case may be, ***shall consider*** . . . .") (emphasis added).)  Section 1321 does not reflect a congressional desire to establish maximum penalties under the CWA as the default starting point.

1016.  In its earlier motion papers, the United States cited *Egan Marine* for the proposition that low "economic benefit to the violator," 33 U.S.C. § 1321(b)(8), automatically triggers the "top down" method.  *See* Rec. Doc. 12479 at 5-6.  This reliance is misplaced.  The Northern District of Illinois case cites no statutory authority for creating this trigger, nor does it cite any support for the textual interpretation that minor economic benefits justify shifting the

burden of proof to the defendant.  No other courts have cited *Egan Marine* for the proposition the United States draws from that case.  In short, *Egan Marine* does not support the government's burden-shifting approach either.

1017.   The other cases the United States relied upon in its earlier motion papers are similarly inapposite.  That a case simply notes that both approaches have been used neither sanctions the "top down" method nor holds that the statute requires the "top down" method.  *See* Rec. Doc. 12479 at 5 n.4 (citing *Atlantic States Legal Found., Inc. v. Tyson Foods, Inc.*, 897 F.2d 1128, 1142 (11th Cir. 1990) for support of the "top down" approach, even though that case did not concern the proper method for calculating CWA penalties).

1018.   The Fifth Circuit has not adopted the "top down" approach.  *See CITGO*, 723 F.3d at 552 ("This circuit has never held that a particular approach must be followed, and we do not decide otherwise today.").  And for this Court to adopt the top-down approach herein would be to run afoul of basic principles of due process.  *See Gross v. FBL Fin. Servs., Inc.*, 557 U.S. 167, 177 (2009) ("Where the statutory text is 'silent on the allocation of the burden of persuasion,' we 'begin with the ordinary default rule that plaintiffs bear the risk of failing to prove their claims.'  *Schaffer v. Weast*, 546 U.S. 49, 56, 126 S. Ct. 528, 163 L.Ed.2d 387 (2005) ….").

1019.   In its earlier briefing, the United States responded to these arguments by denying that each of the eight factors requires the government to carry the burden of proof.  *See* Rec. Doc. 12567 at 2 ("The eight factors are simply categories of facts that . . . do not carry their own individual burdens.").  This position is incompatible with the punitive nature of CWA Section 311)(b) and the fundamental nature of the eight-factor test in CWA Section 311(b)(8).  Since the government carries the burden of proof to secure a CWA penalty and the statute requires

225

consideration of all eight factors before a penalty can be imposed, that overall burden of proof must be imparted to each of the factors (absent a statutory basis for reversing the burden).

1020.   The government's position is also at odds with the Penalty Phase trial process. The reason for conducting this trial was to weigh competing facts.  Where burdens of proof enter the equation is in creating a rule of decision when the evidence is in equipoise and the court must nevertheless decide how to proceed.  *See Reddy v. CFTC*, 191 F.3d 109, 118 (2d Cir. 1999) ("'The preponderance standard is no more than a tie-breaker dictating that when the evidence on an issue is evenly balanced, the party with the burden of proof loses.'") (quoting *United States v. Gigante*, 39 F.3d 42, 47 (2d Cir. 1994), *amended* 94 F.3d 53 (2d Cir. 1996) (table)).

1021.   Here, each of the eight factors presents a distinct question with underlying facts, and a burden of proof is therefore necessary for resolving each of them.  Even if the answers to those eight questions ultimately work together to determine the amount of any civil penalties, a strong showing on the part of the government or BPXP regarding one factor cannot tip the balance on a different factor where the evidence on that different factor is in equipoise.  Nor could a strong showing on one factor by the government substitute for a lack of evidence on another factor.  *See CITGO*, 723 F.3d at 552 (explaining that each factor requires separate analysis and vacating a penalty where that did not occur).  For the United States to argue there is no burden of proof as to the factors is not only legal error, it assumes that resolving disputed facts underlying the penalty factors did not require the testing of those facts via an adversarial trial process.  Instead, it is clear that a trial (and consistent with *Tull*, a bench trial) was required to decide the contested facts relevant to each of the eight penalty factors.  And that, in turn, means that the assignment of the burden of proof to the United States as the proponent of the penalty is required.

1022.  The government is also mistaken in arguing that once it has established liability under CWA Section 311(b)(3) and (7), it need do no more with respect to the eight penalty factors.  *See* Rec. Doc. 12567 at 3.  It is true that the Court has already determined that BPXP is liable under Section 311.  *See* Rec. Doc. 5809.  But that determination predates the current Penalty Phase trial, which serves a purpose independent of answering whether BPXP faces more than statutory minimum liability.  The purpose of the Penalty Phase is to analyze and weigh the penalty factors bearing on the amount of the penalty that BPXP will pay.  As noted, that determination inherently depends on the resolution of factual issues broken down into the eight separate penalty factors.

1023.  The government's attempt to convert its success on liability into a low or non-existent burden of proof on the CWA Section 311(b)(8) penalty factors includes the argument that liability makes a penalty (of some amount) mandatory.  *See* Rec. Doc. 12567 at 3.  But the mandatory nature of a penalty has never been in question.  The plain text of Section 311(b)(7)(D) imposes a minimum penalty of $100,000, 33 U.S.C. § 1321(b)(7)(D), which the EPA has purportedly inflated to $140,000 for the relevant period.  *See* 40 C.F.R. § 19.4 (2010) (column labeled "Penalties effective after January 12, 2009 through December 6, 2013," row labeled "33 U.S.C. 1321(b)(7)(D)").  While BPXP disputes the EPA's authority to inflate the minimum penalty amount, the fact that some penalty is mandatory says nothing about the burden of proof on how much that penalty should be, and the government cites no authority to the contrary.

1024.  *CITGO* makes clear that defendants have a right to present evidence regarding the penalty factors and underscores that a continuing burden of proof remains with the government.  723 F.3d at 555 (noting that penalties were determined after a "two-week bench trial" including "testimony from numerous witnesses and the introduction of hundreds of exhibits").  As the

*CITGO* process illustrates, the Court was correct to conduct the Penalty Phase as an ordinary trial dependent on the facts specific to the eight CWA Section 311(b)(8) penalty factors.  Consistent with that structure is the fact that one party must bear the burden of proof.  And once the basic structure of a trial is in place, assigning the burden of proof to the government as plaintiff is unavoidable.  For instance, if the United States and a Section 1321(b)(7) violator were locked in a dispute about whether a particular form of mitigation succeeded or did not succeed, the Court would need to make a factual finding as to whether such mitigation succeeded and in that dispute, the government would bear the burden to establish that its view was correct on the relevant pieces of mitigation evidence.

1025.   Another corollary of the procedure approved in *CITGO* is that BPXP must have the opportunity to seek review of the evidence on each of the eight penalty factors in both this Court and before the Fifth Circuit.  It was, after all, inadequate analysis of a single factor that warranted the remand in *CITGO*.  723 F.3d at 554 (holding that "[t]he district court needed to have made a finding on the amount of economic benefit" because such factor-by-factor analysis is essential for both district court and appellate review).  Establishing the necessary grounding for future judicial review of this ruling requires use of trial-based fact-finding procedures on each of the penalty factors.

## XIII.   BPXP HAS MADE STRONG SHOWINGS UNDER EACH OF THE CLEAN WATER ACT SECTION 311(B)(8) PENALTY FACTORS.

1026.   Application of the facts set forth in BPXP's Proposed Findings of Fact concerning each of the CWA Section 311(b)(8) penalty factors points toward a CWA penalty for BPXP at the low end of the range, as shown below.

1027.   Preliminarily and as stated in *Comm'r of Internal Revenue v. Acker*, 361 U.S. 87, 91 (1959), "[t]he law is settled that 'penal statutes are to be construed strictly,'" citing *FCC v.*

*ABC*, 347 U.S. 284, 296 (1954).  *Acker* embodies the principle that "one 'is not to be subjected to a penalty unless the words of the statute plainly impose it,'" *id.* citing *Keppel v. Tiffin Savings Bank*, 197 U.S. 356, 362 (1905).  *Acker* thus invokes the "penal canon" and accordingly requires the construction of any ambiguity present in a civil penalty statute in favor of defendant, to preserve that defendant's constitutional rights to fair notice and due process of law.

1028.   Each factor, if possible, weighed by the Court to determine the ultimate penalty assessed against BPXP must be strictly construed in accordance with the penal canon[14] and BPXP's right to due process of law.  To the extent any factor is ambiguous, such ambiguity must be construed in favor of BPXP.  This principle of construction has important consequences for interpretation of seven of the eight factors as next described.

### A.     The Nature, Extent, and Degree of Success of Any Efforts of the Violator to Minimize or Mitigate the Effects of the Discharge.

1029.   The CWA directs the Court to consider "the nature, extent, and degree of success of any efforts of the violator to minimize or mitigate the effects of the discharge."  33 U.S.C. § 1321(b)(8).

1030.   "A fundamental objective of the CWA is to 'ensure effective and immediate removal of a discharge… of oil....'" *In re Deepwater Horizon*, MDL No. 2179, 2012 WL 5960192, at *13.  To that end, "[i]n determining the amount of a civil penalty, particular weight should be given to the rapidity and effectiveness of the response actions by the responsible

---

[14]   Although the penal canon is generally invoked in civil cases and the related rule of lenity invoked in criminal cases, both doctrines apply to the analysis of factors under 33 U.S.C. § 1321(b).  *See, e.g., United States v. Thompson/Center Arms Co.*, 504 U.S. 505, 517-18 (1992) (applying the rule of lenity to a statute that was construed in a civil setting, but had criminal applications); *Leocal v. Ashcroft*, 543 U.S. 1, 11, n.8 (2004) (noting that the rule of lenity can apply when a criminal statute providing for sanctions is applied in a noncriminal context).  In light of this precedent and because the same violation under the Clean Water Act can give rise to either civil or criminal penalties — civil penalties under § 1321 or criminal penalties under § 1319, *see also* 33 U.S.C. § 1321(b)(11)—the Clean Water Act must be construed using the rule of lenity as well as the penal canon.

party."  Conf. Rep. on H.R. 1465, H.R. Rep. 101-653, at 153-54 (Aug. 1, 1990), reprinted in 1990 U.S.C.C.A.N. 779 (Leg.Hist.), 1990 WL 132747.  Accordingly, a company's efforts to respond to and mitigate the effects of a spill warrant a reduced CWA penalty.

1031.  In applying this factor, courts have held that a company's efforts to respond to and mitigate the effects of a spill warrant a reduction in any CWA penalty.  *See CITGO*, 723 F.3d at 553.  In *CITGO*, the Fifth Circuit affirmed the trial court's holding that CITGO was entitled to a reduced CWA penalty based on the company's efforts to mitigate the effects of the spill involved in that case.  *Id.*  In so holding, the trial court considered evidence about the resources that CITGO brought to bear to respond to the spill—including the deployment of 1,500 response personnel—and the company's "full force effort to minimize the damage from the spill[,]" including through the use of booming, skimming, shoreline protection, and other countermeasures.  *CITGO*, 2011 WL 10723934.  The court concluded that CITGO's "well executed clean-up effort" effectively mitigated damage from the spill and resulted in strong environmental recovery.  *Id.*; *see also United States v. Egan Marine Corp.*, No. 08C 3160, 2011 WL 8144393, at *7 (N.D. Ill. Oct. 13, 2011) (defendant's clean-up effort "cuts in favor" of reduced CWA penalty); *In the Matter of: Mike Fuel Oil Corp. d/b/a Sandman Plaza II Truckstop Grantville, Pa 17028, Respondent*, Dkt. No. CWA-III-149, 1997 WL 1098078 (E.P.A. Mar. 27, 1997).

1032.  BPXP's response effort (as part of the Unified Command) to the *Deepwater Horizon* incident reflected the company's "full force effort to minimize the damage from the spill" and successfully mitigated damage to the environment and Gulf Coast economies.  BPXP's contribution to the Unified Command response was on a much larger scale than Citgo's, and according to both BPXP and government sources, unprecedented.  *See* BPXP Proposed Findings

of Fact, Section II.

1033.   The Court has acknowledged BPXP's extraordinary effort at source control, stating in its Phase 2 opinion that "[t]here is no dispute that the source control effort between May and September 2010 was a massive and complex undertaking.  BP's entire Gulf of Mexico resources became focused on the response, which included subsea, surface, and onshore intervention efforts.  The response saw collaboration between BP as the designated responsible party, numerous Government agencies, major oil and gas companies such as Exxon, Shell, and Chevron, oil and gas service companies, and members of academia.  Ultimately, BP spent over $1.6 billion on source control."  Rec. Doc. 14021 ¶ 213.

1034.   It is undisputed that BPXP similarly mounted an unprecedented surface response and placed "no limits" on taking steps to minimize the damage from the spill.    TREX 009124.0111 (ISPR).   While other oil spills have required authorities to compel responsible parties to participate in spill response, BPXP responded willingly, immediately, and with unlimited resources to the *Deepwater Horizon* incident.  BPXP took full responsibility for the incident, was genuinely "committed to obtaining the best result possible," and bore the vast majority of costs associated with response.  *See generally* BPXP Proposed Findings of Fact, Section II.C.  According to government sources, BPXP met its obligations to respond to the *Deepwater Horizon* spill under the NCP, OPA, and the Clean Water Act.   *See* Tr. 641 (VanHaverbeke).

1035.   BPXP's response was effective and successfully achieved the goal of protecting and minimizing the impact to the Gulf shoreline.  *See* BPXP Proposed Findings of Fact, Section II.D.1.  When some oil did reach the Gulf shorelines, BPXP and others in the Unified Command implemented a comprehensive shoreline cleanup program that lasted for four years.  *Id.* at

Section II.D.6.

1036.  Furthermore, BPXP's approximately $25.7 billion in spill-related spending successfully mitigated the adverse economic impacts of the spill.  *See generally id.* at Section II.F.2.  Much of that spending represents steps taken specifically for the purpose of effectively mitigating economic consequences of the spill.  As a result, some regions of the Gulf Coast did not experience significant tourism-related losses, and Louisiana, Mississippi, Alabama, and Florida Panhandle tourism experienced strong growth in 2011-2013.  *Id.* at Section II.F.2.

1037.  BPXP and the United States disputed the definition of removal actions concerning the spilled oil.  *See, e.g.,* Tr. 672-73 (VanHaverbeke).  As one example of this, the parties disagreed about whether in situ burning "removes" oil from the environment.  BPXP's position is supported by the law and the facts.  The text of CWA Section 311(a)(8), 33 U.S.C. § 1321(a)(8), provides a definitive answer—and a very broad definition—of the relevant term.  "'[R]emove' or 'removal' refers to containment and removal of the oil or hazardous substances from the water and shorelines or the taking of such other actions as may be necessary to prevent, minimize, or mitigate damage to the public health or welfare, including, but not limited to, fish, shellfish, wildlife, and public and private property, shorelines, and beaches."  *Id.*  Hence, as the concept of oil removal applies in this CWA context, a complete elimination of the oil is not required in order for some action taken by BPXP to be considered.  Instead, the statutory definition is broad enough to encompass any type of mitigation strategy to reduce harm to health or welfare from the oil.  A consideration of the seriousness and mitigation factors as they bear on oil impacts that were reduced by response measures must be analyzed on the same broad basis.  Consideration of a wide variety of remedial actions by BPXP acting in conjunction with the Unified Command is likewise consistent with established spill response doctrine, government-

approved OSRPs, and government reports.  In short, removal actions are not narrowly defined for CWA Section 311 purposes.

1038.   The United States incorrectly asserts that because BPXP is the Responsible Party, no credit is deserved.  *See* Rec. Doc. 13901.  That argument ignores the statutory language, which states that the Court needs to consider "***any efforts*** of the violator to minimize or mitigate the effects of the discharge," CWA Section 311(b)(8)—without drawing the "unless legally required" distinction that the United States urges, but which is missing from the statute.  *See, e.g., Hall v. United States*, 132 S. Ct. 1882, 1893 (2012) ("Given the statute's plain language, context, and structure, it is not for us to rewrite the statute, particularly in this complex terrain of interconnected provisions and exceptions enacted over nearly three decades.").  Here, the CWA is four-plus decades old whereas even the OPA 1990 amendments to CWA Section 311 are already nearly 25 years old.  Moreover, to the extent there is any ambiguity in the wording of this factor, the penal canon dictates strict construction, and operates to prevent BPXP from being "subjected to a penalty [that] the words of the statute [do not] plainly impose."  *See, e.g., Acker*, 361 U.S. at 91.

1039.   Further, case law confirms that all mitigation efforts are relevant under the CWA.  *See*, *e.g., CITGO*, 723 F.3d at 554 (upholding district court's reduction of penalty based on mitigation efforts ordered as part of injunctive relief); *Egan Marine Corp.*, 2011 WL 8144393, at *7 (when determining the per-barrel amount of a fine under the CWA, the fact that a responsible party "complied with its legal obligations to aid in the cleanup . . . cuts in favor of" the responsible party).

1040.   Additionally, it is important to note that the United States' argument appears to be based on what is legally required ***under OPA***.  But OPA and the CWA are separately codified

233

statutes.  Specifically, it is revealing that the United States' argument relies on what is required of "responsible parties."  Rec. Doc. 13901 at 7.  But the term "responsible party" does not appear in CWA Section 311(b)(8).   The term "responsible party" does appear in CWA Section 311(c)(4)(1), 33 U.S.C. § 1321(c)(4)(1), for instance, but that structural contrast only confirms that the responsible party concept and term of art is not pivotal for CWA Section 311(b)(8) purposes.  *See Russello v. United States*, 464 U.S. 16, 23 (1983) ("[W]here Congress includes particular language in one section of a statute but omits it in another section of the same Act, it is generally presumed that Congress acts intentionally and purposely in the disparate inclusion or exclusion." (quoting *United States v. Wong Kim Bo*, 472 F.2d 720, 722 (5th Cir. 1972)).

1041.  Moreover, trivializing BPXP's extraordinary response and mitigation efforts misses the mark, is contrary to Congress's intent, and is flawed public policy.  If the United States' position is adopted here, future violators would have a disincentive to engage in a robust response like BPXP's.  The United States argues that it would be perverse if violators were to receive credit for actions that they took to assist cleanups that are legally required by OPA and where, if removal orders were not complied with, BPXP would incur additional liability.  *See* Rec. Doc. 13901 at 7-8 & n.9.  But if that were true, then Congress would not have flatly stated in CWA Section 1321(b)(8) that one of the penalty factors is "the nature, extent, and degree of success of any efforts of the violator to minimize or mitigate the effects of the discharge."  33 U.S.C. § 1321(b)(8).  Putting the point differently, Congress would have instead pronounced that the relevant penalty factor was "the nature, extent, and degree of success of any efforts of the violator to minimize or mitigate the effects of the discharge that were not already required under OPA or CWA Section 311(c)."  Yet Congress did not say that.

1042.  Essentially, the United States is offering up a policy argument that there should be

234

three tiers of CWA Section 311(b)(7)-(8) liability as based on its views of how mitigation efforts should be treated:  one for violators who do all that is required of them but nothing more, another for violators who go beyond what is required, and a third for violators who do less than is required.  Nothing in the text of CWA Section 311 creates such a trifurcated regime.  Instead, by indicating in CWA Section 311(b)(7)(B) that failing to comply with removal orders creates additional liability, Congress created only two categories of liability as based on mitigation efforts:  one for violators who disobey removal orders (and thus inherently cannot claim credit for removal actions they did not perform or performed improperly) and one for violators who obey removal orders and cooperate in spill response—action that both prevents them from being held liable under CWA Section 311(b)(7)(B) and allows them to receive positive consideration under the CWA Section 311(b)(8) mitigation penalty factor for their efforts.  This approach not only has the advantage of comporting with the text and structure of CWA Section 311(b) and (c) (and not trying to artificially import OPA considerations into CWA Section 311(b)(8)), but it is an eminently sensible policy approach chosen by Congress that should not be second-guessed in favor of the trifurcated regime that the United States would have preferred for Congress to enact.

1043.  Furthermore, as noted above, the government's economic expert Dr. Mason testified at trial that OPA damages and CWA penalties serve similar deterrent roles.  *See* Tr. 742-43 (Mason); *see also* BPXP Proposed Findings of Fact ¶ 1006.  Dr. Mason's concession undermines the distinction the United States tries to make between giving BPXP credit for voluntary actions but denying it credit for actions BPXP took that were legally compelled.  As a matter of economics, any monies expended by BPXP to mitigate the effects of the spill, whether legally required or not, become part of the total deterrent effect traceable to the spill because those expenditures would not have been necessary unless the spill had occurred.  By mitigating

the spill effects through its source control and response efforts, BPXP alleviated damages by OPA claimants that might otherwise have been sought.  And for that reason, no economist would claim that the voluntary nature of an OPA settlement payment (indeed, OPA is designed to encourage voluntary payments, see 33 U.S.C. § 2713) or large-scale voluntary remedial actions designed to reduce potential OPA damages as experienced by an entire group of OPA or maritime law claimants could be ignored when assessing total deterrence effects.

1044.   The United States has also conceded that BPXP's spill response was effective, stating that "the United States does not intend to put on an affirmative case that BP's response actions were inadequate."  Rec. Doc. 13901 at 6-7; Tr. 22-23 (US Opening Statement).

1045.   The United States has further conceded that even if its unprecedented claim is correct and no penalty reduction or credit can be allowed for activities required by law, BPXP did engage in activities that went well beyond legal requirements and merit a credit or reduction in the penalty of at least $846.2 million.  *See* Rec. Doc. 13901 at 8 and Ex. 1; Tr. 37 (US Opening Statement).

1046.   The United States also suggests that BPXP should perhaps be denied credit for (a) actions directed by the government (a species of the United States' legally required argument resolved above) or (b) actions taken by other BP entities.  *See* Rec. Doc. 13901 at 7 & n.8.

1047.   The first of those arguments is refuted by the fact that CWA Section 311(c)(2)(A) provides that in a substantial spill of this nature "the President shall direct ***all*** Federal, State, and private actions to remove the discharge or to mitigate or prevent the threat of the discharge."  33 U.S.C. § 1321(c)(2)(A) (emphasis added).  Since all response actions here were ultimately directed by the President or his delegates, to accept the government's suggestion would be tantamount to ruling that in such situations BPXP would be entitled to no credit for its mitigation

236

efforts at all.  Nothing in the text of CWA Section 311(b)(8) or any prudent policy-oriented reading of the statute indicates that Congress wanted to allow violators to receive mitigation credit in non-substantial spill situations and yet deny mitigation credit in substantial spill situations, where response efforts will especially require the devotion of as many resources as possible to fighting and containing the spill.  Instead, "the nature, extent, and degree of success of any efforts of the violator to minimize or mitigate the effects of the discharge" was a factor that Congress directed courts to consider without regard to the nature of the spill or the degree of federal control over the response.  Accordingly, BPXP must be given credit for its mitigation efforts in collaboration with the federal government through the Unified Command process.

1048.   The second argument stresses that mitigation consideration is to be given to "any efforts of the violator" only.  33 U.S.C. §1321(b)(8).  On this basis, the United States suggests that mitigation efforts undertaken by non-BPXP entities should perhaps be set aside and not considered under CWA Section 311(b)(8).  This argument ignores the realities that Congress sought to encourage "effective and immediate removal of a discharge."   33 U.S.C. §1321(c)(1)(A).  No structural principle under the CWA would weigh in favor of ignoring the efforts of BP entities other than those of BPXP.  Finally, the penal canon is again applicable. That canon requires a narrow construction of the term "violator" when it would elevate penal liability.  But the canon does not apply in the opposite direction—to elevate liability.

1049.   In conclusion, the mitigation factor weighs particularly heavily in favor of BPXP, and thus in favor of the imposition of a modest penalty at the low end of the range available to the Court in its discretion.   BPXP's sense of accountability and response efforts were unprecedented in terms of scope, sophistication, and success.  *See* BPXP Proposed Findings of Fact, Section II.

### B.     The Seriousness of the Violation

1050.   BPXP incorporates by reference its legal arguments set forth in its motion papers regarding the admission of evidence concerning the seriousness factor.  *See* Rec. Doc. 12463.

1051.   BPXP does not contest that the *Deepwater Horizon* blowout, explosion and oil spill was a serious event.  The Court determined in its Phase 2 Ruling that 3.19 million barrels were discharged into the Gulf of Mexico as a result of the spill.  Given its magnitude, this spill was denominated as one of national significance.

1052.   Legal disagreement between the parties arises over whether "the seriousness of the violation," 33 U.S.C. § 1321(b)(8), requires determination of how serious—along a continuum—the spill was.  *Compare* Rec. Doc. 12463 at 3 (BPXP arguing for a calibrated assessment of seriousness along multiple dimensions) *with* Rec. Doc. 12511 at 2 (United States arguing that it is sufficient that harm totals to somewhere "in the billions of dollars").  In fact, in its opening briefs on this topic in motions practice, the government took a more aggressive position than it did on reply.  Initially, the United States advocated that seriousness was a simply binary: either the spill was serious, or it was not.  Later, however, the United States retreated from that position.  *See* Rec. Doc. 12511 at 1 (United States stating "We agree that the inquiry is not binary.").  But in that case, the implication of acknowledging that seriousness is "not binary," Rec. Doc. 12511 at 1, is that the Court must assess the extent of the spill's impacts in all contested dimensions when evaluating the seriousness factor.

1053.   When the government engages the question of how serious the economic impact of the spill was, it turns to the value of the settlements BPXP has entered.  *See id.* at 2 n.3.  But Federal Rule of Evidence 408 prohibits admission of settlement agreements "to prove or disprove the validity ***or amount*** of a disputed claim."  Fed. R. Evid. 408(a) (emphasis added).  The government responds that "the settlements are not offered to show 'amounts' or 'validity' of

a claim, but rather to show the Spill's seriousness." Rec. Doc. 12511 at 2 n.3.  That response is not logical.  The seriousness of the spill *is* a key and unavoidable factor bearing on the "amount" of government's claim for a particular penalty level, if not also its "validity."  As *CITGO* illustrates, none of the eight penalty factors in Section 311(b)(8) can be overlooked; each of them contributes directly to the amount of the penalty and therefore whether a penalty award in excess of the minimum amount can be justified.  As a result, Rule 408 bars consideration of BPXP's settlements as evidence.

1054.  Looking beyond the simple and inadmissible metric of what the settlement agreements cost BPXP, the actual impact on the Gulf region informs the assessment of the seriousness of the spill.  As explained above, the spill's economic impact across the Gulf economy was varied but generally less far-reaching and harmful than feared, especially because the availability of response-related work offset lost opportunities as a result of the spill itself. *See* BPXP Proposed Findings of Fact, Section III.C.

1055.  Likewise, at an environmental level, the evidence from Drs. Shea and Tunnell indicate that the spill's impact was far less serious than initially feared. *See id.* at Section III.  For example, Dr. Shea looked at almost 18,000 water samples and over 8,000 sediment samples collected in the Gulf of Mexico and determined that the *Deepwater Horizon* oil spill resulted in no harmful exposure from oil-related chemicals or dispersants in the vast majority of the area investigated. *Id.* at Section III.A.  Similarly, Dr. Tunnell evaluated five lines of evidence, including extensive government data, and determined that there were no significant impacts to fish and shellfish populations in the Northern Gulf as a whole, as well in specific areas thought to be most severely affected. *Id.*  As a legal matter, this evidence is compelling because it addresses seriousness at both the level of the entire Gulf ecosystem and in smaller

areas where the consequences might be overlooked by considering the Gulf as a whole. Ultimately and collectively, the evidence points toward a spill that is serious—as BPXP has consistently acknowledged—but relatively less serious as a result of the prompt response measures taken by BPXP and others, the resiliency of the Gulf ecosystem, natural processes that break down the oil, and related considerations. *See id.* at Section III.A.

1056.   Finally, at the level of human health, Dr. Cox found no significant evidence of adverse health effects on cleanup workers or the general population. *See id.* at Section III.B.  Dr. Cox's research, summarized above, considers varied impacts across the population and concludes that the spill was not a serious event for the health of Gulf residents (excluding, as BPXP has always acknowledged, the individuals on the rig who were killed or injured in the immediate explosion and sinking of the *Deepwater Horizon*).

1057.   The balance of the admissible and credible evidence—economic, environmental, medical, and social—indicates that the seriousness of the spill does not justify a penalty amount near the high end of the range authorized by the statute.

**C.    The Economic Impact of the Penalty on the Violator.**

1058.   Any CWA penalty must take into account "the economic impact of the penalty on the violator." 33 U.S.C. § 1321(b)(8).

1059.   The only alleged "violator" in the BP Group is BPXP.  As the United States' expert conceded, BPXP (a) is the only BP Group entity named as a defendant in the CWA suit, (b) was the specific BP Group entity that leased the Macondo well, and (c) was the sole BP Group entity named as the OPA Responsible Party by the Coast Guard.  Tr. 950 (Quivik); *see also* Complaint of the United States of America, *United States v. BP Exploration & Production, Inc.*, Civ. A. No. 2:10-cv-04536 (E.D. La. Dec. 15, 2010), Rec. Doc. 1; Agreed Stipulations at No. 96 (Feb. 29, 2012), Rec. Doc. 5927; TREX 240400.  Moreover, the penal canon dictates that

240

this factor be strictly construed in BPXP's favor.  *See, e.g., Acker*, 361 U.S. at 91.

1060.  Thus, under this factor, the Court must consider carefully how any particular penalty will affect BPXP.  *See CITGO*, 2011 WL 10723934 (recognizing that even though "Citgo is a multi-billion dollar, international company . . . . [s]imply because a violator has a significant amount of money, a Court should not impose a fine that is excessive in light of the violation").

1061.  The United States has already acknowledged that the CWA penalty should be reduced if BPXP can demonstrate the potential penalty's "significant impact."  U.S. Mem. on the Burden of Proof for the Penalty Factors In Section 311(b) of the Clean Water Act at 8-9 (Mar. 10, 2014) Rec. Doc. 12479.  Here, a disproportionately large penalty—taken in conjunction with the tens of billions of dollars BPXP has already expended in response to the *Deepwater Horizon* incident—will undoubtedly impact BPXP's ability to make capital investments, engage contractors, pay for workers, and contribute to the local and national economies.

1062.  Financial evidence relating solely to other BP Group entities' finances and alleged ability to contribute to a CWA penalty is not relevant to the "economic impact of the penalty on the violator" and should be disregarded in the Court's assessment of this factor.  And because BPXP—and no other BP Group entity—is the "violator" in this case, financial evidence relating to BP Group entities other than BPXP has no bearing on BPXP's post-penalty financial condition and thus is not relevant.

1063.  It would be improper to consider non-BPXP financial data in assessing "the economic impact of the penalty on the violator" because doing so would effectively transfer liability from BPXP to other BP Group entities.  To begin, the clear text of the CWA directs the court to review the "economic impact of the penalty ***on the violator***"—not on members of the

241

same corporate family or on other corporate entities that may be able to contribute to penalty payments.   Moreover, such considerations would also violate settled principles of limited liability and corporate separateness.  33 U.S.C. § 1321(b)(8); *see also United States v. Bestfoods*, 524 U.S. 51, 61 (1998) ("It is a general principle of corporate law deeply 'ingrained in our economic and legal systems' that a parent corporation  .  .  . is not liable for the acts of its subsidiaries."); *Bridas S.A.P.I.C. v. Gov't of Turkmenistan*, 447 F.3d 411, 416 (5th Cir. 2006) ("A bedrock principle of corporate law is that 'a parent corporation . . . is not liable' for actions taken by its subsidiaries.") (quoting *Bestfoods*, 524 U.S. at 61).

1064.  Limited liability has been the prevailing rule in the United States for over a century.  As the Supreme Court has explained:

> Normally the corporation is an insulator from liability on claims of creditors.  The fact that incorporation was desired in order to obtain limited liability does not defeat that purpose.  *Elenkrieg v. Siebrecht*, 238 N.Y. 254, 144 N.E. 519, 34 A.L.R. 592.  *See* 7 Harv. Bus. Rev. 496.  ***Limited liability is the rule not the exception; and on that assumption large undertakings are rested, vast enterprises are launched, and huge sums of capital attracted.***

*Anderson v. Abbott*, 321 U.S. 349, 361-62 (1944) (emphasis added).[15]   The rule of limited liability means that corporate parent shareholders do not risk losing more than the amount they invest.[16]  Thus, a corporate parent that invests "$100 of equity into a subsidiary risks that $100, but not more."  TREX 013214.0024.  Absent veil-piercing—which the United States is not pursuing here—a corporate parent is not required to invest additional capital to meet its

---

[15]   In *Anderson*, the Supreme Court held that "double liability" for both the corporation and its shareholders was provided for by statute.  321 U.S. at 353, 357.  No such "double liability" statute exists here.  *See also* Frank H. Easterbrook & Daniel R. Fischel, *Limited Liability and the Corporation*, 52 U. Chi. L. Rev. 89, 97 (1985) ("The increased availability of funds for projects with positive net values is the real benefit of limited liability.").

[16]   *See, e.g.*, *White Rosebay Shipping S.A. v. HNA Grp. Co.*, C.A. No. C-12-096, 2012 WL 6858239, at *7 (S.D. Tex. Dec. 5, 2012) ("Plaintiff's position that a parent corporation must continue supporting a doomed subsidiary with regular cash transfusions, however, is inconsistent with the very notion of limited liability-limitation of the risk of loss from an investment.").

subsidiary's obligations.  Rather, the choice whether to make further investments is within the parent's discretion based on the expected returns.  To assume as a matter of law that the BP Group must invest more capital into BPXP to cover any penalty —"is inconsistent with the very notion of limited liability—limitation of the risk of loss from an investment."  *White Rosebay Shipping S.A. v. HNA Grp. Co.*, C.A. No. C-12-096, 2012 WL 6858239, at \*7 (S.D. Tex. Dec. 5, 2012).

1065.  Courts tasked with setting civil monetary penalties under federal environmental laws and in deciding punitive damages have recognized that parent corporations are not liable for the actions of their subsidiaries.  For example, in *United States v. Dico, Inc.*, 4 F. Supp. 3d 1047 (S.D. Iowa 2014), a recent case examining the amount of civil penalties to be assessed against Dico, Inc., a subsidiary of Titan International, Inc., under CERCLA, the court "decline[d] to consider the assets of Titan International when evaluating Dico's ability to pay" the penalty.  *Id.* at 1064-65 & n.43.  The court explained:

> [T]he proposition of considering the assets of the parent company, which is not a party to the lawsuit, when assessing civil penalties against a subsidiary is **somewhat at odds with the basic principle of corporate law that each incorporated business entity enjoys a separate legal existence**. . . .   [S]*ee also United States v. Bestfoods et al.*, 524 U.S. 51, 61-62, 118 S. Ct. 1876, 141 L.Ed.2d. 43 (1998) ('[I]t is hornbook law that the exercise of the control which stock ownership give to the stockholders . . . will not create liability beyond the assets of the subsidiary . . ., [and] nothing in CERCLA purports to reject this bedrock principle . . . .' (internal citations and quotation marks omitted)).

*Id.* (citation omitted).[17]

1066.  In *Dico*, as here, the United States did not seek a piercing of BPXP's corporate veil.  Indeed, the United States has made it abundantly clear that, among BP Group entities, it

---

[17]    Although the *Dico* court examined this issue under CERCLA and not under the CWA, there is similarly nothing in the CWA that "purports to reject th[e] bedrock principle" relied upon by the *Dico* court." 4 F. Supp. 3d at 1065 n.43.

seeks to hold liable only BPXP.  *See* Rec. Doc. 12355-1 at 1 (stating that, with respect to direct

liability, BPXP is "the liable party in this proceeding"); Tr. 1998 (Gladstein) ("And, Your Honor,

the United States is not seeking to pierce the corporate veil here.  We've repeatedly said that.").[18]

1067.  Furthermore, Delaware—the state of BPXP's incorporation—closely guards its

state veil-piercing law in a fashion that strongly disfavors piercing the veil.  *See, e.g.*, *Mobil Oil*

*Corp. v. Linear Films, Inc.*, 718 F. Supp. 260, 270 (D. Del. 1989) ("Under ordinary

circumstances, a parent corporation will not be held liable for the obligations of its subsidiary.

Limited liability is the general rule, not the exception.  Disregard of the corporate entity is

appropriate only in exceptional circumstances.") (internal citations omitted).  The United States'

express statements about BPXP's sole liability, together with BPXP's adherence to corporate

formalities and sufficient capitalization, therefore point against piercing the corporate veil.

1068.  Courts have also honored the fundamental rule of limited parent/shareholder

liability in the punitive damages context.  For example, in *United Technologies Corp. v. Am.*

*Home Assurance Co.*, 118 F. Supp. 2d 174 (D. Conn. 2000), the court—citing to *Bestfoods* just

as the *Dico* court did—explained that "[the parent] is not a party to this lawsuit, and the Court

therefore finds it improper to use [the parent's] value as a measure of exemplary damages."  *Id*.

at 180 (citing *Bestfoods*, 524 U.S. at 61).  In reaching its holding, the court also noted that the

plaintiff had not overcome "the due process concerns inherent in assessing penalties against a

---

[18]   Moreover, no actions taken by BPXP suggest a veil-piercing would be proper in these circumstances.  The U.S. recognizes that BPXP has followed all necessary corporate formalities and is not undercapitalized—both facts that point powerfully against piercing the corporate veil.  *See* Tr. 1144 (Ratner); *see also, e.g.*, *Huard v. Shreveport Pirates, Inc*., 147 F.3d 406, 411-14 (5th Cir. 1998) (finding insufficient evidence of a disregard of corporate formalities, including proper capitalization, to support veil-piercing on those grounds); *United States v. Jon-T Chems., Inc.*, 768 F.2d 686, 691, 693-94 (5th Cir. 1985) (considering whether a subsidiary was undercapitalized as one factor in a veil piercing analysis).  The U.S. has also conceded that BPXP was operated in a standard, proper way as a corporate subsidiary.  *See* Tr. 31 (US Opening Statement).  Counsel for the U.S. also admitted that the corporate structure of BP Group is neither improper nor illegal.  *See* Tr. 2000-01, 2017 (Gladstein).

non-party." *Id.* at 181.

1069.   Some courts have considered the assets of a parent when setting civil monetary penalties against the parent's subsidiary. *See Dico*, 4 F. Supp. 3d at 1065 n.43. But those cases are distinguishable.

1070.   For instance, the United States has previously relied upon *United States v. Municipal Authority of Union Twp. ("Dean Dairy")*, 929 F. Supp. 800 (M.D. Pa. 1996), *aff'd* 150 F.3d 259 (3d Cir. 1998), for the principle that courts may consider the assets of a parent corporation when setting civil monetary penalties against the parent's subsidiary.  In *Dean Dairy*, the district court ruled that it would "look to the finances of [the non-defendant parent]" when examining the economic impact of a CWA penalty on the defendant subsidiary. *Id.* at 808. *See also United States v. Mun. Auth. of Union Twp. ("Dean Dairy")*, 150 F.3d 259, 268-69 (3d Cir. 1998).   The facts of *Dean Dairy* are very different from those here, and the case is of questionable authority after *Bestfoods*.

1071.   ***First***, the Third Circuit's decision in *Dean Dairy* was decided only six weeks after *Bestfoods*, but it fails to mention the Supreme Court's reaffirmation of the "bedrock principle" that a parent is not liable for actions taken by its subsidiaries. *See Bestfoods*, 524 U.S. at 61; *see also United States v. Magnesium Corp. of Am.*, No. 2:01-CV-00040DB, 2006 WL 1699608, at *3 (D. Utah June 14, 2006) ("Indeed, *Union Township*, the United States' primary case, was decided just six weeks after *Bestfoods*, and fails to mention *Bestfoods*.").  For this reason, *Dean Dairy* starts out as inherently suspect in that it was not explicitly decided in a fashion designed to comply with the Supreme Court's teachings in *Bestfoods*.

1072.   ***Second***, in *Dean Dairy*, the violator-subsidiary was assessed a penalty of approximately $4 million.  However, because the violator's equity exceeded $20 million, the

subsidiary could effectively absorb the penalty without any financial impact on the parent company.[19]

1073. Here, by contrast, the penalty sought by the United States would easily overwhelm the value of BPXP, meaning that the penalty would effectively be assessed against BPXP's parent companies. Although BPXP's equity value was approximately $16 billion as of August 2014,[20] that valuation assumed a $94/barrel oil price.[21] Yet, due to the recent drop in the price of oil, the value of BPXP at the time of trial was considerably lower—roughly $5 billion.[22] In this respect, the present case is much more like *Dico* than *Dean Dairy*. *See Dico*, 4 F. Supp. 3d at 1057, 1064-65, 1068 (the United States proposed a penalty of $2,216,000, but the court found that Dico's ability to pay—disregarding the parent company's value—militated in favor of a lower penalty of $1,620,000).

1074. **Third**, the *Dean Dairy* parent company "was siphoning off profits from [the subsidiary]." *Dean Diary*, 929 F. Supp. at 808. The court explained that "[i]t would constitute a serious injustice to allow [the parent] to profit from [the subsidiary]'s violations of the [CWA] . . . and at the same [time] allow [the parent] to escape liability for the violations." *Id.* at 808-09. On appeal the Third Circuit also focused on "siphoning" as a crucial factor allowing for consideration of the parent company's assets. *Dean Dairy*, 150 F.3d at 268 ("If the subsidiary does not retain its revenues, as the evidence showed in this case, then its parent's financial

---

[19]   *See* Reply Brief of Defendant-Appellant Dean Dairy Products Company, D/B/A Fairmont Foods at 17, n.5 *United States v. Mun. Auth. of Union Twp.*, No. 97-7115 (3d Cir. Dec. 18, 1997) (noting that Dean Dairy (the subsidiary) had equity of $20,636,403).

[20]   TREX 013153.0026-.0027 (Den Uyl Expert Rpt.). The United States' expert has not estimated BPXP's equity value or its book value.

[21]   TREX 013153.0027; TREX 013159.

[22]   TREX 246898.0002; Den Uyl Dep. 270 (noting that the valuation is "very sensitive" to the price of oil, and discussing the sensitivity of valuation to oil price as set forth in produced documents).

resources are highly relevant.").

1075.   Here, by contrast, no BP Group entity has siphoned profits or other funds from BPXP.  This is clear from the fact that BPXP is not undercapitalized.  *See* Tr. 1144 (Ratner).  Moreover, BPXP has not paid a single dividend since the *Deepwater Horizon* incident.[23]  *See* Tr. 948 (Quivik).

1076.   **Fourth**, the *Dean Dairy* court considered the parent company's finances because "it [was] so closely interconnected with [the subsidiary] for purposes of the instant suit that the two should be treated as a single entity."  *Dean Dairy*, 929 F. Supp. at 808.  But here, as the United States' own expert recognized, BPXP is a wholly-owned subsidiary, separate from BP p.l.c. and the other entities within the BP Group.  Tr. 942 (Quivik).

1077.   For all of these reasons, *Dean Dairy* is inapplicable and represents suspect legal authority that should not be applied here.

1078.   Increasing a penalty because of assistance provided by an alleged violator's affiliates after a *Deepwater Horizon*-type incident would also discourage corporate parents and affiliates from voluntarily providing assistance in similar circumstances in the future.  *See* TREX 013215.0029-.0030.  In addition, considering a corporate parent's assets in calculating a penalty would discourage investment by well-capitalized parents.  *See* TREX 013215.0029.

1079.   A thorough evaluation of the "economic impact of the penalty on the violator" also requires the Court to assess BPXP's financial situation, as well as the company's prior and expected expenditures in connection with the *Deepwater Horizon* incident.

1080.   At the time of trial, BPXP's equity value was approximately $5 billion, without accounting for a CWA penalty or contingent liabilities.  *See* TREX 247596.0007.  Since 2010,

---

[23]   BPXP did pay dividends to its then-parent company (BPAPC) and to its preferred shareholder (BP Products North America Inc.) **before** the incident.

BPXP has required three infusions of capital from its parent companied to enable it to satisfy its *Deepwater Horizon*-related liabilities, one in the form of equity and two in the form of debt. *See* D34606; Tr. 1605-06 (Morrison). As crude oil prices continue to decline, BPXP's value will also decline correspondingly. BPXP's cash flows, as well as the value of BPXP's oil reserves, hinge on oil prices--and as crude oil has entered a period of lower prices, BPXP's finances will be impacted. The spot price of oil has declined more than 50%. The futures price for 2018 has declined below the $66.80 low case used in Wood Mackenzie's analysis and in Mr. Den Uyl's December 30, 2014 report. TREX 247596.0007; TREX 247621. Even analyst forecasts such as those cited by Mr. Ratner confirm that the oil price environment in coming years will be challenging to BPXP. For example, Goldman Sachs has lowered its predictions of future oil prices to $47.15/barrel in 2015 and $65/barrel in 2016. *See* Tr. 1162, 1168-69 (Ratner); TREX 247631.0003.

1081. To date, after incident-related insurance and settlement recoveries, BPXP has incurred a net total of $35.7 billion in liabilities from the *Deepwater Horizon* incident, without including BPXP's CWA provision. Tr. 1596 (Morrison); TREX 246896; D34605. Moreover, contingent liabilities have not yet been recorded on BPXP's balance sheets (unlike provisions), because although financial liability may be probable, the amount of liability is not currently estimable. *See* TREX 246898.0006. Regardless, the United States recognizes that BPXP's current total expenditure "is a significant number, under any measure." Tr. 1145 (Ratner). And not only did United States' expert Ratner fail to model any of the possibilities he identified for how BPXP could fund or finance a CWA penalty in 2015, *see* Tr. 1121 (Ratner), he concedes that BPXP cannot require its parent companies to fund or finance a CWA penalty, *see* Tr. 1158 (Ratner).

1082.   Concluding that a penalty of up to $3.5 billion could be considered as having no economic impact on BPXP because of provisions already on BPXP's books, *cf.* Tr. 1010 (Ratner), would create perverse incentives and place any regulated party into an untenable position.   An actual or potential violator could decide not to provision because each dollar provisioned could be mistaken as an admission of sorts that a penalty award of at least that amount of money was appropriate, when a potential or actual violator should be able to both engage in prudent financial planning while maintaining its factual and legal defenses to a penalty award set at any level and insist on putting the government to its proof on the CWA Section 311(b)(8) penalty factors.   Additionally, other, non-environmental regulatory regimes may require some degree of "provisioning," and those regulatory regimes should not be allowed to effectively drive any particular penalty outcome under CWA Section 311(b)(7).   There is no indication that Congress desired such an unintended consequence.   For these reasons, any amounts provisioned to pay penalty awards by BPXP do not act as a *de facto* floor on a penalty award here, whether as a general matter or even under the economic impact factor standing alone.

1083.   Any potential investor (including entities within the BP Group) will perform as a rational economic actor when it decides whether to provide capital to BPXP to pay a penalty. *See* Tr. 1204 (Ratner).   Performing as a rational economic actor means considering the return on an investment, and an expected return depends on BPXP's financial statements, as well as on the magnitude of the CWA penalty and other contingent liabilities (such as NRD and certain governmental and individual OPA claims).   *See* Tr. 1204-05 (Ratner).   The expected return has nothing to do with the ***investor's*** financial statements.   *See* Den Uyl Dep. 271.

1084.   BPXP sought to hold the record open due to an unforeseen illness experienced by

249

economic impact expert Bruce Den Uyl.  Rec. Doc. 14146.  Even though BPXP offered a substitute witness to present testimony in March 2015, the Court decided not to hold open the record.  Rec. Doc. 14181.  Nor did the Court strike from the record the testimony of the United States' economic impact expert.  *Id*.  Consequently, BPXP was unable to provide the Court with a full understanding of the economic impact of a CWA penalty.  BPXP has incorporated by reference for purposes of appeal all of its arguments concerning the issues presented by Mr. Den Uyl's unavailability and the substitute witness it proffered in Rec. Doc. 14146.

1085.  Considering BPXP's current value, contingent liabilities, projected cash flows, and other resources available for paying a penalty, a CWA penalty in excess of $2.3 billion would absorb all of BPXP's available cash for 2015.  *See* TREX 013153.0014.  BPXP has already expended billions of dollars to mitigate the effects of the spill, hence a mid- to high-end penalty under the CWA would not create any greater deterrent or punitive effects.  *See* BPXP Proposed Conclusions of Law, Section X (addressing the issue of over-deterrence).  The limited resources of BPXP, which are the only resources that should be considered by the Court, together with the fact that BPXP has already voluntarily absorbed significant financial impacts concerning the spill, justify a penalty at the low end of the range.[24]

---

[24]  Additionally, a few cases suggest that courts have discretion to order that penalties be paid in installments.  *See* Second Am. Restoration Order, *United States v. Cundiff*, No. 4:01-cv-00006-JHM, Rec. Doc. 207 (W.D. Ky. Dec. 8, 2009); *United States v. Appel*, 210 F.3d 385 (9th Cir. 2000) (Pregerson, C.J., dissenting) (describing district court's order requiring appellant "to pay . . . [Clean Water Act] civil penalties[]. . . in installments over a period of five years."); *United States v. J. B. Williams Co.*, 354 F. Supp. 521, 549-50 (S.D.N.Y. 1973) ("The court also realizes that [one of the defendants] may have great difficulty in paying the [civil] fines assessed in this action in a lump sum.  Consequently, the court will entertain an application by that defendant to pay the penalties over a period of years, in installments with interest, upon a showing of necessity therefor."), *rev'd in non-relevant part*, *United States v. J. B. Williams Co.*, 498 F.2d 414 (2d Cir. 1974) (Friendly, J.) (partial reversal unrelated to structure of civil penalty payment).  Structuring the penalty to be paid in installments, however, would not eliminate the limitations on BPXP's ability to pay a penalty outside the low end of the statutory range nor the severe economic impact such a penalty would have on BPXP, including the impact on its solvency.  As noted above, BPXP is expected to have little or no cash flow in the next few years with which to satisfy a penalty from its own resources.  *See* BPXP Proposed Findings of Fact, Section IV.C.  In addition, even if structured to be paid in installments, if the net present value of the CWA penalty, plus BPXP's contingent liabilities, is greater than the $5 billion equity value of BPXP, any potential BP or outside investors whom

**D.      The Economic Benefit to the Violator, If Any, Resulting from the Violation.**

1086.   There is no basis to assert that BPXP realized any significant economic benefit from the CWA violation which is the basis of the penalty sought.  *See* BPXP Proposed Findings of Fact, Section V.  BPXP, the United States, and Magistrate Judge Shushan have made similar statements concerning this factor—each of them recognizing in some fashion that it weighs in favor of a low penalty.

1087.   Most tellingly, the government described any economic benefit to BPXP as "background noise," unworthy of "wast[ing] [the Court's] time with new evidence."  Mar. 21, 2014 Hr'g Tr. at 26-27.  Instead, the government referred back to possible cost savings identified in the Phase 1 trial.  *See id.* at 26:23-27:1 ("The evidence of the economic benefit is already in the record from Phase 1, if there were delays, that saved them money and so on.").  This Court made Phase 1 Ruling findings regarding three "profit driven" decisions which also "caused the blowout, explosion, and oil spill": (1) BP's decision to "use the LCM as a spacer to avoid the cost of transporting and disposing of the LCM, as well as the cost of creating an entirely new spacer from scratch;" (2) BP's decision to drill the final 100 feet of the Macondo well; and (3) not conducting a cement bond log ("CBL").  *See* Rec. Doc. 13355 ¶¶ 65, 195, 298, 519, 551. The record evidence for each of these "decisions" is discussed in the [proposed] findings above and shows that the cost savings—to the extent any savings occurred and can be calculated based on the record evidence—were relatively minimal.  *See* BPXP Proposed Findings of Fact, Section V.

1088.   Moreover, any operational cost savings identified in the Court's prior findings of fact dissipate when compared to the total cost of the violation to BPXP.  *See Sierra Club v.*

---

BPXP might look to for capital to pay a penalty would see the investment as having a negative overall value and yielding a negative overall return.

*MasTec N. Am.*, Civil Nos. 03-1697-HO, 06-6071-HO, 2009 WL 426205, at *5 (D. Or. Feb. 19, 2009) (court imposed [more limited] penalty where defendant's overall losses on project were significant); *Friends of the Earth, Inc. v. Laidlaw Envtl. Services (TOC), Inc.*, 956 F. Supp. 588, 610-11 (D.S.C. 1997) (considering defendant's overall spending resulting from violation in context of economic benefit analysis and penalty imposed).[25]

1089.   As explained above, the total amount of liabilities incurred to date by BPXP as a result of the *Deepwater Horizon* incident, after its insurance and settlement recoveries (but excluding its CWA provision), is $35.7 billion.  *See* Tr. 1596 (Morrison).   After insurance recoveries, the total amount paid by BPXP to date is $27 billion.   *Id.   See* BPXP Proposed Findings of Fact, Section IV.B.1.  As a result, BPXP's overall spending arising from the incident dwarfs any conceivable "cost savings" resulting from the CWA violation.  *See Sierra Club*, 2009 WL 426205, at *5; *Laidlaw*, 956 F. Supp. at 610-11.

1090.   Furthermore, under the November 2012 plea agreement and the Stipulations, the only two liabilities which may not be argued to reduce the United States' civil claims against BPXP are its payments to the National Academy of Sciences and National Fish and Wildlife Foundation—not, for example, the hundreds of millions of dollars BPXP has already paid to fund GoMRI.  Rec. Doc. 14201 at 1-3.

1091.   Balancing such limited evidence of an economic benefit against the massive cost of the spill, Judge Shushan concluded: "We all agree that there was no economic benefit to either BP or Anadarko."  Apr. 17, 2014 Hr'g Tr. 4.  Her conclusion remains correct, and the existence

---

[25]   The subsequent history in the Fourth Circuit and Supreme Court left unaffected the proposition in *Friends of the Earth* cited above.  *See Friends of the Earth, Inc. v. Laidlaw Envtl. Servs. (TOC), Inc.*, 528 U.S. 167 (2000), *reversing* 149 F.3d 303 (4th Cir. 1998).

of "no economic benefit" weighs in favor of a lower-end penalty under CWA Section 311(b)(8).

1092.   Here, again, the importance of appreciating the government's burden of proof and the corresponding bottom-up approach to calculating a penalty is indispensable.  *See* BPXP Proposed Conclusions of Law, Section XIII.  To the government's credit, it has conceded that the evidence on any economic benefit to BPXP is mere "background noise."  That concession alone does not mean that BPXP should face minimal CWA civil penalties under Section 311, but it means that one of the eight penalty factors (one ordinarily seen as pivotal in the case law, *see CITGO*, 723 F.3d at 553 ("Proper consideration of economic benefit is integral to arriving at an appropriate damage award.")) points toward no—or virtually no—penal liability.

1093.   In sum, the economic benefit factor suggests a penalty at the low end of the range.

### E.   The Degree of Culpability Involved

1094.   In order to construe this factor in accordance with the penal canon, the Court must consider the other parties, specifically Transocean and Halliburton, that engaged in negligent conduct that was a proximate cause of the blowout, explosion and oil spill as the Court concluded in the Phase 1 Ruling.  In the Court's Phase 1 Ruling, which is now on appeal, the Court found three parties responsible for the *Deepwater Horizon* incident.  The Court allocated 67% of the responsibility to BPXP and its affiliate BPAPC, with 30% allocated to Transocean and 3% to Halliburton.  The fact that other parties shared a causal role in the incident indicates that the penalty assessed against BPXP should be set at a level significantly below the statutory maximum, even in a case involving findings of gross negligence and/or willful misconduct.  One of the reasons for this is that the penalty regime inherently accounts for aggravated liability by trebling the penalty ceiling in such situations.

1095.   The Court previously concluded that BPXP's plans for responding to a subsea blowout—in place before the *Deepwater Horizon* incident—complied with then-extant federal

regulations and were approved by the Minerals Management Service.  Furthermore, the Court found that federal regulations as of April 20, 2010 did not require exploration companies like BPXP to have access to a prebuilt capping stack.  Indeed, the Court recognized that, at the time, it was not industry practice to maintain such a device.  *See* Phase 2 Ruling ¶¶ 225-26, Rec. Doc. 14021.  These important findings point toward a lesser degree of culpability for BPXP as the Court considers that factor in the CWA Section 311(b)(8) analysis.

1096.  Additionally, in its Phase 2 Ruling, the Court rejected arguments designed to increase BPXP's allocation of fault in the Phase 1 ruling.  *See* Rec. Doc. 14021 ¶ 249.

1097.  Moreover, BPXP's extraordinary response should be considered when weighing the culpability factor.  CWA precedent confirms that, in assessing the culpability factor, the fact finder may consider "the good faith and diligence of the violator in redressing the violations and fixing the problems."  *See In re Serv. Oil, Inc.*, 2007 WL 3138354, at *52 (EPA 2007); s*ee also In re Indus. Chems. Corp.*, 2000 WL 1770494, at *3-4, *7 (EPA 2000) (reducing penalty on appeal because violator showed "an overall picture . . . of good faith"); *In re Donald Cutler*, 2002 WL 32002754, at *44 (EPA 2002) (remediation efforts held to alleviate or mitigate the culpability); *In re Britton Constr. Co*., 1999 WL 362870, 8 E.A.D. 261, at *16-*17 (EAB 1999) (penalty reduced based in part on completion of mitigation plan).

1098.  BPXP's extraordinary source control and spill response efforts, including the collection of 810,000 barrels, merit the Court setting the CWA civil penalty at a lower level than it otherwise might establish and, together with the other factors, support the setting of a penalty against BPXP at the lower end of the statutory range.

1099.  Ultimately, BPXP is entitled to consideration tending to reduce the penalty under this factor for (1) the portion of fault attributed to Transocean and Halliburton, and (2) the fact

that BPXP engaged in admirable and unprecedented response efforts. Hence, full and fair consideration of this factor justifies a penalty at the lower end of the range.

1100. In a similar vein, the Court should consider as part of this culpability analysis[26] the fact that while the incentives that CWA Section 311(b)(7) establishes require that each liable party must bear its own penalties, this does not mean that such penalties should be set without regard to the fact that there are multiple owners here of the offshore facility known as the Macondo well.

1101. When considering setting penalties for (1) owners of different instrumentalities (i.e., vessels vs. interlocking onshore or offshore facilities); (2) multiple operators dividing their respective responsibilities by contract; or (3) persons in charge acting pursuant to employment or other contracts, such a diffusion of authority cannot be a basis for reducing penalties.[27] In that respect, Congress made the decision to impose penalty liability on multiple types of actors or on entities with different statuses. And this is especially true in this case where the Court has already found as a matter of fact that the lines of authority concerning rig operations were confused. *See* Phase 1 Ruling at ¶¶ 446-48, Rec. Doc. 13355.

1102. However, a voluntary division of ownership as to the same violating instrumentality (here, the well) is different. In that regard, BPXP, Anadarko Petroleum Corporation, and MOEX Offshore 2007 LLC held ownership interests in the leasehold and Macondo well in the following respective percentages: 65%, 25%, and 10%. Theoretically, well

---

[26]   Or in the alternative, the points made from here to the end of this subsection should be considered in connection with the "other matters as justice may require" factor.

[27]   Transocean and MOEX have settled with the United States and are not before the Court for purposes of this trial. However, any rational construction of the statute requires consideration of the fact that in future spills vessel owners and not just well owners may be liable for CWA Section 311(b)(7) penalties under specific future fact scenarios (though the Court has previously ruled that Transocean was not so liable here), and that in general CWA Section 311(b)(7) applies to a wide variety of multi-actor situations and thus that the statute must be interpreted accordingly.

ownership could be split in future cases the statute would apply to across ten owners or even dozens of owners or more.   In such situations, penalties should not be multiplied by the happenstance of how many owners share a stake in a particular vessel, onshore, or offshore facility, such as a well from which a discharge of oil to the waters of the United States occurred. That would create a penalty windfall and lead to over-deterrence in direct proportion to how many owners of an instrumentality from which a discharge of oil to water occurred happened to exist.   Courts must avoid interpretations of statute that create perverse outcomes.   *See, e.g., Allied-Bruce Terminix Cos. v. Dobson*, 513 U.S. 265, 275 (1995) (construing statute to avoid "unnecessarily complicating the law and breeding litigation from a statute that seeks to avoid it"); *Am. Tobacco Co. v. Patterson*, 456 U.S. 63, 71 (1982) ("Statutes should be interpreted to avoid untenable distinctions and unreasonable results wherever possible."); *Holmes v. Air Liquide U.S.A., L.L.C.*, 498 F. App'x 405, 407 (5th Cir. 2012) (per curiam) ("We must interpret the Act in a manner that avoids such unreasonable results."); *Bidwell v. Skeen*, 983 F.2d 1332, 1337 (5th Cir. 1993) ("The Court's first task in statutory interpretation is to review the language of the statute.   In deciding between different alternatives, courts should reject interpretations which lead to unreasonable results in favor of those which produce reasonable results.").

### F.    Any Other Penalty for the Same Incident

1103.   That BPXP has paid over $1 billion in other penalties warrants a lower civil penalty.   The criminal fines paid by BPXP totaling $1.25 billion were not payments made pursuant to paragraph 4(c)(viii) of the Plea Agreement and thus may be considered by the Court in assessing the CWA civil penalty.   *See* Rec. Doc. 13725 ¶ 3; *see also* BPXP Proposed Conclusions of Law, Section X (explaining why applicable concerns in the law to avoid over-deterrence require consideration of the prior criminal penalties that BPXP has paid).

1104.   The $1.25 billion in other penalties that BPXP paid for this same incident, which

may be properly considered by the Court, warrant a lower penalty for BPXP than might otherwise be the case. Indeed, even the United States has conceded that BPXP is entitled to a credit for these other penalty payments (based on criminal plea fine) of up to $1.25 billion, depending on how the Court exercises its discretion in setting the penalty. *See* U.S. Pre-Trial Statement at 5 and Ex. 1 (Dec. 19, 2014), Rec. Doc. 13901; Tr. 37 (US Opening Statement). This significant amount of other penalties paid by BPXP, together with application of the other factors, support the setting of a CWA penalty at the lower end of the statutory range.

1105.  In addition to those criminal fines, BPXP agreed to make payments of $350 million to the National Academy of Sciences for the purposes of oil spill prevention and response in the Gulf of Mexico and $2.394 billion to the National Fish and Wildlife Foundation. Rec. Doc. 13725. Pursuant to the terms of the Plea Agreement, BPXP does not seek any credit, offset, or reduction of the civil CWA penalty in this proceeding for these payments.

### G.    Any History of Prior Violations

1106.  There is no evidence in the trial record of any relevant history of prior violations that would support a CWA penalty beyond the low end of the statutory range.

1107.   Although there is limited case law under CWA Section 311(b)(8) on the precise scope of the "history of prior violations" factor, cases interpreting the analogous "history of such violations" factor under Section 309 of the CWA demonstrate that, to be relevant, the prior violations or incidents must be similar to the violation being penalized. *See* CWA Section 309(d), 33 U.S.C. § 1319(d); *United States v. Gulf Park Water Co.*, 14 F. Supp. 2d 854, 864 (S.D. Miss. 1998) (considering whether defendants have committed similar violations in the past); *United States v. Scruggs*, Civil Action No. G-06-776, 2009 WL 500608, at *5 (S.D. Tex. Feb. 26, 2009) (same); *United States v. Bedford*, Civil Action No. 2:07cv491, 2009 WL 1491224, at *17 (E.D. Va. May 22, 2009) (same).

1108.   The four "prior violations" in the trial record are not similar to the *Deepwater Horizon* incident.  The prior incidents span a period of approximately fifteen years beginning in the mid-1990s and involved different entities, different locations, different types of facilities and operations, and different types of violations.   None of the four prior incidents in question involved BPXP (the defendant and violator here) or deepwater drilling, and only one of the four prior incidents (the pipeline leak in Prudhoe Bay) involved a CWA violation.  *See also* BPXP Proposed Findings of Fact, Section VIII.

1109.   In its Order allowing the guilty pleas to be introduced during the trial, the Court noted that it would "accord that material such weight as it deems appropriate."  Rec. Doc. 13867 at 6.   As the Court found in ruling on BPXP's initial motion before the Phase 1 trial, the Grangemouth, Prudhoe Bay, and Texas City incidents are too dissimilar to the *Deepwater Horizon* incident to be relevant.  *See* Rec. Doc. 5634 at 3–5 (parties "failed to demonstrate any substantial similarity between the prior incidents and the Macondo casualty").   The Court examined the differences between these same prior incidents and the *Deepwater Horizon* incident and found that Grangemouth, Texas City, and Prudhoe Bay were "remote in time" and "all land-based," and that "the circumstances of oil refinery disasters and a MODU exploratory drilling disaster are vastly different." *Id.* at 5.  Now that the guilty pleas have been admitted and can be reviewed by the Court, they confirm the lack of similarity and relevance of these same prior incidents.

1110.   The United States repeatedly has attempted to link the prior incidents to the *Deepwater Horizon* incident through its claim that each of the incidents was caused by BP's failure to establish a sufficient process safety management system.  The Court has already found, however, that at the time of the *Deepwater Horizon* incident, BPXP had a process safety

management system in place, the system applied to the *Deepwater Horizon*, and the system did not cause the incident on the *Deepwater Horizon*.  *See* Phase 1 Ruling ¶¶ 467-69, Rec. Doc. 13355.

1111.  Likewise, before the Phase 1 trial, the United States made this same argument: "The PSC and the Government argue that the similarity between prior incidents and Macondo is that they are all large-scale, process-safety caused industrial accidents."  Rec. Doc. 5634 at 5. The Court disagreed, finding the argument to be "an over-generalization." *Id.* (noting that "the specific process safety failures at a refinery are different from those on a MODU").  *Id.*

1112.  Even if these four prior incidents were somehow similar to the *Deepwater Horizon* incident, they should be accorded no weight because none of the four prior violations at issue were Section 311 violations by BPXP.  As BPXP has previously explained, "prior violations" should be read to encompass only those prior violations of CWA Section 311 by the violator, which is BPXP here.  *See* Rec. Doc. 12347-1 at 9-15; Rec. Doc. 13475-1 at 12-14.[28]

1113.  ***First,*** the term "violations" in "history of prior violations" can only mean violations of CWA Section 311. This logical reading is supported by the statutory context surrounding every use of the term "violation" in Section 311, which makes clear that "violation" refers to a violation of Section 311 or regulations promulgated under Section 311, not some other provision or statute.  Indeed, every time the term "violation" is used in Section 311, the statutory context makes clear that it refers to a violation of Section 311 or regulations promulgated under Section 311, not some other provision or statute. This includes the use of "violation" in the other

---

[28]   Although the Court allowed the United States to admit the four guilty pleas into evidence, the Court did not expressly address BPXP's argument that only prior violations of CWA Section 311 by BPXP are legally relevant.  Rec. Doc. 13867 at 6.  In its Order, the Court stated that it would "accord that material such weight as it deems appropriate."  *Id.*  Accordingly, BPXP renews this argument here and contends that the guilty pleas should be accorded no weight in assessing the CWA penalty.

Section 311(b)(8) penalty factors: "the seriousness of the *violation* or *violations*" and "the economic benefit to the violator, if any, resulting from the *violation* . . . ." 33 U.S.C. § 1321(b)(8) (emphasis added).

1114.   This statutory context demonstrates that the "history of prior violations" refers to violations of Section 311. To interpret the "history of prior violations" factor as encompassing more than CWA Section 311 would essentially require arguing that the addition of the words "history of prior" somehow transforms "violations" to mean violations of any federal, state, local, or foreign statute or regulation (or possibly some undefined subset of those).  Such an interpretation, however, has no basis in the text or structure of Section 311, and violates well-established rules of statutory construction presuming that words have the same meaning when used in different sections of the same statute. *See Moosa v. INS*, 171 F.3d 994, 1007 (5th Cir. 1999) ("In interpreting a statute, it is presumed that words used in the same statute have the same meaning. . . . *Here, we are construing the word 'conviction' as contained not only in the same statute, but in the same section*.") (emphasis added) (citing *U.S. Nat'l Bank of Or. v. Indep. Ins. Agents of Am., Inc.*, 508 U.S. 439, 460 (1993)); *Comm'r v. Keystone Consol. Indus., Inc.*, 508 U.S. 152, 159 (1993)); *Comm'r v. Estate of Ridgeway*, 291 F.2d 257, 259 (3d Cir. 1961) ("Where a word or phrase is used in different parts of the same statute, it will be presumed to have the same meaning throughout. *The need for uniformity becomes more imperative . . . where, as here, a word is used more than once in the same section*.") (emphasis added; internal citations omitted).

1115.   *Second,* under CWA Section 311(b)(8), only prior violations by the violator can be considered in assessing a penalty.  In the context of Section 311(b)(8), the penalty assessed does not depend merely on the severity and effect of the spill, but on considerations specific to

the particular CWA defendant, *i.e.*, the particular party responsible for the discharge giving rise to the CWA violation.  There is no CWA case law to support increasing a defendant's penalty due to prior violations committed by the defendant's affiliates or other related entities.  Thus, any "prior violations" committed by an entity other than BPXP are not relevant.

1116.  Because none of the four prior incidents at issue involved BPXP, none involved deepwater drilling and only one even involved a violation of the CWA, and all were remote in time and dissimilar to the *Deepwater Horizon* incident, the record evidence relating to the "prior violations" factor further supports the setting of a penalty at the lower end of the statutory range.

### H.    Any Other Matters as Justice May Require.

1117.  Construing this factor in favor of BPXP and in accordance with *United States v. CITGO Petroleum Corp.*, No. 08-893, 2011 WL 10723934 (W.D. La. 2011), the Court should consider BPXP's positive impact on the local economy and community.  In addition to the above factors, BPXP contends that this Court should recognize three additional matters in the interest of justice.

1118.  ***First***, this Court should recognize BPXP's "positive impact and role in the community." As the *CITGO* court recognized, in evaluating CWA penalties, "it is only fair to view the role of [the violator] in the community and the state as a whole." *CITGO*, 2011 WL 10723934 (Section 8,  "Any other Matters as Justice May Require"), *aff'd*, *United State*s *ex rel. Adm'r of EPA v. CITGO Petroleum Corp.*, 723 F.3d 547, 553-54 (5th Cir. 2013).

1119.  BPXP is of enormous positive significance to the regional economy.  According to the United States' own expert, BPXP's spending by itself accounts for 4% of the Louisiana economy.  *See* BPXP Proposed Findings of Fact ¶ 940.  That spending, moreover, supports the Louisiana economy in myriad ways, for it goes to uses such as capital spending on infrastructure, *id.* ¶¶ 929-934, 937-939, salaries and wages for 2,300 highly-paid employees, *id.* ¶¶ 941-944,

and payments to vendors, which in turn support 40,000 more jobs providing BPXP with services, *id.* ¶¶ 945-948.  Furthermore, in 2010 BPXP pledged $500 million over a 10-year period to fund GoMRI.  This independent research program allows experts to study the Gulf ecosystem and the effect of hydrocarbon releases on the environment and human health, and develop improved spill mitigation technologies.   *Id.*  ¶¶  955-958.   Even  outside  the  geographic  region,  BPXP's investments in research, development, and technology benefit Louisiana and the other Gulf states indirectly by spurring advances that lead, in turn, to more production and spending in the field. BPXP's positive effect on the regional economy, in short, is unquestionable.

1120.  Principles of "fair[ness]" counsel for taking BPXP's positive contributions into account in calculating penalties.  Moreover, the Court should be wary of setting penalties at a level that, by hampering BPXP's operations, counterproductively damage its advantageous economic activity.  By the same token, the Court should avoid setting a penalty that would have the counterproductive effect of disincentivizing research and development in the energy industry, and so limit activity and growth in this sector of the region's economy.  In other words, penalties imposed on BPXP should not be set at a level that would leave the region *worse* off.

1121.  During the trial, United States' expert economic Dr. Mason suggested that BPXP's contributions to the community should be discounted in some fashion because other economic actors might have made that same contribution if BPXP and its leasing parties did not bid for and obtain the relevant lease.  *See* Tr. 723-24 (Mason).  That is contrary to the fact that the *CITGO* court considered such community welfare contributions.  *See CITGO*, 2011 WL 10723934 (Section 8).

1122.  In any event, much the same way that a particular business owns the good will it generates, *see, e.g., Barrera v. Ciolino*, 636 So. 2d 218, 223 (La. 1994) ("good will" can be sold

by contract), it is BPXP and not some other hypothetical oil industry participant that made the investments necessary to support Gulf communities here and minimize harm to them when this spill began. And just as the amount of good will any particular competitor in the market generates varies from one firm to another, so any given array of CWA Section 311(b)(7) violators may engage in differing levels of response and other activities benefitting affected communities. The purpose of the "other factors that justice may require" inquiry is designed precisely to focus on what a violator does or does not do, specifically, that could tend to decrease or increase a penalty in a particular situation. It would not be sound or appropriate to assume away community-supporting actions by BPXP based on the mere fact that BPXP operates in a competitive industry or because one of its competitors might have obtained the Macondo lease. The CWA Section 311(b)(8) inquiry requires a practical, facts-and-circumstances brand of analysis.

1123. *Second*, this Court should recognize BPXP's contributions to spill response technology in light of this unique spill. Today, that technology is miles ahead of where it was five years ago, before the Macondo spill—and that is in large part attributable to work done by BPXP. During the response to the Macondo spill, BPXP, in collaboration with others, developed new technology on a dynamic and ever-evolving basis, including by making important strides relating to *in situ* burning, booming, dispersant application, skimming, shoreline cleanup, and communications infrastructure. *See* BPXP Proposed Findings of Fact ¶ 974. BPXP willingly developed those advances with the United States in order to ensure that they would be available in the future, including to BPXP's competitors. *See id.* at ¶ 973. And ever since then, BPXP has been a leader in the oil and gas community in sharing those advances worldwide with industry, regulators, and governments engaged in drilling, including by giving more than 150

presentations on oil spill response around the world. *See id.* at ¶¶ 982-985. BPXP's technology sharing has gone beyond spill response to developments in drilling safety to prevent future spills. *See id.* at ¶¶ 981-990.

1124. BPXP's subsequent acts plainly show that it understands the seriousness of the Macondo spill, is fully deterred from risking another such event, and indeed is committed to ensuring that it never happens again. The need for additional fines to press either retribution or additional deterrence on BPXP is neither great nor pressing.

1125. **Third**, this Court should take into consideration the penalties that BPXP has already paid, including its OPA, maritime, and criminal liability payments and for its CWA criminal payments. As explained above, BPXP should receive consideration in setting penalties for the high deterrence and punishment effect already triggered by those other penalties. *See* BPXP Proposed Conclusions of Law, Section X.

1126. BPXP also contends that the Court should take into consideration its unprecedented commitment to fund $1 billion in early restoration projects. *See also* BPXP Proposed Findings of Fact, Section IX.B.2. Essentially, BPXP paid out a form of NRD damages before it was legally required to do so. That proactive commitment warrants setting a penalty at the low-end of the range. BPXP will be entitled to offset any NRD claim as negotiated as part of each stipulation to fund individual projects under the Early Restoration Framework Agreement. And by the same token, there is nothing improper about taking into account, to an appropriate degree, BPXP's early restoration efforts, both because BPXP pulled its obligations ahead, so to speak, and because a proper analysis of the deterrent effects of the CWA Section 311(b)(7) penalty require the Court to consider the total amount that BPXP has paid or will be called on to pay in connection with the *Deepwater Horizon* incident.

1127.   BPXP's positive economic contributions to the economies of the Gulf states over a sustained period of time, plus its sharing of technology with industry and government and the pre-existing deterrence and punishment ascribable to the other penalties that BPXP has already paid, counsel in favor of this Court setting a lower CWA civil penalty than it might otherwise—at the lower end of the statutory range.

## XIV.   CLEAN WATER ACT SECTION 311(B)(7) PROVIDES FOR INHERENTLY PROPORTIONAL PENALTIES AND PENALTY CONSISTENCY ACROSS CASES.

1128.   The penalty to be set in this case will be large as an absolute matter and will inevitably serve one of the two purposes of CWA Section 311 (that of punishment/deterrence), even if a relatively low per-barrel amount within the statutory range is invoked, in part because of the size of the spill, which the Court determined to be 3.19 million barrels in the Phase 2 Ruling.

1129.   On December 9, 2014, BPXP filed a motion asking the Court to take judicial notice of penalties assessed in this case and others.  *See* Rec. Doc. 13811.  The United States informed the Court that it did not oppose the motion, but reserved the right to argue in post-trial briefing whether the cases cited by BPXP are irrelevant or distinguishable.  *See* Rec. Doc. 13938. Accordingly, the Court granted BPXP's motion and took judicial notice of the civil penalties assessed, subject to the United States' right to object.  *See* Rec. Doc. 13938.

1130.   Although the CWA directs an individualized assessment of the spill- and violator-specific factors in assessing a penalty, justice requires that the Court also consider the assessed penalty in the light of other penalties previously assessed under the CWA to ensure that, in both the annals of the federal Judiciary and EPA administrative penalties, the penalty here is consistent with—and certainly not grossly disproportionate to—those other penalties.  *Exxon Shipping Co. v. Baker*, for instance, includes an extended discussion of how the penal purposes

of punitive damages law, which the Court saw as analogous to statutory penalties, should be set on a consistent basis, similar to the policy concerns that motivated the Sentencing Guidelines. 554 U.S. 471, 502-06 (2008).

1131.   BPXP submits that, in exercising its discretion to assess a civil penalty against BPXP for a violation of the CWA, the Court therefore, consistent with fundamental concepts of justice and the analysis set out in *Exxon Shipping*, should consider how the levels of penalties sought by the United States in this case compare to those that have been assessed by courts against other companies in this case and in other types of environmental cases.

1132.   Those other penalties serve as important benchmarks to ensure that any penalty imposed on BPXP is not disproportionate to BPXP's conduct, as calibrated to penalties imposed against other companies in those other cases.

1133.   Although the United States now opposes the Court's consideration of penalties assessed in this case and others, the government has previously argued that it is appropriate to consider other penalties as reference points—both in this very case and in others.  For example, in its memorandum in support of its motion to enter the MOEX consent decree, the United States referred several times to the $70 million penalty as being "the largest civil penalty ever recovered under the Clean Water Act."  Rec. Doc. 6436-1 at 2; *see also id.* at 11, 14.  And in its memorandum in support of its motion to enter the Transocean consent decree, the United States similarly referred to the $1 billion penalty as the "largest civil penalty ever recovered by the United States under any federal environmental statute."  Rec. Doc. 8502-1 at 1; *see also id.* at 12 ("largest civil penalty ever paid under the CWA or any other federal environmental statute, by a factor of ten"), 13, 14.

1134.   Finally, in its Pre-Trial Statement regarding the appropriate penalty against

Anadarko, the United States argued:

> Despite not being held liable for subsea discharges under the CWA, Transocean nonetheless paid a civil penalty of $1 billion.  Of course, Transocean acted with negligence while APC did not, but this $1 billion paid by the "paid charter hire" ***still stands as a guidepost for the appropriate penalty*** for the party who co-owned the well and stood to profit from the oil produced had the well been completed successfully.

Rec. Doc. 13896 at 1-2 (emphasis added).

1135.  The same pattern emerges in briefs that the United States has filed supporting penalty amounts in several other cases.  In defending a number of consent-decree penalties, the government has argued that the penalty sought is similar to and consistent with penalties awarded in other cases:

- "***This amount is scaled to other settlements of similar cases*** in which the size of the civil penalty depended upon the duration and extent of the alleged violations, their environmental impact, the United States' assessment of the degree of litigation risk, and here, AMP's status as a non-profit municipal electricity provider."  United States' Mem. in Support of United States' Mot. to Enter Consent Decree, *United States v. Am. Mun. Power, Inc.*, No. 2:10-cv-00438-MHW-NMK, 2010 WL 4251712 (S.D. Ohio July 30, 2010) (Clean Air Act) (emphasis added).

- "This penalty is significant for any municipality and is ***consistent with the range of penalties assessed in similar municipal CWA cases***."  United States' Mem. in Support of Joint Mot. to Enter Consent Decree, *United States v. Metro. Gov't of Nashville and Davidson Cnty.*, No. 307CV01056, 2008 WL 2908147 (M.D. Tenn. Mar. 14, 2008) (emphasis added).

- "The penalties are also ***consistent with the penalties assessed against Cargill's competitors in the industry for similar Clean Air Act violations***.  The benchmarks were established in recent settlements with the Minnesota ethanol producers, which were entered by this Court in March 2003, and the recent comprehensive settlement with Archer Daniels Midland entered in August 2003."  United States' Mem. in Support of Mot. to Enter Consent Decree, *United States v. Cargill, Inc.*, No. 005CV02037, 2006 WL 5941726 (D. Minn. Feb. 10, 2006) (emphasis added).

- "After several rounds of intense negotiations, the parties finally reached agreement on penalties and SEPs . . . and have determined that the Chevron penalty/SEP total amount ($/bbl) is higher than that paid by the first three (BP, Koch and Motiva/Equilon/Shell Deer Park) but not as high as that paid by the next three multi-refinery global settlements (MarathonAshland, Conoco and Navajo/MRC).  So considered, the penalty/SEP amount to be paid under the proposed consent decree is

*comparable with other global refinery settlements*."  Decl. of James J. Jackson [Attorney Advisor with the EPA], *United States v. Chevron U.S.A. Inc.*, No. 303CV04650, 2005 WL 6179520 (N.D. Cal. Feb. 18, 2005) (emphasis added).

1136.   In a case before the Sixth Circuit, the United States likewise argued "[o]ne measure of reasonableness is whether the consent decree treats Lexington as other consent decrees have treated similarly situated municipalities. . . .  *The penalty in this case is consistent with every other comparable consent decree.*  The civil penalty is *therefore* reasonable."  Br. for the Federal Appellant, *United States v. Lexington Fayette Urban Cnty. Gov't*, No. 08-6296, 2009 WL 601407 (6th Cir. Feb. 25, 2009) (emphasis added).

1137.   The Sixth Circuit, while recognizing that such comparisons may have limitations, generally endorsed the United States' approach and found the comparisons credible.  *United States v. Lexington-Fayette Urban Cnty. Gov't*, 591 F.3d 484, 490 (6th Cir. 2010).

1138.   Elsewhere, the government has pointed to its own policy manuals, which also endorse using other penalties as reference points.  *See* United States' Mem. of Points and Authorities in Support of Mot. of United States to Enter Consent Decree, *United States v. E.I. du Pont de Nemours & Co.*, No. 107CV00930, 2007 WL 5343154 (D.N.J. June 15, 2007) ("This is in accord with EPA's Civil Penalty Policy, located at http://www.epa.gov/compliance/resources///caa/stationary/penpol.pdf, *which serves to ensure that penalties are consistent across the country*.") (emphasis added).

1139.   The penalty advocated by the United States here is over one hundred times greater than the largest environmental penalties assessed outside of the *Deepwater Horizon* incident and is many times greater than the total of all civil penalties paid in all environmental cases ever brought by the United States.  *See* Rec. Docs. 13811, 13938.   Indeed, the three largest environmental penalties outside the *Deepwater Horizon* incident demonstrate that a maximum penalty would be grossly disproportionate:

- Hyundai Motor Company agreed to pay $100 million in civil penalties to resolve claims under the Clean Air Act.  *See* Rec. Doc. 13811-20.

- Colonial Pipeline paid $34 million in civil penalties to resolve claims under the CWA.  *See* Rec. Doc. 13811-22.

- Alpha Natural Resources paid $27.5 million in civil penalties to resolve claims under the CWA.  *See* Rec. Doc. 13811-23.

1140.   Finally, in environmental civil penalty cases that have gone to trial, courts have consistently awarded penalties that are just a fraction of the statutory maximum:

- *United States v. A.A. Mactal Constr. Co*, Civ. A. No. 89-2372-V, 1992 WL 245690, at *4 (D. Kan. Apr. 10, 1992), Rec. Doc. 13811-1 (assessing civil penalty of $126,000 under Section 7413 of the CAA).  The penalty assessed was *27%* of the statutory maximum found by the court.  *Id.* at *2.

- *United States v. Midwest Suspension & Brake*, 824 F. Supp. 713, 737-38 (E.D. Mich. 1993), Rec. Doc. 13811-2 (assessing civil penalty of $50,000 under Section 7413 of the CAA).  The penalty assessed was *10%* of the statutory maximum found by the court. *Id.* 735.

- *United States v. Mun. Auth. of Union Twp. ("Dean Dairy")*, 929 F. Supp. 800, 809 (M.D. Pa. 1996), Rec. Doc. 13811-3 (assessing civil penalty of $4,031,000 under Section 1319 of the CWA). The penalty assessed was *8.8%* of the statutory maximum found by the court.  *Id.* at 806.

- *United States v. Vista Paint Corp.*, No. EDCV 94-0127 RT, 1996 WL 477053, at *16 (C.D. Cal. Apr. 16, 1996), Rec. Doc. 13811-4 (assessing civil penalty of $1,111,250 under Section 7413 of the CAA).  The penalty assessed was *2%* of the statutory maximum.  *Id.*

- *United States v. Avatar Holdings, Inc. ("Florida Cities")*, No. 93-281-CIV-FTM-21, 1996 WL 479533, at *16 (M.D. Fla. Aug. 20, 1996), Rec. Doc. 13811-5 (assessing civil penalty of $309,710 under Section 1319 of the CWA).  The penalty assessed was *0.6%* of the statutory maximum found by the court.  *Id.* at *5.

- *United States v. Smithfield Foods, Inc.*, 972 F. Supp. 338, 354 (E.D. Va. 1997), Rec. Doc. 13811-6 (assessing civil penalty of $12.6 million under Section 1319 of the CWA).  The penalty assessed was *7.2%* of the statutory maximum found by the court.  *Id.* at 343.

- *United States v. Gulf Park Water Co.*, 14 F. Supp. 2d 854, 869 (S.D. Miss. 1998), Rec. Doc. 13811-7 (assessing civil penalty of $1.5 million under Section 1319 of the CWA).  The penalty assessed was *3.3%* of the statutory maximum found by the court.  *Id.* at 857.

269

- *United States v. Donovan*, 466 F. Supp. 2d 595, 600 (D. Del. 2006), Rec. Doc. 13811-8 (assessing civil penalty of $256,000 under Section 1319 of the CWA). The penalty assessed was *2%* of the statutory maximum found by the court. *Id.*

- *Sierra Club v. Franklin Cnty. Power of Ill., LLC*, 670 F. Supp. 2d 825, 831 (S.D. Ill. 2009), Rec. Doc. 13811-10 (assessing civil penalty of $100,000 under Section 7413 of the CAA). The penalty assessed was *0.2%* of the statutory maximum found by the court. *Id.*

- *United States v. Scruggs*, No. G-06-776, 2009 WL 500608, at *6 (S.D. Tex. Feb. 26, 2009), Rec. Doc. 13811-11 (assessing civil penalty of $65,000 under Section 1319 of the CWA). The penalty assessed was *4.7%* of the statutory maximum found by the court. *Id.* at *3.

- *United States v. Bedford*, No. 2:07cv491, 2009 WL 1491224, at *18 (E.D. Va. May 22, 2009), Rec. Doc. 13811-12 (assessing civil penalty of $90,000 under Section 1319 of the CWA). The penalty assessed was *0.2%* of the statutory maximum found by the court. *Id.* at *16.

- *Sierra Club v. City of Colo. Springs*, No. 05-CV-01994, 2009 WL 2588696, at *15 (D. Colo. Aug. 20, 2009), Rec. Doc. 13811-13 (assessing civil penalty of $35,550 under Section 1319 of the CWA). The penalty assessed was *15.6%* of the statutory maximum found by the court. *Id.* at *11.

- *Ogeechee-Canoochee Riverkeeper, Inc. v. T.C. Logging, Inc.*, No. 608CV064, 2010 WL 1009797, at *4 (S.D. Ga. Mar. 18, 2010), Rec. Doc. 13811-14 (assessing civil penalty of $78,000 under Section 1319 of the CWA). The penalty assessed was *0.3%* of the statutory maximum found by the court. *Id.*

- *United States v. Righter*, No. 1:08-CV-0670, 2010 WL 4977046, at *6 (M.D. Pa. Dec. 2, 2010), Rec. Doc. 13811-15 (assessing civil penalty of $37,500 under Section 1319 of the CWA). The penalty assessed was *0.03%* of the statutory maximum found by the court. *Id.* at *1 n.2.

- *Stephens v. City of Morristown, Tenn.*, No. 2:08-CV-96, 2011 WL 797673, at *9 (E.D. Tenn. Mar. 1, 2011), Rec. Doc. 13811-16 (assessing civil penalty of $105,000 under Section 1319 of the CWA). The penalty assessed was *4.4%* of the statutory maximum. *Id* at *7, *9.

- *Idaho Conservation League v. Atlanta Gold Corp.*, 879 F. Supp. 2d 1148, 1169 (D. Idaho 2012), Rec. Doc. 13811-18 (assessing partial civil penalty of $2 million under Section 1319 of the CWA). The penalty assessed was *2.7%* of the statutory maximum found by the court. *Id.*

- *United States v. Egan Marine Corp.* is, aside from *CITGO*, the only other reported case assessing civil penalties under the OPA amendments to the CWA. *See United States v. Egan Marine Corp.*, No. 08 C3160, 2011 WL 8144393 (N.D. Ill. Oct. 13,

2011), Rec. Doc. 13811-17.  In that case, the district court refused to calculate a per-day penalty, which would have yielded a maximum penalty of $3,475,000, an amount the Court thought was inappropriately high as a baseline penalty.  Instead, the district court assessed a $100,000 penalty.  Although that represented 89.3% of the ***per barrel*** maximum calculated by the court, the penalty represented just ***3%*** of the potential maximum penalty under the ***per day*** calculation advocated by the United States.  *See Id.* at *6-7.

1141.   The penalties awarded in these cases range from a low of .03% to a high of 27%.  Courts have thus consistently awarded penalties that were far below the statutory maximum notwithstanding that these cases were serious enough to be among the few that the United States chose to bring to trial and generally involved long-term environmental non-compliance by the defendants.

1142.   These cases demonstrate that the penalties sought by the United States here are grossly disproportionate in comparison to potential penalties assessed by other courts, and are not appropriate here.

1143.   Additionally, a reference point that would be an inappropriate basis for judging proportionality is the size of the spill.  The Clean Water Act already accounts for spill size by multiplying the per-barrel penalty calculated according to the factors in CWA Section 311(b)(8) by the number of barrels discharged.  33 U.S.C. § 1321(b)(7)(A), (D).  Treating the number of barrels as an input into the per-barrel amount would effectively double-count the size of the spill in computing a final penalty amount.  Hence, the better benchmark, displayed in the examples *supra*, for assessing proportionality is the penalty as a percentage of the range authorized under the CWA.  That percentage affords a comparison across spills.  Likewise, the dollar amount paid by other defendants in this case, combined with the allocation of fault determined based on the Phase 1 trial, provides a check on proportionality within the *Deepwater Horizon* context.  Each of these proper metrics points to a penalty far lower than what the United States seeks.

## XV.   ON BALANCE OF ALL FACTORS AND LEGAL CONSIDERATIONS, BPXP SHOULD BE SUBJECTED TO A PENALTY AT THE LOW END OF THE RANGE.

1144.   In sum, based on an application of the eight statutory factors, balancing all of them together, and especially including recognition of BPXP's extraordinary response efforts, the penalty should be assessed at the low end of the statutory range.

1145.   BPXP has shown that, on balance, the admissible and reliable economic, environmental, and medical evidence reveal that while the spill was large and thus serious from that perspective, the seriousness of the spill (properly judged along a continuum of all sub-factors) does not justify a penalty at or near the high end of the range.[29]

1146.   BPXP has shown that the nature, extent, and success of its efforts to minimize and mitigate the effects of the spill were tremendous.  Indeed, the United States has conceded the effectiveness of BPXP's response.

1147.   BPXP has shown that the economic impact of a penalty going beyond the low end of the range would bring drastic consequences.  At the time of trial, BPXP was only worth approximately $5 billion, and its available cash only affords it $2.3 billion to pay a CWA penalty in 2015 (and even that assumed much higher oil prices).  The economic impact of the penalty on the violator from the magnitude of penalties the United States seeks would be grave for BPXP.

1148.   BPXP has also shown that it garnered zero economic benefit from the spill.  Together with the billions of dollars in already realized liabilities, and the contingent liabilities on the horizon including potential NRD liability, this factor points squarely toward a penalty at the low end of the range so as to avoid overdeterrence.

---

[29]   The most serious aspect of the *Deepwater Horizon* incident was undoubtedly the loss of eleven crewmen. BPXP has pleaded guilty to eleven counts of violating 18 U.S.C. § 1115 and paid criminal fines as a result. The relevant criminal fines are not payments made pursuant to paragraph 4(c)(viii) of the Plea Agreement and thus may be considered by the Court in assessing the CWA civil penalty.  *See* Rec. Doc. 13725 ¶ 3.

1149.   Furthermore, it is unquestioned that BPXP engaged in unprecedented response efforts well beyond that of the all other responsible parties.   For that, the Court should further mitigate the penalty assessed based on BPXP's culpability.

1150.   BPXP has shown that it has already paid a sizable $1.25 billion in other penalties generated from the spill.   This militates in BPXP's favor in the CWA Section 311(b)(8) balancing process.

1151.   BPXP has shown that there is no history of prior violations that should augment the CWA penalty.   The four prior violations in the trial record are legally and factually irrelevant here, and should not be considered as reasons to increase BPXP's CWA penalty.

1152.   BPXP has shown that it has made positive, sustained economic contributions to the economies of the Gulf States.   It has also shared technology with industry and government, and helped restore the tourism industry throughout the Gulf Coast.   BPXP's contributions warrant the setting of a CWA penalty at the low end of the range.

1153.   The $27.5 billion dollars spent to date (which are net of incident-related insurance and settlement recoveries and include a record $1.25 billion criminal penalty for the same violation), and substantial contingent liabilities that remain, represent an overwhelming deterrent to BPXP and others.   Adding several billions in penalty to this staggering total provides no additional meaningful deterrent other than to future industry operators, who will be counterproductively incentivized to reserve money for penalty payments rather than deploy the type of spill response and compensation BPXP has provided.

1154.   A penalty in the amount sought by the United States would be so disproportionate to the overall facts and circumstances of this case, so punitive when considered in combination with all of the other payments that BPXP has had to make or may be required to make, and so

enormously greater by orders of magnitude than any other penalty ever assessed under the environmental laws, that to assess such a penalty would violate the constitutional prohibition of excessive fines, and the requirement for due process. *See, e.g.*, *Bajakajian*, 524 U.S. at 334 (a sanction is excessive under the Eighth Amendment if "it is grossly disproportiona[te] to the gravity of a defendant's offense"); *TXO Prod. Corp.*, 509 U.S. at 454-55 (due process "imposes substantive limits beyond which penalties may not go") (internal quotations omitted); *Austin*, 509 U.S. at 609-10 (the Eighth Amendment applies to civil sanctions that constitute "punishment").

1155.   Based on an application of the eight statutory factors, balanced together, and especially in recognition of BPXP's extraordinary response activities, the CWA penalty assessed against BPXP should be set at the low end of the statutory range.

March 27, 2015                                    Respectfully submitted,

                                                 */s/ R. Keith Jarrett*
                                                 R. Keith Jarrett


Richard C. Godfrey, P.C.                         R. Keith Jarrett (Bar #16984)
J. Andrew Langan, P.C.                           Don K. Haycraft (Bar #14361)
Hariklia Karis, P.C.                             Liskow & Lewis
Matthew Regan, P.C.                              701 Poydras Street, Suite 5000
Scott W. Fowkes, P.C.                            New Orleans, Louisiana 70139-5099
Mark J. Nomellini                                Telephone: (504) 581-7979
A. Katrine Jakola                                Facsimile: (504) 556-4108
Emily R. Dempsey
Kirkland & Ellis LLP
300 North LaSalle Street
Chicago, IL 60654
Telephone: (312) 862-2000
Facsimile: (312) 862-2200


Robert C. "Mike" Brock                           Brian D. Israel
Jeffrey Bossert Clark                            Joel M. Gross
Karen M. DeSantis                                ARNOLD & PORTER LLP
Kimberly O. Branscome                            555 12th St., N.W.
Kirkland & Ellis LLP                             Washington, DC 20004
655 15th Street, NW                              Telephone: (202) 942-5000
Washington, DC 20005
Telephone: (202) 879-5000
Facsimile: (202) 879-5200


*Attorneys for BP Exploration & Production Inc.*


275

**CERTIFICATE OF SERVICE**

I hereby certify that the above and foregoing pleading has been served on All Counsel by electronically uploading the same to Lexis Nexis File & Serve in accordance with Pretrial Order No. 12, and that the foregoing was electronically filed with the Clerk of Court of the United States District Court for the Eastern District of Louisiana by using the CM/ECF System, which will send a notice of electronic filing in accordance with the procedures established in MDL 2179, on this 27th day of March 2015.

*/s/ R. Keith Jarrett*
R. Keith Jarrett