14:04:44 1

UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF LOUISIANA

2

\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*

3

IN RE:  OIL SPILL BY THE            Docket No. MDL-2179

4   OIL RIG *DEEPWATER HORIZON*          Section "J"
IN THE GULF OF MEXICO ON            New Orleans, LA

5   APRIL 20, 2010                      Tuesday, September 23, 2014
CIVIL

6

This Document Applies to:

7

*No. 12-970, Bon Secour Fisheries,*

8   *Inc., et al v. BP Exploration &*
*Production, Inc., et al*

9

\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*

10

TRANSCRIPT OF STATUS CONFERENCE

11   HEARD BEFORE THE HONORABLE CARL J. BARBIER
UNITED STATES DISTRICT JUDGE

12

13   APPEARANCES:

14   SPECIAL MASTER:                     PEPPER HAMILTON
BY:  GREGORY A. PAW, ESQ.

15                                        BRIAN NICHLLO, ESQ.
3000 Two Logan Square

16                                     Eighteenth and Arch Streets
Philadelphia, PA 19103

17

FOR JON ANDRY:                      UNGLESBY & MARIONNEAUX

18                                     BY:  LEWIS O. UNGLESBY, ESQ.
246 Napoleon St.

19                                     Baton Rouge, LA 70802

20   FOR GLEN J. LERNER:                 ZUCKERMAN SPAEDER
BY:  WILLIAM W. TAYLOR, III, ESQ.

21                                        KEISHA N. STANFORD, ESQ.
717 Texas St., Suite 3300

22                                     Houston, TX 77002

23                                     JONES WALKER
BY:  JAMES E. WRIGHT, III, ESQ.

24                                     201 St. Charles Ave.
New Orleans, LA 70170

25

```
 1   FOR CHRISTINE REITANO:          MARY OLIVE PIERSON, ESQ.
                                     8702 Jefferson Highway, Suite B
 2                                   Baton Rouge, LA 70809

 3   FOR ANDRY LERNER, LLC:          HELLER, DRAPER, PATRICK & HORN
                                     BY:  DOUGLAS S. DRAPER, ESQ.
 4                                   650 Poydras St., Suite 2500
                                     New Orleans, LA 70130
 5
     FOR ANDRY LAW FIRM, LLC:        SMITH & FAWER
 6                                   BY:  RANDALL A. SMITH, ESQ.
                                          STEPHEN M. GELE, ESQ.
 7                                   201 St. Charles Ave., Suite 3702
                                     New Orleans, LA 70170
 8
     FOR GILBERT ANDRY, IV:          PHELPS DUNBAR
 9                                   BY:  HARRY ROSENBERG, ESQ.
                                     Canal Place
10                                   365 Canal St., Suite 2000
                                     New Orleans, LA 70130
11
     FOR BP AMERICA INC., BP
12   AMERICA PRODUCTION COMPANY,
     BP COMPANY NORTH AMERICA,
13   INC., BP CORPORATION NORTH
     AMERICA, INC., BP EXPLORATION &
14   PRODUCTION INC., BP HOLDINGS
     NORTH AMERICA LIMITED, BP
15   PRODUCTS NORTH AMERICA INC.:    WILLIAMS & CONNOLLY, LLP
                                     BY:  KEVIN M. DOWNEY, ESQ.
16                                   725 12th St., N. W.
                                     Washington, DC 20005-5901
17
     ALSO PRESENT:                   JON ANDRY
18                                   LIONEL SUTTON

19
     OFFICIAL COURT REPORTER:        Karen A. Ibos, CCR, RPR, CRR, RMR
20                                   500 Poydras Street, Room HB-406
                                     New Orleans, LA 70130
21                                   (504) 589-7776

22
          Proceedings recorded by mechanical stenography, transcript
23   produced by computer.

24

25
```

P R O C E E D I N G S

(TUESDAY, SEPTEMBER 23, 2014)

(STATUS CONFERENCE - IN RE:  SHOW CAUSE ORDER [11288])


(OPEN COURT.)

14:04:44    THE COURT:  Good afternoon, everyone.  Please be seated.
14:04:49  All right.  This matter is before -- go ahead and call the case,
14:04:52  Stephanie.

14:04:53    THE DEPUTY CLERK:  Civil Action -- Multi-District Action
14:04:57  10-2179, *In Re:  OIL SPILL by the OIL RIG DEEP WATER HORIZON in the*
14:05:03  *GULF OF MEXICO on April 20th, 2010;* and Civil Action 12-970, *Bon*
14:05:13  *Secour Fisheries, Inc. et al v. BP Exploration and Production Inc.,*
14:05:17  *et al.*

14:05:18    THE COURT:  All right.  This matter is before the Court
14:05:22  for what we set as a status conference to air out some issues, maybe
14:05:30  decide some issues, and narrow some issues and decide how we will
14:05:36  proceed forward, so the Court can decide how we will proceed
14:05:42  forward.

14:05:42    I would like counsel who -- do you have a sign-in sheet,
14:05:46  Stephanie?

14:05:46    THE DEPUTY CLERK:  Yes, sir.

14:05:59    THE COURT:  What I would like to do is have one counsel,
14:06:03  one attorney for each of the show cause parties who intends to speak
14:06:08  here today when we get to different issues, if you can identify
14:06:11  yourself so I'll know who to call on.

14:06:15  1                    MR. UNGELSBY:  Louis Ungelsby for Mr. Andry.

14:06:19  2                    MR. TAYLOR:  William Taylor for --

14:06:20  3                    THE COURT:  Wait.  Which Mr. Andry?

14:06:23  4                    MR. UNGELSBY:  Oh, Jon.  I apologize.

14:06:24  5                    THE COURT:  We have different Andry attorneys and

14:06:26  6  different Andry entities here, so you need to specify.

14:06:30  7                    MR. UNGELSBY:  Jon Andry.

14:06:31  8                    THE COURT:  Okay, Mr. Ungelsby.  Okay, fine.  Thank you.

14:06:37  9                    MR. TAYLOR:  William Taylor for Glen Lerner, your Honor.

14:06:38  10                   THE COURT:  Okay.  Thank you.

14:06:38  11                   MS. PIERSON:  Mary Olive Pierson for Christine Reitano.

14:06:43  12                   THE COURT:  Okay.

14:06:43  13                   MR. DRAPER:  Your Honor, Douglas Draper for Andry Lerner,

14:06:47  14  LLC, the law firm.

14:06:48  15                   THE COURT:  Okay.

14:06:48  16                   MR. SMITH:  Randy Smith, Judge, for the Andry Law Firm.

14:06:54  17                   THE COURT:  Remind me again.  Andry Law Firm is the entity

14:06:58  18  involving Jon and Gibby Andry, right?

14:07:01  19                   MR. SMITH:  Correct.

14:07:03  20                   THE COURT:  Because there's so many Andry Law Firm

14:07:07  21  entities that it gets confusing.

14:07:09  22                   MR. SMITH:  Right.  This is the law firm that had nothing

14:07:10  23  to do with the BP claims, just their --

14:07:13  24                   THE COURT:  They have their own claim.

14:07:15  25                   MR. SMITH:  They had their own claim, correct.

14:07:16   1          THE COURT:  I understand.  I know which group it is now.

14:07:20   2   Anybody else?  Mr. Rosenberg, you stood up and sat down.

14:07:22   3          MR. ROSENBERG:  I apologize, your Honor, Harry Rosenberg

14:07:26   4   for Gibby Andry, your Honor.

14:07:27   5          And I only hesitated because you asked for the show cause

14:07:30   6   parties.  He is not a show cause party, but we may ask to be heard

14:07:35   7   by your Honor later today.

14:07:36   8          THE COURT:  Okay.  Very well.

14:07:38   9          MR. ROSENBERG:  Thank you.

14:07:39  10          THE COURT:  Did I cover everyone?

14:07:41  11          MR. PAW:  Okay.  Mr. Sutton I believe is also here.

14:07:48  12          MR. SUTTON:  I don't intend to speak, your Honor.

14:07:53  13          THE COURT:  Mr. Sutton is here and Mr. Andry is here, one

14:07:56  14   of the Mr. Andry's, Jon Andry is here.  Is Gibby Andry here?

14:08:01  15          MR. ROSENBERG:  He is not, your Honor.

14:08:03  16          THE COURT:  Just so the record will show that.

14:08:10  17          Just to lay the groundwork here.  Obviously, this matter

14:08:27  18   arises out of the DEEPWATER HORIZON MDL, and in particular, the

14:08:37  19   settlement, the economic class settlement, which is Civil Action

14:08:48  20   12-970, Bon Secour Fisheries, et cetera.  And in accordance with

14:08:58  21   that settlement, the Court established the DEEPWATER HORIZON Court

14:09:02  22   Supervised Settlement Program, which established the DEEPWATER

14:09:09  23   HORIZON economic claims center in June I think it was -- I don't

14:09:22  24   know the exact date -- of 2013.

14:09:26  25          Certain things were brought to the Court's attention

14:09:32  1   arising -- related to the resignation or that led to the resignation

14:09:39  2   of Mr. Sutton as a staff attorney at the Court Supervised Settlement

14:09:44  3   Program.  There was an internal investigation undertaken and, for

14:09:54  4   certain reasons, the Court decided that it would be best to bring in

14:10:00  5   an outside party, an independent investigator, and appoint that

14:10:07  6   person as a Special Master to perform this investigation.  And that

14:10:11  7   was Mr. Louis Freeh.

14:10:16  8          Mr. Freeh's appointment included several different

14:10:24  9   assignments, only two of which are really relevant to why we're here

14:10:32 10   today.  That is, first, to perform an independent external

14:10:42 11   investigation into the events that led to the resignation of the

14:10:46 12   staff attorney in the claims center; and also, to further

14:10:53 13   investigate as to any other possible ethical violations or

14:10:56 14   misconduct within the settlement program.  The Court made the formal

14:11:06 15   appointment on July 2nd, 2013.

14:11:09 16          Mr. Freeh and the Freeh Group undertook that investigation

14:11:16 17   and issued their initial report, the initial Special Master's report

14:11:25 18   on September 6th, 2013.  It's entitled "Independent External

14:11:32 19   Investigation of the DEEPWATER HORIZON Court Supervised Settlement

14:11:35 20   Program" dated that same date September 6, 2013.  It was filed with

14:11:43 21   the Court on that day.  And on the same day, the Court issued the

14:11:46 22   order to show cause that brings us here today.

14:11:50 23          And the order to show cause orders as follows -- or did

14:12:01 24   several things, one of which it extended Mr. Freeh's or expanded,

14:12:07 25   that is, Mr. Freeh's duties or assignments as Special Master.

14:12:14   1           And then, in that order, it provided that:  "It is further

14:12:19   2    ordered that Lionel Sutton, Christine Reitano, Jon Andry, Glen

14:12:24   3    Lerner, and any associated law firms, show cause why the Court

14:12:28   4    should not adopt the following findings and recommendations of the

14:12:31   5    Special Master: (A) disallowing the Andry Law Firm's claim under the

14:12:37   6    Unclean Hands Doctrine; (b) disqualifying attorneys Lionel Sutton,

14:12:44   7    Christine Reitano, Glen Lerner, and Jon Andry, as well as any

14:12:46   8    associated law firms, from representing CSSP -- that's Court

14:12:52   9    Supervised Settlement Program -- claimants (or collecting fees from

14:12:55  10    such claimants) under the Unclean Hands Doctrine."

14:12:59  11           Pursuant to Rule 53(f), these parties were instructed that

14:13:07  12    they may file responses or any objections, motions, et cetera, to

14:13:13  13    the Special Master's report.

14:13:17  14           Rule 53 has a default response time of 21 days, unless

14:13:23  15    otherwise ordered by the Court.  The Court initially ordered that

14:13:30  16    the response be filed within 14 days at the request -- several

14:13:37  17    different requests at different times of the show cause parties.

14:13:40  18    The Court ultimately extended the response deadline to January 3rd

14:13:49  19    of 2014, approximately four months from the date of the show cause

14:13:53  20    order.

14:13:58  21           Before we talk about how we're going to proceed forward,

14:14:02  22    I want to dispose of a few preliminary matters the Court does not

14:14:09  23    plan to entertain argument.  There's been extensive briefing in this

14:14:15  24    case.  The parties -- each of the show cause parties have filed

14:14:22  25    responses to the show cause order.  Several parties have filed

14:14:27  1  multiple responses to the show cause order with voluminous documents

14:14:34  2  and additional evidence.

14:14:37  3          With respect to the -- a number of parties raised various

14:14:52  4  jurisdictional, personal subject matter jurisdictional issues

14:14:57  5  questioning the jurisdiction of the Court over them, questioning the

14:15:05  6  scope of the Special Master's authority under Rule 53, objecting to

14:15:10  7  what they perceive was lack of notice and opportunity to be heard,

14:15:15  8  and in some cases, objecting to the role of the Special Master in

14:15:19  9  these proceedings.

14:15:21  10         The Court hereby overrules each and every one of those

14:15:25  11  objections.  Essentially, for the reasons most of them can be

14:15:31  12  disposed of by reference to the Court's earlier order and reasons in

14:15:35  13  the matter of Casey Thonn, which is Record Document 12794, issued

14:15:44  14  April 29, 2014.  And I am not going to repeat everything I said in

14:15:52  15  there.  But clearly this Court has jurisdiction and authority over

14:15:56  16  claimants, over parties, over lawyers who represent parties in the

14:16:05  17  DEEPWATER HORIZON's Court Supervised Claims Program.  And so all of

14:16:12  18  those arguments I consider frivolous.

14:16:16  19         In terms of notice and opportunity to be heard, every one

14:16:21  20  of these parties have had sufficient, more than sufficient notice of

14:16:32  21  the issues here and what's an issue and have had an opportunity to

14:16:42  22  be heard.  The Court, as I said, has extended the response time line

14:16:49  23  several times at the request of the show cause parties, and so I

14:16:56  24  think those arguments are without any basis also.

14:17:02  25         Next, there are pending objections to Judge Shushan's

14:17:09  1   discovery orders.  Judge Shushan issued several orders, at least

14:17:26  2   two, maybe more, dealing with discovery issues.  Ultimately, the

14:17:45  3   Special Master was ordered by Judge Shushan -- what occurred is --

14:17:49  4   and I think the parties are aware of this, is after the initial

14:17:52  5   disclosure of documents or information by the Special Master, there

14:17:58  6   were objections voiced.  The Court referred the matter to Judge

14:18:03  7   Shushan.  Judge Shushan spent an enormous amount of time, and

14:18:08  8   effort, and energy reviewing these objections.  She personally

14:18:14  9   reviewed all of the evidence, all of the documents, and decided

14:18:23 10   which were relevant and which were not.

14:18:27 11         As I appreciate it, the show cause parties, essentially,

14:18:30 12   want everything that the Special Master ever generated or ever

14:18:35 13   obtained or ever produced.  The problem with that is that there are

14:18:43 14   other parties and other issues in this case that have no relevance

14:18:47 15   here whatsoever to the issues involving these show cause parties.

14:18:52 16   And so what Judge Shushan had to do was figure out what was relevant

14:18:59 17   to the claims and defenses and issues involving these show cause

14:19:06 18   parties and what was not.  And she did that after a great deal of

14:19:12 19   time, and energy, and effort.

14:19:19 20         And I believe at my request, Mr. Paw, did you send that --

14:19:25 21   I asked you to -- I had asked you last week or at the end of last

14:19:29 22   week, as I recall, to provide the Court with an inventory, I guess

14:19:36 23   you would call it, a listing of all of the documents, or

14:19:39 24   information, or evidence that the Special Master's office

14:19:44 25   accumulated, and then to distinguish or show what was produced or

14:19:48 1   what was not produced to the show cause parties.  And then, I think

14:19:53 2   you sent that to me today, and I instructed you to share it with the

14:19:58 3   parties so that we could have that here today.  Did you do that?

14:20:02 4         MR. PAW:  Yes, your Honor.  I prepared an inventory of the

14:20:07 5   investigative record from the Special Master for the first phase of

14:20:09 6   our investigation leading to the September 6th, 2013, report.  I,

14:20:15 7   then, provided a listing of the discovery materials that have been

14:20:19 8   provided to the show cause parties.  I also indicated through the

14:20:24 9   investigative files by yellow highlighting which portions of the

14:20:28 10   investigative file, pursuant to Judge Shushan's orders which you

14:20:32 11   just referenced of the 19th of December and, I believe, the 24th of

14:20:37 12   October, that had been produced to the show cause parties.  This was

14:20:42 13   e-mailed to some of the show cause parties earlier this afternoon

14:20:45 14   and copies have been provided here in Court for everybody.

14:20:50 15         THE COURT:  All right.  Anybody want to make any comments

14:20:58 16   on this?  Brief comments?

14:21:01 17         MR. UNGELSBY:  Your Honor, are you meaning as to the

14:21:04 18   document Mr. Paw gave us?  I don't think we have any comments about

14:21:08 19   the document.

14:21:09 20         THE COURT:  Do you have any comments about this issue, the

14:21:13 21   discovery issue?

14:21:14 22         MR. UNGELSBY:  I have one.

14:21:15 23         THE COURT:  Okay.  Come on.  Come on up.

14:21:18 24         MR. UNGELSBY:  Judge, I don't know what order you want to

14:21:22 25   do this, but my complaint -- and I think I speak for everyone, if

14:21:27 1 "complaint" is the right word -- Judge Shushan in her rulings gave

14:21:31 2 us lots of information. But she also at the time embargoed any

14:21:39 3 conversation at all with members of the claims administration

14:21:42 4 office, which is still in effect. So I, speaking very directly on

14:21:47 5 my case, would like to be able to talk to Mark Staley.

14:21:53 6           THE COURT: Who do you represent again?

14:21:55 7           MR. UNGELSBY: Jon Andry. I would like to be able to talk

14:21:58 8 to Mr. Rinaldi. I don't have to talk to them long, not much longer

14:22:04 9 than I am talking to you, but I need access.

14:22:06 10           THE COURT: What would you like to ask them?

14:22:08 11           MR. UNGELSBY: I would ask Mr. Staley and Mr. Rinaldi,

14:22:11 12 "Isn't it true that, in fact, the Andry Law Firm claim was not

14:22:15 13 expedited, that, in fact, the Andry Law Firm claim was not given

14:22:21 14 special treatment, and that really what happened was there was an

14:22:24 15 error made in their office, inadvertent, about the claim which

14:22:30 16 caused the claim to be put away for an extended period of time?"

14:22:34 17 And when it was brought to their attention, these e-mails, of which

14:22:37 18 Mr. Paw makes quite a lot in his accusations, were nothing but the

14:22:43 19 response to Mr. Sutton's inquiry, what's the story on this case.

14:22:48 20 They found it. I believe -- now, this is me talking, this is not

14:22:53 21 them talking. They found it. At that time, they realized it was in

14:22:59 22 order. You know, the missing documents actually were not missing.

14:23:04 23 You know, it was --

14:23:05 24           THE COURT: All of this is put forth in the opposition or

14:23:08 25 response that you filed. I understand that. I understand what your

14:23:08  1    position is.

14:23:14  2                MR. UNGELSBY:  Yes, sir.  There is a distinction between

14:23:15  3    what Louis thinks and what they would tell you under oath.

14:23:19  4                THE COURT:  Okay.

14:23:20  5                MR. UNGELSBY:  And I don't want to speak for anyone else,

14:23:24  6    if they have a succinct need, but I can tell you --

14:23:28  7                THE COURT:  Weren't they -- did you get -- were they

14:23:31  8    statementized, Mr. Paw?

14:23:33  9                MR. UNGELSBY:  Yes, but he didn't ask what I want to know.

14:23:37 10    I mean, yes, sir, but he doesn't ask what I want to know, Judge.

14:23:40 11                MR. PAW:  Your Honor, they were questioned both by

14:23:42 12    Mr. Welker from the CAO, and by the Special Master's staff, and the

14:23:46 13    reports of both of those interviews have been provided.

14:23:49 14                THE COURT:  Okay.  All right.  Thank you, Mr. Ungelsby.

14:23:54 15                MR. UNGELSBY:  But anyway, that's what we would ask in

14:23:55 16    terms of discovery.  That's an issue we have.

14:23:57 17                THE COURT:  All right.  I understand.  Thank you.

14:23:59 18                Anybody have anything they want to say on that?

14:24:06 19                I am going to overrule the objections to Judge Shushan's

14:24:10 20    discovery orders.  I think that the parties have been provided with

14:24:14 21    voluminous discovery in this case, anything that could arguably be

14:24:23 22    relevant to the claims here.

14:24:29 23                I think following Judge Shushan's last order of

14:24:35 24    December 19 there was an additional supplemental production by the

14:24:41 25    Special Master and it was provided even though some of those

14:24:47  1   documents didn't pertain to each of the show cause parties; but

14:24:51  2   nonetheless, Judge Shushan ordered that all of the documents, all of

14:24:56  3   the information be provided in full to each of them, and I think

14:24:59  4   they got, like, another 1,300 pages or documents in addition to the

14:25:09  5   hundreds that had been provided previously.

14:25:24  6          Okay.  Here is what I would like to do.  It seems to me a

14:25:39  7   threshold issue is whether there is a need for any type of

14:25:43  8   evidentiary hearing in this case.  Rule 53, which pertains to

14:25:52  9   Special Masters, provides that after a Special Master files his

14:26:02 10   report, 53(f) is a relevant rule, 53(f)(1), subpart (1), opportunity

14:26:10 11   for a hearing, et cetera, says:  "In acting on a master's order,

14:26:15 12   report, or recommendations, the court must give the parties notice

14:26:20 13   and an opportunity to be heard; may receive evidence; and may adopt

14:26:25 14   or affirm, modify, wholly or partly reject or reverse, or resubmit

14:26:32 15   to the master with instructions."

14:26:34 16          And then it goes on to say in Rule 53(f)(3) that in

14:26:40 17   reviewing factual findings, the Court must decide de novo all

14:26:45 18   objections to findings of fact made or recommended by a master,

14:26:49 19   unless there's a stipulation otherwise, which there is not,

14:26:52 20   obviously, in this case.

14:26:55 21          And 53(f)(4), Reviewing legal conclusions.  The Court,

14:27:01 22   obviously, which is the rule in any type of matter, decides de novo

14:27:06 23   objections to conclusions of law.

14:27:16 24          So what I would like to do -- it seems to me that much of

14:27:23 25   the evidence that supports that -- the Special Master has used to

14:27:28  1   support his report comes directly from these show cause parties

14:27:32  2   themselves, first of all -- the documents such as e-mails, phone

14:27:37  3   records, bank records, contracts, sworn statements by the show cause

14:27:41  4   parties. I don't know why we would have to have an evidentiary

14:27:50  5   hearing on those matters, which are whatever the facts are that are

14:27:57  6   shown demonstrated by those records. Certainly, parties are free to

14:28:01  7   argue what inferences the Court or what conclusions the Court should

14:28:05  8   draw from those records, or documents, or evidence, but I don't see

14:28:09  9   how there is a need for an evidentiary hearing on that.

14:28:12  10        Other evidence includes documents and records from the

14:28:16  11   claims center itself. Again, e-mail records, phone records,

14:28:20  12   employment documents, policies, claims information and so forth.

14:28:28  13   However, the rule does say that the Court should perform a de novo

14:28:32  14   review of objections to factual findings. So I guess what I need to

14:28:41  15   know right now, and I would like each show cause party's attorney

14:28:44  16   can respond if they care to, is what -- I am not going to set an

14:28:51  17   evidentiary hearing and just say we're having an evidentiary

14:28:55  18   hearing. I would need to know what are the issues to be decided,

14:28:59  19   what are we trying. And so, if Mr. Ungelsby wants to start with

14:29:04  20   that. I would like to be specific, if you can.

14:29:08  21        MR. UNGELSBY: Very. You either believe or you don't

14:29:11  22   believe Tiger Sutton. You believe or you don't believe Jon Andry.

14:29:15  23   You believe or you don't believe --

14:29:17  24        THE COURT: Wait, wait. About what?

14:29:18  25        MR. UNGELSBY: I'm sorry.

14:29:19  1            THE COURT:  What is the factual issue?  What?

14:29:21  2            MR. UNGELSBY:  I'm sorry.  Mr. Sutton, in the documents

14:29:25  3    that they presented to you in their statement, the argument is

14:29:29  4    that -- his argument is that he told Mr. Juneau all about this

14:29:34  5    agreement and that it was agreed to.

14:29:37  6            Now, I am not here to argue whether that's true or false

14:29:40  7    at all.  The issue for the Court is, did Glen Lerner or Jon Andry,

14:29:46  8    if Jon Andry was involved in that, have a good faith basis to

14:29:50  9    believe it to be true?  And if they did, what, then, is the next

14:29:56 10    step?

14:29:56 11            If you deal with the -- just simplistically, Jon Andry.

14:30:02 12    The Special Master makes a big deal out of Jon Andry's telephone

14:30:08 13    call with Mike Juneau.  Now, what he doesn't tell you, Judge, is

14:30:13 14    that according to his records, that telephone call lasts 41 seconds.

14:30:18 15    Forty-one seconds, according to the record.  It's an extensive part

14:30:24 16    of his story, of his position with you that Mr. Andry did not tell

14:30:32 17    Mike Juneau the truth.  Mr. Andry ought to have a chance if someone

14:30:36 18    is going to say he didn't tell the truth, to sit up here and let you

14:30:39 19    make that decision and let him explain what he said and what was

14:30:42 20    said, and if Mr. Juneau wishes to, of course, we welcome it.  But he

14:30:48 21    should have that opportunity.

14:30:49 22            There are issues, for example, the jumping off point in

14:30:53 23    the whole case starts with the idea that Christine Mancuso, who

14:30:58 24    works at Andry Lerner, employee, has a -- is asked by Christine

14:31:07 25    Reitano, Mr. Sutton's wife, Ms. Pierson's client, I don't want to

14:31:12  1    speak for her, beyond these facts, for a referral fee on the Casey

14:31:16  2    Thonn case.  And that's replete throughout the Special Master's

14:31:20  3    report and the inferences which he draws from that, both in his

14:31:23  4    original report and his rebuttal to ours.

14:31:25  5         The fact is that Mrs. Mancuso will come here and swear,

14:31:31  6    and has sworn, that there was no conversation about a referral fee

14:31:36  7    whatsoever, that the conversation was about would you keep it the

14:31:41  8    same contingency fee.  No money for her whatsoever.  Now, that

14:31:48  9    lawyer and lady ought to have a chance to say what she said and

14:31:55  10   Mrs. Mancuso, who is an AV rated lawyer, ought to be able to say

14:32:00  11   that what they said I said was wrong.  Mr. Paw and his response to

14:32:06  12   our response just says, "Well, our investigators don't make

14:32:12  13   mistakes, you know."  Well, you have to decide that.  And the only

14:32:16  14   way you can do that is to look at those witnesses and say who is

14:32:19  15   telling the truth?

14:32:20  16        The entire factual basis of this is largely based on

14:32:24  17   inferences.

14:32:25  18        THE COURT:  Well, it may be, it may not be.  It may be

14:32:29  19   that it can be decided.  It depends on what my decision is, but it

14:32:35  20   could be that a lot of it can be decided on records and documents,

14:32:38  21   which are not in dispute.

14:32:40  22        MR. UNGELSBY:  Well, but let me -- yes, in this way.  But

14:32:45  23   then here is another way.  Let me give you an example, a simple one.

14:32:49  24   Without using the Court.  The Court staff likes to eat at Herbsaint,

14:32:54  25   hypothetically.  All right.  We got an order from you to be here

14:32:58  1    today at two o'clock.  We went to eat at Herbsaint.  Say I saw your

14:33:03  2    law clerk, sat down and had coffee with him.  It's a chance meeting.

14:33:07  3    Now, it is true that we planned to be here, but that's a chance

14:33:10  4    meeting.  Mr. Paw takes -- without knowing what was said, he takes

14:33:15  5    the existence of e-mails or texts, whatever those, you know,

14:33:21  6    communications, between Mr. Andry and Mr. Sutton, and then says,

14:33:28  7    Andry's demonstrably not telling the truth when he later says that

14:33:33  8    he ran into Sutton accidentally on the street and they had their

14:33:36  9    meeting.

14:33:37  10          Now, how can you pick?  How can you possibly say, "Well,

14:33:44  11   I just accept what Mr. Paw said is true?"  Because I can hang up the

14:33:47  12   phone right now, walk outside and run into someone who I just talked

14:33:52  13   to.  That doesn't prove anything; but it proves a lot to him because

14:33:55  14   this meeting is supposed to be a bad meeting.

14:34:00  15          Now, starting with this, whether it be Mr. Juneau, the

14:34:05  16   Court, whatever the rule is who wants to come and say it, someone

14:34:10  17   has got to be allowed to come say that while Jon and Gibby Andry may

14:34:17  18   be a pest, they may bother the heck out of people -- there are a lot

14:34:22  19   of people bothering the heck of people -- but talking to Tiger

14:34:27  20   Sutton or any other member of the claims office is not only allowed,

14:34:31  21   it's encouraged.

14:34:32  22          THE COURT:  All right.  I don't need an evidentiary

14:34:34  23   hearing to prove that point.  I mean, I think everyone knows that.

14:34:38  24   That's not -- you know, we are not going to have -- a lot of the

14:34:43  25   stuff you're talking about is all in the periphery.  It's not the

14:34:47 1    heart of this show cause order.

14:34:51 2            MR. UNGELSBY:  Well, perhaps, I would do a better job if

14:34:55 3    you told me what you think the heart of it is.  But I assume you

14:34:58 4    mean the heart of it is --

14:35:00 5            THE COURT:  No, I'm asking you what facts you think I need

14:35:04 6    to have an evidentiary hearing about, and I am hearing you, but so

14:35:08 7    far, I am not really convinced.

14:35:11 8            MR. UNGELSBY:  You need to hear that Glen Lerner paying

14:35:17 9    Sutton through the Crown account was not a new thing or a one -- an

14:35:23 10   unusual thing.

14:35:24 11           THE COURT:  That's in evidence already.  I mean, that's

14:35:26 12   obvious.  But --

14:35:30 13           MR. UNGELSBY:  But you need --

14:35:30 14           THE COURT:  I am not going to give my views of the case

14:35:32 15   now, but you're talking about things that are -- I don't think can

14:35:37 16   be disputed based on the evidence, on the documents and records.

14:35:42 17   The payments were made.  We know they were made.  We know how they

14:35:45 18   were made.  We know when they were made, and anybody can stand up

14:35:50 19   and argue what inferences I should draw from that or not, but we

14:35:55 20   don't need necessarily an evidentiary hearing to go into all of

14:35:59 21   that.

14:36:00 22           MR. UNGELSBY:  Well, your Honor, again, I can't think of

14:36:02 23   what you're thinking, but if you're thinking in a negative fashion,

14:36:06 24   then I suggest that you do --

14:36:09 25           THE COURT:  I am not thinking in any fashion, I am just

14:36:11  1    talking out loud about what it looks like to me in terms of, you

14:36:16  2    know --

14:36:17  3          MR. UNGELSBY:  If the payment was legitimate, okay, or if

14:36:23  4    the payment was in error or as a result of a great misunderstanding

14:36:27  5    between Sutton and Lerner, that's not misconduct under the Unclean

14:36:37  6    Hands Doctrine nor something illegal.  If Lerner's statements about

14:36:42  7    it are, in fact, true, while they're in the Special Master's report

14:36:46  8    attacked, you have to make that choice, and you can't make it, I

14:36:51  9    suggest, your Honor, without looking at these people.  If there

14:36:56 10    are -- the question of what did Jon Andry know as opposed to Glen

14:37:01 11    Lerner and what did Jon Andry do as opposed to Glen Lerner, you have

14:37:06 12    facts, but you have a lot of inferences that the Special Master

14:37:11 13    drew.

14:37:11 14          THE COURT:  Well, I also have documents which can show

14:37:15 15    what people knew when they send e-mails and so forth, you know, so.

14:37:21 16          MR. UNGELSBY:  Well, you have some documents.  But, again,

14:37:23 17    I am just suggesting to your Honor -- I mean, one may misconstrue

14:37:29 18    those or interpret them as they wish, you know.  If you have a

14:37:32 19    witness there and you can ask him, "You wrote this, Mr." -- you

14:37:37 20    know, "What do you mean by that?"  He may or may not have a very

14:37:42 21    legitimate response.  It changes the whole complexity of how one

14:37:47 22    looks at that document.  We have to have a chance, Judge, to put our

14:37:54 23    best foot forward.  There are people --

14:37:58 24          THE COURT:  What do you envision?  Tell me what you

14:38:00 25    envision in terms of the scope and form of an evidentiary hearing.

14:38:04  1          MR. UNGELSBY:  I would think you would want to hear from

14:38:06  2   the parties, you know, the five -- the names you've identified.  I

14:38:12  3   can't speak for Gibby Andry, but Jon, Christine, Tiger --

14:38:17  4          THE COURT:  Four.

14:38:18  5          MR. UNGELSBY:  -- and Mr. Sutton -- I mean, Mr. Lerner,

14:38:22  6   okay.  Those four.  I would like to be able to present the evidence

14:38:28  7   that the suggestion that the payment to Sutton was somehow done as a

14:38:33  8   way to help the Andry -- I'm going to call it the Andry brothers law

14:38:40  9   case, and their claim is dead wrong, you know.  That it's a

14:38:45 10   coincidence, but it's not illegal, nor immoral, nor wrong, period.

14:38:50 11          THE COURT:  That what's a coincidence?

14:38:53 12          MR. UNGELSBY:  That at the same time that Sutton is

14:38:55 13   dealing with Lerner, Andry is talking to Sutton, and Sutton, one

14:39:06 14   time, to Staley and Rinaldi in relationship to that claim.

14:39:10 15          THE COURT:  So you envision putting on your client and

14:39:16 16   the -- well, presumably the other lawyers will put on their clients.

14:39:20 17   Is that what you're envisioning?

14:39:22 18          MR. UNGELSBY:  For sure.  And some people to corroborate

14:39:24 19   what they say.

14:39:25 20          THE COURT:  Like who?

14:39:27 21          MR. UNGELSBY:  Well, for example, David Duval.  I would

14:39:30 22   like -- I can't talk to David because of the Shushan order, but his

14:39:36 23   lawyer is here.  I believe that David Duval, if given an opportunity

14:39:40 24   to testify, he would say, "Nothing Jon Andry ever said to me was

14:39:45 25   improper, unusual, different than a million other people didn't say,

14:39:49  1   ask me to do anything.  Right, wrong.  It wasn't my job, you know,

14:39:54  2   there's nothing" -- this whole idea that Jon Andry was trying to

14:39:58  3   influence the processing of a claim is a myth.  Not only that he

14:40:03  4   couldn't do it, but more importantly he didn't.  I know you know

14:40:06  5   that he couldn't, but what you don't know is -- you'd never know it

14:40:11  6   from reading the Special Master's report -- is that he didn't.  And

14:40:15  7   that's what this is about.  You know, that's what this is about.

14:40:21  8          Sure, we can take some documents and say, Well, there was

14:40:24  9   a communication back and forth between people, but the question is:

14:40:27 10   Is there anything wrong with that?  And independent of the general

14:40:35 11   rule that there's nothing wrong with it, was there, in fact,

14:40:39 12   something wrong with it?  Was the payment made in a conspiratorial

14:40:46 13   way or was it not, you know?  When you say "coincidence," was it

14:40:51 14   coincidence that Tiger Sutton wanted to hide the money from his wife

14:40:57 15   and, perhaps, from Mr. Juneau?  How does that follow the Jon and

14:41:04 16   Glen and what is their knowledge base about?

14:41:07 17          These men have to have a chance, your Honor, to clean

14:41:10 18   themselves of the stain that's been put on them with these

14:41:15 19   inferences.  I don't think that is -- I can't think of anything

14:41:21 20   really more important for a Court to do.

14:41:24 21          THE COURT:  All right.  Thank you.  Let me hear from

14:41:27 22   anybody else who wants to speak.  Thank you, Mr. Ungelsby.

14:41:38 23          MR. TAYLOR:  Bill Taylor for Glen Lerner, your Honor, I

14:41:40 24   appreciate the opportunity to address the Court --

14:41:42 25          THE COURT:  Sure.

14:41:43 1        MR. TAYLOR:  -- this afternoon.  I want to say some

14:41:50 2   things, your Honor, which I say advisedly, because I always have

14:41:55 3   some trepidation in explaining to a federal judge that I think he's

14:41:58 4   headed down the wrong path.

14:42:01 5        THE COURT:  People tell me that all the time.  I don't

14:42:06 6   know why you hesitate to do that.  I see some of them in the

14:42:07 7   audience back there.

14:42:09 8        MR. TAYLOR:  Some metallic garments that one can wear in

14:42:14 9   these circumstances.  Your Honor, Glen Lerner is my client.  He is

14:42:18 10  not a lawyer practicing in Louisiana.  He has --

14:42:21 11       THE WITNESS:  I know who Mr. Lerner is.  Not that I know

14:42:25 12  him personally, but from this case.

14:42:28 13       MR. TAYLOR:  You understand his status.

14:42:30 14       THE COURT:  I know who he is in terms of his status, yes.

14:42:32 15       MR. TAYLOR:  And if I say to you the allegations of

14:42:35 16  bribery and misconduct are enormously significant and harmful to

14:42:38 17  him, you will forgive me if I am repeating what has already been

14:42:42 18  said.

14:42:42 19       THE COURT:  We are not here to argue the substance or the

14:42:45 20  merits of this.  We're here to argue procedurally where we want to

14:42:50 21  go from here.

14:42:50 22       MR. TAYLOR:  That's what I want to address.

14:42:50 23       THE COURT:  Okay.  Go ahead.

14:42:52 24       MR. TAYLOR:  I join Mr. Ungelsby's remarks, and I think,

14:42:56 25  your Honor, the point that I want to make to the Court is the one in

14:43:02 1  which -- when you asked, "Why do we have to have an evidentiary

14:43:05 2  hearing?"  And the reason we have to have an evidentiary hearing is

14:43:09 3  because my client has a right to it.  The question before the Court

14:43:16 4  is what due process is Mr. Lerner to be entitled to.

14:43:21 5          Now, if we were reviewing a magistrate's record or Special

14:43:26 6  Master's record compiled after the traditional form of a hearing in

14:43:32 7  which a magistrate or a Special Master takes testimony and argument

14:43:37 8  from parties, draws conclusions to which the parties can address

14:43:41 9  themselves, and that record comes to the Court, it's one thing.

14:43:45 10 That's not what we have here.  We have an ex parte investigation by

14:43:51 11 a Court officer, identifying himself as having --

14:43:56 12         THE COURT:  Okay, Mr. Taylor, I know exactly how this

14:43:59 13 proceeded.  You don't need to go into all of that.  What I would

14:44:03 14 like you to do is what I asked Mr. Ungelsby to do, identify with

14:44:09 15 specificity the factual issue that you, or issues, that would have

14:44:14 16 to be decided.  Other than what Mr. Ungelsby has already said, you

14:44:19 17 don't need to repeat what he said.

14:44:21 18         MR. TAYLOR:  Well, it seems to me, your Honor, that the

14:44:22 19 factual issue that has to be decided is whether Mr. Lerner committed

14:44:25 20 the acts which the Special Master has found that he did, and that he

14:44:30 21 is entitled to a full hearing in which to contest that and in which

14:44:34 22 the Special Master bears the burden of proof.

14:44:38 23         The consequences, the sanctions of this process are

14:44:42 24 criminal or quasi criminal in nature.  He is entitled to a full

14:44:46 25 measure of due process rights, and that means the right to confront

14:44:51 1    and the right to cross-examine and the right to put on evidence.

14:44:55 2            Now, I can tell you that with regard to Mr. Lerner, the

14:44:59 3    evidence is not in the quantity that it is with regard to some of

14:45:05 4    the other people.  Indeed, Mr. Lerner's involvement is in the paying

14:45:13 5    of the referral fee to Mr. Sutton and the making of the Crown

14:45:18 6    payments which Mr. Lerner believed had been approved by Mr. Juneau.

14:45:23 7    That, I think, if you want to know what the crux of the factual

14:45:28 8    dispute is, that seems to me to be what it is.

14:45:31 9            But when you start to say, "Okay.  What does that mean?"

14:45:35 10   Well, first of all, we're asked to show cause why under the Unclean

14:45:41 11   Hands Doctrine he shouldn't, therefore, be disqualified and his firm

14:45:44 12   be disqualified from handling any of these claims.  Millions of

14:45:49 13   dollars worth of sanctions hang on that decision.  And to say

14:45:55 14   that -- to hold that we are only entitled to a truncated form of

14:46:01 15   process by which we identify what we think the contested facts are

14:46:06 16   and prepare to address them with evidence is not the kind of process

14:46:11 17   that, I think, under Rule 53 or the Constitution that we're entitled

14:46:15 18   to.

14:46:16 19           Whatever the Court orders, we're obviously going to do.

14:46:20 20           THE COURT:  Rule 53, I read it.  It says, "The Court may

14:46:22 21   receive evidence," so that's what I'm here considering right now.

14:46:26 22   And I'm trying to understand, and Mr. Ungelsby was helpful, I think,

14:46:32 23   in identifying discrete issues and what evidence he envisions would

14:46:39 24   be offered at such a hearing.  That's what I am trying to get to.

14:46:43 25           MR. TAYLOR:  Well, I can certainly tell you that the

14:46:45  1   people who have knowledge, including Mr. Lerner, of the

14:46:49  2   circumstances in which he learned that Mr. Sutton was, "referring

14:46:57  3   him a case."  As you may know, the case was referred to the Andry

14:47:03  4   Law Firm in April or May.  Mr. Sutton speaks to Mr. Lerner in about

14:47:09  5   August and says, "I've got a case to refer to you."

14:47:12  6            THE COURT:  I read all of that.  I've read everything

14:47:15  7   that's in this record.  I can promise you, you know.  So you don't

14:47:18  8   have to repeat those facts to me.  Just tell me --

14:47:21  9            MR. TAYLOR:  I don't know whether --

14:47:23 10            THE COURT:  That doesn't seem to be in dispute whether the

14:47:26 11   case was referred to Andry Lerner.

14:47:28 12            MR. TAYLOR:  The Special Master says Mr. Lerner is not

14:47:31 13   credible.

14:47:31 14            THE COURT:  Not credible in what respect?

14:47:34 15            MR. TAYLOR:  As to that issue.

14:47:35 16            THE COURT:  I think the confusion probably is that it

14:47:41 17   seemed that Ms. Reitano said she referred it, the case there back in

14:47:45 18   March or something, and then he said he referred it when he went to

14:47:47 19   work for the Special Master.  And I think that's the confusion.

14:47:48 20            MR. TAYLOR:  He mislead Mr. Lerner.

14:47:50 21            THE COURT:  We are not going to resolve the factual --

14:47:53 22            MR. TAYLOR:  You asked, your Honor.

14:47:54 23            THE COURT:  I don't even how relevant that is to anything.

14:47:57 24            MR. TAYLOR:  Because it explains why Mr. Lerner believed

14:48:00 25   that he should pay Mr. Sutton a referral fee because he believed

14:48:04  1    that Mr. Sutton was referring a case as of that moment, a case which

14:48:09  2    had, indeed, already been referred.

14:48:10  3              THE COURT:  You haven't answered my question, though, that

14:48:13  4    I asked of Mr. Ungelsby:  What evidence do you envision that you

14:48:18  5    would offer at such a hearing?  Mr. Lerner's testimony.  Anything

14:48:20  6    else?

14:48:21  7              MR. TAYLOR:  Well, your Honor, if it's the Court's

14:48:23  8    position that the evidence which constitutes the record gathered by

14:48:30  9    the Special Master is the record in these proceedings -- first of

14:48:37 10    all, we don't know what that is -- but if you're going to review the

14:48:42 11    record de novo --

14:48:43 12              THE COURT:  You don't know what what is?

14:48:45 13              MR. TAYLOR:  The investigative record of the Special

14:48:47 14    Master.

14:48:47 15              THE COURT:  We've identified everything that you've been

14:48:49 16    given, you've got thousands of pages.

14:48:49 17              MR. TAYLOR:  We don't have everything that is relevant.

14:48:52 18              THE COURT:  You have everything that's relevant.

14:48:54 19              MR. TAYLOR:  With all due respect, your Honor, we don't.

14:48:56 20              THE COURT:  Identify one piece of evidence that you don't

14:48:58 21    have that's relevant.

14:49:00 22              MR. TAYLOR:  I can't tell you what I don't have.

14:49:02 23              THE COURT:  Exactly.  Judge Shushan has gone through this.

14:49:05 24    I tasked her with identifying what was relevant and what was not.

14:49:10 25    You're not entitled necessarily to a fishing expedition.  There was

14:49:14  1    a lot of stuff in this report, and the work that the Special Master

14:49:17  2    did that had no arguable relevance whatsoever to the issues

14:49:22  3    involving your client.

14:49:23  4            MR. TAYLOR:  We are not asking for that.

14:49:25  5            THE COURT:  That's what you just said, you want

14:49:26  6    everything.

14:49:27  7            MR. TAYLOR:  No, I want -- you're going to be asked to

14:49:29  8    review the record --

14:49:30  9            THE COURT:  I've already decided that.

14:49:32 10            MR. TAYLOR:  -- de novo, de novo review of the record.

14:49:35 11            THE COURT:  Mr. Taylor, I've decided that.  We know what's

14:49:38 12    in the record now.  I am considering giving you an opportunity to

14:49:41 13    submit additional evidence, and I am trying to refine the issues,

14:49:47 14    narrow the issues, and understand what the scope of this hearing

14:49:51 15    would look like.  That's all I'm trying to do, Mr. Taylor.

14:49:54 16            MR. TAYLOR:  May I ask, your Honor -- and I apologize for

14:49:57 17    trying your patience.  The inventory that Mr. Paw submits has

14:50:01 18    highlighted in yellow those things which he has turned over.

14:50:05 19    There's a lot of material on that inventory which is not in yellow.

14:50:09 20            THE COURT:  And that's stuff that Judge Shushan has

14:50:11 21    reviewed and decided, and I agree with her, that's not relevant to

14:50:15 22    your case, okay.  So don't argue that now because that's already

14:50:19 23    been decided here.  Move on to -- if you can answer, I am going to

14:50:23 24    give you one more chance to try to answer the question I've asked to

14:50:27 25    you.  If you have no answer, we'll move on to the next attorney.

14:50:30  1          MR. TAYLOR:  Of course I have an answer, your Honor.

14:50:33  2    Mr. Lerner will testify on his own behalf that --

14:50:37  3          THE COURT:  Okay.  You don't have to tell me what he is

14:50:41  4    going to testify about.  Who else?

14:50:44  5          MR. TAYLOR:  I don't know.

14:50:45  6          THE COURT:  You're going to have to identify it before the

14:50:47  7    hearing.

14:50:47  8          MR. TAYLOR:  Of course, I will.

14:50:49  9          THE COURT:  I'm trying -- you all are asking for the

14:50:51 10    evidentiary hearing.  I'm asking you to identify what the hearing is

14:50:54 11    going to be on, what are the issues, and what witnesses you plan to

14:51:01 12    likely call.  I'm not carving this in stone right now, but I want

14:51:05 13    some idea.  Are we talking about a hearing that's going to take a

14:51:09 14    half a day, a day, a week or what?  That's what I'm trying to

14:51:12 15    understand here.

14:51:12 16          MR. TAYLOR:  Seems to me that some of that is within the

14:51:15 17    control of the Special Master.  The Special Master would seem, to

14:51:18 18    me, to have the burden, your Honor.

14:51:18 19          THE COURT:  It's in the control of the Court, really.

14:51:21 20          MR. TAYLOR:  Of course, it is.  Our presentation might be

14:51:23 21    very well dictated by his.  He has -- somebody has a burden beyond a

14:51:29 22    preponderance of the evidence --

14:51:30 23          THE COURT:  No.  Rule 53(f) says the Court may take

14:51:33 24    additional evidence.  If I have an evidentiary hearing, I would give

14:51:39 25    you an opportunity and other show cause parties to offer additional

14:51:43  1    evidence.  I'm trying to understand what evidence you might offer.

14:51:47  2            MR. TAYLOR:  What I am saying, your Honor, is when the

14:51:50  3    sanctions which the Court proposes to impose are the nature of

14:51:55  4    these, and an Article III judge is going to impose them, it's not

14:51:58  5    enough to say, "The Special Master's report is what I'm going to

14:52:02  6    rely on," because that implicates the due process clause.

14:52:05  7            THE COURT:  I am going to consider all of the evidence in

14:52:08  8    the record, whatever that consists of at the time, including

14:52:11  9    evidence that the Special Master has gathered and any evidence that

14:52:15  10   you may offer or other parties may offer, if we end up having some

14:52:20  11   type of evidentiary hearing.  And that's what I am trying to

14:52:23  12   understand.

14:52:24  13           MR. TAYLOR:  I take it you're not going to require the

14:52:26  14   Special Master to appear and present evidence to satisfy you beyond

14:52:30  15   a preponderance of evidence that my client has committed these acts.

14:52:33  16           THE COURT:  All right.  Do you have anything else you want

14:52:35  17   to tell me --

14:52:36  18           MR. TAYLOR:  Your Honor --

14:52:40  19           THE COURT:  -- in response to my questions?

14:52:42  20           MR. TAYLOR:  I raised the discovery issue --

14:52:44  21           THE COURT:  I've heard enough, Mr. Taylor.  You keep

14:52:46  22   beating a dead horse.  Who wants to speak next?

14:52:55  23           MS. PIERSON:  Good afternoon, Judge Barbier.

14:53:05  24           THE COURT:  Good afternoon, Ms. Pierson.  How are you?

14:53:07  25           MS. PIERSON:  I'm fine.  Thank you.  I believe you know

14:53:10 1    that I represent Mrs. Reitano.

14:53:13 2            THE COURT:  I do know that.

14:53:15 3            MS. PIERSON:  I have three things that I would like from

14:53:17 4    the Court today.  And I respect your decision that you want to know

14:53:19 5    who we would call as witnesses, but I look back on your decision

14:53:23 6    earlier today, that you believed, without asking these questions,

14:53:25 7    that the evidence is all there, that the documents you have or that

14:53:29 8    Mr. Paw has presented comprise the record --

14:53:32 9            THE COURT:  I didn't make any ruling on that.

14:53:35 10           MS. PIERSON:  Well, that the discovery was over.

14:53:37 11           THE COURT:  I said the discovery was over.  But that

14:53:39 12   doesn't mean, if I have an evidentiary hearing, that you can't call

14:53:42 13   witnesses at the hearing or offer additional evidence.

14:53:46 14           MS. PIERSON:  We would be happy to do that.  But I would

14:53:49 15   suggest to you my first request is that the evidence gathered so

14:53:52 16   far, which is admissible in Court, which is sworn testimony, already

14:53:56 17   proves on the merits that my client, Mrs. Reitano, who was only

14:54:02 18   accused of the possibility of getting a referral fee, it has been

14:54:05 19   proved that she didn't.  And if nothing else proved it, the clawback

14:54:11 20   motion did because she was not named in that.  She did not get that

14:54:15 21   referral fee.  Her husband did.  And if being married to Lionel

14:54:19 22   Sutton is a problem for her or makes her have unclean hands, I can't

14:54:25 23   deal with that.  She has been proved on the merits to be entitled to

14:54:30 24   a dismissal of the show cause order because she didn't do what they

14:54:36 25   said she did.

14:54:37  1                THE COURT:  It seems to me that, I generally agree with

14:54:40  2      you, not necessarily your conclusion, I agree with your statement

14:54:45  3      that seems like as to Ms. Reitano the evidence is not really

14:54:52  4      disputed, except for that point about whether she -- what she

14:55:01  5      discussed with Ms. Mancuso.  That's an issue.  Whether it would be

14:55:06  6      relevant to any finding I would make or how important it would be, I

14:55:10  7      can't say right now.

14:55:11  8                But beyond that, I think the other -- you know, it's --

14:55:18  9      clearly, Ms. Reitano is not -- how shall I say this -- not as

14:55:25 10      probably as culpable in this as the other show cause parties on the

14:55:30 11      face of it.

14:55:30 12                MS. PIERSON:  I don't think she is culpable at all.

14:55:32 13                THE COURT:  That may be.  I am not ruling right now.  But

14:55:34 14      just on the allegations, she is not alleged to be as culpable is

14:55:38 15      what I should say as the other parties.  And so I think you're right

14:55:42 16      in that respect, you know.

14:55:43 17                MS. PIERSON:  To be specifically responsive to your

14:55:47 18      question, who would I call as a witness at an evidentiary hearing, I

14:55:52 19      would certainly call Mrs. Reitano and I would certainly call

14:55:56 20      Ms. Mancuso to repeat under oath in your presence that the only

14:56:02 21      conversation she had with Mrs. Reitano, which was in a couple of

14:56:05 22      weeks of her going to work at the claims office, and she went to

14:56:10 23      work there two days after she wrote to Mr. Thonn and said, "I'm out

14:56:15 24      of here.  I don't represent you anymore."  Then, she spoke to

14:56:20 25      Mrs. Mancuso to clarify because Mr. Thonn had a contract for a

14:56:24  1    contingent fee of 20 percent.

14:56:26  2              THE COURT:  I know what that's about.

14:56:29  3              MS. PIERSON:  And you had said 25.

14:56:31  4              THE COURT:  She said she wanted Ms. Mancuso to agree that

14:56:33  5    they would honor that contract, that 20 percent fee to the client.

14:56:37  6              MS. PIERSON:  She never communicated with anyone else

14:56:40  7    again about the Thonn case, the Thonn referral fee, the Thonn

14:56:44  8    anything.  She is not even mentioned in the clawback motion, which,

14:56:49  9    you know -- but I would call on those -- on that issue, those two

14:56:53  10   witnesses.  Maybe some others, but I doubt it.

14:56:59  11             But I think that we could go on this record -- I think

14:57:02  12   that Mr. Paw's people, I think they're well-intentioned people, but

14:57:06  13   they didn't write down exactly -- their testimony about what they

14:57:10  14   heard versus what Mrs. Mancuso said she told them.  Her affidavit is

14:57:17  15   worthy of note and I think that Mrs. Reitano should be dismissed.

14:57:22  16             The second thing I would say to the Court today is that

14:57:25  17   Mrs. Reitano, as a show cause party, was ordered to come here and

14:57:30  18   prove why she shouldn't be eliminated from the program, the CSSP.

14:57:37  19   At the time, she didn't even have any clients.  But since that time

14:57:43  20   and about four months ago, Mr. Juneau on his own motion in his own

14:57:48  21   volition ordered her not to be able to participate in the CSSP, that

14:57:54  22   hasn't even been done to these other show cause parties.  They can

14:57:57  23   still have -- she had one little person that came to see her and he,

14:58:02  24   on his own, took your place and said, "Well, you're out of here.

14:58:08  25   You can't come back into this program."  I would like that order

14:58:12  1    lifted.  I would like Mr. Juneau --

14:58:14  2         THE COURT:  Well, wait a minute.  That's not what we're

14:58:20  3    here about.

14:58:20  4         MS. PIERSON:  I understand.

14:58:20  5         THE COURT:  That's the first I've even heard of that and

14:58:21  6    that's not what we're here about today, okay, Ms. Pierson.

14:58:25  7         MS. PIERSON:  That's part of the problem.  Mrs. Reitano,

14:58:28  8    as a show cause party, can't make a living.  And what does she know

14:58:32  9    the most about?  The CSSP.  Can she do that?  No, because Mr. Juneau

14:58:37 10    took your place and said, "You can't come here."

14:58:39 11         THE COURT:  First of all, that's the first I've heard of

14:58:41 12    that.  And secondly, I don't know what the basis of that is.  We

14:58:44 13    would have to find out.  He may have some good basis to do that.  I

14:58:48 14    don't know.  I have no idea.

14:58:49 15         MS. PIERSON:  I am not aware of it.

14:58:50 16         THE COURT:  I am not either.  I am not aware of it at all.

14:58:54 17    That's not the subject of why we're here, so.

14:58:56 18         MS. PIERSON:  You now know who I would call as witnesses

14:59:00 19    on the show cause thing.

14:59:02 20         There is one other thing, and since it's been 14 months

14:59:06 21    since we've been able to come here -- and look, I'm really happy to

14:59:09 22    be here, so I'm just going to spit out everything I need.

14:59:12 23         I would like for the Court to reconsider my motion on my

14:59:16 24    civil case to lift the stay on discovery or send it to another

14:59:21 25    section of the Court.  I'm trying to help you out.  I'm trying to

14:59:25 1  get her civil case for damages out of the MDL to any other section

14:59:29 2  in this building.  That's what I really want today, and I wanted to

14:59:32 3  be sure I said that.

14:59:34 4           THE COURT:  Okay.  Thank you very much.

14:59:35 5           MS. PIERSON:  And I really appreciate you letting us come

14:59:37 6  here, and I really appreciate favorable consideration of the fact

14:59:40 7  that Mrs. Reitano did not do what it was alleged that she did and we

14:59:46 8  proved it.

14:59:46 9           THE COURT:  All right.  Thank you, ma'am.

14:59:55 10           MR. DRAPER:  Good afternoon, your Honor, Douglas Draper on

14:59:58 11  behalf of Andry Lerner.

14:59:58 12           THE COURT:  Good afternoon.

15:00:00 13           MR. DRAPER:  I represent the entity Andry Lerner, so

15:00:03 14  basically, my position is really what happened with Glen Lerner,

15:00:07 15  what Jon Andry said, and who he said it to.  You've asked the

15:00:11 16  question who would we call and who would be before the Court.  And I

15:00:14 17  think you have documents, I think you have statements made -- that

15:00:19 18  were made to investigators that are before the record.  I think

15:00:23 19  sitting here and listening, what I would call is the individuals who

15:00:27 20  are accused of saying A or B, have the ability to get up and tell

15:00:31 21  the Court what they said and who they said it to.  And the other

15:00:35 22  party who should be before the Court and the Court can hear is the

15:00:38 23  counterparty to the discussion.

15:00:40 24           So, for example, if Mr. Duval -- if Mr. Andry asked

15:00:46 25  Mr. Duval, "Please expedite" -- it's alleged to have said, "Please

15:00:49 1    expedite the record," and Mr. Andry says, "No, I didn't ask."  And

15:00:53 2    Mr. Duval says, "No, he didn't ask."  I think that's relevant to the

15:00:57 3    Court to hear that.

15:00:58 4        And I think the context of the hearing before the Court is

15:01:00 5    to identify or we identify for you what are the key elements, who

15:01:04 6    are the witnesses on both sides of that, and have the Court hear

15:01:08 7    them and make its determination.

15:01:09 8        THE COURT:  I assume you probably wouldn't have any

15:01:11 9    witness other than what they would call.

15:01:13 10        MR. DRAPER:  That's correct, your Honor.  That's right,

15:01:15 11    your Honor.

15:01:16 12        THE COURT:  Okay.

15:01:17 13        MR. DRAPER:  Thank you.

15:01:18 14        THE COURT:  Okay.  Thank you, Mr. Draper.

15:01:20 15        MR. SMITH:  Good afternoon, Judge, Randy Smith.  Thank you

15:01:24 16    for having us here.

15:01:26 17        The Andry Law Firm, the only issue to the Andry Law Firm

15:01:29 18    is whether their $8 million claim for losses from the DEEPWATER

15:01:34 19    HORIZON that was approved through this whole process should be

15:01:37 20    forfeited --

15:01:39 21        THE COURT:  Wait.  Okay.  I'm sorry, but I'm kind of

15:01:42 22    confused again.  Distinguish your entity from Mr. Draper's entity.

15:01:48 23        MR. SMITH:  Right.  Mine is the Andry Law Firm which was

15:01:51 24    operated by Jon and Gibby Andry.

15:01:55 25        THE COURT:  And Mr. Draper's was what, which entity?

15:01:56  1          MR. DRAPER:  Mine is Andry Lerner.

15:02:00  2          THE COURT:  Okay.  I'm sorry, Andry Lerner.  I have it

15:02:02  3  now.  Okay.  Thank you.

15:02:03  4          MR. SMITH:  Andry Lerner, as I'm sure you remember, was

15:02:07  5  formed by Jon Andry --

15:02:07  6          THE COURT:  It would have been nice if these people would

15:02:08  7  have used different names in all of these entities and firms.

15:02:10  8          MR. SMITH:  Somebody said the Andry firm which is

15:02:13  9  confusing.

15:02:14  10          THE COURT:  Somebody complained somewhere in all the

15:02:17  11  voluminous stuff that I've read in this case, some party complained

15:02:21  12  that they were being conflated, that the firms were being conflated,

15:02:29  13  wrongfully and deceptively or whatever the case is.  But partly, I

15:02:34  14  can understand why because it's very confusing to read these

15:02:38  15  different names and there's overlapping ownership and so forth.

15:02:42  16          Anyway, go ahead, Mr. Smith.

15:02:44  17          MR. SMITH:  The easy distinction from our perspective is

15:02:47  18  that the Andry Law Firm was operated for years by the Andry family,

15:02:52  19  including Jon and Gibby Andry.

15:02:54  20          THE COURT:  Hey, I understand.  I understand when you go

15:02:56  21  in detail, but you have the individual Andry's, you have Andry

15:03:00  22  Lerner, you have the Andry Law Firm, and then you have something

15:03:02  23  called the Andry Law Group, too, so it's very confusing, you know.

15:03:07  24          MR. SMITH:  I agree, Judge.  But just to be clear, the

15:03:10  25  Andry Law Firm didn't handle BP claims.

| | |
|---|---|
| 15:03:14 | 1 |
| 15:03:18 | 2 |
| 15:03:19 | 3 |
| 15:03:19 | 4 |
| 15:03:25 | 5 |
| 15:03:28 | 6 |
| 15:03:29 | 7 |
| 15:03:32 | 8 |
| 15:03:36 | 9 |
| 15:03:40 | 10 |
| 15:03:45 | 11 |
| 15:03:48 | 12 |
| 15:03:49 | 13 |
| 15:03:50 | 14 |
| 15:03:53 | 15 |
| 15:03:57 | 16 |
| 15:04:01 | 17 |
| 15:04:06 | 18 |
| 15:04:10 | 19 |
| 15:04:11 | 20 |
| 15:04:13 | 21 |
| 15:04:19 | 22 |
| 15:04:23 | 23 |
| 15:04:25 | 24 |
| 15:04:28 | 25 |

THE COURT:  You've got the two person -- is it an LLC?
What is it?

MR. SMITH:  Right.

THE COURT:  Between Gibby and Jon Andry.  This is the
preexisting family law firm that they had.

MR. SMITH:  Right.

THE COURT:  And that firm doesn't do any -- doesn't handle
any BP claims for other people, but it has its own claim, right?

MR. SMITH:  Had its own claim.  Jon Andry and Glen Lerner
started their on venture to handle BP claims for others.  And the
only reason we're here is because the suggested sanction by the
Special Master --

THE COURT:  Is to forfeit --

MR. SMITH:  -- is for the conduct, in addition to other
penalties, was that the Andry Law Firm should forfeit its
approximately $8 million claim that was processed through all levels
of the claims process and approved to be paid, and it just hadn't
been paid yet.  But it went through all approvals, the appeals,
everything --

THE COURT:  Okay.  I have a good handle on it, the status
now.  Tell me, would you envision participating in an evidentiary
hearing, and if so, what evidence would you put on beyond what
they're going to put on already?

MR. SMITH:  I think the issue for us is simply whether
there was anything improper in the handling of the Andry Law Firm

15:04:31  1   claim.  And I don't think that the affidavits and the documents

15:04:36  2   presented by the Special Master show that there was, but it makes us

15:04:40  3   concerned that the Court might rely on phone records, or records of

15:04:46  4   communication, or some affidavits, or some e-mails without putting

15:04:51  5   them in context.

15:04:52  6          For example, the phone records don't show what was said.

15:04:56  7   The texts don't show what was said.  I don't believe they've shown

15:05:02  8   anything was done improper.  I mean, some calls being made by

15:05:05  9   members of the Andry Law Firm that were in less volume than many

15:05:09 10   other law firms, you know, the list was provided under protective

15:05:13 11   order in discovery to show many other prominent firms in New Orleans

15:05:16 12   called many more times about the status of their claims.

15:05:19 13          But to the extent that there was some concern about

15:05:23 14   anything improper done with the handling of the Andry Law Firm

15:05:26 15   claim, we would want to call primarily Mr. Staley who was the claims

15:05:31 16   handler for that claim, because we don't -- we haven't gotten to

15:05:36 17   talk to him.  But from what we saw from what they produced, it

15:05:40 18   doesn't appear that he believes any pressure was put on him or

15:05:43 19   anything improper was done with him.  Perhaps, Rinaldi, who was the

15:05:47 20   CPA who worked on that claim, would be who we would want to call.

15:05:53 21          But again -- otherwise, I just don't know what your Honor

15:05:56 22   would consider the evidence in the record.  You made a comment you

15:06:00 23   would just consider the evidence in the record.  The evidence in the

15:06:02 24   record does have a lot of things like statements --

15:06:06 25          THE COURT:  Well, I am not -- I can't itemize everything

15:06:09  1   right now, it's out of my head, but there are voluminous documents,

15:06:09  2   for example.

15:06:13  3              MR. SMITH:  But a lot of e-mails.

15:06:14  4              THE COURT:  There are e-mails, there are phone records,

15:06:17  5   there are bank statements, there are sworn statements of the parties

15:06:20  6   themselves, which all of that would be in the record, for example.

15:06:25  7              MR. SMITH:  Right.  To the extent that there's affidavits

15:06:27  8   that hadn't been subject to cross, there's some concern there.

15:06:32  9              THE COURT:  Well, you all offered some affidavits.

15:06:34 10              MR. SMITH:  Right.  I didn't know if --

15:06:36 11              THE COURT:  You're going to object to your own affidavits?

15:06:39 12              MR. SMITH:  No, not necessarily, Judge.

15:06:41 13              THE COURT:  Okay.

15:06:42 14              MR. SMITH:  I don't know how much there is a problem with

15:06:44 15   that.  That would be the evidence from the Andry Law Firm

15:06:48 16   perspective on the issue of whether anything improper was done in

15:06:53 17   the handling of that claim.

15:06:55 18              THE COURT:  I understand.

15:06:56 19              MR. SMITH:  Otherwise our issue --

15:06:58 20              THE COURT:  What inference or what legal conclusion to

15:07:00 21   draw from that, if anyway.

15:07:03 22              MR. SMITH:  Right.  And the other issue we have is that,

15:07:06 23   of course, the due process or the Eighth Amendment issue of the

15:07:09 24   proportionality of the referral fee --

15:07:13 25              THE COURT:  That's a legal conclusion, yeah.

15:07:15  1                MR. SMITH:  An $8 million --

15:07:17  2                THE COURT:  That's a legal conclusion that wouldn't

15:07:18  3        require an evidentiary hearing on that, but I understand your

15:07:22  4        argument.

15:07:22  5                MR. SMITH:  I agree with that.

15:07:24  6                THE COURT:  Okay.  Thank you.  All right.  Mr. Rosenberg.

15:07:26  7                MR. ROSENBERG:  Your Honor, may I be heard?

15:07:28  8                THE COURT:  Sure.

15:07:28  9                MR. ROSENBERG:  Your Honor, first of all, I accept

15:07:30 10        responsibility for using the term "conflated."

15:07:34 11                THE COURT:  You are the culprit.

15:07:36 12                MR. ROSENBERG:  I am the culprit.

15:07:37 13                THE COURT:  I knew somebody used that term.

15:07:39 14                MR. ROSENBERG:  I'm the first to admit it.  I'm neither

15:07:42 15        proud nor embarrassed, your Honor.  But I will say this --

15:07:44 16                THE COURT:  It's a good word.  It's a good word.

15:07:47 17                MR. ROSENBERG:  I won't use it again, Judge.  But I

15:07:50 18        understand if you call the Smith, Smith and Smith firm and you ask

15:07:53 19        for Mr. Smith, that might be a little bit confusing.  But what has

15:07:56 20        caused the problem here, Judge, is that not only does BP -- but, I

15:08:01 21        believe, the Special Master even acknowledged in his report that

15:08:05 22        these separate firms, one Andry Lerner, than the Andry Lerner Group,

15:08:11 23        then the Andry Law Firm are all distinct entities.

15:08:15 24                THE COURT:  They are, but in fairness, Mr. Rosenberg,

15:08:18 25        there's overlapping membership; particularly, Mr. Jon Andry is a

15:08:23 1    member of all three of those firms.

15:08:25 2              MR. ROSENBERG:  Yes, Judge.

15:08:27 3              THE COURT:  So it's not like they're totally unrelated

15:08:30 4    entities.  What's to be made of that?  You can argue about it.

15:08:34 5              MR. ROSENBERG:  I am not going to argue because your Honor

15:08:36 6    said that's for another day.

15:08:38 7              What I am here to say, though, Judge, while I believe

15:08:41 8    that they're distinct entities, as your Honor recognized, BP didn't

15:08:46 9    recognize that because BP was running these national advertisements

15:08:50 10   in the *New York Times* and the *Wall Street Journal* about Gibby Andry

15:08:54 11   handling claims that were somehow questioned by the Special Master.

15:08:58 12   Not true.  Gibby Andry has never handled a claim involving this BP

15:09:04 13   proceeding, your Honor, as you know.  The only claim he's handled is

15:09:08 14   for his law firm, which Mr. Smith addressed a moment ago.

15:09:11 15             So I am just going to try to cut right to the core of what

15:09:15 16   your Honor asked about what would be involved in evidence.  I think

15:09:19 17   if we could establish from Gibby Andry's perspective, your Honor, a

15:09:24 18   stipulation with counsel for the Special Master that these are

15:09:28 19   separate entities, that Gibby Andry did nothing but make what they

15:09:32 20   called aggravating number of phone calls, which I suspect a number

15:09:37 21   of claimants made, and that that was the extent of it; because that

15:09:42 22   was the exact question your Honor asked Mr. Clark representing BP

15:09:46 23   just 13 months ago in this same proceeding, and he had nothing to

15:09:50 24   show for it.  And if they still have nothing to show for it, your

15:09:54 25   Honor, we would not have a need for any further evidence.

15:09:58  1          Gibby Andry is in a unique factual position, and I believe

15:10:01  2    the fact -- the stipulations of fact could avoid further testimony,

15:10:06  3    your Honor.

15:10:06  4          THE COURT:  Okay.  Thank you very much.  Anybody else?

15:10:12  5          MR. UNGELSBY:  Can I answer a question, Judge?

15:10:15  6          THE COURT:  Sure.

15:10:15  7          MR. UNGELSBY:  I hate to answer a question with a

15:10:17  8    question.  You asked us how long would it take, and I would not

15:10:22  9    think it would take more than a day.  But I would suggest that we

15:10:27 10    really could give you a really good solid answer if we knew, Judge,

15:10:33 11    these two questions which were asked early on, and that's why I

15:10:38 12    guess we have a status conference:  Who do you envision has the

15:10:42 13    burden of proof now and what is the standard of proof whomever that

15:10:49 14    is must meet?  You see.  So that we can telescope whatever evidence

15:10:55 15    we present to fit within those parameters.

15:11:00 16          Our position, obviously, is that the accuser has the

15:11:04 17    burden of proof and that the standard of proof is substantial

15:11:09 18    certainty, you know, right below reasonable doubt.  But there's

15:11:14 19    never been a decision -- no one has ever said, "This is how I want

15:11:18 20    to do this."

15:11:19 21          THE COURT:  Well, I am not going to decide those legal

15:11:22 22    issues right now, but you all can argue that.  I don't have a view

15:11:27 23    to express on that right now.

15:11:29 24          MR. UNGELSBY:  No, I understand that.  I just didn't know

15:11:32 25    if that was something -- in terms of timing, I still think a day

15:11:36  1    would be sufficient because I don't think it's going to take lots of

15:11:40  2    testimony.  But, of course, we can't control our opponent, but I

15:11:47  3    don't think it would take lots of testimony.

15:11:48  4            THE COURT:  Okay.  Thank you.

15:11:49  5            MR. TAYLOR:  May I have a word, your Honor?  Possibly, do

15:11:53  6    it from here.

15:11:54  7            THE COURT:  No, if you're going to speak, come up to the

15:11:56  8    podium.

15:11:59  9            MR. TAYLOR:  Thank you, your Honor.  I simply wanted to

15:12:02 10    say, I think the question of the application of the Unclean Hands

15:12:09 11    Doctrine controls a lot of what is before the Court, and it would be

15:12:14 12    of enormous assistance to the parties, as well as to all parties, to

15:12:18 13    know how the Court views the application of that doctrine in this

15:12:22 14    case.

15:12:23 15            If, in fact, we are right that it doesn't apply beyond the

15:12:28 16    limited case in which it is said to apply, then, as a matter of law

15:12:34 17    you draw certain conclusions from that.  And that does not take an

15:12:37 18    evidentiary hearing, and I think that's one of the things I wanted

15:12:40 19    to convey to you.  It seemed to me that the way to decide the scope

15:12:46 20    of the evidentiary hearing would be to address the application of

15:12:50 21    the Unclean Hands Doctrine.  Then we all know that -- where the

15:12:54 22    Court's ruling on the scope of that doctrine is and we can control

15:12:59 23    ourselves in the timing accordingly.

15:13:01 24            THE COURT:  All right.  Thank you, Mr. Taylor.  I

15:13:03 25    understand that.  I am not going to promise you that I'll do that,

15:13:06  1   but I understand it.

15:13:07  2           Mr. Paw, do you want to respond at all?

15:13:18  3           MR. PAW:  Your Honor, just very briefly.  Quite a bit of

15:13:25  4   what I think have been presented today is already in the record

15:13:28  5   before the Court.  There are positions that Mr. Lerner's taken that

15:13:33  6   have been presented.  He's, of course, testified before the Special

15:13:36  7   Master himself.  There's contrary facts that are presented through

15:13:39  8   e-mails and through the telephone records.

15:13:42  9           THE COURT:  But how do I decide what the truth is if

15:13:45 10   there's contradictory evidence if it comes down to credibility?

15:13:50 11   Let's take the case of what the conversation was between Ms. Reitano

15:13:58 12   and Ms. Mancuso I think her name was.  How do I decide that without

15:14:03 13   hearing the evidence myself?  I guess, theoretically, I could decide

15:14:10 14   that's not important to whatever my finding will be.  But if it is

15:14:14 15   important, and obviously you think it is, how would I decide that

15:14:18 16   without having some type of hearing?

15:14:20 17           MR. PAW:  Well, to the Reitano-Mancuso conversation, I

15:14:24 18   actually submit that it really does not very much matter to the

15:14:27 19   issues before the Court.  So I think that there are issues that you

15:14:31 20   could address in that way by saying whether there is some factual

15:14:34 21   disagreement, some of them could be dealt with in that way.  They're

15:14:38 22   not central to the core issues that are before the Court.

15:14:40 23           For other issues, there's authority that's been cited in

15:14:44 24   the Special Master's brief, and I think there was some other

15:14:46 25   authority that was cited in the Glen Lerner's brief that talked

15:14:49 1    about cases where judges have reviewed findings of credibility by

15:14:54 2    the Special Master based on the record the Special Master presents

15:14:58 3    in writing.   There are other cases where the judge has also taken

15:15:01 4    his own evidence.

15:15:02 5         So I think it's to the judge's discretion which way to

15:15:06 6    go.   But I think that there's certainly been quite a bit of

15:15:10 7    opportunity for the show cause parties to present factual issues in

15:15:14 8    ways that they wanted.   If Mr. Lerner thought there was a specific

15:15:17 9    issue that could have been presented by an affidavit, certainly was

15:15:20 10   something that he could have done during the course of the briefing

15:15:23 11   in this matter.

15:15:25 12        THE COURT:   Okay.   My understanding, in terms of the

15:15:30 13   statements that were taken, some statements were in the form of

15:15:35 14   sworn statements or depositions, if you will, taken under oath with

15:15:39 15   a court reporter.   Some were unsworn but recorded statements, is

15:15:48 16   that right?   Did you record any?

15:15:50 17        MR. PAW:   I don't believe that they were recorded, your

15:15:52 18   Honor.   There were five statements taken before a court reporter.

15:15:55 19        THE COURT:   I'm talking about the types of statements.

15:15:56 20   Describe those to me.

15:16:00 21        MR. PAW:   There are five statements that were taken before

15:16:04 22   a court reporter under oath.

15:16:04 23        THE COURT:   That's primarily the main players, right?

15:16:07 24        MR. PAW:   Correct.   And Pat Juneau was sworn to testimony.

15:16:11 25   The others were questioned by investigators from the Special

15:16:13  1    Master's staff, and notes of those interviews were prepared by the

15:16:17  2    Special Master's staff.  They weren't recorded by tape recorder.

15:16:21  3              THE COURT:  You used the FBI 302 methodology.

15:16:25  4              MR. PAW:  Yes, correct.

15:16:27  5              THE COURT:  I still don't understand why the FBI doesn't

15:16:30  6    record those interviews.  I understand why they say they don't do

15:16:33  7    it, but it has caused so many problems in Court over the years.  I

15:16:39  8    thought I read recently where they were going to change that policy,

15:16:42  9    though.

15:16:42 10              MR. PAW:  I think they are changing it as a matter of

15:16:45 11    fact.

15:16:45 12              THE COURT:  But, you know, whenever you take it, not to be

15:16:48 13    overly critical, but whenever you interview someone and you make

15:16:52 14    your notes and then you go type up your notes later, there's always

15:16:56 15    possibility that you heard it wrong, you understood it wrong, or

15:16:59 16    whatever, you know.

15:17:00 17              MR. PAW:  Of course, your Honor.

15:17:02 18              THE COURT:  It doesn't even have to be a sworn statement.

15:17:04 19    If you just turn on the tape recorder, you have their voice

15:17:07 20    speaking, your voice speaking and you pretty much nail it down.

15:17:10 21              MR. PAW:  I don't think that that happened with any type

15:17:13 22    of frequency here from what the briefing of the show cause parties

15:17:17 23    raised.  I think the dispute between what Ms. Reitano and

15:17:21 24    Ms. Mancuso may have said --

15:17:23 25              THE COURT:  That's the main one, I think, in terms of what

15:17:25  1   was said.

15:17:25  2           MR. PAW:  Again, I submit to the Court, I'm not sure that

15:17:28  3   at the end of the day, I don't think that makes much of a

15:17:30  4   difference.  At the end of the day whether there was a referral

15:17:33  5   agreement in place or not, money was paid to Mr. Sutton.  Nobody

15:17:37  6   disputes that.  And it was called a referral agreement, and it was

15:17:40  7   treated very differently by all of the other referral agreements

15:17:43  8   that were paid by the Andry Lerner law firm.  So there is no dispute

15:17:46  9   to any of those facts.  I guess I put to the show cause parties,

15:17:49 10   where is the core of the dispute then?

15:17:52 11           THE COURT:  Okay.

15:17:53 12           MR. PAW:  Thank you, your Honor.

15:17:53 13           THE COURT:  Thank you.

15:17:59 14           As I pointed out earlier, Rule 53(f) says that before the

15:18:04 15   Court acts on master's order, or report, or recommendations, there

15:18:10 16   must be an opportunity for a hearing and the Court must give the

15:18:16 17   parties notice, which I think they've had in this case, and an

15:18:20 18   opportunity to be heard.  They have had an opportunity to be heard.

15:18:22 19   The question is:  What is the scope of the opportunity to be heard?

15:18:26 20   Does it require an evidentiary hearing?

15:18:28 21           The Rule says the Court may receive evidence and may adopt

15:18:33 22   or affirm, modify, wholly or partly, reject or reverse or resubmit

15:18:38 23   to the master with instructions.  And then it talks about the review

15:18:42 24   is de novo if there are objections to either findings of fact or

15:18:46 25   conclusions of law.

15:18:50  1          I am going to make some preliminary remarks here about

15:18:53  2     the Special Master's report.  First of all, the Special Master's

15:18:59  3     report of September 6th, some 93 pages long, I believe, it covers

15:19:05  4     the issues we've been talking about involving the show cause

15:19:09  5     parties.  But it also covers a number of other issues and findings

15:19:15  6     that, again, have no relevancy to the issues involving the show

15:19:21  7     cause parties.  So I don't need to talk about that.

15:19:30  8          With respect to the show cause parties, it seems to me

15:19:36  9     there are two fundamental issues:  One is, of course, the issues

15:19:52 10     that surround the payment.  And we know there was a payment of

15:19:56 11     moneys, referral fees or whatever they're called, from money -- in

15:20:06 12     connection with the Casey Thonn case.  And the payment, when those

15:20:11 13     claims were settled, I don't think any of this is in dispute, money

15:20:18 14     was sent to the Andry Lerner firm.  There was a disbursement of

15:20:25 15     one-half of the attorney's fee that went to Glen Lerner law firm in

15:20:31 16     Nevada.  And from there, the Glen Lerner firm in Nevada wired or

15:20:41 17     sent payments to -- I think there were three different payments, as

15:20:49 18     I recall.  And I think I have this right.  If I misstate this, it

15:20:54 19     doesn't affect the thrust of what I am trying to say here.

15:20:57 20          But I think the first two payments were sent to the

15:21:00 21     so-called old Crown account, that was essentially dormant here in

15:21:07 22     New Orleans, into which only Mr. Sutton had access or control over

15:21:11 23     that account.  The third payment I believe was sent first to the new

15:21:16 24     Crown account, which is a bank account in -- I forgot where it was.

15:21:24 25     It was another state, maybe Nevada, but in any event, it was another

15:21:28  1    state, and then it was forwarded to the old Crown account so that

15:21:36  2    Mr. Sutton could access the money.

15:21:48  3         All of the facts and circumstances and inferences or

15:21:52  4    legal conclusions to be drawn from those events and related events I

15:22:02  5    think are the primary focus of the show cause issues here.

15:22:10  6         The other issues relate to the Special Master's finding

15:22:17  7    regarding efforts by either Mr. Andry, either or both Mr. Andry's

15:22:32  8    and Mr. Lerner to have some -- either the Andry Lerner -- not Andry

15:22:48  9    Lerner, I'm mixing them up again -- the Andry Law Firm's own claim

15:22:58 10    expedited and/or some of the other Andry Lerner clients' claims

15:23:07 11    expedited.

15:23:13 12         My view of the Special Master's report and evidence on

15:23:17 13    that is pretty much as follows:  There's no doubt that there were a

15:23:25 14    lot of e-mails and phone calls and so forth and some meetings, a

15:23:31 15    couple of lunches and whatever where there were efforts made to move

15:23:41 16    these claims along and get them paid.  However, I do think it's

15:23:49 17    important to point out that the Special Master in two or three

15:23:55 18    places in his report points out that despite the fact that --

15:24:06 19    despite these efforts, and Mr. Sutton was doing on the inside to try

15:24:11 20    to assist those efforts, did not result in any improper influence on

15:24:25 21    the valuation of the claim, the calculation of the claim, the amount

15:24:29 22    of the claim, the amount of the claim that was finally approved and

15:24:33 23    paid.

15:24:43 24         So the most that can be said about the evidence in that

15:24:46 25    respect is that they made efforts to move their cases along, to

15:24:54  1    expedite their clients' claims or their own claim.

15:25:02  2         There are provisions in the settlement agreement which

15:25:06  3    provide on the one hand that claims should be more or less first in,

15:25:16  4    first out, you know, claims should be processed in the order in

15:25:19  5    which they are received.  That's kind of a general provision.

15:25:27  6    However, it's obvious and clear that that doesn't mean -- it's not

15:25:36  7    taken literally.  It can't be applied literally for various reasons.

15:25:40  8    Some claims are more complex than other claims.  You're not going to

15:25:44  9    hold up an easier claim just because a more difficult claim is filed

15:25:50 10    first.  Some claims have to be sent back for more documentation, and

15:25:56 11    therefore, other claims might proceed ahead.  There are various

15:26:02 12    reasons why claims that might be filed later, get paid earlier than

15:26:06 13    other claims.  I mean, they're just common sense in the real world.

15:26:12 14    Everybody knows that that goes on.

15:26:15 15         In addition, the settlement agreement had provisions

15:26:20 16    which talked about that it would be claimant friendly, that it would

15:26:27 17    be transparent, that the claims facility would have people assigned

15:26:33 18    to assist claimants, and for the very purpose of getting their

15:26:44 19    claims resolved, whichever way they're resolved, to get them

15:26:47 20    resolved without any undue and unnecessary delay.

15:26:56 21         Now, does it appear that the Andrys and Mr. Lerner were

15:27:09 22    doing everything they could to try to get their cases paid and moved

15:27:13 23    along?  It certainly appears so.  Does it appear that they asked

15:27:20 24    Mr. Sutton to help them out in that regard?  It certainly appears so

15:27:25 25    from the documents.  On the other hand, as Mr. Sutton says, "Yeah,

15:27:32  1    but I did that for hundreds of people, thousands of people."  And

15:27:36  2    the evidence is pretty clear that people were constantly calling the

15:27:39  3    claims office.  Lawyers were calling the claims office to check on

15:27:45  4    the status of claims, to, you know, what is the hold up?  What is

15:27:49  5    the problem?  Because it was undoubtedly at various points there

15:27:55  6    were bottlenecks and things got stopped up over there for various

15:27:59  7    reasons.

15:28:03  8            So it gets back to the issue of these payments.  The

15:28:10  9    question is:  Were they doing this -- were they paying Mr. Sutton to

15:28:16 10    do this, or was he doing something that he would do anyway, you

15:28:20 11    know?  I believe that if we have an evidentiary hearing, it should

15:28:30 12    focus on the heart of this case, the heart of this -- not case, the

15:28:35 13    heart of this issue, and that is the show cause order, which is not

15:28:39 14    whether these payments were made.  We know they were made.  It's how

15:28:43 15    they were made, why they were made, and whether there was

15:28:49 16    impropriety either ethically, civilly, criminally, or whatever.  I

15:28:54 17    mean, it's not for me to decide if it was criminal.  That would be

15:28:58 18    for someone else to decide.  But it would be my job to decide if it

15:29:02 19    was improper.

15:29:03 20            So I hope that helps you all focus on what -- I'm going

15:29:11 21    to think about this a little more and decide.  And if I decide to

15:29:15 22    have a hearing, I am going to limit it to kind of what I am

15:29:21 23    describing here, and then I would ask you all to submit witness and

15:29:26 24    exhibit lists.  And as I said, the way I view this, the Special

15:29:34 25    Master's evidentiary record, the parts that are relevant to the show

15:29:42  1    cause parties would go into evidence.  The claimants would offer any

15:29:49  2    additional evidence that they wish to offer, which seems to be what

15:29:52  3    Rule 53(f) provides for.  If the Special Master wanted to respond to

15:29:58  4    any of that, I would give them that opportunity.  And then we would

15:30:02  5    submit it for decision.

15:30:05  6           So that's what I am thinking of right now, but I am going

15:30:09  7    to make a final decision and issue a final order on this as soon as

15:30:15  8    I can, okay.  Anybody have any other comments or questions?

15:30:20  9           MR. UNGELSBY:  I don't mean to be impertinent, Judge, but

15:30:28 10    the sooner the better.  We really --

15:30:31 11           THE COURT:  I understand.

15:30:32 12           MR. UNGELSBY:  These are lawyers.  This is really painful.

15:30:35 13           THE COURT:  I understand that.  It is.  And the Court has

15:30:39 14    not intentionally drug its feet to hear this.  We have had a couple

15:30:43 15    of other things on our plate over the last year or two, you know,

15:30:47 16    and that's kind of what it is.  But I'm glad we're finally moving it

15:30:54 17    along.

15:30:54 18           MR. UNGELSBY:  Thank you, Judge.

15:31:01 19           THE COURT:  Ms. Pierson.

15:31:01 20           MS. PIERSON:  Thank you, Judge Barbier, and I appreciate

15:31:03 21    the outline that you've given.  I only want to address one thing

15:31:07 22    that was said by Mr. Paw, and I am going to borrow Mr. Rosenberg's

15:31:12 23    word "conflate."

15:31:15 24           The conversations or the state of mind of Ms. Reitano in

15:31:20 25    her conversation with Ms. Mancuso is extremely important because

15:31:24  1   this is a state of mind situation for her.  Did she intend to get a

15:31:30  2   referral fee?  And I guess, more particularly, did she intend to get

15:31:35  3   the one her husband got nine months later?  And Mr. Paw said, "Well,

15:31:40  4   it's not relevant what she said to them because we know the referral

15:31:43  5   fee went to Mr. Sutton."  You can't conflate, other than the fact

15:31:47  6   that they're married, Mrs. Reitano and Mr. Sutton under these

15:31:51  7   circumstances.  She did not intend to get a referral fee.  She did

15:31:56  8   not have that conversation with Mrs. Mancuso, and I believe that the

15:32:01  9   evidence will bear that out.  I think it's extremely relevant to

15:32:05  10  Mrs. Reitano what was said between these two ladies at the time they

15:32:09  11  were saying it.

15:32:10  12          THE COURT:  Okay.  I understand your position.  Thank you

15:32:12  13  very much.

15:32:14  14          Unless somebody has anything else, we'll adjourn and

15:32:18  15  thank everyone for coming.

15:32:19  16          THE DEPUTY CLERK:  All rise.

15:32:20  17      (WHEREUPON, THE PROCEEDINGS WERE CONCLUDED.)

18

19                          *  *  *  *  *  *

20

21

22

23

24

25

```
 1

 2                      REPORTER'S CERTIFICATE

 3

 4          I, Karen A. Ibos, CCR, Official Court Reporter, United

 5   States District Court, Eastern District of Louisiana, do hereby

 6   certify that the foregoing is a true and correct transcript, to the

 7   best of my ability and understanding, from the record of the

 8   proceedings in the above-entitled and numbered matter.

 9

10

11                         /s/ Karen A. Ibos
                       _____

12                       Karen A. Ibos, CCR, RPR, CRR, RMR

13                       Official Court Reporter

14

15

16

17

18

19

20

21

22

23

24

25
```