**UNITED STATES DISTRICT COURT**
**EASTERN DISTRICT OF LOUISIANA**

| | | |
|---|---|---|
| In Re: Oil Spill by the Oil Rig | ) | |
| "Deepwater Horizon" in the | ) | **MDL NO. 2179; SECTION J** |
| Gulf of Mexico, on April 20, 2010 | ) | |
| | ) | **JUDGE CARL J. BARBIER** |
| This document relates to: | ) | |
| | ) | **MAG JUDGE SHUSHAN** |
| 12-970, *Bon Secour Fisheries, Inc. et al.* | ) | |
| *v. BP Exploration Production Inc.;* | ) | |
| cases within Pleading Bundle B1 | ) | **Oral Argument Requested** |
| | ) | |
| and All Civil Actions, including | ) | |
| 33:2701; 13-6009; 13:6010; 13:5367; | ) | |
| 14:1106; 14:357; 14:358; 14:359; | ) | |
| 14:1321 and 15:6651 | ) | |

**MEMORANDUM IN SUPPORT OF**
**MOTION FOR AN AMENDED CLASS ACTION SETTLEMENT NOTICE**

## I.  Introduction

The Deepwater Horizon Economic and Property Damages Settlement Agreement was presented as a butterfly, but turned out to be a buzzard.  From the moment the Deepwater Horizon Economic and Property Damages Class (the "Class) was announced, a constant drumbeat of its praises was sung both by BP and Class Counsel.  These culminated at the fairness hearing were further adulation was lauded on the Class:

> [The class] gives those businesses and individuals who suffered economic damages a way to quickly get a fair and objectively determined settlement and to avoid litigating for potentially 20 or more years, like what happened in the *Exxon Valdez* oil spill litigation. This settlement provides the class with an opportunity to try to put this behind them and get on with their lives.
> -Jim Roy (Class Counsel)[1]

> …we agreed to enter into two comprehensive and historic settlement agreements designed to fairly and generously compensate the legitimate claims of those who were injured as a result of the oil spill in this tragic casualty.
> -Rick Godfrey (BP Counsel)[2]

---

[1] Transcript of Final Fairness Hearing Proceedings Heard before the Honorable Carl J. Barbier United States District Judge November 8, 2012 at Page 21 lines 7 through 14.

Despite these assertions, the Class has clearly failed in its mission to provide compensation to many Gulf Coast residents harmed by the spill. The March 31, 2015 Report by the Claims Administrator of the Deepwater Horizon Economic and Property Damages Settlement Agreement on the Status of Claims Review, Status Report 31, contains numerous alarming statistics that show this:[3]

- Failed Business Economic Loss: only 35 out of 3611 submissions have been paid;

- Start-Up Business Economic Loss: only 634 out of 5,017 submissions have been paid;

- Business Economic Loss: only 17,792 out of 81,610 submissions have been paid;

- Individual Economic Loss: only 6,148 out of 44,022 submissions have been paid;

- In total, the class has only paid 87,833 claimants out of 205,450 submissions with only 42,964 remaining to be processed.

- Out of the 87,833 claims that have been paid, 34,290 were Coastal Real Property and Vessel's of Opportunity payments, which awarded relatively low dollar amounts and required almost no calculation.

Even worse, BP filed Motions in an attempt to get money back on the relatively few claims that have been paid. Upon the Court's denial of the claim, BP has filed a Motion to Appeal, still seeking to claw back monies from the few business claimants that have already been paid. This Appeal is still looming over the heads of Gulf Coast residents and has been tentatively calendared for oral argument for the week of June 1, 2015.[4]

Frankly speaking, the track record for payment to clients is abysmal. This is due in large part to the substantial modifications and re-interpretations to the terms of the Settlement Agreement since its initial implementation in 2012. Potential Class members may have received some sort of notice about the class prior to the Courts fairness hearing, but the DID

---

[2] *Id.* at Page 50 lines 4 -8.
[3] Rec. Doc. 14355 and Rec. Doc. 14355-1.
[4] *In Re: Deepwater Horizon*, In the United States Court of Appeals For the Fifth Circuit, Case No. 14-31165.

NOT, and COULD NOT HAVE, receive adequate notice under Federal Rule of Civil Procedure Rule 23 about how the Class would actually end up being administered.

Two Policy decisions in particular so dramatically changed the terms of the Class such that re-notice is required.  Policy 495 essentially re-writes the Settlement Agreement for Business Economic Loss Claims.  Policy 345 governs the Customer Mix test and essentially requires many businesses to provide the names and addresses of every single customer they have had from 2007 until 2011.  Several other policy revisions, clarifications, and interpretations have resulted in significant changes to the Class that could not be contemplated by the Claimants prior to their decision whether or not to stay in the class.

Numerous other additions to the class have also limited recovery by injured claimants. Specifically, the Fraud, Waste, and Abuse division that was created in large part due to BP's multi-million dollar advertising campaign against the Class has resulted in wholesale delays to payments, and more and more denials to claimants come every day.   This "black ops" wing of the DHECC operates apparently under their own rules.  Rarely, if ever are they able to site to a portion of the Settlement Agreement or a Policy revision that supports their inane requests.  At least one of their operatives has repeatedly declined to provide her last name.   They continue to request numerous documents that are irrelevant to the calculation of claims, such as tax transcripts for years that are not being used in the calculation of the claim.  They request lengthy interviews for claims worth just a few thousand dollars, at most.  Then they compound matters on these same small claims by interviewing persons tangentially related to the claim.  They do their very best to avoid dealing with the attorney, often talking to represent claimants without their attorneys knowledge or consent.   Compounding all of this is that NONE of their investigations are completed in an efficient manner.

At the fairness hearing Jim Roy, Class Counsel, stated:

We did not want a hundred-plus-thousand claimants being subjected to what many people perceived were subjective claim reviews, like at the GCCF, or some kind of star chamber subjective evaluation that they just didn't -- that wasn't transparent. So transparency was critical. To have it transparent, you had to have your compensation and your causation calculation formulas objectively ascertainable.[5]

Yet, this is exactly what DHECC seems to have created in their Fraud, Waste, and Abuse Division.   Everything about it seems arbitrary and intended as a "gotcha" mechanism intend to deprive claimants of compensation under the settlement.   This goes against the very terms of the settlement which requires vendors to use their "best efforts to provide Economic Class Members with assistance, information, opportunities and notice so that the Economic Class Member has the best opportunity to be determined eligible for and receive the Settlement Payment(s) to which the Economic Class Member is entitled under the terms of the Agreement."[6]

The DHECC has become strict, rigid, and often arbitrary, the very definition of the "star chamber" that it was represented not to be by its authors.   The failure to provide every single document, even the most mundane document results in no payment to the claimant. Furthermore, there is not method for compromise, even were the claimant is 99% compliant.  It's an all or nothing program were the rules have been changing since its very inception.

The end result is that many claims do not even get evaluated by the Class to determine their loss.  The buzzard that the DHECC has become is eating the carcasses of injured Gulf Coast residents one by one, as they slowly give up hope of ever being compensated for their losses. Brent Coon & Associates files the Motion on behalf of our clients who are not getting an opportunity to have their claims fairly evaluated.   We ask that the Court order a re-notice of the

---

[5] Transcript of Final Fairness Hearing Proceedings Heard Before the Honorable Carl J. Barbier United States District Judge November 8, 2012 at Page 159 lines 3 through 10.
[6] *See* Rec. Doc. 6430 ("Settlement Agreement").at Section 4.3.7.

Class and give claimants an opportunity to opt-out of the Class now that's its true stripes have been shown.

## II. Background

On May 2, 2012 the Court preliminarily approved the *Deepwater Horizon* Oil Spill Economic and Property Damages Settlement Agreement ("Settlement Agreement") and conditionally certified the class for settlement purposes.[7]   On December 21, 2012, the Court issued an Order and Reasons and order and judgment certifying the Economic and Property Settlement Class and granting final approval of the Economic and Property Damages Settlement Agreement.[8]   The class was appealed to the Fifth Circuit as *BP Exploration & Production v. Lake Eugenie Land & Development.*   On May 19, 2014 the 5th Circuit upheld the class action settlement.  On December 8, 2014 the United States Supreme Court denied BP's petition for writ of certiorari, effectively finalizing the class settlement for all class members.

During the appeals, the class continued to move forward.   In the interim between preliminary approval and final approval the Court also accepted the *Deepwater Horizon* Oil Spill Economic and Property Damages Notice ("Notice") prepared and proposed by the parties.[9]  By mid-July 2012 the Notice was distributed to Economic Class Members in the Gulf region for the purpose of explaining the terms of the Settlement Agreement.[10] The members had until September 7, 2012 to object to the Settlement Agreement and November 1, 2012 to opt-out of the settlement class.[11]

---

[7] Rec. Doc. 6418 ("Preliminary Approval Order") and Rec. Doc. 6430 ("Settlement Agreement").
[8] Rec. Doc. 8138 ("Order and Reasons") and Rec. Doc. 8139 ("Order and Judgment Granting Final Approval of Economic and Property Damages Settlement and Confirming Certifications of The Economic and Property Damages Settlement Class."
[9] Rec. Doc. 8138 at page 4 of 125.
[10] The Notice is found on the website *http://www.deepwaterhorizonsettlements.com*.
[11] Rec. Doc. 8138 at page 4 of 125.

The Notice explains to Economic Class Members that their ability to receive damages from the *Deepwater Horizon* oil spill is dependent upon whether they meet certain eligibility requirements of the Settlement Agreement. Specifically the Notice directs the members to a Settlement Claims Eligibility and Benefits Chart which illustrates who may be eligible to receive damage awards under various claim categories. For example, under the category marked "Economic Damage Claim" the Notice states that "in general" potential benefits for claimants are "calculated by comparing actual post-spill earnings to earnings that might have been expected in that post-spill period" and that "[d]epending on their industry or geographic zone, some individuals and Entities may need to provide evidence that their economic losses were caused by the Deepwater Horizon incident."[12]

The Notice instructs Economic Class Members to go to the *Deepwater Horizon Economic Claims Center* website and read the Settlement Agreement which describes how they are to be compensated under the Court-Supervised Settlement Program ("Settlement Program"). The Agreement, unfortunately, encompasses over 1,100 pages of highly technical language governing the terms of the settlement for several different types of businesses showing economic losses including General Businesses, Multi-Facility Businesses, Failed Businesses, Start-Up Businesses and Failed Start-Up Businesses.[13]  Regardless, determining losses for such businesses is a three-step process.  *First,* business claimants must submit claims forms to the Claims Administrator overseeing the Settlement Program.[14]  *Second,* the claim forms must be accompanied by rigorous documentation so a final award can be calculated.[15]  *Third,* calculating an award requires the application of extremely complicated compensation frameworks utilizing

---

[12] *See* the Notice, page 12.
[13] Rec. Doc. 8138 at page 10 of 125.
[14] Rec. Doc. 8138 at page 8 of 125.
[15] Rec. Doc. 8138 at pages 8-9 of 125.

higher-level math concepts.  For instance, calculations for Business Economic Loss ("BEL") claims involve the consideration of multiple options with several calculations occurring at each step. While some business owners may be able to work their way through some of the easier steps, others require considerable analytical and investigative skills. Still the Court considers the BEL compensation frameworks to be "transparent" because they permit "class members to understand how their claims will be evaluated under the Settlement."[16]  The Court also believes that the "documents required to support BEL Claims are typically required to calculate business economic loss; they are the documents that businesses either keep in the ordinary course or that may readily be prepared from a business's books and records."[17]

The Settlement Program is implemented by a Claims Administrator under the supervision of the Court.[18]  Although he was appointed to the position on March 8, 2012, the Claims Administrator did not begin operation of the Settlement Program until June 4, 2012.[19]  During this interim period the Claims Administrator instituted what he considered to be extensive planning to ensure the claim intake system was efficient.[20]  Although not mentioned in his first status report to the Court, the interim planning process included the development of 112 policy changes to clarify various terms of the Settlement Agreement *before* the roll-out of the Settlement Program.[21]  The changes occurred despite the assurance of Class Counsel in its Memorandum in Support of Final Approval of the Settlement Agreement that "all class members

---

[16]  Rec. Doc. 8138 at page 8 of 125.

[17] Rec. Doc.  8138 at page 11 of 125.

[18] *See* Rec. Doc. 6430-1: §4.4.7 (Settlement Program is subject to the ongoing supervision of the Court); §4.3.1 (Court appoints and directs the Claims Administrator); §4.3.4 (Court resolves any issues which cannot be resolved by the Administrative Review Panel); §6.6 (Court has discretion to review appeals); §18.1(continuing  jurisdiction of the Court).

[19] Rec. Doc. 3830 and Rec. Doc. 8138 at page 9 of 125.

[20] Rec. Doc. 7282.

[21]  The policy changes are found on the Deepwater Horizon Court-Supervised Settlement Program website at *http://www.deepwaterhorizonsettlements.com*.

will be treated fairly and consistently under the settlement frameworks" that are to be faithfully implemented by the Claims Administrator according to the terms of the Agreement:

§4.3.1 "The Claims Administrator shall be selected and appointed by the Court, and shall be responsible to the Court, serve as directed by the Court, and faithfully implement and *administer the Settlement, according to its terms and procedures*, for the benefit of the Economic Class…."[22]

A few months after the start of the Settlements Program, it become clear that the policy changes to the Settlement Agreement were making it difficult for BEL claimants to be compensated for their losses related to the *Deepwater* Horizon oil spill.[23]  Specifically, BEL claimants represented by the Brent Coon & Associates ("BCA") law firm struggled to meet the rigorous claim paperwork requirements of the Settlement Agreement. Many lacked certain documentation, such as a W-2 forms or Profit & Loss statements, and as a result were at the mercy of the Claims Administrator regarding whether or not they were entitled to any compensation under the Settlement Program. Yet despite these difficulties the BCA firm submitted hundreds of BEL claims to the Settlement Program hoping that they could be worked out with the claims adjusters.  By the fall of 2012 it became obvious that the Settlement Program was inefficient, as evidenced by hundreds BCA claimants receiving a hodge-podge of value assessments for their claims.  Consequently the BCA firm opted-out many of its clients from the settlement class by the November 1, 2012 opt-out deadline, including those with BEL claims. Other law firms, induced by the promises of Class Counsel that the settlement class was fair, efficient, transparent, and better than the Gulf Coast Claims Facility ("GCCF"), advised their clients to stay in the class. To this day many BCA-related BEL claimants, including those with cash-based businesses, are forced to remain in the class with unresolved claims due in part to the numerous policy changes associated with the Settlement Agreement.

[22] Rec. Doc. 7101-2 at page 19 of 67 (emphasis added).
[23] Rec. Doc. 7594.

By September 24, 2012 (only seventeen days after close of the objector deadline), 253 policy changes were made to the Settlement Agreement.[24] Once the Court provided final approval of the settlement on December 21, 2012, there were 316 policy changes.  The hundreds of policy changes to the Settlement Agreement reflected numerous inefficiencies and productivity issues associated with the Settlement Program.[25] Not surprisingly, the majority of the claims denied funding are of the BEL type subject to rigorous documentation requirements.[26]

By the November 15, 2012 Fairness Hearing, Class Counsel's Mr. James Roy insisted that the Settlement Program's compensation frameworks "are uniform, are transparently observable, and are objective as compared to the GCCF adjusters' often subjective and often unevenly applied GCCF claims evaluation criteria ..."[27] He maintained the Settlement Program was a "claimant-friendly process" intended to "maximize claimant recovery" and was "mandated to give as much money in the most advantageous application of the settlement program's formula as is possible".[28]  He further stated that the Settlement Program was "good" and "pay[ed] more than comparable claims were paid on average before the GCCF".[29]  BP's counsel Mr. Richard Godfrey also claimed that "[t]he settlement is working as we anticipated and as…negotiated".[30]  In its Motion for Final Approval of the Settlement Agreement BP also insisted that the Agreement "makes the Plaintiff class more than whole".[31] Even the expert Professor Dean Klonoff stated "It is one of the fairest and most impressive settlements I have seen in more than 20 years of practicing, teaching and writing in the field of class actions."[32]

---

[24] Rec. Doc. 7466.
[25] Rec. Doc. 10976 at pages 10-11.
[26] Rec. Doc. 11358-1 at page 3 of 5 Table 4.
[27] Rec. Doc. 7892 at page 21 of 328.
[28] Rec. Doc. 7892 at pages 22-23 of 328.
[29] Rec. Doc. 7892 at pages 23-24 of 328.
[30] Rec. Doc. 7892 at page 62 of 328.
[31] Rec. Doc. 7114-1 at pages 70 & 125 of 127.
[32] Rec. Doc. 7892 at page 183 of 328.

Yet despite all the hype, the reality was that the 1,100-page Settlement Agreement looked like a Swiss cheese product showing hundreds of after-the-fact policy modifications to fill in the gaps. Many of the changes which were not agreed to by the parties, including those targeting class BEL claimants.  Some of the policies which materially modified the Settlement Agreement and impacted the BEL claimants are highlighted in **Exhibits A** and **A1-A8.**  Regardless, the modifications were never mentioned in the Notice or Settlement Agreement by the November 1, 2012 opt-out deadline.  By August 2013—nearly eight months after the opt-out deadline—the Claims Administrator admitted that he *still* struggled with implementing the terms of the Settlement Agreement:

> MR JUNEAU: "…I got a thousand-page Settlement Agreement that was negotiated between the parties over some extensive period of time, of which I had nothing to do with, and my job is to implement it. I had to enact *over four hundred policies* in this matter. We have an evolving process that's still evolving. We have *unresolved issues…so we don't have a pristine product to measure* when you're talking about productivity… because the system is *changed consistently* because of what we've had to implement in implementing the Settlement Agreement, with the full input and knowledge throughout this whole case of the parties. That's a fact, okay, and we're doing that today."[33]

To date, <u>the settlement has been amended over 500 times</u>, with the most recent "Policy 510: Claims with Results Determined to be Incorrect" being issued on or about February 10, 2015.  Of the hundreds of policies associated with the Settlement Agreement, one in particular best represents how its terms have been modified.   Called Policy 495, it addresses new accounting procedures for numerous BEL claimants who acquired their business receipts on a cash basis before the *Deepwater Horizon* oil spill. (See **Exhibit B**.)

---

[33] Rec. Doc. 10976 at pages 21-22.

Before the opt-out deadline, Exhibit 4C of the Settlement Agreement required damages for cash-based businesses (called "Variable Profit") to be calculated under the following compensation framework:

(1)  Sum the monthly revenue over the period.

(2)  Subtract corresponding variable expenses from revenue over the same time period…[34]

Thus the Exhibit 4C compensation framework calculates damages based upon comparison of "Variable Profit", or monthly revenue minus expenses, obtained in 2010 *after* the spill to a "Variable Profit" amount obtained for a "comparable" period *before* the spill.[35]  The difference would be lost profits awarded as compensation to a business claimant.[36]

On January 15, 2013, and after the opt-out deadline, the Claims Administrator announced a new "BEL Claims Policy" involving the Exhibit 4C compensation framework.[37]  The policy states that under Exhibit 4C, the calculation of "Variable Profit" includes consideration of "both revenues and expenses in the periods in which those revenues and expenses were recorded at the time," and "will not typically re-allocate such revenues or expenses to different periods," but will "reserve the right to adjust the financial statements in certain circumstances, including but not limited to, inconsistent basis of accounting between benchmark and compensation periods, errors in previously recorded transactions and flawed or inconsistent treatment of accounting estimates."[38]  Thus the BEL Claims Policy allows businesses affected by the *Deepwater Horizon* oil spill to establish their losses through revenue and expenses by comparing similar "time

---

[34] Rec. Doc. 6430-10 at Page 3 of 8.
[35] *See* U.S. Fifth Circuit Court of Appeals in Case No. 13-30315, Doc. 00512230427 at page 23.
[36] *See* U.S. Fifth Circuit Court of Appeals in Case No. 13-30315, Doc. 00512230427 at page 23.
[37] Doc. 8913-25.
[38] Doc. 8913-25 at page 2 of 2.

periods" that are chosen by the claimant (e.g. the pre-spill months of May-December 2009 are compared to post-spill months of May-December 2010).[39]

The BEL Claims Policy was published on March 5, 2013.[40]  On that day the Court affirmed the Claims' Administrator's interpretation of the Settlement Agreement as stated in the BEL Claims Policy.[41]  By May 3, 2013 BP appealed the Court's decision to the Fifth Circuit Court of Appeals claiming that the Court's interpretation of revenue and expenses under the policy was in error.  Rather than interpret "Variable Profit" as a comparison of revenue and expenses from comparable "time periods", BP believed that for BEL cash-based claimants, variable expenses must correspond to the revenue those expenses produced.[42]  In other words, BP wanted Exhibit 4C to be applied in a way that expenses would be "matched" with revenue for cash-based claimants, rather than subtracted from their receipts whenever expenditures were recorded during a relevant "time period".[43]  On October 2, 2013, the Fifth Circuit reversed the Court's ruling regarding Exhibit 4C and remanded it so that revenue and expenses related to cash-based claims are "matched" under the Settlement Agreement.[44]

After re-consideration of the merits the Court found on December 24, 2013 that Exhibit 4C requires Variable Profit to be calculated in such a way that revenue is "matched" with the variable expenses incurred by a claimant while conducting its business, and that does not

---

[39]  Rec. Doc. 6430-10 at Page 4 of 8: Step 1 of Exhibit 4C's compensation framework which states "Step 1 of the compensation calculation is determined as the difference in Variable Profit between the 2010 Compensation Period selected by the claimant and the Variable Profit over the *comparable* months of the Benchmark Period."
[40]  Called Policy 324 v2 which is found under the Settlement Program *www.deepwaterhorizonsettlements.com.*
[41]  As acknowledged by the Court, "[n]owhere does the Agreement state or indicate that revenue and expenses be "matched" or revenues "smoothed," nor does it state that one should inquire into when revenue was "earned." Doc. 8812 at page 1 of 6.
[42]  *See* U.S. Fifth Circuit Court of Appeals in Case No. 13-30315, Doc. 00512230427 at page 45; *See also* Doc. 11890 at page 8 of 11.
[43]  *See* U.S. Fifth Circuit Court of Appeals in Case No. 13-30315, Doc. 00512230427 at page 58.
[44]  *See* U.S. Fifth Circuit Court of Appeals in Case No. 13-30315, Doc. 00512394834.

necessarily coincide with when the revenue and variable expenses are recorded.[45]   As such the Court ordered the Claims Administrator to adopt and implement a policy for BEL claims that address situations involving "unmatched" revenue and variable expenses.[46]   The 88-page policy, called "Final Policy 495: Business Economic Loss Claims: Matching Revenues and Expenses" contains new frameworks for "matching" revenue and expenses that takes into consideration the specifics of a particular business, including industry type and the nature and duration of revenue or expense cycles, to determine what lost profits should be awarded as compensation to a business claimant.[47]   Policy 495 was put in place by Court order on May 28, 2014.  Even Class Counsel in its March 19, 2014 memorandum to the Court which argues against the Claims Administrator's issuance of Policy 495, argues that this framework is a new measurement of economic loss outside the Settlement Agreement. (**Exhibit C** at Page 8 of 10.)  Policy 495 is now the final rule of the land as the Court has ruled denying Class Counsel's Motion to Alter or Amend Order Adopting matching Policy on March 31, 2015.[48]

Application of Policy 495 is a three-step process.  First, profit and loss statements ("P&Ls") associated with a claim are analyzed to determine if they contain "unmatched" revenue and variable expenses.[49]   Once the claim is determined to be "unmatched", it is assigned an NAICS industry code outlined in Attachment A to the policy.[50]   Next, the P&Ls are analyzed under one of the methodologies found in Attachment B-H to the policy for purposes of determining business losses.[51]   If the BEL claim is related to construction, agriculture, education, professional service, failed businesses, failed start-up businesses or start-up businesses, new or

---

[45]   Rec. Doc. 12055 at page 5 of 43.
[46]   Rec. Doc. 12055 at page 5 of 37.
[47]   Appendix B, Page 2.
[48]   Rec. Doc. 14356
[49]   Appendix B, Page 5.
[50]   Appendix B, Page 6.
[51]   Appendix B, Pages 6-7.

customized compensation frameworks for "matching" are provided under Attachments C-H of the policy.[52]  For those claims falling under Attachment B, the methodology requires that inconsistencies between P&Ls to be corrected, if possible, so that they can be "matched" up.[53] The "restated" BEL claims with modified P&Ls are then processed under the compensation calculation set forth in Exhibit 4C to the Settlement Agreement.[54]  For those claims with P&Ls that remain as "unmatched", revenue and variable expenses are "matched" under a new framework called the "annual variable margin methodology" for purposes of determining business losses.[55]

According to Policy 495, most BEL claimants will have "unmatched" P&Ls that may require submission of additional documentation and/or information in order to complete the "annual variable margin methodology".[56]  Generally, the methodology totals variable expenses for certain fiscal years and allocates them to each month on a pro-rata basis of monthly revenues for the same period. For example, a *variable expense percentage* will be determined for each year in the Benchmark Period (e.g. 2009, the average of 2008 and 2009, or the average of 2007, 2008 or 2009), and applied to the *monthly revenue amounts* for the years so to determine the *variable expenses for each month*.[57] The same procedure applies to the Compensation Period whereby a *variable expense percentage* will be determined for each year in the Compensation Period, and applied to the *monthly revenue amounts* for the years to determine the *variable expenses for each month*.[58] The variable expenses from the P&Ls serve as input factors in the "annual variable margin methodology" which result in calculating compensation under Exhibit

[52] Appendix B, Pages 6-7.
[53] Appendix B, Page B2.
[54] Appendix B, Page B2.
[55] Appendix B, Pages 3, B1.
[56] Appendix B, Pages 3-4.
[57] Appendix B, Page B2.
[58] Appendix B, Page B3.

4C of the Settlement Agreement.[59]   Although the Claims Administrator states that "annual variable margin methodology" "does not alter the structure as to how compensation is calculated under the Settlement Agreement, he acknowledges that "if matching issues are identified" it does *amend the P&Ls* utilized in such calculations.[60]

Similarly, Policy 345 governs the Application of the Customer Mix Test.  (See **Exhibit D**).   The Customer Mix Test is a formula used to compare the number of local customers with out of area customers (e.g. tourists) that a particular business served during the relevant time periods.   Policy 345 states:

> The Claims Administrator has observed that it is difficult or even impossible for some Claimants with BEL or Start-Up BEL claims to satisfy this test because they do not have documentation to establish the addresses/locations of their customers. This is particularly problematic for businesses that deal primarily in cash, which often do not maintain the type records specified in the above referenced section of the Settlement Agreement. However, the Claims Administrator interprets the Settlement Agreement's documentation requirements as mandatory.

(See **Exhibit D** at Page 2).   Effectively this means that any Business BEL claim that must meet the "Modified V" or "Downturn Only" tests or any Start-UP BEL claim that accepted cash will not be evaluated by the Class.   This policy decision affected literally thousands of businesses all over the Gulf Coast Region.   Yet, nowhere in the notice was it stated that a claim may not be evaluated because the business accepted cash.    Furthermore, it is not realistic (especially given the way the class was presented) for claimants and their personal attorneys to have expected this to be the case.

### III. Procedural Standard

According to §13.14 of the Manual for Complex Litigation, Fourth, if substantial changes are made to a class action settlement agreement, "it may be necessary for the court to begin the

---

[59]   Appendix B, Page B3.
[60]   Appendix B, Page B1.

notice and review process anew."  In fact, a district court has an affirmative obligation to ensure that the class membership remains at all times consistent with the underlying facts and procedural posture of a case. *See, Richardson v. Byrd*, 709 F.2d 1016, 1019 (5th Cir. 1983 ("Under Rule 23…the district judge must define, redefine, subclass, and decertify as appropriate in response to the progression of the case from assertion to facts.") This obligation also coincides with a fiduciary duty to ensure that all class members "have knowledge of proceedings in which a final judgment may directly affect their interests." *Greenfield v. Villager Industries Inc*., 483 F.2d 824, 832 (3d. Cir. 1973) As such a district court's decisions about a class settlement must remain, at all times, in the public interest. *United States v. Ketchikan Pulp Co*., 430 F. Supp. 83, 85–86 (D. Alaska 1977).

## IV. Argument

### A. The Claims Administrator Cannot Materially Modify The Settlement Agreement.

Fed. R. Civ. P. Rule 23(e) "requires court approval of the terms of any settlement of a class action". *See Evans v. Jeff D.*, 475 U.S. 717, 726 (1986).  Prior to final approval, a district court may not modify a class action settlement agreement, nor can it require the parties to accept a settlement to which they have not agreed.  *Id. See also, Klier v. Elf Atochem N. Am., Inc.*, 658 F.3d 468, 475 (5th Cir. 2011)("the court cannot modify the bargained-for terms of the settlement agreement").  Thus a Settlement Agreement is a document that must stand or fall on its own. Even the Fifth Circuit Court of Appeals acknowledges that it is "not free to delete, *modify* or substitute certain provisions of the settlement.  The settlement must stand or fall as a whole." *Cotton v. Hinton*, 559 F.2d 1326, 1331-32 (5th Cir. 1977)(emphasis added).  Once a district court preliminarily approves a settlement agreement, it retains jurisdiction to interpret, implement,

administer and enforce it.[61]  However it must do so in accordance with the terms of the agreement.[62]

In this case there is nothing in the court-approved Settlement Agreement that allows for modification of its terms in accordance with hundreds of policy changes made by the Claims Administrator.[63]  In fact if anything, the Agreement prohibits it.  For instance, §28.1 states that only changes 'ministerial' in nature can be made to the Agreement,[64] while §4.4.7 requires the Claims Administrator to "explore and consider the utilization of streamlined procedures to improve the efficiency of the Claims process, *without changing Claims criteria*."[65]  Under §4.3.1 of the Agreement states "[t]he Claims Administrator shall… faithfully implement and administer the Settlement, *according to its terms and procedures*, for the benefit of the Economic Class, consistent with this Agreement, and/or as agreed to by the Parties and/or as approved by the Court."[66]  Even requests by class members for modifications to the Settlement Agreement will be denied.[67]

As shown herein, modifications have been made to the Settlement Agreement through issuance of hundreds of polices, including those identified in **Exhibits A** and **B**.  The modifications are material rather than ministerial in nature.  For instance, as shown in **Exhibit A,** policy changes have modified the Settlement Agreement with regards to how NAICS codes are determined for business claims (**Exhibit A** – Policy 480), whether existing businesses qualify as start-up businesses (**Exhibit A** – Policy 354 v3), how to qualify certain expenses (**Exhibit A** – Policy 439), and how profit and loss statements are quantified (**Exhibit A** – Policy 464).  As

---

[61]  Rec. Doc. 00512394834 at page 30.
[62]  Rec. Doc. 00512394834 at page 30.
[63]  Rec. Docs. 7466 and 7594.
[64]  Rec. Doc. 6276-1 at page 90 of 117.  Also, according to Black's Law Dictionary, 6th ed., 'ministerial function' is "a function as to which there is no occasion to use judgment or discretion."
[65]  Rec. Doc. 6430-1 at page 25 of 123.
[66]  Rec. Doc. 6430-1 at page 20 of 123 (emphasis added).
[67]  Rec. Doc. 8138 at page 79 of 125.

shown in **Exhibit B**, the Claims Administrator has created a new methodology to the Agreement (called Policy 495) that requires "Variable Profit" to signify "matching expenses with revenue" rather than—as originally understood—"comparing revenue and expenses from comparable time periods".  Furthermore according to Class Counsel's March 19, 2014 memorandum to the Court, the other new frameworks created for agricultural, educational and professional services businesses claims also "materially depart from the Compensation analysis agreed and approved in Exhibit 4C." (**Exhibit C** at Page 7 of 10.)  In fact, Policy 495 likely requires many BEL claimants with "unmatched" P&Ls to submit additional documentation outside the requirements of the Settlement Agreement in order to complete the "annual variable margin methodology". (**Exhibit C** at Page 9 of 10.)

As acknowledged by the Fifth Circuit's Judge James Dennis, the new methodology (proposed by BP and agreed to by a majority panel of the Fifth Circuit) *modifies* the Settlement Agreement because it was *not* agreed to by the parties *before* the final approval hearing of the Settlement Agreement:

> "BP appealed to the district court, complaining of the Administrator's *refusal to either modify the settlement decree or revise his interpretation of the compensation formula so as to bring about the same result as a modification*. The district court, however, upheld the decision of the Administrator, ruling that *BP's proposed modification* would both conflict with the terms of the parties' agreement and add substantive provisions thereto that had not been agreed to by the parties or approved of by the court during the final-approval hearing in which BP could have complained but did not. BP has now appealed to this court.[68]

Since the creation of Policy 495 contains modification to the terms of the Settlement Agreement, the class members are entitled to know about it so as to make an informed decision as to whether it affects their financial interests. Without such notice, the final Policy 495 creates a devastating impact upon the BEL cash-based claimants.  It either thwarts their claims entirely

---

[68] *See* U.S. Fifth Circuit Court of Appeals in Case No. 13-30315, Doc. 00512394834 at page 48.

or treats them less favorably than the cash-basis claims already resolved under the Settlement Program.  It also substantially impacts their substantive due process right to be informed about the Settlement Agreement under a class action notice. See *Cotton v. Hinton*, 559 F.2d 1326, 1331-32 (5th Cir. 1977).[69]  Even if Policy 495 is considered a "contract interpretation" rather than a modification, the impact is the same.  The hundreds of policy changes, which include Policy 495, were never mentioned in the Notice, in the Settlement Agreement, or on the Settlement Program website before the November 1, 2012 opt-out deadline.  In fact it is difficult to fathom how the average claimant understood that when reading the class Notice and Settlement Agreement about "Variable Profit" under Exhibit 4C of the Settlement Agreement— which was originally calculated by the Class Administrator for numerous BEL claims using a comparison of revenue and expenses from comparable "time periods"—it could be changed to an 88-page policy requiring that revenue and variable expenses be "matched" under a new framework called the "annual variable margin methodology" for purposes of determining business losses. Even Class Counsel agrees that the "matching" processes identified in Policy 495 is problematic, and that the new compensation frameworks that apply to construction, agriculture, education, professional services business claims do not apply equally to all claimants under the terms of the Settlement Agreement. (**Exhibit C** at Pages 7-8 of 10.)

   **B. Class Members Have Not Been Properly Notified Under Fed. R. Civ. P. Rule 23 And Due Process Requirements About Material Modifications To The Settlement Agreement.**

According to Fed. R. Civ. P. Rules 23(c)(2)(B) and 23(e), once a settlement is preliminarily approved, each member must be informed about it so to decide whether to request exclusion from the class, so as to preserve the opportunity to pursue their claims separately, or to remain in the class and be bound by the final judgment. *See, Eisen v. Carlilse*, 417 U.S. 156, 176

---

[69] *See also* R. 00512394834 at page 30.

(1974). The notice "must contain information that a reasonable person would consider as material in making an informed, intelligent decision of whether to opt out or remain a member of the class and be bound by the final judgment." *In re Nissan Motor Corp. Antitrust Litig.*, 552 F.2d 1088, 1105 (5th Cir. 1977). While Fed. R. Civ. P. Rule 23(c)(2)(B) provides a list of the minimum content required in a notice to class members, Fed. R. Civ. P. Rule 23(b)(3) states that notice be "reasonably calculated, *under all the circumstances*, to apprise interested parties of the pendency of the action and afford them an opportunity to present their objections". *Mullane v. Central Hanover Bank & Trust Co.,* 339 U.S. 306, 314-15 (1950); *Eisen v. Carlisle & Jacquelin*, 417 U.S. 156, 174-175 (1974)(emphasis added).  It also requires that notice be given "in a form and manner that does not systematically leave an identifiable group without notice." *Mandujano v. Basic Vegetable Prods. Inc.*, 541 F.2d 832, 835 (9th Cir. 1976). Thus a notice must comprehensively describe the class action and the class members' rights as related to it.

The Advisory Committee's Note to Fed. R. Civ. P. Rule 23 states that a class action notice must be "designed to fulfill requirements of due process to which the class action procedure is of course subject." *See* Moore's Federal Practice §23.101 citing to Fed. R. Civ. P. 23 advisory committee note of 1966 ("This mandatory notice pursuant to subdivision (c)(2) ... is designed to fulfill requirements of due process to which the class action procedure is of course subject"); *Mullane*, 339 U.S. at 313 (due process requires actual notice to those whose identity and location may easily be ascertained); and *Crawford v. Equifax Payment Servs., Inc.,* 201 F.3d 877, 881 (7th Cir. 2000) (right to personal notice and to opt out are based on the Seventh Amendment and Due Process clause of the Fifth Amendment, as well as on Rule 23). Consequently notice that fails to provide class members with important information is defective and fails to protect class members' substantive rights.

The *Deepwater Horizon* Oil Spill Economic and Property Damages Notice fails to adequately inform class members about the hundreds of material policy changes made to the Settlement Agreement, and as such they cannot make an informed decision *under all circumstances* regarding whether or not to remain in the settlement class.  Without knowledge of the policy changes to the Settlement Agreement, the average class member cannot and could not make a reasonably informed decision regarding whether or not to opt-out of the class settlement—because he had *no way of knowing what the numerous changes* would be and what compensation, if any, he would receive under the Settlement Agreement.  For example, at the time of the op-out deadline, neither the claimants nor the accounting world could anticipate the abandonment of contemporaneous P&L statements under the terms of the Agreement in favor of an undefined revenue recognition methodology under new compensation framework called Policy 495. They would have not contemplated that new and custom-designed compensation frameworks would be created which apply to construction, agriculture, education, professional services business claims. They would have never expected that they might be required to provide additional documentation for their BEL claims under the policy addressing information prior to the Benchmark Period or subsequent to the Compensation Period despite the original terms outlined in Exhibit 4C to the Settlement Agreement that appear to require otherwise.  Therefore the Notice in this case is defective.  It flies in the face of the Rule 23 requirement that it be the "best notice practicable" under the circumstances.  It does not inform the class members of their substantive rights under any standard of fairness, justice or due process.  It is not the agreement to which thousands of claimants decided to take part of and for which they gave up other rights. In fact the Notice is so defective that it should be amended and sent post haste to all class

members for their review and consideration as to whether they want to remain in or opt-out of the class.

It is now apparent that BP's challenge to the Claims Administrators BEL Claims Policy under an appeal to the Fifth Circuit Court of Appeals has effectively changed the rules of engagement for this settlement class.  Contrary to the earlier holding of the District Court, the Fifth Circuit requires the Claims Administrator to modify the BEL Claims Policy, which is now called Policy 495.  Caught in the cross fire are BEL class members unable to determine how much they are to be compensated under the Settlement Agreement due to Policy 495 and other hundreds of policy changes.  In fact, as noted by Judge James Dennis, BP's changes to the BEL Claims Policy is "devastating to many claimants who are unable to translate or reconstruct their cash-basis data into revenue matched to the expenses that generated it under BP's proposed conversion and ultra matching requirements.  Forcing the conversion of all cash-basis data into accrual-basis data would discriminate against the remaining cash-basis claimants by either thwarting their claims entirely or treating their claims less favorably than the cash-basis claims already resolved."[70]  Therefore all class members, which include the BEL claimants, must be notified about of the policy modifications to the Settlement Agreement through an amended Notice, and be provided an opportunity to make an informed, intelligent decision as to whether they should opt-out of the class, if deemed appropriate.

## V.  Relief

The BCA Class Members with BEL claims request that the Court require the parties to (1) amend the  provisions of the Court-approved May 2012 Notice such that it directs the class members to the hundreds of policy modifications made to the terms of the Settlement Agreement, including Policy 495, (2) modify  the  provisions of the Court-approved May 2012

---

[70] *See* U.S. Fifth Circuit Court of Appeals in Case No. 13-30315, Doc. 00512394834 at page 56.

Notice such that it affords all class members who have not received claimant awards from the Settlement Program another opportunity to opt-out of the settlement class for a reasonable period of time, and (3) send the modified Notice to all members of the settlement class for their review and consideration.  In addition, since there are thousands of BCA class members affected by the hundreds of policy modifications to the Settlement Agreement still waiting to be compensated under the Settlement Program, it is requested for the sake of efficiency that the Court allow opt-out requests to be signed by their counsel associated with the BCA law firm.  The BCA firm does not believe this is an unreasonable request considering that attorney signatures have been permitted in place of claimant signatures on the OPA presentment claim forms submitted to BP.

Dated:  April 16, 2015

Respectfully submitted,
/s/ Brent W. Coon
Brent W. Coon
Federal Bar No. 9308
Texas Bar No. 04769750
215 Orleans
Beaumont, Texas 77701
Tel.: (409) 835-2666
Fax: (409) 835-1912

*Attorney for BCA Class Members*

## CERTIFICATE OF SERVICE

I certify that this document has been filed with the Clerk of the Court and served by ECF on April 16, 2015, upon:

Attorneys for the Defendants:

> Richard C. Godfrey, P.C. J. Andrew
> Langan, P.C. Wendy L. Bloom
> KIRKLAND & ELLIS LLP 300 North
> LaSalle Street Chicago, IL 60654
> Telephone: 312-862-2000

> Jeffrey Lennard
> SNR Denton US LLP
> 233 South Wacker Drive Suite 7800
> Chicago, IL 60606
> Telephone: 312-876-8000

> Jeffrey Bossert Clark
> Steven A. Myers
> KIRKLAND & ELLIS LLP 655
> Fifteenth Street, N.W. Washington, DC
> 20005 Telephone: 202-879-5000

> Don K. Haycraft
> LISKOW & LEWIS
> One Shell Square
> 701 Poydras Street, Suite 5000 New
> Orleans, LA 70139
> Telephone: 504-581-7979

Attorneys for Class Plaintiffs:

> Stephen Jay Herman
> Soren E. Gisleson
> HERMAN HERMAN & KATZ LLP
> 820 O'Keefe Avenue
> New Orleans, LA 70113
> Telephone: 504-581-4892
> Fax: 504-561-6024

> James Parkerson Roy
> DOMENGEAUX, WRIGHT, ROY & EDWARDS
> 556 Jefferson Street - Suite 500
> Lafayette, LA 70501
> Telephone: 337-233-3033

Fax: 337-233-2796

Elizabeth Joan Cabraser
LIEFF, CABRASER, HEIMANN & BERNSTEIN
275 Battery Street - 29th Floor
San Francisco, CA 94111
Telephone: 415-956-1000
Fax: 415-956-1008

Samuel Issacharoff
NEW YORK UNIVERSITY SCHOOL OF LAW
40 Washington Square, S. - Suite 41 1J
New York, NY 10012
Telephone: 212-998-6580
Fax: 212-995-4590

Respectfully submitted,

/s/ Brent W. Coon

*Attorney for BCA Class Members*