**UNITED STATES DISTRICT COURT**
**EASTERN DISTRICT OF LOUISIANA**

**In Re: Oil Spill by the Oil Rig "Deepwater Horizon"**
**in the Gulf of Mexico, on April 20, 2010**

**MDL NO. 2179**

**MEMORANDUM IN SUPPORT OF**
**An AMENDED CLASS ACTION SETTLEMMENT NOTICE**

# Exhibit C

# MEMORANDUM

**To:** Patrick A. Juneau
　　　Claims Administrator

**From:** Class Counsel

**Re:** Final BEL Policy for "Matching" Revenue and Expenses
　　　*Policy Keeper No. 495 (dated 3/13/2014)*

**Date:** March 19, 2014

　　　The final Policy Announcement dated March 13, 2014 for the Matching of Revenue and Expenses in Business Economic Loss (BEL) Claims exceeds the authority of the Claims Administrator and the Court to approve, interpret and implement the Economic & Property Damages Settlement Agreement.  The Claims Administrator is to "faithfully implement and administer the Settlement, according to its terms."[1]  The Court, having approved the Settlement,[2] should enforce the agreement as bargained for, and not modify any of its substantive provisions.[3,4]  While Class Counsel respectfully incorporate, adopt, and reserve all objections, comments and suggestions previously submitted,[5] this Memo is intended to address the fundamental and material ways in which the Policy departs from the Settlement Agreement, even as interpreted by the U.S. Fifth Circuit,[6] and the District Court upon remand.[7]

---

[1] SETTLEMENT AGREEMENT, Section 4.3.1.

[2] *See* In re Deepwater Horizon, 910 F.Supp.2d 891 (E.D.La. 2012), *aff'd,* 739 F.3d 790 (5th Cir. 2014).

[3] *See, e.g.,* Evans v. Jeff D., 475 U.S. 717, 726, 106 S.Ct. 1531, 1537, 89 L.Ed.2d 747 (1986) ("the power to approve or reject a settlement negotiated by the parties before the trial does not authorize the court to require the parties to accept a settlement to which they have not agreed"); Klier v. Elf Atochem, 658 F.3d 468, 475-476 (5th Cir. 2011) ("Because a district court's authority to administer a class-action settlement derives from Rule 23, the court cannot modify the bargained-for terms of the settlement agreement . . . once approved its terms must be followed by the court and the parties alike. … The terms of the settlement agreement are always to be given controlling effect").

[4] In this particular case, moreover, the Economic & Property Damages Settlement Agreement stands as an independent settlement and trust, separate and apart from the requirements or effects of Rule 23. *See generally,* SETTLEMENT AGREEMENT, Section 4 (establishing the *Deepwater Horizon* Court Supervised Settlement Program, a Transition Program, and a Process for Making Claims); Section 5.12 (establishment of a Settlement Trust); Section 21.2 (severability clause); Section 21.3 (processing of submitted Claims even in the absence of final approval); Section 26.1 (regarding the binding effect of the Agreement on the Parties); and Exhibit 26 (Individual Release); HERMAN DECLARATION (Nov. 11, 2013) [Doc 11833-1], ¶¶ 5-7.

[5] *See generally* CLASS COUNSEL *IN CAMERA* SUBMISSION (Oct. 9, 2013) [Doc 11728-1]; CLASS COUNSEL *IN CAMERA* SUBMISSION (Oct. 18, 2013) [Doc 11728-4]; MEMO TO CLAIMS ADMINISTRATOR (Oct. 23, 2013) [Doc 11728-7]; CLASS COUNSEL BRIEF ON THE BEL REMAND ISSUE [Doc 11862]; CLASS COUNSEL SUBMISSION OF PROPOSAL FOR MATCHING EXPENSES [Doc 11885]; CLASS COUNSEL STATEMENT: REVENUE RECOGNITION [Doc 11885-2]; CLASS COUNSEL COMMENTS ON BP "MATCHING" PROPOSALS [Doc 11898]; MEMO TO CLAIMS ADMINISTRATOR (Feb. 27, 2014); CLASS COUNSEL COMMENTS, OBJECTIONS AND SUGGESTIONS (Feb. 27, 2014); *see also,* Class Counsel's Comments, Objections and Suggestions to the final March 13th Policy submitted contemporaneously herewith.

[6] The "BEL OPINION" is the decision in Appeal No. 13-30315, dated  Oct. 2, 2013, and reported as In re Deepwater Horizon, 732 F.3d 326 (5th Cir. 2013).

[7] *See* ORDER AND REASONS (Dec. 24, 2013) [Doc 12055] pp.1-6.

Indeed, BP Counsel repeatedly agreed during the Administrative Panel Meeting that the Fifth Circuit directed the Claims Administrator to use Accrual Basis financials,[8] and the Claims Administrator and Program Accountants have admitted that the Agricultural, Educational and Professional Services Frameworks materially depart from the Compensation analysis agreed and approved in Exhibit 4C.[9]

The Claims Administrator and the Court should:

> I.   Limit the Matching Triggers and Policies to *Cash Basis* Claims, allowing Accrual Basis Claims to be submitted, processed and paid under the established methodologies;
>
> II.  Achieve matching, where required, through the re-allocation of *Expenses only,* without averaging, smoothing, re-allocating or otherwise moving Revenues that were properly recorded in accordance with an accepted Cash, Accrual, Percentage-of-Completion, or other accepted Accounting Methodology; and
>
> III. Utilize the Annual Variable Margin Methodology for *all* un-matched Claims, without resorting to different Construction, Agricultural, Educational or Professional Services Frameworks which were never negotiated nor agreed to, and are in many ways inconsistent with the Settlement Agreement.

In the alternative, the Claims Administrator and the Court should, at the very least:

> a.   Limit the matching generally – and any Revenue adjustments in particular – to the specific transaction or transactions which 'triggered' or caused the Claim to be "un-matched", rather than re-calculating the entire Claim;  and
>
> b.   Not re-visit Causation under Exhibit 4B where Contemporaneous P&Ls objectively indicate a loss caused by the Spill.

---

[8] During the Administrative Panel Meeting on March 12, 2014, when the issue of Accrual Claims was first raised, BP Counsel indicated that the "problem" was that some Claimants called their Claims "Accrual" when they really were not – indicating that Accrual Claims that really were in fact supported by Accrual-basis P&Ls would not require further matching.  Later in the meeting, BP Counsel expressly stated that: "The Court requires accrual-based accounting." And, again, several minutes later: "We were instructed by the Fifth Circuit to use accrual-style accounting." - BP Counsel, Wendy Bloom, March 12, 2014.

[9] The Claims Administrator specifically conceded that "a deviation from the existing methodology set forth in Exhibit 4C was deemed necessary" for Agricultural, Educational and Professional Services Claims. *See* ATTACHMENT D and ATTACHMENT E to Proposed Policy No. 495 (Feb. 12, 2014). During the meeting with the Program Accountants on February 20, 2014, Mr. John Petzold from PwC further acknowledged that the proposed Agriculture and Educational Frameworks were not based on the Settlement Agreement, but rather, constituted a new methodology.  Similarly, Mr. Ted Martens from PwC acknowledged that the Professional Services Framework was not based on the Settlement Agreement (nor any accepted Accounting Methodology), but rather, constituted a new methodology.

**Accrual Claims Require No Further Matching**

The BEL Panel specifically states, at least seven times, that Accrual Claims are already "sufficiently matched" or otherwise "required" under the Settlement Agreement:

- "BP acknowledged that many claims presented data that '*sufficiently match*' revenue and expenses. This is because they apply the *accrual* accounting recognition and matching principles BP advances here as a matter of their ordinary record-keeping";[10]

- "Regardless of whether Exhibit 4C requires matching when it has not been undertaken in the ordinary course of record-keeping, it cannot be said to permit ignoring *sufficiently matched* data from *accrual-basis* claimants";[11]

- "As to *accrual-basis* claimants, matching is '*required*' in the sense that claimants are not permitted to present statements which contain inconsistent methodologies. This means that if a claimant's records are already matched, it must submit them in that form");[12]

- "the agreement cannot be read to permit ignoring '*sufficiently-matched*' revenue and expenses from *accrual-basis* claimants";[13]

- "At least as to claims presented on an *accrual-basis,* not only did BP not assent to ignoring the need for matching revenues with expenses, it clearly *insisted on it*";[14]

- "We remand because the district court did not acknowledge the *requirement* of matching that is foundational for *accrual-basis* claims and it did not then explain why it was interpreting the same Exhibit 4C language that leads to matching for accrual-based claims as not requiring the matching of cash-basis claims";[15]

- "Part I of the panel opinion identifies the crucial question for remand: should matching be required for ***all*** claims when it is clearly *required* for many?"[16]

Echoing the Court's thinking, BP Counsel expressly acknowledged and agreed during the Administrative Panel Meeting that:

- "The Court requires accrual-based accounting"; and

- "We were instructed by the Fifth Circuit to use accrual-style accounting."[17]

---

[10] BEL OPINION, p.12 (732 F.3d at 334) (emphasis supplied).

[11] BEL OPINION, p.15 (732 F.3d at 335) (some emphasis added).

[12] BEL OPINION, p.16 fn.5 (732 F.3d at 336 n.5) (emphasis supplied).

[13] BEL OPINION, p.18 (732 F.3d at 337) (emphasis supplied).

[14] BEL OPINION, p.20 (732 F.3d at 338) (emphasis supplied).

[15] BEL OPINION, p.24 (732 F.3d at 339) (emphasis supplied).

[16] BEL OPINION, p.38 (732 F.3d at 346) (Southwick, J., concurring) (some emphasis added).

[17] Statements by BP Counsel Wendy Bloom during Administrative Panel Meeting, March 12, 2014.

Indeed, the entire basis of the BEL Opinion was that, because Accrual Claims are generally matched, and because the Parties presumably intended that all Class Members be treated the same, then Cash Claims should also generally be matched in the way that Accrual Claims are.[18]

This same logic was adopted by Judge Barbier upon remand: "it is clear that the parties did discuss and were in agreement that similarly situated claimants must be treated alike."[19]

While Class Counsel respectfully disagree that the original interpretation and application of Exhibit 4C resulted in anything to the contrary,[20] there is no basis to alter the existing matching in Accrual Claims, which the BEL Opinion indicates BP "insisted upon" and repeatedly describes as both "sufficient" and "required".

**Matching Should be Accomplished Through the Re-Allocation of Expenses Only**

The basis of the BEL Panel's decision – upon which Judge Barbier's December 24th Order is also based – is that the term "corresponding variable expenses" within part 2 of the Variable Profit definition:

> could be interpreted to mean that the expenses to be subtracted must be those that 'correspond' to the revenue earned and that the 'same time period' refers to the Benchmark period on the one hand, and to the Compensation period on the other, whichever is being calculated. In other words, sum the monthly revenue over the [Benchmark or Compensation] period and then subtract *corresponding* expenses over the same [Benchmark or Compensation] time period.[21]

Clearly, the line item to be adjusted is Expense – not revenue.

---

[18] *See, e.g.,* BEL OPINION, p.19 (732 F.3d at 337) ("Because cash accounting does not inherently recognize the relationships between cash flows and their underlying transactions, the term 'corresponding variable expenses' reasonably could imply an accrual-style framework inherent in Exhibit 4C"); BEL OPINION, p.21 (732 F.3d at 338) ("The record creates a different perplexity, namely, why would parties who agree as to the propriety of matching for one set of claims reject it for other claims?"); BEL OPINION, p.38 (732 F.3d at 346) (Southwick, J., concurring) ("Part I of the panel opinion identifies the crucial question for remand: should matching be required for ***all*** claims when it is clearly required for many?").

[19] ORDER AND REASONS (Dec. 24, 2013) [Doc 12055] p.3.

[20] The underlying assumption to BP's argument is that two hypothetical businesses suffering identical losses but keeping their books differently would be treated differently under the Settlement Agreement. However, the reality is that similar businesses of a similar size and nature typically keep their books under similar accounting methodologies. Class Counsel are not aware of the hypothetical "two jet ski rental shops just down the beach from each other" that kept their books differently and were therefore treated in materially different ways. Class Counsel believe that most jet ski rental shops of the same size and nature will tend to keep their books in the same or similar ways. Indeed, BP's complaints focus on certain groups of businesses – *e.g.* construction, agriculture, professional services – who *all* keep their books under similar cash-basis methodologies. The Settlement, moreover, treats all Class Members similarly by applying the same common, objective and transparent frameworks to all businesses, based on their Contemporaneous business records. Finally, BP's argument (and, frankly, the Claims Administrator's initial P&L Policy) ignores the fact that the Settlement Program should maximize the Compensation Amount of each and both of the hypothetical Claimants under Section 4.3.8. *See, e.g.,* OPPOSITION TO BP MOTION FOR RECONSIDERATION (Feb. 18, 2013) [Doc 8963-54] p.28; HERMAN DECLARATION (Nov. 12, 2013) [Doc 11833-1] ¶8.

[21] BEL OPINION, p.18 (732 F.3d at 337) (emphasis in original).

Not only does the BEL Panel never expressly discuss the re-allocation of revenue in the context of matching, but the only explicit reference to revenue in the BEL Opinion specifically *rejects* the proposition that uneven "cash flows" should be re-allocated or smoothed:

> BP's primary concern seems to be the *uneven cash flows* of certain types of businesses. We accept this possibility, but we see nothing in the agreement that provides a basis for BP's interpretation. Despite the potential existence of this kind of distortion, the parties may not have considered it, agreed to ignore it, or failed for other reasons to provide clearly for this eventuality. The district court was correct that BP's proposed interpretation is not what the parties agreed.[22]

Nor is the re-allocation of properly recorded revenue supported by accepted Accounting Principles.

Paragraph 83(a) of FASB Concepts Statement No. 5, Recognition and Measurement in Financial Statements of Business Enterprises, states that revenue and gains are realized when products (goods or services), merchandise, or other assets are exchanged for cash or claims to cash. Revenue is realizable when related assets received or held are readily convertible to known amounts of cash or claims to cash. FASB Codification, §605-10-25-1.[23] The Construction, Agriculture, Education and Professional Services Frameworks violate this principle by revising the Contemporaneous Profit & Loss Statements to recognize revenue in periods well before they could be recognized under any known accounting standard.

As noted by the Louisiana and Alabama Societies of Certified Public Accountants, appearing as *amici curiae*:

> BP's decision to embrace monthly-internal financial statements, prepared in the ordinary course of business, was made with the undisputed understanding that in preparing such statements most claimants use either the cash basis, income tax basis, modified accrual, or contractual basis of accounting (and not GAAP). The brief submitted by the academic amici never mentions this uncomfortable fact and completely ignores the terms of the Settlement Agreement. The Professors simply recite pages of GAAP concepts that are not recognized by the Settlement Agreement and are utilized by large multi-national companies, such as BP, in producing financial statements reviewed by regulators.
>
> But in the real world, where the thousands of CPA amici here practice, most companies throughout the Gulf Coast Region keep their monthly accounting records on perfectly acceptable and well-recognized bases other than GAAP (which are referred to in authoritative accounting literature as "other comprehensive bases of accounting") and are widely used alternatives to the numerous and often complex accounting

---

[22] BEL OPINION, p.25 (732 F.3d at 340); *see also* ORDER AND REASONS [Doc 12055] pp.5-6.

[23] The Securities & Exchange Commission follows this concept of revenue recognition. *See* Codification of STAFF ACCOUNTING BULLETINS TOPIC 13: REVENUE RECOGNITION, found at http://www.sec.gov/interps/account/sabcodet13.htm.

requirements prescribed by GAAP. These recognized bases of accounting other than GAAP include:
- ° cash basis (including modified cash basis)
- ° regulatory basis
- ° tax basis
- ° contractual basis
- ° modified accrual basis

The cash basis and tax basis methods are the most prevalent.[24]

Section 446(a) of the Internal Revenue Code, which articulates a general rule for methods of accounting, states that "[t]axable income shall be computed under the method of accounting on the basis of which the taxpayer regularly computes his income in keeping his books." Simply put, revenue recognition is based on the accounting method used by a business.[25]

Nevertheless, and in any event, there is no GAAP, Accrual or other accounting standard which allows – much less requires – a company to recognize or record revenue *before* (or after) it is 'earned' based on 'revenue attribution criteria' or past or future 'business activities'.

As verified by Dr. Mark Kohlbeck:

> Recognition of revenue and expenses under the accrual-basis of accounting (GAAP) is based on the revenue recognition principle and the expense recognition principle. The revenue recognition principle requires the revenue to be both earned and realizable to be recognized (Concepts Statement No, 5, ¶83)
>
> \* \* \*
>
> Moving revenue properly recognized in one period under accrual-basis of accounting (GAAP) to another period (for example, in an effort to smooth earnings) is a form of earnings management and is considered unacceptable for financial reporting purposes by the accounting profession.[26]

CPA Allen Carroll further confirms that:

> GAAP recognition rules and 'matching' most often apply to expense recognition not revenue recognition….

---

[24] BRIEF OF *AMICI CURIAE* CERTIFIED PUBLIC ACCOUNTING SOCIETIES IN SUPPORT OF APPELLEES, No.13-30315 (June 24, 2013), at pp.4-5 [Fifth Cir. Doc. 00512285581, at 11-12]; *citing,* PANZECA DECLARATION (Feb. 18, 2013) [Doc 8963-85], ¶14 [R.15968]; *see also,* SUPPLEMENTAL DECLARATION OF W. ALLEN CARROLL (Oct. 24, 2013) [Doc. 11740-1].

[25] BRIEF OF *AMICI CURIAE,* at p.5 [Fifth Cir. Doc. 00512285581, at 12].

[26] DECLARATION OF DR. MARK KOHLBECK, CPA (Feb. 18, 2013) [Doc 8963-80], ¶¶ 6, 10, (emphasis supplied); *see also,* PANZECA DECLARATION (Feb. 18, 2013) [Doc 8963-85] ¶¶ 23, 27; DECLARATION OF ALLEN CARROLL (Jan. 16, 2013) [Doc 8963-77], p.2; ASHER DECLARATION (Jan. 15, 2013) [Doc 8963-78], ¶¶ 7-8; STUTES DECLARATION (Jan. 17, 2013) [Doc 8963-79], ¶¶ 6-7; SUPPLEMENTAL CARROLL DECLARATION (Feb. 18, 2013) [Doc 8963-87], ¶¶ 10, 13, 14.

> [A] proposal to move revenue to match expenses is backwards and violates the very concept referred to as matching in BP's out of date textbook….
>
> The matching approach that BP advocates is not matching in any sense recognized in the accounting world, but is merely an allocation formula that artificially moves revenue into months before or after it was earned based on variable expenses.[27]

Based on the Settlement Agreement, the BEL Opinion, and accepted Accounting Principles, any required matching should be accomplished by a re-allocation of Variable Expenses alone, and not by any re-allocation of properly recorded revenues.

### All BEL Claims that Are Not "Sufficiently Matched" Should be Matched under the Annual Variable Margin Methodology

The Court's decision on remand was based largely on the finding that "the parties did discuss and were in agreement that similarly situated claimants must be treated alike."[28]

Indeed, the Settlement Agreement itself dictates that that the Compensation Criteria for each of the Claims Categories "will apply equally to all Claimants."[29]

As noted, the Claims Administrator and Program Accountants concede that the proposed new Agricultural and Educational Frameworks depart from the Exhibit 4C analysis,[30] and that the proposed new Professional Services Framework not only departs from the Exhibit 4C analysis,[31] but also departs from any standard or accepted accounting methodology.[32]

---

[27] SUPPLEMENTAL CARROLL DECLARATION (Feb. 18, 2013) [Doc 8963-87], ¶¶ 10, 13, 14.

[28] ORDER AND REASONS (Dec. 24, 2013) [Doc 12055] p.3.

[29] SETTLEMENT AGREEMENT, Section 4.4.7.

[30] The Claims Administrator specifically concedes that "a deviation from the existing methodology set forth in Exhibit 4C was deemed necessary." *See* ATTACHMENT D to Proposed Policy No. 495 (Feb. 12, 2014). During the meeting with the Program Accountants on February 20, 2014, Mr. John Petzold from PwC further acknowledged that the proposed Agriculture / Educational Framework was not based on the Settlement Agreement, but was a new methodology, which, when using only one benchmark year, effectively eliminates the "Step Two" Calculation to which the BEL Claimant is entitled under Exhibit 4C.

[31] The Claims Administrator specifically concedes that "deviation from the existing methodology set forth in Exhibit 4C was deemed necessary." *See* ATTACHMENT E to Proposed Policy No. 495 (Feb. 12, 2014). This was further confirmed by Ted Martens from PwC during the meeting with Program Accountants on February 20, 2014.

[32] During the meeting with the Program Accountants on February 20, 2014, Mr. Ted Martens from PwC acknowledged that the 'straight line averaging' approach to revenue (or expenses) cannot be found in any accepted accounting methodology with respect to (at least) a contingent fee situation, where a fee is not earned unless and until a judgment or settlement is paid. *See also, generally,* CLASS COUNSEL STATEMENT: REVENUE RECOGNITION [Doc 11885-2]; BRIEF OF *AMICI CURIAE* CERTIFIED PUBLIC ACCOUNTING SOCIETIES, No.13-30315 (June 24, 2013); FASB CONCEPTS STATEMENT 5, Recognition and Measurement in Financial Statements of Business Enterprises, paragraph 83(b); Con 6, Page 35, Footnote 56 references Concepts Statement 5 (Par. 83 and Footnote 50); SECURITIES AND EXCHANGE COMMISSION STAFF ACCOUNTING BULLETIN NO. 104 (SAB 104), Pages 10 and 1; KIESO, WEYGANDT & WARFIELD, *Intermediate Accounting* (14th Ed.), at p.60; DECLARATION OF DR. MARK KOHLBECK, CPA (Feb. 18, 2013) [Doc 8963-80], ¶¶ 6, 10; PANZECA DECLARATION (Feb. 18, 2013) [Doc 8963-85] ¶¶ 23, 27; DECLARATION OF ALLEN CARROLL (Jan. 16, 2013) [Doc 8963-77], p.2; ASHER DECLARATION (Jan. 15, 2013) [Doc 8963-78], ¶¶ 7-8; STUTES DECLARATION (Jan. 17, 2013) [Doc 8963-79], ¶¶ 6-7; SUPPLEMENTAL CARROLL DECLARATION (Feb. 18, 2013) [Doc 8963-87], ¶¶ 10, 13-14.

It appears that the development of these new frameworks (as well as the new Construction Framework) was motivated by a desire to achieve some vague, subjective and undefined notion of "economic reality".

Clearly, there is no indication or directive from the BEL Panel that either the Claims Administrator or the Court would tear up the Agreement, start from scratch, and develop a completely new methodology that would attempt to "achieve a realistic measure of economic loss."

The BEL Panel was simply weighing the two proffered interpretations of the term "corresponding" as used in Exhibit 4C, and concluded that, <u>as between the two</u>, BP's proffered interpretation was <u>*more*</u> in line with "economic reality".

Upon remand, the Court agreed that the word "corresponding" within the definition of "Variable Profit" should be interpreted to suggest the type of matching of expenses to revenue that one would typically find in accrual-based accounting profit & loss statements.

*However*, this does not in any way suggest or imply that the entire 4C Compensation Framework should be tossed out the window in favor of some new and unspecified standard of "realistic measure of economic loss" – particularly in cases where such methodologies would violate accepted accounting principles.

Class Counsel respectfully submit that the Claims Administrator does not have the authority to abandon the negotiated terms of the Settlement Agreement, and could ensure sufficient matching for all industry groups using the basic Average Variable Margin Methodology.

This approach is supported by not only the absence of industry-based alternative frameworks within Exhibit 4C for BEL Claims,[33] but is also required by Section 4.4.7, which dictates that that the Compensation Criteria for each of the Claims Categories "will apply equally to all Claimants."

**Where Only One or Several Discreet Transactions 'Trigger' or Cause the Claim to be "Un-Matched" the Program Should Simply Re-Allocate that Revenue and/or Expense, Rather Than Completely Changing the Contemporaneous P&Ls and Re-Calculating the Entire Claim**

The matching required under the BEL Opinion generally – and any Revenue adjustments in particular[34] – should be limited, where possible, to the specific transaction or transactions which 'triggered' or caused the Claim to be "un-matched".

For example, where one 'spike' in recorded revenue or other anomaly causes a Claim to be "un-matched" under the Claims Administrator's criteria for Identification of Unmatched Claims, the Program should simply re-allocate the expense and/or revenue associated with that 'spike' or other anomaly, rather than deconstructing the Contemporaneous P&Ls and Re-Calculating the entire Claim.

---

[33] *See also, e.g.,* MEMO TO CLAIMS ADMINISTRATOR (Oct. 23, 2013) [Doc 11728-1] pp.6-7; CLASS COUNSEL BRIEF ON THE BEL REMAND ISSUE [Doc 11862] p.9.

[34] Class Counsel, of course, disagree with any re-allocation of revenue.

The BEL Opinion itself rejects either an increased burden on the Claimant to produce significant additional documentation and other information or a forensic analysis of each Claim by the Settlement Program:

- The documents identified in Exhibit 4A "presumably would allow accountants *fairly, if at times imperfectly,* to 'match' revenues and expenses if such were required."[35]

- "the difference is between what claimants had to present … and what the Administrator was thereafter to do"[36]

- "the Benchmark and Compensation periods were referring to months of the same name, *without any complex analysis of what type of business activities took place within those months*."[37]

The additional documents, records, information and complex analyses called for under the new Construction, Agricultural, Educational and Professional Services Frameworks are not what was contemplated under Section 4.3.7, Exhibit 4A or Exhibit 4C of the Settlement Agreement – even as interpreted by the BEL Panel.

**The Program Should Not Alter or Revisit the Causation Test under Exhibit 4B**

Even assuming *arguendo* that some 'smoothing' or other re-allocation of revenue should occur for Exhibit 4C purposes,[38] there is absolutely no basis under the Settlement Agreement or the BEL Opinion to thereafter re-visit the issue of Causation under Exhibit 4B.

The entire basis of the BEL Opinion – as well as the District Court's decision on remand – centered on the "Variable Profit" definition and specifically the interpretation of "corresponding variable expenses" in Exhibit 4C.[39]

The Causation Test found in Exhibit 4B is a pure revenue test, which has nothing to do with expenses. The terms "Variable Profit" and "variable expenses" are found nowhere in the Exhibit 4B Framework.

Judge Southwick specifically noted in the original BEL Opinion that: "**No one on appeal is challenging Exhibit 4B.**"[40]

---

[35] BEL OPINION, p.20 (732 F.3d at 337) (emphasis supplied).

[36] BEL OPINION, p.20 (732 F.3d at 337).

[37] BEL OPINION, p.24 (732 F.3d at 340) (emphasis supplied).

[38] Class Counsel, of course, disagree with any re-allocation of revenue.

[39] *See* BEL OPINION, pp.9-10, 16-24 (732 F.3d at 332, 336-339); ORDER AND REASONS (Dec. 24, 2013) [Doc 12055] pp.4-5.

[40] BEL OPINION, p.39 (732 F.3d at 347) (Southwick, J., concurring); *see also,* BEL OPINION, p.37 (732 F.3d at 346) (Southwick, J., concurring) (does not join in Part II of Judge Clement's opinion, because it implies "an invalidity to the Settlement Agreement's *causation framework, **which no one challenges***") (emphasis supplied). *See also* In re Deepwater Horizon, No. 13-30315, 2014 WL 841313 (5th Cir. March 3, 2014) (affirming District Court's interpretation and application of the BEL Causation test under Exhibit 4B).

Moreover, and as reflected by the ADDENDUM TO CAUSATION REQUIREMENTS FOR BUSINESS ECONOMIC LOSS CLAIMS AND COMPENSATION FRAMEWORK FOR BUSINESS ECONOMIC LOSS CLAIMS, the two tests are not only separate and distinct, but the Claimant is expressly permitted to use *different months* for the Causation Test than for the Compensation analysis.

The three Scenarios included as examples within this ADDENDUM further reflect that the Causation Test under Exhibit 4B would be applied first.

It likely goes without saying that, in the ordinary course of human events, B comes before C.

On November 2, 2013, Class Counsel asked BP to provide "any and all support for the proposition stated in Footnote 1 of BP's November 1st Letter that the Compensation Framework in Exhibit 4C would be applied *before* the Causation Test under Exhibit 4B"?[41] To the best of Class Counsel's knowledge and recollection, BP did not respond. Nor are Class Counsel aware of any discussions, written communications or other evidence that the Parties intended or agreed that the Compensation Framework would be applied first.[42]

Under the original BEL Opinion, and particularly the District Court's Order of December 24, 2013 – which has now been affirmed with respect to causation by the BEL Panel on appeal[43] – there is absolutely no basis to alter or re-visit the Exhibit 4B Causation analysis based on adjustments to "corresponding variable *expenses*" under Exhibit 4C.

**Additional Comments, Objections and Suggestions**

Class Counsel respectfully incorporate by reference all previous submissions,[44] as well as the additional comments, objections and suggestions contained within the attached "red-line" to the Claims Administrator's March 13, 2014 Policy No. 495, submitted contemporaneously herewith.

Enclosures
cc: Counsel for BP

---

[41] E-Mail from Herman to BP Counsel George Brown, et al (Nov. 2, 2013).

[42] *See, e.g.,* GODFREY E-MAIL (Feb. 17, 2012) [Doc 8963-58] No.2 ("The Compensation Framework is not the "causation test," which determines eligibility to claim that there was a loss *caused by* the oil spill. Rather, *once the causation test has been satisfied* (or presumed, as in Zone A for example), the Compensation Framework is designed to determine the compensation amount for a post-spill loss") (some emphasis added); HOLSTEIN LETTER TO JUNEAU (re Alternative Causation) (Sept. 28, 2012) [Doc 8963-67] ("If a claimant has submitted the required documentation under the Business Economic Loss (BEL) Documentation Requirements (Ex. 4A), and these documents … establish that the claim satisfies the requirements of the BEL Causation Framework (Ex. 4B), *then* Claimant Compensation should be calculated pursuant to the provisions of the BEL Compensation Framework (Ex. 4C)") (emphasis supplied).

[43] *See* In re Deepwater Horizon, No. 13-30315, 2014 WL 841313 (5th Cir. March 3, 2014).

[44] *See generally* CLASS COUNSEL *IN CAMERA* SUBMISSION (Oct. 9, 2013) [Doc 11728-1]; CLASS COUNSEL *IN CAMERA* SUBMISSION (Oct. 18, 2013) [Doc 11728-4]; MEMO TO CLAIMS ADMINISTRATOR (Oct. 23, 2013) [Doc 11728-1]; CLASS COUNSEL BRIEF ON THE BEL REMAND ISSUE [Doc 11862]; CLASS COUNSEL SUBMISSION OF PROPOSAL FOR MATCHING EXPENSES [Doc 11885]; CLASS COUNSEL STATEMENT: REVENUE RECOGNITION [Doc 11885-2]; CLASS COUNSEL COMMENTS ON BP "MATCHING" PROPOSALS [Doc 11898]; MEMO TO CLAIMS ADMINISTRATOR (Feb. 27, 2014); CLASS COUNSEL COMMENTS, OBJECTIONS AND SUGGESTIONS (Feb. 27, 2014).