**UNITED STATE DISTRICT COURT**
**EASTERN DISTRICT OF LOUISIANA**

| | | |
|---|---|---|
| In Re: Oil Spill by the Oil Rig | : | **MDL NO. 2179** |
| "Deepwater Horizon" in the Gulf | : | |
| of Mexico, on April 20, 2010 | : | **SECTION: J** |
| | : | |
| **This Document Relates to:** | : | **JUDGE BARBIER** |
| | : | |
| *Civ. No.* **10-4536** | : | **MAG. JUDGE SHUSHAN** |

. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .

**<u>CLEAN WATER ACT – PENALTY PHASE</u>**


**<u>UNITED STATES' REPLY TO DEFENDANTS' POST-TRIAL PAPERS</u>**

# Table of Contents

## Reply to BPXP

I.      The CWA Focuses on Prevention, Not Clean Up ............................................................. 1

II.     This Violation is Extremely Serious. ................................................................. 2

III.    Low Economic Benefit Does Not Support a Reduced Penalty ........................................... 5

IV.     The Degree of Culpability Involved Cannot be Erased by BPXP'S Statutorily Required Efforts to Clean up the Spill .................................................................. 6

V.      BPXP's Criminal Fine Should Not be Eliminated by Reduction of the Civil Penalty ....... 6

VI.     Prior Violations by the BP Group Support Maximizing the Penalty ................................. 7

VII.    BPXP'S Penalty Should Not be Significantly Reduced by Mitigation Efforts Largely Required by Law ..................................................................................... 8

VIII.   The Economic Impact of the Penalty Does Not Warrant Any Reduction From the Maximum Penalty .......................................................................... 10

        A.      BPXP Has Not Shown that the Statutory Maximum Penalty Would Have a Long-Term Negative Economic Impact on its Operations ................................... 10

        B.      The Court May Consider the Massive BP Group if Necessary .............................. 16

        C.      BP p.l.c. Will Not Abandon its Substantial Assets, Investments, and its Massive Future Potential Cash Flows from its GOM Leases and Reserves......................... 18

IX.     No "Other Matters" Support a Reduced Penalty ............................................................ 19

X.      Conclusion .................................................................................. 20

## Reply to Anadarko

XI.     Anadarko Ignores Congressional Choices and Rewrites CWA 311(b) ............................ 21

XII.    A Substantial Penalty for Anadarko Does Not Raise Due Process Concerns .................. 22

XIII.   Anadarko's Other Arguments for a Zero or Nominal Penalty are Unpersuasive ............. 25

XIV.    An Analysis of Penalty Factors Points to a Significant Penalty Here .............................. 26

XV.     Conclusion .................................................................................. 30

**Reply to BPXP**

BPXP's brief focuses on what happened to BPXP after the Deepwater Horizon exploded: it wants a reduced penalty because of the costs of response, claims payments, and a criminal fine. Meanwhile, it asks the Court to ignore actual and potential harm to others, to ignore its culpability, and to ignore relevant prior violations. This is a massive company, with massive resources, that caused a massive spill requiring a massive response; somehow, BPXP believes that such circumstances call for reducing the penalty rather than maximizing it.

## I.      The CWA Penalty Provision Focuses on Prevention, Not Clean Up.

Earlier in this case, BPXP adopted the United States' interpretation of the Clean Water Act's (CWA) purpose and the role of civil penalties in achieving that purpose:

> The Department of Justice ("DOJ"), which is charged with enforcing the CWA, has … explained that the "punitive and deterrent value of Section 311(b)(7)(A) civil penalties is central to achieving the policies and purposes of the Clean Water Act: the threat of significant civil penalties creates a strong incentive for industry to take precautions to prevent oil spills."

Rec. Doc. 4826 at 18.[1] But now, in an attempt to shield itself from a high civil penalty, BPXP invents a new "fundamental objective" of the Act: "to incentivize the most effective response possible should environmental harm occur without encouraging behavior that might lead to such harm." BPXP's Penalty Phase Post-Trial Brief ("BPXP Br.") at 1 (Rec. Doc. 14344).

BPXP's attempt to shift the driving factor of the penalty calculation from the violation

---

[1] BP's Memo. In Opp. to Transocean's Motion for Partial Summary Judgment (citing *United States' Citations on the Interpretation & Application of the Penalty Provisions in Section 311(b) of the Clean Water Act*, at 4, *United States v. Citgo Petroleum Corp.*, No. 2:08-cv-893 (W.D. La. Apr. 11, 2011) (Rec. Doc. 4826-2)). The United States' interpretation is uncontroversial and supported by decades of CWA case law: The overarching purpose of the CWA is to eliminate all discharges of pollutants into waters of the United States. *See United States v. Aluminum Co. of America*, 824 F. Supp. 640, 645 (E.D. Tex. 1993); 33 U.S.C. § 1251(a); United States' Proposed Conclusions of Law ("COL") ¶ 16 (Rec. Doc. 14339). Section 311 civil penalties serve to punish, deter, and shift the costs of pollution to the relevant "polluting enterprise." *See Tull v. United States*, 481 U.S. 412, 422 (1987); *United States v. Coastal States Crude Gathering Co.*, 643 F.2d 1125, 1128 (5th Cir. 1981); COL ¶ 16.

itself to efforts to respond to the violation ignores that spill prevention is even more important than spill cleanup.[2] *See United States. v. Atlantic Richfield Co*., 429 F. Supp 830, 836-838 (E.D. Pa. 1977), *aff'd*, 573 F.2d 1303 (3d Cir. 1978) (finding that "the principal goal" of penalties under Section 311(b)(6) and Section 311(b)(7)'s penalty provision is "to deter spills," as "the Congress obviously believed: (a) that no clean-up effort could be complete because, after discharge, it is impossible to guarantee against residual harm from quantities of oil too small or too well dispersed to be detectable; and (b) that even the transitory pollution of waters was deleterious to the environment."). Indeed, this Court has agreed:

> a penalty under CWA Section 311(b)(6), which is similar in many respects to Section 311(b)(7), "is not predicated upon the cost of removal, but upon the happening of the discharge. *The determinative factor . . . is the discharge of oil, not its cleanup* …."

Rec. Doc. 5446 at 20-21 (emphasis added).

Congress and the courts have been explicit: Section 311 penalties are retributive, serve general and specific deterrence, and must be imposed *in addition to and separately from* clean up obligations. *See* United States' Proposed Conclusions of Law ("COL") ¶¶ 16, 18-21, 127, 130-131 (Rec. Doc. 14339). BPXP's arguments for a penalty reduction from near the statutory maximum fail. The United States responds to BPXP's interpretation of each penalty factor below (in the order in which the factors appear in the statute).

## II.    This Violation is Extremely Serious.

BPXP agrees that the spill is extremely serious, United States' Proposed Findings of Fact ("FOF") ¶¶ 6-7 (Rec. Doc. 14338), BPXP Br. at 12, but encourages the Court to shift its focus from potential and actual harms to how "The Spill's Effects Were Significantly Less Serious

---

[2] As discussed further below, other provisions of the Act "incentivize" effective responses, by penalizing responsible parties that fail to comply with required response actions. *See, e.g.,* 33 U.S.C. § 1321(b)(7)(B).

Than Initially Feared." BPXP Br. at i., 12-21. For example, while the United States pointed to 1,100 miles of oiled shoreline as evidence of the spill's serious impact on the environment, United States' Post-Trial Brief ("US Br.") at 1 (Rec. Doc. 14341), BPXP noted that "only 25.1%" of the 4,378 miles of shoreline surveyed by SCAT teams were oiled."[3] BPXP Br. at 18. BPXP attempts to downplay the environmental harm to 1,100 miles of oiled shoreline by focusing on the shoreline that was not oiled. That the entire Gulf of Mexico was not devastated by the Macondo spill fails to mitigate the very serious, actual and potential impact the spill had throughout the Gulf ecosystem.

**_Human Health Harm_**. BPXP unsurprisingly highlights the response's injury _rate_, BPXP Br. at 10, without mentioning the 11 men killed, or the others others severely injured, in the explosion and fire, or the thousands of injuries reported during the response. _See also_ US Br. at 10. It _is_ surprising, however, that BPXP argues that "[t]here is no evidence of significant adverse human health effects," BPXP Br. at 19, when Dr. Cox, BPXP's own human health expert, stated at trial that some response workers' injuries were "significant," US Br. at 3; FOF ¶ 73. [4] Interestingly, BPXP highlights the fact that the US human health expert, Dr. Clapp, made no causal connection between human harm and exposure to toxins or chemicals. BPXP Br. at 20. Dr. Clapp never set out to make such a causal connection. Dr. Cox, however, did testify at trial that there _were_ exposure-related adverse health effects of the spill, essentially making that causal

---

[3] BPXP's argument ignores the fact that SCAT teams were not expecting to find oil on all 4,378 miles they searched. _See_ FOF ¶ 509.

[4] Also surprisingly, BPXP accuses Dr. Clapp of not reviewing sampling and monitoring data, when BPXP knows this is not the case. Dr. Clapp responded to this accusation in his Round 3 Expert Report, noting that he had not specifically cited to such data in his earlier reports, but that he had reviewed it; he also pointed to documents from his Round 1 Expert Report's list of considered materials - that included over 200 documents - which contained such data. TREX-013348.05; TREX-013346.029-.034. Moreover, BPXP's attorney asked Dr. Clapp questions about such data during cross-examination, and his responses demonstrate that he reviewed the data. _See, e.g._, PP Tr. 296:18-296:20, 312:14-312:21, 314:21-315:05, 325:03-325:15.

connection. *See* FOF ¶ 113.

*Economic and Sociocultural harms*. BPXP admits that economic harm occurred "in some places," but downplays that harm because it was "not uniform across the Gulf Coast," and was "short-lived." The United States already rebutted the argument that economic harm was short-lived. *See, e.g.*, US Br. at 14. More importantly, BPXP again ignores the fact that temporary harm is still harm and again attempts to minimize harm by focusing on the comparative "winners," and not the "losers."

BPXP's rush to claim credit for compensating some of the spill's victims for their losses ignores the fact that there were harms in the first place, as if all harms have not only been compensated, but erased altogether with the writing of a check. BPXP does not address the extensive and severe social costs documented by Dr. Austin and her research team that have never been and might never be compensated by BPXP. *Cf. In re the Exxon Valdez*, 296 F. Supp. 2d 1071, 1094 & 1103 (D. Alaska 2004) (discussing social and community impacts of the *Exxon Valdez* spill in determining punitive damages). Economic and social harms caused by the DWH spill were extremely serious and are ongoing in communities throughout the Gulf.

*Environmental harm*s. BPXP systematically understates the spill's environmental harm through false equivalences, inapt geographic comparisons, and as a last resort, taking unsubstantiated swipes at studies demonstrating significant harm.

For example, BPXP relies on Dr. Tunnell to argue that fish, shellfish, and bird populations were not "significantly" harmed, suggesting no serious injury to those populations. BPXP Br. at 15-16. But Dr. Tunnell repeatedly admitted that while population data did not show a "crash" or "collapse," he could not say how large the injuries to those populations could be and yet not be seen in the data he examined. US Br. at 17-18. Saying a harm is not catastrophic does

not mean there was no significant harm. BPXP similarly downplays harm by comparing the huge areas where harm did occur to even greater areas where no one would expect harm, (*e.g.*, comparing the extent of oiled shoreline and marshes to the total shoreline surveyed, BPXP Br. at 18, or comparing water and sediment samples with oil against all samples taken, many of which were taken in places and at times to confirm where the oil was not (BPXP Br. at 14). This cannot mask the fact that over 1,100 miles of shoreline, including 430 miles of incredibly sensitive marshlands, were oiled and that a high percentage of surface water samples within the huge slick area showed oil at potentially harmful levels. FOF ¶¶ 516, 536; US Br. at 16-17.

Where important, peer-reviewed studies contradict BPXP's assertion of limited harm, BPXP challenges them on spurious bases. For example, BPXP's toxicity expert claims that the Incardona study showing cardiac edema from low-level PAH exposure is fatally flawed in its methods. BPXP Br. at 14-15. But that study's results are in line with numerous studies conducted over the past two decades showing harmful effects from low PAH levels. And Incardona's methodology passed peer review and generated solutions that matched PAH composition and concentrations of field samples from the Gulf. *See* FOF ¶ 496. Further, BPXP's Dr. Shea ignores EPA's recommendation to supplement dated toxicity benchmarks with additional data where available; he also disregards guidance on the benchmarks' limitations (*i.e.*, they are under-protective for phototoxic effects). US Br. at 18-19. BPXP levels similar unsubstantiated criticisms at relevant research on mahi mahi and dolphins. FOF ¶¶ 414-420, 484-485.

## III.    Low Economic Benefit Does Not Support a Reduced Penalty.

BPXP's interpretation of the economic benefit factor forgets that CWA penalties are meant to deter. That BPXP did not realize a large economic benefit from the cost-saving corners it cut, *see* BPXP Br. at 21, does not support a low penalty. In the course of saving what BPXP

describes as a minimal amount of money, it caused an 87-day oil spill, killed 11 people, and injured or otherwise harmed many more: BPXP should not be rewarded for that. Moreover, adoption of BPXP's approach to economic benefit could encourage others to take similar risks to achieve "relatively minimal" cost savings. That courts have sometimes looked to economic benefit—when it is high—as a way of ensuring that a penalty is high enough to deter future spills, does not mean that where economic benefit is low, a low penalty will sufficiently deter future violations. *Contra* BPXP Brief at 22. While penalties must always be higher than economic benefit to ensure violations are never profitable, the fact that BPXP risked so much for so little means more deterrence is required, not less.

## IV.    The Degree of Culpability Involved Cannot be Erased by BPXP's Statutorily Required Efforts to Clean Up the Spill.

The Court has found that BPXP and BPAPC acted with gross negligence and willful misconduct in causing the spill. Rec. Doc. 13381-1 at 129, 134, ¶¶ 515, 518, 535. That other parties also acted with some negligence has no bearing on the penalty to be paid by BPXP; CWA penalties are tailored to *each violator* through application of the penalty factors. 33 U.S.C. § 1321(b)(8). *See also Tull*, 481 U.S. at 422.

BPXP cites to administrative cases to argue that "the good faith and diligence of the violator in redressing the violations and fixing the problems" can be considered. But the driver of the penalty is the discharge, not the efforts to "fix the problem" after the discharge. *Montauk Oil Transp. Corp. v. Tug El Zorro Grande*, 54 F.3d 111, 114 (2d Cir. 1995). Moreover, BPXP's lack of post-spill candor, especially with respect to statements about flow rate, and its "arguable negligence" in source control do not demonstrate "good faith and diligence." FOF ¶¶ 634-637.

## V.    BPXP's Criminal Fine Should Not be Eliminated by Reduction of the Civil Penalty.

BPXP asks the Court to negate its criminal fine, claiming without citation that the "any

other penalty for the same incident" factor is included in the statute "to avoid an increase in total penalty by virtue of the Government electing to prosecute the same violation criminally and civilly." BPXP Br. at 22-23. But the statute, relevant case law, and the criminal plea itself contradict BPXP's claim. US Br. at 51; COL ¶¶ 94-100. The CWA clearly permits imposition of parallel civil and criminal penalties, COL ¶ 96, and here, Judge Vance specifically prohibited BP from seeking "any reduction in civil liability based on the payments made pursuant to" the Plea Agreement. COL ¶ 98. Yet BPXP continues to seek such reductions based on payments made pursuant to the Plea Agreement. *See* BPXP's Proposed Findings of Fact and Conclusions of Law ("BPXP FFCL") ¶¶ 955-958 (Rec. Doc. 14345).

## VI.   Prior Violations by the BP Group Support Maximizing the Penalty.

BPXP's arguments regarding the irrelevance of the four prior violations are without merit. BPXP Br. at 36-38. First, their exclusion from Phase One trial does not mean that they are irrelevant to the Penalty Phase, where the Court must set a penalty high enough to deter future violations and the statute specifically instructs the court to consider "any history of any prior violations" in doing so. 33 U.S.C. § 1321(b)(8). This is especially true where, as here, the BP Group's serious and deadly violations are followed by promises of "never again," (*see* TREX-000098), which are in turn followed by more serious and deadly violations.

Second, these four prior violations comprise a pattern and practice of behavior that has not yet been, but must be, stopped. That BPXP was not the violator in these prior cases is irrelevant, given that safety and operational decisions are made by and for the BP Group, not by individual legal entities like BPXP. *See* US Br. at 54-58; FOF ¶¶ 750-764. The BP Group's failure to implement and enforce safety reforms in the past is highly relevant to BPXP's penalty here.

7

The pattern is clear: BP entities apologize for their violations (sometimes while blaming contractors BP failed to supervise), sign pleas with promises to do better, and then forget about the pleas and promises. The pattern is already continuing here, where BPXP ignores that its criminal plea for the Macondo disaster prohibits it from asking this Court to reduce its civil penalty based on the non-fine portion of the payments.[5] BPXP FFCL ¶¶ 693, 737.

## VII. BPXP'S Penalty Should Not be Significantly Reduced by Mitigation Efforts Largely Required by Law.

Although the discharge, not the cleanup, is the "determinative factor" in setting a civil penalty, *Montauk*, 54 F.3d at 114, *see also* Rec. Doc. 5446 at 20-21, the Act does instruct courts to consider "the nature, extent, and degree of success of any efforts of the violator to minimize or mitigate the effects of the violation." Given that cooperative participation is required and penalties exist for failing to comply with those requirements, if credit is to be given for mitigation, it should be only for exceptional, successful actions beyond what is legally required.

Response actions should not be judged in relation to the pure number of responders and resources provided, but whether the resources provided were exceptional *in terms of the requirements of the spill.* The United States has already acknowledged that in some cases, BPXP did go beyond the bare minimum. COL at 46. And while the record is clear and the US does not dispute that BPXP complied with its overall response requirements, BPXP continues to overstate its efforts and their degree of success. BPXP Br. at 3-12. For example, BPXP's efforts were not always as rapid or as forthcoming as requested (e.g., establishing initial operations, providing skimming equipment), nor as effective (e.g., health and safety, public communications, oil

---

[5] The Guilty Plea Agreement specifically provides that the defendant (BPXP), "agrees that payments made pursuant to paragraph 4(c)(viii) above shall have no effect on, and shall not be argued by the defendant, BP p.l.c. or any other BP p.l.c. entity, to reduce in any way, any civil claims by any party arising out of the *Deepwater Horizon* blowout, explosion, oil spill and response." TREX-011422.007.

recovery rates) as BPXP would have the Court believe. *See* FOF ¶¶ 652, 656-659. Also, *in situ* burning and the use of dispersants *do not remove oil from the environment*, as BPXP suggests, and therefore cannot be compared on an apples-to-apples basis, with actual removal. Indeed, *in situ* burning releases hazardous substances into the air, and dispersion of oil may break it up into small droplets, but dispersed oil remains *in the environment*, and actually renders oil constituents *more* bioavailable to organisms in the water. US Br. at 23; FOF at ¶ 369, 667, 668. Furthermore, even accepting BPXP's argument, nearly two-thirds of the oil remained in the water.

That the BP Group mounted the biggest spill response in US history is not exceptional, given that this was, by far, the largest oil spill in US history. As one of the USCG's most experienced spill experts stated: the response was "adequate ...." Laferriere Dep. 265:19-266:07. A merely adequate response arguably merits no credit—one should not be rewarded for doing what is legally required—and certainly does not merit the significant reductions BPXP seeks. Indeed, BPXP's efforts to minimize the impacts of the discharge failed for 87 days, and this Court has found BPXP's efforts in this regard to be "arguably … negligent." Rec. Doc. 14021 at ¶ 246; US Br. at 49.

With respect to economic mitigation, BPXP touts the VOO program, tourism grants, and claims payments, but ignores that those efforts caused harm in addition to mitigating harm. Although some Gulf Coast residents and businesses were able to take advantage of such efforts, others were not. US Br. at 15; FOF ¶¶ 227-231. BPXP also seeks credit for money that has not actually been spent, noting that $2.3 billion was "designated" for Seafood Compensation Program payments, but failing to note that as of 2015, only half of that amount had actually been paid. BPXP Br. at 11; FOF ¶ 293.

Any argument that a high penalty in this case will deter parties from mounting vigorous

responses to future spills, *see* BPXP Br. at 3, is misplaced. BPXP was required to respond to the spill. Indeed, the CWA provides several enforcement mechanisms that impose substantial liability on responsible parties that do not mount an appropriate response.[6] Given these other liabilities and penalty exposures, a responsible party would have to be imprudent, or worse, to sit back and refuse to respond to a spill, simply because they fear their response activities will not result in a significant penalty reduction.

Finally, BPXP continues to seek credit for response actions performed by other BP Group entities, a position that cannot square with its argument that the finances of the BP Group are not relevant to the inquiry regarding the economic impact of the penalty on BPXP. For instance, BPXP argues that 85% of responders were working "on behalf of BPXP," BPXP Br. at 5, and that BPXP spent "$14.1 billion on spill response and cleanup." BPXP Br. at 10-11. But much of the funding for the response came from BP p.l.c. and other BP entities, and significant spill costs were incurred under contracts entered into by other BP Group entities, not BPXP. FOF ¶ 816.[7]

## VIII.   The Economic Impact of the Penalty Does Not Warrant Any Reduction From the Maximum Penalty.

BPXP has failed to establish any inability to pay—or inability to finance—the maximum penalty under the CWA, nor has BPXP established that the maximum penalty would jeopardize its continued operation or have a ruinous effect on its business.

### A.   BPXP Has Not Shown that the Statutory Maximum Penalty Would Have a Long-Term Negative Economic Impact on its Operations.

---

[6] In particular, under Section 311(b)(7)(B) of the Act, if a responsible party fails, without sufficient cause, to carry out removal actions or follow an order from the Federal On-Scene Coordinator, the responsible party may be liable for civil penalties of up to $37,500 per day of violation or an amount up to *three times* the amount expended by the Oil Spill Liability Trust Fund as a consequence of the failure to follow the order. 33 U.S.C. § 1321(b)(7)(B); 40 C.F.R. § 19.4; COL ¶ 124.

[7] BPXP claims that Captain VanHaverbeke "admit[ed] that [the] response would not have been successful without *BPXP*." BPXP Br. at 6 (emphasis added). But the testimony BPXP cites in support of this claim, PP Tr. 655-656, is about *BP*, not BPXP.

**BPXP's Current Financial Condition**. As BPXP emphasized at trial, it is one of the largest, if not *the* largest holder of offshore leases and oil and gas reserves in the GOM. FOF ¶¶ 845-851, 902-927; BPXP FFCL ¶¶ 914-919; PP Tr. 1569:13-1572:04.[8] BPXP's brief raises many points about its finances, but none takes away from this strong financial position.

First, BPXP's own cash flow projections are suspect for a number of reasons. For example, the actual production for 2014 was greater than BP's projections, and capital expenses may also be lower than projected. *See* PP Tr. 1057:12-1057:23, 1177:20-1178:04; FOF ¶¶ 865, 972. BPXP also implies that its $3.1 billion intercompany loan will not be renegotiated and will have to be repaid in 2016, but that would be contrary to its past practices of refinancing loans. *See*, PP Tr. 1178:15-1178:17. BPXP also incorrectly argues that a CWA penalty in excess of $2.3 billion will exhaust all of BPXP's 2015 cash resources, based on Mr. Den Uyl's cash flow adjustments to the BP Group Plan Template and BPXP's current internal credit line. BPXP Br. at 27-28; *see also* TREX-013153.012-.015.[9] However, BPXP historically has not been limited to its $5 billion internal funding account (IFA). *See* TREX-013123R.047, Table 19; FOF ¶ 988; BPXP Br. at 29.[10] This contention also does not take into account significant projected BPXP cash flows in 2016 and thereafter. *See* TREX-013123R.039, Table 17; TREX-013153.013, Table 5;

---

[8] BPXP has increased its fixed assets by over $5 billion, or roughly 38%, from 2009-1Q 2014. TREX-013123R.036.

[9] Projected cash flows in the Group Plan Template used by Mr. Den Uyl as a basis for this contention understate the actual production for 2014. PP Tr. 1057:10-1057:23; D-32339. Mr. Den Uyl's conclusion also assumes no reduction in CAPEX and fails to account for cost reductions due to lower oil prices. PP Tr. 1057:24-1058:04, 1066:20-1066:25.

[10] Historically, BPXP has had no problem obtaining any necessary cash resources from the BP Group, including the: Spill Trust fund ($20 billion), equity injection ($14 billion), internal credit line ($5 billion), funds in excess of its internal credit line ($6 billion), a loan ($3.1 billion), and intercompany borrowings ($9 billion). FOF ¶¶ 816-819, 829.

FOF ¶ 992. BPXP's expected cash flows from operations are approximately $21.7 billion over the next 10 years. PP Tr. 1062:20-1063:19. Those expected cash flows could certainly finance the maximum penalty payment, or fund penalty payments over time.

Second, contrary to assertions in its brief, BPXP's spending since the disaster has not "exhausted its own resources." BPXP contends that it has incurred a total of $35.7 billion in pre-tax liabilities in response to the Macondo disaster. BPXP Br. at 26-27. However, BPXP does not dispute that it recorded $11.7 billion in tax benefits through 2Q14. TREX-013123R, Schedule 2; *see also* BPXP FFCL ¶¶ 695-696; BPXP Br. at 26 n.7.[11] Nor does BPXP dispute that the BP Group provided most of the funds for the expenses paid and charged to BPXP. FOF ¶¶ 816-819, 821-822, 824-825, 828; TREX-013161.002.

Third, BPXP contends that it has significant contingent liabilities. BPXP Br. at 27. However, many of the contingent values ultimately may be $0, or the determination and payment may be so far into the future that the net present value (NPV) may be small. And, at least with certain of the contingent claims brought by private parties or state or local governments, other liable BP entities such as BPAPC may be defendants, so the entire onus need not fall on BPXP.

Finally, despite its contentions to the contrary, BPXP could fund a penalty by selling any of the assets for which a NPV was not calculated in the Wood Mackenzie analysis, (approximately 90% of the GOM leases). In fact, BPXP did exactly that when it sold a portion of its Gila Field asset, which was not assigned a NPV by Wood Mackenzie, during the trial. PP Tr. 2098:09-2098:23; TREX-233896.[12] BPXP also could reasonably fund a civil penalty through an

---

[11] BPXP also has spent $10.5 billion in capital expenditures between 2010 and 2013, and the BP Group plans to spend over $15 billion in the GOM between 2014 and 2018. TREX-011968; D-32339; PP Tr. 1057:10-1059:03.
[12] For example, The Wood Mackenzie analysis does not include or value BPXP's Guadalupe Field asset. FOF ¶ 960.

internal equity injection (similar to the past), or raise equity through a stock sale, without a long term impact on BPXP's operations. TREX-013123R.005; TREX-013123E.002.

**BPXP Failed to Offer Even a Plausible Estimate of its Value, Much less a Reliable One.** BPXP makes much of a purported "valuation" prepared by its expert (Mr. Den Uyl). During discovery, however, BPXP refused to produce its own internal projections. Having withheld that information, BPXP then complains that Mr. Ratner did not perform a valuation. Of course BPXP did not provide Mr. Den Uyl with internal information after denying it to the U.S., so instead BPXP provided Mr. Den Uyl with only a portion of a Wood Mackenzie analysis that analyzed the NPV of cash flows for 10% of BPXP's assets. FOF ¶¶ 957-960.

Mr. Den Uyl's opinions on BPXP's value are unreliable because, *inter alia*, he did not perform a business valuation. FOF ¶¶ 938-939; PP Tr. 1075:07-1076:23. Nor did he talk to Wood Mackenzie or do any due diligence on the partial Wood Mackenzie data provided by BPXP. *See* TREX-230560, BP Tab; FOF ¶¶ 954, 947. BPXP deprived Mr. Den Uyl and the United States of about one-half of the Wood Mackenzie analysis and much of the backup materials that would be necessary to reconcile the numbers used in the analysis. FOF ¶¶ 944, 945, 948; PP Tr. 1075:21-1076:09. As Mr. Ratner testified, the Wood Mackenzie analysis is really a net present value (NPV) calculation. PP Tr. 1051:11-1051:19, 1071:22-1072:02, 1074:12-1074:14, 1075:21-1076:09, 1077:24-1078:07; FOF ¶ 938. The NPV does not translate into an equity valuation. PP Tr. 1071:22-1072:23.

Although an actual valuation would be "relevant"[13] to the question of future funding or financing, as noted above, BPXP did not provide Mr. Den Uyl or the United States the information necessary to perform a proper business valuation. FOF ¶ 939; PP Tr. 1050:11-

---

[13] BPXP misstates Mr. Ratner's trial testimony where he confirmed that valuation was "relevant." He did not state that it was "fundamental" as alleged by BPXP. BPXP Br. at 30; PP Tr. 1181:13-1182:23.

1051:05, 1181:13-1182:23. The trial record includes some indicators of BPXP's value: (1) On January 1, 2014, BPXP's carrying (book) value was $17 billion when BPXP's ownership was transferred from BPAPC to BPCNA, FOF ¶ 839; and (2) as of March 2014, BPXP reported $18 billion of fixed assets and $25 billion of total assets, *not including* future cash flows. FOF ¶ 915.

Mr. Den Uyl also alleges that Wood Mackenzie did not have accurate information about BPXP's operating expenses and makes a $7.8 billion adjustment to the Wood Mackenzie NPV. BPXP FFCL ¶ 776b; FOF ¶ 962; Den Uyl Dep. at 243:05-243:12, 243:14-243:17. But Mr. Den Uyl testified that he did not know where Wood Mackenzie obtained its information or even if the information Wood Mackenzie had was confirmed by BP. FOF ¶ 948.

BPXP alleges that Mr. Ratner erroneously used capital expenses instead of operating expenses in his analysis. That is wrong: BPXP's own papers, BPXP FFCL ¶ 785, show that the capital expenses are not the same as the operating expenses that Mr. Ratner used. PP Tr. 1207:11-1213:06; *compare* BPXP FFCL ¶ 783 (Ratner's schedule 4 (TREX-233888.007)) *with* BPXP FFCL ¶ 785; *see also* FOF ¶¶ 962-971, Table 9, Table 10. Mr. Den Uyl's $7.8 billion adjustment to the Wood Mackenzie analysis is inaccurate and unnecessary. *See* FOF ¶¶ 962-973.

***Standard Measure of Oil and Gas (SMOG).*** Although the SMOG does not represent fair market value, it provides information about reserve volumes and is one indicator of BPXP's value. PP Tr. 1139:05-1139:24, 1141:19-1142:08. SMOG is required for public financial reporting purposes to provide comparable information about volume, and it identifies only proved reserves. FOF ¶¶ 870-871, 873; BPXP FFCL ¶ 801. BP's 2013 SMOG shows that BP has 17.996 billion barrels of oil equivalent (bboe) proved reserves. FOF ¶ 876. The 2013 BP GOM SMOG shows 1,199 million barrels of oil equivalent (mmboe) proved reserves. TREX-244133. BP's unproved reserves are 3 times the volume of proved reserves. FOF ¶ 875.

**Oil Prices.** Price volatility is inherent in the oil and gas industry. FOF ¶ 975. BP p.l.c. has built up a $27 billion ($30 billion in 3Q14, FOF ¶ 858) cash buffer against the volatility in cash flow resulting from oil price fluctuations. FOF ¶¶ 867-868. The Wood Mackenzie oil price sensitivity relied upon by Mr. Den Uyl was a mathematical exercise, not a projection of what oil prices will be in the future. PP Tr. 1190:02-1190:05. In fact, Mr. Den Uyl assumes that current low oil prices will remain so forever. FOF ¶ 981. Meanwhile, BP advised its investors that the current low oil price environment is good for BP and will benefit its downstream business, FOF ¶¶ 976-979, and that historically it takes about two years for oil prices to recover. PP Tr. 1067:01-1067:22; D-32342. OPEC production cuts are not necessary for oil prices to recover, as evidenced during 1985-1986. TREX-233856.009.[14]

**BPXP's Alleged Potential for Insolvency.** BPXP argues that a penalty would threaten its solvency.[15] BPXP Br. at 23, 27, 34. But BPXP was insolvent in 2011 to 2012, and there is no evidence that the insolvency changed or jeopardized BPXP's operations in any way.[16] FOF ¶ 833-835. Mr. Den Uyl offers no opinion as to what will happen to BPXP if the Court imposes a

---

[14] In addition, BP has disclosed to investors that projects are sanctioned at $80/barrel and tested at $60/barrel, so oil prices do not necessarily have to return to 2014 levels to be profitable. TREX-233856.010. Projects sanctioned previously in a lower oil price environment likely were based on prices less than $80/barrel. *See* TREX-233856.008 (2006-2014 oil prices).

[15] Given BPXP's substantial operating assets in the GOM, if BPXP refuses to pay the judgement based on purported insolvency, the United States can seek enforcement under Fed. R. Civ. P. 69, the Federal Debt Collection Procedures Act, 28 U.S.C. § 3001 *et seq.*, and the Federal Priority Statute, 31 U.S.C. § 3713.

[16]*See* TREX-012673.002, (At 2Q11, BPXP had negative net assets greater than $15 billion), and TREX-012437 (As of year-end 2011, BPXP's liabilities exceeded its assets by approximately $12 billion). In fact, BP's capital injections to BPXP benefited other BP entities. *See* TREX-012437 (". . . will enable BPXP to settle its outstanding intercompany obligations. . . . The elimination of BPXP's intercompany debt . . . should alleviate any attempt by a State taxing authority to impute interest income on such debt [on entity that BPXP owes money to]."); *see also* TREX-012439 ("The proposed [$3.1 billion] loan will . . . [r]eplace the significant known intercompany balance with Co200 [(BP Company North America)]. . . BPXP currently does not pay interest on the payable with Co200."). In addition, 30% of BPXP's operating expenses (part of the cause of such insolvency) were for insurance payments to other BP entities. PP Tr. 2102:10-2103:07.

penalty. FOF ¶¶ 929, 987, 989-992, 994. BPXP offered no financial expert testimony regarding BPXP's solvency. *See* TREX-013153; TREX-013160; TREX-013161; TREX-247596. Indeed, BPXP has no say over its solvency—or any other strategic or financial concern. As BPXP's witnesses confirmed time again, BPXP owns assets but does not manage them; management of those assets falls to others in the BP Group. FOF ¶ 761. The BP Group makes all investment decisions for the good of the BP Group regardless of the effect on any particular corporation in the BP Group. When making investment decisions, the question that is examined is whether this is "a good investment of Group resources," regardless of which legal entities' books will be charged. FOF ¶ 760; TREX-012435.1.1.US.

### B.       The Court May Consider the Massive BP Group if Necessary.

The United States has not asked this Court to impose a penalty on any entity other than BPXP. *See* COL ¶¶ 148-149; BPXP Br. at 23. Rather, the United States asks this Court to consider, if necessary and as numerous other courts have, the assets of a defendant's parent company in applying the economic impact of the penalty on the violator factor under the CWA. *See, e.g.*, *United States v. Mun. Auth. of Union Twp.*, 929 F. Supp. 800 (M.D. Pa. 1996), *aff'd* 150 F.3d 259, 268-269 (3d Cir. 1998) *(Dean Dairy)*; COL ¶ 146; US Br. at 25-26, 28-30. As the Third Circuit explained in *Dean Dairy*, "[t]he consideration of a parent's financial condition in assessing a penalty on a subsidiary is a far cry from piercing the corporate veil and holding the parent liable for the actions of its subsidiary." *Dean Dairy*, 150 F.3d at 268-269.

BPXP concedes that BP p.l.c. and the BP Group control the operations and financing of BPXP. *See* FOF ¶¶ 748-844. However, BPXP argues that "intercompany financial flows and parental control exist with every wholly owned subsidiary and parent; BPXP is no exception." BPXP Br. at 24. BPXP misses the point. The issue for purposes of determining whether a

parent's assets should be considered when imposing a penalty against a defendant subsidiary under the CWA is not whether the relationship between the parent and subsidiary is proper, appropriate or common in the industry. Rather, as the Third Circuit reasoned in *Dean Dairy*, the issue is whether the parent was closely involved with the polluting activities and siphoned profits from that subsidiary. *Dean Dairy*, 150 F.3d at 268-269.[17]

BPXP relies heavily on the language in the *Dean Dairy* district court opinion which states that "[t]he magnitude of fine which the court believes to be warranted in this case can be easily absorbed by Dean Foods without threatening its solvency." *Dean Dairy*, 929 F. Supp. at 806. However, Dean Foods actually was the ***parent***, not the violator, in the *Dean Dairy* case. *Dean Dairy*, 150 F.3d at 268. As in the *Dean Dairy* case, the magnitude of the penalty proposed by the United States can be easily absorbed by the BP Group without threatening its solvency.

BPXP also erroneously claims that "the facts underpinning the *Dean Dairy* court's consideration of parent participation in the defendant/subsidiary's actionable conduct do not apply here." BPXP Br. at 25-26. BPXP implies that the BP Group had no control over whether and when the blowout occurred. However, BPXP has no employees, (FOF ¶ 798), and no one in the Drilling and Completions organization for the Gulf of Mexico Strategic Performance Unit (SPU) was an employee or officer of BPXP. FOF ¶ 762. It is undisputed that the BP Group played an active role in BPXP operations; that it conducted and managed operations in the Gulf of Mexico, including at the Macondo well, and including the response to the disaster; and that it continues to enjoy the benefits of BPXP's conduct in the Gulf.[18] FOF ¶ 750. The Defendant

---

[17] Accordingly, the United States' experts, Dr. Quivik and Mr. Ratner, focused on the BP Group's undisputed management of BP's operations and finances in the Gulf of Mexico at the Macondo well and in response to the disaster. FOF ¶¶ 748-844. Dr. Quivik offered no opinion as to whether these relationships were proper or improper, appropriate or inappropriate, or normal or abnormal. FOF ¶ 811.

[18] It is undisputed that on December 22, 2009, BPXP declared a dividend of $12 billion to BP America Production Company, its common stockholder and direct parent; and that from December 18, 2006

offered no evidence at trial to support its claim that consideration of a parent's assets under appropriate circumstances "would only discourage corporate parents from voluntarily providing beneficial assistance to subsidiaries in similar future circumstances." BPXP Br. at 26; *see also* FOF ¶¶ 995-997.

### C. BP p.l.c. Will Not Abandon its Substantial Assets, Investments, and its Massive Future Potential Cash Flows from its GOM Leases and Reserves.

It is unlikely that the BP Group, as a rational investor, will walk away from its substantial interests and extremely lucrative investments in the GOM (*i.e.*, BPXP), which is one of the four Key Areas in the BP Group's upstream business. FOF ¶ 905. The GOM accounts for approximately 22% of BP's global oil production, and 89% of the BP Group's GOM activities are operated by BPXP which is the majority owner of the BP Group's GOM leases. FOF ¶¶ 902, 904. BPXP's operations are an integrated component of the global BP enterprise, not a separate stand-alone business possessing its own employees and its own internal services, including technical, engineering, commercial, marketing, environmental, legal, tax, banking, treasury, investment, and financial, accounting, and administrative functions. FOF ¶¶ 765, 798.

From 2010 to 2014, other BP entities made substantial equity and debt investments in BPXP. BPXP FFCL ¶¶ 829, 835. With those investments as a matter of record, BPXP's expert, Mr. Daines, testified that he would expect that BP p.l.c. would act as a rational investor with respect to any requests for funding from BPXP and that shareholders generally provide equity where the expected returns to the shareholder at the time the investment is being considered outweigh the expected costs. PP Tr. 1204:21-1204:24; TREX-013214.023. Considering the

---

through March 24, 2010, BPXP declared dividends of $4.4 billion to BP Products North America Inc., its preferred stockholder, which also owned the Texas City refinery. FOF ¶¶ 794, 795, 918, 919.

actual investments made, it is reasonable to conclude that BP rationally expects returns greater than the costs invested in BPXP. *See* BPXP FFCL ¶ 711.[19]

Further, the BP Group was largely responsible for $38 billion in global assets disposals to fund Macondo liabilities, and BP p.l.c. publicly stated that it was sufficiently resilient to deal with the outcomes of these proceedings and had built up a cash buffer to accommodate any foreseeable requirements. FOF ¶¶ 824-828, 867. In short, the BP Group promised to pay all claims resulting from Macondo, but now seems to be saying the opposite.

## IX.    No "Other Matters" Support a Reduced Penalty.

None of the "other matters" BPXP asks this Court to consider meet the high bar for mitigating penalties based on this factor: prevention of manifest injustice. US Br. at 32-33; COL ¶¶ 159-161. Specific reasons why all of the "other matters" mentioned in BPXP's brief should not reduce the penalty are addressed in the United States' post-trial brief. US Br. at 33-37.

BPXP claims that it provides capital spending on infrastructure, salaries and wages for 2,300 highly compensated "employees," BPXP Br. at 38, but BPXP has no employees. FOF ¶ 798. Moreover, the BP Group's contributions to the regional economy are by no means unique; another oil and gas company would make those same contributions if the BP Group no longer operated in the Gulf of Mexico, consistent with Chevron's recent acquisition of a portion of BPXP's interests in deepwater fields Gila and Tiber. US Br. at 35; FOF at ¶ 1088.

BPXP also seeks "credit" for payments made to fund GOMRI and early restoration

---

[19] BPXP admits that its existing internal $5 billion credit line with NAFCO has been exceeded by up to $6 billion. FOF ¶ 988; BPXP FFCL ¶ 708. BPXP also was extended up to $9 billion interest free from BPCNA. Payments are made by BPCNA on behalf of BPXP. These payments generate payables from BPXP to BPCNA and are subsequently satisfied by borrowings from NAFCO. Even if BPXP is not allowed to borrow more than $5 billion from NAFCO, that limitation does not impact the potential penalty payment because BPCNA would likely pay it. The payable may remain outstanding for period of time, but that is not uncommon. FOF ¶¶ 833-834, 836; TREX-013123R.047, Table 19.

projects, and for "technological achievements." But BPXP's Plea Agreement precludes any BP entity from arguing that any payments made pursuant to the terms of its probation should "reduce in any way, any civil penalty claims," and the continued funding of GOMRI is one of those probation terms. FOF ¶ 627. Some of BPXP's efforts to improve oil spill response technology were also required by the Plea Agreement. US Br. at 36. *See* FOF ¶ 1065. Moreover, any funds spent on early restoration earn BPXP credit toward future Natural Resource Damages claims, and have no bearing on this proceeding. FOF ¶ 728, *In re Deepwater Horizon*, 844 F. Supp. 2d 746, 755-56 (E.D. La. 2012). Finally, BPXP overstates its role in technological achievements and their applicability to future spills. BPXP Br. at 39-40, US Br. at 36-37.

## X.      Conclusion.

The purpose of the Clean Water Act, the role of civil penalties in achieving that purpose, and the statutory penalty factors as informed by the facts here call for penalizing BPXP near the statutory maximum, not quite $13.7 billion, but certainly over $12 billion.

**Reply to Anadarko**

The law and evidence here warrant penalizing Anadarko well in excess of one billion dollars. If anything is unprecedented in this CWA case, it is the size and duration of the oil spill from Defendants' Well and the harm inflicted on the Gulf, not Anadarko's liability. Congress, aware of the potential for a disastrous blowout offshore, crafted a robust statute to prevent both catastrophes and smaller oil spills: it provided a per-barrel formula for maximum penalties; continued to include both operators and owners in its strict liability scheme; provided enhanced penalties for grossly negligent parties but lower per-barrel amounts for those who were not; and prescribed eight distinct penalty factors for each liable party.

Anadarko has been held liable under CWA Section 311(b). It admits that it is experienced in deepwater operations, that it was the 25% owner of the Macondo Well, that the blow-out was extremely serious, and that it has the financial ability to pay more than the maximum penalty. It nonetheless claims to be entitled to a nominal (or even *zero*) penalty. Despite its liability for a massive 311(b) violation, Anadarko seeks double or triple credit for the ruling that it was not negligent, and protests that "it did nothing wrong" and was "innocent." In order to escape any consequences for its violation, however, Anadarko must rewrite 311(b) and its penalty factors to include economic policies not intended by Congress. The Court should not permit that result. Anadarko should be held appropriately accountable for its unprecedented disaster.

**XI.    Anadarko Ignores Congressional Choices and Rewrites CWA 311(b).**

Section 311's declaration "there should be no discharges of oil or hazardous substances into or upon the navigable waters of the United States," 33 U.S.C. § 1321(b)(1), is "an urgent and sharply defined national policy." *True v. United States*, 894 F.2d 1197, 1206 (10th Cir. 1990). To effectuate this policy, focused foremost on the prevention of oil spills, Congress

prescribed a detailed system that mandates penalties in the absence of fault, and requires consideration of eight penalty factors. 33 U.S.C. § 1321(b)(7)(A), (b)(8). Through its expert Dr. Sunding, Anadarko attempts to elevate the economic benefit and culpability factors above the rest, dismisses the seriousness and economic impact factors as wholly irrelevant, and injects a new penalty factor into the mix: payment of OPA damages. But when Congress enacted OPA, it strengthened 311(b)'s penalty provisions and made clear that damages and civil penalties are distinct concepts, and that payment of damages does not offset civil penalties. *See* COL ¶¶ 18-21; 27-31. Citing Dr. Sunding's theories, Anadarko also argues for a zero or nominal penalty based on its lack of fault for the spill or control over operations. Anadarko's Post-Trial Brief ("APC Br."), Rec. Doc. 14343, at 11. That too is at odds with the statutory scheme, as the court stated in assessing a 311(b) penalty against a faultless owner in *United States v. Tex-Tow*:

> An enterprise such as Tex-Tow engaged…in the activity or enterprise which "caused" the spill. Congress had the power to make certain oil-related activities or enterprises the "cause" of the spill rather than the conduct of a third party. With respect to the civil penalty Congress has exercised this power.

589 F.2d 1310, 1314 (7th Cir. 1978). Penalizing Anadarko is consistent with Congress' intent that – to achieve appropriate deterrence of oil spills – the entities that stand to profit are the ones most severely penalized. COL ¶¶ 23-26, 103, 105.

## XII.  A Substantial Penalty for Anadarko Does Not Raise Due Process Concerns.

Anadarko concedes that the Court has broad discretion to tailor a civil penalty, but argues that such discretion is constrained by the Due Process Clause and general notions of fairness and equity. APC Br. at 3, 6. Its arguments rest on Anadarko's implausible assertion that it is an "innocent" party that "violated no law" despite the fact that this Court already held it liable for violating Section 311(b). Anadarko thus is a far cry from the defendant it points to in *Bordenkircher v. Hayes*, 434 U.S. 357 (1978), who did "what the law plainly allows him to do"

in pursuing his right to attack his own criminal conviction. *See id*. at 363.

Congress' decision to enact a per barrel penalty maximum is rationally related to the goal of preventing future harmful spills and applies equally to all violators. None of the cases cited by Anadarko interpret Section 311(b), which Congress crafted to address oil spills – or even any statutes remotely similar. Instead, Anadarko selectively quotes cases in support of its due process "test" that involve radically different criminal statutes,[20] that are archaic and inopposite, or that examine punitive damage claims lacking statutory maximums and explicit penalty factors.[21] These cases provide scant guidance.

Anadarko next asserts that cases under the pre-OPA version of Section 311(b) passed constitutional muster only because the maximum penalty was small and because of the remedial purposes of the revolving fund. In passing OPA, however, Congress was acutely aware of the potential for a high volume spill from an offshore Outer Continental Shelf ("OCS") facility. S. Rep. No. 101-94, at 27 (1989), *reprinted in* 1990 U.S.C.C.A.N. 722, 748-749 ("OCS spills . . . can involve prodigious and seemingly unlimited quantities of crude oil. The size of such spills can be enough to fill hundreds or even thousands of tankers the size of the *Exxon Valdez*."). Consistent with that awareness, Congress enacted a per-barrel statutory maximum and specified eight penalty factors. This explicit framework negates any due process concerns.

---

[20] *See, e.g.*, *U.S. v. Holdridge* (criminal trespass), *Morissette v. U.S.* (larceny), and *U.S. v. Macia* (illegal entry to US). APC Br. at 6-7. Anadarko substitutes "penalties" for "crimes" in citing *U.S. v. Macia*, apparently to mask that the case discussed strict liability *crimes. Id.* at 7; 740 F.3d 96, 105 (2d Cir. 2014). It is not automatically assumed that the full panoply of criminal protections is imported into a civil penalty program. *See, e.g.*, *United States v. Ward*, 448 U.S. 916 (1980) (pre-OPA version of 311(b)); *United States v. Atlantic Richfield*, 429 F. Supp. 830, 835-840 (E.D. Pa. 1977).

[21] *See, e.g. Ratner v. Sioux Natural Gas Corp.*, 719 F.2d 801, 805 (5th Cir. 1983), APC Br. at 5, 11 (punitive damages for common law fraud within a corporate family); *State Farm Mutual Auto. Ins. Co. v. Campbell,* 538 U.S. 408 (2003) (punitive damages); *St. Louis, I.M. & S. Ry. Co. v. Williams,* 251 U.S. 63 (1919) (1919 case involving railroad fares).

Anadarko's statement that 311(b) penalties no longer serve any remedial purpose is demonstrably wrong. At the time of OPA's enactment, Congress reported "gross inadequacies" with the CWA's cost recovery provisions for oil spills. S. Rep. 101-94, at 3, *supra,* 1990 U.S.C.C.A.N. at 724-725; Pub. L. No. 101-380, § 2002(a), 104 Stat. 484, 507 (1990) (supplanting CWA cost recovery provisions for oil spills). OPA provided for the repeal of the 311(k) revolving fund, but also transferred the monies remaining in that fund to the more robust Oil Spill Liability Trust Fund (OSLTF), and directed future 311(b) penalties to the OSLTF. Pub. L. No. 101-380, §§ 2002 and 4304, 104 Stat. at 507 & 540 (partially codified at 33 U.S.C. § 1321(s)). OPA prescribes the uses of the OSLTF, which include payment of removal costs and claims, as well as reimbursement of federal costs necessary to administer and enforce not only OPA, but also CWA Section 311, including 311(b) penalties. 33 U.S.C. § 2712(a). Accordingly, penalties collected under 311(b) continue to serve a remedial and regulatory purpose, in addition to deterrence and punishment.[22]

Anadarko finally complains about the unfairness of penalizing "non-operating investors" on grounds its liability was legally unclear. APC Br. at 17-18. Anadarko here merely reasserts liability arguments rejected on appeal, *In Re Deepwater Horizon*, 772 F.3d 350, 357 (5th Cir. 2014),[23] which do not even pertain to penalty. Indeed, any alleged lack of clarity has nothing to do with Anadarko's status as a "non-operating investor:" the alleged, fact-specific ambiguity it relies on is a separate element, "discharge from a facility." Anadarko's statutory interpretation would affect *all* liable parties in this case, operators and non-operators, whether grossly

---

[22] Section 311(b)'s remedial purpose is not undermined by passage of the RESTORE Act, which continues to direct a portion of civil penalties from the *Deepwater Horizon* Incident into the OSLTF, and eighty percent to the Gulf States. Pub. L. No. 112-141, Subtitle F, § 1602(b), 126 Stat. 405, 588 (2012) (33 U.S.C. § 1321 note, *see* 33 U.S.C.A. § 1321(t)).

[23] Anadarko has petitioned for certiorari (March 24, 2015) (No. 14-1167) regarding this argument.

negligent, negligent or non-culpable, and in no way pertains to Anadarko's self-proclaimed "unusual circumstances."

## XIII. Anadarko's Other Arguments for a Zero or Nominal Penalty are Unpersuasive.

Anadarko invites this Court to assess a zero or nominal penalty, arguing that the statutory language gives it discretion to do so and citing cases under other statutory provisions. APC Br. at 3-4. The majority of courts to consider the issue have held that once a defendant has been found strictly liable under Section 311(b)(7) or the similar language of CWA Section 309(d), a penalty is mandatory—even in the absence of fault. *See* US Br. at 38-39; COL ¶ 78.[24]

Only one case cited by Anadarko to support a nominal penalty, *United States v. General Motors Corp.*, 403 F. Supp. 1151, 1165 (D. Conn. 1975), applied Section 311(b). It involved a discharge due to vandalism by an unknown third party, despite defendant's extensive affirmative measures to secure the facility, and therefore is distinguishable, particularly given the contractual relationship between BP and Anadarko here. Other cited cases involved violations of securities laws or CWA Section 309 penalties for violations of other sections of the CWA pertaining to wetlands or other industries in matters with complicated permitting histories.[25] They therefore do

---

[24] Anadarko further asserts that Congress softened the Section 311(b) language when it passed OPA, from "shall be assessed a civil penalty" to "shall be subject to." APC Br. at 4. But Anadarko is comparing language for *administrative* penalties to *judicial* penalties and the different language does not reflect a Congressional intent to weaken civil penalties. *Compare* CWA 311(b)(6) (1989) (stating that *administrative* "penalties shall be assessed") *with* 311(b)(7) (2010) (stating that strictly liable parties "shall be subject to a civil penalty" in judicial proceedings).

[25] *See, e.g.*, *S.E.C. v. Rosenthal*, 650 F.3d 156, 162 (2d Cir. 2011) (examining legislative history of insider trading law before "evinc[ing] congressional intent" that penalties should not be imposed); *United States v. Bay-Houston Towing, Inc.*, 197 F. Supp. 2d 788 (E.D. Mich. 2002) (considering a protracted history of permit applications with both state and federal regulators and giving weight to regulators' awareness that defendant was mining peat for many years); *U.S. Pub. Interest Research Group v. Atlantic Salmon of Maine, LLC.*, 257 F. Supp. 2d 407 (D. Me. 2003) (award of $50,000 civil penalty due to defendants' lack of profits and high future costs of injunctive relief, as well as regulators' failure to issue permits to industry for more than a decade); *United States v. Lambert,* 589 F. Supp. 366, 374 (M.D. Fla. 1984) (in wetlands case, imposing a civil penalty on husband but not wife that when imposed would "constitute a lien on the joint interest of [husband and wife]," while injunctive relief on the property would apply to

not suggest that the Court should assess a nominal penalty under CWA Section 311, where discharges of oil in harmful quantities are absolutely prohibited and no permits are involved.

In essence, Anadarko requests a judicially-crafted exemption from CWA 311(b) penalties based on its status as a non-operator engaged in deepwater activities, which would be inconsistent with the statute as discussed *supra* at Part XI. To that end, Anadarko presented a safety expert, Mr. Arnold, to opine that BP had ultimate work authority on the rig and to complain about the consequences of penalizing non-operators. FOF ¶ 1114. But BP's responsibility for process safety and its authority on the rig were addressed in Phase I and are not relevant to Anadarko's penalty. 21 F. Supp. 3d 657, 730 (E.D. La. 2014), ¶¶ 467-469; PP Tr. at 2219:13-24. Since Mr. Arnold's opinions cannot be submitted as relevant to Anadarko's culpability, Rec. Doc. 13910, they have little other importance and the Court need not give them any weight.

If anything, the "other matters" evidence regarding non-operators merely underscores that non-operators do *not* warrant any exemption from civil penalties: United States' expert Mr. Walkup shows – and Mr. Arnold at least in part agrees – that non-operating partners actively participate in deepwater activities and have the opportunity to influence safety. US Br. at 42-44; FOF ¶¶ 1114-1201. Non-operators readily harmonize their input to deepwater activities with any safety concerns. *Id.* Thus, compared to other faultless owners who are liable under CWA 311(b), deepwater non-operators are *more* informed and engaged. *See, e.g.*, US Br. at 45-46.

## XIV. An Analysis of Penalty Factors Points to a Significant Penalty Here.

Anadarko does not truly contest the two penalty factors that weigh heavily in favor of a

_____

both); *Resurrection Bay Conserv. Alliance v. City of Seward*, No. 06-0224, 2008 WL 508499, at *6 (D. Alaska Feb. 21, 2008) (held that city as operator was responsible for obtaining NPDES stormwater permit, not individual boat owners; no penalty assessed against City on grounds that "evidence of actual pollution [was] not overwhelming" and penalties would have a "severe economic impact" on the City.)

substantial penalty here: seriousness of the violation and economic impact on the violator.

**Seriousness of the Violation.** Anadarko concedes that the spill was extremely serious,[26] but suggests this factor should carry little weight because Anadarko was not at fault for the spill.[27] But this factor broadly applies to the "seriousness of the *violation*," 33 U.S.C. 1321(b)(8) (emphasis added), and routinely includes an analysis of the spill's impact on the environment, human health, and the economy. *See* COL ¶¶ 46-60. The plain language of the statute makes clear that the focus of the seriousness factor is on the consequences of the violation, *see, e.g., United States v. Smithfield Foods, Inc.,* 972 F. Supp. 338, 343-344 (E.D. Va. 1997), while Anadarko's conduct is to be analyzed under the culpability factor.

**Economic Impact on the Violator.** Anadarko admits that it can pay the maximum civil penalty of $3.5 billion. APC Br. at 18. Anadarko is well-positioned to weather the current drop in oil prices, FOF ¶¶ 1038-1044, and today's lower prices should not reduce its penalty, since, given potential delays during appeals, oil prices may recover by the time Anadarko actually pays any penalty. Anadarko claims that a penalty diverts funds from other uses, but has not met its burden to show that imposition of the maximum penalty would jeopardize its continued operations or have a ruinous effect on its business. *See* COL¶¶ 145, 155. An impact on growth is not enough: Anadarko has grown at impressive rates since 2009 and at the time discovery closed

---

[26] Having admitted that the violation was serious "by any measure," Anadarko inexplicably incorporates by reference BP's Proposed Findings of Fact as to that factor with respect to its continuing impact on the environment. APC Br. at 14, n.5; APC FOF ¶ 23, n.1. The court should ignore this attempt to play both sides and accept Anadarko's admission on seriousness without qualification.

[27] Anadarko's reliance on a quote from *Tull* to suggest that the only basis for the seriousness factor is "retribution for wrongful conduct" is misplaced. There, the Court was discussing the 309(d) penalty factors generally and the quote does not support the proposition that non-culpable parties face no consequences for serious violations. 481 U.S. at 423. In asserting that the spill's seriousness does not justify a penalty, Anadarko also argues that deterrence is advanced only "in relation to *operating* conduct." APC Br. at 14 (emphasis added). But the statute is broadly focused on deterrence of *spills,* and to accomplish this goal Congress decided to penalize both operators and owners.

still had ambitious goals for growth going forward. FOF ¶¶1045-1047; COL ¶ 155.[28]

**Efforts to Mitigate.** Anadarko, a responsible party, attempts to excuse its marginal response contributions by suggesting its role was "limited to following the directions of the Government and BP." APC Br. at 14. BP was the responsible party designated for purposes of OPA presentment requirements and establishing a claims procedure, Rec. Doc. 4845 at 12-13, but Anadarko can point to no evidence that it was ever turned away from playing a more active role during the response itself. The record shows collaboration during the source control effort among BP, the Government, and other oil companies with no nexus to the well. Rec. Doc. 14021 at ¶ 213; FOF ¶¶ 326, 1061. Coast Guard guidance does not restrict membership in the Unified Command (UC) to one responsible party, and provides that an organization not represented in the UC can provide input directly or serve in a supporting role. TREX-013516 at .0058-.0061.

**Prior Penalties Paid.** Anadarko disavows the relevance of the court-approved settlements in this matter. APC Br. at 19-20; *see also* Anadarko's Penalty Phase Trial Proposed Findings of Fact ("APC FOF") and Conclusions of Law ("APC COL"), Rec. Doc. 14342, APC FOF ¶¶ 85-87; APC COL ¶¶ 105-133. The Fifth Circuit (and many others) have held that early settlors receive a discount and judicially-imposed penalties should be higher to encourage early settlement. *See, e.g.*, US Br. at 51-52. With regard to the MOEX settlement, Anadarko makes inaccurate or incomplete assertions:

First, Anadarko values the MOEX civil penalty as only $45 million and downplays that MOEX also committed to perform agreed-upon Supplemental Environmental Projects ("SEPs") to benefit the Gulf States and to pay each state a civil penalty, at an additional cost to MOEX of

---

[28] Anadarko argues that it should not be penalized based on its status as a corporation that can pay a penalty, citing *Mathias v. Accor Economy Lodging, Inc.*, 347 F.3d 672, 676 (7th Cir. 2003). APC Br. at 18-19. That case analyzed a punitive damages scheme which differs from Section 311(b)'s clear inclusion of corporate owners and its penalty factor requiring consideration of the economic impact on the violator.

at least $45 million. Pursuant to EPA's SEP Policy, 63 Fed. Reg. 24796 (May 5, 1998), the

United States took MOEX's commitment to perform these projects into account in arriving at an

agreed settlement penalty. Rec. Doc. 6436-1 at 14. The RESTORE Act now automatically

provides that 80% of any penalty in this case will be allocated to activities in the five Gulf States.

Pub. L. No. 112-141, Subtitle F, § 1602(b), 126 Stat. 405, 488 (2012); 33 U.S.C.A. § 1321 note.

Thus only a $90 million civil penalty would provide a comparable penalty/project value today.

Second, Anadarko points to the United States' Motion to Enter the MOEX settlement to

argue that the United States has taken an inconsistent position regarding non-operators, APC

COL ¶¶ 116-131, but these arguments disappear upon full review of the United States' brief.[29]

Third, the case against MOEX presented a number of significant litigation risks not

present here. In contrast to Anadarko, MOEX disputed its ownership of the well; it also held few

assets in the United States. Rec. Doc. 6436-1, at 3, 13.

Finally, Anadarko claims that MOEX settled too high. But MOEX settled *after* the

negligence claims were dismissed. *See, e.g.*, US Br. at 53 n.42. It was represented by

sophisticated counsel who are presumed to have considered future litigation developments.

The United States previously explained why the $1 billion settlement with Transocean

was a more appropriate benchmark for Anadarko's penalty. US Br. at 51-53; COL ¶¶ 102-105.

---

[29] For example, Anadarko points to a factual recitation in the *Procedural History* of the US Unopposed
Motion for Entry regarding the BP-MOEX OPA settlement, and incorrectly asserts that the US pointed to
that settlement as reason to reduce the CWA civil penalty. *See, e.g.*, APC COL ¶¶ 117, 122; Rec. Doc.
6436-1 at 5-6. Anadarko also claims that a recitation of *MOEX's* own contentions constitutes an
inconsistency. Rec. Doc. 6436-1 at 11-14. But enumerating MOEX's arguments as a litigation risk is
hardly an endorsement of those contentions. Finally, Anadarko points to a US response to a comment that
uses the term "active participation" to argue that the US endorsed the notion that "lack of active
participation" warrants a lower penalty. However, it is clear that the US is using "active participation" as
synonymous with operatorship: the US' response indicated that MOEX "did not physically operate any
part of the well or the rig and was not experienced in drilling operations in the Gulf of Mexico." Rec.
Doc. 6436-1 at 23.

**Other Matters.** Dr. Sunding's policy arguments for a zero or nominal CWA penalty and Mr. Arnold's opinions concerning safety warrant little weight from the Court for the reasons set forth above, *see supra* Sections XI and XIII, respectively. Dr. Sunding's other claims that a penalty imposed on Anadarko will drive investment out of the Gulf and incentivize operators to reduce safety investments are unsupported and provide no basis for the Court to reduce Anadarko's penalty. FOF ¶¶ 1091-1113. Mr. Arnold also launched a host of other criticisms of Mr. Walkup, which are rebutted in the United States' Proposed Findings of Fact.[30]

**Economic Benefit.** Anadarko argues that the United States must precisely quantify the benefit for the court, and asserts that a minimal benefit warrants a minimal penalty. The United States addressed these arguments in its opening brief and proposed conclusions of law. US Br. at 47-49; COL ¶¶ 66-75; 35-37.[31]

## XV.    Conclusion.

In sum, Anadarko fails in its bid to re-write CWA Section 311(b) to avoid substantial penalties for the massive oil spill from its well. Its statutory maximum penalty is rationally calibrated to the volume of the oil spilled, and the existing eight penalty factors suffice to ensure that its penalty is appropriate and equitable. Considering *all* the factors that Congress intended, Anadarko should pay a penalty in excess of $1 billion.

---

[30] For example, FOF ¶¶ 1184-1189 (contradicting claim that non-operators only participate after the exploration phase); FOF ¶¶ 1190-1194 (explaining "strategic" and "tactical" decisions as applied to a well, rebutting claim that Mr. Walkup's article contradicts his expert opinions); FOF ¶¶ 1195-1201 (rebutting claim that scope of design is narrow); FOF ¶¶ 1144-1150 (cited literature has indicia of reliability, rebutting claim that it is not peer-reviewed); and FOF ¶ 1136 (Non-operators perform extensive due diligence prior to joining projects, rebutting that they sometimes enter projects post-design).

[31] Anadarko argues that economic benefit is central to deterrence. But if that were true for Section 311(b), Congress could have set a penalty calibrated to be proportional to economic benefit instead of setting a per-barrel amount. *Compare, S.E.C. v. Rosenthal*, 650 F.3d 156, 163 (2d Cir. 2011) (noting insider trading law referencing economic benefit "clearly evinces congressional intent" to make the penalty "directly proportional to the amount of profit gained or loss avoided.").

Respectfully submitted,

BENJAMIN C. MIZER
Acting Deputy Assistant Attorney General
Civil Division

JOHN C. CRUDEN
Assistant Attorney General
Environment & Natural Resources Division

PETER FROST
Director, Torts Branch, Civil Division
Admiralty and Aviation
SHARON SHUTLER
MALINDA LAWRENCE
Trial Attorneys
R. MICHAEL UNDERHILL, T.A
Attorney in Charge, West Coast Office

SARAH HIMMELHOCH
MICHAEL MCNULTY
PATRICK CASEY
RICHARD GLADSTEIN
MICHAEL ZEVENBERGEN
Senior Counsel
NANCY FLICKINGER
Senior Attorney
ABIGAIL ANDRE

KENNETH A. POLITE, JR.
United States Attorney
Eastern District of Louisiana
SHARON D. SMITH
Assistant United States Attorney
Eastern District of Louisiana

A. NATHANIEL CHAKERES
DANIELLE FIDLER
RACHEL HANKEY
JUDY HARVEY
RACHEL KING
ERICA PENCAK
BRANDON ROBERS
GORDON YOUNG
Trial Attorneys

/s/ Sarah Himmelhoch
STEVEN O'ROURKE
Senior Attorney
Environmental Enforcement Section
U.S. Department of Justice
P.O. Box 7611
Washington, D.C. 20044
Telephone: 202-514-2779
E-mail: steve.o'rourke@usdoj.gov

31

**Certificate of Service**

I hereby certify that the above and foregoing document has been served on all counsel by electronically uploading the same to Lexis Nexis File & Serve in accordance with Pretrial Order No. 12, and that the foregoing was electronically filed with the Clerk of Court of the United States District Court for the Eastern District of Louisiana by using the CM/ECF System, which will send a notice of electronic filing in accordance with the procedures established in MDL 2179.

Date: April 24, 2015.                                        /s/ Sarah Himmelhoch
                                                            U.S. Department of Justice