# Exhibit B

**CONGRESSIONAL RECORD**
Proceedings and Debates of the 95th Congress
LD-4 (Rev. Jan 71)

SENATE

| BILL | DATE | PAGE(S) |
|---|---|---|
| H. R. 3199 | Dec. 15, 1977<br>Part II | S19636-86 |

ACTION   GAO Reference, p. S19643 (2), S19683 (3)

Senate agreed to the conference report

## CLEAN WATER ACT OF 1977—
## CONFERENCE REPORT

Mr. MUSKIE. Mr. President, I submit a report of the committee of conference on H.R. 3199 and ask for its immediate consideration.

The PRESIDING OFFICER. The report will be stated.

The legislative clerk read as follows:

The committee of conference on the disagreeing votes of the two Houses on the amendment of the Senate to the bill (H.R. 3199) to amend the Federal Water Pollution Control Act to provide for additional authorizations, and for other purposes, having met, after full and free conference, have agreed to recommend and do recommend to their respective Houses this report, signed by all of the conferees.

124

The PRESIDING OFFICER. Without objection, the Senate will proceed to the consideration of the conference report.

(The conference report is printed in the House proceedings of the RECORD of December 6, 1977.)

Mr. MUSKIE. Mr. President, it is not my impression that final disposition of the Clean Water Act will take much time. I find no disposition to ask for a rollcall vote, so I gather that there is widespread understanding of what the conference has produced by way of the resolution of differences between the House and Senate versions. I think that formal consideration of the conference report should take a minimum amount of time. I say to my colleagues who may be interested in other matters we shall consider, especially my good friend from Wisconsin (Mr. NELSON).

Mr. President, this legislation represents the culmination of 2 years' of effort to extend the Clean Water Act. It represents the midcourse correction that was promised during consideration of the landmark 1972 amendments to the Federal Water Pollution Control Act.

The thrust of this legislation is two-fold—first, to improve the tools available to the Administrator of EPA to deal with increasingly complex water pollution problems and, second, to make much more flexible those requirements of the act which would otherwise demand a greater investment in regulatory resources and economic investment than benefits derived from the effluent reductions would achieve.

This bill was not easy to put together. In some respects it was more difficult than the 1972 act because the political environment is very different today than in 1972. But, as in 1972, a good faith effort on the part of both bodies, combined with an intense desire to get this legislation behind us so that the water pollution program could get back on track produced the result.

Mr. President, my complete statement describing the results of the conference report consumes 100 pages. I shall be happy to get into any aspect of this bill that any Member of the Senate would like before we act finally on it. This bill has had careful consideration. I know that, over the months since the Senate first gave consideration to this legislation, because of constituent interests, to one or another aspects of the clean water policy of this country and what this bill would do to that policy. So I am confident that there is widespread understanding of what we have done.

Mr. President, at this point, I wish to express my appreciation to several of my colleagues, Members of the other House, and staffs who have made possible our consideration of this bill today. As some of you know, I was not available, for reasons of health, to participate in the conference as fully as I would have liked. I was unable to be in attendance, but I undertook to follow developments in the conference.

Because I was not present, special gratitude is owed by the Senate to Senators BURDICK and STAFFORD, who com-



mitted so many hours in the final days of conference to achieve this result. They were joined by Senators RANDOLPH, CULVER, ANDERSON, CHAFEE, and McCLURE, and by Senators HART, GRAVEL, WALLOP, DOMINICI, and BAKER. And even then there might not have been any bill if the chairman of the full committee, Senator RANDOLPH, had not, in the end, come to the conference and appealed to the House conferees to accept a compromise proposed by the Senate as a means of breaking the final deadlock.

As is so often the case, Senator RANDOLPH'S personal powers of persuasion were essential to final agreement.

Mr. President, it is appropriate to recognize the important contribution of Representative RAY ROBERTS of Texas and his fellow House conferees. Representative ROBERTS pressed hard for this agreement. His good humor and willingness to compromise made final action possible. The distinguished chairman of the House committee, Mr. JOHNSON of California, can take great satisfaction in the role Representative ROBERTS played.

I would also like to recognize the hard work of each of the other House conferees who were untiring in their attendance and participation: Congressmen ANDERSON, ROE, McCORMACK, BREAUX, GINN, OBERSTAR, NOWAK; Congressmen HARSHA, CLEVELAND, CLAUSEN, and SNYDER, and Congressman FOLEY. Each of these men made a contribution to this bill and can be proud of their effort to keep the Nation's clean water program on track.

Finally, I would be remiss if I did not recognize the long hours of work of the staff of the two committees. The joint staffs put together recommendations for the conferees which bridged areas of significant disagreement. They worked nights and weekends to develop workable proposals for the conferees' consideration. Each of the staff deserves special recognition from the Senate and the House for their efforts. I would like to specifically mention for the record the following staff: John Yago, Leon G. Billings, Phil Cummings, Sally Walker, John Freshman, Jackee Schafer, Mimi Feller, and Jim Range from the Senate, and from the House, Richard Sullivan, Lester Edelman, Gordon Wood, Bill Corcoran, Joan Kovalic, Jack Schenendorf, Erroll Tyler, and Mike Toohey.

I would like to single out for recognition the House legislative counsel, Mr. Robert Mowson has been working as counsel to the House Committee on Public Works and Transportation for as long as I can remember. He has been counsel to conferences on water pollution since we first began meeting with the House committee in 1963. He has always served as counsel to the conference as a whole and not just to the House. Again this year, in a time of great stress and pressure, Bob Mowson has served us well. But more important, Bob Mowson has continued to write legislation in a straightforward and understandable manner, a fact which all Members of Congress should appreciate. I want to personally



126

Case 2:10-md-02179-CJB-DPC   Document 14476-2   Filed 04/24/15   Page 6 of 55

thank Bob and his young associate, Arnie Havens, for their help again this year.

Mr. President, in 1972, Congress established as an objective the restoration of the chemical, physical, and biological integrity of the Nation's waters. That is still the objective.

Congress established a national goal of the elimination of the discharge of pollutants. Congress established an interim water quality goal which was to be achieved where possible by 1983. These are still the national goals.

In 1972, the Congress declared it to be national policy to eliminate toxic pollutants in toxic amounts. This bill, unlike the 1972 act, intends to make that objective a reality. And, Mr. President, in 1972, Congress declared that recycling and reuse would be the primary objective of the waste treatment construction grant program. This bill says that the Congress really meant what it said in 1972.

In every respect, the conference agreement underscores the basic thrust of the Senate bill—the application of technology to reduce the flow of waste to streams. However, the cost of high technology, capital-intensive waste water treatment systems is so great that utilization of less costly alternative waste treatment systems must be given high priority for Federal funding.

This is a comprehensive bill, Mr. President. It has nearly 80 provisions. As I said at the outset, it provides the Administrator new tools and, at the same time, provides additional flexibility so that he may maximize his resources for high priority objectives.

Here is a bill which will more sharply focus EPA's limited resources on priority water pollution problems.

Here is a bill which extends our pollution control capability to the limits of the resource jurisdiction of the United States—so that oil and hazardous material spills which threaten our fishery resources can be cleaned up, and the spiller can be forced to pay the cost of clean-up and any damages to natural resources.

Here is a bill which authorizes the Administrator of EPA to require industry to adopt practices which will avoid the Kepone-kind of runoff that has made the James River an ecological disaster.

Here is a bill which extends for 5 years the Federal construction grant program for water pollution and keeps intact the requirement that industries which use these systems pay their fair share of the costs of maintaining those systems.

Perhaps most significantly, Mr. President, here is a bill which includes pervasive requirements to find and apply methods to recycle, reclaim and reuse wastes and waste water. While this was intended in 1972, the 1977 amendments say emphatically that the Congress really means to eliminate the discharge of pollutants as rapidly as possible.

This is not to say that the bill does not ease prior requirements. It does. Deadlines for the next phase of controls have been extended 1 year.

But the ability of the Administrator to get toxics out of water has been meas-

urably improved. And the ability to challenge the level of control required for so-called conventional pollutants has been greatly reduced. At the same time, the water quality impacts of these pollutants will be diminished, both as a result of advanced controls and as a result of improved water quality standards.

The conference did provide a safety valve for other pollutants. Should the Administrator decide to regulate pollutants which are not toxic or conventional, a polluter has a chance under these amendments to prove no adverse environmental effects relating to a particular pollutant, and after making such a showing, escape regulation.

Let me first discuss the concessions which have been made to the practical limitations of the Environmental Protection Agency. This bill directs the Administrator to emphasize the removal of potentially toxic pollutants from waste streams. It directs the Administrator to reduce the discharge of other pollutants about which a great deal is known as rapidly as possible within the constraint of a reasonable relationship between cost and effluent reduction benefits.

The bill does not require that the effluent reduction achieved be equated to the specific water quality benefit because that test is no more realistic in 1977 than it was in 1972. But it does recognize that in establishing limitations for conventional pollutants for categories and classes of industries, the best available technology may not be the most appropriate technology in terms of the relationship of the cost of achieving a particular level of reduction and the amount of reduction actually achieved.

Under the amendments to section 304 effluent guidelines for conventional pollutants are subject to a new cost effectiveness test. Effluent guidelines for toxic and nonconventional pollutants, however, are not subject to any test of cost in relation to effluent reduction benefits or any form of cost/benefit analysis.

This is a fine line. It is one that the conferees believe the Administrator can walk. We are satisfied that he has the capacity to relate cost of effluent reduction to the effluent reduction benefits, and we have provided him with some guidance. The bill provides as a basis comparison of the costs for industry to the costs for municipalities. Clearly, if the cost of achieving a certain level of reduction of conventional pollutants for industry is less than the cost of achieving a similar level of reduction for a community, it would be reasonable. Thus, in the language of the amendments, best conventional control would, and often will, be identical to best available control. The result of the cost test could be a 1984 requirement which is no more than that which would result for best practicable technology but also could result in effluent reductions equal to that required in application of best available technology.

The contrary is not necessarily so. One could well pose a case the cost of achieving a reduction of a conventional pollutant from an industrial category might greatly exceed the cost for the municipal category. In that case, the

Administrator might determine such reduction to be unreasonable at this time and thus modify the requirement in accordance with regulatory authority.

It is important to note that the Senate provision which used a complex modification mechanism for making this kind of determination for conventional pollutants has been deleted. The establishment of regulations applicable to conventional pollutants continues to be the effluent guideline approach of the 1972 act.

Thomas C. Jorling, Assistant Administrator of the Environmental Protection Agency for Water and Hazardous Materials, testified before the Committee on Environment and Public Works this past June. He said:

There will be some industries for which best practicable technology controls for conventional pollutants have achieved all that can reasonably be expected for the immediate future. However, there will be a number of cases where this will not be so. For example, there currently are some industries where the estimated costs of best available technology (BAT) increment of control for BOD is far below even the cost of secondary treatment for municipal systems in terms of cost per pound of pollutant removed. Clearly this is not a hard and fast test of what BAT should be for industry, but it tends to substantiate the point that in some industries additional controls for conventional pollutants can be obtained under BAT for very reasonable costs. Accordingly, the Agency is in the process of reviewing its existing BAT standards for conventional pollutants to insure their overall reasonableness. Where the BAT standards result in additional costs that appear to be unrealistic in light of the associated incremental reductions in pollutant loadings, the standards will be appropriately modified. We believe the Act clearly allows for such a test of 'reasonableness,' especially in the absence of any toxic pollutant problems. As our analysis continues, should we find that the existing legislation does not provide suitable flexibility we will offer appropriate legislative amendments.

Another area of flexibility relates to deep ocean discharges of municipal waste. It has been alleged that a municipality can discharge its waste into ocean waters after something less than secondary treatment without causing any ecological perturbation. Witnesses from Honolulu, Seattle, and Los Angeles have alleged that they have accumulated sufficient evidence to prove no adverse effect on water quality and aquatic ecosystems from such discharges.

The conference provision is identical to the Senate bill in this respect. It does not change the Senate bill in any way. The Administrator should look to the legislative history in the Senate for guidance on this provision.

As was the case in the Senate bill, this provision is intended to provide a very narrow opportunity for certain municipal dischargers, if they can meet a specific burden of proof, to qualify for a modification of the secondary treatment requirement.

Mr. President, a second area of flexibility in this bill deals with the concept introduced by the House which makes a distinction between those pollutants about which we know a great deal—the

Case 2:10-md-02179-CJB-DPC    Document 14476-2    Filed 04/24/15    Page 7 of 55

so-called conventional pollutants—and those about which we are increasingly concerned, the so-called toxic pollutants. The conference bill recognizes a third area of pollutants—the grey area or non-conventional pollutants. It is these contaminants to which EPA can direct only limited, if any, resources in the near future. It is these contaminants about which there is the most to be learned, and it is these contaminants for which industry contends regulation may be inappropriate.

Under existing law, nonconventional pollutants would be subject to the regulatory scheme defined by best available technology—that is, effluent guidelines applicable to classes and categories of industrial dischargers. I did not think that a procedure for modification of the best available technology applicable to these nonconventional pollutants was appropriate or necessary at this time. But the House Conferees insisted that such a procedure be written in the law in order to provide a safety valve for the future, and the Senate concurred in order to obtain action on this legislation.

I suspect that, as a practical matter, most of these pollutants will not be subject to best available technology but, rather, will be regulated as surrogates to conventional and toxic parameters. To the extent that nonconventional pollutants are not specifically regulated by best available technology, the procedure for modification from best available technology is not available. To the extent that they are specifically regulated by best available technology, the modification procedure cannot act to affect any other requirement regarding a conventional or toxic pollutant.

Mr. President, this provision will work to improve both the knowledge of the effects of pollutants and their capacity for regulation. The Administrator may, instead of adding to the toxics list a pollutant about which he has doubt, determine instead that the pollutant should be regulated by best available technology. This determination would then trigger the process by which an industrial class or category would make the kind of investment necessary to prove that the discharge of a particular pollutant will not interfere with the balanced population of fish, shellfish, and wildlife as defined and to show that the pollutant poses no risk to aquatic life, public health, et cetera. However, any doubts as to a pollutant's toxicity should be resolved on the side of protection and margin of safety and therefore listed as a toxic. The changes made to section 307 are to facilitate this discretionary authority.

The procedures for modification place specific burdens on the person seeking the modification, and it is expected that a considerable level of investment and a considerable period of time will be required to make these showings. The result of these studies will add greatly to the level of knowledge of the impacts of pollutants in the environment. Herein lies an important point.

It is not acceptable to allege absence of harm solely on the basis of the loss of the pollutant in the environment. The absence of harm test as specified in this bill, including the secondary treatment modification provision, will require the applicant for modification to show the pathway of the pollutant through the environment and its ultimate disposition in the environment. Only in that way can there be any real demonstration that the discharge of that pollutant will not interfere with a balanced population of aquatic life.

For example, it is possible that a pollutant may be discharged in a freshwater environment and not taken up by any organisms in that environment. However, that pollutant may eventually end up in the ocean environment where more sensitive organisms will be affected.

I only make this point to indicate the extent of the burden which this provision places on the applicant. Any simple allegation that the absence of harm is simply unacceptable. I ask unanimous consent that an article from the December issue of *Science* which underscores this point be printed at this point in the RECORD.

There being no objection, the article was ordered to be printed in the RECORD, as follows:

CHEMICAL PLANTS LEAVE UNEXPECTED LEGACY FOR TWO VIRGINIA RIVERS

(By Luther J. Carter)

The tourist passing through Virginia enjoys what for the most part is still a fine scene—the soft outlines of distant mountains, the sweep of lush valleys, and splendid pastoral vistas and riverscapes are all there to please the eye. Indeed, the official slogan "Virginia is for lovers" is credible enough, for, besides the state's natural blessings, relatively little of it has been touched by the kind of industrial development that grossly pollutes or defaces. This being so, it is surprising and disconcerting to learn that three Virginia rivers are now so badly contaminated by toxic substances that well over 300 stream miles have been closed to fishing, or at least to the taking of fish for eating.

One of these rivers is of course the James, on which most commercial fishing is now prohibited from Richmond to the Chesapeake Bay because of contamination by Kepone. But equally remarkable, though little attention has been given to it outside Virginia, is the contamination of much of the Shenandoah River and the North Fork of the Holston River by mercury.

In fact, this latter problem seems of special significance, both with respect to its persistence—which is extraordinary—and to the questions of regulatory philosophy and practice to which it gives rise.

Not all of the Shenandoah River is contaminated, only the South Fork, which many regard as the best of it. Indeed, if it had been the conscious intent of some malevolent force to do mischief to an exceptional natural treasure, the South Fork of the Shenandoah could have served well as the object of such perverse designs.

Flowing over a bed of limestone and frequent ledges, the South Fork runs northward in a series of great loops between the Blue Ridge Mountains on the east and the Massanutten Mountain on the west. For the canoeist or the float fisherman (the South Fork is famed for its smallmouth bass fishing), the scene is ever-changing but is always good and sometimes spectacular, especially when the winding river turns toward the steeply rising slopes of the Massanuten. Along with the rest of the Shenandoah, the South Fork has long been a prime candidate for consideration as part of the national sys-

tem of wild and scenic rivers, and was so listed in President Carter's environmental message of last May.

Although the Shenandoah was known to have some water quality problems, especially overfertilization from the runoff from farmland and other sources, it was not until this spring that state officials got word that part of the river might be heavily polluted with mercury. On 14 April a delegation from E. I. duPont de Nemours and Company, which has been manufacturing synthetic fibers at Waynesboro, Virginia, since 1929, called on Governor Mills Godwin and Virginia health and pollution control officials and brought the bad news.

Visible if minute globules of mercury had been discovered the previous September in the course of repairing a leaking water pipe beneath the Waynesboro facility's "old chemical building," where mercuric sulfate was used as a catalyst in the manufacture of acetate fiber between 1929 and 1950. Subsequently, analysis of sediment samples taken downstream from the plant in the South River showed that the sediment was heavily contaminated with mercury.

The readings for several samples exceeded 240 parts per million (ppm), compared to readings of less than 1 ppm for sediments tested upstream from the plant. Worse still, the one fish that DuPont had had analyzed for mercury contained 0.86 ppm, or substantially above the Food and Drug Administration (FDA) "action level" of 0.5 ppm which cannot be exceeded in fish that are to be marketed. Although of no legal force in relation to freshwater game fish, which would not be sold commercially in any event, the FDA action level represented a standard by which Virginia health authorities would surely judge whether the fish were too contaminated to be eaten.

The disclosures made by DuPont to state officials were reported skimpily and almost routinely in the Virginia press, but their significance was soon to become more evident. On 6 June Governor Godwin announced, on the basis of sediment and fish samples collected and analyzed by the State Water Control Board (SWCB), that the South River below Waynesboro and the entire South Fork were closed to the taking of fish for eating. The mercury content in bass caught as much as 77 miles downstream from the DuPont plant had been found to be more than twice as high as the FDA standard.[1]

The extraordinary thing about this contamination problem is that it has been 27 years since mercury has been used in any manufacturing processes at Waynesboro, for in 1950 DuPont abandoned the particular acetate production process in which mercuric sulfate served as a catalyst. Moreover, from its sampling of soil and groundwater on the plant site, DuPont is now convinced that, although a few pockets of contaminated soil have been found, no mercury has escaped from the site into the river for many years. (The SWCB's director of enforcement, David S. Bailey, is "guardedly optimistic" that this will prove to be the case.)

As best anyone could tell, most if not all

[1] Actual or potential supplies of drinking water, for which Virginia has adopted a safety standard of 2 parts per billion (ppb), are not threatened. No mercury has been found in samples of either raw or filtered water taken at the town of Shenandoah, 50 miles downstream from the DuPont plant and the only community in the area that gets its water from the river (the limit of the Virginia State Department of Health's detection capability is 0.5 ppb). The SWCB failed to discover the Shenandoah's contamination during the nationwide mercury scare of the early 1970's only because it confined its investigation of this river to the taking and analysis of water samples.

of the contamination of the river had taken place during the 1930's and 1940's as the result of spills of metallic mercury that occurred at the old chemical building. One likely possibility is that some of the spilled mercury was flushed into the river through storm drains. Normally, all mercury was recycled and the volume kept in active inventory, in 75-pound flasks, was never large. Edward T. Ruehl, the Waynesboro plant's manager for health, safety, and environmental affairs, believes that, all told, probably not much more mercury escaped to the river than could be put in a "Volkswagen gas tank."

Thus it seems that a relatively small quantity of mercury which got into the river between 1929 and 1950 has kept the river contaminated for a period of maybe 40 years or longer and may continue to contaminate it for decades to come. Major floods, such as the one that followed Tropical Storm Agnes in 1972, have repeatedly scoured the river bottom but, while some of the mercury in bottom sediments undoubtedly has been moved about, it has not been swept away.

INTO THE NOOKS AND CREVICES

Because of its great weight (it is 13½ times as heavy as water) and its liquid form, metallic mercury seems to find its way into sheltered nooks and crevices—of which the South River, with its irregular limestone bottom, has plenty—and is not easily dislodged. In fact, high concentrations of mercury are still found in sediment samples taken just below the DuPont plant from the natural trap formed by the remnants of a small dam.

Fifteen miles or so downstream from Waynesboro the mercury concentrations in sediments seem to fall off sharply. But they remain at above natural background levels all the way down the South Fork to Front Royal, 130 miles from the DuPont plant, and for at least 30 miles down the Shenandoah's main stem.

Over a period of years and decades, metallic mercury in bottom sediments can be converted at varying rates to ionic inorganic mercury and to organic or methyl mercury, both of which can be easily transported downstream by river currents. Although relatively insoluble in water, some metallic mercury does dissolve, and part of this dissolved mercury becomes attached to suspended soil particles and part remains in solution.

But more important to the uptake of mercury by aquatic life is the fact that microorganisms abundant in the sediments can convert virtually any form of inorganic mercury to methyl mercury. In this form mercury is taken up rapidly by aquatic plants and animals and—of particular significance to its potential for attaining high concentrations (especially in older and larger fish)—it is excreted slowly, having a "biological half-life" of months or even years.

It is in its methylated form that mercury is particularly toxic to humans. If ingested in sufficient amount through a heavy diet of fish (as has happened in Japan), methyl mercury can cause Minimata disease, a severe disorder of the nervous system that can be fatal. By good fortune, no cases of Minimata disease are known to have occurred in Virginia, although epidemiological data are too limited to rule out all possibility of instances of mercury poisoning.

The mercury problem in southwest Virginia on the North Fork of the Holston River, which is far removed from the Shenandoah watershed and is actually part of the Tennessee River system, is in some important respects more frustrating to SWCB officials than the one on the Shenandoah.

The essential difference between the two situations is that, whereas there is as yet no evidence that the Shenandoah is being further contaminated by more mercury from DuPont's Waynesboro facility, the Holston is constantly receiving more mercury from the site of the now closed and dismantled chlorine plant which the Olin Corporation of Stamford, Connecticut, operated at the town of Saltville until the spring of 1972. Moreover, the situation at Saltville is such that the inflow of mercury into the river may never be stopped entirely, whatever the plan of remedial action ultimately agreed to by Olin and the SWCB.

Coincidentally, it was in 1950, the year DuPont stopped using mercury at Waynesboro, that Olin (or rather one of its corporate progenitors, the Mathieson Chemical Company) began using mercury at Saltville, which is noted for its huge underlying salt deposit. For the next 22 years, until the plant was finally shut down (partly because of the pollution control requirements that were to be imposed), mercury served as an electrode in the electrolytic process used to break down sodium chloride to produce chlorine and caustic soda.

In contrast to the situation at the DuPont plant, where mercury was needed in relatively small amounts, the Olin plant used it in huge volume, with the electrolytic cells containing more than 1 million pounds of the metal. As was true of chlorine plants elsewhere, this one at Saltville lost mercury in prodigious amounts, although the aim was supposedly to recycle as much of it as possible.[2] Until 1970 and the big nationwide scare over mercury that led to restrictions on the catching or sale of mercury-contaminated fish in nearly a score of states, up to 100 pounds of mercury was lost every day of plant operation. Some of it was lost as vapor, but much of it was lost as liquid mercury spilled on cell room floors or carried away in various waste streams, at least one of which went directly into the river.

Neither Olin nor state health and pollution control officials had been aware of the hazards to human health resulting from loss of mercury to the river. For it was not until the late 1960's that the methylation phenomenon by which mercury is made more readily available to aquatic life was discovered by Swedish researchers. Once the danger was realized, the changes brought about at the Saltville plant as well as at other chlorine plants around the country were remarkable. Losses were reduced to as little as a quarter of a pound of mercury a day.

Nevertheless, the cumulative effect of the reckless practices of the past (the health hazards of mercury vapor at least had long been known) had led to what may be an almost hopeless bad problem of environmental contamination. How much mercury has gone into the river is beyond calculation: all one knows is that the mercury concentration in both sediments and fish are high today and are likely to remain high for decades, if not generations, to come.

Three-fourths of the fish samples taken in July 1976 at six stations along nearly 70 miles of river showed concentrations at least twice as high as the FDA action level. There is in fact evidence that the contamination extends far down the main stem of the Holston to the Tennessee Valley Authority's big Cherokee Reservoir, more than 100 river miles from Saltville. Eight fish collected this past May from the reservoir's far upper reaches all showed concentrations exceeding the FDA limit.[2] While the sample was too small to justify a ban on the eating of fish from the reservoir—in the case of the North Fork such a ban was imposed by Virginia and Tennessee health authorities in 1970—it was an ominous sign.

Mercury continues to enter the Holston both from the site of the old chlorine plant and from the two big "muck ponds" which were used for disposal of the primary waste stream from the Olin complex. The grounds on which the "cell building" once stood contains an astonishing amount of mercury: according to an Olin consultant, there are some 220,000 pounds of it.

Although the mercury is believed to be present in the soil profile to depths of as much as 30 feet, it is also found near the surface. Sizeable globules of it can be seen along the eroded bank of the river, and during this reporter's recent visit there, a small clod taken from the bank virtually at random contained a globule larger than a dime. Anytime the Holston is in flood, significant amounts of the metal are swept into the stream.

Serious as it is, the problem at the old plant site can perhaps be corrected either by excavating the contaminated soil and extracting the mercury, or, as Olin is now proposing, by sealing off the site from the river with a shield of impervious clay and riprapping. (In 1973, Olin tried to clean up the site by removing the top foot or so of soil, but, as is now evident to all, this was pathetically inadequate.) As for the muck ponds, it has become increasingly apparent that this problem can never be fully overcome; anything short of gargantuan engineering remedies, undertaken at costs that might run into the hundreds of millions, may bring nothing better than a modest, perhaps trifling, amelioration.

The ponds, which cover about 120 acres and extend along the river for more than a mile, contain an accumulation of salts and other wastes that is up to 80 feet thick. Although not much water stands in these basins now, enough water enters them from direct rainfall and from runoff from the adjacent mountainside to make for a problem of mercury-contaminated chloride solutions seeping into the river. The discharge of mercury to the river from this source is estimated to average about 100 grams a day, year in and year out. Given the Holston's present grossly contaminated condition, any additional inflow of mercury would be considered intolerable were there any practical means of preventing it. So far, Olin and its consultants have come up with nothing better than a plan to dig a ditch along the mountainside to intercept the seepage into the river by only half, and, if the SWCB staff is correct in its assessment, the reduction would be much less than that.

However severe and pressing the problems at Saltville, the SWCB has generally shown little sense of urgency in dealing with them. Even the matter of finding a prophylactic remedy for the problem at the chloride plant site continues to drag on. "We haven't been balls of fire on this thing," acknowledges Richard Hill, an aide to one of the top SWCB officials. In part, the situation at Saltville seems to reflect the fact that, absent an imminent health threat or economic loss (both present in the Kepone affair), something such as a ban on eating fish from a mercury-contaminated river does not appear to bring a public outcry in Virginia. Scarcely anyone showed up either at the public hearing which the State Department of Health held in 1973 on the Holston ban or at the one it conducted recently on the Shenandoah situation. In light of the sharp decline in fishing on the famed Shenandoah, the poor turnout for the hearing on the ban there—no local officials were present and only two citizens—was astonishing.

Actually, from a regulatory standpoint, the

---

[2] According to the 1976 report of the National Commission on Supplies and Shortages, during the period 1964 to 1973 chlorine plants in the United States required 463 metric tons of mercury annually to make up for losses. This figure was stated as a yearly average for the period, however, and the actual losses after 1970, when production processes were tightened up drastically, were probably much less.

Case 2:10-md-02179-CJB-DPC   Document 14476-2   Filed 04/24/15   Page 9 of 55

mercury pollution problem poses several hard questions that deserve the public's thoughtful attention. Especially is this true in the Holston River case where there is clearly an opportunity to go beyond measuring the extent of the contamination and to reduce the sources of further pollution.

For instance, how far should the state go in holding Olin accountable for the problem at Saltville? After shutting down the plant, Olin gave most of its property there to the town and state, and at present retains title chiefly to some mineral rights and to the muck ponds (which it wanted to give away but could not). Although town council members praise Olin for treating Saltville fairly and generously, the company clearly does not feel that it has an open-ended obligation to see that the mess which is created on the Holston is cleaned up.

Although willing enough to assist in trying to seal off the site of the chlorine plant from the river, Olin wants the SWCB and the town to agree that once a plan of remedial action has been approved and carried out, its obligation with respect to the problem will end. Yet there may not be complete assurance that the plan will succeed. Certainly the efficacy of any remedies tried at the muck ponds will be in doubt. Bailey, he SWCB enforcement chief, indicates that, in his view, the burden of ultimate responsibility is Olin's forever. "I don't think it would be in the state's best interest to enter into a final, blanket agreement," he says.

Another question is, should the state expect some compensation from Olin and Du-Pont for the contaminatoin of the two rivers? In the Kepone episode, the Allied Chemical Corporation, found to have committed gross violations of law, has been ordered to pay the state and federal governments $18.5 million in penalties, including $5 million which go for research on Kepone in the environment; yet the company remains open to millions in damage claims by individuals and to demands by the state in the future for a massive and costly cleanup of the James River if this should be feasible.

As A. H. Paessler, the SWCB's deputy executive secretary, has observed, the mercury contamination of the Shenandoah and the Holston "resulted from no flouting of state or federal law by DuPont and Olin, and neither has been so accused." Nevertheless, as Paessler also acknowledges, the contamination is a fact and those companies are the cause of it. To measure the damage in precise dollar terms would be impossible, but it is clear that the sports fisheris that existed on the Shenandoah and the Holston (the latter was a resource of at least local significance) were of considerable value and that they have been hurt severely. Some informal discussion of the matter of compensation has gone on within the SWCB staff, but there is no sign that it will be pursued.

Closely related to the compensation issue is the question of whether something might be done to rehabilitate the river—or at least shorten the period of contamination. One idea sometimes mentioned is to try to identify and remove some of the more heavily contaminated sediments. The SWCB staff has searched the relevant literature for possibilities, but thus far has found nothing that looks promising.

The agency is now soliciting help in this matter from the Environmental Protection Agency, which so far has left the mercury problem to the state, and from the U.S. Army Corps of Engineers, the Tennessee Valley Authority, and the Oak Ridge National Laboratory. But should any plan for partial rehabilitation of the Shenandoah or Holston be proposed, the question will then surely arise as to who shall pay for carrying it out—the state, the federal government, the company, or all three?

Still another regulatory question raised by the mercury problem has to do with the FDA action level. R. V. Davis, the SWCB's executive secretary, has suggested that the action level perhaps should be raised. Although this suggestion might at first glance be likened to the one somebody once made with respect to Vietnam—declare victory and withdraw—it finds some support in scientific circles.

In Sweden, where extensive research has been done on mercury problems, the action level is twice as high as the one in this country, and some American scientists (such as Peter Krenkel of the Tennessee Valley Authority) believe the FDA limit is needlessly stringent. James B. Kenley, Virginia's commissioner of health, has rejected Davis' suggestion, however. He observes that the action level for mercury is based on "a far larger amount of information and a far lower safety factor" than the action level for Kepone.

In truth, the mercury contamination of the Shenandoah and the Holston appears to have been one of those bad turns of fate about which not much can be done—or at least not much of certain efficacy. But this is not to say that the best response is simply to adjust to the problem and leave the solution to the ages.

Mr. MUSKIE. Mr. President, during the course of debate on this conference report in this and the other body, attempts will be made to bind the Administrator by creating legislative history describing specific situations. The conferees did not examine specific cases for exemptions, extensions or modifications.

The conference report provides a general framework for the Administrator to make judgments. The Administrator should be guided by the framework of the statute and the statement of managers and other appropriate legislative history, and should not feel bound by attempts to legislate by colloquy special cases which are contrary to the letter and intent of the law.

Mr. President, the conference bill is similar to the Senate-passed bill (S. 1952) in many respects. Since the legislative history of the conference report itself is minimal, the conferees expect that the intent expressed in the Senate report be looked to for guidance.

I would like at this point to review several aspects of the conference agreement in order to provide a fuller understanding of the intent of Congress.

### TRAINING GRANTS

This section increases the limit of a grant for a training facility from $250,-000 to $500,000, exempts any such grant from the priority list requirement of section 204(a)(3), and increases the uses of these funds.

The language which amends section 109(b)(2) of the Federal Water Pollution Control Act is intended to authorize the Administrator in any case where a grant has already been made for a facility to serve two or more States to make an additional grant for individual facilities within any of the participating States. These additional facilities would be supplemental to the multi-State facility. It is not intended that there would be duplication of effort. For example, the States of New Hampshire, Massachusetts, and Maine are planning construction of training facilities within each of their States.

The State facilities would be utilized to train or retrain personnel already operating at treatment facilities. In addition, the six New England States and the State of New York are considering the construction of a regional training facility to be utilized by each of the seven States for the training of new operational personnel. Thus, under this section, the multi-State facility and individual facility in each State could be funded under section 109 of the act if there is no significant duplication of effort.

These authorizations do not provide support for graduate training (master and Ph. D. levels) or State agency fellowships in water quality control curricula as authorized in sections 104(a)(1), 104(g)(3)(A), or 104(g)(3)(B).

Funding authorizations for water quality graduate training grants (masters and Ph. D. levels) to institutions of higher education and State agency fellowships are included in section 104(u)(1).

### GRANTS FOR ALTERNATIVE AND INNOVATIVE TECHNOLOGY

The conference agreement emphasizes the need to use alternative technologies instead of conventional secondary treatment plants and encourages the development of new and innovative systems. To accomplish this, the bill requires republication of cost-effective guidelines to reflect the long-term benefits of reclaiming and recycling, creates a special set-aside for rural and lightly populated areas to be used for alternative technologies, and authorizes a special set-asides for increasing to 85-percent grants for the use of alternative and innovative technologies. The bill also includes a provision for extension of deadlines for industries which use innovative technologies.

The conferees intend to underscore the requirements of the 1972 amendments that all of those involved in implementing the program—the Environmental Protection Agency, States, communities, and consulting engineers—direct the program away from the conventional collection and secondary treatment approach and toward the use of alternative technologies, especially those which rely on controlled natural processes, such as land or lagoons or marshes, in order to make use of the nutrients in the waste waters.

More than any other issue concerning the construction grant program, the conferees are concerned with the need to encourage alternative and innovative systems. The problems of small communities coping with expensive capital-intensive waste treatment systems and the wastefulness of discharging valuable nutrient resources to the Nation's waters were stressed throughout the country. The need for new industrial processes which produce no waste was emphasized.

The conference bill, in every possible way, attempts to reinforce the specific statement of the 1972 act with respect to innovation, use of alternatives, and the adoption of policies which would lead to the confined and contained disposal of waste, utilization of the values of

waste, and the elimination of the discharge of pollutants to the Nation's waters.

This agreement recognizes that sludge, which is a burden to many communities, can be usefully applied as a soil conditioner, as a source of nutrients, and as a fertilizer. But the agreement also recognizes that often sludge is so contaminated by the chemicals and metals which find their way into municipal waste treatment systems that it is useless. These amendments are intended to reverse the waste of this important resource. The Administrator is expected to heed that emphasis of this legislation.

There is no defense for the practice of dumping all of the waste that this country generates into rivers, lakes, and streams. The 1972 act stipulated that the Nation's fresh and marine waters would not be an element of the waste treatment process. That continues to be national policy. For communities and industries, the discharge of waste directly into the Nation's waters and oceans is permitted only where there will be no interference with attainment and maintenance of that water quality which assures protection of water supplies and the protection and propagation of a balanced, indigenous population of fish, shellfish, and wildlife, and allows recreational activities, in and on the water; that is only where ecological balance can be assured. The Agency should expedite promulgation of the criteria in section 403.

Thus, alternative technologies for dealing with waste, particularly land treatment options which will take advantage of the valuable nutrients in the waste stream, and other waste recycling options should become the highest priority for funding under this act wherever these are feasible or available.

The conference agreement provides for a bonus grant, raising the Federal share to 85 percent, for projects which utilize alternative and innovative waste treatment processes.

Sections 9, 12, 13, 15, 16, 17, 21, 28, 37, 38, 39, 49, 60, and 72 of the conference report expand the treatment works construction grant program utilization of innovative and alternative waste water treatment processes and techniques. These sections generally follow a series of provisions in H.R. 9464. They are intended to result in a major reorientation of the construction grant program.

The 1972 amendments redirected the water pollution program to municipal waste treatment alternatives which would lead to the confined and contained disposal of wastes so that pollutants would not migrate to cause environmental pollution. Little was done to achieve this result. The purpose of this and related amendments is to underscore that 1972 intent by providing supplemental assistance for innovative and alternative waste treatment processes which might not otherwise be cost-effective.

The conferees intend that EPA shall require consideration and application of demonstrated alternatives which meet the objectives of section 201 funded from the regular grant program. This supplemental assistance program is intended to force technology so that new and better alternatives which have not been demonstrated can become available. As they are available, funding should come from the regular grant program.

The administration has been provided all of the legislative tools needed to require the utilization of such innovative and alternative waste water treatment processes and techniques.

Care should be taken in the evaluation of grant applications to avoid unnecessary studies, investigations, or analyses which are irrelevant to, and unaffected by, application of new technology, recycle, reuse, or land treatment.

The provisions for increased grants for publicly owned treatment works utilizing innovative and alternative technology has been specifically phased in to avoid delays in ongoing step 1 and step 2 projects. The Administrator is cautioned in promulgation of regulations and implementation of these sections not to cause delays in the construction grant program. The environmental benefits to be realized from these sections on innovative and alternative technology should not be vitiated by such delays.

While treatment works construction grant funds are authorized for 5 years by section 30 of this act, it is to be noted that section 17 provides for increased grants for treatment works using alternative and innovative technology for 3 years only. This provision is not applicable to grants made from funds authorized from either the first or the last year for which grant funds are available. It is expected that Congress will evaluate the program at the same time Congress considers an allotment formula for the grant funds authorized for fiscal year 1982.

While funds to increase construction grants to 85 percent are made available only for fiscal years 1979, 1980, and 1981, it is important to recognize that while 2 percent of the construction grant funds are set aside for fiscal years 1979 and 1980 to carry out this program, 3 percent is set aside for fiscal year 1981. This underscores the intent of Congress to increase the number of projects utilizing innovative and alternative technology. During fiscal year 1981, over 25 percent of new grant awards should utilize such technology.

However, nothing in this section is intended to reduce the current emphasis on funding cost-effective alternatives to conventional treatment under the basic grant program.

It is not intended that conventional processes including advanced biological treatment processes or advanced waste treatment systems utilizing distillation, nitrification, and denitrification or breakpoint chlorination be eligible for the increased Federal share. In addition to improved methods for conventional treatment, innovative technology should include such techniques as nutrient utilization and reclaiming or recycling of water.

The Administrator is expected to coordinate promptly with the other heads of departments, agencies, or instrumentalities of the Federal Government which have jurisdiction over any property or facility utilizing federally owned waste water facilities. The Federal Government is expected to be a leader in the use of alternative and innovative treatment processes and techniques. The cost-effectiveness provision of section 60 is a mechanism for forcing the use of such processes and techniques. Section 60 allows the Administrator to waive the application of such processes and techniques where he determines it to be in the public interest. This authority is not intended to be a means for negating the 15 percent cost-effectiveness provision. The Administrator is not expected to waive this requirement unless there is a clear showing that ongoing projects would be delayed or that important public interest considerations cannot be met.

Several criteria should be relied upon to evaluate the innovative character of technology. The criteria include cost reduction, improved reliability, energy conservation or reclamation, recycling or reclamation of effluents, sludges or beneficial wastewater constituents, better management of toxic materials, and environmental benefits. Where technology does not produce benefits in line with the criteria, the Administrator should not consider the technology to be innovative or alternative under these provisions.

A certain percentage of the State's allotment is set aside for 85-percent grants for innovative and alternative technology. Those moneys are not exclusive of, but can overlap, the 4-percent set-aside for alternative or unconventional systems for small communities.

### INDIVIDUAL SYSTEMS

The authority under this provision is to be exercised in accordance with cost-effectiveness guidelines for the construction grants program. Alternatives including septic tanks and other onsite systems, small systems serving cluster households, pressure and vacuum sewers and the like should be compared to determine relative costs and environmental impacts of each. The cost-effective solution should be chosen.

Collection of moneys under this provision for commercial user cost recovery should be carried out in a manner similar to the collection of moneys for industrial cost recovery, subject to all the requirements of section 204, as amended by other provisions of the new amendments. There is, however, no moratorium of this requirement during the period of the industrial cost recovery study, nor does the 25,000-gallon-per-day exemption apply to commercial users of projects assisted under this authority.

### USER CHARGES

The compromise on user charges is, in many respects, similar to the Senate-passed bill. It requires each industrial and commercial user of federally assisted waste treatment services to pay its proportionate share of the cost of operation and maintenance of waste treatment. Unlike the Senate bill which required all users to pay operation and maintenance costs in proportion to actual use, this bill has an exception. In

those cases in which existing systems on date of enactment already have systems of charges for operation and maintenance costs based on the use of dedicated levies against property values, that system can continue to be applied so long as residential users, as a class, pay no more than the cost of operation and maintenance attributable to that class of use.

The grant recipient must show that this kind of class proportionality exists. Among all classes of users, it must also show that each individual nonresidential user, unless exempt by regulation as a small user, pay its proportionate share. The grant recipient must show that major nonresidential users actually meter their system input as to quantity, strength and constituents of the waste contributed.

The need for these amendments would have been lessened had the Administrator not adopted a policy which permitted partial grants for communities which refused to adopt user charge systems. The Agency's initial determination to make a grant pending adoption of the system was wise. The later determination to make subsequent grants, withholding only a portion for failure to comply, was not. The Administrator is expected to cease to make grants of any kind, to any grant recipient which has not, by the end of the current fiscal year, adopted an approvable user charge system for all its sources. And the Administrator must continue to withhold the remainder of any grant to any community until the modified user charge system is implemented.

The bill contains a Senate provision which indicates that metering is not required for residential users in order to determine exact proportionality. This means that metering is required for nonresidential users. And, it includes a recognition that, in the past and in the future, ad valorem taxes can be the basis for user charge system if such taxes meet the test of proportionality for each user. It is recognized that this will be difficult because property values bear little, if any, relationship to sewage treatment needs. However, if the Administrator is satisfied that proportionality among individual residential or exempt nonresidential users does in fact exist, an ad valorem tax system can be approved.

Finally, the conference agreement includes a requirement that each recipient of waste treatment services be notified as to the cost of the service received. The purpose of this is twofold: First, to create a public understanding of the cost of providing adequate water pollution control; and second, to stimulate conservation.

The conference agreement stresses water conservation as an important public value. This is one reason the Senate insisted on maintaining that where there is a direct relationship between cost and use, there will be the greatest incentive for water conservation.

Finally, the conference compromise keeps in place a basic objective of the 1972 act: the achievement of utility-like management of publicly-owned treatment systems. It is important that these municipal waste treatment systems operate on a utility-like basis. They must begin to develop the capacity to finance their own expansion. They must be self-financing. The Federal Government cannot be forever expected to meet the needs of growing communities. This act does not provide funds for new growth, and it is not likely Congress will provide funds for this purpose in the future.

The 1977 amendments, like the 1972 act, are designed to deal primarily with the backlog of waste treatment needs. It is not intended to deal with the growth needs of communities. Those waste treatment systems which are operating on a utility basis will have the capacity to finance their own growth. Those which are operating on an already overburdened property tax basis will be under constant pressure to seek subsidies for future expansion as the property-tax payers reject increased levies to pay the cost of new development.

In this vein, it should be noted that any system which inequitably distributes operation and maintenance costs among users, in either the commercial or industrial class, or as between those classes and residential users, cannot be approved.

The user charge system should apply to charge back selectively to a source or sources discharging into a publicly-owned treatment works those increased costs in the management of either effluent or sludge caused by the discharge of any toxic pollutant by such source or sources into such publicly-owned treatment works. Thus, for instance, if an identifiable source discharges a toxic pollutant or pollutants which have the effect of preventing a low cost sludge management program such as land spreading and requiring incineration of such sludge, the user charge system shall charge back against the responsible discharge sources the increment of costs over the land spreading systems to carry out such incineration.

The Administrator is authorized to identify "small nonresidential users" which can be exempt from the actual use-user charge requirement. This is intended to provide a mechanism for eliminating small dischargers from the cost of establishing and collecting user charges. The Conference agreement anticipates that these will be commercial and small industrial establishments which contribute only domestic toilet and kitchen waste to the system—or very small quantities of the equivalent of domestic waste.

The Administrator is expected to promulgate these regulations on a categorical rather than volumetric basis in order to avoid forcing each system to pay the cost of making a determination of whether it falls within that category. Small nonresidential users which could be excluded from user charge requirements by regulation are those with smaller flows of essentially domestic waste. Examples would be warehouses, small grocery and dry goods stores, small laundries, museums, and small hotels and motels. Large commercial establishments (e.g., urban trade centers) or "wet commercial establishments" (e.g., photo processing) would require separate metering. Certainly, service stations, repair shops, and other kinds of establishments which have the potential for contributing oil or metals to the system would not. Also, small metal manufacturing shops, printing operations and other nonresidential users which use toxic materials would not be exempt.

It should also be noted that any class or category of industrial or commercial user which has a volume and strength wasteload which in no way correlates to proportionate costs of treatment under an ad volorem tax system, either because of the character of the waste or because of low waste flow relative to the ad valorem tax, should not be determined to be a "small nonresidential" user by the Administrator.

No portion of a grant which has been withheld for noncompliance with this section can be made available unless the Administrator determines that each new requirement of these amendments was complied with prior to enactment.

All recipients being held at the 80 percent payment level as of enactment of this provision must establish an approved user charge system within 1 year of enactment of this provision. Likewise those who apply for grants within 1 year of enactment of this provision must establish an approved user charge system by the end of that year. In both cases the Administrator is to terminate grants of those who fail to establish approved user charge systems by the end of the year. During the one year period it is expected that full payment will be made on grants.

Beginning one year after enactment of this provision, no applicant which has received a grant and has not established an approved user charge system shall receive a substantial grant.

If a system in general fulfills the requirements of the provision as of enactment of the provision, adjustments can be made to the system within the year to make it comply strictly with the requirements of the provision. However, an ad valorem system must be dedicated on enactment for an ad valorem system to fulfill the user charge requirement.

Adjustments can be made within a reasonable time (no more than one year) to achieve full compliance with the requirement of the amendment if the grantee's revenue system in general meets these requirements. Clearly it is intended for example that grantees have an opportunity to adjust their charges to major industries and other large nonresidential users to comply with the proportionality of the requirements of the new amendments. Adjustments may also be necessary to comply with other details, including the requirements for proportionality among user classes, but dedication of revenues must exist on enactment.

### INDUSTRIAL COST RECOVERY

The Senate conferees acceded to the House proposal to declare a moratorium on the collection of those costs of treating industrial wastes which under existing law are required to be returned to the Treasury. During the moratorium, a study is to be conducted by EPA of the implications of industrial cost recovery. The study is to be completed within 1

year, with an additional 6 months for Congress to consider the results of that study and take any appropriate action.

This moratorium will accomplish two purposes. First, it will free up any withheld portions of grants to the extent that portions of grants have been withheld solely for the purpose of developing an industrial cost-recovery system. (The bill does not authorize the payment of withheld grants to applicants which have not adopted approvable user charge system.)

The fact that grants will no longer be withheld and that repayment of 50 percent of the cost of treating industrial wastes will be delayed for 18 months in no way removes the requirement that the grant recipient establish a system of industrial cost recovery. The amendment only delays payment to the Treasury (and possibly recovery to the grant recipient if he so desires) for the period of review and 6-month congressional consideration of any findings. At the end of the 18-month period, if Congress has not acted, the community must immediately begin to repay industrial costs, which costs can be spread out over the remaining useful life of the system. In other words, there will be no lump sum payment requirement.

The conferees did agree that any industrial user which contributed the sanitary waste equivalent of 25,000 gallons or less on a daily basis would not be required to repay the Federal share of the grant attributable to treatment for that source. This decision relates in part to the fact that these kinds of industrial or commercial users would ordinarily not construct a separate waste treatment facility—that they are captive to a municipal system. As such, no inequity occurs among communities by the fact that the Federal Government is subsidizing treatment of these users' waste.

It is recognized that the study performed by the Agency may well show that the 25,000 gallons of sanitary waste equivalent is too high, and that the Congress should reduce that amount in order to assure more efficient cost recovery. But no user of a system which contributes the equivalent of 25,000 gallons of sanitary waste or less per day would in any way be liable for any costs occurred prior to a subsequent change in the law.

Also, it is important to note that the 25,000-gallon exemption applies only to the equivalent of sanitary waste and would not be available to any source of waste regardless of quantity which contributes wastes which are toxic or which pass through, interfere with, or contaminate the sludge of any municipal system.

Among the industrial costs which would be required to be recovered would be any costs associated with any federally assisted sludge disposal system. The operation and maintenance of those systems would also be subject to the user charge provision. Both user charges and industrial cost recovery would necessarily reflect any costs incurred by the system for sludge disposal solely because of the failure of an industrial user to remove pollutants which would otherwise contaminate the sludge, thus making sludge management more expensive.

The Environmental Protection Agency is expected to initiate the study mandated by this amendment as quickly as possible. Among the issues the administrator should address in this review is the exemption in EPA's current regulations of "dry industry" from the industrial cost recovery requirements. The Administrator should look at the size of dry industry sources which are exempt from industrial cost recovery and their contribution to municipal systems.

The General Accounting Office is currently reviewing EPA's implementation of the industrial cost recovery provision of existing law. The conferees expect that this review be completed on an expeditious basis so that it can be made available to the Administrator in ample time to be of use for the study required by this act. The results of this GAO review should be helpful to EPA's analysis of the current program and provide a basis for EPA's study.

Existing law is specific in listing the type of costs which are to be included in the "cost of construction" for the purpose of industrial cost recovery. This definition has not been changed. The costs of developing a system for industrial cost recovery should be included as part of those construction costs which the industrial contributors may repay. System development costs would be included under the definition of "construction" in section 212 of the act and are therefore eligible for a 75-percent Federal grant. Such development costs then should be included as part of the cost of construction which a participating industry would be required to repay. Failure to include development costs of industrial cost recovery systems for small grants often results in situations where costs of managing the industrial cost recovery system exceed the revenues derived.

This amendment specifically provides for the inclusion of administrative costs as recoverable costs for the purpose of industrial cost recovery. This amplifies current law which would provide for the recovery of development and other costs which were paid for by a 75-percent Federal grant.

STATE MANAGEMENT ASSISTANCE

The conference agreement adopts the Senate amendment which authorizes the Environmental Protection Agency to assist financially the States to whom he has authorized certain management functions including the construction grant program, the 402 program, the 208 program, and small community grants. These funds would be reserved from the State's yearly allotment of construction grant program's funds. In no case would the funds exceed 2 percent and no State would be eligible for less than $400,000.

The policy of authorizing the States to manage the construction grant program is being implemented by the Environmental Protection Agency under existing statutory authority. California already manages the full program from approval of design to approval of selection among bidders through disbursement of funds. Twenty-eight States have taken over the permit program, and States are carrying on statewide 208 planning. Other States conduct certain portions of the review.

process in the construction grant program. Because of State resource constraints, they need funds to perform these functions on behalf of the Federal Government.

The bill authorizes the Administrator to distribute up to 2 percent of the grant funds in proportion to the functions of the construction grant program that the State is conducting, whether or not the State has the 402 permit program, whether or not the State manages the permit program, whether or not the State has a statewide 208 program, and whether or not the State has the capability to manage construction grants to small communities. Each of these functions requires manpower and expertise at the State level, and Federal resources should be available in proportion to the amount of the functions conducted and therefore the needs of the program.

This provision is similar to a request by the administration that the bill authorize the Administrator to distribute the funds according to the above criteria.

The purpose of certifying the States and providing commensurate resources is to reduce duplication of effort by State and Federal levels of government, a major complaint in the program; to avoid unnecessary enlargement in the number of Federal personnel needed for program implementation; and to carry out the policy in Public Law 92–500 "to recognize, preserve, and protect the primary responsibilities and rights of States to prevent, reduce, and eliminate pollution."

The Administrator is expected to only make available the full amount when the State has assumed full capabilities. When a State has taken on their full responsibilities, all the funds should not be available unless the State can justify that level of funding.

Sums reserved under this amendment are available for making the type of grants just described for the same period as sums are available from an allotment under subsection (b) of this section, and any grant shall be available for obligation only during that period. Reserve funds that are not obligated by the end of the period for which they are available will be added to the amounts last allotted to a State under section 205 and would be immediately available for obligation in the same manner and to the same extent as such last allotment.

Any reserve funds reverting to a State's general allotment will remain available for a reasonable period of time as determined by the Administrator through regulation before reallotment. In a similar vein, it should be noted that in those cases where a State is granted less than the entire 2 percent of its allotment funds for the purposes of this section, the unobligated funds will revert to the State's general allotment funds as soon as the Administrator determines what percent to grant to any State in any year.

Further, the intent of this provision is that the sums not be used to reduce the level of Federal or State expenditures to administer water pollution control programs as provided in section 106 of the act. However, a grant under this provision may require the reprograming of those amounts of Federal and State funds

Case 2:10-md-02179-CJB-DPC   Document 14476-2   Filed 04/24/15   Page 13 of 55

earmarked for management of municipal facilities construction into other State program elements such as enforcement and monitoring.

Paragraph (d) (2) of this subsection provides that a State assisting the Environment Protection Agency in the implementation of its responsibilities under sections 201, 203, 204, and 212 may receive grants to cover the reasonable cost of that assistance. The activities include infiltration studies, review of preliminary plans to evaluate the size and scope of the project, review of operation and maintenance programs, review of plans and specifications, determination of consistency with section 208 plans and review of priorities.

Technical assistance and information for grantees relate to the activities outlined above.

The Administrator shall determine the size of the grant made to a State based on an assessment of the State's capability to assist with the activities outlined above. The assessment should take into account factors such as the State's capability and performance in reviewing facility plans and design plans and specifications, capacity to provide technical assistance, and availability and adequacy of necessary technically and professionally qualified personnel and other necessary resources.

Further, it is understood that no grant would be made under this provision until the State has demonstrated a commitment to acquiring the capability to manage grant awards to small communities. This would include acquiring the capability to be the contract agency for any engineering design or construction agreements. Most important, the States would have acquired resources to review plans and advise small communities on cost-effective alternatives.

The objective of this policy is to effect a more efficient means for expediting the municipal construction program, the scope and complexity of which has so increased as to make its full implementation at the local level achievable only through reliance on private contractors whose primary objectives may not be minimizing local short- and long-term costs while maximizing environmental benefits.

Two other primary responsibilities in existing law which many States have assumed are the permit program and implementation of statewide section 208 management plans and programs.

Management of the permit program is a difficult responsibility. It requires issuance of permits that are consistent with applicable effluent requirements and water quality standards, review of monitoring reports, and necessary enforcement actions. Each of these activities is resource intensive and requires manpower.

States are finally beginning to assume their responsibilities under the section 208 program. These activities also are resource intensive. A State must integrate the section 303 water quality information, develop best management practices for nonpoint sources, develop plans for siting for industrial and municipal facilities, and review industrial permits

and municipal plants to determine their consistency with the 208 effort.

The Congress expects the State to assume more and more of the responsibilities of the water pollution program. It has therefore fashioned a program which increase Federal resources available as responsibilities increase.

### GRANT ELIGIBLE CATEGORIES

The conference substitute adds two new subsections to section 211 of the act. The first provides that if population density is used as a test of eligibility of a collector sewer for assistance, population density shall only be used for the purpose of evaluating alternatives and in determining the needs for the collection system in relation to ground or surface water quality impact. The second provides that no grant may be made under title II from funds for fiscal years 1978 through 1982 for treatment works for control of pollutant discharges from separate storm sewer systems.

The conference agreement deletes the Senate provision which amends section 211 of existing law relating to major sewer rehabilitation and collector sewer eligibility. This leaves in place existing law. Collector sewer eligibility is thus limited to communities in existence on October 18, 1972, with sufficient existing or planned capacity adequate to treat such collected sewage.

By its actions, the conferees reaffirmed the intent of the 1972 act. The purpose of these funds is not to finance the future growth needs of the United States; rather, the purpose is to eliminate the backlog of waste treatment needs with a limited provision for increased capacity to recognize the cost-effectiveness factors and to achieve a balance between the pressures for economic development and the need for environmental improvement.

A community may be a geographic or jurisdictional area less than the municipality that applies for the grant. The determination of what is a community is based in part on occupied residences in sufficient numbers to justify construction of collector sewers. An existing community for the purposes of section 211 is those residences occupied as of the date of enactment of the 1972 act.

When evaluating the eligibility of collector sewer systems, the Administrator shall bear in mind the preference given to alternative systems for sparsely populated areas by other provisions of the act.

### PRIORITIES

The conferees were disturbed by the fact that there seemed to be little relationship between the enforceable requirements of the act and the distribution of public funds for this program.

Again, to underscore that the purpose of the program is to reduce the backlog of waste treatment facilities needs and not to finance the requirements of future growth, the conference agreement specifically requires that State priority lists reflect the enforceable requirements of the act—the deadlines for municipalities and for those industries which will discharge through those municipalities. Any project on the State list which does not

comply with this requirement will be removed, and the list shall be revised accordingly.

The Administrator may not approve a grant award for a facility designed to meet new growth. He may only approve a grant for that portion of any facility which meets the specific criteria of this act. Nor may the Administrator approve a grant for a project primarily designed to deliver more waste to a receiving water.

The availability of a 75-percent grant has encouraged the construction of collectors. For example, a town in Wisconsin installed an entirely new collection and treatment system to replace existing septic tanks and ended up spending $500 per household per year for debt service and operation and maintenance. A similar situation in Maine has produced costs of $220 per household per year for debt service and operation and maintenance. In a county neighboring Washington, D.C., the State and the county had proposed to construct a $400 million advanced waste treatment facility whose capacity was at least four times that needed by the existing population. Meanwhile, 43 other cities in that same State which would have gone without funds to construct needed secondary treatment facilities are potentially subject to abatement action for failure to comply with minimum treatment standards.

The sections of the act setting out enforceable requirements include sections 201, 208, 301, 309, 402, and 405. These requirements can normally be met by projects for construction of treatment plants, correction of excessive infiltration and inflow into the sewer system, and/or control of pollutant discharges from combined sewer overflows and bypasses. Construction of collector sewers, interceptor sewers and major rehabilitation of sewers (except where necessary to correct excessive infiltration and inflow) ordinarily would not be necessary to meet the enforceable requirements of the law.

The States are expected to continue to give priority to projects within each category of projects on the basis of the severity of the pollution problem to be corrected and related factors such as the size of existing population to be served.

### MODIFICATION OF SECONDARY TREATMENT REQUIREMENT

The Senate-passed bill contained a provision permitting a modification of the secondary treatment requirement for deep ocean municipal discharges. The conference agreement is identical to the Senate-passed bill.

Some communities located along the Nation's coasts have argued that there is no need to require secondary treatment for municipalities which discharge into ocean waters. The Congress determined, after much analysis, that there should be a mechanism by which communities making this argument can test their case in the administrative process. No such contention was made for freshwater discharges. There seems to be general acceptance of the need to achieve a high degree of municipal waste treat-

ment for discharges into the Nation's river, lakes, and streams. But with respect to marine discharges, this bill provides a limited exception.

The Administrator may, on a case-by-case basis, modify the requirements of secondary treatment for marine discharges from publicly owned waste treatment plants where specific conditions are met. Water quality standards must exist for the waters into which the discharge is made and the modification must be limited to pollutants which are covered by those water quality standards. In this case, those pollutants are also limited by the parameters which define secondary treatment. Thus, a waiver could be granted only for the specific effluent parameters which are included in the definition of secondary treatment under existing law. The Administrator would be required to establish an enforceable effluent limit for such works adequate to assure maintenance of ocean ecosystems.

Where applicable water quality standards exist specific to a pollutant in a discharge, the municipal source can apply for a waiver from the secondary requirement for that pollutant if a showing is made that the applicable water quality standard will be maintained, there will not be interference with the national water quality standard for that pollutant, if indirect sources which discharge into that system meet all applicable pretreatment requirements, if no other point or nonpoint source will be required to meet additional requirements because of a modification of the secondary treatment requirement, and if the volume of discharge of the pollutant will not increase beyond that specified in the modified permit for the period during which the waiver is granted.

This provision for modification would be available only to systems which are providing waste treatment services to users which contribute primarily domestic-type wastes or which have sufficient control over industrial input so as to prohibit any 307-type pollutants from entering the system.

Any complex system which is treating wastes for a myriad of industrial and commercial establishments within a metropolitan area could never meet the requirements of this modification procedure unless the control of industrial input was thorough enough to assure that no toxics or other incompatible pollutants pass directly into the ocean environment.

Primary treatment does not deal with these kinds of constituents. Therefore, their presence as an input into municipal waste streams is a prima facie indication that the secondary treatment modification provision is not applicable.

Additionally, the discharger must be able to establish that there is no interference with the attainment and maintenance of water quality which will support a balanced indigenous population of fish, shellfish, and wildlife in all stages of their life cycle. This burden is difficult, but in most cases these outfalls have been in place for many years. Comparative ecosystems exist in nearby ocean waters

Evidence should be available and furnished as a part of an application to determine whether or not the ecosystems which exists in the areas of these outfalls are identical to those which live in unpolluted environments.

There was a great deal of discussion of the term "indigenous" as used in the phrase "balanced indigenous population of fish, shellfish and wildlife." The legislative history reflects an understanding of what is required by this national water quality standard in its application to specific receiving waters.

As in 1972, it was intended that the interim water quality standard be that condition of aquatic life which existed in the absence of pollution. There is no question that man's activities have radically altered receiving water ecosystems in this country and that alteration is continuing at an accelerated pace in many areas. Restoration of aquatic ecosystems which existed prior to the introduction of pollution from man's activities is an important element of the restoration and maintenance of the biological, physical, and chemical integrity of receiving waters. It is an essential aspect of assuring that future generations will have an adequate supply of basic life support resources.

The concept of indigenous does not anticipate the removal of structures from waterways. It does not anticipate the existence of ecosystems which existed in the absence of those structures. But it does fully anticipate the analysis of aquatic populations in terms of man's activities prior to, and subsequent to, pollution.

The secondary treatment modification is not intended to engender the delays created by prior modification provisions such as section 316(a). Procedures are to be as expeditious as practicable. To be approved, applications for modifications must be filed within the time limit provided and must, on their face, provide sufficient justification for granting the application. The burden of demonstrating entitlement to a modification is solely on the application and must be met in the application.

The requirements of section 403, which the Administrator should promulgate immediately, must be met as a condition of the granting of a modification under this provision. It is expected that in evaluating modification applications, the Administrator will pay particular attention to any combined sewer or storm sewer overflows or limitations in treatment plant capacity which result in periodic bypasses. A modification under this provision shall be effective for the full term of the permit.

Mr. President, I ask unanimous consent that a letter I have received from Thomas C. Jorling, Assistant Administrator of the Environmental Protection Agency for Water and Hazardous Materials, on the secondary treatment modification provision be printed in the RECORD at this point.

There being no objection, the letter was ordered to be printed in the RECORD, as follows:

U.S. ENVIRONMENTAL
PROTECTION AGENCY,
*Washington, D.C., December 7, 1977.*
Hon. EDMUND S. MUSKIE,
*Chairman, House-Senate Conference Committee on Amendments to the Federal Water Pollution Control Act, U.S. Senate, Washington, D.C.*

Dear Mr. Chairman and Members of the Conference: as you know, there were some unfortunate delays in the EPA implementation of important sections of the Federal Water Pollution Control Act Amendments of 1972. To some extent these delays were due to confusion surrounding the interpretation of the complicated new sections added to the law by those amendments. To avoid similar problems in implementing the 1977 amendments, I am taking the liberty of addressing one of the major amendments of the bills before Congress that covering requirements for municipal outfalls which discharge into deep marine waters—and stating EPA's interpretation of that proposal.

We interpret the provision for modification of secondary treatment requirements for municipal outfalls to limit its application to very special circumstances: those few existing outfalls into very deep waters or very high tide fluctuation areas. Only under these unusual temperature and high energy conditions can conditions exist which allow waters to receive oxygen-demanding wastes without effect on indigenous populations.

In addition, when EPA determines whether modified discharges will interfere with the indigenous population, etc., of an area, we intend to consider the effects of such discharges over the life expectancy of any project that could result from such modification. In other words, our modification decision, even though any modification will be limited to 5 years, would be made on the basis of long term effects, since such chronic effects are of greatest concern in protecting the integrity of the oceans.

The Conference's adoption of the proposed definitons and criteria restricts the possibility of modification under this provision to a limited number of areas: California (list enclosed), San Juan, American Samos, the Virgin Islands, Honolulu, Seattle, and Anchorage. I would note that this listing does not in any way prejudge the question of whether outfalls in these areas would, in fact, qualify under this section.

Adoption of another, broader set of criteria—which in our opinion the Conferees wisely did not accept—would prompt many municipalities to seek modification of secondary treatment requirements under this provision simply to delay compliance with the law. This would create an extraordinary drain on Agency resources, and effectively suspend secondary treatment requirements for an indeterminate period. Furthermore, because of our limited understanding of the effects of effluents on oceans, decisions would necessarily be highly judgmental and would, of course, be appealable in the courts. The net effect of this process would be a return to the requirement of proof of harm to receiving waters before controls can be required.

Several additional points should be made with regard to our interpretation of the proposed provisions:

1. Modification of secondary treatment requirements is allowed only where applicable water quality standards exist. We will interpret that language, of course, as applying only to standards for the discharge of conventional pollutants regulated by the secondary treatment definition. We will vigorously apply controls on other pollutants, especially toxics, in these circumstances.

2. Our preliminary review indicates there are few ocean outfalls for which any evidence has been accumulated to support an applica-

tion for modification of the requirements for secondary treatment with regard to biochemical oxygen demand and total suspended solids. Although there are studies that would have the effect of justifying discharges of a higher level of oxygen-demanding substances, we are suspicious of these studies as they relate to discharges of other pollutants associated with municipal discharges. We interpret the action of the conferees to reemphasize the overall objectives of P.L. 92-500 applicable to municipalities.

3. We intend to apply the requirement that the burden of proof be placed on an applicant to show no interference with indigenous population, and we will assure that the criteria developed under section 403 are satisfied as well.

4. Senate provision (e) (6), which in our opinion the Conferees have wisely retained, ties modification to a requirement that a discharge source has acted to eliminate the entrance of toxics into the municipal system. This will permit the recycling and reclamation of water and the confining and containment of pollutants in the future. We will interpret this provision to require facilities planning during the initial time extension to achieve those objectives.

5. We endorse the concept of limiting any modification to flows existing on the date of issuance of such modification. Only in this way will the municipality be induced to do the type of planning and implementation which will achieve the objectives of P.L. 92-500.

It should be noted, Mr. Chairman, that while much attention has been focused on the dumping of sewage sludge into the oceans, which the Congress has voted to terminate by 1981 (P.L. 95-153), a comparable or more adverse impact on ocean waters is caused by the discharge of sewage effluents into the ocean through outfalls. We know little about the effect of continued release of persistent pollutants to the oceans, but we know that oceans are vital to the biosphere that supports all life. Prudence dictates that we apply controls as rigorously as possible in order to protect the oceans. Therefore, any modification of pollution controls applicable to the oceans occasioned by short term needs should and, as we interpret the conference agreement, is quite limited in scope.

Sincerely yours,

THOMAS C. JORLING,
Assistant Administrator.

LIST OF OCEAN OUTFALLS TO TERRITORIAL SEAS AND BEYOND

(California)

Cresent City, Westport, Mendocino, Mendocino No. 2, Bolinas, San Francisco (Richmond Sunset), North San Mateo, Pacifica, Montaro, Granada.

Half Moon Bay, Davenport, Santa Cruz, East Cliff, Aptor, Watsonville, Marina, Seaside, Pacific Grove, Monterey.

Carmel, San Simeon, Morro Bay, Shell Beach, Pismo Beach, Avila, South San Luis, Boleta, Santa Barbara, Montecito.

Summerland, Carpinteria, San Buenaventura, Oxnard, Port Hueneme, City of Los Angeles, City of Los Angeles (Terminal Island), Los Angeles County Sanitation District, Avalon, Sunset Beach.

Orange County Sanitation District, Laguna Beach, South Laguna, Dana Point, San Clemente, Oceanside, Encinitas, Cardiff, San Diego, Carlsbad-Buena Vista.

Mr. MUSKIE. Mr. President, with regard to municipal extensions, the conferees approved a case-by-case extension for municipalities which were unable to meet the July 1, 1977, requirements, in part as a result of recognition of the impact of impounded funds. These extensions are available only to municipal-

ities which would require substantial construction and for which Federal funds were not available, if they agree to establish and maintain an interim compliance schedule.

Of 12,500 treatment plants now in operation, 4,150 or one-third meet the 1977 requirements of Public Law 92-500. These plants serve about 52 million persons. Plants that do not meet the deadline serve about 92 million persons. EPA has provided the following estimates as to ultimate municipal compliance:

EPA estimates the cumulative number of facilities currently in operation that would achieve secondary or more stringent treatment levels:

| Fiscal year: | Meet level | Not meet level |
|---|---|---|
| 1977 | 4,150 | 8,370 |
| 1980 | 4,260 | 7,260 |
| 1985 | 8,250 | 4,270 |
| 1990 | 11,200 | |
| 1993 | 12,500 | |

Although there is no precise estimate of the number of present industrial hookups to municipal wastewater systems, roughly 50,000 industries, most of which are relatively small, an EPA approximation. Based on a survey this year of major industrial dischargers in the paper industry, the total number of major industries—flow greater than 50,000 gallons per day—in all categories desiring hookups to municipal systems would be in the order of 70 to 100. There is no estimate of potential hookups for the small industries, but EPA believes that several thousand such industries may find hookups to be advantageous.

The purpose of this amendment is to allow the permitting agency to extend the date of compliance for those treatment works, and industries with contracts to tie in to treatment works, which have made all possible good faith efforts to meet the July 1, 1977, deadline and whose failure to do so is primarily the fault of the Federal Government.

For those industrial and municipal sources which are unable to meet this statutory deadline due to their unwillingness to take appropriate actions and spend necessary amounts of money at the earliest possible time, the conferees intend that no extension be granted and that enforcement actions be undertaken under section 309.

In determining whether or not to grant the extension, the permitting agency must consider whether the delays in construction were due to EPA's inability to make available appropriate construction grant moneys promptly or whether the fault lies with the municipalities' unwillingness to move as fast as possible with all available resources toward the achievement of the requirements of secondary treatment.

Subsection 301(i) (2) (A) (iii) would allow an extension in a permit to an industrial discharger proposing to connect to a municipal treatment system if "engineering or achitectural plans or working drawings made before July 1, 1977, for a publicly owned treatment works"

indicate such connection and other criteria of the new subsection are met. This test is intended to establish that plans or drawings to discharge to a municipal treatment system were in existence prior to July 1, 1977, and were not concocted after that date merely to frustrate enforcement of the act's requirements. Accordingly, plans or drawings that have been discarded or superseded or submitted in a grant application that was determined ineligible should not be considered sufficient to support an extension. To support an extension, such plans or drawings generally should be those accompanying an eligible grant application.

PROCEDURES FOR MODIFICATION

This amendment establishes a procedure for filing aplication for a modification of the requirements of the act for secondary treatment for publicly owned treatment works which discharge into marine waters, and for a modification of the best available technology requirement for nonconventional pollutants.

The amendment requires that any publicly owned system or industrial discharger which wants a modification must file his application to that effect with the Administrator within 9 months of enactment of the 1977 amendments (or in the event that EPA has not promulgated effluent guidelines for the pollutant in question, within 9 months of such a promulgation).

The amendment makes clear that the mere application for a modification does not stay any requirement to achieve BAT by the applicant, unless the Administrator determines that there is a substantial likelihood that the applicant will qualify for the modification on the merits of his application. In the case of a modification of the best available technology requirement for a nonconventional pollutant, the Administrator may condition a stay on the filing of a bond or other appropriate security, such as a line of credit, which will assure timely compliance with the requirements for which a modification is sought.

This provision is intended to discourage the use of the modification procedures for delay by dischargers which have no reasonable chance of qualifying for a modification. Otherwise, the exemptions would provide an opportunity to "buy time" and result in failure to meet the deadlines in the act.

Although numerous changes have been made to sections 301 and 304, effluent limitations and guidelines developed pursuant to these sections remain technology-based standards. Except to the extent expressly provided in the statute, such limitations cannot be varied or modified due to the nature or quality of receiving waters.

Whenever judicial review is sought of the Administrator's action with regard to any modification to or waiver or variance from an effluent limitation, it is expected that such review will be in the courts of appeals pursuant to section 509.

INNOVATIVE TECHNOLOGY

States with approved permit programs under section 402 of the act are to make determinations of whether a claim of

innovative technology supports an extension in consultation with and pursuant to guidance from the Administrator. This does not supersede, of course, the Administrator's ability under section 402(d) of the act to object to a permit proposed to be issued by such a State on the basis that an extension contained in the permit was improvidently granted by the State under the new section 301 (k).

The Administrator is expected to approve as innovative techniques those systems which provide for productive use of nutrients and reclaiming and recycling water.

BEST MANAGEMENT PRACTICES FOR INDUSTRY

The amendment to section 304, adding a new subsection (e), authorizes the Administrator to publish regulations for ancillary industrial activities of point source dischargers which contribute pollutants designated as toxic under section 307 to navigable waters. For these ancillary activities, the regulations will specify treatment requirements, operating procedures, and other management practices by classes and categories of point source dischargers. Once promulgated, the requirements, procedures, and practices established in the regulations must be included in section 402 permits where applicable, being considered as requirements of sections 301, 302, 306, 307, or 403. Of course, prior to promulgation, the same type of controls could be imposed in permits through case-by-case determinations under section 402(a)(1).

This amendment closes a gap in the current regulation of toxic pollutants through the permit program. Under the Federal Water Pollution Control Act of 1972, management and operating practices to abate the discharge of pollutants may only be imposed in permits indirectly; for example, through sections 402 (a)(2), 401(d), 208(e), or 301(b)(1)(C). Where such direct authority is unavailable, the result may be control of only a part of the total "toxic pollutant picture" for a given industrial site or process. Limiting pollution control in this manner may often serve to undermine overall water pollution abatement efforts. For example, wastes containing toxic pollutants may be removed from a point source discharge by treatment, only to cause another form of water pollution problem due to improper onsite management, storage, or disposal practices.

Under the terms of the amendment, direct regulation of the totality of a toxic pollutant problem through management requirements in permits would be available. Increased water pollution control would be provided for such concerns as site runoff, spillage or leaks, lagoons, sludge or waste disposal, and drainage from raw materials storage, as they relate to the processes of an industrial point source discharger.

The following example serves to illustrate the possible use of the amendment's provisions for control of ancillary industrial activities. In the case of an industrial plant that stores materials in open areas, the permit, in addition to specifying effluent limitations for the point source discharge, could prescribe

procedures for the protection of materials from rainfall and runoff, or the collection and treatment of such runoff. The same permit could prescribe methods for the handling and onsite transport of raw materials, waste sludges, lagoons, or byproducts to minimize spillage or accidental release of toxic pollutants that could flow or be washed into navigable waters.

Some recent environmentally devastating incidents underscore the need for this authority:

The carbon tetrachloride spill into the Ohio River was the result of an improper storage practice. Had proper storage practices been specified, that spill might have been avoided.

The toxic chemical mirex from the Hooker Plant in Niagara, which contaminated Lake Erie, was not an intentional discharge. It was a leak. Had the Administrator specified practices to avoid leaks, that also could have been avoided.

The runoff of kepone into the James River from outdoor storage areas could have been prevented.

Effective use of this authority should reduce significantly a major and potentially disastrous source of serious water pollution. Wherever possible the Environmental Protection Agency should specify alternative practices or control measures that will achieve the intended results. In specifying discharge permit conditions, the Environmental Protection Agency or the State should allow the point source to substitute other control measures or practices where equivalent results can be obtained.

It is the intent of the conferees that the Environmental Protection Agency be vigorous in exercising this new responsibility. The pollutants subject to this authority are the most hazardous to water ecosystems and public health.

The new section 304(e) enables the Administrator to specify best management practices in effluent guidelines to supplement effluent limitations in those guidelines under the criteria set forth in the new section. The Administrator has some authority to include best management practices requirements in permits under appropriate circumstances whether or not such practices are specified in effluent guidelines *NRDC* v. *Costle*, f2 (D.C.C. 1977) D.D.C. Nos. 75–2056). This new section does not impair that authority.

TOXICS AND MODIFICATION OF BEST AVAILABLE TECHNOLOGY

The seriousness of the toxics problem is just beginning to be understood. New cases are reported each day of unacceptable concentrations of materials in the aquatic environment, in fish and shellfish, and even in mother's milk. Emperical evidence has shown a statistical correlation between materials in New Orleans' drinking water and cancer mortality rates; Kepone has destroyed the James River, one of America's most productive, and most historic rivers; PCB's are pervasive and have ruined the fishing in the Hudson River and the Great Lakes; carbon tetrachloride is only the most recent material to contaminate the Ohio River; the pesticide endrin has been

found in the Mississippi; perhaps worst of all, are the ones we do not know of yet.

The more we find out, the more cause there is for concern. It is imperative that these materials be controlled. The 1977 requirements have made a beginning, but much more is required.

The Congress has reaffirmed the commitment made in 1972 to achieve a second phase of technology based controls on industrial point sources aimed at toxic and potentially toxic materials which remain after achievement of the 1977 requirements. Considerable testimony was taken on the 1983 requirements based upon best available technology, more than on any other subject. The issue was pursued by all committee members in the House and Senate with great interest.

The conference agreement is clear in indicating that requirement based on best available technology in Public Law 92–500, supplemented by earlier limitations under section 307(a), provide the most effective mechanism in the act for dealing with toxic pollutant discharges. Not only is BAT a technology-based requirement as recommended by the National Commission on Water Quality, but it also calls for heavy reliance on advanced technology and in-process controls which are appropriate for dealing with the majority of toxic discharges. More importantly, the nature of the toxics problem is so pervasive that the most effective approach in dealing with it is on an industry-by-industry basis.

Studies over the past year have identified large numbers of pollutants that have known or strongly suspected toxic effects, many of which are carcinogens. Past experience has shown that the only practical way of dealing with such a problem is to examine each industry category or subcategory. In this manner control options can be developed that deal most effectively with the entire waste stream of an industry. This is the approach called for by best available technology.

Another, and possibly more important, reason for maintaining the BAT requirements is that the Agency currently has a major program underway of using BAT to control toxics. Technology-based effluent limitations are being developed which will place limits on toxic pollutants which pose or are likely to pose human health and ecological hazards.

The conference agreement was specifically designed to codify the so-called "Flannery decision", which set forth 65 families of pollutants which are to be regulated by BAT, and EPA has been implementing this consent decree. To take a different course for dealing with toxics at this point would require a major reprogramming of EPA resources. Such a delay, whether it be to allow utilization of a different section of the act or in order to implement this section, would only cause confusion and add still more delay to efforts to solve the toxics problem. The discharge of toxic pollutants should be eliminated as

soon as possible. Because EPA is already embarked upon a program to control toxics using a proven mechanism, technology-based effluent limitations, and because of the urgency to control toxics, prudent public policy demands that this strategy be maintained.

The conference agreement amends section 301(b) of the act to require that all toxic pollutants actually listed in table 1 of House Public Works and Transportation Committee Print No. 95-30 must comply with effluent limitations which require the application of best available technology no later than July 1, 1984. For all other toxic pollutants, compliance must be achieved no later than 3 years after the limitation is established. For all pollutants other than toxic pollutants or conventional pollutants, compliance with effluent limitations requiring best available technology must be achieved not later than 3 years after the limitation is established or not later than July 1, 1984, whichever is later, but in no case later than July 1, 1987.

The earliest date for which compliance is required is the same as the date for compliance with the requirements of sections 301(b)(2) (C) and (E); that is, not later than July 1, 1984.

For conventional pollutants, effluent limitations shall be achieved no later than July 1, 1984, which require application of "best conventional pollutant control technology" determined in accordance with regulations issued by the Administrator.

For nonconventional pollutants, the conference agreement amends section 301 by adding a new subsection (g) which authorizes the Administrator—with concurrence of the State—to modify BAT requirements with respect to any pollutant—except toxic pollutants, conventional pollutants, and heat—upon a showing satisfactory to the Administrator that the modified requirements will result at least in compliance with section 301(b)(1) (A) or (C), whichever is applicable, that the modified requirements will not result in additional requirements on any other source and will not interfere with attaining or maintaining water quality which assures protection of public water supplies and protection and propagation of a balanced population of fish, shellfish, and wildlife, and allow recreational activities, in and on the water and will not result in the discharge of pollutants in quantities which may reasonably be anticipated to pose an unacceptable risk to human health or the environment because of bioaccumulation, persistency in the environment, acute toxicity, chronic toxicity—including carcinogenicity, mutagenicity or teratogenicity—or synergistic propensities. If an owner or operator of a point source applies for a modification under new subsection (g) with respect to the discharge of any pollutant, the owner or operator shall be eligible to apply for modification under section 301(c) with respect to that pollutant only during the same time period as the owner or operator is eligible to apply for a modification under subsection (g).

The Administrator is expected to expedite these determinations. Whenever

he determines that there is substantial likelihood that a petition for a modification will not prevail on the merits, the conferees expect the Administrator to reject the application so that the process of compliance can begin.

The conference agreement specifically excludes heat—the thermal component of a discharge—from the definition of conventional pollutants and from the category of non-conventional pollutants. This was done to avoid further confusion and delay in the regulation of thermal discharges.

The 1972 act provided a procedure whereby the thermal component of discharges could obtain a modified effluent limitation upon a demonstration of non-interference with the balanced indigenous species of fish, shellfish, and wildlife. That procedure has been utilized; demonstrations are in the process of being made; effluent limitations have been delayed as a result of that procedure. The conferees did not want further delay. The conferees did not want to provide additional opportunities for modification or waiver.

Heat is the one pollutant for which nothing has changed since enactment of the 1972 act. Heat is still subject to best available technology as defined in section 304(b)(2). Heat is still subject to the 1983 deadline.

The conferees are aware of the administrative and judicial implications of modifications of a law as complex as the Clean Water Act. There was only one exception provided in the 1972 act and, in that case, there had been great abuse. More than 100 steam electric powerplants applied for modification of thermal effluent limits. None have yet been placed on a compliance schedule to meet effluent limitations because of extensive delay as a result of this exception. And there is little question that after the administrative process there will be extensive litigation. Heat has become an unregulated pollutant, clearly not the intent of the Congress. The Congress intended that there be a very limited waiver for those major sources of thermal effluents which could establish beyond any question the lack of relationship between federally established effluent limitations and the national water quality standard. That limited exemption has been turned into a gaping loophole.

The cumbersome process which the Agency initiated resulted in part in a decision to avoid any application of 1977 regulatory requirements for steam electric powerplants. There is no basis for that decision in the law. The Agency also concluded that the 1972 act was preemptive with respect to the application of State water quality standards and effluent limits for heat. This is a determination for which there is no substance in law and which is wholly contrary to the committee's long-held view that the States are free to establish any more strict standards of effluent limitations, as specifically set forth in section 510 of the act.

It should be noted that, as was indicated during debate on the Senate floor and as is noted in the Senate committee report, the provisions of this act with respect to any pollutant—heat, a non-

conventional pollutant, a toxic or a conventional pollutant—is not preemptive of any applicable State or local requirement standard limitation or deadline.

Even without the State water quality standards/effluent limits question, the delays in section 316(a) would be unfortunate and indefensible. Similar delays under the modifications of this act would be disastrous to this program. The conferees expect the Administrator to establish an expeditious process for determining the validity of applications for exceptions, and to proceed swiftly to enforce effluent limitations applicable to pollutants for which there are no water quality standards or which would clearly interfere with attainment and maintenance of that water quality which provides for the protection of public water supplies and provides for the protection and propagation of a balanced population of fish, shellfish, and wildlife and provides for recreation, in and on the water. Only in this way can these modifications be useful, both to the source which needs to know as early as possible what will be required and to the environment which will benefit from an entire reduction of discharges of pollutants.

The Administrator is required to review, within 90 days, best available technology guidelines for any industrial categories other than the 21 industrial categories subject to NRDC versus Train. When the Administrator completes that review, in the publication of his finding he should promulgate these effluent limits as best conventional pollutant control technology. By the fact of having completed the review, the Administrator will have applied the new cost test and thus any determination as to effluent limits will be a best conventional pollutant control technology determination.

The Administrator's judgment is final unless it is determined that his action was arbitrary and capricious. Congress has given the Administrator a very brief period for review. The Administrator has testified that his standard for conventional pollutants has been similar to that which the new law requires.

It is intended that best conventional pollutant control technology codify that standard. His review of existing best available technology limits should focus on any categories where there is a possibility that best available technology actually requires more than best conventional pollutant control technology. In many cases no change or only a modest change may be required.

The conferees did not expect this review to be exhaustive or extensive. EPA's resources are limited. To direct maximum resources to removal of toxics, pretreatment, enforcement, and proper implementation of the construction grant program, this is intended to be a very limited review. The data on which these best available technology guidelines are based already exists. No new information need be developed. The Administrator must determine whether or not the cost of achieving reductions of conventional effluent bears a reasonable relationship to the amount of effluent reduction achieved. In making this determina-

tion, the Administrator is to compare the costs of industrial effluent reduction to the cost of municipal waste treatment.

The Administrator may also evaluate the effluent reduction cost/effluent reduction benefit on other cost bases including comparison with other industries. The Administrator should consider costs of process change as well as end-of-pipe treatment. Where the former is more economical, process change, not treatment, should be the basis for both the effluent limit and the cost comparison.

Best conventional pollution technology effluent guidelines are, from a regulatory standpoint, in most respects identical to best available technology except for the cost test in establishing effluent guidelines. The dates are identical, the procedure for 5-year review and update is identical, and the requirement that the Administrator consider process change as well as treatment techniques in establishing the guidelines is identical. Best conventional technology-based effluent limitations are not subject to a modification on the basis of a plant-by-plant test of economic feasibility (301(c)) receiving water quality (301(g)).

The 1972 act provided an opportunity under section 301(c) for specific sources to obtain a modification of best available technology effluent limitations on a showing that the required effluent limitations were economically unachievable for that particular source and that a modified effluent limitation would represent reasonable further progress toward the goal of elimination of discharge of pollutants.

Like toxic pollutants for which there are no waivers or modifications, there are no potential waivers or modifications for conventional pollutants. An adequate consideration of cost is made at the time of promulgation of the effluent guidelines. The statute specifically relates the economic waiver to those pollutants which remain in the best available technology category and which are not toxic—that is nonconventional pollutants. Because conventional pollutants are no longer in the best available technology category, they are not affected by any waivers or modifications, either on the basis of cost or on the basis of the test of attainment and maintenance of water quality based on protection and propagation of fish, shellfish, and wildlife.

One purpose for establishing a separate category for conventional pollutants was to assure periodic review and revision of the effluent guidelines applicable thereto. Effluent guidelines for best practicable technology were not required to be revised and reviewed because they were a time-limited requirement. Best available technology to be achieved under the 1972 act by 1983 was not intended to be the final degree of control to be applied to existing facilities.

There is and will continue to be a need to press technology to improve the degree of control on both best available technology and best conventional technology. Failure to revise and reissue guidelines on a 5-year basis for best conventional technology could lead to technological stagnation. Worse, avail-

able information indicates that growth alone could wipe out the gains made by best practicable technology. Thus, there is no reason to believe that the progress achieved by conventional pollutant control, which will be considerably greater than best practicable technology, will not also be eliminated if the degree of control remains unchanged. Thus, the conferees left in place the requirement that conventional pollutants be updated every 5 years.

The new toxics provision greatly enhances the ability of the Administrator to regulate pollutants which are suspected of having toxic potential. And, the Administrator should add pollutants to the list of toxics whenever he has reason to suspect that they may fall into this category.

The conferees intend the Administrator to have the widest latitude in adding pollutants to the list of toxic pollutants under section 307. He will not be required to justify the relative advantages of listing one pollutant or group of pollutants over another. In determining the toxicity of pollutants, the Administrator must consider the definition of toxic pollutants contained in section 502(13). While he would similarly have latitude in deleting pollutants, no pollutant listed in House Report 95–30 should be deleted without a clear finding that delisting will not compromise adequate control over the discharge of toxic pollutants. Review of the Administrator's action will be in the courts of appeals pursuant to section 509.

Moreover, it should be obvious that the fact that a pollutant listed under section 307(a) has oxygen demanding or other characteristics similar to those of conventional pollutants shall not affect the status of such pollutant as a toxic pollutant.

This provision is not intended to require extensive documentation of toxicity as is the case of toxic effluent standards. It is intended to be more closely akin to the general concept of the 1972 act—that is, that ecological protection will more likely be achieved through the elimination of discharge of all pollutants rather than requiring that the Government bear the burden of establishing a precise relationship between each pollutant in each effluent stream to a particular receiving water quality impact.

The control requirement for any pollutant placed on the toxic list is still best available technology unless the Administrator determines that there is sufficient information on toxicity to establish a separate nationwide effluent standard for that pollutant.

That is an important distinction. The toxic effluent limitation is a best available technology-based control requirement. A toxic effluent standard is a control requirement based on an established relationship between a toxic pollutant and a receiving water/ecosystem impact. A best available technology effluent limitation applies to industrial classes and categories. A toxic effluent standard applies to the pollutant per se, and cannot be exceeded by any source of that pollutant unless the Administrator makes a separate categorical determination.

Thus, for example, toxic effluent standards must be achieved by all municipal treatment plants, whereas best available technology limits apply to industrial point source categories.

The conference agreement includes only the list of toxic pollutants for which the Administrator is currently planning to promulgate best available technology effluent limitations for 21 industrial categories. This list, of course, is in terms of families of pollutants. There are within each of those families numerous chemical compounds, all of which are presumed to be listed by statute as a result of listing the family category. This was clearly the intent of the consent agreement which this legislation codifies, and that fact is in no way changed. However, it is not the intent of this amendment, in any way, to restrict the addition of toxic pollutants to that list. The Administrator is expected to expand that list as rapidly as possible to assure maximum regulation of the discharge of potentially toxic pollutants to the aquatic environment.

The Administrator is expected to rely on other evidence of suspected toxicity. For example, there is no question that if a pollutant is determined toxic under the Federal Insecticide, Fungicide, Rodenticide Act, then that pollutant should also be on the toxic list under 307. A pollutant which is determined to be unacceptable in drinking water should be immediately added to the toxic list, because, after all, drinking water is often derived from sources which are affected by point source discharges of pollutants.

There is significant Federal investment in toxicity determinations. The Administrator should not duplicate this effort. He should rely on the efforts of other sections of EPA and other agencies of the Government such as the Occupational Safety and Health Administration and the Food and Drug Administration and outside sources of information. As indicated above, suspicion of toxicity is an adequate basis for adding a pollutant to a list because, after all, such an addition only makes that pollutant subject to best available technology effluent limitations—a control requirement to which it would have been subject prior to these amendments.

These amendments are intended to improve the Administrator's ability to reduce and eliminate the discharge of pollutants. They are not intended to make that process more difficult. In fact, these amendments reduce the evidentiary burden of establishing a toxic effluent standard. While the Administrator will have to carry out further testing and have more than suspicion on which to base his determination, his decision to establish a standard will only be subject to a judicial review test of substantial evidence.

The Administrator is required by sections 301 and 307 to engage in an ambitious regulatory program. In order to carry out this vital effort, it is expected that he will make extensive use of section 308. When using section 308 for this purpose, he will not be subject to the

Case 2:10-md-02179-CJB-DPC   Document 14476-2   Filed 04/24/15   Page 19 of 55

requirements of the Federal Reports Act, 44 U.S.C. 3501–3512.

Once the review of existing best available technology guidelines for conventional pollutants has occurred and any necessary changes have been made, the reviewed and, if appropriate, adequate guidelines will no longer be considered best available technology. Instead, such guidelines will be considered "best conventional pollutant control technology" pursuant to sections 301(b)(2)(E) and 304(b)(4). The variance under section 301(c) accordingly is not available for such pollutants after the review.

As under prior law, implementation of the act need not be delayed pending promulgation of regulations. Under section 402(a)(1), State and Federal permit issuers have authority to implement the requirements of the act in permits whenever pertinent regulations are not in existence at the time of permit issuance. Of course, the Administrator retains authority under section 402(d) to assure that all permits will carry out the purposes of the act—particularly with regard to control of toxic pollutants—and will not prevent timely compliance with any effluent limitations which the Administrator will subsequently promulgate.

### PRETREATMENT

The agreement reached by the conferees on pretreatment requires EPA to establish technology-based pretreatment standards under section 307(b) and (c). The standards will at least include 21 industries and 65 toxic pollutants; additional industries and pollutants may be added later. Where set, national pretreatment standards will be developed by applying best available technology—used for setting direct discharge effluent limits—to the indirect dischargers.

The Agency will encourage local enforcement of the national pretreatment standards initially, and as municipal permits are revised, require a local compliance program as a condition of the section 402 permit. Local compliance programs will be approved by EPA or by the permitting States with EPA review. Where local compliance programs have been approved, local governments will be responsible for enforcing national and local pretreatment standards. And such standards will be conditions on applicable permits. EPA or permitting States will initiate enforcement procedures wherever local governments do not assume enforcement authority and wherever needed to back up local authorities or to protect the environment.

Where a local compliance program is approved, EPA and the permitting States may approve case-by-case modifications of the national pretreatment standards—or local credits—for documented pollutant removals attained by a publicly owned treatment works. To receive a local credit, there must be a demonstration that the pollutant is degraded or treated; credits will not be given for dilution. Such credit approvals will be conditioned initially upon municipal compliance with Resource Conservation and Recovery Act requirements under subtitles C and D, and in 1983 upon the treatment works being capable of mak-

ing beneficial use of its municipal sludge as established under subsection 405—unless such use is shown to be infeasible. National standards will not permit local credits for pollutants which are bioaccumulative or persistent toxics. Tying local credits to local compliance programs not only provides an incentive for local participation, but .more importantly, it provides assurance that the removal levels which justified the local credits will be maintained by a publicly-owned treatment works committed to operating a sound pretreatment program.

In addition to the local credit incentive, Federal encouragement of local pretreatment programs will include, but not be limited to, financial incentives—funding of State and local program development costs through section 106, 201 and 208. Regulatory incentives will include requiring a local compliance program. Construction grant recipients will be required to have user charge programs which, in combination with other revenue sources, are capable of supporting an approved local pretreatment program. All construction grant recipients will be required to have approved local pretreatment programs as a condition of their grants.

The conference agreement requires that States with permit programs approved prior to enactment must conform their programs to the new pretreatment requirements no sooner than 1 year after enactment or, if new State law is required to do so, no sooner than 2 years after enactment. Such States obviously may not be accorded an unlimited time to conform their programs to these new requirements. The Administrator is expected to establish by regulation a reasonable time by which such States conform their programs to these new requirements or face withdrawal of the approval of their permit programs.

### INDUSTRIAL DEADLINES

With respect to the industrial program, the Congress recognizes and applauds the significant success that most of the Nation's major industries have attained. And, for those who have begun, made the investment in waste treatment facilities, and complied with the 1977 requirements, there will be significant economic as well as environmental benefits. There will be environmental benefit to receiving waters, and economic benefit to those companies which bought pollution control when pollution control was considerably less expensive than it will be as result of inflationary patterns.

Between 80 and 90 percent of the Nation's industries meet the 1977 requirements of the 1972 act. A good portion of those who do not, have failed for what appear to be legitimate reasons. And about half of those who have failed, according to the Environmental Protection Agency, have not complied because of lack of diligence, lack of good faith, or lack of interest in the success of this program.

As of July 1, 1977, only a small percentage of sources within a few major industrial categories were out of compliance with the 1977 requirements and

subject to enforcement actions. Of 4,000 major industrial dischargers, only 633 or 15 percent failed to meet the deadlines. Of these, only 300 are candidates for enforcement. Of the remainder, more than 100-plus are powerplants awaiting 316 exemption decisions; 100 are in adjudicatory hearings contesting legitimate issues; and 100 are tied into municipal systems. Some of the 300 will end up in court if the enforcement order is contested. There are 94 district courts in the country; there is no danger of the courts being overlooked by enforcement actions, and EPA is trying to negotiate enforcement orders without going to court.

For those industrial dischargers not in compliance, the bill provides the Administrator with yet another tool by, in effect, sanctioning what has been a policy of dubious legality with respect to delays in compliance. Three new enforcement tools are provided. First, these amendments provide the Administrator with authority to issue enforcement orders which specify a reasonable time for compliance with final deadline. Current law limits the Administrator to issuing orders of 30 days duration.

Second, these amendments allow the Administrator, at his initiative, to grant a simple extension of up to 18 months to a source whose facilities are under construction but could not have been completed by July 1, 1977. This is simply a codification of the enforcement compliance schedule letter process which the Administrator has used for sources which, in good faith, have tried to comply with the law.

Third, if a source is in violation of the law but does not meet the test outlined above, and the source intends to discharge into a publicly-owned treatment works, the Administrator may grant a compliance order requiring compliance by the earliest practicable date, but no later than July 1, 1983, if the treatment works concurs.

The Environmental Protection Agency has developed an enforcement strategy under current authority to initiate enforcement actions only against recalcitrant major dischargers. Dischargers who miss the July 1, 1977, deadline through no fault of their own will not be subject to enforcement actions; instead, they will receive enforcement compliance schedule letters, stating a specific date by which they must comply with a final deadline and an interim compliance schedule. The conference bill, essentially, codifies this policy.

The act requires industry to take extraordinary efforts if the vital and ambitious goals of the Congress are to be met. This means that business-as-usual is not enough. Prompt, vigorous, and in many cases expensive pollution control measures must be initiated and completed as promptly as possible. In assessing the good faith of a discharger, the discharger is to be judged against these criteria. Moreover, it is an established principle, which applies to this act, that administrative and judicial review are sought on a discharger's own time.

The conferees believe that a case has been made that some relief from penal-

ties must be granted for those sources which have made a good faith attempt to comply with the deadlines in the statute but for justifiable reasons have been unable to do so.

The conferees considered but rejected the alternative in the House-passed bill of providing a case-by-case extension of the deadlines set out in the statute. That alternative was rejected because such a case-by-case extension would not only burden the administrative process but would also provide further opportunity for delay for those sources which are otherwise unable to make a legitimate case for additional time. Consequently, decisions by the Administrator pursuant to this new provision of law should not be the subject of administrative hearings and appeals but, rather, if the Administrator feels he cannot determine that a source meets the requirements of section 309(a) (5) (B) or 309(a) (6), he will immediately proceed under any of the other enforcement options set out in section 309. This authorization of limited flexibility granted to the Administrator will maintain the pressure for compliance while at the same time enabling the Administrator to use his discretion to grant any justifiable extension.

Section 309 is amended to authorize the Administrator to use his enforcement discretion in three new ways in the issuance of administrative orders: First, to require compliance with final permit requirements within a reasonable and expeditious time; second, to require compliance with the requirements of section 301(b) (1) (A) of the act by industrial dischargers meeting specified criteria by April 1, 1979; and third, to require compliance by an industrial discharger not meeting all of the criteria for an extension under the new section 501(i) (2) by discharging its wastes by July 1, 1983, to a publicly owned treatment works that will meet the requirements of section 301 (b) (1) (B) and (C) of the act after receiving the wastes from the industrial discharger by July 1, 1983.

These remedies are all at the discretion of the Administrator. No discharger has any right to compel the Administrator to provide a particular remedy. These remedies are in addition to and not exclusive of existing remedies. The Administrator, for instance, in appropriate cases may seek a civil penalty as well as issuing an administrative order. He is expected, however, not to seek penalties in instances from a discharger to which he issues an administrative order under the new section 309(a) (5) (B) as long as the discharger is in compliance with that order, since that new section was designed in part to remove the stigma of noncompliance from dischargers meeting the criteria of that section not in compliance because of circumstances entirely beyond their control. It should be noted that the extensions available to industrial dischargers in administrative orders in the new section 309(a) (5) (B) and in permits in the new section 301(i) (2) (B) are available only to dischargers that have acted in good faith. The Administrator is not expected to grant comparable extensions in administrative orders under the new section 309(a) (5)

(A) or (C) to industrial dischargers that have not been in good faith.

It must be emphasized that the Administrator is expected to utilize section 309 (a) (6) only in those few cases where the discharger has acted in good faith and the Administrator finds that such means of compliance would result in more rapid and effective reduction of the amount of pollutants discharged than any other alternative means of compliance. The fact that use of a publicly owned treatment works would be less expensive than treatment by the discharger is not relevant to the exercise of the Administrator's discretion to use this enforcement alternative.

In providing the Administrator with additional flexibility to issue enforcement orders where compliance with statutory deadlines would be impracticable, the conferees do not intend to undermine the fundamental concept of strict liability which underlies the act's enforcement provisions. In particular, the Administrator and the courts should not be burdened in enforcement proceedings with determinations of whether a discharger was negligent, not exercising due care, or otherwise at fault.

### OIL SPILL LIABILITY

The conference bill makes some changes in the liability scheme for discharges of oil and hazardous substances. The changes made, while limited, are of considerable importance in the overall implementation of this provision.

First, the language of the bill would permit the expenditure of funds from the section 311 fund for the purpose of mitigating the effects of a spill of a nonremovable hazardous substance. The effect of this amendment would be to place the financial burden of protecting persons and property from the harmful effects of discharges of hazardous substances upon those who are responsible for the discharges, and to thereby provide an incentive to such dischargers to take every reasonable step to mitigate the effects thereof.

Under the current wording of the statute, while it appears that such costs can be recovered in cases of discharges of substances determined to be nonremovable, the language is somewhat ambiguous, and the purpose of this amendment is to remove any ambiguity by making clear the intention that such costs can be recovered, regardless of whether the substance is determined to be removable or nonremovable. In addition, the amendment would make clear that the section 311(k) revolving fund could be used to pay for the mitigation effort. Such authority is essential to insure prompt action to protect public health and safety, including, for example, protection of drinking water supplies in the event of a discharge of a hazardous substance.

The bill also removes the total dollar ceiling on liability for oil spills from vessels except for inland oil barges. The ceiling served no useful purpose, inadvertently subsidizing large tankers and thus enhancing their competitive position over smaller vessels. According to testimony, the $150 per-ton limit should

be adequate for cleanup of all but the most catastrophic spills. The $14 million limit in existing law is totally inadequate to deal with an oil spill of any magnitude from the size of tanker that is expected to be plying the waters of the United States.

The conference bill establishes a minimum liability for small vessels carrying oil as cargo of $150 per gross ton or $250,000 whichever is greater. For inland oil barges, the liability is $125 per gross ton or $125,000, whichever is greater.

According to testimony from the Coast Guard—the Agency charged with the responsibility for cleaning up oil spills—very often spills from small tankers and other sources are among the most difficult to clean up because they occur in areas where the water is moving and the urgency of the application of cleanup techniques is most pronounced. Additionally, the first cost of any cleanup activity is most costly. The current per-ton limit on smaller vessels is not adequate to provide liability commensurate with the costs of cleanup which have been experienced with such spills.

The Congress is particularly concerned with the soundness of the contingency fund. As a result of the 1970 act, $35 million was appropriated to that fund. Most of that has now been depleted. While there are over $26 million in pending claims and while liability payments and penalties have been returned to the fund, depletion has resulted from cleanup from unknown sources, cleanup where costs exceeded liability, and cleanup of spills where a defense to liability was raised. The new minimum liability for smaller oil tankers and the removal of the upper limit should make the fund more sound.

The conference bill contains a provision which assures that, in most cases, the government can pursue the insurer or the spiller to recover cleanup costs without awaiting final disposition of all third-party damage claims. This provision was adopted as a result of discussions with the Justice Department which indicated that the greatest limit on speedy cleanup cost recovery was the joining of cleanup liability suits with third-party negligence actions. This will no longer be the case.

The conference bill extends authority for cleanup and liability out to the 200-mile limit of the fisheries management zone. The many recent incidents of tanker spills, especially the disaster caused by the *Argo Merchant* off the coast of New England, underscores the immediate need for improved protection from and jurisdiction over marine pollution. The absence of clear legal authority to deal with oil spills beyond the territorial seas is indefensible.

The bill contains language that would permit costs expended by the Federal Government or any State government for the restoration or replacement of natural resources damaged by a spill of oil or hazardous substance to be paid by the contingency fund. This provision authorizes the President, or a State representative to act on behalf of the public as trustee of natural resources to

recover such costs. This in an important protection for these natural resources, and this particular provision is fashioned after a similar one in the Deepwater Ports Act.

The Senate committee considered amendments to section 311 to establish liability for damages occurring outside the jurisdiction of any State as a result of an oil spill, including compensation for income loss due to damage to property or natural resources.

The limits for ocean-going vessels are close to the Senate provision in that the outside limit of liability has been removed, thus eliminating the subsidy inherent in a maximum liability for super tankers.

As in the Senate bill, the jurisdiction of the United States to clean up oil spills and assess liability for those spills has been extended to the limits of the jurisdiction of the United States. The language has been modified to reflect the fact that this is an extension of jurisdiction for the purpose of protecting the resources over which the United States exercises jurisdiction rather than an extension of jurisdiction over waters beyond the contiguous zone.

The Senate committee considered amendments to section 311 to establish liability for damages occurring outside the jurisdiction of any State as a result of an oil spill, including compensation for income loss due to damage to property or natural resources. A related amendment creating a new compensation fund covering claims for damages above the spiller's limits of liability and funded by a 3-cent-per-barrel throughput fee on oil not already subject to the fees associated with the existing compensation funds, was also considered. The committee deferred action on these proposals and will consider them as part of the comprehensive oil spill liability legislation, which will be taken up after enactment of this bill. In that context, a provision of liability for damages and a compensation fund which does not pre-empt State liability requirement will be included in any committee action.

The Senate conferees are committed to consideration in this Congress of pending legislation authorizing creation of an oil spill superfund. Legislation to create such a fund has passed the House—H.R. 6803—and has been referred to the Senate Environment and Public Works Committee along with a similar bill reported from the Senate Commerce, Science and Transportation Committee—S. 2083.

These amendments to section 311 will provide interim assurance that adequate funds will be available to clean up most oil spills and will provide a basis against which the Senate committee can consider the superfund legislation.

The conferees expect that matters raised in this section will be further reviewed in conjunction with consideration of the superfund legislation and of any international agreements on pollution beyond the territorial seas.

The conference agreement is not intended to disrupt the process of negotiation of international environmental protection agreements. It is intended rather to indicate the degree of protection which the United States believes is a minimum.

The massive amount of oil which is being moved on the oceans presents a continuing threat to the capacity of the oceans to generate food and oxygen. There is little disagreement that once polluted to the degree where these resources are in danger, the process may be irreversible. Unlike a lake or a river which man can abandon, the oceans are elemental to man's life support system. Thus, a greater environmental ethic must be applied to protection of ocean resources than might otherwise be applied to inland waters.

The international community needs to understand the importance which the United States places on ocean resources. And the international community needs to understand the limits which the Congress imposes on those international agreements intended to make uniform laws which affect the oceans.

Mr. President, I have, as chairman of the the Subcommittee on Environmental Pollution, communicated these deep concerns to Secretary of State Cyrus Vance and Law of the Seas Ambassador Elliot Richardson. I ask unanimous consent that copies of my correspondence on these issues be printed at this point in the legislative history in order that the purpose of these amendments will be absolutely clear.

There being no objection, the letters were ordered to be printed in the RECORD as follows:

WASHINGTON, D.C., March 22, 1977.
Hon. ELLIOT RICHARDSON,
*Ambassador,*
*U.S. Department of State,*
*Washington, D.C.*

DEAR AMBASSADOR RICHARDSON: I have written to Secretary of State Vance to express my concerns about certain aspects of the current Law of the Sea Negotiations. I am enclosing a copy of that letter for your information.

I am particularly concerned by the preemptive nature of the Revised Single Negotiating Text with respect to the vessel source pollution area. As currently written, this proposal would limit the rights of coastal states, such as the United States, to establish and enforce standards under existing United States environmental statutes. As I stated in my letter to Secretary Vance, many of us have worked long and hard to see these environmental statutes enacted, and I would have serious reservations about a Law of the Sea Treaty which would affect the applicability of those statutes.

As a New Englander, I am sure you understand the importance of adequate protection of both marine and recreational resources. I hope the United States delegation will share my concern in this area as negotiations continue. I wish you and your colleagues the best of success.

Sincerely,
EDMUND S. MUSKIE,
*Chairman,*
*Subcommittee on Environmental Pollution.*

---

WASHINGTON, D.C., March 21, 1977.
Hon. CYRUS R. VANCE,
*Secretary of State, U.S. Department of State,*
*Washington, D.C.*

DEAR SECRETARY VANCE: I have followed closely, over these last five years, the progress at the Law of the Sea negotiations because of my deep interest in a variety of issues being considered. Since I have been actively involved in the development of U.S. environmental legislation and am the Chairman of the Environmental Pollution Subcommittee of the Senate Committee on Environment and Public Works, I have watched the formulation of the environmental provisions of the Treaty with particular interest.

I would like to bring you up to date on my position on the pollution issues involved in the Law of the Sea negotiations. I think my position is fully supported by the recent series of tanker accidents, the result of which may be long-term damage to marine ecosystems.

I am committed to seeing that this country takes measures to assure that our oceans and well-being do not continue to suffer this harm in the future. To this end, I have introduced legislation which would extend our pollution control jurisdiction out 200 miles, and I have also introduced other legislation to assure that effective standards are adopted for vessels entering United States ports or traveling near our coastline.

The Law of the Sea Treaty should be an instrument to establish a system to eliminate environmental degradation. Certainly such a Treaty should not include provisions which would impede our efforts to move in the direction of sound marine environmental policy. However, the current negotiating text does, in fact, include such provisions.

As such, the Revised Single Negotiating Text in the vessel source pollution area is not acceptable. In particular, it would pre-empt the rights of coastal states, like the United States, to establish and enforce standards relating to vessel source pollution of coastal areas. Another article would prevent the United States from promulgating national environmental requirements affecting vessels in the territorial sea with respect to design, construction, manning or equipment (and even other matters, such as discharges, if these are covered by international treaty unless coastal state standard setting is specifically authorized). Also, if a vessel were to cause substantial damage to the coast of Maine or any other seaboard state, the United States would not be able to enforce our own domestic laws or international laws against that vessel if the flag state were to commence enforcement proceedings.

If the above vessel source pollution provisions are permitted to remain, they would be inconsistent with existing United States environmental policy; they would be contrary to United States laws including the Ports and Waterways Safety Act and the Federal Water Pollution Control Act; and they could result in more pollution of United States coastal areas and the oceans. While other Members of the Senate and I will want to examine closely all aspects of any final agreed-upon Law of the Sea Treaty and would not, at this point, prejudge what our position on advise and consent to ratification should be, many of us will have serious reservations about the Treaty if the United States will be prevented from establishing and enforcing all standards in its territorial sea—that is, if the Treaty pre-empts existing U.S. environmental legislation. Many of us in Congress have worked long to secure enactment of meaningful United States environmental protection legislation. We would not be prepared to have those years of effort and success pre-empted by less than adequate international treaties.

Finally, with respect to the establishment of a 200 mile economic zone, it seems to me eminently sensible that the United States and other coastal states should have the right to enforce environmental standards for vessels within that economic zone. Such right should be exercisable when any pollution violations occur and should not be limited only to cases of imminent and severe environmental damage (since these are always difficult, if not impossible, to prove). Nor should this right to be subject to preemption by flag states. In the past, our dele-

gation, for reasons which I believe are not defensible, has not been prepared to advocate such extended enforcement. I believe that the United States delegation should insist on the inclusion of this right in the Treaty.

The Law of the Sea negotiations are important to the International community and the United States for a variety of reasons, not the least of which is the protection of the ocean environment. I hope that the United States delegation will vigorously seek the protection of coastal state environmental laws in order to assure fulfillment of that commitment.

Sincerely yours,
EDMUND S. MUSKIE,
*Chairman, Subcommittee on Environmental Pollution.*

Mr. MUSKIE. Mr. President, I would hope that in negotiationss, either with respect to the Law of the Seas Treaty or any international maritime consultative organization agreements, spokesmen for the United States will view this legislation as the baseline from which they will negotiate and not, as has been the case, in the past, a starting position from which the United States will bargain.

I also hope that U.S. representatives to these negotiations will consult more closely with the Senate to assure that positions taken are consistent with domestic law. I would hope that these consultations take place at a time sufficiently prior to the formulation of a U.S. position so that the advise of the Senate can be meaningful. I, for one, am not prepared to support international agreements, the effect of which would compromise the interest of the United States in protecting ocean resources.

The amendments to section 311 underscore the importance of this section and the need for completion of long-delayed regulatory action with respect to hazardous substances. There is no reason for further delay. While designation of hazardous substances and determination of removability, harmful quantities and rates of penalty are major actions, the Administrator is expected only to make a reasonable effort to make these judgments. These are nationally applicable, before-the-fact decisions and are not expected to reflect the myriad of actual circumstances that may occur.

Judicial review should not unnecessarily prevent implementation of these regulations. Burdensome discovery should not be necessary so long as notice and opportunity to comment was provided. Review should also be consolidated as much as possible.

It is also expected that costs of mitigation actions designed to properly dispose of pollutants removed from the water or shorelines will be deemed costs properly included in section 311(c).

FEDERAL FACILITY COMPLIANCE

The phrase "particular effluent source" in the amendment to section 313 is not intended to suggest any limitation on the President's power under the general exemption provision to exempt any Federal activity, such as the strategic petroleum reserve program, from the requirements described in section 313.

ENVIRONMENTAL PROTECTION AGENCY
ISSUANCE OF PERMITS

Section 402(d) as amended provides a process for the issuance of National Pollutant Discharge Elimination System permits by the Administrator after he objects to a State-proposed permit. It is intended that this process be utilized to insure the rapid issuance of an effective, valid permit. The Administrator's action in objecting to a permit would generally not be subject to judicial review since it will always be followed by further administrative action. The final issuance of a permit by EPA would be subject to judicial review pursuant to section 509 (b) (1) (F).

Furthermore, in order to insure the effectiveness of this provision, the Administrator may develop flexible procedural rules to provide for rapid permit issuance. When the record developed by the State is adequate for instance, the Administrator need not provide for public comment or a public hearing. When the record developed by the State is inadequate to support a permit determination by the Administrator, he may remand the permit proceedings to the State with instructions to develop an adequate record or he may develop such record himself.

DREDGE AND FILL PERMIT PROGRAM

The provisions of the conference report dealing with discharge of dredged or fill material amend sections 404 and 208(b) (4) of the act. These amendments are essentially the same approach as taken in the Senate-passed bill, and the Senate report and floor statements at the time of Senate passage are still adequate reflections of legislative intent with respect to this program.

The conference bill follows the Senate bill by maintaining the full scope of Federal regulatory authority over all discharges of dredged or fill material into any of the Nation's waters. It provides for the substitution of adequate State programs for permit issuance by the Corps of Engineers, and for general permits to be issued by the corps or under approved State programs. The bill also provides the exemptions from the permit requirement for certain specified activities as provided in the Senate-passed bill.

The two major changes from the Senate version are a greater degree of specificity about the type of "best management practice" regulation under section 208(b) (4) which qualifies an activity for exemption from the section 404 permit requirement, and a restatement of the exemption for Federal projects.

The conference bill amends section 208(b) (4) to authorize the Administrator to approve statewide regulatory programs to control those discharges of dredged or fill material that are better handled through imposition of best management practice requirements. The section 208(b) (4) (B) program is intended to complement State permit programs approved under section 404. Once a State has an approved section 404 permit program and an approved section

208(b) (4) (B) regulatory program, the Administrator may approve best management practices imposed by the State to control an activity which he determines will have only minor individual or cumulative effects on the aquatic environment. If the Administrator approves best management practices as adequate to control a specific activity without additional permit review, providing a degree of protection comparable to that from section 404(b) (1) guideline review, Federal permits should not be required. Best management practices will not be appropriate as the sole means of control for activities such as channelization and site development fills that can impair the circulation or reduce the reach of navigable waters. Such activities, by their vary nature, will continue to require individual attention through a permit review process, as will all discharges involving any toxic pollutant listed under section 307(a)(1).

Of course, best management practices may be required for such activities as permit conditions. It is not expected that the section 208(b) (4) (C) exemption from permit requirements will be available for whole classes of activity, such as silvaculture. While the intent of section 208(b) (4) is to encourage States to develop best management practice requirements for all such activities, as part of a general forestry practices act or otherwise, each individual activity or practice must be scrutinized in light of the section 404(b) (1) guidelines and approved by the Administrator before the permit exemption is available.

A section 208(b) (4) (B) is not a substitute for the section 404 program, and the Administrator cannot approve best management practices to replace the State's permit review process in its entirety. This is consistent with the principal that section 208(b) programs generally, at the State or area wide level, do not duplicate the permit programs for point sources under sections 402 and 404, but incorporate them in a broader effort to attain the water quality objective of the act.

The Administrator must assure that an approved best management practice is specific enough to inform each person conducting an activity what is specifically required of him. The conferees expect that any approved section 208(b) (4) (B) program will include an active enforcement process with demonstrated capability and adequate resources.

New subsection 404(r) provides an exemption from the permit requirement for discharges of dredged and fill materials associated with the construction of certain Federal projects. Only fully Federal projects which are specifically authorized by the Congress may qualify for this exemption. Federally assisted projects, such as watershed improvement plans under the Soil Conservation Service, do not qualify even if authorized by name. Projects which are authorized by congressional committee resolution and projects which do not belong to the Federal Government but are financed in whole or in part with Federal funds are

Case 2:10-md-02179-CJB-DPC    Document 14476-2    Filed 04/24/15    Page 23 of 55

not eligible for the exemption. Maintenance of existing Federal projects is not covered by the exemption either.

A Federal project may be exempted from the requirement for a permit under section 404 or an approved State section 404 permit program only if the Congress had adequate information on the effects of the discharge of dredged or fill material at the time of authorization, or at the time of a specific appropriation of funds for the construction involving the discharge. This information must be in the form of an environmental impact statement which specifically addresses the effects of the discharge of dredged or fill material, providing an evaluation of those effects equivalent to that required under the section 404(b)(1) guidelines. It is unlikely that environmental impact statements prepared before the passage of this legislation or promulgation of those guidelines would satisfy this requirement.

The Congress must have adequate siting, engineering, and environmental information and analysis on each proposed Federal project, as well as modifications recommended by reviewing agencies, in order to review the available alternatives to and potential adverse impacts of the proposed discharges. The Administrator will be expected to see that the section 404(b)(1) guidelines are sufficiently explicit to focus attention on those aspects of Federal project dredge and fill material discharges that could result in environmental degradation. And the Administrator must assist other agencies by carefully reviewing draft environmental impact statements to assure that the guidelines are being interpreted and implemented properly.

Mr. President, the Senator from Arkansas, Mr. BUMPERS, has written to me as chairman of the conference committee, on the question of Federal projects exemption. I ask unanimous consent that his letter be printed in the RECORD at this point.

There being no objection, the letter was ordered to be printed in the RECORD, as follows:

WASHINGTON, D.C., December 14, 1977.

Hon. EDMUND MUSKIE,

Chairman, Subcommittee on Environmental Pollution, Committee on Environment and Public Works, Washington, D.C.

DEAR ED: I am especially concerned about the effect that the conference report on H.R. 3199 may have on Section 404 of the Water Pollution Control Act. As you know, this provision of law, now codified as 33 U.S.C. Section 1344, places upon the Secretary of the Army, acting through the Chief of Engineers, the authority to issue permits for the discharge of dredged or fill material into the navigable waters at specified disposal sites. Under subsection (c), however, the Administrator of the Environmental Protection Agency is authorized to prohibit or restrict the use of any disposal site for dredged or fill material if he determines that the discharge of such materials at that site will have an unacceptable adverse effect on municipal water supplies, shell-fish beds and fishery areas (including spawning and breeding areas), wildlife, or recreational areas. The Administrator is required to set forth in writing and make public his findings and his reasons for making any such determination.

This provision has played an important part in the orderly development of federal water-resource projects. The power which it grants the Administrator of EPA is especially important in connection with Corps of Engineers projects. In those instances, without subsection (c) of Section 404, the Corps of Engineers would, in effect, be granting itself a permit for the disposal of dredged and fill material. Subsection (c) has provided a valuable check. It has prevented the Corps from being judge in its own cause.

The pending conference report would change this aspect of Section 404 rather significantly. Section 67(b) of H.R. 3199, as agreed to by the conferees, would add a new subsection (r) to Section 404. This new provision would apply to federal projects specifically authorized by Congress. The discharge of dredged or fill material as part of the construction of such projects could not be prohibited by or regulated under Section 404 if certain rather specific conditions are met. If the project is to qualify for this exemption, information on the effects of the discharge, including consideration of the guidelines developed under subsection (b)(1) of Section 404, must be included in an environmental impact statement, and such impact statement must have been submitted to Congress before the actual discharge of dredged or fill material in connection with the construction of such project and prior to either authorization of such project or an appropriation of funds for such construction.

I would like to ask you, as manager of the bill, whether you concur in my construction of subsection (r). The explicit requirement that environmental impact statements include information on the effects of the discharge, including consideration of the guidelines developed under subsection (b)(1) of Section 404, is of course entirely new to the law. It seems clear, therefore, that to qualify for this exemption environmental impact statements prepared before the pending conference report becomes law may well need to be amended or updated, with any amendments or changes going through the customary process of circulation of a draft impact statement.

The depth and quality of discussion of the effects of discharges, including consideration of the (b)(1) guidelines, are crucial to new subsection (r). The filing of an impact statement adequately exploring these issues in depth is a condition precedent to the operation of subsection (r). It is my understanding that until and unless such impact statements, or amendments to statements, are circulated and filed in accordance with the guidelines of the Council on Environmental Quality and other applicable laws and regulations, the Section 404 permit requirements as it existed before the passage of the presently pending bill will remain in full force and effect as to any given project in question.

Your attention to these issues is greatly appreciated. Many thanks for all your courtesies.

Sincerely yours,

DALE BUMPERS.

Mr. MUSKIE. Mr. President, the Senator from Arkansas' letter addresses an important issue. The depth and quality of discussion of the effects of discharges, including consideration of the (b)(1) guidelines, are crucial to the operation of new subsection (r). The filing of an impact statement adequately exploring these issues is a condition precedent to the operation of subsection (r). Until and unless adequate impact statements, or amendments to statements, are circulated and filed in accordance with the National Environmental Policy Act and the (b)(1) guidelines, the permit requirements of section 404 which existed before the passage of the presently pending bill will remain in full force and effect as to any given project in question.

The process of review of environmental impact statements by other agencies should provide the same degree of coordination now provided in the interagency review of permit applications.

In addition, I want to stress that any State permit program for the discharge of fill material approved by the Administrator must have demonstrated itself capable of accomplishing the same objectives as the Federal permit program. The State program must include enforcement authority comparable to the Federal program, with adequate resources including staff and funds, and must assure coordination with all related Federal, State, and local programs. A State permit program must include substantive decisionmaking criteria as stringent as the section 404(b)(1) guidelines.

The conferees agreed to adopt the Senate amendment that legislatively clarifies the exclusion of certain activities that do not typically involve point source discharges of dredged or fill material and will be adequately controlled by best management practices and performance standards. The conferees have adopted the Senate's explicit approach for clarifying that plowing, seeding, cultivating, harvesting, minor drainage, and soil and water conservation practices performed on uplands were not intended to require section 404 permits. Such exemptions were provided by the Corps of Engineers' regulations under the current law.

New subsection 404(f) provides that Federal permits will not be required for those narrowly defined activities that cause little or no adverse effects either individually or cumulatively. While it is understood that some of these activities may necessarily result in incidental filling and minor harm to aquatic resources, the exemptions do not apply to discharges that convert extensive areas of water into dry land or impede circulation or reduce the reach or size of the water body. For the same reasons, paragraph (f)(1)(E) provides that farm and forest roads are to be constructed and maintained in accordance with best management practices to minimize any adverse effects that may occur when water is displaced by fill material.

Subsection (t) of section 404 was a provision of the Senate-passed bill which was adopted by the conferees with limited modifications. Subsection (t) clarifies the intent of Congress that the maintenance dredging activities of the U.S. Army Corps of Engineers, as all other Federal activities, should be subject to State permit requirements.

Subsection (t) was offered in the Senate Environment and Public Works Committee by Senator ANDERSON as a result of varying legal interpretations of the applicability of sections 313 and 404 to dredging activities. The Senate report, page 68, summarizes the past litigation on these provisions. By enacting subsection (t) the Congress will clarify that corps dredging activities are not exempt

from State pollution abatement requirements. In fact, under section 404(t) and the amendments to section 313, every Federal activity is subject to State and Federal procedural requirements, including permits, as well as substantive requirements. Activities on federally managed lands are covered as well.

The conferees agreed to three modifications of related Senate-passed provisions. None of these, however, were intended to detract from the basic thrust of subsection (t): The Corps of Engineers, like any other Federal agency, in performing maintenance dredging or undertaking other activities, is to comply with State substantive and procedural requirements. First, the conferees agreed to amend section 313 to provide the President with a procedure to provide limited exemptions for military equipment and vessels from Federal, State, interstate, or local requirements. This provision arises from concerns expressed by the Department of the Navy about the possible application of subsection (t) to military activities, to the detriment of national defense. Only in cases where the Corps of Engineers is performing dredging for access channels for critical military vessels could this authority limit subsection (t) as it applies to maintenance dredging.

Second, the conferees agreed to restrict subsection (t) to State and interstate requirements only, thereby eliminating from the Senate language local requirements.

Third, the conferees agreed to include in the language of subsection (t) the precise language that appears in section 511(a)(1) of the Federal Water Pollution Control Act of 1972:

This section shall not be construed as affecting or impairing the authority of the Secretary to maintain navigation.

The Senate conferees agreed to this provision on the corps; namely, to combat the current law and was not primarily at issue in the litigation that prompted this provision. It is also not inconsistent with the Senate report on this provision.

The addition of the language from section 511(a)(1) to subsection 404(t) is not interpreted by the conferees as either contradicting, nullifying, or restricting the principal purpose of this provision on the corps; namely, to comply with State water quality standards when dredging.

Those State water quality standards covering turbidity, suspended solids, and other parameters, that are applicable to all other dischargers to public waters, will now be applied to the significant dredging activities of the corps, and all other Federal activities.

The conferees recognize, as was specifically included in the Senate report on this legislation, that compliance with water quality standards by the corps is dependent on the availability of funds for on-land or confined disposal of dredge spoil. We affirm the language in the Senate report that it is the responsibility of the Secretary of the Army to seek funds from the Congress for maintenance dredging to be performed consistent with State water quality standards. The first evidence of the corps' intentions of the corps to comply with section 404(t) of the Clean Water Act of 1977 in good faith will be the expeditious allocation by the Secretary of the Army and Chief of Engineers of funds to local corps district offices for compliance with this provision during the 1978 dredging season, or, if such funds are not available from funds now under the control of the Army, a request to the Congress for a supplemental appropriation to insure that the corps has those funds required to dredge in compliance with State water quality standards.

In summary on subsection (t), the intention of the Federal Water Pollution Control Act of 1972 was not to exempt the U.S. Army Corps of Engineers or any other public or private agency from State water quality standards and the interpretation of section 404 by the courts is at variance with the intent of Congress. In fact, Congress intended that section 404 in the 1972 act would in its initial implementation end the open water disposal of dredge spoil. Quite the contrary has been the case. Section 404(t) of the Clean Water Act of 1977 is clear direction from the Congress to the Corps of Engineers that dredging must be performed in compliance with the same water quality standards and pursuant to the same procedural requirements with which any other dischargers to the Nation's waters must comply.

EMERGENCY FUND

The emergency fund amendment provides general authority for the Administrator of the Environmental Protection Agency to abate environmental emergencies. The authority is not limited to water pollution emergencies. Examples of the kinds of events for which funds authorized by this section might be used include:

Louisville, Ky.: On March 29, 1977, toxic fumes emanating from a sewer line caused several people to faint on the streets of Louisville. It was later determined that the toxic fumes stemmed from a mixture of hexa- and octachlorocyclopentadienes, resulting in the hospitalization of over 10 persons and the closing of the wastewater treatment plant. The plant was forced to divert millions of gallons per day of untreated sewage into the Ohio River for about 2 months until the plant was able to resume its full operation again. The overall cleanup effort included the removal of the chemical contaminant from the sewer line, decontamination of the waste treatment facility, and ultimate disposal of the contaminated sludge. The two organic chemicals are not designated on EPA's hazardous substances regulation, therefore, the 311(k) revolving fund would not have been available for expenses incurred for the cleanup operation.

Kernersville, N.C.: On June 3, 1977, vandals had entered a facility, owned by Destructo Chemway Corp. near Kernersville, N.C., and opened valves on six storage tanks. Approximately 30,000 gallons of waste oil and a mixture of organic chemicals were discharged into an unnamed tributary and eventually entered the Kernersville Reservoir, a 24-acre lake serving as the primary drinking water source for Kernersville's residents and industry. All costs associated with the removal and disposal of the waste oil, which were on the surface of the lake, were charged to the Federal revolving fund under section 311(k) of the Federal Water Pollution Control Act. Other nonoil contaminants remained in solution in the water column and were not removed. These contaminants would pose an imminent threat to downstream water use in the event the reservoir overflows.

Kingston, Tenn.: On March 5, 1973, a transformer owned by General Electric Co., was transported via truck to its new destination. When the transformer started to leak on highway 58 near Kingston, Tenn., the driver of the truck dumped approximately 1,500 gallons of Pyranol near the roadside. Pyranol is composed of a mixture of PCB's and chlorinated benzenes. Because the spill occurred near the top of a hill, a considerable area was contaminated. The contaminated soil was excavated, placed into 11,500 drums, transported and disposed of at a chemical landfill in Texas by General Electric Co. The overall cleanup cost incurred by the company was over $1.7 million. Although PCB's are on the 311 hazardous substances designation list, section 311 of the Federal Water Pollution Control Act is not applicable because the incident did not involve navigable waters of the United States.

Charleston, W. Va.: On February 18, 1977, EPA detected unusually high concentrations of carbon tetrachloride in the Kanawha and Ohio Rivers. It was estimated that 70 tons of carbon tetrachloride had found their way into the rivers. On February 24, 1977, FMC Corp. reported a spill of 5,300 pounds of carbon tetrachloride into the Kanawha River. On March 8, FMC notified EPA of another spill, and again on May 26, FMC experienced a spill of between 200 to 400 pounds of carbon tetrachloride. Carbon tetrachloride is not currently designated on EPA's 311 hazardous substances list—proposed rule.

Hopewell, Va.: A converted gasoline station, owned by Life Science Inc., was used to manufacture kepone at Hopewell, Va. After 16 months of operation, the facility was shut down on July 14, 1975. The kepone was responsible for disabling some of the workers who work at the site. During the operation of the plant, kepone-contaminated effluent was chronically discharged into the James River via Hopewell treatment plant, and it is now found to be spreading in the Chesapeake Bay. In late 1974, the failure of the digesters at the Hopewell treatment plant led to the discovery of relatively high kepone concentrations in the sludge. This kepone-contaminated sludge was placed in a specifically constructed storage lagoon where it remains today. Other materials, such as filters, clothing, and activated carbon, which became contaminated during the demolition of the converted gasoline station, were also stored in sealed barrels

at the Hopewell sewage treatment plant site. The lagoon sludge, barreled material, and decontamination water still require ultimate disposal in an environmentally acceptable manner.

Oswego, N.Y.: On March 23, 1977, a potential major spill of 1.4 million gallons of waste oil and other chemicals at Pollution Abatement Services (PAS) near Oswego, N.Y., was reported to EPA Previous spills from PAS, a liquid waste disposal company, had occurred in June and December 1976. EPA region II assumed responsibility as on-scene coordinator and activated EPA's treatment trailer. On August 29, 1977, a district court judge in New York granted a preliminary injunction against PAS, enjoining it from further discharge of oil or chemical waste. The judge also directed EPA to remove the contents in two containment lagoons and lower the level in two others to eliminate leakage through the dikes. All costs associated with the removal and disposal of PCB-contaminated surface oil and oily sludge can be charged to the Federal revolving fund under section 311(k) of the Federal Water Pollution Control Act. Removal of other nonoil contaminants, such as chemical waste in 55-gallon drums, could pose an imminent threat upon discharge. Expenses incurred for the removal of these nonoil contaminants cannot be charged to the 311(k) Federal revolving fund because the majority of the contaminants are not designated on EPA's hazardous substances list.

Chicago, Ill.—On April 26, 1974, a chemical storage tank at bulk terminal on Chicago's south side ruptured, discharging silicon tetrachloride. The chemical reacted with the moist air and produced a nausea-inducing, acid cloud which measured from 5 to 10 miles long as it moved across the city. Nine governmental agencies were involved in the incident. State, city, and Federal agencies worked for 8 days to stop the leak, neutralize the spill and transfer the material to another tank.

Pensacola, Fla.: L. & N. railroad suffered a 15-car derailment on the east side of Pensacola's city limits, west side of Escambia Bay. Derailment occurred at 6:30 p.m. CST on November 9, 1977. Two cars of anhydrous ammonia were involved, one car ruptured and one car leaking. Sixteen people were hospitalized, four critical and one dead. One thousand people were evacuated. On-scene decisions were made by a disaster team from air products. Their decision was that they could not patch either tank so they hooked a water hose to each tank, flushed it out, diluted the ammonia and discharged it into the bay. This was not a 311 incident. there was no EPA 311 emergency personnel on-scene and no 311 funds were utilized.

### PBB'S IN MICHIGAN

In 1973, a large batch of cattle feed was contaminated by the chemical PBB in Michigan. The result of that contamination and its subsequent dispersal throughout the environment of Michigan has resulted in the contamination of some 9 million human beings with

the chemical and the destruction of thousands of head of livestock.

While the responsible chemical was identified in 1974, reaction by the State and Federal officials to prevent the spread of the chemical and to take remedial action was incredibly slow. For example, in January of this year, nearly 4 years after the contamination incident, Government officials are finally beginning to examine whether or not workers engaged in the manufacturing and processing of PBB may be experiencing ill-health effects. If a section 69 had been applicable when the contamination occurred, the spread of this chemical could have been reduced and much of the suffering and economic damage which exists even today could have been avoided.

### NONCOMPLIANCE FEES

The conferees deleted a provision in the Senate-passed bill which required the Administrator to assess a noncompliance fee against industrial point sources not in compliance with the requirements of the act after July 1, 1979, in amounts commensurate with the economic benefit of the delayed compliance. A similar provision was contained in the Clean Air Act Amendments of 1977.

The conference committee dropped this provision as unnecessary at this time, for two reasons. First, although there are well over a thousand major sources of air pollution that will not be in compliance with Clean Air Act requirements on July 1, 1979, there are only a few hundred major industrial sources of water pollution that are expected to be in noncompliance with Federal Water Pollution Control Act requirements by that date. This relatively good compliance record appears to make the addition of a new enforcement tool unnecessary at this time. Second, the Agency's current enforcement policy is to seek court imposed penalties for noncompliance with Clean Water Act requirements in amounts commensurate with the economic benefit of delayed compliance, among other factors.

This policy embodies congressional intent on the criteria that should be considered by courts in imposing civil penalties under existing provisions of the act. Successful implementation of this policy by the Agency through the courts may make the provision for administratively assessed, economic benefit fees unnecessary. Subsequent review of compliance under the Clean Water Act, the success of the Agency in implementing its penalty policy through the courts, and the time delay and resource demands of seeking judicially imposed penalties may indicate that the administrative assessment mechanism will become necessary in the future.

The deletion of this provision is in no way intended to affect the Agency's current enforcement strategy.

Mr. President, I ask unanimous consent that a letter and a document outlining EPA's enforcement strategy be printed in the RECORD at this point.

There being no objection, the material was ordered to be printed in the RECORD, as follows:

WASHINGTON, D.C.,
*December 14, 1977.*
Hon. EDMNUD S. MUSKIE,
*Chairman, Senate/House Conference Committee on H.R. 3199, U.S. Senate, Washington, D.C.*

DEAR SENATOR MUSKIE: You have asked for an elaboration of the Agency's policy with regard to civil penalties under section 309 of the Federal Water Pollution Control Act and section 113 of the Clean Air Act.

The Agency believes that civil penalties should be utilized to deter violations of and to encourage future voluntary compliance with the requirements of the Acts. To achieve these goals the Agency believes that the amount of civil penalties assessed against major industrial sources of pollution must at least remove any economic gain achieved by non-compliance and may have to be larger in some cases.

The assessment of civil penalties in these amounts will result in greater equity in the enforcement of these Acts by insuring that sources which comply with the Acts' requirements in a timely manner do not suffer an economic disadvantage in comparison with those that do not.

Accordingly, it is the Agency's policy to compute penalties in agreed upon settlements in civil cases commenced under the Acts against major industrial sources of pollution by:

1. Calculating the amount of economic advantage secured by non-compliance;

2. Adding appropriate amounts for aggravating circumstances, such as the degree of environmental harm caused by the violation, the degree to which the integrity of the regulating systems created by the Acts is threatened by the violation, and abnormal expenditures by the Agency to secure compliance;

3. Multiplying the sum of (1) and (2) by a percentage reflecting the probability of successfully proving the alleged violation in court; and

4. In extreme cases, by deferring or reducing the penalty in whole or in part, where the immediate payment of the full amount would render it impossible for the source to install the required pollution controls and stay in business.

In cases that are tried rather than settled the Agency would ask the Judge to take the same factors into account, with two exceptions. Since a litigated case would not reach the issue of penalties unless the underlying violations are proved, no discount to reflect probability of success on the merits would be appropriate. Moreover, penalties assessed by Judges should be sufficiently higher than penalties to which the Agency would have agreed in settlement to encourage violators to settle.

This policy was established for civil cases under the Federal Water Pollution Control Act in a policy memorandum dated June 3, 1977, a copy of which is attached. That policy now also applies to civil actions commenced under section 113 of the Clean Air Act.

The economic benefit component of civil penalties assessed under section 113 of the Clean Air Act, of course, should not be duplicative of administratively assessed noncompliance penalties under section 120 of the Clean Air Act.

The Agency is currently consulting with the Department of Justice, U.S. Attorneys and State officials around the country to explore various issues and questions which have been raised with regard to the implementation of the policy. Such consultation, together with experience in implementation of the policy over time, will lead to future guidance to elaborate and improve the policy to deter violations and encourage compliance by securing penalties in amounts at

least equal to the economic benefit of non-compliance.

If I can be of further assistance in clarifying this policy, please do not hesitate to contact me.

Sincerely yours,

(s) JEFFREY G. MILLER.
MARVIN B. DURNING.
*Assistant Administrator for Enforcement.*

MEMORANDUM

*Washington, D.C. June 3, 1977.*

To Regional Administrators.

Subject: Settlement of Section 309(d) Enforcement Cases for Monetary Amounts.

Section 309(d) of the Federal Water Pollution Control Act sets a maximum civil penalty of $10,000 per day of violation. Although the statute sets a maximum, it provides no guidance as to what would be an appropriate penalty for a particular violation. The amount of the appropriate penalty is especially important when the Agency and a violator are attempting to settle a case without litigation. This memorandum is being transmitted in order to provide some guidance on the level of appropriate penalties in settlement.

The first task in determining an acceptable settlement figure is to estimate, as precisely as possible, the monetary judgment likely to result if the case were to proceed to trial. For planning purposes at this stage the assumption is made that the Agency's position will prevail on the merits.

In arriving at the estimated judgment figure, a number of factors should be considered, including the following:

(1) The extent to which the defendant may have profited by failing or delaying to comply,

(2) The degree of harm to the public caused by the defendant's failure to comply.

(3) The willingness of the violation, or the good or bad faith of the defendant in meeting its obligation to comply,

(4) The necessity of vindicating the authority of EPA.

(5) The ability of the defendant to pay the penalties.

Many of these factors will necessarily be quite subjective; as the attachments explain in more detail, however, these are the considerations analyzed by the courts in determining an appropriate penalty.

Perhaps the most important single criterion in estimating an appropriate judgment amount is an analysis of the economic benefit that accrues to the discharger as a result of noncompliance. From this starting point appropriate penalties can then be calculated either up or down depending upon an examination of the other factors listed above.

After determining the approximate benefit of noncompliance to the violator, the estimated judgment figure should be increased by the amount of any economic harm resulting from the defendant's failure to comply.

An extremely important criterion, which may either increase or reduce the estimated judgment figure, is the degree of willfulness connected with the violation, or the good or bad faith of the defendant.

A factor which could increase the estimated settlement amount is the necessity of vindicating the authority of the Agency. This criterion is frequently intimately connected with the concept of willfulness. For example, an intentional flouting of an order issued by the Administrator under subsection 309(a) of the FWPCA would certainly require a more severe penalty than a negligent or unintentional violation.

It should be noted that, in reaching the estimated figure, a best judgment approximation should suffice, rather than the precise economic calculations necessary if the case were to go to trial. After the above calculations have been made and an estimated judgment amount derived, consideration should be given to the likelihood of prevailing on the merits. The probability of success, expressed in percentage terms, should then be multiplied by the estimated judgment figure. The product represents the bottom-line settlement amount; if the discharger insists on a lower figure as a condition of settlement, (except in the "inability to pay" situation mentioned below) the case should proceed to trial. For example, if the estimated judgment is $1 million, and the probability of success 80%, the Region, while free to seek a higher amount, should not settle the case for less than $800,000.

If the minimum settlement figure, derived in the manner described above, appears excessively disproportionate to the defendant's resources, the Region may determine to lower its settlement demand to a more appropriate level. Two points should be noted here. First, such a reduction is discretionary on the part of the Region, and should not, in any event, be tied to the discharger's concept of what is or is not excessively disproportionate. Second, the defendant's financial condition should be considered only from a standpoint of reducing, rather than increasing, the settlement figure.

If an appropriate settlement cannot be obtained, the case should proceed to trial with the Region seeking the maximum permissible penalty. Although the maximum penalty will in many instances far exceed the estimated judgment figure, such a policy is necessary in order to provide an incentive to settle. This is especially true in those cases where the probability of success on the merits is high. For example, assuming an estimated judgment of $1 million, and a 90 percent success probability, the minimum settlement figure would be $900,000. Assume further that the maximum penalty amounts to $5 million. A policy of seeking only the estimated judgment figure ($1 million) in contested cases provides the discharger with a substantial incentive to litigate—exactly the opposite of what we are seeking to accomplish. This anomaly occurs because the company has only $100,000 to lose (up to $1 million from the settlement figure), while standing to save as much as $900,000 as a result of litigation. On the other hand, the discharger is much more likely to settle if it knows from the outset that, if contested, the penalty could be substantially greater than the settlement figure.

The foregoing guidance should prove helpful to you in articulating the approach we have developed and which is generally already in practice. Regional expertise and knowledge of the situation are major factors to be applied by the Region in applying this guidance to specific cases. On large cases likely to attract widespread interest, and particularly on cases involving industrial facilities or situations similar to those encountered in other Regions, the process should be coordinated closely with the Office of Water Enforcement to ensure that similar situations nationally are receiving comparable treatment. While the foregoing guidance should be useful, it does not constitute a substitute for good judgment, timely and open communication between the Regional Office and the Office of Water Enforcement, and a large measure of common sense in applying this guidance to actual cases.

STANLEY W. LEGRO.

I assure my colleagues that if any of them would like to raise any point raised in any portion, I would be glad to discuss it at length.

Mr. STAFFORD. Mr. President, one of my principal concerns during the development of the Clean Water Act of 1977 has been the water pollution control problems of small communities in rural America. According to the 1970 census

there are 54 million people in this country who live in places of 2,500 or less, some 26.5 percent of the total U.S. population. Because my own State of Vermont is the most rural of all the 50 States (nearly 68 percent of our population is rural), I come by my interest in small communities quite naturally.

However, even the least rural State in America, California, with a 9 percent rural population, nevertheless has 1.8 million people living in communities of 2,500 or less. Pennsylvania, which is thought of as a highly industrialized and heavily populated state, nevertheless boasts the largest rural population in America, some 3.4 milion people. I make this point to emphasize that the problems of rural America are not limited to small States, and that the measures suggested by this new law should command the attention of nearly every State environmental agency. The conference report submitted for the Senate's approval today represents a significant step forward in directing the attention and resources of the U.S. Environmental Protection Agency and the States toward the peculiar financial and institutional characteristics of rural communities.

One of the most important features of the national water pollution control efforts that developed from the 1972 amendments to the Federal Water Pollution Control Act was a vigorous and heavily funded construction grant program to assist and encourage municipalities in the abatement of water pollution. For the last 5 years most States have directed their efforts and their allotments of Federal and State funds to the cities and urbanized areas.

This was certainly appropriate, as these areas were afflicted with the greatest pollution abatement problems. However, in the next 5 years we can expect to see States reaching down in their priority list to plan and fund projects in smaller towns and villages. States like Vermont, or West Virginia, or South Dakota, whose rural populations are such a large proportion of their total populations, have already gained some experience in addressing the special problems of smaller settlements which may be of value to future grant applicants in their own States and elsewhere. Very succinctly, the problem seems to be that conventional centralized collection and treatment systems, which offer many economies of scale in densely populated cities, simply do not work and are far too expensive and extravagant for a community of 500, or 2,500, and perhaps even 10,000 people.

In Vermont we can relate several horror stories where the costs per household of the planned conventional system were outrageously expensive, both in connection costs and in annual charges. Communities in other States face similar situations. There has consequently developed in this country a small cadre of concerned and dedicated people who have been searching for and promoting alternatives which might be suitable for smaller, rural towns and villages. They confront, however, an army of consulting engineers, developers, State environmen-

tal and health department administrators, and the construction industry, who have been convinced that the only solution is to build a central facility with tendrils of concrete pipe reaching out to capture the wastewater from remote settlements. To the extent that septic systems or other alternatives are used in less densely populated areas they are considered a temporary solution, until the population grows large enough to support a collection system. The availability of grants of up to 90 percent in some States has often encouraged collection and central treatment solutions even where the population density may never justify such a system. The moment of truth comes, however, when the operating and maintenance costs are revealed.

For various reasons, septic tanks and other onsite or cluster-type alternatives have no favor with those who plan and construct pollution control facilities. For the health officials, these systems have been unreliable in the confinement of disease organisms; for the construction industry, there is simply less money to be made in some of these alternatives (or it goes to different sectors of the economy); for the consulting engineers, there is less profit associated with a project that costs less than one that costs more; furthermore, engineering schools simply are not teaching much in the way of how to design alternatives; for the State environmental agencies and for many local officials, it is comforting to know that the Federal EPA will approve a known and proven type of technology; also, they do not have the manpower to seek out or administer alternatives which require additional management resources. Finally, there is a lack of direction or mandate from the Federal agency or the Congress to examine alternatives before approving the funding of conventional secondary plants. EPA has failed to encourage, for example, rehabilitation and repair of septic systems before awarding a construction planning grant.

It is the intent of the conferees in developing a number of new provisions in the Clean Water Act to encourage the Environmental Protection Agency, and the States and local governments, to seek out alternatives which are both more cost effective and provide a greater degree of water pollution abatement than the systems we have been building in the past. The problem of small communities should be seen as a subset of the larger problem of the failure to adopt technologies which achieve the requirements of the act, requirements which were in fact in the statute as far back as 1972: the recycling of potential sewage pollutants through the production of agriculture, silviculture, or aquaculture products, the confined and contained disposal of pollutants not recycled, the reclamation of wastewater and the ultimate disposal of sludge in a manner that will not result in environmental hazards.

One of the provisions to encourage these results, which I sponsored, and which was cosponsored by the chairman of the Committee on Environment and Public Works, Senator JENNINGS RAN-DOLPH, is section 27, set aside for alternative systems for small communities.

This section directs the Administrator to set aside 4 percent of the allotment to any State with a rural population of 25 percent or more as determined by the Census Bureau. The Administrator is also authorized to set aside not more than 4 percent of the allotment for any other State, at the request of the Governor.

Such sums are available only for alternatives to conventional sewage treatment works for communities having a population of 3,500 or less, or for the highly dispersed sections of larger municipalities as defined by the Administrator.

Alternatives to conventional treatment works are systems different from conventional secondary treatment (particularly activated sludge) and from conventional advanced waste treatment. In passing this measure, the Congress recognizes that conventional systems are too costly for smaller communities. We also recognize the inherent shortcoming of conventional systems. These include sludge production, nutrient and chlorine pollution, high operating costs, waste of water, and excessive energy demands.

Alternatives are, in general, of two types: First, those described in the new section 201(g)(5); namely, "innovative and alternative wastewater treatment processes and techniques which provide for the reclaiming and reuse of water, otherwise eliminate the discharge of pollutants, and utilize recycling techniques, land treatment, new or improved methods of waste treatment management for municipal and industrial wastes (discharged into municipal systems) and the confined disposal of pollutants, so that pollutants will not migrate to cause water or other environmental pollution"; and

Second, privately owned treatment works of the type described in new section 201(h), subject of course, to the safeguards and limitations in 201(h), including most especially the requirement that such privately owned treatment works will be properly operated and maintained. This essential requirement is expected to overcome the objections of State health officials and environmental agency administrators. There is every reason to believe that onsite systems, including septic tanks, will meet health and pollution abatement concerns when they are properly designed, operated and maintained in accordance with a communitywide program. They need not be, as they have been, a haphazard or temporary solution.

In general, the Congress expects that the rural set-aside will result in, first, lower operating and capital costs for sewage treatment works in small communities; second, energy and water conservation; and third, elimination of pollution or substantial progress in that direction, for rural communities.

It is anticipated that many of the projects funded by the set-aside will be eligible for an increased grant pursuant to new section 202(a)(2).

The set aside for alternative systems in small communities goes into effect for each fiscal year after October 1, 1978.

At this point, Mr. President, I would like to say a word about two other provisions in the Clear Water Act which are particularly important to Vermonters.

The first, with which I am very satisfied, concerns the allotment of construction grant funds to the States. The conferees agreed to a provision which I sponsored in the Senate-passed bill, authorizing a minimum share for small States. Under the conference agreement, no State will receive less than one-half of 1 percent of the total allotment for fiscal years 1978, 1979, 1980, and 1981. Depending of course on the availability of appropriations, this means that no State will receive less than $22.5 million in fiscal year 1978 and not less than $25 million in the following fiscal years. The allotment formula is a complex amalgam of population and needs in various construction grant categories, and is necessarily an imprecise and imperfect way to distribute funds. However, because of the relatively small amounts involved, the less-populated States would be the ones most disadvantaged by errors or biases in the formula. The minimum allotment is designed to overcome this possibility.

The second notable provision, which is a great disappointment to me, is the exemption from the second 404 dredge and fill permit requirement for congressionally authorized projects. I believe most emphatically that all projects, and perhaps especially specific Federal projects sponsored in the Congress, ought to measure up to the standards designed to protect vital and often irreplaceable wetlands and marine environments from the devastation of pollution and the total obliteration by development or altered land use. I understand and appreciate the need for the Senate conferees to come to an agreement in order to secure an otherwise valuable new law, but I cannot personally support this part of the amendment to section 404, and did not in conference.

I would like at this point to describe what was done to the provision in the water bill dealing with the discharge of dredge and fill material. This section amends sections 404 and 208 to modify the existing program for controlling the discharge of dredged or fill material into waters of the United States. The conference bill amends section 404 to provide authority for EPA to approve State permit programs that EPA determines have demonstrated the capability to replace the Corps of Engineers permit program in phase II and III waters. The conferees agreed to adopt the exemptions and the general permit procedure from the Senate bill to prevent overregulation of activities that have little or no effect on the aquatic environment. The bill includes the clarification that permits are not required for certain normal farming activities such as plowing and seeding which are not discharges of dredged or fill material. It should be noted, however, that permits will con-

Case 2:10-md-02179-CJB-DPC   Document 14476-2   Filed 04/24/15   Page 28 of 55

tinue to be required for those farm, forestry, and mining activities that involve the discharge of dredged or fill material that connect water to dry land including, for example, those occasional farm or forestry activities that involve dikes, levees or other fills in wetland or other waters.

Section 404 is further amended to provide that discharges of dredged or fill material by Federal agencies to construct Federal projects specifically identified by Congress when authorized are not subject to permits under section 404 or under an approved State permit program if the environmental impact statement submitted to Congress includes a complete analysis of the effects of the discharge based on the 404(b)(1) guidelines. The conferees agreed that discharges from any activity conducted with assistance from the Federal Government and maintenance of existing Federal projects will remain under the permit program.

Projects, even though fully financed by the Federal Government, which are authorized under continuing authorities or lump sum appropriation shall be subject to 404 permits not withstanding the issuance by the responsible Federal agency of a programmatic or individual NEPA review document. Only the discharge of dredged or fill material for the construction of a new individual Federal project for which there is an environmental impact statement dealing solely with that project furnished to the authorizing committee prior to specific authorization of that project by the committee and by Congress shall be exempted from section 404 permits. In order for the exemption to take effect, such environmental impact statement must contain a full and complete analysis of adverse effects and alternatives as required by the 404(b) guidelines.

For the purposes of this act, Federal projects are those which are entirely planned, financed, and constructed by a Federal agency in every respect. The committee bill includes a number of important improvements to cut redtape and to expedite decisions on section 404 permits. Among these is a section 67(m) which requires that the Department of the Interior submit its written comments on a section 404 permit application within 90 days of receiving notice from the Department of the Army. I am in agreement with the purpose of this provision which, as I understand it, is to assure that the Fish and Wildlife Service submits within a reasonable time, a specific written analysis of the permit application, together with recommendations thereon, and that the Service's comments be in a form that is publicly available. I also concur in section 67(g), which directs the involved agencies of Government to work out procedures for completing the processing of most permit applications within a total of 90 days. I understand that the agencies have already begun to work out these procedures. I would like to point out, however, Mr. President, that there are going to be a few cases where more than 90 days will be required for the total processing of permit applications, and that

it is highly desirable that these cases be resolved at the local level.

There is no intent by the conferees to impose any condition that would automatically or arbitrarily cut off negotiations between any Federal agency and a permit applicant. The conferees intend that the procedures for managing such negotiations, and for the referral of unresolved agency objections to higher authority, be worked out as a part of the interagency agreements developed pursuant to section 67(g).

The conferees have expressed their view that the section 404 permit process is not to be used independent of the provisions of other applicable authorities to force upon non-Federal applicants a requirement for land exchanges. By this, the conferees intend the work proposed within permit applications to be evaluated on its own intrinsic merit. It is not meant by this to absolve any class of permit applicants from the obligation to invest their proposals with environmentally sound design and operational features. Nor do the conferees intend to prevent the Corps of Engineers, or the State permitting agencies from considering the need to incorporate in permit plans desirable provisions for the balanced use and preservation of aquatic resources, including lands or waters which an applicant agrees to set aside for general public benefit. Some State permit processes already recognize these concepts.

Finally, section 404 is amended to assure that all Federal activities comply with all procedural and substantive Federal, State, and interstate requirements. The Secretary is expected to coordinate his authority to enforce Corps issued permits with EPA as EPA is the primary agency responsible for administering the Clean Water Act.

The conferees also agreed to amend section 208(b)(4) to authorize the Administrator to approve statewide regulatory programs to control those discharges of dredged or fill material that are better handled through imposition of best management practice. The 208(b)(4)(B) program is intended to complement State permit programs approved under section 404, but not as a substitute for State permit programs. Once a State has an approved 404 permit program and approved 208 regulatory program, the Administrator may approve best management practices imposed by the State to control those activities which he determines will have only minor individual and cumulative effects on the aquatic environment. If the Administrator approves-best management practices as adequate to control a specific activity without additional permit review, Federal permits should not be required. Best management practices will not be appropriate as the sole means of control of activities such as channelization and site development fills that can impair the circulation or reduce the reach of navigable waters. Such activities, by their very nature, will continue to require individual attention through a permit review process, as will all discharges involving toxic substance requirements under section 307.

I have not addressed myself to the

numerous changes these amendments make in the control of pollution from industrial dischargers. I know that others, especially Chairman MUSKIE, will cover this aspect with care and competence. I do believe, however, that we have succeeded in devising an industrial pollution control program which will require less in the way of control of additional increments of conventional pollutants where the costs may begin to be prohibitive, but more in the way of control over toxic pollutants or nonconventional pollutants about which we know very little. Under the Clean Water Act of 1977, the Environmental Protection Agency must necessarily turn its attention to those suspect and sometimes virulent forms of pollution in accordance with a comprehensive strategy, rather than on a crisis basis.

In sum, Mr. President, I can confidently say that we have produced a thoughtful and beneficial bill which deserves the support of all our colleagues in the Senate and I encourage the adoption of the conference report on H.R. 3199, the Clean Water Act of 1977.

Mr. President, I would like to join the distinguished chairman of the Subcommittee on Environment and Public Works in what he has said about the excellent staff work on both sides of the political aisle in the preparation and management of the bill and the preparation of the conference report in connection with the clean water bill.

I want to pay particular tribute to my colleagues on the committee and especially my senior partner in this matter, the distinguished Senator from Maine (Mr. MUSKIE), the chairman of the full committee (Mr. RANDOLPH), and my distinguished colleagues on my own side of the aisle, all of whom contributed in great measure to the final product of the Clean Water Act of 1977.

As always when legislation from the House and the Senate differ in their details, it required a compromise in good faith on the part of colleagues and conferees from both sides to achieve the bill which is in the conference report before us now.

I am sure that nobody is completely satisfied with the bill which we are asking the Senate to accept as the managers on the part of the Senate. This Senator gave up at least one or two issues which he considered to be important in order for us to reach a bill that we could agree upon between the House and Senate conferees and bring here for passage and, hopefully, Presidential signature.

So with admiration and gratitude on the part of this Senator for all of his colleagues who helped prepare the conference report, and to the members of the staff on both sides who helped us so instrumentally in what we have done, I shall yield the floor.

Mr. DURKIN. Mr. President, in accordance with Federal requirements, the city of Manchester has undertaken a $50 million water pollution abatement program, much of which is already constructed. In addition to this program, and in order to fully abate pollution as required by the Environmental Protection Agency, the city must undertake a

program to separate storm and sanitary sewers.

In compliance with the law, the city initiated a report which studied the various alternatives for its separation program. Because the city has built over a period of 100 years 200 miles of sanitary sewers, the report indicates that the most cost effective and only solution is separation by means of building a storm drainage system.

However, officials of the New Hampshire Water Supply and Pollution Control Commission feel that wording in section 36(c) of the conference report on H.R. 2199 dated November 28, 1977 (amending the Water Pollution Control Act) may prohibit the use of Federal funds for construction of separate storm sewer systems where separate treatment is not contemplated. Consequent to this interpretation, the Commission has indicated that no State funds will be available for a separate storm water system in Manchester.

In response to a letter from Senator McINTYRE and me asking for clarification of the intent of section 36(c), Chairman JENNINGS RANDOLPH, and ranking minority member, Senator ROBERT STAFFORD of the Environment and Public Works Committee have written to me:

The section to which you refer only limits the eligibility of the construction of treatment works for treatment of storm water discharges. The Senate Report 95–370 speaks to this issue:

"This amendment is not meant to restrict the opportunities available to solve pollution problems created by combined sewer overflows or bypasses."

The Conference bill is the same as the Senate bill in this respect.

I hope this will clarify the issue for you.

I see they are both on the floor. They both understand the letter.

I might add that there are other communities besides my home city. I understand there is a problem in Rhode Island and some other problems around the country.

With this clarification, it is clear that communities such as Manchester that want to build are required to build or are building separate storm drainage systems where separate treatment facilities for storm water not contemplated are eligible for Federal funding under the Clean Water Act of 1977, and there is absolutely no prohibition or conflict with section 36(c).

Thus, the city of Manchester's separation project is eligible for funding. The prohibition on separate treatment plants for storm drainage systems contained in paragraph 36(c) of the conference report is not applicable.

Mr. President, I ask unanimous consent that the letters from Chairman RANDOLPH and Senator STAFFORD making clear the conferees' intent be printed in the RECORD, together with letters from Manchester to Senator McINTYRE and me, and our joint letter to Chairman RANDOLPH and Senator STAFFORD.

There being no objection, the material was ordered to be printed in the RECORD, as follows:

WASHINGTON, D.C.,
December 15, 1977.

Hon. JOHN A. DURKIN,
U.S. Senate,
Washington, D.C.

DEAR JOHN: Thank you for your letter of December 13, discussing section 36(c) of the Clean Water Act of 1977.

The section to which you refer only limits the eligibility of the construction of treatment works for treatment of storm water discharges. The Senate Report 95–370 speaks to this issue:

"This amendment is not meant to restrict the opportunities available to solve pollution problems created by combined sewer overflows or bypasses."

The Conference bill is the same as the Senate bill in this respect.

I hope this will clarify the issue for you.

With kind personal regards, I am,
Truly,

JENNINGS RANDOLPH,
Chairman.

—

WASHINGTON, D.C.,
December 15, 1977.

Hon. JOHN A. DURKIN,
U.S. Senate,
Washington, D.C.

DEAR JOHN: Thank you for your letter of December 13th, discussing section 36(c) of the Clean Water Act of 1977.

The section to which you refer only limits the eligibility of the construction of treatment works for treatment of storm water discharges. The Senate Report 95–370 speaks to this issue:

"This amendment is not meant to restrict the opportunities available to solve pollution problems created by combined sewer overflows or bypasses."

The Conference bill is the same as the Senate bill in this respect.

I hope this will clarify the issue for you.

With kind personal regards, I am,
Truly,

ROBERT T. STAFFORD,
Ranking Minority Member, Environment and Public Works Committee.

—

MANCHESTER, N.H.,
December 8, 1977.

Hon. THOMAS J. MCINTYRE,
U.S. Senate.
Hon. JOHN A. DURKIN,
U.S. Senate.
Hon. NORM D'AMOURS,
Member of Congress,
Washington, D.C.

DEAR Senators MCINTYRE and DURKIN and Congressman D'AMOURS:

In accordance with Federal requirements, the City of Manchester has undertaken a fifty million dollar Water Pollution Abatement Program, much of which is already constructed. In addition to this program, and in order to fully abate pollution as required by the Environmental Protection Agency, the City must undertake a "separation" program.

In compliance with the law, the City had initiated a report which studied the various alternatives for its separation program. In essence, the report indicates that the most cost effective and only solution is separation by means of building a storm drainage system.

The City is unique in that over a period of about one hundred years it built about two hundred miles of "sanitary" sewers. Periodically the City obviously connected catchbasins to the sewer system to handle stormwater. As the City does not have a separate storm drainage system the only solution to the separation problem is to construct a storm drain system.

The estimated cost of this separation program is 140 to 200 million dollars over a 10 to 20 year period. The City of Manchester under the current program of 75 percent Federal, 20 percent State of New Hampshire,

and 5 percent local funding, has been prepared to share in the allocated costs.

The final Committee of Conference Report on H.R. 3199 amending the Federal Water Pollution Control Act dated November 28, 1977, includes the following language on Page 38, Sec. 36, paragraph (c):

"(c) No grant shall be made under this title from funds authorized for any fiscal year during the period beginning October 1, 1977, and ending September 30, 1982, for treatment works for control of pollutant discharges from separate storm sewer systems."

This Section of the Conference Report has been interpreted by officials in the Water Supply and Pollution Control Commission of the State of New Hampshire to mean that no Federal funds would be available for Manchester's separation program which requires construction of storm drains. Therefore, they say, no State funds would be allocated for such an undertaking by the City of Manchester.

If the City of Manchester is required to proceed with separation and is determined to be "ineligible" for Federal or State assistance as extended to the separation efforts of other cities, additional local property tax or user charges of up to $2,500 per person will be required. There is absolutely no possibility for the City to meet the objectives of water pollution abatement under such circumstances.

Certainly we must presume it is not the intent of the Congress to punish the City of Manchester for striving to meet the Federally-mandated standards of clean water in an orderly and efficient manner.

It is our considered opinion that the State officials have misinterpreted the legislative intent of Section 36, paragraph (c) of the final Conference Committee Report on H.R. 3199.

We would appreciate substantiation of our view by the Committee of Conference before any floor action is taken on the Committee Conference Report.

We are sure you understand our concerns.

Sincerely,

CHARLES R. STANTON,
Mayor, City of Manchester.
CHRISTOS SPIRO,
Chairman, Highway Commission.

—

WASHINGTON, D.C.,
December 13, 1977.

Hon. JENNINGS RANDOLPH,
Chairman, Committee on Environment and Public Works, U.S. Senate, Washington, D.C.

DEAR MR. CHAIRMAN: We enclose a copy of a letter we recently received from officials of the City of Manchester, New Hampshire, regarding the Conference Report on H.R. 3199 amending the Federal Water Pollution Control Act.

The letter describes a difference of opinion between the State of New Hampshire and the City of Manchester over the interpretation of Section 36, paragraph (c), of the Conference Report, which is seen by the State as forbidding the use of any funds under this title for the construction of separate storm drain piping. The City contends that this is a misinterpretation of the section in question. Because the City is not contemplating constructing a separate treatment facility for storm drainage but is only trying to comply with P.L. 92–500's "separation" requirement, Manchester should not be declared ineligible to receive Federal funds by virtue of this section of the Conference Report.

We would like a speedy clarification of the legislative intent of this particular paragraph in order to determine which interpretation of the disputed paragraph is correct. We request that Senate consideration of the Conference Report be delayed until this matter is clarified. If you believe a colloquy on the Senate Floor in conjunction with consideration of the Conference Report

would be useful in settling this issue, we would be pleased to arrange one with you.

Thanks for your attention to this matter.

Sincerely,

THOMAS J. MCINTYRE.
JOHN A. DURKIN.

WASHINGTON, D.C.,
December 13, 1977.

Hon. ROBERT T. STAFFORD,
Committee on Environment and Public Works, U.S. Senate, Washington, D.C.

DEAR BOB: We enclose a copy of a letter we recently received from officials of the City of Manchester, New Hampshire, regarding the Conference Report on H.R. 3199 amending the Federal Water Pollution Control Act.

The letter describes a difference of opinion between the State of New Hampshire and the City of Manchester over the interpretation of Section 36, paragraph (c), of the Conference Report, which is seen by the State as forbidding the use of any funds under this title for the construction of separate storm drain piping. The City contends that this is a misinterpretation of the section in question. Because the City is not contemplating constructing a separate treatment facility for storm drainage but is only trying to comply wih P.L. 92-500's "separation" requirement, Manchester should not be declared ineligible to receive Federal funds by virtue of this section of the Conference Report.

We would like a speedy identification of the legislative intent of this particular paragraph in order to determine which interpretation of the disputed paragraph is correct. We request that Senate consideration of the Conference Report be delayed until this matter is clarified. If you believe a colloquy on the Senate Floor in conjunction with consideration of the Conference Report would be useful in settling this issue, we would be pleased to arrange one with you.

Thanks for your attention to this matter.

Sincerely,

THOMAS J. MCINTYRE.
JOHN A. DURKIN.

Mr. DURKIN. Mr. President, I yield to my good friend from West Virginia.

Mr. RANDOLPH. Mr. President, referring to the situation that Senator DURKIN has brought to our attention, he is correct that correspondence clarifies the matter which was of concern to him and also to Senator McINTYRE.

We were delighted to respond in a way which insures that not only would the two Senators of that State understand the matter, but more importantly, really, so would the people of the area who are affected. We were delighted to co-operate.

Mr. DURKIN. Once again, I thank the distinguished chairman and the ranking member for his cooperation, because it is very important to our people in Manchester and some other communities around the country.

Mr. RANDOLPH. Mr. President, we have had comment from the able chairman of our Subcommittee on Environmental Pollution. I take this opportunity to express the sincere appreciation for his efforts that I feel personally and as chairman of the Committee on Environment and Public Works. I know this is shared by the ranking member of that committee, Senator STAFFORD, who is in the Chamber. We are grateful for the continuing leadership of Senator MUSKIE in a field which is not always easy of a solution in its various aspects, but one that must have the constant attention that he has given for so long, in con-

structive ways, to measures to purify the air, to clean the water, and to bring about the stabilization of waste materials in this country.

These are tasks which are very complicated; they are very complex; they are subject not only to differing viewpoints but also ofttimes without the entire story understood, resulting in misunderstandings of people. For that reason it is good that, through the years, we have had not only the advantage but also the compelling leadership and the commitment of the Senator from Maine.

I believe it is important for me to say in connection with this conference report that we have had the matter before us since September of 1976, not September of 1977. So we really have had three conferences on the subject, although one of them was in connection with the public works jobs bill.

Mr. MUSKIE. That is right.

Mr. RANDOLPH. Along the way, we have benefited from the knowledge, experience, and the "stickability" of the Senator from down Maine to his task. I appreciate that, as do all the other members of the committee and all Members of the Senate.

Mr. MUSKIE. Mr. President, will the Senator yield?

Mr. RANDOLPH. I yield.

Mr. MUSKIE. I had the feeling, I say to my good friend from West Virginia, that if in future conferences the Senator from Maine could find a way to preside while also being absent from the conference, we could shorten the conference time.

The Senator heard me compliment him earlier on the leadership he demonstrated in the conference, and I say to him personally that I meant what I said. I know how effective he can be when a stalemate seems imminent in getting the conference off dead center and moving. I take this opportunity to underscore and emphasize that point, which I made earlier.

Mr. RANDOLPH. Mr. President, I am very grateful for the thoughtful comment and the generous response made at this time by the Senator from Maine.

Congress first addressed the vitally important issue of water quality protection in 1965. Seven years later the Federal commitment to that concept was substantially broadened and extended under the Water Pollution Control Act of 1972 which became Public Law 92-500.

As significant as those measures were at the time of their adoption, those of us who had a part in fashioning them knew they did not provide all of the answers to the problems at which they were aimed. We were aware that changes and refinements would be required which could effectively be devised only in the light of experience with the program and its impact on the Nation's economy and environment.

The Clean Water Act of 1977, before us for final consideration today, is the product of what we have learned in those intervening years. The more than 50 amendments which it proposes to existing law are the composite result of more than 2 years of intense debate over Federal water policy, culminating with

a comprehensive review of the entire water policy, pollution control program this summer by the Environment and Public Works Committee. The final product came after more than a month of give-and-take discussion in conference to work out the wide range of differences between the Senate and House versions of the bill.

Our task was not an easy one and there were times when I frankly questioned whether agreement could be reached in time for final passage of the legislation this year. The fact that we were able to find a common ground between strong and diverse opinions and positions attests, I think, to the overriding commitment of conferees to the objective of ultimate elimination of water pollution and the inherent risks involved in any substantial delay in further progress toward that goal.

The terms on which we agreed constitute a fair, flexible, practical, and workable program for better pollution abatement.

Since many parts of the conference report are similar or identical to those adopted last August by the Senate, you are already generally familiar with them. For that reason, I confine my comments to the key points in the measure.

One of its most significant aspects is its emphasis on the need for development of new and less costly methods of sewage treatment, particularly in sparsely populated areas, as alternatives to the increasingly expensive conventional systems.

This is a matter which has long been of concern to me both in my capacity as chairman of the Environment and Public Works Committee and as a Senator from the Nation's second most rural State. I have seen the fallacy of trying to apply the same treatment yardstick to rural America as to highly urban areas where large and centralized collection and treatment systems can be used effectively and economically.

Because of that concern, I began urging the Environmental Protection Agency nearly 2 years ago to establish an active program for development and implementation of a cost-effective alternative waste water treatment system for use in rural areas.

I gave that concept a high priority in planning for the bill on which we are now ready to act. I introduced or jointly sponsored three provisions in the bill which bear on the subject.

The first of these proposals directs the Environmental Protection Agency to establish a clearinghouse to collect and disseminate information on the types of technology that are available for alternative systems and how they may be applied to various situations.

I believe this provision will be very helpful in assisting the development of this type of approach in various parts of the country to which it is especially suited.

As a further means of encouraging the use of that concept, I sponsored an amendment with Senator STAFFORD which requires specific amounts to be earmarked for alternative systems. For

those 34 States in which total population is more than 25 percent rural, the Administrator of the Environmental Protection Agency would be required to set aside 4 percent of their allotted waste water treatment facilities construction grants funds for exclusive use in alternative or unconventional systems in communities of 3,500 population or less.

A major policy change, which I did propose, permits Federal grants for construction of privately owned treatment works where a public body, not the person but a public body applies on behalf of a number of such units where we can be assured that they are properly operated and maintained and will be more cost effective than the central systems, the large massive systems which we have in the cities which are not applicable to the rural sections of the country.

It is not enough just to spend money. We want to spend money intelligently, and that is the reason we are making this change. Grants of this type would be intended to solve pollution problems in the lightly populated areas as I said where conventional collection and treatment systems are not suitable. They are available but they are not suitable. They are not practical. They are not reasonable.

The Appalachian Regional Commission, this Commission which serves 13 States, the State of West Virginia as a whole and parts of 12 other States, has conducted a demonstration program. It has been held in Boyd County, Ky., and we have had the experience of that project, and it indicates that individual and cluster systems are a realistic means of meeting the sewage treatment programs at the rural community level.

So, the small communities are going to benefit also from a provision in the bill which will allow the reduction of time, cost, and administrative redtape by combining the design and construction hpases of sewage system projects into a single application and grant procedure where the project cost is under $2 million and planned for areas, as I have said, in the first instance 3,500, and in this instance with a population of under 25,000.

These are the innovative programs. They are the necessary programs. These are the helpful programs as we move with the leadership of Senator MUSKIE and others to this hour.

Similarly, small communities such as those in West Virginia and other rural States will have a strong interest in the section of the bill allowing reservation of up to 2 percent of a State's construction grant allotment, with a minimum of $400,000, for a State to use in administration of any aspect of the construction grant program. This particularly can include developing the capacity and responsibility for managing construction grants for small communities.

Mr. President, one of the most extensively-debated sections of this bill is that relating to the types of facilities which are eligible for Federal assistance under the construction grant program. The Environmental Protection Agency proposed removing collector sewer systems from

eligibility. The conferees rejected this recommendation. The bill continues eligibility for collector sewers under existing law.

I recognize that under the existing program there may have been abuses in some States and communities which utilized funds for excessive construction of collector sewers. In many areas, however, it is impossible to build a treatment system without assistance for the total sewer system. I turn to the State of West Virginia as an example. Our State generally has a widely-dispersed population and extensive sewer lines are needed for the system to function. The cost is so high that occasionally sewage plants cannot be built if local funds must be relied on for all of the sewers. Without some Federal assistance for collector sewers, many communities in West Virginia would be unable to participate in the program and would be forced to continue without pollution abatement facilities.

The conferees, as the Senate bill provided, decided to continue collector sewers as an eligible item. Excessive construction of collector sewers will be controlled by other provisions in the bill which restrict the reserve capacity of treatment systems. I refer again to the emphasis on alternative treatment systems to stress that their use should reduce the need for the construction of extensive sewage networks.

I have directed my remarks to the special provisions of the construction grant program as outlined in this legislation because I think it is important that the significance of the changes should be fully understood as we prepare to vote on the bill as a whole.

I stress the vital role of the grant program as a whole in the overall effort to control water pollution and the complete justification and necessity of its continuance as proposed in the measure before us.

As you know, the $18 billion authorized for this purpose in 1972 has been almost totally committed and a number of States had exhausted their funds and were already being forced to mark time while awaiting the new authorization.

By allocating $4.5 billion for fiscal 1978 and $5 billion for each of the 3 following years as this bill proposes, I am confident that we will be able to restore and maintain the program's momentum.

I likewise believe that the formula we have devised for combining factors of population and demonstrable need will insure both equity and effective utilization as nearly as that can be achieved. There are, however, other issues than the grant program which warrant mention in the context of this legislation.

One of the most controversial of them relates to the regulation of disposal of dredge and fill material, resulting from a judicial decision as to the authority and responsibility of the Army Corps of Engineers under section 404 of the 1972 act. That decision resulted in widespread concern that many activities usually considered routine would be prohibited or made extremely difficult because of the complex regulatory procedure set up by the corps unless there was a new statement of congressional intent.

I believe H.R. 3199, in its present form, provides that clarification and necessary direction. It recognizes that there must be no basic gaps in the program for protection of wetlands and waterways from contamination and thus provides a broad program of control and required discharge permits. Parts of the program would continue to be administered by the Corps of Engineers but the bill also assigns States substantial new areas of administrative responsibility.

To facilitate carrying out the routine activities, it exempts from permit requirements normal farming, silviculture and ranching activities and some mining and construction work.

Mr. President, for many years I have been concerned about the effect on the environment of certain activities carried out in the management of forests. I have been particularly distressed by the results of clearcutting of timber and have worked for the adoption of legislation to restrain this practice in national forests. I have personally seen on many occasions the damaging results of clearcutting. One of its most serious consequences is the adverse effect on water quality.

In its development of this legislation, the Committee on Environment and Public Works provided an exemption from the permit process for "normal silviculture activities." This exemption, among others, was endorsed by the Senate and is retained in the conference report.

The committee report on the bill emphasizes, at my urging, that "normal silviculture" does not include clearcutting in eastern mixed hardwood forests. The intent of the committee was clarified in a colloquy with Senator CHURCH during Senate debate on the bill. I believe it is important for any legislation which seeks to protect and enhance water quality to insure proper regulation of those activities which would damage the integrity of our waters. This definition of "normal silviculture activities" does not prohibit clearcutting. Rather, it insures that this method of harvesting timber will be carefully controlled so as to reduce the potential for damage to water quality.

The conferees were asked by Representatives THOMAS FOLEY, chairman of the House Agriculture Committee, to include language in the conference report which would modify and weaken the language of the Senate report. The conferees did not agree to alter the statement in the Senate report. Therefore, it remains the policy of this legislation that clearcutting on eastern mixed hardwood forests is not a normal silviculture activity, and it is subject to the permit requirements of the Act.

As modified, the section 404 program will also allow for general permits on a regional or national basis for various classes of activities. Federal projects authorized by Congress are likewise exempt from permit requirements but only in those instances in which a final environmental impact statement has been prepared and submitted prior to project authorization and appropriation. That en-

vironmental impact statement must have included a full assessment of the effect of the specific dredge and fill discharge, evaluated from the standpoint of the section 404(b)(1) guidelines, and a judgment similar to that required in a section 404 proceeding.

I am convinced that those stipulations provide all the safeguards necessary, and that the congressional authorization review will provide at least as broad a basis for determining possible environmental damage as the regular permit procedure. That view is shared by EPA Administrator Douglas Costle, who has said officially that he does not see the exemption as, in any sense, a loophole in the law.

In short, President, I believe the provisions of the bill will significantly improve the operation and administration of the section 404 program without impairing its effectiveness or altering its basic purpose.

Other key provisions of the bill include:

An easing of 1983 "best available technology" requirements for nonharmful pollutants.

Extension of oil spill liability and cleanup requirements to a 200-mile limit and an increase in the maximum spill liability.

A cost-sharing program to assist farmers in meeting requirements for control of nonpoint pollution.

Revision and tightening of the program for control of toxic pollutants.

Allowance for enforcement flexibility for those unable to meet 1977 quality requirements despite good-faith efforts.

As that summary suggests, the legislation combines the creation of new goals and policies with adjustment of some of the old ones in the context of past experience and current realities.

There was expectation, when the 1972 act was adopted, that both municipal and industrial dischargers would by the middle of this year have at least "best practical treatment" technology installed and in operation. Principal dischargers could have attained the uniform secondary treatment requirement. That has not proved to be the case in all instances for a variety of reasons.

Lack of Federal funding was a major stumbling block in the case of the cities. Much of the $18 billion provided under the act was impounded by the White House during the early years of the program. Its subsequent release came too late to make full compliance possible by this year's deadline. As a result of the funding problem and some other extenuating circumstances, only about half of the participating municipalities were able to meet that target date. An extension of up to July 1, 1983, will be permitted under the bill before us for those able to establish extenuation for failing to meet the initial deadline.

Industry's compliance record has been much better. Of the 4,000 major industrial dischargers, nearly 90 percent had installed the "best practical treatment" facilities on schedule, leaving only about 600 in the country short of required standards.

The steel industry is the one notable exception to the general rule in this instance. Less than 50 percent of its facilities have so far been brought to required standards, despite allocation of an estimated 75 percent of its capital spending for environmental improvement in recent years.

The difficulty stems from the need to modernize production facilities as well as the pollution control devices and the lack of enough capital funds to achieve both goals at the same time. That capital shortage may reach the $1 billion mark before long and a Presidential task force is recommending a series of Government actions to help restore the industry's general strength and viability.

Meanwhile, the measure before us recognizes the counterproductivity of insisting on retention of unattainable goals in such situations and the necessity for adjustment of timetables without lessening requirements for eventual compliance.

The measure also provides a degree of flexibility in some other areas. Among the most notable are modification of requirements for application of "best available technology" for discharge of nontoxic pollutants and for secondary treatment of discharges into marine waters where waiving that requirement would not interfere with a specific water quality standard.

In the requirements for the control of toxic pollutants adopted by the conferees, the measure before us largely follows the strategy presently being used by the Environmental Protection Agency under the settlement agreement in the case of the Natural Resources Defense Council against Train. That important case required the development of a minimum degree of control for a specified list of pollutants to be achieved on a definite schedule. The principal way in which the conference report modifies the settlement agreement is to require the publication of effluent limitations based on best available technology at a minimum for the listed pollutants by July 1, 1980, and to specify July 1, 1984, as the latest date for compliance with those effluent limitations.

The legislation follows the settlement agreement in listing 65 pollutants and families of pollutants and declaring that each such pollutant is toxic. In publishing an effluent guideline for a particular industrial class or category of sources, the Administrator may specify limitations for individual compounds or members of families of listed pollutants, or the Administrator may establish a limitation for an entire generic class of a listed pollutant. His judgment in choosing between these approaches is not subject to review.

The Administrator does, however, have some flexibility as to the degree to which any effluent guideline for a particular class or category of sources deals with all the 65 listed toxic pollutants. This is similar to some of the authority provided to the Administrator under section 8 of the NRDC against Train settlement agreement. In writing an effluent guideline, the Administrator is authorized to exclude pollutants which are present in the discharge solely in quantities and concentrations found in the intake water, or which are present in insignificant or trivial amounts.

Flexibility in this area is one of the real strengths of this bill and typical of the basis on which the legislation was conceived as a response to experience under the 1972 act, to conditions of today and to the outlook for the future.

There is another element of the measure about which some explanation is appropriate. The objective of the act is to restore and maintain the chemical, physical, and biological integrity of the Nation's waters. Toward that end the act and certain provisions of this conference report require attainment of a degree of water quality variously described as that necessary for the protection and propagation of a balanced population or a balanced, indigenous population of fish, shellfish, and wildlife. Such a balanced population is one which would be found in the waters in question in the absence of population. This would mean taking into account the changes major hydrological modifications might make in the population that would otherwise naturally occur. Of course, in determining whether a particular discharge would interfere with the protection and propagation of such a population, the impact of other sources may be considered.

The Administrator is required to publish information on the factors needed to assure attainment of that degree of water quality. I sponsored the amendment requiring this because of the inadequacies of EPA's earlier efforts under section 304(a)(2) of the 1972 law.

The Subcommittee on Environmental Pollution and its exceptionally able chairman, Senator MUSKIE, developed the initial approach to the measure on the basis of hearings.

When the bill came to the full Environment and Public Works Committee, however, there were significant contributions from every member during the markup phase. As always, BOB STAFFORD was extremely helpful as the ranking minority member but the proposal we reported also carried the imprint of all of our committee colleagues. Thus, appreciation is due to all—MIKE GRAVEL, LLOYD BENTSEN, QUENTIN BURDICK, JOHN CULVER, GARY HART, WENDELL ANDERSON, DANIEL MOYNIHAN, HOWARD BAKER, JAMES McCLURE, PETE DOMENICI, JOHN CHAFEE, and MALCOLM WALLOP.

Most of them also served on the conference committee and afforded the strong and informed support necessary to sustain the Senate's position on major issues. In so doing, they performed a service for which I am grateful and for which I think they are due the thanks of the Senate and the country.

Mr. President, H.R. 3199 as we brought it from conference is a balanced, comprehensive, and effective bill. I believe that, properly implemented, it will give a new impetus and momentum to the drive launched 5 years ago for an ultimate end to water pollution.

I hope the legislation will receive the overwhelming approval it warrants as further evidence of the national commitment to that cause.

Let me digress for a moment. Many

people fail to consider the serious problem of solid waste disposal. We have passed legislation on the subject, however, which is now law. I bring it into the discussion now because it is a vitally important part of the all-out war on pollution of all kinds which originated in our committee and has been approved by the Congress. We are going to end what? Open dumping in this country, which is a scourge upon the landscape, adding to the hazards of health. We are going to stop this dumping of solid waste all over America and, in the process, begin turning it into usable material again.

I believe the American people are going to be responsive to what we have done in this area. It was our obligation and responsibility to do it. I am convinced that in doing it we have built at least in part a strong base for a better America.

THE DEFINITION OF NORMAL SILVICULTURAL PRACTICES

Mr. TALMADGE. Mr. President, I am pleased to note from the conference report that the House conferees refused to accept the Senate's definition of normal silvicultural practices in connection with section 404, related to dredging and filling in the waters of the United States.

The Senate committee report on this bill stated that for Eastern mixed hardwood forests, clearcutting timber or harvesting associated with even-aged management of timber and related activities are not to be a normal silvicultural practice.

As I understand it, when the Senate conferees asked that this same language be agreed to in the conference report, the House conferees declined.

This is certainly appropriate. Last year the Congress made its policy position clear in connection with the even-aged management and clearcutting of Eastern hardwoods when it caused to be enacted the National Forest Management Act.

At that time the Congress learned that Eastern mixed hardwoods are especially well suited to management practices such as shelterwood cutting and clearcutting. We also learned that even-aged practices create the widest range of plant communities of any regeneration method. Therefore, the interpretation of normal silvicultural activities should not restrict or constrain the use of a wide range of sound forestry practices.

In order to make clear what normal silviculture should comprise in connection with the management of Eastern mixed hardwoods, I ask unanimous consent that a letter from the Chief of the Forest Service to Congressman JOHN BREAUX be included in the RECORD at this point.

There being no objection, the material was ordered to be printed in the RECORD, as follows:

U.S. DEPARTMENT OF AGRICULTURE
FOREST SERVICE,
Washington, D.C., October 31, 1977.
Hon. JOHN BREAUX,
House of Representatives.

DEAR CONGRESSMAN BREAUX: We appreciate the opportunity to respond to the questions you raised pertaining to a definition of normal silvicultural activities, procedures used to determine what system of timber management or harvest method is to be used, and procedures used to protect water quality.

Forest managers have two basic management options available to them for establishing forests and controlling composition and growth: uneven-aged and even-aged management. The normal silvicultural systems to achieve these management options are:

For uneven-aged management:
The selection system of silviculture
a. Single tree selection
b. Group selection

For even-aged management:
The clearcutting system of silviculture
The seed-tree system of silviculture
The shelterwood system of silviculture

The selection system of silviculture is the manipulation of a forest for a continuous high-forest cover, recurring regeneration of desirable species, and the orderly growth and development of trees through a range of age or diameter classes to provide a sustained yield of forest products. Individual tree selection involves the removal of individual trees rather than groups of trees. In mixed stands, it leads to an increase in the proportion of shade-tolerant species of the forest. Group selection can be used to maintain a higher proportion of the less shade-tolerant species in a mixture than individual tree selection.

The three silvicultural systems for even-aged management are used to manipulate forests for the periodic regeneration of desirable species, the orderly growth and development of trees to a given size in each stand, and progressive development of harvestable stands to provide sustained yield of forest products. Regeneration occurs at or near the time of complete harvest when the stand reaches the desired age or size. Stands are treated between harvests with thinnings, cleanings, or other cultural treatments designed to promote growth and improve quality.

In the shelterwood system the mature stand is removed in a series of cuts. Regeneration of the new stand occurs under the cover of a partial forest canopy. The seed-tree system involves harvesting nearly all the timber on a selected area in one cut. A few of the better trees of desired species are left, well distributed over the area, to reseed naturally. In the clearcutting system, the harvesting is accomplished in one cut of all trees on an area. The area harvested may be a patch, stand, or strip. Regeneration is obtained through natural seeding, through sprouting of trees that were in or under the cut stand, or through planting or direct seeding. All three techniques have the purpose of creating a new, even-aged stand.

The Forest Service believes any of the above silvicultural systems could be considered normal in certain timber stands under certain conditions. The complex aspect of silviculture is the application of the proper system to a specific stand to meet land management objectives taking into account a broad array of resource values and physical and biological factors. What would be appropriate under one set of conditions might not be appropriate under other conditions. Thus, the prime concern is the selection of the silvicultural system which best meets management objectives. To provide further background on the scientific base for the selection of silvicultural systems, we enclose selected papers prepared for congressional hearings in 1976, "The Scientific Base for Silviculture and Management Decision in the National Forest System," "Agriculture Handbook—Silvicultural Systems," and a recent paper by Dr. David M. Smith, Professor of Silviculture, Yale University, "The Scientific Basis for Timber Harvesting Practices."

We understand that the National Association of State Foresters has provided the conferees with the following definition of normal silviculture:

"Definition of normal silviculture activities as all those generally recognized by professional forest managers for the production of timber crops including site preparation, planting, construction of roads and minor drainage ditches, harvesting methods including clearcutting, prescribed fire, and application of approved chemical pesticides and fertilizers."

We also understand that the Society of American Foresters has provided you and other interested members with a definition of normal silviculture. These definitions will be helpful to you in understanding the broad, recognized usage of the term.

Of particular concern in the Senate Report on S. 1952 is the selection of silvicultural systems for eastern mixed hardwood forests. As presented in our papers prepared for the congressional hearings in 1976, even-aged management practices, such as shelterwood cutting and clearcutting, are especially well suited to many eastern hardwood types because they satisfy the biological requirements of the present stands and maximize many of the resource values. Even-aged practices such as clearcutting create the widest range of plant communities of any regeneration method. These practices are appropriate for areas where wildlife habitat diversity and water yield are primary objectives. Single tree selection, an uneven-aged management practice, leaves the forest with a more undisturbed appearance and is suitable for areas where esthetic and recreational values are important. Timber values may be increased by either even-aged or uneven-aged management depending upon the species present or desired and the extent to which other resource values are to be maintained or enhanced. Perhaps more than any other forest type, eastern hardwoods require a wider range of cutting methods and cultural measures with prescriptions varied to fit each particular tract. We believe that the interpretation of normal silvicultural activities should not restrict or constrain the use of a wide range of scientifically proven silvicultural practices, including both even-aged and uneven-aged systems, in any forest or region.

As you can see, our discussion of the definition of normal silvicultural activities involves a discussion of factors used to determine the proper system for a specific stand. On National Forest System lands, specific management objectives are developed through multi-resource land management planning. In addition, generalized guidelines have been developed for broad classes of timber stands. Based then on the management objectives and guidelines and specific resource information, a specific prescription is prepared by a skilled silviculturist in consultation with other resource specialists. This prescription is made by the man on the ground and prepared and carried out to meet management objectives for the area. State and private forest landowners are similarly encouraged to define multi-resource land management objectives for their lands and proceed with specific silviculturally sound prescriptions.

In answer to your third question, the Forest Service has many procedures and activities underway to protect water quality from sedimentation caused by silvicultural practices. A great deal of research effort is directed toward this subject and results in new information, publications, and knowledge that help to guide action programs. Through our cooperative programs with State forestry organizations we provide technical assistance, training, and advice to loggers, forest landowners and others. This includes, for example, helping to develop and encourage best management practices on non-Federal forest lands.

Logging roads and skid trails are generally the greatest source of possible water quality

degradation. Therefore, the engineering specifications for road construction and contract provisions that control road and skid trail use are of major importance. These controls need to be carefully drawn to meet specific problems for the area being harvested. On National Forest System lands we provide this close control and encourage similar controls on lands of other ownership.

Methods of logging and access route management that hold soil losses close to geological rates are well known and are included in our specifications and sale provisions:

(1) Do not log in streams;

(2) Build the least temporary access routes and skid trails possible, avoiding steep and unstable slopes;

(3) Locate roads away from streams, the distance depending on slope and soil characteristics;

(4) Design access routes carefully;

(5) Apply erosion-control measures as needed; and

(6) Revegetate all temporary access routes as soon as possible.

The selection of the most appropriate silvicultural system, the careful layout and supervision of the actual road construction and harvest, and the treatment of the area following harvest are key factors in protecting water quality.

The control of discharges of sediment from silvicultural practices is specifically identified in EPA regulations 131.11 (J) which were promulgated pursuant to section 208 of P.L. 92–500. These regulations require the identification and evaluation of all measures necessary to produce the desired level of control through the application of best management practices to silviculturally related nonpoint sources of pollution. In addition, the National Forest Management Act of 1976 provides detailed direction for the planning and management of National Forest System lands with emphasis on the protection of watersheds and water quality.

We would be happy to meet with you or others to discuss the scientific base of silviculture and current management practices.

Sincerely,

JOHN R. McGUIRE,
*Chief.*

Enclosures.

SOCIETY OF AMERICAN FORESTERS,
*Washington, D.C.*

DEFINITION OF THE TERM "NORMAL SILVICULTURE" FOR THE PURPOSES OF INTERPRETING H.R. 3100 AND S. 1952, A POSITION OF THE SOCIETY OF AMERICAN FORESTERS [1]

Silviculture has developed as a science and art for more than 400 years. It is the body of scientific and practical knowledge applied to the management of closed stands of trees, shrub lands, forested grazing lands, taiga and related bogs, and tundra, shelterbelts, protection forests, savannas, desert shrub, pocosins, and man-made forests.

Some degree of manipulation of the forest environment is implicit in any silvicultural action. The forest environment includes but is not limited to the soils, waters, animals, plants, and related geologic features that support, affect, and influence the regeneration, growth, and development of the biological systems.

Normal silvicultural actions follow accepted principles, theories, and practices for enhancing the regeneration, growth, development, and utilization of forests for multiple benefits. Normally accepted silvicultural actions of long standing and worldwide use include:

[1] Approved by the Council of the Society of American Foresters, September 29, 1977. A position of the Society of American Foresters expires three years after the date of its adoption unless after thorough review, its continuance is approved.

1. Regeneration of forest stands by various methods, including clearcutting, seedtree, shelterwood, and selection systems, as determined by the silvical requirements of the species, the properties of the site, and ownership objectives.

2. Regulating stand density, tree form and quality, by thinnings, pruning, fertilizers, and spacing of plantings.

3. Regulating genotypes by changing seedbeds, selecting planting stock, planting genetically superior seedlings, introducing exotics, removing undesirable genotypes, changing fertility and soil moisture relations, and affecting succession and competition.

4. Regulating growth rates by controlling the composition and growth of understory species using prescribed fire, chemicals, drainage of surface and ponded water, mechanical removal of slash and litter or their incorporation into the soil, or other techniques.

5. Improving forest productivity for multiple benefits by various techniques, including surface and subsurface drainage, addition of fertilizers, cultivating and shaping the soil, limiting the removal of nutrients, irrigation, and insect and disease management.

6. Regulating the quantity, quality and timing of water yields by timber harvest, size of openings, drainage, terracing, bedding, changing species composition, and vegetation type.

7. Enhancing plant and animal habitat by ponding, stream habitat improvement, drainage, food plots, game and non-game food plantings, timber removals, thinnings, and building access roads and trails.

8. Enhancing visual appearance, recreation enjoyment and aesthetic values by scheduling harvest, building lakes and improved recreation sites, controlling erosion with vegetation, constructing trails and roads for access, and protecting the forest from fire, disease and insects.

9. Improving natural range and savannas by seeding, controlling brush, regulating timber harvest, increasing browse, changing species composition, impounding and regulating water, and amending the soil.

10. Providing environmental amenities by establishing shelterbelts, protection forests, and aesthetic screens.

As indicated, the array of silvicultural actions considered "normal" is very broad. Stand and site characteristics that influence the need for silvicultural action vary from region to region and within regions. The training and experience of the forester, and his understanding of the ecological and economic aspects of the location situation, determine his prescriptions for silvicultural action.

Mr. TALMADGE. Mr. President, second, I would like to include a definition of normal forest practices adopted by the professional foresters organization.

Mr. President, these documents show beyond question that the House conferees acted wisely in refusing to accept conference report language which would have excluded clearcutting or even-aged management of Eastern mixed hardwoods from any rational list of normal forest management practices:

The National Association of State Foresters urges the Conferees of the Senate House Conference on H.R. 3199 and Section 404 of P.L. 92–500 this session to consider that it is essential to remove unnecessary and negative Federal regulatory burden for millions of private forest landowners. State Foresters are trying to encourage these landowners to grow more trees through positive technical assistance and incentive programs.

The amendments should include:

1. Exclusion of all normal silviculture activities from permit requirements of section 404 or 402, and,

2. Definition of normal silviculture activities as all those generally recognized by professional forest managers for the production of timber crops including site preparation, planting, construction of roads and minor drainage ditches, harvesting methods including clearcutting, prescribed fire, and application of approved chemical pesticides and fertilizers.

We support the direction of Congress under section 208 that individual states, with the involvement of State Foresters, determine when silviculture activities are a significant water pollution problem and develop appropriate abatement programs.

Unanimously approved at meeting of State Foresters in Orlando, Florida, on October 13, 1977. (Sent by mailgram to Conferees on October 13 or 14.)

The Society of American Foresters urges Foresters in Orlando, Florida, on October the members of the House-Senate conference on the 1977 Federal Water Quality Act Amendments (P.L. 92–500) to recognize that even-aged management of eastern hardwood forests, including clearcutting, is one of several "normal" silvicultural activities for this group of forest types. This is in accordance with the silvicultural principles, theories and practices set forth in the Society's "Definition of the term 'normal silviculture' for the purposes of interpreting H.R. 3199 and S. 1952." [1]

The Society further suggests that any concern for water quality resulting from this or any other silvicultural system is properly addressed in accordance with Section 208 of the Federal Water Quality Act.

Mr. BAKER. Mr. President, I ask unanimous consent to have printed in the RECORD a statement by the distinguished Senator from Rhode Island (Mr. CHAFEE).

The PRESIDING OFFICER. Without objection, it is so ordered.

STATEMENT BY SENATOR CHAFEE

Among several issues resolved during our conference deliberations on the Clean Water Act of 1977, one issue was of particular interest to me and several of my colleagues. I am talking about the exemption from Section 404 permits for certain Federal projects. Section 67, subsection (r) provides a limited exemption from Federal and state permit programs for discharges of dredged or fill material to construct Federal projects specifically identified by Congress, when authorized or funded. If the procedural and substantive requirements of subsection (r) are satisfied, such discharges shall not require permits under Section 404, as amended, or under state permit programs approved pursuant to this section. The conferees did not intend to exempt Federally assisted projects or maintenance of existing Federal projects from the section 404 review.

The exemption provided by this subsection applies only to discharges that are an integral part of constructing a Federal project which has been reviewed and approved by Congress. Federal projects include only those conducted by a Federal agency and by such contractors as the agency may employ. The conferees did not intend to exempt other discharges which may be associated generally with constructing Federal projects, but which are ancillary to the specific activity submitted to and approved by Congress. For such ancillary discharges, the full section 404 review and approval procedures shall be applied by the Secretary and the Administrator unless other exemptions are applicable.

[1] Approved by SAF September 29, 1977.

In order to qualify for the exemption, an adequate environmental impact statement on the project must have been submitted to Congress prior to authorization of the project or appropriation of construction funds and, in all cases, prior to the actual discharge of dredged or fill material at any particular site. The statement must satisfy the requirements of the National Environmental Policy Act and include complete information and analysis, consistent with the requirements of sections 403 and 404, on the effects of the proposed discharge. Moreover, the guidelines developed by the Administrator under section 404(b)(1) must be fully complied with in developing and assessing this information.

Congress must have adequate siting, engineering, and environmental information on each proposed Federal project, as well as on modifications recommended by reviewing agencies, in order to review the available alternatives to and potential adverse impacts of the proposed discharges, and to weigh those impacts and alternatives against the benefits of the project. The Administrator will be required to see that the section 404 (b)(1) guidelines are sufficiently explicit to focus attention on those aspects of Federal dredged and fill material discharges, in the construction of new projects, that could result in environmental degradation. And the Administrator must assist other agencies by carefully reviewing draft environmental impact statements to ensure that the guidelines are being interpreted and implemented properly.

In reviewing a proposed Federal project, which includes the discharge of dredged or fill material, several factors must be considered. Among these are the effects of such discharges on the aquatic biota, wildlife, shellfish beds, and fishery areas (including spawning and breeding areas). Possible changes in the ecosystem diversity, productivity, and stability must be considered. Effects of disposal on recreation and esthetic values are to be studied. Adverse impact on municipal water supplies and groundwater systems must be identified. These are only a sample of the effects to be considered in preparing the environmental impact statement required for an exempted project.

I look forward to working with the distinguished Chairman (Senator Randolph) and the able Ranking Minority Member (Sen. Stafford) of our Environmental and Public Works Committee, and especially with the Chairman (Sen. Grave) and Ranking Minority Member (Sen. Domenici) of the Water Resource Subcommittee, to develop a thorough process of Committee review for each Federal project and accompanying environmental impact statement for which an exemption from the 404 permit program is sought. A great deal of responsibility is being placed in our Committee to insure that these Federal projects, including discharges of dredged or fill material which are an integral part of these projects, will be conducted in an environmentally sound manner. I would hope that other Committees which have jurisdiction over Federal projects would also adopt strong review procedures for this new provision.

Mr. HANSEN. Mr. President, in June during consideration of the Clean Air Act Amendments of 1977, I stated that I believed that one of the greatest environmental crises that this Nation could experience would be if the lights were to go out in New York City. I made such a statement because, to my way of thinking, some of the actions contemplated in the Clean Air Act amendments appeared at odds with the need for America to achieve a degree of energy independence.

It is my belief that there are some hard lines to draw, some difficult choices to make in the energy area, but we must make those choices and we must make them now or face the type of crisis which confronted New York City on July 13 of this year.

Recently there appeared in the December issue of Harper's magazine a case study of one aspect of the environmental movement. In a detailed analysis of the controversy involving Storm King Mountain in New York State, the author sees the seeds of the energy problems with which we are now faced. In conclusion, he asks "Where is the power going to come from to meet the needs of the next decade and the next generation?" It is a question well worth considering.

Mr. President, I recommend this article to my colleagues and ask unanimous consent at this time that it be printed in the RECORD.

There being no objection, the article was ordered to be printed in the RECORD, as follows:

ENVIRONMENTALISM AND THE LEISURE CLASS

(By William Tucker)

Four years ago, while I was working at the Bergen Record, a suburban newspaper in Hackensack, New Jersey, a press release crossed my desk from the Scenic Hudson Preservation Conference, a small group with headquarters on Madison Avenue which, by its own advertisement, had been working for more than ten years to "save Storm King Mountain."

Although I had grown up in the New York area, I hadn't been living there much during the 1960s, and my memory of the whole Storm King incident was hazy. The most I could recall was the image of a majestic, booming mountain somewhere along the Hudson, a threat by Consolidated Edison of New York to do something terrible to it, and the recollection of protesters and entertainers strumming their guitars and parading in boats until the apparition had somehow been exorcised.

I doubt if I could have identified the Con Edison proposal as a pumped-storage plant. If I had been asked, I probably would have said it was a nuclear plant. I did not know at the time how many other people, including some of the principals of the controversy, would have responded in the same way.

Yet I was getting awfully suspicious about environmentalists. Their solutions to problems had an inordinate amount of impracticality about them, more than they would have tolerated in their own lives. The environmentalists in any given area seemed very easy to identify. They were, quite simply, members of the local aristocracy, often living at the end of long, winding country roads. They had learned the lessons of conspicuous consumption and had allowed a certain amount of genteel rusticity to enter their lives. Instead of imitating Greeks and Romans, they seemed to be patterning themselves after the English gentry.

The environmentalists knew the language of energy and ecology, and could describe a future filled with windmills and with bright sunshine radiating "inexhaustible energy." Yet one never got the impression that these people were planning to be part of it. The "soft energy" of the future was a vision offered to persuade people to forgo the nastier, more vulgar realities of the "hard energies" of the present. I knew this was mostly a lot of nonsense. Solar electrical generating stations would be massive installations, hiding acres upon acres from the sunlight. Storage problems could prove insurmountable. Solar heating on a large scale could mean rebuilding half the homes in America. When I questioned the environmentalists closely,

I found these details rarely intruded upon their vision. "Have faith" was the rejoinder, while economics and matters of sheer quantity were dismissed. "We certainly can't go on the way we're going now" was the comment I heard over and over again. It was difficult to tell just which, if any, of these people really knew what they were talking about.

There was another thing that disturbed me about environmentalism. That was the way it always seemed to favor the status quo. For people who found the present circumstances to their liking, it offered the extraordinary opportunity to combine the qualities of virtue and selfishness. When the first environmentalists were showing up at town meetings arguing against new apartment houses, shopping centers, or whatever, it seemed obvious that they were acting out of the universal human impulse which makes people respond to incursions on their surroundings by saying, "Put it somewhere else." Like everyone, the environmentalists wanted to be left with the illusion that they lived alone in nature without the assistance of other people. They had simply refined their arguments with talk about "ecosystems," "rare, endangered species," and "carrying capacities."

That was before everyone else began catching on to the possibilities of environmentalism. From 1972 to 1974, "protecting the environment" became the favorite argument in the endless debates over new development in the suburban area of Rockland County, New York, where I was reporting. People who would starve to death if they couldn't drive their cars to the supermarket were opposing new road construction because "fossil fuels are disappearing" and "we aren't going to be using cars anymore."

And really, there was nothing in it that was logically inconsistent with the tasks of the original environmentalists. Nothing these first country prophets had said ever had much to do with sacrifice or self-restraint. If tweedy people living at the end of country roads with fireplaces in their living rooms could protect their "environments," why couldn't tacky people living in pink-and-gray houses at the end of cul-de-sacs do so as well? "Environmentalism" always seemed to work in favor of the people who were already established in "the environment." I didn't realize how true this was until I learned that a group of middle-class whites in Newark had been able to block a highly controversial low-income housing project by bringing a long series of challenges to the project's environmental impact statements.

In the course of about six months, I saw several garbage-recycling projects and an experiment in pollution-free burning of coal blocked by local residents who were "protecting their environment." It was easy to see that people who talked about "environmentalism" were not terribly concerned with things like recycling, conservation, and biology.

With all this in mind, I decided it might be worth taking a long look at the incident which is considered the "birthplace of the environmental movement," the Storm King Mountain controversy. I admit I started my investigation with certain anticipations. I expected to find a project that had been opposed by a small but determined group of wealthy people. This turned out to be correct. What I didn't expect to find was the degree to which the opponents of the project had managed to commandeer public opinion and win supporters among people whose best interests might have been served by supporting the plant. Among these was the entire government of the city of New York.

What is most astonishing is that the whole issue is still alive, miraculously em-

Case 2:10-md-02179-CJB-DPC Document 14476-2 Filed 04/24/15 Page 36 of 55

balmed in the deep-freeze storage of the court system. The crowds have departed, the newspapers have stopped covering the story, and no more than a few people can remember even the sketchiest details of the issue. Only Con Edison and its little band of determined opponents remain in deadlock, struggling far into the night.

The chronicle as it comes to us now is really a historical saga. The written record would probably fill a wall of bookcases. I have read the *New York Times* file on the subject, the Bergen *Record* file (which includes most AP dispatches), and several books relating to the subject; I have visited the Storm King area many times, and interviewed close to forty people who played major roles in the controversy. Yet most of the testimony from the fifteen years of court cases and Federal Power Commission hearings is known to me only through excerpts and newspaper reports.

Nevertheless, there is a consistent pattern in the Storm King Mountain controversy, one which, I think, offers an answer to the big question—Why has this particular plant stirred up so much opposition?

The question has long tantalized nearly all the participants. One can see editorial writers, utility executives, residents of the Storm King area who favored the plant, and even the environmentalists themselves reaching for an answer over and over again. I wasn't able to make more than a few vain stabs at it until this year, when I went back and finished a book I should have read in college, *Thorstein Veblen's Theory of the Leisure Class.* There, in a slim fourteen-page chapter called "Industrial Exemption and Conservatism," I found an explanation of "environmental" behavior which I believe goes far beyond the issues at Storm King Mountain. It bears most specifically upon our present industrial crisis—the prospect of fossil-fuel shortages, the conversion to new technologies, the support for "no-growth" economics, and the general future of the industrial system.

I believe the Storm King Mountain controversy contains a story that has never been adequately told but has enormous bearing on the future of our economic system. It is offered here in the hope that, once understood, it will not have to be repeated on a large scale.

### THE CHRISTMAS-LIGHT DEMAND

The leisure class in great measure sheltered from the stress of those economic exigencies which prevail in any modern, highly organized industrial community. The exigencies of the struggle for the means of life are less exacting for this class than for any other; and as a consequence of this privileged position we should expect to find it one of the least responsive of the classes of society to the demands which the situation makes for a further growth of institutions and a readjustment to an altered industrial situation.—Thorstein Veblen, *"The Theory of the Leisure Class."*

In 1962 Consolidated Edison Company, the sole supplier of electricity to New York, was the giant of the industry. The company had some of the most skilled and innovative engineers in the business, and was generally regarded as the most progressive utility in the country. This was hardly a matter of chance, because whatever problems occurred in the utility industry were sure to happen first in New York City.

In the 1950s Con Ed had experienced almost nothing but major changes. The capital-short years of the depression and the diversion of resources during World War II had left the utility almost a generation behind in construction of new generating plants. In 1952 the company had eleven power stations, all of them in New York City and all but three built before 1933. They

could produce a peak output to meet a demand of 3.3 million kilowatts.

But the arrival of new energy-consuming technologies—particularly air-conditioning—was changing the entire pattern of electrical consumption in New York City. Throughout the history of the utilities industry, peak demands always occurred at night. Right through 1957, the biggest strain on Con Ed's system occurred when midwinter lighting and heating demands were at their highest. Old-timers in Con Ed's control command could fondly remember a time when the annual peak usage occurred on Christmas Eve, when tree lights and toy trains put the largest demand on Con Ed's generators.

But by the early 1950s it was obvious that the city's systems were on the verge of enormous changes. Daytime peaks, particularly during the summer air-conditioning season, were growing in gigantic leaps and would soon be overtaking winter nighttime demands. Carrying summer loads was soon going to be the utility's biggest challenge.

Con Edison responded with actions that can only be called appropriate. In the late Fifties the company contracted with the Allis-Chalmers Corporation to build a 1 million-kilowatt coal-burning plant—later to be nicknamed "Big Allis"—that would be more than twice the size of an existing plant, yet would hold off the rising peak demands for only four years.

At the same time, Con Ed ignored the conservatism of other utilities and began developing a nuclear technology. The only atomic generating stations had been built by the U.S. government, and other utilities were avoiding the risks of pioneering in the field. But Con Ed did not have time for such caution. The company bought an abandoned riverside park at Indian Point in upper Westchester County and contracted with General Electric to build, for $140 million, the first privately owned nuclear station in the world. Indian Point would provide only 237,000 kilowatts—less than the next year's projected increases in demand—but would open the way for larger efforts in nuclear technology.

On June 26, 1957, with both Big Allis and Indian Point One still in construction, the company passed a watershed. During the mid-afternoon of an extraordinarily hot day, Con Ed's demand rose to 3.5 million kilowatts. It was the first time a daytime peak had surpassed the annual nighttime peak, and it also put Con Ed over its own capacity. Electricity had to be imported from Long Island and New Jersey over lines that were originally built so Con Ed could sell power to neighboring utilities. All during the long afternoon, Con Ed executives sweated it out at the Manhattan control center, praying that the improvised system would work. Over the next three years, demand would grow at an average rate of 300,000 kilowatts per year.

Big Allis and Indian Point One came on line as scheduled, but the exasperating situation of "peak demands" was leaving Con Edison and other utilities playing a losing hand. New generating capacity was going to have to be added almost continually, yet this capacity would remain idle during most of the year. It was like building an extra wing on a house to accommodate a guest who visited only at Christmas. There were extraordinary inefficiencies in building and maintaining generators whose average "load demand" over the entire year was only about 55 percent of their full capacity.

The problem is that electricity must be used as it is generated. It cannot be stored in normal generating systems. The only proven method of storage—then and now—is "pumped storage," a system whereby water is pumped from a lower to an upper reservoir during off peak hours and released during peak hours to create hydroelectric power.

A few utilities had built pumped-storage

plants during the 1940s, and 50s, but they were clumsy, costly affairs. Two separate tunnels were required—one for pumping, the other for generation. Then, in 1960, engineers perfected a reversible turbine that could serve as both pump and generator. One tunnel could be used for both purposes, cutting construction costs nearly in half.

Several utility companies in areas where mountains and rivers would make pumped-storage systems feasible started exploring the new techniques. Con Ed did not make a deliberate investigation, but in 1961 one of its executives received a call from a manager at Central Hudson Gas and Electric in Newburgh, who said his company had been investigating what appeared to be two excellent pumped-storage sites on opposite sides of the Hudson River within five miles of Newburgh. The first, below Breakneck Ridge on the east bank, would suit Central Hudson, but the second, just south of Storm King Mountain, was too large for the Newburgh utility. It might, however, be on a scale required by the New York City company.

Con Ed made its own investigation of the Storm King site and found it was highly suitable for pumped storage. The generating plant could be tucked into a small inlet in the Palisades Interstate Park just south of Storm King. An upper reservoir for drinking supplies had already been developed about two miles behind the mountain. It belonged to the village of Cornwall, which lay just north of Storm King. The village would probably be happy to have the reservoir put on the tax rolls, and could be furnished with new wells by the company for about $3 million.

Working covertly to avoid land speculation, the utility acquired most of the property around the upper reservoir during the spring and summer of 1962. Then, in July, Con Ed broke the news to political officials in Cornwall, Mayor Michael Donahue was delighted—almost overwhelmed—at the idea of having the huge enlargement of the upper reservoir on the tax rolls. The benefits to the community would be enormous.

On September 27, 1962, village officials and Con Ed made a joint public announcement of the new plant, which they predicted would win quick approval from village residents and from the Federal Power Commission, the licensing agent. In his first interview with the press, Mayor Donahue, a Cornell-educated attorney who had grown up in Cornwall, noted, "There's no chance that the building will reduce the aesthetic qualities of the area" because it would be located "on the waterfront, not on the hills."

Five miles downstream however, a part-time resident on the east bank looked out the front window of his mountain retreat, one of many luxurious second homes in the area, and found a different view of the matter. William Osborn, an engineer whose family owned 2,000 acres and a mountain-side castle, and who served as president of the Hudson River Conservation Society, realized that he would have a clear view of the transmission lines that Con Ed was planning to string across the river to connect the Storm King plant to its circuits in Putnam and Westchester Counties. Osborn called a few of his neighbors in similar mountaintop hideaways and found that they too were upset about the plant, which would be visible from several lookouts on the east side of the river. Osborn, whose brother Frederick was a commissioner of the Palisades Interstate Park, was soon on the phone to Con Ed to see if it couldn't be persuaded to make a few slight changes in the layout of the plant.

At the time, "ecology" was an obscure discipline found only in a few biology textbooks, "conservation" was a movement whose main impetus had occurred around the turn of

the century, and "environmentalism" was a word that didn't even appear in the dictionary. But most people familiar with the history of the Storm King Mountain controversy rightly consider William Osborn's phone calls to his mountaintop neighbors as the birth of the environmental movement.

## HUDSON RIVER VISTAS

The scenery along the Hudson River's 130-mile length from New York to Albany can hardly be characterized in a few simple phrases. Nor can its long history. Both are notable for their diversity.

The Hudson's scenery ranges from the rocky columns of the Palisades at the lower end to the dreamlike vista of the Catskills along its upper reaches; from the beauty of mountainside farms to the leaden industrial shores of Haverstraw and Newbaugh Bays. The latter are two of the larger industrial centers that sprang to life during the early nineteenth century, when the Hudson became the main thoroughfare for most of the new nation's commerce.

Between them lies a stretch that has remained largely untouched. These are the Hudson Highlands. Here, for a length of fifteen miles, the mountains rise straight from the water's edge like the burly shoulders of huge animals. The stretch is the point where water from a preglacial lake broke through on its way to the Atlantic. It is the only breach in the Appalachian Chain, and thus forms a natural pathway from the Eastern coastline to the hinterland of the American continent, making the Hudson the nation's first main highway.

The highlands offered few footholds for commercial and industrial settlement, however; they served instead as a retreat for the wealthy. During the Revolution, they housed the biggest concentration of Tories in the thirteen colonies. As New York City prospered in the early 1800s, some of the area's most successful citizens began trekking up the Hudson to find solace on riverfront properties. The east bank of the river had been "estate country" ever since the Dutch made their first land grants along its shores while the west bank remained "Indian country," and was first settled only by small farmers who were willing to risk confrontations. As the nineteenth century progressed, the distinction remained. The Astors, the Goulds, the Vanderbilts, the Roosevelts, and the Rockefellers all took up residence on the east bank, while the western shore remained in the hands of small farmers except for the large holdings of the Harriman family in Orange and Rockland County utilities.

The highlands were the scene of some of the more elaborate attempts to mimic European nobility. A succession of wealthy stockbrokers and businessmen built mountainside castles in the region. Some proved drafty and uninhabitable, and were succeeded by less ambitious but still impressive second homes. Eventually, many of the great estates became unmanageable and were sold to charitable institutions. But the little colony of wealth in the highlands persisted. A group of artists and admirers of the past clustered around it, and an aristocratic, inward-looking community was formed, with the hamlet of Garrison as its center.

In the cities to the north and south, the story was different. Commerce declined, and industries deteriorated or departed. A wave of urban-renewal projects in the 1950s sent displaced blacks moving from city to city along the river looking for homes.

In the period of 1955-61, two striking incidents occurred within ten miles of each other on either side of Storm King. A group of wealthy activists moved an eighteenth-century mansion piece by piece all the way from Peekskill to Garrison after the federal government threatened to tear it down. It became the Boscobel Restoration, a minor tourist attraction. On the other side of the river, Newburgh was also briefly in the news.

Exasperated by the number of welfare recipients moving into the community, the city manager, Joseph Mitchell, announced that all able-bodied welfare clients would have to perform city jobs to receive their payments. The directive was quickly overturned in the courts, but city officials said it had highlighted the community's economic plight.

Less than a year later, Consolidated Edison of New York arrived on the scene with a proposal to spend $115 million to build a pumped-storage plant at the base of Storm King Mountain.

An advance in technical methods, in population or industrial organization will require at least some of the members of the community to change their habits of life . . . ; and in doing so they will be unable to live up to the received notions as to what are the right and beautiful habits of life—The Theory of the Leisure Class.

Right from the beginning, Con Edison was willing to compromise. It may have been their biggest mistake.

When Osborn made his objections known to Con Ed, the utility quickly agreed to move the plant around to the north side of the mountain, so that, instead of lying within the narrow gorge of the highlands, the plant would be facing the dilapidated scenery of Newburgh Bay, and sitting almost atop the burned-out ruins of Cornwall's abandoned waterfront. The company also agreed to run the power lines through an underwater cable beneath the Hudson. The relocation of the plant would mean a slightly longer tunnel, but it would also put the generating station within the village of Cornwall, which would make local residents even more willing to welcome the project. The additional expense would raise the total cost to only $121 million. Osborn registered his satisfaction, Cornwall was even happier about the plant, and the matter seemed settled. But not quite.

Other owners of weekend homes and small estates on the east bank of the highlands were unhappy about the transmission lines, which, in some cases, would run near to or over their properties. If Con Ed was submerging its cables under the river, why couldn't it bury the lines near their properties as well? Con Ed executives replied that burying all the wires would run the costs far beyond acceptable levels for its New York City and Westchester customers. The estate owners were not satisfied.

As they voiced their complaints, they heard that they had counterparts across the river in a little colony of about twenty-five families of wealthy New York City businessmen and attorneys with summer and weekend homes behind Storm King. These "weekenders" and "mountain people," as they were known in Cornwall, lived around a private compound developed in the 1880s by James Stillman, the president of National City Bank and one of the organizers of the Consolidated Gas Company, the forerunner of Con Ed. Stillman had been regarded as a nouveau riche when he tried to gain entrance to Tuxedo Park, the exclusive community at the other end of Orange County. Rebuffed, he expanded his family holdings at Storm King and started his own private community. Many of the current residents are descendants of the original families, although one of the reigning patriarchs, Chauncey Devereux Stillman, had moved further north, to Columbia County, where he kept a set of four-in-hand coaches and raised peacocks on his property.

The "mountain people" were also unhappy about the new plant. A parade of bulldozers and construction workers threatened havoc for their quiet weekend retreats. Some would lose property holdings around the upper reservoir. In addition, the plant would mark a kind of symbolic invasion of their privacy. The "estate country" people made contact with the "mountain people," and together

they talked about the possibilities of blocking the plant. One of the Cornwall people, Stephen Duggan, was a senior partner in the blue-chip Wall Street law firm of Simpson, Thacher and Bartlett. Duggan felt that if the group could harass Con Ed for a while, the economics would change and the company might give up the project. The Cornwall Stillmans polled their relatives and found they were nearly all opposed to the plant.

Benjamin Frazier, a Garrison antique dealer who had led protest marches in front of the Boscobel mansion because the federal government had wanted to tear it down, felt the same technique might work at Storm King. Alexander Saunders, a Garrison resident, felt a case could be made for keeping industry out of the area, even though in 1964 he would move his own family business, a small tool-and-die factory, from Yonkers to the highlands. The group found its ranks joined by another activist, Leopold Rothschild (not a real Rothschild), a well-connected New York City attorney who liked to hike in the Storm King area and had been active in conservation groups since an attempt to oppose construction of the George Washington Bridge in 1927.

They decided to attend Cornwall Village meetings and express their views, but soon found themselves facing almost unanimous public hostility. There were even a few threatening phone calls. Mayor Donahue, although quietly appalled that the "mountain people" might try to block the plant, made several efforts to mediate. Years later, when I visited his home, he told me of the time when he was invited "up the mountain" to a cocktail party where the Storm King project was to be discussed. "Nobody said much during the entire afternoon," he recalled, "but toward the end a retired West Point general took me aside and said, 'Look, we've got it nice and peaceful up here, why do you want to spoil it?' I bit my tongue and didn't say anything, but what I wanted to say was 'What about all the little people down there in the village who need this plant? Did you ever think about them?'"

Things did not look promising for the fledgling opponents during the early months of discussion, but in April 1963 Con Ed made a bad mistake. In its annual report, the utility printed an artistic rendering of the proposed pumped-storage plant. In an effort to highlight the technical aspects, the artist drew the plant larger than its actual size. As one writer would later describe it, the drawing showed "a portion of Storm King mountain missing, like a slice removed from a tub of cheese." Rothschild wrote letters of protest to both Governor Rockefeller and John B. Oakes, the editorial-page editor of the New York Times.

Rockefeller, an aristocrat among aristocrats, made the half-serious suggestion that if the group didn't want the plant they should buy the mountain. (His brother, Laurance Rockefeller, was later to use the family money to buy the Breakneck Ridge site from Central Hudson.) Oakes, however, was more responsive. On May 29, 1963, the Times ran its first editorial on Storm King, asserting that "it is almost as bad to plunk down a couple of power installations right in the heart of one of the most stunning natural regions in the Eastern United States, Storm King Mountain" as it would be to put a power plant in the middle of Central Park. The paper had proudly taken its stand. It has not wavered one iota from its original position over the succeeding fifteen years.

Duggan, Rothschild, Saunders, and their associates spent the rest of the summer looking for checkpoints where the plant could be temporarily delayed. The village had waived a referendum on selling the upper reservoir, so they asked that the vote be held. The result was a 499-26 defeat in 1964.

The only other possibility was the Federal Power Commission, which would be licensing the plant under its authority to regulate all hydroelectric projects. The little group of opponents discovered the deadline for filing for appearance at the FPC hearings had already passed, but through Rothschild's connections they were put in touch with Dale Doty, a Washington, D.C., attorney who had sat on the FPC during the 1950s and had once persuaded it to reject a dam proposed in Wisconsin because it would ruin recreation for the area. Doty was eager to argue a case before the FPC in which scenic and conservation values would be an issue.

On the evening of November 8, 1963, Rothschild met with representatives from four national conservation groups in the living-room of the Westchester home of Carl Carmer, a popular historian who had written a book on the Hudson. Together they set up the Scenic Hudson Preservation Conference, an alliance of conservation groups that devote itself to the Storm King case. Carmer was named honorary chairman, and Rothschild was elected president.

Through a combination of Doty's influence and the FPC's desire not to ignore any of the issues, Scenic Hudson was granted permission to appear at the license hearings even though the deadline had passed. Doty felt that a case could be made on the basis of the FPC's responsibilities to consider the total impact of the plant. He felt scenic values should play a part. For Rothschild, Saunders, Carmer, and Duggan, it was chiefly a matter of keeping the plant from going ahead on schedule. When the FPC hearings opened in Washington on February 25, 1964, they and their little band of followers from Garrison and Cornwall were waiting to speak in their turn.

As population increases, and as man's knowledge and skill in directing the forces of nature widen . . . the habitual methods of carrying on the life process of the group as a whole, no longer give the same result as before. . . . If the scheme according to which the life process . . . was carried on under the earlier condition gave approximately the highest attainable result . . . in the way of efficiency or facility . . . then the same scheme of life unaltered will not yield the highest result attainable . . . under the altered conditions.—The Theory of the Leisure Class.

Con Ed officials believed that the huge, 2 million-kilowatt pumped-storage plant at Storm King would offer three major advantages to its electrical system.

First, it would solve the problem of peaking power at bargain rates. For an investment of only $121 million, Con Ed would be able to increase its current capacity of 5.5 million kilowatts by more than 33 percent, enough to carry it through to 1969. Building the same capacity with fossil fuel or nuclear plants would cost more than $200 million.

Second, the Storm King plant would create greater efficiencies in Con Ed's existing systems. Instead of adding new generating capacity, it would use existing capacity more efficiently. Coal- and oil-burning plants could be operated at higher levels and would consume less fuel per kilowatt, just as cars burn gas more efficiently at fifty-five miles per hour. Con Ed would be able to retire four of its oldest, least efficient plants. This would be doubly important, since the oldest plants were the worst contributors to air pollution, a growing public concern.

The third advantage was reliability, an increasingly important concern among utilities in the early 1960s. As generating plants became bigger and as transmission lines stretched longer, the possibility of widespread power failures was increasing. Ordinary steam-driven plants could not cope with emergencies because it took from fifteen

to thirty minutes to stoke them up to higher capacity. But a pumped-storage plant, with enormous quantities of water sitting behind simple sluice devices, would be a godsend in an emergency. The Storm King plant could go from zero to 2 million kilowatts of power in less than a minute. The man-made waterfall could be used to restart other generators after a widespread power failure. The plant could prevent some blackouts and limit the effects of others.

Fifteen years later, New York City public officials would have done well to remember the reliability promised by the Storm King plant. The city had suffered two major blackouts in twelve years, the second leading to widespread looting and costing the city more than $1 billion. But by 1977 hardly any political officials could recall more than a few sketchy details of what Storm King had been all about. And none could remember that the city itself had been the major opponent of the project for nearly ten years.

## A CONFLICT OF INTERESTS

The FPC hearings added many novel aspects to what had formerly been a staid and pro forma proceeding. The members of Scenic Hudson presented their arguments under Doty's examination. Rothschild warned that the transmission lines running down the east bank of the highlands would cut a "raw scar" into the landscape. Saunders went even further. "This historic area will be permanently defaced," he warned. The plant would "set a precedent for other projects," while "crisscrossing the area with overhead power transmission lines would destroy many beautiful views."

Carmer made the most eloquent summation of Scenic Hudson's position:

"We believe that ugliness begets ugliness and that nature's beauty, once destroyed, may never be restored by the artifice of man. . . . We would offer the peace and healing our river gives, as it has always given, to those who seek its waters for respite from the tension of their lives. . . . The real question is whether the river's natural importance shall be sacrificed to these enterprises which would change the shoreline, lower high peaks [sic], destroy groves of trees. . . . The Hudson answers a spiritual need more necessary to the nation's health than all the commercial products it can provide, than all the money it can earn."

Carmer's interpretation of Hudson River history was a limited one. It ignored the river's combined role as the first highway of the nation's commerce, the birthplace of the steamboat, the home of one of the nation's first railroads, and the breeding ground for many of its first industries. The suggestion was that the river would now serve only as "respite from the tension of [the] lives" of people who presumably made their living elsewhere. The same kind of reinterpretation of history was taking place along the river, where the interest arising from the Storm King case was bringing suggestions from conservation groups that power boats be banned on the river and no house worth less than $50,000 be built on its shorelines.

The hearing officer, Edward B. Marsh, took their testimony into account, and in June 1964 recommended to the full five-member commission that the plant be granted a license. Con Ed had proposed to turn the rotting waterfront area into a park, and Marsh noted that recreation in the area would actually be improved. He said the plant would not affect the scenery of Newburgh Bay, but found sympathy with the argument that the transmission lines would despoil scenery in the highlands. He told Con Ed to find an alternative route that would take the lines behind the mountains at Breakneck Ridge. Marsh called the project "an exceptionally fine pumped-storage site" and suggested that Con Ed might even consider enlarging the

reservoir to 12 billion gallons for storage of 3 million kilowatts of electricity.

But by the time Marsh was issuing his recommendations, it was obvious that the approval of the Storm King plant was not going to be a routine matter. The New York newspapers had discovered the issue and already, on the pages of every city newspaper (there were then seven), the "Storm over Storm King" was brewing.

The fact that the usage, actions, and views of the well-to-do leisure class acquire the character of a prescriptive canon of conduct for the rest of society gives added weight and reach to the conservative influence of that class. It makes it incumbent upon all reputable people to follow their lead.—The Theory of the Leisure Class.

As soon as the New York newspapers woke up to the controversy in the early months of 1964, they lined up almost unanimously against the plant. Con Ed, after all, did not have a glowing reputation in New York City. For one thing, the utility made the mistake of charging people for the amount of electricity they used, whereas the other utility, the New York City Water Department, charged according to fixed "frontage" charges that allow residential customers to consume unlimited amounts of water while extra costs were hidden on the tax rolls. Then, too, Con Ed was constantly digging up the streets to get at its hard-to-service underground lines. Its slogan was "Dig We Must for a Growing New York," and in 1965 Fortune magazine was to label it "the company you love to hate." So the discovery that Con Edison was planning to "destroy" a beautiful historic mountain somewhere up the Hudson certainly came as no surprise.

The issue was particularly suited to the practices of editorials. Reporters who visit the scene of a controversy are often forced to trim their sails and adjust their preconceptions. Finding, for example, that an entire village of 3,000 people—indeed, almost an entire county of 200,000 people—was in favor of the project was bound to give some pause. Over the years many extremely balanced stories questioning the "scenic" objections to the plant were filed from Cornwall. But editorial writers are under no such constraints. They can proceed without too much attention to details. In the case of Storm King, two fundamental misconceptions emerged: that Newburgh Bay was virgin territory rather than a declining industrial area, and that it was the highlands themselves that were threatened. What is interesting to note is that there was never any question about the economic advantages of the plant.

"Beauty over Electricity," proclaimed the *Herald Tribune* in a May 10, 1964, editorial which stated:

"The Hudson Highlands are . . . a great scenic asset for all the people. And despite the great virtues of Con Edison's cheaper power, the fact remains that this industrial project (for all the intended landscaping works) will detract from nature's beauty. . . . It is well and good that Con Ed wants to bestow so many benefits. . . . But an undefiled Storm King Mountain is worth more than cheap electricity."

The *Times* offered its own summation on May 23, 1964:

"We do not dispute Con Ed's experts to the effects that this is probably the most economic and efficient means of supplying the next increment of power to meet New York City's constantly growing needs. If the required power plant is not erected at Cornwall but at some other place of less notable scenic and historic interest, doubtless the consumers of New York will have to pay more than they would otherwise pay for their power. We think this choice should be faced frankly; and we also think that in the

present instance, preservation is worth the price."

The possibility of there being other sites for the pumped-storage plant was occurring in other people's minds, and at one point a reporter asked Rothschild if he was making any attempt to help the utility find a different location. Rothschild wasn't: "That's their problem," he said.

## HOLDING ACTION

A complete review of the examiner's report would ordinarily take the full FPC about four months, but the mounting pressure of public debate was having its effect. The FPC did not issue its final decision until March 1965, nine months after the original recommendation. By then Scenic Hudson had changed its tactics and was mounting a many-sided campaign. The editorials in the New York newspapers had given the opponents of the project a strong indication that there was fertile territory to be mined among the city's celebrity-conscious media. Pete Seeger composed a ballad in honor of the mountain. James Cagney and Aaron Copland went on record against the plant.

In August 1964 the conservationists, as they were being called, hired Selvage, Lee, and Howard, a small Fifth Avenue public relations firm that had just finished trying to persuade the American public to take a more tolerant view of Portuguese colonial polices in Angola. James Cope, one of the more ambitious account managers, found himself immediately attracted to Rothschild and his group.

Cope arranged a favorable story for publication in *Readers Digest*. He also hit upon the idea of a "sail-in" around Storm King. On September 7, 1964, all seven New York newspapers carried broad coverage of the "waterborne picket line" protesting the plan. The *Times* noted that "fifty yachts, led by the *Westerly*, flagship of the New York Yacht Club," paraded from the Highlands Yacht Club in Garrison to Storm King, with "Commodore Chauncey Devereux Stillman, whose family gave the Black Rock Forest [behind Storm King] to Harvard in the 1920s," in command. Aboard the *Westerly* were Rep. Robert R. Barry of Westchester and State Sen. R. Watson Pomeroy of Dutchess County. "Opponents say the power plant will leave an enormous gash up Storm King and will set a precedent for defilement of the historic valley," noted the *Times*. The sail-in made *Newsweek*, and within weeks forty conservation organizations were offering assistance. The fight to "'save Storm King' was becoming a national issue.

Senator Pomeroy was soon able to create an even more favorable publicity platform for the opponents of the plant. He offered his New York State Legislature Committee on Natural Resources as a forum for Scientific Hudson. The pretext was legislation on the development of the Hudson, but a reporter at the scene noted that "it became obvious that [the] purpose was to give those people opposed to the . . . project an opportunity to express their views for the national press."

The Pomeroy Committee hearings inaugurated a pattern which was to succeed over and over again as a delaying tactic for Scenic Hudson. Initiated *after* the official FPC hearings had been closed, their aim was to petition the commission to "reopen" the hearings to permit the presentation of "new evidence," which was placed on the record under highly favorable circumstances. Con Ed's attorneys, of course, were not allowed to cross-examine witnesses before the Pomeroy Committee. When the "new evidence" was later subjected to stiff scrutiny, much of it proved to be fraudulent or nonsensical. But after the hearings had been closed yet again Scenic Hudson would return with more "new evidence" and ask for further reopenings.

The Storm King project has *never at any court or licensing agency in the federal or state government.* It has simply been delayed and delayed over and over again by agency and court decisions to reopen the hearings in order to consider "new evidence." In the entire fifteen years of the controversy, through literally tens of thousands of pages of transcript, the Federal Power Commission has never finished hearing all the evidence.

The star witness at the Pomeroy hearings was Alexander Lurkis, a recently retired chief engineer with the New York City Bureau of Gas and Electricity. Although the papers never mentioned it, Lurkis had been hired several months before as a paid consultant for Scenic Hudson on technical matters. He became Scenic Hudson's mouthpiece on "alternative" forms of generating electricity.

Lurkis shocked the hearings by testifying that Con Ed could produce adequate peaking power through "gas turbines," actually jet engines driven by the hot exhaust gases which Lurkis said could be run with Con Ed's "surplus natural gas."

As it happened, Con Ed had no "surplus" natural gas. Federal price controls were already upsetting natural-gas distribution, and utilities were being rationed by the FPC. Con Ed had recently lost an appeal for more gas rations before the U.S. Supreme Court.

But there was another problem. Although gas turbines are very good for restarting downed generators, they would not be as useful as Storm King in supplying emergency power. Con Ed board chairman Harland C. Forbes wrote the *New York Times*: "Mr. Lurkis . . . completely ignored the value of the Cornwall project's ability to provide immediately available operating reserve which cannot be furnished by jet-engine equipment—a matter of extreme importance in maintaining reliability of our electric service to the people of New York City." .

In fact, Lurkis's testimony proved so full of holes that Scenic Hudson eventually withdrew it after Lurkis had been cross-examined by Con Ed's attorneys before the FPC two years later. But the testimony led to a reopening of the hearings, and that was probably its main purpose.

The second issue raised at the Pomeroy hearings involved fish kills. Con Ed was already installing screening devices at Indian Point after encountering large fish kills there, but witnesses before the Pomeroy Committee said the problem at Storm King would be different. They noted that eggs and larvae from spawning fish would escape any kind of screening devices, and be sucked into the plant. It was a good point, and Con Ed quickly offered to spend $175,000 to study the problem. But within days the newspapers were carrying statements about how "the Atlantic striped-bass population which spawns in the Hudson will be destroyed for all time."

Robert Boyle, an editor of *Sports Illustrated*, became a participant, forming the Hudson River Fishermen's Association, consisting of the two dozen or so commercial fishermen who still made a part-time living from the river, with "sports fishermen" like Boyle to handle the public-relations aspects. There was a certain irony here, since sports 'fishermen had long since destroyed major stocks in almost every river and stream in the Northeast, and the federal and state governments were annually spending hundreds of thousands of dollars for restocking so that they could continue their pastime. Con Ed also made an offer to restock the river if there was any significant damage to fish life. The opponents again were not satisfied.

But the Hudson River Fishermen soon found themselves facing a formidable obstacle which might be called "nature." Although it was not widely known, scientists were aware that there were tremendous mortality rates in the river, and killing large amounts of eggs and larvae would not necessarily mean disaster for the population. A single female striped bass lays up to 5 million eggs—enough to renew the river's entire stock. Only one egg in 1,000 ever survives to maturity. But such sophisticated understanding of nature's ways didn't tone down the opposition to the plant.

On March 9, 1965, the FPC approved the license for the Storm King plant in a 3-to-1 vote. Despite the acrimony, the impression remained that the conservationists had made important contributions in the hearings and that the utility was making every effort to accommodate them. If compromise had been the goal, there would have been enormous achievement. But the conservationists' purposes were quite different, and their success was to take a much different form.

The exigencies of the general economic situation . . . do not readily produce, in the members of [the leisure] class, that degree of uneasiness with the existing order which alone can lead any body of men to give up views and methods of life that have become habitual to them. The office of the leisure class in social evolution is to retard the movement and to conserve what is obsolescent.—The Theory of the Leisure Class.

Scenic Hudson immediately filed an appeal with the Second Circuit of the U.S. Court of Appeals, arguing that the FPC should reopen the hearings for· more testimony on scenic values, fish life, and alternative sources of energy. Con Ed officials responded by charging that the opponents had "given up trying to defeat the plant on its merits" and were "trying to drag the project into a long war of attrition in the courts."

In any case, the FPC review had already taken far longer than expected, and, with the court case still pending, it was obvious that Storm King was not going to be on line in time to meet the growing power needs. So in November 1965 the utility announced that it would move up plans for a second nuclear plant at Indian Point. The project would cost $90 million but would generate only 800,000 kilowatts—less than half the capacity of Storm King. For New Yorkers, electricity was going to be more expensive.

The dramatic power failure in the Northeast on November 9, 1965, illustrated the dangers of widespread blackouts. Con Ed officials said that Storm King could have shortened the blackout by restarting other generators, but the incident stirred little support for the plant.

Scenic Hudson, for its part, was taking the final step into the big leagues of public relations by hiring Rod Vandivert, a Long Island advertising salesman, as its full-time public-relations director. Vandivert started going after Con Ed executives with a mixture of scorn and sarcasm that was to characterize the conservationist attack for many years. This year I visited Vandivert at his oceanfront home in a small, exclusive community on Fire Island. A big, shambling man with a firm handshake, he wore baggy dungarees and had a patch over his right eye when I saw him.

"We engaged in a technique you might call 'overstatement.' " Vandivert explained. "We learned how to do things like calling in stories to the newspapers on deadline so they couldn't get Con Ed's reaction until the next day, or several days later. The newspapers were very responsive. I remember dictating editorials over the phone to them dozens of times. All along, I think Con Ed was really the underdog in this thing."

I asked Vandivert if he ever thought that Scenic Hudson could simply drag the project on and on through continual rehearings and court delays so that Con Ed would finally give up. "Oh, I'd say we thought it about every third day," he said cheerfully.

The Court of Appeals took only until December 29, 1965, to throw out the first FPC

Case 2:10-md-02179-CJB-DPC Document 14476-2 Filed 04/24/15 Page 40 of 55

license as "incomplete" and order a reopening of the hearings. The decisions, still regarded as the original landmark of environmental law, ruled that scenic and environmental issues must be considered in large projects, and that Scenic Hudson could intervene on behalf of the "public interest," even though its members had no economic standing in the case. Vandivert, for one, was willing to believe that the publicity campaign had played a part. "Court decisions aren't made in a vacuum," he told me. "Judges read newspapers."

### FOUR YEARS OF HEARINGS

The second round of FPC hearings lasted for almost four years. When they began on November 14, 1966, Lyndon Johnson was President and the country was just entering the full-scale conflict in Vietnam. By the time the FPC issued its final decision on August 19, 1970, the Kent State shooting had already occurred, and Richard Nixon had been President for nineteen months. Yet this decision was also eventually remanded for further hearings by the Court of Appeals.

I will not attempt to go into anything more than an outline of the proceedings, but it must be noted that the FPC examiner and the commission itself took extraordinary pains to compile an exhaustive record on every aspect of the case. Scenic concerns, the threat to fish· life, alternative forms of energy, and aesthetics of the Hudson were all discussed almost to the point of irrelevancy. At one point, the hearing examiner, Ewen G. Simpson, had to decide whether the upper reservoir would disrupt a scenic vista from a point twenty miles away. By the time the hearings were over, Con Ed had spent $15 million on studies and attorneys' fees, while Scenic Hudson had spent $1 million (the organization had managed to tap a foundation supported by the estate of Andrew Mellon).

Before the hearings began, Con Ed announced that it could bury the entire plant on the Cornwall waterfront, raising the cost to $169 million. They said that would solve the scenic problems, although Scenic Hudson continued to argue against a visitors' booth on the site. But the new plan created other problems. The Catskill Aqueduct, which carries 40 percent of New York City's water supply, runs under the mountain, and Scenic Hudson immediately claimed that it would be endangered. Con Ed offered to pay the entire cost of relocating the aqueduct 400 feet below the plant, but nothing definite was settled and negotiations dragged on between the city and the utility.

Throughout the hearings, reporters from the *Times* (now one of only three remaining newspapers) gave accurate and unbiased coverage, but the editorial page remained heavily confused on the issues. At one point, it was "discharges from the tailrace tunnels" that endangered fish life. At another, it was "thermal pollution." And despite the plans for an underground plant, the facility remained "on" Storm King Mountain, and wouldn't move to "near" Storm King Mountain until 1969.

The issue of air pollution also became a point of contention at the hearings. Scenic Hudson claimed that Storm King would actually produce more air pollution because they said the power to pump the water up the mountain at Storm King would have to come from fossil-fuel plants within New York City. They said the one-third loss of energy in the pumped-storage process would mean a 50 percent increase in fuel burning. Con Ed had long noted that it could buy off-peak power from neighboring utilities, and that in the long run Storm King would be pumped by nuclear plants. But the notion that Storm King would produce "more air pollution" slowly started to become an accepted fact.

The New York City government had also become involved in air pollution before the FPC hearings, and in early 1966, Mayor John V. Lindsay set up a special Task Force on Air Pollution to negotiate with Con Ed. After several months of studying the problem, the task force decided that Con Ed was correct in its contention that Storm King would mean less air pollution. It signed a memorandum of understanding with the utility, agreeing to back construction of Storm King and help the company appeal to the FPC for more natural gas. In exchange, Con Ed would spend millions of dollars in cleaning up stack emissions, and would promise not to build any more fossil-fuel-burning plants in the city.

The city thought it had struck a good bargain, but the *Times*, in a May 19, 1966, editorial, remained unhappy:

"We deplore the unwarranted concession . . . to [support] a giant hydroelectric plant on Storm King Mountain. Some experts believe that this would increase rather than decrease air pollution here . . . Why should New York City for the first time inject itself into the controversy now, particularly when the Scenic Hudson Preservation Conference promised to present expert engineering testimony of the availability of ample other power sources?"

The "experts" on air pollution, of course, were also Scenic Hudson.

On May 23, 1967, Simpson closed the hearings after listening to over 5,000 pages of testimony. They did not stay closed for long.

First, Scenic Hudson wanted to "correct" Lurkis' "expert" testimony, which had been refuted by Con Ed's cross-examination. Scenic Hudson petitioned to present another "alternative" plan, and its request was granted.

Its proposal, presented through attorney David Sive, representing the Sierra Club in the case, was that Con Ed should build a third nuclear generator of about 1 million kilowatts. It didn't say where. The remaining 1 million kilowatts needed in Con Ed's system would be supplied by turbines burning kerosene. There was nothing unusual at the time in conservationists proposing nuclear plants as the solution for energy problems. During the 1960s, the Sierra Club and other environmental groups supported nuclear energy as the best form of power generation.

On August 7, 1968, almost a year after the closing arguments had been presented, Simpson issued the first of three favorable reports on the plant. He said there was no alternative for equally reliable power for New York, and that the hazards to fish life would be minimal. While acknowledging that the mountain was "a surpassing scene," he noted that "it must be said that Storm King does not exist in an environment of untouched natural beauty as in the idyllic past, but rather is all but irrevocably associated with the present realities."

Responding quickly, the *Times* said: "[The] findings on the scenic effects are at odds with the virtually unanimous opinion among conservationists and nature lovers, who have no economic interest other than the preservation of a majestic national heritage." The paper found the conclusions on fish life suspect because Simpson said the plant should be monitored after it was constructed.

One week later, Con Ed officials announced they might have to consider putting a nuclear plant in Long Island Sound, on an island near New Rochelle. The *Times* said that proposal must also be regarded "with great reserve" because of fish kills and radio-active wastes. Where New York City's power was coming from was obviously someone else's problem.

"Even in cases where one recognizes the substantial merits of the case for which the innovator is spokesman . . . still one cannot but be sensible of the fact that the innovator is a person with whom it is at least distasteful to be associated, and from whose social contact one must shrink. Innovation is bad form."—The Theory of the Leisure Class.

Less than two months later, New York City became the major opponent of the plant. On October 28, 1966, Deputy Water Resources Commissioner Robert Clark petitioned for a reopening of the hearings, saying that the negotiations over the water tunnel "had not been fruitful." It is difficult to assess exactly what happened, but it is interesting to note that when the New York City Democratic boss Carmine DeSapio was convicted on corruption charges in 1970, he was found guilty of attempting to exact bribes from Con Ed officials in exchange for permission to build over city water lines.

While the city was joining the ranks of the "nature lovers" opposed to the plant, the economic scenery around New York City was taking a turn for the worse.

In 1962, when Storm King was proposed, Con Ed officials said they thought they would have to provide 7.15 million kilowatts of power by the summer of 1969. The entire increase in demand could be met through Storm King. As the summer months of 1969 rolled around, Con Ed's seven-year-old predictions were coming in right on the button. The city set a midsummer peak record of 7.26 million kilowatts—only 4 percent above Con Ed's original predictions.

The only trouble was, power wasn't there to meet it.

Indian Point Two was supposed to come on line by 1969, but the Westinghouse Corporation had failed to meet its deadline. (What with fish kills and environmental sults, the plant was not put into operation until 1974.) Con Ed contracted to buy 915,000 kilowatts of peak-power from other utilities—the most expensive way to provide electricity—but was still left with only a 14 percent reserve margin, well under the industry standard of 20 percent.

On July 31, 1969, the troubles began. Big Allis fouled temporarily after the installers of a new turbine forgot to remove some insulating equipment. Under the increased strain, two older plants scheduled to be retired by Storm King also broke down. In a matter of hours, more than 20 percent of the utility's power was gone.

For the next two weeks, New Yorkers began to experience what quickly became known as the "power crisis." Air conditioners were turned off, manufacturing plants cut their schedules, businesses closed down. While people throughout the country were celebrating the first moon landing, New York City turned into a sweltering steambath.

Charles F. Luce, a former Undersecretary of the Interior who had just taken over as board chairman of Con Ed, said the problems were due to "a feeling on the part of the public that even though a particular new power plant were not built, somehow the needed power would be provided." He asked for "a better general public understanding that there must be additional power and that . . . we cannot provide it without some impact on the environment."

Vandivert, now being quoted regularly after every statement by Luce, almost as if Scenic Hudson had become Con Ed's alter ego, saw the problem differently, claiming that opposition to Storm King "is not a narrow conservation battle. It's really the public interest versus the big brother or big daddy approach of Con Edison, which assumes we should let it tell us what is good for the public." Scenic Hudson had obviously assumed the task of representing the public on power and energy as well as conservation.

By early 1970, Storm King was still far on the horizon, and Con Ed told the city it would

have to build another oil-burning plant in Astoria. City officials were livid. Robert N. Rickles, head of the Department of Air Resources, called air pollution "already an intolerable public health problem." Jerome Kretchmer, head of the Environmental Protection Administration, said the battle over the Astoria plant would be "much deeper than the struggle at Storm King." But it was obvious to some city officials that power plants had to go somewhere, and the Mayor's Interdepartmental Committee on Public Utilities voted 3–1 in favor of Astoria.

But while city officials were voting to accept more air pollution, the corporation counsel's office was throwing in the city's lot with the nature-lovers of the Hudson. On February 12, 1970, after a previous rebuff, the city once again petitioned for *another* reopening of the hearings on a "non-quantifiable yet nonetheless real hazard to the aqueduct."

Was the city simply interested in protecting its aqueduct? It seems unlikely, for, when examiner Simpson allowed a second reopening of the hearings in May 1970, city attorneys quickly said that they were opposed to the plant, whether it endangered the aqueduct or not, because of *scenic* considerations. "The city's concern is for the environment as well as economics," corporation counsel J. Lee Rankin told the FPC. "When we speak of preserving the area, the city is not talking about a superficial or cosmetic job; rather it seeks assurance that an area of exceptional natural beauty be preserved for future generations just as it is."

The *Times* rejoiced that "New York City thus joins the battle waged for years by Scenic Hudson Preservation Conservationists against utility incursions on the river." But, strangely enough, the *Times*, had harsh words for Attorney General Louis Lefkowitz, who was trying to block the opening of Indian Point Two after trial runs produced kills of 120,000 fish a day in January and March. "The right answer, given the imperative role Indian Point now plays in meeting metropolitan power demands," said the same editorial, "is not to shut it off precipitously but to see that its plant deficiencies are corrected. Proper steps are already being taken by the Atomic Energy Commission."

Potential fish kills at Storm King were intolerable, but real fish kills at Indian Point, where the problems were complicated by thermal pollution, could be corrected. In addition Indian Point Two, which was built in place of Storm King, was "imperative." While Storm King was unnecessary. It obviously took the skilled eye of a conservationist to be able to make such distinctions.

### THE POWER CRISIS

Things turned out to be much worse than anticipated during the power crisis of 1970. In May, Indian Point One was closed by a defective cooling pipe. Indian Point Two was still far from completion. Then, on July 21, Big Allis went down for extensive repairs immediately projected to last through midwinter. Con Ed had begun installing gas turbines over the winter as a substitute for Storm King; by mid-July one of the turbines had also failed, and Con Ed's total capacity was below the previous year's peak. The result was a summer in which voltage reductions and power failures became almost a daily occurrence. Even rush-hour subways didn't have enough power.

In its scramble for power, Con Ed paid premium prices, importing electricity from as far away as Canada, New England, and the Tennessee Valley Authority. Con Ed's profits, already at the lowest rates of any utility in the country, were getting lower. When another heat wave struck in September, voltage reductions were put into effect for the fifteenth time, and a blackout hit a sixty-five-block area in Queens. The *Wall Street Journal* quoted a Canadian woman who in cutting short a visit to Forest Hills. "You can have New York City," she said. Apparently others agreed. The steady exodus of manufacturing firms and corporate offices was suddenly turning into a rout. From 1969 to 1976, the city, now widely regarded as "unlivable," was to lose 650,000 jobs. Other factors certainly contributed, but the shambles of Con Ed's power system and its soaring rates didn't help. Nothing ripples through an economy more completely than the costs of energy.

On August 19, 1970, the full five-member FPC finally reached its decision to grant a second license for the pumped-storage plant at Storm King. It was Con Ed's one note of optimism for the entire summer. Still, in the midst of the power crisis, the *Times* took the trouble to be gravely disapproving: "Essentially nothing about the plan has changed in the seven years since Con Ed first proposed [it]," said the editorial, without considering that the whole plant would now be built underground. "We are glad that Scenic Hudson intends to carry on the fight in the courts."

Indeed, the possibilities of appeals seemed endless.

Six months after the 1970 power crisis, seven litigants were appealing the FPC's Storm King license to the Second Circuit Court of Appeals. They were the Scenic Hudson Preservation Conference, the Sierra Club, the Wilderness Society, the Izaak Walton League of America, the Audubon Society, the National Parks and Conservation Society—and New York City.

City attorneys must have been dazzled by the company, for, by March 1, 1971, they were telling the Court of Appeals that the project "would be worse from an air-pollution standpoint than construction of additional plants in the city," and were calling the Hudson Highlands "a national treasure" where it would be unlawful to license any site unless there was "a mandate that the site chosen be exactly restored" to its natural state.

But on October 22, 1971, the Court of Appeals upheld the license by a 2–1 vote, and by June 19, 1972, the U.S. Supreme Court had refused to review the decision. A challenge in the state courts followed.

Finally, in August 1973, after more than ten years of effort, the project was suddenly completely free of license requirements and litigation. City officials were furious. Grasping at straws, they took the only possible remaining action and cancelled their ten-year-old agreement to allow the village of Cornwall to tap the aqueduct as part of the plan to replace the upper reservoir. That took another year to overturn in the courts.

Neither had Scenic Hudson run out of "new evidence." On the day of the final state-court decision, Albert Butzel, its new attorney, made a solemn and foreboding statement. "New and revealing evidence has been uncovered which raises serious questions about the viability of this proposed plant and the citizens' need for it," said Butzel. "The evidence is so convincing that the Scenic Hudson group will petition the FPC to reopen the entire case." Butzel said the "new evidence" concerned "fuel cells" which were "just on the horizon."

But in truth the arguments about "alternative sources of power" were wearing a bit thin, particularly since Con Ed was so strapped for power that it was using its peakload gas turbines for base-load generation, burning fuel at about half its normal efficiency. And so, Scenic Hudson decided to concentrate its best efforts on the fish study that had been made by Con Ed from 1965 to 1968 at a cost of $450,000.

The report, supervised by a panel of high officials from the New York State Department of Conservation, the New Jersey Fish and Game Division, and the Bureau of Sports Fisheries and Wildlife and Bureau of Commercial Fisheries, both divisions of the U.S. Department of the Interior, had found that the plant would draw in no more than 3 to 4 percent of the total number of eggs and larvae that drifted past during the May–July spawning season. Hydrological studies showed that the plant would suck in 4 percent of all the water that passed by the plant each day.

Assuming an even distribution of eggs in the river would mean that about 4 percent of the eggs passing each day would be taken into the plant. Assuming that *all* those eggs would be killed (there was plenty to suggest they wouldn't be) meant that 4 percent of all the eggs that passed the plant would be killed. A fair percentage of eggs was spawned below Storm King and never passed the plant, so the final estimate was a 3.6 percent mortality rate of all eggs and larvae. Since 99.9 percent of all eggs and larvae died before maturity under *natural* conditions, the conclusion was that the plant would have no effect on the total fish populations.

Scenic Hudson, however, wasn't satisfied. They decided there was a "fatal flaw" in the analysis. The "flaw" was that the panel of scientists and federal and state officials had "forgotten" that the river was tidal. The group said that the eggs and larvae would be "washing back and forth" in front of the plant and would have "more chance of being caught." The Scenic Hudson members found a hydrologist who said that the river sometimes washed back and forth ten times in front of certain places in New York Harbor. They decided to multiply 3.6 percent by ten, arriving at a mortality rate of 36 percent.

The whole argument, of course, was a lot of sophisticated nonsense. The study had considered all the tidal movements and arrived at an average figure for the net downstream flow of the river. Once the average was known, it wouldn't matter if the river washed back and forth 10, 50, or 100 times, as long as the *net* flow had been determined correctly. The point was that *the plant could take in only so much water per day.*

It is easy to imagine the problem causing some consternation in a fifth-grade math class, but it is difficult to see this logic finding acceptance before such bodies as the Atomic Energy Commission and the U.S. Court of Appeals. Nevertheless, it did.

Scenic Hudson had its "rebuttal" to the fish study. The problem was to get it on the record. But with their multiplying contacts in government and uncritical treatment in the press, this was a relatively simple matter. The target became Dr. Philip Goodyear, a marine biologist in the AEC who was strongly sympathetic to Scenic Hudson's cause and had been a guest speaker at a fund-raising dinner of the Striped Bass Fund, the financial arm of the Hudson River Fishermen's Association. Dr. Goodyear believed—undoubtedly with sincerity—that the three projected Indian Point plants, plus Storm King, would have significant effects on the river's fish life. Whether Goodyear acted with scientific integrity in the Storm King affair will have to be judged from the record.

Scenic Hudson's connection to Goodyear was Sen. Abraham Ribicoff of Connecticut, also sympathetic to its cause. (Since Connecticut was getting many of the corporate headquarters leaving New York City, he certainly had no reason not to be. In October 1973 Ribicoff delivered the FPC fish study, plus Scenic Hudson's critique, to the AEC and asked for an evaluation "within two months." Dixy Lee Ray, chairman of the AEC, said it would take at least six months, but, as arranged beforehand, the report arrived on Goodyear's desk at Oak Ridge Lab-

oratories after only two. "It was a situation where they knew what pitch was coming to them and we knew what hit was coming back at us," Vandivert explained to me.

By mid-December, a "preliminary report" was back in Ribicoff's hands. Dr. Goodyear confirmed that the report was "in error" by ignoring the tidal movement, but did some fast footwork to show that "compensating errors" made the figures correct anyway. He then went on to make his own monumental error by deciding that the entire annual kill of 3 percent of all the eggs and larvae in the river would occur *each day the plant was in operation.*

"If [the estimated removal of 3 percent of eggs and larvae] is applied over a period as short as ten days, nearly 25 percent of the larvae population would be withdrawn," he reported. "If the daily removal estimate [is applied] over the entire seven-week [spawning] period . . . then approximately 75 percent of the annual hatch might be destroyed." The "daily" estimate, of course, was actually an *annual* estimate.

Ray attached a letter that was as long as the report itself, warning Ribicoff to "use caution in drawing conclusions" because of the probable absence of completely adequate data." After reviewing the report, she added sardonically that she continued to believe that a critical analysis of this problem would take a minimum of six months." But the cat was already out of the bag, and so by December 1973 Scenic Hudson was back in business. Within days, a letter was printed in the *New York Times* stating that the Atomic Energy Commission was reported that the Storm King hydroelectric power project might destroy 75 percent of the annual hatch of striped bass in the Hudson River." Sen. Edward Kennedy asked the FPC for a "brief and worthwhile delay" because of the impending "destruction of 75 percent of the striped bass" off the coast of Cape Cod. Ribicoff sponsored an "information meeting" on the report, and a Congressional hearing was eventually arranged. The testimony was inconclusive, but the environmentalists simply declared themselves the winner and carried the "new evidence" back to the Court of Appeals. The court ordered the FPC once again to reopen the hearings for a new study on fish life in the Hudson.

### VICTORY OF ATTRITION

The "brief and worthwhile" delay has cost Con Ed $20 million—one-sixth the original cost of the plant. The money was spent for a third major fish study which took four years to complete, involved seven major universities and scientific institutions, and came to essentially the same conclusion reached by Con Ed's lone scientists more than ten years before—that about 4 to 5 percent of the eggs and larvae would be entrained by the plant, and that the total fish population would not be affected.

Two observations show that there may be something to the utility's side of the story. The three Indian Point plants now take in more water than the Storm King plant would, yet after nearly three years of operation AEC scientists admit that there is no evidence that any portion of the river's fish population has been affected. (The amount of fish scraped off the screening devices each day would fill an average bucket.)

There are other pumped-storage plants in operation, and they have fish problems of a different sort. At the Muddy Run plant in Philadelphia, the problem is that eggs and larvae drawn into the plant quickly produce sizeable fish populations in the upper reservoir. Their numbers can get to be a problem, and Philadelphia Electric allows fishing on the upper reservoir to keep them under control.

All this hardly matters now. The "long war of attrition" predicted by Con Ed executives in 1965 has been fought and lost. Con Ed's finances fell apart in early 1974—a direct result of the high costs of buying outside power, the utility's enormous tax burden (25 percent of its revenue from customer billing goes to taxes), the overwhelming expenses of having to buy low-sulfur oil for city generation, and the resistance to rate increases. The quarterly dividend was cut, and Con Ed's stock—already known as a "widows and orphans" holding (median shareholder, a fifty-year-old woman)—dropped to the floor. "We wanted them to go into receivership so that even we could buy them out—then they would be a true public utility," said Vandivert. But instead the New York State Power Authority authorized the purchase of two uncompleted plants, and Con Ed managed to avoid bankruptcy.

The Storm King plant, of course, could probably have prevented the July 13 blackouts. John B. Oakes, now senior editor of the *New York Times*; Walter Brown, director of the National Electric Reliability Council; and Rod Vandivert all agree on that. After all, that was what the plant was *designed* to do. City officials investigating the power failure said they were amazed to learn that "the generating capacity was available, they just couldn't bring it up in time." Con Ed, of course, had been saying that for fifteen years. The city investigation found that the crucial loss of power didn't occur until the last two lines from the north failed because they became overloaded carrying 2 million kilowatts. The lines from Storm King, which were to run along the same corridor, were to be designed to carry 2 million kilowatts.

But there is hardly a political official in New York who even remembers what the whole Storm King controversy was about. Ed Koch, the leading candidate for mayor, said the problem at Storm King had been "thermal pollution," and didn't know the city is still the major opponent, nor did Paul O'Dwyer, who has now been City Council president for four years. He said the plant hadn't been built because "Pete Seeger and the environmentalists all over the country didn't want it." (He is undoubtedly right.) State Assemblyman Andrew Stein, who has made a political career out of attacking Con Ed, said about Storm King: "I'm against nuclear plants. I think we should keep the ones we have, but I don't think we should build any more." Stanley Steingut, the Brooklyn Assemblyman who is Speaker of the State Assembly, also told me that Storm King was "a nuclear plant."

What is most remarkable is that Scenic Hudson itself now appears to be the city's expert on the matter. When I called Dr. Carolyn Broncato, staff director of the Mayor' Special Committe on Inquiry into Energy Failures, she admitted she remembered nothing about Storm King, but said, "If you want to know more about Storm King, call Al Butzel." When I talked with Carol Bellamy, who will probably succeed O'Dwyer as president of the City Council, she said that "the person to see on that would be Dave Sive" (the Sierra Club attorney).

Even Norman Cousins, the editor of *Saturday Review*, who voted in favor of Storm King as chairman of the Mayor's Special Task Force on Air Pollution, remembered vaguely that the problems had something to do with "radiation." When I asked him what he remembered best about the environmental opponents, he had one clear recollection: "They had a lot of lovely ladies working for them."

By virtue of its high position as the arbiter of good form, the wealthier class comes to exert a retarding influence upon social development far in excess of that which the simple numerical strength of the class would assign it. Its prescriptive example acts to greatly stiffen the resistance of all other classes against any innovation, and to fix men's affections upon the good institutions handed down from an earlier generation.—The Theory of the Leisure Class.

And so we are brought to the point where we can legitimately ask, What in God's name has been going on in New York City for the past fifteen years?

The answer, I believe, can only be understood in terms of Veblen's analysis of leisure-class behavior. It was obvious to anyone willing to look that the opposition was coming from the petty aristocrats of the Hudson Valley who were aristocrats of that solitude was being invaded by the advancing society. There was nothing terribly new about this. The Hudson River Railroad had its tracks right across the front lawns of Washington Irving, John J. Audubon, and William B. Astor in 1842. All were upset, but eventually agreed to yield in the name of the public good. Yet in the Storm King case this did not happen. The question is, Why?

Both critics and defendants of the plant have always assumed that anyone standing in the way of progress could only be acting out of financial self-interest, and that, once a money interest was disproved, the opponents would have to be accepted at face value. The *Times* expressed this so perfectly in defending the conservationists in its August 8, 1968, editorial that it is probably worth repeating: "[The FPC examiner's] findings on the scenic effects are at odds with the virtually universal opinion among conservationists and nature lovers, *who have no economic stake other than the preservation of a majestic national heritage*" (my emphasis).

Veblen, who found this interpretation of leisure-class opposition to progress naive, wrote:

"When an explanation of this class conservatism is offered, it is commonly the invidious one that the wealthy class opposes innovation because it has a vested interest, of an unworthy sort, in maintaining the present conditions. The explanation here put forward imputes no unworthy motive. The opposition of the class to changes in the cultural scheme is instinctive, and does not rest primarily on an interested calculation of material advantages; it is an instinctive revulsion at any departure from the accepted way of doing and of looking at things—a revulsion common to all men and only to be overcome by the stress of circumstances."

But what about the newspapers and the politicians, who are presumably responsible for informing the public and acting in its interest—why were they so completely taken in by sophistries and the publicity gestures of the "environmentalists"?

Here is Veblen's answer:

"Since conservatism is a characteristic of the wealthier and therefore more reputable portion of the community, it has acquired a certain honorific or decorative value. It has become prescriptive to such an extent that it is imperatively incumbent on all who would lead a blameless life in point of social repute [to share these views]. Conservatism, being an upper-class characteristic, is decorous; and conversely, innovation, being a lower-class phenomenon, is vulgar."

This is the puzzle that no one in the entire controversy was ever able to quite figure out. Voting to "save Storm King" gave each of the participants in the political arena the chance to participate in a noble cause, to share an aristocratic vision. It wasn't a matter of money, it was simply a question of good taste. The effort might require of a person that he gaze upon the litter of industrial ruins on Cornwall's waterfront and see "a landscape rich in beauty and history," but isn't selectivity the key to being an aristocrat anyway? It wasn't money that was being passed out aboard Commodore Chauncey Devereux Spillman's yacht as it passed Storm King Mountain on that September morning. It was respectability.

*December 15, 1977*

Case 2:10-md-02179-CJB-DPC Document 14476-2 Filed 04/24/15 Page 43 of 55

The environmental vision is an aristocratic one, conjured at the point where an idyllic past blends nicely with an imaginary future. It can only be sustained by people who have never had to worry much about their security. They are, in Veblen's term, "industrially exempt" from the normal fluctuations of the economic system.

Nuclear energy, for example, was part of that vision when it was a "bright promise" in the 1960s, but now that the realities are here it looks problematic. Tom Wicker writes in the *New York Times:*

"In three decades of experience with nuclear power, the radioactive waste disposal problem has yet to be resolved. Plant de-commissioning costs and problems are not fully known. Nuclear power has grown vulnerable to shortages, breakdowns, and poor productivity; the Federal Power Commission reported 229 plant-months of delay for such reasons at 24 reactors in 1974. The amount of electricity actually produced has averaged, overall, only 55 to 57 percent of full potential."

The litany could easily be made about any new technology. Nothing in the industrial system is "fully known" until it has been done a few times. The "55 to 57 percent" figure is a familiar one, however—it is the average production for the entire electrical industry, due to the problems of peak-load demands. In actual operation, nuclear plants have been slightly more reliable than fossil-fuel plants.

But Wicker has a brighter vision:

"Solar energy, by contrast, is available everywhere, has no public opposition and offers no safety or environmental hazards. It is highly suitable for such low-quality energy demands as space and hot-water heating, while to use electricity produced by nuclear fission for such homely needs is an expensive form of overkill."

Solar energy, of course, has the advantage of not being a reality as yet. A small-scale solar electrical station would be enough to scare the wits out of any environmentalist (one square mile of collectors for a town of 30,000 people with little hope for reducing its size through technological improvements). In any case, if all the country's heat and hot water were produced from solar energy, the demand for electricity would decrease by less than 5 percent.

But the message here is clear, and it should not be obscured by the facts. Nuclear energy is "hard" and "dirty" and involves nasty realities of life. Solar energy, on the other hand, is "soft" and "clean." It is most notable for the *lack of effort* it promises. The future will hold no more grubby realities such as digging coal out of the ground or drilling for oil—no more handling of dangerous materials. There will be nothing to do but sit back and watch the windmills revolve and the sun shine. The correct word for the environmental vision is not *clean* or *soft.* It is *genteel.*

It is *also* a vision that will call us to disaster.

Veblen's great fear was that, as innovation fell behind under the retarding influence of the leisure class, society would split into two extremes—the permanently wealthy and the permanently poor. Each would be even more resistant to change for its own reasons:

"The abjectly poor, and all those persons whose energies are entirely absorbed by the struggle for daily sustenance, are conservative because they cannot afford the effort of taking thought for the day after tomorrow; just as the highly prosperous are conservative because they have small occasion to be discontented with the situation as it stands today."

Veblen predicted that this polarization in society would lead to the loss of the entrepreneurial classes, which operate under

what he called the "instinct of workmanship." The result would be permanent stagnation.

THE LIMITS TO "NO-GROWTH"

There is no doubt that much of our response to the present industrial crisis is being formulated by the leisure class marching under the banner of "environmentalism." This is not to say that we do not face enormous and critical environmental problems and that there are not enormous numbers of people who are dedicated to trying to solve them. My quarrel is with the political "environmentalism" that offers no reasonable alternatives but proposes solutions which entail delaying or abandoning present, feasible, and proven technology and "waiting for" solutions that are "soft," "attractive," and "just on the horizon."

The leisure-class environmentalists will be perfectly content to leave things the way they are, regardless of the economic consequences, since, as Veblen notes, "at any given time this class is in a privileged position, and any departure from the existing order may be expected to work to the detriment of the class rather than the reverse. The attitude of the class [is] to leave well enough alone."

The fundamental environmentalist assumption is that we can "stop growth," at least until the "right" solution to our technological problems comes along. This is foolishness. "Stopping growth" simply means falling behind, with all the economic consequences. It is only the accumulation of social wealth from previously successful technologies that makes it possible to introduce new technologies. The people of New York City will find this out when they realize that they cannot easily turn the clock back and adopt pumped-storage technology. In the 1960s the plant could have offered enormous savings. Now it would cost $1 billion; the people of New York City can hardly afford it."

The great misconception about "stopping growth," is the assumption that things will stay pretty much as they are. They will not. The stagnation of the industrial system will not keep the numbers of the poor from growing. On the contrary, the universal historical experience has been that people do not limit family size until they have achieved a measure of social security. The only way this can be achieved is by the continuing expansion of the industrial system. "No progress" doesn't mean "no growth," and those countries, such as China and India, that have spent the longest periods of their history struggling under the changeless mores of an entrenched leisure class are hardly noted for their achievements in population control.

The great appeal environmental solutions offer is that they can be worn like a badge of success. To say that one is an "environmentalist," or that one favors "no-growth," is to say that one has achieved enough well-being from the present system and that one is now content to let it remain as it is—or even retrogress a little—because one's material comfort under the present system has been more or less assured.

To quote Veblen:

*The institution of a leisure class, by force of class interest and instinct, and by precept and prescriptive example, makes for the perpetuation of the existing maladjustment of institutions, and even favors a reversion to a somewhat more archaic scheme of life (my emphasis).*

Environmentalism has presented itself to us as a form of "science," but it only borrows the language of science to serve its purpose. It is not scientific, either in its origins or its method. It could easily turn anti-scientific, and already has in many instances.

Yet there is no doubt that the environmental vision is winning widespread accept-

ance and is having an enormous effect on our economy. The Edison Electric Institute, the research arm of the utilities industry, is now warning that large portions of the country face widespread power shortages and blackouts within the next few years because the introduction of nuclear technology is not going ahead on schedule. Environmentalists' opposition and regulatory delays have brought new construction almost to a standstill. Power reserves will fall below 20 percent around the Great Lakes by 1979, and in the Southeast by 1981. By 1986 reserves will have dwindled to 1.4 percent in North Dakota, Minnesota, and Nebraska, to 3.2 percent in New England and New York State, and to 10.1 percent in Illinois, Missouri, and Wisconsin. The nuclear-reactor industry says it is already facing "enormous erosion of skills" and "technological regression" simply because there is no work available in building new plants.

"We're going to see a crisis atmosphere," John O'Leary, deputy secretary of the new Department of Energy, said recently. "By the mid-1980s, we may have very severe economic consequences as a result of our improvident attitudes of the late 1970s."

Yet environmental opposition is now working to hinder not only nuclear-plant construction, but also off-shore oil drilling, importation of liquid natural gas, coal-mining, gasification of coal, hydroelectric plants, and practically every conceivable form of producing energy.

Where is the power going to come from to meet the needs of the next decade and the next generation?

The environmentalists say there are alternative means available.

Mr. BAKER. Mr. President, I would like to congratulate my fellow conferees on completion of their major legislative effort to review the Federal Water Pollution Control Act. Their work is the cumulation of efforts which began with the effort of the National Commission on Water Quality to address any deficiencies in the act. This long sought midcourse correction will be of benefit both to the environment and those effected by the law's provisions.

The Water Act is an unusually complex and comprehensive law that deals with a wide spectrum of water quality problems. It therefore has had and will continue to have major impacts on many sectors of the U.S. industry and economy. This fact makes the conference agreement a most important step in the continuation of our national efforts, which we began in 1972 to clean up the Nation's waters. The breadth of the law's impact also has relevance to the fact that most of the important provisions in this bill are hard fought compromises, the result of long hours spent by the conferees. There were many major differences of opinion between the House and Senate as to what the correct approach to a particular water quality problem ought to be. These differences have been dealt with in a most responsible manner by the conferees with the final result being a reasonable bill that will, over the years, eliminate our water pollution problems while at the same time making allowances for other important economic and social problems. This balancing has not been an easy task and I congratulate each of my fellow conferees for their hard work.

I would particularly like to recognize the hard work and leadership of the sub-

committee's chairman Senator MUSKIE and its ranking minority member, Senator STAFFORD, in the passage of this bill

As I have noted, there are many provisions of major importance in this bill but I would particularly like to single out a few for comment as part of my statement.

The conferees have resolved the long-standing controversy that has engulfed the section 404 permit program for discharges of dredged or fill material. The solution presented in the Senate bill was adopted with only minor changes.

First, the conference bill retains the comprehensive jurisdiction over the Nation's waters exercised in the 1972 Federal Water Pollution Control Act to control pollution to the fullest constitutional extent. A permit program will continue to regulate dredged or fill material discharged into all our Nation's waters. However, the Administrator is authorized by amendment to section 404 to approve State permit programs to assume the primary permitting responsibility for protecting those lakes, rivers streams, swamps, marshes, and other portions of the navigable waters that lie outside the corps program in the so-called phase I waters. After approval of a State permit program for phase II and III waters, the corps will continue to administer the section 404 permit program in those waters which are used, or are susceptible to use to transport interstate commerce, including all waters subject to the ebb and flow of the tide, and including any wetlands adjacent to these waters.

Second, conferees adopted the Senate amendment to section 404 that clarifies the exclusion of activities that do not involve point source discharges, such as plowing and upland conservation activities, and exempts others that may involve discharges or other placement of dredged or fill material that will be successfully controlled by management practices and performance standards imposed through the section 208 program. An amendment to section 208(b)(4) is designed to strengthen the section 208 statewide regulatory programs that will control the minor discharges exempted from section 404 and that will control nonpoint sources of pollution originating from materials placed outside the navigable waters.

The conferees believe that the State permit programs will continue to afford the best protection from potentially harmful discharges as the wide diversity and unique values of the Nation's aquatic resources will continue to require a case-by-case assessment of harmful effects. Permits shall continue to be required for any discharge that alters or modifies the specific uses of a body of water and that impairs the flow or circulation or reduces the reach of such waters. For such discharges, best management practices could be approved only for inclusion in permits issued by the State program approved under section 404, but would not be appropriate for approval as a replacement for the permit process. Similarly, discharges containing toxic substances addressed by section 307 will continue to require permits.

The conferees agreed to adopt the approach taken by the Senate in the Senate-passed bill with respect to activities performed by the farming, forestry and mining industries. First, the conference bill clarifies the exclusion of activities that do not involve point source discharges of dredged or fill material, such as plowing, seeding, cultivating, harvesting, and upland conservation and minor drainage practices. The conference bill also responds to testimony received in both the House and Senate committee hearings on the section 404 question by specifically exempting other farming, forestry, and mining practices that do involve minor discharges of dredged or fill material such as stock and farm ponds, logging roads, temporary mining roads, and farm roads. It is expected that these activities, while exempt from permit requirements, would still be subject to section 208 including the best management practices approved by EPA and imposed through a state-wide regulatory program.

The section 208 agencies should continue to concentrate on areawide management of pollution and on nonpoint sources of pollution that degrade surface and groundwaters rather than attempting to duplicate the point source permit programs under sections 402 and 404.

Third, the bill contains a narrow exemption for the construction by Federal agencies of new projects that are specifically identified in the authorization passed by Congress if Congress is provided with a final environmental impact statement that includes a detailed analysis of the adverse effects of the project as required by the section 404(b) guidelines. The purpose of this narrow exemption is not to relieve certain Federal projects from substantive compliance with the Clean Water Act, but rather the intention is to avoid costly delays for Federal construction of environmentally sound projects after they have been authorized by Congress.

Fourth, unnecesary regulation, delays and redtape should be avoided by the use of general permits for discharges that have minimal impact and by the direction to Federal agencies to accelerate interagency coordination during permit review.

The conferees also have clarified the direction which the sewage treatment grants program should be headed. The conference agreement does this in two ways. The first agreement specifies those types of projects that should be eligible for Federal funding. Additionally the bill provides 4 years of funds for this major public works program. Hopefully, the resolution of the questions concerning eligibilities and the assurance of funds over the next few years will be the help and incentive that the States have needed to really make this program accomplish the goal of cleaning up our municipal wastes.

Finally, I am pleased that the conferees were able to resolve most of the controversial issues surrounding the toxic substances question. Recent information received by the Congress from the National Commission on Water Quality and certain other sources have revealed that the toxics question must be dealt with quickly. The conferees have heeded these suggestions and reached agreements on the important provisions related to the control of toxics. The conference agreement in this area is comprehensive and complex but it is a reasonable approach that places the proper burden on both industry and Government to get this important cleanup action begun.

Mr. WALLOP. Mr. President, I am pleased with the conference report on the Clean Water Act of 1977, which is now before the Senate. I am pleased with the substance of the act and the positive effects it will have upon my State of Wyoming, and I am grateful to have had the opportunity to serve as a conferee and to have had some part in the act's formulation. But the benefits which will surely be derived from these amendments are not parochial in nature. Wyoming will benefit because agriculture will benefit from a shift away from permit requirements, and the institution of cost sharing for management alternatives. Wyoming will benefit because municipalities will benefit from increased funding for the construction of treatment works, and the realization that State programs must be provided with a minimum allocation in order to function effectively. We will all benefit because the amendments maintain the Act's goals and standards so that our water resources will remain pure for the use and enjoyment of future generations. Finally, Wyoming will benefit because business will benefit through the application of reasonable timetables and requirements for the installation of only that pollution control equipment which is necessary for the attainment and maintenance of water quality.

Recent Federal actions affecting western water resources have not been good news for the West. The University of Wyoming was fortunate enough to have a professor named Frank Trealease who taught generations of students the practical theorem in water law, that:

Water runs downhill and toward money.

Recent Federal actions appear intent on altering that theorem to read:

Water runs downhill or in any direction the Federal Register so orders.

I believe that the Clean Water Act of 1977 will be a refreshing change in that pattern. Though not perfect, these amendments accommodate the needs of States, municipalities, agriculture, industries, and environmentalists. This legislation does not weaken the purpose of the law; it only provides the degree of flexibility and the pragmatic modifications that 5 years of experience have proven necessary.

Municipalities in Wyoming, and throughout the country will find that this act at last provides adequate annual funding for the construction of municipal waste treatment works. That funding will be for a sufficient number of years so that planning can be undertaken. The act authorizes $4.5 billion for fiscal year 1978, and $5 billion for fiscal year 1979 through 1982.

These provisions represent a significant increase in funding for Wyoming. Wyoming was the first State to run short of funds for the construction of municipal waste water treatment works in 1976. Funds allocated to Wyoming were inadequate to provide money for even those communities on our priority list. In fiscal 1976, Wyoming received less than $3 million. This amount would be insufficient to fund a single treatment works in one of our larger communities or in our communities experiencing rapid growth due to energy impact.

The formula is such that if the full amount is appropriated, Wyoming will receive not less than $13.5 million in fiscal 1978, and $15 million in subsequent years. This is almost 5 times the amount of Wyoming's previous allotment.

An additional $75 million is authorized for a "small State supplement" so that no State would receive less than one-half of 1 percent of the total allotment. Under existing law, small States such as Wyoming have encountered difficulty in operating a program of priorization and administration at the State level. The small State supplement, if appropriated, will bring Wyoming's total construction grant allotment to $22.5 million per year for 1978 and $25 million for each fiscal year 1979 through 1981. If only a portion of the small State supplement is appropriated, Wyoming, because of previous funding inequities, will receive a greater percentage of the appropriation than any other State.

In addition to funding authority, provisions of the Clean Water Act of 1977 make other changes of interest to Wyoming municipalities. Due to the lack of the necessary Federal financial commitment, municipalities had no hope of complying with the July 1, 1977, deadline for the installation of secondary treatment works. The conferees agreed to authorize the administrator to grant time extensions up to July 1, 1983. These extensions will be granted on a case by case basis by the administrator, provided that new construction by the municipality is required, and could not reasonably be completed in time, or the necessary Federal financial assistance has not been made available.

The conferees also agreed on two set-aside provisions which are of particular interest to Wyoming. In rural States, at the request of the Governor, up to 4 percent of a State's allocation will be made available for construction of alternatives to conventional sewage treatment works in municipalities with populations of less than 3,500. The second provision requires a set-aside of a half percent of each State's allotment to raise the Federal grant share from 75 to 85 percent for those municipal projects which utilize innovative processes and techniques.

In response to testimony received from State agencies, including Wyoming's Department of Environmental Quality, the Senate, and to a lesser extent the House, realized the necessity of earmarking funds for administration and manpower necessary to establish a meaningful, efficient, and effective program at the State level. The conferees agreed on a provision similar to the Senate proposal. It authorizes the reservation of up to 2 percent of a State's construction grant allotment, but no less than $400,000, for use by the State in administering any aspect of the construction grant program. These funds may be increased to assist in the administering of the 402 permit program, statewide 208 planning, and responsibility for managing construction grants for small communities.

The Conference Committee also adopted a Senate sponsored amendment which should be of particular interest to very small communities in Wyoming. The provision permits the awarding of grants for the construction of privately owned treatment works where a public body applies for the grant on behalf of a number of the works, and will assure that that the treatment works are properly operated and maintained. This amendment is designed to assist extremely small rural communities where public ownership of the treatment works is not feasible, and the private system would be more cost-effective than collection and central treatment of wastes.

Agriculture, and in particular irrigated agriculture, should be particularly pleased with some provisions of the Clean Water Act of 1977. The conferees agreed to remove return flows from irrigated agriculture, from the definition of the term point source. In addition, the administrator will be prohibited from requiring permits for this type of discharge.

This amendment corrects what has been a discrimination against irrigated agriculture. Return flows, composed of water which had been applied to crops through irrigation, were subject to permit requirements. Farmers in areas of the country which were blessed with adequate rainfall were not subject to permit requirements on their rainwater run-off, which in effect had been used for the same purpose and contained the same pollutants. Only the manner of application differed.

The Clean Water Act contemplates that permits will generally regulate pollution from point sources by imposing effluent limitations. However, irrigation return flows, like rainwater run-off, are more effectively addressed by management practices which are not generally available in NPDES permits. By placing the responsibility to address irrigation return flows in the local planning process under section 208, the conferees envisioned a program which could utilize management practices rather than permit requirements, ensure that the practices will be tailored to local conditions, remove the possibility of conflict between section 402 and 208, and provide for the consideration of cumulative effects.

While I may take credit for sponsoring this amendment, I cannot take credit for its logic. The Environmental Protection Agency's regulations of July 5, 1975, originally excluded irrigation return flows from the necessity to obtain a permit. EPA recognized that these sources were not of the type which could be effectively controlled through a permit process. Only after a decision against the EPA in NRDC against Train, did the EPA begin to implement the permit program against irrigated agriculture. Their regulations would have required general permits to be administered through general permit program areas. Wherever possible, these areas were to be identical to 208 planning areas. This was nothing more than a circuitous approach to the use of management practices in addressing discharges from irrigated agriculture. Yet, irrigated agriculture was to bear the burden of permit requirements due to the definitional deficiencies of the act. This amendment will remedy that problem.

Recognizing that the implementation of agricultural management practices to improve water quality will be an expensive proposition, the Senate conferees were successful in retaining a provision in the bill for agricultural cost sharing. This section authorizes $200 million in fiscal 1979, and $400 million in fiscal 1980 for Federal cost sharing to implement long-term soil conservation practices for improving water quality under section 208. The Federal cost share could be as high as 50 percent of the total project.

To reduce administrative cost and avoid duplication, or the establishment of additional bureaucracy, the program will be administered through the Soil Conservation Service, or other agencies which the Secretary of Agriculture deems appropriate. There should be no mistake, the conferees agreed that the function of this cost-sharing program is to provide financial assistance to reduce nonpoint, agricultural sources of pollution, utilizing soil conservation practices which improve water quality. It is not intended to be a duplication or extension of existing programs which have as their purpose increased production. It is of course hoped by the conferees that these projects will also have positive, if indirect, effects on production.

Agriculture should also benefit from amendments to section 404 of the Act. Though the conferees did not retreat from the section's broad jurisdiction, the amendments which were adopted should help to solve many of the problems resulting from the corps' implementation of the section. At the same time, I do not believe that the amendments reduce the effectiveness of the wetlands protection effort. They provide for the delegation of the permit program to the States, properly preempt many activities from permit requirements, and require speeding of the permit process. The conferees worked with the corp and the Environmental Protection Agency to insure that the amendments are carefully worded to provide protection from harmful activities, while reducing unnecessary government interference.

The conferees agreed to adopt the Senate amendment on particular exclusions from permit requirements. This legislatively clarifies the exclusion of certain activities that do not involve point source discharge and that will be adequately controlled by management practices. The amendment clarifies that normal farming, ranching and silvicultural activities such as plowing, seeding, cultivating, and harvesting, as well as

minor drainage and soil and water conservation practices performed on uplands, were not intended to require 404 permits. The amendment also excludes from permit requirements, discharges of dredged or fill material in conjunction with the following activities that will cause little or no adverse effects either individually or cumulatively:

First, the construction or maintenance of farm and stock ponds or irrigation ditches; second, the construction or maintenance of farm or forest roads, or temporary roads for moving mining equipment so long as they are constructed and maintained in accordance with practices which minimize adverse effects that may occur when water is displaced by fill material; and third, the maintenance and emergency reconstruction of currently serviceable structures such as dikes, levies, dams, and bridge abutments.

The conferees also adopted an amendment to exempt certain Federal projects from permit requirements. Subsection (r) of section 404 will provide a limited exemption from Federal and State permit programs for discharges of dredges or fill material to construct Federal projects specifically identified by Congress when authorized. If the procedural and substantive requirements of subsection (r) are satisfied, these discharges shall not require permits under this section, or under State permit programs approved pursuant to section 404 or section 402 of the Clean Water Act of 1977.

The exemption provided by this subsection applies only to discharges that are an integral part of constructing a Federal project which has been reviewed and approved by Congress. Federal projects include only those conducted by a Federal agency and by such contractors as the agency may employ. The conferees did not intend to exempt other discharges which may be associated generally with constructing Federal projects, but which are ancillary to the specific activity submitted to and approved by Congress. For such ancillary discharges, the full section 404 review and approval procedures shall be applied by the Corps of Engineers and the administrator unless other exemptions are applicable. The conferees did not intend to exempt federally assisted projects from the section 404 review.

In order to qualify for the exemption, an adequate environmental impact statement on the project must have been submitted to Congress prior to authorization of the project or appropriation of construction funds and, in all cases, prior to the actual discharge of dredged or fill material at any particular site. The statement must satisfy the requirements of NEPA and include complete information on the effects of the proposed discharge. Moreover, the guidelines developed by the administrator under section 404(b)(1) must be fully complied within developing and assessing such information.

Congress must have adequate siting, engineering, and environmental information and analysis on each proposed Federal project, as well as modifications recommended by reviewing agencies, in order to review the available alternatives to and potential adverse impacts of the proposed discharges, to weigh those impacts and alternatives against the benefits of the project. The administrator will be expected to see that the section 404(b)(1) guidelines are sufficiently explicit to focus attention on those aspects of Federal dredge and fill material discharges that could result in environmental degradation caused by the construction of new projects. And the administrator must assist other agencies by carefully reviewing draft environmental impact statements to ensure that the guidelines are being interpreted and implemented properly.

The conferees also agreed to provide for State delegation of section 404. This can be accomplished either through the State's assumption of the 404 permit program, or through State assumption of a combination approach, utilizing both a 404 permit program, and a program of management practices for certain dredge and fill activities under section 208. Such a State program will be one which is established under State law and which will function in lieu of the Federal program. It is not a delegation of Federal authority.

The 208 program is a supplement to the 404 program and is intended to complement and be coordinated with a State 404 permit program. It is not a substitute for the 404 program as most discharges of dredged or fill material not specifically excluded will still require a case-by-case review through a permit process. Activities that involve discharges of dredged or fill material that impair the flow or circulation of navigable waters or replace water with dry land will normally require individual permit review. For example, case-by-case permit review is necessary to minimize adverse effects from most channelization and real estate development fills. Moreover, the conferees agreed that a permit should always be required where toxic substances are involved. A case-by-case permit review would not be required for narrowly defined activities that cause little or no adverse effects either individually or cumulatively, including those activities narrowly defined in paragraphs (A–F) of subsection (f) of section 404.

The conferees also agreed that a State must have a permit program approved under section 404 and a statewide regulatory program approved under 208(b) (4) before the administrator can approve the best management practices submitted by the Governor for appropriate activities.

The administrator cannot approve best management practices to replace the State's permit review process in its entirety as only certain activities are appropriate for management practices. A best management practice might be an acceptable method of control for activities that are similar in nature and that cause no more than minimal harm to the environment either individually or cumulatively. Management practices are appropriate for controlling farm roads, log roads, temporary mining roads, stock ponds, farm ponds, and maintenance of existing fills. Management practices will not be appropriate as the sole means of controlling activities the impact of which varies according to location or where advanced review is necessary to assure that the discharge is conditioned to protect the environment.

Management practices might be appropriate for activities that have no more than minor impact, individually or cumulatively and where an approved State permitting agency agrees that permit review is not necessary and that the best management practice will adequately protect the environment. Best management practices are not appropriate for activities that vary in their impact from one ecosystem to the next.

The 208 agencies should continue to concentrate on areawide management of pollution and on nonpoint sources of pollution that degrade critical aquatic areas rather than attempt to duplicate 402 and 404 permit programs that control point sources of pollution.

The administrator should ensure that best management practices are specific enough to inform each person conducting an activity what is specifically required of him. The conferees expect that this 208 process will include an enforcement program with adequate resources.

The third important improvement in section 404 will provide for a reduction in red-tape and delay. The amendment provides that the Corps of Engineers, which operates the 404 permit program, will enter into agreements with the administrator of the Environmental Protection Agency, and the secretaries of the Departments of Commerce, Agriculture, Interior and Transportation, as well as the heads of other appropriate Federal agencies, to minimize to the maximum extent practicable, duplication, needless paperwork and delays in the issuance of under section 404 permits. The agreements will be developed to assure that to maximum extent practicable, decisions with respect to applications under section 404 will be made within 90 days.

The conferees accepted an amendment which will reassure the State that it is the policy of Congress that the Clean Water Act will not be used for the purpose of interfering with State water rights systems. I sponsored this amendment with Senator HART on the floor of the Senate. This amendment came immediately after the release of the Issue and Option Papers for the Water Resource Policy Study now being conducted by the Water Resources Council. Several of the options contained in that paper called for the use of Federal water quality legislation to effect Federal purposes that were not strictly related to water quality. Those other purposes might include, but were not limited to Federal land use planning, plant siting and production planning purposes. This "State's jurisdiction" amendment reaffirms that it is the policy of Congress that this act is to be used for water quality purposes only

The amendment simply states that it is the policy of Congress that the authority of each State to allocate quantities of water within its jurisdiction shall not be superseded, abrogated or otherwise impaired by this act. It also states that it is the further policy of Congress

that nothing in this act will be construed for the purpose of superseding or abrogating rights to quantities of water which have been established by a State.

This amendent is not intended to create a new cause of action. It is not intended to change present law, for a similar prohibition is contained in section 510 of the act. This amendment does seek to clarify the policy of Congress concerning the proper role of Federal water quality legislation in relation to state water law. It should be clear. Legitimate water quality measures authorized by this act may at times have some effect on the method of water usage. Water quality standards and their upgrading are legitimate and necessary under this act. The requirements of section 402 and 404 permits may incidentally affect individual water rights. Management practices developed through State or local 208 planning units may also incidentally effect the use of water under an individual water right. It is not the purpose of this amendment to prohibit those incidental effects. It is the purpose of this amendment to insure that State allocation systems are not subverted, and that effects on individual rights, if any, are prompted by legitimate and necessary water quality considerations.

This amendment is an attempt to recognize the historic allocation rights contained in State constitutions.

It is designed to protect historic rights from mischievous abrogation by those who would use an act, designed solely to protect water quality and wetlands, for other purposes. It does not interfere with the legitimate purposes for which the act was designed.

The amendment speaks only—but significantly—to the rights of States to allocate quantities of their water and to determine priority uses. It recognizes the differences in types of water law across the Nation. It recognizes patterns of use.

When Wyoming became a State and the Congress ratified our constitution in the Act of Admission, that constitution stated then and states today:

The water of all natural streams, springs, or lakes or other collections of still water within the boundaries of this State are hereby declared to be the property of the State.

Water quality and interstate movement is an acceptable Federal role and influence. But the States historic rights to allocate quantity, and establish priority of usage remains inviolate because of this amendment. The Water Pollution Control Act was designed to protect the quality of water and to protect critical wetlands in concert with the various States. In short a responsible Federal role.

The business and industrial community as well should find relief in the Clean Water Act of 1977. For the most part, unrealistic requirements and nonattainable deadlines have been altered to reflect our years of experience with the act. But these amendments, while helping industry, do not detract from the environmental goals of the act, or significantly impair the effectiveness of its

regulatory scheme. The Clean Water Act of 1977 is a bill which both industralist and environmentalist alike can view with some optimism.

The 1972 act requires industrial pollution sources to install what has been defined by the EPA as best practicable control technology by 1977, and best available control technology by 1983. However, the EPA had not been granted the discretion to provide flexibility in these requirements, or to take into consideration the costs of compliance, the quality of the receiving waters, or other special circumstances.

The conferees agreed to a provision authorizing up to an 18-month extension of the 1977 deadline where the administrator finds that the discharger acted in good faith and has made a serious commitment to achieve compliance with the best practicable control technology requirements of the act. The extension will only be granted if compliance will occur no later than April 1, 1979, and the extension will not require the application of additional controls on other sources.

The conference amendment relating to the 1983 requirements is more complicated. It deals separately with toxic pollutants, known harmful substances, conventional pollutants, those nontoxics which we know a great deal about, and for which water quality standards are usually established, and so-called nonconventional pollutants, those about which we know very little. The conferees agreed to provide a 1-year extension, until July 1, 1984 for conventional pollutants. Toxics and nonconventionals would be required to be under control by July 1, 1984 or within 3 years for a newly identified substance, but in no event later than 1987 for nonconventionals. The administrator of the EPA may then modify the requirements for nonconventional pollutants if it were determined that the modification would assure protection of public water supplies, and the protection and propagation of a balanced population of fish and wildlife, as well as allowing recreation in and on the water.

The Clean Water Act of 1977, taken as a whole, expands the role of local 208 planning in the water quality effort. As I have previously stated, we have provided cost sharing provisions for the implementation of agricultural management practices, and provided 208 programs with dredge and fill management responsibilities. The bill also provides continued funding for these 208 programs, of $150 million for each of fiscal years 1977 through 1980. Agencies which were designated after 1975 will be granted an additional year in which to submit their 208 plans. Federal grant amounts under this program will be 100 percent for the first 2 years of a program's operation for the purposes of plan development, and 75 percent for cost incurred in each succeeding year.

In summary, I believe that the Clean Water Act of 1977 is one of the soundest, sanest pieces of legislation to come out of this Congress. It does not compromise environmental goals, nor does it confuse them by injecting unrelated issues. It gives back to the State the flexibility to

take more responsibility for its own waters. It relieves agriculture and industry of irrelevant or unnecessary burdens. It provides municipalities with essential funding for treatment facilities, and agriculture with 50/50 matching grants to clean up nonpoint source pollution. It preserves the State's jurisdiction over water quantity allocation. It provides positive incentives and positive programs, and fewer coercive clauses. It does not foster the confusing proliferation of agencies or the unnecessary promulgation of guidelines and regulations.

I commend the conference report on the Clean Water Act of 1977 to my colleagues and ask for their support of its prompt passage.

Mr. MUSKIE. Mr. President, I ask unanimous consent to have printed in the RECORD a statement by the distinguished Senator from Alaska (Mr. GRAVEL).

The PRESIDING OFFICER. Without objection, it is so ordered.

STATEMENT BY SENATOR GRAVEL

I am pleased that the conference committee completed its work on the Clean Water Act this year so that municipalities, industry and federal, state and local government can go about with their efforts to reduce and eventually eliminate the pollution of the Nation's waters. The committee report is by and large a good one. Its major accomplishment is to provide a continuum of congressional commitment to the proposition of a clean environment. Hence, the "mid-course" correction has been a fine-tuning, not a major overhaul.

The conference report does many favorable things. The report recognizes a principle that the EPA should have embraced long ago—that there are alternative methods of treatment of domestic waste other than massive secondary treatment plants, and the massive commitment of funds necessary to construct and maintain them. There is a firm statement now that the Federal Government must police its own operations so as to comply with existing environmental laws. There is recognition of the problem of toxics as the major health and environmental concern, and a realization that in some cases the principle of "treatment for treatment's sake" is an unacceptable concept. In all, the conference helps to fix the focus of the environmental efforts of government so that pollution control agencies can fix the problems of municipal and industrial discharges. This is but some of the evidence of the rational and constructive measures taken by the conference.

I would comment on three actions taken by the conference: those in the area of federal facilities compliance; compliance of the seafood industry; and modifications from the requirement of secondary treatment for conventional pollutants emanating from municipalities.

Industry is reportedly 90 to 95 percent in compliance, or in progress towards compliance, with the 1977 requirements. Municipalities are well under way towards meeting the requirements of the act. It has become increasingly obvious that in many areas the prime violator of environmental laws has been the federal government itself. Throughout the country, federal facilities fail to meet federal standards, let alone state requirements. This situation has led to the de facto establishment of a double standard that is unacceptable for environmental and economic reasons. Pollution from any source is still pollution; the discharge of a pollutant from a federal facility is none the less harmful because it is under the auspices of

the federal government. Dischargs from federal facilities should not be exempt from meeting standards set by state and local authorities for the control of pollutants. There is nothing sacrosanct about federal wastes. Thus, the federal government, with certain limited national security interests, should comply with the substantive and procedural requirements of federal, state, and local water pollution laws.

During the discussion of the section pertaining to the discharge of dredge and fill materials, a major effort was mounted to exempt all Federal projects. I opposed this effort, and am still in opposition to exempting the Federal Government from any such requirements. However, it became necessary to compromise, and the result was a very limited exemption from section 404 for specifically authorized projects for which there is an adequate environmental impact statement which appropriately addresses the concerns of the effect and mitigating actions necessary to be taken by virtue of the discharge of dredge and fill materials. These must be Federal projects, and the Federal EIS must address the discharge question in the same way as if a 404 permit were required. As I view it, the exemption merely eliminates duplication—it in no way eliminates the necessity both to address the problem and provide mitigation. The EIS will come before the appropriate committees, and it is contemplated at least by the Senate Environment and Public Works Committee that the problem of discharges of dredge and fill will be adequately handled, or the Congress will know that they are acting on a project that will harm the environment.

Two other things should be kept in mind. Guidelines for the preparation of impact statements will have to be updated to accommodate these concerns. The Senate Public Works Committee has jurisdiction over such matters, and it should be expected that that jurisdiction will be exercised to assure compliance with our concerns. Of course, hearings on federally authorized projects will be expected to receive testimony on the adequacy of the particular EIS on the question of dredge and fill materials. In addition, the exemption for Federal projects does not go to the requirement that State and local substantive and procedural requirements be met.

Congress has authorized a study of the seafood industry to determine whether there are grounds for relief from the EPA guidelines for the industry. The study will be of a one year duration, with several parties participating in consultation with the EPA. The Senate bill, and colloquies that took place on the floor of the Senate between Senator Chafee and I and among Senators Muskie, Stevens and I on the fourth of August clearly state the purposes and direction of the study. There is no reason to restate those conversations and understandings. I have been pleased already by the spirit of cooperation from the EPA in this regard. At least in this case, a study will not be an offhand dismissal of a thorny problem.

Finally, a word about the municipal modification procedure. The conference report accurately reflects my concerns about the requirement that certain coastal communities should provide secondary treatment of conventional pollutants when natural action of the receiving body eliminates the need to do so. The conference report mentions several communities that might be likely to qualify for the modification provision. When I introduced the measure I did not intend to limit the application of the provision to Anchorage, Seward, and a few other cities. I intended to allow any city that can meet the geographical requirements to come forward and attempt to prove their case. (That might even include communities currently under schedule to provide traditional secondary treatment.) That is my understanding of the conference's intention as well. I can understand the EPA's concerns about the administrative burden this provision might place on the agency, but I might remind my friends at the agency that we should not legislate unreasonably so as to accommodate an agency. There are a number of communities that have been and will be subjected to administrative burdens way beyond their financial and administrative capacity because of the need to comply with the secondary treatment requirement. With this modification procedure for coastal communities that qualify, and the other provisions in the bill for alternative and innovative technologies, as well as recycle capabilities, the Congress has announced its intention to put some sense into the treatment of municipal wastes.

The modification procedure, then, guarantees to no one that modifications will be granted; it denies no coastal community with the qualifying geographical characteristics the right to show its ability to meet the other conditions of the provision.

The provision applies to communities with discharges into the waters of the territorial seas and the contiguous zone or into saline estuarine waters where there is strong tidal and other hydrological action. There is a recognition that depth is a factor. The conference report clearly states the importance of depth with regard to the territorial seas and the contiguous zone; emphasis is not placed on depth with regard to saline estuarine discharges, but rather on tides and currents and flushing action which act to remove pollutants from large bays and estuaries.

The conditions that an applicant must demonstrate ability to meet are forthright. They are geared to protection of the water body from toxics and violations of water quality in the area of the discharge. To the extent practicable, monitoring of a periodic nature should occur to assure against water quality violation. Modifications will be granted in 5-year increments as a further protection. Pretreatment requirements will be enforced.

In essence, the provision says that there are areas which may be able to show that the discharge of conventional pollutants from a municipal sewage system can be made without secondary treatment and without harm to the environment. If this concept is adopted in regulations promulgated by the agency, we can assure a reasonable approach to sewage treatment in coastal communities while not violating the environment, or the fabric of the act. I will watch closely to see that the provision is implemented in the manner in which I proposed it and the conference adopted it.

I would like to remind my colleagues of the Herculean efforts of Senator Muskie in steering the Clean Water Act off the rocks and shoals of deadlock earlier this year onto a course that ultimately led to a comprehensive measure that will provide the greatly needed direction to the Nation's efforts at providing clean water. During the voyage to passage of the measure by the committee, then the Senate, then the conference, the seas were not always tranquil. But Senator Muskie, with the assistance of Senators Stafford and Burdick and Chairman Randolph, once again delivered. The committee and the conferees deserve a great deal of credit for their determination to arrive at a good bill. I particularly appreciate the efforts of the staff of the committee in working with me on a number of provisions that are important to my State and me.

Mr. MUSKIE. Mr. President, I ask unanimous consent to have printed in the RECORD a statement by the Senator from Minnesota (Mr. ANDERSON).

The PRESIDING OFFICER. Without objection, it is so ordered.

STATEMENT BY SENATOR ANDERSON

As a member of the Subcommittee on Environmental Pollution of the Senate Environment and Public Works Committee, I have several comments I would like to make about the development of the Clean Water Act of 1977, particularly the federal facility compliance, permits for dredged or fill material, and marine sanitation devices sections of the conference report.

It is a remarkable achievement in my judgment that the Senate has before it today for final passage the Clean Water Act of 1977. The Senate and the nation owe a debt of thanks for the dedication and diligence of our Subcommittee chairman, Mr. Muskie; our Chairman, Mr. Randolph; the ranking minority member of the Subcommittee, Mr. Stafford; and the staff of the Senate Environment and Public Works Committee for completing a lengthy series of hearings, extensive markup sessions, floor consideration, and a difficult conference committee in less than 7 months on such a complicated and controversial piece of legislation.

My colleagues should be aware that the Environment and Public Works Committee not only has completed the entire legislative process on the Clean Water Act of 1977 in a very short period of time, but also that the Committee was involved during markup of this bill with an arduous conference on the Clean Air Act, and, during the Conference on the Clean Water Act, several conferees were also members of the Energy Conference Committee.

I am pleased that the father of the Clean Water Act, and most of the major federal environmental statutes, our colleague, Ed Muskie, is here on the floor today to manage this conference report. Senator Muskie without question is responsible for the basic thrust and content of this legislation and the previous congressional actions to preserve and protect the natural resources that we absolutely depend on in this country. I have had the honor and pleasure this year to closely observe Senator Muskie on both the air and water pollution bills. His knowledge, commitment, energy, and dedication to clear air and clean water is without equal.

In the absence of Senator Muskie from most of the latter conference committee sessions, Senator Burdick chaired the conference. The Senate and the Environment and Public Works Committee were exceedingly well-served by him. I want to add my appreciation to Senator Burdick for assuming a most difficult assignment and discharging it well.

Since becoming a member of the Environment and Public Works Committee in January, apart from my involvement in the Public Works Employment Act and the Navigation Developemnt Act, I have devoted considerable time and effort to the Environmental Pollution Subcommitttee's consideration of the Clean Air Act and Clean Water Act. Senator Muskie has assembled a dedicated and experienced staff to whom I am most grateful, especially for this legislation: Leon Billings, John Freshman and Sally Walker, and, Phil Cummings, Dick Harris, Bailey Guard, Jackie Schafer, and Jim Range of the Committee staff.

In the Senate Environment and Public Works Committee report on S. 1952 and during the floor debate on the Clean Water Act of 1977 on August 4, I stated in some detail my own views on this legislation, the importance of clean water to the people of Minnesota, and indicated the background of the several amendments I offered to this legislation that the Senate adopted, most importantly on provisions relating to dredging by the Corps of Engineers, the Clean Lakes Program, and marine sanitation devices. I do

Case 2:10-md-02179-CJB-DPC   Document 14476-2   Filed 04/24/15   Page 49 of 55

not intend to reiterate this information at this time to any great extent, but do want to make very brief comments about several aspects and sections of this conference report.

As a member of the conference committee, I am pleased with the conference report, especially in light of the wide divergence between the House and Senate bills on many of the most significant sections. The Clean Water Act of 1977 as submitted by the conference committee is worthy of support by my colleagues and when enacted should be signed into law by the President.

I very much regretted, Mr. President, that the Senate conferees were forced to drop the provision in S. 1952 offered by Senator Nelson to limit the amount of phosphorous in detergents sold in the eight Great Lakes states. Senator Nelson made a compelling case to the Senate on August 4 for this amendment and it was added to the bill by an overwhelming margin, with no opposition from members from the Great Lakes states. Despite the logic of this provision, an endorsement by the Environmental Protection Agency, the support of every scientific body concerned with the quality of the Great Lakes and the endorsement of a clear majority of the members of the House of Representatives from districts within the Great Lakes drainage and the Governors of the Great Lakes states, the House conferees were unwilling to accept the phosphate detergent provision or a modified, more limited version of it.

I remain confused as to why the manufacturers of household detergents oppose this provision since they must manufacture phosphorous-free products at present for over 35 million potential customers in this country. The House conferees were not able to provide any real justification for opposing the Nelson amendment, except that no hearings had been held in the House on the proposal. While I regret that the Clean Water Act does not include a provision to regulate the sale of phosphate detergent in the Great Lakes, I am encouraged that Representative Roberts has committed the House Public Works and Transportation Committee to hearings early in 1978 on this legislation.

The provision in the Clean Water Act of 1977 that I offered in Committee and have followed with the greatest interest is subsection (t) of Section 404. One of the longstanding concerns of the State of Minnesota and several other states has been the environmental impacts of dredging by the Corps of Engineers in navigable waterways.

In Minnesota, the Corps of Engineers dredges annually approximately 2 million cubic yards of bottom sediments from the Mississippi River and another 100,000 cubic yards from Duluth-Superior Harbor. The water quality impacts associated with this massive removal and subsequent disposal of bottom sediments are often of great significance. The Senate report and my remarks on the Senate floor on August 4 detail the history of administrative and legal efforts by the Minnesota Pollution Control Agency, and joined in legal action by six other states and several environmental organizations, to insure that dredging by the Corps of Engineers is conducted in compliance with state water quality standards and other substantive and procedural requirements.

The amendment in S. 1952 to Section 404 on compliance by federal agencies with state, interstate, and local substantive and procedural requirement, which I authored, was carefully considered by the conferees in its own right and as an issue in the conferee's amendments to Section 313 and 404 of the statute. While the original language of my amendment was modified in three respects at the request of the House conferees, neither I nor the Senate conferees accepted any amendment that detracts or dilutes the purpose of this provision in the Senate bill, that, the Corps of Engineers must obey the same state standards that any other discharger must obey. I have listened to the floor manager's description and explanation of the conferees action on this provision, which is now labeled subsection (t) of Section 404 and agree with his analysis of this section. However, since the statement of managers is primarily devoted to other issues in Section 404, I have several comments on this provision so it is clear in the legislative history of this subsection what the conferees and Congress intend by subsection (t).

In the description of Section 404(t) the floor manager explained the language the conferees accepted to Section 313 regarding exemptions from non-federal control of dredging related to military equipment and vessels. The Department of Navy raised this issue with the conferees because of the possible interpretation of the requirements on federal agencies engaged in dredging of waters adjacent to military installations. At no time did any representative of the Department of Defense raise any concern about this provision regarding maintenance dredging in commercial waterways. The Corps could request a presidential exemption for dredging they propose to conduct that is strictly military in nature, however, that is not the situation that I brought to the Environment and Public Works Committee's attention or prompted the *Minnesota v. Callaway* litigation. It is the judgment of the Senate conferees that maintenance dredging for commercial vessels on the Mississippi River or any other waterway is not subject to the exemption adopted in Section 313.

Mr. Muskie also described the limitation of subsection (t) to state and interstate requirements, not local, which I believe is very clear and the language added to subsection (t) from the present language in Section 511(a)(1) of the Federal Water Pollution Control Act of 1972 regarding the importance of the Corps of Engineers maintaining navigation on the nation's waterways. I believe the burden is now clearly on the Corps to comply with state water quality standards and that the addition of the language from Section 511(a)(1) merely restates the present law, that the Corps does have a responsibility for maintaining navigation that can be cited if necessary.

I am somewhat uneasy that the Corps of Engineers could read subsection (t) and interpret the last line, the language from 511(a)(1), as controlling. I believe that it is not at all the case. Clearly the intent of the conferees for Section 404 (t) of the Clean Water Act of 1977 is to change the way the Corps of Engineers operates when it dredges millions of cubic yards of bottom sidiments each year at dozens of sites in many states. Compliance with appropriate water quality standards is the basic mandate and direction from the Congress to the Corps. The conferees recognize that constraints can and do exist that will preclude compliance in every instance, especially in the dredging seasons shortly after enactment of this provision. But overall, the burden is clearly on the Corps to make every effort in every project to dredge in compliance with the same standards private dredgers and other dischargers must adhere to.

Mr. President, the last comment I desire to ask about the impact of subsection (t) concerns subsection (r) of Section 404, the federal project's exemption Subsection (r) results from provisions in both the House and Senate bills that specific federal projects that have satisfied the requirements of the National Environmental Policy Act of 1969, need not apply for and receive a 404 permit. The conferees did not discuss this provision applying to ongoing maintenance dredging activities by the Corps. In addition, while subsection (r) includes language exempting eligible federal projects from Section 404 permits, whether issued by the Corps or by the state program delegation authorized by the amendment to Section 404, this language deals with the Section 404 permit program itself not any state regulations, requirements, or standards that could be applied to a federal activity. The subsection (r) language does not mention state authority or regulations as activities that could not be applied to federal projects, through the 404 permit program and should not be interpreted consequently as limiting subsection (t).

Mr. President, I have one final comment, concerning the amendments to Section 312, marine sanitation devices. I offered several amendments to Section 312 that the conferees adopted nearly identically to the Senate version. One provision requires that greywater be treated hereforward by marine sanitation devices and another that these devices on commercial vessels using the Great Lakes meet secondary treatment requirements. The latter amendment to Section 312(c)(1) requires, under a new subparagraph B, that the Administrator of the EPA establish standards and regulations to implement the secondary treatment requirement, including a reasonable time period for its implementation. The inclusion of "greywater" to the definition of "sewage" in Section 312(a)(6) does not expressly state a time period for the implementation of the treatment of greywater. It was my intention when I offered these amendments and my interpretation of the Conference Committee report that the EPA will enact regulations both to establish a time period for new and existing vessels to have operable marine sanitation devices to treat greywater, and, to produce an effluent of a quality equal to or better than secondary treatment.

Mr. HELMS. Mr. President, I join my colleagues, including the distinguished chairman of the Agriculture, Forestry and Nutrition Committee, in an effort to correct some misconceptions regarding even-aged management in southeastern forests that has appeared in report language accompanying "clean water" legislation.

First, I think it is important to point out that the Congress held extensive hearings, with expert witnesses, on the subject of forest management and even-aged management, often referred to as clearcutting. At every opportunity the Congress has rejected the prohibition of, or permit requirements for, clearcutting of eastern mixed hardwoods. The Senate specifically rejected an amendment prohibiting clearcutting of eastern mixed hardwoods when it was offered during full Senate consideration of the National Forest Management Act of 1976.

The Senate did this with good reason, for the clearcutting process is part of the practice of even-aged management and is certainly a normal silviculture practice in eastern mixed hardwoods in North Carolina and other States. Even-aged management involves a series of improvement cuts in the rotation cycle of timber harvesting which is culminated by a clear cut for regeneration purposes. Through decades of scientific observation and experimentation, forest managers and conservationists have found that this timber harvesting practice—and it is only one of several techniques used today—is usually the best one for insuring maximum regeneration of some

of our most valuable commercial tree species such as Douglas fir, southern pine, and lodge polepine, as well as hardwood species.

These trees require a lot of sunshine to grow well. Foresters call them shade-intolerant. In areas where the trees were planted at the same time, and therefore are the same age, clearcutting is usually the least costly, most efficient harvesting method. It also disturbs the environment the least, for it requires fewer roads. With this technique, lumber production costs are cheaper and so are reforestation costs, and the clearcut areas quickly grow new ground cover, providing browsing for wildlife.

Indeed, nature was the original clearcutter. Overgrown, overmature forests were cleared out by fire, landslides, wind, and insect invasion. Today, man does a better job by systematic rotation of his harvests and by cleaning up his logging debris and replanting the forests for a new harvest later on.

The opponents of clearcutting and even-age management are well intended, if not always well informed. However, the facts are that forest management has used these practices as silvicultural tools in ways that are completely responsible and environmentally sound. Opposition to these practices is not founded upon sound theory and often amount to emotional and uninformed outbursts against the forest industry.

It is my understanding that research performed on the effects of clearcutting —including eastern mixed hardwoods— has indicated little effect on soil erosion or streamflow if clearcutting is properly carried out. Two reasons why clearcutting of eastern mixed hardwoods has relatively little effect on erosion and streamflow are: First, such sites possess a very high proportion of established regeneration onsite before the cutting takes place. Regeneration on such sites burgeons after clearcutting; and second, since eastern hardwoods are deciduous, they do not transpire during a good part of the year. During these months it makes little difference to streamflow whether trees are cut or left standing. These two effects may indicate that clearcutting of eastern mixed hardwoods has a less serious effect than clearcutting of other forest types.

Also, Mr. President, foresters and even the Environmental Protection Agency generally agree that improperly constructed roads, rather than logging, are the principle cause of increased soil erosion from timber harvest operations on steep topography. Other conditions being equal, a forest managed under a selective cutting system may actually result in more erosion than one under even-aged management utilizing clearcutting. This is because, under a selection system, there will be a significantly larger area of land disturbed annually to harvest a given volume of timber. In addition, more miles of roads are left open, continuously used, and maintained; thus increasing the risk of soil erosion from the road surface.

Mr. President, when the Senate held hearings on this subject last year a very distinguished silvicultural scientist from my State offered his valuable and expert testimony. I ask unanimous consent that the testimony offered by Dr. John W. Duffield, professor of silviculture, Department of Forestry, North Carolina State University at Raleigh be printed following my remarks.

Dr. Duffield points out very effectively just how important even-aged management is to sound forestry and to protection of our natural resources, including clean water. This scientific testimony offers proof that clearcutting of southeastern hardwoods is, indeed, a normal silvicultural practice in North Carolina.

There being no objection, the testimony was ordered to be printed in the RECORD, as follows:

STATEMENT OF DR. JOHN W. DUFFIELD, PROFESSOR OF SILVICULTURE, DEPARTMENT OF FORESTRY, NORTH CAROLINA STATE UNIVERSITY, RALEIGH, N.C.

Mr. Chairman, I am John W. Duffield, Professor of Silviculture in the School of Forest Resources of North Carolina State University. I am presenting the following remarks at the invitation of the Chairman.

Most of my career as a professional forester has been in biological research and teaching, starting in the Northeastern United States—with the title of junior forest ecologist—then California, the Inland Empire, the Pacific Northwest, and since 1963, in the Southeast. I have also studied forests, for periods of several months, in the American Southwest, Australia, New Zealand, and Yugoslavia. This experience has impressed me with the diversity of forests in our country and with the need to match this diversity with flexibility in the application of silvicultural treatments.

Because of my background and interests, I believe it is appropriate for me to limit my remarks to the silvicultural aspects of the legislative proposals under discussion. As a general comment, I consider that S. 3091, introduced by Senator Hubert Humphrey, is a sound approach to the objective of protecting our forest resources and their many uses in that it mandates, specifically in section 3, guidelines for silviculture practice adapted to local conditions. This approach is, in my opinion, much more appropriate to the diversity of our American forests than the blanket prescriptions proposed in S. 2926 introduced by Senator Jennings Randolph.

Because S. 2926 deals in detail with silvicultural matters, I prefer to confine my comments to pertinent sections of this bill. The definitions comprising Section 3 are fundamental; one of the most important is that of the eastern mixed hardwood forest. This term, used frequently, is defined as "deciduous hardwood forests east of the 100th meridian, except those forests consisting principally of one or more of the following kinds of trees: aspen, paperbirch, or cottonwood." The three types of forests mentioned are obviously not mixed. The implication of the definition is that all other deciduous hardwood forests east of the 100th meridian fall under the bill's strictures against even-aged management or conversion to coniferous stands. Some examples, drawn from a single state—North Carolina—illustrate the silviculture consequences that would follow enactment of the bill as drafted. Old-field, pure, even-aged stands of yellow poplar, not at all uncommon on the mountains of North Carolina, would be forced into treatments unsuited to their age structure. Extensive stands of pin cherry, which followed the logging and burning of spruce-fir stands at high elevations could not be recolonized to coniferous forests. Pure even-aged stands of river birch which have invaded abandoned streamside fields in the Piedmont, would have to be handled on an uneven-aged basis, totally

unsuited to the ecological situation. Much the same is true of old-field stands of sweetgum in the coastal plain.

Examples such as these could be cited for state after state in the region east of the 100th meridian. They illustrate the inapplicability of the blanket prescriptions which flow from the definition of the "eastern mixed hardwood forest", and more importantly, the inappropriateness of blanket prescriptions for the complex forest of half a continent. The "eastern mixed hardwood forest" is an abstraction which blankets the complexity suggested by the fact that more than 50 hardwood or hardwood-conifer forest types have been described east of the 100th meridian.

The analysis which in the Congressional Record-Senate for Feb. 4, 1976, follows the text of S. 2926 brings out clearly the inconsistencies written into the bill. An effect of the bill, as stated in section A of the analysis will be the requirement of "greater use of uneven-aged management". The next sentence holds that the "result will be a long rotation high quality timber forest filled with large trees." The forest so described is precisely the sort of forest which does not result from uneven-aged management. A forest "filled with large trees" is obviously one which offers little space for the younger age classes. Such a forest may correspond to a virgin forest, but not to a managed uneven-aged forest. Moreover, the only feasible way to achieve a forest "filled with large trees" is by even-aged management.

The drafters of the bill and of the analysis appear to conceive of the uneven-aged forest as corresponding to the "natural" forest, whereas in fact, a managed uneven-aged forest is more artificial than an even-aged forest, since the former requires more frequent silvicultural treatment to maintain the uneven-aged condition. "Natural" forest regeneration is predominantly by catastrophe—blow-down, fire, insect or disease attack—either by large areas or group-wise. Clearcutting was not an invention of the timber barons.

These obvious biological errors lead one to question the silvicultural competence of the drafters. The good intentions expressed by the drafters are evident; I believe there is general agreement that:

Unsightly clearcuts are an aesthetic insult which should not be tolerated.

Excessively large clearcuts—a characterization which cannot be defined for the forests of the entire territory of the United States, nor for the entire area of the eastern hardwood forests—have adverse effects on wildlife and the appearance of the forest.

Cutting should be carefully controlled near stream courses.

Cutting and road building should be carefully adapted to topography and soil stability.

The public investment in forest management should be protected by the exercise of prudence in restricting these investments to productive and stable soils.

It is desirable that the national forests include a wide diversity of forest types and conditions.

It is highly questionable that these objectives could be assured by detailed prescriptive legislation covering the diverse forests of the United States even if such prescriptions were to be drawn up by individuals with a fundamental understanding of forest biology and forest management. Indeed such individuals would not make the attempt.

Some section by section comments on S. 2926, taken from a detailed analysis of the silvicultural aspects of this bill are as follows:

Sec. 7(a) The general sense of this subsection, namely that no single system dominates in the national forests is to be applauded in that it leaves scope for the exer-

cise of professional judgment in silviculture. The exception, namely that selection management should dominate in the eastern mixed hardwood forests, is a clear case of special pleading without biological warrant. For example, the enforcement of selection management in the mixed hardwood forests would tend to reduce the less tolerant components of these stands, such as yellow poplar, black cherry, and the oaks, and lead to the formation of stands dominated by sugar maple.

Sec. 7(c) (1) This sub-section mandates nationwide standards for clearcuts and evenaged cuts. If nationwide silvicultural prescriptions are considered appropriate, one may ask why they are not appropriate for all silvicultural systems, including selection. The implication of this sub-section is that even-aged management poses hazards to the forests but that uneven-aged management does not. The deteriorated condition of most of the eastern mixed hardwood forests is massive testimony to the destructive effects of selection of the largest and best trees, leaving inferior individuals and less valuable species to reproduce. This process cannot fairly be called uneven-aged management; it has most certainly been uneven-aged mismanagement.

By contrast, clearcuts made, for example, in the Bent Creek Experimental Forest, in the 1930's as demonstrations of what were then considered undesirable practices, have regenerated superior mixed hardwood stands, whereas selectively cut stands in the same forest have failed to develop regeneration adequate in quantity or quality.

Sec. 8(d) This provision would prevent the salvage of immature stands heavily damaged by fire, insects, disease, or climatic catastrophes. Its consequence would be to saddle the national forests with increasing areas of understocked stands, unsightly and constituting fire hazards.

Sec. 10(a) The first paragraph would have the effect of leaving many of the degraded mixed hardwood forests in their present unsatisfactory state of understocking with desirable hardwood species. There is no merit in refraining from conversion of degraded mixed hardwood forests to hardwood forests of higher aesthetic, environmental, and economic value.

The second paragraph should be considered in relation to Sec. 4(a) (4) of this bill, which would provide that "timber sales from national forest lands are made only from . . . lands which are capable of regenerating a commercial stand of timber." Many areas of land in the eastern United States will be capable of growing a commercial stand of timber only if they are stocked with conifers. Many stands of mixed hardwoods which have succeeded old field or planted pines on degraded and abandoned farm land have no prospects of producing commercial yields. Yet these same sites can offer considerable recreational, watershed, aesthetic, and economic values if they are converted, totally or partly to coniferous or mixed hardwood-conifer stands.

The overall effect of the proposed highly restrictive limitations cn conversion would be to prevent the Forest Service from using the knowledge of soil-species relationships, bought by research, to develop healthy productive stands adapted to the soils they grow on. Another general effect of this section is to set up a highly artificial picture of "natural" forests as consisting of either conifers or hardwoods when, as a matter of record, many of the forests now referred to as the "eastern mixed hardwood forest" contained an appreciable conifer component, but were converted to hardwood stands by "high-grading" the conifers. Many forest uses would be best served if the eastern hardwood forests were restored to this truly "mixed" condition.

Mr. SCHWEIKER. Mr. President, the Federal Water Pollution Control Act Amendments are the result of a long, hard road of congressional action, in committees on the floor of both Houses, and in conference. I congratulate the members of the conference committee for tackling such a difficult job and resolving many sincere disagreements in this deeply complex bill.

However, I would like to take a moment to address myself to one particular aspect of this legislation and its possible effect on a major industry in my State whose future has been of such great concern to me and many of my colleagues. I refer to the American steel industry. This conference report will certainly pass with little opposition, because it is so wide-ranging and deals with so many vital water quality issues. But I would be remiss if I did not voice my serious concern over the impact this legislation might have on steel at the very time when many of us in Congress are fighting to keep the steel industry alive and reverse the terrible setbacks American steel is suffering.

Based upon discussions with members of the steel industry, I am concerned that the April 1, 1979 deadline for compliance with best practicable control technology may be impossible to attain or financially beyond reach in certain cases. The Members of this body are well aware of the desperate financial plight of the steel industry. Many steel firms are reporting little or no earnings and have exhausted their ability to borrow funds. Cash flow does not permit even minor modernization in many cases, and may well prove insufficient to pay for major water pollution control installations on the schedule mandated by this legislation.

Pennsylvania has 150,000 wage earners employed in steel. As we are painfully aware, under the circumstances facing our steel industry, few U.S. facilities can compete on an equal footing with those built much more recently in foreign nations, like Japan, with Government assistance. We have seen the recent closing of Alan Wood Steel and other units near Philadelphia, and the Bethlehem Steel Johnstown plant's struggle for survival. Thousands of jobs have already been lost to the combined impact of unfair foreign competition, obsolescence, and the unwillingness of the White House to vigorously address itself to this critical problem.

Unreasonable increases in environmental costs can harm our efforts to give the steel industry a new lease on life. Of course, necessary public health standards are proper and desirable, and I do not mean to quarrel with the need for environmental protection. But with the conditions I have described facing my colleagues in so many areas of the country, such as Ohio, Alabama, Indiana, and California, I think we in Congress should make it clear that wise environmental regulation means taking full account of the needs of our economy, our workers, and the plight of our steel industry.

For example, I am specifically aware that mills of Jones & Laughlin Steel Corp. in western Pennsylvania, employing about 16,000 steelworkers, face additional water quality projects costing about $100 million for the achievement of best practicable water control technology. These same mills also face air quality costs of about $200 million in the next 4 years.

Therefore, Mr. President, I would like to go on record today as indicating my reservations over the section of this conference report dealing with water quality standards for industry, and my disappointment that it fails to more specifically take into account the very unusual and special problems of our struggling steel industry. It appears to me this might well call for future remedial action by the Congress, if indeed the failure to address steel separately does set back the efforts underway to assure American steel's survival. While many good features of the Water Pollution Control Act Amendments argue for its passage, I felt I should warn my colleagues of the possible future problems we may well yet face in regard to balancing the economic survival of the steel industry against environmental factors.

Mr. HEINZ. Mr. President, the joint conference committee, by completing its work on the amendments to the Federal Water Pollution Control Act of 1972, has done a commendable job in compromising a difficult and contentious issue. The final bill comes close to resolving the existent problems and areas of disagreement between industry, public treatment works and the Federal mandate. The conferees have shown a sincere desire to reach a balance between corporate financial ability and a clean environment.

However, the bill fails to deal adequately with one of the main problems facing the steel industry today; that of insufficient capital. This problem is of critical importance since it raises the question of the very survival of the American steel industry. In my home area of western Pennsylvania a severe capital shortage is being felt by the major steel companies which have older coke, iron and steel works. We are all aware of the severe cutbacks in the Johnstown area and to the west in the Mahoning Valley. Jones & Laughlin and United States Steel in the Pittsburgh area have been forced to cut back on their work forces; and in the eastern part of the State we have just recently seen the closing of Alan Wood Steel and other units near Philadelphia.

These steel companies have reported little or no earnings and have reached or come close to the limit of their ability to borrow more funds. Modernization to become competitive with Japanese and other foreign steelmakers is out of the question while capital expenditures are severely cut back.

Pennsylvania, with approximately 150,000 of its wage earners employed in the steel industry, can only lose if Federal requirements inflict additional capital expenditures on them in the near term without consideration of expansion, modernization and especially, sustained, profitable operation. Although Pennsylvania will probably be the hardest hit State, since the steel industry is fairly

concentrated within its borders, it is not unique and I am sure my colleagues can attest to that fact.

Consider specifically Jones & Laughlin Steel Corp. J. & L. employs approximately 16,000 workers in the Pittsburgh and Aliquippa areas. At present, they are struggling to complete environmental projects in both air and water that will cost nearly $300 million, one-third of which is for water pollution controls. There is no feasible way for the company to find this amount of capital in the next 3 years and still survive as complete, integrated mills. Even this forced spending schedule, however, is illegal under this bill and the amended Clean Air Act. The simple fact is that there is no way some part of the industry, J. & L. in particular, can meet the demands of these acts in their present capital positions.

The administration's steel plan partially recognizes this problem in its recommendation that EPA review its environmental recommendations to reduce economic costs and remove barriers and rigidities that inhibit modernization. What that means is a mystery at this point, and we can only hope that it turns out to mean something for the steel industry.

The administration has also recognized the tremendous cost of installing pollution control facilities, and is prepared, I am told, to recommend appropriate tax incentives in its tax reform plan due early next year. My own preference in this regard is legislation permitting the companies to deduct these expenditures in the same year they are made rather than amortize them over a longer period. I have introduced legislation to this effect—S. 1276—and have recently written the President, along with Senators RANDOLPH, PERCY, ALLEN, and DANFORTH urging him to accept this proposal.

The many good parts of the amendments to Public Law 92–500 demand its passage, but I fear that the effect of the bill will be to further endanger communities and cities that are dependent upon the continued survival and prosperity of steel. We must watch the implementation of this legislation carefully to insure that this is not the result.

Mr. MORGAN. Although I support the conference report's exemption of normal farming, forestry, and ranching activities from section 404 permits, I think we should make it clear that in adopting this approach we do not intend to accept the conclusions of the Senate committee report concerning clearcutting of eastern mixed hardwoods.

The committee report could be interpreted to ban or require permits for clearcutting on the 254,000,000 acres of eastern mixed hardwood timberlands in both public and private ownership in every State east of the 100th meridian. This could cripple forest management in the Southern States, the Northeast, the Midwest, and the Lake States.

Many important hardwood species such as aspen, birch, black cherry, walnut, and hickory are difficult, if not impossible to regenerate without clearcutting.

The supply of these hardwoods is vital to the furniture industry of my State, which supplies the overwhelming majority of furniture sold in the United States.

Again and again, the Congress has rejected the idea of banning hardwood clearcutting, or of requiring permits for it.

In 1972, and again in 1976, Congress held extensive hearings, with expert witnesses, on the subject of forest management and clearcutting. In both cases Congress rejected the prohibition of, or permit requirements for, clearcutting of eastern mixed hardwoods. The Senate specifically rejected an amendment prohibiting clearcutting of eastern mixed hardwoods when it was offered during full Senate consideration of the National Forest Management Act of 1976.

Last year, the Congress rejected a proposal to ban or require permits for clearcutting on the 92,000,000 acres of national forest timberlands.

Finally, I emphasize that the vast majority of the 20,000 forestry professionals in the Untied States recognize that even-aged management is an appropriate practice when properly applied. Congressman BREAUX, the conferee from Louisiana, asked the Forest Service to respond to the questions raised by the Senate committee report concerning clearcutting of eastern mixed hardwoods. Chief McGuire of the Forest Service responded by saying: "Even-aged management practices, such as clearcutting, are especially well suited to many eastern hardwood types." Chief McGuire advised against an interpretation of normal silvicultural activities that would restrict the use of a wide range of scientifically proven silvicultural practices including clearcutting in all regions of the country.

I do not believe we should allow committee report's language to lead to an interpretation which the Congress has consistently rejected.

Mr. CULVER. Mr. President, I am pleased to see the Senate act today on the conference report accompanying H.R. 3199, the Clean Water Act of 1977. I am hopeful that both Houses will approve this legislation without further delays, and I want to commend my fellow conferees for their dedicated attention to this important measure.

One of the major water quality issues which has long been of concern to me is the urgent need to reduce nonpoint source pollution. It is widely recognized that our Nation's water quality goals will not be met in many lakes, streams, and rivers without accelerated attention to the problem of controlling agricultural and silvicultural runoff, which may be so severe as to overshadow current water quality improvements from the control of untreated municipal and industrial discharges. It has been estimated by the U.S. Soil Conservation Service (SCS), for example, that cropland is responsible for at least 50 percent of the total sediment entering our inland waterways. Over 400 million acres of cropland contribute 2 billion tons of sediment annually to our streams, lakes, and rivers.

Effective water quality related soil conservation practices will both conserve our valuable topsoil and abate further degradation of our water. Existing soil conservation programs have simply not addressed the problem of nonpoint source pollution and, frankly, have contributed to poor water quality in many instances. In fact, the General Accounting Office recently reported that existing programs are too production oriented, do not emphasize areas with serious water pollution, and do not foster participation on a geographically related basis. It is possible to conserve soil within limits necessary for continued production of food and yet not meet our water-quality standards. As an example, many soil conservation practices which improve agricultural productivity contribute only marginally toward curtailing soil erosion. Though conservation practices which enhance agricultural output are needed, we also need to finance those conservation efforts which are specifically premised on improvements in water quality.

The Committee on Environmental and Public Works, of which I am a member, has recognized the serious problem of nonpoint source pollution ever since the landmark Federal Water Pollution Control Act Amendments of 1972 (Public Law 92–500) were passed. To begin reducing pollution from these sources, Congress established an areawide local planning mechanism under section 208 of Public Law 92–500. Under this provision, the Governor of each State must identify each area within his or her State which has significant water quality problems and subsequently must designate an agency for developing a regional plan for enhancing water quality. Among its primary responsibilities, the areawide management agency must establish local procedures for controlling nonpoint source pollution. This planning process is to assure the necessary local arrangements for implementing coordinated decisions to achieve our water quality goals. In accordance with this process, guidelines for regional "best management practices" have been identified by the EPA for reducing agricultural run-off. Such conservation measures must be compatible with water quality goals and should be the most effective projects for preventing soil erosion. Because of the variability of sources and geography, no one best management practice will be applicable to all activities. They must be tailored to local needs, and local expertise will be utilized in the final selection.

This year the Environmental Pollution Subcommittee conducted several field hearings to review the progress under section 208. At the hearing in Iowa, which I chaired, and at others in Colorado and Minnesota, we received considerable testimony on the success of the local planning efforts under section 208 and on the future requirements of this program. At the hearing in LeMars, Iowa, members of several farm organizations and environmental groups praised the section 208 areawide planning process at the local level and clearly documented the need for financial assistance to help institute the conservation practices identified as best management practices for abating water pollution.

These conservation measures are a

costly endeavor and place a major burden on the average landowner. The National Water Quality Commission, for instance, estimates that presently these rural water quality projects could cost as much as $12 billion nationally. To help farmers comply with water quality goals pertaining to nonpoint source pollution, a system of technical and financial assistance for implementing the appropriate soil conservation practices is essential. Without such an arrangement, it will be difficult for farm operators and owners to install these practices voluntarily.

During consideration of the legislation before us now by the Committee on Environment and Public Works last summer, I offered an amendment, which was approved, to help landowners and operators in rural areas finance the cost of implementing the appropriate conservation measures under section 208 of the Federal Water Pollution Control Act. In order to carry out this cost sharing program $200,000,000 is authorized for fiscal year 1979 and $400,000,000 for fiscal 1980.

Under this Senate-approved provision, the Secretary of Agriculture, acting through the Soil Conservation Service, with the concurrence of the Administrator of the Environmental Protection Agency (EPA), is authorized to enter into long-term contracts with farm operators and owners for the purposes of installing practices to reduce nonpoint source pollution. Only those soil conservation projects identified under section 208 as best management practices are eligible for funding, and the Federal cost share may be as high as 50 percent.

These rural clean water projects are designed to address a major deficiency of current soil conservation programs in their emphasis on land with the most severe water-degrading soil erosion problems. These funds will not be used for practices instituted by one or two operators in a particular area when broader participation is needed to reduce runoff. Under some watershed, hydrologic, or geologic conditions, water quality goals cannot be achieved unless a high percentage of the pollution source is given appropriate treatment. Accordingly, the section 208 management agencies are to assure an appropriate level of participation by landowners and operators in the area before funding becomes available. Additionally, these funds are to be made available only to those areas which have approved management plans under section 208.

Under this cost-sharing provision, the Secretary is authorized to carry out these rural clean water projects through the local soil conservation districts. These conservation districts are uniquely equipped to help plan, manage, and implement portions of the State- and area-wide water quality management plans, particularly those related to the control of pinpoint pollution. They are legal subdivisions of State government, directed by locally elected or appointed commissioners or directors. In most areas, they have been active in the development of 208 water quality management plans and have been particularly involved in the

identification of best management practices for nonpoint source pollution control. Providing these districts with the authority and ability to assist with the implementation at the local level will achieve the most efficient use of funds and resources possible.

In addition, the Secretary of Agriculture is to give priority to those areas that have the most significant and adverse problems with nonpoint source pollution. Funds appropriated under this provision will likely not be dispersed evenly throughout the Nation. The intent of this requirement is to limit the application of the program to carefully selected priority project areas.

The heart of this program is the authority for the Secretary of Agriculture to enter into contracts of not less than 5 years nor more than 10 years with cooperating owners and operators of non-Federal rural land. These long-term contracts will be entered into only upon the assurance that the necessary soil conservation practices will be properly established and maintained. Such contracts will help guarantee that the Federal investment will result in the control of agricultural runoff. A project participant will be required to pay back Federal moneys plus interest in the event that the contract is violated during its term.

The conference committee essentially approved the Senate-passed cost-sharing rural water quality program except for a few minor changes. The Secretary of Agriculture has been given greater flexibility to designate other agencies to administer this program in those instances where the soil conservation districts do not exist. The local soil conservation district, where one exists, is to have the primary responsibility for implementing the clean water projects at the local level. Otherwise, another local agency may be designated. The conferees also agreed that the function of this cost-sharing program is to reduce nonpoint source pollution, and that it is not intended to be a copy or extension of existing soil conservation programs in the Department of Agriculture.

The Senate proposal named the Soil Conservation Service as the administering agency, and the conferees retained that provision, adding the phrase "and such other agencies of the Department of Agriculture as the Secretary may designate." This will allow the Secretary to designate other agencies in the Department of Agriculture to assist SCS in its administration of the program.

The conferees decided to strengthen the possible local and State administration of this program. With this change, the Secretary will, where practicable, enter into agreements with soil conservation districts, State soil and water conservation agencies, or State water quality agencies to administer this program.

To clarify the establishment of priorities for assistance among individual landowners or operators, the conference committee authorized the soil conservation districts, with the local departmental representatives to address this issue. Districts can relate to critical water-quality problems as identified in the 208

plan as a source of guidance for priorities.

It is intended that funds appropriated under this program are to remain available until expended. This will let individuals who participate in this program know that funding will be made on a long-term basis and will be available throughout the life of their contract. Additionally, due to the magnitude of the task nationwide and the limited funds available, these funds should be used on private lands only. Both of these points were intended to be included in the conferee's report, however, through an oversight they were omitted. I have checked with both Houses and the conferees agree that these points should be made a part of the legislative history on this act and given the same weight as the statement of managers.

Mr. President, I believe the changes made by the conference committee are worthwhile and do not diminish the full objective of this provision. It has an areawide water quality focus to reduce soil erosion and, therefore, efforts under this program must meet different requirements from those that have guided us in the past. I encourage my colleagues to approve this legislation.

Mr. MOYNIHAN. Mr. President, I wish to congratulate the conferees and the distinguished chairman of the Environment and Public Works Committee for successfully negotiating the clean water amendments reported to the Senate today. The conference report contains a sound compromise in all respects. The conferees, in my opinion, did an admirable job in balancing environmental and economic considerations.

Industrial dischargers who are not in compliance with the 1977 standards will be treated sternly, but fairly. The new law will recognize good faith efforts by industry by granting an extension to industrial dischargers that have made an honest attempt to comply with the 1972 law. The conferees should be commended for working out this approach and for resisting attempts to provide general exemptions or extensions for the 1977 deadlines.

The amended provision for the 1983 treatment requirements also reflects a rational approach to environmental-economic tradeoffs. The conference report recognizes that the enormous costs required to implement best available technology may result in marginal environmental benefits. Exemptions from BAT are now provided when the discharger can demonstrate that the benefits and costs of treating conventional wastes do not support the implementation of further treatment.

Some people have characterized the above changes in the law as concessions to industry. That characterization is inappropriate; the new provisions are manifestations of a congressional realization that water treatment as a goal, rather than an action to attain a goal, may not always be in the Nation's interest. The indiscriminate imposition of the 1977 treatment standards made a great deal of sense: the majority of waste from point dischargers was treated and major gains in water quality were

achieved as a result of these expenditures. The benefits of the next step, the 1983 standards, are not so great, but the costs are. The conferees recognized that it is time to reinstate the conceptual connection between treatment and environmental quality into water quality legislation.

The conference report preserves the tough stance that the Congress had taken on toxic pollutants and on the protection of wetlands. There is no room for compromise here: toxics must be controlled and our wetlands must be protected. The conferees should again be congratulated for keeping section 404 almost intact and for providing the impetus for an active toxic control program.

An area of great concern to me was the administrative burden that was imposed on localities by the 1972 law. Localities were not permitted to use ad valorem taxes to collect funds for operating pubicly owned sewage treatment plants. I argued during our committee markup against this provision as arbitrarily constraining the local implementation of the law. I am, therefore, pleased that the conferees agreed to an amendment that will permit the use of ad valorem taxes. This new provision is of great importance to local governments, such as Suffolk and Nassau Counties in New York, whose sewage treatment projects would have been jeopardized by the old law.

The conferees also recognized the inordinately large administrative burden of the industrial cost recovery provisions. In some municipalities the administrative cost of recovery would have exceeded the recoverable costs. The provision of a 12-month study of industrial cost recovery and a 25,000-gallon-per-day exemption is a wise one. It will be particularly beneficial for large urban areas with several very small businesses, such as New York City, where industrial cost recovery from all dischargers makes little sense.

Mr. RIEGLE. Mr. President, section 69 of the conference report on H.R. 3199 contains what I believe to be an essential tool to cope with chemical emergencies that have plagued this country over the last several years.

The chemical industry has grown by leaps and bounds in the last decade. With sales in excess of $100 billion per year in this country alone, this gigantic industry is responsible for nearly 10 percent of our gross national product.

While chemicals obviously present great benefit to society, our reliance on chemicals has also brought with it grave emergencies which threaten human health and the environment. For example, since 1968 at least 30 food contamination incidents caused by chemicals have resulted in losses of nearly $100 million. Twenty-four States have been involved, stretching from one coast to the other. Kepone, PCB's, "octa," and BCME have all become code words for human suffering and economic catastrophy.

Earlier this year, I chaired hearings of the Subcommittee on Science, Technology, and Space of the Committee on Commerce, Science, and Transportation to examine the facts surrounding the widespread contamination of food and the environment by the chemical PBB. While this contamination was restricted largely to the State of Michigan, it is merely indicative of those kinds of problems which affect a large number of States. The extent of contamination in Michigan is overwhelming. Of 9½ million residents in the State, fully 9 million have been estimated to contain PBB residues in their systems.

During the 4 days of hearings we held in Michigan, witnesses detailed an incredible story of bureaucratic lethargy and inaction in coping with this catastrophe. While the contamination took place in 1973, and the responsible chemical was identified in 1974, only now are we beginning to understand the full import of the health effects of this disaster. In January of this year, nearly 4 years after the incident occurred, the National Institute of Occupational Safety and Health finally began to examine the occupational implications of the manufacturing and processing of PBB.

In light of this incredible record, it is with great interest and enthusiasm that I note section 69 of the conference report on H.R. 3199, which establishes an emergency fund to deal with the release into the environment of any pollutant or other contaminant. It is precisely this type of need that motivated me to introduce S. 1330, which would establish a chemical emergency response team to deal with chemical disasters. S. 1330 was adopted, in nearly identical form, as title II of S. 1531, which was reported by the Committee on Commerce, Science, and Transportation in May. Unfortunately, a jurisdictional dispute between the Environment Committee and the Committee on Commerce, Science, and Transportation arose with respect to title II. An agreement was reached between our committees, however, whereby a similar provision would be inserted in the Federal Water Pollution Control Act amendments now before us, thus negating any need to retain title II in the Commerce Committee bill.

In early October, I wrote to the conferees on H.R. 3199 urging them to adopt a number of key changes I though important in order to provide in section 69 of H.R. 3199 what I had sought to accomplish in title II of S. 1531. Through the cooperation of the distinguished senior Senator from Maine and other conferees, my suggestions have been incorporated in the product now before us. I ask unanimous consent that my letter of October 11 to the conferees on H.R. 3199 be printed the RECORD.

I applaud the Senate conferees—especially the distinguished Senator from Maine—for their work in this area.

There being no objection, the letter was ordered to be printed in the RECORD, as follows:

U.S. SENATE,
*Washington, D.C., October 11, 1977.*
DEAR CONFEREES: One of the things that keeps cropping up in the country is the high number of chemical contamination emergencies and food poisoning incidents, that the government is being asked to respond to. The Kepone tragedy in Hopewell, Virginia, the polyvinyl chloride catastrophe which killed a substantial number of workers at the Goodyear plant and the PBB contamination incident in Michigan resulting in tens of millions of dollars in damages, are only a few examples of the rise of manufacturing-highly toxic substances.

Since the Commerce Subcommittee on Science, Technology, and Space held extensive hearings in Michigan last spring to examine the PBB incident, it has become increasingly clear that the Federal Government must step up its efforts, to quickly and effectively respond to chemical emergencies. The establishment of an emergency fund under Section 17 of H.R. 3199 is certainly a good start. I heartily applaud the authors of this section of the bill, and urge that it be accepted by the conference.

While Section 17 of the House bill is certainly a step in the right direction, our experience in examining the PBB incident in detail leads me to conclude that a number of changes would make it an even more useful tool. Thus, I would suggest that the conferees may want to consider the following:

(1) There are many resources which now exist at the state and local level which could be of considerable benefit in responding to toxic substance emergencies. Local physicians, toxicology labs, police forces, and others could all provide extremely useful services in responding to emergencies. I would thus urge that EPA be required to undertake a survey of these public and private resources to ascertain the extent to which they could be helpful in responding to disaster of a chemical nature.

(2) Since a response capability requires that timely notice be given, I would also urge that EPA establish a reporting system among state and local authorities to enable rapid discovery and dissemination of emergency information.

(3) While it may be difficult to do any advance planning with respect to specific emergencies, it does seem useful to spell out the manner in which appropriate officials will respond to chemical emergencies. The development of "contingency plans" at both the state and federal levels should aid in promoting a rapid response. I suggest that consideration be given to providing funding to the states to help them create this capability.

(4) Since chemical and pollution emergencies frequently affect the responsibilites of a number of federal agencies, it is extremely important that these agencies be incorporated into the response mechanism. Consequently, I would urge you to make provisions in the bill for a corporative effort among the agencies of the Federal Government.

Again, let me congratulate the work you have done on this bill. I would very much appreciate any consideration you can give to the suggestions that I have made for improving the emergency response capabilities of EPA.

Please feel free to contact me if I can be of further help.

With best wishes.
Sincerely,
DONALD W. RIEGLE, Jr.,
*U.S. Senator.*

The PRESIDING OFFICER. The question is on agreeing to the conference report.

The conference report was agreed to.

Mr. MUSKIE. Mr. President, I move to reconsider the vote by which the conference report was agreed to.

Mr. NELSON. I move to lay that motion on the table.

The motion to lay on the table was agreed to.

Mr. ROBERT C. BYRD. Mr. President, I take this opportunity to commend the distinguished Senator from Maine, Mr. MUSKIE, and the distinguished Senator from Vermont, Mr. STAFFORD, the managers on the part of the Senate, upon the adoption of the conference report on H.R. 3199, the Clean Water Act.

As the Members of the Senate are well aware, there have been few issues more difficult or more complicated to resolve than those surrounding the clean water bill. The attempt to balance the legitimate and often conflicting interests of the public in protecting the environment for the future while permitting necessary continued development has been truly herculean. The very fact that it has taken 2 years to achieve this balance is clear evidence itself of the magnitude of the task involved. Thanks to the expertise and dedication of Senator MUSKIE and Senator STAFFORD, however, the near impossible has been achieved and the Clean Water Act will shortly become a reality.

Mr. President, I would be remiss if I did not also single out the distinguished chairman of the Environment and Public Works Committee, Senator RANDOLPH, for his outstanding contribution to this legislation as well. But for his dedication and diligence we would not have been able to act on this conference report today. His persuasiveness and articulateness are well known and led the way toward acceptable compromise in the face of almost irreconcilable conflict. The people of this country certainly owe to him, as well as to the other Senate conferees, a profound debt of gratitude.