**IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF LOUISIANA**

| | | |
|---|---|---|
| In Re: Oil Spill by the Oil Rig "Deepwater Horizon" in the Gulf of Mexico, on April 20, 2010 | * * * * | MDL NO. 2179 |
| | | SECTION J |
| This Document Relates To: 10-4536 | * * | |
| | * | Honorable CARL J. BARBIER |
| | * | |
| | * | Magistrate Judge SHUSHAN |

---

**PENALTY PHASE POST-TRIAL REPLY BRIEF
OF BP EXPLORATION & PRODUCTION INC.**

Robert C. "Mike" Brock
Jeffrey Bossert Clark
Kimberly O. Branscome
KIRKLAND & ELLIS LLP
655 15th Street, NW
Washington, DC 20005
Telephone: (202) 879-5000
Facsimile: (202) 879-5200

Richard C. Godfrey, P.C.
J. Andrew Langan, P.C.
Hariklia "Carrie" Karis, P.C.
Matthew T. Regan, P.C.
Scott W. Fowkes, P.C.
Mark J. Nomellini
A. Katrine Jakola
KIRKLAND & ELLIS LLP
300 North LaSalle Street
Chicago, IL 60654
Telephone: (312) 862-2000
Facsimile: (312) 862-2200

R. Keith Jarrett (Bar #16984)
Don K. Haycraft (Bar #14361)
LISKOW & LEWIS
701 Poydras Street, Suite 5000
New Orleans, LA 70139-5099
Telephone: (504) 581-7979
Facsimile: (504) 556-4108

Brian D. Israel
Joel M. Gross
ARNOLD & PORTER LLP
555 12th Street, NW
Washington, DC 20004
Telephone: (202) 942-5000

*Attorneys for BP Exploration & Production Inc.*

## TABLE OF CONTENTS

INTRODUCTION ................................................................................................................. 1

ARGUMENT ....................................................................................................................... 2

I.  THE UNITED STATES MISCONSTRUES THE EIGHT PENALTY FACTORS.......... 2

    A.  The Absence of Economic Benefit Cannot Be Used to Increase the Penalty or as a Springboard to the Top-Down Method of Penalty Assessment. ................. 3

    B.  The United States' Argument That the Minimum Per-Barrel Penalty Amount Should Be Set at $1,100 Is Contrary to Law. ........................................... 4

    C.  All Response Efforts Must Be Considered Under the CWA. ................................ 5

    D.  The United States' Arguments Related to BPXP's Plea Agreement are Unavailing. ........................................................................................................... 6

    E.  The United States Expands the "Prior Violations" Factor Beyond the Clear Meaning of the Statute. ........................................................................................ 7

    F.  Consideration of "Other Matters That Justice May Require" Is Mandatory. ......... 8

II.  THE MITIGATION FACTOR WARRANTS A SUBSTANTIAL REDUCTION OF THE PENALTY. ......................................................................................................... 8

III.  THE SERIOUSNESS OF THE INCIDENT WAS REDUCED BY BPXP'S MITIGATION EFFORTS AND NATURAL PROCESSES........................................... 11

    A.  The United States Improperly Speculates About Injuries It Cannot Prove. ......... 11

    B.  The United States Mischaracterizes BPXP's Experts' Analyses That Disprove the United States' Claims of Widespread Long-Term Injury. .............. 12

IV.  A PENALTY ABOVE THE LOW END OF THE STATUTORY RANGE, AND CERTAINLY ONE IN THE RANGE SUGGESTED BY THE UNITED STATES, CANNOT BE IMPOSED UNDER THE CWA............................................... 14

    A.  The United States Cannot Avoid BPXP's Limited Financial Capacity by Looking to Non-Violators' Assets. ....................................................................... 15

    B.  Assistance from Any Investor Is Uncertain and Depends on the Value of BPXP, Including the CWA Penalty Plus Contingent Liabilities. ......................... 16

    C.  BPXP's Future Cash Flow, Selling Assets or Capital Expenditure Reductions Cannot Fund a Penalty Above the Low End of the Statutory Range. .................................................................................................................. 19

i

CONCLUSION.......................................................................................................................... 20

# TABLE OF AUTHORITIES

**Cases**

*Anderson v. Abbott,*
    321 U.S. 349 (1944) ..................................................................................... 16

*Catskill Mountains Chapter of Trout Unlimited v. City of N.Y.,*
    244 F. Supp. 2d 41 (N.D.N.Y. 2003) ....................................................... 15

*Daubert v. Merrell Dow Pharm., Inc.,*
    509 U.S. 579 (1993) ..................................................................................... 11

*Koons Buick Pontiac GMC, Inc. v. Nigh,*
    543 U.S. 50 (2004) ......................................................................................... 4

*Massachusetts v. EPA,*
    549 U.S. 497 (2007) ....................................................................................... 5

*Moore v. Ashland Chem. Inc.,*
    151 F.3d 269 (5th Cir. 1998) ..................................................................... 12

*Rainbow Gun Club, Inc. v. Denbury Onshore L.L.C.,*
    760 F.3d 405 (5th Cir. 2014) ....................................................................... 5

*Robinson v. Shell Oil Co.,*
    519 U.S. 337 (1997) ....................................................................................... 2

*Sealed Appellee 1 v. Sealed Appellant 1,*
    767 F.3d 418 (5th Cir. 2013) ....................................................................... 2

*U.S. v. Allegheny Ludlum Corp.,*
    187 F. Supp. 2d 426 (W.D. Pa. 2002) ..................................................... 18

*U.S. v. Bestfoods,*
    524 U.S. 51 (1998) ....................................................................................... 16

*U.S. v. BP Prods. N. Am. Inc.,*
    610 F. Supp. 2d 655 (S.D. Tex. 2009) ....................................................... 7

*U.S. v. CITGO Petroleum Corp.,*
    723 F.3d 547 (5th Cir. 2013) .................................................................. 3, 5

*U.S. v. Egan Marine Corp.,*
    2011 WL 8144393 (N.D. Ill. Oct. 13, 2011) ............................................ 4

*U.S. v. Municipal Authority of Union Township,*
    929 F. Supp. 800 (M.D. Pa. 1996) ............................................................. 4

*U.S. v. Sibley*,
   448 F.3d 754 (5th Cir. 2006) ........................................................................... 7

*U.S. v. Smithfield Foods, Inc.*
   972 F. Supp. 338 (E.D. Va. 1997) ................................................................. 15

*Vartelas v. Holder*,
   132 S. Ct. 1479 (2012) .................................................................................... 5

**Statutes**

33 U.S.C. § 1321(b)(7)(A) ................................................................................... 4

33 U.S.C. § 1321(b)(7)(D) ................................................................................... 4

33 U.S.C. § 1321(b)(8) ........................................................................................ 5

**INTRODUCTION**

The Clean Water Act, while strict liability, provides eight different penalty factors for a reason—to allow the Court discretion to assess an appropriate fine based on full consideration of all eight factors.  In advocating for a penalty near the statutory maximum, the United States has misconstrued the law, misstated key facts, and mischaracterized BPXP's arguments.  The plain text of the CWA compared against the record evidence supports just the opposite:  a penalty at the low end of the statutory range.

The *Deepwater Horizon* incident was serious and deeply affected the Gulf of Mexico and its communities.  BPXP responded to the spill as one would hope, spending an average of $100 million ***per day*** in 2010 and more than $27.5 billion to date.  BPXP's timely and tremendous response efforts limited the spill's impacts and set new standards for the industry.  Those efforts, however, left BPXP in a weakened financial state, such that a penalty above the low end of the statutory range would threaten its solvency.  Any future financial assistance is uncertain and contingent on the ratio of the penalty to BPXP's equity value and significant outstanding liabilities.

Unable to dispute these facts that warrant a reduced penalty, the United States has manufactured an unsupported and imbalanced reading of the CWA that trivializes the factors that favor a reduced penalty and expands beyond the statutory text those that favor a higher penalty.  Even setting aside the fundamental principle that a penal statute must be construed narrowly, no fair reading of the CWA would show Congress' intent to have been so one-sided.

Just as it misreads the CWA, the United States also misreads BPXP's trial positions.  Avoiding BPXP's actual arguments, the United States instead presents assertions that BPXP never advanced.  For example, the United States repeatedly accuses BPXP of denying the

seriousness of the incident—even suggesting a larger penalty because of "BPXP's attitude." The United States' assertion could not be further from the truth. BPXP's witnesses, pleadings, and response actions have confirmed how seriously the company takes this incident. The United States similarly misstates BPXP's position when it claims that BPXP's expert considered only the company's internal line of credit as a source of funding for a penalty. In fact, BPXP's expert considered the availability of additional funding and factors that an investor would consider before providing such assistance. Because a correct understanding of the evidence compels the conclusion that the penalty suggested by the United States—nearly twice the undisputed net book value of BPXP and nearly three times its equity value—cannot be supported under the CWA or this set of facts, the United States simply ignores that evidence.

Each of the eight statutory factors under Section 1321(b)(8) deserves due consideration. Though not all of the factors weigh in BPXP's favor, many of them do and to a significant degree. To adopt the United States' outcome-driven approach and ignore the statutory language, the relevant case law, and the indisputable evidence would be error and would run counter to the intended goals of the CWA.

## ARGUMENT

## I. THE UNITED STATES MISCONSTRUES THE EIGHT PENALTY FACTORS.

The United States' approach to Section 1321(b)(8)'s penalty factors is to construe them broadly and with an eye to penalty maximization. This violates two longstanding principles of statutory interpretation: (1) statutes should be interpreted according to their plain meaning, and (2) penal statutes should be interpreted narrowly. *See Robinson v. Shell Oil Co.*, 519 U.S. 337, 340 (1997); *Sealed Appellee 1 v. Sealed Appellant 1*, 767 F.3d 418, 421 (5th Cir. 2013); FFCL 1027–28. Section 1321(b)(8) is plain and unambiguous. The text does not direct the Court to

2

prioritize or weigh any one factor more than another.  Nor are the factors set up dependently, such that an outcome on one factor determines the approach for another.  Nevertheless, the United States repeatedly suggests that the factors can and should be contorted and rearranged so as to maximize penalties.[1]  The United States' unsupported approach should be rejected.

### A.   The Absence of Economic Benefit Cannot Be Used to Increase the Penalty or as a Springboard to the Top-Down Method of Penalty Assessment.

"Proper consideration of economic benefit is integral to arriving at an appropriate damage award."  *U.S. v. CITGO Petroleum Corp.*, 723 F.3d 547, 553 (5th Cir. 2013).  Because there is no significant economic benefit here, the United States argues—contrary to *CITGO*—that the factor is "of minor significance" and instead the seriousness factor should be paramount.  US Br. 3 n.3, 47–48.  This does not follow.  The economic benefit factor tends to support a higher penalty when economic benefit is present to dissuade violations made for financial gain.  Its relative absence here should (other things being equal) result in a lower penalty.

Similarly, the United States improperly argues that the top-down approach should be used whenever the economic benefit is low, placing the burden on the violator to establish that a penalty less than the maximum is warranted.  Canons of strict construction, however, require **the United States** to shoulder the burden of establishing that penalties at the high end of the range are appropriate.  *See generally* FFCL 1012–25; Rec. Doc. 12533.  Not surprisingly, the "bottom

---

[1]   Compare US Br. 3 ("seriousness of the violation is paramount") with *id.* n.3 (arguing "[t]hat is not always the case," and then suggesting that in situations where considering seriousness to be "paramount" would not maximize the penalty, then "economic benefit" should be "the principal concern").  *See also id.* 20 (arguing that the consideration of mitigation factor, at least as relates to the payment of spill-related damages by BPXP, can occur only if there are "compelling reasons" to do so); *id.* 25 (arguing BPXP has the burden concerning the economic impact on the violator factor); *id.* 31 (arguing BPXP has burden to show that installment payments should be used); *id.* 48–49 (arguing that consideration of the seriousness factor alone "jump[s] the penalty amount back up to the maximum"); US COL 69 (uncertainty about economic benefit factor should be resolved in favor of higher estimates).  These examples barely scratch the surface of the government's penalty-maximization approach.

up" approach is the majority view. *See U.S. v. Municipal Authority of Union Township*, 929 F. Supp. 800, 806 (M.D. Pa. 1996).

Moreover, the United States' argument is based on a single flawed case—*U.S. v. Egan Marine Corp.*, 2011 WL 8144393 (N.D. Ill. Oct. 13, 2011)—that has never been cited by another court for the proposition advanced by the United States here. *Egan Marine* counterintuitively applies the top-down approach to less blameworthy cases where defendants were never shown to have been motivated by a desire to reap economic benefits from undetected violations. The court in *Egan Marine* neither cites supporting authority on this point nor reconciles its holding with the well-established penal canon. *See* FFCL 1016.

### B. The United States' Argument That the Minimum Per-Barrel Penalty Amount Should Be Set at $1,100 Is Contrary to Law.

The United States' assertion that "the $1,100 per barrel amount should become a minimum amount, otherwise, the Phase One findings would be obviated," US Br. 49, makes no sense. Congress understands how to specify penalty floors and did so in Section 1321(b)(7)(D) ("the person shall be subject to a civil penalty of *not less than $100,000*"). Congress did not make that minimum amount conditional, and no court has found it to be so. There also is no logic behind the United States' new argument that, "Now that gross negligence and willful misconduct have been found, the $1,100 per barrel amount should become a minimum amount." US Br. 49. Congress set the $100,000 statutory minimum (now $140,000) in the context of Section 1321(b)(7)(D), which applies *only to* gross negligence and willful misconduct.[2]

---

[2]    In contrast, Section 1321(b)(7)(A), which applies to situations not involving aggravated liability, does ***not*** provide statutory floors. *See* 33 U.S.C. § 1321(b)(7)(A). *See, e.g.*, *Koons Buick Pontiac GMC, Inc. v. Nigh*, 543 U.S. 50, 60 (2004) ("Statutory construction is a 'holistic endeavor.'").

Even if the statute did not provide for an express statutory minimum, the Court should reject outright an argument that calls for ***$3.509 billion as a minimum penalty*** here when the largest CWA fine in history prior to the *Deepwater Horizon* incident was only a tiny fraction of that amount—$34 million. FFCL 1139.

**C.      All Response Efforts Must Be Considered Under the CWA.**

The argument that legally required mitigation efforts should not be considered finds no support in the CWA or the case law and was rejected in *CITGO*.  *See* Br. 4; FFCL 1038–43, 991–1008.  The CWA directs courts to consider "***any efforts*** of the violator to minimize or mitigate the effects of the discharge."  33 U.S.C. §1321(b)(8) (emphasis added).  There is no ambiguity in the term "any efforts," and it certainly does not mean "some efforts" or only "those efforts not legally required."  *See, e.g.*, *Massachusetts v. EPA*, 549 U.S. 497, 528–29, 532 (2007) ("any" means "any"); *see also CITGO*, 723 F.3d at 554.

The United States cites no case to support its novel approach to the mitigation factor but rather rests its position on a remark by Senator Lieberman in the CWA legislative history.  US Br. 21.  The law in this Circuit is clear that legislative history cannot be consulted unless a statutory ambiguity is first identified.  *See, e.g.*, *Rainbow Gun Club, Inc. v. Denbury Onshore, L.L.C.*, 760 F.3d 405, 410 (5th Cir. 2014) ("We are permitted to look to this legislative history only when the text of the statute is ambiguous.").  Moreover, Senator Lieberman's remark was simply that spills will result in "substantial civil and criminal penalties in addition to responsibility for cleanup costs," US Br. 21, which is true enough here, given what BPXP has paid and expects to incur in the future.

Equally invalid is the United States' use of legislative history connected to the 2012 RESTORE Act.  US Br. 22.  *First*, the United States again fails to establish the threshold of statutory ambiguity.  *Second*, the RESTORE Act was enacted ***after*** this spill and cannot be applied retroactively to enhance the penalties arising from this spill.  *See Vartelas v. Holder*, 132 S. Ct. 1479, 1486 (2012) ("The presumption against retroactive legislation…embodies a legal doctrine centuries older than our Republic.") (internal authority and quotation marks omitted).

5

*Third*, the legislative history cited by the United States provides only that CWA penalties and natural resource damages may both be obtained from OPA responsible parties. That is not disputed. BPXP maintains only that the CWA requires **due consideration** of BPXP's response and mitigation efforts in the penalty-setting process. Indeed, the overlapping penalties have a cumulative deterrent effect that reduces the need for a higher CWA penalty against BPXP.

      **D.**    **The United States' Arguments Related to BPXP's Plea Agreement are Unavailing.**

BPXP should receive credit for $1.25 billion of the criminal penalty because it was paid for the same conduct ($1.15 million for the identical CWA violation). BPXP's total penalty should not be higher because the government chose to pursue penalties in two forums, and the "prior penalties" factor recognizes that. Full credit for the payment of $1.25 billion would not "negate the criminal fine," as the United States suggests, given the additional recoveries under the criminal plea for which BPXP is not allowed to seek (and is not seeking) credit.

The United States' argument that the Plea Agreement precludes BPXP from referencing the GoMRI expenditures is wrong. The Plea Agreement—consistent with BPXP's position here—requires BPXP to make "[p]ayment of criminal recoveries totaling $4 billion," of which approximately $1.25 billion may be used to reduce other penalties. FFCL 693. The United States stipulated that only the "payments" to the National Academy of Sciences and National Fish and Wildlife Foundation are precluded from consideration in this proceeding. *See* Br. 22–23. Moreover, the United States' argument is inconsistent with its use of GoMRI expenditures to differentiate mitigation efforts that were legally required—for which the United States claims BPXP gets no credit—from those that were not. *See* US FOF 644 ("conced[ing] that [GoMRI] expenses were incurred and were beyond the expenses 'required by the Unified Command'");

6

*see also* Rec. Doc. 13901 at 8 (same); *id.* at  Ex. 1 (identifying $500 million commitment to GoMRI as "Reason for Potential Deduction").  Finally, even assuming that the Plea Agreement is ambiguous regarding GoMRI funding, the United States' attempt to change the terms of the Plea Agreement into something not contemplated by the parties at the time of its entry must be rejected given that courts "must construe all ambiguities in the plea agreement against the government." *U.S. v. Sibley*, 448 F.3d 754, 759 (5th Cir. 2006).

### E.   The United States Expands the "Prior Violations" Factor Beyond the Clear Meaning of the Statute.

The United States cannot expand the "prior violations" factor to include incidents that did not involve BPXP or even, in three of the four alleged incidents, the CWA.[3]  The United States contends that these unrelated and dissimilar incidents are relevant because "[i]t is BP plc and the BP Group that control safety and operations in the Gulf of Mexico."  US Br. 54.  To the contrary, the evidence makes clear that the Gulf of Mexico Strategic Performance Unit—not BP p.l.c. or the BP Group—was responsible for identifying and managing the risks associated with deepwater drilling in the Gulf of Mexico.  Rec. Doc. 10467 ¶¶ 2418–19, 2587–2616.

The United States has also ignored the evidence and violated this Court's prior ruling in contending that these prior incidents and the *Deepwater Horizon* incident reflect a "repeat pattern" of deficient safety management and a failure to learn lessons.[4]  US Br. 55–58.  As this

---

[3]   Nor is it appropriate to consider, as the United States suggests, these prior incidents under the "culpability" or "other matters as justice may require" penalty factors.  Evidence relating to culpability is limited to the Phase 1 and 2 trial records, from which all evidence of prior incidents was excluded, Rec. Docs. 12592, 5634, 10903-1, and the United States itself contends that "[c]ourts have…reserved the justice factor for matters not already considered under the other statutory factors," US Br. 32–33.

[4]   The United States violated this Court's pretrial rulings limiting evidence of prior violations to the plea agreements emanating from four prior incidents.  Rec. Docs. 13867, 13994.  *First*, the United States has gone beyond the plea agreements and improperly relied on documents that were excluded by the Court's prior orders.  Specifically, the United States cited to a court opinion approving the Texas City plea agreement, US FOF 611–13 (citing to *U.S. v. BP Prods. N. Am. Inc.*, 610 F. Supp. 2d 655 (S.D. Tex. 2009)), even though the Court

Court has found, BP had a process safety management system in place for the Macondo well and the *Deepwater Horizon* and that system was neither defective nor causal of the incident. Rec. Doc. 13381-1 ¶¶ 467–69.  The United States' contention is also refuted by the Phase 1 evidence demonstrating that BP took significant steps to enhance its process safety management system and had a superior and improving safety record in the Gulf of Mexico in the years leading up to the incident.  Rec. Doc. 10467 ¶¶ 2407–54, 2640–67.

> **F.    Consideration of "Other Matters That Justice May Require" Is Mandatory.**

The United States again misconstrues the CWA in arguing that the "any other matters that justice may require" factor is to be "construed to mitigate penalties in rare circumstances only."  US Br. 32, 57.  Nothing in Section 1321(b)(8) supports that interpretation.  The United States distorts this factor even more, arguing that "the Court can of course use the 'justice' factor to *increase* penalties as it deems fit."  US Br. 33.  The United States' baseless argument that the "justice" factor is a one-way street intended primarily to increase a penalty contradicts the penal canon and rule of lenity and must be rejected.

## II.    THE MITIGATION FACTOR WARRANTS A SUBSTANTIAL REDUCTION OF THE PENALTY.

BPXP's response to this spill was undeniably effective, and the United States' attempts to

---

previously **denied** the United States' request to introduce that same opinion as well as other documents beyond the plea agreements.  Rec. Doc. 13979 (U.S. response to BPXP letter brief/motion, attaching S.D. Tex. opinion); Rec. Doc. 13994 (granting BPXP letter brief/motion).  The United States does not cite the court opinion for its precedential value, but instead as the only "evidentiary" support for proposed factual findings, including summarizing the Baker Panel and CSB reports that also were expressly excluded by the Court.  Rec. Docs. 13867, 13979, 13994.  *Second*, the United States references alleged incidents other than the four specifically permitted by the Court by improperly citing another document beyond the plea agreements:  a Phase 1 exhibit (TREX 7153) that lists over thirty alleged "other spills and incidents."  US FOF 588.  TREX 7153 was excluded by the same pretrial orders cited above and by the Court's order excluding evidence of other incidents from the Phase 1 trial.  Rec. Docs. 13867, 13979, 13994, 5634.  This new "evidence," which BPXP did not have the opportunity to contest at trial because it had been excluded by the Court, is irrelevant and otherwise inadmissible for the reasons set forth in BPXP's pretrial motions, which are incorporated herein by reference.  *See* Rec. Docs. 12347, 12513, 13682.  Accordingly, BPXP objects to and respectfully requests that the Court not rely on, and strike, paragraphs 588 and 611–13 from the US FOF.

discredit the response are disingenuous and without merit.  The United States recognized in its opening brief and proposed findings that the response was "large and costly," that BPXP "satisfied its legal obligation" to respond to the spill, and that "*overall*, as members of the Unified Command, BPXP and the Coast Guard 'did work collaboratively,' 'worked well together,' and were effective in making progress to respond to the spill."  US Br. 2; US FOF 645–46.  The United States' after-the-fact litigation strategy to disparage the response is belied by its official reports—which the United States ignores—and the testimony of its own witnesses. Br. 3–12.  Rather than acknowledge that BPXP's efforts warrant significant reduction, the United States distorts the law and ignores the facts to prop up its goal of a maximum penalty.

The United States' accusation that "BPXP inflated the collection effectiveness" of the response, US Br. 23, is false.  Capt. Paskewich calculated the effectiveness of the response by determining the portion of released oil that was skimmed, burned and chemically dispersed and then comparing that amount to the portion of released oil that was skimmed, burned and chemically dispersed in other large spill responses.  The United States' expert agreed with the accuracy of Capt. Paskewich's calculations, which were based on official government estimates from the United States' sworn interrogatory responses.  Tr. 674–75 (VanHaverbeke).  The United States should not now be permitted to distance itself from its own figures.

Also false is the United States' assertion that Capt. Paskewich "compares apples to oranges by comparing the amount of oil dispersed, burned, and skimmed in the Defendants' spill to the amount of oil skimmed during other spills."  US FOF 662.  In fact, Capt. Paskewich compares apples to apples:  his analysis includes the results of several spill responses that involved dispersing and burning operations—which is the reason he selected those responses as points of comparison.  FFCL 116–17.  For example, the *Sea Empress*, *Montara* and *Ixtoc*

responses each involved substantial dispersant application, and the results of the dispersant operations in those responses are reflected in Capt. Paskewich's chart.[5]  *See* FFCL 116–17.

Contrary to this Court's ruling in Phase 2 and the supporting evidence, the United States persists in contending that BPXP's flow-rate representations and supposedly sub-par source control efforts tainted an otherwise good response.  Yet in the Phase 2 ruling, this Court held that the "weight of the evidence" did not show that the government decision-makers relied on BP's flow-rate representations either in approving the Top Kill procedure or in choosing to abandon the BOP-on-BOP procedure after Top Kill was concluded.  Rec. Doc. 14021 ¶¶ 228–41. Similarly, the United States' statement that this Court found BPXP "arguably…negligent" in its source control efforts, US Br. 49, ignores what this Court made clear, that because simple negligence was not at issue in Phase 2, "the Court ***does not determine*** whether or not BP was negligent in its source control preparation."  Rec. Doc. 14021 ¶ 246 (emphasis added).  Rather, the Court described BPXP's source control effort as a "massive and complex undertaking" that complied with industry practice and on which BPXP spent $1.6 billion.  Rec. Doc. 14021 ¶ 213.

The tremendous efforts made by BPXP and others in Unified Command dwarf any minor "mistakes" that the United States cites in its attempt to discredit the response.  Many of these "mistakes," US Br. 23, either are not supported by the facts or had no impact on the response. *See* TREX 13134.0003–06.  The United States is grasping at straws in trying to justify a penalty near the statutory maximum where the violator, in a collaborative effort with the government,

---

[5]    The United States asserts that the *Deepwater Horizon* response "removed less oil than the average spill response" and attempts to prove this point by altering a demonstrative used during Capt. Paskewich's direct examination.  US FOF 673, Fig. 44.  The demonstrative, as revised by the United States, is misleading and mischaracterizes the evidence because it compares the percentage of oil removed in this response through skimming alone to the percentages of oil removed in other spill responses through a combination of skimming, *in situ* burning, **and** dispersant applications.  As such, BPXP asks this Court to strike the altered demonstrative.

spent more than $25 billion to mitigate the spill's effects on the environment and the local community—behavior that should be incentivized under the CWA, not dismissed.

## III. THE SERIOUSNESS OF THE INCIDENT WAS REDUCED BY BPXP'S MITIGATION EFFORTS AND NATURAL PROCESSES.

The *Deepwater Horizon* incident was unquestionably serious, whether measured by the size of the spill, the consequences, or the remediation costs. But the question posed by the CWA is a relative one; it asks about the "serious*ness* of the violation." The United States has suggested that spill volume alone warrants a penalty near the statutory maximum. US Br. 3, 9. However, spill volume is accounted for by the per-barrel component of the penalty calculation. Increasing the per-barrel penalty based solely on volume would double count the number of barrels. Instead, for the seriousness factor to have meaning, its evaluation must include consideration of the actual effects of the spill. The data simply do not support the widespread catastrophic effects that the United States' experts claim ***might*** have occurred; instead, the data reflect the effectiveness of the response and the resiliency of the Gulf.

### A.    The United States Improperly Speculates About Injuries It Cannot Prove.

Tacitly acknowledging the limited evidence of actual harm, the United States advocates using "potential harm" as a means to include unrealized or speculative harm under the seriousness factor. US Br. 7, 15. The United States asks the Court to base a penalty on (a) speculative theories of harm that have since been disproven or that have no scientific support, and (b) a broad-reaching assumption that every adverse condition observed in the Gulf must have been spill-related (even where evidence suggests other causes may be responsible). US Br. 15. Neither the statutory language nor the case law supports this approach. *See Daubert v. Merrell Dow Pharm., Inc.*, 509 U.S. 579, 589–90 (1993) (opinion testimony must be based on "more

than subjective belief or unsupported speculation"); *Moore v. Ashland Chem. Inc.*, 151 F.3d 269, 276 (5th Cir. 1998) ("[T]he law cannot wait for future scientific investigation and research.  We must resolve cases in our courts on the basis of scientific knowledge that is currently available.").  The United States should not be allowed to sidestep the rules of evidence in order to speculate about and seek recovery for unproven harm.  If the ongoing NRD investigation reveals evidence of environmental injury, then it can be offered during the NRD trial.

> **B.      The United States Mischaracterizes BPXP's Experts' Analyses That Disprove the United States' Claims of Widespread Long-Term Injury.**

The United States falsely contends that BPXP's experts looked for effects in the entire Gulf in order to dilute effects from the spill in smaller areas.[6]  This is untrue.  BPXP's experts examined extensive data to assess the effects of the spill in a manner that would have revealed the level of actual and potential harm claimed by the United States if such harm occurred. Because the data do not show the widespread harm predicted by the United States, it urges this Court to "zoom in" on areas where there was harm and then extrapolate (i.e., speculate) about unrealized harm elsewhere.  Instead, the appropriate analysis of seriousness should include an evaluation—like those conducted by BPXP's experts—of the effects that can reliably be attributed to the spill based on available data.

The United States ignores the targeted analyses performed by BPXP's experts to ensure potential harm was not obscured.  For example, Dr. Shea performed an analysis of water and sediment data using only data that were collected where exposure was likely and found only a small percentage of those samples exceeded the government's own toxicity benchmarks and

---

[6]    The United States also incorrectly argues that Dr. Shea failed to include more recent, site-specific toxicity data.  US Br. 18–19.  In fact, Dr. Shea reviewed over 900 site-specific toxicity tests, all conducted as part of the *Deepwater Horizon* environmental investigation, to ensure that the application of the EPA benchmarks was fully protective of aquatic life.  FFCL 374–79.

most of those exceedances were located near the well in the summer of 2010.  FFCL 383–93.
Dr. Tunnell also performed targeted analyses of fish, shellfish, and bird population data to assess
potential effects in the locations that the United States claims were more heavily oiled and found
no significant change in the post-spill populations even in areas exposed to greater amounts of
oil.  FFCL 455, 485–89; TREX 13165.0005–06.  Dr. Taylor described visible oil at the edge of
the shoreline in a number of locations in 2010 and observed that those oiling levels declined
rapidly over time.  FFCL 549–54.[7]  Finally, Dr. Scott provided tourism data that showed short-
term effects in specific communities along the Alabama shoreline instead of obscuring the
effects by showing only data for the coastal counties as a whole.  Tr. 2054–55.

In contrast, the United States' experts ignored evidence contrary to their predictions of
widespread harm.  For example, Dr. Mason did not include the results of two analyses that would
have shown no negative effects on tourism.  Tr. 754–56.  Dr. Rice did not consider the toxicity
results presented in the Unified Command's OSAT-1 Report, which were consistent with
Dr. Shea's analysis, admitting that he was not familiar with OSAT and would be "guessing" to
interpret the report's conclusions.  Tr. 528, 531.  The United States is critical of Dr. Tunnell's
views on harm to dolphins, but Dr. Boesch did not even look at the dolphin necropsy data despite
admitting its relevance to assessing potential impact.  FFCL 512.

The United States similarly mischaracterizes BPXP's position regarding human health
effects.  BPXP has acknowledged the tragic loss of life and injuries suffered by individuals on
the rig.  Rec. Doc. 10467 ¶ 17.  It also has acknowledged some relatively minor short-term health

---

[7]   The United States misuses a quote from Dr. Taylor in which he defined the Gulf Coast as "[t]echnically"
ranging from the "southern tip of Florida all the way around to the Yucatan Peninsula."  US Br. 6.  Dr. Taylor's
answer, although correct as a matter of geography, has nothing to do with the area of potential oiling that
shoreline response teams surveyed or on which Dr. Taylor focused in his analysis.  FFCL 192.

13

effects in connection with the response. Tr. 1489–92 (Cox). But the United States wants to magnify those injuries, taking a litigation position contrary to its own reports by raising the specter of unrealized, potential human health effects caused by the spill. Not only is this unconvincing, it is counter-productive to the public good. Government agencies have extensively studied the response to assure the public that there is no compelling evidence for any significant exposure-related health effects either in cleanup workers or in residents. FFCL 582. Indeed, the United States' expert Dr. Clapp acknowledged that he has **no information or data** that **any** short or long-term health effects for **any** population were actually "caused by exposure to any toxins or chemicals associated with the *Deepwater Horizon* incident." Tr. 301, 324.

The United States claims there is a **risk** of psychological harm to the broader Gulf Coast population based on articles authored by Dr. George Bonanno—an expert witness who was not called to testify—in spite of Dr. Bonanno's rejection of exactly the mischaracterizations of his research that the United States advances here.[8] TREX 233241R.0009–11. The United States also ignores distinctions between this incident and the types of events in Dr. Bonanno's research (including terrorist attacks). TREX 233241R.0008–09. As Dr. Bonanno explained in his deposition, the studies he cites help generate hypotheses but not conclusions about the mental health impact of any given event. *Id.* at 10–11, 45–47, 59–62.

## IV. A PENALTY ABOVE THE LOW END OF THE STATUTORY RANGE, AND CERTAINLY ONE IN THE RANGE SUGGESTED BY THE UNITED STATES, CANNOT BE IMPOSED UNDER THE CWA.

The United States concedes that the relevant question under the "economic impact to the violator" factor is whether a proposed penalty would have a significant impact on the violator's

---

[8] For example, the United States speculates that the incident *may* have caused "psychological harm" in as much as 5–10% of the Gulf Coast population but cites no data or research from the Gulf Coast for these conclusions. TREX 233241R.0009–11.

operations.[9]  The evidence—including the only expert valuation before the Court—confirms that

a penalty above the low end of the statutory range would threaten BPXP's solvency and would

therefore be improper under any legal standard.  Excluding the charge for the CWA provision,

BPXP's net book value is $7 billion and its equity value as of December 30, 2014 was $5 billion.

Both numbers reflect the financial impact of BPXP's massive response; neither number includes

BPXP's remaining contingent liabilities or falling revenues from lower oil prices since trial.

And none of the funding "options" proposed by the United States for BPXP are realistic for

financing a CWA penalty above the low end of the statutory range.[10]

### A.  The United States Cannot Avoid BPXP's Limited Financial Capacity by Looking to Non-Violators' Assets.

The CWA directs this Court to consider the economic impact of the penalty "**on the

violator**," BPXP.  Still, the United States spends multiple pages describing BPXP's relationship

with non-defendant BP Group corporate shareholders.[11]  US Br. 28–30.  As confirmed at trial,

the United States does not allege this relationship is abnormal or improper.  Tr. 2000–01

(Gladstein); 941–42 (Quivik).  But now, for the first time, the United States asserts that "**typical**"

---

[9]   Though the United States' brief cites cases discussing in dicta that the impact must be "ruinous," its March 10, 2014 brief cited those same cases and summarized the standard as "significant" impact.  Rec. Doc. 12479 at 9; *see also U.S. v. Smithfield Foods, Inc.*, 972 F. Supp. 338, 353 (E.D. Va. 1997) (penalty found to have a "material, but not detrimental, effect on the company's financial condition"); *Catskill Mountains Chapter of Trout Unlimited v. City of N.Y.*, 244 F. Supp. 2d 41, 53–54 (N.D.N.Y. 2003) (noting, "[t]he only evidence at trial with regard to this element indicates that Defendants could absorb the maximum penalty without serious consequences to their financial well-being").

[10]  Further, the United States cites outdated financial data and projections based on an oil price of $100/bbl.  For example, the United States' claim that BP p.l.c.'s projected cash flows would be in excess of $30 billion annually for 2014–16 is based on a projection made in March 2014 that expressly assumed an oil price of $100/bbl.  TREX 12432.0036.

[11]  A significant majority of the assertions in the United States' "findings of fact" on corporate governance matters are wrong, incomplete, and misleading.  In fact, BPXP's board is no less active than any other board of a wholly owned subsidiary; BPXP pays for over 2,000 employees who work in the Gulf of Mexico; BPXP enters into numerous contracts in its own right; and BPXP has maintained a "trial balance" containing the same information as the financial statements since before the incident.  *Cf.* US FOF 791, 793, 797 with Tr. 946–47 (Quivik), 1587 (Morrison), Robertson Dep. 181, 203–04; TREX 13215.0014–15.

parent-subsidiary relationships "make it ***more critical*** that a ***substantial*** penalty be imposed." US Br. 30 n.27 (emphasis added).  This latest position derogates bedrock rules of limited liability and corporate separateness and a legion of cases applying those rules to "typical" parent-subsidiary relationships.[12]  The Supreme Court held that it is the exception to reject limited liability or blur the parent/subsidiary distinction in setting a penalty.  *See U.S. v. Bestfoods*, 524 U.S. 51, 61 (1998); Br. 23–24.  As the Court has explained, "large undertakings are rested, vast enterprises are launched, and huge sums of capital attracted" based on the presumption of limited liability.  *Anderson v. Abbott*, 321 U.S. 349, 362 (1944).  BPXP's typical and normal relationship with its parent is not akin to the relationship or actions at issue in the *Dean Dairy* litigation, as discussed in BPXP's opening brief, and that relationship provides no legitimate basis for the Court to assume that the assets of BPXP's parents are available to pay a penalty.

**B.** **Assistance from Any Investor Is Uncertain and Depends on the Value of BPXP, Including the CWA Penalty Plus Contingent Liabilities.**

The United States does not contest BPXP Chairman Richard Morrison's testimony that BPXP's board does not control whether a BP affiliate would provide funding for a penalty and that such funding is uncertain.[13]  Tr. 1608.  The United States also does not dispute that a potential investor in BPXP would weigh the equity value of BPXP against the sum of the CWA penalty and contingent liabilities (including NRD and OPA).  If the size of the CWA penalty

---

[12]   The United States asserts that "[f]inances of affiliated companies are relevant when the defendant is (1) operationally and (2) financially interdependent on the other entities."  US Br. 26.  But the United States does not dispute that it is "typical" for wholly owned subsidiaries to be operationally and financially interdependent on other entities.  Thus, the United States' newly created operational-and-financial-interdependence test would again result in parents' assets being considered in the "typical" case.

[13]   Notably, the United States has done no analysis as to the anticipated terms of such financing or how much BPXP could reasonably obtain.  Tr. 1127 (Ratner).  Further, if BPXP were required to use debt to finance the CWA penalty, the impact on BPXP's business would not only be the face amount of the loan but also the interest costs.  Tr. 1130 (Ratner).

plus contingent liabilities exceeds the equity value of BPXP, any potential investment in BPXP would have a negative value and yield a negative return.  TREX 13161.0009–10.

Both parties' experts agree that BPXP's value at the time of a CWA penalty is fundamental to BPXP's ability to attract additional funding or financing to pay the penalty. Tr. 1181–82 (Ratner).  But despite having access to detailed public and non-public financial information about BPXP, the United States did not prepare or present a valuation.  BPXP did. As set forth in the expert reports of Bruce Den Uyl, the value of BPXP as of December 30, 2014 was approximately $5 billion.[14]

With no valuation of its own, the United States resorts to criticism of Mr. Den Uyl.  For example, the United States claims that Mr. Den Uyl should not have relied on the third-party Wood Mackenzie industry report on asset value.  The United States' expert Mr. Ratner, however, conceded that the Wood Mackenzie report is one of the due diligence items an investor or lender would use before making an investment in BPXP.  Tr. 1184.  The United States also errs in claiming that Wood Mackenzie "evaluated only a small fraction of BPXP's assets and leases." US Br. 27–28.  In fact, Mr. Ratner conceded that Wood Mackenzie assigned value to both producing assets and not-yet-producing assets.[15]  Tr. 1186; *see also* FFCL 760–68.

After offering no valuation into evidence, the United States now attempts to inject one in its post-trial brief.  This untimely "valuation" takes BPXP's undisputed $7 billion net book value

---

[14]   The United States incorrectly claims that Mr. Den Uyl "assumes that the current low oil prices will continue for the next 40 years, which is not realistic."  US Br. 27.  In fact, Mr. Den Uyl's $5 billion valuation conservatively uses a $66.80/bbl (WTI) oil price for 2018 (an approximately 20% increase from today's price), as well as a 2% increase each year after 2018 in accordance with Wood Mackenzie's approach.  TREX 247596.0002.

[15]   BPXP's January 2015 sale of portions of its interest in Gila does not mean that Gila has any present commercial value.  The sale was part of a "new ownership structure" between BPXP and others under which co-owners plan jointly to develop the next-generation technological systems that may someday permit commercial production from such assets.  TREX 233896.

and improperly tries to increase it.  US Br. 26.  There is no endorsement by Mr. Ratner or any other expert for the alleged $25 billion valuation now proposed by the United States.  Nor could any expert endorse this flawed "calculation."  *First*, adding the "$18 billion" SMOG number to the book value violates basic accounting principles and amounts to double counting.  SMOG calculates discounted cash flows for fields that are already accounted for on a cost basis in a company's book value (i.e., ***they are included in the $7 billion in book equity***).  Bucknall Dep. 204–05.  *Second*, the SEC and Mr. Ratner both explicitly ***rejected*** the use of SMOG as evidence of fair value.  Br. 32; FFCL 800–03.  *Third*, the SMOG estimate of $18 billion assumed an oil price of $104/bbl; oil prices have declined by almost 50% since then.  TREX 244133.

Although ignored by the United States and its expert at trial, no investor would ignore BPXP's substantial remaining contingent liabilities.  TREX 13153.0018–19; *see also* FFCL 820–21.  Unlike the CWA's requirement that the Court evaluate BPXP's financial condition relative to a CWA penalty before setting it, these contingent liabilities have no downward adjustment for financial condition—and thus are of critical import to any future investment in BPXP.  Further, these liabilities serve as a significant additional deterrent above and beyond the CWA.

No one credibly can contend that a penalty of 25 to 50% of an entity's value would not have a significant negative economic impact on that entity.[16]  And given BPXP's value, a penalty in that range would represent the largest CWA civil penalty in history.  Even so, the United States unreasonably seeks a penalty that is nearly twice BPXP's reported net book value (which both parties agree is $7 billion, excluding the charge for the CWA provision), expressly

---

[16]   Even in the *Dean Dairy* case, on which the United States so heavily relies, the court satisfied itself that the violator would not be negatively impacted by comparing the $4 million penalty to the violator's $20 million net book value, a 20% ratio of penalty to net book value.  FFCL 1072; *see also U.S. v. Allegheny Ludlum Corp.*, 187 F. Supp. 2d 426, 442 (W.D. Pa. 2002) *aff'd in part, vacated in part*, 366 F.3d 164 (3d Cir. 2004) (violator's net book value was $635 million in comparison to $8.2 million CWA penalty).

ignoring the statute's clear direction that courts consider "the economic impact on the violator" and adjust a proposed penalty accordingly.

### C. BPXP's Future Cash Flow, Selling Assets or Capital Expenditure Reductions Cannot Fund a Penalty Above the Low End of the Statutory Range.

The United States attempts to explain how BPXP hypothetically could fund a CWA penalty above the low end of the statutory range.  These unsupported suppositions ignore undisputed facts about BPXP's current financial condition.  As set forth in BPXP's opening brief, BPXP has little or no positive net cash flow,[17] and the United States' expert conceded that asset sales of more than $1–3 billion would have a long-term negative effect on BPXP.  Br. 28.  Moreover, BPXP's revenues drop as oil prices decline, and Mr. Den Uyl opined that BPXP's equity value could decrease if the 2018 oil price declined below $66.80/bbl (WTI).  TREX 247596.0002.

By its nature, deepwater drilling requires ongoing capital investment to offset natural declines in production.  Tr. 1614 (Morrison).  As such, significant capex reductions would decrease future production, future cash flows, and the value of BPXP.  *Id*.  Although Mr. Den Uyl recognized that BPXP's $5 billion value could increase modestly if oil price declines led to smaller operational expenditures (i.e., a 10% drop in operational expenditures would add $1 billion to BPXP's value, holding other factors constant), reductions in capital and operational expenditures would negatively impact BPXP's employment and activity levels in the Gulf region, which are an important part of the Gulf economy.

---

[17]   The United States repeatedly and incorrectly claims that Mr. Den Uyl reached the "conclusion that BPXP only has the ability to pay a CWA penalty of $2.3 billion" and that Mr. Den Uyl "unrealistically assumes that BPXP's ability to pay should be based only on its current internal (BP) line of credit."  US Br. 26–27.  Mr. Den Uyl explained that, in addition to that line of credit, he "also look[ed] at someone who potentially would make an investment" and what factors that investor might consider.  Den Uyl Dep. 106–07, 115.

In sum, BPXP's unprecedented response efforts required a massive amount of spending, with significant known and contingent liabilities still to come.  The practical impact of this staggering amount of past spending is that BPXP has less capacity to shoulder a CWA penalty today.  This reality is relevant under the CWA.  Reducing the penalty against a violator that has less capacity to pay because of its proactive and beneficial spending on spill response is an entirely appropriate and just outcome contemplated by the statute.

## CONCLUSION

By arguing for a penalty in the low end of the statutory range BPXP is not asking the Court to assess a small penalty.  Within the statutory range of $100,000 to $13.7 billion, BPXP submits that a penalty greater than $2 billion would violate the CWA by failing to recognize, among other things, (1) the severe negative economic impact of a larger penalty on BPXP given the more than $27.5 billion spent to date (with many known and contingent liabilities still to come), and (2) BPXP's unprecedented and effective response efforts that were made possible by such spending.  A penalty of up to $2 billion would represent an extraordinary and severe sanction—*double* the largest civil CWA penalty in history and more than *58 times* any civil CWA penalty prior to the *Deepwater Horizon* spill—but would still incentivize BPXP and others to respond to future spills as proactively and substantially as BPXP has done here.  In short, consideration of all eight penalty factors and the broader goals of the CWA support a penalty at this low end of the statutory range.

April 24, 2015                                             Respectfully submitted,

                                                          */s/ R. Keith Jarrett*
                                                          R. Keith Jarrett

**CERTIFICATE OF SERVICE**

I hereby certify that the above and foregoing pleading has been served on All Counsel by electronically uploading the same to Lexis Nexis File & Serve in accordance with Pretrial Order No. 12, and that the foregoing was electronically filed with the Clerk of Court of the United States District Court for the Eastern District of Louisiana by using the CM/ECF System, which will send a notice of electronic filing in accordance with the procedures established in MDL 2179, on this 24th day of April 2015.

*/s/ R. Keith Jarrett*
R. Keith Jarrett