UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF LOUISIANA

| | | |
|---|---|---|
| In re:  Oil Spill by the Oil Rig | * | MDL No. 2179 |
| "Deepwater Horizon" in the Gulf | * | |
| of Mexico, on April 20, 2010 | * | SECTION "J" |
| | * | |
| | * | |
| This Document Relates To: | * | JUDGE BARBIER |
| | * | |
| No. 2:13-cv-01962, ATP Oil & Gas Corp. | * | |
| v. BP Exploration & Production Co. et al. | * | |
| | * | MAGISTRATE JUDGE SHUSHAN |

**MEMORANDUM IN SUPPORT OF THE TRUSTEE OF ATP OIL & GAS CORP.'S MOTION TO LIFT STAY AND PROVIDE FOR DIRECTION OF LIMITED REFERENCE TO BANKRUPTCY COURT**

Rodney Tow, the Chapter 7 bankruptcy trustee for Plaintiff ATP Oil & Gas Corp. (the "Trustee"), by and through his attorneys, respectfully requests that this Court lift the stay of *ATP Oil & Gas Corp. v. BP Exploration & Production Co. et al.*, No. 2:13-cv-01962 (E.D. La.) (the "ATP-BP Litigation") and file a suggestion with the Judicial Panel on Multidistrict Litigation (the "Panel") to conditionally sever the case from MDL 2179 for the limited purpose of allowing discovery to proceed through a limited directed reference to the U.S. Bankruptcy Court for the Southern District of Texas (the "Bankruptcy Court"), currently presiding over ATP's Chapter 7 bankruptcy case, or enter an appropriate order directing such a limited reference to the Bankruptcy Court. The Trustee requests that any suggestion or order with respect to such relief reserve to the MDL Court all issues of causation, applicable law, permissible defenses (if any), and all other merits issues, with the exception of a proposed finding regarding the calculation of ATP's damages, which may be efficiently addressed outside the MDL. The Trustee does not seek to interfere with or alter the progression of the five moratoria-related test cases (the "OPA Test Cases") currently proceeding before this Court. Rather, the Trustee commends the Court's

1

decision to proceed with, and management of, these actions. The Trustee merely seeks to alleviate unique but massive financial hardships posed by ATP's unique circumstances.

As explained further below, ATP suffered a staggering amount of damages from the *Deepwater Horizon* Oil Spill and now faces more than two billion dollars in debt. A debtor-in-possession ("DIP") loan, which currently has a balance of over $283 million, as of January 1, 2015, is accruing post-petition interest of over $120,000 per day, which risks diminishing the potential recovery to ATP's creditors. Since ATP has been in a Chapter 7 bankruptcy, it has ceased conducting business, such that its asset base is fixed and the accruing interest depletes the estate at over $120,000 per day. Delay heightens the difficulty of efforts not only to repay this lender, but also to make any distributions to other creditors. ATP's bankruptcy estate therefore faces unique hardship of rapidly depleting assets relating to the interest drain and the stay of the ATP-BP Litigation. Accordingly, the Trustee respectfully requests a suggestion to the Panel or appropriate order providing for a limited directed reference allowing discovery to proceed in Bankruptcy Court, subject to the conditions described above and in anticipation of final pretrial proceedings ultimately being conducted in MDL 2179.

## BACKGROUND

### A. ATP Files for Bankruptcy Protection Due to the Oil Spill.

Before entering Chapter 7 bankruptcy, ATP was an experienced development and production company with significant expertise in drilling and operating offshore wells. ATP incorporated in 1991 and maintained its headquarters in Houston, Texas. *See* Complaint for Damages, No. 2:13-cv-01962, Rec. Doc. #1 ¶ 44 (E.D. La. Apr. 20, 2013) (hereinafter "the ATP-BP Compl."); Decl. of Albert L. Reese, Jr. in Support of First Day Pleadings, *In re: ATP Oil & Gas Corp.*, No. 12-36187, Rec. Doc. 28 ¶ 6 (Bankr. S.D. Tex. Aug. 17, 2012) (hereinafter

2

"Reese Decl."). Compared to its principal competitors, ATP was a smaller company and more focused on the Gulf of Mexico. *See* ATP-BP Compl. ¶ 258. ATP operated and maintained approximately 90% of its wells in the Gulf of Mexico, and served as recognized operator for offshore operations in both shallow and deepwater. *See id.* ¶ 47; Reese Decl. ¶ 9.

ATP's business focused primarily on the development and production phases of oil and gas development, which have substantially less financial and environmental risk than the exploration phase. Unlike in the exploratory wells, development wells are drilled in reservoirs with known geological characteristics. Further, the cost of a development well is incurred only after an exploratory well has confirmed the presence of producible reserves of oil and gas. ATP-BP Compl. ¶ 46; *see also* Motions Hrg. Tr., *In re: ATP Oil & Gas Corp.*, No. 12-36187, Rec. Doc. 186, at 65 (Bankr. S.D. Tex. Aug. 21, 2012) (hereinafter "Aug. 21, 2012 Bankr. Hrg. Tr.") (ATP's Chief Financial Officer, Albert Reese, explaining that, "We are not an exploration company. . . . One of the things that we have been able to do very, very successfully over time is make an acquisition of a property that had proved reserves on it . . . .").

ATP's business model focused on acquiring leases with proven reserves of oil and/or gas, and applying its expertise to develop and produce these resources. Typically, ATP would acquire and develop properties with proven undeveloped reserves that, despite being economically attractive, were not strategic to major independent exploration-oriented oil and gas companies. *See* Reese Decl. ¶ 9; *see also* Aug. 21, 2012 Bankr. Hrg. Tr., at 65 ("[ATP] ha[s] a remarkable success rate in being able take a property that was not producing and to put that property on production").[1]

In addition to serving as an operator of its drilling wells, ATP owned, through wholly or

---

[1] Unless otherwise specified, all references to the August 21, 2012 transcript of the hearing before the bankruptcy court refer to the testimony of Chief Financial Officer Albert Reese.

majority owned non-debtor domestic subsidiaries, two floating production facilities in the deepwater of the Gulf of Mexico: *the ATP Titan* and the *ATP Innovator*. Reese Decl. ¶¶ 9 & 11; *see also* ATP-BP Compl. ¶ 48.

Before the *Deepwater Horizon* oil spill beginning on or about April 20, 2010 (the "Oil Spill"), ATP's business plan had the company slated to significantly increase its production in 2010 and 2011. The development of a deepwater oil well is a carefully orchestrated plan that requires months of lead time, and in the early months of 2010, before the oil spill, ATP was poised for the culmination of such a long-term plan. Specifically, ATP anticipated that, by completing its carefully laid long-range plans, it would drill and bring online six wells during 2010 and 2011. As a result, it would be producing close to 60,000 barrels a day in early 2011. ATP's drilling plans included, but were not limited to:

(1) drill and complete a well on the Mississippi Canyon Block 305 Lease ("MC305") in the spring of 2010 using the *Diamond Ocean Confidence* Rig;

(2) continue drilling wells on the Mississippi Canyon Block 941 Lease ("MC941") and the Mississippi Canyon Block 942 Lease ("MC 942") in the spring and early summer of 2010 using the *Nabors 202* Platform Rig from the *ATP Titan* Platform;

(3) drill wells on the Mississippi Canyon Block 711 Lease ("MC711") after hurricane season in 2010, using the *Diamond Ocean Victory* Rig;

(4) produce oil and/or gas from the wells on the MC 941 Lease and the MC 942 Lease through the use of the *ATP Titan* Platform; and

(5) produce oil and/or gas from the wells on the MC 711 Lease through the use of the *ATP Innovator* Platform.

*See* ATP-BP Compl. ¶ 49; Aug. 21, 2012 Hrg. Tr. at 107-114.

4

The offshore oil and gas industry is capital intensive. Drilling a single deepwater well typically costs over $75 million, and leasing a deepwater drilling rig can cost the lessee in excess of $500,000 per day. *See* ATP-BP Compl. ¶ 35. Accordingly, oil production requires large capital investments.

ATP's drilling and production plans were no exception. *See, e.g.*, Aug. 21, 2012 Hrg. Tr. at 110. In implementing these plans, ATP had spent more than $1 billion on infrastructure construction and other capital expenditures related to five of the wells described above. *See* ATP-BP Compl. ¶ 256.

To finance its operations, ATP pursued in the normal course of its proven business strategy a variety of bond financing and amortizing term loans. Its proven track record of efficiently harnessing oil in over ninety percent of the projects it took on made the company attractive for such investments and loans. *Id.* ¶ 50. ATP funded a major component of its capital expenditures with debt that it expected to service from the wells described above. *Id.* ¶ 51.

In early 2010, ATP went to the bond markets with the assistance of JP Morgan. Its doing so reflected that ATP was "financially and operationally capable of being able to move into the high yield market." Aug. 21, 2012 Hrg. Tr. at 105-106. During the first two months of the year, ATP explored the items that would allow the company to have a successful bond issue. *See id.* at 106. In March and April 2010, ATP returned to the market with a $1.5 billion transaction. ATP successfully priced the $1.5 billion bond offering on April 19, 2010, the day before the Oil Spill began. *Id.* The duration and scope of the disaster were initially unknown, and BP attempted to downplay and conceal the severity of the Oil Spill. *See* ATP-BP Compl. ¶¶ 213, 332. Although the Oil Spill introduced profound and immediate uncertainty to ATP, the market had committed to the bond offering, and the transaction timely closed on Aril 23, 2014. *See id.*; ATP-BP

5

Compl. ¶ 249.  ATP had disclosed its 2010 and 2011 drilling program with respect to the bond offering.  *See* Aug. 21, 2012 Hrg. Tr. at 109.  Its ability to price and close the transaction necessarily reflects the market's confidence in ATP as strong company with a solid business plan.

ATP intended to use the funds from the bond transaction to service existing debt with respect to the wells described above and to complete its long-term business development plans for 2010 and 2011.  *See* ATP-BP Compl. ¶ 51.  By the time the Oil Spill began, ATP had already completed most of the infrastructure needed to drill the wells.  Accordingly, as a practical matter, there would have been no further infrastructure development funding needed, and future capital expenditures would be limited to drilling.  *See* Aug. 21, 2012 Hrg. Tr. at 113.  Further, certain of the wells had been partially drilled.  *Id.* at 109, 111, & 113.

During the initial days of the Oil Spill, ATP lost the use of certain equipment, which was diverted to the response effort.  *See* ATP-BP Compl. ¶ 248.  The vast majority of ATP's production facilities were in the Gulf of Mexico, and the response effort impacted these facilities to the extent that it altered the normal operating schedules of helicopters, support boats, and other components of normal operation.  *Id.*

ATP moved a rig on location to "side-track" a well on the MC305 block on or about May 3, 2010.  *See* Aug. 21, 2012 Hrg. Tr. at 108.  It initially received a permit to proceed with drilling of the well on or about May 12, 2010 and proceeded with drilling under this permit.  ATP was soon forced to terminate this operation, however, after the May 28, 2010 moratorium went into effect.  On or about June 4, 2010, ATP received a suspension notice pursuant to the directives issued by the Secretary of the Interior in response to the Oil Spill.  *See* ATP-BP Compl. ¶ 250.

ATP incurred significant lease operating expenses in connection with the MC305 during

the suspension.  To mitigate its damages, ATP was forced to terminate the contract for the rig that it had moved on location to drill the MC305 well.  ATP incurred significant costs in extracting itself from this contract.  Further, because of changes in the market resulting from delays caused by the Oil Spill, ATP lost the value of the MC 305 well's reserves, which it otherwise would have tapped and used to generate revenues.  *See* ATP-BP Compl. ¶¶ 251-53.

ATP also experienced permitting delays at other wells it had been poised to bring on-line in 2010 and 2011 as a direct and foreseeable result of the Oil Spill.  Ultimately, ATP's plans to drill and bring online six wells during 2010 and 2011 were frustrated.  ATP had spent in excess of $1 billion in infrastructure construction and other capital expenditures related to five of these wells, but was denied the planned cash flows from these wells.  Instead of the projected 60,000 barrels, only 25,000 barrels a day were being produced.  At the same time, expenses continued and ATP was forced to pay for the use of drilling rigs and other equipment that sat idle for weeks or months.  In addition, though not completely idle, drilling rigs and platforms serving wells ATP did have in production were underutilized because the anticipated production from the new wells did not occur.  ATP suffered additional damages and losses as a result.  To keep afloat, ATP was forced to resort to non-traditional financing and paid significant interest costs or accepted a reduced share on future revenues.  The nature and extent of the injuries and damages to ATP are detailed more fully in ATP's filings in the ATP-BP litigation and the bankruptcy court.  *See, e.g.*, ATP-BP Compl. ¶¶ 254-264; Aug. 21, 2012 Hrg. Tr. at 109-110.

Ultimately, ATP was unable to absorb the effect of the Oil Spill.  It lost both the ability to timely and efficiently develop key properties in accordance with its business plan, and the ability to have sufficient capital to take advantage of numerous opportunities on the international oil market.  *Id.* ¶ 264.  ATP had attempted to mitigate its losses by altering its business plans and

7

attempting to complete other drilling projects in lieu of those it had planned for 2010 and 2011, but the liquidity limitations directly and foreseeably resulting from the Oil Spill prevented it from generating funds needed for necessary infrastructure. *See id.* ¶ 265. ATP was forced to file for Chapter 11 bankruptcy protection on August 17, 2012. *See* ATP-BP Compl. ¶¶ 247-266; *In re ATP Oil & Gas Corp.*, No. 12-36187 (Bankr. S.D. Tex.) (the "Bankruptcy Case").

### B. ATP's Bankruptcy Case.

During the administration of the Chapter 11 estate, ATP was required to enter into a debtor-in-possession loan in the aggregate principal amount up to $642.6 million (the "DIP Loan") which included a refinancing of $367.6 million pre-petition debt, and new money facility in the aggregate principal amount up to $275 million to operate the estate. *See In re: ATP Oil & Gas Corp.,* Rec. Doc. 440. The loan was partially repaid during the Chapter 11 by a credit bid sale of assets to the DIP Lenders. *See* Affidavit of Rodney Tow, attached hereto as Ex. A (hereinafter "Trustee Aff.") ¶ 13. Specifically, an Asset Purchase Agreement provided for the sale of substantially all of ATP's operating properties and other assets. *See In re: ATP Oil & Gas Corp., supra*, Rec. Doc. 2706, 3424, 3450. The Bankruptcy Court entered a Final Order approving the sale provided for in the Asset Purchase Agreement on October 17, 2013 and an Order authorizing distributions to the DIP Lenders on January 7, 2015, thus reducing the DIP Loan and thereby limited, to the extent possible, the accruing interest. *See In re: ATP Oil & Gas Corp., supra*, Rec. Doc. 2706 & 3450. The bankruptcy court granted the motion authorizing distribution of the sale funds to pay down the loan, "having determined that the relief requested in the Motion [wa]s in the best interests of the Debtor's estate." *Id.*, Rec. Doc. 3450.

The DIP Loan currently accrues interest at a rate of over $120,000 per day. Accordingly, the bankruptcy estate incurs approximately $44 million per year in interest on this debt. Trustee

Aff. ¶ 14.

On June 26, 2014, the Bankruptcy Case was converted from a Chapter 11 to a Chapter 7 case. *Id.* at ¶ 2. As of that date, the DIP Loan's outstanding balance, according to the lender, had increased to over $265,000,000. *Id.* ¶ 14. With ATP no longer operating, its asset base became fixed, while its liabilities, including the interest payments described above, continue to increase. *See id.* ¶¶ 3 & 16. The balance of the DIP Loan has increased to over $283 million, as of January 1, 2015. *Id.* ¶ 15.

Rodney Tow was appointed the Trustee of the Chapter 7 case and charged with liquidating the estate's assets to pay creditors. *Id.* ¶¶ 1-2. ATP now has less than $10 million worth of physical or operating assets. *Id.* ¶ 9. Its debts, in contrast, exceed $2 billion, and are described in more detail in the attached affidavit of the Trustee. *Id.* ¶¶ 13-17 & 20.

As explained above, the Trustee has been working diligently to minimize the accruing interest and attendant increase in ATP's liability by liquidating assets and paying off debt.

ATP's most significant remaining unliquidated assets are contingent interests in litigation. The Trustee is pursuing preference and other litigation, but believes the ATP-BP Litigation is the estate's most significant asset and the best chance of paying of the DIP Loan so funds can be made for other creditors. Trustee Aff. ¶¶ 10-11. Unless and until the DIP Loan is paid off, "the remaining Chapter 11 administrative expense claims and general unsecured claims of over $2 billion dollars cannot be paid." Trustee Aff. ¶ 15. The Trustee seeks to move all litigation on behalf of ATP as quickly as possible to minimize the interest on the DIP Loan and "to maximize the number of creditors receiving payment from this estate." *Id.* ¶ 16.[2]

BP America Production Company and BP Exploration and Production Inc. (together

---

[2] The Trustee recently reached a settlement involving litigation by and against the U.S. government, but the settlement will not reduce the amount owed on the DIP Loan. *See In re: ATP Oil & Gas Corp.*, Rec. Doc. 3422.

"BP") are creditors in the Bankruptcy Case. As such, BP has asserted claims against ATP in the Bankruptcy Case. *See In re: ATP Oil & Gas Corp.*, No. 12-36187, Rec. Doc. 1728-1 & 1728-2. BP has also filed a number of objections opposing, among other things, the Trustee's efforts to efficiently and expeditiously liquidate ATP's operating assets. *See id.*, Rec. Doc. 1728, 1842, 2051, 2132, 2179, 2215, 3133, & 3440. Most recently, BP objected to terms of a settlement of litigation between the U.S. Government and ATP involving claims against the U.S. government related to the Oil Spill, even though BP was not a party to that lawsuit. *See id.*, Rec. Doc. 3440.

During the administration of the Chapter 11 estate, ATP's special counsel attempted to resolve ATP's claims against BP by filing a "presentment" claim with the BP Claims Program. *See* ATP-BP Compl. ¶¶ 267-270. BP, which should have been familiar with ATP's circumstances and much of ATP's financial information through the Bankruptcy Case, demanded voluminous additional information from ATP. ATP provided certain additional information as sign of good faith, but BP still declined to pay the claim. Despite OPA's mandate that the claims process include procedures to resolve "claims for interim, short-term damages," 33 U.S.C. § 2705(a), in ATP's experience, BP was not open to discussion of interim claims resolution as the statute anticipates.

Beginning August 19, 2014, the Trustee reached out to BP to explore the potential for resolution of the BP Litigation. Trustee Aff. ¶ 18. Unfortunately, no progress was made towards this end. On September 5, 2014, the Trustee therefore moved the bankruptcy court for a status conference with BP to discuss mediation. The bankruptcy court denied the motion. *Id.* Shortly thereafter, the Trustee again reached out to BP, this time requesting that BP voluntarily engage in mediation. BP declined. *Id.* ¶ 19.

**C. The ATP-BP Litigation**

While operating as debtor in possession, ATP received the bankruptcy court's approval to retain special counsel for purposes of pursuing claims against defendants in *In re: Oil Spill by the Oil Rig "Deepwater Horizon" in the Gulf of Mexico, on April 20, 2010*, No. 2:10-md-2179 (E.D. La.) ("*In re: Deepwater Horizon*" or "MDL 2179"). *See In re: ATP Oil & Gas Corp.*, Rec. Doc. 1682; Trustee Aff. ¶ 12. ATP filed the complaint in the ATP-BP Litigation on April 20, 2013, after BP denied ATP's "presentment" claim under the Oil Pollution Act ("OPA"). *See* ATP-BP Compl. ¶¶ 267-70.

Pursuant to orders of this Court, the ATP-BP Litigation has been, and remains, stayed. *See* Pre-Trial Order No. 25, *In re: Deepwater Horizon*, Rec. Doc. 983 (E.D. La. Jan. 12, 2011) ("All individual petitions or complaints that fall within Pleading Bundles B1, B3, D1, or D2, whether pre-existing or filed hereafter, are stayed until further order of the Court."); *see also* Order [Regarding New Related Cases Pending Consolidation], *id.*, Rec. Doc. 10194 (E.D. La. May 20, 2013) (providing that "all responsive pleading deadlines, motion practice, discovery proceedings, and other deadlines . . . are suspended until further order . . ." pending consolidation in MDL 2179); Pre-Trial Order No. 15, *id.*, Rec. Doc. 676 (E.D. La. Nov. 5, 2010) (continuing pending and future motions not specifically exempted by the Court).

**D. The OPA Test Cases**

This Court has selected five actions in MDL 2179 to serve as the OPA Test Cases. BP and the Plaintiffs' Steering Committee ("PSC") negotiated an Agreed Upon Scheduling Order for OPA Test Case Trials, which this Court entered on June 3, 2014. *See In re: Deepwater Horizon*, Rec. Doc. 12972.

**CERTIFICATE OF CONFERENCE**

Pursuant to Pretrial Order ("PTO") 11, the Trustee's counsel have conferred with the Plaintiffs' Liaison Counsel appointed by the Court in MDL 2179. The PSC, through Liaison Counsel, consents to the filing of this motion and understands that the Trustee's attorneys are seeking the relief requested herein.

**ARGUMENT**

This Court's "'express and inherent powers enable the judge to exercise extensive supervision and control of litigation.'" *Ctr. for Biological Diversity, Inc. v. BP Am. Prod. Co.*, 704 F.3d 413, 432 (5th Cir. 2013) (quoting Manual for Complex Litig. (4th) § 10.1 (2004) and citing *In re Air Crash Disaster*, 549 F.2d 1006, 1013 (5th Cir. 1977)). The Federal Rules of Civil Procedure contemplate that district courts may adopt "'special procedures for managing potentially difficult or protracted actions that may involve complex issues, multiple parties, difficult legal questions, or unusual proof problems.'" *Id.* (quoting Fed. R. Civ. P. 16 16(c)(2)(L)). Further, district courts have the "general discretionary power . . . to stay proceedings in the interest of justice and in control of their dockets." *Wedgeworth v. Fibreboard Corp.*, 706 F.2d 541, 545 (5th Cir. 1983). "Proper use of this authority 'calls for the exercise of judgment, which must weigh competing interests and maintain an even balance.'" *Id.* at 545 (quoting *Landis v. North American Co.,* 299 U.S. 248, 254–55 (1936)). Consequently, "the party seeking a stay bears the burden of justifying a delay tagged to another legal proceeding." *Id.* As the Supreme Court has recognized,

> the suppliant for a stay must make out a clear case of hardship or inequity in being required to go forward, if there is even a fair possibility that the stay for which he prays will work damage to someone else. Only in rare circumstances will a litigant in one cause be compelled to stand aside while a litigant in another settles the rule of law that will define the rights of both.

*Landis*, 299 U.S. at 255.

This Court has developed a number of special procedures, including the selection and management of the OPA Test Cases and the stay of other individual actions, in managing MDL 2179. ATP does not seek to disrupt those procedures. ATP does, however, face unique hardship from an extended, indefinite stay.

Advancing this litigation expeditiously provides the best chance of recovery to ATP's creditors. There may be as many as $450 million in administrative claims on ATP's bankruptcy estate. Trustee Aff. ¶ 20. Further, ATP remains obligated on a (now-unsecured) debt on the $1.5 billion second-lien note incurred with the April 19, 2010 bond offering, and has other unsecured creditors as well. *Id.*

The scale of ATP's losses, coupled with the size and volume of the claims on its bankruptcy estate and the interest accruing on the DIP Loan, place ATP in a unique situation relative to other litigants in MDL 2179. Further, many of the creditors themselves may have financial stability issues due to the delay, while the interest owed on the DIP Loan is mounting and is not funded. As a result, an indefinite stay poses a great hardship to the bankruptcy estate. Further, other litigation involving ATP is active and thus anticipated to conclude ahead of the ATP-BP Litigation. The current procedural posture therefore threatens to leave the ATP-BP Litigation as the only unadministered asset in the Bankruptcy Case well after all other assets have been liquidated. In contrast, lifting the stay would pose no hardship to defendants in the ATP-BP Litigation, particularly given that BP is a creditor in ATP's Bankruptcy Case and has actively participated in that proceeding. If anything, proceeding promptly protects the defendants as well in the event they become liable for the interest payments.

BP has the legal resources to proceed with discovery in the ATP-BP Litigation concurrently with the OPA Test Cases. In addition to BP's own in-house counsel, attorneys from at least eight different law firms have appeared on behalf of BP in MDL 2179 and/or ATP's Bankruptcy Case.[3]

ATP's situation is also unique in that BP's active participation in the Bankruptcy Case has given BP the benefit of certain formal discovery into ATP's financial affairs and allowed BP to actively assert its interests against ATP. Meanwhile, ATP is unable to similarly press forward with its claims against BP or conduct formal discovery to support the ATP-BP Litigation. In this respect as well, the unique circumstances posed by the Bankruptcy Case represent a hardship to ATP's bankruptcy estate.

The Trustee therefore requests that the Court file a suggestion with the Panel or enter an appropriate order to conditionally sever the ATP-BP Litigation from MDL 2179 for the limited purpose of directing a limited reference allowing pretrial discovery to proceed in the bankruptcy court. Section 1407 provides that the Panel may remand an action "at or before the conclusion" MDL pretrial proceedings. 28 U.S.C. § 1407(a). Thus, "[i]t is not contemplated that a Section 1407 transferee judge will necessarily complete all pretrial proceedings in all actions transferred and assigned to him by the Panel." *In re Evergreen Valley Project Litig.*, 435 F. Supp. 923, 924 (J.P.M.L. 1977). Rather, the statute anticipates "that the transferee judge in his discretion will conduct the common pretrial proceedings with respect to the actions and any additional pretrial proceedings as he deems otherwise appropriate." *Id.*

In the context of remand, the court presiding over the MDL initiates a remand by filing a suggestion of remand with the Panel. *See* J.P.M.D.L. Rule of Procedure 10.1. Because MDL

---

[3] These law firms include Covington & Burling LLP; Gibson, Dunn, & Crutcher LLP; Locke Lord LLP; Williams & Connolly LLP; Liskow & Lewis; Kirkland & Ellis, LLP; Dentons US LLP; and, Arnold & Porter LLP.

2179 remains ongoing, in this case, coordination with the Panel would ensure that discovery in the ATP-BP Litigation may proceed in the bankruptcy court without delay.  Should the PSC desire, ATP is prepared to cooperate with the PSC to coordinate discovery on issues common to the OPA Test Cases and the ATP-BP Litigation.

This Court's admirable management of the OPA Test Cases is such that the Court can anticipate that these test cases most likely will resolve common issues before they require resolution in the ATP-BP Litigation.  Further, ATP has requested conditions on any severance to ensure that common issues will not be re-litigated outside the MDL forum. Accordingly, the purpose of coordinated pre-trial proceedings will be served even if the ATP-BP Litigation is conditionally severed or a limited directed reference is otherwise entered at this time.

Section 1407 empowers both the MDL court and the Panel to "exercise the powers of a district judge in any district for the purpose of conducting pretrial depositions in such coordinated or consolidated pretrial proceedings."  28 U.S.C. § 1407(b).  This grant of authority is construed to include not only depositions, but other aspects of discovery. *See In re Clients & Former Clients of Baron & Budd, P.C.*, 478 F.3d 670, 671 (5th Cir. 2007) (explaining that although "the statutory language refers to 'pretrial depositions,' the statute wisely has been interpreted to embrace document production subpoenas as well," such that "the transferee court may hear and decide motions to compel or motions to quash or modify subpoenas directed to nonparties in any district") (quoting 9 James W. Moore et al., Moore's Federal Practice § 45.50[4], at 45–75 through 45–77 (Matthew Bender 3d ed.2006) (footnotes omitted)).  The MDL Court and the Panel therefore have the authority to cooperate with the bankruptcy court through a limited directed reference of the ATP-BP Litigation to the bankruptcy court under 28 U.S.C. § 157 for the sole purpose of conducting pre-trial discovery and potentially making a proposed

15

factual finding calculating the amount of ATP's damages. As discussed above, BP is a creditor in ATP's bankruptcy and the Bankruptcy Court is familiar with ATP's damages from the Oil Spill. The Bankruptcy Court therefore presents an efficient forum in which to conduct discovery and potentially make a proposed factual finding, subject to review in the MDL Court and/or by a jury in trial of the ATP-BP Litigation, of the calculation of ATP's damages.

Cooperation between MDL courts and bankruptcy courts has been commended in the past, and a limited directed reference or other means of cooperation would facilitate the ATP-BP Litigation and lessen the hardship to ATP. *Compare, e.g.*, John F. Nangle, *Bankruptcy's Impact on Multidistrict Litigation: Legislative Reform As an Alternative to Existing Mechanisms*, 31 Ga. L. Rev. 1093, 1101 (1997) ("Given the federal judiciary's dedication and commitment to the ends of justice, it can be expected that when judges sitting in different districts are assigned to bankruptcy cases and multidistrict proceedings, they will attempt to coordinate the proceedings over which they have jurisdiction in a manner that will minimize delay and duplication."); *In re Asbestos Bankr. Litig.*, No. 950, 1992 WL 423943, at *2 (J.P.M.L. Dec. 9, 1992) (Panel decision "invit[ing] the various bankruptcy courts to coordinate with Judge Weiner concerning identification and implementation of the means necessary to secure their mutual objectives of fair and efficient resolution of bankruptcy cases and asbestos personal injury claims").

## CONCLUSION

For the foregoing reasons, ATP respectfully requests that its motion be granted.

Respectfully submitted,

This the 27th day of April, 2015.

By: /s/ *Joseph F. Rice*

16

**Joseph F. Rice, T.A. (pro hac vice pending)**
**MOTLEY RICE LLC**
**28 Bridgeside Blvd.**
**Mount Pleasant, SC 29464**
**Phone:  843-216-9000**
**Fax:  843-216-9450**
**jrice@motleyrice.com**

**Calvin C. Fayard, Jr. (LA Bar #5486)**
**D. Blayne Honeycutt (LA Bar #18264)**
**Wanda J. Edwards (LA Bar #27448**)
**FAYARD & HONEYCUTT**
**519 Florida Ave SW**
**Denham Springs, LA 70726**
**Phone:  225-664-0304**
**Fax:  225-664-2010**
**calvinfayard@fayardlaw.com**
**dbhoneycutt@fayardlaw.com**
**wandaedwards@fayardlaw.com**

**CERTIFICATE OF SERVICE**

      I hereby certify that the above and foregoing memorandum will be served on All Counsel by electronically uploading the same to Lexis Nexis File & Serve in accordance with Pretrial Order No. 12, and that the foregoing was electronically filed with the Clerk of Court of the United States District Court for the Eastern District of Louisiana by using the CM/ECF System, which will send a notice of electronic filing in accordance with the procedures established in MDL 2179, on this 27th day of April, 2015.

                                                         /s/ *Joseph F. Rice*
                                                         Joseph F. Rice