

# MEMORANDUM

**To:** Claims Administrator

**From:** Class Counsel

**Re:** <u>Processing Issues</u>

**Date:** April 1, 2015

### "Incompleteness" Issues

**1. A Claim that can be processed under the Settlement Agreement should not be Denied altogether simply because the Claimant is unable to provide a non-essential document or information – particularly when it is not expressly identified in the Settlement Agreement.** Class Counsel have always taken the position that a Claimant is not required to provide a document that simply does not exist. In some cases, such unavailable documentation may effectively prevent the Claim from being reasonably evaluated for Causation or Compensation purposes under the relevant Frameworks, and the Claim will, regrettably, have to be denied. But where documents identified in the Settlement Agreement that are not essential to the calculations simply cannot be provided, Class Counsel have always taken the position that the Claim should nevertheless be processed.[1] Now, however, and particularly with the adoption and implementation of Policy 495, there are voluminous documents and/or other information that the Parties never agreed would be provided under the express terms of the Settlement Agreement, but are being requested by the Program Accountants or other Vendors, in the Settlement Program's discretion. While we understand and agree that the Claims Administrator has discretion to request additional documents and/or information to help reconcile potential discrepancies and/or to otherwise try to understand the P&Ls, tax returns, or other documents or information, the question ultimately becomes: What happens if, despite the best and good faith efforts of the Claimant, the supplemental documents and/or information simply cannot be provided? Class Counsel strongly believe that the Settlement Program has the obligation to go ahead and process the Claim, in a light most favorable, based on the existing and reasonably available documents and information. At the very least, an inference with respect to the missing documents or information could be drawn against the Claimant, and the Claim could be processed in a light least favorable. But the effective result under what we understand to be the current process – *i.e.* that the Claim is completely and substantively Denied – is contrary to the entire nature, structure, spirit, and actual terms of the Settlement Agreement.

**2. The desire to achieve finality on each Claim must yield to the overriding and affirmative obligation to ensure that Claimants are provided with multiple notices, assistance, and opportunities to have the Claim deemed eligible and to receive the highest compensation to which he or she is entitled under the terms of the Settlement Agreement.** We understand the desire to achieve finality within a reasonable time on each submitted Claim. And we understand that the deadlines which have been established by the Program are,

---

[1] *See, e.g.,* MEMO TO CLAIMS ADMINISTRATOR RE DOCUMENTATION PROVISIONS (Sept. 16, 2012).

in part, intended and designed to prompt, encourage and assist the Claimants themselves in providing the requested documents and information, where possible, and not allowing the Claim to languish. But the reality, at this point, is that most of the Claims have not been languishing due to inaction or unresponsiveness on the Claimant's part. They have been languishing, (in some cases for many months or even years), because of BP's multi-faceted challenges to the interpretation and application of the Settlement Agreement, the overall approval of the Settlement Agreement, the Claims Administrator, etc; the stay that was entered by the U.S. Fifth Circuit; the need to develop and implement 495; expansive anti-"fraud" measures that have been adopted; uncertainties, and sometimes changes, regarding the interpretation and/or implementation of the Agreement, as a matter of policy; the limitations of an IT / processing system that had to be put together very quickly in 2012 so that the Program could open timely; delays in getting a new IT system in place; and the understaffing of Program Accountants who, we understand, could not and cannot be efficiently trained and utilized until the new system in in place. Moreover, and in any event, the nature, spirit and actual terms of the Settlement Agreement did not include the deadlines that are being imposed by the Program, but rather, were expressly negotiated and intended to afford the Claimant with every opportunity to complete the Claim, and to have the Claim determined in a light most favorable, based on the available documentation.[2] Some of the sub-issues include:

    a.    **The Program should request documents and/or information at least once informally before a formal Incompleteness Notice goes out.**

    b.    **Where the Claimant is actively working with the Program to attempt to provide the documents and/or information, an Incompleteness Denial should not be issued. And requests for Extensions should be freely granted.**

    c.    An IEL Claimant should likely be able to stay his or her IEL Claim until a Causation determination has been made on his/her employer's BEL Claim. We understand and appreciate that the Program will allow an IEL Claimant to "revive" a previously denied IEL Claim if the employer subsequently passes Causation, but would respectfully suggest that this will often place an unnecessary burden upon the Claimant, while also likely creating an inefficiency within the Program.

    d.    We appreciate the changes to the Incompleteness Notice / Follow-Up / Denial process, and will let you know if we get any new reports of situations where a Follow-Up Notice or Denial is issued based on documents that do not appear to have been previously requested, or requested only one time.

    e.    We are still getting a few reports of situations where Incompleteness Notices and/or Denials are being issued based on documents and/or information that appear to have already been provided.

---

[2] *See, e.g.*, SETTLEMENT AGREEMENT, Sections 4.3.7 and 4.3.8.

  f. **Where the "Incompleteness Denial" is effectively a substantive Denial** – either because (a) the Claim, for some reason, cannot be re-filed,[3] and/or (b) the Claimant simply cannot provide the requested documents and/or information – **there should be a procedure in place to take a Section 6.1.2 appeal**, separate from and in addition to the Claimant's option to seek review under 6.1.1 by the Documentation Reviewer.

  **3. An AVM Claimant that did not maintain Monthly P&Ls in the ordinary course of business should generally not have to attempt to provide month-by-month expenses**, which are going to be re-allocated to different months according to the monthly revenues anyway. We understand and agree that the Settlement Agreement requires Monthly P&Ls. The question has always been whether, particularly given the definition of "Contemporaneous" under the Settlement Agreement, an Entity that did not maintain Monthly P&Ls in the ordinary course of business should be able to create and submit Contemporaneous Monthly P&Ls that are derived from the Annual, Semi-Annual, or Quarterly Financials that were prepared and maintained in the ordinary course of business?[4] Originally, and correctly, the Claims Administrator agreed that this would be permitted.[5] Since then, for reasons not fully clear to Class Counsel, the Policy has apparently changed. However, now, with the adoption and implementation of 495, the general Average Variable Margin (AVM) Methodology renders the actual month-by-month expenses almost completely irrelevant, as the annual expenses are matched to the monthly revenues for Compensation purposes. We understand and agree that, where Monthly P&Ls were prepared and maintained in the ordinary course of business, they must be provided. But where it is either extremely burdensome, or simply impossible, to provide the Source Documents or other Contemporaneous accounting for the specific months in which an expense was paid or incurred, there is no reason to impose that unnecessary burden, and absolutely no basis under the Settlement Agreement to Deny altogether that Claim.

  **4. When a BEL Claim fails the V-Test due to a revenue adjustment made by the Program Accountants under 495, the Claimant should be afforded an opportunity to submit additional documentation in an attempt to satisfy one of the alternative Causation Tests.** We understand that Policy 464 generally results in a Causation Denial, rather than an Incompleteness Denial, where the Claimant fails to even attempt to provide any Customer Mix

---

[3] Class Counsel believe that an "Incomplete" Claim initially filed on or before June 8, 2015 can continue to be re-filed after the June 8th Deadline for the filing of new Claims. Section 6.1.1.1 allows an Incomplete Claim to be re-filed at any time up until the "termination of the Settlement Agreement" (*not* the Claims Deadline). There has been no termination of the Settlement Agreement under Section 21, and the Settlement Program will not terminate until the "issuance of an order of the Court determining that the last Claim eligible for payment has been paid and the last appeal pursuant to the Appeal Process has been completed and that the Settlement Program is closed." Section 4.4.16; (*see also* Section 4.3.2 ("The Court shall retain ongoing and exclusive jurisdiction over the Settlement Program until the consideration and determination of all Claims is complete and the Settlement Program is terminated by the Court")).

[4] *See, e.g.,* MEMO TO CLAIMS ADMINISTRATOR RE MONTHLY PROFIT & LOSS DOCUMENTATION (Sept. 19, 2012).

[5] *See* ANNOUNCEMENT OF POLICY DECISIONS RE CLAIMS ADMINISTRATION, No.1(a) (Sept. 25, 2012) *and* REVISED ANNOUNCEMENT OF POLICY DECISIONS RE CLAIMS ADMINISTRATION, No.1(a) (Oct. 8, 2012) ("If the claimant has submitted documents sufficient to determine the annual revenues and expenses of the business for a year, but no monthly profit and loss statements or other documents showing revenues and expenses by month for that year are available, the Claims Administrator may allocate the total annual revenues and expenses equally over the 12 months or use alternative methods or documents to allocate the amounts over the 12 months"). In the revised announcement, it was clarified that such re-allocation was only permissible for Compensation purposes, and not for Causation purposes; but since Causation is a revenue-only test, the expenses are not relevant to such determinations.

documentation. However, where the Claimant submitted a Claim under the reasonable belief and expectation that the Claim meets the V-Test, (and therefore no other additional documents would be required), but then unexpectedly fails Causation due to an adjustment made by the Program Accountants, it is contrary to the nature, spirit and terms of the Settlement Agreement to deprive that Claimant of an opportunity to try to cure the Denial.

[Previous Memos, E-Mails, and Example Claims regarding Incompleteness Issues include: Memo to Claims Administrator re Documentation (Sept. 18, 2012); Memo to Claims Administrator re Monthly Profit & Loss Documentation (Sept. 19, 2012); E-Mail to Juneau et al re Processing Issues (Oct. 31, 2014) Nos. 1, 2, 4, 5, 10, 11, 12, 13, 14, 19, 20; Easterby Letter to Juneau (June 23, 2014); E-Mail to Juneau re Causation Denials (Oct. 3, 2014); E-Mail to Juneau et al re Holding IEL Claims Pending BEL Causation (Oct. 8, 2014); E-Mail to Juneau at al re Communications with Program Accountants (Oct. 29, 2014); Memo from Easterby re Issues and Examples (Oct. 31, 2014) [*via* E-Mail from Herman to Juneau et al (Nov. 2, 2014)]; Memo from Class Counsel re "Incompleteness" Notices and Denials (Nov. 2, 2014); Memo from Class Counsel re "Incompleteness" Notices and Denials (Nov. 13, 2014); E-Mail to Hron re Claims Processing Issues [██████] (Nov. 17, 2014); Kingsmill Letter to Michelle Daniels (PwC) ██ [and E-Mail from Herman to Black and Hron (Nov. 18, 2014)]; E-mail to Black and Hron re Causation Denials (Nov. 20, 2014); E-Mail to Black and Hron re Processing Issues (Nov. 20, 2014); E-Mail to Forsyth re "Incompleteness" (Dec. 3, 2014); E-Mail to Black and Hron re Incompleteness Denials [██████] (Jan. 3, 2015) [Hron Response (Jan. 7, 2015)]; E-Mail to M. Juneau re Requirement to Restate P&Ls (Jan. 23, 2015) [M. Juneau Response (Jan. 27, 2015)]; E-Mail to Hron re Subsistence Claims [rejection of uploaded evidence of impairment] (Feb. 6, 2015); E-Mails to Hron ██████ (Feb. 18, 2015) [Hron Response (March 2, 2015)] [primarily involves a Claiming Entity/Multi-Facility issue]; E-Mail to Juneau and Alltmont re ██████ (Feb. 24, 2015); E-Mail to Hron [██████] (March 1, 2015); E-Mails to Black and Hron re Incompleteness Notice Issues (March 1, 2015); E-Mail to Juneau re Notice / Incompleteness [██████ Appeal Decision] (March 9, 2015); E-Mail to Juneau and Black re "Incompleteness" Notices, et al (March 11, 2015); E-Mail to Juneau et al re Denials [██████] (March 11, 2015); E-Mail to Hron re Pot. IT Issues [██████] (March 12, 2015); E-Mails to Juneau et al re Incompleteness Denials (Sales Tax Returns) (March 13, 2015); E-Mail to Juneau et al re "Incompleteness" Issues (March 18, 2015); E-Mail to Hron re Incompleteness Notices / Denials ██████ (March 27, 2015); E-Mail to Juneau et al re "Incompleteness" Issues (March 30, 2015).]

## Alleged / Potential "Fraud" Investigations

The overwhelming majority of lawyers representing Claimants in the Settlement Program are doing their best to advocate for the rights and the interests of their clients in an honest, ethical and professional way. When an issue regarding a Claimant represented by counsel is identified by the Settlement Program, the attorney should be advised of the specific issue or issues in question. He or she will likely, in virtually every circumstance, investigate the situation, and respond to the Program in accord with his or her ethical and professional obligations. In many cases, he or she will provide the Program with helpful clarification, explanation, and/or supplemental documentation. In many cases, he or she will amend, or perhaps even withdraw entirely, a Claim or Claims. In some cases, he or she may be required to withdraw from representation. The Program will, of course, remain free, at that point, to interview the Claimant, or to conduct any other further investigation deemed necessary and appropriate. But any such interviews or other further investigations will likely be more focused. And, in virtually all cases, the Program will be a lot closer to a final disposition of the potential "fraud" issue and/or final Claim Determination.

The experience and perception of many of the Claimants' lawyers is that the "fraud" investigations have seemed unduly adversarial, and inefficient, with potentially relevant documents, information, suspicions and/or allegations withheld from the Claimants and their attorneys throughout much, if not all, of the process.

By extending appropriate courtesy and respect to Claimants' counsel, and enlisting them at the outset to assist the Program in getting to the bottom of things, it would likely save the Program (and, indirectly, the BP Defendants) a lot of time, money and effort;  save the Claimants, their attorneys, CPAs, friends, neighbors, family members, employers and/or employees a lot of time, money and effort;  promote the general notions of fairness and due process;  and be consistent with the nature, spirit and actual terms of the Settlement Agreement.

[Previous Memos, E-Mails, and Example Claims regarding Alleged / Potential "Fraud" Investigations include: E-Mail to Piantidosi and Welker re Potential Seafood Program "Fraud" Investigations (Feb. 26, 2014) [Doc 12539-2]; E-Mail to Welker et al re "Fraud Checklists" (Feb. 28, 2014) [Doc 12539-3]; E-Mail to Juneau et al re "BOLO List" (March 7, 2014) [Doc 12539-5]; E-Mail to Piantidosi et al re Investigations Into and Potential Findings of Fraud (April 9, 2014); E-Mail to Piantidosi and Welker re Subsistence Investigations (April 9, 2014); E-Mail String with Welker, Piantidosi, et al re Alleged / Potential "Fraud" Investigations (April 16, 2014); E-Mail String with K. Moskowitz, Juneau, Judge Shushan, and Freeh re Alleged / Potential "Fraud" Investigations (April 23-28, 2014); E-Mail to Souther et al re Alleged / Potential "Fraud" Investigations (May 2, 2014); Memo to Juneau and Freeh re Investigations of Alleged / Potential "Fraud" (Oct. 6, 2014) [Doc 13496-5]; E-Mail to Juneau and Alltmont re FWA Rules Governing Appeals Process (Dec. 2, 2014); E-Mail to Dan Cantor et al re FWA Rules Governing Appeals Process (Dec. 2, 2014); E-mail to Juneau et al re Welker Letter (Feb. 2, 2015); E-Mail to Welker re BP Letter (Feb. 25, 2015); E-Mail to Freeh re Pot. "Fraud" Investigations re Claims with Alleged "Alternative Causation" (March 5, 2015) [with Class *Amicus* re Claim No.168243, E-Mail String with Dan Cantor et al (Feb. 26-28, 2015), and E-Mail to AppealsCoordinator et al (March 5, 2015) with BP 2014 Annual Report p.37]; E-Mail to Welker re Seafood Investigations re Lease of Vessel (March 11, 2015) [Welker Response (March 17, 2015)]; Memo to Welker re Subsistence and Other "Fraud" Investigations (March 12, 2015); E-Mail to Judge Shushan, et al re Subsistence and Other "Fraud" Investigations (March 14, 2015); Memo to Freeh re Communications from BP re Individual Claimants or Claims (March 12, 2015); E-Mail to Hron and Welker re IEL Claim Evaluation [Claimant No. ▇▇▇] (March 24, 2015); E-Mail to Welker re HUB Investigations [Claimant No. ▇▇▇] (March 25, 2015); E-Mail to Welker re HUB Investigations [▇▇▇] (March 27, 2015).]

## **Claiming Entity / Changes-in-Ownership / Multi-Facility Issues**

Class Counsel understand and appreciate the general approach by the Program as set forth in your April 1, 2015 e-mail.  In applying the terms of the Settlement and the Program's general approach to the BEL, Start-Up, Failed and/or Multi-Facility Claims of specific Claiming Entities, we think it's important to keep several points in mind:

- Section 1.2.1 only allows Claims to be filed by Entities that owned, operated or leased Facilities in the Gulf Coast Area (GCA) *during the Class Period* (*i.e.* April 20, 2010 through April 16, 2012).

- Both the Individual Release (Exhibit 26, Paragraph 2) and the Class Release (Section 10.1) extend not only to the Claiming Entity, but also to any and all of the Claiming Entity's *"predecessors"*, *"successors"*, *"corporate parents"*, and *"subsidiaries"*.

- Section 5.3.5, Section 38.135, and Exhibit 7 all refer to and focus on the *"operating history"* of a *"business"* – and not the formation, existence, or ownership of an "Entity".

- To the extent that the Program is directed by the Agreement or otherwise looks to the Claiming "Entity" – (as opposed to the *"business"* that may have been owned or operated by the Entity) – the Program should only be looking at the Entity itself, (and, to the extent

necessary and appropriate, any predecessor and/or successor Entities), and <u>not</u> the *owner* of the Claiming Entity (or Entities).

- There is absolutely nothing in the Settlement Agreement, (either the Class Definition, the definition of an Entity, the definition of a Start-Up Business, the definition of a Failed Business, Exhibit 4, Exhibit 5, Exhibit 6, or Exhibit 7), that defines a "business" or an "Entity" in terms of its Tax ID No. or EIN.

- To the extent that the Multi-Facility Framework (Exhibit 5) allows, and the Claiming Entity elects, to file a "consolidated" claim, the Claiming Entity is compensated based on all revenues of the entire Entity (if located solely within the GCA) or attributable to the entire GCA (if not), *irrespective* of what specific Facilities may have been bought or sold during the Benchmark and/or Compensation Period. This is *not* a "double payment" issue. Both BP and the PSC agreed to this, with the knowledge and understanding that additional Facilities could have either been purchased over the relevant time period (which would generally disfavor the Claimant on Causation and/or Compensation) or sold over that time period (which would generally favor the Claimant).

- It was certainly intended and contemplated that, if an Entity was transferred, merged, sold or otherwise converted into a successor Entity during the Benchmark or Class Period, the successor-in-interest would be able to submit a Claim based, in whole or in part, on the revenues, expenses and/or facilities of the predecessor-in-interest Entity. (Not only is this a basic feature of general corporate and business enterprise law, but BP secured express consideration for this by ensuring that the claims of both "predecessors" and "successors" would be released.)

- To the extent that the Program is going to require a Claim by the (subsidiary) Entity that directly owned or operated the Facility in question, (rather than allowing an Entity that owns and/or operates Facilities through wholly-owned subsidiaries to bring a Claim for those wholly-owned Facilities), that should only apply to the Entity that actually owned and/or operated the Facility during the Class Period (April 20, 2010 – April 16, 2012), (and not require a separate Claim by a predecessor Entity that may have existed and/or directly owned or operated the Facility in question during the pre-Class Benchmark Period).

- With respect to the sale of a business from one Entity to an unrelated Entity during the Benchmark Period, (and putting aside the fact that BP did not negotiate for or secure an agreement against alleged "double payments" generally), it is Class Counsel's recollection and understanding that BP was willing to assume the risk of two separate Claims based upon the same underlying Benchmark financials, because the selling Entity (unless it was located in Zone A or a Tourism business located in Zone B) would generally not have the 2011 revenues necessary to satisfy Causation, and therefore have no compensable Claim. In determining whether the purchasing Entity can utilize the business' pre-sale financials prepared by the selling Entity, we think the Program is correct to look at the nature and extent of the seller's operations, if any, after the sale, as opposed to the mere existence of a Tax ID No. or EIN.

- Hopefully, in at least some cases where a business might have been sold from one Entity to an unrelated Entity during the Class Period, some type of a reservation or assignment will make it clear that one Entity has the right to bring the Claim.

- There is an intentional and agreed-to distinction under Exhibit 5 between Multi-Facility Claimants not located wholly within the GCA that can, versus cannot, submit Contemporaneous P&Ls for each Facility. Particularly where the Claim is filed as a "consolidated" claim, the Program needs to undertake a lot more analysis regarding the revenues and expenses attributable to the GCA Facilities versus the revenues and expenses attributable to the non-GCA Facilities. (And, therefore, as set forth in the Agreement, where Contemporaneous Monthly Facility-specific P&Ls do not exist, the Additional Multi-Facility Business Documentation that exists is required to be submitted.) But where the Claiming Entity can submit Contemporaneous Monthly P&Ls for each of the individual Facilities (or Claiming Facilities) within the GCA, the need for P&Ls and other documentation regarding the non-GCA Facilities is greatly reduced. (And hence, no Additional Multi-Facility Business Documentation is required.)

- Exhibit 5 generally allows, but does not *require,* a Claimant to create "Contemporaneous" new separate P&Ls for each of its Facilities, (particularly non-GCA and/or non-Claiming Facilities).

- The Settlement Agreement, including particularly the Multi-Facility Framework (Exhibit 5), Sections 4.3.7, 4.3.8, 4.4.7, and the definition of "Contemporaneous" (Section 38.38), were specifically intended and agreed to provide the Claimant with optionality and opportunity to pursue the type of Claim that would maximize recovery, while at the same time minimizing the burden with respect to the submission of documentation necessary to reliably calculate the Claim or Claims.

[Previous Memos, E-Mails, and Example Claims regarding Claiming Entities and Multi-Facility Claims include: Memo to Claims Administrator re Multi-Facility Business Claims [Proposed Policy No. 490] (April 23, 2014); Memo to Claims Administrator re Claims by Related Owners, Officers and/or Entities [Proposed Policy Nos. 503, 363, 276, as well as Nos. 490, 328, 468] (May 14, 2014); Memo to Claims Administrator re Evaluation of Claimants with Changes in Ownership [Policy No. 354 v.4, as well as Nos. 490, 503] (June 5, 2014); E-Mail to M. Juneau re Shopping Center Claims (Jan. 19, 2015) [M. Juneau Response (Jan. 27, 2015)]; E-Mail to Sarah Warlick et al re Excluded Revenues / Claiming Entities [███] (Feb. 6, 2015); Letter from Shelton to DHECC (Feb. 23, 2015) [and E-Mail from Class Counsel to Juneau et al (Feb. 24, 2015)] ███ [Hron Response (March 2, 2015)]; E-Mails to M. Juneau and Forsyth re Claiming Entity / Multi-Facility Issues (March 7 and 17, 2015) ███ [M. Juneau Response (April 2, 2015)]; ███ Motion for Reconsideration (March 23, 2015); E-Mail re ███ ███ (March 25, 2015); E-Mail to M. Juneau and Forsyth re Claiming Entity / Multi-Facility Issues (March 25, 2015).]

## 495 Issues

Class Counsel understand that, under Policy 495, the Program Accountants have the discretion to make adjustments to revenues, even in the absence of a clear and objective "error", with respect to BEL Claims that are evaluated under the Average Variable Margin (AVM) Methodology and/or the traditional Exhibit 4C approach. And that, under Policy 495, the Program Accountants have the discretion to subject a BEL Claim to the AVM Methodology, or

to one of the four Specialized Frameworks, irrespective of whether it meets one of the "triggers". At the same time, however, there is nothing in the Fifth Circuit BEL Opinion, Judge Barbier's Orders, or Policy 495 which *requires* any specific BEL Claim to be evaluated under AVM or one of the Specialized Frameworks, when determined to be sufficiently matched, even if one or more of the "triggers" are met. Nor is there anything which *requires* the Program Accountants to move, smooth or otherwise re-allocate revenues in any AVM or traditional Exhibit 4C Claim. Therefore, the question remains: When *should* the Program Accountants subject a BEL Claim to AVM or one of the Specialized Frameworks? And when, if ever, *should* the Program Accountants make non-"error" revenue adjustments to an AVM or traditional Exhibit 4C Claim?

**1. The Program Accountants should only make revenue adjustments to the Contemporaneous P&Ls in the rarest and most exceptional of circumstances, if any.** Again, Class Counsel understand that the Program Accountants have discretion, under Policy 495, to correct clear and objective "errors" and to make other adjustments to revenues, even with respect to AVM or traditional Exhibit 4C Claims. But the statements, representations, and positions advanced by BP, its counsel, and its experts, during settlement negotiations, during the initial implementation and approval process, and from the time that they first raised the issue up until the BEL Panel ruled in October of 2013; the language used by the Fifth Circuit in the BEL Opinion; and the expert accounting and economic standards, literature and other authorities; all support the proposition that both the "corresponding variable expenses" issue in Exhibit 4C and the "matching" of expenses to revenues generally turn on the treatment and adjustment of *expenses,* not revenues.[6] Moreover, the potential effect of a revenue adjustment that might cause a business to fail the V-Test is complete Denial of the Claim; while, under Policy 495, the Program apparently has the authority to go back and re-evaluate Causation under Exhibit 4B after adjustments to revenues, the Claims Administrator, the Program Accountants, and other

---

[6] *See generally:* TRANSCRIPT (April 5, 2013) pp.23-24 (BP Counsel tells the Court that "accrual accounting is not required by the Agreement" and that BP has never sought to "smooth" revenues); LETTER FROM BP COUNSEL TO CLAIMS ADMINISTRATOR (Sept. 28, 2012) [Doc 8963-68]; LETTER FROM BP COUNSEL TO CLAIMS ADMINISTRATOR (Sept. 28, 2012) [Doc 8963-67]; Deepwater Horizon I, 732 F.3d 326, 337 (5th Cir. 2013) (the term "corresponding variable expenses" within part 2 of the Variable Profit definition "could be interpreted to mean that *the expenses to be subtracted* must be those that 'correspond' to the revenue earned and that the 'same time period' refers to the Benchmark period on the one hand, and to the Compensation period on the other, whichever is being calculated. In other words, sum the monthly revenue over the [Benchmark or Compensation] period and then subtract *corresponding expenses* over the same [Benchmark or Compensation] time period"); Deepwater Horizon I, 732 F.3d at 340 (rejecting, with respect to potential 'spikes' in revenues, BP's "primary concern" with "the uneven cash flows of certain types of businesses"); Deepwater Horizon I, 732 F.3d at 340 ("the Benchmark and Compensation periods were referring to months of the same name, *without any complex analysis of what type of business activities took place within those months*"); BRIEF OF *AMICI CURIAE* CERTIFIED PUBLIC ACCOUNTING SOCIETIES IN SUPPORT OF APPELLEES, No.13-30315 (June 24, 2013) [Fifth Cir. Doc. 00512285581]; FASB CONCEPTS STATEMENT 5, Recognition and Measurement in Financial Statements of Business Enterprises, paragraph 83(b); Con 6, Page 35, Footnote 56 references Concepts Statement 5 (Par. 83 and Footnote 50); SECURITIES AND EXCHANGE COMMISSION STAFF ACCOUNTING BULLETIN NO. 104 (SAB 104), Pages 10 and 1; KIESO, WEYGANDT & WARFIELD, *Intermediate Accounting* (14th Ed.), at p.60; DECLARATION OF DR. MARK KOHLBECK, CPA (Feb. 18, 2013) [Doc 8963-80], ¶10 ("Moving revenue properly recognized in one period under accrual-basis of accounting (GAAP) to another period (for example, in an effort to smooth earnings) is a form of earnings management and is considered unacceptable for financial reporting purposes by the accounting profession"); SUPPLEMENTAL DECLARATION OF ALLEN CARROLL (Feb. 18, 2013) [Doc 8963-87], ¶14 ("The matching approach that BP advocates is not matching in any sense recognized in the accounting world, but is merely an allocation formula that artificially moves revenue into months before or after it was earned based on variable expenses"); CLASS COUNSEL'S MASTER *AMICUS* TO THE APPEALS PANELISTS (July 16, 2014) [Doc 13496-6] pp.18-20; CLASS COUNSEL STATEMENT: REVENUE RECOGNITION (Nov. 21, 2013) [Doc 11885-2]; PANZECA DECLARATION (Feb. 18, 2013) [Doc 8963-85]; KOHLBECK DECLARATION (Feb. 18, 2013) [Doc 8963-80]; DECLARATION OF ALLEN CARROLL (Jan. 16, 2013) [Doc 8963-77]; ASHER DECLARATION (Jan. 15, 2013) [Doc 8963-78]; STUTES DECLARATION (Jan. 17, 2013) [Doc 8963-79]; SUPPLEMENTAL CARROLL DECLARATION (Feb. 18, 2013) [Doc 8963-87].

Vendors should be extremely reluctant to do so – as it is inconsistent with not only BP's prior representations and positions during the initial implementation and approval process,[7] but also the general obligation to view the Claim in a light most favorable under Sections 4.3.7 and 4.3.8. Therefore, the Program Accountants should rarely, if ever, move, smooth, or otherwise reallocate or adjust revenues under AVM or the traditional 4C approach.

**2. The Program Accountants should, at most, *either* make discreet revenue or expense *adjustments*, or apply the AVM or a Specialized Framework methodology, but not both.** In the event of isolated 'spikes' or year-end adjustments or other discreet revenues and/or expenses that might cause, or result from, or otherwise indicate a material "mis-matching" issue, the Program Accountants have the discretion to make adjustments to the Monthly P&Ls so that they are sufficiently matched. However, it makes little sense to then further subject the now-matched Claim to the AVM methodology. Which will artificially "un-match" revenues from expenses. The Program Accountants should either achieve sufficient matching by making discrete adjustments and then evaluating the Claim under the traditional 4C approach, or achieve sufficient matching by applying AVM or one of the four Specialized Frameworks, as applicable. But should rarely, if ever, do both.

**3. The Program Accountants should rarely, if ever, engage in any matching adjustments where the Claims are supported by true Accrual-based Monthly P&Ls.** Class Counsel understand from prior discussions, and from the Court's recent Denial of Reconsideration,[8] that some Claims which might appear to be "Accrual" are really Claims by businesses that that for the most part kept their books on a Cash Basis, and then "trued up" or otherwise adjusted the financials at year-end, or for tax filing purposes, or on some other periodic basis. However, where there are Claims that were, in fact, maintained on an Accrual Basis, monthly, in the ordinary course of business, and/or have monthly financials that were formally audited in accordance with GAAP, they are already deemed to be "sufficiently matched" under both the language and the logic of the Fifth Circuit BEL Opinion, BP Counsel's statements during the 495 development process, and the orders and opinions of Judge Barbier on the issue. Even when a true Accrual Claim hits one of the "triggers", it will rarely, if ever, cause, result from, or otherwise indicate a material "mis-matching" issue. These types of Claims should

---

[7] *See, e.g.,* LETTER FROM BP COUNSEL TO CLAIMS ADMINISTRATOR (Sept. 28, 2012) [Doc 8963-68] ("One of the cornerstones of the Settlement Agreement is the use of transparent, objective, data-driven methodologies designed to apply clearly-defined standards to a claimant's *contemporaneously-maintained financial data* submitted in compliance with documentation requirements. These methodologies and requirements were carefully negotiated by the parties and are set forth in the Settlement Agreement as mandatory requirements. Among other reasons, *these methodologies and requirements were negotiated in response to concerns voiced by some that the prior GCCF process was too dependent on accounting judgments that were not transparent.... The Settlement Agreement does not allow for the use of professional judgment or discretion as a substitute for expressly articulated standards or requirements....* The BEL framework expressly requires monthly profit and loss statements or alternate source documents establishing monthly revenues and expenses. These documents are essential to implementing the BEL frameworks' methodology of evaluating causation and damages based on *the actual monthly financial experience of claimants.... [U]se of allocated proxy rather than actual data could severely distort the resulting outcomes,* especially (but not limited to) in the tourism industry, which experiences substantial seasonal and monthly fluctuations in revenues and expenses"); LETTER FROM BP COUNSEL TO CLAIMS ADMINISTRATOR (Sept. 28, 2012) [Doc 8963-67] ("If the accurate financial data establish that the claimant satisfies the BEL causation requirement, then all losses calculated in accord with Exhibit 4C are presumed to be attributable to the Oil Spill").

[8] *See* ORDER DENYING CLASS COUNSEL MOTION FOR RECONSIDERATION OF ORDER ADOPTING POLICY 495 [Doc 14356] (March 31, 2015), at p.2.

almost always, if not always, be deemed sufficiently matched by the Program Accountants, and processed under the traditional 4C approach.

**4. When the Program makes adjustments in revenues, (and particularly when those revenue adjustments cause the Claim to fail the V-Test or alternative causation tests), the Program should tell the Claimant exactly what adjustments were made, and why.** We appreciate the Program's efforts to look into the feasibility of providing a "Denial Workbook" in this regard.

5. When the Program Accountants decide, in their professional judgment, that a "trigger" or other circumstance causes, results from, or otherwise evidences a material "mis-matching" issue, (as opposed to, perhaps, some other explanation), that warrants the subjection of the Claim to AVM or one of the four Specialized Frameworks, the Program should tell the Claimant why (beyond the "trigger" itself) the Program Accountants came to that determination.

[Previous Memos, E-Mails, and Example Claims regarding 495 Issues include: Class Counsel Statement: Revenue Recognition (Nov. 21, 2013) [Doc 11885-2]; Memo in Support of Motion to Alter or Amend (May 27, 2014) [Doc 12941-1]; Class Counsel's *Amicus* Submission: AVM is Correct Methodology for Real Estate Agent/Broker Cases (Jan. 13, 2015) [Claim No.177792 et al]; E-Mail to Hron re Moving Revenues under the AVM Methodology (Jan. 13, 2015); E-Mail to M. Juneau re Accrual Claims Issues (Jan. 16, 2015); E-Mail to M. Juneau re Requirement to Restate P&Ls (Jan. 23, 2015) [M. Juneau Response (Jan. 27, 2015)]; E-Mail from Tom Young to Juneau and M. Juneau re Vast Majority of Accrual P&Ls Sufficiently Matched? (Feb. 13, 2015); E-Mail to Juneau re Application of Professional Judgment to "Triggers" under 495 (Feb. 14, 2015); Class Counsel's Amicus Submission re the Use of Non-Benchmark P&Ls for Matching "Trigger" Testing [Claim No.187010 et al] (Feb. 26, 2015); E-Mail to Juneau and Black re Pre-AVM Adjustments to Revenues (March 9, 2015); E-Mail to Black and Hron re Denial Notices (April 1, 2015).]

### **"Moratoria Loss" Holds / Reviews**

There are essentially three issues relating to the Claims potentially subject to a "Moratoria Loss" Review:

  i.   The substantive issue of which Claims are subject to a "Moratoria Loss" Review.

  ii.  The procedural issue of whether and how a Claimant can challenge the determination that its Claim is subject to a "Moratoria Loss" Review.

  iii. The substantive guidance or policies to be utilized in undertaking an actual "Moratoria Loss" Review.

Taking the last issue first, we understand that the Claims Administrator is without authority to act, unless and until either (a) the Court were to grant Class Counsel's Motion to Authorize the Claims Administrator to Implement the Settlement Agreement with respect to Oil & Gas Support Services Claims,[9] or (b) Class Counsel and BP agree upon additional guidance or policy.

---

[9] *See* MOTION [Doc 11156] (Aug. 27, 2013), *and* REPLY BRIEF [Doc 11460-2] (Sept. 20, 2013).

In the meantime, however, we believe that there should be a way for a Claimant who is currently subject to a "Moratoria Hold" – and particularly a Claimant who did not use a NAICS Code flagged for review under Exhibit 19, but is nevertheless subject to the hold either because the Program has re-assigned the Claimant's NAICS Code to an Exhibit 19 Code or because the Program has determined that there is some other "indicia of a Moratoria Loss" – to attempt to seek further review or reconsideration based upon some additional information, clarification and/or documentation. Class Counsel drafted and submitted Proposed Rules for Challenging Determination that a Review for Potential "Moratoria Losses" is Required, but BP objected. Putting aside for the moment BP's objections to this proposed Program Appeal Process,[10] there is absolutely nothing in the Settlement Agreement that would prevent the Claims Administrator and the Program Vendors from establishing a determination, review, and reconsideration process, internal to the Settlement Program.[11]

Finally, with respect to the first issue, the Settlement Program is directed to conduct a review for "Moratoria Losses" in the event that – and *only* in the event that – **(a)** the BEL Claiming Entity or IEL Claiming Job Employer falls within the NAICS codes and descriptions marked with an "x" in Section I of "Industry Types Subject to Review by Claims Administrator for Potential Moratoria Losses" in Exhibit 19; or **(b)** (i) the BEL Claiming Entity or IEL Claiming Job Employer falls within the NAICS codes and descriptions marked with an "x" in Section II of "Industry Types Subject to Review by Claims Administrator for Potential Moratoria Losses" in Exhibit 19, and (ii) the BEL Claimant or IEL Employer responds affirmatively that, in 2009, the business provided significant services, goods and/or supplies to businesses in the offshore oil & gas industry in the Gulf of Mexico. No other BEL or IEL Claimant is subject to any type of hold, review, or potential exclusion of "Moratoria Losses" under the Settlement Agreement.[12]

[Previous Memos, E-Mails, and Example Claims regarding "Moratoria Loss" Hold / Review issues include: E-Mail to Juneau and Black re Moratorium Holds (Oct. 2, 2014); E-Mail to Black re Moratorium Holds (Oct. 17, 2014); E-Mail to Hron re Moratoria Holds (Nov. 7, 2014) [Claim No. ███████; E-Mail to M. Juneau re Moratorium Holds (Nov. 25, 2014) [M. Juneau Response (Dec. 2, 2014)]; Proposed Rules for Challenging Determination that a Review for Potential "Moratoria Losses" is Required (Dec. 27, 2014); E-Mail to Hron re Moratoria Loss Reviews (Jan. 15, 2015) [███████]; E-Mail to M. Juneau re Claims on Hold Due to Determination of Required Moratoria Loss Review (Jan. 18, 2015); Memo to Claims Administrator re Businesses Subject to Moratoria Loss Review (Jan. 17, 2015); E-Mail to M. Juneau re Claims on Hold Due to Determination of Required Moratoria Loss Review (Jan. 18, 2015).]

---

[10] *See, e.g.,* SETTLEMENT AGREEMENT, Section 6.3 and Exhibit 25, ¶5; (*see also* ¶3(B)).

[11] *See, e.g.,* SETTLEMENT AGREEMENT, Sections 4.3.1, 4.3.7, 4.4.7 and 6.1.

[12] *See generally* MEMO TO CLAIMS ADMINISTRATOR RE BUSINESSES SUBJECT TO MORATORIA LOSS REVIEW (Jan. 17, 2015).

**Real Estate Developer Definition / Exclusion**

      Class Counsel, BP and the Claims Administrator spent months and months to come to a final agreement on the definition of a "Real Estate Developer" for purposes of exclusion under Section 2.2.4.7. Specifically, a so-called "1% Rule" approach, that would have the effect of excluding an Entity based on *any* real estate developer revenues or other activities, was explicitly rejected.[13] Rather, the Parties agreed that the Settlement Program would focus on whether "the entity was *sufficiently engaged* in Real Estate Development Activity[14] *during 2010* such that it may *reasonably be characterized* as a Real Estate Developer."[15]

[Previous Memos and E-Mails regarding the Real Estate Developer Exclusion include: Class Counsel's *Amicus* Submission Regarding the Proper Interpretation and Application of the Real Estate Developer Exclusion (March 9, 2015) [Claim No.58415 et al]; E-Mail to Juneau re Real Estate Developer Exclusion (Aug. 30, 2013); E-Mail to Juneau re Real Estate Developer Exclusion (Oct. 8, 2013)]

---

[13] *See generally* CLASS COUNSEL'S AMICUS SUBMISSION REGARDING THE PROPER INTERPRETATION AND APPLICATION OF THE REAL ESTATE DEVELOPER EXCLUSION (March 9, 2015).

[14] Real Estate Developer Activity is defined in the Settlement Agreement in terms of developing "an entire subdivision of real Property, including condominiums with multiple units" – *i.e.* acquisition of raw land, planning, obtaining government permits, subdividing lots, construction of access roads, installation of utilities, landscaping, and drainage – *as distinguished from* construction companies, homebuilders, general contractors, condo associations, hotel operators, and/or property management companies.

[15] Policy No. 468, Section II(c).