```
08:06:35   1                    UNITED STATES DISTRICT COURT
           2                    EASTERN DISTRICT OF LOUISIANA
              *****************************************************************
           3
              IN RE:  OIL SPILL BY THE            Docket No. MDL-2179
           4  OIL RIG DEEPWATER HORIZON           Section "J"
              IN THE GULF OF MEXICO ON            New Orleans, LA
           5  APRIL 20, 2010                      Thursday, January 22, 2015
              CIVIL
           6
              *****************************************************************
           7  THIS DOCUMENT RELATES TO:
           8  UNITED STATES OF AMERICA
                                                  Docket No. 10-CV-4536
           9  V.                                  Section "J"
          10  BP EXPLORATION & PRODUCTION,
              INC., ET AL
          11  *****************************************************************
          12                 TRANSCRIPT OF TRIAL PROCEEDINGS
                       HEARD BEFORE THE HONORABLE CARL J. BARBIER
          13                 UNITED STATES DISTRICT JUDGE
                                VOLUME III, MORNING SESSION
          14
          15  APPEARANCES:
          16  FOR THE UNITED STATES
              OF AMERICA:                 U.S. DEPARTMENT OF JUSTICE
          17                              ENVIRONMENTAL ENFORCEMENT SECTION
                                          BY:  SARAH HIMMELHOCH, ESQ.
          18                                   STEVE O'ROURKE, ESQ.
                                               ABIGAIL ANDRE, ESQ.
          19                                   PATRICK CASEY, ESQ.
                                               NANCY FLICKINGER, ESQ.
          20                                   RICHARD GLADSTEIN, ESQ.
                                               MICHAEL ZEVENBERGEN, ESQ.
          21                                   A. NATHANIEL CHAKERES, ESQ.
                                               DANIELLE FIDLER, ESQ.
          22                                   RACHEL HANKEY, ESQ.
                                               JUDITH HARVEY, ESQ.
          23                                   RACHEL KING, ESQ.
                                               BRANDON ROBERS, ESQ.
          24                                   ERICA PENCAK, ESQ.
                                               GORDON YOUNG, ESQ.
          25                              P.O. Box 7611
                                          Washington, DC 20044
```

OFFICIAL TRANSCRIPT

```
 1

 2                                  U.S. DEPARTMENT OF JUSTICE
                                    TORTS BRANCH, CIVIL DIVISION
 3                                  BY:  SHARON SHUTLER, ESQ.
                                         MALINDA LAWRENCE, ESQ.
 4                                       LAURA MAYBERRY, ESQ.
                                    P.O. Box 14271
 5                                  Washington, D.C. 20004

 6
     FOR BP AMERICA INC., BP
 7   AMERICA PRODUCTION COMPANY,
     BP COMPANY NORTH AMERICA,
 8   INC., BP CORPORATION NORTH
     AMERICA, INC., BP EXPLORATION &
 9   PRODUCTION INC., BP HOLDINGS
     NORTH AMERICA LIMITED, BP
10   PRODUCTS NORTH AMERICA INC.:   KIRKLAND & ELLIS
                                    BY:  J. ANDREW LANGAN, ESQ.
11                                       MATTHEW T. REGAN, ESQ.
                                         HARIKLIA KARIS, ESQ.
12                                       MARK J. NOMELLINI, ESQ.
                                         A. KATRINE JAKOLA, ESQ.
13                                  300 N. LaSalle
                                    Chicago, IL 60654
14

15                                  KIRKLAND & ELLIS
                                    BY:  ROBERT C. "MIKE" BROCK, ESQ.
16                                       KIMBERLY BRANSCOME, ESQ.
                                    655 Fifteenth St., N.W.
17                                  Washington, D.C. 20005

18
                                    LISKOW & LEWIS
19                                  BY:  R. KEITH JARRETT, ESQ.
                                    One Shell Square
20                                  701 Poydras St., Suite 5000
                                    New Orleans, LA 70139
21

22   FOR ANADARKO PETROLEUM
     CORPORATION, ANADARKO E&P
23   COMPANY, LP:                   BINGHAM McCUTCHEN
                                    BY:  KY E. KIRBY, ESQ.
24                                       THOMAS R. LOTTERMAN, ESQ.
                                    2020 K Street, N.W.
25                                  Washington, D.C. 20006
```

OFFICIAL TRANSCRIPT

```
 1                                MORGAN LEWIS & BOCKIUS
 2                                BY:  JAMES J. DRAGNA, ESQ.
                                  355 South Grand Ave, Suite 4400
 3                                Los Angeles, CA 90071

 4
     FOR THE STATE OF LOUISIANA:  KANNER & WHITELEY
 5                                BY:  ALLAN KANNER, ESQ.
                                       DOUGLAS R. KRAUS, ESQ.
 6                                     SUSANNAH McKINNEY, ESQ.
                                       CYNTHIA ST. AMANT, ESQ.
 7                                701 Camp St.
                                  New Orleans, LA 70130
 8

 9

10   OFFICIAL COURT REPORTER:     Karen A. Ibos, CCR, RPR, CRR, RMR
                                  500 Poydras Street, Box 2-13
11                                New Orleans, LA 70130
                                  (504) 589-7776
12

13        Proceedings recorded by mechanical stenography, transcript
     produced by computer.
14

15

16

17

18

19

20

21

22

23

24

25
```

OFFICIAL TRANSCRIPT

1                           I N D E X

2

3    WITNESSES FOR THE GOVERNMENT:                 PAGE/LINE:

4

5    VIDEO CLIP OF ROGER R. LAFERRIERE            687/20

6

7

8    CHARLES MASON

9

10     Voir Dire Examination by Ms. King          690/5

11     Direct Examination by Ms. King             694/2

12     Cross-Examination by Mr. Jarrett           729/22

13     Cross-Examination by Ms. Kirby             788/11

14     Redirect Examination by Ms. King           803/23

15

16

17

18

19

20

21

22

23

24

25

P R O C E E D I N G S

(THURSDAY, JANUARY 22, 2015)

(MORNING SESSION)

08:06:35    (OPEN COURT.)

08:06:35        THE COURT:  Good morning, everyone.  All right.  Before we

08:06:43    begin, let me just announce the time that has been used by the

08:06:49    parties.  United States has used seven hours, 57 minutes; has

08:06:56    37 hours, three minutes remaining.  BP Anadarko have used seven

08:07:02    hours, 46 minutes, and have 37 hours, 14 minutes remaining.

08:07:09        One more thing while I'm thinking about it.  Today,

08:07:13    regardless of where we are in the testimony of whatever witness is

08:07:15    on the stand, I have to break at 11:50, and we will break from 11:50

08:07:21    to 1 o'clock.  I have an en banc meeting to attend at noon.  So just

08:07:26    heads up on that.

08:07:28        Somebody made a request for -- Ms. Himmelhoch, I think

08:07:38    it's you, right?

08:07:39        MS. HIMMELHOCH:  Yes, I requested we have our morning

08:07:41    break a little early, between the direct and cross of Dr. Mason, for

08:07:48    physical reasons.

08:07:50        THE COURT:  Okay.  We can probably accommodate that.

08:07:52        MS. HIMMELHOCH:  Thank you, your Honor.

08:07:54        We have a couple of document admission procedures to go

08:07:58    through.

08:07:58        THE COURT:  Okay.

08:08:04  1          MR. ROBERS:  Good morning, your Honor.  Brandon Robers for

08:08:05  2   the United States.

08:08:06  3          THE COURT:  Good morning.

08:08:07  4          MR. ROBERS:  I have here two lists that have been

08:08:09  5   circulated to the parties.  The first is documents used and offered

08:08:13  6   in connection with the testimony of Dr. Richard Clapp, and the

08:08:17  7   second is documents offered in connection with the examination of

08:08:21  8   Rear Admiral Meredith Austin.

08:08:24  9          THE COURT:  Okay.  Are there any objections?

08:08:26  10         MS. KARIS:  Not to those, your Honor.

08:08:28  11         MR. LOTTERMAN:  No, your Honor.

08:08:29  12         THE COURT:  All right, fine.  So those are admitted

08:08:32  13  without objection.

08:08:37  14         MS. KARIS:  Hariklia Karis for BP.  We have circulated

08:08:43  15  lists of exhibits for Meredith Austin as well as for Dr. Diane

08:08:48  16  Austin, and we would move for the admission of those documents at

08:08:51  17  this time.

08:08:51  18         THE COURT:  All right.  Any objection from the government

08:08:52  19  on those?

08:08:53  20         MR. ROBERS:  None, your Honor.

08:08:54  21         THE COURT:  All right.  Without objection, those are

08:08:56  22  admitted.

08:08:57  23         MS. KARIS:  Thank you.

08:08:57  24         THE COURT:  Sure.  All right, any other preliminary

08:09:04  25  matters before we resume testimony?  Apparently not.

08:09:09  1          MS. HIMMELHOCH:  Good morning, your Honor, Sarah

08:09:11  2   Himmelhoch for the United States.  We will begin with a ten-minute

08:09:14  3   video deposition of Captain Laferriere, and then we will proceed

08:09:19  4   with our witnesses.  We will have two other short videos before

08:09:22  5   that.

08:09:22  6          Before we begin, I just want to make a note.  We've seen a

08:09:25  7   couple of the fact witnesses in the hallway and we just wanted to

08:09:29  8   confirm the understanding that sequestration is in place as it was

08:09:32  9   in the other phases.  We did sequester witness and we just want to

08:09:37  10  confirm.

08:09:38  11         THE COURT:  Fine with me.  I don't think we actually

08:09:40  12  stated that on the record, but does everyone understand that?

08:09:43  13         MR. BROCK:  Our fact witnesses have not been here and will

08:09:46  14  not be in the courtroom.

08:09:48  15         THE COURT:  Let's just make sure everybody understands:

08:09:49  16  You keep your fact witnesses outside of the courtroom until they're

08:09:52  17  called to testify.  Okay.

08:09:54  18         MS. HIMMELHOCH:  Thank you, your Honor.

08:09:55  19         THE COURT:  All right.  Sure.  Okay.

08:10:00  20     (WHEREUPON, THE VIDEO DEPOSITION OF ROGER R. LAFERRIERE WAS

08:10:07  21        PLAYED.)

08:10:07  22         THE COURT:  Just a minute.

08:10:30  23     (VIDEO PAUSED.)

08:10:32  24         THE COURT:  Go ahead and start it over since I interrupted

08:10:34  25  you.

08:10:36  1          (VIDEO RESUMED.)

08:22:40  2               THE COURT:  Stop this for one second.

08:22:43  3          (VIDEO PAUSED.)

08:22:43  4               MS. HIMMELHOCH:  Your Honor, that was the last repeat and

08:22:45  5     I do apologize for that.

08:22:46  6               THE COURT:  There are two or three places where you're

08:22:49  7     just repeating the same testimony.

08:22:50  8               MS. HIMMELHOCH:  It was twice and I don't understand why

08:22:52  9     that happened.  It will not happen on the other clips, I promise.

08:22:56 10               THE COURT:  All right.  Thank you.  Let's proceed.

08:23:06 11               MS. HIMMELHOCH:  We're almost done.

08:23:19 12               Your Honor, we'll stop at this point, your Honor.  Go

08:23:22 13     ahead and pull down the rest of the video.

08:23:25 14               I apologize for those technical difficulties.

08:23:29 15               THE COURT:  You're going to submit a written transcript;

08:23:32 16     isn't that what we did last time, too?

08:23:33 17               MS. HIMMELHOCH:  Yes.

08:23:34 18               THE COURT:  Just make sure you correct the transcript for

08:23:36 19     what was played.

08:23:37 20               MR. BROCK:  That won't be a problem.

08:23:39 21               THE COURT:  All right.  What's next, Ms. Himmelhoch?

08:23:46 22               MS. HIMMELHOCH:  Ms. King, will handle the next witness,

08:23:52 23     your Honor.

08:23:52 24               THE COURT:  Stephanie, let's turn the lights back on.

08:24:04 25               Next witness is who?

08:24:06   1          MS. KING:  United States calls Dr. Charles Mason to the

08:24:10   2   stand.

08:24:14   3          THE DEPUTY CLERK:  Raise your right hand.

08:24:16   4       (WHEREUPON, CHARLES F. MASON, WAS SWORN IN AND TESTIFIED AS

08:24:19   5       FOLLOWS:)

08:24:19   6          THE DEPUTY CLERK:  Take a seat.  If you'll state and spell

08:24:21   7   your name for the record.

08:24:33   8          THE COURT:  There is a motion with regard to this witness,

08:24:42   9   which, as I read it, is a little different than the other motions.

08:24:45  10          MR. JARRETT:  Good morning, your Honor.  Keith Jarrett for

08:24:48  11   BP.

08:24:48  12          Yes, your Honor, this is not a Daubert motion.  We don't

08:24:51  13   dispute the witness's qualifications.

08:24:53  14          THE COURT:  The motion apparently is arguing that his

08:24:57  15   Round 3 report is not really a rebuttal report.  Is that the issue?

08:25:02  16          MR. JARRETT:  That's the issue, your Honor.

08:25:05  17          THE COURT:  I read his report and I read the motions and

08:25:07  18   briefings.  He says he is responding to something, some argument

08:25:14  19   that Dr. Scott made in his Round 2 opinion.  I haven't read --

08:25:19  20   frankly, I haven't read Dr. Scott's report yet.  So I can't tell for

08:25:24  21   sure if he's really responding.  But, you know, again, since this is

08:25:28  22   a bench trial, I think I'll just let him testify; and after I hear

08:25:32  23   Dr. Scott or read his reports, you know, if I agree with you, I'll

08:25:38  24   just disregard whatever he says about that, okay.

08:25:41  25          MR. JARRETT:  Understood, your Honor.  Thank you.

08:25:42  1                THE COURT:  All right.  Thank you.

08:25:48  2                MS. KING:  Rachel King for the United States.

08:25:51  3                THE COURT:  Sure.

08:25:52  4                          VOIR DIRE EXAMINATION

08:25:53  5    BY MS. KING:

08:25:53  6    Q.  Good morning, Dr. Mason.  Please state your full name for the

08:25:55  7    Court.

08:25:55  8    A.  My name is Charles Frederick Mason, C-H-A-R-L-E-S,

08:26:01  9    F-R-E-D-E-R-I-C-K, M-A-S-O-N.

08:26:06 10    Q.  You've been hired as an expert for the United States?

08:26:08 11    A.  That's correct.

08:26:09 12    Q.  What questions were you asked to answer, Dr. Mason?

08:26:11 13    A.  I was asked to provide a qualitative assessment of the

08:26:17 14    magnitude of economic harm associated with the oil spill.  I was

08:26:19 15    asked -- I was asked to assess the role of BP -- BPXP and Anadarko

08:26:26 16    in the Gulf of Mexico economy and the U.S. economy, generally.  And

08:26:33 17    I was asked to respond -- to read, analyze, and respond to input

08:26:39 18    that was received from BP expert Loren Scott and from Anadarko

08:26:44 19    expert Dr. David Sunding during their Round 1 reports.

08:26:49 20    Q.  Dr. Mason, have you prepared a summary of your educational and

08:26:53 21    work experience?

08:26:53 22    A.  Yes, I have.

08:26:54 23    Q.  Please pull up Demonstrative 33503.  Dr. Mason, please describe

08:27:01 24    your educational background.

08:27:03 25    A.  I have a double bachelors degree in mathematics and economics

08:27:08  1    from the University of California Berkeley.  I have a Ph.D. in

08:27:11  2    economics also from the University of California at Berkeley.

08:27:15  3    Q.  What's your current profession?

08:27:17  4    A.  I am a professor of economics at the University of Wyoming

08:27:21  5    where I hold the H.A. True chair in oil and gas economics.

08:27:25  6    Q.  As an economics professor, do you publish articles in

08:27:29  7    peer-reviewed economics journals?

08:27:31  8    A.  Yes, I do.  I have over 60 publications in peer-reviewed

08:27:34  9    journals.  Two are listed here as examples that I believe to be

08:27:39 10    relevant to the material in this case.  One is an analysis, kind of

08:27:46 11    a variety of vignettes that occurred in the oil industry over the

08:27:51 12    course of its history.  The other is an analysis of a matter in

08:27:56 13    which individuals might be anticipated to make decisions in

08:28:00 14    environments where there is some risk, particularly kind of

08:28:06 15    pertaining to some sort of a catastrophe.

08:28:09 16    Q.  Dr. Mason, what do you consider your expertise to be as it

08:28:12 17    relates to the work you did in this case?

08:28:13 18    A.  So my expertise is resource economics generally, which embodies

08:28:19 19    oil and gas economics, industrial organization, and applied

08:28:26 20    econometrics.

08:28:28 21    Q.  What is econometrics?

08:28:29 22    A.  Econometrics is the use of statistical techniques to analyze

08:28:34 23    economic phenomena.

08:28:34 24    Q.  What is industrial organization?

08:28:36 25    A.  Industrial organization is the analysis of strategic

08:28:39  1    interactions -- strategic interactions amongst firms and

08:28:43  2    corporations.

08:28:44  3    Q.  Do you have peer-reviewed publications in these areas of

08:28:47  4    expertise?

08:28:48  5    A.  I do.  The two I discussed a moment ago would be examples

08:28:52  6    thereof.

08:28:52  7    Q.  Have you taught courses in these areas of expertise?

08:28:55  8    A.  Yes.  Every spring I teach a class in oil -- an undergraduate

08:28:59  9    class in oil and economics.  For the past several years, in the

08:29:03 10    fall, I taught an undergraduate class in industrial organization.

08:29:07 11    Earlier in my career, I regularly taught graduate industrial

08:29:10 12    organization and graduate econometrics.

08:29:12 13    Q.  Are you involved in managing any peer-reviewed journals in the

08:29:16 14    field of economics?

08:29:17 15    A.  I am.  I have a long relationship with the Journal of

08:29:24 16    Environmental Economics and Management, was -- served as the

08:29:28 17    managing editor for five years, from 2006 to 2011.  That's the

08:29:33 18    leading international field journal for environmental and natural

08:29:35 19    resource economics.  And presently, I am one of the three

08:29:40 20    editors-in-chief of Strategic Behavior in the Environment.

08:29:44 21    Q.  Does the field of resource economics include oil and gas

08:29:47 22    economics?

08:29:48 23    A.  Yes, it does.

08:29:49 24    Q.  Do you have any other experience that's relevant to the work

08:29:53 25    you did in this case?

08:29:54  1   A.  I have some consulting experience I think that's relevant.

08:29:57  2   Earlier in my career, I served -- assisted one of my senior

08:30:02  3   colleagues at the University of Wyoming in a minor damages suit in

08:30:07  4   Colorado.  More recently, I worked as a consultant, as an expert for

08:30:12  5   an individual who had suffered damages in the course of development

08:30:17  6   that the City of Cheyenne had undertaken near her property.

08:30:22  7   Q.  Please pull up Demonstrative 33539.  Dr. Mason, is this the

08:30:28  8   first page of your curriculum vitae?

08:30:30  9   A.  Yes, it is.

08:30:30  10  Q.  And does this CV accurately summarize your qualifications and

08:30:35  11  publications?

08:30:36  12  A.  Yes, I think it does.

08:30:37  13  Q.  And this is part of your initial expert report, correct?

08:30:40  14  A.  Correct.

08:30:42  15        MS. KING:  Your Honor, at this time I tender Dr. Charles

08:30:44  16  Mason as an expert in economics, including oil and gas economics,

08:30:49  17  industrial organization, and econometrics.

08:30:52  18        THE COURT:  All right.  Any questions on qualifications?

08:30:54  19        MR. JARRETT:  None, your Honor.

08:30:55  20        THE COURT:  All right.  Thank you.  He is accepted.

08:30:58  21        MS. KING:  Thank you.

08:31:00  22        THE COURT:  Ms. Kirby, do you have any questions?

08:31:03  23        MS. KIRBY:  No objection.

08:31:04  24        THE COURT:  I thought I saw you trying to half stand up

08:31:06  25  there.

08:31:08  1                      DIRECT EXAMINATION

08:31:08  2    BY MS. KING:

08:31:08  3    Q.  Please call up Demonstrative 33538.  Dr. Mason, are these three

08:31:16  4    documents, TREX 13318, TREX 13317, and TREX 13319 your three expert

08:31:26  5    reports in this case?

08:31:27  6    A.  Yes, they are.

08:31:30  7    Q.  And do these three reports accurately summarize your opinions

08:31:33  8    in this matter and the basis for those opinions?

08:31:36  9    A.  Yes, they do.

08:31:37 10    Q.  Dr. Mason, do you adopt the entirety of these three reports as

08:31:41 11    your testimony here today?

08:31:44 12    A.  Yes, I do.

08:31:45 13    Q.  Let's move to the first opinion that you mentioned you were

08:31:47 14    asked to address.  You were asked -- you said you were asked to

08:31:52 15    analyze the magnitude of economic harm resulting from the oil spill.

08:31:55 16    Did you reach an opinion on that question?

08:31:57 17    A.  Yes, I did.  My opinion, the economic harm from the oil spill

08:32:02 18    was severe.

08:32:02 19    Q.  Please pull up Demonstrative 33530.  Why do you conclude that

08:32:09 20    the economic harm due to the oil spill was severe?

08:32:12 21    A.  My conclusion stems from the claims payments that were made

08:32:16 22    through the claims regimes, comprising four reads, if you like:

08:32:22 23    First, the amount of the payments, the magnitude, the $10 billion.

08:32:26 24    Quite a large amount, claims paid representing here an estimate of

08:32:31 25    losses of income, profits, property value, and so on.  These all are

08:32:36  1    measures valid -- economic -- measures of economic harm.

08:32:39  2            Second, the claim payments, aside from being large in

08:32:45  3    kind of absolute magnitude, they're large in comparison to personal

08:32:48  4    income in the Gulf states.  For instance, as noted by Dr. Scott in

08:32:52  5    his Round 1 report.  And then, lastly, this analysis that I

08:32:58  6    undertook that we're talking about here was focused on a subset of

08:33:02  7    the possible harm, so these claims reflect a subset of harms.

08:33:08  8            Second, the geographic scope of harm.  Many counties,

08:33:13  9    scores of counties across the five state Gulf Coast region --

08:33:16 10            THE COURT:  We don't have counties here.

08:33:18 11            THE WITNESS:  And parishes, excuse me.  Counties or

08:33:20 12    parishes.  Point taken.  In my state we have counties.

08:33:28 13            Third, the number of claimants.  Over half a million

08:33:32 14    claimants have received payments -- had received payments as of

08:33:37 15    July 2014.

08:33:37 16            Finally, the variety of range of industries that were

08:33:41 17    impacted.

08:33:43 18    BY MS. KING:

08:33:43 19    Q.  Dr. Mason, did you prepare a slide illustrating your first

08:33:47 20    point regarding the amount of payments?

08:33:48 21    A.  Yes, I did.

08:33:49 22    Q.  Please pull up Demonstrative 33504.  What does this pie chart

08:33:55 23    depict?

08:33:55 24    A.  This pie chart is showing the claims payments from each of the

08:34:01 25    three payment regimes.  First, the BP claims program, which paid out

08:34:07  1    on the order of $400 million; second, the Gulf Coast Claims

08:34:12  2    Facility, individual and business claims, which paid out about

08:34:16  3    $6.3 billion; and most recently, the settlement program for economic

08:34:20  4    property claims, which paid out about $3.7 billion as of the time at

08:34:27  5    which I put this report together.

08:34:29  6           And I would like to note here that this last segment here,

08:34:33  7    this is excluding certain kinds of claims; particularly, Vessels of

08:34:38  8    Opportunity and medical claim payments.  Totalling up here to

08:34:46  9    $10.4 billion.

08:34:46 10    Q.  Do you consider that total to be a precise estimate?

08:34:49 11    A.  Certainly not.  This was meant to be a rough appraisal of the

08:34:52 12    magnitude of harm.  In light of the fact that I was asked to give a

08:34:56 13    qualitative appraisal, I saw no point in coming up with a precise

08:35:01 14    estimate.  This is a big number.

08:35:03 15    Q.  Did you prepare a demonstrative illustrating your second point

08:35:07 16    regarding the geographic scope of claim payments?

08:35:09 17    A.  Yes, I did.

08:35:10 18    Q.  Can you pull up Demonstrative 33512.  What is the significance

08:35:15 19    of this map, Dr. Mason?

08:35:16 20    A.  So this map here is showing, for all of the counties in

08:35:21 21    Louisiana and Mississippi, Alabama, Florida, and several counties in

08:35:25 22    Texas, the magnitude of claim payments, color coded - lighter

08:35:29 23    counties, smaller payments; darker counties, larger payments.  The

08:35:35 24    counties in red representing the counties or parishes where the

08:35:38 25    payments exceeded $100 million.

08:35:40  1              And I think it's noteworthy here that the bulk of the

08:35:47  2    damage assessed by these claims payments located along the Gulf; all

08:35:50  3    the dark red counties tend to be clustered on the coast, the dark

08:35:56  4    orange counties by and large, as well.

08:35:59  5    Q.  Does this map include all of the claims paid?

08:36:01  6    A.  It does not include -- well, this is just for the Gulf Coast

08:36:04  7    claims facility here, so it doesn't include the other claims

08:36:08  8    programs.  Though, I think it's worth noting here that this is a

08:36:12  9    fair representation; particularly, in light of the fact that GCCF

08:36:18 10    payments were the largest chunk of the three slices in that

08:36:21 11    preceding pie chart we showed.

08:36:23 12    Q.  Dr. Mason, regarding your opinion that a wide variety of

08:36:27 13    industries were impacted, what information did you rely upon in

08:36:32 14    forming that opinion?

08:36:33 15    A.  Right.  So there is a documentation coming from the court

08:36:38 16    sponsored settlement program that itemizes the categories of

08:36:42 17    payments of claims types.

08:36:44 18    Q.  Please pull up Demonstrative 33514.  Are these the categories

08:36:49 19    of claim types you were referring to?

08:36:52 20    A.  Yes, they are.

08:36:52 21    Q.  Why, if at all, is it economically significant that there were

08:36:57 22    a variety of claims payments, for instance, under the settlement

08:37:01 23    program?

08:37:01 24    A.  So the -- excuse me.  The list here embodies a wide range of

08:37:08 25    types, running from individuals through to businesses, in a range of

08:37:17  1    different kinds of economic activities, incorporating, as well,

08:37:23  2    property loss and that sort of thing.  The numbers to the right

08:37:29  3    here, generally, from largest to smallest as you run down.  Business

08:37:35  4    Economic Loss here being the largest of these.

08:37:39  5         And so the point I would make in relation to this, you

08:37:44  6    can think of -- think of an individual, for -- let's say, that

08:37:49  7    suffered some loss.  Maybe it's -- it had a downfall in its profits.

08:37:56  8    It has to dial back its operations a little bit.  It lays off one of

08:38:00  9    its workers.  Worker's income now has been reduced, maybe to zero.

08:38:07  10   Their family has to cut back on the kinds of expenditures they

08:38:10  11   undertake, maybe they don't go out to eat very much anymore.  That

08:38:15  12   means the expenditures that they might otherwise have made in a

08:38:18  13   local restaurant, let's say, those get reduced.  So the restaurant

08:38:21  14   has a reduction in its income, its profits, and maybe there's going

08:38:25  15   to be some sort of knock-off effect for its employees.

08:38:28  16        So you can kind of see how these ripple effects, and from

08:38:32  17   the primary effect of the first firm having problems stems out into

08:38:35  18   a variety of different -- to impacting a variety of different

08:38:39  19   people.

08:38:40  20        Now, imagine that there are many firms in many lines of

08:38:45  21   business in many counties and parishes all across the Gulf, all of

08:38:49  22   them generating these sorts of ripple effects.  All of these ripple

08:38:54  23   effects are kind of interacting, stemming out through the whole of

08:38:58  24   the economy.  You can see how this is going to reach out into the

08:39:01  25   fabric of the entire Gulf Coast region and economy.

08:39:03  1    Q.  Dr. Mason, are the data regarding claims payments reliable for

08:39:07  2    purposes of evaluating the severity of economic harm?

08:39:12  3    A.  For my purposes, the kind of providing the general qualitative

08:39:18  4    appraisal, I believe they are.

08:39:20  5    Q.  Please pull up Demonstrative 33537.  Why is it your opinion

08:39:26  6    that the payments are reliable for the purpose of determining

08:39:30  7    whether economic harm was severe?

08:39:31  8    A.  There are four points to be made here.  First, the nature of

08:39:37  9    the claims payment mechanisms.  They, typically, would be based on

08:39:43  10   or built up from an assessment of harm an individual suffered by

08:39:48  11   comparing current profits or income to profits or income in a period

08:39:54  12   right before the spill.  This is consistent with a technique that is

08:40:00  13   widely used in economics.  I want to assess the effect of some

08:40:03  14   particular event, like an oil spill, what I would like to do is

08:40:07  15   compare the level -- the observed level of income or profits with a

08:40:11  16   level of income or profits I might believe would have obtained had

08:40:15  17   the spill not occurred.

08:40:17  18        Absent some sort -- some other sort of information upon

08:40:21  19   which to base that prediction about the hypothetical, what profits

08:40:26  20   or income may have been like, a reasonable place to look is the

08:40:30  21   level of income or profits right before the spill.  And that's the

08:40:33  22   technique that was used in these benchmark methods.

08:40:36  23        Secondly, in order to effect this claim, the individual

08:40:41  24   would be required to bring documentation.  So you would have, you

08:40:44  25   know, you'd know what the profits or income was at the point at

08:40:48  1    which the claim is filed.  You would know what they were in the

08:40:51  2    preceding period.  This documentation was evaluated by trained

08:40:55  3    assessors, so it went through this vetting process.  This sort of

08:41:00  4    vetting process, thinking about the details in the documentation, so

08:41:05  5    forth, is, at least, at the same level of rigor as in the typical

08:41:09  6    economic data set, maybe more rigorous than some.

08:41:15  7    Q.  And can you provide an example of the documentation

08:41:19  8    requirement?

08:41:19  9    A.  So for an individual they might -- they might bring pay stubs

08:41:25 10    from before and after the spill.  They might have photographic

08:41:28 11    evidence.  Maybe it's about -- maybe it's real estate property; a

08:41:32 12    picture before the spill, a picture after the spill.  For a firm, it

08:41:36 13    might be things like profit and loss statements, tax records, that

08:41:41 14    sort of thing.

08:41:41 15    Q.  Please pull up Demonstrative 33507.  And this is TREX 230308,

08:41:51 16    Gulf Coast Claims Facility Final Review Final Payment Claim Form.

08:41:56 17    Did this document inform your opinion, Dr. Mason?

08:42:00 18    A.  Right, yes, it did.  So you can see here in the heading for

08:42:03 19    Section 4 that it clearly tells the claimant that they must provide

08:42:10 20    certain kinds of documentation, that the documentation is required;

08:42:13 21    "required" here being capitalized so for emphasis.  The people who

08:42:20 22    were filing these claims, they knew that they had these reporting

08:42:24 23    requirements.

08:42:24 24    Q.  Was there also a requirement for claimants to show that their

08:42:28 25    damages were caused by the oil spill in the GCCF?

08:42:33  1   A.  There was in the GCCF, yes.

08:42:34  2   Q.  Please pull up Demonstrative 33506.  And this is TREX 11977,

08:42:42  3   Gulf Coast Claims Facility Protocol For Interim and Final Claims,

08:42:46  4   November 22, 2010.  How did this document inform your opinion,

08:42:53  5   Dr. Mason?

08:42:53  6   A.  This documentation here says quite clearly that GCCF will only

08:42:58  7   pay for harm that is proximately caused by the spill.

08:43:01  8   Q.  Was there a causation requirement in the settlement program?

08:43:04  9   A.  There was for some claimants.  For others, causation was

08:43:08 10   presumed.

08:43:08 11   Q.  For those that was presumed, do you still attribute those

08:43:12 12   claims to harm from the oil spill?

08:43:14 13   A.  Again, so for the purposes of this analysis, the qualitative

08:43:20 14   appraisal, I think that that kind of characterization is fair; that

08:43:25 15   the geographic regions, the lines of business for which causation

08:43:30 16   was presumed, are those places, and industries, or lines of

08:43:35 17   business, lines of economic activity that suffered the brunt, that

08:43:39 18   bore the brunt of the spill effects that took on the damages.

08:43:45 19   Q.  Let's turn now to review of the claims and design of the claim

08:43:51 20   programs.  Was BP involved in establishing claim program protocols

08:43:56 21   for the BP operated claims process?

08:43:58 22   A.  Yes, they were.

08:44:00 23   Q.  How?

08:44:01 24   A.  They -- it was their program.  They kind of came up with it and

08:44:10 25   oversaw its implementation.

08:44:11  1   Q.  Was BP involved in establishing claim program protocols for the
08:44:15  2   GCCF?
08:44:16  3   A.  Yeah.  To a lesser extent, but still they had input.
08:44:20  4   Q.  Please pull up Demonstrative 33508.  And this is TREX 230442
08:44:30  5   entitled "GCRO LC Review Economic Analysis, August 2nd, 2011."  Is
08:44:38  6   this a document you consulted regarding BP's involvement in
08:44:41  7   establishing claims program protocols for the GCCF?
08:44:44  8   A.  Yes, it is.  You see here that the highlighted text here
08:44:49  9   indicates clearly that BP was afforded the opportunity to review and
08:44:52  10  comment on the GCCF claim methodology and on special claims paid out
08:45:00  11  by the GCCF.
08:45:02  12  Q.  Was BP involved in establishing claim program protocol for the
08:45:07  13  court supervised settlement program?
08:45:08  14  A.  Yes, they were.  The nature of the interaction here is the
08:45:12  15  negotiated -- the structure of the settlement program, the BP
08:45:16  16  attorneys, the BP representatives negotiating with the Plaintiff
08:45:20  17  Steering Committee.  So this sorts of things that are embodied here;
08:45:25  18  the nature, the kinds of claims that would be considered, the
08:45:29  19  mechanics for evaluating them, and for quantifying those future
08:45:33  20  damages or any future damages, all that was part and parcel that
08:45:37  21  emerged from this negotiating process.
08:45:40  22  Q.  Did BP have the opportunity to review claims paid by the
08:45:44  23  settlement program?
08:45:44  24  A.  Yes, they did.
08:45:45  25  Q.  Please pull up Demonstrative 33509.  This is TREX 231876,

08:45:53  1   report by the claims administrator of the *DEEPWATER HORIZON* economic

08:45:56  2   and property damages settlement, Status Report No. 23.  Dr. Mason,

08:46:02  3   how did this document inform your understanding of BP's ability to

08:46:05  4   review settlement program claims?

08:46:09  5   A.  So as the heading here says, as of this date, which is July of

08:46:15  6   2014, roughly 19,000 eligibility notices had been filed that met or

08:46:22  7   exceeded the threshold, $25,000 threshold that rendered them

08:46:27  8   eligible for appeal by BP.  And all of those nearly 19,000 notices,

08:46:32  9   BP had filed appeals on almost 4,000, which comes to just shy of a

08:46:37 10   21 percent appeal rate.

08:46:40 11   Q.  Please pull down the demonstrative.  In the BP claims program,

08:46:45 12   did some of the payments represent future losses?

08:46:48 13   A.  No.  The BP claims program is just for past losses.

08:46:51 14   Q.  How about the GCCF?

08:46:53 15   A.  For a chunk of the GCCF payments, they're just past losses.

08:47:00 16   For final claims payments, they embodied perspective future losses.

08:47:04 17   Q.  And in the settlement program, did some amount of claims paid

08:47:08 18   represent future losses?

08:47:09 19   A.  Right, yes, some of the payments is for perspective future

08:47:13 20   losses under the settlement program.

08:47:15 21   Q.  How are the payments for future losses calculated?

08:47:18 22   A.  So there are quantified by use of what's called risk transfer

08:47:23 23   premium, or RTP.  That's meant to provide something of an estimate

08:47:29 24   of those future perspective damages produced with input that it was

08:47:37 25   offered up by experts, including economic experts.

08:47:41  1    Q.  Why, in your understanding, did the GCCF and settlement program

08:47:47  2    allow claimants to collect payments for future harms that haven't

08:47:51  3    yet occurred?

08:47:52  4    A.  Well, the alternative here is to imagine sort of an ongoing

08:48:00  5    sequence of claims evaluations, you know, it's on an ongoing basis.

08:48:08  6    Every so often the claimants have to go through the process of

08:48:11  7    obtaining the documentation, coming back in, having it evaluated.

08:48:15  8    All of the things I just described are what economists would call

08:48:19  9    transactions costs.  So an alternative to having the payment settled

08:48:25 10    via this estimate of future perspective payments, is to have the

08:48:29 11    sequence of events with these large transaction costs.  So the

08:48:36 12    alternative to have -- to bearing those transactions costs settle

08:48:38 13    things at that point in time with an estimate of future damages.

08:48:42 14    Q.  Is it valid to rely on the GCCF and settlement program claims

08:48:46 15    payments in your analysis of the severity of economic harm when some

08:48:52 16    portion of those payments represents future harm?

08:48:54 17    A.  I believe it is.

08:48:55 18    Q.  Why?

08:48:56 19    A.  Because, as I noted a moment ago, there was input delivered

08:49:01 20    into the process from economics experts.  From an economist's

08:49:06 21    perspective, I'm thinking about the stream of damages that's going

08:49:09 22    to obtain over time.  The expectation of those harms, converted into

08:49:17 23    current dollars, a technique that we call discounting, generates

08:49:21 24    this thing called expected present discounted future value, and

08:49:26 25    couched in today's dollars, that's a valid measure that comes to

08:49:30 1   recognize that as a valid measure of that prospective future harm.

08:49:34 2   Q.  Is there any evidence that the future harm that was expected

08:49:38 3   when the settlement program was negotiated, in fact, came to

08:49:42 4   fruition?

08:49:42 5   A.  I believe there was.

08:49:45 6   Q.  Did you -- in what sectors?

08:49:48 7   A.  I would talk about two here today:  One was real estate, one

08:49:53 8   was tourism.

08:49:55 9   Q.  Did you prepare a demonstrative illustrating ongoing harm in

08:50:00 10   the real estate sector?

08:50:01 11   A.  I did.

08:50:01 12   Q.  Please pull up Demonstrative 33520.

08:50:04 13         MR. JARRETT:  Your Honor, just for record purposes, this

08:50:06 14   will be the subject matter directed to BP's objection.  I understand

08:50:09 15   your ruling earlier.

08:50:10 16         THE COURT:  All right.  Sure, I'll take that under

08:50:12 17   advisement.

08:50:14 18   BY MS. KING:

08:50:15 19   Q.  And, Dr. Mason, this is Figure 1 from your Round 3 report,

08:50:20 20   correct?

08:50:20 21   A.  That's right.

08:50:21 22   Q.  What methodology did you use in creating this graph?

08:50:25 23   A.  So the analysis that leads into this graph, we call this

08:50:31 24   technique differences-in-differences.  The general idea is that I

08:50:36 25   want to assess the effect of some particular event, like an oil

08:50:41  1    spill.  I have a group of individuals or counties, here this is

08:50:46  2    counties, that was exposed to the spill.  I have a group that was

08:50:50  3    not exposed to the spill.  I track these things over time.  The

08:50:54  4    differences across time amongst the exposed counties as compared to

08:50:59  5    the differences among time experienced by the unexposed counties,

08:51:04  6    the differences between those two differences, then, gives us

08:51:09  7    information about the impact associated with this particular effect,

08:51:14  8    the oil spill.  Filtering out background things.

08:51:19  9         Here, I think, the important background thing that I

08:51:22  10   would worry about is that the particular period of time that we're

08:51:26  11   thinking about, here the spill takes place in April 2010, which is

08:51:30  12   very close to kind of the depths of the great recession.  So going

08:51:35  13   forward from that particular point in time, the U.S. economy,

08:51:39  14   generally, is recovering from the recession, tourism, real estate

08:51:44  15   recovering from the recession, and so that is -- so that is rising

08:51:50  16   tide, if you like.  And the boats that are being lifted by that

08:51:53  17   rising tide would be things like real estate incomes.

08:51:57  18        And that -- you've seen that indication for the Florida

08:52:00  19   Atlantic Coast counties not exposed to the oil spill.  You kind of

08:52:05  20   see how their incomes are going up between 2010 and 2012.  By

08:52:13  21   contrast, counties, for instance, the Florida panhandle counties --

08:52:17  22   that's the bottom line here with diamonds -- that were exposed to

08:52:23  23   the oil spill, they don't rise anywhere near as rapidly.  The

08:52:26  24   differences between those two effects filters out the effect

08:52:31  25   associated with things like recovery from the recession and gives

08:52:35 1    us -- leaving us with the appraisal that this is coming from the oil

08:52:40 2    spill.

08:52:40 3            Gulf Coast counties who were on the Gulf Coast, counties

08:52:42 4    not nearly as exposed as the panhandle counties lie somewhere in

08:52:47 5    between these.  They experienced greater recovery than the panhandle

08:52:51 6    counties, but they did experience some exposure.  They don't recover

08:52:54 7    quite as rapidly as the Atlantic Coast counties.

08:52:57 8    Q.  Does this graph have an implication for the reliability of

08:53:02 9    claim payments that are included in a future recovery factor?

08:53:05 10   A.  Right.  The idea that the claims future perspective claims were

08:53:12 11   manifested, it's borne out by the evidence in this graph.  So the

08:53:16 12   presumption at the start that's built into the analysis, built into

08:53:21 13   the -- built into the claims process as dictated by the input from

08:53:26 14   the economic experts, I believe.  It's corroborated by this

08:53:29 15   information.

08:53:29 16   Q.  Did you include in your -- did you analyze other state's data

08:53:34 17   in your report other than Florida?

08:53:36 18   A.  Other than Florida, I did not.  The point -- this was meant to

08:53:39 19   be a targeted response to Dr. Scott's claims in his second round

08:53:46 20   report; his broad claims about general recovery in the Gulf Coast

08:53:50 21   area.  So I've got here an example that calls into question that

08:53:54 22   broad-based claim.  That was my purposes with this diagram.

08:53:57 23   Q.  Did you prepare a demonstrative illustrating ongoing harm in

08:54:02 24   any other sector, Dr. Mason?

08:54:03 25   A.  Yes, I did.

08:54:04  1   Q.  Please pull up Demonstrative 33519.  And how does this
08:54:14  2   demonstrative support your opinion regarding ongoing harm after
08:54:20  3   2011?
08:54:21  4   A.  It's built up from the same idea.  It's predicated upon this
08:54:26  5   differences-in-differences technique.  Same general idea as before.
08:54:31  6   We're coming out of the great recession.  Tourism is recovering in
08:54:37  7   the U.S., generally, after 2010.  Kind of bottoms out in 2010 and
08:54:43  8   then increases after that.  The tourism activity increases after
08:54:48  9   that.
08:54:48 10        And so we would expect to see increases commensurate with
08:54:52 11   that, or parallel to that, across parts of the exposed areas, parts
08:55:00 12   of the Gulf Coast.  Point related to that coming from Dr. Scott's
08:55:07 13   reports -- or excuse me, from presentation of Dr. Scott made arguing
08:55:13 14   that there was this sort of recovery in many of the states in the
08:55:17 15   southeast.  So this particular -- this particular demonstrative has
08:55:24 16   two diagrams; one for each of two cohorts.  On the right is
08:55:28 17   information for Florida.
08:55:29 18        It's parallel to the analysis that I talked about a
08:55:33 19   minute ago.  I'm comparing here an exposed set of counties, the
08:55:37 20   Florida panhandle illustrated in blue, to a controlling set of
08:55:42 21   counties not exposed to the oil spill, Florida Atlantic Coast here
08:55:47 22   illustrated in red.  And each of these bars is telling us the degree
08:55:52 23   to which revenue for available room.  We can think of that as the
08:55:56 24   average room rate for a typical hotel in a county.  Blue panhandle,
08:56:03 25   red Atlantic Coast.  Compared to 2009.

OFFICIAL TRANSCRIPT

08:56:07  1           And so you see here that there's sort of this steady

08:56:11  2      growth in revenue per available room, RevPAR, for the typical hotel

08:56:17  3      in Florida Atlantic Coast.  A more sluggish recovery for the typical

08:56:22  4      hotel in the Florida panhandle.

08:56:24  5           The difference, as with the preceding story, illustrating

08:56:26  6      that the exposed counties are falling ever farther behind these

08:56:32  7      controlled counties.

08:56:33  8           The illustration on the left is for Mississippi.  It's

08:56:35  9      comparing the exposed counties on the Gulf Coast against controlled

08:56:40 10      counties Mississippi inland.  Again, the exposed counties

08:56:43 11      illustrating blue, the control counties illustrated in red.  You see

08:56:47 12      a steady growth in the inland counties year on year; compared to

08:56:52 13      2009, nowhere near.  There's a fast increase in 2010.  Perhaps, this

08:56:56 14      is an indication of spill response workers coming into the area.

08:57:00 15           But, nevertheless, from 2011 onward you see that the

08:57:04 16      growth in Mississippi is much slower on the Gulf Coast than there is

08:57:08 17      inland.

08:57:11 18   Q.  This demonstrative shows Mississippi and Florida data, as you

08:57:14 19      mentioned, Dr. Mason.  Did you also analyze hotel revenue data for

08:57:18 20      Louisiana or Alabama in your reports?

08:57:20 21   A.  No, I did not.  Again, the graphs that are included here, the

08:57:27 22      information that is conveyed by these diagrams, this was produced in

08:57:34 23      response to claims made by Dr. Scott in his Round 1 report, kind of

08:57:38 24      broad-based claims about general recovery.  It's meant to be a

08:57:42 25      targeted response, a targeted rebuttal.

08:57:45  1              THE COURT:  Tell me again, what is the scale on the left?

08:57:48  2   Is that dollars?

08:57:49  3              THE WITNESS:  Oh sorry.  Yeah, U.S. dollars.

08:57:51  4              THE COURT:  Not percentages?

08:57:53  5              THE WITNESS:  Right.  Let me pick an example here.

08:57:55  6   Florida Atlantic Coast 2010, RevPAR in 2010 is about, you know,

08:58:02  7   $2.60 larger --

08:58:05  8              THE COURT:  Larger than it was.  You're comparing all of

08:58:07  9   this to '09?

08:58:08 10              THE WITNESS:  All of these are compared, yeah.  All four

08:58:10 11   of these are compared to 2009, right, that's correct.

08:58:13 12              THE COURT:  Okay.

08:58:14 13   BY MS. KING:

08:58:14 14   Q.  Did you analyze the statistical significance of the trends

08:58:17 15   noted in these two graphs, Dr. Mason?

08:58:20 16   A.  Yes, I did.  In the Round 3 report, I evaluated the statistical

08:58:24 17   significance of this.  The numbers involved here -- the data that

08:58:28 18   lead into these numbers indicate that the difference between

08:58:31 19   Atlantic Coast and panhandle on the one hand -- Atlantic Coast and

08:58:38 20   panhandle Florida on one hand, inland and Gulf Coast for Mississippi

08:58:41 21   on the other.  These differences are statistically important.

08:58:45 22   Q.  Dr. Mason, are all economic harms included in the $10 billion

08:58:50 23   total that you mentioned earlier?

08:58:52 24   A.  No, they're not.  It's just a subset.

08:58:54 25   Q.  Please pull up Demonstrative 33511.  Which damages were

08:59:02  1    excluded from all programs, Dr. Mason?

08:59:04  2    A.  So the programs don't include natural resource damages;

08:59:10  3    examples of which might be things like ecosystem services,

08:59:14  4    recreation use losses.  They don't include any losses suffered by

08:59:17  5    the states, for instance, forgone tax revenues.  They don't include

08:59:26  6    consequential losses.

08:59:27  7         You can take an example of a consequential loss, there

08:59:31  8    might be somebody who is thinking about taking their vacation on the

08:59:34  9    Gulf of Mexico.  They decide, on the basis of the oil spill, that

08:59:37 10    they don't want to go to that hotel in the Gulf of Mexico.  They go

08:59:40 11    somewhere else instead.  Maybe they go to North Carolina, maybe they

08:59:44 12    go to New Jersey, whatever, they go some place else.  They don't go

08:59:47 13    to their first choice.  They go to their second choice.  They're

08:59:53 14    worse off.  The satisfaction they would have had from the first

08:59:55 15    choice, they don't realize that they have to settle for second best.

08:59:58 16    That's a consequential loss.

09:00:01 17    Q.  Which economic harms were excluded from the Court's supervised

09:00:03 18    settlement program?

09:00:04 19    A.  The settlement program excludes harms to menhaden fishers and

09:00:09 20    processes relating to that.  It excludes harm suffered by real

09:00:13 21    estate developers; banking, financial and insurance industries;

09:00:16 22    gaming industry; those involved in the selling of marketing of BP

09:00:21 23    branded fuel; shareholders in BP stock; enterprises involved in the

09:00:27 24    oil and gas industry that might have suffered any harms associated

09:00:30 25    with the spill or responses to it, for example, various moratorium.

09:00:34  1    Q.  Are there any other economic harms that wouldn't be included in

09:00:38  2    the 10 billion total?

09:00:39  3    A.  Right.  Any individual that did not file a claim, for whatever

09:00:43  4    reason, they didn't have the paperwork, they reckoned that it was

09:00:48  5    going to be so difficult to put everything together in comparison to

09:00:51  6    the amount of money that they might be able to receive as a claim,

09:00:54  7    they opted out.  Those sorts of individuals, their losses aren't

09:00:58  8    reflected in this.  The fact that they didn't file claims doesn't

09:01:03  9    mean that they didn't suffer harm.

09:01:04  10          It also doesn't include any claims that have not been

09:01:08  11   reviewed.  The information that's embodied in the report, my first

09:01:13  12   report, included information up through July 1, 2014.  So claims

09:01:19  13   that had not been reviewed as of July 2014, they can't be included

09:01:23  14   in this estimate.

09:01:24  15   Q.  Did you prepare a demonstrative summarizing the claims that

09:01:28  16   were not yet reviewed as of July 2014?

09:01:30  17   A.  Yes, I did.

09:01:32  18   Q.  Please pull Demonstrative 33510.  How do these pie charts

09:01:38  19   inform your opinion regarding settlement of program claims not yet

09:01:41  20   reviewed?

09:01:42  21   A.  The top left panel here -- top left quarter panel provides

09:01:51  22   information on the set of claims that had been filed as of that

09:01:55  23   date, about 280,000.  Around about 280,000 claims.  Out of those,

09:02:04  24   86,000 had yet to be reviewed.  That's about 30, 31 percent.

09:02:09  25          That 31 percent -- 30, 31 percent of those total claims,

09:02:13  1    the 86,000 that have yet to be reviewed, include some important

09:02:20  2    categories.  Particularly, here, I think it's noteworthy that

09:02:24  3    Business Economic Loss category, which a moment ago I mentioned was

09:02:28  4    the largest dollar value of all of the claims categories, there's

09:02:34  5    just a little bit more than 100,000 claims in that category that had

09:02:37  6    been filed as of July.

09:02:39  7            Out of those, a little over 45,000 yet to be reviewed,

09:02:42  8    that's in the general vicinity of 45 percent not yet reviewed.

09:02:48  9            There are these other categories for which the outstanding

09:02:51  10   claims to be reviewed are well in excess of 50 percent substantive

09:02:55  11   claims, wetland and property claims.

09:02:58  12           MS. KING:  Mr. Jackson, please pull down the slide.

09:02:58  13   BY MS. KING:

09:03:01  14   Q.  Did BP's expert, Dr. Scott, agree with you that the economic

09:03:05  15   harm resulting from the *DEEPWATER HORIZON* oil spill was severe?

09:03:09  16   A.  He does not.

09:03:09  17   Q.  Why not?

09:03:11  18   A.  In his view, the harm -- such harms as were experienced were

09:03:18  19   relatively short-lived in nature and were mitigated by BP's various

09:03:24  20   expenditures.

09:03:25  21   Q.  Was any effect from BP's spending reflected in the analysis

09:03:31  22   that you conducted, Dr. Mason?

09:03:33  23   A.  Yeah.  It would be incorrect to say that I neglected the effect

09:03:41  24   of BP's spending.  To the extent that expenditures that they

09:03:47  25   undertook reduced damages, then that would be manifested in lower

09:03:53  1    possible claims that would be made that would be offered up by

09:03:56  2    claimants.  That is to say that there would be lower claims paid

09:04:00  3    out.  So the number that I came up with, I think, needs to be

09:04:04  4    regarded as net of those, the effects associated with those

09:04:09  5    prophylactic expenditures by BP.

09:04:11  6    Q.  Dr. Mason, you mentioned you were asked to analyze the report,

09:04:17  7    the initial report of Anadarko's expert, Dr. Sunding, as well.

09:04:22  8    Which of his arguments did you analyze?

09:04:25  9    A.  There were two particular points to Dr. Sunding's report that I

09:04:33 10    evaluated and commented on.  One was the conceptual nature of

09:04:39 11    optimal deterrence; and the second was his empirical analysis of the

09:04:48 12    effects that he alleges stemming from the naming of Anadarko as a

09:04:53 13    defendant in December of 2010 upon the Gulf of Mexico non-operators,

09:05:00 14    particularly as manifested in capital or capital flight from the

09:05:05 15    Gulf.

09:05:06 16    Q.  Let's turn first to Dr. Sunding's argument you mentioned

09:05:10 17    regarding optimal deterrence.  Please pull up Demonstrative 33515.

09:05:16 18          What does Dr. Sunding argue regarding optimal deterrence?

09:05:20 19    A.  Well, Dr. Sunding's claim is that $4 billion that was paid from

09:05:27 20    Anadarko to BP provides the appropriate share of damages as to

09:05:35 21    deliver optimal deterrence.  In my view, that claim is an overreach

09:05:42 22    on the grounds that the total amount from the oil spill remains

09:05:47 23    unknown.  It was unknown at the time of the settlement; it was

09:05:51 24    unknown at the time of my filing my report.  In large measure

09:05:54 25    because of these, this subset that I didn't incorporate into the

OFFICIAL TRANSCRIPT

09:06:00   1    appraisal.

09:06:01   2    Q.  Do you have any other disagreement with Dr. Sunding's argument

09:06:06   3    concerning optimal deterrence?

09:06:08   4    A.  Yes.  So let's, for the sake of argument, grant the first

09:06:14   5    point, that that sum of the $4 billion is appropriate.  And that's

09:06:18   6    built up from the damages that they believe to have been realized at

09:06:22   7    the time.

09:06:23   8          The process of pursuing hydrocarbons in the Gulf of Mexico

09:06:29   9    entails some risks.  Individuals who are in the Gulf of Mexico

09:06:35  10    region are exposed to that risk.  There could be a blowout, there

09:06:39  11    could be another blowout, there could be other oil spills.  There

09:06:43  12    could be damages possibly from those particular phenomenon.  Those

09:06:48  13    future potential risks mean that individuals who are there today are

09:06:53  14    exposed to that future risk.

09:06:54  15          To the extent that those individuals are averse to risk --

09:06:57  16    and I think the general presumption in the economics profession is

09:07:03  17    that most individuals are averse to risk -- they have to be

09:07:07  18    compensated for that.  They need to be paid a risk premium.  That's

09:07:11  19    on top of the damages that are incorporated here in this 4 million

09:07:16  20    number that Dr. Sunding came up with.

09:07:19  21          There's a further point and that is that the literature to

09:07:24  22    which Dr. Sunding refers in coming up with his arguments generally

09:07:29  23    takes the perspective -- it generally provides kind of an

09:07:35  24    abstraction template, if you like, in which there's one party or one

09:07:39  25    entity that might be undertaking actions that expose another party

09:07:45 1    to some sort of harm.  So the interactions are between one entity

09:07:50 2    that might be causing the harm, one party that might be experiencing

09:07:53 3    the harm.

09:07:55 4           In this particular problem, though, there are multiple

09:07:59 5    parties involved in this entity that might be exposing society to

09:08:02 6    this harm.  And in my view, it's important to take into account the

09:08:07 7    interactions of those parties within the entity that's exposing

09:08:11 8    society to that harm.  It's the sort of thing -- there are papers in

09:08:15 9    the literature that do, in fact, think about things from that

09:08:19 10   perspective.  Dr. Sunding opted to put this in a kind of one-on-one

09:08:24 11   frame work.

09:08:24 12   Q.  Dr. Mason, you mentioned that you also analyzed Dr. Sunding's

09:08:29 13   empirical analysis concerning capital flight in the period after

09:08:34 14   Anadarko was named as a defendant.  Did you prepare a demonstrative

09:08:40 15   summarizing your analysis of these points?

09:08:42 16   A.  I did.

09:08:42 17   Q.  Please pull up Demonstrative 33535.  What does Dr. Sunding

09:08:51 18   argue regarding firm entry and exit?

09:08:55 19   A.  Well, Dr. Sunding's thinking here is that you have this

09:09:05 20   pattern.  So he evaluates net entry, net exit over the course of

09:09:15 21   31 years, looking to see whether there's been reduction in entry --

09:09:22 22   I'm sorry, an increase in exit.  So if you think of it this way:  An

09:09:26 23   increase in net exit of non-operators in the entire Gulf of Mexico.

09:09:31 24   He wants to see if this particular phenomenon is more pronounced

09:09:38 25   after December of 2010.  Is there a correlation between the naming

09:09:46  1    of Anadarko as a defendant and this pattern of net exit.

09:09:52  2         There's a saying in the economics profession popularized

09:09:57  3    in pretty much every econometrics class that I've been involved in

09:10:01  4    as a teacher and a student, causation -- I'm sorry, "Correlation is

09:10:06  5    not causation."  He has not established causation here.  And, in

09:10:11  6    fact, acknowledges as much in his Round 3 report.

09:10:16  7         He's not established causation in large measure because

09:10:19  8    he's offering up one explanation.  Other phenomenon that you can

09:10:26  9    think of as having a similar sort of time profile, something that

09:10:31 10    happens after 2010, that would be equally capable of explaining this

09:10:36 11    pattern, the blowout itself.  Perhaps parties involved in deepwater

09:10:44 12    operations, non-operators who are involved in deepwater Gulf of

09:10:49 13    Mexico reassess the risk of a future blowout on the basis of this

09:10:54 14    particular event.  It would be natural to do so.  Most individuals

09:10:58 15    think of things in that sort of way.

09:11:00 16         So we observe, for example, if there's an unfortunate

09:11:06 17    event like an airplane crash, it's not uncommon for people to think

09:11:09 18    that, kind of discretely, think now that flying is riskier.

09:11:15 19    Similarly here, maybe it was the case that some parties now thought,

09:11:20 20    this operation's riskier, let me go some place that's safer.

09:11:24 21         There's also the possibility that they chose to redeploy

09:11:30 22    their resources to a different part of the oil patch where they

09:11:35 23    thought that they might be able to make more money, that the

09:11:40 24    prospects would be more profitable.  Either they would have -- they

09:11:44 25    would be more prolific in production or less expensive.  And an

09:11:48  1    obvious example here is the emerging type oil, shale oil bonanza

09:11:55  2    that really kind of took hold in a big way starting in late 2010,

09:12:01  3    early 2011.

09:12:03  4         Either of those events would be equally capable of

09:12:06  5    explaining the particular pattern that Dr. Sunding has identified.

09:12:11  6    He didn't rule out either one of those.

09:12:13  7    Q.  Do you, Dr. Mason, do you have any disagreements concerning

09:12:18  8    technical aspects of Dr. Sunding's empirical analysis concerning

09:12:23  9    firm entry and exit?

09:12:24 10    A.  Yes.  There are some technical concerns that I would bring up.

09:12:31 11    The first is -- so perhaps I should back up here a minute.

09:12:36 12         The root data that he uses in this analysis identifies

09:12:43 13    when, as a calendar date, when an individual non-operator enters or

09:12:49 14    exits the Gulf.  So July 4th, 2012.  He converts that observation to

09:13:00 15    an annual observation.  So there is a firm that made a change in

09:13:04 16    2012 and then he counts up the number of firms that entered or

09:13:08 17    exited in each of these years from 1983 to 2013.  That means he's

09:13:14 18    got 31 separate observations, 31 annual observations.

09:13:18 19         Thirty-one is a relatively small sample size for the

09:13:22 20    particular econometric technique that he is employing in this

09:13:27 21    analysis.  There are analyses that might be using a sample size that

09:13:33 22    was in that neighborhood.  The technique that he is using is known

09:13:37 23    to be somewhat -- to have somewhat poor properties when one applies

09:13:44 24    it to sample sizes that small.

09:13:47 25         Secondly, I think more significantly, over the 30-odd

09:13:52  1    years that we're talking about here, it's simply implausible that

09:13:56  2    there weren't important technological changes, and these are changes

09:14:00  3    that occurred in the oil and gas industry.  For instance, as I think

09:14:07  4    of a very sharp example, there's this fracking boom.  The fracking

09:14:12  5    revolution changed the mind-set in the U.S. from one of a nation

09:14:16  6    that was importing oil to one that might, perhaps, be exporting oil.

09:14:22  7    Sometimes that sort of thing is called a "breakthrough technology."

09:14:26  8    It's a technological leap.  It's a big discrete change.

09:14:30  9              Dr. Sunding's methodology for getting at things

09:14:32  10   like technological changes to include a time trend, something that

09:14:38  11   makes -- you can think of this as sort of the characterizing a

09:14:42  12   gradual increase in technological capabilities over time.

09:14:45  13             By contrast, what we really are seeing are

09:14:47  14   these sort of stair-step effects:  Big increase in technology and

09:14:51  15   then we go along for awhile and there's another big leap through.

09:14:54  16   The technique that he used is really not appropriate for

09:14:58  17   characterizing those technological leaps.

09:15:01  18             Finally -- and I think this is most

09:15:04  19   substantive -- firms are presumably involved in these operations.

09:15:08  20   They're looking to make money.  They make big expenditures when they

09:15:14  21   enter the industry.  They have to put down a lot of money.  They're

09:15:17  22   doing this because they have this anticipation of large rewards.

09:15:21  23   The rewards are going to be related to future prices.  Future

09:15:26  24   expected prices are really important driving factor in dictating a

09:15:32  25   pattern of entry or exit.  Future expected prices can be proxied, I

09:15:39  1    think quite adequately, by publicly available information.  New York

09:15:45  2    Mercantile Exchange has this particular financial instrument they

09:15:50  3    call "futures" that are for oil at some future date.  So he could

09:15:55  4    have gathered information on these future prices and included that

09:15:58  5    into his analysis.

09:16:02  6                    This point that I made in my Round 2 rebuttal,

09:16:06  7    and he elected for some reason not to do that.

09:16:12  8    Q.  Does Dr. Sunding rely upon any other data in support of his

09:16:19  9    opinion regarding capital flight and the time period following

09:16:23 10    Anadarko's naming as a defendant?

09:16:25 11    A.  Yeah.  He has an analysis of concentration of lease shares.

09:16:31 12    Q.  Did you prepare a demonstrative illustrating your opinion

09:16:34 13    regarding this concentration analysis?

09:16:36 14    A.  I did.

09:16:37 15    Q.  Please pull up Demonstrative 33533.  Do you agree, Dr. Mason,

09:16:48 16    that capital is fleeing the Gulf in the period following the time

09:16:52 17    when Anadarko was named as a defendant?

09:16:54 18    A.  I do not.

09:16:55 19    Q.  Why not?

09:16:57 20    A.  Well, simply put, the degree to which market power in the Gulf

09:17:11 21    of Mexico is measured by new leases, adjusted for lease ownership,

09:17:16 22    that measure of market power, market concentration, has remained

09:17:20 23    relatively stable across time before and after the naming of

09:17:27 24    Anadarko.

09:17:27 25                    So this slide here illustrates that point.  It makes use

09:17:33  1   of a particular instrument, a particular index that industrial

09:17:38  2   economists use to measure the concentration of market power within

09:17:42  3   an industry, sometimes called a Herfindahl Index or HHI.  It's built

09:17:50  4   up from the shares of firms involved in that industry in a

09:17:56  5   particular metric that we think is interesting.  Here, the metric

09:18:00  6   that I used was new leases adjusted for ownership shares.  So each

09:18:05  7   of these five years -- 2009, '10, '11, '12, '13 -- there's a certain

09:18:10  8   number of new leases that are acquired.

09:18:18  9        For each of those leases, there might be a pattern of

09:18:21 10   ownership.  Some firms might own -- maybe there's lease here that

09:18:27 11   one firm owns 75 percent, another firm owns 25 percent.  I added up,

09:18:32 12   across all of the firms in the Gulf, in each of these years, the

09:18:35 13   number of leases that they held, number of new leases that they

09:18:40 14   held, taking into account these fractional ownerships.

09:18:43 15        And then you take the amount, the number of fractional

09:18:47 16   leases held by the particular firm, divide that by the total number

09:18:51 17   of leases.  That's the share of new leases attributable to that

09:18:54 18   firm.  The Herfindahl index is built up from those market shares.

09:18:59 19        And so you see here that the numbers that we're talking

09:19:04 20   about, they're relatively stable all across from 2009 to 2013.

09:19:10 21   There is not a marked increase in market concentration.  If there

09:19:15 22   were capital fleeing the Gulf, we would expect to see increases in

09:19:20 23   the concentration measure and we don't.

09:19:22 24   Q.  Did Dr. Sunding conduct the same concentration analysis that

09:19:26 25   you did?

09:19:26  1    A.  No.  He had -- he used the same fundamental metric, this

09:19:33  2    Herfindahl index, but he used it in a different kind of a way.  So

09:19:39  3    whereas I looked at the industry for the Gulf of Mexico, oil and gas

09:19:43  4    industry measured by leases as a whole, his approach was to look at

09:19:48  5    each individual lease.  I think you might -- it might be instructive

09:19:54  6    to think of this approach as saying each lease is it's own separate

09:19:58  7    island.

09:19:58  8          For each lease he wants to know, you know, what's the

09:20:02  9    pattern of ownership?  To what extent is ownership concentrated or

09:20:08 10    consolidated within that individual lease?  So then he compares

09:20:12 11    these many different islands to see whether or not the pattern of

09:20:18 12    ownership within an individual lease changes after December of 2010.

09:20:23 13    That's his approach.

09:20:24 14          I think the more appropriate approach is to look at the

09:20:27 15    market as a whole.  That's the difference between the way we look at

09:20:30 16    this.

09:20:31 17    Q.  Let's turn now, Dr. Mason, to your opinions regarding BPXP and

09:20:37 18    Anadarko's role in the Gulf of Mexico and national economies.  What

09:20:43 19    opinion did you reach regarding the two firms' role in the Gulf of

09:20:47 20    Mexico economy?

09:20:47 21    A.  I came to the conclusion that both BPXP and Anadarko were of

09:20:53 22    moderate importance in the Gulf of Mexico economies.

09:20:56 23    Q.  Did you prepare a demonstrative summarizing how you analyzed

09:21:01 24    that economic role?

09:21:02 25    A.  I did.

09:21:03  1    Q.  Please pull up Demonstrative 33522.  And what did you do in

09:21:12  2    order to analyze BPXP and Anadarko's role in the Gulf of Mexico

09:21:15  3    economy?

09:21:16  4    A.  Okay.  So the analysis here, as I inquired into their economic

09:21:27  5    role, starts by appraising the share of the market associated with

09:21:31  6    each of these two firms in the Gulf of Mexico oil and gas industry

09:21:38  7    as appraised by a handful of metrics.

09:21:44  8            I also evaluated the role of the oil and gas industry

09:21:48  9    generally within the Gulf of Mexico.  It comprises a fraction of

09:21:54 10    economic activity in each of the states.  I evaluated those

09:21:57 11    fractions.

09:21:59 12            BP's argument is that its expenditures benefit the

09:22:03 13    regional and national economy.  I think it's important to bear in

09:22:06 14    mind that it undertakes these expenditures, as firms do, in the

09:22:12 15    pursuit of profit.  Other firms put into sort of a similar situation

09:22:18 16    with similar resources available to them would make similar kinds of

09:22:23 17    expenditures if it would deliver similar sorts of benefits.

09:22:27 18                And it's important here to note that within

09:22:31 19    this industry, the results that I came up with indicate that the

09:22:35 20    Gulf of Mexico oil and gas industry is not highly concentrated.

09:22:39 21    That's an indication that there's relative fluidity here that firms

09:22:44 22    can enter and exit relatively easily and that firms compete

09:22:48 23    vigorously for access to the resources in the Gulf.

09:22:53 24    Q.  Regarding your first point --

09:22:55 25            THE COURT:  Excuse me.  Are you saying, essentially, if BP

09:22:57 1    didn't have these leases, some other oil company would?

09:23:01 2                THE WITNESS:  Yeah.  I think so.

09:23:02 3                THE COURT:  And be producing?

09:23:04 4                THE WITNESS:  Sure.  Those -- if those leases are

09:23:08 5    attractive, somebody else will snatch them up.

09:23:12 6                THE COURT:  Okay.  Go ahead.

09:23:12 7    BY MS. KING:

09:23:14 8    Q.  Dr. Mason, did you prepare a demonstrative summarizing your

09:23:18 9    market share analysis for BPXP?

09:23:19 10   A.  Yes, I did.

09:23:20 11   Q.  Please pull up Demonstrative 33501.  How does this slide

09:23:29 12   illustrate your conclusion that BPXP is modestly important in the

09:23:34 13   Gulf oil and gas industry?

09:23:35 14   A.  Okay.  So this demonstrative articulates BPXP's share of the

09:23:43 15   Gulf of Mexico oil and gas industry using six separate metrics that

09:23:49 16   I think are germane to this investigation, relevant

09:23:54 17   characterizations of the Gulf industry.  Ranging from the lease

09:23:59 18   acquisition at the outset through the boreholes, the wells that were

09:24:05 19   drilled, the production platforms that are in place, the

09:24:07 20   hydrocarbons that are produced, the employment that goes along with

09:24:11 21   this, up to the royalties that are paid.

09:24:15 22                For three of these metrics, the top three, the analysis is

09:24:19 23   undertaken at a particular point in time, July of 2014.  For three

09:24:24 24   of these analysis, for three of these metrics, I'm evaluating

09:24:28 25   information over the course of three years after the oil spill, 2011

09:24:33  1    through 2013.

09:24:35  2            In every case, for all six of these metrics, the industry

09:24:39  3    level, the number that goes for the industry that comes from

09:24:41  4    publicly available information.  For the top three, those items

09:24:46  5    identified in July of 2014, BP's number comes from publicly

09:24:53  6    available information.  For the bottom three metrics, BP's number

09:24:58  7    comes from documents that BP provided.

09:25:03  8            You see here that the shares attributable to BP range from

09:25:08  9    a little bit over 8 to a little bit under 20.5 percent.  So 8 to

09:25:14 10    20 percent, let's say; kind of centered around something in the

09:25:17 11    neighborhood of 10 to 15 percent.

09:25:20 12                To take a point, I think hydrocarbon production

09:25:22 13    is probably the most natural of these things to think about, that's

09:25:25 14    really the focus of all of this activity.  It's about 11 percent.

09:25:31 15    Q.  Did you prepare a slide summarizing your market share analysis

09:25:35 16    of Anadarko's role in the Gulf oil and gas industry?

09:25:39 17    A.  I did.

09:25:39 18    Q.  Please pull up Demonstrative 33502.  How does this slide

09:25:44 19    support your conclusion that Anadarko was modestly important in the

09:25:49 20    Gulf oil and gas industry?

09:25:50 21    A.  So, similar mechanics to the preceding slide.  The metrics,

09:25:58 22    boreholes, permanent production platforms, leases held, hydrocarbon

09:26:03 23    production, and royalties.  I calculated Anadarko's share of the

09:26:07 24    Gulf of Mexico oil and gas industry, the top three as in the

09:26:10 25    preceding slide, at a point in time, July 2014; the bottom two over

09:26:15  1    the three-year period from 2011 to 2013.

09:26:21  2           Again, as with the BP slide, the top three, there's

09:26:25  3    publicly available information for the contribution of the number

09:26:28  4    for the firm.  There's publicly available information for the

09:26:31  5    industry as a whole.  For the bottom two -- now Anadarko did not

09:26:37  6    provide information on hydrocarbon production.  So, there, I used

09:26:42  7    the publicly available information for their number, as well as the

09:26:46  8    publicly available information for the industry number.

09:26:50  9           For the royalty contribution, they did provide

09:26:53 10    information.  I used their royalty number in comparison to the

09:26:55 11    publicly available information for industry royalties.

09:27:00 12           These numbers are a bit smaller than those for BP.  They

09:27:04 13    kind of range from 3 percent plus change for royalties to 14 and

09:27:08 14    change for permanent production platforms.  But generally not large.

09:27:12 15    Q.  Dr. Mason, you mentioned that the oil and gas industry

09:27:17 16    represents a fraction of economic activity in the Gulf region.  Did

09:27:21 17    you prepare a demonstrative summarizing that opinion?

09:27:24 18    A.  Yes, I did.

09:27:25 19    Q.  Please pull up Demonstrative 33521.  And how does this

09:27:33 20    demonstrative inform your opinion regarding BPXP and Anadarko 's

09:27:37 21    role in the Gulf economy?

09:27:38 22    A.  So this slide shows us, for each of the five Gulf Coast states,

09:27:45 23    that fraction of the state's GDP, the typical measure of economic

09:27:53 24    activity, that fraction, that percentage of the state's GDP that's

09:27:55 25    attributable to the oil and gas industry activities.  So these

09:27:59  1    numbers range from about 3 percent for Florida to 35 and a half

09:28:04  2    percent for Louisiana.

09:28:07  3              So if you want to assess the effect of a particular

09:28:11  4    company, maybe it's BPXP, you take the information from their role

09:28:16  5    in the oil and gas industry, combine them with the role of the oil

09:28:21  6    and gas industry within the state.  Those two things together,

09:28:24  7    multiply those two numbers together and that gives you a sense for

09:28:26  8    the contribution of BP for that state.

09:28:29  9              So let's take Louisiana, it's the biggest of

09:28:31  10   these states.  I'll say 36 percent.  Hydrocarbon production was

09:28:35  11   about 11 percent.  BP's share of hydrocarbon production is about 11

09:28:40  12   percent of the industry.  You multiple 11 percent and 36 percent,

09:28:44  13   you get something that's a little bit less than 4 percent.

09:28:47  14              So in that interpretation, BP's contribution to

09:28:51  15   the Louisiana state GDP runs in the neighborhood of 4 percent and

09:28:55  16   the other states are a bit smaller.  It's a bit smaller for Texas,

09:29:01  17   and markedly smaller for the other three states.

09:29:03  18   Q.  You mentioned your opinion that the Gulf of Mexico oil and gas

09:29:06  19   industry is unconcentrated.  Did you prepare a demonstrative

09:29:09  20   explaining your analysis of market concentration for the Gulf oil

09:29:13  21   and gas industry?

09:29:14  22   A.  I did.

09:29:15  23   Q.  Please pull up Demonstrative 33517.  How did you conduct the

09:29:20  24   analysis shown in this slide?

09:29:22  25   A.  Okay.  So this slide has four metrics to appraise the Gulf of

09:29:30    1    Mexico oil and gas industry.  For each of these four metrics -- as a
09:29:35    2    few slides back, we talked about the Herfindahl index.  I calculated
09:29:40    3    the Herfindahl index for each of these four metrics:  Two of them
09:29:43    4    are over a period of time, leases and production.  The production
09:29:46    5    here is by operator, so it doesn't control for ownership patterns.
09:29:52    6    But nevertheless it tells us something about the nature of the
09:29:55    7    industry, I think.
09:29:56    8          So over this five-year period of time for leases and
09:30:00    9    production, snapshot in time in July 2014 for deepwater production,
09:30:08   10    permanent production platforms, and subsea boreholes.  So two of
09:30:11   11    these things are over a period of time; two of these things in
09:30:13   12    deepwater.  In all four of these cases, I've calculated the
09:30:16   13    Herfindahl index for the Gulf of Mexico industry.  This slide places
09:30:21   14    them in a particular context.  Industrial organization economists, I
09:30:26   15    have the view -- so this Herfindahl index is telling us something
09:30:30   16    about it.  As I said, it's the degree of concentration within the
09:30:33   17    market, the degree to which -- you can think of it, I think,
09:30:37   18    truthfully as a -- industries that are not concentrated, there's
09:30:41   19    relatively easy entry and exit, resources are fairly fluid.  The
09:30:45   20    general consensus amongst industrial economists is that a threshold
09:30:50   21    for an unconcentrated industry is the number 1,500 for the
09:30:54   22    Herfindahl index.
09:30:56   23              It's noteworthy here that all four of these
09:30:58   24    metrics fall comfortably below this threshold for an unconcentrated
09:31:03   25    industry.  So this is indicating that, by this interpretation, the

09:31:07  1    Gulf of Mexico oil and gas industry is relatively fluid.  Entry and

09:31:12  2    exit is unconcentrated.

09:31:13  3    Q.  How is fluid entry and exit in the Gulf of Mexico oil industry

09:31:19  4    relevant to your analysis of Anadarko and BPXP's role in the Gulf of

09:31:26  5    Mexico economy?

09:31:26  6    A.  The idea that this industry is unconcentrated, that it's

09:31:31  7    characterized by a relatively fluid entry or exit means that firms

09:31:40  8    placed in the position of developing similar resources to those that

09:31:45  9    BP or Anadarko are developing would make similar efforts to develop

09:31:52 10    those resources.  They would make similar expenditures; similar

09:31:56 11    expenditures on capital, similar expenditures on labor, and thereby

09:32:01 12    deliver similar benefits to the Gulf of Mexico economy.

09:32:11 13            MS.  KING:  Thank you, Dr. Mason.  I pass the witness.

09:32:14 14            THE COURT:  All right.  I'll honor someone's request.

09:32:16 15    Ms. Himmelhoch, I guess.  We'll go ahead and take our 15-minute

09:32:19 16    recess now.

09:32:20 17            THE MARSHAL:  All rise.

09:32:22 18         (WHEREUPON, A RECESS WAS TAKEN.)

09:56:57 19         (OPEN COURT.)

09:56:58 20            THE COURT:  Please be seated everyone.

09:57:01 21            MR. JARRETT:  Good morning, your Honor, Keith Jarrett for

09:57:03 22    BP.

09:57:04 23            THE COURT:  Good morning.

09:57:05 24                        CROSS-EXAMINATION

09:57:07 25    BY MR. JARRETT:

09:57:07  1    Q.  Good morning, Professor Mason, I'm Keith Jarrett.  I am one of
09:57:10  2    BP's lawyers.  We have not met before.  I did see this morning we
09:57:15  3    use the same coffee shop.
09:57:18  4            I am going to talk about three subjects today.  And the
09:57:20  5    first one I am going to talk about is something you've expressed
09:57:24  6    some opinions on, and it's the concept of mitigation.  And the first
09:57:31  7    point on mitigation, I want to talk about tourism grants.  You're
09:57:34  8    familiar that BP granted some tourism grants?
09:57:37  9    A.  Yes, I am.
09:57:38  10   Q.  Can we pull up TREX 13323.1.1.  Dr. Mason, this is BP
09:57:52  11   announcing tourism grants back in May of 2010.  You were aware that
09:57:56  12   they gave the grants at about that time?
09:57:59  13   A.  That's correct.
09:57:59  14   Q.  And if you read it today, it says, "BP is today announcing
09:58:03  15   grants to each of the states of Florida, Alabama, Mississippi, and
09:58:06  16   Louisiana to help their governors promote tourism around the shores
09:58:10  17   of the Gulf of Mexico over the coming months.  This is part of our
09:58:15  18   ongoing commitment to help mitigate the economic harm of the oil
09:58:19  19   spill."
09:58:20  20           Now, you're aware that BP gave these grants voluntarily
09:58:27  21   to the four states mentioned?
09:58:28  22   A.  I understand that they were not obligated to do so.
09:58:35  23   Q.  And you also understand that they gave 25 million to Florida at
09:58:39  24   that time and 15 million each to the other three states:  Alabama,
09:58:43  25   Mississippi, and Louisiana?

09:58:44   1   A.  That's correct.

09:58:45   2   Q.  And the grants totaled -- in total for 2010, they totaled

09:58:51   3   $87 million, and BPXP gave an additional 92 million thereafter.  Are

09:58:57   4   you familiar with that?

09:58:58   5   A.  Yes.  Right.  Yes.

09:59:00   6   Q.  Let's pull up D-35369.  Dr. Mason, you will recognize this

09:59:14   7   exhibit, 35369, as a table that comes from Dr. Loren Scott's report,

09:59:22   8   don't you?

09:59:22   9   A.  That's correct.

09:59:22  10   Q.  You've seen it before?

09:59:23  11   A.  Yes.

09:59:24  12   Q.  Dr. Loren Scott is BP's economic expert, your counterpart

09:59:29  13   actually, right?

09:59:30  14   A.  That's correct.

09:59:31  15   Q.  And he is a professor emeritus at LSU.  Do you know him?

09:59:36  16   A.  The first time I met him was at his deposition.

09:59:41  17   Q.  When you add up all of the tourism promotion grants that BPXP

09:59:45  18   made, they totaled $230,371,337.  And you have not taken issue with

09:59:54  19   those data, have you, sir?

09:59:55  20   A.  No, I have not.

09:59:56  21   Q.  And you have, in connection with your work on this case, you've

10:00:03  22   reviewed the testimony of Dr. Harry Luton, have you not, sir?

10:00:11  23   A.  I believe I looked at Mr. Luton's deposition.

10:00:16  24   Q.  You did.  And so you told us.

10:00:18  25   A.  Yeah.  I didn't know if that's what you were referring to or if

10:00:22  1    you meant something else, but that's what I have reviewed.

10:00:24  2    Q.  Let's pull up D-35343.  This is some testimony.  Dr. Harry

10:00:34  3    Luton is an employee at the Bureau of Ocean Energy Management, you

10:00:38  4    knew that?

10:00:39  5    A.  I recall that, yes.

10:00:40  6    Q.  He is a Ph.D. in social sciences?

10:00:43  7    A.  I knew he was a Ph.D., I couldn't have told you the particular

10:00:47  8    field.

10:00:48  9    Q.  He testified on behalf of the United States at its 30(b)(6)

10:00:53 10    deposition, you probably don't know what that is, but he was

10:00:56 11    designated by the government to testify on the topic of economic

10:00:59 12    harm.  You're aware of that?

10:01:01 13    A.  In broad strokes.

10:01:03 14    Q.  This is what Dr. Luton testified to with regard to the grants.

10:01:09 15    And we can all read it.  Essentially, it says:  "In some cases, BP

10:01:13 16    funds to promote tourism that supported local events like fishing

10:01:17 17    tournaments or fishing rodeos contributed to a doubling of

10:01:20 18    attendance from the 2009 pre-spill attendances at those events."

10:01:26 19            He answered:  "Yes, it contributed to it."

10:01:28 20            Do you see that?

10:01:29 21    A.  Sure.

10:01:29 22    Q.  Then it says:  "In some cases, BP tourism grant money was used

10:01:33 23    by states or counties to promote new events and new tourist

10:01:37 24    opportunities."

10:01:37 25            He agreed with that.  Do you see that?

10:01:39 1   A.  I do.

10:01:39 2   Q.  And he acknowledged that these moneys contributed to inflows of

10:01:44 3   tourism and tourism money, and then he noted that this grant money

10:01:48 4   had a positive contributing impact to the economy.  Do you see that?

10:01:52 5   A.  Yes, I do.

10:01:53 6   Q.  And as I appreciate what you've told us, you agree with

10:01:59 7   Dr. Luton that BPXP's tourism grants had a positive mitigating

10:02:05 8   effect on harm?

10:02:06 9   A.  I am not disagreeing that the payments had a mitigating effect

10:02:12 10  on harm.  As I indicated during direct, it's kind of the net damages

10:02:17 11  that I was focused on.

10:02:18 12  Q.  And your reports don't do anything about trying to put a

10:02:21 13  quantification on that positive effect, do they, sir?

10:02:23 14  A.  No, they do not.  Nor, to the best of my recollection, do

10:02:28 15  Dr. Scott's.

10:02:29 16  Q.  I want to stay on the topic of mitigation.  I'm going to switch

10:02:32 17  from tourism grants to the Vessels of Opportunities program.  I know

10:02:36 18  you're familiar with that, are you not, sir?

10:02:38 19  A.  That's correct.

10:02:39 20  Q.  Let's pull up TREX 13067.15.1.  Again, Dr. Mason, you recognize

10:02:49 21  this Table 7 from Dr. Scott's report where he cumulates the spending

10:02:53 22  on the Vessels of Opportunity program, calls it out by state, and

10:02:58 23  totals it up at $594,400,000.

10:03:04 24  A.  That's right.

10:03:05 25  Q.  And you have not taken any issue with those numbers either,

10:03:08   1   have you, sir?

10:03:09   2   A.  No.

10:03:09   3   Q.  And, in fact, you understand that this, too, was a voluntary

10:03:13   4   program undertaken by BPXP to mitigate economic losses?

10:03:17   5   A.  Well, yeah, my understanding was that they weren't obligated to

10:03:23   6   do that.  I would like to make clear that this is not a legal

10:03:26   7   conclusion.  I don't profess any particular expertise there, but as

10:03:29   8   a lay person, that was sort of my understanding.

10:03:31   9   Q.  Yeah.  Yeah.

10:03:33   10       And you also agree that this program benefited the

10:03:37   11   fishermen who participated in mitigating economic losses?

10:03:40   12   A.  Pardon me.  What -- yes, what I agree to is that those who

10:03:47   13   received payments from this, they benefited.  But other people who

10:03:52   14   didn't receive payments, you know, not so much.

10:03:54   15   Q.  That sounds pretty obvious.  If you participated, you

10:03:57   16   benefited; if you didn't, you didn't benefit, right?

10:03:59   17   A.  Yeah, I mean, I think you're right, it does sound pretty

10:04:03   18   obvious.  But nevertheless it's the case not everybody received

10:04:07   19   these payments; but those who did, they benefited.

10:04:09   20   Q.  And it's also your opinion, is it not, that from an economic

10:04:13   21   perspective, the VOO program that we describe here blunted the

10:04:18   22   adverse effects from the spill on employment?

10:04:20   23   A.  Yes.  I believe it's true, so -- insofar as individuals,

10:04:29   24   fishermen who participated, their employees had access to these

10:04:34   25   moneys and this economic activity.  It would have had -- it would

10:04:37  1    have blunted, as you put it, the economic effects of the spill.

10:04:40  2    Q.  So we've talked about tourism grants, we've talked about the

10:04:45  3    VOO program.  Still on the topic of mitigation, I want to talk about

10:04:49  4    spill response and claims payments.

10:04:51  5            Can we pull up D 35364, please.  Again, Dr. Mason, these

10:04:59  6    are two tables; they come from Dr. Scott's report.  You have seen

10:05:04  7    these before, have you not?

10:05:05  8    A.  Yes, I saw Dr. Scott's report, yes.

10:05:08  9    Q.  And you have not in your reports disputed any of the numbers

10:05:12 10    set out in these two tables, have you, sir?

10:05:14 11    A.  No.

10:05:14 12    Q.  Well, if we look at the first table, this is a topic that you

10:05:18 13    discussed somewhat on direct and quite lengthy, I believe, and it

10:05:24 14    talks about BPXP's claims payments to the Gulf coast states.  Do you

10:05:27 15    see that?

10:05:27 16    A.  Sure.

10:05:27 17    Q.  And it lists the dollars by state, and it totals up to

10:05:32 18    $10.1 billion spent in the states of Louisiana, Mississippi,

10:05:37 19    Alabama, and Florida.  And do you agree with that?

10:05:39 20    A.  Yes, I don't disagree with the numbers that are in that table,

10:05:45 21    correct.

10:05:45 22    Q.  And then we have Table 6 from Dr. Scott's report, which

10:05:49 23    discusses the BPXP spill response spending, and we notice that that

10:05:53 24    totals $14.1 billion of total spending through 2014 -- for the

10:05:59 25    second quarter of 2014.  And you don't dispute those numbers either,

10:06:03  1  did you, sir?

10:06:03  2  A.  You're correct, I don't dispute those numbers.  In contrast,

10:06:10  3  though, to a few of the examples that you gave earlier, as a lay

10:06:16  4  person, not speaking here legal expertise, my understanding is that

10:06:22  5  these spendings were not voluntary.

10:06:24  6  Q.  I didn't ask you that but I am going to get to that.

10:06:27  7        But you don't dispute the numbers, right?

10:06:28  8  A.  No.

10:06:29  9  Q.  And you don't dispute that BPXP spent almost 12 and a half

10:06:34 10  billion dollars in the year 2010 alone?

10:06:36 11  A.  That's what the chart says, yes.

10:06:39 12  Q.  Can you pull up, please, TREX 13118.  Do you recognize this

10:06:50 13  exhibit, Dr. Mason?

10:06:53 14  A.  Yes, I do.

10:06:53 15  Q.  This is a document you cited in your materials.  It's a labor

10:06:59 16  market impact study that was authored by Joseph Aldy, correct?

10:07:03 17  A.  That's right.

10:07:04 18  Q.  Dr. Aldy is also a Ph.D. economist like yourself, is he not?

10:07:09 19  A.  Yes, he is.

10:07:10 20  Q.  Do you know him?

10:07:10 21  A.  I do.

10:07:11 22  Q.  He actually was a special assistant to the president at one

10:07:13 23  time, wasn't he?

10:07:14 24  A.  Yes, he was for -- my recollection was for a year or two.

10:07:18 25  Q.  And he's a professor at Harvard?

10:07:20  1   A.  Yes, he is an assistant professor at Harvard.

10:07:23  2   Q.  And Dr. Aldy, in this exhibit, in the study, he examined and

10:07:31  3   analyzed the effects of BP's cleanup expenditures and their claims

10:07:34  4   payments, didn't he?

10:07:36  5   A.  Yeah.

10:07:37  6   Q.  Let's pull up, if we could, please, TREX 13118.24.1.  This is

10:07:44  7   an excerpt from that study that Dr. Aldy performed.  Section 4.12

10:07:54  8   reads:  "The clean-up activities and compensation for economic

10:07:57  9   damages provided by BP could counter at least some of the impacts of

10:08:01 10   lost income on economic activity.  BP's expenditures in the Gulf

10:08:06 11   states for damage compensation and clean-up were quite significant.

10:08:10 12   By June 1, 2010, BP reported spending nearly a billion dollars for

10:08:16 13   clean-up, and the clean-up tab increased to more than $3 billion by

10:08:20 14   July 5.  On September 17, BP" -- this is back in 2010 -- "BP

10:08:25 15   reported having spent clean-up spending of nearly $10 billion."

10:08:30 16            That's what he wrote?

10:08:31 17   A.  That's what he wrote.

10:08:32 18   Q.  And you don't dispute either the figures or the conclusions, do

10:08:36 19   you, sir?

10:08:36 20   A.  I don't -- if by "conclusions," you mean the passage here that

10:08:41 21   you've highlighted?

10:08:42 22   Q.  Yes, sir.

10:08:43 23   A.  I don't dispute that.

10:08:44 24   Q.  And, in fact, not only do you not dispute it, you agree that it

10:08:48 25   could have countered some of the impacts of lost income?

738

10:08:51 1    A.  Dr. Aldy's analysis demonstrates no net effects of what you say

10:08:57 2    is correct.  I should clarify here:  No net effect in the year 2010.

10:09:03 3    Q.  What Dr. Aldy found is that there was no loss of employment on

10:09:08 4    a net basis in 2010.

10:09:11 5    A.  Kind of weighing it -- yes.  Kind of weighing against what

10:09:15 6    damages might have occurred from the spill, the benefits -- such as

10:09:20 7    they were -- from these various activities, more or less, they

10:09:23 8    canceled out in his analysis.

10:09:24 9    Q.  And importantly, you don't disagree with that finding, do you,

10:09:28 10   sir?

10:09:28 11   A.  I don't disagree that the activities in 2010 came out -- the

10:09:34 12   labor market activities kind of came out as a wash.

10:09:38 13   Q.  Let's pull up, if we could, please, D-35344.  This is some more

10:09:47 14   testimony from Dr. Luton that you reviewed.  And here Dr. Luton is

10:09:52 15   being asked about moneys that BP was paying for spill response and

10:09:58 16   claims, and the question was:  "Your understanding is that BP's

10:10:03 17   payment of substantial amounts of money early after the spill and

10:10:06 18   getting it to individuals and businesses quickly minimized the

10:10:11 19   spill's impact on those individuals and businesses, right?"

10:10:14 20            His answer was:  "Yes."

10:10:16 21            "And BP started paying claims right away, didn't it?"

10:10:19 22            And his answer was:  "Yes."

10:10:24 23            You reviewed that testimony?

10:10:25 24   A.  Yes, that's correct.

10:10:26 25   Q.  And it's true that you agree with Dr. Luton, and, in fact, you

10:10:32  1  have written in your reports that it was not only the amount but the

10:10:35  2  timing of the payments that was so important and so positive?

10:10:40  3  A.  I agree with the prophylactic effect.  I am not -- I wouldn't

10:10:52  4  be comfortable with the word "minimized" here.  Mitigated but not

10:10:56  5  minimized.

10:10:57  6  Q.  Mitigated.  That's the whole subject we're talking about,

10:10:59  7  right?

10:11:00  8  A.  It is.

10:11:00  9  Q.  We talked about tourism payments -- tourism grants minimizing

10:11:05  10  or mitigating economic impact; the VOO program mitigating economic

10:11:10  11  impact; spill response mitigating economic impact; and early claims

10:11:15  12  payments mitigating economic impact, correct?

10:11:17  13  A.  We are.  But for an economist -- well, I am just going to say I

10:11:21  14  think it's important -- it's not -- I am not just sort of splitting

10:11:25  15  semantic hairs.  There is a difference between "minimize" and

10:11:28  16  "mitigate."

10:11:28  17  Q.  Fair enough.

10:11:30  18      As a final subject on this mitigation topic, I want to

10:11:34  19  talk about employment.  I think you've already confirmed for us that

10:11:39  20  Dr. Aldy concluded that the employment was a "wash" was your words,

10:11:43  21  and you're in agreement with that?

10:11:45  22  A.  In the year 2010, there was no -- he measured no net effect.

10:11:50  23  Q.  Thank you, sir.  I am going to -- that's the first topic.  One

10:11:54  24  down.

10:11:54  25      So I am going to turn to a second topic and this topic is

740

10:11:57  1   economic harm.  This is a topic you discussed on direct.  Your

10:12:04  2   evaluation was qualitative, correct, sir?

10:12:07  3   A.  That's correct.

10:12:07  4   Q.  "Qualitative" means so you can use words like "serious" or

10:12:11  5   "severe" rather than numbers like 5 or 10, right?

10:12:14  6   A.  So the general idea here is to give the big picture -- I think

10:12:22  7   that's consistent with what you just said -- not to give a precise

10:12:28  8   numerical evaluation.

10:12:30  9   Q.  You were not trying to give a precise numerical evaluation; you

10:12:34 10   were only trying to give a rough estimate, as I read your stuff?

10:12:36 11   A.  Indeed.  Yes.  Particularly -- I like to emphasize that this is

10:12:42 12   not meant to be precise; it's meant to be a rough estimate.

10:12:45 13   Q.  You're familiar with the concept of uncertainty in economics?

10:12:49 14   A.  Certainly.

10:12:50 15   Q.  That's a concept that we lay people might call "margin of

10:12:54 16   error," correct?

10:12:54 17   A.  Well, that kind of depends upon the application.  "Uncertainty"

10:13:00 18   might mean many different things.  It might, within the particular

10:13:04 19   context, mean "margin of error."

10:13:07 20   Q.  Just to confirm the concept of uncertainty here, you're not

10:13:12 21   prepared to offer an opinion as to the margin of error on your rough

10:13:16 22   estimate because you didn't see the underlying data to make a

10:13:19 23   personal analysis about that; isn't that fair?

10:13:21 24   A.  Right.  So, yeah, if I understand your question correctly, what

10:13:25 25   you're basically saying is:  I've got this number, I can't tell you

10:13:30  1    anything about kind of a statistical range that the estimate of the
10:13:36  2    subset might fall in.  Never my intent to do that, didn't offer any
10:13:40  3    information on that.  What you get is a rough estimate.
10:13:43  4    Q.  We agree on that?
10:13:45  5    A.  Well, I think what I just said agreed with your question.
10:13:48  6    Q.  Yes, sir.
10:13:49  7    A.  Possibly there were some differences around the edges.
10:13:51  8    Q.  No, I think we're in agreement.
10:13:54  9            So what you did do, as you explained in detail, is you
10:13:59 10    looked at aggregated claims data; that is, claims that had been
10:14:03 11    paid?
10:14:04 12    A.  I looked at aggregated claim payment or -- I used the whole
10:14:10 13    universe of the claims, but it's the payments, the aggregation of
10:14:13 14    payments that made its way into this analysis, yeah.
10:14:16 15    Q.  And you understood that these were OPA payments, correct?  Oil
10:14:21 16    Pollution Act payments?
10:14:22 17    A.  Yes.  Now, if I can add a qualifier?  Again, I am not
10:14:27 18    offering -- the answer is yes but not as a legal interpretation.
10:14:32 19    Q.  In none of your three reports that you issued have you offered
10:14:38 20    any opinion about the value of any uncompensated economic harm; you
10:14:42 21    just noted that that exists?
10:14:43 22    A.  That's right.  I mean -- yeah, there's the fact that -- for
10:14:49 23    example, that there are these outstanding claims payments.  I can't
10:14:53 24    tell you with any degree of certainty what fraction of those would
10:14:56 25    be paid.  I think that would be imprudent for me to do that.

10:14:59  1    Nevertheless, you've got this set of payments that's outstanding,

10:15:02  2    you know.  You ball-park figures, the fraction of similar payments

10:15:07  3    that were granted, you know, as a rough estimate again.  I don't

10:15:12  4    think it's unreasonable to imagine that those outstanding payments

10:15:16  5    will have something that looks about like that.  20 percent were

10:15:19  6    paid -- maybe 20 percent of the outstanding payments were paid,

10:15:22  7    maybe 50, maybe 50.

10:15:24  8              I don't have an analysis of that.  I can't give you -- I

10:15:27  9    can't confirm for you, yes, what it will be.  But I think that's a

10:15:32 10    reasonable interpretation an empirical economist would draw.

10:15:36 11    Q.  My question was:  Your three reports don't have any information

10:15:39 12    about that and you haven't offered an opinion about that?

10:15:42 13    A.  About the way that --

10:15:43 14    Q.  About the way --

10:15:44 15    A.  -- on projects from?

10:15:46 16    Q.  About any evaluation of uncompensated damage, yes.

10:15:49 17    A.  No, I don't have anything to say about the uncompensated

10:15:54 18    damage; just noted that there was this share that was left, you

10:15:59 19    know, in particular, this large share of business claims.

10:16:02 20    Q.  Understood.

10:16:02 21              As a final point on this little subset of questions, you

10:16:07 22    agree with me that to the extent that the Clean Water Act penalties

10:16:11 23    are designed in part to serve as a deterrent, do you agree that from

10:16:16 24    an economic perspective OPA payments can serve a deterrent function

10:16:21 25    in cases like this?

10:16:22  1    A.  Okay.  So again, yes, the answer is yes.  But, I am looking --

10:16:29  2    I mean, I am answering this question from the perspective of

10:16:33  3    somebody who dabbles in economic theory.  I'm thinking this is kind

10:16:37  4    of a conceptual economic exercise.  I am not a legal scholar, I

10:16:43  5    don't avow any expertise associated with that.  So from the

10:16:46  6    perspective of an economist, these things might serve similar

10:16:50  7    deterring roles, which isn't necessarily the same thing as saying

10:16:55  8    they serve the same role.

10:16:57  9    Q.  In fairness, you weren't qualified as a legal expert, only an

10:17:01 10    economic expert, and my question was focused on economics and we do

10:17:04 11    have an agreement on that point?

10:17:04 12    A.  On the economic interpretation, you could think of each of

10:17:08 13    these things as offering a deterring role.

10:17:10 14    Q.  Thank you, Doctor.

10:17:13 15           Changing subjects.  I want to talk now about your tourism

10:17:19 16    analysis.  First, let's pull up, if we could, D 33 -- I'm sorry,

10:17:26 17    35368.

10:17:41 18           MR. JARRETT:  Your Honor, after yesterday, I was hoping to

10:17:45 19    not go into any technological issues today.  I think we got it.

10:17:45 20    BY MR. JARRETT:

10:17:48 21    Q.  Dr. Mason, you will recognize these figures on this exhibit,

10:17:54 22    D-35368, as also being figures from Dr. Loren Scott's materials,

10:18:00 23    correct?

10:18:00 24    A.  Yes.  These are figures from Dr. Scott's materials.

10:18:04 25    Q.  This is where Dr. Scott took the annual revenue per available

10:18:11  1    room, that's the same metric that we saw you use in the analysis

10:18:14  2    that you talked about on direct, correct?

10:18:17  3    A.  Yeah, he uses -- these are graphs based on the so-called RevPAR

10:18:22  4    thing.

10:18:23  5    Q.  RevPAR, revenue per available room, that's an acronym?

10:18:27  6    A.  That's the acronym, that's right.

10:18:29  7    Q.  He presented this figure -- these are Figures 3, 7, 8 and 11,

10:18:36  8    if I can read that right.

10:18:38  9         And these are for all four of the affected states, the

10:18:42 10    Florida panhandle, Alabama, Mississippi, and Louisiana.  Correct?

10:18:46 11    A.  That's right.

10:18:47 12    Q.  And you have not disputed any of the numbers in Dr. Scott's

10:18:55 13    tables that we see here?

10:18:56 14    A.  Right.  I am not -- correct, I am not disagreeing with the

10:19:03 15    figures, the representation of the numbers.  I disagree with the

10:19:08 16    interpretation.  As I indicated on direct, we're coming out of The

10:19:13 17    Great Recession, we would expect to see increases.  If, for example,

10:19:19 18    in RevPAR, so viewed in this particular light, just all by

10:19:22 19    themselves here, just thinking about these figures, they really

10:19:26 20    don't tell me a whole lot.

10:19:27 21    Q.  Dr. Scott, please, I just asked you about the data.  You don't

10:19:32 22    dispute the data?

10:19:33 23              THE DEFENDANT:  Dr. Mason.

10:19:35 24              MR. JARRETT:  Dr. Mason, yeah, correct.  Thank you, Judge.

10:19:37 25              THE WITNESS:  Dr. Scott might be better looking.

—— OFFICIAL TRANSCRIPT ——

10:19:37  1   BY MR. JARRETT:

10:19:41  2   Q.  I think he is going to talk about this himself, but you don't

10:19:43  3   dispute the data, correct?

10:19:45  4   A.  Yeah.  As I said a moment ago, I don't disagree with the data;

10:19:48  5   I disagree with the interpretation.

10:19:50  6   Q.  And what the data that Dr. Scott has presented shows is that

10:19:55  7   hotel revenue measured by this metric has increased year over year

10:20:01  8   since 2010, correct?

10:20:02  9   A.  It does show that, but as noted a moment ago, that's what you

10:20:08  10  would expect to happen on the ground; tourism is recovering after we

10:20:11  11  come out of the recession.

10:20:12  12  Q.  And Dr. Scott made that conclusion for all four of the states

10:20:16  13  presented here?

10:20:17  14  A.  I am not sure he made that conclusion for the Mississippi Gulf

10:20:24  15  Coast.  I know he made that conclusion for the other states.  But --

10:20:31  16  Q.  Mississippi was a casino-related issue, wasn't it?

10:20:35  17  A.  Yeah, he made that claim that there was some kind of a link to

10:20:38  18  casinos.

10:20:39  19  Q.  And in fairness, you didn't even know that there were casinos

10:20:43  20  in the Mississippi Gulf Coast, did you?

10:20:45  21  A.  So in fairness here, I don't avow the kind of expertise that he

10:20:53  22  has for the regional economies.  I had seen -- he provided, I

10:20:57  23  believe, his background information for that claim, he provided some

10:21:01  24  visuals that illustrated the location and the identity of casinos in

10:21:07  25  the various states.

10:21:08  1            And as I recall, there are casinos all over the state of

10:21:13  2   Mississippi.  But that's a separate question, I think.

10:21:15  3   Q.  And the casino industry data shows that it's been in a slump

10:21:20  4   for several years, correct?

10:21:21  5   A.  Now, that's something I just can't tell you about because

10:21:25  6   that's not --

10:21:26  7   Q.  We'll ask Dr. Scott about it.

10:21:28  8   A.  Right, it's not to my area of expertise.

10:21:30  9   Q.  Well, Dr. Scott, from viewing these datas, made a conclusion

10:21:33 10   that the tourism industry had recovered, and you decided that you

10:21:38 11   wanted to test that theory and that's what we talked about earlier

10:21:41 12   today on direct, right?

10:21:42 13   A.  I evaluated that conclusion in the rebuttal report and the

10:21:47 14   response report, correct.

10:21:48 15   Q.  Let's pull up TREX 13319.14.1.  So this is an excerpt from your

10:22:01 16   report, Dr. Mason, do you see that?

10:22:03 17   A.  Yes.

10:22:04 18   Q.  It comes from your third report and you're describing how you

10:22:07 19   went about trying to perform this test of Dr. Scott's analysis.  And

10:22:12 20   you said that what you did was you compared changes in a variable of

10:22:18 21   interest in a study area against changes in the same variable in a

10:22:22 22   nearby but unaffected area.  Correct?

10:22:25 23   A.  That's what this quote says, that's right.  This is the

10:22:29 24   so-called difference-in-difference method.

10:22:31 25   Q.  And the general idea is that comparable areas should have

10:22:34  1    similar affects across time?

10:22:36  2    A.   That's the way that we interpret the difference-in-difference

10:22:40  3    approach.

10:22:40  4    Q.   So what you did in this tourism industry analysis was you

10:22:45  5    analyzed tourism in two states, using the same RevPAR data that

10:22:49  6    Dr. Scott used, correct?

10:22:51  7    A.   Yes.

10:22:51  8    Q.   You analyzed the data in the state of Mississippi, correct,

10:22:55  9    sir?

10:22:55 10    A.   Yes, that's right.

10:22:56 11    Q.   And you compared RevPAR data for the Gulf Coast area to RevPAR

10:23:02 12    data from the inland counties, correct?

10:23:05 13    A.   Yeah, the comparison here is between RevPAR for a typical hotel

10:23:10 14    in a Gulf Coast county to RevPAR data for a typical hotel in inland

10:23:15 15    Mississippi.

10:23:16 16    Q.   And then you did the same thing from Florida in that you

10:23:19 17    compared the Florida panhandle, the affected area, with the Atlantic

10:23:23 18    coast of Florida, the unaffected area?

10:23:26 19    A.   That was the general logic.

10:23:28 20    Q.   Could you pull up D-33519.  This was the chart that you showed

10:23:42 21    on direct, the results of your analysis comparing Mississippi Gulf

10:23:46 22    Coast and Mississippi inland, and the Florida panhandle to the

10:23:49 23    Florida Atlantic coast, right?

10:23:51 24    A.   That's right.

10:23:54 25    Q.   Can you now pull up the one that we had before, which was

10:23:56  1   D-33512.

10:24:00  2   Is was also a chart that you used on direct.  Do you recall this?

10:24:03  3   This is where you were showing where GCCF claims payments went?

10:24:08  4   A.  That's right.

10:24:09  5   Q.  One of the assumptions we just talked about that underlies your

10:24:18  6   model is that you were comparing affected areas against unaffected

10:24:22  7   areas, correct?

10:24:24  8   A.  That's right.

10:24:25  9   Q.  Well, if we look at this chart, it looks to me like, for

10:24:29 10   Mississippi, that the area on the Gulf Coast is affected and the

10:24:33 11   inland area is also affected.

10:24:37 12   A.  So this is not identifying the type of claim, the source from

10:24:43 13   where the claims came, the kind of line of business.  You're

10:24:48 14   correct, your assertion here that there are claims from inland

10:24:52 15   Mississippi is obviously indicated by this graph.  That does not

10:24:56 16   mean that those claims came from hotels.  There's no way we can

10:25:00 17   know, looking at this.

10:25:01 18   Q.  You don't know?

10:25:02 19   A.  I just -- yeah.

10:25:03 20   Q.  What we do know is that you had, you compared one affected area

10:25:07 21   to another affected area?

10:25:11 22   A.  Yeah.  So I think it's fair to say here that there are some

10:25:16 23   areas that are clearly more heavily affected; those are the ones

10:25:21 24   that are in the treatment group.  There are other areas that are

10:25:24 25   clearly less affected; those are the areas that are in the un -- are

10:25:29  1    in the control group.

10:25:30  2    Q.  But in fairness to me, "less affected" doesn't mean

10:25:33  3    "unaffected"?

10:25:34  4    A.  It's the same idea, though.  The rising tide idea still applies

10:25:40  5    to the affect as you see heavier damages in areas that are more

10:25:44  6    directly affected, that still is an indication that there is an

10:25:48  7    impact from the spill on those counties.

10:25:50  8    Q.  "Less affected" doesn't equal "unaffected," we agree on that?

10:25:54  9    A.  "Less affected" doesn't equal "unaffected."  But the fact

10:25:58 10    remains that if there was no impact from the spill, you should see

10:26:01 11    similar patterns in those places.

10:26:03 12    Q.  We'll talk about that, too.

10:26:04 13         But also for Florida, this is where you compared the

10:26:09 14    panhandle region -- that's this, right (INDICATING)?

10:26:11 15    A.  Yes.

10:26:11 16    Q.  -- against the Atlantic coast region, right?

10:26:15 17    A.  That's right.

10:26:15 18    Q.  And here, from this chart, Exhibit 33512, we can also see that

10:26:21 19    you compared one affected area to another affected area, correct?

10:26:26 20    A.  I have the same response to the question a moment ago:  The

10:26:31 21    bulk of the impacts were in the panhandle area, we don't know that

10:26:35 22    those counties on the Atlantic coast, the claims payments that we're

10:26:39 23    speaking of right now, came from hotels.

10:26:42 24         And let me just, let me add something else on top of this.

10:26:47 25    The GCCF program did not run through past -- I believe it was 2012.

10:26:56  1    So to the extent that your criticism applies here, it doesn't have

10:27:02  2    direct bearing on observations from 2013.  Just as a side point.

10:27:06  3         But I still think, as a matter of practice, as kind of an

10:27:11  4    applied econometric exercise, the best approach might be to compare

10:27:17  5    unaffected with affected.  But that doesn't make a comparison of

10:27:22  6    more affected and less unaffected invalid.  It still provides us

10:27:28  7    information, it still delivers insight, it still shows us that that

10:27:31  8    was a pattern in the effects, that there was a greater effect by

10:27:34  9    those counties for which there was a greater exposure to the spill.

10:27:39  10   Q.  The resulting calculations that you made are compromised by the

10:27:49  11   fact that you didn't have an unaffected county comparison, you'll

10:27:53  12   give me that?

10:27:54  13   A.  I think, I mean, the idea of the difference-in-difference

10:27:57  14   approach is that there is something that's different between the two

10:28:01  15   places.  So here is something that I think is different is that the

10:28:06  16   coastal counties were more heavily exposed.  If the oil spill

10:28:11  17   doesn't have an affect, then the fact that they're more heavily

10:28:15  18   exposed is irrelevant.  If we see a difference, then that they were

10:28:20  19   more heavily exposed no longer is irrelevant.

10:28:22  20   Q.  That's one of your assumptions that -- one of your assumptions

10:28:27  21   was we're going to compare an affected area to an unaffected area.

10:28:32  22        Another assumption that you made in your analysis is that

10:28:36  23   you would anticipate that the rate of increase in revenue per

10:28:40  24   available room should run parallel.  Isn't that what you said, that

10:28:47  25   they should be comparable?

10:28:48  1  A.  Yes.  Okay.  So what I said was you would expect to see similar

10:28:52  2  patterns in these different places.

10:28:55  3          Are we speaking of RevPAR right here?

10:28:58  4  Q.  Yes, sir, RevPAR.

10:28:59  5  A.  So I would expect to see similar patterns in tourism activities

10:29:05  6  across the board if there were no affect attributable to the oil

10:29:12  7  spill.

10:29:13  8  Q.  What is -- in economic theory, what's the concept of

10:29:16  9  "robustness"?

10:29:17  10  A.  The concept of robustness means that alternative explanations

10:29:25  11  don't greatly adversely impact the conclusion that you draw.

10:29:34  12  Q.  It's the ability of an economic model to remain valid under

10:29:39  13  differences, right?

10:29:41  14  A.  I think that's a fair assumption in very broad strokes.

10:29:46  15  Q.  I looked back at some of the articles you wrote, most recently

10:29:48  16  an article called "Junk Processes and Natural Gas Markets."  You

10:29:52  17  used the whole concept of robustness to test your hypothesis, don't

10:29:57  18  you?

10:29:57  19  A.  That's a pretty standard fair and published applied econometric

10:30:02  20  work.

10:30:02  21  Q.  Nowhere in your three reports that you have presented have I

10:30:06  22  seen you undergo a robustness analysis of your assumption about

10:30:13  23  markets in unaffected and affected areas should be trending the

10:30:17  24  same.  You did not do a robustness analysis, did you, sir?

10:30:22  25  A.  I didn't do a robustness analysis.  I don't think anybody

10:30:26 1   else -- any of the other economic experts undertook a robustness

10:30:31 2   analysis.

10:30:32 3   Q.  So the point I would make is:  When you write something for

10:30:35 4   peer-reviewed literature, like your article you just talked about,

10:30:38 5   you do test your assumption.  And for this purpose in this paper,

10:30:41 6   you did not test your assumption, correct?

10:30:43 7   A.  Yes.  But it's important, I think really critically important

10:30:49 8   here to keep in mind the time frame.  So the particular analysis

10:30:54 9   that you're speaking of, I believe, this is coming from -- I don't

10:30:58 10  remember now if you were referring to something from the Round 2 or

10:31:02 11  Round 3 report.  Doesn't much matter.  Not a whole lot of time.

10:31:06 12          The typical paper that I write, I work on -- for

10:31:09 13  publication as part of my academic duties, I would work on that for

10:31:12 14  a good while, and polish it, and think about it.  That sort of

10:31:19 15  opportunity simply not available under the time frame.  If I have

10:31:23 16  two weeks to write a response report, I can't do all of those

10:31:27 17  robustness checks.

10:31:29 18          But it is, nevertheless, evidence that's offered up in

10:31:32 19  rebuttal to claims made by Dr. Scott.

10:31:35 20  Q.  One way you might have tested the robustness is to go back in

10:31:39 21  time and see if the Florida panhandle and the Florida Atlantic Coast

10:31:45 22  tracked in parallel prior to the spill; that would have been an easy

10:31:48 23  way to do it, right?

10:31:49 24  A.  I think what you're saying is I could have made a comparison

10:31:54 25  between those areas for, I don't know, 2008, something like that.

10:31:59  1    Q.  Yeah.  Over time to see -- that was your assumption.  That --

10:32:02  2    your assumption was that they should parallel over time.  And my

10:32:05  3    criticism is you didn't check it over time, you only checked it from

10:32:10  4    the spill forward and you didn't run any robustness check; that's

10:32:14  5    all correct, right, sir?

10:32:15  6    A.  Okay.  So what's correct is that there's no robustness check.

10:32:19  7    What's not correct is that there's no controlling for the source of

10:32:22  8    things that you're thinking about.  The whole point to using

10:32:25  9    information from a period prior to the event, here the oil spill, is

10:32:31 10    to provide that sort of a context.  That's why we do these

10:32:36 11    difference-in-difference effects.

10:32:38 12    Q.  On this analysis that we've talked about where you did your

10:32:44 13    RevPAR analysis for the states of Mississippi and Florida, your

10:32:49 14    reports didn't present any analysis for the other two relevant

10:32:52 15    states, Louisiana or Alabama, did it?

10:32:54 16    A.  That's right.  I didn't.  And again, as I indicated on direct,

10:32:57 17    that's because I was offering this up as a targeted rebuttal to

10:33:01 18    broad claims made by Dr. Scott.

10:33:02 19    Q.  To use your words from the deposition, however, you acknowledge

10:33:07 20    that those results for the states of Alabama and Louisiana would

10:33:12 21    have expository value?

10:33:15 22    A.  Yeah, I said that in the deposition.

10:33:18 23    Q.  That means it can explain some things?

10:33:22 24    A.  It could.  And if the purpose of this report was to do what

10:33:25 25    Dr. Scott did in his Round 1 report, that would be a different

754

10:33:28 1   question.  If the purpose -- the purpose of that Round 2 report was

10:33:32 2   to rebut some of his claims.  As such, I didn't feel any particular

10:33:38 3   need to redo all of his work.

10:33:43 4   Q.  Even though you thought that the Court might be interested in

10:33:47 5   seeing those data from Louisiana and Alabama, you do agree with

10:33:51 6   that, right?

10:33:52 7   A.  The Court could have interest in that.  But again, the point of

10:33:56 8   that report, of the Round 2 report was to respond, to offer a

10:34:01 9   criticism or to rebut claims made -- broad claims made by Dr. Scott

10:34:06 10  in his Round 1 report.  And similarly, the stuff in the Round 3

10:34:12 11  report responds to claims he made in his Round 2 report.

10:34:15 12  Q.  You also acknowledged that you did two more of these RevPAR

10:34:20 13  analyses that didn't find their way into your report?

10:34:23 14          MS. KING:  Objection, this calls for information that's

10:34:26 15  clearly outside of the scope of direct and outside of the report.

10:34:29 16  The question is about information that's not in Dr. Mason's reports.

10:34:34 17          MR. JARRETT:  This was asked and answered in the

10:34:36 18  deposition, your Honor so it's not a surprise.

10:34:39 19          MS. KING:  I objected.

10:34:40 20          THE COURT:  Overruled.

10:34:40 21  BY MR. JARRETT:

10:34:41 22  Q.  So you presented data for two states.  You did some analysis --

10:34:45 23  some other analysis for other states that you didn't present?

10:34:50 24  A.  So what came up in the deposition, we went through this long

10:34:57 25  list of questions.  Ms. King made similar objections on the grounds

10:35:04 1    that anything to do with stuff that wasn't in the reports was work

10:35:08 2    product between us.  And the culmination of that was a yes/no

10:35:14 3    question, "Did you look at other states?  Any other states?

10:35:19 4    Anywhere?"  It didn't specify.  I recall it didn't specify.  I said,

10:35:23 5    "Yes"; which is to say that there was some other work that wasn't in

10:35:27 6    the report.  Didn't say where.  We didn't say how many.

10:35:32 7    Q.  I get you.

10:35:34 8    A.  We didn't say in particular the two states that you're leading

10:35:36 9    up to.

10:35:37 10   Q.  I get you.  You did some other analyses for other states that

10:35:41 11   didn't make it into your report, that's all I asked.

10:35:44 12   A.  There is some work that wasn't in the report.

10:35:46 13   Q.  Let's pull up, if we could, please, D-35363.  You'll recognize

10:35:58 14   this, Dr. Mason, as Dr. Scott's replication of your analysis for the

10:36:03 15   two missing states - Alabama and Louisiana.  Do you see that?

10:36:06 16   A.  Yes.

10:36:07 17   Q.  He did the same analysis that you did for Mississippi and

10:36:12 18   Florida, but he did it for Alabama and Louisiana, correct?

10:36:17 19   A.  That's right.

10:36:17 20   Q.  And you do not challenge the data that Dr. Scott presented in

10:36:20 21   these two figures, do you, sir?

10:36:22 22   A.  No, I don't.  But I would like to point out here, observing

10:36:30 23   that -- the effect that I was interested in -- and I should stress

10:36:36 24   here.  I didn't do these analyses in the reports that you're talking

10:36:40 25   about here.  Observing that there are places where there is an

756

10:36:44  1   effect doesn't undercut -- I'm sorry.  Observing places as with

10:36:49  2   Alabama and Louisiana in Dr. Scott's Round 3 report where there is

10:36:53  3   no negative effect doesn't undercut the result that I presented that

10:36:57  4   there were other places where there wasn't a negative effect.

10:37:00  5   Q.   Doctor, please, I haven't asked you anything yet about

10:37:04  6   Mississippi or Florida.  I am focused on Alabama and Louisiana.  You

10:37:09  7   don't dispute the data here from Dr. Scott that comes from Alabama

10:37:12  8   and Louisiana?

10:37:14  9   A.   I am not disputing the data that he used in these figures.

10:37:18 10   Q.   And, in fact, if you look at the results of this analysis, this

10:37:23 11   shows that for the states of Alabama and Louisiana on the coast, the

10:37:27 12   recovery and the tourism industry was very robust and outpaced the

10:37:34 13   recovery and increases on tourism from inland Louisiana and inland

10:37:38 14   Alabama respectively, correct, sir?

10:37:40 15   A.   So let me offer up this interpretation.  It's correct that

10:37:49 16   there's a clear pattern, as you described, in Louisiana.  As a

10:37:56 17   qualifier to this, the data that's used in this particular data set

10:38:00 18   excludes a variety of parishes along the Gulf Coast; particularly,

10:38:06 19   the ones that are to the west.  And I think it's Plaquemine is how

10:38:14 20   you pronounce it, not included in this data set.  But with that

10:38:19 21   qualifier understood, then he sees a pattern for Louisiana.

10:38:24 22         Alabama's a little bit choppier.  It still is,

10:38:28 23   apparently, a pattern, but to my eye it really is colored by the

10:38:32 24   effects from 2010, which, I think, most likely are coming from spill

10:38:35 25   response.  That doesn't mean -- I am just offering you a qualified,

OFFICIAL TRANSCRIPT

10:38:39  1   yes, I suppose.

10:38:40  2   Q.  Focus on Alabama a minute.  It did really well in 2010, the

10:38:45  3   tourism industry on the coast because of all of spill response

10:38:47  4   efforts, that's essentially what we're looking at, right?

10:38:50  5   A.  That would be my guess.  As I said, I didn't think about that

10:38:53  6   in great length.  I know that's an argument that Dr. Scott made.

10:38:57  7   Q.  And of course, it went back to a more normal trend in 2011, had

10:39:05  8   year-over-year increases and outpaced the year-over-year increases

10:39:10  9   in the inland counties, correct?

10:39:11  10  A.  That's the indication from this graph, that's right.

10:39:13  11  Q.  And for Louisiana, the same phenomenon is true, which is you

10:39:17  12  have year-over-year increases in tourism that outpaced the inland

10:39:23  13  county -- the inland parishes for us, right?

10:39:25  14  A.  You're seeing that for Louisiana.  And again, as I noted a

10:39:27  15  moment ago, I am not telling you that I disagree that there were --

10:39:31  16  that possibly gains in Louisiana and Alabama doesn't change the fact

10:39:34  17  that there were losses in the other places I looked.

10:39:38  18  Q.  I am going to switch for a minute, now, to -- you did a similar

10:39:43  19  analysis for real estate.  Do you remember that?

10:39:45  20  A.  I did.

10:39:45  21  Q.  And your third report is where that analysis appears for the

10:39:50  22  first time, correct?

10:39:51  23  A.  That's right.

10:39:52  24  Q.  And the data you used for your real estate analysis was not

10:39:56  25  data that you had used in either of your first two reports, correct?

758

10:39:59  1   A.  It's data that I didn't use in either of the first or second

10:40:04  2   report; though, as, I think I clearly indicated during the direct

10:40:09  3   testimony, the methodology that I used in analyzing the real estate

10:40:17  4   data is the same as the methodology that I used in analyzing the

10:40:21  5   RevPAR data.  And that, in particular, that analysis was offered up

10:40:26  6   in direct rebuttal to a claim that Dr. Scott made, a broad claim

10:40:32  7   that Dr. Scott made in his Round 2 report.

10:40:34  8   Q.  Two points about that.  Point No. 1 is, Dr. Scott never said

10:40:40  9   anything in any of his reports about real estate, correct?

10:40:43 10   A.  He made just general comments about broad recovery.  Damages,

10:40:48 11   such as they were, quickly disappeared.

10:40:52 12   Q.  Listen to my question.  He never made any presentation about

10:40:56 13   real estate, correct?

10:40:57 14   A.  He didn't make any specific presentation about real estate, but

10:41:01 15   I still think that the -- the remark that I made is on point here.

10:41:05 16   He did make these broad claims about general recovery.

10:41:10 17   Q.  Second question about your answer a moment ago.  To the extent

10:41:14 18   that your real estate analysis parallels your tourism analysis,

10:41:21 19   rather than me having to go through all of those questions before

10:41:25 20   about the assumptions and whether they are flawed or not flawed, you

10:41:29 21   went about it the same way, correct?

10:41:32 22   A.  So, yes, similar approach, and I have similar observations to

10:41:37 23   make here.  In its purest form, I would want a treated and a

10:41:43 24   non-treated.  What I really need was differences in level of

10:41:46 25   exposure and that, likewise, I think, is the case here.

10:41:51  1    Q.  One cleanup question on this, Doctor, before we move to a

10:41:54  2    different subject, and that relates to the -- your comment about

10:41:58  3    Dr. Scott's data for Louisiana on RevPAR data.  You're aware that

10:42:03  4    when he used RevPAR data from Louisiana, some parishes don't even

10:42:07  5    report data; isn't that true?

10:42:09  6    A.  I understand that the Scott Travel data set does not include

10:42:15  7    observations or, at least, the data that was provided to me, which,

10:42:19  8    as I understand it, was the data that counsel provide to Dr. Scott,

10:42:25  9    it does not include information for those parishes.  And the

10:42:31 10    offer -- the explanation that was offered is nobody lives there.

10:42:35 11    There aren't any hotels there or something along those lines.

10:42:38 12         And as I indicated in the deposition, it really isn't -- I

10:42:44 13    don't know what to make of the claim, you know, there's a small

10:42:47 14    population there.  I don't see how that's relevant.  Because at

10:42:51 15    least, in my state, A, all of the counties have small population.

10:42:55 16    It's the least populated state in the union; but B, the big tourism

10:42:59 17    state -- I'm sorry, the big tourism county in our state, Teton

10:43:03 18    County, which is near Yellowstone Park and Teton National Park is

10:43:06 19    one of the smallest populated counties in the state.  One of the

10:43:10 20    smallest populated counties in the west.  Does the number of people

10:43:14 21    who lives there matter for this?  Maybe yes, maybe no.

10:43:18 22    Q.  It's not the people, sir, it's the data.  The data from Smith

10:43:21 23    don't exist for the parishes that you're making that comment about,

10:43:26 24    right?

10:43:26 25    A.  That I can't tell you.  I can only say that the data provided

760

10:43:32  1   to me do not include that.  You may be right, but all I know is that

10:43:36  2   this is the data that I was given, that your firm gave to Dr. Scott

10:43:40  3   that Dr. Scott gave to us.

10:43:42  4   Q.  Have you ever been to Cameron Parish, sir?

10:43:45  5   A.  My experience in Louisiana is largely restricted to this fine

10:43:49  6   community that we're in right now.

10:43:50  7   Q.  Okay.  I am going to change subjects for a moment.  Could you

10:43:56  8   pull up D-35362.  Again, Dr. Mason, you will recognize this figure

10:44:07  9   as coming out of the Dr. Scott's report?

10:44:10  10  A.  Yes.

10:44:11  11  Q.  And again, you don't dispute the accuracy of any of the numbers

10:44:16  12  that Dr. Scott has portrayed in this table that we're looking at

10:44:20  13  here, correct?

10:44:21  14  A.  I believe that the numbers that he has tabulated here are

10:44:30  15  correct.  So I'll just leave it at that.

10:44:35  16  Q.  Importantly, for my question, you have confirmed that the

10:44:41  17  $430 million figure shown in this third column represents the

10:44:45  18  average annual industry -- fisheries industry revenue over the

10:44:50  19  period shown from 2007 to 2009?

10:44:54  20  A.  Have I confirmed that?  My recollection is I did go through his

10:44:58  21  data and crosscheck some of his numbers.  I cannot tell you that to

10:45:02  22  a certainty today.

10:45:03  23  Q.  I think you told us that number is in the ball park.

10:45:07  24  A.  Okay.

10:45:08  25  Q.  And then, also, Dr. Scott calculated the decline in the fishing

10:45:14  1   industry in 2010, and he determined that number to be about almost

10:45:22  2   $112 million back in 2010.  Do you see that?

10:45:26  3   A.  Right.  Yes, I see that.  And let me make something clear here.

10:45:37  4   There's this AVG, and I am not sure if that means average over 2007

10:45:45  5   through 2009 or averaging across all of the components within this

10:45:51  6   industry.  But what you say is, at least, a fair characterization of

10:45:56  7   this figure.

10:45:56  8   Q.  And you did not dispute this figure again?

10:45:58  9   A.  I didn't dispute this figure.

10:45:59  10  Q.  And you can see that on the column on the left is the

10:46:05  11  $2.3 billion seafood compensation fund that BPXP established,

10:46:10  12  correct?

10:46:11  13  A.  That's right.  Though, if we recall, one of the demonstratives

10:46:17  14  that I brought up during direct indicated the payments, at that

10:46:23  15  point in time, for seafood compensation.  And it was more in the

10:46:28  16  neighborhood of a billion as opposed to 2.3.  But I don't dispute

10:46:33  17  the 2.3 in the seafood compensation fund.

10:46:37  18  Q.  Your point is that BP committed the money, but it hadn't all

10:46:40  19  been distributed yet?

10:46:41  20  A.  What I just said?

10:46:43  21  Q.  Yeah.

10:46:43  22  A.  Yeah, that was my point.

10:46:45  23  Q.  My point is going to be, it's true that BP's settlement fund of

10:46:50  24  $2.3 billion for the fishing industry is 20 times the loss of that

10:46:56  25  industry in 2010.

10:46:58   1    A.  Well, the ratio that you're thinking of, 20-fold certainly is

10:47:06   2    right.  The loss part I am going to disagree with.  It's not

10:47:13   3    industry revenue changes, it's profits that matter.  This

10:47:16   4    information involved in this figure differs from profits because it

10:47:20   5    doesn't tell us much about costs.

10:47:21   6    Q.  Fair enough.

10:47:22   7    A.  The general magnitudes here, it's apparent that the seafood

10:47:27   8    compensation fund is bigger than one year's worth of losses.

10:47:30   9    Q.  All right.  Thank you, Doctor.  We can pull that down.  Thanks,

10:47:36  10    Donnie.

10:47:37  11         We've covered two topics.  This is the last topic.  The

10:47:41  12    last topic I want to talk about is BPXP's impact on the economy in

10:47:46  13    the community.

10:47:49  14         First of all, you understand that this trial is being

10:47:51  15    held so that the Court can gather evidence that might be relevant to

10:47:55  16    any decision to impose penalties in the Clean Water Act?

10:47:58  17    A.  I understand that the purpose of this trial is to determine a

10:48:09  18    penalty under the Clean Water Act, yes.

10:48:11  19    Q.  Can you pull up D-35372.  In connection with your preparation

10:48:21  20    to render opinions in the case, in this trial, Dr. Mason, did you

10:48:25  21    review any of the Fifth Circuit decisions in the case called *Citgo,*

10:48:30  22    *United States of America v. CITGO Petroleum Corporation*?

10:48:36  23    A.  No, I did not.

10:48:38  24         MS. KING:  Objection.  Four corners rule.  This is outside

10:48:41  25    his report.  He said he didn't review any of these documents.

10:48:44  1            MR. JARRETT:  I am going to ask him facts about it, Judge.

10:48:47  2            THE COURT:  Go ahead, overruled.

10:48:49  3            MS. KING:  He's also calling for a legal interpretation.

10:48:52  4            MR. JARRETT:  I won't be calling for a legal

10:48:55  5   interpretation.  You'll see.  I'm calling for a fact.

10:48:57  6            THE COURT:  Okay.  Go ahead.

10:48:57  7   BY MR. JARRETT:

10:48:59  8   Q.  I want to read the first sentence from the district court case,

10:49:04  9   Dr. Mason.  It says, "*CITGO* argues that the Court should consider

10:49:07 10   its positive impact and role in the community in calculating the

10:49:11 11   penalty assessed and the Court agrees."

10:49:14 12            My first question is:  You haven't presented any opinions

10:49:18 13   concerning BPXP's positive impact in the community, have you, sir?

10:49:24 14   You weren't asked to do it and you haven't done it?

10:49:28 15   A.  An assessment of the expenditures, for instance?

10:49:30 16   Q.  The positive impact in the community, have you expressed any

10:49:34 17   opinion on that?  That's all I'm asking.

10:49:36 18   A.  Well, I am going to disagree with that on the grounds that the

10:49:47 19   information, as we discussed during direct, things that were

10:49:51 20   expenditures made to the degree that those lowered harms, to the

10:49:55 21   degree that they lowered damages, that those reduced the claim

10:49:59 22   effects, and I did include that.  And I did include in the reports a

10:50:04 23   statement, roughly, like the one that I just made as a predicate to

10:50:08 24   that particular conclusion.

10:50:10 25   Q.  Okay.  That's good.  Then we agree that BPXP makes a positive

10:50:15 1   impact in the community?

10:50:17 2   A.  I just said that expenditures that they make that lowered --

10:50:23 3   that lowered damages would have been reflected in lowered claims.

10:50:26 4   Q.  The opinions you expressed on direct in terms of your analysis

10:50:32 5   of BPXP's roles were really BPXP's role in the Gulf of Mexico oil

10:50:39 6   and gas industry, right?

10:50:41 7   A.  The focus was, indeed, on their economic role in the oil and

10:50:49 8   gas industry.  Indirect information, though, I think, that's sort of

10:50:53 9   in general.  Direction comes by combine it with the role of the

10:50:56 10  industry and the state's economy.

10:50:58 11  Q.  I'm going to come to that, too.  I'm going to take the slide

10:51:02 12  down, but you'll notice that also one of the things that the Court

10:51:05 13  looked at was employment.  And you haven't offered any opinion on

10:51:09 14  BPXP's role in employment, have you, sir?

10:51:12 15  A.  Well, I don't think it's right.  There was one metric in my

10:51:16 16  analysis that was focused on labor markets.

10:51:17 17  Q.  Okay.  I'm familiar with that.  I'm going to talk about that

10:51:21 18  then.

10:51:24 19          The way you went about doing your analysis was to

10:51:28 20  determine BPXP's market share in the oil and gas industry in the

10:51:34 21  Gulf of Mexico using several different metrics, correct?

10:51:37 22  A.  That's right.

10:51:38 23  Q.  You expressed BPXP's market share in terms of a fraction of the

10:51:45 24  Gulf of Mexico industry as a whole, right?

10:51:46 25  A.  In several different metrics, correct.

10:51:52   1   Q.  And in determining the Gulf of Mexico oil and gas industry, you

10:51:57   2   used all of that, both shallow water and deepwater, right?

10:51:59   3   A.  There's some from shallow water, there's some from deepwater.

10:52:04   4   Q.  Would you pull up TREX 13319.21.1.  This is an excerpt from

10:52:14   5   your report where you write, "A better measure of a firm's

10:52:18   6   importance to the Gulf economy would place that firm in a proper

10:52:23   7   context, comparing that firm against its peers; as such, the measure

10:52:28   8   is tied to the firm's market share."  Those are your words, sir?

10:52:32   9   A.  Those are my words.

10:52:34  10   Q.  And you wrote that we should compare BPXP's importance by

10:52:38  11   looking and comparing it against its peers.  Do you see that?

10:52:42  12   A.  Yes.

10:52:42  13   Q.  Have you identified who BPXP's peers are?

10:52:46  14   A.  Well, my interpretation to peers are firms that are engaged in

10:52:51  15   the practice of extracting hydrocarbons.  So the market has defined

10:53:00  16   firms that are producing oil and gas.

10:53:01  17   Q.  Have you presented any data on how those firms' metrics --

10:53:10  18   those peers' metrics compare to BPXP?

10:53:12  19   A.  On an individual basis there is no such comparison as you just

10:53:17  20   articulated.  Though, I would suggest that the Herfindahl indices

10:53:23  21   get at that sort of question.

10:53:24  22   Q.  We're going to talk about that HHI indices in a minute.

10:53:29  23         But my point is if you're going to compare it to a peer,

10:53:31  24   you have to know what the peers are doing.  And you did it on an

10:53:35  25   aggregated basis.  You aggregated all of their peers.  You didn't

10:53:38  1   identify a peer by name and you didn't present any data for any

10:53:41  2   individual peer, correct?

10:53:42  3   A.  That's correct.  But you'll notice here that the word

10:53:47  4   immediately preceding the semicolon is pluralized, by which it's

10:53:53  5   referring to a group.  The group here being the industry.

10:53:56  6   Q.  Got it.  Let's look at TREX 13327.1.1.  You'll recognize that

10:54:07  7   this is the data that comes from BSEE?

10:54:12  8   A.  I recognize it.  I am trying to get the context of the year.

10:54:15  9   This is 2009.

10:54:17 10   Q.  This is 2009.

10:54:18 11   A.  Yes.

10:54:18 12   Q.  I'll represent to you that this exhibit includes multiple

10:54:21 13   years.  This is the first page of the exhibit.

10:54:23 14   A.  Sure, okay.  Yeah.  This representation for 2009 looks, at

10:54:30 15   least, vaguely familiar to me.

10:54:31 16   Q.  And, in fact, you're familiar with the data you told us in your

10:54:36 17   deposition?

10:54:36 18   A.  I used this -- this is the information I used, in particular,

10:54:39 19   for that range to do with hydrocarbon production from '09 to '13.

10:54:47 20   Q.  The data on this table is actually sorted by quantity of

10:54:53 21   production, correct?

10:54:54 22   A.  Yes, it's oil production.  Oil production operator ranked by

10:54:59 23   volume, that's right.

10:55:00 24   Q.  And who was -- in the year 2009, what company was the largest

10:55:06 25   producer of oil in the Gulf of Mexico?

10:55:10  1    A.  The largest producer in 2009 was BP Exploration & Production.

10:55:17  2    Though, as I indicated in deposition and, I think, in one of the

10:55:24  3    reports, 2009 and 2010 were unusual years for a variety of reasons.

10:55:30  4    If we think about other years, particularly earlier years, BPXP's

10:55:36  5    standing wasn't nearly quite so dramatic.

10:55:39  6    Q.  I'm only asking about 2009.

10:55:43  7    A.  I understand.

10:55:43  8    Q.  I didn't bring any other year up.  In 2009, they were the

10:55:48  9    largest producer of oil in the Gulf of Mexico?

10:55:49 10    A.  They were in 2009.

10:55:52 11    Q.  And by a very, very wide margin, correct, sir?

10:55:55 12    A.  I'm having a little trouble reading the fine print, but I am

10:55:58 13    not going to dispute that they were big.

10:56:01 14    Q.  In fact, I am going to put my glasses on so I can read it.

10:56:04 15    A.  Okay.

10:56:04 16    Q.  If we look over -- I think, it's the fifth column, the column

10:56:07 17    that says, "Total Oil," that's the pertinent column, right?

10:56:10 18    A.  I believe that's correct.

10:56:12 19    Q.  And BPXP produced -- I have a hard time reading that, too.  Is

10:56:17 20    that 187 million barrels of oil that year?

10:56:23 21    A.  I think that's right.  Let's just say that that's right rather

10:56:27 22    than -- okay.

10:56:27 23    Q.  187.

10:56:28 24    A.  Thanks for the blowing up here.  Yeah.

10:56:32 25           To cut to the chase here, yes, they are on the order of

10:56:36  1   twice as large as the No. 2 in this particular year.

10:56:39  2   Q.  Thank you.  That's exactly the question I was going to go to.

10:56:43  3   The next peer is Shell and they were -- had doubled the production

10:56:48  4   of Shell in 2009, correct?

10:56:50  5   A.  In that year they were twice as large as Shell.

10:56:53  6   Q.  And if we were to go through all of years, BPXP is always

10:56:59  7   either the No. 1 oil producer or the No. 2 oil producer for the

10:57:03  8   entire Gulf of Mexico over the whole period under study, correct,

10:57:07  9   sir?

10:57:08  10  A.  I think that's right.  It's certainly in the top group.  But on

10:57:13  11  point to the comment that I made earlier here, really it's not their

10:57:18  12  standing, are they No. 1?  Are they No. 2?  It's the share.  It's

10:57:22  13  the nature of the concentration with the industry, it's the degree

10:57:25  14  to which resources are likely to be able to flow, to move around

10:57:30  15  amongst firms.  That's what matters.

10:57:32  16  Q.  We're going to talk a little bit about that, but I wanted to

10:57:36  17  compare to the peers here, Shell and Chevron.  We see that it was a

10:57:40  18  much larger produce in 2009 than either of those peers, correct?

10:57:45  19  A.  Again, yes, it's bigger than Shell, yes.  It's bigger than

10:57:50  20  Chevron.  Again, it's the standing within the industry.  The group

10:57:53  21  of peers is the others, it's not just any particular other.

10:57:57  22  Q.  I understand your point.  Let's pull up D-35374.  Again,

10:58:08  23  Dr. Mason, you'll recognize this as a chart from the report of

10:58:13  24  Dr. Scott.  Figure 19, do you see that?

10:58:15  25  A.  Yes.

10:58:15  1    Q.  And this is where Dr. Scott has accumulated -- using the very

10:58:20  2    data that we just saw -- he's accumulated production over a

10:58:23  3    five-year period from 2009 to 2013, and he's presented the results

10:58:28  4    of those data on this chart.  And you do not dispute these data

10:58:32  5    either, do you, sir?

10:58:33  6    A.  I don't dispute these data.  I would offer an interpretation to

10:58:39  7    this.  This information is for oil production earlier when I talked

10:58:44  8    about things -- it's an oil and gas industry.  I talked about

10:58:48  9    hydrocarbon production which combined oil and gas into what's called

10:58:54 10    barrels of oil equivalent.

10:58:55 11    Q.  That's different data.  We're not talking about these data, oil

10:58:58 12    production?

10:58:58 13    A.  It's coming from the very documents that you just referred to.

10:59:02 14    Q.  And these data come from the same documents that you used,

10:59:05 15    correct?

10:59:06 16    A.  Yes, they do.

10:59:08 17    Q.  And it shows that for the five-year period at issue, BPXP was

10:59:13 18    50 percent more -- had 50 percent more production than its next

10:59:17 19    highest peer, correct?

10:59:19 20    A.  They do show that they are one-and-a-half times the size of

10:59:22 21    Shell.  They also show that they're on the order of a quarter of the

10:59:26 22    oil production sector.  I think none of that is inconsistent with

10:59:31 23    the remark that I made earlier on, which identified their share of

10:59:37 24    the hydrocarbon production over this period of time as being in the

10:59:41 25    range of 11 percent.

10:59:42  1    Q.  Let's talk, now, about your market concentration analysis that
10:59:48  2    you did.  That was -- when Dr. -- Dr. Scott used Figure 19 to reach
10:59:55  3    his conclusion that BPXP was an important participant in the oil and
11:00:01  4    gas economy, correct?
11:00:03  5    A.  I'm sorry.  Could you repeat that?
11:00:05  6    Q.  Sure.  Dr. Scott used Figure 19, among other metrics, to
11:00:10  7    conclude that BPXP was an important player in the oil and gas
11:00:13  8    industry, did he not?
11:00:14  9    A.  I believe that was the conclusion he drew from this and the
11:00:17 10    similar documents.
11:00:18 11    Q.  And you wanted to test his characterization of BPXP's role as
11:00:24 12    significant, and you wanted to do that through this HHI analysis,
11:00:30 13    correct?
11:00:31 14    A.  Okay.  So the analysis of the rule as regards shares, that's in
11:00:40 15    Round 1.  The evaluation of his claims here, that's in Round 2.  And
11:00:46 16    in that Round 2 report I did present information based on
11:00:52 17    Herfindahl.
11:00:54 18    Q.  And what you decided to do was to check and see whether there
11:00:59 19    were any -- and I'm using your phrase here -- barriers to
11:01:02 20    participation in the industry, correct?
11:01:03 21    A.  So the way that the industrial economists interpret this
11:01:11 22    particular piece of information, Herfindahl index, is that it gives
11:01:16 23    us insights into the degree of fluidity that barriers of
11:01:22 24    participation.
11:01:23 25    Q.  You concluded ultimately based on your analysis, your HHI

11:01:29   1   analysis that the market for production fell into the range of

11:01:36   2   unconcentrated, correct?

11:01:38   3   A.  That's right, it did.

11:01:39   4   Q.  And you also concluded that since the oil production by your

11:01:45   5   assessment was competitive, that BPXP's role "could be replicated by

11:01:52   6   other firms seeking to develop other similar resources," that's what

11:01:58   7   your conclusion was?

11:01:59   8   A.  That's my conclusion.  And I think I would go so for as to say

11:02:02   9   I think a similar conclusion would be drawn by other industrial

11:02:05  10   economists.

11:02:05  11   Q.  Well, let's talk about that, because I had obviously never

11:02:10  12   heard of the HHI so I looked it up, and the literature that I read

11:02:14  13   suggests that the calculations are sensitive to the definition of

11:02:16  14   the relevant market; that's true, isn't it?

11:02:19  15   A.  So the nature of the market you choose does -- there is the

11:02:29  16   possibility that it would have an affect on the conclusions that you

11:02:34  17   draw.  And that is a big part of why I provided information for six

11:02:39  18   separate metrics and six separate themes, if you would like, within

11:02:45  19   the Gulf of Mexico oil and gas industry.

11:02:48  20   Q.  You defined it for six metrics but the market was the same for

11:02:52  21   all six; the market was always the entire Gulf of Mexico, both

11:02:56  22   shallow water and deep, correct, sir?

11:02:58  23   A.  Oh, that's right.  I mean, but, you know, it's hydrocarbon

11:03:03  24   production that we care about.  The source of the production where

11:03:06  25   it should happen to come from, I don't know why that matters.

11:03:09  1    Q.  We'll talk about whether it matters in just a second.  But you

11:03:13  2    agree with me that BPXP's operations are focused in deepwater, not

11:03:17  3    shallow water, right?

11:03:18  4    A.  I do understand that they are focused in deepwater.

11:03:22  5    Q.  And you also recognize that oil companies operating in the Gulf

11:03:25  6    of Mexico have segmented themselves by depth, some operate in

11:03:28  7    shallow water, some that don't operate in deepwater, and vice versa?

11:03:34  8    A.  I think that's a fair, general characterization that there's

11:03:37  9    something like a segmentation.

11:03:38 10    Q.  Let's pull up D-35365.  Dr. Mason, this is a report that

11:03:52 11    Dr. Walkup has issued in this case.  You've met Dr. Walkup -- or

11:03:57 12    Mr. Walkup maybe I think it is?

11:03:59 13    A.  I believe it is Mr. Walkup.  I have not met him, we happened to

11:04:03 14    ride up to the elevator together but we didn't exchange words.

11:04:05 15    Q.  And you cited his report in your report, did you not?

11:04:09 16    A.  That's right.  I relied on information from him to some great

11:04:14 17    length.  The gentleman is, so far as I understand it, he is an

11:04:19 18    expert in the E&P business.

11:04:21 19    Q.  He is an expert in the E&P business.  These are two bullet

11:04:25 20    points that we pulled up from his report, and the first one says,

11:04:29 21    "The industry trend of Gulf of Mexico E&P participants evolving

11:04:35 22    towards the more technically challenging, and more costly lower

11:04:40 23    tertiary projects, which is changing the mix of market participants

11:04:44 24    with majors playing a bigger role and smaller independents leaving

11:04:48 25    the market."  Do you see that?

11:04:50  1    A.  I do see that, yes.

11:04:53  2    Q.  What he's talking about, lower tertiary, that's deepwater?

11:04:57  3    A.  That's right.

11:04:57  4    Q.  So what he is identifying here is that majors -- what he means

11:05:01  5    by majors, the major oil companies like BPXP, the Chevrons, et

11:05:05  6    cetera, correct?

11:05:06  7    A.  I think that's his interpretation, right.

11:05:09  8    Q.  He is saying that the majors play a bigger role and that the

11:05:14  9    smaller independents are leaving the deepwater because of more

11:05:19 10    technically challenging and more costly projects offshore in

11:05:23 11    deepwater, correct?

11:05:26 12    A.  Yeah, I think what he is saying here is that they are playing a

11:05:30 13    bigger role, not in the market as an economist would interpret it.

11:05:34 14    And I think since -- I am not going to pretend that I am an expert

11:05:38 15    in E&P, I think he would agree that he is not an expert in

11:05:42 16    economics.

11:05:42 17          So the market as I interpret it is for hydrocarbons.  But

11:05:47 18    the part of the market that is focused in deepwater, he is saying

11:05:49 19    that's where the majors are going and the smaller companies not so

11:05:54 20    much.

11:05:54 21    Q.  And the second bullet point that Dr. Walkup or Mr. Walkup says

11:05:59 22    is, even more on point, where he says, "The cost of global deepwater

11:06:04 23    activities has rapidly increased since 2010 resulting in a portfolio

11:06:10 24    reallocation away from deepwater for some players, particularly

11:06:15 25    smaller companies."  That's what we just talked about, right?

11:06:17  1    A.  It is.

11:06:18  2    Q.  What we have -- you talked earlier about being aware that there

11:06:22  3    was market segmentation between deepwater and shallow water.  What

11:06:27  4    Dr. Walker has given us is the reasons why there are market

11:06:31  5    segmentation, it's more technically challenging in deepwater and

11:06:34  6    it's more costly, right?

11:06:36  7    A.  That's what he was saying.

11:06:38  8         But it's important to bear in mind here that the place

11:06:41  9    where the production is coming from doesn't matter, it's all going

11:06:47 10    into the same market.  There's no point in saying, oh, it's more

11:06:50 11    expensive to produce in, I don't know, let's pick a state, Oklahoma

11:06:55 12    than it is in Texas so we should have two separate interpretations

11:06:58 13    of the market for oil, or for hydrocarbons, one for Oklahoma one for

11:07:03 14    Texas.

11:07:03 15         It's the market including all of the participants.  The

11:07:07 16    fact that it's more expensive in some places than it is in others,

11:07:10 17    is really neither here nor there.  It's the aggregation of all of

11:07:14 18    these sources that matters, the market is defined by all of the

11:07:18 19    participants.

11:07:18 20    Q.  Let's talk about that a minute.  Because you would agree with

11:07:22 21    me that in the field of economics things like technological

11:07:27 22    challenges and high capital costs constitute what's known as

11:07:32 23    barriers to participation?

11:07:36 24    A.  It is possible that technological challenges and that sort of

11:07:40 25    thing do serve as a barrier to participation.  But again, we're

11:07:45  1    talking about barrier to participation in this particular segment,

11:07:51  2    this particular geographic segment of a bigger market.  My argument,

11:07:57  3    the claim that I made was not that I didn't speak to insofar as

11:08:05  4    surmounting those technological hurdles, I talked about

11:08:09  5    participation in the oil and gas industry generally in the Gulf of

11:08:12  6    Mexico.

11:08:12  7    Q.  To remind us where we started this whole discussion, when you

11:08:16  8    wanted to challenge Dr. Scott's characterization of BPXP's role as

11:08:20  9    significant, you sought to test that opinion by seeing whether there

11:08:25  10   are, "barriers to participation."  That's what you wrote on your

11:08:31  11   Round 2 report at page 25.  Isn't that right, sir?

11:08:34  12   A.  Yes, and again -- and again, I'm challenging his claim about

11:08:40  13   their role in the oil and gas market in the Gulf of Mexico region.

11:08:44  14   Q.  Well, the market where they operate in deepwater we have just

11:08:48  15   seen that there are at least two barriers to participation, correct,

11:08:52  16   sir?

11:08:53  17   A.  For that segment there may be barriers to participation.  It's

11:08:57  18   not the same thing, it's miles away from saying there are barriers

11:09:01  19   to participation in the Gulf of Mexico oil and gas industry.

11:09:06  20   Q.  You will agree that if one did an HHI calculation limited to

11:09:11  21   the Gulf of Mexico deepwater production, the market segment there

11:09:14  22   has a higher concentration for the reasons that Mr. Walkup has

11:09:18  23   identified?

11:09:19  24   A.  So -- pardon me.  So if we think about the information that I

11:09:30  25   conveyed during the direct testimony, there were particular metrics

11:09:36  1   that I incorporated in the last slide that were germane to a

11:09:41  2   conversation about deepwater.  We may have a disagreement about what

11:09:45  3   deepwater means.  It may be that you mean -- you may have some

11:09:50  4   definition.  For example, I've heard 1,000 meters offered up as a

11:09:54  5   definition for deepwater.

11:09:56  6           The interpretation I used in that analysis was the

11:09:59  7   interpretation, my understanding of the interpretation that's coming

11:10:05  8   from BOEM 1,000 feet.  I suppose reasonable people could disagree on

11:10:09  9   that semantic, but I do offer that information about what's going on

11:10:12 10   in the BOEM interpretation of deepwater.

11:10:15 11   Q.  Would you pull up Dr. Mason's deposition at page 188, lines

11:10:19 12   four through 22.  You remember that you were asked the very question

11:10:25 13   I just asked you, Doctor, in your deposition.  The question was,

11:10:30 14   "Q. In the hypothetical world in which one wanted to do an HHI

11:10:34 15   calculation limited to the Gulf of Mexico deepwater, would you agree

11:10:38 16   with me that the market segment is likely to show a higher

11:10:42 17   concentration, fewer participants, and therefore a higher HHI?"  And

11:10:46 18   what was your answer?  You said, "right."

11:10:48 19           "So in the hypothetical that you have in mind, we're

11:10:51 20   focussing our attention solely on the deepwater, there are market

11:10:55 21   concentrations, statistics that support your statement."  That's

11:10:59 22   correct, sir, right?

11:10:59 23   A.  I did say that.  I don't think that's inconsistent though with

11:11:03 24   what I said a minute ago.

11:11:04 25   Q.  Some of us might disagree.

11:11:06   1   A.   Huh?

11:11:08   2   Q.   I said some of us might disagree.

11:11:09   3   A.   So I probably should have said yes --

11:11:12   4          THE COURT:  Wait, wait, wait.  Mr. Jarrett, you shouldn't

11:11:15   5   give commentary on a witness's testimony.

11:11:18   6          MR. JARRETT:  Yes, sir.

11:11:19   7          THE COURT:  And don't talk over each other.

11:11:22   8          THE WITNESS:  Whose turn is it?

11:11:23   9          THE COURT:  Go ahead, yours.

11:11:24  10          THE WITNESS:  I should have said yes, but.  Point taken.

11:11:28  11          MR. JARRETT:  You did not conduct --

11:11:30  12          THE COURT:  Wait, wait, let him finish.

11:11:31  13          THE WITNESS:  I want to say the but.

11:11:32  14          THE COURT:  Go ahead.

11:11:33  15          THE WITNESS:  Yes, I should have acknowledged this, you're

11:11:35  16   correct.  But that doesn't change my observation that in the direct

11:11:41  17   testimony I did, in fact, provide some evidence related to an

11:11:46  18   interpretation of deepwater participation, at least some parties

11:11:52  19   interpretation, BOEM's, for instance.

11:11:54  20          THE COURT:  I think we can move on to something else.

11:11:56  21          MR. JARRETT:  Thank you, your Honor, I intend to.

11:11:59  22   BY MR. JARRETT:

11:11:59  23   Q.   I want to explore a different subject now, which is BPXP's

11:12:04  24   positive economic impact.  Can we pull up slide D-35367.  Again,

11:12:14  25   Dr. Mason, these are two tables that come from Dr. Scott's report

11:12:19  1   where he has accumulated BPXP's Capital Expenditures and its

11:12:25  2   operational expenditures for the five-year period 2009 to 2013.  You

11:12:31  3   have reviewed this summary table of these Capital Expenditures and

11:12:35  4   operational expenditures for the period indicated?

11:12:39  5   A.  Can I clarify the question?

11:12:41  6   Q.  Sure.

11:12:41  7   A.  Are these drawing from his Round 1 report?  I think the answer

11:12:44  8   is yes.

11:12:45  9   Q.  Yes, sir.

11:12:46 10   A.  Yes, I have reviewed these.

11:12:47 11   Q.  And you don't dispute the numbers in this table, correct?

11:12:50 12   A.  No, I don't dispute the numbers that he's presented here.

11:12:57 13   Q.  Can you explain for us lay people the difference between

11:13:00 14   capital expenditures and operational expenditures?

11:13:03 15   A.  Can I explain it?

11:13:05 16   Q.  Yes.

11:13:06 17   A.  His terminology I would guess, I don't know this because I

11:13:14 18   couldn't -- I have to say I couldn't determine this to a certainty

11:13:17 19   from his report.

11:13:18 20        But my understanding was that what he was distinguishing

11:13:23 21   between here was the capital expenditures I think most economists

11:13:29 22   would agree with what that means.  I think operational expenditures

11:13:33 23   here has to do with labor expenditures.

11:13:37 24        But there may be other things in this, too, that I have to

11:13:40 25   say I wasn't quite clear on.  So, you know, it could it be -- there

11:13:45  1   might have been annual rental payments for things that we might,

11:13:48  2   that some economist might have wanted to lump into capital

11:13:53  3   expenditures.

11:13:53  4        So I am going to say in very broad strokes, the one on the

11:13:57  5   left capital, the one on the right labor.

11:13:59  6   Q.  And I want to focus a minute on the question that was asked by

11:14:03  7   the court in *Citgo*, or the issue, is whether there was a positive

11:14:08  8   impact by these expenditures.  You see BPXP in terms of Capital

11:14:12  9   Expenditure spent 13.3 billion over the period involved, and you

11:14:16 10   would agree that those $13.3 billion had a positive impact on the

11:14:21 11   economy of the Gulf Coast?

11:14:23 12   A.  Yes, I agree that the capital expenditures would deliver

11:14:31 13   benefits to the Gulf Coast area.  Some qualifier as I offered up

11:14:38 14   during direct though, I think other firms would be inclined to make

11:14:42 15   those capital expenditures if they were placed in the position of

11:14:46 16   developing similar kinds of resources.

11:14:48 17   Q.  Same questions about the operational expenditures, sir, you see

11:14:52 18   that Dr. Scott is calculated a total of 8.8 billion in operational

11:14:57 19   expenditures over the same period, correct?

11:14:58 20   A.  I see that.

11:14:59 21   Q.  And again, to answer the question from the *Citgo* court, whether

11:15:03 22   that had a positive impact for the Gulf Coast economy, your answer

11:15:07 23   to that question is yes, correct, sir?

11:15:10 24   A.  It's much the same answer as for the CAPEX stuff, yes.  There

11:15:16 25   are benefits as with any other firm making expenditures to the left

11:15:21  1    on capital, to the right on what we might think of as variable costs

11:15:26  2    of labor probably, similar benefits.

11:15:30  3             And again, as the same qualifier as before, it's my view

11:15:34  4    that similar labor expenditures -- are you having trouble hearing

11:15:46  5    me?  My lectures aren't this long.  I believe that firms put in a

11:15:50  6    position of developing similar resources would make similar

11:15:54  7    operational expenditures delivering similar benefits as to BPXP.

11:15:59  8    Q.  Have you identified any other peer of BPXP that has made this

11:16:05  9    sort of capital or operational contributions to the economy in your

11:16:09 10    reports?

11:16:09 11    A.  No, I have not.  It's largely because, as I said before, my

11:16:16 12    focus was on things like their share and things like the

11:16:20 13    concentration measures, not rank orderings or anything of the like.

11:16:24 14    Q.  Can you pull up slide D-33521.  This was a slide that we saw in

11:16:39 15    your direct testimony that you prepared, Dr. Mason?

11:16:41 16    A.  That's right.

11:16:42 17    Q.  I want to focus on the State of Louisiana down here, where you

11:16:47 18    have identified the oil and gas industry as being 35 and a half

11:16:50 19    percent of the state GDP, correct?

11:16:53 20    A.  Yes.

11:16:54 21    Q.  And you commented that based on the math that you did that BPXP

11:16:58 22    accounts for four percent of the State of Louisiana's economy,

11:17:02 23    correct?

11:17:02 24    A.  I said interpreting their role coming from hydrocarbon

11:17:08 25    production that that translates to four percent.

11:17:11   1   Q.  Can you put a dollar value on that for us, sir?

11:17:13   2   A.  No.

11:17:14   3   Q.  If I ask you to assume that the Louisiana GDP is $216 billion,

11:17:20   4   could you multiply that by four percent for us?

11:17:23   5   A.  On the stand, in my head?

11:17:25   6   Q.  I can do it for you.

11:17:26   7   A.  Give me the numbers again and I'll take my best step.

11:17:29   8   Q.  $216 billion is Louisiana's GDP and BPXP is responsible for

11:17:35   9   four percent of that.  Can you do that math?

11:17:37  10   A.  I'm going to say it's something like eight or nine billion.

11:17:41  11   Q.  Thank you, sir.  Have you identified any other company that

11:17:43  12   makes that sort of positive economic contribution to the State of

11:17:48  13   Louisiana?

11:17:48  14   A.  No.  But, again, my focus wasn't on the role played by any

11:17:53  15   specific company but rather -- but the group as a whole, the BPXP's

11:17:59  16   role in the industry on the level of concentration and the like.

11:18:04  17   Q.  Thank you, Doctor.  I am going to turn to my last subject

11:18:07  18   you'll be pleased to know.

11:18:10  19           You've specifically analyzed BPXP's spending on labor and

11:18:14  20   employment, did you not, sir?

11:18:16  21   A.  I did evaluate their spending on labor and vendors.  My

11:18:22  22   understanding is they don't have employees.

11:18:24  23   Q.  Yes, sir.

11:18:25  24   A.  So I am just quibbling with that term, but I think we're

11:18:29  25   talking about the same thing.

11:18:30 1    Q.  You analyzed their contributions to labor and wages and

11:18:34 2    employment, that's really the way I took your report to be.

11:18:37 3    A.  That's fair enough.

11:18:38 4    Q.  And you compared that data to the oil and gas industry spending

11:18:42 5    on wages in the Gulf of Mexico region, correct?

11:18:45 6    A.  Right, built up from, you know, kind of BLS, Bureau of Labor

11:18:51 7    Statistics data for things that like I thought made sense to include

11:18:55 8    as part of the expenditures for the oil and gas industry.

11:18:58 9    Q.  Can you TREX 13318.23.2.  Do you recognize this, Dr. Mason, as

11:19:08 10   an excerpt from your report?

11:19:10 11   A.  Yes.

11:19:11 12   Q.  This is how you went about identifying those people in the oil

11:19:15 13   and gas industry in the Gulf Coast who should be included in your

11:19:21 14   analysis, correct?

11:19:22 15   A.  Yes.

11:19:22 16   Q.  And you identified 14 separate categories of workers who were

11:19:26 17   in the industry by your calculations?

11:19:29 18   A.  Yes.  These 14 -- I am going to take your word for it that

11:19:34 19   there's 14 here.

11:19:35 20   Q.  I added them up.

11:19:37 21   A.  Okay.  That's great.  These are --

11:19:43 22   Q.  You said in your --

11:19:44 23   A.  I'm not done.  These are particular occupations that seemed to

11:19:49 24   me to be likely to be related to the oil and gas industry.

11:19:51 25   Q.  Understood.  And could you pull up TREX 13318.23.1.  This is

11:20:02  1   also from the same page of that, of your report where you said, "For

11:20:06  2   this list of occupations, I determined the total number of

11:20:08  3   individuals employed in the five-state region for each of the five

11:20:12  4   years 2009-2013."  Correct?

11:20:16  5   A.  That's right.

11:20:17  6   Q.  How many people was that?

11:20:19  7   A.  Oh, I can't tell you that today.  I know it's in the report

11:20:23  8   but --

11:20:23  9   Q.  It's not in the report, sir.

11:20:25 10   A.  Oh, it isn't.  Well, then that was -- I just -- I gave you the

11:20:31 11   fractions.  Are you sure it's not in the report?  I thought there

11:20:35 12   was a table that identified that.

11:20:36 13   Q.  I looked for it.

11:20:37 14   A.  I really thought that there was a table that identified the

11:20:39 15   number of employees.

11:20:40 16   Q.  There's a table that identifies the dollars but I couldn't

11:20:42 17   find --

11:20:43 18   A.  Oh, okay.  I'm sorry.  My apologies, I misheard your question.

11:20:50 19   I did not tabulate the number of workers, that part is correct.  I

11:20:53 20   did tabulate -- the point here was to compare to the BPXP data which

11:20:58 21   showed moneys, didn't show employees there, showed moneys.  And so I

11:21:04 22   calculated moneys, the share of moneys.

11:21:05 23   Q.  Yeah, but to do that it says you determined the total number of

11:21:10 24   people, individuals employed.

11:21:12 25   A.  It does.

11:21:13  1    Q.  You added them up and then you went and found out what their

11:21:16  2    wages was to accumulate the total amount of spending, right?  I'm

11:21:20  3    just asking you what the number was of the people that you added up.

11:21:24  4    A.  I didn't put it in the report.  But I think if you carry on,

11:21:27  5    this goes onto the next page, you'll see that I then said I

11:21:32  6    multiplied those individuals by the average wage within that

11:21:35  7    particular subsector, and then added all of that up.  So that's all

11:21:39  8    involved in the calculations, it didn't make its way into the

11:21:42  9    report.

11:21:42  10   Q.  It's a couple of hundred thousand people, wasn't it, sir?

11:21:45  11   A.  That could be about right.

11:21:46  12   Q.  Let's turn to TREX 13318.25.1.  This is how you presented

11:21:54  13   results of your analysis, right, sir?

11:21:56  14   A.  That's -- the presentation here is kind of obscuring the part

11:22:03  15   of the page where I could identify the context, but it looks right

11:22:08  16   to me.

11:22:08  17   Q.  I'm taking it right from your report, sir, I can't remember

11:22:12  18   what page it's on.  I guess it would be page 26 from your report?

11:22:18  19   A.  Looks like five, 25.

11:22:21  20   Q.  Twenty-five.

11:22:21  21   A.  Yeah, okay.

11:22:22  22   Q.  So what you did to explain this is for those five-year periods,

11:22:28  23   2009 to 2013, you first of all, you added up the people we just

11:22:33  24   talked about, the couple hundred thousand people, and you calculated

11:22:36  25   or accumulated their earnings and you put that in this category

11:22:40  1   called Gulf of Mexico labor earnings; and you did it for each of the

11:22:44  2   years and then you added it up?

11:22:47  3   A.  It's in broad strokes correct.

11:22:49  4   Q.  And then you looked at some BPXP information in terms of their

11:22:54  5   expenditures and you identified what they spent on wages here in

11:23:00  6   this second column, and then the third column you identified from

11:23:04  7   their payments to venders how much went to labor, correct?

11:23:08  8   A.  I think that's right.

11:23:09  9   Q.  And we see that cumulatively over that five-year period, BP

11:23:16 10   spent what looks to be, if my math is right, $1.25 billion on wages,

11:23:23 11   9.38 billion on labor for vendors; is that right?

11:23:27 12   A.  I think you are your math is reasonably close there.

11:23:30 13   Q.  And that out of the total spending of these two, couple hundred

11:23:36 14   thousand people, the total cumulative spending is 46.17 billion and

11:23:46 15   you determined that 20 percent of that was attributable to BP,

11:23:49 16   correct?

11:23:49 17   A.  Yes.  To clarify that 20.32 that you're identifying here, that

11:23:53 18   is the fraction that is found by summing the first two, 1.25 billion

11:24:00 19   and 9.38 billion and dividing it by 46.178 billion.

11:24:06 20   Q.  Said another way, would it be fair to say that one out of every

11:24:09 21   five employees in the Gulf of Mexico oil and gas industry can trace

11:24:12 22   their earnings to BPXP, either directly or through BPXP vendors?

11:24:17 23   A.  That's what 20 percent means here.  But just to make a point,

11:24:25 24   two points really:  First, about nine to one it's vendor, not direct

11:24:32 25   employees.  And those people that we're talking about here, it says

11:24:41  1   before, if I am a firm developing similar resources, I am going to

11:24:45  2   be making similar expenditures with my vendors as did BP in this

11:24:52  3   setting.

11:24:53  4   Q.  And if the number is a couple hundred thousand people and BP is

11:24:56  5   responsible for 20 percent of those people wages, that's as much as

11:25:01  6   40,000 individuals, correct, sir, in the Gulf state region?

11:25:04  7   A.  You can say that, I think that's right.  Would you mind giving

11:25:07  8   that again?

11:25:07  9   Q.  Sure.  I said, if there was a couple hundred thousand people

11:25:09 10   who traced their -- who fall in this category of business, the Gulf

11:25:13 11   of Mexico oil and gas industry labor, and if BPXP is responsible for

11:25:20 12   20 percent of their wages, that's as much as 40,000 individuals,

11:25:25 13   right?

11:25:25 14   A.  That's right.  It's 40,000 individuals.  But if I am going to

11:25:28 15   use the same kind of delineation between these, ten percent of those

11:25:33 16   40, they're going to be -- my understanding is that the wage bill

11:25:37 17   comes from BP employees that are subcontracted out to BPXP, so those

11:25:42 18   people, they're in one category.  The other category, those are the

11:25:46 19   vendors.  So 90 percent of those 40,000, so 36,000, these are people

11:25:52 20   that are going to be hired by somebody who is exploiting those

11:25:55 21   resources.

11:25:56 22   Q.  From the perspective of those 40,000 people who trace their

11:26:00 23   earnings to BPXP, you would agree that BPXP has a very major and

11:26:05 24   positive impact on employment in the Gulf of Mexico labor market,

11:26:09 25   wouldn't you, sir?

```
11:26:10   1    A.  The individual who is getting paid certainly appreciates the
11:26:14   2    check, I would think.
11:26:16   3          But again, my point here is that in particular those
11:26:21   4    vendors, they're going to take -- they will take jobs from people
11:26:24   5    who offer them employment.  And they're subcontracting out, they're
11:26:29   6    providing services.  If somebody else was developing those
11:26:32   7    hydrocarbon resources, that somebody else would be looking to that
11:26:35   8    vendor pool.
11:26:36   9          So I think it's too much to say that those individuals owe
11:26:42  10    their livelihood to BP.  They may owe their livelihood to the oil
11:26:47  11    and gas industry.
11:26:48  12    Q.  Have you identified any other private employer in the Gulf
11:26:52  13    state region that's responsible for labor earnings of 40,000 people?
11:26:57  14    A.  No.  And again, it's much as before here, it's not the
11:27:03  15    particular standing kind of in the rank ordering thing, it's the
11:27:09  16    percentage of.
11:27:11  17          MR. JARRETT:  Your Honor, I may be done.  Let me ask.
11:27:14  18    Thank you, your Honor.  Thank you, Dr. Mason.  I appreciate your
11:27:18  19    patience with me.
11:27:19  20          THE COURT:  All right.  Any redirect?
11:27:21  21          MS. KIRBY:  Your Honor, I'm sorry.
11:27:24  22          THE COURT:  No, I'm sorry.
11:27:26  23          MS. KIRBY:  I do have some cross-examination.
11:27:28  24          THE COURT:  Good.  Come on up -- come on down.
11:27:32  25          THE WITNESS:  Would you mind taking a break in 20 minutes?
```

11:27:37  1            THE COURT:  How long do you think you might be, Ms. Kirby?

11:27:41  2   I'm not trying to cut you off.

11:27:41  3            MS. KIRBY:  Depends in part of Dr. Mason.  I know.  I

11:27:44  4   think it will be pretty quick actually.

11:27:47  5            THE WITNESS:  It's the break issue.

11:27:48  6            THE COURT:  You need a break now or can you wait?

11:27:49  7            THE WITNESS:  If we're going to be done in 20 minutes I'll

11:27:53  8   wait.

11:27:53  9            THE COURT:  We're definitely breaking at ten to,

11:27:55 10   regardless of where we are.  Are you okay?

11:27:58 11            THE WITNESS:  I'll hold.  I'll hold my horses.

11:28:01 12            THE COURT:  All right.

11:28:02 13                      CROSS-EXAMINATION

11:28:03 14   BY MS. KIRBY:

11:28:03 15   Q.  Dr. Mason, just to pin this down.  Your analysis regarding

11:28:11 16   Anadarko's modest importance in the Gulf was pretty much the same as

11:28:16 17   your analysis with regard to BP, that is you looked at its position

11:28:22 18   in the oil and gas industry, right?

11:28:24 19   A.  I used the same sort of methodology, the same sort of -- the

11:28:28 20   market share idea.  It's much the same.  There was modest difference

11:28:33 21   because BP provided information on labor and vendors and Anadarko

11:28:37 22   didn't.  I think that's just a little tiny difference.

11:28:41 23   Q.  You didn't see any of the information that Anadarko provided

11:28:43 24   regarding payments to suppliers and so on?

11:28:47 25   A.  Yeah -- well, there wasn't -- it wasn't -- what I want to say

11:28:54   1   here is that I didn't trace through things to the degree of accuracy

11:28:58   2   that would have made me comfortable providing that particular

11:29:01   3   metric.

11:29:02   4   Q.  Sure.  I understand.

11:29:04   5           Now, you in your Demonstrative 33502 share with us your

11:29:13   6   evaluation of Anadarko's importance in the oil and gas industry,

11:29:17   7   right?

11:29:17   8   A.  Yes.

11:29:17   9   Q.  And with regard to hydrocarbon production, you, I believe, told

11:29:25   10  us in your report that you did not have the same information from

11:29:29   11  Anadarko that you got from BP, so you went to a Bureau of Ocean

11:29:35   12  Energy Management document and looked at Anadarko's production

11:29:39   13  reported there, right?

11:29:40   14  A.  That's right.

11:29:40   15  Q.  And let's just pull up TREX 13327, please.  Now, you recall

11:29:48   16  this document from your earlier testimony?

11:29:50   17  A.  This is the 2009 ranked by oil?

11:29:54   18  Q.  Right.

11:29:55   19  A.  Yes.

11:29:55   20  Q.  And if we can just callout the top of the document through the

11:30:00   21  first six, seven entries.  We talked about how BP was No. 1 there,

11:30:05   22  right?

11:30:05   23  A.  In oil.

11:30:06   24  Q.  Right.  And we see there that Anadarko is actually No. 6,

11:30:10   25  right?

11:30:11  1   A.  In oil.

11:30:12  2   Q.  All right.  Now, if we take this down.  There's a lot of

11:30:17  3   companies on this list, aren't there?

11:30:18  4   A.  There are.

11:30:19  5   Q.  Do you know how many there are that were in your peer group, by

11:30:22  6   the way?

11:30:23  7   A.  Off the top of my head I can't give you a precise number.  But

11:30:26  8   my recollection is that this information goes to multiple pages.

11:30:30  9   Q.  Well, don't you think that's important when you're looking at

11:30:33 10   percentages to know how many people are in the peer group that

11:30:37 11   you're looking at?

11:30:38 12   A.  No, I don't really think so.  I mean, the question is:  What is

11:30:41 13   the industry?  Not, what are the number of firms within the

11:30:45 14   industry.

11:30:46 15   Q.  So if there's 200 peers in the industry and somebody has, say,

11:30:51 16   a nine percent share, you don't think that's anything other than

11:30:56 17   modest?

11:30:56 18   A.  It's nine percent of the market.

11:30:58 19   Q.  I see.  Actually, that reminds me.  Mr. O'Rourke said during

11:31:07 20   his opening that he thought oil and gas companies were fungible and

11:31:11 21   one could replace another easily.  Is that your opinion?

11:31:15 22   A.  I think that the remark that I made earlier on was that the

11:31:20 23   degree -- to the degree that we learned something from these

11:31:25 24   concentration measures, it tells us that resources are fungible,

11:31:29 25   that firms can enter and exit easily, and that similar firms placed

11:31:34  1   in similar context would make similar efforts, would undertake

11:31:38  2   similar expenditure.

11:31:39  3   Q.  Don't you think that's the key, similar firms placed in similar

11:31:43  4   concepts -- contexts?  I'm sorry.

11:31:46  5   A.  Sure.

11:31:47  6   Q.  Right.

11:31:47  7   A.  We may quibble about what "similar" means, but I -- what I

11:31:55  8   meant by that, I meant firms that were undertaking exercises to

11:31:59  9   extract oil and gas.

11:32:00  10  Q.  With respect to Anadarko, how many firms are in similar

11:32:04  11  contexts with regard to deepwater drilling as Anadarko?

11:32:08  12  A.  Deepwater Gulf of Mexico as defined how?

11:32:15  13  Q.  Well, how many firms can just take over the same kind of

11:32:18  14  drilling operations that Anadarko does?  Do you think that matters

11:32:22  15  whether you have that skill?

11:32:23  16  A.  It's kind of the same question that I offered in the first part

11:32:31  17  of cross.  I don't particularly think that the segment called

11:32:38  18  deepwater is of qualitative significant difference to the Gulf of

11:32:44  19  Mexico.  It's hydrocarbons.  That's of particular importance in my

11:32:49  20  estimation for natural gas; but it's hydrocarbons that matter, not

11:32:53  21  where they came from.

11:32:55  22  Q.  Do you know if the Bureau of Ocean Energy Management agrees

11:33:00  23  with your assessment that deepwater is the same as oil from anywhere

11:33:04  24  else?

11:33:05  25  A.  Do I know if BOEM thinks that oil from deepwater is the same as

11:33:10  1    oil from anywhere else?

11:33:11  2    Q.  That drilling for oil in deepwater is the same as drilling for

11:33:15  3    it anywhere else.

11:33:16  4    A.  Well, I don't know if BOEM says that drilling is the same.

11:33:25  5    The -- I say that the hydrocarbon production -- hydrocarbons are

11:33:30  6    hydrocarbons.  Oil is oil.  Gas is gas.

11:33:33  7    Q.  I think I heard you say earlier that if BP or Anadarko wasn't

11:33:40  8    in the market, then some other company would just rapidly snap up

11:33:44  9    the leases that they didn't take, right?

11:33:47 10    A.  I think that's in response to the judge's question.  I said if

11:33:51 11    there are attractive resources there, I think somebody else would be

11:33:54 12    interested in picking them up.

11:33:56 13    Q.  And we were talking about snapping up deepwater leases, right?

11:34:00 14    A.  That, I think, was the context of the question the judge posed.

11:34:05 15    Q.  Can we at least agree that if you're snapping up deepwater

11:34:08 16    leases you probably need to have some understanding of how to drill

11:34:15 17    in deepwater?

11:34:16 18    A.  Well, it's an asset.  I think if you were planning to extract

11:34:25 19    from there, then you would have to be either knowledgeable or

11:34:30 20    envisioned being able to partner with somebody who could do that.

11:34:34 21    But it's an asset.  It has value.  I would expect that firms would

11:34:39 22    be attracted to that proposition.

11:34:43 23    Q.  Now, this asset that has value needs to be developed, right?

11:34:52 24    You said somebody else would snap it up and develop it, right?

11:34:55 25    A.  It has to be developed to realize that value, correct.

11:34:58  1   Q.  Sure.  And you do agree that whoever snaps it up and develops

11:35:02  2   it either has to have the talent to drill it in deepwater or find

11:35:08  3   somebody with the talent to do it, right?

11:35:10  4   A.  Yeah.  It could partner.  It could subcontract.  It still would

11:35:15  5   be developing that resource.

11:35:16  6   Q.  And if you have two companies exit that market, right, two

11:35:20  7   companies have to leave, you have two companies less that can either

11:35:25  8   snap up the lease or develop, correct?

11:35:28  9   A.  If there's a -- I think the hypothetical you have is a net exit

11:35:34 10   of two, so that's two less firms in there, then I think what you're

11:35:38 11   saying is right.  That is -- this is worth a qualifier.  It doesn't

11:35:46 12   really matter -- I mean, unless -- so, the two firms that happened

11:35:52 13   to exit were to put us in a position where the industry had a small

11:35:59 14   number of firms, then that would be meaningful to me.  That

11:36:03 15   particular setting would absolutely be one in which the industry

11:36:08 16   became way more concentrated, and as I indicated, I think during

11:36:13 17   direct, the evidence does not seem to suggest that's the case.

11:36:16 18   Q.  And just to be clear, when you talk about the industry, you

11:36:20 19   mean any place from which oil production can come?

11:36:24 20   A.  In the Gulf of Mexico.

11:36:26 21   Q.  Shallow water, deepwater, doesn't matter, right?

11:36:30 22   A.  It's, as I said before, oil is oil, gas is gas.

11:36:34 23   Q.  Well, let's see here.  Now, when you reported Anadarko's share

11:36:38 24   of oil production, you used these BOEM records that only reported

11:36:45 25   production for wells where Anadarko was a designated operator,

11:36:49  1    right?

11:36:50  2    A.  I believe that's correct.  What's the context we're talking

11:36:55  3    about here?

11:36:55  4    Q.  Let's bring it up.  Let's bring up -- I'm going to bring your

11:37:01  5    demonstrative, but we can go to your report if we need to.

11:37:04  6    A.  The demonstrative is fine.

11:37:06  7    Q.  33502.  Hydrocarbon production here.

11:37:09  8    A.  Yeah.  I think -- the answer to your question is:  Yes, I

11:37:13  9    think, I said that, actually, at some point.  I don't remember, now,

11:37:15 10    if it was during the direct or cross.  But that this was based on

11:37:19 11    operatorship.

11:37:20 12    Q.  And it's operatorship.  No non-operatorship is reflected in

11:37:25 13    these tables, right?  Except for possibly -- oh, no, active leases,

11:37:30 14    which we'll talk about in a minute, okay.

11:37:33 15    A.  Could you restate that question?  I don't think I quite

11:37:37 16    understood you.

11:37:38 17    Q.  Let's start with subsea boreholes.  When you did subsea

11:37:43 18    boreholes, you took that information from tables that were reporting

11:37:49 19    based on designated operators, right?

11:37:51 20    A.  And you're go -- are you going to ask the same question for all

11:37:54 21    of these?

11:37:54 22    Q.  Except for active leases.

11:37:56 23    A.  Let me just knock them all off.  I think the answer is:  Yes,

11:38:00 24    you're right.  They're focussing on operatorship.

11:38:03 25    Q.  So setting aside active leases then, none of these numbers

11:38:07  1    reflect non-operator ownership or share, right?
11:38:13  2    A.  So there is a qualifier here again, and the qualifier is that
11:38:20  3    in a particular setting, one could imagine a party being a
11:38:27  4    non-operator.  So there's lots of these things in the Gulf.  I could
11:38:30  5    be a non-operator here and an operator there.  So to the extent
11:38:34  6    that's the case, then somebody who is non-operator in one venture
11:38:38  7    might be an operator elsewhere.  They're not excluded in that
11:38:41  8    particular way.
11:38:42  9          A party that is only a non-operator that is never an
11:38:47 10    operator, then your particular question, I think, the answer is yes.
11:38:50 11    Those parties that are only non-operator, they don't get counted in
11:38:53 12    this.
11:38:53 13    Q.  Active leases held.  Now, when you included this active leases
11:38:59 14    held, that is a snapshot in time, right, as of whenever the lease
11:39:08 15    was acquired, right?
11:39:11 16          I'm sorry, pardon me.  Let me correct myself.
11:39:14 17          Active leases held are leases where there's drilling going
11:39:17 18    on, right?
11:39:18 19    A.  My understanding, I believe the report -- this is Round 2, I
11:39:27 20    think -- I believe in the report I might have used the present tense
11:39:34 21    "is going on."  That would have been a poor choice of words.  Is or
11:39:42 22    was, I believe, is the interpretation that's correct.
11:39:46 23    Q.  Right.  So it would be "is or was" as of July 2014, right?
11:39:51 24    A.  Yes.
11:39:51 25    Q.  So if drilling has stopped or if drilling has never started,

| | |
|---|---|
| 11:39:58 | 1 |
| 11:40:00 | 2 |
| 11:40:04 | 3 |
| 11:40:08 | 4 |
| 11:40:12 | 5 |
| 11:40:14 | 6 |
| 11:40:17 | 7 |
| 11:40:17 | 8 |
| 11:40:24 | 9 |
| 11:40:30 | 10 |
| 11:40:40 | 11 |
| 11:40:45 | 12 |
| 11:40:50 | 13 |
| 11:40:51 | 14 |
| 11:40:58 | 15 |
| 11:41:04 | 16 |
| 11:41:11 | 17 |
| 11:41:16 | 18 |
| 11:41:19 | 19 |
| 11:41:20 | 20 |
| 11:41:23 | 21 |
| 11:41:24 | 22 |
| 11:41:27 | 23 |
| 11:41:27 | 24 |
| 11:41:40 | 25 |

1  it's not counted in this active leases, right?

2  A.  Okay.  So that's why I made that qualifier about incorporating

3  past tense.  A place that's been drilled that's now producing

4  hydrocarbons counts as an active lease.  At least that was my

5  understanding from that website.

6  Q.  That's if it's producing, right?

7  A.  Yes.

8  Q.  Now, going back to 33502, Demonstrative 33502.  Again, with the

9  subsea boreholes, and you drew that information from the table that

10  is called -- I think, it's table -- I'm sorry.  I just lost my place

11  because I'm jumping around.

12        That is Table 7 in your September 15, 2014, report.  Does

13  that sound right?

14  A.  Yeah, okay.  So I would like to offer a mea culpa here.  Same

15  data, same table, Round 2 and Round 1.  I was more careful in the

16  terminology in Round 2 than I was in Round 1, so I was more precise

17  in saying things were "production" as opposed to "drilling".  In

18  Round 2 report, it said, "drilling."  It should have said,

19  "production."

20        But with that particular caveat noted, I think, you're

21  right.

22  Q.  You're talking about the subsea boreholes?

23  A.  Uh-huh.

24  Q.  Let's go to TREX 13318.49.1.  Now, this is the table for subsea

25  boreholes, right?

11:41:41  1    A.  That's right.

11:41:42  2    Q.  And we see that Anadarko has 13.09 percent; is that right?

11:41:46  3    A.  That's correct.

11:41:47  4    Q.  And again, this is a snapshot as of July 1, 2004, right?

11:41:53  5    A.  Yes.

11:41:53  6    Q.  There's what, 24 or so companies on here?

11:41:56  7    A.  I think that's right.  I don't know if it's exactly 24, but

11:42:01  8    you're generally in the right area.

11:42:03  9    Q.  And there's only one other company on this list that has more

11:42:07 10    subsea or a higher percentage of subsea boreholes than Anadarko,

11:42:12 11    right?

11:42:13 12    A.  That's right.  And I am going to give you the same qualifier as

11:42:16 13    I did a moment ago here.  It isn't the particular rank ordering

11:42:20 14    that's important, it's the share.

11:42:23 15    Q.  Right.  And now, let's go back to 33502.  And we see here your

11:42:33 16    assessment of Anadarko's share of permanent platforms, right?

11:42:37 17    A.  Yes.

11:42:38 18    Q.  14.29 percent, right?

11:42:40 19    A.  Correct.

11:42:41 20    Q.  And that is drawn from Table 6 of your September 15, 2014,

11:42:47 21    report?

11:42:47 22    A.  Yes.

11:42:49 23    Q.  Let's go to TREX 13318.48.1.  Here we see the permanent

11:42:58 24    platforms on which you drew your information.  We see Anadarko up

11:43:01 25    here at the top at 14.29 percent, right?

11:43:04  1    A.  Yeah.  Just to be clear here -- yes, you're correct, it's
11:43:09  2    14.29 percent.  Just to be clear here, these are listed in
11:43:12  3    alphabetical order, so that's why Anadarko is at the top.  That's
11:43:14  4    not to diminish its role, just to explain why it's on the top.
11:43:17  5    Q.  And there's only one other company that has as high a
11:43:20  6    percentage as Anadarko, right?
11:43:22  7    A.  Yes.  Same qualifier, not the rank ordering.  It's the
11:43:26  8    percentage.
11:43:26  9    Q.  And that's Shell?  That is Shell?
11:43:29  10   A.  Yes.
11:43:29  11   Q.  Thank you.  Now, there's something you said in your direct
11:43:35  12   testimony that I want to explore the source of.  I don't want to get
11:43:40  13   into your opinion, all right, because really what I'm about to do is
11:43:45  14   voir dire your qualifications for something you said.
11:43:48  15        So you said during direct that you thought it was
11:43:51  16   important, when there were multiple parties involved in an endeavor
11:43:57  17   that was risky, that you assessed the interaction of those parties
11:44:03  18   with one another, right?
11:44:04  19   A.  It sounds about right for what I said.
11:44:06  20   Q.  And you were talking about Anadarko and BPXP, right?
11:44:09  21   A.  Well, I was talking about this is a theoretical proposition.
11:44:13  22   The particular application that we're thinking about here, of
11:44:17  23   course, involves Anadarko and BP, but, I believe, the context of
11:44:20  24   that question was the economic modeling.
11:44:25  25   Q.  Right.  Now, I want to talk about -- and you do, in your

11:44:28  1    report, you didn't testify beyond saying just that today, you didn't

11:44:34  2    testify about it, but in your report you provide us a few pages of

11:44:37  3    opinions on what you think their interaction means, don't you?

11:44:41  4    A.  Yes, I do.  And if I could add a qualifier to this.

11:44:45  5    Q.  And I want to talk about the -- I'm sorry?

11:44:47  6              THE WITNESS:  May I?

11:44:47  7              THE COURT:  Go ahead.

11:44:49  8              THE WITNESS:  I just want to be clear on this, I believe

11:44:52  9    this came up during the deposition.  I avow no expertise in the E&P

11:45:02  10   business, production.  I am an economist, I offer my insights into

11:45:05  11   the economics in this particular problem.  I am pleased that we have

11:45:11  12   access to experts in E&P like Gardner Walkup; and to the extent that

11:45:17  13   I have information there that articulates those things, it's drawn

11:45:21  14   from expert Walkup, or documents such as the JOA.

11:45:26  15   BY MS. KIRBY:

11:45:27  16   Q.  Now, returning to the source, the things you relied on to

11:45:31  17   provide your assessment of the interactions.  You've already told us

11:45:36  18   you're not an expert in the E&P business, right?

11:45:38  19   A.  Correct.

11:45:39  20   Q.  So what you were trying to do is look at the interactions of

11:45:42  21   two companies in the E&P business and what those interactions meant,

11:45:46  22   right?

11:45:46  23   A.  Thinking about -- this is a theoretical exercise.  Thinking

11:45:51  24   about this in relation to the theory that leads to this, correct.

11:45:54  25   Q.  And you relied on exactly two sources; one was Mr. Walkup's

11:46:01  1    expert report, right?

11:46:01  2    A.  Yes.

11:46:02  3    Q.  And the other was the operating agreement between Anadarko and

11:46:06  4    BP, right?

11:46:07  5    A.  You got it.

11:46:08  6    Q.  So if Mr. Walkup said it in his report, you took that as a

11:46:14  7    given, right?

11:46:15  8    A.  My understanding he is an expert in this business.  I took his

11:46:20  9    word as characterizing that expertise.

11:46:24 10    Q.  And with respect to the operating agreement, before this case

11:46:29 11    you had read one contract in the E&P business, and it was an oil

11:46:35 12    recovery contract, right?

11:46:36 13    A.  Your setting is right.  It was in a case that I was involved in

11:46:44 14    in assessing the value of carbon dioxide and enhanced oil recovery.

11:46:49 15    The number that you quoted, one, that's not right.  There were a set

11:46:52 16    of contracts.  I can't tell you the exact number, but I can tell you

11:46:56 17    it was scores of contracts.

11:46:56 18    Q.  Scores of oil and recovery contracts?

11:46:59 19    A.  Scores of contracts between a firm that's undertaking an EOR

11:47:05 20    venture and some particular entity that's supplying the carbon

11:47:09 21    dioxide that's used to facilitate that.

11:47:12 22    Q.  So in other words, you hadn't read an operating agreement like

11:47:15 23    this before?

11:47:15 24    A.  Oh, no.

11:47:16 25    Q.  That's all I want to establish.

11:47:17  1          So in your report, you purport to tell us what this

11:47:21  2  operating agreement permits Anadarko to do or not do, right?

11:47:26  3  A.  Yeah.  I mean, you're correct in saying that I am drawing those

11:47:32  4  inferences from material in the JOA and other places from --

11:47:39  5  including Walkup.

11:47:39  6  Q.  And you don't personally have any experience at all with a

11:47:42  7  non-operating party who has a working interest the Gulf of Mexico,

11:47:46  8  do you?

11:47:46  9  A.  I have no particular experience.  Once again, I am relying on

11:47:51  10  input from expert Walkup.

11:47:53  11  Q.  And you don't have any independent knowledge about what

11:47:57  12  operating agreements between non-operators and operators mean, do

11:48:02  13  you?

11:48:02  14  A.  No, I don't.  Again, I rely on input from Walkup and places

11:48:09  15  like the JOA.

11:48:11  16          MS. KIRBY:  Your Honor, for the record I am going to move

11:48:14  17  to strike a certain portion of Mr. Mason's expert report, and that

11:48:17  18  is in TREX 133.18 (VERBATIM).  It starts at page 36 and goes through

11:48:25  19  39.  It is Section 3B of his report.  And in it, he purports to

11:48:30  20  characterize the relationship between Anadarko and BPXP using a

11:48:37  21  particular legal term that actually is, in my view, at odds with

11:48:41  22  your prior decision about the relationship; namely, that there was

11:48:46  23  an independent contractorship, which you evaluated when you granted

11:48:52  24  the motion to dismiss the negligence claims.

11:48:57  25          I believe, No. 1, the opinion has no foundation and he

OFFICIAL TRANSCRIPT

11:48:59  1    has no expertise for providing this opinion.  There's no factual

11:49:06  2    foundation, certainly.  It's a legal opinion.  It's at odds with

11:49:11  3    your prior opinion, and it's irrelevant.

11:49:13  4              THE COURT:  All right.  I'll take that matter under

11:49:15  5    advisement.  You don't have to say anything.  I am not deciding

11:49:22  6    anything right now, but we're about to break for lunch.  You have

11:49:25  7    about two minutes.

11:49:27  8              MS. KING:  Okay.  Let me know if you would like a

11:49:29  9    response, your Honor.

11:49:30 10              THE COURT:  I'll let you know.

11:49:32 11              MS. KIRBY:  Let's see if I can do this in two minutes.

11:49:32 12    BY MS. KIRBY:

11:49:36 13    Q.  Let's go back to Demonstrative 33533 real quick.  We were

11:49:43 14    talking about using the HHI index here, right?

11:49:47 15    A.  Yes.

11:49:50 16    Q.  You agree, do you not, that this is all based on your -- this

11:49:56 17    is not trying to reflect any change in ownership shares by

11:50:02 18    non-operators, is it?

11:50:04 19    A.  In the manner of the analysis that Dr. Sunding undertook, it's

11:50:08 20    my judgment as to the relevant place to look, but I am not trying to

11:50:15 21    replicate anything that Dr. Sunding did.

11:50:18 22    Q.  You're not trying to represent changes in ownership shares by

11:50:22 23    non-operators?

11:50:22 24    A.  No.  I'm asking whether or not, you know, to the extent that

11:50:26 25    sort of thing mattered, it would manifest itself in greater

OFFICIAL TRANSCRIPT

803

11:50:31 1    concentration, at least to justify ownership shares.

11:50:35 2    Q.  Your report contains no explicit econometric analysis to

11:50:39 3    contradict Dr. Sunding, does it?

11:50:41 4    A.  I have no specific econometrics, correct.

11:50:45 5    Q.  And you do agree that Dr. Sunding's data suggests that there

11:50:48 6    has been a net exit by non-operators in the Gulf, correct?

11:50:53 7    A.  After the year 2010, that's what I saw in the data.

11:50:58 8    Q.  And you have -- while you have offered possible alternative

11:51:03 9    explanations, you did not test those out, did you?

11:51:05 10   A.  No, I didn't offer a particular econometric counter example.

11:51:09 11   You know, for the same sort of reason as with my rebuttal to Scott,

11:51:14 12   I wasn't -- I wasn't trying to do Dr. Sunding's work for him, I was

11:51:19 13   offering a criticism.

11:51:21 14          MS. KIRBY:  All right.  Thank you, Dr. Mason.  I have no

11:51:23 15   further questions.

11:51:26 16          THE COURT:  Is the government going to have any redirect

11:51:29 17   of this witness?

11:51:30 18          MS. KING:  Yes, your Honor.

11:51:31 19          THE COURT:  Is it going to take longer than a minute?

11:51:35 20          MS. KING:  Five questions.

11:51:38 21          THE COURT:  Quickly.  Come on, let's go.

11:51:40 22          THE WITNESS:  I'll try to keep the answers short.  I have

11:51:42 23   a vested interest in this, too.

11:51:44 24          THE COURT:  Okay.

11:51:44 25                      REDIRECT EXAMINATION

11:51:47  1    BY MS. KING:

11:51:48  2    Q.  Dr. Mason, does market share give you more information than

11:51:53  3    rank order when evaluating economic role?

11:51:55  4    A.  I think it does.  It tells us the importance in -- the way that

11:52:00  5    industrial economists assess importance within an industry, they

11:52:05  6    look to shares.  They don't look to the rank ordering.

11:52:08  7    Q.  Can we call up Demonstrative 33517, please.  You mentioned on

11:52:17  8    cross, Dr. Mason, that some of your concentration analysis was

11:52:21  9    focused on the deepwater segment?

11:52:24  10   A.  Yes.

11:52:24  11   Q.  And specifically, what portion of your analysis was focused on

11:52:29  12   that segment?

11:52:31  13   A.  It's those two bars to the right, deepwater permanent

11:52:34  14   production platforms and deepwater subsea boreholes.

11:52:38  15   Q.  And what did your analysis of this segment show?

11:52:41  16   A.  That Herfindahl indices that come from those two statistics are

11:52:44  17   way below the cutoff for an unconcentrated market.  They're very

11:52:49  18   comfortably in this range of unconcentrated markets.

11:52:52  19   Q.  Dr. Mason, you were asked about whether or not you did a

11:53:00  20   robustness study regarding parallel growth between your treatment

11:53:06  21   and control data set.  What was the basis for your assumption that

11:53:10  22   the Atlantic versus panhandle or inland versus coast areas should

11:53:16  23   show parallel growth in this 2011, 2012, 2013 period?

11:53:23  24   A.  So I picked these comparisons because the two places were in

11:53:28  25   the same state, they would be subject to the same sorts of

11:53:31 1  pressures, same taxes, same tourism spending.  With the specific

11:53:35 2  example of Florida, they're both coastal areas.  You would expect

11:53:40 3  for things like visitation, you know, tourists that come to stay in

11:53:46 4  hotels, tourists that are drawn to the beach could go to one side of

11:53:51 5  the peninsula -- I should say to the panhandle, go to the Atlantic

11:53:57 6  Coast or the panhandle and be comparable or equal attraction.

11:54:01 7  Q.  You were also asked by the Aldy report, Dr. Mason.  What time

11:54:04 8  period of data Dr. Aldy help provide on?

11:54:08 9  A.  As I indicated -- I think that might have been during the

11:54:13 10  cross -- his analysis only goes through 2010.  He has no

11:54:20 11  characterization of what happens in those labor markets after 2010.

11:54:24 12  Q.  And his analysis is based on balancing response workers versus

11:54:29 13  negative employment effects from the spill, correct?

11:54:32 14  A.  Yes, that's the general idea.

11:54:33 15  Q.  And after 2010 --

11:54:35 16       THE COURT:  That's about Question No. 8.  You said you had

11:54:38 17  five.

11:54:39 18       MS. KING:  Final one.

11:54:40 19  BY MS. KING:

11:54:41 20  Q.  After 2010, what level of response workers were present?

11:54:44 21  A.  Zero.

11:54:47 22       MS. KING:  No further questions.

11:54:49 23       THE COURT:  All right.  Thank you, Doctor.

11:54:51 24       THE WITNESS:  Thank you.

11:54:51 25       THE COURT:  All right.  We'll come back at one o'clock.

11:54:55   1           THE DEPUTY CLERK:  All rise.

11:54:57   2       (WHEREUPON, A LUNCH RECESS WAS TAKEN.)

        3

        4                   *  *  *  *  *  *

        5

        6                REPORTER'S CERTIFICATE

        7

        8       I, Karen A. Ibos, CCR, Official Court Reporter, United

        9   States District Court, Eastern District of Louisiana, do hereby

       10   certify that the foregoing is a true and correct transcript, to the

       11   best of my ability and understanding, from the record of the

       12   proceedings in the above-entitled and numbered matter.

       13

       14

       15                    /s/ Karen A. Ibos

       16              Karen A. Ibos, CCR, RPR, CRR, RMR

       17              Official Court Reporter

       18

       19

       20

       21

       22

       23

       24

       25

—————————————— OFFICIAL TRANSCRIPT ——————————————