**IN THE UNITED STATES DISTRICT COURT**
**FOR THE EASTERN DISTRICT OF LOUISIANA**

| | | |
|---|---|---|
| In Re:  Oil Spill by the Oil Rig "Deepwater Horizon" in the Gulf of Mexico, on April 20, 2010 | * * * * * * * * * | MDL NO. 2179<br><br>SECTION: J<br><br><br>HONORABLE CARL J. BARBIER<br><br>MAGISTRATE JUDGE SHUSHAN |
| Plaisance, *et al.*, individually and on behalf of the Medical Benefits Settlement Class,<br><br>Plaintiffs,<br>v.<br>BP Exploration & Production Inc., *et al.*,<br><br>Defendants. | * * * * * * * * * * * * * * | NO. 12-CV-968<br><br>SECTION: J<br><br><br>HONORABLE CARL J. BARBIER<br><br>MAGISTRATE JUDGE SHUSHAN |

**STATUS REPORT FROM THE *DEEPWATER HORIZON***
**MEDICAL BENEFITS SETTLEMENT CLAIMS ADMINISTRATOR**

The Garretson Resolution Group, the Claims Administrator of the *Deepwater Horizon* Medical Benefits Class Action Settlement Agreement, submits the following quarterly report to apprise the Court of the status of its work in processing claims and implementing the terms of the Medical Settlement Agreement (the "MSA") between January 1, 2015, and April 3, 2015, (the "Reporting Period").[1]  We have published five reports since Preliminary Approval in May 2012,

---

[1] Capitalized terms not otherwise defined herein shall have the meanings ascribed to their fully capitalized renderings in the Medical Settlement Agreement.

and this marks the first quarterly report filed since the claims filing deadline of February 12, 2015. This report will address the continued processing of claims received from 2012 to 2014, as well as the processing of the newly filed claims in 2015.

This status report provides:

- an executive summary of claims processed during the Reporting Period, which includes claims received from 2012-2014 (hereinafter "2014 Claims")[2] and those received in 2015 (hereinafter "2015 Claims");

- a summary of claims for Specified Physical Conditions and significant developments concerning these claims;

- an update on the operations and activities of the Class Member Services Center;

- an account of participation in the Periodic Medical Consultation Program;

- a summary of claims for Later-Manifested Physical Conditions; and

- a summary of the activities of the grantees of the Gulf Region Health Outreach Program and the operations of the Gulf Region Health Outreach Program Library.

## I.     EXECUTIVE SUMMARY

With the claims filing deadline of February 12, 2015, now past, the Claims Administrator has received the total number (37,594) of claims filed for either compensation for a Specified Physical Condition and/or participation in the Periodic Medical Consultation Program.[3] Notably,

---

[2] The 2014 Claims include all POCFs received by the Claims Administrator from the entry of Preliminary Approval on May 3, 2012 through December 31, 2014. While the Claims Administrator was approved to receive claims after Preliminary Approval, the Claims Administrator was not approved to process claims beyond the Party-approved RAI process until the Effective Date of the Settlement. Hence, all claims received in 2012, 2013, and 2014 are referred to as the 2014 Claims.

[3] Please note this is the total number of unique claims identified as of the Reporting Period. The Claims Administrator may continue to receive claims after this Reporting Period; all claims received are reviewed for timely submission and untimely submissions will be denied.

the total volume received of 2015 Claims is more than double the total volume of 2014 Claims. This status report will provide a processing forecast relative to both the 2014 and 2015 Claims.

As reflected in the 2014 end-of-year status report, the most significant challenge for 2014 Claims continues to be the high rate of claims requiring one or more Requests for Additional Information ("RAI") and/or receiving a Notice of Defect.  Overall, more than sixty-six (66) percent of claims have fallen into one of these two categories, which unavoidably has added months of additional processing time before moving claims to final determination.[4]  However, as projected in the prior status report, due to the relatively recent receipt of responses to both RAIs and Notices of Defect, we have seen an increase in the rate of 2014 Claims moving to final determination.

Comparitive to the 2014 Claims, we may be seeing a potential reduction in the percentage of 2015 Claims currently requiring an RAI but note that the current sample size of 2015 Claims processed through this stage is only ten (10) percent of the total 2015 Claims volume.[5]  The Claims Administrator believes this potential reduction may be directly related to an overall change in claim composition of the 2015 Claims (i.e., the percentage of A1 level claims has increased, while the percentage of A2 and higher claims has decreased, and the average number of conditions claimed has decreased), and we will continue to track this potential change throughout the next reporting period.[6]  In addition to tracking how claim composition impacts progression to final determination, we will continue to analyze and

---

[4] Claimants or Medical Benefits Settlement Class Members ("Class Members") receiving a Request for Additional Information ("RAI") and/or a Notice of Defect have sixty (60) days or 120 days to respond, respectively.  See Section II.B for greater detail.
[5] See Section II.B.
[6] The next reporting period will be from April 4, 2015 through July 3, 2015 and we anticipate filing the report by end of month July.

streamline processing at each stage of claims review in an effort to expedite both 2014 and 2015 Claims reaching finalization.[7]

### A.    <u>Progression of 2014 Claims</u>

The volume of claims moving to determination[8] or clearing lien resolution continued to increase throughout the Reporting Period.  As compared to the end-of-year status report, by the end of April 2015 we have finalized approximately forty-seven (47) percent of the 2014 Claims to determination, including both approval and denial for SPC compensation or approval for PMC benefit for PMCP only claims.[9]  We further project finalizing ninety (90) percent of remaining 2014 Claims (approximately 6,600) by the end of October 2015.

Specific key measures regarding 2014 Claims (12,401 in total) include:

- <u>2014 Claims finalized at the end of the Reporting Period</u>

    o Twelve (12) percent of 2014 Claims reached the Notice of Determination (approved for compensation for a Specified Physical Condition) stage, and the majority of those claims were paid by the end of the Reporting Period;

    o Five (5) percent of 2014 Class Members were qualified for the PMC benefit only; and,

    o Twenty-eight (28) percent of 2014 Claims have been denied because they (a) could not prove class membership, (b) filed a valid opt-out, or (c) did not claim or prove a compensable SPC condition.

- <u>2014 Claims yet to be finalized at the end of the Reporting Period</u>

    o Seven (7) percent of 2014 Claims are pending Declaration Review or RAI processing;

---

[7] Over the Reporting Period, we increased intake (data entry) capacity by fifteen (15) percent.  Additionally, we increased initial claims review capacity by eight (8) percent.

[8] Claims Administrator's Notices of Determination include correspondence both (a) approving a claim for compensation and (b) denying a claim for compensation where claimants (i) fail to meet minimum class requirements, (ii) previously filed a valid opt out, or (iii) fail to claim or prove a compensable condition.

[9] *See* Section I of the STATUS REPORT FROM THE *DEEPWATER HORIZON* MEDICAL BENEFITS SETTLEMENT CLAIMS ADMINISTRATOR (Rec. Doc 14092).

- Twenty-three (23) percent[10] of the 2014 Claims have already received or are scheduled to receive a Notice of Defect and will need to submit additional information; and,

- Twenty-five (25) percent of the 2014 Claims are actively in the Medical Record Review process, and of those claims, the majority have been identified to receive a Notice of Defect.

As projected in the 2014 end-of-year status report, based on receipt of additional materials and processing of cases through the Medical Record Review stage, the overall percentage of 2014 Claims reaching final determination, approved or denied for SPC compensation or approval for PMC benefit for PMCP only claims, has increased over the Reporting Period from thirty-six (36) percent to forty-five (45) percent.

### B.    Progression of 2015 Claims

The Claims Administrator received 25,193 additional Proof of Claims Forms during the Reporting Period in 2015, which raised the total volume of claims filed since Preliminary Approval of the Medical Benefits Class Action Settlement (the "Settlement") to 37,594.[11] More specifically, during the two-week timeframe from February 9, 2015 through February 20, 2015, over 22,000 claims were received.  This total volume of 2015 Claims is approximately seventy (70) percent greater than the volume we anticipated to receive at end of year 2014 and exceeded the total amount of Proof of Claim Forms the Claims Administrator received in the prior three

---

[10] As the Executive Summary notes, over sixty-six (66) percent of total claims have received at least one RAI and/or Notice of Defect.  Responses continue to be received which will lead to an overall reduction of claims pending these processing stages.

[11] As required by MSA, Section V.A, during initial claims review of each Proof of Claim Form, the Claims Administrator will verify that the form was submitted no later than one year from the Effective Date (or by February 12, 2015).  Additionally, during intake processing, we cross-reference to determine if a claim form has already been filed on behalf of a particular claimant.  As of April 3, 2015, the Claims Adminstrator has received 4,023 subsequent claim form submissions for a claimant having already filed at least one claim form.  Therefore, as of the end of the Reporting Period, we had received a total of 41,023 claim forms on behalf of 37,594 unique claimants.

years combined.[12] Consequently, in accordance with MSA § V.J., the Claims Administrator conferred with the Parties about extending the processing deadlines in the MSA. The Parties have agreed to the Claims Administrator's proposed processing schedule, and the Claims Administrator hereby requests the Court's approval of it. A proposed order approving the schedule is attached hereto as Exhibit A.

At a high-level, the Claims Administrator will continue to process 2014 Claims in accordance with the timelines set forth in Section I.A., above (with ninety (90) percent of the remaining 2014 Claims being approved or denied by the end of October 2015). We will process all newly received 2015 Claims through intake, including sorting and logging mail, scanning documents to create electronic records, indexing documents for review and completing data entry for aggregate reporting, by the end of July 2015, ensuring that all 2015 claimants receive a notice of receipt assigning them a unique identifying number no later than the end of August 2015. Furthermore, we will process an average of approximately 3,500 newly received 2015 Claims through initial claims review (i.e., the issuance of the first SPC-related correspondence, such as an RAI or Notice of Defect or, if no RAI or Notice of Defect is required, an SPC Determination or Denial) per month through October 2015. In addition, we forecast claimants whose class membership is confirmed during the initial claims review stage will receive a PMCP Notice of Determination (i.e., an eligibility determination for participation in the Periodic Medical Consultation Program) on a similar rolling basis per month.

During this Reporting Period, the Claims Administrator processed 3,873 of the 25,193 newly received 2015 Claims through intake. Specific key measures regarding these 2015 Claims (3,873) include:

---

[12] *See* Section II.F of the STATUS REPORT FROM THE *DEEPWATER HORIZON* MEDICAL BENEFITS SETTLEMENT CLAIMS ADMINISTRATOR (Rec. Doc 14092), filed on January 30, 2015, estimating that over 15,000 claims had yet to be filed and that the volume could be as great as 20,000.

- <u>2015 Claims finalized at the end of the Reporting Period</u>

  o Several claims received in early 2015 have reached the Notice of Determination (approved for compensation for a Specified Physical Condition) stage, and the majority of those claims were also paid during the Reporting Period, indicating that defective-free claims can progress to finalization within sixty (60) to ninety (90) days of initial receipt and review;[13]

  o Two (2) percent of 2015 Class Members did not seek the Specific Physical Condition ("SPC") compensation benefit and instead claimed the Periodic Medical Consultation Program ("PMCP") benefit only; and,

  o Five (5) percent of 2015 Claims have been denied because they (a) could not prove class membership, (b) filed a valid opt-out, or (c) did not claim or prove a compensable condition.

- <u>2015 Claims yet to be finalized at the end of the Reporting Period</u>

  o Thirty-five (35) percent of 2015 Claims are in the initial claims review process;

  o Forty (40) percent of 2015 Claims are pending Declaration Review or RAI processing;

  o Five (5) percent of the 2015 Claims have already received or are scheduled to receive a Notice of Defect and will need to submit additional information; and,

  o Thirteen (13) percent of the 2015 Claims are actively in the Medical Record Review process.

The Claims Admistrator projected that increased efficiencies and changed claim composition relative to the newly received 2015 Claims received *may* result in a higher velocity of claims progression as compared to the 2014 Claims.  We will continue to track those claim composition changes as more 2015 Claims are processed over the next Reporting Period.[14]

---

[13] Specifically, thirteen (13) 2015 Claims have been qualified for A1 compensation and nine of those have been paid.
[14] As highlighted earlier in the Executive Summary, we note that the current sample size of 2015 Claims processed past initial review is only ten (10) percent of the total 2015 Claims volume.

## II.   CLAIMS FOR SPECIFIED PHYSICAL CONDITIONS

### A.   Claimed Benefits and Compensation Level

During the Reporting Period, the Claims Administrator completed intake for 3,873 of the 25,193 Proof of Claim Forms ("POCFs") newly received in 2015.  Therefore, as of the end of the Reporting Period, 16,274 of the 37,954 POCFs received had proceeded to initial claims review.[15] Of those 3,873 POCFs available for initial claims review during the Reporting Period, 3,751 sought compensation for an SPC and participation in the PMCP, 122 sought only participation in the PMCP.

| TABLE 1: POCF FILINGS AVAILABLE FOR INITIAL CLAIMS REVIEW | | |
|---|---|---|
| | Reporting Period | Total |
| Claims Pending Intake Processing | | 21,320 |
| **Total POCF Filings Available for Initial Claims Review** | **3,873** | **16,274** |
| Claims for Compensation for Both SPCs and Participation in the PMCP | 3,751 | 15,367 |
| Claims for PMCP Only[16] | 122 | 907 |
| Total POCF Filings | | 37,594 |

---

[15] *See* Section I.B for detail on intake and initial claims review processing descriptions.

[16] The reduction in the total number of PMCP Only claims from the prior reporting period is due mainly to the subsequent receipt of injury declarations and medical records on claims having previously requested only the PMCP benefit in Section VI of the POCF.  Submission of such documents indicates a claimant's actual intent to request the SPC compensation benefit as well.

| TABLE 2: CLAIMED COMPENSATION LEVEL | | | | | | | | |
|---|---|---|---|---|---|---|---|---|
| | A1 | A2 | A3 | A4 | B1 | Unclassified | PMCP Only | Total |
| 2014 Claims | 3,219 | 1,013 | 657 | 288 | 1,724 | 4,715 | 785 | 12,401 |
| Percentage of 2014 Claims | 26.0% | 8.2% | 5.3% | 2.3% | 13.9% | 38.0% | 6.3% | |
| 2015 Claims | 1,156 | 226 | 66 | 38 | 205 | 2,060 | 122 | 3,873 |
| Percentage of 2015 Claims | 29.8% | 5.8% | 1.7% | 1.0% | 5.3% | 53.2% | 3.2% | |
| Total Claims | 4,375 | 1,239 | 723 | 326 | 1,929 | 6,775 | 907 | 16,274 |
| Percentage of Total | 26.9% | 7.6% | 4.4% | 2.0% | 11.9% | 41.6% | 5.6% | |

As previously indicated, claim composition has indicated whether a claim will receive of an RAI and/or Notice of Defect and/or require more extensive Medical Record Review potentially adding three (3) to eight (8) months before a claim can reach final determination. We will continue to monitor claim composition throughout the next reporting period to determine the potential impact on the progression of 2015 Claims as compared to the historical rates for 2014 Claims.

**B.    Claims Requiring RAI and/or Notice of Defect**

As highlighted in the Executive Summary, the majority of total claims have received an RAI and/or a Notice of Defect. During the Reporting Period, the Claims Administrator sent 1,939 Requests for Additional Information and 1,268 Notices of Defect. Since the inception of the Settlement, the Claims Administrator sent 10,847 Requests for Additional Information and 4,225 Notices of Defect. As noted above, the cure period for deficiencies noted in an RAI is sixty (60) days, whereas the cure period for defects identified in a Notice of Defect is 120 days.

| TABLE 3: RAIS AND NOTICES OF DEFECT | | |
|---|---|---|
| **RAIs** | **Reporting Period** | **Total** |
| RAIs Sent | 1,939 | 10,847 |
| Responses to RAIs Received | 372 | 5,603 |
| **Defects** | **Reporting Period** | **Total** |
| Notices of Defect Sent | 1,268 | 4,225 |
| Defect Cure Materials Received | 517 | 1,659 |

1.      Requests for Additional Information

Under the party-approved RAI process, a claimant may receive an RAI-Missing for failing to submit a first-party injury declaration with his or her original POCF.  If the claimant responds to that request and still has deficiencies within the first-party injury declaration, the claimant may receive a second RAI, an RAI-Incomplete.  An RAI-Incomplete is issued for deficiencies, such as omissions of timeframes or routes of exposure, associated with the symptom or condition declared.

For each RAI sent by the Claims Administrator, the claimant has sixty (60) days to respond.  Of the 1,865 RAIs sent in 2015, sixty-four (64) percent were RAI-Missing,[17] and thirty-six (36) percent were RAI-Incomplete.[18]  Forty-nine (49) percent were sent to unrepresented claimants, whereas fifty-one (51) were sent to claimants represented by counsel.  Of note, the overall percentage of 2015 Claims receiving at least one RAI is approximately fifty (50) percent, which is lower than the historical average of sixty-five (65) percent for 2014 Claims.  Again, this may indicate 2015 Claims will progress through claims

---

[17] RAI-Missing correspondence is sent to a claimant or Class Member when the individual has failed to submit a first-party injury declaration in support of the conditions the individual claimed in Section VIII of the POCF. Individuals are only eligible to receive one (1) RAI-Missing.  The same individual may receive an RAI-Incomplete if deficiencies exist within their declaration response to RAI-Missing for a maximum of two (2) RAIs.

[18] RAI-Incomplete correspondence is sent to a claimant or Class Member when the individual has deficiencies, such as missing timeframe or route of exposure, within a first-party injury declaration.  Individuals are only eligible to receive one (1) RAI-Incomplete.

review more quickly; however, we will continue to monitor this analytic throughout the next Reporting Period to see if these percentages hold true for a larger sample set.

Because the Parties agreed to initiate the RAI process prior to the Effective Date of the Settlement, RAIs are sent to claimants prior to or while their membership in the class is being confirmed.    Therefore, a claimant having submitted a timely RAI response curing any deficiencies in a first-party injury declaration may still receive a Notice of Defect or a Notice of Denial based on his or her failure to prove class membership as a Clean-Up Worker or Zone Resident.

- **More than sixty-five (65) percent of the 2014 Claims have required at least one (1) RAI, and over twelve (12) percent have required the maximum of two (2) RAIs.**

- **More than eleven (11) percent of the 2014 Claims having received an RAI had either a subsequently defective or denied class membership status.  Despite their responses and cures to the RAI(s), these claimants are or may be ineligible to participate in the Settlement because they are _not_ able to prove they are Class Members.**

- **Approximately (50) percent of the 2015 Claims have required at least one (1) RAI.[19]**

- **More than six (6) percent of the 2015 Claims having received an RAI had either a subsequently defective or denied class membership status.  Despite their responses and cures to the RAI(s), these claimants are or may be ineligible to participate in the Settlement because they are _not_ able to prove they are Class Members.**

- **The overall response rate to RAIs was fifty-one (51) percent, with claimants represented by counsel responding at a slightly higher rate (fifty-five (55) percent) than unrepresented claimants (forty-seven (47) percent).**

- **The overall cure rate for those responding to RAIs is approximately fifty-eight (58) percent, with claimants represented by counsel curing at a significantly higher rate (sixty-seven (67) percent) than unrepresented claimants (forty-seven (47) percent).**

---

[19] The sample set for 2015 Claims requiring at least two (2) RAIs during the Reporting Period was too small for reporting purposes and would not provide guidance on claims progression.  This analytic will be added to the next quarterly status report.

As previously reported, failure to respond to an RAI-Missing within the sixty-(60)-day response period will not result in an automatic determination denying the claim; rather, the failure to respond to an RAI-Missing by submitting a first-party injury declaration in compliance with the Specified Physical Matrix (the "SPC Matrix") will result in a Defect of "Missing Declaration of Injury Document" on a Notice of Defect.  The claimant would then have 120 days to cure that Defect and any other material Defects listed in the notice.

Similarly, it is important to note that failure to (a) respond to or (b) cure all deficiencies identified within an RAI-Incomplete will not result in an automatic determination denying the claim.  This occurs because a claimant may declare multiple conditions within Section VIII of the POCF and first-party injury declaration.  Whereas some of those conditions may be deficient and therefore require an RAI-Incomplete, other conditions may already be valid under the SPC Matrix.[20]  These RAI processing standards and distinctions are highlighted in the "Frequently Asked Questions About Declarations and Requests for Additional Information" available on the Claims Administrator's website.  A copy of this FAQ is included with each RAI sent from the Claims Administrator.

> 2.    Notices of Defect

As set forth in Section V of the MSA, the Claims Administrator is responsible for reviewing each POCF "to determine the sufficiency and completeness of the information contained therein" and sending a Class Member a Notice of Defect for each POCF it rejects, which must identify each Defect and provide a recommendation on how to cure it.  MSA §§ V.D-E.  Notices of Defect can be sent both to claimants who have yet to prove class

---

[20] As discussed previously, please note that a declaration with "valid" conditions does not equate to an approved determination for compensation.  To be eligible for receipt of compensation for an SPC, the claimant must also (a) prove class membership as a Clean-Up Worker or Zone Resident, and (b) may require additional supporting documentation, such a third-party declaration, extrinsic evidence, or medical records, as outlined in the SPC Matrix.

membership and to Class Members who have already proved class membership.[21]   For each Notice of Defect sent, the claimant or Class Member has 120 days to respond.   Of the 4,225 Notices of Defect sent through the end of the Reporting Period, fifty-five (55) percent were sent to unrepresented claimants or Class Members, whereas forty-five (45) percent were sent to claimants or Class Members represented by counsel.   More than eighty-one (81) percent were sent to Class Members claiming to be or approved as Clean-Up Workers.   Approximately fifty (50) percent of the Notices of Defect sent listed multiple Defects.   **More specifically, thirty-nine (39) percent had identified two (2) through five (5) Defects, nine (9) percent identified six (6) through ten (10) Defects, and two (2) percent identified more than ten (10) Defects.**

As of the end of the Reporting Period, the response period had expired for 2,298 (fifty-four (54) percent) of claims having received a Notice of Defect.   The overall response rate was forty-nine (49) percent.   The response rate for unrepresented claimants or Class Members was forty (40) percent, whereas the response rate for represented claimants or Class Members was sixty-six (66) percent.   The five (5) most common material defects identified for the population whose response period has expired are:

- "Missing Declaration of Injury document";

- "Missing Medical Records documentation";

- "Documentation included with the claim does not establish that the claimant was employed as a Clean Up Worker between the dates of April 20, 2010 and April 16, 2012";

- "Completion of a required form (Appendix B – HIPAA) is needed to complete POCF Review"; and,

---

[21] A Claimant who has a Defect in his or her claim for compensation for an SPC but has proven that he or she is a Class Member will receive a Notice of Determination for the PMCP benefit.   Hence, such Class Member can take advantage of that benefit while attempting to cure the Defects in his or her claim for SPC compensation.   See Section IV for more detail on Class Members eligible for this benefit.

- "Proof Of Residency Documents Failed To Prove Residence For 60 Days Between April 20, 2010 And September 30, 2010 for Zone A."

Of the 4,225 Notices of Defect sent through the end of the Reporting Period, twenty-one (21) percent now include defects identified during the Medical Record Review process. Fifty-four (54) percent of the 1,268 Notices of Defect sent during the Reporting Period identified at least one defect subsequent to Medical Record Review. The five (5) most common material defects identified during the Medical Record Review process are:

- "No medical records were submitted or the documentation submitted does not support the claimed SPECIFIED PHYSICAL CONDITION;"[22]

- Generally – "The medical records do not meet the criteria set forth in Level A2, A3, A4, and/or B1 of the Specified Conditions Matrix." Specifically – "The date of first diagnosis for the claimed SPECIFIED PHYSICAL CONDITION occurred on or after April 16, 2012. This claimed condition does not qualify as a SPECIFIED PHYSICAL CONDITION as set forth on the SPECIFIED PHYSICAL CONDITIONS MATRIX;"[23]

- "The documentation submitted does not support the claimed SPECIFIED PHYSICAL CONDITION;"

- "The medical records do not meet the criteria set forth in Level A2 of the Specified Conditions Matrix:  The medical records submitted do not support the assertions in the declaration concerning the time of onset of the claimed SPECIFIED PHYSICAL CONDITION following the alleged exposure as set forth in the SPECIFIED PHYSICAL CONDITIONS MATRIX;" and,

- "The third-party declaration does not meet the criteria set forth in A1 of the Specified Physical Conditions Matrix:  The third-party declaration was not signed by the individual submitting the third-party declaration."

---

[22] Of the claims having received an MRR identified defect, this defect was identified in 50% of the claims.

[23] Of the claims having received an MRR identified defect, this defect was identified in 20% of the claims.  This defect results from the Court's July 23, 2014 Order (Rec. doc. 12862) affirming that all conditions first diagnosed after April 16, 2012 shall be classified as Later-Manifested Conditions.  Notably, the Claims Administrator does not automatically deny claims where originally submitted medical records evidence first diagnosis after April 16, 2012.  Rather, we afford the Class Member the opportunity to provide medical record evidence of said diagnosis that pre-dates April 16, 2012 by issuing a Notice of Defect.  If no cure materials are received, the condition would be denied.

### C.     Claims Processed Through Each Stage of Claims Review

As noted in the Executive Summary and detailed above, a significant percentage of the POCFs submitted continue to contain one or more deficiencies or Defects.  These deficiencies and Defects not only increase the amount of time that it takes for a claimant to reach the determination stage, but also increase the time it takes the Claims Administrator to process claims. The Claims Administrator must wait and then process responses to RAIs and Notices of Defect over or following the respective sixty-(60)-day and 120-day cure periods.

During the Reporting Period, the Claims Administrator has reviewed and/or processed the following numbers of claims through each of the following sequential stages in the claims review process:

| TABLE 4: CLAIM REVIEW PROCESSING | | |
|---|---|---|
| Processing Stage | Number of Claims[24] | |
| | Reporting Period | Total |
| Notice of Defect Gate One Process (Which Includes Class membership Defects)[25] | 889 | 3,031 |
| Declaration Review Process[26] | 1,716 | 14,805 |
| RAI Process[27] | 1,865 | 10,847 |
| Medical Record Review Process[28] | 3,231 | 6,913 |
| Notice of Defect Gate Two Process[29] | 850 | 1,086 |

The Claims Administrator completed another 3,231 Medical Record Reviews during the Reporting Period, bringing the total initial reviews completed since inception to 4,263.  As previously reported, the complexity of the 2014 Claims, involving an average of 4.2 conditions

---

[24] Please note claims can move through Declaration Review (due to responses to RAI), RAI Process (due to defective response to an RAI Missing resulting in an RAI Incomplete), and Medical Record Review (due to cure responses to originally defective claims) multiple times.

[25] Total claims with Gate One Defects, including basis of participation Defects, which received a Notice of Defect. Gate One Defects are those such as "Missing Declaration of Injury Document" or "Missing Medical Records Documentation," which prevent a claim from moving to medical record review.

[26] Total claims for which an injury declaration review was completed.

[27] Total claims requiring an RAI that received a RAI.

[28] Total claims that were reviewed by Claims Administrators medical record review staff.

[29] Total claims that have completed medical record review with remaining Defects preventing final determination.

claimed with up to a maximum of thirty (30) per claim, directly increased the time associated with the medical record review process.  As highlighted in the Executive Summary, however, the Claims Administrator has observed a decrease in the average conditions claimed to 3.8 for 2015 Claims, which may be indicative of reduced processing times.  We will continue to closely monitor all analytics impacting claims progressiong throughout the next reporting period.

**D.**     **Claims Sent Dispositive Correspondence – Determination, Approved or Denied, for Specified Physical Condition**

As highlighted in the Executive Summary, the overall percentage of 2014 Claims reaching final determination, approved or denied for SPC compensation, has increased over the Reporting Period from thirty-six (36) percent to forty-five (45) percent.  The total number of claims reaching an approved determination over the Reporting Period has continued to increase, due in part to receipt of responses to previously pending RAIs and Notices of Defect for the 2014 Claims and improved processing velocity.

During the Reporting Period, the Claims Administrator sent SPC Notices of Determination to 594 Class Members.  Since the inception of the settlement, the total number of Class Members receiving an SPC Notice of Determination is 1,316.  The total compensation for the 594 Class Members approved for SPC compensation during the Reporting Period is $992,350.  Since the inception of the Settlement, the total compensation for the 1,316 Class Members approved for SPC compensation is $2,346,600.

The Claims Administrator sent 744 Notices of Denial during the Reporting Period, for a total of 2,881 Notices of Denial from the inception of the Settlement through the end of the Reporting Period.  All of these claims have been denied because the claimant did not qualify as a

Class Member and/or because the claimant did not meet the criteria established by the MSA to receive compensation for an SPC.

| TABLE 5: CLAIMS DISPOSITION AND CORRESPONDENCE | | |
|---|---|---|
| **Approvals** | **Reporting Period** | **Total** |
| SPC Notices of Determination Sent | 594 | 1,316 |
| **Denials** | **Reporting Period** | **Total** |
| Notices of Denial Sent | 744 | 2,881 |

As reflected in the Executive Summary, both 2014 and 2015 Claims will move incrementally to final determination, approved or denied.  As seen over this Reporting Period, the total percentage of 2014 Claims moving to approved Determination increased by six (6) percent (from six (6) percent to twelve (12) percent).  The Claims Administrator projects that this percentage will continue to increase throughout the next reporting period.  As projected, in addition to the claims eligible for payment increasing, the total amounts paid to Class Members eligible for SPC compensation did increase as payment complications were resolved.  We expect this rate to be maintained or increased throughout the next Reporting Period.

1. <u>Payments for Class Members Determined Eligible for SPC Compensation</u>

As reiterated in this report's Executive Summary, Class Members can only be paid once potential obligations to third-party lienholders are resolved.  This process is dependent upon the responsiveness of both governmental agencies and private interests to reply to the Claims Administrator's requests for information and resolution.  As shown in Table 6, below, during the Reporting Period, the Claims Administrator paid $988,398 to Class Members, for a total of $1,319,987 in SPC payments through the Reporting Period.  The table also shows the approvals and payments for all claims for SPCs, broken down by compensation level.

| TABLE 6: APPROVED CLAIMS FOR SPCs[30] | | | | | | |
|---|---|---|---|---|---|---|
| SPC | Reporting Period Number Approved | Total Number Approved to Date | Reporting Period Amount Approved | Total Amount Approved to Date | Reporting Period Amount Paid | Total Amount Paid to Date |
| A1 | 569 | 1,247 | $739,700 | $1,620,700 | $843,700 | $1,096,800 |
| A2 | 7 | 25 | $49,650 | $186,850 | $59,587 | $75,087 |
| A3 | 16 | 40 | $197,600 | $494,000 | $74,100 | $111,150 |
| A4 | 2 | 3 | $5,400 | $8,100 | $0 | $0 |
| B1 | 0 | 1 | 0 | $36,950 | $11,011 | $36,950 |
| | | | | | | |
| Total | 594 | 1,316 | $992,350 | $2,346,600 | $988,398 | $1,319,987 |

Of the 1,316 Class Members who received an SPC Notice of Determination, 404 have payment complications that, per Section XXIX of the MSA, prevent the Claims Administrator from paying some or all of their awards. Of the 404, forty-two (42) have omitted information in their POCF (mainly omissions in Section IX) that must be completed prior to release of funds. The remaining 362 have other payment complications described in detail in the table below:

| TABLE 7: PAYMENT COMPLICATIONS | |
|---|---|
| Payment Complication | Number of Claims |
| Pending Healthcare Lien Resolution[31] | 189 |
| Attorney Payment Information Missing, Dual Representation Complications and Third-Party Liens (namely attorney liens) | 106 |
| Bankruptcy and Probate | 27 |
| Selected for Random Audit (5%), Program Integrity Review or Filed Request for Review | 40 |

Healthcare lien resolution involves confirming whether a Class Member received benefits from a governmental payor (such as Medicare, Medicaid, or the Veterans' Administration) or private healthcare plan for a compensable injury such that the Class Member must now

---

[30] Please note that the total volumes and total dollars approved are subject to change in each Reporting Period due to a later received and processed Request for Review. Statistics relative to Request for Review processing will be included in the next quarterly status report.

[31] Some claims pending Healthcare Lien Resolution may also be pending one or more of the other Payment Complications listed below.

reimburse those entities for the amounts they paid.   The processing phases include (1) confirming entitlement with the government agency or private plan, (2) receiving claims from the agency or plan, (3) auditing those claims and disputing any that are unrelated to the Class Member's compensable injury,[32] and (4) final resolution.  Pursuant to the terms of the MSA, the Claims Administrator obtained an agreement from CMS establishing capped repayment amounts per SPC for Class Members who are or were beneficiaries of Medicare.   The Claims Administrator also negotiated with state Medicaid agencies to cap recovery for Medicaid-entitled Class Members.   Most states agreed to waive recovery rights for Class Members receiving compensation for an A1 claim.[33]  Additionally, most state Medicaid agencies agreed to a twenty (20) percent cap on and up to a thirty-five (35) percent offset for fees and costs typically associated with their recovery, thereby allowing partial funding to the Class Member while full resolution is pending.[34]   Processing times for Medicaid-entitled Class Members eligible for payment will vary.   Each state has its own processing standards for responding to entitlement requests, producing claims, and finalizing lien amounts.[35]

Payment complications resolution involves identifying the various types of complications (listed in Table 7 above), and working with the claimant or their representative to resolve the complication. The processing phases include (1) identifying the complication (through review of claim documents, PACER searches and searching against the Louisiana Child Support

---

[32] A Class Member must only reimburse the agency or plan for claims related to the Class Member's compensable injury.

[33] As of the end of the Reporting Period, the Claims Administrator sent a proposed agreement to twenty-six (26) state agencies asking them to (a) waive their reimbursement rights on A1 claims and (b) cap their reimbursement rights on all other claims.   Of the twenty-six (26), Texas was the only Medicaid agency that did not agree to the waiver.  As of the end of the Reporting Period, at least eighteen (18) Class Members' claims require the Claims Administrator to obtain claims from the agency, and audit and potentially dispute those claims, before final resolution can be reached and funds can be released.

[34] Two (2) of the twenty-six (26) state agencies agreed to a cap of twenty-five (25) to thirty-five (35) percent.

[35] While the Claims Administrator works directly with the state agencies to streamline processing, timelines for resolution for some states have increased due to the increased involvement of managed care organizations.

Database), (2) sending correspondence seeking documentation that will resolve the complication, (3) reviewing the submitted documentation for sufficiency, and (4) final resolution. The Claims Administrator tracks inbound responses to its outbound correspondence and will send a follow-up letter to non-responsive parties after 30-60 days (depending on the complication). We will also send follow-up correspondence when insufficient documentation is received. The resolution time for payment complications will vary and remains heavily dependent on the timeliness and sufficiency of responses to correspondence seeking additional information.

Once the payment complication(s) affecting a given claim are resolved and any liens or reimbursement obligations are paid, the Claims Administrator is able to disburse the balance of the Class Member's compensation.  As projected, the Claims Administrator more than doubled our percentage (from twenty-seven (27) percent to sixty-five (65) percent) of paid claims since the last Reporting Period.

### E.    Data Disclosure Form Submissions and Results and 2015 Claims Actually Received

Data Disclosure Forms may be filed at any time during the claims review process by Natural Persons seeking information from the databases, data fields and other documentary evidence provided by BP to the Claims Administrator.  **Notably, Data Disclosure Forms may continue to be filed *after* submission of a Proof Claim Form and therefore they can be filed *after* the claims filing deadline of February 12, 2015.**  Information provided via the submission of a Data Disclosure Form allows the Claims Administrator to make a determination concerning (a) the status of a Natural Person claiming to be a Clean-Up Worker and/or (b) a claim made by a Clean-Up Worker for compensation of a Specified Physical Condition.  *See* MSA § XXI.B.

During the Reporting Period, the Claims Administrator received 930 Data Disclosure Forms, for a total of 22,704 Data Disclosure Forms since the approval of the MSA.  The Claims

Administrator responded to 1,169 Data Disclosure Forms during the Reporting Period, bringing the total number of responses to 24,492 since the approval of the MSA.  Of the 22,704 Data Disclosure Forms Received, 18,496 were related to unique claimants, while 4,208 were Data Disclosure Forms with additional information filed by same claimants.  Among the unique claimants filing Data Disclosure Forms, seventy-seven (77) percent are confirmed as Clean-Up Workers by finding a match in at least one employer database, such as the "Badged Workers" database, beyond the "Training" database.  Eleven (11) percent of those unique claimants are matched in the "Medical Encounters" database, while thirteen (13) percent are matched in a medically relevant database, such as the "Traction" or "Injury/Illness" databases.

As previously highlighted in the Executive Summary, in its 2014 end-of-year status report, the Claims Administrator applied the analytics referenced above (specifically the percentage of claimants confirmed as Clean-Up Workers by matching in at least one database beyond training) to project the total number of 2015 Claims yet to be filed.  In applying those analytics, we estimated that approximately 15,000 POCFs had yet to be filed and believed the number could be as great as 20,000.[36]  The Claims Administrator actually received 25,193 additional Proof of Claims Forms through the Reporting Period in 2015.  In future reporting, we will look to compare the percent of claimants matched in the "Medical Encounters" or other medically relevant database with the percentage of claims actually requesting compensation for an A3 award on his or her claim form.

## III.    CLASS MEMBER SERVICES CENTER ACTIVITY

The Claims Administrator operates a Class Member Services Center located in New Orleans to communicate with Class Members and their attorneys and to assist Class Members

---

[36] See STATUS REPORT FROM THE *DEEPWATER HORIZON* MEDICAL BENEFITS SETTLEMENT CLAIMS ADMINISTRATOR (Rec. Doc 14092), filed on January 30, 2015.

and their attorneys with filing their claims.  During the Reporting Period, the Class Member Services Center received 29,420 telephone calls.  Since opening, the Class Member Services Center has received a total of 105,451 telephone calls.  The Class Member Services Center handled an average of 314 calls per day.  The average length of each telephone call was seven minutes and two seconds, with an average wait time of twenty-five seconds.  The Class Member Services Center also received 239 emails during the Reporting Period, and 147 individuals visited the Class Member Services Center in person.  We believe the increase Class Member Services Center metrics directly correlate to the claims filing deadline which fell in the middle of this Reporting Period.

| TABLE 8: CLASS MEMBER SERVICES CENTER | | |
|---|---|---|
| | Reporting Period | Total |
| Calls Received | 29,420 | 105,451 |
| Average Length of Call (min:sec) | 7:02 | 6:44 |
| Average Wait Time (min:sec) | 0:25 | 0:15 |
| Emails Received | 239 | 2,246 |
| Walk-Ins | 147 | 667 |

## IV.   PERIODIC MEDICAL CONSULTATION PROGRAM

### A.   Class Members Eligible for the PMCP Benefit

During the Reporting Period, the Claims Administrator sent PMCP Notices of Determination to 1,440 Class Members.  Since the inception of the settlement, the total number of Class Members receiving a PMCP Notice of Determination is 9,809.

| TABLE 9: CLAIMS DISPOSITION AND CORRESPONDENCE | | |
|---|---|---|
| Approvals | Reporting Period | Total |
| PMCP Notices of Determination Sent | 1,440 | 9,809 |
| PMCP Only – Defective – Process[37] | 2 | 220 |

---

[37] Total PMCP Only claims receiving a Notice of Defect for failure to prove Class Membership.

B.     **Provider Network**

During the Reporting Period, the Claims Administrator added fourteen (14) medical provider organizations, with fourteen (14) delivery sites, to its network of providers established to provide certain covered services to Class Members who participate in the Periodic Medical Consultation Program, bringing the total number of medical provider organizations to thirty-eight (38). These medical provider organizations represent 122 service delivery sites. As a result of these additions, eighty-one (81) percent of eligible Class Members resided within twenty-five (25) miles of a network provider at the conclusion of the Reporting Period. The Claims Administrator continues to expand the medical provider network in its efforts to ensure that no Class Member will have to wait more than thirty (30) days or travel more than twenty-five (25) miles for an appointment.

C.     **Class Member Participation in the PMCP**

During the Reporting Period, the Claims Administrator approved 1,540 claims for participation in the PMCP and mailed 1,440 PMCP Notices of Determination. The Claims Administrator received requests for and scheduled 247 physician visits during the Reporting Period, and Class Members attended 225 appointments in the Reporting Period.

| TABLE 10: PERIODIC MEDICAL CONSULTATION PROGRAM | | |
|---|---|---|
| | **Reporting Period** | **Total** |
| Class Members Approved to Receive Physician Visits[38] | 1,540 | 10,292 |
| PMCP Notices of Determination Sent | 1,440 | 9,809 |
| Physician Visits Requested and Scheduled | 247 | 879 |
| Appointments Attended by Class Members | 225 | 805 |

---

[38] The total physician visits will exceed the total number of Class Members qualified for the PMCP benefit as Class Members may be referred to specialists and will eventually be eligible for subsequent primary visits.

## V.      **BACK-END LITIGATION OPTION**

During the Reporting Period, one-hundred-eleven (111) Class Members filed Notices of Intent to Sue for compensation for a Later-Manifested Physical Condition, bringing the total number to 293 Class Members to date.  Of the 111 Notices of Intent to Sue filed in the Reporting Period, six (6) were approved, fifty-nine (59) contained deficiencies that could be corrected by the Class Member, and forty-six (46) were denied.   Over the Reporting Period, the Claims Adminstator has worked with the Parties to amend the Notice of Intent to Sue Form to collect additional data points required to avoid future deficient submissions (namely, unable to confirm class membership).

| TABLE 11: CLAIMS FOR LATER-MANIFESTED PHYSICAL CONDITIONS | | |
|---|---|---|
| | **Reporting Period** | **Total** |
| Notices of Intent to Sue Filed | 111 | 293 |
| Notices of Intent to Sue Approved | 6 | 16 |
| Notices of Intent to Sue Denied | 46 | 133 |
| Notices of Intent to Sue Deficient | 59 | 145 |

Out of the sixteen (16) approved Notices of Intent to Sue to date, the BP Defendants did not elect to mediate any of the claims.  During the Reporting Period, three (3) Class Members became eligible to file a Back-End Litigation Option Lawsuit, bringing the total number of Class Members eligible to file a Back-End Litigation Option Lawsuit to eight (8).

| TABLE 12: APPROVED NOTICES OF INTENT TO SUE | | |
|---|---|---|
| **Mediation Elections** | **Reporting Period** | **Total** |
| Later-Manifested Physical Condition Claims for Which at Least One BP Defendant Elected Mediation | 0 | 0 |
| Later-Manifested Physical Condition Claims Pending a Decision from One or More BP Defendants Regarding Mediation | 3 | 3 |
| Later-Manifested Physical Condition Claims for Which No BP Defendants Elected Mediation | 3 | 13 |
| | | |
| **TOTAL:** | **6** | **16** |
| | | |
| **Results of Mediation** | **Reporting Period** | **Total** |
| Later-Manifested Physical Condition Claims Settled by Mediation | 0 | 0 |
| Later-Manifested Physical Condition Claims Settled by Mediation as to One but Not All BP Defendants Listed in the Notice of Intent to Sue | 0 | 0 |
| Later-Manifested Physical Condition Claims Mediated but Not Settled | 0 | 0 |
| | | |
| **TOTAL CLAIMS MEDIATED:** | **0** | **0** |
| | | |
| **Back-End Litigation Option Lawsuit** | **Reporting Period** | **Total** |
| Later-Manifested Physical Condition Claims for Which No BP Defendant Elected Mediation | 3 | 13 |
| Later-Manifested Physical Condition Claims Mediated but Not Settled | 0 | 0 |
| | | |
| **TOTAL CLASS MEMBERS ELIGIBLE TO FILE A BACK-END LITIGATION OPTION LAWSUIT**[39] | **3** | **8** |

## VI.    GULF REGION HEALTH OUTREACH PROGRAM

### A.    Funding and Coordinating Committee Activities

In accordance with Section IX of the MSA, the Gulf Region Health Outreach Program

was established in May 2012 to expand capacity for and access to high quality, sustainable,

---

[39] The total eligible for BELO within 2014 was 9. However, of the 9, only 5 are currently eligible for BELO. The other 4 have surpassed the 6-month period for properly and timely filing a Back-End Litigation Option lawsuit.

community-based healthcare services, including primary care, behavioral and mental health care and environmental medicine, in the Gulf Coast communities in Louisiana, Mississippi, Alabama, and the Florida Panhandle.   The program consists of five (5) integrated projects: the Primary Care Capacity Project, Community Involvement, the Mental and Behavioral Health Capacity Project, the Environmental Health Capacity and Literacy Project, and the Community Health Workers Training Project.   As of the end of the Reporting Period, the Claims Administrator disbursed $79,081,738 to the projects, as detailed in the chart below.

| TABLE 13: GULF REGION HEALTH OUTREACH PROGRAM | |
|---|---|
| **Project** | **Funding to Date** |
| Primary Care Capacity Project | $38,660,578 |
| Community Involvement | $1,733,321 |
| Mental and Behavioral Health Capacity Project ((Louisiana State University Health Sciences Center) | $10,683,758 |
| Mental and Behavioral Health Capacity Project (University of Southern Mississippi) | $6,143,159 |
| Mental and Behavioral Health Capacity Project (University of South Alabama) | $6,143,162 |
| Mental and Behavioral Health Capacity Project (University of West Florida) | $3,739,315 |
| Environmental Health Capacity and Literacy Project | $9,024,161 |
| Community Health Workers Training Project | $2,954,284 |
| | |
| **TOTAL:** | **$79,081,738** |

Two additional disbursements are scheduled for May 2015 and May 2016, which will bring the total funding of the Gulf Region Health Outreach Program to $105 million.

The Gulf Region Health Outreach Program is governed by a Coordinating Committee that continues to function in a cooperative and integrated manner, with quarterly in-person meetings around the Gulf Coast, as well as biweekly conference calls.   These quarterly meetings offer the grantees the opportunity to share their progress, discuss challenges faced, and

collaborate with their partners to work through issues that affect the Gulf Region Health Outreach Program as a whole.

The Claims Administrator held a quarterly meetings on January 16, 2015 and March 17, 2015 in New Orleans, Louisiana, which encompassed discussion on a variety of topics, including but not limited to, GRHOP visibility, continuing and increasing community involvement throughout the projects, sustainability amongst the projects, and GRHOP evaluation strategies. Discussions also revolved around the five (5) Gulf Region Health Outreach Program subcommittees — the Data Sharing Subcommittee, Evaluation Subcommittee, Health Promotions Subcommittee, Newsletter Subcommittee, and Publication Subcommittee — formed during the July 31, 2014 quarterly meeting. These subcommittees work to increase collaboration and effectiveness of the projects, as well as assure positive impacts and sustainability within the communities which the Gulf Region Health Outreach Program affects.[40]  Though not specifically mandated by the MSA, the monthly conference calls are also held to promote open conversation between projects regarding updates, progression, and collaboration.

The Coordinating Committee also requested the Claims Administrator to establish a Gulf Region Health Outreach Program website.  This website contains detailed descriptions and notable accomplishments of each project, as well as information regarding the Gulf Region Health Outreach Program Coordinating Committee, news/events, and publications.  The website launched on July 3, 2014 and can be publicly accessed at www.grhop.org.

---

[40] The Claims Administrator will hold their next  quarterly meeting  on July 31, 2015, in Pensacola, Florida. The Claims Administrator will report on that meeting  in its third quarterly report of 2015.

B.  **Gulf Region Health Outreach Program Project Updates**

Each Gulf Region Health Outreach Program ("GRHOP") project has made substantial progress in achieving the goals set forth in their respective Grant Proposals.  Some notable accomplishments of the projects include: [41]

- The **Primary Care Capacity Project**, led by the Louisiana Public Health Institute, which has:

  o Worked towards its goal to expand access to integrated high quality, sustainable, community-based primary care with linkages to specialty mental and behavioral health, and environmental and occupational health services in the implicated 17 Gulf Coast counties and parishes. The key program strategies include:

    ▪ Building community health center (CHC) capacity through direct funding via cooperative agreements to community health centers and delivering customized group and individual technical assistance;

    ▪ Supporting and advancing health systems development through direct funding for health information exchanges, infrastructure investments and technical assistance; and

    ▪ Enhancing the capacity of communities and building strategic partnerships to improve health through funding: state partners, the Community-Centered Health Home Demonstration Project, partnership engagement activities, and technical assistance to non-clinical partners.

  o Worked towards implementing *Phase 2* by executed Cooperative Agreements with 13 CHCs across the Gulf Coast. Once finalizing agreements with the newly engaged communities in the southern part of Plaquemines Parish (Plaquemines Medical Center) and Cameron Parish (West Calcasieu Cameron Parish Hospital), all 17 Gulf Coast counties and parishes will be engaged in the PCCP. PCCP is also implementing 6 adjunctive systems projects among the 4 states. Additionally, PCCP is in developmental phase for an Emergency Management Initiative with the 4-state Primary Care Associations, RAND Corporation, and the Primary Care Development Corporation;

  o Developed a quality initiative project, in partnership with the Prevention Institute to fund a Community-Centered Health Home (CCHH) Demonstration Project. This demo project aims to support and incentivize CHCs across the 4 states to implement

---

[41] The Claims Administrator will report in further detail on GRHOP accomplishments/updates covering March 2015 onwards in the next quarterly report, as more qualitative data will be available for the month of March by that time.

the Community-Centered Health Home (CCHH) model. After an objective review process, the 4 selected health centers to move forward in the award process include: (Louisiana) Daughters of Charity and Crescent Care, (Alabama) Mobile County Health Department Community Clinic, and (Florida) Escambia Community Clinic.

- **Alliance Institute**'s outreach on behalf of the GRHOP and its partners has reached over 1,500 individuals across Louisiana, Mississippi, Alabama, and Florida.   Alliance Institute, the grantee responsible for Community Involvement, has:

    o   Completed organizational assessments for all Community Based Organizations (CBOs) currently under contract. Assessments will be used to effectively build the capacity of each organization, as well as to develop a strategy for sustainability;

    o   Redesigned the funding matrix to increase the number of CBOs serving the 17 counties/parishes covered by the settlement;

    o   Conducted 10 organizational interviews across Louisiana, Mississippi, Alabama to identify qualified CBOs for increasing community involvement across the 17 counties/parishes covered by the settlement;

    o   Began the vetting process for 2 organizations forming the Florida partnership;

    o   Worked in collaboration with BISCO, VIET, BPSOS, and STEPS to accomplish the following:

        ▪   BISCO:

            •   Held a meeting with the Coastal Protection Restoration Agency and residents living in Terrebonne to discuss the coastal land loss and options for residents living in the area;

            •   Developed partner relationships with groups in the community to work on mental health, drug abuse, and divorced families and the effects on children;

            •   Coordinated access to resources for community members starting on June 1, 2015, including a Homeowners' Insurance website; BISCO has been working to ensure accountability implementation of this legislation; and,

            •   Added two more churches to the coalition, thus adding more members to the Board of Directors. This action keeps BISCO accountable to their community and more aware of their community needs.

        ▪   VIET:

            •   Registered individuals for the Affordable Care Act; and

29

- Will provide summer camp for children ages 5 to 12. The camp will include character-building activities, health and fitness awareness, and outreach/education on children's sexual abuse.

  - BPSOS:

    - Educates the community on the accessibility of healthcare at local clinics;

    - Will host a health fair in early May 2015 and is going through the process of recruiting vendors and asking for donations; and

    - Works with, and submitting a proposal to the University of Alabama to do research on the health disparity and its impact on the undeserved members of the community.

  - STEPS:

    - underwent staff changes related to GRHOP.

- The **Environmental Health Capacity and Literacy Project**, with its grantee being Tulane University, has achieved the following:

  o Worked in collaboration with the Association of Occupational and Environmental Clinics to conduct considerable outreach to communities, partners, and clinicians. For example, inroads were made in Lafitte, Louisiana, and 13 to 15 new patients were scheduled for end-of-month appointments at the RFK Lafitte Clinic in March 2015.

  o The Fussy Baby Network® New Orleans and Gulf Coast (FBNNOGC) served 20 families during January and February 2015.

  o Several EHCLP program personnel participated in the Oil Spill and Ecosystem Science Conference, held in Houston, Texas in February 2015.

  o Continued to do work related to CHW placement, as did planning for the 2015 Emerging Scholars Academies and Teacher Workshops at the four regional universities.

  o FBNNOGC published an article in the January 2015 editions of the *Zero to Three Journal,* building the evidence based for research.

  o Maureen Lichtveld, the program leader, organized the public health session at the Gulf of Mexico Oil Spill and Ecosystem Science Conference, which provided visibility for GRHOP activities and highlighted the importance of human health research related to the oil spill.

- The **Community Health Workers Training Project**, directed by the University of South Alabama's Coastal Resource and Resiliency Center, has:

o Conducted a Peer Health Advocate training session in Gulfport, Mississippi, for 24 participants from Mississippi and Alabama;

o Scheduled additional training sessions for 2015 as follows: Community Health Workers' Training (1 session), Peer Health Advocate Training (total of 4 sessions), and Chronic Disease Management (2 sessions);

o Completed curriculum development for the new Chronic Disease Management training;

o Attended, by way of CHWTP staff members, workshops and webinars, made presentations at professional conferences, and wrote for publication in academic journals;

o Been accepted by the Journal of Applied Sociology for one of their academic articles for publication, pending revisions;

o Continued to expand and update their website, recently adding photos from the February PHA training, as well as schedules and application materials for future training sessions; and

o Leveraging their GRHOP activities with additional grant funds from the Baton Rouge Area Foundation and the Gulf of Mexico Research Initiative.

- The **Mental and Behavioral Health Capacity Project**, implemented by a coalition of four academic institutions (Louisiana State University Health Sciences Center, the University of Southern Mississippi, the University of South Alabama, and the University of West Florida):

  o MBHCP-LA has:

    ▪ Provided age-specific supportive and therapeutic services in FQHCs and community clinics, a major goal that has received increased emphasis during the quarter;

    ▪ Recently added the Young Children Program, which is proving value in responding to clinician and parental concerns, and providing developmentally based supportive individual, group, and parental services. For schools, with the ultimate goal of sustainability, there has been increased emphasis on consultations and support to school counselors, teachers, and parents;

    ▪ Worked to expand distance-based consultation and treatment services for FQHCs and community clinics;

    ▪ Responded to diverse cultural needs of the population and took steps for change in perception of behavioral health services;

    ▪ Continued to stress community collaboration and trust;

31

- Participated in community meetings and meetings with stakeholder advisory boards in the designated parishes;

- Collaborated with other GRHOP projects to enhance services;

- Clinics are working toward fully accessible medical records for mental health services;

- Made inter-professional training and education a priority; many primary care clinicians, psychiatry and child psychiatry residents, psychology interns and postdoctoral fellows, social work fellows and other clinicians are participating in these collaborative efforts;

- Provided 1,022 individual services to adults, children and adolescents in January and February 2015;

- Worked toward sustainability; community collaboration in building accessible, high quality on-site and tele-psychiatry services; destigmatizing mental and behavioral health through interprofessional collaboration; and continuous evaluation of the effectiveness of the project.

o MBHCP-MS has:

- Continued to work with the partnering FQHCs to improve access to mental health services to the residents of coastal Mississippi;

- Focused on building an integrated healthcare model and training managers, social workers, nurses and primary care providers on ways to build a system of care that addressees the psychological, social and medical needs of patients using a multidisciplinary team based approach;

- Developed and revised polices that include behavioral health intervention and support PCMH certification;

- Developed a peer review process that meets PCMH requirements;

- Developed clinic specific performance improvement plans and goals for M-IHDP behavioral health programs;

- Participated in clinic level staff meetings to address needs, concerns and service provisions;

- Participated in the yearly all-staff training, sponsored by the FQHC. This participated required that M-IHDP personnel present workshops to all employees of the FQHC on behavioral health and its role in PCMH; and

- Participated, through its M-IDHP Program Director and Coordinator, in the University of Massachusetts' Center for Integrated Primary Care's training in Integrated Care Management; and

- Provided 710 patient encounters in January and February 2015; the M-IHDP staff are working to increase the number of patients actively enrolled in the chronic condition support program.

o MBHCP-AL has:

- Participated in **engagement** and in **establishing integrated health services**:

  ➢ In conjunction with the University of West Florida MBHCP, MBHCP-Alabama has trained 27 individuals from 12 different agencies as Youth Mental Health First Aid Instructors. These new instructors will be able to provide YMHFA training to individuals in corrections settings, personnel in school systems, and citizens throughout the counties we serve;

  ➢ Taught a special diabetes education class to the center staff by Dr. Chondra Butler, USA College of Nursing; and

  ➢ Regularly participated and spoke, through its staff, at the monthly provider meetings held in their FQHCs.

  ➢ Added 6 more Behavioral Health Providers (BHPs) to further advance the FQHCs;

  ➢ Made great strides in solidifying a plan for a chronic disease pathway referral system in the FQHCs; to that end, numerous chart reviews (2,100 as of February 2015), have been conducted at all field sites;

- Embedded Integrated Health to ensure enduring change:

  ➢ The Health Department, LPHI, and MBHCP-AL agreed that using GRHOP resources to hire an HIT and an on-site Behavioral Health Clinical Director is a shared priority. MBHCP-AL is actively recruiting for an on-site BHCD at the Mobile County Health Department (MCHD);

  ➢ The project leader, Dr. Jennifer Langhinrichsen-Rohling, and Dr. John Friend are working with the MCHD staff, including leadership, division heads, social service directors and others on a continuing basis to effectively facilitate workflow priorities and to embed Behavioral Health into EHRs;

  ➢ MBHCP-AL has a writing team that has been asked to author a book chapter on the Nuts and Bolts of Implementing Integrated Health; and

  ➢ Presented a poster related to the project at a local conference in February 2015.

- o MBHCP-FL has:

  - ▪ Put much of its efforts into researching and engaging community partners for sustainability plans within their school district;

  - ▪ Worked with PanCare and Escambia Community Clinics, which has shown commitment to integrating services within their respective clinics;

  - ▪ Continue to work closely with each of the FQHCs to provide assistance, when needed, to further integrate mental and behavioral health services. Both FQHCs have shown interest in moving into school districts to help provide sustainability and increase services within the community;

  - ▪ Engaged the Studer Group to provide Leadership Development to the FQHCs within the grant area, as well as partners within the community who are committed to work with the FQHCs. Studer's proven leadership development will help move FQHCs forward with sound, evidence-based practices that will continue to build on providing high-quality services to its clients.

## VII.   GULF REGION HEALTH OUTREACH PROGRAM LIBRARY

In accordance with Section IX.H of the MSA, the Claims Administrator has established a publicly accessible online library, which exists as a repository of information regarding information related to the health effects of the *Deepwater Horizon* incident, including, but not limited to: (a) the composition, quantity, fate, and transport of oil, other hydrocarbons, and other substances released from the MC252 Well and the *Deepwater Horizon* and the dispersants and contaminants used in Response Activities; (b) health risks and health studies relating to exposure to oil, other hydrocarbons, and other substances released from the MC252 Well and the *Deepwater Horizon* and the dispersants and decontaminants used in Response Activities; (c) the nature, content, and scope of in situ burning performed during the Response Activities; and (d) occupational safety, worker production, and preventative measures for Clean-up Workers.

As of the end of the Reporting Period, the Library houses over 189,885 relevant documents (an increase of 86,195 since the last reporting period), each tagged with a specific

search category based on the type of information identified within the MSA. The Claims

Administrator will continue to add Library Materials in accordance with the MSA.

Respectfully submitted,

*DEEPWATER HORIZON* MEDICAL BENEFITS
CLAIMS ADMINISTRATOR


By: /s/ Matthew L. Garretson
      Matthew L. Garretson

## <u>CERTIFICATE OF SERVICE</u>

I hereby certify that the above and foregoing document has been served on All Counsel by electronically uploading the same to Lexis Nexis File & Serve in accordance with Pretrial Order No. 12, and that the foregoing was electronically filed with the Clerk of Court of the United States District Court for the Eastern District of Louisiana by using the CM/ECF System, which will send a notice of the electronic filing in accordance with the procedures established in MDL 2179, on this 7th day of May, 2015.

Respectfully submitted,

*/s/ Matthew L. Garretson*
Matthew L. Garretson