# EXHIBIT B

Page 1

```
1            UNITED STATES DISTRICT COURT
2            EASTERN DISTRICT OF LOUISIANA
3
4
                          CIVIL ACTION
5                         SECTION "J"
  IN RE:  OIL SPILL BY THE
6  OIL RIG "DEEPWATER
   HORIZON" IN THE GULF OF
7  MEXICO, ON APRIL 20, 2010
                          JUDGE BARBIER
8                         MAG. JUDGE SHUSHAN
9
10
11
12
13       Sworn Statement of VERNON ERNEST
14  ALFONSO, JR., ██████████████████████
   ██████████████████████████████████
   ██████████████████████████████, reported
18  on Wednesday, January 21, 2015 beginning at
19  8:53 p.m.
20
21
22
23
24
25
```

Page 2

```
1  APPEARANCES:
2
3
       FAEGRE, BAKER & DANIELS, LLC
4      (BY:  CRAIG COLEMAN, ESQUIRE)
       2200 WELLS FARGO CENTER
5      MINNEAPOLIS, MINNESOTA 55402
       612.766.6981
6      craig.coleman&faegrebd.com
7            ATTORNEYS FOR VERNON ERNEST
       ALFONSO, JR.
8
9
       PEPPER HAMILTON, LLP
10     (BY:  ALEJANDRO SALICRUP, ESQUIRE
       MARIA A. FEELEY, ESQUIRE)
11     3000 TWO LOGAN SQUARE
       EIGHTEENTH AND ARCH STREETS
12     PHILADELPHIA, PENNSYLVANIA 19103-2799
       215.981.4418
13     salicrupa@pepperlaw.com
       feeleym@pepperlaw.com
14
             ATTORNEYS ON BEHALF OF SPECIAL
15     MASTER
16
17
18
19  ALSO PRESENT:
20        LLOYD DAY, INVESTIGATOR
21
22  REPORTED BY:
23     DIANE TEWIS CLARK, RPR, RMR, CRR
       CERTIFIED COURT REPORTER
24     LOUISIANA CERTIFICATE #73005
       ARKANSAS CERTIFICATE #672
25
```

Page 3

```
1               *   *   *
2            EXAMINATION INDEX
3                         Page
4  EXAMINATION BY MR. SALICRUP ...........6
5  EXAMINATION BY MR. COLEMAN ..........194
6
7               *   *   *
8            INDEX OF EXHIBITS
9                         Page
10
11  Exhibit No. 1  .......................22
12   Subpoena to Testify at a Deposition
     in a Civil Action with Attachment A
13
14  Exhibit No. 2  .......................57
15   Gulf Coast Bank MasterCards with
     numbers ending in ███ (LLC) and
16   ███ (Checking)
17  Exhibit No. 3  .......................73
18   Seafood Compensation Plan Sworn
     Written Statement for Sufficient
19   Documentation of Benchmark Revenue
20  Exhibit No. 4  .......................96
21   Gulf Coast Claims Facility Vernon
     Ernest Alfonso, Jr. Supporting
22   Documentation for a Claim
23  Exhibit No. 5  ......................103
24   Vernon and Mary Alfonso 2008 U.S.
     Individual Income Tax Return
25
```

Page 4

```
1  Exhibit No. 6  ......................109
2   Boat registration for the CAPTAIN
    DYLAN and the PRINCESS BRANDI
3
4  Exhibit No. 7  ......................110
5   Gulf Coast Claims Facility, Vernon
    Ernest Alfonso, Jr. Supporting
6   Documentation for a claim
7  Exhibit No. 8  ......................115
8   2009 U.S. Individual Income Tax
    Return, Vernon E. Alfonso and Mary
9   Alfonso
10  Exhibit No. 9  ......................119
11   Line 1 (Sch C (1040)) - Gross
     Receipts or Sales
12
13  Exhibit No. 10  .....................125
14   Island Seafood Summary by
     Fisherman, 01/01/2009 through
15   12/31/2009
16  Exhibit No. 11  .....................140
17   Set of documents ALPONSO 000001
     through ALFONSO 000482
18
19  Exhibit No. 12  .....................155
20   Bank records for three accounts for
     2007
21
22  Exhibit No. 13  .....................155
23   Bank records for three accounts for
     2008
24
25
```





Page 5

```
1   Exhibit No. 14  ....................155
2     Bank records for three accounts for
      2009
3
4   Exhibit No. 15  ....................155
5     Bank records for three accounts for
      2010
6
7   Exhibit No. 16  ....................163
8     Gulf Coast Bank & Trust Company,
      Vernon Alfonso, Jr., ████████
      ████████████████ statement
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
```

Page 6

```
1                    * * *
2         VERNON ERNEST ALFONSO, JR.,
3   after having been first duly sworn by the
4   above-mentioned court reporter, did testify
5   as follows:
6   EXAMINATION BY MR. SALICRUP:
7       Q.   Mr. Alfonso, good morning, my name
8   is Alejandro Salicrup.  This is my
9   colleague, Maria Feeley.  We're here on
10  behalf of the Office of the Special Master
11  who was appointed by the court to look at
12  certain aspects of BP claims.
13        We're here today to take your
14  interview.  Before we begin, I'm going to
15  give you some instructions.  The court
16  reporter is taking everything down as we
17  speak, so only one person should speak at a
18  time.  Please wait until I finish asking my
19  question before you respond.  You must also
20  respond verbally.  That means no head nods.
21        Do you understand?
22      A.   Yes, sir.
23      Q.   If I ask a question and you
24  respond, I will assume you understood the
25  question.
```

Page 7

```
1        Do you understand?
2      A.   Yes.
3      Q.   If I speak too fast or you don't
4   understand what I say, please let me know
5   and I will repeat or rephrase the question.
6        Do you understand?
7      A.   Yes.
8      Q.   You must answer everything
9   truthfully.
10       Do you understand?
11     A.   Yes.
12     Q.   You're under oath and because you
13  are under oath, that means you have an
14  obligation to tell the truth.  Because we
15  are appointed by the court, it is as if you
16  were sitting before the court today.
17       Do you understand?
18     A.   Yes.
19     Q.   Because you are under oath, the
20  questions asked and answers given may
21  ultimately be used in a court hearing or
22  other proceeding.
23       Do you understand?
24     A.   Yes.
25     Q.   Is there any reason you would be
```

Page 8

```
1   unable to tell the truth today?
2      A.   No.
3      Q.   Is there any reason you would be
4   unable to remember things today?
5      A.   No.
6      Q.   Are you taking any medications or
7   substances that would make you unable to
8   tell the truth today?
9      A.   No.
10     Q.   Are you taking any medications or
11  substances that would make you unable to
12  remember things today?
13     A.   No.
14     Q.   Please answer my questions fully
15  and to the best of your knowledge.  If you
16  don't know the answer, please do not guess.
17       Do you understand?
18     A.   Yes.
19     Q.   Have you been deposed before?
20     A.   I'm sorry?
21     Q.   Have you been part of an interview
22  before?
23     A.   Once -- you mean in a BP
24  investigation?
25     Q.   Have you been deposed in a
```



Page 9

1   separate case and have you been interviewed
2   as part of the BP process for its claims?
3       A.   No.
4       Q.   So if I understand correctly,
5   you've never been deposed?
6       A.   No.
7       Q.   You have never been interviewed
8   for any BP claims?
9       A.   No.
10      Q.   Have you and I spoken before
11  today?
12      A.   No.
13      Q.   Have you and Maria Feeley spoken
14  before today?
15      A.   No.
16      Q.   This is a confidential
17  investigation and we ask that you hold this
18  interview in confidence.  Do you understand?
19      A.   Yes.
20      Q.   Can you state your full name,
21  please?
22      A.   Vernon Ernest Alfonso, Jr.
23      Q.   Do you have any other names?
24      A.   No.
25      Q.   Do you have any nicknames?

Page 10

1       A.   No.
2       Q.   What is your date of birth?
3       A.   ▮▮▮▮▮▮
4       Q.   What is your place of birth?
5       A.   New Orleans.
6       Q.   Can you state the state?
7       A.   Oh, Louisiana.
8       Q.   Thank you.  What is your Social
9   Security number?
10      A.   ▮▮▮▮▮▮▮
11      Q.   Can you please provide your home
12  address?
13      A.   It's ▮▮▮▮▮▮▮▮▮▮▮
    ▮▮▮▮▮▮▮▮
15      Q.   How long have you lived there?
16      A.   Probably right after Katrina,
17  probably, I guess, since '06, '07.  I'm not
18  positive -- I know it was right after
19  Katrina.
20      Q.   I think Katrina was in 2005.
21      A.   It was '05, so it was either '06
22  or '07, when I bought that property.
23      Q.   Are you considering a move from
24  that location?
25      A.   No, not at the moment.

Page 11

1       Q.   Have you made any plans to move
2   from your current address?
3       A.   Not at the moment.
4       Q.   Can you walk me through your
5   educational background?
6       A.   I attended St. Bernard High
7   School, graduated from St. Bernard.
8       Q.   Where is St. Bernard?
9       A.   It's down in -- below New Orleans,
10  about 20, 30 miles.
11      Q.   Is it part of New Orleans?
12      A.   I wouldn't say it's part of
13  New Orleans.  St. Bernard Parish, it's a
14  different parish.
15      Q.   What was your education after high
16  school?
17      A.   That was it.
18      Q.   That was it.  Can you walk me
19  through your employment history?
20      A.   Basically commercial fishing and
21  whatever else I had to do, but, basically,
22  that's what I started out, commercial
23  fishing.
24      Q.   You started being a commercial
25  fisherman in high school?

Page 12

1       A.   Probably before high school.  I
2   was born into -- my dad was a commercial
3   fisherman and his dad was a commercial
4   fisherman.
5       Q.   A long line of fisherman?
6       A.   Yeah, yeah.  I started with my
7   grandpa probably when I was 12 years old or
8   something.
9       Q.   And do you work other jobs besides
10  being a commercial fisherman?
11      A.   Sometimes.
12      Q.   Can you tell me what those jobs
13  are?
14      A.   I did construction work, I did
15  some like seismograph work, stuff like that.
16      Q.   When you mean seismographic work,
17  can you explain that a little bit?
18      A.   In the oilfield industry, you
19  know, companies would go and, you know, look
20  for oil and stuff and --
21      Q.   Are you a seismographer, what is
22  your role?
23      A.   No.  I would be more like a
24  crewman.  I would use my boat and bring
25  people around.



Page 13

1    Q.   So you kind of just help the
2  people get to where they needed to go --
3    A.   Right.
4    Q.   -- with your boat?
5    A.   Right.
6    Q.   Did you always use your boat when
7  you were working seismographic?
8    A.   Most of the time, yeah.  I mean --
9  I mean, we -- yeah, sometimes I ran other
10  people's boats, but most of the time it was
11  my boat.
12    Q.   And then when did you start doing
13  that kind of work?
14    A.   That would be hard to pinpoint,
15  but I would say probably in the '90s,
16  like '92, '93.
17    Q.   And do you still do that work
18  today?
19    A.   No.
20    Q.   Do you do that work every year
21  since '93, I would say?
22    A.   No.  We had a little -- we had
23  a -- it had a run for a little while, as far
24  as -- you know, the oil industry and that
25  kind of faded out probably -- probably by

Page 14

1  the end of the '90s, I would suppose.
2    Q.   You said "we."  What did you mean
3  by we?
4    A.   Well, they had other people that
5  worked the jobs with us, you know, as far
6  as --
7    Q.   Who are those people?
8    A.   Just cousins and friends and
9  different people.
10    Q.   Family members?
11    A.   Yeah.
12    Q.   Did you engage in seismographic
13  work in 2007?
14    A.   In '7?  I don't think so, no.  Not
15  that I can remember, no.
16    Q.   What about 2008?
17    A.   I don't remember.  I'm not sure if
18  we did -- I did do -- I probably did a
19  little -- moved an oil rig maybe in '7
20  or '8.  I can't pinpoint it exactly, what
21  year it was.  I know it was around that
22  time, you know, that I can remember.  I
23  escorted a drilling rig.
24    Q.   Okay.  And that was in 2007, 2008?
25    A.   I can't say for sure.  I'm just --

Page 15

1  no, I can't say for sure.
2    Q.   Do you watch baseball?  I think
3  2007 the Phillies won the World Series, was
4  it that year?  A very important year.
5    A.   I can't tell you that.
6    MR. COLEMAN:
7      That was memorable.
8    THE WITNESS:
9      I can't tell you that.  I'm not a
10  big baseball fan, more football.
11  EXAMINATION BY MR. SALICRUP:
12    Q.   Besides your seismographic work,
13  do you do other kinds of work or have you
14  done other kinds of work?
15    A.   Construction, that's about it.
16    Q.   Construction.  When did you start
17  working on construction?
18    A.   That started after Katrina.
19    Q.   And what year was that?
20    A.   That was in -- Katrina was in '05.
21    Q.   Okay.
22    A.   So it probably started the end
23  of 05.
24    Q.   So, let's say, November 2005
25  approximately?

Page 16

1    A.   Probably.
2    Q.   Around that time?
3    A.   Yeah, around.
4    Q.   And how long did you work in
5  construction?
6    A.   I worked probably till -- probably
7  the end of '09, I would say, sometime
8  in '09.
9    Q.   So if I understand correctly, you
10  worked from, let's say, November 2005, give
11  or take a month, through the end of 2009,
12  you worked in construction, correct?
13    A.   Yes.  Not totally, but, yes.  I
14  did shrimping, too.  I didn't --
15    Q.   You did shrimping as well?
16    A.   Yes.  I did construction work,
17  because my boat was damaged in Katrina, and
18  so, you know, the little bit I could use it,
19  I used it.
20    Q.   Okay.  And you said you've been a
21  commercial fisherman basically all your
22  life, before high school?
23    A.   Yes.
24    Q.   Maybe even middle school you were
25  helping your relatives engaging in



Page 17

1 commercial fishing.  Have you done that
2 every year to the present day?
3     A.  That I can remember.
4     Q.  So it's accurate to say that you
5 were a commercial fisherman in 2007,
6 correct?
7     A.  2007?  I'm not sure.  I'm really
8 not sure.  I can't remember back that far.
9 If I did commercial -- I think I did, but
10 I'm not sure.
11     Q.  Mr. Alfonso, did you prepare for
12 this interview today?
13     A.  Did I prepare how?  In what way
14 like?
15     Q.  What way do you think I mean?
16     A.  I really don't know.  I mean, I
17 just --
18     Q.  Did you use any documents to
19 refresh your recollection today?
20     A.  No, not really.
21     Q.  Could you -- is it no or not
22 really?
23     A.  Well, I'm not -- no.
24     Q.  You did not look at any documents?
25     A.  No -- I'm not sure what I looked

Page 18

1 at.  I'm not sure.  I'm trying -- I might
2 have looked at my -- no, I don't know what I
3 looked at.  I'm not sure.
4     Q.  But you looked at something?
5     A.  Yeah.
6     Q.  You looked at something.  Can you
7 try to tell me what you looked at?
8     A.  I might have looked at -- I'm not
9 sure what I looked at.  I really don't know.
10     MR. COLEMAN:
11         So --
12     THE WITNESS:
13         I mean, I looked at my bank
14 statements.
15     MR. COLEMAN:
16         Yeah, go ahead, if you want to
17 finish your answer.  I don't want to
18 interrupt.
19     THE WITNESS:
20         I know I looked at my bank
21 statements.  I know that.
22     EXAMINATION BY MR. SALICRUP:
23     Q.  You looked at your bank
24 statements?
25     A.  Yes.

Page 19

1     Q.  Are you referring to the bank
2 statements that you provided --
3     A.  That I provided.
4     Q.  -- that you provided us this
5 morning?
6     A.  Yes.
7     Q.  Did you look at any other bank
8 statements that you did not provide us this
9 morning?
10     A.  No.  I provided everything I had.
11     Q.  And did you look at any other
12 documents to refresh your recollection?
13     A.  No, not that I remember.  I mean,
14 I may have looked at something.  I may have
15 looked at --
16     Q.  I'm going to have to ask you that,
17 the conversation is between you and me.
18     A.  I'm sorry.
19     MR. COLEMAN:
20         Well, I just want to make sure
21 he's clear on privilege.  I don't know if
22 you're struggling with that or not.
23         We did meet with him yesterday and
24 if you want to establish that, that's fine.
25 If he asked you about what we talked about,

Page 20

1 I would consider that subject to
2 attorney-client privilege and you shouldn't
3 answer.  If he asks you if we looked at any
4 documents, that's not provided by privilege,
5 you should go ahead and answer.  If you
6 remember.
7     THE WITNESS:
8         Oh, okay.  Well, no, I didn't.
9     MR. COLEMAN:
10         Go ahead.
11     EXAMINATION BY MR. SALICRUP:
12     Q.  No, you didn't what?
13     A.  I didn't look at any other
14 documents as far as --
15     Q.  And just like your counsel said,
16 you're under oath today.
17     A.  Okay.
18     Q.  I won't ask if what you discussed
19 with your attorney, because that is
20 protected, I can't go there.  But I can ask
21 you about what documents you looked at.
22         So besides those bank documents,
23 did you look at any other documents today?
24     A.  No.
25     Q.  Did you look at any of the



1   documents that were produced today?
2       A.   No.
3       Q.   No?
4       A.   (Nods head negatively).
5       Q.   Please answer verbally.
6       A.   No.
7       Q.   Just for the record, not because I
8   want you to.
9           Did you do anything else to
10  prepare for the interview?
11      A.   No.  The only thing I did was meet
12  with my attorney.
13      Q.   Did you make any notes?
14      A.   No.
15      Q.   Did you speak or meet with anyone
16  to prepare for this interview?
17      A.   Other than my attorney, no.
18      Q.   And when did you meet with your
19  attorney?
20      A.   Yesterday evening.
21      Q.   Yesterday evening.  How long did
22  you meet with your attorney?
23      A.   I imagine an hour or two.
24      Q.   Closer to two?
25      A.   Maybe two.

1       Q.   Two, more than two?
2       A.   No, no more than two, two.
3       Q.   Two.  Was anyone else present?
4       A.   My wife.
5       Q.   Your wife was present?
6       A.   Yes.
7       Q.   Is your wife represented by
8   Mr. Coleman?
9       A.   No.
10      Q.   And have you kept any files on
11  this claim?
12      A.   Other than my taxes, that's about
13  it.  My taxes and maybe trip tickets, trip
14  tickets.
15      Q.   Do you have any other diaries or
16  calendars that you may have used, faxes,
17  relating to this claim?
18      A.   No.
19      MR. SALICRUP:
20           I'm now going to show you the
21  subpoena with attachment A, I'm going to ask
22  the court reporter to mark this as
23  Exhibit 1.
24           (Exhibit No. 1 marked for
25  identification.)

1   EXAMINATION BY MR. SALICRUP:
2       Q.   Please review Exhibit 1 and let me
3   know when you're finished, okay?
4       A.   Okay.  (Reading).
5       MR. COLEMAN:
6           You know what, you don't have to
7   read all of that.
8       THE WITNESS:
9           Okay.
10  EXAMINATION BY MR. SALICRUP:
11      Q.   Is Exhibit 1 a copy of the
12  subpoena and attachment that you received to
13  appear for this interview here today?
14      A.   Yes.
15      Q.   Can you please turn to attachment
16  A which would be the last page?
17      A.   Last page, okay.
18      Q.   Have you seen the document request
19  attached as attachment A to the subpoena
20  before?
21      A.   Yes, I think I did see this.
22      Q.   Let's walk through attachment A.
23  Can you please read Paragraph A?
24      A.   "Any and all records or documents
25  including electronically stored information

1   which support or relate in any way to shrimp
2   boat captain's claim or shrimp vessel's
3   owner claim made by Vernon Alfonso, Jr."
4       Q.   Did you provide all the documents
5   requested by heading A or the attachment A
6   to the subpoena?
7       A.   Yes.
8       Q.   Can you please -- and that
9   includes any electronically stored
10  information you may have on your computer,
11  correct?
12      A.   Right.  Yes.
13      Q.   What about Paragraph B, can you
14  read that, please?
15      A.   For the period of time from
16  January 1st, 2007 to December 31st, 2010,
17  any and all records or documents including
18  electronically stored information.
19      Q.   Just read Paragraph 1.
20      A.   Relating to bank account utilized
21  on behalf of Vernon Alfonso, Jr., including
22  but not limited to banking records.
23      Q.   Have you provided all of the
24  information requested by Paragraph B and
25  heading 1 of attachment A to Exhibit 1?



Page 25

1    A.   Yes.
2    Q.   I know that you provided some
3  information to us regarding your bank
4  accounts this morning.
5    A.   Yes.
6    Q.   Do you have any other bank
7  accounts?
8    A.   No.
9    Q.   Can you tell me how many bank
10 accounts you have?
11   A.   Three.
12   Q.   Are they in different banks or the
13 same bank?
14   A.   The same bank.
15   Q.   What bank is that?
16   A.   That's Gulf Coast Bank.
17   Q.   How long have you been at Gulf
18 Coast Bank, how long have you banked with
19 them?
20   A.   Since -- since '06, I would say.
21   MS. FEELEY:
22       Off the record.
23       (Whereupon, an off-the-record
24 discussion was held.)
25   THE WITNESS:

Page 26

1       '06.
2    MR. SALICRUP:
3       Court reporter, you got his
4  response of '06, correct?
5    THE REPORTER:
6       Yes.
7       (Whereupon, an off-the-record
8  discussion was held.)
9    MR. SALICRUP:
10      Court reporter, can you remind me
11 what the last question asked was?
12      (Whereupon, the requested
13 testimony was read by the Court Reporter)
14      "Q   How long have you been at
15   Gulf Coast Bank, how long have you
16   banked with them?"
17 EXAMINATION BY MR. SALICRUP:
18   Q.   And are you still banking at Gulf
19 Coast Bank?
20   A.   Yes.
21   Q.   And if I'm understanding you, you
22 banked with Gulf Coast Bank between -- from
23 2006 to the present?
24   A.   To the present.
25   Q.   Uninterrupted?

Page 27

1    A.   Yes.
2    Q.   And you said you had three
3  accounts.  Can you tell me what kind of
4  accounts they are?
5    A.   I have a savings account, I have a
6  house checking account and I have a personal
7  account that I use for my boat expenses and
8  things like that.
9    Q.   And are you the only person
10 authorized on those three accounts?
11   A.   No.
12   Q.   Who else?
13   A.   My wife Mary Ann Alfonso.
14   Q.   Anybody else?
15   A.   No.
16   Q.   What do you use your savings
17 account for?
18   A.   Just to put in savings for, you
19 know -- just a savings account really.  If
20 we need the money, we take it out and pay
21 bills.
22   Q.   You pay bills out of your savings
23 account and use it for day-to-day expenses,
24 is that fair to say?
25   A.   Yes.

Page 28

1    Q.   And your second account, correct
2  me if I'm wrong, it's a checking account?
3    A.   Yes.
4    Q.   What do you use your checking
5  account for?
6    A.   My checking account is mainly for
7  the boat expenses.
8    Q.   When you say mainly for the boat
9  expenses, what do you mean by that?
10   A.   Well, fuel costs, or any kind of
11 breakdowns or anything I need, equipment.
12   Q.   What kind of equipment do you need
13 for your boat?
14   A.   Nets, sometimes we will buy, you
15 know, any kind of supplies, grocery
16 supplies.
17   Q.   Any other necessities for your
18 boat that you need?
19   A.   Just repairs or stuff like that,
20 repairs and fuel.
21   Q.   And when you say mainly, do you
22 use that checking account for other things?
23   A.   Yes.
24   Q.   What kind of other things?
25   A.   I mean, as far as fuel for the



1   truck sometimes.
2      Q.   For the truck?
3      A.   Yeah, my pickup truck.
4      Q.   Is your truck related to your
5   fishing operation?
6      A.   Yes.
7      Q.   What do you use your truck for?  I
8   don't know anything about fishing, let's get
9   that very clear.  So just walk me through
10   what you need it for.
11      A.   Okay.  Just to haul nets or haul
12   shrimp or any kind of equipment.
13      Q.   Okay.
14      A.   Back and forth.  I live about 25
15   minutes from the boat, traveling.
16      Q.   What is the size of your boat?
17      A.   The size?
18      Q.   Yes.
19      A.   It's 37 foot.
20      Q.   And is that an ice or freeze --
21      A.   Ice boat.
22      Q.   Ice boat.  What was the third
23   account that you mentioned?
24      A.   The house account.
25      Q.   The house account.  And what do

1   you use the house account for?
2      A.   To pay bills.  You know, electric,
3   water.
4      Q.   Anything else?
5      A.   I imagine my wife spends
6   groceries, stuff like that.
7      Q.   Do you manage any of these
8   accounts?
9      A.   No.
10      Q.   What deposits are made into your
11   savings account?
12      A.   Paychecks, whatever I earn or
13   whatever.  When I collect, I usually give my
14   wife the check and she deposits it in an
15   account.
16      Q.   Okay.  When you say I get paid or
17   whatever, what do you mean by that?
18      A.   Like if -- when I collect it at
19   the end of the week from shrimping,
20   something like that, I will give her the
21   check and she will deposit money in my
22   account if I need money for fuel.
23      Q.   When you say my account, what do
24   you mean by that?
25      A.   My boating account.

1      Q.   Okay.  Right now we're talking
2   about your savings account.
3      A.   Okay.
4      Q.   What deposits are made into the
5   savings account?
6      A.   That's at my wife's discretion,
7   what she feels she can save.
8      Q.   Okay.
9      A.   And what she needs for bills.
10      Q.   And what deposits are made into
11   your checking account?
12      A.   Whatever -- if I ask her to
13   deposit money in there for fuel and
14   expenses.
15      Q.   So walk me through.  You get up, I
16   imagine, God knows what time, before the sun
17   rises, you get on your boat --
18      A.   Yes.
19      Q.   -- you take your boat out?
20      A.   (Nodding head affirmatively).
21      Q.   What happens after that?
22      A.   I usually go out for three to four
23   days, depending on how the shrimp is
24   running, and when I come in, we will unload,
25   and, you know, I don't collect it as soon as

1   I come in.  It might be the end of the week
2   or the end of next week.
3      Q.   I didn't understand that.  Run it
4   by me again.
5      A.   I'm sorry.
6      Q.   No, no, no.  It's not you, it's
7   me.  Like I said, I don't know anything
8   about fishing.  So just explain it like you
9   would explain it to a seven year old.
10      A.   Okay, I'm sorry.  We -- when we
11   come in at the end of the trip, we unload
12   and -- at the shrimp dock and they will --
13   usually, it's like the end of the week or
14   the end of the following week, whenever you
15   get paid.
16      Q.   Who pays you?
17      A.   The dealer, the shrimp dealer that
18   we sell to at the dock.
19      Q.   Who do you sell to at the dock?
20      A.   I sell to -- now I sell to Tino
21   Seafood, Tino Mones Seafood.  That's my
22   shrimp dealer now.
23      Q.   Can you spell that name?
24      A.   T-I-N-O.
25      Q.   And you said something I didn't



Page 33

1  understand.
2      A.  Mones.
3      Q.  How do you spell that?
4      A.  M-O-N-E-S.
5      Q.  Seafood?
6      A.  Seafood.
7      Q.  And where -- is that a name, is it
8  Mr. Mones or --
9      A.  Yes.
10     Q.  Where is Mr. Mones based?
11     A.  He's at Delacroix, Delacroix
12 Island.
13     Q.  Near where you live?
14     A.  Yes.
15     Q.  Before Mr. Mones, who did you sell
16 to?
17     A.  I sold to Island Seafood.
18     Q.  Island?
19     A.  Island Seafood.
20     Q.  Who is the owner of Island
21 Seafood?
22     A.  That would be Curtis Morales.
23     Q.  Did you sell to Island Seafood in
24 2007?
25     A.  Yes.

Page 34

1      Q.  Did you sell to Island Seafood in
2  2008?
3      A.  Yes.
4      Q.  What about 2009, did you sell to
5  Island Seafood?
6      A.  Yes.
7      Q.  Did you sell to anybody else?
8      A.  Probably.  I can't remember who,
9  but he was my main dealer, my main shrimp
10 dock.  Because we -- sometimes we travel, we
11 go in different areas, and we might sell a
12 local dock in that area.
13     Q.  When you say "we," what does that
14 mean?
15     A.  I'm sorry, it's my expression that
16 I say all the time.  I don't know why, it's
17 just habit.
18     Q.  No, it's fine.  I just want to
19 make sure.
20     A.  My wife says the same thing.
21     Q.  You're not saying anything wrong,
22 I'm making sure that I understand what
23 you're saying.
24     A.  It's just habit.
25     Q.  Got you.  So in 2009, you sold

Page 35

1  your seafood to Island Seafood, correct?
2      A.  Yes.
3      Q.  And so you get to --
4      A.  Yes.
5      Q.  -- the dock, right?
6      A.  Yes.
7      Q.  Let's bring a little clarity to
8  what happens when you get to the dock with
9  your haul of shrimp.  Is a dealer waiting
10 for you there?
11     A.  Yes.
12     Q.  And what happens?
13     A.  We -- we unload the boat.  Usually
14 he has a crew, you know, a boat and unload
15 the catch and lay it out.
16     Q.  Okay.
17     A.  And he will ice it, re-ice it and
18 either put it on the truck to be delivered
19 or put it in his cooler.
20     Q.  Who does the shrimp count?
21     A.  The dealer.
22     Q.  Does he do that when he gets on
23 the boat?
24     A.  He does that when the shrimp come
25 off the boat.

Page 36

1      Q.  Okay.  And does he pay you in
2  advance at that point?
3      A.  No.
4      Q.  No?
5      A.  No.
6      Q.  So you bring in, I don't know, how
7  much would you say is a good haul of shrimp?
8      A.  3,000 pounds.
9      Q.  That will fit in a 37-foot vessel?
10     A.  Yes.
11     Q.  So you bring in 3,000 pounds of
12 shrimp in.  Mr. -- the Island Seafood owner
13 is there, he comes onto your vessel, he
14 measures the shrimp, tells you the count,
15 doesn't pay you and leaves?
16     A.  That's correct.
17     Q.  And then you get paid the next
18 week?
19     A.  Yes.
20     Q.  How do you get paid?
21     A.  By check.
22     Q.  By check?
23     A.  Yes.
24     Q.  Is that check -- do you go to the
25 dealer's office?  Did you go to Island



Page 37

1   Seafood's office to pick up the check?
2       A.   Yes.
3       Q.   He never mailed them?
4       A.   No, he don't mail them.  We pick
5   them up.
6       Q.   You pick up the check and then
7   what do you do with it?
8       A.   Usually, I will bring the check
9   home, I will sign it.
10      Q.   What do you mean you sign it?
11      A.   I will sign the back of it, and
12  give it to my wife and she will sign and she
13  deposits it in accounts she needs to deposit
14  it in.
15      Q.   It sounds like your wife is the
16  chief financial officer of your home, is
17  that correct?
18      A.   Yes, I suppose so.
19      Q.   So you -- so you don't know where
20  the money is deposited once you give your
21  wife the check?
22      A.   Usually, I will tell her the
23  specific amount to put in my account and
24  then she will -- she decides on the rest,
25  what she can save and what she needs for

Page 38

1   bills.
2       Q.   Run that by me one more time.
3       A.   Usually, she will deposit a
4   certain amount in my checking account for my
5   boat.
6       Q.   Okay.
7       A.   And the rest, she uses at her
8   discretion on what she needs for bills and
9   what she can put in the savings account.
10      Q.   So around 2009, what would be a
11  good price for 3,000 pound of shrimp?
12      A.   I don't remember the prices.  I
13  know they wasn't good, but I really don't
14  remember the prices.
15      Q.   Okay.  Let's just say that you got
16  $2,000 for it, I don't know if that's
17  accurate for market value, but let's assume
18  that, and you hand your wife a check for
19  $2,000, and you endorse it.  You stated that
20  your wife will then put it in your checking
21  account that you to use for your boat
22  expenses.  She will put an amount there, who
23  determines that amount?
24      A.   Me.
25      Q.   So you tell your wife I need 1500

Page 39

1   in my checking account?
2       A.   If that's what I need.
3       Q.   And then the remaining 500, where
4   do they go?
5       A.   She will decide -- if she has
6   bills to pay, she will put it in her
7   checking account to pay bills.
8       Q.   So you just tell her how much is
9   going to your checking account and the rest
10  is distributed as she sees fit?
11      A.   Right.
12      Q.   And who determines how much is
13  placed into the savings account?
14      A.   Her.
15      Q.   Her?
16      A.   Yes.
17      Q.   So she determines how much -- you
18  determine the amount going to the checking
19  account, she determines the amount going to
20  savings and who determines the amount going
21  to the house account?
22      A.   Her.
23      Q.   Her being your wife?
24      A.   Yeah, my wife, I'm sorry.
25      Q.   And you don't use any other type

Page 40

1   of alternative banking methods or anything
2   like that?
3       A.   No, I mean, occasionally if I need
4   cash, I will tell her to save me X amount of
5   dollars in cash.
6       Q.   Good.  You don't buy bitcoins or
7   something like that, do you?
8       A.   No.
9       Q.   Can we go to Paragraph 2 of
10  Attachment A -- excuse me, B2 of Paragraph
11  A?
12      A.   (Reading) okay, it says:
13  "Relating to the employment, income revenue
14  contracted or employment of Vernon Alfonso,
15  Jr., including, but not limited to canceled
16  checks or paystubs."
17      Q.   Okay.  Just a clarification, the
18  first portion of B2 says:  "Relating to the
19  payment, income revenue, contracting or
20  employment."
21           Did you provide all these
22  documents?
23      A.   Yes.
24      Q.   Did you look -- where did you look
25  to find this information?



Page 41

1    A.   The -- through my records.
2    Q.   What records were those?
3    A.   The bank statements and anything I
4  had relating to these years that you
5  requested.
6    Q.   What are these years that I
7  requested?
8    A.   '07 to '10.
9    Q.   Okay.  So you searched through
10  your banking records.  Where do you keep
11  those?
12    A.   In the file cabinet.
13    Q.   The file cabinet in your house?
14    A.   Yes.
15    Q.   Do you have an office?
16    A.   Yes.
17    Q.   Is the filing cabinet in -- is the
18  office in your house?
19    A.   Yes.
20    Q.   Did you look anywhere else?
21    A.   No.
22    Q.   What about the information
23  relating to B1, the banking records, where
24  did you look for that information?
25    A.   In my records, in my office.

Page 42

1    Q.   In the same filing cabinet?
2    A.   Yes.
3    Q.   In a different drawer?
4    A.   I -- my wife takes care of that.
5    Q.   Okay.  So did you look for them or
6  did your wife look for them?
7    A.   My wife looked for them.
8    Q.   Okay.  She looked for them --
9    A.   Right.
10    Q.   -- because she's the one that
11  manages this, your accounts?
12    A.   Right.
13    Q.   Did your wife look anywhere else?
14    A.   Not through my account, no.
15    Q.   Did you ask your wife if she
16  looked anywhere else?
17    A.   I asked her to look through the
18  records that she had and pull out all the
19  bank statements.
20    Q.   Did you show her Attachment A to
21  the subpoena?
22    A.   No, I don't think I did.  I think
23  I just asked her to pull out any records she
24  had relating to '07 to '10.
25    Q.   Did you tell her '07 to '10 for

Page 43

1  banking records or did you just say, 2007
2  through 2010?
3    A.   I'm not exactly sure how I told
4  her.  I just told her -- I know I told her
5  we needed all the banking records from '07
6  to '10.
7    Q.   Is it possible that there could be
8  other banking records that, because she's
9  the one that manages the accounts, she did
10  not give you?
11    A.   She gave me everything she had.  I
12  know that.
13    Q.   Can you read Paragraph B3, please?
14    A.   "Concerning services or work by
15  Vernon Alfonso, Jr., including dates and
16  types of services rendered or work
17  performed."
18    Q.   Did you provide all the documents
19  covered by Paragraph B3?
20    A.   Yes.
21    Q.   Where did you look for those
22  records?
23    A.   That would be in my filing
24  cabinet, any records I have.
25    Q.   Is it the same filing cabinet that

Page 44

1  you referenced a second ago?
2    A.   Yes.
3    Q.   And was it a similar situation,
4  did you tell your wife that you needed
5  records for 2007 through 2010 and she looked
6  them up?
7    A.   Yes.
8    Q.   Is there anywhere else that you or
9  your wife looked for these records?
10    A.   No.  Everything we have would be
11  in that filing cabinet.
12    Q.   And is there -- because your wife
13  looked for the records, is it possible that
14  she didn't include some documents that were
15  responsive to Paragraph B3?
16    A.   No.  She would have included
17  everything we have.
18    Q.   Please read B4.
19    A.   No. 4?
20    Q.   Yes, sir.
21    A.   "Including Internal Revenue
22  Service, IRS forms 1099 or other IRS
23  documents relating to or received by, sent
24  to, issued to, or prepared by, for or on
25  behalf of Vernon Alfonso."



Page 45

1    Q.   Sir, did you provide all the
2   documents requested by Paragraph B4?
3    A.   Yes.
4    Q.   And where did you obtain these
5   documents?
6    A.   In my filing cabinet.
7    Q.   Did you look anywhere else?
8    A.   No.
9    Q.   Did you look for them or did your
10  wife look for them?
11   A.   My wife.
12   Q.   And you communicated to your wife
13  that you needed what exactly?
14   A.   That I needed any IRS forms that
15  we had.
16   Q.   And is it possible that your wife,
17  because she didn't read Attachment A, may
18  have left out some documents?
19   A.   No, she would have submitted
20  everything.
21   Q.   Can you read Paragraph B5?
22   A.   Sure.
23       "Relating to any relationship,
24  communications and employment, contracting
25  or payments between Vernon Alfonso, Jr., and

Page 46

1   Frank & Sons."
2    Q.   Did you provide all the
3   information relating to this request?
4    A.   Yes.
5    Q.   Where did you look for that
6   information?
7    A.   In my filing cabinet.
8    Q.   Did you look anywhere else?
9    A.   No.
10   Q.   Is there anywhere else that you
11  might have documents or other information
12  that is responsive to Paragraph B5?
13   A.   No.
14   Q.   Did you look for it or did your
15  wife look for it?
16   A.   My wife.
17   Q.   Is it possible because you wife
18  didn't read Attachment A, she may not have
19  included certain documents?
20   A.   No.  I asked her -- I told her we
21  must submit all the documents we had.
22   Q.   Please read paragraph B6.
23   A.   "Relating to any communications
24  between Vernon Alfonso, Jr. and persons or
25  entity that assisted Vernon Alfonso, Jr.

Page 47

1   with or prepared tax forms for him."
2    MR. SALICRUP:
3        Court reporter, could you just
4   read back where Mr. Alfonso read to make
5   sure that we check for the accuracy.  I
6   didn't have a chance.
7        (Whereupon, the requested
8   testimony was read by the Court Reporter)
9        "Q   Relating to any
10  communications between Vernon Alfonso,
11  Jr. and persons or entity that assisted
12  Vernon Alfonso, Jr. with or prepared
13  tax forms for him."
14  EXAMINATION BY MR. SALICRUP:
15   Q.   Paragraph B6 states:  "Relating to
16  any communications between Vernon Alfonso,
17  Jr. and any person or entity that assisted
18  Vernon Alfonso, Jr. with or prepared tax
19  forms for him."
20       Sir, did you provide all the
21  documents responsive to Paragraph B6?
22   A.   Yes.
23   Q.   Where did you look for those
24  documents?
25   A.   In my filing cabinet, where all --

Page 48

1   with the -- all my -- all my other
2   documents.
3    Q.   Did you look anywhere else?
4    A.   No.
5    Q.   Did you ever e-mail your tax
6   preparer?
7    A.   No.
8    Q.   Do you have an e-mail address?
9    A.   Just recently I got one,
10  probably -- I might have an e-mail address
11  -- maybe a year.
12   Q.   Is that gmail, what do you use?
13   A.   Ymail.
14   Q.   I don't know that, sir.  But you
15  did not have e-mail in 2007?
16   A.   No.
17   Q.   2008?
18   A.   No.
19   Q.   2009?
20   A.   No.
21   Q.   And do you have a computer in your
22  home?
23   A.   Yes.
24   Q.   Is it a laptop or a desk top?
25   A.   I recently have a laptop.  I do



1  have a desk top.
2      Q.  Do you have -- what kind of
3  computer did you have from 2007 through
4  2009?
5      A.  Probably just a home computer, not
6  a laptop, a regular desktop.
7      Q.  What did you use that computer
8  for?
9      A.  My wife used it.  I'm not sure.  I
10  don't think she stores a whole lot on it.
11      Q.  Do you --
12      A.  I'm not too good with computers so
13  I'm not --
14      Q.  I hear you and I understand better
15  than you think.
16          What does your wife use the
17  computer for?
18      A.  I'm not sure.  I imagine -- I know
19  she plays a lot of games.
20      Q.  Do you know what kind of games?
21      A.  No.  Cards mostly.
22      Q.  I'm sorry?
23      A.  Cards, card games.
24      Q.  Oh, really?
25      A.  Yeah.

1      Q.  And does she have -- do you know
2  what software is kept on the computer?
3      A.  No, not really.  Windows.
4      Q.  Do you know if you have Excel?
5      A.  No, I'm not sure, I couldn't say.
6      Q.  Do you know if you have Quicken?
7      A.  No.
8      Q.  Does your wife, since she's the
9  one that manages the money, ever work with
10  that information on the computer?
11      A.  No.
12      Q.  She never types up a budget for
13  the house and says, you know, Vernon, this
14  is how much we can spend this month and
15  prints it out for you to take on the boat?
16      A.  No.
17      Q.  Does she ever print any financial
18  information out?
19      A.  No, she don't like banking or
20  anything on the computer.
21      Q.  How do you pay your bills?
22      A.  Check.
23      Q.  Check?
24      A.  (Nodding head affirmatively).
25      Q.  Never online?

1      A.  No.  I think she has insurance
2  that -- electronically draws the money out
3  of the account.
4      Q.  Okay.
5      A.  I think she has that.
6      Q.  What about your power bills?  You
7  can pay that stuff electronically.
8      A.  Yeah, but she pays everything with
9  checks.
10      Q.  Water?
11      A.  Water, lights.
12      Q.  Got you.  And what about
13  statements from the bank?  You can get those
14  electronically.
15      A.  She -- I think she receives them
16  in the mail.
17      Q.  She always does?
18      A.  Yes.
19      Q.  Are there any other documents that
20  are responsive to Attachment A of Exhibit 1
21  in your possession?
22      A.  No.
23      Q.  Are there any other documents that
24  are responsive to Attachment A of Exhibit 1
25  in any one else's possession that you are

1  aware of?
2      A.  No -- no.
3      Q.  Have you destroyed any documents?
4      A.  No.
5      Q.  How far back does your wife keep
6  statements and bills?
7      A.  I'm not sure.  I really don't
8  know.
9      Q.  Okay.  Do you know if she, you
10  know, goes through the files and destroys or
11  tosses documents out?
12      A.  No.
13      Q.  It's possible?
14      A.  Not that I'm aware of.  I never
15  seen her destroy documents or throw any out.
16      Q.  And this filing cabinet, how tall
17  is it?
18      A.  Probably 5 foot.
19      Q.  So this is essentially the vault
20  where you keep everything?
21      A.  Yes.
22      Q.  Do you have an ATM card for your
23  checking account?
24      A.  Yes.
25      Q.  Does your wife have an ATM card



Page 53

1  for your checking account?
2     A.  She -- for my checking account?
3     Q.  Uh-huh (indicating affirmatively).
4     A.  My boat account?
5     Q.  Uh-huh (indicating affirmatively).
6     A.  No.
7     Q.  And do you know the number of your
8  checking account?
9     A.  No.
10    Q.  Do you know your number for any of
11  the accounts?
12    A.  No.
13    Q.  Do you have that ATM card with
14  you?
15    A.  Yes.
16    Q.  May I see it?
17    A.  Uh-huh (indicating affirmatively).
18    Q.  Do you have an ATM card for the
19  savings account or the house account?
20    A.  I have another card.  I don't use
21  it.  And I -- yeah -- I forgot about that
22  account.  That is my business account.
23    Q.  This is a fourth account?
24    A.  It's an account that we -- that I
25  opened after the BP spill.  This would

Page 54

1  probably be in 2011 or 2010.  I'm not sure.
2  I don't really use it.
3     MR. COLEMAN:
4        Can you just do something to
5  identify for the record what he's given you
6  so that the transcript reflects it?
7     MR. SALICRUP:
8        Sure, for the record, Mr. Alfonso
9  has provided me with an ATM debit Master
10  Card from Gulf Bank.
11    THE WITNESS:
12       Gulf Coast Bank.
13    MR. SALICRUP:
14       I'm sorry, Gulf Coast Bank, one
15  card ending in ████, which he identified as
16  the ATM for his checking account.  And he
17  provided a second ATM card from Gulf Coast
18  Bank which is a Master Card, with numbers
19  ending in ████, which he identified as a
20  business account.
21  EXAMINATION BY MR. SALICRUP:
22    Q.  Approximately created in --
23    A.  It's an LLC account.
24    Q.  It's an LLC account?
25    A.  Yes.

Page 55

1     Q.  When was the account created?
2     A.  I would say it was after the BP
3  spill, probably 2011.
4     Q.  2011.  Did you have a similar
5  account around 2007 --
6     A.  No.
7     Q.  -- that you may have opened and --
8     A.  No.
9     Q.  -- you know, after the BP spill,
10  you just didn't need it and you said, hey,
11  let's close it?
12    A.  No.
13    Q.  Aside from these four accounts, do
14  you have any other accounts with Gulf Coast
15  Bank or anywhere else?
16    A.  No.
17    Q.  Do you have lines of credit
18  anywhere else?
19    A.  No.
20    Q.  What about Island Seafood?
21    A.  Island Seafood --
22    Q.  Do you have a line of credit?
23    A.  No.
24    Q.  Gas station where you fuel up,
25  where you get your supplies?

Page 56

1     A.  No.  No.  I pay everything with
2  either cash or check, cash or check or my
3  debit card.
4     Q.  Do you have a line of credit with
5  Tino Mones Seafood?
6     A.  No.
7     MR. SALICRUP:
8        Can we go off the record a second.
9        (Whereupon, a brief recess was
10  taken.)
11    MR. SALICRUP:
12       Court reporter, could we enter in
13  copies of the Gulf Coast Bank master cards
14  for Mr. Alfonso's business account, and his
15  checking -- correct me if I'm wrong.
16  EXAMINATION BY MR. SALICRUP:
17    Q.  Is this your checking or savings?
18    A.  That's my checking.
19    Q.  The number ending ████, is that
20  your business?
21    A.  I have to look at the card.
22    Q.  Why don't you just pull it out.
23    A.  I'm sorry.  Yeah, business card.
24    Q.  So the top card --
25    A.  That's the checking account.



1    Q.   Ending in ▮▮▮ is your --
2    A.   Checking account, that's a
3  checking account.
4    Q.   Checking account for the boat?
5    A.   That's a business account.  This
6  is an LLC account.
7    Q.   ▮▮▮ is the LLC account?
8    A.   Yes.
9    Q.   And the card on the bottom ▮▮▮
10  is the checking account for the boat?
11    A.   Correct.
12    Q.   Thank you.
13    MR. SALICRUP:
14        Court reporter, could we enter
15  copies of the business and checking account
16  as Exhibit 2?  Thank you.
17        (Exhibit No. 2 marked for
18  identification.)
19  EXAMINATION BY MR. SALICRUP:
20    Q.   You want to take a look at this,
21  Exhibit 2?
22    A.   (Reading).
23    Q.   Can you confirm that those are the
24  cards that you just showed me which we're
25  now entering as Exhibit 2?

1    A.   Yes.
2    Q.   Mr. Alfonso, you filed a shrimp
3  boat captain claim with the DEEPWATER
4  HORIZON claim center, is that correct?
5    A.   Yes.
6    Q.   Can you walk me through that
7  claim?
8    A.   What I remember of it, yes.
9    Q.   Please do so.
10    A.   I went to the claims office and --
11  to file a claim and they told me the
12  documents I needed to submit, trip tickets
13  and tax returns and I brought them trip
14  tickets and tax returns and they told me I
15  needed trip tickets from the wildlife.
16    Q.   What do you mean by wildlife?
17    A.   Wildlife & Fisheries Department.
18    Q.   For which state or states?
19    A.   Louisiana.
20    Q.   Did you need information from any
21  Wildlife & Fisheries Department from any
22  other state in the Gulf Coast area?
23    A.   No, just Louisiana.
24    Q.   Please proceed.
25    A.   So when I received that, I

1  submitted it, the trip tickets.
2    Q.   Okay.
3    A.   And then they requested my tax
4  return.  They told me that my tax return was
5  my Schedule C, I believe they said, showed
6  everything combined, construction and
7  commercial fishing, and they asked me to
8  have my accountant separate the two.  So I
9  had to separate it.
10    Q.   Who is your accountant?
11    A.   Peggy Flowers.
12    Q.   And you requested that Peggy
13  Flowers separate your Schedule C
14  information?
15    A.   I asked if she could do it,
16  because I don't really know much about
17  taxes.  I asked if she could separate them.
18  She said it was no problem.
19    Q.   Did anyone at the DEEPWATER
20  HORIZON Economic Claims Center, I'm just
21  going to refer to them as the DHECC for ease
22  of communication here.  Did the DHECC
23  request that you separate your Schedule Cs
24  for any other years?
25    MR. COLEMAN:

1        I'm just going to interject one
2  thing.  Just to be clear, I think he's
3  talking about the claim he filed on his own
4  with GCCF, before the creation of the
5  settlement program.
6    THE WITNESS:
7        I am.
8    MR. COLEMAN:
9        When you're referring to DHECC,
10  that would be an entity that was created
11  after the settlement that we dealt with.
12    MR. SALICRUP:
13        Okay.
14  EXAMINATION BY MR. SALICRUP:
15    Q.   Mr. Alfonso, right now I'm asking
16  you about your claim with the DHECC.  The
17  DEEPWATER HORIZON Economic Claim Center.  Do
18  you know what that is?
19    A.   I know they changed, it was GCCF,
20  right?
21    Q.   Do you know what GCCF stands for?
22    A.   Gulf Coast Claim -- I'm not sure.
23  I know I seen it before, but I don't
24  remember exactly.
25    MR. COLEMAN:



Page 61

1      I think it's Facility or --
2  EXAMINATION BY MR. SALICRUP:
3      Q.   But you are aware --
4      A.   Oh, okay.
5      Q.   What is the GCCF, what did they
6  do?
7      A.   That was the one that did the
8  claims in the beginning.
9      Q.   What do you mean by "did the
10  claims in the beginning?"  And I just want
11  to make sure that you understood what the
12  GCCF -- it was.
13      A.   I know it was a claims center
14  where you went to file a claim.
15      Q.   File a claim for what?
16      A.   For the spill, for the BP spill.
17      Q.   Explain it to me like I was your
18  seven-year-old kid.  What is the GCCF?  Why
19  did you go there and why did they give you
20  money?
21      A.   We go there to file a claim for
22  our seafood claim for losses.
23      Q.   For losses?
24      A.   Yes.
25      Q.   Caused by the oil spill?

Page 62

1      A.   Right.
2      Q.   You went to the GCCF and you filed
3  a boat captain claim?
4      A.   I filed a commercial fishing
5  claim.
6      Q.   You filed a commercial fishing
7  claim?
8      A.   Yes.
9      Q.   And the GCCF told you that you
10  needed to split your Schedule C?
11      A.   Right.
12      Q.   As you stated earlier, because it
13  had income from construction and from
14  commercial fishing?
15      A.   Right, it was combined.
16      Q.   Did it have income from other
17  sources?
18      A.   Not that I'm aware of.
19      Q.   Did the GCCF request that you
20  split any other tax information?
21      A.   I'm sorry?  Could you --
22      Q.   You stated that the GCCF asked you
23  to redo the Schedule Cs for your 2009
24  return.
25      A.   Right.  Yes.

Page 63

1      Q.   What happened then?
2      A.   I -- I called Ms. Peggy Flowers
3  and asked her if she could -- if she could
4  do that, if that was possible to separate
5  the incomes and she said, yes.
6      Q.   Okay, and just walk me through how
7  this process happened.
8      A.   And I just told her, asked her to
9  separate them and she separated it.  And I
10  submitted it to the GCCF.
11      Q.   Did the GCCF request anything else
12  from you?
13      A.   They requested -- not that I
14  remember.  Just trip tickets and my tax
15  return.
16      Q.   For which years?
17      A.   From '7 to '9.
18      Q.   And the request you received was
19  for you to -- was for 2009 or for all years?
20      A.   I don't remember.  It was -- I
21  don't remember.
22      Q.   Do you remember what you provided
23  the GCCF?
24      A.   No.  I know I provided what they
25  asked for, but I'm not sure.

Page 64

1      Q.   Do you remember what you asked
2  Ms. Peggy Flowers to do?
3      A.   I just asked her to separate the
4  fishing from the construction.
5      Q.   For which year?
6      A.   I don't recall.
7      Q.   Did you work in construction in
8  2007?
9      A.   Yes.
10      Q.   Did you ask her to separate
11  fishing income from construction income in
12  2007?
13      A.   I don't remember if it was '7, '8,
14  or '9, or if it was all of them, I don't
15  recall.
16      Q.   You have no recollection?
17      A.   No.
18      Q.   And then what happened?
19      A.   I submitted the documents to the
20  GCCF.
21      Q.   And then what happened?
22      A.   And I still don't remember because
23  I know -- no, I don't remember.
24      Q.   So you submitted documents to the
25  GCCF, something must have happened --



Page 65

1    A.  I know we was back and forth, you
2  would go to the claim center.  Every time
3  you went, you would see somebody different
4  and you would get different answers.
5    Q.  Uh-huh (indicating affirmatively).
6    A.  But the details, I don't remember.
7    Q.  Were you going to the GCCF or was
8  someone going to the GCCF for you?
9    A.  I was.
10    Q.  Did you have an attorney working
11  for you?
12    A.  Not at that time.
13    Q.  And what time was this?
14    A.  That was at the beginning.  I'm
15  not sure exactly what --
16    Q.  Was it the year of the oil spill?
17    A.  It was the year of the oil spill.
18    Q.  So it was 2010?
19    A.  2010.
20    Q.  Were you represented in 2010 by
21  any attorney?
22    A.  In 2010 -- no --
23    Q.  I'm not referring exclusively to
24  Mr. Coleman, I'm talking about any attorney
25  that may have represented you.

Page 66

1    A.  I'm not sure when I hired an
2  attorney.  I'm not exactly sure.  I know
3  during the process, I did hire an attorney,
4  but I'm not sure exactly when it was.
5    Q.  Did the GCCF accept the documents
6  that you sent them?
7    A.  To my knowledge, yes.
8    Q.  Did they tell you anything?
9    A.  I don't recall.
10    Q.  Did you get paid by the GCCF?
11    A.  I -- I got paid at the beginning,
12  we got -- they gave us -- emergency
13  payments, I think they called it.
14    Q.  Okay.
15    A.  They gave us like 5,000 for the
16  first -- for a few payments and then that
17  was it.
18    Q.  So what -- how many payments did
19  you receive?
20    A.  I'm not exactly sure.
21    Q.  Did you receive more than one
22  payment?
23    A.  Yes.
24    Q.  Did you receive more than five
25  payments?

Page 67

1    A.  No.  I don't think so, no.
2    Q.  So it was between one and five?
3    A.  Yes.
4    Q.  Was it three?
5    A.  Three would probably be in the
6  area.  I'm not exactly sure, but I know it
7  was in that area.
8    Q.  Each payment was about 5,000?
9    A.  Around 5,000.
10    Q.  You received around $15,000, give
11  or take a thousand?
12    A.  Give or take a few thousand,
13  because I'm not exactly sure.
14    Q.  We're not exactly sure, so we
15  don't know how many thousands to take off.
16  We could take one or two, who knows, but it
17  was in the ballpark of fifteen?
18    A.  Yes.
19    Q.  And you received these payments in
20  2010?
21    A.  No.
22    Q.  When were the payments received?
23    A.  This was at the beginning of the
24  spill, probably in the beginning of 2010,
25  right after the spill.

Page 68

1    Q.  So you did receive them in 2010?
2    A.  Yes.
3    Q.  Aside from the approximate 15,000
4  that you received in 2010, what other
5  payments did you receive from GCCF?
6    A.  I don't remember any payments.
7    Q.  So to your knowledge, you only
8  received 15,000 from GCCF?
9    A.  That I can remember, I received
10  emergency payments that I can remember.
11    Q.  Okay.  And what happened then, how
12  did -- how did we come -- how did we end up
13  here today?  You filed for GCCF, you got
14  approximately $15,000, you gave -- they
15  requested that you provide certain
16  information, you went to your accountant?
17    A.  Yes.
18    Q.  You requested what from your
19  accountant?
20    A.  I just asked her to separate the
21  fishing income and the construction income.
22    Q.  And did she send that to you or
23  did she send it to the GCCF?
24    A.  She sent it to me.
25    Q.  And then you sent it on to the



1  GCCF?
2      A.   Yes.
3      Q.   And then what happened?
4      A.   And then I submitted my paperwork
5  and basically that was it.
6      Q.   You were going to say something?
7      A.   Yeah, I was just going to say
8  that, you know, you didn't really get a lot
9  of answers at the GCCF, you went there and
10  you see somebody and the next time you go,
11  you see someone else.
12      Q.   Did the GCCF transition into
13  another entity?
14      A.   Yes, as far as I know, the
15  DEEPWATER HORIZON.
16      Q.   Do you know the name of the
17  entity?
18      A.   No.
19      Q.   The DEEPWATER HORIZON Economic
20  Claims Center, is that what you were
21  referring to?
22      A.   Yes.
23      Q.   Is that the DHECC, are you
24  familiar with that name?
25      A.   No.

1      Q.   When I say DHECC, do you
2  understand that I'm referring to the
3  DEEPWATER HORIZON --
4      A.   Yeah.
5      Q.   -- Economic Claims Center?
6      A.   Yes.
7      Q.   Do you know what the DHECC did or
8  does?
9      A.   I just know that they took over
10  the GCCF.
11      Q.   Okay.  When you started the
12  process with the DHECC, you filed a shrimp
13  boat captain claim, is that correct?
14      A.   With the DH --
15      Q.   DHECC?
16      A.   I'm not sure if I had an attorney
17  when they changed over or not.
18      Q.   Okay.  Did you have more than one
19  attorney through this process?
20      A.   Yes.
21      Q.   Do you know their names?
22      A.   The first attorney I had?  No, I
23  don't.
24      Q.   Okay.  Did you have more than one
25  attorney?

1      A.   Yes.
2      Q.   Do you know the names of any
3  attorney that represented you?
4      A.   Faegre, Baker, Daniels, the
5  attorney I have now.
6      Q.   Do you know when you began working
7  with Faegre, Baker, Daniels?
8      A.   I don't remember now.
9      Q.   Were they representing you when
10  you filed your claim at the DHECC?
11      A.   Yes, I'm pretty sure -- I'm not --
12  MR. COLEMAN:
13          Just do it to the best of your
14  recollection.  We can clear up facts later
15  if there are any issues.
16  EXAMINATION BY MR. SALICRUP:
17      Q.   Mr. Alfonso, your attorney is
18  there, but forget he's there.
19      A.   Okay.
20      Q.   He's going to get an opportunity
21  at the end.  This is our interview.  It's
22  between you and me.
23      A.   Okay.
24      Q.   He will get an opportunity when
25  I'm done.

1      A.   I'm not -- remembering dates and
2  events and things that happened at a certain
3  time, I mean, my memory is not --
4      Q.   This is not trigonometry in the
5  11th grade.  If you don't know, just tell me
6  that.
7      A.   Okay.
8      Q.   I will accept that, but I want you
9  to tell the truth.
10      A.   Right, yes.
11      Q.   Were you being represented when
12  the GCCF transitioned to the DHECC?
13      A.   I don't remember.
14      Q.   Do you know what claims you filed
15  with the DHECC?
16      A.   I filed a commercial fishing
17  claim.
18      Q.   A commercial fishing claim?
19      A.   Yes.
20      Q.   And do you know what documents you
21  filed in support of that claim?
22      A.   Tax returns and trip tickets, as
23  far as --
24      Q.   Anything else?
25      A.   Not that I remember.



Page 73

1    Q.   Did you file a sworn statement
2  stating how much your fishing income was?
3    A.   Possibly.
4    Q.   I'm going to refer to it as a
5  SWS1.  Did you file an SWS1?
6    A.   Yes.  I remember writing one, but
7  I don't remember exactly what I wrote or
8  anything like that.  But I remember --
9    Q.   When you say remember writing
10 one --
11   A.   I remember -- I don't know if it
12 was requested or not, but I remember writing
13 one.  I don't know if it was submitted or
14 not, but I remember writing something about
15 my losses.
16   MR. SALICRUP:
17       I'm going to ask the court
18 reporter -- can we mark this as Exhibit 3.
19       (Exhibit No. 3 marked for
20 identification.)
21 EXAMINATION BY MR. SALICRUP:
22   Q.   Please review this document.
23   A.   Okay.
24   Q.   Let me know when you're done.
25   A.   (Reading) okay.

Page 74

1    Q.   Can you identify this document for
2  me?
3    A.   As far as I know, it was -- this
4  was -- I mean, I can't identify it exactly
5  what it is, but it's my claim.
6    Q.   I'm going to represent to you that
7  that is your sworn written statement.
8    A.   Okay.
9    Q.   Also known as the SWS1, which is
10 how I'm going to refer to it for the record.
11 Did you write up this document -- earlier,
12 you stated, I wrote up a statement that --
13   A.   I remember hand writing something,
14 that's all I remember.
15   Q.   Is this the document you're
16 referring to?
17   A.   No, this is not it.
18   Q.   Have you seen this document
19 before?
20   A.   Yeah.  This was a document
21 submitted by my attorney.
22   Q.   Who was your attorney at that
23 time?
24   A.   Faegre, Baker, Daniels.
25   Q.   What was the name of your

Page 75

1  attorney?
2    A.   Steven Crowder at the time.
3    Q.   Steven Crowder.  Anybody else from
4  Faegre, Baker, Daniels?
5    A.   Yes, well, the team attorneys.
6    Q.   Do you know their names?
7    A.   Craig Coleman and -- I'm trying to
8  think of other ones.  Mr. Nolting, yeah,
9  he's one, and I can't remember all of them.
10   Q.   You knew Mr. Nolting at that time,
11 I think Mr. Nolting unfortunately has passed
12 on.  But at that time, he was your attorney,
13 is that correct?
14   A.   Yes.
15   Q.   You worked with him on your claim?
16   A.   Yes.
17   Q.   And did you prepare this document
18 or did he prepare this document?
19   A.   He prepared this document for me.
20   Q.   Did you tell him the -- did you
21 provide the information included in this
22 document?
23   A.   Yes.
24   Q.   Can you please turn to Page 2?
25   A.   (Complying) yes.

Page 76

1    Q.   Can you state what Page 2 is?
2    A.   Page 2 looks like a --
3  something -- my shrimp claim, my document on
4  the amount.
5    Q.   The amount of what?
6    A.   The amount of seafood.
7    Q.   The amount of seafood that what?
8    A.   That was caught in '09, from what
9  I can read here.
10   Q.   If I understand you correctly,
11 you're saying that this document states the
12 amount of money that you earned?
13   A.   Yes.
14   Q.   For seafood that you caught in
15 2009, is that correct?
16   A.   Yes.
17   Q.   Does this document state that you
18 landed any shrimp in the GCA?  Do you know
19 what the GCA is?
20   A.   No, I'm not sure.
21   Q.   GCA refers to the Gulf Coast
22 Areas.
23   A.   Okay.
24   Q.   Do you know what the Gulf Coast
25 Areas are?



1      A.  I'm not -- yeah, I know the Gulf
2  Coast, where we shrimp at, yeah.
3      Q.  Do you know what the Gulf Coast
4  Areas means within the definitions of the
5  DEEPWATER HORIZON BP settlement agreement?
6      A.  No.
7      Q.  Was that explained to you by your
8  attorney?
9      A.  I don't remember.
10     MR. COLEMAN:
11          I going to object to that.  It's
12  bating attorney-client privilege.
13  EXAMINATION BY MR. SALICRUP:
14     Q.  Did you ever read the settlement
15  agreement?
16     A.  I don't remember.
17     Q.  Have you ever seen the settlement
18  agreement?
19     A.  I'm not sure.
20     Q.  Okay.  Let's review this document
21  line by line.
22     A.  Okay.
23     Q.  The Gulf Coast Areas, I'm going to
24  represent to you are the areas covered by
25  the settlement agreement.

1      A.  Okay.
2      Q.  For compensation for fishermen.
3  According to this document, how much shrimp
4  did you land in the GCA or what was your
5  income from shrimp landed in the GCA in
6  2007?
7      A.  In 2007?
8      Q.  Yes, sir.
9      A.  I don't have anything here.  I'm
10  pretty sure I had, but I don't see it here.
11     Q.  We're talking about this document.
12     A.  Okay.
13     Q.  What does this document state?
14     A.  Zero.
15     Q.  According to this document, how
16  much income did you generate from shrimp
17  landed in the GCA in 2008?
18     A.  Zero.
19     Q.  According to this document, how
20  much shrimp was landed in the GCA in 2009?
21     A.  46,434.
22     Q.  Is that $46,434?
23     A.  Yes.
24     Q.  According to this document, how
25  much did you earn in income in 2007 for

1  oysters landed in the GCA?
2      A.  Zero.
3      Q.  How much did you earn in 2008 for
4  oysters landed in the GCA?
5      A.  Zero.
6      Q.  How much did you earn for oysters
7  landed in 2009 in the GCA?
8      A.  Zero.
9      Q.  How much did you earn in 2007 for
10  finfish landed in the GCA in 2007?
11     A.  Zero.
12     Q.  How much did you earn in 2008 for
13  finfish landed in the GCA?
14     A.  Zero.
15     Q.  How much did you land (sic) in
16  2009 for finfish landed in the GCA?
17     A.  Zero.
18     Q.  How much did you earn in 2007 for
19  blue crab landed in the GCA?
20     A.  Zero.
21     Q.  How much did you earn in 2008 for
22  blue crab landed in the GCA?
23     A.  Zero.
24     Q.  How much did you earn in 2009 for
25  blue crab landed in the GCA?

1      A.  Zero.
2      Q.  How much did you land (sic) for
3  other seafood landed in the GCA in 2007?
4      A.  Zero.
5      Q.  How much did you earn in 2008 for
6  seafood landed -- I'm sorry, I'm going to
7  restate that question.
8          How much did you earn in 2008 for
9  other seafood landed in the GCA?
10     A.  Zero.
11     Q.  How much did you earn in 2009 for
12  other seafood landed in the GCA?
13     A.  Zero.
14     Q.  If I understand correctly, this
15  document states that in 2009, you only
16  landed shrimp in the GCA, is that correct?
17     A.  Yes.
18     Q.  According to this document, how
19  much did you land in 2007 outside of the
20  GCA?
21     A.  Zero.
22     Q.  According to this document, how
23  much shrimp did you land in 2008 outside of
24  the GCA?
25     A.  Zero.



Page 81

1    Q.   According to this document, how
2 much shrimp did you land outside of the GCA
3 in 2009?
4    A.   Zero.
5    Q.   Does this document state that you
6 landed any oysters, finfish, blue crab or
7 other seafood outside the GCA for 2007,
8 2008, or 2009?
9    A.   Zero.
10    Q.   So for 2007, 2008, and 2009, you
11 earned no income for landings outside the
12 GCA for oyster, finfish, blue crab or other
13 seafood?
14    A.   Right, yes.
15    Q.   Okay.  Can you please turn to
16 Page 2?
17    A.   Okay.
18    Q.   Please state the date of this
19 document?
20    A.   8/16/2012.
21    Q.   Do you remember having a
22 conversation with your attorney about this
23 document?  Don't tell me what the
24 conversation was.  I don't want to know what
25 he told you or you told him, I want you to

Page 82

1 tell me if you had a conversation.
2    A.   I don't remember.
3    Q.   Did he show you this document?
4    A.   I don't remember.
5    Q.   Did you sign this document?
6    A.   I gave my attorney the power to
7 sign it -- power of attorney to sign the
8 document.
9    Q.   So you authorized your attorney to
10 sign this document?
11    A.   Yes.
12    Q.   Would your attorney sign this
13 document -- well, were you consulted before
14 you gave him the power of attorney?
15    A.   Yes.
16    Q.   Were you consulted specifically
17 about this document?
18    MR. COLEMAN:
19       I'm going to object to that.
20    MR. SALICRUP:
21       I'm not asking about the content,
22 I'm asking whether he was consulted.
23    MR. COLEMAN:
24       Well, I mean, you asked him if he
25 had conversations with his attorney about

Page 83

1 the document and he said he didn't remember.
2 And -- go ahead, if you want to ask the
3 question again, if you remember any
4 conversations at any point.
5    MR. SALICRUP:
6       Counsel, you will get your
7 opportunity at the end.  For now, I don't --
8 we're not --
9    MR. COLEMAN:
10       I object to the question on the
11 record.  So if you --
12    MR. SALICRUP:
13       Is that a speaking objection?
14    MR. COLEMAN:
15       No.  It's -- I'm instructing him
16 not to answer the question that you asked.
17    MR. SALICRUP:
18       Well --
19    MS. FEELEY:
20       Let's read back from what the
21 question was.
22       (Whereupon, the requested
23 testimony was read by the Court Reporter)
24       "Q   Were you consulted
25       specifically about this document?"

Page 84

1    MR. COLEMAN:
2       And I guess I'm fine with you
3 giving a yes, no answer to that, or I don't
4 recall, but I'm not okay --
5 EXAMINATION BY MR. SALICRUP:
6    Q.   Please answer.
7    MR. COLEMAN:
8       No, I'm going to advise my client
9 about attorney-client privilege.
10    MR. SALICRUP:
11       Counsel, you have done that.
12    MR. COLEMAN:
13       Well, I'm going to do it again;
14 otherwise, I'm just going to instruct him
15 not to answer the question.
16    MR. SALICRUP:
17       Counsel, you have already in this
18 conversation instructed him about
19 attorney-client privilege.
20    MR. COLEMAN:
21       Well, then, I'm just going to
22 instruct him not to answer, if you're not
23 okay having me advise him -- you're talking
24 over me.
25    MS. FEELEY:



Page 85

1     Please let him tell about the
2  attorney-client privilege again.  That's
3  fine.
4     MR. COLEMAN:
5        Please.
6     MS. FEELEY:
7        That's fine.
8     MR. COLEMAN:
9        It's okay for you to answer
10  whether -- yes or no or I don't recall as to
11  whether you had a conversation with your
12  attorney about this document.  I don't want
13  you going in and discussing the substance of
14  a conversation that you had with your
15  attorney in response to this question or any
16  other.
17        So if you can answer that, the
18  pending question, that way it's fine.
19     THE WITNESS:
20        I don't recall.
21  EXAMINATION BY MR. SALICRUP:
22     Q.  Thank you for your answer.
23  Hopefully, we can move on.
24        You mentioned Peggy Flowers
25  earlier.  How did you meet Peggy Flowers?

Page 86

1     A.  Ms. Peggy's probably been doing my
2  taxes for a number of years now.
3     Q.  Can you describe your relationship
4  with Peggy Flowers?
5     A.  Tax accountant, just tax
6  accountant that takes care of my --
7     Q.  Is it a business only
8  relationship?
9     A.  Mainly, yeah.
10     Q.  When you say mainly, yeah, what do
11  you mean by that?
12     A.  Well, if I have a question or
13  something, I can call on her about my tax
14  purposes or anything like that, but that's
15  about it.
16     Q.  Do you ever socialize with
17  Ms. Flowers?
18     A.  No, not really.  If -- when I go
19  to do my taxes or something, we might ask
20  how she's doing as far as her family
21  standpoint or anything like that, but other
22  than that, I don't talk to her during the
23  year.
24     Q.  I apologize, I'm going to ask you
25  to repeat yourself because I didn't quite

Page 87

1  understand.
2     A.  Okay.  I mean, when I go to file
3  my taxes over there, I may ask her how her
4  family is doing or, you know, something like
5  that.  That's about it.  But as far as
6  conversation during the year, not unless I
7  have a tax question.
8     Q.  Can you confirm for me
9  Ms. Flowers' full-time occupation?
10     A.  Tax accountant.
11     Q.  When did she first start filing
12  your taxes?
13     A.  I'm not sure what year.  It's been
14  a while.
15     Q.  It's been a while, so would you go
16  back to 2008?
17     A.  Yes.
18     Q.  Before 2008?
19     A.  Yes.
20     Q.  How far back would you go?  And
21  you don't need to give a specific number if
22  you don't recall.  If you do recall, please
23  do so.
24     A.  I don't recall.
25     Q.  What about 10 years before 2008?

Page 88

1     A.  I would say before '05.
2     Q.  Before '05?
3     A.  Yeah.
4     Q.  Before Katrina?
5     A.  Yeah, before Katrina.
6     Q.  So since 2000 more or less?
7     A.  I couldn't say.
8     Q.  You're not sure?
9     A.  No, I'm not sure.
10     Q.  How much does Ms. Flowers charge
11  you?
12     A.  She's -- different.  I'm not sure.
13  Usually -- I couldn't be specific on the
14  amount.
15     Q.  You're not sure how much
16  Ms. Flowers charges you for taxes?
17     A.  No.  It's usually different year
18  to year.
19     Q.  Approximately -- does she charge
20  you approximately the same amount every
21  year?
22     A.  It's usually in the same range.
23  It may be four to five hundred maybe.
24     Q.  I'm sorry?
25     A.  You see, I shouldn't be doing



1 that.
2    Q.   No, I just didn't --
3    A.   I'm just guessing.  Four to five
4 hundred, I couldn't be specific.
5    Q.   I didn't know if you said 4500 or
6 four to five hundred, so I just wanted to
7 make sure that I understood you.
8         Do you provide Peggy Flowers with
9 records or documentation?
10    A.   Yes.
11    Q.   What do you provide her with?
12    A.   I provide her with -- usually
13 income and deductions like fuel and
14 expenses.
15    Q.   Do you provide her with anything
16 else?
17    A.   No.  That's it.
18    Q.   1099s?
19    A.   1099s.
20    Q.   W2s?
21    A.   Yes.
22    Q.   Anything else?
23    A.   Insurance statements or anything
24 like that that's required.
25    Q.   What -- do you know the name of

1 Ms. Flowers' business?
2    A.   It's -- I can't remember.
3    Q.   Is the name KF&L?
4    A.   Yes, that's it.
5    Q.   Is Ms. Flowers the only person
6 that works at KF&L?
7    A.   Yes, and as far as I know, her
8 sister is like a secretary.
9    Q.   Her sister?
10    A.   Her sister.
11    Q.   In 2007, was someone else besides
12 her sister working at KF&L?
13    A.   I don't know.
14    Q.   Do you know, was there someone
15 else besides Ms. Flowers' sister working at
16 KF&L in 2008?
17    A.   I don't know.
18    Q.   Do you know if there was someone
19 else besides Ms. Flower's sister,
20 working at KF&L in 2009?
21    A.   I don't know.
22    Q.   When you worked -- not worked,
23 when you provided information to KF&L, did
24 you speak to anyone else besides Peggy
25 Flowers?

1    A.   No.
2    Q.   Did you ever speak with
3 Ms. Flowers' sister?
4    A.   Just to make an appointment.
5    Q.   Any other relatives of Ms. Flowers
6 that you may have spoken with?
7    A.   No.
8    Q.   Just Ms. Flowers?
9    A.   (Nodding head affirmatively).
10    Q.   You responded verbally --
11    A.   I was belching.
12    MR. COLEMAN:
13         There is a pending question he
14 wants an answer to.
15    THE WITNESS:
16         Oh, I'm sorry, can you repeat
17 that?
18    MR. SALICRUP:
19         Court reporter. can you repeat the
20 last question?
21         (Whereupon, the requested
22 testimony was read by the Court Reporter)
23         "Q   Any other relatives of Ms.
24    Flowers that you may have spoken with?"
25    THE WITNESS:

1         No.
2 EXAMINATION BY MR. SALICRUP:
3    Q.   Did anyone else provide Peggy
4 Flowers with records on your behalf?
5    A.   Not that I'm aware of, no.
6    Q.   Can you -- does your wife speak
7 with Peggy Flowers?
8    A.   Yes.
9    Q.   Socially?
10    A.   No, not unless -- to file taxes or
11 something like that.
12    Q.   Does your wife provide Peggy
13 Flowers with any records?
14    A.   It's my wife and me -- my wife and
15 me go together to file our taxes.
16    Q.   Okay.  Does your wife ever speak
17 to Peggy Flowers without you?
18    A.   Occasionally she might.
19    Q.   Do you know if she did in 2007?
20    A.   Not that I'm aware of, no.
21    Q.   Do you know if your wife spoke
22 with Ms. Flowers without you being present
23 in 2008?
24    A.   Not that I'm aware of.
25    Q.   Do you know if your wife spoke



Page 93

1  without you being present in 2009?
2      A.   Not that I'm aware of, no.
3      Q.   Can you please describe your
4  relationship with Frank & Sons?
5      A.   Frank & Sons, it's a company that
6  my aunt and my uncle own.
7      Q.   What are the names of your aunt
8  and uncle?
9      A.   It's Joyce Lopez and Frank Lopez.
10     Q.   Do you know the full name of that
11 company?
12     A.   Frank & Son Boat Rentals.
13     Q.   Is that a boat rental business?
14     A.   Yes.
15     Q.   What else do they do?
16     A.   As far as I know, it's just -- as
17 far as what we did anyway, it was
18 seismograph working.
19     Q.   When you say "what we did," what
20 do you mean by that?
21     A.   My uncle and me and some of my
22 cousins and friends, under the business,
23 anyway.
24     Q.   Did you do any other kind of work
25 besides seismographic work which you earlier

Page 94

1  described as driving people -- correct me if
2  I'm wrong -- driving people around on your
3  boat so that they could do something
4  scientific and measure seismographic
5  movement?
6      A.   Yes.  We did rig movements, and
7  survey work, as far as like surveying
8  different things, waterways and stuff like
9  that.
10     Q.   Besides the seismographic work,
11 did you do any other work for Frank & Sons?
12     A.   Not that I remember.
13     Q.   When did you first start working
14 at Frank & Sons?
15     A.   Probably in the early '90s, '95,
16 maybe -- I'm not sure, '93.
17     Q.   '93, '95?
18     A.   Yes, on that area.
19     Q.   I would tell you who won the World
20 Series then, but I don't think that's going
21 to get us anywhere.
22          Do you still work for Frank &
23 Sons?
24     A.   No.
25     Q.   Why?

Page 95

1      A.   There's no work.
2      Q.   Does Frank & Sons still work?  Is
3  it still an operating business?
4      A.   Yes.
5      Q.   But they have no work for you?
6      A.   No.
7      Q.   When you work for Frank & Sons, do
8  they provide you with a vessel?
9      A.   No.
10     Q.   How do you drive a boat?
11     A.   My boat usually.
12     Q.   Okay.  What's the name of that
13 boat?
14     A.   PRINCESS BRANDI.
15     Q.   Is that the 37-foot ice vessel
16 that you described earlier?
17     A.   Yes.
18     Q.   Has it always been named PRINCESS
19 BRANDI?
20     A.   Yes.
21     Q.   Is it named ███████████████?
22     A.   ████████.
23     Q.   Did anyone from Frank & Sons
24 provide you with any information regarding
25 your tax returns?

Page 96

1      A.   Any years or certain years or --
2  if I worked for them, yes, then I would get
3  a 1099.
4      Q.   You would get a 1099?
5      A.   Yes.
6  MR. SALICRUP:
7          Mr. Alfonso, I'm going to show you
8  a document that I'm going to ask the court
9  reporter to mark as Exhibit 4.  Please take
10 a second to review it and let me know when
11 you're done.
12          (Exhibit No. 4 marked for
13 identification.)
14 EXAMINATION BY MR. SALICRUP:
15     Q.   Mr. Alfonso, I just showed you a
16 document.  Let me know when you're done
17 looking at it.
18     A.   (Reading).
19 MS. FEELEY:
20          Off the record.
21          (Whereupon, an off-the-record
22 discussion was held.)
23 EXAMINATION BY MR. SALICRUP:
24     Q.   Are you done, sir?
25     A.   Yes.



Page 97

1    Q.  Can you identify this document?
2    A.  As far as I can tell, this is
3  my '09 taxes.
4    Q.  Please turn to Page 22, which I
5  already -- they don't have page numbers, but
6  use the first blue flag.
7    A.  Okay.
8    Q.  Can you identify that document?
9    A.  All I know, it's an '08 tax copy.
10   Q.  Is this your 2008 tax return?
11   A.  Yes.
12   Q.  Who prepared this document, sir?
13   A.  Ms. Peggy.
14   Q.  Ms. Peggy?
15   A.  Ms. Peggy Flowers.
16   Q.  Is that her signature on the --
17  turn to the second page of 2008 -- right
18  there at the bottom?
19   A.  Yes.
20   Q.  Do you know Ms. Flowers' preparer
21  tax identification number?
22   A.  No, I don't.
23   Q.  Do you see a tax preparer's tax
24  identification number on the second page
25  where I just indicated?

Page 98

1    A.  I'm not sure what's her number.
2  Is this it, the EIN number?
3    Q.  It's the PTIN number.  It's okay
4  if you can't find it.
5    A.  Okay.  Oh, okay.  I see it now.
6  P00183688.
7    Q.  Can you walk me through the
8  process of how this document was prepared?
9    A.  Not really, no.
10   Q.  Do you know when it was prepared?
11   A.  In '08.  It's '08 taxes, so
12  probably the beginning of '09.
13   Q.  Does the document have a date?
14   A.  3/28/09.
15   Q.  Do you know if the document was
16  prepared on that date?
17   A.  I would assume.  I mean, that's
18  the date, and the signature.
19   Q.  Do you know if this document was
20  filed with the IRS?
21   A.  Yes.
22   Q.  Do you know when it was filed with
23  the IRS?
24   A.  No.
25   Q.  Do you know who filed it with the

Page 99

1  IRS?
2    A.  Ms. Peggy.
3    Q.  How do you know that it was filed
4  with the IRS?
5    A.  She electronically files for me.
6    Q.  And if you don't know when it was
7  filed, how do you know it was actually
8  filed?
9    A.  I trust her to file it.
10   Q.  Did she tell you that she files
11  her tax returns?
12   A.  Yes, she sends it electronically,
13  that's all I know.
14   Q.  And then does she send you a copy
15  electronically?
16   A.  She gives me a copy.
17   Q.  She prints it out?
18   A.  Yes.
19   Q.  She doesn't e-mail it to your
20  wife?
21   A.  No.
22   Q.  Do you provide Ms. Flowers with
23  the information included in that tax return?
24   A.  I provide her with it, yes.
25   Q.  Do you provide her with trip

Page 100

1  tickets?
2    A.  I just provide her with an income
3  amount and expenses.
4    Q.  Can you define for the record,
5  what trip tickets are?
6    A.  Trip tickets is the seafood catch,
7  the amount of seafood, call it net year.
8    Q.  And that is recorded by the
9  Louisiana Department of Wildlife
10  & Fisheries, is that right?
11   A.  Yes.
12   Q.  And you said that you don't
13  provide Ms. Flowers with the trip tickets,
14  you add them yourself?
15   A.  Yes.
16   Q.  What were your sources of income
17  in 2008, sir?
18   A.  In 2008, fishing and construction.
19   Q.  Did you have any other sources of
20  income?
21   A.  I don't remember.
22   Q.  Did anyone else provide
23  Ms. Flowers with the information included in
24  your 2008 return?
25   A.  Me and my wife, that's it.



Page 101

1    Q.   That's it.  Do you have any work
2  papers or notes that you used in the
3  preparation of your 2008 returns?
4    A.   No.
5    Q.   Thank you, sir.  Can you tell me
6  what information you provided Ms. Flowers
7  regarding your 2008 return?  What did you,
8  Vernon Alfonso, provide specifically, not
9  your wife, just you?
10    A.   My wife is the one that totals the
11  income and the receipts.  She's the one that
12  provides --
13    Q.   When you say she's the one that
14  totals the income and the receipts --
15    A.   Well, she will add up my income
16  and my expenses.  And we go together to
17  Ms. Peggy and file our taxes.
18    Q.   When you receive a 1099, do you
19  provide it to Ms. Flowers?
20    A.   Me and my wife together.
21    Q.   So if the 1099 comes in the mail,
22  you open it, you take it with your wife
23  together?
24    A.   Yes.
25    Q.   Who adds the trip tickets that you

Page 102

1  provide to Ms. Flowers?
2    A.   My wife will add up my trip
3  tickets and my income.
4    Q.   Do you always add your trip
5  tickets with your wife?
6    A.   I would say sometimes she will add
7  them.  I might not be there, if I'm working
8  or something, she will do it.
9    Q.   How do you add them?
10    A.   She will total them up.
11    Q.   And write it down where?
12    A.   I guess she just writes it in her
13  notes.
14    Q.   And she keeps those notes?
15    A.   Not that I'm aware of.
16    Q.   And what about when you add them,
17  what do you do?
18    A.   She adds them usually.  If I add
19  them, I might assist her with adding them
20  sometimes, but she will add them up.
21    Q.   Okay.  And then you both go
22  together and provide Peggy Flowers with that
23  information, correct?
24    A.   Yes.
25    Q.   Are you related to Ms. Flowers?

Page 103

1    A.   Uh-uh (indicating negatively).
2  MR. COLEMAN:
3      Is that a no?
4  THE WITNESS:
5      No.  I'm sorry.
6  MR. SALICRUP:
7      Mr. Alfonso, I'm going to provide
8  you with some documents, I'm going to ask
9  the court reporter to mark them as
10  Exhibit 5.  Please review them and let me
11  know when you're done.
12      (Exhibit No. 5 marked for
13  identification.)
14    THE WITNESS:
15      (Reading) okay.
16  EXAMINATION BY MR. SALICRUP:
17    Q.   Can I have that for a second?
18    A.   (Handing).
19  MR. SALICRUP:
20      I'm going to change this sticker
21  to the next page.
22  EXAMINATION BY MR. SALICRUP:
23    Q.   Can you identify this document for
24  me, Mr. Alfonso?
25    A.   It looks like my '08 tax return,

Page 104

1  2008 tax return.
2    Q.   Did you prepare this document?
3    A.   No.
4    Q.   Do you know who prepared this
5  document?
6    A.   Ms. Peggy Flowers.
7    Q.   And you provided Ms. Flowers with
8  the information contained in this document,
9  correct?
10    A.   Yes.
11    Q.   Can you please turn to the page
12  I've previously marked for you?
13    A.   (Complying) okay.
14    Q.   Which is titled Line 1, Schedule
15  C, 1040 gross receipts or sales?
16    A.   Yes.
17    Q.   Can you read for me what your
18  fishing income is according to this page?
19    A.   24,759.
20    Q.   Can you read for me what your
21  income is from Frank & Sons on this page?
22    A.   $3,000.
23    Q.   Can you read for me what your
24  income was from Seedco Taxable Grant?
25    A.   3,000 -- sorry, 9,388.



1    Q.   Can you read for me what your
2  income was on the LA Wildlife Taxable Grant?
3    A.   11,010.
4    Q.   Can you read for me what the total
5  was?
6    A.   48,157.
7    Q.   Did you provide Ms. Flowers with
8  this information?
9    A.   Yes.
10   Q.   Can you turn to Page 4 of this
11 document?
12   A.   That would be --
13   Q.   Start at the beginning, sir.
14   A.   Oh, okay.
15   Q.   My apologies, I meant Page 3,
16 you're on it now.
17   A.   Okay.
18   Q.   This is a Schedule C for 2008,
19 correct?
20   A.   Yes.
21   Q.   Can you tell me what your gross
22 income was, according to this document, sir?
23   A.   I'm not too sure.  I don't do my
24 taxes, so I really don't know what -- let's
25 see, Line 1, it says gross receipts, sales,

1  48,157.
2    Q.   Thank you, sir.  Does this match
3  the number that you previously read to me?
4    A.   Yes.
5    Q.   So we can conclude that your Frank
6  & Son income for that year was included in
7  your commercial fisherman's Schedule C,
8  correct?
9    A.   Yes.
10   Q.   Thank you.
11 MR. SALICRUP:
12     Off the record.
13     (Whereupon, an off-the-record
14 discussion was held.)
15 EXAMINATION BY MR. SALICRUP:
16   Q.   Mr. Alfonso, do you own any other
17 vessels in addition to the PRINCESS BRANDI?
18   A.   Yes, I do.
19   Q.   How many?
20   A.   I own one.
21   Q.   Own one other vessel?
22   A.   Yes, one other vessel.
23   Q.   What's the name of that vessel?
24   A.   The CAPTAIN DYLAN.
25   Q.   CAPTAIN DYLAN?

1    A.   I named it ███████████.
2    Q.   Spell ██████.
3    A.   ███████.
4    Q.   What is the size of that vessel?
5    A.   25 foot.
6    Q.   What do you use that vessel for?
7    A.   I use it for fishing crab and
8  stuff like that.
9    Q.   Can you elaborate on that?
10   A.   I built it in -- probably before
11 Katrina, Hurricane Katrina, and I used to
12 use it for crab fishing.
13   Q.   You used it for crab fishing --
14 what kind of crab?
15   A.   Blue crab.
16   Q.   Any other crab?  Excuse me, any
17 other crab?
18   A.   No, blue crab.
19   Q.   Any other seafood?
20   A.   No, not that I'm aware of, not
21 that I remember.
22   Q.   Do you trawl with that vessel?
23   A.   No.
24   Q.   Did you file a BP claim regarding
25 the CAPTAIN DYLAN?

1    A.   No.
2    Q.   Do you know the vessel ID for the
3  CAPTAIN DYLAN?
4    A.   Let me look.  Registration number
5  would be good?
6  MR. SALICRUP:
7      Let the record show that
8  Mr. Alfonso pulled out two cards.
9  THE WITNESS:
10     Yeah, this is the PRINCESS BRANDI
11 and that's the CAPTAIN DYLAN.
12     That's for boat registration.
13 MR. SALICRUP:
14     Let the record show that
15 Mr. Alfonso pulled out the boat registration
16 card for the PRINCESS BRANDI, a 37-foot
17 vessel and the CAPTAIN DYLAN, a 25-foot
18 vessel, decal No. 052810-14 -- oh, and the
19 registration number, here it is, LA6048FG,
20 Frank Gary.
21     Off the record.
22     (Whereupon, an off-the-record
23 discussion was held.)
24 MR. SALICRUP:
25     Court reporter, could we introduce



1  the boat registration cards provided by
2  Mr. Alfonso for the CAPTAIN DYLAN, the
3  25-foot vessel and the PRINCESS BRANDI, the
4  37-foot vessel as exhibit 6?
5      (Exhibit No. 6 marked for
6  identification.)
7  EXAMINATION BY MR. SALICRUP:
8      Q.  Mr. Alfonso, can you just look at
9  that document?
10     A.  Okay.
11     Q.  Identify it for me that it's an
12 exact copy of what you provided?
13     A.  Yes.
14     Q.  Can we turn briefly back to
15 Exhibit 3?
16     A.  (Complying).
17     Q.  And can you please just review the
18 document one more time?
19     A.  Okay.
20     Q.  Did you provide the information
21 contained in this document, in Exhibit 3,
22 regarding your 2009 income?
23     A.  Yes.
24     Q.  Do you fish for nutria, too, on
25 that 25 foot?

1      A.  Nutria?  No.
2      Q.  I've heard people fish for nutria
3  as well.
4      A.  Yeah, it's a nuisance.
5      Q.  Can you eat it?
6      A.  I think people tried it.  I never
7  have.
8      MS. FEELEY:
9          Off the record.
10         (Whereupon, an off-the-record
11 discussion was held.)
12     MR. SALICRUP:
13         Mr. Alfonso, I'm going to
14 introduce some documents that I will ask the
15 court reporter to mark as Exhibit 7.  Please
16 take a moment to review them and let me know
17 when you're done.
18         (Exhibit No. 7 marked for
19 identification.)
20     THE WITNESS:
21         Okay.
22 EXAMINATION BY MR. SALICRUP:
23     Q.  Can you please identify this for
24 me?
25     A.  It appears to be a copy of my '09

1  tax return.
2      Q.  Have you -- who prepared this
3  document?
4      A.  Ms. Flowers.
5      Q.  And did you provide her with the
6  information contained in this document?
7      A.  Yes.
8      Q.  Is that Ms. Flowers' signature on
9  Page 7?
10     A.  It appears to be Ms. Flowers, yes.
11     Q.  I'm going to ask you to turn to
12 Page 2 of the 1040 document.  Please keep
13 flipping until you get to the 1040 form.
14     A.  (Complying).
15     Q.  Please turn to Page 2 of that
16 document, the next page.
17     A.  The next page?
18     Q.  Yeah.  Is that Ms. Flowers'
19 signature?
20     A.  Yes.
21     Q.  Can you state what the preparer
22 tax identification number is on that
23 document?
24     A.  P00107326.
25     Q.  Do you know who the number belongs

1  to?
2      A.  Ms. Flowers.
3      Q.  Can you please turn to Page 5 of
4  the document.  Start from the beginning,
5  sir.
6      A.  Okay.
7      Q.  Page 5, which starts with
8  Louisiana at the top, it's an LA484453 form.
9      A.  Yes.
10     Q.  Is that Ms. Flowers' signature at
11 the bottom of that document?
12     A.  Yes.
13     Q.  Can you state the preparer tax
14 identification number at the bottom of this
15 document?
16     A.  P00183688.
17     Q.  Do you know who that number
18 belongs to?
19     A.  I would assume Ms. Peggy Flowers.
20     Q.  And when was this document
21 prepared?
22     A.  It states right here, 2/19/2010.
23     Q.  Can you walk me through the
24 process of how this document was prepared?
25     A.  Not really, no.  I don't even know



Page 113

1    what the document -- I know it's part of the
2    tax return. That's all I know.
3        Q.  I mean, the entire document.
4        A.  Oh, okay.
5        Q.  Your 2009 return. Can you walk me
6    through how this document was prepared?
7        A.  I write my -- I submit my income
8    and my expenses to Ms. Peggy and she
9    prepares it.
10       Q.  So you prepare and give it to her
11   in hard copy?
12       A.  All I do is tell her what my
13   income is. I sit down with her and tell her
14   what my income is and my expenses and she
15   takes care of that.
16       Q.  Thank you. Was this document
17   filed with the IRS? The entire document,
18   not just the page you're looking at.
19       A.  Yes.
20       Q.  Do you know when it was filed?
21       A.  I would have to assume the day
22   that she prepared it. I couldn't tell you a
23   specific date.
24       Q.  Do you know if the -- the date
25   when it was prepared?

Page 114

1        A.  2/19/2010.
2        Q.  Can you tell me what your sources
3    of income were in 2009?
4        A.  Construction and commercial
5    fishing.
6        Q.  Do you have any other sources?
7        A.  Not that I'm aware of.
8        Q.  Starting from the beginning of the
9    document, can you please turn to Page 10?
10       A.  (Complying) this one?
11       Q.  Is this -- are you on the document
12   that states Schedule C, profit or loss from
13   business for your return in 2009?
14       A.  Yes.
15       Q.  Can you tell me what your gross
16   income was in 2009, as listed on Line 1 of
17   this document?
18       A.  Gross receipts, it says 73,000.
19       Q.  Is that all it says?
20       A.  Oh, I'm sorry, $73,064.
21       Q.  Is there another Schedule C in the
22   document that you're holding?
23       A.  No.
24       MR. SALICRUP:
25           Now I'm going to ask you to review

Page 115

1    a document which I will ask the court
2    reporter to mark as Exhibit 8.
3    EXAMINATION BY MR. SALICRUP:
4        Q.  Please review it and let me know
5    when you're done.
6           (Exhibit No. 8 marked for
7    identification.)
8        THE WITNESS:
9           Okay.
10   EXAMINATION BY MR. SALICRUP:
11       Q.  Can you identify that document for
12   me, please?
13       A.  It appears to be my '09 tax
14   return.
15       Q.  And this document contains two
16   Schedule Cs instead of one, is that correct?
17       A.  Yes. Yes.
18       Q.  Can you please turn to the first
19   Schedule C.
20       A.  Okay.
21       Q.  I believe I marked them with flags
22   for your ease -- well, maybe not.
23       A.  Okay.
24       Q.  What is this first Schedule C for,
25   sir?

Page 116

1        A.  It says commercial fishing.
2        Q.  Okay. And what is -- what was
3    your gross income, Line 1 state?
4        A.  46,434.
5        Q.  And could you turn to the second
6    Schedule C, please?
7        A.  It says 26,630.
8        Q.  What says 26,000?
9        A.  The Line 1, the gross receipts and
10   sales.
11       Q.  Do you know -- why was this
12   document prepared?
13       A.  This was prepared for the GCCF
14   request.
15       Q.  And the information in this
16   document is identical to Exhibit 7 which I
17   previously showed you?
18       A.  Identical?
19       Q.  Let me rephrase.
20       A.  Okay.
21       Q.  Is your gross income the same
22   total amount in Exhibit 7 as it is in
23   Exhibit 8?
24       A.  I would have to add them because
25   it's two different Schedule Cs.



Page 117

1    Q.   You can take a second to add them.
2    A.   My tax accountant prepared this,
3  so I would assume it's the same. I don't
4  know.
5    Q.   I'm just going to represent to you
6  that they are the same, the same total
7  amount.
8    A.   All right.
9    Q.   Did anyone else provide
10 Ms. Flowers with the information included in
11 Exhibit 8?
12   A.   No.
13   Q.   Do you know if Exhibit 8 was filed
14 with the IRS?
15   A.   Not that I'm aware of.
16   Q.   When did you request that Peggy
17 Flowers prepare the second return for 2009?
18   A.   When the GCCF requested it.
19   Q.   And when was that?
20   A.   I'm not sure of the date. I don't
21 know.
22   Q.   Was it in 2010, the year of the
23 spill?
24   A.   Yes, I would assume.
25   Q.   Was the second 2010 return

Page 118

1  provided for any other reason other than
2  your BP claim?
3    A.   No.
4    Q.   And did you pay Ms. Flowers for
5  preparation of the 2009 return?
6    A.   Yes.
7    Q.   Did you pay Ms. Flowers for the
8  preparation of Exhibit 8?
9    A.   No. I paid her for my original
10 tax return.
11   Q.   You paid her for the preparation
12 of Exhibit 7?
13   A.   Yes.
14   Q.   And the preparation of Exhibit 8
15 was free?
16   A.   When I pay Ms. Peggy my -- to file
17 my taxes, it is for -- it's for the year.
18   Q.   I see.
19   A.   When anything else that comes up
20 or anything like that, she --
21   Q.   And you provided all the
22 information in Exhibit 7, correct?
23   A.   Yes.
24   Q.   And you provided all the
25 information in Exhibit 8, correct?

Page 119

1    A.   I provided her with all that
2  information in this one.
3    Q.   Which one is "this one"?
4    A.   Exhibit 7.
5    Q.   And who provided the information
6  included in Exhibit 8?
7    A.   She took that off of my Exhibit 7.
8    Q.   She copied the information that
9  you provided onto Exhibit 8, is that what
10 you're saying?
11   A.   I would -- I don't know how to
12 answer that. I asked her to separate my
13 Schedule Cs.
14   Q.   Based on the information you --
15   A.   Based on the information that she
16 had.
17   Q.   Based on the information you had
18 provided her?
19   A.   Yes.
20   MR. SALICRUP:
21      Mr. Alfonso, I'm going to show you
22   two pages that I will ask the court reporter
23   to mark as Exhibit 9.
24      (Exhibit No. 9 marked for
25   identification.)

Page 120

1  EXAMINATION BY MR. SALICRUP:
2    Q.   Please review them and let me know
3  when you're done.
4    A.   Okay.
5    Q.   Mr. Alfonso, can you identify this
6  document for me?
7    A.   This, I never have seen.
8    Q.   Okay. Are you referring to the
9  first and second page or only the first
10 page?
11   A.   Yeah, either one. I don't
12 remember seeing this. I know this is a
13 receipt from Mr. Peggy, but I don't remember
14 seeing it.
15   Q.   Again, I'm going to represent to
16 you that this is a document that Ms. Flowers
17 utilized in preparing your returns.
18   A.   Okay.
19   Q.   Can you please tell me what your
20 fishing income is according to this
21 document?
22   A.   24,184.
23   Q.   Can you please tell me what your
24 income is from Frank & Son according to this
25 document?



Page 121

1    A.   22,250.
2    Q.   Can you please tell me what the
3  total of these two numbers is according to
4  this document?
5    A.   46,434.
6    Q.   Can you please go to
7  miscellaneous income Line 2 and tell me what
8  amount is listed for R&M Construction of
9  Louisiana?
10    A.   26,630.
11    Q.   Is it correct to say that you
12  provided Ms. Flowers with this information?
13    A.   Not in this way.  I provided her
14  with the amounts.
15    Q.   So you provided her -- okay, thank
16  you.
17    A.   Total income.
18    Q.   Does the total gross receipt of
19  forty six four hundred and thirty four match
20  the total gross receipts in Exhibit 8?  That
21  would be the Line 1 that was premarked.  I
22  think it has a flag, sir.
23    A.   Yes.
24    Q.   The total amount in Exhibit 9 of
25  twenty six six hundred and thirty, does that

Page 122

1  match the amount for construction in your
2  second Schedule C, in Exhibit 8?
3    A.   Yes.
4    Q.   So according to this document,
5  which Ms. Flowers prepared with your
6  information, you had income from Frank &
7  Sons of the $22,250, correct?
8    A.   According to this, yes.
9    Q.   In 2009?
10    A.   In 2009.
11    Q.   Do you have any reason to believe
12  why this information is wrong, if this
13  information is wrong?
14    A.   I don't know anything about that.
15  I don't remember anything about this.
16    Q.   You stated that you provided this
17  information to Ms. Flowers.
18    A.   I provided my income, my total
19  income and my --
20    Q.   Sources of income, correct?
21    A.   Yeah -- well, my total of income.
22    Q.   You told --
23    A.   I will supply her with my income.
24    Q.   What do you mean by income, sir?
25    A.   I will supply her with my 1099s,

Page 123

1  and my income and shrimp or anything -- any
2  kind of other earnings, besides the 1099s, I
3  just give it to her all together.
4    Q.   Correct me if I'm wrong, you
5  provided Ms. Flowers with the information
6  that she put on this page, correct?
7    A.   Yeah.  Not like this, though.
8    Q.   You provided it in a different
9  format.  You provided -- you represented to
10  Ms. Flowers that in 2009, you earned 22,250
11  from Frank & Son, correct?
12    A.   No.
13    Q.   You did not tell her that?
14    A.   No.
15    Q.   Did you work for Frank & Son in
16  2009?
17    A.   No.
18    Q.   Did you earn $24,184 from fishing
19  in 2009?
20    A.   I would have to check.  Yes.
21    Q.   Do you know who you sold fish to
22  in 2009?
23    A.   In 2009?  Island Seafood.
24    Q.   Island Seafood.  That was your
25  exclusive dealer in 2009?

Page 124

1    A.   That was probably the main one.  I
2  could have sold other places, but my main
3  dealer was-- the main shrimp buyer for me
4  that year was Island Seafood.
5    Q.   What do you mean by "main"?
6    A.   It's the local dock.  When we go
7  to other places, we sell other docks.
8    Q.   We're getting out of my realm of
9  expertise.  I don't even know what you mean
10  by local dock.  I want to make sure I get
11  it.
12    A.   The port that I work out of.
13    Q.   What port is that?
14    A.   Delacroix.
15    Q.   Okay.
16    A.   That would be the dealer that I
17  was dealing with in my main port.
18    Q.   So that dealer bought 95 percent
19  of your shrimp?
20    A.   He bought a lot of it, yes.  I
21  wouldn't say 95 percent, but he bought most
22  of it.
23    Q.   Not all, but most?
24    A.   I couldn't specify exactly how
25  much because I really don't know unless I



Page 125

1  went through trip tickets.
2      MR. SALICRUP:
3          Okay.  Mr. Alfonso, I'm going to
4  provide you with some documents that I'm
5  going to ask the court reporter to mark as
6  exhibit 10.
7          (Exhibit No. 10 marked for
8  identification.)
9  EXAMINATION BY MR. SALICRUP:
10     Q.   Please review them and let me know
11  when you're finished.
12     A.   Okay.
13     Q.   Okay.  I'm going to represent to
14  you that this is a summary for yourself,
15  Vernon Alfonso, Jr. for the year of 2009,
16  from January 1st through December 31st of
17  that year, stating all of the shrimp that
18  you sold to Island Seafood.
19     A.   Okay.
20     Q.   Can you please turn to the second
21  page?
22     A.   Okay.
23     Q.   Can you tell me what your total
24  paid amount was?
25     A.   24,183.65.

Page 126

1      Q.   Now, please turn to where we were
2  earlier in Exhibit 9.  According to that
3  document, what was your fishing income in
4  2009?
5      A.   24,184.
6      Q.   These numbers are nearly
7  identical, correct?
8      A.   Yes.
9      Q.   So we can conclude that your total
10  fishing income for 2009 was $24,000
11  approximately?
12     A.   From Island Seafood, yes.
13     Q.   And they bought, as you stated,
14  most of your seafood, correct?
15     A.   A lot of it.  I can't say exactly,
16  but, yes.
17     Q.   So where did the $22,250 listed
18  for Frank & Son come from?
19     A.   I don't know.  I don't remember.
20     Q.   When you worked for Frank & Sons,
21  how did they pay you?
22     A.   They paid me with a check.
23     Q.   Do they pay you with a check every
24  time?
25     A.   Yes.

Page 127

1      Q.   Are you ever paid in cash?
2      A.   No.
3      Q.   In 2009, were you ever paid in
4  cash for Frank & Sons?
5      A.   No.
6      Q.   How do they pay you, weekly?
7      A.   I didn't work for Frank & Son in
8  '09.
9      Q.   When you do work for Frank & Sons,
10  how do they pay you?
11     A.   They pay me by the invoice.
12     Q.   Is that sent in weekly, daily, by
13  the hour?
14     A.   It depends on the company we work
15  for.
16     Q.   Please explain that.
17     A.   If we worked for a seismograph
18  company that required us to submit an
19  invoice monthly, we did it monthly.  If they
20  wanted it weekly, we did it weekly.
21     Q.   But who paid you, the company or
22  Frank & Sons?
23     A.   The company would pay Frank & Son
24  and then Frank & Son would pay me.
25     Q.   If the company had -- walk me

Page 128

1  through an example.  If the company had a
2  contract with a company, how would that
3  work?
4      A.   I'm sorry?
5      Q.   How would the payment work?  Walk
6  me through an example.  You're working for
7  Frank & Sons doing seismographic work for a
8  month, getting paid and depositing the
9  money.  Track the money, how does that flow?
10     A.   I would submit an invoice.
11     Q.   To who, sir?
12     A.   To the company that I work for.
13     Q.   To which company is that?
14     A.   It depends on which company I
15  worked for.  I think we worked for Western
16  Geophysical at one point and I would submit
17  an invoice to them and after that, I
18  couldn't tell you because Frank & Son would
19  get paid and then they would pay me.
20     Q.   Would you ever get paid by the
21  company directly?
22     A.   No.
23     Q.   Never?
24     A.   No.
25     MR. SALICRUP:



1        It's almost noon.  Off the record.
2        (Whereupon, an off-the-record
3   discussion was held.)
4   EXAMINATION BY MR. SALICRUP:
5        Q.   What was the range of payment
6   amounts that you received from Frank & Sons?
7        A.   I couldn't tell you.
8        Q.   You received payments from Frank &
9   Sons?
10       A.   Yes, when I worked for -- when I
11  did seismic work -- when I did work
12  pertaining to Frank & Sons, yes, I did
13  receive payments.
14       Q.   And when they would pay you, you
15  would look at that payment?
16       A.   Not always.
17       Q.   Can you explain?  Please
18  elaborate.
19       A.   Because a lot of the -- if we
20  worked away from home, I might be gone for
21  three months and if any checks were sent, my
22  wife would take care of that.
23       Q.   You would hand over a check
24  without looking at it to your wife?
25       A.   I trust her that much.

1        Q.   You would receive a phone call?
2        A.   Yes.
3        Q.   You would go into the Frank & Son
4   office?
5        A.   No.
6        Q.   Where would you go to work?
7        A.   Wherever work may be, it may be --
8   like it could be in a different part of the
9   state, you know.  It could be in Houma.
10       Q.   And you would drive there in your
11  boat?
12       A.   In my boat.
13       Q.   And before you got on your boat
14  and went to the project, wherever that was,
15  would you agree to a payment amount with
16  Frank & Sons?
17       A.   Usually.  I'm not exactly sure.  I
18  wouldn't say exactly a payment amount.  We
19  would know what they would pay the boat --
20  what the boat would earn.
21       Q.   When you say the boat, you mean
22  your boat, the PRINCESS BRANDI?
23       A.   Yes.  If a boat earned -- I mean,
24  sometimes they might have two or three boats
25  working there, and if the rate was $350 a

1        MR. COLEMAN:
2            You got to give a verbal answer.
3        THE WITNESS:
4            Yes.
5   EXAMINATION BY MR. SALICRUP:
6        Q.   Your answer is yes?
7        A.   Yes.
8        Q.   Approximately what was -- how much
9   was each check for?
10       A.   I couldn't say approximately.
11       Q.   When you worked for Frank & Sons,
12  did you sign a contract for the engagement?
13       A.   No.
14       Q.   How did you get placed with Frank
15  & Sons?
16       A.   If a job came up where they needed
17  a boat, I would -- or they need somebody to
18  do some work, I would go and do it.
19       Q.   How would you find out about it?
20       A.   Frank & Son would tell me.
21       Q.   How would they tell you?
22       A.   They would tell me, you know, just
23  say, Western Geophysical needs a boat.
24       Q.   Did you receive a letter?
25       A.   No.  He would call and tell me.

1   day, I knew what the rate was when I went.
2        Q.   So you knew how much you were
3   going to get when you were assigned to a
4   project?
5        A.   Yes.
6        Q.   And that was communicated
7   verbally?
8        A.   Verbally.
9        Q.   Was that ever put in writing?
10       A.   Not that I'm aware of.
11       Q.   When you said they had two or
12  three boats, was the CAPTAIN DYLAN ever
13  hired?
14       A.   No.
15       Q.   And so, give me a general example,
16  your average engagement for Frank & Sons,
17  how long did it last?
18       A.   It depended on the job.
19       Q.   Okay.
20       A.   Sometimes a job may be three
21  months, sometimes the job might be a month.
22       Q.   What was the most common that you
23  would say?
24       A.   Usually one month to three months
25  is common.



Page 133

1    Q.   The range is one month to three
2  months?
3    A.   Yes.
4    Q.   What was the most common daily
5  rate for a boat?
6    A.   At that time --
7    Q.   What do you mean by "at that
8  time"?
9    A.   It's just like everything else,
10  prices change.
11    Q.   2008.
12    A.   I would say probably -- maybe --
13  2008, maybe four fifty.
14    Q.   Four fifty a day for a boat?
15    A.   Yes.
16    Q.   Would you work seven days a week?
17    A.   It if that's what the job
18  required.
19    Q.   What was the most common, five
20  days a week, seven days a week?
21    A.   Seven days.
22    Q.   So a common engagement was more or
23  less seven days for a month for three --
24  between one to three months at a rate of
25  four fifty?

Page 134

1    A.   (Nodding head affirmatively)).
2    Q.   Is that correct?
3    A.   Yes.
4    Q.   The checks that you would receive
5  from Frank & Son in those kind of
6  engagements, would come every week?
7    A.   No.
8    Q.   They would come every month?
9    A.   They would come when the invoice
10  was paid.  Different companies pay different
11  times.  Some take longer periods and some
12  shorter periods.
13    Q.   Would checks from Frank & Son
14  usually be over a thousand dollars?
15    A.   Yes.
16    Q.   Did Frank & Sons pay for the fuel?
17    A.   No.
18    Q.   Who paid for the fuel?
19    A.   The company that we worked for.
20    Q.   How did you get reimbursed for
21  that?
22    A.   The company would pay fuel, the
23  fuel was supplied.
24    Q.   Did you have to fill out fuel
25  tickets of some sort?

Page 135

1    A.   Sometimes.
2    Q.   Generally, what was the common
3  business practice for these types of
4  engagements, you go to a fueling station and
5  you fill what out?
6    A.   Sometimes they would -- if the
7  company would -- if there wasn't a fuel dock
8  close by, they would supply us with a barge
9  with diesel, and we would get our fuel off
10  of a fuel barge and if there was a fuel dock
11  close by, the company we worked for might
12  have an account and we would go there and
13  fuel up and sign your name.
14    Q.   You would sign your name or the
15  boat's name?
16    A.   It depended on what they wanted.
17    Q.   What did you usually do?
18    A.   I can't remember that.
19    Q.   Is that general business practice
20  in this kind of work?  I don't know, you
21  tell me.
22    A.   Sometimes they make out a ticket
23  with the boat name on it and you sign your
24  name.
25    Q.   Usually the boat name is on it?

Page 136

1    A.   Usually.
2    Q.   Is usually your name on it, too?
3    A.   Usually.
4    Q.   Would checks from Frank & Son
5  usually be more than $2,000?
6    A.   Probably.
7    Q.   Would they be more than $10,000?
8    A.   That much I can't say.  I imagine
9  occasionally, maybe.
10    Q.   Generally checks from Frank & Son
11  were around $5,000?
12    A.   It depends on the amount of the
13  invoice.
14    Q.   Understood.  But generally?
15    A.   I couldn't say.
16    Q.   Would it be fair to say that it
17  was between two and $5,000?
18    A.   I still couldn't say.  It's been a
19  while since I worked for Frank & Sons.
20    Q.   But a $5,000 check you would
21  recall?
22    A.   Maybe.
23    Q.   So as I understand it -- do you
24  want to take that 20-minute break off the
25  record?



1     MR. COLEMAN:
2        Sure.
3        (Whereupon, a recess was taken for
4  lunch.)
5     MR. SALICRUP:
6        Mr. Lloyd Day, investigator for
7  the Special Master is here.  I asked him to
8  sit in.
9  EXAMINATION BY MR. SALICRUP:
10    Q.  Mr. Alfonso, I have some
11  questions.  You provided us with a set of
12  bank statements for 2007, 2008 and 2009 as
13  well as 2010.
14    A.  Yes.
15    Q.  Do you provide these to Ms. Peggy
16  Flowers when she prepares her returns?
17    A.  No.
18    Q.  Do you show her any bank
19  documentation?
20    A.  The only thing I would -- the only
21  thing we would show is interest earned on
22  the savings or checking or something that's
23  required.
24    Q.  And I'm going to show you a
25  document that you produced this morning as

1  Alfonso -- Bates stamped Alfonso 102 through
2  108.  Will you please look at this document.
3  It's a schedule for 2010.
4    A.  Uh-huh (indicating affirmatively).
5    Q.  Do you have a similar breakdown
6  for 2009, something along those lines?
7    A.  I'm sorry?
8    Q.  Do you have a similar breakdown
9  for your income in 2009?
10    A.  No.  This is -- this is when we
11  started working for the oil spill.  That's
12  what this -- yeah, this is a printout from
13  the parish, St. Bernard Parish.
14    Q.  What does that mean, a printout
15  from the parish?
16    A.  When he started working for the
17  VoO program, it went through the St. Bernard
18  Parish.
19    Q.  Can you identify the document
20  you're looking at?
21    A.  The only thing I can identify --
22  the only thing I can say about it is that
23  was a printout from St. Bernard Parish that
24  I can see.  Yeah, this is what they paid us.
25    Q.  Who is "they," the parish?

1    A.  The parish.
2    Q.  Anyone else?
3    A.  No.
4    Q.  What did they pay you for?
5    A.  They paid us for the VoO program,
6  working on the spill.
7    Q.  Whose handwriting is it on that
8  document?
9    A.  Right here?
10    Q.  Yes, sir.
11    A.  This would be my wife's.
12    Q.  Can you look through the rest of
13  the documents?
14    A.  My wife's handwriting.
15    Q.  And can you identify what the
16  handwritten document is?
17    A.  My wife's -- probably keeping
18  track of the days I worked, I would think,
19  to check to see if it coincided with what
20  the parish paid us.
21    Q.  And does she do something similar
22  for 2009?
23    A.  No.
24    Q.  How does she know which dates you
25  worked?

1    A.  She kept track what days I went to
2  work.
3    Q.  Did you tell her which days you
4  went to work?
5    A.  She knew what days I went to work.
6    Q.  Because you told her?
7    A.  Because she knew when I went to
8  work, when I left the house, I was going to
9  work.
10    Q.  Fair enough.
11    A.  I mean.
12    MR. SALICRUP:
13        Okay.  I'm going to introduce the
14  set that was produced this morning including
15  the document we just discussed as
16  Exhibit 11.
17        (Exhibit No. 11 marked for
18  identification.).
19    MR. SALICRUP:
20        Off the record.
21        (Whereupon, an off-the-record
22  discussion was held.)
23    MR. COLEMAN:
24        What's the last Bates number on
25  there?



Page 141
1    MR. SALICRUP:
2        First Bates is Alfonso 1, last
3  Bates being Alfonso 482.
4  EXAMINATION BY MR. SALICRUP:
5    Q.  Mr. Alfonso, can you walk me
6  through a year in your working life and by
7  that, I mean what periods of the year do you
8  work in construction?
9    A.  I haven't worked construction
10  since '09.
11    Q.  Okay.  So in 2009, do you recall
12  what you were working on?
13    A.  No, I really can't.  I know I
14  did -- we built -- some daiquiri shops we
15  rebuilt, you know, constructed.
16    Q.  You constructed?
17    A.  New Orleans Daiquiris and stuff
18  like that.  We did that kind of work.
19    MR. COLEMAN:
20        You said daiquiri shops?
21    THE WITNESS:
22        Yeah.
23    MR. SALICRUP:
24        What's a daiquiri shop?  I don't
25  know what that is.

Page 142
1    MR. COLEMAN:
2        Fair question, I wondered that
3  myself driving around Louisiana.
4    THE WITNESS:
5        It's a frozen mixed drink.
6    MR. SALICRUP:
7        Oh, really.
8    MR. COLEMAN:
9        That's legal here, to sell
10  daiquiris.
11    THE WITNESS:
12        It's a drive-through.
13  EXAMINATION BY MR. SALICRUP:
14    Q.  And you stated you're a shrimper,
15  correct?
16    A.  Yes.
17    Q.  When is the shrimp season?
18    A.  Shrimp season is year round, but
19  inshore waters is basically, usually around,
20  say, like the end of May on.
21    Q.  When does it start?
22    A.  There's not a specific date set.
23  The date kind of sets itself by the size of
24  the shrimp.
25    Q.  But the department of -- Louisiana

Page 143
1  Wildlife & Fisheries --
2    A.  Announce the opening day.
3    Q.  So there is a start to the season?
4    A.  Yes.
5    Q.  And generally when is the
6  starting -- when does the season start?
7    A.  Usually between the middle and the
8  end of May.
9    Q.  Okay.  And when does it end?
10    A.  It will end usually around
11  December sometime.  Most of the time it's
12  around Christmas.
13    Q.  So shrimping season was only from
14  May to December?
15    A.  The inshore waters.
16    Q.  The inshore waters?
17    A.  Yes.
18    Q.  Is there another shrimp season?
19    A.  No.  There's an area called Breton
20  Sound that we shrimp.  I guess it's
21  considered offshore waters.
22    Q.  Uh-huh (indicating affirmatively).
23    A.  And most of the time that will
24  stay open year round.
25    Q.  Okay.  And do you shrimp offshore?

Page 144
1    A.  Yes.
2    Q.  Do you shrimp offshore year round?
3    A.  Not year round, no.
4    Q.  What kind of shrimp do you catch
5  offshore?  Is that different from inshore?
6    A.  It's basically the same shrimp.
7    Q.  Aren't some brown and some white?
8    A.  It's considered two different
9  seasons, the brown shrimp and the white
10  shrimp.
11    Q.  Do the white shrimp live inshore?
12    A.  Both live inshore and move
13  offshore as they grow.
14    Q.  When they go offshore, do they
15  turn brown?  I don't know.
16    A.  It's a different species.
17    Q.  It's a different species.  So you
18  can catch brown shrimp inshore or offshore?
19    A.  Yes.
20    Q.  And do you shrimp in inshore
21  waters?
22    A.  Yes.
23    Q.  Do you -- do you shrimp when
24  you're working construction?
25    A.  Yes.



Page 145

1    Q.   How do you manage that?
2    A.   It depends on the job.  If there's
3 a job close by, sometimes we will shrimp on
4 the days that we're off.
5    Q.   What about when you're working for
6 R&M?
7    A.   When I worked for R&M, yes, I
8 shrimped.
9    Q.   Would you wake up in the morning
10 and shrimp?
11    A.   No, it just depend on the job.  If
12 there was a job -- like if we worked, say,
13 Monday through Friday, I might do it on
14 weekends.
15    Q.   What kind of work did you do for
16 R&M?
17    A.   That was construction work.
18    Q.   And which dates did you work for
19 them?
20    A.   I couldn't remember the specific
21 dates.  I know I worked for them in '09, '7,
22 '8 and '9.
23    Q.   You worked for R&M in '7, '8 and
24 '9?
25    A.   Yes.

Page 146

1    Q.   Did you work for them before the
2 summer or after the summer?
3    A.   After Hurricane Katrina, I worked
4 for them.
5    Q.   Hurricane Katrina?
6    A.   '05.
7    Q.   Was -- okay, so in 2009 did you
8 work for R&M Construction before the summer
9 or after the Summer?
10    A.   Before.
11    Q.   Before the summer?
12    A.   Before.
13    Q.   Did you work for R&M Construction
14 after the summer?
15    A.   No.  I can't remember the dates.
16    Q.   So how -- I'm a little confused.
17 Can you explain, if you go out shrimping for
18 four days at a time, how can you do that at
19 the same time you're working construction?
20    A.   It's not always four days at a
21 time.
22    Q.   Okay.
23    A.   Sometimes we make -- it depends on
24 the shrimp, too.
25    Q.   I don't know what that means.

Page 147

1    A.   If I can leave today and go out
2 and catch my limit in one day, I'm back in.
3 Sometimes it might take three days or four
4 days or sometimes we could just make a
5 one-day trip.
6    Q.   What's the longest you've stayed
7 out?
8    A.   Four days.
9    Q.   Generally, do you pack your boat
10 for a four-day trip?
11    A.   Most times, yes.
12    Q.   On average, what is the length of
13 most trips?
14    A.   That's hard to say.  I mean,
15 average, probably two to three days.
16    Q.   And in 2009, you were working
17 construction before the summer, correct?
18    A.   Yes.
19    Q.   And you were shrimping at the same
20 time?
21    A.   Yes.  I can't remember the dates.
22 That's what got me.  I don't remember the
23 dates.
24    Q.   For what?
25    A.   You know, exactly what days I did

Page 148

1 construction on, what days I shrimped, I
2 can't remember.
3    Q.   Would you sign in at R&M when you
4 went to work?
5    A.   No.
6    Q.   How did that -- how -- what was
7 your day like at R&M?
8    A.   If we had a job to do, my boss
9 would tell me where the job was or what we
10 was doing and that's what I did.  I would
11 get up in the morning and go to work.
12    Q.   What is the name of your boss?
13    A.   Ronald Doane.
14    Q.   Doane?
15    A.   Doane, D-O-A-N-E.
16    Q.   And would they notify you the same
17 day?
18    A.   Most of the time he would let me
19 know if a job was coming up, if he had a --
20 when he had it scheduled, he would let me
21 know.
22    Q.   With how much lead time?
23    A.   I couldn't say.
24    Q.   On average?
25    A.   Maybe a week sometimes.



Page 149

1    Q.   You did a substantial amount of
2   work for R&M in 2009, correct?
3    A.   I'm not sure.
4    Q.   Approximately?
5    A.   I don't remember.
6    Q.   $26,000 worth?
7    A.   Probably.
8    Q.   How long would it take you to earn
9   that much?
10    A.   I would have to say probably --
11  I'm not even sure, three or four months
12  maybe.
13    Q.   Three or four months?
14    A.   I would have to figure it out.  I
15  couldn't tell you.
16    Q.   Three or four months working every
17  day?
18    A.   Not every day.
19    Q.   When you worked for R&M, how did
20  you get paid?
21    A.   With a check.
22    Q.   By the hour?
23    A.   By -- sometimes by the day,
24  sometimes by the hour, depending on what job
25  was up and what he was doing.

Page 150

1    Q.   What was your position at R&M?
2    A.   I started out as mainly
3   construction and then I was supervisor.
4    Q.   Is a supervisor like a foreman?
5    A.   Superintendent, yeah, I ran the
6   job.
7    Q.   What does a superintendent
8   generally earn?
9    A.   I don't know.  I know what they
10  paid me.
11    Q.   How much did you earn as a
12  superintendent?
13    A.   Anywhere from -- I think it was
14  like two hundred a day sometimes.
15    Q.   And a superintendent has to be
16  there every day, right?  Because if the boss
17  doesn't show up, the people don't work.
18    A.   It depends.  If a job was going on
19  and I had a crew that was working, I didn't
20  have to be on top of them all the time.
21    Q.   When you were supervising a crew,
22  were you required to be there?
23    A.   Yes.
24    Q.   What about Frank & Sons, did you
25  shrimp when you were working for Frank &

Page 151

1   Sons?
2    A.   I'm not sure.  That was a long
3   time ago.
4    Q.   What time of the year did you
5   usually work for Frank & Sons?
6    A.   I couldn't say that either because
7   that depends on the job.
8    Q.   How much lead time would you be
9   told about an upcoming job?
10    A.   Sometimes I might have been told a
11  week ahead, sometimes I might have been told
12  the day before.
13    Q.   And I say this with all due
14  respect because balancing three jobs sounds
15  hard.  How did you manage all of this
16  construction, shrimping, Frank & Sons if
17  people were just telling you the next day?
18    A.   I work, that's all I do.
19    Q.   But you do not recall when you
20  worked for Frank & Sons?
21    A.   No.
22    Q.   Was it generally in the fall?
23    A.   We worked, like I said, it
24  depended on the job, if the job was in the
25  fall, it was in the fall, if it was in the

Page 152

1   winter, it was in the winter.
2    Q.   In 2008, did you work for Frank &
3   Sons?
4    A.   I don't recall.
5    Q.   And all the income that you earned
6   for your shrimping, construction, be it from
7   R&M or otherwise and for Frank & Sons, is
8   deposited into the four bank accounts that
9   you provided this morning?
10    A.   Yes.
11    Q.   You provided records for three of
12  them, correct?
13    A.   Correct.
14    Q.   We don't have records for the
15  fourth LLC account.
16    A.   Right.
17    Q.   Which we will receive, I believe.
18    A.   As soon as I can get it.
19    MR. COLEMAN:
20        I'm not sure if it's in response
21  because the account didn't exist.
22  EXAMINATION BY MR. SALICRUP:
23    Q.   When was the account created?
24    A.   I think it was in '11, either late
25  2010, or '11.



1     MR. COLEMAN:
2         Put that way, if you want it, we
3 will give it to you.
4     MR. SALICRUP:
5         Okay.
6 EXAMINATION BY MR. SALICRUP:
7     Q.   We also had some difficulty
8 copying all these.  We're going to, if it's
9 all right with you, keep these, make copies
10 and return the originals to you.
11    MR. COLEMAN:
12        I'm guessing that makes you a
13 little nervous, but --
14    THE WITNESS:
15        It makes me nervous because of my
16 wife --
17 EXAMINATION BY MR. SALICRUP:
18    Q.   We will take good care of them,
19 while going through them we noticed that we
20 don't have January and February of --
21    A.   That's the one she's -- this
22 morning when I handed them to you, I told
23 you we didn't have, that she didn't find, so
24 she was getting them today.
25    Q.   She's getting them today?

1     A.   Yes.
2     Q.   We will be receiving those?
3     A.   Yes.
4     Q.   We reserve the right to continue
5 your sworn statement once we get those.
6     MR. COLEMAN:
7         I guess, whatever, but as far as
8 taking the deposition, lawyers are good at
9 handling documents, I recommend that you
10 just go ahead and leave them with them and
11 Mr. Salicrup will do his absolute best to
12 ensure that they get back to you.
13 EXAMINATION BY MR. SALICRUP:
14    Q.   We will take care of them and they
15 will be organized.
16    A.   Okay.
17    MR. SALICRUP:
18        Can we go ahead and introduce
19 these?  Exhibit 12 will be 2007, bank
20 records for three accounts for 2007.  We
21 will introduce the records for three
22 accounts for 2008 as Exhibit 13.  We will
23 introduce bank records for three accounts
24 for 2009 as Exhibit 14.  And the bank
25 records for three accounts for 2010 as

1 Exhibit 15.
2         (Exhibit Nos. 12, 13, 14 and 15
3 marked for identification.)
4 EXAMINATION BY MR. SALICRUP:
5     Q.   Mr. Alfonso, these accounts
6 reflect all of your revenue for 2007, 2008,
7 2009 and 2010, correct?
8     A.   Yes.
9     Q.   And that includes all of your
10 income for yourself and your wife, correct?
11    A.   Yes.
12    Q.   And you agree that your 2009
13 return reflects a total revenue of $105,646,
14 correct?
15    A.   I don't know.
16    Q.   Would you like to review your 2009
17 return which was entered as an exhibit?
18    A.   Okay, because I'm not sure --
19    MR. COLEMAN:
20        That number doesn't sound right to
21 me either.
22    MR. SALICRUP:
23        Let's take a look then.
24    MR. COLEMAN:
25        Okay.

1     THE WITNESS:
2         Which one was --
3     MR. COLEMAN:
4         I think that's the amended.  So
5 you need Exhibit 7.
6     THE WITNESS:
7         7?  I don't know what I'm looking
8 at.
9     MR. SALICRUP:
10        You want to go off the record?
11    MR. COLEMAN:
12        No, we can do this on the record.
13 Are you referring to his Line 1 from 1040?
14    MR. DAY:
15        No, total revenue.
16    MR. SALICRUP:
17        Lloyd, that would be line --
18    MR. DAY:
19        Adjusted gross income is on line
20 37.
21    MR. COLEMAN:
22        Okay.  I'm going to start by
23 pointing him to --
24    MR. DAY:
25        Total income is on line 22.  We



1  have got a disconnect because we're looking
2  at the 2009 return and it says negative
3  5,000 on line 22.
4      MR. SALICRUP:
5          I think we're referring to line
6  37.
7      MR. DAY:
8          Do you want to specifically ask
9  him about the one-oh-five?
10     MR. SALICRUP:
11         Yeah.  We're still on the record.
12 EXAMINATION BY MR. SALICRUP:
13     Q.   And your wife's salary in 2009?
14     MR. DAY:
15         That's the total of his W2s and
16 1099s?
17 EXAMINATION BY MR. SALICRUP:
18     Q.   Adding up your W2s and 1099s, your
19 wife's salary in 2009 was 31,781, is that
20 correct?
21     A.   I'm really lost here because I
22 don't know nothing about tax forms or
23 filling them out or --
24     MR. COLEMAN:
25         Off the record.

1          (Whereupon, an off-the-record
2  discussion was held.)
3      MR. SALICRUP:
4          On the record, Exhibit 8 --
5      MR. COLEMAN:
6          Exhibit 8 is the amended two
7  Schedule Cs.
8      MR. SALICRUP:
9          Exactly, that is the 2009 return
10 that you submitted to the GCCF.
11     THE WITNESS:
12         Okay.
13 EXAMINATION BY MR. SALICRUP:
14     Q.   On Page 1 of that return, on line
15 7.
16     A.   Okay.
17     Q.   Can you state the amount there?
18     A.   31,791.
19     Q.    And that is your wife's salary as
20 a teacher, correct?
21     A.   I couldn't tell you.
22     Q.   Do you know?
23     A.   I don't know.
24     Q.   You don't know, okay.
25     MR. DAY:

1          I can help on that, two W2s, one
2  from Lynn Oaks School and another one, W2,
3  from Kevin Smith Construction and if you
4  total those two you get the 31,791.
5  EXAMINATION BY MR. SALICRUP:
6      Q.   I will represent to you that that
7  31,791 is income generated by the Lynn Oaks
8  School W2.
9      A.   That's my wife, yes.
10     Q.   Does your wife work for the Lynn
11 Oaks School?
12     A.   Not anymore.
13     Q.   She did in 2009?
14     A.   Yes.
15     Q.   And you worked for Kevin J. Smith
16 Construction in 2009, correct?
17     A.   Yes.
18     Q.   When we add the amounts in those
19 two W2s, it comes up to 31,791.
20     A.   Okay.
21     Q.   And that is what Line 7 is.  Can
22 you please turn to Line 8A?
23     A.   (Complying).
24     Q.   It's right underneath 7.
25     A.   801?

1      Q.   801.  That is money earned on
2  interest.  Is that amount correct?
3      A.   I couldn't tell you.
4      Q.   Is this what you submitted to the
5  DHECC or the GCCF?
6      A.   If this is my original tax return,
7  yes, this is what I submitted.
8      Q.   Please go to Page 3, Schedule C.
9      A.   Schedule C, okay.
10     Q.   Can you read, please, Line 1?
11     A.   46,434.
12     Q.   And that is your Schedule C for
13 commercial fishing, correct?
14     A.   Yes.
15     Q.   Please turn to Page 5.
16     A.   (Complying) okay.
17     Q.   Can you state what Line 1 lists as
18 your construction income in 2009?
19     A.   26,630.
20     Q.   When we add these numbers
21 together, it gives us approximately
22 $105,646.  That is the total revenue listed
23 in your 2009 return, with two Schedule Cs
24 that were submitted to the DHECC, is that
25 correct?



Page 161

1    A.   I never added it up, but I will
2    take your word for it, yes.
3        Q.   I will represent to you that it
4    is.  If you would like to take an
5    opportunity to add it up, by all means --
6        A.   No, that's okay.
7        Q.   Did you have any other sources of
8    income in 2009?
9        A.   Not that I can remember.  I mean
10   -- no, not that I remember.
11       Q.    And as I mentioned earlier, the
12   2009 bank records are incomplete and you
13   stated that we will be receiving those.  But
14   when we add the deposits in these three
15   accounts for 2009 --
16       A.   Uh-huh (indicating affirmatively).
17       Q.   -- we came up on a total of
18   76,481 --
19       A.   Okay.
20       Q.   -- for your joint account, 53,261
21   for your business account, and 8,000 for
22   your Chase account.
23       A.   Okay.
24       Q.   I'm going to represent to you that
25   that adds up approximately to 137,742 in

Page 162

1    total deposits.  If you disagree, please add
2    it up and if you would like to take a look
3    at the exhibits, please do.  When we
4    subtract the deposits in your 2009 bank
5    account from your total revenue in your 2009
6    return with two Schedule Cs, there is a
7    difference of $33,000, not accounting for
8    the month of January and February that are
9    missing.  In other words, you have a total
10   revenue of -- you have some unaccounted
11   revenue of 33,000 for 2009 that is not in
12   your return, can you explain that?
13       A.   No, I can't.
14       MR. COLEMAN:
15           I'm going to object to the form of
16   the question.  It assumes facts not in
17   evidence, but go ahead and answer if you
18   can.
19   EXAMINATION BY MR. SALICRUP:
20       Q.   Please answer.
21       A.   No, I can't.
22       Q.   And all of the income you and your
23   wife earned in 2009 was deposited in the
24   three accounts which records you provided to
25   the Special Master as contained in

Page 163

1    Exhibit 14, correct?
2        A.   I'm not sure.  I can't answer
3    that.  I don't know.
4        Q.   I will ask another way.  Did you
5    have any other income that you did not
6    deposit in these three accounts in 2009 for
7    you and your wife?
8        A.   Not that I remember.  I don't
9    remember.
10       Q.   Would you like to take a look
11   through the documents?
12       A.   No -- no.
13       Q.   I would also like to show you an
14   additional document.
15       MR. SALICRUP:
16           I'm going to ask the court
17   reporter to mark this as Exhibit 16.
18           (Exhibit No. 16 marked for
19   identification.)
20   EXAMINATION BY MR. SALICRUP:
21       Q.   Mr. Alfonso, please take a
22   second -- take your time in reviewing the
23   document.
24       MS. FEELEY:
25           We can go off the record.

Page 164

1            (Whereupon, an off-the-record
2    discussion was held.)
3    EXAMINATION BY MR. SALICRUP:
4        Q.   Mr. Alfonso, can you identify
5    Exhibit 16?
6        A.   This looks like something from the
7    bank in one of my checking accounts.
8        Q.   Okay.  That is -- I'm going to
9    represent to you Exhibit 16 is the statement
10   from Gulf Coast Bank --
11       A.   Okay.
12       Q.   -- that you provided to us this
13   morning.  That statement shows a wire
14   transfer on August 28th in the amount of
15   $50,570.
16       A.   Okay.
17       Q.   Can you explain that?
18       A.   Yeah, I think I can.  This is Road
19   Home.
20       Q.   What does that mean?
21       A.   Road Home -- it was -- explain
22   Road Home.  It was -- after the storm.
23       Q.   Which storm, sir?
24       A.   After Hurricane Katrina.
25       Q.   Uh-huh (indicating affirmatively).



Page 165

1     A.   They -- I don't even know how the
2   process went, I don't know if it was through
3   the state or whatever it was through, they
4   gave you money to rebuild, like a grant --
5   like a loan or a grant, something like that.
6     Q.   Am I correct, am I understanding
7   you that you're saying that $50,000 was a
8   loan?
9     A.   It's either a loan or a grant, I
10  don't understand -- I think it was more like
11  a grant.  You had to rebuild within so many
12  years for it to be forgiven.  I guess it
13  would be a grant.
14    Q.   And is that grant reflected in
15  your returns?
16    A.   Not unless it was required.  If it
17  was required, yeah, but if it wasn't, no.
18    Q.   How do you know that?
19    A.   I mean, all we would do is ask if
20  it had to be submitted as income or -- I
21  mean, I can't remember back when I received
22  it if it was required or not, I can't
23  remember that.
24    Q.   When you say ask, who would you
25  ask?

Page 166

1     A.   I would have asked Ms. Flowers if
2   it was required or I would have asked the
3   people that -- the Road Home Corporation or
4   whatever it was.
5     Q.   Is -- is that a federal grant
6   program, Road Home?  I'm not familiar with
7   it.
8     A.   I'm not sure.  I'm not sure if it
9   was federal or state.  I thought it was
10  state -- the state was handling it.  I'm not
11  sure how it all works.
12    Q.   Did you build a new home with that
13  grant?
14    A.   I'm in the process.  I'm almost
15  done.
16    Q.   Who applied for that, you did?
17    A.   Me, yes.
18    Q.   I'm going to try to ask you a
19  question that I asked you earlier and we had
20  some difficulty.  Hopefully this rephrasing
21  will help.
22         If we add your income for R&M --
23    A.   Okay.
24    Q.   -- your income for W2 wages, your
25  income for interest, and this deposit of

Page 167

1   $50,570, which you've told us is a grant,
2   that still leaves us with a discrepancy
3   regarding the information you provided in
4   your 2009 bank records, Exhibit 14, and the
5   2009 return with two schedule Cs which you
6   submitted as Exhibit A.  In order to fill up
7   that difference, you would have needed to
8   have made 28,119 -- $28,019 initially, but
9   we've established here today that you sold
10  your seafood to Island Seafood for less than
11  that.
12         Can you explain the differences in
13  income?
14    A.   No.
15    Q.   Okay.  Moving on, we have
16  established that the shrimp season is from
17  May to December.  What did you do for income
18  in -- from January to April of 2009?
19    A.   I'm not sure.  I can't remember
20  dates on when they ran or what.  If I did
21  construction or --
22    Q.   I'm not looking for a precise
23  date.  You can tell me the months.
24    A.   I couldn't even tell you the
25  months.

Page 168

1     Q.   Start with January, do you know
2   what you did in January?
3     A.   No.
4     Q.   Did you work?
5     A.   Probably.
6     Q.   Did you shrimp in January 2009?
7     A.   I don't know.
8     Q.   Did you work for R&M in
9   January 2009?
10    A.   I don't know.
11    Q.   What about February 2009?
12    A.   I don't know.  I don't know -- I
13  don't know -- I know I did work for R&M and
14  I know I did shrimping, but I couldn't tell
15  you exactly what month I did what.  I really
16  couldn't.
17    Q.   According to the information that
18  you have provided, you have trip tickets
19  starting in late May 2009 going through
20  mid-October 2009?
21    A.   Yes.
22    Q.   Which means you weren't shrimping
23  in January 2009?
24    A.   According to this, yes.
25    Q.   And your wife worked for a school



Page 169

1  and how often does she get paid?  She worked
2  for a school in 2009, how often did she get
3  paid?
4      A.  I couldn't tell you.  I don't
5  know.
6      Q.  Do you know how much she earned?
7      A.  No.
8      Q.  Did she earn $10,000 a month?
9      A.  I couldn't tell you.
10     Q.  Did she earn $1,000 a month?
11     A.  All I can tell you, one year she
12 earned 18,000 for the year.
13     Q.  For the year?
14     A.  That's all I can tell you and I
15 don't know what year.
16 MS. FEELEY:
17     Let's go off the record.
18     (Whereupon, an off-the-record
19 discussion was held.)
20 EXAMINATION BY MR. SALICRUP:
21     Q.  And for the record, Mr. Alfonso,
22 I'm going to show you some deposits in your
23 account on various dates and I will ask you
24 some questions about them.  And this is
25 exhibit for -- bank records for 2009, that

Page 170

1  was Exhibit 14.  Please look at this page of
2  Exhibit 14.  On 3/24/2009, you have a
3  deposit in your account of $500.
4      A.  Uh-huh, (indicating
5  affirmatively), yes.
6      Q.  Can you explain where that deposit
7  came from?
8      A.  No.
9      Q.  We've established it's not
10 shrimping income.  Was that income from R&M
11 Construction?
12     A.  I don't know.
13     Q.  Was that income from your wife?
14     A.  I don't know.
15     Q.  You have no idea?
16     A.  No idea.
17     Q.  May I see that document for a
18 second?
19     A.  (Handing).
20     Q.  You turned -- the same document,
21 there's a deposit in your account on 4/06/09
22 of $2,000.  Do you know what that deposit is
23 for?
24     A.  No.
25     Q.  We've established it's not

Page 171

1  shrimping income.  Was that income for
2  construction work?
3      A.  I don't know.
4      Q.  Was that income for your wife?
5      A.  I don't know.
6      Q.  Was that income for working at
7  Frank & Sons?
8      A.  I don't know.
9      Q.  I'm going to show you a different
10 document.
11     A.  I didn't work for Frank & Sons
12 in '09.
13     Q.  4/13/2009.  You show a deposit in
14 your account of $3,200.
15     A.  Okay.
16     Q.  Can you see it?
17     A.  Yeah.
18     Q.  Do you know what that deposit was
19 for?
20     A.  No.
21     Q.  Was that deposit for working at
22 R&M Construction?
23     A.  No.
24     Q.  Was that deposit for doing any
25 other construction work?

Page 172

1      A.  I don't know.
2      Q.  Was that deposit for your wife?
3      A.  I don't know.
4      Q.  And was that deposit for any other
5  unexplained source of income you may have?
6      A.  I don't know.
7      Q.  But we know it's not shrimping
8  income, correct?
9      A.  I don't know that either.
10     Q.  On 4/20/2009, you also have
11 another deposit in your account totaling
12 $500.
13     A.  4/20?
14     Q.  Yes, sir.  Can you see it?
15     A.  Uh-huh (indicating affirmatively).
16     Q.  Is that deposit income generated
17 working for R&M Construction?
18     A.  I don't know.
19     Q.  Is that deposit income generated
20 by your wife?
21     A.  I don't know.
22     Q.  Is that deposit generated by any
23 other source of income you haven't reported?
24     A.  I don't know.
25     Q.  Mr. Alfonso, I'm going to show you



1 another bank statement that you provided to
2 us as exhibit -- as part of Exhibit 14 this
3 morning.  Can you please review this
4 document?
5      A.   (Complying) okay.
6      Q.   Can you identify this document for
7 me?
8      A.   Bank's statement.
9      Q.   From which bank?
10      A.   From Gulf Coast.
11      Q.   Can you see on that statement, a
12 deposit made in your account on 7/13/2009
13 totaling 4,500?
14      A.   I see 4,000 on the 3rd.
15      Q.   Do you see a deposit made in your
16 account totaling $4,000?
17      A.   Yes.
18      Q.   And was that income generated by
19 working at R&M Construction?
20      A.   I don't know.
21      Q.   Was that income generated by your
22 wife?
23      A.   I don't know.
24      Q.   Was that income generated by you?
25      A.   I don't know.

1      Q.   Was that income generated by any
2 other source of income?
3      A.   I don't know.
4      Q.   Thank you, sir.  What was the
5 source of the funds that we've just
6 discussed represented in the bank records
7 that I presented to you as Exhibit 14?
8      A.   The source of income --
9      Q.   For all the numbers that we
10 discussed?
11      A.   Whatever -- I mean, the source
12 would have been whatever jobs I worked that
13 year, whatever shrimping I did that year or
14 my wife's income or --
15      Q.   Did your wife have any other
16 sources of income other than working at the
17 school in 2009?
18      A.   No.
19      Q.   Do your children work?
20      A.   My children?  I have one that
21 works now, but back then, no.
22      Q.   At that time?
23      A.   No.
24      Q.   Did you know that Ms. Peggy
25 Flowers was interviewed yesterday and gave

1 her sworn statement to the Office of the
2 Special Master?
3      A.   I know she was supposed to, I
4 didn't know what date.
5      Q.   How did you know, sir?
6      A.   Just -- I think Ms. Peggy had
7 called me.
8      Q.   When did Ms. Peggy call you,
9 Ms. Flowers?
10      A.   Ms. Flowers, probably -- I would
11 assume it was last week.
12      Q.   Do you recall which day last week?
13      A.   No.
14      Q.   Was is it towards the end of the
15 week?
16      A.   I couldn't remember.
17      Q.   Was it on Sunday?
18      A.   I don't know.
19      Q.   Do you go to church?
20      A.   No.  Not too often, every now and
21 then.
22      Q.   Did you watch football last
23 Sunday?
24      A.   Not enough.
25      Q.   I hear you.  Did you watch

1 football last Sunday?
2      A.   I caught the end of the Packers
3 game, that was it.
4      Q.   Did you speak to Ms. Flowers on
5 that day?
6      A.   I don't recall.  I don't remember
7 what day it was.
8      Q.   And how did you communicate with
9 Ms. Flowers?
10      A.   By telephone.  That was it, by
11 telephone.
12      Q.   Did you write her an e-mail?
13      A.   No.
14      Q.   Did you write her a letter?
15      A.   No.
16      Q.   Did you call her?
17      A.   No.
18      Q.   She called you?
19      A.   Uh-huh (indicating affirmatively).
20      Q.   What did she tell you?
21      A.   She just told me that -- she told
22 me that she had to do -- give a statement or
23 something.  That's all she said.  That's all
24 I remember her saying.
25      Q.   She called and said, "I have to



1  give a statement."  That's it?
2      A.   Yeah, she had to give a statement
3  and I told her I had no problem with it.
4      Q.   Did she tell you who she had to
5  give a statement to?
6      A.   No.
7      Q.   Did she tell you why she had to
8  give a statement?
9      A.   No.  She just said it was about my
10 taxes, I assume.
11     Q.   What about your taxes?
12     A.   Well, I guess it was about -- my
13 tax accountant.
14     Q.   Can you just elaborate on that?
15     A.   I don't know how to elaborate on
16 that.
17     Q.   Just do your best.
18     A.   Okay.  I assumed it was all my
19 taxes, because I know you were investigating
20 my claim.
21     Q.   Did you assume that or did she
22 tell you?
23     A.   No, I just assumed that.  She told
24 me she had to give a statement.
25     Q.   Did she tell you when the

1  statement was?
2      A.   No.
3      Q.   Did you speak with Ms. Flowers
4  yesterday?
5      A.   No.
6      Q.   Did you speak with Ms. Flowers
7  this morning?
8      A.   No.
9      Q.   Do you know if you spoke with
10 Ms. Flowers last Wednesday, January 14th?
11     A.   I couldn't tell you.
12     Q.   Do you know if you spoke with her
13 last Tuesday, January 20th?
14     A.   I couldn't tell you.
15     Q.   Do you know if your attorney
16 communicated with Peggy Flowers?
17     A.   As far as I know, she talked to
18 him.  I couldn't tell you what day, but as
19 far as I know, she spoke with him.
20     Q.   Do you know when she spoke with
21 him?
22     A.   No.
23     Q.   Did she speak with him more than
24 once?
25     A.   I don't know.  That I couldn't

1  tell you.
2      Q.   Do you know if they spoke in
3  person?
4      A.   I don't know.
5      Q.   Do you know if they communicated
6  via e-mail?
7      A.   I don't know.
8      Q.   Do you know if they spoke on the
9  phone?
10     A.   I don't know.
11     Q.   When Ms. Flowers called you last
12 week, did she call your cell phone?
13     A.   Yes.
14     Q.   Does Ms. Flowers usually call your
15 cell phone?
16     A.   Yes, that's the number I gave her
17 to contact me.
18     Q.   Do you have a land line?
19     A.   Yeah.
20     Q.   Does she call you on the land
21 line?
22     A.   No.
23     Q.   So whenever there are any issues,
24 Ms. Flowers contacts you, not your wife,
25 correct?

1      A.   No.  Sometimes she will contact my
2  wife -- no, I can't really say.
3      Q.   If she were to contact your wife,
4  how would she do that?
5      A.   By her cell phone.
6      Q.   Whose cell phone?
7      A.   My wife's.
8      Q.   Your wife has a cell phone and
9  Ms. Flowers has it?
10     A.   I couldn't say because I know she
11 has my phone number.  I know that.
12     Q.   Do you know if your attorney spoke
13 with Ms. Flowers yesterday?
14     A.   I don't know.
15     Q.   Do you know if your attorney spoke
16 with Ms. Flowers this morning?
17     A.   I don't know.
18     Q.   You live in close proximity to the
19 Doanes, is that correct?
20     A.   Yes.
21     Q.   Are the Doanes the same owners of
22 R&M Construction --
23     A.   Yes.
24     Q.   -- that you mentioned earlier?
25 How did you first meet him?



Page 181

1    A.   I met him after Hurricane Katrina.
2    Q.   How did you meet?
3    A.   Just by chance.  I was looking at
4  a house in the area.
5    Q.   What area was that?
6    A.   In ████████████████ .
7    Q.   Your current residence?
8    A.   Yes.
9    Q.   Walk me through how you met him.
10    A.   He was across the street fixing
11  his house and I was in the neighborhood
12  looking for houses and just stopped and
13  talked to him.
14    Q.   And do you socialize with Mr. or
15  Mrs. Doane?
16    A.   Not so much any more, but I used
17  to a little bit.
18    Q.   When did you socialize with Mr. or
19  Mrs. Doane?
20    A.   When I worked for him.
21    Q.   When was that?
22    A.   After Hurricane Katrina.
23    Q.   Did you work for them -- did you
24  socialize with them in 2008?
25    A.   Probably, yes.

Page 182

1    Q.   Did you socialize with them in
2  2009?
3    A.   Probably a little, yeah.
4    Q.   Do they have kids?
5    A.   They have three kids.
6    Q.   Are they the same age as your
7  kids?
8    A.   Yeah, I think his girls are close
9  to my girls.
10    Q.   Do you do family-type events
11  together?
12    A.   No, not really.
13    Q.   Barbecues?
14    A.   No.
15    Q.   Pools?
16    A.   No.
17    Q.   Do you socializes with Joyce Lopez
18  or Frank Lopez?
19    A.   Family get-togethers or something
20  like that.
21    Q.   How often is that, sir?
22    A.   We used to do Christmas together,
23  but that's been a while.
24    Q.   Am I correct, actually, Joyce
25  Lopez is your mother's twin sister, is that

Page 183

1  correct?
2    A.   Yes.
3    Q.   Was Ms. Joyce Lopez the one who
4  approached you to do work for Frank & Sons?
5    A.   It was probably my uncle.
6    Q.   Who is that, sir?
7    A.   Frank.
8    Q.   Frank approached you?
9    A.   It's kind of hard to say
10  approached.  I mean, if a job came up or
11  something, we might have talked about it.
12  But as far as coming to look for me to go do
13  a job or something like that, it might have
14  been just something that we talked about.
15    Q.   Did you receive any additional
16  wires, transfers, payment or grants, Road
17  Home, in addition to the 50,000, the
18  approximately $50,000 that you received?
19    A.   I don't remember.
20    Q.   Did you receive more than one
21  payment?
22    A.   I don't remember that either.
23    Q.   How much did it cost you to build
24  your house?
25    A.   I think we have -- we are

Page 184

1  keeping -- my wife is keeping track.  I'm
2  not sure.  I'm building it myself.
3    Q.   If you're building it yourself,
4  you must buy the materials, correct?
5    A.   Yes.
6    Q.   You must hire the guys to work on
7  it?
8    A.   Most of the work I do.
9    Q.   So you do the work by yourself?
10    A.   Yeah.  I had friends come help me
11  frame it.
12    Q.   It's fair to say if you buy the
13  materials, you should have an idea how much
14  was spent on building the house?
15    A.   I been doing this a few years, so
16  I don't keep track.  I couldn't tell you
17  offhand.
18    Q.   Ballpark?
19    A.   I couldn't tell you.
20    Q.   Less than 500,000?
21    A.   Yes.
22    Q.   More than 250,000?
23    A.   No.
24    Q.   Less than 100,000?
25    A.   Yes.



1     Q.   Less than 75,000?
2     A.   Yes.
3     Q.   Less than 50,000?
4     A.   You're getting close, so I really
5  couldn't tell you.
6     Q.   So is it accurate then that the
7  Road Home grant paid for most of the
8  materials you purchased to build your home?
9     A.   It paid for -- I don't know how
10  much I paid for it.  I really couldn't tell
11  you.  I don't know how it works.  I don't
12  understand the system of how it works.
13     Q.   Let's assume that you received
14  $50,000, which is what is shown in the
15  records you provided and you're telling me
16  that you spent approximately $50,000 in
17  material?
18     A.   I would have to add it up.  I
19  couldn't tell you.
20     Q.   Did you apply to any other grants?
21     A.   Not that I remember.
22     Q.   Do you have any other loans --
23     A.   Any other loans -- I might have a
24  car loan.
25     Q.   On your truck?

1     A.   No, on my son's car.
2     Q.   What kind of car is that, sir?
3     A.   Dodge Dart, I think it was.
4     Q.   What's the model?
5     A.   I'm not even sure.
6     Q.   Have you ever been convicted of a
7  criminal offense involving dishonesty, sir?
8     A.   No.
9     Q.   Have you plead guilty?
10     A.   No.
11     Q.   I just want to clarify before we
12  move on.  The claims with the GCCF and the
13  DHECC are your claims, correct?
14     A.   Yes.
15     Q.   You are the one that worked with
16  the attorneys in getting that filed,
17  correct?
18     A.   Yes.
19     Q.   And you're the one that dealt with
20  Peggy Flowers in obtaining the 2009 return
21  with two Schedule Cs, correct?
22     A.   Yes.
23     Q.   Did you work with anyone else?
24     A.   I didn't, no.
25     Q.   And your wife did not work with

1  the attorneys in your GCCF or DHECC claim?
2     A.   No.
3     Q.   And she did not work with
4  Ms. Peggy Flowers on your 2009 return with
5  two Schedule Cs, correct?
6     A.   No.
7     Q.   Did she work with anyone else?
8     A.   No.
9     Q.   Does your wife know Kim Flowers?
10     A.   Is that Ms. Peggy's sister?
11     Q.   I believe that's Peggy's daughter.
12     A.   I don't think I've met her.
13     Q.   Do you know if your wife has?
14     A.   No.
15     MR. SALICRUP:
16          We're going to go off the record
17  for a second.
18          (Whereupon, a brief recess was
19  taken.)
20     EXAMINATION BY MR. SALICRUP:
21     Q.   Mr. Alfonso, I'm going to rephrase
22  a question I asked earlier.  Actually, I'm
23  going to rephrase -- I'm going to start with
24  a different question before I rephrase.
25          Based on the documents that you

1  have provided from your bank account for
2  2009, you have deposits starting in
3  March 2009 through May 2009, one in
4  3/24/2009, in the amount of $500, one in
5  4/06/09, in the amount of $2,000, one in
6  4/13/2009 in the amount of $3,200, one in
7  4/20/2009 in the amount of $500, one in
8  5/5/2009 in the amount of $300.
9          Do you know what the source of
10  this income was?
11     A.   No.
12     Q.   Was that income generated by your
13  work at R&M Construction?
14     A.   I don't know.
15     Q.   Was that income generated by your
16  wife?
17     A.   I don't know.
18     Q.   The same set of documents has a
19  series of deposits starting 7/13/2009
20  through 8/10/2009, totaling $4,500, $300,
21  $450, $500, $500 again and $600.
22          Do you know the source of income
23  for these deposits?
24     A.   No.
25     Q.   Do you now if your wife was --



1  generated this income?
2      A.   I don't know.
3      Q.   Were these deposits related to
4  your work at R&M Construction?
5      A.   I don't know.
6      Q.   Pardon me?
7      A.   I don't know.
8      Q.   Do you know the source of the
9  income in any of the March statements?
10     A.   No.
11     Q.   Do you know the source of the
12 income for the April statement in 2009?
13     A.   No.
14     Q.   For example, the one that I just
15 mentioned for 4/13/2009 totaling $3,200?
16     A.   I don't know.
17     Q.   Do you know the source of the
18 income for the deposits I listed from
19 July 13, 2009 through August 10, 2009?
20     A.   I don't know.
21     Q.   Do you know the source of income
22 for a deposit in 12/30/2009, totaling $400
23 contained in the documents that you provided
24 to us?
25     A.   No, I don't know.

1      Q.   I'm going to rephrase a question
2  that I asked earlier.  And I think we had
3  some communication difficulty.  I will do my
4  best to be clear, if you don't understand,
5  tell me, please.
6      A.   Okay.
7      Q.   According to the 10 months of bank
8  statements that you have provided in your
9  2009 bank records, your deposits total
10 $137,742.
11     A.   Okay.
12     Q.   Do you understand?
13     A.   Yes.
14     Q.   You confirmed that you had a
15 deposit of $50,000 -- 500 -- $50,570 from
16 Road Home?
17     A.   50,877 cents (sic).
18     Q.   50,570, do you understand?
19     A.   Yes.
20     Q.   When we subtract 137,742 from the
21 50,570, that gives us a total of $87,172 in
22 gross income.  Do you understand?
23     A.   Yes.
24     Q.   According to the 2009 tax returns
25 that you submitted to the GCCA -- GCCF

1  and/or the DHECC, you and your wife in 2009
2  had an income of $31,791 from W2-related
3  work.  Do you understand?
4      A.   Yes.
5      Q.   I'm going to represent to you that
6  that number is accurate.  According to the
7  documentation that you provided, you had
8  additional income in 2009 of 26,620 from R&M
9  Construction in 2009, do you agree?
10     A.   Yes.
11     Q.   When we subtract the 87,172 in
12 gross income that I just mentioned from the
13 income reported in your W2 and the income in
14 your R&M Construction --
15     MS. FEELEY:
16         Just so we're clear, you're doing
17 it backwards.
18         You're going to subtract those
19 from the gross income.
20     MR. SALICRUP:
21         Sorry, excuse me.
22 EXAMINATION BY MR. SALICRUP:
23     Q.   Like I said, 87,172 minus the
24 income on the W2, minus the income from R&M
25 Construction gives us $28,761.

1         Do you understand?
2      A.   Yes.
3      MR. COLEMAN:
4         I'm sorry, start with one thirty
5  seven, subtract 50K from Road Home, that
6  gives us 87,000, and then your next
7  calculation was to subtract --
8      MR. SALICRUP:
9         Eighty-seven minus thirty-one
10 seven nine one.
11     MR. COLEMAN:
12        That would be the wages?
13     MR. SALICRUP:
14        Yes.  Minus twenty-six six twenty
15 from R&M totals twenty-eight seven six one.
16     MR. COLEMAN:
17        28,000.
18     MR. SALICRUP:
19        Yeah.
20     MR. COLEMAN:
21        Got it.
22     THE WITNESS:
23        Yes.
24 EXAMINATION BY MR. SALICRUP:
25     Q.   That number does not match the



Page 193

1 $46,434 included in your 2009 return that
2 you list as fishing income.
3      How do you account for that
4 difference?
5      A.  I can't.  I don't remember what
6 the income was from.
7      Q.  And that $46,434 listed in your
8 2009 return with two Schedule Cs, is the
9 same amount you've included in your SWS1, is
10 that correct?
11      A.  Yes.
12      Q.  Earlier you stated you presented
13 that information to your counsel.  How do
14 you explain the differences in income from
15 your bank account to the income you told the
16 DHECC and the SWS1?
17      A.  I can't.  I don't know.
18      MR. SALICRUP:
19          I think we're done.
20          Are you going to need 10 minutes
21 or what's your --
22      MR. COLEMAN:
23          I don't think so.
24          We just had a break.  Are you good
25 to go?

Page 194

1      THE WITNESS:
2          I'm good.
3      MR. COLEMAN:
4          Off the record.
5          (Whereupon, an off-the-record
6 discussion was held.)
7 EXAMINATION BY MR. SALICRUP:
8      Q.  Mr. Alfonso, one final question.
9 The information included in your 2009
10 returns was -- you reported those amounts to
11 Peggy Flowers, correct?
12      A.  Yes.
13      Q.  Thank you.
14      MR. SALICRUP:
15          We're done.
16          If you would like 10 minutes.
17      MR. COLEMAN:
18          No, no, that's fine.
19 EXAMINATION BY MR. COLEMAN:
20      Q.  Did you work for Frank & Sons in
21 2009?
22      A.  No.
23      Q.  And in -- after hearing about the
24 Special Master's investigation regarding
25 your claim and the forms submitted on your

Page 195

1 behalf, did you make your best effort to
2 investigate whether you worked for Frank &
3 Sons or otherwise received income from Frank
4 & Sons in 2009?
5      A.  Yes, sir, I did.
6      Q.  What was the result of your best
7 effort at investigating that question?
8      A.  That I did not work for Frank &
9 Son in '09.
10      Q.  Did you receive a 1099 from Frank
11 & Sons in -- for 2009?
12      A.  No.
13      Q.  Did you receive or do you have any
14 other paperwork for 2009 reflecting income
15 from Frank & Sons?
16      A.  No.
17      Q.  I'm going to refer you to the
18 first time when you met with Ms. Flowers to
19 prepare your original 2009 return.  I
20 believe that -- we established in the
21 deposition that that was early 2010.
22      A.  Right.
23      Q.  Are you with me?
24      A.  Yes.
25      Q.  At this point, do you recall any

Page 196

1 correspondence or communication with
2 Ms. Flowers about income from Frank & Sons
3 in 2009?
4      A.  No.
5      Q.  You now know, I believe, or you
6 were shown Exhibit 9, which is a document
7 from -- I don't know, let's pause here and
8 pull out Exhibit 9.
9      MR. SALICRUP:
10          You want to go off the record?
11      MR. COLEMAN:
12          No, we're good.
13 EXAMINATION BY MR. COLEMAN:
14      Q.  I put in front of you Exhibit 9,
15 which was represented by Mr. Salicrup to be
16 an accounting worksheet or spreadsheet
17 obtained from Ms. Flowers.  Do you recall
18 looking at this document?
19      A.  No.  This is the first time I seen
20 it.
21      Q.  But you recall Mr. Salicrup
22 presenting it to you?
23      A.  Yes.
24      Q.  And looking at this document,
25 there's a line item for Frank & Sons income



1  and it says $22,250.  Do you see that?
2      A.  Yes.
3      Q.  Do you have any idea how that
4  income, that $22,000 -- $22,250 was
5  recorded?
6      A.  No.
7      Q.  I want to turn to the -- when
8  you -- your second go round with Ms. Flowers
9  on your tax returns for 2009 and I believe
10  you testified, and correct me if I'm wrong,
11  that you returned to Ms. Flowers later in
12  2010 after meeting with the GCCF, do you
13  recall that?
14      A.  Yeah, I called on the phone.
15      Q.  Is that how you communicated with
16  Ms. Flowers about the need to amend your
17  Schedule Cs?
18      A.  Yes.
19      Q.  And what exactly did you tell
20  Ms. Flowers that you needed done on your
21  Schedule Cs?
22      A.  I asked her if she could separate
23  the fishing from the construction.
24      Q.  Did you ever instruct Ms. Flowers
25  to include Frank & Sons income on your

1  fishing revenue?
2      A.  No.
3      Q.  And how did you receive the
4  amended Schedule Cs back from Ms. Flowers?
5      A.  I'm not positive, but I think it
6  was via fax.
7      Q.  Do you know whether you met with
8  Ms. Flowers to review the amended Cs?
9      A.  No.
10      Q.  Did you have -- did you know that
11  Ms. Flowers had included Frank & Son's
12  income on the amended Schedule C that
13  reported your commercial fishing income?
14      A.  No.
15      Q.  Do you recall reviewing the
16  amounts that were recorded on the amended
17  Schedule Cs?
18      A.  I don't recall.  If I did, I
19  wouldn't have known -- I wouldn't have knew
20  the difference because I don't know what I'm
21  looking at as far as tax papers.
22      Q.  At the time you submitted the
23  document to GCCF, were you aware that the
24  Frank & Son's income was recorded on the
25  amended Schedule C?

1      A.  No.
2      Q.  I think you had told Mr. Salicrup
3  that you did not file the amended Schedule
4  Cs with the IRS.  Do you recall saying that?
5      A.  Yes.
6      Q.  Why didn't you file the amended
7  Schedule Cs?
8      A.  My tax accountant said it wasn't
9  necessary.  It didn't change the numbers or
10  something to that effect.
11      Q.  When you were advocating on your
12  own behalf with GCCF, to get some
13  compensation related to the spill, was it
14  your -- were you intending to rely on 2009
15  taxes to support that claim?
16      A.  No.  I was depending on what they
17  asked me to submit, '7, '8 and '9.
18      Q.  At some point, you learned that
19  Miss -- that the Special Master had
20  presented Ms. Flowers with a subpoena for
21  documents, right?
22      A.  Yes.
23      Q.  Did you talk to Ms. Flowers after
24  she had received that subpoena?
25      A.  I think I spoke with her before

1  she had received it.
2      Q.  Did you have a conversation with
3  her about responding to the Special Master's
4  investigation?
5      A.  She told me -- she told me that
6  they was going -- they was going to review
7  my files.
8      Q.  And what were your instructions,
9  if any, to Ms. Flowers regarding her
10  cooperation with the investigations?
11      A.  I told her it was no problem, that
12  they have exactly what I filed on my taxes.
13      Q.  Do you feel like you have anything
14  to hide in connection with this
15  investigation?
16      A.  No.
17      Q.  Do you feel like you've done
18  anything wrong here in connection with your
19  claim?
20      A.  No.
21      Q.  Have you ever intentionally tried
22  to inflate your reported income from
23  commercial fishing?
24      A.  No.
25      Q.  Did you specifically know or



Page 201

1  intend that your commercial fishing income
2  for 2009 was inflated?
3      A.  No.
4      MR. COLEMAN:
5          I have no further questions.
6          (Whereupon the sworn statement was
7  concluded at 2:37 p.m.)
8              * * *
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25

Page 202

1              REPORTER'S CERTIFICATE
2          This certification is valid only for a
   transcript accompanied by my original
3  signature and original required seal on this
   page.
4
          I, Diane Clark, Certified Court
5  Reporter in and for the State of Louisiana,
   as the officer before whom this testimony
6  was taken, do hereby certify that VERNON
   ERNEST ALFONSO, JR., after having been duly
7  sworn by me upon authority of R.S. 37:2554,
   did testify as hereinbefore set forth in the
8  foregoing 201 pages; that this testimony was
   reported by me in the stenotype reporting
9  method, was prepared and transcribed by me
   or under my personal direction and
10 supervision, and is a true and correct
   transcript to the best of my ability and
11 understanding; that the transcript has been
   prepared in compliance with transcript
12 format guidelines required by statute or by
   rules of the board, and that I am informed
13 about the complete arrangement, financial or
   otherwise, with the person or entity making
14 arrangements for deposition services; that I
   have acted in compliance with the
15 prohibition on contractual relationships, as
   defined by Louisiana Code of Civil Procedure
16 Article 1434 and in rules and advisory
   opinions of the board; that I have no actual
17 knowledge of any prohibited employment or
   contractual relationship, direct or
18 indirect, between a court reporting firm and
   any party litigant in this matter nor is
19 there any such relationship between myself
   and a party litigant in this matter.  I am
20 not related to counsel or to the parties
   herein, nor am I otherwise interested in the
21 outcome of this matter.
22
23
24
25          _____
            DIANE CLARK, RPR, RMR, CRR
            CERTIFIED COURT REPORTER

