# EXHIBIT D

Page 1

```
 1          UNITED STATES DISTRICT COURT
 2          EASTERN DISTRICT OF LOUISIANA
 3
 4
    IN RE:  OIL SPILL BY THE        CIVIL ACTION
 5  OIL RIG "DEEPWATER HORIZON"     NO:  MDL 2179
 6
 7
 8          CONFIDENTIAL TRANSCRIPT
 9
        NO COPIES TO BE MADE WITHOUT
10
        PERMISSION OF SPECIAL MASTER'S OFFICE
11
        THIS ALSO APPLIES TO ALL EXHIBITS
12
13          SWORN STATEMENT OF PEGGY FLOWERS,
    TAKEN AT KF&L, LLC, ███████████████████
14          ██████ ON THE 20TH DAY OF JANUARY, 2015,
    COMMENCING AT 9:03 A.M. AND CONCLUDING AT 12:19 P.M.
15
16
17
18
    REPORTED BY:
19
20          RUBY M. WALLEN
            CERTIFIED COURT REPORTER
21
22
23
24
25
```

Page 2

```
 1
 2  APPEARANCES:
 3
    REPRESENTING THE OFFICE OF THE SPECIAL MASTER:
 4
 5          PEPPER HAMILTON, LLP
            ATTORNEYS AT LAW
 6          BY:  ALEJANDRO SALICRUP, ESQ.
            MARIA FEELEY
 7          3000 TWO LOGAN SQUARE
            EIGHTEENTH AND ARCH STREETS
 8          PHILADELPHIA, PENNSYLVANIA 19103-2799
 9          215.981.4418
            SALICRUA@PEPPERLAW.COM
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
```

Page 3

```
 1                 EXHIBIT INDEX
 2
 3  EXHIBIT NO.                              PAGE
 4  Exhibit 1.................................41
    Subpoena
 5
    Exhibit 2.................................67
 6  Declaration of Peggy Flowers
 7  Exhibit 3.................................93
    GCCF Supporting Documentation for a Claim
 8
    Exhibit 4................................101
 9  GCCF Supporting Documentation for a Claim
10  Exhibit 5................................106
    2009 return
11
    Exhibit 6................................115
12  Subpoena compliance documents received on
    11/03/14 from Peggy Flowers
13
    Exhibit 7................................119
14  Gross Receipts or Sales Line 1 (Sch C (1040)
15  Exhibit 8................................121
    IRS account Transcript
16
    Exhibit 9.................................99
17  Subpoena compliance documents received on
    12/18/14 from Peggy Flowers
18
    Exhibit 10...............................44
19  Faxed 2009 return
20  Exhibit 11...............................44
    Line 1(Sch C (1040)-Gross Receipt or Sales
21
    Exhibit 12...............................55
22  Declaration of Peggy Flowers
    (NOT ATTACHED TO THE RECORD)
23
24
25
```

Page 4

```
 1          PEGGY FLOWERS,
 2  after having been first duly sworn by the
 3  above-mentioned court reporter, did testify as
 4  follows:
 5  BY MR. SALICRUP:
 6      Q.   Good morning, Ms. Flowers.  My name is
 7  Alejandro Salicrup.  This is my colleague Maria
 8  Feeley.  We are here on behalf of the Special Master
 9  that was appointed by the court to look at certain
10  aspects of BP claims.  We are here to take your
11  interview and your sworn statement.
12          I am going to give you some
13  instructions before we begin.  The Court Reporter is
14  taking everything down as we speak.  So it is
15  important that only one person speaks at a time.
16  Please wait until I am done asking a question before
17  you respond.  You must also respond verbally.  No
18  head nods.  That is just to make sure that the record
19  is clear.
20          Do you understand?
21      A.   Yes.
22      Q.   If you do not understand my question,
23  or I speak too fast, please let me know.  I will
24  repeat and rephrase the question.
25          Do you understand?
```



ESQUIRE
S O L U T I O N S

1    A.    Yes.
2    Q.    If you answer my question, I will
3  assume you understood the question.
4          Do you understand?
5    A.    Yes --
6    Q.    You must answer everything truthfully.
7  Do you understand?
8    A.    Yes.
9    Q.    You are under oath, and that means
10 that you have an obligation to tell the truth.  And
11 because we are appointed by the court, it is as if
12 you were sitting in front of the court right now.
13         Do you understand?
14   A.    Yes.
15   Q.    Since you are under oath, the
16 questions and answers that you provide today may be
17 used at a court hearing or other proceeding.
18         Do you understand?
19   A.    Yes.
20   Q.    Is there any reason you would be
21 unable to tell the truth today?
22   A.    No.
23   Q.    Is there any reason you would be
24 unable to remember things today?
25   A.    Possibly because it happened so long

1  ago, you know.
2    Q.    Outside of normal memory lapses, is
3  there any reason you would be unable to remember
4  things today?
5    A.    No.
6    Q.    Are you taking any medication or
7  substances that would make you unable to tell the
8  truth today?
9    A.    No.
10   Q.    Just let me finish.
11   A.    I'm sorry.
12   Q.    No.  That is fine.  I am just going to
13 repeat the question real quick for the record.
14   A.    I'm sorry.
15   Q.    No worries.  Is there any -- are you
16 taking any medications or substances that would make
17 you unable to tell the truth today?
18   A.    No.
19   Q.    Are you taking any medication or
20 substances that would make you unable to remember
21 things today?
22   A.    No.
23   Q.    Please answer all questions fully and
24 to the best of your knowledge.  If you do not know
25 the answer, don't guess.  Just tell me that you don't

1  know.
2          Do you understand?
3    A.    Yes.
4    Q.    Have you ever been deposed before?
5    A.    To --
6    Q.    Deposed.
7    A.    A long time ago.  Yes.
8    Q.    When was that?
9    A.    About 30 years ago.
10   Q.    30 years ago.  What type of case was
11 it?
12   A.    It was an automobile case.
13   Q.    Have you been interviewed before?
14   A.    Yes.
15   Q.    By the DHECC?
16   A.    Is that the two people that came
17 previously?
18   Q.    You have been interviewed by the
19 Office of the Special Master.
20   A.    If that is the two people that came
21 before.  Twice they came.
22   Q.    Were their names Doug Dove Seeger and
23 Maurice Berthon?
24   A.    Yes.
25   Q.    So you spoke to them?

1    A.    Yes.
2    Q.    Have you and I spoken before today?
3    A.    I don't think so.
4    Q.    "No"?
5    A.    I don't really remember if we have or
6  not.  Did we do it by E-mail or set this up by phone?
7  I don't know.
8    Q.    Well, I have never spoken with you.
9  Have you ever spoken with me before today?
10   A.    Then, no.
11   Q.    Have you ever spoken with Maria Feeley
12 before?
13   A.    No.
14   Q.    We ask -- this is a confidential
15 investigation and we ask you hold this interview in
16 confidence.
17         Do you understand?
18   A.    Yes.
19   Q.    And lastly, as we are going through
20 the deposition, if you need to use the restroom,
21 drink water and have a snack, just let us know.  We
22 can pause.  I know that you have other time
23 constraints.  But it is important that you know that
24 we can put things on hold for whatever you need.
25         Do you understand?



1    A.    Yes.
2    Q.    Now let's get into the fun stuff.
3          Can you please state your full name?
4    A.    Peggy Flowers.
5    Q.    Do you have any other names?
6    A.    No.
7    Q.    Do you have any nicknames?
8    A.    No.
9    Q.    Is your full name Peggy?
10   A.    Yes.
11   Q.    What was your date of birth?
12   A.    ███████
13   Q.    What was your place of birth?
14   A.    ██████████████
15   Q.    And what is your Social Security
16   number?
17   A.    ███████████
18   Q.    Can you please state for the record
19   your home address?
20   A.    ████████████████████████
21   ██████████████
22   Q.    I apologize.
23   A.    You didn't let me finish.
24   Q.    I know.
25         And how long have you lived here?

1    A.    Since December of 2006.
2    Q.    Have you considered moving from this
3    location?
4    A.    Yes.
5    Q.    Where are you considering moving to?
6    A.    I am having a house built in ███,
7    ████.
8    Q.    ████?
9    A.    Uh-huh.
10   Q.    So do you know when you will move?
11   A.    After tax season is over this year.
12   Q.    Oh.  So around summertime of this
13   year?
14   A.    Yes.
15   Q.    Must be -- is it pretty down there?
16   A.    It is beautiful down there.
17   Q.    Nice.
18         Can you please state your educational
19   background?
20   A.    I have some college experience.  I
21   graduated from high school, and then I have taken
22   courses for income tax and upper management.
23   Q.    Where did you attend high school?
24   A.    High school was in Braggadocio,
25   Missouri.

1    Q.    And where did you attend college?
2    A.    I attended different college courses
3    online:  IBM, and then School of the Ozarks.
4    Q.    And when was that?
5    A.    1963.
6    Q.    And you attended college online in
7    1963?
8    A.    Well, no.  Colleges online have been
9    throughout my years.  The small time I was in School
10   of the Ozarks was in 1963.
11   Q.    I see.  And did you achieve a degree
12   there?
13   A.    No.
14   Q.    So just for the record, in 1963 you
15   went to the School of the Ozarks.  And when did you
16   do the online education?
17   A.    I can't remember.
18   Q.    Do you recall if it was in the 1990s?
19   A.    Probably before that.
20   Q.    In the 1980s?  I'm not sure there was
21   Internet then.
22   A.    Well, it wasn't really maybe Internet.
23   You know, just buy the books.  Take the course.  Take
24   a test.  Things like that.  Throughout my work
25   experience I was required to do that.  Just to stay

1    up to date with the things that were needed when I
2    worked outside of being self-employed.
3    Q.    So was this, like, a continuing
4    education program?
5    A.    Something like that.
6    Q.    For some sort of certification?
7    A.    Yes.
8    Q.    Okay.  And how often do you do that?
9    A.    Well, now I have to do it every year
10   for the Internal Revenue Service.  I am an enrolled
11   agent.  And I had to be approved by them to be an
12   enrolled agent, and I have to keep my hours up
13   yearly.
14   Q.    When did you become an enrolled agent
15   for the IRS?
16   A.    Maybe 15 years ago.
17   Q.    Okay.  And since then every year you
18   need to take a number of courses to remain --
19   A.    Yes.
20   Q.    -- certified?
21   A.    Right.
22   Q.    Do you have any other professional
23   certifications?
24   A.    No.
25   Q.    Can you please state your tax preparer



1   ID number, PTIN?
2       A.    It is P00107326.
3       Q.    Okay.  Do you have any other licensing
4   numbers?
5       A.    I have a CAF number with the IRS.
6       Q.    What number?
7       A.    It is called a CAF number.
8       Q.    Can you just tell me what that is?
9       A.    It is so I can represent clients in
10  front of the IRS.
11      Q.    Okay.  And that allows you to go in
12  for a hearing?
13      A.    Go, yes, for hearings.  Or if they are
14  audited, I can go in and represent them.
15      Q.    I see.  And how long have you had that
16  CAF number?
17      A.    March the 4th of 2009.
18      Q.    2009.  And did you have to take a
19  course to get that?
20      A.    No.
21      Q.    How do you get a CAF number?
22      A.    Because I am enrolled agent, I qualify
23  for that.
24      Q.    Oh.  I see.  So if you are an enrolled
25  agent for a period of time --

1       A.    Yes.
2       Q.    -- you are able to obtain a CAF
3   number?
4       A.    Yes.
5       Q.    Is there anything else you need to do?
6       A.    No.
7       Q.    Okay.  So School of the Ozarks in
8   1963.  You have been certified as an accountant and
9   every year you get some continuing education.
10      A.    Right.
11      Q.    Is there any other educational
12  background that I am missing?
13      A.    No.
14      Q.    What is your employment history?
15      A.    My employment history, I have been
16  self-employed for the past, I would say 30 years.
17      Q.    30 years?
18      A.    Uh-huh.
19      Q.    And before those 30 years, who did you
20  work for?
21      A.    There was a CPA firm on the west bank.
22  I can't remember the name of them.
23      Q.    Is that the west bank of New Orleans?
24      A.    Yes.
25      Q.    Okay.  You don't recall their name?

1       A.    I don't.
2       Q.    Was it a big firm?
3       A.    No.
4       Q.    Was it sort of a Mom-and-Pop?
5       A.    Yeah.
6       Q.    What did you do for that firm?
7       A.    I did bookkeeping.
8       Q.    What else did you do?
9       A.    That was about it.  Just bookkeeping
10  and payroll.
11      Q.    Can you please describe what you mean
12  by bookkeeping?
13      A.    Accounting.
14      Q.    Can you please describe what you mean
15  by "accounting"?  I am not an accountant.  So you
16  have to spell it out for me.
17      A.    I would record debits and credits,
18  take care of small business input and do the payroll.
19      Q.    What kind of clients did you work for?
20      A.    Just anyone that the CPA had just
21  general business.
22      Q.    Was it mostly small businesses,
23  individuals?
24      A.    A little of both.
25      Q.    A little of both.  Was it more

1   individuals?
2       A.    I can't remember.
3       Q.    Don't recall.  That is fine.
4             Why did you leave that firm?
5       A.    I left that firm to go to another firm
6   offshore -- they did some kind of offshore work.  I
7   was the office supervisor there.  I worked there for
8   about a year.  Then I took some time off to raise my
9   child, and then that is when I started my -- I worked
10  for H&R Block for some time, and got a good education
11  with them.  And then I went out on my own.
12      Q.    Got you.
13            So do you recall the name of the firm
14  that did the offshore work?
15      A.    Robert Franks was his name, I believe.
16      Q.    Robert Franks?
17      A.    Yeah.
18      Q.    And you were there for about a year
19  you said?
20      A.    I think so. Yeah.
21      Q.    And then you went to H&R Block?
22      A.    I was off for a small period of time
23  taking care of my daughter.
24      Q.    When was your daughter born?
25      A.    '65.



1    Q.      '65.  Okay.  And then from then you
2  went to H&R?
3    A.      Yes.
4    Q.      And subsequently you went self --
5    A.      Yes.
6    Q.      You mentioned earlier that you spoke
7  with two investigators.  Is that correct?
8    A.      Yes.
9    Q.      Did the investigators identify
10  themselves as investigators for the Office of the
11  Special Master?
12    A.      Yes.
13    Q.      When you met with them, they told you
14  -- you told them actually -- that you are an enrolled
15  agent with the IRS.  Is that correct?
16    A.      Yes.
17    Q.      And that you have worked in tax
18  preparation for over 40 years.  Is that correct?
19    A.      Yes.
20    Q.      You also told the investigators that
21  prior to Hurricane Katrina in 2005 your business was
22  located in St. Bernard Parish.
23    A.      Yes.
24    Q.      Is that correct?
25    A.      Yes.

1    Q.      At that first meeting you told the
2  investigators that you know Alfonso only through tax
3  preparation.  Is that correct?
4    A.      Correct.
5    Q.      Do you ever socialize with Mr.
6  Alfonso?
7    A.      No.
8    Q.      Do you prepare tax returns for any
9  relatives of Mr. Alfonso?
10    A.      No.
11    Q.      At that first meeting you told the
12  investigators that you prepared returns for Mr.
13  Alfonso's father, his brother and others.  Is that
14  correct?
15    A.      Father -- I am trying to remember.  I
16  am not sure about the father.  I know I do a lot of
17  Alfonsos.  I know there is one that is an uncle.  I
18  know one is a brother.  And it could be a father.  I
19  am not sure.  I can't really keep the lines of the --
20    Q.      That is fine.  You prepared taxes
21  returns for relatives of Mr. Alfonso.  Is that
22  correct?
23    A.      Yes.
24    Q.      And you told the investigators that?
25    A.      Yes.

1    Q.      And you told the investigators that
2  you prepare -- have prepared Mr. Alfonso's returns
3  since 2008.  Is that correct?
4    A.      That I couldn't really -- I said about
5  25 years.
6    Q.      About 25 years?
7    A.      Yeah.  20, 25.  Something like that.
8    Q.      At that first meeting you told the
9  investigators that your clients bring in their W-2s
10  and form 1099s.  Is that correct?
11    A.      Yes.
12    Q.      Ms. Flowers, can you explain to me
13  what a client organizer is?
14    A.      A client organizer?
15    Q.      Yeah.
16    A.      Some firms use client organizers.
17  They send out paperwork.  And I, to my best
18  knowledge, I don't use client organizers.  But it is
19  where they list their name, their address, all of
20  their income.  But to me, I don't use that because it
21  is too much work for the client.  They might as well
22  be doing their own return if they do that.
23          What my clients do, they bring in just
24  more or less a piece of paper with their -- I tell
25  them to add up their income, add up their deductions,

1  and that's what they bring in to me.  So I guess that
2  would be my type of organizer.
3    Q.      So a client organizer is a document
4  that helps get -- helps the client list the
5  information.  Correct?
6    A.      Yes.
7    Q.      But you don't use a client organizer?
8    A.      I don't use a format of a client
9  organizer.  Some people use client organizers that
10  come -- that are prewritten and everything.  Got a
11  lot of questions.  More like on the line of Turbo
12  Tax.
13    Q.      I see.
14    A.      And to me that is a lot of questions
15  that doesn't apply to them.  That is why I let them
16  do their own organizer and only list the items that
17  apply to them.
18    Q.      So I just want to make sure I
19  understand.  Do you provide them a template?
20    A.      No.
21    Q.      Do you provide them anything?
22    A.      No.
23    Q.      So the client compiles the information
24  and provides it to you.  Correct?
25    A.      Yes.



1    Q.    At that first meeting you also told
2  the investigators that generally your fishermen
3  clientele adds up trip tickets and show them to you.
4  Is that correct?
5    A.    They don't show me their trip tickets.
6  They just give me their totals.
7    Q.    So at that first meeting you indicated
8  to the investigators that they add up the trip
9  tickets and provide you with the totals.  Is that
10  correct?
11    A.    That is correct.
12    Q.    How do they provide you that
13  information?
14    A.    They list it on a piece of paper.
15  They list their income.  They list their repairs.
16  They list their bait.  They list their totals of all
17  of the expenses that they have.  They -- that is how
18  they do it.
19    Q.    So every client prepares their own
20  list.  Is that correct?
21    A.    Yes.
22    Q.    And because every client perhaps their
23  list, each list is a little different.  Correct?
24    A.    Yes.
25    Q.    Do they prepare them usually,

1  generally, in an Excel worksheet?
2    A.    I don't know.  Some people come in
3  with something that looks like it came off of a
4  computer, and others are just handwritten.
5    Q.    So would you say the majority of your
6  clients prepare them in Excel?
7    A.    No.
8    Q.    "No"?  They just write them down?
9    A.    Yes.
10    Q.    At the first meeting you told the
11  investigators that you take a look at the documents
12  provided by the client, and that you record their
13  revenue and expenses.  Is that correct?
14    A.    Yes.
15    Q.    Also discussed at that first meeting
16  was Mr. Alfonso's 2009 tax returns.  Is that correct?
17    A.    Yes.
18    Q.    What did you discuss regarding Mr.
19  Alfonso's 2009 tax returns?
20    A.    I just pulled up a copy of his tax
21  return.  They also had a copy of it.  They wanted to
22  verify that is what had been electronically filed to
23  the IRS, and it was.
24    Q.    And the investigators showed you a
25  copy of two versions of Mr. Alfonso's tax returns.

1  Is that correct?
2    A.    They did.
3    Q.    Do you recall -- well, what was the
4  difference between those two versions?
5    A.    Well, when I had originally filed Mr.
6  Alfonso's tax return for 2009, he had also been
7  building steps for, I think it was R&M Construction,
8  for the FEMA trailers in St. Bernard Parish.  And I
9  had combined the Schedule Cs.  This was back in '09
10  before the oil spill.
11    I had combined the construction of
12  those trailers -- of those steps -- I'm sorry -- with
13  the commercial fishing income, the waterway income.
14  And when he -- and then the next year when the oil
15  spill happened and he filed a claim, they wanted it
16  separated.
17    So all I did was just pull out how
18  much was for construction and left the rest of it
19  alone on the other Schedule C and sent that in.  Since
20  it made no difference on the physical return itself
21  as far as the balance due to the IRS, the amount
22  owing, the IRS didn't require a copy of it.  Only the
23  people handling the BP oil spill required a copy of
24  the separation.
25    Q.    Was there any other differences

1  between those two 2009 returns?
2    A.    No.  Because everything listed on the
3  original Schedule C was the total he had received
4  from waterway income and from construction of the
5  steps.
6    Q.    I see.
7    A.    And I just tried to lessen his fee by
8  combining it and making it a little easier.  And then
9  BP or whoever represented them wanted it separated.
10  So that is why I did the supposed amended return.
11  And really all I was doing was just separating the
12  two Schedule Cs.  But I think for some reason they
13  kept both Schedule Cs, and it caused some confusion.
14    Q.    I'm sorry.  Who is "they"?
15    A.    Whoever requested this.  I guess BP.
16  Whoever requested the separation of the R&M
17  Construction for the steps and then the waterway
18  income.
19    Q.    At that first meeting you told the
20  investigators that Mr. Alfonso's first tax return was
21  filed on February 19, 2010.  Is that correct?
22    A.    I think that was the date.
23    Q.    At that first meeting you told the
24  investigators that the second 2009 return, with two
25  Schedule Cs, was prepared in connection with a



1 Hangman's fund or a BP claim. Is that correct?
2    A.    BP.
3    Q.    At that first meeting you told the
4 investigators the second 2009 return with two
5 Schedule Cs was prepared in connection with the
6 Hangman's fund or a BP claim?
7    A.    The BP claim.
8    Q.    Did you mention that it was possibly
9 prepared in connection with the Hangman's fund?
10    A.    No.
11    Q.    "No"?
12    A.    I think I mentioned they -- they
13 wanted to know something about where might else he
14 have received a 1099. And I said a lot of my
15 fishermen get money from a Hangman fund. Maybe that
16 is what caused the confusion there.
17    Q.    And at that first meeting when
18 discussing the second 2009 return with two Schedule
19 Cs, you told the investigators that one of the
20 Schedule Cs records a total of $46,434 as a
21 commercial fisherman. Is that correct?
22    A.    I will have to check.
23        (Off the record.)
24    THE WITNESS:
25        What was the figure again?

1 BY MR. SALICRUP:
2    Q.    46,434.
3    A.    That is it. Yes.
4    Q.    I will just repeat the question for
5 the record.
6        At that first meeting you told the
7 investigators that Mr. Alfonso's gross receipts from
8 commercial fishing in that second return with two
9 Schedule Cs was $46,434?
10    A.    Correct. Yes.
11    Q.    You also told the investigators that
12 Mr. Alfonso's gross receipts for construction in the
13 second 2009 return totalled $26,630. Is that
14 correct?
15    A.    Yes.
16    Q.    When were these two Schedule Cs
17 prepared?
18    A.    It looks like "request from BP split
19 Schedule C, show construction on separate Schedule C.
20 Not filed with the IRS. Bottom line did not change."
21 This is the text that I sent him. That was on 6-5 of
22 12.
23    Q.    Ms. Flowers, you just read from a text
24 that you sent?
25    A.    I didn't send him a text. I sent him

1 a fax.
2    Q.    Oh. A fax.
3    A.    He wanted me to fax him the two
4 separate Schedule Cs, and I just wrote a little note
5 to myself why I was doing this.
6    Q.    Okay. Did you provide a copy of that
7 to the investigators in response to the subpoena?
8    A.    A copy of the fax?
9    Q.    With your notes?
10    A.    No. I did not. I don't think they
11 asked for that.
12    Q.    Okay. I think we would like that.
13    A.    Okay.
14    Q.    I think that is responsive to the
15 subpoena.
16    A.    All right.
17    Q.    Could we get the entire document?
18    A.    Sure. You mean as far as the return
19 was concerned?
20    Q.    Everything that was stapled together.
21    A.    Okay.
22    Q.    Thank you, ma'am.
23        Ms. Flowers, could you just remind me,
24 when were those two Schedule Cs prepared?
25    A.    I think it says June 5th of 2012.

1 That is when I sent him the E-mail.
2    Q.    Who is "him"?
3    A.    Vernon Alfonso.
4    Q.    You sent him an E-mail?
5    A.    Not an E-mail. I'm sorry. Fax.
6    Q.    You sent him a fax stating what, Ms.
7 Flowers?
8    A.    I just -- it didn't state anything.
9 It said 2009 return copy, where they wanted the two
10 Schedule Cs.
11    Q.    Could you please read the note that
12 you wrote by hand, the fax cover sheet, dated June
13 5th, 2012?
14    A.    From my information I wrote:
15 "Requested from BP split Schedule C. Show
16 construction on separate Schedule C. Not filed with
17 IRS. Bottom line did not change."
18    Q.    Thank you.
19    A.    You are welcome.
20    Q.    At that first meeting with the
21 investigators, you also provided them with some
22 documents. Is that correct?
23    A.    I think so. Yes.
24    Q.    What documents did you provide to
25 them?



1    A.    Copies of the 2009 tax return, I
2  think.
3    Q.    You provided the investigators with
4  gross receipts reported on 1099-MISC, or W-2, and
5  other information regarding Mr. Alfonso's income.
6  Correct?
7    A.    Correct.
8    Q.    The information you provided contained
9  total gross receipts of $73,064.  Is that correct?
10    A.    Yes.
11    Q.    At that first meeting you also told
12  the investigators that Frank & Sons is a boat rental
13  business in St. Bernard Parish.  Correct?
14    A.    Yes.
15    Q.    You also told the investigators that
16  Mr. Alfonso piloted boats for Frank & Sons.  Correct?
17    A.    I don't really know what he does for
18  Frank & Sons.  Sometimes he uses his own boat, I
19  understand.
20    Q.    Okay.  At that first meeting you told
21  the investigators that Mr. Alfonso piloted boats.  Is
22  that correct?
23    A.    I might have.  It is my understanding
24  that he earns money from Frank & Sons occasionally,
25  and sometimes he pilots their boats; sometimes he

1  pilots his own boat.
2    Q.    I understand.
3    A.    It is very closely tied in with his
4  commercial fishing.  So that is why it was left on
5  that Schedule C. It was on a regular Schedule C. And
6  when I was asked to pull construction out, that is
7  why I pulled just the construction out. Because the
8  other income, what he made from Frank & Sons and what
9  he did as a commercial fisherman were so closely tied
10  in with each other.
11    Q.    Thank you for that explanation.
12    At that meeting, though, you told the
13  investigators that Mr. Alfonso piloted boats for
14  Frank & Sons.  Correct?
15    A.    It is possible I might have said that.
16    Q.    You also identified the owner of Frank
17  & Sons as Frank Lopez.  Is that correct?
18    A.    Yes.
19    Q.    At that first meeting did you discuss
20  two different preparer tax identification numbers?
21    A.    It is very possible my daughter was
22  helping me at the time.  And a lot of times when I
23  was with a client, she might have put her PTIN on
24  something that she had checked and signed.  You know,
25  like I say, it is a very busily run office, and she

1  does -- she did at that time a few years back help me
2  in the office.
3    Q.    I didn't understand what you said.
4  Did you say busily run office?
5    A.    Busily.  Yeah.  Busy.  Very busy
6  office.
7    Q.    You are busy?
8    A.    Yeah.
9    Q.    What is your daughter's name?
10    A.    Kim Flowers.
11    Q.    And that is the child that was born in
12  1965?
13    A.    Yes.
14    Q.    And does she work with you?
15    A.    She used to.
16    Q.    Not anymore?
17    A.    Not anymore.  Yeah.
18    Q.    When did she work for you?
19    A.    She would work part time.  She worked
20  for about, I think three tax seasons part time.  But
21  I don't exactly know.  I think she stopped in about
22  -- she went to dental -- it might have been about
23  four years ago.  So it might have been -- yeah.  I
24  think it was about four years ago she stopped working
25  with me.

1    Q.    So approximately 2011 she stopped
2  working for you?
3    A.    I think she worked 2010, after I moved
4  here.  '9, '10, '11, '12.  Maybe those four years she
5  worked part time.
6    Q.    And do you know, Kim Flowers, your
7  daughter's tax preparer identification number?
8    A.    It is P00183688.
9    Q.    At that first meeting you told the
10  investigators that Kim Flowers signed for you one of
11  the 1040 forms.  Is that correct?
12    A.    Yes.
13    Q.    You also told the investigators that
14  the form which Kim Flowers signed had your preparer
15  tax identification number on it?
16    A.    It is very possible.
17    Q.    Do you recall what you told the
18  investigators?
19    A.    I don't.
20    Q.    You do not recall?
21    A.    No.
22    Q.    Did they present documents to you, the
23  investigators?
24    A.    I think so.  Yes.
25    Q.    When reviewing those documents, did



1  they show you your signature on the returns?
2      A.    I think I had completed the return,
3  put my tax ID number in it.  I was with a client,
4  probably -- I am just speculating -- and she noticed
5  that there was no signature on it.  So she might have
6  signed it.  Get it out the door.
7      Q.    Fine.
8            At the very initial meeting with the
9  investigators, you told the investigators that your
10  daughter signed for you.  Is that correct?
11      A.    At times she did.  Yes.
12      Q.    And she signed the 2009 return for
13  you.  Is that correct?
14      A.    Possibly.  Yes.  Yes.  I will say yes.
15      Q.    Thank you.
16      A.    I think the original return that was
17  actually sent to the IRS, I think I signed that.  I
18  think maybe she might have signed this amended return
19  that didn't go to the IRS.
20      Q.    Okay.  You told the investigators that
21  you charge a fee that covers the entire year.  Is
22  that correct?
23      A.    Well, I charge -- no.  I only charge a
24  one-time fee that covers any tax help they need for
25  the entire year.  If they have any tax questions, or

1  if they are called in for an audit -- which knock on
2  wood, none of my clients have ever been audited --
3  but if they have any tax questions or a problem, I
4  help them during the year at no charge.
5      Q.    Do you also charge your clients per
6  Schedule C?
7      A.    Yes.
8      Q.    In addition to that yearly fee?
9      A.    Well, it is not a flat yearly fee.  My
10  computer program is based on what forms I am doing.
11      Q.    Okay.
12      A.    And then it puts a price on each one
13  of those forms.  And that is how my fee is arrived
14  at.
15      Q.    So you charge your client according to
16  which forms you prepare and ultimately file.
17      A.    Yes.
18      Q.    Is that correct?
19      A.    Yes.
20      Q.    At that initial meeting you discussed
21  with the investigators a charge of $368 for Mr.
22  Alfonso.  Is that correct?
23      A.    Yes.
24      Q.    Did Mr. Alfonso pay that invoice?
25      A.    Yes.

1      Q.    Did he pay it in full?
2      A.    Yes.
3      Q.    Do you recall when it was paid?
4      A.    It would have been paid the date of
5  the service, 2-19 of '10.
6      Q.    2-19 of 2010?
7      A.    Yes.
8      Q.    Ms. Flowers, you met with the
9  investigators a second time on December 18th, 2014.
10  Is that correct?
11      A.    Yes.
12      Q.    At that second meeting you told the
13  investigators that you prepared the first 2009 return
14  with one Schedule C because you were trying to save
15  Mr. Alfonso some money.  Is that correct?
16      A.    Yes.
17      Q.    You also told the investigators that
18  BP required that the revenue be broken down between
19  fishing and construction.  Is that correct?
20      A.    Yes.
21      Q.    You told the investigators that
22  because of BP's request, you prepared two new
23  Schedule Cs to split the revenue.  Is that correct?
24      A.    Yes.
25      Q.    At that second meeting you told the

1  investigators that Mr. Alfonso provided you with the
2  information included in those returns.  Is that
3  correct?
4      A.    Yes.
5      Q.    At that second meeting you also
6  provided the investigators with some
7  computer-generated documents in response to a second
8  subpoena.  Is that correct?
9      A.    I think, yes.
10      Q.    And the documents you provided
11  included tax information for Frank & Sons for 2007,
12  2008 and 2009.  Is that correct?
13      A.    Yes.
14      Q.    And the information you provided also
15  included a 2008 joint return for Mr. Alfonso.  Is
16  that correct?
17      A.    Yes.
18      Q.    You also told the investigators the
19  2007 return was unavailable.  Is that correct?
20      A.    Yes.
21      Q.    Why is the 2007 return unavailable?
22      A.    I am only by law required to keep five
23  years, and once I have five years of returns in my
24  file, I shred or burn the old years.
25      Q.    Do you generally shred or burn?



1    A.    Lately I have been burning because my
2  shredder is going out.
3    Q.    You do that religiously, you cull your
4  files?
5    A.    Yes.
6    Q.    Every five years?
7    A.    Every five years.
8    Q.    Do you keep electronic copies of those
9  files?
10    A.    Sometimes I do keep electronic copies,
11  unless I change computers. And then I try storing
12  them, I think, on a hard drive. But I have no way --
13  I could get a tax expert -- I mean, an IT guy to get
14  them off my old hard drive, I'm sure. I just don't
15  know how to retrieve them. He saved them for me, and
16  they are there. I can see them. I just can't get to
17  them.
18    Q.    So they are sort of in -- I know how
19  that works. I have got a magic hand when it comes to
20  computers. Trust me.
21    A.    My granddaughter could probably do it,
22  but I can't. You know how that is.
23    Q.    But they are in there? You do have
24  electronic files for Mr. Alfonso and other clients?
25    A.    I think so. I think they are there.

1    Q.    Did you tell the investigators that?
2    A.    What? That I had them stored on a
3  hard drive?
4    Q.    Yeah.
5    A.    I might not have. I don't know. Let
6  me see if I can even see them. I go back here to
7  '08. The only thing I am seeing here, the last year
8  is I have '14, '13, '12, '11, '10, '9 and '8. So
9  whether I have got those old years, I am not
10  completely sure of.
11    Q.    And for the record, can you just state
12  what you mean by "here" and what you are looking at?
13    A.    I am looking at my desktop, and I have
14  tax programs in here that go from '08 through 2014.
15    Q.    Okay. At that second meeting, the
16  documents you provided the investigators stated that
17  Mr. Alfonso made $24,000, approximately, from
18  fishing. Is that correct?
19    A.    I think that was one of the questions
20  you asked earlier. Let's see. On the second,
21  commercial fisherman was $46,434. And when we went
22  into the detail on that one, some of it was from
23  Frank & Sons.
24    Q.    How much of that was from Frank &
25  Sons?

1    A.    Let me look at it. Then when we
2  questioned Ms. Alfonso about that, she couldn't find
3  any record of him earning anything in '09.
4    Q.    You questioned Ms. Alfonso?
5    A.    No. He did.
6    Q.    Who is "he"?
7    A.    Vernon Alfonso questioned his aunt,
8  Joyce Lopez, who does the books for Frank & Sons, and
9  she questioned him about -- because she did not send
10  him a 1099 for that year. So he was wanting to know
11  where did I get this figure from. And she said I
12  don't know. I don't have any checks written to you
13  for 2009. And he asked her, he said, well, would you
14  please double-check because it is very important.
15         So she double checked, and he said
16  that there was no -- she said there was no record of
17  any 1099s, or any checks written to him. So she did
18  not know where the figure came from.
19    Q.    So Vernon told you all of this?
20    A.    Vernon said that he had no idea where
21  the figure came from.
22    Q.    Did you speak with Joyce Lopez?
23    A.    No. I did not.
24    Q.    Did you speak with Ms. Alfonso?
25    A.    Mr. Alfonso.

1    Q.    He is married, is he not?
2    A.    He is.
3    Q.    Did you speak with Ms. Alfonso at all?
4    A.    His wife?
5    Q.    Mary.
6    A.    I spoke to her about a week ago when
7  she called me wanting me to do some 1099s. But I
8  didn't speak to her about any of this. Okay. The
9  figure from Frank & Sons for '09 was 22,250, as
10  stated on the return.
11    Q.    And that is what you told the
12  investigators at the second meeting. Correct?
13    A.    Yes.
14    Q.    Okay. And you also told the
15  investigators that Mr. Alfonso's income from
16  commercial fishing was 24,184. Correct?
17    A.    Right.
18    Q.    For the record, can you just confirm
19  what you have been looking at? State it for the
20  record.
21    A.    On the Schedule C, where all of the
22  income is listed, I had been looking at a worksheet.
23  And I gave the investigators a copy of this, which
24  breaks down the income from R&M Construction, from
25  Frank & Sons and from fishing.



1    Q.    Thank you.  I am not going -- now, I
2  am going to show a subpoena with Attachment A.  I have
3  asked the Court Reporter to mark it as Exhibit 1.
4  Please review Exhibit 1 and let me know when you are
5  done.
6    A.    Okay.
7    Q.    This is Exhibit 1 right here.  Please
8  review that and let me know when you are done.
9    A.    Isn't this the same thing that you
10  E-mailed to me?  Yeah.  I think I have seen it
11  before.
12    Q.    Is Exhibit 1 a copy of the subpoena,
13  with an attachment, that you received to appear here
14  for this interview today?
15    A.    Yes.
16    Q.    Have you seen the document requests as
17  Attachment A to Exhibit 1?
18    A.    Attachment A.  Okay.
19    Q.    Have you provided all the documents
20  covered by these requests?
21    A.    Yes.
22    Q.    Are there any other documents that you
23  may have forgotten?  Like, that document with the
24  notes that you showed me earlier that you may have
25  not provided?

1    A.    I didn't know that that was part of
2  this.  But if they had asked for that, I would have
3  given it to them.
4    Q.    Oh.  I have no doubt about that.  I
5  understand.  No.  No.  That is not where I am going.
6      Now since you know that documents like
7  this one are covered by the requests, are there
8  similar documents that you can give us?
9    A.    I don't have any other documents.
10    Q.    Okay.
11    A.    You know, I might have one worksheet
12  that I saw in here later.  But it is of a different
13  year.  He usually does not leave me with a worksheet.
14  But I noticed one typewritten.  It may not have been
15  on this account.  I apologize.  So yes.
16    Q.    Take your time.
17    A.    It looks like -- I mean, I do have a
18  copy of the W-2 from R&M.  And I think I did give them
19  a copy of that.
20    Q.    I believe we have that.
21    A.    Okay.
22    Q.    Are there any other documents in your
23  possession --
24    A.    No.
25    Q.    -- that you understand that are

1  responsive to the subpoena?
2    A.    No.
3    Q.    Are there any other documents in your
4  possession that are responsive to the subpoena?
5    A.    No.
6    Q.    Are there any documents in someone
7  else's possession that are responsive to the
8  subpoena?
9    A.    I don't know.
10    Q.    Off the record.
11      (Off the record.)
12  BY MR. SALICRUP:
13    Q.    On the record.
14      Ms. Flowers, you just provided me with
15  a document for the record.  Can you just state what
16  it is?
17    A.    That is a breakdown I did on the 2010
18  return.  Because the fishermen were allowed to income
19  average for farmers and fishermen.  It is a Schedule
20  J.  That is just my worksheet how I broke down their
21  fishing income as opposed to the oil spill income.
22  And I had to figure a percentage in order to do the
23  Schedule J.
24    Q.    Do you have similar records for 2007,
25  2008?

1    A.    No.  Because it wouldn't have applied
2  in those years.
3    Q.    Do you have similar records for 2009?
4    A.    I think J is the first year they
5  started receiving money.
6    Q.    Let's go off the record.
7      (Off the record.)
8  BY MR. SALICRUP:
9    Q.    Let's go back on the record.
10      Ms. Flowers, I am going to state for
11  the record that you provided me with two documents
12  that are marked as Exhibit 10 and Exhibit 11, because
13  we have a number of pre-marked exhibits.
14      One is the document you already
15  discussed.  It is a fax from June 5th, 2012 that you
16  sent to Mr. Alfonso, and the second is your 2010
17  worksheet with notes that you prepared for Mr.
18  Alfonso.
19    A.    Yes.
20    Q.    Do you have any other handwritten
21  documents regarding Mr. Alfonso's accounting?
22    A.    No.
23    Q.    Do you have any calendars or diaries?
24    A.    No.
25    Q.    Do you have any E-mails discussing Mr.



1 Alfonso's income?
2      A.     No.
3      Q.     Have you E-mailed with anyone
4 regarding Mr. Alfonso?
5      A.     Just between you all.
6      Q.     Could you state who "you all" is?
7      A.     You all, the investigators, we texted
8 or E-mailed back and forth to set up appointments.
9      Q.     Aside from the investigators, have you
10 E-mailed with anyone else regarding Mr. Alfonso's tax
11 return?
12     A.     No.
13     Q.     Do you have any E-mails with Mr. Craig
14 Coleman?
15     A.     Who is that?
16     Q.     Craig Coleman -- do you know Craig
17 Coleman?
18     A.     The name doesn't ring a bell.
19            (Off the record.)
20 BY MR. SALICRUP:
21     Q.     Have you spoken with any attorneys for
22 Mr. Alfonso?
23     A.     Oh.  Craig Coleman, is that his
24 attorney?  Mr. Alfonso's attorney?
25     Q.     Do you know who Mr. Alfonso's attorney

1 is?
2      A.     I am really terrible with names.
3      Q.     I see.  Have you communicated with Mr.
4 Alfonso's attorney?
5      A.     I have.
6      Q.     Do you know Mr. Alfonso's attorney's
7 name?
8      A.     No.
9      Q.     Do you know what firm Mr. Alfonso's
10 attorney worked for?
11     A.     No.
12     Q.     Do you have any E-mails with Mr.
13 Alfonso's attorney?
14     A.     No.
15     Q.     And you have no E-mails with Craig
16 Coleman, who is Mr. Alfonso's attorney?
17     A.     No.
18     Q.     Do you have any faxes with Mr.
19 Alfonso's attorney?
20     A.     No.
21     Q.     You have not exchanged any faxes with
22 Mr. Alfonso?
23     A.     No.
24     Q.     Have you exchanged any faxes with
25 Frank & Sons?

1      A.     No.
2      Q.     Have you exchanged mail with Mr.
3 Alfonso?
4      A.     No.
5      Q.     Have you exchanged mail with Mr.
6 Alfonso's attorney or attorneys?
7      A.     Mail, no.
8      Q.     Have you provided any documents to Mr.
9 Alfonso's attorney?
10     A.     No.
11     Q.     Have you provided any documents to Mr.
12 Alfonso?
13     A.     No.  Not other than what we have
14 talked about; that one that I showed you from 2010.
15 You are talking about current documents?  Since this
16 started?
17     Q.     Or received.  Have you received any
18 documents or received or provided Mr. Alfonso any
19 documents?
20     A.     No.
21     Q.     Have you received or provided any
22 documents from Craig Coleman or any attorneys for Mr.
23 Alfonso?
24     A.     No.
25     Q.     Have you had any communication with

1 Mr. Alfonso?
2      A.     Yes.
3      Q.     Do you recall when?
4      A.     Various times he would call and keep
5 me updated on what is happening.
6      Q.     When was the last time you spoke with
7 Mr. Alfonso?
8      A.     I talked to him the day you all set up
9 the appointment because I wanted to find out his
10 attorney's phone number, and he gave it to me.
11     Q.     You wanted to find out Mr. Alfonso's
12 phone number?
13     A.     Mr. Alfonso's attorney's phone number.
14     Q.     Do you recall what the name was of
15 this attorney?
16     A.     No.  He gave me the phone number for
17 the attorney.
18     Q.     What was the phone number he provided
19 you?
20     A.     I didn't write it down.  Oh.  I do
21 have it.  I'm sorry.  Craig Coleman.  Lawyer Craig
22 Coleman.  612-766-6981.
23     Q.     And why did you want the number for
24 Mr. Alfonso's attorney?
25     A.     Well, I had communicated with him in



1 the past. And he said if I heard from anyone to get
2 in touch with him and let him know what I did. So I
3 called him; let him know I was going to have a
4 deposition. And he said fine.
5   Q.    So you have spoken with Mr. Coleman?
6   A.    I have spoken to him by phone.
7   Q.    By phone. Did you speak with him last
8 week?
9   A.    It probably was last week.
10   Q.    Did you speak with him yesterday?
11   A.    No.
12   Q.    What did you discuss with Mr. Coleman?
13   A.    I told him that he -- we were -- I was
14 going to be deposed.
15   Q.    What else did you tell him?
16   A.    He stopped by on his way to the
17 airport. He was staying in Biloxi, and he -- what
18 did he give me? What did he do? He gave me
19 something. Or he wanted to see a copy of the
20 subpoena, and he said he was surprised that he was
21 not notified. And he told me just to tell the truth.
22 And then he left for the airport. That was about it.
23   Q.    What else did -- did he tell you
24 anything else?
25   A.    Nothing that I can think of. Nothing

1 of any consequence.
2   Q.    And what did you tell him?
3   A.    I told him that I was going to be
4 deposed.
5   Q.    Anything else?
6   A.    What should I expect. And he said
7 they will come in. They will swear you in. They will
8 take a deposition. And I am surprised I wasn't
9 notified. And that was it.
10   Q.    How long did you meet with Mr. Alfonso
11 -- I mean, with Mr. Coleman?
12   A.    He was here for maybe 10, 15 minutes.
13   Q.    So Mr. Coleman came to your home last
14 Wednesday?
15   A.    I don't know if it was Wednesday or
16 not. It was when he was on his way to the airport to
17 catch a flight. He said to Milwaukee or Minnesota or
18 someplace.
19   Q.    So Mr. Coleman came here last week?
20   A.    Yeah.
21   Q.    And met with you. Is that correct?
22   A.    Yes.
23   Q.    And you met with him for 15 minutes to
24 discuss this interview. Is that correct?
25   A.    Yes.

1   Q.    Did you ask him to stop by?
2   A.    He said he -- he had sent me something
3 and he wanted me to go over it. He wanted to verify
4 what I had told him. And so he had printed something
5 up, and he wanted me to sign it. I did not like the
6 way certain parts of it were stated. So I told him
7 to fix that. And so he did. And when he came by --
8 that is what he was coming by for, for me to sign my
9 statement.
10   Q.    So to recap. Mr. Alfonso stopped by
11 last week for you to --
12   A.    No. Not Mr. Alfonso. Mr. Coleman.
13   Q.    I'm sorry. Mr. Coleman stopped by
14 last week --
15   A.    Yes.
16   Q.    -- to discuss with you your statement.
17 Correct?
18   A.    Right.
19   Q.    Had you seen a copy of your statement
20 before?
21   A.    He had E-mailed it to me.
22   Q.    He had E-mailed it?
23   A.    He had E-mailed it. He had. That is
24 right.
25   Q.    Do you have that E-mail?

1   A.    Yes. I do have the E-mail. Do you
2 want a copy?
3   Q.    Yes, please.
4       (Off the record.)
5 BY MR. SALICRUP:
6   Q.    Okay. We are back on the record.
7       Ms. Flowers, for the record, you are
8 correcting your earlier statement that you had not
9 E-mailed with Mr. Coleman. Correct?
10   A.    I am. I apologize. I had not
11 remembered that.
12   Q.    Understood. And you know who Mr.
13 Coleman is. Correct?
14   A.    Yes. I have it written here on the
15 front of the folder.
16   Q.    And who is Mr. Coleman?
17   A.    He is Mr. Alfonso's attorney.
18   Q.    When did you first speak with Mr.
19 Coleman?
20   A.    I don't remember.
21   Q.    Do you recall if it was in November of
22 2014?
23   A.    Sounds like November might have been
24 about the month that --
25   Q.    Was it before Christmas?



Page 53

1    A.    Yes.
2    Q.    Was it after Halloween?
3    A.    Probably.  Yes.
4    Q.    Was it around Thanksgiving?
5    A.    I can't be -- I mean, if it is
6    important -- I just can't remember.
7    Q.    Generally, at some point between
8    Halloween and Thanksgiving?
9    A.    Probably.
10    Q.    Okay.
11    A.    When all of this stuff started, I got
12    a call from Mr. Alfonso's attorney.
13    Q.    Mr. Alfonso's attorney called you?
14    A.    Yes.
15    Q.    And what did he tell you?
16    A.    He asked me more or less what is
17    stated there.  He asked me the details of what was
18    going on and how things were prepared, and just more
19    or less the same questions you all have been asking
20    me today.
21    Q.    When you say more or less what was
22    stated there, what do you mean?
23    A.    That, you know, how -- the chain of
24    events.
25    Q.    The chain of events regarding Mr.

Page 54

1    Alfonso's --
2    A.    The preparation of the 2009 tax
3    return; where the figure came.  All such as that.
4    Q.    Did you speak with Craig Coleman in
5    December of 2014?
6    A.    I don't recall.
7    Q.    Have you spoken to Craig Coleman more
8    than once?
9    A.    Yes.
10    Q.    Have you spoken with Craig Coleman on
11    the phone more than once?
12    A.    Yes.
13    Q.    Was November 2014 the first time you
14    spoke with Craig Coleman?
15    A.    If I had to guess -- and it would be a
16    guess -- I would say yes.
17    Q.    Okay.  When did -- has Mr. Coleman
18    sent you other E-mails?
19    A.    No.  He sent me that draft because we
20    had talked about the chain of events leading up to me
21    preparing the 2009.  And he before I -- before he
22    left to go out of town, he wanted to put something on
23    paper.  He E-mailed me a copy of that.  And I read
24    through it.  I called him back.  And I said I do not
25    like this, this or this.  This isn't stated

Page 55

1    correctly.  So he corrected that and printed it up.
2    And he wanted to stop by here to get me to read it
3    again to see if I agreed with it and to sign it.  And
4    that is what happened.
5    Q.    Is the document you provided to me,
6    and which we will mark as Exhibit 12, is that a draft
7    or is that the final version?
8    A.    That is the final version, the one
9    that I signed.
10    Q.    Do you have copies of the draft in
11    your E-mail?
12    A.    No.  It didn't hold.  I deleted it.
13    Q.    Can you go into your deleted folder or
14    your trash folder?  I think if you go up to the top
15    bar and put in "Coleman," you can search for his
16    name.
17    A.    I did not know I could do that.  That
18    is what you are looking for, messages, documents?
19    Q.    Are you in your trash folder?
20    A.    Yes.
21    Q.    Look at documents, please.
22    A.    It won't let me click on that.  No
23    results.  We have no messages matching your query.
24        (Off the record.)
25    BY MR. SALICRUP:

Page 56

1    Q.    Let's go on the record.  For the
2    record, we are reviewing Exhibit 12.
3    A.    Yes.
4    Q.    Which is your declaration that you
5    signed?
6    A.    Yes.
7    Q.    And which Craig Coleman prepared for
8    you.  Correct?
9    A.    Yes.
10    Q.    And there is a portion of this
11    declaration you disagree with.  Correct?
12    A.    The original one.  Yes.
13    Q.    And for the record, do you have a copy
14    of the original one?
15    A.    No.
16    Q.    How many versions of this declaration
17    were created?
18    A.    The original and this one.
19    Q.    So only two?
20    A.    Two.  Yes.
21    Q.    How did Mr. Coleman get your revised
22    copy?
23    A.    I told him over the phone the portion
24    of it that I didn't agree with.
25    Q.    So Mr. Coleman called you?



1     A.     I called him after I received the
2 E-mail with the first draft.
3     Q.     Okay.  And you read that.  Correct?
4     A.     I read the first draft.  Did not agree
5 with one of the paragraphs.  Told him he would need
6 to change it before I signed it.
7     Q.     What did the paragraph say?
8     A.     I am trying to find the paragraph.
9     Q.     And for the record, you searched your
10 E-mail and you could not find a copy of Mr. Coleman's
11 E-mail.  Correct?
12     A.     Correct.
13     Q.     For the record, you understand you
14 deleted that E-mail.  Correct?
15     A.     Yes.
16     Q.     Is this your only E-mail address?
17     A.     Yes.
18     Q.     Do you use another E-mail address for
19 personal business?
20     A.     No.
21     Q.     Could Mr. Coleman have sent it to your
22 daughter's E-mail address?
23     A.     No.
24     Q.     What did you do with the copy that Mr.
25 Coleman sent you over E-mail?

1     A.     I didn't print it.  I just left it on
2 my E-mail.  Read it.  Called him.  Told him that
3 certain things in a certain paragraph I don't agree
4 with.  And before I would sign it, he would need to
5 redo that.
6     Q.     So when Mr. Coleman sent you an
7 E-mail, was your declaration an attachment to that
8 E-mail?
9     A.     Was my declaration attached?  Yes.
10     Q.     Was it a PDF attachment?
11     A.     I don't remember.
12     Q.     Do you remember if the Adobe opened it
13 up on your computer?
14     A.     I don't remember.  I can't exactly
15 remember which paragraph it was now.  But the gist of
16 it was, it stated that my program brought forward the
17 money from Frank & Sons into the 2009.  I said that
18 is not the way it happened.  The figure from Frank &
19 Sons had to be furnished by Mr. Alfonso.
20     Q.     And that is what you represented to
21 Mr. Coleman?
22     A.     Yes.  And I changed that.  He pulled
23 that out, and then I was able to sign the
24 declaration.
25     Q.     And that is what you told the

1 investigators during the second meeting.  Correct?
2     A.     The investigators -- well, they
3 weren't aware of this then.  Their investigation was
4 before this.  But I did tell them that that figure
5 from Frank & Sons had to come from the Alfonsos.  I
6 don't make up any figure and put it in the tax
7 return.
8     Q.     And when you say "Alfonsos," you meant
9 that figure came from Vernon Alfonso?
10     A.     Yes.
11     Q.     So just for the record, to make sure I
12 understand this, you received a copy of the
13 declaration via E-mail.
14     A.     Yes.
15     Q.     You opened it.  You did not save it.
16     A.     Right.
17     Q.     You did not print it.
18     A.     Right.
19     Q.     I don't know how you do that
20 personally.  I have to print everything.  I have
21 killed three forests.
22     What happened then?
23     A.     I read the E-mail.  I didn't agree
24 with one particular statement.  I called Mr. Coleman,
25 who was stopping by my office the next day for me to

1 sign this statement, I said I don't agree with this.
2 And he said he would adjust it.  When he came to my
3 office, I reread the statement and it sounded okay,
4 and I signed it.
5     Q.     And you just stated that Mr. Coleman
6 already had plans to stop by your home.  Correct?
7     A.     Yes.
8     Q.     And when were those plans made?
9     A.     When he called me the day before, he
10 left to go to Minnesota.  He said he was going to
11 come by here on the way to the airport because he
12 needed my signature on the document.
13     Q.     Is your home on the way to the
14 airport?
15     A.     He said he was going I-10 and it would
16 be just as easy for him to come I-12 and cross the
17 Causeway.
18     Q.     Did you speak with any other attorneys
19 for Mr. Alfonso?
20     A.     No.
21     Q.     Did you speak with Stephen Kreller?
22     A.     Not that I can remember.
23     Q.     Have you spoken with anyone from the
24 Stephen Kreller law firm, or the Kreller law firm?
25     A.     I don't remember names too good.  As



Page 61

1   you can see, I didn't remember Coleman.  I don't
2   recall.  I don't think so.
3       Q.      And have you destroyed any documents
4   that are responsive to the subpoena?
5       A.      Absolutely not.
6       Q.      But you deleted that E-mail you
7   received from Mr. Coleman.  Correct?
8       A.      Yeah.  Because it was going to be
9   corrected, you know.
10      Q.      Are there any other E-mails that you
11  have received that have been deleted --
12      A.      No.
13      Q.      -- regarding Mr. Alfonso?
14      A.      No.
15      Q.      Have you received any other E-mails
16  from Mr. Coleman?
17      A.      No.
18      Q.      So the only time Mr. Coleman E-mailed
19  you was last week?
20      A.      Yes.
21      Q.      Was it last Tuesday?
22      A.      I don't remember exactly when it was.
23      Q.      Well, I think your declaration is
24  signed January 14th.
25      A.      Okay.

Page 62

1       Q.      So he E-mailed you the day before.
2   Correct?
3       A.      Yes.
4       Q.      So he must have E-mailed you January
5   13th.  Correct?
6       A.      Must have.
7       Q.      And the plan to stop by your home was
8   made when?  In January 2015, or in December 2014?
9       A.      It was the day before he was coming
10  here.  So it must have been on the 13th, if I signed
11  that on the 14th.
12      Q.      Okay.  Did you prepare for this
13  interview today?
14      A.      No.
15      Q.      Aside from speaking with Mr. Coleman,
16  have you prepared for this interview today?
17      A.      No.
18      Q.      Did you discuss how this interview was
19  going to proceed with Mr. Coleman?
20      A.      He more or less told me what was going
21  to happen.
22      Q.      What did he tell you?
23      A.      He said -- I told him there were
24  supposed to be four people here.  He said, four?  He
25  said, I am surprised.  And he said just go in and

Page 63

1   tell the truth.
2       Q.      Did he tell you anything else?
3       A.      He said don't elaborate.  He said
4   don't give them information that they don't ask.  I
5   mean, just tell the truth.  That's all he said.
6       Q.      So Mr. Coleman told you tell the
7   truth, but don't give them detail?
8       A.      No.  Not to give you detail.  But just
9   don't go off in different directions.  I told him I
10  had an 11:00 o'clock appointment coming in. He said,
11  well, don't go off in a lot of directions because he
12  knows I am kind of mouthy.
13      Q.      Did you review any documents with
14  Mr. Coleman?
15      A.      No.  Only the one that you see that I
16  signed.  I reviewed that one; signed it; and he was
17  on his way within 10 or 15 minutes.
18      Q.      Did Mr. Coleman show you any copies of
19  returns?
20      A.      No.
21      Q.      Trip tickets?
22      A.      No.
23      Q.      1099s?
24      A.      No.
25      Q.      Did you use anything to refresh your

Page 64

1   recollection for this interview today?
2       A.      No.
3       Q.      You did not review Mr. Alfonso's file?
4       A.      No.
5       Q.      Did you review your E-mail?
6       A.      No.
7       Q.      Calendars?
8       A.      I reviewed nothing.
9       Q.      Nothing?
10      A.      Nothing.
11      Q.      And I know that we have touched on
12  this, but I need to ask this question specifically.
13          Do you have any other files on this
14  claim that reflect conversations or events related to
15  Mr. Alfonso?
16      A.      The only thing I have are the copy of
17  the subpoena that you all furnished me.  That is it.
18  Nothing else.  Nothing from Mr. Alfonso.
19      Q.      But you have the documents you
20  prepared for Mr. Alfonso?
21      A.      Yes.
22      Q.      Did you speak with Craig Coleman on
23  December 17th, 2014?
24      A.      I might have.  I don't know.
25      Q.      Did you speak with Craig Coleman in



1  December 2014?
2      A.      I don't know.
3      Q.      Well, we already covered that you
4  spoke with him at some point in November.
5      A.      Well, you know what.  I don't remember
6  dates.  I can hardly remember what happened last
7  week.  So...
8      Q.      So let's talk in months.  Let's not
9  talk dates.  Let's talk November, December.
10     A.      It is not going to help.  I promise
11  you.  I remember I talked to him.
12     Q.      I know.  I just need it for the
13  record.
14     A.      Well, it is going to be a guess.
15  Whatever I give you is going to be a guess, what
16  month.
17     Q.      Give me your best approximation you
18  can give me, which month or months you spoke with
19  him.
20     A.      I should take better notes.  It was
21  some time last year when all this started.
22     Q.      After you spoke with him in November
23  of 2014, did you speak with Mr. Coleman again?
24     A.      I don't remember.
25     Q.      But we do know that you spoke to him

1  in November of 2014 and in January of 2015.
2      A.      I know I spoke to him in January, and
3  I remember speaking to him before the first of the
4  year when all of this stuff started.
5      Q.      Okay.  And what documents have you
6  received from Craig Coleman or any attorney regarding
7  Mr. Alfonso?
8      A.      This thing that I just gave you that I
9  signed.
10     Q.      Did you show a copy of your subpoena
11  to testify to Mr. Coleman?
12     A.      No.  He didn't ask for that.
13     Q.      Did you show a copy of your subpoena
14  to any other attorney?
15     MS. FEELEY:
16          I'm sorry.  Off the record.
17          (Off the record.)
18  BY MR. SALICRUP:
19     Q.      Just one final question.  You did
20  notify Mr. Coleman that you had been subpoenaed?
21     A.      Yes.
22     Q.      Did you describe what was contained in
23  the subpoena?
24     A.      No.
25     Q.      You only told him that you were

1  meeting us?
2      A.      I said they wanted me to come there to
3  be deposed, and because I have a fear of the city,
4  that you all were coming here.
5      Q.      I don't blame you for the fear of the
6  city.
7      A.      I have to take two Tylenol when I go
8  to Metairie.
9      Q.      Okay.  I'm now going to provide you
10  with a document that I have asked the Court Reporter
11  to mark as Exhibit 2.  Please take a second to review
12  it.  Let me know when you are done.
13          This is the one I just signed from the
14  people that Craig -- whatever his name is.  That is
15  the declaration --
16     A.      Okay.
17     Q.      -- that Mr. Coleman represented you
18  signed.
19     A.      I thought I was reading something that
20  you all had --
21     Q.      No.  No.  That is what was sent to us.
22  So I just wanted you to --
23     A.      Oh.
24     Q.      We have some more questions on that.
25     A.      Okay.

1      Q.      We can just go through them.  Can you
2  please identify Exhibit 2?  Exhibit 2, the document
3  in your hand.
4      A.      Okay.  Yes.
5      Q.      Can you identify what it is?
6      A.      It is Exhibit 2.
7      Q.      And what is Exhibit 2?
8      A.      Oil Spill by the Oil Rig "Deepwater
9  Horizon" in the Gulf of Mexico, on April 2010.  This
10  document relates to" --
11     Q.      We can skip that part.
12     A.      Okay.
13     Q.      Oh.  Sorry.  Go ahead.
14     A.      "Document relates to Case No.
15  2:11-CV-03180."
16     Q.      Please go on.  What is Exhibit 2?
17     A.      You want the MDL number?  2179,
18  Section J.
19     Q.      All right.
20     A.      Honorable Carl J. Barbier, Magistrate
21  Judge Shushan.
22     Q.      And --
23     A.      Declaration of Peggy Flowers.
24     Q.      Is Exhibit 2 your declaration?
25     A.      Yes.



1    Q.    Thank you.  And that is your signature
2  on the last page.  Correct?
3    A.    Yes.
4    Q.    Who asked you to make this
5  declaration, again?
6    A.    Craig Coleman, the attorney for Vernon
7  Alfonso.
8    Q.    And Mr. Coleman drafted it.  Correct?
9    A.    Yes.
10   Q.    Why did you agree to sign this
11  declaration?
12   A.    Because it sounded like the
13  information that was true.
14   Q.    And how many drafts were created of
15  this declaration?
16   A.    One original draft, that I did not
17  agree with one paragraph, and then this draft.
18   Q.    And where are those drafts?
19   A.    I deleted the first draft --
20   Q.    Okay.
21   A.    -- after he corrected it.
22   Q.    If you are giving your sworn statement
23  today, why prepare this declaration?
24   A.    I don't know why lawyers do what
25  lawyers do.

1    Q.    That is fair.
2        Did Mr. Coleman explain what this
3  declaration was for?
4    A.    No.
5    Q.    Mr. Coleman E-mailed you and said
6  please just sign this declaration?
7    A.    We had a conversation by phone.  He
8  said he was going to draft something that more or
9  less combined everything that I had told him in the
10  past, and he would E-mail me a draft.  And to get
11  back with him after I read the draft and to sign it
12  and send it back to him.  I read it.  I didn't agree
13  with one paragraph.  Called him.  He came by my
14  office the next day and gave me a copy of the new
15  draft.
16   Q.    Okay.  So now let's go over your
17  declaration.  Can you please read for me Paragraph 1
18  for the record?
19   A.    Okay.  "I am a tax accountant and a
20  licensed Enrolled Agent, and I have prepared Vernon
21  Alfonso's tax return for approximately 20 years.  I
22  am making this declaration in connection with the
23  Special Master's investigation of Mr. Alfonso's claim
24  submitted to the Seafood Compensation Program.  I
25  have personal knowledge of the facts stated in the

1  declaration.
2        I prepared Mr. Alfonso's 2009 tax
3  return. "
4    Q.    Please stop.  Just Paragraph 1.
5    A.    Okay.
6    Q.    What did you mean when you said you
7  have prepared his returns for approximately 20 years?
8    A.    I meant that I had prepared his tax
9  return for approximately 20 years.
10   Q.    Didn't you state earlier that it was
11  roughly 25 years?
12   A.    It could have been 25.  It could have
13  been 30.  I don't remember.
14   Q.    Okay.  Fair enough.
15        And can you please explain to me what
16  you mean by "in connection with the Special Master's
17  investigation of Mr. Alfonso's claim submitted to the
18  Seafood Compensation Program"?
19   A.    This is something -- the lawyer jargon
20  that was put in there.
21   Q.    Do you understand what that means?
22   A.    Not really.  I mean, they are
23  investigating somebody that -- you know, I guess they
24  are investigating a lot of fishermen.  I don't know.
25   Q.    Can you please read Paragraph 2?

1    A.    "I prepared Mr. Alfonso's 2009 taxes
2  during the normal tax preparation season for that
3  year.  Accordingly, I completed his taxes on February
4  19, 2010.  I signed the completed tax return and
5  electronically filed it on his behalf at that time."
6    Q.    Can you just define "normal tax
7  preparation season"?
8    A.    Normal tax preparation season runs
9  from January the 1st to usually April the 15th, with
10  some people filing extensions, going until August the
11  15th.
12   Q.    And you signed the completed tax
13  return with one Schedule C?
14   A.    Yes.
15   Q.    And that is the 2009 return with one
16  Schedule C that you are referring to --
17   A.    Right.
18   Q.    -- in this paragraph?
19   A.    Yes.
20   Q.    Can you please read Paragraph 3?
21   A.    "Mr. Alfonso receives income and 1099s
22  from a variety of sources.  He is a commercial
23  shrimper and typically earns significant money from
24  shrimping.  I understand that his shrimp income can
25  include both trip tickets and cash sales.  During the



Page 73

1  offseason, he also works in construction and has
2  worked for a marine transport company called Frank &
3  Sons. I typically combine all of his income into one
4  Schedule C when preparing his taxes."
5      Q.    That is it. For Paragraph 3, can you
6  please define what you mean by "1099s from a variety
7  of sources"?
8      A.    Who he gets the 1099s from?
9      Q.    Sure. Let's start with that.
10     A.    Sometimes he gets 1099s from Louisiana
11  Wildlife & Fisheries. Sometimes he gets 1099s from
12  what is called a Hangman's fund, that helps, from
13  what I understand, take care of damages that he has
14  received. And occasionally he gets 1099s from Frank
15  & Sons boats. Once in awhile he might get 1099s from
16  some of the people that he sells his shrimp to. It
17  varies year by year.
18     Q.    But it is less common that he gets
19  1099s?
20     A.    Pardon.
21     Q.    It is less common that he gets 1099s
22  from the shrimp dealers?
23     A.    It is less common.
24     Q.    Can you just tell me what you mean by
25  "typically earns significant money from shrimping"?

Page 74

1      A.    Well, the worksheet that he usually
2  brings in, the majority of his money seems to be
3  coming from shrimping.
4      Q.    What does "significant money" mean in
5  this sentence?
6      A.    The biggest percentage of his money
7  comes from shrimping.
8      Q.    But that is in general, not in 2009.
9  Correct?
10     A.    In 2009, I think he did get the
11  majority. No. That is the year he built the steps.
12  So the majority of his money in 2009 was not earned
13  through shrimping.
14     Q.    The next sentence, can you please tell
15  me what you mean by "his shrimp income can include
16  trip tickets and cash sales"?
17     A.    Well, that is what he tells me; that
18  his trip tickets, he also adds extra money to the
19  cash -- to the shrimp tickets so that it includes --
20  I think he has a separate bank account, and he
21  deposits all his money he gets through his business,
22  through his boat income. Or whatever income he
23  provides, he puts that into his separate bank
24  account.
25     Q.    Do you know which bank he keeps that

Page 75

1  account?
2      A.    I do not.
3      Q.    In the next sentence you say that
4  "Frank & Sons is a marine transport company." But
5  earlier you said it was a boat rental company.
6  Correct?
7      A.    I really don't know what Frank & Sons
8  does. I mean, I thought some people have said they
9  do seismographic work.
10     Q.    I'm sorry. Could you repeat that?
11     A.    Some people have said that some of the
12  work they do is seismographic. Some of it is where
13  they go out and put -- I don't know really know what
14  they do.
15     Q.    But it is not fishing income. Right?
16     A.    I'm not sure if it is or not. I don't
17  know. Frank & Sons, I know they use boats, and I
18  know sometimes Mr. Alfonso uses his own boat and
19  Frank & Sons -- he uses his own boat for whatever he
20  does with Frank & Sons.
21     Q.    But what you told the investigators
22  and what you have told us today is that Frank & Sons
23  rents boats is correct. Right?
24     A.    Frank & Sons rents boats? I wish I
25  knew more about Frank & Sons, what they did.

Page 76

1      Q.    It is a business that involves boats.
2  Correct?
3      A.    Yeah. I do know that. They are on
4  the water.
5      Q.    And don't you prepare the taxes for
6  Frank & Sons?
7      A.    I do.
8      Q.    So shouldn't you know what Frank &
9  Sons does?
10     A.    I know they do boat rental. They do
11  seismographic work. They do a variety of water work.
12     Q.    They do water work, but they don't
13  fish. Correct?
14     A.    I don't know whether any of the income
15  they earn is fishing or not. I really don't know.
16     Q.    But you don't prepare their tax
17  return?
18     A.    I do.
19     Q.    So wouldn't you be able to check?
20     A.    I mean, I do the same thing. I ask
21  how much your income was and I go from there.
22     Q.    At any point has Frank & Sons or
23  anyone from Frank & Sons told you that they earn
24  money selling fish or shrimp or seafood?
25     A.    I'm not sure. I'm not sure. I know I



Page 77

1  do their taxes.  I do 600 people's return.
2      Q.      Would you like to pull their file?
3  You can review it if you like.
4      A.      It is not going to say what they do.
5  Just like with Vernon Alfonso, what we do is, the IRS
6  requires you to put where they earn the most of their
7  money at as their business income.  And Frank & Sons,
8  I think most of their income is earned through boat
9  rental, what they get from -- that is the majority of
10  their income.  So that is what it is listed as, boat
11  rentals.
12      Q.      Do you have any reason to believe that
13  they earn income from fishing or shrimping?
14      A.      Not really.
15      Q.      I'm sorry.
16      A.      I don't have any reason to believe
17  that they do or they don't.  I don't know how they
18  earn their money.  I think the majority of their
19  money is earned through boat rental.
20      Q.      And seismographic work.  Correct?
21      A.      Yes.
22      Q.      Which is not fishing?
23      A.      Right.
24      Q.      Can you read Paragraph 4, please?
25      A.      "I met with Mr. Alfonso when preparing

Page 78

1  his 2009 taxes.  He provided me with his shrimp
2  income for 2009 and a 1099 from R&M Construction.
3  Mr. Alfonso did not have any documents or record of
4  income from Frank & Sons that year.  My accounting
5  software lists $22,260 in income from Frank & Sons in
6  2009.  I must have entered that information in my
7  accounting software when preparing his 2009 taxes.
8  However, I do not recall the source of that
9  information.  I know that I do not have any 1099 or
10  other document saying that Mr. Alfonso worked for
11  Frank & Sons in 2009.  I do not recall Mr. Alfonso
12  telling me to record 2009 income from Frank & Sons.
13  The initial Schedule C for 2009 combined Mr.
14  Alfonso's income from construction, shrimping and
15  Frank & Sons.  That Schedule C labeled the income
16  source as commercial fishing and construction."
17      Q.      Thank you.
18              When did you meet with Mr. Alfonso, as
19  you state in the first sentence, in 2009?
20      A.      February the 19th, 2009.
21      Q.      The same day his returns were filed?
22      A.      Yes.
23      Q.      So he just came in, wham, bam, and
24  gave you the information and you filed it?
25      A.      Yes.

Page 79

1      Q.      And as you already stated, Mr. Alfonso
2  provided you with all the information included in his
3  return?
4      A.      Correct.
5      Q.      And that is why the Frank & Sons
6  income is incorporated into his return.  Correct?
7      A.      Correct.
8      Q.      When you state "commercial fishing,"
9  are you referring to shrimping or commercial fishing?
10      A.      Sometimes I don't even know.
11  Sometimes they are crabbers.  Sometimes they are
12  fishermen.  Sometimes they kill nutria.  I don't
13  know.  I just lump it together.
14      Q.      Okay.  So, in other words, the
15  fishermen just tell you what kind of stuff they --
16      A.      What kind of income they have.
17      Q.      -- catch?
18      A.      Yeah.
19      Q.      Well, the income they derive from
20  particular seafood.  If he is a shrimper, he says I
21  am a shrimper.  Correct?
22      A.      Well, I can usually tell by the kind
23  of deductions they take.  They buy crab traps, I
24  consider them crabbing.  If they deduct nets, usually
25  they are shrimpers.

Page 80

1      Q.      Yeah.  That makes sense for the trawls
2  and all that.
3      A.      Yeah.
4      Q.      (Off the record.)
5  BY MR. SALICRUP:
6      Q.      So in summary, all of the information
7  that you included in the 2009 return and in the first
8  2009 return, the one schedule C and the second 2009
9  return, came from Alfonso.  Correct?
10      A.      He called me, asked me to pull out the
11  construction.  And that is what I did.
12      Q.      But Mr. Alfonso was the source of all
13  the information included in the first 2009 return?
14      A.      Yes.
15      Q.      And the second 2009 return with two
16  Schedule Cs.
17      A.      Yes.
18      Q.      Correct?
19      A.      Yes.
20      Q.      Can you read Paragraph 5?
21      A.      "After the taxes were filed, Mr.
22  Alfonso contacted me in 2010 seeking to amend his tax
23  documents.  Mr. Alfonso informed me that he had met
24  with GCCF to apply for compensation related to the
25  DEEPWATER HORIZON oil spill.  Mr. Alfonso explained



1  that GCCF requested tax documents that separated
2  construction income from commercial fishing.  As a
3  result, Mr. Alfonso asked me to prepare new Schedule
4  C forms showing his revenue from commercial fishing."
5      Q.    When you say he approached you later
6  in 2010 seeking to amend his tax documents, when was
7  that?
8      A.    I don't remember. Because my fax is
9  dated 6-5 of '12.  So I don't really remember when he
10  -- this is an amended 2010.  I don't remember.
11  Because I predated the separation the same date we
12  did the return.
13      Q.    Yes.
14      A.    That is what I am seeing now.
15      Q.    So you dated both returns February
16  19th, 2010?
17      A.    Yeah.  I guess because I didn't have
18  to really send anything into the IRS.
19      Q.    Okay. So the DEEPWATER HORIZON spill
20  was in 2010.  So obviously he must have approached
21  you after that?
22      A.    Yeah.
23      Q.    Do you remember if it was in the
24  summer or after the summer?
25      A.    No idea.  Whenever he applied for his

1  claim and they didn't like the way his Schedule C was
2  formatted.  He got in touch with me some time after
3  that.  But I can't remember the date.
4      Q.    If you had to just give me an
5  approximate, would you say later half of the year?
6  Just ballpark it for me.
7      A.    I have no idea.
8      Q.    No idea.
9      A.    No.
10      Q.    All right.  Let's move on.
11          What do you mean by GCCF in this
12  paragraph?
13      A.    I don't even know what the letters
14  stand for.  I assumed that is who he went for, for
15  his claim.
16      Q.    Okay.  Did Mr. Coleman explain this to
17  you before you signed this?
18      A.    No.
19      Q.    Did you review this declaration with
20  Mr. Coleman?
21      A.    I read through it.  I read it through.
22  Yeah.  I didn't question every little word, every
23  little detail.  You know, I didn't.
24      Q.    Understood.  And you don't know what
25  GCCF means?

1      A.    I have no idea.
2      Q.    But you do recall that Mr. Alfonso
3  approached you and told you that he needed to
4  separate his tax returns?
5      A.    He needed the construction income
6  pulled out is what he said.  That was his exact
7  words.
8      Q.    And why did he need that?  For his --
9      A.    Because that company, whoever he was
10  applying to, did not want his building of the steps,
11  that was considered construction, combined with his
12  other income.
13      Q.    Okay.  Can you please read Paragraph
14  6?
15      A.    "In response to Mr. Alfonso's request,
16  I prepared two Schedule C forms by subtracting his
17  construction income from the initial Schedule C. This
18  resulted in two Schedule C forms -- one for
19  construction and another that included revenue from
20  shrimping and the Frank & Sons income recorded in my
21  accounting software.  It was my judgment and decision
22  to leave Frank & Sons income on the Schedule C for
23  commercial fishing.  In preparing tax documents, I
24  general aggregate income for marine work.  I did so
25  based on generally accounting and tax treatment of

1  revenue from a marine vessel.  Additionally, I did
2  not know exactly what Mr. Alfonso did for Frank &
3  Sons and whether it was related to fishing.  Mr.
4  Alfonso did not instruct me to include the Frank &
5  Sons income on the Schedule C with his shrimping
6  revenue, and I have no reason to believe that he knew
7  that I did so."
8      Q.    Can you just tell me what accounting
9  software you use?
10      A.    What accounting -- I use what is
11  called ATX.
12      Q.    Could you repeat that?  I'm sorry.
13      A.    ATX --
14      Q.    ATX?
15      A.    -- is the accounting software that I
16  use.
17      Q.    Did you draft this paragraph?
18      A.    I didn't draft any of it.
19      Q.    So who prepared this paragraph?
20      A.    Coleman, Mr. Coleman.
21      Q.    So Mr. Coleman added all of the
22  language included here?
23      A.    Yes.
24      Q.    And as you have stated several times
25  today, all the information you included for Mr.



1  Alfonso in his tax returns came from Mr. Alfonso.
2  Correct?
3      A.    Yes.
4      Q.    Let's go towards the end of Paragraph
5  6.
6      A.    Okay.
7      Q.    It is on Page 3.
8      A.    Okay.
9      Q.    When you prepared the first 2009 tax
10 return for Mr. Alfonso, you showed it to him before
11 you filed it.  Correct?
12     A.    Usually I ask them to look over the
13 return. Usually they say tell me where to sign.  I
14 wouldn't understand it if I read it.  So yeah.  I lay
15 it out for him.  But usually they choose just to
16 sign.  They have utmost faith in me, unfortunately.
17     Q.    Yeah.  I wouldn't go that far; not
18 unfortunately.  But usually you show them the
19 documentation?
20     A.    Yes.
21     Q.    And for Mr. Alfonso you showed him the
22 documentation for his first 2009 return?
23     A.    Yes.
24     Q.    And you also showed him the amended --
25 not amended -- excuse me -- you also showed him the

1  second 2009?
2      A.    I faxed it to him.  We didn't meet.
3  He called me.  He told me what he needed.  I faxed
4  him what he needed.
5      Q.    You faxed the second 2009 with the two
6  Schedule Cs?
7      A.    Right.
8      Q.    You faxed it to Mr. Alfonso or to Mr.
9  Alfonso's attorney?
10     A.    No.  To Mr. Alfonso.
11     Q.    Mr. Alfonso has a fax machine?  He
12 gave you a number?
13     A.    He gave me a number.  It is on that
14 paper that I gave you that has got my notes.
15     Q.    Okay. So you did provide Mr. Alfonso
16 with a copy of the second 2009 return?
17     A.    Yes.
18     Q.    So can you explain why it states here
19 that you have no reason to believe that he knew that
20 his fishing income included income from Frank & Sons?
21     A.    No clue.
22     Q.    Is that Mr. Coleman's language?
23     A.    Probably.
24     Q.    Did you write this sentence?
25     A.    I didn't write the sentence.  He wrote

1  all the sentences.
2      Q.    Okay.  Can you we go to Paragraph 7?
3      A.    Sure.
4      Q.    Can you please read it?
5      A.    "I do not recall ever discussing with
6  Mr. Alfonso my decision to combine shrimping revenue
7  with Frank & Sons income on one Schedule C. I do not
8  believe Mr. Alfonso has ever reviewed or seen my
9  accounting worksheets, including the entry for Frank
10 & Sons income in '09, 2009.  I do not recall
11 reviewing the Schedule C forms or their content with
12 Mr. Alfonso, and I do not believe that I did so. I
13 have no reason to believe that Mr. Alfonso knew that
14 his commercial fishing Schedule C included Frank &
15 Sons income, prior to the Special Master's
16 investigation."
17     Q.    Is this all Mr. Coleman's language, or
18 is any of this yours?
19     A.    This is probably something that I
20 relayed to him, that Mr. Alfonso wasn't aware of what
21 I was doing.  Anytime he gave me Frank & Sons, I
22 included it on Schedule C, because it was more or
23 less marine work.  It was more or less done; some of
24 it with Mr. Alfonso's boat, which was being
25 depreciated on Schedule C. So it was just all meshed

1  together.
2      Q.    I understand that.  But Mr. Alfonso
3  told you how much he earned from fishing.  Correct?
4      A.    Yes.
5      Q.    And this paragraph was drafted by
6  Mr. Coleman.  Correct?
7      A.    Yes.
8      Q.    So you had no part in this paragraph?
9      A.    No.  Other than reading it and signing
10 it, I didn't.
11     Q.    Can you read Paragraph 8?
12     A.    Paragraph 8.  "I completed the amended
13 tax forms in December of 2010.  I signed the forms on
14 December 19th of 2010.  After I prepared amended
15 Schedule C forms and provided them to Mr. Alfonso, he
16 asked whether he needed to file the amended forms
17 with the IRS.  I told him that he did not need to
18 file the forms because the amended Schedule C forms
19 did not change his reported income.  The amended
20 forms did not change his status or tax liability."
21     Q.    Did you draft this paragraph?
22     A.    I told Mr. Coleman and he drafted it.
23     Q.    What did you tell Mr. Coleman?
24     A.    I told Mr. Coleman that I didn't mail
25 in a 1040X because there were no changes resulting in



1  the forms, in the splitting of the two Schedule Cs.
2      Q.     And how do you know that you signed
3  the return on December 19th?
4      A.     I don't know. I don't know. Unless I
5  have something in my files. I don't know.
6      Q.     Is that something Mr. Coleman wrote
7  for you?
8      A.     Yes.
9      Q.     Okay.
10     A.     December 19th of 2010.
11     Q.     Can you read Paragraph 9?
12     A.     Paragraph 9. "Several months ago,
13 investigators from the Special Master came to my
14 office and served a subpoena seeking documents
15 related to Mr. Alfonso. The investigators informed
16 me that they were trying to help Mr. Alfonso. In
17 response, I told them that they should indeed help
18 Mr. Alfonso because he is a hard-working fisherman
19 who deserves compensation. I provided them with my
20 files related to Mr. Alfonso, including my accounting
21 worksheets. I was also interviewed by the
22 investigators, and I communicated to them the facts
23 that I have stated in this declaration. In
24 particular, I told investigators that the inclusion
25 of Frank & Sons income on the Schedule C was my

1  responsibility."
2      Q.     Did Mr. Coleman draft this paragraph?
3      A.     Yes.
4      Q.     Is any of this your language?
5      A.     No. Well --
6      Q.     Paragraph 10.
7      A.     Paragraph 10. Okay.
8             "I have known Mr. Vernon Alfonso for
9  many years. I known him to be a hard-working
10 shrimper with significant fishing revenue year in and
11 year out. I have always regarded him as honest,
12 sincere and forthcoming. I do not believe he would
13 intentionally mislead anyone or commit fraud. After
14 reviewing the events here, it is clear to me that
15 there was simply a mistake and miscommunication. In
16 particular, I have no reason to believe that Mr.
17 Alfonso knew that Frank & Sons income I had recorded
18 in my accounting software was included in this year's
19 Schedule C."
20     Q.     Is this Mr. Coleman's language?
21     A.     It is his thoughts put on the paper,
22 but it was definitely something that I had stated.
23     Q.     What did you state to Mr. Coleman?
24     A.     I stated that Vernon was a good guy.
25 I mean, I have known him for many years. He is a

1  fisherman. And if there was a Frank & Sons amount
2  put on his return, it was my doing.
3      Q.     Did you put that in there because that
4  it was your doing, because Mr. Coleman told you to?
5      A.     No.
6      Q.     Is Mr. Alfonso a shrimper?
7      A.     Yes.
8      Q.     Does he catch other seafood from time
9  to time?
10     A.     I don't really know. I can't remember
11 him ever claiming crab traps, though. I would say he
12 mostly shrimps.
13     Q.     Does he ever bring you shrimp?
14     A.     I don't think he is one that brings me
15 shrimp.
16     Q.     You need to talk to him about that.
17     A.     I know. I want some crabs is what I
18 want. But all the number one crabs go to Maryland
19 now I understand.
20     Q.     Well, if you got -- off the record.
21            (Off the record.)
22 BY MR. SALICRUP:
23     Q.     Okay.
24     A.     There were so many people that
25 committed fraud. There were so many that didn't

1  deserve money, but Mr. Alfonso is not one of them.
2  People put their faith in me. If he tells me that he
3  made --
4      Q.     Can we go through Paragraph 10 in a
5  little more detail?
6      A.     Go through Paragraph 10 a little more?
7      Q.     Yes.
8      A.     Read it again?
9      Q.     When you state "after reviewing the
10 events here," that sentence --
11     A.     Okay.
12     Q.     -- was that Mr. Coleman's language?
13     A.     "After reviewing the events here, it
14 is clear to me that there was simply a mistake and
15 miscommunication." I would say they are my thoughts.
16     Q.     What did you review? What events did
17 you review?
18     A.     The fact that I know him to be a
19 commercial fisherman, and he is honest, sincere and
20 forthcoming. And you know what, I am an enrolled
21 agent. I am 70 years old. I would never lie about
22 anyone. It would not be in my best interest to
23 jeopardize my license. And I can tell the good guy
24 from the bad guy. Vernon Alfonso is one of the good
25 guys.



1    Q.    I understand.  And you did your job
2  and you included all the information he provided to
3  you.  Correct?
4    A.    Yeah.
5    Q.    So there is no miscommunication as to
6  that.
7    A.    Right.
8    Q.    I am now going to present you -- if
9  you don't mind, Ms. Flowers, would you mind moving
10  that so I can put the exhibit --
11    A.    Sure.
12    Q.    Just put it right there.  Now I am
13  going to present you with a copy of Exhibit 3.
14  Please review that and let me know when you are done.
15    A.    Okay.
16       (Off the record.)
17  BY MR. SALICRUP:
18    Q.    We are on the record now, Ms. Flowers.
19    A.    Okay.  I have finished reviewing the
20  document.
21    Q.    Okay.  Can you identify this document
22  for me?
23    A.    Yes.
24    Q.    What is it, please?
25    A.    This is the original copy of the tax

1  return as filed in 2009 and then the request for the
2  split of Schedule C. Well, wait.  One is a 2008
3  return.  Okay.  A copy of 2009 and a copy of 2008.
4    Q.    Okay.  Can you turn to the 2008
5  return, please?
6    A.    Okay.
7    Q.    Who prepared this document?
8    A.    I would have prepared it.  My daughter
9  would have looked it over and signed it.
10    Q.    Okay.  So when we go to the second
11  page of the 2008 return.
12    A.    Okay.
13    Q.    Of the 1040.  It has your signature.
14    A.    Well, it really has her signature.
15    Q.    That is Kim Flowers?
16    A.    K. Flowers.  Yeah.
17    Q.    And whose preparer tax identification
18  number is that?
19    A.    That is hers.
20    Q.    That is Kim Flowers?
21    A.    Yes.
22    Q.    Can you walk me just generally through
23  the process of how you prepared this document?
24    A.    How I prepared the document?
25    Q.    Uh-huh.

1    A.    They would have come in. They would
2  have given their income.  Other income listed
3  probably would have been -- maybe Hangman's fund, or
4  something from Louisiana Wildlife & Fisheries.  I
5  would have listed their expenses.  And my program,
6  when you are a previous client, it would have pulled
7  forward all of the information.  It would already
8  have your name, address, your children's names, your
9  dependents.  I would have asked if there was any
10  change in their exemptions.  I would have verified
11  their address, their phone number.  Then we would
12  have got into the heart of the return.
13       My program would have automatically
14  brought over their net operating loss, that was
15  losses from Hurricane Katrina.  Then they would have
16  listed -- we would have started listing their
17  Schedule C income and their deductions.
18    Q.    Okay.  And when did you prepare this
19  document?
20    A.    This document looked like it was
21  prepared 3-28 of '09.
22    Q.    Is that when the document was filed
23  with the IRS?
24    A.    Yes.
25    Q.    Do you prepare and file on the same

1  day?
2    A.    Usually.  Unless I am missing
3  information.
4    Q.    So generally, your business practice
5  is to wait until you have all the information before
6  you file it.  Correct?
7    A.    Yes.
8    Q.    And that is what you did with Mr.
9  Alfonso's 2008 return?
10    A.    Yes.
11    Q.    And Alfonso provided you with all the
12  information included in his 2008 return.  Correct?
13    A.    Yes.
14    Q.    And Mr. Alfonso provided you with his
15  trip ticket information.  Correct?
16    A.    Right.
17    Q.    But he did not provide you with the
18  trip tickets.  He told you how much he had in trip
19  tickets.  Right?
20    A.    Right.  I really don't know how they
21  reach their totals.  I don't know whether it is their
22  bank account totals for the business.  I am sure they
23  add up their trip tickets to make sure that the total
24  that they show in income exceeds that figure, so they
25  can allow enough for their cash income.



1    Q.    Okay.  But they only provide you with
2  a number.  You don't add it.  Correct?
3    A.    Right.
4    Q.    What other sources of income did Mr.
5  Alfonso have in 2008?
6    A.    2008, let's see.
7    Q.    For the record, can you just state
8  what you are looking at on your desktop?
9    A.    I am looking at my actual 2008 return.
10  Because in order to determine what is on the Schedule
11  C, I would have to go back and go to the worksheet
12  that makes up this 76,859.  I would do that by --
13    Q.    And this is on your ATX software?
14    A.    It is.
15    Q.    And did you provide a copy of this to
16  the investigators for the Special Master?
17    A.    If they requested it.  I gave them
18  everything they wanted.
19          (Off the record.)
20    THE WITNESS:
21          This is '08.  Now, this must have been
22  after they, again, asked for the breakdown.
23  BY MR. SALICRUP:
24    Q.    Who is "they"?
25    A.    GCCF.  Let me see if I can get into

1  another return, the original return.  No.  We have
2  that one.  Okay.  1099s. 1099s. Here is the list of
3  the 1099s that I received for 2008.  R&M
4  Construction, 49,100. Nothing from SEEDCO that year.
5  That would have been something that would have been
6  brought from the 2007 return.  Commercial fishing
7  48,157, which was fishing; Frank & Sons; SEEDCO
8  taxable grant, Louisiana Wildlife taxable grant.
9    Q.    So for the record, can you just repeat
10  what his sources of income were in 2008?
11    A.    Fishing, 24,759; Frank & Sons, 3,000;
12  SEEDCO taxable grant, 9,388; Louisiana Wildlife
13  taxable grant, 11,010.
14    Q.    And what is the total of all of those
15  amounts?
16    A.    Total, 48,157.
17    Q.    And according to his filed 2008
18  return, that 48,157 is what was reported as Mr.
19  Alfonso's fishing income.  Correct?
20    A.    Correct.
21    Q.    So in 2008 his income from Frank &
22  Sons was also included?
23    A.    Yes.
24    Q.    And that is your general business
25  practice?

1    A.    Yes.
2    Q.    You add up all the boat work?
3    A.    Yes.
4    Q.    For the record, we are jumping out of
5  order in the exhibits.  But because they are
6  pre-marked, I am just going to enter it as an exhibit
7  now.
8          Ms. Flowers, can you please review
9  Exhibit 9, which I have asked the Court Reporter to
10  already mark, and let me know when you are done?
11    A.    Isn't that the same copy as this?
12    Q.    I am going to represent to you what I
13  have just given to you is what you provided to the
14  investigators for the Office of the Special Master in
15  response to the subpoena.
16    A.    Okay.  It looks like the only
17  difference is the worksheet on this one is attached
18  for the Schedule C.
19    Q.    And is that the same worksheet that
20  you just showed me on your computer?
21    A.    24,759, 3,000, 9,388.  It looks like
22  the same to me.
23    Q.    Okay.
24    A.    48,157.
25    Q.    And to summarize, that just shows that

1  in 2008 you included his Frank & Sons income as part
2  of his fishing income?
3    A.    Yes.
4    Q.    Along with other sources of other
5  income, like, a SEEDCO taxable grant?
6    A.    And let me just explain something.  I
7  know you all are more knowledgeable in certain
8  things, and I am more knowledgeable in others.  The
9  reason IRS wants SEEDCO and Louisiana Wildlife,
10  things like that included in this, they allow you to
11  put it on Line 21.  But if it is subject to Social
12  Security, they want it here.
13    Q.    Okay.  As a Schedule C entry?
14    A.    Yeah.  This is not to their benefit.
15  This is the way the IRS request it.
16    Q.    Okay.  Do you have any other
17  workpapers or notes that you used in preparation of
18  Mr. Alfonso's 2008 tax returns?
19    A.    I don't.  I keep as little paperwork
20  as possible.  My files runneth over.
21    Q.    And did anyone else provide you with
22  the information included in Mr. Alfonso's 2008 tax
23  return?
24    A.    No.
25    Q.    Only Mr. Alfonso provided you with



Page 101

1  that information. Correct?
2      A.    Him, his wife. Him or his wife.
3      Q.    Thank you.
4      A.    They usually come together.
5      Q.    I am now going to show you a document
6  which I have asked the Court Reporter to pre-mark as
7  Exhibit 4. I will hand it to you. Please take a
8  second to review it and let me know when you are
9  done.
10     A.    Okay.
11     Q.    And I am going to represent to you
12  that document is the first half of the previous
13  Exhibit 3.
14          Do you understand?
15     A.    Right. It is the first tax return
16  filed for 2009.
17     Q.    Okay.
18     A.    Where it includes all the income
19  together.
20     Q.    So this is Mr. Alfonso's first 2009
21  tax return. Correct?
22     A.    I understand. Yes.
23     Q.    And who prepared this document?
24     A.    I prepared it.
25     Q.    Is that your signature on the back?

Page 102

1      A.    No. That is my daughter's signature.
2  Evidently when she was reviewing, she noticed I had
3  not signed it, so she signed it.
4      Q.    And is that your preparer tax ID
5  number?
6      A.    It is.
7      Q.    And if you go to Page 5 of the
8  document I just gave you, which starts with Louisiana
9  2009 Individual Income Tax Declaration for Electronic
10  Filing. It is in the first five pages of the
11  document I just handed you.
12     A.    Okay.
13     Q.    Who signed this document?
14     A.    My daughter.
15     Q.    And who --
16     A.    And it has got her number.
17     Q.    Is that Ms. Kim Flowers, your
18  daughter's --
19     A.    Yes.
20     Q.    -- preparer tax ID?
21     A.    Yes.
22     Q.    And can you just walk me through how
23  this document was prepared?
24     A.    Usually Louisiana is a piggyback
25  state. So it picks up information from the state.

Page 103

1  So if the state wasn't prepared at that time to do
2  the return -- it usually takes a couple of days --
3  then maybe she went in and pulled up the return and
4  completed the electronic filing for the state.
5      Q.    Okay. And how was -- can you just
6  walk me through how the rest of the document was
7  prepared?
8      A.    The rest of the document for '09, that
9  would have been the same as usual. It would have
10  pulled up information, most of which was from the
11  '08: Name, address, Social Security numbers,
12  dependents, date of birth. All such as that. And if
13  it was a net operating loss -- which there was -- it
14  would have pulled that from the year before. Did the
15  adjustments. Pulled that forward.
16          Certain questions would had to have
17  been asked, such as what is your income for the year?
18  If it was in 1099s, they would have been listed.
19  Then what was your additional income for the year?
20  That is my usual question.
21     Q.    Who would you ask those questions to?
22  Who would you ask?
23     A.    The taxpayer.
24     Q.    So in this case you would have asked
25  Mr. Alfonso?

Page 104

1      A.    Mr. or Mrs. Alfonso.
2      Q.    Did you ask Mr. Alfonso what his
3  income was in 2009?
4      A.    Yes.
5      Q.    And he provided the information you
6  included in the return?
7      A.    Yes.
8      Q.    Correct?
9      A.    Correct.
10     Q.    When was this document prepared?
11     A.    It looks like 2-19 of 2010.
12     Q.    And when was it filed?
13     A.    The same day.
14     Q.    So just like the 2008 return, you
15  prepared and filed it electronically on the same day.
16  Right?
17     A.    Right. Except as I stated, it might
18  have been a couple days later.
19     Q.    Can you walk me through Mr. Alfonso's
20  sources of income in 2009?
21     A.    Sources of income in 2008, it looks
22  like that is the year he was maybe building steps.
23  So when the fishermen didn't have any fishing, or
24  they were putting out buoys I understand to trap the
25  oil, and using their boat for that. So the sources



1  of income, it says construction and commercial
2  fisherman. So evidently '09 was the year they were
3  building the steps and also doing commercial fishing
4  as allowed. Because I think Katrina hit 8-29. I
5  can't remember the year.
6      Q.    I think Katrina was back in '05.
7      A.    Was it? Yeah. It took FEMA a while
8  to get those trailers out there. But they were
9  building handicap steps for a lot of those people and
10  being paid through R&M Construction. And then they
11  were doing commercial fishing. This does list ice,
12  galley supplies, material and supplies, dry dock,
13  miscellaneous, depreciation for the boat. Repairs
14  and maintenance, supplies. So I suppose he --
15     Q.    To recap, in addition to the Frank &
16  Sons work, he also worked as a shrimper and a
17  construction worker in 2009. Correct?
18     A.    True.
19     Q.    Thank you.
20          Do you have any additional notes or
21  workpapers that you used in preparing his 2009 return
22  with one Schedule C?
23     A.    I might have kept a copy of his 2009
24  income from R&M Construction. I think you all have a
25  copy of that.

1      Q.    Are you referring to a 1099?
2      A.    1099. Yeah.
3      Q.    Can you please look at Exhibit 4 again
4  and confirm that is the 1099 that you are referring
5  to?
6      A.    Yes.
7      Q.    So that is a 1099 from R&M
8  Construction that is filled in by hand, which was
9  submitted as part of Mr. Alfonso's claim. Correct?
10     A.    Correct.
11     Q.    All right. I am now going to show you
12  some documents I have asked the Court Reporter to
13  pre-mark as Exhibit 5. Please review them and let me
14  know when you are done.
15     A.    Okay.
16     Q.    Can you identify this document for me?
17     A.    This is the document that they wanted
18  the construction pulled out of the Schedule C.
19     Q.    Can you just clarify who is "they"?
20     A.    Whoever he was filing the claim with.
21  I guess it is GCCF, maybe. I don't know.
22     Q.    And is this the second 2009 return?
23     A.    Yes.
24     Q.    That you earlier indicated you faxed
25  to Mr. Alfonso?

1      A.    Correct.
2      Q.    And does this second 2009 return
3  include two Schedule Cs?
4      A.    It does.
5      Q.    Are there any other differences
6  between Exhibit 5, which is in your hands, and
7  Exhibit 4 which I just showed you a second ago?
8      A.    We have two Schedule Cs as opposed to
9  one.
10     Q.    Is that the only difference?
11     A.    Yes.
12     Q.    Is there a difference in the
13  self-employment health insurance deduction?
14     A.    I think I remember -- no. Yes. There
15  is, on the original '09, the self-employed health
16  insurance deduction, and when we realized it did not
17  affect the bottom line, it still reflected him owing
18  1,902. It was not put in. It was left out.
19     Q.    Whose decision was it not to include
20  that?
21     A.    I don't know. It had to be mine. I
22  mean, Mr. Alfonso is not aware of any income tax. I
23  mean, the main reason we were doing it is just to
24  separate the two Schedule Cs. And like I say, it was
25  nothing filed with the IRS. It did not affect the

1  net operating loss. It did not affect the amount of
2  Social Security tax figured. It did not affect
3  anything except being able to show the separation of
4  the construction from the other income.
5      Q.    Why was it your decision?
6      A.    Why was it my decision?
7      Q.    Yeah.
8      A.    Because I am the one that makes the
9  decision with the tax return. They know nothing
10  about tax returns. We were just doing a separation.
11  I don't know why it was left out. I really don't.
12     Q.    You --
13     A.    Maybe it is a direct entry. It is
14  nothing that is carried forward. But, you know, it
15  doesn't affect anything.
16     Q.    I guess I am a little confused. If it
17  didn't affect anything, why change it?
18     A.    I don't know. I really don't remember
19  why it was left off.
20     Q.    Did that change impact his adjusted
21  income in any way?
22     A.    It might have changed his adjusted
23  gross income. That would have been adjusted gross
24  income on 16, on Lines 37, 38. It did change that.
25  But it didn't change anything that the IRS needed.



1  It didn't change federal tax withholding.  It didn't
2  change his making work pay credit or his additional
3  child tax credit.  So it didn't change anything that
4  he had to pay the IRS.
5      Q.    Okay.  So it didn't change his tax
6  liability.
7      A.    Right.
8      Q.    Correct?
9      A.    Right.
10      Q.    But it did change his adjusted gross
11  income?
12      A.    Right. But it wasn't really filed.  It
13  wasn't sent into the IRS.  So my -- the only thing
14  that would have been affected is the net operating
15  loss.  This would not have been picked up by my
16  software the following year because it didn't affect
17  his adjusted gross income.
18      Q.    So was the net operating loss greater
19  or lesser?
20      A.    It was -- as the original amount --
21  let me check it and make sure.  That would have been
22  in 2010.
23      Q.    And for the record, can you just state
24  again what you are doing on your desktop?
25      A.    I am getting out of the '08 program

1  and getting into the 2010.
2      Q.    In your ATX software?
3      A.    Yes.  Okay.  So the net operating loss
4  that it brought forward is the amount reflected on
5  the return that was mailed in, in '09, that did have
6  the self-employment health insurance deduction on it.
7  Because the net operating loss would have been the
8  amount on Line 41.  And that was the 22,671.  Why it
9  was left off of the one where we did the split, I
10  have no idea.
11      Q.    Did Mr. Alfonso request that you leave
12  it off?
13      A.    No.
14      Q.    Did anyone else request that you leave
15  it off?
16      A.    No.
17      Q.    Did Mr. Coleman or any attorney for
18  Mr. Alfonso inquire about why the self-employment
19  deduction was left off?
20      A.    I don't think so.
21      Q.    Did Mr. Alfonso's attorney review the
22  second 2009 return?
23      A.    If he did, he didn't with me.
24      Q.    I didn't catch that.
25      A.    He did not look over any of these with

1  me.
2      Q.    Okay.  And any requests from Mr.
3  Alfonso or his attorney, or his attorneys, would go
4  directly to you.  Correct?
5      A.    If it was a request made for any
6  copies, or anything that they didn't have, they would
7  have come to me for them.
8      Q.    Would they approach Kim Flowers?
9      A.    No.
10      Q.    Has Mr. Alfonso or his attorney ever
11  had a conversation with Kim Flowers?
12      A.    No.
13      Q.    But Kim Flowers has worked on his
14  returns?
15      A.    She might have looked over them and
16  signed them if I hadn't signed them.  She was kind of
17  out there to catch any kind of omissions.  She really
18  didn't have any knowledge of the tax return or
19  anything.  She would just kind of look over them to
20  make sure everything was done correctly.  Because
21  like I say, we move at such a fast pace.  I just have
22  her double-check everything.
23      Q.    Does Kim Flowers know Mr. Alfonso?
24      A.    No.
25      Q.    Have they ever met?

1      A.    No.
2      Q.    Does Kim Flowers know Mr. Craig
3  Coleman?
4      A.    No.
5      Q.    Have they ever met?
6      A.    No.
7      Q.    Has Mr. Alfonso or Mr. Coleman spoken
8  with Kim Flowers on the phone?
9      A.    No.
10      Q.    Has Mr. Alfonso or Mr. Coleman spoken
11  with Kim Flowers via fax or E-mail?
12      A.    No.
13      Q.    Has Mr. Alfonso or Mr. Coleman spoken
14  with Kim Flowers through mail?
15      A.    No.
16      Q.    So for the record, Kim Flowers has
17  never communicated with Mr. Alfonso.  Correct?
18      A.    No.
19      Q.    Correct?
20      A.    No.
21      Q.    "No"?
22      A.    No.
23      Q.    I will reask it.  For the record, Kim
24  Flowers has never spoken with Mr. Alfonso?
25      A.    She might have greeted him at the



1 door. Showed him in the office. You know, like
2 that. But never to this effect.
3       Q.      Okay. And for the record, has Kim
4 Flowers ever spoken with Mr. Craig Coleman?
5       A.      No.
6       Q.      Has Kim Flowers spoken with any other
7 attorney representing Mr. Alfonso?
8       A.      No.
9       Q.      Thank you. And going back to the
10 second 2009 return, when was this document prepared?
11      A.      Well, it is predated 2-19-10. The
12 same date the original return was prepared. I don't
13 know exactly what date it was actually done on,
14 though. I have no way of knowing. I didn't charge
15 to redo it. I just did it. Like I say, I have
16 year-round tax service for no additional fee.
17      Q.      I'm sorry. Go ahead.
18      A.      When he called and asked me that
19 whoever was requesting the construction be pulled
20 out, I did it. I faxed it to him and that was it.
21      Q.      Did you charge Mr. Alfonso for his
22 2008 return?
23      A.      I charged for every year's return one
24 time.
25      Q.      And how much is that?

1       A.      2008 return -- I don't have that.
2 That one was evidently shredded.
3       Q.      Approximately how much do you think
4 you charged?
5       A.      It is going to be in the $300 range.
6       Q.      And did you charge him for his 2009
7 return?
8       A.      I did. 2009. I would have charged it
9 in 2010 as 368.
10      Q.      And why did you not charge Mr. Alfonso
11 for the second 2009 return with two Schedule Cs?
12      A.      I charge one time a year when they
13 come to do their taxes. Anything else they need
14 during the year, I do it for nothing.
15      Q.      Is that your standard business model?
16      A.      Yes.
17      Q.      Do you work with all clients that way?
18      A.      Yes.
19      Q.      Or only fishermen?
20      A.      No. I tell everyone as they leave,
21 year-round tax -- I give them my card. Year-round
22 tax service for no additional fees.
23      Q.      Did anyone else provide you with the
24 information included in the second 2009 tax return?
25      A.      No.

1       Q.      Do you have any workpapers or notes
2 that you used in preparation of the second 2009 tax
3 return?
4       A.      No.
5       Q.      Now, I am going to show you some
6 documents that I asked the Court Reporter to pre-mark
7 as Exhibit 6. I am going to represent to you that
8 these are the documents that you provided the
9 investigators for the Office of the Special Master in
10 November of 2014. Please review them and let me
11 know. Sorry about that.
12              Please review them and let me know
13 when you are done.
14      A.      Well, the only thing I can say about
15 this, this is the original return for 2009, after the
16 original copy. But if I would pull up '09 right now,
17 which I got '10 pulled up, it is going to put in
18 today's date. I wish it didn't do that. I have
19 complained to my software developer about that. But
20 it will pull up -- and I can show you. I have pulled
21 up 2010. That has not got today's date on it. This
22 one didn't. This one says 3-26-11.
23              A lot of times it will pull and put in
24 a current year. If you go back into a return, it is
25 going to give you a current date, the date you pull

1 it up for some reason. 11-3 of 2014.
2       Q.      Okay.
3       A.      But that is definitely not a good
4 date.
5       Q.      For the record, does Exhibit 6 consist
6 of the documents you previously provided to the
7 Office of the Special Master?
8       A.      Yes.
9       Q.      Can you identify these documents for
10 me?
11      A.      Yes.
12      Q.      What are they?
13      A.      They are the returns that I filed
14 originally for Mr. Alfonso.
15      Q.      Okay. Who prepared this document?
16      A.      This would have been me.
17      Q.      And is that your preparer tax
18 identification number?
19      A.      It is.
20      Q.      Can you state for the record just what
21 it is?
22      A.      P00107326.
23      Q.      And Mr. Alfonso provided you with all
24 the information contained in this document. Correct?
25      A.      Yes.



Page 117

1    Q.    Did anyone else provide you with the
2 information included in this document?
3    A.    No.
4    Q.    Did you speak with anyone else besides
5 Mr. Alfonso regarding the information contained in
6 Exhibit 6?
7    A.    Perhaps his wife. They come in
8 together.
9    Q.    Aside from his wife, did you --
10   A.    No. Him and his wife only.
11   Q.    Okay. And you mentioned that the date
12 of November 3rd, 2014 is incorrect.
13   A.    Yes. It is.
14   Q.    Why is it incorrect?
15   A.    Sometimes when I am asked to go back
16 in and pull returns up, it inserts the current day's
17 date. This must have been maybe when the
18 investigators came out and wanted a copy of what I
19 had. 11-3-2014. I don't know if that is the date
20 they say they came in.
21   Q.    And what would be the correct date
22 that should be on this document?
23   A.    I think it was 2-19 of 2010.
24   Q.    Does that make it difficult for you to
25 keep records?

Page 118

1    A.    It does. And I complained to my ATX
2 people about that.
3    Q.    That must be a pain.
4    A.    It is. It is. They said if I would
5 mark the return "complete," that maybe the date would
6 stay the same. But when I mark the return
7 "complete," when I get in it, it tells me this return
8 has been marked complete. You have to get out of it
9 and unmark it complete. So, you know, I am just
10 taking an extra step there that I find that I don't
11 have to. If I get into it, it is going to change the
12 date. If I mark it "complete," then I can get into
13 it and view it, but I can't get into it and do
14 anything else to it. I can't amend it. I can't do
15 anything to it. I know it is a problem in my
16 software provider.
17   Q.    Okay. Was this document, Exhibit 6,
18 prepared in connection with Mr. Alfonso's BP claim?
19   A.    Yes. Well, no. Because the BP claim
20 happened after this.
21   Q.    So this document was prepared in
22 connection with Mr. Alfonso's tax returns. Correct?
23   A.    Original tax return. Yes.
24   Q.    And the information included here was
25 provided by Mr. Alfonso in order so that he could

Page 119

1 file his taxes for 2009. Correct?
2    A.    Correct.
3    Q.    And the information included here is
4 accurate as told you by Mr. Alfonso. Correct?
5    A.    Mr. or Mrs. Alfonso. Yes.
6    Q.    Now I am going to show you an exhibit
7 I have asked the Court Reporter to pre-mark as
8 Exhibit 7. Please take a second to review it. It is
9 only two pages. And I am going to represent to you
10 that these are the last two pages of Exhibit 6 that
11 are being entered as Exhibit 7.
12   A.    Okay. These are the ones that are the
13 worksheet for the income that goes along with the
14 original 2009 return, and my fee accordingly.
15   Q.    And this document states that in 2009
16 Mr. Alfonso earned $24,184 from commercial fishing.
17 Correct?
18   A.    Correct.
19   Q.    And this document states that Mr.
20 Alfonso earned $22,250 from Frank & Sons in 2009.
21 Correct?
22   A.    Correct.
23   Q.    This document states that Mr. Alfonso
24 earned $26,630 from R&M Construction of Louisiana.
25 Correct?

Page 120

1    A.    Correct.
2    Q.    And you prepared this page. Correct?
3    A.    Yes.
4    Q.    And Mr. Alfonso provided you with this
5 information. Correct?
6    A.    Correct.
7    Q.    Please turn to the last page of
8 Exhibit 6. Can you describe this document?
9    A.    It is my billing for Vernon Alfonso
10 for the year 2009. The tax preparation fee. Laid it
11 out at $368.
12   Q.    Is this the first time you ever billed
13 Mr. Alfonso regarding his 2009 return?
14   A.    Yes.
15   Q.    And why is this document dated
16 November 3rd, 2014?
17   A.    That might have been the date that the
18 investigators came to see it.
19   Q.    I understand that is the date the
20 investigators came to see you and meet with you. But
21 that is not the date in which you billed Mr. Alfonso.
22 Correct?
23   A.    Correct.
24   Q.    So why does it have a date of November
25 3rd, 2014?



1     A.      They had me pull up the 2009 return on
2  that date, and my program changes the date all the
3  way through to the current date.
4     Q.      Is it the same ATX program?
5     A.      Yes.
6     Q.      So you do both your tax preparation
7  and your billing through ATX?
8     A.      Yes.
9     Q.      And you have the same issue, that it
10  just changes the date for you?
11     A.      It does.
12     Q.      That really sounds like a hard way to
13  do business.
14     A.      I agree.
15     Q.      All right.  Now I am going to show you
16  a document which I have asked the Court Reporter to
17  pre-mark as Exhibit 8.  Please take a look at them
18  and let me know when you are done.
19     A.      Okay.  These look like transcripts
20  from the IRS that would verify what was filed as
21  being correct.  These are transcripts.
22     Q.      Okay.  Can you describe what type of
23  information an IRS transcript contains?
24     A.      It verifies that the return that they
25  have turned in is true and accurate.  You can look at

1  the numbers here and they should correspond with the
2  number from the tax return.
3     Q.      And if a taxpayer files an amended
4  return, that would show up on the IRS transcript.
5     A.      Yes.
6     Q.      Correct?
7     A.      It would.  Unless there were no
8  changes.  Like, in '09 there were no changes.  So
9  this would not have changed in '09 because it starts
10  with adjusted gross income.
11     Q.      But there was a change to the
12  self-employment tax --
13     A.      There was.
14     Q.      -- deduction.  Wasn't there?
15     A.      Yeah.  Yes.  But IRS has said if it
16  doesn't make a bottom-line difference, what you owe,
17  what you get back.
18     Q.      Can you explain what a bottom-line
19  difference means?
20     A.      Tax -- your refund or your balance
21  due.  The amount that you are paying toward your
22  Social Security, if it doesn't change any of those
23  monies that is collected or paid out to the IRS.
24     Q.      But the tax transcript would record an
25  amended tax return that changes the adjusted gross

1  income.  Correct?
2     A.      It would record it, but it is of no
3  consequences.
4     Q.      I understand that.  But it would still
5  show up on the IRS transcript.  Correct?
6     A.      Very possibly.  Yeah.
7     Q.      It would show up.  Correct?
8     A.      I would -- I haven't seen one of these
9  in ages.  But I would say it probably would.  '09.
10     Q.      Can you please tell me what Mr.
11  Alfonso's adjusted gross income was in 2009,
12  according to Exhibit 8?
13     A.      I am looking for 2008?
14     Q.      I'm sorry.  I misspoke.
15          Can you please tell me what Mr.
16  Alfonso's adjusted gross income was in 2009 according
17  to Exhibit 8?
18     A.      2009, according to --
19     Q.      The exhibit is No. 8.
20     A.      Okay.
21     Q.      That is the document that you are
22  holding.
23     A.      Okay.
24     Q.      According to that document, what was
25  Mr. Alfonso's 2009 adjust gross income?

1     A.      It says 63 -- a negative 63,913.
2     Q.      Is that for 2009 or 2008?
3     A.      I'm sorry.  That is '8.  2009.  It
4  says 16,271.
5     Q.      For the record, is it correct that Mr.
6  Alfonso's 2009 IRS transcript states that his
7  adjusted gross income was negative 16,271?
8     A.      Correct.  Yes.
9     Q.      And does that number match Mr.
10  Alfonso's adjusted gross income in Exhibit 3 that I
11  showed you earlier?
12     A.      No.
13     Q.      Would you like to double-check Exhibit
14  3?
15     A.      Well, I think that the one that was
16  sent in to the IRS --
17     Q.      You can refer to the exhibits I
18  provided you, Ms. Flowers.  I think it will be
19  easier.
20          (Off the record.)
21  BY MR. SALICRUP:
22     Q.      Right here.  It is Exhibit 3.  On the
23  record.
24          I am going to represent to you that
25  his adjusted gross income in Exhibit 3 is negative



1 16,271.
2     A.     Okay.
3     Q.     Is that correct?
4     A.     Yes.
5     Q.     And if we turn to Exhibit 4 -- pardon
6 me -- Exhibit 5 -- Mr. Alfonso's adjusted gross
7 income in Exhibit 5 is negative 7,824.  Is that
8 correct?
9     A.     Yes.
10     Q.     So as a result of that, we can
11 conclude that the second 2009 return with two
12 Schedule Cs was never filed.  Is that correct?
13     A.     Correct.
14     Q.     Can you tell me who the individuals
15 that work at Frank & Sons are?
16     A.     I think since Frank Lopez has aged and
17 gotten sick, I think his son Scott has taken over the
18 business.
19     Q.     Does anyone else work there --
20     A.     No.
21     Q.     -- at Frank & Sons?
22     A.     I don't think so.
23     Q.     Does Joyce?
24     A.     Joyce is the one that does the
25 accounting work.  She writes the checks and all, as

1 far as I know.
2     Q.     Please describe your relationship with
3 --
4         (Off the record.)
5 BY MR. SALICRUP:
6     Q.     Can you please describe your
7 relationship with Frank & Sons, LLC?
8     A.     It is a business relationship.  They
9 come once a year.  Unless they are late, and then
10 they come once every two years and do two years at a
11 time.
12     Q.     And what kind of work do you do for
13 Frank & Sons?
14     A.     Income tax.
15     Q.     Do you prepare the returns?
16     A.     Yes.
17     Q.     Do you file them?
18     A.     Yes.
19     Q.     Do you do any other accounting work
20 for them?
21     A.     No.  Sometimes if they send out 1099s,
22 they might want me to send out a 1099 for them.
23 Sometimes she does her own 1099s.
24     Q.     Who is "she"?
25     A.     Joyce Lopez.

1     Q.     And do you handle any payroll for
2 Frank & Sons?
3     A.     No.
4     Q.     Is Frank Lopez deceased?
5     A.     He is not deceased.
6     Q.     Did you represent to the investigators
7 that he might have been deceased in November 3rd,
8 2014?
9     A.     No.  I didn't say he was deceased.  I
10 said he was very ill.
11     Q.     Okay.
12     A.     I attended one funeral in St. Bernard,
13 and I saw Joyce Lopez at it and she left early.  She
14 said I don't think Frank is going to make it too much
15 longer.  So... but I never told anyone that he was
16 deceased.  I said he was very sick.
17     Q.     Understood.
18         Can you please describe any written
19 policies that you have at KF&L addressing the
20 preparation of tax returns?
21     A.     Nothing in writing; only verbally.
22     Q.     Then can you describe your KF&L's
23 practice or business custom in the preparation of tax
24 returns?
25     A.     I make appointments.  I only take new

1 clients if they have been recommended by an old
2 client.  I don't advertise.  I sit down with my
3 clients.  I tell them beforehand -- especially if
4 they are new ones -- what I need.  And I remind them
5 of things to bring in.  And they come in.  They have
6 their things listed.  I put it on the return.  And
7 question them back and forth about things that are on
8 the return.  That is it.  They sign the electronic
9 filing.  They decide where they want their money to
10 go or how they want to pay their balance due.  And I
11 electronically file as many returns as the IRS allows
12 me to.
13         There are certain returns that has
14 paperwork in it that they don't allow to be
15 electronically filed.  But I electronic file, I would
16 say, 99 percent of all my tax returns.
17     Q.     Okay.  So you interview your clients?
18     A.     Yes.
19     Q.     And you interviewed Mr. Alfonso?
20     A.     Yes.
21     Q.     And who recommended Mr. Alfonso to
22 you?
23     A.     I have been doing Mr. Alfonso's return
24 so long ago that I don't remember exactly who
25 recommended him.



1    Q.    Did Frank & Sons recommend Mr. Alfonso
2  to you?
3    A.    It is possible.
4    Q.    What would be your best guess?
5    A.    I wouldn't want to guess.  It has been
6  too long.
7    Q.    Can you describe any policies at KF&L
8  regarding documentation provided by clients?
9    A.    I don't require any documentation
10  provided by clients.  Every now and then a client
11  will bring in something, and I tell them if I have to
12  add these receipts up for you, there is going to be
13  an additional charge for that.  So usually they
14  decide to reschedule the appointment.
15    Q.    And is that policy in writing?
16    A.    No.
17    Q.    That is more of a business practice or
18  custom?
19    A.    Right.
20    Q.    Correct?
21    A.    Correct.
22    Q.    And clients generally bring in their
23  W-2 statements and 1099s. Correct?
24    A.    Correct.
25    Q.    And your fishermen clientele usually

1  bring in trip tickets that day themselves?
2    A.    I usually don't even see the trip
3  tickets. I wouldn't even know what one would look
4  like.
5    Q.    And who is allowed to sign documents
6  in your absence?
7    A.    Well, at one time Kimberly did.  I
8  have since ordered a signature stamp.  So I use that
9  now.
10    Q.    So is anyone else allowed to sign
11  documents in your absence?
12    A.    No.
13    Q.    In 2009, besides Kimberly Flowers, was
14  anyone else allowed to sign for you?
15    A.    No.
16    Q.    In 2008 was anyone else allowed to
17  sign for you, aside from Kimberly Flowers?
18    A.    No.
19    Q.    I think we have a few just minor
20  questions to circle back on.
21    Earlier, at the beginning of this
22  interview, you stated that you planned to move after
23  tax season.  Correct?
24    A.    Right.
25    Q.    What will be your contact information

1  after you move?
2    A.    I hope to keep my same mailing
3  address.  Not my mailing address, but my E-mail
4  address.  My phone number, everything I hope that I
5  can keep that.  I am just moving out of this house
6  because it is too big a house.  After Hurricane
7  Katrina I had to provide a home for four people in
8  FEMA trailers.  So I had to get a big home.  In the
9  meantime, they died.  They moved.  So I got a big
10  house.  I can't take care of it anymore.  So I am
11  downsizing.
12    Q.    So you are downsizing.  And can you
13  just tell me where you are moving?
14    A.    It is still going to be in St. Tammany
15  Parish.
16    Q.    Will you be in Covington?
17    A.    No.  I will be in Bush.
18    Q.    Bush.  You mentioned that.
19    And do you have an address or an
20  address for your new house in Bush?
21    A.    Let's see.  He mailed me the other day
22  what my new address would be.  My new address will be
23  ████████████████████████████
24    Q.    ████████████?
25    A.    ████████.  Yeah.

1    Q.    And what is your CAF number that
2  allows you to represent clients before the IRS?
3  Could you just state the number?
4    A.    That would be 0306-13599R.
5    Q.    And have you ever been convicted of a
6  criminal offense involving dishonesty?
7    A.    No.
8    Q.    Have you ever pled guilty?
9    A.    No.
10    Q.    Ms. Flowers, do you have any -- did
11  you receive any instructions from Craig Coleman
12  regarding what you should do after this interview was
13  over?
14    A.    No.
15    Q.    Did he ask you to call him?
16    A.    No.
17    Q.    Did he ask you to write him an E-mail
18  letting him know how things went?
19    A.    No.
20    Q.    Are you expecting a call from him?
21    A.    Not really.  No.
22    Q.    Did Mr. Alfonso ask that you contact
23  him after this interview?
24    A.    No.
25    Q.    Did Mrs. Alfonso?



Page 133

1    A.    No.
2    Q.    You have not received any letters
3  requesting that you contact Mr. Coleman any further?
4    A.    No.
5    Q.    Is there anything further that you
6  would like to add regarding your communications with
7  Mr. Coleman?
8    A.    No.
9    Q.    Is there anything further you would
10  like to add?
11    A.    No.
12    Q.    Thank you.
13        (Off the record.)
14  BY MR. SALICRUP:
15    Q.    We were just having a chat off the
16  record, Ms. Flowers, and it is my understanding that
17  Mr. Coleman requested or drafted your declaration in
18  such a way that it stated that the reporting of the
19  Frank & Sons income was essentially your software's
20  fault. Correct?
21    A.    It stated something that my software,
22  that figure came from -- it was there when the return
23  was started. It more or less said that it is
24  something that it brought forward.
25    Q.    And you told Mr. Coleman that was

Page 134

1  incorrect. Right?
2    A.    That was incorrect.
3    Q.    Because all the information you
4  included, as you have told me throughout --
5    A.    Yeah. Right.
6    Q.    -- you got from Vernon Alfonso.
7    A.    Right.
8    Q.    And there was not a software mishap?
9    A.    Right. Yeah. I can tell you one
10  thing. That this --
11    Q.    I think we are good.
12        (Off the record.)
13  BY MR. SALICRUP:
14    Q.    So what was the conversation?
15    A.    I don't remember when.
16    Q.    No. What?
17    A.    He said that he don't remember where
18  the figure came from. So after the investigators
19  first left me and noticed the 22,000, they subpoenaed
20  the Lopez, Frank & Sons. They went there. She went
21  through her whole book. She writes a check for
22  everything. She couldn't find no where Vernon had
23  worked for her in 2009.
24    Q.    But tell me about your conversation
25  with Mr. Alfonso.

Page 135

1    A.    Okay. He told me, he said, Ms. Peggy,
2  after I left Aunt Joyce -- that is his aunt -- I
3  asked her please double-check. This is so important.
4  And so she went through it again. And she says I
5  can't find it. So they don't know whether -- she
6  doesn't know whether that is a figure that she --
7  because like I said, her husband was very sick. She
8  don't know where it came from.
9    Q.    Okay. But it still stands that all
10  the information that you put in Mr. Alfonso's 2009
11  return was given to you.
12    A.    Yeah.
13    Q.    From Mr. Alfonso?
14    A.    Yes.
15    Q.    He added his trip tickets?
16    A.    Yep.
17    Q.    He told you he made approximately
18  $24,000 in 2009 from trip tickets?
19    A.    Yeah.
20    Q.    And he knew that the remainder of the
21  money that got reported as commercial fishing came
22  from other sources. Correct?
23    A.    He depended on me to do the whole
24  return. He gave me his R&M. And then he gave me his
25  -- or he read off to me from a sheet. That is what

Page 136

1  he usually does. And so I listed the R&M, and I
2  directed it to go to the Schedule C. And then I
3  listed his total income and I listed the Frank &
4  Sons. That figure had to come from him.
5    Q.    Which came from him?
6    A.    It had to. Yeah.
7    Q.    Perfect. Thank you.
8  (Whereupon, the taking of the testimony of the
9  witness was concluded.)
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25



Page 137

```
1              REPORTER'S CERTIFICATE
2
3         I, RUBY M. WALLEN, Certified Court
4    Reporter, do hereby certify that the above-named
5    witness, after having been first duly sworn by me to
6    testify to the truth, did testify as hereinabove set
7    forth;
8         That the testimony was reported by me in
9    shorthand and transcribed under my personal direction
10   and supervision, that the transcript has been
11   prepared in compliance with transcript format
12   guidelines required by statute or by rules of the
13   board, that I have acted in compliance with
14   prohibition on contractual relationships, as defined
15   by Louisiana Code of Civil Procedure Article 1434 and
16   in rules and advisory opinions of the board; and is a
17   true and correct transcript, to the best of my
18   ability and understanding;
19        That I am not of counsel, not related to
20   counsel or the parties hereto, and not in any way
21   interested in the outcome of this matter.
22        _____
             RUBY M. WALLEN
23           CERTIFIED COURT REPORTER
             CSR NO. 78022
24
25
```

