UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF LOUISIANA

| | | |
|---|---|---|
| In re: Oil Spill by the Oil Rig | * | MDL 2179 |
|     "Deepwater Horizon" in the | * | |
|     Gulf of Mexico on April 20, 2010 | * | SECTION J |
| | * | |
| This document relates to: | * | Honorable CARL J. BARBIER |
| All Cases and No. 12-970 | * | |
| | * | Magistrate Judge SHUSHAN |

**MEMORANDUM IN SUPPORT OF MOTION
TO INTERPRET AND ENFORCE THE SETTLEMENT AGREEMENT**

**I.**

**INTRODUCTION**

Contrary to his obligations under the *Deepwater Horizon* Economic and Property Damages Settlement Agreement (the "Agreement") to "faithfully implement and administer the Settlement, according to its terms and procedures, for the benefit of the Economic Class," the Claims Administrator has issued a policy statement – Version 3 of Policy 345 ("Policy 345 v3") – interpreting Exhibit 4B to the Agreement that is neither consistent with the terms of the Agreement nor beneficial to the Economic Class. Policy 345 v3 effectively deprives Business Economic Loss ("BEL") Claimants that have any significant amount of cash sales from participating in the settlement. Further, Policy 345 v3 is inconsistent with the Agreement and violates basic rules of contract interpretation. Policy 345 v3 also has the effect of depriving BEL Claimants of due process of law because the interpretation changed how BEL Claimants' claims would be processed *after* notice had been issued to the class and *after* class members' deadline to opt out of the class had passed.

1

For each of these reasons, Claimants Nos. 100201250, 100272198, 100247042, and 100167847[1] respectfully request that the Court interpret Exhibit 4B of the Agreement in accordance with its plain language, reject the Claims Administrator's new interpretation as set forth in Policy 345 v3, and order the Claims Administrator to interpret Exhibit 4B consistent with Version 1 of Policy 345, which was in effect at the time the class opt-out period ended.[2]

Claimants Nos. 100201250, 100272198, 100247042, and 100167847 have standing to bring this Motion to Interpret the Settlement Agreement under the Court's December 21, 2012 Order and Judgment Granting Final Approval of Economic and Property Damages Settlement and Confirming Certification of the Economic and Property Damages Settlement Class. In that Order, "the Court retain[ed] continuing and exclusive jurisdiction over the Parties, the Economic Class Members, the Court Supervised Settlement Program and the Settlement Agreement, to interpret, implement, administer and enforce the Settlement Agreement, in accordance with its terms." (Doc. 8139, ¶ 17 at 6.) Claimants Nos. 100201250, 100272198, 100247042, and 100167847 are Economic Class Members who have filed or are filing Business Economic Loss claims and who will be deprived of the benefits of the settlement if the Court does not correctly interpret and enforce the Agreement. Because the Court has retained exclusive jurisdiction over Economic Class Members and the interpretation and enforcement of the Agreement, Claimants' Motion to Interpret the Agreement is properly before the Court.

---

[1] In accordance with the provisions of the Court's June 29, 2012 Order Regarding the Confidentiality of Claims Information of the Claims Administrator (Doc. 6822), Claimants are identified here only by number. (Doc. 6822.)

[2] Similar issues have been raised in the Motion for Amended Class Action Settlement Notice and Memorandum in Support filed by Brent Coon & Associates. (Doc. 14429.) That Motion, however, asks the Court to reissue the notice of the Settlement Agreement to the entire class. Claimants believe that it would be more efficient to have this Court interpret the Settlement Agreement and order the Claims Administrator to process claims in accordance with that interpretation than to spend the time and money necessary to reissue notice of the Settlement Agreement to every class member.

## II.

## BACKGROUND

"Exhibit 4B was the compromise reached by the parties on how an extremely difficult part of the claims process was to be handled" and can be "analogized to a stipulation at trial." *In re Deepwater Horizon*, 753 F.3d 509, 515 (5th Cir. 2014).  In effect, Exhibit 4B represents the parties' stipulation that "the evidentiary criteria of Exhibit 4B were a sufficient substitute for full trial of factual causation by preponderance of the evidence." *Id.*

As relevant to this motion, Exhibit 4B sets forth two evidentiary causation standards for BEL claims:  the "Modified V-Shaped Revenue Pattern" test and the "Decline-Only Revenue Pattern" test.  These Revenue Pattern tests are an agreed upon Court approved substitute for proof of actual causation.  The first revenue test (the "Total Revenue Test") compares a BEL Claimant's "total revenue" in a Benchmark Period of three consecutive months between May and December 2009 against a Compensation Period of the same three consecutive months in 2010.  The second revenue test (the "Customer Mix Test") – which is the subject of Policy 345 – compares "the share of total revenue generated by non-local customers" or "customers located in Zones A-C" and requires that a 10 percent decline be shown between the Benchmark and Compensation Periods.

Significantly, Exhibit 4B expressly states that for revenue to be considered in the Customer Mix Test, it must be "reflected in" four specific types of records:

> [A] decline of 10% in *the share of total revenue generated by non-local [or Zones A-C] customers* over the same period of three consecutive months from May-December 2010 as selected by claimant for the Modified V-Shaped [or Decline-Only] Revenue Pattern as identified in (II.B.1 [or II.B.2]) compared to the same three consecutive month period in 2009, *as reflected in*:

3

- customer credit card receipts or other contemporaneously maintained records of payment; or
- customer registration logs (e.g., hotel registries); or
- documentation maintained in the ordinary course of business that lists customers by location and monthly sales associated with those customers; or
- business documents reflecting contemporaneous recording of receipts or invoices listing customers by location.

Doc. 6430 at Exhibit 4B (attached hereto as Exhibit A) (emphasis added).

The Claims Administrator has issued three conflicting interpretations of the Customer Mix Test in Exhibit 4B. Those interpretations are contained in the Claims Administrator's Approved Policy 345. (Copies of the three versions are attached as Exhibit B).

Version 1 of Policy 345 ("Policy 345 v1") became effective on May 31, 2012 and provided that "[t]he customer mix test must be 'reflected in specified types of acceptable documentation . . . reflecting contemporaneous recording of receipts or invoices listing customers by location." Notably, the Claims Administrator determined in Policy 345 v1 that "[i]f no cash sale information is available, *cash sales would not be included in the analysis of either Benchmark or Compensation Period customer mix*." This interpretation of Exhibit 4B makes perfect sense. First, Exhibit 4B's plain language limited proof of the required decline in revenue to revenue "reflected in" the four types of specified documents. Revenue from sales without documentation of the customer's address is therefore excluded from the calculation. Second, the purpose of the Customer Mix Test is to evaluate the change in the share of sales represented by non-local or Zone A-C customers. Cash sales for which no customer address information is available are logically excluded because they have no probative value in the calculation.

While Policy 345 v1 was in effect, the Deepwater Horizon Oil Spill Economic And Property Damages Notice was distributed to Economic Class Members for the purpose of

4

explaining the terms of the Settlement Agreement and providing an opportunity to opt out of the settlement class. The class members were given until September 7, 2012 to object to the Settlement Agreement and until November 1, 2012 to opt out of the class. (Doc. 8138.) Thus, when evaluating whether to remain in the class or opt out, BEL Claimants, including Claimant Nos. 100201250, 100272198, 100247042, and 100167847, evaluated their potential claims and their ability to satisfy the Customer Mix Test in light of Policy 345 v1 and with no reason to expect that Policy 345 v1 would change.

After the objection and opt-out deadlines passed, the Claims Administrator issued Version 2 of Policy 345, effective February 28, 2013 ("Policy 345 v2"). That version of Policy 345 reaffirmed that "to establish Causation under the Customer Mix Test, a BEL claimant must provide supporting documentation of the type described" in Exhibit 4B. Version 2 did not address how revenue from cash sales is to be treated where customer location information is not available.

Version 2 was superseded by Version 3 on April 21, 2014. Version 3 changed the Customer Mix Test in two important ways. First, it labeled as "unknown" any customer address that was "provided in the form of a P.O. Box and/or any customer address in which the mapping software company's geo-coder can only identify the City and/or Zip Code," regardless of the P.O. Box's address or the location of the city and/or zip code. Second, and more problematically, it provides that revenue generated from any customer whose address is unknown (including cash sales or a P.O. box or zip code without a street address) would be counted *against* the claimant *twice*: first, because unknown addresses will be "excluded from the claimant's share of revenue generated by non-local customers or costumers located in Zones A-C" for the Benchmark Period and second, because unknown addresses will then be "included in

5

the claimant's share of revenue generated by non-local customers or customers located in Zones A-C" for the Compensation Period."

Under Policy 345 v3, any BEL Claimant with cash sales will have those sales counted *against* it in both the Benchmark Period and the Compensation Period. In other words, Policy 345 v3 assumes that during the Benchmark Period all cash sales came from *outside* the applicable geographic zone but that during the Compensation Period the same sales came from *inside* the applicable geographic zone. The result is that virtually any BEL Claimant that has cash sales is unable to meet the Customer Mix Test and is therefore deprived of the benefits of the Agreement.[3]

As demonstrated below, Version 3 is contrary to the express language of Exhibit 4B, is the most disadvantageous interpretation possible to claimants, and violates the Economic Class Members' rights to due process of law. Therefore, these Claimants respectfully requests that the Court interpret the Customer Mix Test in Exhibit 4B as the Claims Administrator did during the opt out period as set forth in Policy 345 v1 and direct the Claims Administrator to replace Policy 345 v3 with Policy 345 v1 and process all claims accordingly.

### III.

### THIS MOTION IS TIMELY

Policy 345 v3 was adopted on April 24, 2014 without any notice to class members. Claimants' counsel first became aware of the new policy on or about August 6, 2014. Claimants' counsel immediately contacted class counsel. On August 29, 2014 Claimants' counsel and class counsel had a conference call to discuss the impact of Version 3 on BEL

---

[3] The Claims Administrator noted that without documentation of cash sales it would be difficult if not impossible for some BEL Claimants to satisfy the test. However, the Claims Administrator interpreted the Settlement Agreement as requiring documentation of all customer addresses.

6

Claimants. Over the next several weeks Claimants' counsel requested that class counsel formally propose that Policy 345 v3 be rescinded and Policy 345 v1 be reinstated. Class counsel declined to do so.[4]

On September 30, 2014 Claimants' counsel presented the issue to the Claims Administrator by letter. Following various communications over the ensuing months, Claimants' counsel met with the Claims Administrator in New Orleans on March 10, 2015 and presented Claimant's arguments in support of rescinding Policy 345 v3. Claimants' counsel followed up with a detailed letter on March 13, 2015.

On April 14, 2015 Claimants' counsel received an e-mail from the Claims Administrator declining to revise Policy 345 v3, although the Claims Administrator indicated it was still considering how to define post office boxes. Claimants' counsel has heard nothing further from the Claims Administrator on this issue. This motion is therefore timely filed.

## IV.

## ARGUMENT AND CITATION OF AUTHORITY

A.  Policy 345 v3 Is Contrary to the Express Language of Exhibit 4B

Policy 345 v3 is not an interpretation of Exhibit 4B but a rewriting of Exhibit 4B. It ignores the plain language of Exhibit 4B, which states that "revenue generated by non-local" or "Zones A-C customers" will only be considered in the Customer Mix Benchmark if it is "*reflected in*" four types of specified documents. Instead, Policy 345 v3 looks at total *business* revenue, including revenue from cash sales, without regard to the fact that customers' locations

---

[4] In accord with Pretrial Order No. 11, Claimants' counsel contacted the Plaintiffs Steering Committee and advised it of their intent to file this motion. The PSC stated: "Class Counsel strongly believe that the original Policy better reflected the intent, spirit and terms of the Settlement Agreement, but question whether this motion is procedurally proper."

7

are not reflected in such sales.  It also adopts an illogical and unsupported approach to determine when customers' locations are "unknown" that greatly increases the number of unknown customers, even when it is obvious that customers are non-local (located more than sixty miles from the business) or outside of Zones A, B and C.  Finally, it implements a procedure that defies all logic – assuming that "unknown" customers are in one location for the Benchmark Period and in an entirely different location for the Compensation Period.  This rewriting of Exhibit 4B is contrary to the plain language of the Settlement Agreement and contrary to basic principles of contract interpretation.

>    1.  By interpreting "total revenue" to include revenues from all sales regardless of a customer's location, Policy 345 v3 contradicts the express language and intent of Exhibit 4B

The plain language of Exhibit 4B requires a BEL Claimant to show a decline in "the total revenue generated by non-local customers" or "customers in Zones A-C" over the same period of three consecutive months from May-December 2010 as selected by a BEL Claimant for the Modified V-Shaped or Decline Only Revenue Pattern compared to the same consecutive three-month period in 2009, "as reflected in" four specified types of documents.  The purpose of this benchmark is to evaluate the change in the share of sales represented by non-local or Zone A-C customers.

In Policy 345 v3, the Claims Administrator interprets "total revenue" to mean total revenue from the entire business or facility without regard to what records the sales are "reflected in."  Policy 345 v3 provides that if a BEL Claimant has cash sales without a street address, those cash sales are assumed to have come from *outside* the applicable geographic area during the Benchmark Period (*i.e.*, before the spill) and that cash sales made during the Compensation Period (*i.e.*, after the spill) came from *within* the applicable geographic area.

8

Policy 345 v3 assumes that cash sales increased after the spill in the applicable geographic zone, thus making it effectively impossible for BEL Claimants with cash sales to show a decline in local sales after the spill. Including revenue from sales in which the address is undocumented is directly contrary to the plain language of Exhibit 4B, which requires that revenue be derived from the listed documents, and its intent, which was to compare revenue based on customer location, not a blend of location-based customer data and data for which no customer information is known.

The Customer Mix Test set forth in Exhibit 4B does not permit the Claims Administrator to include all business revenues in the benchmark calculation; on the contrary, it expressly states that the claimant must demonstrate a decline of 10% in the "share of total revenue *generated by non-local [or Zone A-C] customers*" between the two relevant periods "*as reflected in*" any of the four types of business records specified in Exhibit 4B. Plainly, Exhibit 4B does not refer to all revenues of the business but to a decline in the share of total revenue generated by *certain customers* as reflected in *certain types of documents*. As discussed more fully below, the phrase "as reflected in" means that the four types of business records listed are the exclusive method of determining a customer's location. By including sales to customers at "unknown" addresses, Policy 345 v3 turns Exhibit 4B on its head, and uses *all* business revenues for the Customer Mix Test, including revenues that are *not* "reflected in" the specified documents.

When the Agreement's drafters meant that the business's total revenue should be counted, they knew how to do it. Indeed, the first part of the Modified V Revenue Pattern test requires that the downturn and subsequent upturn be based on "total *business* revenue" without limitation. In contrast, the Customer Mix Test refers not to "total business revenue" but to total

9

revenue "generated by non-local customers" or "customers in Zones A-C" that is "reflected in" four specified types of documents.

The goal of the Customer Mix Test is to assess the change in the share of sales represented by non-local or Zone A-C customers. Sales where the location of the customer is unknown must, therefore, logically be excluded. Policy 345 v3, however, includes all unknown sales and, as discussed more fully below, weighs all such "unknown" sales against BEL Claimants in both the Benchmark and the Compensation Periods. It is plain that Policy 345 v3 has simply rewritten the Customer Mix Test to the detriment of virtually every business that would otherwise qualify for compensation under the Modified V-Shaped or Decline-Only Revenue Patterns test.

        2.        The inclusion of unknown addresses in the Customer Mix Test is contrary to basic principles of statutory and contract interpretation

The plain language of Exhibit 4B states that the Customer Mix Test considers revenues only from sales to customers whose addresses are "reflected in" four specific types of documents. Basic principles of contract interpretation, therefore, support the conclusion that Exhibit 4B limits the proof of a decline in the share of total revenue generated by non-local or Zones A-C customers to the four types of documentation specifically listed.

First, the canon *expressio unius est exclusion alterius* dictates that the list of documents contained in Exhibit 4B are the exclusive types of proof required to show customers' addresses. This fundamental canon of contract construction holds that "to express or include one thing implies the exclusion of the other, or of the alternative." Black's Law Dictionary 620 (8th ed. 2004). As the Fifth Circuit has explained, "the principle of *expressio unius est exclusio alterius* counsels us that the expression in a contract of one or more things of a class implies the exclusion of all not expressed, even though all would have been implied had none been

expressed." *A2D Techs. Inc. v. MJ Sys., Inc.*, 269 F. App'x 537, 542 (5th Cir. 2008) (internal marks and citation omitted). Because Exhibit 4B contains a specific list of the four types of documentation that can be used to show a customer's location—(i) customer credit card receipts or other contemporaneously maintained records of payment; (ii) customer registration logs; (iii) documentation maintained in the ordinary course of business that lists customers by location and monthly sales associated with those customers; or (iv) business documents reflecting contemporaneous recording of receipts or invoices listing customers by location—it necessarily excludes revenue where a customer's location is not shown in those documents.

Second, the phrase "as reflected in" applies to the entire paragraph and therefore limits the proof of a decline to the four types of documentation listed. For example, when used in contracts, "as reflected in" has been held to mean as specified in referenced documents. *Consumers Energy Co. v. United States*, 65 Fed. Cl. 364, 368 (2005). Otherwise, the phrase "as reflected in . . . would have no purpose or effect." *Id.*

This conclusion is also supported by the punctuation used in the paragraph. According to Justice Scalia and Bryan Garner, "[p]unctuation is a permissible indicator of meaning," and, in particular, punctuation "will often determine whether a modifying phrase or clause applies to all that preceded it or only to a part." Antonin Scalia & Bryan A. Garner, Reading Law: The Interpretation of Legal Texts, 161 (2012); *see also U.S. Nat'l Bank of Ore. v. Ind. Ins. Agents*, 508 U.S. 439, 454 (1993) (a legal text's plain meaning must be enforced, and such meaning typically will heed commands of its punctuation); *NACS v. Bd. of Governors of Fed. Reserve*, 756 F.3d 474, 486-87 (D.C. Cir. 2014) (stressing importance of commas in determining the application of a descriptive phrase); *In re Lehman Bros. Mortgage-Backed Sec. Litig.*, 650 F.2d

167, 176 (2d Cir. 2011) (statute should be interpreted considering the ordinary meaning of Congress's chosen language as informed by its punctuation).

In the Customer Mix Test, the calculation methodology is set out and followed by one comma, which is immediately followed by the phrase "as reflected in." There is no other punctuation in the sentence before this comma. "[A]s reflected in" must, therefore, be read to modify the entire provision that precedes it. Thus, "a decline of 10% in the share of total revenue generated by non-local or [Zone A-C] customers" is proven by demonstrating the decline in the share of total revenue generated by customers in the specified locations "as reflected in" the listed categories of documents. Revenues from customers whose locations are unknown—who are, by definition, those not reflected in the four categories of documents, all of which show customer locations—are excluded from the Customer Mix Test.

The parties went to the effort of identifying and specifying the types of documentation maintained by class members that would show the locations of customers, and then specified that those are the records to be used in performing the Customer Mix Test. The parties agreed to these types of documents for the additional reason that they constitute contemporaneous and verifiable sources of data. Policy 345 v3, however, reads this language completely out of the Agreement. The Court should correct this error by directing the Claims Administrator to rescind Policy 345 v3 and to return to the interpretation and methodology set forth in forth in Policy 345 v1, which provided that "[i]f no cash sale information is available, cash sales would not be included in the analysis of either Benchmark or Compensation Period customer mix."[5]

---

[5] Claimants' counsel also suggested to the Claims Administrator that cash sales could be treated the same as sales for which addresses were known. For example, if 70% of documented sales are local then treat 70% of the cash sales as local and 30% as non-local. Non-cash sales would then "reflect" cash sales. The Claims Administrator declined to accept that approach.

B.  Policy 345 v3 Provides an Interpretation of Exhibit 4B That Is Obviously Disadvantageous to the Class

In addition to finding no support in the plain language and intent of Exhibit 4B, Policy 345 v3 further disregards the Claims Administrator's duty to use his best efforts to provide class members with "the best opportunity to be determined eligible for and receive the settlement Payment(s) to which the Economic Class Member is entitled under the terms of the Agreement." (Settlement Agreement § 4.3.7.) Instead, Policy 345 v3 makes it essentially impossible for any BEL Claimant to recover its losses under the Modified V-Shaped or Decline-Only Revenue Patterns tests.

1.  Policy 345 v3's attribution of unknown address revenue and its determination of which customers are unknown is an artificial construct with no basis in reality or in the text of the Settlement Agreement

Under Policy 345 v3, unknown sales are considered to be *within* the 60-mile radius during the Benchmark Period and *outside* the 60-mile radius during the Compensation Period. Likewise, unknown sales are placed in Zone D during the Benchmark Period but then in Zones A-C during the Compensation Period. There is, of course, no textual or factual support in the Agreement for treating revenues from a customer in the *same* location as coming from *different* locations in different periods.

Also not provided for in the Agreement is Policy 345 v3's decision to place customers with P.O. boxes or addresses unrecognized by the Claims Administrator's software in the "unknown" category—thereby deeming the customer to be both inside of the applicable area and outside the applicable area, depending on the time frame. This treatment is wholly illogical. Customers with P.O. Boxes as far away as Anchorage, Alaska and Bangor, Maine are considered to be *within* 60 miles of the claimant's location in the Benchmark Period. *See* Exhibit C, showing actual customers of Claimant No. 100201250 who have only a P.O. Box address and

13

who are obviously located more than 60 miles away but are considered to be within 60 miles of Claimant No. 100201250's facility under Version 3 of Policy 345.  This documentation was provided to the Claims Administrator.

There is no basis for placing such incorrect assumptions on the scales against BEL Claimants.  Nor is it fair to penalize a business by causing it to fail a test under which it otherwise would be entitled to compensation based on the vagaries and inadequacies of the mapping program provided by the Claims Administrator's vendor.  However, if the Customer Mix Test is applied as it is written in Exhibit 4B and Policy 345 v1, such arbitrary results will not occur because unknown addresses will be excluded and will not affect the outcome of the Test.

> 2.  <u>The Customer Mix Test is virtually impossible to pass in light of Policy 345 v3</u>

Because Policy 345 v3 treats customers with P.O. Boxes or addresses unrecognized by the Claims Administrator's vendor's software as unknown and then weighs all unknown customers against a claimant in *both* the Benchmark Period and the Compensation Period, the Customer Mix Test is virtually impossible for any claimant to pass.

Take, for example, this chart showing the revenues from one of Claimant No. 100201250's facilities:

| Policy 345, Version 1 -Ignore unknown sales | Customer Residence | Reference | July-September 2009 | | July-September 2010 | | Zones A-C Decline |
|---|---|---|---|---|---|---|---|
| | Zone D* | (1) | $ 5,428,570.15 | 84.30% | $ 4,253,379.35 | 89.20% | **31.17%** |
| | Zones A-C | (2) | $ 1,010,678.90 | 15.70% | $ 515,135.97 | 10.80% | (15.7-10.8)/15.7 |
| | Known Customers | (1)+(2) | $ 6,439,249.05 | | $ 4,768,515.32 | | Passes Test |
| | | | Not Used in Calculation | | | | |
| | Unknown | (3)-(1)-(2) | $ 2,330,448.50 | 26.57% | $ 1,904,739.20 | 28.54% | |
| | Total Revenues from P&Ls | (3) | $ 8,769,697.55 | | $ 6,673,254.52 | | |

| Policy 345, Version 3 -Unknown sales assumed to be from Zone D in 2009 and from Zones A-C in 2010 | Customer Residence | Reference | July-September 2009 | | July-September 2010 | | Zones A-C Decline |
|---|---|---|---|---|---|---|---|
| | Zone D* | (1) | $ 5,141,074.76 | 58.62% | $ 4,042,198.99 | 60.57% | **-261.60%** |
| | Unknown | (3)-(1)-(2) | $ 2,672,413.12 | 30.47% | $ - | 0.00% | (10.9-39.43)/10.9 |
| | Subtotal: Zone D for Calc. | | $ 7,813,487.88 | 89.10% | $ 4,042,198.99 | 60.57% | Fails Test |
| | Zones A-C | (2) | $ 956,209.67 | 10.90% | $ 482,301.01 | 7.23% | |
| | Unknown | (3)-(1)-(2) | $ - | 0.00% | $ 2,148,754.52 | 32.20% | |
| | Subtotal: Zones A-C for Calc. | | $ 956,209.67 | 10.90% | $ 2,631,055.53 | 39.43% | |
| | Total Revenues from P&Ls | (3) | $ 8,769,697.55 | | $ 6,673,254.52 | | |

*Note: This category includes sales to customers in Zone D as well as to those outside of the Gulf Coast Areas. In other words, it reflects all sales to customers who are not in Zones A-C.

At this facility, when using Policy 345 v1 and excluding cash sales and other unknown customer locations from the test, Claimant No. 100201250 could demonstrate a 31.17% decline in the share of total revenue from Zones A-C customers. This amount easily passes the Revenue Pattern test of Exhibit 4B.[6] Under Policy 345 v3, however, when unknown revenues are added into the calculation during both the Benchmark and Compensation period, Claimant No. 100201250 now inexplicably shows a 261.6% *increase* in the share of total revenue from customers located in Zones A-C. Under version 3, therefore, Claimant No. 100201250 markedly fails the Revenue Pattern test, even though it would have easily passed using the methodology of version 1.

Many similarly situated claimants that would have passed the test when unknown addresses are excluded (per Policy 345 v1) will now fail – dramatically so – when unknown revenues are included and counted against a claimant (per Policy 345 v3). In other words, the

---

[6] A claimant located in Zone B or C needs to show only a *5%* drop and a claimant in Zone D only *10%* drop to satisfy the revenue pattern component of the Modified V test. The steepest decline required by any test in Exhibit 4B is 15% for Zone D facilities qualifying under the Decline-Only Revenue Pattern test

15

unjustified and irrebutable presumptions created by Policy 345 v3 cause claims that would easily pass the Customer Mix Test to fail instead. Contrary to the parties' intent as reflected by the plain language of Exhibit 4B, the effect of Policy 345 v3 is to eliminate the Modified V and Decline-Only Revenue Pattern test for virtually all BEL Claimants. This is in direct conflict with the Claims Administrator's obligation to maximize class members' opportunity to receive settlement payments. Policy 345 v3 *minimizes* the opportunity of class members to recover. The Court should correct this error and direct the Claims Administrator to reinstitute Policy 345 v1.

      C.      <u>Class Members Relied on the Interpretation of Exhibit 4B as Set Out in Policy 345 v1 in Deciding Whether to Object and/or Opt Out</u>

Not only is Policy 345 v3 antithetical to the plain language and intent of Exhibit 4B and illogical in practice, but it also renders inadequate the Class Notice and eviscerates class members' due process rights. Policy 345 v1, which excluded unknown customers from the Customer Mix Test, became effective on May 31, 2012. There was no change to Policy 345 v1 between its effective date and the deadline for potential class members to opt out of the class on November 1, 2012.

In determining whether to opt out of the class, BEL Claimants, including Claimant Nos. 100201250, 100272198, 100247042, and 100167847, relied on the understanding of the Customer Mix Test as set forth in Policy 345 v1 that revenues from unknown sales would be excluded from the test. These Claimants and other BEL Claimants declined to opt out of the class on the assumption that they had claims for which they were entitled to compensation under the Modified V-Shaped or Decline-Only Revenue Pattern causation provisions. Only after the deadline to opt out of the class had passed was the interpretation of the Customer Mix Test changed to make it virtually impossible to pass. Indeed, under Policy 345 v3, Claimants Nos. 100201250, 100272198, 100247042, and 100167847 no longer have compensable BEL claims,

whereas they had compensable claims as of the November 1, 2012 opt-out deadline under Policy 345 v1.

Rule 23 of the Federal Rules of Civil Procedure requires that class members receive notice of a class settlement to ensure that the mandates of constitutional due process are protected. *See In re Monumental Life Ins. Co.*, 365 F.3d at 416-17 (5th Cir. 2004) (explaining that the notice and opt out requirements of Rule 23(b)(3) are "fundamental requisites of the constitutional guarantees of procedural due process"); *see also Wal–Mart Stores, Inc. v. Dukes*, 131 S. Ct. 2541, 2558–59 (2011) (noting the stringent due process requirements imposed for individual monetary claims under Rule 23(b)(3)); Fed. R. Civ. P. 23(e)(2) (requiring a hearing and findings of fairness, reasonableness, and adequacy before the court may approve a settlement that would bind absent class members). Notice of a class settlement "therefore requires that class members be given information reasonably necessary for them to make a decision whether to object to [or opt out of] the settlement." *In re Katrina Canal Breaches Litig.*, 628 F.3d 185, 197 (5th Cir. 2010).

Here, the class notice was intended to provide class members with information so that they could make an informed decision on whether to opt out of the settlement class. The plain language of Exhibit 4B, and Policy 345 v1 interpreting it, made it clear that customers' locations would be determined exclusively through the use of the four types of documents listed in Exhibit 4B and that customers with unknown locations would be excluded from the Test. Using this information, many BEL Claimants, including Claimants Nos. 100201250, 100272198, 100247042, and 100167847, chose not to opt out of the class. Then, after the deadline to opt out had long passed, the Claims Administrator adopt Policy 345 v3, which rewrote the Customer Mix Test in Exhibit 4B and made it impossible for these Claimants and others to satisfy the Test,

17

which they would have under Policy 345 v1. In these circumstances, unless the Court interprets Exhibit 4B of the Settlement Agreement in a manner consistent with its plain language and with Policy 345 v1, class members, including Claimant Nos. 100201250, 100272198, 100247042, and 100167847, will be deprived of their due process rights. Specifically, the Court should order that the four types of documents listed in Exhibit 4B are the exclusive sources to determine a customer's location under the Customer Mix Test. The Court should also order that for customers whose locations are unknown, their revenues must be excluded from the Customer Mix Test.

## V.

## CONCLUSION

In order to protect the integrity of the Settlement and the rights of class members, the Court should abrogate Policy 345 v3 and direct the Claims Administrator to reinstitute Policy 345 v1.

Respectfully submitted this 21ST day of May, 2015.

/s/ James M. Garner
**JAMES M. GARNER (#19589)**
**MARTHA Y. CURTIS (#20446)**
SHER GARNER CAHILL RICHTER KLEIN & HILBERT, L.L.C.
909 Poydras Street, Suite 2800
New Orleans, Louisiana 70112
Telephone: (504) 299-2100
Facsimile: (504) 299-2300

/s/ James R. Swanson
**JAMES R. SWANSON (#18455)**
**LARA K. RICHARDS (#34054)**
FISHMAN HAYGOOD, L.L.P.
201 St. Charles Avenue, Suite 4600
New Orleans, Louisiana 70170-4600
Telephone: (504) 586-5252

Facsimile: (504) 586-5250
/s/ Gladstone N. Jones, III
**GLADSTONE N. JONES, III (# 22221)**
**LYNN E. SWANSON (# 22650)**
**CATHERINE E. LASKY (#28652)**
**H.S. BARTLETT III (# 26795)**
JONES, SWANSON, HUDDELL & GARRISON, L.L.C.
PAN-AMERICAN LIFE CENTER
601 Poydras Street, Suite 2655
New Orleans, LA 70130
Telephone: (504) 523-2500
Facsimile: (504) 523-2500


/s/ Robert B. Remar
**ROBERT B. REMAR**
**JEFFREY W. WILLIS**
**JULIA B. STONE**
ROGERS & HARDIN LLP
2700 International Tower
Peachtree Center
229 Peachtree Street, N.E.
Atlanta, GA  30303-1604
Telephone: (404) 522-4700
Facsimile: (404) 525-2224
Email: rremar@rh-law.com
         jwillis@rh-law.com
         jstone@rh-law.com

PRO HAC ADMISSIONS FORTHCOMING
ATTORNEYS FOR CLAIMANTS


**CERTIFICATE OF SERVICE**

I hereby certify that on May 21, 2015, I filed and served the foregoing pleading via Lexis/Nexis File & Serve and through this Court's CM/ECF Filing System with the Clerk of Court of the United States District Courthouse for the Eastern District of Louisiana, 500 Poydras Street, New Orleans, Louisiana, thereby effecting service on all counsel of record.

/s/ James M. Garner
JAMES M. GARNER