UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF LOUISIANA

| | | |
|---|---|---|
| IN RE:  OIL SPILL BY THE OIL RIG | : | MDL 2179 |
|           "DEEPWATER HORIZON" IN THE | : | |
|           GULF OF MEXICO, ON APRIL 20, 2010 | : | Section J |
| | : | |
| This Document Applies to: | : | Judge Barbier |
| | : | |
| *No. 12-970, Bon Secour Fisheries, Inc., et* | : | Mag. Judge Shushan |
| *al. v. BP Exploration & Production Inc., et al.* | : | |

MEMORANDUM IN SUPPORT OF
MOTION OF THE DHECC FOR RETURN OF PAYMENTS MADE TO
<u>ALLIANCE & ASSOCIATES, LLC, CRYSTAL SEAFOOD COMPANY, INC., AND OTHERS</u>

Claims Administrator Patrick Juneau and Special Master Louis J. Freeh seek to have claimants Alliance & Associates, LLC ("Alliance") and Crystal Seafood Company, Inc. ("Crystal") return payments made by the Deepwater Horizon Economic Claims Center ("DHECC").  Alliance and Crystal filed Business Economic Loss ("BEL") claims with the DHECC for seafood processing businesses that purportedly operated before and after the oil spill at the same location in Port Arthur, Texas.  In fact, Alliance and Crystal ceased processing seafood at the facility no later than September 2009, when a different company began operating at the location.  Alliance and Crystal never resumed business at the facility after the spill, and thus were ineligible for BEL payments.

Relying on the misrepresentations by Alliance and Crystal, the DHECC paid Alliance $2,134,395.45 and Crystal $1,034,228.42.  The DHECC seeks return of this money.

On May 22, 2015, counsel for Alliance withdrew from representation of the entity and repaid legal fees of $533,475.11 to the DHECC.  Alliance has not agreed to repayment. Discussions with counsel for Crystal have not resolved the issues presented in this motion.

### A. *Background*

The Claims Administrator has authority to ensure the integrity of the DHECC, including by repayment of fraudulent claims. *See* Order of May 6, 2015 (Rec. Doc. 14543); Settlement Agreement at ¶ 4.3.10. The Court retains continuing jurisdiction over the Settlement Agreement. Settlement Agreement at ¶¶ 4.4.7 and 18.1. Disputes concerning enforcement of the Settlement Agreement are to be resolved by motion to the Court. *Id*.

### B. *The DHECC Claims*

Alliance and Crystal were organized as Nevada limited liability companies, listing the same address in Carson City, Nevada and sharing the same registered agent.

Alliance, through its authorized representative Vinh Tran, filed a BEL claim with the DHECC, seeking to have the claim paid on Alliance's alleged historical income as reported in financial documents provided by Alliance. *See* Ex. A. Crystal, through its representative Christopher Tran, Vinh Tran's brother, also filed a BEL claim seeking to have the claim paid on Crystal's alleged historical income. *See* Ex. B.

When filing their DHECC claims in July and August 2012, Crystal and Alliance each said that the entities are seafood processors, operating a seafood processing plant at 3933 Martin Luther King Jr. Drive in Port Arthur, Texas (the "Port Arthur Location") before and after the oil spill. Both companies represented that the Port Arthur Location was their current headquarters and had been the only physical location for the business from April 1, 2010 through December 31, 2010. *See* Exs. A & B at B.2 & B.7. Both entities further stated that the businesses had not "ceased operations, declared bankruptcy or liquidated substantially all of [their] assets." *Id.* at B.11.

1.  General Requirements for Business Economic Loss Claims

Entities regularly purchasing seafood harvested in specified gulf waters are included in the DHECC settlement program only if they "owned, operated, or leased a physical facility" in the gulf coast area "at any time from April 20, 2010 to April 16, 2012." *See* Settlement Agreement at ¶ 1.2. Claimants meeting the physical facility requirement must provide the DHECC with, among other items, federal tax returns and monthly profit and loss statements ("P&L") for the selected Benchmark Period, for 2010, and at times for 2011. *Id.* at Ex. 4A at ¶¶ 3-4. Primary seafood processors are not required to provide any evidence of causation. *Id.* at Ex. 4B at ¶ I.

The BEL compensation framework has two steps. The first step compensates claimants for certain reductions in variable profit by comparing variable profits for three or more consecutive months between May and December 2010 with variable profits for those same months during a Benchmark Period. The second step compensates claimants for the incremental profits they might have generated absent the oil spill relative to revenue from a Benchmark Period. Claimants also receive a risk transfer premium. The DHECC calculates the compensation using data provided by claimants.

2.  Business Economic Loss Documentation

    a.  *Alliance*

Alliance initially filed claims with the Gulf Coast Claims Facility ("GCCF"). Alliance provided the GCCF with 2008 – 2010 monthly financial statements and federal tax returns. The 2008 and 2009 returns were dated November 22, 2010, weeks after Alliance filed a claim for GCCF emergency advance payment. While Alliance claimed to be a successful shrimp wholesale business that suffered a significant revenue drop from 2009 to 2010, *see*

Ex. C at 7, the GCCF found that Alliance had not provided supporting documentation such as a seafood dealer license, lease agreements for its business location or trip ticket data.

On July 30, 2012, Alliance filed its BEL claim using the same 2008 – 2010 tax returns and monthly profit and loss statements filed with the GCCF.  The DHECC issued Alliance an eligibility notice, but BP appealed the eligibility finding.  In response to BP's appeal, Vinh Tran filed two affidavits with the DHECC.  In one, he said Alliance operated its business at the Port Arthur Location.  *See* Ex. D at 6.  In the other, he said:

> The Company has not entered bankruptcy, has not liquidated its business capital assets or equipment, and has not "ceased operations and wound down."  The Company continues to maintain its place of business, pay overhead and standing fixed costs, and keep fixtures and equipment ready for a Gulf seafood market recovery sufficient to return the business to profitability.

*See id.* at 11.

        b.    *Crystal*

On August 8, 2012, Crystal filed its BEL claim and provided the DHECC with 2007 – 2010 federal tax returns and monthly profit and loss statements.  The 2009 and 2010 returns were prepared in July 2012, a month before Crystal filed its DHECC claim.

    3.    <u>DHECC Calculation and Payments</u>

The DHECC relied on the data provided by Alliance and Crystal to calculate the claims and used May – December 2009 as the Benchmark Period for both entities.  The DHECC awarded and paid Alliance $2,134,395.45, including accounting fees and other adjustments.  The DHECC awarded and paid Crystal $1,034,228.42. Faegre, Baker, Daniels LLP, received attorney's fees of $258,557.10 on the Crystal claim.

On May 22, 2015, counsel for Alliance, Faegre, withdrew from representation of Alliance and repaid legal fees of $533,475.11 from the Alliance claim to the DHECC.

### C. *Evidence of the Fraudulent Claims*

The totality of the record shows there is no genuine issue as to any material fact and that the DHECC is entitled to a judgment as a matter of law. *See* Order & Reasons on Special Master's Motion for Return of Payment at 19 (Doc. Rec. 12794).

Alliance and Crystal both claimed eligibility as class members in the BEL program because they allegedly "owned, operated, or leased a physical facility" for processing seafood before and after the oil spill. Both entities told the DHECC that the Port Arthur Location was their current headquarters and had been the only physical location for the businesses from April 1, 2010 through December 31, 2010. *See* Exs. A & B at B.2 & B.7. Both entities further said the businesses had not "ceased operations, declared bankruptcy or liquidated substantially all of [their] assets since May 1, 2010." *Id.* at B.11.

The representations for eligibility by Alliance and Crystal were false. Neither Alliance nor Crystal "owned, operated, or leased" the Port Arthur Location after September 2009, when an unrelated entity began leasing the location from the property owner, Lot, Inc. ("Lot"), and became the only seafood processor at the location. After the spill, neither Alliance nor Crystal leased or conducted business at the Port Arthur Location, which Crystal's business representative — also the business representative for Lot — said "remained idle since [the unrelated entity] vacated the premises" in November 2010. *See* Ex. H at 10 at ¶ 7. Before the oil spill, Lot also had purchased the processing equipment at the Port Arthur Location, except for some insulated vats (described in Lot's appraisal as being in poor condition), four wash tanks (also in poor condition) and a shrimp deheading system (also in poor condition) belonging to Crystal. *Id*. at 6-8, 92-94.

1. **Seafood Processing Businesses at the Port Arthur Location Operated By Members of the Tran Family Were Shut Down by September 2009.**

Vinh and Christopher Tran were the authorized business representatives, respectively, for the Alliance and Crystal BEL claims, but their brother Loc Chanh "Victor" Tran was the *de facto* owner of the Port Arthur Location operations. Victor Tran conducted business at the Port Arthur Location under three different trade names: Crystal, Titan Seafood Company ("Titan"), and Lot.[1] Crystal and Titan engaged in seafood processing, while Lot owned and leased the property, facilities and equipment. Alliance appears to have been in the business of printing and selling plastic bags. *See* Ex. F at 42. Faegre represented Crystal, Alliance, Titan, Lot and other related entities and persons.

To the extent that Alliance or Crystal had seafood processing operations at the Port Arthur Location, the entities ceased operation at the Port Arthur Location by September 2009. Investigators interviewed Thomas Crane, the production manager from April 2006 until September 2009 at the Port Arthur Location for Crystal and Titan, which Crane said were the same operation but with different names because of a local tax issue. Crane said the processing business for Crystal and Titan at the Port Arthur Location essentially stopped after Victor Tran was convicted and went to federal prison, and completely ceased by the time a new tenant leased the facility in September 2009.

Crane's statement is corroborated by records from Victor Tran's criminal conviction in the Eastern District of Texas for making false statements to the U.S. Small Business Administration ("SBA") for Titan to obtain Hurricane Rita relief funds. *See* Ex. F. In January 2009, Victor Tran pleaded guilty, and his pretrial release conditions were continued

---

[1] Christopher Tran was the authorized business representative for BEL claims by Crystal, Titan, and for a Failed Business Claim by Lot.

pending his sentencing. *Id*. On April 8, 2009, Victor Tran abruptly and without notice was arrested on an application for revocation of pretrial release. *Id*. He consented to detention, and remained in custody until he completed his 48-month sentence in September 2012. *Id*.

Crane's statement is further corroborated by the records in the trip ticket database maintained by the Texas Parks & Wildlife Department. The last trip tickets documenting seafood purchases by Titan were dated April 7, 2009 – the day before Victor Tran was taken into federal custody. The Texas database has trip tickets for the new tenant who operated at the Port Arthur Location, Flor-Tex Shrimp Company, LLC ("Flor-Tex"), beginning in fall of 2009 through late 2010 when Flor-Tex ceased operation. The database has no tickets for Titan in 2010 or 2011, and has no trip tickets for Crystal or Alliance from January 1, 2007 through December 31, 2011.

Investigators also interviewed Robert Paterson and John Miller, president and general manager of Tampa Bay Fisheries, Inc. ("TBF"), both of whom were formerly with Flor-Tex. Paterson had been a customer of Crystal and Titan until Victor Tran's April 2009 incarceration. Shortly after Tran's incarceration, Paterson and Miller said that Flor-Tex had an opportunity to lease the Port Arthur Location for its own shrimp processing business. In the summer of 2009, before Flor-Tex's operations began, Paterson and other TBF staff visited the site, and found no seafood being processed at the Port Arthur Location at that time. The facility needed extensive renovations before Flor-Tex operations could begin.

On August 27, 2009, Flor-Tex and Lot entered into a lease agreement for the Port Arthur Location[2] which included use of the two buildings and the processing equipment

---

[2] Because the property contained two buildings, the Port Arthur Location has been referred to as 3931 and 3933 Martin Luther King Jr. Drive. The Port Arthur Location, however, to the extent it was in operation, was run as a single seafood processing operation during the benchmark and compensation periods.

- 7 -

from September 1, 2009 through August 31, 2010.  *See* Ex. G at ¶ 5.  Victor Tran's wife signed the agreement on behalf of Lot, but Paterson said he negotiated the agreement's terms with Victor Tran while Tran was in prison.  As Paterson explained and as was confirmed by the Texas trip ticket database, from September 2009 through November 2010, when Flor-Tex vacated the location, Flor-Tex was the only seafood processing operation at the Port Arthur Location.

After Flor-Tex left the facility, neither Crystal nor Alliance had any lease or operations at the Port Arthur Location.  Christopher Tran said in a sworn statement filed with Lot's DHECC claim that Flor-Tex abandoned the Port Arthur Location by November 2010, and that the Port Arthur Location "has remained idle since Flor-Tex vacated the premises."  *See* Ex. H at 2 at ¶¶ 6-7.  An assessor report attached to a November 2012 Christopher Tran affidavit confirmed that the Port Arthur Location "has not had commercial shrimp processing operations for over one year."  *See* Ex. H at 21.  Another report found the location's equipment to be in overall poor condition and "not used on a daily basis," with some pieces described as "not working" and not being "up to health code." *Id*. at 75-76, 93.

The lack of operations at the Port Arthur Location is further confirmed by Christopher Tran's own trip tickets in the Texas database.  His last trip ticket with Titan was on April 7, 2009, the day before Victor Tran entered federal custody.[3]  From September 2009 to November 2010, Christopher Tran had 33 trip tickets with Flor-Tex.  He had ten trip tickets between December 1, 2010 and December 31, 2011, all with Kim's Seafood.  Christopher Tran had no trip tickets in 2009, 2010 or 2011 from Crystal or Alliance.

---

[3] Christopher Tran filed a shrimp boat captain claim, which the DHECC found eligible for $249,501.78 in compensation.  The claim has been placed on hold pending further investigation.

- 8 -

Taken together, the facts show that the representations to the DHECC by Alliance and Crystal about their operations as seafood processors at the Port Arthur Location were false. These entities ceased operations at the Port Arthur Location months before the oil spill, and never resumed operations at the location after the spill. The entities were ineligible for class membership or recovery under the Business Economic Loss Program.

    2.    No Credible Evidence that Alliance Processed Seafood at the Port Arthur Location.

The evidence indicates that Alliance never operated any business, let alone a seafood processing business, at the Port Arthur Location.

Vinh Tran represented in an April 2013 affidavit to the DHECC that Alliance "continues to maintain its place of business, pay overhead and standing fixed costs, and keep fixtures and equipment ready for a Gulf seafood market recovery sufficient to return the business to profitability." *See* Ex. D at 11. Yet on October 8, 2008, a federal grand jury in the Eastern District of Texas indicted Vinh Tran, charging that he made false statements in an SBA Hurricane Rita disaster assistance claim. *See* Ex. E at 4. Vinh Tran apparently had claimed that Alliance's building at a different inland address in Port Arthur was damaged by Hurricane Rita, when in fact the building previously had been partially destroyed in a fire deemed by investigators to have been caused by arson. *Id.* at 9. An SBA investigator also testified under oath before a Texas federal court that Victor Tran had submitted false invoices from Alliance to support other disaster relief claims. Ex. F at 43.

On March 5, 2012, the government moved to dismiss the indictment against Vinh Tran, stating that the government had been unable to locate Vinh Tran, whom the government said apparently fled the United States to avoid prosecution. Ex. E at 12.

Further, Thomas Crane, the Port Arthur Location production manager from 2006 through 2009, told investigators that neither Alliance nor Vinh Tran operated at the location during that period. Senior staff at Flor-Tex, the Port Arthur Location tenant from September 2009 to November 2010, also had no knowledge of Alliance or Vinh Tran operating a seafood processing business at the Port Arthur Location.

The statements by Crane and the Flor-Tex staff are corroborated by the Texas trip ticket database, provided by the Texas Parks & Wildlife Department. The database neither contains any trip tickets for Alliance from January 1, 2007 through December 31, 2011, nor lists any past or present seafood dealer named "Alliance." Consistent with these records, Alliance failed to produce any trip tickets to either the GCCF or the DHECC.

No independent evidence establishes that Alliance ever was a seafood processor at the Port Arthur Location during the DHECC benchmark and compensation periods.

### D. *Legal Analysis*

1. Alliance and Crystal Should Return All Funds Received from the DHECC Because Their Claims Were Fraudulent.

The Court's power to order equitable remedies as a result of fraudulent conduct is a broad, flexible and long-standing power. *See Hazel-Atlas Glass Co. v. Hartford Empire Co.*, 322 U.S. 238, 244 (1944). Here, the evidence shows that Alliance and Crystal presented false information to the DHECC to obtain substantial compensation. Alliance and Crystal claimed to operate a seafood processing business at the Port Arthur Location both before and after the oil spill. But Flor-Tex, an unrelated entity, leased the facility and became the only seafood processor there as of September 2009. Crystal's own representative said the Port Arthur Location was unused after Flor-Tex vacated the premises in November 2010. Neither Crystal nor Alliance had any trip tickets after April 2009.

        a.    *Counsel for Crystal Misconstrues the*
             *Nature of the Misrepresentations Supporting Restitution*

Counsel for Crystal disagrees with the DHECC's restitution request, stating that the DHECC has not cited misrepresentations in the entities' financial data, which counsel says show that Crystal sold shrimp inventory after the spill.

Counsel's position misconstrues the nature of the misrepresentation by Crystal. To be eligible for compensation, Crystal needed to show that it "owned, operated, or leased a physical facility" in the gulf coast area "at any time from April 20, 2010 to April 16, 2012." *See* Settlement Agreement at ¶ 1.2. Crystal claimed to satisfy this requirement through their operations at the Port Arthur Location, yet Crystal did not own, operate or lease the Port Arthur Location after September 2009. Crystal has no trip tickets for shrimp purchases after April 2009. Crystal sold all but some minimal processing equipment in poor condition to Lot long before the oil spill. *See* Ex. H at 6-8, 92-94. And Crystal's own representative said the Port Arthur Location was used by Flor-Tex from September 2009 to November 2010, and unused after Flor-Tex vacated the premises in November 2010. *Id.* at 2 at ¶¶ 6-7. No further misrepresentation need be shown for restitution to be appropriate.

        b.    *Crystal Misrepresented Itself as an On-Going Business*

Crystal's counsel provided the DHECC six checks totaling $312,000.29 and dated from January 2010 to August 2010, all from Tampa Bay Fisheries, Inc. ("TBF"), to support the position that Crystal was an on-going seafood processor in 2010. *See* Ex. I. In fact, the checks further illustrate Crystal's misrepresentations about its business operations.

Crystal represented to the DHECC that it had not "ceased operations, declared bankruptcy or liquidated substantially all of [its] assets," *see* Ex. B at B.11, yet the sales

documented in the six 2010 checks were a liquidation of Crystal's remaining stock from April 2009 when Victor Tran entered custody and Crystal ceased operations.

The TBF business manager explained that the six checks were for the purchase as needed of frozen shrimp sent by Crystal to TBF in June 2009. The TBF business manager said that in June 2009, Crystal said it had a refrigeration failure at its Port Arthur Location and arranged to send several tractor-trailers of frozen shrimp to TBF in Dover, Florida, and to Seaboard Cold Storage ("Seaboard"), a nearby cold storage facility. TBF bought the frozen shrimp in 2010 as need arose for different shrimp types, until no shrimp remained.

The business manager's statement is corroborated in several ways. First, bills of lading provided by Seaboard confirm that Crystal sent numerous tractor-trailer loads of frozen shrimp to Seaboard's facility in Florida, all arriving in late June 2009. *See* Ex. J. Second, the former production manager for Crystal and Titan at the Port Arthur Location said processing for Crystal and Titan at the facility stopped after Victor Tran entered federal custody on April 8, 2009. This stoppage is reflected in the Texas trip ticket database, which show the last seafood purchases by Titan were on April 7, 2009.

Further, the six checks from January to August 2010 are made payable to Crystal but sent to an address in Aliso Viejo, California, contradicting Crystal's representation to the DHECC that the Port Arthur Location was the only physical location for the business from April 1, 2010 through December 31, 2010. *See* Ex. B at B.2 & B.7; Ex. I.

While Crystal presented itself to the DHECC as an on-going shrimp processing business, Crystal in fact had ceased operations and was selling its remaining stock. This misrepresentation was of great relevance because had Crystal disclosed that it no longer had operations at the Port Arthur Location and was selling its remaining stock, the DHECC

would have considered Crystal's claim not under the BEL program, but under the failed business program. Under that program, the DHECC would consider whether Crystal had an "excluded business failure" by evaluating whether Crystal reported negative EBITDA[4] for the 12-month period prior to May 1, 2010. *See* Settlement Agreement Ex. 6(III)(a).

Using the P&L statements filed with the DHECC, Crystal had an EBITDA of negative $180,849.29 in the 12 months prior to May 1, 2010. *See* Ex. K (EBITDA calculation figures highlighted). Crystal would not have been eligible for any compensation.

      c.  *Crystal Shifted Revenue of its Financial Records filed with the DHECC*

The six checks presented by Crystal's counsel contradict financial data filed by Crystal with the DHECC. The checks do not align with the revenue reported on Crystal's monthly P&L, indicating that Crystal shifted revenue on the P&L filed with its claim. For example, Crystal's January 2010 P&L reported $3,000 in revenue. *See* Ex. K. But the checks produced by Crystal's counsel include a January 10, 2010 check payable for $57,771 to Crystal. *See* Ex. I. Similarly, Crystal's March 2010 P&L reported $6,000 in revenue, yet the checks provided by counsel contain two March 2010 checks with a combined value of $49,598 payable to Crystal. *See* Exs. K & I. Thus, just for these two months, Crystal's checks reflect $98,309 more in revenue than was disclosed on Crystal's financial filings with the DHECC. The Court need not resolve this issue, however, as the misrepresentations in Crystal's claim alone disqualify the entity for class membership.

Taking the evidence as a whole, Alliance and Crystal should make restitution to the DHECC so as to make the DHECC whole, deprive these companies of an unjust enrichment and deter others from engaging in similar misconduct. *See* Order & Reasons at 22.

---

[4] EBITDA is defined in the Settlement Agreement as "earnings before interest, income taxes, depreciation, amortization and owner's compensation." *See* Settlement Agreement Ex. 6 at n.3.

      2.      Certain Members of the Tran Family
             <u>Should be Held Personally Liable for Return of All Funds</u>

Christopher, Vinh, and Loc Chanh "Victor" Tran should be held liable personally for the fraudulent payments made to Alliance and Crystal by the DHECC. Christopher and Vinh Tran made numerous false statements to the DHECC regarding the seafood processing operations purportedly taking place in Port Arthur. Victor Tran, the *de facto* owner of the Port Arthur facilities, also provided false information to the tax preparer and the DHECC claims preparer that was used to produce supporting documents submitted to the DHECC.

Based on such conduct, Christopher, Vinh, and Victor Tran should also be liable for the fraudulent payments received by Alliance and Crystal. *See* Restatement (Second) of Torts § 525 ("One who fraudulently makes a misrepresentation . . . for the purpose of inducing another to act . . . in reliance upon it, is subject to liability to the other in deceit for pecuniary loss caused to him by his justifiable reliance upon the misrepresentation."); *LHC Nashua P'ship, Ltd. v. PDNED Sagamore Nashua, L.L.C.,* 659 F.3d 450, 458-59, 462 (5th Cir. 2011) (plaintiff awarded damages where it agreed to purchase shopping mall in reliance on defendant's false representation that a significant tenant would continue to lease space).

      3.      The Court Should Order the Return of All Funds Received
             <u>by Professionals Who Assisted Crystal to Submit False Claims</u>.

The professionals who helped Crystal submit its claim also should be required to return any payment received based on this claim. *See* Order & Reasons at 26. Money paid by contingency fee arrangements may be recouped through restitution where the client's judgment is reversed or voided, as retaining payment if the client does not prevail or prevails but has the award revoked would be an unjust enrichment. *See Mohamed v. Kerr*, 91 F.3d 1124, 1126 (8th Cir. 1996); Order & Reasons at 22-24.

Whether a professional knew of the falsity of a claim is immaterial to the duty to make restitution of sums received from an improper claim.  *See* Order & Reasons at 23.  Yet here, Faegre represented Alliance until May 22, 2015, and has represented Crystal, Titan, Lot and several individual claimants related to these entities.  Faegre was in a position to know that Christopher Tran made sworn statements in the Lot claim that were inconsistent with claims made in the Crystal claim.  A duty of restitution is amply supported against Faegre under these facts.

### E.  *Conclusion*

For the reasons stated, the DHECC seeks entry of a judgment requiring Alliance & Associates, LLC, and Crystal Seafood Company, Inc., to make restitution to the DHECC for payments received on their claims.  All professionals who benefitted from the unjustified payments similarly should be required to make restitution.

Respectfully submitted,

Patrick Juneau
Claims Administrator


By:   /s/ Kevin Colomb
Kevin Colomb
Manager of Compliance and Internal Integrity

Louis J. Freeh
Special Master


By:   /s/ Gregory A. Paw
Gregory A. Paw
Counsel to the Special Master

Dated:   May 26, 2015