**DECLARATION OF CHRISTOPHER TRAN**
**D/B/A Lot, Inc.; Crystal Seafood, Inc; Titan Seafood, Inc.**

Under penalty of perjury, I, Christopher Tran, swear and state as follows:

1. I was born in 1956 in Vietnam and immigrated to the United States in 1977. I am a resident of the State of Texas. I am the Treasurer and President of Lot, Inc., and I am duly authorized to execute this affidavit on behalf of Lot, Inc. I have personal knowledge of the information and facts asserted herein.

2. I have spent my entire adult life in the commercial fishing industry. I am a multi-generational commercial shrimper and have lived and worked in the Gulf of Mexico with my family since the early 1980s. My four brothers and I own one of the largest fleets of freezer boats in the Gulf and have worked those boats together for decades.

3. In addition to our vessels, for over ten years we have owned a seafood processing plant and distributor in Port Arthur, Texas. Its primary business is the purchase, processing, and sale of shrimp. Before collapse of the business caused by the *Deepwater Horizon* disaster, our business bought raw shrimp caught in Louisiana and eastern Texas, processed shrimp on site, and sold that shrimp to buyers across the United States and to China, Germany, France and Mexico. We sort, grade, de-vein, de-head, peel, freeze, de-head, package, and ship shrimp. We also sold ice and supplies to boats.

4. In February 2006, we incorporated Lot, Inc. I served as Treasurer and President. Lot, Inc. owns approximately a 50,000 square foot tract of land and a sea food processing plant on the water in Port Arthur, Texas. The facilities are located on a canal that leads directly to the Gulf of Mexico. Shrimp boats from the Gulf docked and off-loaded shrimp at our facilities.

5. In August 2009, Lot, Inc. entered a leasing agreement with Flor-Tex Co., a seafood processor headquartered in Tampa, Florida, and looking to expand into Texas. Under

the agreement, Flor-Tex leased the land and the processing plant for $36,728.77 per month for a year. The contract was to be renewed annually until an outright purchase could be finalized.

6.  After the spill, Flor-Tex experienced significant operating losses and was forced to close its operations in 2010. In May 2010, Flor-Tex notified Lot, Inc. that it was suffering dramatic losses in revenue as a result of the spill. In July 2010, Lot, Inc. agreed to a significant reduction of rent to allow Flor-Tex to stay in operation. In November 2010, the plant ceased all operations due to lost profits, and Lot, Inc. received notice that Flor-Tex was abandoning the facility. Flor-Tex did not renew the lease and permanently vacated the premises on or about November 30, 2010. Lot, Inc. has been left vacant since Flor-Tex left and has lost all of its revenue.

7.  Despite significant efforts, I have been unable to resume processing operations or find other tenants for the facilities. The processing plant has remained idle since Flor-Tex vacated the premises. Lot, Inc. placed the land and facilities on the market but has been unable to sell it.

8.  On and prior to May 10, 2010, Lot, Inc., was current on all of its financial obligations, including its mortgage, nor had Lot, Inc., filed for bankruptcy protection on or before May 10, 2010. As a result of the oil spill and the substantive destruction of the seafood industry in the Gulf, Lot, Inc. is now deficient on its mortgage, and our lender has issued a notice of foreclosure. Lot, Inc. has been driven out of business as a result of the Deepwater Horizon disaster.

Under penalty of perjury, I declare that the foregoing is true and correct.

Christopher Tran

July 11, 2012

fb.us.8882036.01

UNITED STATES DISTRICT COURT

EASTERN DISTRICT OF LOUISIANA

In Re: Oil Spill by the Oil Rig *Deepwater Horizon* in the Gulf of Mexico, on April 20, 2010,

THANH HAI, INC.; TONY NGUYEN; KHANG VAN DANG, and the more than 700 persons named herein,

Plaintiffs,

vs.

BP AMERICA PRODUCTION COMPANY; BP EXPLORATION AND PRODUCTION, INC.; ANADARKO PETROLEUM CORPORATION; MOEX OFFSHORE 2007, LLC; MOEX USA CORPORATION; MITSUI OIL EXPLORATION CO., LTD.; TRANSOCEAN HOLDINGS LLC; TRITON ASSET LEASING GMBH; TRANSOCEAN DEEPWATER, INC.; TRANSOCEAN OFFSHORE DEEPWATER DRILLING, INC.; TRANSOCEAN LTD.; CAMERON INTERNATIONAL CORPORATION F/K/A COOPER-CAMERON CORPORATION; HALLIBURTON ENERGY SERVICES, INC.; M-I, LLC, WEATHERFORD U.S. L.P.,

Defendants.

MDL NO. 2179

Case No. 2:11-CV-03180

SECTION: J

Judge Barbier
Magistrate Judge Shushan

## AFFIDAVIT OF CHRISTOPHER TRAN

**HARRIS COUNTY**

**STATE OF TEXAS**

**BEFORE ME**, the undersigned notary public came and appeared,

**CHRISTOPHER TRAN**

who, under oath, stated as follows:

1. I am an officer and authorized representative of Lot, Inc. ("Lot").

2. Lot was incorporated as a Nevada corporation on February 22, 2006.

3. Shortly thereafter, Lot set out to purchase the real property and equipment located at located at 3931 Martin Luther King Boulevard, Port Arthur, Texas, 77640 (the "Premises").

4. Irvine Property, Inc.(" Irvine") owned the real property on the Premises. When attempting to purchase the real property, Lot discovered that one of the officers of Irvine—Tuan Tran—had encumbered the assets of Irvine by using them as collateral to acquire a loan from Metro Bank to purchase his own shrimp boats.

5. Thus, to effectuate the purchase, Lot borrowed $1,500,000.00 from East West Bank on April 9, 2007. This promissory note is attached hereto as **Exhibit A**. In addition, we personally provided $1.6 million in cash to resolve the encumbrance on the assets of Irvine.

6. Because Lot, Inc. was unable to make timely payments on the $1,500,000 promissory note, East West Bank recently initiated foreclosure proceedings against Lot Inc. As part of these proceedings, East West Bank performed an appraisal of the real property on the premises. That appraisal is attached hereto as **Exhibit B**.

7. We received the Notice of Default for the Premises dated November 12, 2012, which is attached hereto as **Exhibit C**. The Notice of Default states that East West Bank intends to sell the property in a foreclosure sale on December 4, 2012.

8.      Around the same time, Lot Inc. agreed to purchase certain equipment of Pleasure Island Shrimp House, Inc. ("Pleasure Island").  That equipment included:

| Description of assets | | | Book Value |
|---|---|---|---|
| TRAILER OFFICE | | | $13,500 |
| 15000 GAS TANK | | | $15,700 |
| Turbo ice maker | | | $201,500 |
| 60K GAL FUEL TANK | | | $33,000 |
| 20 HHP LOW TEMP. | | | $97,000 |
| 10000 SQ. FT. FREEZER | | | $250,000 |
| AC UNIT for office building | | | $20,000 |

All of the equipment set forth above was incorrectly placed on the tax returns of another entity—Titan Seafood, Inc. ("Titan").  Instead, this equipment belongs to Lot.  All of this equipment was purchased from Pleasure Island Shrimp House, Inc. by Lot in 2005.

9.      In addition to the equipment outlined above, Lot also purchased IQF equipment from Pleasure Island.  Pleasure Island had purchased the IQF equipment after obtaining an Economic Development Corporation loan from the City of Port Arthur in December 2005 (the "EDC" loan).  A copy of the Promissory Note is attached hereto at **Exhibit D**.  As a part of its purchase of the IQF equipment, Lot also agreed to assume the EDC loan and made payments on the loan (which had a principal balance of $250,000) from 2008 until it was paid off in 2010.  The formal title to the equipment, however, was never changed and the loan statements were never altered to reflect the fact that Lot had assumed the loan.

10.     In August 2009, Titan assigned all of its interest in the equipment to Lot.  A copy of that agreement is attached hereto at **Exhibit E**.  At this point Lot became responsible for all aspects of this equipment and effectively became the owner of this equipment. The

purpose of this agreement was to allow Flor-Tex to enter into one agreement with Lot so that Lot could lease all of the equipment on the Premises to Flor-Tex.

11. At the point Lot entered into the agreement with Flor-Tex, it was effectively the owner of the following equipment, and was responsible for making all payments on the debt to Compass Bank (formerly Texas State Bank):

| **Lot, Inc. Equipment Acquired from Titan in August 2009** | | |
|---|---|---|
| IQFM | 4/27/2007 | $1,715 |
| Pump | 5/3/2007 | $3,500 |
| IQF | 6/15/2007 | $6,750 |
| Fork Lift | 1/31/2007 | $31,893 |
| A/C Unit | 4/5/2007 | $10,000 |
| A/C Unit | 5/24/2007 | $24,500 |
| Cat Generator | 10/1/2005 | $65,000 |
| Freezer | 10/1/2005 | $19,376 |
| Office Equipment | 3/10/2006 | $500 |
| Computer | 10/1/2005 | $554 |
| 1982 Freightliner | 10/1/2005 | $25,586 |
| Floor Electronic Scale | 10/1/2005 | $11,786 |
| Hanging Scale | 10/1/2005 | $1,571 |
| Turbo Ice Maker | 10/1/2005 | $274,998 |
| 3 Trailer Freezer 30 Ft | 10/1/2005 | $14,143 |
| IQF Equipement | 10/1/2005 | $21,426 |
| 30 TS Insulation | 10/1/2005 | $786 |
| Stainless Table | 10/1/2005 | $12,000 |
| 2 Cooler Containers | 10/1/2005 | $11,786 |
| 2 Forklift Clark 5000 lbs | 10/1/2005 | $6,286 |
| 5000 Square Ft Freezer | 10/1/2005 | $95,062 |
| 65 Instillation Temp Vest | 10/1/2005 | $33,572 |
| Stainless Steel Packing | 10/1/2005 | $36,679 |
| Grader 10-7A-C5 | 10/1/2005 | $138,682 |
| Grader Sort Rite 105AC6 | 10/1/2005 | $500,000 |
| Refrigeration Skid Pack | 10/1/2005 | $131,114 |
| Plate Freezer 12 Station | 10/1/2005 | $350,000 |
| Warehouse | 10/1/2005 | $18,996 |
| Ice Dock | 10/1/2005 | $68,130 |
| Unload Dock 120 X 50 | 10/1/2005 | $125,508 |

| | | |
|---|---|---|
| Dozer | 10/1/2005 | $23,000 |
| 2 Frieghtliner | 10/1/2005 | $45,000 |

12. Pursuant to the agreement between Lot and Titan, Lot assumed all payment obligations relating to debt on the equipment it acquired from Titan, which consisted of one loan to Compass Bank (formerly Texas State Bank). Titan had consolidated and refinanced all of its debt related to equipment in April 2007, the end result of which is the promissory note attached hereto as **Exhibit F**.

13. On August 27, 2009, Lot entered a lease agreement with Flor-Tex Shrimp Company, LLC ("Flor-Tex"), pursuant to which Flor-Tex leased one of the two buildings on the premises and all of Lot's equipment, including the equipment that Titan assigned to Lot. The lease agreement is attached hereto as **Exhibit G**. Pursuant to that agreement, Flor-Tex made monthly payments to Lot, Inc. in the amount of $12,000 in rent, and also made all of the necessary tax, insurance, and loan payments to the EDC and to Texas State Bank (now named Compass Bank) on behalf of Lot, Inc.

14. Recently, I hired an equipment appraiser, Richard Wourms, to value all of the remaining equipment on the premises. A copy of Mr. Wourms' Appraisal is attached hereto as **Exhibit H**.

15. Any equipment not identified in Mr. Wourms' appraisal had been removed from the premises and disposed of, except for the Caterpillar Bulldozer, a picture of which is attached hereto as **Exhibit I**. The Caterpillar Bulldozer is kept on the side of the property and was inadvertently missed by Mr. Wourms. The Caterpillar Bulldozer was bought used at a purchase price of $23,000 and is currently inoperable.

16. Equipment identified on the Schedule K forms of Titan and Lot that is not referenced in Mr. Wourm's appraisal report was destroyed by Hurricane Ike in 2008, which completely flooded the premises. The equipment that remained serviceable following Hurricane Ike was used by Flor-Tex. Much of this equipment wore out or broke down while Flor-Tex was using it, and Flor-Tex disposed of that equipment whenever that occurred.

17. I state under penalty of perjury pursuant to 28 U.S.C. § 1746 that the foregoing is true and correct.

Christopher Tran
**Christopher Tran**
**Authorized Representative of Lot, Inc.**

Subscribed and sworn to or affirmed before me this 28th day of November, 2012.

Rosa Sanchez
Notary Public
(Affix seal or stamp.)

ROSA SANCHEZ
Notary Public
STATE OF TEXAS
My Comm. Exp. 03-08-14



***G. Jay Fenner, MAI***

October 26, 2012

East West Bank
Mr. Ernie Lopez
FVP, Chief Appraiser
9300 Flair Drive, 6th Floor
El Monte, CA 91731

Re: Pleasure Island Shrimp House (Titan Seafood) facility located at 3931 Martin Luther King Drive, Port Arthur, Jefferson County, Texas 77640. (East West Bank ATS#201201558)

Dear Mr. Lopez:

In accordance with your request, we have inspected and appraised the referenced property for the purpose of estimating the market value, as defined herein, of the fee simple interest in the property as of October 12, 2012, the date the property was inspected.

The subject property is located on the far south end of Pleasure Island on Martin Luther King Drive or State Highway 82. The subject additionally fronts the Sabine-Neches Waterway between Sabine Pass and the Intracoastal Canal. This places the subject about six miles north of the Gulf of Mexico along the second-busiest port along the Texas Gulf Coast in total tonnage, and within the top four ports in Texas for shrimp.

The appraised property comprises a 1.87-acre site per Jefferson County Appraisal District records containing about 40,000 square feet of gross building area plus open shed dock building and other waterfront improvements per our field measurements, occupant-supplied information, and forwarded information. These improvements were constructed over time starting before 1998 to about 2006. The prior property occupant used docks consisting of sunken barges (now deteriorated) and pier walkways extending outside the property line into the Sabine- Waterway. We assume that these existing uses, as controlled by the US Corps of Engineers, are a legal use of the property. The property has site improvements that extend into the right-of-way of State Highway 82's unused roadway shoulder area. This encroachment is considered in valuation in this appraisal.

The subject has several items of personal property and equipment on site that is specifically excluded from this appraisal. This includes two mobile homes, an ice machine, above-ground fuel storage tanks, all freezing equipment and other shrimp processing equipment, and two sunken, deteriorated barges. The appraisal includes all coolers and freezers and air conditioning and refrigeration equipment associated with the building.

The Cost and Sales Comparison Approaches to value are used in this analysis. Income data was not available to support a valid conclusion of value for the subject and thus the Income Capitalization Approach was not applied. Our research in this appraisal has included that of the Port Arthur area, the Texas and western Louisiana Gulf Coast shrimp industry, and Texas shrimp processing facilities. In general, land data and construction costs applicable to the Port Arthur area are used to estimate overall land values, value attributable to dock area, and construction costs. Shrimp processing facility operations and sales were researched over the entire state.

Based on our analysis, the market value of the fee simple interest in the subject in its "As Is" condition as of October 12, 2012 is:

**ONE MILLION THREE HUNDRED THOUSAND DOLLARS**
**$1,300,000**

The attached Appraisal Report has been prepared to comply with our understanding of the requirements of the *Uniform Standards of Professional Appraisal Practice* promulgated by the Appraisal Standards Board of the Appraisal Foundation and complies with the *Financial Institutions Reform, Recovery and Enforcement Act (FIRREA).* It adheres to all local, state and federal regulations pertaining to appraisal practice and procedures. The appraisal and report are subject to the Code of Ethics of the Appraisal Institute

I appreciate the opportunity to be of service in this appraisal assignment. If I can be of further assistance, please call.

Respectfully submitted,

G. Jay Fenner, MAI
State Certified - TX-1321773-G
General Real Estate Appraiser

## EXECUTIVE SUMMARY

| | |
|---|---|
| Property Name | Titan Foods Facility |
| Address | 3931 Martin Luther King Drive<br>Port Arthur, Texas |
| | |
| Date of Inspection | October 12, 2012 |
| Date of Appraisal | October 12, 2012 |
| Date of Report | October 26, 2012 |
| | |
| Specialized Property Use | Shrimp Processing Plant |
| Property Category | Single Tenant Industrial |
| Total Land Area (Acres) | 1.873 |
| Approximate Feet Water Frontage | 500 |
| Approximate Gross Building Area | 40,000 |
| Land to Building Ratio | 2.04 |
| Year Built | 1990s through 2006 |
| Special Features | Freezers and refridgeration , waterfront |
| | |
| **Value Indications** | |
| "As Is" Land Value | $270,000 |
| Cost Approach | $1,310,000 |
| Sales Comparison Approach | $1,280,000 |
| Income Capitalization Approach | Not Applied |
| **Final Value Conclusion** | $1,300,000 |
| | |
| Insurable Value Estimate | $1,720,000 |

**TABLE OF CONTENTS**

| | |
|---|---|
| Certificate of Appraisal | 2 |
| Basic Assumptions and Limiting Conditions | 3 |
| Property Identification | 6 |
| Purpose and Date of Appraisal | 6 |
| Date of Report | 6 |
| Definition of Prospective Value | 6 |
| Intended Use of the Appraisal | 6 |
| Scope of Appraisal | 7 |
| Competency of the Appraiser | 7 |
| Property Interest Appraised | 8 |
| Definition of Market Value | 8 |
| Marketing and Exposure Period | 8 |
| Definitions | 9 |
| Ownership History | 9 |
| Beaumont-Port Arthur Area Summary | 10 |
| Texas Shrimp Industry Overview | 15 |
| Neighborhood Analysis | 20 |
| Site Analysis | 23 |
| Zoning Analysis | 26 |
| Improvement Analysis | 27 |
| Assessments and Real Estate Taxes | 31 |
| Highest and Best Use | 32 |
| Cost Approach | 34 |
| Sales Comparison Approach | 43 |
| Reconciliation | 53 |
| Insurable Replacement Cost | 55 |

-ADDENDA-

Subject Photographs

Site Plan

Flood Plain Map

Comparable Land Sales

Comparable Improved Sales

Engagement Letter

Environmental Checklist

Qualifications of the Appraiser

Texas Certified General Real Estate Appraiser Certificate

**CERTIFICATE OF APPRAISAL**

I certify that, to the best of my knowledge and belief:

- The statements of fact contained in this report are true and correct;
- The reported analyses, opinions, and conclusions are limited only by the reported assumptions and limiting conditions, and are my person, impartial, and unbiased professional analyses, opinions, conclusions, and recommendations;
- I have no present or prospective interest in the property that is the subject of this report, and I have no person interest with respect to the parties involved;
- I previously appraised the property as of July 6, 2009 as presented in my appraisal report dated July 10, 2009 (EWB ATS#200901323). I have performed no other services, as an appraiser or in any other capacity, regarding the property that is the subject of this report within the three-year period immediately preceding acceptance of this assignment;
- My engagement in this assignment was not contingent upon developing or reporting predetermined results;
- My compensation for completing this assignment is not contingent upon the development or reporting of a predetermined value or direction in value that favors the cause of the client, the amount of the value opinion, the attainment of a stipulated result, or the occurrence of a subsequent even directly related to the intended use of this appraisal assignment;
- My analyses, opinions, and conclusions were developed, and this report has been prepared, in conformity with the *Uniform Standards of Professional Appraisal Practice*;
- I made a personal inspection of the property that is the subject of this report on October 12, 2012;
- No one provided significant real property appraisal or appraisal consulting assistance to the person signing this certification.

Our analysis, opinions, and conclusions were developed, and this appraisal has been prepared, in conformity with and is subject to the requirements of the Code of Professional Ethics and Standards of Professional Practice of the Appraisal Institute. Disclosure of the contents of the appraisal is governed by the bylaws and regulations of the Appraisal Institute. The use of this report is subject to the requirements of the Appraisal Institute relating to review by its duly authorized representatives. The Appraisal Institute conducts a voluntary program of continuing education for its designated members. G. Jay Fenner has completed the requirements under the continuing education program of the Appraisal Institute.

G. Jay Fenner, MAI
State Certified - TX-1321773-G

**BASIC ASSUMPTIONS AND LIMITING CONDITIONS**

This appraisal report has been made with the following general assumptions and limiting conditions:

I    Title to the property is assumed to be good and marketable unless otherwise stated.  No responsibility is assumed for the legal description or any legal matter.  The property is assumed to be under responsible ownership and management and free of all liens and encumbrances except as specifically discussed herein.

2.    The definitions and assumptions upon which our analyses, opinions and conclusions are based are set forth in appropriate sections of this report and are to be considered part of these general assumptions as if included here in their entirety.

3    The information furnished us by others and contained in this report is considered to be from reliable sources and, where feasible, has been verified; however, no responsibility is assumed for its accuracy.

4.    The sketches, plot plans and drawings in this report are included only to assist the reader in visualizing the property.

5.    It is assumed that there are no hidden or unapparent conditions in the property, soil, subsoil, or structures that would render the property more or less valuable.  No responsibility is assumed for such conditions or for arranging engineering study that would be required to discover them.  All materials used in the structures of the property are assumed to be free of potential health risks unless otherwise stated and identified herein.  No opinion is expressed on structural or mechanical conditions.

6.    It is assumed that there is full compliance with all applicable federal, state and local environmental regulations and laws, that all applicable zoning and use regulations and restrictions have been complied with, unless a nonconformity has been stated, defined and considered in the appraisal, and that all required licenses, certificates of occupancy, legislated or administrative consents from any local, state or national government or private entity or organization have been or can be obtained or renewed for any use on which the value estimate contained in this report is based.

7.    It is assumed that the utilization of the land and/or improvements is within the boundaries or property lines of the site described herein and that there is no encroachment or trespass.

8.    By reason of this report, we are not required to give further consultation or testimony or to be in attendance in court or at any governmental or other hearing with reference to the property without prior arrangements having been made relative to such additional employment.

9.    The distribution, if any, of the total valuation in this report between land and improvements applies only under the stated program of utilization. The separate allocations for land and buildings must not be used in conjunction with any other appraisal and are invalid if so used.

10.   Unless specifically discussed and addressed herein, our valuation does not consider any enhancement in value to the property created by ground leases and/or parking leases, but assumes the property unimproved and unencumbered.

11.   Use and disclosure of the contents of this report are governed by the bylaws and regulations of the Appraisal Institute. Neither all nor any part of the contents of this report, especially any conclusions of value, the identity of the appraisers or the firm with which they are connected or any reference to the Appraisal Institute, shall be disseminated to the general public through advertising or sales media, public relations media, news media or other public means of communication without the prior written consent and approval of the appraisers.

12.   Possession of this report or a copy thereof does not carry with it the right of publication. It may not be used for any purpose by any person other than the part to whom it is addressed without the written consent of G. Jay Fenner, and in any event, it may be used only with proper written qualifications and only in its entirety.

13.   The party for whom this report was prepared may distribute copies of this appraisal only in its entirety to such third parties as may be selected by the party for whom this appraisal was prepared; however, portions of this appraisal shall not be given to third parties without our written consent. Liability to third parties will not be accepted.

14.   Unless otherwise stated in this report, the existence of hazardous material, which may or may not be present on the property, was not observed. We have no knowledge of the existence of such materials on or in the property. We, however, are not qualified to detect such substances. The presence of substances such as asbestos, urea-formaldehyde foam insulation or other potentially hazardous materials may affect the value of the property. The value estimate is predicated on the assumption that there is no such material on or in the property that would cause a loss in value. No responsibility is assumed for any expertise or engineering knowledge required to discover them. The client is urged to retain an expert in this field, if desired.

15.   The property is not known to have any cultural or historical significance and no value contribution from these factors was included in this analysis. The property is not known to be the habitat of any endangered species nor is the property known to be the site of wetlands or other environmentally sensitive area. No responsibility is assumed for any expertise or engineering knowledge required to discover them. The client is urged to retain an expert in this field, if desired.

16.    A complete legal description was not forwarded for this analysis. We have used site size as presented by the Jefferson County Appraisal District as the subject's site size.

The appraisal district's measurements generally conform to a survey from 1998, which is mostly illegible, which was given to us by the property occupant at time of our prior (2009) inspection.

17. The subject's improvement size and character are estimated based on forwarded information and an inspection of the property. This appraisal's building measurements represent an approximation of the structures on site and differ from the owner's representative's forwarded measurements and building measurements contained within a forwarded former appraisal of the property. The client may desire to have the property re-surveyed for a more accurate measurement of the site, roadway encroachments, water encroachments, and building size and placement.

18. The property has evident deferred maintenance. The costs to cure deferred maintenance have been based on our experience and research of costs to correct items affected. The exact cost to correct these items can only be determined by examination and bid by qualified contractors, who may also need to consult engineers. As such, the estimates presented in this appraisal are those of a qualified and conscientious appraiser, not an expert of engineering or construction, and are only valid in this context.

19. The property is situated along the Sabine-Nueces Waterway which is subject to regulation by Federal agencies. We have not examined prior applications and permits for various waterfront features at the property nor their status in current use versus current regulations for use.

**PROPERTY IDENTIFICATION**

The appraised property is the Pleasure Island Shrimp House (Titan Seafood) shrimp dock and shrimp processing facility located on Pleasure Island at 3931 Martin Luther King Drive (State Highway 82), Port Arthur, Jefferson County, Texas.   The property is used as a shrimp processing facility with dock along the Sabine-Neches waterway.   The property contains about 1.87 acres of land area and approximately 40,000 square feet of gross building area and related site improvements.   The property is currently operating as a shrimp processing facility.

**PURPOSE AND DATE OF APPRAISAL**

The purpose of the appraisal is to estimate the market value of the fee simple interest in the subject as of the date of inspection or as of October 12, 2012.

**DATE OF REPORT**

The date of this report is October 26, 2012.

**INTENDED USE OF APPRAISAL**

The intended use of this report is for the exclusive use of East West Bank, its subsidiaries, and/or affiliates for loan underwriting or review purposes.   It is not to be used by any other entity for any purpose without the written consent of the appraisers.   The appraisers are not responsible for unauthorized distribution and/or use of this report.

**SCOPE OF WORK**

This appraisal is is prepared in accordance with the Standards of Professional Practice and Code of Ethics of the Appraisal Institute and conforms to the Uniform Standards of Professional Appraisal Practice promulgated by the Appraisal Standards Board of the Appraisal Foundation and FIRREA.   The Sales Comparison Approach is used to value the "As Is" value of the subject vacant land.   The Cost and Sales Comparison Approaches are used to value the improved, "As Is" status of the property.   The Income Capitalization Approach is not employed because of the lack of data and applicability in valuation of this approach for the appraised special-purpose property.   Specifically, our Scope of Work includes:

- Reading, discussing, and understanding the scope of work required by the client,
- Calling the listed contact and making an appointment to inspect the property and gather other information;
- Inspecting the property on October 12, 2012 with the owner's sister-in-law (whose function was to bring keys) and discussing property status, use and operations over the telephone with the owner;
- Driving the subject neighborhood to note land use and activity;
- Researching subject and neighborhood factors such as investment and development activity, infrastructure changes, etc.;
- Researching the shrimp and seafood industry within Texas and the Port Arthur submarket;
- Researching trends in shrimp processing and distribution;
- Researching land sales activity in the subject neighborhood of similar location and size attributes and a similar highest and best use;
- Researching improved industrial and shrimp processing sales and listings and confirming the data along with broker surveys of market dynamics;
- Analyzing the property to its highest and best use given the data collected;
- Performing the appropriate valuation techniques to comply with our engagement of services and provide a credible appraisal;
- Completing a written appraisal report to comply with our engagement of services and provide a credible appraisal report.

## COMPETENCY OF THE APPRAISER

G. Jay Fenner has performed numerous appraisal, market studies, renovation studies, acquisition studies and economic modeling studies on varied industrial and other commercial real estate in the past.  Files are maintained with historical and current data relative to the changing economics in a number of key real estate markets across the South and Southwest United States including.  The appraiser, given the work completed in this assignment, has competence in the analysis of the subject property.

## PROPERTY INTEREST APPRAISED

The real estate interest appraised is the fee simple.  The Dictionary of Real Estate Appraisal, 3rd Edition, 1993, defines fee simple estate as "Absolute ownership unencumbered by any

other interest or estate, subject only to the limitations imposed by the governmental powers of taxation, eminent domain, police power, and escheat."

**DEFINITION OF MARKET VALUE**

"Market Value means the most probable price which a property should bring in a competitive and open market under all conditions requisite to a fair sale, the buyer and seller each acting prudently and knowledgeably, and assuming the price is not affected by undue stimulus. Implicit in this definition is the consummation of a sale as of a specified date and the passing of title from seller to buyer under conditions whereby:

(1) Buyer and seller are typically motivated;

(2) Both parties are well informed or well advised, and acting in what they consider his own best interests;

(3) A reasonable time is allowed for exposure in the open market;

(4) Payment is made in terms of cash in U.S. dollars or in terms of financial arrangements compatible thereto; and

(5) The price represents the normal consideration for the property sold unaffected by special or creative financing or sales concessions granted by anyone associated with the sale."

(Source: Office of the Comptroller of the Currency under 12CFR, Part 34, subparts C-appraisals, 34.42 Definitions (f).)

**MARKETING AND EXPOSURE PERIOD**

Marketing period refers to an estimate of the amount of time the property being appraised might take to sell during the period *immediately following* the effective date of the appraisal.

Exposure Period refers to the amount of time the property being appraised would have been offered on the market prior to the effective date of the appraisal.

The most probable purchaser for the subject would be a current participant in the Port Arthur or surrounding area shrimp industry who desires to expand operations either vertically or horizontally to enhance economies of scale of current activities. An exposure period of less than 12 months is deemed appropriate given market factors and the value estimated in this appraisal.

A marketing period of less than 12 months is deemed appropriate given market factors and the value estimate of this appraisal.

## DEFINITIONS

Unless otherwise noted, the quoted excerpts and definitions in this report are from The Appraisal of Real Estate, 11th Edition, 1996, or The Dictionary of Real Estate Appraisal, 3rd Edition, 1993.

## OWNERSHIP HISTORY

According to Jefferson County Deed records the subject is owned by Lot Inc.  According to Jefferson County Deed Record searches Lot Inc. purchased the property from Irvine Property Inc. in April 2007.  East West Bank is recorded as having taken a deed of trust on the property at the same time.  Irvine Property Inc. had purchased the property in September 2001 from Tran Tuan Van.  Before being converted to a shrimp processing facility the property was a shrimp dock.

Lot Inc. and Irvine Property Inc. are controlled by Victor Tran.  The property is known as the Titan Seafood or Pleasure Island Shrimp House facility.

The property has not had commercial shrimp processing operations for over one year.  Some of the refrigeration equipment associated with former IQF processing has been disassembled and leased ammonia tanks removed from the property.  Property maintenance has been minimal over the past three years.

The property has been marketed by Jim Hendricks Properties, who has a sign on the property gate, over the past year but reportedly without a signed listing agreement.  The asking price price was advertised at $1,650,000 including existing shrimp processing equipment.  Jim Hendricks reports that there was interest in the property from existing shrimp processing industry participants, but no contracts were consummated.

The property is not actively listed for sale and there are no known offers, contracts or options for the property existing.

**BEAUMONT-PORT ARTHUR AREA SUMMARY**

Beaumont-Port Arthur is located on the coastal plain in far southeast Texas and is locally known as the "golden triangle" because of its economic reliance on the oil and gas sectors of the economy. The Beaumont-Port Arthur Metropolitan Statistical Area (MSA) consists of three counties (Jefferson, Hardin and Orange). It encompasses approximately 2,154 square miles and had an estimated 2008 population of 378,255. As of census 2000 it ranks as the 130th largest MSA in the Nation. The subject is depicted relative to the overall region in the map below.

**Regional Location Map**

The Beaumont-Port Arthur MSA is bound by the Gulf of Mexico to the south, Louisiana to the east (Lake Charles MSA), the Houston MSA (bordering primarily rural Chambers and Liberty Counties east of the cities of Houston and Baytown), and principally rural counties to the north. The city of Beaumont is the economic center of the region and has been a traditional port city and relies on mid-draft access for shipping both through the Gulf of Mexico and the Intracoastal Waterway. The Port of Beaumont is recognized as the fifth largest nationally based on tonnage (principally petroleum products). The region is known for the Spindletop oil field, the first major oil discovery in Texas in 1901, which ushered in an

era of oil and gas exploration, production and processing for Beaumont-Port Arthur, the Gulf Coast, and state of Texas.

**Population**

The cities of Beaumont and Port Arthur are principally located in Jefferson County, the geographic and population center of the region with 2010 population estimated at 252,273 persons. The largest cities by 2010 population are Beaumont (118,926), Port Arthur (53,818) and Orange (18,595). The fastest-growing, though still principally rural county in the region, is Hardin County located north of Jefferson County. Unincorporated areas of Jefferson County report the highest levels of population growth and reflect trends of the region's suburban new housing pattern outside of the principal cities in the region.

The Beaumont MSA has 2010 estimated population of about 390,535 persons, up about 3,655 persons from 2000. Beaumont's population, with employment linked directly with both the upstream (exploration and production) and downstream (refining and processing) sectors of the economy, is affected by the boom-to-bust cycles of these industries. In the 1970s, when oil and gas investment and employment was high, Beaumont MSA population increased by about 0.7% per year. In 1982-1983, the peak of oil prices, Beaumont MSA population peaked at 387,177 persons. By 1989, at the end of the oil bust, Beaumont MSA's population had declined to 360,338 persons or by about 26,839 persons. Population slowly recovered through the 1990s and hit a decade-high of 385,090 in 2000 before sliding for the next few years. Since, population has increased with sizable expansion of the region's industrial complex.

The Beaumont-Port Arthur MSA contained about 152,550 households in 2010 indicating average household size of about 2.56 persons per household compared to 2.75 for the state of Texas. In 2010, about 25.6% of the population was over the age of 65 years as compared to the state of Texas at 21.2%. About 25% of the region's population was under the age of 18 years as compared to the State at 29%. The region has a higher percentage of high school graduates but only about half the ratio of college graduates as compared to the State of Texas.

Petrochemical and refining jobs are the overall best paying blue collar jobs in the region and account for a healthy employed middle class economic base for the region. Hourly earnings were reported at $19.10 or just below the Texas average and the highest of any Texas metro other than Houston, Austin and Dallas. However, the Beaumont-Port Arthur area has a disproportionate number of lower income households.

**Radial Population Growth - Beaumont-Port Arthur MSA**

| | Population | | | | Ann. Growth Rate | | | Absolute Growth | | | Percent Total Population | | | |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| MSA/County | 1980 | 1990 | 2000 | 2010 | 80-90 | 90-00 | 00-10 | 80-90 | 90-00 | 00-10 | 1980 | 1990 | 2000 | 2010 |
| Beaumont-Port Arthur MSA Counties | | | | | | | | | | | | | | |
| Jefferson | 248,651 | 239,389 | 252,051 | 252,273 | -0.4% | 0.5% | 0.0% | -9,262 | 12,662 | 222 | 66.5% | 66.3% | 65.5% | 64.9% |
| Hardin | 41,451 | 41,320 | 48,073 | 54,635 | 0.0% | 1.5% | 1.3% | -131 | 6,753 | 6,562 | 11.1% | 11.4% | 12.5% | 14.1% |
| Orange | 83,838 | 80,509 | 84,966 | 81,837 | -0.4% | 0.5% | -0.4% | -3,329 | 4,457 | -3,129 | 22.4% | 22.3% | 22.1% | 21.1% |
| B-PA MSA | 373,940 | 361,218 | 385,090 | 388,745 | -0.3% | 0.9% | 0.1% | -12,722 | 23,872 | 3,655 | 100.0% | 100.0% | 100.0% | 100.0% |

Source: US Bureau of Census

**Employment**

Beaumont-Port Arthur MSA employment averaged 168,639 in 2011 with an unemployment rate of 11.0%.  As of August, 2012 (most recent data available), Beaumont-Port Arthur employment was estimated at 170,587 persons, with an unemployment rate of 10.7%.  The Beaumont-Port Arthur MSA is has a reliance on the oil and gas extraction and specifically the petroleum refining and petrochemical fields.  The following lists the top private employers in the Beaumont-Port Arthur MSA and illustrates the reliance of the region to the refining and petrochemical industries.

**Beaumont-Port Arthur MSA Largest Private Sector Employers**

| Employer | Sector |
|---|---|
| Baptist Hospital of Southeast Texas | Health care |
| CB&I Constructors Inc. | Industrial fabrication |
| Christus Health Southeast Texas | Health care |
| Conex International Corporation | Mechanical contracting |
| ExxonMobil Corporation | Petrochemical manufacturing |
| M&E Foodmart | Retail |
| Motiva Company | Petrochemical manufacturing |
| Signal International Texas LP | Marine and fabrication |
| Texas Home Health Skilled Services | Health care |
| Walmart Associates Inc. | Retail |

Source: Texas Workforce Commission, June 2008

Beaumont is the region's trade center and is located toward the center of the defined MSA at the intersection of Interstate Highway 10 (IH 10) and US Highway 69.

The Beaumont-Port Arthur region, located on low land on the Texas Gulf Coast, is affected by tropical storms including periodic hurricanes.  Most recently, the area was affected by Hurricane Rita (2005), Humberto (2007) and Ike (2008) which cause flood damage in more coastal areas and wind damage throughout the region.

**Port Arthur**

The city of Port Arthur is located within the southern portion of Jefferson County on the west side of Sabine Lake.  The city of Port Arthur also includes the community of Sabine Pass which was annexed several years ago, as well as Pleasure Island, a man-made island in Sabine Lake that serves as a spoil bank to the Sabine-Neches Ship Channel.

The city of Port Arthur had a 2010 population estimated at 53,818.  Population within the city of Port Arthur has been shrinking for several years as the MSA population gradually shifts to the north away from previously developed areas and the extensive industrial base proximate to the coast.  Overall, income levels within the city of Port Arthur are lower than those of the Beaumont-Port Arthur MSA while real estate values, retail sales, and overall consumer activity is below that of the overall region.

The city of Port Arthur's economic base is tied to petrochemicals and marine transportation.  The city of Port Arthur is located at the juncture of the intracoastal waterway and the Sabine-Neches Ship Channel and represents the deepest water access within the Beaumont-Port Arthur industrial complex.  Port Arthur was recently chosen as the site for two LNG terminals for the importation of natural gas.  With a reversal in natural gas pricing, these facilities now have requests to convert facilities to export.  Motiva recently completed its Port Arthur refinery, the largest such undertaking in over 30 years in the refining industry.

Port Arthur recently completed an approximate $1.6 billion expansion of its petrochemical industry.  Employment in the area has grown as large facilities by Motiva and Valero have staffed.  Employment gains at Cheniere and Golden Pass have disappointed with operations stalled by low natural gas prices.  However, GT Omniport recently opened a $50 million rail yard to bring Bakken Shale crude to the Port Arthur refinery complex with another $95 million phase planned.

Like most regions of the Nation, there are varied economic forecasts for the local economy which are highly dependent on larger future performance of global and National growth.  Political actions in Washington regarding budgets, money supply and regulation add to this level of uncertainty.  Locally, the mood is of optimism based on the newly-invigorated domestic petroleum industry, increasing capacity of the Panama Canal, and good prospects for export demand of natural-gas-based chemicals, petrochemicals, and potentially liquified natural gas.

## TEXAS SHRIMP INDUSTRY OVERVIEW

The Texas Coast fronting the Gulf of Mexico extends about 370 miles from Sabine Pass at the Louisiana border to South Padre Island at the Mexican Border. Additionally, there are five significant bay systems within the State: Sabine Lake, Galveston Bay complex, Matagorda Bay complex, Corpus Christi Bay/Aransas Bay complex, and Laguna Madre complex.

Texas is among five Gulf-coast states with commercial fishing.

**Gulf Coast Shrimp Landings, Millions of Pounds, Headless**

| | 2007 | 2008 | 2009 | 2010 | 2011 |
|---|---|---|---|---|---|
| Florida | 45.6 | 49.5 | 47.4 | 54.4 | 55.9 |
| Alabama | 102.6 | 107.7 | 124.2 | 54.6 | 97.4 |
| Mississippi | 64.9 | 46.4 | 63.7 | 25.4 | 63.3 |
| Louisiana | 625.9 | 501.4 | 572.2 | 388.9 | 496.0 |
| Texas | 408.5 | 294.7 | 505.6 | 433.3 | 463.8 |
| Totals | 1,247.5 | 999.7 | 1,313.0 | 956.5 | 1,176.5 |

Source: Shrimp Statistics, December - 2011, NOAA

Texas has four ports among the Nation's top sixty ports by volume and dollar value of landings.



| | 2006 | | 2007 | |
|---|---|---|---|---|
| | Pounds (millions) | Value (millions) | Pounds (millions) | Value (millions) |
| Brownsville | 30.5 | $52.0 | 23.2 | $49.7 |
| Port Arthur | 25 | $42.8 | 17.4 | $39.0 |
| Palacios | 22.3 | $32.6 | 12.6 | $25.2 |
| Galveston | 22 | $40.7 | 19.2 | $40.1 |

Source: US Commercial Landings 2008, NOAA

Texas's commercial fishing industry is dominated by commercial shrimping (over 80%) which is regulated by the state of Texas with licenses for bay or Gulf activity.  Overall, the number of shrimp licenses have declined over the past few years as the State has a moratorium on new licenses and instituted a buyback program for existing licenses.  The most affected are bay shrimpers who typically have smaller boats and roam for generally smaller shrimp.  Bay shrimping, except for bait shrimp, is generally conceded as uneconomical given fuel, insurance and capital costs of operation.  Gulf shrimping is also under economic pressures and has resulting in a decreased fleet and an overall increase in active boat size and efficiency.

Shrimping in Federal waters is regulated with the Federal Government and requires separate licensing and seasons.  The larger boats in the Texas shrimp fleet fish State and Federal waters as well as those of Mexico and Central America.

The impact of imported shrimp on the US market is considered the principal reason for the decline in Texas Gulf Coast shrimping activity.  From 1996 to 2005 shrimp imports to the US increased by 11% per annum while the price per pound of imported shrimp declined about 75%.  In 1996 shrimp imports accounted for about 79% of US shrimp consumption.  By 2005 imported shrimp made up and continues to command over 90% of US shrimp consumption.

**Shrimp Imports, Millions of Pounds, Headless**

| | 2007 | 2008 | 2009 | 2010 | 2011 |
|---|---|---|---|---|---|
| All Imports | 12,206.9 | 12,384.3 | 12,018.9 | 12,170.2 | 12,546.3 |

Source: Shrimp Statistics, December - 2011, NOAA

The increase in shrimp imports and falling imported shrimp prices has had a negative effect on profitability on the Texas and Gulf Coast shrimp industry.  The peak year of shrimp profitability was about 1986 when head-off landings commanded about $4.60 per pound.  In 2007 head-off landings were about $2.50 per pound.  Overall prices have been relatively steady to slightly increasing to date though profits for boat operators can vary widely.  Fuel costs are the largest expense for operations and sometimes account for over 50% of revenues.  As such, years of

higher fuel prices are typically witnessed by low catch totals because the more inefficient component of the fleet limits its activity.

The shrimping industry is historically known as one dominated by family-run businesses in both the harvesting and processing of product. A theme repeated by industry participants in our interviews is their desire that their children not enter the field as the potential for a higher standard of living is superior in other fields.

**Shrimp Processors**

Shrimp Processing entails taking shrimp from boats, cleaning, grading and refrigerating the catch, then de-heading, potentially pealing, and icing or freezing shrimp for shipment. The process of unloading, cleaning, grading and de-heading is more often performed dockside. Pealing has become a more uncommon process in the Texas market because of the decline in bay shrimping and the larger size of shrimp caught in the Gulf. Freezing is either in blocks with ice or flash-frozen, which brings higher processing margins. The processor consigns shrimpers' catch at delivery. Other firms operate brokerages or serve as offload and shipping points only. There has been a trend for processors to locate facilities away from the docks and along freeways for better shipping logistics of finished product. This allows for processors to move facilities away from the risk of direct impact by storms.

The largest processor in the Port Arthur area is JBS Packing (two waterfront facilities), followed by Fisherman's Reef in Beaumont (which has emphasized farm raised catfish and crawfish) and the subject property, which has not operated in over a year. JBS is a family business that also owns a fleet of gulf boats and is the most efficient in the region. JBS has expanded over the past year. Local docks are mostly operated without the business owning fishing boats but rely on relationships to maintain raw material supply. As such, this model relies on the trust of ship captains that pricing and handling of product is proper.

Shrimp processors and docking facilities are primarily located in Sabine Pass, along the south end of Pleasure Island, and along the west side of Sabine-Naches and Intracoastal Canal. Off-season docking is usually on protected water where risk of damage is minimized. Docking rates vary by type dock and craft but are a necessity for home port boats. Employment at shrimp processing plans is somewhat seasonal given the fishing season.

There have been no changes in ownership of shrimp processing facilities in the Port Arthur area over the last five years other than smaller facilities being sold to alternative users. In general, similar to the shrimping industry, smaller and less efficient operators have vanished with the overall diminution of the industry.

We have surveyed shrimp processors in the major ports of Texas including Port Arthur, Galveston, Freeport, Palacios, and Port Isabel. Overall, sentiment among processors is negative though processing volumes for the remaining participants have held relatively stable over the past decade. Most indicate that smaller shrimp are not economical to process and some out-source their smaller or "pealer" shrimp to plants in Louisiana where small shrimp represent the bulk of production. The processors all talked of the declining margins faced by both the shrimpers and processors because of low import prices. The most reliable customers for

processed product are retail grocers and markets who advertise the product as "Gulf Shrimp" for customers who desire the differentiated product.  Most all restaurant units use imported shrimp. The most popular and highest margin produced product locally is IQF shrimp or frozen shrimp which is loose in a bag.  The traditional frozen block shrimp is diminishing in demand.

Overall, Port Arthur shrimp production volumes have held steady over the last decade while the number of shrimp boats working in the industry has declined by over 50%, reflecting the impact of low margins on inefficient producers.  Other ports, such as Port Aransas, once known as the "Shrimp Capital of Texas", have seen the industry almost vanish with the fleet moving to Palacios, Port Isabel, or South America.  Shrimp farming remains a small industry with most production limited to the middle (Palacios) and lower (Port Isabel) coast.  The outlook for the industry is for continued pressure with import prices capping the domestic market prices and continued consolidation of producers and processors as the industry economizes.

## NEIGHBORHOOD ANALYSIS

For purposes of this analysis, the subject neighborhood is land on either side of Sabine-Neches Waterway from Sabine Pass to the city of Port Arthur as depicted on the following map.

***Neighborhood Map***

Land Use and Development – The port of Port Arthur was developed in the late 1800s and early 1900s and is primarily identified as an oil and gas and petrochemical and refined products production area. The primary land use in the subject neighborhood is petrochemical plants or related facilities. Related facilities include petrochemical service firms and firms related to off-shore oil and gas exploration and production. The primary site for petrochemical plants is the west bank of the neighborhood or land south of Port Arthur. The lifeblood of the neighborhood is the Sabine-Neches ship channel which is maintained at 44 feet of depth. More minor uses include commercial marine services, shrimp docks and processing facilities, scrap yards, and recreational facilities. The east side of the neighborhood is comprised of Pleasure Island.

Pleasure Island – The subject is located on Paradise Island, a man-made island created by dredge material from the Sabine-Neches Waterway. Paradise Island is linked to the mainland by the MLK bridge on the north side of the island to the central business district of the city of Port Arthur. Paradise Island is 18 miles long with the north side primarily devoted to recreation save for a Coast Guard station and a marine dry dock facility, both on the north portion of the Island.

This north portion of Paradise Island is primarily leased to owners by a corporation owned by the city of Port Arthur and includes a golf course, recreational marine, park, and fishing areas, and ship repair yard. The east half of Pleasure Island fronts Sabine Lake which has relatively shallow waters and is not appropriate for commercial waterfront use. Land use along the east side of Pleasure Island is dominated by residential, waterfront single-family homes built on stilts with fishing piers.

Pleasure Island is bisected by Martin Luther King Drive, also known as State Highway 82. Because of the orientation of State Highway 82 along the west side of the island, there is little available land for commercial development on Pleasure Island fronting Sabine-Neches Waterway. The east side of the island, fronting Sabine Lake, has no deep water access and is developed with residential structures fronting the water.

Immediate Subject Area – The subject property is located at the south end of Pleasure Island about 1,000 feet west of the bridge crossing Sabine Lake and providing linkage to Louisiana. The subject is one of three developed commercial properties on the south end of Pleasure Island. The property to the northwest of the subject is minimally developed save for a wooden dock and used by a shrimp broker for shrimp boat dockage and some unloading, with the remainder of the property used as a scrap yard. The property to the south east is used as a minimal processing shrimp facility and shrimp boat dock with fuel and ice and supplies that ships goods to others for full processing. All other Sabine-Neches Waterway land to the southeast of these properties is owned by the state of Texas as a park around the base of the bridge. Land to the north of these properties is owned by the State of Texas as roadway right-of-way.



The subject's location places the property with Sabine-Neches Ship Channel frontage and good access to the open Gulf through the Sabine Pass jetties.  Water access is only slightly inferior to that afforded boats in the community of Sabine Pass and is comparable to sites on the west side of Sabine-Neches Ship Channel south of the Intracoastal Canal.  Roadway access for the property along Highway 82 to Port Arthur is superior to that of available properties in the community of Sabine Pass but inferior to that for properties along Highway 87 on the west shore of the Ship Channel.  Because of Pleasure Island's dependence on bridges for access, the area has a higher potential risk of being inaccessible because of damage caused by hurricanes.

## SITE ANALYSIS

The subject site contains 1.871 acres of land area and is located on the south side of State Highway 82 about 1,000 feet west of the bridge linking Pleasure Island to rural, coastal Louisiana. The site additionally fronts on the north side of the Sabine-Neches Ship Channel.

The following summarizes the physical and legal factors affecting the site.

| | |
|---|---|
| Site Size: | 1.87 acres |
| Legal Description: | Tax account records list the site as containing 1.873 acres out of Tract 81, D. Gahagen Survey, Abstract 300123, Lot 59. The subject is identified by tax account number 300123-000-112400-00000-4 of the records of Jefferson County. |
| Site Shape: | Generally rectangular shape with about 500 feet of frontage on State Highway 82 and similar frontage on Sabine-Neches Ship Channel. Property depth is about 180 feet on the west boundary and 150 feet on the east boundary. A copy of a survey completed in 1998 which is generally illegible but was useful in overall site and property understanding is included in the Addenda of this report. |
| Roadway Character: | State Highway 82 is a two-lane, bi-directional roadway at the subject and across much of Pleasure Island. |
| Subject Boundaries: | The subject's boundaries are the waters of the Sabine-Neches Ship channel to the south, State Highway 82 to the north, a low improvement shrimp broker and dock on a 1.5 acre parcel primarily used as a scrap yard to the northwest, and a 2.8-acre parcel with about 8,000 square feet of buildings with limited shrimp processing capacity, fueling and ice plant that also caters to boat docking to the southeast. |
| Easements/Encroachments: | The survey have does not indicate easements impact the subject. The subject's fencing and used parking areas encroach on State Highway 82 right-of-way. Also, the subject's pier area encroaches over the water of Sabine-Neches Ship Channel. |

| | |
|---|---|
| Topography/Drainage: | The subject site, like adjacent land, slopes to the south toward the Neches-Sabine Ship Channel.  State Highway 82 is toward the crown of elevation of Pleasure Island. |
| Visibility: | Good visibility from State Highway 82 and boats from Sabine-Neches Ship Channel. |
| Utilities: | The subject has access to overhead electrical lines paralleling State Highway 82.  The subject has a septic system and water well. |
| Waterfront Improvements: | The subject has minimal formal bulkhead area which is limited to the approximate 150 feet of the property including the covered dock area.  The remainder of the frontage is protected by two sunken barges, which have deteriorated to the point of limited effectiveness.  There is an existing pier on metal pipe with concrete pad extending out over the water.  The pier is deteriorating and shows severe shifting and buckling.  The site is eroded proximate to the water at the non-bulkhead area.  At a minimum, the waterline area needs to be protected by rip-rap and backfilled with busted concrete or old bricks (no natural rocks in the area). |
| Flood Zone: | The subject's current flood plain status is identified in FEMA Flood Insurance Rate Map 4854990045E dated May 4, 1992 as primarily within Zone C or outside the 100-year flood hazard areas along State Highway 82 and as within Zone A11 or subject to tidal floods along the Sabine-Naches Ship Channel. If revised to current standards, the FEMA designation for the subject would probably be downgraded to most or all flood prone because of location with coastal island frontage. |



**FEMA RATE MAP**

Deferred Maintenance:       The site is valued by comparing predominantly bulkheaded lots of comparable location to the subject.  These Sales overall have superior bulkheaded areas as compared to the subject.

Deferred maintenance to the subject site pier and bulkhead areas are summarized in the Improvement Analysis.

Conclusion:       The subject site contains 1.87 acres and is located on State Highway 82 about 1,000 feet west of the bridge linking Pleasure Island to Louisiana.  The site has about 500 feet of frontage on the roadway and Sabine-Neches Ship Channel.  Site depth is minimal ranging from about 150 to 180 feet.

## ZONING ANALYSIS

The subject site is located in the city of Port Arthur which enforces zoning ordinances. According to telephone conversations with the Planning and Zoning department the subject site is zoned for industrial use with the subject being a conforming use.  We have not researched the title of the property to ascertain the property's status in regard to private deed restrictions. However, the property is currently developed and uses dictated by the highest and best use analysis exist at proximate properties.

**IMPROVEMENT ANALYSIS**

The subject site is improved with a boat dock and shrimp processing facility. The following illustrates the general layout of improvements to the site.

The structures are of primarily steel frame with metal siding with some concrete block on dock area structures, all having sloped steel roofs. The following presents a summary of buildings and sizes for the property.

**Summary of Property Building Improvements**

| Structure Number | Ground Floor Area | SF GBA | Covered SF |
|---|---|---|---|
| 1 | Main Structure (pre-1989) | 15,000 | |
| | Added Future Freezer Area | 7,500 | |
| | Added Dock w/office/storage above | 5,000 | |
| 2 | Freezer Building | 4,620 | |
| 3 | Dock Building | 5,250 | |
| 4 | Ice Building (pre-1989) | 990 | |
| | Total First Floor Space | 38,360 | |
| 5 | Covered Dock (pre-1989) | | 3,000 |
| | Upstairs Office | 3,000 | |
| | Total GBA | 41,360 | |

Building Size: We have physically measured the building twice, or one during our prior appraisal in 2009, and during the current appraisal process. Our measurements and calculations of building size have been similar, varying around 41,000 square feet including upstairs office areas.

The Jefferson County Assessor's office measures the property at 40,952 square feet while the broker previously marketing the property measures the improvements at about 39,500 square feet.

Main Structure: The main processing structure is a steel frame structure with steel siding and steel roof on purlins. The structure is a pre-engineered-type building that as been added onto since originally constructed. The structure has an elevated foundation with a general slope to the water. The structure contains two built-in freezer areas and is primarily air-conditioned and has panel insulation for the interior production areas and freezers. The structure also includes a loading dock with two dock doors facing a dock well, and some mezzanine storage. Office areas of the property are on a mezzanine deck in this structure.

Climate control for blast freezing is via an ammonia cooling system with the holding tank to be located to the east of the structure on a concrete pad. The ammonia tower has been removed from the property and the system is not a component appraised in this analysis.

Freezer Building: The freezer building is a pre-engineered steel structure with steel exterior and steel roof on purlins. The interior area has blown-on foam insulation on all walls and ceiling areas. There is minimal lighting.

Climate control is via two evaporative and compressor units located to the east of the structure. These units also supply cooling for an ice machine located adjacent to this building.

Dock Building: The Dock building is also known as the de-header building where shrimp are loaded for the first stage of shrimp processing. This room is open with concrete floor and has block walls and a metal roof. The structure has no climate control and minimal lighting.

Ice Building: The Ice Building abuts the Dock or de-header Building and contains an ice machine reported to have a capacity of about 72 thousand pound of ice per day. The ice machine itself is not included in this appraisal.

Covered Dock: The covered dock is a steel frame enclosure without end walls extending out over a concrete pad. The covered dock is not

considered a portion of Gross Building Area. It has no climate control and only minimal lighting.

Office Finish: The office area has minimal finish with a ceiling height averaging less than eight feet and has drywall ceiling and walls and laminate wood floors. Lighting is surface-mounted. Climate control is limited to residential-type window air-conditioners though the space was built-out with ducts when constructed.

Structures Not Appraised: The property has two mobile home units on site that are person property and not appraised but specifically excluded from analysis.

Other Items Not Appraised: The property has above-ground fuel storage tanks and truck trailers on site that are not included in the appraisal.

Parking/Drives: The subject has a combination of concrete and asphalt-paved areas for parking and driveways. A portion of the parking used by the current occupant is outside the property boundaries and located on the right-of-way of State Highway 82. These areas are considered off-site costs in the Cost Approach estimates of property value.

Other Yard Improvement: Other yard improvements include fencing, gates, concrete pad for ammonia tanks and other equipment, piers, and septic and water systems.

Physical Status: Overall, property improvements are in average condition given age and the harsh environment in which the improvements are located.

The main processing building's concrete floor has buckled and cracked around a center support column which appears to have little movement. At minimum, this condition creates a trip hazard for the property. The cost of repairs is estimated to affect about 1,000 square feet of area needing bust-out, metal tie-in, then re-pouring with concrete and finished. The cost is estimated at about $10 per square foot of area affected or $10,000.

The majority of deferred maintenance at the property is attributable to features outside the property's structures or portions of its site improvements. There is no bulkhead along about 350 feet of the subject site and the barges once used for site protection have deteriorated to offer little protection. The pier has buckling and appears unsafe. The waterfront needs breakfront rip-rap and backfill. In total the costs of effecting repairs to the site is estimated at about $40,000.

In total, deferred maintenance at the property is estimated at about $50,000 as summarized below:

**Deferred Maintenance**

| Requirement | Quantity | Cost |
|---|---|---|
| Foundation/Floor Repair | 1 | $10,000 |
| Required site fill at shoreline | 800 cf | 20,000 |
| Rip Rap at shoreline | 350 lf | 10,000 |
| Pier Repair | 1 | 10,000 |
| Total | | $50,000 |

Functional Status: The property was originally constructed as a shrimp dock with the use of shrimp processing added and expanded at the property over time. If constructed new and at one time, the property would comprise at most two buildings being a loading dock and processing facility. This would result in smaller overall building size and reduced replacement cost over reproduction cost.

The subject's prior representatives indicate a current capacity of about 4 and potential capacity of about 5 million pounds of processed shrimp. We surveyed processing facilities in Freeport (40,000 square feet in three buildings), Galveston County (33,000 square feet in one building) and Cameron County (33,000) that all have processing capacity of 4 to 5 million pounds per year.

In this appraisal we use replacement size of 40,000 square feet and replacement cost estimates based on this property size and optimal configuration.

Economic Status: As detailed previously, the Gulf Coast shrimp industry has been negatively affected by the growing value and falling prices of imported shrimp. This has reduced the number of market participants with survival of only the most efficient producers. There have been no new shrimp processing facilities constructed over the past few years with any new construction associated with existing processors expanding to take market share from fallen competitors or to modernize or increase the efficiency of existing operations. We document the sale of several shrimp processing facilities with estimates of economic obsolescence extracted from these Sales and detailed in the Cost Approach section of this report.

Conclusion: The subject property is primarily metal structural improvements constructed over the last 15 or so years utilized as a shrimp docking, unloading, processing and shipping facility. Equipment not affixed to the property as well as mobile homes are excluded from this appraisal. The property is in average condition with deferred maintenance. The subject as improved is estimated to be impacted by functional and economic obsolescence.

## TAX AND ASSESSMENT ANALYSIS

The subject property is located in the city of Port Arthur and is subject to taxes levied by Jefferson County (including navigation and port districts), city of Port Arthur, and Port Arthur Independent School District (ISD). In Texas, taxes are computed based on 100% of assessed value, in this instance as determined by the Jefferson County Appraisal District. The subject is currently assessed and taxed as summarized below.

**Summary of Real Estate Assessments and Taxes**
**JCAD No. 300123-112400-00000-4**
**Summary of 2012 Assessments and Taxes**

| | 2012 |
|---|---|
| Land | $65,560 |
| Improvements | 989,600 |
| Total | $1,055,160 |
| | |
| **Real Estate Rates** | **2012** |
| Jefferson County (Combined) | $0.8336 |
| Sabine Pass ISD | 1.1400 |
| City of Port Arthur | 0.0792 |
| Total | $2.0528 |
| Real Estate Taxes | **$21,660.61** |

## HIGHEST AND BEST USE

### AS IS PROPERTY

**Highest and Best Use as Vacant:** The subject site consists of a 1.87-acre waterfront parcel fronting State Highway 82 and Sabine-Neches Channel on Pleasure Island in Port Arthur, Texas. The subject has about 500 feet of waterfront area.

The site's water frontage of 500 feet is an attribute of the property valued by fisheries and industrial marine users in the Port Arthur area. The site has depth ranging from about 150 to 180 feet to the right-of-way of State Highway 82 which is a limitation to larger oil and gas, petrochemical and marine repair operations which require more open parking, storage and work and repair area than the site has to offer. Shrimp operators value waterfront more highly than depth of sites. However, the shrimp industry is contracting in number fleet number and profitability is low with pressure on prices and costs.

Waterfront sites require some level of improvement to maintain soil stability and access deeper water. In vacant condition, the subject would require at a minimum rip-rap and fill to minimally protect shoreline areas, with other features such as bulkheads, slips, docks and piers required by varying users. A portion of the deferred maintenance estimated in this analysis is thus associated with the subject's site.

Based on this analysis, which considers the majority of waterfront improvements to be a part of the site, the highest and best use of the site is as a shrimp dock. The curing of deferred maintenance associated with the waterfront area of the site is within the highest and best use of the site as vacant.

**Highest and Best Use as Improved:** The subject property is improved with various structures constructed and previously used as a shrimp processing facility. These improvements represent a substantial investment in the property, especially regarding interior improvement of climate controlled space and freezer storage area.

The Port Arthur area is a primary shrimp harvesting collection node and there are several shrimp processors in the area. Overall, inefficient operations have been economically eliminated from the competitive market. Existing facilities are operating at profitable levels but not generating returns to warrant or spur new construction, but look more toward expanding either vertically or horizontally into existing facilities that can be purchased at a discount to cost new. Given the subject's substantial cost of new improvement, and overall average to good location and attributes, the subject is deemed a valid location and facility for a used shrimp processing plant with associated shrimp dock.

Alternatively, the subject is could be converted to industrial given its good waterfront area and relatively large building size.  This would make the property attractive to a dock-side supply company.  Under such a scenario, an industrial user would have to expend significant funds to complete the property bulkhead.

Another alternative to the property is to divide the property use between a shrimp dock operation for water-based access and general warehouse operation for land-based access to the property.

Under the prior or other alternative uses, the subject is affected by physical, functional, and economic depreciation from cost new.  However, the property improvements have a substantial positive effect on overall property value.  As such, the highest and best use of the property as improved is as a shrimp processing dock and plant, or alternative industrial use.

**COST APPROACH**

To estimate value via the Cost Approach, the following steps are performed:

1. Estimate the market value of the land as if vacant and developable to its highest and best use.
2. Estimate the total replacement cost new of the improvements including hard, soft and other costs as of the date of appraisal.
3. Estimate accrued depreciation within the three major depreciation categories and deduct the total accrued depreciation from the cost new of the improvements.
4. Add the land value to the depreciated value of the improvements.

LAND VALUATION

The Sales Comparison Approach is used to value the subject site. This method compares land sales to the parcel being appraised and considers adjustments for financing, conditions of sale, market conditions (time), and physical characteristics.

Jefferson County Deed Records were researched for sales of comparable sites. Principals and brokers involved with the transactions were contacted to confirm details regarding the properties and transactions. The sales were inspected to verify physical information and to investigate surrounding influences.

Our research of land sites has emphasized the subject's neighborhood, specifically land fronting the Sabine-Neches Ship Channel from the MLK Bridge to the south. The land data summarized below are considered most comparable to the subject site. These data are detailed in the Addenda. As indicated, the Land Data includes both land sales, expired contracts and land listings. The Dales range in date of sale from a November, 2007 to February, 2012, in size from 2.24 to 7.96 acres, and in price from $4.15 to $6.89 per square foot. The properties have all been previously developed to various degrees and were varied states of condition. The expired contract represented by Land Data No. 2, also reflecting listing information, illustrates property price changes within the neighborhood over time. Land Data No. 5 represents a former shrimp processing facility that incurred heavy storm damage now listed for sale as a partially improved (boat slips and docks, pavement) site for sale.



## Land Sales Location Map

| SUMMARY OF COMPARABLE LAND DATA | | | | | |
|---|---|---|---|---|---|
| Sale Data No. | 1 | 2 | 3 | 4 | 5 |
| Date of Sale | Feb-12 | 2012 Expired Contract | May-08 | Nov-07 | Current Listing |
| Location | 5500 S. First Street, Sabine Pass, Texas | 2706 South Gulfway Drive, Port Arthur | 2904 South Gulfway Drive, Port Arthur | 2706 South Gulfway Drive, Port Arthur | 8660 South First Street, Sabine Pass |
| Grantor | Neches Gulf Marine | Jim Hendricks Properties | Seafood Enterprises | Houston Marine Services Inc. | 1st National Bank (Owner) |
| Grantee | Gryphon USA Energy LLC | Confiential | Port Arthur LNG Holdings LLC | Associated Marine Services, Inc. | KET Enterprises (Broker) |
| Improvements | Building, bulkhead, paving | Limited bulkhead and rip rap. Partial stabilization. Some fencing | Building not valued. Bulkhead and pavement limited value. | Limited bulkhead and rip rap. Limited stabilization. | Paving, old bulkhead in need or repairs, boad slip. |
| Land Area (Acres) | 4.00 | 7.96 | 2.24 | 7.96 | 3.07 |
| Water Frontage | 300 | 1,500 | 300 | 1,500 | 300 |
| Frontage/Depth | 3.5 | 6.5 | 0.9 | 6.5 | 0.7 |
| Sales Price | $1,200,000 | $1,000,000 | $700,000 | $1,440,000 | $814,000 |
| Price/SF Land | $6.89 | $2.88 | $7.17 | $4.15 | $6.09 |
| Price/FF Water | $4,000.00 | $666.67 | $2,333.33 | $960.00 | $1,628.00 |
| Comments: | Approximately two dry acres on water with two boat slips and 785 feet bulkhead area. Two acres land across 1st Street had minimal value. Also included small office and waterfront paving. | Property contract expired without closing. Property owner added stabilization and has re-listed for $1.4 million. Limited bulkhead and rip rap. Some potential wetlands. | Property was former shrimp dock purchased for expansion of LNG terminal. Sabine-Neches Ship Channel frontage. Stabilized site. Later extensively damaged in hurricane. | Property purchased with minimal improvements including some bulkhead and rip rap. Limited stabilization. See Land Data No. 2 for current status. | Site was a former Seafood Enterprise shrimp processing brokerage location that had improvements destroyed in 2008. Partial paved with bulkhead needing repairs. |

The first adjustments considered are for those factors that cause prices to vary including property interest conveyed, financing terms, conditions of sale, and market conditions.  All Sales were confirmed to be of the fee simple interest in land (as is the appraised estate in the subject site) and thus are not adjusted.  The Sales were likewise confirmed to be transactions involving cash at closing to the seller or equivalent and thus are not adjusted for financing terms.  No conditions of sale were known to affect the Sales.

In regard to price movement over time, Port Arthur property prices increasing from 2006 through 2008 but declined into 2009.  Transaction volume has slowed as speculators have disappeared from the market, and there are limitations on both speculative and owner-user debt financing.  An illustration of property price declines is Data Nos. 2 (Expired Contract) and 4 (prior Sale).  Comparing these Data over time results in an estimated price diminution of about 30% from 2007 to 2011/2012.  However, a portion of the price variable is reflected in property condition, which degraded in the 2008 hurricane.  In this analysis land prices are estimated to have increased about 5% per annum in 2007 through 2008 but declined about 25% into 2009.  Since, land prices have been stable.

In regard to physical differences in properties, locationally, all data are superior as they have better access to Port Arthur along State Highway 87 as compared to the subject's access along State Highway 82.

A principal adjustment of the Sales is the level of waterfront improvements that were part of the land at sale.  Bulkhead development often exceeds $1,000 per foot of bulkhead area thus, depending on site size and frontage, can have a tremendous effect on prices.  In this analysis the Sales are all adjusted downward for the existence of waterfront features, with the adjustment dependent on both the quality (type and condition) and quantity (frontage) of waterfront features.

The Land Data were all previously improved sites.  Land Data No. 1 had a small structure in average condition as well as site paving.  Land Data No. 2 and 4 had stabilization.  Land Data No. 3 had antiquated buildings, steel tanks, and stabilized areas.  Land Data No. 3 had some site stabilization which requires a more modest downward adjustment.

The subject has about 500 feet of water frontage and depth varying from about 150 to 180 feet.  While water frontage is a valued feature, users also desire yard area and an optimum ratio about a 2:1 is indicated.  The subject has a frontage-to-depth ratio of about 3.0 as compared to the Sales' range from 0.7 to 6.5.  In this analysis Land Data No. 3 is adjusted upward for water front ratios.

In regard to size, all data represent larger parcels as compared to the subject.  As such, all data is adjusted upward to reflect the subject's size.

The adjusted data and resultant range of indications for the subject are presented on the following chart. Based on the data, and considering the adjustments, a value indication of $3.25 per square foot is deemed appropriate for the subject site, as presented below.

**Adjustment Grid - Pleasure Island Seafood Site PPSF**

| Sale Number | 1 | 2 | 3 | 4 | **Subject** |
|---|---|---|---|---|---|
| | | 2012 Expired | | | |
| Date of Sale | Feb-12 | Contract | May-08 | Nov-07 | 12-Oct-12 |
| Land Size (Acres) | 4.00 | 7.96 | 2.24 | 7.96 | 1.873 |
| Price PSF | **$6.89** | **$2.88** | **$7.17** | **$4.15** | |
| Price Adjustments | | | | | |
| Property Interest Conveyed | $0.00 | $0.00 | $0.00 | $0.00 | |
| Financing Terms | 0.00 | 0.00 | 0.00 | 0.00 | |
| Conditions of Sale | -0.69 | 0.00 | 0.00 | 0.00 | |
| Market Conditions | 0.00 | 0.00 | -2.15 | -1.04 | |
| Total Price Adjustments | -$0.69 | $0.00 | -$2.15 | -$1.04 | |
| Price-Adjusted Indication | **$6.20** | **$2.88** | **$5.02** | **$3.11** | |
| Property Adjustments | | | | | |
| Location | -$0.62 | -$0.29 | -$0.50 | -$0.31 | |
| Waterfront Improvements | -$1.55 | -$0.14 | -$0.75 | -$0.16 | |
| Other Improvements | -$0.93 | -$0.14 | -$0.25 | -$0.16 | |
| Frontage to Depth | $0.00 | $0.00 | $1.00 | $0.00 | |
| Size | $0.31 | $0.43 | $0.00 | $0.47 | |
| Total Property Adjustments | **-$2.79** | **-$0.14** | **-$0.50** | **-$0.16** | |
| Final Adjusted Indication | **3.41** | **2.74** | **4.52** | **2.96** | |

| **Range of Indications** | **Unadjusted** | **Adjusted** |
|---|---|---|
| **High** | **$7.17** | **$4.52** |
| **Low** | **$2.88** | **$2.74** |
| **Average** | **$5.27** | **$3.41** |
| **Standard Deviation** | **$2.10** | **$0.79** |
| | | |
| **Conclusion PSF** | | **$3.25** |
| **Conclusion Total** | | **$265,161** |
| **Rounded** | | **$270,000** |

REPLACEMENT COSTS

The second step in the Cost Approach is estimating the replacement cost of the improvements. Replacement cost is defined as "the estimated cost to construct, at current prices as of the effective date of appraisal, a building with utility equivalent to the building being appraised, using modern materials and current standards, design, and layout"

Included in the replacement cost of the improvements are direct costs (or hard costs), indirect costs (or soft costs) and entrepreneurial profit. Direct costs include the costs of labor, materials and contractor's profit. Indirect costs are other costs not directly related to the construction of the improvements, including engineering, architectural and other professional fees, financing costs for interim construction, taxes, and expenses associated with marketing the property to completion of leaseup. Additionally, an allowance for anticipated profit is typically included to recognize the motivation of the developer to build the improvements.

Replacement costs are estimated via the calculator (comparative) method using Marshall Valuation Service. The calculator method is based on a comparison of square foot costs of similarly constructed buildings with the appropriate square foot cost being applied to the subject's estimated replacement gross building area.

The subject’s development costs are evaluated based on comparative costs for base building components plus special features. The subject’s base cost estimates are those described by Marshall Valuation Service Section 14, Page 35. The subject’s base replacement costs are compared to Low to Average Class S light industrial space with upgrades to foundation height. The covered dock area cost is based as a percentage of the overall structure costs, reflecting its relative cost. Interior costs significantly increase the subject’s cost for such items as insulation and climate control systems. Site improvement replacement costs are estimated based on the size, character, and local cost comparables for similar improvements. The various costs are multiplied 7% for additions of soft costs not included in cost estimates. No allocation of developer’s profit is included based on industry standards and appraisal guidelines, as well as the limited profit potential available from this special purpose property class. A summary of the Marshall Valuation Cost indexes, various multipliers and other estimates for property component costs are summarized below.

| | | Multipliers | | | | Adjusted |
|---|---|---|---|---|---|---|
| | Cost/SF | Perimeter | Height | Local | Current | Cost/SF |
| **Industrial Component** | | | | | | |
| MVS Section 14, Page 35 | $26.00 | | | | | |
| Plus: Foundation Upgrades | $2.00 | | | | | |
| Low Cost - Good Class S | $28.00 | 0.907 | 1.086 | 0.86 | 1.01 | $23.96 |
| | | | | | | |
| Ratio for Dock Cover | | | | | | 85% |
| Total Dock Cover Cost | | | | | | $20.36 |
| Ratio for Covered Areas | | | | | | 40% |
| Covered Areas Cost | | | | | | $9.58 |
| | | | | | | |
| **Main Freezer Building** | | | | | | |
| Freezer Size (each) | 2500 | | | | | |
| Height | 18 | | | | | |
| CF | 45,000 | | | | | |
| Roof and Wall Area | 5,700 | | | | | |
| Insulation Cost (Walls and Ceiling) | $8.30 | | | | | |
| Insulation Cost (Floor) | $5.40 | | | | | |
| Refridgeration Cost/CF | $1.60 | | | | | |
| Total Cost | $134,798 | | | | | |
| Number Freezers | 2 | | | | | |
| Total Cost | $269,595 | | | | | |
| **Rounded** | **$270,000** | | | | | |
| | | | | | | |
| **Secondary Freezer Building** | | | | | | |
| Building Size | 4,620 | | | | | |
| Height | 18 | | | | | |
| CF | 83,160 | | | | | |
| Roof and Wall Area | 9,804 | | | | | |
| Insulation (Walls and Ceiling) | $6.00 | | | | | |
| Insulated Foundation | $3.90 | | | | | |
| Refridgeration Cost/CF | $1.60 | | | | | |
| Total Cost | $211,898 | | | | | |
| **Rounded** | **$212,000** | | | | | |
| | | | | | | |
| **Insulation Main Building** | | | | | | |
| SF Building Area (less freezers) | 17,500 | | | | | |
| Height | 18 | | | | | |
| Roof and Wall Area | 24,700 | | | | | |
| Insulation (Walls and Ceiling) | $6.00 | | | | | |
| Insulated Foundation | $3.90 | | | | | |
| Air Conditioining Cost/SF | $6.50 | | | | | |
| Total Cost | $330,200 | | | | | |
| **Rounded** | **$330,000** | | | | | |

ESTIMATE OF ACCRUED DEPRECIATION

Accrued depreciation is defined as "the difference between an improvement's reproduction or reproduction cost and its market value as of the date of appraisal."  In other words, accrued depreciation represents the diminished utility or loss in value in the improvements from cost new.  In this instance, the breakdown method is used to estimate the independent categories of depreciation.  There are five recognized forms of depreciation:

1. Curable physical depreciation
2. Incurable physical depreciation
3. Curable functional obsolescence
4. Incurable functional obsolescence
5. External or economic obsolescence

Each category of depreciation and its effect on the reproduction cost new of the subject improvements is addressed in this section of the report.

Physical deterioration is a reduction in utility resulting from impairment or aging of the improvements.  Physical deterioration is separated into curable and incurable components.

Curable physical depreciation, typically referred to as deferred maintenance, is defined as "the loss of value from cost new which can be recovered or offset by correction, repair or reproduction of the item causing a loss in value."  Physical depreciation is curable only if the cost of correcting the condition is offset by an equal or greater increase in value.  This kind of depreciation is usually calculated as a dollar amount to cure the deficient items.

As detailed in the Improvement Analysis, the property is in average to below average condition as of the date of our inspection and of recent minimally maintained.  As estimated in the Improvement Analysis, deferred maintenance is estimated at about $50,000 and applied in this analysis.

Incurable physical depreciation is "the loss in value from cost new that is impossible to offset or that would involve expenditure in excess of the value increase resulting from the expenditure."  The improvements we completed from the 1990s through 2006.  Effective age of the subject is estimated at 10 years and effective life is estimated at 35 years (overall) given quality of structures and the harsh environment in which the improvements are located.  Based on the age/life method of depreciation, incurable physical depreciation is estimated at 29%.

Functional obsolescence is "a loss in value resulting from defects in design."  Functional obsolescence is caused by construction inadequacies, superadequacies, changes in construction

design, or materials that hinder the structure's utility. Functional obsolescence is segregated into curable and incurable categories.

Functional curable obsolescence represents an item in which the cost to correct would be equal to or less than the value increase of the improvements resulting from the correction. Curable functional obsolescence is measured by the cost to cure the condition. Incurable functional obsolescence reflects a functional problem that is currently not feasible to correct.

As discussed in the Improvement Analysis section of this report, the subject property was constructed over time resulting in some inefficiency which results in larger building size as compared to operating capacity. We have used the replacement size of the property to match capacity and thus have already accounted for the subject's functional inefficiencies because of staged construction.

In regard to external obsolescence, business conditions in the shrimp industry have continually squeezed profit margins and shrunk the overall number of market participants. While the remaining firms are more efficient, the negative and growing impact of imports on shrimp harvesters and processors continues.

The calculation of economic obsolescence affecting the property is extracted from the improved shrimp processing facility Sales detailed in the Sales Comparison Approach which is summarized below.

**Economic Obsolescence Computation (Shrimp Processing Plant)**

| | Sale No. 4 | Sale No. 5 | Sale No. 6 |
|---|---|---|---|
| Sale Price | $2,800,000 | $2,800,000 | $800,000 |
| Less: Time Adjustment | 0% | -$140,000 | -$40,000 |
| Indication | $2,800,000 | $2,940,000 | $840,000 |
| Less: Land Value | 500,000 | 500,000 | 110,000 |
| Indicated Improvement Value | $2,300,000 | $2,440,000 | $730,000 |
| Gross Building Area | 72,000 | 72,000 | 33,066 |
| Cost PSF (includes site costs) | $65.00 | $60.00 | $65.00 |
| Total Cost | $4,680,000 | $4,320,000 | $2,149,290 |
| Effective Age of Improvements | 6 | 5 | 15 |
| Life | 40 | 40 | 40 |
| Physical Depreciation | $702,000 | $540,000 | $805,984 |
| Indicated Remaining Cost | $3,978,000 | $3,780,000 | $1,343,306 |
| Indicated Value loss to Economic Obsolescence | $1,678,000 | $1,340,000 | $613,306 |
| Indicated Percent Cost New | 36% | 31% | 29% |
| | | | |
| Estimated Economic Depreciation From Cost New | **33%** | | |

As indicated on the next page, the "As Is" value of the subject facility in fee simple estate as of the date of appraisal via the Cost Approach is estimated below.

**Cost Approach 3931 Martin Luther King Drive**
**"AS IS" Cost Approach Value Estimate**

| **Cost New Estimates** | | | | |
|---|---|---|---|---|
| Component | Size (SF) | | Cost | Total |
| Primary Buildings | | | | |
| Overall Effective Gross Building Area (Base) | 40,000 | | $23.96 | $958,241 |
| Plus Climate Control Production Area | | | | $330,000 |
| Plus: Main Freezers Installed | | | | $270,000 |
| Plus: Refriderated Building Additions | | | | $212,000 |
| Plus: Office Improvements | | 3,000 | $45.00 | $135,000 |
| Total Cost Primary Building Improvements | 40,000 | | $47.63 | $1,905,241 |
| Other Site Components | | | | |
| Dock Area Cover | 3,000 | | $20.36 | $61,088 |
| Other Covered Areas | | | | $20,000 |
| Truck Wells | | | | $50,000 |
| Paving, Pads and Parking Areas | | | | $120,000 |
| Fencing/Gates/Drives | | | | $20,000 |
| Package Water and Septic Systems | | | | $80,000 |
| Other Site including Piers | | | | $100,000 |
| Bulkhead Waterfront and Slip | | | | $280,000 |
| Total Other Site Components | | | | $711,088 |
| Subtotal Development Costs | 40,000 | | $65.41 | $2,616,329 |
| Plus: Other Site and Soft Costs @ | | 7.0% | | 183,143 |
| Total Hard and Soft Costs | | | | $2,799,472 |
| Plus: Developers Profit @ | | 0.0% | | 0 |
| Total Hard, Soft and Developers Profit | 40,000 | | $69.99 | $2,799,472 |
| **Depreciation** | | | | |
| *Physical Depreciation Curable* | Cost | | | Depreciation |
| All Combined | $50,000 | | | $50,000 |
| *Physical Depreciation Incurable* | Cost | Age | Life | Depreciation |
| All Combined | $2,749,472 | 10 | 35 | $785,564 |
| *Function Depreciation* | | | | Depreciation |
| Curable | | | | $0 |
| Incurable | | | | $0 |
| *External Obsolescence* | Cost | | | Depreciation |
| Estimated Value Loss | $2,799,472 | | 33% | $923,826 |
| Total Depreciation | | | | $1,759,389 |
| **Summary of Indications and Cost Approach Conclusions** | | | | |
| Total Cost New | | | | $2,799,472 |
| Total Depreciation | | | | 1,759,389 |
| Depreciated Cost | | | | $1,040,083 |
| Plus: Land Value | | | | 270,000 |
| Total Estimated Value Via Cost Approach | | | | $1,310,083 |
| **Rounded** | | | | **$1,310,000** |
| **Per Square Foot GBA** | | | | **$32.75** |

## SALES COMPARISON APPROACH

The Sales Comparison Approach involves a comparison of recently-sold, similar properties to the subject. Optimally, characteristics of the comparable transactions (property rights conveyed, financing terms, conditions of sale and market conditions), and characteristics of the properties' location, physical and functional efficiencies, and income potential are similar to the appraised property. Where these characteristics differ, adjustments are required.

There have been few confirmed, operational shrimp processing facilities to evaluate for this analysis. However, there have been several recent improved sales along the waterway in in Port Arthur, including one shrimp dock/limited processing facility, that have been confirmed in our research of the area.

**Improved Port Arthur Property Sales**



Sale Nos. 1 and 2 are industrial facility Sales while Sale No. 3 is the sale of a shrimp dock with limited processing capacity.

We confirmed several Shrimp processing facility transactions and contracts that have occurred over the past few years along the Texas Coast including two properties within the Brownsville market and the aforementioned Sale No. 3.

**Improved Shrimp processing and docks**



**SUMMARY OF COMPARABLE IMPROVED PROPERTY SALES**

| Sale No. | 1 | 2 | 3 | 4 | 5 | 6 |
|---|---|---|---|---|---|---|
| Date of Sale | Jun-11 | Dec-08 | May-08 | Jun-09 | May-07 | Jun-07 |
| Location | Port Arthur | Port Arthur | Port Arthur | Harlingen, Texas | Harlingen, Texas | San Benito, Texas |
| Grantor | Signal International Texas LP | LA Ash Inc. | Seafood Enterprises Inc. | South Texas Shrimp Processors | Advance Food Company Inc. | Matt Gorges dba South Texas Shrimp Processors |
| Grantee | Golden Triangle Properties | Port Arthur Chemical and Environmental | Port Arthur LNG Holdings LLC | Undisclosed vegetable processor | South Texas Shrimp Processors | Valley Hi-5 Investments Ltd. |
| Building Size (SF) | 15,200 | 105,000 | 4,000 | 72,000 | 72,000 | 33,066 |
| Type Tenancy | Office and General Warehouse | Dock building and office, multimode docks | Shrimp Dock | Shrimp Processor | Food Processor | Shrimp Processor |
| Land Area (Acres) | 16.60 | 12.00 | 2.24 | 15.41 | 15.41 | 5.00 |
| Land-to-Building Ratio | 47.57 | 4.98 | 24.39 | 9.32 | 9.32 | 6.59 |
| Type Construction | Class S | Class S | Class S | Class C | Class C | Class C |
| Year Built | 10 years (avg) | 20 effective (est) | 30+ years | 2001 | 2001 | 1983 |
| Sales Price | $3,000,000 | $5,000,000 | $700,000 | $2,800,000 | $2,800,000 | $800,000 |
| Price/SF GBA | $197.37 | $47.62 | $175.00 | $38.89 | $38.89 | $24.19 |
| Price/SF Land | $4.15 | $9.57 | $7.17 | $4.17 | $4.17 | $3.67 |
| Comments: | Property was former marine yard purchased by GT Omniport for expansion of crude and fuel transport associated with Bakken Crude processing facility taking delivery by rail. | Property includes rail spur. Purchased for environmental memediation contractor. Large covered building accessible to waterfront and rail docks. User has EPA on site now with property offered for sale. | Property was former shrimp dock purchased for expansion of LNG terminal. Sabine-Neches Ship Channel frontage. Stabilized site. Later extensively damaged in hurricane. | Shrimp processing building with freezers and good quality production facility located inland in the Port Isabell market. Previously bought for $2.8 million with about $500K added for shrimp production. IQ and freezing equipment to be sold separate. | Prior sale of Sale No. 2. Good quality food processing facility with freezer rooms and good production areas. | Built to FDA standards was converted to shrimp processing facility in 2000 and had capacity of 4 to 5 million pounds per year. Seller moved equipment to new facility. Buyer processes okra and vegetables. |

**Port Arthur Property Analysis**

The Port Arthur Sale data (Sale Nos. 1 through 3) was chosen because of its similarity to the subject in location and its representation of transaction activity in the local market for improved properties with deep water access.  Sale Nos. 1 and 2 are industrial properties with metal buildings and waterfront dock facilities while Sale No. 3 is a former improved shrimp dock with waterfront bulkhead.

 In comparing the comparable sales to the appraised property, units of comparison must be selected.  In the Texas commercial market, the price per square foot of gross building area is most often used by market participants.  In the unit of comparison analysis, the price per square foot is adjusted for elements that cause prices to vary as well as differences in properties.

The sales were all confirmed to be cash equivalent transactions of the fee simple estates of property between willing buyers and seller.  Sale No. 3 was purchased by an adjacent property owner for expansion of an LNG facility.  Market participants indicate that a premium was paid for the property given its deteriorated condition.  As such, a downward adjustment for conditions of sale is applied.

The Sales occurred from 2008 to 2011.  Over this time horizon analyzed market conditions have deteriorated.  As such, Sale Nos. 2 and 3 are adjusted downward for time.

The data is adjusted for factors that cause prices to vary and differences in properties.  These adjustments include those for location, land size, age of improvements, quality of structures, building area, and site improvement size.

Location and site size are grouped into one adjustment.  The location adjustment is applied based on the varied land prices for the Sales multiplied by land size and divided by the gross building area of the Sales.  This square footage of gross building area land value contribution is then subtracted from the overall sales price indication of the Sales.  Thus, in this analysis, value contribution to overall value is subtracted resulting in the ability to adjust property prices based on the marginal contribution to overall sales price from improvement value.

In regard to age of improvements, the subject's effective age is estimated at about 10 years, reflecting the original construction dates of the facility.  The Sales have estimated effective age ranging from about 10 years to 30 years.  Age adjustments are based on the estimated effective age of properties as compared to the subject's, and are modified by overall appeal.  Based on relative age, the Sales are adjusted upward from 0% to 40% for age of improvements.

The subject is a principally Class S structure which is similar to other structures requiring minimal adjustment.

Sale No. 3 is of below average quality and requires upward adjustment while Sale Nos. 1 and 2 were superior to the subject and require downward adjustment.  Sale No. 1 requires downward adjustment for percentage office improvement.

In regard to size Sale No. 1 and 3 are smaller than the subject and require downward adjustment. Sale No. 2 is larger than the subject and requires upward adjustment.

As indicated on the following Improved Sales Summary Grid, the Sales provide an adjusted range of values from $20.20 to $33.34 with an average of $26.08 per square foot.  A value indication of $26 per square foot for the subject's improved structural component is deemed appropriate.

The adjustment process has been applied to improvement value only.  As such, the final value estimate via Sales Comparison requires the addition of land value to improvement value.  Our estimates of deferred maintenance are subtracted from the value estimate.

The following grid presents these calculations of adjustments and estimates of value via the Sales Comparison Approach.

**ADJUSTMENT GRID**

| COMPARABLE | SUBJECT | 1 | 2 | 3 |
|---|---|---|---|---|
| DATE OF SALE | | Jun-11 | Dec-08 | May-08 |
| SALE PRICE/SF | | $197.37 | $47.62 | $175.00 |
| ADJUSTMENTS | | | | |
| FINANCING | | 0% | 0% | 0% |
| | | $197.37 | $47.62 | $175.00 |
| | | E | E | E |
| MOTIVATION | | 0% | 0% | -20% |
| | | $197.37 | $47.62 | $140.00 |
| | | Jun-11 | Dec-08 | May-08 |
| TIME/CONTRACT NEG. | Oct-12 | 0% | -20% | -20% |
| | | $197.37 | $38.10 | $112.00 |
| **EXTRACTED LAND VALUE** | | | | |
| Land Value PSF | | $3.50 | $2.50 | $4.00 |
| Total Land Value PSF GBA | | $166.50 | $12.45 | $97.57 |
| Improvement Value GBA | | $30.87 | $25.65 | $14.43 |
| AGE/APPEAL | 1990s | 1990s | 1970s | 1970s |
| | 2000s | 0% | 30% | 40% |
| TYPE CONSTRUCTION | Class S | S | S | S |
| | | 0% | 0% | 0% |
| INTERIOR FEATURES | AC/Freezers | None | None | Yes |
| | | 10% | 10% | 10% |
| OTHER FEATURES | None | Bulkhead | Rail, Bulkhead | Bulkhead |
| | | -10% | -10% | -10% |
| QUALITY | None | Good | Good | Poor |
| | Avg. | -10% | -10% | 10% |
| PERCENT OFFICE | 7% | 20% | 5% | 7% |
| | | -5% | 0% | 0% |
| SIZE | | 15,200 | 105,000 | 4,000 |
| | 40,000 | -5% | 10% | -10% |
| TOTAL ADJUSTMENTS | | -20% | 30% | 40% |
| ADJUSTED PRICE PSF | | $24.69 | $33.34 | $20.20 |
| Sample Statistics | Average | Minimum | Maximum | |
| Price Per SF of NRA | $26.08 | $20.20 | $33.34 | |

**Summary of Sales Comparison Approach Indication**

| | |
|---|---|
| Indicated Value PSF GBA Improvements | $26.00 |
| Times: SF GBA | 40,000 |
| Indicated Value Improvements | $1,040,000 |
| Rounded | **$1,040,000** |
| Plus: Land Value | 270,000 |
| Less: Deferred Maintenance | 50,000 |
| Indicated Value Total Property | $1,260,000 |
| Rounded | **$1,260,000** |

**Shrimp Processing Facilities**

The Improved Sale (Sale Nos. 3 through 6) data was chosen because of its similarity to the subject in use as shrimp dock and processing facilities along the Texas Gulf Coast.  Sale No. 3 is a former shrimp dock in Port Arthur with structures that had value in the transaction while Sale Nos. 4 through 6 are sales of or for shrimp processing facilities located in Cameron County and served by the largest shrimp port in Texas by weight and value.  These facilities were chosen for analysis because they were the only comparable shrimp processing facilities that were confirmed to have occurred in Texas over the past few years.

In comparing the comparable sales to the appraised property, units of comparison must be selected.  In the Texas commercial market, the price per square foot of gross building area is most often used by market participants.  In the unit of comparison analysis, the price per square foot is adjusted for elements that cause prices to vary as well as differences in properties.

The sales were all confirmed to be cash equivalent transactions of the fee simple estates of property between willing buyers and seller.  Sale No. 3 was purchased by an adjacent property owner for expansion of an LNG facility.  Market participants indicate that a premium was paid for the property given its deteriorated condition.  As such, a downward adjustment for conditions of sale is applied.

The Sales occurred from 2007 to a June, 2009 contract.  Over the time horizon analyzed market conditions have deteriorated.  As such, Sale Nos. 3 and 5 and 6 are adjusted downward for time.

The data is adjusted for factors that cause prices to vary and differences in properties.  These adjustments include those for location, land size, age of improvements, quality of structures, building area, and site improvement size.

Location and site size are grouped into one adjustment.  The location adjustment is applied based on the varied land prices for the Sales multiplied by land size and divided by the gross building area of the Sales.  This square footage of gross building area land value contribution is then subtracted from the overall sales price indication of the Sales.  Thus, in this analysis, value contribution to overall value is subtracted resulting in the ability to adjust property prices based on the marginal contribution to overall sales price from improvement value.

In regard to age of improvements, the subject's effective age is estimated at about 10 years, reflecting the original construction dates of the facility.  The Sales have estimated effective age ranging from about 6 years to 20 years.  Age adjustments are based on the estimated effective

age of properties as compared to the subject's, and are modified by overall appeal.  Based on relative age, the Sales are adjusted upward from 0% to 30% for age of improvements.

The subject is a principally Class S structure while Sale Nos. 4 through 6 are Class C structures requiring modest upward adjustment.  In terms of interior improvement, Sale No. 3 requires substantial upward adjustment while Sale Nos. 4 through 6 are comparable in interior composition.   Sale No. 3 had recently been renovated and requires slight downward adjustment for interior condition.

Sale No. 3 is of below average quality and requires upward adjustment while Sale Nos. 4 through 6 are superior to the subject and require downward adjustment.  Sale No. 3 requires upward adjustment for percentage office improvement.

In regard to size Sale No. 3 is significantly smaller than the subject and requires downward adjustment.  Sale Nos. 4 and 5 are larger than the subject and require slight upward adjustment. Sale No. 6 is overall similar in structure size and not adjusted for size variance.

As indicated on the following Improved Sales Summary Grid, the Sales provide an adjusted range of values from $22.36 to $29.05 with an average of $26.00 per square foot.  The best data within the set is Sale Nos. 4 through 6 which are comparable shrimp processing facilities.  These data indicated an unadjusted range of values from $24.19 to $38.89 per square foot and an adjusted value range from $24.03 to $29.05 per square foot of gross building area.  Based on the data, a value indication of $27 per square foot is deemed most supportable.

The adjustment process has been applied to improvement value only.  As such, the final value estimate via Sales Comparison requires the addition of land value to improvement value, as well as subtraction for deferred maintenance.

The following grid presents these calculations of adjustments and estimates of value via the Sales Comparison Approach.

**ADJUSTMENT GRID**

| COMPARABLE | SUBJECT | 3 | 4 | 5 | 6 |
|---|---|---|---|---|---|
| DATE OF SALE | | May-08 | Jun-09 | May-07 | Jun-07 |
| SALE PRICE/SF | | $175.00 | $38.89 | $38.89 | $24.19 |
| ADJUSTMENTS | | | | | |
| FINANCING | | 0% | 0% | 0% | 0% |
| | | $175.00 | $38.89 | $38.89 | $24.19 |
| | | E | E | E | E |
| MOTIVATION | | -20% | 0% | 0% | 0% |
| | | $140.00 | $38.89 | $38.89 | $24.19 |
| | | May-08 | Jun-09 | May-07 | Jun-07 |
| TIME/CONTRACT NEG. | Oct-12 | -20% | -5% | -10% | -10% |
| | | $112.00 | $36.94 | $35.00 | $21.77 |
| **EXTRACTED LAND VALUE** | | | | | |
| Land Value PSF | | $4.00 | $0.75 | $0.75 | $0.50 |
| Total Land Value PSF GBA | | $97.57 | $6.99 | $6.99 | $3.29 |
| Improvement Value GBA | | $14.43 | $29.95 | $28.01 | $18.48 |
| AGE/APPEAL | 1990s | 1970s | 2001 | 2001 | 1983 |
| | 2000s | 40% | 0% | 0% | 25% |
| TYPE CONSTRUCTION | Class S | S | C | C | C |
| | | 0% | 10% | 10% | 10% |
| INTERIOR FEATURES | AC/Freezers | None | Yes | Yes | Yes |
| | | 10% | -5% | 0% | 0% |
| QUALITY | None | Poor | Good | Good | A. Avg. |
| | Avg. | 10% | -10% | -10% | -5% |
| PERCENT OFFICE | 7% | 0% | 5% | 5% | 7% |
| | | 5% | 0% | 0% | 0% |
| SIZE | | 4,000 | 72,000 | 72,000 | 33,066 |
| | 41,360 | -10% | 2% | 2% | 0% |
| TOTAL ADJUSTMENTS | | 55% | -3% | 2% | 30% |
| ADJUSTED PRICE PSF | | $22.36 | $29.05 | $28.57 | $24.03 |
| Sample Statistics | Average | Minimum | Maximum | | |
| Price Per SF of NRA | $26.00 | $22.36 | $29.05 | | |

**Summary of Sales Comparison Approach Indication**

| | |
|---|---|
| Indicated Value PSF GBA Improvements | $27.00 |
| Times: SF GBA | 40,000 |
| Indicated Value Improvements | $1,080,000 |
| Rounded | **$1,080,000** |
| Plus: Land Value | 270,000 |
| Less: Deferred Maintenance | 50,000 |
| Indicated Value Total Property | $1,300,000 |
| Rounded | **$1,300,000** |

**Sales Comparison Approach Conclusions**

Analysis of Port Arthur industrial and shrimp dock facilities yields a value indication of $1,260,000 while analysis of shrimp processing facilities yields a value estimate of $1,300,000. Based on these indications, a single value indication of $1,280,000 is derived in this analysis.

**RECONCILIATION**

The Cost and Sales Comparison Approaches were used to value the subject shrimp processing facility in fee simple estate as of the effective date of appraisal. The indications provided for land value and the improved property on an "As Is' basis by the employed approaches are summarized as follows:

**Summary of Value Indications**
**3931 Martin Luther King Drive**

| | |
|---|---|
| "As Is" Land Value | $270,000 |
| Cost Approach | $1,310,000 |
| Sales Comparison Approach | $1,280,000 |
| Income Capitalization Approach | Not Applied |

The Cost and Sales Comparison Approaches are typically the most reliable methods of value estimation for special purpose properties such as the subject. The Income Capitalization Approach was not deemed to be a reliable indicator of value in this analysis and not applied.

The Cost Approach is typically the most preferred method of value estimation when improvements are new and land is improved to its highest and best use. The subject property was constructed over several years and has physical curable (allocated to site valuation) and incurable physical depreciation. Additionally, the property has some functional inefficiency because of its staged construction and changed property use. The property is a shrimp processing facility. The shrimp harvesting and processing industry are impacted by high and increasing volumes and falling prices of imported shrimp, eliminating inefficient producers and squeezing profit margins. Economic obsolescence is estimated to affect the subject because of these market conditions.

The Sales Comparison Approach is preferred when comparable data is available for comparison. In this analysis were have analyzed both local or Port Arthur waterfront properties and more similar complete processing centers in similar shrimp markets. Data from each data set is considered in reconciliation. As such, the Sales Comparison Approach is considered a relevant approach in the appraisal of the subject as improved.

Based on the strengths and weaknesses of the Cost and Sales Comparison Approaches, the market value of the fee simple estate in the 'As Is" property as of October 12, 2012, the date the property was inspected, is estimated as follows:

**ONE MILLION THREE HUNDRED THIRTY THOUSAND DOLLARS**
**$1,300,000**

**INSURABLE VALUE**

The subject's insurable value is calculated using Marshall Valuation Service cost estimates (comparative method) developed in the Cost Approach with exclusion ratios indicated as appropriate by East West Bank. The following presents our calculations of the property's insurable value according to standards of estimation provided by East West Bank.

**Insurable Value Estimate**

| | Indication |
|---|---|
| Structure Cost (MVS less 10%) | $1,905,241 |
| Less: Exclusions at 10%* | $190,524 |
| Indicated Insurable Value | $1,714,717 |
| Rounded** | $1,720,000 |

* Per EWB Worksheet using MVS
**Rounded up to the nearest $10,000



Asset Value Appraisals

# *SUMMARY APPRAISAL REPORT OF MACHINERY AND EQUIPMENT*

**Located at:**

**Lot, Inc.**
**3931 S. Martin Luther King Dr.**
**Port Arthur, TX 77642**

Effective Date of Appraisal: November 1, 2012

**PREPARED BY:**
**Asset Value Appraisals, LLC**
**8201 Burkhart**
**Houston, TX 77055**
**Richard Wourms, CMEA, MBA, AIBA, ISBA**
**Certified Machinery/Equipment Appraiser**



Asset Value Appraisals

November 6, 2012

Mr. Loc Tran
Propreitor
Lot, Inc.
3931 S. Martin Luther King Dr.
Port Arthur, TX 77642

Dear Mr. Tran:

Per your request, we respectfully provide a summary appraisal report for certain machinery and equipment items located at Lot, Inc., 3931 S. Martin Luther King Dr., Port Arthur, TX 77642.

This report has been prepared in compliance with the Uniform Standards of Professional Appraisal Practice. Fee Simple Interest has been reported on the machinery and equipment. We are reporting Salvage Value and Scrap Value as of the effective date of November 1, 2012. Use of this report signifies your acceptance of Limiting Conditions contained in the report.

A summary of all information collected indicates that as of this date the estimated Salvage Value of all assets contained in this report would be $220,000.

Respectfully submitted,

Asset Value Appraisals, LLC

Richard Wourms, CMEA, MBA, IABA, SBA

8201 Burkhart Rd., Houston, Texas 77055
713-932-6136, rwourms@yahoo.com, www.assetvalueappraisals.com

# Table of Contents

**Page**

Letter of Transmittal ....................2
General Information ....................4
Summary of Salient Facts....................5
Scope of Work ....................6
Degree to Which the Property is Inspected or Identified ....................8
Extent of Research Into Physical or Economic Factors That Could Affect Property....................8
Extent of Data Research....................8
Type and Extent of Analysis Applied in Arriving at Opinions or Conclusions....................8
Depth of Onsite Inspection....................8
Appropriate Market or Market Level....................8
Intended User(s) ....................9
Confidentiality and Privacy....................9
Overall Condition of Equipment ....................9
Intended Use ....................9
Property Interest Appraised....................9
Statement of Limiting Conditions - Tangible Assets ....................10
Definition of Condition ....................14
Salvage Value Definition ....................15
Scrap Value Definition....................16
Machinery and Equipment Definitions....................17
Methods of Valuation....................19
Cost Approach Analysis ....................19
The Market Data Approach....................19
The Income Approach ....................19
Summary....................20
Sources Contacted ....................20
Additional Considerations....................21
Title of Appraised Equipment....................21
Measurable Marketplace....................21
Market Conditions....................21
Estimated Exposure Time ....................25
Extraordinary Assumptions and/or Hypothetical Conditions....................25
Comments Regarding Capital Equipment ....................26
Capital Equipment ....................27
Final Value Summary and Reconciliation....................29
Appraiser's Certificate....................30
Non-Discrimination....................30
Certification and Re-Certification ....................30
Appraiser's Qualifications ....................31
Addenda ....................32
Additional Definitions and Terms from USPAP ....................34

## General Information

An appraisal is a type of investigation into the law of probabilities with respect to valuation. Through the appraiser's experience, training, and integrity, we are able to project the activities of buyers and sellers in the marketplace into an estimation of value. In reaching a conclusion, comparison of assets usually involves adjustments due to the individuality and uniqueness of each asset. Transactions are often influenced by sentiment, bias, specific needs, politics, familiarity, lack of understanding, and other conditions not considered by the impartial appraiser. The appraiser cannot lend credence to these possible factors lest he misrepresent the very reason for his profession.

An appraisal cannot be guaranteed, nor can it always be proven. The opinion of value can, however, be substantiated and final opinion is the result of a thorough professional analysis of a vast quantity of data. An appraisal must not be considered absolute but should be used as a basis of negotiations between concerned parties, whatever their interests.

The valuation process, as followed in the preparation of this report, is an orderly procedure for arriving at an estimate of value. By following this procedure the appraiser begins with a preliminary study of the problem involved and defines the basis from which the appraisal is to be made. A program is then initiated for the accumulation, analysis, and observation of data. The data called for in the preliminary study is then gathered, classified, and analyzed.

In assignments to estimate Salvage Value and Scrap Value, the ultimate goal of the valuation process is a supported conclusion that reflects the appraiser's study of all influences on the value of the assets being appraised. Therefore, the appraiser studies the assets from various applicable viewpoints.

Various approaches are interrelated, and each involves the gathering and analysis of sales, activity, and value data in relation to the assets being appraised. From the analysis, the appraiser derives separate indications of value for the assets being appraised. One or more approaches may be used, depending on their applicability to the particular appraisal assignment.

To complete the valuation process, the appraiser integrates the information drawn from the market research and analysis of data and from the application of appraisal techniques to form a conclusion. This conclusion may be an estimate of value or a range in which the value may fall. An effective integration depends on an appraiser's skill, experience, and judgment.

With the preceding in mind, the reader's attention is invited to the appraisal report and various exhibits which point out the facts and reasoning leading to the final estimate of value.

**Summary of Salient Facts**

| | |
|---|---|
| Identity of Client | Lot, Inc. |
| Intended User(s) | Loc Tran<br>Jonathan Dettmann, Esq.<br>Kirk Neste |
| Intended Use | Spill Settlement Deepwater Horizon Claims Center |
| Property Interest Appraised | Fee Simple |
| Sales History of Appraised Item(s) | Mostly Purchased Used |
| Physical and Economic Property Characteristics Relative to the Assignment | The items discussed in this report are currently utilized in the particular industry as described in the industry report located in the Addenda section. The individual items are described via basic nomenclature. |
| Class of Property | Food Processing |
| Current Use of Property | Not in Use |
| Use of Property When Appraised | Shrimp Processing |
| Effective Date of Appraisal | November 1, 2012 |
| Date Report Written | November 6, 2012 |
| Date of Inspection | October 29, 2012 |
| Type of Value (as requested by client and approved by appraiser) | Salvage Value |
| Final Estimate of Value | $220,000. |
| Scrap Value is estimated at $0, because the appraiser is not qualified to value Scrap. | Scrap Value |
| Final Estimate of Scrap Value | $0 |

**Scope of Work**

The appraiser has been asked to provide an appraisal effective November 1, 2012 of certain machinery/equipment items located at Lot, Inc., 3931 S. Martin Luther King Dr., Port Arthur, TX 77642.

It has been requested that fee simple interest be reported as an estimation of the Salvage Value. The types of value reported have been determined by the appraiser, upon engagement by the client, to be appropriate to the client's needs.

This report is identified as a Summary Report that is intended to comply with the reporting requirements as defined under Standards Rule 8-2 (b) of the Uniform Standards of Professional Appraisal Practice (USPAP) for a Summary Appraisal Report. As such, it presents only summary discussions of the data, reasoning, and analyses that are used in the processes to develop the Appraiser's Opinion of Value. Supporting documentation that is not provided with the report concerning data, reasoning and analyses is retained in the appraiser's file. The depth of discussion contained in this report is specific to the needs of the client and for the intended use stated within this report. Not all specific requirements are applicable to every assignment. In this assignment, not all data involving subject sales, offerings, options and listing was obtainable and verifiable, although the appraiser has made every effort to gather the data by direct contact with the various sources through telephone or e-mail. If this detailed data is not included or addressed, the data is considered to be irrelevant. Due to the large number of subject properties oftentimes appraised in a machinery/equipment appraisal, the summary report is the most commonly used report form. Summary reports are accepted on a daily basis by the courts, taxing authorities, lenders, business owners, accountants, and other users of appraisal services. As noted in the book "Valuing Machinery and Equipment: The Fundamentals of Appraising Machinery and Technical Assets, Third Edition, American Society of Appraisers, "MTS (machinery and technical specialties) appraisals usually involve a wide variety and multitude of assets. USPAP recognizes three forms of reports: Self-Contained, Summary, and Restricted Use. MTS appraisal reports typically are prepared as Summary reports. The primary difference between the three types of reports is the level of detail presented. The Self-Contained report 'summarizes' and a Restricted Use Report 'states'."

The Income Approach would be purely hypothetical in this assignment, since there is no income. The Cost Approach has been utilized for the final value estimate of each item or category based on Useful Life ratios provided by the National Equipment and Business Builders Institute. The Market Data Approach was deemed inappropriate, because none of the equipment was functioning and the cost of repairs was unknown. A factor appropriate for salvaged items, usually 10-12% of the original purchase price, was applied based on the applicable age and equipment type.

The appraiser has gathered data on the subject items from as many sources as practical, including but not limited to the original equipment manufacturer (if possible), dealers and brokers of like equipment, published catalogs, and guides of similar equipment as well as the Internet. Upon gathering data regarding new and similar models with characteristics of the

subject equipment, the writer has then analyzed the data in an effort to estimate value.

After conversations with various industry professionals, including the above-mentioned sources, the appraiser endeavored to arrive at a value estimate for the subject equipment. After a value was established, this written report was then formulated to set forth the findings and conclusions of the appraiser. An extreme effort was made to comply with the Uniform Standards of Professional Appraisal Practice in providing the final written report.

This is a report estimating value based on reported conditions. If it is the client's desire to verify the physical condition and/or needed repairs of the machinery/equipment, which is the subject of this report, the client should consult a qualified mechanic/technician. To determine actual mechanical condition is outside of the appraiser's expertise and the scope of this assignment.

This assignment has called for only the larger, more expensive items owned by the client to be appraised. It is understood that oftentimes there also exist smaller, less expensive ancillary/support items that "support" the larger items. These items, too, obviously have value but do not in and of themselves merit the time and expense of an individual valuation. Therefore, it is agreed by the client's use of this report, that if these types of items are mentioned in this report, they will be added under a separate section(s) as opposed to the larger capital items and the appraiser will only apply the Cost Approach (less depreciation) to value. The Market Data Approach will not be applied to the smaller, less significant items, due to time and cost factors required in researching smaller items. These items typically include smaller hand tools, furniture, fixtures, shelving, electronic items, i.e., computers, calculators, copiers, telephone systems, etc., and other less expensive items which are considered to "support" the items, which are the focus of this report. Industry depreciation standards have been applied with little, if any, individual description. Lot pricing is employed with these types of items.

Further, the request to the writer as to the type of report needed was implemented. That is to say, the equipment may be valued in place, in use, and as part of a going concern entity; in place, not in use; in place to be removed; not in place, etc. Many types of equipment items are labor intensive in their millwright, installation, or removal.

This evaluation sets forth the findings and conclusions of the writer, and is based upon an investigation of conditions affecting value, and is subject to the Statement of Limiting Conditions and Definitions. Without reading the Statement of Limiting Conditions and Definitions, the report cannot be fully understood.

The scope of this assignment as explained above has been requested and/or agreed to by the client.

Degree to Which the Property is Inspected or Identified

An onsite visit was conducted to view the equipment on October 29, 2012. A visual inspection was made to verify that the equipment exists. The equipment was observed and is assumed to be not in good working order, though a detailed mechanical inspection was not made. Overall, the equipment visually appears to be in Poor Condition. All relevant equipment was photographed. The item numbers listed on the equipment valuation chart are referenced on the photographs. on.

Extent of Research Into Physical or Economic Factors That Could Affect Property

The appraiser has had a number of conversations with manufacturers and suppliers of the subject items. The appraiser has not had access to the profit and loss statements or tax returns of Lot, Inc. It is assumed the business is not operating and the machinery/equipment, which is the subject of this report, will not remain in place into the future.

The purpose of this report is not to comment on profit or loss of the subject business, and if there is concern in those areas, the reader or user of this report should conduct further studies.

Extent of Data Research

The appraiser, in conversations with all listed sources, described to the best of his ability the characteristics of the subject equipment. It is understood equipment items may be purchased/sold with a variety of peripheral attachments, support items, and other amenities, which could affect value. It is not always possible to know of such factors that may or may not exist. Therefore, it is assumed the subject equipment does in fact have basic qualities needed for operation and would have an expected amount of peripheral amenities associated with the subject item.

All information provided the appraiser is believed to be accurate but not warranted or guaranteed. Original invoices were not available to the appraiser. Equipment age and new/used condition at time of purchase was provided by Mr. Loc Tran.

Type and Extent of Analysis Applied in Arriving at Opinions or Conclusions

Conversations were held with manufacturers and dealers providing similar machinery and equipment items. After conversations with manufacturers, dealers, and industry professionals, the appraiser formulated an opinion as to values and market conditions.

Depth of Onsite Inspection

The appraiser viewed the machinery and equipment, which is the subject of this report, unless otherwise noted. The equipment was verified to be in place and not working, although a detailed mechanical inspection was not made. The equipment appears to be in an overall Poor Condition and was photographed when possible.

Appropriate Market or Market Level

The most appropriate market or market level would be for this equipment to be utilized as part of a going concern business operation. Obviously, all machinery and equipment items are best utilized with their income producing capabilities functioning.

Intended User(s)

The intended users of this report are Loc Tran, Jonathan Dettmann, Esq., Kirk Neste.

Confidentiality and Privacy

The appraiser will maintain the conformity and privacy of customer information obtained in the course of this assignment in compliance with USPAP and Regulation Practices, Title V of Gramm, Leach, Bliley Financial Modernization Act.

We do not sell information about our client to others. We protect the security and confidential information about the client. We share information outside of our company only when necessary to administer products or services we provide when we have your permission, or when required or permitted by law.

Overall Condition of Equipment

It is understood the subject equipment is in Poor Condition except as noted, and not used on a daily basis. Appearance is Poor Condition unless otherwise noted.

Intended Use

It is understood this report is to be used for this purpose and no other:
Spill settlement with Deepwater Horizon Claims Center.

Property Interest Appraised

It is understood that the property interest appraised is in Fee Simple Interest.

## Statement of Limiting Conditions - Tangible Assets

1. All facts and data set forth in this report are true and correct to the best of the appraiser's knowledge.

2. The fee for this report is not contingent upon the values reported. There have been no guarantees associated with this fee and no liability can be intimated or assumed in any manner.

3. Since this report has been purchased by the addressee, it is assumed by the appraiser that it is to be used by the addressee in determination of value at that point in time. Use of this report by others should be done so with the understanding that no risk or guarantees have been purchased by the owner of the report nor through the fee paid to the appraiser. The appraiser reserves the right to recall all copies of this report to correct any omission or error.

4. Physical condition in most instances has been determined by observation or indication by others. Any unknown conditions existing at the time of inspection could alter the value. No responsibility is assumed for latent defects of any nature whatsoever which may affect value, nor for any expertise required to disclose such conditions.

5. No consideration has been given to liens or encumbrances, which may be against the property.

6. No investigation of legal fee or title to the property has been made and the claim to the property has been assumed to be valid.

7. Neither the appraiser nor any officer or employee of the appraiser's company has any financial interest in the property appraised, unless specifically noted.

8. No additional values or appraisals have been made in regard to such intangibles as patents, rights to manufacture, trademarks, goodwill, going concern value, etc.

9. This report has been prepared in conformity with the Principles of Good Practice and Code of Ethics of NEBB Institute.

10. Other limitations, if any, are clearly defined and individually set out at that point related to the subject.

11. Neither all nor any part of the contents of this report, or copy thereof, shall be reproduced for any purpose other than stated in the report, nor shall it be made available to the media, another appraiser or anyone else without the written consent of the appraiser.

12. For all appraisals subject to satisfactory completion, repairs, or alterations, this report and value conclusions are contingent upon completion of the improvements in a workmanlike manner.

13. Information, estimates and opinions furnished the appraiser and contained in this report were obtained from sources considered reliable and believed to be true and correct; however, no responsibility for the accuracy of such items furnished to the appraiser can be assumed by the appraiser. No liability or responsibility is expressed for results from actions taken by anyone as a result of this report. Further, there is no accountability, obligation, or liability to any third party.

14. Matters of legal nature or tax consequences have not necessarily been considered in this report. The reader should consult a competent attorney or CPA for information and opinions in those areas.

15. In many instances, the appraiser is given information regarding machinery and equipment concerning repairs, accessories, condition, etc., which may or may not be verifiable by the appraiser for a variety of reasons. In such cases, the appraiser must rely on information provided him in searching for comparative data. The appraiser disclaims any responsibility if given erroneous information by any party.

16. Machinery and equipment appraisers are called on for price evaluation and verification for equipment from many different fields of business. It is impossible for any appraiser to be an authority in every field of machinery/equipment. Therefore, the appraiser has endeavored to use basic sound, accepted methodologies in any assignment (i.e., Cost New Less Depreciation and Market Data Approaches). Conversations with those dealing daily in a specific field were conducted, and all final evaluations are founded on prudence and best effort on the part of the appraiser. "Conclusion of opinion of value" is arrived at from years of experience in the sale and appraisal of machinery, equipment, businesses, and commercial properties. The final form of this report is made possible by omitting many details used in estimating, yet not considered essential to the report.

17. The appraiser has endeavored to use due diligence in all market comparisons. If possible, three comparisons of similar items sold usually provide substance for final value determination. However, at times it is not possible to find any direct sales comparisons that have actually sold. In these cases, the appraiser has relied heavily on comments and testimony from sources considered reliable (dealers, auctioneers, manufacturers, wholesaler, etc.) in arriving at the final value estimate.

18. The writer has based his opinion on certain assumptions that have been presented to him. If these basic assumptions should change for any reason, the final valuation could quite likely change. The appraiser reserves the right to make any adjustments considered necessary as additional or more reliable data becomes available.

19. If the request has been for the writer to accept values given by the principals, i.e., hard assets, fixtures, equipment, inventory, etc., then the assignment becomes hypothetical in nature unless the writer has specifically certified the values of such assets in the report.

20. Nomenclature and identification of tangible assets are assumed by the writer to be accurate, but no guarantee is made in this regard.

21. An appraisal is an estimate of value. When the amount is considered a reasonable and

proper value under the concept of a definition, then it is applied. For this reason, the value is, in many cases, a rounded number. As stated in *Engineering Valuation and Depreciation*, a textbook published by Iowa State University Press of Ames, Iowa, "All values are of the nature of forecast of events and are subject to the uncertainties of all prophecies."

22. In most cases, equipment is itemized, although certain areas require a group estimate, in which case the listings are shown in the quantity column as "lot." This is usually applied in nominal value areas that require general descriptions for applications elsewhere, or in areas where difficulty of access for total description would have required additional time not justified by the items being valued.

23. It is assumed that all equipment has standard features commensurate with its normal operation. For instance, machine tools would include but not be limited to: belt guards, foot pedals, magnetic or standard starters, switch-gear, safety equipment, wiring, piping and controls, electrical, pneumatic or hydraulic systems, or other peripheral items considered standard for operating the indicated model or type of equipment. This type of detailed listing is not described for each machine due to repetition, time, cost, and description length within the listing. An attempt is made, however, to indicate any non-standard features at an appropriate point within the study.

24. The valuation concept used in this report is one chosen by the client and should not be considered a recommendation by the appraiser as to what might result in any later application of the concept. Concept probability and/or feasibility are beyond the scope of the appraisal. The user of the report is to determine the probability of occurrence. The appraisal is purchased in order to allow an opinion of value under any assumed set of circumstances, as requested and mutually agreed upon by the client and the appraiser.

25. Description of items made a part of this report is believed correct. Any errors or omissions were unintentional and should not affect the value assignment. Description is made with the attempt of allowing reasonable identification although it may not allow specific item identification in all cases unless company number tagging is utilized. Examples of this would be in such areas as cabinets, shelving, file cabinets, various hand tools, and unserialized equipment or equipment without justification for serial number search due to associated value and/or time consideration. In some cases, identification numbers cannot be found.

26. In some cases, an appraiser may indicate that certain equipment was observed in operation. This qualification is applicable only to specific pieces of equipment and should not be construed that other equipment was not operable or under operation at the time of inspection. This note could become extremely important in the future but is considered more of note "in passing" at the time of the on-site evaluation.

27. The subject equipment may or may not conform to OSHA standards (Occupational Safety & Health Administration). The sole responsibility for conforming rests with the owner of the subject equipment and may not necessarily affect the final estimate of value reported herein.

28. Any controversy arising out of or relating to this report shall be settled by arbitration in accordance with the rules, then in effect, of the American Arbitration Association. In the unlikely event that differences concerning our services or fees should arise, that are not resolved by mutual agreement, our liability for this engagement will be limited to a return of the fees we have received for this engagement.

29. Since the conclusions by the appraiser are based upon judgments, isolation of any single element as the sole basis of comparison to the whole appraisal may be inaccurate.

30. As stated, this is a report estimating value based on "reported" condition.  If it is the client's desire to verify physical condition and/or needed repair of the items, which are the subject of this report, the client should consult a qualified mechanic/technician.  To determine actual mechanical condition is outside of the appraiser's expertise and the scope of this assignment.  If the condition of the equipment is other than as reported to the appraiser, the estimated value could be unreliable.  The appraiser reserves the right to change the value estimate if additional information comes forward as to condition or other factors, which could affect value.

31. This is a Summary Appraisal Report.  Additional information may be necessary and will be provided to qualified requests by the writer.

32. It should be noted that the term "certified," or "certified appraisal" as used in this report refers to certification and testing from various recognized appraisal and consulting societies, organizations, or institutes.

33. This report is not to be used for insurance purposes unless specifically stated to do so.

## Definitions of Condition

**Very Good (VG)**

This term describes an item of equipment in excellent condition capable of being used to its fully specified utilization for its designated purpose without being modified and not requiring any repairs or abnormal maintenance at the time of inspection or within the foreseeable future.

**Good Condition (GC)**

This term describes those items of equipment which have been modified or repaired and are being used at or near their fully specified utilization but the effects of age and/or utilization indicate that some minor repairs may have to be made or that the item may have to be used to some slightly lesser degree than its fully specified utilization in the foreseeable future.

**Fair Condition (FC)**

This term describes those items of equipment which are being used at some point below their fully specified utilization because of the effects of age and/or application and which require general repairs and some replacement of minor elements in the foreseeable future to raise their level of utilization to or near their original specifications.

**Poor Condition (PC)**

This term is used to describe those items of equipment, which can only be used at some point well below their fully specified utilization, and it is not possible to realize full capability in their current condition without extensive repairs and/or replacement of major elements in the very near future.

**Scrap Condition (X)**

This term is used to describe those items of equipment which are no longer serviceable and which cannot be utilized to any practical degree regardless of the extent of the repairs or modifications to which they may be subjected.  This condition applies to items of equipment which have been used for 100% of their useful life or which are 100% technologically or functionally obsolescent.

## Salvage Value Definition

Salvage Value is the estimated amount, expressed in terms of money, that may be expected for the whole property or a component of the whole property that is retired from service for possible use elsewhere, as of a specific date.

*As defined by Valuing Machinery and Equipment: The Fundamentals of Appraising Machinery & Technical Assets, Second Edition, by the American Society of Appraisers.*

## Scrap Value Definition

Scrap Value is the estimated amount, expressed in terms of money, that could be realized for the property if it were sold for its material content, not for a productive use, as of a specific date. The appraiser is not certified, or experienced at assessing Scrap Value.

*As defined by Valuing Machinery and Equipment: The Fundamentals of Appraising Machinery & Technical Assets, Second Edition, by the American Society of Appraisers.*

## Machinery and Equipment Definitions

The following values are defined in the publication *Valuing Machinery and Equipment: The Fundamentals of Appraising Machinery & Technical Assets*, Second Edition, by the American Society of Appraisers.

1. **Fair Market Value** is the estimated amount, expressed in terms of money (cash or financing terms equivalent to cash), that may reasonably be expected for a property in an exchange between a willing buyer and a willing seller, with equity to both, neither under any compulsion to buy or sell, and both fully aware of all relevant facts, as of a specific date.

2. **Fair Market Value - Removal** is the estimated amount, expressed in terms of money, that may reasonably be expected for an item of property in an exchange between a willing buyer and a willing seller, with equity to both, neither under any compulsion to buy or sell and both fully aware of all relevant facts, considering removal of the property to another location, as of a specific date.

3. **Fair Market value in Continued Use** is the estimated amount, expressed in terms of money, that may reasonably be expected for a property in an exchange between a willing buyer and a willing seller, with equity to both, neither under any compulsion to buy or sell, and both fully aware of all relevant facts, including installation, as of a specific date and assuming that the business earnings support the value reported. This amount includes all normal direct and indirect costs, such as installation and other assemblage costs to make the property fully operational.

4. **Fair Market Value - Installed** is the estimated amount, expressed in terms of money that may reasonably be expected for an installed property in an exchange between a willing buyer and a willing seller, with equity to both, neither under any compulsion to buy or sell, and both fully aware of all relevant facts, including installation, as of a specific date. This amount includes all normal direct and indirect costs, such as installation and other assemblage costs, necessary to make the property fully operational.

5. **Fair Value** is the price that would be received to sell an asset or paid to transfer a liability in an orderly transaction between market participants at the measurement date. Source: FASB 2006 (Used by accountants to determine a net exit value.)

6. **Orderly Liquidation Value** is the estimated gross amount, expressed in terms of money, that could be typically realized from a liquidation sale, given a reasonable period of time to find a purchaser (or purchasers), with the seller being compelled to sell on an "as is," "where is" basis, as of a specific date.

7. **Forced Liquidation Value** is the estimated gross amount, expressed in terms of money, that could typically be realized from a properly advertised and conducted public auction, with the seller being compelled to sell with a sense of immediacy on an as-is , where-is basis, as of a specific date.

8.  **Liquidation Value in Place** is the estimated gross amount, expressed in terms of money that could typically be realized from a failed facility assuming that the entire facility would be sold intact with a limited time to complete the sale, as of a specific date.

9.  **Salvage Value** is the estimated amount, expressed in terms of money that may be expected for the whole property or a component of the whole property that is retired from service for possible use elsewhere, as of a specific date.

10. **Scrap Value** is the estimated amount, expressed in terms of money that could be realized for the property if it were sold for its material content, not for a productive use, as of a specific date.

11. **Insurance Cost New** is the replacement or reproduction cost new as defined in the insurance policy less the cost new of the items specifically excluded in the policy, as of a specific date.

12. **Insurable Value Depreciated** is the insurance replacement or reproduction cost new less accrued depreciation considered for insurance purposes, as defined in the insurance policy or other agreements, as of a specific date.

## Methods of Valuation

Appraisal methods employed in arriving at the final conclusion as to value on all of the equipment in this section include the Cost Approach Analysis and the Market Data Approach Analysis.  At times, the Income Approach Analysis is used.  However, on equipment of this type, it would be deemed unadvisable, as it is the result of a purely hypothetical value.

### Cost Approach Analysis

The Cost Approach Analysis is defined as a "method in which the value of a property is derived by estimating the replacement cost of the improvements and deducting therefrom the estimated depreciation." There are three primary forms of depreciation:  physical, functional and economic.  Physical depreciation is often curable and may involve cosmetic appearance (but, in fact, could go deeper).  Functional depreciation means that the machinery has had a loss in productivity due to wear and tear.  Economic depreciation (sometimes referred to as External Depreciation) occurs outside of the subject property which results in a loss of value. In determining depreciation, the appraiser has used his judgment and prudence in determining the depreciation factor which could be a combination of all three forms described in total.  Experience with this type of equipment has proven the use of a formula, which is as follows:

$$\text{Fair Market Value} = \frac{\text{Remaining Life}}{\text{Normal Life}} \times \text{Cost New}$$

This formula again has proven to be effective on numerous occasions.

### The Market Data Approach

This approach is an appraisal technique in which the market value estimate is predicated upon prices being paid in actual market transactions and current listings, the former fixing the lower limit of value in a static or advancing market and fixing the higher limit of value in a declining market; and the latter fixing the higher limit in any market.  It is a process of correlation and analysis of similar recently sold properties.  The reliability of this technique is dependent upon:

1.  The degree of comparability of each property with the property under appraisal;

2.  The time of the sale;

3.  The verification of the sale data;

4.  The absence of unusual conditions affecting the sale.

### The Income Approach

The Income Approach to value is used only when solid data involving income and expenses for

a particular item can be established. It is considered hypothetical in most situations involving machinery and equipment, and though while considered, has not been applied in the final value estimate.

Reasoning that Supports the Analysis, Opinions and Conclusions

In an effort to provide Cost Less Depreciation Analysis, the appraiser has used, when possible, the actual manufacturer (or dealers) of the subject equipment. At times, new replacement models are offered when the subject model is no longer being made. When this condition exists, the appraiser endeavors to correlate and adjust for various factors involved. If the actual manufacturer of the equipment is not available or cannot be reached for any reason, then dealers or distributors are contacted when possible for verification of similar items with similar utility. Sometimes the manufacturer, distributors, and dealers can provide information for the Market Data Approach as well, since they are oftentimes aware of equipment on the used market, even selling similar equipment at times. A search is also made of similar items in the general market place that have sold and are presently offered for sale. Unless specifically stated, the Income Approach has not been applied in this assignment for reasons mentioned above.

Sources Contacted

The following sources were contacted in this assignment:

- National Equipment Business Builders Institute
  Numerous Food Processing and Restaurant Supply Websites
  Bureau of Labor Statistics/Consumer Price Index

Results of Analysis of Subject Sales, Offers, Options and Listings

Details are maintained in the appraiser's files and will be provided upon request from the client.

## Additional Considerations

Title of Appraised Equipment

It is understood the items listed in this report are owned and belong to Lot, Inc., 3931 S. Martin Luther King Dr., Port Arthur, TX 77642. The writer makes no guarantee, however, concerning ownership or clear title.

Measurable Marketplace

There are distinct levels of trade and each may have its own market value. The writer is under the opinion that other companies similar to Lot, Inc., who provide similar products and services, would be the most appropriate market.

Market Conditions

### June 2012 National Economic Report: Summary

The U.S. economy, which grew by 3.0% during the fourth quarter of 2011, slipped back to a downwardly revised annual growth rate of 1.9% during the first quarter of 2012--falling close to the meager growth rate of 1.7% recorded for all of 2011 and once more igniting concerns about a possible return to economic recession. Likewise, the U.S. unemployment picture, which had been improving for several months, soured as well, as overall employment gains in June were weak for the fourth straight month. Specifically, after creating an initially reported 120,000 jobs in March and 115,000 jobs in April, employers added a mere 69,000 jobs to their payrolls in May--the least since May of last year--and just 80,000 jobs in June. The new jobs figure was well below the 100,000 expected by economists. Moreover, after falling continuously for almost a year and reaching a three-year low of 8.1% in April, the U.S. unemployment rate jumped back to 8.2% in May, and the rate remained stuck at the same level in June. Previously, the unemployment rate had tumbled from 9.1% in September to 8.2% in March.

Other serious problems remain. The U.S. national debt ended 2011 at a record $15.22 trillion, representing 100.3% of U.S. GDP, and the Congressional Budget Office forecast that, for the fourth year in a row, the Federal government would run a $1 trillion-plus deficit. Even without new tax increases, Federal tax collections also were projected to jump by more than 30% between 2012 and 2014. And despite the intense debate over the debt-reduction agreement last summer, the Congressional Budget Office projected that the national debt would triple within 15 years. Elsewhere, U.S. auto sales continued to climb, the stock market finished strong in June, consumer prices remained stable, and spiking oil and gasoline prices continued to drop. On the other hand, industrial production fell, consumer spending was flat, and consumer confidence declined.

### First-Quarter Growth Slows to 1.9%

According to the U.S. Commerce Department, U.S. economic growth cooled during the first quarter of 2012 as businesses cut back on investment and restocked their shelves at only a moderate pace. Overall, the growth in the U.S. gross domestic product (GDP), originally

estimated at an annual rate of 2.2%, was revised downward to 1.9% by the Commerce Department on May 31. Both figures represent a sharp decline from the 3.0% annual growth rate achieved during the fourth quarter of 2011, and re-ignited fears of a return to economic recession.

**Job Gains Slow Further in June; Unemployment Rate Remains Stalled**

U.S. employment gains in June were weak for the fourth straight month. After creating an initially reported 120,000 jobs in March and 115,000 jobs in April, employers added a mere 69,000 jobs to their payrolls in May--the least since May of last year--and just 80,000 jobs in June (half of which were jobs with temporary agencies). The new jobs figure was substantially less than the 100,000 expected by economists. Moreover, after falling continuously for almost a year and reaching a three-year low of 8.1% in April, the U.S. unemployment rate jumped back to 8.2% in May. The rate thereafter remained stuck at 8.2% in June. Previously, the unemployment rate had tumbled from 9.1% in September to 8.2% in March.

**Budget Deficit to Hit $1 Trillion for Fourth Year in a Row**

For the fourth year in a row, the U.S. Congressional Budget Office says, the Federal government will run a $1 trillion-plus deficit. The administration's own budget figures tell a similar story. President Obama's proposed FY 2013 Federal budget forecasts a $901 billion deficit, falling well short of Mr. Obama's goal to halve the deficit in four years.

**Federal Debt Levels to Double in 15 Years**

Federal debt levels will double by the middle of the next decade and reach more than twice the size of the U.S. economy by 2037 unless Congress changes course on taxes and spending, the Congressional Budget Office (CBO) said in a June 5 report. In a similar vein, a report from the staff of the U.S. Senate Budget Committee, released on June 6, projected that the U.S. debt per person would triple within a generation.

**Tax Collections To Jump by 30%**

Unless Congress takes action to the contrary, the amount of money that the Federal government takes out of the U.S. economy in taxes will jump by more than 30% between 2012 and 2014, according to the Budget and Economic Outlook published by the U.S. Congressional Budget Office. In particular, the top dividends tax rate for the highest earners, currently 15%, is set to nearly triple to 43.4% next year.

**Bank Failure Rates Down**

After climbing in 2010 to the highest rates in nearly 30 years--a total of 157 bank failures--bank failure rates were down considerably in 2011, when a total of 92 banks failed. As of July 6, 2012, just 32 U.S. banks had failed, well below the pace of last year.

**Stocks Finish June Strong**

After suffering their worst day of the year on June 1, stocks rebounded on June 29, the final day of the second quarter. The Dow Jones Index logged its best June gain since 1999, while the S&P

500 and Nasdaq posted their strongest June upswings since 1999 and 2000, respectively. Overall, the Dow was up by 4.0% over the month of June, as was the S&P, while the Nasdaq was up by 3.8%.

**Industrial Production Falls in May**

US. industrial production unexpectedly fell by 0.1% in May after climbing by 1.1% in April--a figure that had represented the biggest monthly gain since December--the U.S. Commerce Department reported on June 15. Capacity utilization also declined, slipping to 79.0% in May from 79.2% in April.

**Productivity Falls During First Quarter**

After rising by a downwardly revised annual rate of 1.9% during the third quarter of 2011, U.S. nonfarm business productivity climbed at a slower but upwardly revised 1.3% annual rate during the fourth quarter of 2011. However, productivity thereafter fell at a 0.9% annual rate in the first quarter of 2012.

**U.S. Auto Sales Up Strongly in June**

Following a 26% gain in May, U.S. auto sales rose by double digits on a year-over-year basis again in June. Chrysler Group, Toyota Motor Corp., Honda Motor Co., and Nissan Motor Co. all posted gains in excess of 20%, while General Motors gained 16% and Ford Motor Co. sales increased by 7%. Overall, U.S. new-vehicle sales came in at nearly a 14.1 million annualized pace, compared to an annualized sales rate of 13.8 million in June, according to auto researcher Autodata Inc.

**New Home Sales Up in May, but Existing Home Sales Decline**

New U.S. single-family home sales rose by more than forecast in May, climbing by 7.6% to an annual rate of 369,000--the most since April 2010--the U.S. Commerce Department reported on June 25. In April, new home sales had climbed by 3.3% to a 343,000 annual rate, after falling by 1.6% in March. On the other hand, after rising by 3.4% to a 4.62 million annual rate in April, sales of existing U.S. homes fell by 1.5% to a 4.55 million annual rate, according to the National Association of Realtors.

**Consumer Confidence Drops Again in June**

The Conference Board Consumer Confidence Index, which had declined in May, fell further in June. The Index now stands at 62.0 (1985=100), down from 64.4 in May. Likewise, the University of Michigan/Thomson Reuters consumer-sentiment index fell to 73.2 in June--the lowest level since December--slipping from 79.3 in May.

**Consumer Spending Flat in May**

U.S. consumer spending was flat in May after rising by 0.2% in March and by 0.3% in April, the U.S. Commerce Department reported on June 29. According to the Department, this lack of growth in spending suggests that a faltering job market is slowing down the economy.

**Retail Sales Fall Back in May**

U.S. retail sales fell by 0.2% in May following an identical, revised decline of 0.2% in April, an additional sign that consumers may be pulling back.

**Consumer Prices Fall in May**

On a seasonally adjusted basis, the U.S. Consumer Price Index (CPI) for all goods fell by 0.3% in May after being unchanged in April. The index for all items less food and energy climbed by 0.2% in May after an identical rise in April.

**Oil and Gasoline Prices Both Fall**

After spiking to more than $100 a barrel in April, U.S. crude oil prices fell to $84 a barrel by the second week in June, where they remained through early July. Similarly, the average price paid by U.S. drivers for a gallon of regular gasoline, which reached $3.94 in April, slipped to $3.71 by the third week in May and then to $3.41 by mid- June.

*(c)2012 KeyValueData - All Rights Reserved  -- June 2012 National Economic Report*

Estimated Exposure Time

Exposure time is the estimated length of time that the property interest being appraised would have been offered on the market prior to the hypothetical consummation of a sale at market value on the effective date of the appraisal. This is a retrospective opinion based on an analysis of past events assuming a competitive and open market. The appraiser believes that if properly exposed to the open market the subject item(s) would have sold in approximately 180 days.

Extraordinary Assumptions and/or Hypothetical Conditions

An Extraordinary Assumption is an assumption directly related to a specific assignment, as of the effective date of the assignment results, which if found to be false could alter the appraiser's opinions or conclusions. Extraordinary Assumptions presume as fact otherwise uncertain information about physical, legal or economic characteristics of the subject property; or about conditions external to the property, such as market conditions or trends; or about the integrity of data used in an analysis.

A hypothetical condition is a condition, directly related to a specific assignment, which is contrary to what is known by the appraiser to exist on the effective date of the assignment results, but used for purposes of analysis. Hypothetical conditions are contrary to known facts about physical, legal or economic characteristics of the subject property; or about conditions external to the property, such as market conditions or trends; or about the integrity of data used in an analysis.

1. It is believed there are no hidden defects which are not discernible from a visual inspection and which could affect value.

2. Issues resulting from the above condition could affect the assignment results.

**Comments Regarding Capital Equipment**

The appraiser has attempted to analyze all subject sales comparisons, offers, options, and listings in accordance with USPAP Standards Rule 7-5. Data found was limited and in some cases unobtainable. The appraiser has had conversations with dealers, manufacturers, brokers, and others. The Internet has also been used, all in an effort to determine detail and characteristics of the appraised item(s). Data that was found has been weighted in the final value estimate or otherwise considered irrelevant.

## Capital Equipment

| Item # | Type | Manufacturer | Model / Description | Serial / VIN No. | Year / Age | Condition | Remaining Useful Life In Years* | Comments | Estimated Salvage Value | Estimated Scrap Value |
|---|---|---|---|---|---|---|---|---|---|---|
| 1 | Trailer Office | Unknown | Wooden | None | Unknown | Poor Condition | 0 | Very Little Value | $1,000 | $0 |
| 2 | Electronic Floor Scales | Unknown | CASI-2400BS | NONE | 2000 | Poor Condition | 5 | Only one works | $1,200 | $0 |
| 3 | 15000 Gal. Gas Tank | Unknown | Unknown | Unknown | 1995+ | Poor Condition | 5 | Stores Waste Water | $1,600 | $0 |
| 4 | Twin Turbo Ice Makers | Turbo | OF144R | S805400 | 1995+ | Poor Condition | 10 | Does Not Work. Needs Repair | $27,500 | $0 |
| 5 | Trailer Freezers | Great Dane | 80' Long | 1UYVS2486,KT208205 | 2000+ | Poor Condition | 10 | Neither freezer works.Trailers Bad Shape | $1,700 | $0 |
| 6 | IQF Equipment System | IQF | KF20.CR1755 | 30.148.96 | 2005+ | Poor Condition | 10 | Not working. Needs Repairs | $30,000 | $0 |
| 7 | 100 Insulated Vats | Bonar | Unknown | NONE | 2000 | Poor Condition | 10 | Most leak and are worthless | $1,200 | $0 |
| 8 | 60K Gal Gas Tank | Unknown | Unknown | Unknown | 1995+ | Poor Condition | 10 | Leaks. Could be scrapped | $3,400 | $0 |
| 9 | 2 Stainless Tables | Unknown | Unknown | Unknown | 2000 | Poor Condition | 10 | OK | $1,200 | $0 |
| 10 | 2 Forklifts | Hyster | H50XM | H177827879Y,D177842533N | 2002+ | Poor Condition | 5 | Don't work, severe rust | $630 | $0 |
| 11 | All 20 HHP Freezer | Unknown | Unknown | Unknown | 2000+ | Poor Condition | 10 | Not working needs repairs | $9,800 | |

| Item # | Type | Manufacturer | Model / Description | Serial / VIN No. | Year / Age | Condition | Remaining Useful Life In Years* | Comments | Estimated Salvage Value | Estimated Scrap Value |
|---|---|---|---|---|---|---|---|---|---|---|
| 12 | 1 System Grader Sort | Unavailable | Unavailable | ILLEGIBLE | 2005+ | Poor Condition | 10 | Needs Complete Overhaul. Not up to health code | $60,000 | $0 |
| 13 | Grader | Unknown | 10 7A CS | NONE | 2000+ | Poor Condition | 10 | Not working. For parts only | $14,000 | $0 |
| 14 | 2 Systems Plate Freezer | Unknown | Unknown | NONE | 2000+ | Poor Condition | 10 | Not in working order | $35,000 | $0 |
| 15 | Generator | Caterpillar | 75/900 310 Kilo | A49BH3168 | 2005+ | Poor Condition | 5 | Overheats, cracked engine, does not work | $7,800 | $0 |
| 16 | AC Unit | Unknown | Unknown | Unknown | 2005+ | Poor Condition | 10 | Needs Repairs | $2,500 | $0 |
| 17 | Ammonia Freezer System | Unknown | Custom | NONE | 2000+ | Poor Condition | 10 | Leaks ammonia. Not working | $17,500 | $0 |
| 18 | 4 Product Wash Tanks | Unknown | Unknown | None | 1995 | Poor Condition | 10 | Two Tanks Leak | $1,500 | $0 |
| 19 | Deheading System | Unknown | Unknown | NONE | 2005 | Poor Condition | 10 | Conveyor for manually deheading shrimp | $2,400 | $0 |
| 20 | Hanging Scale | Semco | 3200V | H.S. 1811-1080 | 2000+ | Poor Condition | 10 | Very rusty and needs maintenance | $150 | $0 |
| * This estimate assumes all items have not received periodic maintenance according to instructions of original manufacturing companies (or their successors) and by use of replacement components (new, used, remanufactured, or reverse-engineered) available either from those companies or from alternative suppliers in the aftermarket. | | | | | | | | | | |
| Estimated Salvage Value Total | | | | | | | | | $220,080 | |
| Estimated Scrap Value Total | | | | | | | | | | $0 |

**Purchase Price**

Items that have a + in the Year/Age section above were put into service "Used" in the year indicated. The actual age of the equipment was not available. The purchase prices for the above equipment are contained in loan statements or depreciation and other reports provided in connection with federal tax returns.  They are as follows:

Item 1 – $3,536
Item 2 – $11,786
Item 3 - $15,714
Item 4 – $274,998
Item 5 – $14,143
Item 6 – $250,000 (from Promissory Note with EDC)
Item 7 – $11,786 ($11,000 worth is owned by Crystal Seafood)
Item 8 – $33,760
Item 9 – $12,000
Item 10 – $6,286
Item 11 – $97,743
Item 12 – $500,000
Item 13 – $138,682
Item 14 – $350,000
Item 15 – $65,000
Item 16 – $24,500
Item 17 – $175,182
Item 18 – $15,304 (owned by Crystal Seafood)
Item 19 – $19,736 (owned by Crystal Seafood)
Item 20 – $1,571

Total Purchase Price:  $2,021,727

## Final Value Summary and Reconciliation

Based on the information supplied to the appraiser, using due diligence and discussions with individuals who sell new and used similar equipment, the appraiser has used the Cost Less Depreciation Approach. Good, reliable, market data did not exist or was unclear. All data used has been retained in the appraiser's work file as required in a summary report.

For item numbers: 1-20
the Market Data Approach was considered. However, the Cost Less Depreciation Approach was weighted as being more appropriate in establishing value as significant data was unavailable or unverifiable.

The total estimated Salvage Value of the items not in use is as follows:

| | | Salvage | | Scrap |
|---|---|---|---|---|
| Capital Equipment Items | $ | $220,080 | $ | 0 |
| Total: | $ | $220,080 | $ | 0 |
| Rounded: | $ | $220,000 | $ | 0 |

## Appraiser's Certificate

I certify to the best of my knowledge and belief:

1. The statements of fact contained in this report are true and correct.
2. The reported analyses, opinions, and conclusions are limited only by the reported assumptions and limiting conditions, and are my personal, impartial and unbiased professional analyses, opinions, and conclusions.
3. I have no present or prospective interest in the property that is the subject of this report, and I have no personal interest with respect to the parties involved.
4. I have no bias with respect to the property that is the subject of this report or to the parties involved with this assignment.
5. My engagement in this assignment was not contingent upon developing or reporting pre-determined results.
6. My compensation for completing this assignment is not contingent upon the development or reporting of a predetermined value or direction in value that favors the cause of the client, the amount of the value opinion, the attainment of a stipulated result, or the occurrence of a subsequent event directly related to the intended use of this appraisal.
7. My analyses, opinions, and conclusions were developed, and this report has been prepared, in conformity with the Uniform Standards of Professional Appraisal Practice.
8. I have made a personal inspection of the property that is the subject of this report.
9. Janet Wourms, Photographer, provided significant personal property appraisal assistance to the person signing this certification.
10. Because of my training as an appraiser and my experience in numerous business transactions, I am qualified to perform this assignment.
11. I have performed services, as an appraiser or in any other capacity, regarding the property that is the subject of the work under review, within the three-year period immediately preceding acceptance of this assignment.

Non-Discrimination

In arriving at the estimated reasonable value, the writer has not been improperly influenced in any manner by the race, religion, or national origin of any person.

Certification and Re-Certification

Richard Wourms, CMEA, is in compliance with the NEBB Institute certification or re-certification program.

11/6/12

Richard Wourms, CMEA, MBA, AIBA, ISBA

Date

## Appraiser's Qualifications

Richard Wourms, CMEA, MBA, AIBA, SBA

Professional designations and work experience for Richard Wourms, CMEA, include: CMEA, SBA, Society of Business Analysts, MBA, Executive MBA from the University of Houston, AIBA, Accredited by the Institute of Business Appraisers. He was the President of Houston Wholesale Printing, which he founded in 1981 and sold in 2008. His undergraduate degree is in Political Economy from Amherst College, Amherst, Massachusetts.

Richard Wourms, CMEA has been awarded the CMEA designation (Certified Machinery/Equipment Appraiser) by the NEBB Institute. CMEAs are located throughout the United States and several foreign countries, and are used by banks, other lending institutions, CPAs, attorneys, business buyers/sellers and others to provide needed financial information for a variety of reasons.

**Partial List of Businesses Appraised** - The following is a partial list of the types of businesses that have been appraised by CMEAs:

Accounting Practices
Architectural & Engineering Services
Advertising Agencies
Aerial Spraying Services
Airports
Appliance Sales & Repair
Art & Craft Supply Stores
Asphalt Plants/Sand Pits
Attorney's Practices
Auto Body Shops
Auto Dealerships
Auto Parts Stores
Auto Repair Garages
Bakeries
Banks
Beauty Shops
Bridal Shops
Building Product Supplies
Candy Shops
Catalog & Mail Order Houses
Chemical Manufacturers
Chemical Distributors
Clinics
Clubs/Taverns
Collection Agencies
Construction Companies
Convenience Stores
Cosmetic Stores
Country Clubs
Dairy Farms
Dental Practices
Distribution Companies
Dog Kennels
Donut Shops
Dry Cleaners
Electrical Contracting Services
Exercise Gyms
Fabric Stores
Fast Food Restaurants
Farms
Flower Shops
Food Processing Plants
Furniture Stores
Gasoline Stations
Gift Shops
Golf Courses
Grocery Stores
Hardware Stores
Hobby Shops
Hospitals
High Tech Manufacturing Companies
Historical Buildings
Hotels
Ice Cream Stores
Interior Decorating Shops
Insurance Agencies
Janitorial Companies
Ladies Retail Clothing
Liquor Stores
Lumber Yards
Machine Shops
Maid Service Franchises
Mall Specialty Shops
Manufacturing Companies
Medical Clinics
Millwork Shops
Motels
Moving and Storage Companies
National Franchises
Newspapers
Oil and Gas Refineries
One Hour Photo Stores
Photography Studios
Physicians Practices
Plumbing Contracting Services
Printing Companies
Radio/TV Repair Companies
Real Estate Sales Agencies
Recreational Vehicle Dealerships
Refuse Hauling Companies
Restaurants
Rock Quarries
Rodeo Stadiums
Sandwich Shops
Schools
Supper Clubs
Swimming Pool Builders
Travel Agencies
Trucking Companies
Veterinary Clinics
Video Rental & Sales Shops
Wallpaper Stores
Welding Shops
Well Drilling Companies
Well Servicing Companies
Wholesale Businesses
Woodworking Shops
Wrecker/Towing Services

**Additional Definitions and Terms from USPAP**

Various terms are used throughout the appraisal report. The following are definitions of the terms:

1. ADVOCACY - Representing the cause or interest of another, even if that cause or interest does not necessarily coincide with one's own beliefs, opinions, conclusions, or recommendations.

2. APPRAISAL - (noun) The act or process of developing an opinion of value; an opinion of value. (Adjective) of or pertaining to appraising and related functions such as appraisal practice or appraisal services.

3. APPRAISAL CONSULTING -The act or process of developing an analysis, recommendation, or opinion to solve a problem, where an opinion of value is a component of the analysis leading to the assignment results.

4. APPRAISAL FOUNDATION - The Appraisal Foundation incorporated as an Illinois not for Profit Corporation on November 30, 1987.

5. APPRAISAL PRACTICE - Valuation services performed by an individual acting as an appraiser, including but not limited to appraisal, appraisal review, or appraisal consulting.

6. APPRAISER - One who is expected to perform valuation services competently and in a manner that is independent, impartial, and objective.

7. APPRAISER PEERS - Other appraisers who have expertise and competency in the same or a similar type of assignment.

8. APPRECIATION - Increase in value due to increase in cost to reproduce, value over the cost, or value at some specified earlier point in time brought about by greater demand, improved economic conditions, increasing price levels, reversal of depreciating environmental trends, improved transportation facilities, direction of community or area growth, or other factors.

9. ASSIGNMENT - A valuation service provided as a consequence of an agreement between an appraiser and a client.

10. ASSIGNMENT RESULTS - An appraiser's opinions and conclusions developed specific to an assignment.

11. ASSUMPTION - that which is taken to be true.

12. BIAS - A preference or inclination that precluded an appraiser's impartiality, independence, or objectivity in an assignment.

13. BUSINESS ENTERPRISE - An entity pursuing an economic activity.

14. CLIENT - The party or parties who engage an appraiser (by employment or contract) in a specific assignment.

15. CONFIDENTIAL INFORMATION - Information that is either: Identified by the client as confidential when providing it to an appraiser and that is not available from any other source; or

16. COST - The amount required to create, produce, or obtain a property

17. DEPRECIATION - A loss of utility and hence value from any cause.  An effect caused by physical deterioration and/or obsolescence.

18. ECONOMIC OBSOLESCENCE - Impairment of desirability of useful life arising from factors external to the property, such as economic forces or environmental changes which affect supply-demand relationships in the market.  Loss in the use and value of a property arising from the factors of economic obsolescence is to be distinguished from loss in value from physical deterioration and functional obsolescence, both of which are inherent in the property.  Also referred to as Location or Environmental Obsolescence.

19. EXTRAORDINARY ASSUMPTION - an assumption, directly related to a specific assignment, which, if found to be false, could alter the appraiser's opinion or conclusions.

20. FEASIBILITY ANALYSIS - A study of the cost-benefit relationship of an economic endeavor.

21. FUNCTIONAL OBSOLESCENCE - Impairment of functional capacity or efficiency. Functional obsolescence reflects the loss in value brought about by such factors as overcapacity, inadequacy, and changes in the art that affect the property item itself or its relation with other elements comprising a larger property. The inability of a structure to perform adequately the function for which it is currently employed.

22. HIGHEST AND BEST USE - That reasonable and probable use that will support the highest present value, as defined, as of the effective date of the appraisal.

23. HYPOTHETICAL CONDITION - That which is contrary to what exists but is supposed for the purpose of analysis.

24. INTANGIBLE PROPERTY (INTANGIBLE ASSETS) - Nonphysical assets, including but not limited to franchises, trademarks, patents, copyrights, goodwill, equities, securities, and contracts as distinguished from physical assets such as facilities and equipment.

25. INTENDED USE - The use or uses of an appraiser's reported appraisal, appraisal review, or appraisal consulting assignment opinions and conclusions, as identified by the appraiser based on communication with the client at the time of the assignment.

26. INTENDED USER - The client and any other party as identified, by name or type, as users of the appraisal, appraisal review, or appraisal consulting report by the appraiser on the basis of communication with the client at the time of the assignment.

27. JURISDICTIONAL EXCEPTION - An assignment condition that voids the force of a part or parts of USPAP, when compliance with part or parts of USPAP is contrary to law or public policy applicable to the assignment.

28. MARKET PRICE - The amount actually paid, or to be paid, for a property in a particular transaction differs from market value in that it is an accomplished or historic fact, whereas market value is and remains an estimate until proven.  Market price involves no assumption of prudent conduct by the parties, absence of undue stimulus, or any other condition basic to the market value concept.

29. MARKET VALUE - A type of value, stated as an opinion, that presumes the transfer of property (i.e., a right of ownership or a bundle of such rights), as of a certain date, under specific conditions set forth in the definition of the term identified by the appraiser as applicable in an appraisal.

30. PERSONAL PROPERTY - Identifiable tangible objects that are considered by the general public as being "personal" - for example, furnishings, artwork, antiques, gems and jewelry, collectibles, machinery and equipment; all tangible property that is not classified as real estate.

31. PRESENT VALUE - The current monetary value.  It is the today's cash lump sum, which represents the current value of the right to collect future payments.  It is the discounted value of aggregate future payments.

32. PRICE - The amount asked, offered, or paid for property.

33. REPORT - Any communication, written or oral, of an appraisal, appraisal review, or appraisal consulting service that is transmitted to the client upon completion of an assignment.

34. SCOPE OF WORK - The amount and type of information researched and the analysis applied in an assignment. Scope of work includes, but is not limited to, the following: the degree to which the property is inspected or identified; the extent of research into physical or economic factors that could affect the property; the extent of data research; and the type and extent of analysis applied to arrive at opinions or conclusions.

35. SIGNATURE - Personalized evidence indicating authentication of the work performed by the appraiser and the acceptance of the responsibility for content, analyses, and conclusions in the report.

36. SUPPLEMENTAL STANDARDS - Requirements issued by government agencies, government sponsored enterprises, or other entities that establish public policy which add to the purpose, intent and content of the requirements in USPAP, that have a material effect on the development and reporting of assignment results.

37.  VALUE - The monetary relationship between properties and those who buy, sell, or use those properties.

38.  VALUATION PROCESS - Services pertaining to aspects of property value.

39.  WORKFILE - Documentation necessary to support an appraiser's analysis, opinions, and conclusions.

3431285

Claim # 3431285

Date: Jan. 16th, 2011
Gulf Coast Claims Facility
P.O Box 9658
Dublin, OH 43017-9952

LOT, INC
P.O Box 1363
Garden Grove, CA 92842

RE: GCCF Claim # 3431285

TO WHOM IT MAY CONCERN:

LOT, Inc. owns a shrimp processing plant at 3931 South M.L.K. DR., Port Arthur, TX 77643 at the Sabine River, and it is about a 30 minute boat ride to the Gulf of Mexico. Based on the water way, the plant is at the border between Texas and Louisiana.

The shrimp plant operates year round. It is approximately 50,000 sq. feet and has all the necessary equipment and ice makers. The ice makers produce up to 500 blocks of ice per day. The plant is fully air conditioned as well.

The shrimp plant was built in 2005 and rebuilt in 2005 after Hurricanes Katrina and Rita. It was then rebuilt again in 2008 after Hurricane Ike. It is the most modern plant in the Gulf of Mexico.

The plant actually has two separate and complete buildings and each has a complete set of equipment, meaning that LOT, Inc. has double the equipment. the buildings can be run individually or simultaneously based on volume.

The plant has its own shrimp boat dock with access directly to the Gulf of Mexico. The plant buys shrimp directly from the shrimp boats. The shrimp plant also provides ice and fuel to the shrimp boats. The plant is very popular to all the shrimp boats, again, because it is a very short ride from the Gulf of Mexico and the boats are able to sell their catch directly to the processing plant.

In September, 2009, LOT, Inc. entered into a lease agreement with Flotex Co. which allowed them to operate the shrimp plant- including all equipment at the plant. As outlined in the lease agreement, Flotex Co. was to pay monthly rental costs of $36,728.77 total per month; which consisted of the following:

A) Rental $12,000
B) All property tax
C) Property Insurance & Windstorm Insurance
D) All equipment payments due to:
  1) Compass Bank equipment payment, and
  2) I.Q.F. equipment payment to E.D.C.)

[illegible]

[illegible]

[illegible]

[illegible]

[illegible]

[illegible]

[illegible]

[illegible]

3431285

Rental (A), Property Tax (B) and I.Q.F. equipment lease (D2) charges were paid by Flotex Co. to LOT, Inc. LOT, Inc. allowed Flotex to pay insurance premiums (C) directly to LOT, Inc.'s insurance broker. Also, equipment payment costs due to Compass Bank (D1) were paid by Flotex Co. directly to Compass Bank via a Forebearing Agreement between Flotex Co. and Compass Bank. However, at all times, LOT, Inc. was responsible for monthly payments for Compass Bank and the insurance broker; and all payments made by Flotex Co. to those entities were the equivalent of the payments being made to LOT, Inc. with LOT, Inc. in turn making the payments to the bank and broker.

Enclosed, please find copies of the Deed of Trust; the lease agreement between LOT, Inc. and Flotex Co.; the notice from Flotex Co. to LOT, Inc. to cancel the lease agreement; a rental payment example; the property tax invoice for 2011; property insurance with estimated Windstorm insurance; as well as copies of payments to Compass Bank and to I.Q.F. for equipment.

The I.Q.F. equipment loan was paid off by LOT, Inc. in June, 2010. However, as per the terms of the lease agreement, Flotex Co. was still charged the same monthly I.Q.F. equipment costs as part of their monthly rental costs. Then, Flotex Co. complained that there were not enough shrimp for them to operate the plant due to the BP Oil Spill. LOT, Inc. reduced Flotex Co.'s monthly I.Q.F. costs. The reduction became effective in September, 2010, and Flotex Co. continued the use of all equipment.

Due to the BP Oil Spill, not very much shrimp was available for the shrimp boats to bring to the dock of the processing plant. Volume decreased dramatically and quickly. The tenant, Flotex Co., was unable to operate at such low volume and therefore cancelled the lease agreement as of December 31, 2010 by giving proper notice to LOT, Inc.

LOT, Inc. has put the plant up for lease with another tenant to rent and has also put the plant on the market to sell. Current conditions of shrimp population in the Gulf have made finding a new tenant or owner very difficult- and at this time, none have been found. Due to the BP Oil Spill, the lack of shrimp in the Gulf and lack of shrimp boat deliveries; the processing of shrimp has been minimal.

[illegible]

3431285

As of January 1, 2011, LOT, Inc. has lost all of its monthly income of $36,728.77 which it was receiving since the inception of the lease agreement. Now, LOT, Inc. must pay all expenses for mortgage, equipment, taxes, insurance and now, additional security costs; as well as any other incurred expenses. Therefore, LOT, Inc. would like to make a claim of $36,728.77 for income and expenses lost per month under BP's Oil Spill claim.

Please review the above information and documentation and let us know if any additional information is required. If you have any questions, please do not hesitate to contact us at (713) 591-2666 .

Thank you very much for your help and your professional courtesy.

Best Regards,
Christopher Tran V.P.

LOT, INC June , 2011
P.O Box 1363
Garden Grove, CA 92842

Gulf Coast Claims Facility
Kenneth R. Feinburg, Administrator
P O Box 9658
Dublin, OH 43017-4958

RE: Claimant ID: 3431285

Claim Form ID: 3431285

To Whom it may concern.

I am in receipt of GCCF's letter dated May 16, 2011 for the claim referenced above. This letter shall serve to request a request a re-review of my claim. Attached for your convenience is my original correspondence that details my claim Please note that as of this date, my building and shrimp processing plant and equipment have still not been leased as a result of the decline in both the supply and demand for deep Gulf jumbo shrimp since the oil spill. As such, our revenue losses from January 1st to the end of June 2011 are six times the monthly loss of $37,163, or a total of $222,978 year to date. This is obviously more than the $126,581 53 total offer made to us. Moreover, our monthly losses will continue until the building and equipment are leased Ourbusiness has been listed with a business broker for sale or lease since the cancellation by the prior lessor. and the business has been properly advertised

We acquired the largest shrimp processing plant in the entire Gulf of Mexico area for approximately $5.0 million in 2006 The value of the shrimp processing equipment in 2006 was $700,000 plus the investment included $2.7 million cash equity down payment and a mortgage of approximately $1 6 million. Prior to the BP oil spill the plant was operating at a capacity of approximately 30 million lbs. of shrimp processing and generating revenues for our tenant of more than $60 million per year. After the spill, the entire Gulf area market for Deep water Gulf Jumbo shrimp declined y more than 90% to less than 3 million pounds per year. This decline in the supply from the shrimp vessels who sell their catch to the plant affected our plant more than any other plant since we process the largest jumbo shrimp in the Gulf area.

This made the economic viability of operating the plant infeasible at the current supply/demand levels This caused us to lower the rent to our tenant by $8,000 monthly, however he was still unable to operate efficiently and subsequently cancelled the lease entirely at the end of 2010

Our plant is uniquely designed to process large jumbo shrimp Our sorters, separators, and customer contracts were all designed for the Deep Gulf jumbo shrimp which will take longer to recover than the smaller shrimp processed by other plants in the Gulf area

Our two large buildings are approximately 50,000 square feet of refrigerated and

air conditioned buildings with specialized equipment specifically designed for sorting, icing, and packing jumbo shrimp, and have no other feasible use than the purpose of operating a shrimp processing business with the specialty equipment which we own and lease to our tenant.

Since I have received a total of only $63,290.77 from the GCCF's claims that I have made since the BP spill, I am potentially in a position to lose my entire $5 0 million initial investment plus all of my reinvested earnings over the years if my $1 6 million mortgage payments cannot be made in a timely manner. Time is therefore of the essence in your processing my claim

In order to reach a fair and equitable settlement, therefore, I believe that the $37,163 payments (both back payments and future payments) should be continued until a new tenant commences a new lease Any net difference in future lease amounts should be made up by BP for the next 10 years. If the GCCF wishes, we want to make a lump sum settlement for the decline in value of my real estate and equipment future loss caused by the oil spill, GCCF compensate us $4.3 million and attempt to recover the balance of our $5 million investment by sale of the business for $700,000 using the claim settlement to retire our out stand mortgage and equipment liabilities and other loans we have incurred personally to pay our payments that we have been'waiting for the GCCF to pay our ongoing losses.

Note that in February, 2011, we were offered $1,800,000 for the building and equipment Attached is a copy of the offer. The offer was withdrawn when the tenant canceled the lease. In April we received a verbal offer for $700,000 from one of the Seafood companies. The offer represented a $4 3 million loss from our initial investment enclosed please find the appraisal for our property from our when we purchase the business in 2006 without the equipment.

We submit our demand for immediate payment for my lost income since the spill through June 30th, 2011 Which amounted to $230,151 23 My estimate for the next six months is the same $37,163 per month. I need to make sure that it is received in a timely manner so that we are not foreclosed on while waiting for the shrimp market (for jumbo shrimp) to return to economic levels sufficient to attract a new tenant

I respectively request that you immediately re-review the attached documentation of our loses and our inability to project any foreseeable time frame in which we can mitigate our future loss with a new tenant. We have attempted to estimate the lower value of our business backed on hypothetical levels of rent that a new tenant may be able to afford with power volumes of jumbo shrimp being processed in the plant We wish that we could predict more accurately when and to what degree our business will recover, but no one that we are aware of is predicting a rapid recovery of the deep Gulf jumbo shrimp market that our plant is dependent upon.

We believe that our losses have been adequately document based on the multi-year lease we had in place at the time of the spill and the cancellation if this lease directly resulting from the decline in the shrimp business and volume of jumbo shrimp available to be processed

Please respond within 30 days or as soon as possible We may be forced into

bankruptcy or foreclosure and we are not certain how much longer we can continue using our savings to pay for our losses without a greater percentage of our past losses and continuing losses being paid in a timely manner.

We respectively request that you review this claim as expeditiously as possible and notify us immediately if you believe that any additional documentation is necessary or a more equitable determination of our losses can be determined

Enclosed please find and a review our projection (the revenue) for the next 5 years  Thank you very much for your help

Respectively,

Christopher Tran

As president

