# IN THE UNITED STATES COURT OF APPEALS

# FOR THE FIFTH CIRCUIT

————————————

No. 13-31070

————————————

D.C. Docket No. 2:10-MD-2179
D.C. Docket No. 2:10-CV-4239
D.C. Docket No. 2:10-CV-4240
D.C. Docket No. 2:10-CV-4241

United States Court of Appeals
Fifth Circuit

**FILED**

May 1, 2015

Lyle W. Cayce
Clerk



IN RE: DEEPWATER HORIZON

————————————————————

STATE OF VERACRUZ, Republic of Mexico;

  Plaintiff - Appellant

v.

**Certified as a true copy and issued
as the mandate on May 26, 2015**

Attest:

*Lyle W. Cayce*

**Clerk, U.S. Court of Appeals, Fifth Circuit**

BP, P.L.C.; BP AMERICA, INCORPORATED; BP CORPORATION NORTH
AMERICA, INCORPORATED; BP COMPANY NORTH AMERICA,
INCORPORATED; BP PRODUCTS NORTH AMERICA, INCORPORATED;
BP EXPLORATION & PRODUCTION, INCORPORATED; TRANSOCEAN
OFFSHORE DEEPWATER DRILLING, INCORPORATED; HALLIBURTON
ENERGY SERVICES, INCORPORATED; TRANSOCEAN DEEPWATER,
INCORPORATED,

  Defendants - Appellees

TRANSOCEAN HOLDINGS, L.L.C.; TRITON ASSET LEASING GmbH;

  Appellees

————————————————————

STATE OF TAMAULIPAS, Republic of Mexico;

  Plaintiff - Appellant

v.

BP, P.L.C.; BP AMERICA, INCORPORATED; BP CORPORATION NORTH
AMERICA, INCORPORATED; BP COMPANY NORTH AMERICA,
INCORPORATED; BP PRODUCTS NORTH AMERICA, INCORPORATED;
BP EXPLORATION & PRODUCTION, INCORPORATED; TRANSOCEAN
DEEPWATER, INCORPORATED; TRANSOCEAN OFFSHORE
DEEPWATER DRILLING, INCORPORATED; HALLIBURTON ENERGY
SERVICES, INCORPORATED,

   Defendants - Appellees

TRANSOCEAN HOLDINGS, L.L.C.; TRITON ASSET LEASING GmbH;

   Appellees

_____

STATE OF QUINTANA ROO, Republic of Mexico;

   Plaintiff - Appellant

v.

BP, P.L.C.; BP AMERICA, INCORPORATED; BP CORPORATION NORTH
AMERICA, INCORPORATED; BP COMPANY NORTH AMERICA,
INCORPORATED; BP PRODUCTS NORTH AMERICA, INCORPORATED;
BP EXPLORATION & PRODUCTION, INCORPORATED; TRANSOCEAN
OFFSHORE DEEPWATER DRILLING, INCORPORATED; HALLIBURTON
ENERGY SERVICES, INCORPORATED; TRANSOCEAN DEEPWATER,
INCORPORATED,

   Defendants - Appellees

TRANSOCEAN HOLDINGS, L.L.C.; TRITON ASSET LEASING GmbH;

   Appellees

Appeal from the United States District Court for the
Eastern District of Louisiana, New Orleans

Before STEWART, Chief Judge, and JONES and HIGGINSON, Circuit Judges.

## J U D G M E N T

This cause was considered on the record on appeal and was argued by counsel.

It is ordered and adjudged that the judgment of the District Court is affirmed.

IT IS FURTHER ORDERED that appellants pay to appellees the costs on appeal to be taxed by the Clerk of this Court.

# IN THE UNITED STATES COURT OF APPEALS
# FOR THE FIFTH CIRCUIT

─────────

No. 13-31070

─────────

IN RE: DEEPWATER HORIZON

─────────────────────────────────────

STATE OF VERACRUZ, Republic of Mexico;

      Plaintiff - Appellant

v.

BP, P.L.C.; BP AMERICA, INCORPORATED; BP CORPORATION NORTH
AMERICA, INCORPORATED; BP COMPANY NORTH AMERICA,
INCORPORATED; BP PRODUCTS NORTH AMERICA, INCORPORATED;
BP EXPLORATION ; PRODUCTION, INCORPORATED; TRANSOCEAN
OFFSHORE DEEPWATER DRILLING, INCORPORATED; HALLIBURTON
ENERGY SERVICES, INCORPORATED; TRANSOCEAN DEEPWATER,
INCORPORATED,

      Defendants - Appellees

TRANSOCEAN HOLDINGS, L.L.C.; TRITON ASSET LEASING GmbH;

      Appellees

─────────────────────────────────────

STATE OF TAMAULIPAS, Republic of Mexico;

      Plaintiff - Appellant

v.

BP, P.L.C.; BP AMERICA, INCORPORATED; BP CORPORATION NORTH
AMERICA, INCORPORATED; BP COMPANY NORTH AMERICA,
INCORPORATED; BP PRODUCTS NORTH AMERICA, INCORPORATED;
BP EXPLORATION ; PRODUCTION, INCORPORATED; TRANSOCEAN
DEEPWATER, INCORPORATED; TRANSOCEAN OFFSHORE

United States Court of Appeals
Fifth Circuit

**FILED**

May 1, 2015

Lyle W. Cayce
Clerk

No. 13-31070

DEEPWATER DRILLING, INCORPORATED; HALLIBURTON ENERGY
SERVICES, INCORPORATED,

      Defendants - Appellees

TRANSOCEAN HOLDINGS, L.L.C.; TRITON ASSET LEASING GmbH;

      Appellees

————————————————————————

STATE OF QUINTANA ROO, Republic of Mexico;

      Plaintiff - Appellant

v.

BP, P.L.C.; BP AMERICA, INCORPORATED; BP CORPORATION NORTH
AMERICA, INCORPORATED; BP COMPANY NORTH AMERICA,
INCORPORATED; BP PRODUCTS NORTH AMERICA, INCORPORATED;
BP EXPLORATION ; PRODUCTION, INCORPORATED; TRANSOCEAN
OFFSHORE DEEPWATER DRILLING, INCORPORATED; HALLIBURTON
ENERGY SERVICES, INCORPORATED; TRANSOCEAN DEEPWATER,
INCORPORATED,

      Defendants - Appellees

TRANSOCEAN HOLDINGS, L.L.C.; TRITON ASSET LEASING GmbH;

      Appellees

————————————————

Appeal from the United States District Court
for the Eastern District of Louisiana

————————————————

Before STEWART, Chief Judge, and JONES and HIGGINSON, Circuit
Judges.

CARL E. STEWART, Chief Judge:

No. 13-31070

In April 2010, a blowout, explosion, and fire occurred aboard the mobile offshore drilling unit Deepwater Horizon as it was preparing to temporarily abandon a well 50 miles off the Louisiana coast. Millions of gallons of oil discharged into the Gulf of Mexico before the well was capped nearly three months later.

In September 2010, three Mexican states (Veracruz, Tamaulipas, and Quintana Roo (hereinafter, the "Mexican States" or "Plaintiffs")) filed substantially similar complaints in the Western District of Texas for damages incurred as a result of the oil spill. After the cases were consolidated in the Eastern District of Louisiana as part of the Deepwater Horizon multidistrict litigation, the district court in September 2013 granted summary judgment to the defendants—BP, Transocean, Halliburton, and Cameron[1]—because the Mexican states did not hold a sufficient "proprietary interest" in the allegedly damaged property. The Mexican States have appealed this judgment.

## I. Factual and Procedural Background

The Mexican States each filed suit against BP (well owner, operator, and block lessee), Transocean (owner of the Deepwater Horizon), Halliburton (cement contractor), Anadarko (co-owner and co-lessee with BP), and Cameron (manufacturer of the blowout preventer)[2] for damages they allegedly incurred or would sustain as a result of the oil spill. These damages included "monitoring and preparing to respond to the oil spill; contamination and injury to the waters, estuaries, seabed, animals, plants, beaches, shorelines, etc., of

---

[1] The Mexican States sued many corporate entities, but for the sake of simplicity, and because the corporate niceties are not relevant to the dispute, we will refer to the companies by the names listed in the text above.

[2] All claims against Anadarko were dismissed in December 2011 by the district court, and the Mexican States have not appealed the September 2013 judgment in favor of Cameron. Therefore, the only remaining defendants are BP, Transocean, and Halliburton (collectively, "Defendants").

No. 13-31070

the Mexican States; lost taxes, fees, etc., due to reduced fishing activity and fishing-related industries; lost taxes, etc., due to diminished tourism; and the net costs of providing increased public services." *In re Oil Spill*, 970 F. Supp. 2d 524, 526 (E.D. La. 2013). The Mexican States brought claims alleging negligence, gross negligence, negligence per se, violations of the Oil Pollution Act ("OPA"), private nuisance, and public nuisance.

In December 2011, the district court dismissed the Mexican States' claim for negligence per se, the OPA claim,[3] and the two nuisance claims. The court preserved the negligence and gross negligence claims against the current Defendants "only to the extent there has been a physical injury to a proprietary interest." *In re Oil Spill*, 835 F. Supp. 2d 175, 182 (E.D. La. 2011). Discovery was eventually limited to the proprietary interest prong,[4] and the parties cross-moved for summary judgment.

In September 2013, the district court granted summary judgment to Defendants on the ground that the Mexican States lacked a proprietary interest sufficient to overcome application of the rule, announced in *Robins Dry*

---

[3] In an August 2011 order, the district court determined that the OPA did not displace substantive general maritime law. *See In re Oil Spill*, 808 F. Supp. 2d 943, 958–62 (E.D. La. 2011). The issue of whether the OPA displaces general maritime law is significant, and the subject of considerable debate both in and out of this circuit. *See e.g.*, *South Port Marine, LLC v. Gulf Oil Ltd.*, 234 F.3d 58, 65 (1st Cir. 2000) ("Congress intended the OPA to be the sole federal law applicable in this area of maritime pollution"); *Gabarick v. Laurin Mar. (Am.) Inc.*, 623 F. Supp. 2d 741, 750 (E.D. La. 2009) ("OPA preempts general maritime law claims that are recoverable under OPA."); John J. Costonis, *The BP B1 Bundle Ruling: Federal Statutory Displacement of General Maritime Law (Part II)*, 44 Envtl. L. Rep. News & Analysis 10108 (2014) (critiquing the district court's decision in this case). However, the issue is insufficiently briefed. In light of our resolution, we need not reach and we express no opinion on Defendants' argument that the OPA displaces general maritime law in this or any other case.

[4] The parties continue to dispute whether oil actually entered or damaged Mexican waters, but the district court assumed actual damages for purposes of deciding the proprietary interest issue. We do the same.

4

No. 13-31070

*Dock & Repair Co. v. Flint*, precluding recovery for economic loss absent a proprietary interest in physically damaged property. *See* 275 U.S. 303, 307–09 (1927). After conducting an exhaustive inquiry into Mexican law, the court held that the Mexican federal government, rather than the states, is the true owner of the damaged property. In support of this determination, the district court pointed out that the Mexican federal government, in April 2013, brought a fundamentally similar lawsuit. That case is progressing, though no substantive orders have been issued. The court also stated that "it appears that the Mexican States lack legal standing." *In re Oil Spill*, 970 F. Supp. 2d at 541.

Plaintiffs timely appealed. The issues on appeal are: (1) whether the district court correctly determined that the *Robins Dry Dock* rule is applicable to the Mexican States' claims and (2) whether the district court correctly held that the Mexican States lack proprietary interests in the allegedly damaged property sufficient to maintain their claims.

## II. Standard of Review

This court reviews a district court's grant of summary judgment de novo, applying the same standard as the district court and reviewing the facts in the light most favorable to the nonmovants. *See Tiblier v. Dlabal*, 743 F.3d 1004, 1007 (5th Cir. 2014). Summary judgment is proper "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. ("FRCP") 56(a).

When inquiring into foreign law, courts may consider "any relevant material or source" whether or not presented by the parties. *See* FRCP 44.1 & advisory committee's note to 1966 adoption. The determination "must be treated as a ruling on a question of law." *Id.* "[D]ifferences of opinion among experts on the content, applicability, or interpretation of foreign law do not create a genuine issue as to any material fact." *Access Telecom Inc. v. MCI*

No. 13-31070

*Telecomms. Corp.*, 197 F.3d 694, 713 (5th Cir. 1999); *see also* 9A Charles Alan Wright & Arthur R. Miller, *Federal Practice & Procedure* § 2444 (3d ed. 1998).

### III. Applicability of *Robins Dry Dock*

A threshold question is whether Plaintiffs' claims are even subject to the *Robins Dry Dock* rule precluding recovery "for economic loss if that loss resulted from physical damage to property in which [the plaintiff has] no proprietary interest." *In re Bertucci Contracting Co.*, 712 F.3d 245, 246 (5th Cir. 2013) (internal quotation marks and citation omitted). This hard-edged, longstanding common law principle has been reaffirmed by an en banc panel of this court. *See State of La. ex rel. Guste v. M/V Testbank*, 752 F.2d 1019 (5th Cir. 1985) (en banc) (denying recovery to a wide variety of plaintiffs—including operators of marinas, cargo terminal operators, wholesale and retail seafood enterprises, among others—who sought damages from shipowners responsible for spilling chemicals into a Mississippi River gulf outlet). The rule's purpose is to limit the "consequences of negligence and exclude indirect economic repercussions, which can be widespread and open-ended." *Catalyst Old River Hydroelectric Ltd. v. Ingram Barge Co.*, 639 F.3d 207, 210 (5th Cir. 2011).

The Mexican States contend that the *Robins Dry Dock* rule is cabined to civil negligence and other unintentional conduct. They argue that *Robins Dry Dock* is inapplicable because both BP and Transocean pled guilty to criminal conduct arising from the Deepwater Horizon disaster. The only intentional conduct at issue here, however, is BP's guilty plea to intentionally obstructing a congressional investigation, which the Mexican States contend "exacerbated their damages by lulling regulatory authorities and others into deferring the taking of appropriate and mitigating action."[5] The balance of the guilty pleas involves only criminally negligent conduct.

---

[5] Transocean's guilty plea specifically admitted only "negligent conduct."

No. 13-31070

The Mexican States locate the purported exception in some of our case law. *See Amoco Transp. Co. v. S/S Mason Lykes*, 768 F.2d 659, 666 (5th Cir. 1985) ("This circuit and others have interpreted *Robins Dry Dock* to mean that there can be no recovery for economic losses caused by an *unintentional maritime tort* absent physical damage to property in which the victim has a proprietary interest." (emphasis added)); *Dick Meyers Towing Serv., Inc. v. United States*, 577 F.2d 1023, 1025 (5th Cir. 1978) (recognizing that a plaintiff may "not recover for interference with his contractual relations unless he shows that the interference was intentional or knowing"); *Kaiser Aluminum & Chem. Corp. v. Marshland Dredging Co.*, 455 F.2d 957, 958 (5th Cir. 1972) ("We agree that recovery by Kaiser is precluded as a matter of law because there is . . . no contention that the interference with Kaiser's contract rights was intentional."). These pronouncements are arguably dicta, as Defendants note.[6] But even assuming the existence of a criminal or intentional conduct exception, the Fifth Circuit has not addressed the interplay between such conduct and *Robins Dry Dock*.

With one exception, the criminal conduct at issue here was exclusively negligent in nature, so we first address application of *Robins Dry Dock* in the context of criminal negligence. The First Circuit has confronted this issue. *See Ballard Shipping Co. v. Beach Shellfish*, 32 F.3d 623, 624 (1st Cir. 1994). In *Ballard Shipping*, an oil tanker ran aground in Rhode Island, spilling hundreds of thousands of gallons of oil into a bay. *Id.* The captain and the

---

[6] At least one circuit has recognized a *Robins Dry Dock* exception for "economic losses that are intentionally caused." *See Ballard Shipping Co. v. Beach Shellfish*, 32 F.3d 623, 625 n.1 (1st Cir. 1994) (citing *Dick Myers*, 577 F.2d at 1025). *But see Nautilus Marine Inc. v. Niemela*, 170 F.3d 1195, 1196–1197 (9th Cir. 1999) (holding that "nothing in *Robins Dry Dock* or its progeny . . . support[s] [an] exception" for intentional or reckless tortious conduct, though suggesting that intentional interference with contractual relations may be such an exception).

No. 13-31070

shipping company pled guilty to criminally negligent violations of the Clean Water Act and paid out a total of over $10 million in fines and cleanup costs. *Id.* Shellfish dealers alleging severe economic losses brought a lawsuit alleging violations of, *inter alia*, general maritime law. *Id.* The First Circuit affirmed the dismissal of the general maritime law claims based on *Robins Dry Dock*, holding that the claims did not fit into the "recognized exception[]" for claims based on "economic losses that are intentionally caused." *Id.* at 625 & n.1 (internal quotation marks and citation omitted). Effectively, the court held that criminal negligence did not bar application of *Robins Dry Dock*.[7]

We are persuaded by the First Circuit's analysis. To the extent that the *Robins Dry Dock* rule is concerned with the prospect of runaway recovery stemming from a negligent act, *see Amoco Transp.*, 768 F.2d at 668 ("The spectre of runaway recovery lies at the heart of the *Robins Dry Dock* rubric."), there is no principled reason to distinguish between civil and criminal negligence. This is especially so here because federal law has criminalized much negligence in the context of oil spills in navigable waters. *See In re Ballard Shipping Co.*, 810 F. Supp. 359, 364 (D.R.I. 1993); *cf.* David M. Uhlmann, *Environmental Crime Comes of Age: The Evolution of Criminal Enforcement in the Environmental Regulatory Scheme*, 2009 Utah L. Rev. 1223, 1246 (2009) ("As a matter of prosecutorial discretion, the government

---

[7] The lower court in *Ballard* provided a more focused discussion of the criminal negligence issue. *See In re Ballard Shipping Co.*, 810 F. Supp. 359, 364 (D.R.I. 1993). The court stated that the "*Robins Dry Dock* rule . . . should [not] be distorted or cease to operate because the criminal law imposes penalties on particular negligent behavior. As the federal law now deems criminal virtually all negligence resulting in an oil spill in navigable waters, . . . adopting the claimants' position would transform the *Robins Dry Dock* rule into a meaningless assertion. This Court does not believe that Congress intended that *Robins Dry Dock* be relegated to the scrap heap in this manner." *Id.* (citations omitted). Although the district court was ultimately reversed by the First Circuit on a different issue, its analysis on criminal negligence went unquestioned in that court.

No. 13-31070

considers criminal prosecution in most cases that involve significant harm or risk of harm to the environment.").

We next address the effect of BP's intentional criminal obstruction of a congressional investigation. The plea agreement states that BP did "corruptly, that is, with an improper purpose, endeavor to influence, obstruct, and impede" a congressional investigation. The Mexican States argue that the company's misrepresentations "lull[ed] regulatory authorities and others into deferring the taking of appropriate and mitigating action." The district court held that the misrepresentations were not "causally related to the blowout, the oil spill, or the alleged harm to the Mexican states." *In re Oil Spill*, 970 F. Supp. 2d at 528. We agree. The intent to obstruct a congressional investigation does not directly speak to the intent to cause damage to the Mexican States. *See* Dan B. Dobbs et al., *The Law of Torts* § 29 (2d ed. 2011) ("Intent is not a general state of mind. One has a purpose to accomplish, or a substantial certainty of accomplishing one or more specific objectives. The defendant might intend to touch and also intend his touching to have harmful effects. These are two different intents.").[8]

## IV. Discussion

*Robins Dry Dock* bars recovery for economic damages absent physical injury to a plaintiff's proprietary interest. *See Catalyst Old River*, 639 F.3d at 210. To show a sufficient proprietary interest, the general rule is that a plaintiff must show he is an owner of the damaged property. When the plaintiff is clearly not the owner of the physically damaged property, therefore, *Robins Dry Dock* bars economic damage recovery. *See* 275 U.S. at 308–09 (barring a

---

[8] The Mexican States argue that the "factual context" of the guilty pleas of Transocean and BP are sufficient to raise fact questions about Halliburton's intentional conduct. Nowhere is there a direct allegation about Halliburton's intentional conduct, and the Mexican States provide no authority for such a sweeping reading of the purported exception to *Robins Dry Dock*.

No. 13-31070

time charterer of a steamship from recovery of lost profits where the defendant-dry dock negligently damaged the vessel). Thus, a production plant that suffered losses from interruption of gas services—because a barge negligently damaged another owner's pipeline—was denied recovery. *See Kaiser Aluminum*, 455 F.2d at 958. Likewise, a railroad that had to cease operation because of damage to another owner's bridge, despite the railroad's contractual right to use the bridge, could not recover. *See Louisville & N. R. Co. v. M/V Bayou Lacombe*, 597 F.2d 469, 470, 474 (5th Cir. 1979); *see also Dick Meyers*, 577 F.2d at 1025 (denying recovery for pecuniary losses suffered by a vessel operator when a river closed to traffic because of a negligently constructed and maintained lock).

By contrast, when the plaintiff is the owner of the physically damaged property, he can recover economic damages. In *Vicksburg Towing Co. v. Miss. Marine Transp. Co.*, for example, a dock owner who had leased the dock to another was still able to recover for economic damages sustained as a result of damage to the dock caused by the defendant's negligence. *See* 609 F.2d 176, 177 (5th Cir. 1980); *see also Catalyst Old River*, 639 F.3d at 209, 214 (permitting recovery by the owner of a hydroelectric station against a tow operator that negligently caused a barge to block intake channels that took in water to power the station's generators).

The *Robins Dry Dock* Court itself, however, intimated that something perhaps just shy of outright ownership might suffice to show the requisite proprietary interest. The Court left open the possibility that a "demise" agreement might satisfy the proprietary interest requirement even if the "time charter" at issue in that case did not. *See* 275 U.S. at 308. This court in *Bayou Lacombe* provided a useful explanation of the distinction. With the time charter, the "owner's people continue to navigate and manage the vessel, but her carrying capacity is taken by the charterer for a fixed time." 597 F.2d at

No. 13-31070

473 n.3 (quoting G. Gilmore & C. Black, *The Law of Admiralty* § 4–1, at 194 (2d ed. 1975)). The demise (or bareboat) charter, by contrast, allows the charterer to "take[] over the ship, lock, stock and barrel, and man[] her with his own people. He becomes, in effect, the owner pro hac vice." *Id.* This provides the charterer "complete control" of the vessel. *Id.*

The Mexican States point us to *Texas Eastern Transmission Corp. v. McMoRan Offshore Exploration Co.*, where this court "employed three criteria to evaluate proprietary interest: actual possession or control, responsibility for repair, and responsibility for maintenance." 877 F.2d 1214, 1225 (5th Cir. 1989) (citing *Bayou Lacombe*, 597 F.2d at 474). Characterization of these factors as sanctioning recovery for something less than ownership, however, misapprehends their origin and purpose. The *Bayou Lacombe* court, which originated the factors, explicitly noted that these were "incidents of ownership" rather than alternatives to it. *See* 597 F.2d at 474; *see also Texas E.*, 877 F.2d at 1225 ("Even were we to accept the proposition that repair of property endows one with a proprietary interest . . . ."); *Naviera Maersk Espana S.A. v. Cho-Me Towing Inc.*, 782 F. Supp. 317, 320 (E.D. La. 1992) ("[T]he Fifth Circuit clearly defines the term 'proprietary interest' to mean that a party must have control over the property tantamount to full ownership." (citing *Testbank*, 752 F.2d at 1024)). The reach of the definition of "proprietary interest" extends no further than the demise charter, which is "tantamount to, though just short of, an outright transfer of ownership." *Guzman v. Pichirilo*, 369 U.S. 698, 700 (1962).

With these principles in mind, we turn to the Mexican States' argument that they have carried their burden to show the necessary interest in the damaged property. They rely primarily on: (1) certain Mexican federal statutory provisions; (2) their own state constitutions; (3) two affidavits from state ministers from Quintana Roo and Tamaulipas; and (4) the affidavit of a real estate developer who affirms that he had substantial interaction with the

11

No. 13-31070

state of Tamaulipas about a development. Defendants contend that none of these affidavits or laws vests the requisite proprietary interest in the Mexican States. They chiefly rest on provisions in the Mexican Constitution, which they argue place ownership of all the property at issue in this litigation in the Mexican federal government.

We conclude that none of the Mexican States' cited sources show that they own the relevant property. Instead, as the district court held, both individually and collectively these sources suggest that the Mexican federal government is the true owner. We address these sources in turn.

A. <u>The Mexican Constitution</u>

Article 27 of the Mexican Constitution[9] contains the following broad statements about property ownership:

> Ownership of lands and waters within the boundaries of national land territory[10] is vested originally in the Nation, which has had and has, the right to transmit title thereof to private persons, thereby constituting private property. . . .
>
> The Nation has full ownership over all natural resources of the continental shelf and the seabed and subsoil of the marine areas of the islands . . . .
>
> The Nation has full ownership over the waters of territorial sea in the extension and under the terms set forth by International Law . . . .

---

[9] Our translations of Mexico's Constitution derive entirely from an official version printed by the Mexican Supreme Court, and available on that court's official website at https://www.scjn.gob.mx/normativa/ConstEnglish/CONSTI%20INGLES%20SEPT%202010.pdf.

[10] "National land territory," as used in Article 27, is a term of art with an expansive definition. Defined in Article 42 of the Constitution, it includes: "I. The land territory of all the portions constituting the Federation; II. The territory of the islands, including the reefs and keys in adjacent seas; . . . IV. The continental shelf and the seabed and subsoil of the submarine areas of the islands, keys and reefs; [and] V. The waters of the territorial seas in the extension and under the terms established by International Law and domestic maritime laws."

No. 13-31070

> In the cases established in [the preceding two paragraphs], the
> Nation's dominion is inalienable and not subject to the statute of
> limitation and the exploitation, use or enjoyment of the resources
> in question by private persons or by companies incorporated in
> accordance with Mexican laws, may not be undertaken save by
> means of concessions granted by the President of the Republic and
> in accordance with the rules and conditions set forth by the Laws.

Political Constitution of the United Mexican States ("Mexican Constitution"),

Article 27, ¶¶ 1, 4–6.

This constitutional provision is essentially decisive of this case. Article 27 means that "Mexico's public domain over these assets is inalienable and cannot be taken away from the *federal government* by adverse possession, by either Mexican nationals or foreigners." Jorge A. Vargas, *Mexican Law: A Treatise for Legal Practitioners and International Investors* § 34.4 (2001) [hereinafter *Mexican Law: A Treatise*] (emphasis added); *see also* Jorge A. Vargas, *Mexican Law for the American Lawyer* 161 (2009).

The Mexican States propose a more holistic understanding of the critical word "Nation," a term not defined in the Mexican Constitution. They argue that it embraces the entire Mexican people, and not only the federal government. However, that expansive reading is foreclosed by several interpretations of the term "Nation" in the context of the Mexican constitutional provisions outlined above. The Mexican Supreme Court has interpreted the term "Nation" narrowly, stating that "[t]he nation cannot be mistaken for a state, and consequently, State officials are not the ones who represent it because it is unique and represented by its federal agencies." *In re Oil Spill*, 970 F. Supp. 2d at 533 (citing *Nacion, Representacion de la*, [TA]; 5a. Epoca; 2a. Sala; S.J.F.; LII; Pag. 72 (Registro No. 332930)).[11] And one

---

[11] The Mexican States' arguments against our consideration of this case are unavailing. First, the States claim that the proper translation of the initial clause is "the nation cannot be mistaken for a *federal entity*," which would lead to a different conclusion.

No. 13-31070

commentator on Mexican law explicitly provides that "Nation," as used in Article 27, means the federal government. *See* Stephen Zamora et al., *Mexican Law* 495 (2004).[12] Professor Vargas proposes a more nuanced account of the distribution of sovereignty:

> Under Mexican law, all of the "elements" that compose the national territory of Mexico (including their corresponding natural resources) belong to the Mexican Nation (and not to the Federation or to each of the federal entities), with the legal and political understanding that the Nation is represented by the federal government.

Jorge A. Vargas, *Mexico and the Law of the Sea* 9 (2011) (footnotes omitted). Under either view, we conclude, the Mexican Constitution vests the federal government with the necessary proprietary interest for purposes of *Robins Dry Dock*.

This conclusion about federal supremacy is strengthened by the text in the sixth paragraph of Article 27, which clarifies that only the federal government, through Mexico's president, can allow "exploitation, use or enjoyment" of the long list of resources delineated in the preceding two paragraphs. *See* Mexican Constitution, Article 27, ¶¶ 4–6; *see also Corporacion Mexicana de Servicios Maritimos, S.A. de C.V. v. M/T Respect*, 89 F.3d 650, 653 (9th Cir. 1996), *as amended on denial of reh'g* (Aug. 28, 1996) ("Under Article 27 of the Constitution of the United Mexican States, the government of Mexico is the only entity that may own and exploit the country's natural

---

We are unpersuaded that the translation the district court used is incorrect, however, because the official Mexican Supreme Court translation of the Mexican Constitution translates the same term—"entidad federativa"—as "state." *See* Mexican Constitution, Article 27, ¶ 5. Second, while the case appears not to be controlling precedent under Mexican law, we find persuasive the Mexican Supreme Court's interpretation of the Mexican Constitution. The Mexican States have not offered any subsequent Mexican Supreme Court decision that embraces their preferred interpretation of the term "Nation."

   [12] Professor Zamora served as an expert for Halliburton in this case.

No. 13-31070

resources . . . . The Constitution permits the *federal government* to create organizations that manage and distribute these resources." (emphasis added) (citation omitted)).[13]

### B. Mexican Federal Statutory Law

An elaborate regime of Mexican federal statutory law—while certainly allotting some power to the states—further establishes federal supremacy with respect to the property at issue.

A few examples will suffice. The Mexican States have sought damages for harm to wildlife. But the General Law of Wildlife (GLW)[14] establishes, as relevant here, that the "Federal Attorney General's Office for Environmental Protection . . . shall exercise in an exclusive manner the action for liability for damage caused to wildlife and its habitat." GLW, Article 107. Additionally, while Mexico's General Law of Ecological Balance and Environmental Protection (GLEBEP) affords some power to Mexican states over environmental matters, *see* GLEBEP, Article 7, only the federal government is responsible for "[a]ttending to matters affecting the ecological balance . . .

---

[13] The Mexican States claim that they own certain islands off their coasts. The root of this argument is a provision in Article 48 of the Mexican Constitution. That article states that "islands, keys and reefs of adjacent seas belonging to national land territory, the continental shelf, the sea beds of the islands, keys and reefs, the territorial seas, inland marine waters, and the space over national land territory, shall depend directly from the Government of the Federation, *with the exception of those islands over which the States have up to the present, exercised their jurisdiction.*" Mexican Constitution Article 48 (emphasis added). Article 48 has resulted in great uncertainty in Mexico concerning ownership of these islands. *See generally* Vargas, *Mexico and the Law of the Sea* 405–484 (discussing history of relationship of states to Mexico's islands). However, the states have "abstained from enacting legislation to regulate islands offshore their coasts" in part because they have read Article 48 to provide that the "Federal Government . . . legally and politically exercise[s] control over Mexico's 'Insular territory.'" *Id.* at 455; *see also id.* at 439 (stressing that the islands have effectively been under federal control since passage of the 1917 constitution). We are not persuaded that the Mexican States have demonstrated the mandatory proprietary interest in these islands.

[14] We use the translations of Mexican federal statutory law and the Mexican States' constitutions provided to us by the parties.

No. 13-31070

originating in the territory or areas subject to other States' sovereignty and jurisdiction," *see* GLEBEP, Article 5. Given that the Deepwater Horizon incident "originated" outside Mexico's territorial boundaries, Article 5 signifies that the Mexican States have ceded the power to protect these resources to the Mexican federal government. *See Mexican Law: A Treatise* § 12.61 (highlighting federal control over environmental enforcement); Zamora et al., *Mexican Law* 122 (observing that, in Mexico, "environmental protection remains almost exclusively a federal matter").

C. State Constitutions

The State Constitutions of Veracruz, Quintana Roo, and Tamaulipas provide that the individual states maintain a degree of autonomy and freedom. Article 1 of the Constitution of Veracruz, for example, states that it is "free and autonomous in its administration and internal governance." Article 1 of the Constitution of Quintana Roo explains that it is a "free state as its members determine the organization, function and objectives of its community." Article 1 of the Constitution of Tamaulipas states that it is "free, sovereign and independent in its government and internal administration," but also notes that it is "tied to the branches of government as part of the United Mexican States, in all that the Constitution expressly sets forth."

Although the language of the constitutions is expansive, there is substantial language in these documents recognizing the superior authority of the federal government. The Veracruz Constitution may, for example, note that the state is "free and autonomous," as Plaintiffs argue, but it also makes clear that this is the case only with respect to its "administration and internal governance." Tamaulipas may be "free" and "sovereign" but it is "tied to the branches of government as part of the United Mexican States." These state constitutions must yield to Article 27 of the federal constitution, which vests ownership of the relevant property "originally in the Nation." Mexican

No. 13-31070

Constitution, Article 27, ¶ 1; *see also* Mexican Constitution, Article 133 (containing a supremacy clause—similar to the American version embedded in Article VI of the U.S. Constitution—providing that the Mexican Constitution and federal law bind the states "notwithstanding any provision to the contrary in the local constitutions or local laws").

### D. <u>Minister and Developer Affidavits</u>

The Mexican States rely greatly on three affidavits—two from state ministers, and one from a real estate developer—as further proof of their proprietary interests.[15] In the affidavits filed by the state ministers (the Tamaulipas Minister of Urban Development and the Environment and the Quintana Roo Minister of the Environment), they affirm that the states spent money out of their own treasuries to address oil that washed up on beaches in their territory. Defendants do not appear to dispute this. However, some statements in these affidavits are flatly contradicted by the Mexican Constitution. For example, both ministers affirm that their respective states "own[], manage[], possess[] and maintain[] [their] beaches, waters, estuaries, rivers, waterways, lagoons and flora and fauna of the Gulf of Mexico." These claims conflict with the language of Article 27 of the Mexican Constitution, which again states that "[o]wnership of lands and waters within the boundaries of national land territory is vested originally in the Nation." Mexican Constitution, Article 27, ¶ 1. Even accepting the Mexican States' holistic interpretation of the term "Nation," it would still not be true that the Mexican States own this property. "Estuaries," "river waters," and "lagoons," furthermore, are explicitly committed to the Nation's ownership. Mexican Constitution, Article 27, ¶ 5. We do not find these affidavits persuasive.

---

[15] While the Mexican States complain that these affidavits were ignored by the district court, their own summary judgment briefs do not mention the state ministers and contain only one mention of the real estate developer in a reply brief.

No. 13-31070

As to the real estate developer's declaration, while he avers that he spent much time in consultation with state authorities about the development of a "large scale tourism and beach resort," in that same declaration he provides a list of three pages of permits, agreements, and concessions he received from the federal government for that development.

E. Application of *Robins Dry Dock*

Ultimately, the question in this case is not whether the Mexican States have *some* authority to use or exploit *some* of the land and other resources at issue here. They likely do. The question is whether their property interests rise to the requisite level. They do not.

We recognize that the *Robins Dry Dock* analytical framework does not easily map on to an intragovernmental relationship. However, the Mexican Constitution is sufficiently clear about the distribution of property rights in the country for us to conclude that the Mexican States in no way resemble owners permitted to recover economic damages in our case law. *See e.g.*, *Vicksburg Towing*, 609 F.2d at 177 (permitting the plaintiff to recover lost rental income after damage sustained to its dock because, although the dock was leased to another, the plaintiff remained the sole owner of the property).

Instead, the Mexican States far more closely resemble the railroad company disallowed economic damage recovery from a defendant who negligently damaged another owner's bridge, in spite of the company's right to use the bridge. *See Bayou Lacombe*, 597 F.2d at 474. They also resemble the oil company in *Texas Eastern* that could not recover for a defendant's negligent destruction of a pipeline it did not own, even though it maintained a laundry list of appurtenances to the pipeline. *See* 877 F.2d at 1225–26.

Seen through the prism of the perhaps less onerous demise charter analogy, the Mexican States' interests still do not stack up. Recall that the demise charterer "takes over the ship, lock, stock and barrel, and mans her

18

No. 13-31070

with his own people. He becomes, in effect, the owner pro hac vice." *Bayou Lacombe*, 597 F.2d at 473 n.3 (internal quotation marks and citation omitted). He maintains "complete control." *Id.* The time charterer, by contrast, can provide "orders as to ports touched, cargo loaded, and other business matters" and can have "tonnage under his control for a period of time, without undertaking the responsibilities of ship navigation and management of the long-term financial commitments of vessel ownership." *Id.*

According to the Mexican States, they "are in charge of the natural resources at issue" and have the right to "exploit" these assets. They also note through affidavits of state environmental ministers that they have—at their own expense—repaired, maintained, managed, developed and protected many of the relevant resources. But these interests do not even closely approximate the "complete control" maintained by the demise charterer. It could not be said that the states have taken over the property at issue "lock, stock and barrel." *Bayou Lacombe*, 597 F.2d at 473 n.3 (internal quotation marks and citation omitted). Rather, federal law places the bulk of the power here in the hands of the federal government. The Mexican Constitution vests ownership of "lands and waters within the boundaries of national land territory" in the "Nation." Mexican Constitution, Article 27. The GLEBEP gives the federal government power over "matters affecting the ecological balance . . . originating . . . in areas beyond the jurisdiction of any State." *See* GLEBEP, Article 5. The GLW provides that only the federal government, as relevant here, can bring an action "for damage caused to wildlife and its habitat." *See* GLW, Article 107. The state constitutions, the above-listed laws, and Plaintiffs' cited affidavits bespeak a role for the states in managing some of the country's property. But

19

No. 13-31070

they do not provide the Mexican States with the crucial proprietary interest for purposes of *Robins Dry Dock*.[16]

### V. Conclusion

We hold that the *Robins Dry Dock* doctrine bars recovery in this case for the Mexican States, and therefore AFFIRM the district court's decision.

---

[16] Federal primacy in the environmental arena is further highlighted by the parallel lawsuit brought by the Mexican federal government seeking damages that risk duplicating those potentially awarded in this litigation. *See Amoco Transp.*, 768 F.2d at 668–69 (recognizing that concerns about double recovery lie at the heart of *Robins Dry Dock*). Plaintiffs attempt to characterize that suit as evidence of the concurrent authority exercised by the states and the federal government. But it would be an exercise in futility to separate damages in the one case from those in the other when the complaints allege very similar harm. *Compare* Complaint at 37, *United Mexican States v. BP Exploration & Prod. Inc. et al.*, No. 2:13-cv-01441-CJB-SS (E.D. La. Apr. 19, 2013), ECF No. 1 (seeking relief for, *inter alia*, preventative and monitoring activities, economic damages, and damages to natural resources), *with, e.g.*, First Amended Complaint at 22, 28, *State of Quintana Roo v. BP, PLC et al.*, No. SA10CA0763 OG (W.D. Tex. Nov. 8, 2010), ECF No. 1 (praying for relief for, *inter alia*, response costs, economic damages, and damage to natural resources).

# *United States Court of Appeals*
### FIFTH CIRCUIT
### OFFICE OF THE CLERK

**LYLE W. CAYCE**
**CLERK**

**TEL. 504-310-7700**
**600 S. MAESTRI PLACE**
**NEW ORLEANS, LA 70130**

May 26, 2015

Mr. William W. Blevins
U.S. District Court, Eastern District of Louisiana
500 Poydras Street
Room C-151
New Orleans, LA 70130

       **No. 13-31070   In re: Deepwater Horizon**
                         USDC No. 2:10-MD-2179
                         USDC No. 2:10-CV-4239
                         USDC No. 2:10-CV-4240
                         USDC No. 2:10-CV-4241

Dear Mr. Blevins,

Enclosed is a copy of the judgment issued as the mandate and a copy of the court's opinion.

                    Sincerely,

                    LYLE W. CAYCE, Clerk

                    *Sabrina B. Short*
                  By: _____
                  Sabrina B. Short, Deputy Clerk
                  504-310-7817

cc:
      Ms. Alison Louise Battiste
      Mr. Bruce Wayne Bowman Jr.
      Mr. Brad D. Brian
      Mr. Jeffrey Bossert Clark Sr.
      Mr. Richard Cartier Godfrey
      Mr. Donald Everett Godwin
      Mr. Don Keller Haycraft
      Mr. Sean Daniel Jordan
      Mr. James Andrew Langan
      Ms. Elizabeth A. Larsen
      Mr. Daniel Benjamin Levin
      Ms. Jenny LaNell Martinez
      Mr. Steven Lynn Roberts
      Mr. Enrique G. Serna
      Mr. Robert Alan York