# IN THE UNITED STATES COURT OF APPEALS

## FOR THE FIFTH CIRCUIT

————————————

No. 13-31296 c/w
Nos. 13-31299, 13-31302

————————————

D.C. Docket No. 2:10-MD-2179
D.C. Docket No. 2:12-CV-970

United States Court of Appeals
Fifth Circuit

**FILED**

May 8, 2015

Lyle W. Cayce
Clerk

IN RE:  DEEPWATER HORIZON

-------------------------------------------------------------------------------------

LAKE EUGENIE LAND & DEVELOPMENT, INCORPORATED; ET AL,

       Plaintiffs

PLAINTIFFS' STEERING COMMITTEE,

       Appellee

v.

BP EXPLORATION & PRODUCTION, INCORPORATED; BP AMERICA
PRODUCTION COMPANY; BP, P.L.C.,

       Defendants - Appellants

v.

SEALED APPELLEE,

       Claimants – Appellees

Appeals from the United States District Court for the
Eastern District of Louisiana, New Orleans

Before BENAVIDES, PRADO, and GRAVES, Circuit Judges.

# JUDGMENT

This cause was considered on the record on appeal and was argued by counsel.

It is ordered and adjudged that the judgment of the District Court is affirmed.

IT IS FURTHER ORDERED that each party bear its own costs on appeal.

**Certified as a true copy and issued
as the mandate on Jun 01, 2015**

Attest:

**Clerk, U.S. Court of Appeals, Fifth Circuit**

# IN THE UNITED STATES COURT OF APPEALS
# FOR THE FIFTH CIRCUIT

No. 13-31296 c/w
Nos. 13-31299, 13-31302

United States Court of Appeals
Fifth Circuit

**FILED**

May 8, 2015

Lyle W. Cayce
Clerk

IN RE: DEEPWATER HORIZON

-------------------------------------------------------------------------------------------------

LAKE EUGENIE LAND & DEVELOPMENT, INCORPORATED; ET AL,

      Plaintiffs

PLAINTIFFS' STEERING COMMITTEE,

      Appellee

v.

BP EXPLORATION & PRODUCTION, INCORPORATED; BP AMERICA
PRODUCTION COMPANY; BP, P.L.C.,

      Defendants–Appellants

v.

SEALED APPELLEES,

      Claimants–Appellees

Appeals from the United States District Court
for the Eastern District of Louisiana

Before BENAVIDES, PRADO, and GRAVES, Circuit Judges.

EDWARD C. PRADO, Circuit Judge:

No. 13-31296 c/w Nos. 13-31299, 13-31302

In these consolidated cases, BP Exploration & Production, Inc., BP America Production Company, and BP p.l.c. (collectively "BP") appeals three *Deepwater Horizon*-related settlement awards it paid to nonprofits through its Court-Supervised Settlement Program (CSSP). The district court denied discretionary review of these three awards even though BP argued that the Claims Administrator improperly interpreted the Settlement Agreement (the Agreement). The awards were based on the Claims Administrator's determination that nonprofits may count donations and grants as "revenue" under the terms of the Agreement (the Nonprofit-Revenue Interpretation). BP argues that 1) the Nonprofit-Revenue Interpretation violates the terms of the Agreement, 2) the Nonprofit-Revenue Interpretation puts the class settlement in violation of Rule 23 and Article III, and 3) even if the Nonprofit-Revenue Interpretation is upheld, each of these three awards is improper. We affirm the district court.

## I. FACTUAL AND PROCEDURAL BACKGROUND

This case arises from the class action settlement of civil claims arising from the *Deepwater Horizon* oil spill. The Settlement Agreement negotiated by the parties and approved by the district court established the CSSP, through which class members can submit claims.

### A.    The Claims-Administration Process

The CSSP is managed by the Claims Administrator. After a claim determination has been made, BP or the claimant may appeal to an Appeal Panel.[1] A party may then appeal the Appeal Panel's determination to the district court of Judge Barbier in the Eastern District of Louisiana, which has

---

[1] Appeals of less than $1 million are heard by a single Appeal Panelist.

No. 13-31296 c/w Nos. 13-31299, 13-31302

discretion to hear such appeals. Pursuant to a district court order of May 20, 2013, denials of discretionary review are not docketed.[2] Rather, the district court gives notice to the parties and posts decisions on the CSSP website.

The Settlement Agreement expressly includes nonprofits in the definition of entities who may recover pursuant to the settlement. The awards at issue were granted under the Business Economic Loss (BEL) framework. To recover under the BEL framework, a claimant must fall within one of twelve "Damage Categories" listed in § 1.3 of the Agreement. The Sealed Claimants recovered under the Economic Damage Category, which is summarized as encompassing "[l]oss of income, earnings or profits suffered by Natural Persons or Entities as a result of the DEEPWATER HORIZON INCIDENT." To recover in this category, a claimant must meet one of the "causation requirements" in Exhibit 4B of the Agreement. Claimants can establish causation by showing various "revenue patterns." If a claimant can show one of these revenue patterns, its compensation award is calculated under Exhibit 4C's "compensation framework"; compensation is based on a comparison of its pre- and post-spill revenue.

## B.    The Claims Administrator's "Revenue" Interpretation

This appeal stems from the Claims Administrator's interpretation of "revenue" as it is used in Exhibits 4B and 4C of the Agreement. On November 30, 2012, the Claims Administrator determined that for nonprofit entities "grant monies or contributions shall typically be treated as revenue for the purposes of the . . . settlement agreement." BP challenged this interpretation

_____

[2] BP appealed this order in a related case (the Final Rules appeal), also decided today, and we ordered the district court to begin docketing the denials of discretionary review. *See In re Deepwater Horizon*, No. 13-30843 (5th Cir. 2015).

3

No. 13-31296 c/w Nos. 13-31299, 13-31302

in the district court, and the court affirmed the Claims Administrator on December 12, 2012, via an email to the parties. BP never directly appealed this decision. After the Nonprofit-Revenue Interpretation went into effect, the Sealed Claimants, each a nonprofit organization, counted donations and grants as revenue in their calculations, and received awards through the CSSP.

- The Claimant in No.13-31296 (the *Cy Pres* Claimant) counted as revenue $331,395 in *cy pres* funds from a class action settlement.
- The Claimant in No.13-31299 (the Grant Claimant) counted as revenue its receipt of a large, one-time "Trust Grant."
- The Claimant in No. 13-31302 (the Legal-Services Claimant) included $157,500 in revenue that was based on "legal services performed by its legal fellows."

BP appealed the awards all the way to the district court, which denied its motion for discretionary review. BP now appeals these denials of discretionary review.[3]

## II. LEGAL BACKGROUND

This is the fifth appeal we have heard arising out of this class action settlement, and many of the issues presented relate to our earlier *Deepwater Horizon* decisions. Thus, we begin with a brief overview of the relevant portions of those cases.

### A.  *Deepwater Horizon I*

In *In re Deepwater Horizon* (*Deepwater Horizon I*), 732 F.3d 326 (5th Cir. 2013), BP appealed a district court order affirming the Claims Administrator's interpretation of the terms "revenue" and "expenses" in the Agreement. *Id.* at

---

[3] Also before the Court are BP's motion to supplement the record and file the supplemental record under seal, the Grant Claimant's motion to dismiss, and Class Counsel's motion to dismiss. The motion to supplement the record and file the supplemental record under seal is GRANTED, and both motions to dismiss are DENIED.

4

No. 13-31296 c/w Nos. 13-31299, 13-31302

331. This case centered on a dispute about accounting standards. In a Policy Announcement, the Claims Administrator stated that these terms encompassed only cash payments and disbursements, consistent with the cash-accounting method. *Id.* at 334. BP disagreed and argued that the Agreement was to be governed instead by the accrual-accounting method, which requires matching of revenues and expenditures, and therefore the order allowed claimants to recover for inflated or nonexistent losses. *Id.* at 331–34. We remanded to the district court for further proceedings on this contract-interpretation question. *Id.* at 339.

**B.    *Deepwater Horizon II***

BP next challenged the class certification as violating Federal Rule of Civil Procedure 23 and Article III of the Constitution. *In re Deepwater Horizon* (*Deepwater Horizon II*), 739 F.3d 790, 795 (5th Cir. 2014). At issue in *Deepwater Horizon II* was the district court's affirmance of two Claims Administrator Policy Announcements that interpreted Exhibits 4B and 4C of the Agreement. *Id.* at 795–96. The Claims Administrator determined that Exhibit 4B, which sets forth various causation requirements for claimants, did not require any further proof of causation once a claimant had met one of the 4B criteria. *Id.* at 797. The Claims Administrator also determined that Exhibit 4C, which provides the formula to calculate payments for BEL claimants, allowed the Claims Administrator to use the cash *or* accrual method of accounting in the calculation. *Id.*

BP argued that these interpretations broadened the class to include members whose injuries were not caused by the oil spill, in violation of Article III and Rule 23. *Id.* at 798–99. We noted that the Fifth Circuit had not addressed the standard for Article III standing at the class-certification stage

No. 13-31296 c/w Nos. 13-31299, 13-31302

and that other circuits are split between two tests. *Id.* at 800–02. We held that the Agreement passed both tests and therefore declined to decide which approach was correct. *Id.* at 813. We also rejected BP's numerous arguments that the Policy Announcements included class members with no injury and therefore violated Rule 23. *Id.* at 812–21.

## C.   *Deepwater Horizon III*

The third appeal arose from our remand in *Deepwater Horizon I. In re Deepwater Horizon* (*Deepwater Horizon III*), 744 F.3d 370, 373–74 (5th Cir. 2014), *cert. denied* 135 S. Ct. 754 (2014). On remand, "the district court held that the Settlement Agreement requires matching of revenues and expenses," as BP had originally argued. *Id.* However, the district court rejected BP's newly briefed argument—that the Claims Administrator's refusal to require specific evidence of causation violated Article III and Rule 23. *Id.* at 374. Whereas *Deepwater Horizon II* addressed the certification of the class, *Deepwater Horizon III* "decide[d] . . . whether the implementation of the Settlement Agreement is defective." *Id.* at 375. In spite of the decision in *Deepwater Horizon II*, BP again argued that any interpretation or implementation of the Agreement that does not require proof of causation "reanimates" the Article III and Rule 23 issues decided in that case. *Id.* at 376. BP sought reversal of the district court's ruling and an injunction preventing payment of claims to entities without evidence of causation. *Id.* at 373. We affirmed the district

No. 13-31296 c/w Nos. 13-31299, 13-31302

court's order, denied the injunction, and held that we were bound by our *Deepwater Horizon II* rulings on Rule 23 and Article III. *See id.* at 375–78.

## III. JURISDICTION

We have jurisdiction over this appeal under the collateral-order doctrine.[4] The three denials of discretionary review at issue "'(1) conclusively determine the disputed question, (2) resolve an important issue completely separate from the merits of the action, and (3) [are] effectively unreviewable on appeal from a final judgment,'" *Henry v. Lake Charles Am. Press, L.L.C.*, 566 F.3d 164, 171 (5th Cir. 2009) (quoting *Coopers & Lybrand v. Livesay*, 437 U.S. 463, 468 (1978)); *see also Montez v. Hickenlooper*, 640 F.3d 1126, 1129, 1132–33 (10th Cir. 2011) (finding appellate jurisdiction over a district court's collateral order affirming a special master's denial of an individual claim under a consent-decree dispute-resolution mechanism). The district court's refusal to review these three awards purported to conclusively determine the amount each nonprofit was to recover under the Agreement. The Nonprofit-Revenue Interpretation is "completely separate from the merits of BP's liability for the oil spill," *Deepwater Horizon I*, 732 F.3d at 332 n.3. And the order would be effectively unreviewable if BP had to wait until the settlement of the entire class action, when awards "will have been distributed to potentially thousands of claimants and BP will have no practical way of recovering these funds should it prevail." *Id.*

---

[4] Class Counsel and the Sealed Claimants argue that BP has waived its right to appeal individual awards under the terms of the Agreement. In the Final Rules appeal, we disagreed and held that BP had not waived its right to appeal individual awards. *See In re Deepwater Horizon*, No. 13-30843 (5th Cir. 2015).

No. 13-31296 c/w Nos. 13-31299, 13-31302

## A.    Timeliness

We now turn to Appellees' arguments that these appeals are untimely under Federal Rule of Appellate Procedure 4. Rule 4(a)(1)(A) requires the notice of appeal to be filed "with the district clerk within 30 days after entry of the judgment or order appealed from." Timely notice of appeal is a mandatory prerequisite for this Court's appellate jurisdiction. *Resident Council of Allen Parkway Vill. v. U.S. HUD*, 980 F.3d 1043, 1048 (5th Cir. 1993).

Appellees present two timeliness arguments. First they argue that by failing timely to appeal the December 12, 2012 order affirming the Nonprofit-Revenue Interpretation, BP has effectively waived its general argument that the Interpretation violates the Agreement—as opposed to its specific challenges to the individual awards to the Sealed Claimants. In the alternative, they argue that the appeals of the district court's denials of discretionary review are untimely because Rule 4's thirty-day period should run from the time the order was sent to the parties, not from the time it was entered into the docket by BP.

### 1. The December 12 Order

Appellees argue that the Court lacks jurisdiction over this appeal because BP did not appeal the district court's December 12 order affirming the Nonprofit-Revenue Interpretation within thirty days of its docketing. They contend that BP is effectively appealing the December 12 order because it is challenging the Nonprofit-Revenue Interpretation. When the Interpretation was released, BP challenged it in the district court; the district court upheld the Interpretation in the December 12 order emailed to the parties. BP never filed a direct appeal of the order, instead waiting to appeal the specific awards to the three Sealed Claimants. By failing to appeal this determination,

No. 13-31296 c/w Nos. 13-31299, 13-31302

Appellees contend, BP has waived any argument that the Nonprofit-Revenue Interpretation is incorrect.

In support of this argument, Appellees cite our decision in *Medical Center Pharmacy v. Holder*, 634 F.3d 830 (5th Cir. 2011). In that case, a group of pharmacies sued for declaratory and injunctive relief from certain FDA regulations. *Id.* at 832. After the district court granted summary judgment to the plaintiffs, the FDA appealed, and we reversed. *Id.* at 832–33. On remand, the FDA presented an argument that it did not raise in its summary-judgment appeal and the district court entered judgment for the FDA. *Id.* at 834. On appeal, we held that the FDA had waived its argument by failing to raise it in the first appeal. *Id.* at 834–36.

Here, BP did not waive its challenge of the awards to the Sealed Claimants by failing to appeal the December 12 order. It is well established that parties are not required to appeal interlocutory orders. *See In re Chicken Antitrust Litig. Am. Poultry*, 669 F.2d 228, 236 (5th Cir. 1982) ("Making interlocutory appeals mandatory . . . would turn the policy against piecemeal appeals on its head."); *Caradelis v. Reinferia Panama, S.A.*, 384 F.2d 589, 591 n.1 (5th Cir. 1967) ("[Appellant] lost no rights by failing to take such an [interlocutory] appeal."). Appellees' reliance on *Medical Center Pharmacy* is misplaced; in that case, the party failed to raise an argument in its first appeal from a *final* judgment. 643 F.3d at 835–36. The December 12 order affirming the Nonprofit-Revenue Interpretation was not a final judgment. *See Deepwater Horizon I*, 732 F.3d at 332 n.3. Thus, BP did not forfeit its right to appeal the nonprofit awards to the Sealed Claimants by failing to first appeal the December 12 order. *See Matherne v. Wilson*, 851 F.2d 752, 756 n.9 (5th Cir. 1988) ("[O]n principle, the interlocutory appeal is permissive, not mandatory,

No. 13-31296 c/w Nos. 13-31299, 13-31302

and a party does not forfeit a right to appeal after judgment for failure to appeal interlocutorily." (citing 9 *Moore's Federal Practice* ¶ 110.8 (1986))).

### 2. The Denials of Review

Next we turn to Appellees' alternative argument that this appeal is untimely because BP did not appeal the awards to the Sealed Claimants within thirty days of the district court's denials of BP's motions for discretionary review. Pursuant to the district court's May 20 order, denials of discretionary review were not docketed. Rather, notice was given to the parties and decisions were posted on the CSSP website. The district court denied BP's motion for discretionary review in each case on September 4, 2013. On December 16, 2013, 100 days later, BP filed its notices of appeal with the denials of review attached.

Appellees assert that Rule 4's thirty-day limit should run from the day that the parties received notice of the denials of BP's motions for discretionary review via the CSSP website. Otherwise, Class Counsel argues, BP can "create federal appellate rights by docketing non-litigation material whenever it pleases." BP responds that these appeals are timely because they were filed the same day that the district court's orders were *entered* into the docket. *See* Fed. R. App. P. 4 ("[T]he notice of appeal must be 30 days after *entry* of the . . . order appealed from." (emphasis added)). BP challenges Appellees' equitable argument because the delay was caused by the May 20 order, which denied BP's request to have such decisions entered into the docket, rather than by any bad faith on BP's part.

We agree with BP. Rule 4's plain language makes clear that the thirty days run from the entry of the order. Rule 4(a)(7) explains that an order is "entered" when "the judgment or order is entered in the civil docket." Appellees'

No. 13-31296 c/w Nos. 13-31299, 13-31302

equitable arguments are also unavailing; it was the district court's order, and not BP's conduct, that disadvantaged the parties, because undocketed orders are unappealable. *See In re Am. Precision Vibrator Co.*, 863 F.3d 428, 429 (5th Cir. 1989).[5] Thus, we hold that BP's appeals are timely, we have jurisdiction, and therefore proceed to the merits of the appeals.

## IV. DISCUSSION

The interpretation of a settlement agreement is a question of contract law that this Court reviews de novo. *Deepwater Horizon III*, 744 F.3d at 374 (citing *Waterfowl L.L.C. v. United States*, 473 F.3d 135, 141 (5th Cir. 2006)). The Agreement gives the district court discretion to decide whether it will review an award at all. Thus, the district court's denials of review are reviewed for abuse of discretion. *See Wilton v. Seven Falls Co.*, 515 U.S. 277, 289–90 (1995) (applying an abuse-of-discretion standard to a district court's decision to entertain a declaratory-judgment action). However, the standard of review is effectively de novo because the district court was presented with purely legal questions of contract interpretation. *See United States v. Delgado–Nuñez*, 295 F.3d 494, 496 (5th Cir. 2002) ("[A]buse of discretion review of purely legal questions . . . is effectively *de novo* because '[a] district court by definition abuses its discretion when it makes an error of law.'" (second alteration in original) (quoting *Koon v. United States*, 518 U.S. 81, 100 (1996))).

---

[5] Pursuant to our opinion in the Final Rules appeal, the district court will now have to docket its decisions on individual awards. *See In re Deepwater Horizon*, No. 13-30843 (5th Cir. 2015). Therefore, BP will no longer be able to start the thirty-day clock whenever it chooses to file its notice of appeal. We reiterate here that we do not endorse BP's approach in future cases.

11

No. 13-31296 c/w Nos. 13-31299, 13-31302

## A. Plain-Language Challenges to the Nonprofit-Revenue Interpretation

This appeal concerns the Claims Administrator's interpretation of "revenue" as it is used in the BEL framework of the Agreement. BP first challenges the Nonprofit-Revenue Interpretation as inconsistent with the terms of the Agreement. Under general maritime law,[6] a court interprets, "to the extent possible, all the terms in a contract without rendering any of them meaningless or superfluous." *Chembulk Trading LLC v. Chemex Ltd.*, 393 F.3d 550, 555 (5th Cir. 2004).

### 1. The Language of Exhibits 4B and 4C

BP's contract-interpretation arguments scrutinize the language of Exhibit 4B, the causation requirements, and Exhibit 4C, the compensation framework.

#### a. "Business revenue"

BP argues that "revenue" cannot mean donations and grants. To support its argument, BP first points toward Exhibit 4B, the causation requirements for claimants. A BEL claimant must meet one of the listed criteria to be eligible to recover under the Agreement.[7] The term "business revenue" appears four times in Exhibit 4B. In each instance, the clause "Total business revenue shows the following pattern" introduces a specific revenue pattern that claimants can use to establish causation.

BP argues that grants and donations are not "business revenue." This argument is based on two dictionaries that define "business" as "commercial"

---

[6] The Agreement provides that it "shall be interpreted in accordance with General Maritime Law."

[7] Not *all* claimants must meet one of the causation criteria; Exhibit 4B first lists groups of claimants that are exempt.

No. 13-31296 c/w Nos. 13-31299, 13-31302

activity carried on "for profit," *Black's Law Dictionary* 226 (9th ed. 2009), or "as a means of livelihood," *Webster's Third New International Dictionary* 302 (1976). By using the phrase "business revenue," BP contends, "the agreement plainly does not contemplate awards for lost grants and donations to non-profit entities."

This argument is unpersuasive. As the Amici point out, modern nonprofits are commercial entities that seek to generate cash surpluses. *See Girl Scouts of Manitou Council, Inc. v. Girl Scouts of U.S., Inc.*, 646 F.3d 983, 987–88 (7th Cir. 2011) ("The commercial activity of nonprofits has grown substantially in recent decades, fueled by an increasing focus on revenue maximizing . . . . The principal difference between [for-profit and nonprofit] firm[s] is . . . that a nonprofit enterprise is forbidden to distribute any surplus of revenues over expenses as dividends . . . ."). "Business," as it is used to modify "revenue" in the causation requirements, could just as easily include, "[b]y extension, transactions or matters of a noncommercial nature." *Black's Law Dictionary*, *supra*; *see also The American Heritage Dictionary* 259 (3d ed. 1996) (defining business as, *inter alia*, "a specific occupation or pursuit").

As Appellees note, BP's interpretation conflicts with the Agreement's explicit inclusion of nonprofits as entities that may recover. For if they may recover, then they must be able to calculate their loss by taking into account their primary sources of income. In a footnote, BP argues those nonprofits that "engage in business activities involving commercial transactions," such as a museum operating a gift shop, could use those commercial revenues to meet the BEL causation criteria. But if a museum's gift-shop receipts are "business revenue" but its donations are not, as BP suggests, the museum must be categorized as an entity engaged in commercial activity "for profit" in its gift

13

shop operation, but not in its operation of the museum generally. This hair-splitting is not a sensible construction of the Agreement.

In light of the revenue-generating nature of modern nonprofits and the express inclusion of nonprofits as entities eligible for recovery under the BEL framework, we cannot extrapolate from the use of the word "business" an intent to limit "revenue" to funds obtained only through commercial, profit-seeking activity.

### b. *"Profit" and "Earn"*

Next, BP argues that its interpretation of "revenue" is supported by language in Exhibit 4C, the compensation framework for BEL claimants. Exhibit 4C provides:

> Step 1 – The compensation framework for business claimants compares the actual *profit of the business* during a defined post-spill period in 2010 to the profit that the claimant might have expected *to earn* in the comparable post-spill period of 2010. . . . Step 1 compensation reflects the reduction in Variable Profit (which reflects the claimant's *revenue* less its variable costs) over this period.

(emphasis added). BP argues that "revenue," used here to calculate the "Variable Profit," cannot include grants and donations because they do not relate to the "profit of a business." This is because profits are, according to *Black's*, "[t]he excess of revenues over expenditures in a *business transaction*," and, BP asserts, contributions are "plainly not the result of business transactions."

BP further challenges the Nonprofit-Revenue Interpretation because Exhibit 4C aims to allow recovery of "profit the claimant might have expected *to earn*." Again quoting *Black's*, BP argues that contributions and grants are

No. 13-31296 c/w Nos. 13-31299, 13-31302

not earned because they are not "acquire[d] by labor, service, or performance," *Black's Law Dictionary* 584 (9th ed. 2009).

BP's profit argument relies on the assumption that nonprofits are not "businesses" in the "commercial, for-profit" sense. Yet BP offers no support for its assertion that gratuitous contributions and grants are not the result of business transactions. *Black's*, from which BP borrows its definition of "profit" and "earn," defines "business transaction" as "[a]n action that affects the actor's financial or economic interests, including the making of a contract." *Black's Law Dictionary* 241 (10th ed. 2014). When a nonprofit obtains a grant, fundraises, or accepts donations, its actions affect its financial and economic interests.

BP oversimplifies the work of nonprofits when it claims that they do not earn their revenue. Appellees and the Amici explain that nonprofits have to work to get contributions and improve their bottom line in order to keep their doors open.[8] Thus, the fact that Exhibit 4C seeks to compensate for "profit[s] the claimant[s] might have expected to earn," does not conflict with the Nonprofit-Revenue Interpretation.

*c. "Sales"*

Next, BP contends that the Nonprofit-Revenue Interpretation renders Exhibit 4C's use of the word "sales" meaningless. Exhibit 4C provides:

Step 2 – Compensates claimants for incremental profits or losses the claimant might have been expected to generate in the absence of the spill *relative to sales* from the Benchmark Period. This calculation reflects a Claimant-Specific Factor that captures

---

[8] As one Amicus observes, "[w]ith more than $1 billion in revenue from grants and donations in the Louisiana health and human service not-for-profit sector alone, it comes as no surprise that not-for-profit corporations strive year after year to improve their services and programming to attract donors."

No. 13-31296 c/w Nos. 13-31299, 13-31302

> growth or decline in the pre-spill months of 2010 compared to the
> comparable months of the Benchmark Period and General
> Adjustment Factor.

(emphasis added). The Claimant-Specific Factor (CSF) is calculated using the claimant's "total revenue" from certain pre- and post-spill time periods. Because revenue is a variable in the CSF calculation and the CSF is used to compensate for expected profits or losses "relative to *sales*," BP argues that donations and grants cannot be included as revenue.

But if the term "sales" were given the meaning that BP advocates, then for-profit service entities would be barred from claiming payments for services as revenue as well. For example, an attorney's fees are not "sales," yet an attorney could presumably include them as revenue in a BEL claim. Thus, BP's "sales" argument not only excludes grants and donations, it also excludes payments that are well within the meaning of the contract. *See Chembulk Trading LLC*, 393 F.3d at 555 ("A basic principle of contract interpretation . . . is to interpret, *to the extent possible*, all the terms in a contract without rendering any of them meaningless or superfluous." (emphasis added)).

BP's arguments regarding the use of the terms "business revenue," "profit of a business," and "earn" are unpersuasive. Although the use of the term "sales" is difficult to reconcile with the Nonprofit-Revenue Interpretation, the weight BP gives to the term also causes problems for revenue that all parties would agree should be included. Thus, considering the terms of the contract as a whole, notably the explicit inclusion of nonprofits in the list of entities that may recover under the BEL framework, we find that the

16

No. 13-31296 c/w Nos. 13-31299, 13-31302

Nonprofit-Revenue Interpretation does not conflict with the language of Exhibits 4B and 4C.[9]

### 2. *The Language of Class Definition*

Finally, BP argues that the Nonprofit-Revenue Interpretation "produces awards to claimants that are not class members." BP highlights the summary description of the Economic Damage Category in § 1.3.1.2 of the Agreement: "Loss of income, earnings or profits suffered by Natural Persons or Entities as a result of the DEEPWATER HORIZON INCIDENT, subject to certain Exclusions."

BP argues that entities whose losses are based on "lost grants, donations, and similar receipts—as distinguished from lost profits from commercial transactions—are not encompassed" within this category. First, BP cites to the "Facts and Proceedings" section of *Deepwater Horizon I*, in which we explained that claimants in this category "must have conducted commercial activities in the Gulf Coast region during the relevant period." 732 F.3d at 329–30. From this BP concludes that nonprofits whose damages are based "solely on gratuitous grants and other unearned awards" cannot join the class because they do not engage in commercial activities.

This argument is unavailing. BP attempts to use our mention of "commercial activities" in the facts section of a case that did not address the nonprofit issue to contradict the Claims Administrator's determination. But

---

[9] BP also argues that a recent Claims Administrator interpretation barring most for-profit claimants from counting grants as revenue shows that the interpretation being appealed is incorrect. BP asserts that a Claims Administrator interpretation released on April 24, 2014, states that "'grants for 'for-profit' entities' 'shall not typically be treated as 'revenue' for purposes of the various calculations to be performed under the terms of the Agreement with regard to entities asserting [BEL] claims.'" However, this document is not contained in the record or in BP's supplemental record; thus we do not consider it.

No. 13-31296 c/w Nos. 13-31299, 13-31302

even if our language could be read as a binding summation of the Agreement's terms, BP has failed to show that nonprofits that operate on donation and grant funding are not engaged in commercial activity. *See supra* Part IV(A)(1)(a). Ultimately, BP fails to show that the Nonprofit-Revenue Interpretation violates the language of the Agreement.

## B. Article III and Rule 23 Challenges to the Nonprofit-Revenue Interpretation

We now turn to BP's Rule 23 and Article III challenges. BP argues that many of the Article III and Rule 23 issues raised in *Deepwater Horizon II* are "reanimated" because the Nonprofit-Revenue Interpretation "'abandons' a fundamental premise of the agreement and class definition." BP does not seek decertification of the class on these grounds; rather BP argues that the Interpretation renders the Agreement illegal and, therefore, cannot be accepted. *See Walsh v. Schlecht*, 429 U.S. 401, 408 (1977) ("[A]mbiguously worded contracts should not be interpreted to render them illegal and unenforceable where the wording lends itself to a logically acceptable construction that renders them legal and enforceable."). We disagree and hold that the Nonprofit-Revenue Interpretation does not place the Agreement in violation of Rule 23 or Article III because the Interpretation does not alter our analysis in *Deepwater Horizon II*.

### 1. Rule 23

In *Deepwater Horizon II*, BP challenged class certification on numerous Rule 23 grounds following the district court's affirmance of a different Claims Administrator determination. 739 F.3d at 796. The Claims Administrator determined the Agreement does not require claimants to provide proof of causation provided they meet one of the causation criteria enumerated in Exhibit 4B. *Id.* at 797–98. There, BP argued that this determination put the

No. 13-31296 c/w Nos. 13-31299, 13-31302

class certification in violation of numerous provisions of Rule 23. *Id.* at 799. All of these arguments rested on the "same central premise . . . that a class cannot be certified when it includes persons who have not actually been injured." *Id.* at 808. Nevertheless, we held that certification was proper. *Id.* at 821.

### a. Adequacy

Rule 23(a)(4) requires that "the representative parties will fairly and adequately protect the interests of the class." "The adequacy inquiry . . . serves to uncover conflicts of interest between named parties and the class they seek to represent.'" *Amchem Prods., Inc. v. Windsor*, 521 U.S. 591, 625 (1997). Class representatives must "'be part of the class and possess the same interest and suffer the same injury as the class members.'" *Id.* (quoting *E. Tex. Motor Freight Sys., Inc. v. Rodriguez*, 431 U.S. 395, 403 (1977)).

BP argues that under the Nonprofit-Revenue Interpretation the class representatives are no longer "adequate." BP characterizes our opinion in *Deepwater Horizon II* as a "recogni[tion] that the district court's adequacy determination was based on its conclusion that the class representatives 'included individuals and businesses asserting each category of loss,'" and asserts "[t]hat is not so if the class includes non-profit entities that incurred no business loss." (quoting *Deepwater Horizon II*, 739 F.3d at 812–13).

Even if we assume BP is correct that the Nonprofit-Revenue Interpretation allows entities without business loss to enter the class, our reasoning in *Deepwater Horizon II* still governs this appeal. We upheld the district court's adequacy determination, even accepting BP's argument that the class included individuals with no loss at all. 739 F.3d at 802. We did so because, "in the context of Rule 23 requirements, '[c]lass certification is not precluded simply because a class may include persons who have not been

injured by the defendant's conduct.'" *Id.* at 813 (alteration in original) (quoting *Mims v. Stewart Title Guar. Co.*, 590 F.3d 298, 308 (5th Cir. 2009)). BP has simply resurrected its failed adequacy argument from *Deepwater Horizon II*, and we remain bound by our previous determination that the class satisfies Rule 23(a)(4). *See Jacobs v. Nat'l Drug Intelligence Ctr.*, 548 F.3d 375, 378 (5th Cir. 2008).

### b. Commonality and typicality

Next, BP argues that the Nonprofit-Revenue Interpretation violates Rule 23's requirement that there be "questions of law or fact common to the class." Fed. R. Civ. P. 23(a)(2). As was the case in *Deepwater Horizon II*, BP's commonality argument rests entirely on an out-of-context quotation from *Wal-Mart Stores, Inc. v. Dukes*, 131 S. Ct. 2541 (2011), that commonality requires that class members "have suffered the same injury."[10] *Id.* at 2551 (internal quotation marks omitted).

In *Wal-Mart*, the Court stated:

> Commonality requires the plaintiff to demonstrate that the class members "have suffered the same injury[.]" This does not mean merely that they have all suffered a violation of the same provision of law. Title VII, for example, can be violated in many ways—by intentional discrimination, or by hiring and promotion criteria that result in disparate impact, and by the use of these practices on the part of many different superiors in a single company. Quite obviously, the mere claim by employees of the same company that they have suffered a Title VII injury, or even a disparate-impact Title VII injury, gives no cause to believe that all their claims can productively be litigated at once. *Their claims must depend upon a*

---

[10] In *Deepwater Horizon II* we observed: "Based on this single sentence, [BP suggests] that either the diversity of the class members' economic injuries or the inclusion of members who 'have suffered no injury at all' might preclude class certification. When quoted in its entirety, however, the relevant passage . . . demonstrates why both of these arguments are meritless." 739 F.3d at 810.

No. 13-31296 c/w Nos. 13-31299, 13-31302

> *common contention—for example, the assertion of discriminatory bias on the part of the same supervisor.* That common contention, moreover, must be of such a nature that it is capable of classwide resolution—which means that determination of its truth or falsity will resolve an issue that is central to the validity of each one of the claims in one stroke.

*Id.* (emphasis added) (citation omitted). In *Deepwater Horizon II*, we held that the "same injury" requirement could "be satisfied by an instance of the defendant's injurious conduct, even when the resulting injurious effects—the damages—are diverse." 739 F.3d at 810–11. Thus, even assuming the Nonprofit-Revenue Interpretation allows recovery for class members with no business loss, it does not violate Rule 23(a)(2).[11]

### c. Predominance

Next BP argues that the Nonprofit-Revenue Interpretation puts the class in violation of Rule 23(b)(3)[12] because the damages calculation now "results in significant awards based on extraordinary one-time grants" and fails to "connect a claimant's damages to the class theory of liability."

We have noted that "[c]lass treatment . . . may not be suitable [under Rule 23(b)(3)] where the calculation of damages is not susceptible to a mathematical or formulaic calculation, or where the formula by which the parties propose to calculate individual damages is clearly inadequate." *Bell Atl. Corp. v AT&T Corp.*, 339 F.3d 294, 307 (5th Cir. 2003); *see also Steering Comm.*

---

[11] Based on its commonality argument, BP also contends that the class fails to meet Rule 23(a)(3)'s typicality requirement "since '[t]he commonality and typicality requirements of Rule 23(a) tend to merge.'" (quoting *Gen. Tel. Co. of Sw. v. Falcon*, 457 U.S. 14, 157 n.13 (1986)). This too is a failed argument resurrected from *Deepwater Horizon II*, and we again reject it. *See* 739 F.3d at 812 n.92.

[12] This Rule requires that "the court find[] that the questions of law or fact common to class members predominate over any questions affecting only individual members." Fed R. Civ. P. 23(b)(3).

No. 13-31296 c/w Nos. 13-31299, 13-31302

*v. Exxon Mobil Corp.*, 461 F.3d 598, 602 (5th Cir. 2006) ("[W]here individual damages cannot be determined by reference to a mathematical or formulaic calculation, the damages issue may predominate over any common issues shared by the class.").

Yet, "it is indeed 'possible to satisfy the predominance . . . requirements of Rule 23(b)(3) in a . . . mass accident class action' despite the particular need in such cases for individualized damages calculations." *Deepwater Horizon II*, 739 F.3d at 816 (quoting *Exxon Mobil Corp.*, 461 F.3d at 603). This is the case "when a district court performs a sufficiently 'rigorous analysis' of the means by which common and individual issues will be divided and tried." *Id.* (quoting *Madison v. Chalmette Ref., L.L.C.*, 637 F.3d 551, 556 (5th Cir. 2011)).

BP argues that the Agreement's formula does not meet these standards, and therefore fails the predominance inquiry. First, BP argues that the Nonprofit-Revenue Interpretation results in large awards where "evidence of actual damages is lacking," which proves that the formula is "clearly inadequate," *Bell Atl. Corp*, 339 F.3d at 307. Next, BP argues that the formula fails to "connect a claimant's damages to the class theory of liability," as required by *Comcast Corp. v. Behrend*, 133 S. Ct. 1426, 1433 (2013) ("[A] model purporting to serve as evidence of damages in [a class action based on one theory of liability] must measure only those damages attributable to that theory.").

However, as we stated in response to BP's similar arguments in *Deepwater Horizon II*, these standards do not apply here, where the district court "did not list the calculation of the claimant's damages either in its list of common questions of fact or in its list of common questions of law." 739 F.3d at 816 (footnotes and internal quotation marks omitted). *Comcast* "has no impact

No. 13-31296 c/w Nos. 13-31299, 13-31302

on cases such as the present one, in which predominance was not based on common issues of damages but on numerous common issues of liability." *Id.* at 815. We affirmed the district court's predominance determination because it was based on common issues apart from the calculation of damages. *See id.* at 816 ("But even without a common means of measuring damages, in the district court's view, these common issues nonetheless predominated over the issues unique to individual claimants.").

Moreover, in *Deepwater Horizon II* we explicitly rejected the argument that the choice of "a formula for making voluntary payments under a settlement agreement could threaten the predominance of common questions over individual questions in litigation." *Id.* at 818. Thus, even assuming BP's assertion that the Nonprofit-Revenue Interpretation "awards damages with no connection to many class members' causes of action," we remain bound by our earlier predominance determination under our rule of orderliness. *See Jacobs*, 548 F.3d at 378.

### d. Fairness

Next, BP contends that the Nonprofit-Revenue Interpretation violates Rule 23(e)'s fairness requirement. This rule is meant to protect the nonparty class members. *Deepwater Horizon II*, 739 F.3d at 820. BP argues that the Nonprofit-Revenue Interpretation permits entities with no colorable claim to recover, which results in claims that are not a "fair approximation" of their entitlement to relief, *Reed v. Gen. Motors Corp.*, 703 F.2d 170, 175 (5th Cir. 1983). However, we rejected a nearly identical argument in *Deepwater Horizon II*:

> BP's argument ignores the six *Reed* factors altogether. Rather, BP relies on a short quotation from *Reed* to suggest that district courts should also ensure that settlement agreements are based on a "fair

No. 13-31296 c/w Nos. 13-31299, 13-31302

> approximation of [class members'] relative entitlement." . . . No
> other decision by our court or by any district court has every cited
> *Reed* for such a proposition. Nor can any of the six *Reed* factors be
> easily related to the "fair approximation" analysis that BP
> proposes.

739 F.3d at 820 (alteration in original). Nothing in the Nonprofit-Revenue
Interpretation or BP's briefs changes our analysis now.

### e. Ascertainability

Lastly, BP argues that the Nonprofit-Revenue Interpretation violates
Rule 23's ascertainability requirement. To satisfy this requirement, "'the class
sought to be represented must be adequately defined and clearly
ascertainable.'" *Deepwater Horizon II*, 739 F.3d at 821 (quoting *Union Asset
Mgmt. Holding A.G. v. Dell, Inc.*, 669 F.3d 632, 639 (5th Cir. 2012)). BP
contends that the Nonprofit-Revenue Interpretation "eliminates any rational
demarcation between legitimate and illegitimate claimants" by permitting
recovery to individuals without "*Business* Economic Loss."

In *Deepwater Horizon II*, we rejected BP's nearly identical argument that
the Claims Administrator's "two Policy Announcements render[ed] the class
definition irrational and therefore violate[d] the ascertainability requirement."
739 F.3d at 821. This conclusion was based on our prior decision that "'the
possibility that some [claimants] may fail to prevail on their individual claims
will not defeat class membership' on the basis of the ascertainability
requirement." *Id.* (alteration in original) (quoting *In re Rodriguez*, 695 F.3d
360, 370 (5th Cir. 2012)). Even assuming, as BP does, that the Interpretation
permits recovery for individuals with no "business loss," we remain bound by
our ascertainability determination from *Deepwater Horizon II*. *See Jacobs*, 548
F.3d at 378.

No. 13-31296 c/w Nos. 13-31299, 13-31302

## 2. *Article III Standing*

BP argues that the Claims Administrator, by interpreting "revenue" to include grants and contributions to nonprofit entities, has altered the class definition to include entities with "no colorable claim of injury." This violates Article III, BP argues, because the class now includes "a great many persons who have suffered no injury at the hands of [BP]," *Kohen v. Pac. Inv. Mgmt. Co.*, 571 F.3d 672, 677 (7th Cir. 2009).

Pursuant to Article III, a plaintiff must "allege (1) an injury that is (2) 'fairly traceable to the defendant's allegedly unlawful conduct' and that is (3) 'likely to be redressed by the requested relief.'" *Lujan v. Defenders of Wildlife*, 504 U.S. 555, 590 (1992) (Blackmun, J., dissenting) (quoting *Allen v. Wright*, 468 U.S. 737, 751 (1984)). "As *Lujan* emphasized, however the standard used to establish these three elements is not constant, but becomes gradually stricter as the parties proceed through 'the successive stages of the litigation.'" *Deepwater Horizon II*, 739 F.3d at 799. We have not directly addressed how "to evaluate standing for the purposes of class certification and settlement approval under Rule 23," but other courts have taken two distinct approaches. *Id.* at 800.[13]

Under the first approach, courts look at the *class definition* to "ensure that absent class members possess Article III standing." *Id.* at 801. The Second Circuit has presented the most common formulation of this standard: "We do not require that each member of a class submit evidence of personal standing.

---

[13] Although BP is not seeking decertification of the class in this appeal, it argues that implementing the Nonprofit-Revenue Interpretation results in a class that could not have been certified. Thus, we analyze this issue pursuant to the Rule 23-stage Article III standards utilized in *Deepwater Horizon II*, where class certification was at issue. *See* 739 F.3d at 799–801.

No. 13-31296 c/w Nos. 13-31299, 13-31302

At the same time, no class may be certified that contains members lacking Article III standing. The class must therefore be defined in such a way that anyone within it would have standing." *Denney v. Deutsche Bank AG*, 443 F.3d 253, 263–64 (2d Cir. 2006) (citations omitted). This standard "does not require that each member of a class submit evidence of personal standing, so long as every class member contemplated by the class definition can *allege* standing." *Deepwater Horizon II*, 739 F.3d at 804 (internal quotation marks omitted).

Under the second, more permissive standard, courts look to whether the *named plaintiffs* or *class representatives* have standing, "ignor[ing] the absent class members entirely." *Id.* at 800 (citing *Lewis v. Casey*, 518 U.S. 343, 395–96 (1996) (Souter, J., concurring in part, dissenting in part, and concurring in the judgment)). In *Kohen v. Pacific Investment Management Co.*, 571 F.3d 672 (7th Cir. 2009), the Seventh Circuit took this approach, reasoning that, although it "is true . . . that a class will often include persons who have not been injured by the defendant's conduct," such an "inevitability does not preclude class certification." *Id.* at 677. This is because at the class-certification stage, "many of the members of the class may be unknown, or if they are known still the facts bearing on their claims may be unknown." *Id.*

In *Deepwater Horizon II* we did not adopt either test because we found that the Agreement satisfied both. *See* 739 F.3d at 798–802. Applying the *Denney* test, we noted that the class definition limited the Economic Damage Category to claims based on "'[l]oss of income, earnings or profits suffered . . . *as a result of* the DEEPWATER HORIZON INCIDENT.'" *Id.* at 803 (alteration in original). Even looking beyond this definition paragraph to the entire Amended Complaint, we reasoned, "the result would be no different" because the complaint "include[d] numerous allegations of injuries to the absent class

26

No. 13-31296 c/w Nos. 13-31299, 13-31302

members." *Id.* Thus "every class member contemplated by the class definition 'can *allege* standing.'" *Id.* at 804 (quoting *Deepwater Horizon I*, 732 F.3d at 340–42). Additionally, we found class standing under the more permissive *Kohen* test, which focuses on the standing of the named plaintiffs. *Id.* at 803. This was because "each one of the[] named plaintiffs . . . identified an injury in fact that is traceable to the oil spill." *Id.* at 803.

BP argues that the class now fails both of these tests because "the class definition has been altered to include numerous entities that have no colorable claim of loss." Under the *Denny* test, BP contends, the class is no longer "defined in such a way that anyone within it would have standing," *Denney*, 443 F.3d at 264. Next BP argues that "even under the [*Kohen*] standard, 'a class should not be certified if it . . . contains a *great many persons* who have suffered no injury at the hands of the defendant,'" and the class now contains "an entire set of entities whose claims are based only on gratuitous contributions and that have no colorable claim of injury."

However, BP does not explain how the Nonprofit-Revenue Interpretation allows entities to recover for injuries that were not *caused* by BP's conduct. BP merely states that the Claims Administrator "has issued awards to nonprofit entities based on receipts that cannot qualify as 'revenue,' and thus awards are being issued to entities that have no colorable claim of injury." But whether contributions should qualify as "revenue" under the Agreement is irrelevant to the causal connection between BP's conduct and decreases in contributions to nonprofits. Moreover, Amici for Appellees cite to numerous sources showing how nonprofits are often harmed by calamities because "first, those affected by the calamity tend to slow their giving . . . and, second, donors shift their giving to those impacted directly by the disaster."

No. 13-31296 c/w Nos. 13-31299, 13-31302

We hold that the Nonprofit-Revenue Interpretation does not alter the class definition in violation of Article III. In *Deepwater Horizon II*, this Court found that the Agreement satisfied standing requirements for class certification. Here, BP has failed to show how treating contributions and donations as revenue results in a class of individuals with no colorable claim of injury.

## C.    Challenges to the Individual Awards

In each of the consolidated cases, BP argues that even if the Nonprofit-Revenue Interpretation is permissible, the individual award given to each Sealed Claimant violates the language of the Claims Administrator's own interpretation of the Agreement. We address each award in turn.

### 1. Cy Pres *Award, No. 13-31296*

The *Cy Pres* Claimant received $331,395 in *cy pres* funds from a class action settlement. This "extraordinary" award, according to the organization's director, was the largest single donation in the organization's history. BP argues that treating this windfall as "revenue" violates the Nonprofit-Revenue Interpretation, which states that "grant monies or contributions shall *typically* be treated as revenue," because this was a "one-time, extraordinary award." To hold otherwise, BP argues, would "read the word 'typically' out of the Non-Profit Policy."

The *Cy Pres* Claimant responds that it would characterize every donation it receives as a "'one-time, extraordinary payment' because there is no guaranty that any donation will be made or that any other donation will follow." BP's position, the Claimant argues, means that any unusually sized donation should be excluded from "revenue." This "makes little sense as a matter of practical reality. Non-profit entities receive many donations that are

28

No. 13-31296 c/w Nos. 13-31299, 13-31302

one-time donor payments" resembling this *cy pres* donation. Finally, the Claimant notes the increasing frequency with which courts distribute *cy pres* awards in class action lawsuits to argue that this is not a "novel" source of revenue for nonprofit corporations. *See* Martin H. Redish et al., *Cy Pres Relief and the Pathologies of the Modern Class Action: A Normative and Empirical Analysis*, 62 Fla. L. Rev. 617, 653 (2010) ("[T]he use of class action cy pres awards by federal courts has increased since the 1980s and has accelerated sharply after 2000.").

We see no reason why "revenue" should be read to exclude donations simply because they were given by a court rather than a donor. The Nonprofit-Revenue Interpretation does not say that "typical donations" count as revenue; rather it says that "grant monies or contributions shall typically" count as revenue. "Typically" is not rendered meaningless by the inclusion of *cy pres* donations.

Moreover, denying this award because of its size would open the floodgates to a flurry of challenges to nonprofit awards, undermining the aims of the CSSP. As the Appeals Panel noted in reviewing this award, the CSSP calculations look at revenue on a business level, not on a customer or donor level. Reading limitations into the meaning of "revenue" based on the identity of the donor runs contrary to this agreed-upon framework. Thus, we find no abuse of discretion in the denial of review of the award to the *Cy Pres* Claimant.

### 2. Trust Grant, No. 13-31299

BP makes a similar argument regarding the Grant Claimant's award, which was based on its receipt of a "Trust Grant." BP argues that the inclusion of this "one-time, extraordinary receipt of grant money" distorted the Claimant's CSF and bestowed a windfall on this Claimant.

No. 13-31296 c/w Nos. 13-31299, 13-31302

The CSF is used in "Step 2" of the compensation framework to "compensate[] claimants for incremental profits or losses the claimant might have been expected to generate in the absence of the spill relative to sales from the Benchmark Period." The CSF aims to "capture the impact of pre-[spill] trends in the claimant's revenue performance that might have been expected in the post-[spill] Benchmark Period." Essentially, the CSF is a revenue growth rate metric used to ensure that a business that was growing leading up to the spill will be adequately compensated. It is calculated by "comparing revenue received in the four months leading up to the spill to revenue received in those same four months in the Benchmark Period." Thus, treating the Trust Grant as "revenue" increased the Grant Claimant's CSF, and therefore its award.

BP argues that this improperly inflated the CSF because grants normally did not make up a large portion of the Grant Claimant's revenue, yet this grant was "30% of Claimant's 2010 gross receipts *by itself*." BP argues that because the grant was "atypical," it must be excluded to ensure that, in the language of Exhibit 4C, a claimant is compensated only "for incremental profits the claimant *might have been expected to generate*" in the post-spill period.[14]

In response, the Grant Claimant argues that BP is, "once again, trying to erect a causation test on appeal that does not exist in the Settlement Agreement and has already been resolved by this Court." The Claimant contends that BP seeks to require each claimant, nonprofit or otherwise, to show that revenues from certain sources would have continued to come in

---

[14] BP also contends, as against the *cy pres* award, that this award should not be included as revenue because it is not "typical," per the language of the Nonprofit-Revenue Interpretation. This argument is practically identical to that raised against the *Cy Pres* Claimant, and for the reasons discussed in Part IV(C)(1), *supra*, it fails.

No. 13-31296 c/w Nos. 13-31299, 13-31302

absent the spill, thus "jettison[ing] the Settlement Agreements' Compensation Frameworks for an ad-hoc system."

We agree with the Claimant. By seeking to exclude revenue because it is "atypical," BP attempts to circumvent the causation requirements and compensation framework in the Agreement. BP now asks individual claimants to show that any revenue from the pre-spill period was of the type that they could have expected to continue earning after the spill. But that amounts to requiring that Claimants prove that their lost revenue was caused by the spill, which is precisely what we refused to require in *Deepwater Horizon II. See* 739 F.3d at 797, 821 (affirming the district court's approval of the Claims Administrator's statement that "the Settlement Agreement does not contemplate that the Claims Administrator will undertake additional analysis of causation issues beyond those criteria that are specifically set out in [Exhibit 4B]").

The parties agreed on Exhibit 4C's compensation framework to establish what claimants might have expected to earn after the spill. To accept challenges to the types of revenue included in those calculations because the claimants could not have expected to earn similar revenue after the spill defeats the purpose of the compensation framework itself. We therefore find no abuse of discretion in the district court's denial of review of the award to the Grant Claimant.

### 3. Legal Services, No. 13-31302

Finally, BP challenges the Legal-Services Claimant's award because it included $157,500 in revenue that was based on "legal services performed by [its] legal fellows." The Claimant valued its fellows' work at $150 per hour and multiplied that by the number of hours worked over the year. BP contends this

No. 13-31296 c/w Nos. 13-31299, 13-31302

award is inconsistent with the plain language of the Agreement, namely the terms "profit," "earn," "financial performance," and "sales." Most of BP's textual arguments track BP's general attack on the Nonprofit-Revenue Interpretation; revenue is used to calculate a claimant's "actual *profit*" so that it can be compared to what the claimant "might have been expected to *earn*" during the post-spill period. *See supra* Part IV(A)(1). BP also points to Exhibit 4C's definition of the "Benchmark Period," which is chosen by a claimant "as the baseline for measuring its historical *financial* performance." Finally, BP argues that "if *voluntary* services are 'revenue,' it is difficult to discern why *compensated* services would also not be revenue."

We are not persuaded. BP argues that donated legal services are not "revenue" because they "do not enter into" the profit calculation. As the Legal-Services Claimant notes, certain donated services "requir[ing] specialized skills," including legal services, are included as revenue on financial statements prepared under Generally Accepted Accounting Principles (GAAP).[15] Moreover, donated services affect the profit calculation because they free up organizations' cash donations, allowing nonprofits to manage and allocate a greater pool of money. Additionally, these are "earned" within the Agreement for the same reasons discussed in Part IV(A)(1)(b), *supra*; nonprofits have to work to attract skilled professionals to donate their time just as they have to work to obtain cash donations.

---

[15] *See Stolt-Nielsen S.A. v. AnimalFeeds Int'l Corp.*, 559 U.S. 662, 674 n.6 (2010) ("Under . . . general maritime law, evidence of 'custom and usage' is relevant to determining the parties' intent when an express agreement is ambiguous."); Allan B. Afterman, *WG&L GAAP Practice Manual* § 74.3.2 (2015) ("Contributions of services received . . . should be recognized *only* if they . . . [r]equire specialized skills, are provided by individuals having those skills, and would otherwise typically need to be purchased[.] Services requiring specialized skills would include those provided by . . . lawyers . . . .").

No. 13-31296 c/w Nos. 13-31299, 13-31302

BP's final argument—that if the donated legal services are revenue there is no reason why paid services would not also be revenue—obfuscates the crucial point that the legal services fall under the Non-Profit Interpretation precisely because they are *donated*. No party has suggested that non-profit organizations should be able to treat the services of paid employees as revenue; by contrast, the Non-Profit Interpretation, which we uphold here today, specifically instructs nonprofits to include donations in their revenue calculations.

Moreover, BP has not provided, and we do not see, any meaningful reason to distinguish this type of donation from other donations received by nonprofits.[16] Donated legal time is as valuable to the Legal-Services Claimant as a cash donation that would be used to pay for those services. And the loss of these in-kind donations would require the Claimant to divert cash from other operations to pay for the services instead. We therefore find no abuse of discretion in the district court's denial of review of the award to the Legal-Services Claimant.

## V. CONCLUSION

For the foregoing reasons, we AFFIRM the district court.

---

[16] BP asserts that in contrast to "[a]rms-length commercial sales," "voluntary donations of time have no readily discernible value, and are easily manipulated." Considering that these services are assessed when nonprofits prepare financial statements, we are unpersuaded that this award creates serious problems for the settlement process.

# *United States Court of Appeals*

### FIFTH CIRCUIT
### OFFICE OF THE CLERK

**LYLE W. CAYCE**
**CLERK**

**TEL. 504-310-7700**
**600 S. MAESTRI PLACE**
**NEW ORLEANS, LA 70130**

June 01, 2015

Mr. William W. Blevins
U.S. District Court, Eastern District of Louisiana
500 Poydras Street
Room C-151
New Orleans, LA 70130

      No. 13-31296,   Consolidated with 13-31299 and 13-31302
                In Re: Deepwater Horizon
                USDC No. 2:10-MD-2179
                USDC No. 2:12-CV-970

Dear Mr. Blevins,

Enclosed is a copy of the judgment issued as the mandate and a
copy of the court's opinion.

                Sincerely,

                LYLE W. CAYCE, Clerk

                By: _____
                Dantrell L. Johnson, Deputy Clerk
                504-310-7689

cc:  Mr. George Howard Brown
     Ms. Elizabeth Joan Cabraser
     Mr. Jeffrey Bossert Clark, Sr.
     Mrs. Martha Y. Curtis
     Mr. Kevin Michael Downey
     Mr. Edwin Armistead Easterby
     Mr. Michael Joseph Ecuyer
     Mr. Miguel Angel Estrada
     Mr. S. Gene Fendler
     Mr. James M. Garner
     Ms. Laura S. Gibson
     Mr. Soren E. Gisleson
     Mr. Richard Cartier Godfrey
     Mr. Don Keller Haycraft
     Mr. Stephen Jay Herman
     Mr. Thomas George Hungar
     Mr. Samuel Issacharoff
     Mr. Russell Keith Jarrett
     Mr. Matthew Palmer Lambert
     Mr. James Andrew Langan
     Mr. Scott Payne Martin
     Mr. Sean H. McCarthy
     Mr. Kevin Michael McGlone
     Mr. Theodore B. Olson
     Mr. Ronnie G. Penton
     Mr. John Oliver Pieksen, Jr.
     Mr. James Parkerson Roy
     Mr. Zachary Logan Wool