# IN THE UNITED STATES COURT OF APPEALS

## FOR THE FIFTH CIRCUIT

United States Court of Appeals
Fifth Circuit

**FILED**

May 13, 2015

Lyle W. Cayce
Clerk

_____

No. 14-30269

_____

D.C. Docket No. 2:10-MD-2179
D.C. Docket No. 2:13-CV-5804

IN RE: DEEPWATER HORIZON

-------------------------------------------------------------------------

ROBERT YOUNG,

             Plaintiff

ELTON JOHNSON,

             Intervenor Plaintiff - Appellee

v.

BP EXPLORATION & PRODUCTION, INCORPORATED; BP PRODUCTS
NORTH AMERICA, INCORPORATED; BP CORPORATION NORTH
AMERICA, INCORPORATED,

             Defendants - Appellants

Appeals from the United States District Court for the
Eastern District of Louisiana, New Orleans

Before KING, DAVIS, and OWEN, Circuit Judges.

### J U D G M E N T

This cause was considered on the record on appeal and was argued by
counsel.

It is ordered and adjudged that the judgment of the District Court is affirmed in part, vacated and the cause is remanded to the District Court for further proceedings in accordance with the opinion of this Court.

IT IS FURTHER ORDERED that each party bear its own costs on appeal.

PRISCILLA R. OWEN, Circuit Judge, dissenting.

**Certified as a true copy and issued
as the mandate on Jun 04, 2015**

Attest: *Tyle W. Cayce*

**Clerk, U.S. Court of Appeals, Fifth Circuit**

REVISED May 15, 2015

# IN THE UNITED STATES COURT OF APPEALS
## FOR THE FIFTH CIRCUIT

———————

No. 14-30269

———————

United States Court of Appeals
Fifth Circuit

**FILED**

May 13, 2015

Lyle W. Cayce
Clerk

IN RE: DEEPWATER HORIZON

-----------------------------------------------------------------------

ROBERT YOUNG,

        Plaintiff

ELTON JOHNSON,

        Intervenor Plaintiff - Appellee

v.

BP EXPLORATION & PRODUCTION, INCORPORATED; BP PRODUCTS NORTH AMERICA, INCORPORATED; BP CORPORATION NORTH AMERICA, INCORPORATED,

        Defendants - Appellants

———————

Appeals from the United States District Court
for the Eastern District of Louisiana

———————

Before KING, DAVIS, and OWEN, Circuit Judges.

W. EUGENE DAVIS, Circuit Judge:

      Defendants-Appellants BP Exploration & Production, Inc., BP Products North America, Inc., and BP Corporation North America, Inc. (collectively

No. 14-30269

"BP") appeal the district court's judgment in favor of Intervenor/Plaintiff-Appellee Elton Johnson ("Johnson"). The district court, over BP's objection, enforced a putative $2.7 million settlement agreement against BP in Johnson's favor. On appeal, BP asserts that the parties never formed a binding settlement agreement. In the alternative, BP argues that Johnson fraudulently induced BP into entering the settlement agreement, and that Johnson did not satisfy a condition precedent to recovery because he never signed a release. BP also claims that the district court awarded an unreasonable rate of prejudgment interest.

We hold that the parties formed a binding settlement agreement. We also hold that the district court correctly excused Johnson's failure to sign the release document. However, the district court should have held an evidentiary hearing to determine whether Johnson fraudulently induced BP into entering the settlement agreement. We therefore affirm the district court's order in part, but vacate the judgment and remand for further proceedings.

I.

In the wake of the April 2010 Deepwater Horizon explosion,[1] BP reached an agreement with the White House to establish the Gulf Coast Claims Facility ("GCCF"), an independent mechanism created to settle the numerous claims against BP. BP authorized the GCCF and its Claims Administrator, Kenneth R. Feinberg, to act on BP's behalf to fulfill its statutory obligations as a "responsible party" under the Oil Pollution Act of 1990 ("OPA"). BP also

---

[1] The facts of the Deepwater Horizon blowout are set forth in *United States v. BP Exploration & Prod., Inc. (In re Deepwater Horizon)*, 753 F.3d 570, 571 (5th Cir. 2014) and *Lake Eugenie Land & Dev., Inc. v. BP Exploration & Prod., Inc. (In re Deepwater Horizon)*, 732 F.3d 326, 329 (5th Cir. 2013).

No. 14-30269

authorized the GCCF to process certain non-OPA claims involving physical injury or death.

Although BP authorized the GCCF to settle claims on its behalf, BP does not control the GCCF and cannot prevent it from extending settlement offers. However, if the GCCF sends a claimant a determination letter offering the claimant more than $500,000 to settle his or her claims, BP may appeal that offer within fourteen days from the date of the determination letter.

### A.

Intervenor/Plaintiff-Appellee Elton Johnson was a crew member aboard the M/V DAMON BANKSTON, a supply vessel operated by Tidewater Marine, LLC ("Tidewater"). The vessel was mud-roped to the Deepwater Horizon and was off-loading drilling mud on the night of the blowout. Johnson claims that he sustained physical injuries when the explosion rocked the vessel and threw him against a bulkhead. Johnson further claims that the stress from both the explosion and his attempts to save other seamen endangered by the casualty caused him emotional injury, including post-traumatic stress disorder.

Johnson sued BP for negligence in Louisiana state court in May 2010.[2] BP removed the case to the United States District Court for the Eastern District of Louisiana.

While Johnson's case remained pending before the district court, he submitted his claim to the GCCF. His submission included voluminous medical records from a number of healthcare providers. Those records suggested that, as a result of the explosion, Johnson suffered back and shoulder pain; reduced range of motion; popping or crunching in the shoulderblade; headaches; hearing problems; a cerebral concussion or other brain injury; anxiety;

---

[2] Johnson also sued Tidewater for maintenance and cure in the same case.

No. 14-30269

irritability; depression; hallucinations; nightmares and sleeping problems; memory problems; temporary hearing loss; tinnitus; and post-traumatic stress disorder. Those medical records also indicated that Johnson was taking a number of prescription medications both for his physical pain and his psychological conditions. Johnson's submission to the GCCF also contained a report from a rehabilitation/vocational specialist indicating that Johnson was vocationally disabled and therefore unable to work for the indefinite future. Johnson also submitted his past medical expense records, estimates of his future medical costs, and an economic appraisal quantifying how his injury affected his earning capacity.

The GCCF analyzed Johnson's submission and calculated his damages as follows:

> The claimant's final payment offer is comprised of total economic loss, total medical expenses and non-economic loss. The claimant's economic loss of $758,452 is the projected loss of income through the claimant's remaining work life. The claimant's medical expenses are composed of $25,568 past medical expenses and $271,843 future medical expenses for a total of $297,411. The claimant's non-economic loss calculation is $750,000 plus 3 times the medical expenses ($297,411 x 3 = $892,233) for a total non-economic loss of $1,642,233.

The GCCF therefore concluded that Johnson was entitled to receive a total of $2,698,095 as a result of his alleged injuries.

On September 23, 2011, the GCCF sent Johnson a Determination Letter containing the following language:

> The amount of the Final Payment Offer ("Final Payment Offer")[] is **$2,698,095.00**, which is the amount that can be paid now if you decide to accept the Final Payment Offer and you sign a Release and Covenant Not to Sue (the "Release"). . . . If you want to be paid the Final Payment Offer and fully resolve the entire claim now, you can accept the Final Payment Offer.

4

No. 14-30269

The Determination Letter instructed Johnson:

> To accept the Final Payment Offer, check the box on the Election Form indicating that you accept the Final Payment Offer, sign it and return it to the GCCF no later than 90 days after the date of this Letter. We will then send you a Release to be signed and returned to be paid the Final Payment Amount. . . .

> BP will have the right to appeal to [a] panel of three neutrals because the total monetary award is $500,000 or more. . . . [P]ayment of the Final Amount will not be made until the expiration of the 14-day period for the right of an appeal of this claim by BP. The expiration of the right of an appeal is 14 days from the date of this Letter.

Johnson signed the Final Payment Election Form the day after he received the Determination Letter. He checked the box on the Form indicating that he "elect[ed] to be paid the Final Payment Offer" and understood that "the GCCF w[ould] send [him] a Release and Covenant Not to Sue that [he] must sign and return to be paid." Johnson timely submitted the signed, completed Final Payment Election Form to the GCCF.

## B.

On October 3, 2011, after Johnson submitted the Final Payment Election Form to the GCCF, but before BP's fourteen-day appeal period expired, BP sent Tidewater a letter explaining that the GCCF had offered to settle Johnson's claim, and that BP expected Tidewater to indemnify it for the entire settlement amount.

Tidewater strenuously objected. On October 5, 2011, Tidewater responded with a letter stating that, "[b]ased on the file materials we have, the settlement offered by the GCCF in the amount of nearly $2.7 million is excessive and unreasonable given the defenses to Johnson's claim that are available to Tidewater and BP, and the medical records Tidewater has been

No. 14-30269

provided." Notably, however, Tidewater's letter does not state that it had any reason to believe that Johnson fabricated his injury claims – the letter merely expressed Tidewater's belief that the Final Payment Amount was "excessive and unreasonable." Tidewater "request[ed] in the strongest terms that BP appeal the settlement."

BP responded that it "w[ould] not appeal the GCCF's settlement with Mr. Johnson." As a result, the fourteen-day appeal window closed without BP appealing the Final Payment Offer.

## C.

On October 20, 2011, after BP's appeal period expired, Tidewater's counsel sent the GCCF a letter, complete with documentary exhibits, explaining that it had investigated Johnson's personal injury claims and had reason to believe they were fabricated.

Tidewater first pointed out that the sworn statements of other crew members on the vessel at the time of the explosion directly contradicted Johnson's version of events. One crewman maintained "that Johnson was not thrown, did not fall, did not lose consciousness or make any statement or complaint that he had been struck" at the time of the explosion. "Because of the drilling mud on the deck" of the vessel, Johnson "would have been covered in the mud" if he had fallen, yet two crewmen "reported that Johnson was not covered with any mud" after the explosion.

Another crewman stated that, on the morning after the explosion, he asked Johnson

> if [he was] OK after the previous night's events. Although Johnson stated that he did not sleep well, he specifically denied that he was injured. On several occasions during that day, Johnson (and the remainder of the Tidewater crew) were asked if they were injured and, each time, Johnson denied injury. Johnson performed his

6

No. 14-30269

assigned tasks that day without incident or issue, never complaining to anyone of any injury.

Tidewater further stated that, "[h]ad Johnson been injured or involved in any incident, it is standard Tidewater policy to prepare an accident report. No such report was prepared," and Johnson in fact "specifically denied that he had been injured."

Tidewater also opined that Johnson told several physicians inconsistent versions of the events leading to his alleged injuries. According to Tidewater, Johnson's various accounts differed with respect to (1) whether the explosion threw him against a door or merely caused him to fall down; (2) the distance he was thrown; (3) whether or not he lost consciousness; (4) whether he reported seeing hallucinations at the time of his alleged injury; and (5) the location on the vessel where the injury occurred.

### D.

A week after the GCCF received Tidewater's letter, it retained Guidepost Solutions LLC ("Guidepost") to investigate Johnson's case. On January 24, 2012, Guidepost issued a report concluding that Johnson's claim was unsubstantiated. Guidepost concluded that there was "no credible evidence Johnson suffered injuries as a result of the incident, and multiple fellow crew members, one of whom was standing alongside Johnson at the time of the explosion, disputed the events and injuries Johnson later reported."

Guidepost's investigation corroborated the evidence that Tidewater set forth in its letter to the GCCF. Guidepost found that

> [a]ll crew members were individually questioned shortly after the incident about any injuries they might have sustained, and Johnson never mentioned having been hurt. Additionally, Louis Longlois, who was with Johnson when the explosion occurred, disputed Johnson's claims of being thrown into a door and being

No. 14-30269

rendered dazed or unconscious. Johnson's behavior on the day of the explosion and immediately thereafter is inconsistent with statements attributed to him regarding his purported injuries.

Additionally, Guidepost's report recounts the following exchange Johnson allegedly had with Bill Wayne Marsh, a seaman on the vessel, shortly after the explosion:

> Marsh said that once all of the survivors were pulled from the water and safely on deck, he saw Johnson again; during this meeting Johnson reportedly told Marsh he was going to "get some money out of Tidewater." Marsh recalled that he asked Johnson if he was hurt and that Johnson replied, "No, but everyone on the rig is going to get some money. Why not me?" Marsh said he then asked Johnson, "How do you expect to get money if you are not hurt?" According to Marsh, Johnson replied, "I'm all shook up." Marsh said Johnson never told him he was actually injured as a result of the explosion or the rescue operation.[3]

Guidepost also interviewed Johnson:

> Johnson described his injuries at the time of the incident as a headache and stated that he did not realize he was injured until the following day when he was back at the Tidewater office in Amelia, Louisiana. Johnson stated that he never advised anyone he was injured until then. . . .

> Johnson insisted that no one ever inquired as to his well-being or if he was injured at any time while on the vessel or on land . . . .

> When asked about the conflicting statements he had provided to several of the different attending physicians regarding what happened to him during the explosion, Johnson explained that the doctors were all mistaken. Johnson could not explain the differences in his statements to physicians about the nature and extent of his injuries. Johnson refused to state that he was knocked "unconscious" as in being "knocked out." Instead he explained his condition as an "altered state," after his attorney, Cory Itkin,

---

[3] The report noted, however, that Marsh exhibited poor recollection regarding many of the events surrounding the explosion.

No. 14-30269

suggested that was what had happened to him. Johnson continued
to insist that the explosion knocked him back six feet.

Johnson denied speaking to the Associated Press, which had
reported that he claimed to have been thrown seven feet into
an engine room door and that he was knocked unconscious. Johnson's
attorney, Itkin, suggested that Johnson's former attorneys, Steve
Herman and Eddie Knoll[,] may have provided this information to
the press.

As a result of its investigation, Guidepost concluded that "Johnson's claims of
physical injury as a result of the Deepwater Horizon explosion appear to be
fabricated." Nevertheless, Guidepost also concluded that "Johnson did not
submit any overtly fraudulent document," so "a Finding of Potetnial [sic] Fraud
is not supported by this investigation."

## E.

After reviewing Guidepost's investigative report, the GCCF issued a
denial letter to Johnson (the "Denial Letter") on February 22, 2012. The Denial
Letter informed Johnson that the GCCF "has terminated its process with
respect to Mr. Johnson's claim, will not send Mr. Johnson a Release and
Covenant Not to Sue for his signature, and, accordingly, will not issue to Mr.
Johnson a Final Payment for his submitted claim."

BP never sent Johnson a Release to sign, and it has refused to pay
Johnson the Final Payment Amount. Johnson insists he would have signed the
Release if the GCCF had sent it to him.

## F.

Displeased with BP's refusal to consummate the settlement, Johnson
intervened in *Young et al. v. BP Exploration & Production Inc. et al.*, a Texas
state court suit filed by another injured seaman represented by the same

No. 14-30269

plaintiff's attorney.[4] Johnson candidly admits that he took this unusual procedural step in an attempt to quickly get his claim heard by a court. Johnson's petition in intervention asserted claims of breach of contract, negligent misrepresentation, and tortious interference relating to BP's refusal to honor the putative settlement agreement.

BP removed *Young* to the United States District Court for the Southern District of Texas on March 30, 2012. Before the Judicial Panel on Multidistrict Litigation could decide whether to transfer *Young* to the Eastern District of Louisiana with the other Deepwater Horizon cases, the district court granted summary judgment in BP's favor. The court concluded that the parties never formed a valid settlement agreement because "the lack of a signed release prevented the formation of a contract." The court therefore ruled that "Johnson will take nothing from BP."

### G.

Johnson appealed the district court's summary judgment order. A panel of this Court ruled

> that the practical and prudent course of action in this case is to vacate the judgment of the district court and have that court transfer this case to the Eastern District of Louisiana for disposition there . . . .
>
> We are especially reluctant to decide the question of whether a binding settlement agreement arose here, given the complexities of the BP litigation and the administrative handling of related tort claims and settlement processes. We recognize that there should be some uniformity as to the manner in which such questions are answered – without consistency, we may be faced with serious and

---

[4] On appeal, BP does not challenge the propriety of Johnson's intervention in *Young*. Mr. Young settled his claims against BP and his employers, leaving only Johnson in the case. As a result, the case has essentially become a simple two-party dispute with Johnson on one side and BP on the other.

No. 14-30269

disruptive unintended consequences. The proper way to insure this case is decided in a manner that does justice to all the parties involved – as well as those others affected by the *Deepwater Horizon* incident – is to refer the matter back to the court in which it arose. That court has detailed knowledge of all the aspects of the BP litigation and settlement programs, and is in the best position to decide this issue in a way that is consonant with the handling of this multitudinous litigation. Accordingly, we vacate the judgment of the district court and remand with instructions to the district court to transfer this case to the Eastern District of Louisiana.[5]

## H.

With the case back before the Eastern District of Louisiana, Johnson moved the court to summarily enforce the putative settlement agreement with BP. BP opposed Johnson's motion and filed its own motion for summary judgment.

On March 10, 2014, the district court granted Johnson's motion and denied BP's motion.[6] The court reached its decision without holding an evidentiary hearing. Unlike the United States District Court for the Southern District of Texas, the court ruled that

> there is undisputed evidence that a binding settlement agreement was reached between Elton Johnson and the GCCF acting on behalf of BP. The agreement was to pay the total sum of $2,698,095 to Johnson in full settlement of all of his personal injury claims arising out of the DEEPWATER HORIZON casualty. In exchange, Johnson agreed to waive and release all potential claims against not only BP, but against any other party who might be liable in the casualty . . . The arguments made by BP in its attempt to avoid payment of the settlement are unavailing.

---

[5] *BP Exploration & Prod., Inc. v. Johnson*, 538 F. App'x 438, 439-40 (5th Cir. 2013).

[6] Although Johnson also filed a motion to remand the case, neither the Eastern District of Louisiana nor the Southern District of Texas ruled on that motion before addressing the merits of the parties' arguments. After reviewing the record and the applicable law, however, we are satisfied that we may exercise subject matter jurisdiction over the case.

No. 14-30269

The court therefore entered a judgment enforcing the settlement and awarding "costs and interest at a rate of 5% per annum from October 10, 2011 until paid."

BP now appeals that judgment. BP asks the Court to

> reverse the judgment below and direct the district court to grant BP's motion for summary judgment – either because no contract was formed or because any contract included the execution of the GCCF release as a condition for payment.

> Alternatively, BP requests that the Court vacate the grant of summary judgment to Johnson as improper and remand for a resolution of BP's fraud-in-the-inducement defense. Finally, whatever occurs on the merits, the interest rate should be remanded or reduced.

## II.

The parties first dispute the applicable standard of review, as well as the proper way to characterize the procedural posture of the case. Johnson argues that the district court granted a motion to enforce a settlement agreement, which we must review under the deferential abuse of discretion standard. BP, by contrast, maintains that the district court actually granted summary judgment in Johnson's favor, so we should review that judgment *de novo*.

Neither party is fully correct. A district court may summarily enforce a settlement agreement if no material facts are in dispute,[7] and in such circumstances we review the district court's order for abuse of discretion only.[8] However, "when opposition to enforcement of the settlement is based not on the merits of the claim but on a challenge to the validity of the agreement itself,

---

[7] *Mid-South Towing Co. v. Har-Win, Inc.*, 733 F.2d 386, 390 (5th Cir. 1984) (citing *Autera v. Robinson*, 419 F.2d 1197, 1200 (D.C. Cir. 1969)).

[8] *Harmon v. Journal Publ'g Co.*, 476 F. App'x 756, 757 (5th Cir. 2012).

No. 14-30269

the parties must be allowed an evidentiary hearing on disputed issues of the validity and scope of the agreement."[9]

> This central issue – whether there was any disputed issue of material fact as to the validity of the settlement agreement[] – is similar to that which any court must address when ruling on a motion for summary judgment. This is not mere coincidence. The stakes in summary enforcement of a settlement agreement and summary judgment on the merits of a claim are roughly the same – both deprive a party of his right to be heard in the litigation.[10]

Because BP challenges the validity of its putative settlement agreement with Johnson, we will "treat [BP's] assertions as true, and will affirm the district court only if [Johnson] is entitled to enforcement of the agreement[] as a matter of law."[11] If not, we must remand for an evidentiary hearing[12] regarding the validity of the settlement agreement, because the district court did not hold one in this case.[13]

III.

Because Johnson alleged causes of action under general maritime law and the Jones Act against BP, federal contract law governs the validity and enforceability of Johnson's putative settlement agreement with BP.[14] However,

---

[9] *Mid-South*, 733 F.2d at 390 (citing *Autera*, 419 F.2d at 1200).

[10] *Tiernan v. Devoe*, 923 F.2d 1024, 1031 (3d Cir. 1991) (internal citations omitted).

[11] *Id.* at 1032.

[12] In this respect, a contested motion to enforce a settlement agreement differs from a motion to summary judgment, which would instead result in remand for a trial on the merits if the non-movant identified a genuine issue of material fact.

[13] *See Mid-South*, 733 F.2d at 390 (citing *Autera*, 419 F.2d at 1200).

[14] *Borne v. A & P Boat Rentals No. 4, Inc.*, 780 F.2d 1254, 1256 (5th Cir. 1986) (citations omitted).

BP argues that Louisiana rather than federal law applies because the Release, which BP never mailed to Johnson and Johnson never signed, contains a choice of law clause. We need not decide whether that choice of law clause binds us here. BP does not argue that the result of the case would differ under Louisiana law, and in any event BP relies heavily on cases from outside Louisiana.

13

No. 14-30269

"the federal common law of release is largely undeveloped,"[15] and federal contract law is largely indistinguishable from general contract principles under state common law.[16] Thus, in reaching our decision, we will rely not only on federal cases, but also on treatises and state contract law cases to the extent we find them persuasive.

IV.

BP argues that, for numerous reasons, the parties never formed a binding settlement agreement. As explained below, none of BP's arguments have merit.

A.

The parties first contest whether an offer and acceptance occurred in this case. Johnson argues that the Determination Letter constituted a valid offer to settle Johnson's claims, and he accepted that offer by submitting the Final Payment Election Form. Because BP did not appeal the GCCF's offer within the fourteen day window, Johnson insists that the parties formed an enforceable settlement agreement. BP responds that the Determination Letter was merely "a potential settlement *valuation*," not an offer. According to BP, since the release of Johnson's claims "represents the entire benefit of the bargain for BP, the release *is* the contract." Thus, BP argues, the GCCF cannot extend a valid offer until it mails a formal release to the claimant, and the claimant cannot accept the offer until he or she signs that release. Because

---

[15] *See Hisel v. Upchurch*, 797 F. Supp. 1509, 1518 (D. Ariz. 1992).

[16] *See, e.g.*, *Flores v. Koster*, Civil No. 3:11-CV-0726-M-BH, 2013 WL 6153280, at *3 (N.D. Tex. Nov. 22, 2013); *United States ex rel. Osheroff v. MCCI Group Holdings*, No. 10-24486-cv-SCOLA, 2013 WL 3991964, at *3-4 (S.D. Fla. Aug. 2, 2013); *Hisel*, 797 F. Supp. at 1518.

14

No. 14-30269

neither of those events occurred in this case, BP maintains that the parties never formed a contract.

We agree with Johnson. An offer is judged by the parties' overt acts and words, not by the subjective or secret intent of the offeror.[17] Here, a reasonable person would construe the Determination Letter as an offer because it repeatedly uses the language of offer and acceptance. The Determination Letter repeatedly states that the GCCF, on BP's behalf, is extending a "Final Payment *Offer*," and informs Johnson: "To *accept* the Final Payment Offer, check the box on the Election Form indicating that you accept the Final Payment Offer, sign it and return it to the GCCF no later than 90 days after the date of this Letter." Because Johnson did just that, and BP did not timely appeal, the parties formed a contract.

Furthermore, "[a] settlement is valid and enforceable even if it contemplates the parties signing a release at a later date"[18] unless the parties explicitly provide that a valid contract will not be formed until the parties execute a formal, finalized agreement.[19] Even if one party ultimately fails to execute or sign the final formal release documents, that does not void the original agreement or render it deficient from the outset.[20] Here, the Determination Letter states that the GCCF will send Johnson a Release only *after* he has accepted the offer: "To accept the Final Payment Offer, check the box on the Election Form indicating that you accept the Final Payment Offer, sign it and return it to the GCCF no later than 90 days after the date of this

---

[17] 1 WILLISTON ON CONTRACTS § 4.1 (4th ed. 2014).

[18] *Davison v. Bay Area Credit Serv., LLC*, No. 12-03411-CV-S-DGK, 2013 WL 627003, at *1 (W.D. Mo. Feb. 20, 2013) (citations omitted). *Accord, e.g.*, *Mastroni-Mucker v. Allstate Ins. Co.*, 976 A.2d 510, 522 (Pa. Super. Ct. 2009) (citations omitted).

[19] *See Gen. Metal Fabricating Corp. v. Stergiou*, 438 S.W.3d 737, 747-48 & n.8 (Tex. App. 2014) (citations omitted); 15A C.J.S. COMPROMISE & SETTLEMENT § 21 (2014).

[20] *May v. Anderson*, 119 P.3d 1254, 1256, 1259 (Nev. 2005); *Hagrish v. Olson*, 603 A.2d 108, 110 (N.J. Super. Ct. App. Div. 1992).

No. 14-30269

Letter. *We will then send you a Release* to be signed and returned *to be paid the Final Payment Amount*." Because the Determination Letter does not state that a signed release is a prerequisite to *contract formation* (as opposed to a prerequisite to *payment*), the fact that Johnson ultimately did not sign the Release is immaterial to the question of whether the parties formed a binding contract.

BP insists that, even if the language in the Determination Letter would create an offer in the context of a typical settlement reached on the courthouse steps, it cannot create an offer in the context of proceedings before the GCCF. BP maintains that it, along with the White House, established the GCCF as a "sui generis" exception to the ordinary rules of contract formation. Thus, claims BP, only a signed release could constitute an offer and acceptance, notwithstanding the Determination Letter's repeated use of the words "offer" and "accept."

We disagree. Claims resolution facilities like the GCCF are far from "sui generis" – they are routinely established in large mass tort cases.[21] BP has not identified, and we have not found, any authority for the proposition that otherwise unambiguous offer language is less likely to create a binding contract in the mass tort claims resolution facility context than in a typical litigation environment, or that an objective person would not consider the Determination Letter an offer under these circumstances.

BP also argues that, if the GCCF offered to settle Johnson's claim without first sending him a release, it would be acting outside of its authorization. In support of its argument, it points to language in the GCCF's governing protocol and rules that, in its view, demonstrates that "the execution

---

[21] *See* Deborah R. Hensler, *Alternative Courts? Litigation-Induced Claims Resolution Facilities*, 57 STAN. L. REV. 1429, 1430-31 (2005).

No. 14-30269

of a release is not just a condition on payment but on acceptance itself." BP argues that, because that these protocols and rules were publicly available to claimants, and because Johnson agreed to be bound by those rules by voluntarily submitting his personal injury claim to the GCCF, an objective person in Johnson's position would not consider the Determination Letter an offer.

Again, we disagree. The language BP cites from the protocol and rules only confirms our interpretation that a signed release is a condition precedent to *payment*, not to contract formation.[22] Moreover, the Protocol and Rules state, on at least four separate occasions, that "[a] claimant has the right to consult with an attorney of his or her choosing prior to accepting any settlement *or signing a release of legal rights*." This language makes it clear that an acceptance of the settlement offer is independent of signing the Release.

Thus, because Johnson accepted the offer in the Determination Letter by its own terms by timely submitting the Final Payment Election Form and agreeing to subsequently sign the Release, and because BP declined to appeal that offer within the fourteen-day period, both an offer and acceptance occurred.

## B.

BP next argues that the Determination Letter could not create a valid contract because it lacked material terms: namely, the exact terms of the Release. According to BP, the personal injury release terms were not publicly available, so Johnson could not have known what they were in advance. Thus,

---

[22] *See* ROA 3972 ("*To receive a Final Payment*, a claimant will be required to sign a release . . ."); *id.* at 3964 ("Accepting *a final payment* requires the Claimant to sign a release of past and future claims.").

No. 14-30269

argues BP, the parties could not have reached a meeting of the minds as to the essential terms of the contract.

A putative contract is unenforceable if it lacks material or essential[23] terms.[24] Release provisions are generally – though not always – material terms of settlement agreements.[25] However, even where the *existence* of a release is material, the *precise terms and specific language* of the release are not necessarily material.[26] Consequently, "even where the scope of the release is disputed, . . . courts routinely enforce settlement agreements even where the precise wording of a release has not been finalized."[27] This remains true even when one of the parties ultimately fails to sign the finalized release.[28]

---

[23] The terms "essential" and "material" are effectively synonymous in this context. *See Gen. Metal*, 438 S.W.3d at 744 n.4.

[24] *See* 17 C.J.S. CONTRACTS § 91 (2014).

[25] *See, e.g., Dillard v. Starcon Int'l, Inc.*, 483 F.3d 502, 508-09 (7th Cir. 2007).

[26] *See Blackstone v. Brink*, Civil Action No. 13-cv-0896 (KBJ), 2014 WL 3896018, at *9 (D.D.C. Aug. 11, 2014) (citations omitted) ("[W]hile the general agreement to release Plaintiffs' claims against Defendant Brink was a material element of the settlement agreement, the specific language of the release form was not."); *Schaffer v. Litton Loan Servicing, LP*, No. CV 05-07673 MMM (JCx), 2012 WL 10274678, at *15 (C.D. Cal. Nov. 13, 2012) ("[C]ourts generally find there is agreement on all of the material terms of settlement where the parties have agreed upon the monetary amount of the settlement payment and the fact that plaintiffs will release specific claims. Agreement on the precise terms of a written settlement agreement [or] precise release language . . . is not required."); *Nicholas v. Wyndham Int'l, Inc.*, Civil No. 2001-147, 2007 WL 4811566, at *4 (D.V.I. Nov. 20, 2007) (citations omitted) ("[C]ourts routinely enforce settlement agreements even where the precise wording of a release has not been finalized."); *McDonnell v. Engine Distribs.*, Civil Action No. 03-1999, 2007 WL 2814628, at *8 (D.N.J. Sept. 24, 2007) ("The disputed terms[] concerning the scope of the release . . . all speak to the settlement's implementation. They are not, however, essentials of the settlement."); *Carlson v. State Farm Mut. Auto. Ins. Co.*, 76 F. Supp. 2d 1069, 1076 (D. Mont. 1999) ("Although the *release* was a material element, the *terms* of the release were not." (emphasis added)).

[27] *Mastroni-Mucker*, 976 A.2d at 521 n.5 (citations omitted).

[28] *See May*, 119 P.3d at 1256, 1259; *Hagrish*, 603 A.2d at 110.

Without contending that the Release included any material terms that Johnson could not have reasonably expected, the dissent suggests that the requirement that Johnson sign a release before BP and the GCCF disclosed the terms of that release prevented the formation of a contract. As the cases cited above demonstrate, however, even where the parties have not yet agreed to the precise terms and language of the release, they may nonetheless form a binding settlement agreement by agreeing to both the existence of a release and the amount of payment. Indeed, in the real world of tort litigation, it would be difficult to operate any

18

No. 14-30269

Here, the Determination Letter contained the following description of the release that the GCCF promised to send Johnson if he accepted the offer:

> The Release waives and releases any claims for bodily injury that you have or may have in the future against BP and all other potentially responsible parties with regard to the Oil Spill, and prevents you from submitting any bodily injury claim seeking payment from a court.

This description fully apprises Johnson of both the existence of the Release and its breadth. The GCCF's decision to include these details of the scope of the Release further indicates that it sought to include all material terms of the settlement in its offer so that the settlement would be binding on Johnson once he signed and returned his acceptance. As a result, the Determination Letter contained all material terms. We cannot accept BP's argument that a binding settlement agreement was not perfected simply because the GCCF planned to send Johnson a formal release after Johnson accepted all the terms of the Final Payment Offer.

The cases BP cites in support of its argument are readily distinguishable. In *Nascimento v. Wells Fargo Bank, NA*,[29] for example, the court held that the parties never formed a valid settlement agreement because the parties never agreed to the essential terms of the contract's release provision.[30] In that case, however, the defendant mailed the plaintiff four separate acceptance letters, each containing radically different release provisions which in turn differed from the release terms contained in the plaintiff's offer letter.[31] The court therefore concluded that the parties never reached a meeting of the minds on

---

differently; when an attorney, with his or her client's consent, agrees to settle a case for a sum certain, the plaintiff inevitably realizes that the defendant has bought its peace, and will expect to sign a release that will discharge the defendant in the broadest terms.

[29] No. 2:11–CV–1049 JCM (GWF), 2013 WL 6579575 (D. Nev. Dec. 13, 2013).

[30] *Id*. at *2-4.

[31] *Id*. at *3.

No. 14-30269

the release terms.[32] Here, by contrast, there exists a single release description in the Determination Letter, and it previewed the Release's essential terms to Johnson. The other case BP cites, *Corilant Financial*, involved a disputed earn-out payment provision in a proposed acquisition agreement, and therefore casts little light on whether a description of a release in a settlement offer contains all material terms.[33]

BP nevertheless maintains that the parties could not have reached a meeting of the minds because the GCCF's formal release document contains terms that go far beyond those described in the thumbnail description in the Determination Letter. According to BP, the Determination Letter did not inform Johnson that (1) the Release applies to emotional injury as well as bodily injury claims; (2) the Release "extends to claims held by the releasing party's spouse, parents, heirs, estate, and other beneficiaries;" and (3) the Release contains a two-page list of released parties that are not explicitly mentioned in the Determination Letter, including Johnson's employer, Tidewater.[34] BP emphasizes that, whereas the description of the Release in the Determination Letter consists of a single sentence, the Release contains nine pages of detailed release terms. Thus, argues BP, Johnson could not have predicted these terms in advance, so he could not have agreed to all of the material terms of the settlement agreement at the time he submitted the Final Payment Election Form.

We disagree. The description of the Release in the Determination Letter is particularly broad; it informs Johnson that he will be releasing all claims

---

[32] *Id.*

[33] *See Fiduciary Fin. Servs. of S.W., Inc. v. Corilant Fin., L.P.*, 376 S.W.3d 253, 256-58 (Tex. App. 2012).

[34] BP also argues in passing that the Determination Letter is missing an additional essential term: a choice of law clause that is present in the Release. Because BP does not explain why this term is material, we conclude that BP has waived this argument on appeal.

No. 14-30269

arising from the Deepwater Horizon explosion against all potentially responsible parties.[35] Johnson was represented by zealous and competent counsel at the time he accepted the Final Payment Offer. Johnson therefore would have anticipated that the Release would be lengthy and exhaustive, and that it would encompass any and all legal claims arising from the incident that he or his successors might bring on his behalf against any defendant. Moreover, Johnson must have expected that the term "bodily injury" would include his emotional injury claims because he submitted copious psychological records to the GCCF. The Release therefore does not contain any terms that Johnson could not have anticipated. Thus, the parties reached a meeting of the minds as to all essential terms of the settlement agreement.

## C.

BP also argues, and the dissent agrees, that the settlement agreement fails for lack of mutual consideration. BP claims that, if the parties' roles were reversed, and BP was trying to enforce the putative settlement agreement against Johnson, no court would force Johnson to sign a release he had never seen, given the law's solicitude for seamen as wards of admiralty. Thus, argues BP, if BP could not force Johnson to release his claims under the facts of this case, then Johnson should not be able to force BP to give him the Final Payment Amount.

In support of its argument, BP relies on the following language in the GCCF's internal protocols: "A claimant has a right to consult with an attorney of his or her choosing prior to . . . signing a release of legal rights." According to BP, this language necessarily means that a claimant could permissibly

---

[35] We reject BP's argument that an objective seaman would most naturally interpret the incredibly broad phrase "all other potentially responsible parties" to only include parties who would constitute "responsible parties" as that term is defined by OPA.

No. 14-30269

decline to sign the release after accepting a final payment offer if he or she so chose. Thus, claims BP, an enforceable settlement agreement cannot arise under the GCCF's rules until the claimant actually signs a release.

Johnson has no quarrel with any of the Release's terms, and there is no question that he is willing and ready to sign the Release in its current form and settle all of his claims against all potentially responsible parties. But even if the roles were reversed, we reject BP's premise that it would be unable to require Johnson to sign the Release. A settlement will be enforced against a seaman if he "relinquished his rights with an informed understanding of his rights and a full appreciation of the consequences when he executed a release."[36] "The adequacy of the consideration is just one factor, along with the adequacy of legal representation, and whether the parties negotiated in good faith, or if there is the appearance of fraud or coercion."[37]

We have no doubt that these factors would favor enforcement of the settlement agreement against Johnson if the parties' roles were reversed.[38] Johnson stands to receive generous consideration in exchange for the release of his claims.[39] Johnson is represented by competent and zealous counsel. There is no suggestion of bad faith, coercion, or fraud on the part of BP. Most importantly, as explained above, the description of the Release in the Determination Letter sufficiently apprised Johnson of the consequences of accepting the settlement agreement, as the Release does not contain any terms that Johnson could not reasonably have expected. Thus, Johnson relinquished

---

[36] *Stipelcovich v. Sand Dollar Marine, Inc.*, 805 F.2d 599, 606 (5th Cir. 1986) (citing *Bass v. Phoenix Seadrill/78, Ltd.*, 749 F.2d 1154, 1161 (5th Cir. 1985)).

[37] *Id.* (internal citations omitted).

[38] *See Strange v. Gulf & S. Am. S.S. Co.*, 495 F.2d 1235, 1236-37 (5th Cir. 1974) (enforcing settlement agreement against seaman even though seaman refused to execute release).

[39] *See Durden v. Exxon Corp.*, 803 F.2d 845, 848 (5th Cir. 1986)

22

No. 14-30269

his rights with a full understanding of the consequences at the time he accepted the Final Payment Offer. Finally, the cases BP cites in support of its argument that it could not force Johnson to sign the Release if the roles were reversed all involve facts very different than those presented here.[40]

BP claims, and the dissent agrees, that the language in the GCCF's protocols advising the claimant to seek legal counsel before signing the Release necessarily implies that a seaman could freely refuse to execute a release after submitting the Final Payment Election Form. We disagree. Even if a claimant could not refuse to sign the Release after accepting a settlement offer, that does not mean that an attorney's advice would necessarily be valueless. For instance, the attorney could review the Release to make sure it comports with the description in the Determination Letter upon which the parties agreed. In this case, the release language follows from the thumbnail description in the Determination Letter, so BP could require Johnson to sign it if the parties' roles were reversed.

In support of its argument that BP could not have forced Johnson to sign the Release if he declined to do so after submitting the Final Payment Election Form, the dissent cites the following language from the Release:

> You are under no obligation to accept the final payment offered to you by the Gulf Coast Claims Facility ("GCCF"). You are free to reject the final payment offered by the GCCF and to pursue other means of compensation. *If you want to file a lawsuit regarding the incident do not sign the Release.*[41]

---

[40] *See Castillo v. Spiliada Mar. Corp.*, 937 F.2d 240, 243 (5th Cir. 1991) (holding that district court erred in ruling that seamen's releases were valid as a matter of law where seamen presented evidence of language barriers, coercion, and inadequacy of the source and quality of legal counsel); *Halliburton v. Ocean Drilling & Exploration Co.*, 620 F.2d 444, 445 (5th Cir. 1980) (holding that seaman demonstrated genuine issue of material fact as to validity of release where seaman was not represented by counsel and suffered diminished mental capacity).

[41] (Emphasis added).

23

No. 14-30269

If that language was present in the offer letter, the dissent's argument would have significantly more force. But it is not; the language comes from the Release itself, which the GCCF never sent to Johnson, and Johnson never saw. Again, an offer is judged by the parties' overt acts and words, not by the subjective or secret intent of the offeror.[42] As explained above, all of the documents that Johnson and the GCCF actually exchanged manifest the parties' intent to form a contract to settle Johnson's claims and release BP from liability. Thus, BP could have held Johnson to the material terms of the Release, so the settlement agreement does not fail for lack of mutuality.

In sum, each of the aforementioned challenges to contract formation fail.

## V.

BP argues in the alternative that, even if a signed release was not a condition precedent to *formation* of a settlement agreement, it is at least a condition precedent to *payment* under the contract. Because Johnson never signed the Release, BP argues that Johnson may not recover the Final Payment Amount. Johnson responds that, because BP refused to mail the Release to Johnson, the doctrine of prevention excuses Johnson's failure to sign the Release.

"A condition precedent is either an act of a party that must be performed or a certain event that must happen before a contractual right accrues or a contractual duty arises."[43] "[T]he failure of a condition to occur excuses performance by the party whose performance is dependent on its occurrence."[44]

---

[42] 1 WILLISTON ON CONTRACTS § 4.1 (4th ed. 2014).

[43] 13 WILLISTON ON CONTRACTS § 38:7 (4th ed. 2014).

[44] *Id.*

No. 14-30269

However, "[f]ulfillment of a contract promise . . . is not excused by failure of a condition . . . which the promisor himself causes to happen."[45] "It is a principle of fundamental justice that if a promisor is himself the cause of the failure of performance, either of an obligation due him or of a condition upon which his own liability depends, he cannot take advantage of the failure."[46] This is known as the doctrine of prevention.[47]

The Determination Letter that BP sent to Johnson states: "The amount of the Final Payment Offer . . . is $2,698,095.00, which is the amount that can be paid now if you decide to accept the Final Payment Offer *and you sign a Release and Covenant Not to Sue (the "Release")*." Thus, BP is correct that a signed release is a condition precedent to payment under the contract that has gone unfulfilled.

Nevertheless, BP's refusal to send Johnson the Release excuses his failure to sign it. The Determination Letter states that, if the claimant timely submits the Final Payment Election Form, and if BP opts not to appeal the settlement within fourteen days of the date of the Determination Letter, "*[w]e then will send you a Release* to be signed and returned to be paid the Final Payment Amount." Johnson submitted the Final Payment Election Form, BP did not exercise its appellate rights, and the GCCF never mailed the Release as promised. Johnson would have signed the release if the GCCF sent it to him. Thus, the GCCF – and, by extension, BP – prevented Johnson from signing the Release, which excuses his failure to do so.[48] Thus, the fact that Johnson never signed the Release does not categorically bar him from recovering under the agreement.

---

[45] *Ballard v. El Dorado Tire Co.*, 512 F.2d 901, 907 (5th Cir. 1975).

[46] *Id*.

[47] *E.g.*, *W & G Seafood Assocs., L.P. v. E. Shore Mkts.*, 714 F. Supp. 1336, 1341 (D. Del. 1989).

[48] *See Ballard*, 512 F.2d at 907.

No. 14-30269

BP responds that an exception to the doctrine of prevention exists when the party does not "improperly" prevent the condition precedent from occurring. According to BP, its refusal to send Johnson the Release was not "improper," so the doctrine of prevention does not excuse his failure to sign the Release. We need not decide whether this exception exists as a general matter. BP has not identified, and we have not found, any authority that would render the doctrine of prevention inapplicable under the facts of this case.[49] We therefore reject the argument.

BP also argues that the GCCF's rules and protocols, to which Johnson agreed to be bound when he voluntarily submitted his personal injury claim to the GCCF, authorized the GCCF to withhold the Release from Johnson once it uncovered evidence that Johnson submitted a fraudulent claim. We have reviewed the GCCF's protocols and conclude that, although the GCCF is authorized to investigate fraud prior to extending a settlement offer, and the GCCF is empowered to "refer all evidence of false or fraudulent claims to appropriate law enforcement authorities," the GCCF rules contain no provision allowing the GCCF to repudiate an otherwise binding contract after BP's appeals period has expired merely because it later develops reason to believe that the claimant has submitted a false claim. Nor does the Determination Letter authorize the GCCF to refuse to mail the Release to the claimant after the claimant has accepted a Final Payment Offer.[50]

---

[49] *Mack Trucks, Inc. v. BorgWarner Turbo Systems, Inc.*, Civil Action No. 08-2681, 2011 WL 1045108, at *5-6 (E.D. Pa. Mar. 22, 2011), which BP cites in its brief, merely holds that a party may not raise the doctrine of prevention unless it produces evidence that "support[s] an inference that [the opposing party] frustrated [its] compliance with the condition precedent." The case is inapposite because there is no doubt that the GCCF and BP frustrated Johnson's compliance with the condition precedent by refusing to mail him the Release.

[50] *See Akanthos Capital Mgmt., LLC v. Compucredit Holdings Corp.*, 677 F.3d 1286, 1297 (11th Cir. 2012) (holding that a party may permissibly prevent a condition precedent from occurring if the "alleged 'prevention' is authorized by the contract").

26

No. 14-30269

BP insists that, if we rule in Johnson's favor on this issue, then BP has no remedy if a claimant submits a fraudulent claim that goes undiscovered until after the fourteen-day appeal window has expired. As BP persuasively argues, "[f]iling claims to a settlement facility . . . is not a game of beat-the-clock that allows unscrupulous claimants maintaining a deception until time runs out to keep their ill-gotten gains." This concern is well-taken, and we address it in the following section.

## VI.

BP's final argument is that, even if BP and Johnson formed an otherwise valid contract, the settlement agreement is nonetheless unenforceable because Johnson fraudulently induced BP to enter the settlement. Specifically, BP claims that Tidewater's letter to the GCCF and Guidepost's investigation report demonstrate that Johnson fabricated his personal injury claims and thereby submitted a fraudulent claim to the GCCF.

A court may set aside a settlement agreement induced by fraud.[51] "The essential elements of fraudulent inducement into a settlement are no different from any action on fraud."[52] Thus, BP must prove:[53]

> (1) a material representation was made; (2) the representation was false; (3) when the representation was made, the speaker knew it was false or made it recklessly without any knowledge of the truth and as a positive assertion; (4) the representation was made with the intention that it be acted upon by the other party; (5) the party

---

[51] *E.g.*, *Howard v. Chris-Craft Corp.*, 562 F. Supp. 932, 937 (E.D. Tex. 1982) (citations omitted).

[52] 15B Am. Jur. 2d Compromise and Settlement § 32 (2d ed. 2014) (citations omitted).

[53] BP argues that it need *not* make an *actual showing of fraud* to succeed on its defense, but rather need only show that the GCCF *possessed sufficient evidence to believe Johnson committed fraud* at the time it issued its Denial Letter. Because BP's argument is based on an inaccurate characterization of the GCCF's internal rules and is otherwise unsupported by legal authority, we reject it.

27

No. 14-30269

acted in reliance on upon the representation; and (6) the party suffered injury.[54]

As a general matter, a party may not challenge a settlement agreement on the basis of an alleged fraud that "relates to the underlying merits of the claim that was settled."[55] Were the rule otherwise,

> It would allow a party to reopen any settled litigation if he later discovered evidence bolstering his prior litigation position. If a party was able to undo a binding settlement agreement by simply couching the prior litigation as "fraudulent," there would be no way to assure the full and final resolution of any matter.[56]

Thus, "[a] settlement will not be set aside . . . merely because one party's case becomes stronger after the settlement is concluded."[57]

There is, however, a narrow exception to this general rule. Where the defendant subsequently uncovers previously unavailable evidence that the plaintiff was in fact *not injured at all*, or sustained only *de minimis* injuries, the defendant may argue that the plaintiff fraudulently induced it to enter into a settlement agreement.[58] In such circumstances, the district court must hold an evidentiary hearing to weigh the newly-discovered evidence of fraud.[59]

The Ninth Circuit's opinion in *Russell v. Puget Sound Tug & Barge Co.*[60] is particularly instructive in this regard.[61] In that case, a seaman swore at his deposition that he was permanently disabled as a result of an on-the-job

---

[54] *O'Hare v. Graham*, 455 F. App'x 377, 379-80 (5th Cir. 2011) (citations omitted).

[55] *Johnson v. King*, No. 10-CV-279-S, 2011 WL 4963902, at *14 (D. Wyo. Oct. 17, 2011) ("*King*").

[56] *King*, 2011 WL 4963902, at *14. *Accord Howard*, 562 F. Supp. at 933-38.

[57] *Howard*, 562 F. Supp. at 937.

[58] *See Russell v. Puget Sound Tug & Barge Co.*, 737 F.2d 1510, 1510-11 (9th Cir. 1984).

[59] *Id*. at 1510-11.

[60] *Id*.

[61] *See also City Equities Anaheim, Ltd. v. Lincoln Plaza Dev. Co. (In re City Equities Anaheim, Ltd.)*, 22 F.3d 954, 957 (9th Cir. 1994) ("[W]e have found enforcement upon motion inappropriate . . . where a settlement agreement was apparently procured by fraud.").

No. 14-30269

injury.[62] The seaman and the shipowner agreed to settle the seaman's personal injury claim.[63] After the parties settled the case, however, the shipowner obtained video evidence from its private investigators depicting the seaman performing rigorous physical activity without difficulty.[64] The Ninth Circuit reversed the district court's order enforcing the settlement agreement and remanded for an evidentiary hearing to determine whether the seaman submitted a fraudulent claim regarding his on-the-job injuries.[65] The Ninth Circuit reached this conclusion even though the alleged fraud related directly to the merits of the seaman's claims – namely, the existence and extent of the seaman's injuries.[66]

Here, too, BP has produced evidence suggesting that Johnson did not sustain any injury on the date of the Deepwater Horizon blowout. As described in greater detail above, Johnson's co-workers stated that the force of the blast never caused him to fall, stumble, or lose consciousness. To the contrary, the seamen on duty maintained that Johnson performed his duties capably and did not exhibit any signs of injury whatsoever. BP also produced evidence that Johnson repeatedly denied being injured on the date of the incident. Because BP's evidence suggests that Johnson may have submitted a wholly fabricated claim to the GCCF, BP may raise fraudulent inducement as a defense to enforcement of the settlement.[67]

---

[62] *Russell*, 737 F.2d at 1510-11.
[63] *Id.* at 1511.
[64] *Id.*
[65] *Id.*
[66] *See id.*
[67] *See id.* at 1510-11.

No. 14-30269

The district court therefore erred by discounting BP's substantial evidence of fraud without holding an evidentiary hearing.[68] We must therefore vacate the judgment against BP and remand for further proceedings.[69]

## VII.

BP argues that the district court erred by granting prejudgment interest at a rate of 5%. Because we have vacated the district court's judgment, we need not address this issue. If the district court again rules in Johnson's favor on remand, BP may address the issue with the district court at that time.

## VIII.

In sum, we affirm the district court's order in part. We agree with the district court that Johnson and BP entered into a binding settlement

---

[68] We do not suggest that the evidence in the record is not conflicting. Johnson submitted his medical records into the record, which could demonstrate that he sustained some injury during the explosion. The strength of each side's evidence ultimately depends on a determination of each witness's credibility.

[69] In this connection, we advise the district court to reconsider the weight it gave to Guidepost's statement that "a Finding of Potetnial [sic] Fraud is not supported by this investigation." Although the Guidepost report does state that "Johnson did not submit any overtly fraudulent *document*" to the GCCF, the report nonetheless unequivocally concludes that "Johnson's *claims* of physical injury as a result of the Deepwater Horizon explosion appear to be fabricated."

We are also persuaded that the district court erred by concluding, at least on the record then before it, that BP could not prove justifiable reliance. The district court reasoned that Tidewater's October 20, 2011 letter to BP alerted BP to "Tidewater's suspicions about whether Johnson's accident had occurred as he alleged or whether he had exaggerated his injuries" before BP's appeal period expired. As BP correctly notes, however, Tidewater's letter merely advises BP of Tidewater's belief that the Final Payment Offer was "excessive and unreasonable;" it contains no indication that Tidewater had any reason at that time to believe that Johnson fabricated his claims entirely. Even if Tidewater did believe Johnson submitted a false claim to the GCCF, the letter does not express that belief to BP. Moreover, Tidewater and Guidepost did not complete their investigations of Johnson's claim until after BP's appeal period had already expired. Thus, as we read the record, BP, Guidepost, and Tidewater only became aware of the full extent of Johnson's alleged fraud after BP's opportunity to appeal had elapsed. In sum, what BP should have known – and when it should have known it – are genuine issues of material fact for the district court to resolve after an evidentiary hearing.

No. 14-30269

agreement. Although Johnson's failure to sign a release might ordinarily bar him from recovering under the settlement agreement, BP's refusal to send Johnson the release excuses that failure here.

However, the district court should have held an evidentiary hearing to evaluate whether Johnson fraudulently induced BP into entering the settlement agreement by submitting a fabricated claim to the GCCF. We therefore vacate the district court's judgment and remand for further proceedings.

AFFIRMED in part, VACATED, and REMANDED for further proceedings.

No. 14-30269

PRISCILLA R. OWEN, Circuit Judge, dissenting:

I disagree with the panel majority's conclusion that a contract was formed.  Mutuality is lacking,[1] and I therefore respectfully dissent.  The documents that the Gulf Coast Claims Facility (GCCF) prepared in connection with Elton Johnson's claims unequivocally permitted Johnson to change his mind before he actually signed a release, even after he had indicated that he was willing to accept the amount of $2,698,095.00 in settlement of his claims against the BP entities.  Nothing that Johnson signed or to which he agreed *obligated* him to sign a release.  To the contrary, the documents reflected that the formation of an enforceable agreement would not occur until Johnson actually assented to the Release.  Johnson could have refused to sign a release, and BP could not have enforced a settlement agreement with Johnson.  There was no settlement agreement that either BP or Johnson could have enforced when the GCCF sent the October 2011 letter denying Johnson's claims after further review.

The Determination Letter that the GCCF sent to Johnson provided that "[t]he amount of the Final Payment Offer . . . is $2,698,095.00, which is the amount that can be paid now if you decide to accept the Final Payment Offer and you sign a Release and Covenant Not to Sue (the "Release")."  It is clear from these terms that accepting the Final Payment Offer *and* signing the Release are both necessary components of a settlement agreement.  Importantly, the Determination Letter, in bold and italicized text, also informed Johnson that he had "the right to consult with an attorney of [his]

---

[1] 1 WILLISTON ON CONTRACTS § 7:14 (4th ed. 2014) (explaining that mutuality of obligation can be viewed as simply another "way of stating that there must be valid consideration").

No. 14-30269

own choosing prior to accepting any settlement or signing a release of legal rights." This statement unquestionably permitted Johnson to consult with an attorney "*prior to accepting any settlement*" or "*signing a release of legal rights*." If checking the box on the Final Payment Form indicating an "elect[ion] to be paid the Final Payment Offer" constituted the formation of a settlement agreement, then the statement that Johnson had the right to consult with an attorney of his own choosing before accepting a settlement or signing a release would have conflicted with the Form, would have been virtually meaningless, and would have been misleading.

Consistent with the provisions in the Determination Letter regarding the right to consult counsel, the box Johnson checked on the Final Payment Election Form read: "I elect to be paid the Final Payment Offer described in my Determination Letter . . . . The GCCF will send you a Release and Covenant not to Sue that you must sign and return to be paid." This language informed Johnson that he could choose not to sign the Release, with the obvious consequence of not being paid. Johnson's ability to decline signing the Release demonstrates that BP could not enforce any agreement with Johnson until the Release was signed.

The language contained in the Release itself, although never read by Johnson, reflects that checking the box on the Final Payment Election Form did not give rise to an enforceable contract. The Release states that if a personal injury claimant decides not to accept a Final Payment from the GCCF, the claimant has the right to file suit.[2] The Release emphasized: "You

---

[2] The Release provides:

    If you do not accept a Final Payment from the GCCF for your physical injury claim, you have the right to file a claim in court, including in the multidistrict litigation pending before the United States District Court for the

No. 14-30269

are under no obligation to accept the final payment offered to you by the [GCCF]. You are free to reject the final payment offered by the GCCF and to pursue other means of compensation. If you want to file a lawsuit regarding the incident do not sign the Release." If the Form containing the Final Payment Offer constituted a binding settlement agreement, then the GCCF would not advise a claimant in the Release of his right to decline to sign the Release and to pursue a lawsuit. The Release is another clear indication that checking the box on the Form sent to Johnson did not constitute the formation of a binding contract.

The panel majority opinion asserts that "language in the GCCF's protocols advising the claimant to seek legal counsel before signing the Release" does not mean that Johnson could refuse to sign the Release.[3] The majority opinion reasons that an attorney's advice would not be "valueless," even if Johnson was obligated to sign the Release, since an "attorney could review the Release to make sure it comports with the description in the Determination Letter upon which the parties agreed."[4] But the structure of the sentence that appeared in bold type and was italicized in the

---

Eastern District of Louisiana, titled, *In re Oil Spill by the Oil Rig "Deepwater Horizon" in the Gulf of Mexico, on April 20, 2010* (MDL No. 2179). The multidistrict litigation is a consolidated grouping of federal lawsuits arising out of the Incident. Information regarding the multidistrict litigation may be obtained from the court's website at ww.laed.uscourts.gov.

     . . .

     You are under no obligation to accept the final payment offered to you by the Gulf Coast Claims Facility ("GCCF"). You are free to reject the final payment offered by the GCCF and to pursue other means of compensation. If you want to file a lawsuit regarding the incident do not sign the Release.

[3] *Ante* at 23.

[4] *Id.*

34

No. 14-30269

Determination Letter Johnson received advising him that he had "the right to consult with an attorney of [his] own choosing prior to accepting any settlement or signing a release of legal rights" does not make such a distinction clear.  It did not clearly tell Johnson that once he checked the box on the Form, he was obligated to release his personal injury claims even if he thereafter consulted an attorney and was advised to pursue a different avenue to redress his claim.

The panel majority opinion concedes that the argument that there was no binding agreement "would have significantly more force"[5] if the statements in the Release advising the claimant that he is under no obligation to accept the final payment offered by the GCCF and that he may file suit were also present in the Determination Letter.  The majority opinion characterizes these Release provisions as "the subjective or secret intent of the offeror"[6] since Johnson did not see the Release prior to checking the box on the Form.  However, the Release was not tailored for Johnson's individual claim.  The Release is the standard release for personal injury claims used in the GCCF process, as Johnson recognized in the district court.  It is an integral part of the GCCF claims process and reflects that unless and until a claimant signed the Release, the voluntary GCCF claims process did not result in any relinquishment of a claimant's rights against the BP entities.   The Determination Letter that Johnson did receive reflected the GCCF's intent that there was no binding agreement until the Release was signed by stating that Johnson had the right to be paid only if he accepted the "Final Payment Offer *and* [he] sign[ed] a Release and Covenant Not to Sue."

---

[5] *Ante* at 24.

[6] *Id.*

35

No. 14-30269

The documents are consistent throughout.  Johnson had the right to walk away from the GCCF process even after he sent the Final Payment Election Form to the GCCF.  Since Johnson had the right to walk away, the GCCF did as well.  There was no binding settlement agreement at the time that the GCCF sent the letter denying Johnson's claims.

\* \* \* \* \*

For the foregoing reasons, I dissent.

# *United States Court of Appeals*
### FIFTH CIRCUIT
### OFFICE OF THE CLERK

**LYLE W. CAYCE**
**CLERK**

**TEL. 504-310-7700**
**600 S. MAESTRI PLACE**
**NEW ORLEANS, LA 70130**

June 04, 2015

Mr. William W. Blevins
U.S. District Court, Eastern District of Louisiana
500 Poydras Street
Room C-151
New Orleans, LA 70130

No. 14-30269    In re: Deepwater Horizon
USDC No. 2:10-MD-2179
USDC No. 2:13-CV-5804

Dear Mr. Blevins,

Enclosed is a copy of the judgment issued as the mandate and a
copy of the court's opinion.

Sincerely,

LYLE W. CAYCE, Clerk

By: _____
Dantrell L. Johnson, Deputy Clerk
504-310-7689

cc:
    Mr. Kurt B. Arnold
    Mr. Jeffrey Bossert Clark, Sr.
    Mr. Dominic E. Draye
    Mr. Richard Cartier Godfrey
    Mr. Don Keller Haycraft
    Mr. Cory Daniel Itkin
    Mr. James Andrew Langan
    Mr. Devin Chase Reid