UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF LOUISIANA

| | | |
|---|---|---|
| IN RE:  OIL SPILL BY THE OIL RIG | : | MDL 2179 |
|         "DEEPWATER HORIZON" IN THE | : | |
|         GULF OF MEXICO, ON APRIL 20, 2010 | : | Section J |
| | : | |
| This Document Applies to: | : | Judge Barbier |
| | : | |
| *No. 12-970, Bon Secour Fisheries, Inc., et* | : | Mag. Judge Shushan |
| *al. v. BP Exploration & Production Inc., et al.* | : | |

MEMORANDUM IN SUPPORT OF MOTION OF THE DHECC
FOR RETURN OF PAYMENTS MADE IN RELIANCE ON FINANCIAL
<u>DATA PROVIDED BY CLAIM PREPARER JOSEPH K. BASSLER</u>

The DHECC moves to have claims preparer Joseph K. Bassler ("Bassler") and claimants TNN Enterprise, Inc. ("TNN"), Htun Nyunt, Inc. ("Htun"), and Beach & Luxury Realty, Inc. ("BLR") return payments made by the DHECC in reliance on the financial data Bassler provided in support of claims filed by TNN, Htun and BLR.  Bassler manipulated the monthly profit and loss statements to significantly increase each claimants' purported economic loss suffered after the oil spill.  Relying on Bassler's representations, the DHECC paid TNN $132,579.40, Htun $148,091.98, and BLR $397,884.93.  Bassler took a percentage of each of these awards.

Bassler has declined efforts to discuss this motion with counsel for the DHECC.

### A.  *<u>Background</u>*

The Claims Administrator has authority to ensure the integrity of the DHECC, including by repayment of fraudulent claims.  *See* Order of May 6, 2015 (Rec. Doc. 14543); Settlement Agreement at ¶ 4.3.10.  The Court retains continuing jurisdiction over the Settlement Agreement.  Settlement Agreement at ¶¶ 4.4.7 and 18.1.  Disputes concerning enforcement of the Settlement Agreement are to be resolved by motion to the Court.  *Id.*

## B. *The DHECC Claims*

TNN, Htun, and BLR filed *pro se* Business Economic Loss ("BEL") claims with the DHECC, asking to have the claims paid on their historical income as reported in monthly profit and loss statements ("P&L") and federal tax returns.  Bassler, an individual with an IRS Preparer Tax Identification Number ("PTIN"), prepared the BEL claims for TNN, Htun, and BLR.  He created their monthly P&Ls, communicated with the DHECC on the claimants' behalf, and provided statements to the DHECC for his accounting support services.

1. General Requirements for Business Economic Loss Claims

The Settlement Agreement requires business claimants to provide the DHECC with, among other documents, federal tax returns and monthly P&Ls for the selected Benchmark Period, 2010, and, at times, 2011.  *See* Settlement Agreement Ex. 4A at ¶¶ 3-4.

The DHECC calculates compensation using the data provided by claimants.  The DHECC permits claimants, and the professionals retained by them, to create monthly P&Ls when the claimants did not maintain such information during their normal course of business.  *See* DHECC Policy 286.  The P&Ls must be based on contemporaneous source documents, such as bank statements, invoices, and purchase orders, and must show the actual monthly revenues and expenses.  *See* DHECC Policy 355 v.2.

The BEL compensation framework consists of two steps.  The first step compensates claimants for certain reductions in their variable profits, by comparing variable profits for three or more consecutive months between May and December 2010 with variable profits for those same months during a Benchmark Period.  The second step compensates claimants for the incremental profits they might have generated in the absence of the oil

spill relative to revenue from a Benchmark Period. Claimants also receive a risk transfer premium to determine a total settlement award.

      2.      <u>The Claimants' Business Economic Loss Claims and Payments</u>

Aided by Bassler, the claimants TNN, Htun, and BLR each filed BEL claims with the DHECC. Because the DHECC will reimburse claimants for reasonable and necessary accounting fees related to the preparation of claims, each claimant sought reimbursement for Bassler's accounting support services. Each also authorized Bassler to communicate with the DHECC on their behalf.

For each claim, Bassler provided the DHECC with an executed Sworn Written Statement for Claimant Accounting Support ("SWS-38"), certifying under penalty of perjury that his license was active and in good standing, and that to the best of his knowledge the financial information provided to the DHECC has been prepared on a consistent basis and the implications of information known or reasonably suspected to be untrue or inaccurate have not been ignored. *See* Ex. G. Bassler also provided an invoice for his services, and a copy of his IRS PTIN card. *Id*.

Upon information and belief, in addition to the fees reflected on the invoices Bassler provided to the DHECC, Bassler also had contingency fee agreements with TNN, Htun, and BLR in which he received approximately 10 to 15% of each company's DHECC award amount.

          a.      *BLR*

On September 15, 2012, BLR, a real estate sales and rental property management company in St. Petersburg, Florida, filed its BEL claim and provided the DHECC with federal tax returns and monthly P&Ls prepared by Bassler using the cash method of accounting.

*See* Exs. A & B.  The annual revenue and net income shown on BLR's 2007 – 2010 tax returns were consistent with the annual amounts reported on the P&Ls.

Relying on the P&Ls prepared by Bassler for BLR, the DHECC used the average of 2007 – 2009 for May – August as BLR's Benchmark Period[1] and found as follows:

| Period | Revenue | Variable Expenses | Variable Profit |
|---|---|---|---|
| Benchmark | $880,517 | $791,137 | $89,380 |
| 2010 Compensation | $697,226 | $761,460 | ($64,234) |
| | | **Lost Variable Profit:** | **$153,614** |

From this data, the DHECC awarded and paid BLR $397,884.93, including $2,200 for accounting support.

    b.  *TNN*

On November 5, 2012, TNN, a company that owned grocery store sushi kiosks in the Pinellas Park, Florida area, filed its BEL claim and provided the DHECC with federal tax returns and monthly P&Ls prepared by Bassler using the cash method of accounting.  *See* Exs. C & D.  The annual revenue and net income shown on TNN's 2007 – 2010 tax returns were consistent with the annual amounts reported on the P&Ls.

Relying on the P&Ls prepared by Bassler for TNN, the DHECC used the average of 2007 – 2009 for May – December as TNN's Benchmark Period and found as follows:

| Period | Revenue | Variable Expenses | Variable Profit |
|---|---|---|---|
| Benchmark | $143,432 | $68,761 | $74,671 |
| 2010 Compensation | $107,825 | $64,679 | $43,146 |
| | | **Lost Variable Profit:** | **$31,525** |

From this data, the DHECC awarded and paid TNN $132,579.40, including $1,000 for accounting support.

---

[1] The DHECC used June – November for the Step 2 portion of the award calculation.  The Step 2 portion accounted for less than 5% of the compensation amount.

- 4 -

      c.    *Htun*

On November 9, 2012, Htun, an owner of grocery store sushi kiosks in the Spring Hill, Florida area, filed its BEL claim and provided the DHECC with federal tax returns and monthly P&Ls prepared by Bassler using the cash method of accounting. *See* Exs. E & F. The annual revenue and net income shown on Htun's 2007 – 2010 returns were consistent with the annual amounts reported on the P&Ls. Bassler also provided Florida sales and use tax returns to support monthly sales figures at the request of the DHECC.

Relying on the P&Ls prepared by Bassler for Htun, the DHECC used the average of 2007 – 2009 for May – October as Htun's Benchmark Period[2] and found as follows:

| Period | Revenue | Variable Expenses | Variable Profit |
|---|---|---|---|
| Benchmark | $111,893 | $69,865 | $42,028 |
| 2010 Compensation | $78,140 | $76,178 | $1,962 |
| | | **Lost Variable Profit:** | **$40,066** |

From this data, the DHECC awarded and paid Htun $148,091.98, including $1,000 for accounting support.

### C. *Evidence of the Fraudulent Claims*

Bassler prepared monthly P&Ls to support claims for TNN, Htun, and BLR. The DHECC used these P&Ls to calculate the compensation awards, relying upon Bassler's certification that he had not ignored the implications of untrue or inaccurate information while preparing the claims for TNN, Htun, and BLR.[3]

---

[2] The DHECC used July – December for the Step 2 portion of the award calculation. The Step 2 portion accounted for less than 12% of the compensation amount.

[3] Bassler certified that his PTIN credential was in good standing with the IRS, as required by the Settlement Agreement. The IRS requires annual renewal of PTINs. Preparers must notify and explain to the IRS any criminal convictions. In July 2009, Bassler pled guilty to numerous fraud-related felony charges in Pinellas County, Florida. The DHECC does not know whether Bassler notified the IRS of these convictions.

Despite his certification, Bassler fabricated key financial data on the monthly P&Ls for the three claimants. Bassler provided the DHECC with P&Ls containing artificial monthly revenue and expense amounts that misrepresented the finances of these entities, shifting revenue away from the 2010 compensation period and thus artificially inflating the lost variable profit for each of the companies. His misrepresentations increased the award amounts paid by the DHECC, and thus increased the contingent fees obtained by Bassler.

The misrepresentations for each claimant are addressed below.

1. <u>TNN and Htun's 2010 Monthly Revenues were Altered to Create Losses</u>.

TNN and Htun sold sushi in Florida grocery stores, operating as franchisees of Advanced Fresh Concepts Franchise Corporation ("AFC"), a California-based supplier of fresh sushi to supermarkets. Maung Naing and Htun Yi, the owners of TNN and Htun, respectively, were interviewed by the DHECC investigators and confirmed that their companies did not prepare monthly P&Ls as part of their normal operations, and that those submitted to the DHECC were created by Bassler.

While TNN and Htun did not prepare monthly P&L's, both had contemporaneous financial data detailing their monthly sales and related expenses. AFC provided TNN and Htun with monthly statements showing their monthly sales and related expenses, and also sent the companies' checks for their commission on the sales less expenses. *See* Exs. H & I. Each year, AFC provided TNN and Htun with an IRS Form 1099 listing their total annual sales commission. *See* Exs. J & K. For 2007 through 2010, the sales commission shown on the 1099s AFC issued to TNN and Htun equaled the amounts listed on the monthly statements AFC provided the companies.

In an interview with DHECC investigators, Bassler said he prepared the monthly P&Ls for TNN and Htun using the AFC statements, 1099s, and federal tax returns that were given to him by TNN and Htun, but he explained to investigators that he no longer had copies of the source documents he used to create the P&Ls.

The DHECC obtained by subpoena the AFC monthly statements for TNN and Htun. The AFC statements did not support the monthly P&L statements prepared by Bassler. In fact, each month's revenue for 2007 through 2010 on the Bassler documents was different than the amounts shown on TNN and Htun's monthly AFC statements.

Of particular significance, revenue in 2010 on the Bassler-prepared P&Ls for both claims was shifted away from the months used as the compensation period and instead reflected in other non-compensation period months. The total revenue for the year remained unchanged (and thus consistent with each entities tax filings), but the revenue was shifted to months outside of the compensation period.

This revenue shifting increased the lost variable profit for each company, and, as a result, increased the total DHECC award amounts. A comparison of the revenue by AFC statements to the revenue from the Bassler-produced P&Ls for both entities makes this point clear. For example, for Htun the revenue shifting results in reporting of $42,267.53 less in revenue in the compensation period of May through October (indicated in shading in the chart below), as follows:

| 2010 | Revenue by AFC Statements | Revenue by Bassler-Produced P&L | Monthly Variance | Compensation Period Variance |
|---|---|---|---|---|
| January | $16,481.74 | $25,814.22 | +$9,332.48 | |
| February | $20,795.17 | $25,358.55 | +$4,563.38 | |
| March | $17,713.87 | $25,278.17 | +$7,564.30 | |
| April | $23,398.62 | $26,156.99 | +$2,758.37 | |
| May | $21,348.35 | $12,195.76 | -$9,152.59 | |
| June | $26,634.25 | $12,874.16 | -$13,760.09 | |
| July | $18,994.78 | $12,781.91 | -$6,212.87 | -$42,267.53 |
| August | $17,667.01 | $12,562.66 | -$5,104.35 | |
| September | $19,078.38 | $12,647.65 | -$6,430.73 | |
| October | $16,684.94 | $15,078.04 | -$1,606.90 | |
| November | $21,238.27 | $22,844.45 | +$1,606.18 | |
| December | $16,354.47 | $32,797.55 | +$16,443.08 | |

For TNN, the revenue shifting results in reporting of $28,190.85 less in revenue in the compensation period of May through December (indicated in shading in the chart below), as follows:

| 2010 | Revenue by AFC Statements | Revenue by Bassler-Produced P&L | Monthly Variance | Compensation Period Variance |
|---|---|---|---|---|
| January | $13,815.53 | $21,942.31 | +$8,126.78 | |
| February | $16,448.44 | $23,332.32 | +$6,883.88 | |
| March | $17,094.02 | $22,895.46 | +$5,801.44 | |
| April | $15,199.00 | $22,577.74 | +$7,378.74 | |
| May | $16,220.21 | $8,340.06 | -$7,880.15 | |
| June | $19,958.29 | $8,856.35 | -$11,101.94 | |
| July | $15,603.19 | $9,193.93 | -$6,409.26 | |
| August | $15,204.13 | $9,551.36 | -$5,652.77 | -$28,190.85 |
| September | $19,701.37 | $12,192.38 | -$7,508.99 | |
| October | $15,325.42 | $12,351.24 | -$2,974.18 | |
| November | $20,098.80 | $19,003.43 | -$1,095.37 | |
| December | $13,904.55 | $28,336.36 | +$14,431.81 | |

The DHECC relied upon the Bassler-prepared P&Ls to compare the pre-spill variable profit with the variable profit in the 2010 compensation period months. But shifting the 2010 revenue away from the 2010 compensation period had the effect of artificially overstating the loss for both entities.

Had the figures from the AFC monthly statements been accurately reported, both TNN and Htun would have received significantly different awards from the DHECC. Rather than the $131,579 paid by the DHECC to TNN, the company would have received approximately $16,350 using the figures from the AFC monthly statements (an overpayment of $115,229). And instead of the $147,098 paid by the DHECC to Htun, the company would have received no award using the AFC monthly statement figures.

    2.    <u>BLR's 2010 Monthly Amounts were Manipulated to Create an Artificial Loss</u>.

DHECC investigators met with Crispian Burlew, the owner of BLR, who said the company had two revenue sources: real estate sale commissions and property rental management fees. At year-end, BLR provided an accounting firm, Network Accounting Services ("Network Accounting"), with its bank statements, check register and property closing records for preparation of BLR's tax returns. Using the cash method of accounting, Network Accounting prepared BLR's general ledger, annual balance sheet and income statement, and tax return. *See* Exs. A & L. As Burlew explained, BLR did not prepare monthly P&Ls. Rather, the P&Ls submitted to the DHECC were created by Bassler.

In an interview with DHECC investigators, Bassler said BLR hired him to prepare and submit the documentation for the DHECC claim. Bassler said he prepared the monthly P&Ls provided to the DHECC using BLR's annual financial data, but he did not claim to have received data from BLR that would have enabled creation of accurate monthly P&Ls.

Bassler provided the DHECC with P&Ls that — when compared to the Network Accounting-prepared general ledger — indicated significantly different monthly financial results. Specifically, the Bassler-prepared 2010 P&Ls showed losses in compensation-period months that were contrary to both the actual amounts reported in the Network

Accounting-prepared general ledger and BLR's business model. BLR paid realtors and property owners only after it received commissions from the sale of property and rent from tenants. Thus, BLR's variable expenses did not often exceed monthly revenue. Yet Bassler provided the DHECC with 2010 monthly P&Ls showing three consecutive months where variable expenses exceeded monthly revenue. These three months came in the four-month compensation period of May to August (indicated in shading in the chart below).

Overall, the 2010 revenue on the Bassler-prepared P&Ls was shifted away from the compensation period and instead was reflected in non-compensation period months. The total revenue for the year remained unchanged (and thus was consistent with the entity's tax filing), but the revenue was shifted to months outside of the compensation period. This had the effect of increasing the company's lost variable profit, as follows:

| 2010 | Variable Profit by Network Accounting Data | Variable Profit by Bassler-Produced P&L | Monthly Variance | Compensation Period Variance |
|---|---|---|---|---|
| January | $19,079.96 | -$76,818.05 | -$95,898.01 | |
| February | $15,608.50 | $12,233.36 | -$3,375.14 | |
| March | -$11,029.44 | $21,337.56 | +$32,367.00 | |
| April | $26,609.32 | $40,215.77 | +$13,606.45 | |
| May | $4,213.37 | $47,520.97 | +$43,307.60 | |
| June | $38,258.74 | -$9,309.26 | -$47,568.00 | -$128,434.07 |
| July | -$2,724.68 | -$40,807.46 | -$38,082.78 | |
| August | $24,452.22 | -$61,638.67 | -$86,090.89 | |
| September | $7,781.02 | $34,286.25 | +$26,505.23 | |
| October | $16,944.24 | $38,304.46 | +$21,360.22 | |
| November | $8,704.30 | $59,521.66 | +$50,817.36 | |
| December | $14,393.99 | $96,446.87 | +$82,052.88 | |

Had the financial data been accurately reported, BLR would have received a significantly different award from the DHECC. Rather than the $395,684 paid by the DHECC to BLR, the company would have received approximately $23,000 using the data from Network Accounting (an overpayment of approximately $372,000).

### D. *Legal Analysis*

The Court's power to order equitable remedies as a result of fraudulent conduct is a broad, flexible and long-standing power. *See Hazel-Atlas Glass Co. v. Hartford Empire Co.*, 322 U.S. 238, 244 (1944). Based on Bassler's conduct, he should be held liable for the full amount paid by the DHECC to TNN, Htun, and BLR.

1. Bassler Should Make Restitution to the DHECC on Claims Paid
   Based on his Misrepresentations of the Monthly Financial Documents

The evidence shows that Bassler presented false information to the DHECC to obtain compensation for TNN, Htun, BLR, and his own contingent fees. Bassler provided the DHECC with P&Ls showing annual amounts consistent with each company's federal tax returns, but in which he had manipulated the 2010 monthly revenue and expense amounts to create or increase the companies' DHECC awards. Bassler also falsified Florida Sales and Use Tax Returns submitted with Htun's claim. Bassler admitted to DHECC investigators that he created these returns solely for the Htun claim, but said the forms were harmless because sushi dealers were not required to file the form. Bassler also appears to have presented fabricated documents in other cases.[4]

As the creator of P&Ls that he knew would be provided to and relied upon by the DHECC in determining the claims, Bassler holds an obligation to those he actually knew would rely on the misrepresentation in the claim accounting work. *First National Bank of Commerce v. Monco Agency Inc.*, 911 F.2d 1053, 1060-62 (5th Cir. 1990) (endorsing application of misrepresentation standard for accountants under Louisiana law and Section 552); Restatement (Second) of Torts § 552 (providing liability for those who fail to exercise

---

[4] Bassler prepared and submitted over 40 claims to the DHECC. The DHECC found that Bassler submitted fabricated AFC documents in 16 different claims. Most of the claims were unpaid when the investigations were conducted, and many remain unpaid based on the results of the investigations.

reasonable care and, as a result, supply "false information for the guidance of others in their business transactions" and thereby cause a pecuniary loss).

Unlike cases where privity between the accounting work and the end user may be more remote, Bassler here prepared the accounting work specifically for presentation to the DHECC to induce payment of the claims. Here, Bassler owed a duty of presenting accurate financial information to the DHECC, an entity charged with safeguarding a Trust benefitting those harmed by the spill. *See United States v. Arthur Young & Co.*, 465 U.S. 805, 818 (1984) (accountants hold a "public watchdog" function that "requires complete fidelity to the public trust").

While professionals frequently have been called upon to make restitution only to the portion of an award that the professional retained, here Bassler's misconduct induced the DHECC to make payments on the claims. Under these conditions, Bassler should make full restitution on the claims to the DHECC so as to make the DHECC whole for the loss he caused, deprive Bassler of any unjust enrichment he received, and remind other professionals engaged in preparing claims of the "public watchdog" function that such professionals perform in the process of distribution of Trust funds.

2. The Claimants Should Make Restitution to the DHECC for
   <u>Amounts Overpaid because of Bassler's Misrepresentations</u>

Restitution is an equitable remedy that deprives a party of a benefit that in good conscience he ought not to keep, even though he may have received those benefits honestly in the first instance. *Schock v. Nash*, 732 A.2d 217, 232-233 (Del. 1999); Order & Reasons on Special Master's Motion for Return of Payment at 20-21 & n.15 (Doc. Rec. 12794). Here, the false accounting data provided to the DHECC was prepared by Bassler, who created the monthly P&Ls to support the claims. While the investigation has not clearly indicated

whether the claimants knew of Bassler's misrepresentations on the P&Ls, the claimants nevertheless have been unjustly enriched through Bassler's misstatements.

The claimants' fault or lack thereof, however, is not relevant to the obligation to make restitution of a payment not owed. Had Bassler accurately reported the claimants' monthly financial condition, each claimant would have received only a fraction of the payment (or no payment at all) from the DHECC. If the claimants were allowed to keep the claim payments when such payments were not owed to them, the claimants would be unjustly enriched.

Thus, TNN, Htun, and BLR should make restitution to the DHECC of the payments received on the claims based on Bassler's misrepresentations of the accounting data, less fees retained by Bassler for his benefit and believed to have been ten percent.

### E. *Conclusion*

For the reasons stated, the DHECC seeks entry of a judgment requiring Joseph K. Bassler to make restitution to the DHECC for $678,556.31. The claimants should make restitution jointly and severally with Bassler, as follows: (a) $118,421.46 from TNN; (b) $132,382.79 from Htun; and (c) $356,116.44 from BLR.

Respectfully submitted,

Patrick Juneau
Claims Administrator

By: __/s/ Kevin Colomb_____
Kevin Colomb
Manager of Compliance and Internal Integrity

Louis J. Freeh
Special Master

By: __/s/ Gregory A. Paw_____
Gregory A. Paw
Counsel to the Special Master

Dated: July 2, 2015