DWH: Apache Louisiana Minerals, LLC

Claim ID:

Decision:

Primary Basis for Panelist Decision: Claim should have been excluded

Written Reasons and Opinion:

The entire Appeal Panel has considered in en banc session the body of appeals, including this one, brought by BP from awards by the Settlement Program to Apache Louisiana Minerals, LLC, ("ALM"), all involving the threshold question whether ALM is excluded from the Settlement Class by virtue of being a business in the Oil and Gas Industry, and the Appeal Panel, each of the panelists present and participating, and the necessary majority thereof assenting, has concluded that ALM is excluded on that account. The award in this case is therefore due to be overturned. The Appeal Panel's analysis and determination is as follows.

Pertinent to the Panel's decision are the following facts:

    (1)    ALM was originally organized under the laws of the State of Delaware as a corporate entity. Effective December 31, 2008, ALM was converted to a Delaware Limited Liability Company and its name was changed from Apache Louisiana Minerals, Inc. to Apache Louisiana Minerals, LLC;

    (2)    It is wholly owned by Apache Corporation ("Apache");

    (3)    In its 2002 Annual Report, Apache states that it is engaged in a single line of business; it explores for, develops and produces natural gas crude oil and natural gas liquids both domestically and internationally;

    (4)    Apache further reports that it earned 100% of its revenues from oil and gas production;

    (5)    In its corporate Form10K for 2012, Apache states that references to "Apache" or the "Company" include Apache Corporation and its consolidated subsidiaries;

    (6)    ALM's operations and activities are included in Apache's Annual Report;

    (7)    ALM files a consolidated tax return with Apache;

    (8)    Oil and Gas leases executed by and between ALM and Apache list the address of each at 2000 Post Oak Boulevard, Suite 100, Houston, Texas 77056;

(9) Oil and Gas Leases executed by and between ALM, as lessor, and Apache, as lessee, recite that Apache is agent for ALM and executes the lease documents on behalf of ALM in that capacity;

(10) Said leases are executed by C.R. Hardin who states that she is the attorney-in-fact for both Apache, as agent for ALM as well as Apache, individually;

(11) On December 17, 2002, Apache announced a $260 million acquisition from a private company of certain south Louisiana properties comprising 234,000 net acres (366 square miles) with net proved reserves of 178 billion cubic feet of gas equivalent, 88% of which is natural gas and that anticipated 2003 net daily production is more than 55 million cubic feet of gas and 2,100 barrels of oil;

(12) In a press release, Apache President and CEO G. Steven Farris is quoted as saying: "In addition to adding more than 10 percent to our U.S. natural gas production, the acquisition gives us a significant opportunity to expand our U.S. drilling activity. We own 100 percent of both the mineral and surface rights on 212,000 of the acquired acres, improving the economics over a normal working-interest position. Couple that with the proximity to Henry Hub, which commands the highest netback gas prices in the country, and the current outlook for natural gas prices, and we have added potential for boosting our cash flow on increased gas production."

(13) The press release further states: "Apache allocated $195 million of the purchase price to proved reserves (approximately $1.10 per thousand feet of gas equivalent), $45 million to fee acreage and probable reserves, and $20 million to 3-D seismic data.

The acquisition is additive to per-share cash flow and earnings. Apache has protected the economics of the transaction with "collar" hedges, which preserve the potential for significantly higher gas- price realizations. The purchase is financed with commercial paper with a current interest rate of under one and one-half percent. Apache's debt-to-capitalization is expected to end the year below 35 percent, including the acquisition.

The acquired acreage, located primarily in Terrebonne and Lafourche parishes, provides immediate exploitation and exploration potential, with 23 prospects presently identified.

By making Apache the royalty owner, fee acreage affords the company the benefit of third-party prospect-generation ideas and low-cost reserve additions, along with significantly lower lease-operating expense";

2

(14) In its 2002 Annual Report, Apache repeats its estimate stating that "net daily production from these properties is expected to approximate MMCF of natural gas and 2100 barrels of oil in 2003";

(15) In a Fourth Quarter 2002 Earnings Call telephone conference with investors, Apache Vice President of Investor Relations Bob Dye made the following comments: "We also at the end of the year made one tactical acquisition in South Louisiana for $260 million, which brought our total spending on acquisitions to $352 million at an average cost of $719 per BOE, I might point that the South Louisiana producing properties, $7.19. As you recall, a large portion of that acquisition was pre-acreage in the South Louisiana and the operating costs about 22 cents per mcf. Unlike most years, our 2002 capital spending was weighted toward the end of the year, which really gives our base properties great momentum in 2003. And with the purchase of the properties in South Louisiana late December, I guess, it is 2002, with strong production at the beginning of the year. And that does not include our production that we shipped, yet when we closed the Gulf of Mexico portion of the BP acquisition at the end of March and also does not include obviously the North Sea acquisition that we should close at the end of May…";

(16) During that same conference call, the following question and answer were recorded:

Q. Yes, Thanks. You have characterized your South Louisiana acquisition as tactical. Could you kind of flesh out a little bit of the strategy down there? And also, second question. More general if you could share your thoughts on the apparent of drilling response in spite of the commodity prices, just drivers for that.

A. When we talk about tactical acquisitions, if you look at what we did with the [indiscernible] field or really the order of magnitude with what we did with the Gulf of Mexico, [indiscernible] those were really strategic in all kinds of ways. With respect to the South Louisiana acreage we are active in South Louisiana what it does is add to our inventory it picks up free acreage that we not only can bring drilling prospects to the table that others can't because we own the acreage and fee. So it really is just an add-on to what our activity has been there in off shore for a lot of years. And that is the reason we call it tactical acquisition as opposed to any kind of strategic acquisition in nature…

(17) Apache continues to list these properties as a key aspect of its oil and gas footprint on the Gulf Coast, according to its web site page for Gulf of Mexico operations;

(18) ALM now holds title to approximately 267,000 acres of property in the Louisiana parishes of Cameron, Vermilion, Iberia, Terrebonne, Lafourche and Plaquemines;

(19) It grants mineral leases on its properties for the exploration and production of oil and gas to Apache and other entities;

(20) It negotiates and executes extensive transactions related to oil and gas activity and drilling operations with Apache and others;

(21) It also leases portions of its surface properties for hunting, grazing, fishing, trapping, oyster harvesting and alligator hunting;

(22) ALM lists a local address as P.O. Box 206, Houma, Louisiana 70361 in the Parish of Terrebonne;

(23) ALM registered with the Houma, Louisiana, Chamber of Commerce and identified itself as a member of the "Oil and Gas Industry" and is thus listed in the Oil and Gas Directory in the Houma Chamber of Commerce; and

(24) ALM is a member of the Louisiana Oil and Gas Association.

These facts are supported by documents which BP attached to its Initial and Final Proposal Memoranda. None were previously filed in the underlying appellate record. ALM strenuously objected to the Panel's consideration of them on the basis that they are not verified, not part of the record and contain hearsay. It argued that Rule 13 of the Rules Governing the Appeals Process defines the record on appeal and does not include, among the items listed therein, the documents introduced by BP. This issue was taken up by the entire Appeal Panel which, after due consideration, with each of the Panelists present and participating, established the following procedural rule pursuant to Settlement Agreement Section 6.1.2.2.5.4:

> Rule 7. Record on Appeal. Any exhibits or documents attached to memoranda on appeal are part of the record on appeal, whether or not those exhibits or documents had been previously introduced in the claim process. [effective 12/2/13].

This rule codified the Panel's long-standing practice of considering such documents, whether submitted by claimants or by BP, in reviewing appeals. More often than not, claimants, acting pro se or through counsel, have attached new documents or exhibits to their memoranda and asked that they be accepted and considered in connection with their appeals.

On March 14, 2014, Judge Barbier issued an Order finding that Rule 7 was properly enacted to implement a logical and efficient appeal process and that, for the purpose of the Appeal Panel's en banc review of the exclusion issue in this case, the documents submitted by both Claimant and BP will be considered part of the record and may be considered by the Appeal Panel in its deliberations.

BP maintains that the above cited facts demonstrate that ALM is engaged in the Oil and Gas business and is therefore excluded from the Economic Class. To the contrary, ALM argues that it is one of the largest coastal land owners in Louisiana; that title to the heart of its property in Terrebonne and Lafourche Parishes can be traced back to the early 1900's when the lands were separated from the public domain and that the remainder came into its possession through various acquisitions; that its sole business is the management of its property upon which it conducts a very active surface leasing program. It speaks of its leases to various persons for recreational and commercial activities such as camping, hunting, fishing, trapping and alligator hunting. It asserts that while it is a subsidiary of Apache, it operates a separate and distinct business independent of Apache, with its own management and staff. It denies that any of its activities are included in the Settlement Agreement definition of Oil and Gas Industry; moreover, that while it does not have its own NAICS Code because it files a consolidated tax return with its corporate parent, Apache, even then, the Apache code is not listed as an excluded code.

ALM argues that, as a separate, legal entity, the business of its corporate owner cannot be imputed to it and that its business activity must be evaluated on its own merits.

Class Counsel also submitted an en banc "amicus" memorandum for the purpose of highlighting three significant issues of general class-wide application. The first, having to do with the record documents issue was subsequently foreclosed by Judge Barbier's March 14, 2014 Order. The second asserts that the inquiry into class membership or exclusion is Entity specific. That is, neither Section 38.63 nor Section 2.1 of the Settlement Agreement, in discussing the definition of an Entity and the exclusion thereof, nor Section 4.4.7.1, refer to a "parent" or "affiliate" or "subsidiary." Consequently, an Entity which is a class member should not be excluded based on the fact (or allegation) that a separate and distinct parent entity is excluded.

Third, that Settlement Agreement Exhibits 17 and 18 and Section 4.4.7.1 direct the Settlement Program to examine 2010 business and tax records in order to determine specific NAICS Codes. While there may, from time to time, be exceptional circumstances, an individual or entity attempting to identify its rights should be able to generally rely on its use of a non-excluded NAICS Code as an indication that it was and is a class member and was/is not excluded. Consequently, they argue, the Settlement Program and the Appeal Panel should only look to the business records and activities of the Claiming Entity for the most accurate NAICS Code in applying the exclusions under Exhibit 17 and 18 and that when applying those exclusions, the code actually used on the tax returns and/or business licenses should be deemed presumptively correct. Where, therefore,

5

the Claiming Entity utilized a code that is <u>not</u> listed on one of those exhibits, it should be presumed to be an eligible class member, absent compelling evidence to the contrary.

Section 2 of the Settlement Agreement is entitled "Exclusions From the Economic and Property Damages Settlement Class Definition." Section 2.1 provides, generally, that certain individuals and Entities are excluded from the Economic Class and Section 2.2 identifies them.

Section 2.2.4 then states:

> "<u>The following exclusions are based on the substantive nature of the business, not the legal or juridical form of that business.</u> (Emphasis supplied). Any of the following types of Entity, or any Natural Person to the extent he or she alleges Economic Damage based on their employment by such an Entity, during the Class Period are excluded:
>
>> 2.2.4.5 Oil and Gas Industry, as identified in the NAICS Codes listed on Exhibit 17, which includes by way of example, firms engaged in: extracting crude petroleum, natural gas or other hydrocarbons; drilling wells; preparing, maintaining or constructing petroleum or natural gas well-sites or other mineral extraction sites; mining; maintaining or constructing petroleum or natural gas pipeline or distribution facilities; pipeline distribution of crude petroleum, refined petroleum, oil or natural gas; petroleum or natural gas refining or other mineral refining and/or manufacturing; manufacturing petroleum lubricating oil and grease, petrochemical products, or other petroleum and coal products or chemical products derived from extracted minerals; merchant wholesaling of construction and mining (except oil well) machinery and equipment; wholesale distribution of oil well machinery, equipment and supplies; wholesale distribution of petroleum, petroleum products, other extracted minerals, chemical products produced from extracted or refined minerals, petroleum bulk stations and terminals, petroleum and petroleum products merchant wholesalers."

Settlement Agreement Exhibit 17 is entitled "Oil & Gas Industry Exclusions" and contains the following prefatory paragraphs:

> Business Entities within the NAICS Code descriptions set forth below are excluded from the class. Natural Persons employed by a Business Entity within the NAICS Code descriptions set forth below are excluded to the extent and in the manner set forth in the Excluded Industries Chart (Bates Nos. 026686-026693).
>
> <u>The Claims Administrator shall determine the appropriate NAICS Code for a Business Entity based on his review of</u> (a) the NAICS code shown on a Business

6

>entity claimant's 2010 tax return, (b) 2010 business permits or license(s), and/or <u>(c) other evidence of the business's activities necessary for the Claims Administrator to determine the appropriate NAICS code.</u>" (Emphasis supplied)

It is undisputed that the properties in question were purchased for the sole purpose of increasing Apache's mineral exploration, development and production efforts. That is abundantly clear from the public statements of the Apache executives quoted above. Apache, in its capacity as agent for ALM, acquired title to those properties and holds them in the name of ALM, its wholly owned LLC. Thus, ALM is buying, holding and leasing these properties and otherwise facilitating such extraction from them on behalf of Apache. It is Apache's alter ego. In that respect, it is a very important component of the Apache business operation. For a whole variety of reasons, no doubt including legal and environmental, Apache apparently finds it useful to have a separate entity acquire and hold title to those lands that it needs to further its mineral exploration and production activities. The fact that ALM itself may not be performing the mineral extraction activity but instead holds the property so that extraction can be performed by a sibling or parent within the Apache corporate family is irrelevant. The above-quoted exclusionary provision recites that these exclusions are "based on the subjective nature of the business, not the legal or juridical form of that business."

It has been stated on many occasions by Class Counsel, BP and members of this Panel that the Settlement Agreement is the product of many hours of extended and intensive negotiations. That is obvious. It clearly defines the Economic Class and identifies those persons and entities who are excluded from the Class. This Panel is duty bound to respect and uphold the terms of the Agreement. To accept this Claimant's contention that, in these circumstances, it is a separate, legal entity which does nothing more with respect to managing its properties than any other private land owner would do, would be an abdication of that duty.

For the foregoing reasons, the awards made by the Settlement Program in these cases cannot be sustained and must be overturned.