**BP'S RESPONSE TO EN BANC APPEALS PANEL'S REQUEST REGARDING APACHE LOUISIANA MINERALS AND THE OIL AND GAS EXCLUSION[1]**

The Settlement Program has awarded Claimant Apache Louisiana Minerals LLC more than $44 million in compensation, and has an additional 29 claims pending.  BP Exploration & Production Inc. ("BP") respectfully submits this Memorandum with regard to the following question posed by the En Banc Appeals Panel:  "Is Apache Louisiana Minerals LLC excluded by the Oil & Gas Industry Exclusion?"  The answer is yes.  The Settlement Agreement expressly excludes claimants engaged in the oil and gas industry.  *See* Settlement Agreement, §§ 2.2.4, 2.2.4.5; *see also* Settlement Agreement, Ex. 12A, §1.A.  Claimant and its corporate parent have repeatedly and consistently represented and admitted to the Settlement Program, the United States Securities and Exchange Commission, state regulators, investors, their peers, and the public that Claimant is a member of the oil and gas industry as defined in the Settlement Agreement.

For example, on the sworn Registration Form that Claimant submitted to the Settlement Program, Claimant admitted under penalty of perjury that its NAICS code is 21111, the code for "Oil and Gas Extraction."

Likewise, Claimant, and its parent company, have repeatedly represented to investors in their securities filings and earnings calls, both governed by federal securities laws, that Claimant is engaged in the oil and gas industry.  In its annual report, Claimant's parent publically represented, on behalf of both itself and Claimant, that:  "Apache is engaged in a single line of business.  Both domestically and internationally, the Company explores for, develops, and produces natural gas crude oil and natural gas liquids."  In this same report, Claimant's parent

---

[1] BP respectfully notes that the *en banc* policy is inconsistent with the terms of Section 6 of the Settlement Agreement.  In filing this brief, BP in no way waives its position regarding the propriety of the *en banc* policy.

also stated that 100% of its and Claimant's earnings come from "Oil and gas production revenues."

Still further, when Claimant acquired certain of the properties that are the subject of the instant appeals, Claimant contractually obligated itself to i) develop, maintain, and operate the wells on the property; ii) market hydrocarbons; iii) sell hydrocarbons with reasonable and prudent business judgment and in accordance with sound oil and gas field practices; and iv) comply with accounting principles and Council of Petroleum Accountants Society standards. Consistent with this obligation, Claimant's parent boasted to investors that the acquisition allowed it to expand its "drilling activity." And still today, Claimant identifies the property on its web site as a key element of its oil and gas footprint in the Gulf of Mexico.

Simply put, the "substantive nature of [Claimant's] business"--the governing standard for purposes of thee exclusion--is, by Claimant's own admissions and representations, the oil and gas industry. Claimant therefore is excluded from the Settlement Agreement, and the Settlement Program erred in awarding Claimant more than $44 million in compensation.

## EXPLANATION OF BP'S POSITION

I.    <u>Apache Louisiana Minerals is an Excluded Business in the Oil and Gas Industry</u>

The Settlement Agreement expressly excludes claimants engaged in certain industries, including those engaged in the oil and gas industry. *See* Settlement Agreement, §§ 2.2.4, 2.2.4.5; *see also* Settlement Agreement, Ex. 12A, §1.A. The evidence is overwhelming and unambiguous that Claimant falls within this exclusion.

*First, it is undisputed that* Claimant identifies itself as a participant in the oil and gas industry on its sworn Registration Forms submitted to the Settlement Program under penalty of perjury. *See* Registration Forms submitted by Claimant. Specifically, Claimant identifies its NAICS code as "211110," the code for "Oil and Gas Extraction." This Code applies to

businesses "primarily engaged in operating and/or developing oil and gas field properties and establishments primarily engaged in recovering liquid hydrocarbons from oil and gas field gases." *See* http://www.census.gov/eos/www/naics/, last visited on October 29, 2013.  The Settlement Agreement provides that "[b]usinesses and employers identified on the NAICS codes listed on Exhibit 17 are excluded from the Economic Class." *Id.* at § 5.10.2.1.1.  Exhibit 17 reiterates this, stating "[b]usiness entities within the NAICS Code descriptions set forth below are excluded from the class."  *Id.* at Ex. 17.  Exhibit 17 to the Settlement Agreement lists the only two available subsets under Claimant's selected Code -- 211111 Crude Petroleum and Natural Gas Extraction and 211112 Natural Gas Liquid Extraction -- such that 211110 is necessarily subsumed in Exhibit 17.  Accordingly, Claimant has admitted that it is an entity in the excluded oil and gas industry and thus is not eligible for compensation under the Settlement Agreement.

  *Second*, *it is undisputed* Claimant's parent admits in its public filings that Claimant is engaged in the very types of activities that the Settlement Agreement defines as oil and gas activities.[2]  Claimant is a wholly-owned subsidiary of Apache Corporation and Claimant's operations and activities are included in Apache Corporation's Annual Report discussing its operations.  *See* Apache Corp. Form 10-K for 2012, Ex. 21.1; p. 1 (attached hereto as Exhibit 1) ("References to 'Apache' or the 'Company' include Apache Corporation and its consolidated

---

[2] Admissions against one's own interest -- such as Claimant makes here -- are recognized as particularly important evidence that is given significant weight.  Indeed, "admissions against proprietary interests[] carry their own indicia of credibility" because individuals and corporations are unlikely to make declarations contrary to their interests unless such statements are true. *United States v. Harris*, 403 U.S. 573, 584 (1971).  *See also* Fed. R. Evid. 804(b)(3); La. Evid. Code 804(b)(3) (statements against the declarant's own "pecuniary or proprietary interest" are not hearsay because they are by their nature sufficiently reliable and trustworthy).

subsidiaries…").[3]  Apache admits that it and Claimant are "engaged in a single line of business. Both domestically and internationally, the Company explores for, develops, and produces natural gas crude oil and natural gas liquids."  *See id*. at Note 13.  Apache Corporation further represents that it and Claimant earned 100% of their revenues from "Oil and gas production revenues." *See id.*

*Third*, *it is undisputed that* when Claimant acquired the property at issue in this Claim, it agreed to develop, maintain, and operate the wells located on the property at issue -- activities that fall squarely within the examples of excluded oil company activities provided in the Settlement Agreement,  including "preparing, maintaining or constructing petroleum or natural gas well-sites or other extraction sites."  *See* Settlement Agreement, §2.2.4.5.  Specifically, the relevant contracts obligate Claimant, as purchaser, to "conduct and carry on, or otherwise cause the development, maintenance, operation and abandonment of the Subject Interests."  *See* Conveyance Contract at p.1 , incorporating Act of Sale §4.4(a), (both attached hereto as Exhibit 2.)  The "Subject Interests" include all wells and well locations on the property at issue.  *See id.* at §§ 4.1(k), 4.1(i).

*Fourth*, *it is undisputed that* Claimant agreed in the relevant acquisition contracts to perform several additional activities of an oil and gas company, including to i) market hydrocarbons; ii) sell hydrocarbons with reasonable and prudent business judgment and in

---

[3] Below, Claimant attempted to argue that its own federal securities filings are not properly part of the record.  This is incorrect.  Where Claimant omits from its own submissions evidence that is relevant to determining whether Claimant is a class member, the Appeals Panel may consider such omitted evidence.  For example, the Appeals Panel has taken notice of an excluded claimant's website where the claimant, like Claimant here, failed to acknowledge its excluded status.  *See* Redacted Appeals Panel Decision, attached hereto as Exhibit AD. To accept Claimant's position with regard to the record would be to invite fraud and inaccuracy.

4

accordance with sound oil and gas field practices; and iii) comply with accounting principles and Council of Petroleum Accountants Society standards."[4]  *See* Exhibit 2 at §4.3, §4.4(a), §4.6.

*Fifth*, *it is undisputed that* in connection with the purchase of the subject property, Apache Corporation proudly informed investors that the acquisition would increase its oil and gas drilling activities.  For example, in a report to investors, Apache President and CEO Steven Farris stated that, "[i]n addition to adding more than 10 percent to our U.S. natural gas production, the acquisition gives us a significant opportunity to expand our U.S. drilling activity. We own 100 percent of both the mineral and surface rights on 212,000 of the acquired acres, improving the economics over a normal working-interest position."  *See* Apache Press Release, dated December 17, 2002 (attached hereto as Exhibit 3).  It further explained that the price it paid for the subject property was based wholly on the property's existing and exploitable oil and gas reserves.  *See id.* ("Apache allocated $195 million of the purchase price to proved reserves (approximately $1.10 per thousand feet of gas equivalent), $45 million to fee acreage and probable reserves, and $20 million to 3-D seismic data.").  It also touted that the "acquired acreage …provides immediate exploitation and exploration potential, with 23 prospects presently identified."  *Id.*  And, in its fourth quarter earnings call in 2002, Apache stated that the Louisiana properties brought new "drilling prospects to the table that others can't because we own the acreage and fee. So it really is just an add-on to what our activity has been there in off shore for a lot of years."  *See* Apache Corporation Fourth Quarter 2002 Earnings Call Transcript, p. 7 (attached hereto as Exhibit 4).

Confirming that its uses the property to extract oil and gas, Apache Corporation, in its 2002 Annual Report, advised investors that "net daily production from these properties is

---

[4] The Council of Petroleum Accountants Society "provides expertise for the oil and gas industry through the development of Model Form Accounting procedures, publications, and education."

expected to approximate 55 MMcf of natural gas and 2,100 barrels of oil in 2003" in its 2003

Annual Report.  *See* Apache 2003 Annual Report, p. 7 (attached hereto as Exhibit 5).  Apache

continues to list these properties as a key aspect of its oil and gas footprint in the Gulf Coast.  *See*

Apache Corporation's Website Page for Gulf of Mexico Operations, available at

http://www.apachecorp.com/Operations/US/Region_overview/Gulf_of_Mexico_

regions/index.aspx, last visited October 29, 2013 (attached hereto as Exhibit 6); Apache's

Enercom 2012 Oil and Gas Conference presentation, dated August 15, 2012, p.18 (attached

hereto as Exhibit 7).

  *Sixth*, *it is undisputed that* and entirely consistent with all of the above, Claimant

advertises itself as an oil and gas company.  When Claimant registered with its local Houma,

Louisiana Chamber of Commerce, it was required to identify the industry in which it

participated.  Claimant identified itself as a member of the "Oil & Gas" industry and is thus

listed in the Oil & Gas directory in the Houma Chamber of Commerce.[5]  *See* Houma Chamber of

Commerce website, available at http://houmaterrebonnechamber.chambermaster.com/

list/member/apache-louisiana-minerals-llc-houma-3051.htm, last visited October 29, 2013.

  *Seventh*, *it is undisputed that* Claimant is a member of the Louisiana Oil & Gas

Association.  *See* LOGA 2012 Membership Directory, attached hereto as Ex. 8.  The Louisiana

Oil & Gas Association's ("LOGA") stated mission is

> to represent the Independent and service sectors of *the oil and gas*
> *industry* in Louisiana; this representation includes exploration,
> production and oilfield services.  Our primary goal is to provide
> *our industry* with a working environment that will enhance the
> industry.  LOGA services its membership by creating incentives
> for *Louisiana's oil & gas industry*, warding off tax increases,
> changing existing burdensome regulations, and educating the

---

[5] Notably, there is a category for "Land Company," but ALM did not identify itself as a Land
Company and thus it is not listed in that category with the Chamber of Commerce.

> public and government of the importance of the *oil and gas*
> *industry in the state of Louisiana.*

*See* LOGA Mission Statement, available at http://loga.la/loga, last visited October 29, 2013, attached hereto as Ex. 9 (emphasis added).

*Last, it is undisputed that* in the event that Claimant is paid $44 million on its wetlands claims, those payments will be reflected on the Apache consolidated tax return--a consolidated tax return filed by an oil and gas company for oil and gas activities.

II.    Apache Louisiana Minerals' Arguments Regarding Its Secondary Activities Do Not
       Change Its Status As An Oil and Gas Company

Notwithstanding all of its admissions, which under the law are binding and controlling, Claimant, in an effort to secure tens of millions of dollars of claims awards, now argues that it is merely a land management company and has nothing to do with oil and gas. Claimant suggests that perhaps BP is confusing Claimant with its parent. Claimant is wrong on all counts.

As an initial matter, Claimant cannot now rewrite the nature of its business. It has told the Settlement Program, investors, federal regulators and state regulators that it is an oil and gas company, and it advertises itself as an oil and gas company. That is because it is an oil and gas company. Claimant's admissions against its own interests are accorded special weight under the law. *See, e.g.,* Fed. R. Evid. 804(b)(3) (statements against the declarant's own "pecuniary or proprietary interest" are not hearsay because they are by their nature sufficiently reliable and trustworthy); La. Evid. Code 804(b)(3) (same).

The fact that Claimant happens to perform certain secondary activities with regard to the surface rights (which sit atop its mineral rights) does nothing to undercut the fact that Claimant purchased the subject property to expand the mineral extraction efforts that that are the sworn sole business line of the entire Apache corporate family. It is common for oil and gas companies that own large tracts of property for the purpose of extracting fossil fuels to use the surface rights

for other purposes, including leasing for hunting and for environmental mitigation projects. Indeed, these secondary uses are for purposes of mitigating the environmental impacts of the primary oil and gas use of the property.  The fact that Claimant  makes secondary uses of the property's surface rights is irrelevant.

Likewise, the fact that Claimant itself may not be doing the oil extraction but instead holds the property so that extraction can be performed by a sibling or parent within the Apache corporate family is irrelevant.  The Settlement Agreement's exclusion states that these exclusions are "based on the substantive nature of the business, not the legal or juridical form of that business." *See* Settlement Agreement, § 2.2.4.5.  The nature of Claimant's business is oil and gas extraction, as it has said, and it leases the property to its parent or others to fulfill that business purpose.  As Claimant has affirmatively represented and admitted to the SEC and investors, Apache Corporation's entire corporate family, including Claimant itself, is engaged in the effort to generate revenue from oil and gas extraction.  Claimant's attempt to pretend that it, as a member of a corporate family dedicated solely to oil and gas exploration, is someone not involved in the sole business of the corporate family is absurd.

Claimant is misleading (at best) when it suggests to the panel that "[o]n occasion, mineral leases are granted by ALM to third parties to explore for minerals on its property, as is typical with most coastal landowners in Louisiana."  *See* Exhibit A to ALM's Initial Proposal, p.4.  The supposed third party is a member of the Apache corporate family, and when Claimant leases interests in oil and gas wells to Apache Corporation, ***the same person*** signs the Lease document as both Claimant ALM Apache Louisiana Minerals (the Lessor) and as Apache Corporation (the Lessee)*.  See* Exhibits A -  O, attached hereto.

8

Claimant's attempted disassociation from its parent crumbles further as the same holds true for other oil and gas-related documents, such as unitization agreements and land conveyances where both Claimant and parent Apache are parties.  Again, the ***very same person*** signs on behalf of both Claimant and Apache Corporation.  *See* Exhibits P - Y, attached hereto.

Moreover, Claimant's core business activities  also involve its dealings with other companies that, like Claimant, are involved in the oil and gas industry. In fact, a review of publicly filed documents, including, among other things, oil and gas leases, lease amendments, declarations, conveyances, permits, and releases for three Louisiana parishes reveal a total of 363 oil and gas-related filings - a far cry from "occasional" dealings with third parties. *See* Exhibits Z - AB, attached hereto.

And, of course, if any monies are paid to the Claimant, those monies will be treated as part of the consolidated tax return of the parent, which even Claimant admits in its Initial Proposal is an oil and gas company.

Finally, Claimant attempts to dodge the weight of this evidence by casting it all as hearsay.  A party's admissions are not hearsay.  *See, e.g.,* Federal Rule of Evidence 801(d)(2); *Cowen v. Allstate Ins. Co.*, No. 11-118, 2011 WL 5869449, at *4 (E.D. La. Nov. 22, 2011) ("a statement is not hearsay if it is offered against a party, and it is the party's own statement"). Therefore, Exhibits 1 - 7 to BP's Initial Proposal and Exhibits A-Y to BP's Final Proposal are not hearsay.  All of the other exhibits provided by BP fall under specific exceptions to the hearsay rule, including the business records and public records exceptions, or would otherwise be admissible under Rule 807 due to the trustworthiness and probative value of these documents. *See* Federal Rule of Evidence 803(6) - (9); Federal Rule of Evidence 807.  Even if one of the

documents at issue did constitute hearsay and is not subject to an exception, the hearsay rule does not apply to this appeals process.

III.   Claimant's Argument That BP Is Somehow Precluded From Appealing Its Claims Is Wrong

To date, BP has appealed twenty-three awards made by the Settlement Program to Claimant.  Claimant makes the meritless argument that BP is somehow estopped from contesting the subject award because BP did not appeal 2 out of 26 awards to date.[6]  BP did not, and does not now, acknowledge that either of these 2 awards was proper.  As to one of these awards, Claimant admits that BP has no right of appeal under the Settlement Agreement because the award was for less than $25,000.[7]  *See* Settlement Agreement at Rule 7(b).  The fact that BP did not appeal a claim that it has no appeal rights is irrelevant.

Nor is there any merit to Claimant's argument that BP cannot appeal the instant claim because it did not appeal an unrelated second claim, Claim Number 174553.  The Settlement Agreement has an express "no waiver" clause -- which bars Claimant's argument. *See* Settlement Agreement, § 35.1.  Just as each claim filed by Claimant is separate and distinct, whether BP elects to appeal any given claim has absolutely no bearing on the issue of whether BP may contest an award made for any other claim.  A recent decision of a three-judge Appeal Panel confirms that there has been no waiver.  In that case, the claimant argued that BP had waived its right to claim application of an exclusion with regard to one award where BP did not appeal two

---

[6] BP notes that Claimant has rendered some of these appeals inactive as a result of Claimant seeking re-review of the Claims by the Settlement Program.

[7] During the pendency of these appeals processes, a second non-appealable award has since been issued to Claimant. *See* Claim Numbers 174459 and 174555.

other claims awards made to members of the claimant's corporate family operating under the same name.[8]  The Appeals Panel rejected the claimant's argument, holding that:

> BP did not appeal two of the claims and withdrew its appeals in the other two claims.  While BP's decisions on other claims are interesting, such decisions are not binding precedent for this Panel.  BP has appealed the issue present in the instant Claim.  Under Section 6.4 of the Settlement Agreement, this Panel must conduct "a de novo review of the complete record in the Settlement Program to enforce compliance with this Agreement as approved by the Court."  While consistency of results is a goal of the appeals process, the instant claim is the first appeal of an award to a member of the [] group.

Exhibit AC, attached hereto.

For the same reasons as articulated in the above-quoted Appeals Panel decision, there has been no waiver with regard to the pending appeals.  Moreover, as a factual matter, the fact that BP did not appeal one other award to Claimant is nothing more than an unfortunate oversight. The Settlement Program has made more than 50,000 awards.  Claimant has not and cannot point to a shred of evidence to suggest that there was an intentional waiver of rights, as there was not. Just the opposite, BP has continually and unequivocally asserted its position that Claimant is excluded from participating in the Settlement Program and is not entitled to any award under that program.[9]

* * *

In short, at every turn -- before the Settlement Program, the U.S. SEC, state regulators, investors, its peers, and the public -- Claimant has been crystal clear that it is an oil and gas

---

[8] Claimant seeks to distinguish this decision by noting that the claims awards that BP did not appeal for Claimant are for different parcels of land owned by the same corporate entity, as opposed to different claims by members of the same corporate family.  The principle articulated by the Appeals Panel is the same regardless of corporate structure.  Each claim award stands alone.

[9] Indeed, at the time that Claimant accepted payments in July and August 2013, Claimant was on notice of BP's position both through a letter sent by BP's counsel to the Settlement Program and BP's numerous Notices of Appeal in other contemporaneously filed claims.

company.  As such, it is expressly excluded from the Settlement Agreement pursuant to the oil

and gas exclusion.

# EXHIBIT 1

EDGAR Online

# APACHE CORP

# FORM 10-K
(Annual Report)

## Filed 03/01/13 for the Period Ending 12/31/12

| | |
|---|---|
| Address | 2000 POST OAK BLVD |
| | STE 100 |
| | HOUSTON, TX 77056-4400 |
| Telephone | 7132966000 |
| CIK | 0000006769 |
| Symbol | APA |
| SIC Code | 1311 - Crude Petroleum and Natural Gas |
| Industry | Oil & Gas Operations |
| Sector | Energy |
| Fiscal Year | 12/31 |

Powered By EDGAR Online

http://www.edgar-online.com

© Copyright 2013, EDGAR Online, Inc. All Rights Reserved.

Distribution and use of this document restricted under EDGAR Online, Inc. Terms of Use.

# UNITED STATES SECURITIES AND EXCHANGE COMMISSION
## Washington, D.C. 20549

## FORM 10-K

(Mark One)

[X]   ANNUAL REPORT PURSUANT TO SECTION 13 OR 15(d) OF THE SECURITIES EXCHANGE ACT OF 1934

For the fiscal year ended December 31, 2012

or

[   ]   TRANSITION REPORT PURSUANT TO SECTION 13 OR 15(d) OF THE SECURITIES EXCHANGE ACT OF 1934

For the transition period from          to

Commission file number 1-4300

# APACHE CORPORATION
(Exact name of registrant as specified in its charter)

| Delaware | 41-0747868 |
|---|---|
| (State or other jurisdiction of incorporation or organization) | (I.R.S. Employer Identification No.) |

One Post Oak Central, 2000 Post Oak Boulevard, Suite 100, Houston, Texas 77056-4400
(Address of principal executive offices)

Registrant's telephone number, including area code (713) 296-6000

Securities registered pursuant to Section 12(b) of the Act:

| Title of each class | Name of each exchange on which registered |
|---|---|
| Common Stock, $0.625 par value | New York Stock Exchange, Chicago Stock Exchange and NASDAQ National Market |
| Preferred Stock Purchase Rights | New York Stock Exchange and Chicago Stock Exchange |
| Apache Finance Canada Corporation 7.75% Notes Due 2029 Irrevocably and Unconditionally Guaranteed by Apache Corporation | New York Stock Exchange |
| Depositary Shares Representing a 1/20 th Interest in a Share of 6.00% Mandatory Convertible Preferred Stock, Series D | New York Stock Exchange |

Securities registered pursuant to Section 12(g) of the Act: Common Stock, $0.625 par value

Indicate by check mark if the registrant is a well-known seasoned issuer, as defined in Rule 405 of the Securities Act.  Yes  [X]  No  [   ]

Indicate by check mark if the registrant is not required to file reports pursuant to Section 13 or Section 15(d) of the Act.

Yes  [   ]  No  [X]

Indicate by check mark whether the registrant (1) has filed all reports required to be filed by Section 13 or 15(d) of the Securities Exchange Act of 1934 during the preceding 12 months (or for such shorter period that the registrant was required to file such reports), and (2) has been subject to such filing requirements for the past 90 days.  Yes  [X]  No  [   ]

Indicate by check mark whether the registrant has submitted electronically and posted on its corporate Website, if any, every Interactive Data File required to be submitted and posted pursuant to Rule 405 of Regulation S-T (§ 232.405 of this chapter) during the preceding 12 months (or for such shorter period that the registrant was required to submit and post such files).  Yes  [X]  No  [   ]

Indicate by check mark if disclosure of delinquent filers pursuant to Item 405 of Regulation S-K is not contained herein, and will not be contained, to the best of registrant's knowledge, in definitive proxy or information statements incorporated by reference in Part III of this Form 10-K or any amendment to this Form 10-K.  [   ]

Indicate by check mark whether the registrant is a large accelerated filer, an accelerated filer, a non-accelerated filer, or a smaller reporting company. See the definitions of "large accelerated filer," "accelerated filer" and "smaller reporting company" in Rule 12b-2 of the Exchange Act. Large accelerated filer  [X]  Accelerated filer  [   ]  Non-accelerated filer  [   ]  Smaller reporting company  [   ]

Indicate by check mark whether the registrant is a shell company (as defined in Rule 12b-2 of the Exchange Act):  Yes  [   ]  No  [X]

| | |
|---|---|
| Aggregate market value of the voting and non-voting common equity held by non-affiliates of registrant as of June 30, 2012 | $  34,382,410,237 |
| Number of shares of registrant's common stock outstanding as of January 31, 2013 | 391,758,883 |

## Documents Incorporated By Reference

Portions of registrant's proxy statement relating to registrant's 2013 annual meeting of stockholders have been incorporated by reference in Part II and Part III of this annual report on Form 10-K.

**TABLE OF CONTENTS**
**DESCRIPTION**

Item              Page

**PART I**

| 1. | BUSINESS | 1 |
| 1A. | RISK FACTORS | 21 |
| 1B. | UNRESOLVED STAFF COMMENTS | 32 |
| 2. | PROPERTIES | 1 |
| 3. | LEGAL PROCEEDINGS | 32 |
| 4. | MINE SAFETY DISCLOSURES | 32 |

**PART II**

| 5. | MARKET FOR REGISTRANT'S COMMON EQUITY, RELATED STOCKHOLDER MATTERS AND ISSUER PURCHASES OF EQUITY SECURITIES | 33 |
| 6. | SELECTED FINANCIAL DATA | 35 |
| 7. | MANAGEMENT'S DISCUSSION AND ANALYSIS OF FINANCIAL CONDITION AND RESULTS OF OPERATIONS | 36 |
| 7A. | QUANTITATIVE AND QUALITATIVE DISCLOSURES ABOUT MARKET RISK | 66 |
| 8. | FINANCIAL STATEMENTS AND SUPPLEMENTARY DATA | 69 |
| 9. | CHANGES IN AND DISAGREEMENTS WITH ACCOUNTANTS ON ACCOUNTING AND FINANCIAL DISCLOSURE | 69 |
| 9A. | CONTROLS AND PROCEDURES | 69 |
| 9B. | OTHER INFORMATION | 69 |

**PART III**

| 10. | DIRECTORS, EXECUTIVE OFFICERS AND CORPORATE GOVERNANCE | 70 |
| 11. | EXECUTIVE COMPENSATION | 70 |
| 12. | SECURITY OWNERSHIP OF CERTAIN BENEFICIAL OWNERS AND MANAGEMENT AND RELATED STOCKHOLDER MATTERS | 70 |
| 13. | CERTAIN RELATIONSHIPS AND RELATED TRANSACTIONS, AND DIRECTOR INDEPENDENCE | 70 |
| 14. | PRINCIPAL ACCOUNTING FEES AND SERVICES | 70 |

**PART IV**

| 15. | EXHIBITS, FINANCIAL STATEMENT SCHEDULES | 71 |

i

**DEFINITIONS**

All defined terms under Rule 4-10(a) of Regulation S-X shall have their statutorily prescribed meanings when used in this report. As used in this document:

"3-D" means three-dimensional.

"4-D" means four-dimensional.

"b/d" means barrels of oil or natural gas liquids per day.

"bbl" or "bbls" means barrel or barrels of oil.

"bcf" means billion cubic feet.

"boe" means barrel of oil equivalent, determined by using the ratio of one barrel of oil or NGLs to six Mcf of gas.

"boe/d" means boe per day.

"Btu" means a British thermal unit, a measure of heating value.

"LIBOR" means London Interbank Offered Rate.

"LNG" means liquefied natural gas.

"Mb/d" means Mbbls per day.

"Mbbls" means thousand barrels of oil.

"Mboe" means thousand boe.

"Mboe/d" means Mboe per day.

"Mcf" means thousand cubic feet of natural gas.

"Mcf/d" means Mcf per day.

"MMbbls" means million barrels of oil.

"MMboe" means million boe.

"MMBtu" means million Btu.

"MMBtu/d" means MMBtu per day.

"MMcf" means million cubic feet of natural gas.

"MMcf/d" means MMcf per day.

"NGL" or "NGLs" means natural gas liquids, which are expressed in barrels.

"NYMEX" means New York Mercantile Exchange.

"oil" includes crude oil and condensate.

"PUD" means proved undeveloped.

"SEC" means United States Securities and Exchange Commission.

"Tcf" means trillion cubic feet.

"U.K." means United Kingdom.

"U.S." means United States.

With respect to information relating to our working interest in wells or acreage, "net" oil and gas wells or acreage is determined by multiplying gross wells or acreage by our working interest therein. Unless otherwise specified, all references to wells and acres are gross.

ii

**PART I**

**ITEMS 1 AND 2.       *BUSINESS AND PROPERTIES***

    This Annual Report on Form 10-K and the documents incorporated herein by reference contain forward-looking statements based on expectations, estimates, and projections as of the date of this filing. These statements by their nature are subject to risks, uncertainties, and assumptions and are influenced by various factors. As a consequence, actual results may differ materially from those expressed in the forward-looking statements. See Part II, Item 7A—Quantitative and Qualitative Disclosures About Market Risk—Forward-Looking Statements and Risk of this Form 10-K.

<u>**General**</u>

    Apache Corporation, a Delaware corporation formed in 1954, is an independent energy company that explores for, develops, and produces natural gas, crude oil, and natural gas liquids. We currently have exploration and production interests in six countries: the U.S., Canada, Egypt, Australia, the U.K. North Sea (North Sea), and Argentina. Apache also pursues exploration interests in other countries that may over time result in reportable discoveries and development opportunities. We treat all operations as one line of business.

    Our common stock, par value $0.625 per share, has been listed on the New York Stock Exchange (NYSE) since 1969, on the Chicago Stock Exchange (CHX) since 1960, and on the NASDAQ National Market (NASDAQ) since 2004. On June 7, 2012, we filed certifications of our compliance with the listing standards of the NYSE and the NASDAQ, including our principal executive officer's certification of compliance with the NYSE standards. Through our website, www.apachecorp.com, you can access, free of charge, electronic copies of the charters of the committees of our Board of Directors, other documents related to our corporate governance (including our Code of Business Conduct and Governance Principles), and documents we file with the SEC, including our annual reports on Form 10-K, quarterly reports on Form 10-Q and current reports on Form 8-K, as well as any amendments to these reports filed or furnished pursuant to Section 13(a) or 15(d) of the Securities Exchange Act of 1934. Included in our annual and quarterly reports are the certifications of our principal executive officer and our principal financial officer that are required by applicable laws and regulations. Access to these electronic filings is available as soon as reasonably practicable after we file such material with, or furnish it to, the SEC. You may also request printed copies of our committee charters or other governance documents free of charge by writing to our corporate secretary at the address on the cover of this report. Our reports filed with the SEC are made available to read and copy at the SEC's Public Reference Room at 100 F Street, N.E., Washington, D.C., 20549. You may obtain information about the Public Reference Room by contacting the SEC at 1-800-SEC-0330. Reports filed with the SEC are also made available on its website at www.sec.gov. From time to time, we also post announcements, updates, and investor information on our website in addition to copies of all recent press releases. Information on our website or any other website is not incorporated by reference into, and does not constitute a part of, this Annual Report on Form 10-K.

    Properties to which we refer in this document may be held by subsidiaries of Apache Corporation. References to "Apache" or the "Company" include Apache Corporation and its consolidated subsidiaries unless otherwise specifically stated.

<u>**Growth Strategy**</u>

    Apache's mission is to grow a profitable global exploration and production company in a safe and environmentally responsible manner for the long-term benefit of our shareholders. Apache's long-term perspective has many dimensions, which are centered on the following core strategic components:

•    balanced portfolio of core assets

•    conservative capital structure

•    rate of return focus

1

Throughout the cycles of our industry, these strategies have underpinned our ability to deliver long-term production and reserve growth and achieve competitive returns on invested capital for the benefit of our shareholders. We have increased reserves 23 out of the last 27 years and production 32 out of the past 34 years, a testament to our consistency over the long-term.

Apache pursues opportunities for growth through exploration and development drilling, supplemented by occasional strategic acquisitions. After a three-year period of significant portfolio expansion through acquisitions, we have shifted our focus back to developing our enlarged property base. In 2012, we generated approximately $8.5 billion of cash flows from operating activities, which enabled us to have an active drilling and development program across all of our regions. As a result, we reported record production of 779 Mboe/d, up over four percent from the prior year. At the same time, we have also invested a larger portion of our capital budget on long-lead time projects than we have in the past. In 2012, we spent approximately one-quarter of our capital budget on purchasing additional leasehold acreage, obtaining seismic data, building infrastructure, and proceeding on long-lead development projects including LNG facilities. Coupled with an active drilling program and our new venture exploration efforts, these longer-term investments secure a platform for future profitable growth.

While we are focused on growth through the drill bit, we also seek acquisition opportunities that meet our criteria for risk, reward, rate of return, and growth potential. From April 2010 through the end of 2012, Apache announced several significant acquisitions, each of which fit well with our long-term growth strategy. These properties are strategically positioned with our existing infrastructure and play to the strengths that come with our operating experience. Our significant acquisitions and other transactions since 2010 are described below.

### 2012 Transactions

*Chevron Kitimat transaction*   On December 24, 2012, Chevron Canada Limited (Chevron Canada) and Apache Canada Ltd. (Apache Canada) entered into an agreement to build and operate the Kitimat LNG project. Pursuant to the agreement, each will become a 50-percent owner of the proposed Kitimat LNG plant, the Pacific Trail Pipeline, and 644,000 gross undeveloped acres in the Horn River and Liard basins. Chevron Canada will operate the LNG plant, which will be located on the northern British Columbia coast, and the pipeline; Apache Canada will operate Horn River and Liard. The transaction closed on February 8, 2013.

*Central Anadarko basin acquisition*   In April 2012 Apache completed the acquisition of Cordillera Energy Partners III, LLC (Cordillera), a privately held company, for $2.7 billion in cash and approximately 6.3 million shares of Apache common stock.

*Yara Pilbara Holdings Pty Limited acquisition*   On January 31, 2012, a subsidiary of Apache Energy Limited completed the acquisition of a 49-percent interest in Yara Pilbara Holdings Pty Limited (YPHPL, formerly Burrup Holdings Limited) for $439 million, including working capital adjustments. YPHPL is the owner of an ammonia fertilizer plant on the Burrup Peninsula of Western Australia.

### 2011 Transactions

*North Sea acquisition*   On December 30, 2011, Apache completed the acquisition of Mobil North Sea Limited (Mobil North Sea) from Exxon Mobil Corporation with cash consideration of $1.25 billion.

### 2010 Transactions

*Gulf of Mexico Shelf acquisition*   On June 9, 2010, Apache completed the acquisition of oil and gas assets in the Gulf of Mexico shelf from Devon Energy Corporation for $1.05 billion.

*Permian acquisition*   On August 10, 2010, we completed the acquisition of BP plc's (BP) oil and gas operations, acreage, and infrastructure in the Permian Basin for $2.5 billion, net of preferential rights to purchase.

*Canadian acquisition*    On October 8, 2010, we completed the acquisition of substantially all of BP's upstream natural gas business in western Alberta and British Columbia for $3.25 billion.

*Egyptian acquisition*    On November 4, 2010, we completed the acquisition of BP's assets in Egypt's Western Desert for $650 million.

*Mariner merger*    On November 10, 2010, Apache completed the acquisition of Mariner Energy, Inc. (Mariner) for stock and cash consideration totaling $2.7 billion. We also assumed approximately $1.7 billion of Mariner's debt with the merger.

For a more in-depth discussion of our growth strategy, 2012 results, and the Company's capital resources and liquidity, please see Part II, Item 7—Management's Discussion and Analysis of Financial Condition and Results of Operations of this Form 10-K.

## Geographic Area Overviews

We currently have exploration and production interests in six countries: the U.S., Canada, Egypt, Australia, the U.K. North Sea, and Argentina. Apache also pursues exploration interests in other countries that may over time result in reportable discoveries and development opportunities.

The following table sets out a brief comparative summary of certain key 2012 data for each of our operating areas. Additional data and discussion is provided in Part II, Item 7 of this Form 10-K.

| | 2012 Production (In MMboe) | Percentage of Total 2012 Production | 2012 Production Revenue (In millions) | 12/31/12 Estimated Proved Reserves (In MMboe) | Percentage of Total Estimated Proved Reserves | 2012 Gross Wells Drilled | 2012 Gross Productive Wells Drilled |
|---|---|---|---|---|---|---|---|
| United States | 113.5 | 40% | $ 6,226 | 1,424 | 50% | 1,052 | 1,035 |
| Canada | 44.7 | 16 | 1,322 | 541 | 19 | 169 | 145 |
| Total North America | 158.2 | 56 | 7,548 | 1,965 | 69 | 1,221 | 1,180 |
| Egypt | 58.1 | 20 | 4,554 | 273 | 10 | 198 | 174 |
| Australia | 23.6 | 8 | 1,575 | 342 | 12 | 15 | 8 |
| North Sea | 27.4 | 10 | 2,751 | 170 | 6 | 21 | 16 |
| Argentina | 17.7 | 6 | 519 | 102 | 3 | 30 | 30 |
| Other International | — | — | — | — | — | 1 | — |
| Total International | 126.8 | 44 | 9,399 | 887 | 31 | 265 | 228 |
| Total | 285.0 | 100% | $ 16,947 | 2,852 | 100% | 1,486 | 1,408 |

### North America

Apache's North American asset base primarily comprises operations in the central U.S., the Permian Basin, the Gulf Coast onshore and offshore areas of the U.S., and operations in Western Canada. In 2012, our North America assets contributed 56 percent of our production and 45 percent of our oil and gas production revenues. At year-end 2012, 69 percent of our estimated proved reserves were located in North America.

### United States

*Overview*    We have 12.3 million gross acres across the U.S., approximately 60 percent of which is undeveloped. After expanding our portfolio over the last three years, we now hold leading positions in many attractive basins and plays within the United States. To focus our development efforts in the U.S., we have divided our assets into five distinct regions: Central, Permian, Gulf of Mexico Shelf, Gulf of Mexico Deepwater, and Gulf Coast Onshore. We also have leasehold acreage holdings in Alaska and other states where we are

3

pursuing exploration opportunities. Our holdings in the U.S. provide a balance of hydrocarbon mix and reserve life and an opportunity for continued exploration. In 2012, 54 percent of our U.S. production and 63 percent of our U.S. year-end estimated proved reserves were oil and liquids. In addition, the reserve life of our U.S. regions ranged from 6 to 20 years with the Gulf of Mexico offshore region's shorter-lived reserves balancing longer-lived reserves in the Central and Permian regions. In 2012, 40 percent of Apache's equivalent production and 50 percent of Apache's total year-end estimated proved reserves were in the U.S.

*Central Region*    The Central region includes more than 3,500 producing wells primarily in western Oklahoma and the Texas panhandle and controls nearly 1.9 million gross acres. The region is Apache's first core area dating back over half a century and has historically grown through low-risk, highly predictable natural gas exploitation. Over the last three years, however, a transformation from vertical to horizontal drilling and continued price disparity between crude oil and natural gas have evolved the region from one targeting natural gas to one now targeting oil and liquids-rich gas plays. This focus resulted in liquids production growth of over 115 percent during 2011. Oil and liquids production further expanded during 2012, with oil production more than doubling and NGL production almost tripling compared to the prior year. Total region production was up 37 percent in 2012. The Central region contributed 8 percent of Apache's 2012 equivalent production and 9 percent of total year-end proved reserves.

The primary driver of the region's growth was an active exploration and development program where we drilled or participated in drilling 192 wells during 2012, 99 percent of which were completed as producers. A significant focus of our drilling program has been in the Anadarko basin's Granite Wash play. The Granite Wash consists of a series of thick, multi-layered formations of low-permeability and liquids-rich sandstones. The Company's significant acreage position in the play has generated an active drilling plan for the next several years across numerous formations, notably the Tonkawa, Marmaton, Cottage Grove, and Cleveland.

We have also been drilling Canyon Wash wells on approximately 92,000 net acres in the Whittenburg basin. During the year, we drilled and completed seven successful wells in the Canyon Wash, which averaged 30-day gross rates of approximately 675 b/d and 500 Mcf/d. These tests are an encouraging validation of this play, given the results are from vertically drilled wells.

Our drilling momentum in the Central region was further bolstered in April when the Company completed the acquisition of Cordillera, a privately held company with approximately 312,000 net acres in the heart of the Anadarko basin, nearly 18 Mboe/d of production, and estimated proved reserves of 70 MMboe. The acquisition doubled Apache's acreage in the Granite Wash area and added a robust drilling inventory that was immediately integrated into our existing program.

The region operated an average of 18 drilling rigs during 2012 and, with a growing portfolio of drilling opportunities, plans to run an average of 29 rigs during 2013. We expect to invest approximately $1.4 billion in 2013 for drilling, recompletions, equipment upgrades, and production enhancement projects. The region will also invest in facility and transportation projects to increase takeaway capacity.

*Permian Region*    Our Permian region controls over 3.5 million gross acres with exposure across every major play in the Permian Basin. The region's property and acreage base has increased substantially over the last three years through an active acquisition effort. Apache is now one of the largest operators in the Permian Basin, operating more than 12,000 wells in 152 fields, including 47 waterfloods and 7 active $CO_2$ floods, including the Roberts Unit, which initiated $CO_2$ injection in January 2013. In 2012, liquids production in the region was up 25 percent, contributing to a total sequential production increase of over 18 percent as a result of an active drilling program that is continuing to ramp up. We averaged running 32 rigs during the year, drilling or participating in 781 wells, and plan to run 34 rigs in 2013. The Permian region's year-end 2012 estimated proved reserves were 800 MMboe and represented 28 percent of Apache's total proved reserves.

A key focus area of our activity during the year continued to be the multi-zone development of the Deadwood area. Deadwood is the most active of our plays in the Midland basin, where we ran an average of

4

16 rigs and drilled 317 wells. Specifically, the region is primarily drilling vertical wells targeting the Wolfwood and the Fusselman zones. With additional 3-D seismic data recently acquired, our ability to target other prolific accumulations and new drilling locations has been enhanced.

The region is also building a large inventory of horizontal drilling opportunities based on success achieved over 2012, having drilled or participated in drilling 104 horizontal wells during the period. Two horizontal plays in the Midland Basin, the Wolfcamp and Cline shales, have been drilled and commercialized with multi-rig development programs moving forward. Also in the Midland Basin, we recently drilled and completed oil-producing wells in the Barnett and Deadwood shales focusing on the future potential across our large acreage position. New horizontal plays in the Mississippian Lime and Clearfork shales are planned for 2013. We recently commenced horizontal well programs in the Yeso area of New Mexico as well as in the Bone Spring and Wolfcamp plays in Texas. We also continue to achieve positive results in the Central basin with horizontal redevelopment of historically conventional fields and reservoirs. We expect to conduct greater horizontal drilling into 2013, when we project that nearly half of our rigs will be drilling horizontal wells by year-end.

Our active drilling program has resulted in production growth for the past eight sequential quarters, rising 37 percent over the past two years. Given a current inventory of over 34,000 locations, the region has a deep portfolio of drilling opportunities for multiple years. For 2013, the Permian region plans to invest approximately $2.4 billion in drilling, recompletion projects, equipment upgrades, expansion of existing facilities and equipment, and leasing activities.

*Gulf Coast Regions*     Our Gulf Coast assets are primarily located in and along the Gulf of Mexico, in the areas onshore and offshore Texas, Louisiana, Alabama, and Mississippi. The area is divided into three regions, which include the Gulf of Mexico Shelf, Gulf of Mexico Deepwater, and Gulf Coast Onshore.

In water depths less than 500 feet, which constitutes most of our Gulf of Mexico Shelf region, Apache is currently the largest producer and has been the largest offshore held-by-production acreage owner since 2004, holding approximately three million gross acres. The region contributed 12 percent of our worldwide production and revenue during 2012. With prolific wells, strong cash flows, and a strategic position near the petrochemical-industrial complex on the U.S. Gulf Coast, the region has consistently generated high rates of return. During 2012 the region drilled or participated in 36 wells with an 80-percent success rate, consistent with activity levels of the prior two years. In June 2012, the region also participated in the federal lease sale where we were awarded 60 blocks, opening up additional exploration and development opportunities.

In water depths greater than 500 feet, the Gulf of Mexico Deepwater region is a relatively underexplored and oil prone area that provides exposure to significant reserve and production potential. Apache's strategic presence in the area was gained through the 2010 Mariner merger and was extended through our participation in the June 2012 federal lease sale where we were awarded 28 new leases. The Company now owns approximately 900,000 gross acres across 166 blocks as of the end of 2012. The Deepwater region contributed only 2 percent of Apache's worldwide production in 2012; however, there are several large projects and developments underway that could spur significant growth. The non-operated Lucius project, where Apache holds an 11.7-percent working interest, is currently under development with first production projected for 2014. In addition, the large-scale non-operated Heidelberg project continues to move forward. Apache has a 12.5-percent working interest in this development with first production projected for 2016. The region also continues to increase its exploration activity. After drilling two wells in 2011, we drilled five wells in 2012 with a 60-percent success rate. Seven wells are planned for drilling in the areas in which we hold an interest during 2013.

Apache's Gulf Coast Onshore region includes mature onshore and near-shore basins of Texas, Louisiana, and Mississippi, where it has a significant acreage position of approximately 1.4 million gross acres, including 330,000 mineral fee acres. With advancements in modern seismic imaging, horizontal drilling and completion technologies, additional opportunities continue to evolve. During the year, the region focused on drilling shallow and moderate-depth targets, increasing acreage holdings, and expanding regional 3-D seismic databases. In

5

addition, the region continued evaluating several unconventional resource plays and deeper exploitation opportunities. The region drilled or participated in drilling 35 wells during 2012 and plans to drill or participate in approximately 39 wells in 2013.

In 2013, Apache plans to invest approximately $700 million, $400 million, and $250 million in the Gulf of Mexico Shelf, Gulf of Mexico Deepwater, and Gulf Coast Onshore regions, respectively. The capital will be spent on drilling, recompletion and development projects, equipment upgrades, production enhancement projects, and seismic and lease activities. The Company spent $435 million on abandonment activities in 2012 over the entire Gulf Coast area and expects similar activity levels in 2013.

*U.S. Marketing*    In general, most of our U.S. gas is sold at either monthly or daily market prices. Our natural gas is sold primarily to local distribution companies (LDCs), utilities, end-users, and integrated major oil companies. We maintain a diverse customer portfolio, which is intended to reduce the concentration of credit risk.

Apache primarily markets its U.S. crude oil to integrated major oil companies, marketing and transportation companies, and refiners. Our objective is to maximize the value of crude oil sold by identifying the best markets and most economical transportation routes available to move the product. Sales contracts are generally 30-day evergreen contracts that renew automatically until canceled by either party. These contracts provide for sales that are priced daily at prevailing market prices.

Apache's NGL production is sold under contracts with prices based on market indices, less the costs for transportation and fractionation, or on a weighted-average sales price received by the purchaser.

*Canada*

*Overview*    Since entering the Canadian market in 1995 **,** Apache has continued to increase its presence in the region and now holds approximately seven million gross acres across the provinces of British Columbia, Alberta, and Saskatchewan. The region's large acreage position provides portfolio diversification as well as significant drilling opportunity. Canada represented approximately 19 percent of Apache's worldwide proved reserves at year-end 2012 and approximately 16 percent of 2012 worldwide production.

In 2012, Apache drilled or participated in drilling 169 wells in Canada, with a continued focus on increasing oil and liquids-rich gas production. Reservoir modeling and state-of-the-art horizontal drilling technology advanced several oil plays in the Viking, Glauconite, Dunvegan, and Sparky formations, and success with multi-stage fracture completions continues to increase the scope of oil and liquids-rich gas drilling opportunities.

Future natural gas drilling activity will be driven by market prices and the Kitimat LNG project. In December 2012, Apache announced an agreement with Chevron Canada to build and operate the Kitimat LNG project and develop shale gas resources at the Liard and Horn River basins in British Columbia. Chevron Canada and Apache Canada will each hold a 50-percent interest in the Kitimat LNG plant, the Pacific Trail Pipeline, and approximately 644,000 gross undeveloped acres in the Horn River and Liard basins. Chevron Canada will operate the LNG plant and pipeline, and Apache Canada will operate Horn River and Liard. The Kitimat plant has received all significant environmental approvals and a 20-year export license from the Canadian federal government. Although the project has not reached a final investment decision, we believe Chevron's experience in developing LNG projects and marketing expertise will assist in moving the development forward. The transaction was completed on February 8, 2013.

In 2013, the region plans to invest approximately $680 million in drilling and development projects, equipment upgrades, production enhancement projects, seismic acquisition, and Kitimat project development. Drilling in 2013 will continue to focus on conventional oil and liquids-rich gas plays.

*Marketing*     Our Canadian natural gas marketing activities focus on sales to utilities, end-users, integrated major oil companies, supply aggregators, and marketers. We maintain a diverse client portfolio, which is intended to reduce the concentration of credit risk in our portfolio. To diversify our market exposure, we transport natural gas via firm transportation contracts to export border points for delivery into Washington, California, and the Chicago area. We sell the majority of our Canadian gas on a monthly basis at either first-of-the-month or daily AECO index prices.

Canadian crude oil production is sold to integrated major companies, refiners, and marketing companies based on a WTI price, adjusted for quality, transportation, and a market-reflective negotiated differential. We maximize the value of our condensate and heavier crudes by determining whether to blend the condensate into our own crude production or sell it in the market as a segregated product. The crude is transported on pipeline or truck within Western Canada to the market hubs in Alberta and Manitoba where it is sold, allowing for a more diversified group of purchasers and a higher netback price.

The region's NGL production is sold under contracts with prices based on market indices, less the costs for transportation and fractionation, or on a weighted-average sales price received by the purchaser.

### International

Apache's international assets are located in Egypt, Australia, offshore the U.K. in the North Sea, and Argentina. In 2012, international assets contributed 44 percent of our production and 55 percent of our oil and gas revenues. At year-end 2012, 31 percent of our estimated proved reserves were located outside North America.

### Egypt

*Overview*     Our activity in Egypt began in 1994 with our first Qarun discovery well. Today we control 9.7 million gross acres, making Apache the largest acreage holder in Egypt's Western Desert. Only 18 percent of our gross acreage in Egypt has been developed, with gross production of 213 Mb/d and 900 MMcf/d in 2012, or 100 Mb/d and 354 MMcf/d net to Apache. The remaining 82 percent of our acreage is undeveloped, providing us with considerable exploration and development opportunities for the future. In 2012, the region contributed 27 percent of Apache's worldwide production revenue, 20 percent of our worldwide production, and 10 percent of our year-end 2012 estimated proved reserves. Our estimated proved reserves in Egypt are reported under the economic interest method and exclude the host country share reserves.

Our operations in Egypt are conducted pursuant to production-sharing agreements in 23 separate concessions, under which the contractor partner pays all operating and capital expenditure costs for exploration and development. Development leases within concessions generally have a 25-year life, with extensions possible for additional commercial discoveries or on a negotiated basis, and currently have expiration dates ranging from five to 25 years. A percentage of the production on development leases, usually up to 40 percent, is available to the contractor partners to recover operating and capital expenditure costs, with the balance generally allocated between the contractor partners and Egyptian General Petroleum Corporation (EGPC) on a contractually defined basis.

Historically, growth in Egypt has been driven by an ongoing drilling program, and we are one of the most active drillers in the region. Throughout 2012, we averaged running 25 rigs and drilled 188 development and injection wells and 51 exploration wells. Approximately 55 percent of our exploration wells were successful, further expanding our presence in the westernmost concessions and unlocking additional opportunities in existing plays. A key component of the region's success has been our ability to acquire and evaluate 3-D seismic surveys that enable the region's technical teams to consistently high-grade existing prospects and identify new targets across multiple pay horizons in the Cretaceous, Jurassic, and deeper Paleozoic reservoirs.

7

Heading into 2013, the region will continue an active drilling program and plans to invest approximately $1.1 billion for drilling, recompletion projects, development projects, and seismic acquisition. There are also several key infrastructure projects underway that will focus on maintaining gas deliverability and bringing additional liquids to market.

*Marketing*   Our gas production is sold to EGPC primarily under an industry-pricing formula, a sliding scale based on Dated Brent crude oil with a minimum of $1.50 per MMBtu and a maximum of $2.65 per MMBtu, plus an upward adjustment for liquids content. Apache previously agreed to accept the industry-pricing formula on a majority of gas sold but retained the previous gas-price formula (without an oil price cap) until the end of 2012 for up to 100 MMcf/d gross. The region averaged $3.90 per Mcf in 2012.

Oil from the Khalda Concession, the Qarun Concession, and other nearby Western Desert blocks is sold to third parties in the Mediterranean market or to EGPC when called upon to supply domestic demand. Oil sales are exported from or sold at one of two terminals on the northern coast of Egypt. Oil production that is presently sold to EGPC is sold on a spot basis priced at Brent with a monthly EGPC official differential applied.

*Egypt political unrest*   In February 2011, former Egyptian president Hosni Mubarak stepped down, and the Egyptian Supreme Council of the Armed Forces took power, announcing that it would remain in power until the presidential and parliamentary elections could be held. In June 2012, Mohamed Morsi of the Muslim Brotherhood's Freedom and Justice Party was elected as Egypt's new president. In December 2012 the people of Egypt ratified a new constitution. Under the new constitution, the government must hold elections for the lower house of parliament within 60 days. Apache's operations, located in remote locations in the Western Desert, have not experienced production interruptions, and we have continued to receive development lease approvals for our drilling program. However, a deterioration in the political, economic, and social conditions or other relevant policies of the Egyptian government, such as changes in laws or regulations, export restrictions, expropriation of our assets or resource nationalization, and/or forced renegotiation or modification of our existing contracts with EGPC could materially and adversely affect our business, financial condition, and results of operations.

Apache purchases multi-year political risk insurance from the Overseas Private Investment Corporation (OPIC) and other highly rated international insurers covering a portion of its investments in Egypt. In the aggregate, these insurance policies, subject to the policy terms and conditions, provide approximately $1 billion of coverage to Apache for losses arising from confiscation, nationalization, and expropriation risks, with a $263 million sub-limit for currency inconvertibility.

In addition, the Company has a separate policy with OPIC, which provides $300 million of coverage for losses arising from (1) non-payment by EGPC of arbitral awards covering amounts owed Apache on past due invoices and (2) expropriation of exportable petroleum in the event that actions taken by the government of Egypt prevent Apache from exporting our share of production. In October 2012, the Multilateral Investment Guarantee Agency (MIGA), a member of the World Bank Group, announced that it was providing $150 million in reinsurance to OPIC for the remainder of the policy term. This provision of long-term reinsurance to OPIC will allow Apache to maintain the $300 million of insurance coverage through 2024.

*Australia*

*Overview*   Apache's holdings in Australia are focused offshore Western Australia in the Carnarvon, Exmouth, and Browse basins. We have operated in the Carnarvon basin since acquiring the gas processing facilities on Varanus Island and adjacent producing properties in 1993. Production operations are located in the Carnarvon and Exmouth basins. In total, we control approximately 7.9 million gross acres offshore Western Australia through 30 exploration permits, 17 production licenses, and 13 retention leases. Approximately 90 percent of our acreage is undeveloped, and the region continues to actively pursue additional acreage opportunities.

8

During 2012, the region had net production of 29 Mb/d of oil and 214 MMcf/d of natural gas, contributing 9 percent of Apache's worldwide production revenue, 8 percent of worldwide production and 12 percent of year-end estimated proved reserves. Production compared to the prior year was 7 percent lower primarily as a result of natural decline in the Pyrenees and Van Gogh oil fields. Offsetting production declines was a full year of production from the Reindeer field. This gas is processed through the Devil Creek Gas Plant, which came online in December 2011. This plant is Western Australia's third domestic natural gas processing hub and the first new hub to be constructed in more than 15 years. Gas from the development has been sold to a number of customers in Western Australia's growing mining and minerals processing sectors at prices significantly higher than prior year realizations.

The region is a key component of Apache's exploration program. During 2012, we participated in drilling 15 offshore wells, of which 10 were exploration or appraisal wells. This compares to nine wells drilled in 2011. Over the past decade, the region's exploration activity has established a significant pipeline of projects that are expected to contribute to production growth as they are brought onstream in the coming years.

First production is projected in 2013 from four completed gas wells in the Macedon gas field. Gas will be delivered via a 60-mile pipeline to a 200 MMcf/d gas plant being built at Ashburton North in Western Australia. Apache has successfully marketed nearly all of its proved reserves in the Macedon field under long-term contracts at prices significantly higher than current realizations. We have a 29-percent non-operating working interest in the field and gas plant.

Development of the Coniston oil field project, which lies just north of the Van Gogh field, continued toward projected first production in 2014. The field will be produced via subsea completions tied back to the Floating Production Storage and Offloading Vessel (FPSO) at Van Gogh. To more effectively control the Van Gogh and Coniston field operations, development, and maintenance efforts, this FPSO (the Ningaloo Vision) was purchased from the lessor in January 2012. To accommodate production from Coniston, the FPSO is scheduled to go offline to the shipyard in early 2014 to complete required modifications.

The region will also continue development of the offshore Balnaves field, an oil accumulation located near the Brunello gas field offshore Western Australia. The project is expected to deliver initial gross production of 30 Mb/d in 2014 utilizing a leased FPSO vessel. Apache has a 65-percent working interest in the project.

Further advances were made on the region's largest development effort, which is the Chevron-operated Wheatstone LNG project (Wheatstone) in Western Australia. The first phase of the Wheatstone project will comprise two LNG processing trains with a combined capacity of approximately 8.9 million metric tons per annum (mtpa), a domestic gas plant, and associated infrastructure. Apache has a 13-percent interest in the project and expects to invest approximately $4 billion over five years for the field and LNG facility development. Apache will supply gas to Wheatstone from its operated Julimar and Brunello complex. The 65-percent interest Julimar development project is expected to generate average net sales to Apache of approximately 140 MMcf/d of gas (equivalent to 1.07 million mtpa of LNG) at prices pegged to world oil markets, 22 MMcf/d of sales gas into the domestic market, and 3,250 barrels of condensate per day. First production is projected for the end of 2016.

These development projects require significant capital investments above those for traditional drilling programs. During 2013, the region plans to invest approximately $1.9 billion for drilling, recompletion projects, development projects, equipment upgrades, production enhancement projects, and seismic acquisition. Approximately $1.5 billion of our 2013 capital will be invested in long-lead development projects.

*Marketing*    Western Australia has historically had a local market for natural gas with a limited number of buyers and sellers resulting in sales under mostly long-term, fixed-price contracts, many of which contain periodic price revision clauses based on either the Australian consumer price index or a commodity linkage. As of December 31, 2012, Apache had 21 active gas contracts in Australia with expiration dates ranging from

9

July 2014 to December 2026. Recent increases in demand and higher development costs have increased the prices required from the local market in order to support the development of new supplies. As a result, market prices negotiated on recent contracts are substantially higher than historical levels.

We directly market all of our Australian crude oil production into Australian domestic and international markets at prices generally indexed to Dated Brent benchmark crude oil prices plus premiums, which typically result in sales well above crude sold at West Texas Intermediate (WTI)-based prices.

During 2011, advances were made on Wheatstone, with binding Sales and Purchase Agreements signed by two Asian customers for the delivery of approximately 60 percent of Apache's net LNG offtake. In 2012, further advances were made on the Wheatstone project with the signing of two non-binding Heads of Agreements, which will take the total committed delivery volumes to over 80 percent once the final binding Sales and Purchase Agreements are signed. These binding Sales and Purchase Agreements are expected to be finalized and signed in 2013.

*North Sea*

*Overview*    Apache entered the North Sea in 2003 after acquiring an approximate 97-percent working interest in the Forties field (Forties). Since acquiring Forties, Apache has actively invested in the region, having produced and sold oil volumes in excess of the proved reserves initially recorded. This success spurred last year's Mobil North Sea Limited (Mobil North Sea) acquisition, which provided the region with additional exploration and development opportunities across numerous fields, including operated interests in the Beryl, Nevis, Nevis South, Skene, and Buckland fields and non-operated interests in the Maclure, Scott, and Telford fields. During 2012, we also announced that the U.K. Department of Energy & Climate Change awarded the region 11 new operated licenses and 1 non-operated license, which together added approximately 613,000 gross acres to the region's portfolio. Included in these licenses is all of the available acreage adjacent to the Beryl field plus two key licenses near the Forties field.

In 2012, the North Sea region produced 64 Mb/d of oil and 57 MMcf/d of natural gas, contributing 16 percent of Apache's worldwide production revenue, 10 percent of worldwide production and 6 percent of year-end estimated proved reserves. The region's production was 36 percent higher compared to the prior year on production from the recently acquired Beryl assets and an active drilling program in both the Forties and Beryl fields. Drilling in the Forties field continued to benefit from extensive 4-D seismic interpretations obtained over the last two years and has targeted many areas of bypassed oil in the mature reservoir. A 3-D seismic survey of the Beryl field commenced in early August and, when completed, will further refine our drilling plans for these acquired assets. In 2012, 21 wells were drilled in the North Sea, of which 16 were productive. Two of the highest producing wells were the Beryl B72 well, which commenced production in May at a rate of 11.6 Mb/d and 13.1 MMcf/d, and the Beryl B73 well, which was completed in September with an initial rate of 8.2 Mb/d and 5.9 MMcf/d. Apache has a 55-percent net interest in the Beryl field as of year-end.

The region also made notable progress in several key development projects during the year. In April, production from the first Bacchus field well commenced at a peak rate of 6 Mb/d; in July, a second horizontal well was brought online at a peak rate of 9 Mb/d. Combined production from the two wells has been steady at 10 Mb/d since July. Apache's net interest is 50 percent. In September, the jacket for the Forties Alpha Satellite Platform was installed, with a topside and bridge scheduled to be delivered during the second quarter of 2013. This platform has been constructed to continue to exploit new opportunities at Forties and sits adjacent to the main Alpha platform. It will provide an additional 18 drilling slots beginning in the third quarter of 2013 along with power generation, fluid separation, gas lift compression, and oil export pumping.

In 2013, the region plans to invest approximately $900 million on a diverse set of capital projects. The region will continue to refine drilling programs associated with properties acquired in the Mobil North Sea acquisition and integrate the additional opportunities gained over the last year.

10

*Marketing*    We have traditionally sold our North Sea crude oil under both term contracts and spot cargoes. The term sales are composed of a market-based index price plus a premium, which reflects the higher market value for term arrangements. The prices received for spot cargoes are market driven and can trade at a premium or discount to the market-based index.

Natural gas from the Beryl field is processed through the SAGE gas plant operated by Apache. The gas is sold to a third party at the St. Fergus entry point of the national grid on a National Balancing Point index price basis. The condensate mix from the SAGE plant is processed further downstream. The split streams of propane and butane are sold on a monthly entitlement basis, and condensate is sold on a spot basis at the Braefoot Bay terminal using index pricing less transportation.

### Argentina

*Overview*    We have had a continuous presence in Argentina since 2001 and have grown our holdings in the region through an active drilling program and targeted acquisitions. The region currently has active operations in the provinces of Neuquén, Rio Negro, and Tierra del Fuego. We have interests in 32 concessions, exploration permits, and other interests totaling 4.4 million gross acres in four of the main Argentine hydrocarbon basins: Neuquén, Austral, Cuyo, and Noroeste. Our concessions have varying expiration dates ranging from two years to over 15 years remaining, subject to potential extensions. Apache is currently in the process of extending our concessions in the Tierra del Fuego and Rio Negro Provinces, which are scheduled to expire between 2015 and 2017. Future investment by Apache in the Tierra del Fuego and Rio Negro Provinces will be significantly influenced by the ability to extend the present concessions.

In 2012, Argentina produced 6 percent of our worldwide production and held 4 percent of our estimated proved reserves at year-end. We continue to focus our exploration and development activities in the Neuquén basin. During the year, the region drilled or participated in drilling 28 gross wells pursuant to a development drilling program that achieved a 100-percent success rate by focusing on unconventional Gas Plus gas and shallow oil plays. Our 2012 exploration program included drilling two gross horizontal wells targeting the Vaca Muerta shale formation, where we hold 1.3 million net acres, of which 586,000 net acres are in the oil play. In 2013, the region plans to finish testing and evaluating those wells in preparation for future drilling programs.

During 2013, the region plans to invest approximately $200 million for drilling, recompletion projects, development projects, equipment upgrades, production enhancement projects, and seismic acquisition.

### Marketing

*Natural Gas*    Apache sells its natural gas in Argentina through three pricing structures:

- Gas Plus program: This program was instituted by the Argentine government in 2008 to encourage new gas supplies through the development of conventional and unconventional (tight sands) reserves. Under this program, Apache is allowed to sell gas from qualifying projects at prices that are above the regulated rates. During 2012, the average Gas Plus volume sold by Apache was 73.2 MMcf/d at an average price of $4.89 per Mcf. For 2013, Apache has signed contracts for total gross volumes to be sold under Gas Plus contracts of 80 MMcf/d at $5.01.

- Government-regulated pricing: The volumes we are required to sell at regulated prices are set by the Argentine government and vary based on seasonal factors and industry category. During 2012, we realized an average price of $0.84 per Mcf on government-regulated sales.

- Unregulated market: The majority of our remaining volumes are sold into the unregulated market. In 2012, realizations on sales in the unregulated market averaged $3.52 per Mcf.

- The weighted average of government-regulated and unregulated sales for 2012 was $2.03 per Mcf.

11

*Crude Oil*   Our crude oil is subject to an export tax, which effectively limits the prices buyers are willing to pay for domestic sales. Domestic oil prices are currently based on $42 per barrel, plus quality adjustments and local premiums, and producers realize a gradual increase or decrease as market prices deviate from the base price.

### Other Exploration

*New Ventures*

Apache's global New Ventures team provides exposure to new growth opportunities by looking outside of the Company's traditional core areas and targeting higher-risk, high-reward exploration opportunities located in frontier basins as well as new plays in more mature basins. The New Ventures group was established in 2010 with a worldwide program focused on deepwater exploration, where many of the world's large oil discoveries have occurred over the last decade, unconventional resources in North America and elsewhere, and underexplored basins that can be developed through application of new technologies.

Apache's 2012 activities included drilling in offshore Kenya; participating in the Suriname bid round and winning offshore block 53; establishing a presence in several known U.S. resource plays; and acquiring seismic and spudding our first well on our acreage in the Cook Inlet of Alaska. Apache's first exploration well in Kenya, the Mbawa 1, was drilled in the third quarter of 2012, encountering approximately 170 feet of natural gas pay in three zones. We have a 50-percent interest in the block and continue to analyze the well data to determine future exploration activities. In Alaska, the New Ventures team has acquired approximately 700,000 net acres over the last two years in the Cook Inlet basin and has commenced a robust seismic study over the area to facilitate future drilling activity. Apache has also leased nearly 500,000 net acres in the Mississippian Lime play in Kansas and Nebraska and 300,000 net acres in Montana's Williston basin. We have commenced drilling activity in both of these plays.

During 2013, we plan to invest approximately $100 million to further these projects and continue pursuing additional exploration opportunities.

## Major Customers

In 2012, 2011, and 2010 purchases by Royal Dutch Shell plc and its subsidiaries accounted for 20 percent, 11 percent, and 15 percent, respectively, of the Company's worldwide oil and gas production revenues. In 2011, purchases by the Vitol Group accounted for 13 percent of the Company's worldwide oil and gas production revenues.

## Drilling Statistics

Worldwide in 2012 we participated in drilling 1,486 gross wells, with 1,408 (95 percent) completed as producers. Historically, our drilling activities in the U.S. have generally concentrated on exploitation and extension of existing producing fields rather than exploration. As a general matter, our operations outside of the U.S. focus on a mix of exploration and development wells. In addition to our completed wells, at year-end several wells had not yet reached completion: 70 in the U.S. (55.73 net); 11 in Canada (9.00 net); 26 in Egypt (26.00 net); 2 in Australia (1.65 net); and 4 in Argentina (3.75 net).

12

The following table shows the results of the oil and gas wells drilled and completed for each of the last three fiscal years:

| | Net Exploratory | | | Net Development | | | Total Net Wells | | |
|---|---|---|---|---|---|---|---|---|---|
| | Productive | Dry | Total | Productive | Dry | Total | Productive | Dry | Total |
| **2012** | | | | | | | | | |
| United States | 9.5 | 3.5 | 13.0 | 746.0 | 9.6 | 755.6 | 755.5 | 13.1 | 768.6 |
| Canada | 5.0 | 7.5 | 12.5 | 110.3 | 14.0 | 124.3 | 115.3 | 21.5 | 136.8 |
| Egypt | 28.0 | 22.5 | 50.5 | 144.4 | 1.0 | 145.4 | 172.4 | 23.5 | 195.9 |
| Australia | 1.9 | 2.7 | 4.6 | 1.3 | 0.7 | 2.0 | 3.2 | 3.4 | 6.6 |
| North Sea | 1.3 | 0.0 | 1.3 | 11.7 | 3.9 | 15.6 | 13.0 | 3.9 | 16.9 |
| Argentina | 2.0 | 0.0 | 2.0 | 23.0 | 0.0 | 23.0 | 25.0 | 0.0 | 25.0 |
| Other International | 0.0 | 0.5 | 0.5 | 0.0 | 0.0 | 0.0 | 0.0 | 0.5 | 0.5 |
| Total | 47.7 | 36.7 | 84.4 | 1,036.7 | 29.2 | 1,065.9 | 1,084.4 | 65.9 | 1,150.3 |
| **2011** | | | | | | | | | |
| United States | 12.4 | 5.0 | 17.4 | 522.0 | 17.0 | 539.0 | 534.4 | 22.0 | 556.4 |
| Canada | 4.0 | 5.0 | 9.0 | 77.2 | 5.0 | 82.2 | 81.2 | 10.0 | 91.2 |
| Egypt | 28.2 | 19.8 | 48.0 | 112.6 | 6.0 | 118.6 | 140.8 | 25.8 | 166.6 |
| Australia | 1.0 | 2.3 | 3.3 | 1.0 | 0.0 | 1.0 | 2.0 | 2.3 | 4.3 |
| North Sea | 0.0 | 0.3 | 0.3 | 10.7 | 1.9 | 12.6 | 10.7 | 2.2 | 12.9 |
| Argentina | 4.0 | 1.0 | 5.0 | 29.4 | 0.3 | 29.7 | 33.4 | 1.3 | 34.7 |
| Total | 49.6 | 33.4 | 83.0 | 752.9 | 30.2 | 783.1 | 802.5 | 63.6 | 866.1 |
| **2010** | | | | | | | | | |
| United States | 3.7 | 2.2 | 5.9 | 309.2 | 12.7 | 321.9 | 312.9 | 14.9 | 327.8 |
| Canada | 6.5 | 1.5 | 8.0 | 122.3 | 5.7 | 128.0 | 128.8 | 7.2 | 136.0 |
| Egypt | 19.4 | 18.5 | 37.9 | 144.8 | 5.5 | 150.3 | 164.2 | 24.0 | 188.2 |
| Australia | 5.5 | 3.4 | 8.9 | 4.5 | 1.3 | 5.8 | 10.0 | 4.7 | 14.7 |
| North Sea | 1.0 | 1.2 | 2.2 | 10.7 | 5.8 | 16.5 | 11.7 | 7.0 | 18.7 |
| Argentina | 1.8 | 2.7 | 4.5 | 43.3 | 0.3 | 43.6 | 45.1 | 3.0 | 48.1 |
| Total | 37.9 | 29.5 | 67.4 | 634.8 | 31.3 | 666.1 | 672.7 | 60.8 | 733.5 |

## Productive Oil and Gas Wells

The number of productive oil and gas wells, operated and non-operated, in which we had an interest as of December 31, 2012, is set forth below:

| | Oil | | Gas | | Total | |
|---|---|---|---|---|---|---|
| | Gross | Net | Gross | Net | Gross | Net |
| United States | 13,762 | 9,192 | 5,375 | 3,149 | 19,137 | 12,341 |
| Canada | 2,195 | 997 | 9,065 | 7,744 | 11,260 | 8,741 |
| Egypt | 977 | 937 | 79 | 74 | 1,056 | 1,011 |
| Australia | 49 | 25 | 13 | 8 | 62 | 33 |
| North Sea | 151 | 99 | 23 | 12 | 174 | 111 |
| Argentina | 474 | 397 | 417 | 383 | 891 | 780 |
| Total | 17,608 | 11,647 | 14,972 | 11,370 | 32,580 | 23,017 |

Gross natural gas and crude oil wells include 1,625 wells with multiple completions.

13

**Production, Pricing, and Lease Operating Cost Data**

The following table describes, for each of the last three fiscal years, oil, NGL, and gas production volumes, average lease operating expenses per boe (including transportation costs but excluding severance and other taxes), and average sales prices for each of the countries where we have operations:

| | Production | | | Average Lease Operating | Average Sales Price | | |
|---|---|---|---|---|---|---|---|
| Year Ended December 31, | Oil (MMbbls) | NGLs (MMbbls) | Gas (Bcf) | Cost per Boe | Oil (Per bbl) | NGLs (Per bbl) | Gas (Per Mcf) |
| **2012** | | | | | | | |
| United States | 49.1 | 12.3 | 312.6 | $ 12.83 | $ 94.98 | $ 32.19 | $ 3.74 |
| Canada | 5.8 | 2.3 | 219.9 | 13.87 | 84.89 | 34.63 | 3.42 |
| Egypt | 36.5 | – | 129.5 | 7.73 | 110.92 | | 3.90 |
| Australia | 10.6 | – | 78.3 | 9.08 | 115.22 | – | 4.55 |
| North Sea | 23.3 | 0.6 | 21.0 | 12.38 | 107.97 | 77.11 | 8.95 |
| Argentina | 3.5 | 1.1 | 78.1 | 10.85 | 75.89 | 21.55 | 2.87 |
| Total | 128.8 | 16.3 | 839.4 | 11.49 | 102.53 | 33.45 | 3.80 |
| **2011** | | | | | | | |
| United States | 43.6 | 8.1 | 315.6 | $ 11.80 | $ 95.51 | $ 48.42 | $ 4.91 |
| Canada | 5.2 | 2.2 | 230.9 | 13.86 | 93.19 | 45.72 | 4.47 |
| Egypt | 37.9 | – | 133.4 | 7.19 | 109.92 | | 4.66 |
| Australia | 14.0 | – | 67.6 | 7.80 | 111.22 | – | 2.69 |
| North Sea | 19.9 | – | 0.8 | 11.61 | 104.09 | – | 22.25 |
| Argentina | 3.5 | 1.1 | 77.5 | 9.83 | 68.02 | 27.90 | 2.64 |
| Total | 124.1 | 11.4 | 825.8 | 10.62 | 102.19 | 45.95 | 4.37 |
| **2010** | | | | | | | |
| United States | 35.3 | 5.0 | 266.8 | $ 11.40 | $ 76.13 | $ 41.45 | $ 5.28 |
| Canada | 5.3 | 1.1 | 144.5 | 13.46 | 72.83 | 36.61 | 4.48 |
| Egypt | 36.2 | – | 136.8 | 5.56 | 79.45 | | 3.62 |
| Australia | 16.7 | – | 72.9 | 6.41 | 77.32 | – | 2.24 |
| North Sea | 20.8 | – | 0.9 | 9.23 | 76.66 | – | 18.64 |
| Argentina | 3.6 | 1.2 | 67.5 | 7.97 | 57.47 | 27.08 | 1.96 |
| Total | 117.9 | 7.3 | 689.4 | 9.20 | 76.69 | 38.58 | 4.15 |

**Gross and Net Undeveloped and Developed Acreage**

The following table sets out our gross and net acreage position as of December 31, 2012, in each country where we have operations:

| | Undeveloped Acreage | | Developed Acreage | |
|---|---|---|---|---|
| | Gross Acres | Net Acres | Gross Acres | Net Acres |
| United States | 7,447,487 | 4,896,442 | 4,873,810 | 2,609,338 |
| Canada | 2,659,323 | 2,328,842 | 4,278,252 | 3,226,076 |
| Egypt | 7,934,690 | 5,142,158 | 1,800,720 | 1,693,216 |
| Australia | 7,058,038 | 3,854,352 | 880,467 | 534,665 |
| North Sea | 563,129 | 245,729 | 159,961 | 94,448 |
| Argentina | 4,182,067 | 3,106,969 | 221,422 | 188,795 |
| Total | 29,844,734 | 19,574,492 | 12,214,632 | 8,346,538 |

As of December 31, 2012, we had 5,229,947, 1,940,328, and 2,596,636 net acres scheduled to expire by December 31, 2013, 2014, and 2015, respectively, if production is not established or we take no other action to extend the terms. We strive to continue the terms of many of these licenses and concession areas through operational or administrative actions, but cannot assure that such extensions can be achieved on an economic basis or otherwise on terms agreeable to both the Company and third-parties including governments.

As of December 31, 2012, 37 percent of U.S. net undeveloped acreage and 47 percent of Canadian undeveloped acreage was held by production.

14

**Estimated Proved Reserves and Future Net Cash Flows**

Proved oil and gas reserves are the estimated quantities of natural gas, crude oil, condensate, and NGLs that geological and engineering data demonstrate with reasonable certainty to be recoverable in future years from known reservoirs under existing conditions, operating conditions, and government regulations. Estimated proved developed oil and gas reserves can be expected to be recovered through existing wells with existing equipment and operating methods. The Company reports all estimated proved reserves held under production-sharing arrangements utilizing the "economic interest" method, which excludes the host country's share of reserves.

Estimated reserves that can be produced economically through application of improved recovery techniques are included in the "proved" classification when successful testing by a pilot project or the operation of an active, improved recovery program using reliable technology establishes the reasonable certainty for the engineering analysis on which the project or program is based. Economically producible means a resource that generates revenue that exceeds, or is reasonably expected to exceed, the costs of the operation. Reasonable certainty means a high degree of confidence that the quantities will be recovered. Reliable technology is a grouping of one or more technologies (including computational methods) that has been field-tested and has been demonstrated to provide reasonably certain results with consistency and repeatability in the formation being evaluated or in an analogous formation. In estimating its proved reserves, Apache uses several different traditional methods that can be classified in three general categories: (1) performance-based methods; (2) volumetric-based methods; and (3) analogy with similar properties. Apache will, at times, utilize additional technical analysis, such as computer reservoir models, petrophysical techniques, and proprietary 3-D seismic interpretation methods, to provide additional support for more complex reservoirs. Information from this additional analysis is combined with traditional methods outlined above to enhance the certainty of our reserve estimates.

Proved undeveloped reserves include those reserves that are expected to be recovered from new wells on undrilled acreage, or from existing wells where a relatively major expenditure is required for recompletion. Undeveloped reserves may be classified as proved reserves on undrilled acreage directly offsetting development areas that are reasonably certain of production when drilled, or where reliable technology provides reasonable certainty of economic producibility. Undrilled locations may be classified as having undeveloped reserves only if a development plan has been adopted indicating that they are scheduled to be drilled within five years, unless specific circumstances justify a longer time period.

The following table shows proved oil, NGL, and gas reserves as of December 31, 2012, based on average commodity prices in effect on the first day of each month in 2012, held flat for the life of the production, except where future oil and gas sales are covered by physical contract terms. This table shows reserves on a boe basis in which natural gas is converted to an equivalent barrel of oil based on a 6:1 energy equivalent ratio. This ratio is not reflective of the current price ratio between the two products.

| | Oil (MMbbls) | NGL (MMbbls) | Gas (Bcf) | Total (MMboe) |
|---|---|---|---|---|
| **Proved Developed:** | | | | |
| United States | 474 | 155 | 2,354 | 1,021 |
| Canada | 80 | 22 | 1,735 | 391 |
| Egypt | 107 | – | 690 | 222 |
| Australia | 29 | – | 596 | 128 |
| North Sea | 120 | 2 | 93 | 138 |
| Argentina | 16 | 5 | 365 | 82 |
| **Proved Undeveloped:** | | | | |
| United States | 203 | 61 | 832 | 403 |
| Canada | 71 | 12 | 403 | 150 |
| Egypt | 17 | – | 205 | 51 |
| Australia | 35 | – | 1,074 | 214 |
| North Sea | 28 | – | 20 | 32 |
| Argentina | 3 | 1 | 97 | 20 |
| **TOTAL PROVED** | 1,183 | 258 | 8,464 | 2,852 |

As of December 31, 2012, Apache had total estimated proved reserves of 1,441 MMbbls of crude oil, condensate, and NGLs and 8.5 Tcf of natural gas. Combined, these total estimated proved reserves are the energy equivalent of 2.9 billion barrels of oil or 17.1 Tcf of natural gas, of which oil represents 41 percent. As of December 31, 2012, the Company's proved developed reserves totaled 1,982 MMboe and estimated PUD reserves totaled 870 MMboe, or approximately 30 percent of worldwide total proved reserves. Apache has elected not to disclose probable or possible reserves in this filing.

The Company's estimates of proved reserves, proved developed reserves and PUD reserves as of December 31, 2012, 2011, and 2010, changes in estimated proved reserves during the last three years, and estimates of future net cash flows from proved reserves are contained in Note 14—Supplemental Oil and Gas Disclosures in the Notes to Consolidated Financial Statements set forth in Part IV, Item 15 of this Form 10-K. Estimated future net cash flows as of December 31, 2012 and 2011, were calculated using a discount rate of 10 percent per annum, end of period costs, and an unweighted arithmetic average of commodity prices in effect on the first day of each of the previous 12 months, held flat for the life of the production, except where prices are defined by contractual arrangements.

### Proved Undeveloped Reserves

The Company's total estimated PUD reserves of 870 MMboe as of December 31, 2012, decreased by 128 MMboe from 998 MMboe of PUD reserves estimated at the end of 2011. Driven by the significant decline in North America natural gas prices, a portion of our PUD reserves fell below the threshold for economic development and were removed from our proved reserves balance. The majority of these pricing revisions were associated with dry gas development projects in Canada. During the year, Apache converted 133 MMboe of PUD reserves to proved developed reserves through development drilling activity. In North America, we converted 98 MMboe, with the remaining 35 MMboe in our international areas. We acquired 47 MMboe of PUD reserves during the year. We added 158 MMboe of new PUD reserves through extensions and discoveries and had negative revisions of 200 MMboe associated with changes in product prices and revised development plans.

During the year, a total of approximately $3.4 billion was spent on projects associated with reserves that were carried as PUD reserves at the end of 2011. A portion of our costs incurred each year relate to development projects that will be converted to proved developed reserves in future years. We spent $1.5 billion on PUD reserve development activity in North America and $1.9 billion in the international areas. Other than our Julimar/Brunello development project, which is tied to the construction schedule of the Wheatstone LNG project, with projected first production in 2016, we had no material amounts of PUD reserves that have remained undeveloped for five years or more after they were initially disclosed as PUD reserves and no material amounts of PUD reserves which are scheduled to be developed beyond five years from December 31, 2012.

### Preparation of Oil and Gas Reserve Information

Apache emphasizes that its reported reserves are reasonably certain estimates which, by their very nature, are subject to revision. These estimates are reviewed throughout the year and revised either upward or downward, as warranted.

Apache's proved reserves are estimated at the property level and compiled for reporting purposes by a centralized group of experienced reservoir engineers that is independent of the operating groups. These engineers interact with engineering and geoscience personnel in each of Apache's operating areas and with accounting and marketing employees to obtain the necessary data for projecting future production, costs, net revenues, and ultimate recoverable reserves. All relevant data is compiled in a computer database application, to which only authorized personnel are given security access rights consistent with their assigned job function. Reserves are reviewed internally with senior management and presented to Apache's Board of Directors in summary form on a quarterly basis. Annually, each property is reviewed in detail by our corporate and operating region engineers to ensure forecasts of operating expenses, netback prices, production trends, and development timing are reasonable.

Apache's Executive Vice President of Corporate Reservoir Engineering is the person primarily responsible for overseeing the preparation of our internal reserve estimates and for coordinating any reserves audits conducted by a third-party engineering firm. He has a Bachelor of Science degree in Petroleum Engineering and over 30 years of industry experience with positions of increasing responsibility within Apache's corporate reservoir engineering department. The Executive Vice President of Corporate Reservoir Engineering reports directly to our Chairman and Chief Executive Officer.

The estimate of reserves disclosed in this Annual Report on Form 10-K is prepared by the Company's internal staff, and the Company is responsible for the adequacy and accuracy of those estimates. However, the Company engages Ryder Scott Company, L.P. Petroleum Consultants (Ryder Scott) to review our processes and the reasonableness of our estimates of proved hydrocarbon liquid and gas reserves. Apache selects the properties for review by Ryder Scott based primarily on relative reserve value. We also consider other factors such as geographic location, new wells drilled during the year and reserves volume. During 2012, the properties selected for each country ranged from 77 to 99 percent of the total future net cash flows discounted at 10 percent. These properties also accounted for over 86 percent of the reserves value of our international proved reserves and of the new wells drilled in each country. In addition, all fields containing five percent or more of the Company's total proved reserves volume were included in Ryder Scott's review. The review covered 83 percent of total proved reserves, including 86 percent of proved developed reserves and 74 percent of PUD reserves.

During 2012, 2011, and 2010, Ryder Scott's review covered 88, 81, and 72 percent, respectively, of the Company's worldwide estimated proved reserves value and 83, 70, and 63 percent, respectively, of the Company's total proved reserves volume. Ryder Scott's review of 2012 covered 81 percent of U.S., 78 percent of Canada, 64 percent of Argentina, 99 percent of Australia, 84 percent of Egypt, and 88 percent of the U.K.'s total proved reserves. Ryder Scott's review of 2011 covered 68 percent of U.S., 69 percent of Canada, 58 percent of Argentina, 99 percent of Australia, 62 percent of Egypt, and 61 percent of the U.K.'s total proved reserves. Ryder Scott's review of 2010 covered 59 percent of U.S., 42 percent of Canada, 64 percent of Argentina, 99 percent of Australia, 83 percent of Egypt, and 83 percent of the U.K.'s total proved reserves. We have filed Ryder Scott's independent report as an exhibit to this Form 10-K.

According to Ryder Scott's opinion, based on their review, including the data, technical processes, and interpretations presented by Apache, the overall procedures and methodologies utilized by Apache in determining the proved reserves comply with the current SEC regulations, and the overall proved reserves for the reviewed properties as estimated by Apache are, in aggregate, reasonable within the established audit tolerance guidelines as set forth in the Society of Petroleum Engineers auditing standards.

## Employees

On December 31, 2012, we had 5,976 employees.

## Offices

Our principal executive offices are located at One Post Oak Central, 2000 Post Oak Boulevard, Suite 100, Houston, Texas 77056-4400. At year-end 2012, we maintained regional exploration and/or production offices in Tulsa, Oklahoma; Houston, Texas; Midland, Texas; Calgary, Alberta; Cairo, Egypt; Perth, Western Australia; Aberdeen, Scotland; and Buenos Aires, Argentina. Apache leases all of its primary office space, with the exception of our Midland office, which we own. The current lease on our principal executive offices runs through December 31, 2018. For information regarding the Company's obligations under its office leases, please see Part II, Item 7—Management's Discussion and Analysis of Financial Condition and Results of Operations—Capital Resources and Liquidity—Contractual Obligations and Note 8—Commitments and Contingencies in the Notes to Consolidated Financial Statements set forth in Part IV, Item 15 of this Form 10-K.

17

Title to Interests

As is customary in our industry, a preliminary review of title records, which may include opinions or reports of appropriate professionals or counsel, is made at the time we acquire properties. We believe that our title to all of the various interests set forth above is satisfactory and consistent with the standards generally accepted in the oil and gas industry, subject only to immaterial exceptions that do not detract substantially from the value of the interests or materially interfere with their use in our operations. The interests owned by us may be subject to one or more royalty, overriding royalty, or other outstanding interests (including disputes related to such interests) customary in the industry. The interests may additionally be subject to obligations or duties under applicable laws, ordinances, rules, regulations, and orders of arbitral or governmental authorities. In addition, the interests may be subject to burdens such as production payments, net profits interests, liens incident to operating agreements and current taxes, development obligations under oil and gas leases, and other encumbrances, easements, and restrictions, none of which detract substantially from the value of the interests or materially interfere with their use in our operations.

Additional Information about Apache

In this section, references to "we," "us," "our," and "Apache" include Apache Corporation and its consolidated subsidiaries, unless otherwise specifically stated.

*Remediation Plans and Procedures*

Apache and its wholly owned subsidiary, Apache Deepwater LLC (ADW), developed Oil Spill Response Plans (the Plans) for their respective Gulf of Mexico operations to ensure rapid and effective responses to spill events that may occur on such entities' operated properties as required by the Bureau of Safety and Environmental Enforcement (BSEE) 30 CFR 254.30. Annually, drills are conducted to measure and maintain the effectiveness of the Plans. These drills include the participation of spill response contractors, representatives of the Clean Gulf Associates, and representatives of governmental agencies. In the event of a spill, the CGA is the primary oil spill response association available to Apache and ADW. Apache and ADW have received approval for the Plans from BSEE. Apache and ADW personnel each review their respective Plan biennially and update where necessary.

Both Apache and ADW are members of, and Apache has an employee representative on the executive committee of, Clean Gulf Associates (CGA), a not-for-profit association of producing and pipeline companies operating in the Gulf of Mexico. CGA was created to provide a means of effectively staging response equipment and providing immediate spill response for its member companies' operations in the Gulf of Mexico. Until December 31, 2012, CGA's equipment was maintained by the Marine Spill Response Corporation (MSRC), a national, private, not-for-profit marine spill response organization, which is funded by grants from the Marine Preservation Association. CGA's equipment maintained by MSRC included a high-volume open sea barge oil skimming system, 11 rigid sweeping arms, an oceangoing boom barge with 25,000 feet of offshore containment boom, a fire boom, six fast response vessels, 12 fast response skimming units, multiple shallow water skimming and recovery systems, wildlife cleaning and rehabilitation facilities, and dispersant inventory. In the event of a spill, MSRC stood ready to mobilize all of this equipment to CGA members. MSRC also handled the maintenance and mobilization of CGA non-marine equipment. Effective January 1, 2013, CGA's marine and non-marine equipment is now maintained by the Clean Gulf Associates Service, LLC. In the event of a spill, this equipment, which is positioned at various staging points around the Gulf, is ready to be mobilized. In addition, CGA has contracted with Airborne Support Inc. to provide aircraft and dispersant capabilities for CGA member companies. In 2012, Apache incurred charges for CGA of approximately $380,000 based on a per-member fee and annual production.

In the event that CGA resources are already being utilized, other associations are available to Apache. Apache is a member of Oil Spill Response Limited (OSRL), which entitles any Apache entity worldwide to access OSRL's service. OSRL has access to resources from the Global Response Network, a collaboration of

18

seven major oil industry funded spill response organizations worldwide. OSRL has equipment stockpiles in Bahrain, Singapore, and Southampton that currently include approximately 153 skimmers, booms, (of approximately 12,000 meters), two Hercules aircraft for equipment deployment and aerial dispersant spraying, two additional aircraft, dispersant spray systems and dispersant, floating storage tanks, all-terrain vehicles, and various other equipment. If necessary, OSRL's resources may be, and have been, deployed to areas across the globe, including the Gulf of Mexico. In addition, in February 2012, ADW became a member of MSRC and National Response Corporation (NRC), and their resources are available to ADW for its deepwater Gulf of Mexico operations. Furthermore, the spill response resources of other organizations are also available to both Apache and ADW as non-members, albeit at a higher cost. MSRC has an extensive inventory of oil spill response equipment, independent of and in addition to CGA's equipment. MSRC's equipment currently includes 19 oil spill response barges with storage capacities between 12,000 and 68,000 barrels, 68 shallow water barges, over 290 skimming systems, approximately 50 self-propelled skimming vessels, 7 mobile communication suites with internet and telephone connections, as well as marine and aviation communication capabilities, various small crafts and shallow water vessels, 22,500 feet of fire boom, and 6 dispersant aircraft. MSRC has contracts in place with over 100 environmental contractors around the country, in addition to hundreds of other companies that provide support services during spill response. In the event of a spill, MSRC will activate these contractors as necessary to provide additional resources or support services requested by its customers. NRC owns a variety of equipment, currently including shallow water portable barges, boom, high capacity skimming systems, inland workboats, vacuum transfer units, and mobile communication centers. NRC has access to a vessel fleet of more than 328 offshore vessels and supply boats worldwide, as well as access to hundreds of tugs and oil barges from its tug and barge clients. The equipment and resources available to the MSRC and the NRC changes from time to time, and current information is generally available on each company's website. In 2012, Apache's Gulf of Mexico Deepwater region incurred charges for NRC of $12,000 based on annual production and charges for MSRC of approximately $735,000 based on annual production and total wells spud in 2012.

ADW has also retained the Helix Well Containment Group (HWCG) in conjunction with its CGA membership. HWCG is a consortium of 24 deepwater operators in the Gulf of Mexico that have worked on expanding capabilities to rapidly respond to subsea well incidents like the Deepwater Horizon incident. In June 2011, HWCG announced that it is now capable of responding to a subsea well containment incident in water depths of up to 10,000 feet. Each HWCG member company has entered into a mutual aid agreement, allowing any member to draw upon the technical expertise and resources of the group in the event of an incident. ADW's 2012 membership dues were approximately $1 million.

In 2011, ADW also became a member of the Marine Well Containment Company (MWCC) to fulfill the government's permit requirements for containment and oil spill response plans in deepwater Gulf of Mexico operations. In March 2012, ADW assigned its interest in MWCC to Apache Well Containment LLC, another wholly owned Apache subsidiary. MWCC is a not-for-profit, stand-alone organization whose goal is to improve capabilities for containing an underwater well control incident in the U.S. Gulf of Mexico. MWCC is currently developing a billion-dollar expanded containment system, which is expected to be available in 2013. The MWCC owns and maintains an interim containment system, which became available for use in February 2011. The interim containment system includes a subsea capping stack with the ability to shut in oil flow or to flow the oil via flexible pipes and risers to surface vessels. The system also includes subsea dispersant injection equipment, manifolds, and, through mutual aid among members, capture vessels to provide surface processing and storage. The interim system is designed to meet the BSEE requirements. It can operate in water depths up to 8,000 feet and has storage and processing capacity for up to 60,000 b/d and 120 MMcf/d. The capability of the interim containment system continues to grow as components of the expanded system are completed and delivered. The expanded system is designed to operate in 10,000 feet of water and process up to 100,000 b/d and 200 MMcf/d. Membership in MWCC is open to all companies operating in the U.S. Gulf of Mexico. Members and their affiliates have access to the interim containment system, as well as the expanded system once construction is completed. Non-members will also have access to the systems through a service agreement and fee. As of December 31, 2012, Apache's investment in MWCC totals approximately $88 million.

19

Apache also participates in a number of industry-wide task forces that are studying ways to better access and control blowouts in subsea environments and increase containment and recovery methods. Two such task forces are the Subsea Well Control and Containment Task Force and the Offshore Operating Procedures Task Force.

### Competitive Conditions

The oil and gas business is highly competitive in the exploration for and acquisitions of reserves, the acquisition of oil and gas leases, equipment and personnel required to find and produce reserves, and in the gathering and marketing of oil, gas, and natural gas liquids. Our competitors include national oil companies, major integrated oil and gas companies, other independent oil and gas companies, and participants in other industries supplying energy and fuel to industrial, commercial, and individual consumers.

Certain of our competitors may possess financial or other resources substantially larger than we possess or have established strategic long-term positions and maintain strong governmental relationships in countries in which we may seek new entry. As a consequence, we may be at a competitive disadvantage in bidding for leases or drilling rights.

However, we believe our diversified portfolio of core assets, which comprises large acreage positions and well-established production bases across six countries, and our balanced production mix between oil and gas, our management and incentive systems, and our experienced personnel give us a strong competitive position relative to many of our competitors who do not possess similar political, geographic, and production diversity. Our global position provides a large inventory of geologic and geographic opportunities in the six countries in which we have producing operations to which we can reallocate capital investments in response to changes in commodity prices, local business environments, and markets. It also reduces the risk that we will be materially impacted by an event in a specific area or country.

### Environmental Compliance

As an owner or lessee and operator of oil and gas properties and facilities, we are subject to numerous federal, provincial, state, local, and foreign country laws and regulations relating to discharge of materials into, and protection of, the environment. These laws and regulations may, among other things, impose liability on the lessee under an oil and gas lease for the cost of pollution clean-up resulting from operations, subject the lessee to liability for pollution damages and require suspension or cessation of operations in affected areas. Although environmental requirements have a substantial impact upon the energy industry, as a whole, we do not believe that these requirements affect us differently, to any material degree, than other companies in our industry.

We have made and will continue to make expenditures in our efforts to comply with these requirements, which we believe are necessary business costs in the oil and gas industry. We have established policies for continuing compliance with environmental laws and regulations, including regulations applicable to our operations in all countries in which we do business. We have established operating procedures and training programs designed to limit the environmental impact of our field facilities and identify and comply with changes in existing laws and regulations. The costs incurred under these policies and procedures are inextricably connected to normal operating expenses such that we are unable to separate expenses related to environmental matters; however, we do not believe expenses related to training and compliance with regulations and laws that have been adopted or enacted to regulate the discharge of materials into the environment will have a material impact on our capital expenditures, earnings, or competitive position.

20

**ITEM 1A.    *RISK FACTORS***

Our business activities and the value of our securities are subject to significant hazards and risks, including those described below. If any of such events should occur, our business, financial condition, liquidity, and/or results of operations could be materially harmed, and holders and purchasers of our securities could lose part or all of their investments. Additional risks relating to our securities may be included in the prospectuses for securities we issue in the future.

***Future economic conditions in the U.S. and key international markets may materially adversely impact our operating results.***

The U.S. and other world economies are slowly recovering from a global financial crisis and recession that began in 2008. Growth has resumed but is modest and at an unsteady rate. The continuation of current global market conditions, uncertainty or further deterioration, including the economic instability in Europe, is likely to have significant long-term effects, including a future global economic growth rate that is slower than in the years leading up to the crisis, and more volatility may occur before any sustainable growth rate is achieved. Global economic growth drives demand for energy from all sources, including fossil fuels. A lower future economic growth rate could result in decreased demand growth for our crude oil and natural gas production as well as lower commodity prices, which would reduce our cash flows from operations and our profitability.

***Crude oil and natural gas prices are volatile, and a substantial reduction in these prices could adversely affect our results and the price of our common stock.***

Our revenues, operating results, and future rate of growth depend highly upon the prices we receive for our crude oil and natural gas production. Historically, the markets for crude oil and natural gas have been volatile and are likely to continue to be volatile in the future. For example, the NYMEX daily settlement price for the prompt month oil contract in 2012 ranged from a high of $109.77 per barrel to a low of $77.69 per barrel. The NYMEX daily settlement price for the prompt month natural gas contract in 2012 ranged from a high of $3.90 per MMBtu to a low of $1.91 per MMBtu. The market prices for crude oil and natural gas depend on factors beyond our control. These factors include demand for crude oil and natural gas, which fluctuates with changes in market and economic conditions, and other factors, including:

- worldwide and domestic supplies of crude oil and natural gas;

- actions taken by foreign oil and gas producing nations;

- political conditions and events (including instability, changes in governments, or armed conflict) in crude oil or natural gas producing regions;

- the level of global crude oil and natural gas inventories;

- the price and level of imported foreign crude oil and natural gas;

- the price and availability of alternative fuels, including coal and biofuels;

- the availability of pipeline capacity and infrastructure;

- the availability of crude oil transportation and refining capacity;

- weather conditions;

- electricity generation;

- domestic and foreign governmental regulations and taxes; and

- the overall economic environment.

21

Significant declines in crude oil and natural gas prices for an extended period may have the following effects on our business:

- limiting our financial condition, liquidity, and/or ability to fund planned capital expenditures and operations;

- reducing the amount of crude oil and natural gas that we can produce economically;

- causing us to delay or postpone some of our capital projects;

- reducing our revenues, operating income, and cash flows;

- limiting our access to sources of capital, such as equity and long-term debt;

- a reduction in the carrying value of our crude oil and natural gas properties; or

- a reduction in the carrying value of goodwill.

***Our ability to sell natural gas or oil and/or receive market prices for our natural gas or oil may be adversely affected by pipeline and gathering system capacity constraints and various transportation interruptions.***

A portion of our natural gas and oil production in any region may be interrupted, or shut in, from time to time for numerous reasons, including as a result of weather conditions, accidents, loss of pipeline or gathering system access, field labor issues or strikes, or capital constraints that limit the ability of third parties to construct gathering systems, processing facilities, or interstate pipelines to transport our production, or we might voluntarily curtail production in response to market conditions. If a substantial amount of our production is interrupted at the same time, it could temporarily adversely affect our cash flows.

***Weather and climate may have a significant adverse impact on our revenues and productivity.***

Demand for oil and natural gas are, to a significant degree, dependent on weather and climate, which impact the price we receive for the commodities we produce. In addition, our exploration and development activities and equipment can be adversely affected by severe weather, such as hurricanes in the Gulf of Mexico or cyclones offshore Australia, which may cause a loss of production from temporary cessation of activity or lost or damaged equipment. Our planning for normal climatic variation, insurance programs, and emergency recovery plans may inadequately mitigate the effects of such weather conditions, and not all such effects can be predicted, eliminated, or insured against.

***Our operations involve a high degree of operational risk, particularly risk of personal injury, damage, or loss of equipment, and environmental accidents.***

Our operations are subject to hazards and risks inherent in the drilling, production, and transportation of crude oil and natural gas, including:

- well blowouts, explosions, and cratering;

- pipeline ruptures and spills;

- fires;

- formations with abnormal pressures;

- equipment malfunctions;

22

- hurricanes and/or cyclones, which could affect our operations in areas such as on- and offshore the Gulf Coast and Australia, and other natural disasters; and

- surface spillage and surface or ground water contamination from petroleum constituents or hydraulic fracturing chemical additives.

Failure or loss of equipment, as the result of equipment malfunctions, cyber-attacks, or natural disasters such as hurricanes, could result in property damages, personal injury, environmental pollution and other damages for which we could be liable. Litigation arising from a catastrophic occurrence, such as a well blowout, explosion, or fire at a location where our equipment and services are used, or ground water contamination from hydraulic fracturing chemical additives may result in substantial claims for damages. Ineffective containment of a drilling well blowout or pipeline rupture, or surface spillage and surface or ground water contamination from petroleum constituents or hydraulic fracturing chemical additives could result in extensive environmental pollution and substantial remediation expenses. If a significant amount of our production is interrupted, our containment efforts prove to be ineffective or litigation arises as the result of a catastrophic occurrence, our cash flows, and, in turn, our results of operations could be materially and adversely affected.

***Cyber attacks targeting systems and infrastructure used by the oil and gas industry may adversely impact our operations.***

Our business has become increasingly dependent on digital technologies to conduct certain exploration, development and production activities. We depend on digital technology to estimate quantities of oil and gas reserves, process and record financial and operating data, analyze seismic and drilling information, and communicate with our employees and third party partners. Unauthorized access to our seismic data, reserves information or other proprietary information could lead to data corruption, communication interruption, or other operational disruptions in our exploration or production operations. Also, computers control nearly all of the oil and gas distribution systems in the United States and abroad, which are necessary to transport our production to market. A cyber attack directed at oil and gas distribution systems could damage critical distribution and storage assets or the environment, delay or prevent delivery of production to markets and make it difficult or impossible to accurately account for production and settle transactions.

While we have experienced cyber attacks, we have not suffered any material losses relating to such attacks; however, there is no assurance that we will not suffer such losses in the future. Further, as cyber attacks continue to evolve, we may be required to expend significant additional resources to continue to modify or enhance our protective measures or to investigate and remediate any vulnerabilities to cyber attacks.

***The additional deepwater drilling laws and regulations, delays in the processing and approval of permits and other related developments in the Gulf of Mexico as well as our other locations resulting from the Deepwater Horizon incident could adversely affect Apache's business.***

In response to the Deepwater Horizon incident in the U.S. Gulf of Mexico in April 2010, and as directed by the Secretary of the U.S. Department of the Interior, the Bureau of Ocean Energy Management (BOEM) and the Bureau of Safety and Environmental Enforcement (BSEE) issued new guidelines and regulations regarding safety, environmental matters, drilling equipment, and decommissioning applicable to drilling in the Gulf of Mexico. These new regulations have imposed additional requirements with respect to development and production activities in the Gulf of Mexico and have delayed the approval of applications to drill in both deepwater and shallow-water areas.

Further, at this time, we cannot predict with any certainty what further impact, if any, the Deepwater Horizon incident may have on the regulation of offshore oil and gas exploration and development activity, or on the cost or availability of insurance coverage to cover the risks of such operations. The enactment of new or stricter regulations in the United States and other countries and increased liability for companies operating in this sector could adversely affect Apache's operations in the U.S. Gulf of Mexico as well as in our other locations.

23

*Our commodity price risk management and trading activities may prevent us from benefiting fully from price increases and may expose us to other risks.*

To the extent that we engage in price risk management activities to protect ourselves from commodity price declines, we may be prevented from realizing the full benefits of price increases above the levels of the derivative instruments used to manage price risk. In addition, our hedging arrangements may expose us to the risk of financial loss in certain circumstances, including instances in which:

- our production falls short of the hedged volumes;

- there is a widening of price-basis differentials between delivery points for our production and the delivery point assumed in the hedge arrangement;

- the counterparties to our hedging or other price risk management contracts fail to perform under those arrangements; or

- a sudden unexpected event materially impacts oil and natural gas prices.

*The credit risk of financial institutions could adversely affect us.*

We have exposure to different counterparties, and we have entered into transactions with counterparties in the financial services industry, including commercial banks, investment banks, insurance companies, other investment funds, and other institutions. These transactions expose us to credit risk in the event of default of our counterparty. Deterioration in the credit markets may impact the credit ratings of our current and potential counterparties and affect their ability to fulfill their existing obligations to us and their willingness to enter into future transactions with us. We have exposure to financial institutions in the form of derivative transactions in connection with our hedges and insurance companies in the form of claims under our policies. In addition, if any lender under our credit facility is unable to fund its commitment, our liquidity will be reduced by an amount up to the aggregate amount of such lender's commitment under our credit facility.

*We are exposed to counterparty credit risk as a result of our receivables.*

We are exposed to risk of financial loss from trade, joint venture, joint interest billing, and other receivables. We sell our crude oil, natural gas, and NGLs to a variety of purchasers. As operator, we pay expenses and bill our non-operating partners for their respective shares of costs. Some of our purchasers and non-operating partners may experience liquidity problems and may not be able to meet their financial obligations. Nonperformance by a trade creditor or non-operating partner could result in significant financial losses.

*A downgrade in our credit rating could negatively impact our cost of and ability to access capital.*

We receive debt ratings from the major credit rating agencies in the United States. Factors that may impact our credit ratings include debt levels, planned asset purchases or sales, and near-term and long-term production growth opportunities. Liquidity, asset quality, cost structure, product mix, and commodity pricing levels and others are also considered by the rating agencies. A ratings downgrade could adversely impact our ability to access debt markets in the future, increase the cost of future debt, and potentially require the Company to post letters of credit or other forms of collateral for certain obligations.

*Market conditions may restrict our ability to obtain funds for future development and working capital needs, which may limit our financial flexibility.*

While the credit markets have recovered in the wake of the global financial crises, they remain vulnerable to unpredictable shocks. We have a significant development project inventory and an extensive exploration

24

portfolio, which will require substantial future investment. We and/or our partners may need to seek financing in order to fund these or other future activities. Our future access to capital, as well as that of our partners and contractors, could be limited if the debt or equity markets are constrained. This could significantly delay development of our property interests.

***Our ability to declare and pay dividends is subject to limitations.***

The payment of future dividends on our capital stock is subject to the discretion of our board of directors, which considers, among other factors, our operating results, overall financial condition, credit-risk considerations, and capital requirements, as well as general business and market conditions. Our board of directors is not required to declare dividends on our common stock and may decide not to declare dividends.

Any indentures and other financing agreements that we enter into in the future may limit our ability to pay cash dividends on our capital stock, including common stock. In the event that any of our indentures or other financing agreements in the future restrict our ability to pay dividends in cash on the mandatory convertible preferred stock, we may be unable to pay dividends in cash on the common stock unless we can refinance amounts outstanding under those agreements. In addition, under Delaware law, dividends on capital stock may only be paid from "surplus," which is defined as the amount by which our total assets exceeds the sum of our total liabilities, including contingent liabilities, and the amount of our capital; if there is no surplus, cash dividends on capital stock may only be paid from our net profits for the then current and/or the preceding fiscal year. Further, even if we are permitted under our contractual obligations and Delaware law to pay cash dividends on common stock, we may not have sufficient cash to pay dividends in cash on our common stock.

***Discoveries or acquisitions of additional reserves are needed to avoid a material decline in reserves and production.***

The production rate from oil and gas properties generally declines as reserves are depleted, while related per-unit production costs generally increase as a result of decreasing reservoir pressures and other factors. Therefore, unless we add reserves through exploration and development activities or, through engineering studies, identify additional behind-pipe zones, secondary recovery reserves, or tertiary recovery reserves, or acquire additional properties containing proved reserves, our estimated proved reserves will decline materially as reserves are produced. Future oil and gas production is, therefore, highly dependent upon our level of success in acquiring or finding additional reserves on an economic basis. Furthermore, if oil or gas prices increase, our cost for additional reserves could also increase.

***We may not realize an adequate return on wells that we drill.***

Drilling for oil and gas involves numerous risks, including the risk that we will not encounter commercially productive oil or gas reservoirs. The wells we drill or participate in may not be productive, and we may not recover all or any portion of our investment in those wells. The seismic data and other technologies we use do not allow us to know conclusively prior to drilling a well that crude or natural gas is present or may be produced economically. The costs of drilling, completing, and operating wells are often uncertain, and drilling operations may be curtailed, delayed, or canceled as a result of a variety of factors including, but not limited to:

- unexpected drilling conditions;

- pressure or irregularities in formations;

- equipment failures or accidents;

- fires, explosions, blowouts, and surface cratering;

- marine risks such as capsizing, collisions, and hurricanes;

25

- other adverse weather conditions; and

- increase in the cost of, or shortages or delays in the availability of, drilling rigs and equipment.

Future drilling activities may not be successful, and, if unsuccessful, this failure could have an adverse effect on our future results of operations and financial condition. While all drilling, whether developmental or exploratory, involves these risks, exploratory drilling involves greater risks of dry holes or failure to find commercial quantities of hydrocarbons.

*Material differences between the estimated and actual timing of critical events may affect the completion and commencement of production from development projects.*

We are involved in several large development projects the completion of which may be delayed beyond our anticipated completion dates. Our projects may be delayed by project approvals from joint venture partners, timely issuances of permits and licenses by governmental agencies, weather conditions, manufacturing and delivery schedules of critical equipment, and other unforeseen events. Delays and differences between estimated and actual timing of critical events may adversely affect our large development projects and our ability to participate in large-scale development projects in the future.

*We may fail to fully identify potential problems related to acquired reserves or to properly estimate those reserves.*

Although we perform a review of properties that we acquire that we believe is consistent with industry practices, such reviews are inherently incomplete. It generally is not feasible to review in depth every individual property involved in each acquisition. Ordinarily, we will focus our review efforts on the higher-value properties and will sample the remainder. However, even a detailed review of records and properties may not necessarily reveal existing or potential problems, nor will it permit us as a buyer to become sufficiently familiar with the properties to assess fully and accurately their deficiencies and potential. Inspections may not always be performed on every well, and environmental problems, such as groundwater contamination, are not necessarily observable even when an inspection is undertaken. Even when problems are identified, we often assume certain environmental and other risks and liabilities in connection with acquired properties. There are numerous uncertainties inherent in estimating quantities of proved oil and gas reserves and future production rates and costs with respect to acquired properties, and actual results may vary substantially from those assumed in the estimates. In addition, there can be no assurance that acquisitions will not have an adverse effect upon our operating results, particularly during the periods in which the operations of acquired businesses are being integrated into our ongoing operations.

*The BP Acquisition and/or our liabilities could be adversely affected in the event one or more of the BP entities become the subject of a bankruptcy case.*

In light of the extensive costs and liabilities related to the oil spill in the Gulf of Mexico in 2010, there was public speculation as to whether one or more of the BP entities could become the subject of a case or proceeding under Title 11 of the United States Code or any other relevant insolvency law or similar law (which we collectively refer to as Insolvency Laws). In the event that one or more of the BP entities were to become the subject of such a case or proceeding, a court may find that the three definitive purchase and sale agreements (the BP Purchase Agreements) we entered into in connection with our 2010 acquisition of properties from BP (the BP Properties) are executory contracts, in which case such BP entities may, subject to relevant Insolvency Laws, have the right to reject the agreements and refuse to perform their future obligations under them. In this event, our ability to enforce our rights under the BP Purchase Agreements could be adversely affected.

Additionally, in a case or proceeding under relevant Insolvency Laws, a court may find that the sale of the BP Properties constitutes a constructive fraudulent conveyance that should be set aside. While the tests for

26

determining whether a transfer of assets constitutes a constructive fraudulent conveyance vary among jurisdictions, such a determination generally requires that the seller received less than a reasonably equivalent value in exchange for such transfer or obligation and the seller was insolvent at the time of the transaction, or was rendered insolvent or left with unreasonably small capital to meet its anticipated business needs as a result of the transaction. The applicable time periods for such a finding also vary among jurisdictions, but generally range from two to six years. If a court were to make such a determination in a proceeding under relevant Insolvency Laws, our rights under the BP Purchase Agreements, and our rights to the BP Properties, could be adversely affected.

***Crude oil and natural gas reserves are estimates, and actual recoveries may vary significantly.***

There are numerous uncertainties inherent in estimating crude oil and natural gas reserves and their value. Reservoir engineering is a subjective process of estimating underground accumulations of crude oil and natural gas that cannot be measured in an exact manner. Because of the high degree of judgment involved, the accuracy of any reserve estimate is inherently imprecise, and a function of the quality of available data and the engineering and geological interpretation. Our reserves estimates are based on 12-month average prices, except where contractual arrangements exist; therefore, reserves quantities will change when actual prices increase or decrease. In addition, results of drilling, testing, and production may substantially change the reserve estimates for a given reservoir over time. The estimates of our proved reserves and estimated future net revenues also depend on a number of factors and assumptions that may vary considerably from actual results, including:

- historical production from the area compared with production from other areas;

- the effects of regulations by governmental agencies, including changes to severance and excise taxes;

- future operating costs and capital expenditures; and

- workover and remediation costs.

For these reasons, estimates of the economically recoverable quantities of crude oil and natural gas attributable to any particular group of properties, classifications of those reserves and estimates of the future net cash flows expected from them prepared by different engineers or by the same engineers but at different times may vary substantially. Accordingly, reserves estimates may be subject to upward or downward adjustment, and actual production, revenue and expenditures with respect to our reserves likely will vary, possibly materially, from estimates.

Additionally, because some of our reserves estimates are calculated using volumetric analysis, those estimates are less reliable than the estimates based on a lengthy production history. Volumetric analysis involves estimating the volume of a reservoir based on the net feet of pay of the structure and an estimation of the area covered by the structure. In addition, realization or recognition of proved undeveloped reserves will depend on our development schedule and plans. A change in future development plans for proved undeveloped reserves could cause the discontinuation of the classification of these reserves as proved.

***Certain of our undeveloped leasehold acreage is subject to leases that will expire over the next several years unless production is established on units containing the acreage.***

A sizeable portion of our acreage is currently undeveloped. Unless production in paying quantities is established on units containing certain of these leases during their terms, the leases will expire. If our leases expire, we will lose our right to develop the related properties. Our drilling plans for these areas are subject to change based upon various factors, including drilling results, oil and natural gas prices, the availability and cost of capital, drilling, and production costs, availability of drilling services and equipment, gathering system and pipeline transportation constraints, and regulatory approvals.

*We may incur significant costs related to environmental matters.*

As an owner or lessee and operator of oil and gas properties, we are subject to various federal, provincial, state, local, and foreign country laws and regulations relating to discharge of materials into, and protection of, the environment. These laws and regulations may, among other things, impose liability on the lessee under an oil and gas lease for the cost of pollution clean-up resulting from operations, subject the lessee to liability for pollution damages and require suspension or cessation of operations in affected areas. Our efforts to limit our exposure to such liability and cost may prove inadequate and result in significant adverse effect on our results of operations. In addition, it is possible that the increasingly strict requirements imposed by environmental laws and enforcement policies could require us to make significant capital expenditures. Such capital expenditures could adversely impact our cash flows and our financial condition.

*Our North American operations are subject to governmental risks that may impact our operations.*

Our North American operations have been, and at times in the future may be, affected by political developments and by federal, state, provincial, and local laws and regulations such as restrictions on production, changes in taxes, royalties and other amounts payable to governments or governmental agencies, price or gathering rate controls, and environmental protection laws and regulations. New political developments, laws, and regulations may adversely impact our results on operations.

*Pending regulations related to emissions and the impact of any changes in climate could adversely impact our business.*

Several countries where Apache operates including Australia, Canada, and the United Kingdom either tax or assess some form of greenhouse gas (GHG) related fees on Company operations. Exposure has not been material to date, although a change in existing regulations could adversely affect our cash flows and results of operations.

In the event the predictions for rising temperatures and sea levels suggested by reports of the United Nations Intergovernmental Panel on Climate Change do transpire, we do not believe those events by themselves are likely to impact the Company's assets or operations. However, any increase in severe weather could have a material adverse effect on our assets and operations.

*The proposed U.S. federal budget for fiscal year 2014, when released, is expected to include certain provisions that, if passed, will have an adverse effect on our financial position, results of operations, and cash flows.*

To date, the Office of Management and Budget has not released a summary of the proposed U.S. federal budget for fiscal year 2014. When released, it is anticipated that as a result of possible significant deficit reduction or comprehensive tax reform measures currently under consideration the proposed budget may repeal many tax incentives and deductions that are currently used by U.S. oil and gas companies and impose new taxes. These provisions include elimination of the ability to fully deduct intangible drilling costs in the year incurred; increases in the taxation of foreign source income; repeal of the manufacturing tax deduction for oil and natural gas companies; and an increase in the geological and geophysical amortization period for independent producers. Should some or all of these provisions become law, our taxes will increase, potentially significantly, which would have a negative impact on our net income and cash flows. This could also cause us to reduce our drilling activities in the U.S. Since none of these proposals have yet to be voted on or become law, we do not know the ultimate impact these proposed changes may have on our business.

*Derivatives regulation included in current or proposed financial legislation and rulemaking could impede our ability to manage business and financial risks by restricting our use of derivative instruments as hedges against fluctuating commodity prices.*

The Dodd-Frank Act, which was signed into law in July 2010, contains significant derivatives regulation, including a requirement that certain transactions be cleared on exchanges and a requirement to post collateral (commonly referred to as "margin") for such transactions. The Act provides for a potential exception from these

28

clearing and collateral requirements for commercial end-users and it includes a number of defined terms that will be used in determining how this exception applies to particular derivative transactions and the parties to those transactions. We expect to qualify as a commercial end-user. As required by the Dodd-Frank Act, the Commodities Futures and Trading Commission (CFTC) has promulgated numerous rules to define these terms. In addition, it is possible that the CFTC, in conjunction with prudential regulators, may mandate that financial counterparties entering into swap transactions with end-users must do so with credit support agreements in place, which could result in negotiated credit thresholds above which an end-user must post collateral.

We use derivative instruments with respect to a portion of our expected crude oil and natural gas production in order to reduce the impact of commodity price fluctuations and enhance the stability of cash flows to support our capital investment programs and acquisitions. Given our current investment grade status, our current derivative contracts do not require the posting of margin regardless of the size of our liability positions.

Depending on the rules and definitions adopted by the CFTC and prudential regulators, we could be required to post significant amounts of collateral with our dealer counterparties for derivative transactions. Requirements to post cash collateral could result in negative impacts on our liquidity and financial flexibility and also cause us to incur additional debt and/or reduce capital investment. In addition, the final CFTC rules may also require the counterparties to our derivative instruments to move some of their derivative activities to a separate entity, which may not be as creditworthy as the current counterparty.

### *Proposed federal, state, or local regulation regarding hydraulic fracturing could increase our operating and capital costs.*

Several proposals are before the U.S. Congress that, if implemented, would either prohibit or restrict the practice of hydraulic fracturing or subject the process to regulation under the Safe Drinking Water Act. Several states are considering legislation to regulate hydraulic fracturing practices that could impose more stringent permitting, transparency, and well construction requirements on hydraulic-fracturing operations or otherwise seek to ban fracturing activities altogether. In addition, some municipalities have significantly limited or prohibited drilling activities and/or hydraulic fracturing, or are considering doing so. We routinely use fracturing techniques in the U.S. and other regions to expand the available space for natural gas and oil to migrate toward the wellbore. It is typically done at substantial depths in very tight formations.

Although it is not possible at this time to predict the final outcome of the legislation regarding hydraulic fracturing, any new federal, state, or local restrictions on hydraulic fracturing that may be imposed in areas in which we conduct business could result in increased compliance costs or additional operating restrictions in the U.S.

### *A deterioration of conditions in Egypt or changes in the economic and political environment in Egypt could have an adverse impact on our business.*

In February 2011, the former Egyptian president Hosni Mubarak stepped down, and the Egyptian Supreme Council of the Armed Forces took power, announcing that it would remain in power until the presidential and parliamentary elections could be held. In June 2012, Mohamed Morsi of the Muslim Brotherhood's Freedom and Justice Party was elected as Egypt's new president. In December 2012 the people of Egypt ratified a new constitution. Under the new constitution, the government must hold elections for the lower house of parliament within 60 days. Deterioration in the political, economic, and social conditions or other relevant policies of the Egyptian government, such as changes in laws or regulations, export restrictions, expropriation of our assets or resource nationalization, and/or forced renegotiation or modification of our existing contracts with EGPC could materially and adversely affect our business, financial condition, and results of operations. Our operations in Egypt contributed 20 percent of our 2012 production and accounted for 10 percent of our year-end estimated proved reserves. At year-end 2012, 17 percent of our estimated discounted future net cash flows and 7 percent of our net capitalized oil and gas property was attributable to Egypt.

29

*International operations have uncertain political, economic, and other risks.*

Our operations outside North America are based primarily in Egypt, Australia, the United Kingdom, and Argentina. On a barrel equivalent basis, approximately 44 percent of our 2012 production was outside North America, and approximately 31 percent of our estimated proved oil and gas reserves on December 31, 2012 were located outside North America. As a result, a significant portion of our production and resources are subject to the increased political and economic risks and other factors associated with international operations including, but not limited to:

- general strikes and civil unrest;

- the risk of war, acts of terrorism, expropriation and resource nationalization, forced renegotiation or modification of existing contracts;

- import and export regulations;

- taxation policies, including royalty and tax increases and retroactive tax claims, and investment restrictions;

- price control;

- transportation regulations and tariffs;

- constrained natural gas markets dependent on demand in a single or limited geographical area;

- exchange controls, currency fluctuations, devaluation, or other activities that limit or disrupt markets and restrict payments or the movement of funds;

- laws and policies of the United States affecting foreign trade, including trade sanctions;

- the possibility of being subject to exclusive jurisdiction of foreign courts in connection with legal disputes relating to licenses to operate and concession rights in countries where we currently operate;

- the possible inability to subject foreign persons, especially foreign oil ministries and national oil companies, to the jurisdiction of courts in the United States; and

- difficulties in enforcing our rights against a governmental agency because of the doctrine of sovereign immunity and foreign sovereignty over international operations.

Foreign countries have occasionally asserted rights to oil and gas properties through border disputes. If a country claims superior rights to oil and gas leases or concessions granted to us by another country, our interests could decrease in value or be lost. Even our smaller international assets may affect our overall business and results of operations by distracting management's attention from our more significant assets. Various regions of the world in which we operate have a history of political and economic instability. This instability could result in new governments or the adoption of new policies that might result in a substantially more hostile attitude toward foreign investments such as ours. In an extreme case, such a change could result in termination of contract rights and expropriation of our assets. This could adversely affect our interests and our future profitability.

The impact that future terrorist attacks or regional hostilities may have on the oil and gas industry in general, and on our operations in particular, is not known at this time. Uncertainty surrounding military strikes or a sustained military campaign may affect operations in unpredictable ways, including disruptions of fuel supplies and markets, particularly oil, and the possibility that infrastructure facilities, including pipelines, production facilities, processing plants, and refineries, could be direct targets of, or indirect casualties of, an act of terror or war. We may be required to incur significant costs in the future to safeguard our assets against terrorist activities.

In addition, continued regional conflict in the Middle East could have the following results, among others:

- volatility in global crude prices, which could negatively impact the global economy, resulting in slower economic growth rates, which could reduce demand for our products;

- negative impact on the world's crude oil supply if transportation avenues are disrupted, leading to further commodity price volatility;

- damage to or destruction of our wells, production facilities, receiving terminals, or other operating assets;

- inability of our service equipment providers to deliver items necessary for us to conduct our operations in the Middle East; and

- lack of availability of drilling rigs, oilfield equipment, or services if third-party providers decide to exit the region.

***Our operations are sensitive to currency rate fluctuations.***

Our operations are sensitive to fluctuations in foreign currency exchange rates, particularly between the U.S. dollar and the Canadian dollar, the Australian dollar, and the British Pound. Our financial statements, presented in U.S. dollars, may be affected by foreign currency fluctuations through both translation risk and transaction risk. Volatility in exchange rates may adversely affect our results of operations, particularly through the weakening of the U.S. dollar relative to other currencies.

***We face strong industry competition that may have a significant negative impact on our results of operations.***

Strong competition exists in all sectors of the oil and gas exploration and production industry. We compete with major integrated and other independent oil and gas companies for acquisition of oil and gas leases, properties, and reserves, equipment, and labor required to explore, develop, and operate those properties, and marketing of oil and natural gas production. Crude oil and natural gas prices impact the costs of properties available for acquisition and the number of companies with the financial resources to pursue acquisition opportunities. Many of our competitors have financial and other resources substantially larger than we possess and have established strategic long-term positions and maintain strong governmental relationships in countries in which we may seek new entry. As a consequence, we may be at a competitive disadvantage in bidding for drilling rights. In addition, many of our larger competitors may have a competitive advantage when responding to factors that affect demand for oil and natural gas production, such as fluctuating worldwide commodity prices and levels of production, the cost and availability of alternative fuels, and the application of government regulations. We also compete in attracting and retaining personnel, including geologists, geophysicists, engineers, and other specialists. These competitive pressures may have a significant negative impact on our results of operations.

***Our insurance policies do not cover all of the risks we face, which could result in significant financial exposure.***

Exploration for and production of crude oil and natural gas can be hazardous, involving natural disasters and other events such as blowouts, cratering, fire and explosion and loss of well control, which can result in damage to or destruction of wells or production facilities, injury to persons, loss of life, or damage to property and the environment. Our international operations are also subject to political risk. The insurance coverage that we maintain against certain losses or liabilities arising from our operations may be inadequate to cover any such resulting liability; moreover, insurance is not available to us against all operational risks.

31

**ITEM 1B.**    *UNRESOLVED STAFF COMMENTS*

As of December 31, 2012, we did not have any unresolved comments from the SEC staff that were received 180 or more days prior to year-end.

**ITEM 3.**    *LEGAL PROCEEDINGS*

The information set forth under "Legal Matters" and "Environmental Matters" in Note 8—Commitments and Contingencies in the Notes to Consolidated Financial Statements set forth in Part IV, Item 15 of this Form 10-K is incorporated herein by reference.

**ITEM 4.**  *MINE SAFETY DISCLOSURES*

None.

32

**PART II**

**ITEM 5.** *MARKET FOR REGISTRANT'S COMMON EQUITY, RELATED STOCKHOLDER MATTERS AND ISSUER PURCHASES OF EQUITY SECURITIES*

During 2012, Apache common stock, par value $0.625 per share, was traded on the New York and Chicago Stock Exchanges and the NASDAQ National Market under the symbol "APA." The table below provides certain information regarding our common stock for 2012 and 2011. Prices were obtained from The New York Stock Exchange, Inc. Composite Transactions Reporting System. Per-share prices and quarterly dividends shown below have been rounded to the indicated decimal place.

| | 2012 | | | | 2011 | | | |
|---|---|---|---|---|---|---|---|---|
| | Price Range | | Dividends Per Share | | Price Range | | Dividends Per Share | |
| | High | Low | Declared | Paid | High | Low | Declared | Paid |
| First Quarter | $ 112.09 | $ 91.48 | $ 0.17 | $ 0.15 | $ 132.50 | $ 110.29 | $ 0.15 | $ 0.15 |
| Second Quarter | 102.13 | 77.93 | 0.17 | 0.17 | 134.13 | 114.94 | 0.15 | 0.15 |
| Third Quarter | 94.87 | 81.55 | 0.17 | 0.17 | 129.26 | 80.05 | 0.15 | 0.15 |
| Fourth Quarter | 89.08 | 74.50 | 0.17 | 0.17 | 105.64 | 73.04 | 0.15 | 0.15 |

The closing price of our common stock, as reported on the New York Stock Exchange Composite Transactions Reporting System for January 31, 2013 (last trading day of the month), was $83.76 per share. As of January 31, 2013, there were 391,758,883 shares of our common stock outstanding held by approximately 5,300 stockholders of record and approximately 386,000 beneficial owners.

We have paid cash dividends on our common stock for 48 consecutive years through December 31, 2012. When, and if, declared by our Board of Directors, future dividend payments will depend upon our level of earnings, financial requirements, and other relevant factors.

In 1995, under our stockholder rights plan, each of our common stockholders received a dividend of one preferred stock purchase right (a "right") for each 2.310 outstanding shares of common stock (adjusted for subsequent stock dividends and a two-for-one stock split) that the stockholder owned. These rights were originally scheduled to expire on January 31, 2006. Effective as of that date, the rights were reset to one right per share of common stock, and the expiration was extended to January 31, 2016. Unless the rights have been previously redeemed, all shares of Apache common stock are issued with rights, which trade automatically with our shares of common stock. For a description of the rights, please refer to Note 10—Capital Stock in the Notes to Consolidated Financial Statements set forth in Part IV, Item 15 of this Form 10-K.

Information concerning securities authorized for issuance under equity compensation plans is set forth under the caption "Equity Compensation Plan Information" in the proxy statement relating to the Company's 2013 annual meeting of stockholders, which is incorporated herein by reference.

33

The following stock price performance graph is intended to allow review of stockholder returns, expressed in terms of the appreciation of the Company's common stock relative to two broad-based stock performance indices. The information is included for historical comparative purposes only and should not be considered indicative of future stock performance. The graph compares the yearly percentage change in the cumulative total stockholder return on the Company's common stock with the cumulative total return of the Standard & Poor's Composite 500 Stock Index and of the Dow Jones U.S. Exploration & Production Index (formerly Dow Jones Secondary Oil Stock Index) from December 31, 2007, through December 31, 2012. The stock performance graph and related information shall not be deemed "soliciting material" or to be "filed" with the SEC, nor shall information be incorporated by reference into any future filing under the Securities Act of 1933 or Securities Exchange Act of 1934, each as amended, except to the extent that the Company specifically incorporates it by reference into such filing.

## COMPARISON OF 5 YEAR CUMULATIVE TOTAL RETURN*
Among Apache Corporation, S&P 500 Index
and the Dow Jones US Exploration & Production Index



—□— Apache Corporation

— △ — S&P 500 Index

- - ○ - - Dow Jones US Exploration & Production

* $100 invested on 12/31/07 in stock including reinvestment of dividends.
Fiscal year ending December 31.

| | 2007 | 2008 | 2009 | 2010 | 2011 | 2012 |
|---|---|---|---|---|---|---|
| Apache Corporation | $ 100.00 | $ 69.77 | $ 97.34 | $ 113.16 | $ 86.43 | $ 75.45 |
| S & P's Composite 500 Stock Index | 100.00 | 63.00 | 79.67 | 91.68 | 93.61 | 108.59 |
| DJ US Expl & Prod Index | 100.00 | 59.88 | 84.17 | 98.26 | 94.14 | 99.62 |

34

**ITEM 6.     *SELECTED FINANCIAL DATA***

The following table sets forth selected financial data of the Company and its consolidated subsidiaries over the five-year period ended December 31, 2012, which information has been derived from the Company's audited financial statements. This information should be read in connection with, and is qualified in its entirety by, the more detailed information in the Company's financial statements set forth in Part IV, Item 15 of this Form 10-K. As discussed in more detail under Item 15, 2012 numbers in the following table reflect a total of $1.9 billion ($1.4 billion net of tax) in non-cash write-downs of the carrying value of the Company's Canadian proved oil and gas properties as of March 31, 2012, June 30, 2012, and September 30, 2012, as a result of ceiling test limitations. The 2009 numbers reflect a $2.82 billion ($1.98 billion net of tax) non-cash write-down of the carrying value of the Company's U.S. and Canadian proved oil and gas properties as of March 31, 2009. The 2008 numbers reflect a $5.3 billion ($3.6 billion net of tax) non-cash write-down of the carrying value of the Company's U.S., U.K. North Sea, Canadian, and Argentine proved oil and gas properties as of December 31, 2008.

| | As of or for the Year Ended December 31, | | | | | | | | |
|---|---|---|---|---|---|---|---|---|---|
| | **2012** | | **2011** | | **2010** | | **2009** | | **2008** |
| | (In millions, except per share amounts) | | | | | | | | |
| **Income Statement Data** | | | | | | | | | |
| Total revenues | $ | 17,078 | $ | 16,888 | $ | 12,092 | $ | 8,615 | $ | 12,390 |
| Income (loss) attributable to common stock | | 1,925 | | 4,508 | | 3,000 | | (292) | | 706 |
| Net income (loss) per common share: | | | | | | | | | |
|     Basic | | 4.95 | | 11.75 | | 8.53 | | (0.87) | | 2.11 |
|     Diluted | | 4.92 | | 11.47 | | 8.46 | | (0.87) | | 2.09 |
| Cash dividends declared per common share | | 0.68 | | 0.60 | | 0.60 | | 0.60 | | 0.70 |
| **Balance Sheet Data** | | | | | | | | | |
| Total assets | $ | 60,737 | $ | 52,051 | $ | 43,425 | $ | 28,186 | $ | 29,186 |
| Long-term debt | | 11,355 | | 6,785 | | 8,095 | | 4,950 | | 4,809 |
| Shareholders' equity | | 31,331 | | 28,993 | | 24,377 | | 15,779 | | 16,509 |
| Common shares outstanding | | 392 | | 384 | | 382 | | 336 | | 335 |

For a discussion of significant acquisitions and divestitures, see Note 2—Acquisitions and Divestitures in the Notes to Consolidated Financial Statements set forth in Part IV, Item 15 of this Form 10-K.

**ITEM 7.**     *MANAGEMENT'S DISCUSSION AND ANALYSIS OF FINANCIAL CONDITION AND RESULTS OF OPERATIONS*

Apache Corporation, a Delaware corporation formed in 1954, is an independent energy company that explores for, develops, and produces natural gas, crude oil, and natural gas liquids. We currently have exploration and production interests in six countries: the U.S., Canada, Egypt, Australia, the U.K. North Sea, and Argentina. Apache also pursues exploration interests in other countries that may over time result in reportable discoveries and development opportunities.

The following discussion should be read together with the Consolidated Financial Statements and the Notes to Consolidated Financial Statements set forth in Part IV, Item 15 of this Form 10-K, and the Risk Factors information set forth in Part I, Item 1A of this Form 10-K.

<u>Executive Overview</u>

*Strategy*

Apache's mission is to grow a profitable global exploration and production company in a safe and environmentally responsible manner for the long-term benefit of our shareholders. Our growth strategy focuses on economic growth through drilling, acquisitions, or a combination of both, depending on cost levels, availability of acquisition opportunities, and other factors.

Apache's long-term perspective adheres to a portfolio approach to provide diversity in terms of hydrocarbon mix (crude oil and natural gas), geologic risk, geographic risk, and reserve life in order to achieve consistency in results. Continued volatility in the commodity price environment reinforces the importance of our balanced portfolio. Our 2012 results reflected the benefit of our product balance, as combined crude oil and liquids represented 51 percent of our production but provided 81 percent of our $16.9 billion of oil and gas revenues. In addition, approximately 72 percent of our crude oil production is priced relative to Dated Brent crudes and sweet crude from the Gulf Coast, which continue to be priced at a significant premium to West Texas Intermediate (WTI)-based prices. Our results also reflected our portfolio's geographic balance, with over one-third of our natural gas produced outside of North America. While Apache's 2012 natural gas price realizations in North America fell 24 percent from the 2011 average, outside North America our 2012 natural gas realizations averaged 13 percent higher than the prior year.

The Company's foundation for future growth is driven by our significant producing asset base and large undeveloped acreage positions. This allows for growth through sustainable lower-risk drilling opportunities, balanced by higher-risk, higher-reward exploration. We closely monitor drilling and acquisition cost trends in each of our core areas relative to product prices and, when appropriate, adjust our capital budgets accordingly and allocate funds to projects based on expected value. We do this through a disciplined and focused process that includes analyzing current economic conditions, projected rate of return on internally generated drilling inventories, and opportunities for tactical acquisitions or leasehold purchases that add substantial drilling prospects or, occasionally, provide access to new core areas that could enhance our portfolio. In addition, we actively seek to identify and pursue ways to control costs and maximize our cash flow from operations. Our overall approach to managing capital allocation has enabled us to consistently deliver strong cash flows, with record production and revenues in 2012.

As we pursue growth, we continually monitor the capital resources available to us to meet our future financial obligations and liquidity needs. Apache has historically utilized cash generated from our operations, available borrowing capacity under our global credit facilities, access to both debt and equity capital markets, and proceeds from the occasional sale of nonstrategic assets to meet our financial needs. Access to the equity markets and the interest cost of debt are greatly influenced by Apache's ability to maintain both a strong balance sheet and generate ongoing operating cash flow. In 2012, we issued $5.0 billion of fixed-rate notes in the current low interest rate environment, using the proceeds from the notes to fund the Cordillera acquisition, pay down

maturing debt and commercial paper balances, and for general corporate purposes. The Company's debt-to-capitalization ratio as of December 31, 2012 was 28 percent as compared to 20 percent at December 31, 2011. We believe the liquidity and capital resource alternatives available to us, combined with internally-generated cash flows, will be adequate to fund short-term and long-term operations, including our capital spending program, repayment of debt maturities, and any amount that may ultimately be paid in connection with commitments or contingencies.

Throughout the cycles of our industry, our strategic focus on balanced portfolio growth has underpinned our ability to deliver production and reserve growth and competitive returns on invested capital for the benefit of our shareholders. Delivering successful results under this strategy is bolstered by Apache's unique culture. A strong sense of urgency, empowerment of our employees, effective incentive systems, and an independent mindset are at the heart of how we build value.

### Financial and Operating Results

For the 12-month period ending December 31, 2012, Apache reported record performances in several key metrics. Results for the year include:

- Apache reported its fourth consecutive year of production growth, with annual daily production of oil, natural gas, and natural gas liquids averaging a record 779 Mboe/d, up 4 percent compared with 748 Mboe/d in 2011. Production in the fourth-quarter 2012 averaged 800 Mboe/d, an increase of 5 percent from the 759 Mboe/d averaged in the fourth quarter of 2011.

- Liquids production for the year averaged a record 396 Mboe/d, an increase of 7 percent from 371 Mboe/d in 2011. Crude oil accounted for 89 percent of liquids production.

- Oil and gas production revenues were a record $16.9 billion, up $137 million from the previous record of $16.8 billion set in 2011, reflecting a 4 percent increase in oil production from the prior year, which offset a $416 million reduction in natural gas revenues as realized prices in North America collapsed.

- Apache reported $1.9 billion in income attributable to common stock, or $4.92 per diluted common share, down from $4.5 billion, or $11.47 per share, in 2011. Earnings for 2012 reflect the after-tax impact of oil and gas property write-downs totaling $1.4 billion and certain income tax adjustments of $344 million. For additional discussion regarding these write-downs and tax adjustments, please refer Note 1—Summary of Significant Accounting Policies—"Property and Equipment" and Note 7—Income Taxes in the Notes to Consolidated Financial Statements set forth in Part IV, Item 15 of this Form 10-K.

- Apache's adjusted earnings, which exclude certain items impacting the comparability of results, were $3.8 billion, or $9.48 per diluted common share, down from $4.7 billion, or $11.83 per share, in 2011. Adjusted earnings is not a financial measure prepared in accordance with accounting principles generally accepted in the U.S. (GAAP). For a description of adjusted earnings and a reconciliation of adjusted earnings to income attributable to common stock, the most directly comparable GAAP financial measure, please see "Non-GAAP Measures" in this Item 7.

### 2013 Outlook

As we head into 2013, we believe our inventory of exploration and development projects offers numerous growth opportunities. Recent drilling successes and acquisitions of acreage positions across our portfolio have built a robust drilling inventory for the Company. With large-scale development projects currently in progress, our global allocation of capital is critical. Given the present price disparity between oil and natural gas, our near-term focus is exploiting the oil-prone and more liquids-rich gas properties in our portfolio. Our plan for 2013 also includes further

development of our major oil and gas discoveries and LNG projects in Australia and Canada, which, if completed, would enable us to monetize significant gas resources at prices more closely linked to crude oil. Rate of return will drive our decision making while we continue our focus on costs and operational efficiency.

Our initial 2013 capital budget is approximately $10.5 billion. Approximately $6.4 billion is expected to be spent on projects in North America, with the remaining amount allocated across our international regions. While funds have been committed for certain 2013 exploration wells, long-lead development projects, and front-end engineering and design (FEED) studies, the majority of our drilling and development projects are discretionary and subject to acceleration, deferral, or cancellation as conditions warrant. We closely monitor commodity prices, service cost levels, regulatory impacts, and numerous other industry factors, and we typically review and revise our exploration and development budgets quarterly based on changes to actual and predicted operating cash flows.

Apache's current capital budget is estimated to deliver an increase in 2013 production between 3 percent and 5 percent from full-year 2012 production levels. We generally do not project production impacts from weather-related shut-ins or for acquisitions or divestitures because they are specific, discrete events where occurrence and timing is unpredictable. We are, however, targeting asset sales of approximately $2.0 billion in 2013, of which $405 million was completed on February 8, 2013 with the closing of our Chevron Canada transaction.

## Operational Developments

Apache pursues opportunities for growth through exploration, exploitation, and development drilling, supplemented by strategic acquisitions. In 2012, we invested over $10 billion in capital expenditures across all of our regions while also investing approximately $3.5 billion in various acquisitions.

### Exploration, Exploitation, and Development Activities

Our internally-generated exploration and drilling opportunities, multi-year development projects, and recent acquisitions provide the foundation for our growth. Highlights of our 2012 drilling successes, exploration discoveries, LNG project milestones, and other opportunities for continued growth include:

*International Activities*

*North Sea Drilling, Exploitation, and Exploration*   During 2012, we drilled 21 wells, of which 16 were productive. Two of the highest producing wells were the Beryl B72 well, which commenced production in May at a rate of 11.6 Mb/d and 13.1 MMcf/d, and the Beryl B73 well, which was completed in September with an initial rate of 8.2 Mb/d and 5.9 MMcf/d. A 3-D seismic survey of the Beryl field commenced in early August, which when completed in 2013, will further refine our drilling plans for these Mobil North Sea assets acquired in 2011. We also announced during the year that the U.K. Department of Energy & Climate Change awarded the Company 11 new operated licenses and 1 non-operated license, which added approximately 613,000 gross acres to our North Sea portfolio. This award was effective January 2013 and covers areas surrounding our Beryl field plus two key licenses near the Forties field.

*North Sea Satellite Platform Project*   In September, the jacket of the Forties Alpha Satellite Platform was installed, with a topside and bridge scheduled to be delivered during the second quarter of 2013. This platform sits adjacent to the main Alpha Platform and will provide an additional 18 drilling slots beginning in the third quarter of 2013 along with power generation, fluid separation, gas lift compression, and oil export pumping.

*Egypt Discoveries*   Apache maintained an active drilling and development program throughout 2012, running an average of 25 rigs and drilling 188 development and injection wells. We also drilled 51 exploration wells with a 55 percent success rate. Our exploration program continues to benefit from the acquisition and evaluation of 3-D seismic surveys that enable the Company to high-grade existing prospects and identify new targets across multiple pay horizons in the Cretaceous, Jurassic, and deeper Paleozoic reservoirs.

38

*Argentina Exploration*    Apache focused exploration and development activities primarily in the Neuquén basin during 2012, drilling 28 development wells targeting unconventional Gas Plus gas and shallow oil plays. The region's exploration program included drilling two wells in the Vaca Muerta shale formation. Testing and evaluation of these wells continues in preparation for future drilling opportunities.

*Australia Macedon Field Development*    First production is projected in 2013 from four completed gas wells in the Macedon gas field. Gas will be delivered via a 60-mile pipeline to a 200 MMcf/d gas plant being built at Ashburton North in Western Australia. Apache has successfully marketed nearly all of its proved reserves in the Macedon field under long-term contracts. We have a 29-percent non-operating working interest in the field and gas plant.

*Australia Coniston Oil Field Development*    The Coniston oil field development project, which lies just north of our Van Gogh field, continued toward projected first production in 2014. The field will be produced via subsea completions tied back to the Ningaloo Vision floating production storage and offloading vessel (FPSO) that services Apache's Van Gogh oil field. To more effectively control the Van Gogh and Coniston field operations, development, and maintenance efforts, this FPSO (the Ningaloo Vision) was purchased from the previous lessor in January 2012.

*Australia Balnaves Oil Development*    The Company continues development of its offshore Balnaves field, an oil accumulation located in a separate reservoir within the large gas reservoirs of our Brunello gas field offshore Western Australia. The field is projected to deliver initial gross production of 30 Mb/d in 2014 through a leased FPSO. Apache has a 65-percent working interest in the operated project.

*Australia Wheatstone LNG Project*    During 2011, advances were made on the Chevron-operated Wheatstone LNG development project (Wheatstone) in Western Australia, with binding Sales and Purchase Agreements signed by two Asian customers for the delivery of approximately 60 percent of Apache's net LNG offtake. In 2012, further advances were made on the project with the signing of two non-binding Heads of Agreements, which will take the total committed delivery volumes to over 80 percent once the final binding Sales and Purchase Agreements are signed. These binding Sales and Purchase Agreements are expected to be finalized and signed in 2013. The first phase of the Wheatstone project will comprise two LNG processing trains with a combined capacity of approximately 8.9 million metric tons per annum (mtpa), a domestic gas plant, and associated infrastructure. Apache has a 13-percent interest in the project and expects to invest approximately $4 billion over five years for the field and LNG facility development. Apache will supply gas to Wheatstone from its operated Julimar and Brunello complex. The 65-percent interest Julimar development project is expected to generate average net sales to Apache of approximately 140 MMcf/d of gas (equivalent to 1.07 million mtpa of LNG) at prices pegged to world oil markets, 22 MMcf/d of sales gas into the domestic market, and 3,250 barrels of condensate per day. First production is projected for the end of 2016.

*North American Activities*

*Record Drilling Activity in U.S. Onshore Regions*    For 2012, our Permian region's active drilling program continued to set new highs for net production, averaging 108 Mboe/d, up 18 percent from the prior year. Over 72 percent of this production was from crude oil and natural gas liquids. The Central region also achieved record production on the strength of an active drilling program and the Cordillera acquisition. The region drilled over 190 wells during the year and increased production 37 percent compared to the prior year. Oil and liquids growth increased 128 percent as the Central team targeted drilling oil and liquids-rich gas plays primarily on our Granite Wash acreage. Both the Permian and Central regions have continued their active drilling programs into 2013.

*United States Horizontal Drilling*    Apache continues to evaluate horizontal drilling potential across our acreage positions, in both conventional and unconventional reservoirs. Nearly all of our drilling activity in the Central region is horizontal, while the Permian region continues to develop a large inventory of horizontal opportunities based on 2012 drilling success in the Cline, Atoka, and Wolfcamp shale formations in the Midland

39

basin of Texas. Horizontal redevelopment of historically conventional fields and reservoirs in the Central basin platform in the Permian region have also yielded positive results during 2012. We anticipate a continued shift to more horizontal drilling throughout 2013.

*New Venture Acreage Positions*    During 2012, Apache accumulated acreage positions in several prospective basins. Our New Ventures team has built a 500,000 net acre position in the Mississippian Lime play in Kansas and Nebraska and a 300,000 net acre position in the Williston Basin in Montana. We have commenced drilling activity in both of these plays.

*Gulf of Mexico Deepwater Exploration*    Apache's strategic presence in the Gulf of Mexico deepwater portfolio was gained through the 2010 Mariner merger and was extended through our participation in the June 2012 federal lease sale, where we were awarded 28 new deepwater leases. At the end of 2012, the Company held approximately 900,000 gross acres across 166 blocks. The region increased its exploration activity for 2012, having drilled or participated in five wells during 2012, as compared to only two wells in the prior year. We plan to drill or participate in drilling seven wells during 2013.

*Kitimat LNG Project*    In December 2012, Apache announced an agreement with Chevron Canada Limited (Chevron Canada) to build and operate the Kitimat LNG project and develop shale gas resources at the Liard and Horn River basins in British Columbia. Chevron Canada and Apache Canada will each hold a 50-percent interest in the Kitimat LNG plant, the Pacific Trail Pipeline, and approximately 644,000 gross undeveloped acres in the Horn River and Liard basins. Chevron Canada will operate the LNG plant and pipeline and Apache Canada will operate Horn River and Liard. Although the project has not reached a final investment decision, we believe Chevron's experience in developing LNG projects and marketing expertise will assist in moving the development forward. The transaction was completed on February 8, 2013.

### Merger and Acquisitions of Property and Acreage

During 2012, 2011, and 2010, we completed approximately $17 billion in acquisitions, leaving Apache poised for growth. As we head into 2013, Apache is focused on further developing our inventory of available drilling opportunities. Each of our acquisitions fits well with our long-term strategy of maintaining a balanced portfolio of core assets by adding high-quality properties with a diversity of geologic and geographic risk, product mix, and reserve life. The acquired properties impacted nine of our ten operating regions and are strategically positioned to benefit from our existing infrastructure and operating experience. For detailed information regarding our recent acquisitions, please see "Significant Acquisitions and Divestitures" in this Item 7 and Note 2—Acquisitions and Divestitures in the Notes to Consolidated Financial Statements set forth in Part IV, Item 15 of this Form 10-K.

### Egypt Political Unrest

In February 2011, former Egyptian president Hosni Mubarak stepped down, and the Egyptian Supreme Council of the Armed Forces took power, announcing that it would remain in power until the presidential and parliamentary elections could be held. In June 2012, Mohamed Morsi of the Muslim Brotherhood's Freedom and Justice Party was elected as Egypt's new president. In December 2012 the people of Egypt ratified a new constitution. Under the new constitution, the government must hold elections for the lower house of parliament within 60 days. Apache's operations, located in remote locations in the Western Desert, have not experienced production interruptions, and we have continued to receive development lease approvals for our drilling program. We currently plan to invest $1.1 billion in Egypt in 2013.

Our operations in Egypt contributed 20 percent of our 2012 production and accounted for 10 percent of our year-end estimated proved reserves. At year-end 2012, 17 percent of our estimated discounted future net cash flows and 7 percent of our net capitalized oil and gas property was attributable to Egypt. For further information regarding our Egypt region, please see Note 13—Business Segment Information and Note 14—Supplemental Oil and Gas Disclosures (Unaudited) in the Notes to Consolidated Financial Statements set forth in Part IV, Item 15 of this Form 10-K.

Apache purchases multi-year political risk insurance from the Overseas Private Investment Corporation (OPIC) and other highly-rated international insurers covering a portion of its investments in Egypt. In the aggregate, these policies, subject to the policy terms and conditions, provide approximately $1 billion of coverage to Apache for losses arising from confiscation, nationalization, and expropriation risks, with a $263 million sub-limit for currency inconvertibility. In addition, the Company has a separate policy with OPIC, which provides $300 million of coverage for losses arising from (1) non-payment by Egyptian General Petroleum Corporation (EGPC) of arbitral awards covering amounts owed Apache on past due invoices and (2) expropriation of exportable petroleum in the event that actions taken by the government of Egypt prevent Apache from exporting our share of production. In October 2012, the Multilateral Investment Guarantee Agency (MIGA), a member of the World Bank Group, announced that it was providing $150 million in reinsurance to OPIC for the remainder of the policy term. This provision of long-term reinsurance to OPIC will allow Apache to maintain the $300 million of insurance coverage through 2024.

A deterioration in the political, economic, and social conditions or other relevant policies of the Egyptian government, such as changes in laws or regulations, export restrictions, expropriation of our assets or resource nationalization, and/or forced renegotiation or modification of our existing contracts with EGPC, could materially and adversely affect our business, financial condition, and results of operations.

### *Argentina Tax and Royalty Claims*

ENARGAS, an autonomous entity that functions under the Argentina Ministry of Economy, issued administrative orders creating a tariff charge on all fuel gas used by oil and gas producers in field operations effective December 1, 2011. The tariff charge is applicable to the operations of Company affiliates in Argentina and totaled approximately $24 million in 2012. In addition, in late 2010 and early 2011, the Province of Tierra del Fuego notified Company affiliates of its claims for additional royalty on natural gas, crude oil, and liquefied petroleum gas. The Company's affiliates have initiated legal proceedings challenging both ENARGAS' tariff charge and the Province's claims for additional royalty. The Province's claims for additional royalty on liquefied petroleum gas exports have been paid under protest by the Company's affiliates. That payment is expected to resolve the claims for additional royalty on liquefied petroleum gas exports.

41

**Results of Operations**

*Oil and Gas Revenues*

| | | | For the Year Ended December 31, | | | |
|---|---|---|---|---|---|---|
| | 2012 | | 2011 | | 2010 | |
| | $ Value | % Contribution | $ Value | % Contribution | $ Value | % Contribution |
| | | | ($ in millions) | | | |
| **Total Oil Revenues:** | | | | | | |
| United States | $  4,662 | 35% | $  4,163 | 33% | $  2,683 | 30% |
| Canada | 492 | 4% | 485 | 4% | 388 | 4% |
| North America | 5,154 | 39% | 4,648 | 37% | 3,071 | 34% |
| Egypt | 4,050 | 31% | 4,169 | 33% | 2,875 | 32% |
| Australia | 1,218 | 9% | 1,552 | 12% | 1,296 | 14% |
| North Sea | 2,517 | 19% | 2,072 | 16% | 1,590 | 18% |
| Argentina | 271 | 2% | 238 | 2% | 209 | 2% |
| International | 8,056 | 61% | 8,031 | 63% | 5,970 | 66% |
| Total  (1) | $  13,210 | 100% | $  12,679 | 100% | $  9,041 | 100% |
| **Total Gas Revenues:** | | | | | | |
| United States | $  1,169 | 37% | $  1,550 | 43% | $  1,409 | 49% |
| Canada | 751 | 23% | 1,033 | 29% | 647 | 23% |
| North America | 1,920 | 60% | 2,583 | 72% | 2,056 | 72% |
| Egypt | 504 | 16% | 621 | 17% | 495 | 17% |
| Australia | 357 | 11% | 182 | 5% | 163 | 6% |
| North Sea | 188 | 6% | 19 | 0% | 16 | 0% |
| Argentina | 224 | 7% | 204 | 6% | 132 | 5% |
| International | 1,273 | 40% | 1,026 | 28% | 806 | 28% |
| Total  (2) | $  3,193 | 100% | $  3,609 | 100% | $  2,862 | 100% |
| **Natural Gas Liquids (NGL) Revenues:** | | | | | | |
| United States | $  395 | 73% | $  391 | 75% | $  208 | 74% |
| Canada | 79 | 14% | 99 | 19% | 39 | 14% |
| North America | 474 | 87% | 490 | 94% | 247 | 88% |
| Egypt | – | – | 1 | 0% | 2 | 1% |
| North Sea | 46 | 8% | – | – | – | – |
| Argentina | 24 | 5% | 31 | 6% | 31 | 11% |
| International | 70 | 13% | 32 | 6% | 33 | 12% |
| Total | $  544 | 100% | $  522 | 100% | $  280 | 100% |
| **Total Oil and Gas Revenues:** | | | | | | |
| United States | $  6,226 | 37% | $  6,104 | 36% | $  4,300 | 35% |
| Canada | 1,322 | 8% | 1,617 | 10% | 1,074 | 9% |
| North America | 7,548 | 45% | 7,721 | 46% | 5,374 | 44% |
| Egypt | 4,554 | 27% | 4,791 | 29% | 3,372 | 28% |
| Australia | 1,575 | 9% | 1,734 | 10% | 1,459 | 12% |
| North Sea | 2,751 | 16% | 2,091 | 12% | 1,606 | 13% |
| Argentina | 519 | 3% | 473 | 3% | 372 | 3% |
| International | 9,399 | 55% | 9,089 | 54% | 6,809 | 56% |
| Total | $  16,947 | 100% | $  16,810 | 100% | $  12,183 | 100% |

(1)   Financial derivative hedging activities decreased 2012, 2011, and 2010 oil revenues $146 million, $379 million, and $57 million, respectively.

(2)   Financial derivative hedging activities increased 2012, 2011, and 2010 natural gas revenues $414 million, $272 million, and $222 million, respectively.

*Production*

| | For the Year Ended December 31, | | | | |
|---|---|---|---|---|---|
| | **2012** | **Increase (Decrease)** | **2011** | **Increase (Decrease)** | **2010** |
| **Oil Volume – b/d:** | | | | | |
| United States | 134,123 | 12% | 119,415 | 24% | 96,576 |
| Canada | 15,830 | 11% | 14,252 | (2%) | 14,581 |
| North America | 149,953 | 12% | 133,667 | 20% | 111,157 |
| Egypt [3] | 99,756 | (4%) | 103,912 | 5% | 99,122 |
| Australia | 28,884 | (24%) | 38,228 | (17%) | 45,908 |
| North Sea | 63,692 | 17% | 54,541 | (4%) | 56,791 |
| Argentina | 9,741 | 2% | 9,597 | (4%) | 9,956 |
| International | 202,073 | (2%) | 206,278 | (3%) | 211,777 |
| Total [1] | 352,026 | 4% | 339,945 | 5% | 322,934 |
| **Natural Gas Volume – Mcf/d:** | | | | | |
| United States | 854,099 | (1%) | 864,742 | 18% | 730,847 |
| Canada | 600,680 | (5%) | 632,550 | 60% | 396,005 |
| North America | 1,454,779 | (3%) | 1,497,292 | 33% | 1,126,852 |
| Egypt [3] | 353,738 | (3%) | 365,418 | (3%) | 374,858 |
| Australia | 214,013 | 16% | 185,079 | (7%) | 199,729 |
| North Sea | 57,457 | NM | 2,284 | (4%) | 2,391 |
| Argentina | 213,464 | 1% | 212,311 | 15% | 184,830 |
| International | 838,672 | 10% | 765,092 | 0% | 761,808 |
| Total [2] | 2,293,451 | 1% | 2,262,384 | 20% | 1,888,660 |
| **Natural Gas Liquids (NGL) Volume – b/d:** | | | | | |
| United States | 33,527 | 52% | 22,111 | 60% | 13,777 |
| Canada | 6,258 | 5% | 5,958 | 107% | 2,884 |
| North America | 39,785 | 42% | 28,069 | 68% | 16,661 |
| Egypt | – | NM | 49 | NM | 82 |
| North Sea | 1,618 | NM | 4 | NM | – |
| Argentina | 3,008 | 0% | 3,018 | (5%) | 3,180 |
| International | 4,626 | 51% | 3,071 | (6%) | 3,262 |
| Total | 44,411 | 43% | 31,140 | 56% | 19,923 |
| **BOE per day [4]** | | | | | |
| United States | 310,000 | 9% | 285,650 | 23% | 232,161 |
| Canada | 122,201 | (3%) | 125,636 | 51% | 83,466 |
| North America | 432,201 | 5% | 411,286 | 30% | 315,627 |
| Egypt | 158,713 | (4%) | 164,864 | 2% | 161,680 |
| Australia | 64,552 | (7%) | 69,074 | (13%) | 79,196 |
| North Sea | 74,887 | 36% | 54,925 | (4%) | 57,190 |
| Argentina | 48,326 | 1% | 48,000 | 9% | 43,941 |
| International | 346,478 | 3% | 336,863 | (2%) | 342,007 |
| Total | 778,679 | 4% | 748,149 | 14% | 657,634 |

[1]   Approximately 13 percent of 2012 worldwide oil production was subject to financial derivative hedges, compared to 29 percent in 2011 and 12 percent in 2010.

[2]   Approximately 13 percent of 2012 worldwide natural gas production was subject to financial derivative hedges, compared to 16 percent in 2011 and 23 percent in 2010.

[3]   Gross oil production in Egypt for 2012, 2011, and 2010 was 213,112 b/d, 217,207 b/d, and 189,342 b/d, respectively. Gross natural gas production in Egypt for 2012, 2011, and 2010 was 899,972 Mcf/d, 865,485 Mcf/d, and 798,645 Mcf/d, respectively.

[4]   The table shows production on a barrel of oil equivalent basis (boe) in which natural gas is converted to an equivalent barrel of oil based on a 6:1 energy equivalent ratio. This ratio is not reflective of the price ratio between the two products.

NM – Not meaningful

*Pricing*

| | For the Year Ended December 31, | | | | |
| | 2012 | Increase (Decrease) | 2011 | Increase (Decrease) | 2010 |
|---|---|---|---|---|---|
| Average Oil Price – Per barrel | | | | | |
| United States | $ 94.98 | (1%) | $ 95.51 | 25% | $ 76.13 |
| Canada | 84.89 | (9%) | 93.19 | 28% | 72.83 |
| North America | 93.91 | (1%) | 95.27 | 26% | 75.69 |
| Egypt | 110.92 | 1% | 109.92 | 38% | 79.45 |
| Australia | 115.22 | 4% | 111.22 | 44% | 77.32 |
| North Sea | 107.97 | 4% | 104.09 | 36% | 76.66 |
| Argentina | 75.89 | 12% | 68.02 | 18% | 57.47 |
| International | 108.92 | 2% | 106.67 | 38% | 77.21 |
| Total (1) | 102.53 | 0% | 102.19 | 33% | 76.69 |
| Average Natural Gas Price – Per Mcf: | | | | | |
| United States | $ 3.74 | (24%) | $ 4.91 | (7%) | $ 5.28 |
| Canada | 3.42 | (23%) | 4.47 | 0% | 4.48 |
| North America | 3.61 | (24%) | 4.72 | (6%) | 5.00 |
| Egypt | 3.90 | (16%) | 4.66 | 29% | 3.62 |
| Australia | 4.55 | 69% | 2.69 | 20% | 2.24 |
| North Sea | 8.95 | (60%) | 22.25 | 19% | 18.64 |
| Argentina | 2.87 | 9% | 2.64 | 35% | 1.96 |
| International | 4.15 | 13% | 3.67 | 27% | 2.90 |
| Total (2) | 3.80 | (13%) | 4.37 | 5% | 4.15 |
| Average NGL Price – Per barrel | | | | | |
| United States | $ 32.19 | (34%) | $ 48.42 | 17% | $ 41.45 |
| Canada | 34.63 | (24%) | 45.72 | 25% | 36.61 |
| North America | 32.57 | (32%) | 47.85 | 18% | 40.62 |
| Egypt | – | NM | 66.36 | NM | 69.75 |
| North Sea | 77.11 | 18% | 65.45 | NM | – |
| Argentina | 21.55 | (23%) | 27.90 | 3% | 27.08 |
| International | 40.98 | 43% | 28.56 | 1% | 28.15 |
| Total | 33.45 | (27%) | 45.95 | 19% | 38.58 |

(1) Reflects a per-barrel decrease of $1.13, $3.05, and $0.48 in 2012, 2011, and 2010, respectively, from financial derivative hedging activities.

(2) Reflects a per-Mcf increase of $0.49, $0.33, and $0.32 in 2012, 2011, and 2010, respectively, from financial derivative hedging activities.

NM – Not meaningful

*Crude Oil Prices*

A substantial portion of our oil production is sold at prevailing market prices, which fluctuate in response to many factors that are outside of the Company's control. Prices we received for crude oil in 2012 were essentially flat compared to 2011, although prices varied significantly throughout the year as political unrest and economic uncertainty continued to impact market volatility.

Continued volatility in the commodity price environment reinforces the importance of our balanced portfolio approach. Crude oil prices realized in 2012 averaged $102.53 per barrel; however International Dated Brent crudes and sweet crude from the Gulf Coast continue to be priced at a significant premium to WTI-based

44

prices. We are realizing these premium prices on approximately 72 percent of our crude oil production. Our Egypt, Australia, and North Sea regions, which comprise 55 percent of our worldwide oil production, receive International Dated Brent pricing with 2012 oil realizations averaging $110.59 per barrel compared with 2011 oil realizations averaging $108.55 per barrel. Our Gulf Coast regions, which comprise 17 percent of our worldwide oil production and receive similar premiums, had price realizations averaging $108.02 per barrel, remaining essentially flat with 2011 realizations averaging $108.26 per barrel.

While the market price received for natural gas varies among geographic areas, crude oil tends to trade within a tighter global range. With the exception of Argentina, price movements for all types and grades of crude oil generally move in the same direction. In Argentina, we currently sell our oil in the domestic market. The Argentine government imposes a sliding-scale tax on oil exports, which significantly influences prices domestic buyers are willing to pay. Domestic oil prices are currently indexed to a $42 per barrel base price, subject to quality adjustments and local premiums, and producers realize a gradual increase or decrease as market prices deviate from the base price. In Tierra del Fuego, similar pricing formulas exist; however, Apache retained the value-added tax collected from buyers, effectively increasing realized prices by 21 percent from sales made until May 2012 (when the Federal Government withdrew the benefit). As a result, 2012 oil prices realized from Tierra del Fuego production averaged $71.81 per barrel as compared to our Neuquén basin production, which averaged $77.50 per barrel.

Apache uses financial instruments to manage a portion of its exposure to fluctuations in crude oil prices, particularly in North America. In 2012, 13 percent of our oil production was subject to financial derivative hedges, reducing revenues by $146 million. In 2011, 29 percent of our oil production was subject to financial derivative hedges, reducing revenues by $379 million. For the year-end status of our derivatives, please see Note 3—Derivative Instruments and Hedging Activities in the Notes to Consolidated Financial Statements set forth in Part IV, Item 15 of this Form 10-K.

*Natural Gas Prices*

Natural gas, which currently has a limited global transportation system, is subject to price variances based on local supply and demand conditions. The majority of our gas sales contracts are indexed to prevailing local market prices, highlighting the importance of a geographically balanced portfolio.

Apache primarily sells natural gas into the North American market, where realized prices decreased 24 percent compared to 2011; however, approximately one-third of our natural gas is produced outside North America, where our average contracted prices rose 13 percent from 2011. Our primary markets include North America, Egypt, Australia, and Argentina. An overview of the market conditions in our primary gas-producing regions follows.

- North America has a common market; most of our gas is sold on a monthly or daily basis at either monthly or daily market prices.

- In Egypt, our gas is sold to EGPC, primarily under an industry pricing formula indexed to Dated Brent crude oil with a maximum gas price of $2.65 per MMBtu, plus an upward adjustment for liquids content. Under a legacy oil-indexed contract, which expired at the end of 2012, there was no price cap for our gas up to 100 MMcf/d of gross production. Overall, the region averaged $3.90 per Mcf in 2012.

- Australia has historically had a local market with a limited number of buyers and sellers resulting in mostly long-term, fixed-price contracts that are periodically adjusted for changes in the local consumer price index. Recent increases in demand and higher development costs have increased the prices required from the local market in order to support the development of new supplies. As a result, prices received on recent contracts are substantially higher than historical levels. During 2012, the region averaged $4.55 per Mcf, a 69 percent increase over 2011 pricing.

45

- Natural gas from the North Sea Beryl field is processed through the SAGE gas plant operated by Apache. The gas is sold to a third party at the St. Fergus entry point of the national grid on a National Balancing Point index price basis. The region averaged $8.95 per Mcf in 2012.

- Argentina instituted the Gas Plus program in 2008 to encourage new gas supplies through the development of conventional and unconventional (tight sands) reserves. Under this program, Apache is allowed to sell gas from qualifying projects at prices that are above the regulated rates. During 2012, the average Gas Plus volume sold by Apache was 73.2 MMcf/d at an average price of $4.89 per Mcf. For 2013, Apache has signed contracts for total gross volumes to be sold under Gas Plus contracts of 80 MMcf/d at $5.01.

  Separate from the Gas Plus program, Apache sells volumes under Argentina's government-regulated pricing and into Argentina's unregulated market. The volumes we are required to sell at regulated prices are set by the government and vary based on seasonal factors and industry category. During 2012, we realized an average price of $0.84 per Mcf on government-regulated sales and an average price of $3.52 per Mcf on our unregulated market sales, for a weighted average of $2.03 per Mcf on non-Gas Plus sales.

Apache uses a variety of fixed-price contracts and derivatives to manage our exposure to fluctuations in natural gas prices, primarily in North America. In 2012, 13 percent of our gas production was subject to financial derivative hedges, increasing revenues by $414 million. In 2011, 16 percent of our gas production was subject to financial derivative hedges, increasing revenues by $272 million. For the year-end status of our derivatives, please see Note 3—Derivative Instruments and Hedging Activities in the Notes to Consolidated Financial Statements set forth in Part IV, Item 15 of this Form 10-K. For more specific information on marketing arrangements by country, please refer to Part I, Items 1 and 2—Business and Properties of this Form 10-K.

*Crude Oil Revenues*

*2012 vs. 2011*   During 2012, crude oil revenues totaled $13.2 billion, $531 million higher than the 2011 total of $12.7 billion, driven by a four-percent increase in worldwide production. Average daily production in 2012 was 352.0 Mb/d, with prices averaging $102.53 per barrel. Crude oil represented 78 percent of our 2012 oil and gas production revenues and 45 percent of our equivalent production, compared to 75 and 45 percent, respectively, in the prior year. Higher realized prices contributed $43 million to the increase in full-year revenues, while higher production volumes added another $488 million.

Worldwide oil production increased 12.1 Mb/d, driven by a 14.7 Mb/d increase in the U.S. The Permian region increased 9.2 Mb/d on increased drilling activity, primarily in the Deadwood, Spraberry, and Wolfcamp plays. The Central region increased 7.4 Mb/d on properties added from the Cordillera acquisition and drilling and recompletion activity across several Granite Wash formations. North Sea production increased 9.2 Mb/d primarily on volumes from the 2011 Mobil North Sea acquisition. Australia production decreased 9.3 Mb/d as a result of natural decline from our Pyrenees and Van Gogh fields. Egypt's gross oil production decreased 2 percent, while net oil production decreased 4 percent, a product of the terms of our production sharing contracts.

*2011 vs. 2010*   During 2011, crude oil revenues totaled $12.7 billion, $3.7 billion higher than the 2010 total of $9.0 billion, driven by a 33-percent increase in average realized prices and a five-percent increase in worldwide production. Average daily production in 2011 was 339.9 Mb/d, with prices averaging $102.19 per barrel. Crude oil represented 75 percent of our 2011 oil and gas production revenues and 45 percent of our equivalent production, compared to 74 and 49 percent, respectively, in the prior year. Higher realized prices contributed $3.0 billion to the increase in full-year revenues, while higher production volumes added another $0.7 billion.

46

Worldwide oil production increased 17.0 Mb/d, driven by a 22.8 Mb/d increase in the U.S. The Permian region increased 11.6 Mb/d on properties added from the BP acquisitions, the Mariner merger and drilling and recompletion activity, offset by natural decline. The Gulf of Mexico (GOM) onshore and offshore regions added 8.0 Mb/d as production from the Devon acquisition, the Mariner merger and drilling and recompletion activity was partially offset by natural decline. Central region production increased 3.2 Mb/d on an active drilling program in the Granite Wash play. Egypt's gross oil production increased 15 percent from additional capacity at the Kalabsha oil processing facility, a successful drilling and recompletion program, and volumes acquired in the 2010 BP acquisition. Egypt's net production increased only 5 percent, as higher oil prices impact our cost recovery volumes. Australia production decreased 7.7 Mb/d as a result of repairs to the Van Gogh FPSO vessel, natural decline, and tropical cyclones in the first quarter of 2011.

*Natural Gas Revenues*

*2012 vs. 2011*   Natural gas revenues for 2012 of $3.2 billion were $416 million lower than 2011, the result of a 13-percent decrease in realized prices partially offset by a one-percent increase in production volumes. Worldwide production rose 31.1 MMcf/d, adding $51 million to revenues. Realized prices in 2012 averaged $3.80 per Mcf, a decrease of $0.57 per Mcf, which reduced revenues by $467 million.

Worldwide gas production rose 1 percent on increases in the North Sea and Australia, partially offset by decreases in North America. North Sea daily production increased 55.2 MMcf/d, primarily as a result of the 2011 Mobil North Sea acquisition. Daily gas production in Australia increased 28.9 MMcf/d on new contracts associated with the recently completed gas processing facilities at Devil Creek. Central region rose 29.6 MMcf/d on production from the Cordillera acquisition. Daily production in Canada and the GOM onshore and offshore regions decreased 31.9 MMcf/d and 47.9 MMcf/d, respectively, as drilling and recompletion activity shifted from dry gas to liquids-rich gas properties. Egypt's gross production was up 4 percent while net production decreased 3 percent, a product of the terms of our production sharing contracts.

*2011 vs. 2010*   Natural gas revenues for 2011 of $3.6 billion were $747 million higher than 2010 on a five-percent increase in realized prices and a 20-percent increase in production volumes. Realized prices in 2011 averaged $4.37 per Mcf, an increase of $0.22 per Mcf, which added $150 million to revenues. Worldwide production rose 374 MMcf/d, adding another $597 million to revenues.

Worldwide gas production rose 20 percent, driven by a 236.5 MMcf/d, or 60 percent, increase in Canada on additional volumes from properties acquired from BP and an active drilling and completion program. U.S. daily production increased 133.9 MMcf/d, or 18 percent, primarily a result of 2010 acquisition activity. GOM onshore and offshore region production rose 73.4 MMcf/d on new drilling activity and properties acquired from Devon and the Mariner merger. Permian region production increased 56.4 MMcf/d on incremental volumes from properties added from the BP acquisition and Mariner merger and on increased drilling activity. Argentina's production increased 27 MMcf/d from drilling and recompletions. Daily gas production in Australia fell 14.7 MMcf/d on downtime from tropical cyclones and customer maintenance activities resulting in lower takes under our existing contractual arrangements. Egypt's gross production increased 8 percent on a successful drilling program, additional gas throughput at the Obaiyed Gas Plant, and production from properties added in the BP acquisition. Net production decreased 3 percent, as higher prices impacted our cost recovery volumes.

*Operating Expenses*

The table below presents a comparison of our expenses on an absolute dollar basis and an equivalent unit of production (boe) basis. Our discussion may reference expenses on a boe basis, on an absolute dollar basis or both, depending on context.

| | For the Year Ended December 31, | | | | | |
|---|---|---|---|---|---|---|
| | **2012** | **2011** | **2010** | **2012** | **2011** | **2010** |
| | | **(In millions)** | | | **(Per boe)** | |
| Depreciation, depletion and amortization: | | | | | | |
| Oil and gas property and equipment | | | | | | |
| Recurring | $ 4,812 | $ 3,814 | $ 2,861 | $ 16.88 | $ 13.97 | $ 11.92 |
| Additional | 1,926 | 109 | – | 6.76 | 0.40 | – |
| Other assets | 371 | 281 | 222 | 1.30 | 1.03 | 0.92 |
| Asset retirement obligation accretion | 232 | 154 | 111 | 0.81 | 0.56 | 0.46 |
| Lease operating costs | 2,968 | 2,605 | 2,032 | 10.41 | 9.54 | 8.47 |
| Gathering and transportation costs | 303 | 296 | 178 | 1.08 | 1.08 | 0.73 |
| Taxes other than income | 862 | 899 | 690 | 3.02 | 3.29 | 2.88 |
| General and administrative expense | 531 | 459 | 380 | 1.86 | 1.68 | 1.58 |
| Merger, acquisitions & transition | 31 | 20 | 183 | 0.11 | 0.07 | 0.77 |
| Financing costs, net | 165 | 158 | 229 | 0.58 | 0.58 | 0.95 |
| Total | $ 12,201 | $ 8,795 | $ 6,886 | $ 42.81 | $ 32.20 | $ 28.68 |

*Depreciation, Depletion and Amortization (DD&A)*

The following table details the changes in recurring DD&A of oil and gas properties between December 31, 2010, and December 31, 2012:

| | Recurring DD&A |
|---|---|
| | **(In millions)** |
| 2010 DD&A | $ 2,861 |
| Volume change | 349 |
| DD&A Rate change | 604 |
| 2011 DD&A | $ 3,814 |
| Volume change | 231 |
| DD&A Rate change | 767 |
| 2012 DD&A | $ 4,812 |

*2012 vs. 2011*   Recurring full-cost depletion expense increased $998 million on an absolute dollar basis: $767 million on higher costs and $231 million from additional production. Our full-cost depletion rate increased $2.91 to $16.88 per boe as costs to acquire, find, and develop reserves, which were significantly impacted by higher oil prices, exceeded our historical cost basis. Price related reserve revisions in North America also had a negative impact on the rate.

48

In addition, in 2012 we recorded a non-cash write-down on the carrying value of our proved oil and gas property balances in Canada of $1.9 billion ($1.4 billion net of tax). Under the full-cost method of accounting, the Company is required to review the carrying value of its proved oil and gas properties each quarter on a country-by-country basis. Under these rules, capitalized costs of oil and gas properties, net of accumulated DD&A and deferred income taxes, may not exceed the present value of estimated future net cash flows from proved oil and gas reserves, net of related tax effects and discounted 10 percent per annum and adjusted for cash flow hedges. Estimated future net cash flows are calculated using end-of-period costs and an unweighted arithmetic average of commodity prices in effect on the first day of each of the previous 12 months, held flat for the life of the production, except where prices are defined by contractual arrangements. The Company also recorded $28 million of additional DD&A in 2012 related to the write-off of the carrying value of our oil and gas properties in New Zealand upon exiting the country and $15 million of seismic costs incurred in countries where Apache is pursuing exploration opportunities.

*2011 vs. 2010*    Recurring full-cost depletion expense increased $953 million on an absolute dollar basis: $604 million on higher costs and $349 million from additional production. Our full-cost depletion rate increased $2.05 to $13.97 per boe as costs to acquire, find, and develop reserves, which were significantly impacted by higher oil prices, exceeded our historical cost basis. In 2011, additional depletion expense of $60 million was associated with the write-off of the carrying value of our Chilean oil and gas property leases relinquished during 2011, and $49 million was associated with impairments of new venture seismic activity in countries where Apache is pursuing exploration opportunities but has not yet established a presence. Other asset depreciation increased $59 million over 2010 primarily on higher other asset balances from 2010 acquisitions.

*Lease Operating Expenses*

Lease operating expenses (LOE) include several key components, such as: direct operating costs, repair and maintenance, and workover costs.

Direct operating costs generally trend with commodity prices and are impacted by the type of commodity produced and the location of properties (i.e., offshore, onshore, remote locations, etc.). Fluctuations in commodity prices impact operating cost elements both directly and indirectly. They directly impact costs such as power, fuel, and chemicals, which are commodity price based. Commodity prices also affect industry activity and demand, thus indirectly impacting the cost of items such as labor, boats, helicopters, materials, and supplies. Oil, which contributed nearly half of our 2012 production, is inherently more expensive to produce than natural gas. Repair and maintenance costs are typically higher on offshore properties, which in 2012 accounted for all of our production in Australia and the North Sea and 83 percent of our production from the U.S. Gulf Coast regions, and in areas with remote plants and facilities. Workovers accelerate production; hence, activity generally increases with higher commodity prices. Foreign exchange rate fluctuations impact the Company's LOE, with a weakening U.S. dollar adding to per-unit costs and a strengthening U.S. dollar lowering per-unit costs in our international regions.

49

The following table details the LOE rate impact by component:

| For the Year Ended December 31, 2012 | Per boe |
|---|---|
| 2011 LOE | $   9.54 |
| Repairs and maintenance | 0.39 |
| Labor and pumper costs | 0.31 |
| Non-operated property costs | 0.12 |
| Workover costs | 0.06 |
| Other | 0.10 |
| Other decreased production | 0.01 |
| Acquisitions [(1)] | (0.12) |
| 2012 LOE | $   10.41 |

| For the Year Ended December 31, 2011 | Per boe |
|---|---|
| 2010 LOE | $   8.47 |
| FX impact | 0.23 |
| Labor and pumper costs | 0.21 |
| Workover costs | 0.18 |
| Chemicals, power, and fuel | 0.13 |
| Transportation | 0.11 |
| Other | 0.12 |
| Other decreased production | 0.11 |
| Acquisitions [(1)] | (0.02) |
| 2011 LOE | $   9.54 |

[(1)]   Per-unit impact of acquisitions is shown net of associated production.

   *2012 vs. 2011*   Our 2012 LOE increased $363 million from 2011, or 14 percent. On a per-unit basis, LOE increased 9 percent due to higher costs on the items listed above.

   *2011 vs. 2010*   Our 2011 LOE increased $573 million from 2010, or 28 percent. On a per-unit basis, LOE increased 13 percent due to higher costs on the items listed above.

*Gathering and Transportation*

   We generally sell oil and natural gas under two common types of agreements, both of which include a transportation charge. One is a netback arrangement, under which we sell oil or natural gas at the wellhead and collect a lower relative price to reflect transportation costs to be incurred by the purchaser. In this case, we record sales at the netback price received from the purchaser. Alternatively, we sell oil or natural gas at a specific delivery point, pay our own transportation to a third-party carrier, and receive a price with no transportation deduction. In this case, we record the separate transportation cost as gathering and transportation costs.

   In the U.S., Canada, and Argentina, we sell oil and natural gas under both types of arrangements. In the North Sea, we pay transportation charges to a third-party carrier. In Australia, oil and natural gas are sold under netback arrangements. In Egypt, our oil and natural gas production is primarily sold to EGPC under netback arrangements; however, we also export crude oil under both types of arrangements.

   The following table presents gathering and transportation costs we paid directly to third-party carriers for each of the periods presented:

| | For the Year Ended December 31, | | |
|---|---|---|---|
| | 2012 | 2011 | 2010 |
| | | (In millions) | |
| Canada | $    163 | $    166 | $    75 |
| U.S. | 69 | 64 | 42 |
| Egypt | 39 | 34 | 31 |
| North Sea | 24 | 25 | 25 |
| Argentina | 8 | 7 | 5 |
| Total Gathering and transportation | $    303 | $    296 | $    178 |

*2012 vs. 2011*   Gathering and transportation costs increased $7 million from 2011. The U.S. costs for 2012 increased $5 million as compared to 2011 on increased production in the Central region, primarily resulting from our acquisition of Cordillera. Egypt's costs were up $5 million on a higher number of sales cargoes, increased terminal fees, and higher vessel freight costs. Canada's costs decreased $3 million from a decline in activity in the region.

*2011 vs. 2010*   Gathering and transportation costs increased $118 million from 2010. Canada's expense increased $91 million from a combination of an increase in gas volumes, higher average rates, and foreign exchange impacts. Average per-unit costs were directly influenced by Apache's increased production in Canada's Horn River basin and properties acquired during 2010, where the associated gathering, processing, and transportation contracts have higher average rates than Apache's legacy properties. The $22 million increase in the U.S. is directly related to increased volumes.

*Taxes Other Than Income*

Taxes other than income primarily consist of U.K. Petroleum Revenue Tax (PRT), severance taxes on properties onshore and in state or provincial waters off the coast of the U.S., Australia, and Argentina, and ad valorem taxes on properties in the U.S. and Canada. Severance taxes are generally based on a percentage of oil and gas production revenues, while the U.K. PRT is assessed on net receipts from fields in the U.K. North Sea. We are subject to a variety of other taxes including U.S. franchise taxes, Australian Petroleum Resources Rent tax, and various Canadian taxes, including the Freehold Mineral tax, Saskatchewan Capital tax, and Saskatchewan Resources surtax. We also pay taxes on invoices and bank transactions in Argentina. The table below presents a comparison of these expenses:

|  | For the Year Ended December 31, | | |
|  | 2012 | 2011 | 2010 |
| --- | --- | --- | --- |
|  | (In millions) | | |
| U.K. PRT | $ 451 | $ 538 | $ 422 |
| Severance taxes | 220 | 212 | 142 |
| Ad valorem taxes | 104 | 94 | 80 |
| Other | 87 | 55 | 46 |
| Total Taxes other than income | $ 862 | $ 899 | $ 690 |

*2012 vs. 2011*   Taxes other than income were $37 million lower than 2011. U.K. PRT decreased $87 million over the comparable 2011 period as a result of a decrease in net receipts, primarily driven by lower revenues on qualifying fields during the year. Property acquisitions in 2011 and 2012 resulted in increases of $8 million and $10 million to severance and ad valorem tax expense, respectively.

*2011 vs. 2010*   Taxes other than income were $209 million higher than 2010. U.K. PRT increased $116 million over the comparable 2010 period as a result of an increase in net receipts, primarily driven by higher revenues. Prior-year property acquisitions and higher realized oil and gas prices resulted in a $70 million and $14 million increase to severance and ad valorem tax expense, respectively.

*General and Administrative Expenses*

*2012 vs. 2011*   General and administrative (G&A) expenses increased $72 million, or 16 percent, from 2011. On a per-unit basis, G&A expenses increased 11 percent, or $0.18 per boe: $0.12 per boe primarily relates to stock-based performance plan charges and $0.14 per boe on growth-related increases, less $0.08 on increased production.

51

*2011 vs. 2010*   G&A expenses increased $79 million, or 21 percent from 2010. On a per-unit basis, G&A expenses increased 6 percent, or $0.11 per boe: $0.07 per boe on higher insurance costs and $0.04 per boe on nonrecurring expenses.

### Merger, Acquisitions & Transition Costs

In 2012, the Company recognized $31 million in merger, acquisitions, & transition costs, reflecting additional expenses related to our 2011 acquisition of Mobil North Sea Limited and expenses associated with our 2012 acquisition of Cordillera.

In 2011, the Company recognized $20 million in merger, acquisitions, & transition costs, reflecting additional expenses related to our 2010 BP asset acquisitions and the Mariner merger as well as costs arising from our 2011 acquisition of Mobil North Sea Limited.

In 2010, the Company recognized $183 million in merger, acquisitions, & transition costs related to our BP and Devon acquisitions and the Mariner merger. A summary of these costs follows:

| | For the Year Ended December 31, | | | | | |
|---|---|---|---|---|---|---|
| | **2012** | | **2011** | | **2010** | |
| | | | (In millions) | | | |
| Separation and retention costs | $ | 12 | $ | 12 | $ | 114 |
| Investment banking fees | | 7 | | – | | 42 |
| Other costs | | 12 | | 8 | | 27 |
| Total Merger, acquisitions & transition costs | $ | 31 | $ | 20 | $ | 183 |

### Financing Costs, Net

Financing costs incurred during the period comprised the following:

| | For the Year Ended December 31, | | | | | |
|---|---|---|---|---|---|---|
| | **2012** | | **2011** | | **2010** | |
| | | | (In millions) | | | |
| Interest expense | $ | 509 | $ | 433 | $ | 345 |
| Amortization of deferred loan costs | | 7 | | 5 | | 17 |
| Capitalized interest | | (334) | | (263) | | (120) |
| Interest income | | (17) | | (17) | | (13) |
| Total Financing costs, net | $ | 165 | $ | 158 | $ | 229 |

*2012 vs. 2011*   Net financing costs increased $7 million from 2011. The increase is primarily related to a $76 million increase in interest expense from debt issuances during 2012, partially offset by a $71 million increase in capitalized interest resulting from additional unproved property balances associated with the significant undeveloped acreage from the Cordillera acquisition and the U.S. new ventures program.

*2011 vs. 2010*   Net financing costs decreased $71 million from 2010. The decrease is primarily related to a $143 million increase in capitalized interest, the result of additional unproved balances from the BP acquisitions and Mariner merger. This decrease is partially offset by an $88 million increase in interest expense from debt issuances in 2010.

*Provision for Income Taxes*

*2012 vs. 2011*    The provision for income taxes totaled $2.9 billion in 2012 compared to $3.5 billion in 2011, driven by lower income before income taxes and an increase in the effective tax rate to 59.0 percent from 43.4 percent in 2011. The 2012 effective rate reflects the tax impact from the $1.9 billion Canadian non-cash write-down, a North Sea decommissioning tax rate adjustment charge, and other tax adjustments. As part of the increase in the corporate income tax rate on North Sea oil and gas profits from 50 percent to 62 percent announced in March 2011, the U.K. government also proposed that the corporation income tax relief attributable to decommissioning expenditures in the North Sea remain at 50 percent. Related legislation was then introduced in Finance Bill 2012 and was enacted on July 17, 2012, upon receiving Royal Assent. As a result of this enacted legislation the Company recorded a non-recurring tax charge of $118 million in the third quarter of 2012. For additional information regarding income taxes, please see Note 7—Income Taxes in the Notes to Consolidated Financial Statements set forth in Part IV, Item 15 of this Form 10-K.

*2011 vs. 2010*    The provision for income taxes totaled $3.5 billion in 2011 compared to $2.2 billion in 2010, driven by a 55 percent increase in income before income taxes and an increase in the effective tax rate to 43.4 percent in 2011 from 41.8 percent in 2010. The largest driver of the increased tax rate was an increase in the U.K. corporate income tax rate on North Sea oil and gas profits from 50 percent to 62 percent. As a result of the enacted legislation, in 2011 the Company recorded a tax charge of $218 million resulting from the remeasurement of our U.K. deferred tax liability as of December 31, 2010. The effective rates for 2011 and 2010 were also impacted by the effect of currency exchange rates on our foreign deferred tax liabilities.

## Significant Acquisitions and Divestitures

*2012 Activity*

On December 24, 2012, Apache Canada and Chevron Canada entered into an agreement pursuant to which each will become a 50-percent owner of the Kitimat LNG plant, the Pacific Trail Pipeline, and 644,000 gross undeveloped acres in the Horn River and Liard basins. Chevron Canada will operate the LNG plant, which will be located on the northern British Columbia coast, and the pipeline; Apache Canada will operate Horn River and Liard. Apache's net proceeds from the transaction were approximately $405 million. The transaction closed on February 8, 2013. Apache originally purchased interest in the Kitimat LNG facility and the related proposed pipeline in the first quarter of 2010.

On April 30, 2012, Apache completed the acquisition of Cordillera, a privately held exploration and production company, in a stock and cash transaction. Cordillera's properties include approximately 312,000 net acres in the Granite Wash, Tonkawa, Cleveland, and Marmaton plays in western Oklahoma and the Texas Panhandle. The effective date of the transaction was September 1, 2011. Apache issued 6,272,667 shares of common stock and paid approximately $2.7 billion of cash to the sellers as consideration for the transaction. The cash paid at closing was funded with a portion of the proceeds from the Company's April 2012 public note offering. For further discussion of the equity issuance and note offering, please see Note 10—Capital Stock and Note 6—Debt in the Notes to Consolidated Financial Statements set forth in Part IV, Item 15 of this Form 10-K and "Liquidity" in this Item 7.

On January 31, 2012, a subsidiary of Apache Energy Limited completed the acquisition of a 49-percent interest in Yara Pilbara Holdings Pty Limited (YPHPL, formerly Burrup Holdings Limited) for $439 million, including working capital adjustments. The transaction was funded with debt. YPHPL is the owner of an ammonia plant on the Burrup Peninsula of Western Australia. Apache has supplied gas to the plant since operations commenced in 2006. Yara Australia Pty Ltd (Yara) owns the remaining 51 percent of YPHPL and operates the plant. In addition, Apache also acquired an interest in a planned technical ammonia nitrate plant to be developed with Yara and Orica Limited. The investment in YPHPL is accounted for under the equity method of accounting, with the balance recorded as a component of "Deferred charges and other" in Apache's consolidated balance sheet and results of operations recorded as a component of "Other" under "Revenues and Other" in the Company's statement of consolidated operations.

53

*2011 Activity*

On December 30, 2011, Apache completed the acquisition of Exxon Mobil Corporation's U.K. subsidiary, Mobil North Sea Limited. The assets acquired include: operated interests in the Beryl, Nevis, Nevis South, Skene, and Buckland fields; operated interest in the Beryl/Brae gas pipeline and the SAGE gas plant; non-operated interests in the Maclure, Scott, and Telford fields; and Benbecula (west of Shetlands) exploration acreage. This acquisition was funded with $1.25 billion of existing cash on hand.

*2010 Activity*

In November 2010, Apache completed the acquisition of Mariner, an independent exploration and production company, in a stock and cash transaction totaling $2.7 billion. We also assumed approximately $1.7 billion of Mariner's debt in connection with the merger. The transaction was accounted for as a business combination, with Mariner's assets and liabilities reflected in Apache's financial statements at fair value. Mariner's oil and gas properties are primarily located in the Gulf of Mexico deepwater and shelf, the Permian Basin, and onshore in the Gulf Coast. The Permian Basin and Gulf of Mexico shelf assets are complementary to Apache's existing holdings and provide an inventory of future potential drilling locations, particularly in the Spraberry and Wolfcamp formation oil plays of the Permian Basin.

In the third and fourth quarters of 2010, Apache completed the acquisition of BP's oil and gas operations, related infrastructure, and acreage in the Permian Basin of west Texas and New Mexico, substantially all of BP's Western Canadian upstream natural gas assets, and BP's interests in four development licenses and one exploration concession (East Badr El Din) in the Western Desert of Egypt. The aggregate purchase price of the BP acquisitions, subsequent to exercise of preferential purchase rights, was $6.4 billion, subject to normal post-closing adjustments. The effective date of these acquisitions was July 1, 2010.

In the second quarter of 2010, Apache completed an acquisition of oil and gas assets on the Gulf of Mexico shelf from Devon for $1.05 billion, subject to normal post-closing adjustments. The acquisition from Devon was effective January 1, 2010, and included 477,000 acres across 150 offshore blocks.

For further information regarding these acquisitions, please see Note 2—Acquisitions and Divestitures in the Notes to Consolidated Financial Statements set forth in Part IV, Item 15 of this Form 10-K.

**Capital Resources and Liquidity**

Operating cash flows are the Company's primary source of liquidity. We may also elect to utilize available committed borrowing capacity, access to both debt and equity capital markets, or proceeds from the occasional sale of nonstrategic assets for all other liquidity and capital resource needs.

Apache's operating cash flows, both in the short-term and the long-term, are impacted by highly volatile oil and natural gas prices. Significant deterioration in commodity prices negatively impacts our revenues, earnings and cash flows, and potentially our liquidity if spending does not trend downward as well. Sales volumes and costs also impact cash flows; however, these historically have not been as volatile and have less impact than commodity prices in the short-term.

Apache's long-term operating cash flows are dependent on reserve replacement and the level of costs required for ongoing operations. Our business, as with other extractive industries, is a depleting one in which each barrel produced must be replaced or the Company and its reserves, a critical source of future liquidity, will shrink. Cash investments are required to fund activity necessary to offset the inherent declines in production and proven crude oil and natural gas reserves. Future success in maintaining and growing reserves and production is highly dependent on the success of our exploration and development activities and our ability to acquire additional reserves at reasonable costs.

54

We believe the liquidity and capital resource alternatives available to Apache, combined with internally generated cash flows, will be adequate to fund short-term and long-term operations, including our capital spending program, repayment of debt maturities, and any amount that may ultimately be paid in connection with contingencies.

For additional information, please see Part I, Items 1 and 2—Business and Properties and Part I, Item 1A—Risk Factors of this Form 10-K.

### Sources and Uses of Cash

The following table presents the sources and uses of our cash and cash equivalents for the years presented:

| | For the Year Ended December 31, | | | | | |
|---|---|---|---|---|---|---|
| | 2012 | | 2011 | | 2010 | |
| | | | (In millions) | | | |
| **Sources of Cash and Cash Equivalents:** | | | | | | |
| Net cash provided by operating activities | $ | 8,504 | $ | 9,953 | $ | 6,726 |
| Fixed-rate debt borrowings | | 4,978 | | – | | 2,470 |
| Commercial paper and bank loan borrowings, net | | 549 | | – | | 318 |
| Sale of oil and gas properties | | 27 | | 422 | | – |
| Proceeds from issuance of common stock | | – | | – | | 2,258 |
| Proceeds from issuance of depositary shares | | – | | – | | 1,227 |
| Other | | – | | 84 | | 106 |
| | | 14,058 | | 10,459 | | 13,105 |
| **Uses of Cash and Cash Equivalents:** | | | | | | |
| Capital expenditures [1] | $ | 9,531 | $ | 7,078 | $ | 4,922 |
| Acquisitions | | 2,918 | | 1,813 | | 8,360 |
| Equity investment in Yara Pilbara Holdings Pty Limited (YPHPL) | | 439 | | – | | – |
| Commercial paper, credit facility and bank loan repayments, net | | – | | 925 | | – |
| Project financing repayment | | – | | – | | 350 |
| Payments on fixed-rate notes | | 400 | | – | | 1,023 |
| Dividends | | 332 | | 306 | | 226 |
| Other | | 573 | | 176 | | 138 |
| | | 14,193 | | 10,298 | | 15,019 |
| Increase (decrease) in cash and cash equivalents | $ | (135) | $ | 161 | $ | (1,914) |

[1] The table presents capital expenditures on a cash basis; therefore, the amounts differ from those discussed elsewhere in this document, which include accruals.

### Net Cash Provided by Operating Activities

Operating cash flows are our primary source of capital and liquidity and are impacted, both in the short-term and the long-term, by volatile oil and natural gas prices. The factors in determining operating cash flows are largely the same as those that affect net earnings, with the exception of non-cash expenses such as DD&A, asset retirement obligation (ARO) accretion, and deferred income tax expense, which affect earnings but do not affect cash flows.

Net cash provided by operating activities for 2012 totaled $8.5 billion, down $1.4 billion from 2011. The decrease reflects the impact of a change in working capital during the fiscal year, higher operating costs, and higher income tax payments in 2012 as compared to the 2011 period.

For a detailed discussion of commodity prices, production, and expenses, please see "Results of Operations" in this Item 7. For additional detail on the changes in operating assets and liabilities and the non-cash expenses which do not impact net cash provided by operating activities, please see the Statement of Consolidated Cash Flows in the Consolidated Financial Statements set forth in Part IV, Item 15 of this Form 10-K.

*Proceeds from Debt, Common Stock, and Share Issuance*

In April 2012, the Company issued $3.0 billion principal amount of senior unsecured notes. The Company used the proceeds to fund the cash portion of the purchase price paid to acquire Cordillera, repay $400 million of notes that matured on April 15, 2012, and for general corporate purposes.

In December 2012, the Company issued $2.0 billion principal amount of senior unsecured notes to repay commercial paper borrowings and for general corporate purposes.

On July 28, 2010, in conjunction with Apache's $6.4 billion acquisition of properties from BP, the Company issued 26.45 million shares of common stock and 25.3 million depositary shares for approximately $3.5 billion in proceeds.

On August 20, 2010, the Company issued $1.5 billion principal amount of senior unsecured notes to repay borrowings under a bridge facility and the Company's commercial paper program that were used to finance the 2010 BP acquisitions. On December 3, 2010, the Company issued $1 billion principal amount of senior unsecured notes to redeem the outstanding public debt of $1.0 billion assumed upon completion of Apache's acquisition of Mariner in November 2010.

For further discussion of the equity issuance and note offerings, please see Note 10—Capital Stock and Note 6—Debt in the Notes to Consolidated Financial Statements set forth in Part IV, Item 15 of this Form 10-K.

*Commercial Paper and Lines of Credit*

As of December 31, 2012, Apache had $580 million in commercial paper and money market lines of credit outstanding. For further discussion of our commercial paper program, please see "Liquidity" in this Item 7 and Note 6—Debt in the Notes to Consolidated Financial Statements set forth in Part IV, Item 15 of this Form 10-K.

*Sale of Oil and Gas Properties*

During 2012, Apache completed the sale of certain properties in Canada and the U.S. for $27 million. Divestitures comprised several non-strategic assets. In 2011 Apache completed the sale of certain properties in Canada and the U.S. for $422 million.

We are targeting asset sales of approximately $2.0 billion in 2013, of which $405 million was completed on February 8, 2013 with our Chevron Canada transaction.

*Capital Expenditures*

We fund exploration and development activities primarily through operating cash flows and budget capital expenditures based on projected operating cash flows. Our operating cash flows, both in the short and long term, are impacted by highly volatile oil and natural gas prices, production levels, industry trends impacting operating expenses, and our ability to continue to acquire or find high-margin reserves at competitive prices. For these

reasons, operating cash flow forecasts are revised monthly in response to changing market conditions and production projections. We routinely adjust our capital budget on a quarterly basis in response to changing market conditions and operating cash flow forecasts.

Historically, we have used a combination of operating cash flows, borrowings under lines of credit and our commercial paper program and, from time to time, issues of public debt or common stock to fund significant acquisitions.

The following table details capital expenditures for each country in which we do business.

| | For the Year Ended December 31, | | |
|---|---|---|---|
| | **2012** | **2011** | **2010** |
| | | **(In millions)** | |
| Exploration and Development (E&D): | | | |
| United States | $ 5,151 | $ 2,768 | $ 1,623 |
| Canada | 590 | 817 | 860 |
| North America | 5,741 | 3,585 | 2,483 |
| Egypt | 1,074 | 896 | 757 |
| Australia | 873 | 576 | 624 |
| North Sea | 886 | 823 | 617 |
| Argentina | 289 | 346 | 240 |
| Other International | 98 | 61 | 20 |
| International | 3,220 | 2,702 | 2,258 |
| Worldwide Exploration and Development Costs | 8,961 | 6,287 | 4,741 |
| Gathering, Transmission, and Processing Facilities (GTP): | | | |
| United States | 75 | 27 | – |
| Canada | 172 | 148 | 159 |
| Egypt | 33 | 111 | 182 |
| Australia | 441 | 345 | 162 |
| Argentina | 16 | 12 | 3 |
| North Sea | 1 | – | – |
| Total GTP Costs | 738 | 643 | 506 |
| Asset Retirement Costs | 948 | 819 | 459 |
| Capitalized Interest | 334 | 263 | 120 |
| Capital Expenditures, excluding acquisitions | 10,981 | 8,012 | 5,826 |
| Acquisitions, including GTP | 3,543 | 3,189 | 11,557 |
| Asset Retirement Costs – Acquired | 84 | 592 | 847 |
| Total Capital Expenditures | $ 14,608 | $ 11,793 | $ 18,230 |

*Exploration and Development*   Worldwide E&D expenditures for 2012 totaled $9 billion, or 43 percent above 2011. E&D spending in North America, which totaled 64 percent of worldwide E&D spending, was up 60 percent from the prior year on increased activity in every U.S. region. Expenditures in the U.S. reflect increased drilling activity in the Permian region, particularly in the Deadwood area, and in our Central region where our active horizontal drilling program in the Granite Wash and Cherokee plays continued to expand. U.S.

57

expenditures also reflect an increase in leasehold acquisition efforts where we have spent over $1 billion to gain new acreage positions in several prospects, including the Mississippian Lime play in Kansas and Nebraska, the Williston Basin play in Montana and multiple offshore blocks in the GOM Deepwater and Shelf regions. E&D spending in Canada decreased 28 percent from the prior year period as our drilling program has been re-focused to oil and liquids-rich gas plays given current North American gas prices.

E&D expenditures outside of North America increased 19 percent over 2011. Australia spending rose $297 million from increased exploration and development drilling, and Egypt was $178 million higher than the prior year on continued drilling activity across all major basins. E&D spending in the North Sea was up $63 million on Beryl field development activity, following the field's acquisition at the end of 2011.

*Gathering, Transmission and Processing Facilities*    We invested $738 million in GTP in 2012 compared to $643 million in 2011. The increase is primarily related to Australia, driven by the purchase of the Ningaloo Vision FPSO and higher expenditures for the Wheatstone LNG project.

*Asset Retirement Costs*    During 2012, we recorded $603 million of additional future abandonment liabilities and deferred tax liabilities directly attributable to Apache's active exploration and development capital program. An additional $345 million of abandonment costs were recognized for upward revisions to prior-year estimates of timing and costs, particularly in Australia and Canada.

*Acquisitions*    We acquired $3.5 billion of oil and gas properties and GTP in 2012 compared to $3.2 billion in 2011. Acquisition capital expenditures occur as attractive opportunities arise and, therefore, vary from year to year. For information regarding our acquisitions and divestitures, please see "Significant Acquisitions and Divestitures" in this Item 7 and Note 2—Acquisitions and Divestitures in the Notes to Consolidated Financial Statements set forth in Part IV, Item 15 of this Form 10-K.

*Equity Investment in YPHPL*

On January 31, 2012, a subsidiary of Apache Energy Limited completed the acquisition of a 49-percent interest in YPHPL (formerly Burrup Holdings Limited) for $439 million, including working capital adjustments. The transaction was funded with debt. The investment in YPHPL is accounted for under the equity method of accounting, with the balance recorded as a component of "Deferred charges and other" in Apache's consolidated balance sheet and results of operations recorded as a component of "Other" under "Revenues and Other" in the Company's statement of consolidated operations.

*Payments on Fixed-Rate Notes*

During the second quarter of 2012 Apache repaid the $400 million in aggregate principal amount of 6.25-percent notes that matured on April 15, 2012.

*Dividends*

The Company has paid cash dividends on its common stock for 48 consecutive years through 2012. Future dividend payments will depend on the Company's level of earnings, financial requirements, and other relevant factors. Common stock dividends paid during 2012 totaled $256 million, compared with $230 million in 2011 and $206 million in 2010. The Company paid dividends on its Series D Preferred Stock totaling $76 million in 2012, compared with $76 million in 2011, and $20 million in 2010.

Based on strong future growth prospects and Apache's financial position, in the first quarter of 2012 the Board of Directors approved a 13-percent increase to $0.17 per share for the regular quarterly cash dividend on the Company's common shares. This increase applied to the dividend on common shares payable on May 22, 2012, to stockholders of record on April 23, 2012, and subsequent dividends paid.

In the first quarter of 2013, the Board of Directors approved a further 18-percent increase to $0.20 per share for the regular quarterly cash dividend on the Company's common shares. This increase applies to the dividend on common shares payable on May 22, 2013, to stockholders of record on April 22, 2013.

*Liquidity*

| | At December 31, | |
|---|---|---|
| | **2012** | **2011** |
| | **(In millions, except percentages)** | |
| Cash and cash equivalents | $ 160 | $ 295 |
| Total debt | 12,345 | 7,216 |
| Shareholders' equity | 31,331 | 28,993 |
| Available committed borrowing capacity | 2,811 | 3,300 |
| Floating-rate debt/total debt | 5% | 0.4% |
| Percent of total debt-to-capitalization | 28% | 20% |

*Cash and Cash Equivalents*

At December 31, 2012, we had $160 million in cash and cash equivalents, of which $155 million of cash was held by foreign subsidiaries, and approximately $5 million was held by U.S. subsidiaries. The cash held by foreign subsidiaries is subject to additional U.S. income taxes if repatriated. Almost all of the cash is denominated in U.S. dollars and, at times, is invested in highly liquid, investment-grade securities with maturities of three months or less at the time of purchase. We intend to use cash from our international subsidiaries to fund international projects.

*Debt*

At December 31, 2012, outstanding debt, which consisted of notes, debentures, commercial paper, and uncommitted bank lines, totaled $12.3 billion. Current debt consists of $500 million of 5.25-percent debentures due in April 2013, $400 million in 6.0-percent debentures due in September 2013, and $91 million borrowed under uncommitted money market/overdraft lines of credit in the U.S., Argentina, and Canada. We have $350 million of debt maturing in 2015, $1 million maturing in 2016, $1.4 billion maturing in 2017, and the remaining $9.7 billion maturing intermittently in years 2018 through 2096.

In April 2012 the Company issued $400 million principal amount of senior unsecured 1.75-percent notes maturing April 15, 2017, $1.1 billion principal amount of senior unsecured 3.25-percent notes maturing April 15, 2022, and $1.5 billion principal amount of senior unsecured 4.75-percent notes maturing April 15, 2043. The notes are redeemable, as a whole or in part, at Apache's option, subject to a make-whole premium. The Company used the proceeds to fund the cash portion of the purchase price paid to acquire Cordillera, repay the $400 million 6.25-percent notes that matured on April 15, 2012, and for general corporate purposes.

In December 2012 the Company issued $1.2 billion principal amount of senior unsecured 2.625-percent notes maturing January 15, 2023 and $800 million principal amount of senior unsecured 4.25-percent notes maturing January 15, 2044. The notes are redeemable, as a whole or in part, at Apache's option, subject to a make-whole premium. The Company used the proceeds to pay down commercial paper and for general corporate purposes.

*Available Credit Facilities*

On June 4, 2012, the Company entered into a new Global Credit Facility consisting of a $1.7 billion revolving syndicated bank credit facility for the U.S., a $300 million revolving syndicated bank credit facility for Australia, and a $300 million revolving syndicated bank credit facility for Canada, which replaced the

59

Company's existing syndicated bank credit facilities that were scheduled to mature in May 2013. The new facilities are scheduled to mature on June 4, 2017. There were no changes to the Company's $1.0 billion U.S. credit facility that matures on August 12, 2016.

At the Company's option, the interest rate for the facilities is based on a base rate, as defined, or the London Inter-bank Offered Rate (LIBOR) plus a margin determined by the Company's senior long-term debt rating. The $1.7 billion credit facility also allows the Company to borrow under competitive auctions.

At December 31, 2012, the margin over LIBOR for committed loans was 0.875 percent on the $1.0 billion U.S. credit facility and 0.90 percent on each of the $1.7 billion U.S. credit facility, the $300 million Australian credit facility, and the $300 million Canadian credit facility. The Company also pays quarterly facility fees of 0.125 percent on the total amount of the $1.0 billion facility and 0.10 percent on the total amount of the other three facilities. The facility fees vary based upon the Company's senior long-term debt rating.

The financial covenants of the credit facilities require the Company to maintain a debt-to-capitalization ratio of not greater than 60 percent at the end of any fiscal quarter. At December 31, 2012, the Company's debt-to-capitalization ratio was 28 percent.

The negative covenants include restrictions on the Company's ability to create liens and security interests on its assets, with exceptions for liens typically arising in the oil and gas industry, purchase money liens, and liens arising as a matter of law, such as tax and mechanics' liens. The Company may incur liens on assets located in the U.S. and Canada of up to 5 percent of the Company's consolidated assets, or approximately $3.0 billion as of December 31, 2012. There are no restrictions on incurring liens in countries other than the U.S. and Canada. There are also restrictions on Apache's ability to merge with another entity, unless the Company is the surviving entity, and a restriction on its ability to guarantee debt of entities not within its consolidated group.

There are no clauses in the facilities that permit the lenders to accelerate payments or refuse to lend based on unspecified material adverse changes. The credit facility agreements do not have drawdown restrictions or prepayment obligations in the event of a decline in credit ratings. However, the agreements allow the lenders to accelerate payments and terminate lending commitments if Apache Corporation, or any of its U.S. or Canadian subsidiaries, defaults on any direct payment obligation in excess of the stated thresholds noted in the agreements or has any unpaid, non-appealable judgment against it in excess of the stated thresholds noted in the agreements. The Company was in compliance with the terms of the credit facilities as of December 31, 2012.

There is no assurance that the financial condition of banks with lending commitments to the Company will not deteriorate. We closely monitor the ratings of the 24 banks in our bank group. Having a large bank group allows the Company to mitigate the potential impact of any bank's failure to honor its lending commitment.

*Commercial Paper Program*

In June 2012 the Company increased the size of its commercial paper program from $2.95 billion to $3.0 billion, which generally enables Apache to borrow funds for up to 270 days at competitive interest rates. Our 2012 weighted-average interest rate for commercial paper was 0.43 percent. If the Company is unable to issue commercial paper following a significant credit downgrade or dislocation in the market, the Company's committed credit facilities, which expire in 2016 and 2017, are available as a 100-percent backstop. As of December 31, 2012, the Company had $489 million in commercial paper outstanding.

*Total Debt-to-Capitalization*

The Company's debt-to-capitalization ratio as of December 31, 2012 was 28 percent as compared to 20 percent at December 31, 2011. The increase in our debt-to-capitalization ratio is directly related to the 2012 notes issued for funding the Cordillera acquisition, to pay down commercial paper balances, and for general corporate

60

purposes. Apache has historically utilized available committed borrowing capacity, access to both debt and equity capital markets, and proceeds from the occasional sale of nonstrategic assets for liquidity and capital resources needs.

We believe the liquidity and capital resource alternatives available to Apache, combined with internally-generated cash flows, will be adequate to fund short-term and long-term operations, including our capital spending program, repayment of debt maturities, and any amount that may ultimately be paid in connection with commitments or contingencies.

### Off-Balance Sheet Arrangements

Apache enters into customary agreements in the oil and gas industry for drilling rig commitments, firm transportation agreements, and other obligations as described below in "Contractual Obligations" in this Item 7. Other than the off-balance sheet arrangements described herein, Apache does not have any off-balance sheet arrangements with unconsolidated entities that are reasonably likely to materially affect our liquidity or capital resource positions.

### Contractual Obligations

The following table summarizes the Company's contractual obligations as of December 31, 2012. For additional information regarding these obligations, please see Note 6—Debt and Note 8—Commitments and Contingencies in the Notes to Consolidated Financial Statements set forth in Part IV, Item 15 of this Form 10-K.

| Contractual Obligations [1] | Note Reference | Total | 2013 | 2014-2015 | 2016-2017 | 2018 & Beyond |
|---|---|---|---|---|---|---|
| | | (In millions) | | | | |
| Debt, at face value | Note 6 | $ 12,411 | $ 991 | $ 350 | $ 1,390 | $ 9,680 |
| Interest payments | Note 6 | 11,007 | 533 | 1,035 | 994 | 8,445 |
| Drilling rig commitments [2] | Note 8 | 896 | 602 | 289 | 3 | 2 |
| Purchase obligations [3] | Note 8 | 2,588 | 1,200 | 1,182 | 184 | 22 |
| Firm transportation agreements | Note 8 | 763 | 148 | 264 | 134 | 217 |
| Office and related equipment | | 402 | 49 | 91 | 96 | 166 |
| Other operating lease obligations [4] | Note 8 | 754 | 209 | 316 | 205 | 24 |
| Total Contractual Obligations | | $ 28,821 | $ 3,732 | $ 3,527 | $ 3,006 | $ 18,556 |

[1] This table does not include the Company's liability for dismantlement, abandonment, and restoration costs of oil and gas properties, derivative liabilities, pension or postretirement benefit obligations, or tax reserves. For additional information regarding these liabilities, please see Notes 5, 3, 9, and 7, respectively, in the Notes to Consolidated Financial Statements set forth in Part IV, Item 15 of this Form 10-K.

[2] This represents minimum future expenditures for drilling rig services. Apache's expenditures for drilling rig services will exceed such minimum amounts to the extent Apache utilizes the drilling rigs subject to a particular contractual commitment for a period greater than the period set forth in the governing contract.

[3] Purchase obligations represent agreements to purchase goods or services that are enforceable, are legally binding, and specify all significant terms, including fixed and minimum quantities to be purchased; fixed, minimum or variable price provisions; and the appropriate timing of the transaction. These include minimum commitments associated with take-or-pay contracts, hydraulic fracturing service agreements, obtaining and processing seismic data, and contractual obligations to buy or build oil and gas plants and facilities, including LNG facilities.

[4] Other operating lease obligations pertain to other long-term exploration, development, and production activities. The Company has work-related commitments for oil and gas operations equipment, acreage maintenance commitments, FPSOs, and aircraft, among other things.

Apache is also subject to various contingent obligations that become payable only if certain events or rulings were to occur. The inherent uncertainty surrounding the timing of and monetary impact associated with these events or rulings prevents any meaningful accurate measurement, which is necessary to assess settlements resulting from litigation. Apache's management feels that it has adequately reserved for its contingent obligations, including approximately $104 million for environmental remediation and approximately $12 million for various contingent legal liabilities. For a detailed discussion of the Company's environmental and legal contingencies, please see Note 8—Commitments and Contingencies in the Notes to Consolidated Financial Statements set forth in Part IV, Item 15 of this Form 10-K.

The Company also had approximately $108 million accrued as of December 31, 2012, for an insurance contingency as a member of Oil Insurance Limited (OIL). This insurance co-op insures specific property, pollution liability, and other catastrophic risks of the Company. As part of its membership, the Company is contractually committed to pay a withdrawal premium if we elect to withdraw from OIL. Apache does not anticipate withdrawal from the insurance pool; however, the potential withdrawal premium is calculated annually based on past losses and the nature of our asset base.

**Insurance Program**

We maintain insurance policies that include coverage for physical damage to our assets, third party liability, workers' compensation, employers' liability, sudden pollution, and other risks. Our insurance coverage includes deductibles that must be met prior to recovery. Additionally, our insurance is subject to exclusions and limitations, and there is no assurance that such coverage will adequately protect us against liability from all potential consequences and damages.

Our current insurance policies covering physical damage to our assets provide $1 billion in coverage per occurrence. These policies also provide sudden pollution coverage. Coverage for damage to our U.S. Gulf of Mexico assets specifically resulting from a named windstorm, however, is subject to a maximum of $250 million per named windstorm, which includes a self-insured retention of 40 percent of the losses above a $100 million deductible, and is limited to a maximum of two storms per year.

Our current insurance policies covering general liabilities provide coverage of $660 million subject to Apache's interest. This coverage is in excess of existing policies, including, but not limited to, charterer's liability, aircraft liability, employer's liability, and automobile liability. Our service agreements, including drilling contracts, generally indemnify Apache for injuries and death of the service provider's employees as well as subcontractors hired by the service provider.

Our insurance policies generally renew in January and June of each year. Future insurance coverage for our industry could increase in cost and may include higher deductibles or retentions. In addition, some forms of insurance may become unavailable.

Apache purchases multi-year political risk insurance from the Overseas Private Investment Corporation (OPIC) and other highly rated international insurers covering its investments in Egypt. In the aggregate, these insurance policies, subject to the policy terms and conditions, provide approximately $1 billion of coverage to Apache for losses arising from confiscation, nationalization, and expropriation risks, with a $263 million sub-limit for currency inconvertibility.

In addition, the Company has a separate policy with OPIC, which provides $300 million of coverage for losses arising from (1) non-payment by EGPC of arbitral awards covering amounts owed Apache on past due invoices and (2) expropriation of exportable petroleum in the event that actions taken by the government of Egypt prevent Apache from exporting our share of production. In October 2012, the Multilateral Investment Guarantee Agency (MIGA), a member of the World Bank Group, announced that it was providing $150 million in reinsurance to OPIC for the remainder of the policy term. This provision of long-term reinsurance to OPIC will allow Apache to maintain the $300 million of insurance coverage through 2024.

62

**Non-GAAP Measures**

The Company makes reference to some measures in discussion of its financial and operating highlights that are not required by or presented in accordance with GAAP. Management uses these measures in assessing operating results and believes the presentation of these measures provides information useful in assessing the Company's financial condition and results of operations. These non-GAAP measures should not be considered as alternatives to GAAP measures and may be calculated differently from, and therefore may not be comparable to, similarly titled measures used at other companies.

*Adjusted Earnings*

To assess the Company's operating trends and performance, management uses Adjusted Earnings, which is net income excluding certain items that management believes affect the comparability of operating results. Management believes this presentation may be useful to investors who follow the practice of some industry analysts who adjust reported company earnings for items that may obscure underlying fundamentals and trends. The reconciling items below are the types of items management excludes and believes are frequently excluded by analysts when evaluating the operating trends and comparability of the Company's results.

| | For the Year Ended December 31, | | |
| --- | --- | --- | --- |
| | **2012** | **2011** | **2010** |
| | **(In millions, except per share data)** | | |
| Income (Loss) Attributable to Common Stock (GAAP) | $ 1,925 | $ 4,508 | $ 3,000 |
| Adjustments: | | | |
| Canada and other oil & gas property write-down, net of tax [1] | 1,427 | 60 | – |
| Deferred tax adjustments | 226 | (75) | – |
| U.K. income tax adjustments | 118 | 218 | – |
| Commodity derivative mark-to-market, net of tax [3] | 51 | – | – |
| Merger, acquisitions & transition, net of tax [2] | 19 | 13 | 120 |
| Unrealized foreign currency fluctuation impact on deferred tax expense | 1 | (73) | 52 |
| Adjusted Earnings (Non-GAAP) | $ 3,767 | $ 4,651 | $ 3,172 |
| | | | |
| Net Income per Common Share – Diluted (GAAP) | $ 4.92 | $ 11.47 | $ 8.46 |
| Adjustments: | | | |
| Canada and other oil & gas property write-down, net of tax [1] | 3.53 | 0.15 | – |
| Deferred tax adjustments | 0.56 | (0.19) | – |
| U.K. income tax adjustments | 0.30 | 0.55 | – |
| Commodity derivative mark-to-market, net of tax [3] | 0.13 | – | – |
| Merger, acquisitions & transition, net of tax [2] | 0.04 | 0.03 | 0.33 |
| Unrealized foreign currency fluctuation impact on deferred tax expense | – | (0.18) | 0.15 |
| Adjusted Earnings Per Share – Diluted (Non-GAAP) | $ 9.48 | $ 11.83 | $ 8.94 |

[1]   A non-cash write-down on the carrying value of our proved oil and gas property balances in Canada of $1.9 billion was recorded during 2012, for which a tax benefit of $474 million was recognized. The tax effect was calculated utilizing the Canadian statutory rate currently in effect.

[2]   Merger, acquisitions & transition costs recorded in 2012, 2011, and 2010, totaled $31 million, $20 million, and $183 million, respectively, for which a tax benefit of $13 million, $7 million, and $63 million was recognized, respectively. The tax effect was calculated utilizing the statutory rates in effect in each country where costs were incurred.

63

(3)   Commodity derivative mark-to-market losses recorded in 2012 totaled $79 million, for which a tax benefit of $28 million was recognized.

**Critical Accounting Policies and Estimates**

Apache prepares its financial statements and the accompanying notes in conformity with accounting principles generally accepted in the United States of America, which require management to make estimates and assumptions about future events that affect the reported amounts in the financial statements and the accompanying notes. Apache identifies certain accounting policies as critical based on, among other things, their impact on the portrayal of Apache's financial condition, results of operations, or liquidity and the degree of difficulty, subjectivity, and complexity in their deployment. Critical accounting policies cover accounting matters that are inherently uncertain because the future resolution of such matters is unknown. Management routinely discusses the development, selection, and disclosure of each of the critical accounting policies. The following is a discussion of Apache's most critical accounting policies.

*Reserves Estimates*

Proved oil and gas reserves are the estimated quantities of natural gas, crude oil, condensate, and NGLs that geological and engineering data demonstrate with reasonable certainty to be recoverable in future years from known reservoirs under existing conditions, operating conditions, and government regulations.

Proved undeveloped reserves include those reserves that are expected to be recovered from new wells on undrilled acreage, or from existing wells where a relatively major expenditure is required for recompletion. Undeveloped reserves may be classified as proved reserves on undrilled acreage directly offsetting development areas that are reasonably certain of production when drilled, or where reliable technology provides reasonable certainty of economic producibility. Undrilled locations may be classified as having undeveloped reserves only if a development plan has been adopted indicating that they are scheduled to be drilled within five years, unless specific circumstances justify a longer time.

Despite the inherent imprecision in these engineering estimates, our reserves are used throughout our financial statements. For example, since we use the units-of-production method to amortize our oil and gas properties, the quantity of reserves could significantly impact our DD&A expense. Our oil and gas properties are also subject to a "ceiling" limitation based in part on the quantity of our proved reserves. Finally, these reserves are the basis for our supplemental oil and gas disclosures.

Reserves as of December 31, 2012, 2011, and 2010, were calculated using an unweighted arithmetic average of commodity prices in effect on the first day of each of the previous 12 months, held flat for the life of the production, except where prices are defined by contractual arrangements.

Apache has elected not to disclose probable and possible reserves or reserve estimates in this filing.

*Asset Retirement Obligation (ARO)*

The Company has significant obligations to remove tangible equipment and restore land or seabed at the end of oil and gas production operations. Apache's removal and restoration obligations are primarily associated with plugging and abandoning wells and removing and disposing of offshore oil and gas platforms. Estimating the future restoration and removal costs is difficult and requires management to make estimates and judgments. Asset removal technologies and costs are constantly changing, as are regulatory, political, environmental, safety, and public relations considerations.

ARO associated with retiring tangible long-lived assets is recognized as a liability in the period in which the legal obligation is incurred and becomes determinable. The liability is offset by a corresponding increase in the underlying asset. The ARO liability reflects the estimated present value of the amount of dismantlement,

64

removal, site reclamation, and similar activities associated with Apache's oil and gas properties. The Company utilizes current retirement costs to estimate the expected cash outflows for retirement obligations. Inherent in the present value calculation are numerous assumptions and judgments including the ultimate settlement amounts, inflation factors, credit-adjusted discount rates, timing of settlement, and changes in the legal, regulatory, environmental, and political environments. To the extent future revisions to these assumptions impact the present value of the existing ARO liability, a corresponding adjustment is made to the oil and gas property balance. Accretion expense is recognized over time as the discounted liability is accreted to its expected settlement value.

### *Income Taxes*

Our oil and gas exploration and production operations are subject to taxation on income in numerous jurisdictions worldwide. We record deferred tax assets and liabilities to account for the expected future tax consequences of events that have been recognized in our financial statements and our tax returns. We routinely assess the realizability of our deferred tax assets. If we conclude that it is more likely than not that some portion or all of the deferred tax assets will not be realized under accounting standards, the tax asset would be reduced by a valuation allowance. Numerous judgments and assumptions are inherent in the determination of future taxable income, including factors such as future operating conditions (particularly as related to prevailing oil and gas prices).

The Company regularly assesses and, if required, establishes accruals for tax contingencies that could result from assessments of additional tax by taxing jurisdictions in countries where the Company operates. Tax reserves have been established and include any related interest, despite the belief by the Company that certain tax positions meet certain legislative, judicial, and regulatory requirements. These reserves are subject to a significant amount of judgment and are reviewed and adjusted on a periodic basis in light of changing facts and circumstances considering the progress of ongoing tax audits, case law, and any new legislation. The Company believes that the reserves established are adequate in relation to the potential for any additional tax assessments.

### *Purchase Price Allocation*

Accounting for the acquisition of a business requires the allocation of the purchase price to the various assets and liabilities of the acquired business and recording deferred taxes for any differences between the allocated values and tax basis of assets and liabilities. Any excess of the purchase price over the amounts assigned to assets and liabilities is recorded as goodwill.

The purchase price allocation is accomplished by recording each asset and liability at its estimated fair value. Estimated deferred taxes are based on available information concerning the tax basis of the acquired company's assets and liabilities and tax-related carryforwards at the merger date, although such estimates may change in the future as additional information becomes known. The amount of goodwill recorded in any particular business combination can vary significantly depending upon the values attributed to assets acquired and liabilities assumed relative to the total acquisition cost.

In estimating the fair values of assets acquired and liabilities assumed, we made various assumptions. The most significant assumptions relate to the estimated fair values assigned to proved and unproved crude oil and natural gas properties. To estimate the fair values of these properties, we prepared estimates of crude oil and natural gas reserves as described above in "Reserve Estimates" of this Item 7. Estimated fair values assigned to assets acquired can have a significant effect on results of operations in the future.

**ITEM 7A.**      *QUANTITATIVE AND QUALITATIVE DISCLOSURES ABOUT MARKET RISK*

The primary objective of the following information is to provide forward-looking quantitative and qualitative information about our exposure to market risk. The term market risk relates to the risk of loss arising from adverse changes in oil, gas, and NGL prices, interest rates, or foreign currency and adverse governmental actions. The disclosures are not meant to be precise indicators of expected future losses, but rather indicators of reasonably possible losses. The forward-looking information provides indicators of how we view and manage our ongoing market risk exposures.

## Commodity Risk

The Company's revenues, earnings, cash flow, capital investments and, ultimately, future rate of growth are highly dependent on the prices we receive for our crude oil, natural gas and NGLs, which have historically been very volatile because of unpredictable events such as economic growth or retraction, weather and political climate. In 2012, our average crude oil realizations have remained flat at $102.53 per barrel in 2012 compared to $102.19 per barrel in 2011. Our average natural gas price realizations decreased 13 percent in 2012 to $3.80 per Mcf from $4.37 per Mcf in 2011.

We periodically enter into derivative positions on a portion of our projected oil and natural gas production through a variety of financial and physical arrangements intended to manage fluctuations in cash flows resulting from changes in commodity prices. Apache typically uses futures contracts, swaps, and options to mitigate commodity price risk. In 2012 approximately 13 percent of our natural gas production and approximately 13 percent of our crude oil production was subject to financial derivative hedges, compared with 16 percent and 29 percent, respectively, in 2011.

On December 31, 2012, the Company had open natural gas derivatives in an asset position with a fair value of $48 million. A 10-percent increase in natural gas prices would reduce the fair value by approximately $5 million, while a 10-percent decrease in prices would increase the fair value by approximately $5 million. The Company also had open oil derivatives in a liability position with a fair value of $131 million. A 10-percent increase in oil prices would increase the liability by approximately $438 million, while a 10-percent decrease in prices would move the derivatives to an asset position of $296 million. These fair value changes assume volatility based on prevailing market parameters at December 31, 2012. See Note 3—Derivative Instruments and Hedging Activities in the Notes to Consolidated Financial Statements set forth in Part IV, Item 15 of this Form 10-K.

## Interest Rate Risk

The Company considers its interest rate risk exposure to be minimal as a result of fixing interest rates on approximately 95 percent of the Company's debt. At December 31, 2012, total debt included $580 million of floating-rate debt. As a result, Apache's annual interest costs will fluctuate based on short-term interest rates on approximately 5 percent of our total debt outstanding at December 31, 2012. A 10 percent change in floating interest rates on year-end floating debt balances would change annual interest expense by approximately $1.4 million.

## Foreign Currency Risk

The Company's cash flow stream relating to certain international operations is based on the U.S. dollar equivalent of cash flows measured in foreign currencies. In Australia, oil production is sold under U.S. dollar contracts, and gas production is sold under a combination of Australian dollar and U.S. dollar fixed-price contracts. Approximately half the costs incurred for Australian operations are paid in U.S. dollars. In Canada, oil and gas prices and costs, such as equipment rentals and services, are generally denominated in Canadian dollars but heavily influenced by U.S. markets. Our North Sea production is sold under U.S. dollar contracts, and the

66

majority of costs incurred are paid in British pounds. In Egypt, all oil and gas production is sold under U.S. dollar contracts, and the majority of the costs incurred are denominated in U.S. dollars. Argentine revenues and expenditures are largely denominated in U.S. dollars but are converted into Argentine pesos at the time of payment. Revenue and disbursement transactions denominated in Australian dollars, Canadian dollars, British pounds, and Argentine pesos are converted to U.S. dollar equivalents based on average exchange rates during the period.

Foreign currency gains and losses also arise when monetary assets and monetary liabilities denominated in foreign currencies are translated at the end of each month. Currency gains and losses are included as either a component of "Other" under "Revenues and Other" or, as is the case when we re-measure our foreign tax liabilities, as a component of the Company's provision for income tax expense on the statement of consolidated operations. A 10-percent strengthening or weakening of the Australian dollar, Canadian dollar, British pound, and Argentine peso as of December 31, 2012, would result in a foreign currency net loss or gain, respectively, of approximately $157 million.

**Forward-Looking Statements and Risk**

This report includes "forward-looking statements" within the meaning of Section 27A of the Securities Act of 1933, as amended, and Section 21E of the Securities Exchange Act of 1934, as amended. All statements other than statements of historical facts included or incorporated by reference in this report, including, without limitation, statements regarding our future financial position, business strategy, budgets, projected revenues, projected costs and plans, and objectives of management for future operations, are forward-looking statements. Such forward-looking statements are based on our examination of historical operating trends, the information that was used to prepare our estimate of proved reserves as of December 31, 2012, and other data in our possession or available from third parties. In addition, forward-looking statements generally can be identified by the use of forward-looking terminology such as "may," "will," "could," "expect," "intend," "project," "estimate," "anticipate," "plan," "believe," or "continue" or similar terminology. Although we believe that the expectations reflected in such forward-looking statements are reasonable, we can give no assurance that such expectations will prove to have been correct. Important factors that could cause actual results to differ materially from our expectations include, but are not limited to, our assumptions about:

- the market prices of oil, natural gas, NGLs and other products or services;

- our commodity derivative and hedging arrangements;

- the integration of acquisitions;

- the supply and demand for oil, natural gas, NGLs and other products or services;

- production and reserve levels;

- drilling risks;

- economic and competitive conditions;

- the availability of capital resources;

- capital expenditure and other contractual obligations;

- currency exchange rates;

- weather conditions;

- inflation rates;

- the availability of goods and services;

- legislative or regulatory changes, including hydraulic-fracturing regulation and environmental regulation;

- the impact on our operations due to changes in the Egyptian government;

- terrorism or cyber attacks;

- occurrence of property acquisitions or divestitures;

- the securities or capital markets and related risks such as general credit, liquidity, market, and interest-rate risks; and

- other factors disclosed under Items 1 and 2—Business and Properties—Estimated Proved Reserves and Future Net Cash Flows, Item 1A—Risk Factors, Item 7—Management's Discussion and Analysis of Financial Condition and Results of Operations, Item 7A—Quantitative and Qualitative Disclosures About Market Risk and elsewhere in this Form 10-K.

   All subsequent written and oral forward-looking statements attributable to the Company, or persons acting on its behalf, are expressly qualified in their entirety by the cautionary statements. Except as required by law, we assume no duty to update or revise our forward-looking statements based on changes in internal estimates or expectations or otherwise.

68

**ITEM 8.**      *FINANCIAL STATEMENTS AND SUPPLEMENTARY DATA*

The financial statements and supplementary financial information required to be filed under this Item 8 are presented on pages F-1 through F-72 in Part IV, Item 15 of this Form 10-K and are incorporated herein by reference.

**ITEM 9.**      *CHANGES IN AND DISAGREEMENTS WITH ACCOUNTANTS ON ACCOUNTING AND FINANCIAL DISCLOSURE*

The financial statements for the fiscal years ended December 31, 2012, 2011, and 2010, included in this report, have been audited by Ernst & Young LLP, registered public accounting firm, as stated in their audit report appearing herein. There have been no changes in or disagreements with the accountants during the periods presented.

**ITEM 9A.**      *CONTROLS AND PROCEDURES*

**Disclosure Controls and Procedures**

G. Steven Farris, the Company's Chairman and Chief Executive Officer, in his capacity as principal executive officer, and Thomas P. Chambers, the Company's Executive Vice President and Chief Financial Officer, in his capacity as principal financial officer, evaluated the effectiveness of our disclosure controls and procedures as of December 31, 2012, the end of the period covered by this report. Based on that evaluation and as of the date of that evaluation, these officers concluded that the Company's disclosure controls and procedures were effective, providing effective means to ensure that the information we are required to disclose under applicable laws and regulations is recorded, processed, summarized, and reported within the time periods specified in the Commission's rules and forms and accumulated and communicated to our management, including our principal executive officer and principal financial officer, to allow timely decisions regarding required disclosure. We also made no changes in internal controls over financial reporting during the quarter ending December 31, 2012, that have materially affected, or are reasonably likely to materially affect, the Company's internal control over financial reporting.

We periodically review the design and effectiveness of our disclosure controls, including compliance with various laws and regulations that apply to our operations both inside and outside the United States. We make modifications to improve the design and effectiveness of our disclosure controls and may take other corrective action, if our reviews identify deficiencies or weaknesses in our controls.

**Management's Report on Internal Control over Financial Reporting**

The management report called for by Item 308(a) of Regulation S-K is incorporated herein by reference to the "Report of Management on Internal Control Over Financial Reporting," included on Page F-1 in Part IV, Item 15 of this Form 10-K.

The independent auditors attestation report called for by Item 308(b) of Regulation S-K is incorporated herein by reference to the "Report of Independent Registered Public Accounting Firm," included on Page F-3 in Part IV, Item 15 of this Form 10-K.

**Changes in Internal Control over Financial Reporting**

There was no change in our internal controls over financial reporting during the quarter ending December 31, 2012, that has materially affected, or is reasonably likely to materially affect, our internal controls over financial reporting.

**ITEM 9B.**      *OTHER INFORMATION*

None.

**PART III**

**ITEM 10.**   ***EXECUTIVE OFFICERS AND CORPORATE GOVERNANCE***
***DIRECTORS,***

    The information set forth under the captions "Nominees for Election as Directors," "Continuing Directors," "Executive Officers of the Company," and "Securities Ownership and Principal Holders" in the proxy statement relating to the Company's 2013 annual meeting of shareholders (the Proxy Statement) is incorporated herein by reference.

<u>**Code of Business Conduct**</u>

    Pursuant to Rule 303A.10 of the NYSE and Rule 4350(n) of the NASDAQ, we are required to adopt a code of business conduct and ethics for our directors, officers, and employees. In February 2004, the Board of Directors adopted the Code of Business Conduct (Code of Conduct), and revised it in November 2011. The revised Code of Conduct also meets the requirements of a code of ethics under Item 406 of Regulation S-K. You can access the Company's Code of Conduct on the Governance page of the Company's website at www.apachecorp.com . Any shareholder who so requests may obtain a printed copy of the Code of Conduct by submitting a request to the Company's corporate secretary at the address on the cover of this Form 10-K. Changes in and waivers to the Code of Conduct for the Company's directors, chief executive officer and certain senior financial officers will be posted on the Company's website within five business days and maintained for at least 12 months. Information on our website or any other website is not incorporated by reference into, and does not constitute a part of, this Annual Report on Form 10-K.

**ITEM 11.**   ***COMPENSATION***
***EXECUTIVE***

    The information set forth under the captions "Compensation Discussion and Analysis," "Summary Compensation Table," "Grants of Plan Based Awards Table," "Outstanding Equity Awards at Fiscal Year-End Table," "Option Exercises and Stock Vested Table," "Non-Qualified Deferred Compensation Table," "Employment Contracts and Termination of Employment and Change-in-Control Arrangements" and "Director Compensation Table" in the Proxy Statement is incorporated herein by reference.

**ITEM 12.**   ***OWNERSHIP OF CERTAIN BENEFICIAL OWNERS AND MANAGEMENT AND RELATED STOCKHOLDER MATTERS***
***SECURITY***

    The information set forth under the captions "Securities Ownership and Principal Holders" and "Equity Compensation Plan Information" in the Proxy Statement is incorporated herein by reference.

**ITEM 13.**   ***RELATIONSHIPS AND RELATED TRANSACTIONS, AND DIRECTOR INDEPENDENCE***
***CERTAIN***

    The information set forth under the captions "Certain Business Relationships and Transactions" and "Director Independence" in the Proxy Statement is incorporated herein by reference.

**ITEM 14.**   ***ACCOUNTING FEES AND SERVICES***
***PRINCIPAL***

    The information set forth under the caption "Independent Auditors" in the Proxy Statement is incorporated herein by reference.

**PART IV**

**ITEM 15.**    *EXHIBITS, FINANCIAL STATEMENT SCHEDULES*

   (a)   Documents included in this report:

      1.    Financial Statements

Report of management                                                                                          F-1
Report of independent registered public accounting firm                                                       F-2
Report of independent registered public accounting firm                                                       F-3
Statement of consolidated operations for each of the three years in the period ended December  31, 2012        F-4
Statement of consolidated comprehensive income for each of the three years in the period ended December 31, 2012   F-5
Statement of consolidated cash flows for each of the three years in the period ended December  31, 2012        F-6
Consolidated balance sheet as of December 31, 2012 and 2011                                                   F-7
Statement of consolidated shareholders' equity for each of the three years in the period ended December 31, 2012   F-8
Notes to consolidated financial statements                                                                     F-9

      2.    Financial Statement Schedules

         Financial statement schedules have been omitted because they are either not required, not applicable or the information required to be presented is included in the Company's financial statements and related notes.

      3.    Exhibits

| EXHIBIT NO. | | DESCRIPTION |
| --- | --- | --- |
| 2.1 | – | Agreement and Plan of Merger, dated April 14, 2010, by and among Registrant, ZMZ Acquisitions LLC, and Mariner Energy, Inc. (incorporated by reference to Exhibit 2.1 to Registrant's Current Report on Form 8-K, dated April 14, 2010, filed April 16, 2010, SEC File No. 001-4300) (the schedules and annexes have been omitted pursuant to Item 601(b)(2) of Regulation S-K). |
| 2.2 | – | Amendment No. 1, dated August 2, 2010, to Agreement and Plan of Merger, dated April 14, 2010, by and among Registrant, ZMZ Acquisitions LLC, and Mariner Energy, Inc.(incorporated by reference to Exhibit 2.1 to Registrant's Current Report on Form 8-K, dated August 2, 2010, filed on August 3, 2010, SEC File No. 001-4300) (the schedules and annexes have been omitted pursuant to Item 601(b)(2) of Regulation S-K). |

| EXHIBIT NO. | | DESCRIPTION |
|---|---|---|
| 2.3 | – | Purchase and Sale Agreement by and between BP America Production Company and ZPZ Delaware I LLC dated July 20, 2010 (incorporated by reference to Exhibit 2.1 to Registrant's Current Report on Form 8-K/A, dated July 20, 2010, filed on July 21, 2010, SEC File No. 001-4300) (the exhibits and schedules have been omitted pursuant to Item 601(b)(2) of Regulation S-K). |
| 2.4 | – | Partnership Interest and Share Purchase and Sale Agreement by and between BP Canada Energy and Apache Canada Ltd. dated July 20, 2010 (incorporated by reference to Exhibit 2.2 to Registrant's Current Report on Form 8-K/A, dated July 20, 2010, filed on July 21, 2010, SEC File No. 001-4300) (the exhibits have been omitted pursuant to Item 601(b)(2) of Regulation S-K). |
| 2.5 | – | Purchase and Sale Agreement by and among BP Egypt Company, BP Exploration (Delta) Limited and ZPZ Egypt Corporation LDC dated July 20, 2010 (incorporated by reference to Exhibit 2.3 to Registrant's Current Report on Form 8-K/A, dated July 20, 2010, filed on July 21, 2010, SEC File No. 001-4300) (the exhibits and schedules have been omitted pursuant to Item 601(b)(2) of Regulation S-K). |
| 3.1 | – | Restated Certificate of Incorporation of Registrant, dated February 23, 2010, as filed with the Secretary of State of Delaware on February 23, 2010 (incorporated by reference to Exhibit 3.1 to Registrant's Annual Report on Form 10-K for year ended December 31, 2009, SEC File No. 001-4300). |
| 3.2 | – | Certificate of Designations of the 6.00% Mandatory Convertible Preferred Stock, Series D (incorporated by reference to Exhibit 3.3 to Registrant's Registration Statement on Form 8-A, dated July 29, 2010, SEC File No. 001-4300). |
| 3.3 | – | Amendment to Restated Certificate of Incorporation of Registrant, dated May 5, 2011, as filed with the Secretary of State of Delaware on May 5, 2011 (incorporated by reference to Exhibit 3.1 to Registrant's Current Report on Form 8-K filed May 11, 2011, SEC File No. 001-4300). |
| 3.4 | – | Bylaws of Registrant, as amended July 21, 2011 (incorporated by reference to Exhibit 3.1 to Registrant's Current Report on Form 8-K filed July 27, 2011, SEC File No. 001-4300). |
| 4.1 | – | Form of Certificate for Registrant's Common Stock (incorporated by reference to Exhibit 4.1 to Registrant's Quarterly Report on Form 10-Q for the quarter ended March 31, 2004, SEC File No. 001-4300). |
| 4.2 | – | Form of Certificate for the 6.00% Mandatory Convertible Preferred Stock, Series D (incorporated by reference to Exhibit A of Exhibit 3.3 to Registrant's Registration Statement on Form 8-A, dated July 29, 2010, SEC File No. 001-4300). |

| EXHIBIT NO. | | DESCRIPTION |
|---|---|---|
| 4.3 | – | Form of 3.625% Notes due 2021 (incorporated by reference to Exhibit 4.1 to Registrant's Current Report on Form 8-K, dated November 30, 2010, filed on December 3, 2010, SEC File No. 001-4300). |
| 4.4 | – | Form of 5.250% Notes due 2042 (incorporated by reference to Exhibit 4.2 to Registrant's Current Report on Form 8-K, dated November 30, 2010, filed on December 3, 2010, SEC File No. 001-4300). |
| 4.5 | – | Form of 5.100% Notes due 2040 (incorporated by reference to Exhibit 4.1 to Registrant's Current Report on Form 8-K, dated August 17, 2010, filed on August 20, 2010, SEC File No. 001-4300). |
| 4.6 | – | Form of 1.75% Notes due 2017 (incorporated by reference to Exhibit 4.1 to Registrant's Current Report on Form 8-K, dated April 3, 2012, filed on April 9, 2012, SEC File No. 001-4300). |
| 4.7 | – | Form of 3.25% Note due 2022 (incorporated by reference to Exhibit 4.2 to Registrant's Current Report on Form 8-K, dated April 3, 2012, filed on April 9, 2012, SEC File No. 001-4300). |
| 4.8 | – | Form of 4.75% Notes due 2043 (incorporated by reference to Exhibit 4.3 to Registrant's Current Report on Form 8-K, dated April 3, 2012, filed on April 9, 2012, SEC File No. 001-4300). |
| 4.9 | – | Form of 2.625% Notes due 2023 (incorporated by reference to Exhibit 4.1 to Registrant's Current Report on Form 8-K, dated November 28, 2012, filed on December 4, 2012, SEC File No. 001-4300). |
| 4.10 | – | Form of 4.250% Notes due 2044 (incorporated by reference to Exhibit 4.2 to Registrant's Current Report on Form 8-K, dated November 28, 2012, filed on December 4, 2012, SEC File No. 001-4300). |
| 4.11 | – | Rights Agreement, dated January 31, 1996, between Registrant and Wells Fargo Bank, N.A. (as successor-in-interest to Norwest Bank Minnesota, N.A.), rights agent, relating to the declaration of a rights dividend to Registrant's common shareholders of record on January 31, 1996 (incorporated by reference to Exhibit (a) to Registrant's Registration Statement on Form 8-A, dated January 24, 1996, SEC File No. 001-4300). |
| 4.12 | – | Amendment No. 1, dated as of January 31, 2006, to the Rights Agreement dated as of December 31, 1996, between Apache Corporation, a Delaware corporation, and Wells Fargo Bank, N.A. (as successor-in-interest to Norwest Bank Minnesota, N.A.) (incorporated by reference to Exhibit 4.4 to Registrant's Amendment No. 1 to Registration Statement on Form 8-A, dated January 31, 2006, SEC File No. 001-4300). |

| EXHIBIT NO. | | DESCRIPTION |
|---|---|---|
| 4.13 | – | Senior Indenture, dated February 15, 1996, between Registrant and The Bank of New York Mellon Trust Company, N.A. (formerly known as the Bank of New York Trust Company, N.A., as successor-in-interest to JPMorgan Chase Bank), formerly known as The Chase Manhattan Bank, as trustee, governing the senior debt securities and guarantees (incorporated by reference to Exhibit 4.6 to Registrant's Registration Statement on Form S-3, dated May 23, 2003, Reg. No. 333-105536). |
| 4.14 | – | First Supplemental Indenture to the Senior Indenture, dated as of November 5, 1996, between Registrant and The Bank of New York Mellon Trust Company, N.A. (formerly known as the Bank of New York Trust Company, N.A., as successor-in-interest to JPMorgan Chase Bank, formerly known as The Chase Manhattan Bank), as trustee, governing the senior debt securities and guarantees (incorporated by reference to Exhibit 4.7 to Registrant's Registration Statement on Form S-3, dated May 23, 2003, Reg. No. 333-105536). |
| 4.15 | – | Form of Indenture among Apache Finance Pty Ltd, Registrant and The Bank of New York Mellon Trust Company, N.A. (formerly known as the Bank of New York Trust Company, N.A., as successor-in-interest to The Chase Manhattan Bank), as trustee, governing the debt securities and guarantees (incorporated by reference to Exhibit 4.1 to Registrant's Registration Statement on Form S-3, dated November 12, 1997, Reg. No. 333-339973). |
| 4.16 | – | Form of Indenture among Registrant, Apache Finance Canada Corporation and The Bank of New York Mellon Trust Company, N.A. (formerly known as the Bank of New York Trust Company, N.A., as successor-in-interest to The Chase Manhattan Bank), as trustee, governing the debt securities and guarantees (incorporated by reference to Exhibit 4.1 to Amendment No. 1 to Registrant's Registration Statement on Form S-3, dated November 12, 1999, Reg. No. 333-90147). |
| 4.17 | – | Deposit Agreement, dated as of July 28, 2010, between Registrants and Wells Fargo Bank, N.A., as depositary, on behalf of all holders from time to time of the receipts issued there under (incorporated by reference to Exhibit 4.2 to Registrant's Current Report on Form 8-K, dated July 22, 2010, filed on July 28, 2010, SEC File No. 001-4300). |
| 4.18 | – | Form of Depositary Receipt for the Depositary Shares (incorporated by reference to Exhibit A to Exhibit 4.2 to Registrant's Current Report on Form 8-K, dated July 22, 2010, filed on July 28, 2010, SEC File No. 001-4300). |
| 4.19 | – | Senior Indenture, dated May 19, 2011, between Registrant and Wells Fargo Bank, National Association, as trustee, governing the senior debt securities of Apache Corporation (incorporated by reference to Exhibit 4.14 to Registrant's Registration Statement on Form S-3, dated May 23, 2011, Reg. No. 333-174429). |

| EXHIBIT NO. | | DESCRIPTION |
|---|---|---|
| 4.20 | – | Senior Indenture, dated May 19, 2011, among Apache Finance Pty Ltd, Apache Corporation, as guarantor, and Wells Fargo Bank, National Association, as trustee, governing the senior debt securities of Apache Finance Pty Ltd and the related guarantees (incorporated by reference to Exhibit 4.16 to Registrant's Registration Statement on Form S-3, dated May 23, 2011, Reg. No. 333-174429). |
| 4.21 | – | Senior Indenture, dated May 19, 2011, among Apache Finance Canada Corporation, Apache Corporation, as guarantor, and Wells Fargo Bank, National Association, as trustee, governing the senior debt securities of Apache Finance Corporation and the related guarantees (incorporated by reference to Exhibit 4.20 to Registrant's Registration Statement on Form S-3, dated May 23, 2011, Reg. No. 333-174429). |
| 4.22 | – | Form of Apache Corporation November 10, 2010 First Non-Qualified Stock Option Agreement for Certain Employees of Apache Corporation (incorporated by reference to Exhibit 4.6 to Registrant's Registration Statement on Form S-8 filed on November 10, 2010, Reg. No. 333-170533). |
| 4.23 | – | Form of Apache Corporation November 10, 2010 Second Non-Qualified Stock Option Agreement for Certain Employees of Apache Corporation (incorporated by reference to Exhibit 4.7 to Registrant's Registration Statement on Form S-8 filed on November 10, 2010, Reg. No. 333-170533). |
| 4.24 | – | Form of Apache Corporation November 10, 2010 Non-Statutory Stock Option Agreement for Certain Employees of Apache Corporation (incorporated by reference to Exhibit 4.8 to Registrant's Registration Statement on Form S-8 filed on November 10, 2010, Reg. No. 333-170533). |
| 10.1 | – | Form of Amended and Restated Credit Agreement, dated as of May 9, 2006, among Registrant, the Lenders named therein, JPMorgan Chase Bank, as Administrative Agent, Citibank, N.A. and Bank of America, N.A., as Co-Syndication Agents, and BNP Paribas and UBS Loan Finance LLC, as Co-Documentation Agents (incorporated by reference to Exhibit 10.1 to Registrant's Annual Report on Form 10-K for year ended December 31, 2006, SEC File No. 001-4300). |
| 10.2 | – | Form of Request for Approval of Extension of Maturity Date and Amendment, dated as of April 5, 2007, among Registrant, the Lenders named therein, JPMorgan Chase Bank, as Administrative Agent, Citibank, N.A. and Bank of America, N.A., as Co-Syndication Agents, and BNP Paribas and UBS Loan Finance LLC, as Co-Documentation Agents (incorporated by reference to Exhibit 10.2 to Registrant's Annual Report on Form 10-K for year ended December 31, 2007, SEC File No. 001-4300). |

| EXHIBIT NO. | | DESCRIPTION |
|---|---|---|

10.3   –   Form of Request for Approval of Extension of Maturity Date and Amendment, dated as of February 18, 2008, among Registrant, the Lenders named therein, JPMorgan Chase Bank, as Administrative Agent, Citibank, N.A. and Bank of America, N.A., as Co-Syndication Agents, and BNP Paribas and UBS Loan Finance LLC, as Co-Documentation Agents (incorporated by reference to Exhibit 10.1 to Registrant's Quarterly Report on Form 10-Q for the quarter ended March 31, 2008, SEC File No. 001-4300).

10.4   –   Form of Credit Agreement, dated as of May 12, 2005, among Registrant, the Lenders named therein, JPMorgan Chase Bank, N.A., as Global Administrative Agent, J.P. Morgan Securities Inc. and Banc of America Securities, LLC, as Co-Lead Arrangers and Joint Bookrunners, Bank of America, N.A. and Citibank, N.A., as U.S. Co-Syndication Agents, and Calyon New York Branch and Société Générale, as U.S. Co-Documentation Agents (excluding exhibits and schedules) (incorporated by reference to Exhibit 10.01 to Registrant's Quarterly Report on Form 10-Q for the quarter ended June 30, 2005, SEC File No. 001-4300).

10.5   –   Form of Credit Agreement, dated as of May 12, 2005, among Apache Canada Ltd, a wholly-owned subsidiary of Registrant, the Lenders named therein, JPMorgan Chase Bank, N.A., as Global Administrative Agent, RBC Capital Markets and BMO Nesbitt Burns, as Co-Lead Arrangers and Joint Bookrunners, Royal Bank of Canada, as Canadian Administrative Agent, Bank of Montreal and Union Bank of California, N.A., Canada Branch, as Canadian Co-Syndication Agents, and The Toronto-Dominion Bank and BNP Paribas (Canada), as Canadian Co-Documentation Agents (excluding exhibits and schedules) (incorporated by reference to Exhibit 10.02 to Registrant's Quarterly Report on Form 10-Q for the quarter ended June 30, 2005, SEC File No. 001-4300).

10.6   –   Form of Credit Agreement, dated as of May 12, 2005, among Apache Energy Limited, a wholly-owned subsidiary of Registrant, the Lenders named therein, JPMorgan Chase Bank, N.A., as Global Administrative Agent, Citigroup Global Markets Inc. and Deutsche Bank Securities Inc., as Co-Lead Arrangers and Joint Bookrunners, Citi securities Limited, as Australian Administrative Agent, Deutsche Bank AG, Sydney Branch, and JPMorgan Chase Bank, as Australian Co-Syndication Agents, and Bank of America, N.A., Sydney Branch, and UBS AG, Australia Branch, as Australian Co-Documentation Agents (excluding exhibits and schedules) (incorporated by reference to Exhibit 10.03 to Registrant's Quarterly Report on Form 10-Q for the quarter ended June 30, 2005, SEC File No. 001-4300).

| EXHIBIT NO. | | DESCRIPTION |
|---|---|---|
| 10.7 | – | Form of Request for Approval of Extension of Maturity Date and Amendment, dated April 5, 2007, among Registrant, Apache Canada Ltd., Apache Energy Limited, the Lenders named therein, JPMorgan Chase Bank, N.A., as Global Administrative Agent, and the other agents party thereto (incorporated by reference to Exhibit 10.6 to Registrant's Annual Report on Form 10-K for year ended December 31, 2007, SEC File No. 001-4300). |
| 10.8 | – | Form of Request for Approval of Extension of Maturity Date and Amendment, dated February 18, 2008, among Registrant, Apache Canada Ltd., Apache Energy Limited, the Lenders named therein, JPMorgan Chase Bank, N.A., as Global Administrative Agent, and the other agents party thereto (incorporated by reference to Exhibit 10.2 to Registrant's Quarterly Report on Form 10-Q for the quarter ended March 31, 2008, SEC File No. 001-4300). |
| 10.9 | – | Credit Agreement, dated August 13, 2010, among Registrant, JPMorgan Chase Bank, N.A., as Administrative Agent, and Citibank, N.A., Bank of America, N.A. and Goldman Sachs Bank USA, as Co-Syndication Agents, J.P. Morgan Securities Inc., Citigroup Global Markets Inc., Banc of America Securities, LLC and Goldman Sachs Bank USA, as Co-Lead Arrangers and Joint Bookrunners, and the lenders party thereto (excluding exhibits and schedules) (incorporated by reference to Exhibit 10.1 to Registrant's Current Report on Form 8-K filed August 16, 2010). |
| 10.10 | – | Credit Agreement, dated August 12, 2011, among Registrant, the lenders party thereto, JPMorgan Chase Bank, N.A., as Administrative Agent, and Citibank, N.A., Bank of America, N.A., and Wells Fargo Bank, National Association, as Syndication Agents (incorporated by reference to Exhibit 10.1 to Registrant's Current Report on Form 8-K filed August 18, 2011, SEC File No. 001-4300). |
| 10.11 | – | Credit Agreement, dated as of June 4, 2012, among Apache Corporation, the lenders party thereto, JPMorgan Chase Bank, N.A., as Global Administrative Agent, Bank of America, N.A. and Citibank, N.A., as Global Syndication Agents, and The Royal Bank of Scotland plc and Royal Bank of Canada, as Global Documentation Agents (incorporated by reference to Exhibit 10.1 to Registrant's Current Report on Form 8-K filed June 7, 2012, SEC File No. 001-04300). |
| 10.12 | – | Credit Agreement, dated as of June 4, 2012, among Apache Canada Ltd., the lenders party thereto, JPMorgan Chase Bank, N.A., as Global Administrative Agent, Royal Bank of Canada, as Canadian Administrative Agent, Bank of America, N.A. and Citibank, N.A., as Global Syndication Agents, and The Royal Bank of Scotland plc and Royal Bank of Canada, as Global Documentation Agents (incorporated by reference to Exhibit 10.2 to Registrant's Current Report on Form 8-K filed June 7, 2012, SEC File No. 001-04300). |

| EXHIBIT NO. | | DESCRIPTION |
|---|---|---|
| 10.13 | – | Syndicated Facility Agreement, dated as of June 4, 2012, among Apache Energy Limited (ACN 009 301 964), the lenders party thereto, JPMorgan Chase Bank, N.A., as Global Administrative Agent, Citisecurities Limited (ABN 51 008 489 610), as Australian Administrative Agent, Bank of America, N.A. and Citibank, N.A., as Global Syndication Agents, and The Royal Bank of Scotland plc and Royal Bank of Canada, as Global Documentation Agents (incorporated by reference to Exhibit 10.3 to Registrant's Current Report on Form 8-K filed June 7, 2012, SEC File No. 001-04300). |
| †10.14 | – | Apache Corporation Corporate Incentive Compensation Plan A (Senior Officers' Plan), dated July 16, 1998 (incorporated by reference to Exhibit 10.13 to Registrant's Annual Report on Form 10-K for year ended December 31, 1998, SEC File No. 001-4300). |
| †10.15 | – | First Amendment to Apache Corporation Corporate Incentive Compensation Plan A, dated November 20, 2008, effective as of January 1, 2005 (incorporated by reference to Exhibit 10.17 to Registrant's Annual Report on Form 10-K for year ended December 31, 2008, SEC File No. 001-4300). |
| †10.16 | – | Apache Corporation Corporate Incentive Compensation Plan B (Strategic Objectives Format), dated July 16, 1998 (incorporated by reference to Exhibit 10.14 to Registrant's Annual Report on Form 10-K for year ended December 31, 1998, SEC File No. 001-4300). |
| †10.17 | – | First Amendment to Apache Corporation Corporate Incentive Compensation Plan B, dated November 20, 2008, effective as of January 1, 2005 (incorporated by reference to Exhibit 10.19 to Registrant's Annual Report on Form 10-K for year ended December 31, 2008, SEC File No. 001-4300). |
| †10.18 | – | Apache Corporation 401(k) Savings Plan, as amended and restated, dated October 28, 2010 (incorporated by reference to Exhibit 10.14 to Registrant's Annual Report on Form 10-K for year ended December 31, 2010, SEC File No. 001-4300). |
| †10.19 | – | Amendment to Apache Corporation 401(k) Savings Plan, dated December 30, 2010, effective as of November 10, 2010, except as otherwise specified (incorporated by reference to Exhibit 10.15 to Registrant's Annual Report on Form 10-K for year ended December 31, 2010, SEC File No. 001-4300). |
| †10.20 | – | Amendment to Apache Corporation 401(k) Savings Plan, dated August 31, 2011, effective September 1, 2011 (incorporated by reference to Exhibit 10.1 to Registrant's Quarterly Report on Form 10-Q for the quarter ended September 30, 2011, SEC File No. 001-4300). |

| EXHIBIT NO. | | DESCRIPTION |
|---|---|---|
| †10.21 | – | Amendment to Apache Corporation 401(k) Savings Plan, dated December 19, 2011, effective January 1, 2012, except as otherwise specified (incorporated by reference to Exhibit 10.18 to Registrant's Annual Report on Form 10-K for year ended December 31, 2011, SEC File No. 001-4300). |
| *†10.22 | – | Amendment to Apache Corporation 401(k) Savings Plan, dated November 8, 2012, effective January 1, 2012. |
| †10.23 | – | Non-Qualified Retirement/Savings Plan of Apache Corporation, as amended and restated July 14, 2010, except as otherwise specified (incorporated by reference to Exhibit 10.3 to Registrant's Quarterly Report on Form 10-Q for the quarter ended June 30, 2010, SEC File No. 001-4300). |
| †10.24 | – | Amendment to Apache Corporation Non-Qualified Retirement/Savings Plan of Apache Corporation, dated December 19, 2011, effective January 1, 2012 (incorporated by reference to Exhibit 10.20 to Registrant's Annual Report Form 10-K for year ended December 31, 2011, SEC File No. 001-4300). |
| *†10.25 | – | Amendment to Non-Qualified Retirement/Savings Plan of Apache Corporation, dated November 8, 2012, effective January 1, 2013. |
| †10.26 | – | Non-Qualified Restorative Retirement Savings Plan of Apache Corporation, dated November 7, 2011, effective January 1, 2012 (incorporated by reference to Exhibit 4.7 to Registrant's Registration Statement on Form S-8, dated December 21, 2011, Reg. No. 333-178672). |
| *†10.27 | – | Amendment to Non-Qualified Restorative Retirement Savings Plan of Apache Corporation, dated November 8, 2012, effective January 1, 2013. |
| †10.28 | – | Apache Corporation 2011 Omnibus Equity Compensation Plan, effective May 5, 2011 (incorporated by reference to Exhibit 10.1 to Registrant's Current Report on Form 8-K filed May 11, 2011, SEC File No. 001-4300). |
| †10.29 | – | Apache Corporation 2007 Omnibus Equity Compensation Plan, as amended and restated May 4, 2011 (incorporated by reference to Exhibit 10.1 to Registrant's Quarterly Report on Form 10-Q for the quarter ended March 31, 2011, SEC File No. 001-4300). |
| †10.30 | – | Apache Corporation 1998 Stock Option Plan, as amended and restated May 5, 2011 (incorporated by reference to Exhibit 10.2 to Registrant's Quarterly Report on Form 10-Q for the quarter ended March 31, 2011, SEC File No. 001-4300). |
| †10.31 | – | Apache Corporation 2000 Stock Option Plan, as amended and restated May 5, 2011 (incorporated by reference to Exhibit 10.3 to Registrant's Quarterly Report on Form 10-Q for the quarter ended March 31, 2011, SEC File No. 001-4300). |

| EXHIBIT NO. | | DESCRIPTION |
|---|---|---|
| †10.32 | – | Apache Corporation 2003 Stock Appreciation Rights Plan, as amended and restated May 4, 2011 (incorporated by reference to Exhibit 10.5 to Registrant's Quarterly Report on Form 10-Q for quarter ended March 31, 2011, SEC File No. 001-4300). |
| †10.33 | – | Apache Corporation 2005 Stock Option Plan, as amended and restated May 5, 2011 (incorporated by reference to Exhibit 10.4 to Registrant's Quarterly Report on Form 10-Q for quarter ended March 31, 2011, Commission File No. 001-4300). |
| †10.34 | – | Apache Corporation 2005 Share Appreciation Plan, as amended and restated August 14, 2008 (incorporated by reference to Exhibit 10.7 to Registrant's Quarterly Report on Form 10-Q for the quarter ended September 30, 2008, Commission File No. 001-4300). |
| †10.35 | – | Apache Corporation 2008 Share Appreciation Program Specifications, pursuant to Apache Corporation 2007 Omnibus Equity Compensation Plan (incorporated by reference to Exhibit 10.3 to Registrant's Quarterly Report on Form 10-Q for the quarter ended March 31, 2008, SEC File No. 001-4300). |
| †10.36 | – | Apache Corporation Executive Restricted Stock Plan, as amended and restated November 19, 2008 (incorporated by reference to Exhibit 10.37 to Registrant's Annual Report on Form 10-K for year ended December 31, 2008, SEC File No. 001-4300). |
| †10.37 | – | Apache Corporation Income Continuance Plan, as amended and restated July 14, 2010, effective January 1, 2009 (incorporated by reference to Exhibit 10.5 to Registrant's Quarterly Report on Form 10-Q for the quarter ended June 30, 2010, SEC File No. 001-4300). |
| *†10.38 | – | Apache Corporation Deferred Delivery Plan, as amended and restated February 5, 2013. |
| *†10.39 | – | Apache Corporation Non-Employee Directors' Compensation Plan, as amended and restated February 6, 2013. |
| *†10.40 | – | Apache Corporation Outside Directors' Retirement Plan, as amended and restated February 6, 2013. |
| †10.41 | – | Apache Corporation Equity Compensation Plan for Non-Employee Directors, as amended and restated February 8, 2007 (incorporated by reference to Exhibit 10.2 to Registrant's Quarterly Report on Form 10-Q for quarter ended March 31, 2007, SEC File No. 001-4300). |
| †10.42 | – | Apache Corporation Non-Employee Directors' Restricted Stock Units Program Specifications, dated May 5, 2011, pursuant to Apache Corporation 2011 Omnibus Equity Compensation Plan (incorporated by reference to Exhibit 10.6 to Registrant's Quarterly Report on Form 10-Q for the quarter ended March 31, 2011, SEC File No. 001-4300). |

| EXHIBIT NO. | | DESCRIPTION |
|---|---|---|
| †10.43 | – | Apache Corporation Non-Employee Directors' Restricted Stock Units Program Specifications, as amended and restated July 19, 2012, pursuant to Apache Corporation 2011 Omnibus Equity Compensation Plan (incorporated by reference to Exhibit 10.1 to Registrant's Quarterly Report on Form 10-Q for the quarter ended June 30, 2012, SEC File No. 001-4300). |
| †10.44 | – | Restated Employment and Consulting Agreement, dated January 15, 2009, between Registrant and Raymond Plank (incorporated by reference to Exhibit 10.1 to Registrant's Current Report on Form 8-K, dated January 15, 2009, filed January 16, 2009, SEC File No. 001-4300). |
| †10.45 | – | Amended and Restated Employment Agreement, dated December 20, 1990, between Registrant and John A. Kocur (incorporated by reference to Exhibit 10.10 to Registrant's Annual Report on Form 10-K for year ended December 31, 1990, SEC File No. 001-4300). |
| †10.46 | – | Employment Agreement between Registrant and G. Steven Farris, dated June 6, 1988, and First Amendment, dated November 20, 2008, effective as of January 1, 2005 (incorporated by reference to Exhibit 10.44 to Registrant's Annual Report on Form 10-K for year ended December 31, 2008, SEC File No. 001-4300). |
| †10.47 | – | Amended and Restated Conditional Stock Grant Agreement, dated September 15, 2005, effective January 1, 2005, between Registrant and G. Steven Farris (incorporated by reference to Exhibit 10.06 to Registrant's Quarterly Report on Form 10-Q for the quarter ended September 30, 2005, SEC File No. 001-4300). |
| †10.48 | – | Restricted Stock Unit Award Agreement, dated May 8, 2008, between Registrant and G. Steven Farris (incorporated by reference to Exhibit 10.4 to Registrant's Quarterly Report on Form 10-Q for quarter ended March 31, 2008, SEC File No. 001-4300). |
| †10.49 | – | Form of Restricted Stock Unit Award Agreement, dated February 12, 2009, between Registrant and each of John A. Crum, Rodney J. Eichler, and Roger B. Plank (incorporated by reference to Exhibit 10.1 to Registrant's Current Report on Form 8-K, dated February 12, 2009, filed February 18, 2009, SEC File No. 001-4300). |
| †10.50 | – | Amendment to Restricted Stock Unit Award Agreement, dated March 7, 2011, between Registrant and John A. Crum (incorporated by reference to Exhibit 10.1 to Registrant's Current Report Form 8-K/A filed March 8, 2011, SEC File No. 001-4300). |
| †10.51 | – | Resignation Agreement, dated March 7, 2011 between Registrant and John A. Crum (incorporated by reference to Exhibit 10.2 to Registrant's Current Report on Form 8-K/A filed March 8, 2011, SEC File No. 001-4300). |

| EXHIBIT NO. | | DESCRIPTION |
|---|---|---|
| †10.52 | – | Form of Restricted Stock Unit Award Agreement, dated November 18, 2009, between Registrant and Michael S. Bahorich (incorporated by reference to Exhibit 10.37 to Registrant's Annual Report on Form 10-K for year ended December 31, 2009, SEC File No. 001-4300). |
| †10.53 | – | Form of Restricted Stock Unit Grant Agreement, dated May 6, 2009, between Registrant and each of G. Steven Farris, Roger B. Plank, John A. Crum, Rodney J. Eichler, and Michael S. Bahorich (incorporated by reference to Exhibit 10.38 to Registrant's Annual Report on Form 10-K for year ended December 31, 2009, SEC File No. 001-4300). |
| †10.54 | – | Form of Stock Option Award Agreement, dated May 6, 2009, between Registrant and each of G. Steven Farris, Roger B. Plank, John A. Crum, Rodney J. Eichler, and Michael S. Bahorich (incorporated by reference to Exhibit 10.39 to Registrant's Annual Report on Form 10-K for year ended December 31, 2009, SEC File No. 001-4300). |
| †10.55 | – | Form of 2010 Performance Program Agreement, dated January 15, 2010, between Registrant and each of G. Steven Farris, John A. Crum, Rodney J. Eichler, and Roger B. Plank (incorporated by reference to Exhibit 10.1 to Registrant's Current Report on Form 8-K filed January 19, 2010, SEC File No. 001-4300). |
| †10.56 | – | Form of First Amendment, effective May 5, 2010, to 2010 Performance Program Agreement, dated January 15, 2010, between Registrant and each of G. Steven Farris, Rodney J. Eichler, and Roger B. Plank (incorporated by reference to Exhibit 10.1 to Registrant's Current Report on Form 8-K filed May 11, 2010, SEC File No. 001-4300). |
| †10.57 | – | Form of Restricted Stock Unit Award Agreement, dated January 15, 2010, between Registrant and each of John A. Crum, Rodney J. Eichler, and Roger B. Plank (incorporated by reference to Exhibit 10.2 to Registrant's Current Report on Form 8-K filed January 19, 2010, SEC File No. 001-4300). |
| †10.58 | – | Form of 2011 Performance Program Agreement, dated January 7, 2011, between Registrant and each of G. Steven Farris, John A. Crum, Rodney J. Eichler, Roger B. Plank, Michael S. Bahorich, and Thomas P. Chambers (incorporated by reference to Exhibit 10.1 to Registrant's Current Report on Form 8-K filed January 13, 2011, SEC File No. 001-4300). |
| †10.59 | – | Restricted Stock Unit Award Agreement, dated February 9, 2011, between Registrant and Thomas P. Chambers (incorporated by reference to Exhibit 10.1 to Registrant's Current Report on Form 8-K filed February 14, 2011, SEC File No. 001-4300). |
| †10.60 | – | Form of 2012 Performance Program Agreement, dated January 11, 2012, between Registrant and each of G. Steven Farris, Rodney J. Eichler, Roger B. Plank, P. Anthony Lannie, and Thomas P. Chambers (incorporated by reference to Exhibit 10.1 to Registrant's Current Report on Form 8-K filed January 13, 2012, SEC File No. 001-4300). |

| EXHIBIT NO. | | DESCRIPTION |
|---|---|---|
| †10.61 | – | Form of 2013 Performance Program Agreement, dated January 9, 2013, between Registrant and each of G. Steven Farris, Rodney J. Eichler, Roger B. Plank, and Thomas P. Chambers (incorporated by reference to Exhibit 10.1 to Registrant's Current Report on Form 8-K filed January 13, 2012, SEC File No. 001-4300). |
| *12.1 | – | Statement of Computation of Ratios of Earnings to Fixed Charges and Combined Fixed Charges and Preferred Stock Dividends. |
| 14.1 | – | Code of Business Conduct, as amended and restated November 15, 2011 (incorporated by reference to Exhibit 14.1 to Registrant's Annual Report on Form 10-K for year ended December 31, 2011, SEC File No. 001-4300). |
| *21.1 | – | Subsidiaries of Registrant |
| *23.1 | – | Consent of Ernst & Young LLP |
| *23.2 | – | Consent of Ryder Scott Company L.P., Petroleum Consultants |
| *24.1 | – | Power of Attorney (included as a part of the signature pages to this report) |
| *31.1 | – | Certification (pursuant to Rule 13a-14(a) or Rule 15d-14(a) of the Exchange Act) by Principal Executive Officer. |
| *31.2 | – | Certification (pursuant to Rule 13a-14(a) or Rule 15d-14(a) of the Exchange Act) by Principal Financial Officer. |
| *32.1 | – | Section 1350 Certification (pursuant to Sarbanes-Oxley Section 906) by Principal Executive Officer and Principal Financial Officer. |
| *99.1 | – | Report of Ryder Scott Company L.P., Petroleum Consultants |
| *101.INS | – | XBRL Instance Document. |
| *101.SCH | – | XBRL Taxonomy Schema Document. |
| *101.CAL | – | XBRL Calculation Linkbase Document. |
| *101.LAB | – | XBRL Label Linkbase Document. |
| *101.PRE | – | XBRL Presentation Linkbase Document. |
| *101.DEF | – | XBRL Definition Linkbase Document. |

*        Filed herewith.

†        Management contracts or compensatory plans or arrangements required to be filed herewith pursuant to Item 15 hereof.

NOTE: Debt instruments of the Registrant defining the rights of long-term debt holders in principal amounts not exceeding 10 percent of the Registrant's consolidated assets have been omitted and will be provided to the Commission upon request.

## SIGNATURES

Pursuant to the requirements of Section 13 or 15(d) of the Securities Exchange Act of 1934, the registrant has duly caused this report to be signed on its behalf by the undersigned, hereunto duly authorized.

APACHE CORPORATION

/s/ G. STEVEN FARRIS
G. Steven Farris
*Chairman of the Board and Chief Executive Officer*

Dated: February 28, 2013

## POWER OF ATTORNEY

The officers and directors of Apache Corporation, whose signatures appear below, hereby constitute and appoint G. Steven Farris, Thomas P. Chambers, P. Anthony Lannie and Rebecca A. Hoyt, and each of them (with full power to each of them to act alone), the true and lawful attorney-in-fact to sign and execute, on behalf of the undersigned, any amendment(s) to this report and each of the undersigned does hereby ratify and confirm all that said attorneys shall do or cause to be done by virtue thereof.

Pursuant to the requirements of the Securities Exchange Act of 1934, this report has been signed below by the following persons on behalf of the registrant and in the capacities and on the dates indicated.

| Name | Title | Date |
|---|---|---|
| /s/ G. STEVEN FARRIS<br>G. Steven Farris | Chairman of the Board and Chief Executive Officer (principal executive officer) | February 28, 2013 |
| /s/ THOMAS P. CHAMBERS<br>Thomas P. Chambers | Executive Vice President and Chief Financial Officer (principal financial officer) | February 28, 2013 |
| /s/ REBECCA A. HOYT<br>Rebecca A. Hoyt | Vice President, Chief Accounting Officer and Controller (principal accounting officer) | February 28, 2013 |

84

| Name | Title | Date |
|---|---|---|
| /s/ RANDOLPH M. FERLIC<br>Randolph M. Ferlic | Director | February 28, 2013 |
| /s/ EUGENE C. FIEDOREK<br>Eugene C. Fiedorek | Director | February 28, 2013 |
| /s/ A.D. FRAZIER, JR.<br>A. D. Frazier, Jr. | Director | February 28, 2013 |
| /s/ PATRICIA ALBJERG GRAHAM<br>Patricia Albjerg Graham | Director | February 28, 2013 |
| /s/ SCOTT D. JOSEY<br>Scott D. Josey | Director | February 28, 2013 |
| /s/ CHANSOO JOUNG<br>Chansoo Joung | Director | February 28, 2013 |
| /s/ JOHN A. KOCUR<br>John A. Kocur | Director | February 28, 2013 |
| /s/ GEORGE D. LAWRENCE<br>George D. Lawrence | Director | February 28, 2013 |
| /s/ WILLIAM C. MONTGOMERY<br>William C. Montgomery | Director | February 28, 2013 |
| /s/ RODMAN D. PATTON<br>Rodman D. Patton | Director | February 28, 2013 |
| /s/ CHARLES J. PITMAN<br>Charles J. Pitman | Director | February 28, 2013 |

85

**REPORT OF MANAGEMENT ON INTERNAL CONTROL OVER FINANCIAL REPORTING**

Management of the Company is responsible for the preparation and integrity of the consolidated financial statements appearing in this annual report on Form 10-K. The financial statements were prepared in conformity with accounting principles generally accepted in the United States and include amounts that are based on management's best estimates and judgments.

Management of the Company is responsible for establishing and maintaining effective internal control over financial reporting as such term is defined in Rule 13a-15(f) under the Securities Exchange Act of 1934. The Company's internal control over financial reporting is designed to provide reasonable assurance regarding the reliability of financial reporting and the preparation of the consolidated financial statements. Our internal control over financial reporting is supported by a program of internal audits and appropriate reviews by management, written policies and guidelines, careful selection and training of qualified personnel and a written code of business conduct adopted by our Company's board of directors, applicable to all Company directors and all officers and employees of our Company and subsidiaries.

Because of its inherent limitations, internal control over financial reporting may not prevent or detect misstatements and even when determined to be effective, can only provide reasonable assurance with respect to financial statement preparation and presentation. Also, projections of any evaluation of effectiveness to future periods are subject to the risk that controls may become inadequate because of changes in conditions or that the degree of compliance with the policies or procedures may deteriorate.

Management assessed the effectiveness of the Company's internal control over financial reporting as of December 31, 2012. In making this assessment, management used the criteria set forth by the Committee of Sponsoring Organizations of the Treadway Commission in *Internal Control — Integrated Framework*. Based on our assessment, management believes that the Company maintained effective internal control over financial reporting as of December 31, 2012.

The Company's independent auditors, Ernst & Young LLP, a registered public accounting firm, are appointed by the Audit Committee of the Company's board of directors. Ernst & Young LLP have audited and reported on the consolidated financial statements of Apache Corporation and subsidiaries, and the effectiveness of the Company's internal control over financial reporting. The reports of the independent auditors follow this report on pages F-2 and F-3.

/s/   G. Steven Farris
*Chairman of the Board and Chief Executive Officer*
*(principal executive officer)*

/s/   Thomas P. Chambers
*Executive Vice President and Chief Financial Officer*
*(principal financial officer)*

/s/   Rebecca A. Hoyt
*Vice President, Chief Accounting Officer and Controller*
*(principal accounting officer)*

Houston, Texas
February 28, 2013

F-1

**REPORT OF INDEPENDENT REGISTERED PUBLIC ACCOUNTING FIRM**

The Board of Directors and Shareholders of Apache Corporation:

We have audited the accompanying consolidated balance sheets of Apache Corporation and subsidiaries as of December 31, 2012 and 2011, and the related consolidated statements of operations, comprehensive income, shareholders' equity, and cash flows for each of the three years in the period ended December 31, 2012. These financial statements are the responsibility of the Company's management. Our responsibility is to express an opinion on these financial statements based on our audits.

We conducted our audits in accordance with the standards of the Public Company Accounting Oversight Board (United States). Those standards require that we plan and perform the audit to obtain reasonable assurance about whether the financial statements are free of material misstatement. An audit includes examining, on a test basis, evidence supporting the amounts and disclosures in the financial statements. An audit also includes assessing the accounting principles used and significant estimates made by management, as well as evaluating the overall financial statement presentation. We believe that our audits provide a reasonable basis for our opinion.

In our opinion, the financial statements referred to above present fairly, in all material respects, the consolidated financial position of Apache Corporation and subsidiaries at December 31, 2012 and 2011, and the consolidated results of their operations and their cash flows for each of the three years in the period ended December 31, 2012, in conformity with U.S. generally accepted accounting principles.

We also have audited, in accordance with the standards of the Public Company Accounting Oversight Board (United States), Apache Corporation's internal control over financial reporting as of December 31, 2012, based on criteria established in *Internal Control — Integrated Framework* issued by the Committee of Sponsoring Organizations of the Treadway Commission and our report dated February 28, 2013, expressed an unqualified opinion thereon.

/s/ ERNST & YOUNG LLP

Houston, Texas
February 28, 2013

F-2

**REPORT OF INDEPENDENT REGISTERED PUBLIC ACCOUNTING FIRM**

The Board of Directors and Shareholders of Apache Corporation:

We have audited Apache Corporation and subsidiaries' internal control over financial reporting as of December 31, 2012, based on criteria established in *Internal Control — Integrated Framework* issued by the Committee of Sponsoring Organizations of the Treadway Commission (the COSO criteria). Apache Corporation and subsidiaries' management is responsible for maintaining effective internal control over financial reporting, and for its assessment of the effectiveness of internal control over financial reporting included in the accompanying Report of Management on Internal Control over Financial Reporting. Our responsibility is to express an opinion on the company's internal control over financial reporting based on our audit.

We conducted our audit in accordance with the standards of the Public Company Accounting Oversight Board (United States). Those standards require that we plan and perform the audit to obtain reasonable assurance about whether effective internal control over financial reporting was maintained in all material respects. Our audit included obtaining an understanding of internal control over financial reporting, assessing the risk that a material weakness exists, testing and evaluating the design and operating effectiveness of internal control based on the assessed risk, and performing such other procedures as we considered necessary in the circumstances. We believe that our audit provides a reasonable basis for our opinion.

A company's internal control over financial reporting is a process designed to provide reasonable assurance regarding the reliability of financial reporting and the preparation of financial statements for external purposes in accordance with generally accepted accounting principles. A company's internal control over financial reporting includes those policies and procedures that (1) pertain to the maintenance of records that, in reasonable detail, accurately and fairly reflect the transactions and dispositions of the assets of the company; (2) provide reasonable assurance that transactions are recorded as necessary to permit preparation of financial statements in accordance with U.S. generally accepted accounting principles, and that receipts and expenditures of the company are being made only in accordance with authorizations of management and directors of the company; and (3) provide reasonable assurance regarding prevention or timely detection of unauthorized acquisition, use, or disposition of the company's assets that could have a material effect on the financial statements.

Because of its inherent limitations, internal control over financial reporting may not prevent or detect misstatements. Also, projections of any evaluation of effectiveness to future periods are subject to the risk that controls may become inadequate because of changes in conditions, or that the degree of compliance with the policies or procedures may deteriorate.

In our opinion, Apache Corporation and subsidiaries maintained, in all material respects, effective internal control over financial reporting as of December 31, 2012, based on the COSO criteria.

We also have audited, in accordance with the standards of the Public Company Accounting Oversight Board (United States), the consolidated balance sheets of Apache Corporation and subsidiaries as of December 31, 2012 and 2011, and the related consolidated statements of operations, comprehensive income, shareholders' equity, and cash flows for each of the three years in the period ended December 31, 2012 of Apache Corporation and subsidiaries, and our report dated February 28, 2013, expressed an unqualified opinion thereon.

/s/ ERNST & YOUNG LLP

Houston, Texas
February 28, 2013

F-3

**APACHE CORPORATION AND SUBSIDIARIES**
**STATEMENT OF CONSOLIDATED OPERATIONS**

|  | For the Year Ended December 31, | | |
|---|---|---|---|
|  | 2012 | 2011 | 2010 |
|  | (In millions, except per common share data) | | |
| **REVENUES AND OTHER:** | | | |
| Oil and gas production revenues | $16,947 | $16,810 | $12,183 |
| Other | 131 | 78 | (91) |
|  | 17,078 | 16,888 | 12,092 |
| **OPERATING EXPENSES:** | | | |
| Depreciation, depletion, and amortization: | | | |
| Recurring | 5,183 | 4,095 | 3,083 |
| Additional | 1,926 | 109 | — |
| Asset retirement obligation accretion | 232 | 154 | 111 |
| Lease operating expenses | 2,968 | 2,605 | 2,032 |
| Gathering and transportation | 303 | 296 | 178 |
| Taxes other than income | 862 | 899 | 690 |
| General and administrative | 531 | 459 | 380 |
| Merger, acquisitions & transition | 31 | 20 | 183 |
| Financing costs, net | 165 | 158 | 229 |
|  | 12,201 | 8,795 | 6,886 |
| **INCOME BEFORE INCOME TAXES** | 4,877 | 8,093 | 5,206 |
| Current income tax provision | 2,199 | 2,263 | 1,222 |
| Deferred income tax provision | 677 | 1,246 | 952 |
| **NET INCOME** | 2,001 | 4,584 | 3,032 |
| Preferred stock dividends | 76 | 76 | 32 |
| **INCOME ATTRIBUTABLE TO COMMON STOCK** | $ 1,925 | $ 4,508 | $ 3,000 |
| **NET INCOME PER COMMON SHARE:** | | | |
| Basic | $ 4.95 | $ 11.75 | $ 8.53 |
| Diluted | $ 4.92 | $ 11.47 | $ 8.46 |
| **WEIGHTED-AVERAGE NUMBER OF COMMON SHARES OUTSTANDING:** | | | |
| Basic | 389 | 384 | 352 |
| Diluted | 391 | 400 | 359 |
| **DIVIDENDS DECLARED PER COMMON SHARE** | $ 0.68 | $ 0.60 | $ 0.60 |

The accompanying notes to consolidated financial statements are an integral part of this statement.

F-4

**APACHE CORPORATION AND SUBSIDIARIES**

**STATEMENT OF CONSOLIDATED COMPREHENSIVE INCOME**

| | For the Year Ended December 31, | | |
|---|---|---|---|
| | 2012 | 2011 | 2010 |
| | | (In millions) | |
| NET INCOME | $ 2,001 | $ 4,584 | $ 3,032 |
| OTHER COMPREHENSIVE INCOME (LOSS): | | | |
| Pension and postretirement benefit plan, net of tax | (2) | (1) | (2) |
| Commodity cash flow hedge activity, net of tax: | | | |
| Reclassification of (gain) loss on settled derivative instruments | (199) | 19 | (106) |
| Change in fair value of derivative instruments | 79 | 115 | 256 |
| Derivative hedge ineffectiveness reclassified into earnings | — | (1) | 1 |
| | (122) | 132 | 149 |
| COMPREHENSIVE INCOME | 1,879 | 4,716 | 3,181 |
| Preferred stock dividends | 76 | 76 | 32 |
| COMPREHENSIVE INCOME ATTRIBUTABLE TO COMMON STOCK | $ 1,803 | $ 4,640 | $ 3,149 |

The accompanying notes to consolidated financial statements are an integral part of this statement.

F-5

**APACHE CORPORATION AND SUBSIDIARIES**

**STATEMENT OF CONSOLIDATED CASH FLOWS**

|  | For the Year Ended December 31, | | |
|---|---|---|---|
|  | 2012 | 2011 (In millions) | 2010 |
| **CASH FLOWS FROM OPERATING ACTIVITIES:** | | | |
| Net income | $ 2,001 | $ 4,584 | $ 3,032 |
| Adjustments to reconcile net income to net cash provided by operating activities: | | | |
| Depreciation, depletion, and amortization | 7,109 | 4,204 | 3,083 |
| Asset retirement obligation accretion | 232 | 154 | 111 |
| Provision for deferred income taxes | 677 | 1,246 | 952 |
| Other | 226 | 46 | 190 |
| Changes in operating assets and liabilities: | | | |
| Receivables | 12 | (759) | (496) |
| Inventories | (59) | (37) | 35 |
| Drilling advances | (343) | 26 | (28) |
| Deferred charges and other | 61 | 27 | (141) |
| Accounts payable | (100) | 241 | 214 |
| Accrued expenses | (1,142) | 90 | (309) |
| Deferred credits and noncurrent liabilities | (170) | 131 | 83 |
| NET CASH PROVIDED BY OPERATING ACTIVITIES | 8,504 | 9,953 | 6,726 |
| **CASH FLOWS FROM INVESTING ACTIVITIES:** | | | |
| Additions to oil and gas property | (8,781) | (6,414) | (4,407) |
| Additions to gas gathering, transmission, and processing facilities | (750) | (664) | (515) |
| Acquisition of Cordillera Energy Partners III, LLC | (2,666) | — | — |
| Acquisition of Yara Pilbara Holdings Pty Limited | (439) | — | — |
| Acquisition of Devon properties | — | — | (1,018) |
| Acquisition of BP properties and facilities | — | — | (6,429) |
| Mariner Energy, Inc. merger | — | — | (787) |
| Acquisition of Mobil North Sea Limited | — | (1,246) | — |
| Acquisitions, other | (252) | (567) | (126) |
| Proceeds from sale of oil and gas properties | 27 | 422 | — |
| Other, net | (563) | (176) | (121) |
| NET CASH USED IN INVESTING ACTIVITIES | (13,424) | (8,645) | (13,403) |
| **CASH FLOWS FROM FINANCING ACTIVITIES:** | | | |
| Commercial paper, credit facility and bank notes, net | 549 | (925) | (32) |
| Fixed rate debt borrowings | 4,978 | — | 2,470 |
| Payments on fixed rate debt | (400) | — | (1,023) |
| Proceeds from issuance of common stock | — | — | 2,258 |
| Proceeds from issuance of mandatory convertible preferred stock | — | — | 1,227 |
| Dividends paid | (332) | (306) | (226) |
| Other | (10) | 84 | 89 |
| NET CASH PROVIDED BY (USED IN) FINANCING ACTIVITIES | 4,785 | (1,147) | 4,763 |
| NET INCREASE (DECREASE) IN CASH AND CASH EQUIVALENTS | (135) | 161 | (1,914) |
| CASH AND CASH EQUIVALENTS AT BEGINNING OF YEAR | 295 | 134 | 2,048 |
| CASH AND CASH EQUIVALENTS AT END OF PERIOD | $ 160 | $ 295 | $ 134 |
| **SUPPLEMENTARY CASH FLOW DATA:** | | | |
| Interest paid, net of capitalized interest | $ 146 | $ 156 | $ 187 |
| Income taxes paid, net of refunds | 2,590 | 1,686 | 1,170 |

The accompanying notes to consolidated financial statements are an integral part of this statement.

F-6

**APACHE CORPORATION AND SUBSIDIARIES**

**CONSOLIDATED BALANCE SHEET**

| | December 31, | |
|---|---|---|
| | 2012 | 2011 |
| | (In millions) | |
| **ASSETS** | | |
| CURRENT ASSETS: | | |
| Cash and cash equivalents | $    160 | $    295 |
| Receivables, net of allowance | 3,086 | 3,079 |
| Inventories | 908 | 655 |
| Drilling advances | 584 | 229 |
| Derivative instruments | 31 | 304 |
| Prepaid assets and other | 193 | 241 |
| | 4,962 | 4,803 |
| PROPERTY AND EQUIPMENT: | | |
| Oil and gas, on the basis of full-cost accounting: | | |
| Proved properties | 78,383 | 67,805 |
| Unproved properties and properties under development, not being amortized | 8,754 | 5,530 |
| Gathering, transmission, and processing facilities | 5,955 | 5,175 |
| Other | 1,055 | 709 |
| | 94,147 | 79,219 |
| Less: Accumulated depreciation, depletion, and amortization | (40,867) | (33,771) |
| | 53,280 | 45,448 |
| OTHER ASSETS: | | |
| Goodwill | 1,289 | 1,114 |
| Deferred charges and other | 1,206 | 686 |
| | $ 60,737 | $ 52,051 |
| **LIABILITIES AND SHAREHOLDERS' EQUITY** | | |
| CURRENT LIABILITIES: | | |
| Accounts payable | $  1,092 | $  1,048 |
| Current debt | 990 | 431 |
| Current asset retirement obligation | 478 | 447 |
| Derivative instruments | 116 | 113 |
| Other current liabilities | 2,860 | 2,924 |
| | 5,536 | 4,963 |
| LONG-TERM DEBT | 11,355 | 6,785 |
| DEFERRED CREDITS AND OTHER NONCURRENT LIABILITIES: | | |
| Income taxes | 8,024 | 7,197 |
| Asset retirement obligation | 4,100 | 3,440 |
| Other | 391 | 673 |
| | 12,515 | 11,310 |
| COMMITMENTS AND CONTINGENCIES (Note 8) | | |
| SHAREHOLDERS' EQUITY: | | |
| Preferred stock, no par value, 10,000,000 shares authorized, 6% Cumulative Mandatory Convertible, Series D, $1,000 per share liquidation preference, 1,265,000 shares issued and outstanding | 1,227 | 1,227 |
| Common stock, $0.625 par, 860,000,000 shares authorized, 392,712,245 and 385,249,885 shares issued, respectively | 245 | 241 |
| Paid-in capital | 9,859 | 9,066 |
| Retained earnings | 20,161 | 18,500 |
| Treasury stock, at cost, 1,071,475 and 1,132,242 shares, respectively | (30) | (32) |
| Accumulated other comprehensive loss | (131) | (9) |
| | 31,331 | 28,993 |
| | $ 60,737 | $ 52,051 |

The accompanying notes to consolidated financial statements are an integral part of this statement.

F-7

**APACHE CORPORATION AND SUBSIDIARIES**

**STATEMENT OF CONSOLIDATED SHAREHOLDERS' EQUITY**

| | Series D Preferred Stock | Common Stock | Paid-In Capital | Retained Earnings | Treasury Stock | Accumulated Other Comprehensive (Loss) | Total Shareholders' Equity |
|---|---|---|---|---|---|---|---|
| | | | | (In millions) | | | |
| BALANCE AT DECEMBER 31, 2009 | $ — | $ 215 | $ 4,634 | $ 11,437 | $ (217) | $ (290) | $ 15,779 |
| Net income | — | — | — | 3,032 | — | — | 3,032 |
| Postretirement, net of tax expense of $2 | — | — | — | — | — | (2) | (2) |
| Commodity hedges, net of tax expense of $62 | — | — | — | — | — | 151 | 151 |
| Dividends: | | | | | | | |
| Preferred | — | — | — | (32) | — | — | (32) |
| Common ($0.60 per share) | — | — | — | (214) | — | — | (214) |
| Mandatory convertible preferred stock issued | 1,227 | — | — | — | — | — | 1,227 |
| Common stock issuance | — | 24 | 3,969 | — | 170 | — | 4,163 |
| Common stock activity, net | — | 1 | 26 | — | — | — | 27 |
| Treasury stock activity, net | — | — | 1 | — | 11 | — | 12 |
| Compensation expense | — | — | 225 | — | — | — | 225 |
| Other | — | — | 9 | — | — | — | 9 |
| BALANCE AT DECEMBER 31, 2010 | $ 1,227 | $ 240 | $ 8,864 | $ 14,223 | $ (36) | $ (141) | $ 24,377 |
| Net income | — | — | — | 4,584 | — | — | 4,584 |
| Postretirement, net of tax benefit of $7 | — | — | — | — | — | (1) | (1) |
| Commodity hedges, net of tax expense of $66 | — | — | — | — | — | 133 | 133 |
| Dividends: | | | | | | | |
| Preferred | — | — | — | (76) | — | — | (76) |
| Common ($0.60 per share) | — | — | — | (231) | — | — | (231) |
| Common stock activity, net | — | 1 | 35 | — | — | — | 36 |
| Treasury stock activity, net | — | — | 2 | — | 4 | — | 6 |
| Compensation expense | — | — | 167 | — | — | — | 167 |
| Other | — | — | (2) | — | — | — | (2) |
| BALANCE AT DECEMBER 31, 2011 | $ 1,227 | $ 241 | $ 9,066 | $ 18,500 | $ (32) | $ (9) | $ 28,993 |
| Net income | — | — | — | 2,001 | — | — | 2,001 |
| Postretirement, net of income tax benefit of $5 | — | — | — | — | — | (2) | (2) |
| Commodity hedges, net of tax benefit of $35 | — | — | — | — | — | (120) | (120) |
| Dividends: | | | | | | | |
| Preferred | — | — | — | (76) | — | — | (76) |
| Common ($0.68 per share) | — | — | — | (264) | — | — | (264) |
| Common shares issued | — | 3 | 598 | — | — | — | 601 |
| Common stock activity, net | — | — | (44) | — | — | — | (43) |
| Treasury stock activity, net | — | — | 1 | — | 2 | — | 3 |
| Compensation expense | — | — | 238 | — | — | — | 238 |
| BALANCE AT DECEMBER 31, 2012 | $ 1,227 | $ 245 | $ 9,859 | $ 20,161 | $ (30) | $ (131) | $ 31,331 |

The accompanying notes to consolidated financial statements are an integral part of this statement.

F-8

**APACHE CORPORATION AND SUBSIDIARIES**
**NOTES TO CONSOLIDATED FINANCIAL STATEMENTS**

## Nature of Operations

Apache Corporation (Apache or the Company) is an oil and gas exploration and production company with operations in six countries: the United States (U.S.), Canada, Egypt, the United Kingdom (U.K.) North Sea, Australia, and Argentina. Apache also pursues exploration interests in other countries that may over time result in reportable discoveries.

## 1.   SUMMARY OF SIGNIFICANT ACCOUNTING POLICIES

Accounting policies used by Apache and its subsidiaries reflect industry practices and conform to accounting principles generally accepted in the U.S. (GAAP). Certain reclassifications have been made to prior periods to conform to current-year presentation. Significant policies are discussed below.

## Principles of Consolidation

The accompanying consolidated financial statements include the accounts of Apache and its subsidiaries after elimination of intercompany balances and transactions. The Company's interest in oil and gas exploration and production ventures and partnerships are proportionately consolidated. The Company consolidates all other investments in which the Company, either through direct or indirect ownership, has more than a 50-percent voting interest.

## Use of Estimates

Preparation of financial statements in conformity with GAAP and disclosure of contingent assets and liabilities requires management to make estimates and assumptions that affect reported amounts of assets and liabilities at the date of the financial statements and the reported amounts of revenues and expenses during the reporting period. The Company bases its estimates on historical experience and various other assumptions that are believed to be reasonable under the circumstances, the results of which form the basis for making judgments about carrying values of assets and liabilities that are not readily apparent from other sources. Apache evaluates its estimates and assumptions on a regular basis. Actual results may differ from these estimates and assumptions used in preparation of its financial statements and changes in these estimates are recorded when known. Significant estimates made in preparing these financial statements include the fair value determination of acquired assets and liabilities (see Note 2 — Acquisitions and Divestitures), the estimate of proved oil and gas reserves and related present value estimates of future net cash flows therefrom (see Note 14 — Supplemental Oil and Gas Disclosures), the assessment of asset retirement obligations (see Note 5 — Asset Retirement Obligation), and the valuation of income taxes (see Note 7 — Income Taxes).

## Fair Value Measurements

Certain assets and liabilities are reported at fair value on a recurring basis in Apache's consolidated balance sheet. Accounting Standards Codification (ASC) 820-10-35 provides a hierarchy that prioritizes and defines the types of inputs used to measure fair value. The fair value hierarchy gives the highest priority to Level 1 inputs, which consist of unadjusted quoted prices for identical instruments in active markets. Level 2 inputs consist of quoted prices for similar instruments. Level 3 valuations are derived from inputs that are significant and unobservable; hence, these valuations have the lowest priority.

The valuation techniques that may be used to measure fair value include a market approach, an income approach, and a cost approach. A market approach uses prices and other relevant information generated by market transactions involving identical or comparable assets or liabilities. An income approach uses valuation

F-9

**APACHE CORPORATION AND SUBSIDIARIES**

**NOTES TO CONSOLIDATED FINANCIAL STATEMENTS — (Continued)**

techniques to convert future amounts to a single present amount based on current market expectations, including present value techniques, option-pricing models, and the excess earnings method. The cost approach is based on the amount that currently would be required to replace the service capacity of an asset (replacement cost).

Fair value measurements are presented in further detail in Note 3 — Derivative Instruments, Hedging Activities, Note 6 — Debt, and Note 9 — Retirement and Deferred Compensation Plans.

<u>Cash Equivalents</u>

The Company considers all highly liquid short-term investments with a maturity of three months or less at the time of purchase to be cash equivalents. These investments are carried at cost, which approximates fair value. As of December 31, 2012 and 2011, Apache had $160 million and $295 million, respectively, of cash and cash equivalents.

<u>Accounts Receivable and Allowance for Doubtful Accounts</u>

Accounts receivable are stated at the historical carrying amount net of write-offs and allowance for uncollectible accounts. The carrying amount of Apache's accounts receivable approximates fair value because of the short-term nature of the instruments. The Company routinely assesses the collectability of all material trade and other receivables. Many of Apache's receivables are from joint interest owners on properties Apache operates. The Company may have the ability to withhold future revenue disbursements to recover any non-payment of these joint interest billings. The Company accrues a reserve on a receivable when, based on the judgment of management, it is probable that a receivable will not be collected and the amount of any reserve may be reasonably estimated. As of December 31, 2012 and 2011, the Company had an allowance for doubtful accounts of $82 million and $58 million, respectively.

<u>Inventories</u>

Inventories consist principally of tubular goods and equipment, stated at weighted-average cost, and oil produced but not sold, stated at the lower of cost or market.

<u>Property and Equipment</u>

The carrying value of Apache's property and equipment represents the cost incurred to acquire the property and equipment, including capitalized interest. Interest costs incurred in connection with qualifying capital expenditures are capitalized and amortized in concurrence with the related assets. For business combinations, property and equipment cost is based on the fair values at the acquisition date.

*Oil and Gas Property*

The Company follows the full-cost method of accounting for its oil and gas property. Under this method of accounting, all costs incurred for both successful and unsuccessful exploration and development activities, including salaries, benefits, and other internal costs directly identified with these activities, and oil and gas property acquisitions are capitalized. All costs related to production, general corporate overhead, or similar activities are expensed as incurred. Apache capitalized $404 million, $335 million, and $321 million of internal costs in 2012, 2011, and 2010, respectively.

F-10

APACHE CORPORATION AND SUBSIDIARIES

NOTES TO CONSOLIDATED FINANCIAL STATEMENTS — (Continued)

Proved properties are amortized on a country-by-country basis using the units of production method (UOP). The UOP calculation, in its simplest terms, multiplies the percentage of estimated proved reserves produced each quarter by the cost of those reserves. The amortization base in the UOP calculation includes the sum of proved property, net of accumulated depreciation, depletion and amortization (DD&A), estimated future development costs (future costs to access and develop proved reserves), and asset retirement costs, less related salvage value.

The cost of unproved properties and properties under development are excluded from the amortization calculation until it is determined whether or not proved reserves can be assigned to such properties or until development projects are placed in service. Geological and geophysical costs not associated with specific properties are recorded to proved property immediately. Unproved properties and properties under development are reviewed for impairment at least quarterly. In countries where proved reserves exist, exploratory drilling costs associated with dry holes are transferred to proved properties immediately upon determination that a well is dry and amortized accordingly. In countries where a reserve base has not yet been established, impairments are charged to earnings and are determined through an evaluation considering, among other factors, seismic data, requirements to relinquish acreage, drilling results, remaining time in the commitment period, remaining capital plan and political, economic and market conditions. In 2012, Apache's statement of consolidated operations includes additional DD&A of $28 million related to exiting operations in New Zealand and $15 million of seismic costs incurred in countries where it has no established presence. In 2011, Apache recorded additional DD&A of $60 million related to exiting operations in Chile and $49 million of seismic costs incurred in countries where it has no established presence.

Under the full-cost method of accounting, the net book value of oil and gas properties, less related deferred income taxes, may not exceed a calculated "ceiling." The ceiling limitation is the estimated after-tax future net cash flows from proved oil and gas reserves, discounted at 10 percent per annum and adjusted for cash flow hedges. Future cash outflows associated with settling accrued asset retirement obligations are excluded from the calculation. Estimated future net cash flows are calculated using end-of-period costs and an unweighted arithmetic average of commodity prices in effect on the first day of each of the previous 12 months, held flat for the life of the production, except where prices are defined by contractual arrangements. See Note 14 — Supplemental Oil and Gas Disclosures for a discussion of the calculation of estimated future net cash flows.

Any excess of the net book value of proved oil and gas properties, less related deferred income taxes, over the ceiling is charged to expense and reflected as additional DD&A in the accompanying statement of consolidated operations. Such limitations are imposed separately on a country-by-country basis and are tested quarterly. During 2012, the Company recorded a $1.9 billion ($1.4 billion net of tax) non-cash write-down of the carrying value of the Company's Canadian proved oil and gas properties. Excluding the effects of cash flow hedges in calculating the ceiling limitation, the write-down for the full year would have been higher by $135 million ($101 million net of tax). As of December 31, 2011 and 2010, capitalized costs did not exceed the ceiling limitation, and no write-down was indicated. Cash flow hedges did not materially affect the 2011 or 2010 calculations.

Proceeds from the sale or disposition of oil and gas properties are accounted for as a reduction to capitalized costs unless a significant portion (greater than 25 percent) of the Company's reserve quantities in a particular country are sold, in which case a gain or loss is recognized in income.

### Gathering, Transmission, and Processing Facilities

Gathering, transmission, and processing facilities totaled $6.0 billion and $5.2 billion at December 31, 2012 and 2011, respectively. The Company assesses the carrying amount of its gathering, transmission, and processing facilities whenever events or changes in circumstances indicate that their carrying amount may not be

F-11

**APACHE CORPORATION AND SUBSIDIARIES**

**NOTES TO CONSOLIDATED FINANCIAL STATEMENTS — (Continued)**

recoverable. If the carrying amount of these facilities is less than the sum of the undiscounted cash flows, an impairment loss is recognized for the excess of the carrying value over its fair value. No impairment of gathering, transmission, and processing facilities was recognized during 2012, 2011, or 2010.

Gathering, transmission, and processing facilities, buildings, and equipment are depreciated on a straight-line basis over the estimated useful lives of the assets, which range from three to 25 years. Accumulated depreciation for these assets totaled $1.9 billion and $1.5 billion at December 31, 2012 and 2011, respectively.

*Asset Retirement Costs and Obligations*

The initial estimated asset retirement obligation related to property and equipment is recorded as a liability at its fair value, with an offsetting asset retirement cost recorded as an increase to the associated property and equipment on the consolidated balance sheet. If the fair value of the recorded asset retirement obligation changes, a revision is recorded to both the asset retirement obligation and the asset retirement cost. Revisions in estimated liabilities can result from changes in estimated inflation rates, changes in service and equipment costs and changes in the estimated timing of an asset's retirement. Asset retirement costs are depreciated using a systematic and rational method similar to that used for the associated property and equipment. Accretion expense on the liability is recognized over the estimated productive life of the related assets.

## Goodwill

Goodwill represents the excess of the purchase price of an entity over the estimated fair value of the assets acquired and liabilities assumed. The Company assesses the carrying amount of goodwill by testing for impairment annually and when impairment indicators arise. Goodwill totaled $1.3 billion and $1.1 billion at December 31, 2012 and 2011, respectively. Goodwill of $173 million was booked in the U.S. during 2012 as a result of the acquisition of Cordillera Energy Partners III, LLC, as discussed in Note 2 — Acquisitions and Divestitures. As of December 31, 2012 and 2011, $1.0 billion and $843 million was recorded in the U.S. and $84 million and $82 million in the North Sea, respectively. As of December 31, 2012 and 2011, $103 million and $86 million were recorded in Canada and Egypt, respectively. Each country was assessed as a reporting unit, and no impairment of goodwill was recognized during 2012, 2011, or 2010.

## Accounts Payable

Included in accounts payable at December 31, 2012 and 2011, are liabilities of approximately $255 million and $207 million, respectively, representing the amount by which checks issued but not presented to the Company's banks for collection exceeded balances in applicable bank accounts.

## Commitments and Contingencies

Accruals for loss contingencies arising from claims, assessments, litigation, environmental and other sources are recorded when it is probable that a liability has been incurred and the amount can be reasonably estimated. These accruals are adjusted as additional information becomes available or circumstances change.

## Revenue Recognition and Imbalances

Oil and gas revenues are recognized when production is sold to a purchaser at a fixed or determinable price, when delivery has occurred and title has transferred, and if collectability of the revenue is probable. Cash received relating to future revenues is deferred and recognized when all revenue recognition criteria are met.

F-12

APACHE CORPORATION AND SUBSIDIARIES

NOTES TO CONSOLIDATED FINANCIAL STATEMENTS — (Continued)

Apache uses the sales method of accounting for gas production imbalances. The volumes of gas sold may differ from the volumes to which Apache is entitled based on its interests in the properties. These differences create imbalances that are recognized as a liability only when the properties' estimated remaining reserves net to Apache will not be sufficient to enable the under-produced owner to recoup its entitled share through production. The Company's recorded liability is generally reflected in other non-current liabilities. No receivables are recorded for those wells where Apache has taken less than its share of production. Gas imbalances are reflected as adjustments to estimates of proved gas reserves and future cash flows in the unaudited supplemental oil and gas disclosures.

Apache markets its own U.S. natural gas production. Since the Company's production fluctuates because of operational issues, it is occasionally necessary to purchase third-party gas to fulfill sales obligations and commitments. Both the costs and sales proceeds of this third-party gas are reported on a net basis in oil and gas production revenues. The costs of third-party gas netted against the related sales proceeds totaled $27 million, $28 million, and $33 million, for 2012, 2011, and 2010, respectively.

The Company's Egyptian operations are conducted pursuant to production sharing contracts under which contractor partners pay all operating and capital costs for exploring and developing the concessions. A percentage of the production, generally up to 40 percent, is available to contractor partners to recover these operating and capital costs over contractually defined terms. Cost recovery is reflected in revenue. The balance of the production is split among the contractor partners and the Egyptian General Petroleum Corporation (EGPC) on a contractually defined basis.

## Derivative Instruments and Hedging Activities

Apache periodically enters into derivative contracts to manage its exposure to commodity price risk. These derivative contracts, which are generally placed with major financial institutions, may take the form of forward contracts, futures contracts, swaps, or options. The oil and gas reference prices upon which the commodity derivative contracts are based reflect various market indices that have a high degree of historical correlation with actual prices received by the Company for its oil and gas production.

Apache accounts for its derivative instruments in accordance with ASC Topic 815, "Derivatives and Hedging," which requires that all derivative instruments, other than those that meet the normal purchases and sales exception, be recorded on the balance sheet as either an asset or liability measured at fair value. Changes in fair value are recognized currently in earnings unless specific hedge accounting criteria are met. Hedge accounting treatment allows unrealized gains and losses on cash flow hedges to be deferred in other comprehensive income. Realized gains and losses from the Company's oil and gas cash flow hedges, including terminated contracts, are generally recognized in oil and gas production revenues when the forecasted transaction occurs. Gains and losses from the change in fair value of derivative instruments that do not qualify for hedge accounting are reported in current-period income as "Other" under "Revenues and Other" in the statement of consolidated operations. If at any time the likelihood of occurrence of a hedged forecasted transaction ceases to be "probable," hedge accounting treatment will cease on a prospective basis, and all future changes in the fair value of the derivative will be recognized directly in earnings. Amounts recorded in other comprehensive income prior to the change in the likelihood of occurrence of the forecasted transaction will remain in other comprehensive income until such time as the forecasted transaction impacts earnings. If it becomes probable that the original forecasted production will not occur, then the derivative gain or loss would be reclassified from accumulated other comprehensive income into earnings immediately. Hedge effectiveness is measured at least quarterly based on the relative changes in fair value between the derivative contract and the hedged item over time, and any ineffectiveness is immediately reported as "Other" under "Revenues and Other" in the statement of consolidated operations.

F-13

**APACHE CORPORATION AND SUBSIDIARIES**

**NOTES TO CONSOLIDATED FINANCIAL STATEMENTS — (Continued)**

**General and Administrative Expense**

General and administrative expenses are reported net of recoveries from owners in properties operated by Apache and net of amounts related to lease operating activities or capitalized pursuant to the full-cost method of accounting.

**Income Taxes**

Apache records deferred tax assets and liabilities to account for the expected future tax consequences of events that have been recognized in the financial statements and tax returns. The Company routinely assesses the realizability of its deferred tax assets. If the Company concludes that it is more likely than not that some or all of the deferred tax assets will not be realized, the tax asset is reduced by a valuation allowance. Numerous judgments and assumptions are inherent in the determination of future taxable income, including factors such as future operating conditions (particularly as related to prevailing oil and gas prices) and changing tax laws.

Earnings from Apache's international operations are permanently reinvested; therefore, the Company does not recognize U.S. deferred taxes on the unremitted earnings of its international subsidiaries. If it becomes apparent that any of the unremitted earnings will be remitted, the Company will then recognize taxes on those earnings.

**Foreign Currency Transaction Gains and Losses**

The U.S. dollar is the functional currency for each of Apache's international operations. The functional currency is determined country-by-country based on relevant facts and circumstances of the cash flows, commodity pricing environment and financing arrangements in each country. Foreign currency transaction gains and losses arise when monetary assets and liabilities denominated in foreign currencies are remeasured to their U.S. dollar equivalent at the exchange rate in effect at the end of each reporting period. Foreign currency gains and losses also arise when revenue and disbursement transactions denominated in a country's local currency are converted to a U.S. dollar equivalent based on the average exchange rates during the reporting period.

The Company accounts for foreign currency gains and losses in accordance with ASC Topic 830, "Foreign Currency Matters." Foreign currency transaction gains and losses related to current taxes payable and deferred tax liabilities are recorded as components of the provision for income taxes. In 2012, the Company recorded a net tax expense of $16 million, including a current tax expense of $26 million and deferred tax benefit of $10 million. Included in deferred tax benefit for 2012 is approximately $11 million of tax benefit attributable to realized foreign currency transactions. In 2011, the Company recorded a net tax benefit of $66 million, including a current tax expense of $1 million and deferred tax benefit of $67 million. Included in deferred tax benefit for 2011 is approximately $6 million of tax expense attributable to realized foreign currency transactions. In 2010, the Company recorded net tax expense of $111 million, including a current tax expense of $2 million and deferred tax expense of $109 million. Included in deferred tax expense for 2010 is approximately $57 million of tax expense attributable to realized foreign currency transactions. For further discussion, see Note 7 — Income Taxes. All other foreign currency transaction gains and losses are reflected in "Other" under Revenues and Other in the statement of consolidated operations. The Company's other foreign currency gains and losses netted to a gain in 2012 and 2011 of $24 million and $4 million, respectively, and a loss of $39 million in 2010.

**Insurance Coverage**

The Company recognizes an insurance receivable when collection of the receivable is deemed probable. Any recognition of an insurance receivable is recorded by crediting and offsetting the original charge. Any differential arising between insurance recoveries and insurance receivables is recorded as a capitalized cost or as an expense, consistent with its original treatment.

F-14

APACHE CORPORATION AND SUBSIDIARIES

NOTES TO CONSOLIDATED FINANCIAL STATEMENTS — (Continued)

**Earnings Per Share**

The Company's basic earnings per share (EPS) amounts have been computed based on the weighted-average number of shares of common stock outstanding for the period. Diluted EPS reflects the potential dilution, using the treasury stock method, which assumes that options were exercised and restricted stock was fully vested. The diluted EPS calculation includes additional shares of common stock from the assumed conversion of Apache's convertible preferred stock.

**Stock-Based Compensation**

The Company accounts for stock-based compensation under the fair value recognition provisions of ASC Topic 718, "Compensation — Stock Compensation." The Company grants various types of stock-based awards including stock options, nonvested restricted stock units, and performance-based awards. Additionally, the Company also grants cash-based stock appreciation rights. These plans and related accounting policies are defined and described more fully in Note 10 — Capital Stock. Stock compensation awards granted are valued on the date of grant and are expensed, net of estimated forfeitures, over the required service period.

ASC Topic 718 also requires that benefits of tax deductions in excess of recognized compensation cost be reported as financing cash flows rather than as operating cash flows. The Company classified $4 million, $32 million, and $28 million as financing cash inflows in 2012, 2011, and 2010, respectively.

**Treasury Stock**

The Company follows the weighted-average-cost method of accounting for treasury stock transactions.

**New Pronouncements Issued But Not Yet Adopted**

In December 2011, the Financial Accounting Standards Board (FASB) issued Accounting Standards Update (ASU) No. 2011-11, which increases disclosures about offsetting assets and liabilities. New disclosures are required to enable users of financial statements to understand significant quantitative differences in balance sheets prepared under U.S. GAAP and International Financial Reporting Standards (IFRS) related to the offsetting of financial instruments. The existing U.S. GAAP guidance allowing balance sheet offsetting, including industry-specific guidance, remains unchanged. ASU No. 2013-01, released in January 2013, offers clarification on the scope of ASU No. 2011-11 as it applies to derivatives accounted for in accordance with Topic 815. The guidance in ASU No. 2011-11 and No. 2013-01 is effective for annual and interim reporting periods beginning on or after January 1, 2013. The disclosures should be applied retrospectively for all prior periods presented. The Company does not expect the adoption of this amendment to impact its consolidated financial statements.

In February 2013, the FASB issued ASU No. 2013-02, which requires preparers to report, in one place, information about reclassifications out of accumulated other comprehensive income (AOCI). The ASU also requires companies to report changes in AOCI balances. The guidance in ASU No. 2013-02 is effective for annual and interim periods beginning after December 15, 2012. The Company does not expect the adoption of this amendment to impact its consolidated financial statements.

F-15

APACHE CORPORATION AND SUBSIDIARIES

NOTES TO CONSOLIDATED FINANCIAL STATEMENTS — (Continued)

## 2.   ACQUISITIONS AND DIVESTITURES

### 2012 Activity

#### *Cordillera Energy Partners III, LLC Acquisition*

On April 30, 2012, Apache completed the acquisition of Cordillera Energy Partners III, LLC (Cordillera), a privately-held exploration and production company, in a stock and cash transaction. Cordillera's properties include approximately 312,000 net acres in the Granite Wash, Tonkawa, Cleveland, and Marmaton plays in western Oklahoma and the Texas Panhandle. The effective date of the transaction was September 1, 2011.

Apache issued 6,272,667 shares of common stock and paid approximately $2.7 billion of cash to the sellers as consideration for the transaction. The cash paid at closing was funded with a portion of the proceeds from the Company's April 2012 public note offering. For further discussion of this equity issuance, please see Note 10 — Capital Stock of this Form 10-K. For further discussion of the note offering, please see Note 6 — Debt and Financing Costs of this Form 10-K.

The transaction was accounted for using the acquisition method of accounting, which requires, among other things, that assets acquired and liabilities assumed be recognized at their fair values as of the acquisition date. The following table summarizes the final estimates of the assets acquired and liabilities assumed in the acquisition.

|  | (In millions) |
|---|---:|
| Current assets | $        39 |
| Proved properties | 1,040 |
| Unproved properties | 2,299 |
| Gathering, transmission, and processing facilities | 1 |
| Goodwill [1] | 173 |
| Deferred tax asset | 64 |
| Total assets acquired | $   3,616 |
| Current liabilities | 88 |
| Deferred income tax liabilities | 237 |
| Other long-term obligations | 5 |
| Total liabilities assumed | $      330 |
| Net assets acquired | $   3,286 |

---

[1]   Goodwill was the excess of the consideration transferred over the net assets recognized and represents the future economic benefits arising from assets acquired that could not be individually identified and separately recognized. Goodwill is not deductible for tax purposes.

#### *Yara Pilbara Holdings Pty Limited Acquisition*

On January 31, 2012, a subsidiary of Apache Energy Limited completed the acquisition of a 49-percent interest in Yara Pilbara Holdings Pty Limited (YPHPL, formerly Burrup Holdings Limited) for $439 million, including working capital adjustments. The transaction was funded with debt. YPHPL is the owner of an ammonia plant on the Burrup Peninsula of Western Australia. Apache has supplied gas to the plant since operations commenced in 2006. Yara Australia Pty Ltd (Yara) owns the remaining 51 percent of YPHPL and operates the plant. In addition, Apache also acquired an interest in a planned technical ammonia nitrate plant to

F-16

**APACHE CORPORATION AND SUBSIDIARIES**

**NOTES TO CONSOLIDATED FINANCIAL STATEMENTS — (Continued)**

be developed with Yara and Orica Limited. The investment in YPHPL is accounted for under the equity method of accounting, with the balance recorded as a component of "Deferred charges and other" in Apache's consolidated balance sheet and results of operations recorded as a component of "Other" under "Revenues and Other" in the Company's statement of consolidated operations.

## 2011 Activity

### *Mobil North Sea Limited Acquisition*

On December 30, 2011, Apache completed the acquisition of Mobil North Sea Limited (Mobil North Sea). The assets acquired include: operated interests in the Beryl, Nevis, Nevis South, Skene, and Buckland fields; operated interest in the Beryl/Brae gas pipeline and the SAGE gas plant; non-operated interests in the Maclure, Scott, and Telford fields; and Benbecula (west of Shetlands) exploration acreage. This acquisition was funded with existing cash on hand.

The transaction was accounted for using the acquisition method of accounting. The following table summarizes the final estimates of the assets acquired and liabilities assumed in the acquisition.

| | (In millions) |
|---|---:|
| Current assets | $    219 |
| Proved properties | 2,341 |
| Unproved properties | 476 |
| Gathering, transmission, and processing facilities | 338 |
| Goodwill [1] | 84 |
| Total assets acquired | $  3,458 |
| Current liabilities | 148 |
| Asset retirement obligation | 517 |
| Deferred income tax liabilities | 1,546 |
| Other long-term obligations | 1 |
| Total liabilities assumed | $  2,212 |
| Net assets acquired | $  1,246 |

---

[1] Goodwill was the excess of the consideration transferred over the net assets recognized and represents the future economic benefits arising from assets acquired that could not be individually identified and separately recognized. Goodwill is not deductible for tax purposes.

## 2010 Activity

### *Gulf of Mexico Shelf Acquisition*

In June 2010, Apache completed an acquisition of oil and gas assets on the Gulf of Mexico shelf from Devon Energy Corporation (Devon) for $1.05 billion, subject to normal post-closing adjustments. The acquisition was effective January 1, 2010, and was funded primarily from existing cash balances.

### *BP Acquisitions*

In July 2010, Apache entered into three definitive purchase and sale agreements to acquire properties from subsidiaries of BP plc (collectively referred to as "BP") for aggregate consideration of $7.0 billion. The effective

F-17

**APACHE CORPORATION AND SUBSIDIARIES**

**NOTES TO CONSOLIDATED FINANCIAL STATEMENTS — (Continued)**

date of the transactions was July 1, 2010. The acquisition of BP's oil and gas operations, related infrastructure and acreage in the Permian Basin of west Texas and New Mexico was completed on August 10, 2010, for an agreed-upon purchase price of $3.1 billion. Apache completed the acquisition of substantially all of BP's western Canadian upstream natural gas assets on October 8, 2010, for $3.25 billion. On November 4, 2010, the Company completed the acquisition of BP's interests in four development licenses and one exploration concession in the Western Desert of Egypt for $650 million. Preferential purchase rights for $658 million of the value of the Permian Basin properties were exercised, and accordingly, the aggregate purchase price for all three transactions was reduced to approximately $6.4 billion, subject to normal post-closing adjustments.

The acquisitions were funded with a combination of common stock, mandatory convertible preferred shares, new term debt, commercial paper and existing cash balances.

### Mariner Energy, Inc. Merger

In November 2010, Apache acquired Mariner Energy, Inc. (Mariner), an independent exploration and production company, in a stock and cash transaction totaling $2.7 billion and assumed approximately $1.7 billion of Mariner's debt. Mariner's oil and gas properties are primarily located in the Gulf of Mexico deepwater and shelf, the Permian Basin, and onshore in the Gulf Coast region. The transaction was accounted for using the acquisition method of accounting, which requires that assets acquired and liabilities assumed be recognized at their fair values as of the acquisition date. There were no significant changes to the purchase price subsequent to completion of the acquisition.

### Actual and Pro Forma Impact of Acquisitions (Unaudited)

Revenues attributable to the Devon acquisition, BP acquisitions, and Mariner merger included in Apache's statement of consolidated operations for the year ended December 31, 2010, were $197 million, $308 million, and $95 million, respectively. Direct expenses attributable to the acquisitions and merger included in the statement of consolidated operations for the same period were $39 million, $78 million, and $26 million, respectively.

The following table presents pro forma information for Apache as if the acquisition of properties from Devon and BP and the Mariner merger occurred on January 1, 2010:

|  | For the Year Ended December 31, 2010 |
| --- | --- |
|  | (In millions, except per share amounts) |
| Revenues and Other | $   13,780 |
| Net Income (Loss) | $     3,364 |
| Preferred Stock Dividends | 76 |
| Income (Loss) Attributable to Common Stock | $     3,288 |
| Net Income (Loss) per Common Share — Basic | $       8.62 |
| Net Income (Loss) per Common Share — Diluted | $       8.52 |

The historical financial information was adjusted to give effect to the pro forma events that were directly attributable to the acquisitions and merger and are factually supportable. The unaudited pro forma consolidated results are not necessarily indicative of what the Company's consolidated results of operations actually would

F-18

**APACHE CORPORATION AND SUBSIDIARIES**

**NOTES TO CONSOLIDATED FINANCIAL STATEMENTS — (Continued)**

have been had the acquisitions and merger been completed on January 1, 2010. In addition, the unaudited pro forma consolidated results do not purport to project the future results of operations of the combined company. The unaudited pro forma consolidated results reflect the following pro forma adjustments:

- Adjustment to recognize incremental DD&A expense, using the UOP method, resulting from the purchase of the properties;

- Adjustment to recognize adjusted general and administrative expense as a result of the purchase of the properties;

- Adjustment to recognize issuance of $1.5 billion principal amount of senior unsecured 5.1-percent notes maturing September 1, 2040, associated deferred financing cost amortization, and interest expense, net of amounts capitalized;

- Adjustment to recognize asset retirement obligation accretion on properties acquired;

- Adjustment to recognize a pro forma income tax provision;

- Adjustment to recognize the issuance of 26.45 million shares of Apache common stock to partially fund the BP acquisitions and 17.3 million shares to partially fund the Mariner merger;

- Adjustment to recognize the issuance of 25.3 million depositary shares each representing a 1/20th interest in a share of Apache's 6.00-percent Mandatory Convertible Preferred Stock, Series D, issued to fund a portion of the BP acquisitions;

- Adjustment to recognize additional dividends associated with the issuance of 6.00-percent Mandatory Convertible Preferred Stock; and

- Elimination of transaction costs incurred in 2010 that are directly related to the transactions and do not have a continuing impact on the combined company's operating results.

**Merger, Acquisitions & Transition Expenses**

In 2012, Apache recorded $31 million of expenses reflecting additional costs related to our 2011 acquisition of Mobil North Sea Limited and expenses associated with our 2012 acquisition of Cordillera. In 2011, Apache recorded $20 million of expenses primarily for separation and other costs related to the Mariner merger and the acquisition of Mobil North Sea. In 2010, the Company recorded $183 million of expenses in connection with the acquisition of properties from BP and the Mariner merger: $114 million of separation and other costs; $42 million of investment banking fees; and $27 million of other expenses related to the transactions.

## 3.   DERIVATIVE INSTRUMENTS AND HEDGING ACTIVITIES

### Objectives and Strategies

The Company is exposed to fluctuations in crude oil and natural gas prices on the majority of its worldwide production. Apache manages the variability in its cash flows by occasionally entering into derivative transactions on a portion of its crude oil and natural gas production. The Company utilizes various types of derivative financial instruments, including swaps and options, to manage fluctuations in cash flows resulting from changes in commodity prices.

### Counterparty Risk

The use of derivative instruments exposes the Company to counterparty credit risk, or the risk that a counterparty will be unable to meet its commitments. To reduce the concentration of exposure to any individual counterparty, Apache utilizes a diversified group of investment-grade rated counterparties, primarily financial

F-19

**APACHE CORPORATION AND SUBSIDIARIES**

**NOTES TO CONSOLIDATED FINANCIAL STATEMENTS — (Continued)**

institutions, for its derivative transactions. As of December 31, 2012, Apache had derivative positions with 15 counterparties. The Company monitors counterparty creditworthiness on an ongoing basis; however, it cannot predict sudden changes in counterparties' creditworthiness. In addition, even if such changes are not sudden, the Company may be limited in its ability to mitigate an increase in counterparty credit risk. Should one of these counterparties not perform, Apache may not realize the benefit of some of its derivative instruments resulting from lower commodity prices.

The Company executes commodity derivative transactions under master agreements that have netting provisions that provide for offsetting payables against receivables. In general, if a party to a derivative transaction incurs a material deterioration in its credit ratings, as defined in the applicable agreement, the other party has the right to demand the posting of collateral, demand a transfer, or terminate the arrangement.

## Derivative Instruments

As of December 31, 2012, Apache had the following open crude oil derivative positions:

| | Fixed-Price Swaps | | Collars | | |
| | | Weighted | | Weighted | Weighted |
| | | Average | | Average | Average |
| Production Period | Mbbls [2] | Fixed Price [1] | Mbbls [2] | Floor Price [1] | Ceiling Price [1] |
|---|---|---|---|---|---|
| 2013 | 40,292 | $ 97.31 | 5,701 | $ 82.84 | $ 111.63 |
| 2014 | 76 | 74.50 | — | — | — |

[1] Crude oil prices represent a weighted average of several contracts entered into on a per-barrel basis. Crude oil contracts are primarily settled against NYMEX WTI Cushing Index and Platts Dated Brent. Approximately 50 percent of 2013 contracts are settled against Dated Brent.

[2] For 2013, fixed-price swaps of 38,320 Mbbls have not been designated as cash flow hedges, and changes in fair value are reflected directly in earnings. All other derivative positions have been designated as cash flow hedges.

As of December 31, 2012, Apache had the following open natural gas derivative positions which have all been designated as cash flow hedges:

| | Fixed-Price Swaps | | Collars | | |
| | MMBtu | Weighted | MMBtu | Weighted | Weighted |
| | (in 000's) | Average | (in 000's) | Average | Average |
| Production Period | | Fixed Price [1] | | Floor Price [1] | Ceiling Price [1] |
|---|---|---|---|---|---|
| 2013 | 10,095 | $ 6.74 | 6,825 | $ 5.35 | $ 6.67 |
| 2014 | 1,295 | $ 6.72 | — | $ — | $ — |

[1] U.S. natural gas prices represent a weighted average of several contracts entered into on a per-million British thermal units (MMBtu) basis and are settled against NYMEX Henry Hub.

## Fair Value Measurements

### *Commodity Derivative Instruments*

Apache's commodity derivative instruments consist of variable-to-fixed price commodity swaps and options. The fair values of the Company's derivative instruments are not actively quoted in the open market. The Company uses a market approach to estimate the fair values of its derivative instruments, utilizing commodity futures price strips for the underlying commodities provided by a reputable third party. These valuations are Level 2 inputs.

F-20

APACHE CORPORATION AND SUBSIDIARIES

NOTES TO CONSOLIDATED FINANCIAL STATEMENTS — (Continued)

The following table presents the Company's derivative assets and liabilities measured at fair value on a recurring basis:

| | Fair Value Measurements Using | | | | | |
| | Quoted Price in Active Markets (Level 1) | Significant Other Inputs (Level 2) | Significant Unobservable Inputs (Level 3) | Total Fair Value | Netting [1] | Carrying Amount |
|---|---|---|---|---|---|---|
| | | | (In millions) | | | |
| **December 31, 2012** | | | | | | |
| Assets: | | | | | | |
| Commodity Derivative Instruments | $— | $ 48 | $— | $ 48 | $ (15) | $ 33 |
| Liabilities: | | | | | | |
| Commodity Derivative Instruments | — | 131 | — | 131 | (15) | 116 |
| **December 31, 2011** | | | | | | |
| Assets: | | | | | | |
| Commodity Derivative Instruments | $— | $ 428 | $— | $428 | $ (96) | $ 332 |
| Liabilities: | | | | | | |
| Commodity Derivative Instruments | — | 250 | — | 250 | (96) | 154 |

[1] The derivative fair values are based on analysis of each contract on a gross basis, even where the legal right of offset exists.

The Company accounts for derivative instruments and hedging activity in accordance with ASC Topic 815, "Derivatives and Hedging," and all derivative instruments are reflected as either assets or liabilities at fair value in the consolidated balance sheet. These fair values are recorded by netting asset and liability positions where counterparty master netting arrangements contain provisions for net settlement. The fair market value of the Company's derivative assets and liabilities and their locations on the consolidated balance sheet are as follows:

| | December 31, 2012 | | December 31, 2011 |
|---|---|---|---|
| | | (In millions) | |
| Current Assets: Derivative instruments | $ 31 | | $ 304 |
| Other Assets: Deferred charges and other | 2 | | 28 |
| Total Assets | $ 33 | | $ 332 |
| Current Liabilities: Derivative instruments | $ 116 | | $ 113 |
| Noncurrent Liabilities: Other | — | | 41 |
| Total Liabilities | $ 116 | | $ 154 |

F-21

**APACHE CORPORATION AND SUBSIDIARIES**

**NOTES TO CONSOLIDATED FINANCIAL STATEMENTS — (Continued)**

**Derivative Activity Recorded in Statement of Consolidated Operations**

The following table summarizes the effect of derivative instruments on the Company's statement of consolidated operations:

| | Gain (Loss) on Derivatives Recognized in Income | For the Year Ended December 31, | | |
|---|---|---|---|---|
| | | 2012 | 2011 | 2010 |
| | | | (In millions) | |
| Gain (loss) on cash flow hedges reclassified from accumulated other comprehensive loss | Oil and Gas Production Revenues | $268 | $(13) | $165 |
| Gain (loss) for ineffectiveness on cash flow hedges | Revenues and Other: Other | $ — | $ 2 | $ (2) |
| Loss on derivatives not designated as cash flow hedges | Revenues and Other: Other | $(79) | $ — | $ — |

**Derivative Activity in Accumulated Other Comprehensive Income (Loss)**

As of December 31, 2012, a portion of the Company's derivative instruments were designated as cash flow hedges in accordance with ASC Topic 815. A reconciliation of the components of accumulated other comprehensive income (loss) in the statement of consolidated shareholders' equity related to Apache's cash flow hedges is presented in the table below:

| | For the Year Ended December 31, | | | | | |
|---|---|---|---|---|---|---|
| | 2012 | | 2011 | | 2010 | |
| | Before tax | After tax | Before tax | After tax | Before tax | After tax |
| | | | (In millions) | | | |
| Unrealized gain (loss) on derivatives at beginning of year | $ 145 | $ 114 | $ (54) | $ (19) | $ (267) | $ (170) |
| Realized amounts reclassified into earnings | (268) | (199) | 13 | 19 | (165) | (106) |
| Net change in derivative fair value | 113 | 79 | 188 | 115 | 376 | 256 |
| Ineffectiveness reclassified into earnings | — | — | (2) | (1) | 2 | 1 |
| Unrealized gain (loss) on derivatives at end of period | $ (10) | $ (6) | $ 145 | $ 114 | $ (54) | $ (19) |

Gains and losses on existing hedges will be realized in future earnings through mid-2014, in the same period as the related sales of natural gas and crude oil production. Included in accumulated other comprehensive loss as of December 31, 2012, is a net loss of approximately $12 million ($7 million after tax) that applies to the next 12 months; however, estimated and actual amounts are likely to vary materially as a result of changes in market conditions.

F-22

**APACHE CORPORATION AND SUBSIDIARIES**

**NOTES TO CONSOLIDATED FINANCIAL STATEMENTS — (Continued)**

## 4.   OTHER CURRENT LIABILITIES

The following table provides detail of the Company's other current liabilities at December 31, 2012 and 2011:

|  | December 31, 2012 | December 31, 2011 |
|---|---|---|
|  | (In millions) |  |
| Accrued operating expenses | $ 211 | $ 221 |
| Accrued exploration and development | 1,792 | 1,430 |
| Accrued compensation and benefits | 198 | 180 |
| Accrued interest | 160 | 135 |
| Accrued income taxes | 297 | 533 |
| Accrued U.K. Petroleum Revenue Tax | 53 | 284 |
| Other | 149 | 141 |
| Total Other current liabilities | $ 2,860 | $ 2,924 |

## 5.   ASSET RETIREMENT OBLIGATION

The following table describes changes to the Company's asset retirement obligation (ARO) liability for the years ended December 31, 2012 and 2011:

|  | 2012 | 2011 |
|---|---|---|
|  | (In millions) |  |
| Asset retirement obligation at beginning of year | $3,887 | $2,872 |
| Liabilities incurred | 592 | 419 |
| Liabilities acquired | 72 | 592 |
| Liabilities settled | (550) | (549) |
| Accretion expense | 232 | 154 |
| Revisions in estimated liabilities | 345 | 399 |
| Asset retirement obligation at end of year | 4,578 | 3,887 |
| Less current portion | (478) | (447) |
| Asset retirement obligation, long-term | $4,100 | $3,440 |

The ARO liability reflects the estimated present value of the amount of dismantlement, removal, site reclamation, and similar activities associated with Apache's oil and gas properties. The Company utilizes current retirement costs to estimate the expected cash outflows for retirement obligations. The Company estimates the ultimate productive life of the properties, a risk-adjusted discount rate, and an inflation factor in order to determine the current present value of this obligation. To the extent future revisions to these assumptions impact the present value of the existing ARO liability, a corresponding adjustment is made to the oil and gas property balance.

During 2012, the company recorded $592 million in abandonment liabilities resulting from Apache's active exploration and development capital program. An additional $72 million of abandonment obligations were recognized on properties acquired during the year. An additional $345 million of abandonment costs were recognized for upward revisions to prior-year estimates of timing and costs, particularly in Australia and Canada.

F-23

**APACHE CORPORATION AND SUBSIDIARIES**

**NOTES TO CONSOLIDATED FINANCIAL STATEMENTS — (Continued)**

Liabilities settled primarily relate to individual properties, platforms, and facilities plugged and abandoned during the period. Apache continues to have an active abandonment program that is focused in the U.S. Gulf of Mexico and Canada. The Company's level of abandonment activity is expected to continue, and $478 million has been recorded as a current liability to reflect our estimated expenditures over the next 12 months.

## 6.   DEBT

### Overview

All of the Company's debt is senior unsecured debt and has equal priority with respect to the payment of both principal and interest. The indentures for the notes described below place certain restrictions on the Company, including limits on Apache's ability to incur debt secured by certain liens and its ability to enter into certain sale and leaseback transactions. Upon certain changes in control, all of these debt instruments would be subject to mandatory repurchase, at the option of the holders. None of the indentures for the notes contain prepayment obligations in the event of a decline in credit ratings.

In April 2012 the Company issued $400 million principal amount of senior unsecured 1.75-percent notes maturing April 15, 2017, $1.1 billion principal amount of senior unsecured 3.25-percent notes maturing April 15, 2022, and $1.5 billion principal amount of senior unsecured 4.75-percent notes maturing April 15, 2043. The notes are redeemable, as a whole or in part, at Apache's option, subject to a make-whole premium. The Company used the proceeds to fund the cash portion of the purchase price paid to acquire Cordillera, repay the $400 million 6.25-percent notes that matured on April 15, 2012, and for general corporate purposes.

In December 2012 the Company issued $1.2 billion principal amount of senior unsecured 2.625-percent notes maturing January 15, 2023 and $800 million principal amount of senior unsecured 4.25-percent notes maturing January 15, 2044. The notes are redeemable, as a whole or in part, at Apache's option, subject to a make-whole premium. The Company used the proceeds to repay commercial paper borrowings and for general corporate purposes.

F-24

**APACHE CORPORATION AND SUBSIDIARIES**

**NOTES TO CONSOLIDATED FINANCIAL STATEMENTS — (Continued)**

The following table presents the carrying value of the Company's debt at December 31, 2012 and 2011:

| | December 31, | |
|---|---|---|
| | 2012 | 2011 |
| | (In millions) | |
| **U.S.:** | | |
| Money market lines of credit | $ 13 | $ — |
| Commercial paper | 489 | — |
| 6.25% notes due 2012 [1] | — | 400 |
| 5.25% notes due 2013 [1] | 500 | 500 |
| 6.0% notes due 2013 [1] | 400 | 400 |
| 5.625% notes due 2017 [1] | 500 | 500 |
| 1.75% notes due 2017 [1] | 400 | — |
| 6.9% notes due 2018 [1] | 400 | 400 |
| 7.0% notes due 2018 | 150 | 150 |
| 7.625% notes due 2019 | 150 | 150 |
| 3.625% notes due 2021 [1] | 500 | 500 |
| 3.25% notes due 2022 [1] | 1,100 | — |
| 2.625% notes due 2023 [1] | 1,200 | — |
| 7.7% notes due 2026 | 100 | 100 |
| 7.95% notes due 2026 | 180 | 180 |
| 6.0% notes due 2037 [1] | 1,000 | 1,000 |
| 5.1% notes due 2040 [1] | 1,500 | 1,500 |
| 5.25% notes due 2042 [1] | 500 | 500 |
| 4.75% notes due 2043 [1] | 1,500 | — |
| 4.25% notes due 2044 [1] | 800 | — |
| 7.375% debentures due 2047 | 150 | 150 |
| 7.625% debentures due 2096 | 150 | 150 |
| | 11,682 | 6,580 |
| **Subsidiary and other obligations:** | | |
| Argentina overdraft lines of credit | 69 | 31 |
| Canada lines of credit | 9 | — |
| Apache Finance Canada 4.375% notes due 2015 [1] | 350 | 350 |
| Notes due in 2016 and 2017 | 1 | 1 |
| Apache Finance Canada 7.75% notes due 2029 | 300 | 300 |
| | 729 | 682 |
| Debt before unamortized discount | 12,411 | 7,262 |
| Unamortized discount | (66) | (46) |
| Total debt | $12,345 | $7,216 |
| Current maturities | $ (990) | $ (431) |
| Long-term debt | $11,355 | $6,785 |

[1] These notes are redeemable, as a whole or in part, at Apache's option, subject to a make-whole premium. The remaining notes and debentures are not redeemable.

F-25

**APACHE CORPORATION AND SUBSIDIARIES**

**NOTES TO CONSOLIDATED FINANCIAL STATEMENTS — (Continued)**

Debt maturities as of December 31, 2012, excluding discounts, are as follows:

|  | (In millions) |
|---|---|
| 2013 | $ 991 |
| 2014 | — |
| 2015 | 350 |
| 2016 | 1 |
| 2017 | 1,389 |
| Thereafter | 9,680 |
| Total Debt, excluding discounts | $ 12,411 |

### Fair Value

The Company's debt is recorded at the carrying amount on its consolidated balance sheet. The carrying amount of the Company's money market lines of credit and commercial paper approximate fair value because the interest rates are variable and reflective of market rates. Apache uses a market approach to determine the fair value of its fixed-rate debt using estimates provided by an independent investment financial data services firm, which is a Level 2 fair value measurement.

|  | December 31, 2012 | | December 31, 2011 | |
|---|---|---|---|---|
|  | Carrying Amount | Fair Value | Carrying Amount | Fair Value |
|  | (In millions) | | | |
| Money market lines of credit | $ 91 | $ 91 | $ 31 | $ 31 |
| Commercial paper | 489 | 489 | — | — |
| Notes and debentures | 11,765 | 13,340 | 7,185 | 8,673 |
| Total Debt | $12,345 | $13,920 | $ 7,216 | $8,704 |

### Money Market and Overdraft Lines of Credit

The Company has certain uncommitted money market and overdraft lines of credit that are used from time to time for working capital purposes. As of December 31, 2012, $91 million was drawn on facilities in the U.S., Argentina, and Canada. As of December 31, 2011, $31 million was drawn on facilities in Argentina.

### Unsecured Committed Bank Credit Facilities

As of December 31, 2012, the Company had unsecured committed revolving syndicated bank credit facilities totaling $3.3 billion, of which $1.0 billion matures in August 2016 and $2.3 billion matures in June 2017. The facilities consist of a $1.7 billion facility and a $1.0 billion facility for the U.S., a $300 million facility in Australia, and a $300 million facility in Canada. As of December 31, 2012, available borrowing capacity under the Company's credit facilities was $2.8 billion. The committed credit facilities are used to support Apache's commercial paper program.

On June 4, 2012, the Company entered into a new Global Credit Facility consisting of a $1.7 billion revolving syndicated bank credit facility for the U.S., a $300 million revolving syndicated bank credit facility for Australia, and a $300 million revolving syndicated bank credit facility for Canada, which replaced the Company's existing syndicated bank credit facilities that were scheduled to mature in May 2013. The new facilities are scheduled to mature on June 4, 2017. There were no changes to the Company's $1.0 billion U.S. credit facility that matures on August 12, 2016.

F-26

**APACHE CORPORATION AND SUBSIDIARIES**

**NOTES TO CONSOLIDATED FINANCIAL STATEMENTS — (Continued)**

At the Company's option, the interest rate for the facilities is based on a base rate, as defined, or the London Inter-bank Offered Rate (LIBOR) plus a margin determined by the Company's senior long-term debt rating. The $1.7 billion credit facility also allows the Company to borrow under competitive auctions.

At December 31, 2012, the margin over LIBOR for committed loans was 0.875 percent on the $1.0 billion U.S. credit facility and 0.90 percent on each of the $1.7 billion U.S. credit facility, the $300 million Australian credit facility, and the $300 million Canadian credit facility. The Company also pays quarterly facility fees of 0.125 percent on the total amount of the $1.0 billion U.S. facility and 0.10 percent on the total amount of the other three facilities. The facility fees vary based upon the Company's senior long-term debt rating.

The financial covenants of the credit facilities require the Company to maintain a debt-to-capitalization ratio of not greater than 60 percent at the end of any fiscal quarter. At December 31, 2012, the Company's debt-to-capitalization ratio was 28 percent.

The negative covenants include restrictions on the Company's ability to create liens and security interests on its assets, with exceptions for liens typically arising in the oil and gas industry, purchase money liens, and liens arising as a matter of law, such as tax and mechanics' liens. The Company may incur liens on assets located in the U.S. and Canada of up to 5 percent of the Company's consolidated assets, or approximately $3.0 billion as of December 31, 2012. There are no restrictions on incurring liens in countries other than the U.S. and Canada. There are also restrictions on Apache's ability to merge with another entity, unless the Company is the surviving entity, and a restriction on its ability to guarantee debt of entities not within its consolidated group.

There are no clauses in the facilities that permit the lenders to accelerate payments or refuse to lend based on unspecified material adverse changes. The credit facility agreements do not have drawdown restrictions or prepayment obligations in the event of a decline in credit ratings. However, the agreements allow the lenders to accelerate payments and terminate lending commitments if Apache Corporation, or any of its U.S. or Canadian subsidiaries, defaults on any direct payment obligation in excess of the stated thresholds noted in the agreements or has any unpaid, non-appealable judgment against it in excess of the stated thresholds noted in the agreements.

The Company was in compliance with the terms of the credit facilities as of December 31, 2012.

**Commercial Paper Program**

In June 2012, the Company increased the size of its commercial paper program from $2.95 billion to $3.0 billion. This program generally enables Apache to borrow funds for up to 270 days at competitive interest rates. Apache's 2012 weighted-average interest rate for commercial paper was 0.43 percent. If the Company is unable to issue commercial paper following a significant credit downgrade or dislocation in the market, the Company's committed credit facilities are available as a 100-percent backstop. The commercial paper program is fully supported by available borrowing capacity under committed credit facilities, which expire in 2016 and 2017. As of December 31, 2012, the Company had $489 million in commercial paper outstanding. There was no outstanding commercial paper at December 31, 2011.

**Subsidiary Notes — Apache Finance Canada**

Apache Finance Canada Corporation (Apache Finance Canada) has approximately $300 million of publicly-traded notes due in 2029 and an additional $350 million of publicly traded notes due in 2015 that are fully and unconditionally guaranteed by Apache.

For further discussion of subsidiary debt, please see Note 16 — Supplemental Guarantor Information.

F-27

**APACHE CORPORATION AND SUBSIDIARIES**

**NOTES TO CONSOLIDATED FINANCIAL STATEMENTS — (Continued)**

**Financing Costs, Net**

Financing costs incurred during the periods are composed of the following:

|  | For the Year Ended December 31, | | |
|---|---|---|---|
|  | 2012 | 2011 | 2010 |
|  | | (In millions) | |
| Interest expense | $ 509 | $ 433 | $ 345 |
| Amortization of deferred loan costs | 7 | 5 | 17 |
| Capitalized interest | (334) | (263) | (120) |
| Interest income | (17) | (17) | (13) |
| Financing costs, net | $ 165 | $ 158 | $ 229 |

The Company has $66 million of debt discounts as of December 31, 2012, which will be charged to interest expense over the life of the related debt issuances. Discount amortization of $3 million, $2 million, and $2 million were recorded as interest expense in 2012, 2011, and 2010, respectively.

As of December 31, 2012 and 2011, the Company had approximately $118 million and $48 million, respectively, of unamortized deferred loan costs associated with its various debt obligations. These costs are included in deferred charges and other in the accompanying consolidated balance sheet and are being charged to financing costs and expensed over the life of the related debt issuances.

**7.   INCOME TAXES**

Income before income taxes is composed of the following:

|  | For the Year Ended December 31, | | |
|---|---|---|---|
|  | 2012 | 2011 | 2010 |
|  | | (In millions) | |
| U.S. | $ 1,605 | $ 2,373 | $ 1,328 |
| Foreign | 3,272 | 5,720 | 3,878 |
| Total | $ 4,877 | $ 8,093 | $ 5,206 |

The total provision for income taxes consists of the following:

|  | For the Year Ended December 31, | | |
|---|---|---|---|
|  | 2012 | 2011 | 2010 |
|  | | (In millions) | |
| Current taxes: | | | |
| Federal | $ (150) | $ 64 | $ 25 |
| State | — | 2 | 4 |
| Foreign | 2,349 | 2,197 | 1,193 |
|  | 2,199 | 2,263 | 1,222 |
| Deferred taxes: | | | |
| Federal | 596 | 656 | 431 |
| State | 10 | 17 | 7 |
| Foreign | 71 | 573 | 514 |
|  | 677 | 1,246 | 952 |
| Total | $ 2,876 | $ 3,509 | $ 2,174 |

F-28

**APACHE CORPORATION AND SUBSIDIARIES**

**NOTES TO CONSOLIDATED FINANCIAL STATEMENTS — (Continued)**

A reconciliation of the tax on the Company's income before income taxes and total tax expense is shown below:

| | For the Year Ended December 31, | | |
| --- | --- | --- | --- |
| | 2012 | 2011 | 2010 |
| | | (In millions) | |
| Income tax expense at U.S. statutory rate | $ 1,707 | $ 2,833 | $ 1,822 |
| State income tax, less federal benefit | 6 | 12 | 6 |
| Taxes related to foreign operations | 773 | 568 | 245 |
| Tax credits | (4) | (15) | (8) |
| Non-deductible merger costs | — | — | 6 |
| Current and deferred taxes related to currency fluctuations | 16 | (66) | 111 |
| Increase in U.K. tax rate | 118 | 218 | — |
| Net change in tax contingencies | (115) | (6) | (2) |
| Increase in valuation allowance | 355 | 8 | 12 |
| All other, net | 20 | (43) | (18) |
| | $ 2,876 | $ 3,509 | $ 2,174 |

The net deferred tax liability consists of the following:

| | December 31, | |
| --- | --- | --- |
| | 2012 | 2011 |
| | (In millions) | |
| Deferred tax assets: | | |
| Deferred income | $ (33) | $ (89) |
| Federal and state net operating loss carryforwards | (932) | (236) |
| Foreign net operating loss carryforwards | (61) | (55) |
| Tax credits | (78) | (66) |
| Accrued expenses and liabilities | (2) | (90) |
| Total deferred tax assets | (1,106) | (536) |
| Valuation allowance | 419 | 60 |
| Net deferred tax assets | (687) | (476) |
| Deferred tax liabilities: | | |
| Other | 23 | 21 |
| Depreciation, depletion and amortization | 8,536 | 7,443 |
| Total deferred tax liabilities | 8,559 | 7,464 |
| Net deferred income tax liability | $ 7,872 | $6,988 |

The Company has recorded a valuation allowance against the net deferred tax asset in Canada. The deferred tax position in Canada changed from a net deferred tax liability as of December 31, 2011 to a net deferred tax asset as of December 31, 2012 on $1.9 billion in non-cash ceiling test write-downs. The Company has assessed the realizability of the net deferred tax asset in Canada and has concluded that it is more likely than not that the net deferred tax asset in Canada will not be realized based on current economic conditions.

The Company has not recorded U.S. deferred income taxes on the undistributed earnings of its foreign subsidiaries, as management intends to permanently reinvest such earnings. As of December 31, 2012, the

F-29

**APACHE CORPORATION AND SUBSIDIARIES**

**NOTES TO CONSOLIDATED FINANCIAL STATEMENTS — (Continued)**

undistributed earnings of the foreign subsidiaries amounted to approximately $15.9 billion. Upon distribution of these earnings in the form of dividends or otherwise, the Company may be subject to U.S. income taxes and foreign withholding taxes. It is not practical, however, to estimate the amount of taxes that may be payable on the eventual remittance of these earnings after consideration of available foreign tax credits. Presently, limited foreign tax credits are available to reduce the U.S. taxes on such amounts if repatriated.

On December 31, 2012, the Company had net operating losses as follows:

|  | December 31, 2012 | |
| --- | ---: | ---: |
|  | Amount | Expiration |
|  | (In millions) | |
| Net operating losses: | | |
| U.S. — Federal | $ 2,393 | 2027 |
| U.S. — State | 1,648 | Various |
| Canada | 6 | 2014 |
| Australia | 94 | Indefinite |
| Argentina | 55 | 2013 |

The Company has a federal net operating loss carryforward of $2.4 billion. Included in the federal net operating loss carryforward is $543 million of federal net operating losses related to the merger with Mariner and $183 million of federal net operating losses related to the Cordillera acquisition. The Mariner and Cordillera net operating loss carryforwards are subject to annual limitations under Section 382 of the Internal Revenue Code. The Company also had $170 million of capital loss carryforwards in Canada, which have an indefinite carryover period.

The tax benefits of carryforwards are recorded as assets to the extent that management assesses the utilization of such carryforwards to be "more likely than not." When the future utilization of some portion of the carryforwards is determined to not meet the "more likely than not" standard, a valuation allowance is provided to reduce the tax benefits from such assets. As the Company does not believe the utilization of certain state net operating losses, Argentinian net operating losses, and Canadian capital losses to be "more likely than not," a valuation allowance was provided to reduce the tax benefit from these deferred tax assets.

Apache accounts for income taxes in accordance with ASC Topic 740, "Income Taxes," which prescribes a minimum recognition threshold a tax position must meet before being recognized in the financial statements. A reconciliation of the beginning and ending amount of unrecognized tax benefits is as follows:

|  | 2012 | 2011 | 2010 |
| --- | ---: | ---: | ---: |
|  | | (In millions) | |
| Balance at beginning of year | $ 97 | $110 | $123 |
| Additions based on tax positions related to the current year | — | 13 | (1) |
| Reductions for tax positions of prior years | (29) | (4) | (12) |
| Settlements | (65) | (22) | — |
| Balance at end of year | $ 3 | $ 97 | $110 |

The Company records interest and penalties related to unrecognized tax benefits as a component of income tax expense. Each quarter the Company assesses the amounts provided for and, as a result, may increase (expense) or reduce (benefit) the amount of interest and penalties. During the years ended December 31, 2012,

F-30

**APACHE CORPORATION AND SUBSIDIARIES**

**NOTES TO CONSOLIDATED FINANCIAL STATEMENTS — (Continued)**

2011, and 2010 the Company recorded tax expense of $5 million, $6 million, and $12 million, respectively, for interest and penalties. As of December 31, 2012 and 2011, the Company had approximately $6 million and $42 million, respectively, accrued for payment of interest and penalties.

The Company is under IRS audit for 2009 and 2010 and under audit in various states as well as in most of the Company's foreign jurisdictions as part of its normal course of business. In 2012, the Company reached an agreement with IRS Administrative Appeals office regarding the audits of tax years 2004 through 2008. As a result of this agreement, the Company has reduced the unrecognized tax benefit by $65 million. The resolution of unagreed tax issues in the Company's open tax years cannot be predicted with absolute certainty, and differences between what has been recorded and the eventual outcomes may occur. The Company believes that it has adequately provided for income taxes and any related interest and penalties for all open tax years.

Apache and its subsidiaries are subject to U.S. federal income tax as well as income tax in various states and foreign jurisdictions. The Company's uncertain tax positions are related to tax years that may be subject to examination by the relevant taxing authority. Apache's earliest open tax years in its key jurisdictions are as follows:

| Jurisdiction | |
|---|---|
| U.S. | 2004 |
| Canada | 2008 |
| Egypt | 1998 |
| Australia | 2008 |
| U.K. | 2011 |
| Argentina | 2005 |

## 8.   COMMITMENTS AND CONTINGENCIES

### Legal Matters

Apache is party to various legal actions arising in the ordinary course of business, including litigation and governmental and regulatory controls. The Company has an accrued liability of approximately $12 million for all legal contingencies that are deemed to be probable of occurring and can be reasonably estimated. Apache's estimates are based on information known about the matters and its experience in contesting, litigating, and settling similar matters. Although actual amounts could differ from management's estimate, none of the actions are believed by management to involve future amounts that would be material to Apache's financial position, results of operations, or liquidity after consideration of recorded accruals. For material matters that Apache believes an unfavorable outcome is reasonably possible, the Company has disclosed the nature of the matter and a range of potential exposure, unless an estimate cannot be made at this time. It is management's opinion that the loss for any other litigation matters and claims that are reasonably possible to occur will not have a material adverse effect on the Company's financial position, results of operations, or liquidity.

### *Argentine Environmental Claims*

In connection with the acquisition from Pioneer Natural Resources (Pioneer) in 2006, the Company acquired a subsidiary of Pioneer in Argentina (PNRA) that is involved in various administrative proceedings with environmental authorities in the Neuquén Province relating to permits for and discharges from operations in that province. In addition, PNRA was named in a lawsuit initiated against oil companies operating in the Neuquén basin entitled *Asociación de Superficiarios de la Patagonia v YPF S.A., et. al.* , originally filed on August 21, 2003, in the Argentine National Supreme Court of Justice. The plaintiffs, a private group of landowners known

F-31

**APACHE CORPORATION AND SUBSIDIARIES**

**NOTES TO CONSOLIDATED FINANCIAL STATEMENTS — (Continued)**

as ASSUPA, have also named the national government and several provinces as third parties. The lawsuit alleges injury to the environment generally by the oil and gas industry. The plaintiffs principally seek from all defendants, jointly, (i) the remediation of contaminated sites, of the superficial and underground waters, and of soil that allegedly was degraded as a result of deforestation, (ii) if the remediation is not possible, payment of an indemnification for the material and moral damages claimed from defendants operating in the Neuquén basin, of which PNRA is a small portion, (iii) adoption of all the necessary measures to prevent future environmental damages, and (iv) the creation of a private restoration fund to provide coverage for remediation of potential future environmental damages. Much of the alleged damage relates to operations by the Argentine state oil company, which conducted oil and gas operations throughout Argentina prior to its privatization, which began in 1990. ASSUPA has recently asserted similar lawsuits and claims against numerous oil and gas producers relating to other geographic areas of Argentina, including claims against a Company subsidiary relating to the Austral basin. While the plaintiffs will seek to make all oil and gas companies jointly liable for each other's actions in each of these lawsuits, Company subsidiaries will defend on an individual basis and attempt to require the plaintiffs to delineate damages by company. Company subsidiaries intend to defend each case vigorously. It is not certain exactly what the courts will do in these matters as the lawsuit relating to the Neuquén basin is the first of its kind. While it is possible Company subsidiaries may incur liabilities related to the environmental claims, no reasonable prediction can be made as the Company subsidiaries' exposure related to these lawsuits is not currently determinable.

### U.S. Royalty Litigation

In *Foster v. Apache Corporation* , Civil Action No. CIV-10-0573-HE, in the United States District Court for the Western District of Oklahoma, on August 20, 2012, the United States District Court for the Western District of Oklahoma denied plaintiff's motion for class certification. The plaintiff filed a motion for reconsideration, which was denied, and has petitioned the United States Court of Appeals for the Tenth Circuit to accept an appeal of the District Court's ruling denying class certification. Plaintiffs in the *Foster* case have asserted that they may seek damages of approximately $100 million. No facts have been introduced that would support that amount or any lesser amount. No specific dollar amount has been claimed. Apache intends to vigorously defend against these claims.

In *Joyce Holder Trust v. Apache Corporation* , Civil Action No. 4:11-cv-03872, in the United States District Court for the Southern District of Texas, Houston Division, following a class certification hearing in the United States District Court for the Southern District of Texas, the parties resolved the matter with no material impact on the Company's financial position, results of operations, or liquidity, and with the settlement providing for denial of class certification and dismissal of the case.

### Louisiana Restoration

Numerous surface owners have filed claims or sent demand letters to various oil and gas companies, including Apache, claiming that, under either expressed or implied lease terms or Louisiana law, they are liable for damage measured by the cost of restoration of leased premises to their original condition as well as damages from contamination and cleanup, regardless of the value of the underlying property. Because the Company has continuing operations in Louisiana, from time-to-time restoration lawsuits and claims are resolved by the Company for amounts that are not material to the Company while new lawsuits and claims are asserted against the Company. With respect to each of the pending lawsuits and claims, the amount claimed is not currently determinable or is not material, except that in a lawsuit captioned *Ardoin Limited Partnership et al. v. Meridian Resources & Exploration et al.* , Case No.10-18692, in the District Court of Cameron Parish, Louisiana, the plaintiffs' expert opined that the cost to restore plaintiffs' property would be approximately $61 million. Prior to

F-32

**APACHE CORPORATION AND SUBSIDIARIES**

**NOTES TO CONSOLIDATED FINANCIAL STATEMENTS — (Continued)**

trial the court granted Apache's motions to dismiss the plaintiffs' claims against Apache. Plaintiffs then settled with the other defendant in the case, BP America, Inc. (BP). BP has demanded that Apache indemnify it for the amount of its settlement with plaintiffs, which is not material to Apache. Apache has rejected BP's indemnity claim and, further, Apache has demanded that Wagner Oil Company (which purchased Apache's interest in the subject property) indemnify Apache from and against BP's claim.

In addition to the matters discussed above, in a lawsuit filed on May 4, 2010, against Phoenix Exploration Company LP (Phoenix) captioned *Belle Isle, L.L.C. v. Anadarko Petroleum Corporation et al.*, Docket No. 121742, in the District Court of St. Mary Parish, Louisiana, plaintiff alleges that over three thousand acres of land has been contaminated by oil and gas operations. On August 31, 2011, subsidiaries of Apache acquired 75 percent of the general partner interests and 75 percent of the Class A and Class B limited partner interests in Phoenix. Plaintiff's experts estimated the cost of remediation to be approximately $87 million, and plaintiffs claimed additional damages for canal restoration, among other things, all of which is disputed by the Company's subsidiary. The parties have resolved the matter with no material impact on the Company's financial position, results of operations, or liquidity, and with the settlement providing for certain limited remediation activities on the property.

The overall exposure related to these lawsuits and claims is not currently determinable. While an adverse judgment against Apache is possible, Apache intends to actively defend the cases.

### Hurricane-Related Litigation

On May 27, 2011, a lawsuit captioned *Comer et al. v. Murphy Oil USA, Inc. et al.*, Case No. 1:11-cv-220 HS0-JMR, in the United States District Court for the Southern District of Mississippi, was filed in which certain named residents of Mississippi, as plaintiffs, allege that the oil, coal, and chemical industries are responsible for global warming, which they claim caused or increased the effect of Hurricane Katrina, allegedly resulting among other things in economic losses and increased insurance premiums. Plaintiffs seek class certification, damages for losses sustained, a declaration that state law tort claims are not pre-empted by federal law, and punitive and exemplary damages. Apache is one of numerous defendants. The District Court has granted defendants' motion to dismiss plaintiffs' claims, and plaintiffs have appealed the decision to the United States Court of Appeals for the Fifth Circuit. The overall exposure related to this lawsuit is not currently determinable. While an adverse judgment against Apache is possible, Apache intends to vigorously defend the case. A similar action filed by Comer *et al.* was previously dismissed in 2011.

### Australia Gas Pipeline Force Majeure

In June 2008, Company subsidiaries reported a pipeline explosion that interrupted deliveries of natural gas to customers under various long-term contracts. Company subsidiaries believe that the event was a force majeure, and as a result, the subsidiaries and their joint venture participants declared force majeure under those contracts.

On December 16, 2009, a customer, Burrup Fertilisers Pty Ltd, filed a lawsuit on behalf of itself and certain of its underwriters at Lloyd's of London and other insurers, against the Company and its subsidiaries in Texas state court, asserting claims for negligence, breach of contract, alter ego, single business enterprise, res ipsa loquitur, and gross negligence/exemplary damages. In their Harris County, Texas petition, Cause No. 2009-79834, Burrup Fertilisers and its underwriters and insurers seek to recover unspecified actual damages, cost of repair and replacement, exemplary damages, lost profits, loss of business goodwill, value of the gas lost under the Gas Supply and Purchase Agreement (GSA), interest, and court costs. The Company has filed a motion to dismiss on the ground of *forum non conveniens*, which is pending.

F-33

**APACHE CORPORATION AND SUBSIDIARIES**

**NOTES TO CONSOLIDATED FINANCIAL STATEMENTS — (Continued)**

On March 24, 2011, another customer, Alcoa of Australia Limited ("Alcoa") filed a lawsuit captioned *Alcoa of Australia Limited vs. Apache Energy Limited, Apache Northwest Pty Ltd, Tap (Harriet) Pty Ltd, and Kufpec Australia Pty Ltd* , Civ. 1481 of 2011, in the Supreme Court of Western Australia. The lawsuit concerns the interruption of deliveries of natural gas to Alcoa under two long-term contracts. Alcoa challenges the declaration of force majeure and the validity of the liquidated damages provisions in the contracts. Alcoa asserts claims based on breach of contract, statutory duties, and duty of care. Alcoa seeks approximately $158 million AUD in general damages or, alternatively, approximately $5.7 million AUD in liquidated damages. On June 20, 2012, the Supreme Court struck out Alcoa's claim that the liquidated damages provisions under two long-term contracts are unenforceable as a penalty and also struck out Alcoa's claim for damages for breach of statutory duty. The Company subsidiaries have filed an appeal in the Supreme Court of Western Australia Court of Appeal asking that Alcoa's remaining tort claim for economic loss be dismissed or, alternatively, struck out. The appeal is pending.

The Company and its subsidiaries do not believe that the Burrup Fertilisers and Alcoa claims have merit and will vigorously pursue their defenses against such claims.

Other customers have threatened to file suit challenging the declaration of force majeure under their contracts. Contract prices under customer contracts are significantly below current spot prices for natural gas in Australia. In the event it is determined that the pipeline explosion was not a force majeure, Company subsidiaries believe that liquidated damages should be the extent of the damages under those long-term contracts with such provisions. Approximately 90 percent of the natural gas volumes sold by Company subsidiaries under long-term contracts have liquidated damages provisions. Contractual liquidated damages under the long-term contracts with such provisions would not be expected to exceed $200 million AUD. No assurance can be given that Burrup Fertilisers and other customers would not assert claims in excess of contractual liquidated damages, and exposure related to such claims is not currently determinable. While an adverse judgment against Company subsidiaries (and the Company, in the case of the Burrup Fertilisers lawsuit) is possible, the Company and Company subsidiaries do not believe any such claims would have merit and plan to vigorously pursue their defenses against any such claims.

In December 2008, the Senate Economics Committee of the Parliament of Australia released its findings from public hearings concerning the economic impact of the gas shortage following the explosion on Varanus Island and the government's response. The Committee concluded, among other things, that the macroeconomic impact to Western Australia will never be precisely known, but cited to a range of estimates from $300 million AUD to $2.5 billion AUD consisting in part of losses alleged by some parties who have long-term contracts with Company subsidiaries (as described above), but also losses alleged by third parties who do not have contracts with Company subsidiaries (but who may have purchased gas that was re-sold by customers or who may have paid more for energy following the explosion or who lost wages or sales due to the inability to obtain energy or the increased price of energy). A timber industry group, whose members do not have a contract with Company subsidiaries, has announced that it intends to seek compensation for its members and their subcontractors from Company subsidiaries for $20 million AUD in losses allegedly incurred as a result of the gas supply shortage following the explosion. In *Johnson Tiles Pty Ltd v. Esso Australia Pty Ltd* [2003] VSC 27 (Supreme Court of Victoria, Gillard J presiding), which concerned a 1998 explosion at an Esso natural gas processing plant at Longford in East Gippsland, Victoria, the Court held that Esso was not liable for $1.3 billion AUD of pure economic losses suffered by claimants that had no contract with Esso, but was liable to such claimants for reasonably foreseeable property damage which Esso settled for $32.5 million AUD plus costs. In reaching this decision the Court held that third-party claimants should have protected themselves from pure economic losses, through the purchase of insurance or the installation of adequate backup measures, in case of an interruption in their gas supply from Esso. While an adverse judgment against Company subsidiaries is possible if litigation is filed, Company subsidiaries do not believe any such claims would have merit and plan to vigorously pursue their defenses against any such claims. Exposure related to any such potential claims is not currently determinable.

F-34

**APACHE CORPORATION AND SUBSIDIARIES**

**NOTES TO CONSOLIDATED FINANCIAL STATEMENTS — (Continued)**

On October 10, 2008, the Australia National Offshore Petroleum Safety Authority (NOPSA) released a self-titled "Final Report" of the findings of its investigation into the pipeline explosion, prepared at the request of the Western Australian Department of Industry and Resources (DoIR). NOPSA concluded in its report that the evidence gathered to date indicates that the main causal factors in the incident were: (1) ineffective anti-corrosion coating at the beach crossing section of the 12-inch sales gas pipeline, due to damage and/or dis-bondment from the pipeline; (2) ineffective cathodic protection of the wet-dry transition zone of the beach crossing section of the 12-inch sales gas pipeline; and (3) ineffective inspection and monitoring by Company subsidiaries of the beach crossing and shallow water section of the 12-inch sales gas pipeline. NOPSA further concluded that the investigation identified that Apache Northwest Pty Ltd and its co-licensees may have committed offenses under the Petroleum Pipelines Act 1969, Sections 36A & 38(b) and the Petroleum Pipelines Regulations 1970, Regulation 10, and that some findings may also constitute non-compliance with pipeline license conditions.

On May 28, 2009, the Department of Mines and Petroleum (DMP) filed a prosecution notice in the Magistrates Court of Western Australia, charging Apache Northwest Pty Ltd and its co-licensees with failure to maintain a pipeline in good condition and repair under the Petroleum Pipelines Act 1969, Section 38(b). The maximum fine associated with the alleged offense is $50,000 AUD. The Company subsidiary does not believe that the charge has merit and vigorously pursued its defenses, resulting in the dismissal of the prosecution notice by the Magistrates Court of Western Australia on March 29, 2012.

NOPSA states in its report that an application for renewal of the pipeline license (the "pipeline license") covering the area of the Varanus Island facility was granted in May 1985 with 21 years validity, and an application for renewal of the pipeline license was submitted to DoIR by Company subsidiaries in December 2005 and remained pending at the time NOPSA issued its report. The application by Apache Northwest, Kufpec Australia Pty Ltd, and Tap (Harriet) Pty Ltd for renewal and variation of the pipeline license covering the area of the Varanus Island facility was granted on April 19, 2011, by the DMP. The period of the pipeline license is 21 years commencing April 20, 2011.

Company subsidiaries disagree with NOPSA's conclusions and believe that the NOPSA report is premature, based on an incomplete investigation, and misleading. In a July 17, 2008, media statement, DoIR acknowledged, "The pipelines and Varanus Island facilities have been the subject of an independent validation report [by Lloyd's Register] which was received in August 2007. NOPSA has also undertaken a number of inspections between 2005 and the present." These and numerous other inspections, audits and reviews conducted by top international consultants and regulators did not identify any warnings that the pipeline had a corrosion problem or other issues that could lead to its failure. Company subsidiaries believe that the explosion was not reasonably foreseeable, and was not within the reasonable control of Company's subsidiaries or able to be reasonably prevented by Company subsidiaries.

On January 9, 2009, the governments of Western Australia and the Commonwealth of Australia announced a joint inquiry to consider the effectiveness of the regulatory regime for occupational health and safety and integrity that applied to operations and facilities at Varanus Island and the role of DoIR, NOPSA, and the Western Australian Department of Consumer and Employment Protection. The joint inquiry's report was published in June 2009.

On May 8, 2009, the government of Western Australia announced that the DMP will carry out "the final stage of investigations into the Varanus Island gas explosion." Inspectors were appointed under the Petroleum Pipelines Act to coordinate the final stage of the investigations. That report, prepared by the inspectors in June 2009, was made public by the State government on May 24, 2012. Company subsidiaries disagree with the inspectors' June 2009 conclusions. Two other government reports were not published by the State and are not

F-35

**APACHE CORPORATION AND SUBSIDIARIES**

**NOTES TO CONSOLIDATED FINANCIAL STATEMENTS — (Continued)**

referenced by the inspectors. The Magistrates Court of Western Australia subsequently ordered that both such reports could be released on the basis that the inspectors' June 2009 report "came with some limitations" and the two other government reports "together were part and parcel if not the main reason or the only reason…certainly a significant contribution to the reason for the matter not proceeding to prosecution and trial." In the first such report, the State's senior investigator said in February 2009 that the prospects of a successful prosecution of Apache for failing to maintain the pipeline "would be slight." In the second such report, the State's lead corrosion expert concluded in July 2011 that Apache "had reasonable grounds to believe that the pipeline was in good repair" prior to the explosion.

### Breton Lawsuit

On October 4, 2011, plaintiffs filed suit in *Breton Energy, L.L.C. et al. v. Mariner Energy Resources, Inc., et al.* , Case 4:11-cv-03561, in the United States District Court for the Southern District of Texas, Houston Division, seeking compensation from defendants for allegedly depriving plaintiffs of rights to hydrocarbons in a reservoir described by plaintiffs as a common reservoir in West Cameron Blocks 171 and 172 offshore Louisiana in the Gulf of Mexico. In their original petition plaintiffs named, among others, Mariner Energy, Inc. and certain of its affiliates as defendants. On December 12, 2011, plaintiffs filed an amended petition to add as defendants Apache Corporation and Apache Shelf, Inc. as successors to the Mariner interests. On September 27, 2012, the court dismissed plaintiffs' claims on various grounds, including for failure to state a claim upon which relief may be granted, while granting plaintiffs leave to amend their complaint within 30 days. On October 29, 2012, the plaintiffs filed an amended complaint. The exposure related to the re-filed lawsuit is not currently determinable. While an adverse judgment against Apache is possible, Apache intends to actively defend the case.

### Escheat Audits

The State of Delaware, Department of Finance, Division of Revenue (Unclaimed Property), has notified numerous companies, including Apache Corporation, that the State will examine its books and records and those of its subsidiaries and related entities to determine compliance with the Delaware Escheat Laws. The review is being conducted by Kelmar Associates on behalf of the State. At least 30 other states have retained their own consultants and have sent similar notifications. The scope of each state's audit varies. The State of Delaware advises, for example, that the scope of its examination will be for the period 1981 through the present. It is possible that one or more of the State audits could extend to all 50 states. The exposure related to the audits is not currently determinable.

### Burrup-Related Gas Supply Lawsuits

On May 19, 2011, a lawsuit captioned *Oswal v. Apache Corporation* , Cause No. 2011-30302, in the District Court of Harris County, Texas, was filed in which plaintiff Pankaj Oswal, in his personal capacity and as trustee for the Burrup Trust, asserts claims against the Company under the Australian Trade Practices Act. The Company has filed a motion to dismiss on the ground of *forum non conveniens* , which is pending. This lawsuit is one of a number of legal actions involving the Burrup Fertilisers Pty Ltd (Burrup Fertilisers) ammonia plant in Western Australia (the Burrup plant) founded by Oswal. Oswal's shares, and those of his wife, together representing 65 percent of Burrup Holdings Limited (BHL, which owns Burrup Fertilisers), were offered for sale by externally-appointed administrators in Australia as a result of events of default on loans made to the Oswals by the Australia and New Zealand Banking Group Ltd (ANZ). In the Texas lawsuit, plaintiff Oswal alleges, among other things, that the Company induced him to make investments covering construction cost overruns on the ammonia plant that was completed in 2006. Plaintiff Oswal seeks damages in the amount of $491 million USD. The Company believes that the claims are without merit and intends to vigorously defend against them.

F-36

**APACHE CORPORATION AND SUBSIDIARIES**

**NOTES TO CONSOLIDATED FINANCIAL STATEMENTS — (Continued)**

The Texas lawsuit has been consolidated for certain purposes with the Burrup Fertilisers lawsuit arising from the Australia gas pipeline force majeure as described above and the consolidated action has been stayed by the trial court in Houston, Texas, pending resolution of related litigation in Australia, except that the stay of the consolidated action has been lifted partially in order for the Texas court to consider the Company's motions to dismiss on the ground of *forum non conveniens* .

The Texas lawsuit relates to a pending action filed by Tap (Harriet) Pty Ltd (Tap) against Burrup Fertilisers Pty Ltd et al., Civ 2329 of 2009, in the Supreme Court of Western Australia (the "Tap action"), seeking a declaratory judgment regarding its contractual rights and obligations under a gas sales agreement between Burrup Fertilisers and the Harriet Joint Venture (comprised of a Company subsidiary and two joint venture partners, Tap and Kufpec Australia Pty Ltd).

As part of the sale process described above, on January 31, 2012, a Company affiliate acquired a 49 percent interest in YPHPL, while Yara Australia Pty Ltd (Yara) increased its interest in YPHPL from 35 percent to 51 percent. Yara will operate the ammonia plant and intends to proceed with development of a technical ammonium nitrate (TAN) plant in the Burrup Peninsula region of Western Australia to be developed by a consortium including YPHPL. YPHPL share ownership continues to be the subject of ongoing litigation in Australia with third parties, including Pankaj and Radhika Oswal. A Company affiliate's existing agreement to supply gas to the ammonia plant has been modified (with, among other things, new pricing, delivery quantities, and term). The new gas supply agreement resolves counterclaims by Burrup Fertilisers against Apache and its affiliate in the Tap action. A Company subsidiary purchased Tap, which then modified its agreement to supply gas to the ammonia plant and resolved both Tap's claims against Burrup Fertilisers and Burrup Fertilisers' counterclaims against Tap in the Tap action. If Kufpec does not settle the remaining claims in the Tap action, it is expected that the trial court in the Tap action will issue its ruling in respect of phase 1 of those proceedings, which was tried in September 2011 and concerned construction of the original gas supply agreement.

<u>Environmental Matters</u>

The Company, as an owner or lessee and operator of oil and gas properties, is subject to various federal, provincial, state, local, and foreign country laws and regulations relating to discharge of materials into, and protection of, the environment. These laws and regulations may, among other things, impose liability on the lessee under an oil and gas lease for the cost of pollution clean-up resulting from operations and subject the lessee to liability for pollution damages. In some instances, the Company may be directed to suspend or cease operations in the affected area. We maintain insurance coverage, which we believe is customary in the industry, although we are not fully insured against all environmental risks.

Apache manages its exposure to environmental liabilities on properties to be acquired by identifying existing problems and assessing the potential liability. The Company also conducts periodic reviews, on a Company-wide basis, to identify changes in its environmental risk profile. These reviews evaluate whether there is a probable liability, the amount, and the likelihood that the liability will be incurred. The amount of any potential liability is determined by considering, among other matters, incremental direct costs of any likely remediation and the proportionate cost of employees who are expected to devote a significant amount of time directly to any possible remediation effort. As it relates to evaluations of purchased properties, depending on the extent of an identified environmental problem, the Company may exclude a property from the acquisition, require the seller to remediate the property to Apache's satisfaction, or agree to assume liability for the remediation of the property. The Company's general policy is to limit any reserve additions to any incidents or sites that are considered probable to result in an expected remediation cost exceeding $300,000. Any environmental costs and liabilities that are not reserved for are treated as an expense when actually incurred. In Apache's estimation, neither these expenses nor expenses related to training and compliance programs are likely to have a material impact on its financial condition.

F-37

**APACHE CORPORATION AND SUBSIDIARIES**

**NOTES TO CONSOLIDATED FINANCIAL STATEMENTS — (Continued)**

As of December 31, 2012, the Company had an undiscounted reserve for environmental remediation of approximately $104 million. Apache is not aware of any environmental claims existing as of December 31, 2012 that have not been provided for or would otherwise have a material impact on its financial position or results of operations. There can be no assurance however, that current regulatory requirements will not change or past non-compliance with environmental laws will not be discovered on the Company's properties.

Apache Canada Ltd. asserted a claim against BP Canada arising out of the acquisition of certain Canadian properties under the parties' Partnership Interest and Share Purchase and Sale Agreement dated July 20, 2010. The claim centered on Apache Canada Ltd.'s identification of Alleged Adverse Conditions, as that term is defined in the parties' agreement, and more specifically the contention that liabilities associated with such conditions were retained by BP Canada as seller. The parties have resolved the matter on commercial terms with no material impact on the Company's financial position, results of operations, or liquidity.

On May 25, 2011, a panel of the Bureau of Ocean Energy Management (BOEMRE, as it was then known) published a report dated May 23, 2011, and titled "OCS G-2580, Vermilion Block 380 Platform A, Incidents of Noncompliance." The report concerned the BOEMRE's investigation of a fire on the Vermilion 380 A platform located in the Gulf of Mexico. At the time of the incident, Mariner operated the platform. A small amount of hydrocarbons spilled from the platform into the surrounding water as a result of the incident, and 13 workers were rescued after evacuating the platform. The BOEMRE concluded in its investigation that the fire was caused by Mariner's failure to adequately maintain or operate the platform's heater-treater in a safe condition. The BOEMRE also identified other safety deficiencies on the platform. On December 27, 2011, the Bureau of Safety and Environmental Enforcement (BSEE, successor to BOEMRE) issued several Incidents of Non-Compliance, which may provide the basis for the assessment of civil penalties against Mariner. The Company's subsidiary Apache Deepwater LLC, which acquired Mariner effective November 10, 2010, filed an appeal on August 31, 2012, contesting several of the Incidents of Non-Compliance. It is management's opinion that any loss arising from this matter will not have a material adverse effect on the Company's financial position, results of operations, or liquidity.

**Contractual Obligations**

At December 31, 2012, contractual obligations for drilling rigs, purchase obligations, firm transportation agreements, and long-term operating leases are as follows:

| Net Minimum Commitments | Total | 2013 | 2014-2015 | 2016-2017 | 2018 & Beyond |
|---|---|---|---|---|---|
| | | | (In millions) | | |
| Drilling rig commitments [1] | $ 896 | $ 602 | $ 289 | $ 3 | $ 2 |
| Purchase obligations [2] | 2,588 | 1,200 | 1,182 | 184 | 22 |
| Firm transportation agreements [3] | 763 | 148 | 264 | 134 | 217 |
| Office and related equipment [4] | 402 | 49 | 91 | 96 | 166 |
| Other operating lease obligations [5] | 754 | 209 | 316 | 205 | 24 |
| Total Net Minimum Commitments | $5,403 | $2,208 | $ 2,142 | $ 622 | $ 431 |

[1]   Includes day-rate and other contractual agreements with third party service providers for use of drilling, completion, and workover rigs.

[2]   Includes contractual obligations to buy or build oil and gas plants and facilities, LNG facilities, seismic and drilling work program commitments, take-or-pay contracts, and hydraulic fracturing services agreements.

[3]   Relates to contractual obligations for capacity rights on third-party pipelines.

F-38

**APACHE CORPORATION AND SUBSIDIARIES**

**NOTES TO CONSOLIDATED FINANCIAL STATEMENTS — (Continued)**

(4)   Includes office and other building rentals and related equipment leases.

(5)   Includes commitments required to retain acreage and commitments associated with floating production storage and offloading vessels (FPSOs), compressors, helicopters, and boats.

The table above includes leases for buildings, facilities, and related equipment with varying expiration dates through 2035. Net rental expense was $76 million, $64 million, and $46 million for 2012, 2011, and 2010, respectively.

## 9.   RETIREMENT AND DEFERRED COMPENSATION PLANS

Apache Corporation provides retirement benefits to its U.S. employees through the use of multiple plans: a 401(k) savings plan, a money purchase retirement plan, a non-qualified retirement/savings plan, and a non-qualified restorative retirement savings plan. The non-qualified restorative retirement savings plan was implemented January 1, 2012. The 401(k) savings plan provides participating employees the ability to elect to contribute up to 50 percent of eligible compensation, as defined, to the plan with the Company making matching contributions up to a maximum of 8 percent of each employee's annual eligible compensation. In addition, the Company annually contributes 6 percent of each participating employee's annual eligible compensation, as defined, to a money purchase retirement plan. The 401(k) savings plan and the money purchase retirement plan are subject to certain annually-adjusted, government-mandated restrictions that limit the amount of employee and Company contributions. For certain eligible employees, the Company also provides a non-qualified retirement/savings plan or a non-qualified restorative retirement savings plan that allows the deferral of up to 50 percent of each employee's base salary, up to 75 percent of each employee's annual bonus (that accepts employee contributions) and the Company's matching contributions in excess of the government mandated limitations imposed in the 401(k) savings plan and money purchase retirement plan.

Vesting in the Company's contributions in the 401(k) savings plan, the money purchase retirement plan, the non-qualified retirement savings plan and the non-qualified restorative retirement savings plan occurs at the rate of 20 percent for every completed year of employment. Upon a change in control of ownership, immediate and full vesting occurs.

Additionally, Apache Energy Limited, Apache Canada Ltd., and Apache North Sea Limited maintain separate retirement plans, as required under the laws of Australia, Canada, and the U.K., respectively.

The aggregate annual cost to Apache of all U.S. and International savings plans, the money purchase retirement plan, non-qualified retirement/savings plan, and non-qualified restorative retirement savings plan was $117 million, $93 million, and $80 million for 2012, 2011, and 2010, respectively.

Apache also provides a funded noncontributory defined benefit pension plan (U.K. Pension Plan) covering certain employees of the Company's North Sea operations in the U.K. The plan provides defined pension benefits based on years of service and final salary. The plan applies only to employees who were part of the BP North Sea's pension plan as of April 2, 2003, prior to the acquisition of BP North Sea by the Company effective July 1, 2003.

Additionally, the Company offers postretirement medical benefits to U.S. employees who meet certain eligibility requirements. Eligible participants receive medical benefits up until the age of 65, provided the participant remits the required portion of the cost of coverage. The plan is contributory with participants' contributions adjusted annually. The postretirement benefit plan does not cover benefit expenses once a covered participant becomes eligible for Medicare.

F-39

APACHE CORPORATION AND SUBSIDIARIES

NOTES TO CONSOLIDATED FINANCIAL STATEMENTS — (Continued)

The following tables set forth the benefit obligation, fair value of plan assets and funded status as of December 31, 2012, 2011, and 2010, and the underlying weighted average actuarial assumptions used for the U.K. Pension Plan and U.S. postretirement benefit plan. Apache uses a measurement date of December 31 for its pension and postretirement benefit plans.

| | 2012 | | 2011 | | 2010 | |
|---|---|---|---|---|---|---|
| | Pension Benefits | Postretirement Benefits | Pension Benefits | Postretirement Benefits | Pension Benefits | Postretirement Benefits |
| | | | | (In millions) | | |
| **Change in Projected Benefit Obligation** | | | | | | |
| Projected benefit obligation beginning of year | $ 150 | $ 30 | $ 136 | $ 29 | $ 135 | $ 18 |
| Service cost | 5 | 4 | 5 | 3 | 5 | 2 |
| Interest cost | 7 | 1 | 7 | 1 | 7 | 1 |
| Foreign currency exchange rate changes | 7 | — | (1) | — | (4) | — |
| Amendments | — | — | — | — | — | — |
| Actuarial losses (gains) | 14 | 1 | 6 | (2) | (1) | 8 |
| Effect of curtailment and settlements | — | — | — | — | — | — |
| Benefits paid | (6) | (1) | (3) | (1) | (6) | — |
| Retiree contributions | — | — | — | — | — | — |
| Projected benefit obligation at end of year | 177 | 35 | 150 | 30 | 136 | 29 |
| **Change in Plan Assets** | | | | | | |
| Fair value of plan assets at beginning of year | 145 | — | 135 | — | 118 | — |
| Actual return on plan assets | 14 | — | 4 | — | 14 | — |
| Foreign currency exchange rates | 6 | — | (1) | — | (3) | — |
| Employer contributions | 11 | 1 | 10 | 1 | 12 | — |
| Benefits paid | (6) | (1) | (3) | (1) | (6) | — |
| Retiree contributions | — | — | — | — | — | — |
| Fair value of plan assets at end of year | 170 | — | 145 | — | 135 | — |
| **Funded status at end of year** | $ (7) | $ (35) | $ (5) | $ (30) | $ (1) | $ (29) |
| **Amounts recognized in Consolidated Balance Sheet** | | | | | | |
| Current liability | — | (1) | — | (1) | — | (1) |
| Non-current liability | (7) | (34) | (5) | (29) | (1) | (28) |
| | $ (7) | $ (35) | $ (5) | $ (30) | $ (1) | $ (29) |
| **Pre-tax Amounts Recognized in Accumulated Other Comprehensive Income (Loss)** | | | | | | |
| Accumulated (loss) | (32) | (7) | (25) | (6) | (15) | (8) |
| Prior service cost | — | — | — | — | — | — |
| Transition asset (obligation) | — | — | — | — | — | — |
| | $ (32) | $ (7) | $ (25) | $ (6) | $ (15) | $ (8) |
| **Weighted Average Assumptions used as of December 31** | | | | | | |
| Discount rate | 4.30% | 3.43% | 4.70% | 4.04% | 5.40% | 4.93% |
| Salary increases | 4.60% | N/A | 4.60% | N/A | 5.00% | N/A |
| Expected return on assets | 4.70% | N/A | 4.85% | N/A | 6.25% | N/A |
| Healthcare cost trend | | | | | | |
|    Initial | N/A | 7.25% | N/A | 7.50% | N/A | 8.00% |
|    Ultimate in 2022 | N/A | 5.00% | N/A | 5.00% | N/A | 5.00% |

F-40

**APACHE CORPORATION AND SUBSIDIARIES**

**NOTES TO CONSOLIDATED FINANCIAL STATEMENTS — (Continued)**

As of December 31, 2012, 2011, and 2010, the accumulated benefit obligation for the pension plan was $139 million, $119 million, and $107 million, respectively.

Apache's defined benefit pension plan assets are held by a non-related trustee who has been instructed to invest the assets in an equal blend of equity securities and low-risk debt securities. The Company intends that this blend of investments will provide a reasonable rate of return such that the benefits promised to members are provided.

The U.K. Pension Plan policy is to target an ongoing funding level of 100 percent through prudent investments and includes policies and strategies such as investment goals, risk management practices, and permitted and prohibited investments. A breakout of previous allocations for plan asset holdings and the target allocation for the Company's plan assets are summarized below:

| | Target Allocation | Percentage of Plan Assets at Year-End | |
| --- | --- | --- | --- |
| **Asset Category** | **2012** | **2012** | **2011** |
| Equity securities: | | | |
| U.K. quoted equities | 17% | 16% | 17% |
| Overseas quoted equities | 33% | 33% | 31% |
| Total equity securities | 50% | 49% | 48% |
| Debt securities: | | | |
| U.K. Government bonds | 30% | 30% | 30% |
| U.K. corporate bonds | 20% | 20% | 18% |
| Debt securities | 50% | 50% | 48% |
| Cash | 0% | 1% | 4% |
| Total | 100% | 100% | 100% |

F-41

**APACHE CORPORATION AND SUBSIDIARIES**

**NOTES TO CONSOLIDATED FINANCIAL STATEMENTS — (Continued)**

The plan's assets do not include any direct ownership of equity or debt securities of Apache. The fair value of plan assets is based upon unadjusted quoted prices for identical instruments in active markets, which is a Level 1 fair value measurement. See discussion of the fair value hierarchy as set forth by ASC 820-10-35 in Note 3 — Derivative Instruments And Hedging Activities. The following table presents the fair values of plan assets for each major asset category based on the nature and significant concentration of risks in plan assets at December 31, 2012:

|  | Fair Value Measurements Using: | | | |
|---|---|---|---|---|
|  | Quoted Price in Active Markets (Level 1) | Significant Other Inputs (Level 2) | Unobservable Inputs (Level 3) | Total Fair Value |
|  | | (In millions) | | |
| Equity securities: | | | | |
| U.K. quoted equities [1] | $ 28 | $ — | $ — | $ 28 |
| Overseas quoted equities [2] | 56 | — | — | 56 |
| Total equity securities | 84 | — | — | 84 |
| Debt securities: | | | | |
| U.K. Government bonds [3] | 51 | — | — | 51 |
| U.K. corporate bonds [4] | 34 | — | — | 34 |
| Total debt securities | 85 | — | — | 85 |
| Cash | 1 | — | — | 1 |
| Fair value of plan assets | $ 170 | $ — | $ — | $ 170 |

---

[1] This category comprises U.K. equities, which are benchmarked against the FTSE All-Share Index.

[2] This category includes overseas equities, which comprises 85 percent global equities benchmarked against the MSCI World Index and 15 percent emerging markets benchmarked against the MSCI Emerging Markets Index, both of which have a performance target of 2 percent per annum over the benchmark over a rolling three-year period.

[3] This category includes U.K. Government bonds: 33 percent benchmarked against iBoxx Sterling Overall Gilt Index, with a performance target of 0.75 percent per annum over the benchmark over a rolling three-year period; and 67 percent against the FTSE Actuaries Government Securities Index-Linked Over 5 Years Index.

[4] This category includes U.K. corporate bonds: 50 percent benchmarked against iBoxx Sterling Overall Non Gilt index with a performance target of 0.75 percent per annum over the benchmark over a rolling three-year period; and 50 percent benchmarked against the iBoxx Sterling Overall Non Gilt Index with a performance target of 0.75 percent per annum over the benchmark over a rolling five year period.

F-42

**APACHE CORPORATION AND SUBSIDIARIES**

**NOTES TO CONSOLIDATED FINANCIAL STATEMENTS — (Continued)**

The following table presents the fair values of plan assets for each major asset category based on the nature and significant concentration of risks in plan assets at December 31, 2011:

| | Fair Value Measurements Using: | | | |
| --- | --- | --- | --- | --- |
| | Quoted Price in Active Markets (Level 1) | Significant Other Inputs (Level 2) | Unobservable Inputs (Level 3) | Total Fair Value |
| | | (In millions) | | |
| Equity securities: | | | | |
| U.K. quoted equities [1] | $    24 | $    — | $    — | $    24 |
| Overseas quoted equities [2] | 46 | — | — | 46 |
| Total equity securities | 70 | — | — | 70 |
| Debt securities: | | | | |
| U.K. Government bonds [3] | 43 | — | — | 43 |
| U.K. corporate bonds [4] | 26 | — | — | 26 |
| Total debt securities | 69 | — | — | 69 |
| Cash | 6 | — | — | 6 |
| Fair value of plan assets | $   145 | $    — | $    — | $   145 |

[1] This category comprises U.K. equities, which are benchmarked against the FTSE All-Share Index.

[2] This category includes overseas equities, which comprises 85 percent global equities benchmarked against the MSCI World Index and 15 percent emerging markets benchmarked against the MSCI Emerging Markets Index, both of which have a performance target of 2 percent per annum over the benchmark over a rolling three-year period.

[3] This category includes U.K. Government bonds: 72 percent benchmarked against iBoxx Sterling Overall Index, with a performance target of 0.75 percent per annum over the benchmark over a rolling three-year period; and 28 percent against the FTSE Actuaries Government Securities Index-Linked Over 5 Years Index.

[4] This category comprises U.K. corporate bonds benchmarked against the iBoxx Sterling Overall Index.

The expected long-term rate of return on assets assumptions are derived relative to the yield on long-dated fixed-interest bonds issued by the U.K. government (gilts). For equities, outperformance relative to gilts is assumed to be 3.5 percent per year.

F-43

**APACHE CORPORATION AND SUBSIDIARIES**

**NOTES TO CONSOLIDATED FINANCIAL STATEMENTS — (Continued)**

The following tables set forth the components of the net periodic cost and the underlying weighted average actuarial assumptions used for the pension and postretirement benefit plans as of December 31, 2012, 2011, and 2010:

| | 2012 | | 2011 | | 2010 | |
|---|---|---|---|---|---|---|
| | Pension Benefits | Postretirement Benefits | Pension Benefits | Postretirement Benefits | Pension Benefits | Postretirement Benefits |
| | | | (In millions) | | | |
| **Component of Net Periodic Benefit Costs** | | | | | | |
| Service cost | $    5 | $    4 | $    5 | $    3 | $    5 | $    2 |
| Interest cost | 7 | 1 | 7 | 1 | 7 | 1 |
| Expected return on assets | (7) | — | (8) | — | (8) | — |
| Amortization of actuarial gain (loss) | 1 | — | — | — | 1 | — |
| Net periodic benefit cost | $    6 | $    5 | $    4 | $    4 | $    5 | $    3 |
| **Weighted Average Assumptions used to determine Net Period Benefit Cost for the Years ended December 31** | | | | | | |
| Discount rate | 4.70% | 4.04% | 5.40% | 4.93% | 5.70% | 5.56% |
| Salary increases | 4.60% | N/A | 5.00% | N/A | 5.30% | N/A |
| Expected return on assets | 4.85% | N/A | 6.25% | N/A | 6.65% | N/A |
| Healthcare cost trend | | | | | | |
| Initial | — | 7.50% | — | 8.00% | — | 7.50% |
| Ultimate in 2017 | — | 5.00% | — | 5.00% | — | 5.00% |

Assumed health care cost trend rates affect amounts reported for postretirement benefits. A one-percentage-point change in assumed health care cost trend rates would have the following effects:

| | Postretirement Benefits | |
|---|---|---|
| | 1% Increase | 1% Decrease |
| | (In millions) | |
| Effect on service and interest cost components | $    1 | $    (1) |
| Effect on postretirement benefit obligation | 8 | (6) |

Apache expects to contribute approximately $5 million to its pension plan and $1 million to its postretirement benefit plan in 2013. The following benefit payments, which reflect expected future service, as appropriate, are expected to be paid:

| | Pension Benefits | Postretirement Benefits |
|---|---|---|
| | (In millions) | |
| 2013 | $    5 | $    1 |
| 2014 | 6 | 1 |
| 2015 | 7 | 2 |
| 2016 | 7 | 2 |
| 2017 | 6 | 3 |
| Years 2018 – 2022 | 49 | 18 |

F-44

APACHE CORPORATION AND SUBSIDIARIES

NOTES TO CONSOLIDATED FINANCIAL STATEMENTS — (Continued)

**10.   CAPITAL STOCK**

**Common Stock Outstanding**

|  | 2012 | 2011 | 2010 |
|---|---|---|---|
| Balance, beginning of year | 384,117,643 | 382,391,742 | 336,436,972 |
| Shares issued for stock-based compensation plans: |  |  |  |
|    Treasury shares issued | 60,767 | 144,313 | 363,263 |
|    Common shares issued | 1,189,693 | 1,581,588 | 1,864,498 |
| Cordillera consideration | 6,272,667 | — | — |
| Equity offering (BP acquisitions) | — | — | 26,450,000 |
| Mariner consideration | — | — | 17,277,009 |
| Balance, end of year | 391,640,770 | 384,117,643 | 382,391,742 |

**Net Income per Common Share**

A reconciliation of the components of basic and diluted net income per common share for the years ended December 31, 2012, 2011, and 2010 is presented in the table below.

| | 2012 | | | 2011 | | | 2010 | | |
|---|---|---|---|---|---|---|---|---|---|
| | Income | Shares | Per Share | Income | Shares | Per Share | Income | Shares | Per Share |
| | | | | (In millions, except per share amounts) | | | | | |
| **Basic:** | | | | | | | | | |
| Income attributable to common stock | $1,925 | 389 | $ 4.95 | $4,508 | 384 | $ 11.75 | $3,000 | 352 | $ 8.53 |
| **Effect of Dilutive Securities:** | | | | | | | | | |
| Mandatory Convertible Preferred Stock | $ — | — | | $ 76 | 14 | | $ 32 | 5 | |
| Stock options and other | — | 2 | | — | 2 | | — | 2 | |
| **Diluted:** | | | | | | | | | |
| Income attributable to common stock, including assumed conversions | $1,925 | 391 | $ 4.92 | $4,584 | 400 | $ 11.47 | $3,032 | 359 | $ 8.46 |

The diluted EPS calculation excludes options and restricted shares that were anti-dilutive totaling 4.4 million, 2.5 million, and 2.3 million for the years ended December 31, 2012, 2011, and 2010, respectively. For the year ended December 31, 2012, 14.3 million shares related to the assumed conversion of the Mandatory Convertible Preferred Stock were also anti-dilutive.

**Issuance of Common Stock**

On July 28, 2010, in conjunction with Apache's acquisition of properties from BP, the Company issued 26.45 million shares of common stock at a public offering price of $88 per share. Proceeds, after underwriting discounts and before expenses, from the common stock offering totaled approximately $2.3 billion.

F-45

**APACHE CORPORATION AND SUBSIDIARIES**

**NOTES TO CONSOLIDATED FINANCIAL STATEMENTS — (Continued)**

On November 10, 2010, in connection with the Mariner merger, Apache issued 17.28 million shares of common stock in exchange for Mariner common and restricted stock. The total value of stock consideration, based on the November 10, 2010, closing value on the NYSE of $110.25 per share, was approximately $1.9 billion.

On April 30, 2012, in conjunction with Apache's acquisition of Cordillera, the Company issued 6,272,667 shares of common stock to the sellers.

For further discussion of the BP acquisitions, Mariner merger, and Cordillera acquisition, please see Note 2 — Acquisitions and Divestitures.

## Common Stock Dividend

The Company paid common stock dividends of $0.66 per share in 2012, and $0.60 per share in 2011 and 2010.

## Stock Compensation Plans

The Company has several stock-based compensation plans, which include stock options, stock appreciation rights, restricted stock, and performance-based share appreciation plans. On May 5, 2011, the Company's shareholders approved the 2011 Omnibus Equity Compensation Plan (the 2011 Plan), which is intended to provide eligible employees with equity-based incentives. The 2011 Plan provides for the granting of Incentive Stock Options, Non-Qualified Stock Options, Performance Awards, Restricted Stock, Restricted Stock Units, Stock Appreciation Rights, or any combination of the foregoing. Previously-approved plans remain in effect solely for the purpose of governing grants still outstanding that were issued prior to approval of the 2011 Plan. All new grants are issued from the 2011 Plan.

For 2012, 2011, and 2010, stock-based compensation expensed was $167 million, $113 million, and $164 million ($119 million, $73 million, and $106 million after tax), respectively. Costs related to the plans are capitalized or expensed based on the nature of each employee's activities. A description of the Company's stock-based compensation plans and related costs follows:

|  | 2012 | 2011 | 2010 |
|---|---|---|---|
|  |  | (In millions) |  |
| Stock-based compensation expensed: |  |  |  |
| General and administrative | $104 | $ 69 | $ 98 |
| Lease operating expenses | 63 | 44 | 66 |
| Stock-based compensation capitalized | 67 | 42 | 71 |
|  | $234 | $155 | $235 |

### Stock Options

As of December 31, 2012, officers and employees held options to purchase shares of the Company's common stock under one or more of the employee stock option plans adopted in 1998, 2000, and 2005 (collectively, the Stock Option Plans), as well as the 2007 Omnibus Equity Compensation Plan (the 2007 Plan), and the 2011 Plan discussed above (together, the Omnibus Plans). New shares of Company stock will be issued for employee stock option exercises; however, under the 2000 Stock Option Plan, shares of treasury stock are

**APACHE CORPORATION AND SUBSIDIARIES**

**NOTES TO CONSOLIDATED FINANCIAL STATEMENTS — (Continued)**

used for employee stock option exercises to the extent treasury stock is held. Under the Stock Option Plans and the Omnibus Plans, the exercise price of each option equals the closing price of Apache's common stock on the date of grant. Options generally become exercisable ratably over a four-year period and expire 10 years after granted. The Omnibus Plans and all of the Stock Option Plans, except for the 2000 Stock Option Plan, were submitted to and approved by the Company's shareholders.

A summary of stock options issued and outstanding under the Stock Option Plans and the Omnibus Plans is presented in the table and narrative below:

| | 2012 | |
|---|---|---|
| | Shares Under Option (In thousands) | Weighted Average Exercise Price |
| Outstanding, beginning of year | 6,092 | $      91.96 |
| Granted | 2,072 | 82.65 |
| Exercised | (311) | 56.15 |
| Forfeited or expired | (280) | 102.90 |
| Outstanding, end of year [1] | 7,573 | 90.47 |
| Expected to vest [1] | 2,900 | 96.23 |
| Exercisable, end of year [1] | 3,922 | 85.55 |
| Available for grant, end of year | 15,498 | |
| Weighted average fair value of options granted during the year | $      26.41 | |

_____

[1]   As of December 31, 2012, the weighted average remaining contractual life for options outstanding, expected to vest, and exercisable is 6.7 years, 8.6 years, and 5.0 years, respectively. The aggregate intrinsic value of options outstanding, expected to vest, and exercisable at year-end was $19 million, $0, and $19 million, respectively. The weighted-average grant-date fair value of options granted during the years 2012, 2011, and 2010 was $26.41, $42.20, and $34.12, respectively.

The fair value of each stock option award is estimated on the date of grant using the Black-Scholes option pricing model. Assumptions used in the valuation are disclosed in the following table. Expected volatilities are based on historical volatility of the Company's common stock and other factors. The expected dividend yield is based on historical yields on the date of grant. The expected term of stock options granted represents the period of time that the stock options are expected to be outstanding and is derived from historical exercise behavior, current trends, and values derived from lattice-based models. The risk-free rate is based on the U.S. Treasury yield curve in effect at the time of grant.

| | 2012 | 2011 | 2010 |
|---|---|---|---|
| Expected volatility | 34.94% | 34.47% | 35.02% |
| Expected dividend yields | 0.82% | 0.47% | 0.60% |
| Expected term (in years) | 5.5 | 5.5 | 5.5 |
| Risk-free rate | 0.78% | 1.95% | 2.31% |

The intrinsic value of options exercised during 2012, 2011, and 2010 was approximately $12 million, $50 million and $62 million, respectively. The cash received from exercise of options during 2012 was approximately $17 million. The Company realized an additional tax benefit of approximately $2 million for the amount of

F-47

**APACHE CORPORATION AND SUBSIDIARIES**

**NOTES TO CONSOLIDATED FINANCIAL STATEMENTS — (Continued)**

intrinsic value in excess of compensation cost recognized in 2012. As of December 31, 2012, the total compensation cost related to non-vested options not yet recognized was $90 million, which will be recognized over the remaining vesting period of the options.

### Stock Appreciation Rights

For some non-executive employees, the Company issued stock appreciation rights (SARs) in lieu of stock options. The SARs vest ratably over four years and are settled in cash upon exercise throughout their ten-year life. In 2012, the Company issued 180,555 SARs with a weighted-average exercise price of $82.63 under the 2011 Omnibus Plan. Additionally, in 2003 and 2004 the Company issued 1,809,060 SARs with a weighted-average exercise price of $42.68 and 1,334,300 SARs with a weighted-average exercise price of $28.78, respectively, under the 2003 Stock Appreciation Rights Plan. As of December 31, 2012, a total of 583,688 SARs were outstanding, of which 413,582 were exercisable. Since SARs are cash-settled, the Company records compensation expense based on the fair value of the SARs at the end of each period. As of year-end, the weighted-average fair value of SARs outstanding was $36.20 based on the Black-Scholes valuation methodology using assumptions comparable to those discussed above. During 2012, 60,523 SARs were exercised. The aggregate of cash payments made to settle SARs was $3 million.

### Restricted Stock and Restricted Stock Units

The Company has restricted stock and restricted stock unit plans for eligible employees including officers. The programs created under the Omnibus Plans have been approved by Apache's Board of Directors. In 2012, the Company awarded 1,219,886 restricted stock units at a weighted-average per-share market price of $85.67. In 2011 and 2010, the Company awarded 887,851 and 1,143,989 restricted stock units at a weighted-average per-share market price of $124.16 and $103.88, respectively. The value of the stock issued was established by the market price on the date of grant and is being recorded as compensation expense ratably over the vesting terms. During 2012, 2011, and 2010, $74 million ($48 million after tax), $76 million ($49 million after tax), and $73 million ($47 million after tax), respectively, was charged to expense. In 2012, 2011, and 2010, $25 million, $28 million, and $28 million was capitalized, respectively. As of December 31, 2012, there was $151 million of total unrecognized compensation cost related to 2,163,564 unvested restricted stock units. The weighted-average remaining life of unvested restricted stock units is approximately 1.4 years.

The fair value of the awards vested during 2012, 2011 and 2010 was approximately $114 million, $85 million, and $69 million, respectively. A summary of restricted stock activity for the year ended December 31, 2012, is presented below.

| | Shares (In thousands) | Weighted-Average Grant-Date Fair Value |
|---|---|---|
| Non-vested at January 1, 2012 | 2,115 | $   109.63 |
| Granted | 1,220 | 85.67 |
| Vested | (1,053) | 107.76 |
| Forfeited | (118) | 102.82 |
| Non-vested at December 31, 2012 | 2,164 | 97.34 |

### Conditional Restricted Stock Units

To provide long-term incentives for Apache employees to deliver competitive returns to the Company's stockholders, in January 2012, 2011, and 2010 the Company granted conditional restricted stock units to eligible

F-48

**APACHE CORPORATION AND SUBSIDIARIES**

**NOTES TO CONSOLIDATED FINANCIAL STATEMENTS — (Continued)**

employees. The ultimate number of shares awarded from these conditional restricted stock units is based upon measurement of total shareholder return of Apache common stock as compared to a designated peer group during a three-year performance period. Should any restricted stock units be awarded at the end of the three-year performance period, 50 percent of restricted stock units awarded will immediately vest, and an additional 25 percent will vest on succeeding anniversaries of the end of the performance period. Three conditional restricted stock unit programs have been approved, as described below:

- In November 2009 the Company's Board of Directors approved the 2010 Performance Program, pursuant to the 2007 Plan. In January 2010 eligible employees received initial conditional restricted stock unit awards totaling 541,440 units. Based on measurement of total shareholder return relative to the designated peer group at December 31, 2012, zero shares were awarded and all unvested conditional restricted stock units were cancelled.

- In November 2010 the Company's Board of Directors approved the 2011 Performance Program, pursuant to the 2007 Plan. In January 2011 eligible employees received initial conditional restricted stock unit awards totaling 585,811 units. A total of 503,884 units were outstanding at December 31, 2012, from which a minimum of zero and a maximum of 1,259,710 units could be awarded.

- In January 2012 the Company's Board of Directors approved the 2012 Performance Program, pursuant to the 2011 Plan. In January 2012 eligible employees received initial conditional restricted stock unit awards totaling 802,390 units. A total of 802,390 units were outstanding at December 31, 2012, from which a minimum of zero and a maximum of 2,005,975 units could be awarded.

The fair value cost of the awards was estimated on the date of grant and is being recorded as compensation expense ratably over the vesting terms. During 2012, 2011, and 2010, $47 million ($31 million after tax), $12 million ($8 million after tax), and $7 million ($4 million after tax), respectively, was charged to expense. During 2012, 2011, and 2010, $21 million, $5 million, and $3 million was capitalized, respectively. As of December 31, 2012, there was $72 million of total unrecognized compensation cost related to 1,306,274 unvested conditional restricted stock units. The weighted-average remaining life of the unvested conditional restricted stock units is approximately 2.4 years.

| | Shares (In thousands) | | Weighted-Average Grant-Date Fair Value [1] |
|---|---|---|---|
| Non-vested at January 1, 2012 | 1,019 | $ | 115.10 |
| Granted | 852 | | 70.30 |
| Vested | (1) | | 100.81 |
| Forfeited | (564) | | 132.45 |
| Non-vested at December 31, 2012 | 1,306 | | 78.40 |

[1] The fair value of each conditional restricted stock unit award is estimated as of the date of grant using a Monte Carlo simulation with the following assumptions used for all grants made under the plan: (i) a three-year continuous risk-free interest rate; (ii) a constant volatility assumption based on the historical realized stock price volatility of the Company and the designated peer group; and (iii) the historical stock prices and expected dividends of the common stock of the Company and its designated peer group.

In January 2013 the Company's Board of Directors approved the 2013 Performance Program, pursuant to the 2011 Plan, with terms similar to the 2012 Performance Program. Eligible employees received initial conditional restricted stock unit awards totaling 1,232,176 units, with the ultimate number of restricted stock units to be awarded ranging from zero to a maximum of 2,464,352 units.

**APACHE CORPORATION AND SUBSIDIARIES**

**NOTES TO CONSOLIDATED FINANCIAL STATEMENTS — (Continued)**

*Share Appreciation Plans*

The Company previously utilized share appreciation plans to provide incentives for substantially all full-time employees and officers to increase Apache's share price within a stated measurement period. To achieve the payout, the Company's stock price must close at or above a stated threshold for 10 out of any 30 consecutive trading days before the end of the stated period. Shares of Apache common stock contingently issuable under the plans are excluded from the computation of income per common share until the stated goals are met as described below.

Since 2005, two share appreciation plans have been approved. A summary of these plans is as follows:

- On May 7, 2008, the Stock Option Plan Committee of the Company's Board of Directors, pursuant to the 2007 Plan, approved the 2008 Share Appreciation Program with a target to increase Apache's share price to $216 by the end of 2012 and an interim goal of $162 to be achieved by the end of 2010. The interim target of $162 was not met by the end of 2010, and the related awards were cancelled. The $216 share price target was not met by the end of 2012, and all remaining awards under the 2008 Share Appreciation Program were cancelled.

- On May 5, 2005, the Company's stockholders approved the 2005 Share Appreciation Plan, with a target to increase Apache's share price to $108 by the end of 2008 and an interim goal of $81 to be achieved by the end of 2007. Apache's share price exceeded the interim $81 threshold for the 10-day requirement as of June 14, 2007. Apache's share price exceeded the $108 threshold for the 10-day requirement as of February 29, 2008. Awards under the plan were payable in four equal annual installments to eligible employees remaining with the Company.

A summary of the number of shares contingently issuable as of December 31, 2012, 2011, and 2010 for each plan is presented in the table below:

| | Shares subject to Conditional Grants | | |
| --- | --- | --- | --- |
| | 2012 | 2011 | 2010 |
| | | (In thousands) | |
| **2008 Share Appreciation Program** | | | |
| Outstanding, beginning of year | 1,372 | 1,485 | 2,592 |
| Granted | — | — | 25 |
| Forfeited or cancelled | (1,372) | (113) | (1,132) |
| Outstanding, end of year [1] | — | 1,372 | 1,485 |
| Weighted-average value of grants outstanding [2] | $ — | $71.28 | $ 71.16 |
| **2005 Share Appreciation Plan** | | | |
| Outstanding, beginning of year | — | 400 | 1,103 |
| Issued [3] | — | (398) | (678) |
| Forfeited or cancelled | — | (2) | (25) |
| Outstanding, end of year | — | — | 400 |
| Weighted-average value of grants outstanding [4] | $ — | $ — | $ 21.64 |

_____

[1] Represents shares issuable upon target achievement and vesting of awards related to the $216 and $162 per share price goals of zero shares at December 31, 2012; 1,372,190 and zero shares, respectively, at December 31, 2011; and 1,485,210 and zero shares, respectively, at December 31, 2010.

F-50

**APACHE CORPORATION AND SUBSIDIARIES**

**NOTES TO CONSOLIDATED FINANCIAL STATEMENTS — (Continued)**

(2)   The fair value of each Share Price Goal conditional grant is estimated as of the date of grant using a Monte Carlo simulation with the following weighted-average assumptions used for all grants made under the plan: (i) risk-free interest rate of 2.98 percent; (ii) expected volatility of 28.31 percent; and (iii) expected dividend yield of .54 percent.

(3)   The total fair value of these awards vested during 2011 and 2010 was approximately $9 million and $18 million, respectively.

(4)   The fair value of each Share Price Goal conditional grant is estimated as of the date of grant using a Monte Carlo simulation with the following weighted-average assumptions used for all grants made under the plan: (i) risk-free interest rate of 3.95 percent; (ii) expected volatility of 28.02 percent; and (iii) expected dividend yield of .57 percent.

The Company recognizes over the requisite service period the fair value cost determined at the grant date based on numerous assumptions, including an estimate of the likelihood that Apache's stock price will achieve these thresholds and the expected forfeiture rate. If a price target is not met before the end of the stated achievement period, any unamortized expense must be immediately recognized. Since the $162 and $216 price targets of the 2008 Share Appreciation Program were not met prior to the end of the stated achievement periods, Apache recognized $27 million of unamortized expense and $14 million of unamortized capital costs on December 31, 2010, and $16 million of unamortized expense and $8 million of unamortized capital costs on December 31, 2012, respectively. The Company recognized total expense and capitalized costs for the 2008 Share Appreciation Program of $181 million and as of year-end 2012 had no unamortized cost remaining. As of March 2011, the Company had recognized $79 million of total expense and capitalized costs for the 2005 Share Appreciation Plan and had no unamortized costs remaining. A summary of the amounts recognized as expense and capitalized costs for each plan are detailed in the table below:

| | For the Year Ended December 31, | | |
|---|---|---|---|
| | 2012 | 2011 (In millions) | 2010 |
| **2008 Share Appreciation Program** | | | |
| Compensation expense | $ 22 | $ 8 | $ 49 |
| Compensation expense, net of tax | 14 | 5 | 31 |
| Capitalized costs | 12 | 5 | 27 |
| **2005 Share Appreciation Plan** | | | |
| Compensation expense | — | $ 1 | $ 6 |
| Compensation expense, net of tax | — | 1 | 4 |
| Capitalized costs | — | 1 | 3 |

## Preferred Stock

The Company has 10,000,000 shares of no par preferred stock authorized, of which 25,000 shares have been designated as Series A Junior Participating Preferred Stock (the Series A Preferred Stock) and 1.265 million shares as 6.00-percent Mandatory Convertible Preferred Stock, Series D (the Series D Preferred Stock).

### Series A Preferred Stock

In December 1995, the Company declared a dividend of one right (a Right) for each 2.31 shares (adjusted for subsequent stock dividends and a two-for-one stock split) of Apache common stock outstanding on January 31, 1996. Each full Right entitles the registered holder to purchase from the Company one ten-thousandth (1/10,000) of a share of Series A Preferred Stock at a price of $100 per one ten-thousandth of a share,

F-51

**APACHE CORPORATION AND SUBSIDIARIES**

**NOTES TO CONSOLIDATED FINANCIAL STATEMENTS — (Continued)**

subject to adjustment. The Rights are exercisable 10 calendar days following a public announcement that certain persons or groups have acquired 20 percent or more of the outstanding shares of Apache common stock or 10 business days following commencement of an offer for 30 percent or more of the outstanding shares of Apache's outstanding common stock (flip-in event); each Right will become exercisable for shares of Apache's common stock at 50 percent of the then-market price of the common stock. If a 20-percent shareholder of Apache acquires Apache, by merger or otherwise, in a transaction where Apache does not survive or in which Apache's common stock is changed or exchanged (flip-over event), the Rights become exercisable for shares of the common stock of the Company acquiring Apache at 50 percent of the then-market price for Apache common stock. Any Rights that are or were beneficially owned by a person who has acquired 20 percent or more of the outstanding shares of Apache common stock and who engages in certain transactions or realizes the benefits of certain transactions with the Company will become void. If an offer to acquire all of the Company's outstanding shares of common stock is determined to be fair by Apache's board of directors, the transaction will not trigger a flip-in event or a flip-over event. The Company may also redeem the Rights at $.01 per Right at any time until 10 business days after public announcement of a flip-in event. These rights were originally scheduled to expire on January 31, 2006. Effective as of that date, the Rights were reset to one right per share of common stock and the expiration was extended to January 31, 2016. Unless the Rights have been previously redeemed, all shares of Apache common stock issued by the Company after January 31, 1996 will include Rights. Unless and until the Rights become exercisable, they will be transferred with and only with the shares of Apache common stock.

*Series D Preferred Stock*

On July 28, 2010, Apache issued 25.3 million depositary shares, each representing a 1/20th interest in a share of Apache's 6.00-percent Mandatory Convertible Preferred Stock, Series D (Preferred Share), or 1.265 million Preferred Shares. The Company received proceeds of approximately $1.2 billion, after underwriting discounts and before expenses, from the sale.

Each Preferred Share has an initial liquidation preference of $1,000 per share (equivalent to $50 liquidation preference per depositary share). When and if declared by the Board of Directors, Apache will pay cumulative dividends on each Preferred Share at a rate of 6.00 percent per annum on the initial liquidation preference. Dividends will be paid in cash quarterly on February 1, May 1, August 1, and November 1 of each year, commencing on November 1, 2010, and until and including May 1, 2013. The final dividend payment on August 1, 2013, may be paid or delivered, as the case may be, in cash, shares of Apache common stock, or a combination thereof, at the election of the Company.

The Preferred Shares may be converted, at the option of the holder, into 9.164 shares, subject to adjustment, of Apache common stock at any time prior to July 15, 2013. If not converted prior to that time, each Preferred Share will automatically convert on August 1, 2013, into a minimum of 9.164 or a maximum of 11.364 shares, each subject to adjustment, of Apache common stock depending on the volume-weighted average price per share of Apache's common stock over the ten trading day period ending on, and including, the third scheduled trading day immediately preceding the mandatory conversion. Upon conversion, a minimum of 11.6 million Apache common shares and a maximum of 14.4 million common shares will be issued.

F-52

APACHE CORPORATION AND SUBSIDIARIES

NOTES TO CONSOLIDATED FINANCIAL STATEMENTS — (Continued)

**11.   ACCUMULATED OTHER COMPREHENSIVE INCOME (LOSS)**

Components of accumulated other comprehensive income (loss) consists of the following:

| | For the Year Ended December 31, | | |
| | 2012 | 2011 | 2010 |
| --- | --- | --- | --- |
| | | (In millions) | |
| Currency translation adjustment [1] | $ (109) | $ (109) | $ (109) |
| Unrealized gain (loss) on derivatives (Note 3) | (6) | 114 | (19) |
| Unfunded pension and postretirement benefit plan | (16) | (14) | (13) |
| Accumulated other comprehensive loss | $ (131) | $ (9) | $ (141) |

_____
[1]   Currency translation adjustments resulting from translating the Canadian subsidiaries' financial statements into U.S. dollar equivalents, prior to adoption of the U.S. dollar as their functional currency, were reported separately and accumulated in other comprehensive income (loss).

**12.   MAJOR CUSTOMERS**

In 2012, 2011, and 2010, purchases by Royal Dutch Shell plc and its subsidiaries accounted for 20 percent, 11 percent, and 15 percent, respectively, of the Company's worldwide oil and gas production revenues. In 2011, purchases by the Vitol Group accounted for 13 percent of the Company's worldwide oil and gas production revenues.

F-53

APACHE CORPORATION AND SUBSIDIARIES

NOTES TO CONSOLIDATED FINANCIAL STATEMENTS — (Continued)

## 13.  BUSINESS SEGMENT INFORMATION

Apache is engaged in a single line of business. Both domestically and internationally, the Company explores for, develops, and produces natural gas, crude oil and natural gas liquids. At December 31, 2012, the Company had production in six countries: the United States, Canada, Egypt, Australia, offshore the United Kingdom (U.K.) in the North Sea, and Argentina. Apache also pursues exploration interests in other countries that may over time result in reportable discoveries and development opportunities. Financial information for each country is presented below:

| | United States | Canada | Egypt | Australia | North Sea | Argentina | Other International | Total |
|---|---|---|---|---|---|---|---|---|
| | | | | | (In millions) | | | |
| **2012** | | | | | | | | |
| Oil and gas production revenues | $ 6,226 | $ 1,322 | $4,554 | $ 1,575 | $ 2,751 | $ 519 | $ — | $16,947 |
| Operating Expenses: | | | | | | | | |
| Depreciation, depletion, and amortization | | | | | | | | |
| Recurring | 2,056 | 594 | 925 | 466 | 914 | 228 | — | 5,183 |
| Additional | — | 1,883 | — | — | — | — | 43 | 1,926 |
| Asset retirement obligation accretion | 112 | 41 | — | 17 | 58 | 4 | — | 232 |
| Lease operating expenses | 1,386 | 458 | 410 | 215 | 315 | 184 | — | 2,968 |
| Gathering and transportation | 69 | 163 | 39 | — | 24 | 8 | — | 303 |
| Taxes other than income | 292 | 50 | 14 | 11 | 451 | 44 | — | 862 |
| Operating Income (Loss) [1] | $ 2,311 | $ (1,867) | $3,166 | $ 866 | $ 989 | $ 51 | $ (43) | 5,473 |
| Other Income (Expense): | | | | | | | | |
| Other | | | | | | | | 131 |
| General and administrative | | | | | | | | (531) |
| Merger, acquisitions & transition | | | | | | | | (31) |
| Financing costs, net | | | | | | | | (165) |
| Income Before Income Taxes | | | | | | | | $ 4,877 |
| Net Property and Equipment | $28,552 | $ 6,640 | $5,151 | $ 5,312 | $ 5,927 | $ 1,621 | $ 77 | $53,280 |
| Total Assets | $31,175 | $ 7,142 | $7,311 | $ 6,280 | $ 6,874 | $ 1,835 | $ 120 | $60,737 |
| Additions to Net Property and Equipment | $ 9,586 | $ 1,096 | $1,153 | $ 1,581 | $ 1,104 | $ 337 | $ 98 | $14,955 |
| **2011** | | | | | | | | |
| Oil and gas production revenues | $ 6,103 | $ 1,617 | $4,791 | $ 1,734 | $ 2,091 | $ 474 | $ — | $16,810 |
| Operating Expenses: | | | | | | | | |
| Depreciation, depletion, and amortization | | | | | | | | |
| Recurring | 1,684 | 546 | 818 | 440 | 409 | 198 | — | 4,095 |
| Additional | — | — | — | — | — | — | 109 | 109 |
| Asset retirement obligation accretion | 97 | 26 | — | 10 | 17 | 4 | — | 154 |
| Lease operating expenses | 1,167 | 470 | 398 | 197 | 208 | 165 | — | 2,605 |
| Gathering and transportation | 64 | 165 | 35 | — | 25 | 7 | — | 296 |
| Taxes other than income | 259 | 51 | 13 | 9 | 539 | 28 | — | 899 |
| Operating Income (Loss) [1] | $ 2,832 | $ 359 | $3,527 | $ 1,078 | $ 893 | $ 72 | $ (109) | 8,652 |
| Other Income (Expense): | | | | | | | | |
| Other | | | | | | | | 78 |
| General and administrative | | | | | | | | (459) |
| Merger, acquisitions & transition | | | | | | | | (20) |
| Financing costs, net | | | | | | | | (158) |
| Income Before Income Taxes | | | | | | | | $ 8,093 |
| Net Property and Equipment | $21,038 | $ 8,022 | $4,923 | $ 4,194 | $ 5,737 | $ 1,512 | $ 22 | $45,448 |
| Total Assets | $23,499 | $ 8,816 | $6,656 | $ 4,681 | $ 6,600 | $ 1,766 | $ 33 | $52,051 |
| Additions to Net Property and Equipment | $ 3,854 | $ 1,288 | $1,015 | $ 1,140 | $ 4,175 | $ 374 | $ 73 | $11,919 |

F-54

**APACHE CORPORATION AND SUBSIDIARIES**

**NOTES TO CONSOLIDATED FINANCIAL STATEMENTS — (Continued)**

| | United States | Canada | Egypt | Australia | North Sea (In millions) | Argentina | Other International | Total |
|---|---|---|---|---|---|---|---|---|
| **2010** | | | | | | | | |
| Oil and gas production revenues | $ 4,300 | $ 1,074 | $3,372 | $ 1,459 | $ 1,606 | $ 372 | $ — | $12,183 |
| Operating Expenses: | | | | | | | | |
|   Depreciation, depletion, and amortization | | | | | | | | |
|     Recurring | 1,163 | 294 | 754 | 408 | 304 | 160 | — | 3,083 |
|   Asset retirement obligation accretion | 62 | 23 | — | 9 | 15 | 2 | — | 111 |
|   Lease operating expenses | 924 | 334 | 298 | 185 | 168 | 123 | — | 2,032 |
|   Gathering and transportation | 42 | 75 | 31 | — | 25 | 5 | — | 178 |
|   Taxes other than income | 190 | 35 | 10 | 11 | 422 | 22 | — | 690 |
| Operating Income [1] | $ 1,919 | $ 313 | $2,279 | $ 846 | $ 672 | $ 60 | $ — | 6,089 |
| Other Expense: | | | | | | | | |
|   Other | | | | | | | | (91) |
|   General and administrative | | | | | | | | (380) |
|   Merger, acquisitions & transition | | | | | | | | (183) |
|   Financing costs, net | | | | | | | | (229) |
| Income Before Income Taxes | | | | | | | | $ 5,206 |
| Net Property and Equipment | $19,069 | $ 7,497 | $4,726 | $ 3,495 | $ 1,970 | $ 1,336 | $ 58 | $38,151 |
| Total Assets | $21,326 | $ 8,273 | $6,036 | $ 3,831 | $ 2,362 | $ 1,537 | $ 60 | $43,425 |
| Additions to Net Property and Equipment | $10,371 | $ 5,277 | $1,569 | $ 925 | $ 620 | $ 274 | $ 20 | $19,056 |

[1]    Operating Income (Loss) consists of oil and gas production revenues less depreciation, depletion and amortization, asset retirement obligation accretion, lease operating expenses, gathering and transportation costs, and taxes other than income. Canada's operating loss for 2012 includes additional depletion of $1.9 billon to write-down the carrying value of oil and gas properties.

F-55

APACHE CORPORATION AND SUBSIDIARIES

NOTES TO CONSOLIDATED FINANCIAL STATEMENTS — (Continued)

## 14. SUPPLEMENTAL OIL AND GAS DISCLOSURES (Unaudited)

### Oil and Gas Operations

The following table sets forth revenue and direct cost information relating to the Company's oil and gas exploration and production activities. Apache has no long-term agreements to purchase oil or gas production from foreign governments or authorities.

| | United States | Canada | Egypt | Australia | North Sea | Argentina | Other International | Total |
|---|---|---|---|---|---|---|---|---|
| | | | | (In millions, except per boe) | | | | |
| **2012** | | | | | | | | |
| Oil and gas production revenues | $6,226 | $1,322 | $4,554 | $1,575 | $2,751 | $519 | $ — | $16,947 |
| Operating cost: | | | | | | | | |
| Depreciation, depletion, and amortization | | | | | | | | |
|   Recurring [1] | 1,984 | 580 | 924 | 460 | 912 | 225 | — | 5,085 |
|   Additional | — | 1,883 | — | — | — | — | 43 | 1,926 |
| Asset retirement obligation accretion | 112 | 41 | — | 17 | 58 | 4 | — | 232 |
| Lease operating expenses | 1,386 | 458 | 410 | 215 | 315 | 184 | — | 2,968 |
| Gathering and transportation | 69 | 163 | 39 | — | 24 | 8 | — | 303 |
| Production taxes [2] | 279 | 42 | — | 11 | 451 | 34 | — | 817 |
| Income tax | 851 | (466) | 1,527 | 262 | 614 | 22 | — | 2,810 |
| | 4,681 | 2,701 | 2,900 | 965 | 2,374 | 477 | 43 | 14,141 |
| Results of operation | $1,545 | $(1,379) | $1,654 | $ 610 | $ 377 | $ 42 | $ (43) | $ 2,806 |
| Amortization rate per boe | $17.24 | $ 11.66 | $13.81 | $ 17.67 | $ 32.65 | $ 12.39 | $ — | $ 16.88 |
| **2011** | | | | | | | | |
| Oil and gas production revenues | $6,103 | $ 1,617 | $4,791 | $ 1,734 | $ 2,091 | $ 474 | $ — | $16,810 |
| Operating cost: | | | | | | | | |
| Depreciation, depletion, and amortization | | | | | | | | |
|   Recurring [1] | 1,634 | 537 | 818 | 435 | 405 | 195 | — | 4,024 |
|   Additional | — | — | — | — | — | — | 109 | 109 |
| Asset retirement obligation accretion | 97 | 26 | — | 10 | 17 | 4 | — | 154 |
| Lease operating expenses | 1,167 | 470 | 398 | 197 | 208 | 165 | — | 2,605 |
| Gathering and transportation | 64 | 165 | 35 | — | 25 | 7 | — | 296 |
| Production taxes [2] | 255 | 44 | — | 9 | 538 | 19 | — | 865 |
| Income tax | 1,025 | 95 | 1,699 | 325 | 557 | 29 | — | 3,730 |
| | 4,242 | 1,337 | 2,950 | 976 | 1,750 | 419 | 109 | 11,783 |
| Results of operation | $1,861 | $ 280 | $1,841 | $ 758 | $ 341 | $ 55 | $ (109) | $ 5,027 |
| Amortization rate per boe | $15.55 | $ 10.44 | $11.63 | $ 16.59 | $ 20.21 | $ 10.87 | $ — | $ 13.97 |

F-56

**APACHE CORPORATION AND SUBSIDIARIES**

**NOTES TO CONSOLIDATED FINANCIAL STATEMENTS — (Continued)**

| | United States | Canada | Egypt | Australia | North Sea | Argentina | Other International | Total |
|---|---|---|---|---|---|---|---|---|
| | | | | (In millions, except per boe) | | | | |
| **2010** | | | | | | | | |
| Oil and gas production revenues | $4,300 | $1,074 | $3,372 | $ 1,459 | $ 1,606 | $  372 | $    — | $12,183 |
| Operating cost: | | | | | | | | |
| Depreciation, depletion, and amortization Recurring [1] | 1,126 | 287 | 754 | 403 | 301 | 157 | — | 3,028 |
| Asset retirement obligation accretion | 62 | 23 | — | 9 | 15 | 2 | — | 111 |
| Lease operating expenses | 924 | 334 | 298 | 185 | 168 | 123 | — | 2,032 |
| Gathering and transportation | 42 | 75 | 31 | — | 25 | 5 | — | 178 |
| Production taxes [2] | 177 | 31 | — | 11 | 423 | 14 | — | 656 |
| Income tax | 699 | 82 | 1,099 | 255 | 337 | 25 | — | 2,497 |
| | 3,030 | 832 | 2,182 | 863 | 1,269 | 326 | — | 8,502 |
| Results of operation | $1,270 | $  242 | $1,190 | $  596 | $  337 | $  46 | $    — | $ 3,681 |
| Amortization rate per boe | $13.23 | $ 8.13 | $11.05 | $ 13.38 | $ 14.42 | $ 9.56 | $    — | $ 11.92 |

---

[1]   This amount only reflects DD&A of capitalized costs of oil and gas proved properties and, therefore, does not agree with DD&A reflected on Note 13 — Business Segment Information.

[2]   This amount only reflects amounts directly related to oil and gas producing properties and, therefore, does not agree with taxes other than income reflected on Note 13 — Business Segment Information.

F-57

**APACHE CORPORATION AND SUBSIDIARIES**

**NOTES TO CONSOLIDATED FINANCIAL STATEMENTS — (Continued)**

**Costs Incurred in Oil and Gas Property Acquisitions, Exploration, and Development Activities**

| | United States | Canada | Egypt | Australia | North Sea | Argentina | Other International | Total |
|---|---|---|---|---|---|---|---|---|
| | | | | | (In millions) | | | |
| **2012** | | | | | | | | |
| Acquisitions: | | | | | | | | |
|   Proved | $ 1,076 | $ 5 | $ 28 | $ 32 | $ 110 | $ — | $ — | $ 1,251 |
|   Unproved | 2,329 | — | — | — | 26 | — | — | 2,355 |
| Exploration | 1,369 | 111 | 696 | 149 | 111 | 157 | 96 | 2,689 |
| Development | 4,465 | 762 | 394 | 915 | 837 | 161 | 2 | 7,536 |
| Costs incurred [1] | $ 9,239 | $ 878 | $1,118 | $1,096 | $ 1,084 | $ 318 | $ 98 | $13,831 |
| [1] Includes capitalized interest and asset retirement costs as follows: | | | | | | | | |
|   Capitalized interest | $ 215 | $ 38 | $ 16 | $ 12 | $ 24 | $ 11 | $ — | $ 316 |
|   Asset retirement costs | 473 | 245 | — | 207 | 89 | 18 | — | 1,032 |
| **2011** | | | | | | | | |
| Acquisitions: | | | | | | | | |
|   Proved | $ 368 | $ — | $ (12) | $ — | $ 2,399 | $ — | $ — | $ 2,755 |
|   Unproved | 116 | 33 | 2 | 48 | 476 | — | 13 | 688 |
| Exploration | 418 | 209 | 570 | 286 | 18 | 202 | 59 | 1,762 |
| Development | 2,832 | 883 | 344 | 429 | 941 | 156 | 2 | 5,587 |
| Costs incurred [1] | $ 3,734 | $1,125 | $ 904 | $ 763 | $ 3,834 | $ 358 | $ 74 | $10,792 |
| [1] Includes capitalized interest and asset retirement costs as follows: | | | | | | | | |
|   Capitalized interest | $ 152 | $ 47 | $ 18 | $ 14 | $ — | $ 12 | $ — | $ 243 |
|   Asset retirement costs | 380 | 228 | — | 125 | 678 | — | — | 1,411 |
| **2010** | | | | | | | | |
| Acquisitions: | | | | | | | | |
|   Proved | $ 5,604 | $2,752 | $ 325 | $ — | $ — | $ — | $ — | $ 8,681 |
|   Unproved | 2,497 | 542 | 145 | 32 | — | — | — | 3,216 |
| Exploration | 261 | 312 | 477 | 236 | 142 | 136 | 20 | 1,584 |
| Development | 1,724 | 611 | 290 | 496 | 475 | 131 | — | 3,727 |
| Costs incurred [1] | $10,086 | $4,217 | $1,237 | $ 764 | $ 617 | $ 267 | $ 20 | $17,208 |
| [1] Includes capitalized interest and asset retirement costs as follows: | | | | | | | | |
|   Capitalized interest | $ 52 | $ 23 | $ 10 | $ 15 | $ — | $ 11 | $ — | $ 111 |
|   Asset retirement costs | 1,099 | 98 | — | 93 | — | 16 | — | 1,306 |

F-58

**APACHE CORPORATION AND SUBSIDIARIES**

**NOTES TO CONSOLIDATED FINANCIAL STATEMENTS — (Continued)**

## Capitalized Costs

The following table sets forth the capitalized costs and associated accumulated depreciation, depletion, and amortization, including impairments, relating to the Company's oil and gas production, exploration, and development activities:

| | United States | Canada | Egypt | Australia | North Sea | Argentina | Other International | Total |
|---|---|---|---|---|---|---|---|---|
| | | | | | (In millions) | | | |
| **2012** | | | | | | | | |
| Proved properties | $ 40,163 | $13,477 | $ 7,165 | $ 6,319 | $ 8,401 | $ 2,706 | $ 152 | $ 78,383 |
| Unproved properties | 5,641 | 1,059 | 686 | 284 | 626 | 382 | 76 | 8,754 |
| | 45,804 | 14,536 | 7,851 | 6,603 | 9,027 | 3,088 | 228 | 87,137 |
| Accumulated DD&A | (17,968) | (8,899) | (4,474) | (2,478) | (3,445) | (1,562) | (152) | (38,978) |
| | $ 27,836 | $ 5,637 | $ 3,377 | $ 4,125 | $ 5,582 | $ 1,526 | $ 76 | $ 48,159 |
| **2011** | | | | | | | | |
| Proved properties | $ 33,905 | $12,619 | $ 6,117 | $ 5,183 | $ 7,430 | $ 2,442 | $ 109 | $ 67,805 |
| Unproved properties | 2,690 | 1,093 | 615 | 270 | 513 | 327 | 22 | 5,530 |
| | 36,595 | 13,712 | 6,732 | 5,453 | 7,943 | 2,769 | 131 | 73,335 |
| Accumulated DD&A | (16,013) | (6,506) | (3,672) | (2,061) | (2,550) | (1,343) | (109) | (32,254) |
| | $ 20,582 | $ 7,206 | $ 3,060 | $ 3,392 | $ 5,393 | $ 1,426 | $ 22 | $ 41,081 |

## Costs Not Being Amortized

The following table sets forth a summary of oil and gas property costs not being amortized at December 31, 2012, by the year in which such costs were incurred. There are no individually significant properties or significant development projects included in costs not being amortized. The majority of the evaluation activities are expected to be completed within five to ten years.

| | Total | 2012 | 2011 | 2010 | 2009 and Prior |
|---|---|---|---|---|---|
| | | | (In millions) | | |
| Property acquisition costs | $6,998 | $3,558 | $ 981 | $2,146 | $ 313 |
| Exploration and development | 1,550 | 1,108 | 368 | 16 | 58 |
| Capitalized interest | 206 | 48 | 27 | 55 | 76 |
| Total | $8,754 | $4,714 | $1,376 | $2,217 | $ 447 |

## Oil and Gas Reserve Information

Proved oil and gas reserves are the estimated quantities of natural gas, crude oil, condensate, and natural gas liquids (NGLs) that geological and engineering data demonstrate with reasonable certainty to be recoverable in future years from known reservoirs under existing conditions, operating conditions, and government regulations. Estimated proved developed oil and gas reserves can be expected to be recovered through existing wells with existing equipment and operating methods. The Company reports all estimated proved reserves held under production-sharing arrangements utilizing the "economic interest" method, which excludes the host country's share of reserves.

F-59

**APACHE CORPORATION AND SUBSIDIARIES**

**NOTES TO CONSOLIDATED FINANCIAL STATEMENTS — (Continued)**

Estimated reserves that can be produced economically through application of improved recovery techniques are included in the "proved" classification when successful testing by a pilot project or the operation of an active, improved recovery program using reliable technology establishes the reasonable certainty for the engineering analysis on which the project or program is based. Economically producible means a resource which generates revenue that exceeds, or is reasonably expected to exceed, the costs of the operation. Reasonable certainty means a high degree of confidence that the quantities will be recovered. Reliable technology is a grouping of one or more technologies (including computational methods) that has been field-tested and has been demonstrated to provide reasonably certain results with consistency and repeatability in the formation being evaluated or in an analogous formation. In estimating its proved reserves, Apache uses several different traditional methods that can be classified in three general categories: 1) performance-based methods; 2) volumetric-based methods; and 3) analogy with similar properties. Apache will, at times, utilize additional technical analysis such as computer reservoir models, petrophysical techniques, and proprietary 3-D seismic interpretation methods to provide additional support for more complex reservoirs. Information from this additional analysis is combined with traditional methods outlined above to enhance the certainty of our reserve estimates.

F-60

**APACHE CORPORATION AND SUBSIDIARIES**

**NOTES TO CONSOLIDATED FINANCIAL STATEMENTS — (Continued)**

There are numerous uncertainties inherent in estimating quantities of proved reserves and projecting future rates of production and timing of development expenditures. The following reserve data only represent estimates and should not be construed as being exact.

| | Crude Oil, Condensate and Natural Gas Liquids (Thousands of barrels) | | | | | | | Natural Gas (Millions of cubic feet) | | | | | | | Total (Thousands of barrels of oil equivalent) |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| | United States | Canada | Egypt | Australia | North Sea | Argentina | Total | United States | Canada | Egypt | Australia | North Sea | Argentina | Total | |
| **Proved developed reserves:** | | | | | | | | | | | | | | | |
| December 31, 2009 | 373,010 | 89,222 | 97,787 | 34,662 | 142,022 | 25,985 | 762,688 | 1,785,155 | 1,436,151 | 838,000 | 699,963 | 4,851 | 473,145 | 5,237,265 | 1,635,565 |
| December 31, 2010 | 514,537 | 113,993 | 109,657 | 48,072 | 115,705 | 22,458 | 924,422 | 2,284,116 | 2,181,615 | 748,573 | 682,763 | 4,144 | 462,206 | 6,363,417 | 1,984,991 |
| December 31, 2011 | 535,741 | 105,102 | 105,840 | 35,725 | 145,743 | 21,940 | 950,091 | 2,215,973 | 2,108,801 | 700,866 | 675,618 | 105,028 | 447,132 | 6,253,418 | 1,992,327 |
| December 31, 2012 | 629,345 | 101,691 | 106,746 | 29,053 | 122,073 | 20,852 | 1,009,760 | 2,353,587 | 1,734,657 | 690,436 | 596,052 | 93,319 | 365,054 | 5,833,105 | 1,981,945 |
| **Proved undeveloped reserves:** | | | | | | | | | | | | | | | |
| December 31, 2009 | 150,627 | 57,552 | 17,806 | 43,779 | 29,692 | 5,104 | 304,560 | 652,766 | 869,197 | 321,141 | 661,478 | — | 54,184 | 2,558,766 | 731,021 |
| December 31, 2010 | 244,478 | 60,997 | 17,470 | 18,064 | 38,663 | 4,641 | 384,313 | 988,869 | 1,310,352 | 328,344 | 805,735 | — | 70,465 | 3,503,765 | 968,274 |
| December 31, 2011 | 258,306 | 67,939 | 22,195 | 32,220 | 32,924 | 5,800 | 419,384 | 760,238 | 1,438,710 | 282,100 | 893,966 | 3,414 | 90,427 | 3,468,855 | 997,527 |
| December 31, 2012 | 263,957 | 82,908 | 17,288 | 34,808 | 28,399 | 3,857 | 431,217 | 832,320 | 403,227 | 205,055 | 1,074,018 | 18,985 | 97,496 | 2,631,101 | 869,734 |
| **Total proved reserves:** | | | | | | | | | | | | | | | |
| Balance December 31, 2009 | 523,637 | 146,774 | 115,593 | 78,441 | 171,714 | 31,089 | 1,067,248 | 2,437,921 | 2,305,348 | 1,159,141 | 1,361,441 | 4,851 | 527,329 | 7,796,031 | 2,366,586 |
| Extensions, discoveries and other additions | 72,928 | 6,816 | 41,205 | 4,452 | 3,383 | 426 | 129,210 | 102,180 | 274,755 | 46,692 | 199,958 | 166 | 71,632 | 695,383 | 245,108 |
| Purchase of minerals in-place | 195,131 | 42,440 | 11,261 | — | — | — | 248,832 | 951,654 | 1,064,618 | 49,044 | — | — | — | 2,065,316 | 593,051 |
| Revisions of previous estimates | 7,597 | (14,592) | (4,723) | — | — | 379 | (11,339) | 47,989 | (8,211) | (41,137) | — | — | 1,173 | (186) | (11,370) |
| Production | (40,278) | (6,375) | (36,209) | (16,757) | (20,729) | (4,795) | (125,143) | (266,759) | (144,542) | (136,823) | (72,901) | (873) | (67,463) | (689,361) | (240,037) |
| Sale of properties | — | (73) | — | — | — | — | (73) | — | (1) | — | — | — | — | (1) | (73) |
| Balance December 31, 2010 | 759,015 | 174,990 | 127,127 | 66,136 | 154,368 | 27,099 | 1,308,735 | 3,272,985 | 3,491,967 | 1,076,917 | 1,488,498 | 4,144 | 532,671 | 9,867,182 | 2,953,265 |
| Extensions, discoveries and other additions | 89,591 | 22,602 | 45,039 | 15,762 | 404 | 5,014 | 178,412 | 169,506 | 505,049 | 77,049 | 148,640 | 475 | 81,274 | 981,993 | 342,078 |
| Purchase of minerals in-place | 5,683 | 752 | — | 43,803 | — | — | 50,238 | 67,595 | 8,838 | — | 104,658 | — | — | 181,091 | 80,420 |
| Revisions of previous estimates | (7,191) | (16,343) | (6,185) | — | — | 232 | (29,487) | (7,716) | (133,359) | (37,623) | — | — | 1,107 | (177,591) | (59,086) |
| Production | (51,658) | (7,376) | (37,946) | (13,953) | (19,908) | (4,605) | (135,446) | (315,631) | (230,880) | (133,377) | (67,554) | (835) | (77,493) | (825,770) | (273,074) |
| Sale of properties | (1,393) | (1,584) | — | — | — | — | (2,977) | (210,528) | (94,104) | — | — | — | — | (304,632) | (53,749) |
| Balance December 31, 2011 | 794,047 | 173,041 | 128,035 | 67,945 | 178,667 | 27,740 | 1,369,475 | 2,976,211 | 3,547,511 | 982,966 | 1,569,584 | 108,442 | 537,559 | 9,722,273 | 2,989,854 |
| Extensions, discoveries and other additions | 156,621 | 26,590 | 36,188 | 6,277 | 592 | 1,133 | 227,401 | 365,863 | 252,130 | 55,967 | 176,969 | 16,397 | 2,623 | 869,949 | 372,393 |
| Purchase of minerals in-place | 16,172 | 197 | — | 276 | 2,374 | — | 19,019 | 313,885 | 2,503 | — | 1,745 | 8,494 | — | 326,627 | 73,457 |
| Revisions of previous estimates | (12,033) | (7,146) | (3,678) | (66) | (7,257) | 502 | (29,678) | (156,840) | (1,443,989) | (13,974) | 101 | — | 496 | (1,614,206) | (298,712) |
| Production | (61,361) | (8,083) | (36,511) | (10,571) | (23,904) | (4,666) | (145,096) | (312,600) | (219,849) | (129,468) | (78,329) | (21,029) | (78,128) | (839,403) | (284,997) |
| Sale of properties | (144) | — | — | — | — | — | (144) | (612) | (422) | — | — | — | — | (1,034) | (316) |
| Balance December 31, 2012 | 893,302 | 184,599 | 124,034 | 63,861 | 150,472 | 24,709 | 1,440,977 | 3,185,907 | 2,137,884 | 895,491 | 1,670,070 | 112,304 | 462,550 | 8,464,206 | 2,851,679 |

**APACHE CORPORATION AND SUBSIDIARIES**

**NOTES TO CONSOLIDATED FINANCIAL STATEMENTS — (Continued)**

During 2012, Apache added 73 MMboe of estimated proved reserves through purchases of minerals in-place. The Company recorded 68 MMboe in connection with the acquisition of Cordillera. Other individually insignificant acquisitions added 6 MMboe across several regions. During 2012, Apache also added 372 MMboe from extensions, discoveries and other additions. In the U.S., the Company recorded 218 MMboe primarily associated with drilling successes in the Permian and Anadarko basins, which added 104 MMboe and 77 MMboe, respectively; 23 MMboe from appraisal drilling in the deepwater Gulf of Mexico; and 14 MMboe from various drilling programs in other U.S. regions. In Canada, additions of 69 MMboe were primarily a result of drilling activity for liquids-rich gas targets in the Kaybob field area and shallow oil drilling in Brownfield and Consort field areas. Egypt contributed 46 MMboe from exploration activity in the West Kalabsha, Matruh and Ras Kanayes concessions along with continued development of the Razzak and Abu Gharadig fields and several waterflood projects in the East Bahariya concession. Australia additions of 36 MMboe were primarily from two discoveries and two appraisal wells in the Carnarvon basin offshore Western Australia. Various drilling programs in Argentina and North Sea regions combined to contribute 5 MMboe.

Approximately 15 percent of Apache's year-end 2012 estimated proved developed reserves are classified as proved not producing. These reserves relate to zones that are either behind pipe, or that have been completed but not yet produced, or zones that have been produced in the past, but are not now producing because of mechanical reasons. These reserves are considered to be a lower tier of reserves than producing reserves because they are frequently based on volumetric calculations rather than performance data. Future production associated with behind pipe reserves is scheduled to follow depletion of the currently producing zones in the same wellbores. Additional capital may have to be spent to access these reserves. The capital and economic impact of production timing are reflected in this Note 14, under "Future Net Cash Flows."

Driven by the significant decline in North America natural gas prices, a portion of our proved reserves fell below the threshold for economic development during 2012 and were removed from our proved reserves balance, resulting in negative revisions of 299 MMboe for the year.

**Future Net Cash Flows**

Future cash inflows as of December 31, 2012 and 2011 were calculated using an unweighted arithmetic average of oil and gas prices in effect on the first day of each month in the respective year, except where prices are defined by contractual arrangements. Operating costs, production and ad valorem taxes and future development costs are based on current costs with no escalation.

F-62

**APACHE CORPORATION AND SUBSIDIARIES**

**NOTES TO CONSOLIDATED FINANCIAL STATEMENTS — (Continued)**

The following table sets forth unaudited information concerning future net cash flows for proved oil and gas reserves, net of income tax expense. Income tax expense has been computed using expected future tax rates and giving effect to tax deductions and credits available, under current laws, and which relate to oil and gas producing activities. This information does not purport to present the fair market value of the Company's oil and gas assets, but does present a standardized disclosure concerning possible future net cash flows that would result under the assumptions used.

| | United States | Canada | Egypt | Australia | North Sea | Argentina | Total |
|---|---|---|---|---|---|---|---|
| | | | | (In millions) | | | |
| **2012** | | | | | | | |
| Cash inflows | $ 84,060 | $ 20,512 | $16,210 | $20,823 | $16,732 | $ 3,010 | $161,347 |
| Production costs | (27,230) | (8,543) | (2,126) | (4,896) | (8,451) | (1,162) | (52,408) |
| Development costs | (6,768) | (2,916) | (1,756) | (2,484) | (3,053) | (248) | (17,225) |
| Income tax expense | (12,740) | (754) | (4,246) | (3,172) | (3,163) | (141) | (24,216) |
| Net cash flows | 37,322 | 8,299 | 8,082 | 10,271 | 2,065 | 1,459 | 67,498 |
| 10 percent discount rate | (19,464) | (4,472) | (2,107) | (6,361) | (98) | (443) | (32,945) |
| Discounted future net cash flows [1] | $ 17,858 | $ 3,827 | $ 5,975 | $ 3,910 | $ 1,967 | $ 1,016 | $ 34,553 |
| **2011** | | | | | | | |
| Cash inflows | $ 85,041 | $ 27,727 | $17,092 | $20,579 | $19,012 | $ 3,082 | $172,533 |
| Production costs | (25,379) | (13,142) | (2,467) | (3,588) | (8,810) | (1,190) | (54,576) |
| Development costs | (6,493) | (3,274) | (1,909) | (3,124) | (3,003) | (232) | (18,035) |
| Income tax expense | (15,351) | (972) | (4,565) | (3,455) | (4,453) | (184) | (28,980) |
| Net cash flows | 37,818 | 10,339 | 8,151 | 10,412 | 2,746 | 1,476 | 70,942 |
| 10 percent discount rate | (20,311) | (4,956) | (2,168) | (6,624) | (493) | (443) | (34,995) |
| Discounted future net cash flows [1] | $ 17,507 | $ 5,383 | $ 5,983 | $ 3,788 | $ 2,253 | $ 1,033 | $ 35,947 |

[1]   Estimated future net cash flows before income tax expense, discounted at 10 percent per annum, totaled approximately $48.2 billion and $52.3 billion as of December 31, 2012 and 2011, respectively.

The following table sets forth the principal sources of change in the discounted future net cash flows:

| | For the Year Ended December 31, | | |
|---|---|---|---|
| | 2012 | 2011 | 2010 |
| | | (In millions) | |
| Sales, net of production costs | $(12,589) | $(13,152) | $ (9,152) |
| Net change in prices and production costs | (1,941) | 12,167 | 13,006 |
| Discoveries and improved recovery, net of related costs | 6,742 | 6,751 | 5,147 |
| Change in future development costs | (935) | (2,250) | (1,637) |
| Previously estimated development costs incurred during the period | 4,359 | 2,479 | 1,355 |
| Revision of quantities | (4,065) | (1,475) | (1,905) |
| Purchases of minerals in-place | 1,181 | 2,139 | 7,794 |
| Accretion of discount | 5,234 | 4,161 | 2,439 |
| Change in income taxes | 2,711 | (4,303) | (4,535) |
| Sales of properties | (3) | (1,285) | (3) |
| Change in production rates and other | (2,088) | 273 | 182 |
| | $ (1,394) | $ 5,505 | $12,691 |

F-63

**APACHE CORPORATION AND SUBSIDIARIES**

**NOTES TO CONSOLIDATED FINANCIAL STATEMENTS — (Continued)**

**15.  SUPPLEMENTAL QUARTERLY FINANCIAL DATA (Unaudited)**

| | First | Second | Third | Fourth | Total |
|---|---|---|---|---|---|
| | | (In millions, except per share amounts) | | | |
| **2012** | | | | | |
| Revenues and other | $4,536 | $3,972 | $4,179 | $4,391 | $17,078 |
| Expenses | 3,739 | 3,616 | 3,999 | 3,723 | 15,077 |
| Net income | $ 797 | $ 356 | $ 180 | $ 668 | $ 2,001 |
| Income attributable to common stock | $ 778 | $ 337 | $ 161 | $ 649 | $ 1,925 |
| Net income per common share( [1]: | | | | | |
|    Basic | $ 2.02 | $ 0.87 | $ 0.41 | $ 1.66 | $ 4.95 |
|    Diluted | $ 2.00 | $ 0.86 | $ 0.41 | $ 1.64 | $ 4.92 |
| **2011** | | | | | |
| Revenues and other | $3,925 | $4,338 | $4,328 | $4,297 | $16,888 |
| Expenses | 2,791 | 3,079 | 3,326 | 3,108 | 12,304 |
| Net income | $1,134 | $1,259 | $1,002 | $1,189 | $ 4,584 |
| Income attributable to common stock | $1,115 | $1,240 | $ 983 | $1,170 | $ 4,508 |
| Net income per common share( [1]: | | | | | |
|    Basic | $ 2.91 | $ 3.23 | $ 2.56 | $ 3.05 | $ 11.75 |
|    Diluted | $ 2.86 | $ 3.17 | $ 2.50 | $ 2.98 | $ 11.47 |

[1]  The sum of the individual quarterly net income per common share amounts may not agree with year-to-date net income per common share as each quarterly computation is based on the weighted-average number of common shares outstanding during that period.

**16.  SUPPLEMENTAL GUARANTOR INFORMATION**

In December 1999, Apache Finance Canada Corporation (Apache Finance Canada) issued approximately $300 million of publicly-traded notes due in 2029. In May 2003, Apache Finance Canada issued an additional $350 million of publicly-traded notes due in 2015. Both are fully and unconditionally guaranteed by Apache. The following condensed consolidating financial statements are provided as an alternative to filing separate financial statements.

Apache Finance Canada has been fully consolidated in Apache's consolidated financial statements. As such, these condensed consolidating financial statements should be read in conjunction with the financial statements of Apache Corporation and subsidiaries and notes thereto, of which this note is an integral part.

**APACHE CORPORATION AND SUBSIDIARIES**

**NOTES TO CONSOLIDATED FINANCIAL STATEMENTS — (Continued)**

**CONDENSED CONSOLIDATING STATEMENT OF OPERATIONS**
**For the Year Ended December 31, 2012**

| | Apache Corporation | Apache Finance Canada | All Other Subsidiaries of Apache Corporation (In millions) | Reclassifications & Eliminations | Consolidated |
|---|---|---|---|---|---|
| REVENUES AND OTHER: | | | | | |
| Oil and gas production revenues | $ 4,237 | $ — | $ 12,710 | $ — | $ 16,947 |
| Equity in net income (loss) of affiliates | 1,523 | (737) | 248 | (1,034) | — |
| Other | (80) | 69 | 146 | (4) | 131 |
| | 5,680 | (668) | 13,104 | (1,038) | 17,078 |
| OPERATING EXPENSES: | | | | | |
| Depreciation, depletion, and amortization | 1,391 | — | 5,718 | — | 7,109 |
| Asset retirement obligation accretion | 76 | — | 156 | — | 232 |
| Lease operating expenses | 957 | — | 2,011 | — | 2,968 |
| Gathering and transportation | 51 | — | 252 | — | 303 |
| Taxes other than income | 185 | — | 677 | — | 862 |
| General and administrative | 425 | — | 110 | (4) | 531 |
| Merger, acquisitions & transition | 25 | — | 6 | — | 31 |
| Financing costs, net | 94 | (20) | 91 | — | 165 |
| | 3,204 | (20) | 9,021 | (4) | 12,201 |
| INCOME (LOSS) BEFORE INCOME TAXES | 2,476 | (648) | 4,083 | (1,034) | 4,877 |
| Provision (benefit) for income taxes | 475 | (159) | 2,560 | — | 2,876 |
| NET INCOME (LOSS) | 2,001 | (489) | 1,523 | (1,034) | 2,001 |
| Preferred stock dividends | 76 | — | — | — | 76 |
| INCOME (LOSS) ATTRIBUTABLE TO COMMON STOCK | $ 1,925 | $ (489) | $ 1,523 | $ (1,034) | $ 1,925 |
| COMPREHENSIVE INCOME (LOSS) ATTRIBUTABLE TO COMMON STOCK | $ 1,803 | $ (489) | $ 1,523 | $ (1,034) | $ 1,803 |

F-65

**APACHE CORPORATION AND SUBSIDIARIES**

**NOTES TO CONSOLIDATED FINANCIAL STATEMENTS — (Continued)**

**CONDENSED CONSOLIDATING STATEMENT OF OPERATIONS**
**For the Year Ended December 31, 2011**

| | Apache Corporation | Apache Finance Canada | All Other Subsidiaries of Apache Corporation (In millions) | Reclassifications & Eliminations | Consolidated |
|---|---|---|---|---|---|
| **REVENUES AND OTHER:** | | | | | |
| Oil and gas production revenues | $ 4,380 | $ — | $ 12,430 | $ — | $ 16,810 |
| Equity in net income (loss) of affiliates | 3,590 | 234 | 46 | (3,870) | — |
| Other | 9 | 125 | (52) | (4) | 78 |
| | 7,979 | 359 | 12,424 | (3,874) | 16,888 |
| **OPERATING EXPENSES:** | | | | | |
| Depreciation, depletion, and amortization | 1,257 | — | 2,947 | — | 4,204 |
| Asset retirement obligation accretion | 70 | — | 84 | — | 154 |
| Lease operating expenses | 794 | — | 1,811 | — | 2,605 |
| Gathering and transportation | 51 | — | 245 | — | 296 |
| Taxes other than income | 170 | — | 729 | — | 899 |
| General and administrative | 365 | — | 98 | (4) | 459 |
| Merger, acquisitions & transition | 14 | — | 6 | — | 20 |
| Financing costs, net | 149 | (18) | 27 | — | 158 |
| | 2,870 | (18) | 5,947 | (4) | 8,795 |
| INCOME (LOSS) BEFORE INCOME TAXES | 5,109 | 377 | 6,477 | (3,870) | 8,093 |
| Provision (benefit) for income taxes | 525 | 97 | 2,887 | — | 3,509 |
| NET INCOME (LOSS) | 4,584 | 280 | 3,590 | (3,870) | 4,584 |
| Preferred stock dividends | 76 | — | — | — | 76 |
| INCOME (LOSS) ATTRIBUTABLE TO COMMON STOCK | $ 4,508 | $ 280 | $ 3,590 | $ (3,870) | $ 4,508 |
| COMPREHENSIVE INCOME (LOSS) ATTRIBUTABLE TO COMMON STOCK | $ 4,640 | $ 280 | $ 3,590 | $ (3,870) | $ 4,640 |

F-66

**APACHE CORPORATION AND SUBSIDIARIES**

**NOTES TO CONSOLIDATED FINANCIAL STATEMENTS — (Continued)**

**CONDENSED CONSOLIDATING STATEMENT OF OPERATIONS**
**For the Year Ended December 31, 2010**

| | Apache Corporation | Apache Finance Canada | All Other Subsidiaries of Apache Corporation (In millions) | Reclassifications & Eliminations | Consolidated |
|---|---:|---:|---:|---:|---:|
| REVENUES AND OTHER: | | | | | |
| Oil and gas production revenues | $ 3,665 | $ — | $ 8,518 | $ — | $ 12,183 |
| Equity in net income (loss) of affiliates | 2,265 | 81 | (7) | (2,339) | — |
| Other | 27 | (1) | (113) | (4) | (91) |
| | 5,957 | 80 | 8,398 | (2,343) | 12,092 |
| OPERATING EXPENSES: | | | | | |
| Depreciation, depletion, and amortization | 1,041 | — | 2,042 | — | 3,083 |
| Asset retirement obligation accretion | 57 | — | 54 | — | 111 |
| Lease operating expenses | 797 | — | 1,235 | — | 2,032 |
| Gathering and transportation | 42 | — | 136 | — | 178 |
| Taxes other than income | 140 | — | 550 | — | 690 |
| General and administrative | 273 | — | 111 | (4) | 380 |
| Merger, acquisitions & transition | 183 | — | — | — | 183 |
| Financing costs, net | 158 | (19) | 90 | — | 229 |
| | 2,691 | (19) | 4,218 | (4) | 6,886 |
| INCOME (LOSS) BEFORE INCOME TAXES | 3,266 | 99 | 4,180 | (2,339) | 5,206 |
| Provision (benefit) for income taxes | 234 | 25 | 1,915 | — | 2,174 |
| NET INCOME (LOSS) | 3,032 | 74 | 2,265 | (2,339) | 3,032 |
| Preferred stock dividends | 32 | — | — | — | 32 |
| INCOME (LOSS) ATTRIBUTABLE TO COMMON STOCK | $ 3,000 | $ 74 | $ 2,265 | $ (2,339) | $ 3,000 |
| COMPREHENSIVE INCOME (LOSS) ATTRIBUTABLE TO COMMON STOCK | $ 3,149 | $ 74 | $ 2,265 | $ (2,339) | $ 3,149 |

F-67

**APACHE CORPORATION AND SUBSIDIARIES**

**NOTES TO CONSOLIDATED FINANCIAL STATEMENTS — (Continued)**

**CONDENSED CONSOLIDATING STATEMENT OF CASH FLOWS**
**For the Year Ended December 31, 2012**

| | Apache Corporation | Apache Finance Canada | All Other Subsidiaries of Apache Corporation (In millions) | Reclassifications & Eliminations | Consolidated |
|---|---|---|---|---|---|
| CASH PROVIDED BY (USED IN) OPERATING ACTIVITIES | $   2,357 | $   (40) | $   6,187 | $   — | $   8,504 |
| CASH FLOWS FROM INVESTING ACTIVITIES: | | | | | |
| Additions to oil and gas property | (3,313) | — | (5,468) | — | (8,781) |
| Additions to gas gathering, transmission, and processing facilities | (48) | — | (702) | — | (750) |
| Acquisition of Cordillera | (2,666) | — | — | — | (2,666) |
| Equity investment in Yara Pilbara Holdings Pty Limited | — | — | (439) | — | (439) |
| Acquisitions, other | (66) | — | (186) | — | (252) |
| Proceeds from sale of oil and gas properties | 25 | — | 2 | — | 27 |
| Investment in subsidiaries, net | (657) | — | — | 657 | — |
| Other | (450) | — | (113) | — | (563) |
| NET CASH PROVIDED BY (USED IN) INVESTING ACTIVITIES | (7,175) | — | (6,906) | 657 | (13,424) |
| CASH FLOWS FROM FINANCING ACTIVITIES: | | | | | |
| Commercial paper, credit facility, and bank notes, net | 502 | — | 47 | — | 549 |
| Intercompany borrowings | — | — | 697 | (697) | — |
| Fixed rate debt borrowings | 4,978 | — | — | — | 4,978 |
| Payments on fixed rate debt | (400) | — | — | — | (400) |
| Dividends paid | (332) | — | — | — | (332) |
| Other | 29 | 35 | (114) | 40 | (10) |
| NET CASH PROVIDED BY (USED IN) FINANCING ACTIVITIES | 4,777 | 35 | 630 | (657) | 4,785 |
| NET INCREASE (DECREASE) IN CASH AND CASH EQUIVALENTS | (41) | (5) | (89) | — | (135) |
| CASH AND CASH EQUIVALENTS AT BEGINNING OF YEAR | 41 | 5 | 249 | — | 295 |
| CASH AND CASH EQUIVALENTS AT END OF PERIOD | $   — | $   — | $   160 | $   — | $   160 |

F-68

**APACHE CORPORATION AND SUBSIDIARIES**

**NOTES TO CONSOLIDATED FINANCIAL STATEMENTS — (Continued)**

**CONDENSED CONSOLIDATING STATEMENT OF CASH FLOWS**
**For the Year Ended December 31, 2011**

| | Apache Corporation | Apache Finance Canada | All Other Subsidiaries of Apache Corporation (In millions) | Reclassifications & Eliminations | Consolidated |
|---|---|---|---|---|---|
| CASH PROVIDED BY OPERATING ACTIVITIES | $ 2,191 | $ 13 | $ 7,749 | $ — | $ 9,953 |
| CASH FLOWS FROM INVESTING ACTIVITIES: | | | | | |
| Additions to oil and gas property | (1,478) | — | (4,936) | — | (6,414) |
| Additions to gas gathering, transmission, and processing facilities | — | — | (664) | — | (664) |
| Acquisition of Mobil North Sea | — | — | (1,246) | — | (1,246) |
| Acquisitions, other | (448) | — | (119) | — | (567) |
| Proceeds from sales of oil and gas properties | 204 | — | 218 | — | 422 |
| Investment in and advances to subsidiaries, net | 772 | — | — | (772) | — |
| Other | (81) | — | (95) | — | (176) |
| NET CASH USED IN INVESTING ACTIVITIES | (1,031) | — | (6,842) | (772) | (8,645) |
| CASH FLOWS FROM FINANCING ACTIVITIES: | | | | | |
| Commercial paper, credit facility, and bank notes, net | (927) | — | 2 | — | (925) |
| Intercompany borrowings | — | (1) | (763) | 764 | — |
| Dividends paid | (306) | — | — | — | (306) |
| Other | 108 | (7) | (25) | 8 | 84 |
| NET CASH PROVIDED BY (USED IN) FINANCING ACTIVITIES | (1,125) | (8) | (786) | 772 | (1,147) |
| NET INCREASE (DECREASE) IN CASH AND CASH EQUIVALENTS | 35 | 5 | 121 | — | 161 |
| CASH AND CASH EQUIVALENTS AT BEGINNING OF YEAR | 6 | — | 128 | — | 134 |
| CASH AND CASH EQUIVALENTS AT END OF PERIOD | $ 41 | $ 5 | $ 249 | $ — | $ 295 |

F-69

**APACHE CORPORATION AND SUBSIDIARIES**

**NOTES TO CONSOLIDATED FINANCIAL STATEMENTS — (Continued)**

**CONDENSED CONSOLIDATING STATEMENT OF CASH FLOWS**
**For the Year Ended December 31, 2010**

| | Apache Corporation | Apache Finance Canada | All Other Subsidiaries of Apache Corporation (In millions) | Reclassifications & Eliminations | Consolidated |
|---|---|---|---|---|---|
| CASH PROVIDED BY (USED IN) OPERATING ACTIVITIES | $ (1,848) | $ (100) | $ 8,674 | $ — | $ 6,726 |
| CASH FLOWS FROM INVESTING ACTIVITIES: | | | | | |
| Additions to oil and gas property | (1,552) | — | (2,855) | — | (4,407) |
| Additions to gas gathering, transmission, and processing facilities | (4) | — | (511) | — | (515) |
| Acquisitions of Devon properties | (1,018) | — | — | — | (1,018) |
| Acquisitions of BP properties | — | — | (6,429) | — | (6,429) |
| Mariner Energy, Inc. merger | — | — | (787) | — | (787) |
| Acquisitions, other | — | — | (126) | — | (126) |
| Investment in and advances to subsidiaries, net | (2,853) | — | — | 2,853 | — |
| Other | (72) | — | (49) | — | (121) |
| NET CASH PROVIDED BY (USED IN) INVESTING ACTIVITIES | (5,499) | — | (10,757) | 2,853 | (13,403) |
| CASH FLOWS FROM FINANCING ACTIVITIES: | | | | | |
| Commercial paper, credit facility, and bank notes, net | 928 | — | (960) | — | (32) |
| Intercompany borrowings | — | 2 | 2,720 | (2,722) | — |
| Fixed-rate debt borrowings | 2,470 | — | — | — | 2,470 |
| Payments on fixed-rate notes | — | — | (1,023) | — | (1,023) |
| Proceeds from issuance of common stock | 2,258 | — | — | — | 2,258 |
| Proceeds from issuance of mandatory convertible preferred stock | 1,227 | — | — | — | 1,227 |
| Dividends paid | (226) | — | — | — | (226) |
| Other | 49 | 96 | 75 | (131) | 89 |
| NET CASH PROVIDED BY (USED IN) FINANCING ACTIVITIES | 6,706 | 98 | 812 | (2,853) | 4,763 |
| NET INCREASE (DECREASE) IN CASH AND CASH EQUIVALENTS | (641) | (2) | (1,271) | — | (1,914) |
| CASH AND CASH EQUIVALENTS AT BEGINNING OF YEAR | 647 | 2 | 1,399 | — | 2,048 |
| CASH AND CASH EQUIVALENTS AT END OF PERIOD | $ 6 | $ — | $ 128 | $ — | $ 134 |

F-70

**APACHE CORPORATION AND SUBSIDIARIES**

**NOTES TO CONSOLIDATED FINANCIAL STATEMENTS — (Continued)**

**CONDENSED CONSOLIDATING BALANCE SHEET**
**December 31, 2012**

| | Apache Corporation | Apache Finance Canada | All Other Subsidiaries of Apache Corporation (In millions) | Reclassifications & Eliminations | Consolidated |
|---|---|---|---|---|---|
| **ASSETS** | | | | | |
| CURRENT ASSETS: | | | | | |
| Cash and cash equivalents | $ — | $ — | $ 160 | $ — | $ 160 |
| Receivables, net of allowance | 876 | — | 2,210 | — | 3,086 |
| Inventories | 95 | — | 813 | — | 908 |
| Drilling advances | 21 | 1 | 562 | — | 584 |
| Derivative instruments | 31 | — | — | — | 31 |
| Prepaid assets and other | 3,868 | — | (3,675) | — | 193 |
| | 4,891 | 1 | 70 | — | 4,962 |
| PROPERTY AND EQUIPMENT, NET | 18,517 | — | 34,763 | — | 53,280 |
| OTHER ASSETS: | | | | | |
| Intercompany receivable, net | 4,628 | — | (2,917) | (1,711) | — |
| Equity in affiliates | 21,047 | 934 | 97 | (22,078) | — |
| Goodwill, net | 173 | — | 1,116 | — | 1,289 |
| Deferred charges and other | 152 | 1,002 | 1,052 | (1,000) | 1,206 |
| | $ 49,408 | $ 1,937 | $ 34,181 | $ (24,789) | $ 60,737 |
| **LIABILITIES AND SHAREHOLDERS' EQUITY** | | | | | |
| CURRENT LIABILITIES: | | | | | |
| Accounts payable | $ 639 | $ 1 | $ 2,163 | $ (1,711) | $ 1,092 |
| Current debt | 912 | — | 78 | — | 990 |
| Asset retirement obligation | 471 | — | 7 | — | 478 |
| Derivative instruments | 96 | — | 20 | — | 116 |
| Other current liabilities | 893 | 3 | 1,964 | — | 2,860 |
| | 3,011 | 4 | 4,232 | (1,711) | 5,536 |
| LONG-TERM DEBT | 10,706 | 647 | 2 | — | 11,355 |
| DEFERRED CREDITS AND OTHER NONCURRENT LIABILITIES: | | | | | |
| Income taxes | 2,990 | 5 | 5,029 | — | 8,024 |
| Asset retirement obligation | 992 | — | 3,108 | — | 4,100 |
| Other | 378 | 250 | 763 | (1,000) | 391 |
| | 4,360 | 255 | 8,900 | (1,000) | 12,515 |
| COMMITMENTS AND CONTINGENCIES SHAREHOLDERS' EQUITY | 31,331 | 1,031 | 21,047 | (22,078) | 31,331 |
| | $ 49,408 | $ 1,937 | $ 34,181 | $ (24,789) | $ 60,737 |

F-71

**APACHE CORPORATION AND SUBSIDIARIES**

**NOTES TO CONSOLIDATED FINANCIAL STATEMENTS — (Continued)**

**CONDENSED CONSOLIDATING BALANCE SHEET**
**December 31, 2011**

| | Apache Corporation | Apache Finance Canada | All Other Subsidiaries of Apache Corporation (In millions) | Reclassifications & Eliminations | Consolidated |
|---|---|---|---|---|---|
| **ASSETS** | | | | | |
| CURRENT ASSETS: | | | | | |
| Cash and cash equivalents | $ 41 | $ 5 | $ 249 | $ — | $ 295 |
| Receivables, net of allowance | 773 | — | 2,306 | — | 3,079 |
| Inventories | 51 | — | 604 | — | 655 |
| Drilling advances | 11 | — | 218 | — | 229 |
| Derivative instruments | 113 | — | 191 | — | 304 |
| Prepaid assets and other | 3,859 | — | (3,618) | — | 241 |
| | 4,848 | 5 | (50) | — | 4,803 |
| PROPERTY AND EQUIPMENT, NET | 12,262 | — | 33,186 | — | 45,448 |
| OTHER ASSETS: | | | | | |
| Intercompany receivable, net | 3,931 | — | (1,908) | (2,023) | — |
| Equity in affiliates | 20,214 | 1,372 | 99 | (21,685) | — |
| Goodwill, net | — | — | 1,114 | — | 1,114 |
| Deferred charges and other | 158 | 1,002 | 526 | (1,000) | 686 |
| | $ 41,413 | $ 2,379 | $ 32,967 | $ (24,708) | $ 52,051 |
| **LIABILITIES AND SHAREHOLDERS' EQUITY** | | | | | |
| CURRENT LIABILITIES: | | | | | |
| Accounts payable | $ 609 | $ 1 | $ 2,461 | $ (2,023) | $ 1,048 |
| Current debt | 400 | — | 31 | — | 431 |
| Asset retirement obligation | 434 | — | 13 | — | 447 |
| Derivative instruments | 76 | — | 37 | — | 113 |
| Other current liabilities | 614 | 5 | 2,305 | — | 2,924 |
| | 2,133 | 6 | 4,847 | (2,023) | 4,963 |
| LONG-TERM DEBT | 6,137 | 647 | 1 | — | 6,785 |
| DEFERRED CREDITS AND OTHER NONCURRENT LIABILITIES: | | | | | |
| Income taxes | 2,622 | 5 | 4,570 | — | 7,197 |
| Asset retirement obligation | 936 | — | 2,504 | — | 3,440 |
| Other | 592 | 250 | 831 | (1,000) | 673 |
| | 4,150 | 255 | 7,905 | (1,000) | 11,310 |
| COMMITMENTS AND CONTINGENCIES SHAREHOLDERS' EQUITY | 28,993 | 1,471 | 20,214 | (21,685) | 28,993 |
| | $ 41,413 | $ 2,379 | $ 32,967 | $ (24,708) | $ 52,051 |

F-72

## Board of Directors

**G. Steven Farris** (1)
Chairman and Chief Executive Officer,
Apache Corporation

**Randolph M. Ferlic, M.D.** (1)(2)
Founder and Former President,
Surgical Services of the Great Plains, P.C.

**Eugene C. Fiedorek** (2)
Private Investor, Co-Founder and Former President
and Managing Director,
EnCap Investments L.C.

**A.D. Frazier, Jr.** (3)(5)
President, Georgia Oak Partners

**Patricia Albjerg Graham** (4)
Charles Warren Professor of the
History of Education Emerita,
Harvard University

**Scott D. Josey** (1)
Private Investor, Former Chairman
and Chief Executive Officer
Mariner Energy, Inc.

**Chansoo Joung** (2)(4)
Senior Advisor and Former Partner,
Warburg Pincus LLC

**John A. Kocur** (1)(3)(4)
Attorney at Law; Former Vice Chairman of the Board,
Apache Corporation

**George D. Lawrence** (1)(3)
Private Investor; Former Chief Executive Officer,
The Phoenix Resource Companies, Inc.

**William C. Montgomery** (3)(5)
Managing Director, Quantum Energy Partners

**Rodman D. Patton** (2)
Former Managing Director,
Merrill Lynch Energy Group

**Charles J. Pitman** (4)(5)
Former Regional President — Middle East/
Caspian/Egypt/India, BP Amoco plc

## Officers

**G. Steven Farris**
Chairman and Chief Executive Officer

**Roger B. Plank**
President and Chief Corporate Officer

**Rodney J. Eichler**
President and Chief Operating Officer

**Michael S. Bahorich**
Executive Vice President and Chief
Technology Officer

**Thomas P. Chambers**
Executive Vice President and Chief Financial Officer

**Margery M. Harris**
Executive Vice President — Human Resources

**Jon A. Jeppesen**
Executive Vice President — Gulf of Mexico Regions

**P. Anthony Lannie**
Executive Vice President and General Counsel

**W. Kregg Olson**
Executive Vice President — Corporate Reservoir Engineering

**Thomas E. Voytovich**
Executive Vice President — International Operations

**Matthew W. Dundrea**
Senior Vice President — Treasury and Administration

**Robert J. Dye**
Senior Vice President — Global Communication and
Corporate Affairs

**Alfonso Leon**
Senior Vice President and Chief of Staff

**Janine J. McArdle**
Senior Vice President — Gas Monetization

**Sarah B. Teslik**
Senior Vice President — Policy and Governance

**John R. Bedingfield**
Vice President — Worldwide Exploration and New Ventures

**David L. French**
Vice President — Business Development

**Jon A. Graham**
Vice President — Environmental, Health and Safety

**Rodney A. Gryder**
Vice President — Audit

**Rebecca A. Hoyt**
Vice President, Chief Accounting Officer and Controller

**Aaron S. G. Merrick**
Vice President — Information Technology

**Urban F. O'Brien**
Vice President — Government Affairs

**F. Brady Parish, Jr**
Vice President of Investor Relations

**Jon W. Sauer**
Vice President — Tax

**Cheri L. Peper**
Corporate Secretary

---

(1)    Executive Committee
(2)    Audit Committee
(3)    Management Development and Compensation Committee
(4)    Corporate Governance and Nominating Committee
(5)    Stock Plan Committee

**Shareholder Information**
Stock Data

| | Price Range | | Dividends per Share | |
|---|---|---|---|---|
| | High | Low | Declared | Paid |
| **2012** | | | | |
| First Quarter | $112.09 | $ 91.48 | $ 0.17 | $0.15 |
| Second Quarter | 102.13 | 77.93 | 0.17 | 0.17 |
| Third Quarter | 94.87 | 81.55 | 0.17 | 0.17 |
| Fourth Quarter | 89.08 | 74.50 | 0.17 | 0.17 |
| **2011** | | | | |
| First Quarter | $132.50 | $110.29 | $ 0.15 | $0.15 |
| Second Quarter | 134.13 | 114.94 | 0.15 | 0.15 |
| Third Quarter | 129.26 | 80.05 | 0.15 | 0.15 |
| Fourth Quarter | 105.64 | 73.04 | 0.15 | 0.15 |

The Company has paid cash dividends on its common stock for 48 consecutive years through December 31, 2012. Future dividend payments will depend upon the Company's level of earnings, financial requirements and other relevant factors.

Apache common stock is listed on the New York and Chicago stock exchanges and the NASDAQ National Market (symbol APA). At December 31, 2012, the Company's shares of common stock outstanding were held by approximately 5,300 shareholders of record and 386,000 beneficial owners. Also listed on the New York Stock Exchange are:

- Apache Depositary Shares (symbol APA/PD), each representing a 1/20th interest in Apache's 6% Mandatory Convertible Preferred Stock, Series D

- Apache Finance Canada's 7.75% notes, due 2029 (symbol APA/29)

**Corporate Offices**
One Post Oak Central
2000 Post Oak Boulevard
Suite 100
Houston, Texas 77056-4400
(713) 296-6000

**Independent Public Accountants**
Ernst & Young LLP
Five Houston Center
1401 McKinney Street, Suite 1200
Houston, Texas 77010-2007

**Stock Transfer Agent and Registrar**
Wells Fargo Bank, N.A.
Attn: Shareowner Services
P.O. Box 64854
South St. Paul, Minnesota 55164-0854
(651) 450-4064 or (800) 468-9716

Communications concerning the transfer of shares, lost certificates, dividend checks, duplicate mailings, or change of address should be directed to the stock transfer agent. Shareholders can access account information on the web site: www.shareowneronline.com

**Dividend Reinvestment Plan**

Shareholders of record may invest their dividends automatically in additional shares of Apache common stock at the market price. Participants may also invest up to an additional $25,000 in Apache shares each quarter through this service. All bank service fees and brokerage commissions on purchases are paid by Apache. A prospectus describing the terms of the Plan and an authorization form may be obtained from the Company's stock transfer agent, Wells Fargo Bank, N.A.

**Direct Registration**

Shareholders of record may hold their shares of Apache common stock in book-entry form. This eliminates costs related to safekeeping or replacing paper stock certificates. In addition, shareholders of record may request electronic movement of book-entry shares between your account with the Company's stock transfer agent and your broker. Stock certificates may be converted to book-entry shares at any time. Questions regarding this service may be directed to the Company's stock transfer agent, Wells Fargo Bank, N.A.

**Annual Meeting**

Apache will hold its annual meeting of shareholders on Thursday, May 16, 2013, at 10:00 a.m. in the Ballroom, Hilton Houston Post Oak, 2001 Post Oak Boulevard, Houston, Texas. Apache plans to web cast the annual meeting live; connect through the Apache web site: www.apachecorp.com

**Stock Held in "Street Name"**

The Company maintains a direct mailing list to ensure that shareholders with stock held in brokerage accounts receive information on a timely basis. Shareholders wanting to be added to this list should direct their requests to Apache's Public and International Affairs Department, 2000 Post Oak Boulevard, Suite 100, Houston, Texas, 77056-4400, by calling (713) 296-6157 or by registering on Apache's web site: www.apachecorp.com

**Form 10-K Request**

Shareholders and other persons interested in obtaining, without cost, a copy of the Company's Form 10-K filed with the Securities and Exchange Commission may do so by writing to Cheri L. Peper, Corporate Secretary, 2000 Post Oak Boulevard, Suite 100, Houston, Texas, 77056-4400.

**Investor Relations**

Shareholders, brokers, securities analysts, or portfolio managers seeking information about the Company are welcome to contact F. Brady Parish, Jr., Vice President of Investor Relations, at (713) 296-6472.

Members of the news media and others seeking information about the Company should contact Apache's Public and International Affairs Department at (713) 296-7276.

**Web site: www.apachecorp.com**

**Index to Exhibits**

| EXHIBIT NO. | | DESCRIPTION |
|---|---|---|
| 2.1 | – | Agreement and Plan of Merger, dated April 14, 2010, by and among Registrant, ZMZ Acquisitions LLC, and Mariner Energy, Inc. (incorporated by reference to Exhibit 2.1 to Registrant's Current Report on Form 8-K, dated April 14, 2010, filed April 16, 2010, SEC File No. 001-4300) (the schedules and annexes have been omitted pursuant to Item 601(b)(2) of Regulation S-K). |
| 2.2 | – | Amendment No. 1, dated August 2, 2010, to Agreement and Plan of Merger, dated April 14, 2010, by and among Registrant, ZMZ Acquisitions LLC, and Mariner Energy, Inc.(incorporated by reference to Exhibit 2.1 to Registrant's Current Report on Form 8-K, dated August 2, 2010, filed on August 3, 2010, SEC File No. 001-4300) (the schedules and annexes have been omitted pursuant to Item 601(b)(2) of Regulation S-K). |
| 2.3 | – | Purchase and Sale Agreement by and between BP America Production Company and ZPZ Delaware I LLC dated July 20, 2010 (incorporated by reference to Exhibit 2.1 to Registrant's Current Report on Form 8-K/A, dated July 20, 2010, filed on July 21, 2010, SEC File No. 001-4300) (the exhibits and schedules have been omitted pursuant to Item 601(b)(2) of Regulation S-K). |
| 2.4 | – | Partnership Interest and Share Purchase and Sale Agreement by and between BP Canada Energy and Apache Canada Ltd. dated July 20, 2010 (incorporated by reference to Exhibit 2.2 to Registrant's Current Report on Form 8-K/A, dated July 20, 2010, filed on July 21, 2010, SEC File No. 001-4300) (the exhibits have been omitted pursuant to Item 601(b)(2) of Regulation S-K). |
| 2.5 | – | Purchase and Sale Agreement by and among BP Egypt Company, BP Exploration (Delta) Limited and ZPZ Egypt Corporation LDC dated July 20, 2010 (incorporated by reference to Exhibit 2.3 to Registrant's Current Report on Form 8-K/A, dated July 20, 2010, filed on July 21, 2010, SEC File No. 001-4300) (the exhibits and schedules have been omitted pursuant to Item 601(b)(2) of Regulation S-K). |
| 3.1 | – | Restated Certificate of Incorporation of Registrant, dated February 23, 2010, as filed with the Secretary of State of Delaware on February 23, 2010 (incorporated by reference to Exhibit 3.1 to Registrant's Annual Report on Form 10-K for year ended December 31, 2009, SEC File No. 001-4300). |
| 3.2 | – | Certificate of Designations of the 6.00% Mandatory Convertible Preferred Stock, Series D (incorporated by reference to Exhibit 3.3 to Registrant's Registration Statement on Form 8-A, dated July 29, 2010, SEC File No. 001-4300). |

| EXHIBIT NO. | | DESCRIPTION |
|---|---|---|
| 3.3 | – | Amendment to Restated Certificate of Incorporation of Registrant, dated May 5, 2011, as filed with the Secretary of State of Delaware on May 5, 2011 (incorporated by reference to Exhibit 3.1 to Registrant's Current Report on Form 8-K filed May 11, 2011, SEC File No. 001-4300). |
| 3.4 | – | Bylaws of Registrant, as amended July 21, 2011 (incorporated by reference to Exhibit 3.1 to Registrant's Current Report on Form 8-K filed July 27, 2011, SEC File No. 001-4300). |
| 4.1 | – | Form of Certificate for Registrant's Common Stock (incorporated by reference to Exhibit 4.1 to Registrant's Quarterly Report on Form 10-Q for the quarter ended March 31, 2004, SEC File No. 001-4300). |
| 4.2 | – | Form of Certificate for the 6.00% Mandatory Convertible Preferred Stock, Series D (incorporated by reference to Exhibit A of Exhibit 3.3 to Registrant's Registration Statement on Form 8-A, dated July 29, 2010, SEC File No. 001-4300). |
| 4.3 | – | Form of 3.625% Notes due 2021 (incorporated by reference to Exhibit 4.1 to Registrant's Current Report on Form 8-K, dated November 30, 2010, filed on December 3, 2010, SEC File No. 001-4300). |
| 4.4 | – | Form of 5.250% Notes due 2042 (incorporated by reference to Exhibit 4.2 to Registrant's Current Report on Form 8-K, dated November 30, 2010, filed on December 3, 2010, SEC File No. 001-4300). |
| 4.5 | – | Form of 5.100% Notes due 2040 (incorporated by reference to Exhibit 4.1 to Registrant's Current Report on Form 8-K, dated August 17, 2010, filed on August 20, 2010, SEC File No. 001-4300). |
| 4.6 | – | Form of 1.75% Notes due 2017 (incorporated by reference to Exhibit 4.1 to Registrant's Current Report on Form 8-K, dated April 3, 2012, filed on April 9, 2012, SEC File No. 001-4300). |
| 4.7 | – | Form of 3.25% Note due 2022 (incorporated by reference to Exhibit 4.2 to Registrant's Current Report on Form 8-K, dated April 3, 2012, filed on April 9, 2012, SEC File No. 001-4300). |
| 4.8 | – | Form of 4.75% Notes due 2043 (incorporated by reference to Exhibit 4.3 to Registrant's Current Report on Form 8-K, dated April 3, 2012, filed on April 9, 2012, SEC File No. 001-4300). |
| 4.9 | – | Form of 2.625% Notes due 2023 (incorporated by reference to Exhibit 4.1 to Registrant's Current Report on Form 8-K, dated November 28, 2012, filed on December 4, 2012, SEC File No. 001-4300). |
| 4.10 | – | Form of 4.250% Notes due 2044 (incorporated by reference to Exhibit 4.2 to Registrant's Current Report on Form 8-K, dated November 28, 2012, filed on December 4, 2012, SEC File No. 001-4300). |

| EXHIBIT NO. | | DESCRIPTION |
|---|---|---|
| 4.11 | – | Rights Agreement, dated January 31, 1996, between Registrant and Wells Fargo Bank, N.A. (as successor-in-interest to Norwest Bank Minnesota, N.A.), rights agent, relating to the declaration of a rights dividend to Registrant's common shareholders of record on January 31, 1996 (incorporated by reference to Exhibit (a) to Registrant's Registration Statement on Form 8-A, dated January 24, 1996, SEC File No. 001-4300). |
| 4.12 | – | Amendment No. 1, dated as of January 31, 2006, to the Rights Agreement dated as of December 31, 1996, between Apache Corporation, a Delaware corporation, and Wells Fargo Bank, N.A. (as successor-in-interest to Norwest Bank Minnesota, N.A.) (incorporated by reference to Exhibit 4.4 to Registrant's Amendment No. 1 to Registration Statement on Form 8-A, dated January 31, 2006, SEC File No. 001-4300). |
| 4.13 | – | Senior Indenture, dated February 15, 1996, between Registrant and The Bank of New York Mellon Trust Company, N.A. (formerly known as the Bank of New York Trust Company, N.A., as successor-in-interest to JPMorgan Chase Bank), formerly known as The Chase Manhattan Bank, as trustee, governing the senior debt securities and guarantees (incorporated by reference to Exhibit 4.6 to Registrant's Registration Statement on Form S-3, dated May 23, 2003, Reg. No. 333-105536). |
| 4.14 | – | First Supplemental Indenture to the Senior Indenture, dated as of November 5, 1996, between Registrant and The Bank of New York Mellon Trust Company, N.A. (formerly known as the Bank of New York Trust Company, N.A., as successor-in-interest to JPMorgan Chase Bank, formerly known as The Chase Manhattan Bank), as trustee, governing the senior debt securities and guarantees (incorporated by reference to Exhibit 4.7 to Registrant's Registration Statement on Form S-3, dated May 23, 2003, Reg. No. 333-105536). |
| 4.15 | – | Form of Indenture among Apache Finance Pty Ltd, Registrant and The Bank of New York Mellon Trust Company, N.A. (formerly known as the Bank of New York Trust Company, N.A., as successor-in-interest to The Chase Manhattan Bank), as trustee, governing the debt securities and guarantees (incorporated by reference to Exhibit 4.1 to Registrant's Registration Statement on Form S-3, dated November 12, 1997, Reg. No. 333-339973). |
| 4.16 | – | Form of Indenture among Registrant, Apache Finance Canada Corporation and The Bank of New York Mellon Trust Company, N.A. (formerly known as the Bank of New York Trust Company, N.A., as successor-in-interest to The Chase Manhattan Bank), as trustee, governing the debt securities and guarantees (incorporated by reference to Exhibit 4.1 to Amendment No. 1 to Registrant's Registration Statement on Form S-3, dated November 12, 1999, Reg. No. 333-90147). |
| 4.17 | – | Deposit Agreement, dated as of July 28, 2010, between Registrants and Wells Fargo Bank, N.A., as depositary, on behalf of all holders from time to time of the receipts issued there under (incorporated by reference to Exhibit 4.2 to Registrant's Current Report on Form 8-K, dated July 22, 2010, filed on July 28, 2010, SEC File No. 001-4300). |

| EXHIBIT NO. | | DESCRIPTION |
|---|---|---|
| 4.18 | – | Form of Depositary Receipt for the Depositary Shares (incorporated by reference to Exhibit A to Exhibit 4.2 to Registrant's Current Report on Form 8-K, dated July 22, 2010, filed on July 28, 2010, SEC File No. 001-4300). |
| 4.19 | – | Senior Indenture, dated May 19, 2011, between Registrant and Wells Fargo Bank, National Association, as trustee, governing the senior debt securities of Apache Corporation (incorporated by reference to Exhibit 4.14 to Registrant's Registration Statement on Form S-3, dated May 23, 2011, Reg. No. 333-174429). |
| 4.20 | – | Senior Indenture, dated May 19, 2011, among Apache Finance Pty Ltd, Apache Corporation, as guarantor, and Wells Fargo Bank, National Association, as trustee, governing the senior debt securities of Apache Finance Pty Ltd and the related guarantees (incorporated by reference to Exhibit 4.16 to Registrant's Registration Statement on Form S-3, dated May 23, 2011, Reg. No. 333-174429). |
| 4.21 | – | Senior Indenture, dated May 19, 2011, among Apache Finance Canada Corporation, Apache Corporation, as guarantor, and Wells Fargo Bank, National Association, as trustee, governing the senior debt securities of Apache Finance Corporation and the related guarantees (incorporated by reference to Exhibit 4.20 to Registrant's Registration Statement on Form S-3, dated May 23, 2011, Reg. No. 333-174429). |
| 4.22 | – | Form of Apache Corporation November 10, 2010 First Non-Qualified Stock Option Agreement for Certain Employees of Apache Corporation (incorporated by reference to Exhibit 4.6 to Registrant's Registration Statement on Form S-8 filed on November 10, 2010, Reg. No. 333-170533). |
| 4.23 | – | Form of Apache Corporation November 10, 2010 Second Non-Qualified Stock Option Agreement for Certain Employees of Apache Corporation (incorporated by reference to Exhibit 4.7 to Registrant's Registration Statement on Form S-8 filed on November 10, 2010, Reg. No. 333-170533). |
| 4.24 | – | Form of Apache Corporation November 10, 2010 Non-Statutory Stock Option Agreement for Certain Employees of Apache Corporation (incorporated by reference to Exhibit 4.8 to Registrant's Registration Statement on Form S-8 filed on November 10, 2010, Reg. No. 333-170533). |
| 10.1 | – | Form of Amended and Restated Credit Agreement, dated as of May 9, 2006, among Registrant, the Lenders named therein, JPMorgan Chase Bank, as Administrative Agent, Citibank, N.A. and Bank of America, N.A., as Co-Syndication Agents, and BNP Paribas and UBS Loan Finance LLC, as Co-Documentation Agents (incorporated by reference to Exhibit 10.1 to Registrant's Annual Report on Form 10-K for year ended December 31, 2006, SEC File No. 001-4300). |

| EXHIBIT NO. | | DESCRIPTION |
|---|---|---|
| 10.2 | – | Form of Request for Approval of Extension of Maturity Date and Amendment, dated as of April 5, 2007, among Registrant, the Lenders named therein, JPMorgan Chase Bank, as Administrative Agent, Citibank, N.A. and Bank of America, N.A., as Co-Syndication Agents, and BNP Paribas and UBS Loan Finance LLC, as Co-Documentation Agents (incorporated by reference to Exhibit 10.2 to Registrant's Annual Report on Form 10-K for year ended December 31, 2007, SEC File No. 001-4300). |
| 10.3 | – | Form of Request for Approval of Extension of Maturity Date and Amendment, dated as of February 18, 2008, among Registrant, the Lenders named therein, JPMorgan Chase Bank, as Administrative Agent, Citibank, N.A. and Bank of America, N.A., as Co-Syndication Agents, and BNP Paribas and UBS Loan Finance LLC, as Co-Documentation Agents (incorporated by reference to Exhibit 10.1 to Registrant's Quarterly Report on Form 10-Q for the quarter ended March 31, 2008, SEC File No. 001-4300). |
| 10.4 | – | Form of Credit Agreement, dated as of May 12, 2005, among Registrant, the Lenders named therein, JPMorgan Chase Bank, N.A., as Global Administrative Agent, J.P. Morgan Securities Inc. and Banc of America Securities, LLC, as Co-Lead Arrangers and Joint Bookrunners, Bank of America, N.A. and Citibank, N.A., as U.S. Co-Syndication Agents, and Calyon New York Branch and Société Générale, as U.S. Co-Documentation Agents (excluding exhibits and schedules) (incorporated by reference to Exhibit 10.01 to Registrant's Quarterly Report on Form 10-Q for the quarter ended June 30, 2005, SEC File No. 001-4300). |
| 10.5 | – | Form of Credit Agreement, dated as of May 12, 2005, among Apache Canada Ltd, a wholly-owned subsidiary of Registrant, the Lenders named therein, JPMorgan Chase Bank, N.A., as Global Administrative Agent, RBC Capital Markets and BMO Nesbitt Burns, as Co-Lead Arrangers and Joint Bookrunners, Royal Bank of Canada, as Canadian Administrative Agent, Bank of Montreal and Union Bank of California, N.A., Canada Branch, as Canadian Co-Syndication Agents, and The Toronto-Dominion Bank and BNP Paribas (Canada), as Canadian Co-Documentation Agents (excluding exhibits and schedules) (incorporated by reference to Exhibit 10.02 to Registrant's Quarterly Report on Form 10-Q for the quarter ended June 30, 2005, SEC File No. 001-4300). |

| EXHIBIT NO. | | DESCRIPTION |
|---|---|---|
| 10.6 | – | Form of Credit Agreement, dated as of May 12, 2005, among Apache Energy Limited, a wholly-owned subsidiary of Registrant, the Lenders named therein, JPMorgan Chase Bank, N.A., as Global Administrative Agent, Citigroup Global Markets Inc. and Deutsche Bank Securities Inc., as Co-Lead Arrangers and Joint Bookrunners, Citi securities Limited, as Australian Administrative Agent, Deutsche Bank AG, Sydney Branch, and JPMorgan Chase Bank, as Australian Co-Syndication Agents, and Bank of America, N.A., Sydney Branch, and UBS AG, Australia Branch, as Australian Co-Documentation Agents (excluding exhibits and schedules) (incorporated by reference to Exhibit 10.03 to Registrant's Quarterly Report on Form 10-Q for the quarter ended June 30, 2005, SEC File No. 001-4300). |
| 10.7 | – | Form of Request for Approval of Extension of Maturity Date and Amendment, dated April 5, 2007, among Registrant, Apache Canada Ltd., Apache Energy Limited, the Lenders named therein, JPMorgan Chase Bank, N.A., as Global Administrative Agent, and the other agents party thereto (incorporated by reference to Exhibit 10.6 to Registrant's Annual Report on Form 10-K for year ended December 31, 2007, SEC File No. 001-4300). |
| 10.8 | – | Form of Request for Approval of Extension of Maturity Date and Amendment, dated February 18, 2008, among Registrant, Apache Canada Ltd., Apache Energy Limited, the Lenders named therein, JPMorgan Chase Bank, N.A., as Global Administrative Agent, and the other agents party thereto (incorporated by reference to Exhibit 10.2 to Registrant's Quarterly Report on Form 10-Q for the quarter ended March 31, 2008, SEC File No. 001-4300). |
| 10.9 | – | Credit Agreement, dated August 13, 2010, among Registrant, JPMorgan Chase Bank, N.A., as Administrative Agent, and Citibank, N.A., Bank of America, N.A. and Goldman Sachs Bank USA, as Co-Syndication Agents, J.P. Morgan Securities Inc., Citigroup Global Markets Inc., Banc of America Securities, LLC and Goldman Sachs Bank USA, as Co-Lead Arrangers and Joint Bookrunners, and the lenders party thereto (excluding exhibits and schedules) (incorporated by reference to Exhibit 10.1 to Registrant's Current Report on Form 8-K filed August 16, 2010). |
| 10.10 | – | Credit Agreement, dated August 12, 2011, among Registrant, the lenders party thereto, JPMorgan Chase Bank, N.A., as Administrative Agent, and Citibank, N.A., Bank of America, N.A., and Wells Fargo Bank, National Association, as Syndication Agents (incorporated by reference to Exhibit 10.1 to Registrant's Current Report on Form 8-K filed August 18, 2011, SEC File No. 001-4300). |
| 10.11 | – | Credit Agreement, dated as of June 4, 2012, among Apache Corporation, the lenders party thereto, JPMorgan Chase Bank, N.A., as Global Administrative Agent, Bank of America, N.A. and Citibank, N.A., as Global Syndication Agents, and The Royal Bank of Scotland plc and Royal Bank of Canada, as Global Documentation Agents (incorporated by reference to Exhibit 10.1 to Registrant's Current Report on Form 8-K filed June 7, 2012, SEC File No. 001-04300). |

| EXHIBIT NO. | | DESCRIPTION |
|---|---|---|
| 10.12 | – | Credit Agreement, dated as of June 4, 2012, among Apache Canada Ltd., the lenders party thereto, JPMorgan Chase Bank, N.A., as Global Administrative Agent, Royal Bank of Canada, as Canadian Administrative Agent, Bank of America, N.A. and Citibank, N.A., as Global Syndication Agents, and The Royal Bank of Scotland plc and Royal Bank of Canada, as Global Documentation Agents (incorporated by reference to Exhibit 10.2 to Registrant's Current Report on Form 8-K filed June 7, 2012, SEC File No. 001-04300). |
| 10.13 | – | Syndicated Facility Agreement, dated as of June 4, 2012, among Apache Energy Limited (ACN 009 301 964), the lenders party thereto, JPMorgan Chase Bank, N.A., as Global Administrative Agent, Citisecurities Limited (ABN 51 008 489 610), as Australian Administrative Agent, Bank of America, N.A. and Citibank, N.A., as Global Syndication Agents, and The Royal Bank of Scotland plc and Royal Bank of Canada, as Global Documentation Agents (incorporated by reference to Exhibit 10.3 to Registrant's Current Report on Form 8-K filed June 7, 2012, SEC File No. 001-04300). |
| †10.14 | – | Apache Corporation Corporate Incentive Compensation Plan A (Senior Officers' Plan), dated July 16, 1998 (incorporated by reference to Exhibit 10.13 to Registrant's Annual Report on Form 10-K for year ended December 31, 1998, SEC File No. 001-4300). |
| †10.15 | – | First Amendment to Apache Corporation Corporate Incentive Compensation Plan A, dated November 20, 2008, effective as of January 1, 2005 (incorporated by reference to Exhibit 10.17 to Registrant's Annual Report on Form 10-K for year ended December 31, 2008, SEC File No. 001-4300). |
| †10.16 | – | Apache Corporation Corporate Incentive Compensation Plan B (Strategic Objectives Format), dated July 16, 1998 (incorporated by reference to Exhibit 10.14 to Registrant's Annual Report on Form 10-K for year ended December 31, 1998, SEC File No. 001-4300). |
| †10.17 | – | First Amendment to Apache Corporation Corporate Incentive Compensation Plan B, dated November 20, 2008, effective as of January 1, 2005 (incorporated by reference to Exhibit 10.19 to Registrant's Annual Report on Form 10-K for year ended December 31, 2008, SEC File No. 001-4300). |
| †10.18 | – | Apache Corporation 401(k) Savings Plan, as amended and restated, dated October 28, 2010 (incorporated by reference to Exhibit 10.14 to Registrant's Annual Report on Form 10-K for year ended December 31, 2010, SEC File No. 001-4300). |
| †10.19 | – | Amendment to Apache Corporation 401(k) Savings Plan, dated December 30, 2010, effective as of November 10, 2010, except as otherwise specified (incorporated by reference to Exhibit 10.15 to Registrant's Annual Report on Form 10-K for year ended December 31, 2010, SEC File No. 001-4300). |

| EXHIBIT NO. | | DESCRIPTION |
|---|---|---|
| †10.20 | – | Amendment to Apache Corporation 401(k) Savings Plan, dated August 31, 2011, effective September 1, 2011 (incorporated by reference to Exhibit 10.1 to Registrant's Quarterly Report on Form 10-Q for the quarter ended September 30, 2011, SEC File No. 001-4300). |
| †10.21 | – | Amendment to Apache Corporation 401(k) Savings Plan, dated December 19, 2011, effective January 1, 2012, except as otherwise specified (incorporated by reference to Exhibit 10.18 to Registrant's Annual Report on Form 10-K for year ended December 31, 2011, SEC File No. 001-4300). |
| *†10.22 | – | Amendment to Apache Corporation 401(k) Savings Plan, dated November 8, 2012, effective January 1, 2012. |
| †10.23 | – | Non-Qualified Retirement/Savings Plan of Apache Corporation, as amended and restated July 14, 2010, except as otherwise specified (incorporated by reference to Exhibit 10.3 to Registrant's Quarterly Report on Form 10-Q for the quarter ended June 30, 2010, SEC File No. 001-4300). |
| †10.24 | – | Amendment to Apache Corporation Non-Qualified Retirement/Savings Plan of Apache Corporation, dated December 19, 2011, effective January 1, 2012 (incorporated by reference to Exhibit 10.20 to Registrant's Annual Report Form 10-K for year ended December 31, 2011, SEC File No. 001-4300). |
| *†10.25 | – | Amendment to Non-Qualified Retirement/Savings Plan of Apache Corporation, dated November 8, 2012, effective January 1, 2013. |
| †10.26 | – | Non-Qualified Restorative Retirement Savings Plan of Apache Corporation, dated November 7, 2011, effective January 1, 2012 (incorporated by reference to Exhibit 4.7 to Registrant's Registration Statement on Form S-8, dated December 21, 2011, Reg. No. 333-178672). |
| *†10.27 | – | Amendment to Non-Qualified Restorative Retirement Savings Plan of Apache Corporation, dated November 8, 2012, effective January 1, 2013. |
| †10.28 | – | Apache Corporation 2011 Omnibus Equity Compensation Plan, effective May 5, 2011 (incorporated by reference to Exhibit 10.1 to Registrant's Current Report on Form 8-K filed May 11, 2011, SEC File No. 001-4300). |
| †10.29 | – | Apache Corporation 2007 Omnibus Equity Compensation Plan, as amended and restated May 4, 2011 (incorporated by reference to Exhibit 10.1 to Registrant's Quarterly Report on Form 10-Q for the quarter ended March 31, 2011, SEC File No. 001-4300). |
| †10.30 | – | Apache Corporation 1998 Stock Option Plan, as amended and restated May 5, 2011 (incorporated by reference to Exhibit 10.2 to Registrant's Quarterly Report on Form 10-Q for the quarter ended March 31, 2011, SEC File No. 001-4300). |
| †10.31 | – | Apache Corporation 2000 Stock Option Plan, as amended and restated May 5, 2011 (incorporated by reference to Exhibit 10.3 to Registrant's Quarterly Report on Form 10-Q for the quarter ended March 31, 2011, SEC File No. 001-4300). |

| EXHIBIT NO. | | DESCRIPTION |
|---|---|---|
| †10.32 | – | Apache Corporation 2003 Stock Appreciation Rights Plan, as amended and restated May 4, 2011 (incorporated by reference to Exhibit 10.5 to Registrant's Quarterly Report on Form 10-Q for quarter ended March 31, 2011, SEC File No. 001-4300). |
| †10.33 | – | Apache Corporation 2005 Stock Option Plan, as amended and restated May 5, 2011 (incorporated by reference to Exhibit 10.4 to Registrant's Quarterly Report on Form 10-Q for quarter ended March 31, 2011, Commission File No. 001-4300). |
| †10.34 | – | Apache Corporation 2005 Share Appreciation Plan, as amended and restated August 14, 2008 (incorporated by reference to Exhibit 10.7 to Registrant's Quarterly Report on Form 10-Q for the quarter ended September 30, 2008, Commission File No. 001-4300). |
| †10.35 | – | Apache Corporation 2008 Share Appreciation Program Specifications, pursuant to Apache Corporation 2007 Omnibus Equity Compensation Plan (incorporated by reference to Exhibit 10.3 to Registrant's Quarterly Report on Form 10-Q for the quarter ended March 31, 2008, SEC File No. 001-4300). |
| †10.36 | – | Apache Corporation Executive Restricted Stock Plan, as amended and restated November 4, 2011 (incorporated by reference to Exhibit 10.37 to Registrant's Annual Report on Form 10-K for year ended December 31, 2008, SEC File No. 001-4300). |
| †10.37 | – | Apache Corporation Income Continuance Plan, as amended and restated July 14, 2010, effective January 1, 2009 (incorporated by reference to Exhibit 10.5 to Registrant's Quarterly Report on Form 10-Q for the quarter ended June 30, 2010, SEC File No. 001-4300). |
| *†10.38 | – | Apache Corporation Deferred Delivery Plan, as amended and restated February 5, 2013. |
| *†10.39 | – | Apache Corporation Non-Employee Directors' Compensation Plan, as amended and restated February 6, 2013. |
| *†10.40 | – | Apache Corporation Outside Directors' Retirement Plan, as amended and restated February 6, 2013. |
| †10.41 | – | Apache Corporation Equity Compensation Plan for Non-Employee Directors, as amended and restated February 8, 2007 (incorporated by reference to Exhibit 10.2 to Registrant's Quarterly Report on Form 10-Q for quarter ended March 31, 2007, SEC File No. 001-4300). |
| †10.42 | – | Apache Corporation Non-Employee Directors' Restricted Stock Units Program Specifications, dated May 5, 2011, pursuant to Apache Corporation 2011 Omnibus Equity Compensation Plan (incorporated by reference to Exhibit 10.6 to Registrant's Quarterly Report on Form 10-Q for the quarter ended March 31, 2011, SEC File No. 001-4300). |

| EXHIBIT NO. | | DESCRIPTION |
|---|---|---|
| †10.43 | – | Apache Corporation Non-Employee Directors' Restricted Stock Units Program Specifications, as amended and restated July 19, 2012, pursuant to Apache Corporation 2011 Omnibus Equity Compensation Plan (incorporated by reference to Exhibit 10.1 to Registrant's Quarterly Report on Form 10-Q for the quarter ended June 30, 2012, SEC File No. 001-4300). |
| †10.44 | – | Restated Employment and Consulting Agreement, dated January 15, 2009, between Registrant and Raymond Plank (incorporated by reference to Exhibit 10.1 to Registrant's Current Report on Form 8-K, dated January 15, 2009, filed January 16, 2009, SEC File No. 001-4300). |
| †10.45 | – | Amended and Restated Employment Agreement, dated December 20, 1990, between Registrant and John A. Kocur (incorporated by reference to Exhibit 10.10 to Registrant's Annual Report on Form 10-K for year ended December 31, 1990, SEC File No. 001-4300). |
| †10.46 | – | Employment Agreement between Registrant and G. Steven Farris, dated June 6, 1988, and First Amendment, dated November 20, 2008, effective as of January 1, 2005 (incorporated by reference to Exhibit 10.44 to Registrant's Annual Report on Form 10-K for year ended December 31, 2008, SEC File No. 001-4300). |
| †10.47 | – | Amended and Restated Conditional Stock Grant Agreement, dated September 15, 2005, effective January 1, 2005, between Registrant and G. Steven Farris (incorporated by reference to Exhibit 10.06 to Registrant's Quarterly Report on Form 10-Q for the quarter ended September 30, 2005, SEC File No. 001-4300). |
| †10.48 | – | Restricted Stock Unit Award Agreement, dated May 8, 2008, between Registrant and G. Steven Farris (incorporated by reference to Exhibit 10.4 to Registrant's Quarterly Report on Form 10-Q for quarter ended March 31, 2008, SEC File No. 001-4300). |
| †10.49 | – | Form of Restricted Stock Unit Award Agreement, dated February 12, 2009, between Registrant and each of John A. Crum, Rodney J. Eichler, and Roger B. Plank (incorporated by reference to Exhibit 10.1 to Registrant's Current Report on Form 8-K, dated February 12, 2009, filed February 18, 2009, SEC File No. 001-4300). |
| †10.50 | – | Amendment to Restricted Stock Unit Award Agreement, dated March 7, 2011, between Registrant and John A. Crum (incorporated by reference to Exhibit 10.1 to Registrant's Current Report Form 8-K/A filed March 8, 2011, SEC File No. 001-4300). |
| †10.51 | – | Resignation Agreement, dated March 7, 2011 between Registrant and John A. Crum (incorporated by reference to Exhibit 10.2 to Registrant's Current Report on Form 8-K/A filed March 8, 2011, SEC File No. 001-4300). |

| EXHIBIT NO. | | DESCRIPTION |
|---|---|---|
| †10.52 | – | Form of Restricted Stock Unit Award Agreement, dated November 18, 2009, between Registrant and Michael S. Bahorich (incorporated by reference to Exhibit 10.37 to Registrant's Annual Report on Form 10-K for year ended December 31, 2009, SEC File No. 001-4300). |
| †10.53 | – | Form of Restricted Stock Unit Grant Agreement, dated May 6, 2009, between Registrant and each of G. Steven Farris, Roger B. Plank, John A. Crum, Rodney J. Eichler, and Michael S. Bahorich (incorporated by reference to Exhibit 10.38 to Registrant's Annual Report on Form 10-K for year ended December 31, 2009, SEC File No. 001-4300). |
| †10.54 | – | Form of Stock Option Award Agreement, dated May 6, 2009, between Registrant and each of G. Steven Farris, Roger B. Plank, John A. Crum, Rodney J. Eichler, and Michael S. Bahorich (incorporated by reference to Exhibit 10.39 to Registrant's Annual Report on Form 10-K for year ended December 31, 2009, SEC File No. 001-4300). |
| †10.55 | – | Form of 2010 Performance Program Agreement, dated January 15, 2010, between Registrant and each of G. Steven Farris, John A. Crum, Rodney J. Eichler, and Roger B. Plank (incorporated by reference to Exhibit 10.1 to Registrant's Current Report on Form 8-K filed January 19, 2010, SEC File No. 001-4300). |
| †10.56 | – | Form of First Amendment, effective May 5, 2010, to 2010 Performance Program Agreement, dated January 15, 2010, between Registrant and each of G. Steven Farris, John A. Crum, Rodney J. Eichler, and Roger B. Plank (incorporated by reference to Exhibit 10.1 to Registrant's Current Report on Form 8-K filed May 11, 2010, SEC File No. 001-4300). |
| †10.57 | – | Form of Restricted Stock Unit Award Agreement, dated January 15, 2010, between Registrant and each of John A. Crum, Rodney J. Eichler, and Roger B. Plank (incorporated by reference to Exhibit 10.2 to Registrant's Current Report on Form 8-K filed January 19, 2010, SEC File No. 001-4300). |
| †10.58 | – | Form of 2011 Performance Program Agreement, dated January 7, 2011, between Registrant and each of G. Steven Farris, John A. Crum, Rodney J. Eichler, Roger B. Plank, Michael S. Bahorich, and Thomas P. Chambers (incorporated by reference to Exhibit 10.1 to Registrant's Current Report on Form 8-K filed January 13, 2011, SEC File No. 001-4300). |
| †10.59 | – | Restricted Stock Unit Award Agreement, dated February 9, 2011, between Registrant and Thomas P. Chambers (incorporated by reference to Exhibit 10.1 to Registrant's Current Report on Form 8-K filed February 14, 2011, SEC File No. 001-4300). |
| †10.60 | – | Form of 2012 Performance Program Agreement, dated January 11, 2012, between Registrant and each of G. Steven Farris, Rodney J. Eichler, Roger B. Plank, P. Anthony Lannie, and Thomas P. Chambers (incorporated by reference to Exhibit 10.1 to Registrant's Current Report on Form 8-K filed January 13, 2012, SEC File No. 001-4300). |

| EXHIBIT NO. | | DESCRIPTION |
|---|---|---|
| †10.61 | – | Form of 2013 Performance Program Agreement, dated January 9, 2013, between Registrant and each of G. Steven Farris, Rodney J. Eichler, Roger B. Plank, and Thomas P. Chambers (incorporated by reference to Exhibit 10.1 to Registrant's Current Report on Form 8-K filed January 13, 2012, SEC File No. 001-4300). |
| *12.1 | – | Statement of Computation of Ratios of Earnings to Fixed Charges and Combined Fixed Charges and Preferred Stock Dividends. |
| 14.1 | – | Code of Business Conduct, as amended and restated November 15, 2011 (incorporated by reference to Exhibit 14.1 to Registrant's Annual Report on Form 10-K for year ended December 31, 2011, SEC File No. 001-4300). |
| *21.1 | – | Subsidiaries of Registrant |
| *23.1 | – | Consent of Ernst & Young LLP |
| *23.2 | – | Consent of Ryder Scott Company L.P., Petroleum Consultants |
| *24.1 | – | Power of Attorney (included as a part of the signature pages to this report) |
| *31.1 | – | Certification (pursuant to Rule 13a-14(a) or Rule 15d-14(a) of the Exchange Act) by Principal Executive Officer. |
| *31.2 | – | Certification (pursuant to Rule 13a-14(a) or Rule 15d-14(a) of the Exchange Act) by Principal Financial Officer. |
| *32.1 | – | Section 1350 Certification (pursuant to Sarbanes-Oxley Section 906) by Principal Executive Officer and Principal Financial Officer. |
| *99.1 | – | Report of Ryder Scott Company L.P., Petroleum Consultants |
| *101.INS | – | XBRL Instance Document. |
| *101.SCH | – | XBRL Taxonomy Schema Document. |
| *101.CAL | – | XBRL Calculation Linkbase Document. |
| *101.LAB | – | XBRL Label Linkbase Document. |
| *101.PRE | – | XBRL Presentation Linkbase Document. |
| *101.DEF | – | XBRL Definition Linkbase Document. |

---

\*      Filed herewith.

†      Management contracts or compensatory plans or arrangements required to be filed herewith pursuant to Item 15 hereof.

NOTE: Debt instruments of the Registrant defining the rights of long-term debt holders in principal amounts not exceeding 10 percent of the Registrant's consolidated assets have been omitted and will be provided to the Commission upon request.

**Apache Corporation 401(k) Savings Plan**

**Fourth Amendment Not Covered by the 2010 Determination Letter**

Apache Corporation ("Apache") sponsors the Apache Corporation 401(k) Savings Plan (the "Plan"). In section 10.4 of the Plan, Apache reserved the right to amend the Plan from time to time. Apache hereby exercises that right, (1) by modifying section 6.5(c)(i)(A) to reflect the revised statutory provision on deductible medical expenses, and (2) by eliminating the last sentence of section 6.5(c)(i), both effective as of January 1, 2012, so that section 6.5(c)(i) now states:

   (i)    <u>Financial Need</u> . The following expenses constitute an immediate and heavy financial need: (A) expenses for or necessary to obtain medical care, within the meaning of Code §213(d), (1) that would be deductible by the Employee under Code §213 (determined without regard to whether the expenses exceed the percentage of adjusted gross income specified in Code §213(a)), or (2) that apply to the Employee's primary beneficiary (as determined pursuant to section 6.1); (B) costs directly related to the purchase of a principal residence of the Employee (excluding mortgage payments); (C) payment of tuition, related educational fees, and room and board expenses for up to the next 12 months of post-secondary education of the Employee, the Employee's Spouse, the Employee's children, the Employee's dependents (within the meaning of Code §152, without regard to Code §152(b)(1), §152(b)(2), and §152(d)(1)(B)), or the Employee's primary beneficiary (as determined pursuant to section 6.1); (D) payments necessary to prevent the Employee from being evicted from his or her principal residence; (E) payments necessary to prevent the mortgage on the Employee's principal residence from being foreclosed; (F) payment of burial or funeral expenses for the Employee's deceased parent, Spouse, child, other dependent (within the meaning of Code §152, without regard to Code §152(b)(1), §152(b)(2), and §152(d)(1)(B)), or primary beneficiary (as determined pursuant to section 6.1); (G) expenses for the repair of damage to the Employee's principal residence that would qualify for the casualty deduction under Code §165 (determined without regard to whether the loss exceeds 10% of adjusted gross income); and (H) any other expense that, under IRS guidance of general applicability, is deemed to be on account of an immediate and heavy financial need.

EXECUTED this 8th day of November, 2012.

APACHE CORPORATION

By:   /s/ Margery M. Harris
      Margery M. Harris
      Executive Vice President, Human Resources

Prepared November 6, 2012

Page 1 of 1

Exhibit 10.25

**Non-Qualified Retirement/Savings Plan of Apache Corporation**

Apache Corporation ("Apache") sponsors the Non-Qualified Retirement/Savings Plan of Apache Corporation (the "Plan"). In section 8.02 of the Plan, Apache reserved the right to amend the Plan from time to time. Apache hereby exercises that right, as follows, effective as of January 1, 2013, by adding a sentence to the end of section 2.01 to clarify the relationship of the Plan and the Apache Corporation Restorative Retirement Plan, so that section 2.01 shall read as follows:

The Committee shall from time to time in its sole discretion select those Employees who are eligible to participate in the Plan from those Employees who are among a select group of management or highly compensated employees. Furthermore, (a) an Employee is eligible to make Participant Deferrals to this Plan from his Compensation only if the Employee is not eligible to make similar deferrals to the Apache Corporation Non-Qualified Restorative Retirement Savings Plan (the "Restorative Plan") from the same Compensation, and (b) an Employee is eligible to receive an allocation of Company Deferrals with respect to his Compensation only if he or she is not eligible to receive similar company deferrals attributable to the same Compensation in the Restorative Plan.

EXECUTED this 8th day of November, 2012.

APACHE CORPORATION

By:  /s/ Margery M. Harris
            Margery M. Harris
            Executive Vice President, Human Resources

Prepared November 7, 2012

Page 1 of 1

**Apache Corporation Non-Qualified Restorative Retirement Savings Plan**

Apache Corporation ("Apache") sponsors the Apache Corporation Non-Qualified Restorative Retirement Savings Plan (the "Plan"). In section 8.02(a) of the Plan, Apache reserved the right to amend the Plan from time to time. Apache hereby exercises that right, as follows, effective as of January 1, 2013, by revising section 2.01 to read as follows:

> The Committee shall from time to time in its sole discretion select those Employees who are eligible to participate in the Plan from those Employees who are among a select group of management or highly compensated employees. Furthermore, (a) an Employee is eligible to make Participant Deferrals to this Plan from his Compensation only if the Employee is not eligible to make similar deferrals to the Non-Qualified Retirement\Savings Plan from the same Compensation, and (b) an Employee is eligible to receive an allocation of Company Deferrals with respect to his Compensation only if he or she is not eligible to receive similar company deferrals attributable to the same Compensation in the Non-Qualified Retirement\Savings Plan.

EXECUTED this 8th day of November, 2012.

APACHE CORPORATION

By:  /s/ Margery M. Harris
   Margery M. Harris
   Executive Vice President, Human Resources

Prepared November 7, 2012

Page 1 of 1

**APACHE CORPORATION**
**DEFERRED DELIVERY PLAN**

As Amended and Restated February 5, 2013

**APACHE CORPORATION**
**DEFERRED DELIVERY PLAN**

Apache established this Plan effective as of February 10, 2000. Apache is now amending and restating the Plan in its entirety effective as of February 5, 2013.

Apache intends for this Plan to provide a select group of management or highly compensated employees of the Company with the opportunity to defer income, and, in conjunction with the 2007 and 2011 Omnibus Equity Compensation Plans, to be appropriately rewarded when Apache's shares increase in value, to induce such employees to remain in the employ of the Company, and to reward those employees for their valuable services to the Companies.

Apache intends that the Plan not be treated as a "funded" plan for purposes of either the Code or ERISA. Apache also intends for this Plan to comply with the requirements of Code §409A, and the Plan shall be interpreted in that light.

## ARTICLE I   DEFINITIONS

1.01    Definitions

Defined terms used in this Plan shall have the meanings set forth below:

(a)    "Account" means the memorandum account maintained for each Participant that is credited with all Participant Deferrals and any contributions by the Company. Each Participant's Account is divided into subaccounts, as determined by the Committee, and in general each award or deferral will be allocated to its own subaccount.

(b)    "Apache" means Apache Corporation or any successor thereto.

(c)    "Affiliated Entity" means any legal entity that is treated as a single employer with Apache pursuant to Code §414(b), §414(c), §414(m), or §414(o).

(d)    "Beneficiary" means a Participant's beneficiary, as determined in section 5.04.

(e)    "Change of Control" means a change of control as defined in the Income Continuance Plan that is also described in Code §409A(a)(2)(A)(v).

(f)    "Code" means the Internal Revenue Code of 1986, as amended. Any reference to a particular section of the Code or the regulations issued thereunder shall be treated as a reference to any successor section.

(g)    "Committee" means the Stock Plan Committee of Apache's Board of Directors. The Committee shall be constituted at all times so as to permit the Plan to be administered by "non-employee directors" (as defined in Rule 16b-3 of the Securities Exchange Act of 1934, as amended).

(h)    "Company" means Apache and any Affiliated Entity that, with approval of the Board of Directors of Apache, has adopted the Plan.

(i)    "Company Deferrals" means the allocations to a Participant's Account made pursuant to section 3.02.

(j)    "Compensation" means amounts deferrable under this Plan, as determined by the Committee. "Election Agreement" means an agreement made by an eligible employee whereby he elects the amount(s) to be withheld from his Compensation pursuant to section 3.01.

(k)    "ERISA" means the Employee Retirement Income Security Act of 1974, as amended. Any reference to a particular section of ERISA or the regulations issued thereunder shall be treated as a reference to any successor section.

(l)    "Fair Market Value" means the per share closing price of the Stock as reported on The New York Stock Exchange, Inc. Composite Transactions Reporting System for a particular date or, if the Stock is not so listed on such date, as reported on NASDAQ or on such other exchange or electronic trading system which, on the date in question, reports the largest number of traded shares of Stock, provided, however, that if on the date Fair Market Value is to be determined there are no transactions in the

Page 1 of 14

Stock, Fair Market Value shall be determined as of the immediately preceding date on which there were transactions in the Stock; provided further , however , that if the foregoing provisions are not applicable, the fair market value of a share of the Stock as determined by the Committee by the reasonable application of such reasonable valuation method, consistently applied, as the Committee deems appropriate. For purposes of the foregoing, a valuation prepared in accordance with any of the methods set forth in Treasury Regulation §1.409A-1(b)(5)(iv)(B)(2), consistently used, shall be rebuttably presumed to result in a reasonable valuation. This definition is intended to comply with the definition of "fair market value" contained in Treasury Regulation §1.409A-1(b)(5)(iv) and should be interpreted consistently therewith.

(m)  "Participant" means any eligible employee selected to participate in the Plan.

(n)  "Participant Deferrals" means the amounts of a Participant's Compensation that elects to defer and have allocated to his Account pursuant to section 3.01.

(o)  "Plan" means the plan set forth in this document, as amended.

(p)  "Plan Year" means the calendar year.

(q)  "Separation from Service" has the same meaning as the term "separation from service" in Code §409A(a)(2)(A)(i), determined using the default rules in the regulations and other guidance of general applicability issued pursuant to Code §409A, except that a Separation from Service occurs only if both the Company and the Participant expect the Participant's level of services to permanently drop by more than half. A Participant who has a Separation from Service "Separates from Service."

(r)  "Spouse" means the individual of the opposite sex to whom a Participant is lawfully married according to the laws of the state of the Participant's domicile.

(s)  "Stock" means the $0.625 par value common stock of Apache.

(t)  "Stock Units" mean investment units and any related units from dividend amounts. Each Stock Unit is equivalent to one share of Stock.

(u)  "Trust" means the trust or trusts, if any, created by the Company to provide funding for the distribution of benefits in accordance with the provisions of the Plan. The assets of any such Trust remain subject to the claims of the Company's general creditors in the event of the Company's insolvency.

(v)  "Trust Agreement" means the written instrument pursuant to which each separate Trust is created.

(w)  "Trustee" means one or more banks, trust companies, or insurance companies designated by the Company to hold and invest the Trust fund and to pay benefits and expenses as authorized by the Committee in accordance with the terms and provisions of the Trust Agreement.

1.02  Headings; Gender and Number

The headings contained in the Plan are for reference purposes only and shall not affect in any way the meaning or interpretation of the Plan. Except when otherwise indicated by the context, the masculine gender shall also include the feminine gender, and the definition of any term herein in the singular shall also include the plural.

## ARTICLE II   ELIGIBILITY AND PARTICIPATION

2.01  Eligibility and Participation

The Committee shall from time to time in its sole discretion select those employees of the Company who are eligible to participate in the Plan from among a select group of management or highly compensated employees.

2.02  Election

Participants shall complete the election procedures specified by the Committee. The election procedures may include form(s) for the Participant to designate a Beneficiary, elect Participant Deferrals by entering into an Election Agreement with the Company, select a payment option for the eventual distribution of his Account or any subaccount, and provide such other information as the Committee may reasonably require.

2.03   <u>Failure of Eligibility</u>

The Committee shall have the authority to determine that a Participant is no longer eligible to participate in the Plan. When a Participant becomes ineligible, all outstanding Election Agreements shall be cancelled. The determination of the Committee with respect to the termination of participation in the Plan shall be final and binding on all parties affected thereby. Any benefits vested hereunder at the time the Participant becomes ineligible to continue participation shall be distributed in accordance with the provisions of Article V.

<center>**ARTICLE III   CONTRIBUTION DEFERRALS**</center>

3.01   <u>Participant Deferrals</u>

(a)   <u>General</u> . A Participant may elect to defer a portion of his Compensation by filing the appropriate Election Agreement with the Committee's designee. The Committee has complete discretion to establish procedures for the completion of Election Agreements, including the acceptable forms and formats of the deferral election. The Committee has complete discretion to establish the election periods during which Participants may make Election Agreements, within the bounds described in subsection (b). The Committee may establish different election periods for different types of Compensation, different grants of Compensation, or different groups of Participants.

(b)   <u>Deadlines for Election Agreements</u> .

(i)   <u>Election Period</u> . In order to make Participant Deferrals, a Participant must submit an Election Agreement during the election period established by the Committee. The election period must precede the Plan Year in which the services giving rise to the Compensation are performed, except in the following situations.

(A)   <u>Performance-Based Compensation</u> . If the Compensation is "performance-based compensation based on services performed over a period of at least 12 months" (within the meaning of Code §409A(a)(4)(B)(iii)), the election period must end at least six months before the end of the performance period.

(B)   <u>New Participant</u> . The election period for a new Participant must end no later than 30 days after he became eligible to participate in the Plan; the new Participant's initial Election Agreement may only apply to Compensation for which he has not yet performed any services. However, a Participant who has a lapse in eligibility to participate in the Plan can only use this special 30-day election when he again becomes eligible to accrue benefits (other than investment earnings), (1) on the date of his new eligibility if he has received a complete payout of his benefits from his prior episode of participation, or (2) if his lapse in eligibility was at least 24 months in duration.

(C)   <u>Unvested Deferrals</u> . The election period for any Compensation that is subject to the condition that the Participant continue to provide services for Apache and Affiliated Entities for at least 12 months, such as many grants of restricted stock units, must end within 30 days of the date the Compensation is awarded, provided that (1) the award does not vest for 12 months following the end of the election period, (2) no event other than the Participant's death or disability (within the meaning of Code §409A(2)(C)), or a Change of Control can cause vesting within the 12 months following the end of the election period, and (3) if the Participant's death or disability, or the Change of Control occurs before the first anniversary of the end of the election period, the Election Agreement shall be cancelled.

(ii)   <u>Duration of and Cancellation of Election Agreements</u> . The Committee has full discretion to determine which Compensation is subject to each Election Agreement. The Election Agreement becomes irrevocable by the Participant at the end of the election period. The Committee shall determine, at the time the Election Agreement is made, the circumstances in which the Election

<center>Page 3 of 14</center>

Agreement shall be cancelled, such as upon the Participant's disability (within the meaning of Code §409A(a)(2)(A)(ii)) or upon a Change of Control. An Election Agreement is not affected by a hardship withdrawal from the Non-Qualified Retirement/Savings Plan of Apache Corporation. However, if the Participant takes a hardship withdrawal from the Apache Corporation 401(k) Savings Plan, all outstanding Election Agreements that apply to Compensation that would have been paid to the Participant within six months after the hardship withdrawal (if the Election Agreements had not been in effect) shall be cancelled and no further Participant Deferrals made pursuant to such Election Agreements.

3.02    Company Deferrals

Upon prior approval of the Committee, the Company may credit any amount to a Participant's Account at any time.

## ARTICLE IV    INVESTMENT OF DEFERRALS AND ACCOUNTING; VOTING

4.01    Investments

All amounts credited to a Participant's Account shall be invested in Stock Units, with the number of Stock Units determined using the Fair Market Value of the Stock for the date as of which the amount is credited to the Participant's Account. Amounts equal to any cash dividends declared on the Stock shall be credited to the Participant's Account as of the payment date for such dividend in proportion to the number of Stock Units in the Participant's Account as of the record date for such dividend. Such dividend amounts shall be invested in Stock Units, with the number of Stock Units determined using the Fair Market Value of the Stock on the dividend payment date, and such Stock Units shall vest pursuant to section 5.01. Nothing contained in this section shall be construed to require the Company or the Committee to fund any Participant's Account.

4.02    Voting

Participants shall have no right to vote any Stock Units prior to the date on which such Stock Units are subject to distribution and shares of Stock are issued therefor.

## ARTICLE V    DISTRIBUTIONS

5.01    Vesting

(a)    General . Each award of Compensation to a Participant shall vest in accordance with the terms of the award, which are determined by the Committee. Upon the death or disability of a Participant, the award shall specify whether no vesting occurs, whether the next tranche or some other portion of the award vests, or whether the entire award vests.

(b)    Termination for Cause . If the employment of the Participant is terminated for cause as determined by the Company, the Participant's entire Account balance, whether vested or not, shall be forfeited immediately. For this purpose, "cause" shall mean a gross violation, as determined by the Company, of the Company's established policies and procedures.

(c)    Earnings . Stock Units attributable to dividend amounts credited to a Participant's Account shall vest as the Stock Units on which the dividend amounts are calculated vest.

(d)    Change of Control . If a change of control, within the meaning of Apache's Income Continuance Plan or any successor plan, of Apache occurs, all unvested Stock Units credited to Participants' Accounts shall become automatically vested, without further action by the Committee or Apache's board of directors.

5.02    Payouts of Company Deferrals .

(a)    Timing of Payout . The Committee may specify the timing of the distribution of any grant of Company Deferrals, or the Committee may allow a Participant to make a payout election for his Company Deferrals. If the Participant is given the opportunity to make a payout election, the deadline for the election is 30 days after the grant of a Company Deferral unless the Committee specifies an earlier deadline.

Page 4 of 14

(b) <u>Payout Alternatives</u> . A Participant shall receive a lump sum distribution of the subaccount(s) containing Company Deferrals six months after he Separates from Service, unless the Committee permits him to elect five installments and he so elects, in which case the first installment will be paid six months after his Separation from Service, or as soon as convenient after that date, and subsequent installments will be paid on the anniversary of the first installment, or as near to that date as is administratively convenient.

(c) <u>Death or Change of Control</u> . If there is a Change of Control or the Participant dies before receiving all installments, the remaining vested benefits shall be paid as specified in section 5.04 or 5.05, rather than as provided for in this section.

(d) <u>Disability</u> . Each award of Compensation will specify whether the Participant's disability (which shall fall within the meaning of the term in Code §409A(a)(2)(A)(ii)) will trigger a payout and when such payout(s) shall occur.

(e) <u>Small Accounts</u> . See section 5.03(d) for payouts of small accounts.

5.03 <u>Payouts of Participant Deferrals</u>

(a) <u>Election</u> . Each subaccount containing Participant Deferrals shall be paid in a lump sum six months after the Participant's Separation from Service unless the Committee, in its sole discretion, allows a Participant to elect, and the Participant does elect, to have the Participant Deferrals under an Election Agreement paid to him in one of the following manners. Any payout election that the Participant is permitted make with respect to deferrals pursuant to an Election Agreement must be made by the end of the election period for that Election Agreement. The Committee has the discretion to reduce the possible payout alternatives from the three identified below.

(i) <u>In-Service Withdrawal, Single Payment</u> . The subaccount for Participant Deferrals from an Election Agreement will be paid in a lump sum five years after the Stock Units vest, or as near to that date as is administratively convenient. For example, if the Stock Units under a particular Election Agreement vest over four years, the Participant will receive four annual lump sums. If the Participant Separates from Service before receiving all lump sums with respect to an Election Agreement, (A), if a lump sum is scheduled to be paid during the six months after the Separation from Service, it will be paid as scheduled, and (B) if any lump sum is scheduled to be paid more than six months after the Separation from Service, it will instead be paid 6 months after his Separation from Service, or as soon thereafter as is administratively convenient.

(ii) <u>In-Service Withdrawal, Limited Installments</u> . This payout alternative is available only if all Stock Units relating to an Election Agreement either are vested at the time of the Election Agreement or are scheduled to vest on a single date; thus, for example, this alternative is not available for a restricted stock unit award where vesting is scheduled to occur over four years. The benefits will be paid in five annual installments, with the first installment paid five years after the Stock Units vest (or, if vested when granted, five years after the date of the grant), or as near to that date as is administratively convenient. Subsequent installments are paid on the anniversary of the first installment or as near to that date as is administratively convenient. The amount of each installment is equal to the number of remaining Stock Units associated the Election Agreement, divided by the number of remaining installments, rounded down to the nearest whole Stock Unit, except that the last installment is equal to the number of remaining vested Stock Units, with any fractional share paid in cash. If the Participant Separates from Service before receiving all installments with respect to an Election Agreement, (A), any installment payment scheduled to be paid during the six months after the Separation from Service will be paid as scheduled, and (B) any remaining installment(s) will instead be paid in a lump sum 6 months after his Separation from Service, or as soon thereafter as is administratively convenient.

(iii) <u>No In-Service Withdrawal</u> . The subaccount for the Participant Deferrals from each Election Agreement will be paid out in a single payment or in five annual installments. The single payment or the first installment payment will be paid six months after the Participant's Separation from Service or as soon thereafter as is administratively convenient; subsequent

Page 5 of 14

installments will be paid on each anniversary of the first installment, or as near thereto as administratively convenient. Each installment will be equal to the balance in the subaccount measured as short a period of time before the installment is paid as is administratively convenient, divided by the number of remaining annual installments, rounded down to the nearest whole Stock Unit, except that the last installment shall be equal to the number of remaining Stock Units, with any fractional share paid in cash.

(b)  Existing Elections . If a Participant made an Election Agreement before 2009 for an award that vested over more than one year and the Participant elected to defer such amounts for five years after vesting occurred with each amount paid in five installments, the payments scheduled to be made on or after January 1, 2009 will, in spite of the Participant's previous election, be paid a lump sum on the fifth anniversary of date of the date such Stock Units vested, or, if later, in January of 2009. If the Participant Separates from Service before receiving all lump sums with respect to an Election Agreement, (i) if a lump sum is scheduled to be paid during the six months after the Separation from Service, it will be paid as scheduled, and (ii) if any lump sum is scheduled to be paid more than six months after the Separation from Service, it will instead be paid in January 2009 or if later six months after his Separation from Service, or as soon thereafter as is administratively convenient

(c)  Death or Change of Control . If there is a Change of Control or the Participant dies before receiving all vested Stock Units, the remaining vested Stock Units shall be paid as specified in section 5.02(d), 5.04, or 5.05, rather than as originally scheduled.

(d)  Small Accounts . If the Fair Market Value of a Participant's vested Account six months after he Separates from Service is less than $100,000, he shall receive a lump sum payment of the vested Account balance six months after the Separation from Service or as soon thereafter as is administratively convenient.

5.04  Distributions After Participant's Death

This section applies once a Participant dies.

(a)  Immediate Payment . When a Participant dies, his remaining vested Account balance shall be paid to each beneficiary in one lump sum four months after the Participant's death, which should give each beneficiary adequate time to decide whether to disclaim. However, no payment may be made before the Committee's designee has been furnished with proof of death and such other information as it may reasonably require, including information needed for tax reporting purposes. Such distribution shall be paid in whole shares of Stock, with any fractional shares paid in cash.

(b)  Designating Beneficiaries . Each Participant shall designate one or more persons, trusts, or other entities as his Beneficiary to receive any amounts distributable hereunder after the Participant's death, by furnishing the Committee with a beneficiary designation form. In the absence of an effective Beneficiary designation as to part or all of a Participant's interest in the Plan, such amount will be distributed to the Participant's surviving Spouse, if any, otherwise to the Participant's estate. Unless the Participant's beneficiary designation form specifies otherwise, if a Beneficiary dies after the Participant but before being paid by the Plan, the Plan shall pay the Beneficiary's estate.

(c)  Changing Beneficiaries . A beneficiary designation may be changed by the Participant at any time and without the consent of any previously designated Beneficiary. However, if the Participant is married, his Spouse shall be his Beneficiary unless such Spouse has consented to the designation of a different Beneficiary. To be effective, the Spouse's consent must be in writing, witnessed by a notary public, and filed with the Committee's designee. If a Participant has designated his Spouse as a Beneficiary or as a contingent Beneficiary, and the Participant and that Spouse subsequently divorce, then the former Spouse will be treated as having pre-deceased the Participant for purposes of interpreting a beneficiary designation form completed prior to the divorce; this sentence shall apply only if the Committee's designee is informed of the divorce before payment to the former Spouse is authorized.

(d)  Disclaimers . Any individual or legal entity who is a Beneficiary may disclaim all or any portion of his interest in the Plan, provided that the disclaimer satisfies the requirements of applicable state law and Code §2518(b). The legal guardian of a minor or legally incompetent person may disclaim for such

Page 6 of 14

person. The personal representative (or the individual or legal entity acting in the capacity of the personal representative according to applicable state law) may disclaim on behalf of a Beneficiary who has died. The amount disclaimed shall be distributed as if the disclaimant had predeceased the Participant.

5.05    Change of Control

(a)    Former Employees .

(i)    Separated More than Six Months . Each Participant who is not a "specified employee" (defined below) and each Participant who Separated from Service more than six months before the date of a Change of Control, including those who are already receiving installment payments, will be paid a single payment of his entire remaining vested Account balance on the date of the Change of Control or as soon thereafter as is administratively practicable.

(ii)    Recent Separations . Each Participant who is a specified employee and who Separated from Service less than six months before the Change of Control occurred will be paid a single payment of his entire Account balance six months after his Separation from Service, or as soon thereafter as is administratively practicable.

(iii)    Specified Employee . The term "specified employee" has the same meaning as the term "specified employee" in Code §409A(a)(2)(B)(i), and is determined using the default rules in the regulations and other guidance of general applicability issued pursuant to Code §409A.

(b)    Current Employees . Each Participant who is an employee on the date of a Change of Control will be paid a lump sum of his entire vested Account balance on the date of the Change of Control or as soon thereafter as is administratively practicable.

5.06    Rehires . If a Participant Separated from Service and then becomes eligible to again accrue benefits, the payment of his benefits from his first episode of participation will not be affected by his subsequent participation. He will be treated as a new Participant for making payout elections for benefits accruing during his second episode of participation, except as otherwise provided in section 3.01.

5.07    Form of Distribution . Subject to section 5.08, each payment shall be made in whole shares of Stock, with each Stock Unit being converted into one share of Stock. Any fractional Stock Units will be converted into cash based on the Fair Market Value of a share of Stock on the day preceding the day the payment is processed. Upon a change of control as defined in the Income Continuance Plan or its successor, the payment for each Stock Unit shall be one share of Stock unless the material characteristics of the Stock were affected by the Change of Control, in which case the payment for each Stock Unit shall be in the form of cash equal to the fair market value, determined as of the date of the Change of Control, of the property an Apache shareholder receives upon the change of control in exchange for one of his Shares.

5.08    Withholding

At the time of vesting or payment, as applicable, either the recipient shall pay the Plan cash sufficient to cover the required withholding or the Plan shall withhold from such payment any taxes or other amounts that are required to be withheld pursuant to any applicable law; any Stock Units withheld shall be converted into cash based on the Fair Market Value of a share of Stock (a) on the day preceding the day the payment is processed or (b) on the day the vesting occurs.

5.09    Divorce

(a)    General . If a Participant has divorced his Spouse, all or a portion of his Account may be allocated to his former Spouse. The Participant may be a former or current employee of the Company.

(b)    Contents of Order . The allocation will occur as soon as practicable after the Plan receives a judgment, decree, or order (collectively, an "order") that (i) is made pursuant to a state domestic relations law or community property law, (ii) relates to the marital property rights of the former Spouse, (iii) unambiguously specifies the amount or percentage of the Participant's Account that is to be allocated to the former Spouse, or unambiguously specifies the manner in which the amount or percentage is to be calculated, (iv) does not allocate any benefits that have already been allocated to a different former

Page 7 of 14

Spouse, (v) contains the name and last known mailing address of the Participant and eh former Spouse, (vi) the name of the Plan, (vii) does not contain any provision that violates subsections (c), (d), or (e), and (viii) contains the former Spouse's Social Security number (or other similar taxpayer identification number) unless such number has been provided by the former Spouse to the Plan in a manner acceptable to the Committee.

(c)   Payout Provisions . The vested portion of the amount allocated to the former Spouse will be paid to the former Spouse in a single payment as soon as administratively practicable after (i) the Plan has determined that the order meets the requirements of subsection (b), (ii) the Plan has communicated its interpretation of the order to the Participant and former Spouse, and given them a reasonable amount of time (such as 30 days) to object to the Plan's interpretation, (and if there is a timely objection, the parties must submit a revised order or withdraw their objections), and (iii) the parties agree to the Plan's interpretation of the order.

(d)   Not Fully Vested . If the former Spouse is allocated any unvested amounts, the Plan will establish a separate account for the former Spouse. Unvested amounts are forfeited at the same time as the Participant's unvested amounts are forfeited. If an amount allocated to the former Spouse subsequently become vested, the newly-vested amount will be paid to the former Spouse in a single payment as soon as administratively practicable following the additional vesting. If the former Spouse dies before award is fully vested, the unvested amounts shall be returned to the Participant's Account.

(e)   Source of Funds . The order may specify which subaccounts the former Spouse's benefits shall be taken from; if the order is silent on this matter, the amount awarded to the former Spouse shall be taken from the Participant's subaccounts in the order determined by the Committee and shall be taken on a pro rata basis from the vested portion of the Account and the unvested portion.

5.10   Timing of Payments

The previous sections in this Article specify when payments will be made pursuant to the Plan, and generally provide the Plan with some flexibility, for example by providing that the payment will occur on a specific date or as near to that date as is administratively convenient. Notwithstanding such flexibility, any payment that is scheduled to occur in one calendar year shall occur in that calendar year.

5.11   Administrative Delays in Payments

The Committee may delay any payment from this Plan for as short a period as is administratively necessary. For example, a delay may be imposed upon all payments when there is a change of recordkeeper or trustee, and a delay may be imposed on payments to any recipient until the recipient has provided (a) the information needed to determine the appropriate tax withholding and tax reporting and (b) any other information reasonably requested by the Committee. If possible, the delay will satisfy one of the conditions to be considered a permissible delay under Code §409A.

5.12   Noncompliance with Code §409A

To the extent that the Company or the Committee takes any action that causes a violation of Code §409A or fails to take any reasonable action required to comply with Code §409A, Apache shall pay an additional amount (the "gross-up") to the individual(s) who are subject to the penalty tax under Code §409A(a)(1); the gross-up will be sufficient to put the individual in the same after-tax position he would have been in had there been no violation of Code §409A. The Company shall not pay a gross-up if the cause of the violation of Code §409A is the due to the recipient's action or due to the recipient's failure to take reasonable actions (such as failing to timely provide the information required for tax withholding or failing to timely provide other information reasonably requested by the Committee – with the result that the delay in payment violates Code §409A). Any gross-up will be paid as soon as administratively convenient after the Committee determines the gross-up is owed, and no later than the end of the calendar year immediately following the calendar year in which the additional taxes are remitted. However, if the gross-up is due to a tax audit or litigation addressing the existence or amount of a tax liability, the gross-up will be paid as soon as administratively convenient after the litigation or audit is completed, and no later than the end of the calendar year following the calendar year in which the audit is completed or there is a final and non-appealable settlement or other resolution of the litigation.

Page 8 of 14

## ARTICLE VI   ADMINISTRATION

6.01   Committee to Administer and Interpret Plan

The Plan shall be administered by the Committee. The Committee shall have all discretion and powers necessary for administering the Plan, including, but not by way of limitation, full discretion and power to interpret the Plan, to determine the eligibility, status and rights of all persons under the Plan and, in general, to decide any dispute. The Committee shall direct the Company, the Trustee, or both, as the case may be, concerning distributions in accordance with the provisions of the Plan. The Committee's designee shall maintain all Plan records except records of any Trust. The Committee may delegate any of its administrative duties to a designee.

6.02   Organization of Committee

The Committee shall adopt such rules as it deems desirable for the conduct of its affairs and for the administration of the Plan. The Committee may appoint a designee and/or agent (who need not be a member of the Committee or an employee of the Company) to assist the Committee in administration of the Plan and to whom it may delegate such powers as the Committee deems appropriate, except that the Committee shall determine any dispute. The Committee may make its determinations with or without meetings. The Committee may authorize one or more of its members, designees or agents to sign instructions, notices and determinations on its behalf. The action of a majority of the Committee's members shall constitute the action of the Committee.

6.03   Agent for Process

Apache's General Counsel and Apache's Corporate Secretary shall each be an agent of the Plan for service of all process.

6.04   Determination of Committee Final

The decisions made by the Committee shall be final and conclusive on all persons.

## ARTICLE VII   TRUST

7.01   Trust Agreement

The Company may, but shall not be required to, adopt a separate Trust Agreement for the holding and administration of the funds contributed to Accounts under the Plan. The Trustee shall maintain and allocate assets to a separate account for each Participant under the Plan. The assets of any such Trust shall remain subject to the claims of the Company's general creditors in the event of the Company's insolvency.

7.02   Expenses of Trust

The parties expect that any Trust created pursuant to section 7.01 will be treated as a "grantor" trust for federal and state income tax purposes and that, as a consequence, such Trust will not be subject to income tax with respect to its income. However, if the Trust is separately taxable, the Trustee shall pay all such taxes out of the Trust. All expenses of administering any such Trust shall be a charge against and shall be paid from the assets of such Trust.

## ARTICLE VIII   AMENDMENT AND TERMINATION

8.01   Amendment

The Plan may be amended at any time and from time to time, retroactively or otherwise; however, no amendment shall reduce any vested benefit that has accrued on the effective date of such amendment. Each Plan amendment shall be in writing and shall be approved by the Committee and/or Apache's Board of Directors. An officer of Apache to whom the Committee and/or Apache's Board of Directors has delegated the authority to execute Plan amendments shall execute each such amendment or the Plan document restated to include all such Plan amendment(s).

The Committee shall have the authority to adopt such modifications, procedures and subplans as may be necessary or desirable to comply with the provisions of the laws (including, but not limited to, tax laws and regulations) of countries other than the United States in which the Company may operate, so as to assure the viability of the benefits of the Plan to Participants employed in such countries. In only certain limited circumstances, as described in the Treasury Regulations and other guidance of general applicability issued pursuant to Code §409A, may the termination of a plan affect the timing of the payment of Plan benefits.

8.02    Successors and Assigns; Termination of Plan

The Plan is binding upon Apache and its successors and assigns. The Plan shall continue in effect from year to year unless and until terminated by Apache's Board of Directors. Any such termination shall operate only prospectively and shall not reduce any vested benefit that has accrued on the effective date of such termination.

## ARTICLE IX   STOCK SUBJECT TO THE PLAN

9.01    Number of Shares

Subject to Section 4.01, and to adjustment pursuant to Section 9.03 hereof, 350,000 shares of Stock (adjusted to 735,000 shares for (i) the Company's five-percent stock dividend, record date March 12, 2003, paid April 2, 2003, and (ii) the Company's two-for-one stock split, record date December 31, 2003, distributed January 14, 2004) are authorized for issuance under the Plan in accordance with the provisions of the Plan and subject to such restrictions or other provisions as the Committee may from time to time deem necessary. This authorization may be increased from time to time by approval of the Board and the stockholders of Apache if, in the opinion of counsel for the Company, such stockholder approval is required. Shares of Stock distributed under the terms of the Plan and shares of Stock equal to the number of Stock Units credited to Participants' Accounts maintained under the Plan shall be applied to reduce the maximum number of shares of Stock remaining available for use under the Plan. However, shares of Stock represented by any Stock Units related to the deferral of income from any plan for which shares of Stock have been authorized for issuance, such as the 2007 Omnibus Equity Compensation Plan, shall retain their authorization under such plan, and shall not be applied to reduce the number of shares of Stock remaining available for use under the Plan. Apache, at all times during the existence of the Plan and while any Stock Units are credited to Participants' Accounts maintained under the Plan, shall retain as Stock in Apache's treasury at least the number of shares from time to time required under the provisions of the Plan, or otherwise assure itself of its ability to perform its obligations hereunder.

9.02    Other Shares of Stock

The shares of Stock represented by any Stock Units from dividend amounts that are forfeited, and any shares of Stock that for any other reason are not issued to a Participant or are forfeited, shall again become available for use under the Plan.

9.03    Adjustments for Stock Split, Stock Dividend, Etc.

If Apache shall at any time increase or decrease the number of its outstanding shares of Stock or change in any way the rights and privileges of such shares by means of the payment of a Stock dividend or any other distribution upon such shares payable in Stock, or through a Stock split, subdivision, consolidation, combination, reclassification or recapitalization involving the Stock, then in relation to the Stock that is affected by one or more of the above events, the numbers, rights and privileges of the following shall be increased, decreased or changed in like manner as if they had been issued and outstanding, fully paid and nonassessable at the time of such occurrence: (a) the shares of Stock remaining available for use under the Plan; and (b) the shares of Stock then represented by Stock Units credited to Participants' Accounts maintained under the Plan.

9.04    Dividend Payable in Stock of Another Corporation, Etc .

If Apache shall at any time pay or make any dividend or other distribution upon the Stock payable in securities or other property (except cash or Stock), a proportionate part of such securities or other property

shall be set aside for Stock Units credited to Participants' Accounts maintained under the Plan and delivered to any Participant upon distribution pursuant to the terms of the Plan. Prior to the time that any such securities or other property are delivered to a Participant in accordance with the foregoing, Apache shall be the owner of such securities or other property and shall have the right to vote the securities, receive any dividends payable on such securities, and in all other respects shall be treated as the owner. If securities or other property which have been set aside by Apache in accordance with this Section are not delivered to a Participant because all or part of his Stock Units are forfeited pursuant to the terms of the Plan, then the applicable portion of such securities or other property shall remain the property of Apache and shall be dealt with by Apache as it shall determine in its sole discretion.

9.05    Other Changes in Stock

In the event there shall be any change, other than as specified in Sections 9.03 and 9.04 hereof, in the number or kind of outstanding shares of Stock or of any stock or other securities into which the Stock shall be changed or for which it shall have been exchanged, and if the Committee shall in its discretion determine that such change equitably requires an adjustment in the number or kind of shares (a) remaining available for use under the Plan and/or (b) represented by Stock Units credited to Participants' Accounts maintained under the Plan, then such adjustments shall be made by the Committee and shall be effective for all purposes of the Plan.

9.06    Rights to Subscribe

If Apache shall at any time grant to the holders of its Stock rights to subscribe pro rata for additional shares thereof or for any other securities of Apache or of any other corporation, there shall be reserved with respect to the Stock Units credited to Participants' Accounts maintained under the Plan the Stock or other securities which the Participant would have been entitled to subscribe for if immediately prior to such grant the shares of Stock represented by such Stock Units had been issued and outstanding. If, at the time of distribution under the terms of the Plan, the Participant subscribes for the additional shares or other securities, the price that is payable by the Participant for such additional shares or other securities shall be withheld from such distribution pursuant to Section 5.08 hereof.

9.07    General Adjustment Rules

No adjustment or substitution provided for in this Article IX shall require Apache to sell or otherwise issue a fractional share of Stock. All benefits payable under the Plan shall be distributed in whole shares of Stock, with any fractional shares paid in cash.

9.08    Determination by the Committee, Etc.

Adjustments under this Article IX shall be made by the Committee, whose determinations with regard thereto shall be final and binding upon all parties thereto.

## ARTICLE X   REORGANIZATION OR LIQUIDATION

In the event that Apache is merged or consolidated with another corporation and Apache is not the surviving corporation, or if all or substantially all of the assets or more than 20 percent of the outstanding voting stock of Apache is acquired by any other corporation, business entity or person, or in case of a reorganization (other than a reorganization under the United States Bankruptcy Code) or liquidation of the Company, and if the provisions of Section 9.07 hereof do not apply, the Committee, or the board of directors of any corporation assuming the obligations of the Company, shall, as to the Plan and any Stock Units credited to Participants' Accounts maintained under the Plan, either (i) make appropriate provision for the adoption and continuation of the Plan by the acquiring or successor corporation and for the protection of any Stock Units credited to Participants' Accounts maintained under the Plan by the substitution on an equitable basis of appropriate stock of Apache or of the merged, consolidated or otherwise reorganized corporation which will be issuable with respect to the Stock, provided that no additional benefits shall be conferred upon the Participants with respect to such Stock Units as a result of such substitution or (ii) to the extent permitted by the distribution rules under Code §409A, upon written notice to the Participants, provide that all distributions from the Plan shall be made within a specified number of days of the date of such notice. In the latter event, the Committee shall accelerate the vesting of all unvested Stock Units credited to Participants' Accounts so that all such Stock Units become fully vested and, to the extent permitted by the distribution rules under Code §409A, all Stock Units are payable prior to or upon any such event.

Page 11 of 14

## ARTICLE XI   MISCELLANEOUS

11.01   Funding of Benefits—No Fiduciary Relationship

Benefits shall be paid either out of the Trust or, if no Trust is in existence or if the assets in the Trust are insufficient to provide fully for such benefits, then such benefits shall be distributed by the Company out of its general assets. Nothing contained in the Plan shall be deemed to create any fiduciary relationship between the Company and the Participants. Notwithstanding anything herein to the contrary, to the extent that any person acquires a right to receive benefits under the Plan, such right shall be no greater than the right of any unsecured general creditor of the Company, except to the extent provided in the Trust Agreement, if any.

11.02   Right to Terminate Employment

The Company may terminate the employment of any Participant as freely and with the same effect as if the Plan were not in existence.

11.03   Inalienability of Benefits

Except for disclaimers under section 5.04(d) and payments to a former Spouse pursuant to section 5.09, no Participant or Beneficiary has the right to assign, alienate, pledge, transfer, hypothecate, encumber, or anticipate his interest in any benefits under the Plan, nor are the benefits subject to garnishment by any creditor, nor may the benefits under the Plan be levied upon or attached. The preceding sentence does not apply to the enforcement of a federal tax levy made pursuant to Code §6331, the collection by the United States on a judgment resulting from an unpaid tax assessment, or any debt or obligation that is permitted to be collected from the Plan under federal law (such as the Federal Debt Collection Procedures Act of 1977).

11.04   Claims Procedure

    (a)   General . Each claim for benefits shall be processed in accordance with the procedures that may be established by the Committee. The procedures shall comply with the guidelines specified in this section. The Committee may delegate its duties under this section.

    (b)   Representatives . A claimant may appoint a representative to act on his behalf. The Plan shall only recognize a representative if the Plan has received a written authorization signed by the claimant and on a form prescribed by the Committee, with the following exceptions. The Plan shall recognize a claimant's legal representative, once the Plan is provided with documentation of such representation. If the claimant is a minor child, the Plan shall recognize the claimant's parent or guardian as the claimant's representative. Once an authorized representative is appointed, the Plan shall direct all information and notification regarding the claim to the authorized representative and the claimant shall be copied on all notifications regarding decisions, unless the claimant provides specific written direction otherwise.

    (c)   Extension of Deadlines . The claimant may agree to an extension of any deadline that is mentioned in this section that applies to the Plan. The Committee or the relevant decision-maker may agree to an extension of any deadline that is mentioned in this section that applies to the claimant.

    (d)   Fees . The Plan may not charge any fees to a claimant for utilizing the claims process described in this section.

    (e)   Filing a Claim . A claim is made when the claimant files a claim in accordance with the procedures specified by the Committee. Any communication regarding benefits that is not made in accordance with the Plan's procedures will not be treated as a claim.

    (f)   Initial Claims Decision . The Plan shall decide a claim within a reasonable time up to 90 days after receiving the claim. The Plan shall have a 90-day extension, but only if the Plan is unable to decide within 90 days for reasons beyond its control, the Plan notifies the claimant of the special circumstances requiring the need for the extension by the 90th day after receiving the claim, and the Plan notifies the claimant of the date by which the Plan expects to make a decision.

    (g)   Notification of Initial Decision . The Plan shall provide the claimant with written notification of the Plan's full or partial denial of a claim, reduction of a previously approved benefit, or termination of a

Page 12 of 14

benefit. The notification shall include a statement of the reason(s) for the decision; references to the plan provision(s) on which the decision was based; a description of any additional material or information necessary to perfect the claim and why such information is needed; a description of the procedures and deadlines for appeal; a description of the right to obtain information about the appeal procedures; and a statement of the claimant's right to sue.

(h)  Appeal . The claimant may appeal any adverse or partially adverse decision. To appeal, the claimant must follow the procedures specified by the Committee. The appeal must be filed within 60 days of the date the claimant received notice of the initial decision. If the appeal is not timely and properly filed, the initial decision shall be the final decision of the Plan. The claimant may submit documents, written comments, and other information in support of the appeal. The claimant shall be given reasonable access at no charge to, and copies of, all documents, records, and other relevant information.

(i)  Appellate Decision . The Plan shall decide the appeal of a claim within a reasonable time of no more than 60 days from the date the Plan receives the claimant's appeal. The 60-day deadline shall be extended by an additional 60 days, but only if the Committee determines that special circumstances require an extension, the Plan notifies the claimant of the special circumstances requiring the need for the extension by the 60th day after receiving the appeal, and the Plan notifies the claimant of the date by which the Plan expects to make a decision. If an appeal is missing any information from the claimant that is needed to decide the appeal, the Plan shall notify the claimant of the missing information and grant the claimant a reasonable period to provide the missing information. If the missing information is not timely provided, the Plan shall deny the claim. If the missing information is timely provided, the 60-day deadline (or 120-day deadline with the extension) for the Plan to make its decision shall be increased by the length of time between the date the Plan requested the missing information and the date the Plan received it.

(j)  Notification of Decision . The Plan shall provide the claimant with written notification of the Plan's appellate decision (positive or adverse). The notification of any adverse or partially adverse decision shall include a statement of the reason(s) for the decision; reference to the plan provision(s) on which the decision was based; a description of the procedures and deadlines for a second appeal, if any; a description of the right to obtain information about the second-appeal procedures; a statement of the claimant's right to sue; and a statement that the claimant is entitled to receive, free of charge and upon request, reasonable access to and copies of all documents, records, and other information relevant to the claim.

(k)  Limitations on Bringing Actions in Court . Once an appellate decision that is adverse or partially adverse to the claimant has been made, the claimant may file suit in court only if he does so by the earlier of the following dates: (i) the one-year anniversary of the date of an appellate decision made on or before a Change of Control or the three-year anniversary of the date of an appellate decision made after a Change of Control, or (ii) the date on which the statute of limitations for such claim expires.

11.05   Disposition of Unclaimed Distributions

It is the affirmative duty of each Participant to inform the Plan of, and to keep on file with the Plan, his current mailing address and the mailing address of his Spouse and any Beneficiaries. If a Participant fails to inform the Plan of these current mailing addresses, neither the Plan nor the Company is responsible for any late payment of benefits or loss of benefits. The Plan, the Committee, and the Company have no duty to search for a missing individual until the date of a Change of Control, at which point the Company has the duty to undertake reasonable measures to search for the proper recipient of any payment under the Plan that is scheduled to be paid on or after the date of the Change of Control. If the missing individual is not found within a year after a payment should have been made to him, all his benefits will be forfeited. If the missing individual later is found, the exact number of Stock Units forfeited will be restored to the Account as soon as administratively convenient, without any adjustment for dividends paid in the interim.

11.06   Distributions due Infants or Incompetents

If any person entitled to a distribution under the Plan is an infant, or if the Committee determines that any such person is incompetent by reason of physical or mental disability, whether or not legally adjudicated an

Page 13 of 14

incompetent, the Committee shall have the power to cause the distributions becoming due to such person to be made to another for his benefit, without responsibility of the Committee to see to the application of such distributions. Distributions made pursuant to such power shall operate as a complete discharge of the Company, the Trustee, if any, and the Committee.

11.07 Addresses

Any notice, form, or election required or permitted to be given under the Plan shall be in writing and shall be given by first class mail, by Federal Express, UPS, or other carrier, by fax or other electronic means, or by personal delivery to the appropriate party, addressed:

(a) If to the Company, to Apache Corporation at its principal place of business at 2000 Post Oak Boulevard, Suite 100, Houston, Texas 77056-4400 (Attention: Corporate Secretary) or at such other address as may have been furnished in writing by the Company to a Participant; or

(b) If to a Participant, at the address the Participant has furnished to the Company in writing.

(c) If to a Beneficiary or former Spouse, at the address the Participant has furnished to the Company in writing, or at the address the Beneficiary or former Spouse subsequently provided in writing.

11.08 Statutory References

Any reference to a specific section of the Code or other statute shall be deemed to refer to the cited section or to the appropriate successor section.

11.09 Governing Law

The Plan and all Election Agreements shall be construed in accordance with the Code, ERISA (if applicable), and, to the extent applicable, the laws of the State of Texas excluding any conflicts-of-law provisions.

Dated February 5, 2013

ATTEST:                                                          APACHE CORPORATION

/s/ Cheri L. Peper                                              /s/ Margery M. Harris
Cheri L. Peper                                                  Margery M. Harris
Corporate Secretary                                             Executive Vice President, Human Resources

Page 14 of 14

**APACHE CORPORATION**
**NON-EMPLOYEE DIRECTORS' COMPENSATION PLAN**

As Amended and Restated February 6, 2013

<u>**PURPOSE**</u>

The purpose of the Non-Employee Directors' Compensation Plan (the **"Plan"** ) is to set forth certain of the compensation arrangements for members of the board of directors (the **"Board"** ) of Apache Corporation ( **"Apache"** ) who are not also employees of Apache ( **"Non-Employee Directors"** ). The Plan does not supersede or amend in any way any other arrangements relating to Non-Employee Directors including specifically, without limitation, the Outside Directors' Retirement Plan, the 2007 and 2011 Omnibus Equity Compensation Plans, indemnification provisions of Apache's charter or bylaws, or policies with respect to reimbursement of expenses.

It is Apache's express intention that this Plan comply with the requirements of Code §409A, and the Plan shall be interpreted in that light.

<u>**PLAN PROVISIONS**</u>

**1. <u>Board Retainer</u> .** Each Non-Employee Director shall be paid $37,500 at the end of each calendar quarter (or as soon thereafter as is administratively practicable) during which he or she served as a member of Apache's Board ( **"Cash Retainer Fee"** ). If a Non-Employee Director serves as a member of Apache's Board for less than an entire calendar quarter, the Cash Retainer Fee for that quarter shall be prorated on the basis of the number of weeks served during that calendar quarter.

**2. <u>Committee Chairperson Retainers</u> .** Each Non-Employee Director serving as chairperson of any committee of Apache's Board shall be paid $3,750 at the end of each calendar quarter (or as soon thereafter as is administratively practicable) ( **"Committee Chairperson Retainer Fee"** ). If a Non-Employee Director serves as chairperson of any committee of Apache's Board for less than an entire calendar quarter, the Committee Chairperson Retainer Fee for that quarter shall be prorated on the basis of the number of weeks as chairperson during that calendar quarter.

**3. <u>Attendance Fees</u> .** No attendance fee shall be paid to any Non-Employee Director for any meeting of the Board or any committee thereof attended in person or by teleconference, video conference, or other similar means.

**4. <u>Optional Deferral of Fees</u> .**

(a) <u>**Deferrable Fees**</u> . A Non-Employee Director may defer all or any portion of any unpaid Cash Retainer Fees and Committee Chairperson Retainer Fees ( **"Deferrable Fees"** ).

1

(b) **Election to Defer** . A Non-Employee Director's election to defer all or any portion of Deferrable Fees ( **"Deferral Election"** ) shall be effected by the completion of a Deferral Election form. A Deferral Election form must be executed by the deferring Non-Employee Director and received by Apache on or before December 31 of the year prior to the year in which the Deferrable Fees are earned, except that a new Non-Employee Director may enter into a Deferral Election within 30 days of becoming a Non-Employee Director. A Deferral Election shall apply only to Deferrable Fees paid for services rendered after the date of the Deferral Election. Each December 31, a Deferral Election made for the following year shall become irrevocable. A new Deferral Election must be made each year for the upcoming year.

(c) **Memorandum Account** . Apache shall maintain a separate account ( **"Memorandum Account"** ) for each deferring Non-Employee Director. Each Memorandum Account shall be subdivided into a **"Cash Account"** and a **"Stock Account** . **"** The Memorandum Accounts are merely for recordkeeping purposes, and do not represent any actual property that has been set aside for Non-Employee Directors. Nothing contained in this Plan shall be construed to require Apache to fund any Memorandum Account. Neither the deferring Non-Employee Director nor his or her Beneficiary shall have any property interest whatsoever in any specific assets of Apache. A Non-Employee Director shall have no ownership rights with respect to any balance in his or her Memorandum Account, and thus shall have no right to vote any Stock in his or her Stock Account.

(d) **Crediting of Cash Accounts** . Any deferred Cash Retainer Fees and deferred Committee Chairperson Retainer Fees shall be credited to the Cash Account. Any dividends paid on Stock in the Stock Accounts shall be credited to the Cash Account. All amounts credited to a Cash Account shall be credited with investment earnings at the rate of interest earned by Apache's short-term marketable securities portfolio or an equivalent index or market rate for similar investments in short-term marketable securities.

(e) **Crediting of Stock Accounts** . No deferrals shall be credited to a Stock Account; however, see section 4(f) for transfers from the Cash Account to the Stock Account. All amounts credited to a Stock Account shall be treated as if such amounts were invested in Stock. Apache shall at all times have reserved from its treasury shares for issuance under this Plan a number of shares at least equal to the number of shares of Stock in the Stock Accounts.

(f) **Transfers from Cash Account to Stock Account** . Each year, a Non-Employee Director may elect to transfer all or a portion of his or her Cash Account to his or her Stock Account (but only in whole-share increments) by completing an election form that must be received by Apache on or before December 31. Any such transfer shall be made as of the first trading day of the following year, and shall be based on the per share closing price of the Stock as reported on the Composite Tape for the first trading day of the year. Transfers are not permitted from a Stock Account to a Cash Account.

(g) **Payout Elections** . If a Non-Employee Director's directorship terminated before January 1, 2005, his or her benefit payments shall be determined under the terms of the Plan on December 31, 2004 and the payout elections in effect at the

2

time his or her directorship terminated. If a Non-Employee Director had a Separation from Service after December 31, 2004 and before January 1, 2009, his or her benefits shall be determined under the terms of the Plan in effect at the time of his or her Separation from Service (defined in paragraph (v) below). The remainder of this section 4(g) shall only apply to individuals who continue as Non-Employee Directors after December 31, 2008, or who become Non-Employee Directors after December 31, 2008.

(i) Election . Each individual who is Non-Employee Director on January 1, 2009 has made a payout election for his or her Memorandum Account, which specified both the timing and form of distribution. A new Non-Employee Director shall make a payout election at the same time that he or she makes his or her first Deferral Election. If no payout election is timely made, the Non-Employee Director shall be deemed to have elected to be paid a single lump-sum payment in January after his or her Separation from Service. The payout election with respect to a Memorandum Account is irrevocable after the deadline for making the payout election. The payout election will not apply if there is a change of control (see section 4(h)) or the Non-Employee Director dies (see section 4(i)).

(ii) Form of Payout . A Non-Employee Director may elect to be paid out in a single lump-sum payment or in two to ten annual installments. Each installment from a Stock Account shall be equal to the number of shares in the Stock Account on the second trading day of that year, divided by the number of remaining installments, rounded down to the nearest whole share. For example, the first installment from a Stock Account payable in seven installments beginning in 2010 shall be one-seventh of the shares in the account on the second trading day of 2010; the second installment shall be one-sixth of the shares in the account on the second trading date of 2011; etc. Each installment from a Cash Account shall be equal to the balance of the Cash Account on the second trading day of the year, divided by the number of remaining installments, except that the last installment shall equal the balance of the Cash Account at the time the distribution is processed. Distributions from the Stock Account shall be paid in whole shares of Stock. Distributions from the Cash Account shall be paid in cash.

(iii) Timing of Payment(s) . A Non-Employee Director may select a specific year in which the single lump-sum payment is made or the installment payments begin ( **"In-Service Distribution"** ), in which case the payment will be made as soon as administratively practicable in January of the earlier of the selected year or the year after the Non-Employee Director's Separation from Service. Alternatively, a Non-Employee Director may elect for his or her single lump-sum payment or first installment to be paid as soon as administratively practicable in the January after his or her Separation from Service. Subsequent installment payments shall be made in January of each year, beginning with the year after the first installment was paid.

(iv) Special Rules Where Payments Begin While Still a Director . This paragraph (iv) applies to a Non-Employee Director who elected an In-Service Distribution. A second Memorandum Account shall be established for the Non-Employee Director for any amounts deferred into the Plan during or after the

3

year in which the In-Service Distribution is scheduled to begin. Distributions from the second Memorandum Account shall be subject to the rules specified in this section 4(g), except that a Non-Employee Director must complete a payout election for the second Memorandum Account by the December 31 that immediately precedes the year in which amounts are first deferred into the second Memorandum Account.

(v) Definition of Separation from Service . The term "Separation from Service" has the same meaning as the term "separation from service" in Code §409A(a)(2)(A)(i), determined using the default rules in the regulations and other guidance of general applicability issued pursuant to Code §409A, including the special rules for members of a board of directors found in Treasury Regulation §1.409A-1(h)(5) and §1.409A-1(c)(2)(ii). In general, a Separation from Service will occur when a Non-Employee Director ceases to be a member of the Board.

(vi) Special Rules for Specified Employees .

If a Non-Employee Director is a Specified Employee, (A) any payments under paragraph (iii) above that are triggered by his or her Separation from Service and scheduled to occur within six months after the Separation from Service shall be delayed and paid six months after the Separation from Service, and (B) section 4(h) is modified for a Non-Employee Director whose Separation from Service preceded a change of control by less than six months to provide that the lump sum payment will not occur until six months after the Separation from Service.

The term "Specified Employee" has the same meaning as the term "specified employee" in Code §409A(a)(2)(B)(i), and is determined using the default rules in the regulations and other guidance of general applicability issued pursuant to Code §409A.

(h) **Change of Control** . If there is a change of control of Apache that is described in Code §409A(a)(2)(A)(v), each Memorandum Account shall be paid to the appropriate Non-Employee Director (or to the Beneficiary of a deceased Non-Employee Director) in a single lump-sum payment made on the date of the change of control or as soon thereafter as is administratively practicable and in no event later than the end of the calendar year in which the change of control occurs.

(i) **Beneficiaries** . If a Non-Employee Director dies while there is still a balance in his or her Memorandum Account, that amount shall be paid to his or her Beneficiary in a single lump-sum payment that is made as soon as administratively convenient four months after the Non-Employee Director's death, but in no event later than the end of the calendar year that contains the day that is four months after the Non-Employee Director's death. This four-month period is designed to provide the Beneficiary with a sufficient opportunity to disclaim all or part of the benefit, as explained in paragraph (iv) below. No payment shall be made until Apache has been furnished with proof of death and such other information as it may reasonably require.

4

(i) <u>Designation</u> . Each Non-Employee Director shall designate one or more persons, trusts, or other entities as his or her beneficiary ("Beneficiary"). In the absence of an effective Beneficiary designation as to part or all of a Memorandum Account, such amount shall be distributed to the Non-Employee Director's surviving Spouse, if any, otherwise to the Non-Employee Director's estate. Unless the Non-Employee Director's Beneficiary designation form specifies otherwise, if a Beneficiary dies after the Non-Employee Director but before being paid by the Plan, the Plan shall pay the Beneficiary's estate.

(ii) <u>Changing Beneficiaries</u> . A Beneficiary designation may be changed by the Non-Employee Director at any time and without the consent of any previously designated Beneficiary. However, if the Non-Employee Director is married, the Non-Employee Director's Spouse shall be the Beneficiary unless the Spouse has consented to the designation of a different Beneficiary. To be effective, the Spouse's consent must have been made before January 1, 2005 or, if made on or after January 1, 2005, the Spouse's consent must be in writing, witnessed by a notary public, and filed with Apache. If the Non-Employee Director has designated his or her Spouse as a primary or contingent Beneficiary, and the Non-Employee Director and Spouse later divorce (or their marriage is annulled), then the former Spouse will be treated as having pre-deceased the Non-Employee Director for purposes of interpreting a Beneficiary designation form completed prior to the divorce or annulment; this provision will apply only if Apache is notified of the divorce or annulment before payment to the former Spouse is made.

(iii) **"Spouse"** shall mean the individual to whom a Non-Employee Director is lawfully married according to the laws of the state of the Non-Employee Director's domicile.

(iv) <u>Disclaimers</u> . Any individual or legal entity who is a Beneficiary may disclaim all or any portion of his or her interest in the Plan, provided that the disclaimer satisfies the requirements of Code §2518(b) and applicable state law. The legal guardian of a minor or legally incompetent person may disclaim for such person. The personal representative (or the individual or legal entity acting in the capacity of the personal representative according to applicable state law) may disclaim on behalf of a Beneficiary who has died. The amount disclaimed shall be distributed as if the disclaimant had predeceased the individual whose death caused the disclaimant to become a Beneficiary.

(j) **Adjustments in Stock .** In the event of any merger, consolidation, liquidation, dissolution, recapitalization, or reorganization of Apache, split, subdivision, or consolidation of shares of Stock, the payment of a stock dividend, or any other material change in Apache's capital structure, the number of shares of Stock shown in each deferring Non-Employee Director's Stock Account shall be adjusted to reflect that number of shares of Stock or such cash, securities, or other property to which such Non-Employee Director would have been entitled if, immediately prior thereto, such Non-Employee Director had been the holder of record of the number of shares of Stock shown in the Stock Account. Notwithstanding the foregoing, the issuance by Apache of Stock, rights, options, or warrants to acquire Stock, or securities convertible or exchangeable into Stock in consideration of cash, property, labor, or services, whether or not for fair value, shall not result in an adjustment pursuant to this section 4(j).

**5. <u>Assignment and Transfer</u>** . The right of the Non-Employee Director or any other person to receive payments under the Plan shall not be assigned, transferred, pledged, or encumbered.

**6. <u>Amendment of Plan</u>** . The Plan may be amended from time to time or terminated by vote of the Board. Upon such amendment or termination, Non-Employee Directors shall not be entitled to receive pursuant to the Plan any compensation or other rights or benefits not accrued hereunder prior to the time of amendment or termination hereof; *provided, however,* that no such Plan amendment or termination shall impair any rights of Non-Employee Directors to amounts previously accrued pursuant to the Plan or accumulated in such Non-Employee Director's Memorandum Account. A Plan termination shall not affect the timing of any benefit payments from a Memorandum Account; payment may occur substantially after the Plan is terminated.

**7. <u>Successors and Assigns</u>** . The Plan is binding upon Apache and its successors and assigns. The Plan shall continue in effect until terminated by the Board. Any such termination shall operate only prospectively and shall not affect the rights and obligations under elections previously made.

**8. <u>Administrative Delays</u>** . The Plan shall be administered by the Management Development and Compensation Committee (the "MD&C Committee") of the Board. The MD&C Committee may delay any payment from this Plan for as short a period as is administratively necessary. For example, a delay may be imposed upon all payments from the Plan when there is a change of recordkeeper, and a delay may be imposed on payments to any recipient until they have provided the information needed for tax withholding and tax reporting, as well as any other information reasonably requested by the MD&C Committee. If possible, the delay will satisfy one of the conditions to be considered a permissible delay under Code §409A.

**9. <u>409A Noncompliance</u>** . To the extent that Apache or the MD&C Committee takes any action that causes a violation of Code §409A or fails to take reasonable actions required to comply with Code §409A, Apache shall pay an additional amount (the "gross-up") to the individual(s) who are subject to the penalty tax under Code §409A(a)(1) that is sufficient to put the individual in the same after-tax position he or she would have been in had there been no violation of Code §409A. Apache shall not pay a gross-up if the cause of the violation of Code §409A is the recipient's failure to take reasonable actions (such as failing to timely provide the information required for tax withholding or failing to timely provide other information reasonably requested by the MD&C Committee—with the result that the delay in payment violates Code §409A). Any gross-up will be made as soon as administratively convenient after the MD&C Committee determines the gross-up is owed, and no later than the end of the calendar year immediately following the calendar year in which the additional taxes are remitted. However, if the gross-up is due to a tax audit or litigation addressing the existence or amount of a tax liability, the gross-up will be paid as soon as administratively convenient after the litigation or audit is completed, and no later than the end of the calendar year following the calendar year in which the audit is completed or there is a final and non-appealable settlement or other resolution of the litigation.

6

**10. Notices** . Any notice, form, or election required or permitted to be given under the Plan shall be in writing and shall be given by first class mail, by Federal Express, UPS, or other carrier, by fax or other electronic means, or by personal delivery to the appropriate party, addressed:

(a) If to Apache, to Apache Corporation at its principal place of business at 2000 Post Oak Boulevard, Suite 100, Houston, Texas 77056-4400 (Attention: Corporate Secretary) or at such other address as may have been furnished in writing by Apache to a Non-Employee Director; or

(b) If to a Non-Employee Director or Spouse, at the address the Non-Employee Director has furnished to Apache in writing.

(c) If to a Beneficiary, at the address the Non-Employee Director has furnished to Apache in writing for such Beneficiary, unless the Beneficiary has furnished his or her own address in writing to Apache.

Any such notice to a Non-Employee Director, Spouse, or Beneficiary shall be deemed to have been given as of the third day after deposit in the United States Postal Service, postage prepaid, properly addressed as set forth above, in the case of a mailed notice, or as of the date delivered in the case of any other method of delivery.

**11. Gender** . Any term used herein in the singular shall also include the plural, and the masculine gender shall also include the feminine gender, and vice versa.

**12. Statutory References** . Any reference to a specific section of the Code shall be deemed to refer to that section or to the appropriate successor section.

**13. Governing Law** . The Plan shall be governed by the laws of the State of Texas, ignoring any conflicts-of-law provisions.

Dated: February 6, 2013

**ATTEST:**                                                                 **APACHE CORPORATION**

/s/ Cheri L. Peper                                                      By:  /s/ Margery M. Harris
Cheri L. Peper                                                            Margery M. Harris
Corporate Secretary                                                   Executive Vice President,
                                                                                Human Resources

7

**APACHE CORPORATION**
**OUTSIDE DIRECTORS' RETIREMENT PLAN**
(As Amended and Restated February 6, 2013)

**APACHE CORPORATION** (the "Company") established the Apache Corporation Outside Directors' Retirement Plan (the "Plan"), effective as of December 15, 1992, to provide non-employee Directors of the Company ("Outside Directors") with certain retirement and death payments. The purpose of the Plan is to advance the interests of the Company, its subsidiaries, and its stockholders by continuing to attract and retain outstanding individuals as Outside Directors and to stimulate the efforts of such individuals by giving suitable recognition to services which will contribute materially to the success of the Company.

It is the Company's express intention that this Plan comply with the requirements of Code §409A, and the Plan shall be interpreted in that light.

## ARTICLE I
## Eligibility, Participation and Contributions

1.1   Eligibility and Participation .

    Each Outside Director begins to participate in the Plan as of the date his or her Service begins.

1.2   Contributions .

    All amounts payable under the Plan shall be paid from the general assets of the Company. Nothing contained in the Plan shall be deemed to create any fiduciary relationship between the Company and the participating Outside Director ("Participant"). The rights of a Participant under the Plan are no greater than the rights of an unsecured general creditor of the Company.

## ARTICLE II
## Retirement Payments

2.1   Definitions .

    The term "Separation from Service" has the same meaning as the term "separation from service" in Code §409A(a)(2)(A)(i). A Separation from Service is determined using the default rules in the regulations and other guidance of general applicability issued pursuant to Code §409A, including the special rules for a member of a board of directors found in Treasury Regulation §1.409A-1(h)(5) and §1.409A-1(c)(2)(ii). In general, a Separation from Service will occur when a Participant ceases to be a member of the Company's Board of Directors.

The term "Specified Employee" has the same meaning as the term "specified employee" in Code §409A(a)(2)(B)(i), and is determined using the default rules in the regulations and other guidance of general applicability issued pursuant to Code §409A.

2.2    Retirement Payments .

(a) Eligibility for Benefits . A Participant who Retires with four or more Quarters of Service is entitled to receive benefits under the Plan.

(b) Amount of Benefits . The amount of benefits under the Plan is equal to the value of a series of quarterly payments, with each payment equal in amount to one-fourth of the Participant's Annual Director's Retainer, and with the number of quarterly payments equal to the number of the Participant's Quarters of Service. As a consequence, each Participant will generally receive an annual benefit of 100% of his or her Annual Director's Retainer.

(c) " Annual Director's Retainer " means the aggregate annual amount of an Outside Director's board retainer fee payable pursuant to section 1 of the Company's Non-Employee Directors' Compensation Plan (or comparable section of any successor plan), whether or not all or a portion of such amount is deferred or delayed. Such amount will be determined as of the earlier of the date a Participant ceases to be an Outside Director or the date the Participant dies.

(d) " Quarter of Service " means the aggregate total full months of Service as an Outside Director divided by three and rounded up to the next whole number, up to a maximum of 40 Quarters of Service.

(e) " Retirement, Retired or Retires " means a Participant's ceasing to hold office as an Outside Director, for any reason other than death.

(f) " Service " means the aggregate total, not to exceed 120, of (i) the number of full months beginning on or after July 1, 1992 (whether or not consecutive) that a Participant held office as an Outside Director, whether or not a Participant at the time, and (ii) $\frac{1}{2}$ the number of full months prior to July 1, 1992 (whether or not consecutive) that a Participant held office as an Outside Director; provided, however, that a Participant who, as of December 15, 1992, has held office as an Outside Director for an aggregate total of 15 years shall automatically be credited with 120 full months of Service.

(g) Episodic Participation . If a Participant has a Separation from Service and then becomes an Outside Director again, (i) the Participant's benefits from his or her initial episode of participation shall be paid according to the terms of the Plan on the date of his or her Separation from Service and shall not be affected by any subsequent Service, and (ii) the Participant's benefits from his or her later episodes of participation shall be calculated by ignoring his or her Service from earlier episodes of participation. In calculating the amount of benefits for the most recent episode of participation, the maximum Quarters of Service is 40, reduced by the number of Quarters of Service for which he or she earned benefits under this Plan from earlier episodes of participation.

2

2.3    <u>Retirement Payments Following a Change of Control</u> .

In the event of a "change of control" of the Company, as defined in the Company's Income Continuance Plan (as amended or the corresponding provisions of any successor plan), each then current Outside Director shall be eligible for the benefits described in section 2.2 even if the Outside Director has less than four Quarters of Service. If the change of control is a transaction described in §409A(a)(2)(A)(v) of the Internal Revenue Code of 1986, as amended ("Code"), each Participant shall be paid a single lump-sum payment on the date of the change of control, or as soon as practicable thereafter, equal to the net present value of the benefit to which the Participant is entitled, calculated in the manner described in section 2.5, as of the date of the change of control; however, if the Participant was a Specified Employee whose Separation from Service occurred less than six months before the change of control, he or she shall be paid a single lump-sum payment six months after the Separation from Service, or as soon as practicable thereafter, equal to the net present value of the benefit to which the Participant is entitled, calculated in the manner described in section 2.5, as of the date six months after the Separation from Service. If the change of control is not a transaction described in Code §409A(a)(2)(A)(v), each Participant shall be paid at the time(s) specified in section 2.4 or 2.5, whichever is applicable.

2.4    <u>Quarterly Payments</u> .

A Participant may elect to be paid quarterly installments that are paid on the last day of each calendar quarter (or as near to that date as administratively practicable, except that any installment scheduled to be paid during one calendar year shall be paid during such calendar year). See section 2.5 for the deadline for the Participant's payout election. The first quarterly payment shall be made as of the last day of the calendar quarter after the date of the Participant's Separates from Service, unless the Participant is a Specified Employee, in which case the first two quarterly payments shall be delayed until, and paid with, the third regularly scheduled quarterly payment.

2.5    <u>Lump-Sum Payments</u> .

A Participant shall receive a single lump-sum payment unless the Participant elects quarterly installments. Participants on December 31, 2008 have already made their payout election. A new Participant's payout election must be made within 30 days after the individual becomes an Outside Director. Once the deadline for making a payout election has passed, the payout election is irrevocable.

The lump sum shall be paid as soon as administratively practicable after the Participant's Separation from Service (and no later than the last day of the calendar year containing the day after the Separation from Service), unless the Participant is a

3

Specified Employee, in which case the lump sum shall be paid as soon as administratively practicable after six months after the Participant's Separation from Service (and no later than the last day of the calendar year containing the date that is six months after the Separation from Service). The amount of the lump sum shall be calculated by the Committee as of the date of the Participant's Separation from Service. The amount of the lump sum shall be equal to the net present value of the quarterly payments to which the Participant would otherwise be entitled, determined using an annual interest rate equal to the rate on ten-year treasury bonds/notes as reported in *The Wall Street Journal* published on or most recently prior to the date of the Participant's Separation from Service.

2.6   <u>Retirement before This Restatement</u> .

A Participant who Retired before January 1, 2005, shall receive his or her benefit in accordance with the terms of the Plan in effect at the time of the Retirement. A Participant whose Separation from Service occurred on or after January 1, 2005 shall receive his or her benefit in accordance with the terms of the Plan in effect at the time of the Separation from Service.

<div align="center">

**ARTICLE III**
**<u>Death Payments</u>**

</div>

3.1   <u>Death Benefits</u> .

(a) <u>Eligibility for Death Benefits</u> . If a Participant dies before receiving all of his or her benefits under Article II, the Participant's Beneficiary, as determined in section 3.2, shall receive the remaining benefits. If a Participant elected quarterly payments, the Participant's Beneficiary shall be paid a lump sum equal to the net present value of any remaining payments, calculated as of the date of the Participant's death, and calculated in the manner specified in section 2.5. If a Participant is scheduled to receive a single lump-sum payment, but dies before doing so, the Participant's Beneficiary shall be paid the lump sum.

(b) <u>Timing</u> . Payment to the Beneficiary shall be made as soon as administratively practicable four months after the Participant's death, but in no event later than the end of the calendar year that contains the day that is four months after the Participant's death. This four-month period is designed to provide the Beneficiary with a sufficient opportunity to disclaim all or part of the benefit, as explained in section 3.2(e). No payment shall be made until the Company has been furnished with proof of death and such other information as it may reasonably require.

(c) <u>Beneficiary in Pay Status</u> . The Beneficiary of a Participant shall receive his or her death benefits in accordance with the terms of the Plan in effect on the date of the Participant's death.

<div align="center">4</div>

**3.2**    <u>**Beneficiaries**</u> .

(a) " <u>Beneficiary</u> " means the recipient of the Participant's death benefits under section 3.1.

(b) <u>Designation</u> . Each Participant shall designate one or more persons, trusts, or other entities as his or her Beneficiary. In the absence of an effective Beneficiary designation as to part or all of a Participant's death benefits, the Participant's surviving Spouse, if any, shall be the Participant's Beneficiary, and in the absence of a surviving Spouse, the Participant's estate shall be the Beneficiary. Unless the Participant's Beneficiary designation form specifies otherwise, if a Beneficiary dies after the Participant but before being paid by the Plan, the Plan shall pay the Beneficiary's estate.

(c) <u>Changing Beneficiaries</u> . A Beneficiary designation may be changed by the Participant at any time and without the consent of any previously designated Beneficiary. However, if the Participant is married, the Participant's Spouse shall be the Participant's Beneficiary unless the Spouse has consented to the designation of a different Beneficiary. To be effective, the Spouse's consent must have been made before January 1, 2005 or, if made on or after January 1, 2005, the Spouse's consent must be in writing, witnessed by a notary public, and filed with the Company. If the Participant has designated his or her Spouse as a primary or contingent Beneficiary, and the Participant and Spouse later divorce (or their marriage is annulled), then the former Spouse will be treated as having pre-deceased the Participant for purposes of interpreting a Beneficiary designation form completed prior to the divorce or annulment; this provision will apply only if the Company is notified of the divorce or annulment before payment to the former Spouse is made.

(d) " <u>Spouse</u> " shall mean the individual to whom a Participant is lawfully married according to the laws of the state of the Participant's domicile.

(e) <u>Disclaimers</u> . Any individual or legal entity who is a Beneficiary may disclaim all or any portion of his or her interest in the Plan, provided that the disclaimer satisfies the requirements of Code §2518(b) and applicable state law. The legal guardian of a minor or legally incompetent person may disclaim for such person. The personal representative (or the individual or legal entity acting in the capacity of the personal representative according to applicable state law) may disclaim on behalf of a Beneficiary who has died. The amount disclaimed shall be distributed as if the disclaimant had predeceased the individual whose death caused the disclaimant to become a Beneficiary.

5

**ARTICLE IV**
**Administration, Amendment and Termination**

4.1    The Management Development and Compensation Committee .

The Plan shall be administered by the Management Development and Compensation Committee (the "Committee") of the Company's Board of Directors. All administrative duties, including but not limited to, the power to interpret the Plan and to decide any dispute, shall be carried out by the Committee, which shall have full discretion and authority hereunder. All claims under the Plan shall be filed with the Company and shall be decided by the Committee. The decisions made by the Committee shall be final and binding on all persons having or claiming to have rights under the Plan.

4.2    Termination or Amendment of Plan .

The Plan may be terminated or amended at any time through action of the Company's Board of Directors. No termination or amendment, however, shall reduce the payments (a) to a Participant or Beneficiary where a Participant has already died or reached Retirement, (b) to which a Participant is or may become entitled, based on such Participant's Service and Annual Director's Retainer as determined on the effective date of such termination or amendment, or (c) to which a Participant is or may become entitled pursuant to section 2.3 as a result of a change of control. The termination of the Plan shall not affect the timing of any benefit payments; payments after the Plan has terminated will be made at the time(s) specified in Articles II and III.


**ARTICLE V**
**Miscellaneous**

5.1    Inalienability of Payments .

No Participant shall have the right to assign, transfer, hypothecate, encumber or anticipate his or her interest in any payments under the Plan, nor shall the payments under the Plan be subject to any legal process to levy upon or attach such payments for any claim against the Participant, Spouse, or Beneficiary.

5.2    Notices .

Any notice, form, or election required or permitted to be given under the Plan shall be in writing and shall be given by first class mail, by Federal Express, UPS, or other carrier, by fax or other electronic means, or by personal delivery to the appropriate party, addressed:

(a) If to the Company, to Apache Corporation at its principal place of business at 2000 Post Oak Boulevard, Suite 100, Houston, Texas 77056-4400 (Attention: Corporate Secretary) or at such other address as may have been furnished in writing by the Company to a Participant; or

6

(b) If to a Participant or Spouse, at the address the Participant has furnished to the Company in writing.

(c) If to a Beneficiary, at the address the Participant has furnished to the Company in writing for such Beneficiary, unless the Beneficiary has furnished his or her own address to the Company.

Any such notice to a Participant, Spouse, or Beneficiary shall be deemed to have been given as of the third day after deposit in the United States Postal Service, postage prepaid, properly addressed as set forth above, in the case of a mailed notice, or as of the date delivered in the case of any other method of delivery.

5.3     Disposition of Unclaimed Payments .

Any communication, statement or notice addressed to a Participant at his or her last post office address, as provided to the Company under section 5.2, will be binding on the Participant, Spouse, or Beneficiary for all purposes of the Plan. If the Company cannot ascertain the whereabouts of any person to whom a payment is due under the Plan within three years from the date such payment is due, such payment shall be cancelled on the records of the Plan and the amount thereof forfeited to the Company.

5.4     Administrative Delays .

The Committee may delay any payment from this Plan for as short a period as is administratively necessary. For example, a delay may be imposed upon all payments from the Plan when there is a change of recordkeeper, and a delay may be imposed on payments to any recipient until they have provided the information needed for tax withholding and tax reporting, as well as any other information reasonably requested by the Committee. If possible, the delay will satisfy one of the conditions to be considered a permissible delay under Code §409A.

5.5     409A Noncompliance .

To the extent that the Company takes any action that causes a violation of Code §409A or fails to take reasonable actions required to comply with Code §409A, the Company shall pay an additional amount (the "gross-up") to the individual(s) who are subject to the penalty tax under Code §409A(a)(1) that is sufficient to put the individual in the same after-tax position he or she would have been in had there been no violation of Code §409A. The Company shall not pay a gross-up if the cause of the violation of Code §409A is the recipient's failure to take reasonable actions (such as failing to timely provide the information required for tax withholding or failing to timely provide other information reasonably requested by the Committee—with the result that the delay in payment violates Code §409A). Any gross-up will be made as soon as administratively

7

convenient after the Committee determines the gross-up is owed, and no later than the end of the calendar year immediately following the calendar year in which the additional taxes are remitted. However, if the gross-up is due to a tax audit or litigation addressing the existence or amount of a tax liability, the gross-up will be paid as soon as administratively convenient after the litigation or audit is completed, and no later than the end of the calendar year following the calendar year in which the audit is completed or there is a final and non-appealable settlement or other resolution of the litigation.

5.6   Gender .

Any term herein used in the singular shall also include the plural, and the masculine gender shall also include the feminine gender, and vice versa.

5.7   Statutory References .

Any reference to a specific section of the Code shall be deemed to refer to that section or to the appropriate successor section.

5.8   Governing Law .

The Plan shall be governed by the laws of the State of Texas, ignoring any conflicts-of-law provisions.

Dated: February 6, 2013

**ATTEST:**                                                                               **APACHE CORPORATION**

By:   /s/ Cheri L. Peper                                          By:   /s/ Margery M. Harris
      Cheri L. Peper                                                    Margery M. Harris
      Corporate Secretary                                               Executive Vice President,
                                                                        Human Resources

8

EXHIBIT 12.1

**APACHE CORPORATION**
**STATEMENT OF COMPUTATION OF RATIOS OF EARNINGS TO FIXED CHARGES**
**AND COMBINED FIXED CHARGES AND PREFERRED STOCK DIVIDENDS**
**(In millions, except ratio data)**

| (Unaudited) | 2012 | 2011 | 2010 | 2009 | 2008 |
|---|---|---|---|---|---|
| EARNINGS | | | | | |
| Pretax income from continuing operations | $4,877 | $8,093 | $5,206 | $ 326 | 933 |
| Add: Fixed charges excluding capitalized interest | 255 | 246 | 306 | 286 | 214 |
| Adjusted Earnings | $5,132 | $8,339 | $5,512 | $ 612 | $1,147 |
| FIXED CHARGES AND PREFERRED STOCK DIVIDENDS | | | | | |
| Interest expense including capitalized interest [1] | $ 509 | $ 433 | $ 345 | $310 | $ 281 |
| Amortization of debt expense | 7 | 6 | 18 | 5 | 4 |
| Interest component of lease rental expenditures [2] | 73 | 70 | 64 | 31 | 24 |
| Fixed charges | 589 | 509 | 427 | 346 | 309 |
| Preferred stock dividend requirements [3] | 185 | 134 | 55 | 12 | 7 |
| Combined Fixed Charges and Preferred Stock Dividends [1] | $ 774 | $ 643 | $ 482 | $358 | $ 316 |
| Ratio of Earnings to Fixed Charges | 8.71 | 16.39 | 12.93 | 1.77 | 3.72 |
| Ratio of Earnings to Combined Fixed Charges and Preferred Stock Dividends | 6.63 | 12.97 | 11.44 | 1.71 | 3.63 |

[1]   Interest expense related to the provisions for uncertainty in income taxes under ASC Topic 740, "Income Taxes" is not included in the computation of ratios of earnings to fixed charges and combined fixed charges and preferred stock dividends.

[2]   Represents the portion of rental expense assumed to be attributable to interest factors of related rental obligations determined at interest rates appropriate for the period during which the rental obligations were incurred. Approximately 25 to 35 percent of rental payments related to interest factors for all periods presented.

[3]   The Company does not receive a tax benefit for its preferred stock dividends. This amount represents the pre-tax earnings that would be required to cover its preferred stock dividends.

Exhibit 21.1

Page 1 of 5

**Apache Corporation (a Delaware corporation)**
**Listing of Subsidiaries as of February 20, 2013**

| Exact Name of Subsidiary and Name under which Subsidiary does Business | Jurisdiction of Incorporation or Organization |
|---|---|
| Apache Alaska Corporation | Delaware |
| Apache Corporation (New Jersey) | New Jersey |
| Apache CR Company | Delaware |
| Apache Crude Oil Marketing, Inc. | Delaware |
| Apache Deepwater LLC | Delaware |
| Apache Delaware V LLC | Delaware |
|    Texas and New Mexico Exploration LLC | Delaware |
| Apache Finance Louisiana Corporation | Delaware |
| Apache Foundation | Minnesota |
| Apache Gathering Company | Delaware |
| Apache GOM Pipeline, Inc. | Delaware |
| Apache Holdings, Inc. | Delaware |
| Apache International Employment Inc. | Delaware |
| Apache International LLC | Delaware |
| Apache Louisiana Holdings, LLC | Delaware |
| Apache Louisiana Minerals LLC | Delaware |
| Apache Marketing, Inc. | Delaware |
| Apache MEI Finance, Inc. | Delaware |
| Apache Midstream Enterprises, Inc. | Delaware |
| Apache Midstream LLC | Delaware |
| Apache Natural Gas Transportation Fuels LLC | Delaware |
| Apache North America, Inc. | Delaware |
|    Apache Caribbean Holdings Corporation | St. Lucia |
|    Apache Finance Australia Pty Limited | Australian Capital Territory |
|    Apache Finance Egypt I S.a.r.l. | Luxembourg |
|      Apache Finance Egypt II S.a.r.l. | Luxembourg |
|      Apache Luxembourg Holdings I S.a.r.l. | Luxembourg |
|        Apache Luxembourg Holdings II S.a.r.l. | Luxembourg |
|        Apache Luxembourg Holdings III LDC | Cayman Islands |
|        Apache Luxembourg Holdings VI LDC | Cayman Islands |
|          Apache Luxembourg Holdings IV S.a. r.l. | Luxembourg |
|    Apache Finance Khalda Corporation LDC | Cayman Islands |
|    Apache Finance Qarun Corporation LDC | Cayman Islands |
|    Apache Finance Qarun Exploration Company LDC | Cayman Islands |
|    Apache New Zealand Corporation LDC | Cayman Islands |
| Apache Oil Corporation | Texas |

**Apache Corporation (a Delaware corporation)**
**Listing of Subsidiaries as of February 20, 2013**

| Exact Name of Subsidiary and Name under which Subsidiary does Business | Jurisdiction of Incorporation or Organization |
| --- | --- |
| Apache Overseas, Inc. | Delaware |
| Apache Argentina Corporation LDC | Cayman Islands |
| Apache Petrolera Argentina S.A. | Argentina |
| Apache Asia Holdings Corporation LDC | Cayman Islands |
| Apache Asia Pacific Corporation LDC | Cayman Islands |
| Apache Asyout Corporation LDC | Cayman Islands |
| Apache Darag Corporation LDC | Cayman Islands |
| Apache East Ras Budran Corporation LDC | Cayman Islands |
| Apache Egypt Investment Corporation LDC | Cayman Islands |
| Apache Egypt Holdings I Corporation LDC | Cayman Islands |
| Apache Egypt Holdings II Corporation LDC | Cayman Islands |
| Apache Abu Gharadig Corporation LDC | Cayman Islands |
| Apache Khalda Corporation LDC | Cayman Islands |
| Apache Egypt Midstream Holdings I LDC | Cayman Islands |
| Apache Khalda II Corporation LDC | Cayman Islands |
| Apache East Bahariya Corporation LDC | Cayman Islands |
| Apache El Diyur Corporation LDC | Cayman Islands |
| Apache Faiyum Corporation LDC | Cayman Islands |
| Apache Matruh Corporation LDC | Cayman Islands |
| Apache Mediterranean Corporation LDC | Cayman Islands |
| Apache North Bahariya Corporation LDC | Cayman Islands |
| Apache North El Diyur Corporation LDC | Cayman Islands |
| Apache North Tarek Corporation LDC | Cayman Islands |
| Apache Qarun Corporation LDC | Cayman Islands |
| Apache Qarun Exploration Company LDC | Cayman Islands |
| Apache Shushan Corporation LDC | Cayman Islands |
| Apache South Umbarka Corporation LDC | Cayman Islands |
| Apache Umbarka Corporation LDC | Cayman Islands |
| Apache West Kalabsha Corporation LDC | Cayman Islands |
| Apache West Kanayis Corporation LDC | Cayman Islands |
| Apache EMEA Corporation LDC | Cayman Islands |
| Apache Exploration LDC | Cayman Islands |
| Apache Fertilizer Holdings Corporation LDC | Cayman Islands |
| Apache (TAN) Pte. Ltd. | Singapore |
| Apache Finance East Bahariya Corporation LDC | Cayman Islands |
| Apache Finance Matruh Corporation LDC | Cayman Islands |
| Apache Finance Mediterranean Corporation LDC | Cayman Islands |
| Apache International Holdings S.a.r.l. | Luxembourg |
| Apache International Finance S.a.r.l. | Luxembourg |
| Apache International Finance II S.a.r.l. | Luxembourg |
| Apache Canada Argentina Holdings S.a.r.l. | Luxembourg |
| Apache Canada Argentina Investment S.a.r.l. | Luxembourg |
| Apache Natural Resources Petrolera Argentina S.R.L. | Argentina |
| Apache Energía Argentina S.R.L. | Argentina |
| Petrolera LF Company S.R.L. | Argentina |
| Petrolera TDF Company S.R.L. | Argentina |

**Apache Corporation (a Delaware corporation)**
**Listing of Subsidiaries as of February 20, 2013**

| Exact Name of Subsidiary and Name under which Subsidiary does Business | Jurisdiction of Incorporation or Organization |
| --- | --- |
| Apache Energy Limited | Western Australia |
| Apache Australia Offshore Holdings Pty Ltd | Western Australia |
| Apache PVG Pty Ltd | Western Australia |
| Apache Colombia Exploration and Production LDC | Cayman Islands |
| Apache do Brasil Exploração e Produção de Petróleo e Gás Ltda. | Brazil |
| Apache East Spar Pty Limited | Western Australia |
| Apache Fertilisers Pty Ltd | Western Australia |
| Apache Julimar Holdings Pty Ltd | Western Australia |
| Apache Julimar Pty Ltd | Western Australia |
| Apache Kersail Pty Ltd | Victoria, Australia |
| Apache LNG Pty Ltd | Western Australia |
| Apache Macedon Holdings Pty Ltd | Western Australia |
| Apache Macedon Pty Ltd | Western Australia |
| Apache Northwest Pty Ltd. | Western Australia |
| Apache Oil Australia Pty Limited | New South Wales, Australia |
| Apache Permits Pty Ltd | Western Australia |
| Ningaloo Vision Holdings Pte. Ltd. | Republic of Singapore |
| Northwest Jetty Services Pty Ltd | Western Australia |
| Apache Finance Pty Limited | Australian Capital Territory |
| Apache Australia Management Pty Limited | Victoria, Australia |
| Apache Australia Holdings Pty Limited | Western Australia |
| Apache North Sea Limited | England and Wales |
| Apache North Sea Production Limited | England and Wales |
| Apache UK Investment Limited | England and Wales |
| Apache Beryl I Limited | Cayman Islands |
| Apache Beryl II Limited | England and Wales |
| Apache Beryl III Limited | England and Wales |
| Beryl North Sea II Limited | Cayman Islands |
| Apache Latin America II Corporation LDC | Cayman Islands |
| Apache Madera Corporation LDC | Cayman Islands |
| Apache Netherlands Investment B.V. | Amsterdam |
| Apache Suriname Corporation LDC | Cayman Islands |
| Apache Overseas Holdings, Inc. | Delaware |
| Apache Switzerland Holdings AG | Switzerland |
| Apache Kenya Holdings LLC | Delaware |
| Apache Kenya Limited | Kenya |
| Apache Overseas Holdings II, Inc. | Delaware |
| Onyx Acquisition Corporation LDC | Cayman Islands |
| Harriet (Onyx) Pty Ltd | Western Australia |

**Apache Corporation (a Delaware corporation)**
**Listing of Subsidiaries as of February 20, 2013**

| Exact Name of Subsidiary and Name under which Subsidiary does Business | Jurisdiction of Incorporation or Organization |
|---|---|
| Apache Permian Basin Investment Corporation | Delaware |
| Apache Permian Basin Corporation | Delaware |
| Apache Permian Exploration and Production LLC | Delaware |
| LeaCo New Mexico Exploration and Production LLC | Delaware |
| Permian Basin Joint Venture LLC (95%) | Delaware |
| ZPZ Delaware I LLC | Delaware |
| Apache Ravensworth Corporation LDC | Cayman Islands |
| Apache Reagan LLC | Delaware |
| Apache Shady Lane Ranch Inc. | Delaware |
| Apache Shelf, Inc. | Delaware |
| Apache Stoneaxe Corporation LDC | Cayman Islands |
| Apache Texas LLC | Delaware |
| Apache Texas Property Holding Company LLC | Delaware |
| Apache WTX Holding Company LLC | Delaware |
| Apache Transfer Company | Delaware |
| Apache Transmission Corporation—Texas | Texas |
| Apache UK Limited | England and Wales |
| Apache Lowendal Pty Limited | Victoria, Australia |
| Apache Well Containment LLC | Delaware |
| Apache West Texas Acquisition Corporation | Delaware |
| Apache West Texas Holdings, Inc. | Delaware |
| Apache Delaware Investment LLC | Delaware |
| Apache West Texas Investment LLC | Delaware |
| Apache Western Exploration LLC | Delaware |
| BLPL Holdings LLC | Delaware |
| CDRL Holdings LLC | Delaware |
| Cordillera Energy Partners III, LLC | Colorado |
| Granite Operating Company | Texas |
| Clear Creek Hunting Preserve, Inc. | Wyoming |
| Cottonwood Aviation, Inc. | Delaware |
| CV Energy Corporation | Delaware |
| DEK Energy Company | Delaware |
| Apache Canada Ltd. | Alberta, Canada |
| Apache Canada Chile Holdings ULC | Alberta, Canada |
| Apache Chile Energìa SPA | Chile |
| Apache Canada Diego 2 ULC | Alberta, Canada |
| Apache Austria Investment LLC | Cayman Islands |
| Apache Canada KM ULC | Alberta, Canada |
| Apache Canada Properties Ltd. | Alberta, Canada |
| Apache Canada PTP Ltd. | Alberta, Canada |
| Apache Canada Zama Pipeline Ltd. | Federal – Canada |
| Apache FC Canada Enterprises Inc. | Alberta, Canada |
| Apache FC Capital Canada Inc. | Alberta, Canada |
| KM LNG Operating Ltd. | British Columbia |

**Apache Corporation (a Delaware corporation)**
**Listing of Subsidiaries as of February 20, 2013**

| Exact Name of Subsidiary and Name under which Subsidiary does Business | Jurisdiction of Incorporation or Organization |
|---|---|
| Apache Finance Canada Corporation | Nova Scotia, Canada |
| Apache Canada Management Ltd | Alberta, Canada |
| Apache Canada Holdings Ltd | Alberta, Canada |
| Apache Canada Management II Ltd | Alberta, Canada |
| Apache Finance Canada III ULC | Alberta, Canada |
| Apache Finance Canada IV ULC | Alberta, Canada |
| Apache Finance Canada II Corporation | Nova Scotia, Canada |
| Dove Oil Corporation | Delaware |
| Edge Petroleum Exploration Company | Delaware |
| Edge Petroleum Operating Company, Inc. | Delaware |
| Edge Petroleum Production Company | Delaware |
| GOM Shelf, LLC | Delaware |
| Kitimat Development Inc. | Delaware |
| Mariner LP LLC | Delaware |
| MC Beltway 8, LLC | Delaware |
| Miller Exploration Company | Delaware |
| Miller Oil Corporation | Michigan |
| PBMRE Holdings LLC | Delaware |
| Phoenix Exploration Resources, Ltd. | Delaware |
| TEI Arctic Petroleum (1984) Ltd. | Alberta, Canada |
| Texas International Company | Delaware |
| Wheelco Energy LLC | Delaware |
| ZPZ Acquisitions, Inc. | Delaware |
| ZPZ Delaware II LLC | Delaware |
| Phoenix Exploration Louisiana C LLC (75%) | Delaware |
| ZPZ Delaware III LLC | Delaware |

**Exhibit 23.1**

**Consent of Independent Registered Public Accounting Firm**

We consent to the incorporation by reference in the following Registration Statements:

(1)   Registration Statements (Form S-3 Nos. 333-57785, 333-75633, 333-32580, 333-105536, 333-155884, and 333-174429) of Apache Corporation and in the related Prospectuses,

(2)   Registration Statements (Form S-4 Nos. 333-107934 and 333-166964) of Apache Corporation and in the related Prospectuses, and

(3)   Registration Statements (Form S-8 Nos. 33-59721, 33-63817, 333-26255, 333-32557, 333-36131, 333-31092, 333-48758, 333-97403, 333-102330, 333-103758, 333-106213, 333-125232, 333-125233, 333-135044, 333-143115, 333-170533, 333-175250, and 333-178672) of Apache Corporation;

of our reports dated February 28, 2013, with respect to the consolidated financial statements of Apache Corporation and the effectiveness of internal control over financial reporting of Apache Corporation, included in this Annual Report (Form 10-K) for the year ended December 31, 2012.

/s/ Ernst & Young LLP

Houston, Texas
February 28, 2013



TBPE REGISTERED ENGINEERING FIRM F-1580                                        FAX (713) 651-0849
1100 LOUISIANA    SUITE 3800    HOUSTON, TEXAS 77002-5218              TELEPHONE (713) 651-9191

**Consent of Ryder Scott Company, L.P.**

As independent petroleum engineers, we hereby consent to the incorporation by reference in this Form 10-K of Apache Corporation to our Firm's name and our Firm's review of the proved oil and gas reserve quantities of Apache Corporation as of December 31, 2012, to the incorporation by reference of our Firm's name and review into Apache Corporation's previously filed Registration Statements on Form S-3 (Nos. 333-57785, 333-75633, 333-32580, 333-105536, 333-155884, and 333-174429), on Form S-4 (No. 333-107934 and 333-166964), and on Form S-8 (Nos. 33-59721, 33-63817, 333-26255, 333-32557, 333-36131, 333-31092, 333-48758, 333-97403, 333-102330, 333-103758, 333-106213, 333-125232, 333-125233, 333-135044, 333-143115, 333-170533, 333-175250, and 333-178672), and to the inclusion of our report, dated February 8, 2013, as an exhibit to this Form 10-K filed with the Securities and Exchange Commission.

/s/ Ryder Scott Company, L.P.

**Ryder Scott Company, L.P.**
TBPE Firm Registration No. F-1580

Houston, Texas
February 25, 2013

RYDER SCOTT COMPANY    PETROLEUM CONSULTANTS

EXHIBIT 31.1

## CERTIFICATIONS

I, G. Steven Farris, certify that:

1.    I have reviewed this annual report on Form 10-K of Apache Corporation;

2.    Based on my knowledge, this report does not contain any untrue statement of a material fact or omit to state a material fact necessary to make the statements made, in light of the circumstances under which such statements were made, not misleading with respect to the period covered by this report;

3.    Based on my knowledge, the financial statements, and other financial information included in this report, fairly present in all material respects the financial condition, results of operations and cash flows of the registrant as of, and for, the periods presented in this report;

4.    The registrant's other certifying officer and I are responsible for establishing and maintaining disclosure controls and procedures (as defined in Exchange Act Rules 13a-15(e) and 15d-15(e)) and internal control over financial reporting (as defined in Exchange Act Rules 13a-15(f) and 15d-15(f)) for the registrant and have:

   (a)   Designed such disclosure controls and procedures, or caused such disclosure controls and procedures to be designed under our supervision, to ensure that material information relating to the registrant, including its consolidated subsidiaries, is made known to us by others within those entities, particularly during the period in which this report is being prepared;

   (b)   Designed such internal control over financial reporting, or caused such internal control over financial reporting to be designed under our supervision, to provide reasonable assurance regarding the reliability of financial reporting and the preparation of financial statements for external purposes in accordance with generally accepted accounting principles;

   (c)   Evaluated the effectiveness of the registrant's disclosure controls and procedures and presented in this report our conclusions about the effectiveness of the disclosure controls and procedures, as of the end of the period covered by this report based on such evaluation; and

   (d)   Disclosed in this report any change in the registrant's internal control over financial reporting that occurred during the registrant's most recent fiscal quarter (the registrant's fourth fiscal quarter in the case of an annual report) that has materially affected, or is reasonably likely to materially affect, the registrant's internal control over financial reporting; and

5.    The registrant's other certifying officer and I have disclosed, based on our most recent evaluation of internal control over financial reporting, to the registrant's auditors and the audit committee of the registrant's board of directors (or persons performing the equivalent functions):

   (a)   All significant deficiencies and material weaknesses in the design or operation of internal control over financial reporting which are reasonably likely to adversely affect the registrant's ability to record, process, summarize and report financial information; and

   (b)   Any fraud, whether or not material, that involves management or other employees who have a significant role in the registrant's internal control over financial reporting.

/s/ G. Steven Farris
_____
G. Steven Farris
Chairman and Chief Executive Officer
(principal executive officer)

Date: February 28, 2013

EXHIBIT 31.2

## CERTIFICATIONS

I, Thomas P. Chambers, certify that:

1.  I have reviewed this annual report on Form 10-K of Apache Corporation;

2.  Based on my knowledge, this report does not contain any untrue statement of a material fact or omit to state a material fact necessary to make the statements made, in light of the circumstances under which such statements were made, not misleading with respect to the period covered by this report;

3.  Based on my knowledge, the financial statements, and other financial information included in this report, fairly present in all material respects the financial condition, results of operations and cash flows of the registrant as of, and for, the periods presented in this report;

4.  The registrant's other certifying officer and I are responsible for establishing and maintaining disclosure controls and procedures (as defined in Exchange Act Rules 13a-15(e) and 15d-15(e)) and internal control over financial reporting (as defined in Exchange Act Rules 13a-15(f) and 15d-15(f)) for the registrant and have:

    (a)  Designed such disclosure controls and procedures, or caused such disclosure controls and procedures to be designed under our supervision, to ensure that material information relating to the registrant, including its consolidated subsidiaries, is made known to us by others within those entities, particularly during the period in which this report is being prepared;

    (b)  Designed such internal control over financial reporting, or caused such internal control over financial reporting to be designed under our supervision, to provide reasonable assurance regarding the reliability of financial reporting and the preparation of financial statements for external purposes in accordance with generally accepted accounting principles;

    (c)  Evaluated the effectiveness of the registrant's disclosure controls and procedures and presented in this report our conclusions about the effectiveness of the disclosure controls and procedures, as of the end of the period covered by this report based on such evaluation; and

    (d)  Disclosed in this report any change in the registrant's internal control over financial reporting that occurred during the registrant's most recent fiscal quarter (the registrant's fourth fiscal quarter in the case of an annual report) that has materially affected, or is reasonably likely to materially affect, the registrant's internal control over financial reporting; and

5.  The registrant's other certifying officer and I have disclosed, based on our most recent evaluation of internal control over financial reporting, to the registrant's auditors and the audit committee of the registrant's board of directors (or persons performing the equivalent functions):

    (a)  All significant deficiencies and material weaknesses in the design or operation of internal control over financial reporting which are reasonably likely to adversely affect the registrant's ability to record, process, summarize and report financial information; and

    (b)  Any fraud, whether or not material, that involves management or other employees who have a significant role in the registrant's internal control over financial reporting.

/s/ Thomas P. Chambers
_____
Thomas P. Chambers
Executive Vice President and Chief Financial Officer
(principal financial officer)

Date: February 28, 2013

EXHIBIT 32.1

**APACHE CORPORATION**

**Certification of Chief Executive Officer**
**and Principal Financial Officer**

I, G. Steven Farris, certify pursuant to 18 U.S.C. Section 1350, as adopted pursuant to Section 906 of the Sarbanes-Oxley Act of 2002, that, to my knowledge, the annual report on Form 10-K of Apache Corporation for the period ending December 31, 2012, fully complies with the requirements of Section 13(a) or 15 (d) of the Securities Exchange Act of 1934 (15 U.S.C. §78m or §78o (d)) and that information contained in such report fairly represents, in all material respects, the financial condition and results of operations of Apache Corporation.

/s/ G. Steven Farris
By:      G. Steven Farris
Title:   Chairman and Chief Executive Officer
         (principal executive officer)

Date: February 28, 2013

I, Thomas P. Chambers, certify pursuant to 18 U.S.C. Section 1350, as adopted pursuant to Section 906 of the Sarbanes-Oxley Act of 2002, that, to my knowledge, the annual report on Form 10-K of Apache Corporation for the period ending December 31, 2012, fully complies with the requirements of Section 13(a) or 15(d) of the Securities Exchange Act of 1934 (15 U.S.C. §78m or §78o (d)) and that information contained in such report fairly represents, in all material respects, the financial condition and results of operations of Apache Corporation.

/s/ Thomas P. Chambers
By:      Thomas P. Chambers
Title:   Executive Vice President and Chief Financial Officer
         (principal financial officer)

Date: February 28, 2013

Exhibit 99.1

# APACHE CORPORATION

## Estimated

## Future Reserves

## Attributable to Certain

## Leasehold and Royalty Interests

## and

## Derived Through Certain Production Sharing Contracts

## SEC Parameters

## As of

## December 31, 2012

\s\ Jennifer Fitzgerald

Jennifer A. Fitzgerald, P.E.
TBPE License No. 100572
Vice President

[SEAL]

**RYDER SCOTT COMPANY, L.P.**
TBPE Firm Registration No. F-1580

RYDER SCOTT COMPANY PETROLEUM CONSULTANTS



RYDER SCOTT COMPANY
PETROLEUM CONSULTANTS

TBPE REGISTERED ENGINEERING FIRM F-1580                                                        FAX (713) 651-0849
1100  LOUISIANA SUITE 4600            HOUSTON, TEXAS 77002-5294                       TELEPHONE (713) 651-9191

February 8, 2013

Apache Corporation
2000 Post Oak Boulevard, Suite 100
Houston, Texas 77056-4400

Gentlemen:

At the request of Apache Corporation (Apache), Ryder Scott Company, L.P. (Ryder Scott) has conducted a reserves audit of the estimates of the proved reserves as of December 31, 2012 prepared by Apache's engineering and geological staff based on the definitions and disclosure guidelines of the United States Securities and Exchange Commission (SEC) contained in Title 17, Code of Federal Regulations, Modernization of Oil and Gas Reporting, Final Rule released January 14, 2009 in the Federal Register (SEC regulations). Our third party reserves audit, completed on January 23, 2013 and presented herein, was prepared for public disclosure by Apache in filings made with the SEC in accordance with the disclosure requirements set forth in the SEC regulations. The estimated reserves shown herein represent Apache's estimated net reserves attributable to the leasehold and royalty interests and derived through certain production sharing contracts in certain properties owned by Apache and the portion of those reserves reviewed by Ryder Scott, as of December 31, 2012. The properties reviewed by Ryder Scott incorporate Apache's reserve determinations and are attributable to the interests of Apache Corporation (U.S.A), Apache Canada Ltd. (Canada), Apache Petrolera Argentina S.A. (Argentina), Apache Energy Limited (Australia), Apache Egypt Companies (Egypt), and Apache North Sea Limited (United Kingdom).

The properties reviewed by Ryder Scott account for a portion of Apache's total net proved reserves as of December 31, 2012. Based on the estimates of total net proved reserves prepared by Apache, the reserves audit conducted by Ryder Scott addresses 89 percent of the total proved developed net liquid hydrocarbon reserves, 84 percent of the total proved developed net gas reserves, 62 percent of the total proved undeveloped net liquid hydrocarbon reserves, and 86 percent of the total proved undeveloped net gas reserves of Apache.

The wells or locations for which estimates of reserves were reviewed by Ryder Scott were selected by Apache. Apache informed Ryder Scott that the selected reserves for each country included at least 63 percent or more of the total discounted future net income at 10 percent attributable to the total interests of Apache (coverage) based on SEC hydrocarbon price parameters as of December 31, 2012. Total coverage of world-wide reserves is 87.9 percent of the total discounted future net income at 10 percent.

As prescribed by the Society of Petroleum Engineers in Paragraph 2.2(f) of the Standards Pertaining to the Estimating and Auditing of Oil and Gas Reserves Information (SPE auditing standards), a reserves audit is defined as "the process of reviewing certain of the pertinent facts interpreted and assumptions made that have resulted in an estimate of reserves prepared by others and the rendering of an opinion about (1) the appropriateness of the methodologies employed; (2) the adequacy and quality of the data relied upon; (3) the depth and thoroughness of the reserves estimation process; (4) the classification of reserves appropriate to the relevant definitions used; and (5) the reasonableness of the estimated reserve quantities."

SUITE 600, 1015 4TH STREET, S.W.    CALGARY, ALBERTA T2R 1J4    TEL (403) 262-2799    FAX (403) 262-2790
621 17TH STREET, SUITE 1550    DENVER, COLORADO 80293-1501    TEL (303) 623-9147    FAX (303) 623-4258

Apache Corporation
February 8, 2013
Page 2

Based on our review, including the data, technical processes and interpretations presented by Apache, it is our opinion that the overall procedures and methodologies utilized by Apache in preparing their estimates of the proved reserves as of December 31, 2012 comply with the current SEC regulations and that the overall proved reserves for the reviewed properties as estimated by Apache are, in the aggregate, reasonable within the established audit tolerance guidelines of 10 percent as set forth in the SPE auditing standards.

The estimated reserves presented in this report are related to hydrocarbon prices. Apache has informed us that in the preparation of their reserve and income projections, as of December 31, 2012, they used average prices during the 12-month period prior to the ending date of the period covered in this report, determined as the unweighted arithmetic averages of the prices in effect on the first-day-of-the-month for each month within such period, unless prices were defined by contractual arrangements, as required by the SEC regulations. Actual future prices may vary significantly from the prices required by SEC regulations; therefore, volumes of reserves actually recovered may differ significantly from the estimated quantities presented in this report. The net reserves as estimated by Apache attributable to Apache's interest and entitlement in properties that we reviewed and the reserves of properties that we did not review are summarized as follows:

<div align="center">

**SEC PARAMETERS**
Estimated Net Proved Reserves
Certain Leasehold and Royalty Interests and
Derived Through Certain Production Sharing Contracts of
**Apache Corporation (Total All Regions)**
As of December 31, 2012

</div>

| | % Crude Oil & Condensate Reserves Reviewed | % Natural Gas Liquids Reserves Reviewed | % Gas Reserves Reviewed | Reviewed by Ryder Scott | | | Not Reviewed | | | Total | | |
|---|---|---|---|---|---|---|---|---|---|---|---|---|
| | | | | Crude Oil & Condensate MBarrels | Natural Gas Liquids MBarrels | Sales Gas MMCF | Crude Oil & Condensate MBarrels | Natural Gas Liquids MBarrels | Sales Gas MMCF | Crude Oil & Condensate MBarrels | Natural Gas Liquids MBarrels | Sales Gas MMCF |
| Developed | 89.1 | 88.4 | 83.5 | 734,691 | 162,680 | 4,871,370 | 90,023 | 21,272 | 960,299 | 824,714 | 183,952 | 5,831,669 |
| Undeveloped | 60.0 | 73.2 | 85.7 | 214,854 | 54,436 | 2,255,954 | 143,058 | 19,968 | 376,583 | 357,912 | 74,404 | 2,632,537 |
| Total Proved | 80.3 | 84.0 | 84.2 | 949,545 | 217,116 | 7,127,324 | 233,081 | 41,240 | 1,336,882 | 1,182,626 | 258,356 | 8,464,206 |

<div align="center">

RYDER SCOTT COMPANY PETROLEUM CONSULTANTS

</div>

Apache Corporation
February 8, 2013
Page 3

<div align="center">

**SEC PARAMETERS**
Estimated Net Proved Reserves
Certain Leasehold and Royalty Interests and
Derived Through Certain Production Sharing Contracts of
**Apache Corporation (Summary by Region)**
As of December 31, 2012

</div>

| | % Crude Oil & Condensate Reserves Reviewed | % Natural Gas Liquids Reserves Reviewed | % Gas Reserves Reviewed | Reviewed by Ryder Scott | | | Not Reviewed | | | Total | | |
|---|---|---|---|---|---|---|---|---|---|---|---|---|
| | | | | Crude Oil & Condensate MBarrels | Natural Gas Liquids MBarrels | Sales Gas MMCF | Crude Oil & Condensate MBarrels | Natural Gas Liquids MBarrels | Sales Gas MMCF | Crude Oil & Condensate MBarrels | Natural Gas Liquids MBarrels | Sales Gas MMCF |
| **USA** | | | | | | | | | | | | |
| Developed | 90.8 | 88.2 | 78.9 | 430,068 | 136,287 | 1,856,307 | 43,672 | 18,222 | 495,843 | 473,740 | 154,509 | 2,352,150 |
| Undeveloped | 65.3 | 71.6 | 70.4 | 133,332 | 43,582 | 586,692 | 70,833 | 17,308 | 247,065 | 204,165 | 60,890 | 833,757 |
| Total Proved | 83.1 | 83.5 | 76.7 | 563,400 | 179,869 | 2,442,999 | 114,505 | 35,530 | 742,908 | 677,905 | 215,399 | 3,185,907 |
| **Canada** | | | | | | | | | | | | |
| Developed | 95.4 | 95.0 | 82.9 | 76,008 | 20,895 | 1,438,000 | 3,687 | 1,102 | 296,656 | 79,695 | 21,997 | 1,734,656 |
| Undeveloped | 27.3 | 82.7 | 80.4 | 19,276 | 10,143 | 324,368 | 51,374 | 2,115 | 78,858 | 70,650 | 12,258 | 403,226 |
| Total Proved | 63.4 | 90.6 | 82.4 | 95,284 | 31,038 | 1,762,368 | 55,061 | 3,217 | 375,514 | 150,345 | 34,255 | 2,137,882 |
| **Argentina** | | | | | | | | | | | | |
| Developed | 50.7 | 62.8 | 63.4 | 8,040 | 3,146 | 231,443 | 7,805 | 1,861 | 133,612 | 15,845 | 5,007 | 365,055 |
| Undeveloped | 78.5 | 69.1 | 73.2 | 2,340 | 605 | 71,401 | 641 | 271 | 26,095 | 2,981 | 876 | 97,496 |
| Total Proved | 55.1 | 63.8 | 65.5 | 10,380 | 3,751 | 302,844 | 8,446 | 2,132 | 159,707 | 18,826 | 5,883 | 462,551 |
| **Australia** | | | | | | | | | | | | |
| Developed | 97.4 | N/A | 98.8 | 28,295 | 0 | 588,931 | 759 | 0 | 7,121 | 29,054 | 0 | 596,052 |
| Undeveloped | 100.0 | N/A | 100.0 | 34,808 | 0 | 1,074,018 | 0 | 0 | 0 | 34,808 | 0 | 1,074,018 |
| Total Proved | 98.8 | N/A | 99.6 | 63,103 | 0 | 1,662,949 | 759 | 0 | 7,121 | 63,862 | 0 | 1,670,070 |
| **Egypt** | | | | | | | | | | | | |
| Developed | 74.3 | NA | 97.1 | 79,298 | 0 | 670,227 | 27,447 | 0 | 20,209 | 106,745 | 0 | 690,436 |
| Undeveloped | 38.8 | N/A | 95.8 | 6,701 | 0 | 196,429 | 10,588 | 0 | 8,626 | 17,289 | 0 | 205,055 |
| Total Proved | 69.3 | N/A | 96.8 | 85,999 | 0 | 866,656 | 38,035 | 0 | 28,835 | 124,034 | 0 | 895,491 |
| **United Kingdom** | | | | | | | | | | | | |
| Developed | 94.4 | 96.4 | 92.7 | 112,982 | 2,352 | 86,462 | 6,653 | 87 | 6,858 | 119,635 | 2,439 | 93,320 |
| Undeveloped | 65.7 | 27.9 | 16.0 | 18,397 | 106 | 3,046 | 9,622 | 274 | 15,939 | 28,019 | 380 | 18,985 |
| Total Proved | 89.0 | 87.2 | 79.7 | 131,379 | 2,458 | 89,508 | 16,275 | 361 | 22,797 | 147,654 | 2,819 | 112,305 |

Liquid hydrocarbons are expressed in standard 42 gallon barrels and shown herein as thousand of barrels (MBarrels). All gas volumes are reported on an "as sold basis" expressed in millions of cubic feet (MMCF) at the official temperature and pressure bases of the areas in which the gas reserves are located.

**Reserves Included in This Report**

In our opinion, the proved reserves presented in this report conform to the definition as set forth in the Securities and Exchange Commission's Regulations Part 210.4-10(a). An abridged version of the SEC reserves definitions from 210.4-10(a) entitled "Petroleum Reserves Definitions" is included as an attachment to this report.

The various proved reserve status categories are defined under the attachment entitled "Petroleum Reserves Status Definitions and Guidelines" in this report. The proved developed non-producing reserves included herein consist of the shut-in and behind pipe categories.

Reserves are "estimated remaining quantities of oil and gas and related substances anticipated to be economically producible, as of a given date, by application of development projects to known

<div align="center">

RYDER SCOTT COMPANY PETROLEUM CONSULTANTS

</div>

Apache Corporation
February 8, 2013
Page 4

accumulations." All reserve estimates involve an assessment of the uncertainty relating the likelihood that the actual remaining quantities recovered will be greater or less than the estimated quantities determined as of the date the estimate is made. The uncertainty depends chiefly on the amount of reliable geologic and engineering data available at the time of the estimate and the interpretation of these data. The relative degree of uncertainty may be conveyed by placing reserves into one of two principal classifications, either proved or unproved. Unproved reserves are less certain to be recovered than proved reserves and may be further sub-classified as probable and possible reserves to denote progressively increasing uncertainty in their recoverability. At Apache's request, this report addresses only the proved reserves attributable to the properties reviewed herein.

Proved oil and gas reserves are "those quantities of oil and gas which, by analysis of geoscience and engineering data, can be estimated with reasonable certainty to be economically producible from a given date forward." The proved reserves included herein were estimated using deterministic methods. If deterministic methods are used, the SEC has defined reasonable certainty for proved reserves as a "high degree of confidence that the quantities will be recovered."

Proved reserve estimates will generally be revised only as additional geologic or engineering data become available or as economic conditions change. For proved reserves, the SEC states that "as changes due to increased availability of geoscience (geological, geophysical, and geochemical), engineering, and economic data are made to the estimated ultimate recovery (EUR) with time, reasonably certain EUR is much more likely to increase or remain constant than to decrease." Moreover, estimates of proved reserves may be revised as a result of future operations, effects of regulation by governmental agencies or geopolitical or economic risks. Therefore, the proved reserves included in this report are estimates only and should not be construed as being exact quantities, and if recovered, could be more or less than the estimated amounts.

### Audit Data, Methodology, Procedure and Assumptions

The estimation of reserves involves two distinct determinations. The first determination results in the estimation of the quantities of recoverable oil and gas and the second determination results in the estimation of the uncertainty associated with those estimated quantities in accordance with the definitions set forth by the Securities and Exchange Commission's Regulations Part 210.4-10(a). The process of estimating the quantities of recoverable oil and gas reserves relies on the use of certain generally accepted analytical procedures. These analytical procedures fall into three broad categories or methods: (1) performance-based methods; (2) volumetric-based methods; and (3) analogy. These methods may be used singularly or in combination by the reserve evaluator in the process of estimating the quantities of reserves. Reserve evaluators must select the method or combination of methods which in their professional judgment is most appropriate given the nature and amount of reliable geoscience and engineering data available at the time of the estimate, the established or anticipated performance characteristics of the reservoir being evaluated and the stage of development or producing maturity of the property.

In many cases, the analysis of the available geoscience and engineering data and the subsequent interpretation of this data may indicate a range of possible outcomes in an estimate, irrespective of the method selected by the evaluator. When a range in the quantity of reserves is identified, the evaluator must determine the uncertainty associated with the incremental quantities of the reserves. If the reserve quantities are estimated using the deterministic incremental approach, the uncertainty for each discrete incremental quantity of the reserves is addressed by the reserve category assigned by the evaluator. Therefore, it is the categorization of reserve quantities as proved, probable and/or possible that addresses the inherent uncertainty in the estimated quantities reported. For proved reserves, uncertainty is defined by the SEC as reasonable certainty wherein the "quantities

RYDER SCOTT COMPANY PETROLEUM CONSULTANTS

Apache Corporation
February 8, 2013
Page 5

actually recovered are much more likely than not to be achieved." The SEC states that "probable reserves are those additional reserves that are less certain to be recovered than proved reserves but which, together with proved reserves, are as likely as not to be recovered." The SEC states that "possible reserves are those additional reserves that are less certain to be recovered than probable reserves and the total quantities ultimately recovered from a project have a low probability of exceeding proved plus probable plus possible reserves." All quantities of reserves within the same reserve category must meet the SEC definitions as noted above.

Estimates of reserves quantities and their associated reserve categories may be revised in the future as additional geoscience or engineering data become available. Furthermore, estimates of reserves quantities and their associated reserve categories may also be revised due to other factors such as changes in economic conditions, results of future operations, effects of regulation by governmental agencies or geopolitical or economic risks as previously noted herein.

The proved reserves for the properties that we reviewed were estimated by performance methods, the volumetric method, analogy, or a combination of methods. Approximately 90 percent of the proved producing reserves attributable to producing wells and/or reservoirs that we reviewed were estimated by performance methods or a combination of methods. These performance methods include, but may not be limited to, decline curve analysis, material balance and/or reservoir simulation which utilized extrapolations of historical production and pressure data available through November, 2012, in those cases where such data were considered to be definitive. The data utilized in this analysis were furnished to Ryder Scott by Apache or obtained from public data sources and were considered sufficient for the purpose thereof. The remaining 10 percent of the proved producing reserves that we reviewed were estimated by the volumetric method, analogy, or a combination of methods. These methods were used where there were inadequate historical performance data to establish a definitive trend and where the use of production performance data as a basis for the reserve estimates was considered to be inappropriate.

Approximately 100 percent of the proved developed non-producing and undeveloped reserves that we reviewed were estimated by the volumetric method or analogy. The volumetric analysis utilized pertinent well and seismic data furnished to Ryder Scott by Apache for our review or which we have obtained from public data sources that were available through November, 2012. The data utilized from the analogues in conjunction with well and seismic data incorporated into the volumetric analysis were considered sufficient for the purpose thereof.

To estimate economically recoverable proved oil and gas reserves, we consider many factors and assumptions including, but not limited to, the use of reservoir parameters derived from geological, geophysical and engineering data which cannot be measured directly, economic criteria based on current costs and SEC pricing requirements, and forecasts of future production rates. Under the SEC regulations 210.4-10(a)(22)(v) and (26), proved reserves must be anticipated to be economically producible from a given date forward based on existing economic conditions including the prices and costs at which economic producibility from a reservoir is to be determined. While it may reasonably be anticipated that the future prices received for the sale of production and the operating costs and other costs relating to such production may increase or decrease from those under existing economic conditions, such changes were, in accordance with rules adopted by the SEC, omitted from consideration in conducting this review.

As stated previously, proved reserves must be anticipated to be economically producible from a given date forward based on existing economic conditions including the prices and costs at which economic producibility from a reservoir is to be determined. To confirm that the proved reserves reviewed by us meet the SEC requirements to be economically producible, we have reviewed certain primary economic data utilized by Apache relating to hydrocarbon prices and costs as noted herein.

RYDER SCOTT COMPANY PETROLEUM CONSULTANTS

Apache Corporation
February 8, 2013
Page 6

    The hydrocarbon prices furnished by Apache for the properties reviewed by us are based on SEC price parameters using the average prices during the 12-month period prior to the ending date of the period covered in this report, determined as the unweighted arithmetic averages of the prices in effect on the first-day-of-the-month for each month within such period, unless prices were defined by contractual arrangements. For hydrocarbon products sold under contract, the contract prices, including fixed and determinable escalations exclusive of inflation adjustments, were used until expiration of the contract. Upon contract expiration, the prices were adjusted to the 12-month unweighted arithmetic average as previously described.

    The initial SEC hydrocarbon prices in effect on December 31, 2012 for the properties reviewed by us were determined using the 12-month average first-day-of-the-month benchmark prices appropriate to the geographic area where the hydrocarbons are sold. These benchmark prices are prior to the adjustments for differentials as described herein. The table below summarizes the "benchmark prices" and "price reference" used by Apache for the geographic areas reviewed by us. In certain geographic areas, the price reference and benchmark prices may be defined by contractual arrangements. In cases where there are numerous contracts or price references within the same geographic area, the benchmark price is represented by the unweighted arithmetic average of the initial 12-month average first-day-of-the-month benchmark prices used.

    The product prices which were actually used by Apache to determine the future gross revenue for each property reviewed by us reflect adjustments to the benchmark prices for gravity, quality, local conditions, and/or distance from market, referred to herein as "differentials." The differentials used by Apache were accepted as factual data and reviewed by us for their reasonableness; however, we have not conducted an independent verification of the data used by Apache.

    The table below summarizes Apache's net volume weighted benchmark prices adjusted for differentials for the properties reviewed by us and referred to herein as Apache's "average realized prices." The average realized prices shown in the table below were determined from Apache's estimate of the total future gross revenue before production taxes for the properties reviewed by us and Apache's estimate of the total net reserves for the properties reviewed by us for the geographic area. The data shown in the table on the following page is presented in accordance with SEC disclosure requirements for each of the geographic areas reviewed by us.

        RYDER SCOTT COMPANY PETROLEUM CONSULTANTS

Apache Corporation
February 8, 2013
Page 7

| Geographic Area | Product | Price Reference | Average Benchmark Prices | Average Realized Prices |
|---|---|---|---|---|
| North America | | | | |
|     United States | Oil/Condensate | WTI Cushing | $94.84/Bbl | $95.96/Bbl |
| | NGLs | Mt. Belvieu Non-Tet Propane | $43.08/Bbl | $41.35/Bbl |
| | Gas | Henry Hub | $2.76/MMBTU | $3.13/MCF |
|     Canada | Oil/Condensate | WTI Cushing | $94.84/Bbl | $87.42/Bbl |
| | NGLs | WTI Cushing | $94.84/Bbl | $40.65/Bbl |
| | Gas | AECO | $2.33/MMBTU | $2.32/MCF |
| Argentina | Oil/Condensate | Govt. Regulated | $74.48/Bbl | $74.95/Bbl |
| | NGLs | Nqn LPG | $30.93/Bbl | $30.21/Bbl |
| | Gas | Contracts | Contract | $3.49/MCF |
| Australia | Oil/Condensate | Tapis | $116.17/Bbl | $110.82/Bbl |
| | Gas | Contracts | Contract | $9.06/MCF |
| Egypt | Oil/Condensate | Brent | $111.13/Bbl | $109.14/Bbl |
| | Gas | Contracts | Contract | $3.00/MCF |
| United Kingdom | Oil/Condensate | Brent | $111.13/Bbl | $111.13/Bbl |
| | NGLs | Brent | $111.13/Bbl | $76.55/Bbl |
| | Gas | NBP | $9.19/MMBTU | $9.18/MCF |

The effects of derivative instruments designated as price hedges of oil and gas quantities are not reflected in Apache's individual property evaluations.

Accumulated gas production imbalances, if any, were not taken into account in the proved gas reserve estimates reviewed. The proved gas volumes included herein do not attribute gas consumed in operations as reserves.

Operating costs furnished by Apache are based on the operating expense reports of Apache and include only those costs directly applicable to the leases or wells for the properties reviewed by us. The operating costs include a portion of general and administrative costs allocated directly to the leases and wells. For operated properties, the operating costs include an appropriate level of corporate general administrative and overhead costs. The operating costs for non-operated properties include the COPAS overhead costs that are allocated directly to the leases and wells under terms of operating agreements. Other costs include transportation and/or processing fees as deductions. The operating costs furnished by Apache were accepted as factual data and reviewed by us for their reasonableness; however, we have not conducted an independent verification of the data used by Apache. No deduction was made for loan repayments, interest expenses, or exploration and development prepayments that were not charged directly to the leases or wells.

Development costs furnished by Apache are based on authorizations for expenditure for the proposed work or actual costs for similar projects. The development costs furnished by Apache were accepted as factual data and reviewed by us for their reasonableness; however, we have not

RYDER SCOTT COMPANY PETROLEUM CONSULTANTS

Apache Corporation
February 8, 2013
Page 8

conducted an independent verification of the data used by Apache. The estimated net cost of abandonment after salvage was included by Apache for properties where abandonment costs net of salvage were significant. Apache's estimates of the net abandonment costs were accepted without independent verification.

The proved developed non-producing and undeveloped reserves for the properties reviewed by us have been incorporated herein in accordance with Apache's plans to develop these reserves as of December 31, 2012. The implementation of Apache's development plans as presented to us is subject to the approval process adopted by Apache's management. As the result of our inquiries during the course of our review, Apache has informed us that the development activities for the properties reviewed by us have been subjected to and received the internal approvals required by Apache's management at the appropriate local, regional and/or corporate level. In addition to the internal approvals as noted, certain development activities may still be subject to specific partner AFE processes, Joint Operating Agreement (JOA) requirements or other administrative approvals external to Apache. Additionally, Apache has informed us that they are not aware of any legal, regulatory, political or economic obstacles that would significantly alter their plans.

Current costs used by Apache were held constant throughout the life of the properties.

Apache's forecasts of future production rates are based on historical performance from wells currently on production. If no production decline trend has been established, future production rates were held constant, or adjusted for the effects of curtailment where appropriate, until a decline in ability to produce was anticipated. An estimated rate of decline was then applied to depletion of the reserves. If a decline trend has been established, this trend was used as the basis for estimating future production rates.

Test data and other related information were used by Apache to estimate the anticipated initial production rates for those wells or locations that are not currently producing. For reserves not yet on production, sales were estimated to commence at an anticipated date furnished by Apache. Wells or locations that are not currently producing may start producing earlier or later than anticipated in Apache's estimates due to unforeseen factors causing a change in the timing to initiate production. Such factors may include delays due to weather, the availability of rigs, the sequence of drilling, completing and/or recompleting wells and/or constraints set by regulatory bodies.

The future production rates from wells currently on production or wells or locations that are not currently producing may be more or less than estimated because of changes including, but not limited to, reservoir performance, operating conditions related to surface facilities, compression and artificial lift, pipeline capacity and/or operating conditions, producing market demand and/or allowables or other constraints set by regulatory bodies.

The proved reserves reported herein are limited to the period prior to expiration of current contracts providing the legal right to produce or a revenue interest in such production unless evidence indicates that contract renewal is reasonably certain.

The proved reserves for the properties located in Egypt are subject to the contractual fiscal terms contained in production sharing contracts. For these properties, Ryder Scott audited the gross economic inputs used by Apache in the economic models for Egypt through a comparison of Apache and Ryder Scott's gross economic volumes. Apache's gross economic volumes were then used as input to the economic models to generate the net interests used to determine the net reserves summarized in this report. Ryder Scott reviewed the fiscal terms of such contracts and discussed with Apache the net economic benefit attributed to such operations for the determination of the net

<div align="center">RYDER SCOTT COMPANY PETROLEUM CONSULTANTS</div>

Apache Corporation
February 8, 2013
Page 9

hydrocarbon volumes and income thereof. Ryder Scott has not conducted an exhaustive audit or verification of such contractual information. Neither our review of such contractual information nor our acceptance of Apache's representations regarding such contractual information should be construed as a legal opinion on this matter.

Ryder Scott did not evaluate the country and geopolitical risks in the countries where Apache operates or has interests. Apache's operations may be subject to various levels of governmental controls and regulations. These controls and regulations may include, but may not be limited to, matters relating to land tenure and leasing, the legal rights to produce hydrocarbons including the granting, extension or termination of production sharing contracts, the fiscal terms of various production sharing contracts, drilling and production practices, environmental protection, marketing and pricing policies, royalties, various taxes and levies including income tax, and foreign trade and investment and are subject to change from time to time. Such changes in governmental regulations and policies may cause volumes of proved reserves actually recovered and amounts of proved income actually received to differ significantly from the quantities as estimated by Apache.

The estimates of proved reserves presented herein were based upon a detailed study of the properties in which Apache owns and derives an interest; however, we have not made any field examination of the properties. No consideration was given in this report to potential environmental liabilities that may exist nor were any costs included by Apache for potential liabilities to restore and clean up damages, if any, caused by past operating practices.

Certain technical personnel of Apache are responsible for the preparation of reserve estimates on new properties and for the preparation of revised estimates, when necessary, on old properties. These personnel assembled the necessary data and maintained the data and workpapers in an orderly manner. We consulted with these technical personnel and had access to their workpapers and supporting data in the course of our audit.

Apache has informed us that they have furnished us all of the material accounts, records, geological and engineering data, and reports and other data required for this investigation. In performing our audit of Apache's forecast of future proved production, we have relied upon data furnished by Apache with respect to property interests owned or derived, production and well tests from examined wells, normal direct costs of operating the wells or leases, other costs such as transportation and/or processing fees, ad valorem and production taxes, recompletion and development costs, abandonment costs after salvage, product prices based on the SEC regulations, adjustments or differentials to product prices, geological structural and isochore maps, well logs, core analyses, and pressure measurements. Ryder Scott reviewed such factual data for its reasonableness; however, we have not conducted an independent verification of the data furnished by Apache. We consider the factual data furnished to us by Apache to be appropriate and sufficient for the purpose of our review of Apache's estimates of reserves. In summary, we consider the assumptions, data, methods and analytical procedures used by Apache and as reviewed by us appropriate for the purpose hereof, and we have used all such methods and procedures that we consider necessary and appropriate under the circumstances to render the conclusions set forth herein.

### Audit Opinion

Based on our review, including the data, technical processes and interpretations presented by Apache, it is our opinion that the overall procedures and methodologies utilized by Apache in preparing their estimates of the proved reserves as of December 31, 2012 comply with the current SEC regulations and that the overall proved reserves for the reviewed properties as estimated by Apache are, in the aggregate, reasonable within the established audit tolerance guidelines of 10 percent as set forth in the SPE auditing standards.

<div align="center">RYDER SCOTT COMPANY PETROLEUM CONSULTANTS</div>

Apache Corporation
February 8, 2013
Page 10

We were in reasonable agreement with Apache's estimates of proved reserves for the properties which we reviewed. As a consequence, it is our opinion that on an aggregate basis the data presented herein for the properties that we reviewed fairly reflects the estimated net reserves owned by Apache.

*Other Properties*

Other properties, as used herein, are those properties of Apache which we did not review. The proved net reserves attributable to the other properties account for 11 percent of the total proved developed net liquid hydrocarbon reserves, 16 percent of the total proved developed net gas reserves, 38 percent of the total proved undeveloped net liquid hydrocarbon reserves, and 14 percent of the total proved undeveloped net gas reserves based on estimates prepared by Apache as of December 31, 2012. The other properties represent 12.1 percent of the total proved discounted future net income at 10 percent based on the unescalated pricing policy of the SEC as taken from reserve and income projections prepared by Apache as of December 31, 2012.

The same technical personnel of Apache were responsible for the preparation of the reserve estimates for the properties that we reviewed as well as for the properties not reviewed by Ryder Scott.

*Standards of Independence and Professional Qualification*

Ryder Scott is an independent petroleum engineering consulting firm that has been providing petroleum consulting services throughout the world for over seventy-five years. Ryder Scott is employee-owned and maintains offices in Houston, Texas; Denver, Colorado; and Calgary, Alberta, Canada. We have over eighty engineers and geoscientists on our permanent staff. By virtue of the size of our firm and the large number of clients for which we provide services, no single client or job represents a material portion of our annual revenue. We do not serve as officers or directors of any privately-owned or publicly-traded oil and gas company and are separate and independent from the operating and investment decision-making process of our clients. This allows us to bring the highest level of independence and objectivity to each engagement for our services.

Ryder Scott actively participates in industry-related professional societies and organizes an annual public forum focused on the subject of reserves evaluations and SEC regulations. Many of our staff have authored or co-authored technical papers on the subject of reserves related topics. We encourage our staff to maintain and enhance their professional skills by actively participating in ongoing continuing education.

Prior to becoming an officer of the Company, Ryder Scott requires that staff engineers and geoscientists have received professional accreditation in the form of a registered or certified professional engineer's license or a registered or certified professional geoscientist's license, or the equivalent thereof, from an appropriate governmental authority or a recognized self-regulating professional organization.

We are independent petroleum engineers with respect to Apache. Neither we nor any of our employees have any interest in the subject properties, and neither the employment to do this work nor the compensation is contingent on our estimates of reserves for the properties which were reviewed.

RYDER SCOTT COMPANY PETROLEUM CONSULTANTS

Apache Corporation
February 8, 2013
Page 11

The results of this audit, presented herein, are based on technical analysis conducted by teams of geoscientists and engineers from Ryder Scott. The professional qualifications of the undersigned, the technical person primarily responsible for overseeing the review of the reserves information discussed in this report, are included as an attachment to this letter.

*Terms of Usage*

The results of our third party audit, presented in report form herein, were prepared in accordance with the disclosure requirements set forth in the SEC regulations and intended for public disclosure as an exhibit in filings made with the SEC by Apache Corporation.

Apache makes periodic filings on Form 10-K with the SEC under the 1934 Exchange Act. Furthermore, Apache has certain registration statements filed with the SEC under the 1933 Securities Act into which any subsequently filed Form 10-K is incorporated by reference. We have consented to the incorporation by reference in the registration statements on Form S-3, Form S-4, and Form S-8 of Apache of the references to our name as well as to the references to our third party report for Apache, which appears in the December 31, 2012 annual report on Form 10-K of Apache. Our written consent for such use is included as a separate exhibit to the filings made with the SEC by Apache.

We have provided Apache with a digital version of the original signed copy of this report letter. In the event there are any differences between the digital version included in filings made by Apache and the original signed report letter, the original signed report letter shall control and supersede the digital version.

The data and work papers used in the preparation of this report are available for examination by authorized parties in our offices. Please contact us if we can be of further service.

Very truly yours,

**RYDER SCOTT COMPANY, L.P.**
TBPE Firm Registration No. F-1580

\s\ Jennifer Fitzgerald

Jennifer A. Fitzgerald, P.E.
TBPE License No. 100572
Vice President

**[SEAL]**

JAF (DPR)/pl

RYDER SCOTT COMPANY PETROLEUM CONSULTANTS

### Professional Qualifications of Primary Technical Person

The conclusions presented in this report are the result of technical analysis conducted by teams of geoscientists and engineers from Ryder Scott Company, L.P. Jennifer A. Fitzgerald was the primary technical person responsible for overseeing the reserves audit conducted by Ryder Scott of the estimates of reserves presented herein.

Mrs. Fitzgerald, an employee of Ryder Scott Company, L.P. (Ryder Scott) since 2006, is a Vice President responsible for coordinating and supervising staff and consulting engineers of the company in ongoing reservoir evaluation studies worldwide. Before joining Ryder Scott, Mrs. Fitzgerald served in a number of engineering positions with ExxonMobil. For more information regarding Mrs. Fitzgerald's geographic and job specific experience, please refer to the Ryder Scott Company website at www.ryderscott.com/Experience/Employees.

Mrs. Fitzgerald earned a Bachelor of Science degree in Chemical Engineering from University of Illinois Urbana-Champaign in 2001 and is a registered Professional Engineer in the State of Texas. She is also a member of the Society of Petroleum Evaluation Engineers and Society of Petroleum Engineers. She currently serves as the Chairman of the Houston Chapter of the Society of Petroleum Evaluation Engineers.

In addition to gaining experience and competency through prior work experience, the Texas Board of Professional Engineers requires a minimum of fifteen hours of continuing education annually, including at least one hour in the area of professional ethics, which Mrs. Fitzgerald fulfills. As part of her 2012 continuing education hours, Mrs. Fitzgerald attended 9 hours of formalized training including the 2012 RSC Reserves Conference and various professional society presentations specifically relating to the definitions and disclosure guidelines contained in the United States Securities and Exchange Commission Title 17, Code of Federal Regulations, Modernization of Oil and Gas Reporting, Final Rule released January 14, 2009 in the Federal Register. Mrs. Fitzgerald attended an additional 12.5 hours of formalized external training during 2012 covering such topics as reservoir engineering, geoscience and petroleum economics evaluation methods, procedures and software and ethics for consultants. She also presented presentations at the 2012 RSC Reserves Conference, the 2012 North American Petroleum Accounting Conference (NAPAC), and the 2012 National Oil and Gas Reserves Conference held by AICPA/PDI relating to the definitions and disclosure guidelines contained in the United States Securities and Exchange Commission Title 17, Code of Federal Regulations, Modernization of Oil and Gas Reporting, Final Rule released January 14, 2009 in the Federal Register. Mrs. Fitzgerald also previously attended the one and two day short courses presented by Dr. John Lee specific to the new SEC regulations.

Based on her educational background, professional training and more than 11 years of practical experience in the estimation and evaluation of petroleum reserves, Mrs. Fitzgerald has attained the professional qualifications as a Reserves Estimator and Reserves Auditor set forth in Article III of the "Standards Pertaining to the Estimating and Auditing of Oil and Gas Reserves Information" promulgated by the Society of Petroleum Engineers as of February 19, 2007.

RYDER SCOTT COMPANY PETROLEUM CONSULTANTS

## PETROLEUM RESERVES DEFINITIONS

### As Adapted From:
### RULE 4-10(a) of REGULATION S-X PART 210
### UNITED STATES SECURITIES AND EXCHANGE COMMISSION (SEC)

*PREAMBLE*

On January 14, 2009, the United States Securities and Exchange Commission (SEC) published the "Modernization of Oil and Gas Reporting; Final Rule" in the Federal Register of National Archives and Records Administration (NARA). The "Modernization of Oil and Gas Reporting; Final Rule" includes revisions and additions to the definition section in Rule 4-10 of Regulation S-X, revisions and additions to the oil and gas reporting requirements in Regulation S-K, and amends and codifies Industry Guide 2 in Regulation S-K. The "Modernization of Oil and Gas Reporting; Final Rule", including all references to Regulation S-X and Regulation S-K, shall be referred to herein collectively as the "SEC regulations". The SEC regulations take effect for all filings made with the United States Securities and Exchange Commission as of December 31, 2009, or after January 1, 2010. Reference should be made to the full text under Title 17, Code of Federal Regulations, Regulation S-X Part 210, Rule 4-10(a) for the complete definitions (direct passages excerpted in part or wholly from the aforementioned SEC document are denoted in italics herein).

*Reserves are estimated remaining quantities of oil and gas and related substances anticipated to be economically producible, as of a given date, by application of development projects to known accumulations.* All reserve estimates involve an assessment of the uncertainty relating the likelihood that the actual remaining quantities recovered will be greater or less than the estimated quantities determined as of the date the estimate is made. The uncertainty depends chiefly on the amount of reliable geologic and engineering data available at the time of the estimate and the interpretation of these data. The relative degree of uncertainty may be conveyed by placing reserves into one of two principal classifications, either proved or unproved. Unproved reserves are less certain to be recovered than proved reserves and may be further sub-classified as probable and possible reserves to denote progressively increasing uncertainty in their recoverability. Under the SEC regulations as of December 31, 2009, or after January 1, 2010, a company may optionally disclose estimated quantities of probable or possible oil and gas reserves in documents publicly filed with the SEC. The SEC regulations continue to prohibit disclosure of estimates of oil and gas resources other than reserves and any estimated values of such resources in any document publicly filed with the SEC unless such information is required to be disclosed in the document by foreign or state law as noted in §229.1202 Instruction to Item 1202.

Reserves estimates will generally be revised only as additional geologic or engineering data become available or as economic conditions change.

Reserves may be attributed to either natural energy or improved recovery methods. Improved recovery methods include all methods for supplementing natural energy or altering natural forces in the reservoir to increase ultimate recovery. Examples of such methods are pressure maintenance, natural gas cycling, waterflooding, thermal methods, chemical flooding, and the use of miscible and immiscible displacement fluids. Other improved recovery methods may be developed in the future as petroleum technology continues to evolve.

Reserves may be attributed to either conventional or unconventional petroleum accumulations. Petroleum accumulations are considered as either conventional or unconventional based on the nature of their in-place characteristics, extraction method applied, or degree of processing prior to sale.

RYDER SCOTT COMPANY PETROLEUM CONSULTANTS

PETROLEUM RESERVES DEFINITIONS
Page 2

Examples of unconventional petroleum accumulations include coalbed or coalseam methane (CBM/CSM), basin-centered gas, shale gas, gas hydrates, natural bitumen and oil shale deposits. These unconventional accumulations may require specialized extraction technology and/or significant processing prior to sale.

Reserves do not include quantities of petroleum being held in inventory.

Because of the differences in uncertainty, caution should be exercised when aggregating quantities of petroleum from different reserves categories.

## RESERVES (SEC DEFINITIONS)

Securities and Exchange Commission Regulation S-X §210.4-10(a)(26) defines reserves as follows:

*Reserves.* *Reserves are estimated remaining quantities of oil and gas and related substances anticipated to be economically producible, as of a given date, by application of development projects to known accumulations. In addition, there must exist, or there must be a reasonable expectation that there will exist, the legal right to produce or a revenue interest in the production, installed means of delivering oil and gas or related substances to market, and all permits and financing required to implement the project.*

*Note to paragraph (a)(26): Reserves should not be assigned to adjacent reservoirs isolated by major, potentially sealing, faults until those reservoirs are penetrated and evaluated as economically producible. Reserves should not be assigned to areas that are clearly separated from a known accumulation by a non-productive reservoir ( i.e. , absence of reservoir, structurally low reservoir, or negative test results). Such areas may contain prospective resources ( i.e. , potentially recoverable resources from undiscovered accumulations).*

## PROVED RESERVES (SEC DEFINITIONS)

Securities and Exchange Commission Regulation S-X §210.4-10(a)(22) defines proved oil and gas reserves as follows:

*Proved oil and gas reserves.* *Proved oil and gas reserves are those quantities of oil and gas, which, by analysis of geoscience and engineering data, can be estimated with reasonable certainty to be economically producible—from a given date forward, from known reservoirs, and under existing economic conditions, operating methods, and government regulations—prior to the time at which contracts providing the right to operate expire, unless evidence indicates that renewal is reasonably certain, regardless of whether deterministic or probabilistic methods are used for the estimation. The project to extract the hydrocarbons must have commenced or the operator must be reasonably certain that it will commence the project within a reasonable time.*

*(i) The area of the reservoir considered as proved includes:*

*(A) The area identified by drilling and limited by fluid contacts, if any, and*

*(B) Adjacent undrilled portions of the reservoir that can, with reasonable certainty, be judged to be continuous with it and to contain economically producible oil or gas on the basis of available geoscience and engineering data.*

RYDER SCOTT COMPANY PETROLEUM CONSULTANTS

PETROLEUM RESERVES DEFINITIONS
Page 3

## PROVED RESERVES (SEC DEFINITIONS) CONTINUED

*(ii) In the absence of data on fluid contacts, proved quantities in a reservoir are limited by the lowest known hydrocarbons (LKH) as seen in a well penetration unless geoscience, engineering, or performance data and reliable technology establishes a lower contact with reasonable certainty.*

*(iii) Where direct observation from well penetrations has defined a highest known oil (HKO) elevation and the potential exists for an associated gas cap, proved oil reserves may be assigned in the structurally higher portions of the reservoir only if geoscience, engineering, or performance data and reliable technology establish the higher contact with reasonable certainty.*

*(iv) Reserves which can be produced economically through application of improved recovery techniques (including, but not limited to, fluid injection) are included in the proved classification when:*

*(A) Successful testing by a pilot project in an area of the reservoir with properties no more favorable than in the reservoir as a whole, the operation of an installed program in the reservoir or an analogous reservoir, or other evidence using reliable technology establishes the reasonable certainty of the engineering analysis on which the project or program was based; and*

*(B) The project has been approved for development by all necessary parties and entities, including governmental entities.*

*(v) Existing economic conditions include prices and costs at which economic producibility from a reservoir is to be determined. The price shall be the average price during the 12-month period prior to the ending date of the period covered by the report, determined as an unweighted arithmetic average of the first-day-of-the-month price for each month within such period, unless prices are defined by contractual arrangements, excluding escalations based upon future conditions.*

RYDER SCOTT COMPANY PETROLEUM CONSULTANTS

**PETROLEUM RESERVES STATUS DEFINITIONS AND GUIDELINES**

**As Adapted From:**
**RULE 4-10(a) of REGULATION S-X PART 210**
**UNITED STATES SECURITIES AND EXCHANGE COMMISSION (SEC)**

**and**

**PETROLEUM RESOURCES MANAGEMENT SYSTEM (SPE-PRMS)**
**Sponsored and Approved by:**
**SOCIETY OF PETROLEUM ENGINEERS (SPE)**
**WORLD PETROLEUM COUNCIL (WPC)**
**AMERICAN ASSOCIATION OF PETROLEUM GEOLOGISTS (AAPG)**
**SOCIETY OF PETROLEUM EVALUATION ENGINEERS (SPEE)**

Reserves status categories define the development and producing status of wells and reservoirs. Reference should be made to Title 17, Code of Federal Regulations, Regulation S-X Part 210, Rule 4-10(a) and the SPE-PRMS as the following reserves status definitions are based on excerpts from the original documents (direct passages excerpted from the aforementioned SEC and SPE-PRMS documents are denoted in italics herein).

**DEVELOPED RESERVES (SEC DEFINITIONS)**

Securities and Exchange Commission Regulation S-X §210.4-10(a)(6) defines developed oil and gas reserves as follows:

*Developed oil and gas reserves are reserves of any category that can be expected to be recovered:*

*(i) Through existing wells with existing equipment and operating methods or in which the cost of the required equipment is relatively minor compared to the cost of a new well; and*

*(ii) Through installed extraction equipment and infrastructure operational at the time of the reserves estimate if the extraction is by means not involving a well.*

**Developed Producing (SPE-PRMS Definitions)**

While not a requirement for disclosure under the SEC regulations, developed oil and gas reserves may be further sub-classified according to the guidance contained in the SPE-PRMS as Producing or Non-Producing.

***Developed Producing Reserves***

*Developed Producing Reserves are expected to be recovered from completion intervals that are open and producing at the time of the estimate.*

*Improved recovery reserves are considered producing only after the improved recovery project is in operation.*

RYDER SCOTT COMPANY PETROLEUM CONSULTANTS

PETROLEUM RESERVES STATUS DEFINITIONS AND GUIDELINES
Page 2

### Developed Non-Producing

*Developed Non-Producing Reserves include shut-in and behind-pipe reserves.*

### Shut-In

*Shut-in Reserves are expected to be recovered from:*

*(1) completion intervals which are open at the time of the estimate, but which have not started producing;*

*(2) wells which were shut-in for market conditions or pipeline connections; or*

*(3) wells not capable of production for mechanical reasons.*

### Behind-Pipe

*Behind-pipe Reserves are expected to be recovered from zones in existing wells, which will require additional completion work or future re-completion prior to start of production.*

*In all cases, production can be initiated or restored with relatively low expenditure compared to the cost of drilling a new well.*

## UNDEVELOPED RESERVES (SEC DEFINITIONS)

Securities and Exchange Commission Regulation S-X §210.4-10(a)(31) defines undeveloped oil and gas reserves as follows:

*Undeveloped oil and gas reserves are reserves of any category that are expected to be recovered from new wells on undrilled acreage, or from existing wells where a relatively major expenditure is required for recompletion.*

*(i) Reserves on undrilled acreage shall be limited to those directly offsetting development spacing areas that are reasonably certain of production when drilled, unless evidence using reliable technology exists that establishes reasonable certainty of economic producibility at greater distances.*

*(ii) Undrilled locations can be classified as having undeveloped reserves only if a development plan has been adopted indicating that they are scheduled to be drilled within five years, unless the specific circumstances, justify a longer time.*

*(iii) Under no circumstances shall estimates for undeveloped reserves be attributable to any acreage for which an application of fluid injection or other improved recovery technique is contemplated, unless such techniques have been proved effective by actual projects in the same reservoir or an analogous reservoir, as defined in paragraph (a)(2) of this section, or by other evidence using reliable technology establishing reasonable certainty.*

RYDER SCOTT COMPANY PETROLEUM CONSULTANTS

# EXHIBIT 2

CB1521
P 670

**930631**

## ACT OF SALE

This Act of Sale is effective for all purposes as of the 1st day of December, 2002, at 7:00 a.m., Central Time ("**Effective Time**") by and between:

**LaTerre Co., Ltd.,** a Texas limited partnership (hereinafter referred to as "**Seller**"), whose mailing address is 333 North Sam Houston Parkway East, Suite 1060, Houston, Texas 77060, and whose federal employer identification number is 76-0488636, represented herein by its sole general partner Castex Energy, Inc., a Texas corporation appearing herein by its undersigned duly authorized President John R. Stoika, and

**Apache North America, Inc.,** a Delaware corporation (hereinafter referred to as "**Buyer**"), whose mailing address is 2000 Post Oak Boulevard, Suite 100, Houston, Texas 77056, and whose federal employer identification number is 73-1302675, represented herein by its undersigned duly authorized Vice President Eric L. Harry.

### W I T N E S S E T H :

#### Article I.

For the price and consideration, and on the terms and conditions hereinafter expressed, Seller does by this act grant, bargain, sell, convey, transfer, assign, set over and deliver unto Buyer here accepting and purchasing for itself, its successors and assigns, and acknowledging delivery and possession thereof, all of Seller's right, title and interest in and to:

the property described on Exhibit "A" hereto ("**Land**"), together with all buildings and improvements thereon and all rights, ways, privileges, and appurtenances thereunto belonging or in anywise appertaining, LESS AND EXCEPT (i) the Production Payment (as defined in and governed by Article IV below) and (ii) the other Excluded Properties (as defined in that certain Purchase and Sale Agreement dated December 16, 2002, by and among the parties hereto and others, as amended (the "**PSA**"))

(all of Seller's right, title and interest in the foregoing, less and except the Production Payment and the other Excluded Properties, shall be referred to collectively as the "**Properties**" and singularly as the "**Property**")

TO HAVE AND TO HOLD the Properties unto Buyer, its successors and assigns forever.

#### Article II.

THIS SALE IS MADE AND ACCEPTED for and in consideration of the price and sum of $1,000.00 and other good and valuable consideration, the receipt and adequacy of which are hereby acknowledged.

## 930631                           671

### Article III.

The Properties are sold, and this Act of Sale is made, subject to the terms of the PSA. Buyer and Seller agree in the event of a conflict between the terms of the PSA and this Act of Sale, the terms of the PSA shall prevail.

### Article IV.

Section 4.1. Definitions. When used in this Article IV, the following terms shall have the meanings indicated below. The single includes the plural, and vice versa.

(a)   "**Affiliate**" means, as to the Person specified, any Person controlling, controlled by, or under common control with such Person. The term "control" as used in the preceding sentence means, with respect to a corporation, the right to exercise voting rights, directly or indirectly, with respect to fifty percent (50%) or more of the shares of any class of securities with voting rights of the corporation, and with respect to any Person other than a corporation, the possession, directly or indirectly, of the power to direct or cause the direction of management policies of such Person.

(b)   "**Applicable Rate**" means the lesser of (a) six percent (6%) per year or (b) the maximum rate of interest permitted by applicable law; except, however, if and when the applicable legal interest rate is greater than six percent (6%) per year, then the Applicable Rate shall equal the applicable legal interest rate.

(b1)   "**Business Day**" means any day that is not a Saturday, Sunday or federal holiday.

(b2)   "**Existing Area**" means those lands (including all water bottoms) within the geographic area described next to the label "Existing Area" on Exhibit "D-1" hereto.

(c)   "**Governmental Authority**" means any federal, state, local, municipal, or other governments; any governmental, regulatory or administrative agency, commission, body or other authority exercising or entitled to exercise any administrative, executive, judicial, legislative, police, regulatory or taxing authority or power; and any court or governmental tribunal.

(c1)   "**Hydrocarbons**" means oil, gas well gas, casinghead gas, condensate, natural gas liquids and other liquid or gaseous hydrocarbons and all components of any of them and shall also refer to any other minerals of every kind and character.

(d)   "**Law**" means any law, statute, ordinance, decree, requirement, order, judgment, rule, or regulation of, including, but not limited to, the terms of any license or permit issued by any Governmental Authority.

(e)   "**Payment Date**" with respect to a calendar month means the last Business Day of the second month following such calendar month.

(f)   "**Person**" means any natural person, corporation, partnership, limited liability company, trust, estate, Governmental Authority or other legal entity.

**930631**

672

(g)   "**Production Payment**" means the Production Payment Percentage of the Subject Hydrocarbons. The Production Payment is a non-operating and (except for the deduction from Seller's monthly payments to Buyer as contemplated by the parenthetical phrase in Section 4.2(d) of this Article IV) non-expense bearing limited mineral right and interest in and to the Subject Interests and shall burden 100% of the Subject Interests during the Term.

(h)   "**Production Payment Percentage**" means an undivided five percent (5%) of 8/8ths interest, proportionately reduced (subject to Section 4.9 of this Article IV and without duplication) to the extent that the interest in a Subject Interest (without regard to the Production Payment) sold to Buyer under this Act of Sale (as such undivided interest may change as a result of an obligation existing as of the Effective Time under one or more of the contracts and other agreements comprising a portion of the Properties) is less than the entirety of the ownership of such Subject Interest. Nonetheless, if a third Person who is not an Affiliate of Buyer hereafter non-consents to an operation, the Production Payment Percentage shall not change as a result thereof.

(h1)   "**Proposed Well**" means the first well that is drilled by Assignee (or its successors and assigns) after the Effective Time which is capable of producing Hydrocarbons that are from or otherwise attributable to a Prospect Area as to the corresponding Zones for that Prospect Area (whether or not such well is first completed in such corresponding Zones).

(h2)   "**Prospect Area**" means those lands (including all water bottoms) (1) within the geographic area described next to the label "Prospect Area" on Exhibit "D-2" hereto.

(i)   "**Scheduled Properties**" means all Land INSOFAR AND ONLY INSOFAR as same relate to or are otherwise attributable to:

(1)   any or all of the wells described on Exhibit "B" hereto as to all depths from the surface of the earth to the total depth drilled in each such well as of the Effective Time,

(2)   any or all of the well locations described on Exhibit "C" hereto as to all depths from the surface of the earth to the base of the corresponding reservoirs described on Exhibit "C" hereto,

(3)   any or all of the wells described next to the label "Well" on Exhibit "D-1" hereto as to all depths from the surface of the earth to the total depth drilled in each such well as of the Effective Time,

(4)   any or all of the Existing Areas as to the corresponding Zones for such Existing Areas (whether or not any Hydrocarbons attributable to such Existing Areas and Zones are produced from any well described on Exhibit "D-1" hereto),

930631

673

(5)    any or all of the Proposed Wells described on Exhibit "D-2" hereto as to all depths from the surface of the earth to the base of the deepest corresponding Zones for such Proposed Well and/or

(6)    any or all of the Prospect Areas as to the corresponding Zones for such Prospect Areas described on Exhibit "D-2" hereto (whether or not any Hydrocarbons attributable to such Prospect Areas and Zones are produced from any Proposed Well).

(j)    "**Subject Hydrocarbons**" means all Hydrocarbons produced from or attributable to the Subject Interests during the Term.

(k)    "**Subject Interests**" means all Scheduled Properties as the same shall be enlarged (except through Buyer's efforts hereafter by acquisition or otherwise not pursuant to the PSA or this Act of Sale): (i) by any reversionary interest, (ii) by the discharge of any payments out of production, or (iii) by the removal or expiration of any mineral servitude, mineral lease, charges or encumbrances to which any of the same are subject.

(l)    "**Subject Taxes**" means all severance and gross production taxes imposed on the production of Subject Hydrocarbons, but shall not include any income or other taxes and shall not include any interest or penalties.

(m)    "**Term**" means that certain period of time beginning at the Effective Time to and including and expiring at 7:00 a.m., Central Time, on December 1, 2008.

(n)    "**Zones**" with respect to any specified Existing Area means those sands, reservoirs, depths and zones specifically described next to the entry "Zones" corresponding to such Existing Area, as specified on Exhibit "D-1" hereto. "**Zones**" with respect to any specified Prospect Area means those sands, reservoirs, depths and zones specifically described next to the entry "Zones" corresponding to such Prospect Area, as specified on Exhibit "D-2" hereto.

Section 4.2.  Production Payment.

(a)    Reservation. This Act of Sale specifically reserves to Seller, and does not otherwise convey, assign or transfer to Buyer, the right, title or interest in the Production Payment.  The Production Payment reserved by Seller in this Act of Sale shall expire and terminate upon the expiration of the Term.

(b)    [intentionally blank].

(c)    Method of Computation.  The Production Payment with respect to any Subject Hydrocarbons shall be calculated and paid based on the gross price received by Buyer for such Subject Hydrocarbons, taking into account the deductions set forth in the parenthetical phrase in Section 4.2(d) of this Article IV.

674                930631

(d)    Payment. On or before the Payment Date for each calendar month during the Term, Buyer shall pay to Seller by wire transfer of immediately available funds to the account specified from time to time by Seller an amount equal to the Production Payment (less deductions for the Subject Taxes attributable to such Production Payment and also less a deduction for such Production Payment's proportionate share of all applicable gathering, transportation, separating, compressing, treating and processing costs and expenses incurred by Buyer in connection with the sale of the Subject Hydrocarbons) for such calendar month.  Any change in wiring instructions by Seller must be communicated in writing to Buyer at least ten (10) Business Days prior to a Payment Date.  Any amount not paid by Buyer to Seller on or before the Payment Date shall bear, and Buyer shall pay, interest at the Applicable Rate from such Payment Date until such amount is paid (plus all costs and expenses of collection, including without limitation attorneys' fees and court costs, paid by Seller).

(e)    Monthly Statement.  On or before the Payment Date for each calendar month during the Term, Buyer shall deliver to Seller a statement showing, in reasonable detail, the computation of the Production Payment for such calendar month.

(f)    Non-Liability of Seller.  In no event shall Seller be liable or responsible in any way for any Subject Taxes or for costs or liabilities incurred by Buyer or other Persons attributable to the Subject Interests or to the Subject Hydrocarbons.  It is the express intention, agreement and understanding of Buyer and Seller that the Production Payment shall constitute a non-expense bearing interest for all purposes, except for the deductions from Seller's monthly payments to Buyer as contemplated by the parenthetical phrase in Section 4.2(d) of this Article IV.

Section 4.3.  Marketing of Subject Hydrocarbons.  Buyer shall use all reasonable efforts to market or cause to be marketed all commercial quantities of Subject Hydrocarbons, subject to the provisions of Section 4.4(a) of this Article IV.  Buyer may enter into one or more sales contracts; provided, however, that Buyer shall not enter into a sales contract with an Affiliate unless such sales contract is on the same terms and prices prevailing in the area in arms'-length sales contracts that Buyer acting as a reasonably prudent operator could enter into with a Person who is not an Affiliate of Buyer.

Section 4.4.  Operation of Subject Interests

(a)    Prudent Operator Standard.  Buyer will conduct and carry on, or otherwise cause, the development, maintenance, operation and abandonment of the Subject Interests and the sale of the Subject Hydrocarbons with reasonable and prudent business judgment and in accordance with sound oil and gas field practices as if not burdened by the Production Payment. Nothing contained in this Section 4.4 shall be deemed to prevent or restrict Buyer from electing not to participate in any operation that is to be conducted under the terms of any operating agreement, unit operating agreement, contract for development or similar instrument affecting or pertaining to the Subject Interests (or any portion thereof) and allowing consenting parties to conduct non-consent operations thereon if such election is made by Buyer (unless any of the

**930631**

675

consenting parties under such agreement or instrument is an Affiliate of Buyer, in which event Seller's prior written consent for Buyer's non-consent election shall be required, which consent will not be unreasonably withheld). In the event of such non-participation by Buyer, the Production Payment shall be relinquished or forfeited as to the affected Subject Interest (or any portion thereof), to the extent Buyer's rights as to such Subject Interest (or any portion thereof) is relinquished or forfeited.

(b)    <u>Abandonment of Properties</u>.    Nothing herein shall obligate Buyer to operate or continue to operate any well when, in Buyer's good faith opinion acting as reasonably prudent operator as provided in <u>Section 4.4(a) of this Article IV</u>, such well ceases to produce or is not capable of producing Hydrocarbons in commercial quantities.

(c)    <u>Insurance</u>.    Buyer shall maintain insurance with respect to the Subject Interests against such liabilities, casualties, risks and contingencies as is customary in the oil and gas industry.

(d)    <u>Subject Taxes</u>.    Buyer shall pay all Subject Taxes (and all other taxes imposed on the Subject Interests and Subject Hydrocarbons), except those being contested in good faith and as to which adequate reserve has been established. Nonetheless, Buyer shall be entitled to make deductions for Subject Taxes, as provided for in the parenthetical phrase in <u>Section 4.2(d) of this Article IV</u>.

Section 4.5.   <u>Pooling and Unitization</u>

(a)    <u>Pooled Subject Interests</u>.    Certain of the Subject Interests may have been previously pooled or unitized for the production of Hydrocarbons.   Such Subject Interests are and shall be subject to the terms and provisions of such pooling or unitization agreements or orders, as same may be amended or revised from time to time.  The Production Payments and <u>this Article IV</u> shall apply to and affect only the production of Hydrocarbons from such units that accrues to such Subject Interests under and by virtue of the applicable pooling or unitization agreements or orders, as same may be amended or revised from time to time.

(b)    <u>Right to Pool</u>.  Buyer shall have the right and power to pool or unitize any of the Subject Interests and to alter, change, amend or terminate any pooling or unitization agreements previously or hereafter entered into, as to all or any part of the lands covered by the Scheduled Properties, as to any one or more of the formations or horizons thereunder, upon such terms and provisions as Buyer shall in its sole discretion determine acting as a reasonably prudent operator would act if its interest was not burdened by the Production Payment.  If and whenever through the exercise of such right and power, or pursuant to any Law, any of the Subject Interests are pooled or unitized in any manner, the Production Payment shall apply to and affect only the production of Hydrocarbons that accrues to such Subject Interests under and by virtue of such pooling or unitization.

676                    **930631**

Section 4.6.  Books and Records; Inspection and Audit.  Buyer shall at all times maintain true and correct books and records in accordance with generally accepted accounting principles and Council of Petroleum Accountants Society (COPAS) standards sufficient to determine (a) the Production Payment and (b) the amounts payable to Seller hereunder.  During the Term and for two years thereafter, upon ten (10) Business Days' prior written notice to Buyer, Seller and its representatives shall have the right to inspect and audit Buyer's books and records relating to the Production Payment at the office of Buyer during normal business hours.

Section 4.7.  Arbitration.  Any dispute, controversy or claim arising out of or in relation to or in connection with the production payment, including without limitation any dispute as to the construction, validity, interpretation, enforceability or breach of the provisions of this Article IV, shall be exclusively and finally settled by arbitration in accordance with the provisions of Section 11.13 of the PSA.

Section 4.8.  Buyer's Other Interests.  Notwithstanding anything to the contrary, this Production Payment does not affect any rights or interests in the Land currently owned by Assignee or hereafter acquired by Assignee outside of this Act of Sale and not pursuant to the PSA.

Section 4.9  Leasehold Assignments.  Reference is made to that certain Assignment, Bill of Sale and Conveyance between Castex Energy 1995, L.P. and Castex Energy 1996, L.P. as Assignor and Apache Corporation as Assignee executed on December 16, 2002 (recorded, among other places, at Entry No. 278715 of the conveyance records of Cameron Parish, Louisiana, in Book 1518 at Page 242 et seq. under Entry No. 928352 in the conveyance records of Lafourche Parish, Louisiana and in Book 1508 at Entry No. 1135690 of the conveyance records of Terrebonne Parish, Louisiana) and amended contemporaneously herewith pursuant to the PSA (the "**Leasehold Assignment**").  The Production Payment reserved herein does not cover or affect any Hydrocarbons if, when and to the extent that they are subject to the corresponding Production Payment reserved to Castex Energy 1995, L.P. and Castex Energy 1996, L.P. in the Leasehold Assignment.

Section 4.10  Exhibits, Proposed Wells and Prospect Areas.  The parties acknowledge that most, if not all, of the Proposed Wells are not yet in existence and thus that their precise location and official name cannot be described with further specificity at the time of execution of this Act of Sale.  Accordingly, among other reasons, the parties further agree as follows:

(a)     The Proposed Well names listed on Exhibit "D-2" hereto are for convenience only.  A well may constitute a Proposed Well, even though it is not located on lands of the landowner referenced in such Proposed Well name and/or carries another well name.

(b)     If a Proposed Well has been drilled and completed as a producer, then upon the request of either party, the parties shall execute and record an

Page 7 of 12

## 930631                           677

amendment to this Act of Sale to specify the precise location, name and Louisiana Office of Conservation serial number(s) for such Proposed Well.

### Article V.

BUYER ACKNOWLEDGES AND AGREES THAT, EXCEPT AS EXPRESSLY PROVIDED OTHERWISE IN AND SUBJECT TO THE TERMS AND PROVISIONS OF THE PSA AND/OR IN ARTICLE VI OF THIS ACT OF SALE, BUYER IS RELYING SOLELY ON ITS OWN TITLE EXAMINATION AND INSPECTION OF THE PROPERTIES, IS NOT RELYING ON ANY WARRANTY OR REPRESENTATION BY ANY OF SELLER, ITS AFFILIATES (AS DEFINED IN ARTICLE IV ABOVE) AND ITS AND THEIR OFFICERS, DIRECTORS, EMPLOYEES, AGENTS AND REPRESENTATIVES (EACH INDIVIDUALLY, A "SELLER GROUP MEMBER"), IS BUYING THE PROPERTIES AT BUYER'S PERIL AND RISK AND ACCEPTS THE PROPERTIES FROM SELLER "AS IS" "WHERE IS" WITH ALL FAULTS IN THEIR CURRENT PHYSICAL AND ENVIRONMENTAL CONDITION AND STATE OF REPAIR, WITHOUT WARRANTY OR RECOURSE; THAT ANY FILES OR OTHER INFORMATION (WRITTEN, ORAL OR OTHERWISE) PREVIOUSLY OR HEREAFTER FURNISHED OR OTHERWISE MADE AVAILABLE TO OR FOR BUYER BY ANY SELLER GROUP MEMBER IS PROVIDED AS A CONVENIENCE ONLY AND SHALL NOT CREATE OR GIVE RISE TO ANY LIABILITY AGAINST ANY SELLER GROUP MEMBER; AND THAT ANY RELIANCE ON OR USE OF SAME SHALL BE AT BUYER'S SOLE RISK TO THE MAXIMUM EXTENT PERMITTED BY LAW. BUYER FURTHER ACKNOWLEDGES AND AGREES THAT IT IS NOT RELYING ON SELLER'S SKILL OR JUDGMENT IN SELECTING ANY PROPERTY (EVEN IF SELLER MAY KNOW OR HAVE REASON TO KNOW OF THE PARTICULAR USE BUYER INTENDS FOR ANY PROPERTY OR OF BUYER'S PARTICULAR PURPOSE FOR BUYING ANY PROPERTY). EXCEPT AS EXPRESSLY PROVIDED IN AND SUBJECT TO THE TERMS AND PROVISIONS OF THE PSA AND/OR IN ARTICLE VI OF THIS ACT OF SALE:

(A)    SELLER DISCLAIMS ANY AND ALL (AND BUYER ACKNOWLEDGES THAT IT IS NOT RELYING ON ANY) REPRESENTATIONS AND WARRANTIES (EXPRESS, STATUTORY, IMPLIED OR OTHERWISE) CONCERNING ANY PROPERTIES;

(B)    SELLER DISCLAIMS ANY AND ALL LIABILITY AND RESPONSIBILITY FOR OR ASSOCIATED WITH (AND BUYER ACKNOWLEDGES THAT IT IS NOT RELYING ON) THE QUALITY, ACCURACY, COMPLETENESS OR MATERIALITY OF ANY DATA, INFORMATION AND MATERIALS FURNISHED (ELECTRONICALLY, ORALLY, BY VIDEO, IN WRITING OR BY OR THROUGH ANY OTHER MEDIUM) AT ANY TIME TO BUYER OR ANY OTHER PERSON IN CONNECTION WITH THE PSA AND/OR THIS ACT OF SALE; AND

(C)    BUYER IRREVOCABLY WAIVES, AND RELEASES EACH SELLER GROUP MEMBER FROM AND AGAINST, ANY AND ALL CLAIMS, DEMANDS, DISPUTES, JUDGMENTS, SUITS, ACTIONS, PROCEEDINGS, INVESTIGATIONS, PAYMENTS, OFFSETS, ADJUSTMENTS, CAUSES OF ACTION, LOSSES, DAMAGES, LIABILITIES, LIENS, FINES, SANCTIONS, PENALTIES, COSTS AND EXPENSES WHATSOEVER (INCLUDING ATTORNEYS' FEES, EXPERT FEES AND COSTS OF LITIGATION) ("CLAIMS"), WHETHER DIRECT OR INDIRECT, KNOWN OR UNKNOWN, FORESEEN OR UNFORESEEN, THAT MAY ARISE OUT OF OR IN ANY WAY BE CONNECTED TO THE PROPERTIES, THE PSA AND/OR THIS ACT OF SALE WHETHER BEFORE, AT OR AFTER THE EFFECTIVE TIME AND WHETHER OR NOT ARISING DURING THE PERIOD OF, OR FROM, OR IN CONNECTION WITH SELLER'S OWNERSHIP OR USE OF THE PROPERTIES, AND *WHETHER OR NOT CAUSED OR CONTRIBUTED IN WHOLE OR IN PART BY THE NEGLIGENCE (WHETHER ACTIVE,*

678        930631

PASSIVE, SOLE, SIMPLE, CONCURRENT OR OTHERWISE), FAULT OR STRICT LIABILITY OF ANY SELLER GROUP MEMBER OR BY ANY OTHER THEORY OF LIABILITY OR FAULT WHETHER IN LAW (STATUTORY, COMMON, CIVIL, JUDICIAL OR OTHERWISE), EQUITY OR OTHERWISE.

THESE DISCLAIMERS BY SELLER AND THESE WAIVERS, RELEASES OF CLAIMS AND ACKNOWLEDGMENTS BY BUYER RELATE WITHOUT LIMITATION TO:

(1) ANY WARRANTY OF TITLE, OWNERSHIP, MERCHANTABILITY OR PEACEFUL POSSESSION, OTHER THAN THE SPECIAL TITLE WARRANTY EXPRESSLY SET FORTH IN THE PSA AND/OR IN ARTICLE VI OF THIS ACT OF SALE,

(2) THE EXISTENCE OF ANY OR ALL PROSPECTS,

(3) THE GEOGRAPHIC, GEOLOGIC OR GEOPHYSICAL CHARACTERISTICS ASSOCIATED WITH ANY PROPERTIES, INCLUDING WITHOUT LIMITATION ANY OR ALL PROSPECTS,

(4) THE EXISTENCE, QUALITY, QUANTITY OR RECOVERABILITY OF HYDROCARBON RESERVES ASSOCIATED WITH ANY PROPERTY,

(5) THE COSTS, EXPENSES, REVENUES OR RECEIPTS ASSOCIATED WITH ANY PROPERTY,

(6) THE CONTRACTUAL, ECONOMIC OR FINANCIAL DATA ASSOCIATED WITH ANY PROPERTY,

(7) THE CONTINUED FINANCIAL VIABILITY OR PRODUCTIVITY OF ANY PROPERTY,

(8) FITNESS FOR BUYER'S INTENDED USE OR PURPOSE, FOR ANY OTHER PARTICULAR USE OR PURPOSE OR FOR ORDINARY USE (UNDER LOUISIANA CIVIL CODE ARTICLE 2475 OR 2524 OR OTHERWISE),

(9) THE ENVIRONMENTAL OR PHYSICAL CONDITION OR STATE OF REPAIR OF ANY PROPERTY,

(10) THE COSTS, REQUIREMENT OR NEED FOR ANY INVESTIGATION, STUDY, REPAIR, CLEAN-UP, DETOXIFICATION OR REMEDIATION OF ANY PROPERTY,

(11) THE PLUGGING (AND AS NECESSARY REPLUGGING) AND ABANDONMENT OF ANY WELL, THE SALVAGE OR REMOVAL OF ANY ASSOCIATED WELL COLLARS, WELL STRUCTURES, TANK BATTERIES, COMPRESSORS, INJECTORS, EQUIPMENT OR OTHER MOVABLE PROPERTY (WHETHER PLACED BEFORE OR AFTER THE EFFECTIVE TIME), THE REMOVAL, FLUSHING OR CAPPING OF ANY ASSOCIATED FLOWLINES, GATHERING LINES OR TRANSMISSION LINES, THE SALVAGE OR REMOVAL OF UNDERWATER OBSTRUCTIONS, THE CLOSURE OR REMEDIATION OF ANY ASSOCIATED PITS OR CANALS, THE DISPOSAL OF ANY RELATED WASTE MATERIALS (INCLUDING WITHOUT LIMITATION ANY NATURALLY OCCURRING RADIOACTIVE MATERIAL ("NORM"), ASBESTOS OR OTHER HAZARDOUS SUBSTANCES OR MATERIALS) OR THE RESTORATION OF THE ASSOCIATED SURFACE, SUBSURFACE, WETLANDS, MARSHES OR WATER BOTTOMS;

(12) (I) POLLUTION, NORM, ASBESTOS, HAZARDOUS SUBSTANCES, HAZARDOUS MATERIALS OR ENVIRONMENTAL DAMAGE OR DEFECTS, (II) THE CLEAN UP OR REMEDIATION OF POLLUTION, NORM, ASBESTOS, HAZARDOUS SUBSTANCES, HAZARDOUS MATERIALS, ENVIRONMENTAL DAMAGE OR DEFECTS, WASTE DISPOSAL, WELL SITES OR OIL AND GAS FACILITIES OR (III) THE PROTECTION OF THE ENVIRONMENT OR OF HUMAN HEALTH; IN ALL THREE CASES INCLUDING WITHOUT LIMITATION UNDER THE LOUISIANA ENVIRONMENTAL QUALITY ACT AS AMENDED, LOUISIANA REVISED STATUTES TITLE 30 CHAPTER 1 AS AMENDED AND THE FOLLOWING ACTS (AS PREVIOUSLY AMENDED AND AS MAY BE AMENDED FROM TIME TO TIME) AS WELL AS ANY SIMILAR FEDERAL, STATE OR LOCAL LAWS (AS CURRENTLY EXISTING OR AS MAY BE AMENDED FROM TIME TO TIME): THE CLEAN AIR ACT, THE CLEAN WATER ACT, THE COMPREHENSIVE ENVIRONMENTAL RESPONSE, COMPENSATION AND LIABILITY ACT OF 1980, THE EMERGENCY PLANNING

Book 1521, Page 670, File Number 930631

930631                           679

AND COMMUNITY RIGHT-TO-KNOW ACT, THE FEDERAL WATER POLLUTION CONTROL ACT, THE HAZARDOUS AND THE SOLID WASTE AMENDMENTS ACT OF 1984, THE HAZARDOUS MATERIALS TRANSPORTATION ACT, THE NATIONAL ENVIRONMENTAL POLICY ACT, THE OIL POLLUTION ACT OF 1990, THE RESOURCE CONSERVATION AND RECOVERY ACT OF 1976, THE SAFE DRINKING WATER ACT OF 1974, THE SUPERFUND AMENDMENTS AND REAUTHORIZATION ACT OF 1986 AND THE TOXIC SUBSTANCES CONTROL ACT,

(13)   SAFETY,
(14)   THE ABSENCE OF APPARENT, PATENT, LATENT OR HIDDEN DEFECTS OR VICES,
(15)   FREEDOM FROM OR DIMINUTION IN VALUE BECAUSE OF REDHIBITORY DEFECTS OR VICES (UNDER LOUISIANA CIVIL CODE ARTICLE 2520 ET SEQ. OR OTHERWISE, WHETHER KNOWN OR UNKNOWN AND WHETHER APPARENT, PATENT, LATENT, HIDDEN OR OTHERWISE),
(16)   EVICTION (UNDER LOUISIANA CIVIL CODE ARTICLE 2500 OR OTHERWISE),
(17)   NON-DECLARED ENCUMBRANCES (UNDER LOUISIANA CIVIL CODE ARTICLE 2500 OR OTHERWISE) OR
(18)   CONFORMITY WITH MODELS OR SAMPLES OF MATERIALS.

FURTHER, EXCEPT AS EXPRESSLY PROVIDED OTHERWISE IN AND SUBJECT TO THE TERMS AND PROVISIONS OF THE PSA, BUYER SHALL PROTECT, INDEMNIFY, DEFEND AND HOLD HARMLESS EACH SELLER GROUP MEMBER FROM AND AGAINST, ANY AND ALL CLAIMS, WHETHER DIRECT OR INDIRECT, KNOWN OR UNKNOWN, FORESEEN OR UNFORESEEN, THAT MAY ARISE OUT OF OR IN ANY WAY BE CONNECTED TO ANY OR ALL SUBJECTS LISTED IN ITEMS (9)-(12) ABOVE, WHETHER BEFORE, AT OR AFTER THE EFFECTIVE TIME AND WHETHER OR NOT ARISING DURING THE PERIOD OF, OR FROM, OR IN CONNECTION WITH SELLER'S OWNERSHIP OR USE OF THE PROPERTIES, AND *WHETHER OR NOT CAUSED OR CONTRIBUTED IN WHOLE OR IN PART BY THE NEGLIGENCE (WHETHER ACTIVE, PASSIVE, SOLE, SIMPLE, CONCURRENT OR OTHERWISE), FAULT OR STRICT LIABILITY OF ANY SELLER GROUP MEMBER OR BY ANY OTHER THEORY OF LIABILITY OR FAULT WHETHER IN LAW (STATUTORY, COMMON, CIVIL, JUDICIAL OR OTHERWISE); EQUITY OR OTHERWISE* (EXCLUDING ONLY THE GROSS NEGLIGENCE OR WILFUL MISCONDUCT ON THE PART OF THE PERSON TO BE INDEMNIFIED). Notwithstanding the foregoing, this Act of Sale is made with full rights of substitution and subrogation of Buyer in and to all rights and actions of warranty against previous owners, sellers, lessors, lessees and grantors (with the exception of Seller, Castex Energy, Inc., Castex Energy 1995, L.P., Castex Energy 1996, L.P., Mirant Americas Production Company, Mirant South Louisiana Production, LLC and Mirant South Louisiana Fee, LLC).

     In the event of any conflict or inconsistency between the terms and provisions of this Article V and the terms and provisions set forth in the PSA, the terms and provisions of the PSA shall control.

                         **Article VI.**

     SELLER MAKES NO WARRANTY WHATSOEVER, EXPRESSED OR IMPLIED, AS TO TITLE TO THE PROPERTIES, except that Seller specially warrants and agrees to defend Seller's title against the lawful claims of all persons claiming title to the

**680**

**930631**

Properties by through or under Seller (subject to and as further provided in Section 9.16 of the PSA), but not otherwise.

### Article VII.

Seller and Buyer waive the production of Mortgage and Conveyance Certificates and relieve and release the undersigned Notary Public from all responsibility in connection therewith.  The parties hereto take cognizance of the fact that no title examination has been requested by the undersigned Notary Public, and relieve and release the undersigned Notary Pubic of any and all liability in connection therewith.

### Article VIII.

This Act of Sale shall be binding upon and inure to the benefit of the parties hereto and their respective successors and assigns, and to the extent permitted by law, covenants hereof shall constitute real obligations and shall run with the Land. Nonetheless, Seller's obligations under the special warranty of title in Article VI above or otherwise under or pursuant to the PSA shall not be binding on any third Person (as defined in Article IV above) solely by virtue of such third Person's obtaining any right, title or interest in or to any or all of the Production Payment.

IN WITNESS WHEREOF, the parties hereto have signed this Act of Sale to be effective for all purposes as of the Effective Time in the presence of the undersigned competent witnesses, who hereunto sign their names with Seller and Buyer.

WITNESSES:

SELLER:

LATERRE CO., LTD.
By Castex Energy, Inc., its sole general partner

By: _____
John R. Stoka, President

BUYER:
APACHE NORTH AMERICA, INC.

By: _____
Eric L. Harry, Vice President

Page 11 of 12

Book 1521, Page 670, File Number 930631

(Page 12 of 53)

## 930631                      681

### Acknowledgments

STATE OF TEXAS
COUNTY OF HARRIS

BEFORE ME, a duly authorized notary public, on this day personally appeared **Eric L. Harry**, known to me to be the person whose name is subscribed to the foregoing instrument, and known to me to be the Vice President of **Apache North America, Inc.**, a Delaware corporation, and acknowledged to me that he executed said instrument for the purposes and consideration therein expressed, and as the act of said corporation.

Given under my hand and official seal this 31st day of January 2003.

Notary Public in and for the State of Texas
My commission expires _11-30-2005_

STATE OF TEXAS
COUNTY OF HARRIS

BEFORE ME, a duly authorized notary public, on this day personally appeared **John R. Stolka**, known to me to be the person whose name is subscribed to the foregoing instrument, and known to me to be the President of Castex Energy, Inc., the sole General Partner of **LaTerre Co., Ltd.**, a Texas limited partnership, and acknowledged to me that he executed said instrument for the purposes and consideration therein expressed, and as the act of said limited partnership.

Given under my hand and official seal this 31st day of January 2003.



Notary Public in and for the State of Texas
My commission expires _11-30-2005_

REGINA C. GORMAN
Notary Public, State of Texas
Commission Expires
NOVEMBER 30, 2005

Book 1521, Page 670, File Number 930631

## 930631

682

**EXHIBIT "A"**
**to Act of Sale between LaTerre Co., Ltd., as Seller, and Apache North America, Inc., as Buyer**

### TERREBONNE PARISH, LOUISIANA

WARD 4

A) Township 19 South-Range 17 East

    1) Section 14 -    All

    2) Section 15 -    All

    3) Section 82 -    All, fractional as per Official Township Plat dated November 4, 1856.

    4) Section 82 -    Section 82, as shown upon the Official Township Plat of said township approved on June 4, 1832, based upon the survey by John Maxwell, Deputy United States Surveyor, during the years 1830 and 1831, which as not included within the area designated as Section 82 of said township as shown upon the Official Township Plat of said township approved on November 4, 1856, based upon the re-survey of said township by Joseph Gorlinski, Deputy United States Surveyor, during the year 1856, said portion of said Section 82 estimated to contain 494.71 acres.

B) Township 20 South-Range 17 East

    1) Section 1 -    All

    2) Section 2 -    East Half of Southeast Quarter.

    3) Section 12 -    All

    4) Section 13 -    All, less and except West Half of Southwest Quarter and less and except any interest in said lands quitclaimed to the St. Martins by that certain Agreement dated November 2, 1970, and recorded in Conveyance Book 510, Page 635 and also less and except any interest in said lands quitclaimed to Dr. Forrest E. Baker by that certain Agreement dated April 15, 1971, and recorded in Conveyance Book 516, Page 742, but including any interest in said section acquired by LaTerre Co., Inc. in said Agreements.

Page 1 of 23

Book 1521, Page 670, File Number 930631

930631                    683

5) Section 24 -   Northeast Quarter and less and except any interest in said lands quitclaimed to the St. Martins by that certain Agreement dated November 2, 1970, and recorded in Conveyance Book No. 510, Page 635, and also less and except any interest in said lands quitclaimed to Dr. Forrest E. Baker by that certain Agreement dated April 15, 1971, and recorded in Conveyance Book 516, Page 742, but including any interest in said section acquired by LaTerre Company, Inc. in said Agreements.

## WARD 6

A)   Township 19 South-Range 19 East

1) Section 11 -   Lot 2

2) Section 12 -   Lot 2

3) Section 13 -   Lot 2

4) Section 15 -   All that portion lying East of Bayou Terrebonne, less and except Lot 1.

5) Section 28 -   All

6) Section 29 -   All, less and except Lot 1.

7) Section 30 -   All

8) Section 31 -   All

9) Section 32 -   Northeast Quarter, West Half of Southwest Quarter and East Half of Southeast Quarter.

10) Section 33 -   Lot Nos. 15 and 16.

11) Section 34 -   All

12) Section 35 -   All

13) Section 36 -   All, less and except Southeast Quarter of Southeast Quarter.

14) Section 37 -   All, less and except West Half of Southwest Quarter.

15) Section 38 -   East Half, East Half of Northwest Quarter and Southwest Quarter of Southwest Quarter; less and except that certain portion quitclaimed by LaTerre Co., Inc. to Pierre Chaisson, Joseph Naquin and Henry Dardan by three (3) instruments

Page 2 of 23

684                    **930631**

dated October 24, 1951, and recorded in Conveyance Book 183, Pages 430, 428 and 427, respectively;

| | | |
|---|---|---|
| 16) Section 39 - | All | |
| 17) Section 40 - | All | |
| 18) Section 41 - | All | |
| 19) Section 42 - | All | |
| 20) Section 43 - | All | |
| 21) Section 44 - | All, less and except Lot 8. | |
| 22) Section 45 - | All | |
| 23) Section 46 - | All | |
| 24) Section 47 - | All | |
| 25) Section 48 - | All | |

26) Section 49 -   All; less and except   Northeast Quarter of Northwest Quarter; and less and except those   certain portions quitclaimed by LaTerre Co., Inc. to Hellen (or Helien) Verdin Dardar, et al, by instrument dated June 28, 1949, and recorded in Conveyance Book 169, Page 234; and less and except those certain portions quitclaimed by LaTerre Co., Inc. to Pierre Chaisson, by instrument dated October 24, 1951, and recorded in Conveyance Book 183, Page 430

27) Section 53 -   East Half of East Half, Southwest Quarter of Northeast Quarter Southwest Quarter of Southeast Quarter and West Half of West Half.

B) Township 20 South-Range 19 East

| | | |
|---|---|---|
| 1) Section 1 - | All | |
| 2) Section 2 - | All | |
| 3) Section 3 - | All | |
| 4) Section 4 - | All | |
| 5) Section 5 - | All | |
| 6) Section 6 - | All | |

Book 3521, Page 670, File Number 930631

**930631**      685

7) Section 7 -       All

8) Section 8 -       All

9) Section 9 -       All

10) Section 10 -     All

11) Section 11 -     All

12) Section 12 -     All

13) Section 13 -     All

14) Section 14 -     All

15) Section 15 -     All

16) Section 17 -     All

17) Section 18 -     All

18) Section 19 -     All

19) Section 20 -     All

20)  Section 21 -    All

21)  Section 22 -    All

22)  Section 23 -    All

23)  Section 24 -    All

24)  Section 25 -    All

25)  Section 26 -    All

26)  Section 27 -    All

27)  Section 28 -    All

28)  Section 29 -    All

29)  Section 30 -    All

30)  Section 31  -   All

31)  Section 32  -   All

Page 4 of 23

Book 1521, Page 670, File Number 930631

**686**          **930631**

      32) Section 33 -   All

      33) Section 34 -   All

      34) Section 35 -   All

      35) Section 36 -   All

C) Township 20 South-Range 20 East

      1) Section 1 -   West Half of Southwest Quarter and Southeast Quarter of Southwest Quarter.

      2) Section 2 -   All

      3) Section 3 -   All

      4) Section 4 -   All

      5) Section 5 -   All

      6) Section 6 -   All

      7) Section 7 -   All fractional.

      8) Section 8 -   All fractional.

      9) Section 9  -   All fractional.

      10) Section 10 -   All

      11) Section 11 -   All

      12) Section 12 -   West Half.

      13) Section 13 -   Northwest Quarter of Southeast Quarter lying West of Bayou Chien (or Bayou Point Aux Chene), East Half of Southwest Quarter, Southwest Quarter of Southwest Quarter and Northwest Quarter.

      14) Section 14 -   All

      15) Section 15 -   All

      16) Section 17 -   All fractional.

      17) Section 18 -   All fractional.

      18) Section 19 -   All fractional.

Book 1521, Page 670, File Number 930631

**930631**     ⅃  **687**

| | | |
|---|---|---|
| 19) Section 20 - | All fractional. |
| 20) Section 21 - | All fractional. |
| 21) Section 22 - | All |
| 22) Section 23 - | All |
| 23) Section 24 - | West Half of Northwest Quarter and South Half West of Bayou Chien (or Bayou Point Aux Chene). |
| 24) Section 25 - | All West of Bayou Chien (or Bayou Point Aux Chene). |
| 25) Section 26 - | All fractional. |
| 26) Section 27 - | All fractional. |
| 27) Section 30 - | All fractional. |
| 28) Section 31 - | All fractional. |
| 29) Section 35 - | All, less and except Coast Half of Northeast Quarter and Southeast Quarter. |
| 30) Section 36 - | Northwest Quarter of Northwest Quarter and West Half of Southwest Quarter. |

**WARD 7**

A) Township 18 South-Range 18 East

| | | |
|---|---|---|
| 1) Section 62 - | All fractional. |
| 2) Section 63 - | North Half of Northwest Quarter, Southeast Quarter of Northwest Quarter, Northeast Quarter of Southwest Quarter, and East Half. |
| 3) Section 64 - | All |
| 4) Section 66 - | All |
| 5) Section 67 - | All, less and except Northeast Quarter of Northeast Quarter. |
| 6) Section 68 - | Northeast Quarter, Southwest Quarter of Southwest Quarter and Northwest Quarter of Southeast Quarter. |
| 7) Section 69 - | Northeast Quarter of Northeast Quarter. |

Page 6 of 23

**930631**

**688**

| | | |
|---|---|---|
| 8) Section 70 - | Northeast Quarter of Southeast Quarter, South Half of Southwest Quarter, and South Half of Southeast Quarter. |
| 9) Section 71 - | All |
| 10) Section 72 - | All |
| 11) Section 73 - | East Half, Southeast Quarter of Northwest Quarter, East Half of Southwest Quarter and Southwest Quarter of Southwest Quarter. |
| 12) Section 74 - | Southeast Quarter of Northeast Quarter, Northwest Quarter, West Half of Southwest Quarter, East Half of Southeast Quarter and Southwest Quarter of Southeast Quarter. |
| 13) Section 75 - | South Half of Northwest Quarter, Southwest Quarter and West Half of Southeast Quarter. |
| 14) Section 78 - | Southeast Quarter of Northeast Quarter, Southwest Quarter of Southeast Quarter and East Half of Southeast Quarter and an undivided interest in minerals in certain lands, said minerals acquired from Jean Baptiste LeBlanc by, and said lands being described in, the Compromise Agreement dated March 22, 1943, and recorded either in Conveyance Book Nos. 145 or 154, Page 5, less and except lands awarded LeBlanc by the Compromise Agreement. |
| 15) Section 80 - | All, less and except Northeast Quarter of Southeast Quarter, and less and except those portions awarded Jean Baptiste LeBlanc by Compromise Agreement dated March 22, 1943, and recorded either in Conveyance Book Nos. 145 or 154, Page 5 including the mineral interest awarded Tenneco by LeBlanc in certain lands by the Compromise Agreement. |
| 16) Section 81 - | All, less and except Northeast Quarter of Southeast Quarter. |

B) Township 19 South-Range 18 East

| | | |
|---|---|---|
| 1) Section 65 - | All fractional. |
| 2) Section 66 - | All |
| 3) Section 67 - | All |
| 4) Section 68 - | All |
| 5) Section 69 - | All fractional. |

Book 1521, Page 670, File Number 930631

930631

9   689

| 6) Section 70 - | All |
|---|---|
| 7) Section 71 - | All |
| 8) Section 72 - | All fractional. |
| 9) Section 73 - | All fractional. |
| 10) Section 74 - | All fractional. |
| 11) Section 75 - | All fractional. |
| 12) Section 81 - | Lot Nos. 4 and 5, as per Official Township Plat dated November 4, 1856. |
| 13) Section 81 - | Lot No. 6 containing 36.43 acres as per Official Township Plat dated October 23, 1951. |
| 14) Section 83 - | All, as per Official Township Plat dated November 4, 1856. |
| 15) Section 83 - | Lot No. 10 containing 65.17 acres as per Official Township Plat dated October 23, 1951. |
| 16) Section 84 - | All, as per Official Township Plat dated November 4, 1856. |
| 17) Section 84 - | Lot Nos.10 and 11 containing 153.02 acres as per Official Township Plat dated October 23, 1951. |
| 18) Section 98 - | Section 98 containing 267.98 acres as per Official Township Plat dated October 23, 1951. |
| 19) Section 99 - | Section 99 containing 254.05 acres as per Official Township Plat dated October 23, 1951. |

C) Township 19 South-Range 19 East

| 1) Section 15 - | All West of Bayou Terrebonne |
|---|---|
| 2) Section 33 - | Lot Nos. 5, 6, 10, 11, 12 and 13. |

D) Township 20 South-Range 18 East

| 1) Section 108 - | All |
|---|---|
| 2) Section 109 - | All |
| 3) Section 110 - | All |
| 4) Section 111 - | All |

Page 8 of 23

690          930631

5) Section 112 -    Lot Nos. and 4, East Half of Southwest Quarter, Northwest Quarter of Southwest Quarter and Northwest Quarter and less and except any interest in said lands quitclaimed to the St. Martins by that certain Agreement dated November 2, 1970, and recorded in Conveyance Book 510, Page 635 and also less and except any interest in said lands quitclaimed to Dr. Forrest E. Baker by that certain Agreement dated April 15, 1971, and recorded in Conveyance Book 516, Page 742, but including any interest in said section acquired by LaTerre Co., Inc. in said Agreements.

6) Section 113 -    Northeast Quarter of Northwest Quarter and less and except any interest in said lands quitclaimed to the St. Martins by that certain Agreement dated November 2, 1970, and recorded in Conveyance Book 510, Page 635 and also less and except any interest in said lands quitclaimed to Dr. Forrest E. Baker by that certain Agreement dated April 15, 1971, and recorded in Conveyance Book 516, Page 742, but including any interest in said section acquired by LaTerre Co., Inc. in said Agreements.

**WARD 9**

A)  Township 18 South-Range 16 East

1) Section 23 -    All

2) Section 24 -    All

**WARD 10**

A)  Township 18 South-Range 16 East

1) Section 25 -    All

2) Section 26 -    North Half, North Half of South Half, Southwest Quarter of Southwest Quarter, East Half of Southeast Quarter of Southeast Quarter, and Northwest Quarter of Southeast Quarter of Southeast Quarter.

3) Section 35 -    West Half of East Half, East Half of Southeast Quarter, Southeast Quarter of Northeast Quarter, Southeast Quarter of Southwest Quarter, East Half of Northeast Quarter of Southwest Quarter, and East Half of Southeast Quarter of Northwest Quarter.

4) Section 36 -    Southeast Quarter of Northeast Quarter, Southeast Quarter, South Half of Southwest Quarter, West Half of Northwest

## 930631  0  691

Quarter of Southwest Quarter, and Southeast Quarter of
Northwest Quarter of Southwest Quarter.

B) Township 19 South-Range 13 East

    1) Section  1 -    All

    2) Section  2 -    All

    3) Section  3 -    All

    4) Section  4 -    All

    5) Section  5 -    All

    6) Section  6 -    All

    7) Section  7 -    All

    8) Section  8 -    All

    9) Section  9 -    All

    10) Section 10 -    All

    11) Section 11 -    All

    12) Section 12 -    All

    13) Section 13 -    All

    14) Section 14 -    All

    15) Section 15 -    All

    16) Section 17 -    All

    17) Section 18 -    All

    18) Section 19 -    All

    19) Section 20 -    All

    20) Section 21 -    All

    21) Section 22 -    All

    22) Section 23 -    All

    23) Section 24 -    All

930631

692

24) Section 25 -   All

25) Section 26 -   All

26) Section 27 -   All

27) Section 28 -   All

28) Section 29 -   All

29) Section 30 -   All

30) Section 31 -   All

31) Section 32 -   All

32) Section 33 -   All

33) Section 34 -   All

34) Section 35 -   All

35) Section 36 -   All

C) Township 19 South-Range 14 East

1) Section 6 -   All

2) Section 7 -   All

3) Section 18 -   All

4) Section 19 -   All

5) Section 30 -   All

6) Section 31 -   All

D) Township 19 South-Range 15 East

1) Section 1 -   All

2) Section 2 -   All

3) Section 3 -   All, less and except a certain 40 acre tract surrounding Billiot's Shell Island, subject to Boundary Agreement with Billiot's Shell Island, Inc. dated November 16, 1963, recorded in Conveyance Book 364, Entry No. 254172.

Page 11 of 23

**930631**              **693**

| | | |
|---|---|---|
| 4) | Section 4 | All |
| 5) | Section 5 - | All |
| 6) | Section 6 - | All |
| 7) | Section 7 - | All |
| 8) | Section 8 - | All |
| 9) | Section 9 - | All |
| 10) | Section 10 - | All |
| 11) | Section 11 - | All |
| 12) | Section 12 - | All |
| 13) | Section 13 - | All, less and except the Northwest Quarter of the Northwest Quarter, subject to Boundary Agreement with Arthur Liner, et al dated July 18, 1956, and recorded in Conveyance Book 231, Entry No. 155936. |
| 14) | Section 14 - | Northwest Quarter of Northeast Quarter, North Half of Northwest Quarter; South Half of Southwest Quarter, Northeast Quarter of Southwest Quarter, and Southeast Quarter, subject to Boundary Agreement with Arthur Liner, et al dated July 18, 1956, and recorded in Conveyance Book 231, Entry No. 155936. |
| 15) | Section 15 - | All |
| 16) | Section 17 - | All |
| 17) | Section 18 - | All |
| 18) | Section 19 - | All |
| 19) | Section 20 - | All |
| 20) | Section 21 - | All |
| 21) | Section 22 - | All |
| 22) | Section 23 - | All |
| 23) | Section 24 - | All |
| 24) | Section 25 - | All |

Page 12 of 23

Ō   694

930631

| | | |
|---|---|---|
| 25) | Section 26 - | All |
| 26) | Section 27 - | All |
| 27) | Section 28 - | All |
| 28) | Section 29 - | All |
| 29) | Section 30 - | All |
| 30) | Section 31 - | All |
| 31) | Section 32 - | All |
| 32) | Section 33 - | All, North of Bayou DeCade. |
| 33) | Section 34 - | All, North of Bayou DeCade. |
| 34) | Section 35 - | All, Less and except SW/4 of SW/4. |
| 35) | Section 36 - | All |

E) Township 19 South-Range 16 East

| | | |
|---|---|---|
| 1) | Section 1 - | All |
| 2) | Section 2 - | All |
| 3) | Section 3 - | Southeast Quarter of Northeast Quarter, Southwest Quarter of Northwest Quarter, South Half of Southwest Quarter, South Half of Northeast Quarter of Southwest Quarter, and Southeast Quarter. |
| 4) | Section 4 - | North Half, North Half of Southwest Quarter, Southwest Quarter of Southwest Quarter, North Half of Southeast Quarter of Southwest Quarter, West Half of Northwest Quarter of Southeast Quarter and South Half of Southeast Quarter of Southeast Quarter. |
| 5) | Section 5 - | All |
| 6) | Section 6 - | All |
| 7) | Section 7 - | All |
| 8) | Section 8 - | West Half, North Half of Northeast Quarter, and South Half of Southeast Quarter |

Page 13 of 23

# 930631

O. 695

| | | |
|---|---|---|
| 9) | Section 9 – | South Half, Northeast Quarter Southeast Quarter of Northwest Quarter, Southeast Quarter of Southwest Quarter of Northwest Quarter, East Half of Northeast Quarter of Northwest Quarter and Northwest Half of Northwest Quarter of Northwest Quarter. |
| 10) | Section 10 – | All |
| 11) | Section 11 – | All |
| 12) | Section 12 – | All |
| 13) | Section 13 – | North Half. |
| 14) | Section 14 – | All |
| 15) | Section 15 – | All |
| 16) | Section 17 – | All |
| 17) | Section 18 – | All |
| 18) | Section 19 – | All |
| 19) | Section 20 – | All |
| 20) | Section 21 – | All |
| 21) | Section 22 – | All, less and except Southeast Quarter of Southeast Quarter. |
| 22) | Section 23 – | North Half of Northeast Quarter and Northwest Quarter. |
| 23) | Section 26 – | Northeast Quarter of Northwest Quarter, Southwest Quarter of Northwest Quarter, and a certain tract of land fronting 672 feet, more or less, on the right descending bank of Bayou Dularge, by full depth thereunto belonging, bounded above or North by property of Walton Champagne, now or formerly, and by property of LaTerre Co., Inc., below or South by property of the heirs of Claude Joseph Chauvin, now or formerly, East by Bayou Dularge and West by property of LaTerre Co., Inc. |
| 24) | Section 27 – | Northwest Quarter of Northeast Quarter, Northwest Quarter, Southeast Quarter of Southwest Quarter, Southwest Quarter of Southeast Quarter, and East Half of Southeast Quarter. |
| 25) | Section 28 – | North Half, North Half of South Half, and Southwest Quarter of Southwest Quarter. |

Page 14 of 23

(Page 27 of 53)

## 696

930631

26) Section 29 -    All

27) Section 30 -    All

28) Section 31 -    All

29) Section 32 -    All

30) Section 33 -    All, less and except North Half of Northwest Quarter.

31) Section 34 -    North Half, Southwest Quarter, and Northwest Quarter of Southeast Quarter.

F) Township 20 South-Range 15 East

1) Section 5 -    All

2) Section 6 -    All

3) Section 7 -    All

4) Section 8 -    All

5) Section 17 -    All

6) Section 18 -    All

7) Section 19 -    All

8) Section 20 -    All

## LAFOURCHE PARISH, LOUISIANA

### Ward 4

1.    Township 18 South, Range 19 East

a.    Section 62 - All

b.    Section 63 - All

c.    Section 67 - All

d.    Section 68 - All

2.    Township 18 South, Range 20 East

a.    Section 7 - South Half

Page 15 of 23

Book 1521, Page 670, File Number 930631

930631                     697

b.    Section 8 - South Half

c.    Section 9 - South Half

d.    Section 10 - South Half

e.    Section 11 - South Half West of Grand Bayou Canal

f.    Section 14 - All West of Grand Bayou Canal

g.    Section 15 - All West of Grand Bayou Canal

h.    Section 22 - North Half West of Grand Bayou Canal

i.    Section 17 - All

j.    Section 18 - All

k.    Section 19 - North Half

l.    Section 20 - North Half

m.    Section 21 - North Half

**Ward 10**

1.    Township 18 South, Range 20 East

a.    Section 12 - South Half

b.    Section 13 - All

c.    Section 23 - North Half

d.    Section 24 - North Half

e.    Section 11 - South Half East of Grand Bayou Canal

f.    Section 14 - All East of Grand Bayou Canal

g.    Section 15 - All East of Grand Bayou Canal

h.    Section 22 - North Half East of Grand Bayou Canal

2.    Township 18 South, Range 21 East

a.    Section 48 - Southwest Quarter of Northeast Quarter, South Half of Northwest Quarter and South Half

b.    Section 53 - All

Page 16 of 23

Book 1521, Page 670, File Number 930631

**698**

**930631**

    c.    Section 54 - All

    d.    Section 55 - North Half

    e.    Section 56 - North Half

    f.    Section 66- Fractional South Half

3.    Township 20 South, Range 21 East

    a.    Section 1 - All

    b.    Section 2 - All

    c.    Section 3 - All

    d.    Section 4 - All

    e.    Section 5- All

    f.    Section 8- All

    g.    Section 9 - All

    h.    Section 10 - All

    i.    Section 11 - All

    j.    Section 12 - All

    k.    Section 13 - All

    l.    Section 14 - All

    m.    Section 15 - All

    n.    Section 17 - All

    o.    Section 20 - All

    p.    Section 21 - All

    q.    Section 22 - All

    r.    Section 23 - All

    s.    Section 24 - All

    t.    Section 25 - All

Book 1521, Page 670, File Number 930631

**930631**                                                         **699**

| | |
|---|---|
| u. | Section 26 - All |
| v. | Section 27 - All |
| w. | Section 28 - All |
| x. | Section 29 - All |
| y. | Section 32 - All |
| z. | Section 33 - All |
| a. | Section 34 - All |
| b. | Section 35 - All |
| c. | Section 36 - All |

4.   Township 20 South, Range 21 East and/or Township 21 South, Range 21 East

Tract of land situated in Township 20 South, Range 21 East, and/or Township 21 South, Range 21 East, Lafourche Parish, Louisiana proceeding from the compromise Agreement between La-Terre Co., Inc. and The Louisiana Land and Exploration Co., recorded September 11, 1965 in COB 342 at Page 264 under Entry No. 250583, Lafourche Parish, Louisiana, and more particularly described as follows:

Beginning at a point having Lambert Grid Coordinate values of X=231,693.62 and Y=227,021.31, said point bearing South 54 degrees 19 minutes 30 seconds West a distance of 6,040.34 feet from U.S.C.&G.S. Triangulation Station "Rack, 1934"; thence North 1 degree 11 minutes 08 seconds" West a distance of 5,505.56 feet to a point; thence North 88 degrees 38 minutes 34 seconds East a distance of 25,094.69 feet to a point; thence South 3 degrees 08 minutes 53 seconds West a distance of 637.32 feet to a point; thence South 2 degrees 14 minutes 08 seconds East a distance of 3,964.00 feet to a point; thence South 86 degrees 34 minutes 33 seconds West a distance of 25,138.25 feet to the point of beginning, containing 2,909.37 acres more or less.

All bearings and all coordinates set forth herein are based on State Plane Lambert Grid, Louisiana.

5.   Township 20 South, Range 22 East

a. Section 6 -        West Half, and West Half of East Half less and except those portions conveyed to Alex J. Plaisance, et al, by deed dated April 13, 1959, and recorded in COB 251 at Page 652, and less and except from all of the lands in said section

Page 18 of 23

700                 930631

otherwise included those two certain tracts or parcels of land conveyed to the State of Louisiana and the Department of Highways of the State of Louisiana by that certain Sale recorded under Entry No. 424785, but including the minerals Underlying said tracts, which were reserved in said sale.

b. Section 7 -          All

c. Section 8 -          West Half of Southwest Quarter, less and except those portions awarded Harvey Peltier, et al, by Compromise Agreement dated May 20, 1941 and recorded in COB 101 at Page 23

d. Section 17 -         West Half of Southeast Quarter, and West Half, less and except those portions awarded Harvey Peltier, et al, by Compromise Agreement dated May 20, 1941 and recorded in COB 101 at Page 23

e. Section 18 -         All

f. Section 19 -         All

g. Section 20 -         All

h. Section 28 -         West Half of West Half

i. Section 29 -         All

j. Section 30 -         All

k. Section 31 -         All

l. Section 32 -         All

m. Section 33 -         West Half

**Ward 11**

1.   Township 18 South, Range 19 East

   a.   Section 59 - Southeast Quarter of Northeast Quarter

   b.   Section 60 - North Half

   c.   Section 61 - North Half

   d.   Section 66 - Fractional North Half

2.   Township 20 South, Range 20 East

Book 1521, Page 670, File Number 930631

930631                    ᷣ  701

a. Section 1 -     Northwest Quarter of Northeast Quarter and East Half of East Half

b. Section 12 -     Northeast Quarter of Northeast Quarter

c. Section 13 -     East Half of East Half, and Northwest Quarter of Southeast Quarter East of Bayou Pointe Aux Chene

d. Section 24 -     East Half of Northeast Quarter, Southwest Quarter of Northeast Quarter, and South Half East of Bayou Pointe Aux Chene

e. Section 25 -     East Half of East Half East of Bayou Pointe Aux Chene (Title Acquired by LaTerre Co., Inc. by quitclaim from South Louisiana Land Company, Limited, dated June 2, 1972 and recorded in COB 471 at page 202.

f. Section 36 -     East Half of East Half

3.     Township 20 South, Range 21 East

    a.     Section 6 - All

    b.     Section 7 - All

    c.     Section 18 - All

    d.     Section 19 - All

    e.     Section 30 - All

    f.     Section 31 - All

4.     Township 20 South, Range 21 East and/or Township 21 South, Range 21 East

Tract of land situated in Township 20 South, Range 21 East and/or Township 21 South, Range 21 East, Lafourche Parish, Louisiana proceeding from the Compromise Agreement between La-Terre Co., Inc. and The Louisiana Land and Exploration Co., recorded September 11,1965 in COB 342 at Page 264 under Entry No. 250583, and more particularly described as follows to-wit:

Beginning at a point having Lambert Grid Coordinate values of X=2,305,611.45 and Y=226, 7720.21, said point bearing South 68 degrees 57 minutes 26 seconds West a distance of 10,649.13 feet from U.S.C. & G.S. Triangulation Station "Rack, 1934"; thence North 1 degree 0 minutes 0 seconds West a distance of 5,687.46 feet to a point; thence North 88 degrees 38 minutes 34 seconds East a distance of 5,018.94 feet to a point; thence South 1 degree 11 minutes 08 seconds East a distance of 5,505.56 feet to a point; thence South 86

Page 20 of 23

0   702                   930631

degrees 34 minutes 33 seconds West a distance of 5,041.17 feet to the point of beginning, containing 645.98 acres more or less

All bearings and all coordinates set forth herein are based on State Plane Lambert Grid, Louisiana (South Zone).

## CAMERON PARISH

### Township 14 South, Range 10 West

Section 17:   Entire Fractional Section 17;
Section 18:   Southeast Quarter (SE/4);
Section 19:   All;
Section 20:   All;
Section 29:   West Half (W/2); Northeast Quarter (NE/4); North Half of Southeast Quarter (N/2 of SE/4); Southwest Quarter of Southeast Quarter (SW/4 of SE/4);
Section 30:   All;
Section 31:   Northeast Quarter (NE/4); East Half of Northwest Quarter (E/2 of NW/4); Northwest Quarter of Northwest Quarter (NW/4 of NW/4); Northwest Quarter of Southeast Quarter (NW/4 of SE/4); East Half of Southwest Quarter (E/2 of SW/4);
Section 32:   Northwest Quarter of Northwest Quarter (NW/4 of NW/4).

### Township 14 South, Range 11 West

BLOCK ONE:
Section 19:   All;
Section 20:   All;
Section 21:   All;
Section 22:   All;
Section 23:   All;
Section 24:   All;
Section 25:   All;
Section 26:   All;
Section 29:   All;
Section 30:   All;
Section 31:   All;
Section 32:   All;
Section 35:   West Half (W/2); Southeast Quarter (SE/4); West Half of Northeast Quarter (W/2 of NE/4); Northeast Quarter of Northeast Quarter (NE/4 of NE/4);
Section 36:   Northwest Quarter of Northwest Quarter (NW/4 of NW/4); Northeast Quarter of Northeast Quarter (NE/4 of NE/4);

BLOCK TWO:
All of Sections 27, 28, 33 and 34, LESS AND EXCEPT approximately 480 acres owned by Matilda Geddings Gray, or her successors or assigns, as described in

Page 21 of 23

## 930631

that certain Agreement between The Lutcher and Moore Lumber Company and Matilda Geddings Gray dated July 15, 1935, recorded in Conveyance Book 27, Page 206, Entry No. 31872, records of the Clerk of Court of Cameron Parish, Louisiana.

### Township 14 South, Range 12 West

All of Sections 19, 20, 21, 22, 23, 24, 25, 26, 27, 28, 29, 30, 31, 32, 33, 34, 35, and 36, LESS AND EXCEPT the rights in that certain 1.955 acre tract conveyed by U.S. Oil of Louisiana, Ltd., et al, to the State of Louisiana by instrument dated January 27, 1970, recorded in Conveyance Book 267, Page 435, Entry No. 122662, records of the Clerk of Court of Cameron Parish, Louisiana.

### Township 15 South, Range 11 West

| | |
|---|---|
| Section 2: | North Half (N/2); |
| Section 3: | West Half (W/2); West Half of Southeast Quarter (W/2 of SE/4); West Half of Northeast Quarter (W/2 of NE/4); Northeast Quarter of Northeast Quarter (NE/4 of NE/4), LESS AND EXCEPT those certain surface rights conveyed by Bill of Sale from U.S. Oil of Louisiana, Ltd., et al, to the State of Louisiana by instrument dated January 27, 1970, recorded in Conveyance Book 267, Page 435, Entry No. 122662, records of the Clerk of Court of Cameron Parish, Louisiana; |
| Section 4: | All; |
| Section 5: | All; |
| Section 6: | All; |
| Section 7: | All; |
| Section 8: | Entire Fractional Section 8; |
| Section 9: | Entire Fractional Section 9; |
| Section 10: | Northwest Quarter (NW/4); West Half of Northeast Quarter (W/2 of NE/4); Southwest Quarter (SW/4); West Half of Southeast Quarter (W/2 of SE/4). |

### Township 15 South, Range 12 West

| | |
|---|---|
| Section 1: | All; |
| Section 2: | All; |
| Section 3: | All; |
| Section 4: | All; |
| Section 5: | All; |
| Section 6: | All; |
| Section 7: | All; |
| Section 10: | Entire Fractional Section 10; |
| Section 25: | All (Lot #40); |
| Section 26: | All (Lot #39); |
| Section 27: | All (Lot #38); |
| Section 28: | All (Lot #37); |
| Section 29: | All (Lot #36); |

704                         930631

| | |
|---|---|
| Section 30: | All (Lot #35); |
| Section 31: | All (Lot #34); |
| Section 32: | All (Lot #33); |
| Section 33: | All (Lot #32); |
| Section 34: | All (Lot #31); |
| Section 35: | All (Lot #30); |
| Section 36: | All (Lot #29); |
| Section 37: | All (Lot #28); |
| Section 38: | All (Lot #27); |
| Section 39: | All (Lot #26); |
| Section 40: | All (Lot #25); |
| Section 41: | All (Lot #24); |
| Section 42: | All (Lot #23). |

Certain discrepancies may exist with reference to the governmental surveys for Township 14 South, Range 11 West, Township 14 South, Range 12 West, Township 15 South, Range 11 West and Township 15 South, Range 12 West and the location of their respective sections, or portions thereof, and therefore, as to the location of the lands to be conveyed pursuant to this Agreement. Accordingly, the lands to be conveyed pursuant to this Agreement shall include all of Fina's right, title and interest in and to all lands owned by it situated within Township 14 South, Range 10 West, Township 14 South, Range 11 West, Township 14 South, Range 12 West, Township 15 South, Range 11 West and Township 15 South, Range 12 West, Cameron Parish, Louisiana, whether or not said lands are properly described above.

[End of Exhibit "A"]

930631                               705

## Exhibit "B"

Attached to and made a part of that certain Act of Sale dated
effective December 1, 2002, by and between LaTerre Co., Ltd.,
Seller, and Apache North America, Inc., Buyer

| FIELD | WELL | SERIAL NO. | PARISH |
|---|---|---|---|
| BAY BAPTISTE | LATERRE B-5 | | TERREBONNE |
| BAY BAPTISTE | SL 17234 1 ST | 217342 | TERREBONNE |
| BAYOU COPASAW | CONTINENTAL LAND & FUR 1 | 227344 | TERREBONNE |
| BAYOU JEAN LA CROIX | DUPONT 38 1 | 218638 | TERREBONNE |
| BAYOU JEAN LA CROIX | DUPONT 38 1-D | 221087 | TERREBONNE |
| BAYOU JEAN LA CROIX | FINA FEE D-1 | 221525 | TERREBONNE |
| BAYOU PENCHANT | 63 N LATERRE CO INC A 33 | 212375 | TERREBONNE |
| BAYOU PENCHANT | 63 SO LATERRE CO INC A 36 | 153552 | TERREBONNE |
| BAYOU PENCHANT | CL&F  1 | 158918 | TERREBONNE |
| BAYOU PENCHANT | CL&F  7 | 174343 | TERREBONNE |
| BAYOU PENCHANT | CL&F  9ST | 214943 | TERREBONNE |
| BAYOU PENCHANT | CL&F 11 | 78411 | TERREBONNE |
| BAYOU PENCHANT | CL&F 14 | 216558 | TERREBONNE |
| BAYOU PENCHANT | CL&F 7 | 224337 | TERREBONNE |
| BAYOU PENCHANT | CL&F 8 | 174343 | TERREBONNE |
| BAYOU PENCHANT | CL&F A 5 | 133168 | TERREBONNE |
| BAYOU PENCHANT | CL&F D-1 | 218278 | TERREBONNE |
| BAYOU PENCHANT | LATERRE A-1 | 226907 | TERREBONNE |
| BAYOU PENCHANT | LATERRE A-16 | 218318 | TERREBONNE |
| BAYOU PENCHANT | LATERRE A-2 | 77438 | TERREBONNE |
| BAYOU PENCHANT | LATERRE A-28 | 217267 | TERREBONNE |
| BAYOU PENCHANT | LATERRE A-4 | 151433 | TERREBONNE |
| BAYOU PENCHANT | LATERRE A-5 | 219899 | TERREBONNE |
| BAYOU PENCHANT | LATERRE A-6 | 224232 | TERREBONNE |
| BAYOU PENCHANT | LATERRE A-6D | 224678 | TERREBONNE |
| BAYOU PENCHANT | LATERRE A-9 | 225196 | TERREBONNE |
| BAYOU PENCHANT | R4C RC SUA;CL&F CO 1 | 226665 | TERREBONNE |
| BAYOU PIGEON | BROWNELL KIDD 1 | 161242 | IBERIA |
| BAYOU PIGEON | C RA SUA LANDRY 3 | 213932 | IBERIA |
| BAYOU PIGEON | I RC SUA LANDRY 12 | 66872 | IBERIA |
| BAYOU PIGEON | LANDRY 6 | 213957 | IBERIA |
| BAYOU PIGEON | LANDRY A-1 | 70508 | IBERIA |
| BAYOU PIGEON | LYNCH-MCHUGH 1 | 216247 | IBERIA |
| BAYOU RAMBIO | BOURG #1 & #2 | 218137 | IBERIA |
| BULLY CAMP | EXXON FEE 40 | 220891/ 221071 | LAFOURCHE |
| CAILLOU ISLAND | SL 2857 NOS. 13 & 16 | 204887 | LAFOURCHE |
| CHAUVIN SOUTH | LATERRE C 3 (BP1) | 119939 | TERREBONNE |
| CHEGBY | ONCALE, EJ 1 | 118437 | TERREBONNE |
| DEER ISLAND | CL&F B 7-D | 216920 | LAFOURCHE |
| DEER ISLAND | CL&F D6A | 219617 | TERREBONNE |
| DEER ISLAND | CL&F D6B | 217108 | TERREBONNE |
| DEER ISLAND, NE | CL&F D1 | 217108 | TERREBONNE |
| DEER ISLAND, W. | LACOSTE #1 | 212002 | TERREBONNE |
| GOLDEN MEADOW | BILLIOT NO. 1 | 220458 | LAFOURCHE |
| GOLDEN MEADOW | LATERRE CO | 223582 | LAFOURCHE |
| GOLDEN MEADOW | LATERRE CO 207 | 141642 | LAFOURCHE |

Exhibit B
Page 1 of 3
Book 1521, Page 670, File Number 930631

) '706                        930631

| FIELD | WELL | SERIAL NO. | PARISH |
|---|---|---|---|
| GOLDEN MEADOW | LATERRE CO 286 | 219894 | LAFOURCHE |
| GOLDEN MEADOW | LATERRE CO 287A | 220499 | LAFOURCHE |
| GOLDEN MEADOW | LATERRE CO 288 | 220308 | LAFOURCHE |
| GOLDEN MEADOW | LATERRE CO 291 | 220674 | LAFOURCHE |
| GOLDEN MEADOW | LATERRE CO 295 | 221260 | LAFOURCHE |
| GOLDEN MEADOW | LATERRE CO 296 | 226965 | LAFOURCHE |
| GOLDEN MEADOW | LATERRE CO 45 | 49427 | LAFOURCHE |
| GOLDEN MEADOW | S.L. 378 120 | 205908 | LAFOURCHE |
| GOLDEN MEADOW | S.L. 378 130 | 219686 | LAFOURCHE |
| GOLDEN MEADOW | S.L. 378 136 | 220327 | LAFOURCHE |
| GOLDEN MEADOW | S.L. 378 137 | 220270 | LAFOURCHE |
| GOLDEN MEADOW | S.L. 378 139A | 221130 | LAFOURCHE |
| GOLDEN MEADOW | S.L. 378 142 | 226966 | LAFORCHE |
| GOLDEN MEADOW | S.L. 378 LPSB U1  VUA | 216241 | LAFOURCHE |
| GOLDEN MEADOW | SL 378 | | LAFOURCHE |
| HOUMA SOUTH | S RA SU PETERS 8 | 67596 | TERREBONNE |
| HOUMA SOUTH | TENNECO OIL COMPANY 2 | 201637 | TERREBONNE |
| KENT BAYOU | 2400 VUA CONTL LD & FUR 1 | 219041 | TERREBONNE |
| LAKE ARTHUR AREA | BOL P RA SUA;SL 7712 #5 | 195988 | VERMILION |
| LAKE ARTHUR AREA | CAM 4 RA SUA;H G BLACK ET UX | 217815 | JEFFERSON DAVIS |
| LAKE ARTHUR AREA | CAM 4 RA SUA;SL 7712 #1 | 168414 | JEFFERSON DAVIS |
| LAKE ARTHUR AREA | CAM 4 RU SUA E. BROUSSARD | | JEFFERSON DAVIS |
| LAKE ARTHUR AREA | L MIOGYP RA SUE;GLENN #1 | 201397 | VERMILION |
| LAKE ARTHUR AREA | LANG, FRITZ 2 | 206858 | VERMILION |
| LAKE ARTHUR AREA | LEJEUNE 1 | 206892 | VERMILION |
| LAKE ARTHUR AREA | MARG H RA SUB;D RICE | 208660 | CAMERON |
| LAKE ARTHUR AREA | MARG H RA SUE;SEAGRAVES #1 | 210470 | CAMERON |
| LAKE ARTHUR AREA | MARG H RB SUG;VINCENT HEIRS | 213924 | VERMILION |
| LAKE ARTHUR AREA | MIDD MIOGYP RA SUB; PRICE #1 | 193746 | VERMILION |
| LAKE ARTHUR AREA | MIDD MIOGYP RA SUC;PRICE #2 | 203792 | VERMILION |
| LAKE ARTHUR AREA | MIDD MIOGYP RA SUD;FISHER #1 | 198296 | VERMILION |
| LAKE ARTHUR AREA | MIDD MIOGYP RA SUE;GLENN #4 | 207037 | VERMILION |
| LAKE ARTHUR AREA | MIDD MIOGYP RA SUF;GLENN #2 | 203283 | VERMILION |
| LAKE ARTHUR AREA | MIDD MIOGYP RA SUH LEJEUNE 1 | 206892 | VERMILION |
| LAKE ARTHUR AREA | MIDD MIOGYP RA SUI;FRITZ LANG | 206858 | VERMILION |
| LAKE ARTHUR AREA | SL 7712  3 | 178859 | VERMILION |
| LAKE ARTHUR AREA | U MIOGYP RA SUA;SL 7712 #1 | 168414 | JEFFERSON DAVIS |
| LAKE ARTHUR AREA | U MIOGYP RA SUC;PRICE | 203792 | JEFFERSON DAVIS |
| LAKE ARTHUR AREA | U MIOGYP RA SUD;BYLER | 208026 | JEFFERSON DAVIS |
| LAKE ARTHUR AREA | U MIOGYP RA SUE;GLENN #5 | 211244 | JEFFERSON DAVIS |
| LAKE ARTHUR AREA | U MIOGYP RB SUA;MACDONNELL | 164042 | VERMILION |
| LAKE ARTHUR AREA | U ROCHE RA SUA;WINN | 201388 | JEFFERSON DAVIS |
| LAKE BOUDREAUX | TEX W1 RA SUA SL 5351 3AL | 164765 | TERREBONNE |
| LAKE DECADE | FINA FEE 2 | 204188 | TERREBONNE |
| LAKE DECADE | FINA FEE 6 | 207014 | TERREBONNE |
| LAKE DECADE | LL&E 34-2 | 225068 | TERREBONNE |
| LAKE DECADE | S.L. 16000 1 | 225363 | TERREBONNE |
| LAKE DECADE, E. | LATERRE 1 (GRMNY OFST) | 224011 | TERREBONNE |
| LAKE DECADE, E. | SL 17174  1 | 226627 | TERREBONNE |
| LAKE DECADE, N. | TENNECO FEE 7 | 169067 | TERREBONNE |
| LAKE PAGIE | LATERRE 1 | 218649 | TERREBONNE |
| LAKE PAGIE | LATERRE 2-D | 220084 | TERREBONNE |
| LAKE PAGIE | LATERRE 3 | 220294 | TERREBONNE |
| LAKE PAGIE | LATERRE 4 | 222851 | TERREBONNE |

930631                                    707

| FIELD | WELL | SERIAL NO. | PARISH |
|---|---|---|---|
| LAKE PAGIE | LATERRE B-1 | 220168 | TERREBONNE |
| LAKE PAGIE | LATERRE B-3 | 85207 | TERREBONNE |
| LAKE PAGIE | LATERRE C-1 | 221073 | TERREBONNE |
| LAKE PAGIE | LATERRE C-1D | 221510 | TERREBONNE |
| LAKE PAGIE | LATERRE C-4 | 94280 | TERREBONNE |
| LAKE PAGIE | LATERRE CO INC B 14 | 129889 | TERREBONNE |
| LAKE PAGIE | LATERRE D-2 | 221975 | TERREBONNE |
| LAKE PAGIE | LL&E W 1 | 79755 | TERREBONNE |
| LAKE PAGIE | LL&E W 2 | 82579 | TERREBONNE |
| LAKE PAGIE | S.L. 3475  1 | 201358 | TERREBONNE |
| LAKE PAGIE | TENNECO 1 | 195863 | TERREBONNE |
| LAKE PAGIE | TENNECO 2 | 206554 | TERREBONNE |
| LAKE PAGIE | TENNECO A-4 | 204941 | TERREBONNE |
| LAKE PAGIE | TENNECO A-5 | 206581 | TERREBONNE |
| LAKE PAGIE | TEX W 7 RB SUA LL&E W 4 | 95834 | TERREBONNE |
| LAKE PAGIE | TEX W-3A LPG SU LATERRE B-3 | 85207 | TERREBONNE |
| LIRETTE | DELTA SECURITIES 6 | 55351 | TERREBONNE |
| LIRETTE | EXXON 2D | 162042 | TERREBONNE |
| LIRETTE | EXXON FEE 10D | 219456 | TERREBONNE |
| LIRETTE | LATERRE 10D | 219456 | TERREBONNE |
| LIRETTE | LATERRE 12 | 221272 | TERREBONNE |
| LIRETTE | LATERRE 29A | 153887 | TERREBONNE |
| LIRETTE | LATERRE 32 | 158624 | TERREBONNE |
| LIRETTE | LATERRE 34D | 158628 | TERREBONNE |
| LIRETTE | LATERRE 39 | 178148 | TERREBONNE |
| LIRETTE | LATERRE 41 | 180115 | TERREBONNE |
| LIRETTE | LATERRE 42 | 180013 | TERREBONNE |
| LIRETTE | LATERRE 43 | 189642 | TERREBONNE |
| LIRETTE | LATERRE 44 | 184559 | TERREBONNE |
| MUD LAKE EAST | EXXONMOBIL LUTCHER C 3 | 34665 | CAMERON |
| MUD LAKE EAST | FINA FEE 2-EML | 222369 | CAMERON |
| MUD LAKE EAST | FINA FEE LAND EML 1 | 219921 | CAMERON |
| MUD LAKE EAST | LATERRE CO. LTD  #1 EML | 219921 | CAMERON |
| MUD LAKE EAST | LUTCHER C 7-D | 50748 | CAMERON |
| MUD LAKE EAST | MECOM FEE A 3 | 154220 | CAMERON |
| SECOND BAYOU | MOBIL LUTCHER C 1 | 32434 | CAMERON |
| SECOND BAYOU | FINA FEE LAND NO. 2 | 209214 | CAMERON |
| SECOND BAYOU | FINA FEE LAND NO. 3 | 214200 | CAMERON |
| SECOND BAYOU | LATERRE CO. LTD  1 SB | 226842 | CAMERON |
| SECOND BAYOU | LUTCHER A 11 | 86921 | CAMERON |
| SECOND BAYOU | LUTCHER A 3 | 58907 | CAMERON |
| SECOND BAYOU | LUTCHER A 6 | 69036 | CAMERON |
| SECOND BAYOU | LUTCHER B 3 | 43501 | CAMERON |
| SECOND BAYOU | MECOM FEE 11 | 167040 | CAMERON |
| SECOND BAYOU | MECOM FEE 11-D | 169522 | CAMERON |
| SECOND BAYOU | MECOM FEE 20 | 175458 | CAMERON |
| SECOND BAYOU | MECOM FEE 23 | 207806 | CAMERON |
| SECOND BAYOU | MECOM FEE 25 | 210777 | CAMERON |
| SECOND BAYOU | MECOM FEE 28 | 209951 | CAMERON |

708

930631

# Exhibit "C"

**Attached to and made a part of that certain Act of Sale effective December 1, 2002, by and between LaTerre Co. Ltd., Seller, and Apache North America, Inc., Buyer**

| FIELD | LEASE | SERIAL NUMBER | RESERVOIR | PARISH |
|---|---|---|---|---|
| BAYOU DULARGE | HUGHES-DENNY 1 OFST | To be drilled | TEX W-10 | TERREBONNE |
| BAYOU PENCHANT | CL&F E-1D (D1 OFFSET #1) | To be drilled | 50 SD | TERREBONNE |
| BAYOU PENCHANT | CL&F F-1 (D1 OFFSET #2) | To be drilled | 50 SD | TERREBONNE |
| BAYOU PENCHANT | CL&F G-1 (D1 OFFSET #3) | To be drilled | 50 SD | TERREBONNE |
| GOLDEN MEADOW | LATERRE 297 #1 SEC 5 | To be drilled | 10000' | LAFOURCHE |
| GOLDEN MEADOW | LATERRE 297 #2 SEC 5 | To be drilled | 10000' | LAFOURCHE |
| GOLDEN MEADOW | LATERRE 299 SEC 10 | To be drilled | 10500' | LAFOURCHE |
| GOLDEN MEADOW | LATERRE 29X PUD | To be drilled | 7200' | LAFOURCHE |
| LIRETTE | LATERRE PROB 1 | To be drilled | 6100' SD | TERREBONNE |
| LIRETTE | LATERRE PROB 2 | To be drilled | 6100' SD | TERREBONNE |
| MUD LAKE EAST | CASTEX SDI C PUD | To be drilled | SIPH DAVISI | CAMERON |

Exhibit C
Page 1 of 1

Book 1521, Page 670, File Number 930631

930631

709

EXHIBIT D-1
Page 1 of 10

Exhibit D-1
Attached to Act of Sale by and between
Laterre Co., LTD., as Seller, and Apache North America, Inc., as Buyer

## Bayou Penchant Field, Terrebonne Parish, Louisiana

| | | |
|---|---|---|
| 1 | Well | the Castex Energy Inc.; CL&F D No. 1-D well (Louisiana Office of Conservation Serial No. 227037), which has an approximate surface location more particularly described as starting from the northeast corner of Section 27, Township 18 South, Range 13 East, Terrebonne Parish, Louisiana, then southerly 1560.6 feet along the east line of Section 27, then westerly 2305.8 feet parallel to the north line of Section 27 to the surface location of that same well. |
| | Existing Area | 160 acres, more or less, being the NW/4 of Section 27, Township 18 South, Range 13 East, Terrebonne Parish, Louisiana. |
| | Zones | The stratigraphic equivalent of the 42 sand (which is defined as any depths between 10,430 feet and 10,438 feet) and/or the 50 sand (which is defined as any depths between 10,634 feet and 10,730 feet). All such depths are as measured on the electrical log of that same well. |
| 2 | Well | the Castex Energy Inc.; Laterre Co. Inc.. A No. 7 well (Louisiana Office of Conservation Serial No. 227026), which has an approximate surface location more particularly described as starting from the southeast corner of Section 11, Township 19 South, Range 13 East, Terrebonne Parish, Louisiana, then northerly 2840.8 feet along the east line of Section 11, then westerly 45.2 feet parallel to the south line of Section 11 to the surface location of that same well. |
| | Existing Area | 360 acres, more or less, being the S/2 N/2 and the N/2 S/2 of Section 12 and the E/2 SE/4 NE/4 of Section 11, all of Township 19 South, Range 13 East, Terrebonne Parish, Louisiana |
| | Zones | The stratigraphic equivalent of the 50 sand (which is defined as any depths between 11,073 feet and 11,155 feet) as measured on the electrical log of the Castex Energy Inc.; Laterre Co. Inc. A No. 7 well (Item 2 herein) and/or the Tex W 4 sand (which is defined as any depths between 13,410 feet and 13,830 feet) as measured on the electrical log of the Castex Energy Inc.; Laterre Co. Inc. A No. 13 well (Item 3 herein). |
| 3 | Well | the Castex Energy Inc.; Laterre Co. Inc. A No. 13 well (Louisiana Office of Conservation Serial No. 227441), which has an approximate surface location more particularly described as starting from the southwest corner of Section 12, Township 19 South, Range 13 East, Terrebonne Parish, Louisiana, then northerly 2193.2 feet along the west line of Section 12, then easterly 1793.4 feet parallel to the south line of Section 12 to the surface location of that same well. |
| | Existing Area | the same Area described in Item 2 above. |
| | Zones | The stratigraphic equivalent of any depths between the top of the Tex W 4 sand (which is defined as a depth of 13,410 feet as measured on the electrical log of that same well) and the base of the deepest formation penetrated by that same well. |

141441-1

'710                                930631

| | | |
|---|---|---|
| **4** | Well | the William G. Helis, VUA; Latarre Co., Ltd. et al. No. 1 well (Louisiana Office of Conservation Serial No. 227069), which has an approximate surface location more particularly described as starting from the southwest corner of Section 35, Township 18 South, Range 13 East, Terrebonne Parish, Louisiana, then northerly 1316.6 feet along the west side of Section 35, then easterly 829.8 feet parallel to the south line of Section 35 to the surface location of that same well. |
| | Existing Area | 460 acres, more or less, being the SE/4 of Section 34 and the W/2 SW/4 of Section 35, all of Township 18 South, Range 13 East, Terrebonne, Parish, Louisiana, and the E/2 NW/4 and the NE/4 of Section 3, Township 19 South, Range 13 East, Terrebonne Parish, Louisiana. |
| | Zones | The stratigraphic equivalent of the 70 (upper and lower) sand (which is defined as any depths between 13,005 feet and 13,260 feet as measured on the electrical log of that same well). |

## Bayou Pigeon and Big Bayou Pigeon Fields, Iberia Parish, Louisiana

| | | |
|---|---|---|
| **5a** | Well | the 13400 RA SUA; Williams Land Co, LLC No. 1 well (Louisiana Office of Conservation Serial No. 226809), which has an approximate surface location more particularly described as starting from the southwest corner of Section 31, Township 12 South, Range 11 East, Iberia Parish, Louisiana, then northerly 1431 feet along the west line of Section 31, then easterly 1290 feet parallel to the south line of Section 31 to the surface location of that same well. |
| | Existing Area | 124.40 acres, more or less, being all of those lands lying in Iberia Parish, Louisiana within the geographic boundaries of the 13400 RA SUA (as that unit is defined in Louisiana Office of Conservation Order No. 483-R dated October 17, 2002 and effective September 17, 2002). |
| | Zones | The stratigraphic equivalent of the Plan 4C (upper and lower) sand (which is defined as any depths between 13,795 feet and 13,930 feet as measured on the electrical log of that same well). |
| **5b** | Well | the 13400 RA SUA; Williams Land Co. LLC No. 1 well (described in item 5a above). |
| | Existing Area | 117.60 acres, more or less, being all of those lands lying in Iberia Parish, Louisiana within the geographic boundaries of the 13350 RA SUA (as that unit is defined by Louisiana Office of Conservation Order No. 483-P dated October 17, 2002 and effective September 17, 2002). |
| | Zones | The stratigraphic equivalent of the Plan 4B sand (which is defined as any depths between 13,660 feet and 13,745 feet as measured on the electrical log of that same well). |
| **6** | Well | the C RA SUB; Brownell-Kidd No. 2-Alt well (Louisiana Office of Conservation Serial No. 226429), which has an approximate surface location more particularly described as starting from the southwest corner of Section 18, Township 12 South, Range 11 East, Iberia Parish, Louisiana, then northerly 1960 feet along the west line of Section 18, then easterly 1934.7 feet parallel to the south line of Section 18 to the surface location of that same well. |
| | Existing Area | 915.66 acres, more or less, being all of those lands lying in Iberia Parish, Louisiana within the geographic boundaries of the C RA SUB (also known as the "C" SUB) (as that unit is defined in Louisiana Office of Conservation Order No. 387-P-2 dated April 29, 1965 and effective May 1, 1965). |
| | Zones | The stratigraphic equivalent of the C sand (which is defined as any depths between 11,118 feet and 11,220 feet as measured on the electrical log of that same well). |

Exhibit D-1
Page 2 of 10

141441-1

930631

'711

## South Chauvin Field, Terrebonne Parish, Louisiana

| | |
|---|---|
| Well | the MM RB SUA; Laterre Co. Inc. C No. 6 well (Louisiana Office of Conservation Serial No. 225769), which has an approximate surface location more particularly described as lying in Section 66, Township 18 South, Range 18 East, Terrebonne Parish, Louisiana, and having Lambert coordinates of X=2,228,059.99 feet and Y=292,164.87 feet (South Louisiana NAD-1927 coordinate system). |
| 7 Existing Area | 586.776 acres, more or less, being all of those lands lying in Terrebonne Parish, Louisiana within the geographic boundaries of the MM RB SUA (as that unit is defined in Louisiana Office of Conservation Order No. 547-R-1 dated July 17, 2001 and effective June 19, 2001). |
| Zones | The stratigraphic equivalent of the HH sand (which is defined as any depths between 13,470 feet and 13,500 feet) and/or the JJ sand (which is defined as any depths between 13,980 feet and 14,140 feet) and/or the KK sand (which is defined as all depths between 14,290 feet and 14,370 feet) and/or the LL Upper sand (which is defined as all depths between 14,760 feet and 14,830 feet) and/or the LL Lower, or LL2, sand (which is defined as all depths between 14,850 feet and 14,970 feet) and/or the MM sand (which is defined as all depths between 15,729 feet and 15,664 feet). All such depths are as measured on the electrical log of that same well. |

## Four League Bay Field, Terrebonne Parish, Louisiana

| | |
|---|---|
| Well | the Castex Energy Inc.; Laterre Co. Inc. No. 1 well (Louisiana Office of Conservation Serial No. 226358), which has an approximate surface location more particularly described as starting from the southeast corner of Section 30, Township 19 South, Range 13 East, Terrebonne Parish, Louisiana, then northerly 1373.2 feet along the east line of Section 30, then westerly 1 foot parallel to the south line of Section 30 to the surface location of that same well. |
| 8 Existing Area | 160 acres, more or less, being the NE/4 of Section 31, Township 19 South, Range 13 East, Terrebonne Parish, Louisiana. |
| Zones | The stratigraphic equivalent of the Tex L 3 sand (which is defined as any depths between 11,275 feet and 11,330 feet) and/or the Tex L 4 sand (which is defined as any depths between 11,526 feet and 11,620 feet). All such depths are as measured on the electrical log of that same well. |
| Well | the Castex Energy Inc.; LL&E No. 1 well (Louisiana Office of Conservation Serial No. 227308), which has an approximate surface location more particularly described as starting from the northwest corner of Section 36, Township 19 South, Range 12 East, Terrebonne Parish, Louisiana, then southerly 384.5 feet along the west line of Section 36, then easterly 648.3 feet parallel to the north line of Section 36 to the surface location of that same well. |
| 9 Existing Area | 535.539 acres, more or less, being a composite of (a) the W/2 of Section 36 and the NE/4 of Section 35, all of Township 19 South, Range 12 East, Terrebonne Parish, Louisiana, and (b) all of those lands that are described in that certain LL&E lease dated June 25, 2002 (recorded in Book 1787 under Entry No. 112319 of the conveyance records of Terrebonne Parish, Louisiana), LESS & EXCEPT; in said lease, those lands located in Sections 25 and 26, Township 19 South, Range 12 East, Terrebonne Parish, Louisiana. |
| Zones | The stratigraphic equivalent of the Tex L(D) sand (which is defined as any depths between 11,980 feet and 12,050 feet) and/or the Tex L(E) sand (which is defined as any depths between 12,105 feet and 12,240 feet). All such depths are as measured on the electrical log of that same well. |

1414414-1

Exhibit D-1
Page 3 of 10

712                    930631

## South Houma Field, Terrebonne Parish, Louisiana

| | |
|---|---|
| 10a Existing Area | **Well** the Denbury Resources Inc.; Castex Energy Inc. No. 1 well (Louisiana Office of Conservation Serial No. 209616), which has an approximate surface location more particularly described as starting from the southwest corner of Section 71, Township 18 South, Range 18 East, Terrebonne Parish, Louisiana, then North 0°14'35" West a distance of 1007.12 feet, then North 88°19'26" East a distance of 1587.07 feet to the surface location of that same well. |
| | **Existing Area** 150 acres, more or less, being the S/2 SW/4 and the W/2 SW/4 SE/4 of Section 71 and the NW/4 NW/4 and the NW/4 NE/4 of Section 72, all of Township 18 South, Range 18 East, Terrebonne Parish, Louisiana. |
| | **Zones** The stratigraphic equivalent of the JJ Upper sand (which is defined as any depths between 12,818 feet and 12,868 feet) and/or the JJ Lower sand (which is defined as any depths between 12,894 feet and 13,040 feet). All such depths are as measured on the electrical log of that same well. |

| | |
|---|---|
| 10b Existing Area | **Well** the Denbury Resources Inc.; Castex Energy Inc. No. 4 well (described in Item 10a above). |
| | **Existing Area** 80 acres, more or less, being the S/2 NE/4 SW/4, the SE/4 SW/4 and the W/2 SW/4 SE/4 of Section 71, Township 18 South, Range 18 East, Terrebonne Parish, Louisiana. |
| | **Zones** The stratigraphic equivalent of the BB3 sand (which is defined as any depths between 12,122 feet and 12,140 feet as measured on the electrical log of that same well). |

## Lac Blanc Field, Vermillion Parish, Louisiana

| | |
|---|---|
| 11 Existing Area | **Well** the Castex Energy Inc.; OA A0217 No. 1 well (Louisiana Office of Conservation Serial No. 218295), which has an approximate surface location more particularly described as lying in Lac Blanc in Township 15 South, Range 1 West, Vermilion Parish, Louisiana, and having Lambert coordinates of X=1,653,654.22 feet and Y=379,830.80 feet (South Louisiana NAD-1927 coordinate system). |
| | **Existing Area** 376 acres, more or less, being (a) all of the area subject to Operating Agreement No. A0217, dated effective October 12, 1994, between the State of Louisiana and CXY Energy Inc., recorded under Entry No. 34-03553 of the conveyance records of Vermilion Parish, Louisiana, (b) LESS AND EXCEPT all of the area lying north of an east-west line running across the above-described lands and having a Lambert coordinate of Y=378,028.20 feet (South Louisiana NAD-1927 coordinate system). |
| | **Zones** The stratigraphic equivalent of the 75 sand (which is defined as any depths between 15,920 feet and 16,140 feet as measured on the electrical log of that same well). |

141441-1

Exhibit D-1
Page 4 of 10

...Book 1521, Page 670, File Number 930631

930631

0 713

## Lake Decade Field, Terrebonne Parish, Louisiana

| | | |
|---|---|---|
| 12a Existing Area | Well | the 14800 RA VUA; Fina Laterre Fee 27 No. 1 well (Louisiana Office of Conservation Serial No. 209940), which has an approximate surface location more particularly described as starting from the northeast corner of Section 27, Township 19 South, Range 15 East, Terrebonne Parish, Louisiana, then South 0°5'139" East a distance of 1468.84 feet, then South 89°0821" West a distance of 844.59 feet to the surface location of that same well. |
| | Existing Area | 560 acres, more or less, being a composite of (a) all of those lands lying within the geographic boundaries of the 14800 Sand VUA (as that unit is defined in that Unitization Agreement dated July 25, 1990, recorded in COB 1250 under Entry 870120 of the conveyance records of Terrebonne Parish, Louisiana) and (b) an additional 80 acres, more or less, lying in Section 26, Township 19 South, Range 15 East, Terrebonne Parish, and more particularly described as beginning at the southeast corner of that same unit, then east 2640 feet, then north 1320 feet, then west 2640 feet, more or less, to intersect the east line of that same unit, then southerly along the east line of that same unit to the point of beginning. |
| | Zones | The stratigraphic equivalent of the interval defined as any depths between 14,830 feet and 15,150 feet. All such depths are as measured on the electrical log of that same well. |
| 12b Existing Area | Well | the 14800 RA VUA; Fina Laterre Fee 27 No. 1 well (described in item 12a above). |
| | Existing Area | 377 acres, more or less, being a composite of (a) the N/2 of Section 27 of Township 19 South, Range 15 East, Terrebonne Parish, Louisiana and (b) an additional 80 acres, more or less, lying in Section 26, Township 19 South, Range 15 East, Terrebonne Parish, and more particularly described as beginning at the southeast corner of that same unit, then east 2640 feet, then north 1320 feet, then west 2640 feet, more or less, to intersect the east line of that same unit, then southerly along the east line of that same unit to the point of beginning. |
| | Zones | The stratigraphic equivalent of the Discorbis 12 sand (which is defined as any depths between 10,170 feet and 10,180 feet as measured on the electrical log of that same well). |

## East Lake Decade Field, Terrebonne Parish, Louisiana

| | | |
|---|---|---|
| 13a Existing Area | Well | the Castex Energy Inc.; Fina Fee H No. 2-ST well (Louisiana Office of Conservation Serial No. 219864), which has an approximate surface location more particularly described as starting from the northwest corner of Section 15, Township 19 South, Range 16 East, Terrebonne Parish, Louisiana, then southerly 1013 feet along the west line of Section 15, then easterly 444 feet parallel to the north line of Section 15 to the surface location of that same well. |
| | Existing Area | 200 acres, more or less, being the NW/4 and the W/2 W/2 NE/4 of Section 15, Township 19 South, Range 16 East, Terrebonne Parish, Louisiana. |
| | Zones | The stratigraphic equivalent of the Falgout sand (which is defined as any depths between 10,726 feet and 10,746 feet) and/or the Pelican sand (which is defined as any depths between 11,725 feet and 11,740 feet). All such depths are as measured on the electrical log of that same well. |
| 13b Existing Area | Well | the Castex Energy Inc.; Fina Fee H No. 2-ST well (described in item 13a above). |
| | Existing Area | 160 acres, more or less, being the NW/4 of Section 15, Township 19 South, Range 16 East, Terrebonne Parish, Louisiana. |
| | Zones | The stratigraphic equivalent of the 6,800' sand (which is defined as any depths between 6,868 feet and 7,195 feet as measured on the electrical log of that same well). |

141441-1

Exhibit D-1
Page 6 of 10

| | | |
|---|---|---|
| 14a | Well | the Castex Energy Inc.; Fina Fee H No. 3 well (Louisiana Office of Conservation Serial No. 226976), which has an approximate surface location more particularly described as starting from the southwest corner of Section 10, Township 19 South, Range 16 East, Terrebonne Parish, Louisiana, then northerly 157.7 feet along the west line of Section 10, then easterly 1761.0 feet parallel to the south line of Section 10 to the surface location of that same well. |
| | Existing Area | 390 acres, more or less, being the S/2 S/2 of Section 10 and the NW/4, the W/2 W/2 NE/4, the NE/4 NW/4 NE/4 and the N/2 NE/4 NE/4 of Section 15, all of Township 19 South, Range 16 East, Terrebonne Parish, Louisiana. |
| | Zones | The stratigraphic equivalent of the Dularge sand (which is defined as any depths between 11,740 feet and 11,880 feet as measured on the electrical log of that same well). |
| 14b | Well | the Castex Energy Inc.; Fina Fee H No. 3 well (described in Item 14a above). |
| | Existing Area | 240 acres, more or less, being the S/2 SW/4 and the SW/4 SE/4 of Section 10 and the NW/4 NE/4 of Section 15, all of Township 19 South, Range 16 East, Terrebonne Parish, Louisiana. |
| | Zones | The stratigraphic equivalent of the 7,200' (Big A) sand (which is defined as any depths between 7,290 feet and 7,420 feet as measured on the electrical log of that same well). |
| 15 | Well | the Castex Energy Inc.; Laterre Co. Ltd. 22 No. 1 well (Louisiana Office of Conservation Serial No. 225568), which has an approximate surface location more particularly described as starting from the northwest corner of Section 27, Township 19 South, Range 16 East, Terrebonne Parish, Louisiana, then southerly 535 feet along the west line of Section 27, then easterly 888 feet parallel to the north line of Section 27 to the surface location of that same well. |
| | Existing Area | 383,618 acres, more or less, lying in Sections 21, 22, 27 and 28, Township 19 South, Range 16 East, Terrebonne Parish, Louisiana, being more particularly described as follows: beginning at a point in the SE/4 of Section 22 and having Lambert coordinates of X=2,165,529.77 feet and Y=257,302.67 feet (South Louisiana NAD-1927 coordinate system), thence South 0°45'01" East a distance of 1709.89 feet, thence South 89°04'22" West a distance of 4833.37 feet, thence North 0°58'01" West a distance of 3452.61 feet, thence North 89°04'22" East a distance of 4846.63 feet, thence South 0°45'01" East a distance of 1742.78 feet to the point of beginning. |
| | Zones | The stratigraphic equivalent of the Big A sand (which is defined as any depths between 7407 feet and 7550 feet as measured on the electrical log of that same well). |
| 16 | Well | The Castex Energy Inc.; Laterre Co. Ltd. 22 No. 2 well (Louisiana Office of Conservation Serial No. 226197), which has an approximate surface location more particularly described as starting from the northwest corner of Section 27, Township 19 South, Range 16 East, Terrebonne Parish, Louisiana, then southerly 472 feet along the west line of Section 27, then easterly 940.6 feet parallel to the north line of Section 27 to the surface location of that same well. |
| | Existing Area | the same Area described in Item 15 above. |
| | Zones | The stratigraphic equivalent of the Big A sand (which is defined as any depths between 7550 feet and 7670 feet as measured on the electrical log of that same well). |
| 17 | Well | the Castex Energy Inc.; Laterre Co. Ltd. 22 No. 3 well (Louisiana Office of Conservation Serial No. 226319), which has an approximate surface location more particularly described as starting from the northwest corner of Section 27, Township 19 South, Range 16 East, Terrebonne Parish, Louisiana, then southerly 402.1 feet along the west line of Section 27, then easterly 943.9 feet parallel to the north line of Section 27 to the surface location of that same well. |
| | Existing Area | the same Area described in Item 15 above. |
| | Zones | The stratigraphic equivalent of the Big A sand (which is defined as any depths between 7625 feet and 7790 feet as measured on the electrical log of that same well). |

Exhibit D-1
Page 6 of 10

14144-1

(Page 46 of 53)

930631

'715

## Lake Pagie Field, Terrebonne Parish, Louisiana

| | | |
|---|---|---|
| 18 | Well | the LPG SU; Laterre B No. 9 well (Louisiana Office of Conservation Serial No. 99648), which has an approximate surface location more particularly described as lying in Section 30, Township 19 South, Range 15 East, Terrebonne Parish, Louisiana, and having Lambert coordinates of X=2,116,355 feet and Y=263,231 feet (South Louisiana NAD-1927 coordinate system). |
| | Existing Area | 3237.233 acres, more or less, being all of those lands lying in Terrebonne Parish, Louisiana within the geographic boundaries of the composite Tex W unit area (as that composite unit area is defined in Louisiana Office of Conservation Order 681-C dated April 17, 1969 and effective May 1, 1969, and as further set forth in that Unit Agreement dated January 9, 1969, recorded in Book 471 under Entry 358320 of the conveyance records of Terrebonne Parish, Louisiana). |
| | Zones | The stratigraphic equivalent of all sands unitized by Louisiana Office of Conservation Order 681-C dated April 17, 1969 and effective May 1, 1969. |
| 19 | Well | the LPG SU; Laterre C No. 3 well (Louisiana Office of Conservation Serial No. 92058), which has an approximate surface location more particularly described as starting from the southwest corner of Section 20, Township 19 South, Range 15 East, Terrebonne Parish, Louisiana, then North 0°51'32" West a distance of 825 feet, then North 89°0821" East a distance of 1970 feet to the surface location of that same well. |
| | Existing Area | the same Area described in Item 18 above. |
| | Zones | the same Zones described in Item 18 above. |
| 20 | Well | the LPG SU; Laterre C No. 8 well (Louisiana Office of Conservation Serial No. 112547), which has an approximate surface location more particularly described as lying in Section 29, Township 19 South, Range 15 East, Terrebonne Parish, Louisiana, and having Lambert coordinates of X=2,120,586 feet and Y=262,802 feet (South Louisiana NAD-1927 coordinate system). |
| | Existing Area | the same Area described in Item 18 above. |
| | Zones | the same Zones described in Item 18 above. |
| 21 | | Item 21 has been intentionally left blank |

141441-1

Book 1521, Page 670, File Number 930631

Exhibit C-1
Page 7 of 10

## Lirette Field, Terrebonne Parish, Louisiana

| | |
|---|---|
| Well | the TP RA SUA; Leon Hebert Heirs et al. No. 1 well (Louisiana Office of Conservation Serial No. 223973), which has an approximate surface location more particularly described as lying in Section 7, Township 19 South, Range 19 East, Terrebonne Parish, Louisiana, and having Lambert coordinates of X=2,239,710 feet and Y=268,755 feet (South Louisiana NAD-1927 coordinate system). |
| 22 Existing Area | 369,835 acres, more or less, being all of those lands lying in Terrebonne Parish, Louisiana within the geographic boundaries of the TP RA SUA (as that unit is defined in the Louisiana Office of Conservation Order No. 705-CC dated January 31, 2000 and effective January 11, 2000). |
| Zones | The stratigraphic equivalent of the TP1 sand (which is defined as any depths between 16,598 feet (TVD) and 16,780 feet (TVD) as measured on the electrical log of that same well and also includes the TP Zone, Reservoir A as defined in the Louisiana Office of Conservation No. 705-CC dated January 31, 2000 and effective January 11, 2000). |

## East Mud Lake Field, Cameron Parish, Louisiana

| | |
|---|---|
| Well | the Castex Energy Inc.; Lutcher C No. 1 well (Louisiana Office of Conservation Serial No. 219095), which has an approximate surface location more particularly described as starting from the northeast corner of Section 24, Township 14 South, Range 11 West, Cameron Parish, Louisiana, then South 0°58'29" West a distance of 1135.4 feet, then North 88°31'09" West a distance of 557.6 feet to the surface location of that same well. |
| 23 Existing Area | 131.5 acres, more or less, lying in the N/2 of Section 24, Township 14 South, Range 11 West, Cameron Parish, Louisiana, being more specifically (a) the area shown on a plat attached to a Partial Assignment dated July 2, 1996, effective June 15, 1996 and recorded in COB 840 under Entry 246743 of the records of Cameron Parish, Louisiana, (b) LESS AND EXCEPT the area lying north of an easterly-westerly line that is 400 feet south of and parallel to the north line of that same Section 24. |
| Zones | The stratigraphic equivalent of the 9,100' sand (which is defined as any depths between 9172 feet and 9202 feet) and/or the 9,100' sand (which is defined as any depths between the Siph Davisi 1 sand (which is defined as any depths between 9246 feet and 9300 feet) and/or the Siph Davisi 1 sand (which is defined as any depths between 9456 feet and 9956 feet). All such depths are as measured on the electrical log of that same well. |
| Well | the VUB; J.W. Mecom Fee A No. 1 well (Louisiana Office of Conservation Serial No. 152493), which has an approximate surface location more particularly described as starting from the northeast corner of Section 24, Township 14 South, Range 11 West, Cameron Parish, Louisiana, then southerly 3401.5 feet along the east line of Section 24, then westerly 1669.4 feet parallel to the north line of Section 24 to the surface location of that same well. |
| 24 Existing Area | 191.4985 acres, more or less, lying in Section 24, Township 14 South, Range 19 and Section 19, Township 14 South, Range 10 West, Cameron Parish, Louisiana, being more specifically all of those lands lying within the geographic boundaries of the Voluntary Unit B (as that unit is shown on the plat attached to a Voluntary Unit Agreement dated effective January 15, 2002 and recorded in Book 947 under Entry Nos. 276179 and 275180 of the conveyance records of Cameron Parish, Louisiana). |
| Zones | The stratigraphic equivalent of the Plan 2 sand (which is defined as any depths between 11,070 feet and 11,420 feet as measured on the electrical log of that same well). |

930631    930631    717

| | | |
|---|---|---|
| 25 | Well | the VUA; J.W. Mecom Fee A No. 11 well (Louisiana Office of Conservation Serial No. 198721), which has an approximate surface location more particularly described as starting from the northeast corner of Section 24, Township 14 South, Range 11 West, Cameron Parish, Louisiana, then southerly 3851 feet along the east line of Section 24, then westerly 2480 feet parallel to the north line of Section 24 to the surface location of that same well. |
| | Existing Area | 143 acres, more or less, lying in Sections 23, 24, 25 and 26, Township 14 South, Range 11 West, Cameron Parish, Louisiana, being more specifically all of those lands within the geographic boundaries of the Voluntary Unit A (as that unit is shown on the plat attached to that Voluntary Unit Agreement dated effective January 15, 2001 and recorded in Book 947 under Entry No. 27618 of the conveyance records of Cameron Parish, Louisiana). |
| | Zones | The stratigraphic equivalent of the Plan 1L sand (which is defined as any depths between 11,050 to 11,140 feet on the electrical log of that same well). |

## Second Bayou Field, Cameron Parish, Louisiana

| | | |
|---|---|---|
| 26 | Well | the Castex Energy Inc.; Laterre Co. Ltd. SB No. 2 well (Louisiana Office of Conservation Serial No. 227108), which has an approximate surface location more particularly described as starting from the southwest corner of Section 31, Township 14 South, Range 11 West, Cameron Parish, Louisiana, then northerly 453.5 feet along the west line of Section 31, then easterly 675.7 feet parallel to the south line of Section 31 to the surface location of that same well. |
| | Existing Area | 400 acres, more or less, being the composite of (a) the NE/4 and N/2 SE/4 of Section 6, Township 15 South, Range 11 West, Cameron Parish, Louisiana within the geographic boundaries of the L A-2 RA SUA (as that unit is defined in Louisiana Office of Conservation Order No. 463-N-1 dated September 12, 1996 and effective August 27, 1996). |
| | Zones | The stratigraphic equivalents of the Abbeville 1 & 2 sands (which is defined as any depths between 12,410 feet and 13,590 feet) and/or the Abbeville 3 sand (which is defined as any depths between 13,770 feet and 13,930 feet) and/or the Lower Abbeville sand (which is defined as any depths between 14,840 feet and 14,940 feet). All such depths are as measured on the electrical log of that same well. |
| 27a | Well | the L A-2 RA SUA; Lutcher A No. 13-Alt well (Louisiana Office of Conservation Serial No. 218520), which has an approximate surface location more particularly described as starting from the southeast corner of Section 31, Township 14 South, Range 11 West, Cameron Parish, Louisiana, then northerly 561.26 feet along the east line of Section 31, then westerly 694.86 feet parallel to the south line of Section 31 to the surface location of that same well. |
| | Existing Area | 320 acres, more or less, being the N/2 S/2 and the S/2 N/2 of Section 31, Township 14 South, Range 11 West, Cameron Parish, Louisiana. All such depths are as measured on the electrical log of that same well. |
| | Zones | The stratigraphic equivalent of the Abbeville 1 Lower sand (which is defined in item 27a above). |
| 27b | Well | the L A-2 RA SUA; Lutcher A No. 13-Alt well (described in item 27a above). |
| | Existing Area | 800 acres, more or less, being a composite of (a) the S/2 of Section 31, Township 14 South, Range 11 West, Cameron Parish, Louisiana, (b) all of those lands in Section 6, Township 15 South, Range 11 West, Cameron Parish, Louisiana that lie to the north of an easterly-westerly line that is 4200 feet south of and parallel to the north line of that same Section 6; and (c) all lands lying in Cameron Parish, Louisiana within the geographic boundaries of the A-1 RA SUA (as that unit is defined in Louisiana Office of Conservation Order No. 463-F dated November 20, 1990 and effective October 23, 1990). |
| | Zones | The stratigraphic equivalent of the Abbeville 1 Upper sand (which is defined as any depths between 12,250 feet and 12,380 feet as measured on the electrical log of the Castex Energy Inc.; L A-2 RA SUA; Lutcher A No. 13-Alt well). |

Exhibit D-1
Page 9 of 10

141441-1

(Page 49 of 53)

718

930631

Exhibit D-1
Page 10 of 10

| | | |
|---|---|---|
| 28 | Well | the Castex Energy Inc.; Lutcher A Nos. 5 and 5-D well (Louisiana Office of Conservation Serial Nos. 64248 and 66670), which has an approximate surface location more particularly described as starting from the northwest corner of Section 31, Township 14 South, Range 11 West, Cameron Parish, Louisiana, then southerly 1125 feet along the west line of Section 31, then easterly 2500 feet to the north line of Section 31 to the surface location of that same well. |
| | Existing Area | 1740 acres, more or less, being the SW/4 of Section 28, the S/2 and the S/2 N/2 of Section 29, the S/2 and the S/2 N/2 of Section 30 (LESS AND EXCEPT those lands lying in the W/2 SW/4 of Section 30), the N/2 of Section 31 (LESS AND EXCEPT the W/2 NW/4 NW/4 of Section 31), the N/2 of Section 32 and the NW/4 NW/4 of Section 33, all of Township 14 South, Range 11 West, Cameron Parish, Louisiana. |
| | Zones | The stratigraphic equivalent of the Abbeville 2 sand (which is defined as all depths between 11,860 feet and 12,130 feet as measured on the electrical log of this same well). |
| 29 | Well | the PLAN 9 RA SUA; J.W. Mecom Fee B No. 4 well (Louisiana Office of Conservation Serial No. 156571), which has an approximate surface location more particularly described as starting from the southeast corner of Section 24, Township 14 South, Range 12 West, Cameron Parish, Louisiana, then northerly 2128.4 feet along the east line of Section 24, then westerly 1532.6 feet parallel to the south line of Section 24 to the surface location of that same well. |
| | Existing Area | The composite of (a) the E/2 SW/4 and the SE/4 of Section 24, Township 14 South, Range 12 West, Cameron Parish, Louisiana, and the S/2 N/2 S/2 and the S/2 S/2 of Section 13, Township 14 South, Range 11 West, Cameron Parish, Louisiana and (b) all of those lands lying in N/2 S/2 and the S/2 S/2 of Section 13, Township 14 South, Range 11 West, Cameron Parish, Louisiana within the geographic boundaries of the PLAN 9 RA SUA (as that unit is defined in Louisiana Office of Conservation Order No. 463-J dated November 20, 1990 and effective October 23, 1990). |
| | Zones | The stratigraphic equivalent of the Plan 9 sand (which is defined as any depths between 13,160 feet and 13,390 feet as measured on the electrical log of this same well). |

* As used on this exhibit, the term "between" means "between and including" each of the referenced depths.

*[End of Exhibit D-1]*

14441-1

930631

"O" "719"

Exhibit D-2
Page 1 of 5

Exhibit D-2
Attached to Act of Sale by and between
Laterre Co., Ltd., as Seller, and Apache North America, Inc., as Buyer

## Bayou Penchant Field, Terrebonne Parish, Louisiana

| | |
|---|---|
| Proposed Well | CL&F E-1 (CL&F D No. 1 offset #1) |
| 1 Prospect Area | 220 acres, more or less, being the S/2 SE/4 of Section 20, the S/2 SW/4 of Section 21, the NW/4 NW/4 of Section 28 and the N/2 NE/4 of Section 29, all of Township 18 South, Range 13 East, Terrebonne Parish, Louisiana. |
| Zones | The stratigraphic equivalent of the 51 sand (which is defined as any depths between 10,380 feet and 10,570 feet as measured on the electrical log of the Texaco Inc.; CL&F E No. 1 well in Section 29 T18S-R13E (Serial # 65036)). |
| Proposed Well | Laterre A-14 |
| 2 Prospect Area | 120 acres, more or less, being the S/2 SW/4 and the NE/4 SW/4 of Section 3, Township 19 South, Range 13 East, Terrebonne Parish, Louisiana. |
| Zones | The stratigraphic equivalent of the 50 sand (which is defined as any depths between 10,765 feet and 10,875 feet as measured on the electric log of the Castex Energy Inc.; Tenneco Fee No. 2-ST well in Section 2 T19S-R13E (Serial # 182555)). |
| Proposed Well | Laterre A-14A |
| 3 Prospect Area | 600 acres, more or less, being the N/2 S/2 of Section 2, the SE/4, the S/2 SW/4 and the NE/4 SW/4 of Section 3 and the NW/4 of Section 10, all of Township 19 South, Range 13 East, Terrebonne Parish, Louisiana. |
| Zones | The stratigraphic equivalent of the 51 sand (which is defined as any depths between 10,970 feet and 11,135 feet as measured on the electric log of the Castex Energy Inc.; Tenneco Fee No. 2-ST well in Section 2 T19S-R13E (Serial # 182555)). |
| Proposed Well | Laterre A-15 |
| 4 Prospect Area | 140 acres, more or less, being the NE/4 of Section 11 (LESS AND EXCEPT those lands lying in the E/2 SE/4 NE/4 of Section 11), Township 19 South, Range 13 East, Terrebonne Parish, Louisiana. |
| Zones | The stratigraphic equivalent of the 50 sand (which is defined as any depths between 11,073 feet and 11,155 feet as measured on the electrical log of the Castex Energy Inc.; LaTerre Co. Inc. A No. 7 well in Section 11 T19S-R13E (Serial # 227026)). |

141444-1

720        930631

## Lake Boudreaux Field, Terrebonne Parish, Louisiana

| | |
|---|---|
| Proposed Well | L&E 1 (Alabaster Loc.) |
| Prospect Area 5 | 220 acres, more or less, lying in Township 19 South, Range 18 East, Terrebonne Parish, Louisiana, being more particularly described as beginning at a point having Lambert coordinates of X=2,221,195 feet and Y=268,090 feet (South Louisiana NAD-1927 coordinate system), (which is the midpoint along the south line of State Lease No. 17535 dated July 15, 2002 from the State Mineral Board to Harold J. Anderson, Inc.), then north approximately 3650 feet to intersect an east-west projection of the south line of Section 74, then east along the south line of Section 74 a distance sufficient to intersect with the western boundary of Section 20, then southwesterly along the western boundary of Section 20 and 21 a distance of approximately 675 feet to intersect the southern boundary of the Tex W-3 RA SUA (as that unit is defined in Louisiana Office of Conservation Order No. 895-A dated August 10, 1972 and effective August 1, 1972), then southeasterly along this south line of this unit to the southeastern most point of this unit, then South 20°35'28" West approximately 1760.51 feet to a point on the southern boundary of Section 23, then North 69°15'00" West approximately 1,400 feet to intersect with a north-south line having a Lambert coordinate of X=2,222,740 feet (which line is the east line of this same lease), then south approximately 900 feet to an east-west line having a Lambert coordinate of Y=268,090 feet (which is the southeast corner of this same lease), then west a distance of 1,545 feet to the point of beginning. |
| Zones | The stratigraphic equivalent of the Dularge sand (which is defined as all depths between 11,950 feet and 12,340 feet as measured on the electrical log of the 12000 RB SUA; SL 13211 No. 2 well in Lake Boudreaux in T19S-R18E (Serial # 211732)). |

## Lake Pagie Field, Terrebonne Parish, Louisiana

| | |
|---|---|
| Proposed Well | Laterre E-2 Loc |
| Prospect Area 6 | 480 acres, more or less, being the SW/4 and the W/2 SE/4 of Section 29 and the NW/4 and the W/2 NE/4 of Section 32, all of Township 19 South, Range 15 East, Terrebonne Parish, Louisiana, LESS & EXCEPT, those lands lying within that composite Tex W unit area as defined in Louisiana Office of Conservation Order 681-C dated April 17, 1989 and effective May 1, 1969. |
| Zones | The stratigraphic equivalent of the Tex W 6 sand (which is defined as any depths between 15,390 feet and 15,420 feet as measured on the electrical log of the VUF; Laterre-State E No. 1 well lying in Section 32 T19S-R15E (Serial # 123272)). |
| Proposed Well | Laterre E-2A Loc |
| Prospect Area 7 | The same Prospect Area as described in Item 6 above. |
| Zones | The stratigraphic equivalent of the Tex W 5 Lower sand (which is defined as any depths between 15,300 feet and 15,315 feet as measured on the electrical log of the VUF; Laterre-State E No. 1 well lying in Section 32 T19S-R15E (Serial # 123272)). |
| Proposed Well | Laterre E-2B Loc |
| Prospect Area 8 | The same Prospect Area as described in Item 6 above. |
| Zones | The stratigraphic equivalent of the Tex 5 W Upper sand (which is defined as any depths between 15,200 feet and 15,270 feet as measured on the electrical log of the VUF; Laterre-State E No. 1 well lying in Section 32 T19S-R15E (Serial # 123272)). |

Exhibit D-2
Page 2 of 3

141444-1

(Page 52 of 53)

930631

721

Exhibit D-2
Page 3 of 3

| | | |
|---|---|---|
| Proposed Well | Laterre C-3A Loc | |
| Prospect Area 9 | 3237.233 acres, more or less, being all of those lands lying in Terrebonne Parish, Louisiana within the geographic boundaries of the composite Tex W unit area (as that composite unit area is defined in Louisiana Office of Conservation Order 681-C dated April 17, 1969 and effective May 1, 1969, and as further set forth in that Unit Agreement dated January 9, 1969, recorded in Book 471 under Entry 356320 of the conveyance records of Terrebonne Parish, Louisiana). | |
| Zones | The stratigraphic equivalent of the Tex W 3-A sand (which is defined as any depths between 14,550 feet and 14,585 feet as measured on the electrical log of the LPG SU; LL&E W No. 2 well in Section 25 T19S-R14E (Serial # 82579) and the stratigraphic equivalent of all sands of the composite Tex W unit area utilized by Louisiana Office of Conservation Order 681-C dated April 17, 1969 and effective May 1, 1969. | |

| | | |
|---|---|---|
| Proposed Well | Laterre C-3C Loc | |
| Prospect Area 10 | The same Prospect Area as described in Item 9 above. | |
| Zones | The stratigraphic equivalent of the Tex W 3-C sand (which is defined as any depths between 14,456 feet and 14,510 feet as measured on the electrical log of the LPG SU; Laterre Co. Inc. B No. 5 well lying in Section 30 T19S-R15E (Serial # 86851)) and the stratigraphic equivalent of all sands of the composite Tex W unit area utilized by Louisiana Office of Conservation Order 681-C dated April 17, 1969 and effective May 1, 1969. | |

| | | |
|---|---|---|
| Proposed Well | Laterre C-3D Loc | |
| Prospect Area 11 | The same Prospect Area as described in Item 9 above. | |
| Zones | The stratigraphic equivalent of the Tex W 3-D sand (which is defined as any depths between 14,488 feet and 14,878 feet as measured on the electrical log of the Union Oil Company of California; Laterre Co. Inc. B No. 2 well lying in Section 30 T19S-R15E (Serial # 83354)) and the stratigraphic equivalent of all sands of the composite Tex W unit area utilized by Louisiana Office of Conservation Order 681-C dated April 17, 1969 and effective May 1, 1969. | |

## Second Bayou Field, Cameron Parish, Louisiana

| | | |
|---|---|---|
| Proposed Well | Abbeville 3 NW PROB | |
| Prospect Area 12 | 715 acres, more or less, being the N/2 of Section 36, the S/2 S/2 N/2 and the S/2 of Section 25, all of Township 14 South, Range 11 West, Cameron Parish, Louisiana, and the W/2 SW/4 of Section 30 and the NW/4 of Section 31, all of Township 14 South, Range 11 West, Cameron Parish, Louisiana. | |
| Zones | The stratigraphic equivalent of the Abbeville 3 sand (which is defined as any depths between 12,650 feet and 13,000 feet as measured on the electrical log of the Castex Energy Inc.; Lutcher A No. 3 well lying in Section 25 T14S-R12W (Serial # 58907)). | |

* As used on this exhibit, the term "between" means "between and including" each of the referenced depths.

*[End of Exhibit D-2]*

141444-1

Book 1521, Page 670, File Number 930631

930631

722

FILED FOR RECORD

2003 FEB -7 A 11: 51

CLERK OF COURT
PARISH OF
LAFOURCHE, LA

Book 1521, Page 670, File Number 930631

9234943

FILE#279582

## CONVEYANCE

FILED AND RECORDED

This Conveyance is dated and made effective as of February 1, 2003, at 7:00 a.m., Central Time (**"Effective Time"**), and is executed by **Apache North America, Inc.**, a Delaware corporation, whose mailing address is 2000 Post Oak Boulevard, Suite 1060, Houston, Texas 77056 (hereinafter referred to as **"Seller"**), in favor of **Apache Louisiana Minerals Inc.**, a Delaware corporation, whose mailing address is 2000 Post Oak Boulevard, Suite 1060, Houston, Texas 77056 (hereinafter referred to as **"Buyer"**).

CARL E. BROUSSARD
CLERK OF COURT

Reference is hereby made for all purposes to that certain Act of Sale made effective as of December 1, 2002, at 7:00 a.m., Central Time, whereby LaTerre Co., Ltd. conveyed to Apache North America, Inc. the "Properties", as defined therein, (hereinafter referred to as the **"Act of Sale"**). The Act of Sale is recorded in under Entry No. 57942 in the Conveyance records of Cameron Parish, Louisiana, in Book 1097 under Entry No. 113704 in the Conveyance records of Terrebonne Parish, Louisiana, and in Book 1524 at Page — et seq. under Entry No. 782681 in the Conveyance records of Lafourche Parish, Louisiana.

For good and valuable consideration paid by Buyer to Seller, the receipt and adequacy of which is hereby acknowledged by Seller, Seller does hereby grant, bargain, sell, convey, transfer, assign, set over and deliver unto Buyer, herein accepting and purchasing for itself, its successors and assigns, and acknowledging delivery and possession thereof, all right, title and interest in and to and relating to the Properties acquired by Seller in the Act of Sale, TO HAVE AND TO HOLD unto Buyer, its successors and assigns, subject to and in accordance with all of the terms and provisions of the Act of Sale but effective, however, as of the Effective Time.

Buyer and Seller further agree as follows:

1.     Buyer agrees to perform all of the duties and obligations of Seller (and ratifies all waivers and releases of Seller) with respect to the Properties and/or under the Act of Sale and/or under the PSA (as defined in the Act of Sale).

2.     This Conveyance is executed by Seller in favor of Buyer without warranty of title, express or implied, except as to acts by, through and under Seller, but not otherwise.

3.     Buyer expressly acknowledges that Buyer is aware that the Land (as defined in the Act of Sale) is largely marsh lands, and there are numerous water covered areas within the boundaries of such lands, which may be susceptible to a claim by the State of Louisiana that the beds of such water covered areas are owned by the State of Louisiana as the beds of navigable waterbodies.   Seller does hereby exclude any contractual, implied or other warranty or representation regarding whether water covered areas are navigable or not navigable, and whether the beds of such water covered areas are owned by Seller or, alternatively, owned by the State of Louisiana; provided, however, nothing contained in these statements is intended to limit in any manner Buyer's right to dispute any claim of ownership which may be asserted, in litigation or otherwise, by the State of Louisiana respecting any claim to the ownership of the beds of water covered areas, and Buyer's right to assert that the beds of such water covered areas are owned in part by Buyer because such water covered areas are, in fact, not navigable.

- 1 -

4.    Buyer further acknowledges that Seller has made no representation or warranty concerning the acreage content of the Land, regarding the location of the boundaries of the Lands, concerning any encroachments upon the Land, and especially that Seller has made no representations or warranties concerning whether portions of the Land may have eroded into or subsided beneath adjacent water covered areas since the date such Land were acquired by Seller (and hence such areas may have become subject to a claim of ownership by the State of Louisiana).

5.    Buyer agrees that if Buyer elects to sell or otherwise transfer the Land (or any portion of the Land), Buyer shall include in any such sale or transfer (or, alternatively, in any unrecorded purchase and sale agreement or similar agreement executed in connection with any such sale or transfer) provisions identical to the two preceding paragraphs, and Buyer shall protect, indemnify and hold Seller harmless from and against any and all claims, causes of action or liability arising as a result of Buyer's failure to include such provisions in any further sale or other transfer by Buyer relating to the Land (or any portion of the Land).

**IN WITNESS WHEREOF**, this Conveyance is executed by Seller and Buyer on the date first above written in the presence of the undersigned competent witnesses.

WITNESSES:

SELLER:

Apache North America, Inc.

By: _Eric L. Harry_ _____
      Eric L. Harry
      Vice President and
      Associate General Counsel

BUYER:

Apache Louisiana Minerals, Inc.

By: _Eric L. Harry_ _____
      Eric L. Harry
      Vice President and
      Associate General Counsel

- 2 -

## ACKNOWLEDGEMENT

STATE OF TEXAS                §

COUNTY OF HARRIS              §

On this 31st day of January, 2003, appeared Eric L. Harry, to me personally known, who being by me duly sworn did say, to me and the two competent witnesses who signed their names next to his on the foregoing instrument at the same time he did, that he is the Vice President and Associate General Counsel of Apache North America, Inc., a Delaware corporation, and that the foregoing instrument was executed on behalf of said corporation by authority of its Board of Directors, and said Appearer acknowledged said instrument to be the free act and deed of said corporation.



Notary Public in and for the State of Texas
My Commission expires on 11-30-2005

REGINA C. GORMAN
Notary Public, State of Texas
Commission Expires
NOVEMBER 30, 2005

## ACKNOWLEDGEMENT

STATE OF TEXAS                §

COUNTY OF HARRIS              §

On this 31st day of January, 2003, appeared Eric L. Harry, to me personally known, who being by me duly sworn did say, to me and the two competent witnesses who signed their names next to his on the foregoing instrument at the same time he did, that he is the Vice President and Associate General Counsel of Apache Louisiana Minerals, Inc., a Delaware corporation, and that the foregoing instrument was executed on behalf of said corporation by authority of its Board of Directors, and said Appearer acknowledged said instrument to be the free act and deed of said corporation.



Notary Public in and for the State of Texas
My Commission expires on 11-30-2005

REGINA C. GORMAN
Notary Public, State of Texas
Commission Expires
NOVEMBER 30, 2005

-3-

# EXHIBIT 3

Apache Corporation (ticker: APA, exchange: New York Stock Exchange) News Release - 17-Dec-2002

---

## Apache Acquires South Louisiana Properties; Large Fee Acreage Position Enhances Economics

HOUSTON, Dec. 17 /PRNewswire-FirstCall/ -- Apache Corporation (NYSE: APA) today announced the acquisition from a private company for $260 million of certain South Louisiana properties comprising 234,000 net acres (366 square miles) with net proved reserves of 178 billion cubic feet of gas equivalent, 88 percent of which is natural gas. Anticipated 2003 net daily production is more than 55 million cubic feet of gas and 2,100 barrels of oil.

The acquisition, effective Dec. 1, 2002, includes 135 producing wells and access to 849 square miles of 3-D seismic covering the relatively contiguous acreage position.

Apache President and CEO G. Steven Farris said, "In addition to adding more than 10 percent to our U.S. natural gas production, the acquisition gives us a significant opportunity to expand our U.S. drilling activity. We own 100 percent of both the mineral and surface rights on 212,000 of the acquired acres, improving the economics over a normal working-interest position. Couple that with the proximity to Henry Hub, which commands the highest netback gas prices in the country, and the current outlook for natural gas prices, and we have added potential for boosting our cash flow on increased gas production."

Apache allocated $195 million of the purchase price to proved reserves (approximately $1.10 per thousand feet of gas equivalent), $45 million to fee acreage and probable reserves, and $20 million to 3-D seismic data.

The acquisition is additive to per-share cash flow and earnings. Apache has protected the economics of the transaction with "collar" hedges, which preserve the potential for significantly higher gas-price realizations. The purchase is financed with commercial paper with a current interest rate of under one and one-half percent. Apache's debt-to-capitalization is expected to end the year below 35 percent, including the acquisition.

The acquired acreage, located primarily in Terrebonne and Lafourche parishes, provides immediate exploitation and exploration potential, with 23 prospects presently identified.

By making Apache the royalty owner, fee acreage affords the company the benefit of third-party prospect-generation ideas and low-cost reserve additions, along with significantly lower lease-operating expense.

Maps and additional information on the acquisition are on Apache's website at www.apachecorp.com.

Apache Corporation is a large oil and gas independent with operations in the United States, Canada, Western Australia, Egypt, China, Argentina and Poland.

This report contains certain "forward-looking statements" as defined by the Private Securities Litigation Reform Act of 1995, including, without limitation, expectations, beliefs, plans and objectives regarding reserve and production potential of the acquisition. Among the important factors that could cause actual results to differ materially from those indicated by such forward-looking statements are future exploration and development results, fluctuations in oil and gas prices, general economic conditions and the negotiation and execution of commercially acceptable marketing arrangements in respect of hydrocarbons discovered. SOURCE Apache Corporation

-0- 12/17/2002

/CONTACT: media, Tony Lentini, +1-713-296-6227, or David Higgins, +1-713-296-6690, or investors, Robert Dye, +1-713-296-6662, all of Apache Corporation/

Case 2:10-md-02179-CJB-DPC Document 14879-1 Filed 07/15/15 Page 310 of 511
web.archive.org/web/20030507213322/http://www.corporate-ir.net/ireye/ir_site.zhtml?ticker=APA&script=413&layout=23&item_id=364597

/Photo: NewsCom: http://www.newscom.com/cgi-bin/prnh/20010918/APALOGO

```
            AP Archive:  http://photoarchive.ap.org
            PRN Photo Desk, +1-888-776-6555 or +1-212-782-2840/
```

/Company News On-Call: http://www.prnewswire.com/comp/101390.html /

# EXHIBIT 4

Company Name: Apache Corp.
Company Ticker: APA US
Date: 2003-01-30
Event Description: Q4 2002 Earnings Call

initial

Bloomberg Transcript

# Q4 2002 Earnings Call

## MANAGEMENT DISCUSSION SECTION

### Operator

Please standby, we are about to begin. Good day everyone and welcome to Apache Corporation Fourth Quarter and Yearend 2002 Earnings Conference Call. This call is being recorded. Today's presentation will be hosted by Mr. Bob Dye, Vice President of Investor Relations Mr. Dye. Please go ahead sir.

Bob Dye: Well thank you all for joining us today, Apache Corporation reported fourth quarter 2002 earnings this morning of $179.4 million or $1.24 per diluted share with full year 2002 earnings of $543.5 million or $3.78 per diluted share. For anyone that is interested, we have put a copy of the release as well as the yearend reserves on our web page for you to view it www.apachecorp.com. Today we will have prepared remarks from Steve Ferris, our CEO and Roger Plank our CFO prior to beginning question and answer and with that I will turn the call over to Steve.

Steve Ferris: Thank you Bob and thank all of you for joining us today. As Bob pointed out we pleased to report another excellent year both on a financial side and in operating results for Apache. As we mentioned in our release earlier today during the last quarter of 2001 and most of all of the first half of 2002 service costs got out of [indiscernible], we really did quick drilling and used our excess cash flow to pay down debt. Service cost came down in second half about 2002 we really increased our drilling activity and continue to be patient on the acquisition front. And we were pleased enough to announce on January 13th that we had entered into an agreement with BP for $1.3 billion to purchase 233 million barrels of oil equivalent in the Gulf of Mexico and the North Sea. This purchase established a new core area for us in North sea and in fact Roger and I and Lisa happened to be in London at the moment and we had just been with the Minister of Energy who was kind enough to make a press release today a little bit about Apache getting into North Sea. And we [indiscernible] in the morning and [indiscernible] Apache trips, so we are please with buying high quality assets both in the Gulf of Mexico and the 96% working interest what we consider still a premium asset in the North Sea, the [indiscernible] field. From a financial perspective, the transaction is highly equated to both earnings and cash flow per share and as most of you, I am sure know that we have hedged a significant portion of the production for the next two years at very attractive prices. Actually in the last 45 days we committed about $1.6 billion of producing property asset purchases. We financed a portion of these two purchases with equity and we saw many of you on the road the last couple of weeks and I want to personally thank those of you who participated both on the book side on the Morgan Stanley and many of those who participated as well as guys who supported apache during our offering. And the one thing I would say for me and for all of the Apaches, we will work hard to continue to earn your support. Also I like to thank BP again and our management team for giving us the opportunity to purchase these assets under negotiated transactions.

During that period that we were on the road show, we did an awful lot of talking about the BP transaction, which really does not impact our 2000 results and [indiscernible] to this call. From a financial standpoint as Bob pointed, our [estimated] earnings were $544 million and our cash flow was $1.54 billion. Our [indiscernible] year-over-year production declined a little less than 1% actually without production interruptions in the Gulf of Mexico from [indiscernible] which really effected us more than anytime, I have been in the Gulf of Mexico. We could have a slight production increase for the year. Liquids production rose 3% to 161,000 barrels of oil a day and natural gas production declined about 4% to 1.08 bcf a day. 58% of our equivalent 2002 production came from outside the lower 48, however 41% of our total production is leveraged in North American gas markets. We are proud that our reserves grew 4% to 1.313 million barrels and we replaced 138% of our worldwide production. Our finding and development costs as I am sure many of you [indiscernible] Apache, on an all end basis for 2002 with $7.04 cents. And if you exclude the capital we are spending, which is a little unusual for us in the west mat, which is our west mat deep drilling, our finding costs would be a little under $6.90. We spent $860 million on exploration and development worldwide and drilled a record of 1129 wells, I would point out that that is $500 million less than we spent in 2001 on E&D side. Through drilling

Bloomberg

Company Name: Apache Corp.
Company Ticker: APA US
Date: 2003-01-30
Event Description: Q4 2002 Earnings Call

additions and revisions we replaced 99% of the production and had a finding cost little under $7. For [indiscernible] we spent $1.35 billion in 2001. We also at the end of the year made one tactical acquisition in South Louisiana for $260 million, which brought our total spending on acquisitions to $352 million at an average cost of $719 per BOE, I might point that the South Louisiana producing properties, $7.19. As you recall, a large portion of that acquisition was pre-acreage in the South Louisiana and the operating costs about 22 cents per mcf. Unlike most years, our 2002 capital spending was weighted toward the end of the year, which really gives our base properties great momentum in 2003. And with the purchase of the properties in South Louisiana late December, I guess, it is 2002, with strong production at the beginning of the year. And that does not include our production that we shipped, yet when we closed the Gulf of Mexico portion of the BP acquisition at the end of March and also does not include obviously the North Sea acquisition that we should close at the end of May.

Our balance sheet remains strong even after the BP transaction closes, which gives us flexibility to pursue additional acquisitions that they become available. I would like to go into a few of the highlights from our operation standpoint. In the US we completed a 168 of a 194 wells with an 87% success rate. We replaced 95% of the production through drilling. For those of you who keep tabs on our US gas production, we averaged 467 million a day in the fourth quarter down slightly from 492 in the third quarter really due to the [indiscernible]. December US gas production added 494, so we got most of that back from the third quarter. In the Gulf of Mexico, we successfully completed 41 of 56 wells growth, most notably successes were at South [indiscernible] 295 and Granda [ph] 43. We continue to grow quality prospects in and around the reserves and production base that we own and really reloaded Gulf of Mexico inventory with our BP acquisition.

In the central region, we completed a 127 out of 138 wells and really we are in the bread and butter areas of traditional stuff, which is western Oklahoma and East and West Texas. We look ahead for 2003, our activity level is at pretty high phase right now and really our preliminary capital spending should exceed about $400million with the three-quarters of the allocation drilling in the Gulf region. In the central region, we should drill over 200 wells and in the gulf region our focus really will be on P acreage we bought and as we get on around the BP acquisition in the Gulf of Mexico on the BP stuff. In Canada we completed 820 out of 850 wells with a 96% success rate, we also replaced a 156% of our production. From an activity standpoint, the big story in Canada was a continued development around our [indiscernible] field where we drilled 599 wells. Our growth [indiscernible] production increased about 24 million a day and overall our fourth quarter Canadian region gas volumes increased in large part because of the [indiscernible] program and as I understand from Bob we have had some questions about this Canadian death. We also had some prior incurred adjustments in there from [indiscernible] from 330-335 million a day. We also had good success with the [indiscernible] with our drilling program. On a preliminary basis for 2003 and I must state preliminary because we are really starting to go back and [indiscernible] plan with a new acquisition from BP in the mix, but we should spend around $350 million and right now our inventory is [indiscernible] wells. We will continue to grow [Haven] and [indiscernible] area we have [indiscernible] project that we are kicking off and interestingly we are going to drill 5 [indiscernible] well this year.

From an exploration standpoint, we have a 8 [indiscernible] well plan, we have 13K little plan, we have 64 [indiscernible] plan, so we are going to be very busy there. In China the drilling platform arrived in November. We expect a complete driving conductor pipe and a 25 drilling squad on the platform by next February at which point we should begin drilling. The production platform is scheduled to arrive in April, late April, and first production is planned for the summer and a peak production of 20,000 barrels a day is planned by the end of this year. We booked reserves for the first time in China and technically their [indiscernible] reserves. We booked about a 11.3 million barrels of oil equivalent which should be on by the end of this year. Preliminary capital spending for the rest of the China project for 2003 is about $30 million. In Australia, we had a very active program. We completed 10 of 0.2 wells. On the exploration side, we continued to drill around our flying stuff, which was the Victoria, Pederika, Little Sandy, South Simpson, and Hover, all were 2002 like Sandstone discovery. We were able to fast track the development of several of these discoveries and achieved first production and South Simpson, Pederika and Little Sandy and Victoria during the year. We also achieved first production at Gibson in South Plateau, which we had discovered in 2001. All of these were in shallow water and are in close proximity [indiscernible]. The Double Island development is scheduled to begin producing in the late first quarter of 2003 with expected initial IPs of about 5000 barrels a day. Our 2003 capital

Bloomberg

initial

Company Name: Apache Corp.
Company Ticker: APA US
Date: 2003-01-30
Event Description: Q4 2002 Earnings Call

Bloomberg Transcript

program should be about the same as it this year, a little bit different in the mix, we should send about $100 million, but we are including and added about 37 drilling wells. I will turn to Egypt now. We have real active program in Egypt [indiscernible] where we did not go back on our capital program in Egypt and Australia like we did in North America. We completed 48 out of 63 wells for 76% success rate. The bulk of the drilling was around our Khalda, our cable drilling and development drilling, we had several moldable exploration discoveries at Khalda. It has actually helped us increase our growth Egyptian equivalent production 23% during 2002 and had an excellent rate of about 87,000 barrels a day and 250 mcf of gas a day. Our January 2003 day production has climbed as high as 91,000 barrels a day and 263 million mcf of gas a day. Some of the exploration highlights in Khalda that we have announced with reserves 1X which were offsetting [indiscernible] results [indiscernible] against two wells in the field that are currently producing about 1500 barrels a day. The circuit 1X discovered a 1000 [indiscernible] around the Korido [ph] zone, actually came along at about 5100 barrels a day. We are currently producing about 2800 barrels a day and we just drilled an appraisal well at Circuit 4, but actually found a thickish section of [indiscernible] thus far in a field, and that well, came on in about 2200 barrels a day and we are offsizing that pump. Last May, the 251 and 252 wells were discovered in the AEB and Kapato [ph] phase These two wells now are producing 36 million a day and about 2100 barrels of condensate. We have had good success at each part of [indiscernible] many of you are aware of our [indiscernible] development. The [indiscernible] extent to $1140 a day from [indiscernible] G. We have also had several successes in the upper part of [indiscernible] Colomba development for 2003 will really center around the water [indiscernible] we are starting to put in as we speak. At Ras El Hekma which is North East of the Khalda proper field are the Emerald 1X discoveries where we actually found about 218 feet of AB both tested to about $4200 barrels a day and 17 million cubic feet of gas a day. We are offsetting that relatively south with the Emerald 2X, which should be done in another two weeks.

I will turn now to the West Med, at West Med we continued to deep water discoveries to the western part of the Nile delta and in 2002 we drilled four deep water wells and made four discoveries. The Abu-Sir 1x, Al Bahig 1x, the Al Max 1x and Al King 1x all made (myocin) tertiary gas discovery. In addition on the Al King we also found the upper [indiscernible] which is deeper than the myocin and discovered a significant gas column and we also tested about 2600 barrels of liquids in the lower part of that section. The myocin went up to the gas zone in the myocin at the Al King and tested 32 million a day and about 3300 barrels of condensate and we are really encouraged by the liquids reserve.

But currently drilling the Al Bahig 2x which is an appraisal well for the 1x down to the pliacin [ph] and then we are continuing down to drill on a exploratory phase that's the full myocin section and in fact this well is scheduled to go to about 11,700 feet. We are currently at about a 11,000 feet and we should be down in a couple of weeks. Our preliminary budgets for 2003 is much like we had in 2001 or 2002. We should spend about $250 million and [indiscernible] 115 wells. There is little doubt in my mind that we can continue to grow and we had an excellent inventory for 2003. We had 84 exportation programs, but we focused mainly on the 29 wells [indiscernible] will be 37 wells and [indiscernible] 9 wells. The south Emberka exploitation program, we are really focused on -- we are going to do a west Texas style water flood project which will be really the first one ever done in Egypt and which we will do a 25 well water program targeting the [indiscernible] zone. And should this be successful, it should open us up to -- we have a possible 250 well input program [indiscernible] program in that field going forward. At East Barteria [ph], we have nine well exploitation program which we will continue to develop the Kharama and also a water flood program to reinject the water there. On a exploration side, we have 31 [indiscernible] plans on a variety of concessions placed out, actually we have [indiscernible] planned on eight different concessions. In terms of the exploration that we are going to do at West Med, we intend to current well down, we are currently working with the Egyptian Government with respect to a gas contract, we have a number of prospects on the book which we will decide how to proceeds as we drop further with EGPC about a gas contract, as you are aware we did not book any of our deep water reserves in West Med in 2002, so we are hopeful by the end of this year to enter into a term sheet although there is nothing finalized on that with respect to the gas in the deep water and as many of you are aware – case we think we found about 2.7 to 3cc of gas wells on our block, Amie I would like to talk a little bit about the North – and I have John [indiscernible] and Lisa Stuart and they might want to jump in also because they have been very instrumental in making this acquisition and moving forward with respect to the taken over operation. Obviously we were thrilled with the North Sea and the – will become the highest value field we have worldwide those growth, between now and am closing the market qualified as an operator in the North Sea. from the DTI with – and industry.

Bloomberg

Company Name: Apache Corp.
Company Ticker: APA US
Date: 2003-01-30
Event Description: Q4 2002 Earnings Call

initial

We had a very nice meeting with the minister of energy today and we also setting up a new office -- what we consider conservative capital spending in the – for this year, we had about $43,000 million in our capital forecast for 2003, which really encompasses refurbishment and work overs and recompletions. As many of you heard on the road show, we have identified 19 drilling locations which shortly will get started by the end of this year or the first of next year. I look forward to welcoming you over 250 members of the BP 40 [indiscernible] to Apache Corporation [indiscernible] and hopefully with their expertise and our enthusiasm and our interest in the North Sea will have a long term commitment to the North Sea going forward. I might close with same – 2002 with an outstanding year for it, unlike a lot of year we do start overall END program from 2001 to 2002 by $500 million. We got our debt down, which really gave us the opportunities to be able to make an acquisition to size of BP which is largest acquisition we have ever made.

We believe we are in our 49th year of existence and everything is up from here. We began in 1954 and as Raymond likes to say it is important to know who you are not as well as who you are and hopefully the other year we learn a little bit more about who we – who we are not and who we are. And with that I would like to turn over to Roger.

Company Representative: Well, I am Roger Plank. Thank you Steve and good afternoon everybody. I would – I could finally characterize our 48th year, as a year of discipline and patience followed by a mad scramble in the year end to buy properties that as Steve indicated will certainly benefit 2003 far more than in 2002. But that that having been said 2002 itself was an excellent year. If you refer that data and one in which we delivered what we set out we achieved some 15 months ago. Against our number one objective is to add to our financial flexibility despite already having a strong area of the balance sheet. We did that during the year from 36.9% to 34.4% despite the South Louisiana Acquisition for $260 million in December. [indiscernible] that acquisition to give you a better measure of our progress, debt cap would have been down to 32 – just over 32%. So it would have been in the way about 5% during the year and then give us flexibility to go up early [indiscernible] to identify properties and subsequent to yearend BP properties.

Several factors enabled the progress, and Steve touched on some of them, obviously we held our water on capital expenditures earlier in the year during an acquisition cost we outlined. Our total capital expenditures including the acquisitions were $11/4 billion in '02 that was just about precisely half of what we had spent the year before and it was also well below the $1.5 million of cash flow that we generated during the year. So the difference we put in the bank and pay down debt. We also earned $544 million, as I indicated earlier, and that add is over half a billion dollar through our shareholders' equity, which also made a meaningful dent in our debt-to-cap. We talked a lot about earnings and obviously earning lot of money does wonders for our balance sheet which is why earnings truly are important despite what some might have been led to believe.

So that's important to improved balance sheet is the fact that it was accomplished while both holding line on production and growing reserves at reasonable cost which is obviously not an easy [feed] in this business particularly in this way. And of course that's why the supplier to [wider tactics] these days and prices are high. On a BRE basis, our production was 341,500 barrels of oil equivalent per day and, as Steve indicated, that's up 1% of our '01 level. Despite the substantially lower capital expenditures in a hurricane season, that cost is somewhere around 7800 barrels of oil equivalent production in the fourth quarter alone. Although, the same [indiscernible] capital has been replaced, 138% of production grew the reserve base 4% at a respectable $7.4 cents. So 2002 marked as 17 consecutive annual increase in reserves. Our momentum built throughout the year with the fourth quarter being our strongest of the year. The $179 million that we earned represented a third of our full year earnings in a single quarter and any timing get a third per quarter in the oil business has done pretty well. Fourth quarter earnings more than doubled the earnings at our levels as did our earnings per share at a $1.24. Fourth quarter cash flow 463 million or 319 per share is a smart indicator to approach but perfectly feels to approach half a billion dollars in just 92 days. Obviously, substantially higher oil and gas prices made excellent margins despite slow increase in cost from the third to fourth quarter. Weak operating expense per barrel of oil equivalent increased slightly by a 4 cent per BOE or about 1% to $3.82 cent per barrel equivalent. [indiscernible] to higher cost and lower production resulting from a hurricane damage is just the cost itself over 10 cent per BRE is associated with hurricane expense that will not be recovered – that portion will not be recovered because of our $5 million deductible. So ROE – since that non-recurrent event ROE per BOE was pretty good. [indiscernible] staff presented a half from third quarter levels to $6.85 cent per BRE from $6.75 as the cost defined to purchase oil and gas is driven throughout our industry. G&A per BRE was essentially flat at 83 cents per

Bloomberg Transcript

Bloomberg

Company Name: Apache Corp.
Company Ticker: APA US
Date: 2003-01-30
Event Description: Q4 2002 Earnings Call

barrel of oil equivalent and – we've got some gas price out here. In total our cost per BRE excluding a non-recurring aftertax impairment in Poland increased about 1% or 19 cents per BRE and so our cost were – all in cost were up 19 cents to barrel of oil produced. Well we favor a absolute growth by $1.98 improvements in price. So we obviously had very strong margin.

I think you will find that price is comfortable BRE excluding impairment at $13.41 per barrel equivalent is very competitive throughout our industry and that's why we are [indiscernible] quite favorably from our peers when it comes to earnings. But basically the formula was pretty simple, we tried to keep a very tight hand on cost especially refining and acquisition costs were the big money is often spent. To our arising prices and earnings can be very substantial and that has pretty much captured as a nutshell in the fourth quarter. Which means the whole [indiscernible] way started, I believe is the most significant thing that we did in 2002 in addition to hosting a fine year to tick up 2003 with the bang. And the progress on the debt-to-cap while maintaining significant production which is now generating very substantial cash flows each month with these projects. And then I will pass you to one of the few independents that it was able to purchase or bring under contract at a $1.5 billion of properties in the last 45 days. While others were enjoying their holidays many of our people were working their tails up to evaluate, negotiate, and capture Apache's largest transaction to date and one that had very significant shareholder value as those of you saw on our road show perhaps concurred. Obviously, as now of the BP's production and only 15 days at the Louisiana-acquired production hit most in 2002 so we are very much looking forward to seeing fruits of our efforts in 2002 and for our shareholders in 2003. One last point, if any chance we did miss [bigwig] yesterday's [bigwig] per gas and with the February three day average price of $5.50 on MCS, [indiscernible] paid $5.30 followed by more than a $1 above the $3.99 per MCS that we averaged in the fourth quarter. And oil prices too recorded $4 to $5 per barrel higher than our fourth quarter price and here too we've gotten off to a very strong service offering. But approximately two-thirds of our combined including oil production and about same units of our gas production un-hedged at present. We are primary beneficiary based on commodity prices. So we are looking to picking up the year with a very strong start and hopefully with the continued progress throughout the balance of the year. As this time we will be happy to answer questions.

# Q&A

## Operator

Thanks you gentlemen. Our question and answer session will be conducted electronically. If you would like to ask a question please firmly press the star key followed by the digit one on your touchtone telephone. We will come to you in the order that you signal and if you find that your question has been asked and answered before you could ask it, and you would like to remove yourself from the question roster, please firmly press the pound key. Again if you would like to ask a question press the star key followed by the digit one. And if you are on a speaker phone, please make sure that your mute button is disengaged so that your signal can reach our equipment. For our first question we go to John Herrlin with Merrill Lynch.

<Q>: Yeah. Hi. I have got two quick ones. What was the US cost incurred?

<A>: I don't have that in front of me.

<Q>: Okay fine. Steve, regarding the average [indiscernible] well, you said they are at about 11,000 feet with TD at 11,700. Are you officially in the [indiscernible] and you know, can you give us any sort of information about the well that you are willing to talk about?

<A>: I think we have the same posture on this well that we have had on all four wells because if I give information out as to or tentative information out, all I can say is that we set 9 and 5 8-inch casing and we drilled that below 10,500 feet which was the point we set our casing. And we are going to [indiscernible] to 11,700 feet to 12,000 feet next. That is really about all the information that I can give.

<Q>: Last one from me Steve. You guys said that you are in the UK. Do you see any sort of delays associated with closing the deal in May for this field?

**initial**

**Company Name: Apache Corp.**
**Company Ticker: APA US**
**Date: 2003-01-30**
**Event Description: Q4 2002 Earnings Call**

**<A>**: Actually, we don't. In field, My [indiscernible] John [indiscernible] a little bit about our safety and environmental [indiscernible] that we have to bottom. We got some good news there in the last day or two. So John, you might?

**<A>**: Yeah, John, the critical path [indiscernible] operators for getting safety case probed and what do they do as [indiscernible] of course, that is the best way to treat your people. They are used to working [indiscernible] safety case. But we just have to make some minor adjustments to that. And we have got an agreement with [indiscernible] take some executive there to do just that. So we are feeling pretty confident about moving forward in [indiscernible] fashion.

**<A>**: Okay thank you. On the cost control. EMD was 561 million. Acquisitions 352 million. Did you ask in North America or US?

**<Q>**: US. I read the release. I was wondering if it was US.

**<A>**: Okay. 303 million of EMD and 260 in acquisitions. So all in so [indiscernible] cost is 688.

**<Q>**: Thanks Roger.

**<A>**: You bet.

## Operator

We go next to George Gaspar with Robert W. Baird.

**<Q>**: Good afternoon to everyone. Good evening to you Steve and Roger. First question. I would like to follow on with what John was asking you on the [indiscernible]. Just a generalized question. This [indiscernible] that you are moving toward. If there was a discovery in that lower formation how prevalent is that particular formation across the face of the four previous wells that have been drilled.

**<A>**: Well. I have got to say two things. The first is that structurally, at least in the position that we drilled, the original four wells did not have a [indiscernible] structure on them. As many of you have seen in some of our presentations a [indiscernible] structure is a pretty big structure. The other thing that I would say is that this is I think, one of only two wells that have been drilled this deep on the western side of the Nile. So in terms of information available we are in pretty wildcat area. I don't know what to say other than that, George.

**<Q>**: Okay. Could you clarify? You had mentioned something about total reserve expectations in [indiscernible] what you are drilling in at. Could you repeat that again?

**<A>**: The wells that we have drilled so far to the [indiscernible] the reserves added from the [indiscernible] from a [indiscernible] obviously now they have got to be appraised but we think we are about 2.7 tcf of gas associated with the discovery so far.

**<Q>**: So far meaning when you say so far that doesn't include the existing?

**<A>**: It doesn't include the well that we are drilling at the present time.

**<Q>**: Okay. There is a pretty good shot you can get over at 3 tcf which was the original target?

**<A>**: Yeah. With the prospects but the [indiscernible] that we are drilling [indiscernible] other prospects we have about 13 prospects and leads to the [indiscernible] And what we have had – the [indiscernible] that we have had in the first four [indiscernible] wells I would tell you, we are going to work throughout this block. So you know, I feel very comfortable with the amount of gas that we have available on this.

**<Q>**: Okay. My other question on the North Sea [indiscernible] the number that was used generally speaking was 45,000 barrels a day. Is that a target that you are working at in terms of production across the plane of '03? Is that a start plane? Where do you think you are going to end up? What are showing as a decline curve toward the end of the year? And how long is it going to take you to potentially flatten this thing out to a mere modest decline curve relative to what



Company Name: Apache Corp.
Company Ticker: APA US
Date: 2003-01-30
Event Description: Q4 2002 Earnings Call

B.P. has experienced?

**<A>**: Well [indiscernible] at least answer that from a macro standpoint the first thing I would say is we use B.P.'s basically historical decline here. So we did not try to over promise from where we are today but at least you might have a

**<A>**: [indiscernible] if you look at this historical decline of 40 it has averaged just short of 11% without any additional drilling. So I am going to think that is an expectation if we did nothing. We certainly think there are some things we can do with the wells and on the platforms even without drilling new wells that will stem that decline in the 45,000 barrels a day with our acquisition of [indiscernible] average for the year. So you know, we are pretty confident that we will able to stem any decline during the year.

**<Q>**: Okay, very good. Thank you.

## Operator

For our next question, we go to Dan Morrison with Aperion.

**<Q>**: Yes. Thanks. You have characterized your South Louisiana acquisition as tactical. Could you kind of flesh out a little bit of the strategy down there? And also, second question. More general if you could share your thoughts on the apparent of drilling response in spite of the commodity prices, just drivers for that.

**<A>**: When we talk about tactical acquisitions, if you look at what we did with the [indiscernible] field or really the order of magnitude with what we did with the Gulf of Mexico, [indiscernible] those were really strategic in all kinds of ways. With respect to the South Louisiana acreage we are active in South Louisiana what it does is add to our inventory it picks up free acreage that we not only can bring drilling prospects to the table that others can't because we own the acreage and fee. So it really is just an add-on to what our activity has been there in off shore for a lot of years. And that is the reason we call it tactical acquisition as opposed to any kind of strategic acquisition in nature. I assume you are talking about why don't we see more drilling activity than we see today given the current commodity pricing? Is that basically the question.

**<Q>**: Correct.

**<A>**: Obviously, everybody has their own opinions. I would tell you the biggest – in my mind the biggest reason really are two-fold. One is that we have had so tremendous volatility associated with the natural gas price and regardless of whether or not we want to talk about it, we had numerous people admit to manipulating the gas market. What we really need to find is what the really supply and demand in natural gas is so that everybody can feel comfortable with both the economics they are using makes sense. No one minds volatility they just don't like manipulated volatility. So I think that has something to do with it. And the other thing I would say is I think, from a lower 48 standpoint there is no doubt that the size of the prospect are getting smaller and they just can't stand the cost and while you saw 2001, and we are not [indiscernible] but it [indiscernible] got so out of hand that it just made absolutely no sense to drill a well. So went from about 64 wells in drilling activity to 5 by the end of 2001. And I think people are [indiscernible].

**<Q>**: Thanks.

## Operator

We go next to Bill Preavy with Geneva Capital Management.

**<Q>**: Hi. Couple of questions on Venezuela and Iraq. Obviously right now, the production is depressed. Looking ahead a year, assuming that some resolution of the problems and more normal production, what would your forecast be all of things considered for gas and crude prices?

Company Name: Apache Corp.
Company Ticker: APA US
Date: 2003-01-30
Event Description: Q4 2002 Earnings Call

**<A>**: I will tell you [indiscernible] about oil prices. I think the volatility of oil prices now that is because I would tell you we are in the most uncertain times that we have ever been in so trying to make some prediction as to what is going to happen in Iraq or what is going to happen in Venezuela, I can't predict. The one thing I would say is that I think a little bit of the idea that we have that all this value in oil prices because of the [indiscernible] before we had Iraq and Venezuela indicated that they wanted a [band] on oil prices and we are doing a pretty good job at doing that. So $32 in a normal environment is not sustainable obviously but I think the OPEC countries have picked up something around $23 to $25 and I think they were doing a pretty good job of that. On the gas side, I have to tell you unless something isn't done on the natural gas side, we are going to kill the goose that lays the golden egg because the consumer cannot stand $5.65 gas prices. For us producers that is a great number for a while, but over time we are going to kill demand. I mean that is not in the next six months but probably in the next three to five years. If we want to depend on natural gas, we are going to have to do something as an industry and as a country. To deal with the volatility and [indiscernible] drilling. And I don't mean from a tax standpoint I mean from a volatility standpoint. We are going to have to have longer term contracts with consumers. Consumers [indiscernible] are going to have to realize that they can't just let the [indiscernible] the utility pass through those costs to the retail customers. So you know, I think that maybe in that regard it might go back to some of those long term contracts. In order to sustain natural gas in this country.

**<Q>**: Thanks.

## Operator

We go next to Scott Burke with Bear Stearns.

**<Q>**: Hello. I would just like to ask a little bit more about the situation in the Gulf of Mexico. Did you say the gas production is back to 494 million cubic feet a day?

**<A>**: [indiscernible] December always production rate as I understand it.

**<Q>**: Okay. And so going into with the addition of Louisiana properties and [indiscernible] properties, what kind of production growth would you expect in the US? Is that going to just kind of you know, flatten out to decline or offset the decline or are you actually going to have some production growth? What are your [indiscernible] for next year?

**<A>**: [indiscernible]. And you have probably those numbers in front of you. I don't know. [indiscernible] What we are trying to get [indiscernible] something we haven't posed yet so when we are now over [indiscernible] which has been working on the fields and that kind of stuff so if you try to predict number one how much gas is there, and number two, what our production profile is going to be it is pretty difficult right now.

**<A>**: Yeah, I mean, on the gas side we average right outside of 100 million a day in the US. We have announced a transaction that would add another 200 million a day. And that is what we assume would be our average rate for the last nine months of the year. Since we are planning on closing the Gulf of Mexico part of it in March. So you know, if you just took three quarters of that, that is another 150 million a day. We have also made some South Louisiana property purchases so I think you can get an idea of what we are targeting for '03 on the gas side. On the oil side we averaged right at 53,000 barrels a day in the US. Of course we announced that we would buy right at 20,000 barrels a day, but if you annualize it it is really 15 since we are only going to own it for nine months so you know, that would put you somewhere in the mid to high 60s. So that's the kind of what we are looking at currently.

**<Q>**: And just to clarify that 494 with the hurricane production back online if you will, that's what the US production was ....

**<A>**: In process.

**<Q>**: I am sorry that's what I meant US production.

**<A>**: Yeah.

**<A>**: Okay, thanks.

Company Name: Apache Corp.
Company Ticker: APA US
Date: 2003-01-30
Event Description: Q4 2002 Earnings Call

## Operator

Again, if you would like to ask a question, please firmly press the star key followed by the digit one. We go next to Andrew [Louis] with RBC.

<Q>: Hi guys. Just wondering maybe, Lisa, if you could kind of go through what you would envision as a quarterly progression in the Forties production 45,000 is your annual, but I mean is it going to be less upfront as you shut [in stuff] to do work-overs or is that going to rise later?

<A>: I wish it was that good. Right now I mean, as Steve said, about the Gulf of Mexico we are doing pricing over here and trying to get our arms around production. Since the time we have signed the deal it is producing 48,000 barrels a day. There are things going on, on the platform as you see and fuel production is slightly below that depending on what they look at. And I think it would be very difficult for us right now, you know, one obviously depending the timing of closing that's going to drive how we can implement the plans that we have that we are not already using it full fledged. So it is very difficult for us to predict a quarter-by-quarter production profile at this time. And to get with a couple of months, I guess, some plans set in place, we will be in a better position to maybe I addressed that.

<A>: The other thing that I can't say on that and I know this is the – we mostly now at the quarter report. So when we look at what we've done in Egypt, what we have done in Australia, what we have done in Canada, we intend to grow our productions. And we hope that we can grow up in terms of what we are going to be able to find on Forties field and going some [indiscernible] with the completion as soon as we takeover operations and drill some oil wells later in this year, fourth quarter next year. But we really overtime intend to grow our North Sea production. So not unlike what we have been able to do in other areas because we are now going to have a staff setting in abundance. We take the very good staff and the job is assembled and good field people and so we are [indiscernible].

<A>: If I were to add to that quickly, I am pretty excited talking to the staff and saying that we've got lots of idea about things that can be done pretty quickly, some of the interesting things about the Forties oil field that does have excess production capacity that we've had already. So we need to go and spend some [indiscernible] on the surface kit and we will be doing that with our standards manner of doing the business.

<Q>: All right, thanks.

## Operator

For our next question, we go to Shaun Reynolds with [indiscernible] Department.

<Q>: Good afternoon, I am sorry guys, I might have missed the CapEx you gave for the US, I caught Canada, China, Australia, Egypt, and UK. Did you draw out a number for the entire US, and if broke it out on shore versus off shore that would be great.

<A>: It only exceeds 400 million this year with probably three quarters other than the Gulf region.

<Q>: Compared to the Gulf coast and .......

<A>: Compared to the Gulf coast in off shore and obviously most other would be off shore and I know that John Jefferson and his staff are working pretty hard reviewing the BP properties and so that budget is still perhaps a little influx. But that's – I can't say, you know, penciling in numbers right now as we started to work major fields in the Gulf of Mexico is very difficult.

<Q>: Right.

<A>: And getting back to Egypt's and the Korea, I have been intrigued with the South [kit] discoveries. Any other look alikes in near by area?

Company Name: Apache Corp.
Company Ticker: APA US
Date: 2003-01-30
Event Description: Q4 2002 Earnings Call

<A>: Mark, you know, we actually the south report, we are having to re-map that whole circuit structure because the circuit board actually was been on in the two upper [crude] and all of a sudden we got in about 94 filed accrued in the lower, what we call the Korea three which is, you know, because it's third one down. So we are obviously, we are not seen that. So that fields could be better than we think it is. We actually have had a little bit of crude in them embark the field itself and then embark it 25th, in fact came on I think they were about 1100 barrels a day. So, I can't tell you know, but one thing about the coldest is called the weather coldest area. If you have to paid from the upper [indiscernible] which is about 6000 feet, ordinary down we are going to drill a well upon the ridge to the [indiscernible] off of the main ridge. This year this is going to go 15,000 feet because we were able to find [indiscernible] in the reserves which is off the ridge. We have structure to the [indiscernible] which is a big gap also the main structures. So we will be drilling wells in the colder proper and America and South America and Russia and all [indiscernible] depths for a number of year. They embark a water platform instance that's is the first upper ___ real wet structures as water forms and the whole western deserts. I mean annual, you know, and now, on each barrel we have ___. So we have tremendous potential in terms of just old-fashioned oil field type work to do in the western deserts.

<Q>: Just, kind of given the successes you had in the last couple of years and the fact that you are going to spend the same amount of capital should we kind of expect to see you the same order of magnitude growth?

<A>: But I think, yes, it is ought to mix up values as you have growth exports but I will tell you there is absolutely no doubt in my mind we can continue to grow production in Egypt and that's why we are there.

<Q>: Thanks a lot.

<A>: Operator, I am going to give him one more question to Steve and the group in London and the rest of you all bear with us. They have a plane to catch and they have a meeting with the Forties team in the morning, and they need to get to Aberdeen tonight. So if we could allow them to take one more question and to the extent that you guys have additional questions, we have people hear in Houston they maybe able to help you out.


# Operator

And that question will come from Kenneth Beer Johnson Rice.

<Q>: Hi guys actually this is the pricing ticking with Bob [indiscernible] the Growth expert, just the reserve growth that you are showing year-over-year, if you held prices flat either at a higher level or at lower level what kind of growth would you have had, I mean, how many – basically how many barrels came on because of price as opposed to on the revision side for performance? Do I recognize that Egypt actually has a negative revision because of the contract there? But kind of net net what would have lost with just flat pricing?

<A>: Lucy you want to take that one.

<A>: Yeah, it looks like all in we picked up in courses of SEC so this is yearend pricing. We expect about 2.4 million barrels equivalent worldwide. As you mentioned we did have a big negative revision in Egypt we took a relatively, you know, equivalent offer in North America that is all pricing-driven.

<Q>: Okay, so net net price was not big determinant.

<A>: Net net we lost in Egypt and we gained a little bit in North America.

<Q>: Okay the downward revision kind of in the international catch hold where did that come from the 14 million?

<A>: It is all price in Egypt.

<Q>: Got you.

<A>: And the reserves are summarized on our web page if you want to know where they are in terms of countries.

<Q>: You know, that's okay I got you. All right thanks guys.

initial

**Company Name: Apache Corp.**
**Company Ticker: APA US**
**Date: 2003-01-30**
**Event Description: Q4 2002 Earnings Call**

**<A>**: If you don't understand the higher the price goes the barrels we need for cost recovery so it's kind of upside down relation.

**<A>**: You know, but it's a nice edge to have because, you know, revision sorted even themselves out with price because of Egypt.

**<Q>**: I got you. Thank you guys. You bet thanks guys.

**<A>**: Thanks Paul.

**<A>**: Thank you all for joining us where we are and we appreciate people in Houston to finish this call so thank you very much.

**<A>**: Moderator if there are no other questions.

## Operator

And we do have a question from Fadel Gheit with Fahnestock.

**<Q>**: Can you imagine Bob I had a question on the gas pricing in Egypt it is the same for offshore and onshore.

**<A>**: We don't have a contract for our offshore gas yet. So we are not sure exactly what it will be.

**<Q>**: So its not settled yet.

**<A>**: No not at all. Now I think it's safe to say you are not going to get a Khalda contact.

**<Q>**: You know not, but the government had not given you any hint of which way they are heading to.

**<A>**: We had a number of discussions with them about both L&G and an onshore contract. I think structurally those contracts would be quite different, but an onshore contract would probably be structurally much like the Khalda contract we have although we are expecting them to put a floor and the ceiling on the price.

**<Q>**: And right now on your onshore six or half a dozen it doesn't matter since its effect oil price, correct?

**<A>**: Yes sir.

**<Q>**: Okay. Thanks.

## Operator

We will go next to Patrick [indiscernible] with Frisco Capital management.

**<Q>**: Hi, I just had a quick question what was the hedge positioned for oil and gas for '03?

**<A>**: For '03, hang on a minute. I can go basically up memory, we have a NYMEX hedge for oil that is from February of '03 through January of '04. It is 50,000 barrels a day and the average price is 25-59. We then have, we have two other oil hedges. One has a 25,000 barrel a day, oil physical hedge that runs for the same period as the NYMEX hedge, it is a Brent-based price 25,000 barrels a day, and price is 25-26. Then picking up that physical hedge the daily volume grows to 40,000 barrel a day again it is a Brent-based price and it is $22 Brent through December of '04. On the gas side, in association with our South Louisiana purchase we put 50 million cubic per day hedges is on from April '03, through June of '05. From April of '03 to December of '03, it's structurally different than the oil hedges which were basically swap oriented and these were [color] oriented. For that first nine-month period it was 354 and 609 ceiling. Then in calendar 2004, again we have 50 million a day with a floor of 31/4 and a ceiling of $5.81 cents, and then from January to June '05 it is 50 million a day 31/4 floor in a 520 ceiling. We also entered into a NYMEX swap for our BP transaction and that's a 118 cubic feet a day at 475, that's a NYMEX price and then continuing on in calendar year '04

Bloomberg Transcript

Bloomberg

**Company Name: Apache Corp.**
**Company Ticker: APA US**
**Date: 2003-01-30**
**Event Description: Q4 2002 Earnings Call**

of same volume of 100 million a day of 433 per MMboe NYMEX. And that's the extent of our hedges.

**<Q>**: Thank you.

**<A>**: Welcome.

## Operator

With a followup question we will return to John Herrlin with Merrill Lynch.

**<Q>**: Hey Bob, they had been articles about some of the L&G players in Egypt being short gas, anybody approached you to try to secure [swap]?

**<A>**: John this is this is Raymond [indiscernible] and basically we are not very much interested in the L&G market nor do we think the Egyptians with their gas demands having actually grown 8 to 12% in a fairly large portion of the country in that base served by the gas at the present time. Therefore there are, you could sort of draw your own conclusions from that.

**<Q>**: Okay thanks, Raymond.

## Operator

And also with a followup question, we return to George Gaspar with Robert W. Baird.

**<Q>**: Thank you, I questioned on the Gulf of Mexico in terms of the acquisition from BP. The initial work that's going to be done on the primary platforms, the 100% ownership, I assume are close to that. Is that going to require platform, drilling rigs to be put on board or will this be jack up type requirements?

**<A>**: I think it is mostly jack up, George.

**<Q>**: Okay, is there any program up the front that you could identify as to how aggressive you might be in terms of taken equipment down through this situation?

**<A>**: George, I think it is a little early. We had a team of people that has been at BP's office really since we announced it and they are high grading and formulating their plans for 2003 and so it's just a little early to make a call on that.

**<Q>**: Okay.

**<A>**: I know, numerically we can but you could unless assure that they are going to hit the water swimming.

**<Q>**: Okay, question on the give back, on the closings of late margined may, based on the current prices, particularly in the Gulf of Mexico on the Gas side which you should really be enjoying being able to maybe get little more give back into the equation before at the closed. What would you estimate now to have that give that total?

**<A>**: Well, that's hard to tell George because we are not sure exactly when we are going to close first of all and what those prices will be. So I'd really hate to allow the number out there at this point.

**<Q>**: Is there a possibility that the closings are going to be other than late March for the Gulf and late May for the North Sea?

**<A>**: That's only a possibility but we continue to believe that's one it will be and then maybe earlier than what we estimate as well.

**<Q>**: Okay, all right. And then last one on China. Can you give me a total all in cost boe for China at the day start up and the reserves – I know that Steve mentioned I think it was 11 – was it $11 million? But what would the total reserve count be on the day of start up and what would the boe cost at that time?

**Company Name: Apache Corp.**
**Company Ticker: APA US**
**Date: 2003-01-30**
**Event Description: Q4 2002 Earnings Call**

**<A>**: Well, about the $11.3 million barrels and we are looking around here to see if somebody has a cost side or – and everything I would mention here is that I am not sure that we are fully booked on that as well, so that was sort of I mean on understood but – I mean -

**<A>**: We are doing the recovery other than to our projection because we still haven't carried down and I can't say that you guys are either [indiscernible] production that triggers the chart. I'll have to get back to the [indiscernible].

**<Q>**: Okay, all right. And just closing on the water flood project in Egypt. How do you develop water for water flood in Egypt?

**<A>**: Water bearing zones.

**<Q>**: Okay, so you are basically are going to extract from water bearing zone to – in Egypt.

**<A>**: Yeah, there has not been much surface water in that area.

**<Q>**: Okay, all right. Thank you.

## Operator

We'll go next to David Tameron with Stifel Nicolaus.

**<Q>**: Hi, good afternoon. Couple of quick questions for you. Just going through the numbers, it looks like CapEx for '03 you are talking about $1112 billion. Is that a correct number that [indiscernible] numbers right?

**<A>**: That's in the ballpark.

**<Q>**: Okay and second question is as far as the North Sea goes is the pipe line capacity such – is the infrastructure in place going forward if you do increase?

**<A>**: There is spare capacity on that line.

**<Q>**: Okay. Thank you very much.

**<A>**: You're welcome.

## Operator

Ladies and gentlemen we have not further question on our rooster at this time. Therefore Mr. [indiscernible] I'll turn the conference over to you for any closing remarks.

Unidentified: Thanks for joining us today and as always Melissa and I will be in our offices. If any body has any follow up questions please feel free to give us a call and we appreciate you joining us. Talk to all of you soon. Thanks bye.

## Operator

Ladies and gentlemen, this does conclude the Apache Corporation fourth quarter and year-end 2002 earnings conference call. We do appreciate your participation. You may disconnect at this time.

*This transcript may not be 100 percent accurate and may contain misspellings and other inaccuracies. This transcript is provided "as is", without express or implied warranties of any kind. Bloomberg retains all rights to this transcript and provides it solely for your personal, non-commercial use. Bloomberg, its suppliers and third-party agents shall have no liability for errors in this transcript or for lost profits, losses, or direct, indirect, incidental, consequential, special or punitive damages in connection with the furnishing, performance or use of such transcript. Neither the*



initial

Company Name: Apache Corp.
Company Ticker: APA US
Date: 2003-01-30
Event Description: Q4 2002 Earnings Call

*information nor any opinion expressed in this transcript constitutes a solicitation of the purchase or sale of securities or commodities. Any opinion expressed in the transcript does not necessarily reflect the views of Bloomberg LP.*

*© COPYRIGHT 2007, BLOOMBERG LP. All rights reserved. Any reproduction, redistribution or retransmission is expressly prohibited.*

Bloomberg Transcript

Bloomberg

# EXHIBIT 5

# APACHE CORP

## FORM 10-K
### (Annual Report)

## Filed 3/25/2003 For Period Ending 12/31/2002

| Address | 2000 POST OAK BLVD ONE POST OAK CENTER STE 100 |
|---|---|
| | HOUSTON, Texas 77056-4400 |
| Telephone | 713-296-6000 |
| CIK | 0000006769 |
| Industry | Oil & Gas Operations |
| Sector | Energy |
| Fiscal Year | 12/31 |

Generated by **EDGAR Online Pro**
http://pro.edgar-online.com



Contact **EDGAR Online**
Customer Service: 203-852-5666
Corporate Sales: 212-457-8200

# UNITED STATES
# SECURITIES AND EXCHANGE COMMISSION
### Washington, D.C. 20549

# FORM 10-K

```
(MARK ONE)
[X]       ANNUAL REPORT PURSUANT TO SECTION 13 OR 15(d)
          OF THE SECURITIES EXCHANGE ACT OF 1934
            FOR THE FISCAL YEAR ENDED DECEMBER 31, 2002,
                              OR


[ ]       TRANSITION REPORT PURSUANT TO SECTION 13 OR 15(d)
          OF THE SECURITIES EXCHANGE ACT OF 1934
            FOR THE TRANSITION PERIOD FROM          TO
```

**COMMISSION FILE NUMBER 1-4300**

# APACHE CORPORATION
### A DELAWARE CORPORATION IRS EMPLOYER NO. 41-0747868

**ONE POST OAK CENTRAL**
**2000 POST OAK BOULEVARD, SUITE 100**
**HOUSTON, TEXAS 77056-4400**
**TELEPHONE NUMBER (713) 296-6000**

**Securities Registered Pursuant to Section 12(b) of the Act:**

| TITLE OF EACH CLASS | NAME OF EACH EXCHANGE ON WHICH REGISTERED |
|---|---|
| Common Stock, $1.25 par Value | New York Stock Exchange Chicago Stock Exchange |
| Preferred Stock Purchase Rights | New York Stock Exchange Chicago Stock Exchange |
| Automatically Convertible Equity Securities Conversion Preferred Stock, 6.5% Series C | New York Stock Exchange Chicago Stock Exchange |
| 9.25% Notes due 2002 | New York Stock Exchange |
| Apache Finance Canada Corporation 7.75% Notes Due 2029 Irrevocably and Unconditionally Guaranteed by Apache Corporation | New York Stock Exchange |

**Securities registered Pursuant to Section 12(g) of the Act: NONE**

Indicate by check mark whether the registrant (1) has filed all reports required to be filed by Section 13 or 15(d) of the Securities Exchange Act of 1934 during the preceding 12 months (or for such shorter period that the registrant was required to file such reports), and (2) has been subject to such filing requirements for the past 90 days. Yes [X] No [ ]

Indicate by check mark if disclosure of delinquent filers pursuant to Item 405 of Regulation S-K is not contained herein, and will not be contained, to the best of registrant's knowledge, in definitive proxy or information statements incorporated by reference in Part III of this Form 10-K or any amendment to this Form 10-K. [ ]

Indicate by check whether registrant is an accelerated filer (as defined in Rule 12b-2 of the Act). [ ]

```
          Aggregate market value of the voting and non-voting common
```

```
equity held by non-affiliates of registrant as of June 28,
   2002.......................................................   $8,212,561,395
Number of shares of registrant's common stock outstanding as
   of February 28, 2003.....................................      153,850,136
```

**DOCUMENTS INCORPORATED BY REFERENCE:**

Portions of registrant's proxy statement relating to registrant's 2003 annual meeting of stockholders have been incorporated by reference into Part III hereof.

# TABLE OF CONTENTS

## DESCRIPTION

| ITEM | | PAGE |
|---|---|---|
| | PART I | |
| 1. | BUSINESS........................................................... | 1 |
| 2. | PROPERTIES......................................................... | 13 |
| 3. | LEGAL PROCEEDINGS.................................................. | 13 |
| 4. | SUBMISSION OF MATTERS TO A VOTE OF SECURITY HOLDERS......... | 13 |
| | PART II | |
| 5. | MARKET FOR THE REGISTRANT'S COMMON EQUITY AND RELATED STOCKHOLDER MATTERS...................................... | 13 |
| 6. | SELECTED FINANCIAL DATA............................................ | 14 |
| 7. | MANAGEMENT'S DISCUSSION AND ANALYSIS OF FINANCIAL CONDITION AND RESULTS OF OPERATIONS.................................... | 15 |
| 7A. | QUANTITATIVE AND QUALITATIVE DISCLOSURES ABOUT MARKET RISK................................................................. | 29 |
| 8. | FINANCIAL STATEMENTS AND SUPPLEMENTARY DATA................. | 31 |
| 9. | CHANGES IN AND DISAGREEMENTS WITH ACCOUNTANTS ON ACCOUNTING AND FINANCIAL DISCLOSURE................................... | 32 |
| | PART III | |
| 10. | DIRECTORS AND EXECUTIVE OFFICERS OF THE REGISTRANT.......... | 32 |
| 11. | EXECUTIVE COMPENSATION............................................ | 32 |
| 12. | SECURITY OWNERSHIP OF CERTAIN BENEFICIAL OWNERS AND MANAGEMENT......................................................... | 32 |
| 13. | CERTAIN RELATIONSHIPS AND RELATED TRANSACTIONS............. | 32 |
| 14. | CONTROLS AND PROCEDURES...................................... | 32 |
| | PART IV | |
| 15. | EXHIBITS, FINANCIAL STATEMENT SCHEDULES, AND REPORTS ON FORM 8-K............................................................... | 33 |

All defined terms under Rule 4-10(a) of Regulation S-X shall have their statutorily prescribed meanings when used in this report. Quantities of natural gas are expressed in this report in terms of thousand cubic feet (Mcf), million cubic feet (MMcf), billion cubic feet (Bcf) or trillion cubic feet (Tcf). Oil is quantified in terms of barrels (bbls); thousands of barrels (Mbbls) and millions of barrels (MMbbls). Natural gas is compared to oil in terms of barrels of oil equivalent (boe) or million barrels of oil equivalent (MMboe). Oil and natural gas liquids are compared with natural gas in terms of million cubic feet equivalent (MMcfe) and billion cubic feet equivalent (Bcfe). One barrel of oil is the energy equivalent of six Mcf of natural gas. Daily oil and gas production is expressed in terms of barrels of oil per day (b/d) and thousands or millions of cubic feet of gas per day (Mcf/d and MMcf/d, respectively) or millions of British thermal units per day (MMBtu/d). Gas sales volumes may be expressed in terms of one million British thermal units (MMBtu), which is approximately equal to one Mcf. With respect to information relating to our working interest in wells or acreage, "net" oil and gas wells or acreage is determined by multiplying gross wells or acreage by our working interest therein. Unless otherwise specified, all references to wells and acres are gross.

PART I

## ITEM 1. BUSINESS

### GENERAL

Apache Corporation, a Delaware corporation formed in 1954, is an independent energy company that explores for, develops and produces natural gas, crude oil and natural gas liquids. In North America, our exploration and production interests are focused in the Gulf of Mexico, the Gulf Coast, the Permian Basin, the Anadarko Basin and the Western Sedimentary Basin of Canada. Outside of North America we have exploration and production interests offshore Western Australia, offshore and onshore Egypt, offshore The People's Republic of China and onshore Argentina, and exploration interests in Poland. Our common stock, par value $1.25 per share, has been listed on the New York Stock Exchange since 1969, and on the Chicago Stock Exchange since 1960. Through our website, http://www.apachecorp.com, you can access electronic copies of documents Apache files with the Securities and Exchange Commission (SEC), including our annual reports on Form 10-K, quarterly reports on Form 10-Q and current reports on Form 8-K and any amendments to these reports. Access to these electronic filings is available as soon as practicable after filing with the SEC.

We hold interests in many of our U.S., Canadian and international properties through operating subsidiaries, such as Apache Canada Ltd., DEK Energy Company (DEKALB), Apache Energy Limited (AEL), Apache International, Inc., and Apache Overseas, Inc. Properties referred to in this document may be held by those subsidiaries. We treat all operations as one line of business.

### 2002 RESULTS

Apache posted a very good year. Rising prices and production within one percent of 2001's record levels combined to make 2002 our third best year in terms of earnings and cash flow. Strong financial performance coupled with curtailed capital spending enabled us to achieve our primary 2002 objective of enhancing our financial flexibility. Our conservative approach to capital spending through most of 2002 enabled us to further strengthen our balance sheet and maintain a senior unsecured long-term debt rating of A3 from Moody's, and A- from Standard and Poor's and Fitch rating agencies, all of which were reaffirmed by those agencies after the announcement of our largest acquisition to-date following year-end from BP p.l.c. (BP). Our 2002 income attributable to common stock totaled $544 million on total revenues of $2.6 billion, while cash provided by operating activities was $1.4 billion, a 28 percent decrease from 2001. Our average daily production for the year was 161 Mbbls of oil and natural gas liquids and 1,080 MMcf of natural gas.

We increased our total reserves by four percent, compared with the end of 2001, resulting in 1,313 MMboe of estimated proved reserves at year-end, 51 percent of which were natural gas. Even though Apache did not pursue an active acquisition program for most of 2002, at the end of the year we began seeking acquisitions of additional properties. We completed two acquisitions of producing properties in Canada and one in South Louisiana, described below in the discussion of our U.S. and Canadian operations. In January 2003, we agreed to purchase properties from subsidiaries of BP in the Gulf of Mexico and in the North Sea offshore the United Kingdom for $1.3 billion (subject to normal closing adjustments and the exercise of preferential rights by third parties), which will be our largest acquisition to-date. The Company closed the Gulf of Mexico portion on March 13, 2003 at an adjusted price of $509 million, which has estimated proved reserves of 72.2 MMboe. The price was adjusted from the originally announced $670 million to account for the exercise of preferential rights by third parties involved in some of the properties (a reduction of $70 million), production and expenses since January 1, 2003, the effective date of the transaction, and other minor adjustments. The North Sea portion is expected to close early in the second quarter of 2003. The acquisition is being funded by a combination of proceeds from the equity offering we completed in January 2003, cash from our operations and debt.

Per share results have been adjusted for the 10 percent common stock dividend paid on January 21, 2002, to our shareholders of record on December 31, 2001, and the five percent common stock dividend to be paid on April 2, 2003, to our shareholders of record on March 12, 2003. The stock dividends reflect our board of

1

directors' belief that we can reward our shareholders while remaining focused on our primary objective of building Apache to last by achieving profitable growth.

## OUR GROWTH STRATEGY

Throughout our 48-year history, Apache has been and continues to be driven to grow. It is a constant pursuit and part of our culture. However, it is tempered by the desire to grow economically rather than to grow at any price.

At this point in our progression we have developed our abilities to grow through drilling, through acquisitions, or through a combination of both, depending on what the environment gives us.

As indicated in this section a year ago, early in 2002, we planned to reduce spending on both drilling and acquisition opportunities in favor of paying down debt and adding financial flexibility. This was not driven by a weak balance sheet (in fact our balance sheet was then among the strongest in our sector), it was driven by a highly uncertain industry and economic environment in which drilling costs were relatively high and prices, for natural gas in particular, were relatively low and extremely volatile. In addition, our assessment was that with reasonably priced properties unavailable for purchase, it was prudent to curtail capital expenditures and wait for better opportunities to present themselves.

As drilling costs came down and product prices rose during 2002, Apache authorized incremental drilling and operating capital increases. For example, when quality properties became available in South Louisiana at year-end from a privately-held company at a reasonable price, we acted. Despite these drilling and acquisition capital increases, Apache's 2002 capital expenditures approximated half those of the prior year, driving a reduction in debt as a percent of capitalization. Using a strict definition to calculate debt as a percentage of capitalization, Apache's ratio dropped to 30 percent at year-end 2002 from 34 percent a year earlier. However, the strict measurement ignores two important considerations particular to Apache's situation. Our balance sheet includes preferred interests of subsidiaries ($437 million and $441 million at December 31, 2002 and 2001, respectively) which, although not debt, are redeemable under certain circumstances and, in our opinion, should be included in the calculation. We also occasionally have short-term investments and cash balances ($52 million and $139 million at December 31, 2002 and 2001, respectively), both of which are available to pay down debt and, in our opinion, should be subtracted from debt. Allowing for both of these factors, Apache's adjusted debt-to-capitalization ratio was 34 percent at year-end, higher than the strict formula, but below the comparable 37 percent ratio at the end of 2001. We believe this is a more conservative way of expressing this ratio.

Apache's financial discipline paid off. Not only were our 2002 finding and acquisition costs quite competitive within our industry sector, our financial strength left us as the only publicly traded independent in the U.S. with a single-A rating by both Moody's and Standard and Poor's.

Our strategy provided us with the financial wherewithal sufficient to pursue the asset acquisition from BP. This transaction took only 35 days from initial discussions on December 9, 2002 to the signing of a purchase and sale agreement and announcement on January 13, 2003. With completion of this purchase, Apache's production and reserve growth is virtually assured for 2003, if our assumptions regarding prices and the opportunities available on the BP properties are correct. Given the existing outlook for high commodity prices, we expect the BP acquisition to be accretive to both cash flow and earnings.

Looking ahead, we will continue to pursue growth that is economic, whether it is through drilling, acquisitions, or both. Although we review industry conditions and our capital expenditures constantly, present conditions are quite attractive for both drilling and acquisitions and are likely to lead to increases in drilling and acquisition expenditures in 2003.

## REVIEW OF COMPANY'S WORLDWIDE OPERATING AREAS

Our portfolio approach provides diversity in terms of hydrocarbon mix (oil or gas), geologic risk and geographic location. In each of our core producing areas, we have built teams that have the technical

2

knowledge, sense of urgency and the desire to wring more out of Apache's assets. Our local expertise also provides an advantage in day-to-day operations and when acquisition opportunities arise in our core areas.

We currently have interests in seven countries: the United States, Canada, Egypt, Australia, China, Poland and Argentina. After closing the BP transaction, we will add a new core area, the U.K. North Sea. In the U.S., our exploration and production activities are divided into two regions: Gulf Coast and Central. In 2001, Apache had three domestic regions, which were reconfigured into the current two in April 2002. At year-end, approximately 78 percent of our estimated proved reserves were located in North America. Outside North America, our exploration and production activities are focused primarily in Egypt and Australia. Additionally, we have a development project underway in China that is expected to commence production in 2003, and we have a small production interest in Argentina. We also own exploration acreage in Poland.

The table below sets out a brief comparative summary of certain 2002 data for our core geographic areas. More detailed information regarding the natural gas, oil, and natural gas liquids (NGLs) production and average prices received in 2002, 2001 and 2000 for the core geographic areas is available in Management's Discussion and Analysis of Financial Condition and Results of Operations in Item 7 of this Form 10-K. In addition, information concerning the amount of revenue, expenses, operating income (loss) and total assets attributable to each of the same geographic areas is set forth in Note 15, Supplemental Oil and Gas Disclosures (Unaudited), and Note 14, Business Segment Information, both in Item 15 of this Form 10-K.

| Region/Country: | 2002 PRODUCTION (IN MMBOE) | 2002 PRODUCTION REVENUE (IN MILLIONS) | 12/31/02 ESTIMATED PROVED RESERVES (IN MMBOE) | PERCENTAGE OF TOTAL ESTIMATED PROVED RESERVES | 2002 GROSS NEW WELLS DRILLED | 2002 GROSS NEW PRODUCING WELLS COMPLETED |
|---|---|---|---|---|---|---|
| Gulf Coast.............. | 32.2 | $ 699.5 | 276.3 | 21.0% | 56 | 41 |
| Central................. | 20.2 | 401.9 | 354.4 | 27.0 | 138 | 127 |
| Total U.S. ........... | 52.4 | 1,101.4 | 630.7 | 48.0 | 194 | 168 |
| Canada.................. | 29.9 | 557.7 | 386.8 | 29.5 | 836 | 799 |
| Total North America.... | 82.3 | 1,659.1 | 1,017.5 | 77.5 | 1,030 | 967 |
| Egypt................... | 23.4 | 560.1 | 136.6 | 10.4 | 59 | 45 |
| Australia............... | 18.2 | 334.0 | 145.2 | 11.1 | 25 | 10 |
| China................... | -- | -- | 11.3 | 0.9 | -- | -- |
| Poland.................. | -- | -- | -- | -- | -- | -- |
| Argentina............... | 0.7 | 6.5 | 1.9 | 0.1 | -- | -- |
| Total International.... | 42.3 | 900.6 | 295.0 | 22.5 | 84 | 55 |
| Total.................. | 124.6 | $2,559.7 | 1,312.5 | 100.0% | 1,114 | 1,022 |

The following core area discussions include references to the 2003 Plan. These represent initial estimates only and will be reviewed and revised throughout the year in light of changing industry conditions.

### United States

In the U.S. we completed one significant acquisition during the year with the purchase of 234,000 net acres in South Louisiana, holding estimated net proved reserves of 178 Bcf of gas equivalent, together with access to 849 square miles of 3-D seismic data and fee interests in most of the acreage, for $259 million. Anticipated net daily production from these properties is expected to approximate 55 MMcf of natural gas and 2,100 barrels of oil in 2003. The transaction was effective December 1, 2002. We also entered into a separate exploration joint venture with the seller under which the seller will generate exploration prospects on certain South Louisiana acreage for a total cost of $25 million over two years. The new properties are in our Gulf Coast region.

3

Our curtailment of capital spending in the first half of the year did not stop us from having a busy year in the U.S. we completed 168 out of 194 total wells and replaced 71 percent of our domestic production through drilling. A continuing goal is to drill quality prospects in and around our large domestic reserve and production bases.

Gulf Coast -- The Gulf Coast region comprises our interests in and along the Gulf of Mexico, primarily in the areas in and offshore Louisiana and Texas. In 2002, the Gulf Coast region was our leading region for production volumes and revenues. This region performed 586 workover and recompletion operations during 2002 and completed 41 out of 56 total wells drilled. As of year-end 2002, Gulf Coast accounted for 21 percent of our estimated proved reserves. In 2003, we currently plan on spending approximately $350 million drilling an estimated 90 wells and continuing our production enhancement program and exploiting the properties acquired from BP in March 2003.

Central -- The Central region includes assets in the Permian Basin of west Texas and New Mexico, the San Juan Basin of New Mexico, east Texas and the Anadarko Basin of western Oklahoma. At year-end 2002, the Central region accounted for 27 percent of our estimated proved reserves, the second largest in the company. During 2002, we participated in 138 wells, 127 of which were completed as productive wells, replacing 96 percent of the region's production from drilling. Apache performed 519 workovers and recompletions in the region during the year. In 2003, we currently plan to spend approximately $100 million drilling an estimated 200 wells and continuing our production enhancement programs.

Marketing -- In July 1998, we entered into a gas purchase agreement with Cinergy Marketing and Trading, LLC (Cinergy) to market most of our U.S. natural gas production for a 10-year period, with an option by either party, after prior notice, to terminate after six years. We also agreed to work with Cinergy to develop terms for the marketing of most of our Canadian gas production. In December 1998, however, Apache and Cinergy agreed to postpone the negotiation of Canadian gas sales terms. During the period of the gas purchase agreement, we are generally obligated to deliver our domestic gas production to Cinergy and, under certain circumstances, may have to make payments to Cinergy if certain gas throughput thresholds are not met. All throughput thresholds have been met to date. The prices received for our gas production under this agreement are based on published indexes. Disputes have arisen between Cinergy and Apache concerning various matters, including Cinergy's claim to market our Canadian gas production. As a result, in September 2001, Cinergy commenced an arbitration proceeding seeking, among other things, specific performance to require us to sell our Canadian gas production to Cinergy or pay damages. We are disputing Cinergy's assertions (including their claim to market our Canadian production), filing a general denial and counterclaim against Cinergy for amounts arising from, among other things, an audit commenced in 2001. We do not believe the arbitration outcome will be material to our financial position or results of operations. We continue to market most of our U.S. gas production through Cinergy, although we are actively discussing with Cinergy our gas marketing arrangements and a resolution of our disputes.

We used long-term, fixed-price physical contracts to lock in a portion of our domestic future natural gas production at a fixed price. These contracts represented approximately 11 percent of our 2002 domestic natural gas production. The contracts provide protection to the Company in the event of decreasing natural gas prices.

We market our own U.S. crude oil with most of it sold through lease-level marketing to refiners, traders and transporters. Contracts are generally less than 30 days and renew automatically until canceled. The oil contracts provide for sales at specified prices, or at prices that change with market conditions.

### Canada

Our exploration and development activity in the Canadian region is concentrated in the Provinces of Alberta, British Columbia, Saskatchewan and the Northwest Territories. The region comprises 30 percent of our estimated proved reserves, the largest in the Company. We hold over four million net acres in Canada, the largest of the North American regions.

4

2002 -- We completed two acquisitions in Alberta, Canada, purchasing properties in August from Burlington Resources affiliates with estimated proved reserves of 4.8 MMboe for $26 million and completing the purchase of properties from Canadian affiliates of ConocoPhillips in October with estimated proved reserves of 10.7 MMboe for $60 million. Canada was our most active region for drilling in 2002, with Apache participating in 836 gross wells, 799 of which were completed as producers. We also conducted 707 workover and recompletion projects. We replaced 144 percent of our Canadian production through drilling and another 54 percent through acquisition.

2003 -- We currently plan to spend approximately $400 million drilling an estimated 900 wells, continuing the exploration program, the exploitation of the acquired properties and developing our gas processing infrastructure.

Marketing -- Our Canadian natural gas sales include sales to supply aggregators, to whom we dedicate reserves, and direct sales to brokers and end-users in the United States and Canada. With the expansion of pipeline transport capacity out of Canada in recent years, Canadian prices have strengthened and become more closely correlated to United States domestic prices. To diversify our market exposure, we transport natural gas via our firm transportation contracts to California (12 MMcf/d), the Chicago area (40 MMcf/d), and Eastern Canada (2 MMcf/d), which are included in Note 11, under Item 15 of this Form 10-K. Pursuant to an agreement entered into in 1994, we are also selling 5 MMcf/d of natural gas to the Hermiston Cogeneration Project, located in the Pacific Northwest of the United States. In 1996, we entered an agreement to sell 5 MMcf/d into Michigan over a 10-year term. In 2002, with the acquisition from ConocoPhillips, we entered into two agreements to sell 5 MMcf/d each into the Northeastern U.S. with one terminating in 2007 and the other in 2008, 3 MMcf/d to an Eastern Canadian Cogeneration project until 2011, and 5 MMcf/d to a broker netback pool until 2005. The prices we receive under these contracts are generally based on market indices.

Oil and NGLs produced from our Canadian properties are sold to crude oil purchasers or refiners at market prices, which depend on worldwide crude prices adjusted for transportation and crude quality.

## Egypt

In Egypt, our operations are generally conducted pursuant to production sharing contracts under which contractor partners pay all operating and capital costs for exploration and development. A percentage of the production, usually up to 40 percent, is available to the contractor group to recover operating and capital costs. The balance of the production is allocated between this contractor group and the Egyptian General Petroleum Corporation (EGPC) on a contractually defined basis. Apache is the largest leaseholder and the most active driller in the Western Desert. Egypt is the country with our largest single acreage position. As of December 31, 2002, we held over 6.9 million net acres encompassing 13 concessions (12 operated). Apache is the largest producer of liquid hydrocarbons and the second largest producer of natural gas in the Western Desert and operates 11 percent of Egypt's daily oil and gas output.

2002 -- Egypt accounted for 22 percent of production revenues on 19 percent of total production for the year and accounted for 10 percent of total proved reserves at December 31, 2002. During the year we increased production significantly in Egypt. Net oil production grew by 12 percent and net gas production by 28 percent over the prior year. The production growth occurred in most of our concessions, with the most significant increases being in the South Umbarka concession, where gross oil and condensate production increased from 2,520 b/d to 9,650 b/d (a 283 percent increase), and the Umbarka concession, where gross oil production increased from 1,277 b/d to 7,127 b/d or 458 percent. Also, three concessions (Ras Kanayes, Matruh, and Northeast Abu Gharadig) commenced production in 2002.

Apache had an active onshore drilling program in Egypt, completing 45 of 55 gross wells, for a success rate of 82 percent. The onshore program was weighted more than 75 percent to development activity with the remaining to exploration drilling. Apache also drilled four successful exploration wells in the deepwater portion of the West Mediterranean block, including the first deepwater oil discovered in the Nile Delta at the El King-1X well. On March 4, 2003, we announced that the fifth deepwater well had successfully appraised the earlier discoveries. No reserves have been recorded to-date for the deepwater wells. Reserve recognition

and proper scaling of the significant future development infrastructure are pending negotiation and completion of a sales contract for this gas with EGPC.

Apache made six new field discoveries onshore in 2002. The most significant were Selkit 1X in the South Umbarka concession, which flowed 5,103 b/d from Kharita sands; Emerald 1X in the Ras El Hekma concession, which flowed 16.9 MMcf/d and 4,285 b/d of condensate from the AEB 6 sand; and the Tut 52 in the Khalda concession, which flowed 29.2 MMcf/d and 781 b/d of condensate from Khatatba sands. In addition to these larger discoveries, Apache also had three new field discoveries in its East Bahariya concession and drilled 10 consecutive successful development wells.

2003 -- We currently plan to spend approximately $250 million to drill more than 100 wells and continue exploitation.

Marketing -- In 1996, we and our partners in the Khalda Block entered into a take-or-pay contract with EGPC, which obligates EGPC to pay for 75 percent of 200 MMcf/d of future production of gas from the Khalda Block. In late 1997, the same partners entered into a supplement to the contract with EGPC to sell an additional 50 MMcf/d. In connection with our acquisition of interests from Repsol YPF (Repsol) in 2001, we acquired rights under an existing gas sales contract for 25 MMcf/d from the South Umbarka area. Gas sales from the contracts are based on a price that is the energy equivalent of 85 percent of the price of Suez Blend crude oil, FOB Mediterranean port. Sales of gas under the contract began in 1999 upon completion of a gas pipeline from the Khalda Block. In 2000, other producers agreed to accept a negotiated price with a group of industry players for an alternative gas pricing formula for certain quantities of gas purchased from them. This "Industry Pricing" is a sliding scale based on Dated-Brent crude oil with a minimum of $1.50 per MMbtu and a maximum of $2.65 per MMbtu. These latest agreements do not impact our existing gas sales contracts in the Khalda Block or at Qarun. However, we have entered into new gas sales contracts containing "Industry Pricing" at our Matruh, Ras Kanayes, Ras El Hekma, and Akik development leases.

In Egypt, oil from the Qarun concession and other nearby Western Desert blocks is delivered by pipeline to tanks at the Dashour tank farm northeast of the Qarun Block. At the discretion of Arab Petroleum Pipeline Company, the operator of the SUMED pipelines, oil from the Qarun Block is pumped into the 42-inch diameter pipelines, which transport significant quantities of Egyptian and other crude oil from the Gulf of Suez to Sidi Kerir on the Mediterranean Coast. Alternatively, oil can be transported via pipeline owned by Petroleum Pipeline Company (PPC) to the Mostorad Refinery south of Cairo. In Egypt, all our oil production is sold to EGPC on a spot basis at a "Western Desert" price (indexed to Brent Crude Oil). We have the right to export our Egyptian crude oil production, however, EGPC has first call on the purchase of our Egyptian crude oil and has exercised this right. We expect EGPC to continue to exercise its call right. Deteriorating economic conditions during 2001 and 2002 in Egypt have lessened the availability of U.S. dollars, resulting in a one to two month delay in receipts from EGPC. While the delay in payment has not significantly improved or deteriorated in 2002, continuation of the hard currency shortage in Egypt could lead to further delays, deferrals of payment or non-payment in the future.

### Australia

2002 -- We produced 18.2 MMboe in Australia (15 percent of our total) generating $334 million of production revenues. Estimated proved reserves in Australia were 11 percent of our year-end total. During the year we participated in drilling 25 wells, 10 completed as producers, and in five workover and recompletion projects.

We had a successful exploration year in Australia, with discoveries at Double Island, Victoria, Pedirka, and Little Sandy in the first quarter of the year. Production from the Victoria, Pedirka, and Little Sandy oil fields commenced in November 2002, eight months from discovery, while the Double Island oil development began production in February 2003, 12 months after discovery. There were three additional discoveries over the remainder of the year at Hoover, South Simpson, and Endymion.

On the development side, we had six new oil fields and one new gas field that commenced production during 2002 in the Carnarvon Basin offshore Western Australia. The Gibson and South Plato oil fields

6

(68.5 percent interest) were developed from a common facility and brought on-line in June 2002 at a combined initial average rate of 10,400 gross barrels of oil per day. The South Simpson oil field (68.5 percent interest) was placed on production in October at an average initial rate of 3,000 gross barrels of oil per day. The Victoria, Pedirka, and Little Sandy oil fields (68.5 percent interest) were developed from a common facility and commenced production in November at a combined average rate of 10,000 barrels of oil per day. The Endymion gas field (68.5 percent interest) commenced production in November at an average initial rate of 18 MMcf/d.

2003 -- In February 2003, Apache brought the Double Island oil development (68.5 percent interest) on-line at an average rate of 8,000 barrels of oil per day. For 2003, we have budgeted expenditures of $100 million for an estimated 30 exploration wells, five development wells, and various production development, enhancement and other capital projects.

Marketing -- In Australia we entered into two new gas sales contracts and extended two existing gas sales contracts during 2002, bringing our total to 25 contracts. In aggregate, we committed a further 655 Bcf for delivery. Under the largest contract, we will supply more than 600 Bcf over a 25-year period commencing in July 2005. Our total Australian delivery rates are expected to average approximately 100 MMcf/d in 2003. Generally, natural gas is sold in Western Australia by AEL under long-term contracts, many of which contain escalation clauses that provide for an annual increase in the contract price based on the Australian consumer price index. The contract price escalates at an average of 80 percent of the index. These contracts reduce gas price volatility in Australia.

## Other International

We have exploration and production interests offshore China and in Argentina, and exploration interests in Poland.

We are the operator, with a 24.5 percent interest, of the Zhao Dong Block in Bohai Bay, offshore China. In 1994 and 1995, discovery wells tested at rates between 1,300 and 4,000 b/d of oil. In early 1997, one well tested at rates up to 11,571 b/d of oil and another tested at rates up to 15,359 b/d. An overall development plan for the C and D Fields in the Zhao Dong Block was approved by Chinese authorities in December 2000. Work commenced in 2001 with the awarding of contracts for development drilling and the construction of production facilities in accordance with the approved overall development plan. We currently plan to spend an estimated $25 million this year. First production is expected in the second half of 2003.

We obtained our first acreage position in Poland in 1997 when we assumed operatorship and a 50 percent interest in over 5.5 million gross acres from FX Energy, Inc. At year-end 2002, we had 1,353,307 net undeveloped acres in Poland. In 2002, we recorded additional impairments to our properties in Poland, as described in Item 7 of this Form 10-K. At December 31, 2002, the Company had $13 million of unproved property costs remaining. Apache is considering various alternatives for maximizing the value of the Poland assets, including sale to a third party. This evaluation may result in additional impairments in 2003.

In 2001, we acquired exploration and production assets of Fletcher Challenge and Anadarko Petroleum in Argentina. After these transactions, we held interests in a number of blocks in Argentina's Neuquen basin. We are the operator, with a 100 percent interest, of the Lindero de Piedra and El Santigueno Blocks. We also hold interests in the following blocks: Agua Salada (30 percent), Faro Virgenes (20 percent), CNQ-16 (seven percent) and CNQ-16A (25 percent). For the year, these interests held less than one percent of our proved reserves and generated small amounts of production and revenue. Our total net acreage in Argentina is 367,690 acres, with 324,790 developed and 42,900 undeveloped at year-end 2002. In light of the social and economic turmoil in Argentina, we have limited our investments. Hence, our 2003 Plan does not presently contemplate any drilling activity. Our staff will concentrate on identifying opportunities and strategies for growth that might be implemented in anticipation of improved political and economic conditions.

**DRILLING STATISTICS**

Worldwide, in 2002, we participated in drilling 1,114 gross new wells, with 1,022 (92 percent) completed as producers. Canada was our most active region, drilling 836 gross new wells, 599 of which were shallow development wells drilled in the Hatton field. Canada's success rate was 96 percent. We also performed over 2,066 major workovers and recompletions during the year. Our drilling activities in the United States generally concentrate on exploitation of existing, producing fields rather than exploration. As a general matter, our international and Canadian drilling activities focus more on exploration drilling. In addition to our completed wells at year-end, we were participating in several wells that had not yet reached completion: four in the U.S. (2.5 net); three in Canada (2.1 net); nine in Egypt (7.2 net); and one in Australia (0.7 net).

The following table shows the results of the oil and gas wells drilled and tested for each of the last three fiscal years:

| | NET EXPLORATORY | | | NET DEVELOPMENT | | | TOTAL NET WELLS | | |
|---|---|---|---|---|---|---|---|---|---|
| | PRODUCTIVE | DRY | TOTAL | PRODUCTIVE | DRY | TOTAL | PRODUCTIVE | DRY | TOTAL |
| **2002** | | | | | | | | | |
| United States............... | 3.0 | 3.5 | 6.5 | 92.8 | 17.1 | 109.9 | 95.8 | 20.6 | 116.4 |
| Canada...................... | 25.9 | 10.1 | 36.0 | 714.2 | 20.4 | 734.6 | 740.1 | 30.5 | 770.6 |
| Egypt....................... | 7.7 | 7.0 | 14.7 | 32.3 | 6.0 | 38.3 | 40.0 | 13.0 | 53.0 |
| Australia................... | 6.3 | 7.6 | 13.9 | 1.3 | -- | 1.3 | 7.6 | 7.6 | 15.2 |
| Other International.......... | -- | -- | -- | -- | -- | -- | -- | -- | -- |
| Total................ | 42.9 | 28.2 | 71.1 | 840.6 | 43.5 | 884.1 | 883.5 | 71.7 | 955.2 |
| **2001** | | | | | | | | | |
| United States............... | 5.9 | 4.4 | 10.3 | 202.9 | 32.0 | 234.9 | 208.8 | 36.4 | 245.2 |
| Canada...................... | 0.7 | 7.0 | 7.7 | 348.4 | 17.2 | 365.6 | 349.1 | 24.2 | 373.3 |
| Egypt....................... | 4.5 | 4.5 | 9.0 | 25.0 | 7.5 | 32.5 | 29.5 | 12.0 | 41.5 |
| Australia................... | 1.4 | 5.2 | 6.6 | 5.0 | 2.6 | 7.6 | 6.4 | 7.8 | 14.2 |
| Other International.......... | -- | 3.4 | 3.4 | 0.3 | -- | 0.3 | 0.3 | 3.4 | 3.7 |
| Total................ | 12.5 | 24.5 | 37.0 | 581.6 | 59.3 | 640.9 | 594.1 | 83.8 | 677.9 |
| **2000** | | | | | | | | | |
| United States............... | 5.8 | 9.1 | 14.9 | 201.0 | 41.6 | 242.6 | 206.8 | 50.7 | 257.5 |
| Canada...................... | 1.0 | 7.0 | 8.0 | 58.7 | 11.7 | 70.4 | 59.7 | 18.7 | 78.4 |
| Egypt....................... | 5.0 | 5.8 | 10.8 | 9.7 | 1.6 | 11.3 | 14.7 | 7.4 | 22.1 |
| Australia................... | 1.4 | 13.7 | 15.1 | 4.3 | -- | 4.3 | 5.7 | 13.7 | 19.4 |
| Other International.......... | -- | 0.9 | 0.9 | -- | -- | -- | -- | 0.9 | 0.9 |
| Total................ | 13.2 | 36.5 | 49.7 | 273.7 | 54.9 | 328.6 | 286.9 | 91.4 | 378.3 |

**PRODUCTIVE OIL AND GAS WELLS**

The number of productive oil and gas wells, operated and non-operated, in which we had an interest as of December 31, 2002, is set forth below:

|  | GAS | | OIL | | TOTAL | |
|---|---|---|---|---|---|---|
|  | GROSS | NET | GROSS | NET | GROSS | NET |
| Gulf Coast | 895 | 560 | 995 | 690 | 1,890 | 1,250 |
| Central | 2,488 | 1,233 | 3,242 | 1,992 | 5,730 | 3,225 |
| Canada | 4,445 | 3,858 | 2,555 | 1,037 | 7,000 | 4,895 |
| Egypt | 23 | 21 | 201 | 185 | 224 | 206 |
| Australia | 9 | 5 | 38 | 19 | 47 | 24 |
| Argentina | 23 | 6 | 31 | 20 | 54 | 26 |
| Total | 7,883 | 5,683 | 7,062 | 3,943 | 14,945 | 9,626 |

**GROSS AND NET UNDEVELOPED AND DEVELOPED ACREAGE**

The following table sets out our gross and net acreage position in each country where we have operations.

|  | UNDEVELOPED ACREAGE | | DEVELOPED ACREAGE | |
|---|---|---|---|---|
|  | GROSS ACRES | NET ACRES | GROSS ACRES | NET ACRES |
| United States | 1,092,822 | 632,970 | 2,116,100 | 1,232,026 |
| Canada | 3,225,171 | 2,493,056 | 2,686,271 | 1,853,500 |
| Egypt | 9,406,675 | 5,957,898 | 1,106,823 | 992,516 |
| Australia | 8,518,240 | 4,179,110 | 467,770 | 274,470 |
| China | 5,314 | 2,657 | 5,911 | 1,448 |
| Poland | 1,471,524 | 1,353,307 | -- | -- |
| Argentina | 191,418 | 42,900 | 520,572 | 324,790 |
| Total Company | 23,911,164 | 14,661,898 | 6,903,447 | 4,678,750 |

**ESTIMATED PROVED RESERVES AND FUTURE NET CASH FLOWS**

As of December 31, 2002, Apache had total estimated proved reserves of 637 million barrels of crude oil, condensate and NGLs and 4.1 Tcf of natural gas. Combined, these total estimated proved reserves are equivalent to 1.3 billion barrels of oil or 7.9 Tcf of gas. The company's reserves have grown for the 17th consecutive year. Estimated proved developed reserves comprise 72 percent of our total estimated proved reserves on a boe basis.

The Company's estimates of proved reserves and proved developed reserves at December 31, 2002, 2001 and 2000, changes in proved reserves during the last three years, and estimates of future net cash flows and discounted future net cash flows from proved reserves are contained in Footnote 15, Supplemental Oil and Gas Disclosures (Unaudited), in the Apache Corporation 2002 Consolidated Financial Statements of Item 15 of this Form 10-K.

Proved oil and gas reserves are the estimated quantities of natural gas, crude oil, condensate and NGLs that geological and engineering data demonstrate with reasonable certainty to be recoverable in future years from known reservoirs under existing economic and operating conditions. Reserves are considered proved if economical producibility is supported by either actual production or conclusive formation tests. Reserves that can be produced economically through application of improved recovery techniques are included in the "proved" classification when successful testing by a pilot project or the operation of an installed program in the reservoir provides support for the engineering analysis on which the project or program is based. Proved developed oil and gas reserves can be expected to be recovered through existing wells with existing equipment and operating methods.

9

Apache emphasizes that the volumes of reserves are estimates which, by their nature, are subject to revision. The estimates are made using available geological and reservoir data, as well as production performance data. These estimates are reviewed annually and revised, either upward or downward, as warranted by additional performance data.

We engage an independent petroleum engineering firm to review our estimates of proved hydrocarbon liquid and gas reserves. While this firm doesn't evaluate our entire reserve base, they do concentrate on those reserves that represent a substantial percentage of the Securities and Exchange Commission (SEC) value. During 2002, 2001 and 2000, their review covered 68, 61 and 72 percent of the SEC value, respectively.

## RISK FACTORS RELATED TO OUR BUSINESS AND OPERATIONS

### ACQUISITIONS OR DISCOVERIES OF ADDITIONAL RESERVES ARE NEEDED TO AVOID A MATERIAL DECLINE IN RESERVES AND PRODUCTION

The rate of production from oil and gas properties generally declines as reserves are depleted. Except to the extent that we acquire additional properties containing proved reserves, conduct successful exploration and development activities or, through engineering studies, identify additional behind-pipe zones or secondary recovery reserves, our proved reserves will decline materially as reserves are produced. Future oil and gas production is, therefore, highly dependent upon our level of success in acquiring or finding additional reserves.

### SUBSTANTIAL COSTS INCURRED TO CONFORM TO GOVERNMENT REGULATION OF THE OIL AND GAS INDUSTRY

Our exploration, production and marketing operations are regulated extensively at the federal, state and local levels, as well as by other countries in which we do business. We have made and will continue to make all necessary expenditures in our efforts to comply with the requirements of environmental and other regulations. Further, the oil and gas regulatory environment could change in ways that might substantially increase these costs. Hydrocarbon-producing states regulate conservation practices and the protection of correlative rights. These regulations affect our operations and limit the quantity of hydrocarbons we may produce and sell. In addition, at the U.S. federal level, the Federal Energy Regulatory Commission regulates interstate transportation of natural gas under the Natural Gas Act. Other regulated matters include marketing, pricing, transportation and valuation of royalty payments.

### SUBSTANTIAL COSTS INCURRED RELATED TO ENVIRONMENTAL MATTERS

We, as an owner or lessee and operator of oil and gas properties, are subject to various federal, provincial, state, local and foreign country laws and regulations relating to discharge of materials into, and protection of, the environment. These laws and regulations may, among other things, impose liability on the lessee under an oil and gas lease for the cost of pollution clean-up resulting from operations, subject the lessee to liability for pollution damages, and require suspension or cessation of operations in affected areas.

We maintain insurance coverage, which we believe is customary in the industry, although we are not fully insured against all environmental risks. We are not aware of any environmental claims existing as of December 31, 2002, which would have a material impact upon our financial position or results of operations.

We have made and will continue to make expenditures in our efforts to comply with these requirements, which we believe are necessary business costs in the oil and gas industry. We have established policies for continuing compliance with environmental laws and regulations, including regulations applicable to our operations in all countries in which we do business. We also have established operational procedures and training programs designed to minimize the environmental impact on our field facilities. The costs incurred by these policies and procedures are inextricably connected to normal operating expenses such that we are unable to separate the expenses related to environmental matters; however, we do not believe any such additional expenses are material to our financial position or results of operations.

Apache manages its exposure to environmental liabilities on properties to be acquired by identifying existing problems and assessing the potential liability. The Company also conducts periodic reviews, on a company-wide basis, to identify changes in its environmental risk profile. These reviews evaluate whether

10

there is a probable liability, its amount, and the likelihood that the liability will be incurred. The amount of any potential liability is determined by considering, among other matters, incremental direct costs of any likely remediation and the proportionate cost of our employees who are expected to devote a significant amount of time directly to any possible remediation effort. Our general policy is to limit any reserve additions to any incidents or sites that are considered likely to result in an expected remediation cost exceeding $100,000. Any environmental costs and liabilities not reserved are expensed when incurred. In our estimation, these expenses are not likely to have a material impact on our financial condition.

Although environmental requirements have a substantial impact upon the energy industry, generally these requirements do not appear to affect us any differently, or to any greater or lesser extent, than other companies in the industry. We do not believe that compliance with federal, state, local or foreign country provisions regulating the discharge of materials into the environment, or otherwise relating to the protection of the environment, will have a material adverse effect upon the capital expenditures, earnings or competitive position of Apache or its subsidiaries; however, there is no assurance that changes in or additions to laws or regulations regarding the protection of the environment will not have such an impact.

## COMPETITION WITH OTHER COMPANIES COULD HARM US

The oil and gas industry is highly competitive. Our business could be harmed by competition with other companies. Because oil and gas are fungible commodities, one form of competition is price competition. We strive to maintain the lowest finding and production costs possible in order to maximize profits. In addition, as an independent oil and gas company, we frequently compete for reserve acquisitions, exploration leases, licenses, concessions and marketing agreements against companies with financial and other resources substantially larger than those we possess. Many of our competitors have established strategic long-term positions and maintain strong governmental relationships in countries in which we may seek new entry.

## INSURANCE DOES NOT COVER ALL RISKS

Exploration for and production of oil and natural gas can be hazardous, involving unforeseen occurrences such as blowouts, cratering, fires and loss of well control, which can result in damage to or destruction of wells or production facilities, injury to persons, loss of life, or damage to property or the environment. We maintain insurance against certain losses or liabilities arising from our operations in accordance with customary industry practices and in amounts that management believes to be prudent; however, insurance is not available to us against all operational risks.

## RISKS ARISING FROM THE FAILURE TO FULLY IDENTIFY POTENTIAL PROBLEMS RELATED TO ACQUIRED RESERVES OR TO PROPERLY ESTIMATE THOSE RESERVES

One of our primary growth strategies is the acquisition of oil and gas properties. Although we perform a review of the acquired properties that we believe is consistent with industry practices, such reviews are inherently incomplete. It generally is not feasible to review in depth every individual property involved in each acquisition. Ordinarily, we will focus our review efforts on the higher-value properties and will sample the remainder. However, even a detailed review of records and properties may not necessarily reveal existing or potential problems, nor will it permit a buyer to become sufficiently familiar with the properties to assess fully their deficiencies and potential. Inspections may not always be performed on every well, and environmental problems, such as ground water contamination, are not necessarily observable even when an inspection is undertaken. Even when problems are identified, we often assume certain environmental and other risks and liabilities in connection with acquired properties. There are numerous uncertainties inherent in estimating quantities of proved oil and gas reserves and actual future production rates and associated costs with respect to acquired properties, and actual results may vary substantially from those assumed in the estimates (see above). In addition, there can be no assurance that acquisitions will not have an adverse effect upon our operating results, particularly during the periods in which the operations of acquired businesses are being integrated into our ongoing operations.

11

INVESTORS IN OUR SECURITIES MAY ENCOUNTER DIFFICULTIES IN OBTAINING, OR MAY BE UNABLE TO OBTAIN, RECOVERIES FROM ARTHUR ANDERSEN WITH RESPECT TO ITS AUDITS OF OUR FINANCIAL STATEMENTS

On March 14, 2002, our previous independent public accountant, Arthur Andersen LLP, was indicted on federal obstruction of justice charges arising from the federal government's investigation of Enron Corp. On June 15, 2002, a jury returned with a guilty verdict against Arthur Andersen following a trial. As a public company, we are required to file with the SEC periodic financial statements audited or reviewed by an independent public accountant. On March 29, 2002, we decided not to engage Arthur Andersen as our independent auditors, and engaged Ernst & Young LLP to serve as our new independent auditors for 2002. However, included in this annual report on Form 10-K, are financial data and other information for 2001 and 2000 that were audited by Arthur Andersen. Investors in our securities may encounter difficulties in obtaining, or be unable to obtain, from Arthur Andersen with respect to its audits of our financial statements relief that may be available to investors under the federal securities laws against auditing firms.

## ISSUES RELATED TO ARTHUR ANDERSEN LLP MAY IMPEDE OUR ABILITY TO ACCESS THE CAPITAL MARKETS

In the unlikely event that the SEC ceases accepting financial statements audited by Arthur Andersen LLP, we would be unable to access the public capital markets unless Ernst & Young LLP, our current independent accounting firm, or another independent accounting firm, is able to audit the financial statements originally audited by Arthur Andersen. In addition, investors in any subsequent offerings for which we use Arthur Andersen's audit reports will not be entitled to recovery against Arthur Andersen under Section 11 of the Securities Act of 1933, as amended, for any material misstatements or omissions in those financial statements. Furthermore, Arthur Andersen will be unable to participate in the "due diligence" process that would customarily be performed by potential investors in our securities, which process includes having Arthur Andersen perform procedures to assure the continued accuracy of its report on our audited financial statements and to confirm its review of unaudited interim periods presented for comparative purposes. As a result, we may not be able to bring to the market successfully an offering of our securities in a timely and efficient manner. Consequently, our financing costs may increase or we may miss attractive market opportunities.

## EMPLOYEES

On December 31, 2002, we had 1,958 employees.

## OFFICES

Our principal executive offices are located at One Post Oak Central, 2000 Post Oak Boulevard, Suite 100, Houston, Texas 77056-4400. At year-end 2002, we maintained regional exploration and/or production offices in Tulsa, Oklahoma; Houston, Texas; Calgary, Alberta; Cairo, Egypt; Perth, Western Australia; Beijing, China; Warsaw, Poland; and Buenos Aires, Argentina. We established an office in Aberdeen, Scotland early in 2003.

## TITLE TO INTERESTS

We believe that our title to the various interests set forth above is satisfactory and consistent with the standards generally accepted in the oil and gas industry, subject only to immaterial exceptions which do not detract substantially from the value of the interests or materially interfere with their use in our operations. The interests owned by us may be subject to one or more royalty, overriding royalty and other outstanding interests customary in the industry. The interests may additionally be subject to obligations or duties under applicable laws, ordinances, rules, regulations and orders of arbitral or governmental authorities. In addition, the interests may be subject to burdens such as production payments, net profits interests, liens incident to operating agreements and current taxes, development obligations under oil and gas leases and other encumbrances, easements and restrictions, none of which detract substantially from the value of the interests or materially interfere with their use in our operations.

12

**ITEM 2.PROPERTIES**

For information on our domestic and international properties, see the discussions in Item 1 of this Form 10-K under Review of Company's Worldwide Operating Areas as identified by country. For tables setting out a description of our drilling activities, well counts and acreage positions, see the information in Item 1 under Drilling Statistics, Productive Oil and Gas Wells and Gross and Net Undeveloped Acreage.

**ITEM 3.LEGAL PROCEEDINGS**

See the information set forth under the caption "Commitments and Contingencies" in Note 11 to our financial statements under Item 15 of this Form 10-K.

**ITEM 4.SUBMISSION OF MATTERS TO A VOTE OF SECURITY HOLDERS**

No matters were submitted for a vote of security holders during the fourth quarter of 2002.

## PART II

**ITEM 5.MARKET FOR THE REGISTRANT'S COMMON EQUITY AND RELATED STOCKHOLDER MATTERS**

Apache common stock, par value $1.25 per share, is traded on the New York Stock Exchange and the Chicago Stock Exchange under the symbol APA. The table below provides certain information regarding our common stock for 2002 and 2001. Prices were obtained from the New York Stock Exchange Composite Transactions Reporting System; however, the per share prices and dividends shown in the following table have been adjusted to reflect the 10 percent and five percent stock dividends described below and have been rounded to the indicated decimal place.

|  | 2002 | | | | 2001 | | | |
|---|---|---|---|---|---|---|---|---|
|  | PRICE RANGE | | DIVIDENDS PER SHARE | | PRICE RANGE | | DIVIDENDS PER SHARE | |
|  | HIGH | LOW | DECLARED | PAID | HIGH | LOW | DECLARED | PAID |
| First Quarter......................... | $55.43 | $42.25 | $.095 | $.095 | $63.10 | $46.93 | $  -- | $  -- |
| Second Quarter........................ | 57.23 | 50.07 | .095 | .095 | 57.84 | 41.60 | -- | -- |
| Third Quarter......................... | 57.13 | 42.92 | .095 | .095 | 47.09 | 33.12 | .242 | -- |
| Fourth Quarter........................ | 57.75 | 47.09 | .095 | .095 | 47.73 | 35.14 | .095 | .242 |

The closing price per share of our common stock, as reported on the New York Stock Exchange Composite Transactions Reporting System for February 28, 2003 , was $65.28 ($62.17 adjusted for the five percent dividend). At February 28, 2003, there were 153,850,136 shares of our common stock outstanding (161,542,642 shares adjusted for the five percent stock dividend) held by approximately 8,000 shareholders of record and approximately 104,000 beneficial owners.

We have paid cash dividends on our common stock for 36 consecutive years through December 31, 2002. During 2000, we implemented a change in the payment schedule for dividends on our common stock from a quarterly basis to an annual basis; however, we later implemented a return to a quarterly dividend payment schedule beginning in 2002. When, and if, declared by our board of directors, future dividend payments will depend upon our level of earnings, financial requirements and other relevant factors.

In 1995, our board of directors adopted a stockholder rights plan to replace the former plan adopted in 1986. Under our stockholder rights plan, each of our common stockholders received a dividend of one "preferred stock purchase right" for each 1.155 outstanding shares of common stock (adjusted for the 10 percent and five percent stock dividends) that the stockholder owned. We refer to these preferred stock purchase rights as the "rights." Unless the rights have been previously redeemed, all shares of Apache common stock are issued with rights. The rights trade automatically with our shares of common stock. Certain triggering events will give the holders of the rights the ability to purchase shares of our common stock, or the equivalent stock of a person that acquires us, at a discount. The triggering events relate to persons or groups acquiring an amount of our common stock in excess of a set percentage, or attempting to or actually acquiring us. The details of how the rights operate are set out in our certificate of incorporation and the Rights

13

Agreement, dated January 31, 1996, between Apache and Wells Fargo Bank Minnesota, N.A. (formerly Norwest Bank Minnesota, N.A.). Both of those documents have been filed as exhibits to this Form 10-K and you should review them to fully understand the effects of the rights. The purpose of the rights is to encourage potential acquirers to negotiate with our board of directors before attempting a takeover bid and to provide our board of directors with leverage in negotiating on behalf of our stockholders the terms of any proposed takeover. The rights may have certain anti-takeover effects. They should not, however, interfere with any merger or other business combination approved by our board of directors.

In May 1999, we issued 140,000 shares of 6.5 percent Automatically Convertible Equity Securities, Conversion Preferred Stock, Series C (Series C Preferred Stock) in the form of seven million depositary shares each representing 1/50th of a share of Series C Preferred Stock. The depositary shares were traded on the New York Stock Exchange and the Chicago Stock Exchange. The Series C Preferred Stock was not subject to a sinking fund or mandatory redemption. In 2000, Apache bought back 75,900 depositary shares at an average price of $34.42 per share. The excess of the purchase price to reacquire the depositary shares over the original issuance price, $330,000, is reflected as a preferred stock dividend in the accompanying statement of consolidated operations. The remaining depositary shares converted into 6,554,865 shares of Apache common stock in 2002.

On September 13, 2001, our board of directors declared a 10 percent dividend on our shares of common stock payable in common stock on January 21, 2002 to shareholders of record on December 31, 2001. Pursuant to the terms of the declared 10 percent stock dividend, we issued 13,070,068 shares of our common stock on January 21, 2002 to the holders of the 130,888,270 shares of common stock outstanding on December 31, 2002. No fractional shares were issued in connection with the stock dividend and cash payments totaling $891,132 were made in lieu of fractional shares.

On December 18, 2002, our board of directors declared a five percent dividend on our shares of common stock payable in common stock on April 2, 2003 to shareholders of record on March 12, 2003. Pursuant to the terms of the declared five percent stock dividend, we expect to issue approximately 7,868,000 shares of our common stock on April 2, 2003 to the holders of the 153,867,875 shares of common stock outstanding on March 12, 2003. No fractional shares will be issued in connection with the stock dividend and we expect to make cash payments totaling approximately $1,347,000 in lieu of fractional shares.

On January 22, 2003, in conjunction with the BP acquisition, the Company completed the public offering of 9.9 million shares of Apache common stock, including 1.3 million shares for the underwriters' over-allotment option, at $58.10 per share. Net proceeds after placement fees totaled approximately $554 million. The proceeds were used to repay indebtedness under our commercial paper program and money market lines of credit and to invest in short-term treasury-only money market funds and treasury notes to hold funds for the BP acquisition.

## ITEM 6. SELECTED FINANCIAL DATA

The following table sets forth selected financial data of the Company and its consolidated subsidiaries over the five-year period ended December 31, 2002, which information has been derived from the Company's audited financial statements. Our financial statements for the years 1998 through 2001 were audited by Arthur Andersen LLP, independent public accountants. For a discussion of the risks relating to Arthur Andersen's audit of our financial statements, please see discussion of risks related to Arthur Andersen in Item 1 of this Form 10-K, "Factors That May Affect Future Results -- Risks Relating to Arthur Andersen LLP." This

14

information should be read in connection with, and is qualified in its entirety by, the more detailed information in the Company's financial statements in Item 15 of this Form 10-K.

|  | \multicolumn{5}{c}{AS OF OR FOR THE YEAR ENDED DECEMBER 31,} |
|---|---|---|---|---|---|
|  | 2002 | 2001 | 2000 | 1999 | 1998 |
|  | \multicolumn{5}{c}{(IN THOUSANDS, EXCEPT PER SHARE AMOUNTS)} |
| INCOME STATEMENT DATA |  |  |  |  |  |
| Total revenues.............. | $2,559,873 | $2,809,391 | $2,301,978 | $1,161,697 | $ 772,791 |
| Income (loss) attributable to |  |  |  |  |  |
| common stock................... | 543,514 | 703,798 | 693,068 | 186,406 | (131,391) |
| Net income (loss) per common share: |  |  |  |  |  |
| Basic........................ | 3.66 | 4.89 | 5.09 | 1.50 | (1.16) |
| Diluted...................... | 3.60 | 4.73 | 4.91 | 1.49 | (1.16) |
| Cash dividends declared per common share.................. | .38 | .33 | .18 | .24 | .24 |
| BALANCE SHEET DATA |  |  |  |  |  |
| Total assets.................... | 9,459,851 | 8,933,656 | 7,481,950 | 5,502,543 | 3,996,062 |
| Long-term debt.................. | 2,158,815 | 2,244,357 | 2,193,258 | 1,879,650 | 1,343,258 |
| Preferred interests of subsidiaries................... | 436,626 | 440,683 | -- | -- | -- |
| Shareholders' equity............. | 4,924,280 | 4,418,483 | 3,754,640 | 2,669,427 | 1,801,833 |
| Common shares outstanding........ | 151,253 | 143,958 | 142,798 | 131,666 | 112,923 |

For a discussion of significant acquisitions, refer to Note 3 to the Company's consolidated financial statements in Item 15 of this Form 10-K. During 1998, the Company recorded a $243 million pre-tax ($158 million net of tax) non-cash write-down of the carrying value of the Company's U.S. proved oil and gas properties in compliance with full-cost accounting rules (refer to Critical Accounting Policies in Item 7 of this Form 10-K).

## ITEM 7.MANAGEMENT'S DISCUSSION AND ANALYSIS OF FINANCIAL CONDITION AND RESULTS OF OPERATIONS

### OVERVIEW

In 2002, Apache reported another very satisfactory year of growth and progress in our mission to build Apache incrementally to last. We finished the year with strong results, the third-best year on a per-share basis over our 48-year history. Our strong cash flow provided us the flexibility to make necessary and appropriate investments in continuation of our long-term incremental growth strategy.

On the back of a strong fourth quarter, we ended the year with a solid $544 million of net income attributable to common stock and $1.4 billion in cash from operating activities. We exited 2002 with our best quarter of the year and a strong financial position. Thirteen days into the new year, we announced the acquisition of $1.3 billion (subject to normal closing adjustments and the exercise of preferential rights by third parties) in properties from BP p.l.c. (BP), setting the stage for an exciting 2003.

Facing 2002 with the prospect of continued volatility in commodity prices, high service costs (including drilling, materials and contracted geophysical surveys) and unattractive acquisition prices, we exercised patience and discipline, restricting capital spending and focusing efforts on maintaining our competitive position by strengthening our balance sheet, growing our reserve base and maintaining production levels. As the year progressed, improving commodity prices and declining drilling costs placed us in an ideal position where we could continue increasing financial flexibility while simultaneously increasing capital spending, which we did beginning in the third quarter. Our worldwide capital expenditures for exploratory and development drilling of $860 million were 46 percent higher than our initial plan, but still well below the $1.3 billion we spent in 2001. Ultimately, this strategy manifested itself in lower drilling costs, one of the lowest debt-to-capitalization ratios in our peer group, and our 17th consecutive year of reserve growth, ending

15

with 1.3 billion barrels of oil equivalent. It also left us positioned to acquire the BP properties in 2003 while maintaining our financial flexibility.

Our capital expenditure reductions in the first half of 2002 were selective, both by region and by type of drilling. Rather than decrease exploration drilling, we increased it in the areas of Canada, Egypt, and Australia, all core producing areas that saw production growth in 2002. We had a successful exploration drilling program in 2002, reporting 16 discoveries worldwide. Production remained within one percent of prior-year levels despite our capital spending curtailment in the first half of the year and back-to-back hurricanes, which forced us to shut-in all of our Gulf of Mexico production for a brief period in late September and then again in early October.

The foundation of Apache's strategy is a portfolio approach that was developed to provide diversity in terms of hydrocarbon product (oil or gas), geologic risk and geographic location. In 2002, 58 percent of our equivalent production came from outside the U.S., up from 51 percent in 2001. At year-end 2002, our reserves were 49 percent oil and 51 percent gas, compared with 47 percent and 53 percent at year-end 2001.

In each of our core producing areas, our front line teams have the technical knowledge, sense of urgency and drive necessary to wring more value from Apache's assets. Building local expertise also provides a platform to compete and expand in our core areas through both operations and acquisitions. In the latter half of 2001, we felt that acquisition prices had reached exorbitant levels, relative to commodity prices, leading us to the sidelines until appropriate opportunities arose at reasonable prices, which began late in 2002. We spent approximately $355 million on acquisitions in 2002, compared with $1.2 billion in 2001 and $1.4 billion in 2000. The most significant of the 2002 activity came in December, when we announced the acquisition of properties in South Louisiana. As we have done in the past, and what has become a cornerstone of our acquisition strategy, we entered into hedges to protect the economics of the transaction, while at the same time preserving the potential for significantly higher gas realizations. See Note 4, in Item 15 of this Form 10-K.

In January 2003, we announced that we had entered into a definitive agreement with BP to purchase producing properties in the North Sea and Gulf of Mexico for $1.3 billion (subject to normal closing adjustments and the exercise of preferential rights by third parties), the largest single acquisition in Apache's history. The acquisition from BP is significant in many respects: it extends our relationship to one of the world's premier integrated major oil companies; it adds production and reserves and a new exploitation portfolio in North America's strongest gas market; and it establishes a new core area in the North Sea, which fits our balanced-portfolio business model and further diversifies our reserves and production. The Gulf properties are synergistic with our existing properties and made Apache the fourth-largest producer and the second-largest acreage holder in Gulf of Mexico waters to 1,200 feet deep. We will also become the ninth-largest oil producer in the North Sea. The effective date of the transaction is January 1, 2003; the Gulf portion closed on March 13, 2003; the North Sea portion is projected to close early in the second quarter. The acquisition is being financed through a combination of internally generated funds, the issuance in January 2003 of common equity, and debt. A substantial portion of the oil and gas production for the first two years has been hedged to protect the acquisition economics and to maintain Apache's position as a reliable purchaser of major companies' assets as they rationalize their portfolios in the future.

On January 22, 2003, in conjunction with the BP transaction, we completed a public offering of 9.9 million shares of common stock, including 1.3 million shares for the underwriters' over-allotment option, raising net proceeds of $554 million.

After announcing the BP acquisition, all three rating agencies reaffirmed Apache's single-A credit ratings, a testament to our financial position, our conservative financial strategy, where we employ hedges to protect acquisition economics, and our three-pronged approach to finance large-scale transactions with internally generated funds, equity and debt.

In December 2002, to recognize the Company's continued progress on both the financial and operational fronts, Apache's board of directors declared a special five percent common stock dividend payable on April 2,

16

2003, to shareholders of record on March 12, 2003. All of the share and per share information included in this filing has been adjusted to reflect this stock dividend.

## CRITICAL ACCOUNTING POLICIES

The discussion and analysis of our financial condition and results of operations are based upon the consolidated financial statements, which have been prepared in accordance with accounting principles generally accepted in the United States. The preparation of these financial statements requires us to make estimates and assumptions that affect the reported amounts of assets, liabilities, revenues and expenses, and related disclosure of contingent assets and liabilities. Certain accounting policies involve judgments and uncertainties to such an extent that there is reasonable likelihood that materially different amounts could have been reported under different conditions, or if different assumptions had been used. We evaluate our estimates and assumptions on a regular basis. We base our estimates on historical experience and various other assumptions that are believed to be reasonable under the circumstances, the results of which form the basis for making judgments about the carrying values of assets and liabilities that are not readily apparent from other sources. Actual results may differ from these estimates and assumptions used in preparation of our financial statements. Below, we have provided expanded discussion of our more significant accounting policies, estimates and judgments. We discussed the development, selection and disclosure of each of these with our audit committee. We believe these accounting policies reflect our more significant estimates and assumptions used in preparation of our financial statements. Additional accounting policies and estimates made by management are discussed in Results of Operations and in Note 1 of Item 15 of this Form 10-K.

### Full-Cost Method of Accounting for Oil and Gas Operations

The accounting for our business is subject to special accounting rules that are unique to the oil and gas industry. There are two allowable methods of accounting for oil and gas business activities: the successful-efforts method and the full-cost method. There are several significant differences between these methods. Under the successful-efforts method, cost such as geological and geophysical (G&G), exploratory dry holes and delay rentals are expensed as incurred where under the full-cost method these types of charges would be capitalized to their respective full-cost pool. In the measurement of impairment of oil and gas properties, the successful-efforts method of accounting follows the guidance provided in SFAS No. 144, "Accounting for the Impairment or Disposal of Long-Lived Assets," where the first measurement for impairment is to compare the net book value of the related asset to its undiscounted future cash flows using commodity prices consistent with management expectations. Under the full-cost method the net book value (full-cost pool) is compared to the future net cash flows discounted at 10 percent using commodity prices in effect at the end of the reporting period.

We have elected to use the full-cost method to account for our investment in oil and gas properties. Under this method, the Company capitalizes all acquisition, exploration and development costs for the purpose of finding oil and gas reserves, including salaries, benefits and other internal costs directly attributable to these activities. Although some of these costs will ultimately result in no additional reserves, we expect the benefits of successful wells to more than offset the costs of any unsuccessful ones. As a result, we believe that the full-cost method of accounting better reflects the true economics of exploring for and developing oil and gas reserves. Our financial position and results of operations would have been significantly different had we used the successful-efforts method of accounting for our oil and gas investments.

### Reserve Estimates

Our estimate of proved reserves is based on the quantities of oil and gas which geological and engineering data demonstrate, with reasonable certainty, to be recoverable in future years from known reservoirs under existing economic and operating conditions. The accuracy of any reserve estimate is a function of the quality of available data, engineering and geological interpretation, and judgment. For example, we must estimate the amount and timing of future operating costs, severance taxes, development costs, and workover costs, all of which may in fact vary considerably from actual results. In addition, as prices and cost levels change from year

17

to year, the estimate of proved reserves also changes. Any significant variance in these assumptions could materially affect the estimated quantity and value of our reserves.

Despite the inherent imprecision in these engineering estimates, our reserves are used throughout our financial statements. For example, since we use the units-of-production method to amortize our oil and gas properties, the quantity of reserves could significantly impact our depreciation, depletion and amortization (DD&A) expense. Our oil and gas properties are also subject to a "ceiling" limitation based in part on the quantity of our proved reserves. Finally, these reserves are the basis for our supplemental oil and gas disclosures.

We engage an independent petroleum engineering firm to review our estimates of proved hydrocarbon liquid and gas reserves. While this firm doesn't evaluate our entire reserve base, they do concentrate on those reserves that represent a substantial percentage of the Securities and Exchange Commission (SEC) value. During 2002, 2001 and 2000, their review covered 68, 61 and 72 percent of the SEC value, respectively.

## Bad Debt Expense

We routinely assess the recoverability of all material trade and other receivables to determine their collectibility. Many of our receivables are from joint interest owners on properties of which we are the operator. Thus, we may have the ability to withhold future revenue disbursements to recover any non-payment of joint interest billings. Generally, our crude oil and natural gas receivables are typically collected within two months. In Egypt, however, we have experienced a gradual decline in the timeliness of receipts from Egyptian General Petroleum Corporation (EGPC). Deteriorating economic conditions during 2001 and 2002 in Egypt have lessened the availability of U.S. dollars, resulting in an additional one to two month delay in receipts from EGPC. Continuation of the hard currency shortage in Egypt could lead to further delays, deferrals of payment or non-payment in the future. We accrue a reserve on a receivable when, based on the judgment of management, it is probable that a receivable will not be collected and the amount of any reserve may be reasonably estimated.

## Asset Retirement Obligation

The Company has significant obligations to remove tangible equipment and restore land or seabed at the end of oil and gas production operations. Apache's removal and restoration obligations are primarily associated with plugging and abandoning wells and removal and disposal of offshore oil and gas platforms. The estimated undiscounted costs, net of salvage value, of dismantling and removing these facilities are accrued over the production life of the oil and gas property. Estimating the future asset removal costs is difficult and requires management to make estimates and judgments because most of the removal obligations are many years in the future and contracts and regulations often have vague descriptions of what constitutes removal. Asset removal technologies and costs are constantly changing, as well as regulatory, political, environmental, safety and public relations considerations.

In 2001, the Financial Accounting Standards Board (FASB) issued Statement of Financial Accounting Standards No. 143 (SFAS No. 143), "Accounting for Asset Retirement Obligations." SFAS No. 143 significantly changed the method of accruing for costs associated with the retirement of fixed assets an entity is legally obligated to incur. Primarily, the new statement requires the Company to record a separate liability for asset retirement obligations that represents the present value of the costs to be incurred. The separate liability is similar to our previous estimates in that the obligations are based on expected cost estimates and expected economic lives of the asset retirement that occurs many years in the future, but the new rule now requires additional discounting assumptions to be considered by management. Revisions to the asset retirement obligation recorded upon adoption of SFAS No. 143 can potentially result from changes in the assumptions used to estimate the cash flows required to settle the obligation. Potential changes include adjustments in estimated probabilities, amounts, and timing of the settlement, as well as changes in the legal requirements of an asset retirement obligation. Any such changes that result in upward and downward revisions in the estimated cash flows will adjust the liability and the related capitalized asset on a prospective basis. Apache adopted this statement effective January 1, 2003, as discussed in Note 2 of Item 15 of this Form 10-K.

## Income Taxes

Oil and gas exploration and production is a global business. As a result, we are subject to taxation on our income in numerous jurisdictions. We record deferred tax assets and liabilities to account for the expected future tax consequences of events that have been recognized in our financial statements and our tax returns. We routinely assess the realizability of our deferred tax assets. If we conclude that it is more likely than not that some portion or all of the deferred tax assets will not be realized under accounting standards, the tax asset would be reduced by a valuation allowance. We consider future taxable income in making such assessments. Numerous judgments and assumptions are inherent in the determination of future taxable income, including factors such as future operating conditions (particularly as related to prevailing oil and gas prices).

We intend to permanently reinvest earnings from our international operations; therefore, we do not recognize deferred taxes on the unremitted earnings of our international subsidiaries. If it becomes apparent that some or all of the unremitted earnings will be remitted, we would then reflect taxes on those earnings.

## Derivatives

Apache uses commodity derivative contracts on a limited basis to manage its exposure to oil and gas price volatility. Apache accounts for its commodity derivative contracts in accordance with SFAS No. 133, "Accounting for Derivative Instruments and Hedging Activities" (SFAS 133). Realized gains and losses from the Company's cash flow hedges, including terminated contracts, are generally recognized in oil and gas production revenues when the forecasted transaction occurs. The Company does not enter into derivative or other financial instruments for trading purposes. SFAS 133 requires that gains and losses from the change in fair value of derivative instruments that do not qualify for hedge accounting be reported in current period income, rather than in the period in which the hedged transaction is settled. This may result in significant volatility to current period income.

SFAS 133 is complex and subject to a potentially wide range of interpretations in its application. As such, in 1998 the FASB established the Derivative Implementation Group (DIG) task force specifically to consider and to publish official interpretations of issues arising from the implementation of SFAS 133. The potential exists for additional issues to be brought under review, therefore, if subsequent interpretations of SFAS 133 are different than our current policy, it is possible that our policy, as stated above, would be modified.

## RESULTS OF OPERATIONS

## Acquisitions and Divestitures

In 2002, we elected to exercise patience on the acquisition front, waiting for the frenzy that drove acquisition prices to unreasonable levels to ebb. We focused our attention on managing our financial structure by building equity and paying down debt so we would be in a position to act quickly when attractive assets became available at reasonable prices. Our oil and gas acquisitions in 2002 totaled approximately $350 million, adding 49 MMboe to our reserve base, far short of the $880 million and $1.3 billion we expended during 2001 and 2000, respectively, which added 213 MMboe and 254 MMboe of proved reserves. In addition, the acquisitions added $3 million, $146 million and $94 million of production, processing and transportation facilities in 2002, 2001 and 2000, respectively, and $197 million of goodwill in 2001. These acquisitions strengthened our position in core areas and provided promising prospects for future exploration and development activities. We will continue our strategy of finding additional reserves on the acquired properties and accelerating the production of those already identified while endeavoring to lower costs.

In connection with our 2002 South Louisiana acquisition, we entered into costless-collar hedges to protect Apache from the potential for falling gas prices and to protect the economics of the transaction. These hedges are consistent with some of our 2001 and 2000 acquisitions whereby we entered into and assumed fixed-price commodity swaps and costless-collars that protected Apache from falling commodity prices. This enabled us to better predict the financial performance of our acquisitions.

Note that, in light of the uncertainty of how the collapse of Enron Corp. would impact the derivatives markets, we closed all of our derivatives positions in October and November 2001, most of which were

associated with prior acquisitions, recognizing a net gain of $16 million. A net gain of $24 million was recognized in 2002 and a $4 million net loss will be recognized in 2003 as the originally hedged volumes are produced. These, as well as the unwinding of our gas price swaps associated with advances from gas purchasers, increased the Company's average natural gas price by $.04 per Mcf during 2002, $.09 per Mcf during 2001 and $.05 per Mcf during 2000. They increased our average crude oil price by $.15 per bbl during 2002, and reduced our average crude oil price by $.42 per bbl during 2001 and $1.62 per bbl during 2000.

We routinely evaluate our property portfolio and divest those that are marginal or no longer fit into our strategic growth program. We divested $7 million, $348 million and $26 million of properties during 2002, 2001 and 2000, respectively.

## Revenues

Our revenues are sensitive to changes in prices received for our products. A substantial portion of our production is sold at prevailing market prices, which fluctuate in response to many factors that are outside of our control. Imbalances in the supply and demand for oil and natural gas can have dramatic effects on the prices we receive for our production. Political instability and availability of alternative fuels could impact worldwide supply, while economic factors such as the current U.S. recession could impact demand.

20

The table below presents oil and gas production revenues, production and average prices received from sales of natural gas, oil and natural gas liquids.

|  | FOR THE YEAR ENDED DECEMBER 31, | | |
|---|---|---|---|
|  | 2002 | 2001 | 2000 |
| **Revenues (in thousands):** | | | |
| Natural gas | $1,130,692 | $1,521,959 | $1,107,486 |
| Oil | 1,383,749 | 1,246,384 | 1,149,028 |
| Natural gas liquids | 45,307 | 54,616 | 52,319 |
| Total | $2,559,748 | $2,822,959 | $2,308,833 |
| **Natural Gas Volume -- Mcf per day:** | | | |
| United States | 503,310 | 615,341 | 544,703 |
| Canada | 329,344 | 298,424 | 130,485 |
| Egypt | 122,655 | 95,918 | 47,464 |
| Australia | 117,802 | 116,943 | 107,894 |
| Argentina | 7,276 | 648 | -- |
| Total | 1,080,387 | 1,127,274 | 830,546 |
| **Average Natural Gas Price -- Per Mcf:** | | | |
| United States | $ 3.15 | $ 4.15 | $ 4.02 |
| Canada | 2.74 | 3.81 | 3.65 |
| Egypt | 3.71 | 3.51 | 4.51 |
| Australia | 1.28 | 1.22 | 1.34 |
| Argentina | .42 | 1.20 | -- |
| Total | 2.87 | 3.70 | 3.64 |
| **Oil Volume -- Barrels per day:** | | | |
| United States | 53,009 | 58,501 | 56,521 |
| Canada | 25,220 | 25,895 | 14,720 |
| Egypt | 43,772 | 39,238 | 27,745 |
| Australia | 30,361 | 23,548 | 15,551 |
| Argentina | 617 | 117 | -- |
| Total | 152,979 | 147,299 | 114,537 |
| **Average Oil Price -- Per barrel:** | | | |
| United States | $ 25.31 | $ 24.39 | $ 27.85 |
| Canada | 23.46 | 19.22 | 22.25 |
| Egypt | 24.65 | 23.59 | 27.81 |
| Australia | 25.17 | 23.89 | 29.99 |
| Argentina | 23.90 | 17.90 | -- |
| Total | 24.78 | 23.18 | 27.41 |
| **NGL Volume -- Barrels per day:** | | | |
| United States | 6,691 | 7,679 | 6,030 |
| Canada | 1,756 | 1,272 | 1,204 |
| Total | 8,447 | 8,951 | 7,234 |
| **Average NGL Price -- Per barrel:** | | | |
| United States | $ 15.29 | $ 16.60 | $ 20.04 |
| Canada | 12.41 | 17.45 | 18.36 |
| Total | 14.69 | 16.72 | 19.76 |

### Natural Gas Revenues

Consolidated natural gas revenues declined $391 million in 2002, consistent with an $.83 per Mcf decline in the weighted-average realized price for natural gas and a four percent decline in production. The price

21

decline reduced revenues by $342 million, while lower gas production reduced revenues by another $49 million. The production decline was concentrated in the U.S., with declines of 21 percent and 13 percent in the Gulf Coast and Central regions, respectively. Capital curtailments, property sales in late 2001 and back-to-back hurricanes in September and October 2002 contributed to the production decline in the U.S. Collectively, Canada, Egypt, Australia and Argentina saw a 13 percent increase in natural gas production. Canada's increase was the result of previous acquisitions and subsequent drilling activity, coupled with successful results at Ladyfern, which offset natural decline at Zama. Egypt's increase also came from previous acquisition and subsequent drilling activity. See Note 3 of Item 15 of this 10-K for further discussion of acquisition and divestiture activity.

A 36 percent increase in our natural gas production contributed $390 million to 2001 revenues. Canada's increase was primarily driven by our acquisition of producing properties from Phillips Petroleum Company (Phillips) in December 2000 and Fletcher Challenge in March 2001 as well as strong exploration and development results from the Ladyfern area. A full year of production from the properties we acquired from Occidental Petroleum Corporation (Occidental) in August 2000 and Collins & Ware, Inc. (Collins & Ware) in June 2000 helped boost our domestic production by 13 percent, while properties acquired from Repsol helped double our Egyptian production. See Note 3 of Item 15 of this Form 10-K for further discussion of acquisition and divestiture activity.

We have used long-term, fixed-price physical contracts to lock in a small portion of our domestic future natural gas production. The contracts provide protection to the Company in the event of decreasing natural gas prices and represented approximately 11 percent of our 2002 and 2001 domestic natural gas production. In 2002, these contracts positively impacted our average realized price in by $.01 per Mcf. Historically high prices in the first half of 2001 resulted in a negative impact of $.06 per Mcf in that year. Additionally, substantially all of our natural gas production sold in Australia is subject to long-term fixed-price contracts.

### Crude Oil Revenues

Oil revenues improved $137 million in 2002 with both a higher realized price and higher production. The weighted-average realized price for oil improved $1.60 per barrel, adding $86 million to oil revenues, while oil production gains added another $51 million. The price improvement was across-the-board, while production gains of 29 percent and 12 percent occurred in Australia and Egypt, respectively. The Legendre, Simpson and Gibson/South Plato developments drove Australia's gain, while Egypt's increase was related to the Repsol acquisition and subsequent drilling. U.S. production declined nine percent related to natural decline, back-to-back hurricanes in late September and early October and property sales. See Note 3 of Item 15 of this Form 10-K for further discussion of acquisition and divestiture activity.

Our crude oil revenues increased in 2001 despite a 15 percent drop in the average realized price, as crude oil production increased 29 percent. The acquisition and subsequent exploitation of properties acquired from Repsol, in March 2001, contributed to a 41 percent increase in our year-over-year Egyptian production. Strong results on properties acquired from Fletcher Challenge in March 2001 and Phillips in December 2000 helped us increase our Canadian oil production by 76 percent. We also had success on the drilling front, increasing our Australian production by nearly 51 percent with successful development of the Legendre, Gipsy/North Gipsy and Simpson fields.

22

**Operating Expenses**

The table below presents a detail of our expenses.

| | YEAR ENDED DECEMBER 31, | | |
|---|---|---|---|
| | 2002 | 2001 | 2000 |
| | (IN MILLIONS) | | |
| Depreciation, depletion and amortization: | | | |
| Oil and gas property and equipment......................... | $ 784 | $ 760 | $ 548 |
| Other assets............................................... | 60 | 61 | 36 |
| International impairments.................................. | 20 | 65 | -- |
| Lease operating costs...................................... | 462 | 405 | 254 |
| Gathering and transportation costs........................ | 38 | 35 | 19 |
| Severance and other taxes.................................. | 63 | 70 | 59 |
| General and administrative expenses....................... | 105 | 89 | 76 |
| Financing costs, net...................................... | 113 | 118 | 106 |
| Total.................................................. | $1,645 | $1,603 | $1,098 |

### Depreciation, Depletion and Amortization

Apache's full-cost DD&A expense is driven by many factors including certain costs incurred in the exploration, development, and acquisition of producing reserves, production levels, and estimates of proved reserve quantities and future developmental costs. During 2002, our full-cost DD&A per boe increased by $.24 to $6.29, the result of higher finding costs and estimates of future costs necessary to extract reserves. During 2001, full-cost DD&A expense increased by $.30 to $6.05 per boe, reflecting higher finding costs and negative reserve revisions associated with declining prices.

Depreciation on other assets remained flat in 2002 after increasing $25 million in 2001 associated with additional facilities acquired from Fletcher Challenge and Repsol in March 2001 and the amortization of goodwill. In connection with the adoption of a new accounting principle effective January 1, 2002, we no longer amortize our goodwill. Instead, it is assessed for periodic impairment, as discussed in the impairment section below.

### Impairments

We periodically assess all of our unproved properties for possible impairment based on geological trend analysis, dry holes or relinquishment of acreage. When an impairment occurs, costs associated with these properties are generally transferred to our proved property base where they become subject to amortization. In some of our international exploration plays, however, we have not yet established proved reserves. As such, any impairments in these areas are immediately charged to earnings. During 2001, we impaired a portion of our unproved property costs in Poland and China by $65 million ($41 million after-tax). In 2002, we impaired an additional $20 million in Poland ($12 million after-tax). At December 31, 2002, the Company had $13 million of unproved property costs remaining in Poland. We are continuing to evaluate our operations in Poland, which may result in additional impairments in 2003.

As discussed in Note 1 of Item 15 of this Form 10-K, goodwill is subject to a periodic fair-value-based impairment assessment beginning in 2002. Goodwill totals $189 million at December 31, 2002 and no impairment was recorded in 2002.

### Lease Operating Costs

Lease operating costs (LOE) is generally comprised of several components; direct operating costs, repair and maintenance costs, workover costs and ad valorem costs. LOE is driven in part by the type of commodity produced, the level of workover activity and the geographical location of the properties. Oil is inherently more expensive to produce than natural gas. Workovers continue to be an important part of our strategy. They enable us to exploit our existing reserves by accelerating production and taking advantage of high pricing

23

environments. Repair and maintenance costs are higher on offshore properties and in areas with plants and facilities.

During 2002, LOE was $3.71 per boe, a $.49 increase from 2001. Higher absolute costs accounted for 94 percent, $.46 per boe, of this rate increase, with lower production accounting for the remaining $.03 per boe. We experienced higher absolute costs in the Gulf Coast region, Egypt and Canada. In the Gulf Coast region increased repairs and maintenance, related to both routine operations and hurricane repairs, generally higher costs on properties operated by others on offshore Gulf of Mexico properties and increased workover activity in the region, contributed to higher LOE. In Egypt, higher workover activity on the Khalda, South Umbarka and East Bahariya concessions drove up LOE. In Canada, the increased costs reflect the impact of the Fletcher, Conoco and Burlington acquisitions, which carry higher production costs than our other operations, and increased workover activity, with the heaviest activity at House Mountain, Hatton, Zama and Simonette fields. In 2001, LOE was $3.22 per boe, a $.56 increase from 2000. This increase was driven by our acquisitions of Canadian and offshore Gulf of Mexico oil properties, higher service costs and increased workover activity in the U.S. and Canada.

### Gathering and Transportation Costs

During 2002, the Company adopted Emerging Issues Task Force Issue 00-10, "Accounting for Shipping and Handling Fees and Costs." Prior to adoption, amounts paid to third parties for transportation had been reported as a reduction of revenue instead of an increase in operating expenses. Recent property acquisitions and their associated transportation arrangements have increased the significance of transportation costs paid to third parties. For comparative purposes, previously reported transportation costs paid to third parties were reclassified as corresponding increases to oil and gas production revenues and operating expenses with no impact on income attributable to common stock.

### Severance and Other Taxes

Severance and other taxes are comprised primarily of severance taxes on properties onshore and in state or provincial waters in the U.S. and Australia. Severance taxes, which are generally based on a percentage of oil and gas production revenues, decreased in 2002. The decrease reflects the impact of lower gas realizations in the U.S. and a higher percentage of total oil and gas production revenues generated from Egypt and Canada, core areas that are not subject to these taxes. Partially offsetting this decrease were higher severance taxes in Australia. The 2002 increase in Australia resulted from higher oil realizations and a change in the production mix. A higher portion of production was attributable to properties in provincial waters, such as Legendre and Harriet relative to production from federal waters.

In 2001, severance taxes increased in line with our production-driven increase in oil and gas revenues and a higher effective production tax rate. Available incentives granted by the state of Oklahoma decline with rising commodity prices, increasing the effective tax rate. Also contributing to the 2001 increase is additional Canadian Large Corporation Tax, a component of Severance and Other Taxes, related to production from properties acquired from Fletcher in March 2001.

### General and Administrative Expenses

Overall, general and administrative expenses (G&A) trended higher in 2002, rising $.13 to $.84 per boe. Thirty-eight percent of the increase is tied to rising medical costs, a sharp increase in premiums on business insurance policies renewed subsequent to the September 11, 2001 terrorist attacks and the addition of a sizeable political risk insurance package added in mid-2001. The remaining increase is related to non-recurring employee separation costs, a consequence of our region realignment in the U.S., higher outside legal support costs related to arbitration proceedings with our gas marketer, Cinergy and litigation with Predator (see Note 11 of this Form 10-K), costs associated with the implementation of and compliance with various sections of Sarbanes-Oxley, and a full year of expense related to additional staff and office costs incurred with the acquisition of Canadian subsidiaries of Fletcher during 2001.

24

During 2001 absolute G&A increased as the size of our company grew from acquisitions. However, 2001 G&A on an equivalent-barrel basis declined 10 percent from 2000 to $.71 as the incremental production was added at a lower G&A rate.

### Financing Costs, Net

Net financing costs decreased by five percent in 2002. The major components of net financing costs are interest expense and capitalized interest. Lower average debt outstanding during 2002 resulted in a decrease in interest expense of $23 million. A reduction in capitalized interest of $16 million, associated with lower unproved property balances, partially offset this decrease. Net financing costs increased 11 percent in 2001, related to higher average outstanding borrowings coupled with lower capitalized interest, partially offset by lower average effective interest rates. Our weighted-average cost of borrowing on December 31, 2002 was 6.3 percent compared to 5.9 percent on December 31, 2001. The rate is higher at year-end 2002 as a lower percentage of our debt is at floating rates, which carry a lower rate than fixed-rate debt.

## OIL AND GAS CAPITAL EXPENDITURES

|  | YEAR ENDED DECEMBER 31, | | |
|---|---|---|---|
|  | 2002 | 2001 | 2000 |
|  | (IN THOUSANDS) | | |
| Exploration and Development: |  |  |  |
| United States | $302,611 | $ 699,180 | $ 495,803 |
| Canada | 258,191 | 410,345 | 135,627 |
| Egypt | 171,160 | 127,603 | 84,949 |
| Australia | 89,813 | 85,169 | 73,835 |
| Other international | 38,409 | 20,838 | 18,077 |
|  | $860,184 | $1,343,135 | $ 808,291 |
| Capitalized Interest | $ 40,691 | $ 56,749 | $ 62,000 |
| Gas Gathering Transmission and Processing Facilities | $ 32,155 | $ 28,759 | $ 121,294 |
| Acquisitions: |  |  |  |
| Oil and gas properties | $351,707 | $ 880,286 | $1,324,427 |
| Gas gathering, transmission and processing facilities | 2,875 | 146,295 | 94,000 |
| Goodwill | -- | 197,200 | -- |
|  | $354,582 | $1,223,781 | $1,418,427 |

In 2002, Apache added 172.1 MMboe of proved reserves through acquisitions, drilling and revisions, replacing 138 percent of production.

The preliminary capital expenditure budget for 2003 is approximately $1.3 billion (excluding acquisitions), including $850 million for North America. Preliminary North American capital expenditures include $350 million in the Gulf Coast region, $100 million in the Central region and $400 million in Canada. The Company has estimated its international capital expenditures in 2003 at $400 million. Capital expenditures will be reviewed periodically, and possibly adjusted throughout the year in light of changing industry conditions.

## CASH DIVIDEND PAYMENTS

Apache paid a total of $13 million in dividends during 2002 on its Series B Preferred Stock issued in August 1998 and its Series C Preferred Stock issued in May 1999. Dividends on the Series C Preferred Stock were paid through May 15, 2002, when the shares automatically converted to common stock (see Note 9 under Item 15 of this Form 10-K). Common dividends paid during 2002 rose 61 percent to $56 million, reflecting the increase in common shares outstanding and the higher common stock dividend rate. The Company has paid cash dividends on its common stock for 36 consecutive years through 2002. Future

dividend payments will depend on the Company's level of earnings, financial requirements and other relevant factors.

## CAPITAL RESOURCES

Apache's primary needs for cash are for exploration, development and acquisition of oil and gas properties, repayment of principal and interest on outstanding debt and payment of dividends. The Company funds its exploration and development activities primarily through internally generated cash flows and budgets capital expenditures based on projected cash flows. Apache routinely adjusts capital expenditures in response to changes in oil and natural gas prices, drilling and acquisition costs, and cash flow. The Company has historically utilized net cash provided by operating activities, debt, preferred interests of subsidiaries and equity as capital resources to obtain necessary funding for all other cash needs.

### Net Cash Provided by Operating Activities

Apache's net cash provided by operating activities during 2002 totaled $1.4 billion, a decrease of 28 percent from 2001 driven by lower oil and gas production revenues and slightly higher operating expenses. Oil and gas production revenues fell with a 22 percent decline in gas prices, which was partially offset by a seven percent improvement in oil prices. The impact of lower gas production was partially offset by rising oil production. Net cash provided by operating activities during 2001 increased 26 percent to a record $1.9 billion from $1.5 billion in 2000. The primary reason for the increase is attributed to the additional oil and gas revenues from production on properties acquired during 2000 and 2001.

### Debt

At December 31, 2002, Apache had outstanding debt of $280 million under its commercial paper program and uncommitted lines of credit and a total of $1.9 billion of other debt. This other debt included notes and debentures maturing in the years 2003 through 2096. Based on our current plan for capital spending and projections of debt and interest rates, interest payments on the Company's debt for 2003 are projected to be $157 million (using weighted-average balances for floating rate obligations).

On June 3, 2002, Apache entered into a new $1.5 billion global credit facility to replace its existing global and 364-day credit facilities. The new global credit facility consists of four separate bank facilities: a $750 million 364-day facility in the United States; a $450 million five-year facility in the United States; a $150 million five-year facility in Australia; and a $150 million five-year facility in Canada. Loans under the global credit facility do not require the Company to maintain a minimum credit rating.

The five-year facilities are scheduled to mature on June 3, 2007 and the 364-day facility is scheduled to mature on June 1, 2003. The 364-day facility allows the Company the option to convert outstanding revolving loans at maturity into one-year term loans. The Company may request extensions of the maturity dates subject to approval of the lenders.

The Company has a $1.2 billion commercial paper program which enables Apache to borrow funds for up to 270 days at competitive interest rates. The commercial paper balances at December 31, 2002 and 2001 were classified as long-term debt in the accompanying consolidated balance sheet as the Company has the ability and intent to refinance such amounts on a long-term basis through either the rollover of commercial paper or available borrowing capacity under the U.S. five-year facility and the 364-day facility. If the Company is unable to issue commercial paper following a significant credit downgrade or dislocation in the market, the Company's U.S. five-year credit facility and 364-day credit facility are available as a 100 percent backstop. The weighted-average interest rate for commercial paper was 1.85 percent in 2002 and 4.10 percent in 2001.

### Preferred Interests of Subsidiaries

During 2001, several of our subsidiaries issued a total of $443 million ($441 million, net of issuance costs) of preferred stock and limited partner interests to unrelated institutional investors, adding to the Company's financial liquidity. We pay a weighted-average return to the investors of 123 basis points above the

26

prevailing LIBOR interest rate. These subsidiaries are consolidated in the accompanying financial statements with the $437 million and $441 million at December 31, 2002 and 2001, respectively, reflected as preferred interests of subsidiaries on the balance sheet.

### Stock Transactions

In December 2002, our board of directors declared a five percent stock dividend, payable on April 2, 2003, to shareholders of record on March 12, 2003. No fractional shares will be issued and cash payments will be made in lieu of fractional shares. In connection with the declaration of this stock dividend, a reclassification was made to transfer $396 million from retained earnings to common stock and additional paid-in-capital in the accompanying consolidated balance sheet.

On May 15, 2002, we completed the mandatory conversion of our Series C Preferred Stock into approximately 6.6 million common shares.

In September 2001, our Board of Directors declared a 10 percent stock dividend, which was paid on January 21, 2002, to shareholders of record on December 31, 2001. No fractional shares were issued and cash payments were made in lieu of fractional shares. In connection with the declaration of this stock dividend, a reclassification was made to transfer $545 million from retained earnings to common stock and additional paid-in-capital in the accompanying consolidated balance sheet.

On January 22, 2003, we completed a public offering of approximately 9.9 million shares of common stock, including 1.3 million shares for the underwriters' over-allotment option, for net proceeds of $554 million.

## LIQUIDITY

During 2002, we strengthened our financial flexibility and continued to build upon the solid financial performances of previous years. We believe that cash on hand, net cash generated from operating activities, and unused committed borrowing capacity under our global credit facility will be adequate to satisfy future financial obligations and liquidity needs.

As of December 31, 2002, available borrowing capacity under our global credit facility was $1.2 billion. We had $52 million in cash and cash equivalents on hand at December 31, 2002, an increase from $36 million at the prior year-end. In addition, the ratio of current assets to current liabilities increased from 1.34 at the end of last year to 1.44 at December 31, 2002.

In August 2001, we purchased $116 million in U.S. Government Agency Notes and subsequently sold $13 million of the notes in 2001. Of the remaining balance, $17 million were designated as "available for sale" securities and were sold for approximately $17 million in January 2002. The remaining $86 million were designated as "held to maturity" and carried at amortized cost until they matured on October 15, 2002. The sales proceeds were used to pay down on our commercial paper balance.

We have assumed various financial obligations and commitments in the normal course of operations. These contractual obligations represent known future cash payments that we are required to make and relate primarily to long-term debt, preferred interests of subsidiaries, operating leases, pipeline transportation commitments and international commitments. The Company expects to fund these contractual obligations with cash generated from operating activities. The following table summarizes the Company's contractual

27

obligations as of December 31, 2002. Refer to the indicated footnote to the Company's consolidated financial statements under Item 15 of this Form 10-K for further information regarding these obligations.

| CONTRACTUAL OBLIGATIONS | FOOTNOTE REFERENCE | TOTAL | 2003 | 2004 | 2005 | 2006 | 2007 | THEREAFTER |
|---|---|---|---|---|---|---|---|---|
| | | | | (IN THOUSANDS) | | | | |
| Long-term debt................. | Note 6 | $2,158,815 | $    -- | $    -- | $   830 | $   274 | $489,559 | $1,668,152 |
| Preferred interests of subsidiaries................. | Note 12 | 436,626 | -- | -- | -- | -- | -- | 436,626 |
| Operating leases and other commitments................. | Note 11 | 310,143 | 107,234 | 49,735 | 33,769 | 31,158 | 23,096 | 65,151 |
| International lease commitments................. | Note 11 | 71,456 | 40,780 | 17,099 | 7,010 | 6,567 | -- | -- |
| Exploration agreement.......... | Note 11 | 25,000 | 12,500 | 12,500 | -- | -- | -- | -- |
| Properties acquired requiring future payments to Occidental Petroleum Corporation........ | Note 3 | 20,478 | 10,609 | 9,869 | -- | -- | -- | -- |
| Operating costs associated with a pre-existing volumetric production payment of acquired properties.......... | Note 3 | 13,879 | 4,502 | 3,770 | 3,047 | 2,530 | 30 | -- |
| Total Contractual Obligations(a).......... | | $3,036,397 | $175,625 | $92,973 | $44,656 | $40,529 | $512,685 | $2,169,929 |

(a) Note that this table does not include the liability for dismantlement, abandonment and restoration costs of oil and gas properties. The Company currently includes such costs in the amortizable base of its oil and gas properties. Effective with adoption of SFAS No. 143, "Accounting for Asset Retirement Obligations" on January 1, 2003, the Company recorded a separate liability for the fair value of this asset retirement obligation. See Note 2 under Item 15 of this Form 10-K for further discussion.

Apache is also subject to various contingent obligations that become payable only if certain events or rulings were to occur. The inherent uncertainty surrounding the timing of and monetary impact associated with these events or rulings prevents any meaningful accurate measurement, which is necessary to assess any impact on future liquidity. Such obligations include environmental contingencies and potential settlements resulting from litigation. As discussed in more detail in Footnote 11 under Item 15 of this Form 10-K, Apache's management feels that it has adequately reserved for its contingent obligations.

Upon closing of our acquisition of the North Sea properties, Apache will assume BP's abandonment obligation for those properties and such costs were considered in determining the purchase price. The purchase of the properties, however, does not relieve BP of its liabilities if Apache does not satisfy the abandonment obligation. Although not currently required, to ensure Apache's payments of these costs, Apache agreed to deliver a letter of credit to BP if the rating of our senior unsecured debt is lowered by both Moody's and Standard and Poor's from the Company's current ratings of A3 and A-, respectively. Any such letter of credit would be in an amount equal to the net present value of future abandonment costs of the North Sea properties as of the date of any such ratings change. If Apache is obligated to provide a letter of credit, it will expire if either rating agency restores its rating to the present level. The initial letter of credit amount would be $282 million. This amount represents the letter of credit requirement through March 2004, and will be negotiated annually based on Apache's future abandonment obligation estimates. In addition, under Apache's long-term oil physical sales contract with BP, related to the BP acquisition, Apache may be required to post margin if the mark-to-market exposure, as defined, exceeds the credit threshold limits.

In addition to the letter of credit requirements covering BP's abandonment obligations, our liquidity could be further impacted by a downgrade of the credit rating for our senior unsecured long-term debt by Standard and Poor's to BBB- or lower and by Moody's to Baa3 or lower; however, we do not believe that such a sharp downgrade is reasonably likely. If our debt were to receive such a downgrade, our subsidiaries that issued the preferred interests described in Note 12 under Item 15 of this Form 10-K could be in violation of their covenants which may require them to redeem some of the preferred interests as noted. In addition, generally under our commodity hedge agreements, Apache may be required to post margin or terminate outstanding positions if the Company's credit ratings decline significantly.

**OFF-BALANCE SHEET ARRANGEMENTS**

Apache does not currently utilize any off-balance sheet arrangements with unconsolidated entities to enhance liquidity and capital resource positions, or any other purpose. Any future transactions involving off-balance sheet arrangements will be scrutinized and disclosed by the Company's management.

## FUTURE TRENDS

Apache's strategy is to increase its oil and gas reserves, production, cash flow and earnings through a balanced growth program that involves:

- exploiting our existing asset base;

- acquiring properties to which we can add incremental value; and

- investing in high-potential exploration prospects.

Apache's present plans are to increase 2003 worldwide capital expenditures for exploratory and development drilling to approximately $1.3 billion from $860 million in 2002. We will continue to monitor commodity prices and adjust our capital expenditures accordingly. We will also continue to evaluate and pursue acquisition opportunities should they become available at reasonable prices.

### Exploiting Existing Asset Base

Apache seeks to maximize the value of our existing asset base by increasing production and reserves while reducing operating costs per unit. In order to achieve these objectives, we rigorously pursue production enhancement opportunities such as workovers, recompletions and moderate-risk drilling, while divesting marginal and non-strategic properties and identifying other activities to reduce costs. We expended a lot of effort in 2002 identifying exploitation opportunities which, when combined with our South Louisiana property purchase and our acquisition from BP, give us a large inventory at a time of high commodity prices.

### Acquiring Properties to Which We Can Add Incremental Value

Apache seeks to purchase reserves at appropriate prices by generally avoiding auction processes where we are competing against other buyers. Our aim is to follow each acquisition with a cycle of reserve enhancement, property consolidation and cash flow acceleration, facilitating asset growth and debt reduction. Exorbitant acquisition prices caused Apache to sideline its 2002 acquisition activities early in the year until appropriate opportunities arose at reasonable prices, which began at the end of the year.

### Investing in High-Potential Exploration Prospects

Apache seeks to concentrate its exploratory investments in a select number of international areas and to become the dominant operator in those regions. We believe that these investments, although generally higher-risk, offer potential for attractive investment returns and significant reserve additions. Our international investments and exploration activities are a significant component of our long-term growth strategy. They complement our North American operations, which are more development oriented.

A critical component in implementing our three-pronged growth strategy is maintenance of significant financial flexibility. All three rating agencies recently reaffirmed "A-credit ratings" on Apache's senior unsecured long-term debt, a testament to our conservative financial structure and commitment to preserving a strong balance sheet while building a solid foundation and competitive advantage with which to pursue our growth initiatives.

## ITEM 7A.QUANTITATIVE AND QUALITATIVE DISCLOSURES ABOUT MARKET RISK

## COMMODITY RISK

The major market risk exposure is in the pricing applicable to our oil and gas production. Realized pricing is primarily driven by the prevailing worldwide price for crude oil and spot prices applicable to our United

29

States and Canadian natural gas production. Prices received for oil and gas production have been and remain volatile and unpredictable. Monthly oil price realizations ranged from a low of $18.85 per barrel to a high of $28.79 per barrel during 2002. Average gas price realizations ranged from a monthly low of $2.11 per Mcf to a monthly high of $3.62 per Mcf during the same period. Based on the Company's 2002 worldwide oil production levels, a $1.00 per barrel change in the weighted-average realized price of oil would increase or decrease revenues by $56 million. Based on the Company's 2002 worldwide gas production levels, a $.10 per Mcf change in the weighted-average realized price of gas would increase or decrease revenues by $39 million.

If oil and gas prices decline significantly, even if only for a short period of time, it is possible that non-cash write-downs of our oil and gas properties could occur under the full-cost accounting rules of the Securities Exchange Commission (SEC). Under these rules, we review the carrying value of our proved oil and gas properties each quarter on a country-by-country basis to ensure that capitalized costs of proved oil and gas properties, net of accumulated depreciation, depletion and amortization, and deferred income taxes, do not exceed the "ceiling." This ceiling is the present value of estimated future net cash flows from proved oil and gas reserves, discounted at 10 percent, plus the lower of cost or fair value of unproved properties included in the costs being amortized, net of related tax effects. If capitalized costs exceed this limit, the excess is charged to additional DD&A expense. The calculation of estimated future net cash flows is based on the prices for crude oil and natural gas in effect on the last day of each fiscal quarter except for volumes sold under long-term contracts. Write-downs required by these rules do not impact cash flow from operating activities.

While we agree that costs on our balance sheet should be written down if they exceed the value of our reserves, the valuation methodology currently prescribed is, in the Company's opinion, flawed. For purposes of the test, except where there are long-term contracts, the price used to calculate the present value of reserves is that price in effect on the last day of the quarter. As earlier indicated, this is a highly volatile price and one that often has little to do with long-term value. We have pointed this out in discussions with the SEC and will continue to work to resolve this important issue.

We periodically enter into hedging activities on a portion of our projected oil and natural gas production through a variety of financial and physical arrangements intended to support oil and natural gas prices at targeted levels and to manage our overall exposure to oil and gas price fluctuations. Apache may use futures contracts, swaps, options and fixed-price physical contracts to hedge its commodity prices. Realized gains or losses from the Company's price risk management activities are recognized in oil and gas production revenues when the associated production occurs. Apache does not generally hold or issue derivative instruments for trading purposes. As indicated in Notes 3 and 4 under Item 15 of this Form 10-K, the Company entered into several derivative positions in conjunction with the South Louisiana acquisition in December 2002 and following year-end, with the acquisition from BP. These positions were entered into to preserve our strong financial position in a period of cyclically high gas and oil prices and were designated as cash flow hedged at anticipated production.

At December 31, 2002, the Company had natural gas commodity collars with a negative fair value of $4 million. A 10 percent increase in gas prices would change the fair values of the gas collars by $(5) million. A 10 percent decrease in gas prices would change the fair values of the gas collars by $5 million. The model used to arrive at the fair values for the commodity collars is based on a third-party option pricing model. Changes in fair value, assuming 10 percent price changes, assume non-constant volatility with volatility based on prevailing market parameters at December 31, 2002. The natural gas and crude oil fixed-price swaps and crude oil fixed-price physical contracts entered into during the first quarter 2003 involved substantially more oil and gas volumes than the 2002 collars. For additional detail on our 2003 derivative positions, refer to Notes 3 and 4 of Item 15 of this Form 10-K.

We sell all of our Egyptian crude oil and natural gas to the EGPC for U.S. dollars. Deteriorating economic conditions in Egypt during 2001 and 2002 have lessened the availability of U.S. dollars resulting in a one to two month delay in receipts from EGPC. Continuation of the hard currency shortage in Egypt could lead to further delays, deferrals of payment or non-payment in the future.

30

**INTEREST RATE RISK**

Approximately 85 percent of the Company's debt is issued at fixed interest rates, minimizing the Company's exposure to fluctuations in short-term interest rates. At December 31, 2002, the Company had $317 million of floating-rate debt and $437 million of preferred interests of subsidiaries, both of which are subject to fluctuations in short-term interest rates. A 10 percent change in the floating interest rate (approximately 22 basis points) on these year-end balances, would be approximately $2 million. The Company did not have any open derivative contracts relating to interest rates at December 31, 2002 or 2001.

**FOREIGN CURRENCY RISK**

The Company's cash flow stream relating to certain international operations is based on the U.S. dollar equivalent of cash flows measured in foreign currencies. Australian gas production is sold under fixed-price Australian dollar contracts and over half the costs incurred are paid in Australian dollars. Revenue and disbursement transactions denominated in Australian dollars are converted to U.S. dollar equivalents based on the exchange rate as of the transaction date. Prior to October 1, 2002, reported cash flow from Canadian operations was measured in Canadian dollars and converted to the U.S. dollar equivalent based on the average of the Canadian and U.S. dollar exchange rates for the period reported. The majority of Apache's debt in Canada is denominated in U.S. dollars and, as such, was adjusted for differences in exchange rates at each period end. This unrealized adjustment was recorded as other revenues (losses). In light of the continuing transformation of the U.S. and Canadian energy markets into a single energy market, we adopted the U.S. dollar as our functional currency in Canada, effective October 1, 2002. A 10 percent strengthening of the Australian and Canadian dollar will result in a foreign currency net loss of approximately $31 million. The Company did not have any open derivative contracts relating to foreign currencies at December 31, 2002, or 2001.

**FORWARD-LOOKING STATEMENTS AND RISK**

Certain statements in this report, including statements of the future plans, objectives, and expected performance of the Company, are forward-looking statements that are dependent upon certain events, risks and uncertainties that may be outside the Company's control, and which could cause actual results to differ materially from those anticipated. Some of these include, but are not limited to, the market prices of oil and gas, economic and competitive conditions, inflation rates, legislative and regulatory changes, political market conditions, political and economic uncertainties of foreign governments, future business decisions and other uncertainties, all of which are difficult to predict.

There are numerous uncertainties inherent in estimating quantities of proved oil and gas reserves and in projecting future rates of production and the timing of development expenditures. The total amount or timing of actual future production may vary significantly from reserve and production estimates. The drilling of exploratory wells can involve significant risks, including those related to timing, success rates and cost overruns. Lease and rig availability, complex geology and other factors can affect these risks. Although Apache makes use of futures contracts, swaps, options and fixed-price physical contracts to mitigate risk, fluctuations in oil and gas prices, or a prolonged continuation of low prices, may substantially adversely affect the Company's financial position, results of operations and cash flows.

**ITEM 8. FINANCIAL STATEMENTS AND SUPPLEMENTARY DATA**

The financial statements and supplementary financial information required to be filed under this item are presented on pages F-1 through F-54 of this Form 10-K, and are incorporated herein by reference.

**ITEM 9.CHANGES IN AND DISAGREEMENTS WITH ACCOUNTANTS ON ACCOUNTING AND FINANCIAL DISCLOSURE**

The financial statements for the fiscal year ended December 31, 2002, included in this report, have been audited by Ernst & Young LLP, independent public auditors, as stated in their audit report appearing herein. The financial statements for the fiscal years ended December 31, 2001, and December 31, 2000, included in this report, have been audited by Arthur Andersen LLP, independent public accountants, as stated in their audit report appearing herein. Arthur Andersen has not consented to the inclusion of their audit report in this report. For a discussion of the risks relating to Arthur Andersen's audit of our financial statements, please see "Risks relating to Arthur Andersen LLP" in Item 1.

Arthur Andersen's audit reports on our consolidated financial statements for each of the fiscal years ended December 31, 2001, and December 31, 2000, included elsewhere in this report, did not contain an adverse opinion or disclaimer of opinion, nor were they qualified or modified as to uncertainty, audit scope or accounting principles.

During the years ended December 31, 2001 and December 31, 2000, and through the date we dismissed Arthur Andersen LLP, there were no disagreements with Arthur Andersen on any matter of accounting principle or practice, financial statement disclosure, or auditing scope or procedure which, if not resolved by Arthur Andersen's satisfaction, would have caused them to make reference to the subject matter in connection with their report on our consolidated financial statements for such years; and there were no reportable events as set forth in applicable SEC regulations.

We provided Arthur Andersen LLP with a copy of the above disclosures on April 2, 2002. In a letter dated April 2, 2002, Arthur Andersen confirmed its agreement with these statements.

<div align="center">

**PART III**

</div>

**ITEM 10.DIRECTORS AND EXECUTIVE OFFICERS OF THE REGISTRANT**

The information set forth under the captions "Nominees for Election as Directors", "Continuing Directors", "Executive Officers of the Company", and "Securities Ownership and Principal Holders" in the proxy statement relating to the Company's 2003 annual meeting of stockholders (the Proxy Statement) is incorporated herein by reference.

**ITEM 11.EXECUTIVE COMPENSATION**

The information set forth under the captions "Summary Compensation Table", "Option/SAR Exercises and Year-End Value Table", "Employment Contracts and Termination of Employment and Change-in-Control Arrangements" and "Director Compensation" in the Proxy Statement is incorporated herein by reference.

**ITEM 12.SECURITY OWNERSHIP OF CERTAIN BENEFICIAL OWNERS AND MANAGEMENT**

The information set forth under the captions "Securities Ownership and Principal Holders" and "Equity Compensation Plan Information" in the Proxy Statement is incorporated herein by reference.

**ITEM 13.CERTAIN RELATIONSHIPS AND RELATED TRANSACTIONS**

The information set forth under the caption "Certain Business Relationships and Transactions" in the Proxy Statement is incorporated herein by reference.

**ITEM 14.CONTROLS AND PROCEDURES**

Apache's certifying officers evaluated the effectiveness of our disclosure controls and procedures within the last 90 days preceding the date of this report. Based on that review and as of the date of that evaluation, these officers found the company's disclosure controls to be adequate, providing effective means to insure that

<div align="center">32</div>

we timely and accurately disclose the information we are required to disclose under applicable laws and regulations. We also made no significant changes in internal controls or any other factors that could affect our internal controls since our most recent internal controls evaluation.

We periodically review the design and effectiveness of our disclosure controls, including compliance with various laws and regulations that apply to our operations both inside and outside the United States. We make modifications to improve the design and effectiveness of our disclosure controls, and may take other corrective action, if our reviews identify deficiencies or weaknesses in our controls.

## PART IV

## ITEM 15.EXHIBITS, FINANCIAL STATEMENT SCHEDULES, AND REPORTS ON FORM 8-K

(a) Documents included in this report:

1. Financial Statements

```
                 Report of management........................................   F-1
                 Report of Independent Auditors..............................   F-2
                 Reports of independent public accountants...................   F-3
                 Statement of consolidated operations for each of the three
                   years in the period ended December 31, 2002...............   F-4
                 Statement of consolidated cash flows for each of the three
                   years in the period ended December 31, 2002...............   F-5
                 Consolidated balance sheet as of December 31, 2002 and
                   2001......................................................   F-6
                 Statement of consolidated shareholders' equity for each of
                   the three years in the period ended December 31, 2002.....   F-7
                 Notes to consolidated financial statements..................   F-8
```

2. Financial Statement Schedules

Financial statement schedules have been omitted because they are either not required, not applicable or the information required to be presented is included in the Company's financial statements and related notes.

3. Exhibits

```
     EXHIBIT
       NO.                              DESCRIPTION
     -------                            -----------
       2.1    --    Agreement and Plan of Merger among Registrant, YPY
                    Acquisitions, Inc. and The Phoenix Resource Companies, Inc.,
                    dated March 27, 1996 (incorporated by reference to Exhibit
                    2.1 to Registrant's Registration Statement on Form S-4,
                    Registration No. 333-02305, filed April 5, 1996).
       2.2    --    Purchase and Sale Agreement by and between BP Exploration &
                    Production Inc., as seller, and Registrant, as buyer, dated
                    January 11, 2003 (incorporated by reference to Exhibit 2.1
                    to Registrant's Current Report on Form 8-K, dated January
                    13, 2003, SEC File No. 1-4300).
       2.3    --    Sale and Purchase Agreement by and between BP Exploration
                    Operating Company Limited, as seller, and Apache North Sea
                    Limited, as buyer, dated January 11, 2003 (incorporated by
                    reference to Exhibit 2.2 to Registrant's Current Report on
                    Form 8-K, dated January 13, 2003, SEC File No. 1-4300).
       3.1    --    Restated Certificate of Incorporation of Registrant, dated
                    December 16, 1999, as filed with the Secretary of State of
                    Delaware on December 17, 1999 (incorporated by reference to
                    Exhibit 99.1 to Registrant's Current Report on Form 8-K,
                    dated December 17, 1999, SEC File No. 1-4300).
```



```
EXHIBIT
NO.                          DESCRIPTION
-------                      -----------
 3.2    --   Bylaws of Registrant, as amended May 2, 2002 (incorporated
             by reference to Exhibit 3.1 to Registrant's Quarterly Report
             on Form 10-Q for the quarter ended March 31, 2002, SEC File
             No. 1-4300).
 4.1    --   Form of Certificate for Registrant's Common Stock
             (incorporated by reference to Exhibit 4.1 to Registrant's
             Annual Report on Form 10-K for year ended December 31, 1995,
             SEC File No. 1-4300).
 4.2    --   Form of Certificate for Registrant's 5.68% Cumulative
             Preferred Stock, Series B (incorporated by reference to
             Exhibit 4.2 to Amendment No. 2 on Form 8-K/A to Registrant's
             Current Report on Form 8-K, dated April 18, 1998, SEC File
             No. 1-4300).
 4.3    --   Form of Certificate for Registrant's Automatically
             Convertible Equity Securities, Conversion Preferred Stock,
             Series C (incorporated by reference to Exhibit 99.8 to
             Amendment No. 1 on Form 8-K/A to Registrant's Current Report
             on Form 8-K, dated April 29, 1999, SEC File No. 1-4300).
 4.4    --   Rights Agreement, dated January 31, 1996, between Registrant
             and Norwest Bank Minnesota, N.A., rights agent, relating to
             the declaration of a rights dividend to Registrant's common
             shareholders of record on January 31, 1996 (incorporated by
             reference to Exhibit (a) to Registrant's Registration
             Statement on Form 8-A, dated January 24, 1996, SEC File No.
             1-4300).
10.1    --   Credit Agreement, dated June 12, 1997, among Registrant, the
             lenders named therein, Morgan Guaranty Trust Company, as
             Global Documentation Agent and U.S. Syndication Agent, The
             First National Bank of Chicago, as U.S. Documentation Agent,
             NationsBank of Texas, N.A., as Co-Agent, Union Bank of
             Switzerland, Houston Agency, as Co-Agent, and The Chase
             Manhattan Bank, as Global Administrative Agent (incorporated
             by reference to Exhibit 10.1 to Registrant's Current Report
             on Form 8-K, dated June 13, 1997, SEC File No. 1-4300).
10.2    --   Form of Credit Agreement, dated as of June 3, 2002, among
             Registrant, the Lenders named therein, JPMorgan Chase Bank,
             as Global Administrative Agent, Bank of America, N.A., as
             Global Syndication Agent, Citibank, N.A., as Global
             Documentation Agent, Bank of America, N.A. and Wachovia
             Bank, National Association, as U.S. Co-Syndication Agents,
             and Citibank, N.A. and Union Bank of California, N.A., as
             U.S. Co-Documentation Agents (excluding exhibits and
             schedules) (incorporated by reference to Exhibit 10.2 to
             Registrant's Quarterly Report on Form 10-Q for the quarter
             ended June 30, 2002, SEC File No. 1-4300).
10.3    --   Form of 364-Day Credit Agreement, dated as of June 3, 2002,
             among Registrant, the Lenders named therein, JPMorgan Chase
             Bank, as Global Administrative Agent, Bank of America, N.A.,
             as Global Syndication Agent, Citibank, N.A., as Global
             Documentation Agent, Bank of America, N.A. and BNP Paribas,
             as 364-Day Co-Syndication Agents, and Deutsche Bank AG, New
             York Branch, and Societe Generale, as 364-Day
             Co-Documentation Agents (excluding exhibits and schedules)
             (incorporated by reference to Exhibit 10.3 to Registrant's
             Quarterly Report on Form 10-Q for the quarter ended June 30,
             2002, SEC File No. 1-4300).
10.4    --   Credit Agreement, dated June 12, 1997, among Apache Canada
             Ltd., a wholly-owned subsidiary of the Registrant, the
             Lenders named therein, Morgan Guaranty Trust Company, as
             Global Documentation Agent, Royal Bank of Canada, as
             Canadian Documentation Agent, The Chase Manhattan Bank of
             Canada, as Canadian Syndication Agent, Bank of Montreal, as
             Canadian Administrative Agent, and The Chase Manhattan Bank,
             as Global Administrative Agent (incorporated by reference to
             Exhibit 10.2 to Registrant's Current Report on Form 8-K,
             dated June 13, 1997, SEC File No. 1-4300).
```

34

```
EXHIBIT
  NO.                          DESCRIPTION
-------                       -----------
 10.5    --   Form of Credit Agreement, dated as of June 3, 2002, among
              Apache Canada Ltd, a wholly-owned subsidiary of Registrant,
              the Lenders named therein, JPMorgan Chase Bank, as Global
              Administrative Agent, Bank of America, N.A., as Global
              Syndication Agent, Citibank, N.A., as Global Documentation
              Agent, Royal Bank of Canada, as Canadian Administrative
              Agent, The Bank of Nova Scotia and The Toronto-Dominion
              Bank, as Canadian Co-Syndication Agents, and BNP Paribas
              (Canada) and Bayerische Landesbank Girozentrale, as Canadian
              Co-Documentation Agents (excluding exhibits and schedules)
              (incorporated by reference to Exhibit 10.4 to Registrant's
              Quarterly Report on Form 10-Q for the quarter ended June 30,
              2002, SEC File No. 1-4300).

 10.6    --   Credit Agreement, dated June 12, 1997, among Apache Energy
              Limited and Apache Oil Australia Pty Limited, wholly-owned
              subsidiaries of the Registrant, the Lenders named therein,
              Morgan Guaranty Trust Company, as Global Documentation
              Agent, Bank of America National Trust and Savings
              Association, Sydney Branch, as Australian Documentation
              Agent, The Chase Manhattan Bank, as Australian Syndication
              Agent, Citisecurities Limited, as Australian Administrative
              Agent, and The Chase Manhattan Bank, as Global
              Administrative Agent (incorporated by reference to Exhibit
              10.3 to Registrant's Current Report on Form 8-K, dated June
              13, 1997, SEC File No. 1-4300).

 10.7    --   Form of Credit Agreement, dated as of June 3, 2002, among
              Apache Energy Limited, a wholly-owned subsidiary of
              Registrant, the Lenders named therein, JPMorgan Chase Bank,
              as Global Administrative Agent, Bank of America, N.A., as
              Global Syndication Agent, Citibank, N.A., as Global
              Documentation Agent, Citisecurities Limited, as Australian
              Administrative Agent, Bank of America, N.A., Sydney Branch,
              and Deutsche Bank AG, Sydney Branch, as Australian Co-
              Syndication Agents, and Royal Bank of Canada and Bank One,
              NA, Australia Branch, as Australian Co-Documentation Agents
              (excluding exhibits and schedules) (incorporated by
              reference to Exhibit 10.5 to Registrant's Quarterly Report
              on Form 10-Q for the quarter ended June 30, 2002, SEC File
              No. 1-4300).

 10.8    --   Concession Agreement for Petroleum Exploration and
              Exploitation in the Khalda Area in Western Desert of Egypt
              by and among Arab Republic of Egypt, the Egyptian General
              Petroleum Corporation and Phoenix Resources Company of
              Egypt, dated April 6, 1981 (incorporated by reference to
              Exhibit 19(g) to Phoenix's Annual Report on Form 10-K for
              year ended December 31, 1984, SEC File No. 1-547).

 10.9    --   Amendment, dated July 10, 1989, to Concession Agreement for
              Petroleum Exploration and Exploitation in the Khalda Area in
              Western Desert of Egypt by and among Arab Republic of Egypt,
              the Egyptian General Petroleum Corporation and Phoenix
              Resources Company of Egypt incorporated by reference to
              Exhibit 10(d)(4) to Phoenix's Quarterly Report on Form 10-Q
              for quarter ended June 30, 1989, SEC File No. 1-547).

 10.10   --   Farmout Agreement, dated September 13, 1985 and relating to
              the Khalda Area Concession, by and between Phoenix Resources
              Company of Egypt and Conoco Khalda Inc(incorporated by
              reference to Exhibit 10.1 to Phoenix's Registration
              Statement on Form S-1, Registration No. 33-1069, filed
              October 23, 1985).

 10.11   --   Amendment, dated March 30, 1989, to Farmout Agreement
              relating to the Khalda Area Concession, by and between
              Phoenix Resources Company of Egypt and Conoco Khalda
              Inc(incorporated by reference to Exhibit 10(d)(5) to
              Phoenix's Quarterly Report on Form 10-Q for quarter ended
              June 30, 1989, SEC File No. 1-547).
```

| EXHIBIT NO. | | DESCRIPTION |
| --- | --- | --- |
| 10.12 | -- | Amendment, dated May 21, 1995, to Concession Agreement for Petroleum Exploration and Exploitation in the Khalda Area in Western Desert of Egypt between Arab Republic of Egypt, the Egyptian General Petroleum Corporation, Repsol Exploracon Egipto S.A., Phoenix Resources Company of Egypt and Samsung Corporation (incorporated by reference to exhibit 10.12 to Registrant's Annual Report on Form 10-K for year ended December 31, 1997, SEC File No. 1-4300). |
| 10.13 | -- | Concession Agreement for Petroleum Exploration and Exploitation in the Qarun Area in Western Desert of Egypt, between Arab Republic of Egypt, the Egyptian General Petroleum Corporation, Phoenix Resources Company of Qarun and Apache Oil Egypt, Inc., dated May 17, 1993 (incorporated by reference to Exhibit 10(b) to Phoenix's Annual Report on Form 10-K for year ended December 31, 1993, SEC File No. 1-547). |
| 10.14 | -- | Agreement for Amending the Gas Pricing Provisions under the Concession Agreement for Petroleum Exploration and Exploitation in the Qarun Area, effective June 16, 1994 (incorporated by reference to Exhibit 10.18 to Registrant's Annual Report on Form 10-K for year ended December 31, 1996, SEC File No. 1-4300). |
| +10.15 | -- | Apache Corporation Corporate Incentive Compensation Plan A (Senior Officers' Plan), dated July 16, 1998 (incorporated by reference to Exhibit 10.13 to Registrant's Annual Report on Form 10-K for year ended December 31, 1998, SEC File No. 1-4300). |
| +10.16 | -- | Apache Corporation Corporate Incentive Compensation Plan B (Strategic Objectives Format), dated July 16, 1998 (incorporated by reference to Exhibit 10.14 to Registrant's Annual Report on Form 10-K for year ended December 31, 1998, SEC File No. 1-4300). |
| +10.17 | -- | Apache Corporation 401(k) Savings Plan, dated August 1, 2002 (incorporated by reference to Exhibit 10.1 to Registrant's Quarterly Report on Form 10-Q for the quarter ended September 30, 2002, SEC File No. 1-4300). |
| +*10.18 | -- | Amendment to Apache Corporation 401(k) Savings Plan, dated January 27, 2003, effective as January 1, 2003. |
| +10.19 | -- | Apache Corporation Money Purchase Retirement Plan, dated August 1, 2002 (incorporated by reference to Exhibit 10.2 to Registrant's Quarterly Report on Form 10-Q for the quarter ended September 30, 2002, SEC File No. 1-4300). |
| +*10.20 | -- | Amendment to Apache Corporation Money Purchase Retirement Plan, dated January 27, 2003, effective as of January 1, 2003. |
| +10.21 | -- | Non-Qualified Retirement/Savings Plan of Apache Corporation, restated as of January 1, 1997, and amendments effective as of January 1, 1997, January 1, 1998 and January 1, 1999 (incorporated by reference to Exhibit 10.17 to Registrant's Annual Report on Form 10-K for year ended December 31, 1998, SEC File No. 1-4300). |
| +10.22 | -- | Amendment to Non-Qualified Retirement/Savings Plan of Apache Corporation, dated February 22, 2000, effective as of January 1, 1999 (incorporated by reference to Exhibit 4.7 to Registrant's Registration Statement on Form S-8, Registration No. 333-31092, filed February 25, 2000); and Amendment dated July 27, 2000 (incorporated by reference to Exhibit 4.8 to Amendment No. 1 to Registrant's Registration Statement on Form S-8, Registration No. 333-31092, filed August 18, 2000). |
| +10.23 | -- | Amendment to Non-Qualified Retirement/Savings Plan of Apache Corporation, dated August 3, 2001, effective as of September 1, 2000 and July 1, 2001 (incorporated by reference to Exhibit 10.13 to Registrant's Quarterly Report on Form 10-Q for the quarter ended June 30, 2001, SEC File No. 1-4300). |
| +10.24 | -- | Apache Corporation 1990 Stock Incentive Plan, as amended and restated September 13, 2001 (incorporated by reference to Exhibit 10.01 to Registrant's Quarterly Report on Form 10-Q for the quarter ended September 30, 2001, SEC File No. 1-4300). |

```
EXHIBIT
   NO.                           DESCRIPTION
 -------                       -----------

 +10.25   --   Apache Corporation 1995 Stock Option Plan, as amended and
               restated September 13, 2001 (incorporated by reference to
               Exhibit 10.02 to Registrant's Quarterly Report on Form 10-Q
               for the quarter ended September 30, 2001, SEC File No.
               1-4300).

+*10.26   --   Apache Corporation 2000 Share Appreciation Plan, as amended
               and restated February 5, 2003, effective as of March 12,
               2003.

 +10.27   --   Apache Corporation 1996 Performance Stock Option Plan, as
               amended and restated September 13, 2001 (incorporated by
               reference to Exhibit 10.03 to Registrant's Quarterly Report
               on Form 10-Q for the quarter ended September 30, 2001, SEC
               File No. 1-4300).

 +10.28   --   Apache Corporation 1998 Stock Option Plan, as amended and
               restated September 13, 2001 (incorporated by reference to
               Exhibit 10.04 to Registrant's Quarterly Report on Form 10-Q
               for the quarter ended September 30, 2001, SEC File No.
               1-4300).

 +10.29   --   Apache Corporation 2000 Stock Option Plan, as amended and
               restated March 5, 2003 (incorporated by reference to Exhibit
               4.5 to Registrant's Registration Statement on Form S-8,
               Registration No. 333-103758, filed March 12, 2003).

 +10.30   --   1990 Employee Stock Option Plan of The Phoenix Resource
               Companies, Inc., as amended through September 29, 1995,
               effective April 9, 1990 (incorporated by reference to
               Exhibit 10.33 to Registrant's Annual Report on Form 10-K for
               year ended December 31, 1996, SEC File No. 1-4300).

 +10.31   --   Apache Corporation Income Continuance Plan, as amended and
               restated May 3, 2001 (incorporated by reference to Exhibit
               10.30 to Registrant's Annual Report on Form 10-K for the
               year ended December 31, 2001, SEC File No. 1-4300).

 +10.32   --   Apache Corporation Deferred Delivery Plan, as amended and
               restated December 18, 2002, effective as of May 2, 2002
               (incorporated by reference to Exhibit 4.5 to Post-Effective
               Amendment No. 2 to Registrant's Registration Statement on
               Form S-8, Registration No. 333-31092, filed March 11, 2003).

 +10.33   --   Apache Corporation Executive Restricted Stock Plan, as
               amended and restated December 18, 2002, effective as of May
               2, 2002 (incorporated by reference to Exhibit 4.5 to
               Post-Effective Amendment No. 1 to Registrant's Registration
               Statement on Form S-8, Registration No. 333-97403, filed
               December 30, 2002).

 +10.34   --   Apache Corporation Non-Employee Directors' Compensation
               Plan, as amended and restated December 17, 1998
               (incorporated by reference to Exhibit 10.26 to Registrant's
               Annual Report on Form 10-K for year ended December 31, 1998,
               SEC File No. 1-4300).

 +10.35   --   Apache Corporation Outside Directors' Retirement Plan, as
               amended and restated May 3, 2001 (incorporated by reference
               to Exhibit 10.08 to Registrant's Quarterly Report on Form
               10-Q for the quarter ended June 30, 2001, SEC File No.
               1-4300).

 +10.36   --   Apache Corporation Equity Compensation Plan for Non-Employee
               Directors, as amended and restated May 3, 2001 (incorporated
               by reference to Exhibit 10.09 to Registrant's Quarterly
               Report on Form 10-Q for the quarter ended June 30, 2001, SEC
               File No. 1-4300).

 +10.37   --   Amended and Restated Employment Agreement, dated December 5,
               1990, between Registrant and Raymond Plank (incorporated by
               reference to Exhibit 10.39 to Registrant's Annual Report on
               Form 10-K for year ended December 31, 1996, SEC File No.
               1-4300).

 +10.38   --   First Amendment, dated April 4, 1996, to Restated Employment
               Agreement between Registrant and Raymond Plank (incorporated
               by reference to Exhibit 10.40 to Registrant's Annual Report
               on Form 10-K for year ended December 31, 1996, SEC File No.
               1-4300).

 +10.39   --   Amended and Restated Employment Agreement, dated December
               20, 1990, between Registrant and John A. Kocur (incorporated
               by reference to Exhibit 10.10 to Registrant's Annual Report
               on Form 10-K for year ended December 31, 1990, SEC File No.
               1-4300).
```

| EXHIBIT NO. | | DESCRIPTION |
|-------|----|-------------|
| +10.40 | -- | Employment Agreement, dated June 6, 1988, between Registrant and G. Steven Farris (incorporated by reference to Exhibit 10.6 to Registrant's Annual Report on Form 10-K for year ended December 31, 1989, SEC File No. 1-4300). |
| +10.41 | -- | Amended and Restated Conditional Stock Grant Agreement, dated June 6, 2001, between Registrant and G. Steven Farris (incorporated by reference to Exhibit 10.10 to Registrant's Quarterly Report on Form 10-Q for the quarter ended June 30, 2001, SEC File No. 1-4300). |
| 10.42 | -- | Amended and Restated Gas Purchase Agreement, effective July 1, 1998, by and among Registrant and MW Petroleum Corporation, as seller, and Producers Energy Marketing, LLC, as buyer (incorporated by reference to Exhibit 10.1 to Registrant's Current Report on Form 8-K, dated June 18, 1998, SEC File No. 1-4300). |
| 10.43 | -- | Deed of Guaranty and Indemnity, dated January 11, 2003, made by Registrant in favor of BP Exploration Operating Company Limited (incorporated by reference to Registrant's Current Report on Form 8-K, dated January 13, 2003, SEC File No. 1-4300). |
| *12.1 | -- | Statement of Computation of Ratios of Earnings to Fixed Charges and Combined Fixed Charges and Preferred Stock Dividends |
| *21.1 | -- | Subsidiaries of Registrant |
| *23.1 | -- | Consent of Ernst & Young LLP |
| *23.2 | -- | Consent of Ryder Scott Company L.P., Petroleum Consultants |
| *24.1 | -- | Power of Attorney (included as a part of the signature pages to this report) |
| *99.1 | -- | Certification of Chief Executive Officer and Chief Financial Officer |

* Filed herewith.

+ Management contracts or compensatory plans or arrangements required to be filed herewith pursuant to Item 15 hereof.

NOTE: Debt instruments of the Registrant defining the rights of long-term debt holders in principal amounts not exceeding 10 percent of the Registrant's consolidated assets have been omitted and will be provided to the Commission upon request.

(b) Reports on Form 8-K

There were no current reports on Form 8-K filed by Apache during the fiscal quarter ended December 31, 2002.

38

**SIGNATURES**

Pursuant to the requirements of Section 13 or 15(d) of the Securities Exchange Act of 1934, the registrant has duly caused this report to be signed on its behalf by the undersigned, thereunto duly authorized.

**APACHE CORPORATION**

```
                              /s/ G. STEVEN FARRIS
                        ---------------------------------------
                              G. Steven Farris
                        President, Chief Executive Officer and
                              Chief Operating Officer
```

```
          Dated: March 21, 2003
```

**POWER OF ATTORNEY**

The officers and directors of Apache Corporation, whose signatures appear below, hereby constitute and appoint G. Steven Farris, Roger B. Plank, P. Anthony Lannie and Eric L. Harry each of them (with full power to each of them to act alone), the true and lawful attorney-in-fact to sign and execute, on behalf of the undersigned, any amendment(s) to this report and each of the undersigned does hereby ratify and confirm all that said attorneys shall do or cause to be done by virtue thereof.

Pursuant to the requirements of the Securities Exchange Act of 1934, this report has been signed below by the following persons on behalf of the registrant and in the capacities and on the dates indicated.

| NAME | TITLE | DATE |
|------|-------|------|
| /s/ G. STEVEN FARRIS<br>G. Steven Farris | Director, President, Chief Executive Officer and Chief Operating Officer (Principal Executive Officer) | March 21, 2003 |
| /s/ ROGER B. PLANK<br>Roger B. Plank | Executive Vice President and Chief Financial Officer (Principal Financial Officer) | March 21, 2003 |
| /s/ THOMAS L. MITCHELL<br>Thomas L. Mitchell | Vice President and Controller (Principal Accounting Officer) | March 21, 2003 |
| /s/ RAYMOND PLANK<br>Raymond Plank | Chairman of the Board | March 21, 2003 |
| /s/ FREDERICK M. BOHEN<br>Frederick M. Bohen | Director | March 21, 2003 |
| /s/ RANDOLPH M. FERLIC<br>Randolph M. Ferlic | Director | March 21, 2003 |
| /s/ EUGENE C. FIEDOREK<br>Eugene C. Fiedorek | Director | March 21, 2003 |
| /s/ A. D. FRAZIER, JR.<br>A. D. Frazier, Jr. | Director | March 21, 2003 |

| NAME | TITLE | DATE |
| ---- | ----- | ---- |
| /s/ PATRICIA ALBJERG GRAHAM | Director | March 21, 2003 |
| Patricia Albjerg Graham | | |
| /s/ JOHN A. KOCUR | Director | March 21, 2003 |
| John A. Kocur | | |
| /s/ GEORGE D. LAWRENCE | Director | March 21, 2003 |
| George D. Lawrence | | |
| /s/ F. H. MERELLI | Director | March 21, 2003 |
| F. H. Merelli | | |
| /s/ RODMAN D. PATTON | Director | March 21, 2003 |
| Rodman D. Patton | | |
| /s/ CHARLES J. PITMAN | Director | March 21, 2003 |
| Charles J. Pitman | | |
| /s/ JAY A. PRECOURT | Director | March 21, 2003 |
| Jay A. Precourt | | |

**CERTIFICATIONS**

I, Roger B. Plank, certify that:

1. I have reviewed this annual report on Form 10-K of Apache Corporation;

2. Based on my knowledge, this annual report does not contain any untrue statement of a material fact or omit to state a material fact necessary to make the statements made, in light of the circumstances under which such statements were made, not misleading with respect to the period covered by this annual report;

3. Based on my knowledge, the financial statements, and other financial information included in this annual report, fairly present in all material respects the financial condition, results of operations and cash flows of the registrant as of, and for, the periods presented in this annual report;

4. The registrant's other certifying officers and I are responsible for establishing and maintaining disclosure controls and procedures (as defined in Exchange Act Rules 13a-14 and 15d-14) for the registrant and we have:

(a) designed such disclosure controls and procedures to ensure that material information relating to the registrant, including its consolidated subsidiaries, is made known to us by others within those entities, particularly during the period in which this annual report is being prepared;

(b) evaluated the effectiveness of the registrant's disclosure controls and procedures as of a date within 90 days prior to the filing date of this annual report (the "Evaluation Date"); and

(c) presented in this annual report our conclusions about the effectiveness of the disclosure controls and procedures based on our evaluation as of the Evaluation Date;

5. The registrant's other certifying officers and I have disclosed, based on our most recent evaluation, to the registrant's auditors and the audit committee of registrant's board of directors (or persons performing the equivalent function):

(a) all significant deficiencies in the design or operation of internal controls which could adversely affect the registrant's ability to record, process, summarize and report financial data and have identified for the registrant's auditors any material weaknesses in internal controls; and

(b) any fraud, whether or not material, that involves management or other employees who have a significant role in the registrant's internal controls; and

6. The registrant's other certifying officers and I have indicated in this annual report whether or not there were significant changes in internal controls or in other factors that could significantly affect internal controls subsequent to the date of our most recent evaluation, including any corrective actions with regard to significant deficiencies and material weaknesses.

```
                              /s/ ROGER B. PLANK
                    ------------------------------------
                          Roger B. Plank
                    Executive Vice President and
                      Chief Financial Officer

        Date: March 14, 2003
```

**CERTIFICATIONS**

I, G. Steven Farris, certify that:

1. I have reviewed this annual report on Form 10-K of Apache Corporation;

2. Based on my knowledge, this annual report does not contain any untrue statement of a material fact or omit to state a material fact necessary to make the statements made, in light of the circumstances under which such statements were made, not misleading with respect to the period covered by this annual report;

3. Based on my knowledge, the financial statements, and other financial information included in this annual report, fairly present in all material respects the financial condition, results of operations and cash flows of the registrant as of, and for, the periods presented in this annual report;

4. The registrant's other certifying officers and I are responsible for establishing and maintaining disclosure controls and procedures (as defined in Exchange Act Rules 13a-14 and 15d-14) for the registrant and we have:

(a) designed such disclosure controls and procedures to ensure that material information relating to the registrant, including its consolidated subsidiaries, is made known to us by others within those entities, particularly during the period in which this annual report is being prepared;

(b) evaluated the effectiveness of the registrant's disclosure controls and procedures as of a date within 90 days prior to the filing date of this annual report (the "Evaluation Date"); and

(c) presented in this annual report our conclusions about the effectiveness of the disclosure controls and procedures based on our evaluation as of the Evaluation Date;

5. The registrant's other certifying officers and I have disclosed, based on our most recent evaluation, to the registrant's auditors and the audit committee of registrant's board of directors (or persons performing the equivalent function):

(a) all significant deficiencies in the design or operation of internal controls which could adversely affect the registrant's ability to record, process, summarize and report financial data and have identified for the registrant's auditors any material weaknesses in internal controls; and

(b) any fraud, whether or not material, that involves management or other employees who have a significant role in the registrant's internal controls; and

6. The registrant's other certifying officers and I have indicated in this annual report whether or not there were significant changes in internal controls or in other factors that could significantly affect internal controls subsequent to the date of our most recent evaluation, including any corrective actions with regard to significant deficiencies and material weaknesses.

```
                                  /s/ G. STEVEN FARRIS
                         ------------------------------------
                              G. Steven Farris
                         President, Chief Executive Officer and
                              Chief Operating Officer

         Date: March 14, 2003
```

## REPORT OF MANAGEMENT

The financial statements and related financial information of Apache Corporation and subsidiaries were prepared by and are the responsibility of management. The statements have been prepared in conformity with accounting principles generally accepted in the United States and include amounts that are based on management's best estimates and judgments.

Management maintains and places reliance on systems of internal control designed to provide reasonable assurance, weighing the costs with the benefits sought, that all transactions are properly recorded in the Company's books and records, that policies and procedures are adhered to, and that assets are safeguarded. The systems of internal controls are supported by written policies and guidelines, internal audits and the selection and training of qualified personnel.

The consolidated financial statements of Apache Corporation and subsidiaries have been audited by the independent auditors, Ernst & Young LLP for 2002 and Arthur Andersen LLP for 2001 and 2000. Their audits included developing an overall understanding of the Company's accounting systems, procedures and internal controls and conducting tests and other auditing procedures sufficient to support their opinion on the fairness of the consolidated financial statements.

The Apache Corporation Board of Directors exercises its oversight responsibility for the financial statements through its Audit Committee, composed solely of outside directors who are not current employees of Apache or who have not been employees of Apache within the past ten years. The Audit Committee meets periodically with management, internal auditors and the independent auditors to ensure that they are successfully completing designated responsibilities. The internal auditors and independent auditors have open access to the Audit Committee to discuss auditing and financial reporting issues.

G. Steven Farris President, Chief Executive Officer and Chief Operating Officer

Roger B. Plank Executive Vice President and Chief Financial Officer

Thomas L. Mitchell Vice President and Controller

(Chief Accounting Officer)

Houston, Texas
March 14, 2003

F-1

# REPORT OF INDEPENDENT AUDITORS

**To the Shareholders of Apache Corporation:**

We have audited the accompanying consolidated balance sheet of Apache Corporation (a Delaware corporation) and subsidiaries as of December 31, 2002 and the related consolidated statements of operations, shareholders' equity, and cash flows for the year then ended. These financial statements are the responsibility of the Company's management. Our responsibility is to express an opinion on these financial statements based on our audit. The financial statements of Apache Corporation as of December 31, 2001, and for each of the two years in the period then ended, were audited by other auditors who have ceased operations and whose report dated March 12, 2002 expressed an unqualified opinion on those financial statements before the adjustments described in Note
1. Their report, however, had an explanatory paragraph indicating that the Company, as described in Note 1 to the consolidated financial statements, changed its method of accounting for crude oil inventories effective January 1, 2000, and as discussed in Notes 1 and 4 to the consolidated financial statements changed its method of accounting for derivative instruments effective January 1, 2001.

We conducted our audit in accordance with auditing standards generally accepted in the United States. Those standards require that we plan and perform the audit to obtain reasonable assurance about whether the financial statements are free of material misstatement. An audit includes examining, on a test basis, evidence supporting the amounts and disclosures in the financial statements. An audit also includes assessing the accounting principles used and significant estimates made by management, as well as evaluating the overall financial statement presentation. We believe that our audit provides a reasonable basis for our opinion.

In our opinion, the consolidated financial statements referred to above present fairly, in all material respects, the financial position of Apache Corporation and subsidiaries as of December 31, 2002 and the results of their operations and their cash flows for the year then ended in conformity with accounting principles generally accepted in the United States.

As discussed above, the financial statements of Apache Corporation as of December 31, 2001, and for each of the two years in the period then ended, were audited by other auditors who have ceased operations. As described in Note 1, these financial statements have been revised to reflect third party gathering and transportation costs as an operating cost instead of a reduction of revenues as previously reported. We audited the adjustments described in Note 1 that were applied to revise the 2001 and 2000 consolidated statement of operations. As described in Note 1, in 2002 the Company's Board of Directors approved a five percent stock dividend, and all references to number of shares and per share information in the financial statements have been adjusted to reflect the stock dividend on a retroactive basis. We audited the adjustments that were applied to restate the number of shares and per share information reflected in the 2002 financial statements. Our procedures included (a) agreeing the authorization for the five percent stock dividend to the Company's underlying records obtained from management, and (b) testing the mathematical accuracy of the restated number of shares, basic and diluted earnings per share. In our opinion, such adjustments are appropriate and have been properly applied. However, we were not engaged to audit, review, or apply any procedures to the 2001 and 2000 financial statements of Apache Corporation other than with respect to such adjustments and, accordingly, we do not express an opinion or any other form of assurance on the 2001 and 2000 financial statements taken as a whole.

**ERNST & YOUNG LLP**

Houston, Texas
March 14, 2003

F-2

# REPORT OF INDEPENDENT PUBLIC ACCOUNTANTS

**To the Shareholders of Apache Corporation:**

We have audited the accompanying consolidated balance sheet of Apache Corporation (a Delaware corporation) and subsidiaries as of December 31, 2001 and 2000, and the related consolidated statements of operations, shareholders' equity, and cash flows for each of the three years in the period ended December 31, 2001. These financial statements are the responsibility of the Company's management. Our responsibility is to express an opinion on these financial statements based on our audits.

We conducted our audits in accordance with auditing standards generally accepted in the United States. Those standards require that we plan and perform the audit to obtain reasonable assurance about whether the financial statements are free of material misstatement. An audit includes examining, on a test basis, evidence supporting the amounts and disclosures in the financial statements. An audit also includes assessing the accounting principles used and significant estimates made by management, as well as evaluating the overall financial statement presentation. We believe that our audits provide a reasonable basis for our opinion.

In our opinion, the consolidated financial statements referred to above present fairly, in all material respects, the financial position of Apache Corporation and subsidiaries as of December 31, 2001 and 2000, and the results of their operations and their cash flows for each of the three years in the period ended December 31, 2001 in conformity with accounting principles generally accepted in the United States.

As discussed in Note 1 to the consolidated financial statements, effective January 1, 2000, the Company changed its method of accounting for crude oil inventories. In addition, as discussed in Notes 1 and 4 to the consolidated financial statements, effective January 1, 2001, the Company changed its method of accounting for derivative instruments.

<div align="center">

**ARTHUR ANDERSEN LLP**

</div>

Houston, Texas
March 12, 2002

THIS IS A COPY OF AN ACCOUNTANTS' REPORT PREVIOUSLY ISSUED BY ARTHUR ANDERSEN LLP, AND HAS NOT BEEN REISSUED BY ARTHUR ANDERSEN. SEE ITEM 9 OF THIS FORM 10-K FOR FURTHER INFORMATION.

<div align="center">

F-3

</div>

APACHE CORPORATION AND SUBSIDIARIES

STATEMENT OF CONSOLIDATED OPERATIONS

|  | FOR THE YEAR ENDED DECEMBER 31, | | |
|--|------|------|------|
|  | 2002 | 2001 | 2000 |
|  | (IN THOUSANDS, EXCEPT PER COMMON SHARE DATA) | | |
| REVENUES: | | | |
| Oil and gas production revenues................ | $2,559,748 | $2,822,959 | $2,308,833 |
| Other revenues (losses)........................ | 125 | (13,568) | (6,855) |
|  | 2,559,873 | 2,809,391 | 2,301,978 |
| OPERATING EXPENSES: | | | |
| Depreciation, depletion and amortization....... | 843,879 | 820,831 | 583,546 |
| International impairments...................... | 19,600 | 65,000 | -- |
| Lease operating costs......................... | 462,124 | 404,814 | 253,709 |
| Gathering and transportation costs............. | 38,567 | 34,584 | 19,616 |
| Severance and other taxes...................... | 63,088 | 69,827 | 59,173 |
| General and administrative..................... | 104,588 | 88,710 | 75,615 |
| Financing costs: | | | |
| Interest expense............................ | 155,667 | 178,915 | 168,121 |
| Amortization of deferred loan costs......... | 1,859 | 2,460 | 2,726 |
| Capitalized interest........................ | (40,691) | (56,749) | (62,000) |
| Interest income............................. | (4,002) | (5,864) | (2,209) |
|  | 1,644,679 | 1,602,528 | 1,098,297 |
| PREFERRED INTERESTS OF SUBSIDIARIES............. | 16,224 | 7,609 | -- |
| INCOME BEFORE INCOME TAXES...................... | 898,970 | 1,199,254 | 1,203,681 |
| Provision for income taxes..................... | 344,641 | 475,855 | 483,086 |
| INCOME BEFORE CHANGE IN ACCOUNTING PRINCIPLE..... | 554,329 | 723,399 | 720,595 |
| Cumulative effect of change in accounting principle, net of income tax................ | -- | -- | (7,539) |
| NET INCOME...................................... | 554,329 | 723,399 | 713,056 |
| Preferred stock dividends...................... | 10,815 | 19,601 | 19,988 |
| INCOME ATTRIBUTABLE TO COMMON STOCK............. | $ 543,514 | $ 703,798 | $ 693,068 |
| BASIC NET INCOME PER COMMON SHARE: | | | |
| Before change in accounting principle.......... | $ 3.66 | $ 4.89 | $ 5.14 |
| Cumulative effect of change in accounting principle................................... | -- | -- | (.05) |
|  | $ 3.66 | $ 4.89 | $ 5.09 |
| DILUTED NET INCOME PER COMMON SHARE: | | | |
| Before change in accounting principle.......... | $ 3.60 | $ 4.73 | $ 4.96 |
| Cumulative effect of change in accounting principle................................... | -- | -- | (.05) |
|  | $ 3.60 | $ 4.73 | $ 4.91 |

The accompanying notes to consolidated financial statements are an integral part of this statement.

F-4

# APACHE CORPORATION AND SUBSIDIARIES

## STATEMENT OF CONSOLIDATED CASH FLOWS

| | FOR THE YEAR ENDED DECEMBER 31, | | |
|---|---|---|---|
| | 2002 | 2001 | 2000 |
| | (IN THOUSANDS) | | |
| **CASH FLOWS FROM OPERATING ACTIVITIES:** | | | |
| Net income........................................... | $ 554,329 | $ 723,399 | $ 713,056 |
| Adjustments to reconcile net income to net cash provided by operating activities: | | | |
| Depreciation, depletion and amortization............... | 843,879 | 820,831 | 583,546 |
| Provision for deferred income taxes.................... | 137,672 | 305,214 | 350,703 |
| Amortization of deferred loan costs.................... | 1,859 | 2,460 | 2,726 |
| International impairments.............................. | 19,600 | 65,000 | -- |
| Amortization of inherited derivatives.................. | (23,693) | (70,028) | -- |
| Cumulative effect of change in accounting principle, net of income tax........................................ | -- | -- | 7,539 |
| Other.................................................. | 9,531 | 10,469 | 9,719 |
| Changes in operating assets and liabilities, net of effects of acquisitions: | | | |
| (Increase) decrease in receivables..................... | (122,830) | 199,160 | (253,721) |
| (Increase) decrease in advances to oil and gas ventures and other............................................. | (26,116) | (14,474) | (6,167) |
| (Increase) decrease in product inventory.............. | 717 | (3,005) | 722 |
| (Increase) decrease in deferred charges and other...... | 496 | (922) | 5,967 |
| Increase (decrease) in payables........................ | 32,219 | (143,969) | 111,841 |
| Increase (decrease) in accrued expenses................ | (16,595) | 10,065 | 33,263 |
| Increase (decrease) in advances from gas purchasers..... | (14,574) | (13,079) | (27,850) |
| Increase (decrease) in deferred credits and noncurrent liabilities........................................... | (15,776) | 13,879 | (13,976) |
| NET CASH PROVIDED BY OPERATING ACTIVITIES.......... | 1,380,718 | 1,905,000 | 1,517,368 |
| **CASH FLOWS FROM INVESTING ACTIVITIES:** | | | |
| Additions to property and equipment.................... | (1,037,368) | (1,528,984) | (955,576) |
| Acquisition of Louisiana properties.................... | (258,885) | -- | -- |
| Acquisition of Fletcher subsidiaries, net of cash acquired............................................. | -- | (465,018) | -- |
| Acquisition of Repsol properties, net of cash acquired.... | -- | (446,933) | (118,678) |
| Acquisition of Phillips properties.................... | -- | -- | (490,250) |
| Acquisition of Occidental properties.................. | (11,000) | (11,000) | (321,206) |
| Acquisition of Collins & Ware properties.............. | -- | -- | (320,682) |
| Proceeds from sales of oil and gas properties, net........ | 7,043 | 348,296 | 26,271 |
| Proceeds from (purchase of ) short-term investments, net.................................................. | 101,723 | (103,863) | -- |
| Other, net............................................ | (37,520) | (76,835) | (36,875) |
| NET CASH USED IN INVESTING ACTIVITIES.............. | (1,236,007) | (2,284,337) | (2,216,996) |
| **CASH FLOWS FROM FINANCING ACTIVITIES:** | | | |
| Long-term borrowings................................... | 1,467,929 | 2,759,740 | 1,125,981 |
| Payments on long-term debt............................. | (1,553,471) | (2,733,641) | (793,531) |
| Dividends paid......................................... | (68,879) | (54,492) | (52,945) |
| Preferred stock activity, net.......................... | -- | -- | (2,613) |
| Common stock activity, net............................. | 30,708 | 10,205 | 465,306 |
| Treasury stock activity, net........................... | 1,991 | (42,959) | (17,730) |
| Cost of debt and equity transactions.................. | (6,728) | (1,718) | (838) |
| Proceeds from preferred interests of subsidiaries, net of issuance costs......................................... | -- | 440,654 | -- |
| NET CASH PROVIDED BY (USED IN) FINANCING ACTIVITIES...................................... | (128,450) | 377,789 | 723,630 |
| NET INCREASE (DECREASE) IN CASH AND CASH EQUIVALENTS........ | 16,261 | (1,548) | 24,002 |
| CASH AND CASH EQUIVALENTS AT BEGINNING OF YEAR.............. | 35,625 | 37,173 | 13,171 |
| CASH AND CASH EQUIVALENTS AT END OF YEAR................... | $ 51,886 | $ 35,625 | $ 37,173 |

The accompanying notes to consolidated financial statements are an integral part of this statement.

F-5

# APACHE CORPORATION AND SUBSIDIARIES

## CONSOLIDATED BALANCE SHEET

|  | DECEMBER 31, | |
|---|---|---|
|  | 2002 | 2001 |
|  | (IN THOUSANDS) | |
| **ASSETS** |  |  |
| **CURRENT ASSETS:** |  |  |
| Cash and cash equivalents............................... | $ 51,886 | $ 35,625 |
| Receivables............................................ | 527,687 | 404,793 |
| Inventories............................................ | 109,204 | 102,536 |
| Drilling advances...................................... | 45,298 | 26,438 |
| Prepaid assets and other............................... | 32,706 | 25,407 |
| Short-term investments................................. | -- | 102,950 |
|  | 766,781 | 697,749 |
| **PROPERTY AND EQUIPMENT:** |  |  |
| Oil and gas, on the basis of full cost accounting: |  |  |
| Proved properties.................................... | 12,827,459 | 11,390,692 |
| Unproved properties and properties under development, not being amortized.................................. | 656,272 | 839,921 |
| Gas gathering, transmission and processing facilities..... | 784,271 | 748,675 |
| Other.................................................. | 194,685 | 168,915 |
|  | 14,462,687 | 13,148,203 |
| Less: Accumulated depreciation, depletion and amortization........................................... | (5,997,102) | (5,135,131) |
|  | 8,465,585 | 8,013,072 |
| **OTHER ASSETS:** |  |  |
| Goodwill, net.......................................... | 189,252 | 188,812 |
| Deferred charges and other............................. | 38,233 | 34,023 |
|  | $ 9,459,851 | $ 8,933,656 |
| **LIABILITIES AND SHAREHOLDERS' EQUITY** |  |  |
| **CURRENT LIABILITIES:** |  |  |
| Accounts payable....................................... | $ 214,288 | $ 179,778 |
| Accrued operating expense.............................. | 47,382 | 50,584 |
| Accrued exploration and development.................... | 146,871 | 175,943 |
| Accrued compensation and benefits..................... | 32,680 | 30,947 |
| Accrued interest...................................... | 30,880 | 28,592 |
| Accrued income taxes.................................. | 44,256 | 40,030 |
| Other................................................. | 15,878 | 16,584 |
|  | 532,235 | 522,458 |
| LONG-TERM DEBT......................................... | 2,158,815 | 2,244,357 |
| **DEFERRED CREDITS AND OTHER NONCURRENT LIABILITIES:** |  |  |
| Income taxes.......................................... | 1,120,609 | 991,723 |
| Advances from gas purchasers.......................... | 125,453 | 140,027 |
| Oil and gas derivative instruments.................... | 3,507 | -- |
| Other................................................. | 158,326 | 175,925 |
|  | 1,407,895 | 1,307,675 |
| PREFERRED INTERESTS OF SUBSIDIARIES.................... | 436,626 | 440,683 |
| COMMITMENTS AND CONTINGENCIES (Note 11) |  |  |
| **SHAREHOLDERS' EQUITY:** |  |  |
| Preferred stock, no par value, 5,000,000 shares authorized -- |  |  |
| Series B, 5.68% Cumulative Preferred Stock, 100,000 shares issued and outstanding..................... | 98,387 | 98,387 |
| Series C, 6.5% Conversion Preferred Stock, 138,482 shares issued and outstanding for 2001............... | -- | 208,207 |
| Common stock, $1.25 par, 215,000,000 shares authorized, 155,464,540 and 148,230,383 shares issued, respectively......................................... | 194,331 | 185,288 |
| Paid-in capital....................................... | 3,427,450 | 2,803,825 |
| Retained earnings..................................... | 1,427,607 | 1,336,478 |
| Treasury stock, at cost, 4,211,328 and 4,272,045 shares, respectively......................................... | (110,559) | (111,885) |
| Accumulated other comprehensive loss.................. | (112,936) | (101,817) |

```
                                    4,924,280       4,418,483
                                  -----------     -----------
                                  $ 9,459,851     $ 8,933,656
                                  ===========     ===========
```

The accompanying notes to consolidated financial statements are an integral part of this statement.

F-6

# APACHE CORPORATION AND SUBSIDIARIES

## STATEMENT OF CONSOLIDATED SHAREHOLDERS' EQUITY

| | COMPREHENSIVE INCOME | SERIES B PREFERRED STOCK | SERIES C PREFERRED STOCK | COMMON STOCK | PAID-IN CAPITAL | RETAINED EARNINGS | TREASURY STOCK |
|---|---|---|---|---|---|---|---|
| | | | | (IN THOUSANDS) | | | |
| BALANCE AT DECEMBER 31, 1999....... | | $98,387 | $ 210,490 | $168,057 | $1,694,474 | $ 558,721 | $ (52,256) |
| Comprehensive income (loss): | | | | | | | |
|   Net income..................... | $713,056 | -- | -- | -- | -- | 713,056 | -- |
|   Currency translation | | | | | | | |
|     adjustments.................. | (31,389) | -- | -- | -- | -- | -- | -- |
|   Marketable securities.......... | (397) | -- | -- | -- | -- | -- | -- |
| Comprehensive income............. | $681,270 | | | | | | |
| Cash dividends: | | | | | | | |
|   Preferred...................... | | -- | -- | -- | -- | (19,658) | -- |
|   Common ($.18 per share)........ | | -- | -- | -- | -- | (25,258) | -- |
| Preferred stock repurchased...... | | -- | (2,283) | -- | -- | (330) | -- |
| Common shares issued............. | | -- | -- | 14,579 | 453,771 | -- | -- |
| Treasury shares purchased, net... | | -- | -- | -- | 428 | -- | (17,306) |
| BALANCE AT DECEMBER 31, 2000....... | | 98,387 | 208,207 | 182,636 | 2,148,673 | 1,226,531 | (69,562) |
| Comprehensive income (loss): | | | | | | | |
|   Net income..................... | $723,399 | -- | -- | -- | -- | 723,399 | -- |
|   Currency translation | | | | | | | |
|     adjustments.................. | (74,028) | -- | -- | -- | -- | -- | -- |
|   Commodity hedges............... | 12,136 | -- | -- | -- | -- | -- | -- |
|   Marketable securities.......... | 307 | -- | -- | -- | -- | -- | -- |
| Comprehensive income............. | $661,814 | | | | | | |
| Cash dividends: | | | | | | | |
|   Preferred...................... | | -- | -- | -- | -- | (19,601) | -- |
|   Common ($.33 per share)........ | | -- | -- | -- | -- | (48,980) | -- |
| Ten percent common stock | | | | | | | |
|   dividend...................... | | -- | -- | -- | 544,848 | (544,871) | -- |
| Common shares issued............. | | -- | -- | 2,652 | 109,086 | -- | -- |
| Treasury shares purchased, net... | | -- | -- | -- | 1,218 | -- | (42,323) |
| BALANCE AT DECEMBER 31, 2001....... | | 98,387 | 208,207 | 185,288 | 2,803,825 | 1,336,478 | (111,885) |
| Comprehensive income (loss): | | | | | | | |
|   Net income..................... | $554,329 | -- | -- | -- | -- | 554,329 | -- |
|   Currency translation | | | | | | | |
|     adjustments.................. | 5,328 | -- | -- | -- | -- | -- | -- |
|   Commodity hedges............... | (16,322) | -- | -- | -- | -- | -- | -- |
|   Marketable securities.......... | (125) | -- | -- | -- | -- | -- | -- |
| Comprehensive income............. | $543,210 | | | | | | |
| Cash dividends: | | | | | | | |
|   Preferred...................... | | -- | -- | -- | -- | (10,815) | -- |
|   Common ($.38 per share)........ | | -- | -- | -- | -- | (56,565) | -- |
| Five percent common stock | | | | | | | |
|   dividend...................... | | -- | -- | -- | 395,820 | (395,820) | -- |
| Common shares issued............. | | -- | -- | 1,240 | 26,044 | -- | -- |
| Conversion of Series C Preferred | | | | | | | |
|   Stock......................... | | -- | (208,207) | 7,803 | 200,404 | -- | -- |
| Treasury shares issued, net...... | | -- | -- | -- | 666 | -- | 1,326 |
| Other............................ | | -- | -- | -- | 691 | -- | -- |
| BALANCE AT DECEMBER 31, 2002....... | | $98,387 | $ -- | $194,331 | $3,427,450 | $1,427,607 | $(110,559) |

| | ACCUMULATED OTHER COMPREHENSIVE INCOME (LOSS) | TOTAL SHAREHOLDERS' EQUITY |
|---|---|---|
| | (IN THOUSANDS) | |
| BALANCE AT DECEMBER 31, 1999....... | $ (8,446) | $2,669,427 |
| Comprehensive income (loss): | | |
|   Net income..................... | -- | 713,056 |
|   Currency translation | | |
|     adjustments.................. | (31,389) | (31,389) |
|   Marketable securities.......... | (397) | (397) |
| Comprehensive income............. | | |
| Cash dividends: | | |
|   Preferred...................... | -- | (19,658) |
|   Common ($.18 per share)........ | -- | (25,258) |
| Preferred stock repurchased...... | -- | (2,613) |
| Common shares issued............. | -- | 468,350 |

```
Treasury shares purchased, net...                 (16,878)
                                     ---------    ----------
BALANCE AT DECEMBER 31, 2000.......   (40,232)     3,754,640
  Comprehensive income (loss):
    Net income.....................        --        723,399
    Currency translation
      adjustments..................   (74,028)      (74,028)
    Commodity hedges...............    12,136         12,136
    Marketable securities..........       307            307
  Comprehensive income............
  Cash dividends:
    Preferred......................        --        (19,601)
    Common ($.33 per share)........        --        (48,980)
  Ten percent common stock
    dividend.......................        --            (23)
  Common shares issued.............        --        111,738
  Treasury shares purchased, net...        --        (41,105)
                                     ---------    ----------
BALANCE AT DECEMBER 31, 2001.......  (101,817)     4,418,483
  Comprehensive income (loss):
    Net income.....................        --        554,329
    Currency translation
      adjustments..................     5,328          5,328
    Commodity hedges...............   (16,322)      (16,322)
    Marketable securities..........      (125)          (125)
  Comprehensive income............
  Cash dividends:
    Preferred......................        --        (10,815)
    Common ($.38 per share)........        --        (56,565)
  Five percent common stock
    dividend.......................        --             --
  Common shares issued.............        --         27,284
  Conversion of Series C Preferred
    Stock..........................        --             --
  Treasury shares issued, net......        --          1,992
  Other............................        --            691
                                     ---------    ----------
BALANCE AT DECEMBER 31, 2002.......  $(112,936)    $4,924,280
                                     =========    ==========
```

The accompanying notes to consolidated financial statements are an integral part of this statement.

**APACHE CORPORATION AND SUBSIDIARIES**

**NOTES TO CONSOLIDATED FINANCIAL STATEMENTS**

## 1. SUMMARY OF SIGNIFICANT ACCOUNTING POLICIES

Nature of Operations -- Apache Corporation (Apache or the Company) is an independent energy company that explores for, develops and produces natural gas, crude oil and natural gas liquids. The Company's North American exploration and production activities are divided into two U.S. operating regions (Central and Gulf Coast) and a Canadian region. Approximately 78 percent of the Company's proved reserves are located in North America. Internationally, Apache has exploration and production interests in Egypt, offshore Western Australia and in Argentina, a development project underway offshore The People's Republic of China (China) that is expected to commence production in 2003 and exploration interests in Poland.

The Company's future financial condition and results of operations will depend upon prices received for its oil and natural gas production and the costs of finding, acquiring, developing and producing reserves. A substantial portion of the Company's production is sold under market-sensitive contracts. Prices for oil and natural gas are subject to fluctuations in response to changes in supply, market uncertainty and a variety of other factors beyond the Company's control. These factors include worldwide political instability (especially in the Middle East), the foreign supply of oil and natural gas, the price of foreign imports, the level of consumer demand, and the price and availability of alternative fuels.

Stock Dividends -- On September 13, 2001, the Company's Board of Directors declared a 10 percent stock dividend payable on January 21, 2002 to shareholders of record on December 31, 2001. As a result, the Company reclassified approximately $545 million from retained earnings to common stock and paid-in capital, which represents the fair market value at the date of declaration of the shares distributed. No fractional shares were issued and cash payments totaling $891,000 were made in lieu of fractional shares.

On December 18, 2002, the Company's Board of Directors declared a five percent stock dividend payable on April 2, 2003 to shareholders of record on March 12, 2003. As a result, in December 2002, the Company reclassified approximately $396 million from retained earnings to common stock and paid-in capital, which represents the fair market value at the date of declaration of the shares distributed. No fractional shares will be issued and cash payments will be made in lieu of fractional shares.

All share and per share information in these financial statements and notes thereto have been restated to reflect both the 10 percent and five percent stock dividends.

Principles of Consolidation -- The accompanying consolidated financial statements include the accounts of Apache and its subsidiaries after elimination of intercompany balances and transactions. The Company's interests in oil and gas exploration and production ventures and partnerships are proportionately consolidated.

Cash Equivalents -- The Company considers all highly liquid debt instruments purchased with an original maturity of three months or less to be cash equivalents. These investments are carried at cost, which approximates fair value.

Allowance for Doubtful Accounts -- The Company routinely assesses the recoverability of all material trade and other receivables to determine their collectibility. Many of Apache's receivables are from joint interest owners on properties of which the Company is the operator. Thus, Apache may have the ability to withhold future revenue disbursements to recover any non-payment of joint interest billings. Generally, the Company's crude oil and natural gas receivables are typically collected within two months. In Egypt, however, the Company has experienced a gradual decline in the timeliness of receipts from the Egyptian General Petroleum Corporation (EGPC). Deteriorating economic conditions during 2001 and 2002 in Egypt have lessened the availability of U.S. dollars, resulting in an additional one to two month delay in receipts from EGPC. Continuation of the hard currency shortage in Egypt could lead to further delays, deferrals of payment or non-payment in the future. The Company accrues a reserve on a receivable when, based on the judgment of management, it is probable that a receivable will not be collected and the amount of any reserve may be

# APACHE CORPORATION AND SUBSIDIARIES

## NOTES TO CONSOLIDATED FINANCIAL STATEMENTS -- (CONTINUED)

reasonably estimated. As of December 31, 2002 and 2001, the Company had an allowance for doubtful accounts of $31 million and $24 million, respectively.

Marketable Securities -- The Company accounts for investments in debt and equity securities in accordance with Statement of Financial Accounting Standards (SFAS) No. 115, "Accounting for Certain Investments in Debt and Equity Securities." Investments in debt securities classified as "held to maturity" are recorded at amortized cost. Investments in debt and equity securities classified as "available for sale" are recorded at fair value with unrealized gains and losses recognized in other comprehensive income, net of income taxes. The Company utilizes the average-cost method in computing realized gains and losses, which are included in other revenues in the consolidated statements of operations.

Inventories -- Inventories consist principally of tubular goods and production equipment, stated at the lower of weighted-average cost or market, and oil produced but not sold, stated at the lower of cost (a combination of production costs and depreciation, depletion and amortization (DD&A) expense) or market.

Property and Equipment -- The Company uses the full-cost method of accounting for its investment in oil and gas properties. Under this method, the Company capitalizes all acquisition, exploration and development costs incurred for the purpose of finding oil and gas reserves, including salaries, benefits and other internal costs directly attributable to these activities. Exclusive of field-level costs, Apache capitalized $22 million, $20 million and $23 million of these internal costs in 2002, 2001 and 2000, respectively. Costs associated with production and general corporate activities, however, are expensed in the period incurred. Interest costs related to unproved properties and properties under development are also capitalized to oil and gas properties. Unless a significant portion of the Company's proved reserve quantities in a particular country are sold (greater than 25 percent), proceeds from the sale of oil and gas properties are accounted for as a reduction to capitalized costs, and gains and losses are not recognized.

Apache computes the DD&A of oil and gas properties on a quarterly basis using the unit-of-production method based upon production and estimates of proved reserve quantities. Unproved properties are excluded from the amortizable base until evaluated. Future development costs and dismantlement, restoration and abandonment costs, net of estimated salvage values, are added to the amortizable base. These future costs are generally estimated by engineers employed by Apache. Beginning in 2003, Apache changed its method of accounting for dismantlement, restoration and abandonment costs as described in Note 2.

Apache limits, on a country-by-country basis, the capitalized costs of proved oil and gas properties, net of accumulated DD&A and deferred income taxes, to the estimated future net cash flows from proved oil and gas reserves discounted at 10 percent, net of related tax effects, plus the lower of cost or fair value of unproved properties included in the costs being amortized. If capitalized costs exceed this limit, the excess is charged to additional DD&A expense. Included in the estimated future net cash flows are Canadian provincial tax credits expected to be realized beyond the date at which the legislation, under its provisions, could be repealed. To date, the Canadian provincial governments have not indicated an intention to repeal this legislation.

Given the volatility of oil and gas prices, it is reasonably possible that the Company's estimate of discounted future net cash flows from proved oil and gas reserves could change in the near term. If oil and gas prices decline significantly, even if only for a short period of time, it is possible that write-downs of oil and gas properties could occur.

While Apache agrees that costs on its balance sheet should be written down if they exceed the value of its reserves, the valuation methodology currently prescribed is, in the Company's opinion, flawed. For purposes of the test, except where there are long-term contracts, the price used to calculate the present value of reserves is that price in effect on the last day of the quarter. This is a highly volatile price and one that often has little to do with long-term value. The Company has pointed this out in discussions with the Securities and Exchange Commission (SEC) and will continue to work to resolve this important issue.

F-9

**APACHE CORPORATION AND SUBSIDIARIES**

**NOTES TO CONSOLIDATED FINANCIAL STATEMENTS -- (CONTINUED)**

Significant unproved properties are periodically assessed for possible impairments or reductions in value. If a reduction in value has occurred, the impairment is transferred to proved properties. Unproved properties that are individually insignificant are generally amortized over an average holding period. For international operations where a reserve base has not yet been established, the impairment is charged to earnings. During 2002, the Company recorded approximately $20 million ($12 million after tax) in impairments of unproved property costs in Poland. The Company will continue to evaluate its operations in Poland, which may result in additional impairments in 2003. During 2001, the Company recorded a $65 million ($41 million after tax) impairment of unproved property costs in China and Poland.

Buildings, equipment and gas gathering, transmission and processing facilities are depreciated on a straight-line basis over the estimated useful lives of the assets, which range from three to 20 years. Accumulated depreciation for these assets totaled $240 million and $182 million at December 31, 2002 and 2001, respectively.

Goodwill -- The Company adopted SFAS No. 142 "Goodwill and Other Intangible Assets" effective January 1, 2002. SFAS No. 142 addresses financial accounting and reporting for acquired goodwill and other intangible assets and supersedes Accounting Principles Board (APB) Opinion No. 17 "Intangible Assets." As a result of this pronouncement, goodwill is no longer subject to amortization. Rather, goodwill is subject to at least an annual assessment for impairment by applying a fair-value-based test. Goodwill totaled $189 million at December 31, 2002, representing the excess of the purchase price over the estimated fair value of the assets acquired and liabilities assumed in the Fletcher Challenge Energy (Fletcher) and Repsol YPF (Repsol) acquisitions, adjusted for currency fluctuations. Apache has recognized no impairment of goodwill as of December 31, 2002. Had the principles of SFAS No. 142 been applied to prior years, goodwill amortization of $7 million ($4 million after tax) expensed during 2001 would not have been incurred. Income attributable to common stock for the comparative period, adjusted to exclude the effect of goodwill amortization, would have increased diluted earnings per share by $.03.

Accounts Payable -- Included in accounts payable at both December 31, 2002 and 2001, are liabilities of approximately $37 million representing the amount by which checks issued, but not presented to the Company's banks for collection, exceeded balances in applicable bank accounts.

Revenue Recognition -- Apache uses the sales method of accounting for natural gas revenues. Under this method, revenues are recognized based on actual volumes of gas sold to purchasers. The volumes of gas sold may differ from the volumes to which Apache is entitled based on its interests in the properties. These differences create imbalances that are recognized as a liability only when the estimated remaining reserves will not be sufficient to enable the underproduced owner to recoup its entitled share through production. In both years ended December 31, 2002 and 2001, the Company recorded liabilities of $4 million for gas imbalances, which are reflected in other non-current liabilities. No receivables are recorded for those wells where Apache has taken less than its share of production. Gas imbalances are reflected as adjustments to proved gas reserves and future cash flows in the unaudited supplemental oil and gas disclosures. Adjustments for gas imbalances totaled less than one percent of Apache's proved gas reserves at December 31, 2002, 2001 and 2000.

The Company's Egyptian operations are conducted pursuant to production sharing contracts under which contractor partners pay all operating and capital costs for exploring and developing the concessions. A percentage of the production, usually up to 40 percent, is available to the contractor partners to recover all operating and capital costs. The balance of the production is split among the contractor partners and EGPC on a contractually defined basis.

Derivative Instruments and Hedging Activities -- Apache periodically enters into commodity derivative contracts to manage its exposure to oil and gas price volatility. Commodity derivative contracts, which are usually placed with major financial institutions that the Company believes are minimal credit risks, may take the form of futures contracts, swaps or options. The oil and gas reference prices upon which these commodity

F-10

# APACHE CORPORATION AND SUBSIDIARIES

## NOTES TO CONSOLIDATED FINANCIAL STATEMENTS -- (CONTINUED)

derivative contracts are based, reflect various market indices that have a high degree of historical correlation with actual prices received by the Company for its oil and gas production.

Effective January 1, 2001, Apache adopted SFAS No. 133, "Accounting for Derivative Instruments and Hedging Activities," as amended. SFAS No. 133, as amended, establishes accounting and reporting standards requiring that all derivative instruments be recorded in the balance sheet as either an asset or liability measured at fair value (which is generally based on information obtained from independent parties) and requires that changes in fair value be recognized currently in earnings unless specific hedge accounting criteria are met. Hedge accounting treatment allows unrealized gains and losses on cash flow hedges to be deferred in other comprehensive income. Realized gains and losses from the Company's cash flow hedges, including terminated contracts, are generally recognized in oil and gas production revenues when the forecasted transaction occurs. If at any time the likelihood of occurrence of a hedged forecasted transaction ceases to be "probable," hedge accounting under SFAS No. 133 will cease on a prospective basis and all future changes in the fair value of the derivative will be recognized directly in earnings. Amounts recorded in other comprehensive income prior to the change in the likelihood of occurrence of the forecasted transaction will remain in other comprehensive income until such time the forecasted transaction impacts earnings. If it becomes probable that the original forecasted production will not occur, then the derivative gain or loss would be reclassified from accumulated other comprehensive income into earnings immediately. Hedge effectiveness is measured at least quarterly based on the relative changes in fair value between the derivative contract and the hedged item over time and any ineffectiveness is immediately reported in other revenue (losses) in the statement of consolidated operations.

Upon adoption, Apache formally documented and designated all hedging relationships and verified that its hedging instruments were effective in offsetting changes in actual prices received by the Company. Prior to the adoption of SFAS No. 133, as amended, derivative instruments were not reflected as derivative assets and liabilities and, therefore, had no carrying value. Derivative instruments documented and treated as normal purchases or sales will continue to be recorded and recognized in income using accrual accounting.

Income Taxes -- Oil and gas exploration and production is a global business. As a result, Apache is subject to taxation on our income in numerous jurisdictions. The Company records deferred tax assets and liabilities to account for the expected future tax consequences of events that have been recognized in its financial statements and tax returns. Apache routinely assesses the realizability of its deferred tax assets. If the Company concludes that it is more likely than not that some portion or all of the deferred tax assets will not be realized under accounting standards, the tax asset would be reduced by a valuation allowance. The Company considers future taxable income in making such assessments. Numerous judgments and assumptions are inherent in the determination of future taxable income, including factors such as future operating conditions (particularly as related to prevailing oil and gas prices).

Earnings from Apache's international operations are permanently reinvested; therefore, the Company does not recognize deferred taxes on the unmitted earnings of its international subsidiaries. If it becomes apparent that some or all of the unremitted earnings will be remitted, the Company would then reflect taxes on those earnings.

Foreign Currency Translation -- The U.S. dollar is considered the functional currency for each of Apache's international operations. In light of the continuing transformation of the U.S. and Canadian energy markets into a single energy market, the Company adopted the U.S. dollar as the functional currency in Canada, effective October 1, 2002. Prior to this, the Canadian subsidiaries' functional currency was the Canadian dollar. Translation adjustments resulting from translating the Canadian subsidiaries' foreign currency financial statements into U.S. dollar equivalents were reported separately and accumulated in other comprehensive income. Some of the Company's Canadian subsidiaries had intercompany debt denominated in U.S. dollars. Prior to conversion, these transactions were long-term investments, and therefore, foreign currency gains and losses were recognized in other comprehensive income. Transaction gains and losses are

F-11

APACHE CORPORATION AND SUBSIDIARIES

NOTES TO CONSOLIDATED FINANCIAL STATEMENTS -- (CONTINUED)

recognized in other revenues (losses). Currency translation adjustments held in other comprehensive income on the balance sheet will remain there indefinitely unless there is a substantially complete liquidation of the Company's Canadian operations.

Net Income Per Common Share -- Basic net income per common share is computed by dividing income attributable to common stock by the weighted-average number of common shares outstanding during the period. Diluted net income per common share reflects the potential dilution that could occur if the Company's dilutive outstanding stock options were exercised using the average common stock price for the period and if the Company's 6.5% Automatically Convertible Equity Securities, Conversion Preferred Stock, Series C (Series C Preferred Stock) was converted to common stock using the conversion rate in effect during the period. The Series C Preferred Stock converted to Apache common stock on May 15, 2002. These potentially dilutive securities are excluded from the computation of dilutive earnings per share when their effect is antidilutive. Contingently issuable shares under the 2000 Share Appreciation Plan (Share Appreciation Plan) will be excluded from the calculation of income per common share until the stated goals are met (see Note 9).

Stock-Based Compensation -- At December 31, 2002, the Company had several stock-based employee compensation plans, which are defined and described more fully in Note 9. The Company accounts for those plans under the recognition and measurement principles of APB Opinion No. 25, "Accounting for Stock Issued to Employees," and related interpretations. Under this method, the Company records no compensation expense for stock options granted when the exercise price of those options is equal to or greater than the market price of the Company's common stock on the date of grant, unless the awards are subsequently modified. The following table illustrates the effect on income attributable to common stock and earnings per share if the Company had applied the fair value recognition provisions of SFAS No. 123, "Accounting for Stock-Based Compensation," as amended, to stock-based employee compensation for the Stock Option Plans, the Performance Plan, and the Share Appreciation Plan.

|  | FOR THE YEAR ENDED DECEMBER 31, | | |
|  | 2002 | 2001 | 2000 |
| --- | --- | --- | --- |
|  | (IN THOUSANDS) | | |
| Income attributable to Common Stock, as reported............ | $543,514 | $703,798 | $693,068 |
| Add: Stock-based employee compensation expense included in reported net income, net of related tax effects........... | 751 | -- | -- |
| Deduct: Total stock-based employee compensation expense determined under fair value based method for all awards (see Note 9), net of related tax effects................. | (20,494) | (22,463) | (13,212) |
| Pro forma Income Attributable to Common Stock............... | $523,771 | $681,335 | $679,856 |
| Net Income per Common Share: | | | |
| Basic: | | | |
| As reported.......................................... | $ 3.66 | $ 4.89 | $ 5.09 |
| Pro forma............................................ | $ 3.52 | $ 4.73 | $ 4.99 |
| Diluted: | | | |
| As reported.......................................... | $ 3.60 | $ 4.73 | $ 4.91 |
| Pro forma............................................ | $ 3.45 | $ 4.56 | $ 4.83 |

The effects of applying SFAS No. 123, as amended, in this pro forma disclosure should not be interpreted as being indicative of future effects. SFAS No. 123, as amended, does not apply to awards prior to 1995, and the extent and timing of additional future awards cannot be predicted.

Use of Estimates -- The preparation of financial statements in conformity with accounting principles generally accepted in the U.S. requires management to make estimates and assumptions that affect the reported amounts of assets and liabilities and related disclosure of contingent assets and liabilities at the date

F-12

APACHE CORPORATION AND SUBSIDIARIES

NOTES TO CONSOLIDATED FINANCIAL STATEMENTS -- (CONTINUED)

of the financial statements and the reported amounts of revenues and expenses during the reporting period. Certain accounting policies involve judgments and uncertainties to such an extent that there is reasonable likelihood that materially different amounts could have been reported under different conditions, or if different assumptions had been used. Apache evaluates its estimates and assumptions on a regular basis. The Company bases its estimates on historical experience and various other assumptions that are believed to be reasonable under the circumstances, the results of which form the basis for making judgments about carrying values of assets and liabilities that are not readily apparent from other sources. Actual results may differ from these estimates and assumptions used in preparation of its financial statements. Significant estimates with regard to these financial statements include the estimate of proved oil and gas reserve quantities and the related present value of estimated future net cash flows therefrom (see Note 15).

Treasury Stock -- The Company follows the weighted-average-cost method of accounting for treasury stock transactions.

Change in Accounting Principle -- In December 2000, the staff of the Securities and Exchange Commission (SEC) announced that commodity inventories should be carried at cost, not market value. As a result, Apache changed its accounting for crude oil inventories in the fourth quarter of 2000, retroactive to the beginning of the year, and recognized a non-cash cumulative-effect charge to earnings effective January 1, 2000 of $8 million, net of income tax, to value crude oil inventory at cost.

Reclassifications -- To comply with the consensus reached on Emerging Issues Task Force Issue 00-10, "Accounting for Shipping and Handling Fees and Costs," third party gathering and transportation costs have been reported as an operating cost instead of a reduction of revenues as previously reported. Reclassifications have been made to reflect this change in prior period statements of consolidated operations.

## 2. NEW ACCOUNTING PRONOUNCEMENTS

In 2001, the Financial Accounting Standards Board (FASB) issued SFAS No. 143, "Accounting for Asset Retirement Obligations." SFAS No. 143 addresses financial accounting and reporting for obligations associated with the retirement of tangible long-lived assets and the associated asset retirement costs. This statement requires companies to record the present value of obligations associated with the retirement of tangible long-lived assets in the period in which it is incurred. The liability is capitalized as part of the related long-lived asset's carrying amount. Over time, accretion of the liability is recognized as an operating expense and the capitalized cost is depreciated over the expected useful life of the related asset. The Company's asset retirement obligations relate primarily to the plugging dismantlement, removal, site reclamation and similar activities of its oil and gas properties. Prior to adoption of this statement, such obligations were accrued ratably over the productive lives of the assets through its depreciation, depletion and amortization for oil and gas properties without recording a separate liability for such amounts.

Effective January 1, 2003, the Company adopted SFAS No. 143 which will result in an increase to net oil and gas properties of $410 million and additional liabilities related to asset retirement obligations of $369 million. These entries reflect the asset retirement obligation of Apache had the provisions of SFAS No. 143 been applied since inception. This will result in a non-cash cumulative-effect increase to earnings of $27 million ($41 million pretax).

In November 2002, the FASB issued Interpretation No. 45 "Guarantor's Accounting and Disclosure Requirements for Guarantees, Including Indirect Guarantees of Indebtedness of Others." This Interpretation elaborates on the disclosures to be made by a guarantor in its interim and annual financial statements about its obligations under certain guarantees that it has issued. It also clarifies that a guarantor is required to recognize, at the inception of a guarantee, a liability for the fair value of the obligation undertaken in issuing the guarantee. The initial recognition and initial measurement provisions of this Interpretation are applicable on a prospective basis to guarantees issued or modified after December 31, 2002, irrespective of the guarantor's

F-13

**APACHE CORPORATION AND SUBSIDIARIES**

**NOTES TO CONSOLIDATED FINANCIAL STATEMENTS -- (CONTINUED)**

fiscal year-end. The Company adopted this pronouncement upon the FASB's issuance and the implementation had no current impact on the consolidated financial statements.

3. ACQUISITIONS AND DIVESTITURES

<div align="center">

**Acquisitions**

</div>

On December 17, 2002, Apache announced the acquisition of certain South Louisiana properties comprising 234,000 net acres (366 square miles) with net proved reserves of approximately 29.8 million barrels of oil equivalent (MMboe), 88 percent of which is natural gas, from a private company. The acquisition includes 135 producing wells, access to 849 square miles of 3-D seismic covering the relatively contiguous acreage position and ownership of the surface and mineral rights on most of the acreage, for approximately $259 million, subject to post-closing adjustments. Apache also entered into a separate exploration joint venture with the seller whereby the seller will actively generate prospects on certain South Louisiana acreage for a total cost of $25 million over a two-year period. (See Note 11.)

In 2002, the Company also completed other acquisitions for cash consideration totaling $95 million. These acquisitions added approximately 19.5 MMboe to the Company's proved reserves.

In March 2001, Apache completed the acquisition of substantially all of Repsol's oil and gas concession interests in Egypt for approximately $447 million in cash, subject to normal post closing adjustments. The properties included interests in seven Western Desert concessions and had estimated proved reserves of 66 MMboe as of the acquisition date. The Company already held interests in five of the seven concessions.

In March 2001, Apache completed the acquisition of subsidiaries of Fletcher for approximately $465 million in cash and 1.9 million restricted shares of Apache common stock issued to Shell Overseas Holdings (valued at $52.85 per share), subject to normal post closing adjustments. The transaction included properties located primarily in Canada's Western Sedimentary Basin. Estimated proved reserves totaled 120.8 MMboe as of the acquisition date. Apache assumed a liability of $103 million representing the fair value of derivative instruments and fixed-price commodity contracts entered into by Fletcher.

The Fletcher and Repsol purchase prices were allocated to the assets acquired and liabilities assumed based upon their estimated fair values as of the date of acquisition, as follows:

|  | FLETCHER | REPSOL |
|---|---|---|
|  | (IN THOUSANDS) | |
| Value of properties acquired, including gathering and transportation facilities................................. | $ 571,718 | $299,933 |
| Goodwill...................................................... | 107,200 | 90,000 |
| Derivative instruments and fixed-price contracts............ | (103,486) | -- |
| Common stock issued......................................... | (100,325) | -- |
| Working capital acquired, net............................... | (2,846) | 57,000 |
| Notes assumed............................................... | (5,356) | -- |
| Deferred income tax liability............................... | (1,887) | -- |
| Cash paid, net of cash acquired............................. | $ 465,018 | $446,933 |

In August 2001, Apache completed the acquisition of properties located in Texas, Oklahoma and New Mexico with estimated proved reserves of 9.2 MMboe as of the acquisition date for approximately $53 million in cash and the assumption of certain liabilities, representing the fair value of derivative instruments of $9 million, subject to normal post-closing adjustments.

In November 2001, Apache completed the acquisition of all of Novus Bukha Limited's (Novus) oil and gas concession interests in Egypt for approximately $66 million in cash. The acquisition included estimated

F-14

**APACHE CORPORATION AND SUBSIDIARIES**

**NOTES TO CONSOLIDATED FINANCIAL STATEMENTS -- (CONTINUED)**

proved reserves of approximately 11.7 MMboe as of the acquisition date. The properties included interests in three Western Desert concessions, in which Apache previously held an interest.

In 2001, the Company also completed other acquisitions for cash consideration totaling $44 million. These acquisitions added approximately 4.9 MMboe to the Company's proved reserves.

In January 2000, Apache completed the acquisition of producing properties in Western Oklahoma and the Texas Panhandle, formerly owned by a subsidiary of Repsol, for approximately $119 million, plus assumed liabilities of approximately $30 million. The properties were subject to an existing volumetric production payment, which burdens future production from the acquired properties. The $30 million assumed liability represents the estimated operating costs associated with the volumetric production payment. The acquisition included estimated proved reserves of approximately 28.7 MMboe, which was net of the 8.4 MMboe production payment as of the acquisition date.

In June 2000, Apache completed the acquisition of long-lived producing properties in the Permian Basin and South Texas from Collins & Ware, Inc. (Collins & Ware) for approximately $321 million. The acquisition included estimated proved reserves of approximately 83.7 MMboe as of the acquisition date. One-third of the reserves were liquid hydrocarbons.

In August 2000, Apache completed the acquisition of a Delaware limited liability company (LLC) owned by subsidiaries of Occidental Petroleum Corporation (Occidental) and related natural gas production for approximately $321 million including a discounted liability of $37 million, as of the acquisition date, representing the present value of future payments of approximately $44 million over four years. The remaining discounted liability at December 31, 2002 was $20 million. The Occidental properties are located in 32 fields on 93 blocks on the Outer Continental Shelf of the Gulf of Mexico. The acquisition included estimated proved reserves of approximately 53.1 MMboe as of the acquisition date.

In December 2000, Apache completed the acquisition of Canadian properties from Canadian affiliates of Phillips Petroleum Company (Phillips) for approximately $490 million. The acquisition included estimated proved reserves of approximately 70.0 MMboe as of the acquisition date. The properties comprise approximately 212,000 net developed acres and 275,000 net undeveloped acres, 786 square miles of 3-D seismic and 4,155 miles of 2-D seismic located in the Zama area of Northwest Alberta. The assets also include three sour gas plants with a total capacity of 150 million cubic feet per day (MMcf/d), 13 compressor stations and 150 miles of owned and operated gas gathering lines.

In 2000, the Company also completed other acquisitions for cash consideration totaling $104 million. These acquisitions added approximately 18.3 MMboe to the Company's proved reserves.

The following unaudited pro forma information shows the effect on the Company's consolidated results of operations as if the Fletcher and Repsol acquisitions occurred on January 1, 2000. The pro forma information

F-15

APACHE CORPORATION AND SUBSIDIARIES

NOTES TO CONSOLIDATED FINANCIAL STATEMENTS -- (CONTINUED)

includes only significant acquisitions and numerous assumptions, and is not necessarily indicative of future results of operations.

|  | FOR THE YEAR ENDED DECEMBER 31, | | | |
|---|---|---|---|---|
|  | 2001 | | 2000 | |
|  | AS REPORTED | PRO FORMA | AS REPORTED | PRO FORMA |
| (UNAUDITED) | (IN THOUSANDS, EXCEPT PER COMMON SHARE DATA) | | | |
| Revenues...................................... | $2,809,391 | $2,916,346 | $2,301,978 | $3,090,248 |
| Net income.................................... | 723,399 | 748,976 | 713,056 | 908,974 |
| Preferred stock dividends..................... | 19,601 | 19,601 | 19,988 | 19,988 |
| Income attributable to common stock.......... | 703,798 | 729,375 | 693,068 | 888,986 |
| Net income per common share: |  |  |  |  |
|   Basic...................................... | $     4.89 | $     5.05 | $     5.09 | $     6.16 |
|   Diluted.................................... | 4.73 | 4.89 | 4.91 | 5.96 |
| Average common shares outstanding............ | 144,007 | 144,450 | 136,265 | 144,405 |

Each transaction described above has been accounted for using the purchase method of accounting and has been included in the consolidated financial statements of Apache since the date of acquisition.

**Pending Acquisitions**

On January 13, 2003, Apache announced the acquisition of producing properties in the U.K. North Sea and the Gulf of Mexico, with estimated proved reserves of 233.2 MMboe, from BP p.l.c. (BP), for $1.3 billion, subject to normal closing adjustments, with an effective date of January 1, 2003. Approximately two-thirds of the reserves are in the North Sea's Forties oil field, establishing a new international operating region for the Company. Apache will become field operator with a 97 percent working interest. In conjunction with the Forties acquisition, Apache may be required to issue a letter of credit to BP to cover the present value of related asset retirement obligations if the rating of our senior unsecured debt is lowered by both Moody's and Standard and Poor's from the Company's current ratings of A- and A3, respectively. Additionally, Apache has hedged a portion of Forties production at fixed prices (see Note 4) and will create a defined benefit pension plan for certain employees (see Note 11). The Gulf of Mexico properties are located offshore Texas and Louisiana, where the Company has substantial existing operations. The assets comprise 113 total blocks and 61 fields and 70 percent of the production is operated. Apache will acquire a 100 percent working interest in 19 of the fields. The Gulf of Mexico segment of the transaction closed March 13, 2003 and the North Sea segment is expected to close early in the second quarter. The Company is financing the acquisition with a combination of internally generated funds, previously issued equity and debt.

**Divestitures**

In 2002, Apache sold marginal properties containing 1.8 MMboe of proved reserves, for $7 million. Apache used the sales proceeds to reduce bank debt.

During 2001, Apache sold marginal properties, primarily in North America, containing 88 MMboe of proved reserves, for $348 million. Apache used the proceeds to reduce bank debt.

During 2000, Apache sold proprietary rights to certain Canadian seismic data and various non-strategic oil and gas properties, collecting cash of $26 million.

4. DERIVATIVE INSTRUMENTS AND FIXED-PRICE PHYSICAL CONTRACTS

Apache uses a variety of strategies to manage its exposure to fluctuations in commodity prices. Primarily, the company enters into cash flow hedges in connection with certain acquisitions. The success of these

F-16

**APACHE CORPORATION AND SUBSIDIARIES**

**NOTES TO CONSOLIDATED FINANCIAL STATEMENTS -- (CONTINUED)**

acquisitions is significantly influenced by Apache's ability to achieve targeted production at forecasted prices. These hedges effectively reduce price risk on a portion of the production from the acquisitions.

Apache 2002 Derivative Activity -- As part of the South Louisiana properties acquired in December 2002, Apache entered into, and designated as a cash flow hedge, natural gas option agreements to establish floor and ceiling prices on anticipated future natural gas production. As of December 31, 2002, the Company had the following natural gas volumes hedged through natural gas options:

| PRODUCTION PERIOD | OPTION TYPE | TOTAL VOLUMES (MMBTU) | WEIGHTED AVERAGE FLOOR/CEILING | FAIR VALUE ASSET/ (LIABILITY) |
|---|---|---|---|---|
| | | | | (IN THOUSANDS) |
| 2003.......................................... | Collars | 13,750,000 | $3.50/6.09 | $ (859) |
| 2004.......................................... | Collars | 18,300,000 | 3.25/5.81 | (1,921) |
| 2005.......................................... | Collars | 9,050,000 | 3.25/5.20 | (727) |

The fair value of derivative assets and liabilities recorded for the Company's hedging activity represents the market value of the natural gas options as of December 31, 2002. The hedging activity had no impact on natural gas revenues during 2002. There was no material ineffectiveness associated with the cash flow hedges during the period the options were outstanding.

2001 Unwind -- Prior to Apache's derivative activity during 2002, the Company had historically entered into derivative positions divided into three general categories: (1) Apache's hedging activity, (2) derivatives assumed in acquisitions (Acquired Contracts), and (3) advances from gas purchasers. Driven by the uncertainty of how the collapse of Enron Corp. could have impacted the derivative markets, Apache closed all of its derivative positions and certain fixed-price physical contracts during October and November 2001, receiving proceeds of approximately $62 million (referred to as the "Unwind")

Upon adoption of SFAS No. 133 on January 1, 2001, or as of the acquisition date in the case of the Acquired Contracts, the fair value of Apache's derivative instruments was:

| | APACHE HEDGING ACTIVITY (JANUARY 1, 2001) | ACQUIRED CONTRACTS (ACQUISITION DATE) | ADVANCES FROM GAS PURCHASER (JANUARY 1, 2001) |
|---|---|---|---|
| | | (IN THOUSANDS) | |
| Commodity derivatives instruments............ | $(116,229) | $ (98,557) | $ 121,453 |
| Fixed-price physical contracts............... | -- | (14,085) | (121,453) |
| | $(116,229) | $(112,642) | $ -- |

At the time SFAS 133 was implemented, natural gas prices were approaching record highs. Although Apache was realizing higher prices on its unhedged production, the fair value of the Company's cash flow hedges was out-of-the-money by approximately $116 million ($71 million, net of income tax). This unrealized loss was reflected as a charge to other comprehensive income. Throughout the year, commodity prices were trending downward. As a result, Apache realized only $40 million of this loss during the year. In connection with the Unwind, the Company closed out the rest of these open positions and received cash proceeds of $8 million. These proceeds will be recognized in earnings as the original hedged production occurs. As of December 31, 2002, $3 million remains to be recognized in 2003.

The Company also uses long-term, fixed-price physical contracts to lock in a portion of its natural gas production at a given price. In the Unwind, the Company received approximately $13 million to terminate contracts with certain counterparties. Since the Company has no continuing performance obligations under the contracts, the amount was recognized as a gain in other revenues (losses) in 2001.

In addition to the cash flow hedges the Company entered into, Apache assumed $113 million of derivative and physical contracts in connection with two acquisitions. Because these derivatives were out-of-

F-17

APACHE CORPORATION AND SUBSIDIARIES

NOTES TO CONSOLIDATED FINANCIAL STATEMENTS -- (CONTINUED)

the-money when the Company acquired them, the liability was factored into the consideration paid to the sellers (see Note 3). Since commodity prices generally decreased after the acquisitions, Apache was able to settle this liability in the Unwind for only $67 million, including $37 million paid to terminate the remaining open positions. As a result, Apache recognized a gain of $32 million during 2001, and $14 million during 2002. As of December 31, 2002, a loss of $527,000 remains and will be recognized in 2003 and 2004.

Effective January 1, 2001, Apache recognized a derivative asset of $121 million reflecting the fair value of gas price swaps entered into in connection with certain advance payments received from gas purchasers in 1998 and 1997. Apache also recognized a derivative liability of $121 million reflecting the fair value of an embedded fixed price physical contract. The net effect of these transactions resulted in Apache delivering natural gas to the advance purchasers at prevailing market prices. Apache terminated the gas price swaps in the Unwind, receiving proceeds of $78 million. These proceeds will be recognized into earnings over the remaining life of the contracts and effectively increase the original contract's fixed prices by approximately 51 percent. Upon termination, Apache designated the remaining contractual volumes of gas that will be delivered to the purchaser as a normal, fixed-price physical contract. See Note 8 for additional information on the advances from gas purchasers.

Apache 2003 Derivative Activity -- Subsequent to year end and in conjunction with the BP acquisition, Apache entered into several derivative transactions in order to preserve the Company's financial position in a period of cyclically high gas and oil prices. The Company entered into the following natural gas and crude oil fixed-price swaps:

| NATURAL GAS FIXED-PRICE SWAPS (NYMEX) | | | CRUDE OIL FIXED-PRICE SWAPS (NYMEX) | | |
|---|---|---|---|---|---|
| PRODUCTION PERIOD | TOTAL VOLUMES (MMBTU) | AVERAGE FIXED PRICE | PRODUCTION PERIOD | TOTAL VOLUMES (BARRELS) | AVERAGE FIXED PRICE |
| 2003................. | 61,675,000 | $5.19 | 2003................. | 16,700,000 | $26.59 |
| 2004................. | 51,240,000 | 4.52 | 2004................. | 1,550,000 | 26.59 |

Although the fixed-price swaps are settled at NYMEX, the Company's hedged forecasted sales are based on pricing at different locations. The Company believes the hedging relationships are highly effective; however, Apache entered into separate natural gas basis swap contracts to fix a portion of the sales price differential. Apache designated all of the natural gas and crude oil fixed-price swaps and basis swaps as cash flow hedges of anticipated sales.

In addition to the fixed-price swaps, Apache entered into a separate crude oil physical sales contract with BP.

| CRUDE OIL FIXED-PRICE PHYSICAL CONTRACTS (BRENT) | | |
|---|---|---|
| PRODUCTION PERIOD | TOTAL VOLUMES (MMBTU) | AVERAGE FIXED PRICE |
| 2003................................................. | 8,350,000 | $25.32 |
| 2004................................................. | 14,175,000 | 22.24 |

5. SHORT-TERM INVESTMENTS

In August 2001, Apache purchased $116 million in U.S. Government Agency Notes. The Company subsequently sold $13 million of the notes in 2001. Of the remaining balance, $17 million were designated as "available for sale" securities and were sold for approximately $17 million in January 2002. Approximately $86 million were designated as "held to maturity" and carried at amortized cost. These notes paid interest at rates from 6.25 percent to 6.375 percent and matured on October 15, 2002.

F-18

APACHE CORPORATION AND SUBSIDIARIES

NOTES TO CONSOLIDATED FINANCIAL STATEMENTS -- (CONTINUED)

6. DEBT

**Long-Term Debt**

| | DECEMBER 31, | |
|---|---|---|
| | 2002 | 2001 |
| | (IN THOUSANDS) | |
| Apache: | | |
| Money market lines of credit................................ | $ 8,900 | $ 1,600 |
| Global credit facility -- U.S. ............................ | -- | 100,000 |
| Commercial paper........................................... | 271,400 | 530,700 |
| 9.25-percent notes due 2002, net of discount.............. | -- | 99,974 |
| 6.25-percent debentures due 2012, net of discount......... | 397,307 | -- |
| 7-percent notes due 2018, net of discount................. | 148,446 | 148,391 |
| 7.625-percent notes due 2019, net of discount............. | 149,134 | 149,109 |
| 7.7-percent notes due 2026, net of discount............... | 99,660 | 99,655 |
| 7.95-percent notes due 2026, net of discount.............. | 178,614 | 178,595 |
| 7.375-percent debentures due 2047, net of discount........ | 148,009 | 148,003 |
| 7.625-percent debentures due 2096, net of discount........ | 149,175 | 149,175 |
| | 1,550,645 | 1,605,202 |
| Subsidiary and other obligations: | | |
| Money market lines of credit............................... | -- | 1,196 |
| Global credit facility -- Canada.......................... | -- | 30,000 |
| Fletcher notes............................................. | 5,356 | 5,356 |
| Apache Finance Australia 6.5-percent notes due 2007, net of discount..................................... | 169,260 | 169,137 |
| Apache Finance Australia 7-percent notes due 2009, net of discount..................................... | 99,535 | 99,478 |
| Apache Finance Canada 7.75-percent notes due 2029, net of discount..................................... | 297,019 | 296,988 |
| Apache Clearwater notes due 2003.......................... | 37,000 | 37,000 |
| | 608,170 | 639,155 |
| Total debt................................................. | 2,158,815 | 2,244,357 |
| Less: current maturities.................................. | -- | - |
| Long-term debt............................................. | $2,158,815 | $2,244,357 |

In April 2002, the Company issued $400 million principal amount, $397 million net of discount, of senior unsecured 6.25-percent notes maturing on April 15, 2012. The notes are redeemable, as a whole or in part, at Apache's option, subject to a make-whole premium. The proceeds were used to repay a portion of the Company's outstanding commercial paper and for general corporate purposes.

On June 3, 2002, Apache entered into a new $1.5 billion global credit facility to replace its existing global and 364-day credit facilities. The new global credit facility consists of four separate bank facilities: a $750 million 364-day facility in the United States (364-day facility); a $450 million five-year facility in the United States (U.S. five-year facility); a $150 million five-year facility in Australia; and a $150 million five-year facility in Canada. The financial covenants of the global credit facility require the Company to: (i) maintain a consolidated tangible net worth, plus the aggregate amount of any non-cash write-downs, of at least $2.3 billion as of December 31, 2002, adjusted for subsequent earnings, (ii) maintain an aggregate book-value for assets of Apache and certain subsidiaries, as defined, on an unconsolidated basis of at least $2 billion as of December 31, 2002, and (iii) maintain a ratio of debt to capitalization of not greater than 60 percent at the end of any fiscal quarter. The Company was in compliance with all financial covenants at December 31, 2002.

F-19

APACHE CORPORATION AND SUBSIDIARIES

NOTES TO CONSOLIDATED FINANCIAL STATEMENTS -- (CONTINUED)

The five-year facilities are scheduled to mature on June 3, 2007 and the 364-day facility is scheduled to mature on June 1, 2003. The 364-day facility allows the Company the option to convert outstanding revolving loans at maturity into one-year term loans. The Company may request extensions of the maturity dates subject to approval of the lenders. At the Company's option, the interest rate is based on (i) the greater of (a) The JP Morgan Chase Bank prime rate or
(b) the federal funds rate plus one-half of one percent or (ii) the London Interbank Offered Rate (LIBOR) plus a margin determined by the Company's senior long-term debt rating. In addition, the U.S. five-year facility allows the Company the option to borrow under competitive auctions. At December 31, 2002, the margin over LIBOR for committed loans was .30 percent on the five-year facilities and .32 percent on the 364-day facility. If the total amount of the loans borrowed under all of the facilities equals or exceeds 33 percent of the total facility commitments, then an additional .125 percent will be added to the margins over LIBOR. The Company also pays a quarterly facility fee of .10 percent on the total amount of each of the five-year facilities and .08 percent on the total amount of the 364-day facility. The facility fees vary based upon the Company's senior long-term debt rating. The U.S. five-year facility and the 364-day facility are used to support Apache's commercial paper program. The available borrowing capacity under the global credit facility at December 31, 2002 was $1.2 billion.

At December 31, 2002, the Company also had certain uncommitted money market lines of credit which are used from time to time for working capital purposes, under which an aggregate of $9 million was outstanding as of December 31, 2002. Such borrowings are classified as long-term debt in the accompanying consolidated balance sheet as the Company has the ability and intent to refinance such amounts on a long-term basis through available borrowing capacity under the U.S. five-year facility and the 364-day facility.

The Company has a $1.2 billion commercial paper program which enables Apache to borrow funds for up to 270 days at competitive interest rates. The commercial paper balances at December 31, 2002 and 2001 were classified as long-term debt in the accompanying consolidated balance sheet as the Company has the ability and intent to refinance such amounts on a long-term basis through either the rollover of commercial paper or available borrowing capacity under the U.S. five-year facility and the 364-day facility. The weighted average interest rate for commercial paper was 1.85 percent in 2002 and 4.10 percent in 2001.

The 9.25-percent notes matured June 1, 2002 and were repaid using commercial paper. These notes were classified as long-term debt at December 31, 2001, in the accompanying consolidated balance sheet as the Company had the ability and intent to refinance such amount on a long-term basis through available borrowing capacity under the global credit facility and 364-day facility.

The Company does not have the right to redeem any of its notes or debentures (other than the Apache Corporation 6.25-percent notes due April 15, 2012 and the Apache Finance Australia 6.5-percent notes due 2007, mentioned below) prior to maturity. Under certain conditions, the Company has the right to advance maturity on the 7.7-percent notes, 7.95-percent notes, 7.375-percent debentures and 7.625-percent debentures.

The notes issued by Apache Finance Pty Ltd (Apache Finance Australia) and Apache Finance Canada Corporation (Apache Finance Canada) are irrevocably and unconditionally guaranteed by Apache and, in the case of Apache Finance Australia, by Apache North America, Inc., an indirect wholly-owned subsidiary of the Company. Under certain conditions related to changes in relevant tax laws, Apache Finance Australia and Apache Finance Canada have the right to redeem the notes prior to maturity. In the case of the 6.5-percent notes, Apache Finance Australia may also redeem the notes at its option subject to a make-whole premium (see Note 17).

In August 2001, Apache Clearwater, Inc. (Apache Clearwater), a subsidiary of Apache, issued $37 million of senior floating rate notes, which mature August 9, 2003. The notes bear interest at a rate equal to three-month LIBOR plus 1.05 percent and are redeemable at the Company's discretion. The balance is classified as long-term debt in the accompanying consolidated balance sheet as the Company has the ability

F-20

**APACHE CORPORATION AND SUBSIDIARIES**

**NOTES TO CONSOLIDATED FINANCIAL STATEMENTS -- (CONTINUED)**

and intent to refinance such amounts on a long-term basis through available borrowing capacity under the U.S. five-year facility and the 364-day facility.

The $14 million of discounts on the Company's debt at December 31, 2002, is being amortized over the life of the debt issuances as additional interest expense.

As of December 31, 2002 and 2001, the Company had approximately $19 million and $14 million, respectively, of unamortized deferred loan costs associated with its various debt obligations. These costs are included in deferred charges and other in the accompanying consolidated balance sheet and are being amortized to expense over the life of the related debt.

The indentures for the notes described above place certain restrictions on the Company, including limits on Apache's ability to incur debt secured by certain liens and its ability to enter into certain sale and leaseback transactions. Upon certain change in control, all of these debt instruments would be subject to mandatory repurchase, at the option of the holders.

**Aggregate Maturities of Debt**

|  | (IN THOUSANDS) |
|---|---|
| 2003 | $         -- |
| 2004 | -- |
| 2005 | 830 |
| 2006 | 274 |
| 2007 | 489,559 |
| Thereafter | 1,668,152 |
|  | $2,158,815 |

The Company made cash payments for interest, net of amounts capitalized, of $99 million, $105 million and $93 million for the years ended December 31, 2002, 2001 and 2000, respectively.

7. INCOME TAXES

Income before income taxes is composed of the following:

|  | FOR THE YEAR ENDED DECEMBER 31, | | |
|---|---|---|---|
|  | 2002 | 2001 | 2000 |
|  | (IN THOUSANDS) | | |
| United States | $286,840 | $  605,392 | $  654,136 |
| Foreign | 612,130 | 593,862 | 549,545 |
| Total | $898,970 | $1,199,254 | $1,203,681 |

F-21

APACHE CORPORATION AND SUBSIDIARIES

NOTES TO CONSOLIDATED FINANCIAL STATEMENTS -- (CONTINUED)

The total provision for income taxes consists of the following:

|  | FOR THE YEAR ENDED DECEMBER 31, | | |
|---|---|---|---|
|  | 2002 | 2001 | 2000 |
|  | (IN THOUSANDS) | | |
| Current taxes: | | | |
| Federal........................................... | $ 25,657 | $ 19,054 | $ 12,000 |
| State............................................. | 1,564 | 4,995 | -- |
| Foreign........................................... | 179,748 | 146,592 | 120,383 |
| Deferred taxes..................................... | 137,672 | 305,214 | 350,703 |
| Total.......................................... | $344,641 | $475,855 | $483,086 |

A reconciliation of the U.S. federal statutory income tax amounts to the effective amounts is shown below:

|  | FOR THE YEAR ENDED DECEMBER 31, | | |
|---|---|---|---|
|  | 2002 | 2001 | 2000 |
|  | (IN THOUSANDS) | | |
| Statutory income tax.......................... | $314,639 | $419,739 | $421,288 |
| State income tax, less federal benefit........ | 7,171 | 15,135 | 9,650 |
| Effect of foreign operations.................. | 35,283 | 38,890 | 52,354 |
| Realized tax basis in investment.............. | (16,321) | (1,350) | -- |
| All other, net................................ | 3,869 | 3,441 | (206) |
|  | $344,641 | $475,855 | $483,086 |

The net deferred tax liability is comprised of the following:

|  | DECEMBER 31, | |
|---|---|---|
|  | 2002 | 2001 |
|  | (IN THOUSANDS) | |
| Deferred tax assets: | | |
| Deferred income............................................ | $ (1,120) | $ (3,744) |
| Federal net operating loss carryforwards.................. | (40,700) | (2,462) |
| State net operating loss carryforwards.................... | (16,436) | (13,469) |
| Statutory depletion carryforwards......................... | (5,652) | -- |
| Alternative minimum tax credits........................... | (13,836) | (14,472) |
| Foreign net operating loss carryforwards.................. | (9,764) | (9,444) |
| Accrued expenses and liabilities.......................... | (5,818) | (8,088) |
| Other...................................................... | (3,539) | (3,415) |
| Total deferred tax assets............................. | (96,865) | (55,094) |
| Valuation allowance....................................... | 9,764 | -- |
| Net deferred tax assets............................... | (87,101) | (55,094) |
| Deferred tax liabilities: | | |
| Depreciation, depletion and amortization.................. | 1,207,710 | 1,043,687 |
| Other...................................................... | -- | 3,130 |
| Total deferred tax liabilities........................ | 1,207,710 | 1,046,817 |
| Net deferred income tax liability........................... | $1,120,609 | $ 991,723 |

F-22

APACHE CORPORATION AND SUBSIDIARIES

NOTES TO CONSOLIDATED FINANCIAL STATEMENTS -- (CONTINUED)

The Company has not recorded deferred income taxes on the undistributed earnings of its foreign subsidiaries as management intends to permanently reinvest such earnings. As of December 31, 2002, the undistributed earnings of the foreign subsidiaries amounted to approximately $2.1 billion. Upon distribution of these earnings in the form of dividends or otherwise, the Company may be subject to U.S. income taxes and foreign withholding taxes. It is not practical, however, to estimate the amount of taxes that may be payable on the eventual remittance of these earnings after consideration of available foreign tax credits. Presently, limited foreign tax credits are available to reduce the U.S. taxes on such amounts if repatriated.

At December 31, 2002, the Company had federal net operating loss carryforwards of $116 million, state net operating loss carryforwards of $317 million and foreign net operating loss carryforwards of $10 million. The state and federal net operating losses will expire over the next 15 and 20 years, respectively, if they are not otherwise utilized. The foreign net operating loss carryforwards relate to foreign pre-production expenditures which will not be deductible for foreign income tax purposes until production begins, which is expected to be in 2003. Once these expenditures are deducted for foreign income tax purposes, any net operating loss has a five-year carryforward period. A full valuation allowance has been provided on these foreign losses. The Company has alternative minimum tax (AMT) credit carryforwards of $14 million that can be carried forward indefinitely, but which can be used only to reduce regular tax liabilities in excess of AMT liabilities.

The Company made cash payments for income and other taxes, net of refunds, of $171 million, $172 million and $123 million for the years ended December 31, 2002, 2001 and 2000, respectively.

8. ADVANCES FROM GAS PURCHASERS

In July 1998, Apache received $72 million from a purchaser as an advance payment for future natural gas deliveries ranging from 6,726 MMBtu per day to 24,669 MMBtu per day, for a total of 45,330,949 MMBtu, over a ten-year period commencing August 1998. In addition, the purchaser pays Apache a monthly fee of $.08 per MMBtu on the contracted volumes. Concurrent with this arrangement, Apache entered into three gas price swap contracts with a third party under which Apache became a fixed price payor for identical volumes at prices ranging from $2.34 per MMBtu to $2.56 per MMBtu. The net result of these related transactions was that gas delivered to the purchaser was reported as revenue at prevailing spot prices with Apache realizing a premium associated with the monthly fee paid by the purchaser.

In August 1997, Apache received $115 million from a purchaser as an advance payment for future natural gas deliveries of 20,000 MMBtu per day over a ten-year period commencing September 1997. In addition, the purchaser pays Apache a monthly fee of $.07 per MMBtu on the contracted volumes. Concurrent with this arrangement, Apache entered into two gas price swap contracts with a third party under which Apache became a fixed price payor for identical volumes at average prices starting at $2.19 per MMBtu in 1997 and escalating to $2.59 per MMBtu in 2007. The net result of these related transactions was that gas delivered to the purchaser was reported as revenue at prevailing spot prices with Apache realizing a premium associated with the monthly fee paid by the purchaser.

Contracted volumes relating to these arrangements are included in the Company's unaudited supplemental oil and gas disclosures.

These advance payments have been classified as advances from gas purchasers and are being recognized in oil and gas production revenues as gas is delivered to the purchasers under the terms of the contracts. At December 31, 2002 and 2001, advances of $125 and $140 million, respectively, were outstanding. Gas volumes delivered to the purchaser are reported as revenue at prices used to calculate the amount advanced, before imputed interest, plus or minus amounts paid or received by Apache applicable to the price swap agreements. Interest expense is recorded based on a rate of eight percent.

In October and November 2001, Apache terminated the gas price swap contracts associated with these advances and received proceeds of $78 million. The effect of terminating these derivative instruments reduces

F-23

**APACHE CORPORATION AND SUBSIDIARIES**

**NOTES TO CONSOLIDATED FINANCIAL STATEMENTS -- (CONTINUED)**

future price risk exposure to natural gas price volatility by establishing a fixed price for the remaining quantities of gas to be delivered under the terms of the contracts. Upon termination, Apache designated the remaining contractual volumes of gas that will be delivered to the purchasers as a normal fixed-price physical sale. The prices used in settling the derivatives represented an average 51 percent increase over the prices reflected in the original contracts. No gain or loss was recognized at termination. The settlement is carried as advances from gas purchases on the consolidated balance sheet and will be recognized in monthly sales based on the portion of the proceeds applicable to each production month over the remaining life of the contracts.

## 9. CAPITAL STOCK

The following shares have been restated to reflect the 10 percent and five percent stock dividends as discussed in Note 1 of these financial statements.

### Common Stock Outstanding

|                                                | 2002 | 2001 | 2000 |
|------------------------------------------------|------------:|------------:|------------:|
| Balance, beginning of year                     | 143,958,338 | 142,798,134 | 131,665,916 |
| Treasury shares issued (acquired), net         | 60,716 | (961,782) | (530,699) |
| Shares issued for:                             | | | |
|   Public offering(1)(4)              | -- | -- | 10,626,000 |
|   Acquisition of Fletcher subsidiaries(2) | -- | 1,898,275 | -- |
|   Conversion of Series C Preferred Stock(3) | 6,554,865 | -- | -- |
|   Stock option plans                 | 679,293 | 242,470 | 1,036,917 |
|   Fractional shares repurchased      | -- | (18,759) | -- |
| Balance, end of year                           | 151,253,212 | 143,958,338 | 142,798,134 |

(1) In August 2000, Apache completed a public offering of 10.6 million shares of common stock, including 1.4 million shares for the underwriters' over-allotment option, for net proceeds of $434 million.

(2) In March 2001, Apache issued to Shell Overseas Holdings 1.9 million restricted shares for net proceeds of $100 million in connection with the Fletcher acquisition.

(3) On May 15, 2002, we completed the mandatory conversion of our Series C preferred stock into approximately 6.5 million common shares.

(4) On January 22, 2003, in conjunction with the BP transaction, we completed a public offering of 9.9 million shares of common stock, including 1.3 million shares for the underwriters' over-allotment option, raising net proceeds of $554 million.

F-24

APACHE CORPORATION AND SUBSIDIARIES

NOTES TO CONSOLIDATED FINANCIAL STATEMENTS -- (CONTINUED)

Net Income Per Common Share -- A reconciliation of the components of basic and diluted net income per common share for the years ended December 31, 2002, 2001 and 2000 is presented in the table below:

| | 2002 | | | 2001 | | | 2000 | | |
|---|---|---|---|---|---|---|---|---|---|
| | INCOME | SHARES | PER SHARE | INCOME | SHARES | PER SHARE | INCOME | SHARES | PER SHARE |
| | | | (IN THOUSANDS, EXCEPT PER SHARE AMOUNTS) | | | | | | |
| BASIC: | | | | | | | | | |
| Income attributable to common stock............. | $543,514 | 148,617 | $3.66 | $703,798 | 144,007 | $4.89 | $693,068 | 136,265 | $5.09 |
| EFFECT OF DILUTIVE SECURITIES: | | | | | | | | | |
| Stock options and other.... | -- | 1,283 | | -- | 1,061 | | -- | 1,209 | |
| Series C Preferred Stock... | 5,149 | 2,406 | | 13,952 | 6,555 | | 14,307 | 6,573 | |
| DILUTED: | | | | | | | | | |
| Income attributable to common stock, including assumed conversions...... | $548,663 | 152,306 | $3.60 | $717,750 | 151,623 | $4.73 | $707,375 | 144,047 | $4.91 |

Stock Option Plans -- At December 31, 2002, officers and employees had options to purchase shares of the Company's common stock under one or more employee stock option plans adopted in 1990, 1995, 1998 and 2000 (collectively, the Stock Option Plans). Under the Stock Option Plans, the exercise price of each option equals the market price of Apache's common stock on the date of grant. Options generally become exercisable ratably over a four-year period and expire after 10 years.

The 2000 Stock Option Plan also permits the company to issue options with a reload provision, which has been included in certain options granted to officers and certain key employees of the Company. Options with reload provisions vest over two years, in equal installments every six months. The reload provision permits the granting of new options for shares with a current market value equal to any portion of the original option exercise price, or withholding taxes due on the exercise of the original option, paid by the optionee by means of the transfer or attestation of ownership of shares of the company's common stock or units in the company's Deferred Delivery Plan (if the income from the exercise is to be deferred into that plan). The Deferred Delivery Plan allows the executive officers and certain key employees of the company to defer the receipt of income from equity compensation plans such as the Company's Stock Option Plans. The new option granted as a reload vests after six months, expiring on the same date as the original option

1996 Performance Stock Option Plan -- On October 31, 1996, the Company established the 1996 Performance Stock Option Plan (the Performance Plan) for substantially all full-time employees, excluding officers and certain key employees. Under the Performance Plan, the exercise price of each option equals the market price of Apache common stock on the date of grant. All options become exercisable after nine and one-half years and expire 10 years from the date of grant. Under the terms of the Performance Plan, no grants were made after December 31, 1998.

F-25

APACHE CORPORATION AND SUBSIDIARIES

NOTES TO CONSOLIDATED FINANCIAL STATEMENTS -- (CONTINUED)

A summary of the status of the plans described above as of December 31, 2002, 2001 and 2000, and changes during the years then ended, is presented in the table and narrative below (shares in thousands):

|  | 2002 | | 2001 | | 2000 | |
| --- | --- | --- | --- | --- | --- | --- |
|  | SHARES UNDER OPTION | WEIGHTED AVERAGE EXERCISE PRICE | SHARES UNDER OPTION | WEIGHTED AVERAGE EXERCISE PRICE | SHARES UNDER OPTION | WEIGHTED AVERAGE EXERCISE PRICE |
| Outstanding, beginning of year........ | 5,629 | $35.77 | 5,013 | $32.06 | 5,225 | $29.00 |
| Granted............................. | 893 | 55.97 | 1,201 | 49.89 | 1,021 | 43.00 |
| Exercised........................... | (739) | 30.56 | (277) | 28.05 | (1,021) | 27.23 |
| Forfeited........................... | (229) | 40.42 | (308) | 37.57 | (212) | 32.91 |
| Outstanding, end of year(1).......... | 5,554 | 39.53 | 5,629 | 35.77 | 5,013 | 32.06 |
| Exercisable, end of year............ | 2,755 | 33.68 | 2,435 | 31.65 | 1,615 | 28.23 |
| Available for grant, end of year..... | 534 | | 1,279 | | 1,707 | |
| Weighted average fair value of options granted during the year(2).......... | $20.28 | | $20.88 | | $ 18.05 | |

The Black-Scholes model used by Apache to calculate option fair values was originally developed to estimate the fair value of freely tradable, fully transferable options without vesting and/or trading restrictions, which significantly differs from Apache's stock option awards. These models also require highly subjective assumptions, including future stock price volatility and expected time until exercise, which significantly affect the calculated values. Accordingly, management does not believe that this model provides a reliable single measure of the fair value of Apache's stock option awards, but in the absence of a better prescribed methodology, utilizes it to "value" options in accordance with SEC guidelines.

The following table summarizes information about stock options covered by the plans described above that are outstanding at December 31, 2002 (shares in thousands):

|  | OPTIONS OUTSTANDING | | | OPTIONS EXERCISABLE | |
| --- | --- | --- | --- | --- | --- |
| RANGE OF EXERCISE PRICES | NUMBER OF SHARES UNDER OUTSTANDING OPTIONS | WEIGHTED AVERAGE REMAINING CONTRACTUAL LIFE | WEIGHTED AVERAGE EXERCISE PRICE | NUMBER OF SHARES UNDER EXERCISABLE OPTIONS | WEIGHTED AVERAGE EXERCISE PRICE |
| $18.94 - $29.44......................... | 1,171 | 4.66 | $26.86 | 1,032 | $26.76 |
| 29.55 - 31.17......................... | 1,298 | 4.48 | 30.49 | 491 | 30.29 |
| 31.49 - 46.19......................... | 1,140 | 7.06 | 40.19 | 696 | 39.90 |
| 47.62 - 56.11......................... | 1,945 | 8.77 | 52.81 | 536 | 50.25 |
|  | 5,554 | | | 2,755 | |

(1) Excludes 133,701, 142,931 and 164,588 shares as of December 31, 2002, 2001 and 2000, respectively, issuable under stock options assumed by Apache in connection with the 1996 acquisition of The Phoenix Resource Companies, Inc.

(2) The fair value of each option is estimated as of the date of grant using the Black-Scholes option-pricing model with the following weighted-average assumptions used for grants in 2002, 2001 and 2000, respectively: (i) risk-free interest rates of 4.87, 4.95 and 6.74 percent; (ii) expected lives of 4.5 years for 2002 and five years for 2001 and 2000 for the Stock Option Plans; (iii) expected volatility of 37.17, 41.39 and 37.42 percent; and (iv) expected dividend yields of .68, .51 and .57 percent.

**APACHE CORPORATION AND SUBSIDIARIES**

**NOTES TO CONSOLIDATED FINANCIAL STATEMENTS -- (CONTINUED)**

Share Appreciation Plan -- In October 2000, the Company adopted the Share Appreciation Plan under which grants were made to the Company's officers and substantially all full-time employees. The Share Appreciation Plan provides for issuance of up to an aggregate of 4.04 million shares of Apache common stock, based on attainment of one or more of three share price goals (the Share Price Goals) and/or a separate production goal (the Production Goal). Generally, shares will be issued in three installments over 24 months after achievement of each goal. When and if the goals are achieved, the Company will recognize compensation expense over the 24-month vesting period equal to the value of the stock on the date the particular goal is achieved. The shares of Apache common stock contingently issuable under the Share Appreciation Plan will be excluded from the computation of income per common share until the stated goals are met.

The Share Price Goals are based on achieving a share price of $87, $104 and $156 per share before January 1, 2005. A summary of the number of shares contingently issuable under the Share Price Goals as of December 31, 2002, 2001 and 2000 is presented in the table below (shares in thousands):

|                                                                          | SHARES SUBJECT TO CONDITIONAL GRANTS | | |
|--------------------------------------------------------------------------|-------|-------|-------|
|                                                                          | 2002  | 2001  | 2000  |
| Outstanding, beginning of year........................................... | 3,195 | 2,882 | --    |
| Granted..................................................................  | 218   | 647   | 2,882 |
| Forfeited................................................................  | (296) | (334) | --    |
| Outstanding, end of year(1)..............................................  | 3,117 | 3,195 | 2,882 |
| Exercisable, end of year.................................................  | --    | --    | -     |
| Weighted average fair value of conditional grants -- Share Price Goals(2)....................................... | $15.95 | $18.61 | $34.86 |

The Production Goal will be attained if and when the Company's average daily production equals or exceeds 1.33 barrels of oil equivalent per diluted share (calculated on an annualized basis) during any fiscal quarter ending before January 1, 2005. Such level of production was approximately twice the Company's level of production at the time the Share Appreciation Plan was adopted. Shares issuable in connection with the Production Goal will be a number of shares of the Company's common stock equal to (a) 37.5 percent, 75 percent or 150 percent of a participant's annual base salary (at the time of attainment), as applicable, divided by (b) the average daily per share closing price of the Company's common stock for the fiscal quarter during which the Production Goal is attained.

In 2001, the Company modified the Stock Option Plans, 1996 Performance Stock Option Plan and 2000 Share Appreciation Plan to allow for immediate vesting upon a change in control of ownership. This modification did not require recognition of any compensation expense.

---

(1) Represents shares issuable upon attainment of $87, $104 and $156 per share price goals of 675,896 shares, 1,690,525 shares and 750,699 shares, respectively, in 2002 and 693,134 shares, 1,732,394 shares and 769,897 shares, respectively, in 2001 and 626,010 shares, 1,562,715 shares and 694,155 shares, respectively, in 2000.

(2) The fair value of each Share Price Goal conditional grant is estimated as of the date of grant using a Monte Carlo simulation with the following weighted-average assumptions used for grants in 2002, 2001 and 2000, respectively: (i) risk-free interest rate of 2.90, 4.16 and 5.95 percent;
(ii) expected volatility of 38.77, 46.27 and 44.69 percent; and (iii) expected dividend yield of .70, .77 and .44 percent.

F-27

**APACHE CORPORATION AND SUBSIDIARIES**

**NOTES TO CONSOLIDATED FINANCIAL STATEMENTS -- (CONTINUED)**

In December 1998, the Company entered into a conditional stock grant agreement with an executive of the Company which would award up to 115,496 shares of the Company's common stock in five annual installments. Each installment has a five-year vesting period, 40 percent of the conditional grants will be paid in cash at the market value of the stock on the date of payment and the balance (69,297 shares) will be issued in Apache common stock. In 2001, the Company modified the conditional stock grant agreement to allow for immediate vesting upon a change in control of ownership. This modification did not require recognition of any compensation expense.

In May 2002, Apache's board of directors approved an executive restricted stock plan for all executive officers and certain key employees in lieu of stock options. During the year, the Company awarded 114,975 restricted shares that are subject to ratable vesting over four years. The value of the stock issued was established by the market price on the date of grant and will be recorded as compensation expense over the vesting terms. During 2002, $538 thousand was charged to expense.

**Preferred Stock**

The Company has five million shares of no par preferred stock authorized, of which 25,000 shares have been designated as Series A Junior Participating Preferred Stock (the Series A Preferred Stock), 100,000 shares have been designated as the 5.68 percent Series B Cumulative Preferred Stock (the Series B Preferred Stock) and 140,000 shares have been designated as Series C Preferred Stock. The shares of Series A Preferred Stock are authorized for issuance pursuant to certain rights that trade with Apache common stock outstanding and are reserved for issuance upon the exercise of the Rights as defined and discussed below.

Rights to Purchase Series A Preferred Stock -- In December 1995, the Company declared a dividend of one right (a Right) for each 1.155 shares (adjusted for the 10 percent and five percent stock dividends) of Apache common stock outstanding on January 31, 1996. Each full Right entitles the registered holder to purchase from the Company one ten-thousandth (1/10,000) of a share of Series A Preferred Stock at a price of $100 per one ten-thousandth of a share, subject to adjustment. The Rights are exercisable 10 calendar days following a public announcement that certain persons or groups have acquired 20 percent or more of the outstanding shares of Apache common stock or 10 business days following commencement of an offer for 30 percent or more of the outstanding shares of Apache common stock. In addition, if a person or group becomes the beneficial owner of 20 percent or more of Apache's outstanding common stock (flip in event), each Right will become exercisable for shares of Apache's common stock at 50 percent of the then market price of the common stock. If a 20 percent shareholder of Apache acquires Apache, by merger or otherwise, in a transaction where Apache does not survive or in which Apache's common stock is changed or exchanged (flip over event), the Rights become exercisable for shares of the common stock of the company acquiring Apache at 50 percent of the then market price for Apache common stock. Any Rights that are or were beneficially owned by a person who has acquired 20 percent or more of the outstanding shares of Apache common stock and who engages in certain transactions or realizes the benefits of certain transactions with the Company will become void. If an offer to acquire all of the Company's outstanding shares of common stock is determined to be fair by Apache's board of directors, the transaction will not trigger a flip in event or a flip over event. The Company may also redeem the Rights at $.01 per Right at any time until 10 business days after public announcement of a flip in event. The Rights will expire on January 31, 2006, unless earlier redeemed by the Company. Unless the Rights have been previously redeemed, all shares of Apache common stock issued by the Company after January 31, 1996 will include Rights. Unless and until the Rights become exercisable, they will be transferred with and only with the shares of Apache common stock.

Series B Preferred Stock -- In August 1998, Apache issued 100,000 shares ($100 million) of Series B Preferred Stock in the form of one million depositary shares, each representing one-tenth (1/10) of a share of Series B Preferred Stock, for net proceeds of $98 million. The Series B Preferred Stock has no stated maturity,

F-28

APACHE CORPORATION AND SUBSIDIARIES

NOTES TO CONSOLIDATED FINANCIAL STATEMENTS -- (CONTINUED)

is not subject to a sinking fund and is not convertible into Apache common stock or any other securities of the Company. Apache has the option to redeem the Series B Preferred Stock at $1,000 per preferred share on or after August 25, 2008. Holders of the shares are entitled to receive cumulative cash dividends at an annual rate of $5.68 per depositary share when, and if, declared by Apache's board of directors.

Series C Preferred Stock -- In May 1999, Apache issued 140,000 shares ($217 million) of Series C Preferred Stock in the form of seven million depositary shares each representing one-fiftieth (1/50) of a share of Series C Preferred Stock, for net proceeds of $211 million. Holders of the shares were entitled to receive cumulative cash dividends at an annual rate of 6.5 percent, or $2.015 per depositary share when, and if, declared by Apache's board of directors.

In 2000, Apache bought back 75,900 depositary shares at an average price of $34.42 per share. The excess of the purchase price to reacquire the depositary shares over the original issuance price is reflected as a preferred stock dividend in the accompanying statement of consolidated operations. The remaining depositary shares converted into 6,554,865 shares of Apache common stock in 2002.

Comprehensive Income -- Components of accumulated other comprehensive income (loss) consist of the following:

|  | FOR THE YEAR ENDED DECEMBER 31, | | |
|  | 2002 | 2001 | 2000 |
|  | --------- | --------- | -------- |
|  | (IN THOUSANDS) | | |
| Currency translation adjustments................... | $(108,750) | $(114,078) | $(40,050) |
| Unrealized gain (loss) on available for sale securities....................................... | -- | 125 | (182) |
| Unrealized gain (loss) on derivatives.............. | (4,186) | 12,136 | -- |
| Accumulated other comprehensive loss............... | $(112,936) | $(101,817) | $(40,232) |

The unrealized gain (loss) on available for sale securities at December 31, 2001 and 2000 is net of income tax expense (benefit) of $67,000 and $(94,000), respectively. The currency translation adjustments are not adjusted for income taxes as they relate to a permanent investment in non-U.S. subsidiaries.

A rollforward of the unrealized gain on derivatives is presented in the table below:

|  | GROSS | AFTER-TAX |
|  | -------- | --------- |
|  | (IN THOUSANDS) | |
| Unrealized gain on derivatives at December 31, 2001......... | $ 20,559 | $ 12,136 |
| Reclassification of net realized losses into earnings....... | (24,193) | (14,128) |
| Net change in derivative fair value........................ | (3,507) | (2,194) |
| Unrealized loss on derivatives at December 31, 2002......... | $ (7,141) | $ (4,186) |

Based on commodity prices as of December 31, 2002, the Company expects to reclassify losses of $5 million ($3 million after tax) to earnings from the balance in accumulated other comprehensive income during the next twelve months. The remaining balance in other comprehensive income is expected to be reclassified to future earnings, contemporaneously with the related sales of natural gas production as applicable to specific hedges. The actual amounts that will be reclassified to earnings over the next year and beyond could vary materially from this estimated amount as a result of changes in market conditions.

F-29

APACHE CORPORATION AND SUBSIDIARIES

NOTES TO CONSOLIDATED FINANCIAL STATEMENTS -- (CONTINUED)

## 10. FINANCIAL INSTRUMENTS

The following table presents the carrying amounts and estimated fair values of the Company's financial instruments at December 31, 2002 and 2001. See Note 4 for a discussion of the Company's derivative instruments.

|  | 2002 | | 2001 | |
|---|---|---|---|---|
|  | CARRYING AMOUNT | FAIR VALUE | CARRYING AMOUNT | FAIR VALUE |
|  | (IN THOUSANDS) | | | |
| Short-term investments............................. | $  -- | $  -- | $102,950 | $103,967 |
| Long-term debt: | | | | |
|   Apache | | | | |
|     Money market lines of credit................. | 8,900 | 8,900 | 1,600 | 1,600 |
|     Global credit facility -- U.S. .............. | -- | -- | 100,000 | 100,000 |
|     Commercial paper............................ | 271,400 | 271,400 | 530,700 | 530,700 |
|     6.25-percent debentures..................... | 397,307 | 448,880 | -- | -- |
|     9.25-percent notes.......................... | -- | -- | 99,974 | 102,560 |
|     7-percent notes............................. | 148,446 | 179,445 | 148,391 | 148,845 |
|     7.625-percent notes......................... | 149,134 | 180,990 | 149,109 | 157,350 |
|     7.7-percent notes........................... | 99,660 | 122,890 | 99,655 | 105,130 |
|     7.95-percent notes.......................... | 178,614 | 226,926 | 178,595 | 194,454 |
|     7.375-percent debentures.................... | 148,009 | 177,090 | 148,003 | 152,415 |
|     7.625-percent debentures.................... | 149,175 | 179,205 | 149,175 | 157,380 |
|   Subsidiary and other obligations | | | | |
|     Money market lines of credit................ | -- | -- | 1,196 | 1,196 |
|     Global credit facility -- Canada............ | -- | -- | 30,000 | 30,000 |
|     Fletcher notes.............................. | 5,356 | 6,065 | 5,356 | 5,716 |
|     Apache Finance Australia 6.5-percent notes.... | 169,260 | 193,936 | 169,137 | 172,822 |
|     Apache Finance Australia 7-percent notes...... | 99,535 | 116,430 | 99,478 | 104,230 |
|     Apache Finance Canada 7.75-percent notes...... | 297,019 | 380,280 | 296,988 | 320,880 |
|     Apache Clearwater notes..................... | 37,000 | 37,000 | 37,000 | 37,000 |

The following methods and assumptions were used to estimate the fair value of the financial instruments summarized in the table above. The Company's trade receivables and trade payables are by their very nature short-term. The carrying values included in the accompanying consolidated balance sheet approximate fair value at December 31, 2002 and December 31, 2001.

Short-Term Investments -- The fair value of the Company's short-term investments are estimates provided to the Company by independent investment banking firms.

Long-Term Debt -- The 2002 fair value of the notes and debentures is based upon an estimate provided to the Company by an independent investment banking firm. The fair value of the notes and debentures for 2001 is based on quoted market prices and in the case of the 7.625-percent debentures, an estimate provided by an independent banking firm. The carrying amount of the global credit facility, commercial paper, money market lines of credit and Apache Clearwater notes approximated fair value because the interest rates are variable and reflective of market rates.

**APACHE CORPORATION AND SUBSIDIARIES**

**NOTES TO CONSOLIDATED FINANCIAL STATEMENTS -- (CONTINUED)**

11. COMMITMENTS AND CONTINGENCIES

**Litigation**

China -- Apache China Corporation LDC was sued in an arbitration by Texaco China, B.V. in September 2001. Texaco China later added Apache Bohai Corporation LDC to the arbitration. The arbitration covers Texaco's claims for damages arising out of Apache Bohai's alleged failure to drill three wells, prior to re-assignment of the interest to Texaco. Apache China and Apache Bohai deny any liability. Apache Bohai filed suit in federal district court, contending there is no right to arbitration. The district court denied Apache's claim. Apache has filed with the federal court of appeals to have the trial court's opinion reviewed and reversed. That matter is currently pending, as is the arbitration, with a hearing date expected during 2003.

On February 5, 2003, the Bankruptcy Court for the Western District of Louisiana entered an order confirming Debtor XCL-China Ltd.'s most recently filed plan of arrangement. XCL-China is a participant in certain of our concessions in the Zhao Dong Block in the Bohai Bay of China. We understand that XCL Ltd. will now have one percent or less ownership interest, if any, in XCL-China with any remaining ownership interest being held by the bondholders of XCL Ltd. In connection with the order, Apache China has agreed to waive its approval and preferential purchase rights of the XCL-China interest in the Zhao Dong Block for the event of the confirmation and reorganization of the Debtor only, without waiver of any rights concerning future events. All agreements approved in 2001 by Apache China, XCL-China and the various Chinese parties, which resolved the funding and subsequent repayment of XCL-China's share of development costs, remain in place.

Canada -- In December 2000, certain subsidiaries of the Company and Murphy Oil Corporation (Murphy) filed a lawsuit in Canada charging The Predator Corporation Ltd. (Predator) and others with misappropriation and misuse of confidential well data to obtain acreage offsetting a significant natural gas discovery made by Apache and Murphy during 2000 in the Ladyfern area of northeast British Columbia. In February 2001, Predator filed a counterclaim seeking more than C$6 billion and has since reduced this amount to no more than C$4 billion. Management believes that the counterclaim is without merit and that the amount claimed by Predator is frivolous.

Cinergy -- As described in Note 13 Transactions with Related Parties and Major Customers, Cinergy Marketing & Trading, LLC (Cinergy) purchases most of the Company's United States natural gas production. Disputes have arisen between Cinergy and Apache concerning various matters, including Cinergy's claim to market Apache's Canadian gas production. In response to these disputes, Cinergy commenced an arbitration proceeding in September 2001 seeking, among other things, specific performance to require the Company to sell its Canadian gas production to Cinergy or pay damages. The Company is disputing Cinergy's assertions (including their claim to market our Canadian production), filing a general denial and counterclaim against Cinergy for amounts arising from, among other things, an audit commenced in 2001. Management does not believe the outcome of the arbitration will be material to our financial position or results of operations. The Company continues to market most of its U.S. gas production through Cinergy, although the Company is actively discussing its gas marketing arrangements and a resolution of the disputes with Cinergy.

The Company is involved in litigation and is subject to governmental and regulatory controls arising in the ordinary course of business. It is management's opinion that all claims and litigation involving the Company are not likely to have a material adverse effect on its financial position or results of operations.

Environmental -- The Company, as an owner or lessee and operator of oil and gas properties, is subject to various federal, provincial, state, local and foreign country laws and regulations relating to discharge of materials into, and protection of, the environment. These laws and regulations may, among other things, impose liability on the lessee under an oil and gas lease for the cost of pollution clean-up resulting from

F-31

APACHE CORPORATION AND SUBSIDIARIES

NOTES TO CONSOLIDATED FINANCIAL STATEMENTS -- (CONTINUED)

operations and subject the lessee to liability for pollution damages. In some instances, the Company may be directed to suspend or cease operations in the affected area. We maintain insurance coverage, which we believe is customary in the industry, although we are not fully insured against all environmental risks.

Apache manages its exposure to environmental liabilities on properties to be acquired by identifying existing problems and assessing the potential liability. The Company also conducts periodic reviews, on a company-wide basis, to identify changes in its environmental risk profile. These reviews evaluate whether there is a probable liability, its amount, and the likelihood that the liability will be incurred. The amount of any potential liability is determined by considering, among other matters, incremental direct costs of any likely remediation and the proportionate cost of employees who are expected to devote a significant amount of time directly to any possible remediation effort. As it relates to evaluations of purchased properties, depending on the extent of an identified environmental problem, the Company may exclude a property from the acquisition, require the seller to remediate the property to Apache's satisfaction, or agree to assume liability for the remediation of the property. The Company's general policy is to limit any reserve additions to any incidents or sites that are considered likely to result in an expected remediation cost exceeding $100,000. Any environmental costs and liabilities that are not reserved for are treated as an expense when actually incurred. In our estimation, neither these expenses nor expenses related to training and compliance programs, are likely to have a material impact on our financial condition. As of December 31, 2002, the Company had an undiscounted reserve for environmental remediation of approximately $10 million. Apache is not aware of any environmental claims existing as of December 31, 2002, which have not been provided for or would otherwise have a material impact on its financial position or results of operations. There can be no assurance, however, that current regulatory requirements will not change, or past non-compliance with environmental laws will not be discovered on the Company's properties.

Exploration Agreement -- In conjunction with the purchase of oil and gas properties in December 2002, Apache entered into a separate exploration joint venture with the seller whereby the seller will actively generate prospects on certain South Louisiana acreage through December 31, 2004. Under the terms of the agreement, Apache will pay up to $25 million for the seller's share of seismic, lease acquisition and drilling and completion cost on covered prospects, with no more than $13 million of carried cost required to be paid on behalf of the seller through December 31, 2003. Apache has the option, but not the obligation, to participate in any individual prospect proposed by the seller. If Apache does not pay a total of $25 million of covered cost through December 31, 2004, it is obligated to pay the difference to the seller within 90 days of the expiration of the agreement.

International Lease Concessions -- The Company, through its subsidiaries, has acquired or has been conditionally or unconditionally granted exploration rights in Australia, Egypt, China and Poland. In order to comply with the contracts and agreements granting these rights, the Company, through various wholly-owned subsidiaries, is committed to expend approximately $71 million through 2006.

Retirement and Deferred Compensation Plans -- The Company provides a 401(k) savings plan for employees which allows participating employees to elect to contribute up to 25 percent of their salaries, with Apache making matching contributions up to a maximum of six percent of each employee's salary. In addition, the Company annually contributes six percent of each participating employee's compensation, as defined, to a money purchase retirement plan. The 401(k) plan and the money purchase retirement plan are subject to certain annually-adjusted, government-mandated restrictions which limit the amount of each employee's contributions.

For certain eligible employees, the Company also provides a non-qualified retirement/savings plan which allows the deferral of up to 50 percent of each such employee's salary, and which accepts employee contributions and the Company's matching contributions in excess of the above-referenced restrictions on the 401(k) savings plan and money purchase retirement plan. Additionally, Apache Energy Limited and Apache

F-32

**APACHE CORPORATION AND SUBSIDIARIES**

**NOTES TO CONSOLIDATED FINANCIAL STATEMENTS -- (CONTINUED)**

Canada Ltd. maintain separate retirement plans, as required under the laws of Australia and Canada, respectively.

Vesting in the Company's contributions to the 401(k) savings plan, the money purchase retirement plan and the non-qualified retirement/savings plan occurs at the rate of 20 percent per year. Upon a change in control of ownership, vesting is immediate. Total costs under all plans were $18 million, $16 million and $9 million for 2002, 2001 and 2000, respectively. The unfunded liability for all plans as of December 31, 2002 and 2001 has been recorded in other accrued expenses.

In connection with the pending acquisition of U.K. North Sea assets from BP, Apache will establish a defined benefit pension plan for certain employees acquired in the transaction. BP will contribute amounts to the new plan related to past service for the transferred employees.

Operating Lease and Other Commitments -- The Company has leases for buildings, facilities and equipment with varying expiration dates through 2008. Net rental expense was $16 million, $18 million and $16 million for 2002, 2001 and 2000, respectively.

As of December 31, 2002, minimum rental commitments under long-term operating leases, net of sublease rentals; and long-term pipeline transportation commitments, ranging from one to 21 years, are as follows:

|  | NET MINIMUM COMMITMENTS | | | |
|  | TOTAL | LEASES | DRILLING RIGS | PIPELINE TRANSMISSION |
|  |  | (IN THOUSANDS) | | |
| 2003..................... | $107,234 | $13,213 | $68,234 | $ 25,787 |
| 2004..................... | 49,735 | 13,404 | 14,182 | 22,149 |
| 2005..................... | 33,769 | 11,969 | 2,957 | 18,843 |
| 2006..................... | 31,158 | 11,543 | 2,957 | 16,658 |
| 2007..................... | 23,096 | 4,137 | 2,957 | 16,002 |
| Thereafter.............. | 65,151 | 319 | 478 | 64,354 |
|  | $310,143 | $54,585 | $91,765 | $163,793 |

## 12. PREFERRED INTERESTS OF SUBSIDIARIES

In August 2001, Apache entered into a series of financing transactions, described below, to pay down existing debt and increase financial flexibility.

Apache contributed interests in various fields valued at $923 million to new subsidiaries in connection with the financing transactions. Additionally, Apache contributed $116 million in U.S. Government Agency Notes, as discussed in Note 5. Unrelated institutional investors contributed $443 million ($441 million, net of issuance costs) to the various subsidiaries in exchange for preferred stock ($82 million) of the subsidiaries and a limited partner interest ($361 million) in one of the entities. The third party investors are entitled to receive a weighted average return of 123 basis points above the prevailing LIBOR interest rate. The preferred stock and limited partner interests are repayable from the assets of the subsidiaries. Apache retains credit risks related to collection of proceeds from product sales and intercompany loans. Apache also has an obligation to contribute an aggregate amount not to exceed $250 million to fund present and future business operations of the subsidiaries. However, the investors are not entitled to receive more than their $443 million original investment, plus the agreed-upon return. One of the subsidiaries also issued $37 million of senior floating rate notes as discussed in Note 6.

F-33

**APACHE CORPORATION AND SUBSIDIARIES**

**NOTES TO CONSOLIDATED FINANCIAL STATEMENTS -- (CONTINUED)**

The limited partnership is scheduled to terminate as of August 9, 2021. However, the general partner, an Apache subsidiary, may elect to retire all or part of the limited partner's interest at any time without penalty. In addition, the limited partnership agreement requires that the limited and general partners reset the partners' rate of return over LIBOR every five years beginning in 2006. If the partners fail to mutually agree on new rates of return, the general partner must either dissolve the partnership or purchase the limited partner's interest. Upon dissolution of the partnership, retirement of the limited partner's interest, or purchase of the limited partner's interest by the general partner, the limited partner will receive the unrecouped balance of its initial $361 million capital investment.

If Apache's senior unsecured long-term debt ratings from Standard & Poor's and Moody's fall to BBB- or lower and Baa3 or lower, respectively, or if either rating is withdrawn, our subsidiaries that issued the preferred stock and limited partnership interests may need to obtain additional cash or cash equivalents or redeem part of the preferred interests to remain in compliance with certain covenants. Also, if Apache's rating falls to BB or lower or Ba2 or lower, the limited partner has the right to cause the dissolution of the partnership, though Apache can avoid this by exercising its right to retire the limited partnership interests without penalty.

The preferred stock certificates require that the Apache subsidiaries and their preferred shareholders reset the preferred stock dividend rate every five years beginning in 2006. If they fail to mutually agree on a new rate, the Apache subsidiaries must either register the stock for public sale, or redeem all of the outstanding preferred stock. The Apache subsidiaries may elect to redeem all or part of the preferred stock at any time without penalty.

The assets and liabilities of the subsidiaries are included in Apache's consolidated financial statements at historical costs, with the preferred stock and limited partner interests of the subsidiaries reflected as a preferred interests of subsidiaries in the consolidated balance sheet. The dividends paid on the preferred stock and distributions paid on the limited partner interests are reflected as preferred interests of subsidiaries in the statement of consolidated operations.

## 13. TRANSACTIONS WITH RELATED PARTIES AND MAJOR CUSTOMERS

Cinergy Corp. - In June 1998, Apache contracted with Cinergy Corp. to market substantially all the Company's natural gas production from the United States and agreed to develop terms for the marketing of most of Apache's Canadian production under an amended and restated gas purchase agreement effective July 1, 1998. Apache sold its 57 percent interest in ProEnergy for 771,258 shares of Cinergy Corp. common stock, which the Company subsequently sold for $26 million. In December 1998, Apache and Cinergy Corp. agreed to postpone the negotiation of terms to market most of Apache's Canadian production. Pursuant to the gas purchase agreement, ProEnergy, renamed Cinergy Marketing and Trading LLC (Cinergy), will continue to market Apache's North American natural gas production until June 30, 2008, with an option, following prior notice, to terminate on June 30, 2004. During this period, Apache is generally obligated to deliver most of its United States gas production to Cinergy and, under certain circumstances, reimburse Cinergy if certain gas throughput thresholds are not met. All throughput thresholds have been met. The prices received for its gas production under this agreement approximate market prices. As described in Note 11, Commitments and Contingencies, Apache and Cinergy are parties to arbitration. Apache continues to market most of its U.S. gas production through Cinergy, although the Company is actively discussing with Cinergy its gas marketing arrangements and a resolution of its disputes.

Related Parties -- In the ordinary course of business, Apache paid to Maralo, LLC or related entities ("Maralo") during 2002 approximately $9,000 in revenues relating to four oil and gas wells in which Maralo owns an interest and of which Apache is operator. Maralo paid Apache approximately $1,000 in 2002 for Maralo's share of routine expenses relating to such wells. Also during 2002, Maralo sub-leased certain office space from Apache, for which Maralo paid Apache approximately $95,000. Mary Ralph Lowe, a member of

F-34

APACHE CORPORATION AND SUBSIDIARIES

NOTES TO CONSOLIDATED FINANCIAL STATEMENTS -- (CONTINUED)

Apache's board of directors through December 19, 2003, is president, chief executive officer and the sole stockholder of Maralo.

In the ordinary course of business, Cimarex Energy, Co. ("Cimarex"), formerly Key Production Company, Inc., paid to Apache during 2002 approximately $2 million for Cimarex's proportionate share of drilling and workover costs, mineral interests and routine expenses relating to oil and gas wells in which Cimarex owns interests and of which Apache is the operator. Cimarex was paid approximately $4 million directly by Apache or related entities for its proportionate share of revenues from wells in which Cimarex marketed its revenues with Apache as operator. Apache paid to Cimarex during 2002 approximately $217,000 for Apache's proportionate share of drilling and workover costs, mineral interests and routine expenses relating to oil and gas wells in which Apache owns interests and of which Cimarex is the operator. Apache was paid approximately $785,000 directly by Cimarex for its proportionate share of revenues from wells in which Apache marketed its revenues with Cimarex as operator. F. H. Merelli, a member of the Apache's board of directors, is chairman of the board and chief executive officer of Cimarex.

In the ordinary course of business, Matador Petroleum Corporation ("Matador") paid to Apache during 2002 approximately $708,000 for Matador's proportionate share of drilling and workover costs, mineral interests and routine expenses relating to oil and gas wells in which Matador owns interests and of which Apache is the operator. Matador was paid approximately $1 million directly by Apache for its proportionate share of revenues from wells in which Matador marketed its revenues with Apache as operator. Apache paid to Matador during 2002 approximately $2 million for Apache's proportionate share of drilling and workover costs, mineral interests and routine expenses relating to oil and gas wells in which Apache owns interests and of which Matador is the operator. Apache was paid approximately $621,000 directly by Matador for its proportionate share of revenues from wells in which Apache marketed its revenues with Matador as operator. Eugene C. Fiedorek, a member of the Apache's board of directors, is a member of the board of directors of Matador.

During 2002, in the ordinary course of business, Aquila, Inc. ("Aquila") and related companies paid to Apache approximately $33 million for natural gas produced by Apache, primarily in Canada. Aquila was paid approximately $348,000 by Apache for gathering, transportation and compression services provided by Aquila. Janine McArdle, Vice-President -- Oil and Gas Marketing of Apache since October 2002, previously was employed by Aquila Europe.

Major Customers -- In 2002, purchases by Cinergy and EGPC accounted for 19 percent and 22 percent of the Company's oil and gas production revenues, respectively. In 2001, purchases by Cinergy and EGPC accounted for 35 percent and 17 percent of the Company's oil and gas production revenues, respectively. In 2000, purchases by Cinergy and EGPC accounted for 26 percent and 16 percent of the Company's oil and gas production revenues, respectively. No other purchaser has accounted for more than 10 percent of revenues for 2002, 2001 or 2000.

Concentration of Credit Risk -- The Company's revenues are derived principally from uncollateralized sales to customers in the oil and gas industry; therefore, customers may be similarly affected by changes in economic and other conditions within the industry. Apache has not experienced significant credit losses on such sales. Sales of natural gas by Apache to Cinergy are similarly uncollateralized. Apache sells all of its Egyptian crude oil and natural gas to the EGPC for U.S. dollars. Deteriorating economic conditions during 2001 and 2002 in Egypt have lessened the availability of U.S. dollars, resulting in a one to two month delay in receipts from EGPC. Continuation of the hard currency shortage in Egypt could lead to further delays, deferrals of payment or non-payment in the future.

APACHE CORPORATION AND SUBSIDIARIES

NOTES TO CONSOLIDATED FINANCIAL STATEMENTS -- (CONTINUED)

14. BUSINESS SEGMENT INFORMATION

Apache has five reportable segments which are primarily in the business of crude oil and natural gas exploration and production. The accounting policies of the segments are the same as those described in the summary of significant accounting policies. The Company evaluates performance based on profit or loss from oil and gas operations before income and expense items incidental to oil and gas operations and income taxes. Apache's reportable segments are managed separately based on their geographic locations. Financial information by operating segment is presented below:

| | UNITED STATES | CANADA | EGYPT | AUSTRALIA | OTHER INTERNATIONAL | TOTAL |
|---|---|---|---|---|---|---|
| | | | (IN THOUSANDS) | | | |
| **2002** | | | | | | |
| Oil and Gas Production Revenues................. | $1,101,388 | $ 557,720 | $ 560,099 | $334,039 | $ 6,502 | $2,559,748 |
| Operating Expenses: | | | | | | |
| Depreciation, depletion and amortization....... | 387,187 | 182,584 | 163,648 | 107,993 | 2,467 | 843,879 |
| International impairments............ | -- | -- | -- | -- | 19,600 | 19,600 |
| Lease operating costs.... | 239,837 | 114,299 | 69,160 | 37,107 | 1,721 | 462,124 |
| Gathering and transportation costs... | 17,311 | 21,256 | -- | -- | -- | 38,567 |
| Severance and other taxes................. | 34,792 | 5,489 | -- | 22,807 | -- | 63,088 |
| Operating Income (Loss).... | $ 422,261 | $ 234,092 | $ 327,291 | $166,132 | $(17,286) | 1,132,490 |
| Other Income (Expense): | | | | | | |
| Other revenues........... | | | | | | 125 |
| Administrative, selling and other............. | | | | | | (104,588) |
| Financing costs, net..... | | | | | | (112,833) |
| Preferred interests of subsidiaries........... | | | | | | (16,224) |
| Income Before Income Taxes.................... | | | | | | $ 898,970 |
| Net Property and Equipment................ | $4,068,362 | $2,190,029 | $1,263,560 | $807,332 | $136,302 | $8,465,585 |
| Total Assets............... | $4,309,736 | $2,401,319 | $1,713,267 | $883,704 | $151,825 | $9,459,851 |
| Additions to Net Property and Equipment........... | $ 597,954 | $ 379,413 | $ 196,975 | $100,761 | $ 37,767 | $1,312,870 |

F-36

APACHE CORPORATION AND SUBSIDIARIES

NOTES TO CONSOLIDATED FINANCIAL STATEMENTS -- (CONTINUED)

|  | UNITED STATES | CANADA | EGYPT | AUSTRALIA | OTHER INTERNATIONAL | TOTAL |
|---|---|---|---|---|---|---|
|  | | | (IN THOUSANDS) | | | |
| **2001** | | | | | | |
| Oil and Gas Production Revenues................ | $1,474,628 | $ 628,967 | $ 460,910 | $257,407 | $ 1,047 | $2,822,959 |
| Operating Expenses: | | | | | | |
| Depreciation, depletion and amortization....... | 423,727 | 178,770 | 135,225 | 82,686 | 423 | 820,831 |
| International impairments............ | -- | -- | -- | -- | 65,000 | 65,000 |
| Lease operating costs.... | 227,418 | 95,833 | 49,449 | 31,728 | 386 | 404,814 |
| Gathering and transportation costs... | 15,790 | 18,794 | -- | -- | -- | 34,584 |
| Severance and other taxes................. | 49,555 | 8,483 | -- | 11,789 | -- | 69,827 |
| Operating Income (Loss).... | $ 758,138 | $ 327,087 | $ 276,236 | $131,204 | $(64,762) | 1,427,903 |
| Other Income (Expense): | | | | | | |
| Other revenues (losses).............. | | | | | | (13,568) |
| Administrative, selling and other............. | | | | | | (88,710) |
| Financing costs, net..... | | | | | | (118,762) |
| Preferred interests of subsidiaries........... | | | | | | (7,609) |
| Income Before Income Taxes.................... | | | | | | $1,199,254 |
| Net Property and Equipment................ | $3,855,674 | $1,984,147 | $1,238,234 | $814,423 | $120,594 | $8,013,072 |
| Total Assets.............. | $4,172,551 | $2,163,615 | $1,564,474 | $882,141 | $150,875 | $8,933,656 |
| Additions to Net Property and Equipment........... | $ 834,581 | $1,015,184 | $ 515,551 | $113,171 | $ 34,048 | $2,512,535 |

F-37

APACHE CORPORATION AND SUBSIDIARIES

NOTES TO CONSOLIDATED FINANCIAL STATEMENTS -- (CONTINUED)

| | UNITED STATES | CANADA | EGYPT | AUSTRALIA | OTHER INTERNATIONAL | TOTAL |
|---|---|---|---|---|---|---|
| | | | (IN THOUSANDS) | | | |
| **2000** | | | | | | |
| Oil and Gas Production Revenues.................. | $1,386,642 | $ 337,876 | $ 360,772 | $223,543 | $ -- | $2,308,833 |
| Operating Expenses: | | | | | | |
| Depreciation, depletion and amortization....... | 356,998 | 79,892 | 84,425 | 62,183 | 48 | 583,546 |
| Lease operating costs.... | 167,986 | 32,945 | 28,328 | 24,450 | -- | 253,709 |
| Gathering and transportation costs... | 11,701 | 7,915 | -- | -- | -- | 19,616 |
| Severance and other taxes.................. | 48,015 | 5,072 | -- | 6,086 | -- | 59,173 |
| Operating Income (Loss).... | $ 801,942 | $ 212,052 | $ 248,019 | $130,824 | $ (48) | 1,392,789 |
| Other Income (Expense): | | | | | | |
| Other revenues (losses)............... | | | | | | (6,855) |
| Administrative, selling and other.............. | | | | | | (75,615) |
| Financing costs, net..... | | | | | | (106,638) |
| Income Before Income Taxes..................... | | | | | | $1,203,681 |
| Net Property and Equipment................ | $3,643,439 | $1,378,639 | $ 854,531 | $783,884 | $151,969 | $6,812,462 |
| Total Assets............... | $4,022,749 | $1,463,306 | $ 965,733 | $856,575 | $173,587 | $7,481,950 |
| Additions to Net Property and Equipment........... | $1,461,479 | $ 649,804 | $ 93,083 | $117,248 | $ 20,865 | $2,342,479 |

## 15. SUPPLEMENTAL OIL AND GAS DISCLOSURES (UNAUDITED)

Oil and Gas Operations -- The following table sets forth revenue and direct cost information relating to the Company's oil and gas exploration and production activities. Apache has no long-term agreements to purchase oil or gas production from foreign governments or authorities.

| | UNITED STATES | CANADA | EGYPT | AUSTRALIA | OTHER INTERNATIONAL | TOTAL |
|---|---|---|---|---|---|---|
| | | | (IN THOUSANDS) | | | |
| **2002** | | | | | | |
| Oil and gas production revenues................... | $1,101,388 | $557,720 | $560,099 | $334,039 | $ 6,502 | $2,559,748 |
| Operating costs: | | | | | | |
| Depreciation, depletion and amortization(1).......... | 369,864 | 181,087 | 163,648 | 107,194 | 2,455 | 824,248 |
| International impairments... | -- | -- | -- | -- | 19,600 | 19,600 |
| Lease operating expenses.... | 239,837 | 114,299 | 69,160 | 37,107 | 1,721 | 462,124 |
| Gathering and transportation costs.................... | 17,311 | 21,256 | -- | -- | -- | 38,567 |
| Production taxes(2)......... | 33,336 | -- | -- | 18,659 | -- | 51,995 |
| Income tax................. | 165,390 | 104,869 | 157,100 | 58,167 | (6,536) | 478,990 |
| | 825,738 | 421,511 | 389,908 | 221,127 | 17,240 | 1,875,524 |
| Results of operations........ | $ 275,650 | $136,209 | $170,191 | $112,912 | $(10,738) | $ 684,224 |
| Amortization rate per boe..... | $ 7.06 | $ 5.71 | $ 6.10 | $ 5.36 | $ 3.68 | $ 6.29 |

APACHE CORPORATION AND SUBSIDIARIES

NOTES TO CONSOLIDATED FINANCIAL STATEMENTS -- (CONTINUED)

| | UNITED STATES | CANADA | EGYPT | AUSTRALIA | OTHER INTERNATIONAL | TOTAL |
|---|---|---|---|---|---|---|
| | | | (IN THOUSANDS) | | | |
| **2001** | | | | | | |
| Oil and gas production revenues.................. | $1,474,628 | $628,967 | $460,910 | $257,407 | $  1,047 | $2,822,959 |
| Operating costs: | | | | | | |
| Depreciation, depletion and amortization(1)........... | 409,096 | 177,159 | 135,086 | 81,930 | 388 | 803,659 |
| International impairments... | -- | -- | -- | -- | 65,000 | 65,000 |
| Lease operating expenses.... | 227,418 | 95,833 | 49,449 | 31,728 | 386 | 404,814 |
| Gathering and transportation costs.................... | 15,790 | 18,794 | -- | -- | -- | 34,584 |
| Production taxes(2)......... | 47,462 | -- | -- | 11,789 | -- | 59,251 |
| Income tax................. | 290,573 | 150,450 | 132,660 | 44,866 | (24,279) | 594,270 |
| | 990,339 | 442,236 | 317,195 | 170,313 | 41,495 | 1,961,578 |
| Results of operations......... | $ 484,289 | $186,731 | $143,715 | $ 87,094 | $(40,448) | $ 861,381 |
| Amortization rate per boe..... | $   6.64 | $  5.80 | $  5.66 | $  4.70 | $  4.72 | $   6.05 |
| **2000** | | | | | | |
| Oil and gas production revenues.................... | $1,386,642 | $337,876 | $360,772 | $223,543 | $     -- | $2,308,833 |
| Operating costs: | | | | | | |
| Depreciation, depletion and amortization(1)........... | 345,624 | 76,286 | 84,302 | 61,358 | -- | 567,570 |
| Lease operating expenses.... | 167,985 | 32,945 | 28,328 | 24,451 | -- | 253,709 |
| Gathering and transportation costs.................... | 11,701 | 7,915 | -- | -- | -- | 19,616 |
| Production taxes(2)......... | 46,509 | -- | -- | 6,086 | -- | 52,595 |
| Income tax................. | 305,559 | 98,489 | 119,108 | 44,760 | -- | 567,916 |
| | 877,378 | 215,635 | 231,738 | 136,655 | -- | 1,461,406 |
| Results of operations......... | $ 509,264 | $122,241 | $129,034 | $ 86,888 | $     -- | $ 847,427 |
| Amortization rate per boe..... | $   6.16 | $  5.53 | $  5.46 | $  4.42 | $     -- | $   5.75 |

(1) This amount reflects DD&A of capitalized costs of oil and gas proved properties only and, therefore, does not agree with DD&A reflected on Note 14, Business Segment Information.

(2) This amount reflects amounts directly related to oil and gas producing properties and, therefore, does not agree with severance and other taxes reflected on Note 14, Business Segment Information.

F-39

APACHE CORPORATION AND SUBSIDIARIES

NOTES TO CONSOLIDATED FINANCIAL STATEMENTS -- (CONTINUED)

Costs Not Being Amortized -- The following table sets forth a summary of oil and gas property costs not being amortized at December 31, 2002, by the year in which such costs were incurred:

|  | TOTAL | 2002 | 2001 | 2000 | 1999 AND PRIOR |
|---|---|---|---|---|---|
|  |  | (IN THOUSANDS) |  |  |  |
| Property acquisition costs......................... | $417,095 | $165,247 | $ 47,935 | $70,622 | $133,291 |
| Exploration and development........................ | 239,177 | 124,639 | 53,914 | 24,041 | 36,583 |
| Total............................................. | $656,272 | $289,886 | $101,849 | $94,663 | $169,874 |

Capitalized Costs Incurred -- The following table sets forth the capitalized costs incurred in oil and gas producing activities:

|  | UNITED STATES | CANADA | EGYPT | AUSTRALIA | OTHER INTERNATIONAL | TOTAL |
|---|---|---|---|---|---|---|
|  |  |  | (IN THOUSANDS) |  |  |  |
| **2002** |  |  |  |  |  |  |
| Acquisitions(1)............... | $ 267,537 | $ 84,170 | $ -- | $ -- | $ -- | $ 351,707 |
| Purchase of non-producing leases...................... | 2,264 | 20,150 | -- | 50,327 | -- | 22,414 |
| Exploration................... | 19,805 | 2,833 | 55,580 | 50,327 | 2,330 | 130,875 |
| Development................... | 280,542 | 235,208 | 115,580 | 39,486 | 36,079 | 706,895 |
| Capitalized interest.......... | 13,200 | 14,392 | 8,875 | 4,224 | -- | 40,691 |
| Property sales................ | 873 | 84 | (8,000) | -- | -- | (7,043) |
|  | $ 584,221 | $356,837 | $172,035 | $94,037 | $38,409 | $1,245,539 |
| **2001** |  |  |  |  |  |  |
| Acquisitions(1)............... | $ 65,395 | $561,700 | $240,255 | $ -- | $12,936 | $ 880,286 |
| Purchase of non-producing leases...................... | 14,004 | 27,941 | -- | -- | -- | 41,945 |
| Exploration................... | 47,688 | 64,172 | 39,806 | 38,727 | 12,536 | 202,929 |
| Development................... | 637,488 | 318,232 | 87,798 | 46,441 | 8,302 | 1,098,261 |
| Capitalized interest.......... | 24,500 | 13,920 | 11,293 | 7,036 | -- | 56,749 |
| Property sales................ | (200,445) | (147,851) | -- | -- | -- | (348,296) |
|  | $ 588,630 | $838,114 | $379,152 | $92,204 | $33,774 | $1,931,874 |
| **2000** |  |  |  |  |  |  |
| Acquisitions(1)............... | $ 922,523 | $401,904 | $ -- | $ -- | $ -- | $1,324,427 |
| Purchase of non-producing leases...................... | 10,712 | 11,548 | -- | -- | -- | 22,260 |
| Exploration................... | 26,045 | 16,331 | 51,819 | 40,917 | 18,077 | 153,189 |
| Development................... | 459,046 | 107,748 | 33,130 | 32,918 | -- | 632,842 |
| Capitalized interest.......... | 27,185 | 10,063 | 12,194 | 9,908 | 2,650 | 62,000 |
| Property sales................ | (10,853) | (15,418) | -- | -- | -- | (26,271) |
|  | $1,434,658 | $532,176 | $ 97,143 | $83,743 | $20,727 | $2,168,447 |

(1) Acquisitions include unproved costs of $70 million, $77 million and $125 million for transactions completed in 2002, 2001 and 2000, respectively.

F-40

**APACHE CORPORATION AND SUBSIDIARIES**

**NOTES TO CONSOLIDATED FINANCIAL STATEMENTS -- (CONTINUED)**

Capitalized Costs -- The following table sets forth the capitalized costs and associated accumulated depreciation, depletion and amortization, including impairments, relating to the Company's oil and gas production, exploration and development activities:

| | UNITED STATES | CANADA | EGYPT | AUSTRALIA | OTHER INTERNATIONAL | TOTAL |
|---|---|---|---|---|---|---|
| | | | (IN THOUSANDS) | | | |
| **2002** | | | | | | |
| Proved properties.... | $7,906,966 | $2,478,623 | $1,232,119 | $ 970,386 | $ 239,365 | $12,827,459 |
| Unproved properties.. | 203,366 | 204,059 | 174,925 | 39,962 | 33,960 | 656,272 |
| | 8,110,332 | 2,682,682 | 1,407,044 | 1,010,348 | 273,325 | 13,483,731 |
| Accumulated DD&A..... | (4,121,751) | (637,546) | (502,658) | (357,271) | (137,668) | (5,756,894) |
| | $3,988,581 | $2,045,136 | $ 904,386 | $ 653,077 | $ 135,657 | $ 7,726,837 |
| **2001** | | | | | | |
| Proved properties.... | $7,314,153 | $2,103,263 | $1,037,431 | $ 816,620 | $ 119,225 | $11,390,692 |
| Unproved properties.. | 211,958 | 215,003 | 197,578 | 99,691 | 115,691 | 839,921 |
| | 7,526,111 | 2,318,266 | 1,235,009 | 916,311 | 234,916 | 12,230,613 |
| Accumulated DD&A..... | (3,751,887) | (466,703) | (359,792) | (259,373) | (115,613) | (4,953,368) |
| | $3,774,224 | $1,851,563 | $ 875,217 | $ 656,938 | $ 119,303 | $ 7,277,245 |

F-41

APACHE CORPORATION AND SUBSIDIARIES

NOTES TO CONSOLIDATED FINANCIAL STATEMENTS -- (CONTINUED)

Oil and Gas Reserve Information -- Proved oil and gas reserve quantities are based on estimates prepared by the Company's engineers in accordance with guidelines established by the SEC. The Company's estimates of proved reserve quantities of its U.S., Canadian and international properties are subject to review by Ryder Scott Company, L.P. Petroleum Consultants, independent petroleum engineers. Their review concentrated on those reserves that constitute a substantial percentage of the SEC value. During 2002, 2001 and 2000, their review covered 68 percent, 61 percent and 72 percent of the SEC value, respectively.

There are numerous uncertainties inherent in estimating quantities of proved reserves and projecting future rates of production and timing of development expenditures. The following reserve data represents estimates only and should not be construed as being exact.

| | CRUDE OIL, CONDENSATE AND NATURAL GAS LIQUIDS (THOUSANDS OF BARRELS) | | | | | | NATURAL GAS (MILLIONS OF CUBIC FEET) | | |
|---|---|---|---|---|---|---|---|---|---|
| | UNITED STATES | CANADA | EGYPT | AUSTRALIA | OTHER INT'L | TOTAL | UNITED STATES | CANADA | EGYPT |
| **PROVED DEVELOPED RESERVES:** | | | | | | | | | |
| December 31, 1999 | 186,962 | 50,401 | 30,719 | 33,887 | -- | 301,969 | 1,004,844 | 397,704 | 106,830 |
| December 31, 2000 | 232,361 | 66,484 | 26,028 | 29,124 | -- | 353,997 | 1,579,865 | 660,334 | 93,205 |
| December 31, 2001 | 230,017 | 76,250 | 59,188 | 45,628 | 699 | 411,782 | 1,407,561 | 1,148,516 | 338,707 |
| December 31, 2002 | 240,880 | 89,554 | 51,162 | 31,746 | 1,033 | 414,375 | 1,444,677 | 1,255,068 | 246,529 |
| **TOTAL PROVED RESERVES:** | | | | | | | | | |
| Balance December 31,1999 | 238,657 | 83,043 | 39,076 | 54,466 | -- | 415,242 | 1,214,887 | 407,053 | 156,049 |
| Extensions, discoveries and other additions | 36,681 | 6,589 | 9,168 | 6,074 | -- | 58,512 | 154,489 | 94,792 | 32,967 |
| Purchases of minerals in-place | 60,519 | 29,514 | -- | -- | -- | 90,033 | 736,079 | 246,360 | -- |
| Revisions of previous estimates | 2,655 | 159 | 1,012 | | -- | 4,255 | 32,414 | (8,397) | 2,966 |
| Production | (22,894) | (5,828) | (10,155) | (5,691) | -- | (44,568) | (199,362) | (47,758) | (17,371) |
| Sales of properties | (914) | (87) | -- | -- | -- | (1,001) | (10,454) | (333) | -- |
| Balance December 31, 2000 | 314,704 | 113,390 | 39,101 | 55,278 | -- | 522,473 | 1,928,053 | 691,717 | 174,611 |
| Extensions, discoveries and other additions | 54,533 | 21,121 | 17,121 | 12,320 | -- | 105,095 | 166,307 | 281,037 | 52,938 |
| Purchases of minerals in-place | 6,728 | 35,298 | 36,465 | -- | 1,099 | 79,590 | 34,827 | 512,927 | 247,302 |
| Revisions of previous estimates | (7,943) | 814 | 2,621 | -- | -- | (4,508) | (61,522) | 8,391 | 13,392 |
| Production | (24,157) | (9,916) | (14,322) | (8,595) | (42) | (57,032) | (224,600) | (108,925) | (35,010) |
| Sales of properties | (22,428) | (23,802) | -- | -- | -- | (46,230) | (167,271) | (83,265) | -- |
| Balance December 31, 2001 | 321,437 | 136,905 | 80,986 | 59,003 | 1,057 | 599,388 | 1,675,794 | 1,301,882 | 453,233 |
| Extensions, discoveries and other additions | 20,082 | 31,366 | 18,227 | 4,221 | 11,793 | 85,689 | 102,050 | 70,066 | 6,123 |
| Purchases of minerals in-place | 7,109 | 5,055 | -- | -- | -- | 12,164 | 154,459 | 66,113 | -- |
| Revisions of previous estimates | 6,630 | 159 | (8,140) | 106 | 40 | (1,205) | 37,944 | 20,900 | (37,480) |
| Production | (21,790) | (9,846) | (15,977) | (11,082) | (225) | (58,920) | (183,708) | (120,210) | (44,769) |
| Sales of properties | (46) | -- | (305) | -- | -- | (351) | (2,446) | -- | (6,440) |
| Balance December 31, 2002 | 333,422 | 163,639 | 74,791 | 52,248 | 12,665 | 636,765 | 1,784,093 | 1,338,751 | 370,667 |

| | NATURAL GAS (MILLIONS OF CUBIC FEET) | | | TOTAL (THOUSAND BARRELS OF OIL EQUIVALENT) |
|---|---|---|---|---|
| | AUSTRALIA | OTHER INT'L | TOTAL | |
| **PROVED DEVELOPED RESERVES:** | | | | |
| December 31, 1999 | 364,369 | -- | 1,873,747 | 614,260 |
| December 31, 2000 | 331,390 | -- | 2,664,794 | 798,129 |
| December 31, 2001 | 307,509 | 1,524 | 3,203,817 | 945,751 |
| December 31, 2002 | 256,790 | 3,469 | 3,206,533 | 948,797 |
| **TOTAL PROVED RESERVES:** | | | | |
| Balance December 31,1999 | 573,589 | -- | 2,351,578 | 807,172 |
| Extensions, discoveries and other additions | 55,195 | -- | 337,443 | 114,752 |
| Purchases of minerals in-place | -- | -- | 982,439 | 253,773 |
| Revisions of previous estimates | (6) | -- | 26,977 | 8,751 |
| Production | (39,489) | -- | (303,980) | (95,231) |
| Sales of properties | -- | -- | (10,787) | (2,799) |

| | | | |
|---|---|---|---|
| Balance December 31, 2000.... | 569,289 | -- | 3,383,670 | 1,086,418 |
| Extensions, discoveries and other additions.......... | 25,084 | -- | 525,366 | 192,656 |
| Purchases of minerals in-place................ | -- | 2,969 | 798,025 | 212,594 |
| Revisions of previous estimates................ | -- | -- | (39,739) | (11,131) |
| Production................. | (42,684) | (236) | (411,455) | (125,608) |
| Sales of properties........ | -- | -- | (250,536) | (87,986) |
| Balance December 31, 2001.... | 571,689 | 2,733 | 4,005,331 | 1,266,943 |
| Extensions, discoveries and other additions.......... | 28,943 | 3,355 | 210,537 | 120,779 |
| Purchases of minerals in-place................ | -- | -- | 220,572 | 48,926 |
| Revisions of previous estimates................ | 22 | 37 | 21,423 | 2,366 |
| Production................. | (42,998) | (2,656) | (394,341) | (124,644) |
| Sales of properties........ | -- | -- | (8,886) | (1,832) |
| Balance December 31, 2002.... | 557,656 | 3,469 | 4,054,636 | 1,312,538 |

As of December 31, 2002, 2001 and 2000, on a barrel of equivalent basis 28, 25 and 27 percent of our worldwide reserves, respectively, were classified as proved undeveloped.

F-42

APACHE CORPORATION AND SUBSIDIARIES

NOTES TO CONSOLIDATED FINANCIAL STATEMENTS -- (CONTINUED)

Future Net Cash Flows -- Future cash inflows are based on year-end oil and gas prices except in those instances where future natural gas or oil sales are covered by physical contract terms providing for higher or lower amounts. Operating costs, production and ad valorem taxes and future development costs are based on current costs with no escalation.

The following table sets forth unaudited information concerning future net cash flows for oil and gas reserves, net of income tax expense. Income tax expense has been computed using expected future tax rates and giving effect to tax deductions and credits available, under current laws, and which relate to oil and gas producing activities. This information does not purport to present the fair market value of the Company's oil and gas assets, but does present a standardized disclosure concerning possible future net cash flows that would result under the assumptions used.

| | UNITED STATES | CANADA(1) | EGYPT | AUSTRALIA | OTHER INTERNATIONAL | TOTAL |
|---|---|---|---|---|---|---|
| | | | (IN THOUSANDS) | | | |
| **2002** | | | | | | |
| Cash inflows........... | $17,550,514 | $ 9,597,042 | $3,820,016 | $2,436,477 | $402,311 | $ 33,806,360 |
| Production and development costs.... | (5,104,900) | (2,267,595) | (922,965) | (698,600) | (81,505) | (9,075,565) |
| Income tax expense..... | (3,875,478) | (2,288,073) | (963,906) | (482,883) | (59,164) | (7,669,504) |
| Net cash flows......... | 8,570,136 | 5,041,374 | 1,933,145 | 1,254,994 | 261,642 | 17,061,291 |
| 10 percent discount rate................ | (4,170,620) | (2,633,601) | (651,524) | (373,032) | (80,894) | (7,909,671) |
| Discounted future net cash flows(2)........ | $ 4,399,516 | $ 2,407,773 | $1,281,621 | $ 881,962 | $180,748 | $ 9,151,620 |
| **2001** | | | | | | |
| Cash inflows........... | $10,424,737 | $ 5,468,028 | $2,831,285 | $1,838,437 | $ 22,381 | $ 20,584,868 |
| Production and development costs.... | (4,071,024) | (1,871,840) | (871,257) | (571,188) | (17,321) | (7,402,630) |
| Income tax expense..... | (1,417,677) | (851,971) | (683,856) | (345,392) | -- | (3,298,896) |
| Net cash flows......... | 4,936,036 | 2,744,217 | 1,276,172 | 921,857 | 5,060 | 9,883,342 |
| 10 percent discount rate................ | (2,286,959) | (1,337,536) | (427,744) | (286,696) | (946) | (4,339,881) |
| Discounted future net cash flows(2)........ | $ 2,649,077 | $ 1,406,681 | $ 848,428 | $ 635,161 | $ 4,114 | $ 5,543,461 |
| **2000** | | | | | | |
| Cash inflows........... | $26,652,689 | $ 8,865,939 | $1,430,178 | $2,133,073 | $ -- | $ 39,081,879 |
| Production and development costs.... | (5,549,309) | (1,343,831) | (298,711) | (651,151) | -- | (7,843,002) |
| Income tax expense..... | (7,132,257) | (2,194,511) | (375,112) | (385,953) | -- | (10,087,833) |
| Net cash flows......... | 13,971,123 | 5,327,597 | 756,355 | 1,095,969 | -- | 21,151,044 |
| 10 percent discount rate................ | (6,148,566) | (2,478,102) | (238,985) | (337,741) | -- | (9,203,394) |
| Discounted future net cash flows(2)........ | $ 7,822,557 | $ 2,849,495 | $ 517,370 | $ 758,228 | $ -- | $ 11,947,650 |

(1) Included in the estimated future net cash flows are Canadian provincial tax credits expected to be realized beyond the date at which the legislation, under its provisions, could be repealed. To date, the Canadian provincial government has not indicated an intention to repeal this legislation.

(2) Estimated future net cash flows before income tax expense, discounted at 10 percent per annum, totaled approximately $13.2 billion, $7.4 billion and $17.7 billion as of December 31, 2002, 2001 and 2000, respectively.

APACHE CORPORATION AND SUBSIDIARIES

NOTES TO CONSOLIDATED FINANCIAL STATEMENTS -- (CONTINUED)

The following table sets forth the principal sources of change in the discounted future net cash flows:

| | FOR THE YEAR ENDED DECEMBER 31, | | |
|---|---|---|---|
| | 2002 | 2001 | 2000 |
| | (IN THOUSANDS) | | |
| Sales, net of production costs........................ | $(1,994,631) | $(2,327,679) | $(2,064,471) |
| Net change in prices and production costs............. | 4,767,785 | (10,125,666) | 4,693,840 |
| Discoveries and improved recovery, net of related costs.............................................. | 1,885,266 | 1,760,299 | 2,703,195 |
| Change in future development costs.................... | 222,160 | 182,816 | 67,442 |
| Revision of quantities............................... | (15,400) | (79,138) | 135,669 |
| Purchases of minerals in-place....................... | 603,608 | 1,332,244 | 5,796,278 |
| Accretion of discount................................ | 737,112 | 1,772,520 | 606,801 |
| Change in income taxes............................... | (2,200,925) | 3,949,890 | (4,284,904) |
| Sales of properties.................................. | (14,502) | (1,306,042) | (25,585) |
| Change in production rates and other................. | (382,314) | (1,563,433) | (255,976) |
| | $ 3,608,159 | $(6,404,189) | $ 7,372,289 |

Impact of Pricing -- The estimates of cash flows and reserve quantities shown above are based on year-end oil and gas prices, except in those cases where future natural gas or oil sales are covered by physical contracts at specified prices. Price fluctuations are largely attributable to supply and demand perceptions for natural gas and volatility in oil prices.

Under the full-cost accounting rules of the SEC, the Company reviews the carrying value of its proved oil and gas properties each quarter on a country-by-country basis. Under these rules, capitalized costs of proved oil and gas properties, net of accumulated DD&A and deferred income taxes, may not exceed the present value of estimated future net cash flows from proved oil and gas reserves, discounted at 10 percent, plus the lower of cost or fair value of unproved properties included in the costs being amortized, net of related tax effects (the "ceiling"). These rules generally require pricing future oil and gas production at the unescalated oil and gas prices at the end of each fiscal quarter and require a write-down if the "ceiling" is exceeded. Given the volatility of oil and gas prices, it is reasonably possible that the Company's estimate of discounted future net cash flows from proved oil and gas reserves could change in the near term. If oil and gas prices decline significantly, even if only for a short period of time, it is possible that write-downs of oil and gas properties could occur in the future.

F-44

APACHE CORPORATION AND SUBSIDIARIES

NOTES TO CONSOLIDATED FINANCIAL STATEMENTS -- (CONTINUED)

## 16. SUPPLEMENTAL QUARTERLY FINANCIAL DATA (UNAUDITED)

| | FIRST | SECOND | THIRD | FOURTH | TOTAL |
|---|---|---|---|---|---|
| | | (IN THOUSANDS, EXCEPT PER SHARE AMOUNTS) | | | |
| **2002** | | | | | |
| Revenues............................. | $527,996 | $656,315 | $645,189 | $730,373 | $2,559,873 |
| Expenses, net........................ | 447,324 | 510,005 | 498,661 | 549,554 | 2,005,544 |
| Net income.......................... | $ 80,672 | $146,310 | $146,528 | $180,819 | $ 554,329 |
| Income attributable to common stock.... | $ 75,764 | $143,229 | $145,122 | $179,399 | $ 543,514 |
| Net income per common share (1)(2): | | | | | |
| Basic............................. | $  0.53 | $  .97 | $  .96 | $ 1.19 | $   3.66 |
| Diluted............................ | $  0.52 | $  .95 | $  .95 | $ 1.18 | $   3.60 |
| **2001** | | | | | |
| Revenues............................. | $803,515 | $808,681 | $659,917 | $537,278 | $2,809,391 |
| Expenses, net........................ | 521,314 | 602,936 | 503,084 | 458,658 | 2,085,992 |
| Net income.......................... | $282,201 | $205,745 | $156,833 | $ 78,620 | $ 723,399 |
| Income attributable to common stock.... | $277,293 | $200,868 | $151,925 | $ 73,712 | $ 703,798 |
| Net income per common share (1)(2): | | | | | |
| Basic............................. | $  1.94 | $ 1.39 | $ 1.05 | $  .51 | $   4.89 |
| Diluted............................ | $  1.86 | $ 1.34 | $ 1.03 | $  .51 | $   4.73 |

(1) The sum of the individual quarterly net income per common share amounts may not agree with year-to-date net income per common share as each quarterly computation is based on the weighted average number of common shares outstanding during that period. In addition, certain potentially dilutive securities were not included in certain of the quarterly computations of diluted net income per common share because to do so would have been antidilutive.

(2) Earnings per share have been restated to reflect the 10 percent stock dividend declared September 13, 2001, paid January 21, 2002 to shareholders of record on December 31, 2001 and the five percent stock dividend declared December 18, 2002, payable April 2, 2003 to shareholders of record on March 12, 2003.

F-45

APACHE CORPORATION AND SUBSIDIARIES

NOTES TO CONSOLIDATED FINANCIAL STATEMENTS -- (CONTINUED)

17. SUPPLEMENTAL GUARANTOR INFORMATION

Prior to 2001, Apache Finance Australia was a finance subsidiary of Apache with no independent operations. In this capacity, it issued approximately $270 million of publicly traded notes that are fully and unconditionally guaranteed by Apache and, beginning in 2001, Apache North America, Inc. The guarantors of Apache Finance Australia have joint and several liability. Similarly, Apache Finance Canada was also a finance subsidiary of Apache and had issued approximately $300 million of publicly traded notes that were fully and unconditionally guaranteed by Apache.

Generally, the issuance of publicly traded securities would subject those subsidiaries to the reporting requirements of the SEC. Since these subsidiaries had no independent operations and qualified as "finance subsidiaries", they were exempted from these requirements.

During 2001, Apache contributed stock of its Australian and Canadian operating subsidiaries to Apache Finance Australia and Apache Finance Canada, respectively. As a result of these contributions, they no longer qualify as finance subsidiaries. As allowed by the SEC rules, the following condensed consolidating financial statements are provided as an alternative to filing separate financial statements.

Each of the companies presented in the condensed consolidating financial statements is wholly owned and has been consolidated in Apache Corporation's consolidated financial statements for all periods presented. As such, the condensed consolidating financial statements should be read in conjunction with the financial statements of Apache Corporation and subsidiaries and notes thereto of which this note is an integral part.

F-46

APACHE CORPORATION AND SUBSIDIARIES

NOTES TO CONSOLIDATED FINANCIAL STATEMENTS -- (CONTINUED)

CONDENSED CONSOLIDATING STATEMENT OF OPERATIONS
FOR THE YEAR ENDED DECEMBER 31, 2002

| | APACHE CORPORATION | APACHE NORTH AMERICA | APACHE FINANCE AUSTRALIA | APACHE FINANCE CANADA | ALL OTHER SUBSIDIARIES OF APACHE CORPORATION |
|---|---|---|---|---|---|
| | | | (IN THOUSANDS) | | |
| **Revenues:** | | | | | |
| Oil and gas production revenues..................... | $ 814,225 | $ -- | $ -- | $ -- | $1,906,009 |
| Equity in net income of affiliates................... | 391,295 | 20,976 | 32,905 | 76,707 | (37,036) |
| Other revenues (losses)........ | 7,909 | -- | (25) | -- | (7,759) |
| | 1,213,429 | 20,976 | 32,880 | 76,707 | 1,861,214 |
| **Operating Expenses:** | | | | | |
| Depreciation, depletion and amortization................. | 211,291 | -- | -- | -- | 632,588 |
| International impairments...... | -- | -- | -- | -- | 19,600 |
| Lease operating costs.......... | 198,052 | -- | -- | -- | 424,558 |
| Gathering and transportation costs....................... | 15,896 | -- | -- | -- | 22,671 |
| Severance and other taxes...... | 34,015 | -- | -- | 270 | 28,803 |
| Administrative, selling and other........................ | 87,860 | -- | -- | -- | 16,728 |
| Financing costs, net........... | 72,721 | -- | 18,050 | 41,058 | (18,996) |
| | 619,835 | -- | 18,050 | 41,328 | 1,125,952 |
| Preferred Interests of Subsidiaries................... | -- | -- | -- | -- | 16,224 |
| Income (Loss) Before Income Taxes........................ | 593,594 | 20,976 | 14,830 | 35,379 | 719,038 |
| Provision (benefit) for income taxes........................ | 39,265 | -- | (6,146) | (16,221) | 327,743 |
| Net Income..................... | 554,329 | 20,976 | 20,976 | 51,600 | 391,295 |
| Preferred stock dividends...... | 10,815 | -- | -- | -- | -- |
| Income Attributable to Common Stock.......................... | $ 543,514 | $20,976 | $20,976 | $ 51,600 | $ 391,295 |

| | RECLASSIFICATIONS & ELIMINATIONS | CONSOLIDATED |
|---|---|---|
| | (IN THOUSANDS) | |
| **Revenues:** | | |
| Oil and gas production revenues..................... | $(160,486) | $2,559,748 |
| Equity in net income of affiliates................... | (484,847) | -- |
| Other revenues (losses)........ | -- | 125 |
| | (645,333) | 2,559,873 |
| **Operating Expenses:** | | |
| Depreciation, depletion and amortization................. | -- | 843,879 |
| International impairments...... | -- | 19,600 |
| Lease operating costs.......... | (160,486) | 462,124 |
| Gathering and transportation costs....................... | -- | 38,567 |
| Severance and other taxes...... | -- | 63,088 |
| Administrative, selling and other........................ | -- | 104,588 |
| Financing costs, net........... | -- | 112,833 |
| | (160,486) | 1,644,679 |
| Preferred Interests of | | |

```
  Subsidiaries...................                 --              16,224
                                             ---------         ----------
Income (Loss) Before Income
  Taxes..........................          (484,847)           898,970
    Provision (benefit) for income
      taxes.......................                 --              344,641
                                             ---------         ----------
Net Income.......................          (484,847)           554,329
    Preferred stock dividends......                --              10,815
                                             ---------         ----------
Income Attributable to Common
  Stock...........................         $(484,847)        $   543,514
                                             =========         ==========
```

F-47

APACHE CORPORATION AND SUBSIDIARIES

NOTES TO CONSOLIDATED FINANCIAL STATEMENTS -- (CONTINUED)

CONDENSED CONSOLIDATING STATEMENT OF OPERATIONS
FOR THE YEAR ENDED DECEMBER 31, 2001

| | APACHE CORPORATION | APACHE NORTH AMERICA | APACHE FINANCE AUSTRALIA | APACHE FINANCE CANADA | ALL OTHER SUBSIDIARIES OF APACHE CORPORATION |
|---|---|---|---|---|---|
| | | | (IN THOUSANDS) | | |
| **Revenues:** | | | | | |
| Oil and gas production revenues.................... | $1,388,017 | $ -- | $ -- | $ -- | $1,897,305 |
| Equity in net income of affiliates.................. | 202,137 | 16,227 | 26,170 | 88,243 | (31,085) |
| Other revenues (losses)........ | (3,064) | -- | 3,053 | -- | (13,557) |
| | 1,587,090 | 16,227 | 29,223 | 88,243 | 1,852,663 |
| **Operating Expenses:** | | | | | |
| Depreciation, depletion and amortization................. | 170,854 | -- | -- | -- | 649,977 |
| International impairments...... | -- | -- | -- | -- | 65,000 |
| Lease operating costs.......... | 214,075 | -- | -- | -- | 653,102 |
| Gathering and transportation costs........................ | 15,337 | -- | -- | -- | 19,247 |
| Severance and other taxes...... | 49,201 | -- | -- | 36 | 20,590 |
| Administrative, selling and other........................ | 78,440 | -- | -- | -- | 10,270 |
| Financing costs, net........... | 71,150 | -- | 18,119 | 37,450 | (7,957) |
| | 599,057 | -- | 18,119 | 37,486 | 1,410,229 |
| Preferred Interests of Subsidiaries................... | -- | -- | -- | -- | 7,609 |
| **Income (Loss) Before Income Taxes.......................** | 988,033 | 16,227 | 11,104 | 50,757 | 434,825 |
| Provision (benefit) for income taxes....................... | 264,634 | -- | (5,123) | (16,344) | 232,688 |
| Net Income...................... | 723,399 | 16,227 | 16,227 | 67,101 | 202,137 |
| Preferred stock dividends...... | 19,601 | -- | -- | -- | -- |
| Income Attributable to Common Stock.......................... | $ 703,798 | $16,227 | $16,227 | $ 67,101 | $ 202,137 |

| | RECLASSIFICATIONS & ELIMINATIONS | CONSOLIDATED |
|---|---|---|
| | (IN THOUSANDS) | |
| **Revenues:** | | |
| Oil and gas production revenues.................... | $(462,363) | $2,822,959 |
| Equity in net income of affiliates.................. | (301,692) | -- |
| Other revenues (losses)........ | -- | (13,568) |
| | (764,055) | 2,809,391 |
| **Operating Expenses:** | | |
| Depreciation, depletion and amortization................. | -- | 820,831 |
| International impairments...... | -- | 65,000 |
| Lease operating costs.......... | (462,363) | 404,814 |
| Gathering and transportation costs........................ | -- | 34,584 |
| Severance and other taxes...... | -- | 69,827 |
| Administrative, selling and other........................ | -- | 88,710 |
| Financing costs, net........... | -- | 118,762 |
| | (462,363) | 1,602,528 |
| Preferred Interests of | | |

```
Subsidiaries....................           --              7,609
                                       ---------        ----------
Income (Loss) Before Income
  Taxes..........................      (301,692)         1,199,254
  Provision (benefit) for income
    taxes........................          --              475,855
                                       ---------        ----------
Net Income.......................      (301,692)           723,399
  Preferred stock dividends......          --               19,601
                                       ---------        ----------
Income Attributable to Common
  Stock..........................      $(301,692)       $  703,798
                                       =========        ==========
```

F-48

APACHE CORPORATION AND SUBSIDIARIES

NOTES TO CONSOLIDATED FINANCIAL STATEMENTS -- (CONTINUED)

CONDENSED CONSOLIDATING STATEMENT OF OPERATIONS
FOR THE YEAR ENDED DECEMBER 31, 2000

| | APACHE CORPORATION | APACHE NORTH AMERICA | APACHE FINANCE AUSTRALIA | APACHE FINANCE CANADA | ALL OTHER SUBSIDIARIES OF APACHE CORPORATION |
|---|---|---|---|---|---|
| | | | (IN THOUSANDS) | | |
| **Revenues:** | | | | | |
| Oil and gas production revenues..................... | $1,409,724 | $    -- | $    -- | $    -- | $1,281,209 |
| Equity in net income of affiliates.................... | 290,644 | -- | -- | 21,417 | (10,884) |
| Other revenues (losses)......... | (4,323) | -- | -- | -- | (3,394) |
| | 1,696,045 | -- | -- | 21,417 | 1,266,931 |
| **Operating Expenses:** | | | | | |
| Depreciation, depletion and amortization.................. | 356,998 | -- | -- | -- | 226,548 |
| Lease operating costs............ | 168,336 | -- | -- | -- | 467,473 |
| Gathering and transportation costs......................... | 11,701 | -- | -- | -- | 7,915 |
| Severance and other taxes....... | 48,014 | -- | -- | -- | 11,159 |
| Administrative, selling and other......................... | 63,418 | -- | -- | -- | 12,197 |
| Financing costs, net............. | 80,066 | -- | -- | 19,297 | 7,275 |
| | 728,533 | -- | -- | 19,297 | 732,567 |
| Income (Loss) Before Income Taxes........................... | 967,512 | -- | -- | 2,120 | 534,364 |
| Provision (benefit) for income taxes........................... | 246,917 | -- | -- | (8,413) | 244,582 |
| Income (Loss) Before Change in Accounting Principle........... | 720,595 | -- | -- | 10,533 | 289,782 |
| Cumulative effect of change in accounting principle, net of income tax.................... | (7,539) | -- | -- | -- | (4,831) |
| Net Income....................... | 713,056 | -- | -- | 10,533 | 284,951 |
| Preferred stock dividends....... | 19,988 | -- | -- | -- | -- |
| Income Attributable to Common Stock........................... | $ 693,068 | $    -- | $    -- | $10,533 | $ 284,951 |

| | RECLASSIFICATIONS & ELIMINATIONS | CONSOLIDATED |
|---|---|---|
| | (IN THOUSANDS) | |
| **Revenues:** | | |
| Oil and gas production revenues..................... | $(382,100) | $2,308,833 |
| Equity in net income of affiliates.................... | (300,315) | 862 |
| Other revenues (losses)......... | -- | (7,717) |
| | (682,415) | 2,301,978 |
| **Operating Expenses:** | | |
| Depreciation, depletion and amortization.................. | -- | 583,546 |
| Lease operating costs........... | (382,100) | 253,709 |
| Gathering and transportation costs......................... | -- | 19,616 |
| Severance and other taxes....... | -- | 59,173 |
| Administrative, selling and other......................... | -- | 75,615 |
| Financing costs, net............. | -- | 106,638 |
| | (382,100) | 1,098,297 |

| | | |
|---|---:|---:|
| Income (Loss) Before Income Taxes........................... | (300,315) | 1,203,681 |
| Provision (benefit) for income taxes........................ | -- | 483,086 |
| | --------- | ---------- |
| Income (Loss) Before Change in Accounting Principle............ | (300,315) | 720,595 |
| Cumulative effect of change in accounting principle, net of income tax.................... | 4,831 | (7,539) |
| | --------- | ---------- |
| Net Income........................ | (295,484) | 713,056 |
| Preferred stock dividends....... | -- | 19,988 |
| | --------- | ---------- |
| Income Attributable to Common Stock........................... | $(295,484) | $ 693,068 |
| | ========= | ========== |

F-49

APACHE CORPORATION AND SUBSIDIARIES

NOTES TO CONSOLIDATED FINANCIAL STATEMENTS -- (CONTINUED)

CONDENSED CONSOLIDATING STATEMENT OF CASH FLOWS
FOR THE YEAR ENDED DECEMBER 31, 2002

| | APACHE CORPORATION | APACHE NORTH AMERICA | APACHE FINANCE AUSTRALIA | APACHE FINANCE CANADA | ALL OTHER SUBSIDIARIES OF APACHE CORPORATION | RECLASSIFICATIONS & ELIMINATIONS | CONSOLIDATED |
|---|---|---|---|---|---|---|---|
| | | | | (IN THOUSANDS) | | | |
| Cash Provided by (Used in) Operating Activities..... | $ 39,727 | $ -- | $(18,687) | $(43,819) | $ 1,403,497 | $ -- | $ 1,380,718 |
| Cash Flows from Investing Activities: | | | | | | | |
| Additions to property and equipment.............. | (249,971) | -- | -- | -- | (787,397) | -- | (1,037,368) |
| Acquisitions............. | (269,885) | -- | -- | -- | -- | -- | (269,885) |
| Proceeds from sales of oil and gas properties............. | -- | -- | -- | -- | 7,043 | -- | 7,043 |
| Purchase of U.S. Government Agency Notes.................. | -- | -- | -- | -- | 101,723 | -- | 101,723 |
| Investment in and advances to subsidiaries, net...... | (168,481) | (18,050) | -- | -- | (843,894) | 1,030,425 | -- |
| Other, net............... | (15,105) | -- | -- | -- | (22,415) | -- | (37,520) |
| Net Cash Used in Investing Activities.............. | (703,442) | (18,050) | -- | -- | (1,544,940) | 1,030,425 | (1,236,007) |
| Cash Flows from Financing Activities: | | | | | | | |
| Long-term debt activity, net.................... | 700,464 | -- | 637 | 2,826 | 34,847 | (824,316) | (85,542) |
| Dividends paid........... | (68,879) | -- | -- | -- | -- | -- | (68,879) |
| Common stock activity, net.................... | 30,708 | 18,050 | 18,050 | 41,120 | 128,889 | (206,109) | 30,708 |
| Treasury stock activity, net.................... | 1,991 | -- | -- | -- | -- | -- | 1,991 |
| Cost of debt and equity transactions........... | (6,728) | -- | -- | -- | -- | -- | (6,728) |
| Net Cash Provided by Financing Activities..... | 657,556 | 18,050 | 18,687 | 43,946 | 163,736 | (1,030,425) | (128,450) |
| Net Increase (Decrease) in Cash and Cash Equivalents.............. | (6,159) | -- | -- | 127 | 22,293 | -- | 16,261 |
| Cash and Cash Equivalents at Beginning of Year..... | 6,383 | -- | 2 | -- | 29,240 | -- | 35,625 |
| Cash and Cash Equivalents at End of Year........... | $ 224 | $ -- | $ 2 | $ 127 | $ 51,533 | $ -- | $ 51,886 |

F-50

APACHE CORPORATION AND SUBSIDIARIES

NOTES TO CONSOLIDATED FINANCIAL STATEMENTS -- (CONTINUED)

CONDENSED CONSOLIDATING STATEMENT OF CASH FLOWS
FOR THE YEAR ENDED DECEMBER 31, 2001

| | APACHE CORPORATION | APACHE NORTH AMERICA | APACHE FINANCE AUSTRALIA | APACHE FINANCE CANADA | ALL OTHER SUBSIDIARIES OF APACHE CORPORATION | RECLASSIFICATIONS & ELIMINATIONS | CONSOLIDATED |
|---|---|---|---|---|---|---|---|
| | | | | (IN THOUSANDS) | | | |
| Cash Provided by (Used in) Operating Activities.......... | $1,149,273 | $ -- | $(1,575) | $ (29) | $ 757,331 | $ -- | $1,905,000 |
| **Cash Flows from Investing Activities:** | | | | | | | |
| Additions to property and equipment................... | (708,139) | -- | -- | -- | (820,845) | -- | (1,528,984) |
| Acquisitions.................. | (11,000) | -- | -- | -- | (911,951) | -- | (922,951) |
| Proceeds from sales of oil and gas properties.............. | 200,445 | -- | -- | -- | 147,851 | -- | 348,296 |
| Purchase of U.S. Government Agency Notes................ | -- | -- | -- | -- | (103,863) | -- | (103,863) |
| Investment in and advances to subsidiaries, net.......... | (1,055,334) | (5,568) | (5,568) | (250,849) | (652,967) | 1,970,286 | -- |
| Other, net.................... | (17,564) | -- | -- | -- | (59,271) | -- | (76,835) |
| Net Cash Used in Investing Activities.................... | (1,591,592) | (5,568) | (5,568) | (250,849) | (2,401,046) | 1,970,286 | (2,284,337) |
| **Cash Flows from Financing Activities:** | | | | | | | |
| Long-term debt activity, net......................... | 532,409 | -- | 1,577 | 250,878 | 668,787 | (1,427,552) | 26,099 |
| Dividends paid................ | (54,492) | -- | -- | -- | -- | -- | (54,492) |
| Common stock activity, net.... | 10,205 | 5,568 | 5,568 | -- | 531,598 | (542,734) | 10,205 |
| Treasury stock activity, net......................... | (42,959) | -- | -- | -- | -- | -- | (42,959) |
| Cost of debt and equity transactions................ | (1,718) | -- | -- | -- | -- | -- | (1,718) |
| Proceeds from preferred interests of subsidiaries, net of issuance costs....... | -- | -- | -- | -- | 440,654 | -- | 440,654 |
| Net Cash Provided by Financing Activities.................... | 443,445 | 5,568 | 7,145 | 250,878 | 1,641,039 | (1,970,286) | 377,789 |
| Net Increase (Decrease) in Cash and Cash Equivalents.......... | 1,126 | -- | 2 | -- | (2,676) | -- | (1,548) |
| Cash and Cash Equivalents at Beginning of Year............. | 5,257 | -- | -- | -- | 31,916 | -- | 37,173 |
| Cash and Cash Equivalents at End of Year..................... | $ 6,383 | $ -- | $ 2 | $ -- | $ 29,240 | $ -- | $ 35,625 |

F-51

APACHE CORPORATION AND SUBSIDIARIES

NOTES TO CONSOLIDATED FINANCIAL STATEMENTS -- (CONTINUED)

CONDENSED CONSOLIDATING STATEMENT OF CASH FLOWS
FOR THE YEAR ENDED DECEMBER 31, 2000

| | APACHE CORPORATION | APACHE NORTH AMERICA | APACHE FINANCE AUSTRALIA | APACHE FINANCE CANADA | ALL OTHER SUBSIDIARIES OF APACHE CORPORATION | RECLASSIFICATIONS & ELIMINATIONS | CONSOLIDATED |
|---|---|---|---|---|---|---|---|
| | | | | (IN THOUSANDS) | | | |
| Cash Provided by (Used in) Operating Activities..... | $ 899,872 | $ -- | $ 250 | $ 1,721 | $ 615,525 | $ -- | $1,517,368 |
| Cash Flows from Investing Activities: | | | | | | | |
| Additions to property and equipment.............. | (579,856) | -- | -- | -- | (375,720) | -- | (955,576) |
| Acquisitions............. | (760,566) | -- | -- | -- | (490,250) | -- | (1,250,816) |
| Proceeds from sales of oil and gas properties............. | 10,853 | -- | -- | -- | 15,418 | -- | 26,271 |
| Investment in and advances to subsidiaries, net...... | (472,778) | -- | (406) | (27,084) | (25,337) | 525,605 | -- |
| Other, net.............. | (15,380) | -- | -- | -- | (21,495) | -- | (36,875) |
| Net Cash Used in Investing Activities.............. | (1,817,727) | -- | (406) | (27,084) | (897,384) | 525,605 | (2,216,996) |
| Cash Flows from Financing Activities: | | | | | | | |
| Long-term debt activity, net.................... | 530,390 | -- | 156 | 202 | 280,741 | (479,039) | 332,450 |
| Dividends paid........... | (52,945) | -- | -- | -- | -- | -- | (52,945) |
| Issuance (repurchase) of preferred stock........ | (2,613) | -- | -- | -- | -- | -- | (2,613) |
| Common stock activity, net................... | 465,306 | -- | -- | 25,161 | 21,405 | (46,566) | 465,306 |
| Treasury stock activity, net................... | (17,730) | -- | -- | -- | -- | -- | (17,730) |
| Cost of debt and equity transactions........... | (838) | -- | -- | -- | -- | -- | (838) |
| Net Cash Provided by Financing Activities..... | 921,570 | -- | 156 | 25,363 | 302,146 | (525,605) | 723,630 |
| Net Increase (Decrease) in Cash and Cash Equivalents.............. | 3,715 | -- | -- | -- | 20,287 | -- | 24,002 |
| Cash and Cash Equivalents at Beginning of Year..... | 1,542 | -- | -- | -- | 11,629 | -- | 13,171 |
| Cash and Cash Equivalents at End of Year........... | $ 5,257 | $ -- | $ -- | $ -- | $ 31,916 | $ -- | $ 37,173 |

F-52

APACHE CORPORATION AND SUBSIDIARIES

NOTES TO CONSOLIDATED FINANCIAL STATEMENTS -- (CONTINUED)

CONDENSED CONSOLIDATING BALANCE SHEET
FOR THE YEAR ENDED DECEMBER 31, 2002

| | APACHE CORPORATION | APACHE NORTH AMERICA | APACHE FINANCE AUSTRALIA | APACHE FINANCE CANADA | ALL OTHER SUBSIDIARIES OF APACHE CORPORATION | RECLASSIFICATIONS & ELIMINATIONS | CONSOLIDATED |
|---|---|---|---|---|---|---|---|
| | | | | (IN THOUSANDS) | | | |
| **ASSETS** | | | | | | | |
| Current Assets: | | | | | | | |
| Cash and cash equivalents........... | $ 224 | $ -- | $ 2 | $ 127 | $ 51,533 | $ -- | $ 51,886 |
| Receivables............. | 121,410 | -- | -- | -- | 406,277 | -- | 527,687 |
| Inventories............. | 15,509 | -- | -- | -- | 93,695 | -- | 109,204 |
| Advances to oil and gas ventures and others... | 19,468 | -- | -- | -- | 58,536 | -- | 78,004 |
| Short-term investments........... | -- | -- | -- | -- | -- | -- | - |
| | 156,611 | -- | 2 | 127 | 610,041 | -- | 766,781 |
| Property and Equipment, Net..................... | 3,403,716 | -- | -- | -- | 5,061,869 | -- | 8,465,585 |
| Other Assets: | | | | | | | |
| Intercompany receivable, net................... | 1,146,086 | -- | (662) | (253,851) | (891,573) | -- | -- |
| Goodwill, net........... | -- | -- | -- | -- | 189,252 | -- | 189,252 |
| Equity in affiliates.... | 2,994,954 | 142,422 | 402,596 | 958,382 | (808,503) | (3,689,851) | -- |
| Deferred charges and other................ | 31,804 | -- | -- | 2,472 | 3,957 | -- | 38,233 |
| | $7,733,171 | $142,422 | $401,936 | $ 707,130 | $4,165,043 | $(3,689,851) | $9,459,851 |
| **LIABILITIES AND SHAREHOLDERS' EQUITY** | | | | | | | |
| Current Liabilities: | | | | | | | |
| Accounts payable........ | $ 124,152 | $ -- | $ -- | $ -- | $ 90,136 | $ -- | $ 214,288 |
| Other accrued expenses.............. | 134,191 | -- | 2,229 | 1,263 | 180,264 | -- | 317,947 |
| | 258,343 | -- | 2,229 | 1,263 | 270,400 | -- | 532,235 |
| Long-Term Debt............ | 1,550,645 | -- | 268,795 | 297,019 | 42,356 | -- | 2,158,815 |
| Deferred Credits and Other Noncurrent Liabilities: | | | | | | | |
| Income taxes............ | 736,661 | -- | (11,510) | (1,205) | 396,663 | -- | 1,120,609 |
| Advances from gas purchasers............ | 125,453 | -- | -- | -- | -- | -- | 125,453 |
| Oil and gas derivative instruments........... | 3,507 | -- | -- | -- | -- | -- | 3,507 |
| Other................... | 134,282 | -- | -- | -- | 24,044 | -- | 158,326 |
| | 999,903 | -- | (11,510) | (1,205) | 420,707 | -- | 1,407,895 |
| Preferred Interests of Subsidiaries............ | -- | -- | -- | -- | 436,626 | -- | 436,626 |
| Commitments and Contingencies | | | | | | | |
| Shareholders' Equity...... | 4,924,280 | 142,422 | 142,422 | 410,053 | 2,994,954 | (3,689,851) | 4,924,280 |
| | $7,733,171 | $142,422 | $401,936 | $ 707,130 | $4,165,043 | $(3,689,851) | $9,459,851 |

F-53

## APACHE CORPORATION AND SUBSIDIARIES

### NOTES TO CONSOLIDATED FINANCIAL STATEMENTS -- (CONTINUED)

### CONDENSED CONSOLIDATING BALANCE SHEET
### FOR THE YEAR ENDED DECEMBER 31, 2001

| | APACHE CORPORATION | APACHE NORTH AMERICA | APACHE FINANCE AUSTRALIA | APACHE FINANCE CANADA | ALL OTHER SUBSIDIARIES OF APACHE CORPORATION |
|---|---|---|---|---|---|
| | | | (IN THOUSANDS) | | |
| **ASSETS** | | | | | |
| **Current Assets:** | | | | | |
| Cash and cash equivalents........... | $ 6,383 | $ -- | $ 2 | $ -- | $ 29,240 |
| Receivables............. | 94,881 | -- | -- | -- | 309,912 |
| Inventories............. | 17,024 | -- | -- | -- | 85,512 |
| Advances to oil and gas ventures and others.... | 24,644 | -- | -- | -- | 27,201 |
| Short-term investments... | -- | -- | -- | -- | 102,950 |
| | 142,932 | -- | 2 | -- | 554,815 |
| **Property and Equipment,** | | | | | |
| Net.................... | 3,098,485 | -- | -- | -- | 4,914,587 |
| **Other Assets:** | | | | | |
| Intercompany receivable, net................... | 1,426,455 | -- | (25) | (251,025) | (1,175,405) |
| Goodwill, net........... | -- | -- | -- | -- | 188,812 |
| Equity in affiliates..... | 2,566,969 | 103,577 | 369,691 | 1,082,328 | (812,827) |
| Deferred charges and other................. | 27,688 | -- | -- | 2,564 | 3,771 |
| | $7,262,529 | $103,577 | $369,668 | $ 833,867 | $ 3,673,753 |
| **LIABILITIES AND SHAREHOLDERS' EQUITY** | | | | | |
| **Current Liabilities:** | | | | | |
| Accounts payable......... | $ 75,164 | $ -- | $ -- | $ -- | $ 104,614 |
| Other accrued expenses... | 165,858 | -- | 2,599 | 1,246 | 172,977 |
| | 241,022 | -- | 2,599 | 1,246 | 277,591 |
| Long-Term Debt............ | 1,605,201 | -- | 268,615 | 296,988 | 73,553 |
| **Deferred Credits and Other Noncurrent Liabilities:** | | | | | |
| Income taxes............ | 696,441 | -- | (5,123) | 18 | 300,387 |
| Advances from gas purchasers............ | 140,027 | -- | -- | -- | -- |
| Other................... | 161,355 | -- | -- | -- | 14,570 |
| | 997,823 | -- | (5,123) | 18 | 314,957 |
| **Preferred Interests of Subsidiaries............** | -- | -- | -- | -- | 440,683 |
| **Commitments and Contingencies** | | | | | |
| Shareholders' Equity....... | 4,418,483 | 103,577 | 103,577 | 535,615 | 2,566,969 |
| | $7,262,529 | $103,577 | $369,668 | $ 833,867 | $ 3,673,753 |

| | RECLASSIFICATIONS & ELIMINATIONS | CONSOLIDATED |
|---|---|---|
| | (IN THOUSANDS) | |
| **ASSETS** | | |
| **Current Assets:** | | |
| Cash and cash equivalents........... | $ -- | $ 35,625 |
| Receivables............. | -- | 404,793 |
| Inventories............. | -- | 102,536 |
| Advances to oil and gas ventures and others.... | -- | 51,845 |

| | | |
|---|---:|---:|
| Short-term investments... | -- | 102,950 |
| | ----------- | ---------- |
| | -- | 697,749 |
| | ----------- | ---------- |
| Property and Equipment, Net..................... | -- | 8,013,072 |
| | ----------- | ---------- |
| Other Assets: | | |
| Intercompany receivable, net.................... | -- | -- |
| Goodwill, net............. | -- | 188,812 |
| Equity in affiliates..... | (3,309,738) | -- |
| Deferred charges and other.................. | -- | 34,023 |
| | ----------- | ---------- |
| | $(3,309,738) | $8,933,656 |
| | =========== | ========== |

LIABILITIES AND SHAREHOLDERS' EQUITY

| | | |
|---|---:|---:|
| Current Liabilities: | | |
| Accounts payable......... | $      -- | $  179,778 |
| Other accrued expenses... | -- | 342,680 |
| | ----------- | ---------- |
| | -- | 522,458 |
| | ----------- | ---------- |
| Long-Term Debt............. | -- | 2,244,357 |
| | ----------- | ---------- |
| Deferred Credits and Other Noncurrent Liabilities: | | |
| Income taxes............. | -- | 991,723 |
| Advances from gas purchasers............. | -- | 140,027 |
| Other.................... | -- | 175,925 |
| | ----------- | ---------- |
| | -- | 1,307,675 |
| | ----------- | ---------- |
| Preferred Interests of Subsidiaries............. | -- | 440,683 |
| | ----------- | ---------- |
| Commitments and Contingencies | | |
| Shareholders' Equity....... | (3,309,738) | 4,418,483 |
| | ----------- | ---------- |
| | $(3,309,738) | $8,933,656 |
| | =========== | ========== |

F-54

## BOARD OF DIRECTORS

**FREDERICK M. BOHEN(3)(5)**
Acting Executive Vice President and
Chief Operating Officer,
The Rockefeller University

**G. STEVEN FARRIS(1)**
President, Chief Executive Officer and
Chief Operating Officer,
Apache Corporation

**RANDOLPH M. FERLIC, M.D.(1)(2)**
Founder and Former President,
Surgical Services of the Great Plains, P.C.

**EUGENE C. FIEDOREK(2)**
Private Investor, Former Managing Director, EnCap Investments L.C.

**A. D. FRAZIER, JR.(3)(5)**
President and Chief Executive Officer,
Caremark Rx, Inc.

**PATRICIA ALBJERG GRAHAM(4)**
Charles Warren Research Professor
of the History of American Education,
Harvard University

JOHN A. KOCUR(1)(3)
Attorney at Law; Former Vice Chairman of the Board, Apache Corporation

**GEORGE D. LAWRENCE(1)(3)**
Private Investor; Former Chief Executive Officer, The Phoenix Resource Companies, Inc.

F. H. MERELLI(1)(2)
Chairman of the Board, Chief Executive Officer and President
Cimarex Energy Co. (formerly Key Production Company, Inc.)

**RODMAN D. PATTON(2)**
Former Managing Director,
Merrill Lynch Energy Group

**CHARLES J. PITMAN(4)**
Former Regional President - Middle East/Caspian/ Egypt/India, BP Amoco plc; Sole Member, Shaker Mountain Energy Associates, LLC

**RAYMOND PLANK(1)**
**Chairman of the Board, Apache Corporation**

**JAY A. PRECOURT(4)**
Chairman of the Board and Chief Executive Officer, Scissor Tail Energy LLC
Chairman of the Board, Hermes Consolidated, Inc.

## OFFICERS

**RAYMOND PLANK**
**Chairman of the Board**

**G. STEVEN FARRIS**
President, Chief Executive Officer and
Chief Operating Officer

**MICHAEL S. BAHORICH**
**Executive Vice President -- Exploration and Production Technology**

**JOHN A. CRUM**
**Executive Vice President -- Eurasia and New Ventures**

**RODNEY J. EICHLER**
**Executive Vice President**

**ROGER B. PLANK**
**Executive Vice President and Chief Financial Officer**

**FLOYD R. PRICE**
Executive Vice President and
President, Apache Canada Ltd.

**LISA A. STEWART**
Executive Vice President
Business Development and E&P Services

**JON A. JEPPESEN**
**Senior Vice President**

**JEFFREY M. BENDER**
**Vice President -- Human Resources**

**MICHAEL J. BENSON**
**Vice President -- Security**

**THOMAS P. CHAMBERS**
**Vice President -- Corporate Planning**

**MATTHEW W. DUNDREA**
**Vice President and Treasurer**

**ROBERT J. DYE**
**Vice President -- Investor Relations**

**ERIC L. HARRY**
**Vice President and Associate General Counsel**

**P. ANTHONY LANNIE**
**Vice President and General Counsel**

**ANTHONY R. LENTINI, JR.**
**Vice President -- Public and International Affairs**

**JANINE J. MCARDLE**
**Vice President -- Oil and Gas Marketing**

**THOMAS L. MITCHELL**
**Vice President and Controller**

**JON W. SAUER**
**Vice President -- Tax**

**CHERI L. PEPER**
**Corporate Secretary**

---

(1) Executive Committee

(2) Audit Committee

(3) Management, Development & Compensation Committee

(4) Nominating Committee

(5) Stock Option Plan Committee

**SHAREHOLDER INFORMATION**

**Stock Data**

|  | Price Range* | | Dividends per Share** | |
|---|---|---|---|---|
|  | HIGH | LOW | DECLARED | PAID |
| **2002** | | | | |
| First Quarter........ | $55.43 | $42.25 | $.095 | $.095 |
| Second Quarter....... | 57.23 | 50.07 | .095 | .095 |
| Third Quarter........ | 57.13 | 42.92 | .095 | .095 |
| Fourth Quarter....... | 57.75 | 47.09 | .095 | .095 |
| **2001** | | | | |
| First Quarter........ | $63.10 | $46.93 | $ -- | $ -- |
| Second Quarter....... | 57.84 | 41.60 | -- | -- |
| Third Quarter........ | 47.09 | 33.12 | .242 | -- |
| Fourth Quarter....... | 47.73 | 35.14 | .095 | .242 |

* Per share prices have been adjusted to reflect the effects of the ten percent stock dividend in 2001 and the five percent stock dividend in 2002.

** The amounts in the chart have been adjusted to reflect the ten percent stock dividend in 2001 and the five percent stock dividend in 2002.

The Company has paid cash dividends on its common stock for 36 consecutive years through December 31, 2002. During 2000, the Company changed the dividend payment schedule on its common stock from a quarterly basis to an annual basis; however, during 2001, the Company implemented a return to a quarterly dividend payment schedule beginning in 2002. Future dividend payments will depend upon the Company's level of earnings, financial requirements and other relevant factors.

Apache common stock is listed on the New York and Chicago stock exchanges (symbol APA). At December 31, 2002, the Company's shares of common stock outstanding were held by approximately 8,000 shareholders of record and 104,000 beneficial owners. Also listed on the New York Stock Exchange are:

o the Company's 9.25% notes, due 2002
(symbol APA 02)

o Apache Finance Canada's 7.75% notes, due 2029 (symbol APA 29)

**CORPORATE OFFICES**
One Post Oak Central
2000 Post Oak Boulevard
Suite 100
Houston, Texas 77056-4400
(713) 296-6000

**INDEPENDENT PUBLIC ACCOUNTANTS**
Ernst & Young LLP
Five Houston Center
1401 McKinney Street, Suite 1200
Houston, Texas 77010-2007

**STOCK TRANSFER AGENT AND REGISTRAR**
Wells Fargo Bank Minnesota, N.A.
Attn: Shareowner Services
P.O. Box 64854
South St. Paul, Minnesota 55164-0854
(651) 450-4064 or (800) 468-9716

Communications concerning the transfer of shares, lost certificates, dividend checks, duplicate mailings or change of address should be directed to the stock transfer agent.

**DIVIDEND REINVESTMENT PLAN**
Shareholders of record may invest their dividends automatically in additional shares of Apache common stock at the market price. Participants may also invest up to an additional $5,000 in Apache shares each quarter through this service. All bank service fees and brokerage commissions on purchases are paid by Apache. A prospectus describing the terms of the Plan and an authorization form may be obtained from the Company's stock transfer agent, Wells Fargo Bank Minnesota, N.A.

**ANNUAL MEETING**
Apache will hold its annual meeting of shareholders on Thursday, May 1, 2003, at 10 a.m. in the Ballroom, Doubletree Hotel at Post Oak, 2001 Post Oak Boulevard, Houston, Texas. Apache plans to web cast the annual meeting live; connect through the Apache web site: http://www.apachecorp.com.

**STOCK HELD IN "STREET NAME"**
The Company maintains a direct mailing list to ensure that shareholders with stock held in brokerage accounts receive information on a timely basis. Shareholders wanting to be added to this list should direct their requests to Apache's Public and International Affairs Department, 2000 Post Oak Boulevard, Suite 100, Houston, Texas, 77056-4400, by calling (713) 296-6157 or by registering on Apache's web site: http://www.apachecorp.com.

**FORM 10-K REQUEST**
Shareholders and other persons interested in obtaining, without cost, a copy of the Company's Form 10-K filed with the Securities and Exchange Commission may do so by writing to Cheri L. Peper, Corporate Secretary, 2000 Post Oak Boulevard, Suite 100, Houston, Texas, 77056-4400.

**INVESTOR RELATIONS**
Shareholders, brokers, securities analysts or portfolio managers seeking information about the Company are welcome to contact Robert J. Dye, Vice President of Investor Relations, at (713) 296-6662.

Members of the news media and others seeking information about the Company should contact Apache's Public and International Affairs Department at (713) 296-6107.

WEB SITE: http://www.apachecorp.com

INDEX TO EXHIBITS

| EXHIBIT NO. | | DESCRIPTION |
|---|---|---|
| 2.1 | -- | Agreement and Plan of Merger among Registrant, YPY Acquisitions, Inc. and The Phoenix Resource Companies, Inc., dated March 27, 1996 (incorporated by reference to Exhibit 2.1 to Registrant's Registration Statement on Form S-4, Registration No. 333-02305, filed April 5, 1996). |
| 2.2 | -- | Purchase and Sale Agreement by and between BP Exploration & Production Inc., as seller, and Registrant, as buyer, dated January 11, 2003 (incorporated by reference to Exhibit 2.1 to Registrant's Current Report on Form 8-K, dated January 13, 2003, SEC File No. 1-4300). |
| 2.3 | -- | Sale and Purchase Agreement by and between BP Exploration Operating Company Limited, as seller, and Apache North Sea Limited, as buyer, dated January 11, 2003 (incorporated by reference to Exhibit 2.2 to Registrant's Current Report on Form 8-K, dated January 13, 2003, SEC File No. 1-4300). |
| 3.1 | -- | Restated Certificate of Incorporation of Registrant, dated December 16, 1999, as filed with the Secretary of State of Delaware on December 17, 1999 (incorporated by reference to Exhibit 99.1 to Registrant's Current Report on Form 8-K, dated December 17, 1999, SEC File No. 1-4300). |
| 3.2 | -- | Bylaws of Registrant, as amended May 2, 2002 (incorporated by reference to Exhibit 3.1 to Registrant's Quarterly Report on Form 10-Q for the quarter ended March 31, 2002, SEC File No. 1-4300). |
| 4.1 | -- | Form of Certificate for Registrant's Common Stock (incorporated by reference to Exhibit 4.1 to Registrant's Annual Report on Form 10-K for year ended December 31, 1995, SEC File No. 1-4300). |
| 4.2 | -- | Form of Certificate for Registrant's 5.68% Cumulative Preferred Stock, Series B (incorporated by reference to Exhibit 4.2 to Amendment No. 2 on Form 8-K/A to Registrant's Current Report on Form 8-K, dated April 18, 1998, SEC File No. 1-4300). |
| 4.3 | -- | Form of Certificate for Registrant's Automatically Convertible Equity Securities, Conversion Preferred Stock, Series C (incorporated by reference to Exhibit 99.8 to Amendment No. 1 on Form 8-K/A to Registrant's Current Report on Form 8-K, dated April 29, 1999, SEC File No. 1-4300). |
| 4.4 | -- | Rights Agreement, dated January 31, 1996, between Registrant and Norwest Bank Minnesota, N.A., rights agent, relating to the declaration of a rights dividend to Registrant's common shareholders of record on January 31, 1996 (incorporated by reference to Exhibit (a) to Registrant's Registration Statement on Form 8-A, dated January 24, 1996, SEC File No. 1-4300). |
| 10.1 | -- | Credit Agreement, dated June 12, 1997, among Registrant, the lenders named therein, Morgan Guaranty Trust Company, as Global Documentation Agent and U.S. Syndication Agent, The First National Bank of Chicago, as U.S. Documentation Agent, NationsBank of Texas, N.A., as Co-Agent, Union Bank of Switzerland, Houston Agency, as Co-Agent, and The Chase Manhattan Bank, as Global Administrative Agent (incorporated by reference to Exhibit 10.1 to Registrant's Current Report on Form 8-K, dated June 13, 1997, SEC File No. 1-4300). |
| 10.2 | -- | Form of Credit Agreement, dated as of June 3, 2002, among Registrant, the Lenders named therein, JPMorgan Chase Bank, as Global Administrative Agent, Bank of America, N.A., as Global Syndication Agent, Citibank, N.A., as Global Documentation Agent, Bank of America, N.A. and Wachovia Bank, National Association, as U.S. Co-Syndication Agents, and Citibank, N.A. and Union Bank of California, N.A., as U.S. Co-Documentation Agents (excluding exhibits and schedules) (incorporated by reference to Exhibit 10.2 to Registrant's Quarterly Report on Form 10-Q for the quarter ended June 30, 2002, SEC File No. 1-4300). |

```
EXHIBIT
 NO.                         DESCRIPTION
-------                     -----------
  10.3   --  Form of 364-Day Credit Agreement, dated as of June 3, 2002,
            among Registrant, the Lenders named therein, JPMorgan Chase
            Bank, as Global Administrative Agent, Bank of America, N.A.,
            as Global Syndication Agent, Citibank, N.A., as Global
            Documentation Agent, Bank of America, N.A. and BNP Paribas,
            as 364-Day Co-Syndication Agents, and Deutsche Bank AG, New
            York Branch, and Societe Generale, as 364-Day
            Co-Documentation Agents (excluding exhibits and schedules)
            (incorporated by reference to Exhibit 10.3 to Registrant's
            Quarterly Report on Form 10-Q for the quarter ended June 30,
            2002, SEC File No. 1-4300).

  10.4   --  Credit Agreement, dated June 12, 1997, among Apache Canada
            Ltd., a wholly-owned subsidiary of the Registrant, the
            Lenders named therein, Morgan Guaranty Trust Company, as
            Global Documentation Agent, Royal Bank of Canada, as
            Canadian Documentation Agent, The Chase Manhattan Bank of
            Canada, as Canadian Syndication Agent, Bank of Montreal, as
            Canadian Administrative Agent, and The Chase Manhattan Bank,
            as Global Administrative Agent (incorporated by reference to
            Exhibit 10.2 to Registrant's Current Report on Form 8-K,
            dated June 13, 1997, SEC File No. 1-4300).

  10.5   --  Form of Credit Agreement, dated as of June 3, 2002, among
            Apache Canada Ltd, a wholly-owned subsidiary of Registrant,
            the Lenders named therein, JPMorgan Chase Bank, as Global
            Administrative Agent, Bank of America, N.A., as Global
            Syndication Agent, Citibank, N.A., as Global Documentation
            Agent, Royal Bank of Canada, as Canadian Administrative
            Agent, The Bank of Nova Scotia and The Toronto-Dominion
            Bank, as Canadian Co-Syndication Agents, and BNP Paribas
            (Canada) and Bayerische Landesbank Girozentrale, as Canadian
            Co-Documentation Agents (excluding exhibits and schedules)
            (incorporated by reference to Exhibit 10.4 to Registrant's
            Quarterly Report on Form 10-Q for the quarter ended June 30,
            2002, SEC File No. 1-4300).

  10.6   --  Credit Agreement, dated June 12, 1997, among Apache Energy
            Limited and Apache Oil Australia Pty Limited, wholly-owned
            subsidiaries of the Registrant, the Lenders named therein,
            Morgan Guaranty Trust Company, as Global Documentation
            Agent, Bank of America National Trust and Savings
            Association, Sydney Branch, as Australian Documentation
            Agent, The Chase Manhattan Bank, as Australian Syndication
            Agent, Citisecurities Limited, as Australian Administrative
            Agent, and The Chase Manhattan Bank, as Global
            Administrative Agent (incorporated by reference to Exhibit
            10.3 to Registrant's Current Report on Form 8-K, dated June
            13, 1997, SEC File No. 1-4300).

  10.7   --  Form of Credit Agreement, dated as of June 3, 2002, among
            Apache Energy Limited, a wholly-owned subsidiary of
            Registrant, the Lenders named therein, JPMorgan Chase Bank,
            as Global Administrative Agent, Bank of America, N.A., as
            Global Syndication Agent, Citibank, N.A., as Global
            Documentation Agent, Citisecurities Limited, as Australian
            Administrative Agent, Bank of America, N.A., Sydney Branch,
            and Deutsche Bank AG, Sydney Branch, as Australian Co-
            Syndication Agents, and Royal Bank of Canada and Bank One,
            NA, Australia Branch, as Australian Co-Documentation Agents
            (excluding exhibits and schedules) (incorporated by
            reference to Exhibit 10.5 to Registrant's Quarterly Report
            on Form 10-Q for the quarter ended June 30, 2002, SEC File
            No. 1-4300).

  10.8   --  Concession Agreement for Petroleum Exploration and
            Exploitation in the Khalda Area in Western Desert of Egypt
            by and among Arab Republic of Egypt, the Egyptian General
            Petroleum Corporation and Phoenix Resources Company of
            Egypt, dated April 6, 1981 (incorporated by reference to
            Exhibit 19(g) to Phoenix's Annual Report on Form 10-K for
            year ended December 31, 1984, SEC File No. 1-547).

  10.9   --  Amendment, dated July 10, 1989, to Concession Agreement for
            Petroleum Exploration and Exploitation in the Khalda Area in
            Western Desert of Egypt by and among Arab Republic of Egypt,
            the Egyptian General Petroleum Corporation and Phoenix
            Resources Company of Egypt incorporated by reference to
            Exhibit 10(d)(4) to Phoenix's Quarterly Report on Form 10-Q
            for quarter ended June 30, 1989, SEC File No. 1-547).
```



```
EXHIBIT
   NO.                    DESCRIPTION
-------                   -----------
 10.10  --   Farmout Agreement, dated September 13, 1985 and relating to
             the Khalda Area Concession, by and between Phoenix Resources
             Company of Egypt and Conoco Khalda Inc(incorporated by
             reference to Exhibit 10.1 to Phoenix's Registration
             Statement on Form S-1, Registration No. 33-1069, filed
             October 23, 1985).
 10.11  --   Amendment, dated March 30, 1989, to Farmout Agreement
             relating to the Khalda Area Concession, by and between
             Phoenix Resources Company of Egypt and Conoco Khalda
             Inc(incorporated by reference to Exhibit 10(d)(5) to
             Phoenix's Quarterly Report on Form 10-Q for quarter ended
             June 30, 1989, SEC File No. 1-547).
 10.12  --   Amendment, dated May 21, 1995, to Concession Agreement for
             Petroleum Exploration and Exploitation in the Khalda Area in
             Western Desert of Egypt between Arab Republic of Egypt, the
             Egyptian General Petroleum Corporation, Repsol Exploracion
             Egipto S.A., Phoenix Resources Company of Egypt and Samsung
             Corporation (incorporated by reference to exhibit 10.12 to
             Registrant's Annual Report on Form 10-K for year ended
             December 31, 1997, SEC File No. 1-4300).
 10.13  --   Concession Agreement for Petroleum Exploration and
             Exploitation in the Qarun Area in Western Desert of Egypt,
             between Arab Republic of Egypt, the Egyptian General
             Petroleum Corporation, Phoenix Resources Company of Qarun
             and Apache Oil Egypt, Inc., dated May 17, 1993 (incorporated
             by reference to Exhibit 10(b) to Phoenix's Annual Report on
             Form 10-K for year ended December 31, 1993, SEC File No.
             1-547).
 10.14  --   Agreement for Amending the Gas Pricing Provisions under the
             Concession Agreement for Petroleum Exploration and
             Exploitation in the Qarun Area, effective June 16, 1994
             (incorporated by reference to Exhibit 10.18 to Registrant's
             Annual Report on Form 10-K for year ended December 31, 1996,
             SEC File No. 1-4300).
+10.15  --   Apache Corporation Corporate Incentive Compensation Plan A
             (Senior Officers' Plan), dated July 16, 1998 (incorporated
             by reference to Exhibit 10.13 to Registrant's Annual Report
             on Form 10-K for year ended December 31, 1998, SEC File No.
             1-4300).
+10.16  --   Apache Corporation Corporate Incentive Compensation Plan B
             (Strategic Objectives Format), dated July 16, 1998
             (incorporated by reference to Exhibit 10.14 to Registrant's
             Annual Report on Form 10-K for year ended December 31, 1998,
             SEC File No. 1-4300).
+10.17  --   Apache Corporation 401(k) Savings Plan, dated August 1, 2002
             (incorporated by reference to Exhibit 10.1 to Registrant's
             Quarterly Report on Form 10-Q for the quarter ended
             September 30, 2002, SEC File No. 1-4300).
+*10.18 --   Amendment to Apache Corporation 401(k) Savings Plan, dated
             January 27, 2003, effective as January 1, 2003.
+10.19  --   Apache Corporation Money Purchase Retirement Plan, dated
             August 1, 2002 (incorporated by reference to Exhibit 10.2 to
             Registrant's Quarterly Report on Form 10-Q for the quarter
             ended September 30, 2002, SEC File No. 1-4300).
+*10.20 --   Amendment to Apache Corporation Money Purchase Retirement
             Plan, dated January 27, 2003, effective as of January 1,
             2003.
+10.21  --   Non-Qualified Retirement/Savings Plan of Apache Corporation,
             restated as of January 1, 1997, and amendments effective as
             of January 1, 1997, January 1, 1998 and January 1, 1999
             (incorporated by reference to Exhibit 10.17 to Registrant's
             Annual Report on Form 10-K for year ended December 31, 1998,
             SEC File No. 1-4300).
+10.22  --   Amendment to Non-Qualified Retirement/Savings Plan of Apache
             Corporation, dated February 22, 2000, effective as of
             January 1, 1999 (incorporated by reference to Exhibit 4.7 to
             Registrant's Registration Statement on Form S-8,
             Registration No. 333-31092, filed February 25, 2000); and
             Amendment dated July 27, 2000 (incorporated by reference to
             Exhibit 4.8 to Amendment No. 1 to Registrant's Registration
             Statement on Form S-8, Registration No. 333-31092, filed
             August 18, 2000).
```

EXHIBIT
NO.                                       DESCRIPTION
-------                                   -----------

+10.23  --  Amendment to Non-Qualified Retirement/Savings Plan of Apache
            Corporation, dated August 3, 2001, effective as of September
            1, 2000 and July 1, 2001 (incorporated by reference to
            Exhibit 10.13 to Registrant's Quarterly Report on Form 10-Q
            for the quarter ended June 30, 2001, SEC File No. 1-4300).

+10.24  --  Apache Corporation 1990 Stock Incentive Plan, as amended and
            restated September 13, 2001 (incorporated by reference to
            Exhibit 10.01 to Registrant's Quarterly Report on Form 10-Q
            for the quarter ended September 30, 2001, SEC File No.
            1-4300).

+10.25  --  Apache Corporation 1995 Stock Option Plan, as amended and
            restated September 13, 2001 (incorporated by reference to
            Exhibit 10.02 to Registrant's Quarterly Report on Form 10-Q
            for the quarter ended September 30, 2001, SEC File No.
            1-4300).

+*10.26 --  Apache Corporation 2000 Share Appreciation Plan, as amended
            and restated February 5, 2003, effective as of March 12,
            2003.

+10.27  --  Apache Corporation 1996 Performance Stock Option Plan, as
            amended and restated September 13, 2001 (incorporated by
            reference to Exhibit 10.03 to Registrant's Quarterly Report
            on Form 10-Q for the quarter ended September 30, 2001, SEC
            File No. 1-4300).

+10.28  --  Apache Corporation 1998 Stock Option Plan, as amended and
            restated September 13, 2001 (incorporated by reference to
            Exhibit 10.04 to Registrant's Quarterly Report on Form 10-Q
            for the quarter ended September 30, 2001, SEC File No.
            1-4300).

+10.29  --  Apache Corporation 2000 Stock Option Plan, as amended and
            restated March 5, 2003 (incorporated by reference to Exhibit
            4.5 to Registrant's Registration Statement on Form S-8,
            Registration No. 333-103758, filed March 12, 2003).

+10.30  --  1990 Employee Stock Option Plan of The Phoenix Resource
            Companies, Inc., as amended through September 29, 1995,
            effective April 9, 1990 (incorporated by reference to
            Exhibit 10.33 to Registrant's Annual Report on Form 10-K for
            year ended December 31, 1996, SEC File No. 1-4300).

+10.31  --  Apache Corporation Income Continuance Plan, as amended and
            restated May 3, 2001 (incorporated by reference to Exhibit
            10.30 to Registrant's Annual Report on Form 10-K for the
            year ended December 31, 2001, SEC File No. 1-4300).

+10.32  --  Apache Corporation Deferred Delivery Plan, as amended and
            restated December 18, 2002, effective as of May 2, 2002
            (incorporated by reference to Exhibit 4.5 to Post-Effective
            Amendment No. 2 to Registrant's Registration Statement on
            Form S-8, Registration No. 333-31092, filed March 11, 2003).

+10.33  --  Apache Corporation Executive Restricted Stock Plan, as
            amended and restated December 18, 2002, effective as of May
            2, 2002 (incorporated by reference to Exhibit 4.5 to
            Post-Effective Amendment No. 1 to Registrant's Registration
            Statement on Form S-8, Registration No. 333-97403, filed
            December 30, 2002).

+10.34  --  Apache Corporation Non-Employee Directors' Compensation
            Plan, as amended and restated December 17, 1998
            (incorporated by reference to Exhibit 10.26 to Registrant's
            Annual Report on Form 10-K for year ended December 31, 1998,
            SEC File No. 1-4300).

+10.35  --  Apache Corporation Outside Directors' Retirement Plan, as
            amended and restated May 3, 2001 (incorporated by reference
            to Exhibit 10.08 to Registrant's Quarterly Report on Form
            10-Q for the quarter ended June 30, 2001, SEC File No.
            1-4300).

+10.36  --  Apache Corporation Equity Compensation Plan for Non-Employee
            Directors, as amended and restated May 3, 2001 (incorporated
            by reference to Exhibit 10.09 to Registrant's Quarterly
            Report on Form 10-Q for the quarter ended June 30, 2001, SEC
            File No. 1-4300).

+10.37  --  Amended and Restated Employment Agreement, dated December 5,
            1990, between Registrant and Raymond Plank (incorporated by
            reference to Exhibit 10.39 to Registrant's Annual Report on
            Form 10-K for year ended December 31, 1996, SEC File No.
            1-4300).

```
EXHIBIT
NO.                              DESCRIPTION
-------                          -----------
```

+10.38  --  First Amendment, dated April 4, 1996, to Restated Employment
            Agreement between Registrant and Raymond Plank (incorporated
            by reference to Exhibit 10.40 to Registrant's Annual Report
            on Form 10-K for year ended December 31, 1996, SEC File No.
            1-4300).

+10.39  --  Amended and Restated Employment Agreement, dated December
            20, 1990, between Registrant and John A. Kocur (incorporated
            by reference to Exhibit 10.10 to Registrant's Annual Report
            on Form 10-K for year ended December 31, 1990, SEC File No.
            1-4300).

+10.40  --  Employment Agreement, dated June 6, 1988, between Registrant
            and G. Steven Farris (incorporated by reference to Exhibit
            10.6 to Registrant's Annual Report on Form 10-K for year
            ended December 31, 1989, SEC File No. 1-4300).

+10.41  --  Amended and Restated Conditional Stock Grant Agreement,
            dated June 6, 2001, between Registrant and G. Steven Farris
            (incorporated by reference to Exhibit 10.10 to Registrant's
            Quarterly Report on Form 10-Q for the quarter ended June 30,
            2001, SEC File No. 1-4300).

 10.42  --  Amended and Restated Gas Purchase Agreement, effective July
            1, 1998, by and among Registrant and MW Petroleum
            Corporation, as seller, and Producers Energy Marketing, LLC,
            as buyer (incorporated by reference to Exhibit 10.1 to
            Registrant's Current Report on Form 8-K, dated June 18,
            1998, SEC File No. 1-4300).

 10.43  --  Deed of Guaranty and Indemnity, dated January 11, 2003, made
            by Registrant in favor of BP Exploration Operating Company
            Limited (incorporated by reference to Registrant's Current
            Report on Form 8-K, dated January 13, 2003, SEC File No.
            1-4300).

*12.1   --  Statement of Computation of Ratios of Earnings to Fixed
            Charges and Combined Fixed Charges and Preferred Stock
            Dividends

*21.1   --  Subsidiaries of Registrant
*23.1   --  Consent of Ernst & Young LLP
*23.2   --  Consent of Ryder Scott Company L.P., Petroleum Consultants
*24.1   --  Power of Attorney (included as a part of the signature pages
            to this report)
*99.1   --  Certification of Chief Executive Officer and Chief Financial
            Officer

* Filed herewith.

+ Management contracts or compensatory plans or arrangements required to be filed herewith pursuant to Item 15 hereof.

EXHIBIT 10.18

Amendment
To
Apache Corporation 401(k) Savings Plan

Apache Corporation ("Apache") maintains the Apache Corporation 401(k) Savings Plan (the "Plan"). In section 10.4 of the Plan, Apache reserved the right to amend the Plan from time to time. Apache hereby exercises such right as follows, by replacing the last part of Appendix C, beginning with the paragraph labelled "Acquisitions," with the following, effective as of January 1, 2003.

## ACQUISITIONS

A Period of Service for vesting purposes for a New Employee (listed below) shall be determined by treating all periods of employment with the Former Employer Controlled Group as periods of employment with Apache. The "Former Employer Controlled Group" means the Former Employer (listed below), its predecessor company/ies, and any business while such business was treated as a single employer with the Former Employer or predecessor company pursuant to Code section 414(b), 414(c), 414(m), or 414(o).

Any special provisions that apply to a New Employee shall also be listed in the chart below.

The following individuals are "New Employees" and the following companies are "Former Employers":

| Former Employer | New Employees |
| --------------- | ------------- |
| Hadson Energy Resources Corporation ("HERC") and Hadson Energy Limited ("HEL") | All individuals employed by HERC or HEL on November 12, 1993. |
| Crystal Oil Company ("Crystal") | All individuals hired from Crystal or related companies within a week of the closing date on an asset purchase that was originally scheduled to close on December 31, 1994. |
| Texaco Exploration & Production, Inc. | All individuals hired from TEPI or Inc. ("TEPI") related companies in late February and early March 1995 in connection with an acquisition of assets from TEPI. |
| The Phoenix Resource Companies, Inc. ("Phoenix") | All individuals hired by Apache in 1996 who were Phoenix employees on May 20, 1996. |
| Crescendo Resources, L.P. ("Crescendo") | All individuals hired from April 30, 2000 through June 1, 2000 from Crescendo and related companies in connection with an April 30, 2000 asset acquisition from Crescendo. |

Page 1 of 2

| Former Employer | New Employees |
|---|---|
| Collins & Ware ("C&W") and Longhorn Disposal, Inc. ("Longhorn") | All individuals hired from C&W and Longhorn and related companies in connection with a May 23, 2000 asset acquisition from C&W and Longhorn. |
| Occidental Petroleum Corporation ("Oxy") | All individuals hired from Oxy and related companies in connection with an August 2000 asset acquisition from an Oxy subsidiary. |
| Private company ("Private") | All individuals hired in January 2003 from Private and related companies in connection with an acquisition of certain property in Louisiana effective as of December 1, 2002. Each such individual shall be eligible to make Participant Before-Tax Contributions as of the day he becomes a Covered Employee. |

**EXECUTED this 27th day of January 2003.**

**APACHE CORPORATION**

By:   /s/ Jeffrey M. Bender
      ----------------------------------
Name:  Jeffrey M. Bender
Title: Vice President, Human Resources

**EXHIBIT 10.20**

Amendment
To

Apache Corporation Money Purchase Retirement Plan

Apache Corporation ("Apache") maintains the Apache Corporation Money Purchase Retirement Plan (the "Plan"). In section 9.4 of the Plan, Apache reserved the right to amend the Plan from time to time. Apache hereby exercises such right as follows, by replacing the chart at the end of Appendix C with the following chart, effective as of January 1, 2003.

| Former Employer | New Employees |
| --------------- | ------------- |
| Crescendo Resources, L.P. ("Crescendo") | All individuals hired from April 30, 2000 through June 1, 2000 from Crescendo and related companies in connection with an April 30, 2000 asset acquisition from Crescendo. |
| Collins & Ware ("C&W") and Longhorn Disposal, Inc. ("Longhorn") | All individuals hired from C&W, Longhorn, and related companies in connection with a May 23, 2000 asset acquisition from C&W and Longhorn. |
| Occidental Petroleum Corporation ("Oxy") | All individuals hired from Oxy and related companies in connection with an August 2000 asset acquisition from an Oxy subsidiary. |
| Private company ("Private") | All individuals hired in January 2003 from Private and related companies in connection with an asset acquisition of certain property in Louisiana effective as of December 1, 2002. |

**EXECUTED this 27th day of January 2003.**

**APACHE CORPORATION**

By:   /s/ Jeffrey M. Bender
      ----------------------------------
Name: Jeffrey M. Bender
Title: Vice President, Human Resources

Page 1 of 1

**EXHIBIT 10.26**

**APACHE CORPORATION**

**2000 SHARE APPRECIATION PLAN**
"120 BY '04"

(AS AMENDED AND RESTATED FEBRUARY 5, 2003, EFFECTIVE AS OF MARCH 12, 2003)

# TABLE OF CONTENTS

PAGE
----

Section 1 - Introduction.................................................................1

    1.1    Establishment.................................................1
    1.2    Purposes......................................................1

Section 2 - Definitions...............................................................1-6

    2.1    Definitions.................................................1-6
    2.2    Headings; Gender and Number...................................6

Section 3 - Plan Administration.........................................................6

Section 4 - Stock Subject to the Plan...................................................7

    4.1    Number of Shares..............................................7
    4.2    Other Shares of Stock.........................................7
    4.3    Certain Adjustments...........................................7

Section 5 - Reorganization or Liquidation...............................................8

Section 6 - Grant of Plan Units......................................................8-13

    6.1    Grants......................................................8-9
    6.2    Grant Agreements...........................................9-10

            6.2.1    Grant Terms......................................9
            6.2.2    Payment of Payout Amounts.....................9-10

    6.3    Termination of Employment, Death, Disability, etc........10-11
    6.4    Payment and Tax Withholding...............................11-12
    6.5    Subsequent Grant Agreements..................................12
    6.6    Stockholder Privileges.......................................12
    6.7    Limitations on Stock Issuable to Officers and Directors...12-13
    6.8    Deferral of Income...........................................13

                                                                    PAGE
                                                                    ----

Section 7 - Change of Control.................................................13-14

        7.1     In General...........................................................13
        7.2     Limitation on Payments...............................................14
        7.3     Definition...........................................................14

Section 8 - Rights of Employees, Participants.................................14-15

        8.1     Employment...........................................................14
        8.2     Non-transferability.................................................14-15

Section 9 - Other Employee Benefits..............................................15

Section 10 - Plan Amendment, Modification and Termination........................15

Section 11 - Requirements of Law.................................................16

        11.1    Requirements of Law..................................................16
        11.2    Section 16 Requirements..............................................16
        11.3    Governing Law........................................................16

Section 12 - Duration of the Plan................................................16

**APACHE CORPORATION**
**2000 SHARE APPRECIATION PLAN**
(AS AMENDED AND RESTATED FEBRUARY 5, 2003, EFFECTIVE AS OF MARCH 12, 2003)

SECTION 1

## INTRODUCTION

1.1 Establishment. Apache Corporation, a Delaware corporation (hereinafter referred to, together with its Affiliated Corporations (as defined below) as the "Company" except where the context otherwise requires), hereby established the Apache Corporation 2000 Share Appreciation Plan (the "Plan"), effective as of October 12, 2000.

1.2 Purposes. The primary purpose of this Plan is to focus the energies of the Company's employees on significantly increasing shareholder wealth through stock price appreciation to share prices of $87, $104 and $156 and a doubling of the Company's currently projected oil and gas production per share for calendar year 2000 (as adjusted for (i) the Company's ten-percent stock dividend, record date December 31, 2001, payable January 21, 2002, and (ii) the Company's five-percent stock dividend, record date March 12, 2003, payable April 2, 2003). The share price goals of this Plan seek to increase shareholder wealth by approximately $5.2 to $7.8 billion dollars with the Company's employees sharing in approximately three percent of the additional shareholder value created. The production goal is designed to inspire the Company's employees to significantly improve the one factor that is most within the control of the Company, production, and that is involved in determining the Company's earnings per share and cash flow per share. Additional purposes of this Plan include the retention of existing key employees and as an additional inducement in the recruitment of talented personnel in a competitive environment.

SECTION 2

## DEFINITIONS

2.1 Definitions. The following terms shall have the meanings set forth below:

"Affiliated Corporation" means any corporation or other entity (including but not limited to a partnership) which is affiliated with Apache Corporation through stock ownership or otherwise and is treated as a common employer under the

1

provisions of Sections 414(b) and (c) or any successor section(s) of the Internal Revenue Code.

"Base Salary" means, with regard to any Participant, such Participant's base compensation as an employee of the Company at the date of award of a Plan Unit (except for the calculation of the Independent Production Goal Amount, in which case the date shall be the Independent Production Goal Date), without regard to any bonus, pension, profit sharing, stock option, life insurance or salary continuation plan which the Participant either receives or is otherwise entitled to have paid on his behalf.

"Board" means the Board of Directors of the Company.

"Category" means one of the three groupings of Participants in the Plan whose Plan Units represent the right to receive the same multiple of their base salary for each Payout Amount.

"Committee" means the Stock Option Plan Committee of the Board or such other Committee of the Board that is empowered hereunder to administer the Plan. The Committee shall be constituted at all times so as to permit the Plan to be administered by "non-employee directors" (as defined in Rule 16b-3 of the Securities Exchange Act of 1934, as amended).

"Deferred Delivery Plan" means the Company's Deferred Delivery Plan, effective as of February 10, 2000, as it may be amended from time to time, or any successor plan.

"Eligible Employees" means those full-time employees (including, without limitation, the Company's executive officers), and certain part-time employees, of the Company.

"Fair Market Value" means the closing price of the Stock as reported on The New York Stock Exchange, Inc. Composite Transactions Reporting System ("Composite Tape") for a particular date. If there are no Stock transactions on such date, the Fair Market Value shall be determined as of the immediately preceding date on which there were Stock transactions.

"Final Amount" means with regard to any:

(a) Category I Participant, such number of shares of Stock (rounded down to the nearest full share) which equals two (2) times such Participant's Base Salary divided by $156;

2

(b) Category II Participant, such number of shares of Stock (rounded down to the nearest full share) which equals one (1) times such Participant's Base Salary divided by $156; and

(c) Category III Participant, such number of shares of Stock (rounded down to the nearest full share) which equals 50 percent (.50) times such Participant's Base Salary divided by $156;

which amount, in each case, shall be fixed and not subject to adjustment due to market fluctuation.

"Final Price Threshold Date" means the last of any 10 trading days (which need not be consecutive) during any period of 30 consecutive trading days occurring prior to January 1, 2005, but not thereafter, on each of which 10 days the closing price of the Stock as reported on the Composite Tape equaled or exceeded $156 per share. If the above trading criteria are met more than once, the first occurrence shall be deemed to be the Final Price Threshold Date.

"Final Plan Unit" means an investment unit convertible into the applicable Final Amount for a Participant upon occurrence of the Final Price Threshold Date.

"Grant" has the meaning set forth in Section 6 hereof.

"Grant Agreement" has the meaning set forth in Section 6 hereof.

"Independent Production Goal Amount" means with regard to any:

(a) Category I Participant, such number of shares of Stock (rounded down to the nearest full share) which equals one and one half (1.5) times such Participant's Base Salary divided by the Independent Production Goal Price;

(b) Category II Participant, such number of shares of Stock (rounded down to the nearest full share) which equals 75 percent (.75) times such Participant's Base Salary divided by the Independent Production Goal Price; and

(c) Category III Participant, such number of shares of Stock (rounded down to the nearest full share) which equals 37.5 percent (.375) times such Participant's Base Salary divided by the Independent Production Goal Price;

3

which amount, in each case, shall be fixed and not subject to adjustment due to market fluctuation.

"Independent Production Goal Date" means the last day of any fiscal quarter ending on or before December 31, 2004 during which fiscal quarter the Company's average daily production (calculated on an annualized basis) equals or exceeds 1.33 barrels of oil equivalent per outstanding share of Stock (calculated on a fully diluted basis), as confirmed by the Company's independent auditors. If the above production criterion is met more than once, the first occurrence shall be deemed to be the Independent Production Goal Date.

"Independent Production Goal Price" means the average daily closing price of the Stock as reported on the Composite Tape for the quarter ending on the Independent Production Goal Date.

"Independent Production Goal Plan Unit" means an investment unit convertible into the applicable Independent Production Goal Amount for a Participant upon occurrence of the Independent Production Goal Date.

"Initial Amount" means with regard to any:

(a) Category I Participant, such number of shares of Stock (rounded down to the nearest full share) which equals one (1) times such Participant's Base Salary divided by $87;

(b) Category II Participant, such number of shares of Stock (rounded down to the nearest full share) which equals 50 percent (.50) times such Participant's Base Salary divided by $87; and

(c) Category III Participant, such number of shares of Stock (rounded down to the nearest full share) which equals 25 percent (.25) times such Participant's Base Salary divided by $87;

which amount, in each case, shall be fixed and not subject to adjustment due to market fluctuation.

"Initial Price Threshold Date" means the last of any 10 trading days (which need not be consecutive) during any period of 30 consecutive trading days occurring prior to January 1, 2005, but not thereafter, on each of which 10 days the closing price of the Stock as reported on the Composite Tape equaled or exceeded $87 per share. If the above trading criteria are met more than once, the first occurrence shall be deemed to be the Initial Price Threshold Date.

4

"Initial Plan Unit" means an investment unit convertible into the applicable Initial Amount for a Participant upon occurrence of the Initial Price Threshold Date.

"Internal Revenue Code" means the Internal Revenue Code of 1986, as it may be amended from time to time.

"Participant" means an Eligible Employee designated by the Committee from time to time during the term of the Plan to receive one or more grants of Plan Units under the Plan.

"Payout Amounts" means the Initial Amount, the Secondary Amount, the Final Amount and/or the Independent Production Goal Amount.

"Plan Units" means each of the Initial Plan Units, Secondary Plan Units, Final Plan Units and/or Independent Production Goal Plan Units.

"Price Threshold Date" means the Initial Price Threshold Date, the Secondary Price Threshold Date, the Final Price Threshold Date and/or the Independent Production Goal Date, as the context may require.

"Secondary Amount" means with regard to any:

(a) Category I Participant, such number of shares of Stock (rounded down to the nearest full share) which equals three (3) times such Participant's Base Salary divided by $104;

(b) Category II Participant, such number of shares of Stock (rounded down to the nearest full share) which equals one and one half (1.5) times such Participant's Base Salary divided by $104; and

(c) Category III Participant, such number of shares of Stock (rounded down to the nearest full share) which equals 75 percent (.75) times such Participant's Base Salary divided by $104;

which amount, in each case, shall be fixed and not subject to adjustment due to market fluctuation.

5

"Secondary Price Threshold Date" means the last of any 10 trading days (which need not be consecutive) during any period of 30 consecutive trading days occurring prior to January 1, 2005, but not thereafter, on each of which 10 days the closing price of the Stock as reported on the Composite Tape equaled or exceeded $104 per share. If the above trading criteria are met more than once, the first occurrence shall be deemed to be the Secondary Price Threshold Date.

"Secondary Plan Unit" means an investment unit convertible into the applicable Secondary Amount for a Participant upon occurrence of the Secondary Price Threshold Date.

"Stock" means the $1.25 par value Common Stock of the Company.

"Stock Units" means investment units under the Deferred Delivery Plan, each of which is deemed to be equivalent to one share of Stock.

2.2 Headings; Gender and Number. The headings contained in the Plan are for reference purposes only and shall not affect in any way the meaning or interpretation of the Plan. Except when otherwise indicated by the context, the masculine gender shall also include the feminine gender, and the definition of any term herein in the singular shall also include the plural.

SECTION 3

## PLAN ADMINISTRATION

The Plan shall be administered by the Committee. In accordance with the provisions of the Plan, the Committee shall, in its sole discretion, adopt rules and regulations for carrying out the purposes of the Plan, including, without limitation, selecting the Participants from among the Eligible Employees and the Category of participation for each Participant, appointing designees or agents (who need not be members of the Committee or employees of the Company) to assist the Committee with the administration of the Plan, and establish such other terms and requirements as the Committee may deem necessary or desirable and consistent with the terms of the Plan. No member of the Committee shall be liable for any action or determination made in good faith. The determinations, interpretations and other actions of the Committee pursuant to the provisions of the Plan shall be binding and conclusive for all purposes and on all persons.

6

## STOCK SUBJECT TO THE PLAN

4.1 Number of Shares. Subject to Sections 4.3 and Section 6.1 hereof, up to four million forty two thousand five hundred (4,042,500) shares of Stock are authorized for issuance under the Plan upon conversion of any Plan Units in accordance with the Plan's terms and subject to such restrictions or other provisions as the Committee may from time to time deem necessary. Shares of Stock which may be issued pursuant to the conversion of any Plan Units awarded hereunder shall be applied to reduce the maximum number of shares of Stock remaining available for use under the Plan. The Company shall at all times during the term of the Plan and while any Plan Units are outstanding retain as authorized and unissued Stock and/or Stock in the Company's treasury, at least the number of shares from time to time required under the provisions of the Plan, or otherwise assure itself of its ability to perform its obligations hereunder.

4.2 Other Shares of Stock. Any shares of Stock that are subject to issuance upon conversion of a Plan Unit which expires, is forfeited, is cancelled, or for any reason is terminated, and any shares of Stock that for any other reason are not issued to a Participant or are forfeited shall automatically become available for use under the Plan.

4.3 Certain Adjustments. If the Company shall at any time increase or decrease the number of its outstanding shares of Stock (other than by way of issuing Stock in a public or private offering for cash or property) or change in any way the rights and privileges of such shares by means of a Stock dividend or any other distribution upon such shares payable in Stock, or through a Stock split, subdivision, consolidation, combination, reclassification or recapitalization involving the Stock or a subscription for shares of Stock that has the effect of diluting the Company's capital (hereinafter a "capital restructuring"), then for purposes of determining the entitlement to payments under Section 6, (i) the number of shares authorized for issuance under this Section 4, and (ii) the $87 per share amount, $104 per share amount and $156 per share amount referenced in

Section 1 and contained in the definitions set forth in Section 2 hereof and the amount of production required to attain the Independent Production Goal shall be, in each case, equitably and proportionally adjusted to take into account any capital restructuring. Any adjustment under this Section shall be made by the Committee, whose determination with regard thereto, including whether any adjustment is needed, shall be final and binding upon all parties.

7

## REORGANIZATION OR LIQUIDATION

In the event that the Company is merged or consolidated with another corporation and the Company is not the surviving corporation, or if all or substantially all of the assets or more than 20 percent of the outstanding voting stock of the Company is acquired by any other corporation, business entity or person, or in case of a reorganization (other than a reorganization under the United States Bankruptcy Code) or liquidation of the Company, and if the provisions of Section 7 hereof do not apply, the Committee, or the board of directors of any corporation assuming the obligations of the Company, shall, as to the Plan and outstanding Plan Units either (i) make appropriate provision for the adoption and continuation of the Plan by the acquiring or successor corporation and for the protection of any holders of such outstanding Plan Units by the substitution on an equitable basis of appropriate stock of the Company or of the merged, consolidated or otherwise reorganized corporation which will be issuable with respect to the Stock, provided that no additional benefits shall be conferred upon the Participants holding such Plan Units as a result of such substitution, or (ii) provided that a Price Threshold Date has occurred, upon written notice to the Participants, the Committee may accelerate the vesting and payment dates of the entitlement to receive cash and Stock under outstanding Plan Units so that all such existing entitlements are paid prior to any such event. In the latter event, such acceleration shall only apply to entitlements to cash and Stock payable as the result of the occurrence of the most recent Price Threshold Date and shall not by such acceleration, deem the occurrence of a Price Threshold Date that has not occurred by the date of the notice.

SECTION 6

## GRANT OF PLAN UNITS

6.1 Grants. Each Participant may be awarded an initial grant (a "Grant") of Plan Units under this Plan by the Committee, which Grant shall be composed of one Initial Plan Unit, Secondary Plan Unit, Final Plan Unit and Independent Production Goal Unit. The Committee, in its sole discretion, may award additional Grants to any Participant in connection with such Participant's receiving a significant increase in salary and/or a promotion within the Company. Each Grant awarded by the Committee shall be evidenced by a written agreement entered into by the Company and the Participant to whom the Grant is awarded (the "Grant Agreement"), which shall contain the terms and conditions set out in

8

this Section 6, as well as such other terms and conditions as the Committee may consider appropriate.

6.2 Grant Agreements. Each Grant Agreement entered into by the Company and each Participant shall specify which Category applies for such Participant and contain at least the following terms and conditions. In the event of any inconsistency between the provisions of the Plan and any Grant Agreement, the provisions of the Plan shall govern.

6.2.1 Grant Terms. Each Grant Agreement shall evidence the Grant of Plan Units and entitle the Participant to receive the indicated Plan Units which shall convert into the right to receive a conditional payment of cash and issuance of Stock upon the occurrence of one or more of the Price Threshold Dates, all as set forth below.

(a) If at any time prior to January 1, 2005, the Initial Price Threshold Date occurs, the Participant may become entitled to receive a portion or all of the Initial Amount payable to Participants in such Category, as specified in the applicable Grant Agreement, in accordance with the payment schedule and as otherwise set out in Section 6.2.2.

(b) If at any time prior to January 1, 2005, the Secondary Price Threshold Date occurs, the Participant may become entitled to receive a portion or all of the Secondary Amount payable to Participants in such Category, as specified in the applicable Grant Agreement, in accordance with the payment schedule and as otherwise set out in Section 6.2.2.

(c) If at any time prior to January 1, 2005, the Final Price Threshold Date occurs, the Participant may become entitled to receive a portion or all of the Final Amount payable to Participants in such Category, as specified in the applicable Grant Agreement, in accordance with the payment schedule and as otherwise set out in Section 6.2.2.

(d) If at any time prior to January 1, 2005, the Independent Production Goal Date occurs, the Participant may become entitled to receive a portion or all of the Independent Production Goal Amount payable to Participants in the same Category, as specified in the applicable Grant Agreement, in accordance with the payment schedule and as otherwise set out in Section 6.2.2.

6.2.2 Payment of Payout Amounts. Subject to the provisions of Section 6.3, the Payout Amounts shall be payable in increments strictly in accordance with the following schedule:

9

(a) The entitlement to receive the first one-third (1/3) of any Payout Amount shall vest on the applicable Price Threshold Date and shall be paid by the Company to the Participant within thirty (30) days of the applicable Price Threshold Date in the manner set out in Section 6.4 below.

(b) The entitlement to receive the remainder of any Payout Amount shall vest and become payable in equal parts on the dates occurring, respectively, 12 months and 24 months after the applicable Price Threshold Date, in the same proportions and amounts as set forth in Section 6.4 below, and shall be paid by the Company to the Participant within thirty (30) days of such date. If any of the above dates is not a business day during which the Company is open for business, such date of vesting or payment shall be the first business date occurring immediately thereafter.

(c) No Payout Amount or portion thereof shall be payable under this Section 6.2.2 if the applicable Price Threshold Date has not occurred prior to January 1, 2005.

6.3 Termination of Employment, Death, Disability, etc. Except as set forth below, each Grant Agreement shall state that each Grant, the Plan Units received thereunder and the right to receive any payment thereunder upon conversion of the Plan Units shall be subject to the condition that the Participant has remained an Eligible Employee from the initial award of a Grant until the applicable vesting date as follows:

(a) If the Participant voluntarily leaves the employment of the Company, or if the employment of the Participant is terminated by the Company for cause or otherwise, any Plan Units not previously converted and the right to receive any Payout Amounts not yet paid in accordance with Section 6.2.2 shall thereafter be void and forfeited for all purposes.

(b) If the Participant retires from employment with the Company on or after attaining age 60, the retired Participant shall be entitled to receive the payments in Stock and cash in accordance with Section 6.2.2, provided that (i) such Participant has certified in writing to the Committee his commitment not to enter into full-time employment or a consulting arrangement with a competitor of the Company, and (ii) the applicable Price Threshold Date has occurred prior to the Participant's last day of employment with the Company. Such retired Participant shall not be entitled to any payment which may arise due to the occurrence of a Price Threshold Date after the effective date of such Participant's retirement. If the retired Participant dies before receiving all of the payments to which he or she is entitled under this Section 6.3(b), such payments shall be made to those entitled under the retired Participant's will or by the laws of descent

10

and distribution. A failure of the Participant to comply with the undertaking of clause (i) above shall void such Participant's right to payments hereunder.

(c) If the Participant dies, or if the Participant becomes disabled (as determined pursuant to the Company's Long-Term Disability Plan or any successor plan), while still employed, payment in Stock and cash in accordance with
Section 6.2.2 shall be made to the disabled Participant or to those entitled under the Participant's will or by the laws of descent and distribution, provided that the applicable Price Threshold Date has occurred prior to the earlier of such Participant's disability or death. There shall be no entitlement to any payment, which may arise due to the occurrence of a Price Threshold Date after the earlier of such Participant's disability or death.

6.4 Payment and Tax Withholding. Each Grant Agreement shall provide that, upon payment of any entitlement upon conversion of any Plan Units, the Participant shall make appropriate arrangements with the Company to provide for the amount of minimum tax withholding required by Sections 3102 and 3402 or any successor section(s) of the Internal Revenue Code and applicable state and local income and other tax laws, as follows:

(a) If upon the achievement of a Threshold Date the credit rating of the Company's long term, unsecured debt is at or above investment grade, then each payment of the related Payout Amount shall be made in a proportion of cash and shares of Stock, determined by the Committee, such that the cash portion shall be sufficient to cover the withholding amount required by this Section. The cash portion of any payment of a Payout Amount shall be based on the Fair Market Value of the shares of Stock on the business day immediately preceding the payment date. Such cash portion shall be withheld by the Company to satisfy applicable tax withholding requirements.

11

(b) If upon the achievement of a Threshold Date the Company's long term, unsecured debt has a credit rating below investment grade, the Committee, in its sole discretion, may either (i) provide for the payment of the withholding amount required by this Section as set forth in Subsection (a) above or (ii) specify that each payment of the related Payout Amount to a Participant be made only after the Participant has made funds available to the Company sufficient to cover the withholding amount required by this Section. The funds required by this Subsection (b) may be obtained by the Participant by means of a loan from a securities broker or dealer, in which case the Participant may satisfy the requirements hereof by delivering to the Company an irrevocable instruction to such broker or dealer to promptly deliver to the Company, by wire transfer or certified or cashier's check, the funds necessary to meet the Participant's obligations hereunder and such delivery instructions for the shares issuable to the Participant as the broker or dealer may require. The calculation of the funds to be provided by the Participant under this paragraph shall be based on the Fair Market Value of the shares of Stock to be issued to the Participant, on the business day immediately preceding the payment date.

(c) Upon a request made to the Committee by a Participant, the proportion of cash and Stock as set forth in Subsection (a) above may be, but need not be, changed by the Committee, in its sole discretion, to provide for, among other things, special or additional tax burdens on a Participant but, in no event, shall the cash portion of any payment exceed fifty percent (50%).

6.5 Subsequent Grant Agreements. Following the award of Grants in 2000, additional Participants may be designated by the Committee for grants of Plan Units thereafter subject to the same terms and conditions set forth above for initial grants except that the Committee, in its sole discretion, may reduce the value of the Initial Amount, Secondary Amount, Final Amount or Independent Production Goal Amount to which subsequent Participants may become entitled and the applicable Grant Agreement shall be modified to reflect such reduction.

6.6 Stockholder Privileges. No Participant shall have any rights as a stockholder with respect to any shares of Stock into which a Plan Unit is convertible until the Participant becomes the holder of record of such Stock.

6.7 Limitations on Stock Issuable to Officers and Directors. Any provision of the Plan notwithstanding, the total number of shares of Stock issuable to Participants who are directors or officers of the Company (as defined for the purposes of Section 16 of the Securities Exchange Act of 1934, as amended) shall not exceed 49 percent of the total shares issuable under the Plan (the "D&O Limitation"). If the total number of shares of Stock issuable to all of the Company's directors and officers who are Participants in the Plan shall exceed

12

the D&O Limitation, then the total number of shares of Stock issuable to such Participants shall be reduced to a number equal to the D&O Limitation and the number of shares of Stock issuable to each such Participant upon conversion of any Plan Unit shall be reduced pro rata.

6.8 Deferral of Income. For Participants eligible for participation in the Deferred Delivery Plan, all or a portion of the income resulting from the conversion of Plan Units into Payout Amounts is subject to deferral into the Participant's Deferred Delivery Plan account, if the Participant has made an irrevocable election to make such a deferral, as follows: (a) with respect to the first payment to be made upon the occurrence of a Price Threshold Date, no more than 30 days after the Participant executes the applicable Grant Agreement and/or (b) with respect to any other payment to be made after the occurrence of a Price Threshold Date, at least six months prior to the date such payment is to be made by the Company. If the Participant has complied with the above requirements, all or a portion of the income resulting from any payment upon the conversion of Plan Units into Payout Amounts shall be deferred into the Participant's Deferred Delivery Plan account and no additional cash or shares of Stock shall be delivered to the Participant.

SECTION 7

## CHANGE OF CONTROL

7.1 In General. In the event of the occurrence of a change of control of the Company as defined in Section 7.3 hereof, and assuming the occurrence of a Price Threshold Date, the entitlement to receive cash and Stock upon conversion of any Plan Units shall vest automatically, without further action by the Committee or the Board, and shall become payable as follows:

(a) If such change of control occurs subsequent to the occurrence of a Price Threshold Date, (i) the first one-third (1/3) of the applicable Payout Amount shall vest and be paid pursuant to Section 6.2.2(a) hereof, and (ii) the remainder of such Payout Amount shall vest as of the date of such change of control and shall be paid by the Company to the Participant within thirty (30) days of the date of such change of control in the manner set out in Section 6.4 hereof.

(b) If the occurrence of a Price Threshold Date occurs subsequent to the date of a change of control, the applicable Payout Amount shall vest in full as of such Price Threshold Date and shall be paid by the Company to the Participant within thirty (30) days of such Price Threshold Date in the manner set out in
Section 6.4 hereof.

13

7.2 Limitation on Payments. If the provisions of this Section 7 would result in the receipt by any Participant of a payment within the meaning of Section 280G or any successor section(s) of the Internal Revenue Code, and the regulations promulgated thereunder, and if the receipt of such payment by any Participant would, in the opinion of independent tax counsel of recognized standing selected by the Company, result in the payment by such Participant of any excise tax provided for in Sections 280G and 4999 or any successor section(s) of the Internal Revenue Code, then the amount of such payment shall be reduced to the extent required, in the opinion of independent tax counsel, to prevent the imposition of such excise tax; provided, however, that the Committee, in its sole discretion, may authorize the payment of all or any portion of the amount of such reduction to the Participant.

7.3 Definition. For purposes of the Plan, a "change of control" shall mean any of the events specified in the Company's Income Continuance Plan or any successor plan which constitute a change of control within the meaning of such plan.

SECTION 8

## RIGHTS OF EMPLOYEES, PARTICIPANTS

8.1 Employment. Neither anything contained in the Plan or any Grant Agreement nor the granting of any Plan Units under the Plan shall confer upon any Participant any right with respect to the continuation of his or her employment by the Company or any Affiliated Corporation, or interfere in any way with the right of the Company or any Affiliated Corporation, at any time to terminate such employment or to increase or decrease the level of the Participant's compensation from the level in existence at the time of the award of Plan Units.

8.2 Non-transferability. No right or interest of any Participant in a Plan Unit granted pursuant to the Plan shall be assignable or transferable during the lifetime of the Participant, either voluntarily or involuntarily, or subjected to any lien, directly or indirectly, by operation of law, or otherwise, including execution, levy, garnishment, attachment, pledge or bankruptcy. In the event of a Participant's death, a Participant's rights and interests in any Plan Unit shall, to the extent provided in Section 6.3 hereof, be transferable by testamentary will or the laws of descent and distribution, and payment of any entitlements due under the Plan shall be made to the Participant's legal representatives, heirs or legatees. If in the opinion of the Committee a person entitled to payments or to exercise rights with respect to the Plan is disabled from caring for his or her affairs because of mental condition, physical condition or age, payment due such

14

person may be made to, and such rights shall be exercised by, such person's guardian, conservator or other legal personal representative upon furnishing the Committee with evidence satisfactory to the Committee of such status.

SECTION 9

## OTHER EMPLOYEE BENEFITS

The amount of any income deemed to be received by a Participant as a result of the payment upon conversion of a Plan Unit shall not constitute "earnings" or "compensation" with respect to which any other employee benefits of such Participant are determined, including without limitation benefits under any pension, profit sharing, life insurance or salary continuation plan.

SECTION 10

## PLAN AMENDMENT, MODIFICATION AND TERMINATION

The Committee or the Board may at any time terminate, and from time to time may amend or modify the Plan. No amendment, modification or termination of the Plan shall in any manner adversely affect any Plan Unit theretofore awarded under the Plan, without the consent of the Participant holding such Plan Unit.

The Committee shall have the authority to adopt such modifications, procedures and subplans as may be necessary or desirable to comply with the provisions of the laws (including, but not limited to, tax laws and regulations) of countries other than the United States in which the Company may operate, so as to assure the viability of the benefits of the Plan to Participants employed in such countries.

15

## REQUIREMENTS OF LAW

11.1 Requirements of Law. The issuance of Stock and the payment of cash pursuant to the Plan shall be subject to all applicable laws, rules and regulations, including applicable federal and state securities laws. The Company may require a Participant, as a condition of receiving payment upon conversion of a Plan Unit, to give written assurances in substance and form satisfactory to the Company and its counsel to such effect as the Company deems necessary or appropriate in order to comply with federal and applicable state securities laws.

11.2 Section 16 Requirements. If a Participant is an officer or director of the Company within the meaning of Section 16, Grants awarded hereunder shall be subject to all conditions required under Rule 16b-3, or any successor rule(s) promulgated under the Securities Exchange Act of 1934, as amended, to qualify the Plan Units for any exemption from the provisions of Section 16 available under such Rule. Such conditions are hereby incorporated herein by reference and shall be set forth in the agreement with the Participant, which describes the Grant.

11.3 Governing Law. The Plan and all Grant Agreements hereunder shall be construed in accordance with and governed by the laws of the State of Texas.

SECTION 12

## DURATION OF THE PLAN

The Plan shall terminate at such time as may be determined by the Committee, and no Plan Units shall be awarded after such termination. If not sooner terminated under the preceding sentence, the Plan shall fully cease and expire at midnight on December 31, 2004. Payout Amounts for which one or more of the Price Threshold Dates has occurred and which remain outstanding at the time of the Plan termination shall continue in accordance with the Grant Agreement pertaining to such Plan Units.

16

Dated: February 5, 2003 effective as of March 12, 2003

**APACHE CORPORATION**

**ATTEST:**

```
    /s/ Cheri L. Peper                    By: /s/ Jeffrey M. Bender
    ------------------------------        ----------------------------------
    Cheri L. Peper                            Jeffrey M. Bender
    Corporate Secretary                       Vice President
```

17

**EXHIBIT 12.1**

# APACHE CORPORATION
## STATEMENT OF COMPUTATION OF RATIOS OF EARNINGS TO FIXED CHARGES
## AND COMBINED FIXED CHARGES, PREFERRED STOCK DIVIDENDS
## AND PREFERRED INTERESTS OF SUBSIDIARIES
### (IN THOUSANDS)

| (UNAUDITED) | 2002 | 2001 | 2000 |
|---|---|---|---|
| **EARNINGS** | | | |
| Pretax income (loss) from continuing operations before | | | |
| preferred interests of subsidiaries ............................ | $ 915,194 | $ 1,206,863 | $ 1,203,681 |
| Add:Fixed charges excluding capitalized interest and | | | |
| preferred interest requirements of consolidated subsidiaries .... | 128,730 | 134,484 | 116,190 |
| | | | |
| Adjusted Earnings ............................................ | $ 1,043,924 | $ 1,341,347 | $ 1,319,871 |
| | | | |
| **FIXED CHARGES AND PREFERRED STOCK DIVIDENDS** | | | |
| Interest expense including capitalized interest ................... | $ 155,667 | $ 178,915 | $ 168,121 |
| Amortization of debt expense ..................................... | 1,859 | 2,460 | 2,726 |
| Interest component of lease rental expenditures (1) .............. | 11,895 | 9,858 | 7,343 |
| Preferred interest requirements of consolidated subsidiaries (2)... | 19,581 | 8,608 | -- |
| | | | |
| Fixed charges ................................................ | 189,002 | 199,841 | 178,190 |
| Preferred stock dividend requirements (3) ........................ | 17,540 | 32,495 | 33,386 |
| | | | |
| Combined Fixed Charges and Preferred Stock Dividends .............. | $ 206,542 | $ 232,336 | $ 211,576 |
| | | | |
| Ratio of Earnings to Fixed Charges ................................ | 5.52 | 6.71 | 7.41 |
| | | | |
| Ratio of Earnings to Combined Fixed Charges and Preferred | | | |
| Stock Dividends ................................................. | 5.05 | 5.77 | 6.24 |

| (UNAUDITED) | 1999 | 1998 |
|---|---|---|
| **EARNINGS** | | |
| Pretax income (loss) from continuing operations before | | |
| preferred interests of subsidiaries ............................ | $ 344,573 | $ (187,563) |
| Add:Fixed charges excluding capitalized interest and | | |
| preferred interest requirements of consolidated subsidiaries .... | 90,398 | 78,728 |
| | | |
| Adjusted Earnings ............................................ | $ 434,971 | $ (108,835) |
| | | |
| **FIXED CHARGES AND PREFERRED STOCK DIVIDENDS** | | |
| Interest expense including capitalized interest ................... | $ 132,986 | $ 119,703 |
| Amortization of debt expense ..................................... | 4,854 | 4,496 |
| Interest component of lease rental expenditures (1) .............. | 5,789 | 3,808 |
| Preferred interest requirements of consolidated subsidiaries (2)... | -- | -- |
| | | |
| Fixed charges ................................................ | 143,629 | 128,007 |
| | | |
| Preferred stock dividend requirements (3) ........................ | 24,788 | 2,905 |
| | | |
| Combined Fixed Charges and Preferred Stock Dividends .............. | $ 168,417 | $ 130,912 |
| | | |
| Ratio of Earnings to Fixed Charges ................................ | 3.03 | -- (4) |
| | | |
| Ratio of Earnings to Combined Fixed Charges and Preferred | | |
| Stock Dividends ................................................. | 2.58 | -- (4) |

(1) Represents the portion of rental expense assumed to be attributable to interest factors of related rental obligations determined at interest rates appropriate for the period during which the rental obligations were incurred. Approximately 32 to 34 percent applies for all periods presented.

(2) The Company does not receive a tax benefit for a portion of its preferred interests of consolidated subsidiaries. As a result, this amount represents the pre-tax earnings that would be required to cover preferred interest requirements of consolidated subsidiaries.

(3) The Company does not receive a tax benefit for its preferred stock dividends. As a result, this amount represents the pre-tax earnings that would be required to cover its preferred stock dividends.

(4) Earnings in 1998 were inadequate to cover either fixed charges or combined fixed charges and preferred stock dividends by $237 million and $240 million, respectively, as the Company reported a loss for the period after a $243 million write-down of the carrying value of United States oil and gas properties in compliance with full-cost accounting rules (refer to Critical Accounting Policies under Item 7 of this Form 10-K).

**EXHIBIT 21.1**

PAGE 1 OF 2

## APACHE CORPORATION - LISTING OF SUBSIDIARIES
## AS OF FEBRUARY 28, 2003

| EXACT NAME OF SUBSIDIARY AND NAME UNDER WHICH SUBSIDIARY DOES BUSINESS | JURISDICTION OF INCORPORATION OR ORGANIZATION |
|---|---|
| Apache Corporation (New Jersey) | New Jersey |
| Apache Aviation, Inc. | Delaware |
| Apache Delaware LLC | Delaware |
| Apache Finance Louisiana Corporation | Delaware |
| Apache Foundation | Minnesota |
| Apache Gathering Company | Delaware |
| Apache Holdings, Inc. | Delaware |
| Apache International, Inc. | Delaware |
|     Apache North America, Inc. | Delaware |
|         Apache Finance Pty Limited | Australian Capital Territory |
|             Apache Australia Management Pty Limited | Victoria, Australia |
|             Apache Australia Holdings Pty Limited | Western Australia |
|     Apache Qarun Corporation LDC | Cayman Islands |
| Apache Louisiana Holdings, LLC | Delaware |
| Apache Louisiana Minerals, Inc. | Delaware |
| Apache Overseas, Inc. | Delaware |
|     Apache Abu Gharadig Corporation LDC | Cayman Islands |
|     Apache Argentina Corporation LDC | Cayman Islands |
|         RME Argentina S.A. | Argentina |
|     Apache Asyout Corporation LDC | Cayman Islands |
|     Apache Bohai Corporation LDC | Cayman Islands |
|     Apache China Corporation LDC | Cayman Islands |
|     Apache Darag Corporation LDC | Cayman Islands |
|     Apache East Bahariya Corporation LDC | Cayman Islands |
|     Apache Enterprises LDC | Cayman Islands |
|     Apache Faiyum Corporation LDC | Cayman Islands |
|     Apache FC Argentina Company LDC | Cayman Islands |
|     Apache Matruh Corporation LDC | Cayman Islands |
|     Apache Mediterranean Corporation LDC | Cayman Islands |
|     Apache North Sea Limited | United Kingdom |
|     Apache Poland Holding Company | Delaware |
|         Apache Eastern Europe B.V. | Netherlands |
|             Apache Poland Sp. z o.o. | Poland |
|     Apache South Umbarka Corporation LDC | Cayman Islands |
|     Apache Umbarka Corporation LDC | Cayman Islands |
| Apache Oil Corporation | Texas |
| Apache Topwater, LLC | Delaware |
|     Apache Clearwater, Inc. | Delaware |
|         Clearwater Interests, LLC | Delaware |
| Apache Topwater Operations, LLC | Delaware |
|     Apache Clearwater Operations, Inc. | Delaware |
| Burns Manufacturing Company | Minnesota |

## APACHE CORPORATION - LISTING OF SUBSIDIARIES
## AS OF FEBRUARY 28, 2003

```
EXACT NAME OF SUBSIDIARY AND NAME                    JURISDICTION OF
UNDER WHICH SUBSIDIARY DOES BUSINESS                 INCORPORATION OR ORGANIZATION
------------------------------------                 -----------------------------
Apache Energy Limited                                Western Australia
        Apache Northwest Pty Ltd.                    Western Australia
        Apache Carnarvon Pty Ltd.                    Western Australia
        Apache Dampier Pty Ltd.                      Western Australia
        Apache East Spar Pty Limited                 Western Australia
        Apache Harriet Pty Limited                   Victoria, Australia
        Apache Kersail Pty Ltd                       Victoria, Australia
        Apache Miladin Pty Ltd                       Victoria, Australia
        Apache Nasmah Pty Ltd                        Victoria, Australia
        Apache Oil Australia Pty Limited             New South Wales, Australia
            Apache Airlie Pty Limited                New South Wales, Australia
        Apache Varanus Pty Limited                   Queensland, Australia
        Apache Pipeline Pty Ltd                      Western Australia
Apache West Australia Holdings Limited               Island of Guernsey
        Apache UK Limited                            England and Wales
            Apache Lowendal Pty Limited              Victoria, Australia
Apache Transfer Company                              Delaware
DEK Energy Company                                   Delaware
        DEK Energy Texas, Inc.                       Delaware
        DEK Exploration Inc.                         Delaware
            Apache Finance Canada Corporation        Nova Scotia, Canada
                Apache Canada Management Ltd         Alberta, Canada
                    Apache Canada Holdings Ltd       Alberta, Canada
                Apache Canada Management II Ltd      Alberta, Canada
        DEK Petroleum Corporation                    Illinois
            Apache Canada Ltd.                       Alberta, Canada
                Apache Canada Properties Ltd.        Alberta, Canada
                Apache FC Capital Canada Inc.        Alberta, Canada
                Apache FC Canada Enterprises Inc.    Alberta, Canada
        DEPCO, Inc.                                  Texas
        Heinold Holdings, Inc.                       Delaware
GOM Shelf, LLC                                       Delaware
Phoenix Exploration Resources, Ltd.                  Delaware
        TEI Arctic Petroleum (1984) Ltd.             Alberta, Canada
        Texas International Company                  Delaware
Apache Khalda Corporation LDC                        Cayman Islands
Apache Qarun Exploration Company LDC                 Cayman Islands
Nagasco, Inc.                                        Delaware
        Apache Marketing, Inc.                       Delaware
        Apache Transmission Corporation - Texas      Texas
        Apache Crude Oil Marketing, Inc.             Delaware
        Nagasco Marketing, Inc.                      Delaware
```

**EXHIBIT 23.1**

## CONSENT OF INDEPENDENT PUBLIC AUDITORS

As independent public auditors, we hereby consent to the incorporation by reference of our report dated March 14, 2003, included in this Form 10-K for the year ended December 31, 2002, into Apache Corporation's previously filed Registration Statements on Form S-3 (Nos. 33-53129, 333-57785, 333-75633 and 333-32580) and Form S-8 (Nos. 33-31407, 33-37402, 33-53442, 33-59721, 33-59723, 33-63817, 333-04059, 333-25201, 333-26255, 333-32557, 333-36131, 333-53961, 333-31092, 333-48758, 333-97403, 333-102330 and 333-103758).

/s/ Ernst & Young LLP

ERNST & YOUNG LLP

Houston, Texas
March 14, 2003

[Ryder Scott Company, L.P. Letterhead]

**EXHIBIT 23.2**

**Consent of Ryder Scott Company, L.P.**

As independent petroleum engineers, we hereby consent to the incorporation by reference in this Form 10-K of Apache Corporation to our Firm's name and our Firm's review of the proved oil and gas reserve quantities of Apache Corporation as of January 1, 2003, and to the incorporation by reference of our Firm's name and review into Apache Corporation's previously filed Registration Statements on Form S-3 (Nos. 33-53129, 333-57785, 333-75633 and 333-32580), and on Form S-8 (Nos. 33-31407, 33-37402, 33-53442, 33-59721, 33-59723, 33-63817, 333-04059, 333-25201, 333-26255, 333-32557, 333-36131, 333-53961, 333-31092, 333-48758, 333-97403, 333-102330 and 333-103758).

/s/ Ryder Scott Company, L.P.

Ryder Scott Company, L.P.

Houston, Texas
March 21, 2003

**EXHIBIT 99.1**

**APACHE CORPORATION**

**CERTIFICATION OF CHIEF EXECUTIVE OFFICER
AND CHIEF FINANCIAL OFFICER**

I, G. Steven Farris, certify that the Annual Report of Apache Corporation on Form 10-K for the year ended December 31, 2002, fully complies with the requirements of Section 13(a) or 15(d) of the Securities Exchange Act of 1934 (15 U.S.C. Section 78m or Section 78o (d)) and that information contained in such report fairly represents, in all material respects, the financial condition and results of operations of Apache Corporation.

```
                    /s/ G. Steven Farris
                    ---------------------------------------
                    By:   G. Steven Farris
                    Title: President, Chief Executive Officer
                           and Chief Operating Officer
```

I, Roger B. Plank, certify that the Annual Report of Apache Corporation on Form 10-K for the year ended December 31, 2002, fully complies with the requirements of Section 13(a) or 15(d) of the Securities Exchange Act of 1934 (15 U.S.C. Section 78m or Section 78o (d)) and that information contained in such report fairly represents, in all material respects, the financial condition and results of operations of Apache Corporation.

```
                    /s/ Roger B. Plank
                    ---------------------------------------
                    By:   Roger B. Plank
                    Title: Executive Vice President
                           and Chief Financial Officer
```



# EXHIBIT 6



# GULF OF MEXICO REGIONS



Our Gulf Coast assets are primarily located in and along the Gulf of Mexico (GOM), in the areas onshore and offshore Texas, Louisiana, Alabama, and Mississippi. The area is divided into three regions, which include the GOM Shelf, GOM Deepwater, and Gulf Coast Onshore.

In the GOM Shelf Region, Apache is currently the largest producer and has been the largest offshore held-by-production acreage owner since 2004, holding approximately three million gross acres. The region contributed 12 percent of our worldwide production and revenue during 2012 and drilled or participated in 36 wells with an 80-percent success rate, consistent with activity levels of the prior two years. On July 18, 2013, Apache announced its plans to sell its Gulf of Mexico Shelf assets. *Read the news release*.

The GOM Deepwater Region contributed only two percent of Apache's worldwide production in 2012; however, there are several large projects and developments underway that could spur significant growth. After drilling two wells in 2011, we drilled five wells in 2012 with a 60-percent success rate. Seven wells are planned for drilling in the areas in which we hold an interest during 2013.

Apache's Gulf Coast Onshore Region has a significant acreage position of approximately 1.4 million gross acres, including 330,000 mineral fee acres. The region drilled or participated in drilling 35 wells during 2012 and plans to drill or participate in approximately 39 wells in 2013.

## FIRST-QUARTER 2013 UPDATE

### GULF COAST ONSHORE

- First-quarter 2013 production in the Gulf Coast Onshore Region was 29,859 barrels of oil equivalent (Boe) per day, essentially flat compared to the fourth quarter of 2012.
- Gas production increased from the fourth quarter of 2012 due to increasing gross gas sales at Atchafalaya Bay Field from 140 million cubic feet per day (MMcfd) to 155 MMcfd. This was partially offset by compressor downtime at Main Pass 69 and freezing issues in various fields.
- During the quarter, Apache averaged three drilling rigs in the region drilling a total of 10 gross (nine net) wells with a 90 percent success rate.

### GOM SHELF

- First-quarter 2013 production in the GOM Shelf was 92,024 Boe per day, a 4-percent decline from the fourth quarter of 2012.
- During the quarter, Apache averaged five rigs and drilled a total of six operated wells.
- Apache and Energy XXI formed a joint venture over approximately 100 blocks in the Main Pass Concession (APA 75-percent working interest) which will target sub-salt exploration / exploitation.
- Wide Azimuth and Short Cable seismic acquisitions will enhance imaging to aid the exploration / exploitation of the new joint venture sub-salt play.

### GOM DEEPWATER

- First-quarter 2013 production in the GOM Deepwater was 13,311 Boe per day, a 26 percent decline from the fourth quarter of 2012.
- The Apache-operated Staurolite well, targeting the Lower Pleistocene oil objective, spud during mid-March and is expected to reach total depth of 21,000 feet during the second quarter of 2013.
- Apache was the apparent high bidder on five blocks during the March 2013 OCS Sale – 227.

## LUCIUS DEVELOPMENT

- During the first quarter, a development well was drilled and tested on the eastern flank of the field.
- Two additional development wells are scheduled to be drilled in 2013 before the rig will begin completion activities in the field.
- First production is anticipated in the second half of 2014.

## HEIDELBERG

- During the first quarter, fabrication of the spar began, which will be a Lucius look-a-like facility with 80,000 barrels of oil equivalent per day .
- Initial production is expected in 2016.

Copyright © 2013 Apache Corporation. All rights reserved.
This material may not be published, broadcast, rewritten or redistributed.

# EXHIBIT 7





# ENERCOM 2012 OIL AND GAS CONFERENCE

Roger Plank

August 15, 2012

# FORWARD-LOOKING STATEMENTS

Certain statements in this presentation contain "forward-looking statements" within the meaning of the "safe harbor" provisions of the Private Securities Litigation Reform Act of 1995 including, without limitation, expectations, beliefs, plans and objectives regarding production and exploration activities. Any matters that are not historical facts are forward-looking and, accordingly, involve estimates, assumptions, risks and uncertainties, including, without limitation, risks, uncertainties and other factors discussed in our most recently filed Annual Report on Form 10-K, recent Quarterly Reports on Form 10-Q, recent Current Reports on Form 8-K available on our website, http://www.apachecorp.com/, and in our other public filings and press releases. These forward-looking statements are based on Apache Corporation's (Apache) current expectations, estimates and projections about the company, its industry, its management's beliefs and certain assumptions made by management. No assurance can be given that such expectations, estimates or projections will prove to have been correct. Whenever possible, these "forward-looking statements" are identified by words such as "expects," "believes," "anticipates" and similar phrases.

Because such statements involve risks and uncertainties, Apache's actual results and performance may differ materially from the results expressed or implied by such forward-looking statements. Given these risks and uncertainties, you are cautioned not to place undue reliance on such forward-looking statements. Unless legally required, we assume no duty to update these statements as of any future date. However, you should review carefully reports and documents that Apache files periodically with the Securities and Exchange Commission.

Cautionary Note to Investors: The United States Securities and Exchange Commission ("SEC") permits oil and gas companies, in their filings with the SEC, to disclose only proved, probable, and possible reserves that meet the SEC's definitions for such terms. Apache uses certain terms in this presentation, such as "BO resource," "BO Potential" and other similar terms that the SEC guidelines strictly prohibit Apache from including in filings with the SEC. "BO Resource," "BO Potential" and other such terms do not take into account the certainty of resource recovery, which is contingent on exploration success, technical improvements in drilling access, commerciality and other factors, and are therefore not indicative of expected future resource recovery and should not be relied upon. Investors are urged to consider carefully the disclosure in Apache's Annual Report on Form 10-K for the fiscal year ended December 31, 2011, and amendments thereto, available from Apache at www.apachecorp.com or by writing Apache at: 2000 Post Oak Blvd., Suite 100, Houston, Texas 77056 (Attn: Corporate Secretary). You can also obtain this report from the SEC by calling 1-800-SEC-0330 or from the SEC's website at www.sec.gov

2



# PROFITABLE LONG-TERM GROWTH



MBOE/D, Net

CAGR ~12%

2012:
6-9% Growth

3



# SECOND QUARTER 2012 RESULTS

▼ Record production of 774 MBOE/D net (50% liquids)

▼ $821 MM adjusted earnings*

▼ $2.4 BN cash flow*

▼ 3 BN boe in 2011 YE reserves
   (46% liquids)

*Cash from operations before changes in operating assets and liabilities and adjusted earnings are non-GAAP measures. For supplemental and non-GAAP information and a reconciliation of these measures, please go to http://www.apachecorp.com/financialinfo



# DELIVERING, BUILDING STRENGTH









5

The above measures are non-GAAP measures. They are presented because management believes the information is useful for investors as it is used internally and widely accepted by those following the oil and gas industry. Reconciliation of Adjusted Earnings Per Share and Cash Flow are available on the company's website at http://www.apachecorp.com/Investors/Non-GAAP.aspx



# DRIVEN BY OUR UNCHANGED PRINCIPLES

▼ **Long Term Profitable Growth**

    ◢ Portfolio Balance               product, geography

    ◢ Rate of Return Focus        fully loaded, cash

    ◢ Financial Prudence          live within our means

    ◢ Independent Thinking        seek opportunities away from the herd

▼ **Relentless Pursuit of Opportunity!**

6



# DIVERSITY MITIGATES VOLATILITY
## *THE PORTFOLIO APPROACH*

### 2Q Production Breakout By Product



### 2Q Revenue Breakout By Product



International Liquids

North American Liquids

International Natural Gas

North American Natural Gas



# BENEFITING FROM RISING INTERNATIONAL GAS PRICES

## Realized Gas Price



## International Gas Revenue



8   * Realized gas prices include hedges. Removing hedge impact, Q2 gas prices would have been $2.27 and $4.08 for NA and International respectively.



# ACTIVE DRILLING ACROSS PORTFOLIO

| Region | Current Rigs | Recent Highlights |
|---|---|---|
| Permian | 36 | 187 wells added in Q2: 167 vertical and 20 horizontal, 2Q production surpassed 100,000 BOPD |
| Central | 24 | 28 operated wells completed in Q2; including 12 Granite Wash and 10 Tonkawa |
| GOM Shelf | 4 | TD'd 7 wells in 2Q, 83% productive, 17 of 61 blocks awarded to date |
| Deepwater | 1 | Mandy project online June 7, producing 5,000 BOPD and 3.5 MMCFD gross |
| Gulf Coast | 2 | 18 wells drilled in 2Q; 89% productive |
| Canada | 9 | Continue to target oil and liquids-rich drilling |
| Egypt | 28 | 68 wells drilled in Q2, including 16 exploratory wells with 13 discoveries |
| Australia | 1 | Pyrenees Stickle-8 commenced July 14 adding 11,000 BOPD gross |
| North Sea | 4 | Beryl B73: 358' net pay, 2 Bacchus wells flowing 13,000 BOPD gross |
| Argentina | 3 | Sold 97 MMCF/D at an average of $4.96 per MCF under Gas Plus in Q2 |
| Total | 112 | *An Apache record!* |

9



# WHAT'S CHANGED AT APACHE

▼ *Expanded U.S. onshore position*
  - ◢ 67K locations, 9.2 BN BOE (97% unbooked)
  - ◢ Drill, drill, drill!

▼ *Global exploration*
  - ◢ 8.8 BN BOE discovered (unbooked)
  - ◢ 6.2 BN BO potential in oil projects

▼ *Goal: Over 1 MM BOE/D by 2016*
  - ◢ Growth driven by U.S. onshore oil

▼ *Continuing to build our upside*

10



# APACHE PERMIAN
## A MAJOR GROWTH BUSINESS



New Mexico / Texas

Midland

20 mi

APA acreage
★ Region Office (Open July 2010)
● District Office (5)
● Field Office (27)
◆ Gas Plant (2)

▶ 3.5 million acres (1.6 million net)

▶ 2012E: avg 32 drilling rigs; Drill 760 wells

▶ Continuing to ramp up activity

  ▲ 2010 - 5 rigs; Today - 36 rigs

  ▲ 2010 - CAPEX $0.4B; 2012 ~ $2.0B

▶ Q2 Production: 104,475 MBOE/D net (72% Liquids)

11

# PERMIAN REGION INVENTORY

| | |
|---|---|
| **Known Locations to Drill** | **34,518** |
| **Net MMBOE** | **3,785** |
| **% of MMBOE PUD** | **6.2%** |



**CBP + N/NW Shelf**

| | |
|---|---|
| Locations | 9,798 |
| Net MMBOE | 691 |

**Yeso**

| | |
|---|---|
| Locations | 1,789 |
| Net MMBOE | 108 |

**Delaware Basin**

| | |
|---|---|
| Locations | 1,823 |
| Net MMBOE | 284 |

**Midland Vertical**

| | |
|---|---|
| Locations | 17,816 |
| Net MMBOE | 1,714 |

**Cline Shale**

| | |
|---|---|
| Locations | 2,321 |
| Net MMBOE | 642 |

**Wolfcamp Shale**

| | |
|---|---|
| Locations | 971 |
| Net MMBOE | 347 |

21 mi

12



# EXECUTING OUR GROWTH STRATEGY
## *PERMIAN REGION*

▼ Avg rig count in Q3 projected to increase to 35, up 3 from Q2



# ANADARKO BASIN GROWTH AREAS
## *REJUVENATED BY HORIZONTAL LIQUIDS GROWTH*





▾ Q2 Production: 55 MBOE/D net (29% Liquids)

▾ 1.9 million acres (1.1 million net)

▾ 2012E: Drill 240 wells

▾ Ramping up activity

  ▴ Currently running 24 rigs, up from 7 in Jan 2012

14

# CANYON WASH

## APACHE-LED EXPLORATION WASH PLAY



**Bivins-LIT 4-3**
30-day IP BOE/D   117

**Bivins-LIT 28-2**
30-day IP BOE/D   309

**Boys Ranch  115-1**
30-day IP BOE/D   175

**Bivins-LIT 4-5**
23-day IP BOE/D   473

**Bivins-LIT 115-5**
13-day IP BOE/D 1,311

**Bivins-LIT 3-2**
30-day IP BOE/D  1,031

**Boys Ranch 116-1**
30-day IP BOE/D  663

.5 mi

APA acreage
APA wells to date
Additional 2012 locations
Additional 2013 locations

| Acres | 141 , 000 (93,000 net) |
|---|---|
| Current Production (mid-August) | ~3300 BOED (90% liquids) |
| 2012 New Wells | 12 |
| Drilling Inventory | 1,016  Locations<br>    101  MMBOE net |

▶ Apache-led exploration / exploitation play

▶ 240 square mile position

▶ Second rig scheduled to arrive in Sept.

15



# EXECUTING OUR GROWTH STRATEGY
## *CENTRAL REGION*

▼  24 rigs currently running, up 5 from Q2



# ACTIVE 2H12 EXPLORATION CALENDAR

| First Well Spud Date | Target/Location | Details |
| --- | --- | --- |
| Aug 7 | Vaca Muerta Neuquen Basin, Argentina | .8 BN barrel potential across oil window |
| Aug 10 | Kenya Deepwater | Targeting a 289 MMBO prospect with billion barrel upside on the block |
| Mid August | Mississippian Lime, Kansas | 2 BN barrel potential across 580,000 net acres |
| Late August | Williston Basin, Montana | 1.0 BN barrel potential across 300,000 net acres |
| October | Cook Inlet, Alaska | Billion barrel upside across 1,000,000 acres |

17



# EXPANDING OUR GULF OF MEXICO FOOTPRINT

**GOM SHELF REGION RESULTS**



**GOM DEEPWATER REGION RESULTS**



▼ Most active bidder in June 2012 Central GOM Lease Sale

▼ 61 blocks on the Shelf, 26 awarded to date

▼ 29 blocks in Deepwater, 7 awarded to date

18



# EGYPT: CLOUDS OF UNCERTAINTY BEGINNING TO LIFT

▾ President Morsi elected after June 17 run-off
- ◢ 51.7% Morsi; 48.3% Shafiq
- ◢ Morsi earned PhD in Engineering from USC (1982)

▾ Prime Minister and Cabinet appointed Aug 2

▾ General Sissi appointed Defense Minister Aug 12
- ◢ New Top General has US Ties*

▾ "We are all Egyptians. This is the People's Government. It doesn't belong to any political trend." – PM Qandil (8/3/12)

*Impact on Apache: 18 months into transition with no production disruption; approval and award process fully functional*

19

*Apache*

# INDUSTRY CONTINUES TO INVEST IN EGYPT

## Foreign Investment in Petroleum E&D ($B)



Source: Arab Republic of Egypt Ministry of Petroleum. Foreign companies include British Gas, BP, Apache, Eni, Shell, RWE, Edison and Petronas among others.

20



# OPPORTUNITY FOR UPSIDE

## Price-to-cashflow multiple



Source: ThomsoneOne. Cash flow multiple based on analyst consensus for fiscal-year 2012 cash flow and equity prices as of August 13, 2012. Peers include: Anadarko Petroleum, Chesapeake Energy, ConocoPhillips, Devon Energy, Encana, EOG Resources, Marathon Oil, Noble Energy and Occidental Petroleum.



# PROFITABLE LONG-TERM GROWTH



MBOE/D, Net

CAGR ~12%

2012:
6-9% Growth

22





APPENDIX

# EVOLUTION FOR LONG-TERM GROWTH

▼ **North America**
expanded liquids
growth portfolio



Permian, Anadarko:
67,000 location inventory
9.2 BN BOE

▼ **Global Exploration**
company-moving
results, running room



First mover in 7 global plays:
8.8 BN BOE discovered (unbooked)
Exploration upside = 5x 2011 reserves

▼ **LNG**
long term oil-linked
visibility



Wheatstone, Kitimat:
90-140 MBOE/D
Designed for expansion

Position APA to lead with profitable growth amid macro change



# MAINTAINING FINANCIAL DISCIPLINE



**2011 Net Debt / EBITDA**

Source: Goldman Sachs. Peer companies in group displayed: Anadarko, Berry, Bill Barrett, Cabot, Chesapeake, Devon, EnCana, EOG, Forest, Hess, Newfield, Noble, Occidental, Pioneer, Plains, Quicksilver, Range, SandRidge, Southwestern, Talisman and Ultra

25



# ASSET DISCLOSURES

## RESOURCE DEPTH, EXPLORATION SUCCESS, UPSIDE



**Liard Basin**
48 net TCF discovery
(Apache = 100%)

**Williston Basin**
• New 300K net acre position
• 1 BN net BO potential

**Cook Inlet**
1.3 BN net
BOE potential

**Mississippian Lime**
• New 580K net acre position
• 2 BN net BO potential

**Anadarko Basin**
• 33K development locations
• 5.4 BN net BOE (1.5% PUD)

**Permian Basin**
• 35K development locations
• 3.8 BN net BOE (6.2% PUD)

**Kenya Deepwater Oil**
1.4 BN net BO potential
in 8 prospects

**Vaca Muerta Shale Oil**
• 450K net acres
• 0.8 BN net BO resource

**New Zealand Oil**
• 450K net acres
• 0.5 BN net BO potential

**Apache Acreage**

26



# U.S. LIQUIDS LEAD GROWTH

▼ Exploration and investment upside to offshore, international





# APACHE: OVER 1MM BOE/D BY 2016

▼ **Base: 6-9%** production/share CAGR:
   - ▲ Living within cash flow (strip)
   - ▲ No investment in NA gas

▼ **Upside: 12%+** production/share CAGR: NA gas projects, exploration/NV upside

▼ LNG (2017): + 90-140 MBOE/D





# EXECUTING OUR GROWTH STRATEGY
## *PERMIAN REGION*

▼  Rig count in Q3 expected to increase to 35, up 3 from Q2



Quarterly Production Since 2010

# EXECUTING OUR GROWTH STRATEGY
## *CENTRAL REGION*

▼ 24 rigs currently running, up 5 from Q2 average



Quarterly Production Since 2010

# EGYPT'S GROWTH REQUIRES FOREIGN INVESTMENT

▼ Previously, Egypt's growing demand was met with significant investments – allowing supply to triple

▼ Since 2008 Egypt has been a net importer of oil



Egypt's NG Supply vs. Consumption



Egypt's Oil Supply vs. Consumption

31

Source: EIA



# TOURISM RAMPING UP
## *EGYPT'S PRIMARY INDUSTRY*

### Number of Tourists Visiting Egypt Pre and Post Revolution (000's)



Average number of tourists before Jan 2011

*"Here, you should feel safe. Move as you please, enjoy Egypt's atmosphere and its ancient civilization. Egypt is safer than before, and is open for all."*
*- President Morsi August 3, 2012*

32

Note: seasonal variances are not adjusted for; Source: Central Bank of Egypt

# EGYPTIAN STOCK MARKET BEGINNING TO RECOVER

## EGX30 Performance



Egyptian stock markets closed due to revolution

Source: ThomsonOne

33

# EXHIBIT 8