# MEMORANDUM

**From:** Class Counsel

**To:** Claims Administrator

**Re:** Clawback / FWA Determinations in Seafood Program Claims

**Date:** June 8, 2015

We understand that, as of March 31, 2015, the responsibility for all clawback proceedings and other fraud determinations has been transferred solely to the Claims Administrator.[1]  Based on our knowledge and impressions from the settlement negotiations with BP, the development of the Seafood Compensation Plan by the Seafood Neutrals, the processing of Seafood Claims by the Settlement Program, our discussions with representatives of the Special Master and others during workstream meetings, and the Clawback Motions and FWA Denials with which we are familiar to date, Class Counsel respectfully express the following observations and concerns:

There are always exceptions to the rule.  In some cases, Claimants may have actually forged or altered documents, or made other knowing and intentional misrepresentations in order to deceive the Program.  Nothing excuses such fraud.  And Class Counsel have always supported any and all reasonable efforts to prevent it.

At the same time, however, the Clawback Motions and FWA Denials to date have generally seemed premised on the negative inference and assumption from discrepancies in the available documentation that there is some precise, knowable, correct, and objectively verifiable benchmark revenue allocation number, and that any submission to the Program, at any time, which deviates from that number was a knowing and intentional misrepresentation at the time it was made.

In some cases, this may have been true.  And we by no means intend to excuse a fraud on the Settlement Program.

But, as a general matter, the approach that has been taken by the Special Master (and perhaps more recently by FWA) seems premised on a number of fallacies about the Seafood Compensation Program, and/or the claims process, and in disregard of the actual terms of the Settlement Agreement, the Seafood Compensation Plan, and the Claims Administrator's Policies:

**1. The Seafood Program was negotiated and developed on a completely different model than the other economic frameworks, such as BEL.**  The primary focus of most of the economic loss models was to compensate the losses that had occurred in 2010.  The RTP would provide for further risks or losses, but such compensation was derived from an objective

---

[1] UPDATE TO THE COURT (May 1, 2015) [Rec. Doc. 14514], p.2.

Page | 1

quantification of the actual losses that had occurred in 2010.  With respect to the commercial fishing industry, the considerations were completely different.  Yes, the PSC wanted to compensate commercial fishermen for their past losses, if any;  but, as a practical matter, the Vessel of Opportunity (VoO) program and/or emergency payments from the GCCF had mitigated many of their 2010 commercial fishing losses.  The primary concern, when the agreement was made in 2012, was:  How do you protect commercial fisherman from future losses, and, in particular, the risk of a total collapse?   Secondly, because commercial fishermen were generally viewed to have a claim for punitive damages under an exception to the *Robins Dry Dock* Rule, how do you fairly and reasonably divide up money that is not really intended to compensate people for their losses, but rather, is intended to punish BP and deter other companies from future misconduct?   Everyone negotiating the settlement, and everyone providing input for the development of the Seafood Compensation Plan, was aware of the fact that in many cases documentation would be sparse, and that the records which did exist would in many cases be unreliable, inaccurate and/or incomplete.  Plus, you had a number of hurricanes, a strike, and other events that had altered the general reliability of earnings during the Benchmark Years.  So there was a push, by some, to focus on loss of *earning opportunity,* rather than actual past earnings.  The theory was that a given boat owner or captain on a certain sized boat had the opportunity to earn $X over the next, say 5-10 years, irrespective of how the captain or vessel may have performed during the Benchmark Years.  While the Seafood Neutral ultimately required a threshold showing based on Benchmark Revenues, this was, (at least based on Class Counsel's general understanding and impression), the rationale behind the Expedited and Reduced Expedited Methodologies.  (Many of the Seafood Compensation Frameworks further employ standardized and formulaic approaches to the breakdown of profits between and among owner, captain, and deckhands; cost factors; and other elements; irrespective of what may have actually occurred for a given vessel during the Benchmark Years.)   So, again, not to excuse any actual fraud that may have been committed.  But the lens through which Seafood Compensation should be viewed generally is a different lens:  It was not intended to be a precise and mathematical formula to identify and compensate 2010 losses;  but rather, a general framework for fairly and reasonably dividing up an extremely large Fund that was primarily intended to punish BP and to protect the commercial fishing industry from *post-*2012 potential risks and losses.

**2. Everyone in the Seafood Compensation Program will be fully compensated.**  Representatives of the Special Master have noted, at times, that a fraud committed within the Seafood Program takes money away from the other members of the Seafood Program who have filed legitimate claims.  Of course, this is true.  And no one wants that to happen.  But, at the same time, and as a practical matter, we are dealing with a fund that has a billion dollar excess.  Every member of the Seafood Compensation Program can be fully compensated under the Seafood Neutral's Frameworks, with additional distributions.[2]   A $300,000 Denial and/or Clawback to Fisherman A has a huge effect on Fisherman A, but almost zero effect on anyone else. (Fractions of pennies, in the context of a $2.3 Billion Fund.)  Does this mean we should turn a blind eye to actual fraud?  No, of course not.  But the Claims Administrator should be

---

[2] Which is consistent with what was predicted and expected from the outset. *See, e.g.,* PERRY DECLARATION (Aug. 10, 2012) [Rec. Doc. 7110-5] p.5-6; BALHOFF DECLARATION (Aug. 10, 2012) [Rec. Doc. 7110-2] p.5; HERMAN DECLARATION (July 23, 2012) [Rec. Doc. 7104-5] ¶11; RICE DECLARATION (Seafood) (Aug. 10, 2012) [Rec. Doc. 7104-6] ¶¶7-9.

absolutely certain that an actual fraud has been committed before depriving Fisherman A of not only the excess that was claimed, but all compensation to which he or she is entitled under the Settlement Agreement.  And the fact that there may be some *de minimis* effect on other classmembers should not be used to relax that standard.

**3. In many cases, the exact amount of a particular species caught on a particular vessel by a particular captain back in 2007, 2008 or 2009 is ultimately unknown.** Commercial fishing records are not kept like a law firm's trust account ledger, where every penny coming in and out is contemporaneously and meticulously accounted for.  When a claimant, or an attorney, or the Program, or the Special Master, is presented, in 2012, or 2013, or 2014, or 2015, with the question of how many dollars of X species were caught on Y vessel in 2008**,** the exact figure is likely unknown.  Working from memory (at the time the question is posed), and/or the tax returns (if any), or trip ticket information (if any) that might have been in his or her possession at the time, or existing journals or ledgers or receipts (if any), someone would be able to form a reasonable inference or belief about what is likely.  Again, there are always exceptions. And this is in no way intended to excuse fraud. But given the way that people do, and more particularly do not, keep exacting and reliable records of catches and sales, you are in many cases working with a number that is ultimately unknowable, or at least unknown.

**4. The fact that a Claimant amended his or her Claim Form, SWS or other documentation should not be interpreted as an "admission" of "fraud".** Claims, SWSs and other documents have been amended, supplemented and/or withdrawn over the past three years for a number of reasons, having nothing to do with "fraud":

    a. To correct a mistake that was pointed out by the Program;

    b. To correct a mistake identified by the claimant himself or herself;

    c. At the request of the Program, to account for a Policy implementation, clarification, or change;

    d. By the Claimant himself or herself, to account for a Policy implementation, clarification, or change;  and/or, in many cases:

    e. By the Claimant himself or herself, who continues to believe that the original Claim or SWS is correct and/or supportable under the terms of the Settlement Agreement, but is willing to accept less in order to avoid further delays.

There may, of course, be a few exceptional cases in which a Claimant attempts to amend the Claim after being "caught" in an attempt to knowingly and intentionally defraud the Program.  But there is no reason for the Program to make this negative presumption.  Rather, the Program should assume, absent compelling evidence to the contrary, that such amendments have been made by the Claimant in good faith.  Indeed, that is what the Settlement requires.

**5. The refusal to allow a Claimant to amend his or her Claim Form, SWS or other documentation is contrary to the terms of the Settlement Agreement and Claims Administrator Policy.**  Section 4.3.7 of the Settlement Agreement requires the Settlement Program to "use its best efforts to provide Economic Class Members with assistance, information, opportunities and notice so that the Economic Class Member has the best opportunity to be determined eligible for and receive the Settlement Payment(s) to which the

Economic Class Member is entitled."[3]  Section 4.3.8 of the Settlement Agreement requires the Settlement Program to "evaluate and process the information in the Claim Form and all supporting documentation to produce the greatest Compensation Amount that such information and supporting documentation allows."[4]  And the Claims Administrator's Policy No. 262 provides that where a conflict between the available trip ticket data and a sworn written statement is found, "the Claims Administrator will notify the claimant to resolve the issue or take such other steps as are necessary to determine the correct allocation."[5]  Despite Class Counsel's repeated requests that questions or issues be communicated to Claimants on the front end,[6] the Program has, as a matter of policy, declined to inform Claimants of issues until after the investigation is concluded and an actual "fraud" determination has been made.  Moreover, Claimants have been prevented from withdrawing Claims after the imposition of an initial SIT, HUB, or FWA Hold – which was often the first general notice the Claimant received that there was a problem with one of his or her claims.  Certainly, had Claimants been informed sooner of the specific discrepancies or other issues, many of their Claims, SWSs, or other submissions would have been appropriately amended, clarified, corrected and/or withdrawn.  Although now, in hindsight, the Claimants, in some cases, appear to be criticized or condemned for not acting sooner, the existing Policies have actually delayed and/or prevented the amendment, correction and/or withdrawal of documents and/or claims.

**6. Many discrepancies likely resulted from the form of claim submissions and the timing of processing.**  Rather than allowing a Seafood Claimant to make one Seafood Claim for all compensation that may have been due, BrownGreer required separate claims to be filed, separating out Owner from Captain Claims, by Vessel, and by Catch Type.  In some cases, a single commercial fisherman might have submitted as many as seven or eight different Seafood Claims.  This naturally increases the potential for confusion and for inconsistencies between and among the different Claims.  Additionally, the Program did not process all of the Claimant's Claims at once.  In many cases, additional information would be obtained by the Program; additional information, or a change in recollection, on the part of the Claimant might come to light;  a formal Policy would come into effect, or be clarified, or change;  and/or an informal approach taken by the Program might have been communicated by the BrownGreer Liaison or other Program representative.  In these cases, Claims, SWSs, and other documentation may have been supplemented, amended, withdrawn, and/or otherwise reflect discrepancies, having nothing

---

[3] *See also* SETTLEMENT AGREEMENT, Section 6.1 ("Subject to and in accordance with Sections 4.3.7 and 4.3.8, Economic Class Members will have up to three opportunities, depending on their circumstances, to have their Claims reconsidered and reviewed to assure accuracy, transparency, independence, and adherence by the Settlement Program to the terms of this Agreement").

[4] *See also, e.g.,* SETTLEMENT AGREEMENT, Section 4.4.9 ("there shall be no negative inference or presumption of any kind as to the eligibility or right of any Economic Class Member to receive a Settlement Payment under the terms of the Settlement Agreement").

[5] *See also, e.g.,* SETTLEMENT AGREEMENT, Section 4.4.7 ("The Claims Administrator shall explore and consider the utilization of streamlined procedures to improve the efficiency of the Claims process, without changing Claims criteria");  Section 4.3.1 (the Claims Administrator shall implement and administer the Settlement "for the benefit of the Economic Class").

[6] *See, e.g.,* CLASS COUNSEL MEMO TO CLAIMS ADMINISTRATOR AND SPECIAL MASTER RE ALLEGED / POTENTIAL "FRAUD" INVESTIGATIONS (Oct. 6, 2014) [Rec. Doc. 14517-2]; CLASS COUNSEL MEMO TO WELKER RE SUBSISTENCE AND OTHER "FRAUD" INVESTIGATIONS (March 12, 2015) [Rec. Doc. 14517-4].

to do with any type of a "fraud", but based simply on the varying time lags in processing, and/or the timing of the submission or Program Determination.

**7. The available trip ticket data contained within the La. DWF database is not a definitive authority for the Benchmark Seafood Revenues experienced by owner, captain, vessel or species.**  As a factual matter, and as set forth in Class Counsel's Master *Amicus,* trip ticket data is inherently unreliable, and frequently inaccurate and/or incomplete.[7]   It was never agreed by the Parties that Seafood Compensation would be tied to trip ticket data.  The Seafood Neutrals, in devising the Seafood Compensation Plan, did not tie Benchmark Revenue to available trip ticket database data.[8]   And neither the Claims Administrator nor the Seafood Neutral, in the stated formal Policies, tied Benchmark Revenue to available trip ticket data.[9]  Yet the Freeh Group and/or FWA appear to rely on such trip ticket data as definitive, and unreasonably infer that other inconsistent documentation submitted by the Claimant must be "fabricated" or "fraudulent".

**8. Much of the trip ticket database information was not before the Claimants when they initially submitted their Claims and/or SWSs.**  Some Claimants may have had some documentary trip ticket information when their Claims were submitted in 2012.  But, particularly for Claimants who intended to rely on their Tax Return revenues, there was no reason for them to have taken the time or the effort to attempt to collect or submit comprehensive Trip Ticket information.  While data from the Louisiana Department of Wildlife & Fisheries was transferred to the Settlement Program after Claims started to be submitted in the summer of 2012, Claimants who were relying on Tax Return revenues were told, in original Policy No. 257, that the Claims Administrator would "not consider" such trip ticket data, and, in Policy No. 262, which went into effect in October of 2012, (and, to our knowledge, remains in effect to this day), that the Claims Administrator would simply "survey" the documents available to note any information that conflicted with the SWS, and, in the event of such conflict, would "notify the claimant to resolve the issue or take such other steps as are necessary to determine the correct allocation on the claim."[10]   Therefore, there remained no reason for a Claimant to proactively obtain his or her own trip ticket data.  Rather, the Claimant would, quit reasonably, reconsider the allocation in the Claim or the SWS only if and when some conflicting information was brought to his or her attention by the Program, consistent with the Settlement Agreement and the Policy.

**9. Claiming seafood revenues from certain commercial fishing related projects and/or subsidies is not "fraudulent".**  Class Members were invited to submit their Claims based on the proposition that the Settlement Program would "evaluate and process the information in the Claim Form and all supporting documentation to produce the greatest

---

[7] CLASS COUNSEL'S MASTER *AMICUS* TO APPEAL PANELISTS (July 16, 2014) [Rec. Doc. 13496-6] at pp.7-9.

[8] *See generally* SETTLEMENT AGREEMENT, Exhibit 10, pp.10-11, 18-20.

[9] *See* Original Policy No. 257 (Sept. 25, 2012) and POLICY NO. 262 (eff. Oct. 8, 2012).

[10] Notably, as Class Counsel understood it, a "conflict" was only intended to denote something that was truly incompatible, in terms of the allocation between and among Vessels or Catch Types.  (*e.g*. a Claimant allocates all Tax Return Revenue to Oysters, but the Trip Tickets attribute material revenue to Crabs;  or a Claimant allocates all Tax Return Revenue to Vessel One, but the Trip Tickets attribute material catch to Vessel Two)  A "conflict" did *not* (at least as Class Counsel understood it) arise by the mere fact that one source reflected more total revenues.

Compensation Amount that such information and supporting documentation allows."[11] It was perfectly reasonable for commercial fishermen to include revenues received in connection with their commercial fishing activities as part of their Seafood Benchmark Revenues. Indeed, the Claims Administrator has always treated CDSOA grants as "revenues".[12] Both the Claims Administrator and the Seafood Neutral have determined that "Oyster Relay" payments from the Government for reef rehabilitation programs following Hurricanes Ivan and Katrina should be treated as Seafood Harvester Revenues.[13] And, while the Seafood Neutral apparently determined recently that CDSOA payments should not be included within Seafood Benchmark Revenues, **(i)** that Policy was not announced until February 10, 2015, and **(ii)** at least some Settlement Program Appeal Panelists have disagreed. *See, e.g.,* CLAIM NO. 11270 (finding that it was correct to include both CDSOA grants and payments from the National Marine Fisheries Service's Fishermen's Contingency Fund Program (FCFP) as Qualifying Revenue of a shrimper to meet the Expedited Method).[14] Some of the "debris removal" income which has been questioned by the Special Master can also reasonably be characterized as Seafood Benchmark Revenue, particularly when part of Government programs available only to licensed commercial fishermen, and included as commercial fishing revenue on the Claimant's Tax Returns, which is the source documentation specified within Settlement Agreement. Such official debris removal projects are similar to the recognized oyster reef rehabilitation projects. *See also, e.g.,* 50 C.F.R. ¶600.10 (which defines "fishing" to include "any operations at sea in support of, or in preparation for" the actual catching, taking or harvesting of fish).[15] The Program can, of course, refuse to recognize such income as a matter of settlement interpretation and/or policy. But **(i)** if such revenues are not recognized as Seafood Revenue, they should be evaluated by the Program as revenues under the BEL or IEL methodologies, and **(ii)** advocating for the most favorable treatment available under the Settlement Agreement is *not* "fraud".

**10. In many situations, there would have been no reason for the Claimant to have distinguished between vessels, owners, and/or captains, with respect to either Trip Tickets or Tax Returns during the Benchmark Years.** The Special Master and FWA seem to assume that either the Claimants, the dock workers processing trip tickets, or the Claimants' CPAs, would have had some reason, during the 2007-2009 Benchmark Years, to allocate catch between and among Vessels, Owners, and/or Captains, in the way that the Seafood Compensation Plan would ultimately be formulated in 2012. Where a vessel, or multiple vessels, were owned and/or captained by a husband and wife team, reporting their taxes together, and taking in income as community property, there would have been no reason to concern themselves, or whoever may have been filling out the trip ticket information, (or tax returns), with what they believed to be an accurate breakdown of who was the captain, or from which vessel the catch was landed, for a given year, or on a given day. Nor would the owner and/or captain of multiple vessels likely have concerned himself or herself with whether he was being paid as an "owner" or as a "captain" or on which vessel, (or, to a large extent, even what species). Arguably, each Claimant

---

[11] SETTLEMENT AGREEMENT, Section 4.3.8.

[12] POLICY NO. 328.

[13] POLICY NO. 496.

[14] *See also, e.g.,* New Hampshire Ball Bearing, Inc. v. United States, 8l5 F.Supp.2d 1301 (Ct. Int'l Trade 2012); FASB ACCOUNTING STANDARDS: Current Text Extraordinary Items, § I17.107; APB 30, ¶20.

[15] *See also, generally*: SUSTAINABLE FISHERIES ACT, 16 U.S.C. §§1801, *et seq.*

should have been able to allocate their total revenues in whichever way maximized their recovery under the Seafood Compensation Plan.[16] But, even to the extent that Claimants were attempting, in good faith, to factually allocate between and among vessels, owners/captains, and catch type, the Seafood Compensation Plan creates artificial distinctions that do not necessarily exist in real life, and would not be likely to be accurately reflected on either available trip ticket data or tax returns. (Which should not really have created a problem, because, again, the Plan was mostly attempting to achieve a generally fair and reasonable distribution to qualified Claimants based on the risk or loss of future earning opportunities, and not precise compensation for the actual past losses that may or may not have occurred in 2010.)

**11. In some cases, less than 100% of the total tax return seafood revenues are allocated.** In some cases, Claimants only allocated on SWSs the revenues that were necessary to meet Expedited or Reduced Expedited Compensation levels. This has been questioned by the Special Master or FWA as a suspicious attempt to shift revenues to other vessels or catch types in order to maximize the total Claims. Without getting into the issue of whether such most-favorable-allocation should actually be *required* under Section 4.3.8, the Special Master seems to ignore the fact that, in some cases, the Claimant was not allocating all of the revenues that are reflected on the tax returns. So if, for example, a Claimant owns two vessels, and has $100,000 of reported income on his or her Tax Returns, and needs $40,000 to reach Expedited or Reduced Expedited on each vessel, he or she may have only allocated $40,001 to each vessel; perhaps, in that case, there might have been $5,000 in fin-fish trip tickets, (which may or may not be correct); the Special Master generally seems to take the view that the $40,001 are a suspicious if not "fraudulent" maximization of the Claimant's Claims. When, in reality, the Claimant was only purporting to account for $80,002 of his or her revenues; he may not know, or remember, or care, how exactly he or she had earned the other $19,998 in income, and was not making any representation to the Program regarding same.

**12. The effective requirement that Tax Returns and/or SWSs be supported by Trip Ticket Data is contrary to the actual terms of the Settlement Agreement, the Seafood Compensation Plan, and the Claims Administrator's stated Policy.** The Special Master and FWA have argued that SWSs which are consistent with the revenues reported on the Claimant's Tax Returns may nevertheless be "unreasonable" or "fraudulent" or "fabricated" when they exceed the amounts found in the La. DWF trip ticket database. Putting aside the question of whether the trip ticket database is reliable or not,[17] the Settlement Agreement entitles the Class Member to receive the *higher of* the available trip ticket data *or* the commercial fishing revenues reflected on the Claimant's Income Tax Return.[18] The SWS does *not* have to be "supported" by the available Trip Ticket Data. Rather, under Policy No. 262, the SWS *is* itself "sufficient information" and support for the allocation of the Income Tax Revenues.[19]

---

[16] *See* SETTLEMENT AGREEMENT, Section 4.3.8.

[17] CLASS COUNSEL'S MASTER *AMICUS* TO APPEAL PANELISTS (July 16, 2014) [Rec. Doc. 13496-6] at pp.7-9 (Trip Ticket Data is Frequently Inaccurate and/or Incomplete).

[18] *See generally* SETTLEMENT AGREEMENT, Exhibit 10, pp.10-11, 18-20.

[19] *See* Original Policy No. 241 (Aug. 14, 2012) and POLICY NO. 262 (eff. Oct. 8, 2012).

Again, Section 4.3.7 of the Settlement Agreement requires the Settlement Program to "use its best efforts to provide Economic Class Members with assistance, information, opportunities and notice so that the Economic Class Member has the best opportunity to be determined eligible for and receive the Settlement Payment(s) to which the Economic Class Member is entitled."[20] Section 4.3.8 of the Settlement Agreement requires the Settlement Program to "evaluate and process the information in the Claim Form and all supporting documentation to produce the greatest Compensation Amount that such information and supporting documentation allows."[21] And the Claims Administrator's Policy No. 262 provides that where a conflict is found, based on a "survey" the documents, the Claims Administrator would "notify the claimant to resolve the issue or take such other steps as are necessary to determine the correct allocation on the claim."[22]

Where an actual fabrication or forgery of documents has occurred, or a Claimant has knowingly and intentionally attempted to deceive the Settlement Program, the Claims Administrator is certainly empowered to initiate clawback proceedings and to deny all compensation from the Settlement Program.

But advocating for the most favorable treatment available under the Settlement Agreement is *not* "fraud".[23]

And where there is only evidence of a discrepancy, the Program should not draw a negative inference, and assume that "fraud" has occurred.[24]

In some of these cases, it appears that the Class Member is not only being deprived of the benefit of the doubt, to which he or she is expressly entitled,[25] but is being deprived of even the compensation that he or she would inarguably deserve, in a light *least* favorable.

A complete Denial of All Claims and/or an attempted Clawback of All Payments should be based on clear and convincing evidence that someone actually knowingly attempted to deceive the Settlement Program, and not simply a suspicion or a negative inference from discrepancies – particularly when such discrepancies are being resolved *contrary* to the terms of the Settlement Agreement, the Seafood Compensation Plan, and/or Claims Administrator Policies.

---

[20] *See also, e.g.,* SETTLEMENT AGREEMENT, Sections 4.3.1, 4.4.7, and 6.1.

[21] *See also* SETTLEMENT AGREEMENT, Section 4.4.9 ("there shall be no negative inference or presumption of any kind as to the eligibility or right of any Economic Class Member to receive a Settlement Payment under the terms of the Settlement Agreement").

[22] Again, a "conflict" (as Class Counsel understood it) was only intended to denote a true incompatibility between the documents, and *not* the mere fact that one document reflected more revenues from a particular source than the other.

[23] BP and its attorneys certainly aren't bashful about employing zealous advocacy in their attempts to avoid payments that BP has promised, agreed, and legally obligated itself to pay.

[24] *See* SETTLEMENT AGREEMENT, Section 4.4.9.

[25] *See* SETTLEMENT AGREEMENT, Section 4.3.8.

As always, we appreciate the Claims Administrator's time and consideration in this matter.

Class Counsel further refer the Claims Administrator to and respectfully incorporate: CLASS COUNSEL'S MASTER *AMICUS* TO APPEAL PANELISTS (July 16, 2014) [Rec. Doc. 13496-6] at pp.6-9 (Seafood Claimants Are Entitled to the *Greater* of Trip Tickets vs. Tax Returns); CLASS COUNSEL MEMO TO CLAIMS ADMINISTRATOR AND SPECIAL MASTER RE ALLEGED / POTENTIAL "FRAUD" INVESTIGATIONS (Oct. 6, 2014) [Rec. Doc. 14517-2]; "FRAUDULENT" BP PAYMENTS REPRESENT LESS THAN 1% OF ALL CLAIMS (Nov. 3, 2014) [Rec. Doc. 14517-1]; CLASS COUNSEL MEMO TO WELKER RE SUBSISTENCE AND OTHER "FRAUD" INVESTIGATIONS (March 12, 2015) [Rec. Doc. 14517-4]; CLASS COUNSEL MEMO TO CLAIMS ADMINISTRATOR RE PROCESSING ISSUES (April 1, 2015) [Rec. Doc. 14517-6] at pp.4-5 (Alleged/Potential "Fraud" Investigations); CLASS COUNSEL COMMENTS RE CLAIMS ADMINISTRATOR'S UPDATE (May 4, 2015) [Rec. Doc. 14517]; CLASS COUNSEL'S SUBMISSION RE CLAWBACK MOTIONS (June 8, 2015) [Rec. Doc. 14693].

cc: David Welker, Head of FWA