# MEMORANDUM

**To:**     Claims Administrator

Settlement Program Appeal Panelists

**From:**  Class Counsel

**Re:**     <u>BEL Claim Evaluations: "Atypical" or "Extraordinary" Revenue Experiences</u>
*U.S. Fifth Circuit Decision,* No.13-31296 (May 8, 2015)

**Date:**  May 11, 2015


In the original BEL Decision, the U.S. Fifth Circuit expressly rejected the argument that "uneven cash flows" might distort the compensation analysis, based on spikes in revenues or other inconsistencies between the Benchmark and Compensation Periods.  Rather, the Parties, in negotiating the Settlement Agreement, deemed and presumed that the general experiences and accounting of the business during the Benchmark Period would be "comparable" for settlement purposes to the general experiences and accounting during those same months of the Compensation Period, "without any complex analysis of what type of business activities took place within those months."[1]

For this reason, and others, Class Counsel have suggested that the Program Accountants should not generally make revenue adjustments, in the absence of a clear and objective "error", particularly under the general Average Variable Margin (AVM) Methodology.[2]

On May 8, 2015, the U.S. Fifth Circuit handed down a decision in a series of appeals brought by BP which further rejects the notion that an "extraordinary" or "atypical" experience during the Benchmark Period (or Compensation Period) should be excluded from the calculation of "revenues" or otherwise modified. *In re Deepwater Horizon,* No. 13-31296 [Doc. 00513036479] (5th Cir. May 8, 2015) ("SLIP OPINION").

First, rejecting an argument by BP that a *cy pres* award to a BEL Claimant should be excluded from the calculation of revenues, the Court stated as follows:

> **[D]enying this award because of its size would open the floodgates to a flurry of challenges to nonprofit awards, undermining the aims of the CSSP.**  As the Appeals Panel noted in reviewing this award, the CSSP calculations look at revenue on a business level, not on a customer or

---

[1] <u>In re Deepwater Horizon</u>, 732 F.3d 326, 340 (5th Cir. 2013) ("*Deepwater Horizon I*").

[2] *See generally* MEMO TO CLAIMS ADMINISTRATOR RE PROCESSING ISSUES (April 1, 2015) [Doc 14517-6], at pp.7-10 (and materials referenced therein).

donor level.  Reading limitations into the meaning of 'revenue' based on the identity of the donor runs contrary to this agreed-upon framework.[3]

Next, the Court rejected an argument by BP that a "'one-time, extraordinary receipt of grant money' distorted the Claimant's CSF and bestowed a windfall on this Claimant."[4]  In explaining its holding, the Court stated as follows:

> … **By seeking to exclude revenue because it is "atypical," BP attempts to circumvent the causation requirements and compensation framework in the Agreement.**  BP now asks individual claimants to show that any revenue from the pre-spill period was of the type that they could have expected to continue earning after the spill.  But that amounts to requiring that Claimants prove that their lost revenue was caused by the spill, which is precisely what we refused to require in *Deepwater Horizon II. See* 739 F.3d at 797, 821 (affirming the district court's approval of the Claims Administrator's statement that "the Settlement Agreement does not contemplate that the Claims Administrator will undertake additional analysis of causation issues beyond those criteria that are specifically set out in [Exhibit 4B]").

> **The parties agreed on Exhibit 4C's compensation framework to establish what claimants might have expected to earn after the spill. To accept challenges to the types of revenue included in those calculations because the claimants could not have expected to earn similar revenue after the spill defeats the purpose of the compensation framework itself.** [5]

Finally, the Court rejected an argument that the value of legal services donated to a BEL Claimant should not be counted as "revenue" under the Causation and Compensation Frameworks contained within the Settlement Agreement.  The Court noted that "most of BP's textual arguments track BP's general attack on the Nonprofit-Revenue Interpretation; revenue is used to calculate a claimant's 'actual *profit*' so that it can be compared to what the claimant 'might have been expected to *earn*' during the post-spill period."[6]  However, the Court held that the donated legal services in question are treated as revenue on GAAP financial statements and "are 'earned' within the Agreement" for the reasons discussed at Pages 14-15 of the decision.[7]

---

[3] SLIP OPINION, p.29 (emphasis supplied).

[4] SLIP OPINION, p.29.

[5] SLIP OPINION, p.31 (emphasis supplied).

[6] SLIP OPINION, p.32.

[7] *See* SLIP OPINION, p.32.

This latest decision by the Fifth Circuit further supports the notion that "extraordinary" or "atypical" events or accounting should not be excluded or otherwise adjusted by the Program Accountants.  Such manipulation, as BP's Counsel itself noted in September of 2012,[8] threatens to undermine and/or circumvent the structure and purpose of the objective Causation test and the Compensation framework.  Rather, the AVM Methodology should simply match expenses to the revenues as those revenues are recorded on Contemporaneous P&Ls, without any complex analysis of what type of business activities took place.

---

[8] *See* LETTER FROM BP COUNSEL TO CLAIMS ADMINISTRATOR (Sept. 28, 2012) [Doc 8963-68] ("One of the cornerstones of the Settlement Agreement is the use of transparent, objective, data-driven methodologies designed to apply clearly-defined standards to a claimant's contemporaneously-maintained financial data….  The Settlement Agreement does not allow for the use of professional judgment or discretion as a substitute for expressly articulated standards or requirements….  [U]se of allocated proxy rather than actual data could severely distort the resulting outcomes"); (*see also* LETTER FROM BP COUNSEL TO CLAIMS ADMINISTRATOR (Sept. 28, 2012) [Doc 8963-67]).