# CLASS COUNSEL *AMICUS* SUBMISSION RE THE USE OF NON-BENCHMARK P&LS FOR MATCHING "TRIGGER" TESTING

[Claim No. 187010 and other BEL Claims]

Policy 495, as adopted by the Administrator and approved by the Court, contains threshold "trigger" testing to help determine whether the submitted profit and loss statements are "insufficiently matched".[1] In developing the procedures to implement the trigger testing portion of the Policy, the Program Vendors created a system that tests all submitted profit and loss statements for all years at one time. The result of the way the Policy is implemented creates false positives where an entry in a Non-Benchmark year causes the profit and loss statements to hit a trigger, but the Benchmark statements are sufficiently matched. For example, assume the Claimant's claim is based on a 2009 Benchmark Period. However, the Claimant submitted his 2007 profit and loss statements, and at the end of 2007 the Claimant made a large adjusting entry. That 2007 adjusting entry causes one or more of the triggers of Policy 495 to be tripped. However the 2009-2011 statements, if tested without the 2007 statement, reflect no matching issue, and would not be called into question. Based on the way the Program is implementing the Policy, the 2009-2011 statements are being artificially adjusted to cure a "matching" issue that does not exist. Indeed, sufficiently matched P&Ls will become artificially "unmatched". That result is both illogical and is contrary to the agreed terms of the Settlement Agreement.

---

[1] The Program Accountants are then supposed to apply their professional accounting judgment to determine whether such "triggers" are the result of true matching issues, or whether they are the result of other business cycles, conditions and/or anomalies. Particularly with respect to P&Ls that were maintained on an accrual basis, one would not expect to find too many "matching" issues, even where, for other reasons, the "triggers" might be met. It appears to Class Counsel that, in many cases, the Program Accountants are mechanically applying the general Average Variable Margin (AVM) (or one of the four Specialized Frameworks) to a BEL Claim whenever one or more of the "triggers" are met, irrespective of whether such issues might be attributable to business cycles, conditions and/or events wholly unrelated to a "mis-matching" of revenues to expenses. That, however, is another issue for another day. The focus of this submission is the Settlement Program's consideration of Non-Benchmark P&Ls to determine whether the Benchmark and Compensation P&Ls should be altered under the AVM or other Specialized Framework methodologies.

One of the central features of the Settlement Agreement was the assurance that the Claimant's claim would be maximized by the Program. The Parties specifically agreed that the evaluation of claims must ensure the best possible result for claimants. Section 4.3.7 of the Settlement Agreement provides:

> The Settlement Program, including the Claims Administrator and Claims Administration Vendors, shall work with Economic Class Members (including individual Economic Class Members' counsel and Class Counsel) to facilitate Economic Class Members' assembly and submission of Claims Forms, including all supporting documentation necessary to process Claim Forms under the applicable Claims Processes. The Settlement Program, including the Claims Administrator and Claims Administration Vendors, shall use its best efforts to provide Economic Class Members with assistance, information, opportunities and notice so that the **Economic Class Member has the best opportunity to be determined eligible for and receive the Settlement Payment(s) to which the Economic Class Member is entitled under the terms of the Agreement.**

Section 4.3.8 of the Settlement Agreement provides:

> The Claims Administration Vendors **shall evaluate and process the information in the completed Claim Form and all supporting documentation under the terms in the Economic Damage Claim Process to produce the greatest ECONOMIC DAMAGE COMPENSATION AMOUNT that such information and supporting documentation allows under the terms of the ECONOMIC DAMAGE CLAIM FRAMEWORK**. By way of example, but not to be exclusive, if the Claimant selected a, COMPENSATION PERIOD or BENCHMARK PERIOD based on information in a completed Claim Form and all supporting documentation submitted by the Claimant, but a different Compensation Period or Benchmark Period from the information in the submitted Claim Form and/or the supporting documentation results in a greater Economic Damage Compensation Amount under the terms of the Economic Damage Claim Framework, that latter, different Compensation Period and/or Benchmark Period shall be applied.

Taken together, the negotiated and approved terms of the Settlement Agreement make clear that it is the responsibility of the Settlement Program to faithfully apply the terms of the

Settlement Agreement, in a manner designed to produce the greatest allowable economic damage compensation amount.

In application, these two terms assured Claimants that they could submit information for the entire 2007-2011 period without fear that the inclusion of 2007 data could possibly lower the claim.[2]

Many Claimants submitted 2007 data even though their own calculations showed the 2008-2009 or 2009 benchmark period was higher, based on the assurance there could be no negative impact by giving the program additional data.  The implementation of the trigger tests of Policy 495 violates that assurance.

Also, the Settlement Agreement requires all claims to be treated the same based on established and objective formulas.  The specific intent of the Agreement was to ensure that all claimants would be treated fairly, with no special deals and no special burdens, based on the frameworks set forth in the Agreement.  This principle is embraced throughout the Settlement Agreement, and is particularly reflected in Section 4.4.7, which provides that:

> The criteria, documentation, proof, and Compensation Amount provisions of each of the Claims categories **shall apply equally to all Claimants** regardless whether they are proceeding individually, represented by others, or proceeding as an assignee of an individual Claim.

The parties clearly intended that all claims were to be evaluated and paid based on the same formulas negotiated and set out in the Settlement Agreement.  This principle is violated by the way the Program is testing for matching.

Assume two Claimants have identical 2007-2011 profit and loss statements.  Assume further that the 2007 P&Ls cause the claim to hit a trigger, but a 2009-only Benchmark produces the highest claim.  Claimant A had submitted all of the statements.  Claimant B had submitted

---

[2] Under Exhibit 4A, the BEL Documentation Framework, a business is only required to submit P&Ls for the applicable Benchmark Period, (*e.g.* 2007-2009, 2008-2009, or 2009 only), and *not* all three years, (*see* ¶4).

only 2009-2011. Although the 2007-2011 P&Ls for each Claimant are identical – (*and* although the 2009-2011 P&Ls are in fact sufficiently matched) – the awards are totally different. This is not what the Parties intended, and certainly not what the Parties agreed to as determined by Judge Barbier upon remand of the BEL matching issue originally raised by BP.[3]

Finally, the result outlined here is not logical and does not advance the goal of achieving more accurate claim determinations. Under the scenario outlined above, the Claimant's 2009-2011 profit and loss statements are sufficiently matched. The matching occurred either because of the nature of the business or because the statements were fully accrual-based statements. By altering the statements by application of the AVM or Specialized Framework methodology found in 495, the already matched statements are being distorted. And the distortion is being driven by activity that has no bearing on the claim calculation. The resulting distorted Compensation Amount is less, not more, accurate, and is not even consistent with BP's newly stated desire for achieving awards that reflect the "economic reality".[4]

For the above and foregoing reasons, Non-Benchmark P&Ls should not trigger the application of AVM or one of the four Specialized Frameworks to "match" already sufficiently matched Benchmark and Compensation Period financials.

---

[3] *See, e.g.,* ORDER AND REASONS (Dec. 24, 2013) [Rec. Doc. 12055] at p.3 ("it is clear that the parties did discuss and were in agreement that similarly situated claimants must be treated alike").

[4] Of course, as set forth in CLASS COUNSEL'S MASTER *AMICUS* TO THE APPEALS PANELISTS (July 16, 2014) [Doc 13496-6] at pp.18-20, we generally believe that the Appeal Panelists should reject, out of hand, any attempt by BP to argue what the Claimant allegedly "would have been expected to earn" and/or other vague and alleged notions of "economic reality". *See also* LETTER FROM BP COUNSEL TO CLAIMS ADMINISTRATOR (Sept. 28, 2012) [Rec. Doc. 8963-68] ("The BEL framework expressly requires monthly profit and loss statements or alternate source documents establishing monthly revenues and expenses. These documents are essential to implementing the BEL frameworks' methodology of evaluating causation and damages based on the actual monthly financial experience of claimants…. Use of allocated proxy rather than actual data could severely distort the resulting outcomes, especially (but not limited to) in the tourism industry, which experiences substantial seasonal and monthly fluctuations in revenues and expenses").