# MEMORANDUM

**To:**  Claims Administrator

**From:** Class Counsel

**Re:**  Business Economic Loss Claims: Evaluation of Claimants with Changes in Business Ownership or Operating Activities
*Policy No. 354 v.4*

   Also relates to:
   **Multi-Facility Claims / BEL Claimants**
*Policy No. 490 / Policy No. 503*

**Date:** June 5, 2014


### An Entity that Suspends its Business Operations after the Oil Spill should be Excluded from the Application of Section II.B.5.c of the Proposed Policy

Section II.B.5.c of Proposed Policy 354 (v.4) dictates that, for businesses that suspend operations for a period of longer than 365 days, the date upon which operations were resumed becomes the business' commencement date.  This is problematic for businesses that suspended operations following the Spill, because, when read together with other Policies, it could (erroneously) remove them from membership in the Class.

*For Example:*  A bait shop that had operated in Zone A for 30 years suspends their operations on June 1, 2010.  The bait shop does not resume operations until July of 2011.  Under current Policy No. 362, that business would be deemed to have 'commenced' in July of 2011, and – despite that fact that causation is presumed – would be (incorrectly) deemed ineligible for recovery as a BEL Class Member.[1]

Hence, Proposed Section II.B.5.c should be revised so that it only applies to businesses that suspended their operations *prior to* April 20, 2010.

### The Proper Entity to File a Claim

As has been the subject of prior communications, Program Vendors have attempted to force BEL Claimants, and especially those with Multi-Facility Claims, to file a separate Claim for each subsidiary with a separate TIN, refusing to process that Entity's Claim.  This issue has been more fully addressed by Class Counsel in formal Memoranda to the Claims Administrator dated April 23, 2014, and May 14, 2014.

---

[1] Proposed Policy No. 362 v.2 (May 15, 2014) provides that: "Only claimants that can establish an operating history, in accordance with this analysis, that commenced before April 20, 2010 will be eligible for compensation under the Start-Up BEL framework."

The Program Vendors have historically (and recently) cited to portions of Policy 354 as support for these directives. For example, on or about February 21, 2014, a claimant received the following e-mail from the Program:

> The parent company has filed these claims under its tax ID, but it was determined that these claims are for the subsidiaries and operate under different tax IDs than the parent company. Can you please confirm that each Claim ID does in fact operate under a different tax ID than the parent company?
>
> If that is the case, we will need to withdraw these claims and they will each need to be established as under their own Claimant IDs.  The business would still submit the parent company's tax returns for each subsidiary claimant.  A consolidated claim cannot be filed under the parent company if the subsidiaries operate under their own tax IDs.  This can be found in Policy 354 v3, part A:
>
> **A. TIN Used by Claimants in Claim Submissions.**
>
> All claimants must file the Registration Form, Claim Form, and W-9 with the TIN that is currently active at the time they submit the Form or W-9 to the Settlement Claims Administrator. This requirement is in part based on the need for a current TIN to ensure that a claimant's identity can be confirmed, that the correct entity or individual is then paid, and that any payments are reported correctly to the IRS.

The language of Policy 354 v.3, part A, is incorporated verbatim in Proposed Policy 354 v.4, in Section II.A, and is completely unsupported by the terms of the Settlement Agreement.

Nowhere does the language in Section 5.3, Section 38.15, Exhibit 4 or Exhibit 5 prohibit an Entity from making Claims with respect to the businesses and facilities it owns or operates – particularly when those Claims are based on the Entity's own consolidated tax returns and other financials as they were prepared and maintained in the ordinary course of business.  Nowhere is an Entity defined by, or limited to, a Tax Identification Number.  Nowhere does the Settlement Agreement indicate that a subsidiary with separate and distinct TIN must register with the Settlement Program as a separate Claimant, "regardless of the financial reporting or tax structure of the parent corporation."  Nowhere does the Settlement Agreement indicate that an Entity cannot be compensated for the losses of a subsidiary's Facility to the extent the parent does not "*directly*" own, lease or operate the Facility.  Rather, Exhibit 5 uses the words "maintained" and "had"; to "perform" or "manage" its operations.  The entire nature and structure of Section 38.38 and Exhibit 5 were intended and agreed to provide Entities with flexibility and optionality – not to mention ease and efficiency – in making their Claims, which was to be facilitated and maximized by the Program under Sections 4.3.7 and 4.3.8.  BP could have, but did not, attempt to insist on the limiting and unduly burdensome language which appears in current Proposed Policies Nos. 354, 490 and 503 "to ensure that a claimant's identity can be confirmed, that the correct entity or individual is then paid."  Rather, that is an administrative function, whose burden should fall upon the Program, (*not* the Claimant). BP, for its part, obtained consideration and protection in the release of all "corporate parents" and "subsidiaries" under Section 10.1 and Exhibit 26, ¶2.

To the extent Proposed Policy 354 perpetuates this unintended and unduly burdensome mis-application of the terms of the Settlement Agreement, Class Counsel vehemently object. Businesses who were promised a "Claimant-friendly" process over *two years ago* should not now be told that they need to go back and completely re-do and re-submit their claims and potentially numerous other new unnecessary additional Claims.

**<u>Entities Included within the Class</u>**

Policy 354 v.4 periodically mentions several qualifications that an "Entity" must meet or that will be evaluated under the terms of the proposed policy:

- **II.B:** …With respect to BEL claims, in assessing whether an Entity was doing business or operating during the period April 20, 2010 to April 16, 2012 as required by the Settlement Agreement, the Settlement Program's analysis will focus on whether during the relevant period the Entity (a) sold products in the Gulf Coast Areas or Specified Waters, (b) performed its full time services while physically present in the Gulf Coast Areas or Specified Gulf Waters, or (c) owned, operated or leased a vessel that was Home Ported or landed seafood in the Gulf Coast Areas.

- **II.B.1.b:** …For a claiming Entity to have a potentially compensable claim, the claimant must meet the definition of an Entity per Section 1.2 of the Settlement Agreement. Accordingly, it must have been engaged in the sale of product, performance of a service, or it must have owned, leased or operated a vessel in the relevant post-spill time period.

- **II.C:** … In evaluating whether a business has suspended operations for the required period, the Settlement Program typically will consider several factors to assess if the business was still in operation. Such factors include whether the business (a) sold products in the Gulf Coast Areas or Specified Gulf Waters, (b) performed its full time services while physically present in the Gulf Coast Areas or Specified Gulf Waters, or (c) owned, operated or leased a vessel that was Home Ported or landed seafood in the Gulf Coast Areas.

Notably, and as a non-exclusive example, none of the illustrations above include Entities that "regularly purchased Seafood harvested from Specified Gulf Waters in Order to produce goods for resale." *See* Settlement Agreement, Section 1.2.1.  These statements should be revised to either explicitly reference the language of Section 1.2 of the Settlement Agreement or include that language verbatim in the policy itself.

cc: Counsel for BP