# MEMORANDUM

**To:**   Claims Administrator

**From:** Class Counsel

**Re:**   **Claims by Related Owners, Officers and/or Entities**
         BEL Claimants / Owner and Officer Claims / GCCF Releases
         *Policy No. 503 / Policy No. 363 / Policy No. 276*

   Also relates to:

   **Multi-Facility Claims / Non-Revenue Items / Real Estate Developer Exclusion**
   *Policy No. 490 / Policy No. 328 / Policy No. 468*

**Date:** May 14, 2014

Initially, Class Counsel respectfully incorporate and include for reference Class Counsel's Memo to the Claims Administrator dated October 2, 2012, re BEL Owners or Officers Who Are Also Employees, and Class Counsel's Memo to the Claims Administrator dated April 23, 2014, re Multi-Facility Business Claims.  Class Counsel respectfully ask the Claims Administrator to consider these Memos together with Class Counsel's formal response to Proposed Policy No. 503, Proposed Policy No. 363 v.5, and Proposed Policy No. 276 v.2, as provided more fully herein:

**Introduction**

As noted by the Claims Administrator in the introduction to Proposed Policy No. 503, the definition of "Business Claimant" or "Business Economic Loss Claimant" broadly and expansively includes not only an Entity (which is likewise broadly defined under the Settlement Agreement) but also a Natural Person who filed a Form 1040 Schedule C, E or F.  The Settlement Agreement does not expressly direct or require that an individual or corporate owner be treated separately and distinctly from its subsidiary Entities.

In interpreting the various provisions of the Settlement Agreement, the Claims Administrator has taken different approaches with respect to business distinctions and formalities.

The original policy regarding the scope and effect of GCCF Releases [No. 276], the current policy regarding Non-Revenue Items [No. 328], and the current policy regarding the Owner and Officer Exclusion [No. 363], all largely disregard corporate or other business distinctions and formalities.[1]  On the other hand, the proposed policy regarding Business Economic Loss Claimants [No. 503], and the proposed policy regarding Multi-Facility Claims

---

[1] The policy regarding the exclusion of Real Estate Developers also potentially disregards corporate or other business distinctions and formalities, as Policy No. 468 Sections C(1) and C(3) look to the 2010 Tax Returns, which would typically include and reflect information about parents and/or subsidiaries if they were prepared and filed on a consolidated basis;  in addition, Policy No. 468 Section C(5) looks to websites and other promotional materials, which frequently summarize and project information about the business as a whole, without regard to corporate or other business distinctions or formalities.

Page **1** of **6**

[No. 490], strictly enforce all corporate and other business distinctions and formalities. While each of these issues has arisen within its own context of Settlement Agreement terms and other considerations, the common thread that seems to run through these policies is that they are _all_ to the burden and/or detriment of the Claimant, while to the benefit of BP.[2]  In sum, when it is favorable to BP, the Settlement Program frequently ignores corporate formalities;  but when it would deter, frustrate, burden or complicate Claims, the Settlement Program strictly respects and enforces business distinctions and formalities.

Under Sections 4.3.7 and 4.3.8, and for other reasons, (as have been previously presented, and as are further outlined herein), the result should be just the opposite: These policies and proposed policies should interpret and apply the Settlement Agreement in a way that facilitates the efficient filing and processing of Claims, and that produces for each Claimant the maximum available recovery.

This is particularly true given both the Class Release and the Individual Release, which expressly extinguish all claims, rights, interests, actions and demands of not only the Business Claimant, but also "corporate parents" and "subsidiaries". _See_ SETTLEMENT AGREEMENT, Section 10.1 and Exhibit 26, ¶2.

With this background, Class Counsel respectfully submit their comments regarding Proposed Policy No. 503, Proposed Policy No. 363 v.5, and Proposed Policy No. 276 v.2:

**Proposed Policy re BEL Claimants and Claims [No. 503]**

For nearly two years, the owners and/or officers of businesses have been filing BEL Claims.  The BEL Claim Form is accompanied by 26 pages of instructions that were initially approved by the Parties during the Spring or Summer of 2012.  Nowhere in the INSTRUCTIONS FOR COMPLETING THE BUSINESS ECONOMIC LOSS CLAIM FORM has the owner or officer of a business ever been informed that (a) entities and their subsidiaries which are separate legal entities with separate and distinct TINs must register as separate claimants, regardless of the financial reporting or tax structure of the parent; (b) entities and their subsidiaries which are separate legal entities with separate and distinct TINs are compensable only for losses attributable to their specific entity; or (c) a BEL Claim by the parent or other owner of a business is not compensable for the losses of its subsidiary's Facilities to the extent the owner or parent does not directly own, lease or operate those Facilities.

These newly annunciated restrictions are, as noted, unnecessary, in light of the Class Release and Individual Release. _See_ SETTLEMENT AGREEMENT, Section 10.1 and Exhibit 26, ¶2 (extinguishing all claims, rights, interests, actions and demands of "corporate parents" and "subsidiaries").  Indeed, the _quid pro quo_ that was struck between Class Counsel and BP toward the end of the negotiations was that all parents and subsidiaries would be released in exchange for the flexibility of those businesses to file Multi-Facility Claims.

---

[2] Proposed Policy No. 276 v.2 does appear to respect corporate and other business distinctions and formalities in the Claimant's favor.  As a practical matter, however, those effects will frequently be rendered moot by Section II(A)(4) and the Owner / Officer Exclusion [No. 363].

These newly annunciated restrictions are inconsistent with the BEL Documentation provisions in Exhibit 4A, which require copies of the actual Tax Returns filed during the Benchmark Period, 2010, and, if applicable, 2011; as well as the monthly and annual profit and loss statements. Where tax returns and/or other financial statements were prepared on a consolidated basis in the ordinary course of business, those tax returns will be rendered largely useless in the evaluation of a subsidiary's claim, and the new claiming entity will be required, in many cases, to prepare new monthly profit & loss statements from scratch.

These newly annunciated restrictions are also inconsistent with the Multi-Facility Framework contained in Exhibit 5, which expressly allows a multi-facility business to file a "consolidated" claim.

These newly annunciated restrictions are inconsistent with Policy No. 328(f) and (g), which – rather than treating related entities as separate and distinct – essentially disregard corporate or other business distinctions and formalities, by excluding revenue from intercompany sales and related party transactions.

These newly annunciated restrictions are also inconsistent with Policy No. 363, which – rather than respecting the corporate or other distinctions between a formal business entity and its owners and officers – prevents the owner or officer from making a claim where compensation has been paid to the separate and distinct legal entity.

By definition, the owner of a wholly-owned business or subsidiary is also the ("actual") owner of any and all of its subsidiaries and/or facilities.

The entire structure, language, purpose and intent of the Settlement Agreement generally, including Exhibits 4-7, and in particular Section 4.3.7, Section 4.3.8, Exhibit 5, and the Individual Release, were to provide the Claimant with flexibility and optionality in the efficient submission and processing of Claims in a way that would produce the maximum available recovery.

Neither Section 5.3.2, Section 5.3.3, Section 38.15, Exhibit 4 nor Exhibit 5 in any way dictate or require a Claiming Entity to submit separate additional Claims for each of its affiliates or subsidiaries. (Nor does Section 1.2, nor Section 38.63.)

Neither Section 1.2, Section 5.3.2, Section 5.3.3, Section 38.15, Section 38.20, nor Section 38.63 define a Business, a Claimant, nor an Entity in terms of its Tax Identification Number (TIN).

The proposed policy, in this regard, is inconsistent with Section 4.4.7, which requires that the Settlement Agreement be applied in the same way to all persons or businesses within the same Claims Category. The proposed policy will create a different result for sole proprietorships and single member LLC's that have employees versus those that do not, and corporations that operate several divisions or single member LLC's as opposed to those that operate with corporate subsidiaries.

Under IRS Publication 1635, corporations, and multi-member LLCs, are required to have Employer Identification Numbers (EINs). However, sole proprietors and single member LLC's are not required to have an EIN, unless they have one or more employees. Under Section II(A)(2) of the proposed policy, a sole proprietorship or a single member LLC with no employees can use the owner's Social Security Number and file separate claims or, if applicable, a Multi-Facility Claim. However, if the sole proprietorship or single member LLC has an EIN, it is required to file separate claims for each entity. The mere existence of an EIN should not change the burdens or compensation available under the Settlement Agreement. EINs are often used as an alternative to supplying Social Security Numbers for security purposes and to prevent identity theft; it does not change the nature or substance of the business.

Section II(B)(2)(A) of the proposed policy requires a corporation with subsidiaries to file separate claims for each subsidiary, regardless of where the headquarters are located. This will effect C Corporations and S Corporations with subsidiaries, whereas a corporation with several operational groups or divisions, (with no separate TINs), can file either separate claims or a consolidated claim, in accordance with the Multi-Facility Framework.

Furthermore, if a parent corporation owns several single member LLC's with Tax ID Nos., they cannot file a single consolidated Claim, but another corporation with multiple single member LLC's that have No Tax ID Nos. could file either separate or consolidated Claims.

Further to the rumors that limitations in BrownGreer's IT system were a driving factor in the development of this proposed policy and the proposed multi-facility policy, Class Counsel note the observation in Section II(A)(1) of Proposed Policy No. 503 that: "The DHECC Database Application uses TIN as the unique identifier for each claimant."

Nevertheless, and whatever the reasoning behind Proposed Policy Nos. 490 and 503, there is simply no reason or basis to unnecessarily burden Claimants (or the Program itself) with the obligation to file numerous, voluminous and unnecessary Claims. It is not in any way "Claimant-friendly" and serves no purpose in light of the broad and protective Release.

**Proposed Policy re Owner / Officer Exclusion [No. 363 v.5]**

Class Counsel object to the revised proposed version of Policy No. 363 for the same reasons expressed in Class Counsel's Memo to the Claims Administrator dated October 2, 2012, re BEL Owners or Officers Who Are Also Employees, (attached).

Class Counsel additionally note the inconsistency between this policy and Proposed Policies Nos. 490 and 503, which require strict respect for and enforcement of corporate and other business distinctions and formalities.

The entire notion of a "double payment" looks at the question from BP's point of view, rather than the Claimant's. BP could have, but did not, suggest, and Class Counsel did not agree, to include a set-off, exclusion, release, or other prohibition on "double payments" generally, nor with respect to these particular IEL Claimants within either the Class Definition or Exhibit 8 of the Settlement Agreement. Respectfully, the question is not what Claims BP should or should

Page **4** of **6**

not have to pay under the Settlement Agreement, but rather, what compensation is promised and owed to each eligible Class Member under the terms of the Agreement?

Several Settlement Program Appeal Panelists have rejected application of Policy No. 363, particularly in cases where it was not clear that a "double payment" had, in fact, occurred. *See, e.g.,* CLAIM NO. 54208 (release by business should not preclude claim by owner/officer in capacity of W-2 employee); CLAIM NO. 84233 (IEL Claim should not have been denied where owner/officer's salary was not separated out in the financials and treated as a "fixed expense" in the BEL Claim); CLAIM NO. 114046 (IEL Claim remanded where it was unclear whether owner's W-2 salary was broken out and treated as a "fixed expense" in the BEL Claim); CLAIM NO. 211144 (IEL Claim of "Chief Financial Officer" recognized where the employer did not compensate him as an executive along with the partners).

While Class Counsel believe that the IEL Claims of Owners and Officers should generally be recognized irrespective of whether there was, in fact, an actual "double payment" by BP, such claims should certainly not be prohibited across-the-board, as a matter of policy.

In addition to the points made in Class Counsel's Memo of October 2, 2012, and above, Class Counsel respectfully note the absurdity of the Policy's unfair effect on eligible Class Members outside of the sole proprietorship or other closely-held situation. What about, for example:

      a.    An Officer who is *not* an Owner?

      b.    A former Officer, who is no longer either an Officer nor an Owner?

      c.    An employee, or former employee, who has a very small minority Ownership interest?

      d.    An employee, or former employee, who had a very small minority Ownership interest at the time of the Spill, but has since sold it?

There is no justified presumption that a part-owner or officer of a corporation was paid a portion of the earnings from the corporation, and did not have separate W-2 earnings. Nor can it be presumed that the proceeds from any BEL recovery will be passed on to a part-owner, officer, or former owner or officer of the company.

Scenario 5 appears to force the inclusion of officer and owner's compensation into the BEL Claim, even though it will not reconcile with the P&L's or with the Tax Returns.

Finally, where the employer's claim was a GCCF Business Claim, as opposed to a Settlement Program BEL Claim, there is no basis to apply this Policy, (nor Proposed Policy No. 276 v.2, Section II(A)(4)), because the GCCF did not treat owner or officer compensation as a "fixed expense" under any type of concrete or objective framework analogous to Exhibit 4C.

**Proposed Policy on GCCF Releases [No. 276 v.2]**

        Class Counsel agree with the proposed revision to Policy No. 276, with the exception of Section II(A)(4), for the reasons stated in Class Counsel's Memo to the Claims Administrator dated October 2, 2012, re BEL Owners or Officers Who Are Also Employees,[3] and above.

Enclosures

cc: Counsel for BP

---

[3] *Note* – The Oct. 2, 2012 Memo to the Claims Administrator states that: "With respect to BP's reference to 'sole proprietors', Class Counsel agree that sole proprietors cannot make IEL claims. *See* Section 38.84." While we are not certain exactly what BP reference we were responding to, what we believe this was intended to convey was that, under Section 38.82 (*not* 38.84), an Individual Claimant is a natural person alleging damages arising out of the Spill "*in addition to or other than* a Claim for Economic Damages related to such Natural Person's *sole proprietorship business or other self-employment* as reflected on Schedule C, D or E of a federal income tax return." SECTION 38.82 (emphasis supplied). Depending on the situation, the execution of a GCCF Release by the owner of a sole proprietorship may or may not release either the BEL Claim of the business or an IEL Claim of the owner, depending on the facts and circumstances.

# MEMORANDUM

**To:** Patrick A. Juneau, Esq.
     Claims Administrator

**From:** Class Counsel

**Matter:** <u>In re: Deepwater Horizon</u>
         MDL No. 2179

**Re:** BEL Owners or Officers Who Are Also Employees

**Date:** October 2, 2012


This Memo is intended to address two questions:

1. Where the owner or part owner of an Entity is also a W-2 employee of the Entity, can he or she assert an Individual Economic Loss claim within the Settlement Program?

2. When the owner or officer of a "business" has executed a GCCF Release, is he or she – or any other owner or officer of the "business" – precluded from filing an IEL claim within the Settlement Program for his or her loss of income as a W-2 employee?

There have been a number of e-mails regarding this issue, including Wendy Bloom's September 27th response to Steve Herman's e-mail of September 25th, in addition to references in Question 67 on the "Unresolved Questions Spreadsheet" – which all agree relates only to the processing of BEL claims, and not to the separate issue of whether an owner or officer maintains his own separate IEL claim under the Settlement Agreement.

For the following reasons, Class Counsel suggest that the answers to the questions are as follows:

1. Yes.

2. It depends on the nature of the entity or other "business" that made the previous GCCF claim; the capacity in which the GCCF Release was executed on behalf of the business claimant; and the relationship of the business and/or signatory to the potential IEL Settlement Program claimant.

## **Background**

Class Counsel received several questions / complaints by potential classmembers who reported that they were told by the Program that the owners or part owners of an Entity could not make a separate IEL claim for their own loss of income as W-2 employees, as that would constitute a "double payment".

Class Counsel asked the Program to clarify whether this was, in fact, the Program's official policy, and, if so, what specific Settlement Agreement language was it based upon?

Orran Brown, for the Program, indicated that no claims had been denied on this basis, and that he would gt back to us with the Program's official policy (if any).

In the meantime, Wendy Bloom, on behalf of BP, indicated that BP agreed that this was a "double payment" prohibited under the Settlement Agreement.

When Class Counsel asked Ms. Bloom to provde the specific terms of the Settlement Agreement (and/or, where applicable, GCCF Release) that BP was relying upon, she pointed to:  **(i)** the exclusion of owner/officer compensation from the calculation for payroll expenses under Exhibit 4C, Section I;  **(ii)** the set-off for prior Spill-Related Payments under Exhibit 8A; and **(iii)** language regarding the release by "shareholders" and others of a business claimant's claim in the standard GCCF Release.

Class Counsel have been asked by the Claims Administrator to provide a formal position on the issues, and, for the reasons that follow, respectfully suggest that the cited provisions in the Settlement Agreement (and, where applicable, GCCF Release) do not support BP's position.

**An Owner, Part Owner or Officer of a BEL Claimant under the Settlement Agreement is an Eligible IEL Class Member and Claimant with Respect to His or Her Loss of Income as a W-2 Employee**

This Class Settlement was filed, preliminarily approved, and formal notice has been sent out to hundreds of thousands of individuals, directly or indirectly.  We have an opt-out date in less than 30 days.  In the Class Definition, an Individual who had an ownership interest in a company that was doing business in the Gulf Coast Areas that suffered an economic loss as described in the damage categories is a member of the Class, unless excluded.  No one asserts these individuals are excluded from Class.

The Individual class member is directed to Exhibit 8A to determine how he or she is treated under the Class Settlement Agreement.  Nowhere in the document is it stated that an owner, part owner or officer of a business is excluded from making an Individual claim if he or she otherwise satisfies the Class Definition and qualifications. (Indeed, it is specifically contemplated under the Settlement Agreement that an Entity's employees will make claims within the Settlement Program based on the recognition of the Entity's Settlement Program Claim. *See* Exhibit 8A, Section I(B)(2)(b)(i).)  Nothing tells an investor in a business entity that he or she is excluded.  Nothing in the Settlement Agreement provides notice to an Individual that if a Business Economic Loss is paid and you are an owner or part owner of the business, you are excluded from filing an Individual claim if you otherwise qualify.  Nothing in Exhibit 26, which is the applicable release to be signed by a BEL Class Member, excludes or releases an employee's Individual Economic Loss claim.

Nor is there an exclusion or offset of such owner/officer compensation in particular, or what someone might contend to be a "double payment" generally, in the Exhibit 8A Individual Economic Loss Framework, or the Settlement Agreement generally.

While BP is correct that "Owner/Officer Compensation" is unambiguously excluded from the calculation of payroll expenses under the BEL Framework, (*see* Settlement Agreement, Exhibit 4C, Section I (definition of "Fixed and Variable Payroll Expenses")), we are troubled by BP's unwillingness to accept that the Agreement also unambiguously allows owners and officers who are Individuals under the Agreement to recover their lost W-2 employee earnings from BP. This position contradicts the mandatory terms of the IEL Framework. Moreover, both Parties have consistently understood, and publically represented, that (with the exception of the Seafood Program) compensation awarded to any one Class Member has no impact on any other Class Member. The Settlement Program, in this regard, was purposefully designed to provide a prompt, uniform, and claimant-friendly process under which BP would pay 100% of all properly documented claims, relieving class members of the need to pursue recovery from third parties.

The Agreement's express terms dictate which business owners are barred from making IEL claims.

Specifically, the definition of "Individual Claimant" excludes the owners of sole proprietorships and self-employed individuals. *See* Section 38.84. These individuals must instead make BEL claims. *See* Section 38.15 (definition of "Business Claimant").

Other owner and officer employees of business Entities qualify as Individual Claimants and are entitled to the benefit of the IEL claims process.

The Settlement Agreement's different treatment of these individuals makes good sense. Under the law, a formal corporate or other business entity is considered a separate legal person from the owner(s) and officer(s). The entity has no legal obligation to share its award with any other party. And, there is no reason to assume it will do so. For example, an individual who owned a business at the time of the spill may have since sold it; that person will lack leverage to obtain part of the business's BEL award. Similarly, a minority partner would be powerless to force a majority owner to give him or her a portion of the business's recovery. Even in single-owner cases, corporate policy or fiduciary duties may prevent an owner from taking part of the entity's compensation for himself or herself.

Further, the Agreement expressly mandates inclusion of "[a]ll bonuses and/or commissions" in the lost earnings calculation on a *pro rata* basis. *See* Exhibit 8A, at 16. It also expressly states which earnings may be deducted from the calculation.

The IEL Framework provides a detailed definition of these "Offsetting Earnings." *See* Exhibit 8A, at 6. The definition conspicuously omits Owner/Officer Compensation from the Claiming Job, as well as BEL compensation paid to the employer. *Id.* Had the parties intended such offsets to apply, they would have made an express provision for them, as they did with every other offset and exclusion in the Agreement.

BP effectively concedes this point in suggesting that the entity's BEL compensation (or part thereof) should be deducted as a "Spill-Related Payment." Though creative, this argument fails for three obvious reasons:

First, the definition of "Spill-Related Payments" under the IEL Framework is limited to compensation paid "*for the Claiming Job*." *See* Exhibit 8A, at 8 (emphasis added). A BEL claim is paid for the lost profits of the business, not for any Claiming Job. This narrow definition is specifically intended to protect Claimants who make claims under multiple frameworks. In the rare instance in which payments under one framework are meant to be offset against payments under another, the Agreement expressly sets forth the relevant offset, rather than treating it as a "Spill-Related Payment." *See* Section 38.164 (defining "VoO Earned Income Offset"); Section 38.166 (defining "VoO Settlement Payment Offset"); Section 5.5.2.1-5.5.3 (dictating which claims are subject to VoO offsets).

Likewise, whenever a settlement payment must be allocated among multiple claimants, the Agreement dictates that the Claims Administrator make the allocation and pay each claimant directly. It does not leave claimants to squabble among themselves or pay one claimant at the expense of others. *See* Exhibit 11A, at 7 (allocation of Coastal Real Property Compensation Amount); Exhibit 12A, at 7 (allocation of Wetlands Real Property Compensation Amount); Exhibit 13A, at 4 (allocation of Real Property Sales Compensation Amount).

Second, and more importantly, the Agreement is not written, and was never understood, to allow economic loss compensation awarded to one claimant to be deducted from, or entirely bar, another claimant's award. The current dispute could set a dangerous precedent if BP later decides that other negotiated terms are overly generous.

Third, BP's position would result in similarly situated claimants being treated quite differently. By definition, "Spill-Related Payments" include only those payments which have *actually been made*, not any that hypothetically might be. Accordingly, the fortuity of which claim was submitted and processed first – IEL or BEL – would dictate the compensation available to the individual. (And, some claimants might be able to game the system simply by delaying the entity's BEL claim). These results directly contradict the Agreement's stated goal of uniformity. *See, e.g.*, Section 4.4.7 (stating that the claims frameworks "shall apply equally to all claimants…").

Because the Agreement does not distinguish between owners, officers, and other W-2 employees, all are subject to the same documentation, causation, and compensation frameworks, and are eligible for the same types of awards.

**Whether an Owner, Part Owner or Officer of a GCCF Business Claimant that Settled in the GCCF Is Excluded from the Class Settlement is an Individual Question that Must be Decided on a Case-by-Case Basis**

The Settlement Class Definition excludes:

> Any Natural Person or Entity who or that made a claim to the GCCF, was paid and executed a GCCF Release and Covenant Not to Sue.

Section 2.2.6.  The Exclusion, therefore: **(i)** distinguishes between Natural Persons "*or*" Entities; **(ii)** requires that the Natural Person *or* Entity made a claim to the GCCF; **(iii)** requires that the Natural Person or Entity was "paid" by the GCCF; and **(iv)** requires that the Natural Person or Entity "executed" the GCCF Release.

At the same time, the standard GCCF Release for a GCCF "Business" Claim provides that:

> Claimant also, on behalf of Claimant's spouse, heirs, beneficiaries, agents, estates, executors, administrators, personal representatives, subsidiaries, parents, affiliates, partners, limited partners, members, joint venturers, shareholders, predecessors, successors, assigns, insurers, and attorneys (collectively, "Affiliates"), hereby releases....

Significantly, the GCCF Release does **_not_** purport to release the claims of either "owners" or "officers" or "employees".

(Indeed, it is specifically contemplated under the Settlement Agreement that an Entity's employees will make claims within the Settlement Program based on the recognition of the Entity's GCCF Claim. *See* Exhibit 8A, Section I(B)(2)(b)(i).)

Similarly, questions are raised about the extent of the release by other Affiliates under the GCCF Release – *e.g.,* is a "shareholder" or a "member" or a "joint venturer" of a GCCF Business Claimant really releasing any and all BP Oil Spill Claims, or only claims *in the capacity* of a "shareholder" or a "member" or a "joint venturer" of the relevant Business entity?

Nevertheless, and in any event, in order to determine whether the Exclusion in the Settlement Agreement applies, you have to know:  the nature of the entity or other "business" that made the previous GCCF claim (*i.e.,* who is the GCCF "Claimant"); the capacity in which the GCCF Release was executed on behalf of the business claimant; and the relationship of the business and/or signatory to the potential IEL Settlement Program claimant.

With respect to BP's reference to "sole proprietors", Class Counsel agree that sole proprietors cannot make IEL claims. *See* Section 38.84.

At the same time, the Court-Supervised Settlement Program was meant to correct, not replicate, the shortcomings of the GCCF. The relevant release here is the Individual Release in Exhibit 26.

Contrary to BP's characterization, the cited signature requirement is best understood as a means of preventing challenges to the release as improperly authorized.  No part of the Individual Release allows an Entity to release the claims of its W-2 employees, nor could it. (Indeed, the inability to obtain a competent release of individual claims from a business entity may be the reason BP refused to consider an aggregate formula that would have spared employees the need to file claims.)  All the Individual Release does, and lawfully could do, is prevent third-parties from asserting claims *on behalf of the business*;  it in no way impacts those parties' own, individual claims. *See* Exhibit 26.  Moreover, the Individual Release has no bearing on claims under the Settlement Agreement; it is expressly subject to "the right to receive additional Settlement Payment(s) for any additional claims" pursuant to Section 4.4.8.

## Conclusion

An Individual who is an owner or part owner or officer of a business – other than owners of sole proprietorships and/or self-employed individuals – are members of the Settlement Class; they are not excluded; they are directed to Exhibit 8A to determine their compensation; they have been given notice of this; and nothing now can change the terms of the Settlement Agreement as it relates to those Individuals; irrespective of what BP now claims its intent was in negotiating the terms of the Agreement.

# MEMORANDUM

**To:** Claims Administrator

**From:** Class Counsel

**Re:** Multi-Facility Business Claims
*Policy No. 490*

**Date:** April 23, 2014


Class Counsel respectfully submit the following objections to the Proposed Multi-Facility Policy issued on April 16, 2014:

## Requirement to Submit Separate Claims by Wholly-Owned Subsidiaries

The entire intent and purpose of the Multi-Facility Framework was to reduce the burden on Claimants and to provide them with greater optionality. There is absolutely nothing in Exhibit 5 or anywhere else within the Settlement Agreement which would dictate that the options available to Multi-Facility Businesses are limited "to the actual owner, lessee and/or operator of the facility(ies) at issue," that a corporate parent is not entitled to pursue a Multi-Facility claim for wholly-owned subsidiaries and/or their facilities, or that the Program should refuse to "consider multiple Entities that file a consolidated tax return part of the same Multi-Facility Business if the Entities maintain separate TINs." This is entirely inconsistent with the nature, structure, spirit and actual terms of Exhibit 5, as well as Sections 4.3.7 and 4.3.8, and the broad provisions of Section 10.1 and Exhibit 26 Section 2 which expressly release both "corporate parents" and "subsidiaries". Indeed, the *quid pro quo* that was struck between Class Counsel and BP toward the end of the negotiations was that all parents and subsidiaries would be released in exchange for the flexibility of those businesses to file Multi-Facility Claims.

Neither Section 5.3.2, Section 5.3.3, Section 38.15, Exhibit 4 nor Exhibit 5 in any way dictate or require a Claiming Entity to submit separate additional Claims for each of its affiliates or subsidiaries. (Nor does Section 1.2, nor Section 38.63.)

The word used in Exhibit 5 is "Business". There is no reference to the term "Entity" nor any identification, classification or separation of businesses or their facilities according to either a formal structure or a separate Tax Identification Number (TIN). Nor is there any reference, restriction or limitation to "the actual owner, lessee and/or operator of" the facility or facilities at issue.

By definition, the owner of a business or subsidiary is also the ("actual") owner of any and all of its facilities.

Moreover, the express and specific ability to file a "consolidated" claim makes it clear that a single Claiming Entity (or individual Business Claimant) would be permitted to file a

Claim based on that Entity's consolidated Profit & Loss Statements, irrespective of its subsidiary businesses or facilities.

Additionally, this Proposed Policy is inconsistent with Policy No. 328(f) and (g), which exclude revenues from intercompany sales and related party transactions. For revenue purposes, the Program is effectively treating all affiliated businesses as one single Claiming Entity, whereas the Program is in this case, by contrast, effectively treating each of the affiliated businesses as a separate and distinct Claiming Entities.

Finally, there is simply no reason or basis to unnecessarily burden Claimants (or the Program itself) with the obligation to file numerous, voluminous and unnecessary Claims. It is not in any way "Claimant-friendly" and serves no purpose in light of the Release.

Class Counsel respectfully note that the background leading to the promulgation of this Proposed Policy is extremely troubling. Initially, Class Counsel received reports that BrownGreer was telling Claimants that they needed to withdraw their existing Claims, and submit separate new Claims for each affiliate or subsidiary. When Class Counsel addressed with the Claims Administrator and his staff, Class Counsel were assured that there was no such formal policy. It was believed that a preliminary decision may have been made by BrownGreer based on "requirements" of the Release. Class Counsel pointed out, however, that Section 10.1 and Exhibit 26 Section 2 released both "corporate parents" and "subsidiaries". There was also some speculation that the decision may have been related to the definition of "Entity". But Class Counsel pointed out that a "Business Claimant" or "Business Economic Loss Claimant" under Section 38.15 of the Settlement Agreement was not necessarily an Entity. While the Claims Administrator and his staff were further looking into the situation, Class Counsel continued to get reports that BrownGreer was continuing to instruct Claimants to withdraw their existing Claims and submit separate additional new Claims on behalf of each subsidiary. BrownGreer, at that time, invoked Policy No. 354, which simply discusses the requirement of each Claimant to include its current TIN, and says nothing about the necessity to file multiple claims for each and every related business entity that has a separate Tax Identification Number. (And, notably, neither Section 1.2, Section 5.3.2, Section 5.3.3, Section 38.15, Section 38.20, nor Section 38.63 define a Business, a Claimant, nor an Entity in terms of its Tax ID.) When Class Counsel pointed this out, the Claims Administrator advised that the Program was still considering the issue and working on a formal Proposed Policy. Class Counsel then heard a rumor that the "BrownGreer Policy" was being driven by IT or other administrative constraints of the BrownGreer claims processing system. While this rumor was neither confirmed nor denied, Class Counsel repeatedly expressed the strong (and correct) sentiment that Claimants could not and should not be unduly burdened (and certainly not substantively prejudiced) due to some problem with the BrownGreer IT system. (Particularly in light of Sections 4.3.7 and 4.3.8 and the fact that IBM had been retained to substantially revise and improve the Program's IT system.) Despite several requests, Class Counsel have still never been provided with an explanation of: Where this policy comes from? To what extent was BrownGreer involved in developing the policy? What specific language in the Settlement Agreement supports or compels the policy? Why the policy is necessary in light of the release of parents and subsidiaries? Or to what extent the policy may have been driven by IT and/or other limitations in the BrownGreer processing system?

**Limitation on the Ability to Submit Facility-by-Facility Claims using Contemporaneous P&Ls**

Sections II(C)(3) and II(C)(4) of the Proposed Policy refer to businesses that did or did not "maintain separate contemporaneous profit and loss statements for each Facility in the Gulf Coast Areas during the Benchmark Period and 2010." This fails to give the full intended and agreed meaning and application of "Contemporaneous" as defined in Section 38.38 of the Settlement Agreement:

> … "contemporaneous" or "contemporaneously" prepared evidence or documentation, even if not proximate in time to the event or occurrence to which it relates, shall include (1) documentation that is based on or derived from other data, information, or business records created at or about the time of the event, occurrence or item in question, (2) a statement that is consistent with documentation created at or about the time of the event, occurrence or item in question, or (3) would support a reasonable inference that such event, occurrence, or other item in question actually occurred.

**Limitation on the Ability to File Claims for Some, but not All, Facilities**

With respect to Section II(C)(1) of the Proposed Policy, and as set forth in Class Counsel's Memorandum of January 13, 2014, Claimants should be able to "file separate claims for one, some, or all of its facilities located in the Gulf Coast Area," as set forth in Exhibit 5.[1]

---

[1] Class Counsel understand that individual Facilities with different Causation standards and/or RTPs cannot be grouped together (beyond what is expressly permitted in Exhibit 5 with respect to Consolidated claims). However, as a practical / mechanical matter, some Facilities with the same Causation standard and RTP can be grouped together for efficiency or other purposes.