# Memorandum

**To:** Claims Administrator

**From:** Class Counsel

**Re:** Subsistence Claims Based on Bartering
  *Policy Keeper No. 484*

**Date:** March 2, 2014

## I.      Introduction

Policy No. 484 is directed towards individuals who hold recreational fishing licenses, are exempt from recreational fishing license requirements, and/or barter Game.  We understand that there has been no dispute regarding, and the Claims Administrator does not question, the genuineness of these individuals' losses.  Rather, Proposed Policy No. 484 would apply notwithstanding the fact that a Claimant barters in a traditional and customary manner to sustain his or his family's most basic needs, and in doing so relied on natural resources that were diminished or restricted by the oil spill.

The Claims Administrator announced Reissued Policy No. 484 after reviewing the Parties' responses to an August 7, 2013 request for input.  It appears the Claims Administrator was persuaded by BP's position.  BP's position, however, is inconsistent with the plain language of the Settlement Agreement, the purpose of the Subsistence Claim framework, and the widely-recognized cultural and economic value of subsistence bartering to the Gulf Coast Areas.  Class Counsel therefore strongly object to Proposed Reissued Policy 484 and respectfully request that it be rescinded.

The enforcement of State laws, we respectfully submit, is a matter between the Claimant and the relevant State regulatory authority, which may or may not, as a practical matter, enforce the provisions cited in Policy 484 Exhibit A.  These authorities in no way prohibit an individual from receiving compensation under a voluntary settlement.  Further, the previous policy, which did not require any Third Party Sworn Written Statement to verify "nominal quantities" of Seafood and Game, appropriately declined to unduly burden Subsistence Claimants and minimized administrative expense.[1]

## II.     Discussion

At the outset, it is important to note two important points.  First, subsistence bartering of fish and game is both widely recognized and widely valued in the Gulf Coast Areas.  Significant barter economies have long existed in coastal communities along the Gulf of Mexico.  They reflect a part of the region's history and culture.  For example, "[p]eople in and around the

---

[1] Reissued Policy Announcement, Policy 484: Subsistence Claims: Claims based on Bartering Seafood or Game at 1.

Louisiana marshes famously eat fish they catch and ducks they shoot and trade or barter."[2]   The Parties negotiated against this backdrop, and they intended their Agreement to "reflect the socio-economic realities of the Gulf coast ethnic, traditional, and customary subsistence communities and individuals."[3]

Second, there is no question that, under the plain language of the Agreement, individuals who barter Game, as well as people who barter fish caught in reliance on recreational fishing licenses or exemptions, can have valid Subsistence claims.[4]   Indeed, Section A.4 of Exhibit 9 expressly states that the "Subsistence Claimant definition *does include* individuals who hold a recreational fishing license . . . "  (emphasis added).  Exhibit 9, Section C.5 likewise recognizes that a "recreational fishing and/or hunting license" may appropriately document a subsistence claim, as well as that Deckhands and others not required to possess a fishing license are "excused" from any requirement to document a license.

With respect to bartering, the Subsistence Claimant definition makes clear that individuals who "fish *or hunt* to . . . barter . . . or trade Gulf of Mexico natural resources (*including* Seafood and *Game*)" may receive compensation for their losses.  *See* Exhibit 9, Section A.2 (emphasis added).  Sections 1.3.1.3,[5] 5.4,[6] and 38.138[7] likewise recognize the validity of Subsistence Claims based on bartering of Game.  *See also* Exhibit 9, Section B.2. Accordingly, the relevant inquiry is simply whether the catch or harvest that is used to support the Claimant and/or his or her family through barter (as opposed to direct consumption) is covered within Section B.2 of Exhibit 9 if the claimant only has a recreational license.[8]  Plainly, the "quantity of natural resources" compensable under Section B.2 includes bartered Game, and Policy 484 appears to acknowledge that the Subsistence framework contemplates compensation for such losses.[9]

---

[2] Robert Gramling et al., *Subsistence Use and Value: The Sharing, Distribution and Exchange of Wetland Resources Among Households in Coastal Communities*, University of Louisiana at Lafayette, at 3-4 (explaining that "'everyone knows' that subsistence use of resources in coastal Louisiana is wide spread").

[3] Agreement, Exhibit 9 n. 2 (Framework for Subsistence Claims).

[4] As we understand Proposed Reissued Policy 484, it does not question the legality of subsistence-bartering claims by individuals with commercial fishing licenses.

[5] Defining the "Subsistence Damage Category" to include "Damages suffered by Natural Persons who fish or hunt to harvest, catch, barter, consume, or trade Gulf of Mexico natural resources, including Seafood and Game, in a traditional or customary manner, to sustain their basic or family dietary, economic, security, shelter, tool or clothing needs, and who relied upon Subsistence resources that were diminished or restricted in the geographic region used by the Claimant due to or resulting from the Deepwater Horizon Incident."

[6] Referencing Subsistence Claim framework as inclusive of "Claims by Subsistence Claimants who fish or hunt to . . . barter . . . Gulf of Mexico natural resources (including Seafood and Game).

[7] "Subsistence shall mean fishing or hunting to harvest, catch barter, consume or trade Gulf of Mexico natural resources (including Seafood and Game), in a traditional or customary manner, to sustain basic personal or family dietary, economic security, shelter, tool, or clothing needs."

[8] Section B.2 provides that compensation for lost natural resources "will include quantities of natural resources given to members of [a] Claimant's extended family unit for their personal consumption or for purposes of barter."

[9] Policy Announcement, *supra*, at 1; Reissued Policy Announcement, *supra*, at 1.

The initial Policy Announcement cites perceived "conflicts between the selected state law provisions and the terms of Settlement Agreement" as the impetus for the request for input and resulting policy.[10]  Respectfully, remedying perceived conflicts between the Agreement and state wildlife regulations is outside the authority of the Claims Administrator.  The Claims Administrator also lacks authority to unilaterally alter the affidavit required of Subsistence Claimants in response to BP's changed view of Subsistence Claims.  Under Exhibit 9, Section 4.a, the "Parties shall collaborate on a form affidavit for Subsistence Claimants, which shall be subject to approval by the Claims Administrator Panel."

Policy 484 cites the Claims Administrator's "supervision and oversight" responsibilities in support of the new requirements as the Claims Administrator "shall implement the terms of the Settlement Agreement."[11]  These responsibilities, however, do not allow modification of the Settlement Agreement's terms. Rather, the Claims Administrator must apply the Subsistence Claims framework as written.  Similarly, Section C.4 of Exhibit 9 does not authorize the imposition of Policy 484's new documentation requirements; that provision permits the request of additional documents only *after* an interview and is intended to account for individualized circumstances in which the interview generates suspicion or confusion.

Moreover, the Claims Processes were intended to be objective, transparent, and Claimant-friendly.[12]  Subsistence Claimants lack the resources of sophisticated businesses and may have difficulty with the legal citations called for under Policy 484.  In addition, Policy 484 does not disclose how the CADA will determine whether a particular Claimant's bartering was "legal."  It is also unclear whether the individuals making the CADA Team's determination would be attorneys equipped to interpret the patchwork of state, federal, and tribal wildlife laws contemplated by Policy 484.[13]

BP could have insisted on making compliance with Policy 484's interpretation of State Law a condition of compensation under the Agreement.  It declined to do so.  Instead, the Parties negotiated sufficient documentation (and other measures) to ensure that Subsistence Claimants subject to licensing requirements made a good faith effort to obtain appropriate licenses.  They also recognized that some Subsistence Claimants, such as Deckhands who lack formal commercial fishing licenses but are permitted to barter their portion of the Seafood caught under the commercial license held by the vessel own or operator, should be considered excused from licensing requirements.   At no time during the negotiation process did BP suggest that

---

[10] Policy Announcement, *supra*, at 1.

[11] Agreement, Section 4.3.10.

[12]  The GCCF received thousands of subsistence claims, but payment of these claims was frustrated by difficulties in documenting this type of loss.  The Parties intended Exhibit 9 to avoid the problems encountered with GCCF.

[13] Policy 484 purports to interpret nuanced areas of wildlife law and regulation across the Gulf region.  While there may perhaps be some legal authority to call into question the ability of Claimants to barter certain catch, there may also be contrary authority, and the relevant States may not interpret their laws in the same manner as the Settlement Program.  By way of example, Exhibit A to Policy 484 references a regulation of the Mississippi Department of Natural Resources prohibiting bartering of seafood caught by a "recreational fisherman."  This provision does not appear aimed at subsistence use, and like Exhibit 9, it may well distinguish between recreational fisherman who fish for pleasure, and subsistence fisherman holding recreational licensees.

compensation for Subsistence Claims must adhere to State Law requirements of Louisiana, Alabama, Florida, Mississippi, and/or Texas as provided under Policy 484.  Moreover, there may be Subsistence Claimants who are citizens of recognized Indian Tribes and not subject to State Laws, under the Supremacy Clause.

Class Counsel respectfully maintain that it is not the obligation nor the role of the Settlement Program to enforce what it perceives to be State Law.  It is the prerogative of the States to determine how their laws will be interpreted and applied, including the officers, agents or other employees to whom they will grant standing to enforce their laws, as well as the manner and basis upon which they will be applied.  No such authority has been granted the Settlement Program.  Indeed, well-intentioned but overzealous enforcement efforts may frustrate State policy.  Mississippi, for example, recognizes "[h]unting, trapping, and fishing" as "vital parts of the heritage of the State."  Miss. Code Ann. § 49-7-1.1 (2013).  It is therefore the public policy of the State to promote and preserve such activities.  *Id.*  Throughout the Gulf Coast Areas, State authorities have not undertaken to enforce their laws in a manner that would chill subsistence activities, which play an important role in the history, culture, and economy of the region.

Finally, Section 36.1 of the Agreement directs that its terms be interpreted in a manner consistent with the Oil Pollution Act of 1990 ("OPA").  OPA, in turn, specifically recognizes a claim for subsistence loss.  *See* 33 U.S.C. § 2702(b)(2)(C) (providing for damages for lost subsistence use of natural resources "without regard to the ownership or management of the resources").

Had the Subsistence Claims resolved by the Agreement been litigated, questions such as those raised by the Claims Administrator's August 7, 2013 Request for Input might have been raised by BP as a defense.  The compensation for Subsistence Claims under the agreed terms set forth in Exhibit 9 presumably takes into account such risks.

It is unclear, however, that such a defense would pose much legitimate concern, as it would be grounded in equity, not OPA.  To seek equity, one must have clean hands.  And BP, of course, cannot be considered a shining example of regulatory compliance.