# MEMORANDUM

**To:** Claims Administrator

**From:** Class Counsel

**Re:** Subsistence Claims: Fishing or Hunting Area Impairment
*Policy No. 316 (v4)*

**Date:** November 19, 2013

      In response to proposed Subsistence Policy No. 316 (v4), Class Counsel respectfully request that the Settlement Program adopt a policy that eliminates a subjective application of the Settlement by claimant and ensures a fair and orderly resolution of subsistence claims. The Settlement Program has predictably struggled with processing subsistence claims because no objective policy exists to guide the evaluation of subsistence "impairment" claims. Class Counsel respectfully suggest that the Settlement Program institute a more claimant-friendly, objective and consistent approach by instituting a presumed (although rebuttable) sphere of "impairment" policy in both duration and location, separate and distinct from fishing closures, that more fairly compensates Claimants as the Settlement intends.

      A subsistence claimant, in part, is one that "relied upon subsistence resources that were **diminished _or_ restricted** in the geographic region used by the claimant **due to _or_ resulting from** the DWH Spill." See Ex. 9, ¶ A 2. As such, a subsistence claimant can a present a claim as broadly defined by the Settlement Agreement if his resources were "diminished" – even if his grounds were not closed ("diminished" vs. "restricted") or oiled ("due to" as opposed to "result from"). Indeed, impairment is a separate, compensable claim from a closure:

> "Identify the time period of loss of subsistence use with the **closure _or_ impairment** of geographic areas relied upon by the Claimant between April 20, 2010 and December 31, 2011." Id. at ¶ B 1

> ***

> "Length of time that fishing or hunting areas were closed _or_ impaired as a result of the spill." Id. at ¶ C 3.

      The Settlement's language intentionally lists "impairment" and "closures" as *separate* methods to prove loss. Thus "impairment" of a fishing or hunting location cannot and must not be interpreted as synonymous with "closure" of that location. Just because a claimant's subsistence impairment occurred beyond the time period or geographic expanse of a closure does not mean the impairment did not occur.

Further, the Facility is required to confirm subsistence claims based on "closure maps" and "**other relevant reports,**" Id. at ¶ C 3(a), which plainly intends to include evidence beyond closures.

The following examples illustrate why impairment to fishing grounds can reasonably exist well beyond the geographic or time period limitations of fishing closures:

- Sea creatures are constantly migrating throughout the Gulf of Mexico[1], and there is no reason to believe that contaminated sea creatures did not do the same thing. Sea creatures are not restricted by the time period duration or geographical limit of a fishing closure.

- Reports of deformed, sick fish throughout the Gulf of Mexico,[2] as well as studies that show "exposure long after the oil spill disappeared [from the water]"[3] indicate that areas remained impaired by the Spill outside of the time and geographical limits of the closures.

- Reports suggesting that lethal bacteria still exists in weathered oil – even after fishing closures have been lifted.[4]

- Reports suggesting that shorelines and waters continue to be oiled – even after fishing closures have been lifted.[5]

---

[1] For example, see http://www.gtopppublications.org/repository/195_06-30-11_Teo_etal_2006_ABFT_GOM.pdf,; http://www.nwrc.usgs.gov/wdb/pub/species_profiles/82_11-030.pdf (Finding that flounder movements can be as far as 18 kilometers); http://www.sciencedaily.com/releases/2010/05/100528210726.htm and http://www.tagagiant.org/science/atlantic-ocean (Finding that tuna species migrate over an expansive region, and that yellowfin tuna are "more widely distributed throughout the warm Gulf waters.").

[2] See Gulf Seafood Deformities Alarm Scientists, April 20, 2012, http://www.aljazeera.com/indepth/features/2012/04/201241682318260912.html (Report notes that "Eyeless shrimp and fish with lesions are becoming common, with BP oil pollution believed to be the likely cause.").

[3] "Study:  Gulf oil spill is sickening fish vital to seafood industry", May 2, 2013, http://articles.latimes.com/2013/may/02/science/la-sci-sn-gulf-oil-spill-fish-20130502; "Scientists, fishermen worried about sick fish caught near oil spill 2 years after Gulf disaster", April 19, 2012, http://www.syracuse.com/news/index.ssf/2012/04/scientists_fishermen_worried_a.html
.
[4] See "Flesh Eating Bacteria Tied to BP Oil Spill Tar Balls", Nov. 7, 2013, http://www.wkrg.com/story/23905999/flesh-eating-bacteria-tied-to-bp-oil-spill-tar-balls; Study:  Tar Balls Found in Gulf Teeming with 'Flesh Eating' Bacteria, November 12, 2013, http://www.chron.com/news/houston-texas/houston/article/Study-Tar-balls-found-after-BP-oil-spill-teeming-4977264.php.

[5] See "BP Oil Spill's Sticky Remnants Wash Up Sporadically on Gulf Beaches, March 22, 2012, http://news.nationalgeographic.com/news/energy/2012/03/120322-gulf-oil-spill-tar-balls-wash-up-on-beaches/ ("We don't fully understand what all the impacts of the oil may be … It's a contaminant and we want to remove as much of it as possible from the refuge…"); "La. officials close 12 miles of coastline after Isaac washes up tar balls, oil from BP hotspot", September 4, 2012, http://www.nola.com/hurricane/index.ssf/2012/09/la_officials_close_12_miles_of.html (in September 2012, La. officials closed 12 miles of coastline after Isaac washes up tar balls, oil from BP spill hotspot); "Gulf Oil Spill Cleanup Ends as BP Pulls Out, Leaves Unanswered Questions," June 16, 2013, http://www.huffingtonpost.com/2013/06/16/gulf-oil-spill-cleanup_n_3451488.html (Noting that "government reports, even in 2013, continue to "show that patches of tar balls … are still reported almost daily in or near popular spots like Gulf Shores and Pensacola Beach, Florida.").

- Reports suggesting that the oyster industry had still not recovered in 2012 from the oil spill.[6]

- Reports showing that the impacts of unprecedented Corexit use to combat the spill is still a legitimate concern to scientists and residents in the Gulf of Mexico.[7] One study showed that "levels of hydrocarbons in seafood were up to 3,000 times higher than safety thresholds for human consumption … Concentrations in biota [i.e., all marine life] samples were even greater." *Id.*

Proposed Policy No. 316 (v4) suggests that the only way a claimant can prove that his or her subsistence time of impairment is compensable beyond the fishing closure time period on the grounds that the seafood was unsafe or contaminated would be if the claimant can provide actual, extrinsic evidence supporting this fact. This is contrary to the language and intent of the Settlement, which, as a "claimant-friendly" process, contemplates accepting the claimant's allegations of impairment as true, absent some compelling evidence to the contrary.

Rather than requiring the claimant to initially prove impairment, Class Counsel believe that the Settlement Program can determine impairment objectively with the assistance of both parties – thereby eliminating the time-consuming process of determining impairment to fishing grounds, claimant by claimant. Aside from the time-consuming and unpredictable process that currently exists, the Program's proposed policy unfairly places the burden of proof on the claimant (who, based on the nature of subsistence claims, could very well be a *pro se* claimant), and putting him or her in the untenable position of fact-finder for information beyond his or her reach.

Instead, the determination of the "sphere of impairment" must be based not only on the location and duration of fishing closures, but also on reports and studies that identify impairment, or present reasonable concern for impairment in a certain area. In such an instance, a subsistence claimant can prove damage (along with information regarding his normal consumption rates) by showing that his fishing grounds exist within the "sphere of impairment".

The following considerations weigh in favor of establishing a more expansive, reasonable "sphere of impairment" for subsistence claimants:

- A claimant that supplements his subsistence diet from the same fishing grounds as another claimant can prove his "impairment" loss because he has access to certain information, while the other claimant that suffered the same "impairment", but is incapable of locating the before-stated data, goes uncompensated. For subsistence claimants, this a real possibility,

---

[6] "No Sign of Oyster Recovery Two Years After BP Oil Spill," March 30, 2012, http://www.foodsafetynews.com/2012/03/no-sign-of-oyster-recovery-two-years-after-bp-oil-spill/#.UoaorFTnbL8

[7] "Corexit, Oil Dispersant Used by BP, Is Destroying Gulf Marine Life, Scientist Say, April 25, 2013, http://www.huffingtonpost.com/2013/04/25/corexit-bp-oil-dispersant_n_3157080.html (On the fact that divers taking samples were sickened "If we are getting sick, then you know the marine life out in the Gulf is too.").

considering many are unrepresented and do not have access to a computer or the internet to locate "actual", "objective" information. Regardless of the "objective" language identified, the result is actually a subjective application, whereby some deserving claimants are compensated while others are not, simply on the basis of their access to information – information which is likely already in the possession of the Settlement Program.

- Under the Seafood Compensation methodology, many of the same claimants that can present a compensable claim for a lost seafood harvest in 2010 due to an impairment of fishing grounds cannot prove a claim under the Facility's rigorous subsistence interpretation. It is expected that many, if not most, commercial fishermen will also be subsistence claimants simply because they consume a portion of their harvest for subsistence purposes. It is completely reasonable to assume that impairment to the commercial fishing season, regardless of whether fishing closures existed or not, will directly implicate subsistence fishermen that are also commercial fishermen.

- Even given the uncertainty created by the unprecedented use of chemical dispersant and the largest oil spill in United States history, the policy assumes that a claimant responsible for feeding his family is unreasonable in believing that Gulf Seafood harvested in close proximity and time to oil spill closures is unsafe.

While Class Counsel defer to the Claims Administrator in adjudicating these claims, we respectfully believe that additional guidance, consistent with the Settlement Agreement's spirit and intent, must be given to subsistence claimants (and Settlement Program personnel) to ensure the orderly and efficient processing of subsistence "impairment" claims.