# MEMORANDUM

**To**:   Patrick A. Juneau, Esq.
         Claims Administrator

**From**: Class Counsel

**Re**:   Response to January 11th Request for Positions of the Parties on Policy Issues

**Date**: January 19, 2013

### 1. Seafood Program: Calculation of Boat Captain Income on Claims by Owner/Operators

Class Counsel agrees with the Claims Administrator that the claimant who is a Boat Owner or Lessee and also serves as the Boat Captain for that boat, or for another boat, would have two separate compensable claims.

Class Counsel disagree on how those claims should be calculated.

The Settlement Agreement provides a detailed process that was discussed by the parties, but ultimately decided by the Seafood Neutral.

It appears that the Claims Administrator understands the Seafood Compensation Program as written, but believes that it provides an inappropriate compensation level to Boat Captains under the circumstances of joint ownership and operation by the same claimant. This limits the options expressly provided by the Court-Appointed Seafood Neutral after careful deliberation.

There is nothing in the Seafood Compensation Program which limits the use of the Federal Tax Returns and Schedules to only those Boat Captains who were operating a separate vessel. The methodology that is provided for Class Members who are Boat Captains applies whether they own the vessel they were operating or were operating a separately owned vessel. The position set forth by the Claims Administrator in the January 11th Memo would limit the optionality provided by the Seafood Neutral and the Settlement Agreement, at least as to some Class Members.

More importantly, however, the Claims Administrator's interpretation appears to misunderstand the Seafood Compensation Program and how it was designed. Boat Owner claims do not use actual vessel loss profits as their Benchmark measurement. Rather, the Seafood Compensation Program was purposefully designed to apply a constant variable cost for all Boat Owners, resulting in a uniform profit rate of 88%. Whether this rate is too high or too low for a given vessel is immaterial. It was determined by the Seafood Neutral to be the fairest and best approach to be taken, in light of all the facts and circumstances considered.

If the Claims Administrator were to now use that profit level and assume it was the actual performance for a given vessel, it would substantially penalize the Boat Captain for his revenue. In order to avoid this, the Seafood Neutral developed a process that specifically

allowed the Boat Captain to avoid a uniform deduction, and to rely on his tax returns to establish the claim.  In relying on their tax returns, Lines 29/28/36 are the applicable values.  Class Counsel believe the Seafood Compensation Program is unambiguous, and that Boat Captains should have their losses calculated using their Federal Tax Returns if that is the option they choose.

## 2. Economic Loss Claims:  The Appropriate RTP for Primary Seafood Processors

The Settlement Agreement provides that "businesses satisfying the Primary Seafood Processor Definition in the Seafood Distribution Chain Definitions who process Shrimp/Crab/Oyster and are located in Zone A, Zone B, Zone C or Zone D," receive an RTP of 3.  (Exhibit 15 of the Settlement Agreement.)  In the alternative, those who "process seafood other than Shrimp/Crab/Oyster and are located in Zone A, Zone B, Zone C or Zone D," receive an RTP of 2.25.

Nowhere in this language does it state or imply that a Primary Seafood Processor must be exclusively engaged in the processing of Shrimp/Crab/Oyster to receive the RTP of 3.  Nor does this language state or imply that a Primary Seafood Processor who processes a combination of Shrimp/Crab/Oyster and Other seafood is to by default receive an RTP of 2.25.

Adherence to an "exclusivity" test would not reflect what goes on in the real world, and is inconsistent with Section 4.3.8 of the Settlement Agreement.

Many processors who primarily depend on shrimp, crabs, and oysters for their livelihood would be unfairly penalized under this type of rigid analysis, which is not dictated by the Settlement Agreement nor the Notice that was provided to the Class.

If a "1% rule" were to be applied, it should be applied in the claimant's favor: Namely, the processing of *any* Shrimp, Crabs or Oysters should result in the higher RTP.

Nevertheless, it would likely be reasonable for the Claims Administrator to take an approach similar to the one recently adopted with respect to the "Tourism" definition.

The characterization of a Primary Seafood Processor as one who processes Shrimp/Crab/Oyster versus Other seafood should be based on the totality of the circumstances, including a consideration of the type, volume and revenue derived from seafood primarily processed by a particular claimant during the Benchmark Period.

This type of case-by-case analysis based on documented production and sales activity during the Benchmark Period would allow the Claims Administrator to more reasonably determine the appropriate RTP as contemplated by the Settlement Agreement.

Class Counsel would strongly urge the Claims Administrator to allocate the claim when possible, applying an appropriate RTP to the particular percentage of earnings.  However, to the extent that this is administratively burdensome or impractical, the Claims Administrator should make the decision based on available documentation, and perhaps create a Sworn Written Statement

that provides additional information on the amount and type of seafood processed in the event this type of information is not kept and discernable from the ordinary business records.

To the extent the Shrimp/Crab/Oyster processing compensation can be segregated from the Other compensation, the Claimant should, at the very least, receive an RTP of 3 on the compensation allocated to Shrimp/Crab/Oyster.  To the extent it can't be allocated, a Primary Seafood Processor that primarily processes Shrimp, Crabs and/or Oysters, under the totality of the circumstances, should receive an RTP of 3.

*3. Business Economic Loss Claims: Partial Year Step 2 Compensation*

Class Counsel would begin their response to this question by again referring the Claims Administrator to Section 4.3.8 of the Settlement Agreement which places a duty on the Claims Administrator to maximize the claimant's recovery.  In that regard, Class Counsel believes the appropriate answer to the question is to use Scenario 1 as the appropriate methodology.  The use of Scenario 1 abides by the Settlement Agreement by including all months in each Benchmark Year in the calculation of the Step 2 process just as it does in calculation of the Step 1 process.  If the Claims Administrator uses anything but Scenario 1, it is writing into the Settlement Agreement new options for the Benchmark selection.  While there may logically be a reason to write such an option in for the rare instance where there is no revenue production in one or more months between January and April of 2007 in the Benchmark Year, there would be no equitable basis to not allow for that same optionality in dealing with Step 2 by another claimant in another claim.  BP or the Claims Administrator may find it logical to exclude for purposes of Step 1 calculation 2007 and use only 2008 and 2009, however a claimant who wants to use August, September, and October as his Benchmark Months but wants to exclude 2009 because in 2009 in September and October his business was undergoing substantial repairs and he had limited or no income, should be allowed that same optionality, using only 2007 and 2008.  To change the interpretation of the Settlement Agreement to do anything other than apply Scenario 1 would result in the need to allow the same optionality throughout the Class.

Class Counsel would further point out that the application of Scenario 2 or Scenario 3 deprives the Class Member from ever using the negotiated Growth Rate of up to 10%, which again is not provided for anywhere in the Settlement Agreement.

*4. Business Economic Loss Claims:  Customer Mix Test*

Class Counsel will continue to work with Judge Shushan to attempt to obtain access to credit card information from representative major banks and credit card companies, which would go a long way towards assisting both Claimants and the Program in applying the Customer Mix Test.

In the meantime, Class Counsel would invite the Claims Administrator to focus in more detail on the Customer Mix Test not only with respect to questions raised in the January 11th Memorandum, but to also address other Customer Mix questions that have been raised, which include, for expample:

> There are many Class Members that have the Modified V or Downturn Only, but do not have a blend of customers that fall into the "local" and "non-local" category. By way of example, if I am a rental property manager of 20 independent standing rental properties on Destin Beach, are my customers viewed as the owners of the property with the Zone following the property (*i.e.* they are all in Zone A), or are my customers the renters of the properties, which in all probability render them Zone D or outside of the Gulf Coast Area entirely? Under these circumstances, there is no comparative basis available.

Class Counsel have numerous other examples of how the Customer Mix Test creates significant obstacles as a matter of administration, and should be the subject of further discussions with the Claims Administrator and BP.

Addressing the specific examples that are given by the Claims Administrator in Question 4, Class Counsel would respond as follows:

a. The Claims Administrator and Claims Center is going to have to assist in every way possible in the gathering of the necessary records.

b. The Claims Administrator has to apply the test in the way most beneficial to the claimant. In the BEL Claims from claimants that do not have access to addresses, the Claims Administrator must allow the best evidence to be used including affidavits from the claimants as to their blend of customers.

c. In example 2(a) and 2(b) the claimant should have the option of choosing to either use the address of the physical location of the customer's headquarters or the location of the construction site in order to maximize their recovery.

d. In question (3) the completion of a contract should not be interpreted as the loss of a customer.

*5.Economic Loss Claims:  Appropriate Treatment of Revenues for Clean Up Activities*

Class Counsel would answer Question No. 1: Yes.  The answer to Question No. 2 would be to exclude the revenue from Actual Earnings.  The answer to Question No. 3 would be:  Yes, and the offset should be based on a gross profit calculation.