

# MEMORANDUM

**TO:** Class Counsel
BP

**FROM:** Patrick A. Juneau, Claims Administrator

**DATE:** January 11, 2013

**RE:** Request for the Positions of the Parties on Policy Issues Affecting Claims Administration

---

The Claims Administrator requests input from the Parties on their positions on the following issues, with citations to the provisions of the Settlement Agreement on which such positions are based, within seven days from the date of this memo. After receiving that input, the Claims Administrator will inform the Parties of the policy he has adopted on the issue.

**1.** *Seafood Program: Calculation of Boat Captain Income on Claims by Owner/Operators.*

Under Exhibit 10, Class Members who owned and captained their own vessel ("owner/operators") during the qualifying time period have both (1) a Vessel Owner and (2) a Boat Captain claim in the Seafood Compensation Program.[1]  The Historical Revenue Compensation Method, which is available for all of the Seafood species types, uses revenues in past Benchmark Years to calculate an award amount that differs by operator type.

Vessel Owners/Lessees may submit trip tickets or tax returns to establish a vessel's gross revenues in past Benchmark Years. (*See*, *e.g.*, Ex. 10 at 45-46.) Exhibit 10 reduces that gross revenue by a "Cost Percentage" reflecting the "standard industry non-labor variable costs" associated with operating the vessel. (*See*, *e.g.*, Ex. 10 at 47.) Exhibit 10 applies a Loss Percentage to that net revenue number (s*ee*, *e.g.*, Ex. 10 at 48) and then multiplies the remainder by a set Owner Share percentage to derive the vessel owner's share of the vessel's revenues as profits. (*See*, *e.g.*, Ex. 10 at 47.)  The RTP applies to that resulting number to calculate the compensation amount.

Boat Captains may submit either (1) trip tickets or their equivalent or (2) tax records and other documentation sufficient to establish catch type-specific revenue earned on a vessel-specific basis in the Gulf Coast Areas. (*See*, *e.g.*, Ex. 10 at 46-47.) On claims with trip tickets or their equivalent, Exhibit 10 derives the Boat Captain's share of those gross by the same Cost

---

[1] Vessel owners or lessees can assert such a claim. In this memo, for the sake of simplicity, we use the term "Vessel Owner" also to include claimants who lease the vessel.

1

DEEPWATER HORIZON
CLAIMS CENTER
ECONOMIC & PROPERTY DAMAGE CLAIMS

Percentage applied to Vessel Owners. (*See*, *e.g.*, Ex. 10 at 47.) It then applies the Loss Percentage to that net revenue number and multiplies the remainder by a set Captain Share percentage (which is lower than the Owner Share percentage) to derive the Boat Captain's share of the vessel's revenues as profits. (*See*, *e.g.*, Ex. 10 at 48.) The Boat Captain RTP applies to the resulting number to calculate the payment amount. (*See*, *e.g.*, Ex. 10 at 48-49.)

On claims from Boat Captains who submit tax returns to support their claims, we may receive a Schedule C compiled by the Vessel Owner. (*See*, *e.g.*, Ex. 10 at 47 ("The Claims Administrator may determine the gross vessel revenue for Boat Captain earnings from finfish landings in the Gulf Coast Areas based on . . . financial information.") Line 1 in the Schedule C for a Vessel Owner shows the gross revenues of the vessel. In those gross revenue situations, we apply the Cost Percentage, Loss Percentage and Boat Captain's share steps described above, using the Line 1 gross revenues.

If the Boat Captain submits his personal tax returns with a W-2 (or, in some instances, his own Schedule C that shows only his or her individual personal income from the vessel, rather than the gross revenues of the vessel), Exhibit 10 does not apply a Cost Percentage to Boat Captain's tax return earnings. (*See*, *e.g.*, Ex. 10 at 47 ("If the Claimant is a Boat Captain and Benchmark Revenue was calculated *based upon his earnings*, such as from tax returns or financial information, then no Finfish Cost Percentage is applied, skip to step 3.") (emphasis added).) Exhibit 10 applies the Loss Percentage to those personal earnings to derive a net number to multiply by the RTP to calculate the claimant's award. (*See*, *e.g.*, Ex. 10 at 48.) In this scenario, there is no Boat Captain Share step, for we are using the known income of the Boat Captain.

This inquiry to the Parties arises when the Boat Captain claimant was not employed by a Vessel Owner/Lessee, but rather owned (or leased) the vessel on which he served as captain and thus was an owner/operator. We consider such a claimant to have two compensable claims—one as the Vessel Owner, and a separate one as the Boat Captain.

We handle the owner/operator's claim as Vessel Owner in the same manner as any Vessel Owner as described above. Also, if the claimant submits trip tickets or their equivalent on the Boat Captain claim, the Program follows the same steps outlined above for a Boat Captain claim by someone who is not an owner/operator.

The question arises when an owner/operator claimant submits a Schedule C to report the revenues, expenses and net profit of the vessel the claimant both owns and captains. Line 1 of a Schedule C shows "[g]ross receipts or sales" from that tax year. Line 29 of Schedule C, on the other hand, shows "[t]entative profit (or loss)," meaning all profit or loss after the expenses shown in the Schedule C (other than Line 30's exclusion of expenses resulting from the business use of one's home). For an owner/operator, Line 29 reflects both the vessel's profit and the Boat Captain's profit from operating the vessel. That Line 29 profit has not been reduced by above-the-line Boat Captain labor expenses because the owner captained his own vessel.

When a claimant who is both Boat Captain and Vessel Owner has submitted a Schedule C to support the Boat Captain claim, we use the gross revenues in Line 1 of the



Schedule C and then apply the Exhibit 10 Cost Percentage, the Loss Percentage and the Boat Captain share set by Exhibit 10 to derive the number multiplied by the RTP to get the award amount. We treat it the same as any Boat Captain who submits a Schedule C showing gross revenues for a vessel. One law firm has questioned that approach and asked why we do not use the Schedule C Line 29 net profits number on the Boat Captain claim of an owner/operator, rather than the Line 1 gross revenue number.

We do not use the Line 29 net vessel profits number in that situation because doing so would allocate 100% of the vessel's profit to the Boat Captain claim. That would mean that as Vessel Owner, the claimant had no income from the same vessel, which in turn would mean that the claimant could not be paid for lost income on a Vessel Owner claim. Using the Line 29 net profits number on the Boat Captain claim, while still paying the same claimant on a Vessel Owner claim, would double count a portion of the claimant's income by assuming a Vessel Owner share of profits on the Vessel Owner claim but then assuming there was no Vessel Owner share of profits on the Boat Captain claim.

While the Line 29 method would result in a higher payment on the Boat Captain claim than the Line 1 method, it would eliminate the premise for the claimant receiving any payment on the Vessel Owner claim by artificially assuming that the Vessel Owner had no share of the vessel's profits. Owner/operator claimants will receive greater total compensation from being paid on both a Vessel Owner claim and a Boat Captain claim, rather than being paid only on a Boat Captain claim. Using the Line 29 method on the Boat Captain claim would seem to preclude payment on the Vessel Owner claim. The Claims Administrator asks for the Parties' views on whether gross revenues in Line 1 or net profits in Line 29 of a Schedule C should be used to evaluate the Boat Captain claim of a claimant who is also the vessel owner/lessee.

2. *Economic Loss Claims: The Appropriate RTP for Primary Seafood Processors.*

Exhibit 15 to the Settlement Agreement states that an RTP of 3.00 applies to "businesses satisfying the Primary Seafood Processor Definition in the Seafood Distribution Chain Definitions who process Shrimp/Crab/Oyster and are located in Zone A, Zone B, Zone C or Zone D." It then provides that an RTP of 2.25 applies to "businesses satisfying the Primary Seafood Processor Definition in the Seafood Distribution Chain Definitions who process seafood other than Shrimp/Crab/Oyster and are located in Zone A, Zone B, Zone C or Zone D."

We have encountered businesses in these Zones satisfying the Primary Seafood Processor Definition in the Seafood Distribution Chain Definition who process Shrimp/Crab/Oyster and also process seafood other than Shrimp/Crab/Oyster. The Claims Administrator seeks input from the Parties on what RTP is to be applied to such businesses.

3. *Business Economic Loss Claims: Partial Year Step 2 Compensation.*

Exhibit 4C of the Settlement Agreement details the framework for the calculation of Step 1 and Step 2 Compensation for Business Economic Loss claims. However, the Settlement Agreement does not address BEL claims with a partial year start date that do not qualify as Start-Up or Failed Business claims. In a scenario in which the business began earning revenue in

3

417137



April 2007 and the 2007/2008/2009 Benchmark Period results in the larger Step 1 Compensation, the Claims Administrator seeks input from the Parties on how the Settlement Program is to calculate Step 2 Compensation.  The calculations in Attachment A set forth a number of scenarios to illustrate this issue:

> Scenario 1:  If you assume that the period of January-April 2007 (pre-operating period) included zero revenue and that claimant's Benchmark Period is 2007/2008/2009, the resulting Step 1 and Step 2 Compensation would be as follows:
>
> Step 1 = $23,302.14
> Step 2 = $11,866.46 (Claimant Specific Factor plus General Adjustment Factor = 12%)
>
> Scenario 2:  If you assume that the claimant can use the 2007/2008/2009 Benchmark Period, but the claimant would be limited to only the 2% General Adjustment Factor because the claimant did not earn any revenue during the January-April 2007 period, the resulting Step 1 and Step 2 Compensation would be as follows:
>
> Step 1 = $23,302.14
> Step 2 = $3,286.92 (Claimant Specific Factor plus General Adjustment Factor = 2%)
>
> Scenario 3:  If the claimant were limited to the 2% General Adjustment Factor, in this scenario, the claimant would be better off using a 2008/2009 Benchmark Period and the Step 1 and Step 2 Compensation would be as follows:
>
> Step 1 = $23,275.34
> Step 2 = $4,958.68 (Claimant Specific Factor plus General Adjustment Factor = 4.58%)

**4.**     *Business Economic Loss Claims:  Customer Mix Test.*

Exhibit 4B of the Settlement Agreement provides that one of the ways claimants with BEL claims can establish Causation is by satisfying what is referred to in Exhibits B and C as the Customer Mix Test, together with other requirements.  The Customer Mix Test requires the claimant to demonstrate:

> A decline of 10% in the share of total revenue generated by non-local customers[2] over the same period of three consecutive months from May-December 2010 as selected by the claimant for the applicable Revenue Pattern test compared to the same three consecutive month periods in 2009; OR
>
> For business claimants that have customers in Zones A-C, the claimant demonstrates a decline of 10% in the share of total revenue generated by customers located in Zones A-C over the same period of the three consecutive months from May-December 2010 as selected by the claimant for the applicable Revenue Pattern test compared to the same three consecutive month period in 2009.

---

[2] A non-local customer is defined as one that resides more than 60 miles from a claimant's business location.

4

417137



The Settlement Agreement states that the claimant may submit the following types of documents to establish the required revenue decline:

(a) Customer credit card receipts or other contemporaneously maintained records of payment;

(b) Customer registration logs (*e.g.*, hotel registries);

(c) Documentation maintained in the ordinary course of business that lists customers by location and monthly sales associated with those customers; or

(d) Business documents reflecting contemporaneous recording of receipts or invoices listing customers by location.

The Claims Administrator seeks input from the Parties on how to apply the Customer Mix Test in the following scenarios:

(1) The Claims Administrator has observed that it is difficult or impossible for many Business Claimants to satisfy this test because they do not have documentation to show the addresses of their customers. This is particularly problematic for businesses that deal primarily in cash, which often do not have any of the types of documents specified in the above-referenced section of the Settlement Agreement. How should the Claims Administrator apply the Customer Mix Test to BEL Claims from claimants that do not have access to the addresses of their customers?

(2) Additionally, the Claims Administrator seeks guidance about how to determine a customer's address in certain situations when the claimant is not a retail business.

   (a) One example is a claimant in the construction industry. Would the address of the claimant's customers be the physical location of their headquarters or the location of the construction sites?

   (b) Another example is a claimant who is an owner of commercial property such as shopping malls. Would the address of this claimant's customers be the physical location of the Headquarters of each retailer or the location of the leased space within the shopping mall?

(3) Finally, the Claims Administrator has questions about completed contracts from project-based entities such as construction companies, and whether the completion of these contracts constitutes the loss of customers. The Customer Mix test compares revenue generated in post-Spill months of 2010 with revenue generated in the same months in 2009. Project-based businesses such as construction companies expect to complete contracts, and do not equate the completion of these contracts to the loss of customers. As such, how should the Program account for contracts completed in 2009 and 2010 when in applying the Customer Mix Test?

417137



     **5.**    *Economic Loss Claims: Appropriate Treatment of Revenues for Clean Up Activities.*

     Section II of Ex. 4C to the Settlement Agreement provides that "[f]or Claimants that participated in the VoO program, Variable Profit in the Compensation Period will exclude revenue generated or costs incurred in connection with the VoO." The Claims Administrator has encountered certain claimants that received payments to perform clean-up activities that were not part of the VoO program from BP or a contractor engaged by BP. The Claims Administrator seeks input from the Parties on these questions that the Claims Administrator has developed or has received from claimants affected by this issue:

(1) On BEL claims, are revenues and costs in connection with such clean-up activities are to be treated in the same manner as revenue generated or costs incurred in connection with the VoO?

(2) On IEL claims, are earnings in connection with such clean-up activities to be excluded from the calculation of Offsetting Earnings from Non-Claiming Jobs or from Actual Earnings during the Compensation Period?

(3) If the answer to Questions (1) and (2) are yes, then are payments or earnings from such clean-up activities to be treated instead as Spill-Related Payments to be deducted from any award to the claimant in the Program?

417137

## Attachment A

| | JANUARY | FEBRUARY | MARCH | APRIL | TOTAL | PRE-LOSS 4-MONTH TREND | GENERAL ADJ FACTOR | Adj. Claimant Specific Factor plus General Adj. Factor | | TOTAL May - Dec Benchmark Revenue | VARIABLE MARGIN % | Total Step 2 Comp |
|---|---|---|---|---|---|---|---|---|---|---|---|---|
| | | | | | | MAX = 10% MIN = 0% | ALWAYS 2% | | | | | |
| 2007 | N/A | N/A | N/A | $ 5,350.00 | $ 5,350.00 | | | | 2007 | $ 152,947.22 | | Step 2 Comp = (Incremental Revenue) X (Variable Margin %) |
| 2008 | $ 14,521.62 | $ 23,685.04 | $ 28,325.53 | $ 18,723.10 | $ 85,255.29 | | | | 2008 | $ 173,745.36 | | |
| 2009 | $ 24,518.76 | $ 21,117.19 | $ 25,625.78 | $ 20,431.22 | $ 91,692.95 | | | | 2009 | $ 166,346.14 | | |
| 2007-2009 | $ 13,013.46 | $ 14,934.08 | $ 17,983.77 | $ 14,834.77 | $ 60,766.08 | | | | AVG (07-09) | $ 164,346.24 | | |
| 2010 | $ 19,809.20 | $ 20,987.92 | $ 24,879.79 | $ 25,078.04 | $ 90,754.95 | 10.00% | 2.00% | 12.00% | X 12% | X 12% | 60.17% | |
| Growth Rate | 34.31% | 28.84% | 27.72% | 40.85% | 49.35% | | | | = Incremental Revenue | $ 19,721.55 | | $ 11,866.46 |
| 2008-2009 | $ 19,520.19 | $ 22,401.12 | $ 26,975.66 | $ 19,577.16 | $ 88,474.12 | | | | AVG (08-09) | $ 170,045.75 | | |
| 2010 | $ 19,809.20 | $ 20,987.92 | $ 24,879.79 | $ 25,078.04 | $ 90,754.95 | 2.58% | 2.00% | 4.58% | X 4.58% | X 4.58% | 63.67% | |
| Growth Rate | 1.46% | -6.73% | -8.42% | 21.94% | 2.58% | | | | = Incremental Revenue | $ 7,784.63 | | $ 4,956.47 |

7

417137