# MEMORANDUM

**To:** Patrick A. Juneau, Esq.
      Claims Administrator

**From:** Class Counsel

**Matter:** <u>In re: Deepwater Horizon</u>
          MDL No. 2179

**Re:** October 9th Request for Positions on Policy Issues

**Date:** October 11, 2012

      The following sets forth Class Counsel's response to the Claims Administrator's Request for the Positions of the Parties on Policy Issues Affecting Claims Administration dated October 9, 2012:

## 1. TREATMENT OF POTENTIAL MORATORIA LOSSES

      First, it is important to note that the Settlement Agreement establishes its own negotiated *sui generis* test for the definition of "Moratoria Losses".  By agreement of the parties, and for the purposes of this Settlement only, such losses are defined as a loss "caused by or resulting from federal regulatory action or inaction directed at offshore industry activity – including shallow water and deepwater activity – that occurred after May 28, 2010, including the federal moratoria...."

      This is completely separate from and independent of the legal test under OPA (to be applied outside of this Settlement) for any and all losses of income and/or earning capacity due to or resulting from the oil spill.

      For litigation purposes, Plaintiffs have taken and will continue to take the position that these are *not* mutually exclusive.

      To the contrary, we believe that virtually *all* of the damages that are sometimes referred to as "Moratorium claims" were *due to* and/or *resulting from* the BP Oil Spill, under OPA – irrespective of whether they may have also been "caused" (in whole or in part) by the Moratorium.

      With that background and clarification, Class Counsel address the treatment of potential "Moratoria Losses" as defined by and excluded under the Settlement Agreement:

**(1)**    **The General Tests for Separating Moratoria and Non-Moratoria Losses**

      As noted, the Settlement Agreement defines "Moratoria Loss" as:

> any loss whatsoever *caused by or resulting from* federal regulatory action or inaction directed at offshore oil industry activity – including shallow water and deepwater

activity -- that occurred after May 28, 2010, including the federal moratoria on offshore permitting and drilling activities imposed on May 28, 2010 and July 12, 2010 and new or revised safety rules, regulations, inspections or permitting practices.[1]

Hence, in order to exclude losses as "Moratoria Losses", the Program must conclude that such losses were "*caused by or resulting from*" some action or inaction of the Federal Government.

Additionally, Exhibit 16 provides that:

> In general, one of the parameters shall be that the Claims Administrator shall be directed to calculate the claimant's non-moratoria economic loss due to or resulting from the DWH Spill by isolating losses that occurred prior to imposition of the moratoria on May 28, 2010, and any continuation of such losses that might have been expected in the absence of the moratoria. The incremental impact of the moratoria on claimant's losses generally would not be recoverable in the settlement.

From this, four explicit guiding principles are derived:

1. Losses sustained before May 28, 2010 are fully compensable under the Settlement.

2. Where some loss was experienced between April 20, 2010 and May 28, 2010, it is expected that at least some of the post-May 28th loss would have continued even in the absence of the Moratoria.

3. Claimants performing work in phases of the offshore oil and gas industry that were not affected by Federal Government action or inaction following the DWH Spill should not have their losses deemed to be "Moratoria Losses."

4. Action (or inaction) of the Federal Government should only be applied to losses if such directives were in force at the time of the loss.

In applying the first principle: Where a claimant's Compensation Period includes the month of May, the difference in Variable Profit between May of the Compensation Period and the month(s) of May for the Benchmark Period can be multiplied by 0.90 to calculate the loss for 28 of 31 days in the month of May.[2] For example, assume that a Service & Support Claimant includes May as a compensable month. The Claimant has Variable Profits of $200,000 in May of 2009 and $100,000 in May of 2010. That difference/loss of $100,000 is multiplied by 0.90 to create a Step 1 Compensation amount of $90,000 for the month of May.

---

[1] Settlement Agreement, Section 38.93 and Exhibit 16, at p.1.

[2] 28 days divided by 31 days is 0.90322580645, which was rounded to 0.90

With respect to the consideration of whether the loss in question was "caused by or arising from" the Federal Government action defined in the Settlement Agreement, it is important to remember several things.

First, these actions/inactions did not take place at one moment in time, but rather, over a period of several months. Hence, actions taken by the government should only be applied to lessen, reduce, or otherwise affect losses sustained by the claimant after said action was actually taken (*e.g.,* a September 2010 order from the MMS should not affect a claimant's losses during July - August).

Second, in general terms, the actions of the Federal Government suspended and/or made more burdensome operations involving a blowout preventer ("BOP"). Several aspects of the offshore oil and gas industry were not affected by these Government directives: *e.g.* primarily completions, workovers, plug and abandonment. These phases of the industry occur after the BOP is removed and were not subjected to most of the new requirements nor were they suspended. For instance, if a company's only source of revenue is to place employees on production platforms, this work was not caused by or resulting from actions or inactions taken by the Federal Government in 2010. That company's loss, rather, was likely the result of business interruption otherwise caused by the spill, and, in any event, is fully compensable under the terms and framework of the Settlement Agreement.

A summary timeline of Federal Government directives follows, to provide further guidance:

| | | |
|---|---|---|
| May 28, 2010 | Salazar Memo | Six Month suspension of **(i)** new **(ii)** deepwater **(iii)** drilling operations. |
| May 30, 2010 | First Moratorium Order | |

Notably, the first Moratorium did not prohibit any shallow water (*i.e.* 500 feet or less) drilling operations, nor, with respect to deepwater operations: **(a)** Workover Operations; **(b)** Completion Operations; **(c)** Abandonment Operations; **(d)** Intervention (both Emergency and Non-Emergency); or **(e)** Waterflood, Gas Injection or Disposal Wells. Essentially, operations that did not involve a BOP (*i.e.,* where the BOP was already pulled) were not suspended or otherwise affected.

| | | |
|---|---|---|
| June 8, 2010 | MMS Order re BOP Certification | Required all operators on the Outer Continental Shelf to certify that they were knowledgeable of all operating regulations at 30 C.F.R. ¶50. |
| June 18, 2010 | BOEMRE Directive | Simply changed "worst case scenario" reporting requirements. |
| June 22, 2010 | EDLA Decision | Enjoining First Moratorium. |

July 12, 2010          Second Moratorium     Applied to drilling configurations and technologies, rather than "deepwater" drilling operations.

Notably, the Second Moratorium did *not* apply to:

> environment set forth in this memorandum have been sufficiently addressed. These suspensions do not apply to production activities; drilling operations that are necessary to conduct emergency activities, such as the drilling operations related to the ongoing BP Oil Spill; drilling operations necessary for completions or workovers (where surface BOP stacks are installed, they must be utilized during these operations); abandonment or intervention operations; or waterflood, gas injection, or disposal wells. BOEM shall order any current drilling operations covered by this decision to proceed to the next safe opportunity to secure the well and take all necessary steps to cease operations and temporarily abandon or close the well. Pursuant to 30 CFR § 250.168(a), BOEM may

In addition, Secretary Salazar instructed BOEM to order any currently drilling operations covered by the decision to proceed to the next safe opportunity to secure and temporarily abandon or close the well – *i.e.,* more work for abandonment contractors.

Oct. 15, 2010          Directive enacting / enhancing guidelines to *increase* abandonment activities in the Gulf.

Nov. 30, 2010          Second Moratorium ends.

**(2)   Meaning of "Significant"**

The Claims Administrator is not asked to determine whether the offshore oil and gas services and/or support was "significant".

For Section I "flagged" types of businesses, the Claims Administrator reviews all BEL (or IEL) claims for potential Moratoria Losses, (irrespective of whether the activities were "significant").

For Section II flagged types of businesses, the Claimant (or his Employer) answers the question of whether the business provides "significant" services. If the Claimant (or his Employer) attests that it is not "significant" then those businesses (or employees) are analyzed under the ordinary BEL (or IEL) framework. *See* Exhibit 16, at p.2 ("If the claimant responds negatively, its claim proceeds under normal processing").

**(3)** **There is No "Importing" of the Prohibition on the Payment of "Moratoria" Losses to Other BEL (or IEL) Claims**

The analysis of Moratoria Losses is limited solely to **(a)** the Exhibit 19 Section I businesses or **(b)** the Exhibit 19 Section II businesses who attest that the services are significant. Every other eligible business (or employee) is analyzed under the standard BEL (or IEL) frameworks, without any regard to the potential presence of "Moratoria Losses".

*See, e.g.,* Exhibit 16, p.1 fn.2 and Exhibit 19 Heading ("Industry Types Subject to Review by Claims Administrator for Potential Moratoria Losses"). No other industry types are subject to such review.[3]

**(4)** **Choice of NAICS Code for Oil & Gas / Service & Support Claims**

The NAICS Code that was actually used by the business in the ordinary course of business should be presumed to be correct.

If the business used more than one NAICS Code in the ordinary course of business that would dictate two different results (*e.g.* one that is excluded as "Oil & Gas" under Exhibit 17 and one that is "flagged" as Service & Support under Exhibit 19), then the Program needs to apply its judgment and discretion from the materials provided to determine the most appropriate classification from the NAICS definitions and examples.

With respect to the diving example provided, the Program should look first to see whether the business used NAICS 561990 or NAICS 213112 in the ordinary course of business. If it used one, but not the other, the Program should go with the Code that was used. If the business, for different purposes, or at different times, used both, then the Program should use its best judgment as to whether the business as a whole more fairly falls within the definitions and examples in Exhibit 17 or Exhibit 19. If the business did not use either Code in the ordinary course of its business, then the presumption should be that the business is neither excluded under Exhibit 17 or "flagged" under Exhibit 19, absent compelling evidence to the contrary.

## 2. DEFINITION OF "TOURISM" UNDER EXHIBIT 2

By way of background, towards the conclusion of the negotiations, there was a disagreement about how the "Tourism" Definition that had been negotiated over the past eight months should be applied. Class Counsel took the position that the introductory definition was controlling, with all of the following NAICS Codes merely illustrative examples. BP, by contrast, took the position that the NAICS Codes listed on Exhibit 2 were exclusive, and that no other business or NAICS Code could be considered "Tourism".

---

[3] *See also, e.g.,* Exhibit 16, at p.2 ("If the claimant responds negatively, its claim proceeds under normal processing").

The compromise, brokered by Judge Shushan, is reflected in the final version of Exhibit 2, which describes the following NAICS Codes as neither illustrative nor exclusive.

Significantly, what was retained in Exhibit 2 is not only the lists of specific types of businesses that are identified under the relevant NAICS Codes, but the Industry Definitions themselves.

So, for example, NAICS Code 447110 is not simply the enumerated examples:

- Convenience food with gasoline stations
- Gasoline stations with convenience stores
- Gasoline with convenience stores

But also includes an Industry Definition of:

"...establishments engaged in retailing automotive fuels (*e.g.,* diesel fuel, gasohol, gasoline) in combination with convenience store or food mart items.  These establishments can either be in a convenience store (*i.e.* food mart) setting or a gasoline station setting.  These establishments may also provide automotive repair services."

With that background, Class Counsel believe that the following general rules should apply in determining whether a Claimant or his Employer is treated as a "tourism" business under the Settlement Agreement:

**General Rules**

1. Where the Claimant (or Employer) is a business that is specifically identified on Exhibit 2, it should be treated as a "Tourism" business, irrespective of what NAICS Code the business may have used for various purposes in the ordinary course of its business.

2. When the Claimant (or Employer) actually used one of the NAICS Codes that is listed on Exhibit 2 on its tax returns, business licenses, or otherwise, for at least some purposes, in the ordinary course of its business, it should be presumed to be "Tourism" – and should be conclusively deemed to be "Tourism" where the business was actually engaged in activities reasonably described in the Industry Definition and/or examples listed.

3. When the Claimant (or Employer) is neither a business that is specifically identified on Exhibit 2 and did not use an NAICS Code that is listed on Exhibit 2 in the ordinary course of its business, then the Claims Administrator should fairly apply the entirety of Exhibit 2 – including the introductory definition of Tourism generally, the Industry Definitions that accompany each NAICS Code listed on Exhibit 2, and the examples that are specifically listed under each NAICS Code listed on Exhibit 2 –

        to determine whether the Claimant (or Employer) should fairly and reasonably be considered "Tourism".

4.      The Program should be looking at whether the Entity (or Employer) is engaged in substantial business activity that falls within Exhibit 2, rather than attempting to shoehorn a multi-faceted business into a single NAICS Code / description.[4]

So, taking the example of a Liquor Store located on Highway 98 in Destin, Florida, near the beach. Applying Rule 1, the words "liquor store" do not appear on Exhibit 2. Nevertheless, applying Rule 2, if the Liquor Store used an NAICS Code listed on Exhibit 2 in the ordinary course of its business, then it should be presumed to be "Tourism". In the alternative, applying Rule 3, this Liquor Store clearly "provides services such as attracting, transporting, accommodating or catering to the needs or wants of persons traveling to, or staying in, places outside their home community." *See also, e.g.,* NAICS Code 452990 ("retail a general line of new merchandise, such as ... *groceries, housewares*"); NAICS Code 447110 ("convenience store or food mart"); NAICS Code 722211 ("establishments primarily engaged in providing food services ... where patrons generally select items and pay before eating. Food and drink may be consumed on premises, *taken out,* or *delivered* to the customer's location. Some establishments in this industry may provide these food services in combination with *selling alcoholic beverages*"); NAICS Code 722410 ("establishments ... primarily engaged in preparing and serving alcoholic beverages"). Particularly where the Liquor Store also, (as is typical), offers food items, (*e.g.* cheese, crackers, chips), or other retail goods, (*e.g.,*

---

[4]Class Counsel note that these General Rules differ slightly from the suggested use and application of NAICS Codes for the purpose of "flagging" potential businesses for a Moratoria loss evaluation under Exhibit 16. However, these provisions were negotiated at different times, in different ways, for different purposes. The result of being "flagged" under Exhibit 16 (which was negotiated in a very short time period) may or may not affect the ultimate outcome under the Settlement Agreement; and, to the extent it does affect the Claimant's compensation under the Settlement Agreement, the remainder of his or her claim for "Moratoria Losses" is Expressly Reserved. The application of the "Tourism" definition, by contrast, (which was negotiated over a period of several months), will conclusively and irrevocably affect the interests of the Class Member within the bounds of the Settlement Agreement.

      The language and structure of the Settlement Agreement itself further supports such a distinction. Exhibit 17 states that "Business Entities within the NAICS code descriptions set forth below are excluded from the class"; Exhibit 18 states that "Business Entities within the NAICS code descriptions set forth are excluded from the class to the extent and manner set forth in the Excluded Industries Chart"; and Exhibit 19 explicitly states that the NAICS codes and descriptions are determinative of Automatic Review for Potential Moratoria claims. Exhibit 2, by contrast, provides a specific definition of Tourism, which is separate and controlling over the NAICS Code descriptions that follow.

      The bottom line is: Exhibits 16, 17 and 19 are used to exclude the Claimant and/or treat the Claimant less favorably; while Exhibit 2 is used to include the Claimant and treat the Claimant more favorably; so, when interpreted in light of Sections 4.3.1, 4.3.7 and 4.3.8, the "Tourism" definition should generally be interpreted and applied more liberally.

wine glasses, shot glasses, other household items, souvenirs[5]), the Program should consider the Liquor Store to fall within the definition of "Tourism" under the totality of the circumstances.

It is important, in applying these Rules, to recognize that a business will often be engaged in activities that crossover / encompass several different types of Industry Definitions, and the inquiry should therefore be focused on whether the Entity (or Employer) in question conducts substantial business activities within the Tourism Definition and the NAICS Codes within Exhibit 2. (*i.e.,* Rule 4)

**(1)   Scope of the Tourism Definition**

While it's likely fair to say that the "Codes" listed are "exhaustive", those Codes, as outlined above, both **(i)** include Industry Definitions which would encompass additional businesses that are not specifically listed, but which, in light of the general introductory Tourism definition, and the nature of the business, should be treated as falling under one or more of those Codes; and **(ii)** extends to the businesses that are specifically identified under the Codes, even if, for some reason, the Claimant (or Employer) did not use that specific Code (or Codes) in the ordinary course of its business.

A studio that takes pictures of vacationers or weddings on the beach should be placed in Tourism if it used one of the NAICS Codes identified on Exhibit 2 in the ordinary course of its business. Alternatively, the Program might consider such a business to fall within the definition of "Tourism" under a totality of the circumstances. As an initial matter, that business certainly falls within the general definition of Tourism ("provides services such as attracting, transporting, accommodating or catering to the needs or wants of persons traveling to, or staying in, places outside their home community"); *see also, e.g.,* NAICS 453220 ("souvenirs ... seasonal and holiday decorations"); NAICS 448190 ("bridal gowns"); NAICS 487110 ("scenic and sightseeing transportation"); NAICS 561520 ("tour operators"); NAICS 712190 ("nature parks"); NAICS 713990 ("ballrooms ... beaches ... picnic grounds ... tourist guide services").

Jewelry Stores are specifically identified on Exhibit 2: *see* NAICS Code 448150.

**(2)   Assigning a NAICS Code**

*See* General Rules 1, 2 and 3, above.

But, again, where a business is engaged in activities that crossover / encompass several different types of Industry Definitions, and the inquiry should be focused on whether the Entity (or Employer) in question conducts substantial business activities within the Tourism Definition and the

---

[5] NAICS Code 453220 ("Gift, Novelty and Souvenir Stores").

NAICS Codes within Exhibit 2 – not trying to pigeonhole the business into one single NAICS Code. (*i.e.* Rule 4) [6]

Moreover, in close cases, where the Claimant (or Employer) can fairly and reasonably be classified as a "Tourism" business, Section 4.3.8 (and, to a lesser extent, Sections 4.3.1 and 4.3.7) should favor general application of the Tourism definition in a Claimant-favorable way.

**(3)   Relevant Time Period for Tourism Analysis**

Section 4.4.7.1 of the Settlement Agreement indicates that the determination should be "based on its review of (a) the NAICS code shown on an Entity Claimant's 2010 tax return, (b) 2010 business permits or license(s), and/or (c) other evidence of the Entity's activities necessary for the Settlement Program to determine the appropriate NAICS code."

**(4)   General Tourism Analysis**

Program should use it's best judgment, in light of the available information, following General Rules 1, 2, 3, and 4, above.

### 3. SCOPE OF THE GCCF RELEASE EXCLUSION

As stated in our Memo of October 2nd,[7] the Settlement Class Definition excludes:

> Any Natural Person or Entity who or that made a claim to the GCCF, was paid and executed a GCCF Release and Covenant Not to Sue.[8]

Therefore, the Exclusion:

   i.   distinguishes between Natural Persons "*or*" Entities;

   ii.  requires that the Natural Person *or* Entity made a claim to the GCCF;

   iii. requires that the Natural Person or Entity was "paid" by the GCCF; *and,*

   iv.  requires that the Natural Person or Entity "executed" the GCCF Release.

---

[6] For example, a "marina" likely includes a "marine service station" (NAICS Code 447190), and/or a "fishing supply store" and/or "tackle shop" (NAICS Code 45110), and/or "boat rental" (NAICS Code 532292), and/or "excursion boat operations" or "sightseeing boat operations" and/or "harbor sightseeing tours" (NAICS Code 487210). A "fruit and vegetable market" may include a "restaurant" and/or a "bar" and/or a "deli" (NAICS Codes 722110, 722211, 722213 and/or 722410). A "jewelry store" (which is listed in NAICS Code 448150) could also be / include a "collectible gift shop" (NAICS Code 453220) because they sell "crystal, pewter, porcelain" etc.

[7] Re: "BEL Owners or Officers Who Are Also Employees".

[8] Section 2.2.6.

Apparently the GCCF and certainly the Settlement Program treat some claims as "Business" or "Entity" claims, despite the absence of corporate (or LLC, or limited partnership, or other business) formalities. In those cases, a release signed by the owner of the "business" or "entity" would presumably release such claims – but would *not* release the claims of any other formal business entity owned by him/her and/or his/her Spouse.

On the other hand, where there are corporate (or LLC, or limited partnership, or other business) formalities, the execution of a release for that entity would generally not bar the signatory's separate and independent individual claim, nor the claim of some other separate and distinct entity, and would certainly not bar his/her spouse's.

So, in order to determine whether the Exclusion applies to a previous GCCF Release, you would have to know: the nature of the entity or other "business" (or individual) that made the previous GCCF claim (*i.e.,* who is the GCCF "Claimant"); the capacity in which the GCCF Release was executed on behalf of the business claimant and/or the individual claimant; and the relationship of the business and/or signatory to the potential Settlement Program claimant.

(In addition, it may depend upon specific / individualized terms of a GCCF Release. We understand, for example, that in at least one case the GCCF agreed to expressly limit the release to one Division of a multi-unit company, expressly reserving the claims of the other Divisions. In that case, the GCCF Release should not prohibit the Entity from making a Settlement Program claim on behalf of its other units or Divisions.)

(1) <u>Is GCCF Claimant's Spouse Barred from Making Independent Claim in Settlement Program?</u>

As noted above, it will likely depend upon the nature of any relevant "businesses" and/or "entities", but generally:

If the GCCF claim was an "Individual" GCCF claim, then the spouse should be able to assert a Class Settlement Program claim on behalf of a separate formal Entity, or a claim for a Claiming Job or Seafood Vessel / Lease that is separate from what was claimed by the GCCF claimant.

If the GCCF claim was a "Business" GCCF claim, then the Spouse cannot make a claim for the same Entity in the Settlement Program, but can make a claim for a different Entity or for his/her own separate Claiming Job or Seafood Vessel / Lease that was not the subject of the GCCF claim.

**(2) A GCCF Business Claimant Can Submit a Settlement Program Claim for a Separate Entity, a Claiming Job or Seafood Vessel / Lease that was not the subject of the GCCF Claim.**

Assuming that the "business" was a formal and distinct entity, then a GCCF Business Claimant should be able to submit a Settlement Program claim for a separate entity, a separate Claiming Job, or separate Seafood Vessel / Lease that was not the subject of the GCCF Claim.

**(3)   A GCCF Individual Claimant Can Submit a Settlement Program Claim for a Separate Entity**

Assuming that the "Entity" Claimant in the Settlement Program is a formal and distinct entity, then an Individual GCCF Claimant should be able to bring a Settlement Program claim for the separate Entity.

**(4)   A GCCF Release Would General Bar a Settlement Program Claim by the Same Claimant, except for VoO Charter and/or Vessel Damage Claims**

Assuming that the claimants are the same Individuals or "Businesses" / "Entities", the GCCF Release would generally bar a claim in the Settlement Program, except for a VoO or Vessel Damage Claim.

**(5)   "Double Payment" Policy**

*See* Memo from Class Counsel to Claims Administrator, re: "BEL Owners or Officers Who Are Also Employees" (Oct. 2, 2012).

The "Double Payment" Policy is completely unsupported by the terms of the Settlement Agreement.

Where, particularly, the IEL Claimant is an Officer, but *not* an Owner, the GCCF Business and/or Settlement Program Entity has absolutely no authority to release an employee's own separate individual claim.

The Officer might not even work for the Entity anymore.

The "Double Payment" Policy would also be egregious if applied to an entity that is not closely held. Is the employee of a publicly held company prohibited from making a claim simply because he or she owns a few shares of the company's stock?

In addition to the fact that the Policy is *not* what was negotiated and agreed to by the Parties as a substantive matter, it could give rise to potential Class, Notice and Due Process concerns.

### 4. DISCONTINUING INCOMPLETENESS REASONS ASSOCIATED WITH SWS-10

We agree with the Claims Administrator's suggestion to eliminate the SWS-10 requirement. Alternatively, we agree with the Claims Administrator's alternative suggestion to require the form at the end of the process, prior to payment.

### 5. QUESTIONS REGARDING THE SEAFOOD PROGRAM

**A.     Private Oyster Leases**

The Parties have consulted with the Court-Appointed Neutral to ascertain his intent, and all are in agreement with the following position, memorialized in the following FAQ:

Q.     What is the scope of the Seafood Compensation Program with respect to Oyster Leaseholders? Are "private leases" included in the settlement class and Compensation Program?

A.     The Class is defined to include all Oyster Leaseholders, whether the lease establishes the Claimant as the lessee of an oyster leasehold for which the state is the lessor ("state-issued lease") or the lessee of an oyster leasehold for which a private landowner is the lessor ("private lease"). However, while private leases are included in the Settlement Class, certain private leases may not be eligible to receive payment under the Seafood Compensation Program, and thus those oyster leaseholders will have their associated Oyster Leaseholder Interest claims in connection with such private leases Expressly Reserved.

To be eligible for compensation under the Seafood Compensation Program, a Oyster Leaseholder Claimant seeking recovery for oyster leaseholds in Louisiana, Florida, Mississippi, and Texas must be the lessee of an oyster lease (whether "state-issued" or "private") for which the State has issued an oyster lease ID number. In Alabama, where the state does not issue oyster lease ID numbers for oyster leases, then Claimants who are lessees of oyster leases (whether "state-issued" or "private") are eligible for compensation from the Seafood Compensation Program.

Thus, if a claiming Oyster Leaseholder seeks compensation for a lease in Louisiana, Florida, Mississippi or Texas that did not have a State-issued lease oyster ID number for the year 2010, then the Claimant remains in the Class and may be eligible for compensation under other aspects of the Seafood Compensation Program, (*e.g.,* Oyster Harvester Lost Income Compensation, compensation under a different Seafood Compensation Program category such as the Shrimp Compensation Plan or Finfish Compensation Plan, or Oyster Leaseholder Interest claims for oyster leases in Louisiana, Florida, Mississippi or Texas that do have a State-issued lease ID number); however, that Claimant's Oyster Leaseholder Interest claims and Oyster Leaseholder Lost Income claims arising out of any Louisiana, Florida, Mississippi or Texas oyster lease without a State-issued lease ID number are Expressly Reserved Claims under the Settlement Agreement, such that they are neither compensated in nor released by the Economic Loss and Property Damages Settlement or the Individual Release.

**B.     Sub-Leases of Oyster Leaseholds**

This should be governed by the rule above.  In the States where a state-issued registration ID Number is required, a lessee or sub-lessee who has such a valid registration can recover; a lessee or sub-lessee who does not, cannot;  however, his or her such claims are Expressly Reserved.

There may be (where both the lessee and the sub-lessee are eligible under the Settlement) an administrative potential double-recovery issue for the Program to work out, but we understand that, as a practical matter, in most cases where there is a sub-lease, the sub-lease is not formally registered with the State (and therefore will generally not be eligible).

### C.     Vessel Owners Who Sold One or More Multiple Vessels Before April 20, 2010

Class Counsel and BP have been in consultation with the Court-Appointed Neutral to ascertain his intent, and to formalize in a FAQ.

### D.     Clam Aquaculture Businesses

Clams are treated as "Other" under the Seafood Compensation Program Frameworks. Hence, losses related to the harvesting of clams would fall under the Seafood Compensation Other Frameworks.

To the extent that such business (or a separate individual or entity) may be engaged in processing, those losses may be compensable under the BEL Frameworks for Primary (or perhaps Secondary) Seafood, per Exhibit 3.

We are in ongoing discussions with the Court-Appointed Neutral and BP regarding the appropriate treatment of a single person or entity that has an integrated harvesting / processing business.

### 6. THE NEED TO REMOVE THE SPECIFIC DOLLAR AMOUNT FROM THE INDIVIDUAL RELEASES

Class Counsel support the Claims Administrator's recommendation.

At the same time, and in any event, the Program's current process / communications regarding the Eligibility Notices continue to cause confusion due to the multiple appearances of the same GCCF offsets and continued confusion regarding the meaning of "acceptance".

There is also continued delay in getting the Notices of Appeal to the Claimants and their counsel.

### 7. FORM OF SIGNATURE ON THE ATTORNEY FEE ACKNOWLEDGMENT FORM

Class Counsel support the Claims Administrator's proposal.

The Settlement Agreement does not require a "wet ink" signature except in the case of the Individual Release. *See, e.g.,* Section 4.4.6.