# MEMORANDUM

**To:** Patrick A. Juneau, Esq.
Claims Administrator

**From:** Class Counsel

**Matter:** In re: Deepwater Horizon
MDL No. 2179

**Re:** September 25th Policy Memo from the Claims Administrator

**Date:** September 28, 2012


### Section 1(a): Monthly Allocations of Revenue/Expenses

Class Counsel agree with the Claims Administrator's Policy for the reasons stated in the Claims Administrator's September 25th Memo and for the additional reasons outlined in Class Counsel's Memo to the Claims Administrator re "Monthly Profit & Loss Documentation" dated September 19, 2012.

We assume, and would agree, that this policy can be further applied to Semi-Annual and/or Quarterly revenue and expenses where either Quarterly or Semi-Annual (but not Monthly) Profit & Loss Statements were generated and maintained by the Claimant in the ordinary course of business.


### Section 1(c): Restatement of Profit & Loss Statements

Class Counsel respectfully disagree with the stated Policy to the extent that: **(i)** a business that prepared both cash and accrual reports for different purposes in the ordinary course of business would be prevented from presenting its claim on a cash basis; **(ii)** a business that maintained the underlying data in such a way that either cash or accrual reports could (and can) be readily generated would be prevented from presenting its claim on a cash basis; or **(iii)** businesses that prepared reports on a cash basis in the ordinary course of business might have their claims delayed, reduced or denied.

The primary reference to monthly profit and loss statements is in Exhibit 4A to the Agreement, which states that the claimant is required to produce:

> Monthly and annual profit and loss statements (which identify individual expense line items and revenue categories), or alternate source documents establishing monthly revenues and expenses for the claimed Benchmark Period, 2010 and, if applicable, 2011. Profit and loss statements shall identify the dates on which they were created. The Claims Administrator may, in his discretion, request source

documents for profit and loss statements. If there is a discrepancy between amounts reflected in a tax return and comparable items reflected in a profit and loss statement for the same period, the Claims Administrator may request the claimant to provide additional information or documentation.[1]

This provision is supplemented by the Definition of "Contemporaneous" which provides that:

"Contemporaneous" or "Contemporaneously prepared" records or documentation shall mean documents or other evidence generated or received in the ordinary course of business at or around the time period to which they relate; in the case of financial statements, this shall include all periodic financial statements regularly prepared in the ordinary course of business. *In addition, "contemporaneous" or "contemporaneously" prepared evidence or documentation*, even if not proximate in time to the event or occurrence to which it relates, *shall include (1) documentation that is based on or derived from other data, information, or business records created at or about the time of the event, occurrence or item in question,* (2) a statement that is consistent with documentation created at or about the time of the event, occurrence or item in question, or (3) would support a reasonable inference that such event, occurrence, or other item in question actually occurred.[2]

Nothing in these provisions or elsewhere in the Settlement Agreement specifies the accounting method which must be used to create the monthly profit and loss statements. A cash statement is just as valid as an accrual statement, and we would respectfully submit that the Claims Administrator lacks authority to deny a claim based on an accurate and "Contemporaneous" cash statement.

Section 4.3.7 of the Agreement states that:

The Claims Administrator . . . shall use its best efforts to provide Economic Class Members with . . . opportunities . . . so that the Economic Class Member has the best opportunity to be determined eligible for and receive the Settlement Payments to which the Economic Class Member is entitled under the terms of the Agreement.

To the extent that a policy decision would preclude the utilization and submission of a standard and accepted method of accounting, widely employed by small businesses, such policy would be contrary to both the letter and the spirit of the Settlement Agreement.

---

[1]Exhibit 4A, Item 4.

[2]Section 38.38.

Similarly, the Claims Administration Vendors are required under Section 4.3.8 to:

> ...evaluate and process the information in the completed Claim Form and all supporting documentation . . . to produce the greatest Economic Damage Compensation Amount that such information and supporting documentation allows . . . .

A policy precluding the use of the cash method in certain cases runs contrary to this mandate.

Second, there is nothing "unfair" in allowing a claimant to select either the cash or accrual accounting method so long as the claimant uses the same method for both the Benchmark Period and the Loss Period.  As long as the claimant uses the same method for both the Benchmark and the Loss periods, there is no "manipulation" of the claim.

The Administrator's Memo expresses concern that the timing of cash collections could have an impact on the claim by increasing the loss for reasons unrelated to the Oil Spill. This risk was accounted for by BP in negotiating and agreeing to the final Causation and Compensation Frameworks, and frankly exists with any cash basis profit & loss statements, not just accrual profit and loss statements that are re-stated to cash.

Disallowing this flexibility leads to unfairness and inconsistency among different claimants and creates problems in application.

If, for example, a claimant did not produce monthly financial statements in the ordinary course of business, that claimant should have the option of creating such monthly P&Ls from contemporaneous data using whichever method it chooses.

And, if that is the case:  Why should a business that produced an accrual statement lose that opportunity?

Moreover, many small businesses keep their books both ways.  Smaller operations using Quick Books can effectively produce either version at the push of a button.  And almost all businesses now maintain their books in an electronic format.  Frequently, both methods are readily available to the business. Even though they may never print a set of monthly or even annual statements.  Others may maintain monthly information on a cash basis, and make adjustments to convert to accrual at year-end.  Given the multitude of different scenarios, it is difficult to determine whether profit and loss statements "were prepared on an accrual basis".

As a result of this Policy, many businesses could have their claims rejected, reduced or delayed solely because they chose to print out statements in a certain format instead of simply maintaining the information in electronic form.

Further, how will the Program determine that accrual statements were used in the ordinary course of business?  Many claimants produce monthly cash reports, but then reconcile book income based on the accrual method for Tax Return purposes.  In fact, some businesses use monthly statements based on the cash method, but by regulation are required to show annual

income on based on the accrual method on their tax returns.  Will those Claimants be forced to use the accrual method, even though he generated monthly P&Ls on a cash basis?   Are they now forced to go back and produce accrual monthly P&Ls?

Class Counsel respectfully suggest that this Policy is unnecessary, inconsistent with the terms of the Settlement Agreement, and was never disclosed to the Class.

**Section 3: 2012 Tax Returns**

Class Counsel agree with the Claims Administrator's Policy for the reasons stated and for the reasons stated in Class Counsel's Memo to the Claims Administrator re "Documentation Provisions" dated September 16, 2012.

**Section 4: Sworn Written Statements of Prior Spill-Related Payments to Seafood Program Members**

Class Counsel agree with the Policy, and further note that: **(i)** Because the set-off is in the nature of an affirmative defense, the burden of proof should be on BP to establish the existence and amount of any set-off, (not on the Claimant); **(ii)** It was likely not the intention of the Court-Appointed Neutral, in drafting and finalizing the Seafood Program document, to create additional procedural or administrative burdens on Seafood Program Claimants with respect to matters of general applicability, (*e.g.* the set-off for prior spill-related payments, which runs across the Settlement Agreement); and **(iii)** The nature and structure of the Seafood Program vest the ultimate authority and discretion with the Court-Appointed Neutral to determine and the Claims Administrator to implement allocation of the Fund to eligible Class Members.

**Section 7: Retail and Lodging Information**

Class Counsel respectfully disagree with the Claims Administrator's interpretation that such documentation requirements are "mandatory" to the extent that a Claimant, in order to recover under the Settlement Agreement, would be required to submit documents that do not exist, for the reasons set forth in Class Counsel's Memo to the Claims Administrator re "Documentation Provisions" dated September 16, 2012.

**Sections 10-12: Seafood Program Issues**

        Class Counsel believe that the Policies set forth in the Claims Administrator's September 25th Memo are reasonable, and further note, as above, that the nature and structure of the Seafood Program vest the ultimate authority and discretion with the Court-Appointed Neutral to determine and the Claims Administrator to implement allocation of the Fund to eligible Class Members.