**MEMORANDUM**

TO: Patrick A. Juneau, Claims Administrator

FROM: Class Counsel

DATE: August 1, 2012

RE: Policy Questions Requiring Input from Parties[1]

_____

**1.  Business Economic Loss Claims:  Multi-Facility Business:**

Class Counsel stands by its position.  If the individual claimants are class members and have not previously released their claims, they are entitled to file a claim.  A claim can only be offset by a prior payment if it was for the same loss.  Therefore, before the accountants can apply their presumed FIFO approach, they must determine that the prior payment was for the same loss.

**2.  Business Economic Loss Claims:  Start-Up Business**

Class Counsel can accept the recommendation so long as there is an affirmative denial on the specific and express basis that they are not members of the Class.

We have defined the class as any business that "at any time from April 20, 2010 to April 16, 2012 owned, operated or leased a physical facility" in the class geography.   A business that opens on August 1, 2010 could be a Start-Up because it has zero (less than 18 months) of operations history before the spill.  It is also located in the Gulf Coast Area prior to April 2012.  If the business doesn't meet the definition of a Start-Up because it doesn't have expenses prior to April 20, then it can't be a class member.  The intent of Section 1.3 was to avoid the situation where Class Members were not provided with any potential avenue for compensation under the Frameworks provided.

**3.   Business Economic Loss Claims:  Economic Loss Zones**

(1) Class Counsel generally agrees with the recommendation with one exception.  The recommendation refers to a *permanent* office in any of these locations, and under Section 1.2.1 it is "at any time from April 20, 2010 to April 16, 2012, owned, operated or leased a physical facility . . ."

---

[1] *See* MEMO FROM LYNN GREER, July 30, 2012.

> There is no requirement that the facility be "permanent" in order to be an entity within the Class.

> (2) Class Counsel would agree with (2) under the facts given. However, if John Smith's dispatch office kept him in the French Quarter, then this should be treated as Zone A.

4. **Business Economic Loss Claims: Loss Location Outside the Zone**

> (1) Class Counsel does not believe that XYZ Trucking Co. is a Class Member unless the alternative suggested by the Claims Administrator is allowed. If XYZ Trucking Company is not allowed to treat each route as a physical location or physical facility, then it is an entity with its HQ outside of the Gulf Coast Area that does not own, operate, or lease a physical facility in the Gulf, and, treating it as a service business, the operators do not perform their full-time services while physically present in the Gulf because the hypothetical has them going to Charlotte, NC routinely. Therefore, in the absence of the alternative being applied, we do not think XYZ is a Class Member and does not meet the definition of "entity" in Section 1.2.

> (2) Class Counsel agrees that Beach Products Distribution, LLC is not a Class Member.

5. **Business Economic Loss Claims: Startup Business**

   See Class Counsel Comments re Issue No. 2.

6. **Business Economic Loss Claims: Start-Up Business**

   If a business was in operation and new ownership took over, it should not automatically revert to a start-up. Many businesses in the Gulf are family owned; it could simply be that the new owner is a different family member. If the business doesn't undergo a fundamental change and was operating prior to the spill (*i.e.* was not otherwise a "start-up"), it should generally be considered a standard business under the BEL rules if the claimant can document the claim with financials. The claimant should have the option for whichever available methodology provides the highest compensation.

7. **Business Economic Loss Claims: Start-Up Business**

   Under Sections 4.3.7-4.3.8 and the other obligations of the Claims Administrator, the Administrator is supposed to allow the Claimant the benefit of the greatest compensable loss and should allow the Claimant to select either projection as its measure.

**8.   Business Economic Loss Claims:  Documentation Requirements**

Class Counsel defers to the recommendation.

**9.   Business Economic Loss:  Failed Business**

Class Counsel disagrees with the Recommendation.  It would be inappropriate to take cash received that was in existence prior to the Spill as part of the offset value for the loss.  It should only be the value received from liquidating the long-term assets, plant, property and equipment.

**10.   Business Economic Loss:  Churches Without Tax Returns**

Class Counsel agrees with the recommendation.

**11.   Review, Reconsideration, and Appeal Questions**

Class Counsel generally agrees with the *recommendation* in **Section I(B)(2)(c)** of Lynn's Memo.[2]  Just to provide additional context / background / support, for the Program's reference, the "up to three times" language in Section 6.1 was intended primarily to address denials.  This, however, would depend on the circumstances:  If, for example, it were absolutely clear that the person was not a class member or could otherwise never qualify, the Program was not expected to solicit (or even allow, beyond formal Reconsideration) additional chances.  If a business, however, was close on a causation test, for example, it would generally get up to three chances to submit additional documentation, etc, to try to establish causation.  (Not necessarily that the Claim or the Documentation was "incomplete" but simply that it didn't establish eligibility; although additional documentation, etc, might.)  With respect, however, to claims that either required more documentation, or received Determinations at a level that was lower than the Claimant submitted / could have submitted / believed that he or she was entitled to, (while the total number of "attempts" or "communications" would likely be case- / circumstance- / claimant-specific), the 6.1 language was intended to be specifically modified by the introduction: "Subject to and in accordance with 4.3.7 and 4.3.8…."

Class Counsel agree with the *recommendation* in **Section II(C)(2)** of Lynn's Memo.  The Claimant, BP and Class Counsel should all be provided with the Program's analysis at the time of the Determination.

---

[2] *See* Lynn Greer, POLICY ISSUES AFFECTING CLAIMANTS' ACCESS TO INFORMATION, CHANCES TO PERFECT CLAIMS, AND RECONSIDERATION/APPEAL STEPS, July 30, 2012.

Class Counsel strongly disagree with the *Recommended Process* on the flowchart with respect to the issue identified in **Section II(D).** Allowing BP to wait until there is either a formal "acceptance" or the 30-day period lapses before filing an appeal creates unnecessary and unwanted delay. Rather, BP's appeal rights should trigger at the point BP is notified of the Determination. BP doesn't need to know whether the Claimant will ask for Reconsideration in order for BP to determine whether BP believes that the Administrator appropriately applied the terms of the Settlement Agreement.[3]

12. **VoO Charter Payment: Presumption of Training**

We agree with the recommendation. First, there is no training "requirement" for a Working VoO Participant; the definitional language in Section 38.170 aside, the intent was to compensate anyone with a charter agreement who had been placed on-hire; it was assumed that BP (or its sub-contractors) would not have placed anyone on-hire who had not been thru the training; but if such a person exists, the intent (certainly from our point of view) was that he or she be compensated. Second, there is no Documentation requirement for evidence of training for a Working VoO Participant. Indeed, there are no specific VoO Documentation requirements, as it was contemplated that, in the first instance, most of the determinations could be made according to the "master" Database [*i.e.* "evidence of which shall include Charterers' dispatch logs"]. Finally, this issue implicates the general standard of review / burden of proof in applying the terms of the Settlement Agreement. Particularly where the formal Documentation requirements (if any) are silent on the issue, or would allow for such a reading, the Program can and should make reasonable inferences and conclusions (consistent with Sections 4.3.7 and 4.3.8) from the information provided on the claim form and the documentation provided in support of a claim.

13. **VoO Charter Payment: Evaluating Multiple Claims for the Same Vessel**

Class Counsel defer to the recommendation.[4]

---

[3] Obviously, if the Determination were revised based upon the Claimant's request for Reconsideration, a Re-Review, or otherwise, the time limit would start again for BP to appeal the revised Determination.

[4] It may be, in the Michael Jones example, that there are actually two different vessels, and the MVCAs have the wrong information. The Program might follow up with the claimant or his attorney to see whether a clarification and/or additional documentation can be provided.

14. **VoO Charter Payment: Confirming Vessel Length**

    In this specific example, under the facts presented, we defer to the recommendation. However, as a general matter, (and as we believe the Program has already decided), the Claimant should be paid the optimal VoO rate based on the available documentation. If, for example, there was evidence (either in documentation submitted by the claimant or in the BP database) that BP had actually paid Jane Brown the 30-45 foot rate, the claimant should get that rate under the Settlement Program, despite the existence of evidence that the length (according to one measurement) may have only been 29 feet.

15. **VoO Charter Payment: Using a Notice of Decontamination to Prove Working Status**

    Generally, see Response to Issue No. 12, above, (and E-Mail from Steve Herman to Christine Reitano, dated Tue 7/31/2012 3:00 PM). But, specifically, if someone claims that he or she was placed on-hire, and has submitted a Notice of Decontamination in support of that – and there is no contrary evidence in BP's database – the Program can and should reasonably conclude that the person was placed on-hire as claimed. Even if, in some cases, Notices of Decontamination might have been sent to "non-working" VoO participants who had never been placed on-hire, a decontamination would only be necessary for a vessel that had been exposed to the oil. If BP has some other evidence or argument to challenge the sufficiency of the Determination, then BP should appeal.

16. **Proposed FAQs**

    It is the word "accepted" that was causing the confusion. If that term has been eliminated, then the proposed FAQ makes sense.

    As a general matter, the Program should not wait indefinitely for BP to expressly approve of the exact language in a proposed FAQ that is clear and correct on its face and has been circulated for weeks. It is Class Counsel and the Program who are being peppered with questions that need to be answered in a timely basis.

17. **Subsistence. Compensation Formula for Consumption Losses**

    Response submitted *via* E-Mail from Steve Herman to Christine Reitano, Tue 7/31/2012 11:41 PM.

18. **Subsistence. Verification of Bartering Losses**

    Response submitted *via* E-Mail from Steve Herman to Christine Reitano, Tue 7/31/2012 11:41 PM.

19. **Subsistence. Updated Seafood and Game Retail Price Chart**

    Response submitted *via* E-Mail from Steve Herman to Christine Reitano, Tue 7/31/2012 11:41 PM.

20. **Zone A Mapping Question**

    Exhibit 1B, (at Bates Page 028276), Section A-28, sets out the following language in describing Zone A for the Florida Keys: "This zone consists of the **entirety of the series of islands** off the south coast of Florida stretching from Key West [an island] in the south/west to Key Largo [an island] in the north/east" (emphasis added). The Settlement Agreement defines this zone through the use of islands – not cities. There is simply no other way for this language to be interpreted if we are going to give meaning to the words "entirety of the series of islands." BP is attempting to change the description to a description of municipalities by taking the position that the city of North Key Largo, which is on the eastern end of the island of Key Largo, is not included in Zone A. However, the zone is not described in terms of municipalities. If the parties had desired to split the island of Key Largo into Zone A and Zone D, the parties knew how to do that. All zones in Exhibit 1B are defined precisely. There are exact geographical boundaries described. The position taken by BP that Zone A ends somewhere "just north of U.S. Highway 1" is not described anywhere in the settlement agreement. That interpretation would be completely inconsistent with every other zone described. Given that there is no description in the settlement of an eastern boundary of Zone A somewhere east of Highway 1A prior to North Key Largo, it should be clear that the parties intended that the entire island of Key Largo be included in Zone A. Otherwise, the inclusion of the phrase "entirety of the series of islands" is meaningless.