# BROWNGREER ‖ PLC

# MEMORANDUM

**TO:**     **Patrick A. Juneau, Claims Administrator**

**FROM:**     **Lynn C. Greer**

**DATE:**     **July 30, 2012**

**RE:**     **Policy Questions Requiring Input from Parties**

---

Pursuant to the Claims Administrator's new policy for posing any outstanding policy issue, we are submitting this memo that contains outstanding issues, as well as new issues we believe require input from the Parties.

1. **Business Economic Loss Claims:  Multi-Facility Businesses.**

   (a) **Accountants' Question:** If under the GCCF a claimant filed a consolidated claim and was paid and the claimant then files individual claims for each facility location under the New Facility, how will those previous payments be applied to these claims? For example, FIFO?

   (b) **Outstanding or New Issue?**  Outstanding.  This issue first appeared on a spreadsheet to the Parties on 5/10/12, and we have not been able to resolve it.

   (c) **History of Comments:  (Comments Taken Verbatim from Spreadsheet)**

      (1) **5/15/12:  Class Counsel.**  You have to apply the best information available to offset previous payments.  However, in order for there to be an offset you are required to find that the previous payment was made for the same loss you are now compensating for.

      (2) **5/22/12:  BP.**  The total prior payment must be deducted.  It can be applied pro rata to each facility (ignoring facilities for which no claim is made, which presumably suffered no compensable loss).  Where allocation to each facility cannot be determined, FIFO should be used.

      (3) **5/26/12:  Class Counsel.**  In order for there to be an offset, the Program must determine that the previous payment was made for the same loss that is being compensated under the Settlement.  What is the Program's recommendation?

**(4) Accountant's First Recommendation:**  Assuming all individual claims for each Facility is tracked collectively under the new administration then we will apply the GCCF payments against each specific facility on a one for one basis assuming gains and losses for each location were not offset.  If gains and losses were offset in connection with the GCCF consolidated claim then we will need to allocate the gain on a pro-rata basis.

**(5) 6/24/12:  Class Counsel**.  Defer to CA

**(6) 6/25/12: BP.**  BP is unclear as to the meaning of the CA Accountant Recommendation in Column N.  BP does not understand what is meant by "we will apply the GCCF payments  . . . on a one for one basis . . . ."  Further, BP is not clear why it matters whether or not GCCF offset gains and losses for each location of the multi-facility business, nor does BP understand how the accountants are proposing to treat the GCCF offset in the different scenarios.  Also, BP is interested in the answer to the accountants' question regarding whether the Settlement Program will track individual claims for each Facility collectively, as submitted by the same multi-facility claimant.  Like the accountants, we too assume the Settlement Program will do so.

**(7) *Accountant's Clarified Recommendation*.**  Offsets for prior BP, GCCF, VoO and/or Real Estate Fund Payments will be applied on a First-In, First-Out basis.  For example, assume a Multi-Facility business is filing separately for three Claiming Facilities and the aggregate amount of all prior payments to the claimant is $50,000.  The offsets would be applied as follows:

**Facility #1**
Calculated Losses Before Offsets:   $20,000
Less:  Offsets Applied:              ($20,000)
Total Net Compensation:                   $0
**Facility #2**
Calculated Losses Before Offsets:   $35,000
Less:  Offsets Applied:              ($30,000)
Total Net Compensation:               $5,000
**Facility #3**
Calculated Losses Before Offsets:  $20,000
Less:  Offsets Applied:                   ($0)
Total Net Compensation:              $20,000
**Total Compensation for all Three Facilities:  $25,000**

**(8) 7/13/12:  BP.**  BP agrees with the Accountants' recommendation.

**(9) 7/15/12:  Class Counsel.**  The problem with the Program's Recommendation is that it ignores the issue of loss causation.  The Program is assuming that the offset is available (i.e. that the previous amounts were paid by GCCF) with respect to the claim that is now being made under the Class Settlement Program. GCCF could have made payments with respect to facilities that are either not making

2

claims under the Settlement or do not meet the causation test under the Settlement Agreement. It would not be appropriate to apply an offset against a qualified claim based on money that was previously paid for a claim that is not recognized in the Class - particularly where the previous payment may have been related to a facility located outside of the Gulf Coast Area, which is categorically ineligible to recover within the Class.

2. **Business Economic Loss Claims: Start-Up Businesses.**

   (a) **Accountants' Question:** Are claimants that do not generate revenue prior to April 20, 2010 excluded from the program?

   (b) **Outstanding or New Issue?** Outstanding. This issue first appeared on a spreadsheet to the Parties on 7/10/12, and we have not been able to resolve it.

   (c) **History of Comments: (Comments Taken Verbatim from Spreadsheet)**

      (1) **7/13//12: BP.** A claimant must have begun operations as of April 20, 2010, i.e. begun to sell goods or services, which means they must have earned revenue as of that date.

      (2) **7/15/12: Class Counsel.** The Start-Up Framework does not require the claimant to "generate revenue" before April 20, 2010. The start-up is only required to have three consecutive months of revenue before April 2011, for the causation test in Exhibit 7, Sections III(A)(1)(a)(1), (B)(1), (B)(2), (C)(1)(b)(1) and (C)(1)(b)(2). Also note the definition of Compensation and Benchmark. Ultimately, the framework supports a valid claim for any start-up with three months of operations before April of 2011 - which makes sense because a business may have started after the spill but still have been adversely impacted on its initial profits / revenue.

   (d) *Recommendation*: If a business can establish that it incurred Start-Up expenses prior to the Spill it would qualify for compensation.

3. **Business Economic Loss Claims: Economic Loss Zones**

   (a) **Question:** If a BEL Claimant is physically located in one Zone, but the Claimant's business activity, sales or service activity, or revenue source is located in a different, more preferable Zone, which do we apply?

   (b) **Outstanding or New Issue?** New.

   (c) **No Comment History.**

   (d) **Examples to Guide Discussion.**

      (1) ABC Construction Co., Inc. has an office that is physically located in Birmingham, AL (Zone D). At the time of the spill, ABC Construction Co., Inc. was performing Construction services at active worksites in Gulf Shores, AL (Zone A), Broussard, LA (Zone B), and Panama City, FL (Zone C). ABC

3

Construction Co., Inc. does not own or maintain a permanent office in any of these locations.

***Recommendation.***  Apply Zone D.  While the Claimant has business activity in more preferential Zones, all business activity is routed through its Zone D office.  A provision in Exhibit 8A allows an individual claimant to prove a location of loss other than his or her employer's physical location; however, there is no comparable provision for BEL Claimants.  **Alternative:** Advise the Claimant to file a Multi-facility Business Claim.  If the Claimant provides specific financial data from each worksite, we can review each site as a separate claim and apply the various Zone rules as applicable.  If not, the office will be treated as HQ, and we will apply the rules for that Zone.

(2) John Smith is a Taxi Driver contracted through American Cab Company, whose sole office and Dispatch Center is located at 10 Poydras Street, New Orleans, LA 70130 (Zone B).  John files a Schedule C with expenses and files a BEL Claim.  John's dispatches take him throughout the greater New Orleans Area, but the majority of his calls or fares are to and from New Orleans International Airport in Kenner, LA (Zone D).

***Recommendation:*** Use the dispatch office as the location of John's business.  All of his business and revenues are routed through this office, and it is the most centralized location.

## 4.  Business Economic Loss Claims:  Loss Location Outside the Zone

**(a) Question:**  If a BEL Claimant is physically located outside the Economic Loss Zones, but the Claimant's business activity, sales or service activity, or revenue source is located within one of the Economic Loss Zones, should we treat that claimant as excluded from the class or use the Zone where the business activities occurred?

**(b) Outstanding or New Issue?**  New.

**(c) No Comment History.**

**(d) Examples to Guide Discussion.**

(1) XYZ Trucking Co., Inc. has an office and transfer hub in Charlotte, NC (Outside Gulf Coast Area).  Drivers who are full-time employees of XYZ Trucking Co., Inc. routinely travel from Charlotte, NC to various locations in all zones of the Gulf Coast Area, as well as various locations outside the Area.  These drivers are full-time employees that live in Charlotte but work in the Gulf Coast Areas for part of the time.  XYZ Trucking Co., Inc. does not own or maintain any permanent location anywhere outside of Charlotte, NC.  It is a service business.

***Recommendation.***  Deny the Claim as not compensable.  This Claimant is a member of the Class, maintaining full-time employees (including owner-operators) in the Gulf Coast Area, but the Claimant itself is not located in any Eligibility Zone.  While this claimant may have suffered a loss due to the spill,

such losses cannot be compensated if the Claimant does not maintain any location in the Zone.  **Alternative**: Advise the Claimant to file a Multi-facility Business Claim.  If the Claimant provides specific financial data from each delivery route, we can review each site as a separate claim and apply the various Zone rules as applicable.  If not, the office will be treated as HQ, and the claim will be denied as outside the Zone.

(2) Beach Products Distribution, LLC is an internet-based beach novelty distributor and has an office and distribution center in Memphis, TN (Outside Gulf Coast Area).  **All** of Beach Products Distribution's sales are to retailers along the Gulf Coast, in Zone A.  Beach Products Distribution does not maintain any physical location or have any full time employees physically located in the Gulf Coast, uses phone and internet sales for all of its ordering, and uses common carriers for delivery.  However, the Claimant insists that its loss is directly tied to the Deepwater Horizon incident.

*Recommendation.*  This Claimant is not a Member of the Class.  All Claimants must be able to demonstrate that they are members of the Class under Section 1.2 of the Settlement Agreement in order to file a Claim, even if Causation is clear.

## 5.  Business Economic Loss Claims: Start-Up Businesses

(a) **Accountants' Question:**  The accounting team requires clarification on how operating history shall be defined.

(b) **Outstanding or New Issue?** New.

(c) **No Comment History.**

(d) *Recommendation*: For purposes of inclusion in the Start-Up framework, define operating history as the date that a Start-Up business begins incurring Start-Up expenses or begins bringing in revenues, whichever is most beneficial for the claimant.  However, only months in which the business was open for business would be considered compensable months.

## 6.  Business Economic Loss Claims: Start-Up Businesses

(a) **Accountants' Question:**  Will an existing business that was acquired during the Start-Up period be treated as a Start-Up Business?

(b) **Outstanding or New Issue?** New.

(c) **No Comment History.**

(d) *Recommendation*: Yes.  The use of a previous owner's financial statements to perform the standard BEL calculation would be problematic.

#410697

7. **Business Economic Loss Claims: Start-Up Businesses**

   (a) **Accountants' Question:** Is the allowable timeframe for projections, May 2010 – April 2011 or May 2011 to April 2012?  The settlement agreement does not specify. What was the intent of not specifically specifying the timeframe?

   (b) **Outstanding or New Issue?** New.

   (c) **No Comment History.**

   (d) *Recommendation*: Need guidance on the intent of the settlement agreement.

8. **Business Economic Loss Claims: Documentation Requirements**

   (a) **Accountants' Question:** In certain industries it is common for an entity to report revenue and expenses on a periodic basis as opposed to monthly and annual profit and loss statements.  For example in the food service industry it is common for entitles to report on thirteen periods (28 day cycles) in a fiscal year versus twelve months in a calendar year.  The framework requires that a business claimant must provide monthly and annual profit and loss statements (which identify individual expense line items and revenue categories), or alternate source documents establishing monthly revenue and expenses for the claimed Benchmark Period, 2010 and, if applicable, 2011.  If a claimant in the regular course of business reports on periods other than monthly and annual periods, as required by the framework, how should the fiscal periods be converted to conform to the framework?

   (b) **Outstanding or New Issue?** New.

   (c) **No Comment History.**

   (d) *Recommendation*: We recommend that the accountants at the Deepwater Horizon Claims Center have the ability to convert the 13-period revenue and expense statements into a twelve month year by allocating each period's revenue and expense items into their respective months.  For example, if Period 1 starts on 1/1 and ends on 1/28 and Period 2 starts on 1/29 and ends on 2/25, 100% (28 days / 28 days) of the Period 1 revenue and expenses will be included in January as well as 10.71% (3 days / 28 days) of Period 2 revenue and expenses.  The remaining 89.29% (25 days / 28 days) of the Period 2 revenue and expenses will be included in February.

9. **Business Economic Loss: Failed Businesses**

   (a) **Accountants' Question:** How are assets being defined as used in "Liquidation Value of assets"?  Assets meaning both current and/or long term assets e.g., current assets; cash, accounts receivables, marketable securities and/or long term assets; plant, property, equipment? Example: Claimant had a dental practice that commenced operations prior to November 1, 2008 that was closed November 6, 2010.  The dental practice equipment sold for $30,000 while total distributions from closing the dental practice were $110,000. Is "liquidation of value of assets" the proceeds the owner received from the sale of the dental equipment $30,000 or is it the total distributions

6

the owner received from liquidating their business (sale of equipment $30,000 + cash distribution $80,000)?

**(b) Outstanding or New Issue?** New.

**(c) No Comment History.**

**(d)** *Recommendation***:** For purposes of inclusion in the Failed Business Compensation framework, define assets in Liquidating Value of assets to mean all assets received from liquidating a failed business both current and long term assets.

## 10. Business Economic Loss:  Churches without Tax Returns

**(a) Question:**  We recently received a question from a law firm that represents a church that is attempting to file a BEL claim.  This church is not required to file a tax return, so the firm is concerned that the church would not be able to satisfy the BEL document requirements.

**(b) Outstanding or New Issue?**  New.

**(c) No Comment History.**

**(d)** *Recommendation***:**  According to the Settlement Agreement and the responses from the Parties on the Framework Questions, Non-Profit Organizations are included in the Class; however, a strict interpretation of Exhibit 4A suggests that a church that does not file Federal tax returns cannot satisfy the document requirements for BEL claims. Exhibit 4A of the Settlement Agreement states that "a business claimant must provide the following … federal tax returns (including all schedules and attachments for the years included in the claimant-selected Benchmark Period, 2010, and, if applicable, 2011."

We verified that churches are exempt from filing an annual Federal tax return (a Form 990) if they have gross income of less than $1,000 for the taxable year from the conduct of any "trade or business, regularly carried on, that is not substantially related to the charitable, educational, or other purpose that is the basis of the organization's exemption."  We also verified with the IRS that they do not issue such churches any sort of documentation to certify that they are not required to file a tax return for a given year.

To address this situation, we recommend that the Program allow churches to satisfy the Federal tax return requirement in Exhibit 4A by providing a Verification of Nonfiling from the IRS, together with the church's organizational documents.  A Verification of Nonfiling is proof from the IRS that the claimant did not file a return for the applicable year.  Claimants can obtain this document free of charge by submitting a Form 4506-T Request for Transcript of Tax Return to the IRS and checking Box 7, by visiting IRS.gov and clicking on "Order a Transcript", or by calling 1-800-908-9946.  While this document does not certify that the entity was not required to file taxes for a given year, we feel that this document, together with organizational documents indicating that the entity is a Non-Profit organization with a

7

#410697

religious purpose, should be sufficient for our purposes as proof that a church was not required to file a Federal tax return.

**11. Review, Reconsideration, and Appeal Questions.  (**See attached memorandum for full discussion of the issues raised by Class Counsel, with the Claims Administrator's Recommendations.)

**12. VoO Charter Payment:  Presumption of Training.**

    **(a) Claims Administrator Question**.  May we presume the VoO training requirement is satisfied if we can determine the claimant to be a Working VoO Participant based on the VoO Master Database or independent proof of VoO payments or decontamination documentation?

    **(b) Outstanding or New Question**?  Outstanding.  This issue was first raised in an email from David Smith on 7/25/12.

    **(c) History of Comments**.

        **(1) Text from David Smith's 7/25/12 Email to the Parties:**  Christine asked that I forward the Claims Administrator's recommendation on a policy change that involves the review of VoO Charter Payment claims.  We have been contacted by three firms (Herman Herman & Katz LLP, Faegre, Baker, Daniels LLP and the Cao Law Firm) about the Incompleteness Notices we issued to certain VoO Charter Payment claimants who did not provide proof of their VoO training, despite being confirmed VoO participants who were paid for their on-hire status.  Steve stated:

            We seem to be getting a lot of Incompleteness Notice asking for one or another piece of documentation.  It may be that the information in BP's Database is either incomplete or inconsistent with the Claim being submitted.  If, however, the Program is able to confirm from the BP Database that the person, was, in fact, a VoO participant, and was dispatched at some point, at the vessel length rate claimed, no further "documentation" should be required.

        All three firms questioned why they were being asked to provide proof of VoO training if they already had provided proof of payments by BP for their participation in the VoO program, which should be sufficient indicia that the claimant was a VoO on-hire participant who completed the necessary VoO training.  Their argument is that if we have proof that the claimant participated in the VoO program and was paid, then all of the other elements of a VoO Charter Payment claim should be satisfied without additional documentation or proof from the claimant.

        We agree with this premise, but changing the process to not require proof of training would require a change to the VoO eligibility requirements as stated within the Settlement Agreement.  The Settlement Agreement definitions

8

specify that eligible VoO Charter Payment claimants include those who: (1) owned, *operated or leased* the claimed vessel (this inference for operators or lessees was confirmed by the Parties over Memorial Day, even though the Settlement Agreement language only says "owner"); (2) have executed a Master Vessel Charter Agreement; and (3) completed the initial VoO training program. The claimant must then prove that he or she was dispatched or placed on hire ("Working VoO Participant" in Section 38.170), or verify that he or she was not dispatched or placed on hire ("Non-Working VoO Participant" in Section 38.96).

BP provided us with two databases of VoO records that we use in our review process to help make these determinations. The first database contains vessel and MVCA information, which includes Working or Non-Working information but not the training status ("VoO Master Database"). The second database contains the first name, last name, date of birth and last four digits of the SSN number or Tax ID number for persons who completed the VoO training program ("VoO Training Database"). We require proof of VoO training regardless of whether the claimant is identified as a Working or Non-Working VoO Participant, either through documents establishing training attendance or the claimant's presence in the VoO Training Database. While there are 31,600 records in the VoO Training Database, we know that the data is incomplete and does not contain all of the VoO participants who completed the necessary training. The claimants who received the Incompleteness Notice were not in the VoO Training Database.

These firms argue that their clients do not have the necessary VoO training documents, either because they never received them from BP or they lost them. Because these claimants are not identified in the VoO Training Database, we made the claims incomplete for no proof of VoO training. The attorneys argue that if a claimant can establish that they were a Working VoO Participant, we should presume the claimant attended the necessary training because the claimant would not have been permitted to work in the VoO program without attending the training. They also argue that proof of decontamination of a vessel through the VoO program establishes that a claimant participated as a Working VoO Participant because BP only decontaminated vessels that were dispatched and placed on-hire. We agree with this logic; however, we developed our review system to follow the eligibility requirements identified in the Settlement Agreement.

***Recommendation:*** We recommend modifying our VoO claims review process to presume the VoO training requirement is satisfied if we can determine the claimant to be a Working VoO Participant based on the VoO Master Database or independent proof of VoO payments or decontamination documentation. We still will require proof of training if the claimant is a Non-Working VoO Participant because no presumption can be made about the VoO training if they were never dispatched or placed on-hire. We

9

recommend this policy change because it: (1) is logical to presume completion of VoO training if we have proof of VoO payments or decontamination efforts using BP's own database or previously approved payments to VoO participants; and (2) will reduce the number of Incompleteness Notices that are frustrating claimants.

**(2) 7/25/12. Class Counsel.** Thank you. The conclusion reached in your Recommendation is correct.

**(3) No Comment Yet from BP.**

## 13. VoO Charter Payment: Evaluating Multiple Claims for the Same Vessel.

**(a) Claims Administrator Questions**. We previously received confirmation from the Parties that only one claimant may file a VoO Charter Payment claim on behalf of a vessel, specifically the person who signed the MVCA agreement. If we receive documentation suggesting that two people signed MVCA agreements for the same vessel, should we just pay one claimant, or both?

*Recommendation***:** We will pay each contract only once.

**(b) Outstanding or New Issue**? New. We have received claims that raise this question.

**(c) Comment History.** No comment history on this specific issue.

**(d) Examples to Guide Discussion.** (The real claimant and vessel names have been changed.)

(1) John Smith submitted a claim for the vessel Miss Liberty for work performed under MVCA contract MOB-11111. In support of his claim, John submitted a hard copy of the MVCA that shows John as the signatory, but no other supporting documents.

John's brother, Robert Smith, submitted a claim for the same vessel and contract. In support of his claim, Robert submitted documents showing that Robert attended the initial VoO training, that Robert owns the vessel in question and a 1099 from Danos & Curole showing VoO payments made to Robert.

The VoO records that BP provided to us list Robert as the MVCA signatory. There is a conflict here as to who is the MVCA signatory.

*Recommendation.* We will only pay each contract once. In this example, if we reviewed John's claim first, we would find it incomplete for proof of training under the current protocol. If we reviewed Robert's claim, which is complete, in the meantime and issued an Eligibility Notice, we would then deny John's claim

#410697

and issue a Denial Notice with an explanation that we already issued a Payment Notice for this contract.

(2) Michael Jones has one vessel, but signed two MVCAs with two different charterers in the VoO program.  He performed work under MVCA contract MOB-22222, for which BP was the Charterer.  He did not perform work under MVCA contract HOU-12345, for which Lawson was the Charterer.  He submits two claims for the vessel, one for each contract.

*Recommendation.*  We will only pay each vessel once, regardless of the number of MVCAs the claimant signed.  If the Working Status for the contracts differs, with one or more being Working and another being Non-Working, we will issue a Payment Notice with a Working Participant status and payment.  In this example, we would review the claim and issue a payable notice for the Claim Form containing the contract under which the claimant has a Working Participant status.  If we cannot determine which contract is tied to the Claim Form because the claimant does not include the contract numbers, we will issue a Payment Notice for the first claim reviewed and use the Working Participant status, as it is most beneficial to the claimant.

## 14. VoO Charter Payment:  Confirming Vessel Length.

(a) **Claims Administrator Question.**  If the claimant submits a VoO invoice showing a vessel length range rather than a specific length, should we use this document to overrule the VoO data BP provided us?

*Recommendation:*  No.

(b) **Outstanding or New Issue?**  Outstanding.

(c) **No Comment History.**

(d) **Example to Guide Discussion:**  Jane Brown submits a claim for the vessel Miss Cynthia.  In support of her claim, Ms. Brown submits a vessel registration showing a vessel length of 29 feet and an invoice for the VoO program showing that she requested payment for the vessel's work based on the >30 – 45 foot vessel length range.  When we search the VoO records during the review, we find the vessel information, and it lists the vessel length as 29 feet.

*Recommendation.*  We will not use invoices containing vessel length ranges to determine vessel length.  We will only use official documentation, such as a vessel registration or title, and the VoO records if they list the vessel.  If the submitted documents conflict with the VoO records, we will use the greater length.  We cannot use an invoice because it does not provide a specific length and the invoices are generally filled out by the VoO participants and are not verified by the VoO program.

#410697

**15. VoO Charter Payment:  Using a Notice of Decontamination to Prove Working Status.**

    **(a) Claims Administrator Question.**  If the claimant submits a Notice of Decontamination report, is this sufficient to prove that the claimant was dispatched or placed on hire in the VoO program, or were Non-Working vessels also decontaminated?

        *Recommendation*. Yes.

    **(b) Outstanding or New Issue?**  New.

    **(c) No Comment History.**

**16. Proposed FAQs.**

    **(a) Claims Administrator Question.**  Are the proposed FAQs circulated by Steve Herman on 7/21/12, approved for posting?  These FAQs are included as an attachment to this memo.

        *Recommendation***:**  We should post the FAQs, as circulated by Steve Herman, except as follows:

        Because the Determination Notice does not use the words "deemed accepted," and we have taken "deemed accepted" off of the Portal, we propose a change to the FAQ on that issue as follows:

            If I do not ask for Reconsideration of my offer within 30 days, will I no longer be able to Opt Out of the Settlement?

            No.  If you do not seek Reconsideration in 30 days, you will not be able to later appeal or challenge the amount of that offer; however, you will still have the right to Opt-Out until either the expiration of the Opt-Out Deadline or the execution of an Individual Release.

    **(b) Outstanding or New Issue?**  The FAQs are Outstanding, but the proposed redraft of the "deemed accepted FAQ is new.

    **(c) Class Counsel.**  Has approved, but see change to "deemed accepted" FAQ.

    **(d) No Comment Yet from BP.**

**17. Subsistence. Compensation Formula for Consumption Losses.**

    **(a)  Claims Administrator's Question.** What compensation formula should we use to calculate compensation for losses related to consumption?

        *Recommendation***:** Use BP's compensation formula to calculate compensation for losses related to consumption. Exhibit 9, Section B(2)(c) requires that quantities of lost natural

#410697

resources do not exceed reasonable consumption rates.  BP's example calculation provided a method for which we could use to calculate reasonable consumption rates.

**(b) Outstanding or New Issue?**  Outstanding.  We raised this in our 7/18/12 memo to the Parties, and we discussed it during our meeting with Mr. Juneau and the Parties on 7/18/12.

**(c) 7/18/12 Meeting. Class Counsel.**  Class Counsel disagreed with our recommendation and stated that they would like to continue to research this issue.

**(d) 7/18/12 Meeting.**  BP.  BP agreed with our recommendation.

## 18. Subsistence. Verification of Bartering Losses.

**(a)  Claims Administrator's Question.** May we require third party affidavits to verify bartering losses?

*Recommendation***:** Yes

**(b) Outstanding or New Issue?**  Outstanding.  We raised this in our 7/18/12 memo to the Parties, and we discussed it during our meeting with Mr. Juneau and the Parties on 7/18/12.

**(c) No Comment from BP or Class Counsel.** We have received no comment from the Parties on how the CADA Team will verify Subsistence losses related to bartering.

## 19. Subsistence.  Updated Seafood and Game Retail Price Chart.

**(a) Claims Administrator's Question.**  What Seafood and Game Retail Price Chart should we use?

*Recommendation***:** We use Class Counsel's updated price chart.

**(b) Outstanding or New Issue**?  Outstanding.  We raised this in our 7/18/12 memo to the Parties, and we discussed it during our meeting with Mr. Juneau and the Parties on 7/18/12.

**(c) 7/18/12**.  Class Counsel indicated during our meeting that we would receive an updated price chart, and we have not yet received this.  Class Counsel plans to update their chart with post-Spill retail values for specific species of Seafood and Game.

## 20. Zone A Mapping Question.

**(a)  Question.**  Should Key Largo, FL be included in Zone A? What compensation formula should we use to calculate compensation for losses related to consumption?

**(b) Outstanding or New Issue?**  Outstanding.  This issue first arose on 7/17 from Plaintiffs' counsel, Brian Barr.

**(c) Comment History.**

13

**(1) 7/17/12 Question from Brian Barr.**   In the settlement agreement, the following language describes the Keys as Zone A:

**A-28:** *Florida Keys:* This zone consists of the entirety of the series of islands off the south coast of Florida stretching from Key West in the south/west to Key Largo in the north/east.

However, on the online map, Zone A stops in Key Largo (the city) and does not include north Key Largo.  North Key Largo is listed as Zone D.

**(2) 7/19/12.  BP's Response.** North Key Largo is located in Zone D, and this is reflected in both the Economic Loss Zone Map and the supporting description of this Zone.  The area of the Florida Keys designated as a Zone A ends just north of U.S. Highway 1.  Areas to the north of this boundary, such as North Key Largo, are in Zone D.   The description of this Zone A is also consistent with the Economic Loss Zone Map.  North Key Largo is a separate municipality from Key Largo, and as a result, the description does not include North Key Largo as part of the Zone A definition.

**(3) 7/19/12. Class Counsel.** That is completely inconsistent with the description of Zone A-28 on page 8 of Exhibit 1B, which refers to "the entire series of islands … to Key Largo."  Key Largo is and island.  North Key Largo is located on the island.  Nothing in the description talks about Highway 1 or the formal Key Largo (or North Key Largo) municipalities.

**(d)** *Recommendation.*  Need input from the Parties on the intention of the Settlement Agreement.

#410697

# BROWNGREER ‖ PLC

# MEMORANDUM

**TO:**      **Patrick A. Juneau, Claims Administrator**

**FROM:**    **Lynn C. Greer**

**DATE:**    **July 30, 2012**

**RE:**      **Policy Issues Affecting Claimants' Access to Information, Chances to Perfect Claims, and Reconsideration/Appeal Steps**

---

This memo addresses various issues that have arisen recently in email exchanges with Class Counsel. These questions initially asked when claimants will have access to workbooks and calculations used in determining a claim's value. That question led to a larger discussion of the process and opportunities claimants have to perfect claims under the Settlement Agreement. We have evaluated each of the issues raised, have examined our current processes, and recommend certain adjustments.

## I.   Opportunities to Perfect a Claim.

**A. Settlement Agreement Requirements and the Program's Compliance.** Class Counsel Class Counsel invokes various sections of the Settlement Agreement for the overall argument that the Program owes a duty to claimants to be flexible and accommodating as the claimant attempts to perfect a claim.

### 1. Section 4.3.7.

**(a)** Section 4.3.7 is fairly general but describes our overarching duty to assist claimants. It requires us to work with claimants to facilitate the "assembly and submission of Claims Forms, including all supporting documentation necessary to process Claim Forms under the applicable Claims Processes." It obligates us "to use our best efforts to provide claimants with assistance, information, opportunities and notice so that the claimants have the best opportunity to be determined eligible for and receive the Settlement Payments to which the claimant is entitled."

**(b) Settlement Program's Compliance with Section 4.3.7.** The processes we have in place for assisting claimants meet, we believe, the requirements and spirit of Section 4.3.7. Everything we do is designed to make the process user friendly on the front-end, including: (1) fully-staffed Claimant Assistance Centers that help

1

claimants assemble and submit Claim Forms, and answer questions; (2) an online Claim Form process that facilitates the submission of claims; (3) trained call center representatives who can assist callers; (4) instruction booklets and online instructions that guide claimants on how to answer each question on the claim Form and which documents to submit; and (5) implementation of the process outlined in Section 6.1 of the Settlement Agreement that provides a claimant with chances to submit what is missing in support of his claim.

2. **Section 6.1**. Class Counsel cites to Section 6.1 that for the proposition that claimants will have "at least" three opportunities to have Claims reconsidered and reviewed. Use of the words "at least" three opportunities suggests that the Program should be flexible enough to entertain multiple layers and back and forth.

    **(a) Section 6.1**. Section 6.1 of the Settlement Agreement states:

> Subject to and in accordance with 4.3.7 and 4.3.8 [which obligates us to evaluate claims in a way that yields the highest compensation amount possible for the claimant], Economic Class Members will have *up to three opportunities*, depending on their circumstances, to have their Claims reconsidered and reviewed to assure accuracy, transparency, independence, and adherence by the Settlement Program to the terms of this Agreement.

Section 6.1 does not say "at least" three opportunities. Rather, it says "up to" three opportunities. Second, Section 6.1 cannot be read in isolation to support endless rounds of reviews. We must read it in context and in conjunction with the sections that follow it, which outline three distinct paths a claimant can take for seeking another review or consideration of a claim. These are: (1) Appeal for Insufficient Documentation, to the Documentation Reviewer, if a claim is so incomplete that it "cannot be fully processed, in whole or in part, on grounds of insufficient documentation ("Fatally Incomplete"); (2) Reconsideration of a "Final Determination" of the Settlement Program; and (3) Appeals to the Appeal Panel of a Final Determination of the Settlement Program. The "circumstance" that influences whether the claimant has three opportunities or fewer than that, is whether the claim is Fatally Incomplete or whether it is eligible and payable.

If a claim is Fatally Incomplete, then the Settlement Agreement affords three distinct paths for review and reconsideration: (1) Re-Review (6.1.1); (2) Reconsideration; (6.1.2.1); and (3) Appeal to the Documentation Reviewer (6.1.2.2).

If a claimant has received a "final determination" from the Settlement Program, the Settlement Agreement suggests only two available paths for review and reconsideration; (1) Reconsideration; and (2) Appeal.

    **(b) Settlement Program's Compliance with Section 6.1 for Fatally Incomplete Claims.** If a claim is Fatally Incomplete and cannot be evaluated for eligibility and payment at all because of missing information or documentation, we**:**

2

410476
7/25/12

(1) Issue an Incompleteness Notice and give the claimant 30 days to respond.

(2) If the claimant's submission does not cure the insufficiency or the claimant does not respond, we issue an Incompleteness Denial;

(3) The claimant may ask for Reconsideration of the Incompleteness Denial and submit additional documentation;

(4) If the claimant's submission does not cure the insufficiency, we issue a Post-Reconsideration Denial Notice, which gives the claimant 20 days to appeal to the Documentation Reviewer;

(5) If the Documentation Reviewer denies the claim, we issue a "Post-Appeal Incompleteness Denial" Notice. Thereafter, the claimant is free to resubmit a claim at any point up to the applicable deadline for claim submission.

This path available to Fatally Incomplete claims affords claimants three opportunities to perfect a claim.

**(c) Settlement Program's Compliance with Section 6.1 for Eligible Claims**. If we can evaluate a claim for eligibility and payment, we issue an Eligibility Notice, which informs the claimant that we found the claim eligible and provides the payment amount to which the claimant is entitled, if any. If the claimant agrees with the amount, he can accept it. If, however, the claimant does not agree with the amount, there are two opportunities for the claimant to submit additional documentation:

(1) The claimant may ask for Reconsideration. We will re-review the claim and issue a Post-Reconsideration Eligibility Notice, which will contain the same amount, a higher amount, or possibly a lower amount, depending on how the documentation affects the original review.

(2) If the claimant does not agree with the results of the Reconsideration, he may Appeal to the Panel.

This path available to claimants we have found eligible affords two opportunities to perfect a claim.

**B.      Discussion of Process and Possible Change**.

**1.   Gap in Settlement Agreement Logic**. Although we have designed a process that we believe complies with the requirements of the Settlement Agreement, there is an unintended gap in the language that results in disparate treatment of claimants whose claims are Fatally Incomplete, such that that we cannot review them at all, and those whose claims are complete enough to yield a payable result, even though perhaps not the maximum amount the claimant would be entitled to if he could submit additional documentation ("Partially Incomplete but Eligible). For the Partially Incomplete but

3

Eligible claimant, the Program allows only two opportunities to maximize the claim; (1) Reconsideration; and (2) Appeal.  If a claimant receives our initial Eligibility Notice and realizes that information was missing that could increase the offer amount, he must invoke the Reconsideration step to submit new information. Our review is basically a new review at that point. We then issue a Post-Reconsideration Eligibility Notice, but the claimant has no opportunity to ask us to look at that again, without paying the cost of asking for an Appeal.

Although technically consistent with the Settlement Agreement, we believe that it is an unintended result for the Program to give the claimant whose claim is Fatally Incomplete more opportunities to perfect a claim than we do the claimants who are Partially Incomplete but Eligible.

**2.   Available Options.**  We have three possible options for how to address this possible incongruence in the process:  (a) Do nothing; (b) Make more claims incomplete; or (c) Inject a re-review process before the formal Reconsideration step for claims that are eligible.  Our analysis of each option follows:

**(a)  Do Nothing.**  We could decide not to change or process, on the grounds that it adheres to the strict terms and requirements of the Settlement Agreement.  This would be the easiest of the options administratively because we would simply continue our process as designed and make no changes.

*Recommendation:*  We should not adopt this option.  This already has and is likely to invite criticism as violating the spirit of the Settlement Agreement. However, the Parties have already instructed us to issue an Incompleteness Notice in certain situations, rather than an Eligibility Notice.  These situations include where a claimant selects a two year Benchmark Period but only submits financial information for one of the two years.  Although we could issue an Eligibility Notice based only on the one year of records, we will issue an Incompleteness Notice instead, based on the directive from the Parties.

**(b)  Make More Claims Incomplete.**  Section 6.1.1 triggers the steps outlined above that put the claim on the path to the Documentation Reviewer.  This path clearly affords the claimant with generous opportunities to perfect a claim.  Rather than send an Eligibility Notice to a Partially Incomplete but Eligible claimant, we could send that claimant an Incompleteness Notice.  This would put such a claimant on the same path as a claimant whose submissions were Fatally Incomplete. This is consistent with the language in Section 6.1.1 that the Appeal to Documentation Reviewer is available to a claimant whose claim "cannot be fully processed, *in whole or in part*, on grounds of insufficient documentation." Perhaps the "in part" language means that if we cannot process a claim to its maximum value, we should deem it insufficient.

*Recommendation:*  We should not adopt this option.  From the beginning of this process, we have received the very strong message to minimize the number of insufficiency Notices we issue.  Insufficiency Notices are always the biggest source of frustration for claimants, and we should reserve them for Fatally

Incomplete claims. Furthermore, claimants would much prefer to receive a Notice showing the payment to which they are entitled and have the choice to accept it or to submit more documentation.  There will be claimants who decide to accept offers, either because they do not have more documentation to submit, or because they decide that it is not worth it for whatever incremental amount it might yield.

However, the Parties have instructed us to issue an Incompleteness Notice in certain situations, rather than an Eligibility Notice.  These situations include where a claimant selects a two year Benchmark Period but only submits financial information for one of the two years.  Although we could issue an Eligibility Notice based only on the one year of records, we will issue an Incompleteness Notice instead, based on the directive from the Parties.

(c) **Institute a Re-Review Step in the Process before Reconsideration.**  We could change our Eligibility Notice and process to allow claimants who receive the first Notice and disagree with it, to seek Re-Review of the claim.  This Re-Review step would come before Reconsideration and would afford the claimant with a chance to submit documentation to render his claim more complete and to increase his award. After we conduct the Re-Review, we would issue a Notice that then triggers the Reconsideration step.

*Recommendation:*  Although this will require fairly significant changes to our process flow and Notices, we recommend this option.  We think it solves the unintended gap in the Settlement Agreement for Partially Incomplete but Eligible Claimants.

II.    **Claimants' Access to Information and Triggers for Reconsideration and Appeal.**
Touching on this process are several additional questions and policy considerations.  These include when claimants have access to full information on the calculations behind their claims, and when Reconsideration and Appeal Rights are triggered.

A.  **Settlement Agreement Provisions**.  Access to information and triggers for Reconsideration and Appeal hinge in the Settlement Agreement on when we issue determinations that are "final."

1.   **Reconsideration:**  A Claimant may request in writing reconsideration, "within 30 days of issuance of notice in writing to the Claimant of a *final determination* of a Claim by the Settlement Program."  (Section 6.1.2.1.1)

2.  **Claimant Appeal:**  A Claimant may Appeal within 30 days of the issuance of a *final written notice* from the Settlement Program of a determination of a *final compensation award*.  (Section 6.1.2.3)

3.  **BP Appeal:**  The BP Parties may Appeal a f*inal compensation award determination* where the Compensation Amount determined by the Settlement Program is in excess of $25,000.  The BP Parties shall receive notice of an award on the same date that notice is provided to the Economic Class Member. . ."

5

(Section 6.1.2.4) [Section specifies different time periods depending on amount of award.]

    **4.**  **Access:**  Immediately upon issuance of a *final written notice* from the Claims Administrator *of a determination* of a Claim, the Settlement Program shall provide BP, Lead Class Counsel, Claimant and Claimant's counsel (if Claimant is represented) with electronic access to the full record of the Claim at issue." (Section 6.8)

The Settlement Agreement does not define exactly when a determination or notice is "final" in any of these provisions; therefore, we must interpret the Settlement Agreement against the backdrop of our process.

  **B.**  **Interpretations of "Final" Language in Settlement Agreement.**  To have a process that flows practically and within the spirit of the Settlement Agreement, we think we should define "final" as follows:

    **1.**  **Issuance of the Eligibility Notice.**  Our issuance of the Eligibility Notice constitutes a "final determination" and a "final written notice. . . of a determination."  Thus, issuance of the Eligibility Notice triggers Reconsideration and access to information by the Claimant, Claimant's Counsel, Class Counsel and BP.

    **2.**  **Acceptance of a Determination, Issuance of a Post-Reconsideration Eligibility Notice, or Expiration of Time Period to Request Reconsideration.**  An award becomes a "final compensation award" when there is no opportunity for the amount to change.  This occurs only when one of three things happens:  (1) the Claimant accepts the award; (2) the Claimant seeks Reconsideration within 30 days, we re-review the claim and issue the Post-Reconsideration Eligibility Notice; or (3) 30 days from the first Eligibility Notice has passed and the Claimant has not sought Reconsideration.  When the award becomes the "final compensation award," BP's appeal rights are triggered.  If the Claimant has sought Reconsideration, then the Claimant's Appeal rights are also triggered upon issuance of the Post-Reconsideration Eligibility Notice.

  **C.**  **Claimants' Access to Information.**  Class Counsel has raised the question of when a Claimant is granted access to everything relied upon by the Settlement Program in reaching a final determination.  For every claim type except the Business Economic Loss claims, the level of detail and transparency is in the Notice itself, because every calculation appears, and each relevant factor that drives the result is included on the Notice.  For Business Economic Loss claims, however, the detailed workbooks and information that drive the results are not provided in the Notice itself.  Thus, Class Counsel's question is relevant only to the Accountant workbooks.

    **1.**  **Current Policy.**  The current policy is to make the Accountant workbooks available only when the Claimant requests Reconsideration.  The reason for this policy was because the specific language addressing the "forms, calculations and worksheets relied upon by the Settlement Program" appears in Section 6.1.2.1.1,

6

which is the section addressing Reconsideration.  However, upon further reflection, and consistent with Section 6.8 that specifies access at the time of a determination of a claim (the Eligibility Notice),we do not think the language means necessarily that we must make the forms, calculations and worksheets available only upon a claimant's request for Reconsideration.

2.  **Class Counsel's Position.** Class Counsel asks for the workbooks to be available at the time of the Eligibility Notice to inform the claimant's decision whether to seek Reconsideration.  Section 6.1.2.1.1 suggests, and our Eligibility Notice requires the claimant to specify whether he is seeking Reconsideration because we: (1) committed a calculation error; (2) failed to take into account relevant information or data; or (3) otherwise failed to follow the standards governing the determination.

A claimant who is trying to figure out whether we made a calculation error or failed to take into account relevant information or data will not know how to do that unless we show him exactly how we arrived at our decision.

***Recommendation:***  Change the current policy to make the Accountant workbooks available when we issue the Eligibility Notice.  This is consistent with the access provisions in Section 6.8, as well our interpretation of what constitutes a "final written notice."  We can make the workbook available in PDF only so that a claimant cannot view the specific Excel formulas used by the accountants.

D.  **When BP Must Note an Appeal.** In the redlined changes to the Appeals Protocol, Class Counsel has taken issue with BP's appeal rights being triggered at any time other than when the claimant receives the first notice.

1.  **When is BP's Appeal Right Triggered?** As we have discussed, it does not make sense for BP to appeal during the window when the claimant can ask for Reconsideration, because the final determination in the Eligibility Notice it not really "final" at all.  Furthermore, if we define *final compensation award*  to the earlier of:  (1) the date the claimant accepts the Eligibility Notice; or (2) the date of the Post-Reconsideration Eligibility Notice if the claimant asks for Reconsideration; or (3) Day 31 following the Eligibility Notice, if the claimant does not ask for Reconsideration, BP's appeal rights are not triggered until one of these events occurs, not by the Eligibility Notice.

2.  **Injection of Re-Review Step and Effect Appeal Timetable.**  If we add a Re-Review step into the process after issuance of the Eligibility Notice, we would need to inject 30 days into the process to afford claimants with enough of a chance to respond.  Therefore, the timeline for either the Claimant or BP to appeal, as applicable, would be adjusted accordingly.

The flowchart on the next page depicts the current process and shows how our recommended changes would affect it.

410476
7/25/12

After you have had a chance to consider the recommendations in his memo, please let me know if you have any questions or if we should talk or meet to discuss this in more detail.

Thank you.

410476
7/25/12

**CURRENT PROCESS**

Claimant Receives Eligibility Notice. Class Counsel and BP Receive Access to Claim and BP gets Notice of Award. (Day 1)

Does Claimant Accept the Offer within 30 Days?

— Yes → BP's Appeal Rights Triggered from Date of Acceptance

No ↓

BP's Appeal Rights Triggered on Day 31 ← No — Does Claimant Request Reconsideration within 30 Days? — Yes → Claimant Receives PDF of Accountant Workbooks → Claimant Receives Post-Reconsideration Eligibility Notice → Claimant and BP's Appeal Rights Triggered from Date of Post-Reconsideration Eligibility Notice

**RECOMMENDED PROCESS**

Claimant Receives Eligibility Notice. Class Counsel and BP Receive Access to Claim and BP gets Notice of Award. Claimant Receives PDF of Accountant Workbooks (Day 1)

Does Claimant Accept the Offer within 30 Days?

— Yes → BP's Appeal Rights Triggered from Date of Acceptance

No ↓

Does Claimant Request Re-Review within 30 Days? — Yes → Claimant Receives Post Re-Review Eligibility Notice → Does Claimant Accept Post Re-Review Offer within 30 Days? — Yes → BP Receives Notice of Award, and BP's Appeal Rights Triggered from Date of Acceptance

No →

BP's Appeal Rights Triggered on Day 61 ← No — Does Claimant Request Reconsideration within 30 Days? — Yes → Claimant Receives Post-Reconsideration Eligibility Notice → BP Receives Notice of Award, and Claimant and BP's Appeal Rights Triggered from Date of Post-Reconsideration Eligibility Notice

401502  7/25/12

~~**4. What happened to the $20 billion BP set aside in August 2010 to pay for damage caused by the Deepwater Horizon Incident?**~~

[PARTIES AGREE THIS FAQ IS UNNECESSARY]

**11. Are any Individuals or Entities excluded from the Economic Class?**

Yes.  The following Individuals and Entities are excluded from the Economic Class:

- Those who choose to exclude themselves from ("Opt Out" of) the Economic Class (Click Here to jump to Section III for more information on Opting Out)

- Those who received a payment from the GCCF <u>and</u> executed a GCCF Release and Covenant Not to Sue (*except* those who seek a VoO Charter Payment Claim or Vessel Physical Damage Claim or those who signed a release that only covered bodily injury)

- Defendants in MDL 2179 and current employees of BP and other Defendants in MDL 2179

- Former Employees of BP and other Defendants in MDL 2179 who were employed by BP and other Defendants during the Class Period

- Any sitting Judges of the United States District Court for the Eastern District of Louisiana and their immediate families

- Law clerks who served in the United States District Court for the Eastern District of Louisiana during the pendency of MDL 2179 and their immediate families

The following Entities and their employees (to the extent they allege economic damage based on their employment by such entity during the Class Period) are excluded, subject to certain exceptions:

- Certain Financial Institutions [link to Ex. 18]

- Certain Funds, Financial Trusts, and Other Financial Vehicles [link to Ex. 18]

- Certain Gaming Entities [link to Ex. 18]

- Certain Insurance Entities [link to Ex. 18]

- Certain Oil and Gas Industry Entities [link to Ex. 17]

- Certain Defense Contractors/Subcontractors

- Entities selling or marketing BP-branded fuel, including jobbers and branded dealers

- Certain Real Estate Developers, including those that develop commercial, residential, or industrial properties, (except that these Entities can make claims for Coastal Real Property Damage, Wetlands Real Property, and Real Property Sales Damage);

- Governmental Organizations

More detail on the exceptions to the exclusion of Entities in these industries and their employees can be found in Sections 2 and 5.10 of the Settlement Agreement. [link to Section 2 and 5.10].

[SA 2 and **5.10**]

**22. If I qualify as an Economic Class Member, am I required to participate in the Settlement?**

No.  If you do not want to participate in this Settlement you have the right to Opt Out (i.e., exclude yourself from the Economic Class).  The Economic Class Action Settlement Notice provides instructions regarding the procedures that must be followed to Opt Out of the Economic Class.

In the event you decide to Opt Out of the Class, the Settlement Program will not continue to process any claim you have submitted, or thereafter submit, to the Program.

To validly exclude yourself from the Economic Class, you must submit a written request stating "I wish to be excluded from the Economic Class."  The request must include your printed name, address and phone number and must be postmarked no later than October 1, 2012. The written request must be signed by the Natural Person or Entity seeking to exclude himself, herself or itself from the Economic Class, even if they are represented by an attorney.  Electronic signatures will not be accepted.  The request should be mailed to:

> Deepwater Horizon Court-Supervised Settlement Program
> Exclusions Department
> P.O. Box 222
> Hammond, LA 70404-0222
>
> [SA 8.2.1]

**28. If I'm an Economic Class Member and I Opt Out, may I sue BP or file a claim with the federal Oil Spill Liability Trust Fund?**

Yes, provided you do so in a timely manner and have satisfied the applicable legal requirements including the presentment requirement of the Oil Pollution Act of 1990, 33 U.S.C. § 2713.

If you have questions about filing a lawsuit, you should contact an attorney of your choice.  You (or your attorney) may also consult with Class Counsel at (855) 359-2327 or classcounseloffice@mdl2179psc.com.

For more information about how to file an OPA claim with BP visit www.bp.com/claims or call 1-855-687-2631.

For more information about how to file a claim with the federal Oil Spill Liability Trust Fund, visit http://www.uscg.mil/npfc/Claims/default.asp. If you choose to file with the Federal Oil Spill Liability Trust Fund instead of filing suit, you must strictly comply with the Federal Regulations pertaining to such.


**29. If I am not an Economic Class Member, can I still sue BP for alleged damages arising out of the Deepwater Horizon incident or file a claim with the federal Oil Spill Liability Trust Fund?**

Yes, provided you do so in a timely manner and have satisfied the applicable legal requirements including the presentment requirement of the Oil Pollution Act of 1990, 33 U.S.C. § 2713.

If you have questions about filing a lawsuit, you should contact an attorney of your choice.  You (or your attorney) may also consult with Class Counsel at (855) 359-2327 or classcounseloffice@mdl2179psc.com.

For more information about how to file an OPA claim with BP visit www.bp.com/claims or call 1-855-687-2631.

For more information about how to file a claim with the federal Oil Spill Liability Trust Fund, visit http://www.uscg.mil/npfc/Claims/default.asp. If you choose to file with the Federal

Oil Spill Liability Trust Fund instead of filing suit, you must strictly comply with the Federal Regulations pertaining to such.

**55. I had a pending offer from the GCCF when the Transition Process opened and I accepted the 60% payment that the Transition Process offered.  What do I need to do now?**

You may now file a claim with the Settlement Program.  All of your claims-related information, files, and data that you previously submitted to the GCCF or the Transition Process have been transferred to the Settlement Program, but the Settlement Program will not begin to review your file unless and until you file a claim with the Settlement Program.  (Click Here to jump to FAQs about how to file a claim.)

Once the Settlement Program has reviewed your claim, you will receive your Settlement Payment less any amounts paid during the Transition Process or the remaining 40% of your GCCF offer, whichever is larger, in exchange for executing a release.

If you do not wish to file a claim in the Settlement Program, you may choose to receive the remaining 40% of your GCCF offer in exchange for executing a release. (**NOTE – You will be giving up your right to any and all additional claims.**)

If you Opt Out of the Settlement, or if you are not an Economic Class Member, you can choose to receive the remaining 40% of your GCCF offer in exchange for a release, or you can also choose to forego the remaining 40% and pursue any rights available to you outside of the Settlement.  [SA 4.2.3.1, 4.4.2, 4.4.5]

~~**2d ½ Priority FAQ 17: If I opt out of the Settlement, how do I elect to receive the remaining 40% of my Transition Process Offer?**~~

[PARTIES AGREED TO DELETE AS DUPLICATIVE]

**2d ½ Priority FAQ 27: I had 6% withheld from my Transition Process payment.  Will I get that money back?**

If you are an Economic Class Member and you choose to participate in the Settlement Program, yes.  If you are not an Economic Class Member, or if you Opt Out of the Settlement, then the funds will be held in trust.  Once the Court has determined what, if any, common benefit fees may be awarded, any excess will be returned to you.

**2d ½ Priority FAQ 28: I had 6% withheld from a GCCF payment I received before February 26, 2012.  Will I get that money back?**

These funds are being held in trust.  Once the Court has determined what, if any, common benefit fees may be awarded, any excess will be returned to you.

NEW FAQ RE ACCOUNTING FEES

**The Claimant Accounting Support section of the Settlement Agreement says that the reasonable and necessary time for accounting services will only be reimbursed up to certain specific standard hourly rates (Click Here to see those hourly rates).   Can I hire an accountant at rates or fees that are greater than what is spelled out in the Settlement Agreement?**

Yes.  You are free to hire the accountant of your choice.  However, the Settlement Program will only reimburse reasonable and necessary accounting fees as set forth in the Settlement (Click Here [FAQ 101]).  In addition, the total amount of reimbursable accounting fees are subject to specific limits based on the type of claim you submit (Click Here to read more about those limits).  As a result, if you hire an accountant who charges an hourly rate or other

fees that are greater than what is provided under the Settlement Agreement, you (and not the Settlement Program or BP) will be responsible for the difference.

NEW FAQ RE CONFIDENTIALITY

**Will information that I submit to the Settlement Program be treated as confidential?**

Yes.  The Court has entered an Order that addresses the confidential treatment of information submitted by a claimant to the Settlement Program. (Click Here to see a copy of the Order)

NEW FAQ RE NON-PROFITS

**Are non-profit entities eligible to participate in the Settlement Program?**

Yes, non-profit entities are generally eligible to participate in the Settlement Program unless they are excluded as Governmental Organizations [link to definition] (or some other Exclusion).

NEW FAQ RE "ACCEPTED" IN PAYMENT NOTICE  [Edits proposed by BrownGreer]

**My determination notice states that "If you do not respond within 30 days, your Payment Notice will be deemed accepted."  Does that mean that, if I wait 30 days, If I do not ask for Reconsideration of my offer within 30 days, will II will no longer be able to Opt Out of the Settlement?**

No.  If you do not seek Reconsideration in 30 days, you will not be able to later appeal or challenge the amount of that offer; however, you will The term "accepted" simply means that you are not seeking Reconsideration with respect to that that particular Claim.  You would still

have the right to Opt Out until either the expiration of Opt-Out Deadline or the execution of an

Individual Release.


NEW FAQ RE SIX-MONTH PERIOD UNDER SECTION 4.4.8

**Section 4.4.8 of the Settlement Agreement (and Section 18 of the Individual Release) afford Class Members six months from the date of the "initial payment" to file additional Claims with the Settlement Program.  How do I determine the date of initial payment?**

The Settlement Program interprets "initial payment" to mean the date of the first check (even if, for some reason, the check needs to be reissued) or the date of the wire transfer. For ease of implementation and tracking, we will calculate "six months" as 180 days.