DWH: █████████████████

Claim ID: 2205

Written Reasons and Opinion:

This Claimant appeals the denial of its Business Economic Loss claim upon a finding by the Claims Administrator that it is a Real Estate Developer and thus excluded from the class.

The Denial Notice contained the following explanation:

1. Your claim is excluded under Section 2.2.4.7 of the Settlement Agreement because your business is an excluded real estate developer. You may submit claims for Coastal Real Property, Wetlands Real Property, and Real Property Sales Damage, if you are otherwise eligible for those claims under the Settlement Agreement. The Claims Administrator determined that your business is a real estate developer based on the following:

2. The business is an excluded real estate developer because it identified its business activity as real estate development on its 2010 tax return.

3. The business is an excluded real estate developer because there are indications that it engaged in real estate development activity in 2010, including any activities involved in the making of any material changes in the use of buildings or land, including the renovation and re-lease of existing buildings, the purchase of raw land for development, the sale of improved land or parcels to others and the planning, design, arranging of financing, zoning approvals, construction, marketing, sale, or lease of such projects.

Claimant's request for reconsideration was denied. The Post- Reconsideration Denial Notice repeated the explanation referenced above and provided the following Reconsideration Analysis:

The Claimant has submitted a Reconsideration Request challenging the exclusion of the Business. We have verified that the Business remains excluded due to the fact that all Real Estate activities were not "completed" because the Claimant did not "sell, convey, transfer, or otherwise dispose of all Real Property on which [its] prior Real Estate Development Activities took place or entered in contracts to do so" as defined in Policy 299.

Claimant argues that it was created for two purposes; i.e. (1) initially, to build a luxury waterfront condominium tower in ███████████████; and (2) thereafter, to manage and rent its condominium units in concert with vacation property management companies. According to Claimant:

1

In August 2006, ████ completed construction and received its certificate of occupancy. ████ boasted 20 floors with 155 luxuriously appointed condominium units as well as a 6 story clubhouse, fitness center, indoor/outdoor pool, sauna and hot tub.

Between 2006 and 2007, 100 condos were sold to pay back construction financing. At this point, ████ completed its development and construction activities. In line with its long term vision, ████ retained the remaining condos for vacation and short-term rental. In May 2007, ████ signed an agreement with ███, a rental condo company, for marketing and condo rental management.

By the first quarter of 2010, the tourism market was strong. On April 20, 2010 the Oil Spill hit the ████ Gulf Coast tourism market with force. In the months that followed, the vacation rental and hospitality market suffered deep losses resulting from the Oil Spill. As a result of the depressed vacation rental market, ████ was forced to put up some of its condos for sale to cover cash flow needs and service debt. ████ sold condo units 2004 and 2007 in August and September of 2010. *See* Doc. File Id. 80309 at 213 and Doc File Id. at 221. Despite these obstacles, ████ (through 4 different rental companies) actively marketed and rented its remaining 29 condos throughout 2010 and as well as managing 4 condos owned by others.

According to Claimant, the Claims Administrator's decision is premised upon a misinterpretation of the general rules contained in CAO Approved Policy 468 which ignores evidence of the substantive nature of its business which demonstrates it ended all development activity long before the year 2010.

BP, on the contrary, simply argues that:

> It is undisputed that Claimant developed a condominium development and held out for sale and sold units from that development in 2010. That Claimant claims to have also engaged in other non-development activities is irrelevant.

Moreover, in a footnote, it asserts:

> BP notes that Section 2.2.4.7 does not limit excluded real estate development to 2010. As the Panel recently found, Section 2.2.4.7 does not confine the analysis "to any particular year or time period". Appeal Panel Decision, Claim No. 275837. Rather, it excludes real estate development, regardless of when performed. Failing to apply the exclusion to real estate development in the benchmark years would be directly contrary to the purpose of the exclusion, which is to prevent compensation of alleged declines in real estate development profits given the crash in the national housing market. For example, if a claimant

2

had real estate development activities in 2009 but truly had none in 2010, failure to apply the exclusion would result in claimant receiving compensation for 100% of it 2009 real estate development activities, even though the Settlement Agreement expressly excludes real estate development. It is not, however, necessary to reach this issue, as the record is clear that Claimant continued to engage in real estate development in 2010.

Class Counsel also weighed in on this subject with an amicus submission dated March 9, 2015, which was uploaded in the record and identified as a "Supporting Document" following filing of Claimant's Notice of Appeal. The relevant portion of that submission provides:

> **The Settlement Agreement and the Current Policy Clearly Call for a Totality-of-the-Circumstances Test, which Views the Entity as a Whole, as of the Time of the Spill, and Allows for some Real Estate Development Revenues and/or Activities**
>
> The language used in the Settlement Agreement calls for a "totality of the circumstances" evaluation to determine the true nature of an Entity as a whole. Section 2.2.4. states that exclusion from the Business Economic Class will be based on the "substantive nature of the business", indicating that substantially more than 1% or *any* evidence of real estate development activity will be necessary to exclude an Entity.
>
> The common meaning of the term "substantive nature" is that a condition is of, relating to, containing or being the real nature or the essential element of a thing.[7] Thus, to determine the substantive or real nature of a business, the Program Vendor or Appeal Panelist should consider the totality of the Claiming Entity's 2010 business activity, and determine: (a) whether any of the business activity constitutes "real estate developer activity" and (b) whether the real estate developer activity so predominates all other types of the Entity's business activity such that the Entity may reasonably be deemed a "Real Estate Developer".

---

[7] *See* http://dictionary.reference.com/browse/substantive.

3

The Claims Administrator acknowledged the Settlement Agreement's mandate to conduct a totality of the circumstances type evaluation when determining whether an Entity should be excluded under the Real Estate Developer Exclusion. In Policy 468, the Claims Administrator noted that "the Settlement Agreement provides no revenue threshold applicable to determining who is or is not a Real Estate Developer; rather, the Settlement Agreement takes a more *subjective* approach and leaves that determination to the sound discretion of the Claims Administrator."

Moreover, the Policy states that a Claimant will be evaluated using a number of indicators "to determine whether it was *more likely than not* that the Entity was *sufficiently engaged* in Real Estate Development Activity *during 2010* such that it may *reasonably be characterized* as a *Real Estate Developer*." (which is the same language that BP agreed to in 2010)

Policy 468 lists the factors, or "other evidence" of an Entity's activities that will be examined and considered in deciding whether the Real Estate Developer Exclusion applies. The first factor is whether the Entity expressly identified or described its business operations as being related to real estate development on its 2010 tax return. If so, the Entity shall be presumed to be a Real Estate Developer; however, as noted, that presumption may be rebutted with evidence showing "to a reasonable degree of certainty that the Entity had …ceased Real Estate Development Activity." The second factor for determining whether an Entity is a "Real Estate Developer" is whether the Entity held any business licenses and permits indicating that it was engaged in real estate development activity. The third factor is whether a claimant's 2010 tax return reports revenue from real property sales as ordinary income (other than depreciation recapture), rather than as capital gains income. The fourth factor focuses on the types of expenditures incurred in 2010.[8] The final inquiry is whether any other 2010 activity can be fairly considered "real estate development activity". (Again, it is important to distinguish, in this regard, between the actual *development* of a subdivision or other project, versus construction of homes or the management of properties that have long since been developed.) Policy No. 468 asks the Program to review an Entity's financial documentation and other available documentation or information using all of these five factors, *not one*, to determine whether the Entity was "more likely than not" "sufficiently engaged" in real estate development activity during 2010 to be fairly and reasonably characterized as a "Developer".

With its proffered 1% Rule, BP attempts to incorrectly define a "Real Estate Developer" as an Entity that was engaged in *any* real estate development activity,

4

or derived *any* revenue from any real estate development activity, at *any* time, no matter how small, and irrespective of such activities or revenues relative to the Entity's overall business.

This is clearly contrary to Policy No. 468, in which the Claims Administrator explicitly acknowledges that a claimant may derive some income from real estate development activity and still not reasonably be characterized as a "developer".

Indeed, Section II.E provides that all of an entity's revenues and expenses are to be included in the causation and loss calculations, *"including any Real Estate Development Activity,"* so long as the claimant is not an excluded real estate developer. This provision recognizes that an Entity may have some real estate development revenue or expenses, but that should not necessarily lead to classification as an excluded "Real Estate Developer".

Looking at Policy No. 468 as a whole, it clearly provides that some real estate development is allowable, and the exclusion only applies where the level of real estate development activity in 2010 was substantial enough that the claimant may reasonably be classified as a "developer".

Despite these provisions, the Policy is often being misconstrued by Program Vendors and in some cases Appeal Panelists, under a bright-line or "1% rule", such that any use of the word "development" on a 2010 tax return, or the sale of a single property in 2010 which the Claimant had previously developed, automatically makes Claimant a developer, despite the undisputed fact that Claimant's actual business activities in 2010 were in no way related to real estate development. This misapplication of the Real Estate Developer Exclusion distorts the purpose and intent of the exclusion, and impermissibly expands its scope beyond what was originally (and subsequently) agreed and intended.

---

[8] According to Policy No. 468, expenses associated with real estate development include: "Expenses for permitting; architectural, surveying and construction fees and costs; draws to contractors, and expenses relating to the acquisition of raw land; land use planning; landscape architecture appraisal; architecture; association start-up; bank inspection; builder's risk/professional liability; civil engineering and surveying; civil site work; construction loans and title insurance; debt financing fees; demolition; developer fees and warranties; environmental and geotech; fences, gates, walls and signage; interest paid to debt sources; land planning; landscaping and irrigation; legal and condominium/association documents; parking structure; pool, pool deck and fencing; project management; project theming; road improvements; site improvements; site lighting; threshold and concrete testing; and waterproofing consultation."

Examination of the record produces the following information relevant to the five Policy 468 criteria for analysis:

(1) The NAICS Code recorded on Claimant's 2010 tax return is Real Estate Development; that is a holdover from the year 2006 when Claimant's condominium building was under construction. Claimant's construction and development activities concluded by 2007;

(2) During its Benchmark years (2007, 2008 and 2009) and its Compensation year (2010), Claimant was licensed by the city of ▓▓▓▓ as a "Lessor of Residential Buildings";

(3) Claimant sold units 2004 and 2007 in August and September, 2010, respectively, to service its cash flow needs. Income from those sales was reported as capital gains/loss in its tax returns for that year on the appropriate IRS schedule. Additionally, on its 2010 profit and loss statements, Claimant recorded "Construction Cost of Sales" as a revenue item in December, 2010. That revenue line item reflects the book value of units sold and captures depreciation.

Its 2010 profit and loss statements demonstrate that the sale of condominium units accounted for only 7.1% of net income and that 64% of its net income was generated by condominium unit rentals. Claimant's 2010 income tax returns also show that a predominant percentage of its income came from condominium rentals and not condominium sales;

(4) None of the expenses recorded by Claimant during 2010 are among those itemized in Policy 498 II.c.4; and

(5) All of Claimant's promotional materials reflect that it markets itself as a Vacation Rental Condominium and its record of day to day activities and leasing history support that conclusion.

This panelist has given careful consideration to all of the foregoing facts as well as the well articulated opposing briefs of the parties and the referenced submission of Class Counsel. That study has led to these conclusions. The NAICS tax code presumption has effectively been rebutted. The isolated sale of two condominium units from a portfolio of 31 in order to satisfy cash flow needs is not enough to support the conclusion that Claimant was sufficiently engaged in Real Estate Development Activity during 2010 such that it may reasonably be characterized as a Real Estate Developer. The Claims Administrator erred in so holding.

For the foregoing reasons, Claimant's appeal is sustained. This claim is hereby remanded to the Claims Administrator for further processing in keeping with this opinion.


Decision: June 16, 2015