**CLASS COUNSEL'S *AMICUS* SUBMISSION**
**REGARDING THE PROPER INTERPRETATION AND APPLICATION OF**
**THE REAL ESTATE DEVELOPER EXCLUSION**

The Real Estate Developer Exclusion set forth in Section 2.2.4.7 of the Settlement Agreement and further clarified by the Parties in Policy No. 468 is unique.  Unlike many of the other Exclusions, "Real Estate Developers" were not defined according to objective NAICS Codes.  Rather, the Exclusion defines a Developer as:

> …any Entity developing an entire subdivision (as defined by the law of the state in which the parcel is located) of real Property, including condominiums with multiple units and/or a residential subdivision with contiguous home sites and homes…

After much discussion and consideration among the Claims Administrator, Class Counsel, and BP, a Developer was further defined in Policy No. 468.  Like Section 2.2.4.7, Policy No. 468 is unique among Settlement Program Policies.  With respect to most policies, either BP, Class Counsel, or both, simply deferred to the interpretation of the Claims Administrator, reserving the right of individual Claimants (and, in some cases, BP) to argue to Appeal Panelists and/or to the Court that the Claims Administrator incorrectly interpreted the Settlement Agreement or had misapplied it to the particular facts and circumstances in question.  In this case, however, Class Counsel and BP expressly agreed that, in applying the Real Estate Developer Exclusion, the Claims Administrator would focus on whether:

> …it was more likely than not that the entity was *sufficiently engaged* in Real Estate Development Activity *during 2010* such that it may *reasonably be characterized* as a Real Estate Developer…[1]

Throughout the pre-settlement negotiations, and the post-settlement discussions, two central points were addressed: **(i)** both Parties always intended and agreed that while Real Estate *Developers* would be excluded, general contractors, construction companies, homebuilders, condo associations, and real estate management companies were intended to be *included* in the Settlement Class, and **(ii)** the exclusion was not intended to exclude an Entity that engaged in *any* real estate development activity prior to or during the Benchmark or Compensation Periods, but rather, only those Entities that could reasonably be characterized as "Real Estate Developers" based on a totality of the circumstances.

Because BP now seems to argue, and the Program Vendors and some Appeal Panelists have sometimes agreed, that any development activities or revenues during the Benchmark or Compensation Period disqualifies the Entity as an excluded "Real Estate Developer",  Class Counsel believe that a summary of the history and development of the Exclusion and the Policy would be helpful in the correct interpretation and application of the Settlement Agreement.

---

[1] The Parties' agreement was memorialized in Policy No. 299 in December of 2012.  While BP has subsequently deferred, rather than formally agreed to, subsequent changes in the Policy, this same agreed-to language remains the cornerstone of the current Policy, No. 468.

Pre-Settlement Negotiations

During the settlement negotiations, both BP and Class Counsel decided (although perhaps for different reasons) that the Exhibit 4C Compensation Framework would not work with respect to large Real Estate Developers who had substantial projects that had recently concluded or were in the planning or development stages at the time of the Spill in April of 2010.

The Parties were not particularly concerned about Entities that had previously developed subdivisions or other properties years before the Spill, and were now in the business of leasing or managing hotels, apartment buildings, shopping centers, or other properties.

Nor were the Parties concerned about developments that had been completed long before the Spill, with most of the units or properties having already been leased or sold.[2]

While the Parties wanted to exclude true Real Estate *Developers* as of the time of the Spill, both BP and Class Counsel wanted to make sure that other real estate businesses – *e.g.* general contractors, construction companies, homebuilders, real estate agents, management companies – would be *included* within the Settlement Class.

The Parties struggled, without success, to identify and agree upon a definitive set of NAICS Codes that would reliably capture the true Real Estate Developers that they were attempting to exclude, and therefore, after much discussion, ultimately came to the language found in Section 2.2.4.7 – *i.e.* "any Entity developing an entire subdivision (as defined by the law of the state in which the parcel is located) of real Property, including condominiums with multiple units and/or a residential subdivision with contiguous home sites and homes."

In applying the exclusion, the Claims Administrator is directed in Exhibit 18, which provides that "the applicability of the exclusion will be determined by the Claims Administrator based upon his review of (a) the claimant's 2010 tax return, (b) 2010 business permits or license(s), and/or (c) other evidence of the relevant business's or individual's activities necessary for the Claims Administrator to determine whether the exclusion applies."

In addition, the Parties agreed that such Exclusions are to be "based on the *substantive nature of the business.*" Section 4.4.7 (emphasis supplied).


The Claims Administrator's Post-Settlement Interpretation

Initially, the Claims Administrator suggested that a business deriving part of its revenues from real estate development might be segregated into "real estate development losses" and other losses, with the real estate developer portion excluded from the Claim.

---

[2] Indeed, the Parties agreed that even a true Real Estate Developer that actually sold a unit or property during the Class Period would be compensated under the Real Estate Sales Loss Framework, as provided in Section 5.9 and Exhibit 13.

Based on BP's objection, and perhaps some practical considerations about how such a proposal might be applied, the Claims Administrator then proposed a "primary business" test.

Specifically, on September 25, 2012, the Claims Administrator interpreted Section 2.1.4.7 to exclude only those persons or entities "whose *primary* business is real estate development."

Which was consistent with Policy No. 480, which similarly looks to the Claiming Entity's "primary" business activity.[3]

More specifically, the Claims Administrator went on to interpret the exclusion as follows:

> If *50% or more* of the claimant's revenues in 2010 were derived from the development of commercial, residential or industrial properties, the claimant will be considered to be a Real Estate Developer excluded from the Settlement Agreement.

But:

> If *less than 50%* of the claimant's revenues in 2010 were derived from the development of commercial, residential or industrial properties, the claimant will *not* be considered to be a Real Estate Developer excluded from the Settlement Agreement.[4]

BP rejected the Claims Administrator's proposal, and the Parties began to explore several different compromise definitions.

Post-Settlement Discussions Between the Parties Leading to the Language in the Current Policy

In October and November of 2012, Class Counsel and BP went back and forth on various different proposals and positions. A few compromise agreements were explored, only to have one or both parties subsequently retreat.

BP kept returning to what would effectively be a "1% rule" (*i.e.* the existence of *any* real estate development activities or revenues), and wanted to expand the inquiry to the Benchmark Years (2007-2009), as well as the post-Spill April 2010 to April 2012 Class Period.

---

[3] *See* Policy No. 480, Section II(B) ("The appropriate NAICS Code for an Entity shall be the NAICS Code that most accurately describes the Entity's **primary** business activities, which are the activities in which the Entity was **primarily** engaged"); and Section II(C) ("The Claims Administrator will review an Entity's 2010 tax return and 2010 business permit(s) (if available) and all other evidence of the business activities of the Entity necessary to determine the NAICS Code that describes the Entity's **primary** business activity").

[4] *See* ANNOUNCEMENT OF POLICY DECISIONS REGARDING CLAIMS ADMINISTRATION (Sept. 25, 2012) No.13, p.6 [attached as Exhibit "A" to Herman Declaration (attached hereto)] (emphasis supplied).

Although Class Counsel was willing to explore various compromise positions in an attempt to put the matter to rest, Class Counsel had not originally intended, (nor understood that BP had originally intended), that *any* real estate development activity at any time from 2007-2010 would render the Entity a "Real Estate Developer" and thereby preclude such Entity from making a BEL Claim with the Settlement Program.[5]

Finally, on or around December 3, 2012, both Class Counsel and BP formally agreed to Policy language that was originally formalized as Policy No. 299, and remains the cornerstone of current Policy No. 468, which appropriately focuses on whether "it was *more likely than not* that the entity was *sufficiently engaged* in Real Estate Development Activity *during 2010* such that it *may reasonably be characterized* as a Real Estate Developer" (emphasis supplied).

Class Counsel do not recall, at any time, either during the settlement negotiations or during the policy development and implementation process, that Class Counsel ever agreed that the purpose or intent of Section 2.4.4.7 was to exclude any business that had engaged in *any* real estate development activity (or had received *any* revenues from any real estate development activity) during the Benchmark and/or Compensation Periods.[6]

Rather, it was intended that, in order for the exclusion to apply, a substantial part of the Entity's business activities must have related to actual real estate development, (*i.e.* the development of an entire subdivision or condominium building with multiple residential units), such that the Entity, when considering its business as a whole, could fairly and reasonably be described as a "Real Estate Developer".

Significantly, the "sufficiently engaged" / 2010 / "reasonably characterized" language which appears in Policy No. 468 was specifically agreed to by BP.

Further, it is significant that the "to any extent" in 2010 language was ultimately *rejected by both Parties,* who clearly did not intend or agree upon a "1% rule".

---

[5] As reflected in the Claims Administrator's Revisions to or Clarifications of Selected Policy Decisions Following the October 1, 2012 Panel Meeting, dated October 8, 2012, the Parties had tentatively explored a possible compromise, focusing on whether the person or entity was involved in the business of real estate development "to any extent" during the year 2010. This language, however, was subsequently rejected and repudiated by both BP and Class Counsel. The "to any extent" language – though not originally intended by Class Counsel – was considered under a potential compromise with BP, in exchange for BP's acknowledgment that the only applicable year of inquiry would be 2010. Upon further consideration, BP insisted (despite the language of Exhibit 18) that the Settlement Program exclude businesses based upon revenues or activities during the Benchmark Period (as well as 2010), and Class Counsel ultimately rejected a "1% rule", even if limited to the Compensation Period.

[6] Again, the tentative proposal discussed in Footnote 5 *supra* was merely an attempt, from Class Counsel's perspective, to come to a potentially workable compromise with BP. Class Counsel, however, do not recall that this had been their actual intent or understanding at the time the Settlement Agreement was negotiated and executed in April of 2012. Indeed, the ultimate rejection by *both Parties* of the "to any extent" in 2010 language draws a sharp contrast with the "sufficiently engaged" / "reasonably characterized" language, and demonstrates further that a "1% rule" was not intended nor agreed upon.

The Evolution of Current Policy No. 468, (following the Agreement of the Parties to Former Policy No. 299 in December of 2012).

As noted, current Policy No. 468 retains the essential "sufficiently engaged" / 2010 / "reasonably characterized" language to which the Parties formally and expressly agreed to as part of Policy No. 299 in December of 2012.

Since that time, however, the Claims Administrator has made some changes to the Policy **(a)** to clarify that homebuilders, in particular, like general contractors and other construction companies, were not intended to be excluded as "developers", and **(b)** which allows a Claimant to rebut a reference to "real estate development" on its 2010 Tax Returns, and further makes it clear that the Settlement Agreement's Real Estate Developer Exclusion should be viewed under a totality-of-the-circumstances test, which allows for some real estate development activities and/or revenues, even in 2010.

Specifically Policy No. 299 v.2 revised Policy No. 299 (v.1) in order to remove the provision that automatically excluded a claimant as a "Real Estate Developer" based solely on the fact that the Entity may have identified itself as "developer" on its 2010 tax return. The revised Policy, (to which BP deferred), describes this change and the reasoning behind it as follows:

> This provision created an absolute rule that excludes any entity (or a Claiming Job at any entity) that described its principal business activity and/or principal product or service as real estate development on its 2010 tax returns. We have encountered certain instances, however, where the evidence in the claim file establishes that the entity had ceased all development activity by 1/1/10 and that the designation on its 2010 tax returns did not accurately reflect its actual operations before and after the Spill in 2010. This would lead to exclusions that seem arbitrary and unfair because not grounded in reality.

The revised Policy went on to state that the presumption is now rebuttable if a Claimant can show that it "had in fact ceased real estate development activity before 1/1/10."

Policy No. 468, (to which BP also deferred), further modified this provision by including it as one of the five "Criteria for Analysis" contained in Section II.C. This change is significant, because it clearly shows that it is only one of five criteria to be considered in evaluating whether "it was more likely than not that the Entity was sufficiently engaged in real estate development activity in 2010 such that it may reasonably be characterized as a developer."

All five of the criteria are to be used in making that determination. The fact that a Claimant may have some criteria indicating real estate development activity does not mean that the remaining criteria cannot outweigh those to establish that the Claimant cannot reasonably be characterized as a "Real Estate Developer".

**The Settlement Agreement and the Current Policy
Clearly Call for a Totality-of-the-Circumstances Test,
which Views the Entity as a Whole, as of the Time of the Spill,
and Allows for some Real Estate Development Revenues and/or Activities**

The language used in the Settlement Agreement calls for a "totality of the circumstances" evaluation to determine the true nature of an Entity as a whole.   Section 2.2.4. states that exclusion from the Business Economic Class will be based on the "substantive nature of the business",  indicating that substantially more than 1% or *any* evidence of real estate development activity will be necessary to exclude an Entity.

The common meaning of the term "substantive nature" is that a condition is of, relating to, containing or being the real nature or the essential element of a thing.[7]  Thus, to determine the substantive or real nature of a business, the Program Vendor or Appeal Panelist should consider the totality of the Claiming Entity's 2010 business activity, and determine: (a) whether any of the business activity constitutes "real estate developer activity" and (b) whether the real estate developer activity so predominates all other types of the Entity's business activity such that the Entity may reasonably be deemed a "Real Estate Developer".

The Claims Administrator acknowledged the Settlement Agreement's mandate to conduct a totality of the circumstances type evaluation when determining whether an Entity should be excluded under the Real Estate Developer Exclusion.  In Policy 468, the Claims Administrator noted that "the Settlement Agreement provides no revenue threshold applicable to determining who is or is not a Real Estate Developer; rather, the Settlement Agreement takes a more *subjective* approach and leaves that determination to the sound discretion of the Claims Administrator."

Moreover, the Policy states that a Claimant will be evaluated using a number of indicators "to determine whether it was *more likely than not* that the Entity was *sufficiently engaged* in Real Estate Development Activity *during 2010* such that it may *reasonably be characterized* as a *Real Estate Developer.*"  (which is the same language that BP agreed to in 2010)

Policy 468 lists the factors, or "other evidence" of an Entity's activities that will be examined and considered in deciding whether the Real Estate Developer Exclusion applies.  The first factor is whether the Entity expressly identified or described its business operations as being related to real estate development on its 2010 tax return.  If so, the Entity shall be presumed to be a Real Estate Developer;   however, as noted, that presumption may be rebutted with evidence showing "to a reasonable degree of certainty that the Entity had …ceased Real Estate Development Activity."   The second factor for determining whether an Entity is a "Real Estate Developer" is whether the Entity held any business licenses and permits indicating that it was engaged in real estate development activity.  The third factor is whether a claimant's 2010 tax return reports revenue from real property sales as ordinary income (other than depreciation

---

[7] *See* http://dictionary.reference.com/browse/substantive.

recapture), rather than as capital gains income.  The fourth factor focuses on the types of expenditures incurred in 2010.[8]   The final inquiry is whether any other 2010 activity can be fairly considered "real estate development activity".  (Again, it is important to distinguish, in this regard, between the actual *development* of a subdivision or other project, versus construction of homes or the management of properties that have long since been developed.)  Policy No. 468 asks the Program to review an Entity's financial documentation and other available documentation or information using all of these <u>five</u> <u>factors</u>, *not one*, to determine whether the Entity was "more likely than not" "sufficiently engaged" in real estate development activity during 2010 to be fairly and reasonably characterized as a "Developer".

With its proffered 1% Rule, BP attempts to incorrectly define a "Real Estate Developer" as an Entity that was engaged in *any* real estate development activity, or derived *any* revenue from any real estate development activity, at *any* time, no matter how small, and irrespective of such activities or revenues relative to the Entity's overall business.

This is clearly contrary to Policy No. 468, in which the Claims Administrator explicitly acknowledges that a claimant may derive some income from real estate development activity and still not reasonably be characterized as a "developer".

Indeed, Section II.E provides that all of an entity's revenues and expenses are to be included in the causation and loss calculations, "*including any Real Estate Development Activity*," so long as the claimant is not an excluded real estate developer. This provision recognizes that an Entity may have some real estate development revenue or expenses, but that should not necessarily lead to classification as an excluded "Real Estate Developer".

Looking at Policy No. 468 as a whole, it clearly provides that some real estate development is allowable, and the exclusion only applies where the level of real estate development activity in 2010 was substantial enough that the claimant may reasonably be classified as a "developer".

Despite these provisions, the Policy is often being misconstrued by Program Vendors and in some cases Appeal Panelists, under a bright-line or "1% rule", such that any use of the word "development" on a 2010 tax return, or the sale of a single property in 2010 which the Claimant had previously developed, automatically makes Claimant a developer, despite the undisputed fact that Claimant's actual business activities in 2010 were in no way related to real estate development.  This misapplication of the Real Estate Developer Exclusion distorts the purpose and intent of the exclusion, and impermissibly expands its scope beyond what was originally (and subsequently) agreed and intended.

---

[8] According to Policy No. 468, expenses associated with real estate development include: "Expenses for permitting; architectural, surveying and construction fees and costs; draws to contractors, and expenses relating to the acquisition of raw land; land use planning; landscape architecture appraisal; architecture; association start-up; bank inspection; builder's risk/professional liability; civil engineering and surveying; civil site work; construction loans and title insurance; debt financing fees; demolition; developer fees and warranties; environmental and geotech; fences, gates, walls and signage; interest paid to debt sources; land planning; landscaping and irrigation; legal and condominium/association documents; parking structure; pool, pool deck and fencing; project management; project theming; road improvements; site improvements; site lighting; threshold and concrete testing; and waterproofing consultation."

**UNITED STATES DISTRICT COURT**
**EASTERN DISTRICT OF LOUISIANA**

In re:  Oil Spill by the Oil Rig
       "Deepwater Horizon" in the Gulf
       of Mexico, on April 20, 2010

This Document Relates to:

       No. 12-970

MDL No. 2179

SECTION: J

JUDGE BARBIER

MAGISTRATE SHUSHAN

## DECLARATION OF STEPHEN J. HERMAN

I, Stephen J. Herman, respectfully declare, under penalty of perjury, that the following is true and correct to the best of my knowledge, information and belief:

1.  I am licensed to practice law in the State of Louisiana, the United States District Court for the Eastern District of Louisiana, the U.S. Fifth Circuit Court of Appeals, and the U.S. Supreme Court.

2.  James Parkerson Roy and I have been appointed by the Court to serve as Co-Liaison Counsel for Plaintiffs in MDL No. 2179 and Co-Lead Class Counsel for the Economic & Property Damages Settlement Class.

3.  I have previously submitted a Declaration dated July 23, 2012 [Doc 7104-5], a Declaration dated April 1, 2013 [Doc 9087-3], a Declaration dated November 5, 2013 [Doc 11804-1], a Declaration dated November 11, 2013 [Doc 11833-1], and a Declaration dated October 15, 2014 [Doc 13496-1], which are respectfully incorporated by reference herein.

4.  This Declaration is intended to assist in the interpretation and application of the Real Estate Developer Exclusion contained within the Economic & Property Damages Settlement Agreement, §2.2.4.7.

Page **1** of **4**

5.  Pursuant to existing Settlement Program Policy No. 468, (dated April 21, 2014), the Claims Administrator is instructed to determine whether, more likely than not, the Claiming Entity sufficiently engaged in Real Estate Development Activity during 2010 such that the Entity may "reasonably be characterized" as a Real Estate Developer.

6.  BP has, at various times since the Settlement Agreement was executed, taken the position that *any* Real Estate Development Activity during *either* 2010 *or the Benchmark Period* should render the Entity a "Real Estate Developer" and should preclude such Entity from making a Business Economic Loss (BEL) Claim.

7.  This was never the intent of Class Counsel, nor agreed to by the Parties, and was, to the best of my recollection, consistently rejected by both Class Counsel and the Claims Administrator in developing what is now Settlement Program Policy No. 468.

8.  Initially, the Claims Administrator suggested that a business deriving part of its revenues from real estate development might be segregated into "real estate development losses" and other losses, with the real estate developer portion excluded from the Claim.  Based on BP's objection, and perhaps some practical considerations about how such a proposal might be applied, the Claims Administrator then proposed a "primary business" test.

9.  Specifically, on September 25, 2012, the Claims Administrator interpreted Section 2.1.4.7 to exclude only those persons or entities "whose *primary* business is real estate development."[1]  The Claims Administrator went on to propose as follows: "If *50% or more* of the claimant's revenues in 2010 were derived from the development of commercial, residential or industrial properties, the claimant will be considered to be a Real Estate Developer excluded from the Settlement Agreement."  But: "If *less than 50%* of the claimant's revenues in 2010 were derived from the development of commercial, residential or industrial properties, the claimant will *not* be considered to be a Real Estate Developer excluded from the Settlement Agreement." (emphasis supplied)

---

[1] *See* ANNOUNCEMENT OF POLICY DECISIONS REGARDING CLAIMS ADMINISTRATION (Sept. 25, 2012) No.13, p.6, (attached hereto as Exhibit "A"), (emphasis supplied).

10. BP objected to the Claims Administrator's interpretation, and, following the exploration and rejection of a short-lived potential compromise,[2] the Claims Administrator issued a revised Policy, which, (like the current final Policy), focused on whether "it was more likely than not that the entity was sufficiently engaged in Real Estate Development Activity during 2010 such that it *may reasonably be characterized* as a Real Estate Developer." (emphasis supplied) [3]

11. I do not recall, at any time, either during the settlement negotiations or during the policy development and implementation process, Class Counsel ever agreeing that the purpose or intent of Section 2.4.4.7 was to exclude any business that had engaged in *any* Real Estate Development Activity (or received *any* revenues from any Real Estate Development Activity) during the Benchmark and/or Compensation Periods.[4]

12. Rather, it was intended that, in order for the Exclusion to apply, a substantial part of the Entity's business activities must have related to actual real estate development, (*i.e.* the development of an entire subdivision or condominium building with multiple residential units), such that the Entity, when considering its business as a whole, could fairly and reasonably be described as a "Real Estate Developer".

---

[2] As reflected in the Claims Administrator's Revisions to or Clarifications of Selected Policy Decisions Following the October 1, 2012 Panel Meeting, dated October 8, 2012, the Parties had tentatively explored a possible compromise, focusing on whether the person or entity was involved in the business of real estate development "to any extent" during the year 2010. This language, however, was subsequently rejected and repudiated by both BP and Class Counsel. To the best of my recollection, the "to any extent" language – though not originally intended by Class Counsel – was considered under a potential compromise with BP, in exchange for BP's acknowledgment that the only applicable year of inquiry would be 2010. Upon further consideration, BP insisted (despite the language of Exhibit 18) that the Settlement Program exclude businesses based upon revenues or activities during the Benchmark Period (as well as 2010), and Class Counsel ultimately rejected a "1% rule", even if limited to the Compensation Period.

[3] Based on the information available, it appears that this language was adopted as Policy No. 299 on or around December 3, 2012.

[4] Again, the tentative proposal discussed in Footnote 2 *supra* was merely an attempt, from Class Counsel's perspective, to come to a potentially workable compromise with BP. Class Counsel, however, do not recall that this had been their actual intent or understanding at the time the Settlement Agreement was negotiated and executed in April of 2012. Indeed, the ultimate rejection by *both Parties* of the "to any extent" in 2010 language draws a sharp contrast with the "sufficiently engaged" / "reasonably characterized" language, and demonstrates further that a "1% rule" was not intended nor agreed upon.

Signed, under penalty of perjury, this 9th day of <u>March</u>, <u>2015</u>, in New Orleans, Louisiana.

_____
Stephen J. Herman

DEEPWATER HORIZON
CLAIMS CENTER
ECONOMIC & PROPERTY DAMAGE CLAIMS

# MEMORANDUM

**TO:**      **Class Counsel**
            **BP**

**FROM:**    **Patrick A. Juneau, Claims Administrator**

**DATE:**     **September 25, 2012**

**RE:**        **Announcement of Policy Decisions Regarding Claims Administration**

---

Under the terms of the Deepwater Horizon Economic and Property Damages Settlement Agreement ("Settlement Agreement"), the Claims Administrator is charged with the duty to "faithfully implement and administer the Settlement, according to its terms and procedures, for the benefit of the Economic Class, consistent with this Agreement, and/or as agreed to by the Parties and/or as approved by the Court." (Section 4.3.1 of the Settlement Agreement). Further, the Claims Administrator is charged with the responsibility to "work with Economic Class Members . . . to facilitate . . . assembly and submission of Claims Forms, including all supporting documentation necessary to process Claims Forms under the applicable Claims Processes . . . [and to] provide Economic Class Members with assistance, information, opportunities and notice so that the Economic Class Member has the best opportunity to be determined eligible for and receive the Settlement Payment(s) to which the Economic Class Member is entitled under the terms of this Agreement." (Section 4.3.7 of the Settlement Agreement).

In furtherance of these responsibilities, the Claims Administrator advises the Parties of the following interpretations of the Settlement Agreement and procedures/policies to be implemented to promote the efficient and timely administration of claims in compliance with the terms of the Settlement Agreement.

**1.**     *"Alternate Source Documents" for Revenues and Expenses of Business Economic Loss Claimants.* Pursuant to Section 4 of Exhibit 4A to the Settlement Agreement, the Claims Administrator has adopted the following interpretations of the Settlement Agreement with regard to the documents required to establish monthly revenues and expenses for the claimed Benchmark Period, 2010, and, if applicable, 2011:

(a) *Monthly Allocations of Revenues/Expenses:* If the claimant has submitted documents sufficient to determine the annual revenues and expenses of the business for a year, but no monthly profit and loss statements or other documents showing revenues and expenses by month for that year are available, the Claims Administrator may allocate the total annual revenues and expenses equally over the 12 months or use alternative

1

414015



and their allocation by vessel and catch type and will not consider trip tickets other document for that purpose.

(d) If the Claimant is not subject to (a), (b) or (c), the Claims Administrator will determine the claimant's Benchmark Period revenues and their allocation using trip tickets or their equivalent.

**13.**     ***Determination of an Excluded Real Estate Developer.***  For purposes of determining those who are excluded from the Class as a Real Estate Developer under Section 2.2.4.7 of the Settlement Agreement, the Claims Administrator interprets the Settlement Agreement to exclude those persons or entities whose primary business is real estate development.  In accord with Exhibit 18 of the Settlement Agreement, the Claims Administrator's determination will be based upon his review of (a) the claimant's 2010 tax return, (b) 2010 business permits or license(s), and/or (c) other evidence of the relevant business's or individual's activities as determined relevant under the circumstances of a particular claim. The Claims Administrator will apply a revenue-based test as follows:

(a)  If 50% or more of the claimant's revenues in 2010 were derived from the development of commercial, residential or industrial properties, the claimant will be considered to be a Real Estate Developer excluded from the Settlement Agreement.

(b) If less than 50% of the claimant's revenues in 2010 were derived from the development of commercial, residential or industrial properties, the claimant will not be considered to be a Real Estate Developer excluded from the Settlement Agreement.

(c) Where the information available on the claim of an Individual Economic Loss claimant suggests that the claimant's employer in 2010 was a Real Estate Developer, the Claims Administrator will contact the claimant and determine on a case-by-case basis the appropriate measures to obtain sufficient information and/or documents regarding the claimant's employer as outlined above.

414015