**CLASS COUNSEL'S *AMICUS* SUBMISSION TO BP'S RESPONSE TO THE CLAIMS ADMINISTRATOR'S SUMMARY OF REVIEW AND TO BP'S SUPPLEMENTAL MEMORANDUM FOR CLAIM NO. 177792 (and all eligible BEL Claims).**

**[AVM is the Correct Methodology Utilized in Real Estate Agent/Broker Claims]**

Class Counsel respectfully submit the following memorandum in connection with BP's Appeal of real estate agent and real estate broker (collectively, "real estate agents") claims concerning the question of whether the Settlement Program has properly applied the Annual Variable Margin ("AVM") methodology to real estate agents in lieu of the Professional Services methodology.  In its appeals of real estate agent claims, including Claim No. 177792, BP seeks to simply move revenues to a different time period, which is not supported by Exhibit 4 of the Settlement Agreement, Standard Accounting Principles, or the U.S. Fifth Circuit's BEL Decision.  Therefore, as set forth in CLASS COUNSEL'S MASTER *AMICUS* TO THE APPEALS PANELISTS (July 16, 2014) [Doc 13496-6] at pp.18-20, the Settlement Program and Appeal Panelists should reject, out of hand, any attempt by BP to argue what the Claimant allegedly "would have been expected to earn" and/or other vague and alleged notions of "economic reality".

As a class-wide policy issue, Class Counsel further respectfully advise that the Settlement Program and Appeal Panelists have, within their professional judgment afforded to them under the Settlement Agreement and Policy 495, uniformly applied the AVM methodology to real estate agents' claims.  In fact, Class Counsel are unaware of <u>any</u> instance where the Settlement Program, in its professional judgment, opted to utilize the Professional Services methodology instead of the AVM methodology when a matching issue arose for a real estate agent claimant.  Further, Class Counsel are unaware of any appeal panel decision that overturned, remanded or otherwise concluded that AVM was the improper matching methodology for real estate agents.

Page **1** of **10**

1. **BP's Current Attempts to "Smooth" Revenues is Contrary to its Position in Negotiating and Implementing the Settlement Agreement.**

Employing its now-familiar "bait and switch" tactics, BP attempts to have the Settlement Program improperly allocate revenues for real estate agent claims via the Professional Services methodology or some other vague, subjective and undefined notion of "economic reality". Prior to its appeal to the Fifth Circuit, BP consistently took the position that contemporaneous Cash Basis P&Ls were acceptable (if not required) for Exhibit 4 purposes, and that BP was not seeking to "smooth" revenues. *See, e.g.,* TRANSCRIPT (April 5, 2013) pp.23-24 (BP Counsel tells the Court that "accrual accounting is not required by the Agreement" and that BP has never sought to "smooth" revenues). In fact, BP counsel Rick Godfrey clearly stated in his letter to the lead negotiators for the class that: "The economics or accounting for determining a compensation amount for a post-spill loss is, in simple terms, to compare the *actual financial results* during the defined loss period measured against the profit that the claimant *might or should have been expected to earn* in the comparable post-spill period of 2010."[1]

Indeed, the basis of BP's appeal, and the ultimate Fifth Circuit BEL Panel Decision, (upon which the District Court's December 24, 2013 Order is also based), was that the term "corresponding variable expenses" within part 2 of the Variable Profit definition

> could be interpreted to mean that <u>the expenses to be subtracted</u> must be those that 'correspond' to the revenue earned and that the 'same time period' refers to the Benchmark period on the one hand, and to the Compensation period on the other, whichever is being calculated. In other words, sum the monthly revenue over the [Benchmark or Compensation] period and then subtract <u>*corresponding* expenses</u> over the same [Benchmark or Compensation] time period.[2]

Clearly, the line item to be adjusted is expense – not revenue.

---

[1] GODFREY E-MAIL (Feb. 17, 2012) [Rec. Doc. 8963-58] No. 3.
[2] BEL OPINION, p.18 (In re Deepwater Horizon, 732 F.3d 326, 337 (5th Cir. 2013)) (*emphasis* in original; <u>emphasis</u> supplied).

With respect to potential 'spikes' in revenues, the U.S. Fifth Circuit expressly *rejected* BP's "primary concern" with "the uneven cash flows of certain types of businesses."[3]

Contrary to BP's current desire to require the Program Accountants (and/or Appeals Panelists) to examine the specific months in which earnings activities occurred, BP Counsel Mark Holstein told the Claims Administrator on September 28, 2012 that:

> One of the cornerstones of the Settlement Agreement is the use of transparent, objective, data-driven methodologies designed to apply clearly-defined standards to a claimant's *contemporaneously-maintained financial data* submitted in compliance with documentation requirements. These methodologies and requirements were carefully negotiated by the parties and are set forth in the Settlement Agreement as mandatory requirements. Among other reasons, *these methodologies and requirements were negotiated in response to concerns voiced by some that the prior GCCF process was too dependent on accounting judgments that were not transparent.… The Settlement Agreement does not allow for the use of professional judgment or discretion as a substitute for expressly articulated standards or requirements*.… The BEL framework expressly requires monthly profit and loss statements or alternate source documents establishing monthly revenues and expenses. These documents are essential to implementing the BEL frameworks' methodology of evaluating causation and damages based on *the actual monthly financial experience of claimants.… [U]se of allocated proxy rather than actual data could severely distort the resulting outcomes…*.[4]

Similarly, the Fifth Circuit, in the BEL Decision, concluded that:

> the Benchmark and Compensation periods were referring to months of the same name, *without any complex analysis of what type of business activities took place within those months.*[5]

---

[3] BEL OPINION, p.25 (732 F.3d at 340).

[4] LETTER FROM BP COUNSEL MARK HOLSTEIN TO CLAIMS ADMINISTRATOR (Sept. 28, 2012) [Rec. Doc. 8963-68] (emphasis supplied).

[5] BEL OPINION, p.24 (732 F.3d at 340) (emphasis supplied).

2. **BP's Current Position to Allocate Revenues for Real Estate Agents is Inconsistent with Standard Accounting Principles.**

In addition to Exhibit 4A, Exhibit 4C, the BEL Decision, and BP's own repeated statements and representations prior to October 2, 2013, BP's current position is also inconsistent with Standard Accounting Principles. *See, e.g.,* DECLARATION OF DR. MARK KOHLBECK, CPA (Feb. 18, 2013) [Doc 8963-80], ¶10 ("Moving revenue properly recognized in one period under accrual-basis of accounting (GAAP) to another period (for example, in an effort to smooth earnings) is a form of earnings management and is considered unacceptable for financial reporting purposes by the accounting profession"); SUPPLEMENTAL DECLARATION OF ALLEN CARROLL (Feb. 18, 2013) [Doc 8963-87], ¶14 ("The matching approach that BP advocates is not matching in any sense recognized in the accounting world, but is merely an allocation formula that artificially moves revenue into months before or after it was earned based on variable expenses").[6]

To date, Appeals Panelists have therefore correctly rejected BP's attempts to **(a)** have claims further examined, modified and/or remanded due to alleged 'spikes' in revenues (or expenses) where the Program Accountants have already performed matching determined to be sufficient under Policy 495, and/or **(b)** have Average Variable Margin (AVM) real estate agent and/or other claims modified and/or remanded to be re-evaluated under the Professional Services Framework. *See, e.g.,* CLAIM NO. 16122; CLAIM NO. 204776; CLAIM NO. 204384; CLAIM NO.

---

[6] *See also, generally,* CLASS COUNSEL STATEMENT: REVENUE RECOGNITION [Doc 11885-2]; BRIEF OF AMICI CURIAE CERTIFIED PUBLIC ACCOUNTING SOCIETIES IN SUPPORT OF APPELLEES, No.13-30315 (June 24, 2013) [Fifth Cir. Doc. 00512285581]; FASB CONCEPTS STATEMENT 5, Recognition and Measurement in Financial Statements of Business Enterprises, paragraph 83(b); Con 6, Page 35, Footnote 56 references Concepts Statement 5 (Par. 83 and Footnote 50); SECURITIES AND EXCHANGE COMMISSION STAFF ACCOUNTING BULLETIN NO. 104 (SAB 104), Pages 10 and 1; KIESO, WEYGANDT & WARFIELD, *Intermediate Accounting* (14th Ed.), at p.60; DECLARATION OF DR. MARK KOHLBECK, CPA (Feb. 18, 2013) [Doc 8963-80]; PANZECA DECLARATION (Feb. 18, 2013) [Doc 8963-85]; DECLARATION OF ALLEN CARROLL (Jan. 16, 2013) [Doc 8963-77]; ASHER DECLARATION (Jan. 15, 2013) [Doc 8963-78]; STUTES DECLARATION (Jan. 17, 2013) [Doc 8963-79]; SUPPLEMENTAL CARROLL DECLARATION (Feb. 18, 2013) [Doc 8963-87].

163629; Claim No. 227302; Claim No. 214802; Claim No. 220410; Claim No. 189050; Claim No. 163749; Claim No. 250777; Claim No. 160513. The entire Professional Services Framework is, moreover, still subject to a Motion for Reconsideration.[7]

### 3. AVM is the Most Proper Methodology for Real Estate Agents.

The non-AVM methodologies of Policy 495 (Construction, Agriculture, Educational Institutions and Professional Services) that call for reallocating revenue are simply not congruent with the activities of a real estate agent. Specifically, these non-AVM methodologies were derived for industries where variable expenses are significant and may commonly be incurred well in advance of a sale or realization of revenue. In those cases, Policy 495 has provided a much different treatment, which includes the reallocation of revenues. However, most real estate agents incur few variable expenses – *i.e.* most of their expenses are incurred whether or not a transaction closes. To recalculate this real estate claim (and all other real estate claims) based on seemingly insignificant variable expenses would completely deviate from economic reality.

Additionally, Policy 495 explains that the AVM methodology is otherwise referred to as "Short Revenue Cycle Methodology." Certainly, real estate agent activities generally have a shorter revenue cycle than the nine listed categories of the Professional Services Methodology,[8] with the majority of the effort (and related expenses) provided by a real estate agent occurring at the end of the process in negotiating the settlement and closing process.

In many instances, including this claim, BP argues that real estate agent revenue should be allocated over a certain period of time, such as when a particular property is listed on the

---

[7] *See* MEMORANDUM IN SUPPORT OF CLASS COUNSEL'S MOTION TO ALTER OR AMEND ORDER ADOPTING MATCHING POLICY [NO. 495] (May 27, 2014) [Doc 12941-1].

[8] The Professional Services industries listed on Policy 495 are: (1) legal services, (2) accounting, tax preparation, bookkeeping and payroll services, (3) architectural, engineering and related services, (4) specialized design services, (5) computer systems design and related services, (6) management, scientific and technical consulting services, (7) scientific research and development services, (8) advertising, public relations, and related services, and (9) other professional, scientific, and technical services.

market. However, the time in which a property is listed for sale is not determinative of when a real estate agent performs services or the type of services performed. That is because in most cases, the majority of a real estate agent's activities are performed in the 30 days preceding the closing date for a particular transaction. These services include, but are not limited to, the execution and negotiation of the contract, scheduling and assisting with property inspections, obtaining and reviewing property surveys, working with a buyer's lender to secure financing, working to remove contract contingencies, review of title work and exception documents, review of closing documents and the settlement statement, negotiating contract addendums, obtaining condominium or homeowner association approval, review of condo/HOA documents, attending the closing and attention to post-closing items such as post occupancy agreements and internal file review and processing. Thus, any assertion by BP that revenue generated from these real estate activities should be allocated over a particular listing time is improper and does not accurately reflect a realtor's activities. It is for this reason that real estate agents' claims would not require the additional matching procedures outlined by the Professional Services methodology.

    a. **Real Estate Agents were not Included in the Professional Services Businesses That Were Approved by the Court in Policy 495**

BP, along with the Claims Administrator, the Settlement Program and Class Counsel, spent an extensive amount of time and effort creating Policy 495. After thorough input, analysis and consideration was given by all parties, the final version of Policy 495 (1) was agreed to by BP, (2) was approved by the Court, and (3) is binding, (subject to Class Counsel's pending Motion for Reconsideration).

In creating Policy 495, it was extremely apparent to all parties, including BP, that numerous real estate agents had filed business economic loss claims with the Settlement

Program. Nevertheless, real estate agent businesses were not included in the Professional Services methodology framework. Further, it is clearly the intent of Policy 495 that most claimants be characterized as businesses to which the AVM methodology applies. This is plainly outlined in Policy 495, Underlying Issues/Principles, section 6, which states that, "It is the CSSP's considered assessment that, for the majority of claimants, sufficient 'matching' of revenue and expense will be best accomplished through an annual variable margin methodology…" Moreover, in response to various appeal panelist requests, the Claims Administrator has provided a detailed explanation as to why AVM is the proper methodology for real estate agents:

> "The CAO does not believe that real estate brokers/agents typically exhibit the same criteria as those businesses included within the Professional Services methodology, as the level of effort involved in securing a purchase/sale of real estate is not comparable to the effort expended by a professional services claimant, and the level of objective supporting documentation available to businesses included in the Professional Services methodology is often not, if ever, available to real estate brokers/agents. Therefore, **the NAICS Code for real estate agents/brokers was deliberately withheld from the Professional Services section of Exhibit A of Policy 495**, as real estate brokers/agents were deemed by the Claims Administrator's Office to typically be most appropriately reviewed using the AVM methodology." (emphasis added)

Claims Administrator's Summary of Review (Doc File Id: 20990105).

The utilization of AVM for real estate agents is further supported by the Claims Administrator in noting that "[i]t is not feasible in the context of a class-wide settlement involving thousands of different claims, with each claimant's financial information potentially spanning a time period in excess of four years, to attempt to match specific expenses to specific revenues on an individual transaction by transaction basis. The time, effort and expense required under this approach would be prohibitive." Policy 495, Underlying Issues/Principles, at pg 3.

"[I]t is unlikely that such individualized matching of specific expenses to specific revenues would be possible based on information and documentation available to the claimants or the CSSP." *Id*.

BP concedes that real estate agents are not identified by NAICS Code in the Professional Services methodology. In its Response To The Claims Administrator's Summary, BP partially quotes Attachment A of Policy 495 in that "where there are factors that indicate that revenues and expenses would be more sufficiently matched by applying an alternative methodology the alternative methodology should be used."[9] However, BP purposefully omits the final sentence of that paragraph, which qualifies that, "As a result, some businesses within a certain three-digit NAICS Subsector may be treated under a different methodology from others within the same Subsector." Policy 495 at A1. This sentence specifies that the first three digits of the NAICS codes are not determinative to how a claim will be treated as some codes with the same first three digits could potentially be analyzed outside of the Professional Services methodology. Importantly, nowhere in Policy 495 does it state that NAICS codes or industry types that are not included in Attachment F, Professional Services methodology, can be added to this list. Real estate agent NAICS codes begin with a "531" prefix while all of the Professional Services industries begin with a "541" prefix. Simply, Policy 495 does not provide that unlisted codes or industry types may be added to a particular industry list, but rather that codes with the same prefix may be treated differently, depending upon the actual business activities of that claimant.

---

[9] See, BP'S RESPONSE TO THE CLAIMS ADMINISTRATOR'S SUMMARY OF REVIEW FOR CLAIM NO. 177792, pg. 9.

### b. The Settlement Program has Properly Used Its Professional Judgment Explicitly Granted It under Policy 495 to Determine that AVM is the most Appropriate Methodology for Real Estate Agents.

The Settlement Program is comprised of accounting professionals with a clear understanding of accounting principles and methodologies, especially those espoused in the Settlement Agreement and all applicable policies. To that end, Policy 495 clearly allows the Settlement Program accountants to exercise their own professional judgment in determining which methodology to assign to a particular claimant. The Settlement Program accountants have responded by unanimously determining that the AVM methodology is best suited for real estate agent claimants. In this claim, as in others, BP has ultimately failed to demonstrate that the Program accountants' have erred or have exceeded their inherent discretionary authority conferred under Policy 495 in utilizing the AVM methodology for real estate agent claims.

### 4. BP has Failed to Provide Any Appeal Panel Decision Where Professional Services Was Found to be the Proper Methodology for Real Estate Agents.

The Appeal Panelist requested that BP provide "all appeals decisions where the Appeal Panelist has ruled that the professional services methodology should be applied to real estate agent or broker claims." Of note, BP's responded by uploading its Supplemental Memorandum (Doc File Id: 21056431) in which <u>it failed to provide a single appeal panel decision that ruled that the Professional Services methodology should be applied to real estate agent claims</u>. BP's failure to do so speaks volumes and is a testament to fact that Appeals Panelists have correctly rejected BP's numerous attempts to have AVM real estate agent claims modified and/or remanded to be re-evaluated under the Professional Services Framework. *See, e.g.,* CLAIM NO. 204384; CLAIM NO. 163629; CLAIM NO. 227302; CLAIM NO. 214802; CLAIM NO. 220410; CLAIM NO. 189050; CLAIM NO. 163749; CLAIM NO. 250777; and CLAIM NO. 160513

**Conclusion**

The purpose of Policy 495 was to insure "sufficient" (not exact) matching of revenue and variable expenses. The Claims Administrator and the Settlement Program have accomplished this by applying the AVM methodology to unmatched real estate agent claims. In their professional judgment provided under Court-approved Policy 495, the Claims Administrator and Settlement Program believe that AVM is the proper methodology for real estate agents and that real estate agent activities are not comparable with the long term revenue cycles of Professional Services claimants. BP has failed to show that the Settlement Program and Appeal Panelists have erred or have exceeded their inherent discretionary authority conferred under Policy 495. Likewise, BP has failed to provide any instance where the Settlement Program or an Appeal Panelist determined that Professional Services was the proper methodology for real estate agents.

This <u>13th</u> day of <u>January</u>, <u>2015</u>.

Respectfully submitted,

| | |
|---|---|
| /s/   Stephen J. Herman | /s/ James Parkerson Roy |
| **Stephen J. Herman**, La. Bar No. 23129 | **James Parkerson Roy**, La. Bar No.11511 |
| **HERMAN HERMAN & KATZ LLC** | **DOMENGEAUX WRIGHT ROY & EDWARDS LLC** |
| 820 O'Keefe Avenue | 556 Jefferson Street, Suite 500 |
| New Orleans, Louisiana 70113 | Lafayette, Louisiana 70501 |
| Telephone: (504) 581-4892 | Telephone: (337) 233-3033 |
| Fax No. (504) 569-6024 | Fax No. (337) 233-2796 |
| E-Mail: sherman@hhklawfirm.com | E-Mail: jimr@wrightroy.com |
| *Co-Lead Class Counsel* | *Co-Lead Class Counsel* |