

# MEMORANDUM

TO:      **Class Counsel**
              **BP**

FROM:     **Patrick A. Juneau, Claims Administrator**

DATE:     **October 9, 2012**

RE:       **Request for the Positions of the Parties on Policy Issues Affecting Claims Administration**

---

The Claims Administrator requests input from the Parties on their positions on the following issues, with citations to the provisions of the Settlement Agreement on which such positions are based.  After receiving that input, the Claims Administrator will inform the Parties of the policy he has adopted on each issue.

    **1.**      ***Treatment of Potential Moratoria Losses in the DWH Settlement Program.***

Section 2.2.4.5 and Exhibit 17 of the Settlement Agreement exclude businesses in the Oil & Gas Industry from the Settlement Agreement altogether.  Section 5.10.3 of the Settlement Agreement bars recovery of economic losses arising out of the federal oil and gas moratoria of May 28, 2010, and July 12, 2010, for any business/employer that falls within the Support Services to Oil and Gas Industry ("Support Services Industry"), as defined in Exhibits 16 and 19. The Settlement Agreement defines the Support Services Industry and lays out two tests for determining whether businesses within this industry meet the potential moratoria criteria. Businesses with an Exhibit 19, Section I NAICS are subject to potential moratoria review if they engage in at least one X-marked index entry within their NAICS. SA ¶s 5.10.3.1.1; 5.10.3.2.2. Businesses with an Exhibit 19, Section II NAICS are only subject to further moratoria review if they engage in at least one X-marked index entry within their NAICS and also provided significant services, goods, and/or supplies to businesses in the offshore oil and gas industry in the Gulf of Mexico in 2009.  SA ¶s 5.10.3.1.2; 5.10.3.2.3.

Business claimants and individuals whose employers meet these criteria may recover for non-moratoria economic losses but are barred from recovering moratoria-related losses.  Those who do not meet these potential moratoria criteria are eligible for full compensation of proven economic losses.

In addition to this Support Services Industry Analysis, Section 38.93 defines Moratoria Losses as "any loss whatsoever" caused by or resulting from the federal oil and gas moratoria of May 28 and July 12, 2010.   Exhibit 16 reiterates this definition and instructs that "[c]laims for

414984
10/9/12



recovery of Moratoria Losses are excluded from the Economic and Property Damages Settlement Class, and no Class Member shall recover for Moratoria Losses." Ex. 16 at 1.

The Claims Administrator seeks the views of the Parties on the following issues:

**(1) Separating Moratoria and Non-Moratoria Losses:**  Please provide the specific test(s) that you propose be applied to distinguish Moratoria from Non-Moratoria losses of a business that is subject to the Moratoria Losses analysis?

**(2) Meaning of "Significant:"**  The Settlement Agreement does not define "significant" for purposes of deciding whether an X-marked entry in Section II of Exhibit 19 provided significant services, goods, and/or supplies to businesses in the offshore oil and gas industry in the Gulf of Mexico in 2009.  (a)  What specific criteria/test do you propose be applied to determine whether this "significant" threshold has been satisfied?  (b)  What is your position regarding whether the following revenue test should be applied to address this issue?:  "Significant" shall mean that the business derived at least 33.00% of its 2009 revenue from provision of services, goods, and/or supplies to the businesses in the offshore oil and gas industry in the Gulf of Mexico. Under that analysis, a business with an Exhibit 19, Section II NAICS that only derived less than 30% of its 2009 revenue from the provision of services to the offshore oil industry in the Gulf of Mexico would receive compensation in full for its economic losses and would not be subject to the Moratoria Losses analysis.

**(3) Import of the Prohibition on Payment of Moratoria Losses:**  Do the broad definitions in Section 38.93 of Moratoria Losses as "any loss whatsoever" caused by or resulting from the federal oil and gas moratoria and the blanket prohibition in Exhibit 16 on paying for Moratoria Losses require the Claims Administrator to assess whether the losses of any business not within the X-marked NAICS codes in Section I or Section II of Exhibit 19 were related to the federal oil and gas moratoria? Alternatively, is the analysis of Moratoria Losses limited to the businesses within one of the NAICS Codes in Exhibit 19 and to the X-marked entries in Exhibit 19?

**(4) Choice of NAICS Code:**  Some businesses fit within multiple NAICS Codes, straddling the line between Exhibit 17 (Oil & Gas and completely excluded) and Exhibit 19 (Oil & Gas Support and potentially subject to the Moratoria Losses analysis).  For these businesses, the NAICS assignment determines whether we completely exclude economic losses or whether we may compensate Non-Moratoria Losses.  However, it is not always clear which NAICS best fits a business.  For example, many entities engage in diving.  While these businesses appear to fall into contract diving under Exhibit 19 (NAICS 561990), many are diving to complete a subsea pipeline installation or another similar support activity squarely within Exhibit 17 (NAICS 213112).  What is your position on how these NAICS Codes should be applied?  For example, should the presumption be to choose the NAICS Code more favorable to the claimant where two or more NAICS Codes are equally applicable but carry different consequences under the Settlement Agreement?

414984
10/9/12



2.    *Definition of Tourism under Exhibit 2.*

Exhibit 2 of the Settlement Agreement defines "Tourism" as:

> **Tourism** means businesses which provide services such as attracting, transporting, accommodating or catering to the needs or wants of persons traveling to, or staying in, places outside their home community.  Therefore, if you are in one of the following businesses or work for such a business, you are in the Tourism Industry.

Exhibit 2 then lists 41 NAICS Codes describing business types that the Parties have identified as meeting the definition of Tourism, along with their specific definitions and sub-classifications.

The Tourism classification bestows preferential treatment on claimants in two ways:

(a) Causation:  BEL Claimants in Zone B receive presumed causation if the business satisfies the Tourism Definition.  Similarly, IEL claimants in Categories I-III are entitled to presumed causation if their employers satisfy the Tourism Definition and are in Zone B.  Otherwise, these claimants are required to provide evidence of causation (unless the IEL claimant's employer has been found eligible).

(b) Risk Transfer Premium:  The RTP for Businesses satisfying the Tourism Definition are considerably higher than the equivalent Non-Tourism and Non-Seafood businesses.  This applies to all BEL Claims and all IEL Claims (other than Category IV IEL claimants, for whom Exhibit 8A specifies an RTP of 1, regardless of industry), which results in higher compensation:

| Eligibility Zone | Tourism | Non-Tourism/Non-Seafood |
|---|---|---|
| Zone A | 2.50 | 1.50 |
| Zone B | 2.00 | 1.25 |
| Zone C | 2.00 | 0.25 |
| Zone D | 1.25 | 0.25 |

Many claimants have contended that their businesses or employers "provide services such as attracting, transporting, accommodating or catering to the needs or wants of persons traveling to, or staying in, places outside their home community" and should be counted as in the Tourism industry under Exhibit 2 of the Settlement Agreement, even if they do not fit in any of the NAICS Codes listed in Exhibit 2.  Many BEL claimants enter the answer "Yes" to Question 18 of the BEL Claim Form, which asks "Does your business fall within the Tourism Definition?"  Claimants provide this response regardless of the NAICS Code on the claimant's Tax forms or the NAICS Code listed by the claimant in response to Question 9 of the Claim Form.  Those

3



numbers often do not match. Claimants and their lawyers seem to assume that Tourism is a subjective factor having nothing to do with NAICS Codes, and contend that because the claimant filed the business as a Tourism industry, the Claims Administrator is obligated to classify as Tourism.

The Claims Administrator seeks input from the Parties on the following questions:

(1) **Scope of the Tourism Definition:**  Are the NAICS Codes enumerated in Exhibit 2 an exhaustive list of the businesses that may be classified as Tourism?  Alternatively, may a business be classified as Tourism if its NAICS Code is not listed in Exhibit 2, but the claimant does "provide services such as attracting, transporting, accommodating or catering to the needs or wants of persons traveling to, or staying in, places outside their home community," as described in the opening section of Exhibit 2?  For example by way of hypothetical, a photography studio is NAICS Code 541922 (Commercial Photography), which is not on Exhibit 2.  Should a studio that takes pictures of vacationers or weddings on the beach be placed in Tourism?  As another hypothetical, a jewelry store is NAICS Code 448310 (Jewelry Stores), which is not on Exhibit 2.  It is located in a beach community and sells jewelry to many tourists.  Should such a jewelry store be considered a Tourism business?

(2) **Assigning a NAICS Code:**  Should the NAICS Code that best fits a business's operations be assigned to that business, without regard to the consequences under the Settlement Agreement, or should the NAICS Code most favorable to the claimant be used as a default, straining to place the business in a NAICS Code that is listed on Exhibit 2 where that classification could be seen as reasonable?  In the jewelry store example, rather than NAICS Code 448310 (Jewelry Stores; not on Exhibit 2), should NAICS Code 453220 (Gift, Novelty, and Souvenir Stores; is on Exhibit 2) be applied to that business?

(3) **Relevant Time Period for Tourism Analysis:**  For purposes of assigning a NAICS Code to a business, or for determining whether a business sells to tourists (if that expansion from Exhibit 2 NAICS Codes is adopted), should that company's activities only in 2010 be considered?  If other time frames should be considered, what language in the Settlement Agreement dictates what period(s) should be considered?

(4) **General Tourism Analysis:**  If the NAICS Code list in Exhibit 2 is not an exhaustive list of businesses in Tourism, what criteria are to be used to determine whether the business "provide[s] services such as attracting, transporting, accommodating or catering to the needs or wants of persons traveling to, or staying in, places outside their home community"?   Is this a percentage 2010 revenue test?  What is the scope of the claimant's "home community"?  What proof is required to establish these criteria?

414984
10/9/12

**DEEPWATER HORIZON**
CLAIMS CENTER
ECONOMIC & PROPERTY DAMAGE CLAIMS

**3.** *Scope of the GCCF Release Exclusion.*

We have encountered questions on how to apply Section 2.2.6 of the Settlement Agreement, which excludes the following from the Class:

> Any Natural Person or Entity who or that made a claim to the GCCF, was paid and executed a GCCF RELEASE AND COVENANT NOT TO SUE, *provided,* however, that the execution of a GCCF Release and Covenant Not to Sue shall not prevent a Natural Person or Entity from making a VoO Charter Payment Claim or a Vessel Damage Claim, nor shall a release covering only bodily injury prevent a Natural Person from making Claims under this Agreement.

Section 38.75 defines the GCCF Release and Covenant Not to Sue as "the release executed in exchange for payment of a GCCF claim." We apply this as including the GCCF General Release, as well as the Business Quick Payment Release (for $25,000) and the Individual Quick Payment Release.

We identify claimants with paid GCCF Releases by an automatic data match of the SSN or EIN on the GCCF claim with the SSN or EIN on the DWH claim. We are using that data comparison to find DHW claims that must be denied (unless it is a VoO Charter Payment Claim or a Vessel Damage Claim), after we confirm that: (1) the names for both the DWH and GCCF claimants match; (2) the GCCF paid the claimant on the Release; and (3) the Final Offer amount and Final Paid amount are the same, to confirm that the claimant is not a Transition claimant with a signed GCCF Release but received 60% of the Final Offer who can pursue claims in the DWH. If any of these data points do not match or are incorrect, we dig further into the data on the DWH claimant and GCCF claimant to determine the source of the problem and whether the DWH claimant should be denied.

We have questions on the scope of the GCCF Release exclusion:

(1) Is a claimant's spouse who signed a GCCF Release barred from pursuing his/her own claims, independent of his/her spouse's claims, in the DWH Program?

(2) If a claimant submitted a claim for a business in the GCCF, signed a Release and was paid, is the claimant barred from pursuing a claim as an individual, unrelated to the business involved in the GCCF claim?

(3) If a claimant submitted a claim as an individual in the GCCF, signed a Release and was paid, is the claimant barred from pursuing a claim for a business operated by the claimant that is unrelated to the individual claim involved in the GCCF claim?

(4) Does a GCCF Release after asserting one claim type in the GFFC (not a personal injury claim) bar the claimant from pursuing a different claim type in the DWH Program?

414984
10/9/12



(5) Does the double payment policy apply to Releases? That is, does a GCCF Release signed by an owner of a business on a business claim bar that person from asserting a DWH claim as a W-2 employee of that business?   Does the reverse situation have the same answer?  That is, does a GCCF Release signed by an owner of a business as a W-2 employee of that business bar that business from asserting a DWH claim?

Class Counsel's 10/2/12 memo suggests that Class Counsel would not see the prior Release to be a bar on DWH claims in Questions (2)-(5).

### 4.      *Discontinuing Incompleteness Reasons Associated with SWS-10*.

As a part of our continuing effort to reduce the number of claims we find incomplete, we are reviewing the Individual Economic Loss (IEL) document requirements to determine the necessity of those documents.  We have identified the SWS-10 requirement as one that could be removed.

Exhibit 8A to the Settlement Agreement requires a Claimant Sworn Written Statement (SWS-10) attesting to the number of hours a claimant worked towards earnings reported on a Schedule C or F, for both Claiming Jobs and Non-Claiming Jobs.  The number of hours is involved in the Offsetting Earnings calculation.

Offsetting Earnings are defined as "earnings from any Non-Claiming Job(s) during the claimant's Compensation Period in excess of earnings from any Non-Claiming Job(s) during the claimant's Benchmark Period" and are used "to offset Claimant Lost Earnings."  The Settlement Agreement provides for two exceptions to offsetting a claimant's earnings: (1) if the claimant can provide documentation showing that he worked the same or more total hours at his Claiming Job(s) during the Compensation Period; or (2) if the claimant can provide documentation showing that he worked fewer hours at the Claiming Job(s) and worked increased hours at the Non-Claiming Job(s) during the Compensation Period.

A Schedule C or F does not list the hours worked to generate the income reported on those schedules, thus necessitating a sworn written statement to furnish us that information.  We created SWS-10 for that purpose.  Currently, an IEL claimant with a Schedule C or F (not showing deduction of expenses, which would make the claimant a BEL claimant rather than an IEL claimant), and with no SWS-10 will receive an Incomplete Notice asking for the SWS-10.

The SWS-10 is not essential to perform a calculation on a claim.  We can do a full loss calculation without any adjustment of the Offsetting Earnings, which is what we have to do for claimants who submit paychecks with no hours information or other forms of PPED that do not contain information on hours and as to which Exhibit 8A does not require an SWS to provide the hours.  The submission of an SWS-10 can increase the claimant's overall loss calculation by reducing the claimant's Actual or Offsetting Earnings, though it may not affect it at all if the claimant worked fewer hours in the Benchmark Period as compared to the Compensation Period. If we did not treat the presence of an SWS-10 as a prerequisite to issuing an Eligibility Notice, we would run the loss calculation without it, using the post-Spill earnings in the Schedule C or F as off-sets, which would yield an Eligibility Notice potentially for a lesser award than if we had

6

414984
10/9/12



complete hours information, rather than an Incompleteness Notice asking for something that may or may not increase the claimant's overall award.

We prefer to eliminate the SWS-10 requirement altogether and compensate claimants without consideration of the hours worked towards these earnings. Alternatively, we could require claimants to submit an SWS-10 before receiving payment, rather than before we send an Eligibility Notice, similar to how we handle Claim Form signature and EIN/SSN verification issues. The Claims Administrator seeks the Parties' views on these options.

**5.**    ***Questions Relating to the Seafood Program.***

**A.**    <u>**Private Oyster Leases.**</u>

The Claims Administrator asks for the views of the Parties on whether Oyster Leaseholder claims involving oyster leases of beds owned by private parties, rather than state-owned beds, are compensable in the Oyster Compensation Plan in the Seafood Program. Exhibit 10 describes the Oyster Compensation Plan:

> The Oyster Compensation Plan provides compensation to Oyster Leaseholders and Oyster Harvester Claimants. Oyster Harvesters eligible under the Oyster Compensation Plan are (i) Seafood Vessel Owners, (ii) Oyster Harvester lessees of Seafood Vessels, and (iii) Seafood Boat Captains. Oyster Leaseholders can submit Leaseholder Property Claims and/or Leaseholder Lost Income Claims. Oyster Harvesters can submit Harvester Lost Income Claims. A single Claimant can qualify as both an Oyster Leaseholder and an Oyster Harvester. Compensation plans for each of these claim types are set forth below.

> In some instances, Oyster Leaseholders earn income solely from allowing another natural person or entity to harvest oysters from their oyster leaseholds. In other instances, Oyster Leaseholders may be combined such that they both own oyster leaseholds and harvest from those and other leaseholds. For purposes of the Oyster Compensation Plan, Claimants should submit claims reflecting both their harvesting and leaseholder claims together. A combined Oyster Leaseholder/Oyster Harvester is eligible for compensation as both an Oyster Leaseholder and an Oyster Harvester.

Exhibit 10 does not define "Oyster Leaseholder." Exhibit 3 describes the "Seafood Distribution Chain." Section 1.c of Exhibit 3 defines "Oyster Leaseholder" as follows:

> An **Oyster Leaseholder** shall be defined as a Natural Person or entity that is a lessee holding one or more private oyster leases.

When we were exchanging Excel sheets of questions with the Parties, we posed a question that bears on this issue and received these answers:

**DEEPWATER HORIZON**
CLAIMS CENTER
ECONOMIC & PROPERTY DAMAGE CLAIMS

**Question:**
For Private Oyster Grounds outside of Louisiana, if the grounds are owned by a private entity and leased out to a third party, are both the person who owns the grounds and the Lessee allowed to make a claim on the lost income? (5/29/12)

**BP Response:**
Per Exhibit 3 and Exhibit 10 definitions of "Oyster Leaseholder," the oyster leaseholder is a lessee, not a lessor.  Thus, only a lessee who satisfies all other eligibility requirements may be compensated under the Oyster Leaseholder compensation plan methods, namely, Leaseholder Interest Compensation and Leaseholder Lost Income Compensation.  To the extent there exists a legally valid oyster lease with a private lessor, it is possible such a person or entity might qualify for the Oyster Harvester compensation plan method, Historical Revenue Compensation, provided all the other requirements are met.  (5/31/12); To the extent BP's responses to the six Seafood questions differ from those of John Perry / Dan Balhoff, BP now defers to the responses of John Perry / Dan Balhoff.  It is BP's view that the Seafood Compensation Program should be implemented by the Settlement Program consistent with the responses from John Perry/Dan Balhoff to all six questions.  Perhaps Steve or Jim can comment for PCC in this regard. (6/29/12)

**PCC Response:**
John Perry should provide the answer.

**Seafood Neutral Response:**
The Claims Administrator should only consider leaseholder interest compensation and leaseholder lost income compensation claims under the oyster compensation plan compensable if said claims are submitted by an entity or person that was a lessee of an oyster bed or beds on the date specified in the seafood compensation program.  Lessors and owners are not eligible for leaseholder interest compensation and leaseholder lost income compensation.  A lessor does not satisfy the definition of oyster leaseholder as set forth in the seafood compensation plan (Exhibit 10, page 25). (6/27/12)

Though the Seafood Neutral's answer did not speak expressly to privately-owned versus state-owned oyster beds, he may have intended for it to apply equally in both cases.  The Claims Administrator asks for clarification on this issue.

**B.    Subleases of Oyster Leaseholds.**

The Claims Administrator requests input from the Parties on whether claims based on subleases of oyster beds are compensable in the Oyster Compensation Plan in the Seafood Program.  Applying the response by the Seafood Neutral to the question described in Item A above, we adopted the rule that Oyster Leaseholder claims are compensable only if submitted by the lessee of the beds, but claims by the owner/lessor of the beds are not compensable as Oyster Leaseholder claims.

414984
10/9/12

Adhering to the premise underlying that rule would lead to the conclusion that claims by the sublessee of an oyster bed are compensable Oyster Leaseholder claims, while claims by the lessee/sublessor are not.  The Claims Administrator asks for confirmation of that conclusion.

### C.   Vessel Owners Who Sold One or More of Multiple Vessels Before April 20, 2010.

Under the Settlement Agreement, each vessel a claimant owns must be its own separate claim in the Seafood Program.  For each Vessel Owner claim, the Agreement requires the vessel owner to provide "[p]roof of ownership of the vessel during the time period of April 20, 2010, to December 31, 2010."  (Ex. 10 at 52.)  A vessel sold by the claimant before April 20, 2010, is not compensable in the Seafood Program.

The Claims Administrator has received claims from vessel owners who assert that a vessel sold before April 20, 2010, had been used alternately with one or more other vessels before that time, thereby depressing the Benchmark Period revenues associated with vessels still owned by the claimant on April 20, 2010, while the claimant cannot claim losses based on the Benchmark Period revenues of the sold vessel.  These claimants urge us to adopt an "alternating use" rule under which we would allow the claimant's revenue from both the sold and unsold vessel to drive his compensation calculation for a single vessel owner claim. The Claims Administrator asks for input on this issue.

### D.   Clam Aquaculture Businesses.

The Claims Administrator asks for the views of the Parties on the proper treatment of a business engaged in Clam Aquaculture or clam farming.  A Clam Aquaculture business either spawns its own or purchases from a nursery "clam seeds" which are immature clams.  It then plants them in the open waters of the Gulf of Mexico, particularly off the coast of Cedar Key, FL, a town in the northern Florida Peninsula.  The farms are on leases issued by the State of Florida.  These clam farms are required to carry an Aquaculture Certificate indicating what leases are held and a wholesale saltwater products license to be able to sell the products.  They sell clams in wholesale "bags" of about 2,000 clams in a manner somewhat comparable to selling oysters in sacks, though it appears that the clams are grown in these bags that are staked to the clam bed.  After harvesting, some aquaculture businesses perform their own processing activities.  Also, some of them provide sales receipts to landing sites or processors, but they do not produce formal trip ticket landing reports.

These claimants assert that the Spill threatened their beds and that the public's fear of the safety of seafood from the Gulf resulted in lower production and demand for clams in 2010 and beyond.  Thus far we have seen the following claimants, all but one of whom have filed BEL claims and not Seafood Compensation Program claims.  The majority believe they should be included in the definition of Primary Seafood Industry (Landing Site, Primary Seafood Processor, or Commercial Wholesale or Retail Dealer "A"):

(1) 100025022 – Quality Shellfish Company (Beasley, Allen, Crow, Methvin, Portis & Miles, PC) (BEL):  Claim form states that the company farms, processes, and wholesales

414984
10/9/12

**DEEPWATER HORIZON**
CLAIMS CENTER
ECONOMIC & PROPERTY DAMAGE CLAIMS

Gulf-raised clams in Cedar Key, FL, which is on the Gulf Coast. It holds a commercial wholesale saltwater products license. The BEL Claim Form asserts a Primary Seafood Industry (Question 16; includes Landing Sites, Primary Seafood Processors, and Commercial Wholesale or Retail Dealers A). The claimant has explained in a letter that he raises young clams in a controlled environment and then seeds them in the Gulf, where they are tended until they are mature and ready for harvest. The claimant owns a vessel for use in tending and harvesting the clams.

(2) 100037951 – McCumber's Seafood (Brent Coon & Associates) (BEL): According to the Claim Form, the claimant is "an aquaculturist who farms hard clams in the Gulf of Mexico, off the coast of Cedar Key, Florida. The claimant's customers are the local wholesalers, including one wholesaler who acts as an intermediary to a national membership warehouse chain." This claimant also asserts membership in the Primary Seafood industry. The claimant's aquaculture leases are in the Gulf Waters and are not inland.

(3) 100016742 – Cedar Key Aquaculture Farms, Inc. (Beasley, Allen, Crow, Methvin, Portis & Miles, PC) (BEL): The claim form, describes the claimant as an "[a]quaculture farm that harvests, processes, packages, and sells clams from a 20 acre plot in the Gulf of Mexico. Cedar Key Aquaculture sells and ships clams directly to retailers and food service operators." This claimant provided an aquaculture certificate that shows that the claimant's inland facility is the nursery where the immature seeds are spawned, but the farming, tending, and harvesting steps occur in Gulf Waters.

(4) 100013705 – Stephanie May (*pro se*) (IEL, SCP): Claimant filed an IEL claim and a Seafood Claim (Other Seafood), has an aquaculture certification and provided "trip tickets" (sales receipts to landing sites), but stated in a letter that she does not know what trip ticket landing data is and needed an explanation. She reports her income on a Schedule F on which expenses are deducted, so this claimant will have to be treated as a business with a BEL claim and not an IEL claimant. This claimant also is located in Cedar Key, FL.

(5) 100071097 – Rick's Seafood of Dixie, Inc. (Barton Smith, PL) (BEL): The Claim Form states only that this claimant is a clam farm and that it should be included in the Secondary Seafood Industry (Commercial Wholesale and Retail Dealer B, Secondary Seafood Processor, Seafood Wholesaler or Distributor, or Seafood Retailer). This claimant is located in Cedar Key, FL.

The definitions of "Seafood" in Exhibit 3 and of "Other Seafood" in footnote 10 of Exhibit 10 do not mention clams. The Seafood Program provides no clear framework to calculate losses of owners of clam farming and harvesting operations or workers in those businesses. The Claims Administrator seeks input on whether such a business should be treated as a harvester of Other Seafood under the Seafood Program, or as BEL/IEL claims from members of the Seafood Distribution Chain (perhaps a Primary Seafood Processor).

414984
10/9/12

**DEEPWATER HORIZON**
CLAIMS CENTER
ECONOMIC & PROPERTY DAMAGE CLAIMS

      **6.**    ***The Need to Remove the Specific Dollar Amount from the Individual Release.***
The Claims Administrator asks the Parties to reconsider this issue.  We raised this before and BP
opposed this change.  We propose that the specific dollar amount recited in Section 2 of the
Individual Release be replaced with a general statement of consideration to avoid administrative
problems caused by having a dollar amount in the Release and to reduce the confusion
experienced by claimants with more than one claim who are asked to sign a Release stating a
payable amount based on only one claim.  To accelerate the claims process, we send a Release
with an Eligibility Notice that announces a claimant's award.  The dollar amount reflected in that
Release can change after that Eligibility Notice as a result of Reconsideration, Appeal, or other
re-review.  When that occurs, the dollar amount in the original Release has become stale,
necessitating re-generation of the Release and requiring another "wet ink" signature by the
claimant when the claimant has already signed the original Release.  When we have a signed
Release with an obsolete dollar figure, we cannot pay the claim until the entire Release signature,
submission and review cycle has been repeated.  In addition, we regularly receive complaints
from claimants and lawyers who refuse to resolve their claims and sign the Release because they
are apprehensive about the impact of the dollar amount on one claim shown in the Release on
other claims on which the claimants do not yet have an award.  Removing these obstacles to
payment and this source of Class dissatisfaction and confusion would facilitate the
administration of this Program.

      **7.**    ***Form of Signature on the Attorney Fee Acknowledgment Form.***  Paragraph 8 of
Exhibit 27 of the Settlement Agreement requires that a represented claimant and the claimant's
attorney sign an Attorney Fee Acknowledgment acknowledging that the Settlement Payments to
be paid under the Settlement Agreement satisfy all claims for fees or costs relating to
representation of the claimant.  Based upon requirements imposed by BP when we implemented
this requirement, we are requiring claimants to submit an original, hard copy of this Attorney Fee
Acknowledgment with a "wet ink" signature, as we require for submission of a signed Release.
Unlike the provisions in Section 4.4.10.4 that prohibit electronic signature on a Release, the
Settlement Agreement does not expressly forbid electronic signatures on the Attorney Fee
Acknowledgment required by Exhibit 27.  As a result, the Claims Administrator asks the Parties
for the basis in the Settlement Agreement for the requirement of an original hard copy with a
"wet ink" signature on the Attorney Fee Acknowledgment.

414984
10/9/12