# IN THE UNITED STATES COURT OF APPEALS

# FOR THE FIFTH CIRCUIT

_____

No. 14-30823

_____

D.C. Docket No. 2:10-MD-2179
D.C. Docket No. 2:12-CV-970

United States Court of Appeals
Fifth Circuit

**FILED**

July 16, 2015

Lyle W. Cayce
Clerk

IN RE: DEEPWATER HORIZON

--------------------------------------------------------------

LAKE EUGENIE LAND & DEVELOPMENT, INCORPORATED; BON
SECOUR FISHERIES, INCORPORATED; FORT MORGAN REALTY,
INCORPORATED; LFBP 1, L.L.C., doing business as GW Fins; PANAMA
CITY BEACH DOLPHIN TOURS & MORE, L.L.C.; ZEKES CHARTER
FLEET, L.L.C.; WILLIAM SELLERS; KATHLEEN IRWIN; RONALD
LUNDY; CORLISS GALLO; JOHN TESVICH; MICHAEL GUIDRY, on
behalf of themselves and all others similarly situated; HENRY HUTTO;
BRAD FRILOUX; JERRY J. KEE,

       Plaintiffs - Appellees

v.

BP EXPLORATION & PRODUCTION, INCORPORATED; BP AMERICA
PRODUCTION COMPANY; BP, P.L.C.,

       Defendants - Appellants

Appeal from the United States District Court for the
Eastern District of Louisiana, New Orleans

Before STEWART, Chief Judge, and KING and ELROD, Circuit Judges.

# J U D G M E N T

This cause was considered on the record on appeal and was argued by counsel.

It is ordered and adjudged that the appeal is dismissed for lack of jurisdiction.

IT IS FURTHER ORDERED that defendants-appellants pay to plaintiffs-appellees the costs on appeal to be taxed by the Clerk of this Court.

JENNIFER WALKER ELROD, Circuit Judge, dissenting.



**Certified as a true copy and issued
as the mandate on Jul 16, 2015**

**Attest:**

**Clerk, U.S. Court of Appeals, Fifth Circuit**

# IN THE UNITED STATES COURT OF APPEALS
# FOR THE FIFTH CIRCUIT

No. 14-30823

United States Court of Appeals
Fifth Circuit

**FILED**

July 16, 2015

Lyle W. Cayce
Clerk

IN RE: DEEPWATER HORIZON

----------------------------------------------------------

LAKE EUGENIE LAND DEVELOPMENT, INCORPORATED; BON
SECOUR FISHERIES, INCORPORATED; FORT MORGAN REALTY,
INCORPORATED; LFBP 1, L.L.C., doing business as GW Fins; PANAMA
CITY BEACH DOLPHIN TOURS & MORE, L.L.C.; ZEKES CHARTER
FLEET, L.L.C.; WILLIAM SELLERS; KATHLEEN IRWIN; RONALD
LUNDY; CORLISS GALLO; JOHN TESVICH; MICHAEL GUIDRY, on
behalf of themselves and all others similarly situated; HENRY HUTTO;
BRAD FRILOUX; JERRY J. KEE,

> Plaintiffs - Appellees

v.

BP EXPLORATION & PRODUCTION, INCORPORATED; BP AMERICA
PRODUCTION COMPANY; BP, P.L.C.,

> Defendants - Appellants

Appeal from the United States District Court
for the Eastern District of Louisiana

Before STEWART, Chief Judge, and KING and ELROD, Circuit Judges.

CARL E. STEWART, Chief Judge:

In May 2012, BP Exploration & Production Inc. ("BP") and related
entities reached a settlement with a class of individuals who suffered economic

No. 14-30823

and property damage after the Deepwater Horizon incident. That settlement agreement established a fund and an elaborate multi-tiered claims process. A provision in the agreement governs the scope and timing of the parties' access to information about these claims as they advance through that process. The district court determined that the provision did not entitle the parties to claim-specific information until an initial decision about a claim's eligibility had been made by the settlement program. BP appeals that decision. Counsel for the settlement class ("Class Counsel") argue chiefly that this court lacks jurisdiction to hear the appeal. We agree and DISMISS for lack of jurisdiction.

## I. BACKGROUND

The district court approved the settlement and expressly adopted it in a December 2012 order. The agreement (the "Settlement Agreement" or the "Agreement") provides that the district court retains "continuing and exclusive jurisdiction over the Parties and their Counsel for the purpose of enforcing, implementing and interpreting th[e] Agreement." At the time of briefing in this case, 288,000 claims had been filed, resulting in 75,000 awards totaling $5.2 billion.

The settlement regime ("Settlement Program") provides for the resolution of a variety of claims—e.g., business economic loss claims, vessel damage claims, coastal real property damage claims—through a wide array of procedures. Submitting a claim requires providing completed forms and documentation proof such as tax returns and profit/loss statements.

After the Settlement Program makes a determination about a particular claim's eligibility, a claimant or BP may, in certain circumstances, avail themselves of a multi-tiered internal review process crafted to "assure accuracy, transparency, independence, and adherence" to the terms of the Settlement Agreement. The deadline for internal appeal of an eligibility determination is a function of which party appeals and the amount of the

No. 14-30823

award, but all appeals must be filed within 30 days of notice of the award. Appeals are heard de novo by a panel, whose decision is intended to be "final." Discretionary review, however, is available in the district court, which treats the panel's decision like a magistrate judge's report and recommendation, reviewing de novo any dispositive issues. *See* Fed. R. Civ. P. 72(b)(3).

The disputed provision here, § 4.4.14 of the Settlement Agreement, governs access to information associated with individual claims and the precise timing of that access. The relevant excerpt reads:

> BP and Class Counsel shall have access to all Claim Files and Claims-related data transferred to or generated in the Settlement Program for any legitimate purpose including, without limitation, the operation of BP's separate [Oil Pollution Act] facility, prosecuting and defending appeals, reviewing and auditing the Settlement Program, reporting financial results, and pursuing indemnification, contribution, subrogation, insurance and other claims from third parties. However, BP and Class Counsel shall not have access to any Claim Files for Claims that are being processed and have not yet been resolved in the Settlement Program except if the Claim File is needed by BP, a Claimant, or their counsel to prosecute or defend an Appeal.[1]

Class Counsel claim that BP violated § 4.4.14 by accessing claim-specific information on an internal site run by the Claims Administrator and used regularly by the parties in the normal operation of the Settlement Program. BP counters that it was permitted to do so under § 4.4.14. After this dispute arose, the Claims Administrator interpreted § 4.4.14 to permit both parties to access claim-specific information before issuance of an eligibility notice. After such notice, the Claims Administrator determined, BP and Class Counsel could view the internal work files of the program.

---

[1] The Settlement Agreement defines "Claim" as "any demand or request for compensation . . . together with any properly completed form and accompanying required documentation, submitted by a Claimant to the Settlement Program." The terms "Claim File" and "Claims-related data" are not defined in the Settlement Agreement.

No. 14-30823

In February 2014, Class Counsel brought a motion seeking to block BP's access to claim-specific information before the Settlement Program made an initial determination about a claim's eligibility. The district court determined in an order dated March 25, 2014 (the "March 25 Order") that neither BP nor Class Counsel should be permitted "access to any individual claim file before the Program issues a Denial Notice or an Eligibility Notice."

BP filed a motion for reconsideration and cited five examples of situations where access to pre-determination, claim-specific data on one claim helped the company detect an improper award on a post-determination claim. For example, in one case, BP's review of claim-specific data on a group of pre-determination individual claims for property damage to a single building revealed that a different claimant had already received a $1.8 million award for the same damage alleged by the pre-determination claimants. BP appealed that award, and an appeals panel reversed it. BP's five examples show improper awards totaling about $4 million. The district court adhered to its prior holding in a June 6, 2014 order (the "June 6 Order") denying BP's motion for reconsideration.[2] The court noted that BP's request for "all pre-determination data is not justified either by the express terms of the Settlement Agreement or by the few examples it cites in its motion." While "no program handling hundreds of thousands of claims can be flawless," the court stated, the elaborate fraud-protection measures in place were sufficient to protect BP.

BP has appealed, citing two bases for jurisdiction. First, BP contends that this court has jurisdiction to review the district court's Orders under the collateral order doctrine. Alternatively, BP argues, this court can assert

---

[2] For simplicity, we will refer to the March 25 and June 6 orders collectively as the "Orders."

No. 14-30823

jurisdiction under 28 U.S.C. § 1292(a)(1), which permits appellate jurisdiction in limited circumstances when, as relevant here, a court grants or modifies an injunction. Finally, on the merits, BP claims that the district court incorrectly interpreted the Settlement Agreement to prevent it from accessing claim-specific data on unresolved claims.

## II. DISCUSSION

The Orders did not terminate all proceedings in this case, so the panel must first determine if jurisdiction exists. Because we conclude that we lack jurisdiction under either the collateral order doctrine or § 1292(a)(1), we do not reach the merits.

### A. Collateral Order Doctrine

BP first invokes the collateral order doctrine as a basis for jurisdiction. As relevant here, 28 U.S.C. § 1291 provides that the courts of appeal have "jurisdiction of appeals from all final decisions of the district courts." Generally, a final decision is one "by which a district court disassociates itself from a case." *Swint v. Chambers Cnty. Comm'n*, 514 U.S. 35, 42 (1995). The collateral order doctrine—typically associated with *Cohen v. Beneficial Indus. Loan Corp.*, 337 U.S. 541, 545–46 (1949)—is "best understood not as an exception" to this finality rule, "but as a practical construction of it." *Will v. Hallock*, 546 U.S. 345, 349 (2006) (internal quotation marks and citations omitted).

The doctrine supplies jurisdiction for a "'small class' of pre-judgment orders that 'finally determine claims of right separable from, and collateral to, rights asserted in the action [and that are] too important to be denied review and too independent of the cause itself to require that appellate consideration be deferred until the whole case is adjudicated.'" *Lauro Lines s.r.l. v. Chasser*, 490 U.S. 495, 498 (1989) (quoting *Cohen*, 337 U.S. at 546). Put otherwise, we have jurisdiction under the collateral order doctrine when an order: (1)

5

No. 14-30823

conclusively determined the disputed question; (2) resolved an important issue separate from the merits of the case; and (3) is effectively unreviewable on appeal from a final judgment. *See Will*, 546 U.S. at 349; *Richardson-Merrell Inc. v. Koller*, 472 U.S. 424, 431 (1985) (citation omitted).[3]

"Importance" has sometimes been characterized as a discrete fourth requirement and other times been wrapped up in an analysis of both the second and third requirements. *See Mohawk Indus. Inc. v. Carpenter*, 558 U.S. 100, 107 (2009) (explaining that the question of whether a right is effectively unreviewable "cannot be answered without a judgment about the value of the interests that would be lost through rigorous application of a final judgment requirement" (internal quotation marks and citation omitted)); *Will*, 546 U.S. at 353 (recognizing that effective unreviewability requires that a "substantial public interest" be imperiled); *Lauro Lines*, 490 U.S. at 502 (Scalia, J., concurring) ("The importance of the right asserted has always been a significant part of our collateral order doctrine."); *Henry v. Lake Charles Am. Press LLC*, 566 F.3d 164, 178–181 (5th Cir. 2009) (analyzing "importance" as a distinct fourth requirement); Eric J. Magnuson & David F. Herr, *Federal Appeals: Jurisdiction and Practice* § 2.4 (2015) (same).[4]

The Court has repeatedly stressed that the conditions for appeal under the collateral order doctrine are "stringent." *E.g.*, *Digital Equip. Corp. v. Desktop Direct Inc.*, 511 U.S. 863, 868 (1994). Expanding the doctrine to permit jurisdiction in too many cases risks allowing the exception to swallow the rule.

---

[3] It is undisputed here that the Orders were conclusive and separate from the merits.

[4] This court recently addressed the taxonomic uncertainty in this area in *NCDR, L.L.C. v. Mauze & Bagby, P.L.L.C.*, 745 F.3d 742, 748 n.5 (5th Cir. 2014) ("[I]t [is] not clear whether importance is a fourth requirement or is instead wrapped up in the second and third requirements."). This is an academic dispute. It is quite clear from both the Supreme Court's collateral order doctrine jurisprudence and our own that the importance of the asserted right is a significant component in the jurisdictional analysis under this doctrine.

No. 14-30823

*See Will*, 546 U.S. at 349–50; *Digital Equip.*, 511 U.S. at 868; *Firestone Tire & Rubber Co. v. Risjord*, 449 U.S. 368, 374 (1981) (identifying the substantial finality interests in judicial efficiency and the "sensible policy of avoiding the obstruction to just claims that would come from permitting the harassment and cost of a succession of separate appeals from the various rulings to which a litigation may give rise" (internal quotation marks, alterations, and citation omitted)).

A brief comparison of the types of orders immediately appealable under the collateral order doctrine with those not immediately appealable is instructive. Immediately appealable orders include: those rejecting absolute immunity or qualified immunity; denying a state's claim to Eleventh Amendment immunity; and—in the criminal context—a defendant's adverse ruling on a double jeopardy defense. *See Will*, 546 U.S. at 350 (collecting cases). These types of orders, the Court explained, implicate weighty public interest concerns: in each one, "some particular value of a high order" was at issue. *Id.* at 352.

By contrast, orders generally not immediately appealable under the collateral order doctrine include: denial of a motion to enforce a forum selection clause or to dismiss on forum non conveniens grounds, *see Lauro Lines*, 490 U.S. at 496; *Van Cauwenberghe v. Biard*, 486 U.S. 517, 527–530 (1988); discovery orders generally (including orders permitting discovery into otherwise-privileged, attorney–client communication because of waiver), *see* Richard L. Marcus et al., *Civil Procedure: A Modern Approach* 1149–51 (6th ed. 2013); *Mohawk*, 558 U.S. at 103, 108; attorney disqualification decisions, *see, e.g.*, *Richardson–Merrell*, 472 U.S. at 426 (order disqualifying counsel in civil case not immediately appealable); *Flanagan v. United States*, 465 U.S. 259, 260 (1984) (same outcome in criminal case, despite Sixth Amendment rights at issue); and an order refusing to enforce a settlement agreement that

7

No. 14-30823

allegedly sheltered a party from suit, *see Digital Equip.*, 511 U.S. at 879, 884 ("Including [an immunity] provision in a private contract . . . is barely a prima facie indication that the right secured is 'important' to the benefited party.").[5]

The collateral order doctrine has been successfully invoked in favor of jurisdiction in three appeals in this court arising from this Settlement Program. In the first of these cases, this court heard an appeal arising from a dispute about an interpretation of the Settlement Agreement. *See In re Deepwater Horizon*, 732 F.3d 326, 329 (5th Cir. 2013) ("*Deepwater Horizon I*"). The appeal involved an accounting methodology that potentially affected "thousands of claimants" and "hundreds of millions of dollars" in the business economic loss recovery framework. *Id.* at 331, 332 n.3, 345. We determined that the district court's order conclusively resolved the interpretive dispute, that the dispute was "separate from the merits of BP's liability for the oil spill," and that the order would "be effectively unreviewable on appeal from final judgment because, at that point, the improper awards will have been distributed to potentially thousands of claimants and BP will have no practical way of recovering these funds should it prevail." *Id.* at 332 n.3 (citing *Walker v. U.S. Dep't of Hous. & Urban Dev.*, 99 F.3d 761, 766–67 (5th Cir. 1996)).

In two subsequent companion appeals, this court relied on *Deepwater Horizon I* to again find jurisdiction under the collateral order doctrine. One of these cases dealt with an order approving a set of final rules governing discretionary review in the district court of internal appeal determinations. *See*

---

[5] When assessing an order's appealability, courts should not engage in an "individualized jurisdictional inquiry." *Coopers & Lybrand v. Livesay*, 437 U.S. 463, 473 (1978). Instead, the focus should be on the "entire category to which a claim belongs." *Digital Equip.*, 511 U.S. at 868; *see also Mohawk*, 558 U.S. at 107. Thus, in *NCDR*, this court looked not to whether the order in that particular case was immediately appealable, but rather to whether orders in that context would generally "satisfy the conditions of the collateral order doctrine." 745 F.3d at 748 (citing *Henry*, 566 F.3d at 173).

No. 14-30823

*In re Deepwater Horizon*, 785 F.3d 986, 989 (5th Cir. 2015) ("*Deepwater Horizon II*"). In that case, we asserted jurisdiction because the decision was conclusive and separate from the merits, and because:

> [t]he Final Rules affect the rest of the Settlement Program's administration, given that they will govern *all future reviews* by the district court. Because the Final Rules preclude appeals of certain cases to the district court, and because they are silent as to appeals to this court and lack requirements to file requests or docket orders on the civil docket, they would be unreviewable from a final judgment of claim determinations were we not to review them in this case.

*Id.* at 993 (emphasis added). The underlying order therefore had substantial, settlement-wide ramifications.

The last relevant appeal (which in fact involved three consolidated appeals from individual awards) centered on another interpretive dispute about whether donations and grants could qualify as "revenue" for nonprofit organizations under the Settlement Agreement for purposes of calculating loss. *See In re Deepwater Horizon*, 785 F.3d 1003, 1006 (5th Cir. 2015) ("*Deepwater Horizon III*"). This court decided that the three awards had conclusively determined the recovery amount for the three claimants; that the dispute about the interpretation of the Settlement Agreement with respect to nonprofit revenue was completely separate from the merits; and that the order would be "effectively unreviewable if BP had to wait until the settlement of the entire class action, when awards 'will have been distributed to potentially thousands of claimants and BP will have no practical way of recovering these funds should it prevail.'" *Id.* at 1009 (quoting *Deepwater Horizon I*, 732 F.3d at 332 n.3).

BP rightly concedes that not every dispute over an interpretation of the Settlement Agreement resolved in the district court is immediately appealable to this court. But the two primary limiting principles it proposes are unsatisfying in this case. First, BP contends that this case, like the other BP

9

No. 14-30823

appeals in which this court permitted application of the doctrine, involves an important issue and effectively unrecoverable funds. Second, BP claims, this case arrives here in a post-judgment posture.[6] The thrust of this argument is that we need not fear opening up Pandora's Box by permitting wholesale abuse of the collateral order doctrine because appeals in the post-judgment context are rare. We take these arguments in turn.

BP's first contention is that its purported right to the information at issue in this case presents an important issue with effectively unrecoverable funds at stake. While these arguments might have justified immediate appealability in *Deepwater Horizon I, II*, and *III*, they fall short in this case. In each of the aforementioned cases, we determined that the orders at issue were effectively unreviewable at least in part based on their broad ramifications to the administration of the settlement. Appealability was endorsed in *Deepwater Horizon I* because the interpretation affected "potentially thousands of claimants." 732 F.3d at 332 n.3. The same was true in *Deepwater Horizon III*. *See* 785 F.3d at 1009. *Deepwater Horizon II* presented an even stronger case for appealability because the rules at issue might have prevented certain appeals to the district court and possibly all appeals to this court. *See* 785 F.3d at 992–93. At issue in each of these cases was more than the right to an accurate interpretation of a Settlement Agreement provision. The right in these cases is better characterized as the right to an interpretation of the Settlement Agreement on an issue with a serious impact on the effective and fair administration of the settlement.

By that measure, the disputed issue in this case does not stack up. Here, BP claims, principally, that it needs specific information about pre-

---

[6] The case is post-judgment in the sense that a final order approving the settlement has been entered. *See Bogard v. Wright*, 159 F.3d 1060, 1062 (7th Cir. 1998) (citing, *inter alia, Edwards v. City of Houston*, 78 F.3d 983, 993 (5th Cir. 1996) (en banc)).

No. 14-30823

determination "Claim A" in order to establish the legitimacy (or illegitimacy) of separate, but related, post-determination "Claim B." BP states that there have been about 288,000 claims filed and 75,000 awards totaling $5.2 billion at the time of briefing. But although by its own account it had "uninterrupted access to claimant-specific information" (except internal Settlement Program work files) for nearly 20 months, at the time of briefing BP had appealed 4,728 claim determinations, *see* Report by the Claims Administrator at 18, *In re Deepwater Horizon*, MDL No. 2179 (E.D. La. Nov. 26, 2014), ECF No. 13729, and directs the panel to only five fruitful appeals (from which it recouped about $4 million) where pre-determination information proved useful to its success. This does not constitute a showing of a disruption to the Settlement Program framework rising to the level of the disruptions in *Deepwater Horizon I, II*, and *III*, where either thousands of claims or all claims were unavoidably impacted by the interpretations at issue. *See Deepwater Horizon I*, 732 F.3d at 332 n.3; *Deepwater Horizon II*, 785 F.3d at 992–93; *Deepwater Horizon III*, 785 F.3d at 1009. Here, by contrast, BP has shown a total of five claims in which this data appeared to have made any difference at all.[7]

   We similarly see little merit in BP's argument that it needs this data for "reviewing and auditing the Settlement Program" and "pursuing indemnification, contribution, subrogation, insurance and other claims from

---

[7] Still, BP argues, why is $4 million in proven fraud—detected at least in part with the assistance of pre-determination data—insufficient to confer a right to immediate appealability in this case? And BP correctly notes that both *Walker v. U.S. Department of Housing & Urban Development* and *Deepwater Horizon III*—both of which permitted appeal—involved amounts far below the $4 million at issue here. *See Walker*, 99 F.3d at 766–67 ($910,228.13); *Deepwater Horizon III*, 785 F.3d at 1007 (involving awards totaling about $1.2 million). But this argument misses the mark. We reiterate that an individualized jurisdictional inquiry (one in which a court evaluates an order's appealability based on the particular facts presented, rather than looking to the category in which the asserted right falls) is improper. *See Mohawk*, 558 U.S. at 107; *NCDR*, 745 F.3d at 748; *Henry*, 566 F.3d at 173.

11

No. 14-30823

third parties." BP never justifies its need for pre-determination, claim-specific data to exercise these rights. If BP were seeking contribution or subrogation for a particular claimant's demonstrated loss, for example, it would presumably be because that claim's legitimacy had been conclusively determined. By that time, BP would have access to any data it needs related to that particular claim.

In addition, the Settlement Agreement has an entire preexisting framework in place to address fraud. Anyone—including members of the general public—can report fraud to the Claims Administrator, and a special master, former Federal Bureau of Investigation Director Louis Freeh, has been tasked with assisting the program with fraud prevention. The MDL docket reveals that Freeh has been actively bringing claims to recoup fraudulently obtained funds. Federal prosecutors, too, have brought criminal charges against individuals who have allegedly committed fraud.[8] There was no comparable way to recoup improper awards in *Deepwater Horizon I*, *II*, or *III*.

Even were it otherwise, "[t]he mere identification of some interest that would be 'irretrievably lost' has never sufficed to meet the third *Cohen* requirement." *Digital Equip.*, 511 U.S. at 872. This is why immediate appealability is denied even when, as noted earlier, a criminal defendant seeks

---

[8] When filling out paperwork to submit a claim, a claimant must declare under penalty of perjury that the information provided is true and accurate. One mandatory form for all claimants contains the following language: "I understand that false statements or claims . . . may result in fines, imprisonment, and/or any other remedy available by law to the Federal Government, and that suspicious claims will be forwarded to federal, state, and local law enforcement agencies for possible investigation and prosecution." The Department of Justice has placed a "high priority on promptly investigating and prosecuting all meritorious reports of fraud related to the oil spill and its aftermath." *See* U.S. Dep't of Justice, *Deepwater Horizon (BP) Oil-Spill Fraud*, *available at* http://www.justice.gov/criminal/oilspill/. A website owned and operated by BP that tracks legal developments related to the oil spill states that there have been 264 reported fraud cases leading to criminal charges, and 187 convictions stemming from reported fraud cases. *See The Whole Story*, State of the Gulf, https://www.thestateofthegulf.com/the-whole-story/fraud-tally/ (last updated June 24, 2015).

No. 14-30823

reinstatement of his disqualified attorney, *see Flanagan*, 465 U.S. at 260, or, as in *Coopers & Lybrand v. Livesay*, an erroneous district court order would, as a practical matter, sound the death knell for plaintiffs' claims that might have been successful had the error been corrected on appeal. *See* 437 U.S. 463, 473–74 (1978) ("Perhaps the principal vice of the 'death knell' doctrine is that it authorizes *indiscriminate* interlocutory review of decisions made by the trial judge."). Orders like these result in harm far more irreparable than the injury at issue in this case. Here, BP will eventually come into possession of all the data it claims to need. At that time, it will be able to cross-check individual claims for fraud that has not already been detected and pursue any of a variety of available avenues to recoup improperly awarded funds.

*Walker v. U.S. Department of Housing and Urban Development*, on which BP relies, is not to the contrary. *See* 99 F.3d at 766. In *Walker*, attorneys for plaintiffs in a housing discrimination class action won fees for work they undertook outside of the immediate scope of the litigation, including for monitoring a consent decree and pursuing environmental claims to address lead poisoning. *See id.* We held the fee order appealable under the collateral order doctrine in part because the victories did not result from litigation, so the orders were not "appealable or in any way subject to reversal." *Id.* By contrast, any fraudulently obtained award here—discoverable with the aid of the data BP seeks—will be uncovered sooner or later, since BP will eventually have access to this data. Even if this means BP will not be able to bring a timely appeal in the Settlement Program—which is far from certain—other avenues to challenge the award remain open. *See In re Deepwater Horizon*, 753 F.3d 516, 520 n.5 (5th Cir. 2014) (Clement, J., dissenting from denial of rehearing en banc) ("BP may seek recovery for losses due to fraud in individual actions,

No. 14-30823

and government prosecutors may pursue those who submit fraudulent claims.").[9]

Interpreting effective unreviewability to permit appeal in this case would signify that each time BP could show a handful of claims arguably impacted by the district court's interpretation of the Settlement Agreement, it could immediately appeal to this court. The limited benefits of such unrestricted access to the appellate court are outweighed by the attendant systemic disruption and institutional cost. *See Mohawk*, 558 U.S. at 112; *Digital Equip.*, 511 U.S. at 884.

BP's second contention, that there is little prospect for abuse of the collateral order doctrine in the post-judgment context, is belied, first, by the sheer quantity of appeals that BP, Class Counsel, and individual plaintiffs have brought since reaching the Settlement Agreement. As noted above, BP has appealed: a determination about the accounting method in the business economic loss framework, *see Deepwater Horizon I*, 732 F.3d at 329–32; an order approving the rules governing internal appeals procedures, *see Deepwater Horizon II*, 785 F.3d at 989; and various claimant awards premised on an interpretation of the Settlement Agreement governing nonprofit awards, *see Deepwater Horizon III*, 785 F.3d at 1006. BP has also challenged: the validity of the Settlement Agreement itself (No. 13-30095); the dismissal of a lawsuit to enjoin the Claims Administrator from distributing payment on business economic loss claims (No. 13-30329); the causation standards relevant to certain business losses (No. 13-31220); the denial of a motion to recoup business loss payments issued under a later-rejected accounting method (No.

---

[9] In *Deepwater Horizon I*, 732 F.3d at 332 n.3, however, *Walker* was properly invoked because there is no indication that BP had recourse outside the immediate bounds of the settlement framework to address awards calculated under an improper accounting methodology. *See Walker*, 99 F.3d at 766.

No. 14-30823

14-31165); and the denial of a motion to remove the Claims Administrator (No. 14-31299).

Class Counsel have filed their own various appeals, and dissatisfied individual claimants have done so as well. Although the collateral order doctrine has thus far supplied jurisdiction in Settlement Agreement disputes only in *Deepwater Horizon I, II,* and *III*—and some of the other decided appeals have asserted jurisdiction on other grounds—the potential for this "'narrow' exception . . . to swallow the general rule," *Digital Equip.*, 511 U.S. at 868 (citation omitted), is obvious enough.

The notion that we should loosen the strings in the context of post-judgment proceedings like this one is further undermined by the increasing frequency of court-supervised settlement agreements and consent decrees.[10] *See* Larry Kramer, *Consent Decrees and the Rights of Third Parties*, 87 Mich. L. Rev. 321, 321 (1988) (recognizing that settlement by consent decree has become increasingly common in antitrust cases, "environmental cases, prison cases, school and housing desegregation cases, and especially employment discrimination cases"). Our circuit alone is home to a multitude of ongoing consent decrees related to, among other issues, desegregation of public workplaces, prisoner's rights, and health care mandates.

---

[10] Although the Settlement Agreement at issue is not a consent decree, the judicial imprimatur associated with the incorporation of the Agreement in the approval order and the ongoing retention of jurisdiction renders the distinction thin. *See Kokkonen v. Guardian Life Ins. Co. of Am.*, 511 U.S. 375, 381 (1994); *Smyth ex rel. Smyth v. Rivero*, 282 F.3d 268, 281 (4th Cir. 2002) ("Where a settlement agreement is embodied in a court order such that the obligation to comply with its terms is court-ordered, the court's approval and the attendant judicial over-sight (in the form of continuing jurisdiction to enforce the agreement) . . . may be functionally a consent decree . . . ."); *see also Buckhannon Bd. & Care Home, Inc. v. W. Va. Dep't of Health & Human Res.*, 532 U.S. 598, 618 (2001) (Scalia, J., concurring) ("[I]n the case of court-approved settlements and consent decrees, even if there has been no judicial determination of the merits, the outcome is at least the product of, and bears the sanction of, judicial action in the lawsuit." (emphasis omitted)).

No. 14-30823

In this case, as in the many others like it discussed above, an earlier decision of ours in a multidistrict litigation "of nearly unprecedented scope" illuminates the problem:

> Before the litigation is completed, the case will undoubtedly present numerous opportunities for parties dissatisfied with some aspect of a court ruling to claim entitlement to appellate review. In the context of such complex litigation it is important to remember that "we must be parsimonious in our analysis of appealability."

*In re Corrugated Container Antitrust Litig.*, 611 F.2d 86, 89 (5th Cir. 1980) (citing *N. Am. Acceptance Corp. Sec. Cases v. Arnall, Golden & Gregory*, 593 F.2d 642, 645 (5th Cir. 1979)). The prospect for abuse of the collateral order doctrine in post-judgment proceedings is plainly evident. We therefore reject the notion that this would serve as an effective limiting principle were we to permit appeal here.

We emphasize three additional reasons for our ruling today. First, we highlight the deference "owe[d] to the trial judge as the individual initially called upon to decide the many questions of law and fact that occur" over the course of a litigation. *Firestone Tire & Rubber Co.*, 449 U.S. at 374. "Permitting piecemeal appeals would undermine the independence of the district judge, as well as the special role that individual plays in our judicial system." *Id.*; *see also Mohawk*, 558 U.S. at 106–07; *Johnson v. Jones*, 515 U.S. 304, 315–17 (1995); *Richardson–Merrell*, 472 U.S. at 436. This is perhaps nowhere more true than in the management of the *Deepwater Horizon* class action litigation, the scope and size of which are nearly unprecedented. *See In re Corrugated Container Antitrust Litig.*, 611 F.2d at 89 (emphasizing special concerns about overuse of the collateral order doctrine in complex litigation).[11]

---

[11] To the extent that interpretation of § 4.4.14 of the Settlement Agreement might rest on factual determinations about the parties' course of conduct, a point BP presses in its

No. 14-30823

Second, we call attention to the general rule that only serious and unsettled questions of law come within the collateral order doctrine. *See Nixon v. Fitzgerald*, 457 U.S. 731, 742 (1982) ("As an additional requirement, *Cohen* established that a collateral appeal of an interlocutory order must 'presen[t] a serious and unsettled question.'" (citing *Cohen*, 337 U.S. at 547)); *Baldridge v. SBC Commc'ns, Inc.*, 404 F.3d 930, 931 (5th Cir. 2005); *Davis v. E. Baton Rouge Parish Sch. Bd.*, 78 F.3d 920, 925–26 (5th Cir. 1996). *Deepwater Horizon I, II,* and *III* each involved issues that—regardless of how they were decided—would unquestionably and substantially impact the judicially-managed administrative framework. *See Deepwater Horizon I*, 732 F.3d at 332 n.3 (large components of business economic loss framework affected); *Deepwater Horizon III*, 785 F.3d at 1009 (same); *Deepwater Horizon II*, 785 F.3d at 992–93 (all claims impacted). There is no comparable serious and unsettled question of law here.

Finally, effective appellate review of orders interpreting the settlement agreement can be had by other means. *See Mohawk*, 558 U.S. at 110–12; *Digital Equip.*, 511 U.S. at 883. First, aggrieved parties in this situation might employ 28 U.S.C. § 1292(b), which permits discretionary interlocutory appeal from a district court order "involv[ing] a controlling question of law as to which there is substantial ground for difference of opinion." The "discretionary appeal provision (allowing courts to consider the merits of individual claims) would seem a better vehicle for vindicating serious contractual interpretation claims than the blunt, categorical instrument of § 1291 collateral order appeal." *Digital Equip.*, 511 U.S. at 883 (citations omitted). Further, in extraordinary

---

briefing, deference to the district court is even more appropriate. *See* 15A Charles A. Wright & Arthur R. Miller, *Federal Practice and Procedure* § 3911.5 ("[T]he considerations that cause appellate courts to confide in trial court discretion should affect the timing of appeal as well as the scope of review.").

No. 14-30823

cases, a writ of mandamus under the All Writs Act, 28 U.S.C. § 1651, is available to correct manifest injustices. *See Cheney v. United States Dist. Court for D.C.*, 542 U.S. 367, 380 (2004).[12] In light of the foregoing analysis, we are unpersuaded that the Orders here are appealable under § 1291.

### B. § 1292(a)(1)

BP's second proffered basis for appellate jurisdiction is 28 U.S.C. § 1292(a)(1), which permits jurisdiction over appeals from "[i]nterlocutory orders . . . granting, continuing, modifying, refusing or dissolving injunctions." Just as it has done with the collateral order doctrine, the Court has "approach[ed] this statute somewhat gingerly lest a floodgate be opened" that permits immediate appeal over too many nonfinal orders. *Switz. Cheese Ass'n, Inc. v. E. Horne's Mkt., Inc.*, 385 U.S. 23, 24–25 (1966) (emphasizing a strong "congressional policy against piecemeal appeals").

A district court "grant[s]" an injunction when an action it takes is "directed to a party, enforceable by contempt, and designed to accord or protect some or all of the substantive relief sought in the complaint in more than a temporary fashion." *Police Ass'n of New Orleans Through Cannatella v. City of New Orleans*, 100 F.3d 1159, 1166 (5th Cir. 1996) (internal quotation marks and citation omitted); 16 Charles A. Wright & Arthur R. Miller, *Federal Practice and Procedure* § 3922 (3d ed. 2014); *see also* Black's Law Dictionary 855 (9th ed. 2009) (defining injunction as a "court order commanding or preventing an action"). A district court "modif[ies]" an injunction when it "changes the obligations imposed by the injunction." 16A Wright & Miller

---

[12] BP mentioned mandamus relief in passing in its reply brief. Even if it has waived this argument, "[t]his court has the discretion to treat an appeal as a petition for a writ of mandamus." *In re Grand Jury Subpoena*, 190 F.3d 375, 389 n.16 (5th Cir. 1999). Failing to see an "exceptional circumstance[] amounting to a judicial usurpation of power or a clear abuse of discretion," *Cheney*, 542 U.S. at 380 (internal quotation marks and citations omitted), we do not believe mandamus relief is appropriate here.

No. 14-30823

§ 3924.2. On the other hand, a court has not modified an injunction when it "simply implements an injunction according to its terms or [] designates procedures for enforcement without changing the command of the injunction." *Id.* Interpretation, then, is not modification. *See In re Seabulk Offshore Ltd.*, 158 F.3d 897, 899 (5th Cir. 1998). This court takes a practical view of modification, "look[ing] beyond the terms used by the parties and the district court to the substance of the action." *Id.*

In addition to showing that an order granted, modified, refused, or dissolved an injunction, a party challenging an interlocutory order must show "serious, perhaps irreparable, consequence[s]," because the § 1292(a)(1) "exception is a narrow one," *Gardner v. Westinghouse Broad. Co.*, 437 U.S. 478, 480 (1978) (internal quotation marks and citation omitted); *see also Carson v. Am. Brands, Inc.*, 450 U.S. 79, 84 (1981).

BP asserts that the March 25 Order interpreting § 4.4.14 of the Settlement Agreement constituted an injunction. Alternatively, BP proposes that the district court's approval of the settlement constituted an injunction, which was in turn modified by the March 25 Order and the subsequent denial of the motion for reconsideration. Class Counsel argue that neither the Orders nor the settlement approval provided injunctive relief, and alternatively that the Orders merely interpreted (rather than modified) any putative injunction.

Even assuming *arguendo* that the March 25 Order was an injunction or that the settlement approval order was an injunction modified by the Orders, BP has not shown "serious, perhaps irreparable, consequence[s]." *Gardner*, 437 U.S. at 480. As articulated in our discussion on the collateral order doctrine, any harm here is adequately reparable through the multiple avenues BP has to pursue awards obtained fraudulently. *See Sampson v. Murray*, 415 U.S. 61, 90 (1974) ("The possibility that adequate compensatory or other corrective relief will be available at a later date . . . weighs heavily against a claim of

No. 14-30823

irreparable harm." (internal quotation marks and citation omitted)); *Miss. Power & Light Co. v. United Gas Pipe Line Co.*, 760 F.2d 618, 629 (5th Cir. 1985) ("[I]t is nevertheless settled that an injury is 'irreparable' only if it cannot be undone through monetary remedies." (internal quotation marks, alterations, and citation omitted)). Further, there has been no showing, unlike in *Philip Morris USA Inc. v. Scott*, 131 S. Ct. 1, 4 (2010) (Scalia, J., in chambers), on which BP relies, that a "substantial portion" of the fraudulent awards "will be irrevocably expended."

### III. CONCLUSION

We therefore DISMISS this appeal for lack of jurisdiction.

No. 14-30823

JENNIFER WALKER ELROD, Circuit Judge, dissenting:

The majority opinion is well-reasoned, and were we writing on a clean slate, I might be inclined to join it.[1]  Nevertheless, because I believe that *Deepwater Horizon I, II,* and *III* support a determination of jurisdiction under the collateral order doctrine, I respectfully dissent.  The interlocutory order at issue here "conclusively determined the interpretation dispute, which is completely separate from the merits of BP's liability for the oil spill," *In re Deepwater Horizon*, 732 F.3d 326, 332 n.3 (5th Cir. 2013) ("*Deepwater Horizon I*"), and it will be effectively unreviewable on appeal because BP will have no practical way to recover on appeal from final judgment.  *See id.*; *In re Deepwater Horizon*, 785 F.3d 986, 993 (5th Cir. 2015) ("*Deepwater Horizon II*"); *In re Deepwater Horizon*, 785 F.3d 1003, 1009 (5th Cir. 2015) ("*Deepwater Horizon III*").  In addition, the order at issue here will "affect the rest of the Settlement Program's administration," *Deepwater Horizon II*, 785 F.3d at 993, and in particular, BP's ability to detect and appeal fraudulent awards.

BP has presented five examples of successful appeals in which access to pre-determination information was necessary, and these examples amount to $4 million in prevented fraud.  In *Deepwater Horizon III*, we reviewed an

---

[1] In creating the collateral order doctrine, the Supreme Court interpreted 28 U.S.C. § 1291—which confers appellate jurisdiction on the courts of appeals over only "final decisions" of federal district courts—to include a grant of authority to review certain orders traditionally considered non-final.  *See Cohen v. Beneficial Indus. Loan Corp.*, 337 U.S. 541, 545–47 (1949).  The Court recognized that this was a "practical rather than a technical construction" of § 1291.  *Id.* at 546.  Perhaps in part because of the doctrine's tension with the text of § 1291 and § 1292 (which expressly grants appellate jurisdiction over specified interlocutory orders), the Court cautioned that the doctrine should be limited to "that *small class*" of decisions that involve "serious and unsettled question[s]" and "which finally determine claims of right separable from, and collateral to, rights asserted in the action, too important to be denied review and too independent of the cause itself to require that appellate consideration be deferred until the whole case is adjudicated."  *Id.* at 546, 547 (emphasis added).

No. 14-30823

interlocutory order denying discretionary review of three individual awards to non-profits with disputed amounts totaling only about $1.2 million. 785 F.3d at 1007; *see also ante*, at 11 n.7. Despite the relatively small number of awards and amount in controversy, we recognized that the order had implications for the calculation of awards made to other non-profits. *Id.* at 1009. A similar inference is appropriate here. Because, as BP explains, the district court's order here impacts BP's ability to determine whether awards comply with the Settlement Agreement's award criteria, under our precedent, the order involves a question sufficiently important to trigger jurisdiction under the collateral order doctrine. *See id.* (determining jurisdiction under the collateral order doctrine and recognizing that the doctrine is limited to orders that "resolve an *important* issue completely separate from the merits" (emphasis added) (internal quotation marks omitted)). Moreover, the reasons for determining that we have jurisdiction are even stronger here than in *Deepwater Horizon III*. In this case, we deal not with potentially miscalculated awards, but rather with potentially fraudulent ones that should not have been awarded at all.

Therefore, I would determine that we have jurisdiction over this appeal under the collateral order doctrine and reach the merits. On the merits, I would reverse the judgment of the district court because it conflates the terms "Claims-related data" and "Claim Files" in § 4.4.14 of the Settlement Agreement. I respectfully dissent.

# *United States Court of Appeals*

### FIFTH CIRCUIT
### OFFICE OF THE CLERK

**LYLE W. CAYCE**
**CLERK**

**TEL. 504-310-7700**
**600 S. MAESTRI PLACE**
**NEW ORLEANS, LA 70130**

July 16, 2015

Mr. William W. Blevins
U.S. District Court, Eastern District of Louisiana
500 Poydras Street
Room C-151
New Orleans, LA 70130

        No. 14-30823    In Re: Deepwater Horizon
                        USDC No. 2:10-MD-2179
                        USDC No. 2:12-CV-970

Dear Mr. Blevins,

Enclosed is a copy of the judgment issued as the mandate and a
copy of the court's opinion.

                        Sincerely,

                        LYLE W. CAYCE, Clerk

                        By: _____
                        James R. Schaeffer, Deputy Clerk

cc:
        Mr. George Howard Brown
        Ms. Elizabeth Joan Cabraser
        Mr. Kevin Michael Downey
        Mr. Miguel Angel Estrada
        Mr. Soren E. Gisleson
        Mr. Don Keller Haycraft
        Mr. Stephen Jay Herman
        Mr. Thomas George Hungar
        Mr. Samuel Issacharoff
        Mr. Scott Payne Martin
        Mr. Theodore B. Olson
        Mr. James Parkerson Roy