## UNITED STATES DISTRICT COURT

## EASTERN DISTRICT OF LOUISIANA

In Re:  Oil Spill by the Oil Rig *Deepwater Horizon*
in the Gulf of Mexico, on April 20, 2010

This document relates to:

No. 12-970

MDL NO. 2179

SECTION: J

Honorable Carl J. Barbier

Magistrate Judge Shushan

---

## OPPOSITION TO MOTION OF THE DHECC FOR RETURN OF PAYMENTS MADE TO CRYSTAL SEAFOOD COMPANY, INC.

---

### INTRODUCTION

The Deepwater Horizon Economic Claims Center ("DHECC") accuses Crystal Seafood

Company, Inc. ("Crystal") of fraud in connection with the *Deepwater Horizon* settlement

program.  However, it fails to address important facts surrounding Crystal's claim.  For example,

DHECC repeatedly accuses Crystal of misrepresenting its status as a "Primary Seafood

Processor," without acknowledging that DHECC did not rely on or accept Crystal's claimed

status as a seafood processor.  Rather, DHECC paid Crystal a lesser amount as a commercial

wholesaler or retailer, in the category Primary Seafood Industry II.  It cannot be denied that

Crystal sold processed shrimp at wholesale, so, at a minimum, it qualified for that designation.

The facts also show that Crystal had a reasonable basis in fact and law to assert that it was not a

failed business.  Far from wound down, it was still selling shrimp in 2010 after the spill.  To this

day, Crystal maintains its business, has ensured its ability to continue operations, and evaluates

when to resume actively processing shrimp at the Port Arthur facility.  For these and numerous

other reasons set forth herein, DHECC's motion should be denied.

## FACTUAL BACKGROUND



*Fig. 1*:  Aerial view of the property.  *See* Ex. 1 (Affidavit of Loc Tran dated July 30, 2015) at ¶ 3.

## I.        CRYSTAL SEAFOOD AND RELATED COMPANIES

Crystal is located at 3933 South Martin Luther King Drive in Port Arthur, Texas.  Crystal sits on a roughly two-acre lot that contains two main buildings, an office, a loading dock, and about five hundred feet of dock frontage on a ship channel connecting to the Sabine River, which flows into the Gulf of Mexico.  Crystal is owned principally by Loc Tran, and Mr. Tran's brother, Christopher, is also a shareholder and an officer. Ex. 1 at ¶¶ 1-2.

Crystal's main processing facility is the large building in the center of Figure 1.  The facility is 22,500 square feet and contains a high capacity IQF (individually quick frozen) machine and 5,000 square feet of freezer space.  Its shrimp is sold to seafood distributors for sale to grocery stores, with consumers purchasing the shrimp at retail being the end users.  *Id.* at ¶ 4.

Mr. Tran also owns a second processing company, Titan Seafood Co. ("Titan"), which is located at 3931 South Martin Luther King Drive.  Titan's processing facility is in a separate building (the building to the left of the main building in Figure 1).  This building is 5,000 square feet and contains a freezer for shrimp purchased from boats, as well as de-heading and peeling machines.  Titan sells to a number of distributors and restaurants, and its shrimp is primarily used for food-service and restaurant preparation of shrimp.  *Id.* at ¶ 5.

In addition to each business having its own building and equipment, Titan and Crystal have their own electrical meters, bills, bank accounts, and business records.  *Id.* at ¶ 6.

The building in the upper left of Figure 1, with a dark gray roof, is a double-wide trailer that served as office space and living quarters for both Crystal and Titan.  *Id.* at ¶ 7.

The land and buildings are owned by a third company, Lot, Inc. ("Lot"), which Mr. Tran also owns.  Lot owns the processing equipment used by Titan.  Crystal, on the other hand, continues to own all of its equipment outright and currently has no debt on the equipment.

Crystal's equipment includes a variety of processing equipment representing well more than a million dollars of invested capital and capable of processing high volumes of shrimp. *Id.* at ¶ 8.

## II.    THE HISTORY OF THE COMPANIES

Mr. Tran purchased the Port Arthur property in 1993, through a company called Irvine Property, Inc.  Mr. Tran and his brother, Tuan, also established a different company called Pleasure Island Shrimp House, Inc., to operate the dock. *Id.* at ¶ 9.

In February 2004, Mr. Tran incorporated Crystal to process shrimp.  Crystal built a processing facility and purchased its own processing equipment.  Crystal's equipment is top quality.  The de-heading systems can process 50,000 pounds of shrimp per day.  The IQF machine – by itself a $575,000 investment – can freeze 25,000 pounds per day.  Each of 120 vats can hold 1,000 pounds of shrimp tails.  All of this equipment remains on-site and is made from stainless steel, so it can still be refurbished, cleaned, and used. *Id.* at ¶ 10.

The following is a recent photograph of Crystal's equipment:



*Id. See also* additional photographs in Tran Aff. at ¶ 10.

Mr. Tran established Titan in 2005.  Titan used separate equipment, including a de-header, a separate plate freezer, and a peeling machine.  Whereas Crystal focused on IQF shrimp sold by grocery and retail outlets, Titan focused on peeled shrimp sold in restaurants.  Roughly 95% of Titan's product was sold to seafood distributors for resale to restaurants, and roughly 5% was sold directly to local markets and restaurants.  Titan and Crystal sell different products using different packaging under different brands to different customers.  *Id.* at ¶¶ 11-12.

In late 2005, Hurricane Rita damaged the Port Arthur property and buildings.  Mr. Tran repaired the Crystal facility and added an upstairs office.  The Titan facility suffered more damage than the Crystal facility, so in 2006, Mr. Tran rebuilt the Titan facility with more space and capacity.  *Id.* at ¶ 13.

In 2006, Mr. Tran incorporated Lot, and in 2007, Lot purchased the land and buildings from Irvine, while also assuming debt.  Lot effectuated this purchase in part with Mr. Tran's personal money, and in part with a $1.5 million bank loan from East West Bank.  *Id.* at ¶ 14.

Crystal does not buy shrimp directly from commercial fishing vessels, so it is not required to submit trip tickets to the Texas Parks & Wildlife Department.  Instead, Crystal purchased shrimp from several different docks in Texas and Louisiana.  As a result, the Texas Parks & Wildlife Department should have no trip tickets for Crystal in 2008-2010.  *Id.* at ¶ 15.

During this time, Crystal employed five to ten people in its plant.  One of these employees was Thomas Crane, who worked in the processing facility.  Mr. Crane was never Crystal's production manager.  He was hired to run the IQF machine and watch the unloading dock.  He was never involved in the management of Crystal or Titan, never interacted with customers, and knows little about Crystal's operations.  Mr. Crane was not involved in Crystal's sales of shrimp, including its ongoing sales of shrimp following the *Deepwater Horizon* disaster.

Mr. Crane left the business in 2009 and would have no knowledge of Crystal's business since that date. *Id.* at ¶ 16.

In September 2008, Hurricane Ike again damaged the Port Arthur property and buildings. Both Crystal and Titan resumed their processing operations almost immediately, powered by an on-site generator. Crystal had a substantial inventory of frozen shrimp and processed this inventory into finished product until about April or May 2009. Because the Crystal freezer had suffered damage in Hurricane Ike, Crystal began shipping finished shrimp to Seaboard Cold Storage located at 402 E. Ohio Street, in Plant City, Florida. Crystal continued processing and shipping shrimp until April or May 2009. It shipped approximately 30 truckloads – about 1 million pounds – of finished shrimp to Seaboard Cold Storage. *Id.* at ¶ 17.

In April or May 2009, after Crystal had finished processing its inventory of frozen shrimp, it stopped processing operations to complete repairs on its building and facilities. Crystal annually shut down processing operations every spring to complete repairs and maintenance, and repairs were particularly needed in 2009 due to hurricane damage. Crystal and Titan completed the repairs to their buildings and equipment in August 2009. *Id.* at ¶ 18.

## III.   THE FLOR-TEX LEASE

In April 2009, Mr. Tran was incarcerated following a plea bargain for an unrelated charge. With its equipment fixed and Mr. Tran's brothers able to continue operating the business, Crystal faced a decision about whether to restart processing in 2009. Because Crystal still had a significant amount of inventory to sell from cold storage, it decided to sell existing inventory rather than resume processing at that time. Instead, on September 1, 2009, Lot leased Crystal's processing facility to Flor-Tex Shrimp Company, LLC ("Flor-Tex"), a company owned by Crystal's main customer, Tampa Bay Fisheries, Inc. Thus, Flor-Tex leased the processing building and equipment while Crystal focused on selling its existing inventory. The Flor-Tex

lease was for a one-year term ending August 31, 2010, with an option to renew for one additional year.  Rental payments under the lease were $12,000 per month.  *Id.* at ¶ 19.

It was never Crystal's intention to close down permanently, wind up its business, or liquidate its assets.  In fact, the Flor-Tex lease allowed Lot to terminate on 60 days' written notice.  Crystal owns all of its equipment, has no outstanding debt, and has sufficient capacity to compete aggressively with its competitors.  There was no good reason for Crystal to cease operations and wind down, and Crystal did not do so.  While Crystal was not currently processing shrimp, it could resume processing in one to two months.  It has maintained its corporate charter to this day and annually pays its fees for a corporate charter.  *Id.* at ¶ 20.

Crystal continued to maintain an office and business presence at the Port Arthur facility throughout 2009 and 2010.  Christopher and Sinh Tran staffed the office, oversaw operations, and sold shrimp throughout 2010.  Both Christopher and Sinh had long experience in assisting with the operation of Crystal's business.  *Id.* at ¶ 21.

## IV.    IMPACTS FROM THE BP OIL SPILL

Crystal continued to sell shrimp after the BP oil spill in April 2010.  Due to the lack of shrimp available after the spill, Flor-Tex did not renew its lease in August 2010 and vacated the facility.  Crystal, however, continued to sell shrimp.  For example, Crystal sold $33,256 in June 2010, $66,000 in July 2010, and $140,192 in August 2010.  *Id.* at ¶ 22.

Crystal was significantly damaged by the *Deepwater Horizon* disaster.  Flor-Tex's termination of the lease demonstrates the severe disruption the spill caused to the shrimp industry.  Following Flor-Tex's termination in August 2010, Crystal faced the same challenges as Flor-Tex:  there were major disruptions to the supply of shrimp, demand for Gulf shrimp plummeted, and an entirely new set of risks altered the calculation of whether a shrimp processor could operate profitably.  From August 2010 to the present, Crystal has faced the decision

7

whether to resume buying and processing shrimp, and Mr. Tran has exercised his business judgment not to undertake that significant economic risk until business conditions improve.  *Id.* at ¶ 23.

Today, Crystal retains the ability to process shrimp at the Port Arthur facility.  Crystal owns the necessary shrimp processing equipment debt-free.  At no time has Crystal ever left or abandoned the Port Arthur site.  Even during Mr. Tran's imprisonment and Flor-Tex's lease, Mr. Tran's brothers continued to operate Crystal out of the office pictured in Figure 1.  To this day, because of the size of Crystal's operation and the continued lack of supply and depressed prices, conditions have not favored Crystal resuming its processing operations.  Crystal is a high-volume processor that requires a sufficient steady supply of shrimp, high demand, and favorable spreads between purchase and sales prices of shrimp.  The oil spill has negatively impacted all of those factors, leading Mr. Tran to conclude that it is too economically risky to resume processing.  *Id.* at ¶ 24.

As for Titan, although it scaled back considerably after the spill, it has resumed buying and selling shrimp.  It now continues to sort, weigh, grade, and sell shrimp.  *Id.* at ¶ 25.

Once Flor-Tex left the Port Arthur property, Lot had no income with which to make its loan payments to East West Bank.  Accordingly, the bank initiated foreclosure proceedings against Lot.  Since then, Lot has attempted, unsuccessfully, to sell its assets.  It is effectively insolvent and has not been able to sell its property or assets for the amount it owes to East West Bank.  *Id.* at ¶ 26.

While some of the equipment at the Port Arthur site needs maintenance, the core of Crystal's equipment is still functional, as it is high-quality equipment made from stainless steel.

The equipment may have little current market value because of its specialized nature and current depressed market conditions, but it remains operational. *Id.* at ¶ 27.

In addition to processing shrimp, Crystal bought fuel at wholesale to sell to shrimp boats. At the time it filed its claim, it had substantial accounts related to its fuel business, including debts to fuel suppliers and accounts receivable for money owed by shrimp boats. Crystal has chosen not to declare bankruptcy and instead continued to work to resolve these accounts in the years following the oil spill. It continued to make payments to its fuel suppliers. *Id.* at ¶ 28.

## V.   CRYSTAL'S BEL CLAIM

Crystal submitted its BEL claim to DHECC on August 8, 2012. *See* DHECC Memo. Ex. B at 10 (Crystal's claim form). The claim form stated that Crystal's headquarters are at 3933 South Martin Luther King Drive in Port Arthur, and provided the following business description:

> Crystal Seafood Company (the "Company") is a Primary Seafood Processor. The company operates its business at 3933 South Martin Luther King Dr., Port Arthur, Texas. Before the explosion of the Deepwater Horizon and the ensuing oil spill, its primary business was the purchase, processing, and sale of Gulf shrimp. The Company would purchase shrimp caught in Texas, Louisiana, and federal waters of the Gulf of Mexico directly from Shrimp Fishermen in the Port Arthur area. The Company would then process the shrimp, and sort, grade by size, clean, de-head, ice, freeze, salt, package, and store shrimp for shipment to customers.

*Id.* at 4. Crystal selected Economic Loss Zone D, a Benchmark Period of 2009, and a Step 1 Compensation Period of May through July. *Id.* at 8. Crystal also submitted its profit-and-loss statements ("P&Ls") and federal tax returns in support of its claim. Because most of its financial documentation was destroyed by Hurricane Ike, Crystal had little remaining documentation other than its monthly bank statements, which it obtained from its bank. Crystal hired a tax preparer, Cathy Huynh, to prepare the P&Ls and tax returns from the bank statements. Ex. 1 ¶ 31.

After submitting its BEL claim, Crystal never received any incompleteness notices or other inquiries from DHECC. On December 19, 2012, DHECC issued an Eligibility Notice to

Crystal with an award of $1,034,228.42.  Ex. 2 (Crystal's Eligibility Notice.)  The award was based entirely on Step 1 compensation and included no Step 2 compensation.  *Id.* at 5.  Consistent with Crystal's claim form, DHECC selected an Economic Loss Zone of Zone D, a Benchmark Period of 2009, and a Step 1 Compensation Period of May to July.  *Id.*

However, DHECC did not compensate Crystal as a Primary Seafood Processor.  Instead, the Notice designated Crystal as Primary Seafood Industry II, with a Risk Transfer Premium of 2.25.  *Id.*  Neither the Notice nor the accompanying Accountant's Analysis includes any explanation of how or why DHECC lowered the Industry Classification from Crystal's claim form.  *See id.*; Ex. 3 (DHECC Accounting Analysis).  Nevertheless, Crystal accepted the award, and BP did not appeal.[1]

When Crystal received its settlement payment, it made payments to Lot.  Those payments amounted to rent to maintain access to the facility and the ability to process shrimp at the site.  Lot used the payments to make tax and bank payments on the property.  Ex. 1 at ¶ 32.

## VI.    ALLIANCE & ASSOCIATES, LLC

Crystal has never had a corporate relationship or affiliation with Alliance and Associates, LLC ("Alliance").  They are completely separate companies owned by different individuals.  Alliance owned shrimp boats and sold shrimp to multiple docks, as well as directly to its own customers.  Ex. 1 at ¶ 34.  Its owner, Vinh Tran, has relocated back to Vietnam and is unable or

---

[1] Both Titan and Lot also filed claims.  Lot filed a failed-business claim based on the fact that the company has had no income since Flor-Tex left in 2010, other than payments it received from Crystal after Crystal received its settlement payment.  On January 22, 2015, DHECC issued an Eligibility Notice of $0 for this claim, which Lot is now appealing.  Titan filed a BEL claim, which is still pending.  Neither Crystal, Lot, nor Titan received any prior spill-related payments from BP or GCCF.  Likewise, on information and belief, Flor-Tex never made a claim under the settlement for any work performed at 3933 South Martin Luther King Drive.

unwilling to cooperate in defending DHECC's allegations against him. Accordingly, the undersigned counsel has remitted its fees and terminated its relationship with Alliance.

## VII.   INVESTIGATION OF CRYSTAL'S CLAIMS

Loc Tran, Titan Seafood, and Crystal have cooperated in both the Special Master's and DHECC's investigations of the Crystal and Titan claims. Both Christopher Tran and Loc Tran provided interviews to HUB Enterprises. Crystal also facilitated a guided physical inspection of the Port Arthur property by HUB Enterprises. Crystal obtained bank statements, invoices, and other documents to support the P&L statements submitted with Crystal's claim. Crystal explained its 2010 sales to the Special Master and provided documents showing ongoing operation of the business after the date of the spill. *Id.* at ¶ 35.

## ARGUMENT

## I.   STANDARD OF REVIEW

As this Court has recognized with respect to DHECC's motions under Rule 56, DHECC can only obtain summary judgment on a fraud claim if it shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law. Order dated July 7, 2015 at 3-4 (Rec. Doc. 14813) ("July 7 Order"), *citing* Fed. R. Civ. P. 56(a).) As the Court further recognized:

> The non-moving party can then defeat the motion by either countering with sufficient evidence of its own, or 'showing that the moving party's evidence is so sheer that it may not persuade the reasonable fact-finder to return a verdict in favor of the moving party.' *Int'l Shortstop, Inc. v. Rally's, Inc.*, 939 F.2d 1257, 1265 (5th Cir. 1991). Any factual controversies must be construed in the light most favorable to the non-mover, assuming an actual controversy exists. *Edwards v. Your Credit, Inc.*, 148 F.3d 427, 432 (5th Cir. 1998). In a similar vein, summary judgment must be denied when reasonable minds might differ on the inferences arising from the undisputed facts. *Xerox Corp. v. Genmoora Corp.*, 888 F.2d 345, 352 (5th Cir. 1989).

July 7 Order at 3-4.

## II.    DHECC HAS NOT PROVEN THE ELEMENTS OF COMMON LAW FRAUD

Applying general maritime law under the Amended Settlement Agreement,[2] DHECC

must establish that, based on the undisputed facts in the record, it is entitled to judgment as a

matter of law with respect to each of the five elements of common law fraud:

1.    The defendant made a false representation;

2.    The defendant knew or believed that the representation was
      false;

3.    The defendant intended to defraud the plaintiff by inducing
      the plaintiff to act in reliance on the representation;

4.    The plaintiff justifiably relied on the representation; and

5.    The plaintiff was damaged because of such reliance.

*See, e.g.*, *Operaciones*, 926 F. Supp. 2d at 862; *Cargill*, 875 F. Supp. 2d at 674; *Elmwood*, 1997

WL 781298, at *21-22 (citing W. PAGE KEETON, ET AL., PROSSER AND KEETON ON THE LAW OF

TORTS, § 107 (5th ed. 1984)); *see also Pence v. United States*, 316 U.S. 332, 338 (1942); *United

States v. Toyobo Co. Ltd.*, 811 F. Supp. 2d 37, 52 (D.D.C. 2011).  In Crystal's case, DHECC

cannot satisfy *any* of these five elements.

DHECC does not assert here that the financial or other supporting information Crystal

submitted with its claim contained any misrepresentations.  *See* DHECC Memo. at 11.  Instead,

---

[2] Under the Amended Settlement Agreement, which governs the settlement program, general
maritime law applies to any disputes regarding the Agreement or the settlement program: "[T]his
Agreement and the Release and Individual Releases hereunder shall be interpreted in accordance
with General Maritime Law as well as in a manner intended to comply with OPA [Oil Pollution
Act]." Amended Settlement Agreement, § 36.1. General maritime law incorporates the common
law of fraud.  July 7 Order at 4.  *See also Su v. M/V S. Aster*, 978 F.2d 462, 473 (9th Cir. 1992);
*Black Gold Marine, Inc. v. Jackson Marine Co., Inc.*, 759 F.2d 466, 470 (5th Cir. 1985);
*Operaciones Technicas Marinas S.A.S. v. Diversified Marine Servs., LLC*, 926 F. Supp. 2d 858,
862 (E.D. La. 2013); *Cargill, Inc. v. Degesch Am., Inc.*, 875 F. Supp. 2d 667, 674 (E.D. La.
2012); *Elmwood Dry Dock & Repair v. H & A Trading Co., Ltd.*, Nos. 93-02156, 94-01844, 94-
03783, 97-00191, 1997 WL 781298, at *21 (E.D. La. Dec. 16, 1997).

DHECC's sole argument is that Crystal's claim form contained false statements about its business:

> Alliance and Crystal both claimed eligibility as class members in the BEL program because they allegedly "owned, operated, or leased a physical facility" for processing seafood before and after the oil spill. Both entities told the DHECC that the Port Arthur Location was their current headquarters and had been the only physical location for the businesses from April 1, 2010 through December 31, 2010. … Both entities further said the businesses had not "ceased operations, declared bankruptcy, or liquidated substantially all of [their] assets since May 1, 2010."

*Id.* at 5.

Crystal does not dispute that it was not actively processing seafood at the time of the spill.  Crystal does, however, deny that it committed fraud on its claim form by answering the questions as it did.  DHECC's motion gets key facts wrong and fails to provide important details about the nature of its own award.  DHECC's allegations do not support a finding of fraud compelling summary judgment under Rule 56.

### A.    Crystal's Characterization Of Its Business As A Primary Seafood Processor Was Not A Fraudulent Misrepresentation, Nor Was It Relied Upon By DHECC

Crystal's representation of its claim form regarding its status as a Primary Seafood Processor cannot constitute fraud.  First, the statement was not a misrepresentation of fact.  Second, DHECC did not rely on it and never paid Crystal as a Primary Seafood Processor.  Instead, DHECC paid Crystal as a seafood wholesaler, and there is no dispute that it sold seafood in the relevant time periods.

### 1.    Crystal reasonably and correctly claimed to be a Primary Seafood Processor

Crystal had good reason to consider itself a Primary Seafood Processor when filing its claim, even though it was not actively processing shrimp at the time of the spill.  At that time, Crystal had a substantial inventory of shrimp that it had already processed at its Port Arthur

facility.  Ex. 1 at ¶ 19.  Crystal actively sold that inventory before, during, and after the spill.

Selling shrimp it had processed was its business throughout 2010.  *Id.* at ¶¶ 19, 22.

The Amended Settlement Agreement defines Primary Seafood Processor to be an entity

that "receives and prepares Seafood purchased from a Commercial Fisherman, Landing Site, or

Commercial Wholesale or Retail Dealer including, but not limited to, cleaning, cooking,

canning, smoking, salting, drying or freezing, grading by size, packing storing [sic] Seafood for

shipment."  Amended Settlement Agreement, Ex. 3 at (2)(c) (emphases omitted).  Crystal met

that definition since its business involved selling shrimp it had graded, sorted, deheaded, frozen,

and packed.  *Id.* at ¶ 4.  Indeed, the definition of Primary Seafood Processor provides the best

description of the value that Crystal added to the seafood it sold throughout 2009 and 2010.

The Flor-Tex lease did not negate Crystal's status as a seafood processor at the time it

filed its claim with DHECC.  The lease was, by its express terms, temporary, and Crystal

continued to own its processing equipment throughout the lease.  *Id.* at ¶ 20.  When Flor-Tex left

in September 2010 – long before Crystal filed its claim with the settlement program – Crystal

could have resumed processing shrimp, and would have done so if it had made business sense.  It

did not, because of commercial conditions caused by the BP oil spill.  *Id.* at ¶ 23.  Yet Crystal

continued in business and operated out of the Port Arthur facility after the spill, which is what it

represented on the claim form.  Far from being a fraudulent misrepresentation, it was reasonable

for Crystal to take the position that it was a Primary Seafood Processor on its claim form.

Moreover, Crystal never represented that it processed shrimp at the Port Arthur facility

after the oil spill.  To the contrary, Crystal's claim form says that it processed seafood "[b]efore

the explosion of the Deepwater Horizon and the ensuing oil spill."  DHECC Memo. Ex. B at 4.

2. **Crystal's claim to be a Primary Seafood Processor did not induce reliance or cause damage to DHECC**

Crystal did not fraudulently misrepresent its status as a seafood processor. But DHECC's motion also fails because Crystal *was not paid as a Primary Seafood Processor*. DHECC did not accept Crystal's claim to be a Primary Seafood Processor, which would have carried a Risk Transfer Premium of 3.0. Instead, DHECC's Eligibility Notice designated Crystal as "Primary Seafood Industry II," with a Risk Transfer Premium of 2.25. Ex. 2 at 5. This means that DHECC paid Crystal only as a commercial wholesaler or retailer—a status that was plainly justified by its ongoing sales of shrimp—not as a seafood processor.

Nowhere in the Eligibility Notice or the Accountant Analysis did DHECC explain the basis for this designation. Crystal could have appealed or reconsidered the determination, but it chose not to do so. Instead, it accepted DHECC's payment calculated on the basis of its being a commercial wholesaler or retailer.

DHECC plainly did not rely on Crystal's characterization of its business as a Primary Seafood Processor. On the contrary, it rejected that characterization. Thus, even assuming there was a misrepresentation, the necessary element of reliance is missing. Likewise, DHECC cannot show that it suffered any damages as a result of Crystal's claim to be a Primary Seafood Processor, since it did not pay Crystal on that basis. *See, e.g.,* July 7 Order at 4, *citing Abernathy-Thomas Eng'g Co. v. Pall Corp.*, 103 F. Supp. 2d 582, 599 (E.D.N.Y. 2000) ("[D]amages are an essential element of a fraud claim under New York law.").

Accordingly, DHECC cannot establish that Crystal's representation of itself as a seafood processor was false, that it was made with fraudulent intent, that DHECC relied on it, or that DHECC suffered any damages as a result of the representation. DHECC's motion should therefore be denied.

**B.** **Crystal Did Not Make A Fraudulent Misrepresentation By Stating That It Was Not A "Failed Business"**

Contrary to DHECC's assertion, Crystal neither made a false statement nor induced reliance by taking the position on its claim form that it is not a Failed Business.

**1.** **Crystal did not make a fraudulent misrepresentation by claiming it is not a Failed Business**

Question No. 11 on Crystal's claim form asked:

> **11.  Has your business ceased operations, declared bankruptcy or liquidated substantially all of its assets since May 1, 2010?**  If your business failed between May 1, 2010 and December 31, 2011, stop filling out this Claim Form and submit the **Failed Business Economic Loss Claim Form (Red Form)** instead.

DHECC Memo. Ex. B at 5 (emphases in original).  In response, Crystal checked the "No" box.  There is no assertion, nor could there be, that Crystal declared bankruptcy or liquidated substantially all of its assets.  Rather, DHECC alleges that, because Crystal suspended processing shrimp, it is so clear that Crystal "ceased operations" in April 2009, that checking "No" is not just wrong, but intentionally fraudulent.  Crystal's answer was a reasonable application of the Amended Settlement Agreement to Crystal's circumstances, and Crystal continues to maintain that it was accurate.  Ex. 1 at ¶ 36.

The definition of "Failed Business" in the Amended Settlement Agreement, as opposed to the abbreviated version on the claim form, contemplates finality—the conclusive end or death of an organization.  A Failed Business is defined as:

> an entity that commenced operations prior to November 1, 2008 and that, subsequent to May 1, 2010 but prior to December 31, 2011, either (i) **ceased operations and wound down**, or (ii) entered bankruptcy (through the filing of a petition for bankruptcy protection in a court of competent jurisdiction), or (iii) otherwise initiated or completed a liquidation of substantially all of its assets.

Settlement Agreement at ¶ 38.68 (emphasis added).  Crystal did not commit fraud by taking the position that it was not a "Failed Business" under the Amended Settlement Agreement.  A

16

business does not cease to exist, as DHECC now asserts, merely because it suspends production while continuing to sell existing inventory.  Far from ceasing operations or winding down, Crystal continued to sell seafood that it had previously processed at Port Arthur.

Further, Crystal at no time has wound down its business, as required by the definition of Failed Business set forth in the Amended Settlement Agreement.  Crystal retains its corporate charter, continues to own its shrimp processing equipment, has made payments to Lot to retain access to the main processing building at the Port Arthur facility, and remains capable of processing shrimp when business conditions are favorable.  Ex. 1 at ¶¶ 30, 36.  DHECC erroneously assumes that Crystal's and Titan's equipment was one and the same.  DHECC Memo. at 5.  It was not.  Crystal and Titan possessed and used distinct sets of equipment, and Crystal never sold or transferred its equipment to Lot.[3]  Even when Flor-Tex left in 2010, Crystal retained ownership of its core operational assets: the IQF machine, the freezer, and other equipment.  Additionally, rather than declare bankruptcy and cease operations, Crystal continued to pay its debts and collect on accounts in the years following submission of its claim.  Ex. 1 at ¶¶ 20, 28, 36.

The business judgment of the owner has to matter when assessing whether a business has ceased to exist or wound down.  Loc Tran, who owns Crystal, avers that Crystal has never ceased operations or wound down its business.  Crystal has not resumed processing shrimp since the *Deepwater Horizon* spill because market conditions have not permitted it to do so profitably, not because it has ceased to exist or has liquidated its assets.  Even today, Crystal retains the ability to refurbish its equipment and resume processing and selling shrimp, should conditions justify

---

[3] The equipment described in the Affidavit of Christopher Tran, Ex. H at 6-8, was Titan's, not Crystal's.  Ex. 1 at ¶¶ 10, 20, 24, 29

the necessary investment.  Ex. 1 at ¶ 20.  It has taken actions – including payments to Lot and other creditors – to retain the ability to operate.  DHECC has offered no admissible or persuasive evidence that contradicts Mr. Tran's averments about the status of his business.[4]

Additionally, DHECC's position leads to the perverse result that any claimant who makes the wrong choice between Exhibit 4C (the BEL framework) and Exhibit 6 (the Failed Business framework), is guilty of fraud, even if the business bases its position on a good-faith assessment of its status.  A reasonable interpretation of the Amended Settlement Agreement does not constitute fraud, even if ultimately rejected by DHECC during the claims process.  Moreover, if granted, DHECC's motion would absolve it of its own responsibility to assist claimants in submitting claim forms and to evaluate and process claims so as to pay claimants.  *See* Amended Settlement Agreement ¶¶ 4.3.7., 4.3.8.

### 2. Crystal disclosed the relevant financial facts about its business operations

DHECC does not assert that it relied on Crystal's response to the "Failed Business" question to process Crystal's claim.  Any such position would be unreasonable because Crystal submitted financial documents showing the status of its business in 2009 and 2010, enabling DHECC to independently assess the issue. *See* DHECC Memo. at Ex. K.

---

[4] The "Interview Reports" DHECC submitted for Tommy Crane and other individuals in support of its motion are at best unreliable, if not misleading.  First, they are not actual transcripts of testimony taken under oath.  Rather, they are notes of the interviewer's impression of a conversation, making them inadmissible hearsay.  Likewise, it is impossible to tell the context in which these statements were made. A third-party statement that a company's manufacturing operations have "ceased" does not support, let alone compel, a finding that the business committed fraud by claiming that it had not failed within the meaning of the Amended Settlement Agreement.  And Mr. Crane had no direct knowledge of Crystal's sales or business in 2010 and subsequent years.

In fact, the decrease in business activity that DHECC now says is conclusive evidence of a failed business is clear from the P&Ls that Crystal submitted with its claim.  *Id.*  Far from misrepresenting the scope or nature of its post-2008 business, Crystal supplied DHECC with financial statements showing its revenue and expenses on a month-by-month basis.  It is uncontroverted that DHECC issued its Eligibility Notice knowing that Crystal's revenues and purchases fell off significantly in August 2009 and continuing into 2010.  *See* Exs. 2, 3.  Indeed, Crystal's revenue dropped to $0 in August, September, October, and December of 2009, and stayed low through most of 2010.  *Id.*

These are the same financial documents that DHECC now relies on in its motion as grounds for finding fraud.  Remarkably, DHECC's motion cites "the P&L statements filed with the DHECC" when arguing that Crystal had failed.  DHECC Memo. at 13.  It is not reasonable to accuse a claimant of fraud based on the very information the claimant submitted and disclosed to DHECC.  Nor should DHECC claim fraud based on information it has always had, does not dispute, and on which it now relies to show Crystal's financial status to the Court.[5]  *See, e.g.*, *Rayford v. N.Y. Life Ins. Co.*, 359 F. Supp. 139, 144 (E.D. La. 1973) (holding that voluntary disclosure of relevant facts showed the lack of intent to deceive); *LaBarge Pipe & Steel Co. v. First Bank*, 550 F.3d 442, 464 (5th Cir. 2008) (finding no justifiable reliance in negligent misrepresentation case where facts can be ascertained from documents); *Hawes v. Kilpatrick*

---

[5] DHECC raises an allegation about undisclosed revenues in January and March 2010 but in the next breath asserts that the "Court need not resolve this issue." DHECC Memo. at 13. Nevertheless, these additional revenues are worth noting for two reasons.  First, they show more business activity than the P&Ls disclose, so there is even less basis for DHECC's argument that the business had failed. Second, if anything, the inclusion of these revenues in the pre-spill months of 2010 would have only increased Crystal's compensation under the settlement methodologies, as DHECC awarded Crystal $0 in Step 2 compensation. Ex. 2 at 5.

*Funeral Homes, Inc.*, 887 So.2d 711, 715 (La. Ct. App. 2004) (holding that there is no fraud where the facts can be ascertained from documents)..

Crystal provided full disclosure of the financial status of its business in 2009 and 2010. Crystal continues to maintain that it has suffered damages as a result of the spill, but Crystal has never represented to DHECC that all of its losses were caused by the spill, that it was financially thriving at the time, or that its finances were anything other than what was disclosed in its claim. Instead, Crystal fairly and accurately availed itself of the objective terms of the Amended Settlement Agreement, and it was paid based on a correct application of those terms to its financial documents.  Whatever judgment DHECC might now have about Crystal being deserving of compensation, DHECC fails to point to any misrepresentation that justifies a finding of fraud.

The Special Master has not shown that Crystal's statement that it was not a Failed Business was false; that it was made with fraudulent intent; that DHECC reasonably relied on such statement; or that DHECC sustained any damages as a result of such reliance.

### C.    Crystal Continued To Operate Out Of The Port Arthur Facility During And After The Flor-Tex Lease

DHECC argues, finally, that Crystal "did not own, operate or lease the Port Arthur Location after September 2009," and that Crystal's representation to the contrary is fraudulent. DHECC Memo. at 11.  Once again, DHECC cannot show that Crystal's statements were anything other than a reasonable application of the Amended Settlement Agreement to the facts of its claim.

The Amended Settlement Agreement provides that an entity is a member of the Settlement Class if, "at any time from April 20, 2010 to April 16, 2012, [it] owned, operated, or leased a physical facility in the Gulf Coast Areas…."  Amended Settlement Agreement at ¶

20

1.2.1.  In this case, Crystal stated its business address on its claim form as 3933 South Martin

Luther King Drive in Port Arthur.  DHECC Memo. Ex. B at 4.  DHECC now deems Crystal's

description of its address to be not just wrong, but intentionally fraudulent.

It is undisputed that at the time of the spill and thereafter, Crystal had shrimp for sale that

had been processed at its Port Arthur address.  Ex. 1 at ¶ 22.  Sinh and Christopher Tran, who

had long experience operating the business with Mr. Tran, continued to maintain a business

office on site, even during the Flor-Tex lease.  *Id.* at ¶ 21.  The Port Arthur facility is where

Crystal conducted business, where its operations continued to be located throughout 2010, where

it suffered damages as a result of the spill, and where it hopes to resume shrimp processing. *Id.* at

¶ 32.  Even after receiving its settlement payment, Crystal made payments to Lot to ensure

continued access to the Port Arthur location.  No other location more accurately describes its

business address than the address listed on the claim form, and it was reasonable for Crystal to

list that address.

Moreover, DHECC's motion misses the critical fact of Crystal's continued ownership of

processing equipment located at the Port Arthur location.  This processing equipment qualifies as

a "facility" for the purposes of the Amended Settlement Agreement.  At all relevant times up to

the present, Crystal continued to own its processing equipment, including a $575,000 IQF

machine and freezers, the heart of its production operations.  That equipment has always been,

and still is, located at the Port Arthur address.  Even though Crystal did not own the land or

building in which its operations were conducted, it did own a physical "facility" by virtue of

owning all of the equipment necessary to operate its production line.  *See, e.g., Merriam-Webster*

*Dictionary*, http://www.merriam-webster.com/dictionary/facility (defining "facility" as

"something (such as a building or a large piece of equipment) that is built for a specific purpose"

(emphasis added)); *A Dictionary of Modern American Usage* 283 (1998) ("Not only is *facility* often unnecessary; it has also become virtually meaningless. The word is so abstract that it refers to just about anything, from a laboratory to a stadium to a toilet."). DHECC itself felt the need to define the term "Physical Facility" by issuing an extensive, detailed policy in January 2014 – long after Crystal submitted its claim. *See* DHECC Policy 467. It is not reasonable for DHECC to accuse a claimant of fraud for making its best effort to apply what DHECC itself acknowledges is an an ambiguous and undefined term.

Whether Crystal had transported its inventory to a storage facility in Florida is irrelevant. Seaboard Cold Storage, located at 402 E. Ohio Street, in Plant City, Florida, is also in Zone D, like Crystal. Even assuming that Crystal's business activity in 2010 centered on that location, it would have no bearing on Crystal's compensation. Either way, Crystal did business and had a physical presence in the Gulf Coast Area, and it was immaterial whether it described the location of the business as grounded in Port Arthur or Plant City.

Given that it is not disputed that Crystal maintained an office at the Port Arthur facility and conducted its business (*i.e.*, selling shrimp) from that facility, DHECC wrongly claims that it was fraudulent for Crystal to list its address as 3933 South Martin Luther King Drive in Port Arthur. Still less has DHECC offered any evidence—let alone evidence sufficient to sustain summary judgment—that Crystal intended to defraud DHECC by so listing its address.

## III.    JOINT AND SEVERAL LIABILITY AMONG ALL DEFENDANTS IS NOT PROPER

Joint and several liability among family members named in the motion is not appropriate based on the mere fact of being related. In particular, while Loc Tran owned and operated Crystal Seafood, he had no connection to Vinh Tran, Alliance & Associates, or the claim it filed

with DHECC.  Ex. 1 at ¶ 34.  The motion provides no evidence indicating otherwise.  There is no basis to hold Loc Tran or Crystal Seafood liable for the Alliance claim.

<u>**CONCLUSION**</u>

For the foregoing reasons, Crystal respectfully requests that the Court deny the motion for return of payments.

Date: July 30, 2015

**THE KRELLER LAW FIRM**

_/s/ Stephen Skelly Kreller_____
Stephen Skelly Kreller (Bar No. 28440)
757 St. Charles Avenue, Suite 301
New Orleans, Louisiana 70130
T: (504) 484-3488
F: (888) 294-6091
E: ssk@krellerlaw.com

**FAEGRE BAKER DANIELS LLP**
William L. Roberts
Craig S. Coleman
2200 Wells Fargo Center
90 South Seventh Street
Minneapolis, MN 55402
T: (612) 766-7000
F: (612) 766-1600
E: william.roberts@faegrebd.com
E: craig.coleman@faegrebd.com

_**Attorneys for Claimant Crystal Seafood Company, Inc.**_

**CERTIFICATE OF SERVICE**

I hereby certify that a copy of the above and foregoing has been filed on the Court's CM/ECF system, and thereby served on all counsel of record who have entered an appearance in this case, on July 30, 2015.

*/s/ Stephen Skelly Kreller*

US.75652865.02