**IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF LOUISIANA**

| | | |
|---|---|---|
| In Re:  Oil Spill by the Oil Rig "Deepwater Horizon" in the Gulf of Mexico, on April 20, 2010 | * * * * * * * * * | **MDL NO. 2179**<br><br>**SECTION: J**<br><br><br>**HONORABLE CARL J. BARBIER**<br><br>**MAGISTRATE JUDGE SHUSHAN** |
| Plaisance, *et al.*, individually and on behalf of the Medical Benefits Settlement Class,<br><br>Plaintiffs,<br>v.<br>BP Exploration & Production Inc., *et al.*,<br><br>Defendants. | * * * * * * * * * * * * * * * | **NO. 12-CV-968**<br><br>**SECTION: J**<br><br><br>**HONORABLE CARL J. BARBIER**<br><br>**MAGISTRATE JUDGE SHUSHAN** |

**STATUS REPORT FROM THE *DEEPWATER HORIZON*
<u>MEDICAL BENEFITS SETTLEMENT CLAIMS ADMINISTRATOR</u>**

The Garretson Resolution Group, the Claims Administrator of the *Deepwater Horizon* Medical Benefits Class Action Settlement (the "Settlement"), submits the following quarterly report to apprise the Court of the status of its work in processing claims and implementing the terms of the Medical Settlement Agreement (the "MSA") between April 4, 2015, and July 3, 2015, (the "Reporting Period").[1]  We have published six reports since Preliminary Approval in

---

[1] Capitalized terms not otherwise defined herein shall have the meanings ascribed to their fully capitalized renderings in the MSA.

May 2012, and this marks the second quarterly report filed since the claims filing deadline of February 12, 2015.  This report will address the continued processing of claims received from 2012 to 2014 (collectively, the "2014 Claims")[2] and the claims received in 2015 (the "2015 Claims").

This status report provides:

- an executive summary of claims processed during the Reporting Period;

- a detailed overview of the progression of the 2014 and 2015 Claims;

- a summary of claims for Specified Physical Conditions ("SPC") and significant developments concerning these claims;

- an update on the operations and activities of the Class Member Services Center;

- an account of participation in the Periodic Medical Consultation Program ("PMCP");

- a summary of claims for Later-Manifested Physical Conditions; and

- a summary of the activities of the grantees of the Gulf Region Health Outreach Program ("GRHOP") and the operations of the Gulf Region Health Outreach Program Library.

## I.   <u>EXECUTIVE SUMMARY</u>

The Claims Administrator has received 37,797 unique claims for compensation for a Specified Physical Condition and/or participation in the Periodic Medical Consultation Program through the end of the Reporting Period.[3]  This status report will provide an overview of the claims processing forecast for both the 2014 and 2015 Claims, the variables impacting the progression of those claims, and the outcome of claims as they progress through the stages of review.  In summary:

---

[2] The 2014 Claims include all POCFs received by the Claims Administrator from the entry of Preliminary Approval on May 3, 2012 through December 31, 2014.  While the Claims Administrator was approved to receive claims after Preliminary Approval, the Claims Administrator was not approved to process claims beyond the Party-approved RAI process until the Effective Date of the Settlement.   Hence, all claims received in 2012, 2013, and 2014 are referred to as the 2014 Claims.

[3] This is the total number of unique claims identified as of the end of the Reporting Period.  The Claims Administrator received an additional sixty-four (64) claims within this Reporting Period; all claims received are reviewed for timely submission, and untimely submissions will be denied, as required by the MSA.

- The 2014 Claims are proceeding to final determination.

  o Through the end of the Reporting Period, fifty-one percent (51%) of the 2014 Claims have reached a final determination (either approval or denial). Of those claims, twenty-seven percent (27%) were approved for compensation for an SPC, and another thirty-six percent (36%) were approved to participate in the PMCP. Furthermore, eighteen percent (18%) of the 2014 Claims going through the Notice of Defect Process have received an "Approved with Defects" notice, meaning that the Medical Benefits Settlement Class Member ("Class Member") has been approved for at least one compensable SPC.

  o The 2014 Claims, however, continue to be impacted by high defect rates, with seventy-six percent (76%) receiving either a Request for Additional Information ("RAI") or Notice of Defect. Additionally, twenty-two percent (22%) are impacted by changes or updates the claimants made to their Proof of Claim Forms or supporting documentation, which require us to re-review the claims.

- The 2015 Claims are progressing through initial review and resulting in determinations for SPC compensation.

  o Through the end of the Reporting Period, eleven percent (11%) of the 2015 Claims that have been processed through intake have reached a final determination. Close to 300 2015 Claims were determined for SPC compensation.

  o We expect to complete the intake of 2015 Claims by mid-August (within two (2) weeks of the original estimated completion date).

- The compensation allocated to SPC-determined claims continues to increase.

  o During the Reporting Period, the Claims Administrator approved Class Members for over $1.6 million in SPC compensation, bringing the cumulative total to $3.9 million.

  o Additionally, the Claims Administrator determined that another approximately 450 Class Members who had partially defective claims also had at least one valid SPC claim and that the total amount of compensation for which the Class Members were currently eligible on those claims was $3.4 million. The Claims Administrator sent those claimants an "Approved with Defects" notice, giving them the option of either attempting to cure the Defects in an effort to get greater compensation or waiving their opportunity to cure and accepting the compensation for which they had qualified at that time.

- - Between the amounts allocated through SPC-determined claims and the amounts to be allocated through the "Approved with Defects" claims, the total SPC compensation for which Class Members qualified as of the end of the Reporting Period amounted to more than $7 million.

- Class Members continue to be approved to participate in the PMCP.

  - During the Reporting Period, we approved 2,708 Class Members to participate in the PMCP, bringing the total to 13,000 to date. We sent PMCP Notices of Determination to 1,985 Class Members during the Reporting Period, for a total of 11,794 over the life of the program.

  - The Class Members approved to participate in the PMCP requested and were scheduled to receive 258 physician visits during the Reporting Period and 1,137 in total to date.

This information is discussed in greater detail below.

## II.   DETAILED CLAIMS PROGRESSION

### A.   Progression of 2014 Claims

The number of claims receiving a final determination or clearing lien resolution continued to increase throughout the Reporting Period. Of the 12,401 2014 Claims, fifty-one percent (51%), have been processed to a final determination, and forty-nine percent (49%), are undergoing review. Of the claims reaching a final determination,

- twenty-seven percent (27%) were approved for compensation for a Specified Physical Condition, and sixty-six percent (66%) of those claims were paid;

- twelve percent (12%) did not seek the SPC compensation benefit and instead claimed the Periodic Medical Consultation ("PMCP") benefit only; and

- twenty-four percent (24%) proved they were Class Members and were approved to receive the PMCP benefit but failed to prove they qualified for SPC compensation; and

- thirty-seven (37%) had to be denied because they (a) did not prove they were Class Members, (b) filed a valid opt-out, or (c) did not claim or prove a compensable SPC.

**Figure 1: Composition of Finalized 2014 Claims**



Of the claims that are undergoing review:

- eleven percent (11%) are pending Declaration Review or RAI processing;

- fifty percent (50%) have already received or are scheduled to receive a Notice of Defect and will need to submit additional information[4]; and

- thirty-nine percent (39%) are undergoing Medical Record Review.

---

[4] We continue to receive responses that will lead to an overall reduction of claims in these processing stages. Only forty-one percent (41%) are considered fully defective claims, meaning the claimant must provide a cure to receive compensation. The remaining nine percent (9%) are "Approved with Defect." As previously explained, these claims be qualified for SPC compensation.

**Figure 2: Composition of Pending 2014 Claims**



Thus, the current overall composition of the 2014 Claims is as follows:

**Figure 3: Overall Composition of 2014 Claims**

B.     **Progression of 2015 Claims**

The Claims Administrator has received 25,396 2015 Claims to date, sixty-four (64) of which it received during the Reporting Period.[5]  We are currently tracking to have all 2015 Claims processed through intake (including sorting and logging mail, scanning documents to create electronic records, indexing documents for review, and completing data entry for aggregate reporting) by mid-August and still project that all notices of receipt will be sent by the end of August.  In addition to the newly filed 2015 Claims received just prior to or at the claims filing deadline, over the Reporting Period, we have received approximately 1,750 changes or updates to those same claim forms.  This additional information must also be processed through intake to record the changes and updates.[6]  Current reporting suggests that the percentage of 2015 Claims impacted by receipt of changes or updates to information may exceed that for 2014 Claims.

After a claim makes it through intake, it proceeds to initial review and subsequent processing.  During the Reporting Period, the Claims Administrator processed an additional 9,402 of the 25,396 2015 Claims through intake, bringing the total 2015 Claims processed through intake to 13,275.  Therefore, the total 2015 Claims available for initial review and subsequent processing is 13,275.

Of the 13,275 claims, eleven percent (11%) have been processed to a final determination, and eighty-nine percent (89%) are undergoing review.  Of the claims reaching a final determination,

---

[5] Pursuant to Section V.A. of the MSA, any claim submitted to the Claims Administrator more than one year after the Effective Date is untimely and must be denied.

[6] During intake processing, we use the unique claim number assigned to each claimant to cross-reference and determine if a claim form has already been filed on behalf of that particular claimant.  As of July 3, 2015, the Claims Administrator had received 6,589 subsequent Proof of Claim Form submissions to change or update information for an already-filed claim.  Therefore, as of the end of the Reporting Period, we had received a total of 44,365 Proof of Claim Forms on behalf of 37,797 unique claimants.

- twenty percent (20%) were approved for compensation for an SPC, and fifty-seven percent (57%) of those claims were paid;

- ten percent (10%) did not seek the SPC compensation benefit and instead claimed the PMCP benefit only; and

- six percent (6%) proved they were Class Members and were approved to receive the PMCP benefit but prove they qualified for SPC compensation; and

- sixty-four (64%) had to be denied because they (a) did not prove they were Class Members, (b) filed a valid opt-out, or (c) did not claim or prove a compensable SPC.

**Figure 4: Composition of Finalized 2015 Claims**



Of the claims that are being processed through intake or are undergoing review:

- forty-one (41%) are in the initial claims review process;

- thirty-six percent (36%) are pending Declaration Review or RAI processing;

- twelve percent (12%) have already received or are scheduled to receive a Notice of Defect and will need to submit additional information; and

- eleven percent (11%) are actively in the Medical Record Review process.

**Figure 5: Composition of Pending 2015 Claims**



Thus, the current overall composition of the 2015 Claims is as follows:

**Figure 6: Overall Composition of 2015 Claims**



## III.     CLAIMS FOR SPECIFIED PHYSICAL CONDITIONS

### A.     Claimed Benefits and Compensation Level

As discussed above, during the Reporting Period, the Claims Administrator completed intake for 9,402 of the 25,396 Proof of Claim Forms ("POCFs") received in 2015.  Therefore, as of the end of the Reporting Period, 25,676 of the 37,797 POCFs received had proceeded to initial claims review.  Of the 9,402 POCFs for 2015 Claims that were available for initial claims review during the Reporting Period, 9,226 sought compensation for an SPC and participation in the PMCP, and 176 sought only participation in the PMCP.

| TABLE 1: POCF FILINGS AVAILABLE FOR INITIAL CLAIMS REVIEW | | |
|---|---|---|
| | **Reporting Period** | **Total** |
| Claims Pending Intake Processing | | 12,121 |
| **Total POCF Filings Available for Initial Claims Review** | **9,402** | **25,676** |
| Claims for Compensation for Both SPCs and Participation in the PMCP | 9,226 | 24,593 |
| Claims for PMCP Only | 176 | 1,083 |
| Total POCF Filings | | 37,797 |

The graphs below provide a breakdown of the compensation levels claimed in the 2014 and 2015 Claims, respectively:

**Figure 7: Compensation Level Composition of 2014 Claims**



**Figure 8: Compensation Level Composition of 2015 Claims**



Table 2, below, compares the composition of the claimed compensation levels in the 2014 Claims with those in the 2015 Claims and shows the percentage change between those two groups of claims.

| Table 2: Claimed Compensation Level | | | | | | | | |
|---|---|---|---|---|---|---|---|---|
| | A1 | A2 | A3 | A4 | B1 | Multiple | None | PMCP Only |
| Percentage of 2014 Claims | 26.40% | 8.13% | 5.27% | 2.28% | 13.77% | 20.93% | 15.93% | 7.3% |
| Percentage of 2015 Claims | 24.47% | 3.5% | 0.81% | 0.56% | 2.4% | 16.05% | 50.87% | 1.34% |
| Vintage Claim Comparison | (1.93%) | (4.63%) | (4.46%) | (1.72%) | (11.36%) | (4.89%) | 34.94% | (5.96%) |

In Table 3 below, we provide statistics of the claimed compensation level in Section VII of the POCF as compared to the awarded compensation level.  In over ninety-seven percent (97%) of claims where the Class Member has claimed a single compensation level, that same level of compensation has been awarded.  For the three percent (3%) not awarded the same claimed compensation level, the Claims Administrator has awarded both higher and lower compensation levels based on review of the POCF and supporting documentation provided.  For claims where the Class Member selects multiple compensation levels or no compensation level in Section VII of the POCF, the rate of claims qualifying for A2 or higher compensation exceeds those qualifying for A1-only compensation by over twenty percent (20%).

| Table 3: Determined Compensation Level | | | | | | | | | | | |
|---|---|---|---|---|---|---|---|---|---|---|---|
| Claimed Compensation Level | A1 | | A2 | | A3 | | A4 | | B1 | | Grand Total |
| Section VII of POCF | Count | % | Count | % | Count | % | Count | % | Count | % | |
| A1 | 1,705 | 99.71% | 2 | 0.12% | 2 | 0.12% | 1 | 0.06% | | 0.00% | 1,710 |
| A2 | | 0.00% | 46 | 85.19% | 8 | 14.81% | | 0.00% | | 0.00% | 54 |
| A3 | 1 | 0.76% | 13 | 9.85% | 111 | 84.09% | 7 | 5.30% | | 0.00% | 132 |
| A4 | | 0.00% | | 0.00% | | 0.00% | 6 | 100.00% | | 0.00% | 6 |
| B1 | 2 | 8.70% | 10 | 43.48% | 7 | 30.43% | | 0.00% | 4 | 17.39% | 23 |
| Multiple | 15 | 35.71% | 11 | 26.19% | 12 | 28.57% | 2 | 4.76% | 2 | 4.76% | 42 |
| None | 6 | 50.00% | 2 | 16.67% | 2 | 16.67% | 2 | 16.67% | 0 | 0.00% | 12 |
| Total | 1,729 | 87.37% | 84 | 4.24% | 142 | 7.18% | 18 | 0.91% | 6 | 0.30% | 1,979 |

## B.      Claims Requiring RAI and/or Notice of Defect

As has been the case historically, the majority of claims have received an RAI and/or a Notice of Defect according to the requirements of the MSA.  During the Reporting Period, the Claims Administrator sent 3,785 RAIs and 1,171 Notices of Defect.  Since the inception of the Settlement, the Claims Administrator sent 14,632 RAIs and 5,396 Notices of Defect.

| TABLE 4: RAIS AND NOTICES OF DEFECT | | |
|---|---|---|
| RAIs | Reporting Period | Total |
| RAIs Sent | 3,785 | 14,632 |
| Responses to RAIs Received | 2,468 | 8,071 |
| Defects | Reporting Period | Total |
| Notices of Defect Sent | 1,171 | 5,396 |
| Defect Cure Materials Received | 490 | 2,149 |

### 1.      Requests for Additional Information

Of the 3,785 RAIs sent during the Reporting Period, eighty-three percent (83%) were RAI-Missing, and seventeen percent (17%) were RAI-Incomplete.[7]  Fifteen percent (15%) were

---

[7] Under the Party-approved RAI process, a claimant may receive an RAI-Missing for failing to submit a first-party injury declaration with his or her original POCF.  If the claimant submits a first-party injury declaration that omits

sent to unrepresented claimants, and eighty-five percent (85%) were sent to claimants represented by counsel. More than sixty-five percent (65%) of the 2014 Claims have required at least one (1) RAI, and over thirteen percent (13%) have required the maximum of two (2) RAIs. Approximately thirty-six percent (36%) of the 2015 Claims have required at least one (1) RAI, and the number requiring at least two (2) RAIs during the Reporting Period was too small to provide a meaningful percentage at this time. The overall response rate to RAIs was fifty-five percent (55%), with claimants represented by counsel responding at the exact same rate as those who are unrepresented. The overall cure rate for those responding to RAIs is approximately forty-nine percent (49%), with claimants represented by counsel curing at a slightly higher rate (fifty-two percent (52%)) than unrepresented claimants (forty-five percent (45%)).

As previously reported, failure to respond to an RAI-Missing within the sixty-day (60-day) response period will not necessarily result in the denial of a claim; rather, the failure to respond to an RAI-Missing by submitting a first-party injury declaration in compliance with the Specified Physical Condition Matrix (the "SPC Matrix") will result in a Defect of "Missing Declaration of Injury Document" on a Notice of Defect. The claimant would then have 120 days to cure that Defect and any other material Defects listed in the notice.

Similarly, failure to respond to or cure all deficiencies identified within an RAI-Incomplete will not necessarily result in the denial of a claim, because only some of a claimant's claimed or declared conditions may be deficient and included in the RAI. In that circumstance, even if the claimant fails to respond to the RAI, the claimant might still receive compensation for the valid conditions in his or her declaration (assuming the claimant met the other requirements of the MSA). These RAI processing standards and distinctions are highlighted in the

_____

necessary information, either in response to an RAI-Missing or at another point in the claims process, the claimant may receive an RAI-Incomplete. For each RAI sent by the Claims Administrator, the claimant has sixty (60) days to respond. A claimant may receive only one (1) RAI-Missing and one (1) RAI-Incomplete, as applicable.

"Frequently Asked Questions About Declarations and Requests for Additional Information" available on the Claims Administrator's website.  A copy of this FAQ is included with each RAI sent from the Claims Administrator and is published on our website, and we have call center representatives and firm liaisons available to provide assistance.

2.    Notices of Defect

Of the 5,396 Notices of Defect sent through the end of the Reporting Period, forty-eight percent (48%) were sent to unrepresented claimants or Class Members, and fifty-two percent (52%) were sent to claimants or Class Members represented by counsel.  More than eighty-one percent (81%) were sent to Class Members claiming to be or approved as Clean-Up Workers.  Approximately forty-six percent (46%) of the Notices of Defect sent listed multiple Defects.  More specifically, thirty-six percent (36%) identified two (2) through five (5) Defects, eight percent (8%) identified six (6) through ten (10) Defects, and two percent (2%) identified more than ten (10) Defects.

As of the end of the Reporting Period, the response period had expired for 3,389 (sixty percent (60%)) of claims having received a Notice of Defect.  The overall response rate was forty-nine percent (49%).  The response rate for unrepresented claimants or Class Members was forty-one percent (41%), while the response rate for represented claimants or Class Members was sixty-one percent (61%).  The five (5) most common material Defects identified for the population whose response period had expired are as follows:

- "Missing Declaration of Injury document";

- "Missing Medical Records documentation";

- "Documentation included with the claim does not establish that the claimant was employed as a Clean Up Worker between the dates of April 20, 2010 and April 16, 2012";

- "Missing Third Party Witness Injury Declaration document"; and

15

- "Proof Of Residency Documents Failed To Prove Residence For 60 Days Between April 20, 2010 And September 30, 2010 for Zone A."

Of the 5,396 Notices of Defect sent through the end of the Reporting Period, thirty-one percent (31%) now include Defects identified during the Medical Record Review process. Seventy-three percent (73%) of the 1,171 Notices of Defect sent during the Reporting Period identified at least one Defect subsequent to the Medical Record Review stage in the claims process. The five (5) most common material Defects identified during the Medical Record Review process are as follows:

- "No medical records were submitted or the documentation submitted does not support the claimed SPECIFIED PHYSICAL CONDITION";

- Generally – "The medical records do not meet the criteria set forth in Level A2, A3, A4, and/or B1 of the Specified Conditions Matrix." Specifically – "The date of first diagnosis for the claimed SPECIFIED PHYSICAL CONDITION occurred on or after April 16, 2012. This claimed condition does not qualify as a SPECIFIED PHYSICAL CONDITION as set forth on the SPECIFIED PHYSICAL CONDITIONS MATRIX"[8];

- "The documentation submitted does not support the claimed SPECIFIED PHYSICAL CONDITION";

- "The medical records do not meet the criteria set forth in Level A2 of the Specified Conditions Matrix: The medical records submitted do not support the assertions in the declaration concerning the time of onset of the claimed SPECIFIED PHYSICAL CONDITION following the alleged exposure as set forth in the SPECIFIED PHYSICAL CONDITIONS MATRIX"; and

- "The third-party declaration does not meet the criteria set forth in A1 of the Specified Physical Conditions Matrix: The third-party declaration was not signed by the individual submitting the third-party declaration."

---

[8] This Defect results from the Court's July 23, 2014 Order (Rec. doc. 12862) affirming that all conditions first diagnosed after April 16, 2012 must be classified as Later-Manifested Physical Conditions. Notably, the Claims Administrator does not automatically deny claims where the medical records initially submitted with the claim indicate a date of first diagnosis after April 16, 2012. Rather, we issue a Notice of Defect to afford the Class Member the opportunity to provide medical record evidence of the diagnosis that pre-dates April 16, 2012. If the Class Member does not submit any such records, the Class Members claim for SPC compensation would be denied, but the Class Member would be free to pursue compensation for that condition as an LMPC.

As previously reported, failure to respond to or cure all Defects identified within a Notice of Defect will not necessarily result in the denial of a claim, because only some aspects of a claimant's claim may be defective and listed in a Notice of Defect.  In that circumstance, even if the claimant failed to respond to the Notice of Defect or to cure all of the Defects listed in it, the claimant might still receive compensation.  Furthermore, a claimant who has a Defect in his or her claim for compensation for an SPC but has proven that he or she is a Class Member will receive a Notice of Determination for the PMCP benefit.  Hence, such Class Member can take advantage of that benefit while attempting to cure the Defects in his or her claim for SPC compensation.

**C.**  **Claims Processed Through Each Stage of Claims Review**

As discussed above, a significant percentage of the POCFs submitted continue to contain one or more deficiencies or Defects.  These deficiencies and Defects not only increase the amount of time it takes for a claimant to reach the determination stage, but also increase the time it takes the Claims Administrator to process the claims.  The Claims Administrator must wait as long as sixty (60) or 120 days to receive the responses to the RAIs and/or Notices of Defects, respectively, and then must process the responses.

During the Reporting Period, the Claims Administrator has reviewed and/or processed the following numbers of claims through each of the following sequential stages in the claims review process:

| TABLE 5: CLAIM REVIEW PROCESSING | | |
|---|---|---|
| **Processing Stage** | **Number of Claims**[9] | |
| | **Reporting Period** | **Total** |
| Notice of Defect Gate One Process (Which Includes Class Membership Defects)[10] | 559 | 3,590 |
| Declaration Review Process[11] | 2,540 | 17,345 |
| RAI Process[12] | 4,604 | 15,451 |
| Medical Record Review Process[13] | 1,549 | 8,462 |
| Notice of Defect Gate Two Process[14] | 852 | 1,938 |

The Claims Administrator completed another 1,549 medical record reviews during the Reporting Period, bringing the total initial reviews completed since inception to 8,462. As previously reported, the complexity of the 2014 Claims, involving an average of 4.2 conditions claimed but with as many as thirty (30) per claim, directly increased the time required for Medical Record Review. The average number of conditions claimed in the 2015 Claims has stayed constant at 3.8 conditions during the past two reporting periods.

**D.**   **Claims Sent Dispositive Correspondence for a Specified Physical Condition**

The overall percentage of 2014 Claims reaching final determination has increased over the Reporting Period to fifty-one percent (51%). The total number of claims approved for SPC compensation over the Reporting Period has continued to increase, due in part to the receipt of responses to previously pending RAIs and Notices of Defect for the 2014 Claims and improved processing speeds. Similar increases were seen for 2015 Claims.

---

[9] Claims can move through Declaration Review (due to responses to RAI), the RAI Process (due to a defective response to an RAI-Missing, resulting in an RAI-Incomplete), and Medical Record Review (due to cure responses to originally defective claims) multiple times.

[10] Total claims with Gate One Defects, including basis of participation Defects, which received a Notice of Defect. Gate One Defects are those such as "Missing Declaration of Injury Document" or "Missing Medical Records Documentation," which prevent a claim from moving to Medical Record Review.

[11] Total claims for which an injury declaration review was completed.

[12] Total claims requiring an RAI that received a RAI.

[13] Total claims that were reviewed by Claims Administrator's Medical Record Review staff.

[14] Total claims that have completed Medical Record Review but that contain Defects preventing a final determination.

During the Reporting Period, we sent SPC Notices of Determination to 443 Class Members, approving them for $1,626,100 in compensation. Since the inception of the Settlement, we sent SPC Notices of Determination to 1,758 Class Members, approving them for $3,971,400 in compensation. Over this Reporting Period, the total percentage of finalized 2014 Claims moving to an approved determination increased to twenty-seven percent (27%).

The Claims Administrator also sent 342 "Approved with Defects" notices during the Reporting Period, bringing the total number of "Approved with Defects" notices sent since inception to 473. An "Approved with Defects" notice is sent to a Class Member who has at least one valid SPC but one or more other SPCs that contain a Defect and might result in an award of higher compensation. A Class Member receiving this notice can choose either to attempt to cure the Defects and thus possibly receive greater compensation or to waive that opportunity and proceed to determination on his or her valid SPC(s). Twelve (12) of the 473 Class Members who received an "Approved with Defects" notice subsequently received an SPC Notice of Determination. The total compensation for the remaining 461 Class Members who received an "Approved with Defects" notice but who have not yet received an SPC Notice of Determination is $3,415,700. Therefore, the total amount allocated (by SPC Notices of Determination) and to be allocated (by "Approved with Defects" letter) is $7,387,100.

The Claims Administrator sent 806 Notices of Denial during the Reporting Period, for a total of 3,687 Notices of Denial from the inception of the Settlement through the end of the Reporting Period. All of these claims have been denied because the claimant did not qualify as a Class Member and/or because the claimant did not meet the criteria established by the MSA to receive compensation for an SPC.

A summary of the dispositive correspondence sent on claims for compensation for an SPC is set forth in Table 6, below.

| TABLE 6: CLAIMS DISPOSITION AND CORRESPONDENCE | | |
|---|---|---|
| **Approvals** | **Reporting Period** | **Total** |
| SPC Notices of Determination Sent — 2014 Claims | 203 | 1,505 |
| SPC Notices of Determination Sent — 2015 Claims | 240 | 253 |
| SPC Notices of Determination Sent Total | 443 | 1,758 |
| **Denials** | **Reporting Period** | **Total** |
| Notices of Denial Sent — 2014 Claims | 377 | 3,164 |
| Notices of Denial Sent — 2015 Claims | 429 | 523 |
| Notices of Denial Sent — Total | 806 | 3,687 |

### E.  Claims Approved for SPC Compensation

During the Reporting Period, the amount of SPC compensation for which Class Members were approved increased, as reflected in Table 7, below.

| TABLE 7: APPROVED CLAIMS FOR SPCs[15] | | | | | | |
|---|---|---|---|---|---|---|
| **SPC** | **Reporting Period Number Approved** | **Total Number Approved to Date** | **Reporting Period Amount Approved** | **Total Amount Approved to Date** | **Total "Approved with Defects" Amount Allocated to Date** | **Total Compensation Allocated to Date** |
| **A1** | 334 | 1,580 | $433,400 | $2,052,800 | $145,600 | $2,198,400 |
| **A2** | 34 | 59 | $256,600 | $443,450 | $1,221,000 | $1,664,450 |
| **A3** | 64 | 104 | $790,400 | $1,284,400 | $1,827,800 | $3,112,200 |
| **A4** | 9 | 12 | $24,300 | $32,400 | $99,900 | $132,300 |
| **B1** | 2 | 3 | $121,400 | $158,350 | $121,400 | $279,750 |
|  |  |  |  |  |  |  |
| **Total** | **443** | **1,758** | **$1,626,100** | **$3,971,400** | **$3,415,700** | **$7,387,100** |

As set forth in the MSA, Class Members can only be paid once certain potential obligations to third parties are identified and resolved.  The resolution of these obligations is

---

[15] Please note that the total volumes and total dollars approved are subject to change in each Reporting Period due to a later received and processed Requests for Review.

dependent upon the responsiveness of both governmental agencies and private interests in replying to the Claims Administrator's requests for information and resolution. The obligations generally fall into two general categories: healthcare-related obligations and other obligations.

The resolution of healthcare obligations involves confirming whether a Class Member received benefits from a governmental payor (such as Medicare, Medicaid, or the Veterans' Administration) or a private healthcare plan for a compensable injury such that the Class Member must now reimburse those entities for the amounts they paid. The processing phases include (1) confirming entitlement with the government agency or private plan, (2) receiving claims from the agency or plan, (3) auditing those claims and disputing any that are unrelated to the Class Member's compensable injury, and (4) final resolution. Pursuant to the terms of the MSA, the Claims Administrator obtained an agreement from CMS establishing capped repayment amounts per SPC for Class Members who are or were beneficiaries of Medicare. The Claims Administrator also negotiated with state Medicaid agencies to cap recovery for Medicaid-entitled Class Members. Most states agreed to waive recovery rights for Class Members receiving compensation for an A1 claim. Additionally, most state Medicaid agencies agreed to a twenty percent (20%) cap on and up to a thirty-five percent (35%) offset for fees and costs typically associated with their recovery, thereby allowing partial funding to the Class Member while full resolution is pending. Processing times for Medicaid-entitled Class Members eligible for payment will vary.[16] Each state has its own processing standards for responding to entitlement requests, producing claims, and finalizing lien amounts.

---

[16] Entitlement requests average one-and-one-half months; claims receipts average two months; and lien finalizations average one month. GRG has experienced a general range of ninety (90) to 210 days from initiation to final resolution. While the Claims Administrator works directly with the state agencies to streamline the processing, the timelines for resolution for some states have increased due to the increased involvement of managed care organizations.

The resolution of non-healthcare-related obligations involves identifying the various types of obligations and working with the claimant or the claimant's representative to resolve them.  The processing phases include (1) identifying the obligation (through review of claim documents, PACER searches, and searches of the Louisiana Child Support Database), (2) sending correspondence seeking documentation that will resolve the complication, (3) reviewing the submitted documentation for sufficiency, and (4) final resolution.  The Claims Administrator tracks responses to its correspondence and sends a follow-up letter to non-responsive parties after thirty (30) to sixty (60) days have passed (with the length of time depending on the complication).  We will also send follow-up correspondence when the responses contain insufficient documentation.  The resolution time for payment complications varies and remains heavily dependent upon the timeliness and sufficiency of the third parties' responses to our information requests.

Once the obligations affecting a given claim are resolved and any liens or reimbursement obligations are paid, the Claims Administrator is able to disburse the balance of the Class Member's compensation.

**F.**     **Data Disclosure Form Submissions and Results**

Data Disclosure Forms may be filed at any time during the claims review process by Natural Persons seeking information from the databases, data fields, and other documentary evidence provided by BP to the Claims Administrator.  Notably, Data Disclosure Forms may continue to be filed *after* the submission of a Proof Claim Form, and therefore they can be filed *after* the claims filing deadline of February 12, 2015.  Information provided via the submission of a Data Disclosure Form allows the Claims Administrator to make a determination concerning

(a) the status of a Natural Person claiming to be a Clean-Up Worker and/or (b) a claim made by a Clean-Up Worker for compensation of a Specified Physical Condition. *See* MSA § XXI.B.

During the Reporting Period, the Claims Administrator received 1,314 Data Disclosure Forms, for a total of 24,018 Data Disclosure Forms since the approval of the MSA. The Claims Administrator responded to 5,065 Data Disclosure Forms during the Reporting Period, bringing the total number of responses to 29,557 since the approval of the MSA. Of the 24,018 Data Disclosure Forms received, 19,396 were related to unique claimants, while 4,622 were Data Disclosure Forms with additional information filed by same claimants. Among the unique claimants filing Data Disclosure Forms, seventy-seven percent (77%) were confirmed as Clean-Up Workers by finding a match in at least one employer database other than the "Training" database. Eleven percent (11%) of those unique claimants were matched in the "Medical Encounters" database, while thirteen percent (13%) were matched in a medically relevant database, such as the "Traction" database or the "Injury/Illness" database.

## IV.   CLASS MEMBER SERVICES CENTER ACTIVITY

The Claims Administrator operates a Class Member Services Center located in New Orleans to communicate with Class Members and their attorneys and to assist them with filing their claims. During the Reporting Period, the Class Member Services Center received 16,686 telephone calls. Since opening, the Class Member Services Center has received a total of 122,137 telephone calls. The Class Member Services Center handled an average of 257 calls per day. The average length of each telephone call was five minutes and forty-five seconds, with an average wait time of nineteen (19) seconds. The Class Member Services Center also received 129 emails during the Reporting Period, and twenty-four (24) individuals visited the Class Member Services Center in person.

| TABLE 8: CLASS MEMBER SERVICES CENTER | | |
|---|---|---|
| | **Reporting Period** | **Total** |
| Calls Received | 16,686 | 122,137 |
| Average Length of Call (min:sec) | 5:45 | 6:40 |
| Average Wait Time (min:sec) | 0:19 | 0:15 |
| Emails Received | 129 | 2,375 |
| Walk-Ins | 24 | 691 |

## V.   PERIODIC MEDICAL CONSULTATION PROGRAM

### A.   Class Members Eligibility for and Participation in the PMCP

During the Reporting Period, the Claims Administrator approved 2,708 claims for participation in the PMCP and mailed 1,985 PMCP Notices of Determination.  Since the inception of the Settlement, the total number of Class Members receiving a PMCP Notice of Determination is 11,794.  The Claims Administrator received requests for and scheduled 258 physician visits during the Reporting Period, and Class Members attended 147 appointments in the Reporting Period.

| TABLE 9: PERIODIC MEDICAL CONSULTATION PROGRAM | | |
|---|---|---|
| | **Reporting Period** | **Total** |
| Class Members Approved to Receive Physician Visits[17] | 2,708 | 13,000 |
| PMCP Notices of Determination Sent | 1,985 | 11,794 |
| Physician Visits Requested and Scheduled | 258 | 1,137 |
| Appointments Attended by Class Members | 147 | 1,052 |

### B.   Provider Network

During the Reporting Period, the Claims Administrator added six (6) medical provider organizations, with eighteen (18) delivery sites, to its network of providers established to provide certain covered services to Class Members who participate in the PMCP, bringing the total number of medical provider organizations to forty-four (44).  These medical provider

---

[17] The total physician visits will exceed the total number of Class Members qualified for the PMCP benefit, as Class Members may be referred to specialists and will eventually be eligible for subsequent primary visits.

organizations represent 140 service delivery sites.  As a result of these additions, eighty percent (80%) of eligible Class Members resided within twenty-five (25) miles of a network provider at the conclusion of the Reporting Period.  The Claims Administrator continues to expand the medical provider network in its efforts to ensure that no Class Member will have to wait more than thirty (30) days or travel more than twenty-five (25) miles for an appointment.

## VI.   BACK-END LITIGATION OPTION

During the Reporting Period, fifty-seven (57) Class Members filed Notices of Intent to Sue for compensation for a Later-Manifested Physical Condition, bringing the total number to 350 Class Members to date.  Of the fifty-seven (57) Notices of Intent to Sue filed in the Reporting Period, three (3) were approved, twenty-nine (29) contained deficiencies that could be corrected by the Class Member, and twenty-five (25) were denied.  Over the Reporting Period, the Claims Administrator worked with the Parties to amend the Notice of Intent to Sue Form to collect additional data points required to avoid future deficient submissions (namely, the omission of information necessary to determine class membership).

| TABLE 10: CLAIMS FOR LATER-MANIFESTED PHYSICAL CONDITIONS | | |
|---|---|---|
|  | **Reporting Period** | **Total** |
| Notices of Intent to Sue Filed | 57 | 350 |
| Notices of Intent to Sue Approved | 3 | 19 |
| Notices of Intent to Sue Denied | 25 | 158 |
| Notices of Intent to Sue Deficient | 29 | 174 |

Out of the nineteen (19) approved Notices of Intent to Sue to date, the BP Defendants did not elect to mediate any of the claims.  During the Reporting Period, three (3) Class Members became eligible to file a Back-End Litigation Option Lawsuit, bringing the total number of Class Members eligible to file a Back-End Litigation Option Lawsuit to eight (8).

| TABLE 11: APPROVED NOTICES OF INTENT TO SUE | | |
|---|---|---|
| **Mediation Elections** | **Reporting Period** | **Total** |
| Later-Manifested Physical Condition Claims for Which at Least One BP Defendant Elected Mediation | 0 | 0 |
| Later-Manifested Physical Condition Claims Pending a Decision from One or More BP Defendants Regarding Mediation | 2 | 2 |
| Later-Manifested Physical Condition Claims for Which No BP Defendants Elected Mediation | 3 | 17 |
| | | |
| **TOTAL:** | **5** | **19** |
| | | |
| **Results of Mediation** | **Reporting Period** | **Total** |
| Later-Manifested Physical Condition Claims Settled by Mediation | 0 | 0 |
| Later-Manifested Physical Condition Claims Settled by Mediation as to One but Not All BP Defendants Listed in the Notice of Intent to Sue | 0 | 0 |
| Later-Manifested Physical Condition Claims Mediated but Not Settled | 0 | 0 |
| | | |
| **TOTAL CLAIMS MEDIATED:** | **0** | **0** |
| | | |
| **Back-End Litigation Option Lawsuit** | **Reporting Period** | **Total** |
| Later-Manifested Physical Condition Claims for Which No BP Defendant Elected Mediation | 3 | 17 |
| Later-Manifested Physical Condition Claims Mediated but Not Settled | 0 | 0 |
| | | |
| **TOTAL CLASS MEMBERS ELIGIBLE TO FILE A BACK-END LITIGATION OPTION LAWSUIT**[18] | **3** | **8** |

---

[18] The total eligible for BELO over the life of the project was seventeen (17). However, of the seventeen (17), only eight (8) are currently eligible for BELO. The other nine (9) have let expire the six-month (6-month) deadline for properly and timely filing a Back-End Litigation Option Lawsuit.

## VII.   GULF REGION HEALTH OUTREACH PROGRAM

### A.   Funding and Coordinating Committee Activities

In accordance with Section IX of the MSA, the GRHOP was established in May 2012 to expand capacity for and access to high quality, sustainable, community-based healthcare services, including primary care, behavioral and mental health care and environmental medicine, in the Gulf Coast communities in Louisiana, Mississippi, Alabama, and the Florida Panhandle. The program consists of five (5) integrated projects: the Primary Care Capacity Project, Community Involvement, the Mental and Behavioral Health Capacity Project, the Environmental Health Capacity and Literacy Project, and the Community Health Workers Training Project.  As of the end of the Reporting Period, the Claims Administrator disbursed $93,689,744 to the projects, as detailed in the chart below.

| TABLE 12: GULF REGION HEALTH OUTREACH PROGRAM | |
|---|---|
| **Project** | **Funding to Date** |
| Primary Care Capacity Project | $43,406,841 |
| Community Involvement | $2,473,406 |
| Mental and Behavioral Health Capacity Project (Louisiana State University Health Sciences Center) | $12,913,418 |
| Mental and Behavioral Health Capacity Project (University of Southern Mississippi) | $7,425,213 |
| Mental and Behavioral Health Capacity Project (University of South Alabama) | $7,425,216 |
| Mental and Behavioral Health Capacity Project (University of West Florida) | $4,519,696 |
| Environmental Health Capacity and Literacy Project | $12,021,670 |
| Community Health Workers Training Project | $3,504,284 |
| | |
| **TOTAL:** | **$93,689,744** |

One final disbursement is scheduled for May 2016, which will bring the total funding of the GRHOP to $105 million.

27

The GRHOP is governed by a Coordinating Committee that continues to function in a cooperative and integrated manner, with quarterly in-person meetings around the Gulf Coast, as well as monthly conference calls.  These quarterly meetings offer the grantees the opportunity to share their progress, discuss challenges faced, and collaborate with their partners to work through issues that affect the GRHOP as a whole.

The Claims Administrator held quarterly meetings on March 17, 2015 in New Orleans, Louisiana, and July 31, 2015 in Pensacola, Florida.[19]   The March meeting encompassed discussions on a variety of topics, including, but not limited to, GRHOP visibility, continuing and increasing community involvement throughout the projects, sustainability amongst the projects, and GRHOP evaluation strategies.   Discussions also revolved around the five (5) GRHOP subcommittees — the Data Sharing Subcommittee, Evaluation Subcommittee, Health Promotions Subcommittee, Newsletter Subcommittee, and Publication Subcommittee — formed during the July 31, 2014 quarterly meeting.  These subcommittees work to increase collaboration and effectiveness of the projects, as well as to ensure positive impacts and sustainability within the communities that the GRHOP affects. Though not specifically mandated by the MSA, the monthly conference calls are also held to promote open conversation among projects regarding updates, progression, and collaboration.

The Coordinating Committee also asked the Claims Administrator to establish a GRHOP website.   This website contains detailed descriptions and notable accomplishments of each project, as well as information regarding the Gulf Region Health Outreach Program Coordinating Committee, news and events, and publications.  The website launched on July 3, 2014 and can be publicly accessed at www.grhop.org.

---

[19] Details from the July 31, 2015 meeting will be available in the next status report.  The Claims Administrator will hold the next quarterly meeting on November 20, 2015.

B.     **Gulf Region Health Outreach Program Project Updates**

Each GRHOP project has made substantial progress in achieving the goals set forth in their respective Grant Proposals.  Some notable accomplishments of the projects include:

- The **Primary Care Capacity Project**, led by the Louisiana Public Health Institute, which has:

  o Worked towards its goal to expand access to integrated high quality, sustainable, community-based primary care with linkages to specialty mental and behavioral health, and environmental and occupational health services in the implicated seventeen (17) Gulf Coast counties and parishes. The key program strategies include:

    (1)     Building community health center ("CHC") capacity through direct funding via cooperative agreements to community health centers and delivering customized group and individual technical assistance;

    (2)     Supporting and advancing health systems development through direct funding for health information exchanges, infrastructure investments and technical assistance; and

    (3)     Enhancing the capacity of communities and building strategic partnerships to improve health through funding: state partners, the Community-Centered Health Home Demonstration Project, partnership engagement activities, and technical assistance to non-clinical partners.

  o Executed and now monitoring scope of work and deliverables for Phase 2 Cooperative Agreements with fifteen (15) CHCs across the Gulf Coast.

  o Additionally, PCCP is implementing several strategic health systems projects that support or advance primary care access and capacity, such as:

    ▪ Developed a quality initiative project, in partnership with the Prevention Institute to fund a Community-Centered Health Home ("CCHH") Demonstration Project. This demo project aims to support and incentivize CHCs across the four (4) states to implement the CCHH model. Five (5) health centers were awarded and are now undergoing technical assistance training regarding the CCHH framework and related models.

    ▪ Developed and launched the Greater New Orleans Community Health Connection ("GNOCHC") Primary Care Capacity Project ("PCCP") Quality Improvement Initiative ("GNOPQ") with eleven (11) FQHCs to support quality improvement initiatives in the reduction of Emergency Room usage and coordination of care across agencies with a focus on improving access to primary health care, disease management outcomes and behavioral health integration.

- In developmental phase for an Emergency Management Initiative with the four-state (4-state) Primary Care Associations, the RAND Corporation, and the Primary Care Development Corporation.

- **Alliance Institute**'s outreach on behalf of the GRHOP and its partners has reached over 1,500 individuals across Louisiana, Mississippi, Alabama, and Florida. Alliance Institute, the grantee responsible for Community Involvement, has:

  o Completed organizational assessments for all Community Based Organizations ("CBOs") currently under contract. Assessments will be used to effectively build the capacity of each organization, as well as to develop a strategy for sustainability;

  o Redesigned the funding matrix to increase the number of CBOs serving the seventeen (17) counties/parishes covered by the settlement;

  o Conducted ten (10) organizational interviews across Louisiana, Mississippi, Alabama to identify qualified CBOs for increasing community involvement across the seventeen (17) counties/parishes covered by the settlement;

  o Completed the vetting process for nine (9) organizations;

  o Worked in collaboration with BISCO, VIET, BPSOS, and STEPS to accomplish the following:

    - BISCO:

      - Held a meeting with the Coastal Protection Restoration Agency and residents living in Terrebonne to discuss the coastal land loss and options for residents living in the area;

      - Developed partner relationships with groups in the community to work on mental health, drug abuse, and divorced families and the effects on children;

      - Coordinated access to resources for community members starting on June 1, 2015, including a Homeowners' Insurance website; BISCO has been working to ensure accountability implementation of this legislation; and,

      - Added two (2) more churches to the coalition, thus adding more members to the Board of Directors. This action keeps BISCO accountable to their community and more aware of their community needs.

    - VIET:

      - Registered individuals for the Affordable Care Act; and

      - Will provide summer camp for children ages five (5) to twelve (12). The camp will include character-building activities, health and fitness awareness, and outreach/education on children's sexual abuse.

- BPSOS:

  - Educates the community on the accessibility of healthcare at local clinics;

  - Hosted a "Spring into Health Wellness Fair" for the community.  The local clinic, Bayou Clinic, was able to give out health surveys at the Health Fair; and

  - Works with, and submitting a proposal to the University of Alabama to do research on the health disparity and its impact on the underserved members of the community.

- STEPS:

  - Steps and Cherokee Concerned Citizens Coalition held a meeting with Dr. Kathy Kirkland, Dr. Gellar, and Michelle Brazeal to discuss the environmental health issues residents were experiencing in Moss Point, Mississippi due to possible toxic exposure from multiple sites; and

  - Steps and Mississippi Coalition for Vietnamese American Fisherfolks and Families held a meeting with Dr. Kathy Kirkland, Dr. Gellar, and Michelle Brazeal to discuss the environmental health issues Vietnamese fisherman and their families experienced due to the oil spill.

- The **Environmental Health Capacity and Literacy Project**, with its grantee being Tulane University, has achieved the following:

  o Worked in collaboration with the Association of Occupational and Environmental Clinics to conduct considerable outreach to communities, partners, and clinicians. For example, inroads were made in Lafitte, Louisiana, and thirteen (13) to fifteen (15) new patients were scheduled for end-of-month appointments at the RFK Lafitte Clinic in March 2015.  In addition, three (3) community informational meetings were held in Mississippi in June 2015.

  o The Fussy Baby Network® New Orleans and Gulf Coast ("FBNNOGC") served twenty (20) families during January and February 2015 and have successfully brought on a new infant health specialist to meet the needs of even more families going forward, as their services are in high demand.

  o Several EHCLP program personnel participated in the Oil Spill and Ecosystem Science Conference, held in Houston, Texas in February 2015.

  o The RFP for 2015 to 2017 CHW Placement funding was released the first week of April, and an informational webinar was held April 8th, 2015. The webinar consisted of a short overview of the program and a proposal description by Laila Fox and a demonstration of budget creation by Senior Grants Administrator Lisa Paterson. Twenty-three (23) applications were received by the deadline of June 1st, and the

review committee met to select applications on June 15th. Eighteen (18) awards were made, including twelve (12) renewals and six (6) new awards.

o Continued Planning for the 2015 Emerging Scholars Academies and Teacher Workshops at the four regional universities.

o Tulane's 2015 Teacher's Workshop was held in March, with five (5) Environmental Science Teachers partnering with Tulane, each receiving a stocked classroom. Tulane's Emerging Scholars 2015 session began in June, with eight (8) students selected to participate in mentored research projects, field experiences, and a varied rotation of environmental health science modules.

o FBNNOGC published an article in the January 2015 edition of the *Zero to Three Journal,* building the evidence base for research.

o Maureen Lichtveld, the program leader, organized the public health session at the Gulf of Mexico Oil Spill and Ecosystem Science Conference, which provided visibility for GRHOP activities and highlighted the importance of human health research related to the oil spill.

• The **Community Health Workers Training Project**, directed by the University of South Alabama's Coastal Resource and Resiliency Center, has:

o Conducted a Peer Health Advocate training session in Gulfport, Mississippi for twenty-four (24) participants from Mississippi and in Mobile, Alabama for twenty-five (25) participants;

o Published an academic paper on the utility of community health workers in emergency preparedness and recovery in the Journal of Applied Social Science;

o Continued to expand and update their website and Facebook page with training schedules, application materials, and photos from previous trainings;

o Scheduled additional training sessions for 2015 as follows: Community Health Workers' Training (one (1) session), Peer Health Advocate Training (total of four (4) sessions), and Chronic Disease Management (two (2) sessions);

o Completed curriculum development for the new Chronic Disease Management training;

o Attended, by way of CHWTP staff members, workshops, and webinars, made presentations at professional conferences, and wrote for publication in academic journals; and

o Leveraging their GRHOP activities with additional grant funds from the Baton Rouge Area Foundation and the Gulf of Mexico Research Initiative.

- The **Mental and Behavioral Health Capacity Project**, implemented by a coalition of four (4) academic institutions (Louisiana State University Health Sciences Center, the University of Southern Mississippi, the University of South Alabama, and the University of West Florida):

  o MBHCP-LA has:

    ▪ Provided age-specific and strength-based supportive and  therapeutic services in FQHCs and community clinics, a major goal that has received increased emphasis during the quarter;

    ▪ The Young Children Program has continued to grow in response to clinician and parental concerns, and providing developmentally based supportive individual, group, and parental services.  For schools, with the ultimate goal of sustainability, there has been increased emphasis on consultations and support to school counselors, teachers, and parents; recently increased the range of services offered to include psychological assessments for children within the primary care setting;

    ▪ Worked to expand distance-based consultation, treatment, and educational services for FQHCs and community clinics;

    ▪ Responded to diverse cultural needs of the population and took steps for change in perception of behavioral health services;

    ▪ Continued to stress community collaboration and trust;

    ▪ Participated in community meetings and meetings with stakeholder advisory boards in the designated parishes;

    ▪ Collaborated with other GRHOP projects to enhance services;

    ▪ Worked toward fully accessible medical records for mental health services; access has been obtain in over half of the clinics;

    ▪ Made inter-professional training and education a priority; primary care clinicians, psychiatry and child psychiatry residents, psychology interns and postdoctoral fellows, social work fellows and other clinicians are participating in these collaborative efforts. Over 660 inter-professional consultations have been provided in April through June 2015 by MBHCP-LA faculty and staff;

    ▪ Provided approximately 1,800 individual services to adults, children and adolescents between April 3 and July 3, 2015;

    ▪ Worked toward sustainability; community collaboration in building accessible, high quality on-site and tele-psychiatry services; destigmatizing mental and behavioral health through inter-professional collaboration; and continuous evaluation of the effectiveness of the project.

- MBHCP-MS has:

  - Continued to work with the partnering FQHCs to improve access to mental health services to the residents of coastal Mississippi;

  - Focused on building an integrated healthcare model and training managers, social workers, nurses and primary care providers on ways to build a system of care that addressees the psychological, social and medical needs of patients using a multidisciplinary team based approach;

  - Developed and revised polices that include behavioral health intervention and support PCMH certification;

  - Developed a peer review process that meets PCMH requirements;

  - Developed clinic specific performance improvement plans and goals for M-IHDP behavioral health programs;

  - Participated in clinic level staff meetings to address needs, concerns and service provisions;

  - Participated in the yearly all-staff training, sponsored by the FQHC. This participated required that M-IHDP personnel present workshops to all employees of the FQHC on behavioral health and its role in PCMH; and

  - Participated, through its M-IDHP Program Director and Coordinator, in the University of Massachusetts' Center for Integrated Primary Care's training in Integrated Care Management;

  - Provided 710 patient encounters in January and February 2015; the M-IHDP staff are working to increase the number of patients actively enrolled in the chronic condition support program; and

  - The Mississippi Integrated Health and Disaster Program has worked with the Mississippi Health Information Network to develop partnerships that will increase electronic data sharing between coastal hospitals, behavioral health providers and the local FQHC.

- MBHCP-AL has:

  - Hosted a Youth Mental Health First Aid (MHFA) Train the Trainer course in February of 2015. This program occurred in conjunction with the University of West Florida's Mental and Behavioral Health Capacity Project; by the end of the forty-hour (40-hour) training, twenty-five (25) new instructors from twelve (12) different agencies were designated as certified trainers.  With the help of these new trainers, MBHCP-AL has brought Youth MHFA/Adult MHFA courses to many key community members and agencies.

- ➢ March & April 2015/YMHFA: Trained 122 teachers, counselors, social workers and administrators from the Baldwin County Public School System.

- ➢ June 1 and 19th, 2015/MHFA for Public Safety:  Trained forty-seven (47) police officers and dispatchers.

- ➢ June 1 and 19th, 2015/MHFA for Public Safety:  Trained forty-seven (47) police officers and dispatchers.

- ▪ Reached agreements to:

  - ➢ Train all 320 of the employees in a Mobile Public Schools high-need feeder pattern in Youth MHFA; and

  - ➢ Helped facilitate a Youth MHFA class for the Mobile Metro Jail.

- ▪ Added two (2) additional Behavioral Health Providers (BHP) to further advance integrated care in our FQHCs. One of the recently added BHPs is bilingual; he is the sole provider of integrated behavioral health services to members the Alabama Hispanic community.

- ▪ Implemented chronic disease pathway referral system in the FQHCs; which entailed 2,100 chart reviews; and resulted in 1,100 new patients being seen for behavioral health issues associated with their chronic disease (e.g., diabetes, hypertension).

- ▪ Hired a psychologist to serve as the onsite behavioral Health Clinical Director at the Mobile County Health Department.  She begins work in August of 2015;

- ▪ Funded three child psychiatry fellows in the newly developed USA/Altapointe Child Psychiatry residency program.  They began work on July 1, 2015.

- ▪ Based on a needs assessment and feedback from primary health care providers, MBHCP-AL has established an insomnia group at for patients receiving services at Franklin Primary Health Center.

- ▪ MBHCP-AL's writing team authored a book chapter called "The Nuts and Bolts of Developing Integrated Healthcare in Underserved Primary Care Settings: Challenges and Lessons Learned." This chapter will appear in the book entitled "Integrated Psychological Services in Primary Care," which is scheduled to be published in December 2015.  During this reporting period, scientific information generated from the MBHCP-AL project was disseminated locally, regionally, and nationally in posters, presentations, and submitted and published manuscripts.

- o MBHCP-FL has:

  - ▪ Put much of its efforts into researching and engaging community partners for sustainability plans within their school district;

35

- Worked with PanCare and Escambia Community Clinics, which has shown commitment to integrating services within their respective clinics;

- Continue to work closely with each of the FQHCs to provide assistance, when needed, to further integrate mental and behavioral health services. Both FQHCs have shown interest in moving into school districts to help provide sustainability and increase services within the community;

- Engaged the Studer Group to provide Leadership Development to the FQHCs within the grant area, as well as partners within the community who are committed to work with the FQHCs. Studer's proven leadership development will help move FQHCs forward with sound, evidence-based practices that will continue to build on providing high-quality services to its clients.

## VIII.  GULF REGION HEALTH OUTREACH PROGRAM LIBRARY

In accordance with Section IX.H of the MSA, the Claims Administrator has established a publicly accessible online library, which exists as a repository of information regarding information related to the health effects of the *Deepwater Horizon* incident, including, but not limited to: (a) the composition, quantity, fate, and transport of oil, other hydrocarbons, and other substances released from the MC252 Well and the *Deepwater Horizon* and the dispersants and contaminants used in Response Activities; (b) health risks and health studies relating to exposure to oil, other hydrocarbons, and other substances released from the MC252 Well and the *Deepwater Horizon* and the dispersants and decontaminants used in Response Activities; (c) the nature, content, and scope of in situ burning performed during the Response Activities; and (d) occupational safety, worker production, and preventative measures for Clean-up Workers.

As of the end of the Reporting Period, the Library houses 189,885 relevant documents, each tagged with a specific search category based on the type of information identified within the MSA.  The Claims Administrator will continue to add Library Materials in accordance with the MSA.

Respectfully submitted,

*DEEPWATER HORIZON* MEDICAL BENEFITS
CLAIMS ADMINISTRATOR


By: /s/ Matthew L. Garretson
      Matthew L. Garretson

## <u>CERTIFICATE OF SERVICE</u>

I hereby certify that the above and foregoing document has been served on All Counsel by electronically uploading the same to Lexis Nexis File & Serve in accordance with Pretrial Order No. 12, and that the foregoing was electronically filed with the Clerk of Court of the United States District Court for the Eastern District of Louisiana by using the CM/ECF System, which will send a notice of the electronic filing in accordance with the procedures established in MDL 2179, on this 12th day of August, 2015.

Respectfully submitted,

*/s/ Matthew L. Garretson*
Matthew L. Garretson

38