**UNITED STATES DISTRICT COURT**
**EASTERN DISTRICT OF LOUISIANA**

| | | |
|---|---|---|
| IN RE: OIL SPILL BY THE OIL RIG | : | MDL 2179 |
|    "DEEPWATER HORIZON" IN THE | : | |
|    GULF OF MEXICO, ON APRIL 20, 2010 | : | SECTION "J" |
| | : | |
| This Document Applies to: | : | Judge Barbier |
| | : | |
| No. 12-970, Bon Secour Fisheries, Inc., et | : | Mag. Judge Shushan |
| al. v. BP Exploration & Production Inc., et al. | : | |
| | : | |

## OPPOSITION TO MOTION OF THE DHECC FOR RETURN OF PAYMENTS MADE TO CLAIMANTS FROM VESSELS THE *SIR LAWRENCE*, THE *CAPT T*, THE *LADY KATHLEEN* AND OTHERS

      Claimants Gulf Finest Investment Co. ("Gulf Finest"), LVS Investment Group Inc. ("LVS"), Sinh Tran, Christine Ho, Ngoc Lam, and Christopher Tran (collectively, "Claimants"), through undersigned counsel, respectfully submit their Opposition to the Motion for Return of Payments, filed by the Deepwater Horizon Economic Claims Center ("DHECC") with respect to certain claims made by them for shrimping vessels named the *Sir Lawrence*, *Capt T*, and *Lady Kathleen* (Rec. Doc. 14761).

## INTRODUCTION

      The DHECC's Motion sets forth very serious allegations, many of which mischaracterize and distort the facts, to accuse Claimants of fraud. The DHECC takes every opportunity to unfairly present the facts in a suspicious light, including by devoting an inordinate amount of the Motion and attaching superfluous exhibits to malign a family member of the Trans who is not even a Claimant in this case. The DHECC then goes so far as to imply that Sinh Tran and Christopher Tran are not actually boat captains. However, Sinh and Christopher are hardworking, full-time shrimp fisherman who have derived their income from shrimping in the

Gulf of Mexico for decades.  Indeed, indisputable evidence in the Special Master's possession shows that both Sinh and Christopher were and are the boat captains for their respective vessels. Moreover, the DHECC states that the claims were fraudulent and must be repaid because they were based on trip tickets that "do not represent genuine sales of shrimp."  *See* Rec. Doc. 14761-1, at p. 5.  However, more than sufficient evidence – much of which is in the Special Master's possession – shows that, based on genuine sales of shrimp, the payments were justified to compensate Claimants for damages from the oil spill.[1]  As explained herein, the DHECC's Motion should be denied because the claims were appropriate and justified – and at the very least, the Motion should be denied because the DHECC falls far short of proving that no genuine issues of material fact exist with regard to its claim of fraud.

## FACTUAL BACKGROUND

**I.      Claimants   Are   Entirely   Dependent   On   The   Shrimp   Industry   To Support                   Themselves                   And                   Their Families.**

Claimants have all been involved in the shrimping business for many years, deriving all of their income from the shrimp industry, including from 2007 through 2009, the period relevant to their claims.  In other word, they are precisely the type of claimants who were damaged by the oil spill, and who the seafood settlement program was designed to protect.[2] Christopher has been a shrimp fisherman as his profession for approximately thirty years.  *See* Ex. "A," Decl. Christopher Tran (hereinafter "Christopher Decl.").  His younger brother, Sinh

---

[1]      Christine Ho does not contest the DHECC's Motion for Return of Payment with regard to the Boat Captain claim that she received, and no Opposition is submitted with regard to that claim.  Her claim was filed based on a misunderstanding of the eligibility criteria under the seafood program.  Counsel for Ms. Ho attempted to settle the disputed claim with counsel for the Special Master; however, an agreement was unable to be reached.  As such, the Motion can be granted with respect to Ms. Ho.

[2]      Indeed, even as to Ms. Ho, she has been involved with the shrimp business from 1999 to the present, and has often captained shrimp boats over the years, which may explain the misunderstanding as to her eligibility to file a shrimp boat captain claim.

Tran, has been a full-time shrimp fisherman as his profession for approximately twenty years. *See* Ex. "B," Decl. Sinh Tran (hereinafter "Sinh Decl."). Sinh, through companies of which he is an officer, is also a shrimp vessel owner. *Id.* Specifically, Gulf Finest owns the vessel named the *Sir Lawrence*, and LVS owns the vessel named the *Capt T*. *Id.* During the shrimp season, both vessels are out shrimping most days, with Sinh captaining either the *Capt T* or the *Sir Lawrence*, and another captain he works with captaining the other vessel. *Id.* The vessel named the *Lady Kathleen* is owned by Ngoc Lam. *See* Exhibit "B," Decl. Ngoc Lam (hereinafter "Lam Decl."). Ms. Lam has four children with Christopher, who is the boat captain for the *Lady Kathleen*. *Id.* Christopher has worked the *Lady Kathleen* as his primary shrimp vessel since 1994, and he and Ms. Lam have supported their children almost solely with income from the *Lady Kathleen* since that time. *Id.*; *see also* Christopher Decl.

## II.   Persistent Documentation Issues Pervading The Shrimp Industry.

As the Court is well aware, documentation issues are a persistent problem in the shrimp business. Fisherman are rarely sophisticated business people adept at keeping organized and accurate business records – especially years later for documents they never would have known they would need. Claimants are no different. In addition, commercial fishing is a volatile business, with the price of shrimp and fuel fluctuating during a short season in which shrimpers must earn all of their income for the year, creating an environment where transactions are conducted quickly, often in cash, and without the formality of many other industries. Reporting practices on the part of purchasers is also lacking. Unlike in Louisiana where trip ticket reporting is strictly enforced, docks and processors in Texas routinely fail to report shrimp landings to the Texas Department of Parks & Wildlife ("Texas P&W"). *See* Christopher Decl.;

Sinh Decl.; *see also, e.g*., Ex. "A3" attached to Christopher Decl.; Ex. "B5" attached to Sinh
Decl.

In addition, docks and processors in Texas often refuse to provide a trip ticket to
the shrimper. *See* Christopher Decl.; Sinh Decl.; Lam Decl.  When Texas processors do report
shrimp landings to Texas P&W, they are often inaccurately reported, with changes made to the
price or quantity of the purchase. *See, e.g*., Ex. "A3" attached to Christopher Decl.; Exs. "B2"
and "B5" attached to Sinh Decl.   Because trip tickets and invoices are created as separate
documents, unlike in Louisiana where trip tickets are created in triplicate to ensure consistency,
processors in Texas often calculate one price and quantity to the shrimper and then calculate a
different price or quantity when reporting to the State.  *See id*.  Therefore, while the Special
Master makes much of which shrimp landings were recorded in the Texas database – and which
shrimp landings were not – the database is far from conclusive.

Compounding the problem here, Christopher and Sinh sold the majority of their
shrimp to Titan Seafood, Co. ("Titan") because it is owned by their brother Victor, with
Christopher selling his shrimp almost exclusively to Titan.  *See* Christopher Decl.; Sinh Decl.;
Lam Decl.  As such, many of the landings for the *Sir Lawrence*, the *Capt T*, and especially the
*Lady Kathleen* will only be documented in the database if Titan was properly reporting to Texas
P&W.  However, Tommy Crane, who began overseeing production at the Titan facility in April
of 2006, was cited with a Class "C" misdemeanor in August of 2009 by Texas P&W for failing
to report shrimp purchases. *See* Ex. "D," Decl. Tommy Crane (hereinafter "Crane Decl.").
Indeed, Mr. Crane did not know that Titan was required to report its purchases to Texas P&W,
and therefore, between April of 2006 and August of 2009, he never reported a purchase to Texas
P&W.  *Id*.  Therefore, while Titan has a handful of trip tickets on file during that timeframe,

several of which are 2009 purchases from the *Sir Lawrence* and the *Lady Kathleen*, it is not surprising that a dearth of filed Titan trip tickets exist.[3]

Moreover, any failure to file trip tickets was not the fault or responsibility of the fisherman, who had no way of knowing whether they were filed or had any control over Titan's reporting. *See* Christopher Decl. Claimants should not be punished by the draconian measures the Special Master seeks, and branded as filing fraudulent claims, due to the negligence of Texas seafood processors.[4] Further, notwithstanding the Special Master's accusations, the fact that a trip ticket was not reported does not prove that the landing did not occur. If that were the case, the settlement would have required reported trip tickets in support of shrimp claims – to the contrary, the DHECC accepted unfiled trip tickets as proof of landings, and then augmented those amounts with landings that the DHECC discovered were on file in Louisiana or Texas. *Compare* Ex. "E," LVS Eligibility Notice (with values substantiated by trip tickets and sworn statement) *with* Ex. "F," LVS Revised Eligibility Notice (with information from the trip ticket database added to the trip tickets submitted). But most incredibly, as explained herein, in deciding that Claimants' seafood payments should be returned, the Special Master chose to ignore evidence of the volume of shrimp landings that were reported and that support Claimants' claims.

---

[3]    Mr. Crane explained that any trip tickets that Titan did manage to file before he was cited were likely filed by one of Titan's secretaries since they were the people involved with all of Titan's purchasing paperwork. *See id.*

[4]    Further, while the Motion claims that Victor Tran, the principal of Titan, knew that Titan had a duty to report trip tickets and told DHECC investigators that Titan did in fact report all shrimp purchases to Texas P&W, that claim is not supported by the Exhibit the DHECC cites – a "Recorded Statement Summary" from Victor Tran. *Compare* Rec Doc. 14761-1, at p. 5-6 *with* 14761-6 (Ex. "D"), at p. 6. The statement reflects that Victor said that Texas P&W comes out once a month to inspect Titan's landing invoices. In addition, in another "Recorded Statement Summary" for Victor that the DHECC chose not to attach to its Motion, Victor explained that Titan reported all trip tickets to the National Oceanic and Atmospheric Administration ("NOAA"). *See* Ex. "G," Stmt. of Victor Tran, at p. 2. Mr. Crane also confirmed that, unlike for Texas P&W, he was aware of Titan's duty to report to NOAA, and he believes that the NOAA reporting was indeed accurately performed. *See* Crane Decl.

Finally, an additional impediment to maintaining business records for businesses that operate on the Coast is obviously hurricane damage.  Mr. Crane explained that the Titan facility was severely damaged by Hurricane Ike in 2008, and Titan lost much of its documentation and computer records.  *See* Crane Decl.  Victor reported the same in both his statement to the DHECC attached to the Motion and in his statement to the DHECC attached hereto – that many of Titan's records of shrimp purchases were destroyed in Hurricane Ike.  *See* Rec. Doc. 14761-6, at p. 6; Ex. "G," at p. 2.  Similarly, Sinh has lived for years in a trailer on the site of the Titan facility, and lost many of his records in the hurricane and its aftermath as he travelled back and forth between Houston and Port Arthur while trying to rebuild his shrimping business after the storm.  *See* Sinh Decl.

### III.    Shrimping Revenue for the *Capt T*.

Sinh submitted a shrimp boat vessel claim to the DHECC on behalf of LVS, and a shrimp boat captain claim on behalf of himself, showing shrimping revenue in 2009 of $492,149.78 for the *Capt T*.  *See* Ex. "E."  He based the amount of the claim on LVS' timely-filed tax return which reflected the *Capt T*'s shrimp landings during 2009.  *See* Ex. "H," LVS Tax Transcript; Sinh Decl.  However, he no longer had in his possession most of the 2009 invoices or trip tickets, some of which he had never even received from Texas shrimp processors.  *See* Sinh Decl.  When Sinh originally filed his claim with the GCCF directly in the aftermath of the oil spill, he was told that if he did not submit invoices or trip tickets that the claim would be denied.  *Id*.  As a full-time shrimper who derives all of his income from the shrimp industry, the prospect of the damage that the oil spill would cause to his ability to earn a living was frightenin*g*.  *See id*.  Sinh therefore used LVS' tax return and notes he had of the *Capt*

*T*'s shrimp landings and the amount of money divided between the crew to create Titan invoices that represented the *Capt T*'s shrimp landings for 2009. *Id.*

Sinh did not intend to make any misrepresentation to the DHECC. While he did not have genuine invoices in his possession, the *Capt T* claims were based on genuine 2009 shrimp landings in the Gulf area. Moreover, indisputable evidence supports that the *Capt T* in fact did have 2009 shrimp landings in the Gulf area of $449,779.44. *See* Sinh Decl, at Ex. "B2," attached thereto. A simple review of the vessel database reports from Texas and Louisiana of filed trip tickets proves that, at an absolute minimum, the shrimp landings for the *Capt T* in 2009 were $449,779.44. *See id.* As such, there is no doubt that the *Capt T*'s 2009 shrimp landings, which is the benchmark year for which it was paid, exceeded $400,000 and that LVS' vessel owner and Sinh's boat captain claims therefore qualified for the expedited compensation model.

In addition, the Special Master is well aware of the volume of the *Capt T*'s 2009 landings, citing in the Motion the $340,987.04 in trip tickets found in the Texas database for that year for that vessel. Rec. Doc. 14761-1, at p. 9.[5] It is difficult to believe that the Special Master did not also consult the Louisiana trip ticket database, which contains an additional $108,792.40 in unassailable shrimp landings. *See* Sinh Decl., at Ex. "B2." Therefore, it is disingenuous for the Special Master to accuse Sinh and LVS of fraud and insist that payments rightfully made to them based on their genuine 2009 shrimp landings be paid back simply because Sinh did not have the right documents in his possession to submit for the claims. Moreover, Sinh has now thoroughly searched all of his records in order to reconstruct his claims and found a handful of 2009 invoices and trip tickets attributable to the shrimp landings on file, a Titan trip ticket, with invoice, that was filed in Texas, and two Tropical Seafood trip tickets filed in Louisiana. *See id.*

---

[5]     Indeed, the Flor-Tex trip tickets included in Exhibit "B2" to Sinh's Declaration were produced with the Special Master's production in connection with the Motion.

However, as before, much of the underlying documentation simply does not exist because it was either destroyed, lost, or never provided by the processor, and the only way that Sinh could reconstruct his claims was by requesting data from the Texas and Louisiana databases. *See* Sinh Decl.  In addition to the filed landings, he was able to find copies of two 2009 checks for shrimp landings paid by Sophies Seafood, Inc. that total $70,000.  *See* Sinh Decl., at Ex. "B2".  Those shrimp sales are not recorded in any database.  As such, the total documented shrimp landings for the *Capt T* in 2009 is $519,779.44 – well above the amount that Sinh presented in support of his claims.  There is nothing equitable about forcing a fisherman to repay a claim that is supported by genuine benchmark shrimp sales, even if he was unable to supply genuine invoices at the time the claim was made.

Further, because LVS supplied its corporate tax return showing gross receipts from shrimp sales in 2009 of $492,149, the same amount of revenue submitted for the vessel claim, it should have been approved on that basis alone – claimants were required to submit either trip tickets or tax documents in support of their claims.  *See* Ex. "H."  The Special Master implies that because the tax returns for LVS and Gulf Finest were filed shortly before they were submitted for emergency relief from the oil spill that they were only filed in order to obtain the relief.  *See* Rec. Doc. 14761-1, at p. 3.  Such an insinuation is unfounded and distorts the facts – the tax returns are not attributable to some distant past; they are for the prior tax year, 2009, and were filed at the beginning of June, or 6 weeks after the April 15th deadline, which that year came during the chaos of the oil spill.  *See* Ex. "H;" *see also* Ex. "I," Gulf Finest 2009 Tax Transcript.[6]

---

[6]      Moreover, Gulf Finest, of which Sinh is also the principal, filed its tax return attributable to the 2008 tax year in 2009, reporting gross shrimping receipts of $430,520 which was used as the 2008 revenue to support the *Sir Lawrence*'s claim.  *See* Ex. "J," Gulf Finest 2008 Tax Transcript.  The fact that the previous

Finally, shrimp landings exceeding $400,000 per year is not an anomaly for the *Capt T*.  LVS did not own the *Capt T* in 2008, so it did not supply 2008 documentation for its claim.  However, Sinh was the boat captain for the *Capt T* in 2008, and could have provided documentation for that year in support of his captain claim.  The total documented shrimp landings for 2008 for the *Capt T* were $532,526.61.  *See* Sinh Decl., at Ex. "B1."

## IV.   Shrimping Revenue for the *Sir Lawrence*.

Similarly, Sinh submitted a shrimp vessel claim to the DHECC on behalf of Gulf Finest showing shrimping revenue in 2009 of $472,779.39 for the *Sir Lawrence* and shrimping revenue for 2008 of $430,520.47.  *See* Ex. "K," Gulf Finest Eligibility Notice.[7]  He based the amount of the claim on Gulf Finest's timely-filed tax returns which reflected the *Sir Lawrence*'s shrimp landings for those years.  *See* Ex. "I;" Ex. "J," *see also* Sinh Decl.  For the same reasons, he no longer had in his possession most of the 2008 and 2009 invoices or trip tickets, and had never received some of them from Texas shrimp processors.  *See* Sinh Decl.  Sinh therefore used the tax returns of Gulf Finest and the notes he had of the *Sir Lawrence*'s shrimp landings for the previous two years to create Titan invoices that represented the *Sir Lawrence*'s shrimp landings for 2008 and 2009.  *Id.*

The evidence collected to reconstruct the claims shows that the *Sir Lawrence* indeed had qualifying shrimp revenue to support the claims.  In 2009, the benchmark year that the DHECC selected to calculate the claims, the *Sir Lawrence* had documented shrimp landings of $480,150.41.  *See* Sinh Decl., at Ex. "B2" attached thereto.  Of the documented revenue,

---

year's tax return was timely filed, well before the oil spill, eliminates any accusation that the tax returns were orchestrated.

[7]    Notes that the Gulf Finest approved payment indicated on this Eligibility Notice was subsequently reduced by approximately $15,000 to account for a prior oil spill related payment.

$335,419.41 of the shrimp landings are on file either with Texas or Louisiana.  *Id.*  In addition, even though the DHECC did not use the 2008 shrimp revenue to calculate the *Sir Lawrence* claim, the shrimp landings documented by Titan invoices, alone, is $424,972.88.  That value is very close to the $430,520 value that Gulf Finest submitted as its revenue for 2008, further demonstrating that the invoices that Sinh based on his corporate tax returns and notes from the shrimp season, and submitted in support of his claims, were a reliable assessment of his shrimp landings.  Moreover, as with the *Capt T* claim, the total value of documented shrimp landings, with the reported and unreported trip tickets, exceeds the value of the claim as submitted.  That is, the *Sir Lawrence* had total documented shrimp landings in 2008 of $600, 272.18 – therefore, far from being unjustly enriched, the *Sir Lawrence*'s vessel owner claim would have been significantly greater if it had not suffered from poor record keeping.

**V.**      **Shrimping Revenue for the *Lady Kathleen*.**

However, unlike the claims filed for the *Capt T* and the *Sir Lawrence*, the claims submitted by Christopher and Ms. Lam for the *Lady Kathleen* were submitted with authentic invoices that were created contemporaneously with the shrimp landings.  *See* Christopher Decl.; Lam Decl.  Christopher and Ms. Lam were simply better at maintaining and organizing their files and were able to locate original invoices.  *Id.*  As such, the eligibility notice accurately reflects the value of the 2007 and 2008 invoices that Christopher and Ms. Lam had in their possession and the invoices they submitted in support of the *Lady Kathleen* claims.  *See* Ex. "M," Christopher Tran Eligibility Notice.  Those invoices show shrimp revenue of $393,886.61 for 2007 and of $467,067.90 for 2008.  *See* Christopher Decl., at Exs. "A1" and "A2" attached thereto.  Christopher and Ms. Lam selected the historical revenue method for calculating their claims, and the DHECC selected 2008 as the benchmark year.  *See id.*  And again, better

documentation would have actually increased the value of the claim.  The *Lady Kathleen* claims did not include one approximately $27,000 shrimp landing reported in the Texas database in 2008 because Christopher and Ms. Lam did not have that documentation.  *See* Christopher Decl., at Ex. "A2" attached thereto.

In addition, the *Lady Kathleen* claims did not include 2009 shrimping revenue. The *Lady Kathleen* suffered a mechanical failure in 2009 and was out of commission for portions of the season; therefore, Christopher and Ms. Lam knew their shrimp revenue was significantly lower than the prior years and they sought to exclude 2009 from the benchmark calculation.  *See* Christopher Decl.; Lam Decl.; Ex. "N," Christopher Tran Revised Eligibility Notice.  Therefore, minimal documentation – one Titan invoice – was submitted for 2009, and no 2009 shrimp revenue was used to calculate the claims.  As such, when the Special Master casts doubt on the validity of the *Lady Kathleen* invoices by pointing out that none of the 2008 invoices that were used to calculate the DHECC claim had been submitted by Ms. Lam in support of the GCCF claim that she filed, he is not making a fair comparison – the invoices Ms. Lam presented to the GCCF were for landings in 2009 and 2010 (three records total).  *See* Rec. Doc. 14761-1, at p. 5; *see also* Ex. "L," Lam GCCF Trip Tickets.  Thus, the accusation is misleading in comparing trip tickets filed for different years but insinuating that they were all 2008 trip tickets.

Finally, Christopher and Ms. Lam were correct that the *Lady Kathleen*'s shrimping revenue was lower in 2009 due to the mechanical failure than it had been in 2007 and 2008.  However, if they had filed the 2009 invoices and trip tickets in their possession and requested the *Lady Kathleen's* trip tickets from the Texas and Louisiana databases, the documented shrimp landings would have been much higher than the amount originally calculated by the DHECC for 2009.  *See* Ex. "M."  The Lady Kathleen had documented shrimp landings of

$186,801.81 in 2009, with $107,195.32 in trip tickets documented as reported in either Texas or Louisiana.  *See* Christopher Decl., at Ex. "A3" attached thereto.

## LAW AND ARGUMENT

**I.      There Is Sufficient Evidence To Support The Amount Of Payments Made To Claimants And The DHECC Cannot Succeed On Its Claim Of Fraud.**

The Special Master's Motion is predicated upon a claim of fraud, as it must be to seek return of the payments.  However, despite the Special Master's attempt to cast the facts in the most egregious light, and ignore all facts to the contrary, the Special Master cannot succeed on his claim.  In that regard, the common law of fraud applies to the Motion.  Pursuant to the Amended Settlement Agreement, which governs the settlement program, general maritime law applies to any disputes regarding the Agreement or the settlement program:  "[T]his Agreement and the Release and Individual Releases hereunder shall be interpreted in accordance with General Maritime Law as well as in a manner intended to comply with OPA [Oil Pollution Act]."  Amended Settlement Agreement, § 36.1.  General maritime law incorporates the common law of fraud.  *See Black Gold Marine, Inc. v. Jackson Marine Co., Inc.*, 759 F.2d 466, 470 (5th Cir. 1985*); Operaciones Technicas Marnas S.A.S. v. Diversified Marine Servs.*, *LLC*, 926 F. Supp. 2d 858, 862 (E.D. La. 2013); *Cargill, Inc. v. Degesch Am., Inc.* 875 F. Supp. 2d 667, 674 (E.D. La. 2012); *Elmwood Dry Dock & Repair v. H & A Trading Co., Ltd.*, Nos. 93-02156, 94-01844, 94-03783, 97-00191, 1997 WL 781298, at *21 (E.D. La. Dec. 16, 1997).

As such, the Special Master must establish that, based on the undisputed facts in the record, he is entitled to judgment as a matter of law with respect to each of the five elements of common law fraud: (1) the defendant made a false representation; (2) the defendant knew or believed that the representation was false; (3) the defendant intended to defraud the plaintiff by inducing the plaintiff to act in reliance on the representation; (4) the plaintiff justifiably relied on

the representation; and (5) the plaintiff was damaged because of such reliance.  *See Operaciones*, 926 F. Sup. 2d at 862; *Cargill*, 975 F. Supp. 2d at 674; *Elmwood*, 1997 WL 781298, at *21-22. Notwithstanding the clear legal standard applicable to the Motion, the Special Master cites virtually no law in support of his position that the payments should be clawed back, and provides no legal analysis for how the elements of fraud are in any way satisfied here.  Instead, the Special Master provides only a vague reference to restitution as an equitable remedy appropriate "even though he [Claimants] may have received those benefits honestly in the first instance."  *See* Rec. Doc. 14761-1, at p. 5.

However, to the extent the Special Master is attempting to seek restitution based on non-fraudulent conduct, it is inconsistent with the controlling documents applicable to the settlement program.  The Amended Settlement Agreement consistently limits the investigative authority of the Claims Administrator to instances or suspicions of "fraudulent conduct."  (*See, e.g.,* Amended Settlement Agreement Ex. 8A [Doc. 6430-16] at 50 n. 40; Ex. 8D [Doc. 6430-19] at 8 n.5; Ex. 8E [Doc. 6430-20] at ¶6; Ex. 10 [Doc. 6430-22] at 94 n. 16.)  Likewise, the Court's Order granting the Special Master authority to initiate clawback motions limits such authority to cases of fraud:  "[T]he Special Master shall . . . initiate legal action to 'clawback' the payment of any fraudulent claims; and do this in a manner which does not delay or impede the payment of legitimate claims."  (Order [Doc. 11288] at 2-3.)  Moreover, DHECC policies limit rescission of payments and denial of claims to instances of fraud and fraudulent conduct.  (*See* Policy 185 ("The Program may not rescind a payment award after the claimant has submitted a properly completed Release, except for fraud or the claimant's exercise of an opt-out."); Policy 489 ("The FWA will deny all claim(s) of any type that are filed by an claimant who has filed any claim that has been determined with finality to have been fraudulent").)

Therefore, the Court should reject an expansion of the draconian measures that the Special Master seeks here.  In that regard, the operation of a claimant-friendly settlement program should limit punitive sanctions to instances of fraud, and should not penalize claimants for good faith attempts to interpret what the settlement program requires them to do, or for technical non-compliance with those requirements.  While the settlement program was designed in many ways to be responsive and claimant-friendly, it often involves complex claim forms compounded by language barriers, the need to assemble claims in the face of messy or non-existent documentation, and efforts to recollect details several years after the fact.  The elements of common law fraud, therefore, appropriately delineate the type of misconduct warranting punishment and ensure that claimants are not excluded from the settlement program for mistakes, immaterial misstatements, or good faith efforts to interpret the requirements of the program.  Thus, an attempt to rescind payments should not be justified on anything short of fraud.

Here, rather than furthering the responsive, claimant-friendly principles upon which the program was created, or upholding the integrity of the program by investigating actual fraud, the Special Master's Motion attempts to hold Claimants to a standard for proving their damages that would only be appropriate in complex commercial litigation between sophisticated parties.  However, the settlement program was not intended to be an exercise in submitting perfect documentation; it is an exercise in identifying claimants who have been harmed and compensating them based on certain benchmark criteria.  Claimants are precisely the type of people who were harmed by the oil spill – full-time commercial shrimpers – and they meet the criteria for the compensation that they received.  The fact that they may not have submitted the best possible documentation to demonstrate that criteria does not justify subjecting them to

hardship by requiring them to forfeit payments to which they were rightfully entitled, and punishing them further by excluding them from the settlement program.

Moreover, the Special Master's accusations fall far short of establishing that Claimants committed fraud.  As an initial matter, the Motion spends an inordinate amount of time discussing Titan, and in particular, its principal Victor Tran, in order to try to paint the entire family in a negative light based on one family member's unrelated criminal charge.  However, the critical issue relevant here is not the extent to which Titan, a non-Claimant in this matter, was operating during late 2009; the critical issue is what the value of Claimant's shrimping revenue was during the relevant period and whether it satisfies the criteria for the claims that were made.  The Special Master significantly overreaches when he demands that all payments made to Claimants must be clawed back – and especially with regard to the *Capt T* when government records show that the *Capt T*'s shrimp landings satisfy the criteria for the expedited compensation model for the benchmark year.[8]

As to Christopher's boat captain claim and Ms. Lam's boat vessel claim, the Special Master cannot even establish the most basic element of fraud because there were no misrepresentations.  *See* Christopher Decl.; Lam Decl.  They submitted valid and genuine invoices documenting their trip tickets.  The issue is simply that the Special Master does not believe them.  However, he bases those very serious allegations on flimsy facts: that some of the invoices submitted differ in appearance from others, and that the invoices submitted were not filed in the Texas database.  However, Claimants have no control over the invoices that are given

---

[8]     In addition, while the extent of Titan's operations in late 2009 should not be the focus, it is worth noting the lack of credibility as to the Special Master's declaration, with certainty, that Titan did not operate at all after April 7, 2009 when Victor Tran was arrested – and therefore to attack the *Lady Kathleen* invoice dated three days later on that business – when the exhibits submitted with the DHECC's Motion belie that assertion.  Indeed, Titan's Profit & Loss Statement submitted by the Special Master as Rec. Doc. 14761-16 shows purchases (though less) through the end of the 2009 year.

to them by processors and whether those processors properly file their trip tickets, and it is inequitable to punish Claimants on that basis.  Further, there is no dispute that Ms. Lam is the owner of the *Lady Kathleen*, that Christopher is the boat captain for the *Lady Kathleen*, or that they derive their income from shrimping – yet, if the Special Master were correct that a lack of trip tickets in the Texas database is dispositive proof that shrimp landing did not occur, then the *Lady Kathleen* would not have shrimped at all in 2007 and would have had only one landing in 2008.  In other words, it is not simply that the invoices that Christopher and Ms. Lam submitted are not in the Texas database – they have no trip tickets in the database in 2007 and only one in 2008.  *See* Christopher Decl, at Exs. "A1" and "A2."  Clearly, the *Lady Kathleen's* sales in those years went unreported, not that they did not have any sales in those years.

Indeed, the *Lady Kathleen* sells its shrimp almost exclusively to Titan, and 2007 and 2008 were years when Titan was not reporting to the database.  *See* Crane Decl.  Titan's non-reporting was so pervasive that Mr. Crane did not even know that he was required to make the reports and was eventually cited with a violation.  *Id.*  Further, the *Sir Lawrence* and *Capt T* also sell significant amounts of their shrimp to Titan – yet neither vessel has a single Titan trip ticket on file in Texas in 2007 or 2008.  *See* Sinh Decl. and Exs. attached thereto.  Thus, the fact that the Titan invoices are not in the Texas database is proof of nothing more than Titan was not properly reporting during those years; it is not proof that the shrimp sale did not occur.  Finally, Tommy Crane offered a reasonable explanation as to why the invoices could differ in appearance – they were created using different templates on different computers that each had its own hard drive.  *See* Crane Decl.  That is the same explanation that Victor Tran gave to DHECC

investigators when he was asked why the invoices sometimes had a different heading or format – yet, that statement was not attached to the DHECC's Motion.  *See* Ex. "G."[9]

As to the vessel owner claims for the *Sir Lawrence* and the *Capt T*, and Sinh's boat captain claim for the *Capt T*, the Special Master also cannot succeed on his claim of fraud. While a misrepresentation was made as to the authenticity of the documents submitted, the documents are representative of genuine shrimp landing – therefore, there was no material misrepresentation because the value of the shrimp landings reported was accurate, for that year, for that vessel, and in the Gulf area.  For the same reasons, he did not believe that the representation was false – he knew that the documents did not contain the correct details of the sales, but he knew that the relevant substance of the representation was in fact true because he based the invoices on his corporate tax returns and notes from the shrimp season.  This is not as if a taxi driver who had never been on a shrimp boat manufactured invoices of sales that never occurred and then submitted them to the DHECC and pretended to be a shrimp fisherman.

As such, there was no intent to defraud with the claims submitted by Sinh, Gulf Finest, or LVS.  Claimants did the best they could to supply the documentation they believed was required, and to supply sufficient relevant information to demonstrate their legitimate shrimp revenue in order for the DHECC to accurately calculate their claims.   The altered invoices were not presented for the purpose of misleading the DHECC because the *Sir Lawrence* and the *Capt T* actually had shrimp landing to that effect that qualified for relief.  Finally, neither the DHECC nor any other claimant has been damaged by the payment of Claimants' claims – the Claimants met the criteria to receive the payments, and they had the appropriate qualifying revenue to receive the claims.

---

[9]      More specifically, during the interview Victor was asked about the validity of the *Lady Kathleen* invoices, which he reviewed, and confirmed their authenticity.  *See id*.

**II.    The DHECC's Motion For Return Of Payments Is Governed By A Summary Judgment Standard, And the DHECC Has Not Met Its Burden.**

        **A.    Standard Governing Summary Judgment.**

This Court has determined that the summary judgment standard, embodied in Federal Rule of Civil Procedure 56, governs Motions of this kind by the Special Master.  *See, e.g.*, Rec. Doc. 14813, at pp. 3-4.  In that regard, summary judgment should be granted when the pleadings, depositions, answers to interrogatories, admissions and affidavits show that there is no genuine issue of material fact and that the moving party is entitled to judgment as a matter of law.  Fed. R. Civ. P. 56.  The initial burden of showing that no genuine issue of material fact exists rests with the movant.  *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986).  To satisfy this burden, the movant must inform the court of the basis for its motion and identify "those portions of 'the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any,' which it believes demonstrate the absence of a genuine issue of material fact."  *Id.*

The court's function on a motion for summary judgment is not "to weigh the evidence and determine the truth of the matter but to determine whether there is a genuine issue."  *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 249 (1986).  Moreover, "if the moving party fails to meet this initial burden, the motion must be denied, regardless of the nonmovant's response."  *Little v. Liquid Air Corp.*, 37 F.3d 1069, 1075 (5th Cir. 1994).  Only when the moving party has discharged its initial burden, does the burden shift to the non-moving party to set forth specific facts showing there is a genuine issue of material fact.  *See* Fed. R. Civ. P. 56(e).

Here, the DHECC bears the burden of proving all elements essential to its claim of fraud.  It has not met this burden and the Motion must, therefore, be denied as a matter of law. At the very least, Claimants have demonstrated that there exist numerous genuine issues of

disputed fact, which preclude summary judgment.

    **B.**      **The DHECC Cannot Support its Motion with Hearsay.**

        In opposition to a motion for summary judgment "[a] party may object that the material cited to support or dispute a fact cannot be presented in a form that would not be admissible in evidence." Fed. R. Civ. P. 56(c)(2). In that regard, "on a motion for summary judgment, the evidence proffered by the [movant] to satisfy his burden of proof must be competent and admissible at trial." *Bellard v. Gautreaux*, 675 F.3d 454, 460 (5th Cir. 2012) (*citing Martin v. John W. Stone Oil Distrib., Inc.,* 819 F.2d 547, 549 (5th Cir.1987)). Inadmissible "hearsay … [is] not proper evidence for summary judgment." *Id.* at 462.

        Further, where the moving party will bear the burden of proof at trial, he:

> must come forward with evidence which would 'entitle it to a directed verdict if the evidence went uncontroverted at trial.' The nonmoving party can then defeat the motion by either countering with sufficient evidence of its own, or 'showing that the moving party's evidence is so sheer that it may not persuade the reasonable fact-finder to return a verdict in favor of the moving party.'

*Murungi v. Texas Guaranteed*, 693 F.Supp.2d 597, 603 (E.D. La. 2010) *quoting Int'l Shortstop, Inc. v. Rally's Inc.*, 939 F.3d 1257, 1263-64 (5th Cir. 1991). Evidence submitted in support of a motion for summary judgment "is subject to the same rules of admissibility applicable to a trial." *Resolution Trust Corp. v. Starkey*, 41 F.3d 1018, 1024 (5th Cir. 1995); *see also* Fed. Rule Civ. Pro. 56(c) (party may object that a fact is not supported by admissible evidence).

        The DHECC has failed to supply competent evidence to prove its assertions. For example, the DHECC relies heavily upon a "summary" of a recorded statement by Victor Tran and an almost entirely redacted letter from Victor Tran's wife to a Judge asking for leniency in her husband's sentencing. *See* Rec Docs. 14761-6, 14761-8; *see also* Ex. "O," Unredacted Letter of Victor Tran's Wife. In addition to other issues, these statements are not admissible – hearsay

is defined as "a statement that: (1) the declarant does not make while testifying at the current trial or hearing; and (2) a party offers in evidence to prove the truth of the matter asserted in the statement."  Fed. R. Evid. 801(c).  It is well-settled, for example, that unsworn statements made by a party to an insurance adjuster are inadmissible hearsay.  *Lovell v. Childs*, CIV.A. 07-568, 2012 WL 1016054, *2 (M.D. La. Mar. 22, 2012); *Rock v. Huffco Gas & Oil Co., Inc.*, 922 F.2d 272, 282 (5th Cir. 1991).

Similarly, the "Recorded Statement Summary" of alleged statements made by Victor Tran during a conversation is inadmissible hearsay.  The statement is a "summary" of someone else's notes – it is not a transcribed – of an unsworn, apparently recorded conversation, with no indication even of whether the notes were taken contemporaneously or later from the recording.  The summary is also difficult to understand, or even follow at times, likely indicating that language barriers were an issue.  Therefore, in addition to be inadmissible hearsay, it is also unreliable.  The same issues are present with Victor Tran's wife's letter to the Judge.  *See* Ex. "O."  These statements were both made out of court and are offered to prove the truth of the matters asserted.  *See* Fed. R. Evid. 801(c); *Lovell*, 2012 WL 1016054 at *2; *Rock*, 922 F.2d at 282.  Moreover, not only is the wife's statement offered to prove the truth of the matter asserted – that Titan ceased operating after Victor was incarcerated – but it is also inexplicably attached to the Motion in a version that is redacted almost in its entirety, making it impossible to even ascertain what the matter is that the letter asserts.

C.    **The DHECC Misrepresents the Content of the Evidence and Facts Presented in Support of its Motion, Most of which is Not Even Material.**

The Special Master also mischaracterizes the content of many of the documents submitted in support of it Motion, and distorts the nature of other facts presented.  As explained above, the Motion misrepresents Victor Tran's statements regarding Titan's record of properly

reporting trip tickets to the Texas database, and fails to acknowledge his statements that much of Titan's records of shrimp purchases were destroyed in Hurricane Ike and that is why he does not have records of Claimants' shrimp sales to Titan.  *See* Rec. Doc. 14761-6, at p. 6.  Further, the DHECC's Motion presents that summary of Victor Tran's statement as if it is the full record of his interview with DHECC investigators, but fails to attach other portions of the interview that support the validity of Claimants' claims.  *See* Ex. "G," at p. 2.

The content of Victor Tran's wife's letter to the Judge is also mischaracterized, and seems to have been redacted for the sole reason that it paints Victor in a positive light.  *See* Ex. "O," Unredacted Version.  In addition, as explained above, the Motion takes every opportunity to present mundane facts in a manner that implies suspicion – such as making it seem like tax returns were filed late, or in order to take advantage of the settlement, when the returns were filed within a few weeks of April 15th, or making it seem like Ms. Lam's filing of different trip tickets with the GCCF than with the DHECC shows wrongdoing when in reality the trip tickets were not for comparable year.

As a result, the DHECC has not carried its initial burden of establishing that no disputed issues of material fact exist.  *See* Fed. R. Civ. P. 56(c).  Finally, nearly all of the evidence reliable upon by the DHECC is not relevant to the critical issue – whether the claims submitted by Claimants fairly represents their shrimping revenue during the relevant period – and therefore is not material.  In that regard,

> As to materiality, the substantive law will identify which facts are material. **Only disputes over facts that might affect the outcome of the suit** under the governing law will properly preclude the entry of summary judgment. **Factual disputes that are irrelevant or unnecessary will not be counted**.

*Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248, 106 S. Ct. 2505, 2510, 91 L. Ed. 2d 202 (1986) (emphasis added).

## CONCLUSION

The Special Master's Motion falls far short of establishing that Claimants committed fraud. To the contrary, more than sufficient evidence – much of which is in the Special Master's possession – shows that, based on genuine sales of shrimp, the payments were justified to compensate Claimants for damages from the oil spill. The DHECC's Motion should therefore be denied – and at the very least, genuine issues of material fact exist and preclude granting the Motion.

Respectfully submitted

*/s/ Ellie T. Schilling*
William P. Gibbens, 27225
Ellie T. Schilling, 33358
SCHONEKAS, EVANS, MCGOEY
& MCEACHIN, L.L.C.
909 Poydras Street, Suite 1600
New Orleans, Louisiana  70112
Telephone:  (504) 680-6050
Fax:  (504) 680-6051
billy@semmlaw.com
ellie@semmlaw.com

Attorneys for Claimants, Gulf Finest Investment Co., LVS Investment Group Inc., Sinh Tran, Christine Ho, Ngoc Lam, and Christopher Tran

## CERTIFICATE OF SERVICE

I hereby certify that the above and foregoing pleading has been served on all counsel by electronically uploading the same to Lexis Nexis File & Serve in accordance with Pretrial Order No. 12, and that the foregoing pleading was electronically filed with the Clerk of Court of the United States District Court for the Eastern District of Louisiana by using the CM/ECF system, which will send a notice of electronic filing in accordance with the procedures established in MDL 2179, on this 25th day of September, 2015.

/s/ Ellie T. Schilling
ELLIE T. SCHILLING