IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF LOUSIANA

| | |
|---|---|
| IN RE: OIL SPILL BY THE OIL RIG DEEPWATER HORIZON IN THE GULF OF MEXICO, APRIL 20, 2010 | 2:10-md-02179-CJB-SS (MDL No. 2179) |
| IN RE THE COMPLAINT AND PETITION OF TRITON ASSET LEASING GmbH, ET AL. FOR EXONERATION OR LIMITATION OF LIABILITY (No. 10-2771) | Section:  J (1)  Judge:  Barbier |
| This Document Relates To: Local Government Short Form 10-CV-09999, Doc. 29 | Magistrate:  Shushan |

# COMPLAINT

NOW INTO COURT, through undersigned counsel, comes plaintiff, the Pointe-au-Chien Indian Tribe, who files the following Answer in Limitation and Claim in Limitation, and Cross Claim for damages, declaratory and injunctive relief resulting from the explosion of the drilling rig the "Deepwater Horizon" and the ensuing MC252 oil spill of national significance (commonly known as the BP Oil Spill). Plaintiff respectfully avers as follows:

I.

ALLEGATIONS INCORPORATED BY REFERENCE

1.  The Pointe-au-Chien Indian Tribe adopts and incorporates by reference each jurisdictional, venue, and factual allegations contained in the C1 Local Government Entities Master Answer to Complaint and Petition for Exoneration From or Limitation of Liability, Master Claim in Limitation, and Master Complaint, Cross-Claim and Third Party Complaint for Economic Loss (Doc. 1093) and the D1 Master Complaint for Injunctive Relief (Doc. 880), both as filed in the MDL 2179 docket in the Eastern District of Louisiana, as if specifically pled here in their entirety. Pursuant to this Court's Order dated August 28, 2015 (Rec. Doc 15269), the

Pointe-au-Chien Indian Tribe also adopts and incorporates by reference its Local Government Short Form filed in MDL record 10-CV-09999, Doc. 29.

2. The BP Defendants, Transocean Defendants, and Halliburton Defendants are liable to the Pointe-au-Chien Indian Tribe ("PACIT") for all damages caused by or resulting from the MC252 Spill including, but not limited to, physical damage to and destruction of real and personal property; physical damage to and diminution in the value and use of tribal cultural and natural resources; loss of the tribal subsistence use of natural resources; natural resource damages; costs of response, removal, restoration, and remediation; any other damages to be proven at trial pursuant to the provisions of the Oil Pollution Act (33 U.S.C. §§ 2701, *et seq*.), and for punitive damages that may be available under the general maritime law.

3. In addition, BP Defendants, through its agents, induced the Pointe-au-Chien Indian Tribe to share confidential information regarding the location, history, and use of PACIT's tribal cultural assets and historic sites within PACIT's tribal territory, including historical cemeteries, middens, historic homesites, and burial mounds. BP agreed to use the information to create anthropological and archeological reports concerning the tribe's history and present cultural landscape, which PACIT could use in its quest for federal recognition. BP and its agents obtained the confidential information breached this contract by failing to produce the reports as promised.

II.

JURISDICTION AND VENUE

4. This Court has jurisdiction pursuant to: (1) 28 U. S. C. § 1332 because the matter in controversy exceeds the sum or value of $75,000.00, exclusive of interest and costs, and is brought by a citizen of a state that is different from the state where at least one of the Defendants is incorporated or does business; (2) 28 U.S.C. § 1331, because the claims asserted herein arise

under the laws of the United States of America and pursuant to the provisions of the general maritime law; and (3) under 33 U.S.C. § 2701 *et seq.,* the Oil Pollution Act ("OPA").

5. The Pointe-au-Chien Indian Tribe has timely presented its damage claims under the Oil Pollution Act of 1990, 33 U.S.C. 2701, et seq. (2006).

6. Venue in this district is proper because the events or omissions giving rise to the claims asserted here occurred in this district, pursuant to 28 U.S.C. §1391. Plaintiff designates this matter as a maritime claim under Rule 9(h) of the Federal Rules of Civil Procedure.

III.

PARTIES

Made Plaintiff herein is:

7. Plaintiff Pointe-au-Chien Indian Tribe ("PACIT") is a tribal government duly recognized by the governments of the State of Louisiana, Terrebonne Parish and Lafourche Parish, organized as a Louisiana non-profit corporation. PACIT has filed a federal petition for recognition with the Department of Interior, Bureau of Indian Affairs. That petition is pending.

8. PACIT is governed by an elected tribal council and chairmen including Chiefs Charles Verdin and Donald Dardar. The council meets in the aboriginal community of lower Pointe-au-Chien, Louisiana, on the southern-most inhabited portion of Bayou Pointe-au-Chien.



9. PACIT's members have lived on Bayou Pointe-au-Chien in an aboriginal territory in Lafourche and Terrebonne Parishes since time

3

immemorial. PACIT's territory was recognized by the MC252 Unified Incident Command ("UIC") and is shown on the UIC map seen here.

10. Most of the Tribe's members live in or near Pointe-au-Chien and fish and hunt in PACIT's aboriginal territory.

Made Defendants herein are:

11. BP EXPLORATION AND PRODUCTION, INC. ("BPXP"), a foreign corporation doing business in the State of Louisiana;

12. BP, PLC ("BPPLC"), a foreign corporation doing business in the State of Louisiana;

13. BP AMERICA PRODUCTION COMPANY ("BPAPC"), a foreign corporation doing business in the State of Louisiana (BPXP, BPPLC and BPAPC are sometimes collectively referred to as "BP" or the "BP Defendants" herein);

14. HALLIBURTON ENERGY SERVICES, INC., ("HESI"), a foreign corporation doing business in the State of Louisiana;

15. SPERRY DRILLING SERVICES, ("Sperry") a division of Halliburton, a foreign corporation doing business in the State of Louisiana (HESI and Sperry are sometimes referred to herein as "Halliburton");

16. TRANSOCEAN HOLDINGS, INC., a foreign corporation doing business in the State of Louisiana;

17. TRANSOCEAN DEEPWATER, INC., a foreign corporation doing business in the State of Louisiana; and

18.     TRANSOCEAN OFFSHORE DEEPWATER DRILLING, INC., a foreign corporation doing business in the State of Louisiana (the Transocean entities are collectively referred to herein as "Transocean").

IV.

STATEMENT OF FACTS

19.     On the evening of April 20, 2010, all Defendants were attempting to temporarily plug and abandon the deep water well known as the MACONDO when it experienced a blowout, causing an explosion and fire aboard the mobile drilling unit named the Deepwater Horizon.

20.     Over the next eighty-seven (87) days, massive quantities of oil discharged from the MACONDO well into the Gulf of Mexico, covering tens of thousands of square miles of ocean and making landfall across the Gulf of Mexico. The MC252 Oil Spill (commonly known as the BP Spill) was in fact the largest oil spill in the history of the United States.

21.     BP was the primary leaseholder of the MACONDO well and its responsibilities included assessing the geology of the site, engineering the well design, obtaining regulatory approvals for well operations, retaining and overseeing the project's contractor's, and working on various aspects of the well and drilling operations.

22.     Transocean was contracted by BP to drill the MACONDO well, which was located in approximately 5,000 feet of water. Transocean was the owner and operator of the Deepwater Horizon and participated and directed various aspects of the drilling activities.

23.     Halliburton and its Sperry division were contracted by BP to provide cementing and mudlogging services, including calculating the proper mud weight to drill the well, well monitoring to ensure safe drilling margins were being maintained, and formulating the cement slurry for the production casing and to plug the well for temporary abandonment.

24. On April 20, 2010 an explosion occurred upon the Deepwater Horizon drilling rig, which subsequently discharged nearly five million barrels of oil into the Gulf of Mexico.

25. The spilled oil directly impacted vast portions of the Gulf of Mexico coastline, including PACIT's aboriginal lands. These are lands historically occupied by tribal members and ancestors, and include tribal cemeteries, sacred sites, Indian mounds, archaeological sites, village sites, shell middens, and traditional fisheries.

26. In early May, as soon as the magnitude of the spill became clear, PACIT's Tribal Council voted to actively participate in the protection of its historic, cultural and natural resources. The Council designated Tribal Chairman Charles Verdin as its representative for all purposes in connection with the incident. On May 23, 2010, PACIT notified Federal On-Scene Coordinator USCG Captain Edwin Stanton of its designation.

27. Because PACIT members are intimately familiar with the marshes, bayous, canals and interior of northern Terrebonne Basin, during the active stage of the spill, PACIT routinely deployed tribal members in their own vessels to assess the tribal territory for the presence of oil contamination. PACIT shared information PACIT gathered with the UIC, including its discovery of "Dead-Bird" Island, an island covered by dead birds.

28. In May and throughout the spill, oil landed on PACIT's aboriginal territory, as depicted in this picture taken on the shores of Lake Chien, and penetrated and otherwise impacted PACIT's aboriginal fisheries.

29. In late May, the Unified Area Command (UAC) designated Pointe-au-Chien as a staging area for response efforts. BP was ordered to train and deploy tribal members to participate

in booming and clean-up operations in PACIT's territory. Under this Vessels of Opportunity Program, PACIT members worked many days protecting its land and cultural and historic sites.

30. In August of 2010, PACIT began its participation in the UIC's Section 106 compliance work regarding the cultural resources potentially impacted by the oil spill, including the delineation of an Area of Potential Impact, as required by the National Historic Preservation Act and the National Contingency Plan.

31. On September 22, 2010, PACIT notified the President, through the Federal On-Scene Coordinator, of PACIT's decision to participate further in the cleanup efforts and damage assessment as a natural resource trustee. PACIT's request was unlawfully denied.

32. In October of 2010, Federal On-Scene Coordinator USCG Captain Perry wrote PACIT to recognize its compliance with the National Contingency Plan and PACIT's valued role in helping the UIC to combat the MC252 oil spill. Captain Perry attached a "Funding Fact Sheet for State and Local Government" that included provisions for the payment of tribal claims, including subsistence.

33. PACIT submitted an interim claim to BP pursuant to the "State and Local Funding Fact Sheet" promulgated by UIC, but BP failed to pay PACIT interim damages required by OPA.

34. In 2011, PACIT was again instructed by UIC to inform the Incident Command concerning the cultural assets found within the PACIT Territory for purposes of compliance with the National Historic Preservation Act. BP contractors subsequently approached PACIT and requested access to confidential data concerning the location and content of PACIT cultural sites.

35. Based on the contractor's commitment that its anthropologic and archeologic work would be shared with PACIT, PACIT divulged a great deal of confidential information for purposes of Section 106 reporting, specifically concerning PACIT's subsistence cultural landscape

and historic and sacred sites. Upon information and belief, BP's contractors have completed the work but have failed or been prevented by BP from sharing their work with PACIT.

36. Throughout the course of the spill, PACIT members were unable to fish as a result of government spill-related closures of its fishing grounds. After fisheries reopened, the resources were less available and subject to greater pressure, causing a decrease in the amount of natural resources available for subsistence use. For these reasons, and because oil contamination caused a reasonable safety concern amongst tribal members, the PACIT sustained a loss of use of subsistence resources they otherwise would have harvested.

37. The MC252 oil spill caused both direct and indirect physical damage to PACIT's aboriginal lands and to its cultural resources.

## V. BINDING PRIOR JUDGMENTS

38. A "Phase One" trial was held between February 25, 2013 and April 17, 2013 to address fault determinations for the loss of well control and resulting blowout. On September 14, 2014, the Court issued its Findings of Fact and Conclusions of Law from the Phase One Trial and apportioned fault under the general maritime law as follows:

   a. 67% - BPXP and BPAPC;
   b. 30% - Transocean; and
   c. 3% - Halliburton.

The Court also determined that defendants' violations of federal regulations directly led to the blowout and explosions.

39. With respect to the BP Defendants, the Court made a factual finding that employees of the BP Defendants engaged in willful misconduct and acted recklessly with regard to the level of care required by the circumstances. The Court also found that the BP Defendants committed a series of negligent acts, some of which were designed to cut time and costs at the

expense of safety, which taken together amounted to gross negligence. The Court determined that the gross negligence and reckless conduct of the BP Defendants and its employees directly led to the loss of well control, explosions and Spill.

40. By early April 2010, BP was well over-budget and nearly two months behind schedule on the Macondo well. Moreover, the HORIZON was under pressure to quickly complete the Macondo well as BP had to spud the Kaskida well by May 16th or potentially lose the lease. Consequently, management made the decisions to rush critical parts of the operation and completely forego others, which decisions directly caused the blowout and Spill. The court found that these decisions, made by BP management, were motivated by the desire to increase profit and made at the expense of safety.

41. Specifically, prior to undertaking the production casing cement job, BP had trouble getting the float collar to convert, a necessary prerequisite to a successful cement job. BP made nine (9) attempts to convert the float collar by repeatedly increasing pressure as mud was pumped down the well. Circulation was finally achieved with 3,142 psi, which is approximately five times the pressure called for by the float collar's manufacturer's specifications. After circulation was achieved, there was a rapid depressurization to 150-200 psi, an anomaly which caused concern among BP personnel about whether the float collar had actually converted or whether the high circulating pressure resulted in a breach of the casing which, in turn, would result in improper cement placement and a failure to achieve zonal isolation. Nonetheless, the decision was made to run the production casing cement job.

42. The Court made the factual finding that there was indeed a breach in the "shoe track" below the float collar. Consequently, no cement was placed in the annulus below the breach point and, therefore, the hydrocarbon-bearing zones were not isolated from the well and had unrestricted access into the casing through the breach in the shoe track. Significantly, BP

9

elected not to run a cement bond log ("CBL") after the cement job which test would have given a clear indication that the cement was improperly placed and permitted BP to remediate the cement job before proceeding with abandonment. This is despite BP's suspicions that the cement job would fail and the fact that a Schlumberger team was standing by on the HORIZON available to perform the CBL if requested.

43. BP's decision not to run the CBL is in addition to other risks that BP took in connection with the cement job, including, but not limited to, its decision to use on 6 centralizers rather than the 21 recommended, its decision not to perform a full bottoms up circulation, and its decision to use a low volume of cement compared to previous jobs. The Court found that BP's decision not to run the CBL when the necessary equipment and personnel were on hand to do so was primarily driven by a desire to save time and money and, further, was a substantial cause of the blowout, explosion and oil spill.

44. The Court also found BP Defendants were responsible for interpreting the negative pressure test, which is a straightforward safety-critical "pass" or "fail" test. The Well Site Leader, Don Vidrine, declared the negative pressure test a success, despite the fact that significant anomalies indicated that the test had failed, specifically the fact that pressure rose to 1400 psi in the drill pipe after it had been bled to zero. In addition, approximately an hour after the test had failed, Mark Hafle, the senior drilling engineer in Houston, spoke to Don Vidrine and told him that the negative pressure test could not be considered a success given the inconsistent pressure readings. Both Vidrine and Hafle, as employees and representatives of the BP Defendants, had authority to shut the well in knowing the negative pressure test was faulty, but did not do so.

45. Vidrine and Hafle were aware of the difficulties encountered with the float collars, the possibility of a failed cement job, and of the decision to forgo the CBL job. The Court concluded this should have increased the level of caution required in interpreting the negative pressure test beyond the "high alert" status already demanded. Accordingly, both Hafle

and Vidrine acted recklessly with respect to the negative pressure test, which reckless conduct was a substantial cause of the spill and the damages sustained by PACIT.

46. The Court found several instances where the conduct of the Transocean fell below the standard of care, including, but not limited to, the misinterpretation of the negative pressure test, failure to detect pressure anomalies, failure to perform flow check and immediate shutdown, and failure to maintain the blowout preventer. Consequently, the Court concluded that Transocean's failures and negligence resulted in the oil pollution from the facility.

47. Halliburton provided engineering services, materials, testing, mixing, and pumping for cementing operations on board the HORIZON and provided onshore engineering support for those operations. Halliburton was also responsible for monitoring the well, including mud pit fluid levels, mud flow in and out of the well, mud gas levels, pressure fluctuations and other "measurement while drilling" and "surface data logging" monitoring. The Court determined that Halliburton's failures and negligent conduct in connection with its monitoring responsibilities led to the loss of well control and Spill.

VI.

CAUSES OF ACTION

48. The Pointe-au-Chien Indian Tribe holds aboriginal title to over six square miles of land and waterbottoms in the coastal zone, including shorelines that were directly damaged or destroyed by oiling and other chemicals, including dispersants. These lands and waterbottoms continue to be damaged and are subject to periodic re-oiling as a result of the presence of oil remaining from the MC252 spill and Louisiana's dynamic coastal processes. As a result, PACIT is entitled to the cost of monitoring, assessing, planning, treating, removing, remediating and restoring the damage caused by the oil and future re-oiling under the Oil Pollution Act and/or the general maritime laws of the United States.

49. A great deal of response equipment was lost during the MC252 response. Much of the lost equipment, including boom, posts, absorbent pom-poms and the like, were pushed into the territory by super tidal forces associated with the tropical storms that occurred in the time of the spill and response. PACIT is entitled to the cost of assessing, removing, and disposing of response debris throughout its territory, for which BP Defendants have been designated the Responsible Party under the Oil Pollution Act, the Clean Water Act and/or the general maritime laws of the United States.

50. The MC252 UIC response also caused direct and indirect physical damage to PACIT's land, cultural and historic sites. For example, the increased boat traffic attendant with VOO operations caused increased erosion at some of these sites. PACIT is entitled to the cost of assessing and restoring damage caused by the MC252 UIC response, for which BP Defendants have been designated the Responsible Party under the Oil Pollution Act, the Clean Water Act and/or the general maritime laws of the United States.

51. PACIT has incurred direct costs for actions taken in response to the spill. PACIT employed members in undertaking its response and experts in guiding its response activities. PACIT leadership spent uncompensated time attending Section 106 forums at the direction of the UIC and to inform the UIC of the condition of the territory and tribal needs. PACIT's actions were deemed by the Unified Command to be consistent with the National Contingency Plan. PACIT's response activities are also presumed to be consistent with the National Contingency Plan and hence reimbursable under the Clean Water Act and/or Oil Pollution Act. PACIT is entitled to reimbursement of all assessment and response costs associated with the MC2525 Oil Spill cleanup response effort.

52. PACIT and its members have and will continue to suffer grievous economic and cultural harm as a direct result of the loss of use of subsistence resources caused by the MC252 Oil Spill. PACIT asserts this claim under the Oil Pollution Act on its own right and in *parens patriae* on behalf of its members. PACIT is entitled to compensatory damages for its loss of use of subsistence resources.

53. Under the Oil Pollution Act, natural resource damages are available to to *any Indian tribe* for natural resources belonging to, managed by, controlled by, or appertaining to such Indian tribe." (emphasis added). PACIT meets the definition of "Indian tribe" under 33 U.S.C. § 2701(15) (2006) as PACIT members are eligible for federal funds under the "Title VII Indian Education Formula Grant Program." 20 U.S.C. § 7112(a) (2006). PACIT children directly benefit from this funding through the Terrebonne Parish School Board. PACIT has historically managed its aboriginal homeland and exerted control over the land through yearly marsh burnings to regenerate the land, protection of the land and sacred sites, collective use of the land for hunting and fishing and self-government as documented by the Bureau of Indian Affairs since the days of Indian removal. All of this, as it relates to PACIT territory, is demonstrated by the filing of an aboriginal land title claim in 1995. Additionally, PACIT managed its territory in the MC252 spill response and through the §106 National Historic Preservation Act process. As a result, PACIT is entitled to access all documents, information, and non-monetary resources belonging to the Unified Command, the documents generated by the Natural Resource Damage Assessment process, and damages for injury to, destruction of, loss of, or loss of use of, natural resources, including the reasonable costs of assessing same.

54. PACIT revealed sensitive and confidential information regarding its cultural resources found throughout the PACIT territory by means of an oral contract entered into with an

agent for BP. BP breached the contract by failing to complete and transmit the promised reports. PACIT is entitled to the anthropological and/or archeological reports it was promised. PACIT demands same.

55. The Court determined that PACIT was injured as a result of the gross negligence and recklessness of the BP Defendants. Though the Court ruled that punitive damages are not available in this particular circuit (as opposed to much of the rest of the country), that particular decision is on appeal. PACIT believes that this portion of the Court's ruling is in error. PACIT asserts that the BP Defendants are liable to it for punitive damages as a result of their gross negligence.

56. These casualties and damages set forth in this Complaint occurred as a direct result of the negligence and/or recklessness and/or gross negligence of BP, Transocean, and Halliburton. These acts of negligence and/or recklessness and/or gross negligence render the Defendants liable to the Plaintiff, Pointe-au-Chien Indian Tribe, pursuant to the laws of the United States of America, the Oil Pollution Act and the general maritime law.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiff Pointe-au-Chien Indian Tribe requests that this Court enter a judgment in favor of plaintiff and against the BP Defendants, the Transocean Defendants, and the Halliburton Defendants for all damages and other relief allowed by law, including:

1) The cost of monitoring, assessing, planning, treating, removing, remediating and restoring the damage caused by the oiling and future re-oiling in PACIT territory;
2) The cost of assessing, removing, and disposing of MC252 response debris throughout PACIT territory;
3) The cost of assessing and restoring damage caused by the MC252 UIC clean-up effort;
4) Reimbursement of all assessment and response related costs associated with the MC2525 Oil Spill cleanup response effort, for which BP has been designated the Responsible Party under the Oil Pollution Act;

5) Compensatory damages for its loss of use of subsistence resources;

6) Damages for injury to, destruction of, loss of, or loss of use of, natural resources, including the reasonable costs of assessing same;

7) Access to all documents, information, and data belonging to the Unified Command or generated by the Natural Resource Damage Assessment process; and

8) The anthropological and/or archeological reports generated by BP made subject to the oral contract of BP's agent;

9) Punitive damages;

10) Any other relief allowed under OPA, the general maritime law, or other relevant statute;

11) Pre-judgment and post-judgment interest at the maximum rate allowed by law;

12) Attorney's fees and costs of litigation; and

13) All other just and equitable relief.

Respectfully Submitted:

WaltzerWiygulGarside

Joel Waltzer (LA #19268)
Clay Garside (LA#29873)
Marc Florman (LA#35128)
Michael Brown (LA#35444)
1000 Behrman Highway
Gretna, LA  70056
Office:  (504) 340-6300
Fax (504) 340-6330
joel@waltzerlaw.com

and

Patty Ferguson-Bohnee
Director, Indian Legal Clinic
Sandra Day O'Connor College of Law
Arizona State University
PO Box 877906
Tempe, AZ  85287
(480) 727-0420

Counsel for Plaintiff
  Pointe-au-Chien Indian Tribe