**Appendix 4: Administrative Agreement**



**UNITED STATES ENVIRONMENTAL PROTECTION AGENCY**
WASHINGTON, D.C. 20460

## BEFORE THE UNITED STATES ENVIRONMENTAL PROTECTION AGENCY

|  |  |  |
|---|---|---|
| In the matter of: | ) | OFFICE OF<br>ADMINISTRATION<br>AND RESOURCES<br>MANAGEMENT |
|  | ) |  |
|  | ) |  |
| BP p.l.c. | ) | EPA Case No. 12-0295-00 |
| BP America, Inc. | ) | EPA Case No. 12-0295-02 |
| BP Exploration and Production Inc. | ) | EPA Case No. 12-0295-05 |
| BP Products North America, Inc. | ) | EPA Case No. 12-0295-06 |
| BP Exploration (Alaska), Inc. | ) | EPA Case No. 12-0295-19 |

## ADMINISTRATIVE AGREEMENT

### I.    INTRODUCTION

This Administrative Agreement ("Agreement") is made between the United States Environmental Protection Agency ("EPA"), acting as lead federal agency, and: BP p.l.c.; BP America, Inc. ("BPA"); BP Exploration and Production Inc. ("BPXP"); BP Products North America, Inc. ("BPPNA"); BP Exploration (Alaska), Inc. ("BPXA"); and other BP Group Entities as set forth herein. For purposes of this Agreement, unless otherwise stated herein, BP Group Entities groupings are designated as set forth in Section II below, and the provisions of this Agreement specifically applicable to these respective groupings are set forth in Section IV herein.

This Agreement resolves all administrative matters relating to suspension and debarment and statutory disqualification, and any suspension and debarment matter based on affiliation or imputation, arising from:

A.  BPXP's January 29, 2013 conviction for violating the Clean Water Act ("CWA"), eleven (11) counts of Seaman's Manslaughter, violating the Migratory Bird Treaty Act ("MBTA") and Obstruction of Congress;

B.  BP p.l.c.'s December 10, 2012 Securities Exchange Commission ("SEC") Judgment Order;

C.  BPXA's November 29, 2007 conviction for violating the CWA; and

D.  BPPNA's March 12, 2009 conviction for violating the Clean Air Act ("CAA").

## II.   DEFINITIONS

**AGENTS.**  Shall mean any person(s) as defined by 2 C.F.R. § 180.985, who act(s) on behalf of or who is authorized by a BP Covered Entity to commit the BP Covered Entity in a business transaction in the United States ("U.S.").

**AFFILIATES.**  As defined in 2 C.F.R. § 180.905, an Affiliate to BP p.l.c. is any entity that directly or indirectly controls or is controlled, or has the power to control or be controlled by BP p.l.c.  In addition, an Affiliate to BP p.l.c. is any entity that is controlled by the same third party as BP p.l.c.  Indicia of control include, but are not limited to: (a) interlocking management or ownership; (b) identity of interests among family members; (c) shared facilities and equipment; (d) common use of employees; or (e) a business entity which has been organized following the exclusion of a person which has the same or similar management, ownership or principal employees as the excluded person.  Affiliates shall not include joint ventures.

**ARM'S LENGTH TRANSACTION.**  Shall mean a bona fide transaction between a purchaser and a seller, each acting independently and having no Affiliate relationship with a BP Group Entity.  Both parties in the transaction are acting in their own self-interest and are not subject to any duress from the other party.

**BP GROUP ENTITIES.**  Shall be used as the generic title for BP p.l.c. and the entirety of Affiliates, subsidiaries, operations, etc. ultimately overseen by BP p.l.c.

**BP AFFILIATES WITH FOREIGN BUSINESS.**  Shall mean a BP Group Entity that is not currently a Respondent or Group US Business but that enters into or is currently a party to a contract with or award by the U.S. under (a) a Federal Government procurement, or (b) nonprocurement transaction in excess of five hundred thousand dollars ($500,000.00), the performance of which will occur outside the U.S. during the term of this Agreement.

**BP COVERED ENTITIES.**  Shall mean Respondents, Group US Businesses, Covered Affiliates and BP Affiliates with Foreign Business.

**BP SENIOR LEVEL LEADER.**  Shall mean BP Covered Entity Employees at Level "F" and above.

**BP'S AUTHORIZED REPRESENTATIVE(S).**  Shall mean the primary contact(s) for BP Covered Entities for the purpose of this Agreement.  That person(s) is listed at paragraph 31 of Section XII (General Provisions) herein.  All matters involving this Agreement shall be coordinated through this person(s), including but not limited to questions, requests and other communications.

**BPXP/BPXA ENTITIES.**  For the purposes of Section IX (Process Safety), BPXP/BPXA Entities shall mean BPXP, BPXA and any Affiliates participating in activities in the waters of the U.S.

**CONTRACTOR.** Shall mean any individual or other legal entity, other than an Employee of a BP Covered Entity or Contract Personnel, with whom a BP Covered Entity has a primary mutually binding legal relationship or contract to conduct business or provide goods or services in the U.S., or to conduct business or provide goods or services on projects under Federal Government procurement or nonprocurement awards worldwide. Contractors shall not be considered Contract Personnel.

**CONTRACT PERSONNEL.** Shall mean administrative staff of an organization other than a BP Covered Entity (who is thus subject to that organization's salary and benefits structure), provided that organization sells the employee's services to a BP Covered Entity on a project or time basis.

**COVERED AFFILIATES.** Shall mean: BP America Production Company; BP Corporation North America Inc.; BP Oil International Limited; Air BP Limited; BP Marine Limited; BP West Coast Products LLC; BP Singapore; BP Australia PTY Limited; BP Marine Global Investments Salah Company LLC; BP Energy Company; Atlantic Richfield Company; BP Amoco Chemical Company; BP Company North America Inc.; Standard Oil; BP International Limited; BP Marine Americas; IGI Resources, Inc.; Castrol Marine Americas; BP Alternative Energy; and BP Pipelines (Alaska), Inc.

**EMPLOYEES.** Shall mean any natural person hired directly by a BP Covered Entity in an employer-employee relationship (and thus subject to the BP Covered Entity's salary and benefits structure) to provide labor or services to the BP Covered Entity. The term includes temporary, full-time or part-time employees who meet the criteria of the preceding sentence, and "Principal," as defined below.

**EPA AUTHORIZED REPRESENTATIVE(S).** Shall mean the EPA official(s) who is the primary EPA contact(s) for the purpose of this Agreement. That person(s) is listed at paragraph 31 of Section XII (General Provisions) herein. All matters involving this Agreement shall be coordinated through this person(s), including but not limited to questions, submittals and other communications.

**EPA INDEPENDENT AUDITOR.** Shall mean the auditor responsible for reviewing and reporting on the BP Covered Entities' compliance with this Agreement. Specific duties and responsibilities of the EPA Independent Auditor, and the BP Covered Entities' obligations with respect to the EPA Independent Auditor, are further set forth herein.

**ETHICS MONITOR.** Shall mean the "Ethics Monitor" set forth in Exhibit B of the January 29, 2013 Plea Agreement in *United States v. BP Exploration and Production, Inc.*, 2:12-CR-00292-SSV-DEK (E.D. La.). Specific duties and requirements of the Ethics Monitor and obligations are set forth in the Remedial Order and in this Agreement.

**FEDERAL GOVERNMENT.** Shall mean any department, agency, division or independent establishment of the Executive Branch of the federal government of the U.S.

3

**GOVERNMENT ENTITY(IES).** Shall mean all U.S. federal, state, commonwealth, territory and local governments, including the governments of the District of Columbia, the Commonwealth of Puerto Rico and other U.S. territories or possessions.

**GROUP US BUSINESSES.** Shall mean BPA and its affiliates, or any successors of BPA and its affiliates, to the extent that their operations are in the U.S. or the waters of the U.S., as well as other BP Group Entities to the extent that they, during the term of this Agreement, conduct substantial operations in the U.S. or waters of the U.S.

**GROUP US EMPLOYEES.** Shall mean all Employees of Group US Businesses who perform duties in the U.S., including any Employees seconded to joint ventures in the U.S.

**PERIOD OF TIME.** The number of days referenced in this Agreement shall be calculated by calendar days, inclusive of all weekdays, weekends and holidays.

**PRINCIPAL.** Shall be defined as set forth in 2 C.F.R. § 180.995 and 48 C.F.R. § 2.101(b). The term Principal includes BP Covered Entities' BP Senior Level Leaders.

**PROCESS SAFETY MONITOR.** Shall mean the "Process Safety Monitor" set forth in Exhibit B of the January 29, 2013 Plea Agreement in *United States v. BP Exploration and Production, Inc.*, 2:12-CR-00292-SSV-DEK (E.D. La.). Specific duties and requirements of the Process Safety Monitor are set forth in the Remedial Order.

**RESPONDENTS.** Shall mean BP p.l.c., BPA, BPXP, BPPNA and BPXA.

**THIRD-PARTY AUDITOR.** Shall mean the "Third-Party Auditor" set forth in Exhibit B of the January 29, 2013 Plea Agreement in *United States v. BP Exploration and Production, Inc.*, 2:12-CR-00292-SSV-DEK (E.D. La.). Specific duties and requirements of the Third-Party Auditor are set forth in the April 19, 2013 Implementation Plan.

**US RESPONDENTS.** Shall mean BPA, BPXP, BPPNA and BPXA.

## III.   RECITALS

### A.   Prudhoe Bay, Alaska

1.     On or about October 24, 2007, the U.S. Attorney for the District of Alaska filed a Criminal Information in the U.S. District Court for the District of Alaska charging BPXA with one (1) count of violating the CWA in connection with two (2) 2006 oil spills. *See* **Attachment 1 (Information,** *U.S. v. BP Exploration (Alaska), Inc.***).**

2.     On or about October 25, 2007, BPXA entered into a Plea Agreement ("Alaska Plea Agreement") with the U.S. Attorney for the District of Alaska, under which BPXA was required to:

    a.  Plead guilty to the aforementioned CWA charge;

4

b. Pay a fine, restitution and community service payment totaling $20 million; and

c. Serve a three-year term of probation.

*See* **Attachment 2 (Plea Agreement, *U.S. v. BP Exploration (Alaska)*).**

3.    On or about November 29, 2007, the U.S. District Court for the District of Alaska entered judgment against BPXA according to the terms of the Alaska Plea Agreement. ***See*** **Attachment 3 (Judgment, *U.S. v. BP Exploration (Alaska)*).**

4.    On or about February 26, 2008, the EPA Suspension and Debarment Official ("EPA SDO") issued a Notice of Statutory Disqualification to BPXA based on BPXA's November 29, 2007 conviction for violating the CWA (Violating Facility – Prudhoe Bay, Alaska Facility). ***See*** **Attachment 4 (February 26, 2008 Notice of Statutory Disqualification).**

5.    On or about December 27, 2011, BPXA completed its term of probation under the Alaska Plea Agreement and fulfilled its obligations thereunder. ***See*** **Attachment 5 (District Court Opinion).**

## B.    Texas City, Texas

1.    On October 22, 2007, the U.S. Attorney for the Southern District of Texas filed a Criminal Information in the U.S. District Court for the Southern District of Texas (Houston Division) charging BPPNA with one (1) felony count of violating the CAA in connection with the March 23, 2005 release and explosion at BPPNA's Texas City, Texas refinery ("Texas City Refinery"). ***See*** **Attachment 6 (Information, *U.S. v. BP Products North America, Inc.*).**

2.    On March 12, 2009, BPPNA entered into a Plea Agreement ("Texas Plea Agreement") with the U.S. Attorney for the Southern District of Texas, under which BPPNA was required to:

a. Plead guilty to the aforementioned CAA charge;

b. Pay a fine of $50 million; and

c. Serve a three year term of probation, during which it would comply with the terms of a Settlement Agreement executed between BPPNA and the U.S. Occupational Health and Safety Administration ("OSHA").

*See* **Attachment 7 (Plea Agreement, *U.S. v. BP Products North America, Inc.*).**

3.    On March 12, 2009, the U.S. District Court for the Southern District of Texas (Houston Division) issued a Memorandum and Order accepting the Texas Plea Agreement and entering judgment against BPPNA according to the terms of that Agreement. ***See*** **Attachment 8**

5

(Memorandum and Order, *U.S. v. BP Products North America, Inc.*); *see also* **Attachment 9** (Judgment, *U.S. v. BP Products North America, Inc.*).

4.      On or about March 20, 2009, the EPA SDO issued a Notice of Statutory Disqualification to BPPNA based on BPPNA's March 12, 2009 conviction for violating the CAA (Violating Facility – Texas City, Texas Refinery). *See* **Attachment 10 (March 20, 2009 Notice of Statutory Disqualification).**

5.      On or about March 12, 2012, BPPNA completed its term of probation under the Texas Plea Agreement. *See* **Attachment 11 (Termination of supervision letter).**

6.      On or about February 1, 2013, BPPNA sold the Texas City Refinery to Marathon Petroleum Corporation. *See* **Attachment 12 (Texas City Refinery Sale Notice).**

**C.    *Deepwater Horizon***

1.      On or about April 20, 2010, the Macondo Well which was being temporarily abandoned by the *Deepwater Horizon* blew out. The blowout resulted in multiple explosions and the release of oil into the Gulf of Mexico. On or about July 16, 2012, the BP Group Entities submitted a Present Responsibility Presentation to the EPA SDO ("July 16, 2012 PRP"). *See* **Attachment 13 (BP July 2012 Present Responsibility Submission)**.

2.      On November 14, 2012, the Federal Government filed a Superseding Indictment in the U.S. District Court for the Eastern District of Louisiana, charging both Robert Kaluza and Donald Vidrine with eleven (11) counts of Involuntary Manslaughter, eleven (11) counts of Seaman's Manslaughter and one (1) count of violating the CWA. *See* **Attachment 14 (Superseding Indictment, *U.S. v. Robert Kaluza and Donald Vidrine*).**

3.      On November 14, 2012, the U.S. Department of Justice ("DOJ") filed an Indictment in the U.S. District Court for the Eastern District of Louisiana charging David Rainey with one (1) count of Obstruction of Congress and one (1) count of making False Statements. *See* **Attachment 15 (Indictment, *U.S. v. David Rainey*).**

4.      On November 15, 2012, the U.S. Attorney for the Eastern District of Louisiana and the Assistant Attorney General for the Criminal Division of DOJ filed a Plea Agreement and Information in the U.S. District Court for the Eastern District of Louisiana, charging BPXP with eleven (11) counts of Seaman's Manslaughter, one (1) count of violating the CWA, one (1) count of violating the MBTA and one (1) count of Obstruction of Congress in connection with the April 20, 2010 *Deepwater Horizon* explosion, oil spill and response. *See* **Attachment 16 (November 15, 2012 Plea Agreement and Information).**

5.      On November 23, 2012, the EPA Suspension and Debarment Division ("EPA SDD") submitted a November 23, 2012 Revised Action Referral Memorandum ("ARM") to the EPA SDO recommending that all Respondents and Covered Affiliates—except for Castrol Marine Americas, BP Alternative Energy and BP Pipelines Alaska—be suspended. The November 23, 2012 ARM is attached hereto. *See* **Attachment 17 (Revised ARM re: BP).**

6

6.　　　On November 28, 2012, the EPA SDO issued a Notice of Suspension to all Respondents and Covered Affiliates—except for Castrol Marine Americas, BP Alternative Energy and BP Pipelines Alaska—based, in part, on criminal charges filed against BPXP on November 15, 2012. *See* **Attachment 18 (Notice of Suspension re: BP).**

7.　　　On December 10, 2012, the U.S. District Court for the Eastern District of Louisiana entered a civil "Final Judgment as to Defendant, BP p.l.c." *See* **Attachment 19 (SEC Final Judgment Order).**

8.　　　On January 4, 2013, in response to EPA SDD's January 4, 2013 Supplemental ARM, the EPA SDO issued a Notice of Suspension to Castrol Marine Americas. *See* **Attachment 20 (Supplemental ARM re: Castrol Marine Americas).**

9.　　　On January 29, 2013, the U.S. District Court for the Eastern District of Louisiana accepted the Plea Agreement between the U.S. and BPXP, and BPXP was convicted of eleven (11) counts of Seaman's Manslaughter, one (1) count of violating the CWA, one (1) count of violating the MBTA and one (1) count of Obstruction of Congress. *See* **Attachment 21 (Judgment, *U.S. v. BP Exploration and Production, Inc.*)**; *see also* **Attachment 22 (April 19, 2013 Implementation Plan).**

10.　　On February 1, 2013, the EPA SDO issued a Notice of Statutory Disqualification to BPXP based on BPXP's January 29, 2013 conviction for violating the CWA. *See* **Attachment 23 (February 1, 2013 Notice of Statutory Disqualification).**

11.　　On February 15, 2013, the Respondents and Covered Affiliates submitted their opposition to the November 28, 2012 Notice of Suspension and the EPA SDO's February 1, 2013 Notice of Statutory Disqualification. *See* **Attachment 24 (BP's February 15, 2013 Presentation of Matters in Opposition).**

12.　　On July 19, 2013, after additional submissions were made by the parties, the EPA SDO issued his decision continuing the suspensions. *See* **Attachment 25 (EPA SDO's July 19, 2013 Written Decision).**

13.　　On August 12, 2013, Respondents and Covered Affiliates filed a Complaint for Declaratory and Injunctive Relief in the U.S. District Court for the Southern District of Texas in which Respondents and Covered Affiliates challenge EPA's November 28, 2012 and January 4, 2013 suspension actions and EPA's February 1, 2013 statutory disqualification action. *See* **Attachment 26 (BP's August 12, 2013 Complaint).**

14.　　On November 22, 2013, EPA SDD submitted a second Revised Action Referral Memorandum and Exhibits (collectively, "November 22, 2013 ARM") to the EPA SDO recommending the continued suspension and proposed debarment of Respondents and Covered Affiliates. *See* **Attachment 27 (November 22, 2013 ARM).**

15.     On November 26, 2013, the EPA SDO issued a Notice of Continued Suspension and Proposed Debarment to Respondents and Covered Affiliates. *See* **Attachment 28 (November 26, 2013 Notice of Continued Suspension).**

**NOW WHEREFORE,**

Recognizing the information described above is grounds for debarment as it raises issues concerning the BP Covered Entities' present responsibility as Federal Government contractors, and nonprocurement transaction participants;

ensuring the integrity of procurement and nonprocurement programs of the EPA and other federal agencies; and

resolving all issues of discretionary and statutory suspension and debarment pursuant to 48 C.F.R. Subpart 9.4 and 2 C.F.R. Part 180, 33 U.S.C. §1368(a), and 42 U.S.C. §7606(a) that arise from said criminal convictions;

BP Covered Entities agree as follows:

## IV.    SCOPE AND APPLICATION

**1.     Role of BP p.l.c.**  To the extent expressly set forth in the following enumerated paragraphs, paragraph 2 of Section V (Compliance with Other Agreements); paragraphs 1-3, 5A, 5C, 7C, 10A, 11 and 14 of Section VII (Ethics & Compliance); Section VIII (Corporate Governance); paragraph 8 of Section IX (Process Safety); Section X (BP Covered Entities' Annual Reports); and all paragraphs of Section XII (General Provisions) except paragraphs 6 and 12, apply to BP p.l.c.  In addition to the specific obligations set forth in this Agreement for BP p.l.c., BP p.l.c., as guarantor of this Agreement, shall: (a) irrevocably guarantee that, in the event of any failure of the BP Covered Entities to meet their obligations under this Agreement, BP p.l.c. will cause the BP Covered Entities to meet such obligations; (b) irrevocably commit that it will comply, and will cause each of the BP Covered Entities to comply, with the terms of this Agreement; and (c) consent to the jurisdiction of the U.S. courts solely for purposes of resolving issues with this Agreement.

**2.     Role of Group US Businesses.**  Except for those obligations in this Agreement that are specifically assigned or limited to other BP Covered Entities, such as certain provisions under Section VIII (Corporate Governance) and Section IX (Process Safety), the provisions of this Agreement apply to Group US Businesses and Group US Employees.

**3.     Role of BP Affiliates With Foreign Business.**  Provisions set forth at paragraphs 5A, 5C, 8A, 8C and 11 of Section VII (Ethics & Compliance) of this Agreement, and all paragraphs of Section XII (General Provisions), except paragraphs 6 and 12, apply to BP Affiliates with Foreign Business and to the Employees of the particular BP Affiliate with Foreign Business to the extent expressly set forth in those enumerated paragraphs.

8

4.     **Election of BP Affiliates With Foreign Business.**  A BP Affiliate with Foreign Business that is also a Covered Affiliate that determines not to implement the terms of this Agreement applicable to BP Affiliates with Foreign Business shall send written notice to the EPA Authorized Representative(s) and the BP Authorized Representative(s) within ninety (90) days of the Effective Date of this Agreement, and to the EPA Independent Auditor upon retention. Upon such notice, the BP Affiliate with Foreign Business shall forego participating in covered procurement or nonprocurement transactions with the Federal Government during the term of this Agreement, and shall promptly enter into a voluntary exclusion agreement in the form attached as Attachment 29.  The terms and obligations of this Agreement shall no longer apply to the BP Affiliate with Foreign Business and such entity shall not be considered a party to this Agreement.

5.     **Election of BP Group Entities to Become BP Affiliates with Foreign Business.**  A BP Group Entity which is not currently a BP Covered Entity but which enters into a contract with or award by the U.S. under (a) a Federal Government procurement transaction, or (b) Federal Government nonprocurement transaction in excess of five hundred thousand dollars ($500,000.00), the performance of which will occur outside the U.S. during the term of this Agreement, shall become a BP Affiliate with Foreign Business upon the effective date of the contract.  Any such entity shall send written notice to the EPA Authorized Representative(s), the EPA Independent Auditor and the BP Authorized Representative(s) by electronic mail and certified mail or equivalent within sixty (60) days of entering into such contract.  The written notice shall be signed by an authorized BP Group Entity officer stating that the BP Group Entity has a copy of this Agreement and agrees to be bound by it.  Such notice shall become an addendum to this Agreement.

## V.     COMPLIANCE WITH OTHER AGREEMENTS

## 1.     COMPLIANCE WITH THE TERMS OF PROBATION

BPXP shall comply in full with the terms and conditions of probation ("Terms of Probation") imposed upon it by the U.S. District Court for the Eastern District of Louisiana at sentencing in the matter of *United States v. BP Exploration and Production, Inc.*, 2:12-CR-00292-SSV-DEK (E.D. La.), and entered by the Court on January 29, 2013.  The Terms of Probation address deepwater drilling operations, process safety, Ethics & Compliance and other matters as set forth in the Remedial Order (Exhibit B of the Plea Agreement), and the Implementation Plan, as approved by DOJ and the Probation Officer as of April 19, 2013. Unless modified by the Court, the period of probation extends for five (5) years after entry of the Remedial Order.  The Plea Agreement, Remedial Order, Implementation Plan and Judgment in the Criminal Case are attached hereto and hereby incorporated by reference as if restated in full.

A.     The Remedial Order and Implementation Plan are applicable to BPXP, and its affiliates, controlled directly or indirectly by BP p.l.c., that participate in deepwater drilling operations in the Gulf of Mexico, whether such entity is in existence now or in the future.

B.     Compliance with the Implementation Plan's provisions is a special condition of

9

BPXP's probation.  As set forth in the Remedial Order and Implementation Plan, BPXP is required to provide prompt notice to the Probation Officer and DOJ of its failure to comply with any of the provisions of the Implementation Plan, including meeting any of the interim milestones, and to submit a proposal for corrective action.  As specified in the Implementation Plan, failure to comply with the Implementation Plan may be grounds for the revocation or modification of BPXP's probation.  (*See* Implementation Plan, Non-compliance, Paragraph G.)

C.      BPXP shall implement those final recommendations or corrective action plans (after any dispute resolution process) resulting from the work of the Ethics Monitor, Process Safety Monitor or Third-Party Auditor under the Remedial Order, and progress on the implementation of any such recommendations or corrective action plans shall be reported pursuant to the Remedial Order.

D.      BPXP shall submit to the EPA Authorized Representative(s) and EPA Independent Auditor any correspondence BPXP is required to submit to the U.S. as described in the DOJ-approved Implementation Plan, including prompt notice of non-compliance with the Implementation Plan and its proposal for corrective action.

E.      BPXP shall notify the EPA Authorized Representative(s) and EPA Independent Auditor within ten (10) days of BPXP's discovery of any violation of the Terms of Probation or the Implementation Plan as well as any failure to comply with the Terms of Probation, Remedial Order or Implementation Plan identified by the Third-Party Auditor, Process Safety Monitor or Ethics Monitor that may lead to a Court finding of a violation of Probation.

F.      BPXP's violation of the Terms of Probation, as determined by the District Court, may constitute a breach of this Agreement.  Revocation of BPXP's probation by the District Court shall constitute a material breach of this Agreement.

G.      No terms of this Agreement are meant to conflict with the Terms of Probation as required by the Plea Agreement.  To the extent that any requirements of this Agreement conflict with the Terms of Probation as required by the Plea Agreement, BPXP shall provide notice to the EPA Authorized Representative(s) and the EPA Independent Auditor of such conflict, and the Terms of Probation shall take precedence over and preempt the requirements of this Agreement.

## 2.      COMPLIANCE WITH THE SEC JUDGMENT ORDER

BP p.l.c. shall comply in full with the terms and conditions of the SEC Judgment Order entered by the U.S. District Court for the Eastern District of Louisiana on December 10, 2012 in the matter of *Securities Exchange Commission v. BP p.l.c.*, 2:12-cv-2774-CJB-SS (E.D. La.). The SEC Judgment Order and all attachments or exhibits to that document are attached hereto and hereby incorporated by reference as if restated in full.

A.    BP p.l.c. shall notify the EPA Authorized Representative(s) within ten (10) days of BP p.l.c.'s discovery of any violation of the terms and conditions of the SEC Judgment Order.

B.    BP p.l.c. shall submit to the EPA Authorized Representative(s) and the EPA Independent Auditor any correspondence BP p.l.c. is required to submit pursuant to the SEC Judgment Order in accordance with the schedules set forth in those documents.

C.    BP p.l.c.'s violation of the terms and conditions of the SEC Judgment Order, as determined by the SEC, may constitute a breach of this Agreement.

## VI.    COORDINATION WITH PLEA AGREEMENT MONITORS

1.    BPXP shall provide the EPA Independent Auditor and the EPA Authorized Representative(s) with the reports of the Ethics Monitor and Process Safety Monitor under the Remedial Order within ten (10) days of receipt.

2.    The EPA Independent Auditor shall submit all of the EPA Independent Auditor's written reports pursuant to the terms of this Agreement to the Ethics Monitor, the Third-Party Auditor (for informational purposes) and the Process Safety Monitor.

3.    BPXP shall provide the Third-Party Auditor reports to the EPA Authorized Representative(s) within ten (10) days of receipt.

## VII.    ETHICS & COMPLIANCE

**1.    ETHICS & COMPLIANCE PROGRAM(S).** BP p.l.c. shall continue to maintain an independent Ethics & Compliance function (not reporting to the operating businesses) to support the operating businesses and the BP Covered Entities as described in the following paragraphs.

In addition to the duties set forth under the Remedial Order, the Ethics Monitor shall have the duties set forth in this Paragraph. The Ethics Monitor shall review the programs set forth in this Section VII (Ethics & Compliance) and in paragraphs 1C, 2A and 2D of Section VIII (Corporate Governance), in accordance with the schedule set forth in the Ethics Monitor's work plan pursuant to the Remedial Order. Provided that the Ethics Monitor completes three (3) complete cycles of review during the period of this Agreement, the Ethics Monitor may exercise its discretion to make modifications to the schedule and work plans, as appropriate. The Ethics Monitor shall review, and may make recommendations for improvement with respect to, the programs set forth in the Ethics & Compliance and Corporate Governance terms identified in this paragraph and their implementation by BP p.l.c. and/or specific Group US Businesses. to the extent that such terms of this Agreement apply to BP p.l.c. and/or Group US Businesses. The Ethics Monitor may provide that certain recommendations apply only to a specific Group US Business or shall be phased in throughout Group US Businesses in an orderly manner. The Ethics Monitor shall continue to report, based on the Remedial Order review schedule, to the EPA Authorized Representative(s), the EPA Independent Auditor and BP's Authorized

11

Representative(s) on the status of improvements.

Upon each review, the Ethics Monitor shall prepare a written report to document the review along with any recommended or required improvements to the programs set forth in the Ethics & Compliance and Corporate Governance terms identified in this paragraph and their implementation within the applicable Group US Businesses. The report shall clearly designate which recommendations are made pursuant to the Remedial Order and which are made pursuant to this Agreement. The Ethics Monitor shall submit these reports to the EPA Authorized Representative(s), the EPA Independent Auditor and BP's Authorized Representative(s).

BPA shall cause to be implemented those final recommendations (after any dispute resolution process) resulting from the work of the Ethics Monitor under this Agreement. To the extent that BPA disputes any recommendation of the Ethics Monitor, BPA shall notify the Ethics Monitor in writing within thirty (30) days of receiving the report, and BPA and the Ethics Monitor shall meet in good faith to attempt to resolve the dispute. If the dispute cannot be resolved within forty-five (45) days after BPA provides written notice to the Ethics Monitor, BPA shall inform the EPA Authorized Representative(s) in writing, and EPA shall determine whether the recommendation shall be implemented.

**2.     AUDITING ETHICS & COMPLIANCE.** BP p.l.c. shall conduct internal and/or commissioned external audits of Group US Businesses to be conducted with respect to key Ethics & Compliance risks each year. Audits may address one or more elements of Ethics & Compliance programs in place to meet the objectives of the BP Code of Conduct ("Code" or "Code of Conduct"), including compliance, risk assessment, internal controls or other topics. The results and/or findings of these audits shall be provided to the Group Ethics & Compliance Officer ("GE&CO"), the EPA Authorized Representative(s), the EPA Independent Auditor, the Ethics Monitor and the BP Authorized Representative(s) within ten (10) days of issuance, along with any recommendations and timelines for improvement or necessary remedial action.

**3.     SCHEDULE OF AUDITS.** Beginning in the last quarter of 2014 calendar year, BP p.l.c. shall provide the EPA Independent Auditor, the Ethics Monitor and the EPA Authorized Representative(s) with a schedule of all formal internal and commissioned external audits planned for Group US Businesses for the calendar year pursuant to paragraph 2 of Section VII (Ethics & Compliance). The schedule of audits shall include a description of the audit, the name and contact information of any lead external auditor and, when applicable, dates or proposed dates of the audits. BP p.l.c. may modify the schedule during the course of the year.

**4.     ETHICS & COMPLIANCE STAFFING.** The Ethics Monitor may review and make recommendations regarding general Ethics & Compliance staffing levels and resources within the Group US Businesses.

**5.     BP CODE OF CONDUCT.**

A.     BP p.l.c. shall maintain a Code of Conduct for BP Covered Entities to:

12

1.      Provide rules and/or guidance for compliance in areas such as Health, Safety, Security and the Environment ("HSSE"); conflicts of interest; competition; trade restrictions; export controls; money laundering; and bribery and corruption.

2.      Include or reference guidance to assist Employees in making proper decisions when faced with difficult situations involving Ethics or Compliance.

3.      Specify that Employees are obligated to report discovery of any violations or potential violations of the Code or legal requirements. In support of this obligation, the Code shall also outline other channels available for raising concerns, including the OpenTalk program.

4.      Include a zero tolerance statement against any form of retaliation against Employees or Contractors who raise good faith concerns regarding compliance, safety and/or ethics.

B.      Code of Conduct Certification

1.      BPA shall continue to implement MyPlan or its equivalent system.[1] BPA shall ensure that MyPlan (or equivalent) is designed so that Group US Employees who use MyPlan (or equivalent) shall submit annual certifications of their compliance with the Code by the end of the first quarter of the following calendar year. At a minimum, beginning in calendar year 2015, the Code of Conduct certification shall state that the Group US Employee has in the prior calendar year: adhered to the Code of Conduct; reported compliance concerns or exceptions through available reporting channels; and been advised about, or was aware of, the OpenTalk program. The system shall be designed so that:

     a.      Beginning with certifications for the calendar year 2014, Group US Employees who use MyPlan (or equivalent) shall be required to certify annually through MyPlan that they are familiar with the Code of Conduct and have complied with the Code, except for breaches that he or she has reported.

     b.      Group US Employees using MyPlan (or equivalent) who are hired on or after July 1, 2014 shall certify, no later than the first completed cycle of MyPlan that they have read the Code and agree to abide by it.

---

[1] MyPlan is a performance evaluation system generally used by Group US Employees, components of which include certifications and performance priorities. Certifications for calendar year 2013 were completed in early 2014. The calendar year 2014 cycle will be completed in early 2015.

2.    Beginning with certifications for calendar year 2014, BPA shall require Group US Business and function Senior Level Leaders who use MyPlan (or equivalent) and who have direct reports who are Group US Employees to certify as part of the review under MyPlan (or equivalent) that they have discussed with their teams as part of the My Plan review:

    a.    The content and application of the Code.

    b.    Encouragement to report potential Code violations and other Ethics & Compliance concerns through OpenTalk and other reporting programs.

    c.    Instructions on the use of OpenTalk and other reporting programs.

    d.    That BPA may take disciplinary action, including discharge, for any violation of law, regulation or the Code of Conduct.

    e.    An explanation of the non-retaliation policy or statement.

C.    Enforcement

1.    BP Covered Entities shall continue to apply sanctions for Employees found to have breached the Code.  Such sanctions may include: oral or written warnings; loss of variable compensation; dismissal and referral to appropriate authorities for civil or criminal proceedings; or other appropriate actions, depending on the nature of the breach.

2.    BPA shall provide the Ethics Monitor with relevant information and documentation regarding BP p.l.c.'s development and implementation of its prior and now inactive tracking system for Code breaches within six (6) months of the Effective Date of this Agreement.

3.    BP Covered Entities shall continue to impose consequences as appropriate, including but not limited to those sanctions set forth in paragraph 5(C)(1) of Section VII (Ethics & Compliance), herein, on Contractors working for BP Covered Entities whose performance violates the Code.

**6.    RISK-BASED COMPLIANCE STANDARDS AND PROCEDURES.**  BPA shall maintain policies and/or standards and control processes designed to prevent, detect and remediate unethical or illegal conduct with respect to Group US Businesses.

A.    BPA shall continue to maintain a centrally organized, online register to record potential conflicts of interest.

14

B.     BPA shall continue to maintain a centrally organized "gifts and entertainment" register to record receiving and giving of gifts and entertainment between Group US Employees and third parties.

**7.      COMMUNICATIONS REGARDING ETHICS & COMPLIANCE ISSUES.** BPA shall maintain a communications plan for Group US Businesses that promotes awareness of Ethics & Compliance topics and includes: communication activities to be undertaken; the status of such activities; the channel of communications; and the timing of such messaging and actions. More specifically:

A.     Communications channels and media shall be tailored to the target audience and may include, among other communications: communications in the form of posters, banners, brochures, leaflets and cards; "town hall" briefings; videos; and postings on the intranet and bp.com.

B.     BP p.l.c.'s intranet shall contain an Ethics & Compliance site, which shall contain Ethics & Compliance information.  Ethics & Compliance information may include, among other information: relevant Ethics & Compliance staff information; information about the OpenTalk (or equivalent) reporting channel; information on key risks faced by BP Group Entities; the Code of Conduct; links to key standards, policies and guidance; and summaries of certain OpenTalk cases and actions taken based upon these cases.

C.     The BP Group Chief Executive ("GCE") shall continue to set the tone from the top by annually communicating to all Employees with respect to expectations regarding compliance with the Code of Conduct.

**8.      ETHICS & COMPLIANCE TRAINING.**  As set forth in this paragraph, Ethics & Compliance Training shall include Code of Conduct training, targeted Ethics & Compliance training and ethical leadership training.

A.     Code of Conduct Training for Employees

1.     Beginning in the last quarter of calendar year 2014, and on an annual basis thereafter, BPA shall provide Ethics & Compliance training that includes one (1) or more topics under the Code of Conduct to Group US Employees, and BP Affiliates with Foreign Business shall provide Ethics & Compliance training that includes one (1) or more topics under the Code of Conduct to their Employees.  The first annual training shall be completed no later than March 1, 2015.

2.     BPA shall provide training on the Code of Conduct for all new Group US Employees hired on or after July 1, 2014, and BP Affiliates with Foreign Business shall provide a training program on the Code of Conduct for all of their new Employees hired on or after January 1, 2015.  The training

program shall be designed to provide training for each new Employee no later than ninety (90) days after their date of hire.

3. The Code of Conduct training program for Group US Employees and Employees of BP Affiliates with Foreign Business shall:

    a. Reference and reinforce the availability of the OpenTalk system.

    b. Emphasize the importance of compliance with laws and regulations requiring reporting of financial and other information to government agencies.

    c. Emphasize the importance of adherence to operating, safety and process standards in maintaining a safe workplace.

    d. Emphasize the importance of ethical conduct and adherence to the Code of Conduct.

B. Targeted Compliance Training for Group US Employees

1. Beginning in the last quarter of 2014 calendar year, BPA shall annually identify appropriate positions occupied by Group US Employees for targeted compliance training and the subject matter of the training, and shall prepare a plan for providing such targeted compliance training. Targeted compliance training shall cover one (1) or more Ethics & Compliance topics, such as: Our Code; Anti-Bribery and Corruption; Anti-Money Laundering, Competition and Anti-Trust; Trade Sanctions; and Conflicts of Interest. New Group US Employees hired into those positions identified for targeted training shall receive this training within one (1) year of hire.

C. Leadership Training Program for Senior Level Leaders

1. BPA shall continue to provide leadership training for BP Senior Level Leaders and above who are Group US Employees, and BP Affiliates with Foreign Business shall provide leadership training for BP Senior Level Leaders who are their Employees.

2. BP Senior Level Leaders and above subject to paragraph 8(C)(1) of Section VII (Ethics & Compliance) who are hired or promoted into such positions on or after July 1, 2014 shall receive leadership training within the first year of hire or promotion into such positions.

3. The leadership training program required by paragraph 8(C)(1) of Section VII (Ethics & Compliance) currently includes the following objectives:

16

a.      Define ethics and articulate the business case for ethical behavior.

b.      Describe the impact that personal values have on behavior and decision making.

c.      Describe effective ethical decisions using a structured decision making model.

d.      Identify leadership behaviors necessary to create and sustain an ethical culture.

e.      Identify leadership behaviors necessary to create and sustain a speaking up culture.

f.      Encourage ethical leadership.

## 9.   TRACKING OF TRAINING

A.      BPA shall continue to develop a centralized database to track, among other things, Ethics & Compliance training provided to Group US Employees, subject to review by the Ethics Monitor.

B.      Upon full implementation of the centralized database, BPA shall maintain the database to track the completion of Code of Conduct, targeted compliance and leadership training sessions by Group US Employees.

C.      BPA shall retain relevant documentation (such as summaries and training materials) used in the course of such training for the duration of this Agreement.

## 10.  REPORTING AVENUES

A.      OpenTalk. BP p.l.c. shall maintain the OpenTalk program as permitted by law in the applicable jurisdiction, or a substantially similar replacement program, that allows Employees, Contractors or any other third party to raise concerns or seek guidance about Ethics & Compliance or the Code of Conduct.

1.      BPA shall post the dedicated contact information for OpenTalk at the usual place for posting employment-related information and on the company's intranet site.

2.      The OpenTalk program shall continue to provide Employees and Contractors access twenty-four (24) hours a day, seven (7) days a week. Concerned individuals shall be able to contact OpenTalk through a number of avenues such as the web, fax, telephone or letter, and shall be able to maintain their anonymity (unless legally impermissible in their jurisdiction).

17

3.    BPA shall continue to promote awareness of OpenTalk.  Any such program to promote awareness shall include signage or other forms of communications directed at Employees without computer access.  The program shall provide information about speaking up, listening, and taking actions consistent with the obligations under the Code of Conduct.

4.    On an annual basis, and consistent with applicable privacy laws, the GE&CO shall compile a summary report of information pertaining to the nature, status and outcome of significant investigations resulting from calls to OpenTalk originating in the applicable BP Covered Entities during the previous year, and provide that report to the EPA Authorized Representative(s), the Ethics Monitor and the EPA Independent Auditor.

5.    During the term of the Agreement, BPA shall maintain a system for tracking concerns reported to OpenTalk related to Group US Businesses.

**11.    NON-RETALIATION STATEMENT.**  BP Covered Entities shall prohibit retaliation, reprisal or harassment by any Employees against any individual, including an Employee, Contractor, Contract Personnel or consultant for making any report or notification raising any good faith questions or concerns related to issues regarding: an actual or potential violation(s) of this Agreement; an actual or potential violation of any federal, state or local law or regulation; or an actual or potential violation of the Code of Conduct or other rules or policies.  BP Covered Entities shall take appropriate action, in accordance with the BP Code of Conduct, against any Employee who violates the non-retaliation statement.

**12.    FRAUD AND MISCONDUCT INVESTIGATIONS.**  In accordance with BP p.l.c's Fraud and Misconduct Reporting Standard and its Investigation Guidelines, as they may be amended or revised from time to time:

A.    BPA shall review reportable allegations of fraud and misconduct related to the applicable Group US Businesses that are reported to Ethics & Compliance, the Fraud and Misconduct Investigation Team or other recognized channels for reporting.  BPA shall investigate credible allegations, and the results of these investigations shall be recorded.

B.    Results from investigations conducted under subparagraph 12(A) above involving findings of fraud or misconduct, and any proposed corrective actions, shall be reviewed by the appropriate leader in the applicable Group US Business where the incident occurred.  That leader shall be responsible for implementing corrective actions, within the applicable Group US Business.

**13.    EMBEDDING COMPLIANCE PROGRAMS AT THE BUSINESS UNIT LEVEL.**
BPA shall continue to embed Ethics & Compliance Leaders ("ECLs") in Group US Businesses.
The ECLs shall support and assist in the implementation of Ethics & Compliance standards, training and communications in their respective Group US Businesses.

A.     Current ECL job responsibilities include:

      1.     Encouraging Group US Employees and Contractors who work for Group US Businesses to speak up about Ethics & Compliance issues, including through the use of OpenTalk;

      2.     Supporting or facilitating, as appropriate, the delivery of Ethics & Compliance training, including Code of Conduct training;

      3.     Meeting or communicating with management teams for their respective Group US Businesses and with the respective Ethics & Compliance Regional Directors on matters related to Ethics & Compliance;

      4.     Maintaining awareness of the overall Ethics & Compliance risks that have been identified for the particular business in which the ECL is located, and recommending interventions as needed;

      5.     Communicating broader Ethics & Compliance issues to the Ethics & Compliance function; and

      6.     Staying informed of Ethics & Compliance issues through regular communications and contact between ECLs and Ethics & Compliance staff associated with their respective business.

B.     The job responsibilities set forth above may be amended from time to time provided that ECLs continue to support and assist in the implementation of Ethics & Compliance standards, training and communications in their respective Group US Businesses.

## 14.    INCENTIVES FOR INDIVIDUALS AND BUSINESS UNITS.

A.     BP p.l.c. or BPA shall maintain an Employee compensation system for Group US Businesses which includes a variable pay plan, or annual cash bonus, paid to eligible (non-union) Group US Employees on an annual basis. The variable pay plan will continue to provide variable pay contingent upon both individual and business unit performance using key objectives, including key safety goals and metrics.

B.     BP p.l.c. or BPA shall maintain the MyPlan evaluation system, or a similar replacement system, for eligible Group US Employees. The MyPlan evaluation system, or similar replacement system, shall require all eligible Group US Employees to work with their supervisors to set objectives for job performance in the following areas, among others: (1) contributions to safety, compliance and risk management, which includes compliance with the Code of Conduct, laws and regulations; (2) values and behaviors; and (3) personal development actions.

Under this system, eligible Group US Employees shall be required to submit annual certifications of their compliance with the Code of Conduct, which shall continue to require compliance with all applicable regulations.

C. The compensation of Group US Businesses' Executive Leaders at Level D or above shall continue to be explicitly tied to safety performance and operational risk management through BP p.l.c.'s "Group Performance Factor" or a similar replacement mechanism. Bonus stock awards for such executives shall continue to be dependent on meeting criteria which include an assessment of safety and environmental sustainability (*i.e.*, reinforcement of safety culture within BP).

**15.     AWARD/SPOT BONUS INCENTIVE PROGRAM.** BPA shall maintain an award program by which managers in Group US Businesses may reward Group US Employees with cash bonuses and/or other recognition for outstanding contributions to the company's ethical culture, compliance with HSSE principles and regulatory compliance assurance. BPA shall provide awards to selected Group US Employees.

**16.     KAPLAN REPORT REVIEW AND IMPLEMENTATION.** BPA shall provide the Kaplan Report (an evaluation of BP p.l.c.'s Ethics & Compliance programs by an outside consultant) to the EPA Independent Auditor, the EPA Authorized Representative(s) and the Ethics Monitor. The Ethics Monitor shall consider all recommendations in the Kaplan Report and may incorporate Kaplan Report recommendations in its reviews, as appropriate.

**17.     ETHICS MONITOR REVIEW OF SYSTEMIC ISSUES.** The Ethics Monitor shall be provided an opportunity to review past culture assessments and surveys, including any employee engagement surveys (including methodology and implementation) conducted for Group US Businesses for a period of not greater than five (5) years prior to the Effective Date of this Agreement. Additionally, using the methodology identified in his Work Plan at Section II.B., the Ethics Monitor shall review the existing culture and compliance environment at Group US Businesses. The Ethics Monitor will provide his findings and conclusions as part of his reports to the BP Authorized Representative(s), the EPA Authorized Representative(s) and the EPA Independent Monitor.

## VIII.   CORPORATE GOVERNANCE

**1.     EXECUTIVE AND BOARD OVERSIGHT OF ETHICS & COMPLIANCE FUNCTION**

A. BP p.l.c. Board of Directors. The BP p.l.c. Board of Directors ("BP p.l.c. Board") and its committees shall, consistent with applicable law, provide oversight regarding BP Covered Entities' performance under this Agreement. Such oversight shall comprise compliance with the matters described in the remainder of this sub-paragraph A (publication of Board governance principles), the following sub-paragraph B (maintenance of MBAC and SEEAC committees or replacement committees), considering reports from the GE & CO as described in paragraph 2B of this Section VIII, and paragraphs 3 and 4 of this Section VIII

20

(Board Recognition and Annual Reporting). The BP p.l.c. Board shall continue to maintain documented "Board Governance Principles" and shall continue to make the documentation available on the BP public website. Any change to the "Board Governance Principles" shall be documented and made available on the BP public website.

B.      The BP p.l.c. Board shall maintain the Safety, Ethics and Environmental Assurance Committee ("SEEAC") and the Main Board Audit Committee ("MBAC") (or replacement committees) that are accountable for their oversight functions as set forth in the "Board Governance Principles." The SEEAC and MBAC currently are accountable for the following oversight functions:

   1.      With respect to SEEAC:

        a.      Monitoring and obtaining assurance that the GCE's internal control system for operations is designed and implemented effectively in support of his observance of the relevant executive limitations.

        b.      Monitoring and obtaining assurance that the management or mitigation of significant BP risks of a non-financial nature is appropriately addressed by the GCE.

        c.      Receiving and reviewing regular reports from the GCE, or his delegate, the Group Internal Auditor and the GE&CO regarding the GCE's adherence to the relevant executive limitations and his management in responding to risk.

        d.      Reviewing material to be placed before shareholders which addresses environmental, safety and ethical performance and making recommendations to the BP p.l.c. Board about their adoption and publication.

        e.      Reviewing reports on the BP Group Entities' compliance with the Code of Conduct and on its employee concerns program, OpenTalk (or its equivalent replacement system), as it relates to non-financial issues.

        f.      Recommending to the BP p.l.c. Board any changes or further delineation of the executive limitations in relation to non-financial matters.

   2.      With respect to MBAC:

        a.      Monitoring and obtaining assurance that the GCE's internal control system is designed and implemented effectively in support of his observance of the relevant executive limitations.

21

b.      Monitoring and obtaining assurance that the management or mitigation of significant BP risks of a financial nature is appropriately addressed by the GCE.

c.      Receiving and reviewing regular reports from the GCE, or his delegate, the Group Internal Auditor and the GE&CO regarding the GCE's adherence to the relevant executive limitations and his management in responding to risk.

d.      Monitoring and obtaining assurance that the legally required standards of disclosure are being observed.

e.      Reviewing financial disclosure documents to be placed before shareholders or filed with regulatory bodies and making recommendations to the BP p.l.c. Board about their adoption and publication.

f.      Monitoring and reviewing the effectiveness of BP's internal audit function.

g.      Reviewing BP's internal financial controls and its systems of internal control and risk management.

h.      Reviewing and monitoring the external financial auditor's independence, objectivity and the effectiveness of the audit process and recommending to the BP p.l.c. Board the appointment, reappointment and removal of the external auditor and approving the auditor's remuneration and terms of engagement.

i.      Implementing and monitoring policy on the engagement of the external auditor to supply non-audit services to BP.

j.      Reviewing the systems in place, including OpenTalk (or equivalent replacement system), enabling those who work for BP Group Entities to raise, in confidence, any concerns about possible improprieties in matters of financial reporting or other financial issues and for those matters to be appropriately investigated.

k.      Recommending to the BP p.l.c. Board any changes or further delineation of executive limitations in relation to financial matters.

C.      BP p.l.c. shall continue to maintain the Ethics & Compliance Committee ("ECC"), or a similar replacement executive committee, subject to any changes required or recommended by the Ethics Monitor.  The ECC shall continue to: provide oversight and direction to BP's Ethics & Compliance program; meet on a

22

quarterly basis; and be chaired by the GCE and/or the GE&CO. The ECC shall continue to be responsible for:

1. Reviewing further development of the Ethics & Compliance program, including new initiatives and improvements, and monitoring Ethics & Compliance performance, including training, audits and certifications;

2. Reviewing significant Ethics & Compliance risks that are identified by Ethics & Compliance and the plans that are in place to manage those risks; and

3. Reviewing and endorsing Ethics & Compliance standards on behalf of BP's executive-level leadership and disseminating the standards as appropriate.

D.   BPA Board Oversight. The BPA Board of Directors (the "BPA Board") shall, consistent with applicable law, provide oversight regarding BPA's performance under this Agreement.

## 2.   REPORTS FROM THE GE&CO.  The GE&CO shall:

A.   Report directly to BP p.l.c.'s General Counsel at least once per quarter on matters involving the BP Group Entities' Ethics & Compliance and the Ethics & Compliance requirements of this Agreement. BP p.l.c. shall maintain a record of: (a) the occurrence of meetings between the GE&CO and the BP p.l.c. General Counsel pertaining to this Agreement; and (b) the fact that Ethics & Compliance and the requirements of this Agreement were discussed.

B.   Have direct access, and annually report orally and in writing, to the BP p.l.c. Board of Directors' committees, SEEAC and MBAC, on matters relating to BP p.l.c.'s Ethics & Compliance, and the Ethics & Compliance requirements of this Agreement and their implementation. BP p.l.c. shall maintain a record of: (a) the occurrence of such reports; and (b) the fact that Ethics & Compliance and the requirements of this Agreement and their implementation were discussed.

C.   Meet at least annually with the BPA Board to report orally and in writing on matters relating to Ethics & Compliance, and the Ethics & Compliance requirements of this Agreement and their implementation. BPA shall maintain a record of: (a) the occurrence of such meetings; and (b) the fact that the Ethics & Compliance requirements of this Agreement and their implementation were discussed.

D.   Meet at least annually with BP p.l.c.'s Executive Team to report orally and in writing on matters relating to the BP Group Entities' Ethics & Compliance and the Ethics & Compliance requirements of this Agreement and their implementation. BP p.l.c. shall maintain a record of: (a) the occurrence of such

meetings; and (b) the fact that the Ethics & Compliance requirements of this Agreement and their implementation were discussed.

**3.     BOARD RECOGNITION.** Respondents shall furnish this Agreement to all members of their respective Boards of Directors at their next regularly scheduled meetings after May 1, 2014. Each of the Respondents also shall furnish a written summary and oral presentation of this Agreement to all members of their Boards of Directors at the next regularly scheduled meetings of those Boards after May 1, 2014. For the duration of this Agreement, each of the Respondents shall provide new members to their Boards with a written summary or copy of this Agreement no later than ninety (90) days from their appointment to a Board. Each of the Respondents shall maintain records reflecting that the actions required pursuant to this paragraph have been taken.

**4.     ANNUAL REPORTING TO THE BOARDS.** BP p.l.c. shall provide a copy of each annual report prepared pursuant to Section X (BP Covered Entities' Annual Reports) of this Agreement to the Boards of Directors of each of the Respondents. Each of the Respondents shall maintain records reflecting its respective Boards' consideration of these annual reports as well as their respective Boards' decisions or directions to management, if any, in response to information in the reports.

**5.     MAINTAINANCE OF GE&CO POSITION.** BP p.l.c. shall maintain the position of GE&CO (or equivalent) dedicated to the BP Group Entities' overall Ethics and Compliance and charged with fulfilling the duties of the GE&CO as set forth in this Agreement. The current GE&CO is Maryann Clifford. BP p.l.c. shall notify the Ethics Monitor, the EPA Independent Auditor and the EPA Authorized Representative(s) of any change in the GE&CO position and shall provide a copy of the resume of the new GE&CO no later than ten (10) days after selection. BP p.l.c. shall consult with the Ethics Monitor with respect to the appropriate qualifications and skills of a new GE&CO prior to making that selection.

## IX.     PROCESS SAFETY

**1.     APPLICABILITY OF OCSLA.** BPXP, BPXA and any Affiliates participating in activities in the waters of the U.S. (collectively, "BPXP/BPXA Entities") are subject to the requirements of the Outer Continental Shelf Lands Act, 43 U.S.C. § 1331 *et seq.*, ("OCSLA") and its implementing regulations to the extent set forth therein. For purposes of this Agreement, "waters of the U.S." shall have the same definition as in the Implementation Plan. (*See* Implementation Plan, Section B (Definitions), Paragraph 17.)

**2.     BSEE REGULATORY COMPLIANCE AND CRITERIA FOR UNACCEPTABLE PERFORMANCE.** This Agreement shall not supersede or replace the BPXP/BPXA Entities' ongoing legal obligations to comply with OCSLA and the Department of the Interior Bureau of Safety and Environmental Enforcement ("BSEE") regulations at 30 C.F.R. Parts 203-291. If, in accordance with 30 C.F.R. § 250.135, after providing notice and an opportunity for review, BSEE determines that a BPXP/BPXA Entity's operating performance is unacceptable, and BSEE refers such determination of unacceptable performance to the Bureau of Ocean Energy Management ("BOEM"), EPA may consider the unacceptable performance to be a material

24

breach of this Agreement. BSEE shall promptly notify the EPA Authorized Representative(s) if it refers a determination of unacceptable performance by a BPXP/BPXA Entity to BOEM pursuant to 30 C.F.R. § 250.135-.136. BSEE and BOEM reserve the right to take any other action they deem appropriate to address or respond to a BPXP/BPXA Entity's unacceptable operator performance, in accordance with their statutory and regulatory authority. Such BSEE or BOEM action shall be independent of any review or process undertaken or determination made by EPA under this Agreement.

**3.     CONTRACTOR OVERSIGHT.** With respect to deepwater drilling operations (*see* Implementation Plan, Section B (Definitions), Paragraph 8) in waters of the U.S., the BPXP/BPXA Entities shall maintain:

A.     Contract Governance Boards for review and approval of deepwater drilling rig contracts and cementing contracts for deepwater drilling operations;

B.     Contractor audits and correction of Contractor safety management deficiencies prior to hiring or using a new deepwater drilling rig Contractors and new cementing Contractors in deepwater drilling operations;

C.     Maintenance of a list of approved deepwater drilling rig Contractors and cementing Contractors for deepwater drilling activities; and

D.     A process to address areas for Contractor performance improvement with respect to process safety management for deepwater drilling rig Contractors and cementing Contractors retained for deepwater drilling operations to the extent such areas are identified in the course of Contractor performance management reviews or other means adopted by the BPXP/BPXA Entities.

**4.     SEMS REQUIREMENTS.** For any offshore facility that is subject to BSEE's Safety and Environmental Management System ("SEMS") regulations at 30 C.F.R. §§ 250.1900-1933, the BPXP/BPXA Entities shall:

A.     Within thirty (30) days of the Effective Date of this Agreement, provide the EPA Authorized Representative(s) with the SEMS audit schedule for the remainder of the calendar year, and provide an updated schedule annually thereafter;

B.     No later than thirty (30) days following BSEE approval of the SEMS audit plan, provide the EPA Authorized Representative(s) with the BSEE-approved SEMS audit plan for the facility being audited; and

C.     No later than thirty (30) days following the completion of each SEMS audit, provide an audit report of the findings to the EPA Authorized Representative(s), including deficiencies identified and a Corrective Action Plan ("CAP") for addressing the deficiencies.