Failure to provide a SEMS audit schedule, audit plan, audit report or CAP, and/or failure to timely and fully comply with the CAP with respect to deficiencies may be considered by EPA to be a material breach of this Agreement.

5.      **SEMS AUDIT REPORTING TO PROCESS SAFETY MONITOR.**  By no later than thirty (30) days following the completion of each SEMS audit, BPXP shall provide the Process Safety Monitor with the audit plan, a comprehensive report of all audit findings, not limited to identified regulatory deficiencies, but including all areas of concern and opportunities for improvement identified by the SEMS auditor, in order to assist the Process Safety Monitor in fulfilling his or her duties under the Remedial Order.  BPXP shall facilitate access for the Process Safety Monitor to each SEMS lead auditor at the conclusion of each SEMS audit if the Process Safety Monitor requests a discussion of the findings and recommendations of a given audit and/or a description of how the audit was conducted in order to fulfill his or her duties under the Remedial Order.

6.      **PROCESS SAFETY MONITOR.**

      A.      Within thirty (30) days after the DOJ and BPXP comment period under the Remedial Order, BPXP shall provide a copy of the Remedial Order work plan to the EPA Authorized Representative(s) and BSEE for work to be performed by the Process Safety Monitor appointed under the Remedial Order.

      B.      Within ten (10) days following issuance, BPXP shall provide the EPA Authorized Representative(s) with the Process Safety Monitor's written reports containing the initial and follow up reviews and recommendations in accordance with the Remedial Order.

      C.      Consistent with the process and requirements set forth in the Remedial Order, BPXP shall adopt the recommendations of the Process Safety Monitor.  Failure to adopt the recommendations pursuant to the process and requirements of the Remedial Order shall constitute a material breach of this Agreement.

      D.      BPXP shall ensure that resources, including funding and personnel, are made available for BPXP to implement the recommendations of the Process Safety Monitor, as required under the Remedial Order.  Failure to adequately fund and provide personnel for implementation of those recommendations shall constitute a material breach of this Agreement.

7.      **TRACKING LEADING AND LAGGING INDICATORS.**  Within ninety (90) days of the Effective Date of this Agreement, BPXP shall begin tracking and reporting a range of leading and lagging indicators for personnel and process safety consisting of: losses of primary containment; reported injury frequency; number of reportable incidents; and overdue SEMS CAP items and such other indicators as BPXP and BSEE may agree to in writing.  These safety metrics shall be: reported to the BPXP Board of Directors; provided in the BP Covered Entities' annual report; and provided to BSEE.

26

**8.     GLOBAL WELLS ORGANIZATION.**  BP p.l.c. shall maintain a Global Wells Organization ("GWO") or similar entity that provides deepwater drilling expertise.  The GWO shall continue to maintain its own Safety and Operational Risk Committee, or similar committee.

**9.     GULF OF MEXICO COMPLIANCE MANAGEMENT SYSTEM.**  BPXP shall establish and maintain a Gulf of Mexico compliance management system, or similar system to track regulatory requirements.  BPXP shall continue to periodically update the compliance management system to reflect new requirements promulgated by BSEE and other agencies, as necessary.

**10.    BLY REPORT.**  BPXP shall: (a) provide to the EPA Authorized Representative(s), the Process Safety Monitor and the Ethics Monitor the Bly Report and recommendations; and (b) make available to the EPA Authorized Representative(s) and Process Safety Monitor, as requested, the reports of the current independent expert or similar entity or individual retained by the BP p.l.c. Board to assess progress on implementation of the Bly Report recommendations. The Process Safety Monitor may consider all recommendations in the Bly Report and any of the expert's findings in its review, as appropriate.

## X.     BP COVERED ENTITIES' ANNUAL REPORTS

**1. ANNUAL REPORT.**  On or before March 31, 2015 and annually thereafter, BP Covered Entities shall prepare and submit a consolidated written report to the EPA Authorized Representative(s), the Ethics Monitor, the Third-Party Auditor (for informational purposes) and the EPA Independent Auditor describing the measures taken by the applicable BP Covered Entities during the previous calendar year to ensure compliance with this Agreement ("Annual Report").  The final report shall be submitted no earlier than sixty (60), and no later than thirty (30), days prior to the end of this Agreement.

These Annual Reports shall include, but not be limited to, the following items pursuant to the terms of this Agreement.

A.     Information required to summarize the applicable BP Covered Entities' activities pursuant to Sections V through XII of this Agreement.  For purposes of this Agreement, documentation evidencing compliance with Sections V through XII of this Agreement shall also be made available to the EPA Independent Auditor and the EPA Authorized Representative(s) as an accompaniment to the Annual Report.

B.     The status of any legal proceedings for which reporting is required under paragraph 5 of Section XII (General Provisions) of this Agreement.  The status shall include the initiation, times, places and subject matter of search warrants, subpoenas, criminal charges or criminal or civil agreements identified in paragraph 5 of Section XII.

C.     A summary report identifying: the date, responsible business unit and general type or classification of all OpenTalk reports from Group US Businesses; the number

27

of reports in each general type or classification; and information regarding any corrective actions related to significant reports made to the OpenTalk program.

D.       A report summarizing the information required by paragraph 7 of Section XII (General Provisions) of this Agreement.

E.       A summary of any findings made by the EPA Independent Auditor under this Agreement during the previous review cycle, and any unresolved findings from the EPA Independent Auditor from prior review cycles and the status of corrective measures being implemented with respect to such recommendations.

F.       The certifications required by paragraph 3 of Section XII (General Provisions) of this Agreement.

G.       A list of all current BP Covered Entities, and their classification (*e.g.*, BP Affiliate with Foreign Business, Respondent, etc.).

H.       Information on leading and lagging indicators required by paragraph 7 of Section IX (Process Safety) of this Agreement.

**2.      ADDITIONAL SUBMISSION TO ETHICS MONITOR.** For purposes of identifying adequate corporate governance responses, upon submission of the annual report, the Group US Businesses shall separately submit to the Ethics Monitor a consolidated summary report by the Fraud and Misconduct Committee and the Fraud and Misconduct Investigation Team (or their equivalents) providing metrics related to allegations of fraud and misconduct brought to the attention of the Fraud and Misconduct Committee and the Fraud and Misconduct Investigation Team during the preceding calendar year with respect to Group US Businesses. Such submission shall track each matter with a unique identification number, describe the nature of the matter (e.g. retaliation, etc.), the approximate date of the incident, the business unit or operation in which the matter occurred, the status of the matter, and the final resolution of the matter and provide summary metrics on the information in the report. Matters pending resolution at the time of a reporting period shall be reported to the Ethics Monitor in the next annual submission until final resolution of the matter is reported.

## XI.     EPA INDEPENDENT AUDITOR

**1.      SELECTION OF THE EPA INDEPENDENT AUDITOR.** BPA shall engage, at its own expense and without recourse to EPA, an experienced Independent Auditor whose qualifications are acceptable to the EPA to serve as the EPA Independent Auditor for the oversight of this Agreement.

A.       Within ninety (90) days after the Effective Date of this Agreement, BPA shall provide the EPA Suspension and Debarment Director ("EPA SDD Director") with a list of at least two (2) proposed EPA Independent Auditors for EPA's approval. BPA's submission should contain the name, telephone number, email address,

current position, resume and duties of each of the potential EPA Independent Auditors. BPA shall also provide a statement by the proposed EPA Independent Auditors on its ability to access the appropriate resources to effectively audit this Agreement and its past experience with managing resources to audit similar Agreements.

B.  Should the EPA SDD Director determine that none of BPA's proposed EPA Independent Auditors are acceptable for the purposes of this Agreement, BPA shall promptly nominate additional proposed EPA Independent Auditors for approval by EPA within thirty (30) days of notification of denial.

C.  Upon notification by EPA that the SDD Director has determined that any one (1) or all of the proposed EPA Independent Auditors are acceptable, BPA shall select one (1) of the EPA Independent Auditors whose qualifications were acceptable to the EPA SDD Director to serve as the EPA Independent Auditor for this Agreement.

D.  BPA shall enter into a contract with the EPA Independent Auditor for the performance of duties in this Agreement within sixty (60) days of notification that a nominee is acceptable to the EPA SDD Director. The EPA-approved EPA Independent Auditor selected by BPA shall provide an agreed upon work plan to be performed by the EPA Independent Auditor, in accordance with the scope and provisions of this Agreement, as soon as possible, but no later than sixty (60) days after the EPA Independent Auditor has entered into a contract.

E.  Any change of the EPA Independent Auditor requires prior approval from EPA. Should EPA become concerned with the performance of the EPA Independent Auditor, the EPA Authorized Representative(s) will raise those concerns to the BP Authorized Representative(s) and the EPA Independent Auditor. If EPA's concerns are not resolved promptly, the EPA Authorized Representative(s) shall refer the matter to the EPA Suspension and Debarment Counsel, who in consultation with the EPA SDO, may require BPA to propose a new EPA Independent Auditor within sixty (60) days of EPA's notification. BPA agrees to propose and hire a new EPA Independent Auditor upon notification from EPA. The same process and time requirements for the initial selection of the EPA Independent Auditor as set forth in this provision apply for selection of a replacement EPA Independent Auditor.

F.  It is BPA's responsibility to hire a qualified auditor. Due to general standards of ethical conduct for government employees, no EPA official or employee may direct BPA to hire a particular individual or firm as an EPA Independent Auditor. BPA will not request that any representative of EPA identify or suggest qualified monitors.

29

2.   **NATURE AND GENERAL TERMS OF EMPLOYMENT**

   A.   Nature of Employment.  The EPA Independent Auditor serves to provide an independent verification of the applicable BP Covered Entities' compliance with this Agreement.  The EPA Independent Auditor shall not be an agent of the BP Group Entities, and his or her work shall not be subject to the BP Group Entities' assertion of the attorney-client or work product privilege doctrines.  The EPA Independent Auditor shall be an independent party who is appropriately certified, licensed or otherwise adequately qualified, and who has had no previous business relationship with BP Covered Entities in the five (5) years prior to the Effective Date of this Agreement that would create an actual or perceived conflict of interest in monitoring the applicable BP Covered Entities' compliance with this Agreement.  Notwithstanding the foregoing, the Third-Party Auditor, Process Safety Monitor, and Ethics Monitor appointed by DOJ under the Remedial Order may be eligible to be considered as an EPA Independent Auditor candidate under this Agreement.

   B.   Annual Certification of Independence.  Upon nomination, and upon each anniversary of the Effective Date of this Agreement, BPA shall furnish EPA with an affidavit from the EPA Independent Auditor certifying that he or she has no financial, professional, personal, familial or other interest that would create an actual or apparent conflict of interest with the BP Covered Entities or the BP Covered Entities' Employees, other than that arising from the appointment as the EPA Independent Auditor or as the Third-Party Auditor under the Remedial Order.  The affidavit must also certify that his or her representation of any other client will not create an actual or apparent conflict of interest in fulfilling his or her responsibilities as EPA Independent Auditor.

   C.   Confidentiality.  The EPA Independent Auditor shall maintain as confidential all non-public information, documents and records it receives from BP Covered Entities, subject to the EPA Independent Auditor's reporting requirements herein and paragraph 8 of Section XII (General Provisions).  The EPA Independent Auditor shall take appropriate steps to ensure that any of his or her consultants or employees shall also maintain the confidentiality of all such non-public information.

3.   **SCOPE OF INDEPENDENT AUDITOR'S COMPLIANCE DUTIES**

   A.   Particular Duties.  The EPA Independent Auditor shall:

      1.   Conduct an annual review of applicable BP Covered Entities' compliance with Sections V through XII of this Agreement and draft a report summarizing each such review.

2.      Receive and review the reports and other information required to be provided to the EPA Independent Auditor under Section VI of this Agreement.

3.      Review BPA's annual compliance certification with this Agreement and Annual Reports.

4.      Submit its findings in an annual written report to the BP Authorized Representative(s), the Ethics Monitor, the Process Safety Monitor (for informational purposes) and the EPA Authorized Representative(s) within ninety (90) days after each anniversary of the Effective Date of this Agreement.  The final annual report shall be submitted to the BP Authorized Representative(s), the Ethics Monitor and the EPA Authorized Representative(s) no earlier than sixty (60), and no later than thirty (30), days prior to the termination of the Agreement.

5.      If the EPA Independent Auditor identifies a potential violation of law or regulation as an incidental consequence of auditing compliance with this Agreement, and if the EPA Independent Auditor deems it appropriate, the EPA Independent Auditor shall inform the relevant BP Covered Entity and/or the EPA Authorized Representative(s).

6.      If either (a) BPA's certification or report identifies a deficiency in compliance, or (b) the EPA Independent Auditor identifies a deficiency in compliance, the EPA Independent Auditor shall so report to the EPA Authorized Representative(s) and the BP Authorized Representative(s), and the relevant BP Covered Entity shall develop a timely and appropriate corrective action plan for the identified non-compliance, the implementation of which the EPA Independent Auditor shall review as part of its compliance assessment.

B.      Scope of Annual Compliance Assessment.  The EPA Independent Auditor shall verify the applicable BP Covered Entities' compliance with Sections V through XII of this Agreement as follows:

1.      It is the expectation of the parties that the EPA Independent Auditor's annual compliance review can be completed based on: (a) the BP Covered Entities' Annual Reports under this Agreement, and supporting documentation as outlined in Section X (BP Covered Entities' Annual Reports); (b) BP Covered Entities' annual certifications; (c) reports and records provided by the Ethics Monitor and the Process Safety Monitor; (d) interviews with the Ethics Monitor and Process Safety Monitor; and (e) District Court findings with respect to the Plea Agreement or the SEC Judgment Order.  In the event that the EPA Independent Auditor determines that it is unable to verify compliance on that basis, the EPA Independent Auditor shall be provided the same access to records,

31

documents and other information as the EPA Authorized Representative(s) as set forth in paragraph 8 of Section XII (General Provisions) of this Agreement, subject to the specific provisions and limitations in subparagraphs 2 through 5, below.

2.      With respect to Section V (Compliance With Other Agreements), Section VI (Coordination with Plea Agreement Monitors) and paragraphs 6C and 6D of Section IX (Process Safety) of this Agreement, and the status of any recommendations of the Ethics Monitor or Process Safety Monitor, the EPA Independent Auditor's annual compliance reviews shall be completed based on the BP Covered Entities' annual reports under this Agreement, any reports or other submissions under the Remedial Order of the Ethics Monitor or Process Safety Monitor, interviews with the Process Safety Monitor or Ethics Monitor as the EPA Independent Auditor deems appropriate and any findings of the U.S. District Court with respect to BPXP's probation and the SEC Judgment Order.

3.      With respect to Section VIII (Corporate Governance) of this Agreement, requests by the EPA Independent Auditor for additional information from the relevant BP Covered Entities' Boards shall be directed to and completed by the BP Authorized Representative(s) by providing further documentation of compliance to the EPA Independent Auditor.

4.      With respect to the Ethics & Compliance training in paragraph 8 of Section VII (Ethics & Compliance) of this Agreement, the EPA Independent Auditor's first annual compliance review shall address BPXP; the second annual compliance review shall address Group US Businesses; and annual compliance reviews thereafter shall address BP Covered Entities.

5.      As set forth in paragraph 8 of Section XII (General Provisions) of this Agreement, EPA may at its discretion conduct audits of the applicable BP Covered Entities' compliance with the terms of this Agreement.  EPA may elect to have the EPA Independent Auditor accompany and assist EPA on the audit at the BP Covered Entities' expense.  The EPA Independent Auditor, at EPA's election, may conduct audit activities set forth in paragraph 8 of Section XII (General Provisions) of this Agreement, including but not limited to: interviewing the applicable BP Covered Entities' Employees; reviewing the applicable BP Covered Entities' files or other records required pursuant to this Agreement; touring the applicable BP Covered Entities' facilities; developing documents to prepare for the interview; and drafting the Audit Report.

## XII.   GENERAL PROVISIONS

**1.     LANGUAGES.**  All communications to Group US Employees, including but not limited to written materials, oral communication and training required under this Agreement, will be provided in English or, if the Group US Employee has a limited ability to read, write, speak or understand English, in another language in which the Group US Employee is sufficiently fluent so that each Employee can understand the communication.

**2.     NOTICE TO EMPLOYEES AND SENIOR LEVEL LEADERS.**  BPA will notify Group US Employees, and BP p.l.c. will notify Employees of BP Affiliates with Foreign Business, within sixty (60) days of the Effective Date of this Agreement, of: the fact and substance of this Agreement; the facts related to the Plea Agreement; and the importance of each such Employee abiding by the terms and conditions of this Agreement and the Code of Conduct. BPA may provide the required notification to Group US Employees by posting the Agreement on BP p.l.c.'s intranet site and sending an email or other similar communication to Employees notifying them of such posting.  BP p.l.c. shall supplement the intranet posting in another appropriate manner for Employees of BP Affiliates with Foreign Business, such as email communication, town hall meetings, targeted posting of notices or new Employee training.

**3.     CORPORATE OFFICIAL'S CERTIFICATION.**  As part of the Annual Reports required by Section X (BP Covered Entities' Annual Reports) of this Agreement, the BP p.l.c. GE&CO and/or the relevant Corporate Secretary of each Respondent shall certify that applicable Respondent is in compliance with its respective obligations under paragraphs 1, 3 and 4 of Section VIII (Corporate Governance) of this Agreement.  The certification shall state:

> I certify under penalty of law that, [except as set forth below], based on my reasonable inquiry of the persons within the applicable Respondent who manage the applicable Respondent's obligations under the Administrative Agreement and of my review of information generated during the course of the applicable Respondent's performance under this Agreement, to the best of my knowledge, the applicable Respondent is in compliance with its respective obligations under Paragraphs 1, 3, and 4 of the Administrative Agreement.

If the Respondent's designated  officer cannot so certify with respect to any particular obligation, term or condition, the certification shall identify the deficiency and the corrective measures being taken or to be taken to achieve compliance.

The BP Covered Entities agree that nothing in this paragraph shall limit the EPA SDO's ability to take an action pursuant to paragraph 19 of Section XII (General Provisions) of this Agreement (Breach of Agreement/Survival of Cause for Debarment).

**4.     TRUTHFULNESS IN REPORTING AND CONVEYING INFORMATION TO EPA AND OTHER REGULATORY AGENCIES.**  The BP Covered Entities shall comply with their obligations under federal law or regulation to provide accurate information to EPA or its designees and to other Federal Government Entities, including the Department of the Interior. Within sixty (60) days of the Effective Date of this Agreement, BP Covered Entities shall

33

provide written notification to the BP Covered Entities' Principals of the commitment to cooperate fully with all requests for information and inquiries from the EPA SDO, the EPA Suspension and Debarment Division, the Ethics Monitor and the EPA Independent Auditor made pursuant to this Agreement.

**5.** **REPORTS OF LEGAL PROCEEDINGS.** Except as set forth in Attachment 30, and with the exception of the ongoing civil litigation, administrative proceedings and investigation involving the *Deepwater Horizon* blowout, explosion and spill, BP Covered Entities represent that, to the best of their knowledge, no BP Covered Entities: (a) have been informed that they are currently the target or subject of an ongoing U.S. federal criminal investigation; or (b) are currently named in an action of the kind set forth in paragraphs (A) through (D), below.

Beginning on July 1, 2014, Respondents shall notify the EPA Authorized Representative(s) on or before the beginning of each calendar quarter of any of the following matters:

A.      The initiation of any criminal investigation or civil enforcement action by any Federal Government Entity involving allegations of any violation(s) of federal environmental laws, the Foreign Corrupt Practices Act, false statements, false claims, kickbacks, conflict of interest or antitrust laws, if Respondents have been informed that they or any BP Covered Entity or Principal of a BP Covered Entity is a target or subject of such investigation. In the case of a Principal, such allegations must be related to duties performed by the Principal in the course of employment. For the purposes of this paragraph, "initiation" in a criminal investigation shall mean the issuance of a subpoena, the execution of a search warrant, or the filing of formal charges; "initiation" in a civil enforcement action shall mean the filing of a judicial or administrative complaint (but not the issuance of a notice of violation or incident of noncompliance), the service of administrative subpoenas (but not information requests or inspections) or the issuance of show cause orders.

B.      Initiation of qui tam actions or citizen action suits against a BP Covered Entity or any of their Principals by any person or entity alleging: violations of any U.S. federal environmental laws or the Foreign Corrupt Practices Act; false statements to Federal Government authorities or in public filings, including filings required by U.S. securities laws; false claims for government reimbursement, kickbacks, conflict of interest; or anti-trust violations. For purposes of this paragraph, the term "citizen action suit" shall mean a private enforcement action expressly authorized by a U.S. statute.

C.      Criminal charges or suspension or debarment actions brought by any Federal Government Entity against a BP Covered Entity or any of their Principals in a matter relating to the business of the BP Covered Entity.

D.      Any conviction or guilty plea, *nolo contendere* plea, deferred prosecution agreement, pre-trial diversion agreement, civil judgment or civil judicial consent

decree in a matter brought by a Federal Government Entity to which any BP
Covered Entities are parties in a matter relating to the business of the BP Covered
Entity.

E.      Nothing in this paragraph shall be interpreted to require any BP Covered Entity to
disclose information that is subject to the attorney-client privilege, work product
doctrine or other applicable legal privilege.

**6.      ELECTRONIC TRACKING OF FORMAL ENFORCEMENT ACTIONS.**  BPA
shall develop, implement and maintain a database or computerized system for tracking those
matters identified in paragraph 5 of Section XII (General Provisions) of this Agreement.

**7.      REPORTS OF MISCONDUCT.**  During the term of this Agreement, BP Covered
Entities shall timely disclose in writing to the EPA Authorized Representative(s), the Ethics
Monitor and the EPA Independent Auditor whenever, in connection with the award, performance
or closeout of a federal procurement or nonprocurement covered transaction, any BP Covered
Entity or Principal of a BP Covered Entity has credible evidence that BP Covered Entity's
Employee has committed: (a) a violation of Federal criminal law involving fraud, conflict of
interest, bribery or gratuity violations found in Title 18 of the U.S. Code; or (b) a violation of the
civil False Claims Act, 31 U.S.C. §§ 3729-3733.

BP Covered Entities will investigate all credible reports of such misconduct that come to
their attention and will notify the EPA Authorized Representative(s), the Ethics Monitor and the
EPA Independent Auditor of the outcome of such investigations and any potential or actual
impact on any aspect of BP Covered Entities business with a Federal Government Entity.  The
BP Covered Entity will take corrective action, including prompt restitution when established by a
court or a tribunal with competent jurisdiction or agreed upon between the parties, of any harm
to the Federal Government.  BP Covered Entities will include summary reports of the status of
each such investigation to the EPA Authorized Representative(s) in the reports submitted
pursuant to this Agreement until each matter is finally resolved.  This requirement does not in
any way waive BP Covered Entities' obligations to submit reports pursuant to any other section
in this Agreement or to the requirements of Federal Acquisition Regulation ("FAR") 9.406-2
(b)(1)(vi) and 9.407-2 (a)(8), if applicable, or any other statutory or regulatory reporting
requirement.

Nothing in this paragraph shall be interpreted to require BP Covered Entities to disclose
information that is subject to the attorney-client privilege, work product doctrine or other
applicable legal privilege.

**8.      GOVERNMENT AUDITS AND ACCESS TO RECORDS AND INFORMATION.**
In addition to any other right the Federal Government may have by statute, regulation or
contract, the EPA Authorized Representative(s) may, for the purpose of verifying BP Covered
Entities' compliance with the terms and conditions of this Agreement, evaluate each of BP
Covered Entities' books, records and other company documents and supporting materials
(collectively, "BP Covered Entities' Records") including:

35

A.   BP Covered Entities' business conduct in its dealings with all of its customers, including the Federal Government;

B.   BP Covered Entities' compliance with federal laws, regulations and procurement policies; and

C.   BP Covered Entities' compliance with the requirements of Federal Government contracts, leases, covered transactions or subcontracts,

The materials described above, except to the extent that such documents are subject to attorney-client privilege, work product or other applicable legal privilege, shall be made available by BP Covered Entities at all reasonable times for inspection or audit. The EPA Authorized Representative(s) may evaluate reports, records or other documents of the EPA Independent Auditor, the Ethics Monitor, the Process Safety Monitor and the Third-Party Auditor. Further, if EPA determines that an annual report of the EPA Independent Auditor is not sufficient for the purposes of evaluating the BP Covered Entities' compliance with this Agreement and, after notice and consultation, the BP Covered Entities are unable to resolve the concern, EPA may enlist the EPA Independent Auditor in further audit activities under this provision. For purposes of this provision, the EPA Authorized Representative(s), the Ethics Monitor or the EPA Independent Auditor may interview any Group US Employee at the Employee's place of business during normal business hours, or at such other place and time as may be mutually agreed between the Employee and the EPA Authorized Representative(s), the Ethics Monitor or the EPA Independent Auditor. Group US Employees may be interviewed without a representative of the BP Group Entities' Employees or Principals being present. The Group US Employee may be represented personally by his or her own counsel or other representative, if requested by the Employee. The Employee also may decline to be interviewed.

**Respondents agree to pay to the U.S. Treasury as miscellaneous receipts the reasonable costs actually incurred by EPA personnel or its authorized agents for conducting such records examinations during the term of this Agreement.** The parties agree that "cost" shall include reasonable expenses for travel, transportation, lodging and meals, to the extent normally authorized under federal rules governing Federal Government travel, as such expenses are actually incurred by EPA personnel or its authorized agents in conducting site visits for the purpose of verifying compliance with this Agreement. No part of the payments for costs in accordance with this provision shall be an allowable cost under any EPA or Federal Government contract, subcontract or nonprocurement covered transaction.

As an alternative to an onsite audit of BP Covered Entities' compliance with the terms and conditions of this Agreement, EPA may, at its sole election, conduct an audit by mail in which instance BP Covered Entities shall provide documentation of their compliance with this Agreement, including but not limited to copies of documentation maintained as required in this Agreement and such additional documentation and/or certifications as may be requested by EPA.

**9.    SALE OF THE RESPONDENTS' BUSINESSES.** The sale, assignment, or transfer of ownership of BP Covered Entities' business or any divisions, subsidiaries, Affiliates, business units, facilities, offices or other corporate components (collectively "assets") shall not be

36

executed as an artifice to avoid being subject to the Agreement. However, this Agreement is not intended to restrict the lawful and legitimate sale, assignment, or transfer of ownership of assets through an arm's length transaction and would not bind an asset purchaser who purchases through an arm's length transaction.

With respect to the sale, assignment or transfer of more than fifty percent (50%) of a Respondent's assets to an unaffiliated entity pursuant to an arm's length transaction, including but not limited to the transfer of operational control of a jointly owned asset to an unaffiliated third party, such third party shall not be liable for the BP Covered Entities' obligations and the BP Covered Entity shall remain obligated to comply with the terms and conditions of this Agreement with respect to all non-disposed assets but not with respect to the sold, assigned or transferred assets or assets for which operational control has been transferred. The Respondent shall send notification to the EPA Authorized Representative(s) and the EPA Independent Auditor no less than thirty (30) days after the date of sale. The notification shall be signed and dated, and shall state in writing: the date of the sale; the name(s), address(es) and contact person(s) representing the purchaser(s) on the sale; a specific description of subject business or property being sold; and certify in writing whether said sale is an arm's length transaction.

In the event that any Respondent sells or in any way transfers ownership of any BP Covered Entity in its entirety to a third party, the BP Covered Entity shall send notification to the EPA Authorized Representative(s) and the EPA Independent Auditor no less than thirty (30) days prior to the closing date of the sale. The notification shall be signed and dated, and shall state in writing: the date of the planned sale; the name(s), address(es) and contact person(s) representing the purchaser(s) on the sale; a specific description of subject business or property being sold; and certify in writing whether said sale is an arm's length transaction.

**10.** **BP GROUP ENTITIES' PURCHASE OF BUSINESSES.** In the event that any BP Group Entity purchases or establishes new business units in the U.S. or new BP Affiliates With Foreign Business during this Agreement, such BP Group Entity shall implement provisions of this Agreement, as applicable, including any training or education requirements, within one hundred eighty (180) days following such purchase or establishment. Should the BP Group Entity be unable to integrate such purchase or establishment within one hundred eighty (180) days, the BP Group Entity shall notify the EPA Authorized Representative(s) in writing, and shall provide a timeline for complete integration, which will be subject to EPA approval. The BP Group Entity shall be notified of EPA's decision on the integration plan within thirty (30) days of receipt. If the EPA Authorized Representative(s) does not respond within sixty (60) days of receipt, the BP Group Entity's proposed timeline shall be deemed approved.

If, during the period covered by this Agreement, a BP Group Entity acquires or gains control (other than through a joint venture) of any business concern, which enters into procurement or covered non-procurement transactions with the U.S., the EPA Authorized Representative(s) shall be notified within thirty (30) days after the closing of the transaction. Such notice shall state the name, address, nature of the business concern and any work it has done for any Government Entities over the last year.

**11.     RESTRUCTURING OR ACQUISITION OF NEW BUSINESSES.** BP Group
Entities shall not, through a change of name; business reorganization, restructuring or
realignment; sale or purchase of assets; or similar action, seek to avoid the obligations and
conditions set forth in this Agreement.

**12.     HIRING INELIGIBLE INDIVIDUALS.** Beginning thirty (30) days after the Effective
Date of this Agreement, prior to any Principal becoming employed in a US Respondent's
business, US Respondents shall make reasonable inquiry into the status of that potential
employee which shall include a review of the System for Award Management ("SAM") as
maintained by the General Services Administration ("GSA") on the internet
(https://www.sam.gov) for federal procurement and nonprocurement programs.  The results from
all SAM searches shall be kept in Respondent's records.

**13.     INELIGIBLE EMPLOYEES.** BP Covered Entities are not required to terminate the
employment of individuals who are or become suspended, debarred, proposed for debarment or
otherwise ineligible as prescribed by any Federal Government Entity debarment program during
their employment with BP Covered Entity.  However, the BP Covered Entity will remove such
Employees from responsibility for, or involvement with, business affairs related in any manner
whatsoever with Federal Government covered procurement or non-procurement transactions or
programs until the final resolution of such suspension or proposed debarment.

       If any BP Covered Entity is aware that its Employee is debarred, the BP Covered Entity
shall notify the EPA Authorized Representative(s) of such debarment and the reasons therefore,
and of whatever personnel action has been taken or will be taken against the Employee, within
thirty (30) days of the BP Covered Entity's knowledge of the debarment.

       If any BP Covered Entity learns that any Principal is charged with a U.S. federal criminal
offense relating to business activities or otherwise relating to honesty or integrity, the BP
Covered Entity will remove that Principal immediately from responsibility for, or involvement
with, business affairs as related in any manner to Federal Government procurement or covered
nonprocurement transactions.

**14.     BUSINESS RELATIONSHIPS WITH SUSPENDED OR DEBARRED ENTITIES.**
For the purposes of specifically fulfilling their obligations under Federal procurement or
nonprocurement covered transactions, BP Covered Entities shall not knowingly form a contract
with, purchase from, or enter into any procurement or covered nonprocurement transaction (as
defined at 48 C.F.R. Subpart 9.4, and 2 C.F.R. Part 180 and relevant agency implementing rules)
with any individual or business entity that is listed on SAM as debarred, suspended, proposed for
debarment or otherwise ineligible at the time of such procurement or nonprocurement award or
transaction.

       BP Covered Entities may enter into a business relationship or continue a federally funded
procurement or nonprocurement covered transaction with a suspended or debarred
Contractor/participant if: (a) the BP Covered Entity submits to EPA in writing the compelling
reasons that justify entering into a business transaction with a person listed on SAM as soon as
possible, but not later than sixty (60) days prior to entering into such a business relationship; and

(b) the EPA SDO approves the request to enter into the transaction.  EPA shall respond to the request within thirty (30) days of receipt of the request.  Unless otherwise indicated in writing by EPA, each request must be made on a transaction by transaction basis.  The BP Covered Entity shall keep documentation of all search results and certifications that are required pursuant to this provision.

**15.** **FUTURE MISCONDUCT DURING AGREEMENT.**  In matters unrelated to the matters addressed herein, EPA may find that a BP Covered Entity has materially breached this Agreement based on any misconduct that occurs during the period of the Agreement that may lead to any action taken pursuant to 2 C.F.R. § 180.700 or 2 C.F.R. § 180.800.

**16.** **RESPONDENTS' LEGAL OBLIGATIONS**.  Nothing in this Agreement shall be deemed to limit a BP Covered Entity's obligations under any federal, state or local law or regulation, nor does this Agreement limit in any manner EPA's ability to enforce any law or regulation within EPA's jurisdiction.

**17.** **UNALLOWABLE COSTS.**  BP Covered Entities agree that all costs, as defined in FAR 31.205-47, incurred by, for, or on behalf of any BP Covered Entity or any current or former officer, director, agent, Employee, consultant or Affiliate of BP Covered Entities shall be expressly unallowable costs for Federal Government contract or covered transaction accounting purposes.  Unallowable costs include, but are not limited to, costs arising from, related to, or in connection with:

      a.  The matters at issue herein;

      b.  The Federal Government's criminal and civil investigations regarding the matters at issue herein; and

      c.  EPA's review of BP's present responsibility, including but not limited to the costs of the company's submissions, presentations and appearances before the EPA SDO's Office and/or the EPA SDD.

The BP Covered Entity's costs of performing and administering the terms and conditions of this Agreement, the cost of the EPA Authorized Representative(s) and any fines or penalties levied or to be levied in or arising out of the matter at issue here are agreed to be expressly unallowable costs.  Also unallowable are the BP Covered Entity's costs of bringing the BP Covered Entity's self-governance and Ethics & Compliance programs to a level acceptable to the EPA Authorized Representative(s).  The BP Covered Entities agree to account separately for such costs.  BP Covered Entities' costs of maintaining, operating and improving their corporate self-governance/compliance/ethics programs that are incurred after expiration of this Agreement, may be allowable costs.

BP Covered Entities agree to treat as unallowable costs the full salary and benefits of any officer, Employee or consultant terminated from their employ or removed from Federal Government contracting as a result of the wrongdoing at issue here and the cost of any severance payments or early retirement incentive payments paid to Employees released from the BP

Covered Entity as a result of the wrongdoing at issue here.  For purposes of the preceding sentence, the salary and benefits costs shall include all such costs from the first instance of participation of each individual in the matters at issue here, as determined by the EPA Authorized Representative(s).

BP Covered Entities recognize that in order to comply with the terms and conditions of this paragraph, certain costs may need to be reclassified.  BP Covered Entities shall proceed immediately to identify and reclassify such costs and, within ninety (90) days of the Effective Date of this Agreement, BP Covered Entities shall adjust any bid rate, billing rate or unsettled final indirect cost rate pools to eliminate any costs made unallowable by this Agreement, and shall advise the EPA Authorized Representative(s), the cognizant administrative contracting officer and the cognizant Federal Government auditor of the amount and nature of the reclassified costs within one hundred and twenty (120) days of the date of this Agreement.

**18.**     **ADVERSE ACTIONS.**  Each BP Covered Entity avers that adverse actions taken, or to be taken by it against any Employee or other individual associated with any BP Covered Entity arising out of or related to the matters at issue herein were not the result of any action by, or on behalf of, agents or employees of the U.S.

**19.**     **BREACH OF AGREEMENT/SURVIVAL OF CAUSE FOR DEBARMENT.**  A BP Covered Entity's failure to meet any of its obligations pursuant to the terms and conditions of this Agreement, if determined by the EPA SDO to be a material breach of this Agreement by that BP Covered Entity, shall constitute a separate cause for suspension and/or debarment of that BP Covered Entity.  Violation of multiple non-material provisions, or repeated violations of a non-material provision, of this Agreement by a BP Covered Entity may cumulatively constitute a material breach of the Agreement by that BP Covered Entity.  The underlying causes for debarment survive the execution of this Agreement, and EPA may initiate suspension or debarment proceedings against a BP Covered Entity or statutorily disqualify a BP Covered Entity on these grounds if there is a material breach of this Agreement.  Nothing in this provision or this Agreement shall be construed as a waiver of any legal rights of a BP Covered Entity to contest the EPA SDO's determination of materiality or breach.

**20.**     **RESOLUTION OF DEBARMENT, SUSPENSION, OR STATUTORY DISQUALIFICATION.**  Upon execution of this Agreement, EPA, as Lead Agency in this matter pursuant to the Interagency Suspension and Debarment Committee process, shall terminate the suspension of BP Covered Entities and shall lift the statutory disqualification of BPXP as well as the statutory disqualifications of BPXA based on its November 29, 2007 CWA conviction and BPPNA based on its March 12, 2009 CAA conviction.  In addition, provided that the terms and conditions of this Agreement are faithfully fulfilled, EPA, as Lead Agency, will not suspend, debar, or otherwise reinstate the statutory award disqualification of, a BP Covered Entity, as applicable, based on: (i) the *Deepwater Horizon* explosion, spill and cleanup, and matters related thereto, including the January 29, 2013 *Deepwater Horizon* conviction, the December 10, 2013 SEC Judgment Order and any judgment in civil litigation in which a BP Covered Entity is a defendant; (ii) the November 29, 2007 CWA conviction of BPXA; or (iii) the March 12, 2009 CAA conviction of BPPNA.  EPA's decision, which is based upon the facts at issue here, shall not restrict EPA or any other agency of the Federal Government from instituting

administrative actions, including, without limitation, suspension, debarment or statutory disqualification should:

    a. Other information—indicating the propriety of such action come to the attention of EPA or such other Federal Government agency and such information provides an independent cause for suspension or debarment unrelated to the *Deepwater Horizon* explosion, spill and cleanup; or

    b. Additional facts concerning the *Deepwater Horizon* explosion, spill and cleanup be discovered by the Federal Government which were not disclosed by Respondents or otherwise produced to, or in the possession of, the Federal Government, prior to the Effective Date of this Agreement, including in any litigation related to the *Deepwater Horizon* explosion, spill and cleanup, and such facts provide an independent cause for suspension or debarment.

   This Agreement relates solely to suspension, debarment and statutory disqualification issues, pursuant to 48 C.F.R. Subpart 9.4 and 2 C.F.R. Part 180, and 33 U.S.C. § 1368(a), in conjunction with the circumstances recited herein and in no way waives any criminal, civil, contractual or any other administrative remedy or right which the Federal Government may have for the circumstances so described in this Agreement.

**21. CONCLUSION OF DEBARMENT PROCEEDINGS.** BP Covered Entities hereby waive all further notice and opportunity for hearing to which they may otherwise be entitled to but for the terms and conditions of this Agreement except that BP Covered Entities shall receive such notice(s) as they would otherwise be entitled if paragraphs 19 or 20 of Section XII (General Provisions) of this Agreement are invoked.

**22. RELEASE OF LIABILITY.** BP Covered Entities hereby release the U.S., its instrumentalities, agents and employees in their official and personal capacities, of any and all liability or claims arising out of or related to the November 28, 2012 suspension of Respondents and Covered Affiliates, the February 1, 2013 CWA disqualification of BPXP at its Houston headquarters, the negotiation of this Agreement, the suspension, proposed debarment, or debarment of Respondents or Covered Affiliates and the discussions leading to this Agreement and all matters related to the February 26, 2008 and March 20, 2009 statutory disqualification notices.

   Within seven (7) days after the Effective Date of this Agreement, Respondents shall enter into a stipulation of dismissal with EPA pursuant to Fed. R. Civ. P. 41(a)(1)(ii), which stipulation shall provide that the August 12, 2013 Complaint filed in the U.S. District Court for the Southern District of Texas against EPA, the EPA Administrator, the EPA SDO and EPA employees in civil case number 4:13-cv-2349 is dismissed with prejudice, with each party bearing its own fees and costs.

   Within fifteen (15) days after the Effective Date of this Agreement, BPXP shall withdraw with prejudice its administrative appeal of BOEM's May 31, 2013 and June 27, 2013 decision

letters pending before the Interior Board of Land Appeals (IBLA 2013-0194), each party to bear its own costs.

**23.    RESPONSIBILITY.**  This Agreement is not an endorsement of BP Group Entities' ethics and compliance, corporate governance, process safety, or other programs.  The SDO is only resolving the administrative actions herein based upon the BP Covered Entities' obligations to comply with the terms of this Agreement.  By entering into this Agreement, EPA does not address any finding of responsibility under 48 C.F.R. § 9.104 or other applicable federal nonprocurement regulations for any specific Federal Government procurement or nonprocurement transaction.  BP Covered Entities' compliance with the terms and conditions of this Agreement may constitute a contributing factor to be considered when rendering a responsibility finding for a specific government procurement or nonprocurement transaction.

**24.    RESTRICTION ON USE.**  BP Covered Entities shall not use any term or condition of this Agreement, or the fact of the existence of this Agreement, for any purpose related to the defense of, or in mitigation of, any criminal, civil or administrative investigation, proceeding or action except as set forth below.

Notwithstanding the restriction on use herein, the existence and substance of this Agreement may be used (a) to respond to Federal Government civil or administrative demands for injunctive relief, otherwise addressed by the terms of this Agreement or (b) in any criminal, civil or administrative matter in which the other party introduces evidence of this Agreement or of the suspension, debarment or statutory disqualifications which this Agreement resolves, or (c) in any matter initiated by any Government Entity to suspend, debar, or otherwise render ineligible or find not responsible a BP Covered Entity based on the events giving rise to this Agreement and the matters addressed herein.

The use of any term or condition of this Agreement, or the fact of the existence of this Agreement shall be strictly limited to the purposes for which this Agreement is used as provided under (a), (b) or (c) of this paragraph.

**25.    BANKRUPTCY.**  A BP Covered Entity shall not use bankruptcy proceedings to affect the enforcement of this Agreement in the interests of the Federal Government.

**26.    ENTIRE AGREEMENT.**  This Agreement constitutes the entire agreement between the parties and supersedes all prior agreements and understandings, whether oral or written, relating to the subject matter hereof.  This Agreement shall be binding upon and inure to the benefit of and be enforceable by the parties hereto and their respective successors and assigns.

**27.    COUNTERPARTS.**  This Agreement may be executed in one (1) or more counterparts, each of which shall be an original, but all of which taken together, shall constitute one and the same Agreement.

**28.    SEVERABILITY.**  In the event that any one or more of the provisions contained in this Agreement shall for any reason be held to be invalid, illegal or unenforceable in any respect, such invalidity, illegality or unenforceability shall not affect other provisions of this Agreement.

**29.   PARAGRAPH HEADINGS.** The paragraph headings in this Agreement are inserted for convenient reference only and shall not affect the meaning or interpretation of this Agreement.

**30.   MODIFICATION.** This Agreement may be amended or modified only by a written document signed by EPA and Respondents and shall become effective only upon acceptance by the EPA SDO.  Respondents may request to terminate this Agreement effective as of the termination of BPXP's probation described in paragraph 1 of Section V.  Any request for modification or termination by Respondents shall be submitted to the EPA Authorized Representative(s).  Requests shall be denied, approved or approved as modified by the EPA SDO within thirty (30) days of the EPA Authorized Representative's(s') receipt of said request.

The Plea Agreement Ethics Monitor may also request to modify this Agreement with written authorization from Respondents.  Such requests shall be submitted to the EPA Authorized Representative(s) and shall become effective only upon acceptance by the EPA SDO. Requests shall be denied, approved or approved as modified by the EPA SDO within thirty (30) days of the EPA Authorized Representative's(s') receipt of said request.

**31.   AUTHORIZED REPRESENTATIVES.** All matters involving this Agreement shall be coordinated through the Authorized Representatives listed below, including but not limited to questions, requests and other communication.  BP Covered Entities shall provide EPA thirty (30) days written notice prior to any change to the designation of Respondents' Authorized Representative(s).

**To Respondents (BP Covered Entities' Authorized Representative(s)):**

> Gabe Cuadra
> Gabriel.Cuadra@bp.com
> (713) 323 3777
> 501 Westlake Park Blvd.
> Houston, TX 77079

**To EPA (EPA Authorized Representative(s)):**

> Peggy Anthony
> anthony.peggy@epa.gov
> (202) 564-5364

U.S. Postal Service:        United States Environmental Protection Agency
                            Office of Grants and Debarment
                            Suspension and Debarment Division (3902-R)
                            1200 Pennsylvania Avenue, NW
                            Washington, D.C. 20460
                            Attn:  Peggy Anthony

Express Mail or Courier:    United States Environmental Protection Agency
Office of Grants and Debarment
Suspension and Debarment Division (3902-R)
1300 Pennsylvania Avenue, NW
Washington, D.C. 20004
Attn: Peggy Anthony

or such other address as either party shall have designated by notice in writing to the other party.

**32.**    **NOTICES.** Any notices, reports or information required hereunder shall be in writing and delivered or mailed by registered or certified mail, by electronic mail, or by hand delivery to the appropriate Authorized Representative(s) at the address listed in paragraph 31 of this Section.

**33.**    **PUBLIC DOCUMENT.** This Agreement, including all attachments and reports submitted pursuant to this Agreement, subject to the restrictions under the Privacy Act and exemptions in accordance with the Freedom of Information Act, is a public document and may be distributed by EPA throughout the Federal Government and entered into Federal Government database systems as appropriate, and provided to other interested persons upon request. It is BP Covered Entities' responsibility to claim as Confidential Business Information ("CBI") and privileged documents and communications, per the Freedom of Information Act, any and all documents attached to and submitted pursuant to the requirements of this Agreement. If CBI is not claimed at the time such documentation is submitted to EPA, BP Covered Entities hereby agree that they have waived such claim and have no objection to EPA releasing such information to the public, as appropriate.

    A copy of this Agreement will be entered into the Federal Awardee Performance and Integrity Information System and, as required by law or regulation, the fact of entry or a copy of the Agreement will be posted on any other public website.

**34.**    **EPA RELIANCE.** Respondents and BP Covered Entities' signatories hereto represent that, subject to criminal penalties pursuant to 18 U.S.C. § 1001, all written materials and other information supplied to EPA by its Authorized Representative(s) during the course of discussions with EPA preceding this Agreement were true, current, accurate and complete at the time of submission, to the best of their information and belief. Respondents also represent that they have provided to EPA information in their possession relating to the facts at issue. Respondents understand that this Agreement is executed on behalf of EPA in reliance upon the truth, accuracy and completeness of all such information.

**35.**    **RECORDS RETENTION.** BP Covered Entities shall maintain all records necessary or incidental to this Agreement, including but not limited to those records specifically identified by terms in this Agreement, for no less than sixty (60) months subsequent to the expiration of this Agreement.

**36.**    **MAINTENANCE OF PRIVILEGE.** Nothing in this Agreement shall be interpreted to require a BP Covered Entity to disclose information that is subject to the attorney-client privilege, work product doctrine or other applicable legal privilege.

44

**37.    TIME IS OF THE ESSENCE.**  Time is of the essence with respect to the performance of, compliance with and receipt of the benefit of all rights, duties and obligations herein.  If EPA should provide additional time for a BP Covered Entity to comply with any specific deadline hereunder, such tolerance by EPA shall not be construed as a waiver or modification for any future deadlines as required herein.

**38.    RESPONDENT'S SIGNATORY(IES).**  The signatories below are fully authorized to execute this Agreement, and each represents that he or she has authority to bind the BP Covered Entities for which he or she has signed.

**39.    ENDORSEMENT BY SUSPENSION AND DEBARMENT OFFICIAL.**  This Agreement shall become effective only upon its approval and endorsement by the EPA SDO.

**40.    TERM.**  The period of this Agreement shall be five (5) years from the date of endorsement by the EPA SDO.

## XIII.  PARTIES' ENDORSEMENTS

**FOR BP p.l.c. AND ON BEHALF OF COVERED AFFILIATES**

_Rupert Bondy_

NAME

13ᵗʰ March 2014

TITLE _Group General Counsel_

DATE

**FOR BPA**

NAME

DATE

TITLE

**FOR BPXP**

NAME

DATE

TITLE

**FOR BPPNA**

NAME

DATE

TITLE

**FOR BPXA**

NAME

DATE

TITLE

46

## XIII.  PARTIES' ENDORSEMENTS

### FOR BP p.l.c. AND ON BEHALF OF COVERED AFFILIATES

NAME
TITLE

DATE

FOR BPA

NAME   John C. Hinge
TITLE   President and Chairman
        BP America Inc.

DATE   3/12/14

FOR BPXP

NAME
TITLE

DATE

FOR BPPNA

NAME
TITLE

DATE

FOR BPXA

NAME
TITLE

DATE

46

## XIII.   PARTIES' ENDORSEMENTS

**FOR BP p.l.c. AND ON BEHALF OF COVERED AFFILIATES**

NAME _____     DATE _____
TITLE

**FOR BPA**

NAME _____     DATE _____
TITLE

**FOR BPXP**

NAME *RICHARD MORRISON*     13 MARCH 2014
TITLE *PRESIDENT, GULF OF MEXICO*     DATE

**FOR BPPNA**

NAME _____     DATE _____
TITLE

**FOR BPXA**

NAME _____     DATE _____
TITLE

46

## XIII.   PARTIES' ENDORSEMENTS

**FOR BP p.l.c. AND ON BEHALF OF COVERED AFFILIATES**

NAME _____     DATE _____
TITLE

**FOR BPA**

NAME _____     DATE _____
TITLE

**FOR BPXP**

NAME _____     DATE _____
TITLE

**FOR BPPNA**

NAME _____     DATE *March 12, 2014*
TITLE

**FOR BPXA**

NAME _____     DATE _____
TITLE

## XIII.  PARTIES' ENDORSEMENTS

## FOR BP p.l.c. AND ON BEHALF OF COVERED AFFILIATES

NAME _____  DATE _____
TITLE

## FOR BPA

NAME _____  DATE _____
TITLE

## FOR BPXP

NAME _____  DATE _____
TITLE

## FOR BPPNA

NAME _____  DATE _____
TITLE

## FOR BPXA

_Bruce Williams_

NAME   BRUCE WILLIAMS         DATE  3/12/2014
TITLE  VP. OPERATIONS

46

**FOR THE UNITED STATES ENVIRONMENTAL PROTECTION AGENCY**

_____       3/12/14
NAME                                       DATE
Debarment Counsel
EPA Suspension and Debarment Division

_____       3/12/14
NAME                                         DATE
Debarment Counsel
EPA Suspension and Debarment Division

_____       3/12/14
NAME                                         DATE
Debarment Counsel
EPA Suspension and Debarment Division

_____       3/12/14
NAME                                         DATE
Debarment Counsel
EPA Suspension and Debarment Division

## COORDINATING AGENCY CONCURRENCE

### FOR THE UNITED STATES DEPARTMENT OF THE INTERIOR

Debra E. Sonderman
Director
Office of Acquisition and Property Management

MAR 1 2 2014
DATE

48

## SUSPENSION AND DEBARMENT OFFICIAL'S ENDORSEMENT

Having reviewed the terms and conditions of the above Administrative Agreement between the U.S. Environmental Protection Agency and BP Covered Entities, and in reliance on the representations, covenants, and terms herein, I hereby approve the said terms and conditions as an appropriate resolution of this matter. This approval is conditioned upon full compliance with all the terms and conditions of this Agreement. Any material breach or failure to comply with all the terms and conditions of this Agreement may result in a discretionary suspension or debarment or statutory disqualification as appropriate.


MAR 1 3 2014

Laura Fernandez                                                    DATE
Acting EPA Suspension and Debarment Official