October 5, 2015

*via* **ECF**

Hon. Joseph C. Wilkinson
U.S. Magistrate Judge
500 Poydras Street, Room B409
New Orleans, Louisiana  70130

      Re:  <u>In re Deepwater Horizon Litigation</u>
            **MDL No. 2179; Nos. 12-970, 15-4143, 15-4146, 15-4654**
            *Halliburton and Transocean Settlement Allocation*

Dear Judge Wilkinson:

      We respectfully submit this letter jointly, on behalf of Halliburton, Transocean, and Co-Liaison/Co-Lead Class Counsel, in response to the Court's Order of September 29, 2015 [Rec. Doc. 15411].  These Parties had an understanding of the relative risk assessments and strengths/weaknesses of the claims at the times of the settlements, and originally conceived of, agreed to, and proposed the allocation process now at issue before the Court.

Background

      The MDL 2179 litigation history has been extensive since the April 20, 2010 blowout. The first class settlements with BP, on the eve of the original Limitation & Liability Trial date, in early 2012, established both a Medical Benefits Class and an Economic & Property Damages Class, each separately administered, and ultimately fully and finally approved by the Courts.[1] The Economic & Property Damages Settlement included a provision wherein BP assigned virtually all of its rights and claims against Transocean and Halliburton to the Economic & Property Damages Class.[2]  The assignment was made "to the Economic Class, only as a juridical entity and not to Economic Class Members individually."[3]   The members of the class, however, reserved their individual punitive damage claims (if any) against Transocean and Halliburton.[4]

      Therefore, when the Limitation & Liability Trial was rescheduled and actually conducted in 2013, Halliburton and the Transocean Defendants were facing potential liability **(i)** for punitive damages, pursued by the PSC, on behalf of individual BP Classmembers and other Claimants in the Limitation Action with general maritime law standing to bring maritime

---

[1] The Medical Benefits Class Settlement was approved at 295 F.R.D. 112 (E.D.La. 2013) (appeals dismissed); the Economic & Property Damages Class Settlement was approved at 910 F.Supp.2d 891 (E.D.La. 2012), *aff'd,* 739 F.3d 790 (5th Cir. 2014) ("*Deepwater Horizon II*"), *rehearing en banc denied,* 756 F.3d 320 (5th Cir. 2014), *cert. denied,* 135 S.Ct. 734 (2014).

[2] *See generally* EXHIBIT 21 to the Economic & Property Damages Settlement Agreement, [Rec. Doc. 6276-39].

[3] EXHIBIT 21, Section 1.1.3.

[4] *See* BP ECON. SETTLEMENT AGREEMENT, Section 3.6 [Rec. Doc. 6276-1, at 15].

punitive damage claims, and **(ii)** for compensatory (and/or punitive) damages that might be owed to the BP Parties, pursued by the PSC in their role as Class Counsel, on behalf of the Economic & Property Damages Class, standing in the shoes of and as an assignee of BP.[5]

While the Phase One Trial was still under submission before Judge Barbier, the PSC and Halliburton consummated a settlement agreement, (as amended, Rec. Doc. 15322-1), calling for Halliburton to make an aggregate payment of $1,028,000,000 to settle both the Economic & Property Damages Class's assigned claims and virtually all if not all punitive damage claims, (*i.e.* those plaintiffs and claimants-in-limitation with *Robins Dry Dock* standing to sue under the general maritime law), generally believed to be captured within the definition of a New Punitive Damages Class.[6] The Settlement Agreement requires the appointment of an Allocation Neutral to allocate how much of the aggregate payment will go to the existing Economic & Property Damages Settlement Class, and how much will go to the New Punitive Damages Class.[7] This was done, out of an abundance of caution, to avoid any argument or contention that the PSC / Economic & Property Damages Settlement Class Counsel / Proposed New Punitive Damages Class Counsel might have some alleged "conflict" in the allocation of settlement proceeds between the existing class and the proposed New Class. Once the allocation has been made, a new Claims Administrator will be appointed to develop a Distribution Model for and otherwise administer the New Punitive Damages Class.[8]

Shortly before the PSC's Phase One Trial Appeal Brief was scheduled to be filed in the U.S. Fifth Circuit Court of Appeals, the PSC and Transocean consummated a settlement agreement, (Rec. Doc. 14644-1), structured almost identically to the Halliburton Settlement. The agreement calls for Transocean to make an aggregate payment of $211,750,000 to settle both the Economic & Property Damages Class's assigned claims and virtually all if not all punitive damage claims through a New Punitive Damages Class.[9] This Settlement Agreement, like the Halliburton Agreement, requires the appointment of an Allocation Neutral to allocate how much of the aggregate payment will go to the existing Economic & Property Damages Settlement Class, and how much will go to the New Punitive Damages Class.[10] And, as with the Halliburton Settlement, once the allocation has been made, a new Claims Administrator will be appointed to develop a Distribution Model for and otherwise administer the New Punitive Damages Class.[11]

---

[5] *See generally* PLAINTIFFS' OPPOSITION TO TRANSOCEAN'S MOTIONS FOR PARTIAL JUDGMENT ON THE PLEADINGS [Doc. 10186] (May 20, 2013) at pp.5-6 (Overview of Existing Claims), *and,* PLAINTIFFS' OPPOSITION TO HALLIBURTON'S MOTIONS FOR PARTIAL JUDGMENT ON THE PLEADINGS [Doc. 10187] (May 20, 2013), at pp.4-5 (Overview of Existing Claims); *see also, e.g.,* PLAINTIFFS PROPOSED PHASE ONE FINDINGS, pp.17-19 [Rec. Doc. 10459, at 24-26]; ORDER AND REASONS [Rec. Doc. 5493] (Jan. 31, 2012); ORDER AND REASONS [Rec. Doc. 5446] (Jan. 26, 2012).

[6] *See* HALLIBURTON SETTLEMENT AGREEMENT, Section 4 [Rec. Doc. 15322-1, at 5-7]; *see also* EXHIBIT D (Gulf Coast Area and Specified Waters) [Rec. Doc. 15322-5]. *See also* COMPLAINT, No.15-4143, at p.1 and ¶88.

[7] *See* HALLIBURTON SETTLEMENT AGREEMENT, Section 7.

[8] *See* HALLIBURTON SETTLEMENT AGREEMENT, Section 8(a).

[9] *See* TRANSOCEAN SETTLEMENT AGREEMENT, Section 4 [Rec. Doc. 14644-1, at 5-7]; *see also* EXHIBIT D (Gulf Coast Area and Specified Waters) [Rec. Doc. 14644-5]. *See also* COMPLAINT, No.15-4146, at p.1 and ¶118.

[10] *See* TRANSOCEAN SETTLEMENT AGREEMENT, Section 7.

[11] *See* TRANSOCEAN SETTLEMENT AGREEMENT, Section 8(a).

The Parties have all agreed that the New Halliburton Punitive Damages Class and the New Transocean Punitive Damages Class can be noticed and administered together.

Your Honor has, of course, been appointed to serve as the Allocation Neutral.[12]

No Claims Administrator has yet been appointed to develop a Distribution Model for and otherwise administer the New Punitive Damages Class part of the settlements.

Sole Issue For Determination by Allocation Neutral

The sole task of the Allocation Neutral is to allocate how much of the Transocean and Halliburton aggregate payments will go to the existing Economic & Property Damages Class and how much will go to the New Punitive Damages Class.

This allocation is *not* intended to determine how settlement proceeds might be internally allocated or distributed within each class. Rather, the existing Claims Administrator and Trustee of the Court-Supervised Settlement Program will decide how the funds allocated to the existing Economic & Property Damages Class will be distributed between and among those classmembers, and a new Claims Administrator will create a Distribution Model which will determine how the settlement proceeds allocated to the New Punitive Damages Class will be distributed between and among eligible participants in that settlement class, (subject to notice and court approval, etc., as required under Fed. Rule Civ. Pro. 23).

The Type of Information or Insight that May Be Helpful to Your Honor

Both Halliburton and Transocean have insight into the way that each company evaluated its exposure with respect to the relevant claims. Because, however, much of this information is subject to attorney-client and work product privileges, as well as settlement discussion privileges, it was specifically contemplated that the Allocation Neutral could choose to communicate with the parties, as appropriate, on an *ex parte* and confidential basis.[13]

PSC/Class Counsel are, of course, happy to provide any information that might be requested by the Allocation Neutral, but will not advocate for either class to receive a greater allocation than the other.

While the Parties do not believe that it is necessary to obtain information from any other person or entity, we wanted to afford the Allocation Neutral flexibility in gathering any insights or perspectives. Hence, in accordance with Section 7(c) of the Settlement Agreements, Your Honor may wish to communicate with any non-parties, whether *ex parte* or *in camera* or otherwise, to obtain additional information that you might deem helpful or appropriate. Such

---

[12] Rec. Doc. 15398.

[13] *See* HALLIBURTON SETTLEMENT AGREEMENT, Section 7(b); TRANSOCEAN SETTLEMENT AGREEMENT, Section 7(b).

non-parties might include representatives of States, or the United States, who have settled, but are generally familiar with the litigation, or with some of the other MDL Defendants, the existing Economic and/or Medical Claims Administrators, and/or one or more of the Special Masters (including the former Seafood Neutrals) who have been appointed by Judge Barbier.

Potential Way to Proceed

Within 14 Days:  Your Honor meets *in camera* with the PSC/Class negotiating team (Co-Liaison/Co-Lead Class Counsel Steve Herman and Jim Roy, and PSC/Class Counsel members Calvin Fayard and Joe Rice) to understand the background and settlement strategy and positions of the PSC/Class Counsel.  Similar *in camera* meetings would take place separately with Halliburton through its counsel, and with Transocean through its counsel, to better understand where each company stood at the time of settlement, and how they might have evaluated the relative exposures from different types of claims.  The Parties would respectfully request that these meetings be conducted *in camera* to protect attorney-client and work product privileges as well as settlement discussion privileges.  No more than one to two hours should be needed for each meeting.

Your Honor may also wish to meet with non-parties, as noted above.

35 Days:  Deadline for Court to receive any formal submissions by any interested person with standing, not to exceed 10 pages each, and encouraging aligned or coordinated interests to consolidate briefing.

45 Days: Deadline for the Court to receive any written responses.

Your Honor may wish to conduct a Hearing, in order to hear further from the Parties, or to hear from those others, with standing, who have provided written submissions.

Within 60 Days:  Decision on allocation.

We appreciate your time and assistance in this matter, and stand ready to answer any questions or concerns that the Court may have.

Respectfully submitted,

JAMES PARKERSON ROY
STEPHEN J. HERMAN
*Co-Liaison/Co-Lead Class Counsel*

R. ALAN YORK
*Counsel for Halliburton*

KERRY J. MILLER
*Counsel for Transocean Defendants*