UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF LOUISIANA

| | |
|---|---|
| IN RE:  OIL SPILL by the OIL RIG "DEEPWATER HORIZON" in the GULF OF MEXICO on APRIL 20, 2010<br><br>**This Document Relates to:**<br>**2:10-cv-02454, 2:10-cv-01768** | ) MDL NO. 2179<br>)<br>) SECTION: J<br>)<br>) JUDGE BARBIER<br>) MAG. JUDGE SHUSHAN<br>)<br>)<br>) **MEMORANDUM IN SUPPORT OF**<br>) **PLAINTIFF'S MOTION FOR**<br>) **RECONSIDERATION OF THE COURT'S**<br>) **SEPTEMBER 14, 2015 ORDER RE:**<br>) **CROSS-MOTIONS FOR SUMMARY**<br>) **JUDGMENT (ECF NO. 15352)** |

Pursuant to Fed. R. Civ. Proc. 59(e), the Center for Biological Diversity (the "Center"),

plaintiff in *Center for Biological Diversity v. BP America, et al.*, 2:10-cv-02454 and 2:10-cv-

01768, respectfully submits this Memorandum in Support of Plaintiff's Motion for

Reconsideration of the Court's September 14, 2015 Order re: Cross-Motions for Summary

Judgment, ECF No. 15352.  Reconsideration is sought on the Court's holding that Defendants'

injection of excess, unused spacer and drilling muds into the Macondo Well were "associated

with the exploration, development, or production of crude oil[.]"  40 C.F.R. § 261.4(b)(5).  This

motion is timely brought within 28 days after the Court's September 14, 2015 entry of judgment

against Plaintiff in both 2:10-cv-02454 and 2:10-cv-01768.  Fed. R. Civ. Proc. 59(e).

**LEGAL STANDARD**

Fed. R. Civ. Proc. 59(e) allows for motions to alter or amend judgments if such motions

are filed within 28 days after entry of the judgment.  In this Circuit, motions to reconsider grants

of summary judgment are treated as motions to alter or amend under Rule 59(e).  *See Harcon*

*Barge Co., Inc. v. D&G Boat Rentals, Inc.*, 784 F.2d 665, 667 (5th Cir. 1986), *cert. denied sub*

*nom.*, *Southern Pacific Transportation Co. v. Harcon Barge Co.*, 479 U.S. 930 (1986).  Motions

for reconsideration serve "the narrow purpose of allowing a party to correct manifest errors of

1

law or fact or to present newly discovered evidence." *Waltman v. Intl. Paper Co.*, 875 F.2d 468, 473 (5th Cir. 1989). In considering such motions, as well as any new evidence attached thereto, the Court must "strike the proper balance between two competing imperatives: (1) finality, and (2) the need to render just decisions on the basis of all the facts." *Edward H. Bohlin Co., Inc. v. Banning Co., Inc.*, 6 F.3d 350, 355 (5th Cir. 1993); *Ford v. Elsbury*, 32 F.3d 931, 937 (5th Cir. 1994).

## ARGUMENT

In the decision at issue, the Court held that the "petroleum exclusion," 42 U.S.C. § 9601(14), was not vitiated by BP's injection of hazardous materials into the Macondo Well. Decision at 17. The Center argued in its briefing that the addition of 454-barrels of unused spacer and 28,000-30,000 barrels of used drilling muds into the Macondo Well were, under the circumstances of this case, unrelated to the production or refining processes, and therefore removed the oil released from the well from the scope of the petroleum exclusion. *E.g.,* ECF No. 12898 at 5-6 (Center's Reply Brief). BP did not dispute that the unused spacer and used drilling muds contained listed hazardous substances that would otherwise need to be disposed of pursuant to RCRA and reported under EPCRA. The Court partially agreed with the Center, finding that, if BP had added hazardous substances into the well, then "BP would be required to report the release of the petroleum mixed with the drilling fluids from the well." *Id.* at 16. The Court then determined, however, that the unused 454-barrel spacer and the 28,000-30,000 barrels of drilling fluids injected into the well and Blowout Preventer were exempt from the definition of "hazardous substances" because such materials were "associated with the exploration,

2

development, or production of crude oil[.]"  40 C.F.R. § 261.4(b)(5).[1]  This conclusion is a

manifest error of both law and fact, creating serious public policy implications that could have

widespread impact if not corrected by this Court.

     First, as to the unused spacer, it is undisputed that BP dumped the unused and unneeded

spacer into the well in order to get rid of it without complying with the hazardous waste disposal

requirements of the Resource Conservation and Recovery Act, 42 U.S.C. § 6901 *et seq.  See*

Uncontested Deposition Testimony of Leo Linder, ECF No. 12673-7, Ex. 3 (Ex M. at pp. 33-36)

(BP told Mr. Linder not to keep the spacer "pills" because BP "didn't want to have to dispose of

them," and "no one wanted to have to keep either one of this pills," because they likely would

have had to been disposed of properly as non-exempt waste).  The Center contends that this

testimony clearly showed the excess spacer did not fall under the regulatory exemption for

hazardous waste, as *unused* and *unwanted* material *cannot be* "associated with" crude oil

exploration, production, or development.  The excess spacer was not used to explore for crude

oil, was not used to produce crude oil, and was not used in the development of crude oil.  It was

dumped into the well as an unwanted and unneeded waste in order to avoid the cost of regulatory

compliance.

     The Court disagreed.  It decided that the spacer, even though unused and unnecessary for

exploration, production, and development, was still "associated with" these activities.  Decision

---

[1] The Court also stated that "[t]he Center asserts that the contents of the spacer fluid and drilling mud are not subject to the reporting requirement[.]"  Decision at 15.  This statement by the Court is manifestly incorrect. To the contrary, the Center directly argued that BP is required to report the release of all reportable quantities of EPCRA-covered substances. The Center simply did not move for summary judgment on these particular elements because of potential material issues of fact. *See, e.g.,* Center's Statement of Material Fact, ECF No. 12673-2 at ¶¶ 18-19 (drilling muds contained ethylene glycol, caustic soda, and methanol, all listed hazardous substances); ¶ 36 n. 1 (noting that no reports about the release of any other hazardous substances were submitted by BP).

at 16.  Based on this reasoning, any material, regardless of whether it is actually used in connection with crude oil exploration, production, and development, would fall under the ambit of the EPA exemption at 40 C.F.R. § 261.4(b)(5).  Indeed, based on the Court's interpretation, the phrase "associated with" stretches so far that any material that is merely *present* at a drilling site is subject to the exemption.  This broad interpretation takes the exemption well beyond its intended reach.

The same is true for the Court's holding concerning the 28,000-30,000 barrels of drilling muds injected into the well.  Decision at 16.  The Court reasoned that the drilling muds – muds that undisputedly contained hazardous substances, ECF No. 12673-2 at ¶¶ 18-19 – injected into the Macondo Well to stop the uncontrolled discharge of oil were "associated with" crude oil exploration, production, and development.  This interpretation exceeds the bounds of a reasonable application of "associated with."  The drilling muds were injected in a failed attempt to *stop* the uncontrolled flow of oil, not to facilitate the exploration of crude oil, the development of crude oil, or the production of crude oil.  The steps BP took to try to stop of the flow of oil, are unequivocally *not*  "associated with" activities designed to locate oil, remove oil from the ground, or to produce and refine oil for use in the marketplace.  Put differently, stopping the flow of oil and killing the Macondo well are not the same thing as exploring, producing, and developing that well.  They are exactly the opposite.

Importantly, the Court relied upon some EPA guidance documents, including an EPA General Counsel decision from 1987, in rendering its Decision in this matter.  The Center respectfully submits that the Court relied upon partial and incomplete guidance, and that to render a just and fair decision in this case, it must look to the complete set of guidance documents that directly touch upon this issue.  *Decker v. Nw. Envtl. Def. Ctr.*, 133 S. Ct. 1326,

1337 (2013) (courts to defer to agency interpretation of its own regulation unless it is plainly

erroneous or inconsistent with regulation).  For instance, the EPA issued a "clarification"

document on March 22, 1993, which described the hazardous waste exemption found at 40

C.F.R. § 261.4(b)(5), and, in particular, the scope of the phrase "associated with."  Specifically,

the Agency stated:

> "[F]or a waste to be exempt from regulation as hazardous waste under RCRA Subtitle C, it must be associated with operations **to locate or remove oil or gas from the ground** or **to remove impurities from such substances and it must be intrinsic to and uniquely associated with oil and gas exploration, development or production operations** (commonly referred to simply as exploration and production or E&P)."

The document provides additional useful guidance:

> "A simple rule of thumb for determining the scope of the exemption is whether the waste in question has come from down-hole (i.e., brought to the surface during oil and gas E&P operations) or has otherwise been generated by contact with the oil and gas production stream during the removal of produced water or other contaminants from the product (e.g., waste demulsifiers, spent iron sponge)."

*Clarification of the Regulatory Determination for Wastes from the Exploration, Development and Production of Crude Oil, Natural Gas and Geothermal Energy*, 58 F.R. 15284 (March 22, 1993) (attached hereto as Appendix A) (emphases added).

Similarly, in an October, 2002 EPA publication, the Agency provided further guidance to

the oil and natural gas industry for when a waste is "associated with the exploration,

development, and production of crude oil."  Relevant here is the "common misunderstandings"

section, which states:

> "**Misunderstanding:** All wastes located at E&P sites are exempt.
>
> **Fact:** All wastes located at E&P sites are not necessarily exempt. **To be considered an exempt waste, the waste must have been generated from a material or process uniquely associated with**

**the exploration, development, and production of crude oil and natural gas.** For example, a solvent used to clean surface equipment or machinery is not exempt because it is not uniquely associated with exploration, development, or production operations. Conversely, if the same solvent were used in a well, it would be exempt because it was generated through a procedure that is uniquely associated with production operations."

…

**Misunderstanding:** Unused products are exempt.

**Fact: Unused products, if disposed of, are not exempt, regardless of their intended use, because they have not been used and therefore are not uniquely associated with the exploration or production of oil and gas.** When unused products become waste (e.g., they are disposed of), they are subject to RCRA Subtitle C hazardous waste regulations if they are listed or exhibit a hazardous characteristic.

EPA Publication EPA530-K-01-004, "Exemption of Oil and Gas Exploration and Production Wastes from Federal Hazardous Waste Regulations," pp. 18-20, October, 2002 (emphases added) (attached hereto as Appendix B).

These EPA interpretative documents directly contradict the Court's conclusions that the unused excess spacer dumped into the wellbore and the 28-30,000 barrels of used drilling muds injected into the Blowout Preventer to stop the flow of oil are "associated with the exploration, development, or production of crude oil" and thus subject to the exemption found at 40 C.F.R. § 261.4(b)(5).[2] *Chevron, U.S.A. v. Nat. Res. Def. Council, Inc.*, 467 U.S. 837, 844 (1984)

---

[2] The Center recognizes that the cited references could be considered "new evidence" that should not be submitted after summary judgment briefing has concluded. However, the Center respectfully submits that it reasonably believed the language of the exemption clear enough on its face, such that no secondary sources were required to support the Center's position. In any event, the purpose of Plaintiff's Motion is to correct a manifest error of law and fact in the Court's decision, and the Center submits that the Court should consider these materials in revisiting its opinion. These are, after all, the types of documents for which the Court can take judicial notice. *Martinez v. Dow Chem. Co.*, 219 F. Supp. 2d 719, 734 n. 4 (E.D. La. 2002) (J. Barbier) ("the Court is authorized to take judicial notice of official government publications").

(considerable weight should be accorded to agency's administrative interpretations); *Ford Motor Credit Co. v. Milhollin*, 444 U.S. 555, 566 (1980) ("An agency's construction of its own regulations has been regarded as especially due that respect.").  Instead, these documents show that EPA – the Agency responsible for implementing RCRA – would itself determine that the excess spacer and drilling muds *were* hazardous waste not subject to the exemption, for these materials *were not* used "to locate or remove oil…from the ground…or to remove impurities from such substances," nor "intrinsic to" or "uniquely associated" with oil and gas exploration, development, or production operations.[3]   Simply put, the overuse of spacer material and the injection of drilling muds to cease an unanticipated blowout are not part of, nor "associated with," the expected crude oil exploration, development, and production process.

Public policy also calls into question the Court's decision.  By judicially extending the regulatory exemption of hazardous waste under RCRA to virtually any substance located in proximity to an oil or gas well – an expansion well beyond EPA's own interpretation of its regulations – the Court has created a veritable black hole in which oil and gas companies can dump untold sums of hazardous waste into the environment that would not otherwise be considered "associated with" oil and gas exploration, development, and production.  This is especially problematic in the context of oil spills – situations in which Congress has said the public deserves *more* information about the types and quantities of materials being released into the environment, not less.  In sum, EPA's interpretative guidance, as well as a common sense interpretation of the phrase "associated with," directly contradict the Court's conclusion about the hazardous waste exemption in its Decision.  To avoid manifest injustice and creation of case

---

[3]  Furthermore, counsel for the Center contacted EPA to seek their position on this Court's decision.  While EPA has said that they agree with the Center's position, see e-mail from Dean Ziegel of EPA attached to the Declaration of Charles M. Tebbutt, they also indicated that they would not likely weigh in unless the matter went before the Court of Appeals.

law that could lead to further misinterpretations of the laws designed to protect against pollution and provide the public the right to know, the Center respectfully requests that the Court reconsider this particular holding.[4]

**CONCLUSION**

For the reasons articulated herein, the Center respectfully requests that the Court revisit and alter or amend its Decision in this matter.  As the Court itself noted, if the drilling muds and spacer fluid are indeed hazardous substances, then "BP would be required to report the release of the petroleum mixed with the drilling fluids from the well."  Decision at 16.  BP did not contradict the Plaintiff's calculations about the reportable quantities of benzene, toluene, and xylene released from the well, nor the fact that the spacer fluid and drilling muds themselves contain hazardous substances that require reporting.  Accordingly, the Court should revise its opinion and grant the Center's Motion for Partial Summary Judgment as set forth herein.

DATED this 9th Day of October, 2015.

Respectfully submitted,

s/Charles M. Tebbutt
Charles M. Tebbutt
Daniel C. Snyder
Law Offices of Charles M. Tebbutt, P.C.
941 Lawrence St.
Eugene, OR 97401
Ph: 541-344-3505
E-mail: Charlie@tebbuttlaw.com
E-mail: Dan@tebbuttlaw.com

---

[4] While the Center does not agree with the Court's holdings on other issues concerning EPCRA's application to the Gulf disaster, reconsideration is sought only on the issue raised herein.

## <u>CERTIFICATE OF SERVICE</u>

I hereby certify that the above and foregoing Memorandum in Support of Plaintiff's Motion for Reconsideration of the Court's September 14, 2015 Order re: Cross-Motions for Summary Judgment has been served on All Counsel by electronically uploading the same to Lexis Nexis File & Serve in accordance with Pretrial Order No. 12, and that the foregoing was electronically filed with the Clerk of the Court of the United States District Court for the Eastern District of Louisiana by using the CM/ECF System, which will send notice of electronic filing in accordance with the procedures established in MDL 2179, on this 9th day of October, 2015.

s/ Charles M. Tebbutt
Charles M. Tebbutt
Law Offices of Charles M. Tebbutt, P.C.

# APPENDIX A

FEDERAL REGISTER
VOL. 58, No. 53

Rules and Regulations

ENVIRONMENTAL PROTECTION AGENCY (EPA)

40 CFR Part 261

[FRL-4606-6]

Clarification of the Regulatory Determination for Wastes From the Exploration, Development and Production of Crude Oil, Natural Gas and Geothermal Energy

58 FR 15284

DATE: Monday, March 22, 1993

ACTION: Clarification.

--------------------------------------------------------------

SUMMARY: This document provides additional clarification of the Resource Conservation and Recovery Act (RCRA) Regulatory Determination for Oil and Gas and Geothermal Exploration, Development and Production Wastes dated June 29, 1988 (53 FR 25446; July 6, 1988). This document clarifies the regulatory status of wastes generated by the crude oil reclamation industry, service companies, gas plants and feeder pipelines, and crude oil pipelines. Since this document only further clarifies the status of these wastes under the RCRA Subtitle C hazardous waste exemption discussed in EPA's 1988 Regulatory Determination, and does not alter the scope of the current exemption in any way, comments are not being solicited by the Agency on this notice.

FOR FURTHER INFORMATION CONTACT: For general information on the scope of the RCRA Subtitle C exemption for wastes from the exploration, development and production of crude oil, natural gas and geothermal energy, contact the RCRA/Superfund hotline at (800) 424-9346 (toll free) or (703) 412-9810. For technical information, contact Mike Fitzpatrick, U.S. Environmental Protection Agency OS-323W, 401 M Street, SW., Washington, DC 20460; phone (703) 308-8411.
SUPPLEMENTARY INFORMATION:

Table of Contents

I. Introduction

II. Clarification of the Scope of the Oil and Gas Exemption

    A. Crude Oil Reclamation Industry

58 FR 15284

B. Service Companies

C. Crude Oil Pipelines

D. Gas Plants and Feeder Pipelines

III. Administrative Procedures Act Requirements

IV. EPA RCRA Docket

## I. Introduction

In the Solid Waste Disposal Act Amendments of 1980 (Pub. L. 94-580), Congress amended the Resource Conservation and Recovery Act (RCRA) to add sections 3001 (b)(2)(A), and 8002(m). Section 3001(b)(2)(A) exempted drilling fluids, produced waters, and other wastes associated with exploration, development, and production of crude oil, natural gas and geothermal energy from regulation as hazardous wastes. Section 8002(m) required the Administrator to complete a Report to Congress and provide an opportunity for public comment. The Administrator was also required by section 3001 (b)(2)(A) to make a determination no later than six months after completing the Report to Congress as to whether hazardous waste regulations under RCRA Subtitle C were warranted for these wastes.

EPA's Report to Congress was transmitted to Congress on December 28, 1987. In the process of preparing the Report to Congress, the Agency found it necessary to define the scope of the exemption for the purpose of determining which wastes were considered "wastes from the exploration, development or production of crude oil, natural gas or geothermal energy." Based upon statutory language and legislative history, the Report to Congress identified several criteria used in making such a determination. In particular, for a waste to be exempt from regulation as hazardous waste under RCRA Subtitle C, it must be associated with operations to locate or remove oil or gas from the ground or to remove impurities from such substances and it must be intrinsic to and uniquely associated with oil and gas exploration, development or production operations (commonly referred to simply as exploration and production or E&P); the waste must not be generated by transportation or manufacturing operations.

Transportation of oil and gas can be for short or long distances. For crude oil, "transportation" is defined in the Report to Congress and the subsequent Regulatory Determination as beginning after transfer of legal custody of the oil from the producer to a carrier (i.e., pipeline or trucking concern) for transport to a refinery or, in the absence of custody transfer, after the initial separation of the oil and water at the primary field site. For natural gas, "transportation" is defined as

58 FR 15284

beginning after dehydration and purification at a gas plant, but prior to transport to market. To accurately determine the scope of the exemption, the reader is referred to the December 28, 1987, Report to Congress, Management of Wastes from the Exploration, Development, and Production of Crude Oil, Natural Gas, and Geothermal Energy (NTIS # PB88-146212) for the specific application of the criteria.

The Agency's Regulatory Determination was published in the Federal Register on July 6, 1988 (53 FR **[Page 15285]**  25446). The Regulatory Determination included a list of example wastes that generally are exempt and a list of example wastes that generally are not exempt. Neither of these lists was intended to be a complete itemization of all possible exempt or non-exempt wastes. Also, because definitions of the terms used in these lists vary, the criteria identified in the Report to Congress remain the authoritative source for determining the scope of the exemption. The reader is referred to the July 6, 1988, notice for detailed background on all aspects of the Regulatory Determination.

Since 1987, the terms uniquely associated and intrinsic have been used as interchangeable synonyms in various documents in reference to oil and gas wastes qualifying for the exemption from Subtitle C regulation. (For simplicity's sake, when referring to exempt wastes, this notice combines the use of these two terms into the single term uniquely associated.) A simple rule of thumb for determining the scope of the exemption is whether the waste in question has come from down-hole (i.e., brought to the surface during oil and gas E&P operations) or has otherwise been generated by contact with the oil and gas production stream during the removal of produced water or other contaminants from the product (e.g., waste demulsifiers, spent iron sponge). If the answer to either question is yes, the waste is most likely considered exempt.

Since the Agency's Regulatory Determination, numerous requests have been received for determination, on a site-specific basis, of the regulatory status of wastes not itemized in the Regulatory Determination's list of examples. Many of these requests have dealt with broad categories of similar wastes (e.g., crude oil reclaimer wastes, service company wastes, pipeline wastes). Today's notice responds to the many requests for clarification of the scope of the exemption.

## II. Clarification of the Scope of the Oil and Gas Exemption

A. Crude Oil Reclamation Industry

The crude oil reclamation industry recovers marketable crude oil and other
hydrocarbons from produced water, crude oil tank bottoms and

                              58 FR 15285

other oily wastes that are generated by the production of crude oil

and natural gas. In general, the marketable crude oil is recovered from the waste materials by simple thermal and/or physical processes (e.g., heat and gravity separation). Occasionally, demulsifiers may be added to produced waters from which crude oil cannot be separated with heat and settling time alone. The typical residual materials left after removal of the crude oil by the reclaimers are also produced water and tank bottom solids. These residuals will often exhibit the same characteristics as the parent waste, although the concentrations of some constituents may vary from those in the parent.

In September 1990, the crude oil reclamation industry requested that the Agency provide an interpretation of the language in the 1988 Regulatory Determination pertaining to RCRA Subtitle C coverage of wastes from crude oil and tank bottom reclaimers. (The list of "non-exempt" wastes in the Regulatory Determination included "liquid and solid wastes generated by crude oil and tank bottom reclaimers.") In particular, they requested that EPA clarify whether any wastes generated by crude oil reclaimers are included within the oil and gas exemption, particularly those originating from the crude oil itself, such as produced water and the other extraneous materials in crude oil, otherwise known as basic sediment and water (BS&W).

In April 1991, the Agency responded to the request with a letter that included broad guidance on the status of wastes from the crude oil reclamation industry. (A copy of the letter is included in the docket to this notice.) EPA explained that the inclusion of "liquid and solid wastes" from crude oil
reclamation on the list of non-exempt wastes contained in the Regulatory Determination was intended to refer only to those non-E&P wastes generated by reclaimers (e.g., waste solvents from cleaning reclaimers' equipment) and was not intended to refer to wastes remaining from the treatment of exempt wastes originally generated by the exploration, development or production of crude oil or natural gas.

EPA's basis for this position is several-fold. First, the Agency has consistently taken the position that wastes derived from the treatment of an exempt waste, including any recovery of product from an exempt waste, generally remain exempt from the requirements of RCRA Subtitle C. Treatment of, or product recovery from, E&P exempt wastes prior to disposal does not negate the exemption. [The same principle applies to exempt mining and mineral processing wastes. See, 54 FR at 36621 (Sept. 1, 1989).] For example, waste residuals (e.g., BS&W) from the on-site or off-site process of recovering crude oil from tank bottoms obtained from crude oil storage facilities at primary field operations (i.e., operations at or near the wellhead) are exempt from RCRA Subtitle C because the crude oil storage tank bottoms at primary field operations are exempt. In effect,

                                           58 FR 15285

reclaimers are conducting a specialized form of waste treatment in which valuable product is recovered and removed from waste uniquely

associated with E&P operations. In addition, in many cases, product recovery or treatment reduces the volume and overall toxicity of the waste and thereby contributes to the Agency's policy and goals for waste minimization and treatment of waste prior to disposal.

EPA further notes that the off-site transport of exempt waste from a primary field site for treatment, reclamation, or disposal does not negate the exemption. The change of custody criterion (which is discussed in the Report to Congress) for the purpose of defining transportation refers to the transport of product (crude oil, natural gas) and does not apply to exempt wastes moving off-site for treatment or disposal since these wastes were generated by the exploration, development or production operations and not by the transportation process. Thus, the off-site transport and/or sale of exempt oil-field wastes to crude oil reclaimers for treatment does not terminate the exempt status either of the wastes or the residuals from a reclamation process applied to these wastes.

However, there are solid and liquid wastes from reclamation operations that are not exempt from RCRA Subtitle C. These are wastes which the Agency intended to refer to in its example within the 1988 Regulatory Determination. Generally, these reclaimer wastes are derived from non-exempt oilfield wastes or otherwise contain materials that are not uniquely associated with exploration, development or production operations. An example would be waste solvents generated from the solvent cleaning of tank trucks that are used to transport oilfield tank bottoms. Such wastes would not be exempt from Subtitle C because the use of cleaning solvents is not uniquely associated with the production of crude oil.

Generally, crude oil reclaimer wastes that are derived from exempt oilfield wastes (e.g., produced water, BS&W) are not subject to the Subtitle C waste management requirements of RCRA. Such wastes, however, remain subject to any applicable state solid waste management requirements. Moreover, this exemption from RCRA Subtitle C requirements may not apply if the crude oil reclaimer wastes are combined with other wastes that are subject to RCRA Subtitle C requirements.   **[Page 15286]**

B. Service Companies

Oil and gas service companies are those companies hired by the principal operating company to, among other things, supply materials for use at a drilling or production site or provide a service to be performed. Some of the activities of service companies take place on-site while others may take place off-site. Examples of the types of activities that may take place

58 FR 15286

off-site are product formulation, transport of materials, laboratory analysis, and waste handling and disposal.

The 1988 Regulatory Determination stated that "oil and gas service company wastes, such as empty drums, drum rinsate, vacuum truck

rinsate, sandblast media, painting wastes, spent solvents, spilled
chemicals, and waste acids" are not covered by the oil and gas E&P
exemption. The Agency intended this statement to identify those
wastes, including unused and discarded product materials, generated
by service companies that are not uniquely associated with primary
field operations. (Primary field operations occur at or near the
wellhead or gas plant and include only those operations necessary to
locate and recover oil and gas from the ground and to remove
impurities.) Similar to the reference to crude oil reclamation
wastes, the Agency did not intend to imply that under no
circumstances will a service company ever generate a RCRA Subtitle
C-exempt waste. For example, if a service company generates spent
acid returns from a well work-over, the waste is exempt since the
waste acid in this case came from down-hole and was part of primary
field operations.

EPA is aware that some confusion exists in various segments of the
industry with regard to the scope of the exemption from RCRA Subtitle
C for solid wastes not uniquely associated with oil and gas
exploration and production. One common belief is that any wastes
generated by, in support of, or intended for use by the oil and gas
E&P industry (including most service company wastes) are exempt. This
is not the case; in fact, only wastes generated by activities
uniquely associated with the exploration, development or production
of crude oil or natural gas at primary field operations (i.e., wastes
from down-hole or wastes that have otherwise been generated by
contact with the production stream during the removal of produced
water or other contaminants from the product) are exempt from
regulation under RCRA Subtitle C regardless of whether they are
generated on-site by a service company or by the principal operator.
In other words, wastes generated by a service company (e.g., unused
frac or stimulation fluids and waste products) that do not meet the
basic criteria listed in the Report to Congress (i.e., are not
uniquely associated with oil and gas E&P operations) are not exempt
from Subtitle C under the oil and gas exemption, just as wastes
generated by a principal operator that do not meet these criteria are
not exempt from coverage by RCRA Subtitle C.

The 1988 Regulatory Determination also stated that "vacuum truck
and drum rinsate from trucks and drums transporting or containing
non-exempt waste" is not included within the exemption (emphasis
added). The unstated corollary to this is that vacuum truck and drum
rinsate from trucks and drums transporting or containing exempt
wastes is exempt, provided that the trucks or drums only contain
E&P-related exempt wastes and that the water

58 FR 15286

or fluid used in the rinsing is not subject to RCRA Subtitle C (i.e.,
is itself non-hazardous). This is consistent with the general policy
principle that certain wastes derived exclusively from RCRA Subtitle
C-exempt wastes remain exempt from RCRA Subtitle C.

C. Crude Oil Pipelines

Crude oil is produced from the ground through a system of one or more wells in an oilfield. The oil and any related produced water typically is directed to a series of tanks known as a tank battery where the water and oil separate naturally due to gravity; sometimes, separation is enhanced by the use of heat. Most water is separated from the oil at the tank battery. The volume of oil produced is then metered prior to a change in custody or ownership of the oil and/or its transportation off-site.

In the case of crude oil, all production-related activities occur as part of primary field operations at or near the wellhead. Wastes generated as part of the process of transporting products away from primary field operations are not exempt. Generally, for crude oil production, a custody transfer of the oil (i.e., the product) or, in the absence of custody transfer, the end point of initial product separation of the oil and water, will define the end point of primary field operations and the beginning of transportation. Only wastes generated before the end point of primary field operations are exempt. In this context, the term end point of initial product separation means the point at which crude oil leaves the last vessel, including the stock tank, in the tank battery associated with the well or wells. The purpose of the tank battery is to separate the crude oil from the produced water and/or gas. The movement of crude oil by pipeline or other means after the point of custody transfer or initial product separation is not part of primary field operations.

Therefore, any waste generated by the transportation or handling of the crude oil (product) after custody transfer or, in the absence of custody transfer, after the end point of initial product separation of the oil and water, is not within the scope of the exemption. Examples of non-exempt wastes resulting from transportation include transportation pipeline pigging wastes, contaminated water and snow resulting from spills from transportation pipelines or other forms of transport of the product, and soils contaminated from such spills. It should be noted that the hydrocarbon-bearing soils identified in the 1987 Report to Congress and listed in the 1988 Regulatory Determination as being exempt are limited to those hydrocarbon-bearing soils that occur at oil or gas E&P sites or result from spills of exempt waste. As discussed above, the exempt status of wastes generated by primary field operations and transported off-site for treatment or disposal is not affected by

                                                        58 FR 15286

custody transfer.

D. Gas Plants and Feeder Pipelines

Natural gas is produced from the ground through a system of one or more wells in a gas field. Some water may be separated from the gas at the wellhead, but due to economy of scale, the gas from several wells is generally commingled and sent to a central gas plant where additional water and other impurities are removed. The ownership, or custody, of the natural gas commonly changes hands between the

wellhead and the gas plant, yet the removal of impurities from the gas at a gas plant is still a necessary part of the production process for natural gas.

For natural gas, primary field operations (as defined in the 1987 Report to Congress) include those production-related activities at or near the wellhead and at the gas plant (regardless of whether or not the gas plant is at or near the wellhead) but prior to transport of the natural gas from the gas plant to market. Because the movement of the natural gas between the wellhead and the gas plant is considered a necessary part of the production operation, uniquely associated wastes derived from the production stream along the gas plant feeder pipelines (e.g., produced water, gas condensate) are considered exempt wastes, even if a change of custody of the natural gas has occurred between **[Page 15287]** the wellhead and the gas plant. Some wastes generated at this production stage may not be uniquely associated with the natural gas production stream and are, therefore, not exempt (e.g., pump lube oil, waste mercury from meters and gauges). Similarly, soils contaminated by spills of wastes that are not uniquely associated with production operations, such as soils contaminated by mercury from gauges, are not exempt wastes.

Wastes generated at compressor stations and facilities located along the transportation and distribution network downstream from the gas plant or at the market end of the transportation system are not covered by the E&P exemption. These wastes are not uniquely associated with oil or gas exploration and production and are not exempt.

In addition, wastes generated by non-production related activities (i.e., manufacturing) that may occur at a gas plant are not exempt. These non-exempt manufacturing activities include operations that go beyond the removal of impurities from the raw gas and the physical separation of the gas into its component fractions. Manufacturing activities would be those that are similar to petrochemical plant operations, such as the cracking and reforming of the molecular structures of the various gas fractions and the addition of odorants or other substances. The end point of the scope of the exemption for natural gas is in the gas plant once manufacturing begins or, if no manufacturing

58 FR 15287

occurs, at the point at which the natural gas leaves the gas plant for transportation to market.

It should be noted that the production of elemental sulfur from hydrogen sulfide gas at a gas plant is considered treatment of an exempt waste (i.e., the hydrogen sulfide gas is a uniquely associated waste). This waste treatment process reduces the volume and/or toxicity of the exempt waste and produces a saleable product. As such, this process is similar to crude oil reclamation and any residual waste derived from the hydrogen sulfide remains exempt.

Finally, wastes uniquely associated with operations to recover natural gas from underground gas storage fields are covered by the exemption just as if the gas were being produced for the first time. This is because operations to store and retrieve natural gas from natural underground formations, as well as the types of wastes generated, are virtually identical to those involved with the production of natural gas for the first time, although the volume of wastes generated by natural gas storage and retrieval is typically smaller than the volume generated by the initial production. In effect, in the context of the E&P exemption, the storage of natural gas in natural underground formations returns the gas to the beginning point of the production process.

## III. Administrative Procedure Act Requirements

Today's notice is issued without request for public comment since it does not revise, amend, repeal, change, or otherwise alter any EPA regulation, nor constitute a change to EPA's 1988 Regulatory Determination regarding oil and gas exploration and production wastes. This notice merely provides further clarification of EPA's statements regarding the scope of the exemption for oil and gas wastes. Thus, EPA does not believe that today's notice constitutes an action for which notice and comment is required under the Administrative Procedure Act (APA).

To the extent today's notice is covered by APA requirements, EPA believes that it is merely interpreting the scope of the existing RCRA statutory exclusion for oil and gas wastes, for which notice and comment is not ordinarily required. Alternatively, EPA believes it has good cause under Section 553(b) of the APA to publish this notice without opportunity for comment. EPA has already received substantial comment regarding the scope of the oil and gas exemption in response to its 1987 Report to Congress, and further comment on the issue is unnecessary, particularly since EPA is not altering its position from that which the Agency announced in the 1988 Regulatory Determination.

### IV. EPA RCRA Docket

58 FR 15287

The EPA RCRA docket is located at: United States Environmental Protection Agency, RCRA Information Center, room M2427, 401 M Street, SW., Washington, DC 20460.

The RCRA Information Center is open from 9:00 to 4:00 Monday through Friday, except for federal holidays. The public must make an appointment to review docket materials. Call the docket at (202) 260-9327 for appointments. Copies cost $.15 per page.

The following documents related to the July 6, 1988 regulatory determination are available for inspection in docket number F-88-OGRA-FFFFF.

   -- Report to Congress on Management of Wastes from the

Exploration, Development, and Production of Crude Oil, Natural Gas, and Geothermal Energy;

    -- All supporting documentation for the regulatory determination, including public comments on the Report to Congress and EPA response to comments, and

    -- Transcripts from the public hearings on the Report to Congress.

    All supporting documentation for this Federal Register Notice are available for inspection in docket number F-93-OGRC-FFFFF.

    Dated: March 11, 1993.

    Richard J. Guimond,

    Assistant Surgeon General, USPHS. Acting Assistant Administrator. [FR Doc. 93-6153 Filed 3-19-93; 8:45 am]

    BILLING CODE 6560-50-P

# APPENDIX B



United States
Environmental Protection
Agency

# Exemption of Oil and Gas Exploration and Production Wastes from Federal Hazardous Waste Regulations



Printed on paper that contains at least 30 percent postconsumer fiber.

Cover photo: Oil Production, Bakersfield, California

# Introduction

This publication provides an understanding of the exemption of certain oil and gas exploration and production (E&P) wastes from regulation as hazardous wastes under Subtitle C of the Resource Conservation and Recovery Act (RCRA).

The information contained in this booklet is intended to furnish the reader with:

- A basic background on the E&P exemption.

- Basic rules for determining the exempt or non-exempt status of wastes.

- Examples of exempt and non-exempt wastes.

- Status of E&P waste mixtures.

- Clarifications of several misunderstandings about the exemption.



- Answers to frequently asked questions.
- Recommendations for sensible waste management.
- Additional sources of information.

The American Petroleum Institute (API) estimated that 149 million barrels of drilling wastes, 17.9 billion barrels of produced water and 20.6 million barrels of other associated wastes were generated in 1995 from exploration and production (E&P) operations.

Once generated, managing these wastes in a manner that protects human health and the environment is essential for limiting operators' legal and financial liabilities and also makes good business sense. Operators must also determine if the waste is subject to hazardous waste regulations. At times this determination is misunderstood and can lead to improper waste management decisions.

Drilling waste volumes are directly related to the level of drilling activity. API data show that the total footage drilled for all oil and gas wells dropped from 315.4 million feet in 1985 to 118 million feet in 1995, a decrease of 60 percent. A corresponding drop in the volume of drilling waste, from 361 million barrels in 1985, to 149 million barrels in 1995, was estimated.

On the other hand, as hydrocarbons from producing wells deplete, produced water volumes typically increase. API has estimated that the average volume of produced water increased from 6 barrels of water per barrel of oil in 1985, to 7.5 barrels of water per barrel of oil in 1995.

Prudent waste management decisions, even for nonhazardous wastes, should be based on the inherent nature of the waste. Not all waste management options are appropriate for every waste. Operators also should be familiar with state and federal regulations governing the management of hazardous and nonhazardous wastes.

The preferred option for preventing pollution is to avoid generating wastes whenever possible (source reduction). Examples include process modifications to reduce waste volumes and materials substitution to reduce toxicity.



Understanding the procedures for determining the exempt or nonexempt status of a waste is a valuable tool, especially for operators who choose to develop voluntary waste management plans. When these procedures are used in conjunction with a knowledge of the nature of the waste, the operator will be better prepared to develop site-specific waste management plans and to manage E&P wastes in a manner that protects human health and the environment.



# Scope of the Exemption

In December 1978, EPA proposed hazardous waste management standards that included reduced requirements for several types of large volume wastes. Generally, EPA believed these large volume "special wastes" are lower in toxicity than other wastes being regulated as hazardous waste under RCRA. Subsequently, Congress exempted these wastes from the RCRA Subtitle C hazardous waste regulations pending a study and regulatory determination by EPA. In 1988, EPA issued a regulatory determination stating that control of E&P wastes under RCRA Subtitle C regulations is not warranted. Hence, E&P wastes have remained exempt from Subtitle C regulations. The RCRA Subtitle C exemption, however, did not preclude these wastes from control under state regulations, under the less stringent RCRA Subtitle D solid waste regulations, or under other federal regulations. In addition, although they are relieved from regulation as hazardous wastes, the exemption does not mean these wastes could not present a hazard to human health and the environment if improperly managed.

Among the wastes covered by the 1978 proposal were "gas and oil drilling muds and oil production brines." The oil and gas exemption was expanded in the 1980 legislative amendments to RCRA to include "drilling fluids, produced water, and other wastes associated with the exploration, development, or production of crude oil or natural gas. . . ." (Geothermal energy wastes were also exempted but are not addressed by this publication.)

According to the legislative history, the term "other wastes associated" specifically includes waste materials intrinsically derived from primary field operations associated with the exploration, development, or production of crude oil and natural gas. The phrase "intrinsically derived from the primary field operations" is intended to distinguish exploration, development, and production operations from transportation and manufacturing operations.





With respect to crude oil, primary field operations include activities occurring at or near the wellhead and before the point where the oil is transferred from an individual field facility or a centrally located facility to a carrier for transport to a refinery or a refiner.

With respect to natural gas, primary field operations are those activities occurring at or near the wellhead or at the gas plant, but before the point where the gas is transferred from an individual field facility, a centrally located facility, or a gas plant to a carrier for transport to market. Examples of carriers include trucks, interstate pipelines, and some intrastate pipelines.

Primary field operations include exploration, development, and the primary, secondary, and tertiary production of oil or gas. Crude oil processing, such as water separation, de-emulsifying, degassing, and storage at tank batteries associated with a specific well or wells, are examples of primary field operations. Furthermore, because natural gas often requires processing to remove water and other impurities prior to entering the sales line, gas plants are considered to be part of production operations regardless of their location with respect to the wellhead.

In general, the exempt status of an E&P waste depends on how the material was used or generated as waste, not necessarily whether the material is hazardous or toxic. For example, some exempt E&P wastes might be harmful to human health and the environment, and many non-exempt wastes might not be as harmful. The following simple rule of thumb can be used to determine if an E&P waste is exempt or non-exempt from RCRA Subtitle C regulations:

◆ Has the waste come from down-hole, i.e., was it brought to the surface during oil and gas E&P operations?

◆ Has the waste otherwise been generated by contact with the oil and gas production stream during the removal of produced water or other contaminants from the product?

If the answer to either question is yes, then the waste is likely considered exempt from RCRA Subtitle C regulations. It is important to remember that *all* E&P wastes require proper management to ensure protection of human health and the environment.



# Exempt and Non-Exempt Wastes

In its 1988 regulatory determination, EPA published the following lists of wastes that were determined to be either exempt or non-exempt. These lists are provided as examples of wastes regarded as exempt and non-exempt and should not be considered to be comprehensive. The exempt waste list applies only to those wastes generated by E&P operations. Similar wastes generated by activities other than E&P operations are not covered by the exemption.



# Exempt E&P Wastes

- Produced water
- Drilling fluids
- Drill cuttings
- Rigwash
- Drilling fluids and cuttings from offshore operations disposed of onshore
- Geothermal production fluids
- Hydrogen sulfide abatement wastes from geothermal energy production
- Well completion, treatment, and stimulation fluids
- Basic sediment, water, and other tank bottoms from storage facilities that hold product and exempt waste
- Accumulated materials such as hydrocarbons, solids, sands, and emulsion from production separators, fluid treating vessels, and production impoundments
- Pit sludges and contaminated bottoms from storage or disposal of exempt wastes
- Gas plant dehydration wastes, including glycol-based compounds, glycol filters, and filter media, backwash, and molecular sieves
- Workover wastes
- Cooling tower blowdown
- Gas plant sweetening wastes for sulfur removal, including amines, amine filters, amine filter media, backwash, precipitated amine sludge, iron sponge, and hydrogen sulfide scrubber liquid and sludge
- Spent filters, filter media, and backwash (assuming the filter itself is not hazardous and the residue in it is from an exempt waste stream)
- Pipe scale, hydrocarbon solids, hydrates, and other deposits removed from piping and equipment prior to transportation
- Produced sand
- Packing fluids
- Hydrocarbon-bearing soil
- Pigging wastes from gathering lines
- Wastes from subsurface gas storage and retrieval, except for the non-exempt wastes listed on page 11
- Constituents removed from produced water before it is injected or otherwise disposed of
- Liquid hydrocarbons removed from the production stream but not from oil refining

- Gases from the production stream, such as hydrogen sulfide and carbon dioxide, and volatilized hydrocarbons

- Materials ejected from a producing well during blowdown

- Waste crude oil from primary field operations

- Light organics volatilized from exempt wastes in reserve pits, impoundments, or production equipment

# Non-Exempt Wastes

- Unused fracturing fluids or acids

- Gas plant cooling tower cleaning wastes

- Painting wastes

- Waste solvents

- Oil and gas service company wastes such as empty drums, drum rinsate, sandblast media, painting wastes, spent solvents, spilled chemicals, and waste acids

- Vacuum truck and drum rinsate from trucks and drums transporting or containing non-exempt waste

- Refinery wastes

- Liquid and solid wastes generated by crude oil and tank bottom reclaimers [1]

- Used equipment lubricating oils

- Waste compressor oil, filters, and blowdown

- Used hydraulic fluids

- Waste in transportation pipeline related pits

- Caustic or acid cleaners

- Boiler cleaning wastes

- Boiler refractory bricks

- Boiler scrubber fluids, sludges, and ash

- Incinerator ash

- Laboratory wastes

- Sanitary wastes

- Pesticide wastes

- Radioactive tracer wastes

- Drums, insulation, and miscellaneous solids

[1] Although non-E&P wastes generated from crude oil and tank bottom reclamation operations (e.g., waste equipment cleaning solvent) are non-exempt, residuals derived from exempt wastes (e.g., produced water separated from tank bottoms) are exempt. For a further discussion, see the Federal Register notice, Clarification of the Regulatory Determination for Waste from the Exploration, Development, and Production of Crude Oil, Natural Gas and Geothermal Energy, March 22, 1993, Federal Register Volume 58, Pages 15284 to 15287.

# Exempt/Non-Exempt Wastes



# Mixing Wastes

Mixing wastes, particularly exempt and non-exempt wastes, creates additional considerations. Determining whether a mixture is an exempt or non-exempt waste requires an understanding of the nature of the wastes prior to mixing and, in some instances, might require a chemical analysis of the mixture. Whenever possible, avoid mixing non-exempt wastes with exempt wastes. If the non-exempt waste is a listed or characteristic hazardous waste, the resulting mixture might become a non-exempt waste and require management under RCRA Subtitle C regulation. Furthermore, mixing a characteristic hazardous waste with a non-hazardous or exempt waste for the purpose of rendering the hazardous waste non-hazardous or less hazardous might be considered a treatment process subject to appropriate RCRA Subtitle C hazardous waste regulation and permitting requirements.

NOTE: In a policy letter dated September 25, 1997, EPA clarified that a mixture is exempt if it contains exempt oil and gas exploration and production (E&P) waste mixed with non-hazardous, non-exempt waste. Mixing exempt E&P waste with non-exempt characteristic hazardous waste, however, for the purpose of rendering the mixture non-hazardous or less hazardous, could be considered hazardous waste treatment or impermissible dilution.

Below are some basic guidelines for determining if a mixture is an exempt or non-exempt waste under the present mixture rule.

◆ **A mixture of an exempt waste with another exempt waste remains exempt.**

**Example:** A mixture of stimulation fluid that returns from a well with produced water results in an exempt waste.

◆ **Mixing a non-hazardous waste (exempt or non-exempt) with an exempt waste results in a mixture that is also exempt.**

**Example:** If non-hazardous wash water from rinsing road dirt off equipment or vehicles is mixed with the contents of a reserve pit containing only exempt drilling waste, the wastes in the pit remain exempt regardless of the characteristics of the waste mixture in the pit.

◆ **If, after mixing a non-exempt characteristic hazardous waste with an exempt waste, the resulting mixture exhibits any of the same hazardous characteristics as the hazardous waste (ignitability, corrosivity, reactivity, or toxicity), the mixture is a non-exempt hazardous waste.**

**Example:** If, after mixing non-exempt caustic soda (NaOH) that exhibits the hazardous characteristic of corrosivity in a pit containing exempt waste, the mixture also exhibits the hazardous characteristic of corrosivity as determined from pH or steel corrosion tests, then the entire mixture becomes a non-exempt hazardous waste.

**Example:** If, after mixing a non-exempt solvent containing benzene with an exempt waste also containing benzene,

the mixture exhibits the hazardous characteristic for benzene, then the entire mixture becomes a non-exempt hazardous waste.

◆ **If, after mixing a non-exempt characteristic hazardous waste with an exempt waste, the resulting mixture does not exhibit any of the same characteristics as the hazardous waste, the mixture is exempt. Even if the mixture exhibits some other characteristic of a hazardous waste, it is still exempt.**

**Example:** If, after mixing non-exempt hydrochloric acid (HCl) that only exhibits the corrosive characteristic with an exempt waste, the mixture does not exhibit the hazardous characteristic of corrosivity but does exhibit some other hazardous characteristic such as toxicity, then the mixture is exempt.

**Example:** If, after mixing a non-exempt waste exhibiting the hazardous characteristic for lead with an exempt waste exhibiting the characteristic for benzene, the mixture exhibits the characteristic for benzene but not for lead, then the mixture is exempt.

◆ **Generally, if a listed hazardous waste[2] is mixed with an exempt waste, regardless of the proportions, the mixture is a non-exempt hazardous waste.**

**Example:** If any amount of leaded tank bottoms from the petroleum refining industry (listed as waste code K052) is mixed with an exempt tank bottom waste, the mixture is considered a hazardous waste and is therefore non-exempt.

[2] Listed hazardous wastes are those wastes listed as hazardous in the Code of Federal Regulations under Subpart D of 40 CFR Part 261.

It is also important to emphasize that a mixture of an exempt waste with a listed hazardous waste generally becomes a non-exempt hazardous waste regardless of the relative volumes or concentrations of the wastes. However, if the listed hazardous waste was listed solely for one or more of the characteristics of ignitability, corrosivity, or reactivity, then a mixture of this waste with an exempt waste would only become non-exempt if the mixture exhibits the characteristic for which the hazardous waste was listed (i.e., if the mixture is ignitable, corrosive, or reactive).

Similarly, if a mixture of an exempt waste with a non-exempt characteristic hazardous waste exhibits any of the same hazardous waste characteristics as the hazardous waste, or if it exhibits a characteristic that would not have been exhibited by the exempt waste alone, the mixture becomes a non-exempt hazardous waste regardless of the relative volumes or concentrations of the wastes. In other words, for any of these scenarios, the wastes could become non-exempt even if only one barrel of hazardous waste were mixed with 10,000 barrels of exempt waste.

NOTE: The act of mixing a hazardous waste with an exempt waste may be subject to RCRA regulations affecting hazardous waste treatment, including the need for a permit (unless the unit or process is otherwise exempt). Moreover, the waste may still be subject to the 40 CFR 268 Land Disposal Restrictions (LDR) regulations (as applicable), including the prohibition of dilution as a substitute for adequate treatment.

# Possible Waste Mixtures and Their Exempt and Non-Exempt Status





# Common Misunderstandings

An incomplete understanding of the hazardous waste regulations can result in misinterpretations of the regulatory status of various wastes. The following are common misunderstandings that arise with the RCRA Subtitle C exemption and hazardous waste determinations.

**Misunderstanding:** All wastes located at E&P sites are exempt.

**Fact:** All wastes located at E&P sites are not necessarily exempt. To be considered an exempt waste, the waste must have been generated from a material or process uniquely associated with the exploration, development, and production of crude oil and natural gas. For example, a solvent used to clean surface equipment or machinery is not exempt because it is not uniquely associated with exploration, development, or production operations. Conversely, if the same solvent were used in a well, it would be exempt because it was generated through a procedure that is uniquely associated with production operations.



**Misunderstanding:** All service company wastes are exempt.

**Fact:** Not all service company wastes are exempt. As with all oilfield wastes, only those wastes generated from a material or process uniquely associated with the exploration and pro-

duction of oil and gas are considered exempt. The previous example of solvents used for cleaning equipment and machinery would also apply in this case—the solvent is not an exempt waste.



**Misunderstanding:** Unused products are exempt.

**Fact:** Unused products, if disposed of, are not exempt, regardless of their intended use, because they have not been used and therefore are not uniquely associated with the exploration or production of oil and gas. When unused products become waste (e.g., they are disposed of), they are subject to RCRA Subtitle C hazardous waste regulations if they are listed or exhibit a hazardous characteristic.



**Misunderstanding:** All exempt wastes are harmless to human health and the environment.

**Fact:** Certain exempt wastes, while excluded from RCRA Subtitle C hazardous wastes control, might still be harmful to human health and the environment if not properly managed. The exemption relieves wastes that are uniquely associated with the exploration and production of oil and gas from regulation as hazardous wastes under RCRA Subtitle C but does not indicate the hazard potential of the exempt waste. Additionally, some of these wastes might still be subject to state hazardous or non-hazardous waste regulations or other federal regulations (e.g., hazardous materials transportation regulations and National Pollutants Discharge Elimination System (NPDES) or state discharge regulations) unless specifically excluded from regulation under those laws.

**Misunderstanding:** Any mixture of a non-exempt hazardous waste with an exempt waste becomes an exempt waste.

**Fact:** Not all mixtures of a non-exempt hazardous waste with an exempt waste become exempt wastes. Generally, a mixture of a listed hazardous waste with an exempt waste becomes a non-exempt hazardous waste.

Also, a mixture of a hazardous waste that exhibits one of the characteristics of a hazardous waste (ignitability, corrosivity, reactivity, or toxicity) with an exempt waste, becomes a non-exempt characteristic hazardous waste if the mixture exhibits one of the same hazardous characteristics as the original hazardous waste. Conversely, if the mixture does not exhibit one of the same hazardous characteristics of the hazardous waste, the mixture becomes a non-hazardous exempt waste. Remember, mixing a non-exempt hazardous waste with an exempt waste for the purpose of rendering the hazardous waste non-hazardous or less hazardous may be considered a treatment process and must be conducted in accordance with applicable RCRA Subtitle C regulations.



**Misunderstanding:** A waste exempt from RCRA Subtitle C regulation is also exempt from state and other federal waste management regulations.

**Fact:** The exemption applies only to the federal requirements of RCRA Subtitle C. A waste that is exempt from RCRA Subtitle C regulation might be subject to more stringent or broader state hazardous and non-hazardous waste regulations and other state and federal program regulations. For example, oil and gas exploration and production wastes are subject to regulation under the Clean Air Act (CAA), Clean Water Act (CWA), Safe Drinking Water Act (SDWA), and Oil Pollution Act of 1990 (OPA).

# Frequently Asked Questions

EPA receives calls on a regular basis requesting answers to questions related to the E&P exemption. The most common questions and answers are listed below.

**Q:** **Are RCRA-exempt wastes also exempt under other federal laws?**

**A:** Not necessarily. Unless specifically excluded from regulation under other federal laws, RCRA-exempt wastes might still be subject to regulation under authorities other than RCRA.

◆ ◆ ◆

**Q:** **What is the benefit of the RCRA exemption if the operator is still liable for cleanups under RCRA?**

**A:** Although the operator might still be liable for cleanup actions under RCRA for wastes that pose an imminent and substantial endangerment to human health and the environment, the RCRA exemption does allow the operator to choose a waste management and disposal option that is less stringent and possibly less costly than those required under RCRA Subtitle C. The operator,

however, should make every effort to choose the proper management and disposal procedures for a particular waste to avoid the need for later cleanup action.

◆ ◆ ◆

**Q** : **When is a waste considered "uniquely associated with" exploration and production operations?**

**A** : A waste is "uniquely associated with" exploration and production operations if it is generated from a material or procedure that is necessary to locate and produce crude oil or natural gas. Also, a waste is "uniquely associated with" exploration and production operations if it is generated from a material or procedure that only occurs during the exploration and production of crude oil or natural gas. A simple rule of thumb for identifying "uniquely associated wastes" is whether the waste came from downhole or otherwise was generated in contact with the oil or gas production stream for the purpose of removing water or other contaminants from the well or the product.

◆ ◆ ◆

**Q** : **Are wastes generated from a transportation pipeline considered exempt wastes under RCRA Subtitle C?**

**A** : No. The RCRA Subtitle C exemption only applies to wastes generated from the exploration, development, and production (i.e., primary field operations) of crude oil or natural gas. Hence, wastes generated from the transportation of crude oil or natural gas are not RCRA-exempt.

◆ ◆ ◆

**Q** : **Do exempt wastes lose their exempt status if they undergo custody transfer and are transported offsite for disposal?**

**A** : No. Custody transfer is used to define the endpoint of production operations for crude oil and applies only to the change in ownership of the product (e.g., crude oil). Exempt wastes maintain their exempt status even if they undergo custody transfer and are transported off-site for disposal or treatment.

◆ ◆ ◆

**Q** : **Are all wastes generated at facilities that treat or reclaim exempt wastes also exempt?**

**A** : No. The exemption applies only to those wastes derived from exempt wastes, not to additional wastes generated by the treatment or reclamation of exempt wastes. For example, if a treatment facility uses an acid in the treatment of an exempt waste, any waste derived from the exempt waste being treated is also exempt but the spent acid is not.

◆ ◆ ◆

**Q** : **When does transportation begin?**

**A** : For crude oil, transportation begins at the point of custody transfer of the oil or, in the absence of custody transfer, after the endpoint of production separation and dehydration. Storage of crude oil in stock tanks at production facilities is considered part of the production separation process, not transportation, and is

included in the exemption. For natural gas, transportation begins at the point where the gas leaves the facility after production separation and dehydration at the gas plant. Natural gas pipelines between the gas well and the gas plant are considered to be part of the production process, rather than transportation, and wastes that are uniquely associated with production that are generated along such a pipeline are exempt.

EPA periodically issues interpretive letters regarding the oil and gas exemption. One such letter was in response to a request for clarification of the exempt or non-exempt status of wastes generated at natural gas compressor stations. In some regions, such as the Appalachian states, natural gas might not require sweetening or extensive dehydration. Therefore, the gas generally does not go to a gas plant but is carried from the wellhead to a main transmission line and, in some cases, directly to the customer. Compressor stations are located as needed along the pipelines that run between the wellhead and the main transmission line or the customer to maintain pressure in the lines. The Agency has taken the position that these compressor stations (in the absence of gas plants, and handling only local production) should be treated the same as gas plants, and that wastes generated by these compressor stations are exempt. On the other hand, compressor stations located along main gas transmission lines are considered to be part of the transportation process, and any wastes generated by these compressor stations are non-exempt.

# **S**ensible Waste Management

Sensible waste management begins with "good housekeeping." Prudent operators design E&P facilities and processes to minimize potential environmental threats and legal liabilities. EPA promotes sensible waste management practices through a number of joint efforts with organizations such as API, individual states, and the Interstate Oil and Gas Compact Commission (IOGCC). The following waste management suggestions have been compiled from publications produced by these organizations as well as from literature available from industry trade associations, trade journals, and EPA.



# Suggested E&P Waste Management Practices

- Size reserve pits properly to avoid overflows.

- Use closed loop mud systems when practical, particularly with oil-based muds.

- Review material safety data sheets (MSDSs) of materials used, and select less toxic alternatives when possible.

- Minimize waste generation, such as by designing systems with the smallest volumes possible (e.g., drilling mud systems).

- Reduce the amount of excess fluids entering reserve and production pits.

- Keep non-exempt wastes out of reserve or production pits.

- Design the drilling pad to contain stormwater and rig-wash.

- Recycle and reuse oil-based muds and high density brines when practical.

- Perform routine equipment inspections and maintenance to prevent leaks or emissions.

- Reclaim oily debris and tank bottoms when practical.

- Minimize the volume of materials stored at facilities.

- Construct adequate berms around materials and waste storage areas to contain spills.

- Perform routine inspections of materials and waste storage areas to locate damaged or leaking containers.

- Train personnel to use sensible waste management practices.





# Sources of Information

## Resource Conservation and Recovery Act (RCRA)

RCRA regulates hazardous waste generators, hazardous waste transporters, and hazardous waste treatment, storage, and disposal facilities (TSDFs). RCRA encourages environmentally sound methods for managing commercial and industrial waste, as well as household and municipal waste.

RCRA Resources:

- 40 CFR Parts 260 to 279
- RCRA Call Center: 800 424-9346 or Washington, DC Area Local 703 412-9810 or TDD 800 553-7672 or TDD Washington, DC Area Local 703 412-3323 Fax: 703 308-8686
- Internet access: <www.epa.gov/epaoswer/other/oil/index.htm>

## Clean Water Act (CWA)

The Water Pollution Control Act, commonly known as the Clean Water Act (CWA), is the Federal program designed to restore and maintain the integrity of the nation's surface waters. CWA controls direct discharges to surface waters (e.g., through a pipe) from industrial processes or stormwater systems associated with an industrial activity. It also regulates indirect discharges, or discharges to publicly owned treatment works (POTWs) through a public sewer system, by requiring industrial facilities to pretreat their waste before discharging to a public sewer.

CWA Resources:

- 40 CFR Parts 100-129 and 400-503
- EPA Office of Water: 202 260-5700
- State water authority, regional EPA office, and local POTW
- Internet access: <www.epa.gov/ow/>

# Oil Pollution Prevention (Spill Prevention, Control and Countermeasures Regulations)

Spill prevention, control and countermeasures (SPCC) regulations promulgated pursuant to the CWA are designed to protect our nation's waters from oil pollution caused by oil spills that could reach the navigable waters of the United States or adjoining shorelines. The regulations apply to non-transportation-related facilities with a specific aboveground or underground oil storage capacity that, due to its location, can be reasonably expected to discharge oil into the navigable waters of the United States.

SPCC Regulations Resources:

- 40 CFR Part 112
- RCRA Call Center: 800 424-9346
- Internet Access: <www.epa.gov/oilspill/index.htm>

## Discharge of Oil

The section of the CWA regulations commonly known as the "sheen rule" provides the framework for determining whether a facility or vessel responsible for an oil spill must report the spill to the federal government. These rules require oil spills that may be "harmful to the public health or welfare" to be reported to the National Response Center. Usually, oil spills that cause a sheen or discoloration on the surface of a body of water, violate applicable water quality standards, and cause a sludge or emulsion to be deposited beneath the surface of the water or on adjoining shorelines, must be reported.

Discharge of Oil Regulations Resources:

- 40 CFR Part 110
- RCRA Call Center: 800 424-9346
- Internet Access: <www.epa.gov/oilspill/index.htm>
- Reporting discharges to the National Response Center: 800 424-8802.

## Oil Pollution Act (OPA)

OPA of 1990 amended the CWA, and provided new requirements for contingency planning by government and industry under the National Oil and

Hazardous Substances Pollution Contingency Plan. OPA also increased penalties for regulatory noncompliance, broadened the response and enforcement authorities of the federal government, and preserved state authority to establish laws governing oil spill prevention and response.

OPA Resources:

- ■ Internet Access: <www.epa.gov/oilspill/index.htm>

## Safe Drinking Water Act (SDWA)

SDWA mandates that EPA establish regulations to protect human health from contaminants present in drinking water. Under the authority of the SDWA, EPA developed national drinking water standards and created a joint federal/state system to ensure compliance with these standards. EPA also regulates underground injection of liquid wastes through the Underground Injection Control (UIC) program under the SDWA. The UIC program regulates five classes of injection wells to protect underground sources of drinking water.

SDWA Resources:

- ■ 40 CFR Parts 141-143 (SDWA); 40 CFR Parts 144-148 (UIC)
- ■ SDWA Hotline: 800 426-4791
- ■ State oil and gas regulatory authority.
- ■ Internet Access: <www.epa.gov/ogwdw>

## Clean Air Act (CAA)

CAA regulates air pollution. It includes national emission standards for new stationary sources within particular industrial categories. It also includes the National Emission Standards for Hazardous Air Pollutants (NESHAPs), which are designated to control the emissions of particular hazardous air pollutants (HAPS). NESHAPs specific to oil and gas production were promulgated in 1999.

The CAA includes a Risk Management Program. This program requires stationary sources with more than a threshold quantity of a regulated substance (designated in the regulations) to develop and implement a risk management program (RMP). The RMP must include a hazard assessment, a prevention program, and an emergency response program.

CAA Resources:

- 40 CFR Parts 50-99
- Control Technology Center, Office of Air Quality, Planning and Standards (OAQPS), EPA, General Information: 919 541-0800; Publications: 919 541-2777
- RCRA Call Center (CAA §112(r) questions): 800 424-9346
- Internet Access: <www.epa.gov/oar/oaq_caa.html>
- Oil and Gas Production NESHAPs Rule: <www.epa.gov/ttn/uatw/oilgas/oilgaspg.html>

## The Emergency Planning and Community Right-to-Know Act (EPCRA)

EPCRA was designed to improve community access to information about potential chemical hazards and to facilitate the development of chemical emergency response plans by State and local governments. EPCRA regulations establish four types of reporting obligations for facilities that store or manage certain chemicals above specified quantities.

EPCRA Resources:

- 40 CFR Parts 350-372
- RCRA Call Center: 800 424-9346
- Internet Access: <www.epa.gov/opptintr/tri/> and <www.epa.gov/swercepp>

## Comprehensive Environmental Response Compensation, and Liability Act (CERCLA or Superfund)

Superfund authorizes EPA to respond to releases, or threatened releases, of hazardous substances that might endanger public health, welfare, or the environment. It also grants EPA the authority to force parties responsible for environmental contamination to clean it up or to reimburse response costs incurred by EPA. CERCLA also contains hazardous substance release reporting regulations that require facilities to report to the National Response Center (NRC) any release of a hazardous substance that exceeds the specified quantity for that substance.

CERCLA Resources:

- 40 CFR Parts 300-399
- RCRA Call Center: 800 424-9346

■ Internet Access: <www.epa.gov/superfund>

## Toxic Substances Control Act (TSCA)

TSCA allows EPA to collect data on chemicals to evaluate, assess, mitigate, and control risks that might be posed by their manufacture, processing, and use. Facilities are required to report information as necessary to allow EPA to develop and maintain this inventory.

TSCA Resources:

■ 40 CFR Parts 702-799

■ TSCA Hotline: 202 554-1404

■ Internet Access: <www.epa.gov/internet/opptsfrs/home/opptsim.htm>

# Other EPA Information Resources

Office of Solid Waste
Industrial and Extractive Wastes Branch
1200 Pennsylvania Avenue, NW.
Mail Code 5306W
Washington, DC  20460

RCRA Call Center: 800 424-9346 or
Washington, DC Area Local 703 412-9810 or
TDD 800 553-7672 or TDD Washington, DC
Area Local 703 412-3323 Fax: 703 308-8686
Internet access: <www.epa.gov/epaoswer/hotline>

The RCRA Call Center is a publicly accessible service that provides up-to-date information on several EPA programs. Please note that the Center cannot provide regulatory interpretations. It also processes requests for relevant publications and information resources.

Office of Emergency and Remedial Response,  Oil Spill Program
1200 Pennsylvania Avenue, NW.
Washington, DC  20460
Oil Spill Program Information Line: 800 424-9346
Internet access: <www.epa.gov/oilspill/>

The Office of Emergency and Remedial Response (OERR) manages the Superfund and Oil Spill programs.

## National Response Team

c/o U.S. EPA
1200 Pennsylvania Avenue, NW.
Washington, DC 20460
Telephone: 800 424-8802
Fax: 202 260-0154
Internet access: <www.nrt.org>

The National Response Team and the Regional Response Teams are the federal component of the National Response System (NRS), the federal government's coordinated mechanism for emergency response to discharges of oil and releases of chemicals. The NRT is chaired by the U.S. EPA with the United States Coast Guard serving as Vice Chair. The National Response Center (800 424-8802) is the sole federal point of contact for reporting oil and chemical spills.

# Other Federal Agencies

## U.S. Department of Interior

U.S. Bureau of Land Management
Fluid Minerals Group
1849 C Street, Room 406-LS
Washington, DC 20240
Telephone: 202 452-5125
Fax: 202 452-5124
Internet access: <www.blm.gov/nhp/300/wo310/>

The Bureau of Land Management's (BLM's) management of fluid minerals includes overseeing the production and conservation of oil and gas, geothermal energy, and helium. BLM is responsible for leasing oil and gas resources on all federally owned lands, including those lands managed by other federal agencies. This includes about 564 million acres of federal minerals estate, or about 28 percent of all lands within the United States. Additionally, BLM is responsible for the review and approval of all permits and licenses to explore, develop, and produce oil and gas and geothermal resources on both Federal and Indian lands.

U.S. Fish and Wildlife Service
Division of Environmental Quality
4401 North Fairfax Drive, Suite 322
Arlington, VA  22203
Telephone: 703 358-2148
Internet access: <contaminants.fws.gov>

The U.S. Fish and Wildlife Service is the main federal agency dedicated to protecting wildlife and their habitat from pollution's harmful effects. Specialists in the Environmental Contaminants Program focus on detecting toxic chemicals; addressing their effects; preventing harm to fish, wildlife and their habitats; and removing toxic chemicals and restoring habitat when prevention is not possible. These specialists are experts on oil and chemical spills, pesticides, water quality, hazardous materials disposal and other aspects of pollution biology.

## U.S. Department of Energy

Office of Natural Gas & Petroleum Technology,
Office of Fossil Energy
1000 Independence Ave. SW. - Forrestal Building
Washington, DC  20585
Telephone: 202 586-6503
Fax: 202 586-5145
Internet access: <www.fe.doe.gov/programs_oilgas.html>

The Department of Energy's (DOE's) Office of Natural Gas and Petroleum Technology is responsible for the gas and oil exploration and production program, natural gas storage and delivery, downstream petroleum processing, and environmental and regulatory analysis programs for oil and natural gas operations, and natural gas import/export authorizations.

# Other Information Resources

## American Petroleum Institute

1220 L Street, NW.
Washington, DC  20005
Telephone: 202 682-8000
Internet access: <www.api.org>

The American Petroleum Institute (API) is the national trade association representing over 400 companies involved in oil and gas exploration, production, transportation, refining, and marketing. API represents its members in addressing public policy and regulatory issues. API also sponsors research, collects statistics, conducts workshops, and develops standards and recommended practices for industry equipment and operations.

## Interstate Oil and Gas Compact Commission

P.O. Box 53127
Oklahoma City, OK  73152-3127
Telephone: 405 525-3556
Fax: 405 525-3592
E-mail: iogcc@iogcc.state.ok.us
Internet access: <www.iogcc.state.ok.us>

Founded by six states in 1935, the Interstate Oil and Gas Compact Commission (IOGCC) was established to control unregulated petroleum overproduction and resulting waste. "Since that time, states have established effective regulation of the oil and natural gas industry through a variety of IOGCC programs designed to gather and share information, technologies and regulatory methods."

## Ground Water Protection Council

13208 N. MacArthur
Oklahoma City, OK 73142
Telephone: 405 516-4972
Fax: 405 516-4973
Internet access: <www.gwpc.org>

The Ground Water Protection Council is an organization whose members consist of state and federal ground water agencies, industry representatives, environmentalists, and concerned citizens. Since it includes state Underground Injection Control (UIC) program directors, it is the best source of data on Class II well injection issues.

## National Governors' Association

Emergency Management and Oil Spill Prevention and
   Response Project
Hall of States
444 North Capitol Street, NW.
Washington, DC  20001-1512
Telephone: 202 624-5300
Internet access: <www.nga.org>

The National Governors' Association's project on oil spill prevention, pre-paredness, and response offers states an opportunity to share their experiences and coordinate with the federal agencies involved in oil spill prevention and response. This program facilitates the exchange of information on successful state programs among state and federal emergency managers. NGA works with U.S. EPA to coordinate and promote state oil spill prevention programs by holding workshops, summarizing successful state oil programs, and establishing ongoing workgroups to discuss oil spill topics.

## Publications

**Title:** "Report to Congress: Management of Wastes from the Exploration, Development, and Production of Crude Oil, Natural Gas, and Geothermal Energy," U.S. EPA, December 1987, NTIS Publication No. PB 88-146212.

**Available from:** National Technical Information Service, 5285 Port Royal Road, Springfield, VA  22161, 703 487-4650.



**Title:** "Regulatory Determination for Oil and Gas and Geothermal Exploration, Development, and Production Wastes," July 6, 1988, Federal Register Volume 53, Pages 25446 to 25459.

**Available from:** RCRA Call Center, Washington, DC, 800 424-9346

**Internet access:** <www.epa.gov/epaoswer/other/oil/index.htm>



**Title:** "Clarification of the Regulatory Determination for Wastes from the Exploration, Development, and Production of Crude Oil, Natural Gas and Geothermal Energy," March 22, 1993, Federal Register Volume 58, Pages 15284 to 15287.

**Available from:** RCRA Call Center, Washington, DC, 800 424-9346

**Internet access:** <www.epa.gov/epaoswer/other/oil/index.htm>



**Title:** Associated Wastes Reports: "Crude Oil Tank Bottoms and Oily Debris," "Completion and Workover Wastes," "Dehydration and Sweetening Wastes."

**Available from:** EPA Office of Solid Waste

**Internet access:** <www.epa.gov/epaoswer/other/oil/execrep.htm>



**Title:** "Profile of the Oil and Gas Extraction Industry"

**Available from:** EPA Office of Enforcement and Compliance Assurance

**Internet access:** <es.epa.gov/oeca/sector/index.html#oilgasex>



**Title:** "Environmental Guidance Document: Waste Management in Exploration and Production Operations," API Bulletin E5, Second Edition, February 1997.

**Available from:** American Petroleum Institute, c/o Global Engineering Documents, 15 Inverness Way E., Englewood, CO 80112, 800 854-7179

**Internet access:** <www.api.org/cat>



**Title:** "Guidelines for Commercial Exploration and Production Waste Management Facilities," (Order Number G0004), March 2001.

**Available from:** American Petroleum Institute, c/o Global Engineering Documents, 15 Inverness Way E., Englewood, CO 80112, 800 854-7179

**Internet access:** <www.api.org/ehs/CommFac>



**Title:** "Environmental Engineering for Exploration and Production Activities," Monograph Volume 18.

**Available from:** Society of Petroleum Engineers, P.O. Box 833836, Richardson, TX 75083-3836, 972 952-9393

**E-mail:** books@spe.org

**Internet access:** <www.spe.org>



**Title:** "Suggested Procedure for Development of Spill Prevention Control and Countermeasure Plans," API Bulletin D16, Second Edition, August 1, 1989.

**Available from:** American Petroleum Institute, c/o Global Engineering Documents, 15 Inverness Way E., Englewood, CO 80112, 800 854-7179

**Internet access:** <www.api.org/cat>



**Title:** "Onshore Oil and Gas Production Practices for Protection of the Environment," API Recommended Practice 51, Third Edition, February 2001.

**Available from:** American Petroleum Institute, c/o Global Engineering Documents, 15 Inverness Way E., Englewood, CO 80112, 800 854-7179

**Internet access:** <www.api.org/cat>



**Title:** "Revised Guidelines for Waste Minimization in Oil and Gas Exploration and Production."

**Available from:** Interstate Oil and Gas Compact Commission, P.O. Box 53127, Oklahoma City, OK 73152-3127, 405 525-3556

**Internet access:** <www.iogcc.state.ok.us>





United States
Environmental Protection Agency
Office of Solid Waste (5305W)
Washington, DC 20460

Official Business
Penalty for Private Use $300
EPA530-K-01-004
October 2002
www.epa.gov/osw

Plaintiff's Memorandum in Support of
Motion for Reconsideration

Appendix B