**IN THE CIRCUIT COURT OF THE SIXTH JUDICIAL CIRCUIT**
**IN AND FOR PINELLAS COUNTY, FLORIDA**
**CIVIL ACTION**

JOSEPH F. KAMINSKI

     Plaintiff,

CASE NO. 12-3623 CI 20

v.

BP EXPLORATION & PRODUCTION INC., and
BP AMERICA PRODUCTION COMPANY

     Defendants.

_____/

RECEIVED
CIVIL COURT RECORDS

MAR 23 2012

KEN BURKE
CLERK CIRCUIT COURT
PINELLAS COUNTY

## COMPLAINT

COMES NOW Plaintiff, JOSEPH F. KAMINSKI (hereinafter "Kaminski"), by and

through his undersigned attorney, files this action against Defendants BP EXPLORATION &

PRODUCTION INC., a Delaware Corporation doing business in the State of Florida (hereinafter

"BP Exploration"); and BP AMERICA PRODUCTION COMPANY, a Delaware Corporation

doing business in the State of Florida (hereinafter "BP America"), and alleges as follows:

### NATURE OF ACTION

1. On April 20, 2010, an explosion and fire occurred aboard the mobile offshore drilling

unit Deepwater Horizon. On the morning of April 22, 2010, the Deepwater Horizon sank

resulting in a massive oil spill incident. Oil flowed from the Macondo well into the Gulf of

Mexico unchecked for nearly five months. The Macondo well tapped into a reservoir more than

13,000 feet below the sea floor, containing approximately 110 million barrels of oil. Millions of

barrels of oil were discharged into the Gulf of Mexico and upon adjoining shorelines, causing

EXHIBIT F

immense environmental and economic harm to the entire region.

2. Defendant BP Exploration was designated as a "Responsible Party" by the U.S. Coast Guard under the Oil Pollution of 1990 ("OPA").

3. Under OPA, "the responsible party for a vessel or a facility from which oil is discharged, or which poses the substantial threat of a discharge of oil, into or upon the navigable waters or adjoining shorelines or the exclusive economic zone is liable for the removal costs and damages that result from such incident."

4. Pursuant to the Clean Water Act ("CWA"), Defendant BP Exploration is also subject to a judicially assessed civil penalty of up to $1,100 per barrel of oil that has been discharged or up to $4,300 per barrel of oil that has been discharged, to the extent that the discharge of oil was the result of gross negligence or willful misconduct by Defendant BP Exploration. With 4.9 million barrels spilled, the civil penalty could be approximately $21 billion.

5. On April 20, 2010, Defendants BP Exploration and BP America were unprepared to respond to a deepwater blowout. A relief well was the only source control option mentioned by name in Defendants' Initial Exploration Plan for the area that included the Macondo well. Other than the lengthy process (at least 100 days) of drilling a relief well, Defendants had no available, tested technique to control or stop a deepwater blowout in the event of a failure of the blowout preventer ("BOP") to properly function.

6. Defendants attempted to place a large containment dome, also known as a cofferdam, over the larger of the two leaks from the broken riser. At the top of the cofferdam, a pipe would channel hydrocarbons to the *Discoverer Enterprise*, a ship on the surface.

7. Defendants already had several cofferdams, which had been used to provide safe

EXHIBIT F

working space for divers repairing leaks from shallow-water wells following Hurricanes Katrina and Rita. On May 4, 2010, Defendants finished modifying for deep-sea use and oil collection a preexisting dome that was 14 feet wide, 24 feet long, and 40 feet tall.

8. Defendants' effort to capture oil from the Macondo well with the containment dome did not succeed.

9. On May 7, 2010, when crews started to maneuver the cofferdam over the leak at the end of the riser, hydrates formed before the cofferdam could be put in place, clogging the opening through which oil was to be funneled.

10. BP Vice President Richard Lynch, who oversaw the cofferdam effort, stated that BP did not anticipate hydrates forming this early. Because hydrocarbons are lighter than water, the containment dome became buoyant as it filled with oil and gas while BP tried to lower it. In the *New York Times*, Lynch recalled engineers telling him that they had "lost the cofferdam," which, after filling with highly flammable material, had begun floating up toward the ship-covered ocean surface. Engineers were eventually able to gain control of the 98-ton dome and move it to safety on the sea floor. One high-level government official recalled Andy Inglis, BP's Chief Executive of Exploration & Production, saying "if we had tried to make a hydrate collection contraption, we couldn't have done a better job."

11. On May 11, 2010 at 10:24 p.m., approximately twenty-one days after the blowout began, Plaintiff Kaminski telephones the BP Help Hotline and offers to assist BP to control the source of the oil spill resulting from the blowout. During this initial telephone conversation, Plaintiff Kaminski briefly explains to BP technical support team representatives how his insertion pipe design can be used to collect the oil flowing from the well. Plaintiff Kamiski's

-3-

EXHIBIT F

idea is to insert a smaller pipe into the broken pipe past the break and inflate sealing rings. A technical support team representative is so impressed with the solution that he requests Plaintiff Kaminski's email address in order to forward him a form to fill out and return to the Horizon Support Team ("HST").

12. On May 12, 2010 at 2:49 p.m., Plaintiff Kaminski emails the solution to HST using the insertion pipe to collect oil. This idea is to insert a smaller pipe into the broken pipe past the break and inflate sealing rings. This is the idea and design which Plaintiff Kaminski had briefly explained to HST during their telephone conversation on May 11, 2010 at 10:24 p.m.

13. On May 13, 2010 at 12:46 a.m., Plaintiff Kaminski emails HST. In this email, Plaintiff Kaminski tells HST that he wants at least $2 million for his assistance, ideas and/or designs if they use them. Plaintiff Kaminski also explains to HST why the BP-designed "Top Hat" will not work.

14. On May 13, 2010 at 1:30 p.m., during a conference call with BP representatives organized by Attorney Elizabeth Hittos, Legislative Counsel for U.S. Congressman Gus Bilirakis in Washington, DC, Plaintiff Kaminski again explained his idea and answered questions from BP representatives. Attorney Hittos was asked questions by BP representatives on the line and conveyed the questions to Plaintiff Kaminski. Plaintiff Kaminski provided detailed and specific answers to the questions being asked by the BP representatives. During this conference call, Plaintiff Kaminski also explained to BP representatives that, since time is of the essence, an alternative would be to use readily-available flap seals in lieu of inflatable seals.

15. At the end of this conference call, Attorney Hittos asked Plaintiff Kaminski what he wanted for all his help. Plaintiff Kaminski replied, "It's in my email to HST. I want at least $2

-4-

EXHIBIT F

million for the design because it's a unique design." Attorney Hittos said, "Send me copies of those emails so I can look at them." Attorney Hittos gave Plaintiff Kaminski her email address.

16. On May 13, 2010 at 3:01 p.m., Plaintiff Kaminski starts to forward requested emails to Attorney Hittos, again demanding that he be paid at least $2 million.

17. At all times material herein, Plaintiff Kaminski was led to believe, and did believe, that Attorney Hittos had authority to receive and transmit messages to Defendants, including Plaintiff Kaminski's demand that he be paid at least $2 million by Defendants and her knowledge of this payment demand was the knowledge of Defendants.

18. On May 13, 2010 at 3:04 p.m., Plaintiff Kaminski emails Attorney Hittos copies of the other ideas he had sent to HST.

19. On May 14, 2010 at 10:43 p.m., Plaintiff Kaminski receives an email from Attorney Hittos wherein she requests Plaintiff Kaminski's further assistance. In her email, Attorney Hittos states, "Joseph, I'd like to forward you a slide show of BP's plan. Take a look and specifically tell me where they are going wrong. I would like to point out their inherent mistakes in our next conference call. Thanks."

20. On May 15, 2010 at 12:16 a.m., Plaintiff Kaminski emails his detailed answers to Attorney Hittos' request for assistance which she had emailed on May 14, 2010 at 10:43 p.m.

21. Plaintiff Kaminski conceived, invented, and designed the novel, unique, and concrete insertion pipe idea. Defendants, both directly and indirectly via Attorney Elizabeth Hittos, requested the use of Plaintiff Kaminski's insertion pipe invention, idea, and design, and the ongoing engineering services of Plaintiff Kaminski, and have knowingly and voluntarily accepted their substantial benefits. The insertion pipe idea was submitted by Plaintiff Kaminski

-5-

EXHIBIT F

to Defendants with the understanding and expectation, fully and clearly understood by Defendants and Attorney Hittos, that Plaintiff Kaminski would be reasonably compensated in the amount of "at least two million U.S. dollars" for its use by Defendants. Defendants did in fact use Plaintiff Kaminski's precise insertion pipe idea and design. Defendants have failed to pay Plaintiff Kaminski any part of the reasonable value of his insertion pipe invention, idea, and design, and ongoing engineering services.

22. Plaintiff Kaminski conceived, invented, and designed the novel, unique, and concrete "Top Hat" with thermal lifting action idea. Defendants, both directly and indirectly via Attorney Elizabeth Hittos, requested the use of Plaintiff Kaminski's "Top Hat" with thermal lifting action invention, idea, and design, and the ongoing engineering services of Plaintiff Kaminski, and have knowingly and voluntarily accepted their substantial benefits. The "Top Hat" with thermal lifting action idea was submitted by Plaintiff Kaminski to Defendants with the understanding and expectation, fully and clearly understood by Defendants and Attorney Hittos, that Plaintiff Kaminski would be reasonably compensated in the amount of "at least two million U.S. dollars" for its use by Defendants. Defendants did in fact use Plaintiff Kaminski's precise "Top Hat" with thermal lifting action idea and design. Defendants have failed to pay Plaintiff Kaminski any part of the reasonable value of his "Top Hat" with thermal lifting action invention, idea, and design, and ongoing engineering services.

23. Plaintiff Kaminski conceived, invented, and designed the novel, unique, and concrete riser spool and two-pin riser spool flange alignment idea. Defendants, both directly and indirectly via Attorney Elizabeth Hittos, requested the use of Plaintiff Kaminski's riser spool and two-pin riser spool flange alignment invention, idea, and design, and the ongoing engineering

-6-

EXHIBIT F

services of Plaintiff Kaminski, and have knowingly and voluntarily accepted their substantial benefits. The riser spool and two-pin riser spool flange alignment idea was submitted by Plaintiff Kaminski to Defendants with the understanding and expectation, fully and clearly understood by Defendants and Attorney Hittos, that Plaintiff Kaminski would be reasonably compensated in the amount of "at least two million U.S. dollars" for its use by Defendants. Defendants did in fact use Plaintiff Kaminski's precise riser spool and two-pin riser spool flange alignment idea and design. Defendants have failed to pay Plaintiff Kaminski any part of the reasonable value of his riser spool and two-pin riser spool flange alignment invention, idea, and design, and ongoing engineering services.

24. Plaintiff Kaminski conferred the benefit of the use of his novel, unique, and concrete insertion pipe invention, idea, and design upon Defendants BP Exploration and BP America. Defendants, both directly and indirectly via Attorney Elizabeth Hittos, requested the use of Plaintiff Kaminski's insertion pipe invention, idea, and design, and the ongoing engineering services of Plaintiff Kaminski, and have knowingly and voluntarily accepted their benefits. Defendants BP Exploration and BP America were unjustly enriched by appreciating the use of Plaintiff Kaminski's novel, unique, and concrete insertion pipe invention, idea, and design. Defendants' unjust enrichment includes, but is not limited to, the fact that the use by Defendants of Plaintiff Kaminski's novel, unique, and concrete insertion pipe invention, idea, and design has saved Defendants an extensive amount of money by limiting: (a) Defendant BP Exploration's liability, as a responsible party under OPA, for the removal costs and damages that resulted from the Deepwater Horizon oil spill incident; and (b) the civil penalty under CWA that resulted from the Deepwater Horizon oil spill incident. This civil penalty is $1,100 per barrel of oil that has

-7-

been discharged or up to $4,300 per barrel of oil that has been discharged, to the extent that the discharge of oil was the result of gross negligence or willful misconduct by Defendants. With 4.9 million barrels spilled, this civil penalty could be approximately $21 billion. Defendants' acceptance and retention of this conferred benefit are under circumstances that make it inequitable for Defendants to retain it without paying the value thereof to Plaintiff Kaminski.

25. Plaintiff Kaminski conferred the benefit of the use of his novel, unique, and concrete "Top Hat" with thermal lifting action invention, idea, and design upon Defendants BP Exploration and BP America. Defendants, both directly and indirectly via Attorney Elizabeth Hittos, requested the use of Plaintiff Kaminski's "Top Hat" with thermal lifting action invention, idea, and design, and the ongoing engineering services of Plaintiff Kaminski, and have knowingly and voluntarily accepted their benefits. Defendants BP Exploration and BP America were unjustly enriched by appreciating the use of Plaintiff Kaminski's novel, unique, and concrete "Top Hat" with thermal lifting action invention, idea, and design. Defendants' unjust enrichment includes, but is not limited to, the fact that the use by Defendants of Plaintiff Kaminski's novel, unique, and concrete "Top Hat" with thermal lifting action invention, idea, and design has saved Defendants an extensive amount of money by limiting: (a) Defendant BP Exploration's liability, as a responsible party under OPA, for the removal costs and damages that resulted from the Deepwater Horizon oil spill incident; and (b) the civil penalty under CWA that resulted from the Deepwater Horizon oil spill incident. This civil penalty is $1,100 per barrel of oil that has been discharged or up to $4,300 per barrel of oil that has been discharged, to the extent that the discharge of oil was the result of gross negligence or willful misconduct by Defendants. With 4.9 million barrels spilled, this civil penalty could be approximately $21

-8-

billion. Defendants' acceptance and retention of this conferred benefit are under circumstances that make it inequitable for Defendants to retain it without paying the value thereof to Plaintiff Kaminski.

26. Plaintiff Kaminski conferred the benefit of the use of his novel, unique, and concrete riser spool and two-pin riser spool flange alignment invention, idea, and design upon Defendants BP Exploration and BP America. Defendants, both directly and indirectly via Attorney Elizabeth Hittos, requested the use of Plaintiff Kaminski's riser spool and two-pin riser spool flange alignment invention, idea, and design, and the ongoing engineering services of Plaintiff Kaminski, and have knowingly and voluntarily accepted their benefits. Defendants BP Exploration and BP America were unjustly enriched by appreciating the use of Plaintiff Kaminski's novel, unique, and concrete riser spool and two-pin riser spool flange alignment invention, idea, and design. Defendants' unjust enrichment includes, but is not limited to, the fact that the use by Defendants of Plaintiff Kaminski's novel, unique, and concrete riser spool and two-pin riser spool flange alignment invention, idea, and design has saved Defendants an extensive amount of money by limiting: (a) Defendant BP Exploration's liability, as a responsible party under OPA, for the removal costs and damages that resulted from the Deepwater Horizon oil spill incident; and (b) the civil penalty under CWA that resulted from the Deepwater Horizon oil spill incident. This civil penalty is $1,100 per barrel of oil that has been discharged or up to $4,300 per barrel of oil that has been discharged, to the extent that the discharge of oil was the result of gross negligence or willful misconduct by Defendants. With 4.9 million barrels spilled, this civil penalty could be approximately $21 billion. Defendants' acceptance and retention of this conferred benefit are under circumstances that make it

EXHIBIT F

inequitable for Defendants to retain it without paying the value thereof to Plaintiff Kaminski.

27. The conduct of Defendants, Attorney Elizabeth Hittos (U.S. Congressman Gus Bilirakis' Legislative Counsel), and Plaintiff Kaminski clearly shows that the parties intended an agreement to exist between Plaintiff Kaminski and Defendants.

28. Furthermore, even if an agreement did not exist between Plaintiff Kaminski and Defendants, the relationship between the parties before and after the disclosure, the seeking of disclosure by Defendants and Attorney Hittos, Attorney Hittos' implied promise of compensation, the specific character, novelty, originality and concreteness of Plaintiff Kaminski's inventions, the subsequent use made of them by Defendants, and the lack of compensation given Plaintiff Kaminski by Defendants - all indicate that the application of the principle of unjust enrichment is required.

29. To permit Defendants to refuse to pay any compensation to Plaintiff Kaminski would be to permit an injustice of the most fundamental sort.

30. This case is brought by Plaintiff under the following causes of action: (a) Breach of Implied-in-Fact Contract (3 counts); and (b) Unjust Enrichment (3 counts).

## JURISDICTION AND VENUE

31. This is an action for damages which exceeds fifteen thousand dollars ($15,000.00).

32. Venue in this judicial district is proper under Florida Statute § 48.193 because the tortious acts and injuries alleged in this action were committed in Pinellas County, Florida and Defendants operate, conduct, engage in, or carry on a business or business venture in Pinellas County, Florida.

EXHIBIT F

## PARTIES

33. Plaintiff Kaminski, a resident of Pinellas County, Florida, is an individual with approximately twenty years of broad-based engineering design, analysis, testing and evaluation experience.

34. Defendant BP Exploration is a Delaware corporation which lists its principal office address with the Florida Department of State, Division of Corporations, as 501 Westlake Park Blvd., Houston, TX 77079. BP Exploration was a lease holder and the designated operator in the lease granted by the former Minerals Management Service ("MMS") allowing it to perform oil exploration, drilling, and production-related operations in Mississippi Canyon Block 252, the location known as "Macondo" where the BP oil spill of April, 2010 originated. BP Exploration was designated as a "Responsible Party" by the U.S. Coast Guard under the Oil Pollution of 1990 ("OPA"), 33 U.S.C. § 2714. BP Exploration is registered to do business in Florida, does business in Florida, and has a registered agent in Florida.

35. Defendant BP America is a Delaware corporation which lists its principal office address with the Florida Department of State, Division of Corporations, as 501 Westlake Park Blvd., Houston, TX 77079. BP America was the party to the Drilling Contract with Transocean Ltd. for the drilling of the Macondo well by the Deepwater Horizon rig. BP America is registered to do business in Florida, does business in Florida, and has a registered agent in Florida.

36. At the request of Defendant BP Exploration and Defendant BP America, Kenneth R. Feinberg, acting through and as Managing Partner of Feinberg Rozen, LLP, established the Gulf Coast Claims Facility ("GCCF") to administer, settle, and authorize the payment of certain claims asserted against Defendant BP Exploration as a result of the explosion at the Deepwater

-11-

EXHIBIT F

Horizon rig and consequent spillage of oil into the Gulf of Mexico. GCCF is controlled by Defendants. GCCF is fully funded by Defendants via the Deepwater Horizon Oil Spill Trust which was created by Defendant BP Exploration on August 6, 2010. On August 23, 2010, GCCF replaced the original claims process of Defendant BP Exploration and commenced performing Defendant BP Exploration's obligations under OPA with respect to private economic loss claims. At all times material herein, GCCF had 13 offices located in the State of Florida including an office located in Pinellas County at 2551 Drew Street, Suite 301, Clearwater, FL 33765.

## **BACKGROUND FACTS**

37. At approximately 10 p.m. on April 20, 2010, the U.S. Coast Guard District Eight command center in New Orleans, Louisiana received a report of an explosion and fire aboard the mobile offshore drilling unit Deepwater Horizon. On the morning of April 22, 2010, the Deepwater Horizon sank, resulting in a massive oil spill incident. Oil flowed into the Gulf of Mexico unchecked for months. Ultimately, the "Macondo Well" was finally sealed on September 19, 2010, nearly five months after the blowout began. By that time, millions of barrels of oil had been discharged into the Gulf of Mexico and upon adjoining shorelines, causing immense environmental and economic harm to the entire region.

38. On May 11, 2010 at 10:24 p.m., approximately twenty-one days after the blowout began, Plaintiff Kaminski telephones the BP Help Hotline and offers to assist BP to control the source of the oil spill resulting from the blowout. During this initial telephone conversation, Plaintiff Kaminski briefly explains to BP technical support team representatives how his insertion pipe design can be used to collect the oil flowing from the well. Plaintiff Kamiski's

-12-

EXHIBIT F

idea is to insert a smaller pipe into the broken pipe past the break and inflate sealing rings. A technical support team representative is so impressed with the solution that he requests Plaintiff Kaminski's email address in order to forward him a form to fill out and return to the Horizon Support Team ("HST").

39. On May 11, 2010 at 10:33 p.m., Plaintiff Kaminski receives an email from HST with an attached form requesting a brief description of the technology, required materials, equipment, and expertise regarding Plaintiff Kaminski's proposed solutions to the Deepwater Horizon blowout. The form also requests Plaintiff Kaminski's contact information and areas of expertise. Plaintiff Kaminski immediately begins documenting at least three separate ideas for controlling the source of the oil spill and capping the blowout.

40. On May 12, 2010 at 2:49 p.m., Plaintiff Kaminski emails the solution to HST using the insertion pipe to collect oil. This idea is to insert a smaller pipe into the broken pipe past the break and inflate sealing rings. This is the idea and design which Plaintiff Kaminski had explained to HST during their telephone conversation on May 11, 2010 at 10:24 p.m.

41. On May 12, 2010 at 7:19 p.m., Plaintiff Kaminski, after viewing the video of the well released to the public by BP, emails HST and insists that HST look at the insertion pipe solution again.

42. On May 13, 2010 at 12:46 a.m., Plaintiff Kaminski emails HST. In this email, Plaintiff Kaminski tells HST that he wants at least $2 million for his assistance, ideas and/or designs if they use them. Plaintiff Kaminski also explains to HST why the BP-designed "Top Hat" will not work. Early in the morning on May 13, 2010, Plaintiff Kaminski also contacts Congressman Bilirakis' office via the congressman's web page stating in a complaint that he had

-13-

EXHIBIT F

a solution for the oil leak and that BP appears to be rejecting his solutions almost automatically via email.

43. On May 13, 2010 at 8:13 a.m., Plaintiff Kaminski receives an email from HST wherein HST rejects Plaintiff Kaminski's proposal.

44. On May 13, 2010 at 1:30 p.m., Plaintiff Kaminski receives a telephone phone call from Attorney Elizabeth Hittos ("Hittos"), Legislative Counsel for U.S. Congressman Gus Bilirakis in Washington, DC, in response to Plaintiff Kaminski's email earlier in the morning. Plaintiff Kaminski's complaint had been forwarded higher up for immediate consideration. Plaintiff Kaminski started to explain, after 5 minutes Hittos said, "Can I call you right back in about 2 minutes? I need to get a three-way [call] going here." Plaintiff Kaminski said, "Sure." Hittos calls back in 3 minutes. During this conference call, Plaintiff Kaminski explained his idea and answered questions. Hittos was being asked questions by BP representatives on the line and conveying the questions to Plaintiff Kaminski as follows:

Hittos - "Where would all the oil from the insertion tube go?"

Plaintiff Kaminski - "Into a tanker on the surface."

Hittos - "Did you hear they are planning a Junk Shot? What do you think of that?"

Plaintiff Kaminski - "It would not work."

Hittos - "About those inflatable seals. Do you know where we can get them?"

Plaintiff Kaminski suggested a few places.

Hittos - "Well, if you get some more info on them, or who can make them, can you send it to me?"

Plaintiff Kaminski - "Yes."

EXHIBIT F

Hittos - "What do you think if they used a smaller pipe, say 6 inches or so, and three rubber baffles instead of the inflatable seals and back fill them with junk from a junk shot?"

Plaintiff Kaminski - "I don't think it would be a good idea to shoot junk in the pipe we were trying to pump from. It could plug the pipe we are trying to collect oil from. I think the largest pipe possible is the best idea but I have no idea how big the opening is in actual size. Just use really thick rubber and more seals if you have to." Since time is of the essence, Plaintiff Kaminski also explains that an alternative would be to use readily-available flap seals in lieu of inflatable seals.

Hittos - "How many seals do you think we need? Will three be enough?"

Plaintiff Kaminski - "At least three, maybe five."

Hittos - "How long is the insertion pipe?"

Plaintiff Kaminski - "I think five feet minimum, up to about twenty feet max with seals equally spaced along the length."

45. During this telephone conversation, Plaintiff Kaminski was asked to explain the flow diversion ("bypass") method or the valve that was on the pipe to allow the insertion pipe to be placed in the bigger pipe without back pressure forcing it out during insertion. Plaintiff Kaminski told them there were too many other details to explain and that it would be a good idea if they had him come in on the problem to help on the details.

46. The BP representatives disconnected from the conference call and Hittos asked Plaintiff Kaminski to send her copies of the information he had sent to BP. Hittos said she can send it in a more formal manner through the congressman's office to the new Unified Command just now being put together in Washington to solve this problem.

47. At the end of the telephone conversation, Hittos asked Plaintiff Kaminski what he wanted for all his help. Plaintiff Kaminski replied, "It's in my email to HST. I want at least $2 million for the design because it's a unique design." Hittos said, "Send me copies of those emails

-15-

EXHIBIT F

so I can look at them." Hittos gave Plaintiff Kaminski her email address. She also wanted a copy of the HST email rejection of Plaintiff Kaminski's insertion pipe idea. Hittos told Plaintiff Kaminski that she wanted to meet him in the congressman's Tarpon Springs, Florida office.

48. On May 13, 2010 at approximately 3:00 p.m., following the conference call between Plaintiff Kaminski, Hittos, and the BP representatives, BP announces to the press that they have decided on a "recent new proposal." MSNBC reported, in an article titled, "BP to try Tube, Not 'Top Hat,' in Gulf Gusher," the following: "Setting aside their 'top hat' strategy for now, BP officials said Thursday they would instead try threading a small tube into a jagged pipe gushing crude from the Gulf seafloor.....The smaller tube will be surrounded by a stopper to keep oil from leaking into the sea. If it works, the tube will then siphon the crude to a tanker at the surface....Company spokesman Bill Salvin said engineers hope to start moving the tube into place Thursday night, but it will take 12 hours to get the tube fully hooked up. BP had earlier weighed first going with a small containment box called a "top hat," which is already on the seafloor and also would siphon oil to a tanker on the surface. Officials are waiting to use the box until they know if the tube works, and how well it's working, Salvin said."

49. On May 13, 2010 at 2:47 p.m., Plaintiff Kaminski, convinced that BP's "recent new proposal" was the insertion pipe idea and design he had submitted, sent an email to HST regarding their acceptance of his insertion pipe idea and asking them to let him help more directly.

50. On May 13, 2010 at 3:01 p.m., Plaintiff Kaminski starts to forward requested emails to Hittos, again demanding that he be paid at least $2 million.

51. On May 13, 2010 at 3:04 p.m., Plaintiff Kaminski emails Hittos copies of the other

-16-

EXHIBIT F

ideas he had sent to HST.

52. On May 13, 2010 at 3:12 p.m., Plaintiff Kaminski emails Hittos a copy of the completed form which he had been required to submit to HST. Plaintiff Kaminski reiterates that the insertion pipe with seals will do the job.

53. On May 13, 2010 at 3:23 p.m., Plaintiff Kaminski emails Hittos additional information in regard to his insertion pipe design.

54. On May 13, 2010 at 4:00 p.m., Plaintiff Kaminski telephones and consults with Mr. Richard Messner, a research design engineer at Seal Master Corporation, in regard to the insertion pipe seals. Mr. Messner tells Plaintiff Kaminski that the insertion pipe idea is very clever and may even be patentable. He also states that Seal Master would like to be involved in applying Plaintiff Kaminski's insertion pipe idea to other applications. This telephone conversation ended at approximately 4:30 p.m.

55. On May 13, 2010 at 4:39 p.m., Plaintiff Kaminski emails Hittos details of his telephone conversation with, and contact information for, Richard Messner.

56. On May 13, 2010 at 5:28 p.m., Plaintiff Kaminski emails Hittos. Plaintiff Kaminski tells Hittos that he believes BP is stealing his idea and slightly altering it. Plaintiff Kaminski informs Hittos that his idea will not work as well if his design is altered.

57. On May 13, 2010 at 6:37 p.m., Plaintiff Kaminski emails Hittos additional suggestions in regard to his insertion pipe design.

58. On May 13, 2010 at 7:56 p.m., Plaintiff Kaminski emails Hittos and makes it clear that BP needs to have the lines on the insertion pipe in order to pull the insertion pipe in and hold it in.

-17-

EXHIBIT F

59. On May 14, 2010 at 3:10 p.m., Plaintiff Kaminski receives another boilerplate rejection email from HST. At 4:34 p.m. forwards the email to Hittos. At this point, Plaintiff Kaminski is concerned that all contact with HST is going through Hittos, thereby resulting in a communication breakdown. BP is clearly using Plaintiff Kaminski's ideas but Plaintiff Kaminski is merely receiving automatically generated boilerplate rejection notices from HST.

60. On May 14, 2010 at 10:43 p.m., Plaintiff Kaminski receives an email from Hittos wherein she requests Plaintiff Kaminski's further assistance. In her email, Hittos states, "Joseph, I'd like to forward you a slide show of BP's plan. Take a look and specifically tell me where they are going wrong. I would like to point out their inherent mistakes in our next conference call. Thanks."

61. On May 14, 2010 at 10:44 p.m., Plaintiff Kaminski receives an email from Hittos titled, "BP Gulf of Mexico Update" and the slide show of BP's plan. In this update, released on May 14, 2010 at 3:00 p.m., BP states,

"Riser Insertion Tube - A tool has been fabricated and lowered to the sea floor. One end will be attached to the riser and drill pipe which run to the Transocean *Enterprise*, on the surface. The other end will be inserted into the ruptured riser pipe that is the primary source of the leak. All necessary equipment is on location and engineers plan to move them into place Friday night.

Containment Recovery System - A containment dome, called a "top hat," has been deployed to the sea floor and is being readied to be placed over the main leak, if needed. It is designed with injection ports that can accommodate "anti-freeze" in order to mitigate the formation of frozen hydrates.

It is important to note that this technology has never been done at this water depth. Significant technical and operational challenges must be overcome for it to be successful."

BP fails to note that the "Riser Insertion Tube" was invented and designed by Plaintiff Kaminski.

62. On May 15, 2010 at 12:16 a.m., Plaintiff Kaminski emails his detailed answers to Hittos' request for assistance which she had emailed on May 14, 2010 at 10:43 p.m.

EXHIBIT F

63. On May 15, 2010 at 1:55 a.m., Plaintiff Kaminski, in order to clarify typos in the previous email, sends a second email to Hittos.

64. On May 15, 2010 at 2:50 a.m., Plaintiff Kaminski emails Hittos explaining that it is imperative that BP add lines to pull the insertion pipe in and hold it in place. Plaintiff Kaminski includes drawings. As a result of Plaintiff Kaminski's insistence, BP finally brings the insertion pipe to the surface, modifies it, adds lines, and reinserts it on Sunday, May 16, 2010.

65. On May 15, 2010 at 5:30 p.m., Plaintiff Kaminski emails Hittos and explains how to collect even more oil and possible ways to anchor the insertion pipe lines. Again, Plaintiff Kaminski explains how to draw the insertion pipe in and keep it in.

66. On May 15, 2010 at 8:11 p.m., Plaintiff Kaminski emails Hittos in regard to the "Top Hat." Plaintiff Kaminski suggests injecting warm upper seawater into the "Top Hat" to create a thermal lifting action. Plaintiff Kaminski includes a drawing. This modification to the "Top Hat" by Plaintiff Kaminski would allow BP to collect the oil which leaks from the insertion pipe.

67. On May 15, 2010 at 9:22 p.m., Plaintiff Kaminski receives an email from Hittos wherein Hittos requests that they reschedule their meeting as follows: "Instead of meeting at 10am next Friday, let's meet at 230pm. I can then let you listen in to the 300pm conference call with the unified command."

68. On May 15, 2010 at 11:41 p.m., Plaintiff Kaminski emails Hittos and provides greater clarification on how to improve the design of the "Top Hat."

69. On May 16, 2010 at 12:30 a.m., Plaintiff Kaminski sends email to Hittos discussing the possible root causes of the blowout.

70. On May 16, 2010 at 10:05 a.m., Plaintiff Kaminski emails Hittos describing his

-19-

EXHIBIT F

theory of how the oil may be hiding below the surface and why.

71. On May 16, 2010 at 12:53 p.m., Plaintiff Kaminski receives a forwarded email from Hittos titled, "Fw: Update on Riser Insertion Tube Tool Program." This update from the Unified Area Command states, "Overnight the Riser Insertion Tube Tool was successfully tested and inserted into the leaking riser, capturing some amounts of oil and gas. The oil was stored on board the Discoverer Enterprise drill ship 5,000 feet above on the water's surface.... The test was halted temporarily when the tube was dislodged...... The tool is fashioned from a 4-inch pipe and is inserted into the leaking riser, from which the majority of the flow is coming. While not collecting all of the leaking oil, this tool is an important step in reducing the amount of oil being released into Gulf waters.... The procedure - never attempted before at such depths - involves inserting a 5-foot length of the specifically-designed tool into the end of the existing, damaged riser from where the oil and gas is leaking. In a procedure approved by federal agencies and the Federal On Scene Coordinator, methanol will also be flowed into the riser to help prevent the formation of gas crystals, known as hydrates. Gas and oil will then flow to the surface to the Discoverer Enterprise drillship."

72. The insertion pipe was "dislodged" because BP didn't have strain lines on it as had been demanded by Plaintiff Kaminski. The insertion pipe was only 5 feet long. This was the length Plaintiff Kaminski had first suggested during the conference call on May 13, 2010. As BP emphasizes, the insertion pipe is a "specifically-designed tool." At this point, BP insists on injecting methanol into the riser "to help prevent the formation of gas crystals."

73. On May 16, 2010 at 6:46 p.m., MSNBC reported the following: "Reporting its first success in containing the massive Gulf oil leak nearly a month after it started, BP on Sunday said

-20-

oil and natural gas were flowing via a mile-long pipe to a ship at the surface....The contraption used by BP was hooked up successfully and sucking oil from a pipe at the blown well Sunday afternoon after being hindered by several setbacks. Engineers had worked since Friday to place the four-inch tube into a 21-inch pipe nearly a mile below the sea. 'So far it's working extremely well,' BP Senior Executive Vice President Kent Wells said of the strategy. 'We're very slowly increasing the rate' to get more oil and natural gas up, he told reporters. 'We will just learn as we go with this approach.' Siphoning oil from a mile down had never before been successful."

74. On May 17, 2010, BP released a statement to the press announcing that the "Top Hat" could be used in conjunction with the insertion pipe to increase collection up to 80%. BP modified all the "Top Hats" to use warm surface seawater pumped into the "Top Hat" to create a thermal lifting action. This is precisely the modification suggested by Plaintiff Kaminski on May 15, 2010. It is obvious that BP was reading everything Plaintiff Kaminski submitted and using Plaintiff Kaminski's ideas all along the way.

75. On May 17, 2010, BP releases a new video of the insertion pipe working. The picture in Plaintiff Kaminski's email on May 15, 2010 at 2:50 a.m. is the same as BP's picture in this video. Plaintiff Kaminski drew the picture two days before BP released their picture.

76. On May 18, 2010, BP makes statements to the press that it was working on the insertion pipe for a long time. However, this contradicts BP's initial press releases (e.g. May 13, 2010) wherein BP clearly announces to the press that they have decided on a recent new proposal. This "recent new proposal" is indubitably Plaintiff Kaminski's insertion pipe idea/design/proposal. Prior to May 13, 2010, BP made no mention of the insertion pipe.

77. From May 19, 2010 through July, 2010, Plaintiff Kaminski continued to work with

-21-

EXHIBIT F

the same Hittos/HST/BP network, and Professor Robert Bea, to develop a viable "remove the riser" plan that would allow for the installation of a BOP on top. During this period, using the detailed LMRP/BOP diagrams sent to him, Plaintiff Kaminski: (a) devised a stint pipe, later called the "Riser Spool" by BP; (b) provided plans to cradle the old riser pipe with surface ship lines and steer it away as it is cut off, blown off, or unbolted; and (c) provided plans to HST for the purpose of installing two (2) pins (one long & one short) in the riser spool to allow it to be mated to the old riser pipe adapter plate. The ROVs guide the first pin (the long pin) to a hole on the plate, then rotate the pipe on that pin to align the second pin as it is lowered. Plaintiff Kaminski's two-pin design for riser spool flange alignment allowed for the error-free and expedient installation of a BOP on top.

78. On May 26, 2010 at 1:34 p.m., Plaintiff Kaminski receives an email from Professor Robert Bea, Center for Catastrophic Risk Management, Department of Civil & Environmental Engineering, UC Berkeley wherein Professor Bea states, "bless you brother....very useful. I will pass to our Deepwater Horizon Study Group." This email was in response to Plaintiff Kaminski having emailed his ideas and designs to Professor Bea in an effort to expedite and facilitate communication with BP.

79. On July 1, 2010 at 6:10 p.m., Plaintiff Kaminski receives a "Thank you" email from the office of U.S. Congressman Bilirakis. This email, which isn't even suitable for framing, states, "Dear Joseph: Thank you for sharing your creative solution in the hopes of plugging the leak to the continuous flow of oil in the Gulf of Mexico…I appreciate you sharing your ideas on how to quickly and safely resolve the oil spill in the Gulf of Mexico. I will also share your ideas and suggestions with my House colleagues. I am certain they will benefit from your views."

-22-

EXHIBIT F

### I. The Insertion Pipe Idea

80. Plaintiff, Joseph F. Kaminski, refers to and incorporates by reference as though fully set forth herein each and every foregoing paragraph of this Complaint.

### A. Novel and Original

81. Plaintiff's Breach of Implied-in-Fact Contract-based claim requires only a showing that the disclosed insertion pipe idea was novel to the Defendants in order to find consideration. A fact-specific inquiry that focuses on the perspective of the Defendants clearly shows that: (a) a relief well was the only source control option mentioned by name in Defendants' Initial Exploration Plan for the area that included the Macondo well; (b) other than the lengthy process (at least 100 days) of drilling a relief well, Defendants had no available, tested technique to control or stop a deepwater blowout in the event of a failure of the blowout preventer ("BOP") to properly function; and (c) Defendants' effort to capture oil from the Macondo well with the containment dome was laughable. On May 7, 2010, when crews started to maneuver the cofferdam over the leak at the end of the riser, hydrates formed before the cofferdam could be put in place, clogging the opening through which oil was to be funneled.

82. Plaintiff's Unjust Enrichment-based claim requires that the insertion pipe idea be novel and original in absolute terms. This is so because unoriginal, known ideas have no value as property and the law does not protect against the use of that which is free and available to all. Here, Plaintiff Kaminski's insertion pipe invention, idea, and design information is novel and original in absolute terms based upon: (a) the insertion pipe idea's specificity (the insertion pipe idea was for a very specific application); (b) the insertion pipe idea's non-commonality (Plaintiff Kaminski was the only person who knew of the idea); (c) the insertion pipe idea's uniqueness

EXHIBIT F

(this idea is different from any generally known ideas); and (d) the insertion pipe idea's commercial non-availability (the insertion pipe idea was never previously used in the oil & gas exploration and production industry).

83.   Defendants used and benefited from Plaintiff Kaminski's insertion pipe invention, idea, and design information which was otherwise unknown to either Defendants or the oil & gas exploration and production industry in general.

### B. Concrete

84.   Concreteness of an idea pertains to the requisite developmental stage of the idea when it is presented. An idea is a protectable property interest, if it is sufficiently developed to be ready for immediate use without additional embellishment. If an idea requires extensive investigation, research, and planning before it is ripe for implementation, it is not concrete. Plaintiff Kaminski's insertion pipe invention, idea, and design were very specific and sufficiently developed to be ready for immediate use without additional embellishment by Defendants.

85.   Oral presentations and demonstrations of ideas and written proposals of ideas have been held to be sufficiently developed to be "usable," and thus satisfy the concreteness requirement. Plaintiff fully explained his insertion pipe idea both orally and via emails.

86.   On May 12, 2010 at 2:49 p.m., Plaintiff Kaminski, as per HST's request, emails the solution to HST using the insertion pipe to collect oil. This email included a description of the technology, required materials, and equipment that would be required for the immediate use of the insertion pipe idea by Defendants. This insertion pipe idea is to insert a smaller pipe into the broken pipe past the break and inflate sealing rings. This is the idea and design which Plaintiff

-24-

EXHIBIT F

Kaminski had briefly explained to HST during their telephone conversation on May 11, 2010 at 10:24 p.m

87. On May 13, 2010 at 1:30 p.m., during a conference call with BP representatives organized by Attorney Elizabeth Hittos, Legislative Counsel for U.S. Congressman Bilirakis in Washington, DC, Plaintiff Kaminski again explained his idea and answered questions from BP representatives. Attorney Hittos was asked questions by BP representatives on the line and conveyed the questions to Plaintiff Kaminski. Plaintiff Kaminski provided detailed and specific answers to the questions being asked by the BP representatives. During this conference call, Plaintiff Kaminski also explains to BP representatives that, since time is of the essence, an alternative would be to use readily-available flap seals in lieu of inflatable seals.

88. On May 15, 2010 at 2:50 a.m., Plaintiff Kaminski again emails Attorney Hittos explaining that it is imperative that BP add lines to pull the insertion pipe in and hold it in place. Plaintiff Kaminski includes drawings. As a result of Plaintiff Kaminski's insistence, BP finally brings the insertion pipe to the surface, modifies it, adds lines, and reinserts it on Sunday, May 16, 2010.

### C. Use of the Insertion Pipe Idea by Defendants

89. Defendants made use of Plaintiff Kaminski's specific novel and original insertion pipe idea and design.

90. On May 16, 2010 at 6:46 p.m., MSNBC reported the following: "Reporting its first success in containing the massive Gulf oil leak nearly a month after it started, BP on Sunday said oil and natural gas were flowing via a mile-long pipe to a ship at the surface….The contraption used by BP was hooked up successfully and sucking oil from a pipe at the blown well Sunday

-25-

EXHIBIT F

afternoon after being hindered by several setbacks. Engineers had worked since Friday to place the four-inch tube into a 21-inch pipe nearly a mile below the sea. 'So far it's working extremely well,' BP Senior Executive Vice President Kent Wells said of the strategy. 'We're very slowly increasing the rate' to get more oil and natural gas up, he told reporters. 'We will just learn as we go with this approach.' Siphoning oil from a mile down had never before been successful."

## II. The "Top Hat" with Thermal Lifting Action Idea

91.  Plaintiff, Joseph F. Kaminski, refers to and incorporates by reference as though fully set forth herein each and every foregoing paragraph of this Complaint.

### A. Novel and Original

92.  Plaintiff's Breach of Implied-in-Fact Contract-based claim requires only a showing that the disclosed "Top Hat" with thermal lifting action idea was novel to the Defendants in order to find consideration. A fact-specific inquiry that focuses on the perspective of the Defendants clearly shows that: (a) a relief well was the only source control option mentioned by name in Defendants' Initial Exploration Plan for the area that included the Macondo well; (b) other than the lengthy process (at least 100 days) of drilling a relief well, Defendants had no available, tested technique to control or stop a deepwater blowout in the event of a failure of the blowout preventer ("BOP") to properly function; and (c) Defendants' effort to capture oil from the Macondo well with the containment dome was laughable. On May 7, 2010, when crews started to maneuver the cofferdam over the leak at the end of the riser, hydrates formed before the cofferdam could be put in place, clogging the opening through which oil was to be funneled. BP Vice President Richard Lynch, who oversaw the cofferdam effort, stated that BP did not anticipate hydrates forming this early. Because hydrocarbons are lighter than water, the

-26-

EXHIBIT F

containment dome became buoyant as it filled with oil and gas while BP tried to lower it. In the *New York Times*, Lynch recalled engineers telling him that they had "lost the cofferdam," which, after filling with highly flammable material, had begun floating up toward the ship-covered ocean surface. Engineers were eventually able to gain control of the 98-ton dome and move it to safety on the sea floor. One high-level government official recalled Andy Inglis, BP's Chief Executive of Exploration & Production, saying "if we had tried to make a hydrate collection contraption, we couldn't have done a better job."

93. Plaintiff's Unjust Enrichment-based claim requires that the "Top Hat" with thermal lifting action idea be novel and original in absolute terms. This is so because unoriginal, known ideas have no value as property and the law does not protect against the use of that which is free and available to all. Here, Plaintiff Kaminski's "Top Hat" with thermal lifting action invention, idea, and design information is novel and original in absolute terms based upon: (a) the "Top Hat" with thermal lifting action idea's specificity (the "Top Hat" with thermal lifting action idea was for a very specific application); (b) the "Top Hat" with thermal lifting action idea's non-commonality (Plaintiff Kaminski was the only person who knew of the idea). On May 15, 2010 at 8:11 p.m., Plaintiff Kaminski emails Attorney Hittos in regard to the "Top Hat." Plaintiff Kaminski suggests injecting warm upper seawater into the "Top Hat" to create a thermal lifting action. Plaintiff Kaminski includes a drawing. This modification to the "Top Hat" by Plaintiff Kaminski would allow BP to collect the oil which leaks from the insertion pipe; (c) the "Top Hat" with thermal lifting action idea's uniqueness (this idea is different from any generally known ideas); and (d) the "Top Hat" with thermal lifting action idea's commercial non-availability (the "Top Hat" with thermal lifting action idea was never previously used in the oil & gas exploration

-27-

EXHIBIT F

and production industry).

94.  Defendants used and benefited from Plaintiff Kaminski's "Top Hat" with thermal lifting action invention, idea, and design information which was otherwise unknown to either Defendants or the oil & gas exploration and production industry in general.

### B. Concrete

95.  Concreteness of an idea pertains to the requisite developmental stage of the idea when it is presented. An idea is a protectable property interest, if it is sufficiently developed to be ready for immediate use without additional embellishment. If an idea requires extensive investigation, research, and planning before it is ripe for implementation, it is not concrete. Plaintiff Kaminski's "Top Hat" with thermal lifting action invention, idea, and design were very specific and sufficiently developed to be ready for immediate use without additional embellishment by Defendants.

96.  Oral presentations and demonstrations of ideas and written proposals of ideas have been held to be sufficiently developed to be "usable," and thus satisfy the concreteness requirement. Plaintiff fully explained his "Top Hat" with thermal lifting action idea via emails.

97.  On May 15, 2010 at 8:11 p.m., Plaintiff Kaminski emails Attorney Hittos in regard to the "Top Hat." Plaintiff Kaminski suggests injecting warm upper seawater into the "Top Hat" to create a thermal lifting action. Plaintiff Kaminski includes a drawing. This modification to the "Top Hat" by Plaintiff Kaminski would allow BP to collect the oil which leaks from the insertion pipe.

98.  On May 15, 2010 at 11:41 p.m., Plaintiff Kaminski emails Hittos and provides greater clarification on how to improve the design of the "Top Hat."

-28-

EXHIBIT F

**C. Use of the "Top Hat" with Thermal Lifting Action Idea by Defendants**

99. On May 17, 2010, BP released a statement to the press announcing that the "Top Hat" could be used in conjunction with the insertion pipe to increase collection up to 80%. BP modified all the "Top Hats" to use warm surface seawater pumped into the "Top Hat" to create a thermal lifting action. This is precisely the modification suggested by Plaintiff Kaminski on May 15, 2010. It is obvious that BP was reading everything Plaintiff Kaminski submitted and using Plaintiff Kaminski's ideas all along the way.

**III. Riser Spool and Two-Pin Design for Riser Spool Flange Alignment**

100. Plaintiff, Joseph F. Kaminski, refers to and incorporates by reference as though fully set forth herein each and every foregoing paragraph of this Complaint.

**A. Novel and Original**

101. Plaintiff's Breach of Implied-in-Fact Contract-based claim requires only a showing that the disclosed riser spool and two-pin design for riser spool flange alignment idea was novel to the Defendants in order to find consideration. A fact-specific inquiry that focuses on the perspective of the Defendants clearly shows that: (a) a relief well was the only source control option mentioned by name in Defendants' Initial Exploration Plan for the area that included the Macondo well; (b) other than the lengthy process (at least 100 days) of drilling a relief well, Defendants had no available, tested technique to control or stop a deepwater blowout in the event of a failure of the blowout preventer ("BOP") to properly function; and (c) Defendants' effort to capture oil from the Macondo well with the containment dome was laughable. On May 7, 2010, when crews started to maneuver the cofferdam over the leak at the end of the riser,

-29-

EXHIBIT F

hydrates formed before the cofferdam could be put in place, clogging the opening through which oil was to be funneled.

102. Plaintiff's Unjust Enrichment-based claim requires that the riser spool and two-pin design for riser spool flange alignment idea be novel and original in absolute terms. This is so because unoriginal, known ideas have no value as property and the law does not protect against the use of that which is free and available to all. Here, Plaintiff Kaminski's riser spool and two-pin design for riser spool flange alignment invention, idea, and design information is novel and original in absolute terms based upon: (a) the riser spool and two-pin design for riser spool flange alignment idea's specificity (the riser spool and two-pin design for riser spool flange alignment idea was for a very specific application); (b) the riser spool and two-pin design for riser spool flange alignment idea's non-commonality (Plaintiff Kaminski was the only person who conceived and knew of the idea); (c) the riser spool and two-pin design for riser spool flange alignment idea's uniqueness (this idea is different from any generally known ideas); and (d) the riser spool and two-pin design for riser spool flange alignment idea's commercial non-availability (the riser spool and two-pin design for riser spool flange alignment idea was never previously used in the oil & gas exploration and production industry).

103. Defendants used and benefited from Plaintiff Kaminski's riser spool and two-pin design for riser spool flange alignment invention, idea, and design information which was otherwise unknown to either Defendants or the oil & gas exploration and production industry in general.

**B. Concrete**

104. Concreteness of an idea pertains to the requisite developmental stage of the idea

-30-

when it is presented. An idea is a protectable property interest, if it is sufficiently developed to be ready for immediate use without additional embellishment. If an idea requires extensive investigation, research, and planning before it is ripe for implementation, it is not concrete. Plaintiff Kaminski's riser spool and two-pin design for riser spool flange alignment invention, idea, and design were very specific and sufficiently developed to be ready for immediate use without additional embellishment by Defendants.

105. Oral presentations and demonstrations of ideas and written proposals of ideas have been held to be sufficiently developed to be "usable," and thus satisfy the concreteness requirement. Plaintiff fully explained his riser spool and two-pin design for riser spool flange alignment idea via emails.

106. On May 14, 2010 at 10:43 p.m., Plaintiff Kaminski receives an email from Attorney Hittos wherein she requests Plaintiff Kaminski's further assistance. In her email, Attorney Hittos states, "Joseph, I'd like to forward you a slide show of BP's plan. Take a look and specifically tell me where they are going wrong. I would like to point out their inherent mistakes in our next conference call. Thanks."

107. On May 15, 2010 at 12:16 a.m., Plaintiff Kaminski emails his detailed answers to Attorney Hittos' request for assistance which she had emailed on May 14, 2010 at 10:43 p.m.

108. From May 19, 2010 through July, 2010, Plaintiff Kaminski using the detailed LMRP/BOP diagrams sent to him, Plaintiff Kaminski: (a) devised a stint pipe, later called the "Riser Spool" by BP; (b) provided plans to cradle the old riser pipe with surface ship lines and steer it away as it is cut off, blown off, or unbolted; and (c) provided plans to HST for the purpose of installing two (2) pins (one long & one short) in the riser spool to allow it to be

-31-

EXHIBIT F

mated to the old riser pipe adapter plate. The ROVs guide the first pin (the long pin) to a hole on the plate, then rotate the pipe on that pin to align the second pin as it is lowered. Plaintiff Kaminski's two-pin design for riser spool flange alignment allowed for the error-free and expedient installation of a BOP on top.

### C. Use of the Riser Spool and Two-Pin Design for Riser Spool Flange Alignment by Defendants

109. Defendants began the installation of the capping stack, essentially a smaller version of a BOP, on July 10, 2012. After removing the "Top Hat" from the top of the riser, remotely operated vehicles unbolted the stub of riser connected to the top of the BOP stack, removed this stub, slid the capping stack into place, and bolted the capping stack to the top of the BOP stack. Installation of the capping stack was completed on July 12, 2012. The capping stack was closed, thereby ending the spill, on July 15, 2012.

110. Defendants' capping stack included Plaintiff Kaminski's specific riser spool and two-pin design for riser spool flange alignment invention, idea, and design.

### COUNT I
### BREACH OF IMPLIED-IN-FACT CONTRACT

111. Plaintiff, Joseph F. Kaminski, refers to and incorporates by reference as though fully set forth herein each and every foregoing paragraph of this Complaint.

112. Plaintiff Kaminski conceived, invented, and designed the novel, unique, and concrete insertion pipe idea.

113. Defendants, both directly and indirectly via Attorney Elizabeth Hittos, requested the use of Plaintiff Kaminski's insertion pipe invention, idea, and design, and the ongoing

-32-

engineering services of Plaintiff Kaminski, and have knowingly and voluntarily accepted their substantial benefits.

114. The insertion pipe idea was submitted by Plaintiff Kaminski to Defendants with the understanding and expectation, fully and clearly understood by Defendants and Attorney Hittos, that Plaintiff Kaminski would be reasonably compensated in the amount of "at least two million U.S. dollars" for its use by Defendants.

115. Defendants did in fact use Plaintiff Kaminski's precise insertion pipe idea and design and did so under circumstances from which it could be concluded that there was a meeting of the minds and Defendants and Attorney Hittos voluntarily accepted the disclosure knowing the conditions on which it was tendered and the reasonable value of the work.

116. Defendants have failed to pay Plaintiff Kaminski any part of the reasonable value of his insertion pipe invention, idea, and design, and ongoing engineering services.

**COUNT II**
**BREACH OF IMPLIED-IN-FACT CONTRACT**

117. Plaintiff, Joseph F. Kaminski, refers to and incorporates by reference as though fully set forth herein each and every foregoing paragraph of this Complaint.

118. Plaintiff Kaminski conceived, invented, and designed the novel, unique, and concrete "Top Hat" with thermal lifting action idea.

119. Defendants, both directly and indirectly via Attorney Elizabeth Hittos, requested the use of Plaintiff Kaminski's "Top Hat" with thermal lifting action invention, idea, and design, and the ongoing engineering services of Plaintiff Kaminski, and have knowingly and voluntarily accepted their substantial benefits.

-33-

EXHIBIT F

120. The "Top Hat" with thermal lifting action idea was submitted by Plaintiff Kaminski to Defendants with the understanding and expectation, fully and clearly understood by Defendants and Attorney Hittos, that Plaintiff Kaminski would be reasonably compensated in the amount of "at least two million U.S. dollars" for its use by Defendants.

121. Defendants did in fact use Plaintiff Kaminski's precise "Top Hat" with thermal lifting action idea and design and did so under circumstances from which it could be concluded that there was a meeting of the minds and Defendants and Attorney Hittos voluntarily accepted the disclosure knowing the conditions on which it was tendered and the reasonable value of the work.

122. Defendants have failed to pay Plaintiff Kaminski any part of the reasonable value of his "Top Hat" with thermal lifting action invention, idea, and design, and ongoing engineering services.

## COUNT III
## BREACH OF IMPLIED-IN-FACT CONTRACT

123. Plaintiff, Joseph F. Kaminski, refers to and incorporates by reference as though fully set forth herein each and every foregoing paragraph of this Complaint.

124. Plaintiff Kaminski conceived, invented, and designed the novel, unique, and concrete riser spool and two-pin riser spool flange alignment idea.

125. Defendants, both directly and indirectly via Attorney Elizabeth Hittos, requested the use of Plaintiff Kaminski's riser spool and two-pin riser spool flange alignment invention, idea, and design, and the ongoing engineering services of Plaintiff Kaminski, and have knowingly and voluntarily accepted their substantial benefits.

-34-

EXHIBIT F

126. The riser spool and two-pin riser spool flange alignment idea was submitted by Plaintiff Kaminski to Defendants with the understanding and expectation, fully and clearly understood by Defendants and Attorney Hittos, that Plaintiff Kaminski would be reasonably compensated in the amount of "at least two million U.S. dollars" for its use by Defendants.

127. Defendants did in fact use Plaintiff Kaminski's precise riser spool and two-pin riser spool flange alignment idea and design and did so under circumstances from which it could be concluded that there was a meeting of the minds and Defendants voluntarily accepted the disclosure knowing the conditions on which it was tendered and the reasonable value of the work.

128. Defendants have failed to pay Plaintiff Kaminski any part of the reasonable value of his riser spool and two-pin riser spool flange alignment invention, idea, and design, and ongoing engineering services.

**COUNT IV**
**UNJUST ENRICHMENT**

129. Plaintiff, Joseph F. Kaminski, refers to and incorporates by reference as though fully set forth herein each and every foregoing paragraph of this Complaint.

130. Plaintiff Kaminski conferred the benefit of the use of his novel, unique, and concrete insertion pipe invention, idea, and design upon Defendants BP Exploration and BP America.

131. Defendants, both directly and indirectly via Attorney Elizabeth Hittos, requested the use of Plaintiff Kaminski's insertion pipe invention, idea, and design, and the ongoing engineering services of Plaintiff Kaminski, and have knowingly and voluntarily accepted their benefits.

-35-

EXHIBIT F

132. Defendants BP Exploration and BP America were unjustly enriched by appreciating the use of Plaintiff Kaminski's novel, unique, and concrete insertion pipe invention, idea, and design. Defendants' unjust enrichment includes, but is not limited to, the fact that the use by Defendants of Plaintiff Kaminski's novel, unique, and concrete insertion pipe invention, idea, and design has saved Defendants an extensive amount of money by limiting: (a) Defendant BP Exploration's liability, as a responsible party under OPA, for the removal costs and damages that resulted from the Deepwater Horizon oil spill incident; and (b) the civil penalty under CWA that resulted from the Deepwater Horizon oil spill incident. This civil penalty is $1,100 per barrel of oil that has been discharged or up to $4,300 per barrel of oil that has been discharged, to the extent that the discharge of oil was the result of gross negligence or willful misconduct by Defendants. With 4.9 million barrels spilled, this civil penalty could be approximately $21 billion.

133. Defendants' acceptance and retention of this conferred benefit are under circumstances that make it inequitable for Defendants to retain it without paying the value thereof to Plaintiff Kaminski.

**COUNT V**
**UNJUST ENRICHMENT**

134. Plaintiff, Joseph F. Kaminski, refers to and incorporates by reference as though fully set forth herein each and every foregoing paragraph of this Complaint.

135. Plaintiff Kaminski conferred the benefit of the use of his novel, unique, and concrete "Top Hat" with thermal lifting action invention, idea, and design upon Defendants BP Exploration and BP America.

-36-

EXHIBIT F

136. Defendants, both directly and indirectly via Attorney Elizabeth Hittos, requested the use of Plaintiff Kaminski's "Top Hat" with thermal lifting action invention, idea, and design, and the ongoing engineering services of Plaintiff Kaminski, and have knowingly and voluntarily accepted their benefits.

137. Defendants BP Exploration and BP America were unjustly enriched by appreciating the use of Plaintiff Kaminski's novel, unique, and concrete "Top Hat" with thermal lifting action invention, idea, and design. Defendants' unjust enrichment includes, but is not limited to, the fact that the use by Defendants of Plaintiff Kaminski's novel, unique, and concrete "Top Hat" with thermal lifting action invention, idea, and design has saved Defendants an extensive amount of money by limiting: (a) Defendant BP Exploration's liability, as a responsible party under OPA, for the removal costs and damages that resulted from the Deepwater Horizon oil spill incident; and (b) the civil penalty under CWA that resulted from the Deepwater Horizon oil spill incident. This civil penalty is $1,100 per barrel of oil that has been discharged or up to $4,300 per barrel of oil that has been discharged, to the extent that the discharge of oil was the result of gross negligence or willful misconduct by Defendants. With 4.9 million barrels spilled, this civil penalty could be approximately $21 billion.

138. Defendants' acceptance and retention of this conferred benefit are under circumstances that make it inequitable for Defendants to retain it without paying the value thereof to Plaintiff Kaminski.

EXHIBIT F

## COUNT VI
## UNJUST ENRICHMENT

139. Plaintiff, Joseph F. Kaminski, refers to and incorporates by reference as though fully set forth herein each and every foregoing paragraph of this Complaint.

140. Plaintiff Kaminski conferred the benefit of the use of his novel, unique, and concrete riser spool and two-pin riser spool flange alignment invention, idea, and design upon Defendants BP Exploration and BP America.

141. Defendants, both directly and indirectly via Attorney Elizabeth Hittos, requested the use of Plaintiff Kaminski's riser spool and two-pin riser spool flange alignment invention, idea, and design, and the ongoing engineering services of Plaintiff Kaminski, and have knowingly and voluntarily accepted their benefits.

142. Defendants BP Exploration and BP America were unjustly enriched by appreciating the use of Plaintiff Kaminski's novel, unique, and concrete riser spool and two-pin riser spool flange alignment invention, idea, and design. Defendants' unjust enrichment includes, but is not limited to, the fact that the use by Defendants of Plaintiff Kaminski's novel, unique, and concrete riser spool and two-pin riser spool flange alignment invention, idea, and design has saved Defendants an extensive amount of money by limiting: (a) Defendant BP Exploration's liability, as a responsible party under OPA, for the removal costs and damages that resulted from the Deepwater Horizon oil spill incident; and (b) the civil penalty under CWA that resulted from the Deepwater Horizon oil spill incident. This civil penalty is $1,100 per barrel of oil that has been discharged or up to $4,300 per barrel of oil that has been discharged, to the extent that the discharge of oil was the result of gross negligence or willful misconduct by Defendants. With 4.9 million barrels spilled, this civil penalty could be approximately $21 billion.

-38-

EXHIBIT F

143. Defendants' acceptance and retention of this conferred benefit are under circumstances that make it inequitable for Defendants to retain it without paying the value thereof to Plaintiff Kaminski.

### PRAYER FOR RELIEF

WHEREFORE, Plaintiff, Joseph F. Kaminski, demands judgment against Defendants, jointly and severally, as follows:

(a) Economic and compensatory damages in amounts to be determined at trial;

(b) Punitive damages;

(c) Pre-judgment and post-judgment interest at the maximum rate allowable by law;

(d) Attorney's fees and costs of litigation;

(e) Such other and further relief as the Court may deem just and appropriate; and

(f) A trial by jury as to all Defendants on all issues so triable.

DATED: March 23, 2012

Respectfully submitted,

Brian J. Donovan
Attorney for Plaintiff
Florida Bar No. 143900
3102 Seaway Court, Suite 304
Tampa, FL 33629
Tel: (352)328-7469

EXHIBIT F