**IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF LOUISIANA**

| | | |
|---|---|---|
| **In Re:  Oil Spill by the Oil Rig "Deepwater Horizon" in the Gulf of Mexico, on April 20, 2010** | * * * * * * * * * | **MDL NO. 2179**<br><br>**SECTION: J**<br><br><br>**HONORABLE CARL J. BARBIER**<br><br>**MAGISTRATE JUDGE SHUSHAN** |
| **Plaisance, *et al.*, individually and on behalf of the Medical Benefits Settlement Class,**<br><br>**Plaintiffs,**<br>**v.**<br>**BP Exploration & Production Inc., *et al.*,**<br><br>**Defendants.** | * * * * * * * * * * * * * * | **NO. 12-CV-968**<br><br>**SECTION: J**<br><br><br>**HONORABLE CARL J. BARBIER**<br><br>**MAGISTRATE JUDGE SHUSHAN** |

**STATUS REPORT FROM THE *DEEPWATER HORIZON*
<u>MEDICAL BENEFITS SETTLEMENT CLAIMS ADMINISTRATOR</u>**

The Garretson Resolution Group, the Claims Administrator of the *Deepwater Horizon* Medical Benefits Class Action Settlement (the "Settlement"), submits the following quarterly report to apprise the Court of the status of its work in processing claims and implementing the terms of the Medical Settlement Agreement (the "MSA") between July 4, 2015, and October 2, 2015, (the "Reporting Period").[1]  We have published seven reports since Preliminary Approval

---

[1] Capitalized terms not otherwise defined herein shall have the meanings ascribed to their fully capitalized renderings in the MSA.

in May 2012, and this marks the third quarterly report filed since the claims filing deadline of February 12, 2015. This report will address the continued processing of claims sets received from 2012 to 2014 (collectively, the "2014 Claims")[2] and the claims received in 2015 (the "2015 Claims").

This status report provides:

- an executive summary of claims processed during the Reporting Period;

- a detailed overview of the progression of the 2014 and 2015 Claims;

- a summary of claims for Specified Physical Conditions ("SPC") and significant developments concerning these claims;

- an update on the operations and activities of the Class Member Services Center;

- an account of participation in the Periodic Medical Consultation Program ("PMCP");

- a summary of claims for Later-Manifested Physical Conditions; and

- a summary of the activities of the grantees of the Gulf Region Health Outreach Program ("GRHOP") and the operations of the Gulf Region Health Outreach Program Library.

## I.     <u>EXECUTIVE SUMMARY</u>

The Claims Administrator has received 37,265 unique claims for compensation for an SPC and/or participation in the PMCP through the end of the Reporting Period.[3] This status report will provide an overview of the claims processing forecast for both the 2014 and 2015 Claims, the variables influencing the progression of those claims, and the outcome of claims as they progress through the stages of review. In summary:

- The 2014 Claims are proceeding to final determination.

---

[2] The 2014 Claims include all POCFs received by the Claims Administrator from the entry of Preliminary Approval on May 3, 2012 through December 31, 2014. While the Claims Administrator was approved to receive claims after Preliminary Approval, the Claims Administrator was not approved to process claims beyond the Party-approved RAI process until the Effective Date of the Settlement. Hence, all claims received in 2012, 2013, and 2014 are referred to as the 2014 Claims.

[3] Quality control resulted in prior period's unique claims to be re-classified and associated with an existing claim.

2

- o Through the end of the Reporting Period, fifty-eight percent (58%) of the 2014 Claims have reached a final determination (either approval or denial), and forty-two percent (42%) require additional processing.

- o Of the fifty-eight percent (58%) reaching a final determination, thirty-two percent (32%) were approved for compensation for an SPC, and another thirty-four percent (34%) were approved to participate in the PMCP. Furthermore, sixteen percent (16%) of the 2014 Claims going through the Notice of Defect Process have received an "Approved with Defects" notice, meaning that the Medical Benefits Settlement Class Member ("Class Member") has been approved for at least one compensable SPC.

- o Overall, the 2014 Claims continue to be impacted by high defect rates, with seventy-eight percent (78%) receiving either a Request for Additional Information ("RAI") or Notice of Defect during the life of the claim. Additionally, twenty-five percent (25%) are impacted by changes or updates the claimants made to their Proof of Claim Forms or supporting documentation, which require us to re-review the claims.

- o The Claims Administrator currently forecasts that the forty-two percent (42%) of 2014 Claims requiring additional processing will be finalized at an even rate through mid-2016 as responses to defects and deficiencies, as well as changes or updates, undergo re-review.

- The 2015 Claims are progressing through initial review and resulting in determinations for SPC compensation.

  - o Consistent with previous projections, the Claims Administrator completed intake and data entry for 100% of the 2015 Claims by the end of the Reporting Period.

  - o Through the end of the Reporting Period, sixteen percent (16%) of the 2015 Claims have reached a final determination (either approval or denial), and eighty-four percent (84%) require additional processing.

  - o Of the sixteen percent (16%) reaching a final determination, fifty percent (50%) were approved for compensation for an SPC.

  - o Like the 2014 Claims, the 2015 Claims are also impacted by substantial defect rates, with forty percent (40%) receiving either a Request for Additional Information ("RAI") or Notice of Defect. Additionally, thirty-four percent (34%) are impacted by changes or updates the claimants made to their Proof of Claim Forms or supporting documentation, which require us to re-review the claims.

  - o The Claims Administrator currently forecasts that the eighty-four percent (84%) of the 2015 Claims requiring additional processing will be finalized

3

at an even rate through late-2016 as responses to defects and deficiencies, as well as changes or updates, undergo re-review.

- The compensation allocated to SPC-determined claims continues to increase.

  o During the Reporting Period, the Claims Administrator approved Class Members for over $4.1 million in SPC compensation, bringing the cumulative total to $8 million.

  o Additionally, the Claims Administrator determined that another approximately 400 Class Members who had partially defective claims also had at least one valid SPC claim and that the total amount of compensation for which the Class Members were currently eligible on those claims was $3.4 million. The Claims Administrator sent those claimants an "Approved with Defects" notice, giving them the option of either attempting to cure the Defects in an effort to get greater compensation or accepting the compensation for which they currently qualify.

  o Between the amounts allocated through SPC-determined claims and the amounts to be allocated through the "Approved with Defects" claims, the total SPC compensation for which Class Members qualified as of the end of the Reporting Period amounted to more than $11 million.

- Class Members continue to be approved for enrollment in the PMCP.

  o During the Reporting Period, we approved 6,351 Class Members to participate in the PMCP, bringing the total to 19,351 to date. We sent PMCP Notices of Determination to 3,845 Class Members during the Reporting Period, for a total of 15,639 over the life of the program.

This information is discussed in greater detail below.

## II.   DETAILED CLAIMS PROGRESSION

### A.   Progression of 2014 Claims

The Claims Administrator received 12,401 2014 Claims. Over the Reporting Period, the Claims Administrator received 311 changes or updates to those same claims forms, for a total of 3,058 changes or updates received for 2014 Claims to date. The additional information must be processed through intake and then re-reviewed at each subsequesnt processing stage to determine the impact. The number of 2014 Claims receiving a final determination or clearing lien

resolution continued to increase throughout the Reporting Period.  Of the 12,401 2014 Claims, fifty-eight percent (58%), have been processed to a final determination, and forty-two percent (42%), require additional processing.  Of the claims reaching a final determination,

- thirty-two percent (32%) were approved for compensation for a Specified Physical Condition, and fifty-seven percent (57%) of those claims were paid;

- eleven percent (11%) did not seek the SPC compensation benefit and instead claimed and qualified for the PMCP benefit only; and

- twenty-three percent (23%) proved they were Class Members and qualified to receive the PMCP benefit but failed to prove they qualified for SPC compensation; and

- thirty-four (34%) were denied because they (a) did not prove they were Class Members, (b) filed a valid opt-out, or (c) did not claim or prove a compensable SPC.

Notably, over this Reporting Period, of the 2014 Claims reaching final determination, a greater percentage were approved for compensation than those denied.

**Figure 1: Composition of Finalized 2014 Claims**



Of the claims that require additional processing:

- twelve percent (12%) are pending Declaration Review or RAI processing;

- fifty percent (50%) have already received or are scheduled to receive a Notice of Defect and will need to submit additional information; and

- thirty-eight percent (38%) are undergoing Medical Record Review.

**Figure 2: Composition of Pending 2014 Claims**



Thus, the current overall composition of the 2014 Claims is as follows:

**Figure 3: Overall Composition of 2014 Claims**



### B.    Progression of 2015 Claims

The Claims Administrator received 24,864 2015 Claims to date.[4]  Over the Reporting Period, we received approximately 3,621 changes or updates to 2015 Claims, for a total of 8,488 changes or updates to the 2015 Claims to date.  Similar to the 2014 Claims, this additional information must also be processed through intake and then be re-reviewed.

After a claim makes it through intake, it proceeds to initial review and subsequent processing.  During the Reporting Period, the Claims Administrator processed an additional 15,415 of the 24,864 2015 Claims through intake, bringing the total 2015 Claims processed

---

[4] Pursuant to Section V.A. of the MSA, any claim submitted to the Claims Administrator more than one year after the Effective Date is untimely and must be denied.

through intake to 24,817.   Therefore, the total 2015 Claims available for initial review and subsequent processing is 24,817.

Of the 24,817 claims, sixteen percent (16%) have been processed to a final determination, and eighty-four percent (84%) require additional processing.   Of the claims reaching a final determination,

- fifty percent (50%) were approved for compensation for an SPC, and thirty-seven percent (37%) of those claims were paid;

- four percent (4%) did not seek the SPC compensation benefit and instead claimed and qualified for the PMCP benefit only; and

- four percent (4%) proved they were Class Members and qualified to receive the PMCP benefit but failed to prove they qualified for SPC compensation; and

- forty-two (42%) were denied because they (a) did not prove they were Class Members, (b) filed a valid opt-out, or (c) did not claim or prove a compensable SPC.

**Figure 4: Composition of Finalized 2015 Claims**



Of the claims that require additional processing:

- thirty-eight (38%) are in the initial claims review process;

- thirty-six percent (36%) are pending Declaration Review or RAI processing;

- sixteen percent (16%) have already received or are scheduled to receive a Notice of Defect and will need to submit additional information; and

- ten percent (10%) are actively in the Medical Record Review process.

**Figure 5: Composition of Pending 2015 Claims**



Thus, the current overall composition of the 2015 Claims is as follows:

**Figure 6: Overall Composition of 2015 Claims**



### III.    CLAIMS FOR SPECIFIED PHYSICAL CONDITIONS

#### A.    Claimed Benefits and Compensation Level

As discussed above, during the Reporting Period, the Claims Administrator completed intake for an additional 15,415 of the 24,864 Proof of Claim Forms ("POCFs") received in 2015. Therefore, as of the end of the Reporting Period, 37,218 of the 37,265 POCFs received had proceeded to initial claims review.  Of the 11,542 POCFs for 2015 Claims that completed initial claims review during the Reporting Period, 11,410 sought compensation for an SPC and participation in the PMCP, and 132 sought only participation in the PMCP.

| TABLE 1: POCF FILINGS AVAILABLE FOR INITIAL CLAIMS REVIEW | | |
|---|---|---|
| | Reporting Period | Total |
| Claims Pending Intake Processing | | 47 |
| **Total POCF Filings Available for Initial Claims Review** | **11,542** | **37,218** |
| Claims for Compensation for Both SPCs and Participation in the PMCP | 11,410 | 36,003 |
| Claims for PMCP Only | 132 | 1,215 |
| Total POCF Filings | | 37,265 |

The graphs below provide a breakdown of the compensation levels claimed in the 2014 and 2015 Claims, respectively:

**Figure 7: Compensation Level Composition of 2014 Claims**



**Figure 8: Compensation Level Composition of 2015 Claims**



Table 2, below, compares the composition of the claimed compensation levels in the 2014 Claims with those in the 2015 Claims and shows the percentage change between those two groups of claims.

| Table 2: Claimed Compensation Level | | | | | | | | |
|---|---|---|---|---|---|---|---|---|
| | A1 | A2 | A3 | A4 | B1 | Multiple | None | PMCP Only |
| Percentage of 2014 Claims | 28.28% | 8.14% | 5.27% | 2.17% | 13.08% | 20.46% | 15.12% | 7.48% |
| Percentage of 2015 Claims | 29.46% | 3.59% | 1.75% | .49% | 1.76% | 15.33% | 46.45% | 1.16% |
| Vintage Claim Comparison | 1.18% | (4.56%) | (3.52%) | (1.68%) | (11.31%) | (5.13%) | 31.33% | (6.31%) |

In Table 3 below, we provide statistics of the claimed compensation level in Section VII of the POCF as compared to the awarded compensation level.  In over ninety-three percent (93%) of claims where the Class Member has claimed and qualified for a single compensation level, that same level of compensation has been awarded.  For the seven percent (7%) not

12

awarded the same claimed compensation level, the Claims Administrator has awarded both higher and lower compensation levels based on review of the POCF and supporting documentation provided. For claims where the Class Member selects multiple compensation levels or no compensation level in Section VII of the POCF, the rate of claims qualifying for A1-only compensation to those qualifying for A2 or higher compensation is approximately two to one (2:1).

| Table 3: Determined Compensation Level | | | | | | | | | | | |
|---|---|---|---|---|---|---|---|---|---|---|---|
| Claimed Compensation Level | A1 | | A2 | | A3 | | A4 | | B1 | | Grand Total |
| Section VII of POCF | Count | % | Count | % | Count | % | Count | % | Count | % | |
| A1 | 3,402 | 99.01% | 10 | 0.29% | 21 | 0.61% | 3 | 0.09% | | 0.00% | 3,436 |
| A2 | 40 | 26.49% | 97 | 64.24% | 14 | 9.27% | | 0.00% | | 0.00% | 151 |
| A3 | 22 | 8.91% | 23 | 9.31% | 185 | 74.90% | 17 | 6.88% | | 0.00% | 247 |
| A4 | 6 | 27.27% | 1 | 4.55% | 5 | 22.73% | 10 | 45.45% | | 0.00% | 22 |
| B1 | 51 | 39.23% | 41 | 31.54% | 30 | 23.08% | 3 | 2.31% | 5 | 3.85% | 130 |
| Multiple | 68 | 45.64% | 45 | 30.20% | 30 | 20.13% | 4 | 2.68% | 2 | 1.34% | 149 |
| None | 127 | 85.23% | 10 | 6.71% | 9 | 6.04% | 3 | 2.01% | | 0.00% | 149 |
| Total | 3,716 | 86.74% | 227 | 5.30% | 294 | 6.86% | 40 | 0.93% | 7 | 0.16% | 4,284 |

## B. Claims Requiring RAI and/or Notice of Defect

As has been the case historically, the majority of claims have received an RAI and/or a Notice of Defect according to the requirements of the MSA. During the Reporting Period, the Claims Administrator sent 6,004 RAIs and 1,893 Notices of Defect. Since the inception of the Settlement, the Claims Administrator sent 20,636 RAIs and 7,289 Notices of Defect.

| TABLE 4: RAIS AND NOTICES OF DEFECT | | |
|---|---|---|
| **RAIs** | **Reporting Period** | **Total** |
| RAIs Sent | 6,004 | 20,636 |
| Responses to RAIs Received | 3,414 | 11,485 |
| **Defects** | **Reporting Period** | **Total** |
| Notices of Defect Sent | 1,893 | 7,289 |
| Defect Cure Materials Received | 547 | 2,696 |

1.      Requests for Additional Information

Of the 6,004 RAIs sent during the Reporting Period, eighty-two percent (82%) were RAI-Missing, and eighteen percent (18%) were RAI-Incomplete.[5]  Eleven percent (11%) were sent to unrepresented claimants, and eighty-nine percent (89%) were sent to claimants represented by counsel.  More than sixty-five percent (65%) of the 2014 Claims have required at least one (1) RAI, and over nineteen percent (19%) have required the maximum of two (2) RAIs.  Approximately thirty-seven percent (37%) of the 2015 Claims have required at least one (1) RAI, and over three percent (3%) have required the maximum of two (2) RAIs.  The overall response rate to RAIs was fifty-six percent (56%), with claimants represented by counsel responding at a slightly higher rate (fifty-six percent (56%)) than those who are unrepresented (fifty-four percent (54%)).  The overall cure rate for responding to RAIs for both claimants represented by counsel and those unrepresented is approximately forty-four percent (44%).

As previously reported, failure to respond to an RAI-Missing within the sixty-day (60-day) response period will not necessarily result in the denial of a claim; rather, the failure to respond to an RAI-Missing by submitting a first-party injury declaration in compliance with the

_____

[5] Under the Party-approved RAI process, a claimant may receive an RAI-Missing for failing to submit a first-party injury declaration with his or her original POCF.  If the claimant submits a first-party injury declaration that omits necessary information, either in response to an RAI-Missing or at another point in the claims process, the claimant may receive an RAI-Incomplete.  For each RAI sent by the Claims Administrator, the claimant has sixty (60) days to respond.  A claimant may receive only one (1) RAI-Missing and one (1) RAI-Incomplete, as applicable.

Specified Physical Condition Matrix (the "SPC Matrix") will result in a Defect of "Missing Declaration of Injury Document" on a Notice of Defect. The claimant would then have 120 days to cure that Defect and any other material Defects listed in the notice.

Similarly, failure to respond to or cure all deficiencies identified within an RAI-Incomplete will not necessarily result in the denial of a claim, because only some of a claimant's claimed or declared conditions may be deficient and included in the RAI. In that circumstance, even if the claimant fails to respond to the RAI, the claimant might still receive compensation for the valid conditions in his or her declaration (assuming the claimant met the other requirements of the MSA). These RAI processing standards and distinctions are highlighted in the "Frequently Asked Questions About Declarations and Requests for Additional Information" available on the Claims Administrator's website. A copy of this FAQ is included with each RAI sent from the Claims Administrator and is published on our website, and we have call center representatives and firm liaisons available to provide assistance.

2.    <u>Notices of Defect</u>

Of the 7,289 Notices of Defect sent through the end of the Reporting Period, forty-four percent (44%) were sent to unrepresented claimants or Class Members, and fifty-six percent (56%) were sent to claimants or Class Members represented by counsel. More than eighty percent (80%) were sent to Class Members claiming to be or approved as Clean-Up Workers. Approximately forty-six percent (46%) of the Notices of Defect sent listed multiple Defects. More specifically, thirty-three percent (33%) identified two (2) through five (5) Defects, seven percent (7%) identified six (6) through ten (10) Defects, and three percent (3%) identified more than ten (10) Defects.

Of the 7,289 Notices of Defect sent through the end of the Reporting Period, fifty-six percent (56%) include Defects identified during initial claims review and prior to the Medical Record Review stage. Fifty-five percent (55%) of the 1,893 Notices of Defect sent during the Reporting Period identified at least one Defect prior to the Medical Record Review stage in the claims process. The five (5) most common material Defects identified for the population are as follows:

- "Missing Declaration of Injury document";

- "Missing Medical Records documentation";

- "Documentation included with the claim does not establish that the claimant was employed as a Clean Up Worker between the dates of April 20, 2010 and April 16, 2012";

- "Missing Third Party Witness Injury Declaration document"; and

- "Proof Of Residency Documents Failed To Prove Residence For 60 Days Between April 20, 2010 And September 30, 2010 for Zone A."

Of the 7,289 Notices of Defect sent through the end of the Reporting Period, forty-four percent (44%) include Defects identified during the Medical Record Review process. Forty-five percent (45%) of the 1,893 Notices of Defect sent during the Reporting Period identified at least one Defect subsequent to the Medical Record Review stage in the claims process. The five (5) most common material Defects identified during the Medical Record Review process are as follows:

- "No medical records were submitted or the documentation submitted does not support the claimed SPECIFIED PHYSICAL CONDITION";

- Generally – "The medical records do not meet the criteria set forth in Level A2, A3, A4, and/or B1 of the Specified Conditions Matrix." Specifically – "The date of first diagnosis for the claimed SPECIFIED PHYSICAL CONDITION occurred on or after April 16, 2012. This claimed condition does not qualify as a SPECIFIED PHYSICAL

CONDITION as set forth on the SPECIFIED PHYSICAL CONDITIONS MATRIX"[6];

- "The documentation submitted does not support the claimed SPECIFIED PHYSICAL CONDITION";

- "The medical records do not meet the criteria set forth in Level A2 of the Specified Conditions Matrix: The medical records submitted do not support the assertions in the declaration concerning the time of onset of the claimed SPECIFIED PHYSICIAL CONDITION following the alleged exposure as set forth in the SPECIFIED PHYSICAL CONDITIONS MATRIX"; and

- "The third-party declaration does not meet the criteria set forth in A1 of the Specified Physical Conditions Matrix: The third-party declaration was not signed by the individual submitting the third-party declaration."

As of the end of the Reporting Period, the response period had expired for 4,894 (sixty-seven percent (67%)) of claims having received a Notice of Defect. The overall response rate was forty-five percent (45%). The response rate for unrepresented claimants or Class Members was forty percent (40%), while the response rate for represented claimants or Class Members was forty-nine percent (49%). As previously reported, failure to respond to or cure all Defects identified within a Notice of Defect will not necessarily result in the denial of a claim, because only some aspects of a claimant's claim may be defective and listed in a Notice of Defect. In that circumstance, even if the claimant failed to respond to the Notice of Defect or to cure all of the Defects listed in it, the claimant might still receive compensation. Furthermore, a claimant who has a Defect in his or her claim for compensation for an SPC but has proven that he or she is a Class Member will receive a Notice of Determination for the PMCP benefit. Hence, such

---

[6] This Defect results from the Court's July 23, 2014 Order (Rec. doc. 12862) affirming that all conditions first diagnosed after April 16, 2012 must be classified as Later-Manifested Physical Conditions. Notably, the Claims Administrator does not automatically deny claims where the medical records initially submitted with the claim indicate a date of first diagnosis after April 16, 2012. Rather, we issue a Notice of Defect to afford the Class Member the opportunity to provide medical record evidence of the diagnosis that pre-dates April 16, 2012. If the Class Member does not submit any such records, the Class Members claim for SPC compensation would be denied, but the Class Member would be free to pursue compensation for that condition as an LMPC.

Class Member can take advantage of that benefit while attempting to cure the Defects in his or her claim for SPC compensation.

### C.   Claims Processed Through Each Stage of Claims Review

As discussed above, a significant percentage of the POCFs submitted continue to contain one or more deficiencies or Defects.  These deficiencies and Defects not only increase the amount of time it takes for a claimant to reach the determination stage, but also increase the time it takes the Claims Administrator to process the claims.  The Claims Administrator must wait as long as sixty (60) or 120 days to receive the responses to the RAIs and/or Notices of Defects, respectively, and then must process the responses.

During the Reporting Period, the Claims Administrator has reviewed and/or processed the following numbers of claims through each of the following sequential stages in the claims review process:

| TABLE 5: CLAIM REVIEW PROCESSING | | |
|---|---|---|
| Processing Stage | Number of Claims[7] | |
| | Reporting Period | Total |
| Notice of Defect Gate One Process (Which Includes Class Membership Defects)[8] | 1,212 | 4,665 |
| Declaration Review Process[9] | 5,035 | 22,380 |
| RAI Process[10] | 4,584 | 20,035 |
| Medical Record Review Process[11] | 4,313 | 12,775 |
| Notice of Defect Gate Two Process[12] | 681 | 2,624 |

---

[7] Claims can move through Declaration Review (due to responses to RAI), the RAI Process (due to a defective response to an RAI-Missing, resulting in an RAI-Incomplete), and Medical Record Review (due to cure responses to originally defective claims) multiple times.

[8] Total claims with Gate One Defects, including basis of participation Defects, which received a Notice of Defect. Gate One Defects are those such as "Missing Declaration of Injury Document" or "Missing Medical Records Documentation," which prevent a claim from moving to Medical Record Review.

[9] Total claims for which an injury declaration review was completed.

[10] Total claims requiring an RAI that received a RAI.

[11] Total claims that were reviewed by Claims Administrator's Medical Record Review staff.

[12] Total claims that have completed Medical Record Review but that contain Defects preventing a final determination.

The Claims Administrator completed another 4,313 medical record reviews during the Reporting Period, bringing the total initial reviews completed since inception to 12,775.

### D.      Claims Sent Dispositive Correspondence for a Specified Physical Condition

The overall percentage of 2014 Claims reaching final determination has increased over the Reporting Period to fifty-eight percent (58%).  The total number of claims approved for SPC compensation over the Reporting Period has continued to increase, due in part to the receipt of responses to previously pending RAIs and Notices of Defect for the 2014 Claims and improved processing speeds.  Similar increases were seen for 2015 Claims.

During the Reporting Period, we sent SPC Notices of Determination to 1,690 Class Members, approving them for $4,064,950 in compensation.   Since the inception of the Settlement, we sent SPC Notices of Determination to 3,447 Class Members, approving them for $8,041,500 in compensation.  Over this Reporting Period, the total percentage of finalized 2014 Claims moving to an approved determination increased to thirty-two percent (32%).   Over this Reporting Period, the total percentage of finalized 2015 Claims moving to an approved determination increased to eight percent (8%).

The Claims Administrator also sent 145 "Approved with Defects" notices during the Reporting Period, bringing the total number of "Approved with Defects" notices sent since inception to 618.  An "Approved with Defects" notice is sent to a Class Member who has at least one valid SPC but one or more other SPCs that contain a Defect and might result in an award of higher compensation.  A Class Member receiving this notice can choose either to attempt to cure the Defects and thus possibly receive greater compensation or to waive that opportunity and proceed to determination on his or her valid SPC(s).   Two hundred fourteen (214) of the 618 Class Members who received an "Approved with Defects" notice subsequently received an SPC

Notice of Determination.  The total compensation for the remaining 404 Class Members who received an "Approved with Defects" notice but who have not yet received an SPC Notice of Determination is $3,355,250.   Therefore, the total amount allocated (by SPC Notices of Determination) and to be allocated (by "Approved with Defects" letter) is $11,396,750.

The Claims Administrator sent 1,072 Notices of Denial during the Reporting Period, for a total of 4,754 Notices of Denial from the inception of the Settlement through the end of the Reporting Period.  All of these claims have been denied because the claimant did not qualify as a Class Member and/or because the claimant did not meet the criteria established by the MSA to receive compensation for an SPC.

A summary of the dispositive correspondence sent on claims for compensation for an SPC is set forth in Table 6, below.

| TABLE 6: CLAIMS DISPOSITION AND CORRESPONDENCE | | |
|---|---|---|
| **Approvals** | **Reporting Period** | **Total** |
| SPC Notices of Determination Sent — 2014 Claims | 456 | 1,960 |
| SPC Notices of Determination Sent — 2015 Claims | 1,234 | 1,487 |
| SPC Notices of Determination Sent Total | 1,690 | 3,447 |
| **Denials** | **Reporting Period** | **Total** |
| Notices of Denial Sent — 2014 Claims | 346 | 3,505 |
| Notices of Denial Sent — 2015 Claims | 726 | 1,249 |
| Notices of Denial Sent — Total | 1,072 | 4,754 |

### E.   Claims Approved for SPC Compensation

During the Reporting Period, the amount of SPC compensation for which Class Members were approved increased, as reflected in Table 7, below.

| TABLE 7: APPROVED CLAIMS FOR SPCs[13] | | | | | | |
|---|---|---|---|---|---|---|
| SPC | Reporting Period Number Approved | Total Number Approved to Date | Reporting Period Amount Approved | Total Amount Approved to Date | Total "Approved with Defects" Amount Allocated to Date | Total Compensation Allocated to Date |
| A1 | 1,453 | 3,031 | $1,824,100 | $3,874,300 | $55,500 | $3,929,800 |
| A2 | 98 | 157 | $736,500 | $1,175,350 | $1,528,700 | $2,704,050 |
| A3 | 117 | 222 | $1,444,950 | $2,741,700 | $1,420,250 | $ 4,161,950 |
| A4 | 22 | 34 | $59,400 | $91,800 | $108,000 | $199,800 |
| B1 | 0 | 3 | $0 | $158,350 | $242,800 | $401,150 |
| | | | | | | |
| Total | 1,690 | 3,447 | $4,064,950 | $8,041,500 | $3,355,250 | $11,396,750 |

As set forth in the MSA, Class Members can only be paid once certain potential obligations to third parties are identified and resolved. The resolution of these obligations is dependent upon the responsiveness of both governmental agencies and private interests in replying to the Claims Administrator's requests for information and resolution. The obligations generally fall into two general categories: healthcare-related obligations and other obligations.

The resolution of healthcare obligations involves confirming whether a Class Member received benefits from a governmental payor (such as Medicare, Medicaid, or the Veterans' Administration) or a private healthcare plan for a compensable injury such that the Class Member must now reimburse those entities for the amounts they paid. The processing phases include (1) confirming entitlement with the government agency or private plan, (2) receiving claims from the agency or plan, (3) auditing those claims and disputing any that are unrelated to the Class Member's compensable injury, and (4) final resolution. Pursuant to the terms of the MSA, the Claims Administrator obtained an agreement from CMS establishing capped repayment amounts per SPC for Class Members who are or were beneficiaries of Medicare. The

---

[13] Please note that the total volumes and total dollars approved are subject to change in each Reporting Period due to a later received and processed Requests for Review.

Claims Administrator also negotiated with state Medicaid agencies to cap recovery for Medicaid-entitled Class Members.  Most states agreed to waive recovery rights for Class Members receiving compensation for an A1 claim.  Additionally, most state Medicaid agencies agreed to a twenty percent (20%) cap on and up to a thirty-five percent (35%) offset for fees and costs typically associated with their recovery, thereby allowing partial funding to the Class Member while full resolution is pending.  Processing times for Medicaid-entitled Class Members eligible for payment will vary.[14]   Each state has its own processing standards for responding to entitlement requests, producing claims, and finalizing lien amounts.

The resolution of non-healthcare-related obligations involves identifying the various types of obligations and working with the claimant or the claimant's representative to resolve them.  The processing phases include (1) identifying the obligation (through review of claim documents, PACER searches, and searches of the Louisiana Child Support Database), (2) sending correspondence seeking documentation that will resolve the complication, (3) reviewing the submitted documentation for sufficiency, and (4) final resolution.  The Claims Administrator tracks responses to its correspondence and sends a follow-up letter to non-responsive parties after thirty (30) to sixty (60) days have passed (with the length of time depending on the complication).   We will also send follow-up correspondence when the responses contain insufficient documentation.  The resolution time for payment complications varies and remains heavily dependent upon the timeliness and sufficiency of the third parties' responses to our information requests.

---

[14] Entitlement requests average one-and-one-half months; claims receipts average two months; and lien finalizations average one month.  GRG has experienced a general range of ninety (90) to 210 days from initiation to final resolution.  While the Claims Administrator works directly with the state agencies to streamline the processing, the timelines for resolution for some states have increased due to the increased involvement of managed care organizations.

Once the obligations affecting a given claim are resolved and any liens or reimbursement obligations are paid, the Claims Administrator is able to disburse the balance of the Class Member's compensation.

### F.     Data Disclosure Form Submissions and Results

Data Disclosure Forms may be filed at any time during the claims review process by Natural Persons seeking information from the databases, data fields, and other documentary evidence provided by BP to the Claims Administrator.  Notably, Data Disclosure Forms may continue to be filed *after* the submission of a Proof Claim Form, and therefore they can be filed *after* the claims filing deadline of February 12, 2015.  Information provided via the submission of a Data Disclosure Form allows the Claims Administrator to make a determination concerning (a) the status of a Natural Person claiming to be a Clean-Up Worker and/or (b) a claim made by a Clean-Up Worker for compensation for a Specified Physical Condition.  *See* MSA § XXI.B.

During the Reporting Period, the Claims Administrator received 937 Data Disclosure Forms, for a total of 24,955 Data Disclosure Forms since the approval of the MSA.  The Claims Administrator responded to 363 Data Disclosure Forms during the Reporting Period, bringing the total number of responses to 29,920 since the approval of the MSA.  Of the 24,955 Data Disclosure Forms received, 19,824 were related to unique claimants, while 5,131 were Data Disclosure Forms with additional information filed by the same claimants.  Among the unique claimants filing Data Disclosure Forms, seventy-one(71%) were confirmed as Clean-Up Workers by finding a match in at least one employer database other than the "Training" database. Ten percent (10%) of those unique claimants were matched in the "Medical Encounters" database, while twelve percent (12%) were matched in a medically relevant database, such as the "Traction" database or the "Injury/Illness" database.

## IV.      CLASS MEMBER SERVICES CENTER ACTIVITY

The Claims Administrator operates a Class Member Services Center located in New Orleans to communicate with Class Members and their attorneys and to assist them with filing their claims.  During the Reporting Period, the Class Member Services Center received 13,375 telephone calls.  Since opening, the Class Member Services Center has received a total of 135,512 telephone calls.  The Class Member Services Center handled an average of 206 calls per day.  The average length of each telephone call was five minutes and forty-two seconds, with an average wait time of fourteen (14) seconds.  The Class Member Services Center also received 80 emails during the Reporting Period, and twelve (12) individuals visited the Class Member Services Center in person.

| TABLE 8: CLASS MEMBER SERVICES CENTER | | |
|---|---|---|
| | **Reporting Period** | **Total** |
| Calls Received | 13,375 | 135,512 |
| Average Length of Call (min:sec) | 5:42 | 6:36 |
| Average Wait Time (min:sec) | 0:14 | 0:15 |
| Emails Received | 80 | 2,455 |
| Walk-Ins | 12 | 703 |

## V.      PERIODIC MEDICAL CONSULTATION PROGRAM

### A.      Class Members Eligibility for and Participation in the PMCP

During the Reporting Period, the Claims Administrator approved 6,351 claims for participation in the PMCP and mailed 6,219 PMCP Notices of Determination.  Since the inception of the Settlement, the total number of Class Members receiving a PMCP Notice of Determination is 16,028.  The Claims Administrator received requests for and scheduled 366 physician visits during the Reporting Period, and Class Members attended 323 appointments in the Reporting Period.

| TABLE 9: PERIODIC MEDICAL CONSULTATION PROGRAM | | |
|---|---|---|
| | Reporting Period | Total |
| Class Members Approved to Receive Physician Visits[15] | 6,351 | 19,351 |
| PMCP Notices of Determination Sent | 5,885 | 15,694 |
| Physician Visits Requested and Scheduled | 366 | 1,503 |
| Appointments Attended by Class Members | 323 | 1,375 |
| Annual Update Letters Sent to Class Members | 7,774 | 7,774 |

### B.    Provider Network

During the Reporting Period, the Claims Administrator added nineteen (19) medical provider organizations, with nineteen (19) delivery sites, to its network of providers established to provide certain covered services to Class Members who participate in the PMCP, bringing the total number of medical provider organizations to sixty-three (63). These medical provider organizations represent 147 service delivery sites. As a result of these additions, eighty-six percent (86%) of eligible Class Members resided within twenty-five (25) miles of a network provider at the conclusion of the Reporting Period. The Claims Administrator continues to expand the medical provider network in its efforts to ensure that no Class Member will have to wait more than thirty (30) days or travel more than twenty-five (25) miles for an appointment.

### VI.    BACK-END LITIGATION OPTION

During the Reporting Period, thirty (30) Class Members filed Notices of Intent to Sue for compensation for a Later-Manifested Physical Condition, bringing the total number to 380 Class Members to date. Of the thirty (30) Notices of Intent to Sue filed in the Reporting Period, four (4) were approved, twenty (20) contained deficiencies that could be corrected by the Class Member, and six (6) were denied.

---

[15] The total physician visits will exceed the total number of Class Members qualified for the PMCP benefit, as Class Members may be referred to specialists and will eventually be eligible for subsequent primary visits.

| TABLE 10: CLAIMS FOR LATER-MANIFESTED PHYSICAL CONDITIONS | | |
|---|---|---|
| | Reporting Period | Total |
| Notices of Intent to Sue Filed | 30 | 380 |
| Notices of Intent to Sue Approved | 4 | 36 |
| Notices of Intent to Sue Denied | 6 | 165 |
| Notices of Intent to Sue Deficient[16] | 20 | 179 |

Out of the thirty-six (36) approved Notices of Intent to Sue to date, the BP Defendants did not elect to mediate any of the claims.  During the Reporting Period, fourteen (14) Class Members became eligible to file a Back-End Litigation Option Lawsuit, bringing the total number of Class Members eligible to file a Back-End Litigation Option Lawsuit to eighteen (18).

| TABLE 11: APPROVED NOTICES OF INTENT TO SUE | | |
|---|---|---|
| Mediation Elections | Reporting Period | Total |
| Later-Manifested Physical Condition Claims for Which at Least One BP Defendant Elected Mediation | 0 | 0 |
| Later-Manifested Physical Condition Claims Pending a Decision from One or More BP Defendants Regarding Mediation | 5 | 5 |
| Later-Manifested Physical Condition Claims for Which No BP Defendants Elected Mediation | 14 | 31 |
| | | |
| TOTAL: | 19 | 36 |
| | | |
| Results of Mediation | Reporting Period | Total |
| Later-Manifested Physical Condition Claims Settled by Mediation | 0 | 0 |
| Later-Manifested Physical Condition Claims Settled by Mediation as to One but Not All BP Defendants Listed in the Notice of Intent to Sue | 0 | 0 |
| Later-Manifested Physical Condition Claims Mediated but Not Settled | 0 | 0 |
| | | |
| TOTAL CLAIMS MEDIATED: | 0 | 0 |
| | | |

---

[16] Class Members who cure Defects within original Notice of Intent to Sue will then be classified as "approved" in future reporting.

| Back-End Litigation Option Lawsuit | Reporting Period | Total |
|---|---|---|
| Later-Manifested Physical Condition Claims for Which No BP Defendant Elected Mediation | 14 | 31 |
| Later-Manifested Physical Condition Claims Mediated but Not Settled | 0 | 0 |
| | | |
| **TOTAL CLASS MEMBERS ELIGIBLE TO FILE A BACK-END LITIGATION OPTION LAWSUIT**[17] | **14** | **18** |

## VII.    GULF REGION HEALTH OUTREACH PROGRAM

### A.    Funding and Coordinating Committee Activities

In accordance with Section IX of the MSA, the Gulf Region Health Outreach Program ("GRHOP") was established in May 2012 to expand capacity for and access to high quality, sustainable, community-based healthcare services, including primary care, behavioral and mental health care and environmental medicine, in the Gulf Coast communities in Louisiana, Mississippi, Alabama, and the Florida Panhandle.  The program consists of five (5) integrated projects: the Primary Care Capacity Project, Community Involvement, the Mental and Behavioral Health Capacity Project, the Environmental Health Capacity and Literacy Project, and the Community Health Workers Training Project.  As of the end of the Reporting Period, the Claims Administrator disbursed $93,689,744 to the projects, as detailed in the chart below.

---

[17] The total eligible for BELO over the life of the project was thirty-one (31). However, of the thirty-one (31), only eighteen (18) are currently eligible for BELO. The other thirteen (13) have let expire the six-month (6-month) deadline for properly and timely filing a Back-End Litigation Option Lawsuit.

| TABLE 13: GULF REGION HEALTH OUTREACH PROGRAM | |
|---|---|
| **Project** | **Funding to Date** |
| Primary Care Capacity Project | $43,406,841 |
| Community Involvement | $2,473,406 |
| Mental and Behavioral Health Capacity Project ((Louisiana State University Health Sciences Center) | $12,913,418 |
| Mental and Behavioral Health Capacity Project (University of Southern Mississippi) | $7,425,213 |
| Mental and Behavioral Health Capacity Project (University of South Alabama) | $7,425,216 |
| Mental and Behavioral Health Capacity Project (University of West Florida) | $4,519,696 |
| Environmental Health Capacity and Literacy Project | $12,021,670 |
| Community Health Workers Training Project | $3,504,284 |
| | |
| **TOTAL:** | **$93,689,744** |

One additional disbursement is scheduled for May 2016, which will bring the total funding of the GRHOP to $105 million.

The GRHOP is governed by a Coordinating Committee that continues to function in a cooperative and integrated manner, with quarterly in-person meetings around the Gulf Coast, as well as monthly conference calls. These quarterly meetings offer the grantees the opportunity to share their progress, discuss challenges faced, and collaborate with their partners to work through issues that affect the GRHOP as a whole.

The Claims Administrator held a quarterly meeting on July 31, 2015 in Pensacola, Florida, which encompassed discussion on a variety of topics, including but not limited to, future sustainability amongst the projects and GRHOP evaluation strategies. Discussions also revolved around the five (5) GRHOP subcommittees — the Data Sharing Subcommittee, Evaluation Subcommittee, Health Promotions Subcommittee, Newsletter Subcommittee, and Publication Subcommittee — formed during the July 31, 2014 quarterly meeting. These subcommittees work to increase collaboration and effectiveness of the projects, as well as assure positive impacts and

sustainability within the communities which the GRHOP affects.[18]   Though not specifically mandated by the MSA, the monthly conference calls are also held to promote open conversation between projects regarding updates, progression, and collaboration.

The Coordinating Committee also requested the Claims Administrator to establish a GRHOP website.  This website contains detailed descriptions and notable accomplishments of each project, as well as information regarding the Gulf Region Health Outreach Program Coordinating Committee, news/events, and publications.  The website launched on July 3, 2014 and can be publicly accessed at www.grhop.org.

**B.  Gulf Region Health Outreach Program Project Updates**

Each GRHOP project has made substantial progress in achieving the goals set forth in their respective Grant Proposals.  Some notable accomplishments of the projects include:

**1.  Primary Care Capacity**

The Primary Care Capacity Project, led by the Louisiana Public Health Institute, which has worked towards its goal to expand access to integrated high quality, sustainable, community-based primary care with linkages to specialty mental and behavioral health, and environmental and occupational health services in the implicated seventeen (17) Gulf Coast counties and parishes. The key program strategies include:

- Continuing to build community health center capacity through direct funding and customized group and individual technical assistance through cooperative agreements to 17 community health center operators (with over 80 site locations) across all 17 Gulf Coast counties and parishes;

- Continuing to support and advance health systems development through direct funding for health information exchanges, infrastructure investments and technical assistance; and

---

[18] The Claims Administrator will hold the next quarterly meeting on November 20, 2015, in New Orleans, Louisiana. The Claims Administrator will report on that meeting in its fourth quarterly report of 2015.

- Enhancing the capacity of communities and building strategic partnerships to improve health through funding, partnership engagement, and technical assistance to non-clinical partners through State Partners Agreements with the 4 State Primary Care Associations; and the Community-Centered Health Home Demonstration Project with 5 community health centers in partnership with the Prevention Institute.

- Additionally, PCCP implemented an Emergency Management Initiative, under the Regional Care Collaborative, with the 4-state Primary Care Associations, RAND Corporation, and the Primary Care Development Corporation.

2.   Alliance Instititute

Alliance Institute's outreach on behalf of the GRHOP and its partners has reached over 1,500 individuals across Louisiana, Mississippi, Alabama, and Florida.  Alliance Institute, the grantee responsible for Community Involvement, has:

- Signed contracts with 11 Community Based Organizations located in Louisiana, Mississippi, Alabama and Florida.

- For the 10th anniversary of Katrina, Education, Economics, Environmental, Climate and Health Organization (EEECHO) held a five day climate justice conference in Gulfport. During their week long events, EEECHO, held events for clergy around environmental justices, provided seminars and workshops to educate the community on climate justice and worked with local organizations to build out a strategic plan around climate justice and other local issues

- On September 19 and 20th, over 3000 residents attended the United Houma Nation annual powwow. This powwow, the largest to date, honored individuals with disabilities for the talents and abilities they contribute to our community.

- Hosted an introductory webinar for 11 organizations. The webinar gave staff at organizations information on GRHOP, the responsibilities of Alliance Institute in Community Involvement, social determinants of health, and intersectional framework to talk about their work.

- In 2015, 8 youth leaders determined the content and curriculum for the program and implemented the course to 30 of VAYLA's new organizers. Leaders trained youth in political education and critical thinking to develop greater self-knowledge to undertake actions that will help their community function effectively and humanely. Leaders also supported youth in exploring their world, community, family, and personal relationships to develop a strong sense of identity.

3.    Environmental Health Capacity and Literacy Project

The Environmental Health Capacity and Literacy Project, with its grantee being Tulane

University, has achieved the following:

- AOEC continued to expand and conduct their community outreach efforts in all four states.  AOEC is also collaborating with LPHI to identify additional outreach sites in Louisiana.

- The Fussy Baby Network® New Orleans and Gulf Coast (FBNNOGC) served approximately 45 families, including 20 new families, during March - June 2015.  The program expanded its service capacity by hiring a second Infant Specialist with matching grant funds from the Institute of Mental Hygiene (IMH), a foundation based in New Orleans.

- Franklin Primary Health Clinic's CHW program has been such a successful pilot that they partnered with the Alabama Department of Public Health to fund another GRHOP-trained CHW.

- The Emerging Scholars Environmental Health Sciences Academy completed its third year at Tulane and graduated another excellent group of students. The University of South Alabama and the University of West Florida also held successful student programs during the summer months.  The Environmental Health Sciences Teachers' Workshop continues to solidify EHCLP's relationship with New Orleans area high schools and science teachers.

- The CHW Placement Program released the RFP for an additional 2-year funding cycle; 12 organizations were re-funded and 4 new organizations were awarded subcontracts.

4.    Community Health Workers Training Project

The Community Health Workers Training Project, directed by the University of South

Alabama's Coastal Resource and Resiliency Center, has:

- Completed the curriculum and held two training sessions in Advanced Training in Chronic Disease Management, one in Mobile, Alabama, July 12-17 and in New Orleans, September 20-25.

- Two Peer Health Advocate training sessions were held, one in Mobile, AL in March 2015 for 25 trainees from Louisiana, Alabama, and Florida, and one in Baton Rouge, LA in May 2015 for 24 trainees from Louisiana, Mississippi, and Alabama;

- Published an article online in the *Journal of Applied Social Science* entitled "The Utility of Community Health Workers in Disaster Preparedness, Recovery, and Resiliency". Authors included Keith Nicholls, J. Steven Picou, Joycelyn Curtis, and Janel Lowman.

5.   Mental and Behavioral Health Capacity Project

The Mental and Behavioral Health Capacity Project, implemented by a coalition of four academic institutions (Louisiana State University Health Sciences Center, the University of Southern Mississippi, the University of South Alabama, and the University of West Florida):

- MBHCP-LA has:

  o Continued to have success in developing and implementing efficient, high quality integrated care services in communities with prior disparities in care with improvement in mental and physical health symptoms and with high client and clinic satisfaction;

  o Provided supportive services in schools with students and consultation with parents, school counselors, teachers, and other school staff leading towards sustainability of helpful services;

  o  In collaboration with the Primary Care Capacity Project, made progress toward the long term goal of integrating mental and behavioral health care into electronic medical records at affiliated clinics, even as several clinics are transitioning to a new electronic medical records system; Made progress in expanding on-site and telepsychiatry distance-based services for FQHCs and community clinics consistent with American Telemedicine Association and state and federal guidelines contributing to sustainability of these important components;

  o Implemented the Growth of the young child (0-5 year) program in FQHCs and community clinics, schools, and early childhood programs in resonse to clinician and parental concerns and in issues raised by national pediatric and child psychiatry associations; and,

  o Led a collaborative effort built around multiple components of response and recovery, which includes other GRHOP projects, for a full day of presentations at the Gulf of Mexico Oil Spill and Ecosystem Science meeting in February 2016.

- MBHCP-MS has:

  o Continued to work with the partnering FQHCs to improve access to mental health services to the residents of coastal Mississippi;

- o Supported organizational change efforts designed to improve the implementation of new health system requirements;

- o Developed a care team program that will support PCMH certification for the FQHC;

- o Facilitated collaborations between various community agencies and the partnering FQHC to improve communications, information sharing and patient care;

- o Participated in both FQHC leadership and clinical level staff meetings to address needs, concerns and service provision;

- o Developed a patient screen protocol to expedite referral processes for patients in need of comprehensive mental health services only available through community mental health agencies;

- o Completed The University of Massachusetts' Center for Integrated Primary Care's training in Integrated Care Management by the Program Director and Coordinator;

- o Added a full-time research assistant to expedite evaluation efforts;

- o Refined the online assessment and data collection system to improve functionality; and,

- o Advanced initiatives designed to improve collaboration and data sharing between coastal agencies.

- • MBHCP-AL has:

    - o Hosted a Youth Mental Health First Aid (MHFA) Train the Trainer course in February 2015, which occurred in conjunction with the MBHCP-FL. By the end of the 40-hour training, there were 26 new instructors from 12 different agencies designated as certified trainers. With the help of these trainers, MBHCP-AL has brought Youth MHFA/Adult MHFA courses to many key community members and agencies

        - ➢ March & April 2015/YMHFA: trained 122 teachers, counselors, social workers and administrators from the Baldwin County Public School System

        - ➢ June 1 and 19, 2015/MHFA for Public Safety: trained 47 police officers and dispatchers.

        - ➢ June 18, 2015/YMHFA: trained 26 behavioral health, care coordinators, case managers, nurses and office managers from a local Federally Qualified Health Center.

- o March & April 2015/YMHFA: trained 122 teachers, counselors, social work

  - ➢ All the teachers in a Mobile Public School high-need feeder pattern were trained in YMHFA in August, 2015

  - ➢ Added 2 additional Behavioral Health Providers (BHP) to further advance integrated care in our FQHCs

  - ➢ Implemented a chronic disease pathway referral system in the FQHCs which resulted in 1,100 new patients being seen for behavioral health issues associated with chronic disease (e.g. diabetes, hypertension)

  - ➢ Hired a psychologist to serve as the onsite BH Clinical Director at the Mobile County Health Department. Franklin Primary Health also hired a BH Clinical Director. MBHCP-AL is hosting a bi-monthly Director's meeting to facilitate integration at both sites.

  - ➢ Funded 3 child psychiatry fellows in the newly developed USA/AltaPointe Child Psychiatry residency program. These fellows started providing services in July of 2015

  - ➢ Established an insomnia group for patients receiving services as Franklin Primary Health Center

  - ➢ Authored as a team a book chapter called "The Nuts and Bolts of Developing Integrated Healthcare in Underserved Primary Care Settings: Challenges and Lessons Learned", which will appear in the book *Integrated Psychological Services in Primary Care*, which has a publication date of December 2015.

- • MBHCP-FL has:

  - o Put much of its efforts into researching and engaging community partners for sustainability plans within their school district;

  - o Worked with PanCare and Escambia Community Clinics, which has shown commitment to integrating services within their respective clinics;

  - o Continued to work closely with each of the FQHCs to provide assistance, when needed, to further integrate mental and behavioral health services. Both FQHCs have shown interest in moving into school districts to help provide sustainability and increase services within the community;

  - o Engaged the Studer Group to provide Leadership Development to the FQHCs within the grant area, as well as partners within the community who are committed to work with the FQHCs. Studer's proven leadership development will help move FQHCs forward with sound, evidence-based practices that will continue to build on providing high-quality services to its clients.

## VIII.   GULF REGION HEALTH OUTREACH PROGRAM LIBRARY

In accordance with Section IX.H of the MSA, the Claims Administrator has established a publicly accessible online library, which exists as a repository of information regarding information related to the health effects of the *Deepwater Horizon* incident, including, but not limited to: (a) the composition, quantity, fate, and transport of oil, other hydrocarbons, and other substances released from the MC252 Well and the *Deepwater Horizon* and the dispersants and contaminants used in Response Activities; (b) health risks and health studies relating to exposure to oil, other hydrocarbons, and other substances released from the MC252 Well and the *Deepwater Horizon* and the dispersants and decontaminants used in Response Activities; (c) the nature, content, and scope of in situ burning performed during the Response Activities; and (d) occupational safety, worker production, and preventative measures for Clean-up Workers.

As of the end of the Reporting Period, the Library houses over 189,885 relevant documents, each tagged with a specific search category based on the type of information identified within the MSA.  The Claims Administrator will continue to add Library Materials in accordance with the MSA.

Respectfully submitted,

*DEEPWATER HORIZON* MEDICAL BENEFITS
CLAIMS ADMINISTRATOR


By: /s/ Matthew L. Garretson
        Matthew L. Garretson

## <u>CERTIFICATE OF SERVICE</u>

I hereby certify that the above and foregoing document has been served on All Counsel by electronically uploading the same to Lexis Nexis File & Serve in accordance with Pretrial Order No. 12, and that the foregoing was electronically filed with the Clerk of Court of the United States District Court for the Eastern District of Louisiana by using the CM/ECF System, which will send a notice of the electronic filing in accordance with the procedures established in MDL 2179, on this 6th day of November, 2015.

Respectfully submitted,

*/s/ Matthew L. Garretson*
Matthew L. Garretson