# GREGORY M. FRIEDLANDER & ASSOCIATES, P.C.
WWW.GMFPC.COM
251-470-0303

November 6, 2015

**Via Fax: 504-589-7633**

Hon. Joseph C. Wilkinson, JR
U.S. Magistrate Judge
500 Poydras Street, Room B409
New Orleans, Louisiana 70130

Re: **In re Deepwater Horizon Litigation**
MDL 2179: Document 15411 (Order soliciting Comments on the Agenda)
MDL No. 2179; Nos. 12-970, 15-4143, 15-4146, 15-4654
*Halliburton and Transocean Settlement Allocation*

Magistrate Wilkinson, hereinafter "Magistrate," suggested that certain groups had competing interests for the punitive fund. These groups include: Local Government; Coastal Real Property; BEL; Personal Injury; excluded class, opt-outs, etc. The Magistrate suggested individuals interested in the outcome should submit proposal regarding the issues raised pertaining to Magistrate's task of allocating Settlement Proceeds between the New Class and Old Class.

The issues addressed herein include:

1) The Magistrate's authority/Legal Standard
2) The availability of punitive damages and the legal standard for damages, especially in light of Exxon Valdez
3) The effect of *Robbins Dry Dock*
4) How funds should be divided between the "New Class" and "Old Class"

On October 16, 2015 your petitioner finished going through the pleadings and doing initial research and circulated this research to the various parties tasked by the Magistrate with various roles. That information was not copied to the court since it required five e-mails to send, but is

available if desirable and contains most of the source material for this letter brief. Documents filed in this case were extensively used, as they are most relevant to the discussion herein.

## DETAILED DISCUSSION

1. **The Magistrate's authority is the authority of a special master, a "neutral" appointed by the court.**

"As a threshold matter the Special Master must determine whether it had jurisdiction [deleted]. The authority of special masters is governed by Federal Rule of Civil Procedure 53. Under Rule 53(c), "unless the appointing order expressly directs otherwise, a master has authority to regulate all proceedings and take all appropriate measures to perform fairly and efficiently the assigned duties." Thus, the touchstone for ascertaining a special master's authority to take any given action is the district court's appointment order and any specific order of reference. *See* Fed. R. Civ. P. 53(c); *U.S. v. Clifford Matley Family Trust*, 354 F.3d 154 (9th Cir. 2004); *Turner v. Orr*, 722 F.2d 661, 665 (11th Cir. 1984)". *Allapattah Services, Inc. v. Exxon Corp.*, Lead Case: No.: 91-0986-Civ-Goldi/Simonton.[1]

2. **The availability of punitive damages**

Punitive damages as a part of the settlement were determined appropriate when the settlements by Haliburton and Transocean were approved. The availability is a matter not considered appropriate for the Magistrate to revisit, so they are also dealt with only in cursory way. See for example document 15322 and the order dated 15389 (filed 09/28/15) and as to Transocean 14906 filed (7/16/15). See Documents 13646 filed 11/13/14; 13647 and 13649 both filed 11/14/14 (as to Halliburton). See also document 00512896398 in case 12-30883 filed 1/9/15 the order of the Firth Circuit affirming the Clean Water Act judgment by the district court.

---

[1] Additional authority can be found in Pfander & Birk, Article III Judicial Power, Yale Law Journal 124:1346 (2015); Cross; The Erie Doctrine in Equity, Louisiana Law Review (60:1 (1999); Collins, Article III, Equity and Judge Made Law, Duke Law Journal (60:2 2010); document 11994 filed 12/17/13.

From:FRIEDLANDER & ASSOCIATES PC        2514700303        11/06/2015 11:28    #639 P.003/010
Case 2:10-md-02179-CJB-DPC   Document 15556   Filed 11/06/15   Page 3 of 10

3

Punitive damages are excluded from this court's consideration. This was an issue that addressed by the court that approved the settlements. The appropriateness vel non was addressed directly or indirectly by the court's findings in the underlying case that allowed the court to refer other issues of punitive damages to an Allocation Neutral. That is, while the settlement agreement must gain the approval of the district judge, once approved its terms must be followed by the court and the parties alike." *Klier v. Elf Atochem N. Am., Inc.,* 658 F.3d 468, 475 (5th Cir. 2011) (citations omitted). "[T]he power to approve or reject a settlement negotiated by the parties before trial does not authorize the court to require the parties to accept a settlement to which they have not agreed." Evans v. Jeff D., 475 U.S. 717, 726 (1986). (See document 13530 filed 10/20/14)

A supplement follows this letter covering the punitive damages issue in depth, although the prior discussion obviates this discussion in my opinion and the lengthy discussion is only provided for purposes of guiding those who might feel differently.

3.  **The effect of Robins Dry Dock on the class.**

It is felt that this issue is adequately addressed by the pleadings already filed in this case, but specific reference is made to document 13269 filed 8/8/14 for example, page [18] (27)-[29] (37) [The page number of the document [] and the page number of the court stamp (). It is submitted that claimants to the punitive damages fund should have to show that they were oiled. It is further submitted that a rebuttable presumption can be prepared as to this issue based on the facts accumulated. To accomplish this without extensive evidentiary hearings on each claim, it is submitted that Zone A, B and C would be treated as oiled to the extent the property in question is on a navigable waterway continuous with the Gulf of Mexico in Zone C or any waterway continuous with the gulf of Mexico in Zones A and B. Anyone could object to a property as not

being oiled at which point in time the Plaintiff would have to submit evidence of the oiling which would have to be evaluated.

### 4. How funds should be divided by class

Factual data, including the allocation between classes, defining the classes and issues of overlap of classes and the number of individual claimants in each class exist, but are not an impediment since the purpose of the neutral's appointment is one of equitable aggregation. [*See generally* document 00512361333 Case 13-30095 and 00512253711 filed in 13-30315 5/24/13). Rule 23 Concerns Require Equal Treatment of Similarly Situated Claimants (see for example document 13073 filed 6/27/14) Rule 23(b)(3) seeks to "'achieve economies of time, effort, and expense, and promote uniformity of decision as to persons similarly situated.'" *Amchem Prods., Inc. v. Windsor*, 521 U.S. 591, 615 (1997).

Aggregation should further the pursuit of justice under law by advancing the following goals:

    (a) Enforcing substantive rights and responsibilities;

    (b) Promoting the efficient use of litigation resources;

    (c) Facilitating binding resolutions of civil disputes; and

    (d) Facilitating accurate and just resolutions of civil disputes by trial and settlement.

Principles of the Law of Aggregate Litigation, §1.03 (2010).

Parties whether in one class or both should only share once, otherwise, individuals are treated differently just because of a nearly random classification. You don't punish someone twice for the same offense, nor is it appropriate to be paid twice for the same wrong. Class is not considered relevant to this inquiry. The better inquiry is how much should each claimant be paid.

From:FRIEDLANDER & ASSOCIATES PC   2514700906   Case 2:10-md-02179-CJB-DPC Document 15556 Filed 11/06/15 Page 5 of 10   11/06/15 11:28   #630 P.005/010

5

It makes no sense to go through legal gymnastics to arrive at an equitable solution. If the court determines that is appropriate, it may lead to problems and not a quick solution. Justice delayed is justice denied and after the settlement was put in place, every payment thereafter was denied to some extent or another by delay.

The court has to decide whether to take into account those "protected" by the settlement should be treated differently than those who were not. Those who have unpaid claims under the class that claim to be qualified can be expedited to help resolve this issue. Hence, the goal is to come up with a mathematical model that can be applied to both in class and out of class claims, that allows for the court to determine who is or is not within a punitive damages class and that can determine a payout to any one member more or less instantly once the members are determined.

Additional authority can be found at Rodgers, et al, The Exxon Valdez Reopener, Alaska Law Review (22;135 2005) [Dealing with Native American Losses] It is my opinion that only one punitive award per person is appropriate and why there should only be one category of punitive damages. A rough plan for payment, it is suggested, is necessary in order to treat everyone the same and this suggests, if it is easy, that the claimants be identified, otherwise the possibility of inconsistent or illogical separation of funds or leaving unclaimed funds might exist. The claims paid punitive damages would be all those on (owned or leased) a navigable waterway in Zone C or any body of water contiguous with the gulf in zones A and B. Others who claim to be oiled could provide evidence on a case-by-case basis. Moratoria cases should be included in this group. This process was used in the original settlement, see document 005512361333 filed 9/3/13 page 76 although admittedly with the more restrictive Scat maps [providing evidence of oiling where not otherwise included by Scat map].

The notice would only go to those who already had claims filed (including presentment with short form joinder and separate law suit) so that notice would be relatively easy. The response to the notice would be: 1) what was paid/the claim amount; (2) the address used to achieve "oiled" status or natural resources affected, special circumstances surrounding that property or natural resources affected, (3) the name of the waterway adjoining the property. For Moratoria type cases, the body of water where the work was done would be specified. If a claim filed not paid yet for any reason it would be listed as "unpaid" or "denied" or "excluded class."

While the Magistrate may not "want" to look at the ultimate distribution, it is felt that an analysis of that ultimate distribution is necessary to split the amount paid fairly.

Basically the idea is as follows:

1) Determine what claims have been paid under the existing class settlement that have Robbins Dry Dock standing (number of these claims=N1) rdscASES

2) Determine which of the average value of the claims paid under item 1 (AVG=total paid to claimants/N1) TSP/RDSCASES

3) The process in steps 1 and 2 should also be done for municipal cases since those are also settled.

4) Determine how many claims are under the excluded class that have Robbins Dry Dock standing (number of these claims=N2) RDECCases

5) Total claims=N1+N2

6) For each claim under the "new class" (N2) you take the "amount requested in the presentment"/"total amount requested in all presentments" to get a "claim percentage." (CP)

Using the number of cases of each type you can calculate how the amount should be apportioned and the amount based on the average value of the cases. The process is shown in the spreadsheet below (a picture of the actual spreadsheet). The numbers in yellow would be

From:FRIEDLANDER & ASSOCIATES PC                2514706909                    11/06/2015 11:29    #639  P.007/010
Case 2:10-md-02179-CJB-DPC   Document 15556   Filed 11/06/15   Page 7 of 10

7

obtained using the payouts made and the questionnaires suggested. The only numbers that change according to claimant are the green number (the top green number being an example for an in-class claim, the bottom green number being an example of an opt-out/excluded class claim class member). At "first blush" this appears prejudicial to the excluded classes, but one has to remember that the excluded class cases are being paid based on an "unchallenged claim amount" which is probably much larger than a claim based on an actual payout so the prejudice is only against those who were more conservative in their claim presentment.

CLASS SETTLEMENT WORKSHEET (SEE BELOW)

| | | | | | |
|---|---|---|---|---|---|
| sample of how process would occur | | | | | |
| Total claims paid that identify and pass muster as RD settled cases (oiled) | | | | | |
| RDSCases | | | | | 100000 |
| Amount paid to RDS Cases total (TSP) identified as RDS cases | | | | | |
| TSP | | 50,000 case avg assumed | $ | 5,000,000,000.00 | |
| Total Municipal cases that have RD status | | | | | |
| RDMCases | | | | | 100 |
| Amount paid to Municipal class idnetified as RDM cases | | | | | |
| TMP | | 150000 case avg assumed | $ | 15,000,000.00 | |
| | | | | | |
| Average amount for any claim | $5,015,000,000.00 | | $ | 50,099.90 | 100100 |
| Total Paid on all included class cases | | | $ | 5,015,000,000.00 | |
| | | | | | |
| Amount to be distributed | 1,200,000,000 | | | | |
| Amount to settled cases (RDM/RDS) | 0.909173479 | | $ | 1,091,008,174.39 | |
| Amount to unsettled cases | 0.090826521 | | $ | 108,991,825.61 | |
| | | | | | |
| Total excluded class, uncompensated cases with RD status | | | | | |
| RDECCases | | | | | 10000 |
| Total Claimed by RDECcases | | | | | |
| TCEC | | 1000000 case avg assumed | $ | 10,000,000,000.00 | |
| | | | | | |
| TOTAL CLAIMS | | | | | 110100 |
| | | | | | |
| Case examples | | | | | |
| | | | | | |
| Excluded class case | | | | | |
| amount claimed | | 75000 assumed | | | |
| | CP | $ 0.000007500 calculated | | 817.4386921 | |
| | | | | | |
| In Class case | | 75000 assumed payment | | | |
| amount claims | CP | $ 0.000014955 | | $ 16,316.17 | |

This tells you (in simple steps) how much everyone gets in punitive damages. The unpaid claims would best be paid as if they were allowed because the amount is calculated in that fashion, but for simplicity those cases are ignored for now. The math doesn't change just because unpaid claims are included, it only requires they be put into the appropriate group.

As has been pointed out previously, these results would allow, through extrapolation, a framework for the resolution of all remaining cases whether settled or not. If requested that can be done.

The need for complex formulas to determine compensation is best accomplished through the class action procedure, where consistent treatment of like claims and ongoing judicial oversight combine to ensure against random, arbitrary, or dissimilar treatment of similar claims, thereby allowing claims to be grouped objectively and ensuring fair treatment to all. See, e.g., In re Holocaust Victim Assets Litigation, No.96-4849, 2000 WL 33241660, 2000 U.S. Dist. LEXIS 20817 (Nov. 22, 2000), aff'd, 413 F.3d 183 (2d Cir. 2005)

Sincerely,
/s/Gregory Friedlander/
Gregory M. Friedlander

GMF/gf
File No.:

Supplement: Punitive Damages
    **a) Punitive Damages, with reference also to Exxon Valdez:**

    The liability of Halliburton and Transocean can be tied to the conduct of BP, but the issue is thoroughly briefed. See for example document 10729 filed 7/12/13; 10714 filed 7/11/13; 10458 filed 6/21/13; 10459 filed 6/21/13; 10462 filed 6/21/13; 10461 filed 6/21/13; 10463 and 10464 filed 6/21/13.

    **The district court gave its opinion finding Halliburton and Transocean liable along with BP in its order on liability document 13355 filed 9/4/14 in depth.**

From:FRIEDLANDER & ASSOCIATES PC  2147003051  Case 2:10-md-02179-CJB-DPC Document 15556  Filed 11/06/15  Page 9 of 10  P.009/010

9

In the 9/4/14 order the court held, inter allia, [BPXP] "is subject to enhanced civil penalties...as the discharge of oil was the result of BPXP's gross negligence and ... willful misconduct." The court went on to hold "Transocean's conduct was negligent. Halliburton's conduct was negligent." The court further found that "BP's conduct warrants the imposition punitive damages under general maritime law, BP cannot be held liable for such damages under Fifth Circuit precedent."

Bp argued, inter alia, that punitive damages are available under maritime law only in cases of "wanton, willful, or outrageous conduct." Atlantic Sounding Co. v. Townsend, 557 U.S. 404, 409, 415 n.4(2009); see also In re P&E Boat Rentals, Inc., 872 F.2d 642, 650 (5th Cir. 1989) (same). This demanding standard, as the Fifth Circuit has explained, necessarily implies a culpable mental state, i.e., it "'requires an element of bad faith.'"36 Tullos v. Res. Drilling, Inc., 750 F.2d 380, 388 (5th Cir. 1985) (quoting Harper v. Zapata Off-Shore Co., 741 F.2d 87, 90 (5th Cir. 1984)). [See document 11559 filed 10/1/13];

The PSC argued (Doc 00513061358 in 14-31374 Appeal to 5th Cir 6/1/15), inter alia:  On November 15, 2012, BP Exploration & Production, Inc. pled guilty to eleven felony counts of Seaman Manslaughter (18 U.S.C. §1115), a felony count of Obstruction of Congress (18 U.S.C. §1505), and criminal violations of the Clean Water Act (33 U.S.C. §§1319(c)(1)(A) and 1321(b)(3)) and the Migratory Bird Treaty Act (16 U.S.C. §§703 and 707(a). They go on to allege, "BP's Guilty Plea itself establishes willful and intentional misconduct at the corporate level." The criminal liability pleas of Haliburton and Transocean (among others) is deal with in document 13725 filed 11/26/14.

The operation of the Deepwater Horizon at the Macondo Well was, by contrast, a significant and substantial operation, requiring the full commitments and attentions of the BP defendants involved.

Under the law of this Court, "the 'mental attitude of the defendant' is what turns ordinary negligence into gross negligence." Clements v. Steele, 792 F.2d 515, 516-517 (5th Cir. 1986). In determining whether the defendant's conduct is egregious enough to warrant the imposition of punitive damages, the Court looks to the entirety of the record to determine whether the defendant acted with willful or wanton disregard. Clements v. Steele, 792 F.2d at 517.

As numerous courts have held, an accumulation or series of negligent acts or omissions can and should be viewed together in order to determine whether the defendant has acted out of gross negligence, willful misconduct, or a wanton or reckless disregard. See, e.g., Clements v. Steele, 792 F.2d at 517 (recognizing that gross negligence may be established where the defendant's acts of ordinary negligence demonstrated that the defendant was consciously indifferent); Kuykendall v.Young Life, 261 F.App'x 480, 489 (4th Cir. 2008) (multiple acts of simple negligence can amount to gross negligence where the cumulative effect of the negligent acts demonstrates an

utter disregard of prudence amounting to an indifference to others' health and safety); In re Tug OCEAN PRINCE, 584 F.2d 1151, 1164 (2d Cir. 1978) ("While any one of the faults ... alone ... may not constitute 'willful misconduct,' on the entire record the various inactions and gross disregard of the potential harm amount ... to willful misconduct"); Water Quality Ins. Syndicate (re Barge Morris J. Berman) v. United States, 522 F.Supp.2d 220, 228-230 (D.D.C. 2007) (district court "should have looked at the 'series of occurrences' or events that together constitute the 'incident' that led to the spill.... [W]illful misconduct was based on no single proximate cause, but on an accumulation of acts,' 'a chain of circumstances which [were] a contributing cause even though not the immediate or proximate cause of the casualty'"); Adams v. Phillips, No.01-3803, 2002 WL 31886737 at *4, 2002 U.S. Dist. LEXIS 24888 at **9-10 (E.D.La. Dec. 19, 2002) (defendant's "pattern of brazen misconduct" and the "entirety of his actions" were grounds for imposing punitive damages).

See also document 11601-11604 filed 10/7/13

    This may be compared with what actually happened in Alaska. Exxon recklessly caused the accident, but the recklessness was not the same series of events that was found present in this case. Nor was the clean up as convoluted. For example, while the PSC "chose" not to develop the Corexit portion of the case, the results of that treatment remain with those affected by the Punitive damages.

    As the United States pointed out, this involved death, an unprecedented and ongoing ecological disaster, disruption of economies on several levels, psychological harm and the like (see Document 14338 and 14339 3/27/15).

    In the Exxon Case it was set out that "The measure of punitive damages is governed by BMW of North America v. Gore(fn334): (1) the degree of reprehensibility of the defendant's conduct; (2) the ratio between the harm or potential harm suffered by the victim and the amount of punitive damages awarded; and (3) the comparison between the punitives and other criminal or civil penalties authorized by law or imposed in like cases.(fn335) In applying this test, the Ninth Circuit found, first, because the spill was an accident and Exxon acted promptly to mitigate its effects, its reprehensibility was reduced.(fn336) Second, the ratio of punitive to compensatory damages was seventeen-to-one, which exceeded the four-to-one ratio the Supreme Court called "close to the line" in Pacific Mutual Life Insurance Co. v. Haslip.(fn337) Finally, the Court determined that the punitive damages award far exceeded other comparable penalties and those allowable under the Oil Pollution Act.(fn338) Based on these factors, the district court was ordered to reduce the amount of punitive damages."