

Stephen S. Kreller
ssk@krellerlaw.com

November 13, 2015

The Honorable Joseph C. Wilkinson, Jr.
Chief Magistrate Judge
500 Poydras Street
Room B409
New Orleans, LA  70130

Dear Judge Wilkinson:

Pursuant to your invitation, we respectfully submit the following comments regarding

allocation of funds as between the "Old Class" and "New Class" under the Halliburton and

Transocean settlements.  Thank you for considering these and the comments of others as you

determine the appropriate allocation.

**I.     Introduction**

During the October 8 Status Conference you indicated that allocation of the Halliburton

and Transocean settlements between the New Class and the Old Class will involve an assessment

of the total exposure the settling parties faced and the litigation risks confronting each set of

claims. Given the level of uncertainty and number of unknowns, such an assessment will require

the exercise of independent judgment by the Allocation Neutral. Your assessment may also be

influenced by information from Halliburton's and Transocean's internal assessments, to which

only you have access. This memorandum serves to identify some key points, based on publicly

available information, that may impact your assessment.

The potential value of the punitive damages claims against each of Halliburton and

Transocean likely ranged from $3.2 billion to $18.7 billion, depending on how the Court would

have measured qualifying compensatory damages. The potential value of the assigned claims

likely ranged from $3.2 billion to $27.8 billion (discounted by the percentage of fault assigned to

757 Saint Charles Avenue, Suite 301 / New Orleans, LA 70130 / 504.484.3488
888.929.3488 / Fax: 888.294.6091 / www.krellerlaw.com

Licensed in Alabama, Georgia, Louisiana and New York

Halliburton and Transocean), depending on the types of BP damages deemed subject to contribution from Halliburton and Transocean. Both sets of claims faced significant legal risks. For example, regarding the culpability needed to hold Transocean and Halliburton liable, the New Class had to show gross negligence, while the Old Class also had to prove more than gross negligence as to at least part of its claim in order to overcome BP's contractual indemnifications of Halliburton and Transocean. Both class's claims faced other legal risks as well.

## II.      Overview of Economic Harm Caused by the Oil Spill

BP paid large sums in compensatory damages and cleanup costs, and BP suffered its own losses as a result of the loss of the Macondo prospect. Calculating the amount of BP's payments and losses is relevant both to understanding the scope of BP's claims against Halliburton and Transocean (for Old Class claims) and to measuring the compensatory damages predicate for punitive damages (for New Class claims).

BP paid about $6.2 billion to third parties through GCCF for oil spill compensation. *See* Tab 1.[1] BP also paid $399 million in emergency payments directly to claimants. *See* Tab 2.[2] Its payments through DHECC will likely range from $10.7 to $12.1 billion. *See* Tab 3. To date, BP has paid $6.3 billion through DHECC. *See* Tab 4.[3] To project future payments, two calculations are necessary: 1) the average payment for eligible claims in each category; and 2) the denial rate within each claim category to estimate the number of remaining unpaid claims that will be deemed eligible. For BEL claims, the average payment has materially dropped since DHECC adopted Policy 495 on May 5, 2014, following the Fifth Circuit's decision on BP's appeal regarding matching issues. Tab 3 presents two sets of calculations: the first (Table 1) applying

---

[1] BDO Consulting, *Independent Evaluation of the Gulf Coast Claims Facility* (Apr. 9, 2012) at 1, http://www.justice.gov/iso/opa/resources/697201241917226179477.pdf (report prepared for the U.S. Department of Justice).
[2] BP Annual Report and Form 20-F 2010, at 36.
[3] DHECC, *Public Statistics for the Deepwater Horizon Economic and Property Damages Settlement*, http://www.deepwaterhorizoneconomicsettlement.com/docs/statistics.pdf (last visited Nov. 11, 2015) at 3.

the overall average BEL payment since 2012 (for a high-end estimate of $12.1 billion in total payments), and a second (Table 2) applying the post-495 average payment to estimated future eligible claims (for a low-end estimate of $10.7 billion).

In addition, BP estimates its total cleanup costs at $14.3 billion. *See* Tab 5.[4] BP has not quantified a lost profits claim, to our knowledge, in the public record. *See* Tabs 6-8.[5] BP may have made payments to claimants who were excluded from or opted out of its settlement, but no public figures exist on this point.

## III.    Considerations Regarding the Claims Assigned by BP to the Old Class

As the items listed above reflect, the claims BP assigned to the Old Class could have had a large upside for potential recovery. As the Allocation Neutral, you will likely need to address two additional sets of issues to appropriately gauge Halliburton's and Transocean's actual exposure to the assigned claims. First, Halliburton and to a lesser extent Transocean each had arguments that they were not subject to contribution for various categories of BP's damages, such as BP's payments to third parties for claims brought solely under the Oil Pollution Act ("OPA"). Second, based on arguments raised in the litigation prior to settlement, the assigned claims faced other litigation risks that may have resulted in no or limited recovery on these claims, reducing their practical settlement value.

---

[4] BP Annual Report and Form 20-F 2014, at 38.

[5] Some information useful in estimating BP's potential lost profits exists in the public domain. The Macondo prospect was estimated to contain 15 to 50 million extractable barrels of oil. Matthew Moerschbeacher & John W. Day, Jr., *Ultra-Deepwater Gulf of Mexico Oil and Gas: Energy Return of Financial Investment and a Preliminary Assessment of Energy Return on Energy Investment*, 2011 SUSTAINABILITY at 5 (Oct. 2011) (Tab 6). Two other companies, Anadarko and Moex, held a combined 35% interest in the Macondo oil, leaving up to an estimated 32.5 million barrels for BP.  *See* BP Press Release, *BP Announces Settlement with Anadarko Petroleum Company of Claims Related to Deepwater Horizon Accident* (Oct. 17, 2011), http://www.bp.com/en/global/corporate/press/press-releases/bp-announces-settlement-with-anadarko-petroleum-company-of-claims-related-to-deepwater-horizon-accident.html (Tab 7); BP Press Release, *BP Announces Settlement with Moex/Mitsui of Claims Between the Companies Related to the Deepwater Horizon Accident* (May 20, 2011), http://www.bp.com/en/global/corporate/press/press-releases/bp-announces-settlement-with-moexmitsui-of-claims-between-the-companies-related-to-the-deepwater-horizon-accident.html (Tab 8).

### A.    Potential Recovery on the Assigned Claims

The claims BP assigned to the Old Class had essentially four components (*see generally* BP Settlement, ECF No. 6430-39, Ex. 21, ¶ 1.1.3 (Tab 9)):

- Any contribution claim BP may have had related to compensatory damages it paid through GCCF ($6.2 billion, as described above), through DHECC (between $10.7 and $12.1 billion), and directly in emergency payments ($399 million) and to opted-out or excluded parties (amount unknown).
- Any contribution claim BP could have asserted for clean-up costs ($14.3 billion).
- Lost profits from the oil and damages related to replacing the well (amount unquantified).
- BP's potential claim for punitive damages against Halliburton and Transocean.[6]

As to BP's third-party payments, both GCCF and DHECC payments included compensation for purely economic losses (under OPA), for physical damage to proprietary interests (under general maritime law), and for losses to commercial fishermen (under general maritime law).  The Old Class faced a risk that payments to OPA claimants might be in whole or part excluded from contribution. Before the Halliburton and Transocean settlements, Judge Barbier had ruled that claims "for purely economic losses" are not recoverable under general maritime law, ECF No. 3830 at 19 (citing *Robins Dry Dock & Repair Co. v. Flint*, 273 U.S. 303 (1927)) (Tab 11), which limits recovery to "claimants who either allege physical damage to a proprietary interest" or who are "commercial fishermen," ECF No. 3830 at 24-25. Moreover, OPA imposes primary liability only on defendants who qualify as "responsible parties" under OPA, *see* ECF No. 5809 at 5-6 (Tab 12) (quoting 33 U.S.C. §§ 2701(32), 2702(a)), and Halliburton has never been deemed a responsible party in this case. Under OPA's contribution provision, Halliburton therefore had argued that it could not be liable in contribution under the

---

[6] BP purported to assign all its claims for "punitive, exemplary, multiple, or non-compensatory damages." *Id.* ¶ 1.1.3.6.  However, BP had not pled punitive or exemplary damages in its crossclaims again Halliburton or Transocean, *see* ECF Nos. 2074, 2057, 2082, 2083 (all at Tab 10).

OPA for any of BP's economic-damages payments to non-*Robins Dry Dock* parties. ECF No. 8268-1 at 14-15 (Tab 13). Transocean, for its part, was a responsible party for surface discharge only, but not as to sub-surface discharge, which was the majority of the oil spill. ECF No. 5809 at 14-15, 23 (Tab 12). The DHECC data make it possible to calculate the amounts and proportions of payments made to *Robins Dry Dock* versus OPA-only plaintiffs. GCCF does not appear to have publicized any similar break-out; however, it seems likely that either GCCF or DHECC could perform that calculation.

For similar reasons, the Old Class faced challenges in establishing BP's entitlement to contribution for cleanup costs. Judge Barbier held that Transocean, as "owner/operator" of the *Deepwater Horizon*, was potentially liable for a portion of the federal, state, and local governments' cleanup costs under OPA. ECF No. 5809 at 14-15 (Tab 12); ECF No. 13355 at ¶¶ 603-609 (Tab 14). On the other hand, Halliburton did not face owner or operator liability, and the parties had not litigated any basis for requiring Halliburton to contribute to BP's cleanup costs. Additionally, Halliburton's defense against contribution for OPA payments may have applied equally against contribution for cleanup costs.

Finally, the settlement payments BP received from its other business partners would likely be offset against its total payments for purposes of seeking contribution from Halliburton and Transocean. In 2011, BP received settlements from other defendants facing potential contribution to spill-related damages. BP's co-lessees, Anadarko and MOEX, respectively paid $4 and $1.065 billion to BP. *See* Tabs 7-8.[7] Cameron, the designer and manufacturer of *Deepwater Horizon*'s blowout preventer, paid $250 million, and Weatherford, a manufacturer of

---

[7] BP-Anadarko Press Release and BP-Moex Press Release, *supra* n.5.

drilling equipment, paid $75 million. *See* Tabs 15-16.[8] This totals $5.165 billion in payments from co-defendants.

As a result, Halliburton's and Transocean's total possible exposure to BP's assigned claims fell between approximately $3.2 billion[9] and $27.8 billion.[10]

### B.      Legal Hurdles to the Assigned Claims

#### 1.      BP's Culpability

BP's culpability presented a hurdle to establishing entitlement to contribution. In a motion pending at the time of settlement, Transocean maintained that BP should not be able to recover in contribution or on its direct claims against Halliburton or Transocean if BP itself had been grossly negligent, or worse. ECF No. 10281-1 at 18-19 (Tab 17); *see also Hunley v. Ace Maritime Corp.*, 927 F.2d 493, 497-98 (9th Cir. 1991) (in maritime law, the claimant's "grossly negligent conduct" was "an intervening force" that "supersede[d] prior negligence" and precluded contribution). Judge Barbier ultimately found that BP had engaged in gross negligence, although that finding was unknown at the time of Halliburton's settlement. Thus, the assigned claims faced a risk that BP's own gross negligence might bar recovery.

---

[8] BP Press Release, *BP Agrees to Settlement with Weatherford of Potential Claims Between the Companies Related to The Deepwater Horizon Accident* (June 20, 2011), http://www.bp.com/en/global/corporate/press-releases/bp-agrees-to-settlement-with-weatherford-of-potential-claims-between-the-companies-related-to-the-deepwater-horizon-accident.html; BP Press Release, *BP Announces Settlement with Cameron International Corporation of Claims Related to the Deepwater Horizon Accident* (Dec. 15, 2011), http://www.bp.com/en/global/corporate/press-releases/bp-announces-settlement-with-cameron-international-corporation-of-claims-related-to-the-deepwater-horizon-accident.html.

[9] $3.2 billion is the total of estimated DHECC payments to the five categories of claimants with *Robins Dry Dock* standing. It does not include prior GCCF payments or BP emergency payments to those same claimants, because those amounts are not publicly available to date. It also does not include any payments to opt-outs or excluded parties with *Robins Dry Dock* standing. If Halliburton's and Transocean's liability had been limited to these narrow categories, then the vast majority of the $5.165 billion in offsets noted above likely would have been applied to other payments made by BP. As noted in Section III.B.3, though not impossible, it was unlikely that Halliburton or Transocean would be found 100% at fault. The actual contribution amount for each would be limited to their percentage of fault, which this sum does not reflect.

[10] $27.8 billion is the sum of all the damages items listed above, using the maximum estimate for total DHECC payments, less the offsetting settlement payments received by BP.

### 2.      Level of Culpability

The New Class would have needed to prove gross negligence to obtain punitive damages from Halliburton or Transocean. The Old Class would have needed to match (or for contribution claims, exceed) that threshold of culpability to recover on BP's assigned claims.  That result follows from BP's contracts with Halliburton and Transocean, in which BP indemnified and released both against losses from an oil spill.

BP's contracts with Halliburton and Transocean included comprehensive indemnification-and-release regimes that allocated nearly all responsibility for the oil spill to BP. As Judge Barbier held, BP both indemnified Halliburton and Transocean against all applicable claims arising from "pollution or contamination," and released all its own such claims against either of them. ECF No. 5446 at 7 (Tab 18) (Transocean); ECF No. 5493 at 2 (Tab 19) (Halliburton). At the time of the settlements, Judge Barbier had ruled that the indemnification clauses would not be rendered unenforceable even if Halliburton and Transocean were found grossly negligent. ECF No. 5446 at 7-8, 18 (Tab 18); ECF No. 5493 at 2-4, 10-11 (Tab 19). Under that ruling, BP (and hence the Old Class) could defeat the indemnification clauses only by showing something more – that Halliburton or Transocean committed reckless or intentional misconduct, fraud, or perhaps "a fundamental, core breach of the contract." ECF No. 5446 at 25 (Tab 18); ECF No. 5493 at 5-6 (Tab 19). Judge Barbier also indicated that the releases would be enforceable absent a showing of at least gross negligence. ECF No. 5446 at 14 (Tab 18); ECF No. 13381 at ¶ 583 (Tab 14).

### 3.      Halliburton's and Transocean's Proportionate Fault

If successful, the assigned claims would have entitled the Old Class to payment from Halliburton and Transocean in an amount equal to their percentage of fault, multiplied by the total of BP's losses and BP's eligible payments to third parties. Judge Barbier allocated 3% of

7

responsibility for the spill to Halliburton and 30% to Transocean, leaving BP with 67% fault. *Id.* at ¶¶ 544, 612 (Tab 14). Of course Halliburton settled before Judge Barbier made this finding and Transocean's settlement avoided a possible appeal from that finding, so the maximum realistic exposure, particularly for Halliburton, was likely higher. Contribution by each party would nonetheless be discounted by their allocation of fault.

### 4. Other Pending Motions

At the time of the settlements, Halliburton and Transocean had pending motions that raised various arguments challenging the validity of BP's assignment of claims to the Old Class. The motions contended, among other things, that the Old Class had been certified for settlement purposes only and so could not litigate the assigned claims; that BP had no contribution claims because its settlement had not procured the release of plaintiffs' punitive-damages claims against Halliburton and Transocean, whereas a full release is required to trigger contribution rights; that BP's settlement payments were unreasonable in amount; that the class acknowledged in the settlement that BP's own payments were full satisfaction for their claims and so could not seek a double recovery from Halliburton or Transocean; and that the assignment was prohibited by their contracts with BP. *See* ECF Nos. 8120 (Tab 20), 8268 (Tab 13). Judge Barbier had not ruled on these issues.

## IV. Considerations Associated With The New Class's Claims For Punitive Damages

The New Class consists, by definition, of members who have *Robins Dry Dock* standing. *See* ECF No. 13346-1 § 4(a) (Tab 21) (defining Halliburton New Class); ECF No. 14644 § 4(a) (Tab 22) (same, for Transocean). The class includes commercial fishers and others whose livelihoods depend on the Gulf Coast fisheries which have suffered long-term, ongoing damage. The protection of members of this class is at the heart of maritime law. *See, e.g., Barber Lines A/S v. M/V Donau Maru,* 764 F.2d 50, 54-55 (1st Cir. 1985) (Breyer, J.) (explaining why

8

maritime law is more solicitous of the claims of the "physically injured" than those of the "financially injured").

### A.      Potential Value of the Punitive Damages Claims

Under controlling Supreme Court precedent, both Halliburton and Transocean faced exposure to this class's punitive damages claims in an amount equal to the total compensatory damages from the spill. *Exxon Shipping Co. v. Baker*, 554 U.S. 471, 513 (2008). At the time of the settlements, Judge Barbier had ruled that punitive damages were available in this case under general maritime law, if the predicate elements were shown. ECF No. 3830 at 19-27 (Tab 11). Each defendant faced punitive liability up to the total compensatory awards reflecting the full economic harm caused by the spill, and none of them could assume that their punitive exposure was limited to a fraction of the total damages the spill caused.[11]

As discussed above, compensatory payments by BP relating to the spill can be estimated between $17.3 billion and $18.7 billion.[12] In the *Exxon* case, the Supreme Court "t[ook] for granted" (554 U.S. at 515) the trial court's inclusion of all compensatory damages and settlement amounts paid by the defendant, under whatever theory of liability, in the 1:1 punitive-to-compensatory-damages ratio. *See In re The Exxon Valdez*, 296 F. Supp. 2d 1071, 1099-1101 (D. Alaska 2004). Thus, in *Exxon*, the amount of the punitive award was predicated in part on the economic damages of area businesses and other parties whose compensatory claims were precluded under *Robins Dry Dock*. *See id.* Nevertheless, because the Supreme Court did not expressly decide the question, Halliburton or Transocean may have argued that the ratio should properly be limited solely to compensatory damages paid to claimants with *Robins Dry Dock*

---

[11] In multi-defendant cases, the courts often compare the punitive award against each defendant with the sum of all compensatory awards against all defendants.  *E.g.*, *Transgo, Inc. v. Ajac Trans. Parts Corp.*, 768 F.2d 1001, 1024-25 (9th Cir. 1985); *Merrick v. Paul Revere Life Ins. Co.*, 594 F. Supp. 2d 1168 (D. Nev. 2008); *United States v. Oak Manor Apartments*, 11 F. Supp. 2d 1047, 1053 (W.D. Ark. 1998).  Other courts have viewed the matter differently. *E.g.*, *Grabinski v. Blue Springs Ford Sales, Inc.*, 203 F.3d 1024, 1026 (8th Cir. 2000).  Judge Barbier had not decided this issue at the time of the settlements.

[12] This is the sum of BP's projected total DHECC payments ($10.7 billion to $12.1 billion), BP's GCCF payments ($6.2 billion), and BP's emergency payments ($399 million).

standing. If so limited, Halliburton and Transocean each faced a potential liability of at least $3.2 billion in punitive damages.[13] Thus, each party's potential exposure to punitive damages ranged from $3.2 billion to $18.7 billion.

### B.    Legal Hurdles to Recovery on the Punitive Damages Claims

Transocean and Halliburton had argued that OPA precluded an award of punitive damages, but Judge Barbier ruled against them on that issue before the settlements occurred. ECF No. 3830 at 26-27 (Tab 11). Nonetheless, other risks impacting the value of the New Class's punitive damages claims remained.

### 1.    Level of Culpability

At the time of the settlements, Judge Barbier had held that a showing of gross negligence would be required to recover punitive damages. *Id.* at 19-20. Proving this level of culpability was a risk, but the parties presented substantial evidence to support such a finding at the Phase One trial.

Halliburton elected to settle two days before Judge Barbier issued his Phase One findings, suggesting that Halliburton may have considered the threat of punitive damages significant enough to settle before Judge Barbier ruled. Judge Barbier ultimately declined to find gross negligence by Halliburton, but he did find that Halliburton committed "egregious" misconduct in the design and testing of its cement prior to the disaster. ECF No. 13381 at ¶ 558 (Tab 14). It avoided legal fault for this misconduct solely based on the Court's findings regarding causation. *Id.* at ¶¶ 232, 558. Moreover, the Court also described as "egregious" Halliburton's post-spill destruction of cement tests and computer simulations, *id.* at ¶ 558, a pattern of destroying evidence that led Halliburton to plead guilty to criminal destruction of evidence, resulting in the

---

[13] As in footnote 9 *supra*, $3.2 billion is the total of estimated DHECC payments to the five categories of claimants with *Robins Dry Dock* standing.

maximum statutory fine. *See* Tab 23.[14] (The Court's allocation of 3% responsibility to Halliburton was based on separate negligent misconduct regarding well monitoring. ECF No. 13381 at ¶¶ 321, 558 (Tab 14).) Without the benefit of the Court's ruling on causation at the time of settlement, Halliburton had to account for the risk that its misconduct could be found to warrant punitive damages.

Transocean was not found grossly negligent. Yet its percentage of fault for ordinary negligence was 30%. It continued to face appellate risk of a reversal or new trial at the time of its settlement.

### 2.    Fifth Circuit Law

Fifth Circuit maritime law also presented a hurdle to the punitive damages claims. It provides that punitive damages are available only for misconduct that "emanate[s] from corporate policy or that a corporate official with policy-making authority participated in, approved of, or subsequently ratified." *Id.* ¶ 563 (citing *P&E Boat Rentals*, 872 F.2d 652-53). The parties disagreed about application of the rule to the complex facts here. *See, e.g.*, ECF 10458 at 19-20 (Tab 24). After Halliburton settled, Judge Barbier noted that the class's argument for distinguishing *P&E Boat* "is not without merit," but ultimately rejected it. ECF No. 13381 at ¶¶ 565-66 (Tab 14). The Court's application of *P&E Boat* was not certain at the time Halliburton settled.

Additionally, while Judge Barbier found that BP had not ratified its reckless misconduct, he never reached the question whether the *P&E Boat* requirement was met as to Halliburton or Transocean. The PSC's post-trial brief reviewed the evidence indicating involvement of, and misrepresentations by, Halliburton management. ECF 10458 at 57-59 (Tab 24). Settling prior to

---

[14] *See* U.S. Dept. of Justice Press Release (Sept. 19, 2013), http://www.justice.gov/opa/pr/halliburton-pleads-guilty-destruction-evidence-connection-deepwater-horizon-disaster.

the Phase One order, Halliburton faced the risk that it may have been found to meet the *P&E Boat* threshold for punitive damages.

Even following Judge Barbier's findings, *P&E Boat* was not necessarily fatal to the New Class's punitive claims. Judge Barbier recognized that "some cases may ultimately be resolved under the law of other Circuits," ECF No. 13381 at ¶ 266 (Tab 14), and numerous other Circuits do not follow the *P&E Boat* rule or otherwise require corporate ratification to award punitive damages.[15] The Eleventh Circuit, in particular, has not addressed whether ratification is required for an award of punitive damages. Moreover, as Judge Barbier's conclusions reflect, there is a significant argument for a change in Fifth Circuit law—indeed the Supreme Court had already granted certiorari on the issue once, only to divide equally on the question.  *Exxon*, 554 U.S. at 482-84. Thus, appellate risk remained after the Court's Phase One ruling, and continued to exist at the time of the Transocean settlement.

## V.    Conclusion

Quantification of the settlement value of the claims held by each class ultimately depends on the exercise of the Allocation Neutral's independent judgment. Under the circumstances, based on the points discussed herein, the realistic exposure and litigation risks as between the punitive damages claims and the assigned claims would appear to be fairly balanced.

With kindest regards, I am

Very truly yours,

Stephen S. Kreller

cc:    William L. Roberts, Esq.
       Craig S. Coleman, Esq.
       Jonathan W. Dettmann, Esq.
       Casey Lott, Esq.

---

[15] *E.g., CEH, Inc. v. F/V Seafarer*, 70 F.3d 694, 705 (1st Cir. 1995); *Protectus Alpha Nav. Co., Ltd. v. N. Pac. Grain Growers, Inc.*, 767 F.2d 1379, 1386-87 (9th Cir. 1985).