**BDO Consulting, a Division of BDO USA, LLP**

# INDEPENDENT EVALUATION OF THE GULF COAST CLAIMS FACILITY

# EXECUTIVE SUMMARY

April 19, 2012



Tab 01

# INDEPENDENT EVALUATION OF
# THE GULF COAST CLAIMS FACILITY
# EXECUTIVE SUMMARY

BDO Consulting, a division of BDO USA LLP ("BDO"), presents to the U.S. Department of Justice, this Executive Summary of BDO's findings and observations drawn from our independent evaluation of the Gulf Coast Claims Facility ("GCCF").

## I. Overview of BDO's Findings and Observations

After a process that included meetings with representatives of Attorneys General of the Gulf States, the DOJ selected BDO to perform an independent evaluation of the GCCF. We assembled a team of over 130 professionals, including those with experience in investigations, claims administration, and the preparation of business interruption claims related to losses in the Gulf region from catastrophic events, such as Hurricane Katrina. Our independent evaluation combined interviews, document review and testing of claims files to enable us to gain an understanding of the GCCF's operations and to identify potential errors in its processing of claims. As errors were identified, we, in conjunction with the GCCF, conducted searches of its entire database of over one million claims to determine whether the identified errors negatively affected other claimants.

In conducting our independent evaluation, we were at all times mindful of the unprecedented nature of the 2010 *Deepwater Horizon* explosion and resulting oil spill (the "Spill"), and the acute financial distress endured by individuals and businesses in the region. The Spill dwarfed the 1989 *Exxon Valdez* oil spill (which gave rise to the Oil Pollution Act of 1990) both in terms of the amount of oil discharged and the extent of the impact. Nevertheless, the extent to which the GCCF processed and paid claims constituted a significant advance in responding to and compensating affected individuals and businesses in a timely manner. Undoubtedly, further enhancements can be made as lessons are learned from this seminal response to such a catastrophic event.

As a result of our independent evaluation, we note the following:

- During its one and one-half year tenure, the GCCF processed over one million claims and paid a total of more than $6.2 billion to over 220,000 individual and business claimants. In its second full month of operation, the GCCF paid claimants over $840 million—an average of more than $27 million per day—in emergency advance payments.



Page 1 of 13                    Prepared at the Request of
                                The U.S. Department of Justice

- Ninety-seven percent of payments made by the GCCF were made to claimants in the Gulf States, almost exclusively to individuals and businesses in the Gulf Coast shore line vicinity and Gulf Alliance counties.

- The GCCF operated in an extremely time-sensitive, challenging and dynamic environment, and its methodologies necessarily evolved during the tenure of the facility. It was evident from our interviews, document reviews and testing of specific individual and business claims that the GCCF continuously communicated its methodologies, and changes to those methodologies, to its claims reviewers.

- While our independent evaluation did uncover instances in which errors were made in the claims evaluation process, in general, the GCCF appeared to have consistently applied its protocols and methodologies in processing claims.

- As a result of our independent evaluation, we identified errors in claims processing that negatively affected almost 7,300 claimants. The GCCF has already begun making first-time and additional payments and/or offers for payment, which are currently estimated to total more than $64 million, to these claimants.

- Certain errors identified during our independent evaluation resulted in overpayments being made to claimants. The GCCF did not request the return of these overpayments from the affected claimants.

- We also identified more than 2,600 claimants whose claims were erroneously denied to whom payments or offers will not be issued because their claim files did not contain information needed to determine whether the claimants sustained a financial loss.

We discuss the above, as well as additional findings and observations, in more detail below.

## II.   Background

On April 20, 2010, an explosion occurred on the *Deepwater Horizon*, an offshore oil drilling rig owned by Transocean Ltd., which resulted in, among other things, the deaths of eleven crewmen and the discharge of oil into the Gulf of Mexico for several months. Shortly thereafter, the U.S. Coast Guard's National Pollution Funds Center ("NPFC") identified seven entities, including two BP subsidiaries, as "Responsible Parties" under the Oil Pollution Act of 1990 ("OPA") for Spill-related claims. BP established an initial facility ("the BP-operated facility") to receive and process all claims against Responsible Parties and began paying emergency compensation to individuals and businesses within weeks of the explosion.



Page 2 of 13                                   Prepared at the Request of
                                               The U.S. Department of Justice

Shortly after the Spill, BP entered into negotiations with the U.S. Government that resulted in an announcement by President Obama, on June 16, 2010, that BP had agreed to: (a) establish a $20 billion trust, funded over four years, that would be available to pay, among others, claims of individuals and businesses arising under OPA, as well as the claims of local and state governments and claims of Federal, state and tribal trustees for natural resource damages; and (b) create a new claims process to be administered by a neutral third party. Kenneth Feinberg, Managing Partner of the Washington, D.C.-based law firm, Feinberg Rozen, LLP ("Feinberg Rozen"), was appointed to administer this new claims process. The GCCF thereafter undertook to receive, process and, where it deemed appropriate, pay claims of losses resulting from: (1) lost earnings or profits for individuals and businesses; (2) removal and clean-up costs; (3) damage to real or personal property; (4) loss of subsistence use of natural resources; and (5) physical injury or death.[1]

Immediately upon Mr. Feinberg's selection as Claims Administrator, Feinberg Rozen began the process of assembling a large team of experienced professionals, including claims processing firms, accounting firms, investigators, catastrophe response companies, economists, academics and other professionals, to assist it in the development and implementation of claims processing protocols and methodologies. At the same time, the GCCF publicized its existence to potential claimants and created methods through which it communicated with claimants during the tenure of the GCCF.

The GCCF received, processed and, where it deemed appropriate, paid claims during two distinct phases: In Phase I (the "Emergency Advance Payment" or "EAP" claims process), which began on August 23, 2010, the GCCF implemented an interim claims process by which eligible claimants would receive compensation for the loss of earnings or profits, removal and clean-up costs, real or personal property damage, loss of subsistence use of natural resources and physical injury or death caused by the Spill by submitting a lesser level of documentation than would be required in Phase II of the GCCF. During Phase II (the "Interim Payment/Final Payment" or "IP/FP" claims process), the GCCF received claims for both interim payments designed to compensate claimants for past losses and final payments designed to compensate claimants for past and future losses. As a general matter, the GCCF subjected claims filed during Phase II to more stringent documentation requirements than those applied to claims filed during Phase I, while, at the same time, it expanded the types of businesses that potentially would be eligible for compensation and granted automatic eligibility to claimants located on the Gulf shore who were involved in businesses that were particularly reliant upon Gulf resources and, therefore, more likely to be negatively impacted by the Spill.

---

[1] Other claims processes were available to address other costs associated with the Spill, such as losses by oil rig workers during the moratorium on deepwater drilling in 2010.



### III. Genesis and Scope of Independent Evaluation

In July 2011, following input from public officials, claimants and other interested parties regarding their expectations about the transparency and timeliness of the GCCF's operations, Mr. Feinberg reached an agreement with U.S. Attorney General Eric Holder in which Mr. Feinberg agreed that the GCCF would undergo an independent evaluation of its operations and that the independent evaluation would begin before the end of the year.  Congress passed legislation that required the U.S. Department of Justice ("DOJ") "to identify an independent auditor to evaluate" the GCCF.  On December 21, 2011, the DOJ publicly announced the selection of BDO to perform the independent evaluation and mandated that our work be fully independent and meet the highest professional standards.

During the selection process and in discussions after we were selected, the DOJ requested that we gain an understanding of and memorialize the GCCF's operations, protocols and methodologies; test claims to identify and correct errors and improve GCCF processes; and provide input to help determine the validity of certain concerns brought to our attention by the DOJ, as a result of its meetings with public officials and stakeholders in the Gulf States.  We designed our approach to meet these objectives.

We also met with Mr. Feinberg, who, from the outset, pledged cooperation on the part of the GCCF, its subcontractors and expert advisors.  We were granted access to GCCF subcontractors and advisors to conduct interviews and provided with access to GCCF databases, including claims files. We also worked with GCCF personnel to understand issues identified in our claims testing.  When we determined that an issue might be an error, we worked with the GCCF to confirm whether it was an error, determine its likely cause and search the claims database for other claimants potentially affected by those errors.  We also worked with the GCCF to identify errors that resulted in underpayments to claimants and to expedite the issuance of payments and/or offers to those claimants.

BDO professionals who conducted this independent evaluation have experience in:

- **Investigations** - including those undertaken at the direction of the DOJ, the U.S. Securities & Exchange Commission, the Board of Governors of the Federal Reserve System and the U.S. Office of the Comptroller of the Currency;

- **Claims Evaluation** - including preparing business interruption claims as a result of Hurricanes Katrina, Wilma, Gustav and Ike; and

- **Claims Administration** - including serving as claims administrators and as court-accepted expert witnesses in litigation following mass tort claims administration.



Our leadership group included partners and managing directors, each with between 15 and 35 years of forensic accounting, investigative, technology and/or auditing experience, who oversaw the work of over 130 professionals.

We approached our work with open minds and impartiality. Our approach included interviews of over 40 GCCF subcontractor and advisor personnel at their offices, claims processing centers and claims offices in the Gulf States. We also evaluated aspects of tens of thousands of claims files and programmatically searched the entire database of over one million claims for those with attributes similar to claims found to contain errors. We supplemented our findings by requesting documents and information from the GCCF and undertook a process with the GCCF to develop an accurate understanding of the factual information required to complete our independent evaluation.

From the outset of our independent evaluation, Mr. Feinberg made clear that the GCCF's priority was to compensate those claimants most likely to have been adversely affected by the Spill in as expeditious a manner as possible. In its effort to execute this priority, the GCCF's approach to the development and implementation of its protocols and methodologies was, by necessity, a dynamic one. The GCCF constantly made adjustments and improvements as it gained a greater understanding of the myriad challenges that emerged during its operations.

While we did, through the course of the independent evaluation, gain an understanding of the protocols and methodologies of the GCCF, we did not set out to substitute our own judgment for that of the GCCF. Rather, we undertook an objective assessment of certain aspects of the GCCF with the primary purpose of gaining a comprehensive understanding of how it operated and testing compliance with the protocols and methodologies established by the GCCF. Because of the potential historical significance of the GCCF, both in and outside the context of OPA, we will set forth in the body of our forthcoming final report the details of many of those protocols and methodologies and their underlying rationale for consideration, in the future, by the administrators of large claims facilities, policy makers and others.

The analysis of specific claims and the assessment of the implications of this analysis for broader populations of claims were integral to our approach to identify and correct errors in the GCCF's implementation of its claims processing protocols and methodologies. Mr. Feinberg informed us that, throughout its tenure, the GCCF strived to apply its protocols and methodologies in a consistent manner and that while errors undoubtedly occurred in processing such a substantial number of claims in such a short period of time, the GCCF in the past had corrected any identified errors and was committed to doing so as part of the independent evaluation. Our experienced professionals were trained on the GCCF processes and collectively committed thousands of hours to reviewing claim files. As potential issues were identified, they were discussed with the GCCF until we were independently satisfied as to whether they were, in fact, issues that might affect a broader population of claims. Our professionals, both independently



and in cooperation with the GCCF, made extensive efforts to search the claims data in the GCCF database using a variety of sophisticated approaches to determine broader populations that may have been affected by the issues we identified. While it was not possible to ensure that every claimant was treated fairly or in accordance with GCCF protocols and methodologies, these activities provided the GCCF with an opportunity to address issues negatively affecting specific claimants. These activities also permitted the GCCF to make enhancements to its processes to improve the processing of future claims during its tenure.

### IV. Results of Interviews, Document Review and Claims-Testing

As a result of our interviews, document review and claims-testing, we make the following findings and observations:

- The GCCF received claims from a broad range of claimants, from individuals who were living paycheck-to-paycheck to businesses with annual revenues in the billions of dollars. Some claimants had losses that were difficult to quantify, including individuals working on a cash-basis (with no formal documentation of earnings) and start-up businesses with limited historical earnings. Claimants also included those whose claims needed to be referred to other funds (for example, the fund to compensate those affected by the moratorium on certain oil drilling operations). The volume and diversity of claimants necessitated significant complexity in the claims administration process and presented unique challenges to the GCCF.

- The GCCF operated in an extremely time-sensitive, challenging and dynamic environment, and its methodologies necessarily evolved during the tenure of the facility. It was evident from our interviews, document reviews and testing of specific individual and business claims that the GCCF continuously communicated its methodologies and changes to those methodologies to its claims reviewers.

- While our independent evaluation did uncover instances in which errors were made in the claims evaluation process, in general, the GCCF appeared to have consistently applied its protocols and methodologies in processing claims.

- Ninety-seven percent of payments made by the GCCF were made to claimants in the Gulf States, almost exclusively to individuals and businesses in the Gulf Coast shore line vicinity and Gulf Alliance counties.[2]

---

[2] According to the GCCF, the concept of the "Gulf Alliance Counties" was derived from the Gulf of Mexico Alliance ("GOMA"). On its website, www.gulfofmexicoalliance.org, GOMA describes itself as "a partnership of the states of Alabama, Florida, Louisiana, Mississippi, and Texas, with the goal of significantly increasing regional collaboration to enhance the ecological and economic health of the Gulf of Mexico." GOMA has identified 141 counties as being part of the Gulf of Mexico Region. The GCCF included in its definition of "Gulf Alliance Counties" any non-coastal Zip Code that was wholly or partially within one of these 141 counties.



Page 6 of 13                      Prepared at the Request of
                                  The U.S. Department of Justice

- GCCF data indicated that it denied approximately 60 percent of the claimants who filed claims from its inception. During Phase I, a significant portion of the claims were denied because the claimants' business types were not compensable or the claimants failed to submit required financial documentation. During Phase II, a majority of the claims denied were due to claimants not providing documentation sufficient to establish that their financial losses occurred as a result of the Spill. The remainder of the denied claims during Phase II was largely the result of the claimants: (1) failing to respond to Deficiency Letters requesting documents necessary for the GCCF to evaluate their claims or submitting insufficient additional information for the evaluation of their claims; or (2) submitting information that showed that losses were due to alternate causes.

- In the course of our claims-testing, we inquired about claims that had been in process for an extended period of time. We observed that most of these claims had extenuating circumstances, including: (1) claims that were referred for investigation of potential indicators of fraud; (2) claims for which the GCCF had requested additional information from the claimants; and (3) business claims in the process of being resolved through discussions between the GCCF and the claimants or their representatives.

- During the course of our independent evaluation, we identified errors in claims processing that negatively affected almost 7,300 claimants. As a result, the GCCF has made (or will shortly make) first-time and additional payments and/or offers for payment, which are currently estimated to total more than $64 million, to these claimants.

- Certain errors identified during our independent evaluation resulted in <u>overpayments</u> being made to claimants.[3] The GCCF did not request the return of these overpayments from the affected claimants.

- We also identified more than 2,600 claimants whose claims were erroneously denied to whom payments or offers were not issued because their claims files did not contain information needed to determine whether the claimant sustained a financial loss.[4] In light of Judge Barbier's March 8, 2012 First Amended Order Creating Transition Process in the multi-district class action lawsuit (the "MDL"), *In Re: Spill by the Oil Rig "Deepwater Horizon" in the Gulf of Mexico on April 20, 2010*, the GCCF has determined that it cannot contact those claimants.

---

[3] We did not perform the same extensive procedures to search for, and quantify, additional errors that resulted in overpayments as our focus was on addressing claimants who were negatively affected.

[4] The GCCF noted that the denial letters it initially sent to these claimants contained language instructing them that, if they disagreed with the GCCF's denial, claimants could submit their claims to the U.S. Coast Guard's National Pollution Funds Center or could file claims in court, including in the MDL. Those claimants who are members of the class in the proposed MDL settlement will have the opportunity to submit their claims to the court-supervised claims process if the proposed settlement receives preliminary approval. Those claimants who are not members of the class in the proposed MDL settlement will be able to submit their claims to a new claims processing facility that BP will be operating pursuant to OPA.



Page 7 of 13                                    Prepared at the Request of
                                                The U.S. Department of Justice

- The GCCF modified its processes to improve accuracy and consistency among outcomes throughout its tenure. In addition, as a result of our independent evaluation, the GCCF instituted over 20 additional process improvements.

V. **Practices and Achievements of the GCCF**

Because the scope of the Spill's economic impact in the Gulf region was so extensive, the experience of the GCCF, in processing more than a million claims from such a diverse claimant population, was unprecedented. In the unfortunate, but inevitable, event of future disasters requiring the creation of large claims administration processes, we hope that the experience of the GCCF, along with our forthcoming final report will prove instructive. As described below, there are many aspects of the approach taken by the GCCF that should provide a foundation for future claims facilities; the GCCF's experience also provides some insight into additional efforts that the administrators of those facilities may want to undertake.

Notwithstanding the challenges that it faced throughout its tenure, the GCCF implemented many meaningful practices that resulted in significant achievements. These practices and achievements included, but were not limited to:

- **Payment Disbursement:** Consistent with its priority of compensating those claimants most likely to have been adversely affected by the Spill in as expeditious a manner as possible, during its one and one-half year tenure, the GCCF processed over one million claims and paid a total of more than $6.2 billion to over 220,000 individual and business claimants.[5] The GCCF's efforts in this regard were facilitated by its implementation of the EAP claim process during Phase I, which enabled individuals and businesses in locations and industries the GCCF determined were most likely to be impacted by the Spill to receive compensation for their losses on an expedited basis without providing extensive documentation. During October 2010, the GCCF's second full month of operation, it paid claimants over $840 million – an average of more than $27 million per day – in emergency advance payments.

- **Rapid Response:** The GCCF began its operations approximately two months after Mr. Feinberg was selected as its Administrator. Feinberg Rozen assembled a large team of experienced professionals, including claims processing firms, accounting firms, investigators, catastrophe response companies, economists, academics and other professionals, which at one point numbered in excess of 4,500, to assist it in the development and implementation of claims processing protocols and methodologies.

---

[5] The GCCF also created a fund (the "Real Estate fund") by distributing $60 million to the five Gulf States to compensate real estate brokers and agents harmed by the Spill. That fund paid more than $54 million in claims.



- **Range Of Payment Options:** During Phase II, the GCCF offered claimants three different payment options: Two of these – Final Payments (for past and future losses) and Quick Payments (final payments of predetermined amounts based on no additional documentation requirements beyond having received a prior payment from the GCCF or the fund created by the GCCF to compensate real estate brokers and agents harmed by the Spill) – compensated affected claimants for future anticipated losses, after they executed a release in which they agreed not to sue BP and other potentially liable parties. The third option, Interim Payments, permitted claimants to seek compensation for past losses without waiving the right to continue to submit additional claims in the future.

- **Claims Processing Platform:** The GCCF created and utilized a sophisticated claims processing platform that allowed for maintenance of digital claims files containing all claims-related documentation. This system both facilitated the uniform processing of claims and provided a document trail allowing for the subsequent review (including this independent evaluation) of the GCCF's operations.

VI.  **Observations Relating to Certain Concerns of Claimants, Public Officials and Other Stakeholders**

The DOJ requested that the independent evaluation seek to identify the possible causes of certain concerns raised by claimants, public officials and other stakeholders. These concerns included, among others: whether communications with claimants were effective; whether the GCCF gave appropriate consideration to documentation submitted by claimants; and why there seemed to be inconsistent outcomes among claimants that may appear to have been similarly situated. As we conducted our interviews and gained an understanding of the GCCF's processes and became more familiar with the results of the application of the GCCF's protocols and methodologies in performing our detailed claims testing, we were better positioned to understand potential causes of these concerns. We cannot, however, identify with certainty the direct cause of one or more of those concerns. A confluence of factors, including those beyond the control of the GCCF, likely contributed to certain of these concerns.

Regarding communications with claimants, despite substantial efforts to communicate effectively with claimants so as to efficiently and expeditiously process claims, the GCCF recognized that, with hindsight, there were areas where improvements could have been made sooner. These are noted below in Section VII, "GCCF's Suggestions for Future Claims Facilities." In our forthcoming final report, BDO will identify specifics regarding the GCCF's communications with claimants, and we emphasize below in Section VIII, "Further Suggestions for Future Claims Facilities," the importance of effective communications with claimants.

We observed that the GCCF generally handled documentation submitted by claimants in accordance with its processes and that the facility's processes provided a complete trail of the claimant-submitted information and communications. This enabled us to review claim files effectively and permitted the GCCF to process claims or correct for identified errors. Some human errors occurred in the selection of documents to use in processing claims. These types of



Page 9 of 13                Prepared at the Request of
                           The U.S. Department of Justice

errors, which represented the most frequent type of error we identified, may have contributed to this concern, as well as to different outcomes for claimants that may appear to have been similarly situated. As an example, the GCCF rules specified the circumstances under which various types of financial documents, including Forms W-2, Forms 1099-MISC, Paycheck Stubs and payroll records, were to be used to calculate losses. We observed instances where GCCF reviewers selected the incorrect type of financial document when calculating an individual claimant's losses.

A variety of factors contributed to different outcomes for claimants that may appear to have been similarly situated, including, among others: differences in earnings preceding the Spill; differences in cost structures of businesses; the effect of when claimants submitted claims to the GCCF (as a result of evolving methodologies); and the effect of errors that resulted in overpayments, underpayments or erroneous denials. Ironically, some of the GCCF's methodologies which were clearly intended to be (and were) beneficial to claimants, such as automatic eligibility in Phase II for any claimant who was paid in Phase I, actually created circumstances in which claimants that may appear to have been similarly situated received different outcomes. A deeper understanding of the GCCF's protocols and methodologies, which will be presented in our forthcoming final report, is needed to appreciate the variety of factors that contributed to different outcomes for claimants that may appear to have been similarly situated.

Overall, valid reasons existed for certain concerns raised by claimants, public officials and other stakeholders; however, it is important to understand that a variety of factors contributed to those concerns (including those beyond the control of the GCCF). We identify here and will identify in our forthcoming final report improvements that can, and should, be made in the administration of future claims facilities.

VII.    **GCCF's Suggestions for Future Claims Facilities**

Because the GCCF was created amid unique and unprecedented circumstances, the insights of those who were involved in its daily operations and who experienced its challenges, achievements and frustrations, will likely prove useful to those seeking to address the compensation of a wide range of individuals and businesses immediately following future catastrophic events. We inquired of the GCCF regarding those aspects of its operations that, in hindsight, it would have addressed differently. Several of the GCCF's own suggestions for improvements dealt with communications and interactions with claimants, including, fundamentally, not making statements that set unachievable expectations regarding the time needed to process claims.



Beyond this, the GCCF recommended staffing site offices with, and providing greater access to, more knowledgeable GCCF representatives; providing more detailed and specific information for deficient or denied claims; immediately advising disgruntled claimants when their claims had been referred to law enforcement as being potentially fraudulent; and providing all communications with claimants in the language of their choice. The GCCF implemented most of these suggestions at some point during its operations; however, the GCCF acknowledged that, had it been able to do so earlier, the GCCF claims evaluation process would have been more efficient.

Further, during its tenure, the GCCF instituted a policy whereby it treated as automatically eligible (without further documentation that claimed losses were caused by the Spill) any individual claimant who was employed by a business which the GCCF deemed eligible. Potential inconsistencies arose in cases in which a business was deemed eligible after the claim of one of its employees was denied. The GCCF stated to us that, with the benefit of hindsight, it would have been preferable to have put into place procedures whereby it would have re-evaluated the claim of a denied individual claimant upon the subsequent determination that the claimant's employer was eligible.

The GCCF also informed us that, from its inception, it attempted to arrange for a process by which claimants would be able to receive free legal assistance. Its initial attempts to do this, by approaching law firms both in the Gulf region and nationally to provide this legal assistance on a *pro bono* basis, were frustrated because most law firms in the region had a conflict of interest. On December 15, 2011, the GCCF entered into an agreement with the Mississippi Center for Justice, a nonprofit, public interest law firm, to oversee a consortium of legal service entities in the Gulf region that provided legal assistance to all claimants who sought it, regardless of income level. The GCCF made clear that the provision of free legal assistance to individuals and businesses submitting claims to the GCCF was an important practice and recommended that it be adopted by claims facilities addressing losses from future catastrophic events.

## VIII. Further Suggestions for Future Claims Facilities

In addition to the suggestions made by the GCCF, which are consistent with observations we have made during our independent evaluation, we suggest several additional approaches that future claims facilities may wish to consider adopting.

First, as mentioned above, one of the primary concerns raised by the DOJ at the beginning of our independent evaluation dealt with communications with claimants and, indeed, the GCCF's own suggestions for potential improvements focused upon communications. In this context, we recommend that future claims facilities dedicate time and resources upfront to the development of an integrated communications strategy incorporating the lessons learned by the GCCF's experiences.



Second, we recommend that, as resources and circumstances permit, future facilities include a function, independent of claims processing, dedicated to: identifying potential errors in processing; recommending claims processing improvements; and providing input to the facility regarding inquiries and criticisms. Importantly, this function would need to operate in a manner that does not interfere with the primary goal of compensating adversely impacted claimants as expeditiously as possible.

Third, with a few exceptions, the GCCF did not retroactively review previously processed claims in light of subsequent changes to its methodologies. This approach may have created instances in which the outcome of a claim would be dependent upon the timing of its submission and may have resulted in different outcomes for claimants that appear similarly situated. We recommend that future facilities consider a process by which, in appropriate circumstances, previously processed claims will be re-evaluated periodically in the wake of changes to methodologies.

## IX. Conclusion

The GCCF was designed to respond, and did respond, with urgency to the economic difficulties of those most likely affected by the Spill. However, because of the complexity and unprecedented nature of the task undertaken by the GCCF, it was inevitable that some claimants and stakeholders would have concerns about its operations. While hundreds of thousands of individual and business claimants received payment without litigation over the two years immediately following the Spill, many others have sought an alternative to the GCCF. We hope that all those who have been genuinely affected by the Spill, ultimately receive an appropriate resolution to their claims.

Finally, we hope that the findings and observations discussed above and those contained in our forthcoming final report will provide insight into the operations of the GCCF, including the causes of claimant concerns, and assist those charged with designing future claims facilities to address catastrophic events.

Very truly yours,

BDO USA, LLP

*BDO USA, LLP*



The BDO Project Leadership Team thanks the DOJ for the trust they placed in BDO to perform this independent evaluation of the GCCF. We have undertaken our responsibilities with the understanding that the events that precipitated the creation of the GCCF had a real and substantial negative impact on the quality of life of many persons living and working in the Gulf region.

By: Carl W. Pergola
Partner

By: Anthony M. Lendez
Partner

By: Lee M. Dewey
Partner

By: Kevin R. Hubbard
Partner

By: Stephanie Giammarco
Partner

By: Brian J. Mich
Managing Director

By: Clark Schweers
Managing Director

