# Annual Report and Form 20-F 2010

bp.com/annualreport



# What's inside?

**5 Business review**
- 6 Chairman's letter
- 8 Board of directors
- 10 Group chief executive's letter
- 12 Progress in 2010
- 14 Group overview
- 34 Gulf of Mexico oil spill
- 40 Exploration and Production
- 55 Refining and Marketing
- 61 Other businesses and corporate
- 63 Liquidity and capital resources
- 68 Corporate responsibility
- 76 Research and technology
- 78 Regulation of the group's business
- 81 Certain definitions

**83 Directors and senior management**
- 84 Directors and senior management
- 87 Directors' interests

**89 Corporate governance**
- 90 Board performance report
- 105 Corporate governance practices
- 106 Code of ethics
- 106 Controls and procedures
- 107 Principal accountants' fees and services
- 108 Memorandum and Articles of Association

**111 Directors' remuneration report**
- 112 Part 1 Summary
- 114 Part 2 Executive directors' remuneration
- 120 Part 3 Non-executive directors' remuneration

**123 Additional information for shareholders**
- 124 Critical accounting policies
- 127 Property, plants and equipment
- 127 Share ownership
- 128 Major shareholders and related party transactions
- 129 Dividends
- 130 Legal proceedings
- 133 Relationships with suppliers and contractors
- 134 Share prices and listings
- 135 Material contracts
- 135 Exchange controls
- 135 Taxation
- 137 Documents on display
- 137 Purchases of equity securities by the issuer and affiliated purchasers
- 138 Fees and charges payable by a holder of ADSs
- 138 Fees and payments made by the Depositary to the issuer
- 139 Called-up share capital
- 139 Administration
- 139 Annual general meeting
- 140 Exhibits

**141 Financial statements**
- 142 Consolidated financial statements of the BP group
- 150 Notes on financial statements
- 228 Supplementary information on oil and natural gas (unaudited)
- PC1 Parent company financial statements of BP p.l.c.

Tab 02

# UNITED STATES
# SECURITIES AND EXCHANGE COMMISSION
Washington, D.C. 20549

# FORM 20-F

(Mark One)

REGISTRATION STATEMENT PURSUANT TO SECTION 12(b) or (g)
OF THE SECURITIES EXCHANGE ACT OF 1934
OR
ANNUAL REPORT PURSUANT TO SECTION 13 OR 15(d)
OF THE SECURITIES EXCHANGE ACT OF 1934

For the fiscal year ended 31 December 2010
OR
TRANSITION REPORT PURSUANT TO SECTION 13 OR 15(d) OF THE SECURITIES EXCHANGE ACT OF 1934
OR
SHELL COMPANY REPORT PURSUANT TO SECTION 13 OR 15(d) OF THE SECURITIES EXCHANGE ACT OF 1934
Commission file number: 1-6262

## BP p.l.c.
(Exact name of Registrant as specified in its charter)

**England and Wales**
(Jurisdiction of incorporation or organization)

1 St James's Square, London SW1Y 4PD
United Kingdom
(Address of principal executive offices)

Dr Byron E Grote
BP p.l.c.
1 St James's Square, London SW1Y 4PD
United Kingdom
Tel +44 (0) 20 7496 4495
Fax +44 (0) 20 7496 4630
(Name, Telephone, E-mail and/or Facsimile number and Address of Company Contact Person)

Securities registered or to be registered pursuant to Section 12(b) of the Act

| Title of each class | Name of each exchange on which registered |
|---|---|
| Ordinary Shares of 25c each | New York Stock Exchange* |
| Floating Rate Guaranteed Notes due 2011 | New York Stock Exchange |
| Substitute Floating Rate Guaranteed Note due 2011 | New York Stock Exchange |
| 1.55% Guaranteed Notes due 2011 | New York Stock Exchange |
| 3.125% Guaranteed Notes due 2012 | New York Stock Exchange |
| 5.25% Guaranteed Notes due 2013 | New York Stock Exchange |
| 3.625% Guaranteed Notes due 2014 | New York Stock Exchange |
| 3.875% Guaranteed Notes due 2015 | New York Stock Exchange |
| 3.125% Guaranteed Notes due 2015 | New York Stock Exchange |
| 4.75% Guaranteed Notes due 2019 | New York Stock Exchange |
| 4.5% Guaranteed Notes due 2020 | New York Stock Exchange |

*Not for trading, but only in connection with the registration of American Depositary Shares, pursuant to the requirements of the Securities and Exchange Commission

Securities registered or to be registered pursuant to Section 12(g) of the Act.
None

Securities for which there is a reporting obligation pursuant to Section 15(d) of the Act.
None

Indicate the number of outstanding shares of each of the issuer's classes of capital or common stock as of the close of the period covered by the annual report.

| | |
|---|---|
| Ordinary Shares of 25c each | 18,796,461,292 |
| Cumulative First Preference Shares of £1 each | 7,232,838 |
| Cumulative Second Preference Shares of £1 each | 5,473,414 |

Indicate by check mark if the registrant is a well-known seasoned issuer, as defined in Rule 405 of the Securities Act.
Yes ☑     No ☐

If this report is an annual or transition report, indicate by check mark if the registrant is not required to file reports pursuant to Section 13 or 15(d) of the Securities Exchange Act of 1934.
Yes ☐     No ☑

Note — Checking the box above will not relieve any registrant required to file reports pursuant to Section 13 or 15(d) of the Securities Exchange Act of 1934 from their obligations under those Sections.

Indicate by check mark whether the Registrant (1) has filed all reports required to be filed by Section 13 or 15(d) of the Securities Exchange Act of 1934 during the preceding 12 months (or for such shorter period that the Registrant was required to file such reports), and (2) has been subject to such filing requirements for the past 90 days.
Yes ☑     No ☐

Indicate by check mark whether the registrant has submitted electronically and posted on its corporate website, if any, every Interactive Data File required to be submitted and posted pursuant to Rule 405 of Regulation S-T (§ 232.405 of this chapter) during the preceding 12 months (or for such shorter period that the registrant was required to submit and post such files).*
Yes ☑     No ☐

*This requirement does not apply to the registrant until its fiscal year ending December 31, 2011.

Indicate by check mark whether the registrant is a large accelerated filer, an accelerated filer, or a non-accelerated filer. See definition of "accelerated filer and large accelerated filer" in Rule 12b-2 of the Exchange Act. (Check one):

Large accelerated filer ☑     Accelerated filer ☐     Non-accelerated filer ☐

Indicate by check mark which basis of accounting the registrant has used to prepare the financial statements included in this filing:

U.S. GAAP ☐     International Financial Reporting Standards as issued by the International Accounting Standards Board ☑     Other ☐

If "Other" has been checked in response to the previous question, indicate by check mark which financial statement item the registrant has elected to follow.

Item 17 ☐     Item 18 ☐

If this is an annual report, indicate by check mark whether the registrant is a shell company (as defined in Rule 12b-2 of the Exchange Act).
Yes ☐     No ☑

1

# Cross reference to Form 20-F

|  |  |  | Page |
|---|---|---|---|
| Item 1. |  | Identity of Directors, Senior Management and Advisors | n/a |
| Item 2. |  | Offer Statistics and Expected Timetable | n/a |
| Item 3. |  | Key Information |  |
|  | A. | Selected financial data | 23 |
|  | B. | Capitalization and indebtedness | n/a |
|  | C. | Reasons for the offer and use of proceeds | n/a |
|  | D. | Risk factors | 27-32 |
| Item 4. |  | Information on the Company |  |
|  | A. | History and development of the company | 4, 14-15 |
|  | B. | Business overview | 14-22, 33-82 |
|  | C. | Organizational structure | 220-221 |
|  | D. | Property, plants and equipment | 22, 43, 50-54, 127, 247-248 |
| Item 4A. |  | Unresolved Staff Comments | None |
| Item 5. |  | Operating and Financial Review and Prospects |  |
|  | A. | Operating results | 24-26, 34, 41-42, 56-57, 61, 124-127 |
|  | B. | Liquidity and capital resources | 63-67 |
|  | C. | Research and development, patent and licenses | 76-77, 175 |
|  | D. | Trend information | 67 |
|  | E. | Off-balance sheet arrangements | 64 |
|  | F. | Tabular disclosure of contractual commitments | 65 |
|  | G. | Safe harbor | 4 |
| Item 6. |  | Directors, Senior Management and Employees |  |
|  | A. | Directors and senior management | 84-87 |
|  | B. | Compensation | 112-121, 214-217 |
|  | C. | Board practices | 90-104, 214-217 |
|  | D. | Employees | 74-75 |
|  | E. | Share ownership | 87, 112-118, 127-128, 214-216 |
| Item 7. |  | Major Shareholders and Related Party Transactions |  |
|  | A. | Major shareholders | 128-129 |
|  | B. | Related party transactions | 129, 183-184 |
|  | C. | Interests of experts and counsel | n/a |
| Item 8. |  | Financial Information |  |
|  | A. | Consolidated statements and other financial information | 129-133, 134, 144-227 |
|  | B. | Significant changes | None |
| Item 9. |  | The Offer and Listing |  |
|  | A. | Offer and listing details | 134 |
|  | B. | Plan of distribution | n/a |
|  | C. | Markets | 134 |
|  | D. | Selling shareholders | n/a |
|  | E. | Dilution | n/a |
|  | F. | Expenses of the issue | n/a |
| Item 10. |  | Additional Information |  |
|  | A. | Share capital | n/a |
|  | B. | Memorandum and articles of association | 108-109 |
|  | C. | Material contracts | 135 |
|  | D. | Exchange controls | 135 |
|  | E. | Taxation | 135-137 |
|  | F. | Dividends and paying agents | n/a |
|  | G. | Statements by experts | n/a |
|  | H. | Documents on display | 137 |
|  | I. | Subsidiary information | n/a |
| Item 11. |  | Quantitative and Qualitative Disclosures about Market Risk | 185-190, 192-196 |
| Item 12. |  | Description of securities other than equity securities |  |
|  | A. | Debt Securities | n/a |
|  | B. | Warrants and Rights | n/a |
|  | C. | Other Securities | n/a |
|  | D. | American Depositary Shares | 138 |
| Item 13. |  | Defaults, Dividend Arrearages and Delinquencies | None |
| Item 14. |  | Material Modifications to the Rights of Security Holders and Use of Proceeds | None |
| Item 15. |  | Controls and Procedures | 106-107 |
| Item 16A. |  | Audit Committee Financial Expert | 97 |
| Item 16B. |  | Code of Ethics | 106 |
| Item 16C. |  | Principal Accountant Fees and Services | 107 |
| Item 16D. |  | Exemptions from the Listing Standards for Audit Committees | n/a |
| Item 16E. |  | Purchases of Equity Securities by the Issuer and Affiliated Purchasers | 137 |
| Item 16F. |  | Change in Registrant's Certifying Accountant | None |
| Item 16G. |  | Corporate governance | 105 |
| Item 17. |  | Financial Statements | n/a |
| Item 18. |  | Financial Statements | 144-227, 228-248 |
| Item 19. |  | Exhibits | 140 |

# Miscellaneous terms

In this document, unless the context otherwise requires, the following terms shall have the meaning set out below.

**ADR**
American depositary receipt.

**ADS**
American depositary share.

**AGM**
Annual general meeting.

**Amoco**
The former Amoco Corporation and its subsidiaries.

**Annulus**
The space between two concentric objects, such as between the wellbore and casing of an oil well or between casing and tubing, where fluid can flow. It allows fluids, such as drilling mud, to circulate in the well.

**Atlantic Richfield**
Atlantic Richfield Company and its subsidiaries.

**Associate**
An entity, including an unincorporated entity such as a partnership, over which the group has significant influence and that is neither a subsidiary nor a joint venture. Significant influence is the power to participate in the financial and operating policy decisions of an entity but is not control or joint control over those policies.

**Barrel**
42 US gallons.

**b/d**
barrels per day.

**boe**
barrels of oil equivalent.

**BP, BP group or the group**
BP p.l.c. and its subsidiaries.

**Burmah Castrol**
Burmah Castrol PLC and its subsidiaries.

**Cent or c**
One-hundredth of the US dollar.

**The company**
BP p.l.c.

**Dollar or $**
The US dollar.

**EU**
European Union.

**GAAP**
Generally accepted accounting practice.

**Gas**
Natural gas.

**GCRO**
Gulf Coast Restoration Organization.

**Hydrocarbons**
Crude oil and natural gas.

**IFRS**
International Financial Reporting Standards.

**Joint control**
Joint control is the contractually agreed sharing of control over an economic activity, and exists only when the strategic financial and operating decisions relating to the activity require the unanimous consent of the parties sharing control (the venturers).

**Joint venture**
A contractual arrangement whereby two or more parties undertake an economic activity that is subject to joint control.

**Jointly controlled asset**
A joint venture where the venturers jointly control, and often have a direct ownership interest in the assets of the venture. The assets are used to obtain benefits for the venturers. Each venturer may take a share of the output from the assets and each bears an agreed share of the expenses incurred.

**Jointly controlled entity**
A joint venture that involves the establishment of a corporation, partnership or other entity in which each venturer has an interest. A contractual arrangement between the venturers establishes joint control over the economic activity of the entity.

**Liquids**
Crude oil, condensate and natural gas liquids.

**LNG**
Liquefied natural gas.

**London Stock Exchange or LSE**
London Stock Exchange plc.

**LPG**
Liquefied petroleum gas.

**mb/d**
thousand barrels per day.

**mboe/d**
thousand barrels of oil equivalent per day.

**mmBtu**
million British thermal units.

**mmboe**
million barrels of oil equivalent.

**mmcf**
million cubic feet.

**mmcf/d**
million cubic feet per day.

**MW**
Megawatt.

**NGLs**
Natural gas liquids.

**OPEC**
Organization of Petroleum Exporting Countries.

**Ordinary shares**
Ordinary fully paid shares in BP p.l.c. of 25c each.

**Pence or p**
One-hundredth of a pound sterling.

**Pound, sterling or £**
The pound sterling.

**Preference shares**
Cumulative First Preference Shares and Cumulative Second Preference Shares in BP p.l.c. of £1 each.

**PSA**
A production-sharing agreement (PSA) is an arrangement through which an oil company bears the risks and costs of exploration, development and production. In return, if exploration is successful, the oil company receives entitlement to variable physical volumes of hydrocarbons, representing recovery of the costs incurred and a stipulated share of the production remaining after such cost recovery.

**SEC**
The United States Securities and Exchange Commission.

**Subsidiary**
An entity that is controlled by the BP group. Control is the power to govern the financial and operating policies of an entity so as to obtain the benefits from its activities.

**Tonne**
2,204.6 pounds.

**Trust**
Deepwater Horizon Oil Spill Trust.

**UK**
United Kingdom of Great Britain and Northern Ireland.

**US**
United States of America.

# Information about this report

This document constitutes the Annual Report and Accounts in accordance with UK requirements and the Annual Report on Form 20-F in accordance with the US Securities Exchange Act of 1934, for BP p.l.c. for the year ended 31 December 2010. A cross reference to Form 20-F requirements is on page 2.

This document contains the Directors' Report, including the Business Review and Management Report, on pages 5-109 and 123-140, 142 and PC1. The Directors' Remuneration Report is on pages 111-121. The consolidated financial statements of the group are on pages 141-248 and the corresponding reports of the auditor are on pages 143-145. The parent company financial statements of BP p.l.c. and corresponding auditor's report are on pages PC1-PC16 and page PC2 respectively.

The statement of directors' responsibilities in respect of the consolidated financial statements, the independent auditor's report on the annual report and accounts to the members of BP p.l.c. and the parent company financial statements of BP p.l.c. and corresponding auditor's report do not form part of BP's Annual Report on Form 20-F as filed with the SEC.

*BP Annual Report and Form 20-F 2010* and *BP Summary Review 2010* may be downloaded from *www.bp.com/annualreport*. No material on the BP website, other than the items identified as *BP Annual Report and Form 20-F 2010* or *BP Summary Review 2010*, forms any part of those documents.

BP p.l.c. is the parent company of the BP group of companies. Unless otherwise stated, the text does not distinguish between the activities and operations of the parent company and those of its subsidiaries.

The term 'shareholder' in this report means, unless the context otherwise requires, investors in the equity capital of BP p.l.c., both direct and indirect. As BP shares, in the form of ADSs, are listed on the New York Stock Exchange (NYSE), an Annual Report on Form 20-F is filed with the US Securities and Exchange Commission (SEC).

### Cautionary statement

*BP Annual Report and Form 20-F 2010* contains certain forward-looking statements within the meaning of the US Private Securities Litigation Reform Act of 1995 with respect to the financial condition, results of operations and businesses of BP and certain of the plans and objectives of BP with respect to these items.

In order to utilize the 'Safe Harbor' provisions of the United States Private Securities Litigation Reform Act of 1995, BP is providing the following cautionary statement. This document contains certain forward-looking statements with respect to the financial condition, results of operations and businesses of BP and certain of the plans and objectives of BP with respect to these items. These statements may generally, but not always, be identified by the use of words such as 'will', 'expects', 'is expected to', 'aims', 'should', 'may', 'objective', 'is likely to', 'intends', 'believes', 'plans', 'we see' or similar expressions. In particular, among other statements, (i) certain statements in the Business review (pages 6-82), including under the heading 'Outlook', with regard to strategy, management aims and objectives, future capital expenditure, the completion of planned and announced divestments and disposals, acquisitions and other transactions, future hydrocarbon production volume and the group's ability to satisfy its long-term sales commitments from future supplies available to the group, date(s) or period(s) in which production is scheduled or expected to come onstream or a project or action is scheduled or expected to begin or be completed, capacity of planned plants or facilities and impact of health, safety and environmental regulations; (ii) the statements in the Business review (pages 6-63 and 68-81) with regard to anticipated energy demand and consumption, global economic recovery, oil and gas prices, global reserves, refining capacity, expected future energy mix and the potential for cleaner and more efficient sources of energy, management aims and objectives, strategy, production, petrochemical and refining margins, anticipated investment in Alternative Energy, anticipated future project developments, growth of the international businesses, Refining and Marketing investments, reserves increases through technological developments, with regard to planned investment or other projects, timing and ability to complete announced transactions and future regulatory actions; (iii) the statements in the Business review (pages 23-26, 63-67 and 73) with regard to the plans of the group, the cost of and provision for future remediation programmes and environmental operating and capital expenditures, taxation, liquidity and costs for providing pension and other post-retirement benefits; and including under 'Liquidity and capital resources – Trend Information', with regard to global economic recovery, oil and gas prices, petrochemical and refining margins, production, demand for petrochemicals, production and production growth, depreciation, underlying average quarterly charge from Other businesses and corporate, costs, foreign exchange and energy costs, capital expenditure, timing and proceeds of divestments, balance of cash inflows and outflows, dividend and optional scrip dividend, cash flows, shareholder distributions, gearing, working capital, guarantees, expected payments under contractual and commercial commitments and purchase obligations; and (iv) certain statements in Chairman's letter (pages 6-7) and Business review (pages 10-11) in relation to an anticipated increase in the level of the dividend; are all forward-looking in nature.

By their nature, forward-looking statements involve risk and uncertainty because they relate to events and depend on circumstances that will or may occur in the future and are outside the control of BP. Actual results may differ materially from those expressed in such statements, depending on a variety of factors, including the specific factors identified in the discussions accompanying such forward-looking statements; the timing of bringing new fields onstream; future levels of industry product supply, demand and pricing; operational problems; general economic conditions; political stability and economic growth in relevant areas of the world; changes in laws and governmental regulations; actions by regulators; exchange rate fluctuations; development and use of new technology; the success or otherwise of partnering; the actions of competitors; natural disasters and adverse weather conditions; changes in public expectations and other changes to business conditions; wars and acts of terrorism or sabotage; and other factors discussed elsewhere in this report including under 'Risk factors' (pages 27-32). In addition to factors set forth elsewhere in this report, those set out above are important factors, although not exhaustive, that may cause actual results and developments to differ materially from those expressed or implied by these forward-looking statements.

### Statements regarding competitive position

Statements referring to BP's competitive position are based on the company's belief and, in some cases, rely on a range of sources, including investment analysts' reports, independent market studies and BP's internal assessments of market share based on publicly available information about the financial results and performance of market participants.

---

Unless otherwise indicated, information in this document reflects 100% of the assets and operations of the company and its subsidiaries that were consolidated at the date or for the periods indicated, including minority interests. The company was incorporated in 1909 in England and Wales and changed its name to BP p.l.c. in 2001. BP's primary share listing is the London Stock Exchange. Ordinary shares are also traded on the Frankfurt Stock Exchange in Germany and, in the US, the company's securities are traded in the form of ADSs. (*See page 134 for more details*.)

The registered office of BP p.l.c., and our worldwide headquarters, is:
1 St James's Square,
London SW1Y 4PD, UK.
Tel +44 (0)20 7496 4000.
Registered in England and Wales No. 102498. Stock exchange symbol 'BP'.

Our agent in the US is BP America Inc.,
501 Westlake Park Boulevard, Houston, Texas 77079.
Tel +1 281 366 2000.

# Business review

| | |
|---|---|
| 6 | Chairman's letter |
| 8 | Board of directors |
| 10 | Group chief executive's letter |
| 12 | Progress in 2010 |
| 14 | Group overview |
| 34 | Gulf of Mexico oil spill |
| 40 | Exploration and Production |
| 55 | Refining and Marketing |
| 61 | Other businesses and corporate |
| 63 | Liquidity and capital resources |
| 68 | Corporate responsibility |
| 76 | Research and technology |
| 78 | Regulation of the group's business |
| 81 | Certain definitions |

# Chairman's letter

## Dear fellow shareholder

2010 was a profoundly painful and testing year. In April, a tragic accident on the Deepwater Horizon rig claimed the lives of 11 men and injured others. Above all else, I want to remember those men, and say that our thoughts remain with their families and friends. BP's priority is to ensure that the people who work for us, and with us, return home safely. The accident should never have happened. We are shocked and saddened that it did.

The spill that resulted caused widespread pollution. Our response has been unprecedented in scale, and we are determined to live up to our commitments in the Gulf. We will also do everything necessary to ensure BP is a company that can be trusted by shareholders and communities around the world.

In the days after the accident in the Gulf of Mexico the company faced a complex and fast-changing crisis. With oil escaping into the ocean, uncertainty grew around our ability to seal the well and restore the areas affected. This was an intense period, with the situation worsening almost daily. Our meeting with President Obama on 16 June 2010 provided reassurance to the US government that BP would do the right thing in the Gulf, and this marked a turning point. Through diligence and invention, our teams stopped the flow of oil in July and completed relief-well operations in September.

During these difficult days your board focused on three critical objectives.

First, we ensured the response team had the resources it required to stop the leak, contain and clean up the damage, and provide financial support to those affected. This was an unprecedented response to an industrial accident, with some 48,000 people involved at the height of the effort. We have set up a $20-billion fund to show our willingness and capacity to pay all legitimate claims for compensation. For the long term, we have committed $500 million to a 10-year independent research programme that will examine the environmental impact of the oil spilled and dispersants used. BP will continue to help restore the environment and economy of the Gulf, however long that takes.

Second, we resolved to understand what happened on and below the Deepwater Horizon, to apply the lessons learned and to make our findings available publicly. BP's comprehensive internal investigation concluded that a sequence of failures involving a number of different parties led to the explosion and fire.

We are implementing the report's recommendations. We have established a powerful safety and operational risk function, and we have enhanced risk management through the restructuring of our upstream business. We are also conducting a wide-ranging review of when and how we outsource operations.

Third, we moved to secure the long-term future of BP and our capacity to meet our financial responsibilities in the Gulf of Mexico. Decisive action was required here because events in the US led to a crisis of confidence in BP within the financial markets. In response, we made the difficult decision to cancel three dividend payments. We do not underestimate the effect of this on small and large shareholders alike. However, there is no doubt in my mind that this action steadied and strengthened our position at a critical point.

I am pleased that we have been able to resume dividend payments promptly. The dividend for the fourth quarter of 2010, to be paid in March 2011, is 7 cents per share (US$0.42 per ADS). The scrip dividend programme approved last year is in operation once again, and this presents an opportunity to take the dividend in shares or ADSs rather than cash. We intend to raise the level of the dividend as the company's circumstances and performance improve.

## Further note on certain activities

During the period covered by this report, non-US subsidiaries or other non-US entities of BP conducted limited activities in, or with persons from, certain countries identified by the US Department of State as State Sponsors of Terrorism or otherwise subject to US sanctions ('Sanctioned Countries'). These activities continue to be insignificant to the group's financial condition and results of operations. In the first half of 2010, new sanctions against Iran and against companies that make investments that enhance Iran's ability to develop petroleum resources or provide or facilitate the production or import of refined petroleum products into Iran were adopted in the US under the Comprehensive Iran Sanctions Accountability and Divestment Act of 2010. The European Union and the UN also adopted new restrictive measures. The EU sanctions restrict the provision of certain technologies to Iranian entities and also prohibit providing assistance to help develop certain exploration and production, refining, and LNG facilities or operations in Iran.

BP has interests in, and is the operator of, two fields and a pipeline located outside Iran in which Naftiran Intertrade Co. Ltd, NICO SPV Limited (NICO) and Iranian Oil Company (UK) Limited have interests. One of these fields, the North Sea Rhum field, has suspended production pending clarification of the impact of the EU restrictive measures. The Shah Deniz field continues in operation under the EU measures. BP has purchased or shipped quantities of crude oil, refinery and petrochemicals feedstocks, blending components and LPG of Iranian origin or from Iranian counterparties primarily for sale to third parties in Europe and a small portion is used by BP in its own facilities in South Africa and Europe. BP incurs some port costs for cargos loaded in Iran and sometimes charters Iranian-owned vessels outside of Iran. Small quantities of lubricants are sold to non-Iranian third parties for use in Iran. Until recently BP held an equity interest in an Iranian joint venture that has a blending facility and markets lubricants for sale to domestic consumers. In January 2010, BP restructured its interest in the joint venture and currently maintains its involvement through certain contractual arrangements. BP does not seek to obtain from the government of Iran licences or agreements for oil and gas projects in Iran, is not conducting any technical studies in Iran, and does not own or operate any refineries or petrochemicals plants in Iran.

BP sells lubricants in Cuba through a 50:50 joint venture and trades in small quantities of lubricants. In Syria, BP sells lubricants through a distributor and BP obtains crude oil and refinery feedstocks for sale to third parties in Europe and for use in certain of its non-US refineries. In addition, BP sells crude oil and refined products into and from Syria and incurs port costs for vessels utilizing Syrian ports. BP sold small quantities of LPG to an agent on behalf of a Sudanese party for making aerosols in Sudan, but no longer makes such sales. A non-BP operated Malaysian joint venture has sold small quantities of petrochemicals into Burma; these sales have now terminated. A non-controlled and non-operated Brazilian biofuels joint venture in which BP has an interest sold a cargo of sugar cane by-products to Iran and to Syria.

BP supplies to airlines and shipping companies from Sanctioned Countries fuels and lubricants at airports and ports located outside these countries. BP sells to third parties who may re-sell to entities from Sanctioned Countries. A non-controlled, non-operated joint venture in Hamburg, Germany provided fuel delivery services (but did not sell fuel) to Iranian airlines. BP terminated all fuel sales to Iranian airlines as of July 2010 and to Sudanese airlines in December 2010. Sales to Iranian shipping companies have also been terminated. BP has registered, and paid required fees for, patents and trademarks in Sanctioned Countries.

BP monitors its activities with Sanctioned Countries and keeps them under review to ensure compliance with applicable laws and regulations of the US, the EU and other countries where BP operates.

Business review

# Gulf of Mexico oil spill

## Incident summary

On 20 April 2010, following a well blowout in the Gulf of Mexico, an explosion and fire occurred on the semi-submersible rig Deepwater Horizon and on 22 April the vessel sank. Tragically, 11 people lost their lives and 17 others were injured. Hydrocarbons continued to flow from the reservoir and up through the casing and the blowout preventer (BOP) for 87 days, causing a very significant oil spill.

The Deepwater Horizon rig was operated by Transocean Holdings LLC and was drilling the Macondo exploration well. The well forms part of the Mississippi Canyon Block 252 (MC252) lease, in respect of which BP Exploration & Production Inc. was the named party and operator with a 65% working interest. The well was in a water depth of 5,000 feet and 43 nautical miles from shore.

BP tackled the leak at its source in multiple, parallel ways, which over time included: attempting to fit caps on the well, using containment systems to pipe oil to vessels on the surface, sealing the well through a static-kill procedure and drilling relief wells. BP recognized early in the incident that drilling relief wells constituted the ultimate means to seal and isolate the well permanently and stop the flow of oil and gas. Two relief wells were drilled, the first of which was started on 2 May; the second was started on 16 May as a contingency.

On 15 July, BP successfully shut in the Macondo well and then commenced a static-kill procedure. On 9 August, BP confirmed that the casing had been successfully sealed with cement. On 16 September, the first relief well intercepted the annulus of the Macondo well. After completing cementing operations on 19 September, BP, the federal government scientific team and the National Incident Commander concluded that the well-kill operations had successfully sealed the annulus.

BP then began the abandonment of the Macondo well, which included removing portions of the casing and setting cement plugs. This work was completed on 8 November. In parallel, operations to plug and abandon (P&A) the relief well that intercepted the Macondo well also took place and were completed on 30 September. P&A of the second relief well is in progress and is expected to complete in early March 2011. All response activities at the Macondo site (with the exception of the final seabed survey and seismic sweep, which are scheduled to take place at the end of first quarter in 2011), were completed on 8 January with the recovery of the buoy and anchor system for the free-standing riser.

The group income statement for the year ended 31 December 2010 includes a pre-tax charge of $40.9 billion in relation to the Gulf of Mexico oil spill. See Financial consequences on page 38 and Financial statements – Note 2 on page 158 for more details.

## Key statistics

| | 2010 |
|---|---|
| Total pre-tax cost recognized in income statement ($ million) | 40,935 |
| Total cash flow expended (pre-tax) ($ million) | 17,658 |
| Total payments from $20-billion trust fund ($ million) | 3,023 |
| Total number of claimants to GCCF[a] | 468,869 |
| Number of people deployed (at peak) (approximately) | 48,000 |
| Number of active response vessels deployed during the response (approximately) | 6,500 |
| Barrels of oil collected or flared (approximately) | 827,000 |
| Barrels of oily liquid skimmed from surface of sea (approximately) | 828,000 |
| Barrels of oil removed through surface burns (UAC estimate) | 265,450 |

[a] Gulf Coast Claims Facility (GCCF).

## Gulf Coast Restoration Organization (GCRO)

Following the accident, BP established a separate organizational unit – the Gulf Coast Restoration Organization (GCRO) – to provide the necessary leadership and dedicated resources to facilitate BP's fulfilment of its clean-up responsibilities and to support the long-term effort to restore the Gulf coast. The GCRO addresses all aspects of the response, including: executing our ongoing clean-up operations and all associated remediation activities; coordinating with government officials; keeping the public informed; and implementing the $20-billion Deepwater Horizon Oil Spill Trust established to meet certain of our financial obligations. At the end of 2010, the GCRO had a permanent staff of 100 employees and about 5,900 contractors including the Gulf Coast incident management team. The majority of the clean-up, maintenance and monitoring is being carried out by contract staff. Since inception, many other BP staff and contractors have been, and will continue to be, temporarily seconded to assist the permanent team and to provide additional resources or specialist skills where required.

## Our response

BP immediately took responsibility for responding to the incident, taking steps to remedy the harm that the spill caused to the Gulf of Mexico, the Gulf coast environment, and the livelihoods of the people in the region. The US government formed a Unified Area Command (UAC) to link the organizations responding to the incident and provide a forum for those organizations to make co-ordinated decisions. If consensus could not be reached on a particular matter, the Federal On-Scene Coordinator (FOSC) made the final decision on response-related actions. BP's comprehensive response focused on three strategic fronts: stopping the flow of hydrocarbons at the source; working to capture, contain and remove oil offshore and near the shore; and cleaning and restoring impacted shorelines and beaches along the Gulf coast.

Initially BP mobilized a fleet of 30 vessels and over a million feet of protective boom. Thereafter the scale of activity grew rapidly, and at its peak included more than 6,500 vessels, more than 13 million feet of boom and almost 48,000 personnel.

BP also formed an investigation team charged with gathering the facts surrounding the accident, analysing available information to identify possible causes and making recommendations that would help prevent similar accidents in the future. The team concluded that no single action or inaction caused this accident. Rather, a complex and interlinked series of mechanical failures, human judgments, engineering design, operational implementation and team interfaces came together to allow the accident. Multiple companies, work teams and circumstances were involved over time. See Internal investigation and report on page 37 for further information on the investigation and its findings.

### Subsea

Subsea intervention activities were initiated by BP immediately following the explosion. Initial attempts to stop the flow of oil focused on attempting to actuate the failed BOP with remotely operated vehicles (ROVs). At the same time, planning also began for two relief wells. Attempts to stop the flow of oil by activating the various components of the BOP continued until 5 May, while plans and tools for potential containment options were being developed in parallel.

From 5 May BP attempted to contain the flow of oil using a number of different strategies. Firstly, one of the three leak points was plugged with the installation of a drill pipe overshot and pack-off device, reducing the complexity of the seabed situation. Following a failed attempt to contain the flow of oil using a containment dome, a riser insert tube tool was successfully deployed in the end of the riser on 16 May. This allowed roughly 3,000 barrels of oil per day (b/d) to be captured and returned to the surface for processing on the drillship Discoverer Enterprise. An attempt was also made to 'top kill' the well by pumping heavy drilling mud into the well at high rates but this effort was unsuccessful. By shearing and removing a damaged section of riser from the lower marine riser package (LMRP) on top of the BOP stack, it was possible to attach a new containment system (sometimes referred to as a top hat). This system allowed for up to 15,000b/d of oil to be produced through this non-sealing LMRP cap via a riser to the Discoverer Enterprise for processing. Containment capacity was eventually enhanced to over 40,000b/d of oil. In total, approximately 827,000 barrels of crude oil were recovered using the various containment systems. On 10 July, the top-hat containment cap was removed from the LMRP to allow the installation of a three-ram capping stack, which was completed on 12 July.

The flow of oil into the Gulf of Mexico was finally stopped on 15 July. After verifying integrity of the capping stack, a static-kill procedure was executed. Following a series of tests and the pumping of heavy drilling mud, static conditions were achieved in the Macondo well on 3 August and cement was pumped in two days later. On 2 September, after a successful test of the cement plug, the capping stack was removed from the top of the BOP.

On 3 September, the BOP was removed from the Macondo wellhead to be replaced by the BOP stack from the Development Driller II. The Deepwater Horizon BOP was subsequently recovered to surface, preserved and shipped to the NASA Michoud Facility in Louisiana for examination by the US government and other parties.

Progress on the two relief wells continued in parallel with the containment operations outlined above. The first relief well was delayed on several occasions due to adverse weather and while critical testing and operations were conducted on the Macondo well. On 16 September, the first relief well successfully intersected the Macondo wellbore. On 19 September, after cementing operations on the relief well were complete, the Macondo well was officially declared killed.

The P&A of the first relief well was completed by the Development Driller III rig on 30 September. P&A of the Macondo well was concluded on 8 November by the Development Driller II, and the P&A of the second relief well is in progress and is expected to complete in early March 2011.

Work to recover and secure the subsea infrastructure used for the various containment systems commenced following completion of the Macondo well P&A programme and was completed on 8 January 2011.

During the latter stages of the response, work commenced to restore and decontaminate the many vessels involved in the incident. This is largely complete, with the remaining 25 vessels expected to be completed by the end of April 2011.

The only outstanding work associated with the Macondo site is the seabed and seismic surveys of the area. In consideration of, and subject to, the weather conditions, it is anticipated that the seabed and seismic surveys will take place at the end of first quarter of 2011.

### Shoreline and surface

The priorities for the shoreline and surface response were removing oil from the surface of the Gulf, preventing oil from reaching the shoreline and cleaning up any oil that did reach the shores. The response strategy included aerial surveillance to understand where concentrations of oil were located, mechanical skimming, controlled surface burning, application of dispersants, and multiple in-water and onshore booming techniques. Onshore, multiple techniques for cleaning and removing oil from marshes, wetlands, and beaches were deployed. BP worked with local organizations to refine existing area contingency plans to enable the most effective response to the spill.

Extensive surface skimming activities took place, ranging from large-scale offshore skimmers to inland and shallow water equipment. The UAC also leveraged its Vessels of Opportunity (VoO) programme to assist with this and to support the fish and wildlife, Shoreline Clean-up Assessment Team (SCAT), and Rapid Assessment Team.

Controlled in situ burning of oil on the surface of the water was conducted where concentrations of oil with suitable characteristics could be identified. Approximately 400 controlled burns were performed, which in total removed an estimated 265,450 barrels of oil according to the UAC.

Chemical dispersants were deployed under the close supervision of the UAC. Dispersants are mixtures of solvents, surfactants and other additives that break up the surface tension of an oil slick or sheen and make oil more soluble in water. On the surface, dispersants help break oil down into microscopic droplets that can be dispersed through the seawater and more easily degraded by oil-eating bacteria. Subsea application of dispersants was used to break the oil into small particles that disperse throughout the water column, forming a more dilute oil-and-water solution that degrades more easily.

BP worked closely with state and local officials, seeking to prevent shoreline oiling. The effort involved significant deployment of boom. BP worked closely with experts from the US Coast Guard, the US Fish & Wildlife Service, the National Oceanic and Atmospheric Administration (NOAA), the National Park Service, as well as state agencies to identify the most sensitive wildlife habitats and prioritize appropriate spill countermeasures. These measures included booming wildlife refuges and using methods to deter wildlife from entering oiled areas. BP also established animal treatment facilities, with significant capacity to treat birds, mammals and turtles.

Once oiling of the shoreline had occurred, SCATs assessed the damage and developed clean-up methods for each type and area of impact, including treatment plans designed to optimize oil removal with minimal intrusion and impact to the marsh. Thousands of personnel organized into operating teams were mobilized for the clean-up efforts.

Beach-cleaning operations were undertaken in collaboration with residents from the highest impacted communities, with almost 11,000 community responders being trained in beach clean-up efforts.

Throughout this response, BP met with local officials and organized town halls and information sessions in the coastal communities. As the response continued, BP opened community outreach and claims centres in each of the coastal counties and established telephone call lines for all activities.

BP has committed to pay all legitimate claims to individuals, businesses and governments and to establish a $20-billion trust fund, following consultation with the US government. As part of the US Natural Resource Damage Assessment (NRDA) process, BP is working with federal and state trustees to identify wildlife and habitats that may have been injured; to restore the environment back to an objective baseline condition; to restore access to and use of the natural resources; and to compensate for losses caused by the incident. Finally, BP has provided long-term funding for response projects, research and community support programmes as part of our long-term commitment to the Gulf.

The Food and Drug Administration (FDA), the NOAA, and state agencies also conducted fisheries testing and monitoring throughout the response. These testing and monitoring programmes included smell and edible tissue tests for oil detection. Approximately 89,000 square miles of federal fisheries were closed at the peak of the response; as of 1 February 2011, 99.6% of federal fisheries were open to fishing. To date, BP has committed $127 million for ongoing monitoring, marketing, and tourism support in the Gulf States.

### Restoration, research and other donations

In conjunction with the Gulf of Mexico Alliance (a partnership of the states of Alabama, Florida, Louisiana, Mississippi and Texas with the goal of significantly increasing regional collaboration to enhance the ecological and economic health of the Gulf of Mexico), we have established the Gulf of Mexico Research Initiative (GRI) providing $500 million to study and monitor the spill's potential long-term impacts on the environment and local public health. Specifically, the 10-year programme will examine the spread and fate of the oil and other contaminants, the degree of biodegradation, effects of the spill on local ecosystems, and detection, clean-up and mitigation technology. While the details of the programme were being developed, BP awarded a series of fast-track grants to five research groups, totalling $40 million. BP and the Gulf of Mexico Alliance appointed an equal number of research scientists to the governing board of the GRI and, in December, the GRI held its first meeting.

BP has now contributed a total of $260 million under its agreement to fund the $360-million cost of six berms in the Louisiana barrier islands project.

BP has established a $100-million charitable fund to support unemployed rig workers experiencing economic hardship as a result of the moratorium on deepwater drilling imposed by the US federal government. The Rig Worker Assistance Fund will be administered through the Gulf Coast Restoration and Protection Foundation, a supporting organization of The Baton Rouge Area Foundation.

In line with BP's previous commitment to donate its share of the revenue (net of royalties and transportation costs) from the sale of recovered oil to the National Fish and Wildlife Foundation (NFWF), total donations to date have amounted to $22 million.

### Claims process and trust fund

BP initially established a claims process in accordance with the requirements of the Oil Pollution Act 1990 (OPA 90), allowing claimants to make a claim against BP as one of the designated responsible parties. BP has endeavoured to promptly pay all legitimate claims including those from individuals, businesses and government entities. BP paid $399 million in claim payments to individuals and businesses before 23 August 2010, when the administration of these claims was transferred to the Gulf Coast Claims Facility (GCCF) headed by Kenneth Feinberg. Mr Feinberg was jointly appointed by BP and the President of the United States to manage the GCCF. According to GCCF statistics, as of 31 December 2010, 468,869 claimants had submitted claims and $2,776 million in payments had been made. BP continues to evaluate and pay claims from government entities. State and local government entities, as at 31 December 2010, had received $550 million through the trust fund (see below) and BP directly to cover claims and response and removal advances and payments.

In support of the settlement of claims BP established the Deepwater Horizon Oil Spill Trust (Trust), and committed $20 billion to the Trust over a period of three-and-a-half years. While funds are building , BP has secured its commitments to the Trust by granting, conveying, and/or assigning to the Trust first priority perfected security interests in production payments pertaining to certain Gulf of Mexico oil and natural gas production. During 2010, BP made payments to the Trust totalling $5 billion and is committed to making additional payments of $1.25 billion, in one or more instalments, during and prior to the end of each calendar quarter commencing with the first calendar quarter of 2011 and continuing until the last calendar quarter of 2013. The trust fund is available to satisfy legitimate individual and business claims administered by the GCCF, state and local government claims resolved by BP, final judgments and settlements, state and local response costs, and natural resource damages and related costs. Fines and penalties will be paid separately and not from the Trust. Payments from the Trust are made as costs are finally determined or claims are adjudicated, whether by the GCCF, or by a court, or as agreed by BP. The GCCF evaluates all individual and business OPA 90 claims, excluding all government claims. The establishment of this Trust does not represent a cap or floor on BP's liabilities, and BP does not admit to a liability of any amount in the Trust. The Trust agreement provides for the term of the Trust to continue until 30 April 2016, subject to the right of the Individual Trustees to extend or expedite this expiry date under certain circumstances. Any amounts left in the Trust once all legitimate claims have been resolved and paid will revert to BP. See Financial statements – Note 2 on page 158, Note 37 on page 199 and Note 44 on page 218 for further information on the Trust and on contingent liabilities arising from the incident. See Proceedings and investigations relating to the Gulf of Mexico oil spill on pages 130-131 for information on legal proceedings.

Internal investigation and report
BP's investigation found that no single factor caused the Macondo well tragedy; rather, it concluded that decisions made by 'multiple companies and work teams' contributed to the accident which arose from 'a complex and interlinked series of mechanical failures, human judgments, engineering design, operational implementation and team interfaces.'

The report – based on a four-month investigation led by BP's head of Safety and Operations and conducted independently by a team of over 50 technical and other specialists drawn from inside BP and externally – found that:
- The annulus cement barrier – and in particular the cement slurry that was used – at the bottom of the Macondo well failed to contain hydrocarbons within the reservoir, as it was designed to do. The annulus cement probably experienced nitrogen breakout and migration, allowing gas and liquids to enter the wellbore annulus. The investigation team concluded that there were weaknesses in cement design and testing, quality assurance and risk assessment.
- The shoe track barriers at the bottom of the Macondo well failed to contain hydrocarbons as they were designed to do, allowing hydrocarbons to flow up the production casing. The shoe track barriers consisted of two barriers in the shoe track: the cement in the shoe track and the float collar. BP's investigation team identified a number of potential failure modes that could explain how both the shoe track cement and the float collar allowed hydrocarbon ingress into the production casing, but has not determined which of these failure modes occurred.
- The results of the negative pressure test were incorrectly accepted by BP and Transocean, although well integrity had not been established.
- Over a 40-minute period, the Transocean rig crew failed to recognize and act on the influx of hydrocarbons into the well until the hydrocarbons had passed through the BOP and into the riser and were rapidly flowing to the surface.
- Well control response actions failed to regain control of the well. The first well control actions were to close the BOP and diverter, routing the fluids exiting the riser to a mud gas separator rather than to the overboard diverter line. If fluids had been diverted overboard, rather than to the mud gas separator, there may have been more time to respond, and the consequences of the accident may have been reduced.
- Diversion of the hydrocarbons to the mud gas separator resulted in gas venting onto the rig. The design of the mud gas separator system allowed diversion of the riser contents to the mud gas separator vessel although the well was in a high-flow condition. This overwhelmed the mud gas separator system, resulting in gas venting onto the rig. This increased the potential for the gas to reach an ignition source.
- The flow of gas into the engine rooms through the ventilation system created a potential for ignition that the rig's fire and gas system did not prevent.
- Even after the explosion and fire had disabled its crew-operated controls, the rig's BOP on the seabed should have activated automatically to seal the well. But it failed to operate, probably because critical components were not working. Through a review of rig audit findings and maintenance records, the investigation team found indications of potential weaknesses in the testing regime and maintenance management system for the BOP.

The investigation team developed a series of recommendations based on the above findings. These recommendations cover contractor oversight and assurance, risk assessment, well monitoring and well-control practices, integrity testing practices and BOP system maintenance. The report makes the following recommendations, among others:

Procedures and engineering technical practices
- Update and clarify current practices to ensure that a clear and comprehensive set of cementing guidelines and associated Engineering Technical Practices (ETPs) are available as controlled standards.
- Review and update requirements for subsea BOP configuration.
- Update the relevant technical practices to incorporate certain improved design requirements for subsea wellheads.
- Review and update ETPs regarding negative-pressure testing.
- Clarify and strengthen standards for well-control and well-integrity incident reporting and investigation.
- Propose to the American Petroleum Institute the development of a recommended practice for design and testing of foam cement slurries in high-pressure, high-temperature applications.
- Review and assess the consistency, rigour and effectiveness of the current risk management and management of change processes practised by Drilling and Completions (D&C).

Capability and competency
- Reassess and strengthen the current technical authority's role in the areas of cementing and zonal isolation.
- Enhance D&C competency programmes to deepen the capabilities of personnel in key operational and leadership positions and augment existing knowledge and proficiency in managing deepwater drilling and wells.
- Develop an advanced deepwater well-control training programme that supplements current industry and regulatory training and embeds lessons learned from the Gulf of Mexico incident.
- Establish BP's in-house expertise in the areas of subsea BOPs and BOP control systems through the creation of a central expert team, including a defined segment engineering technical authority role to provide independent assurance of the integrity of drilling contractors' BOPs and BOP control systems.
- Request that the International Association of Drilling Contractors review and consider the need to develop a programme for formal subsea engineering certification of personnel who are responsible for the maintenance and modification of deepwater BOPs and control systems.

Audit and verification
- Strengthen BP's rig audit process to improve the closure and verification of audit findings and actions across BP-owned and BP-contracted drilling rigs.

Process safety performance management
- Establish D&C leading and lagging indicators for well integrity, well control and rig safety critical equipment.
- Require drilling contractors to implement an auditable integrity monitoring system to continuously assess and improve the integrity performance of well-control equipment against a set of established leading and lagging indicators.

Cementing services assurance
- Conduct an immediate review of the quality of the services provided by all cementing service providers. Confirm that adequate oversight and controls are in place within the service provider's organization and BP.

Well-control practices
- Assess and confirm that essential well-control and well-monitoring practices, such as well monitoring and shut-in procedures, are clearly defined and rigorously applied on all BP-owned and BP-contracted offshore rigs.

*Rig process safety*
- Require hazard and operability reviews of the surface gas and drilling fluid systems for all BP-owned and BP-contracted drilling rigs.
- Include in the hazard and operability reviews a study of all surface system hydrocarbon vents, reviewing suitability of location and design.

*Blowout preventer design and assurance*
- Establish minimum levels of redundancy and reliability for BP's BOP systems. Require drilling contractors to implement an auditable risk management process to ensure that their BOP systems are operated above these minimum levels.
- Strengthen BP's minimum requirements for drilling contractors' BOP testing, including emergency systems.
- Strengthen BP's minimum requirements for drilling contractors' BOP maintenance management systems.
- Define BP's minimum requirements for drilling contractors' management of changes for subsea BOPs.
- Develop a clear plan for remotely operated vehicle intervention as part of the emergency BOP operations in each of BP's operating regions, including all emergency options for shearing pipe and sealing the wellbore.
- Require drilling contractors to implement a qualification process to verify that shearing performance capability of blind shear rams is compatible with the inherent variations in wall thickness, material strength and toughness of the rig drill pipe inventory.
- Include testing and verification of these BOP recommendations in the rig audit process.

**National Commission report**
BP has co-operated fully with the National Commission on the BP Deepwater Horizon Oil Spill and Offshore Drilling (National Commission), which released the full report of its investigation on 11 January 2011. The National Commission acknowledged the complexities and risks inherent to deepwater energy exploration and production; it also concluded that neither industry nor government was fully prepared to assess or manage those risks. The National Commission identified certain missteps and oversights by individuals at BP, Transocean and Halliburton that led to the blowout and concluded that its root cause involved systemic management failures in the industry. These management issues, the National Commission found, extended beyond BP to contractors that serve the entire industry. This included BP's failure to adequately address risks created by late changes to well design and procedures, inadequate testing of the Macondo cement slurry by BP and Halliburton, inadequate communication between BP, Halliburton and Transocean, inadequate communication between Transocean and its crew, and inadequate decision-making processes at the Macondo well. The National Commission also found regulatory failures to be a contributing factor to the Macondo tragedy, in particular the lack of administrative resources and technical expertise at the Minerals Management Service.

The National Commission's report made a number of recommendations in nine distinct areas for addressing the causes and consequences of the spill, including principally the following: improving the safety of offshore operations by enhancing the government's role and by establishing an industry-run, private-sector oversight entity; safeguarding the environment by increasing support for environmental science and regulatory review related to Outer Continental Shelf oil and gas activities; strengthening spill response planning and capacity; advancing well-containment capabilities by increasing government expertise and requiring enhanced containment plans by operators; dedicating funding by the US Congress to Gulf restoration; ensuring financial responsibility by raising the $75-million liability cap for offshore facility accidents; promoting Congressional awareness of the risks of offshore drilling; and developing expertise and research programmes devoted to exploration and spill containment in the Arctic.

Given the emerging consensus that the Gulf of Mexico accident was the result of multiple causes involving multiple parties, we support the National Commission's efforts to strengthen industry-wide safety practices. We are committed to working with government officials and other operators and contractors to identify and implement operational and regulatory changes that will enhance safety practices throughout the oil and gas industry. Even prior to the conclusion of the National Commission's investigation, BP instituted changes designed to further strengthen safety and risk management. These changes include the creation of an enhanced Safety and Operational Risk function, reporting directly to group chief executive Bob Dudley, that maintains an independent view of the implementation of internal and external requirements and of safety and operational risks.

On 17 February 2011, the Commission's Chief Counsel published a separate report on his investigation about the causes of the incident. The Chief Counsel's investigation concluded that the blowout resulted from a series of engineering and management mistakes by the companies involved in the incident, including BP, Halliburton and Transocean.

**Consequences of the accident for BP and its shareholders**
Financial consequences
The group income statement for 2010 includes a pre-tax charge of $40.9 billion in relation to the Gulf of Mexico oil spill. This comprises costs incurred up to 31 December 2010, estimated obligations for future costs that can be estimated reliably at this time, and rights and obligations relating to the trust fund, described below.

Costs incurred during the year mainly related to oil spill response activities, which included the drilling of relief wells and other subsea interventions, surface response activities including numerous vessels, and shoreline response involving deployment of boom and beach cleaning activities.

Under US law BP is required to compensate individuals, businesses, government entities and others who have been impacted by the oil spill. Individual and business claims are administered by the GCCF, which is separate from BP. BP has established a trust fund of $20 billion to be funded over the period to the fourth quarter of 2013, which is available to satisfy legitimate individual and business claims administered by the GCCF, state and local government claims resolved by BP, final judgments and settlements, state and local response costs, and natural resource damages and related costs arising as a consequence of the Gulf of Mexico oil spill. In 2010, BP contributed $5 billion to the fund, and further quarterly contributions of $1.25 billion are to be made during the period 2011 to 2013. The income statement charge for 2010 includes $20 billion in relation to the trust fund, adjusted to take account of the time value of money. The establishment of the trust fund does not represent a cap or floor on BP's liabilities and BP does not admit to a liability of this amount.

BP has provided for all liabilities that can be estimated reliably at this time, including fines and penalties under the Clean Water Act (CWA). The total amounts that will ultimately be paid by BP in relation to all obligations relating to the incident are subject to significant uncertainty.

BP considers that it is not possible to estimate reliably any obligation in relation to natural resource damages claims under the OPA 90, litigation and fines and penalties except for those in relation to the CWA. These items are therefore contingent liabilities.

BP holds a 65% interest in the Macondo well, with the remaining 35% held by two joint venture partners. While BP believes and will assert that it has a contractual right to recover the partners' shares of the costs incurred, no recovery amounts have been recognized in the financial statements.

For a full understanding of the impacts and uncertainties relating to the Gulf of Mexico oil spill refer to Financial statements – Note 2 on page 158, Note 37 on page 199 and Note 44 on page 218. See also Risk factors on page 27 and Proceedings and investigations relating to the Gulf of Mexico oil spill on pages 130-131.

### Share price and dividend consequences

As a result of the incident, BP's board reviewed its dividend policy and decided that no ordinary share dividends would be paid in respect of the first, second and third quarters of 2010. Furthermore, the BP share price suffered a significant fall on the London Stock Exchange, from 655 pence per share on the day of the incident to reach a trading low point of 296 pence per share on 25 June 2010. Although there has since been some recovery in the share price, at 493 pence per share on 18 February 2011, it remained considerably below its level immediately before the incident. (*See Share prices and listings on page 134 for further information on the performance of BP's share price.*)

### Other consequences

BP's reputation has been damaged by the incident. For further information, see Risk factors on pages 27-32.

### BP's long-term commitment to the Gulf of Mexico region

The Gulf of Mexico incident has had a profound impact on the people and economy of the Gulf coast as well as the offshore energy industry and BP.

From the beginning, BP has worked tirelessly to address the economic and environmental impact of the spill and has a dedicated team working closely with local and state officials to ensure that government claims are paid in a fair and expeditious manner.

BP has also provided funding to promote tourism and seafood safety – two cornerstones of the Gulf coast economy – and has worked closely with state and local leaders to restore the economic health of the region.

We recognize that environmental and economic restoration means more than just cleaning up the oil and paying for losses experienced across the Gulf coast. We intend to ensure that the long-term impacts of the oil spill are understood and remediated.

Business review

# Exploration and Production

### Organizational and governance changes in Exploration and Production

As part of our response to the Gulf of Mexico oil spill, at the beginning of the fourth quarter we decided to reorganize our Exploration and Production segment to create three separate divisions: Exploration, Developments, and Production, integrated through a Strategy and Integration organization. This is designed to change fundamentally the way we operate, with a particular focus on managing risk, delivering common standards and processes and building personnel and technological capability for the future.

The Exploration division is accountable for renewing our resource base through access, exploration and appraisal. The Developments division is accountable for the safe and compliant execution of wells (drilling and completions) and major projects, building on the centralized developments organization established in 2010. The Production division is accountable for safe and compliant operations, including upstream production assets, midstream transportation and processing activities, and the development of our resource base. Divisional activities are integrated on a regional basis by a regional president reporting to the Production division.

The group Safety and Operational Risk (S&OR) function is being enhanced to further our objectives in safety, compliance and risk management and demonstrates our commitment to preventing future low-probability, high-impact incidents. It has its own expert staff embedded in the divisions and is responsible for ensuring that all operations are carried out to common standards and for auditing compliance with those standards.

The Strategy and Integration organization is accountable for optimization and integration across the divisions, including delivery of support from finance, procurement and supply chain, human resources and information technology.

Our Exploration and Production segment included upstream and midstream activities in 29 countries in 2010, including Angola, Azerbaijan, Canada, Egypt, Norway, Russia, Trinidad & Tobago (Trinidad), the UK, the US and other locations within Asia, Australasia, South America and Africa, as well as gas marketing and trading activities, primarily in Canada, Europe and the US. Upstream activities involve oil and natural gas exploration and field development and production. Our exploration programme is currently focused on Egypt, the deepwater Gulf of Mexico, Libya, the North Sea, Oman and onshore US. Major development areas include Angola, Azerbaijan, Canada, Egypt, the deepwater Gulf of Mexico, the UK North Sea and Russia. During 2010, production came from 20 countries. The principal areas of production are Angola, Azerbaijan, Egypt, Russia, Trinidad, the UK and the US.

Midstream activities involve the ownership and management of crude oil and natural gas pipelines, processing facilities and export terminals, LNG processing facilities and transportation, and our NGL extraction businesses in the US, the UK, Canada and Indonesia. Our most significant midstream pipeline interests are the Trans-Alaska Pipeline System in the US, the Forties Pipeline System and the Central Area Transmission System pipeline, both in the UK sector of the North Sea; the South Caucasus Pipeline (SCP), which takes gas from Azerbaijan through Georgia to the Turkish border; and the Baku-Tbilisi-Ceyhan pipeline, running through Azerbaijan, Georgia and Turkey. Major LNG activities are located in Trinidad, Indonesia and Australia. BP is also investing in the LNG business in Angola.

Additionally, our activities include the marketing and trading of natural gas, power and natural gas liquids. These activities provide routes into liquid markets for BP's gas and power, and generate margins and fees associated with the provision of physical and financial products to third parties and additional income from asset optimization and trading.

Our oil and natural gas production assets are located onshore and offshore and include wells, gathering centres, in-field flow lines, processing facilities, storage facilities, offshore platforms, export systems (e.g. transit lines), pipelines and LNG plant facilities.

Upstream operations in Argentina, Bolivia, Chile, Abu Dhabi, Venezuela and Russia, as well as some of our operations in Angola, Canada and Indonesia, are conducted through equity-accounted entities.

### Our market

Energy markets recovered in 2010 from the impact of the global economic recession, with crude oil prices in particular bouncing back following a decline in 2009 – the first since 2001.

Dated Brent for the year averaged $79.50 per barrel, 29% above 2009's average of $61.67 per barrel. Prices fluctuated in a relatively narrow band of $70-$80 per barrel for most of the year before rising in the fourth quarter. Prices exceeded $90 per barrel in December, the highest level since October 2008.

In 2011, we expect oil price movements to continue to be driven by the pace of global economic growth and its resulting implications for oil consumption, and by OPEC production decisions.

Natural gas prices strengthened in 2010, but were volatile. The average US Henry Hub First of Month Index rose to $4.39/mmBtu, a 10% increase from the depressed prices in 2009.

Gas consumption recovered across the world along with the economy. In the US, a cold start to 2010 followed by a hot summer and low temperatures towards the end of the year also contributed to demand strength. Yet domestic production growth – of shale gas in particular – continued apace and limited price rises. Henry Hub gas prices stayed below coal parity in US power generation from the summer, leading to the displacement of coal by gas. The differentials of production area prices to Henry Hub prices continued to narrow as pipeline bottlenecks were reduced.

In Europe, spot gas prices at the UK National Balancing Point increased by 38% to an average of 42.45 pence per therm for 2010. Yet plentiful global LNG supply kept spot gas prices below oil-indexed contract levels for most of the year, causing competition with contract pipeline supplies and marginal European gas production. UK spot gas prices only attained contract price levels from the end of November as cold weather caused rapid inventory draw-downs.

In 2011, we expect gas markets to continue to be driven by the economy, weather, domestic production trends and continued significant growth of global LNG supply.

### Our strategy

In Exploration and Production, our priority is to ensure safe, reliable and compliant operations worldwide. Our strategy is to invest to grow long-term value by continuing to build a portfolio of enduring positions in the world's key hydrocarbon basins with a focus on deepwater, gas (including unconventional gas) and giant fields. Our strategy is enabled by:
- Continuously reducing operating risk.
- Strong relationships built on mutual advantage, deep knowledge of the basins in which we operate, and technology.
- Building capability along the value chain in Exploration, Developments and Production.

We are increasing investment in Exploration, a key source of value creation at the front end of the value chain, and we are evolving the nature of our relationships, particularly with National Oil Companies. We will also continue to actively manage our portfolio, with a focus on value growth.