## UNITED STATES DISTRICT COURT
## EASTERN DISTRICT OF LOUISIANA

| | | |
|---|---|---|
| In re: Oil Spill by the Oil Rig "*Deepwater Horizon*" in the Gulf of Mexico, on April 20, 2010 | : : : : | MDL No. 2179 SECTION: J |
| This Document Relates To: All Cases and No. 2:10-cv-2771 (*In re The Complaint And Petition Of Triton Asset Leasing GmbH, et al.*) | : : : : | JUDGE BARBIER MAGISTRATE JUDGE SHUSHAN |
| ………………………………………….... | : | |

## BP PARTIES' COUNTER-COMPLAINT, CROSS-COMPLAINT AND THIRD PARTY COMPLAINT AGAINST TRANSOCEAN AND CLAIM IN LIMITATION

Counter-, cross-, and/or Third-Party Plaintiffs BP Exploration & Production Inc. ("BPXP") and BP America Production Company ("BPAP") (collectively, the "BP Parties") bring this action under Federal Rules of Civil Procedure 13 and 14 against Transocean Ltd., Transocean, Inc., Transocean Offshore Deepwater Drilling Inc., Transocean Deepwater Inc., Transocean Holdings LLC, and Triton Asset Leasing GmbH (collectively, "Transocean"). The BP Parties further submit this Claim in Limitation pursuant to Federal Rule of Civil Procedure Supplemental Rule F(5) in response to the Complaint for Exoneration from or Limitation of Liability filed by Petitioners Triton Asset Leasing GmbH, Transocean Holdings LLC, Transocean Offshore Deepwater Drilling, Inc., and Transocean Deepwater, Inc. in Case No. 2:10-cv-2771.

### INTRODUCTION

1.      Transocean owned and operated the *Deepwater Horizon*, a mobile offshore drilling unit or rig. On April 20, 2010, the *Deepwater Horizon* was in the process of completing an exploratory drilling well in the Gulf of Mexico when it exploded and caught fire. Lives were lost and people were injured. Two days later, on April 22, 2010, the vessel sank and from that

Tab 10

point forward, until July 15, 2010, oil flowed out of the well and into the Gulf of Mexico.  The BP Parties bring this action to hold Transocean accountable for having caused the blowout, explosion, fire, deaths and personal injuries, and subsequent oil spill.  But for Transocean's improper conduct, errors, omissions, and violations of maritime law, there would not have been any blowout of the exploratory well in Mississippi Canyon, Block 252 ("MC252," commonly referred to as the Macondo prospect).  Nor, but for Transocean's misconduct, would there have been any explosion and fire on the *Deepwater Horizon*, or any deaths and personal injuries, or an oil spill in the Gulf of Mexico.  ***The simple fact is that on April 20, 2010, every single safety system and device and well control procedure on the Deepwater Horizon failed, resulting in the casualty.***  Accordingly, the BP Parties seek at least $40 billion in damages and contribution from Transocean for the costs, expenses, injuries and damages that BP has incurred, continues to incur, and will incur as a result of the *Deepwater Horizon* incident and oil spill caused by Transocean's multiple failures.

2.       Transocean Offshore Deepwater Drilling Inc., Transocean Deepwater Inc., Transocean Holdings LLC, and Triton Asset Leasing GmbH (the "Transocean *Deepwater Horizon* Companies") have alleged that they are the *Deepwater Horizon's* owners, managing owners, owners *pro hac vice*, and/or operators.  Each of these Transocean entities therefore is directly liable for the improper conduct, errors, omissions, and violations of maritime law related to the *Deepwater Horizon*.  Transocean's top level corporate entities, Transocean Ltd. and Transocean Inc., dominate, control, or are otherwise the alter egos of the Transocean *Deepwater Horizon* Companies.  Transocean Ltd. and Transocean Inc. are also directly responsible for the policies and practices that led to the MC252 well blowout.

2

3.     The BP Parties bring this Complaint and Claim in Limitation pursuant to this Court's Case Management Order No. 1 ("CMO 1").   The BP Parties acknowledge that BPAP and Transocean Holdings LLC are parties to a Drilling Contract with an arbitration provision. That arbitration provision does not apply here because, among other reasons, Transocean and Transocean Holdings LLC through their conduct in these proceedings have waived any rights to arbitrate any aspects of the disputes between the BP Parties and Transocean relating to the *Deepwater Horizon* incident and resulting oil spill.

4.     By filing this Complaint and Claim in Limitation, the BP Parties do not waive, but instead expressly reserve, every objection or argument that the BP Parties' claims are not subject to Limitation of Liability pursuant to 46 U.S.C. § 30501, *et seq.*, and/or Rule F of the Supplemental Rules for Admiralty or Maritime Claims of the Federal Rules of Civil Procedure.

## THE PARTIES

5.     BPXP is a Delaware corporation with its principal place of business at 501 Westlake Park Boulevard, Houston, Texas, 77079.

6.     BPAP is a Delaware corporation with its principal place of business at 4101 Winfield Road, Warrenville, Illinois, 60555.

7.     Transocean Offshore Deepwater Drilling Inc. is a Delaware corporation with its principal place of business at 4 Greenway Plaza, Houston, Texas, 77046-0400.

8.     Transocean Deepwater Inc. is a Delaware corporation with its principal place of business at 4 Greenway Plaza, Suite 700, Houston, Texas, 77046-0400.

9.     Transocean Holdings LLC is a Delaware limited liability company with its principal place of business at 4 Greenway Plaza, Suite 700, Houston, Texas, 77046-0400.

10.     Triton Asset Leasing GmbH is a Swiss Confederation limited liability company with its principal place of business at Turmstrasse 30, CH-6300 Zug, Switzerland.

3

11.     Transocean Inc. is a Cayman Islands corporation with principal places of business at 4 Greenway Plaza, Houston, Texas, 77046, and 70 Harbour Drive, Grand Cayman, Cayman Islands, KY1-1003.  Transocean Inc. is the direct or indirect parent of the Transocean *Deepwater Horizon* Companies.

12.     Transocean Ltd. is a Swiss Confederation corporation with its principal place of business at Turmstrasse 30, CH-6300 Zug, Switzerland.  Transocean Ltd. owns 100% of defendant Transocean Inc., and is the ultimate parent and controlling entity of the Transocean *Deepwater Horizon* Companies.

### JURISDICTION

13.     This action arises out of and in connection with drilling operations by the *Deepwater Horizon*, a vessel.  This Court has jurisdiction pursuant to 28 U.S.C. § 1333.  The claims presented in this Counter-Complaint, Cross-Complaint and Third-Party Complaint are admiralty or maritime claims within the meaning of Rule 9(h) of the Federal Rules of Civil Procedure, and the BP Parties designate this case as an admiralty or maritime case as provided in that Rule.

14.     In addition, the Transocean *Deepwater Horizon* Companies have filed a Rule 14(c) Third-Party Complaint against the BP Parties, among other defendants, tendering the third-party defendants to the plaintiffs/claimants.  This Court has jurisdiction over the Transocean *Deepwater Horizon* Companies' Rule 14(c) Third-Party Complaint pursuant to Rule 9(h) of the Federal Rules of Civil Procedure and 28 U.S.C. § 1333.  The BP Parties also are named as defendants in admiralty, maritime and other complaints pending before this Court.

15.     Venue is proper pursuant to 28 U.S.C. § 1391(b)-(c).

### RULE 14(C) TENDER OF TRANSOCEAN LTD. AND TRANSOCEAN INC.

16.     The Transocean *Deepwater Horizon* Companies have filed a Complaint and Petition for Exoneration from or Limitation of Liability, Civil Action No. 10-2771 ("Limitation Action").   Plaintiffs/Claimants have filed claims against the Transocean *Deepwater Horizon* Companies in the Limitation Action.  On February 18, 2011, the Transocean *Deepwater Horizon* Companies filed a Rule 14(c) Third-Party Complaint against the BP Parties, among others, to implead them into the Limitation Action and tender them to the Plaintiffs/Claimants.

17.     Pursuant to Rule 14(c), and as part of their Third-Party Complaint, the BP Parties implead Transocean Ltd. and Transocean Inc. and hereby tender them to the Plaintiffs/Claimants in the Limitation Action.   Accordingly, Transocean Ltd. and Transocean Inc. must defend against the Plaintiffs/Claimants' claims, and the action proceeds as if the Plaintiffs/Claimants had sued Transocean Ltd. and Transocean Inc. Fed. R. Civ. P. 14(c)(2).  The BP Parties demand judgment in the Plaintiffs/Claimants' favor against Transocean Ltd. and Transocean Inc. pursuant to Rule 14(c)(2) for the reasons alleged by Plaintiffs/Claimants against the Transocean entities in the pleading bundles and complaints filed in MDL No. 2179 and the Limitation Action.  Such reasons include, but are not limited to, that Transocean Ltd. and Transocean Inc. (as well as Transocean as a whole) were negligent in:

- Failing to properly operate the *Deepwater Horizon*;

- Operating the *Deepwater Horizon* in such a manner that explosions and a fire occurred onboard, causing it to sink and resulting in the oil spill in the Gulf of Mexico;

- Failing to properly inspect the *Deepwater Horizon* to assure that its equipment and personnel were fit for their intended purposes;

- Failing to properly assess the risk of failure of key safety and emergency equipment;

- Acting in a careless and negligent manner without due regard for the safety of others;

- Failing to implement and enforce rules and regulations pertaining to the safe operations of the *Deepwater Horizon* which, if they had been so implemented and enforced, would have averted the blowout, explosions, fire, personal injuries, deaths, sinking, and spill;

- Operating the *Deepwater Horizon* with untrained or insufficiently trained personnel;

- Negligently hiring, retaining and/or training personnel;

- Failing to take appropriate action to avoid or mitigate the incident;

- Negligently implementing or failing to implement policies and procedures to safely conduct offshore operations in the Gulf of Mexico;

- Failing to warn in a timely manner;

- Failing to timely bring the well and oil release under control;

- Failing to provide appropriate accident prevention equipment;

- Failing to observe and read gauges that would have indicated excessive pressures in the well;

- Failing to properly and timely control the well;

- Failing to properly and timely activate emergency and safety equipment; and

- Failing to react to danger signs.

18.     The BP Parties also bring their own claims directly against Transocean Ltd. and Transocean Inc., as well as the Transocean *Deepwater Horizon* Companies, as described in this Complaint.

## FACTS COMMON TO ALL CLAIMS

19.     BPXP obtained a lease for Mississippi Canyon, Block 252, commonly known as the Macondo prospect.  BP, like other oil companies, contracts with and relies upon third parties experienced and expert in the drilling and provision of other services and products for the exploration, drilling, and development of deepwater wells.  Pursuant to a Drilling Contract between BPAP and Transocean Holdings LLC, Transocean was hired to drill the MC252 well using the *Deepwater Horizon* mobile offshore drilling unit ("MODU").  Triton Asset Leasing

GmbH, Transocean Holdings LLC, Transocean Offshore Deepwater Drilling Inc., and Transocean Deepwater Inc. admit that they are the owners, managing owners, owners *pro hac vice*, and/or operators of the *Deepwater Horizon*.

> ### A.   Transocean's Duties And Obligations.

20.   Transocean had numerous express obligations under the Drilling Contract, including:

- Transocean "shall be solely responsible for the operation of the Drilling Unit" and "shall act at all times as an independent contractor."

- Transocean "shall exercise due diligence to prevent the well from blowing out." Transocean's manuals specify that "Detection of a kick (intrusion of liquid or gas into the wellbore) is the responsibility of the Driller," a Transocean employee, and that "It is the responsibility of the Driller (or person performing the Driller's role) to shut-in the well as quickly as possible if a kick is indicated or suspected."

- Transocean was responsible for "maintain[ing] the Drilling Unit at optimal operating condition, in accordance with good oilfield practices through the duration of the Contract," and "agree[d] to ensure that the Drilling Unit and all equipment and materials furnished by [Transocean] are adequately maintained and in such condition as to permit their continuous and efficient operation."

- Transocean "shall have the primary responsibility for the safety of all its operations, shall take all measures necessary or proper to protect the personnel and facilities and, in addition, shall observe all safety rules and regulations of any governmental agency having jurisdiction over operations conducted hereunder."

- Transocean "represents that all of [Transocean's] personnel shall be fully qualified, trained, competent, able bodied and fit for their respective assignments and shall have complied with all necessary laws and regulations in connection therewith."

- Transocean "represents that during the Contract Period, the Drilling Unit is outfitted, conformed, and equipped to meet all applicable laws, rules, requirements, and regulations promulgated by the U.S. Coast Guard, the U.S. Environmental Protection Agency, the United States of America Department of the Interior as well as any other agency, bureau, or department of the U.S. federal, territorial possession, state, municipal, or local governments, any political subdivisions thereof, having jurisdiction over the operations in U.S. federal waters."

21.   The provisions of the Drilling Contract should have reflected the operational realities onboard the *Deepwater Horizon* and Transocean's duties under the law. For example,

7

as a vessel owner, Transocean had non-delegable legal duties with respect to seaworthiness and providing a properly trained crew and Captain.

22.     Transocean also was required by law and contract to comply with certain international conventions and codes.  The Marshall Islands, the flag state of the *Deepwater Horizon*, is a signatory to the International Convention for the Safety of Life at Sea, 1974 ("SOLAS"), and its flagged vessels must comply with SOLAS's safety regulations.  Exhibit B-1 of the Drilling Contract, which contains the specifications for the drilling unit, specifies that SOLAS is an applicable rule and regulation for the rig.  SOLAS in turn incorporates the International Safety Management Code ("ISM") (2002), which sets forth requirements for safely operating ships and preventing pollution.

**B.     Transocean's Equipment And Maintenance Practices.**

23.     The *Deepwater Horizon* carried various appurtenances to drill subsea wells and to protect the vessel during drilling.  These included a blowout preventer ("BOP"), a specialized assembly of valves, annular preventers, and ram preventers, that sits atop the well on the sea floor and is used to monitor, seal, and control the well during drilling operations.  The *Deepwater Horizon's* BOP also was equipped with an Emergency Disconnect System ("EDS"), which was supposed to activate the BOP's blind shear rams and separate the rig from the riser that connected it with the BOP, allowing the rig to seal the well and disconnect from it.  The BOP also had an automatic mode or "deadman" function that should have closed the BOP's blind shear rams, shearing the drill pipe and sealing the open hole, if hydraulic and electrical power and communication with the rig were lost.  This deadman function depended on two identical, independent control pods (yellow and blue) having sufficient battery charge and hydraulic fluid to activate the blind shear rams if the BOP lost connection with the rig.

8

24.     Other rig protection equipment included an alarm system that was supposed to activate when gas was detected on the rig; the emergency shutdown system ("ESD") designed to cut off ventilation and electricity in areas where gas was detected; rig savers that should have prevented gas flow to the engine control room and shut down the rig's engines if combustible gas was detected; and overspeed controls designed to shut down the engines when their rotational speed significantly increased, preventing sparking that could ignite gas.

25.     All of the *Deepwater Horizon's* safety equipment depended on frequent, competent, and quality maintenance for its operation.   The BOP in particular, because it contained a number of complex and redundant hydraulic and electrical systems, required extensive and diligent maintenance by Transocean and its contractors.

26.     Audits and inspections of the *Deepwater Horizon*, and the investigations to date, have discovered a number of problems with Transocean's maintenance programs for the *Deepwater Horizon* and its equipment.   These audits and inspections as well as Transocean's maintenance problems provided Transocean with actual knowledge of the problems related to the *Deepwater Horizon's* equipment and maintenance.

27.     These problems included Transocean's failure to perform necessary and appropriate BOP inspections.[1]   Transocean's own deficient inspection and maintenance practices, of which Transocean had actual knowledge, caused the *Deepwater Horizon*'s BOP to have numerous leaks that impaired its functions.   Transocean also made various unauthorized (and, in many cases, undocumented) modifications to the BOP, or failed to properly perform

---

[1] The BP Parties understand that Cameron International Corporation ("Cameron") conducted certain maintenance on or modifications to the BOP at Transocean's request.   Thus, all allegations in this Complaint concerning maintenance of or modifications to the BOP are made either directly or vicariously against Transocean, which was responsible for the BOP.

approved modifications. In addition to the BOP, various other critical systems on the *Deepwater Horizon* also experienced problems because of Transocean's maintenance practices.

### C.    Transocean's Captain And Crew.

28.     Transocean's training and organization of the *Deepwater Horizon's* captain and crew was plainly inadequate. Under maritime law, SOLAS, and the ISM, a vessel's captain (also known as the master) should have ultimate decision-making authority and responsibility over the vessel at all times. Yet, for the *Deepwater Horizon* (and apparently other rigs as well), Transocean divided authority between the captain and the offshore installation manager ("OIM") as a matter of corporate policy. Transocean policies designated the OIM as the person-in-charge when the vessel was in drilling mode, sowing confusion as to who was the ultimate commander of the vessel.

29.     Concerns about Transocean's drilling rig crew are not limited to the Captain. Prior to April 20, 2010, Transocean's management has acknowledged that it was diluting its crews, leading to close calls that put rigs and their crews in danger. Indeed, just a few months before the *Deepwater Horizon* incident, a Transocean rig drilling the Shell 711 well in the North Sea suffered a blowout whose pattern and loss of well control was strikingly similar to what would occur a short time later to the *Deepwater Horizon*.

30.     Audits of the *Deepwater Horizon* confirmed that it experienced high crew turnover. Interviews by an outside consultant reviewed by Transocean management revealed that many supervisors were concerned over the crew's ability to identify hazards and understand the relevant risks. This concern increased after March 8, 2010, when the MC252 well experienced a kick that went unidentified by the Transocean drilling crew for approximately 33 minutes.

     **D.**    **Transocean's Errors And The *Deepwater Horizon's* Unseaworthiness Caused The April 20 Blowout, Explosion And Fire, As Well As The Tragic Deaths, Personal Injuries, And Resulting Oil Spill.**

     31.    On April 20, 2010, Transocean's *Deepwater Horizon* was executing a temporary abandonment procedure on the MC252 well, which involved capping the well so that offshore oil and gas production could begin at a later date. As part of this process, the crew installed casing — a large diameter pipe — that reached to the bottom of the wellbore. A contractor (Halliburton Energy Services, Inc.) then cemented the casing to the wellbore. In addition to casing and cementing, Transocean and other contractors removed from the wellbore dense drilling fluid or "mud" used to contain hydrocarbons such as oil and gas during drilling procedures. When the kick began on April 20, Transocean's drillers and other crew members were in the process of removing this drilling fluid and displacing it with seawater.

     **1.**    **Transocean Failed To Identify And React To Warning Signs That The Well Was Flowing.**

     32.    On April 20, 2010, from approximately 20:00 until the incident began, Transocean's drilling crew was displacing drilling fluid with seawater. Although the explosion on the *Deepwater Horizon* occurred at approximately 21:49, clear and obvious warnings of a well control incident had begun almost an hour earlier.

     33.    To fulfill his duties in monitoring the well to detect kicks and to shut in the well when necessary, the *Deepwater Horizon* driller typically ran three data screens in the driller cabin. The screens would have displayed, among other things, the drill pipe pressure and the volume of drilling fluids. Transocean's drillers could (and should) be able to identify a kick in a well by monitoring the flow of drilling fluids into and out of the well, and the pressure on the drill pipe.

34.    At approximately 20:52 hydrocarbons began flowing into the wellbore.  The first indications of a kick occurred between 20:58 and 20:59, when the flow out of the well nearly doubled while the flow into the well decreased—a standard indication of a kick.  A few minutes later, at 21:01, the drill pipe pressure increased from 1250 psi to 1350 psi while the pump rate remained constant.  This occurred while mud was being removed from the wellbore and replaced with lighter seawater, which should have resulted in a *decrease* in pressure, not the increase that went undetected.  Over the next half hour, high drill pipe pressure and flow out of the well continued to indicate a kick.  Notwithstanding these clear kick indications, Transocean did nothing.

35.    Gas did not pass from the well into the riser until approximately 21:38 — 46 minutes after the well began flowing and long after indications of flow should have been apparent to Transocean.  If Transocean had closed the BOP around the drill pipe at any time before 21:38 — and if Transocean's poorly maintained BOP had shut in the well — the flow of hydrocarbons into the riser would have been eliminated.

36.    But without any well control action taken by Transocean, by 21:38 hydrocarbons had headed up the riser and onto the rig.  At 21:40, the expanding gas pushed out drilling fluid and spewed mud onto the rig floor.  One minute later, mud shot through the *Deepwater Horizon's* derrick.

37.    At 21:41, Transocean took its first well control action, apparently attempting to close the lower annular preventer.  This was *over forty minutes after* the initial indications that the well was flowing.  Transocean's failure to identify the kick during this period resulted from its inadequate policies and training, and led directly to gas reaching and then flowing onto the rig.

12

2.      **Transocean Failed To Properly Monitor The Well To Detect Whether It Was Flowing.**

38.      Transocean's failure to monitor the "mud pits" also is likely to have contributed to its failure to recognize that a kick was in progress (though the changes in drill pipe pressure and flow in versus flow out each gave clear, sufficient indications of a kick).  The amount of return and loss of drilling fluids is a key indicator of well integrity.  Upon being displaced from the well, these fluids are discharged into mud pits.  Comparing changes in pit volumes to seawater volume pumped into the well is one way to determine whether the well was experiencing a kick during displacement.  Any discrepancy in the two volumes could indicate that the well was flowing.

39.      Transocean failed to monitor the return and loss of drilling fluids from the well. Instead, it transferred mud to another vessel without measuring its volume and discharged drilling fluids directly overboard.  These procedures prevented Transocean and other contractors upon whom the BP Parties relied to accurately measure the volume of pit gains and thus removed another data set, in addition to drill pipe pressure and flow in versus flow out, that would have shown that a kick was in progress.

3.      **Transocean's Belated Well Control Actions Dispersed Gas Onto The Rig, Causing The Explosions.**

40.      Even with gas coming up through the riser, the blowout still could have been controlled by a properly trained crew.  But Transocean's manuals do not address or explain to its crews how to handle a continuous and uncontrolled flow of gas from a well.  As a consequence, and due to a lack of training, Transocean's crew used the wrong equipment at the wrong times to attempt to control the blowout.

41.      The *Deepwater Horizon* was equipped with a diverter system that provided two alternate paths for gas or gas-bearing mud reaching the rig from the well.  The first path was

through the mud-gas separator ("MGS"), which is designed to remove gas from relatively small quantities of mud.  The second diverter path sends flow directly overboard through two 14-inch pipes, one starboard and one portside.

42.     The obvious question is which path—the MGS or overboard diverters—should be used when mud and hydrocarbons are proceeding up the riser to the rig.  Transocean's shut-in protocols do not fully address or explain how to respond to high flow emergency situations, and, in fact, provide contradictory instructions.  On the night of April 20, 2010, the drilling crew chose to use the MGS, which was almost immediately overwhelmed, causing gas to spray onto the center of the rig rather than over the side of the vessel through the diverters.

43.     Transocean's protocols also do not fully address or explain how to respond to a loss of well control.  There are no instructions on how to handle continuous well flow, such as by closing the BOP's blind shear rams.  Nor is there any mention of whether or when to activate the EDS in response to a well control emergency.

44.     On April 20, 2010, Transocean's attempts to activate the BOP came far too late to successfully shut in the well.  Transocean's crew did not attempt to activate the BOP until 21:41, when they triggered the BOP's annular preventer.  The lower annular apparently failed to seal until approximately five minutes later, at 21:47.  During this time, highly combustible gas continued to spew onto the rig.[2]

      **4.**     **The *Deepwater Horizon's* ESD, Rig Savers, And Overspeed Controls Failed.**

45.     Because of Transocean's decision to use the MGS rather than the overboard diverter, gas quickly covered the rig.  Although the *Deepwater Horizon* had multiple safety

---

[2] In addition to activating the annular preventer, Transocean's drilling crew may have belatedly attempted to activate one or more of the variable bore rams at approximately 21:46.  While it is possible that these rams may have temporarily sealed the well, they did not shut it in.

devices designed to prevent that gas from igniting, these devices—some of which had malfunctioned before and all of which were subjected to Transocean's poor maintenance practices—failed when they were needed most.    Transocean had actual knowledge of the inadequate maintenance on these safety devices from audits and inspections.

46.     The first such device was the rig's emergency shutdown system ("ESD"), which should cut off ventilation and electricity in areas where gas is detected.  But on April 20, 2010, Transocean's ESD safety systems failed to prevent gas from reaching the rig's engine spaces.

47.     The next safety device was the rig savers, which should have prevented gas flow to the engine spaces and tripped or shut down the engines if combustible gas was detected.  The rig savers failed to function on April 20, 2010 when gas from the well entered the engine spaces.

48.     The *Deepwater Horizon*'s engines themselves had yet another safety device that failed.  Engines 3 and 6, which were on-line at the time of the incident, were equipped with two independent sets of overspeed controls designed to shut down the engines when their rotational speed significantly increased.  These devices should have prevented the engines from igniting any gas reaching the rig.  But on April 20, 2010, the overspeed controls failed when gas from the blowout reached the engines, causing them to overspeed significantly and trigger the explosions on the vessel.

        5.      **The Rig's Power Generators Failed To Operate After The Explosion,
                Rendering The Vessel And Its Crew Helpless.**

49.     Engines supplied all of the electrical power to the *Deepwater Horizon*, including to the rig's six primary generators.  These primary generators shut down after the first explosion, when engine 3 likely blew up.  Yet none of the other primary generators started up, leaving the vessel dead in the water and without power.  Three Transocean crew members attempted to start the vessel's backup generator, which was necessary to power the rig's emergency and

firefighting equipment, but that generator also would not start.   This rendered the rig's firefighting systems inoperable, as the lack of power disabled the electric pump that drives the watering system.   Although the three crew members who attempted to start the vessel's backup generator did their best, they had not been trained by Transocean in how to start the vessel's backup generator.

> **6.      Transocean's Divided Command Structure, Combined With The Failures Of Its Captain, Compounded The Effects Of The Casualty.**

50.      Transocean's split command led to confusion during the well control incident. Who was in charge of the vessel was unclear.   When disaster struck on the evening of April 20, 2010, neither the *Deepwater Horizon's* Captain nor its OIM gave clear orders to crew members and passengers.   Instead, following the explosions, the crew scattered throughout the rig. Transocean's Captain — who by law should have been in control of the vessel — never took the measures necessary to secure the vessel or the well.   The Captain's actions (and, more importantly, his inactions) demonstrate that he underestimated the severity of the incident, even after the emergency was obvious to everyone else.

> **7.      Transocean And Its Captain Erred In Delaying To Activate The Blowout Preventer and EDS.**

51.      Transocean's Captain inexplicably delayed when it came to the vessel's ultimate safety device: the EDS.   Transocean personnel on the bridge — particularly the Captain — could and should have taken decisive action to save the vessel and shut in the well by immediately activating the EDS.   Instead, the Captain delayed ordering that the EDS be triggered until several minutes after the explosion, when it was too late.   Even then, the Captain did not order activation of the EDS until he had first conferred with the OIM.   In the meantime, in the midst of the emergency and before the OIM arrived on the bridge following the explosions, the Captain expressly forbade the crew from activating the EDS.   Transocean's inadequate training of the

16

Captain and failure to identify when the EDS should be operated in well control situations caused these errors.

### 8.   Transocean's EDS And Blowout Preventer Malfunctioned, Failing To Shut In The Well.

52.     When Transocean finally activated the EDS and BOP, these safety devices failed. Given the loss of control over the BOP, its deadman functionality should have automatically activated, closing the blind shear rams, shearing the drill pipe, and sealing the open hole.  But despite the rig losing control of the BOP, the deadman failed to operate.

53.     Investigation after the casualty revealed that, of the two independent control pods on the BOP, a valve in one did not function when tested and the battery in the other was insufficiently charged to activate the deadman.  A number of different leaks in the BOP pods also were identified, which may also have compromised their ability to generate sufficient hydraulic power to activate the BOP.

### 9.   Transocean's Uncoordinated Fire-Fighting Attempts Allowed The Rig To Burn For Over 36 Hours And Then Sink Into The Gulf of Mexico.

54.     After the *Deepwater Horizon* was set ablaze on April 20, 2010, Transocean not only failed to undertake its own fire-fighting efforts onboard the vessel, but also abdicated its responsibility to coordinate efforts of the response vessels that arrived on the scene shortly after the explosions.  As a result, the *Deepwater Horizon* burned for over thirty-six hours before sinking into the Gulf of Mexico.

### E.   The Claims, Lawsuits, And Expenses Asserted Against BP As Result Of The *Deepwater Horizon* Incident.

55.     Because of Transocean's misconduct and multiple errors, both before, on and after April 20, 2010, oil and gas flowed from the MC252 well into the Gulf of Mexico until July 15, 2010, when BP sealed the well.  The scale of BP's response program was massive and

unprecedented.  Under the dictates of and as required by the Oil Pollution Act of 1990, 33 U.S.C. § 2701, *et seq*. ("OPA"), BP has committed to paying all legitimate claims for damages pursuant to the requirements and terms of OPA, while reserving its right to seek reimbursement, contribution, and indemnification from Transocean and other responsible parties.  Because of Transocean's conduct, BP faces hundreds of lawsuits and thousands of claims arising out of the *Deepwater Horizon* incident.

56.     The total amounts that will ultimately be paid by BP under OPA or otherwise in relation to the incident are subject to significant uncertainty.  The ultimate exposure and cost to BP will depend on many factors, including the amount of claims that become payable by BP, the amount of fines ultimately levied against BP (including any determination of negligence by BP), the outcome of lawsuits and claims, and any costs arising from any longer-term environmental consequences of the oil spill.

57.     As of the end of 2010, BP's incurred costs relating to the incident were $17.7 billion.  BP's group income statement for 2010 reflects a pre-tax charge of $40.9 billion in relation to the Gulf of Mexico oil spill.

**F.      Transocean's Domination And Control Of Its Corporate Subsidiaries.**

58.     Transocean Ltd. is the holding company of an international group of companies involved in offshore contract drilling services for oil and gas wells, oil and gas drilling management services, drilling engineering services and drilling project management services, and oil and gas exploration and production activities.  Transocean Ltd. conducts its business through a tightly controlled labyrinth of subsidiaries and related entities owned by Transocean Ltd. in whole or in significant part, and through joint ventures with other entities.  Transocean Ltd. has no assets or operations independent from its wholly owned subsidiary Transocean Inc. Transocean Inc. itself holds interests in a variety of Transocean operating companies, and is the

18

direct or indirect parent company of defendants Transocean Offshore Deepwater Drilling Inc. and Triton Asset Leasing GmbH. Transocean Offshore Deepwater Drilling Inc., in turn, is the direct corporate parent of defendants Transocean Deepwater Inc. and Transocean Holdings LLC.

59.     Transocean Ltd., Transocean Inc. and other parent Transocean entities exercised, directly or indirectly, complete control over the various Transocean subsidiaries, including the Transocean *Deepwater Horizon* Companies. Together, the Transocean entities operated as a *de facto* single economic enterprise and the affairs of the junior subsidiaries were conducted for the sole benefit of their direct or indirect corporate owners.

60.     Corporate formalities are on the whole not observed and/or are moot given the senior entities' direct or indirect control over the selection of and leverage over the officers and directors of their subsidiaries.

61.     On information and belief, Transocean subsidiaries were owned and controlled by and for the benefit of their corporate owners in various ways, including but not limited to the following:

- common or overlapping stock ownership;

- de facto control and leverage over the selection of the Transocean subsidiaries' officers and directors, which overlapped with the officers and directors of other Transocean entities;

- common and/or de facto ownership of significant assets such as, for example, the *Deepwater Horizon* (in which four of the defendants claim an interest, for purposes of limiting their liability, as "Owner, Managing Owners, Owners *Pro Hac Vice*, and/or Operators");

- formal or informal agreements under which one Transocean entity pays the wages and salaries of Transocean employees working on or in connection with an asset owned by another entity;

- shared facilities and services pursuant to formal or informal agreements;

- common or consolidated financial and shareholder reporting and income tax and securities filings, which deceive the public about the true financial condition of the various Transocean entities, individually and collectively;

- formal or informal agreements under which significant business decisions could not be made without consultation with and/or approval of the corporate parent, either directly or indirectly;

- formal and informal intracorporate loans;

- intermingled daily operations and treating property of the junior subsidiaries as the property of their owners;

- providing the sole or a significant source of the subsidiaries' financing; and

- company-wide policies relating to the operation and maintenance of drilling rigs and the training and performance of their crews.

62.     On information and belief, junior Transocean subsidiaries had unreasonably small capital relative to the significant risk of their various operations, which prejudiced the entities' creditors, including those injured by the subsidiaries' operations and those to which the subsidiaries owe indemnity and/or contribution obligations.

63.     Transocean entities intentionally represented the independence of their direct or indirect subsidiaries, which had in effect no independent existence.  An adherence to the fiction of separate identity would serve only to defeat justice and equity by permitting the Transocean entities to escape liability arising out of operations conducted for the benefit of the senior entities or the collective economic enterprise.

## THE BP PARTIES' CLAIMS AGAINST TRANSOCEAN

### CLAIM I:  BREACH OF CONTRACT

64.     The BP Parties reallege and incorporate by reference each and every allegation set forth in all preceding paragraphs as if fully restated here.

65.     The Drilling Contract is a valid and enforceable contract.

66.     BPAP has substantially performed its obligations under the Drilling Contract.

67.     The Drilling Contract imposes a series of duties on Transocean Holdings LLC.

The Drilling Contract requires that Transocean Holdings LLC:

- "shall maintain well control equipment in accordance with good oilfield practices at all times and shall use all reasonable means to control and prevent fire and blowouts . . . ." Drilling Contract ¶ 15.2.

- "exercise due diligence to prevent the well from blowing out, and to enable the efficient drilling, logging, and testing of all formations without caving or formation contamination." *Id.* ¶ 15.6.

- "shall take all measures necessary or proper to protect the personnel and facilities." *Id.* ¶ 17.1.

- "shall place the highest priority on safety while performing the work." *Id.*

- "shall observe all of [BP's] safety rules and guidelines . . . and the requirements contained in Exhibit D." *Id.*

- represent that its personnel "shall be fully qualified, trained, competent, able bodied and fit for their respective assignments and shall have complied with all necessary laws and regulations in connection therewith." *Id.* ¶ 3.1.4.

- "maintain the Drilling Unit at optimal operating condition, in accordance with good oilfield practices through the duration of the Contract." *Id.* ¶ 14.1.

- represent that "it will diligently perform the Work in a good workmanlike manner consistent with applicable industry standards and practices, ... it will use sound technical principles where applicable, [and] ... it will perform the Work in compliance with this Contract." *Id.* ¶ 14.1.1.

- "represent[] that during the Contract Period, the Drilling Unit is outfitted, conformed, and equipped to meet all applicable laws, rules, requirements, and regulations promulgated by the U.S. Coast Guard, the U.S. Environmental Protection Agency, the United States of America Department of the Interior as well as any other agency, bureau, or department of the U.S. federal, territorial possession, state, municipal, or local governments, any political subdivisions thereof, having jurisdiction over the operations in U.S. federal waters." *Id.* ¶ 14.5.

- shall comply with SOLAS, including the ISM. *Id.* Ex. B-1 at 6.

68.     Transocean materially breached its contractual duties in its actions and inactions

leading to the loss of well control, the explosion, and the loss of life and injuries onboard the

21

*Deepwater Horizon*, as well as the resulting oil spill.   Specifically, Transocean breached its contractual duties by the following acts and omissions, among others:

- Transocean did not adequately maintain the *Deepwater Horizon* and persistently delayed maintenance on the vessel.

- Transocean did not properly maintain the BOP.

- Transocean failed to conduct appropriate inspections of the BOP.

- Transocean had prior failures of the engine overspeed controls, which were not properly fixed.

- Because of Transocean's poor maintenance, the rig savers on the vessel failed to function to shut down the engines.

- After the explosion and the on-line primary generators shut down, other generators failed to function.

- Transocean made numerous unapproved (and, in many cases, undocumented) changes to the BOP.

- Authority for the vessel was improperly and unlawfully divided between Transocean's Captain and OIM.

- Transocean's Captain was not trained to use the rig's EDS, the vessel's ultimate safety device.

- The actions and inactions of Transocean's Captain showed that he underestimated the severity of the incident.

- Transocean had diluted its crews on the rigs and had experienced high levels of turnover.

- Transocean failed to properly coordinate efforts to fight the fires on board the *Deepwater Horizon* from April 20 to 22, 2010.

- Transocean failed to provide a seaworthy vessel, and also failed to provide proper training and a well-trained crew for the *Deepwater Horizon*.

- Before the well blew out on April 20, 2010, Transocean frustrated a safety check by transferring to another vessel drilling fluid displaced from the well and by discharging drilling fluids directly overboard.

- Transocean failed to properly train its drilling crews in how to handle blowouts.

⊚    Transocean's drilling crew failed to promptly identify and address the kick that caused the incident.

As investigations into the incident continue, and once the BP Parties obtain discovery from Transocean, the BP Parties believe that the evidence may support additional breaches of the Drilling Contract. In general, Transocean repeatedly breached the Drilling Contract in multiple, material ways—all leading to the casualty and injuries which took place on and after April 20, 2010.

69.    These obligations and breaches apply to Transocean as a whole because Transocean Ltd., Transocean Inc. and other parent Transocean entities exercised, directly or indirectly, complete control over the various Transocean subsidiaries, including the Transocean *Deepwater Horizon* Companies, and issued and/or enforced various policies and practices applicable to the *Deepwater Horizon*.

70.    Transocean's breach of its contractual duties has directly and proximately caused harm, loss, injuries, and damages to the BP Parties—as well as the harm, loss, injuries and damages to others.

## CLAIM II:  UNSEAWORTHINESS

71.    The BP Parties reallege and incorporate by reference each and every allegation set forth in all preceding paragraphs as if fully restated here.

72.    Respondents Triton Asset Leasing GmbH, Transocean Holdings LLC, Transocean Offshore Deepwater Drilling Inc., and Transocean Deepwater Inc., as the owner and/or operators of the *Deepwater Horizon* vessel, owed the BP Parties the duty to maintain the vessel in a seaworthy condition. This duty requires that Transocean provide a vessel that is staunch and strong, fitted out with all proper equipment and in good order, and that carries a sufficient and competent crew and complement of officers. A vessel owner's obligation to supply a seaworthy

vessel extends to the vessel's appurtenances, including but not limited to the BOP, as well as the captain and crew of the vessel.

73. Transocean breached its duties to supply a seaworthy vessel. Specifically, Transocean breached its duties by the acts and omissions listed in the preceding paragraphs, including but not limited to Paragraphs 23-54 and 68. As investigations into the incident continue, and once the BP Parties obtain discovery from Transocean, the BP Parties believe that the evidence is likely to provide additional examples of the *Deepwater Horizon's* unseaworthiness. In general, Transocean caused the *Deepwater Horizon* to be unseaworthy in multiple, material ways—all leading to the casualty and injuries which took place on and after April 20, 2010.

74. These obligations and breaches apply to Transocean as a whole because Transocean Ltd., Transocean Inc. and other parent Transocean entities exercised, directly or indirectly, complete control over the various Transocean subsidiaries, including the Transocean *Deepwater Horizon* Companies, and issued and/or enforced various policies and practices applicable to the *Deepwater Horizon*.

75. The *Deepwater Horizon's* unseaworthiness has directly and proximately caused harm, loss, injuries, and damages to the BP Parties—as well as the harm, loss, injuries and damages to others.

## CLAIM III: NEGLIGENCE—DEVIATIONS FROM STANDARD OF CARE AND/OR LAWS AND REGULATIONS

76. The BP Parties reallege and incorporate by reference each and every allegation set forth in all preceding paragraphs as if fully restated here.

24

77.     Transocean owed the BP Parties various duties to use reasonable care related to the *Deepwater Horizon* vessel.  These included, though are not limited to, the duty to use reasonable care in:

- Operating the *Deepwater Horizon* rig and drilling wells;

- Maintaining and repairing the vessel;

- Maintaining and repairing the appurtenances of the vessel, including the BOP;

- Not making modifications to the BOP that would impair its functions;

- Properly and promptly operating the BOP;

- Responding to kicks encountered while operating the vessel;

- Preventing blowouts;

- Safely operating the vessel;

- Properly maintaining and using all safety equipment on board the vessel;

- Providing a competent and qualified crew;

- Providing proper and necessary training to the crew and Captain of the vessel;

- Properly maintaining the vessel;

- Providing proper well monitoring and well control training;

- Providing a seaworthy vessel and crew; and

- Complying with SOLAS, including the ISM.

78.     Transocean breached these duties of care and acted with negligence, or gross negligence and/or gross fault as may be established at trial based upon the evidence. Specifically, Transocean breached its duties by the acts and omissions listed in the preceding paragraphs, including but not limited to Paragraphs 23-54 and 68.  As investigations into the incident continue, and once the BP Parties obtain discovery from Transocean, the BP Parties believe that the evidence is likely to provide additional examples of Transocean's negligent acts

and omissions by Transocean. In general, Transocean acted with negligence, or gross negligence and/or gross fault as may be established at trial based upon the evidence, in multiple, material ways—all leading to the casualty and injuries which took place on and after April 20, 2010.

79.     These obligations and breaches apply to Transocean as a whole because Transocean Ltd., Transocean Inc. and other parent Transocean entities exercised, directly or indirectly, complete control over the various Transocean subsidiaries, including the Transocean *Deepwater Horizon* Companies, and issued and/or enforced various policies and practices applicable to the *Deepwater Horizon*.

80.     Transocean's negligence, or gross negligence and/or gross fault as may be established at trial based upon the evidence, in operating the *Deepwater Horizon* has directly and proximately caused harm, loss, injuries, and damages to the BP Parties—as well as the harm, loss, injuries and damages to others.

### CLAIM IV: CONTRIBUTION

81.     The BP Parties reallege and incorporate by reference each and every allegation set forth in all preceding paragraphs as if fully restated here.

82.     The *Deepwater Horizon* incident has caused and continues to cause harm, loss, injuries, and damages to the BP Parties.

83.     Transocean is wholly or partly at fault for the *Deepwater Horizon* incident, resulting oil spill, personal injuries, deaths, and other damages for the reasons explained in the preceding allegations.

84.     As a result, the BP Parties are entitled to contribution under admiralty law from Transocean for all or a part of the damages resulting from the *Deepwater Horizon* incident, resulting oil spill, and related damages.

## CLAIM V: CONTRIBUTION UNDER OPA

85.    The BP Parties reallege and incorporate by reference each and every allegation set forth in all preceding paragraphs as if fully restated here.

86.    The *Deepwater Horizon* incident has caused and continues to cause harm, loss, injuries, and damages to the BP Parties.

87.    OPA states that a "person may bring a civil action for contribution against any other person who is liable or potentially liable under this Act or another law." 33 U.S.C. § 2709.

88.    Transocean is liable or potentially liable under "[OPA] or another law" for the *Deepwater Horizon* incident, resulting oil spill, personal injuries, deaths, and other damages for the reasons explained in the preceding allegations.

89.    As a result, the BP Parties are entitled to contribution under OPA from Transocean for all or a part of the damages resulting from the *Deepwater Horizon* incident, resulting oil spill, and related damages.

## CLAIM VI: SUBROGATION

90.    The BP Parties reallege and incorporate by reference each and every allegation set forth in all preceding paragraphs as if fully restated here.

91.    The *Deepwater Horizon* incident has caused and continues to cause harm, loss, injuries, and damages to the BP Parties.

92.    BPXP has a statutory duty to pay, has paid, and will continue to pay damages to resolve claims brought against BP resulting from the casualty and oil spill.

93.    Transocean is wholly or partly at fault for the *Deepwater Horizon* incident, resulting oil spill, personal injuries and deaths, and other damages for the reasons explained in the preceding allegations.

94.     Accordingly, the BP Parties are entitled to recover from Transocean reimbursement for all or a part of the damages related to the *Deepwater Horizon* incident and resulting oil spill that the BP Parties have paid or will pay.

## CLAIM VII:  SUBROGATION UNDER OPA

95.     The BP Parties reallege and incorporate by reference each and every allegation set forth in all preceding paragraphs as if fully restated here.

96.     OPA states that "Any person … who pays compensation pursuant to this Act [OPA] to any claimant for removal costs or damages shall be subrogated to all rights, claims, and cause of action that the claimant has under any other law."  33 U.S.C. § 2715(a).

97.     The *Deepwater Horizon* incident has caused and continues to cause harm, loss, injuries, and damages to the BP Parties.

98.     BPXP has a statutory duty to pay, has paid, and will continue to pay damages to resolve claims brought against BP resulting from the casualty and oil spill.

99.     Transocean is wholly or partly at fault for the *Deepwater Horizon* incident, resulting oil spill, personal injuries and deaths, and related damages for the reasons explained in the preceding allegations.

100.    Accordingly, the BP Parties are entitled to recover from Transocean reimbursement for all or a part of the damages related to the *Deepwater Horizon* incident and resulting oil spill that the BP Parties have paid or will pay.

## CLAIM VIII:  DECLARATORY JUDGMENT REGARDING TRANSOCEAN'S RESPONSIBILITY FOR THE *DEEPWATER HORIZON* INCIDENT AND OIL SPILL

101.    The BP Parties reallege and incorporate by reference each and every allegation set forth in all preceding paragraphs as if fully restated here.

102.    Transocean is wholly or partly at fault for the *Deepwater Horizon* incident and resulting damages for the reasons explained in the preceding allegations.

103.    The BP Parties have paid, and will continue to pay, various costs related to the casualty and oil spill.

104.    Transocean has not reimbursed the BP Parties for damages, costs, and expenses related to the blowout of the MC252 well, the resulting explosion and fire onboard the *Deepwater Horizon*, the effort to regain control of the MC252 well, the oil spill that ensued before control of the MC252 well could be regained, and claims related to the *Deepwater Horizon* incident and oil spill.

105.    The BP Parties are entitled to financial recovery from Transocean for the *Deepwater Horizon* incident and oil spill.  Transocean, however, is not entitled to any such financial recovery from or finding of liability against BP resulting from the *Deepwater Horizon* incident and oil spill.

106.    Transocean caused or contributed to the *Deepwater Horizon* incident and subsequent oil spill and is responsible in whole or in part for all resulting damages incurred by the BP Parties.  The BP Parties, however, are not liable in contribution or indemnification or other forms of monetary payment to Transocean with regards to liabilities arising from the *Deepwater Horizon* incident under OPA, the Drilling Contract (including but not limited to Articles 21 through 25), or any applicable law.

107.    An actual and justiciable controversy has arisen and now exists between the BP Parties and Transocean as to the parties' duties and obligations, if any.  As a result, the BP Parties seek a declaratory judgment that Transocean is wholly and/or partly responsible for the *Deepwater Horizon* incident, resulting oil spill, and related damages, costs and expenses;

determining Transocean's proportionate responsibility for the *Deepwater Horizon* incident, resulting oil spill, and related damages; and requiring Transocean to pay its proportionate share of all damages, costs and expenses related to the *Deepwater Horizon* incident and resulting oil spill.

## PRAYER FOR RELIEF

WHEREFORE, the BP Parties respectfully ask that this Court:

A.      Enter judgment in the BP Parties' favor against Transocean.

B.      Order that the Plaintiffs/Claimants assert their claims directly against Transocean Ltd. and Transocean, Inc.

C.      Award the BP Parties, in proportion to Transocean's fault, compensatory and economic damages for costs and expenses incurred by the BP Parties to clean up and remediate the oil spill, the amount of claims paid by the BP Parties under OPA, the amount of any judgments or settlements that the BP Parties incur or pay, the amount of any OPA financial liability that the BP Parties are liable for, the lost profits from and/or diminution in value of the Macondo prospect, and all other costs and damages incurred by the BP Parties related to the *Deepwater Horizon* incident and resulting oil spill, plus interest.

D.      Declare that Transocean caused or contributed to the *Deepwater Horizon* incident and subsequent oil spill and is responsible in whole or in part for all damages incurred by the BP Parties related to the *Deepwater Horizon* incident and resulting oil spill, and that the BP Parties are not liable in contribution, indemnification, or otherwise to Transocean for damages, costs, or other expenses arising from the *Deepwater Horizon* incident and resulting oil spill under any applicable law or contract.

E.      Find that Transocean breached the Drilling Contract, causing the BP Parties to suffer damages in an amount to be determined at trial.

30

F.      Find that Transocean's *Deepwater Horizon* vessel was unseaworthy, causing the BP Parties to suffer damages in an amount to be determined at trial.

G.      Find that Transocean committed negligence, or gross negligence and/or gross fault as may be established at trial based upon the evidence, causing the BP Parties to suffer damages in an amount to be determined at trial

H.      Award the reasonable costs and attorneys' fees incurred by BP in prosecuting this action.

I.      Award such other relief as the Court may deem appropriate and just.

Dated:  April 20, 2011                          Respectfully submitted,


                                                /s/ Don K. Haycraft
                                                Don K. Haycraft (Bar #14361)
                                                R. Keith Jarrett (Bar #16984)
                                                LISKOW & LEWIS
                                                One Shell Square
                                                701 Poydras Street, Suite 5000
                                                New Orleans, Louisiana 70139-5099
                                                Telephone: (504) 581-7979
                                                Facsimile: (504) 556-4108

                                                and

                                                Richard C. Godfrey, P.C.
                                                J. Andrew Langan, P.C.
                                                Kirkland & Ellis LLP
                                                300 North LaSalle Street
                                                Chicago, Illinois  60654
                                                Telephone: (312) 862-2000
                                                Facsimile: (312) 862-2200

                                                and

                                                Robert C. "Mike" Brock
                                                Covington & Burling LLP
                                                1201 Pennsylvania Avenue, NW
                                                Washington, DC 20004-2401
                                                Telephone: (202) 662-5985
                                                Facsimile: (202) 662-6291

                                                Attorneys for BP Exploration & Production
                                                Inc.

## CERTIFICATE OF SERVICE

I hereby certify that the above and foregoing pleading has been served on All Counsel by electronically uploading the same to Lexis Nexis File & Serve in accordance with Pretrial Order No. 12, and that the foregoing was electronically filed with the Clerk of Court of the United States District Court for the Eastern District of Louisiana by using the CM/ECF System, which will send a notice in accordance with the procedures established in MDL 2179, on this 20th day of April, 2011.

/s/ Don K. Haycraft

# UNITED STATES DISTRICT COURT

## EASTERN DISTRICT OF LOUISIANA

IN RE: OIL SPIL by the Oil Rig      MDL No. 2179
"DEEPWATER HORIZON" in the GULF OF
MEXICO on April 20, 2010      SECTION J

IN RE: TRITON ASSET LEASING      JUDGE BARBIER
GmbH, et al      MAG. JUDGE SHUSHAN

THIS DOCUMENT RELATES TO:
Civil Action No. 10-2771

## ANSWER TO COMPLAINT AND PETITION OF TRITON ASSET LEASING GmbH, et al FOR EXONERATION FROM OR LIMITATION OF LIABILITY AND CLAIMS

### AND

### COUNTERCLAIM, CROSS-CLAIM, AND THIRD PARTY COMPLAINT

### Complaint in Admiralty – Rule 9(h)

**I. ANSWER TO COMPLAINT AND PETITION OF TRITON ASSET LEASING GmbH, et al FOR EXONERATION FROM OR LIMITATION OF LIABILITY AND CLAIMS**

**NOW INTO COURT**, through undersigned counsel, come respondents: Gary and

Deborah Sellno, Kerry and Sandra Lauricella, William and Georgia Gibson, Dale and Denise

LeBrun, Larry and Kelly Tapp, E.P. and M.B. Geghardt, Michael L. and Dawn Dawson, Michael

L. Dawson Construction, Ned and Ginger Naquin, Gordon R. Cordes, James Agent, Clark

Barrios, Rose Baudoin, Rex and Beverly Rambo, Vincent and Marlene Lobue, Mark and Carol

Dawson, Henry J. Becnel, Jr., Anthony Caramonta, Paul Leone, Brian Reuther, Peter and Karen

Casbarian, Gerard Cormeaux, Keith and Boksoon Fabre, Kevin and Kelly Poteet, Quality Metal

Works, Inc., Kirk Fabre, Denise and Sean Migliore, Casbarian Engineering Associates, L.L.C.,

Jody and Tammy Sellno, Carolyn Campo, Robin Campo and Richard A. Campo III, Buddy and

Luanna Cambas, Buddy and David Cambas, Cambas Electric, Inc., Doug and Mary Moore, Juro

Bezmalinovic, Bez Fabrication, Inc. and Caleb H. Didriksen and Sondra Brown, hereinafter

"Respondents" and/or Claimants, who in answer to the Complaint in Limitation filed herein

respectfully respond as follows:

### FIRST DEFENSE

Respondents object to Petitioners invoking the jurisdiction of this Court in any manner

other than that which is granted to the Court under the Limitation of Liability Act, 46 U.S.C.A.

30501 *et seq.*

### SECOND DEFENSE

Respondents specifically reserve their rights pursuant to the Oil Pollution Act, 33

U.S.C.A. 2701 *et seq* to file damage suits elsewhere and include in their suits the issues of

liability, damages, and the interpretation of any applicable insurance policies available to

Petitioners herein.

### THIRD DEFENSE

Petitioners are not entitled to limit their liability because at all times relevant the MODU

Deepwater Horizon was operated in a willful, wanton, and reckless manner.  The conduct that

resulted in Respondents' damages occurred with the privity or knowledge of the Petitioners and

bars the limitation of liability.

### FOURTH DEFENSE

The protections of the Limitation of Liability Act are unavailable to the insurers of the

Petitioners under the circumstances herein.  No *prima facie* case has been made establishing that

they are entitled to avail themselves of the Limitation of Liability Act.

2

### FIFTH DEFENSE

Respondents' damages resulted from the negligence, fault, or want of due care on the part of the Petitioners and/or those for whom Petitioners are responsible, and/or the unseaworthiness of the MODU Deepwater Horizon, all of which was within the privity and knowledge of Petitioners and bars the limitation of liability.

### SIXTH DEFENSE

Respondents are free from fault and have mitigated the damages that resulted from the acts and omissions of the Petitioners.

### SEVENTH DEFENSE

Respondents reserve the right to contest the appraisal value of the MODU Deepwater Horizon, its engines, apparel, appurtenances, pending freight and the adequacy of the security.

### EIGHTH DEFENSE

The limitation fund is inadequate and should be increased and/or the limitation action should be dismissed because the limitation fund does not properly account for the value of the minerals and other appurtenances, attachments, freight and/or cargo aboard the vessel, subject to the control of the vessel, and/or owned by Petitioners including but not limited to the value of contract for its lease and/or operation.

### NINTH DEFENSE

The limitation action should be dismissed because the MODU Deepwater Horizon is not a vessel for the purposes of the Limitation Act.

**AND NOW**, answering the particular allegations of the Complaint for Limitation, Respondents aver upon information and belief:

3

1.

The allegations of Paragraph 1 are denied.

2.

The allegations of Paragraphs 2, 3, 4, and 5 are denied for lack of sufficient information to justify a belief therein.

3.

The allegations of Paragraph 6 are denied for lack of sufficient information to justify a belief therein.

4.

The allegations contained in the first two sentences of Paragraph 7 are denied for lack of sufficient information to justify a belief therein.  The remaining allegations of Paragraph 7 are denied.

5.

Respondents admit that portions of the MODU Deepwater Horizon now lay sunken in deepwater in the Gulf of Mexico but deny the remaining allegations of Paragraph 8 for lack of sufficient information to justify a belief therein.

6.

Respondents admit that on or about April 20, 2010, one or more fires and explosions occurred on the MODU Deepwater Horizon causing damage to it as well as loss of life and injury to persons and further admit that on or about April 22, 2010, the MODU Deepwater Horizon sank.  The remaining allegations of Paragraph 9 are denied for lack of sufficient information to justify a belief therein.

7.

The allegations of Paragraph 10 are denied.

8.

The allegations of Paragraph 11 are denied.

9.

The allegations of Paragraph 12 are denied.

10.

The allegations of Paragraph 13 are denied for lack of sufficient information to justify a belief therein.

11.

Respondents admit that claims and demands have been made against Petitioners. Respondents deny the remaining allegations of Paragraph 14 for lack of sufficient information to justify a belief therein.

12.

The allegations of Paragraph 15 are denied for lack of sufficient information to justify a belief therein.

13.

The allegations of Paragraph 16 are denied for lack of sufficient information to justify a belief therein.

14.

The allegations of Paragraph 17 are denied for lack of sufficient information to justify a belief therein.

15.

The allegations of Paragraph 18 are denied for lack of sufficient information to justify a belief therein.

16.

The allegations of Paragraph 19 are denied for lack of sufficient information to justify a belief therein.

17.

The allegations of Paragraph 20 are denied.

18.

The allegations of Paragraph 21 are denied for lack of sufficient information to justify a belief therein.

19.

The allegations of Paragraph 22 are denied for lack of sufficient information to justify a belief therein.

20.

The allegations of Paragraph 23 are denied for lack of sufficient information to justify a belief therein.

21.

The allegations of Paragraph 24 are denied for lack of sufficient information to justify a belief therein.

## II.    COUNTERCLAIM, CROSS-CLAIM, AND THIRD PARTY COMPLAINT

### Rule 9(h)

**NOW INTO COURT**, through undersigned counsel, come Petitioners, Gary and
Deborah Sellno, Kerry and Sandra Lauricella, William and Georgia Gibson, Dale and Denise
LeBrun, Larry and Kelly Tapp, E.P. and M.B. Gebhardt, Michael L. and Dawn Dawson, Michael
L. Dawson Construction, Ned and Ginger Naquin, Gordon R. Cordes, James Agent, Clark
Barrios, Rose Baudoin, Rex and Beverly Rambo, Vincent and Marlene Lobue, Mark and Carol
Dawson, Henry J. Becnel, Jr., Anthony Caramonta, Paul Leone, Brian Reuther, Peter and Karen
Casbarian, Gerard Cormeaux, Keith and Boksoon Fabre, Kevin and Kelly Poteet, Quality Metal
Works, Inc., Kirk Fabre, Denise and Sean Migliore, Casbarian Engineering Associates, L.L.C.,
Jody and Tammy Sellno, Carolyn Campo, Robin Campo and Richard A. Campo III, Buddy and
Luanna Cambas, Buddy and David Cambas, Cambas Electric, Inc., Doug and Mary Moore, Juro
Bezmalinovic, Bez Fabrication, Inc. and Caleb H. Didriksen and Sondra Brown, hereinafter
"Plaintiffs," who allege as follows:

1.

Plaintiffs are natural and juridical persons who have suffered property loss, economic
damages, other costs, and general damages such as emotional distress and mental anguish, as a
result of the Spill.

2.

Gary and Cathy Sellno, husband and wife, domiciled and own residential and
unimproved real property in Orleans.  As a result of the intentional, willful, wanton, reckless,
negligent and grossly negligent acts and omissions of the Defendants, they have sustained

damages consisting of diminution of value, loss of use and emotional damages for injury to their residence.

3.

Kerry and Sandra Lauricella, husband and wife, are domiciled and own residential and unimproved real property in Barataria, Louisiana in Jefferson Parish.  As a result of the intentional, willful, wanton, reckless, negligent and grossly negligent acts and omissions of the Defendants, they have sustained damages consisting of diminution of value, loss of use and emotional damages for injury to their residence, plus loss of value and use of their unimproved lots.

4.

William and Georgia Gibson, husband and wife, are domiciled and own residential real property in Barataria, Louisiana in Jefferson Parish.  As a result of the intentional, willful, wanton, reckless, negligent and grossly negligent acts and omissions of the Defendants, they have sustained damages consisting of diminution of value, loss of use and emotional damages for injury to their residence.

5.

Dale and Denise Lebrun, husband and wife, are domiciled and own residential real property in Barataria, Louisiana in Jefferson Parish.  As a result of the intentional, willful, wanton, reckless, negligent and grossly negligent acts and omissions of the Defendants, they have sustained damages consisting of diminution of value, loss of use and emotional damages for injury to their residence.

6.

Larry and Kelly Tapp, husband and wife, are domiciled and own residential real property and unimproved real property in Barataria, Louisiana in Jefferson Parish.  As a result of the intentional, willful, wanton, reckless, negligent and grossly negligent acts and omissions of the Defendants, they have sustained damages consisting of diminution of value, loss of use and emotional damages for injury to their residence, plus loss of value and use of their unimproved lots.

7.

E.P. and M.B. Gebhardt, husband and wife, are domiciled in Orleans Parish and own residential real property in Barataria, Louisiana in Jefferson Parish.  As a result of the intentional, willful, wanton, reckless, negligent and grossly negligent acts and omissions of the Defendants, they have sustained damages consisting of diminution of value, loss of use and emotional damages for injury to their residence.

8.

Michael L. and Dawn Dawson, husband and wife, are domiciled in St. Charles Parish and own residential real property in Barataria, Louisiana in Jefferson Parish.  As a result of the intentional, willful, wanton, reckless, negligent and grossly negligent acts and omissions of the Defendants, they have sustained damages consisting of diminution of value, loss of use and emotional damages for injury to their residence.

9.

Michael L. Dawson, d/b/a Michael L. Dawson Construction, is a sole proprietorship domiciled in St. Charles Parish and doing business in Jefferson Parish.  As a result of the intentional, willful, wanton, reckless, negligent and grossly negligent acts and omissions of the

Defendants, they have sustained damages consisting of diminution of value, loss of use and emotional damages for injury to their business. It also sustained damages consisting of loss project contracts and income.

10.

Ned and Ginger Naquin, husband and wife, are domiciled in and own residential real property in Barataria, Louisiana in Jefferson Parish.  As a result of the intentional, willful, wanton, reckless, negligent and grossly negligent acts and omissions of the Defendants, they have sustained damages consisting of diminution of value, loss of use and emotional damages for injury to their residence.

11.

Gordon R. Cordes is domiciled in and owns residential real property in Barataria, Louisiana in Jefferson Parish.  As a result of the intentional, willful, wanton, reckless, negligent and grossly negligent acts and omissions of the Defendants, they have sustained damages consisting of diminution of value, loss of use and emotional damages for injury to their residence.

12.

James Agent is domiciled in and owns residential real property in Barataria, Louisiana in Jefferson Parish.  As a result of the intentional, willful, wanton, reckless, negligent and grossly negligent acts and omissions of the Defendants, he has sustained damages consisting of diminution of value, loss of use, loss of rents, and emotional damages for injury to his properties.

13.

Clark Barrios and Rosalie Baudoin are domiciled in and own residential real property and unimproved real property in Barataria, Louisiana in Jefferson Parish.  As a result of the

intentional, willful, wanton, reckless, negligent and grossly negligent acts and omissions of the Defendants, they have sustained damages consisting of diminution of value, loss of use and emotional damages for injury to their residence, plus loss of value and use of their unimproved lots.

14.

Buddy and Luanna Cambas, husband and wife, are domiciled in Jefferson Parish and own residential and unimproved real property in Handcock County, Mississippi.  As a result of the intentional, willful, wanton, reckless, negligent and grossly negligent acts and omissions of the Defendants, they have sustained damages consisting of diminution of value, loss of use and emotional damages for injury to their residence, plus loss of value and use of their unimproved lots.

15.

Rex and Beverly Rambo, husband and wife, are domiciled in and own residential real property and a large boat in Barataria, Louisiana in Jefferson Parish.  As a result of the intentional, willful, wanton, reckless, negligent and grossly negligent acts and omissions of the Defendants, they have sustained damages consisting of loss of use, diminution of value, loss of rents, loss of income and earning capacity, property damage to their boat, and emotional damage claims.

16.

Vincent and Marlene Lobue, husband and wife, are domiciled in and own residential real property in Barataria, Louisiana in Jefferson Parish.  As a result of the intentional, willful, wanton, reckless, negligent and grossly negligent acts and omissions of the Defendants, they

have sustained damages consisting of loss of use, diminution of value, property damage to their boat, and emotional damage claims.

17.

Mark and Carol Dawson, husband and wife, are domiciled in and own residential real property in Barataria, Louisiana in Jefferson Parish.  As a result of the intentional, willful, wanton, reckless, negligent and grossly negligent acts and omissions of the Defendants, they have sustained damages consisting of loss of use, diminution of value, loss of rents, and emotional damage claims.  Further, as a result of the intentional, willful, wanton, reckless, negligent and grossly negligent acts and omissions of the Defendants, Mark Dawson Construction has sustained damages consisting of lost profits and loss of business opportunities.

18.

Henry J. Becnel, Jr. is domiciled in and owns residential real property in Barataria, Louisiana in Jefferson Parish.  As a result of the intentional, willful, wanton, reckless, negligent and grossly negligent acts and omissions of the Defendants, he has sustained damages consisting of diminution of value, loss of use and emotional damages for injury to his residence.

19.

Anthony Caramonta, Jr. is domiciled in and owns residential real property in Barataria, Louisiana in Jefferson Parish.  As a result of the intentional, willful, wanton, reckless, negligent and grossly negligent acts and omissions of the Defendants, he has sustained damages consisting of diminution of value, loss of use and emotional damages for injury to his residence.

20.

Paul Leone is domiciled in and owns residential real property in Barataria, Louisiana in Jefferson Parish.  As a result of the intentional, willful, wanton, reckless, negligent and grossly

negligent acts and omissions of the Defendants, he has sustained damages consisting of diminution of value, loss of use and emotional damages for injury to his residence.

21.

Buddy Cambas, d/b/a Cambas Electric, Inc., is a corporation domiciled and doing business in Jefferson Parish.  As a result of the intentional, willful, wanton, reckless, negligent and grossly negligent acts and omissions of the Defendants, they have sustained damages consisting of diminution of value, loss of use and emotional damages for injury to their business. It also sustained damages consisting of loss project contracts and income.

22.

Brian Reuther is domiciled in and owns residential real property in Barataria, Louisiana in Jefferson Parish.  As a result of the intentional, willful, wanton, reckless, negligent and grossly negligent acts and omissions of the Defendants, he has sustained damages consisting of diminution of value, loss of use and emotional damages for injury to his residence, plus loss of value and use of his unimproved lots.

23.

Peter and Karen Casbarian, husband and wife, are domiciled and own residential real property in Barataria, Louisiana in Jefferson Parish.  As a result of the intentional, willful, wanton, reckless, negligent and grossly negligent acts and omissions of the Defendants, they have sustained damages consisting of loss of use, diminution of value, loss of rents, and emotional damage claims and loss of income for his job.  Casberian Engineering Inc. is a business located in Orleans Parish that provided and does provide professional engineering services to offshore companies, individuals, oil companies and contractors and has suffered a significant loss in business volume.

24.

Gerard Cormeaux is domiciled and owns residential real property in Barataria, Louisiana in Jefferson Parish. As a result of the intentional, willful, wanton, reckless, negligent and grossly negligent acts and omissions of the Defendants, he has sustained damages consisting of diminution of value, loss of use and emotional damages for injury to his residence.

25.

Jody and Tammy Sellno, husband and wife, are domiciled in and own residential real property in Barataria, Louisiana in Jefferson Parish. As a result of the intentional, willful, wanton, reckless, negligent and grossly negligent acts and omissions of the Defendants, they have sustained damages consisting of loss of use, diminution of value, loss of rents, and emotional damage claims.

26.

Keith and Boksoon Fabre, husband and wife, are domiciled and own residential real property in Barataria, Louisiana in Jefferson Parish. As a result of the intentional, willful, wanton, reckless, negligent and grossly negligent acts and omissions of the Defendants, they have sustained damages consisting of diminution of value, loss of use and emotional damages for injury to their residence.

27.

Kevin and Kelly Poteet, husband and wife, are domiciled and own residential real property in Barataria, Louisiana in Jefferson Parish. As a result of the intentional, willful, wanton, reckless, negligent and grossly negligent acts and omissions of the Defendants, they have sustained damages consisting of diminution of value, loss of use and emotional damages for injury to their residence.

28.

Quality Metal Works, Inc. is a Louisiana domestic corporation whose domicile address is in Jefferson Parish, Louisiana.  Quality Metal Works, Inc. provided equipment for the outfitting of offshore platforms and other offshore facilities.  As a result of the intentional, willful, wanton, reckless, negligent and grossly negligent acts and omissions of the Defendants, Quality Metal Works, Inc. has sustained damages consisting of lost profits and loss of business opportunities.

29.

Carolyn Campo, Robin Campo and Richard A. Campo, III, are domiciled in and own residential real property in St. Tammany Parish.  As a result of the intentional, willful, wanton, reckless, negligent and grossly negligent acts and omissions of the Defendants, they have sustained damages consisting of loss of use, diminution of value, loss of rents, and emotional damage claims.

30.

Juro Bezmalinovic is domiciled and owns residential real property in Myrtle Grove, Louisiana in Plaquemines Parish.  As a result of the intentional, willful, wanton, reckless, negligent and grossly negligent acts and omissions of the Defendants, he has sustained damages consisting of diminution of value, loss of use and emotional damages for injury to his residence.

31.

Bez Fabrication, Inc. is a Louisiana domestic corporation whose domicile address is in Plaquemines Parish, Louisiana. Bez Fabrication, Inc. provided equipment for the outfitting of offshore platforms and other offshore facilities.  As a result of the intentional, willful, wanton, reckless, negligent and grossly negligent acts and omissions of the Defendants, Bez Fabrication, Inc.  has sustained damages consisting of lost profits and loss of business opportunities.

32.

Doug and Mary Moore husband and wife, whose domicile address is in Orleans Parish and own residential real property St. Tammany Parish. As a result of the intentional, willful, wanton, reckless, negligent and grossly negligent acts and omissions of the Defendants, they have sustained damages consisting of diminution of value, loss of use and emotional damages for injury to their residence.

33.

Kirk Fabre is domiciled and owns residential real property in Jefferson Parish. As a result of the intentional, willful, wanton, reckless, negligent and grossly negligent acts and omissions of the Defendants, they have sustained damages consisting of diminution of value, loss of use and emotional damages for injury to their residence.

34.

Denise and Sean Migliore, husband and wife, are domiciles in Jefferson Parish. Mr. Migliore made his living fishing in the Gulf of Mexico and associated waters. As a result of the intentional, willful, wanton, reckless, negligent and grossly negligent acts and omissions of the Defendants, Mr. and Mrs. Migliore have sustained damages consisting of loss of earning capacity and loss of business opportunities.

35.

Casbarian Engineering Associates, L.L.C., is a Louisiana limited liability company, whose domicile address is in Orleans Parish. Casbarian Engineering Associates, L.L.C. provided engineering services in the design of offshore platforms and other offshore facilities. As a result of the intentional, willful, wanton, reckless, negligent and grossly negligent acts and omissions

of the Defendants, Casbarian Engineering Associates, L.L.C. has sustained damages consisting of lost profits and loss of business opportunities.

36.

Buddy and David Cambas, siblings, are domiciled in Jefferson Parish, Louisiana, and own residential real property in St. Tammany Parish. As a result of the intentional, willful, wanton, reckless, negligent and grossly negligent acts and omissions of the Defendants, they have sustained damages consisting of loss of use, diminution of value, and emotional damage claims.

37.

Caleb H. Didriksen and Sondra Brown, husband and wife, are domiciled in Jefferson Parish, Louisiana, and own residential real property in Lake Catherine, Louisiana in Orleans Parish. As a result of the intentional, willful, wanton, reckless, negligent and grossly negligent acts and omissions of the Defendants, they have sustained damages consisting of loss of use, diminution of value, and emotional damage claims.

38.

Made defendants, cross-defendants and/or third-party defendants herein are:

A.     BP Exploration & Production, Inc. (BP Exploration), a Delaware corporation with its principal place of business in Warrenville, Illinois, and

B.     BP America Production Company (BP America), a Delaware corporation with its principal place of business in Houston, Texas, and

C.     BP p.l.c., a British public limited company with its corporate headquarters in London, England,

All three of which are referred to collectively hereinafter as "BP."

17

D.      Transocean Ltd., a Swiss corporation with offices in Houston, Texas.

E.      Transocean Offshore Deepwater Drilling, Inc., a Delaware corporation with its principal place of business in Houston, Texas.

F.      Transocean Deepwater, Inc., a Delaware corporation with its principal place of business in Houston, Texas.

G.      Transocean Holdings, L.L.C., a Delaware corporation with its principal place of business in Houston, Texas.

H.      Triton Asset Leasing, GmbH, a Swiss limited liability company with its principal place of business in Zug, Switzerland,

        All five of which are referred to collectively hereinafter as "Transocean."

I.      Halliburton Energy Services, Inc. is a Delaware corporation with its principal place of business in Houston, Texas and operated through its Sperry Drilling Services division.

J.      M-I L.L.C. also known as M-I SWACO is a Delaware limited liability company with its principal place of business in Wilmington, Delaware.

        All ten of the preceding defendants are hereinafter collectively referred to as the "Drilling Defendants."

K.      Cameron International Corporation f/k/a Cooper-Cameron Corporation is a Delaware corporation with its principal place of business in Houston, Texas.

L.      Weatherford U.S. L.P. is a Louisiana limited partnership with its principal place of business in Hosuton, Texas.

M.      Anadarko Petroleum Corporation Co. is a Delaware corporation with its principal place of business in The Woodlands, Texas.

N.      Anadarko E&P Company L.P. is a Delaware limited partnership with its principal place

of business in The Woodlands, Texas.

O.      MOEX Offshore 2007 L.L.C. is a Delaware corporation with its principal place of

business in Houston, Texas.

P.      MOEX USA Corporation is a Delaware corporation and has its principal place of

business in Houston, Texas.

Q.      Mitsui Oil Exploration Co., Ltd. is a Japanese corporation with its principal place of

business in Tokyo, Japan.

39.

This Court has subject matter jurisdiction pursuant to:

A.      The Oil Pollution Act, 33 U.S.C. Section 2717(b) (the "OPA").

B.      In addition, this Court has supplemental jurisdiction over Petitioners' state law claims

pursuant to 28 U.S.C. 1367.

C.      Article III, Section 2 of the United States Constitution empowers the federal judiciary to

hear all cases of admiralty and maritime jurisdiction.

40.

Venue is proper in this Court under 28 U.S.C. 1391 because the acts and omissions

giving rise to the claims asserted herein occurred in this District.  Venue is otherwise appropriate

in this district consistent with 28 U.S.C. Section 1407 and the 2010 Transfer Order of the

Judicial Panel on Multidistrict Litigation.  Venue is also proper pursuant to the OPA, 33 U.S.C.

2717(b) as the discharge occurred in this District.  In addition, venue is proper pursuant to this

Court's Pretrial Order No. 20, which allows petitioners to directly file their complaints arising

out of the Spill in this District.

41.

As more fully set forth below, all of the defendants,  cross-defendants and/or third-party defendants are liable to the petitioners jointly, severally, and solidarily under the Oil Pollution Act and various principles of State and Federal law.

42.

On or about April 20, 2010, the MODU Deepwater Horizon was located 50 miles southeast of Venice, Louisiana, adjacent to the Louisiana shore when, while performing drilling operations for crude oil, it caught fire and exploded, eventually sinking to the floor of the Gulf of Mexico.

43.

The accident was caused by no fault of the Petitioners and was caused solely by the intentional, willful, wanton, reckless, negligent, and grossly negligent acts and omissions of the Defendants herein all of whom, acting through their officers, employees, servants, and agents participated in MODU Deepwater Horizon's offshore oil drilling operations in Mississippi Canyon Block 252, the location known as "Macondo," in the Gulf of Mexico and/or supplied equipment and/or appurtenances that due to defects therein failed to prevent the accident or mitigate the damage that resulted from it.

44.

Defendants' intentional, willful, wanton, reckless, negligent, and grossly negligent acts and omissions include but are not limited to:

a.      Failing to supervise their employees;

b.      Failing to properly train and supervise employees and subcontractors working on the vessel;

20

c.      Failing to properly inspect the MODU Deepwater Horizon to assure that its equipment and personnel were fit for their intended purposes;

d.      Failing to provide sufficient personnel to perform operations on the Deepwater Horizon;

e.      Failing to properly assess the risk of failure of key safety and emergency equipment;

f.      Failing to properly follow drilling protocols and policies, proper well monitoring and control practices;

g.      Failing to take appropriate steps to mitigate the damages caused by the fire and explosion and the release of oil;

h.      Failing to bring the oil release under control in a timely fashion;

i.      Failing to heed warnings and warning signs that, if heeded, would have prevented the fire, explosion and release of oil or minimized the damages resulting from them;

j.      Other intentional, willful, wanton, reckless, negligent and grossly negligent acts and omissions as set out below and to be shown at the trial of this matter.

45.

The Drilling Defendants owed and breached duties of ordinary and reasonable care to Petitioners in connection with the drilling operations of the MODU Deepwater Horizon and its maintenance and repair as well as that of its appurtenances and equipment, and additionally owed and breached duties to Petitioners to guard against and/or prevent the risk of an oil spill.

46.

Transocean Ltd., Transocean Offshore Deepwater Drilling, Inc., Transocean Deepwater, Inc., and Transocean Holdings, L.L.C. , and Triton Asset Leasing, GmbH (hereinafter collectively Transocean) owned, navigated, manned, possessed, managed and controlled the MODU Deepwater Horizon at all times material hereto.

21

47.

In those capacities, Transocean owed Plaintiffs duties of care to man, possess, manage, control, navigate, maintain and operate the MODU Deepwater Horizon with reasonable and ordinary care.

48.

Transocean breached its duties to Plaintiffs by:

A.      Failing to properly man, manage, control, maintain and operate the MODU Deepwater Horizon and its safety equipment before the blow out;

B.      Making or acquiescing to a series of reckless decisions concerning well design, the use of centralizers, mudding operations, cementing, integrity testing, deployment of the casing hanger lockdown sleeve, spacer material, and simultaneous operations causing worker confusion and loss of focus;

C.      Failing to properly maintain the MODU Deepwater Horizon, train personnel, and perform appropriate risk assessment analyses.

49.

BP leased and operated the MODU Deepwater Horizon.  Together, Transocean and BP were responsible for design and well control.

50.

BP owed duties to Plaintiffs to exercise reasonable care to design, create, manage, and control the well and the flow of hydrocarbons therefrom in a safe and prudent manner and to conduct its drilling operations with reasonable and ordinary care.

51.

BP breached its duties to Plaintiffs by:

22

A.      Choosing and implementing a less expensive and less time-consuming long string well design, which had few barriers against a gas blow-out, instead of a safer liner/tieback design which would have provided additional barriers to gas blowout, despite its knowledge that the liner-tieback design was a safer option;

B.      Using pipe material that it knew and recognized before the blowout might collapse under high pressure;

C.      Using too few centralizers to ensure that the casing was centered into the wellbore;

D.      Failing to implement a full bottoms up circulation of mud between the running of the casing and the beginning of the cement job in violation of industry standards;

E.      Failing to require comprehensive lab testing to ensure the density of the cement and failing to heed the ominous results of negative pressure testing which indicated that the cement job was defective;

F.      Cancelling the cement bond log test that would have determined the integrity of the cement job;

G.      Failing to deploy the casing hanger lockdown sleeve to prevent the wellhead seal from being blown out by pressure from below;

H.      Using an abnormally large quantity of mixed and untested spacer fluid;

I.      Failing to train drilling workers and/or onshore employees, and to hire personnel qualified in risk assessment and management of complex systems like that found on the MODU Deepwater Horizon; and

J.      Requiring simultaneous operations in an effort to expedite the project making it difficult for workers to track fluid volumes in the wellbore.

23

52.

All of the foregoing acts and omissions by BP proximately caused and/or contributed to Plaintiffs' injuries and damages.

53.

At all times material hereto, Halliburton was responsible for cementing the well that was the subject of the spill, and further was engaged in testing, analysis and monitoring of the Deepwater Horizon's well.

54.

At all times material hereto, Halliburton owed duties to Plaintiffs to exercise reasonable care in conducting the cementing, testing, analysis and monitoring of the well.

55.

Halliburton breached its duties by Plaintiffs by:

A.      Failing to exercise reasonable care in conducting its cementing, testing, analysis and monitoring of the Deepwater Horizon's well;

B.      Failing to use a full bottoms up circulation of mud between the running of the casing and the and the beginning of the cement job in violation of industry standards; failing to require comprehensive lab testing to ensure the density of the cement, and failing to heed the ominous results of negative pressure testing, which indicated that the cement job was defective;

C.      Cancelling or acquiescing in the cancellation of the cement bond log test that would have determined the integrity of the cement job;

D.      Failing to deploy, or acquiescing in the decision not to deploy, the casing hanger lockdown sleeve to prevent the wellhead seal from being blown out by pressure from below.

E.      Other acts of negligence to be shown at the trial of this matter.

56.

All of the foregoing acts and omissions by Halliburton proximately caused and/or contributed to Plaintiffs' injuries and damages.

57.

At all times material hereto, M-I was providing the drilling fluids or "mud" for the drilling operations on the MODU Deepwater Horizon and was responsible for mud drilling, composition and monitoring, and for the provision of "spacer" solution.

58.

At all times material hereto, M-I owed duties of care to Plaintiffs to exercise reasonable care in providing, controlling and monitoring the mud and spacer solutions used on the MODU Deepwater Horizon.

59.

M-I breached its duties to Plaintiffs by:

A.      Failing to provide, control, and monitor the mud and spacer solutions used on the MODU Deepwater Horizon in a reasonably safe manner.

B.      Other acts of negligence to be shown at the trial of this matter.

60.

All of the foregoing acts and omissions by M-I proximately caused and/or contributed to Plaintiffs' injuries and damages.

61.

At all relevant times hereto, Cameron designed, manufactured and supplied the BOP that was, at all relevant times, appurtenant to and a part of the MODU Deepwater Horizon's equipment.

62.

At all times relevant hereto, Cameron owed duties to Plaintiffs to exercise reasonable and ordinary care in the design and manufacture and supply of the BOP for the MODU Deepwater Horizon.

63.

Cameron breached its duties to Plaintiffs by:

A.      Failing to exercise reasonable care in the design, manufacture, and supply of the BOP such that it failed to operate to prevent the blowout;

B.      Failing to ensure and verify that the BOP it designed and manufactured was suitable for the types of drill pipe and casing assembly design which would foreseeably be used during the MODU Deepwater Horizon's drilling and exploration activities;

C.      Designing the BOP such that it was vulnerable to a single point failure;

D.      Failing to install a backup activation system for the BOP; and

E.      Failing to provide adequate warnings, instructions and guidelines on the permissible uses, modifications, and applications of the BOP.

F.      Other acts of negligence to be shown at the trial of this matter.

64.

All of the foregoing acts and omissions by Cameron proximately caused and/or contributed to Plaintiffs' injuries and damages.

65.

At all times relevant hereto, Weatherford designed, manufactured, and supplied the float collar used in the Macondo well.

66.

At all times relevant hereto, Weatherford owed duties to Plaintiffs to exercise reasonable and ordinary care in the design and manufacture and supply of the float collar in the long string casing.

67.

Weatherford breached its duties to Plaintiffs by:

A.      Designing and manufacturing a float collar that failed to seal properly and which allowed hydrocarbon backflow into the casing.

B.      Other acts of negligence to be shown at the trial of this matter.

68.

All of the foregoing acts and omissions by Weatherford proximately caused and/or contributed to Plaintiffs' injuries and damages.

69.

Anadarko Petroleum Corporation Co., Anadarko E&P Company L.P., and MOEX Offshore 2007, L.L.C. had access to Halliburton/Sperry Sun INSITE real time data that was transmitted from the MODU Deepwater Horizon on April 20, 2010.  They had the right to conduct HSE inspections and call HSE meetings and had assumed certain duties with respect to health and safety when they acquired these rights.  They knew or should have known of the presence of the impending disaster and should have warned the drilling vessel crew so that it could have taken steps to prevent it.  Anadarko Petroleum Corporation Co., Anadarko E&P Company L.P., and MOEX Offshore 2007, L.L.C. breached their duties to Plaintiffs by failing to warn the drilling crew of the imminent blowout so that they could take evasive action.

70.

Mitsui Oil Exploration Co., Ltd. (MOECO) controlled the business, operations, policies, and actions of its subsidiaries MOEX Offshore 2007, L.L.C. and MOEX USA Corporation to such an extent that they were agents and/or alter egos of MOECO.  All activities of MOEX Offshore 2007, L.L.C. and MOEX USA Corporation should be imputed to MOECO, rendering MOECO liable to Petitioners for the intentional, willful, grossly negligent and negligent acts and omissions of MOEX Offshore 2007, L.L.C. and MOEX USA Corporation.

71.

The existence and breach of these legal duties are established under the general maritime and state law as deemed applicable herein.

72.

In addition to the intentional, willful, wanton, reckless, negligent and grossly negligent acts and omissions described herein, and in the alternative thereto, the damages suffered by Petitioners were caused by acts or omissions of the Defendants that are beyond proof by the Petitioners but were within the knowledge and control of the Defendants, there being no other possible conclusion that the blowout, explosions, fire, sinking, and spill resulted from the negligence of Defendants.  The blowout, explosions, fire, sinking, and the resulting spill would not have occurred had the Defendants satisfied the duty of care imposed on them.  Petitioners therefore plead the doctrine of *res ipsa loquitor*.

73.

As a result of this explosion, oil, chemical dispersants, and petroleum fumes soiled the coast of Louisiana damaging and threatening to damage natural resources including air, land, water, and marine life and personal and real property.

74.

Defendants' intentional, willful, wanton, reckless, negligent and grossly negligent acts and omissions caused Petitioners' damages which consist of the oiling and contamination of their real and personal property, devaluation of their property, stigma resulting from the taint of their property caused by the spill, lost business opportunities, loss of goodwill, lost profits, lost rents, loss of earning capacity, loss of use, inconvenience, mental anguish, and emotional distress.

75.

Petitioners seek exemplary damages including attorney's fees, litigation expenses, court costs, and expert witness fees.

76.

Petitioners seek punitive damages due to the willful, wanton, reckless, and grossly negligent acts and omissions of the Petitioners.

77.

Due to the intentional, willful, wanton, reckless, and grossly negligent character of the acts and omissions that caused Petitioners' damages, Defendants are liable to Petitioners for all their claimed damages, whether reasonably foreseeable or not.

78.

Petitioners seek prejudgment interest.

WHEREFORE, Respondents, Claimants, and Petitioners, Gary and Deborah Sellno, Kerry and Sandra Lauricella, William and Georgia Gibson, Dale and Denise LeBrun, Larry and Kelly Tapp, E.P. and M.B. Geghardt, Michael L. and Dawn Dawson, Michael L. Dawson Construction, Ned and Ginger Naquin, Gordon R. Cordes, James Agent, Clark Barrios, Rose Baudoin, Rex and Beverly Rambo, Vincent and Marlene Lobue, Mark and Carol Dawson, Henry

J. Becnel, Jr., Anthony Caramonta, Paul Leone, Brian Reuther, Peter and Karen Casbarian,

Gerard Cormeaux, Keith and Brooksoon Fabre, Kevin and Kelly Poteet, Quality Metal Works,

Inc., Kirk Fabre, Denise and Sean Migliore, Casbarian Engineering Associates, L.L.C., Jody and

Tammy Sellno, Carolyn Campo, Robin Campo and Richard A. Campo III, Buddy and Luanna

Cambas, Buddy and David Cambas, Cambas Electric, Inc., Doug and Mary Moore, Juro

Bezmalinovic, Bez Fabrication, Inc. and Caleb H. Didriksen and Sondra Brown, demand

judgment against Petitioners, Counterclaim Defendants, and Third Party Defendants jointly,

severally, and solidarily, for:

(a)     Economic and compensatory damages, including general damages, in amounts to be

determined at trial;

(b)     Exemplary and punitive damages;

(c)     Attorneys' fees, expert witness fees, and all costs of litigation;

(d)     Pre-judgment and post-judgment interest at the maximum rate allowable by law;

(e)     Such other and further relief available under all applicable state and federal laws and any

relief the Court deems just and appropriate.

> Respectfully submitted,
>
> **DIDRIKSEN LAW FIRM**
> */s/ Caleb H. Didriksen*
> **CALEB H. DIDRIKSEN**, La. Bar No. 1334
> **RICHARD J. GARVEY**, La. Bar No. 20822
> **RICHARD TRAINA**, La. Bar No. 22170
> **DIANE R. COSENZA**, La. Bar No. 4419
> 3114 Canal Street
> New Orleans, LA 70119
> Telephone:  (504) 586-1600
> Facsimile:  (504) 822-3119
> Email: caleb@didriksenlaw.com
>        garvey@didriksenlaw.com
>        diane@didriksenlaw.com
>        rtraina@didriksenlaw.com

UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF LOUISIANA

| | | | |
|---|---|---|---|
| In re: | Oil Spill by the Oil Rig *"Deepwater Horizon"* in the Gulf of Mexico, on April 20, 2010 | * * * * | MDL No. 2179 |
| | | | SECTION: J |
| | This Document Relates To: All Cases and No. 10-2771 (*In re The Complaint And Petition Of Triton Asset Leasing GmbH, et al.*) | * * * * * * | JUDGE BARBIER MAGISTRATE SHUSHAN |

\* \* \* \* \* \* \* \* \* \* \* \* \* \*

## BP'S CROSS-COMPLAINT AND THIRD-PARTY COMPLAINT AGAINST HALLIBURTON

BP Exploration & Production Inc. and BP America Production Company (collectively "BP") bring this cross-complaint and third-party complaint to hold Halliburton Energy Services, Inc. ("Halliburton") accountable for its improper conduct, errors and omissions, including fraud and concealment, as set forth below, that caused and/or contributed to the explosion, fire, loss of rig, deaths, personal injuries, and the resulting release of oil and hazardous substances in connection with the *Deepwater Horizon* incident.

### INTRODUCTION

1. BP Exploration & Production and its co-lessees, as leaseholders of the Macondo prospect, drilled an exploratory well in Mississippi Canyon 252 ("MC252") to discover whether any oil and gas could be extracted. To drill the well, BP hired Transocean Inc. ("Transocean"), which used the *Deepwater Horizon* to drill the MC252 exploratory well.

2. Halliburton provided cementing and mud logging services at the MC252 exploratory well.

1

3.      Halliburton's improper conduct, errors and omissions, including fraud and concealment, caused and/or contributed to the *Deepwater Horizon* incident.   In overview, Halliburton designed and pumped a cement slurry into the Macondo well that was unstable and unlikely to isolate the hydrocarbons.  Halliburton could not have caused the resulting damage without concealing from BP material facts and expert opinions about its cement slurry, including its properties, weaknesses, and its likelihood of failure.  This concealment by Halliburton from BP of material facts about its cement slurry began before the cement job and continued after the cement job, after the explosion occurred, and even as BP was drilling a relief well to stop oil from flowing into the Gulf of Mexico.  Halliburton additionally failed to monitor the well during critical operations on the evening of April 20, 2010.  Halliburton's intentional misstatement of material facts to BP, combined with its intentional concealment of material information and data from BP—both before and after the explosion—caused significant injuries to BP as well as to other third parties.  As a direct result of Halliburton's improper conduct, the Macondo well blew out, killing eleven men, injuring numerous others, sinking the *Deepwater Horizon*, and spilling crude oil and hydrocarbons into the Gulf of Mexico with its attendant environmental consequences.

4.      Transocean filed a Complaint and Petition for Exoneration from or Limitation of Liability, Civil Action No. 10-2771 ("Limitation Action").  Plaintiffs/Claimants have filed or will file claims against Transocean in the Limitation Action.  On February 18, 2011, Transocean filed a Rule 14(c) Third-Party Complaint against BP, among others, to implead them into the Limitation Action and tender them to the Plaintiffs/Claimants.

5.      On December 15, 2010, the United States of America filed a complaint, Civil Action No. 10-4536 (the "DOJ Complaint") against BP Exploration & Production Inc.,

2

Anadarko Exploration & Production LP ("Anadarko Exploration"), Anadarko Petroleum Corporation ("Anadarko Petroleum"), MOEX Offshore 2007 LLC ("MOEX"), Triton Asset Leasing GmbH ("Triton"), Transocean Holdings LLC ("Transocean Holdings"), Transocean Offshore Deepwater Drilling Inc. ("Transocean Offshore"), Transocean Deepwater Inc. ("Transocean Deepwater"), and QBE Underwriting Ltd., Lloyd's Syndicate 1036 ("Lloyd's") seeking, *inter alia*, "a declaratory judgment that is binding in this action and any subsequent action or actions against Defendants BP, Anadarko Exploration, Anadarko Petroleum, MOEX, Triton, Transocean Holdings, Transocean Offshore, and Transocean Deepwater, jointly and severally and without any limitation, and Lloyd's, the latter up to the amount of its COFR guarantee, that said Defendants are liable for, *inter alia*, removal costs and damages in this action and in any such subsequent action or actions."

## THE PARTIES

6.     BP Exploration & Production Inc. is a Delaware Corporation with its principal place of business in Houston, Texas.   Its address is 501 Westlake Park Boulevard, Houston, Texas 77079.

7.     BP America Production Company is a Delaware Corporation with its principal place of business in Warrenville, Illinois.   Its address is 4101 Winfield Road, Warrenville, Illinois 60555.

8.     Halliburton is organized under the laws of Delaware with its principal place of business in Houston, Texas.

## JURISDICTION & VENUE

9.     This action arises out of and in connection with drilling operations by the *Deepwater Horizon* in the MC252 operating area in the Gulf of Mexico.

3

10.     BP's claim arises out of and in connection with drilling operations by the *Deepwater Horizon*, a vessel.  This Court has jurisdiction pursuant to 28 U.S.C. § 1333.  The claims presented in this pleading are admiralty or maritime claims within the meaning of Rule 9(h) of the Federal Rules of Civil Procedure, and BP designates this case as an admiralty or maritime case as provided in that Rule.

11.     Venue is proper in this District pursuant to 28 U.S.C. § 1391(b)-(c).

## BACKGROUND ON THE COMPANIES INVOLVED

12.     BP is one of the world's largest energy companies, providing its customers with fuel for transportation, energy for heat and light, retail services and petrochemicals products for everyday use.  Among its operations, BP conducts drilling operations in the Gulf of Mexico where the accident that gives rise to this lawsuit occurred.

13.     Halliburton is one of the world's largest providers of services to the energy industry.  With more than 55,000 employees in approximately 70 countries, Halliburton provides services to the oil and gas industry throughout the lifecycle of the reservoir—from locating hydrocarbons and managing geological data, to drilling and formation evaluation, well construction and completion, including cement and mud logging operations, and optimizing production through the life of the field.  Halliburton holds itself out to the industry in general, and to BP in particular, as a provider of expert services in various fields, including cementing and drilling fluid ("mud") monitoring services.

14.     Halliburton claims that it originated oilfield cementing and further claims that it "leads the world in effective, efficient delivery of zonal isolation and engineering for the life of the well."  BP reasonably believed and relied upon Halliburton's representations in this regard with respect to the operations at the Macondo well.

4

15.     Halliburton claims that "Halliburton's Surface Data Logging from Sperry Drilling Services ensures you get the best information from your well, so you make better drilling decisions, faster."   Halliburton also makes express representations in its contracts, including its contract with BP, regarding its expertise and the performance characteristics of its data logging and drilling services.   BP reasonably believed and relied upon Halliburton's representations in this regard with respect to the operations at the Macondo well.

16.     Halliburton claims that "Sperry Drilling Services is the preferred deepwater drilling provider in the Gulf of Mexico, where we serve more than half the rigs drilling in ultra-deepwater of 5000 feet or more.   When you've got challenges out of the ordinary, we are the company to go to."   BP reasonably believed and relied upon Halliburton's representations in this regard with respect to the operations at the Macondo well.

17.     Halliburton further claims that "Detecting fluid influx and mud losses while circulating, [Sperry's] Early Warning System immediately alerts operators to flow changes, and identifies washouts or restrictions in the system, as well as hole 'breathing' or ballooning, so you can take action to avert trouble."   BP reasonably believed and relied upon Halliburton's representations in this regard with respect to the operations at the Macondo well.

**BP'S LEASEHOLD AND INTEREST IN THE MACONDO WELL.**

18.     The well at issue is the exploratory well drilled in the Macondo prospect of Mississippi Canyon 252 in the outer continental shelf of the Gulf of Mexico (the "Macondo well").   The Macondo well is located approximately forty-eight miles from the nearest shoreline, and approximately 130 miles southeast of New Orleans, Louisiana.   (*See* Figure 1.)

5



**Figure 1.** Geographic Location of the Lease and Well

19.     On March 19, 2008, BP submitted its bid application to lease lot #252 in the Mississippi Canyon (MC 252) to the Minerals Management Service ("MMS"), a bureau within the United States Department of the Interior.  The MMS issued the lease (Lease OCS-G 32306) to BP on June 1, 2008.  The MMS has since been renamed as the Bureau of Ocean Energy Management, Regulation and Enforcement ("BOEMRE").

20.     After acquiring the leasehold in the Macondo prospect, BP exchanged portions of its interest in the Macondo prospect with other companies.  MOEX Offshore 2007 LLC became a 10% owner and Anadarko Petroleum Corporation became a 25% owner.

### WELL PLANNING AND DESIGN

21.     The Macondo well was designed so that it could later be completed to be a production well if sufficient hydrocarbons were found.

6

22.　　The BP Macondo well engineering team worked in conjunction with the BP subsurface team and selected specialist contractors to develop the Macondo well design. The teams estimated the pore pressures and strengths of the geologic formations and used these estimates in developing the design basis for the well.

23.　　In October 2009, BP began drilling the Macondo well with the *Transocean Marianas* rig. After Hurricane Ida damaged the *Transocean Marianas*, BP planned to use the Transocean *Deepwater Horizon* rig to resume drilling operations on the well.

## THE *DEEPWATER HORIZON* MOBILE OFFSHORE DRILLING UNIT

24.　　The *Deepwater Horizon* was a fifth-generation, RBS-8D design (*i.e.*, model type), deepwater dynamically positioned, column-stabilized, semi-submersible mobile offshore drilling unit, designed to drill subsea wells for oil exploration and production using an 18.75 in (476 mm), 15,000 psi (100,000 kPa) blowout preventer, and a 21 in (530 mm) outside diameter marine riser. The vessel was capable of operating in waters up to 8,000 feet deep, to a maximum drill depth of 30,000 feet.

25.　　The *Deepwater Horizon* was owned and operated by Transocean and had been under contract to BP in the GoM for approximately nine years. During this time, it drilled approximately thirty wells, two-thirds of which were exploration wells. The rig was chosen to finish the Macondo well after completing its previous project (the Kodiak appraisal well).

26.　　In February 2010, the *Deepwater Horizon* recommenced drilling operations on the Macondo well.

**BP HIRES HALLIBURTON TO DESIGN AND CEMENT ITS WELLS, AND TO BE THE SENTINEL ON GUARD FOR WELL FLOW TO PREVENT A BLOWOUT.**

27.    Like other operators in the Gulf of Mexico, BP relies upon and hires specialists and experts to perform operations associated with offshore drilling.  Halliburton is one of the companies that provide specialized and expert support to operators such as BP.

28.    Halliburton holds itself out as the leader in cementing services:

a. "Halliburton, the industry leader in cementing innovation, offers proven solutions for every cement job."

b. "Halliburton originated the cementing process and remains today the world leader in market position and customer perception."

c. "While the majority of wells drilled can be cemented with standard slurries and equipment, Halliburton has also distinguished itself as a reliable provider of cementing solutions to meet challenging downhole and environmental conditions."

d. "From Halliburton, the cementing and drilling fluids pioneer, comes another innovative, fit-for purpose cementing first:  our **Tuned Cementing Solutions™** approach. Halliburton's **Tuned** systems deliver the best solution for any given set of wellbore conditions.…  For reliability and ingenuity, the one to call is Halliburton.  Whatever your cementing challenge."

e. "Foam cement helps improve mud displacement, helps prevent gas migration and helps protect the formation:

    The compressed gas bubbles in foam cement shrink or expand, but they don't move around or coalesce.…Result:

8

virtually no gas migration into the cement, ever—while the

cement is being placed or while it sets."

29.    Halliburton made the aforementioned representations and others with the

intention that operators like BP would rely upon them and hire Halliburton as a contractor to

provide cementing and other services.

30.    BP relied on the many Halliburton representations as part of its decision to

enter into an agreement with Halliburton to provide cementing, mud logging and other services.

BP paid Halliburton significant sums of money for the specialized and expert services

Halliburton provided to BP.  BP also relied upon Halliburton with respect to the cementing and

mud logging services Halliburton provided to BP in connection with and for the Macondo well.

**UNDER THE WELL SERVICES CONTRACT, HALLIBURTON PROMISED AND
REPRESENTED THAT IT WOULD PROVIDE AN ARRAY OF PROFESSIONAL
SERVICES IN SUPPORT OF BP'S OPERATIONS IN THE GULF OF MEXICO,
INCLUDING CEMENTING AND MUD LOGGING SERVICES**

31.    On April 15, 2009, BP Exploration & Production and Halliburton entered

into a written contract for Offshore Well Services in the Gulf of Mexico ("Well Services

Contract").

32.    The Well Services Contract covered a number of professional services,

including cementing and mud logging, that Halliburton would provide to BP in support of its

drilling operations in the Gulf of Mexico.  The services are referred to in the contract by the

defined term "WORK."

33.    Under the contract, Halliburton promised and represented to BP that it

would "carry out all of its obligations under the contract and shall execute the WORK with all

due care and diligence and with the skill to be expected of a reputable contractor experienced in

the types of work to be carried out under the contract." BP reasonably believed and relied upon Halliburton's representations in this regard with respect to the operations at the Macondo well.

34.    Under the Well Services Contract, Halliburton promised and represented to BP that it "shall take full responsibility for the adequacy, stability, health, safety and environmental protection of all its operations and methods necessary for the performance of the WORK." BP reasonably believed and relied upon Halliburton's representations in this regard with respect to the operations at the Macondo well.

35.    Under the contract, Halliburton agreed to comply with BP's requests, "except to the extent" they "create a hazard to safety." Thus, under the contract, Halliburton was empowered to refuse any task or request that created a safety hazard.

36.    Under the Well Services Contract, Halliburton represented and promised to BP that "all personnel employed on the WORK shall, for the WORK they are required to perform, be competent, properly qualified, skilled and experienced in accordance with good industry practice." BP reasonably believed and relied upon Halliburton's representations in this regard with respect to the operations at the Macondo well.

37.    Under the contract, Halliburton warranted, promised, represented, and guaranteed to BP that it would "exercise all reasonable skill, care and diligence in the performance of the WORK and shall carry out the WORK in accordance with the requirements of the CONTRACT and to internationally recognized good oilfield practices and standards." BP reasonably believed and relied upon Halliburton's representations in this regard with respect to the operations at the Macondo well.

38.    Under the Well Services Contract, Halliburton represented and promised to BP that it "shall ensure that its personnel are aware of and carry out their own obligations with

regard to health, safety and the environment including the strict obligation to report unsafe working conditions, hazards…and environmental issues."   BP reasonably believed and relied upon Halliburton's representations in this regard with respect to the operations at the Macondo well.

## CEMENTING SERVICES UNDER THE WELL SERVICES CONTRACT

39.     Halliburton's cementing services were covered in Section 3, Appendix 5 (A) to the Well Services Contract.   Pursuant to the contract, Halliburton promised and represented to BP that it would provide an onshore engineer to work at BP's offices and be a member of the BP well planning team with the following roles and responsibilities:

(a)     Provide Safety Leadership training to all [Halliburton] personnel performing work under the contract;

(b)     Participate in all [BP's] safety initiatives and setting of safety targets and goals for all [Halliburton] personnel performing work under the contract;

(c)     Take full accountability for the technical quality, safety and environmental performance of all sub-contracted services managed by [Halliburton];

(g)     Apply risk based engineering processes to prepare the BOD, individual well programs and all associated engineering and documentation;

(i)     Provide engineering support for all aspects of the service provided and fully competent in running all engineering software models offered to support the service, including the ability to run [Halliburton's] cementing software from [BP']s office;

(j)     Provide solutions where conventional cement design and procedures are not suitable, such as blend and foam cement;

(k)     Make recommendations on fit for purpose slurry designs to meet agreed specification;

(l)     Participate in the review of the previous days drilling activities with [BP's] onsite and offsite drilling management as required;

(w)     [Halliburton's] Onshore Engineer shall ensure the equipment is fit to perform the planned work;

(x)     Produce or ensure the following documents are prepared, approved, and issued:

**Cement Program**

- ◦ Specific well details which impact cementing design (depths/casing sizes/temperatures (static and circulating), hole sizes, proposed excess)
- ◦ Agreed Drilling and Completions SPM score card objectives as found in Attachment D - Global Drilling and completions SPM Score Card.
- ◦ Slurry designs and expected properties
- ◦ Proposed spacers (volumes/formulations/properties)
- ◦ Assumed mud properties
- ◦ Temperature simulation results
- ◦ Predicted circulating densities and pressures at any potential loss zones
- ◦ Centralizer details (type and placement)
- ◦ Logistical, bulk and additive requirement
- ◦ Cementing hardware needed on location (cement head/water bushings etc.)
- ◦ Commercial breakdown of program covering:
    - i.     Cement and chemicals
    - ii.    Rental equipment
    - iii.   Consumables
    - iv.    Third party equipment being supplied
    - v.     Personnel changes
- ◦ Recommended procedures and techniques
- ◦ Agreed contingencies

**Detailed Cement Report**

- ◦ Actual well details
- ◦ Slurry recipes
- ◦ Laboratory test results on rig materials
- ◦ Spacer design, volumes and recommended properties
- ◦ Equipment requirements
- ◦ Job execution procedures, including chemical handling bulk transfers and surface lines pressure testing
- ◦ Pumping schedule
- ◦ Displacement simulation and ECD prediction
- ◦ Frequency - Per cement job - 24 hours prior to execution

BP reasonably believed and relied upon Halliburton's representations in this regard with respect to the operations at the Macondo well.

12

40.     Paragraph 8.3.5 of the contract between Halliburton and BP states that Halliburton must "Provide detailed program and work instructions and ensure all hazards are adequately debated prior to commencing operations.  Participate in all COSHH and risk assessments associated with the casing and cement operation."  BP reasonably believed and relied upon Halliburton's representations in this regard with respect to the operations at the Macondo well.

### MUD LOGGING SERVICES UNDER THE WELL SERVICES CONTRACT

41.     Section 3, Appendix 5 (C) sets forth Halliburton's contractual responsibilities for the mud logging services that it provided on the Macondo well.

42.     Paragraph 10.1 "defines the minimum level of service that the COMPANY requires from any [Halliburton] Mud logging Unit": "CONTRACTOR is deemed to have an expert knowledge and capability" and BP "expects… (b) The maintenance and calibration of all sensors to ensure that they are always providing accurate data to assist real time decision making, and for processing to aid post-well analysis."  BP reasonably believed and relied upon Halliburton's representations in this regard with respect to the operations at the Macondo well.

43.     Paragraph 10.2 on the Well Services Contract states that the "Principal objectives of the mud logging service" are to "Monitor the drilling operations parameters…understand their significance to the downhole conditions and advise COMPANY and Drilling Contractor personnel of any situation developing with safety or efficiency implications.  Where the situation is judged to be of a serious potential impact, logging personnel should contact the rig floor directly if COMPANY representative cannot immediately be contacted."  BP reasonably believed and relied upon Halliburton's representations in this regard with respect to the operations at the Macondo well.

13

44.     Paragraph 10.5.1 of the parties' contract provides that Halliburton must have a "Drilling Monitor Program" capable of monitoring, "in graphical and textual form," "Mud flow rate in," "Mud flow rate out," and "standpipe pressure." Paragraph 10.5.2 states that Halliburton must have a "Pit Volume Totalization and Monitor Program" capable of monitoring "trends of the total and individual pit volumes, and trends in the active circulating volume" to "allow for totalizing in any combination to give resultant active and reserve volumes" of the mud pits.   And, Paragraph 10.5.4 states that Halliburton must have a "Kick and Kill Monitor Program" to monitor "When the well is shut-in, or whilst killing the well" parameters including: "Casing pressure"; "Standpipe pressure"; "Total pit volume"; "Mud weight in/out"; "Mud flow in"; "Total barrels displaced"; and "Total strokes pumped."   Under the Parties' contract, Halliburton agreed, promised and represented that it would provide all of these services and equipment to BP with respect to the Macondo well.  BP reasonably believed and relied upon Halliburton's representations in this regard with respect to the operations at the Macondo well.

45.     Paragraph 10.7.3 titled "Data Sampling, Processing, and Storage Specifications" specifies "the recording specifications to ensure that accurate, pertinent data is obtained in a reliable manner to aid the real time decision making process and for post well analysis."   Specifically, Halliburton's mud logging services must meet the following specifications, among others:

a.     Dynamic drilling parameter measurements (including block/kelly position, rig heave, hookload, torque, rotary speed, stand-pipe pressure) shall be filtered to minimize the effects of data aliasing;

b.     Parameters shall all be sampled at a consistent frequency.   A minimum sampling frequency of 10Hz is required;

c.     Each of the critical variables shall be allocated low and high level alarms and the setting of these discussed with BP Drilling Representative/Engineer at the start of the well; and

14

        d.      Placement of mud logging sensors shall allow all measurements to be made independently of other CONTRACTOR equipment.

BP reasonably believed and relied upon Halliburton's representations in this regard with respect to the operations at the Macondo well.

46.      Paragraph 10.10 states that the "prime responsibility of the [Halliburton] Mud Logging service [is] well monitoring and safety" and "defines Mud Logging activities that are to take precedence during each type of activity … to avoid ancillary function acting to the detriment of the prime responsibility." Paragraph 10.10.1 expressly states that the "Primary responsibilities [of Halliburton] during Drilling/Circulating" are "Well monitoring, including total gas levels, circulating system volumes, mud flow, mud weight/temperature, mud losses"; "Monitoring for indications of drilling problems, e.g., poor hole cleaning, pipe sticking, bit balling, excessive cavings"; and "Monitoring and display of all logged parameters." BP reasonably believed and relied upon Halliburton's representations in this regard with respect to the operations at the Macondo well.

## HALLIBURTON'S CONDUCT IN CONNECTION WITH THE CEMENTING JOB BEFORE, ON AND AFTER, APRIL 19-20, 2010

47.      To obtain a cement slurry and placement design that would make zonal isolation possible, Halliburton designed and recommended to BP a nitrified foam cement slurry to cement the production casing in the Macondo well. Foamed slurries can be used to reduce the cement slurry density and prevent gas migration. Halliburton's recommended plan for cement placement in the Macondo well called for pumping base oil, spacer, bottom wiper plug, cap cement, foamed cement, tail cement, top wiper plug and spacer. BP accepted, and reasonably relied upon, Halliburton's written recommendations for the cement slurry design and the cement plan for the Macondo well.

48.     The intended purpose of the nitrified foam cement was to isolate the formation and form a protective barrier to flow.  The intended purpose of the tail cement was to fill the shoe track and likewise form a barrier preventing flow into the casing.

49.     The ingredients designed and recommended by Halliburton to BP for the Macondo well cement slurry were:

| Fluid 4: Foamed Tail Cement – **Foamed to average density of 14.5 ppg** | | |
|---|---|---|
| Premium Cement | Fluid Weight | 16.74 lbm/gal |
| 94 lbm/sk  Premium Cement (Cement) | Slurry Yield: | 1.37 ft³/sk |
| 0.07 %  Halliburton EZ-FLO (Bulk Flow Enhancer) | Total Mixing Fluid: | 5.04 Gal/sk |
| 0.25 %  D-AIR 3000 (Defoamer) | Top of Fluid: | 17400 ft |
| 1.88 lbm/sk  KCL (Additive Material) | Calculated Fill: | 904 ft |
| 20 %  SSA-1 (Additive Material) | Volume: | 55.41 bbl |
| 15 %  Common White-100 Mesh, SSA-2 | Calculated Sacks: | 191.44 sks |
| 0.2 lbm/sk  SA-541 (Additive Material) | Proposed Sacks: | 200 sks |
| 0.11 Gal/sk  Zonesealant 2000 (Foamer) | | |
| 0.09 Gal/sk  SCR-100L (Retarder) | | |
| **1 lbm/bbl  WellLife 734 (Additive Material) – added by hand to down hole side** | | |

50.     On information and belief, Halliburton's EZ-FLO, D-AIR 3000, KCl, and SCR-100L additives are dispersing agents that can destabilize foamed cement slurry.

51.     At the time Halliburton recommended the use of its EZ-FLO, D-AIR 3000, KCl, and SCR-100L additives and pumped the cement slurry in the production interval of the Macondo well, Halliburton knew or should have known of the properties of these additives and that they should not be used with foamed cement slurries.

52.     Specifically, Halliburton knows and indeed warns that defoamers such as D-AIR 3000 should not be used with foamed cement slurry.

53.     Further, Halliburton knows and indeed warns that salts such as potassium chloride (KCl) and dispersants such as SCR-100L should not be used with foamed cement slurry.

54.     At no time prior to the *Deepwater Horizon* explosion on April 20, 2010 did Halliburton inform or warn BP that any of the additives in its cement slurry design would

destabilize the foamed cement slurry that it recommended using at the Macondo well.  To the contrary, Halliburton recommended that BP use the cement slurry that it designed that contained these defoamer and dispersant additives.

## HALLIBURTON'S FEBRUARY CEMENT SLURRY TESTING

55.    On February 12, 2010, Halliburton conducted a foam stability test on a pilot cement slurry that was similar to the final slurry design but used more retarder additive. The cement slurry was foamed at 14.496 pounds per gallon ("ppg") or 1.737 specific gravity ("sg").  According to Halliburton, the slurry was then poured into a PVC pipe to cure at 180°F for 48 hours.  The laboratory worksheet indicates that no conditioning was done on the slurry before foaming, and the test resulted in a cured cement density of 2.02 sg (or 16.8 ppg) on the top and 2.11 sg (or 17.6 ppg) on the bottom.  The test results give two indications that the cement slurry did not form a stable foam:  the cured cement density was greater than the foamed cement density indicating gas breakout; and the difference in density from top to bottom indicates settling within the foamed cement slurry.  These results were not provided to BP before the cement job.  Moreover, Halliburton never reported to BP these foam stability test results indicating that the foamed cement slurry was not stable.

56.    In addition, the February 12, 2010 laboratory worksheet indicates that a crush compressive strength test on the foam slurry was abandoned because it was observed that the "slurry is settling."   Settling is an indication that the foam slurry is not stable.  Again, Halliburton did not provide these test observations to BP before the cement job was performed or even after the blowout.

57.    On February 16, 2010, Halliburton conducted a second set of tests.  The laboratory worksheet indicates that Halliburton conditioned the cement slurry at 180°F for two hours before foaming.  As noted above, the Halliburton cement slurry contains a temperature-

17

activated suspension additive, SA-541.   SA-541 begins thickening the cement slurry at temperatures of 140°F.  The purpose of the additive is to prevent the cement from settling while it is curing at its intended location.  Activating the suspension agent makes the cement more viscous and increases the foam stability.

58.     However, this laboratory condition is not representative of field conditions.   Specifically, the cement on the rig is not conditioned for hours at an elevated temperature before foaming.

59.     Using the more viscous cement slurry prepared under modified conditions, Halliburton was able to generate a foam stability test result with a uniform density on the top and bottom of 1.91 sg (15.9 ppg).  However, the density was still greater than the target of 14.5 ppg, indicating the cement slurry was not stable.

60.     Further, on this February 16, 2010 laboratory worksheet, Halliburton noted additional problems with the crush compressive strength test on the foam slurry it had designed.  The lab worksheet states that after 60 hours of cure time the foam cube is "hard on bottom; soft on top" and after 96 hours the cube is "hard on bottom; firm on top."  Despite these indications that the foam slurry was unstable and not curing properly, Halliburton performed a crush compressive strength test.

61.     Neither the February 12th nor the February 16th laboratory worksheets containing Halliburton's test results and observations were provided to BP.

62.     On March 8, 2010, Halliburton provided a materially false and fraudulent laboratory report to BP.   In the communication attaching the report, Jesse Gagliano of Halliburton misrepresented to BP that he had "attached the lab test for your review."  The same laboratory report was transmitted again on April 1, 2010 with a further materially false and

18

fraudulent misrepresentation from Mr. Gagliano of Halliburton to BP that he had "a pilot test run, see attached."

63.     The materials transmitted to BP on March 8, 2010 and again on April 1, 2010 were not the entirety of the February pilot slurry testing.  The transmitted materials were not as Mr. Gagliano represented, and they omitted several test results and observations that indicated that the cement slurry was not stable.  Specifically, Halliburton failed to report the foam stability testing results from the February 12th lab worksheet that strongly indicated foam instability.  Rather, Halliburton reported only the test results from the February 16th lab worksheet that could suggest foam stability.

64.     Halliburton made further misrepresentations and omissions in the report itself.  Specifically, when reporting the foam stability test results on March 8, 2010 and April 1, 2010, Halliburton misrepresented the conditions under which those results had been achieved: Halliburton falsely reported to BP that the slurry had been conditioned for 0 hours when in fact it had been conditioned for 2 hours.

65.     In the report transmitted on March 8, 2010 and April 1, 2010, Halliburton also reports the crush compressive strength test in a fraudulent and incomplete manner. Halliburton's report suggests that there was a successful crush test when, in fact, there were known problems with the test.  Specifically, the laboratory report provided to BP reports only the crush compressive strength result and omits information regarding the conditioning time or the physical observations indicating slurry instability.

66.     Put most simply, Halliburton affirmatively and falsely represented material facts to BP including (i) that it was transmitting all the test results for the pilot cement slurry; and (ii) that the pilot slurry had passed the tests.  In fact, Halliburton had not transmitted

19

the entire test results and, instead, concealed the test results that clearly indicated foam instability. Further, with knowledge of these undisclosed facts, Halliburton did not inform BP that the cement slurry it recommended did not form a stable foam.

67.     On March 23, 2010, BP engineers participated in a meeting with Halliburton engineer Mr. Gagliano where they discussed casing options and whether to run a foamed cement slurry. A BP engineer suggested running conventional cement slurry to avoid the added equipment associated with using foamed cement slurry. At that time, Halliburton did not inform BP of or discuss the stability issues with recommended foamed cement.

68.     Thus, as of March 23, 2010, Halliburton knew that there were serious problems with its cement slurry design but intentionally withheld and concealed that information from BP. Halliburton knew that BP was considering using conventional cement slurry and did not reveal the known risks with using the Halliburton foam slurry. At the same time, Halliburton provided BP with data and information suggesting that the slurry was stable and that there were no problems with the cement slurry. BP, unaware of the problems with the cement design, continued to work toward completing the well. BP reasonably believed and relied upon Halliburton to tell it the truth and to disclose all material facts and information with respect to Halliburton's laboratory testing of the slurry it was designing.

## HALLIBURTON'S APRIL CEMENT SLURRY TESTING

69.     After the February testing, Halliburton did not redesign the cement slurry. Instead, on April 13, 2010, Halliburton conducted a foam stability test on a similar slurry (with only a change in the concentration of retarder) that was conditioned at 180°F for 1.5 hours. Once again, Halliburton's laboratory worksheets show that the foam was not stable: 1.88 sg (or 15.7 ppg) at the top; and 1.82 sg (or 15.1 ppg) at the bottom. These foam stability test results were never reported to BP.

20

70.     On April 14, 2010, BP engineers and Halliburton engineer Mr. Gagliano met to discuss Halliburton's modeling for the upcoming cement job at the Macondo well. Mr. Gagliano assured BP engineers that the well could be successfully cemented with a foamed cement slurry even if BP chose to cement a long-string production casing. On April 14, 15, 17, and 18, 2010, Mr. Gagliano sent BP engineers OptiCem models and cement plans for the cement job at the Macondo well. Despite discussing the cement slurry with BP engineers and later sending recommendations to use the foamed cement, Mr. Gagliano did not disclose the foam stability test results from April 13, 2010 or the prior failed stability tests. Nor did Mr. Gagliano raise any concerns with using a foamed cement slurry.

71.     On April 16, 2010, a laboratory worksheet was generated for cement testing on the exact cement slurry that was ultimately pumped in the Macondo well, incorporating 0.09 gps of retarder. The listed tests included a foam stability test. However, that test was not run. Instead, there is an internal Halliburton note to "cancel foamed stability as per Jesse." Indeed, no foam stability test was ever completed on the exact cement slurry pumped into the Macondo well. Neither this laboratory worksheet nor the fact that the foam stability test was cancelled was ever provided or disclosed to BP before the April 20, 2010 incident.

72.     On April 17, 2010, Halliburton provided another materially false and fraudulent report to BP. Mr. Gagliano set another laboratory report and falsely stated and misrepresented to BP that he had "[a]ttached the lab tests." But that report did not include the pilot cement tests from February or April indicating that Halliburton had been unable to generate a stable foam cement despite numerous different attempts to do so.

73.     As recorded on a laboratory worksheet dated April 17, 2010, Halliburton performed a repeat foam stability test. Halliburton conditioned the cement slurry at 180°F for 3

21

hours for this test.  The test results in a specific gravity of 1.8 on top and 1.799 on bottom—equivalent to 15.0 ppg and still above the target of 14.5 ppg.  The conditions for the test conducted on this laboratory worksheet were also unrepresentative of the field conditions because the cement slurry is not conditioned at elevated temperatures for three hours before foaming on the rig.  Further, Mr. Gagliano and the Halliburton cement team did not have these test results before beginning the cement job on April 19, 2010.

      74.     On April 18, 2010, Mr. Gagliano sent BP a "recommended procedure for cementing the casing strings in the referenced well."  By this time, Halliburton had performed three foam stability tests on the cement slurry that it was recommending for use in sealing the bottom of the Macondo well.  In each foam stability test that Halliburton had performed, the cement slurry had failed the test and indicated instability.  Despite this, Halliburton sent BP a job recommendation to pump this slurry:

> Enclosed is our recommended procedure for cementing the casing strings in the referenced well. The information in this proposal includes well data, calculations, materials requirements, and cost estimates.  This proposal is based on information from our field personnel and previous cementing services in the area.

      75.     Under the heading "Job Recommendation," Halliburton recommended the unstable foamed cement slurry.

      76.     Halliburton further provided the Job Procedure, including Detailed Pumping Schedule and Foam Design Specifications.  Nowhere in this Job Recommendation did Halliburton inform BP that all of the Halliburton foam stability testing to date had indicated that the recommended foamed cement slurry was unstable.  Likewise, Halliburton did not tell BP that it had never tested the foam stability of this particular recommended cement slurry.

77.     Hallibuton never informed BP engineers of the instability of the foam slurry nor did it redesign the slurry.  Instead, Halliburton recommended that BP proceed with the final operations to temporarily abandon the well.

78.     On April 19, 2010, based on Halliburton's representations and recommendations, BP gave Halliburton the go-ahead to perform the cement job that was intended to achieve zonal isolation and form a cement barrier that would keep the well from flowing.

79.     Halliburton, using its own cementing personnel, began the cement job at approximately 8:00 p.m. on April 19, 2010.  Halliburton's mud loggers were charged with monitoring the flow data during the cement job.  The cement job took approximately four and one half hours to complete.  At the conclusion of the cement job, Halliburton reported to BP that the cement job was a success.  Halliburton reported that there were full returns (*i.e.*, no cement losses) and lift pressure during the cement operation.  Based on this information, BP personnel on the rig communicated to BP personnel onshore that the cement job was a success.

80.     On the morning of April 20, 2010, BP held its morning Macondo meeting. Members of the BP onshore team attended in person and rig personnel attended by phone.  In addition, Mr. Gagliano of Halliburton and various contractors attended the morning meeting in person and by phone.  A Halliburton cement engineer on the rig gave an overview of the cement job and indicated that it was executed successfully.  At the meeting, BP announced its intention not to run a cement bond log in light of Halliburton's report that there were full returns during the cement job and that the cement job was successful.  At that time, the various parties and contractors involved with the Macondo well were invited to comment on this decision.  Despite having unique information about the stability of the cement slurry, Halliburton did not request

that a cement bond log be run or notify BP that the improperly-designed Halliburton cement could fail even if it were pumped correctly.

81.     BP continued operations without performing a cement bond log and the rig crew proceeded with a negative pressure test that underbalanced the well without ever knowing what Halliburton knew—that the cement at the bottom of the well was highly unstable. Less than 24 hours after Halliburton finished its work, the cement on the bottom of the well allowed hydrocarbons to flow uncontrolled, resulting in the blowout and explosion, loss of life and personal injuries, and subsequent flow of oil into the Gulf of Mexico.

82.     Thus, from February 2010 until April 19, 2010 when Halliburton performed the cement job to isolate the reservoir, Halliburton repeatedly misrepresented the results and nature of its testing, reported false and misleading test results, and concealed unfavorable test data.  At no time before April 20, 2010 was BP aware that Halliburton had information showing that the cement slurry it pumped on April 19-20, 2010 was unstable.  Based on Halliburton's fraudulent misrepresentations and omissions, BP allowed Halliburton to pump the cement slurry that it recommended to BP.  Halliburton has only recently admitted that its cement failed to achieve zonal isolation and permitted hydrocarbon flow.

**CHEVRON FOUND THAT HALLIBURTON'S CEMENT DESIGN WAS DEFECTIVE**

83.     The problems with the cement slurry that Halliburton designed, recommended and pumped were also confirmed by Chevron.   Following the incident, Halliburton provided cement and additive samples similar to those used at the Macondo well to Chevron for testing.  On October 26, 2010, Chevron stated that it was unable to generate a stable foam cement using the same components and design parameters that Halliburton used to produce the cement slurry for the Macondo well production casing.  Among other things, Chevron identified numerous problematic issues with the Halliburton cement:

- First, the unfoamed cap and shoe cement slurry had poor fluid loss properties. And, despite its poor fluid loss qualities, the Halliburton-designed cement slurry did not incorporate a fluid loss additive.

- Second, the crush compressive strength test could not be performed on the foam slurry cubes because, after the appropriate cure time, the samples were removed from the molds and were observed to have lost approximately one-half inch of their original two-inch height.

- Third, FYSA Viscosity Profile testing on the foamed cement could not be performed because a stable foam could not be formed.

- Fourth, foam stability testing showed that the Halliburton-designed slurry did not generate a stable foam. Specifically, Chevron stated that a series of nine tests were conducted under varying conditions but none of the tests produced a stable foam.

- Fifth, the foam stability tests on cement slurry contaminated with mud or spacer were canceled due to the inability to generate stable foams.

- Finally, static gel strength testing showed that the Halliburton-designed slurry had poor gel transition time and would not be suitable for controlling gas migration.

## HALLIBURTON, WHO WAS THE SENTINEL FOR THE WELL, FAILED TO DETECT AND ALERT THE CREW TO THE IMPENDING BLOW OUT

84.     On April 20, 2010, once the cement job was finished, the *Deepwater Horizon* crew then began taking the next steps to temporarily abandon the well. This included running a negative pressure test and displacing the heavy drilling mud with seawater. As the heavy drilling mud was displaced, the well bore would become underbalanced relative to the pore pressure exerted from the formation over three miles below the surface. A critical barrier standing between a pressurized reservoir of oil and gas and the crew on the *Deepwater Horizon* was the cement designed and pumped by Halliburton. If that cement failed to isolate the hydrocarbon layers, for whatever reason, it fell to the Halliburton mud loggers, whose "prime responsibility" was "well monitoring and safety," to monitor the sensors for indications of a kick and alert the Transocean drilling crew in time for steps to be taken to prevent a blowout.

85.     The Halliburton mud logger on duty on April 20, 2010 at all relevant times during the displacement of the riser was Joseph Keith. Mr. Keith began his shift at approximately 5:30 p.m. on April 20, 2010. To perform his duties, Mr. Keith was stationed at the mud loggers shack or office, where he monitored both real time graphical readouts of data on large computer monitors as well as closed circuit television screens that allowed him to monitor a number of essential parameters, including flow in versus flow out, drill pipe pressure and mud level changes in the trip tanks

86.     From approximately 7:00 p.m. until 8:52 p.m., the Transocean crew was engaged in steps to temporarily abandon the well. At approximately 8:00 p.m., the crew began displacing the drilling mud in the well with seawater. The well was now being deliberately underbalanced. If the cement barrier had failed to isolate the hydrocarbon layers, the well would begin to flow posing a safety risk to the crew on the *Deepwater Horizon*. Halliburton knew and

26

understood that, at critical junctures like this, continuous monitoring of the well by its mud loggers was essential to prevent a blowout. However, Mr. Keith either abandoned his post during this critical time period or he missed the indicators that the well was flowing. Significantly, post-incident, Mr. Keith represented and told BP's Internal Investigation Team that at no time did he leave his position. Only months later did Mr. Keith finally reveal that, in fact, he did leave his post unattended around 9:00 p.m. for the purpose of having a smoke, getting some coffee, and using the bathroom.

87.     At 8:52 p.m., the data available to the Halliburton mud loggers indicated that the well had begun to flow. By 8:58 p.m., the data indicators that the well had begun flowing were evident to any competent mud logger. But Halliburton's mud loggers did not inform anyone about these indicators.

88.     By 9:08 p.m., the trip tank had gained 39 barrels, another indicator that the well was flowing. Also at or near this time a visible alarm showing that there had been an abnormal gain in the tanks appeared on the Halliburton mud logger's monitor. It required manual acknowledgment to turn it off. Mr. Keith either missed this alarm or had turned off his alarms without BP's knowledge.

89.     By 9:08 p.m., the drill pipe pressure, which should have been decreasing during the displacement, had reversed course and climbed from 1,250 psi to 1,350 psi. Halliburton's mud logger, Mr. Keith, did not see this signal indicating a kick either.

90.     At 9:08 p.m., the spacer returned to the surface and the pumps were shut down in order to allow sheen testing of the spacer.

91.     From 9:08 p.m. to 9:14 p.m., while the sheen test was being conducted and the rig's pumps were shut off, the pressure on the drill pipe increased another 250 psi.  Mr. Keith missed this kick signal also.

92.     Having determined that the sheen test was satisfactory, the *Deepwater Horizon* crew restarted the pumps to continue displacing the riser with seawater.

93.     From 9:14 p.m. to 9:25 p.m., the drill pipe pressure increased to over 2,500 psi.  Halliburton's mud logger, Mr. Keith, claims that he was at his station but did not see that the well was now experiencing a large kick and on its way to blowing out.  By now the gas was rapidly expanding in the riser.

94.     At approximately 9:41 p.m., the Halliburton mud logger, Mr. Keith, finally noticed that the well was flowing.  But it was not because of the computer displays that he was charged with monitoring.   It was because the well had blown out and mud was literally raining down on the mud loggers shack where he was sitting.  Minutes later, the first explosion occurred.

## AFTER THE *DEEPWATER HORIZON* INCIDENT

95.     Post-job report:  On April 23, 2010, Halliburton sent to BP a post-job report purporting to summarize the results of the April 19, 2010 cement operation on Macondo. In the report, Halliburton represented to BP that the cement job had been completed successfully:

- Cement job pumped as planned.
- Chemical straps determined that additives were pumped at planned volumes.
- Rig completed displacement and both plugs were bumped.
- Full returns seen throughout entire job.

28

- Estimated 100 psi of lift pressure (350 psi circulating to 450 psi circulating), before bumping top plug.

- Floats held after job.

Nowhere in the April 23, 2010 transmission did Halliburton indicate that the cement job had failed or that the cement slurry had stability issues.

96.     Halliburton, in its April 23, 2010 transmission to BP, additionally represented that there was no mud lost during cementing, no annular flow, and that MMS requirements for top of cement ("TOC") were achieved:

- Returns While Cementing?  Yes.

- Mud Lost While Cementing?  No.

- Annular Flow Before/After Cementing?  No.

- Estimated TOC:  17,300 ft.

- MMS. Req. met:  Yes.

97.     Halliburton's representations were made with no foundation in fact and, on information and belief, with the intent to continue to conceal its defective cement.

98.     On April 26, 2010, four days after the *Deepwater Horizon* sank, Halliburton sent the partial results from its April testing in a laboratory report.  Mr. Gagliano wrote in the e-mail transmitting the report:  "See attached, Lab test not captured in Post-job Report."  The report, however, does not contain the failed foam stability test results from the April 13, 2010 laboratory worksheet or the earlier February tests.  Once again, even after the explosion, Halliburton concealed the failed test results.

99.     Further, the laboratory report sent on April 26, 2010 misrepresents the composition of the cement slurry tested.  Although the report indicates that it is for the cement

29

slurry pumped into the Macondo well with 0.09 gallon per sack ("gps") of retarder, many of the results are for cement tests on a slurry with 0.080 gps of retarder.

100.    Specifically, the foam stability test reported for the slurry with 0.09 gps of retarder was actually performed on a slurry with less retarder as shown in a laboratory worksheet dated April 17, 2010.

101.    On April 26, 2010, a BP engineer requested information about the cement operation from Jessie Gagliano.  The purpose of the request was to obtain relevant data and information about the cement slurry and its properties and the cement operation in order to assist in the relief well efforts.  After receiving some of the reports and test reports previously provided to BP, the BP engineer noticed that the cement slurry design included D-AIR 3000 defoamer additive.  The BP engineer asked Mr. Gagliano if there were any problems with the foamed cement stability, Mr. Gagliano misrepresented that Halliburton had tested the cement slurry with the defoamer and there were no stability problems.  In addition to this affirmative misrepresentation that there were no stability problems, Mr. Gagliano provided the BP engineer with the April 26, 2010 laboratory report, which did not report or include information about the unstable foam stability test results.

102.    On April 30, 2010, Halliburton issued a press release that suggests its cement worked as intended and that its cement slurry did not have any involvement in the Macondo blowout.  Among other things, Halliburton stated:  "Halliburton had completed the cementing of the final production casing string in accordance with the well design approximately 20 hours prior to the incident.  The cement slurry design was consistent with that utilized in other similar applications."

103.    On September 26, 2010, Halliburton told the public, the financial markets, its shareholders, BP and United States governmental officials that "Using rig cement, additives, and rig water, a stable foam cement system was designed, tested, delivered and quality assured on location." Halliburton further stated that its "Foam slurry passed all API 10B-4 9.3.4 requirements" because "[t]he density of the cured foam slurry, using the Archimedes principle, was identical at top and bottom," indicating "no free water" and "no settling." This statement, however, was materially misleading because it ignored the settling and foam instability observed in the cement tests.

104.    Shortly after the casualty, BP formed an Internal Investigation Team. Its purpose and charge was to determine the cause of the casualty. On May 14, 2010, BP's investigation team interviewed Jesse Gagliano. Mr. Gagliano did not tell the investigation team that the cement slurry that Halliburton had designed, recommended and pumped had instability issues. To the contrary, he told the investigation team that Halliburton had completed the testing and it all looked good. On August 24, 2010, Mr. Gagliano publicly repeated that statement.

105.    Further, on at least July 7, 2010, BP's Internal Investigation Team requested all of Halliburton's test results for the foamed cement slurry pumped at the Macondo well. This information was needed for the investigation that would result in the September 8, 2010 public report issued by BP's Internal Investigation Team. Halliburton represented to investigation team that it had provided all of the results from its laboratory testing. This statement was later demonstrated to be false when it was shown on November 8, 2010 that Halliburton had additional test results showing foam instability.

106.    In brief, even following the blowout and sinking of the *Deepwater Horizon*, Halliburton continued to conceal its role in designing, recommending and pumping a

31

defective cement slurry.  On April 23, 2010, Halliburton falsely told BP that the cement job was completed successfully.  On April 30, 2010, Halliburton repeated those false assertions to the world.  Around April 26, 2010, Jesse Gagliano told BP that Halliburton had tested the cement slurry with the defoamer additive and it was stable.  And, on May 14, 2010, Halliburton cement engineer Jesse Gagliano stated falsely and misrepresented to the BP Internal Investigation Team that all of the test results looked good.  Halliburton likewise falsely told the BP Internal Investigation Team that it had provided all of the test results to the team.  On August 24, 2010, a Halliburton cement engineer falsely stated to the public that Halliburton had conducted cement testing and the results looked good.  On September 26, 2010, Halliburton representatives again falsely represented to the public that it had successfully tested the cement slurry.  Even as BP, government agencies and scientists were working around the clock to determine the cause of the *Deepwater Horizon* incident in order to stop to flow of hydrocarbons and prevent similar incidents in the future, Halliburton continued to conceal and make false statements to prevent BP and others from learning the truth about the defective cement slurry that it designed, recommended and pumped at the Macondo well.

107.    Halliburton possessed unique knowledge and expertise concerning cement slurry, design, formulation and ingredients, and foam cement design, formulation and ingredients for the production string at the Macondo well.

108.    Halliburton knew before it began the cementing operation that it had not tested the foam stability of the cement slurry that it was pumping into the Macondo well but that foamed cement slurries with similar composition had failed the foam stability tests.

109.    As such, Halliburton knew that even if its slurry was pumped as planned and resulted in full returns as envisioned in BP's decision tree, there was still a significant risk of

failure of the cement to isolate the hydrocarbons because of the foamed cement slurry was unstable in laboratory testing.

110.    Despite Halliburton's unique knowledge of the foam cement slurry that it designed and pumped into the production interval of the Macondo well, Halliburton did not inform BP of any risks to the well, and did not warn BP or any of the other parties or the drilling crew of the potential risk of blow out.  As such, BP and the other parties were not able to take additional precautions in light of the added risk of an unstable foamed cement slurry.

### THE CLAIMS, LAWSUITS, AND EXPENSES ASSERTED AGAINST BP AS RESULT OF THE *DEEPWATER HORIZON* INCIDENT

111.    Oil and gas flowed from the Macondo well into the Gulf of Mexico until July 15, 2010.  The scale of the response program was massive and unprecedented.  From the outset of the *Deepwater Horizon* incident, BP has expressed its commitment to pay all legitimate OPA claims, while always reserving its right to seek reimbursement, contribution, and indemnification from other responsible parties.

112.    Plaintiffs have named BP as a defendant in hundreds of lawsuits arising out of the *Deepwater Horizon* incident pending before this Court and in other courts.

113.    The DOJ Complaint seeks, *inter alia*, "a declaratory judgment that is binding in this action and any subsequent action or actions against Defendants BP, Anadarko Exploration, Anadarko Petroleum, MOEX, Triton, Transocean Holdings, Transocean Offshore, and Transocean Deepwater, jointly and severally and without any limitation, and Lloyd's, the latter up to the amount of its COFR guarantee, that said Defendants are liable for removal costs and damages in this action and in any such subsequent action or actions."

114.    The DOJ Complaint also alleges that: "'natural resources,' as that term is defined in OPA, 33 U.S.C. § 2701(2), have been injured, destroyed, or lost;" the "amount of

33

damages and the extent of injuries sustained by the United States as a result of the Deepwater

Horizon Spill are not yet fully known, but far exceed $75,000,000" and that "[a]s a result of the

Deepwater Horizon Spill, the United States has expended and/or sustained and/or will expend or

sustain, *inter alia*, 'removal costs' and 'damages,' within the meaning of OPA, 33 U.S.C.

§ 2702(b)."

115.    The total amounts that ultimately will be paid by BP in any form relating

to the incident are subject to significant uncertainty.  The ultimate exposure and cost to BP will

depend on many factors, including the amount of claims that become payable by BP, the

outcome of lawsuits, and any costs arising from any longer-term environmental consequences of

the oil spill.

116.    As of the end of 2010, BP's incurred costs relating to the incident were

$17.7 billion.  BP's group income statement for 2010 reflects a pre-tax charge of $40.9 billion in

relation to the Gulf of Mexico oil spill.

## COUNT I:  HALLIBURTON'S FRAUDULENT CONDUCT

117.    BP realleges and incorporates by reference each allegation contained in

the preceding paragraphs as if fully set forth herein.

118.    Halliburton made at least the following affirmative material false

statements and misrepresentations to BP:

    a. On March 8, 2010, Mr. Gagliano told BP that he was sending "the lab test

       for your review" when, in fact, he did not send all of the pilot test results

       nor did he send the test results showing that the cement slurry had failed

       the tests;

    b. On April 1, 2010, Mr. Gagliano wrote to BP that "I already have a pilot

       test run, see attached" when, in fact, he did not send all of the pilot testing

results nor did he send the test results showing that the cement slurry had
failed the tests;

c. The pilot test results sent on March 8th and April 1st indicated that no
conditioning had been done on the foamed cement slurry when, in fact, the
slurry had been conditioned for two hours;

d. The pilot test results indicated that the crush compressive strength test was
successfully conducted when, in fact, one test was cancelled due to
settling and the other test had indications of foam instability;

e. On April 17, 2010, Mr. Gagliano told BP that he had "[a]ttached the lab
tests" when, in fact, he had not attached all of the test results nor did he
send the test results which showed failures of the tests;

f. On April 23, 2010, Mr. Gagliano transmitted a post-job report to BP that
stated that "Cement job pumped as planned," "Full returns seen
throughout entire job," "Mud Lost While Cementing: No," " Estimated
TOC: 17,300 ft.," and "MMS. Req. met: Yes"—even though Halliburton
could not verify this information;

g. On April 26, 2010, Mr. Gagliano told BP to "See attached. Lab test not
captured in Post-job Report" when, in fact, he had not attached all of the
lab tests not captured in the post-job report nor did he attach any failed test
results;

h. The laboratory report transmitted on April 26, 2010 to BP indicated that
Halliburton had tested the foam stability of the cement slurry poured at the
Macondo well when, in fact, Halliburton had not tested that slurry;

    i.   On or around April 26, 2010, Mr. Gagliano told a BP engineer that the cement slurry containing a defoamer had no stability problems when, in fact, it did have stability problems based on Halliburton's testing; and

    j.   On April 30, 2010, Halliburton issued a press release informing BP and others that "Halliburton had completed the cementing of the final production casing string in accordance with the well design approximately 20 hours prior to the incident.  The cement slurry design was consistent with that utilized in other similar applications" but at no time did Halliburton tell or inform BP or anyone else about any failed test results.

119.   The testing information that Halliburton misrepresented was material—indeed, it was critical.  Had Halliburton disclosed the failed test results to BP, BP would not have proceeded with the cement job on April 19-20, 2010.  Moreover, BP would not have authorized the pouring of an unstable foamed cement slurry into the Macondo well and it would have taken significant mitigating steps, such as running additional tests to ensure well bore integrity.

120.   Halliburton knew and understood it was misrepresenting material information, knew that BP was relying upon those representations, and did so knowing that BP was relying upon Halliburton to provide professional cementing services.  But for Halliburton's false statements and misrepresentations, BP would not have authorized the pouring of the unstable slurry.  Halliburton's misconduct and false statements induced BP to proceed with the cement job, believing that the cement slurry design recommended by Halliburton had passed the necessary tests, when in fact it had not.

121.    Following the incident, Halliburton continued to deceive BP and others. Thus, its intent to deceive BP both before and after the casualty was evident in its continued efforts to misrepresent and conceal the results of the slurry testing from BP.

122.    Had BP been informed of the testing information that Halliburton misrepresented it would have never authorized the pouring of the cement on April 19, 2010.

123.    Had BP been informed of the testing information that Halliburton misrepresented, it would have taken significant mitigating steps to address the risk on April 20, 2010 following the cementing operations.  BP also would have alerted its own personnel onboard and the crew of the *Deepwater Horizon* to be particularly vigilant had Halliburton given BP any reason to believe that the cement slurry Halliburton designed was unstable or would not work.

124.    Halliburton's knowing misrepresentations were a cause-in-fact and also a legal cause of BP's injuries.  As a result of Halliburton's knowing misrepresentations, BP allowed Halliburton to pour the unstable foamed cement slurry and did not detect the failure of the cement through the additional precautions that it would have taken had it known the results of Halliburton's testing.  But for Halliburton's multiple acts of material misrepresentations of fact, that is fraud, the casualty would not have occurred, the well would not have become uncontrollable, the explosion would not have happened, and the resulting deaths, injuries and oil spill would have been avoided.

## COUNT II: HALLIBURTON'S FRAUDULENT CONCEALMENT

125.    BP realleges and incorporates by reference each allegation contained in the preceding paragraphs as if fully set forth herein.

126.    From February 2010 to April 20, 2010 Halliburton concealed from BP the results of testing that it had performed that showed that the cement was unstable.  Specifically, Halliburton concealed from BP at least the following material facts:

37

a. Mr. Gagliano and others at Halliburton concealed from BP known problems with the stability of the foam cement slurry that Halliburton recommended to BP for the Macondo well;

b. Mr. Gagliano and others at Halliburton concealed from BP the results of the foam stability test reported on the laboratory worksheet dated February 12, 2010;

c. Mr. Gagliano and others at Halliburton concealed from BP the cancelled crush compressive strength test and the observations of settling in the foam cement reported on the laboratory worksheet dated February 12, 2010;

d. Mr. Gagliano and others at Halliburton concealed from BP the cement slurry preparation conditions on the laboratory worksheet dated February 16, 2010;

e. Mr. Gagliano and others at Halliburton concealed from BP the observations of foam instability in the crush compressive strength test reported on the laboratory worksheet dated February 16, 2010;

f. Mr. Gagliano and others at Halliburton concealed from BP the results of the foam stability test reported on the laboratory worksheet dated April 13, 2010;

g. Mr. Gagliano and others at Halliburton concealed from BP the cancellation of the foam stability test reported on the laboratory worksheet dated April 16, 2010; and

38

    h.  Mr. Gagliano and others at Halliburton concealed from BP that the foam stability test reported on the report sent April 26, 2010 was not for the slurry poured at the Macondo well.

127.    The testing information that Halliburton concealed was material, indeed, it was critical. Had Halliburton provided the failed test results to BP, BP would not have proceeded with the cement job on April 19-20, 2010. Moreover, as BP would not have authorized the pouring of an unstable foamed cement slurry into a pressurized reservoir and it would have taken significant mitigating steps, such as running additional tests to ensure well bore integrity.

128.    Halliburton knew and understood it was concealing material information, knew that BP was relying upon its expertise, and did so knowing that BP was relying upon Halliburton to do its job under the parties' contract. But for Halliburton's concealment, BP would not have authorized the pouring of the unstable slurry. Halliburton's misconduct and concealment induced BP to proceed with the cement job, believing that the cement slurry design recommended by Halliburton had passed the necessary tests when, in fact, it had not.

129.    Had BP been informed of the testing information that Halliburton concealed it would have never authorized the pouring of the cement on April 19, 2010.

130.    Had BP been informed of the testing information that Halliburton concealed, it would have taken significant mitigating steps to address the risk on April 20, 2010 following the cementing operations. BP also would have alerted its own personnel onboard and the crew of the *Deepwater Horizon* to be particularly vigilant had Halliburton given BP any reason to believe that the cement slurry Halliburton designed was unstable or would not work.

131.    Halliburton's knowing concealment was a cause-in-fact and also a legal cause of BP's injuries.   As a result of Halliburton's knowing concealment, BP allowed Halliburton to pour the unstable foamed cement slurry and did not detect the failure of the cement through additional precautions that it would have taken had it known the results of Halliburton's testing.  But for Halliburton's multiple acts of fraudulent concealment, the casualty would not have occurred, the well would not have become uncontrollable, the explosion would not have happened, and the resulting deaths, injuries and oil spill would have been avoided.

## COUNT III:  HALLIBURTON'S NEGLIGENCE AND FAULT

132.    BP realleges and incorporates by reference each allegation contained in the preceding paragraphs as if fully set forth herein.

133.    Halliburton had a duty to use reasonable care in the design, testing, mixing and pumping of the cement and in the monitoring of the well.  As described above, Halliburton breached that duty of reasonable care with respect to, among other things, its provision of professional services.  Moreover, Halliburton was negligent by, among other things:

    a.  Failing to properly run the OptiCem model, including failing to make the proper assumptions and inputs.  In this regard, Halliburton made numerous basic mistakes in the OptiCem model, including inputting demonstrably wrong information when it had the correct information to input into the model;

    b.  Failing to properly design the cement for the on-site conditions, including designing a cement slurry that was unstable and prone to nitrogen breakout;

    c.  Adding a defoamer that destabilized the foam cement slurry;

    d.  Failing to add appropriate fluid loss control additives;

e.   Failing to properly test the cement slurry design;

f.   Failing to report to BP the results of the cement testing;

g.   Failing to run the minimum tests required under the BP-Halliburton contract;

h.   Failing to follow Halliburton's own cementing guidelines;

i.   Pouring a cement that it knew was unstable;

j.   Failing to properly evaluate the success of the cement job;

k.   Failing to provide competent cementing personnel;

l.   Failing to provide competent mud logging personnel;

m.   Abandoning the mud logging station at a critical time;

n.   Missing or ignoring data indicators that the well was flowing; and

o.   Missing or ignoring alarms that indicated that the well was flowing.

134.   Halliburton's negligence, or if established based upon the evidence at trial that Halliburton's conduct constituted gross fault and/or gross negligence, was a cause-in-fact and also a legal cause of BP's injuries.  But for Halliburton's multiple acts of negligence, the casualty would not have occurred, the well would not have become uncontrollable, the explosion would not have happened, and the resulting deaths, injuries and oil spill would have been avoided.

## COUNT IV:  CONTRIBUTION

135.   BP realleges and incorporates by reference each allegation contained in the preceding paragraphs as if fully set forth herein.

136.   The Oil Pollution Act of 1990 ("OPA") states that "A person may bring a civil action for contribution against any other person who is liable or potentially liable under this Act or another law."  33 U.S.C. § 2709.

41

137.   The DOJ Complaint alleges that, as a result of the *Deepwater Horizon* incident, natural resources have been injured, destroyed, or lost; the amount of damages and the extent of injuries sustained by the United States are not yet fully known; and the United States has expended and/or sustained and/or will expend or sustain, *inter alia*, "removal costs" and "damages," within the meaning of OPA, 33 U.S.C. § 2702(b).  The DOJ Complaint also seeks a declaratory judgment that BP and the other defendants are liable for removal costs and damages in this action and in any such subsequent action or actions.

138.   If the United States successfully obtains and/or will obtain a monetary recovery from BP pursuant to OPA as a result of the release of oil and hazardous substances in connection with the *Deepwater Horizon* incident, including but not limited to the removal costs and damages alleged in the DOJ Complaint, such OPA financial liabilities to the United States on the part of BP would not primarily be due to any fault or negligence on the part of BP.

139.   In addition to the claims in the DOJ Complaint, plaintiffs have initiated hundreds of suits naming BP as a defendant under federal, state and common law claims.

140.   Halliburton is liable under "[OPA] or another law" for the alleged damages related to the oil spill resulting from the *Deepwater Horizon* incident for the reasons explained above.

141.   If BP is held liable to the United States or plaintiffs for any monetary recovery "under [OPA] or another law," including but not limited to the removal costs and damages alleged in the DOJ Complaint, Halliburton is liable in contribution to BP under Sections 1009 and 1017 of OPA, 33 U.S.C. §§ 2709 and 2717.

142.   To the extent other laws are applicable, Halliburton is further liable for contribution to BP.

143.     Furthermore, BP for its part is *not* liable to Halliburton for contribution, indemnification or otherwise for liabilities arising from the *Deepwater Horizon* incident.   In particular and based on, among other things, the allegations set forth above, BP is not liable in such fashion to Halliburton under OPA, the terms and conditions of the Well Services Contract, or under any applicable law.

144.     An actual controversy currently exists between BP and Halliburton with regard to Halliburton's liability to BP for any monetary recovery from BP obtained and/or to be obtained by the United States and plaintiffs in connection with the *Deepwater Horizon* incident. A declaratory judgment is therefore appropriate to define Halliburton's liability in contribution to BP for BP's liabilities, if any, to the United States and plaintiffs and also to bind Halliburton in any subsequent action or actions that BP may bring.

## COUNT V: SUBROGATION

145.     BP realleges and incorporates by reference each allegation contained in the preceding paragraphs as if fully set forth herein.

146.     The Oil Pollution Act of 1990 ("OPA") states "Any person … who pays compensation pursuant to this Act to any claimant for removal costs or damages shall be subrogated to all rights, claims, and causes of action that the claimant has under any other law." 33 U.S.C. § 2715.

147.     The *Deepwater Horizon* incident has caused and continues to cause harm, loss, injuries, and damages to BP, including but not limited to harm, loss, injuries, and damages related to the blowout of the Macondo well, the resulting explosion and fire onboard the *Deepwater Horizon*, the effort to regain control of the MC252 well, the oil spill that ensued before control of the Macondo well could be regained, and claims related to the *Deepwater Horizon* incident and oil spill.

148. BP has paid, and, on information and belief, will continue to pay damages to resolve claims related to the *Deepwater Horizon* incident.

149. Halliburton is wholly or partly at fault for the *Deepwater Horizon* incident, resulting oil spill, and related damages for the reasons explained in the preceding allegations.

150. Halliburton is liable in subrogation to the extent that BP has directly or indirectly paid claims to settle causes of action against BP under non-OPA causes of action, whether based on international law, state law, or other federal law.

151. To the extent other laws are applicable, Halliburton is further liable to BP in subrogation.

152. Accordingly, under Section 2715 of OPA, BP is entitled to recover from Halliburton reimbursement for all or a part of the damages, costs and expenses related to the *Deepwater Horizon* incident and resulting oil spill that BP has paid or will pay.

153. In addition, under subrogation law, BP is also entitled to recover from Halliburton reimbursement for all or a part of the damages, costs and expenses related to the *Deepwater Horizon* incident and resulting oil spill that BP has paid or will pay.

## PRAYER FOR RELIEF

Wherefore, BP respectfully asks of this Court:

1. Enter judgment in BP's favor against Halliburton.

2. Award BP compensatory and economic damages equal to, or in the alternative proportional to Halliburton's fault, the amount of costs and expenses incurred by BP to clean up and remediate the oil spill, the amount of claims paid by BP under the Oil Pollution Act, the amount of any judgments BP incurs or pays, the amount of any OPA financial

liability that BP is liable for, the lost profits from and/or diminution in value of the Macondo prospect, and all other costs and damages incurred by BP related to the *Deepwater Horizon* incident and resulting oil spill, plus interest.

3. Find that Halliburton misrepresented material facts to BP causing BP to suffer damages in an amount to be determined at trial.

4. Find that Halliburton intentionally misrepresented material facts to BP causing BP to suffer damages in an amount to be determined at trial;

5. Find that Halliburton concealed material facts from BP causing BP to suffer damages in an amount to be determined at trial.

6. Find that Halliburton intentionally concealed material facts from BP causing BP to suffer damages in an amount to be determined at trial.

7. Find that Halliburton committed negligence, or if established by the evidence at trial, gross fault and/or gross negligence, in the performance of its professional services, including cementing and/or mud logging services, causing BP to suffer damages in an amount to be determined at trial.

8. Find that Halliburton caused or contributed to the *Deepwater Horizon* incident and is responsible in whole or in part for all damages incurred by BP in an amount to be determined at trial.

9. Award damages in light of Halliburton's tortious conduct or, if it is established that BP's injury was caused by Halliburton's gross fault or gross negligence, appropriate damages.

10.    Declare pursuant to 28 U.S.C. § 2201 that BP may recover from Halliburton any financial liability amounts for which BP is determined to be liable, if any.

11.    Further, declare pursuant to 28 U.S.C. § 2201 that BP is not liable in contribution, indemnification or other forms of monetary payment to Halliburton with regards to liabilities arising from the *Deepwater Horizon* incident under OPA, the Well Services Contract, or under any applicable law.

12.    Award the reasonable costs and attorneys' fees incurred by BP in prosecuting this action.

13.    Award such other relief as the Court may deem appropriate and just.

46

Dated:  April 20, 2011

Respectfully submitted,

By: *s/ Don K. Haycraft*
    Don K. Haycraft (Bar #14361)
    R. Keith Jarrett (Bar #16984)
    LISKOW & LEWIS
    701 Poydras Street, Suite 5000
    New Orleans, Louisiana 70139-5099
    Telephone: (504) 581-7979
    Facsimile: (504) 556-4108

    and

    Richard C. Godfrey, P.C.
    J. Andrew Langan, P.C.
    KIRKLAND & ELLIS LLP
    300 North LaSalle Street
    Chicago, Illinois 60654
    Telephone: (312) 862-2000
    Facsimile: (312) 862-2200

    and

    Robert C. "Mike" Brock
    COVINGTON & BURLING LLP
    1201 Pennsylvania Avenue, NW
    Washington, DC 20004-2401
    Telephone: (202) 662-5985
    Facsimile: (202) 662-6291

    Attorneys for BP Exploration & Production Inc.
    and BP America Production Company

**CERTIFICATE OF SERVICE**

I hereby certify that the above and foregoing pleading has been served on All Counsel by electronically uploading the same to Lexis Nexis File & Serve in accordance with Pretrial Order No. 12, and that the foregoing was electronically filed with the Clerk of Court of the United States District Court for the Eastern District of Louisiana by using the CM/ECF System, which will send a notice in accordance with the procedures established in MDL 2179, on this 20th day of April, 2011.

/s/ Don K. Haycraft

# UNITED STATES DISTRICT COURT
# EASTERN DISTRICT OF LOUISIANA

| | | |
|---|---|---|
| In re:  Oil Spill by the Oil Rig | * | MDL No. 2179 |
| "*Deepwater Horizon*" in the Gulf | * | |
| of Mexico, on April 20, 2010 | * | SECTION: J |
| | * | |
| This Document Relates to:  2:10-cv- | * | JUDGE BARBIER |
| 04536-CJB-SS (*United States v. BP* | * | MAGISTRATE SHUSHAN |
| *Exploration & Production Inc., et al.*) | * | |
| | * | |

\* \* \* \* \* \* \* \* \* \* \* \* \*

## BP'S THIRD-PARTY COMPLAINT AGAINST HALLIBURTON

Defendant/Third-Party Plaintiff BP Exploration & Production Inc. ("BP") hereby brings this third-party complaint for contribution pursuant to the Oil Pollution Act of 1990 ("OPA"), 33 U.S.C. §§ 2701 *et seq.*, against Third-Party Defendant Halliburton Energy Services, Inc. ("Halliburton"), as set forth below, for the monetary recovery, if any, obtained by the United States pursuant to OPA and as a result of the release of oil and hazardous substances in connection with the *Deepwater Horizon* incident.

## INTRODUCTION

1.     BP Exploration & Production and its co-lessees, as leaseholders of the Macondo prospect, drilled an exploratory well in Mississippi Canyon 252 ("MC252") to discover whether any oil and gas could be extracted.  To drill the well, BP hired Transocean Inc. ("Transocean"), which used the *Deepwater Horizon* to drill the MC252 exploratory well.

2.     Halliburton provided cementing and mud logging services at the MC252 exploratory well.

3.     Halliburton's improper conduct, errors and omissions, including fraud and concealment, caused and/or contributed to the *Deepwater Horizon* incident.  In overview,

1

Halliburton designed and pumped a cement slurry into the Macondo well that was unstable and unlikely to isolate the hydrocarbons.  Halliburton could not have caused the resulting damage without concealing from BP material facts and expert opinions about its cement slurry, including its properties, weaknesses, and its likelihood of failure.  This concealment by Halliburton from BP of material facts about its cement slurry began before the cement job and continued after the cement job, after the explosion occurred, and even as BP was drilling a relief well to stop oil from flowing into the Gulf of Mexico.  Halliburton additionally failed to monitor the well during critical operations on the evening of April 20, 2010.  Halliburton's intentional misstatement of material facts to BP, combined with its intentional concealment of material information and data from BP—both before and after the explosion—caused significant injuries to BP as well as to other third parties.  As a direct result of Halliburton's improper conduct, the Macondo well blew out, killing eleven men, injuring numerous others, sinking the *Deepwater Horizon*, and spilling crude oil and hydrocarbons into the Gulf of Mexico with its attendant environmental consequences.

4.      Transocean filed a Complaint and Petition for Exoneration from or Limitation of Liability, Civil Action No. 10-2771 ("Limitation Action").  Plaintiffs/Claimants have filed or will file claims against Transocean in the Limitation Action.  On February 18, 2011, Transocean filed a Rule 14(c) Third-Party Complaint against BP, among others, to implead them into the Limitation Action and tender them to the Plaintiffs/Claimants.

5.      On December 15, 2010, the United States of America filed a complaint, Civil Action No. 10-4536 (the "DOJ Complaint") against BP Exploration & Production Inc., Anadarko Exploration & Production LP ("Anadarko Exploration"), Anadarko Petroleum Corporation ("Anadarko Petroleum"), MOEX Offshore 2007 LLC ("MOEX"), Triton Asset

Leasing GmbH ("Triton"), Transocean Holdings LLC ("Transocean Holdings"), Transocean Offshore Deepwater Drilling Inc. ("Transocean Offshore"), Transocean Deepwater Inc. ("Transocean Deepwater"), and QBE Underwriting Ltd., Lloyd's Syndicate 1036 ("Lloyd's") seeking, *inter alia*, "a declaratory judgment that is binding in this action and any subsequent action or actions against Defendants BP, Anadarko Exploration, Anadarko Petroleum, MOEX, Triton, Transocean Holdings, Transocean Offshore, and Transocean Deepwater, jointly and severally and without any limitation, and Lloyd's, the latter up to the amount of its COFR guarantee, that said Defendants are liable for, *inter alia*, removal costs and damages in this action and in any such subsequent action or actions."

## THE PARTIES

6.     BP Exploration & Production Inc. is a Delaware Corporation with its principal place of business in Houston, Texas.  Its address is 501 Westlake Park Boulevard, Houston, Texas 77079.

7.     Halliburton is organized under the laws of Delaware with its principal place of business in Houston, Texas.

## JURISDICTION & VENUE

8.     This action arises out of and in connection with drilling operations by the *Deepwater Horizon* in the MC252 operating area in the Gulf of Mexico.

9.     BP's claim arises out of and in connection with drilling operations by the *Deepwater Horizon*, a vessel.  This Court has jurisdiction pursuant to 28 U.S.C. § 1333.  The claims presented in this pleading are admiralty or maritime claims within the meaning of Rule 9(h) of the Federal Rules of Civil Procedure, and BP designates this case as an admiralty or maritime case as provided in that Rule.

3

10.     Because of the acts and omissions described herein, Halliburton is wholly or partly liable to the United States and/or to BP for any OPA financial liability. Accordingly, pursuant to Federal Rule of Civil Procedure 14(c)(2), BP impleads Halliburton and hereby tenders it to the United States. Accordingly, Halliburton must defend against the United States' claims for OPA financial liability, and the action proceeds as if the United States had sued Halliburton. BP also brings its own third-party claims directly against Halliburton.

11.     Venue is proper in this District pursuant to 28 U.S.C. § 1391(b)-(c).

## BACKGROUND ON THE COMPANIES INVOLVED

12.     BP is one of the world's largest energy companies, providing its customers with fuel for transportation, energy for heat and light, retail services and petrochemicals products for everyday use. Among its operations, BP conducts drilling operations in the Gulf of Mexico where the accident that gives rise to this lawsuit occurred.

13.     Halliburton is one of the world's largest providers of services to the energy industry. With more than 55,000 employees in approximately 70 countries, Halliburton provides services to the oil and gas industry throughout the lifecycle of the reservoir—from locating hydrocarbons and managing geological data, to drilling and formation evaluation, well construction and completion, including cement and mud logging operations, and optimizing production through the life of the field. Halliburton holds itself out to the industry in general, and to BP in particular, as a provider of expert services in various fields, including cementing and drilling fluid ("mud") monitoring services.

14.     Halliburton claims that it originated oilfield cementing and further claims that it "leads the world in effective, efficient delivery of zonal isolation and engineering for the life of the well." BP reasonably believed and relied upon Halliburton's representations in this regard with respect to the operations at the Macondo well.

4

15.      Halliburton claims that "Halliburton's Surface Data Logging from Sperry Drilling Services ensures you get the best information from your well, so you make better drilling decisions, faster."   Halliburton also makes express representations in its contracts, including its contract with BP, regarding its expertise and the performance characteristics of its data logging and drilling services.   BP reasonably believed and relied upon Halliburton's representations in this regard with respect to the operations at the Macondo well.

16.      Halliburton claims that "Sperry Drilling Services is the preferred deepwater drilling provider in the Gulf of Mexico, where we serve more than half the rigs drilling in ultra-deepwater of 5000 feet or more.   When you've got challenges out of the ordinary, we are the company to go to."   BP reasonably believed and relied upon Halliburton's representations in this regard with respect to the operations at the Macondo well.

17.      Halliburton further claims that "Detecting fluid influx and mud losses while circulating, [Sperry's] Early Warning System immediately alerts operators to flow changes, and identifies washouts or restrictions in the system, as well as hole 'breathing' or ballooning, so you can take action to avert trouble."   BP reasonably believed and relied upon Halliburton's representations in this regard with respect to the operations at the Macondo well.

**BP'S LEASEHOLD AND INTEREST IN THE MACONDO WELL.**

18.      The well at issue is the exploratory well drilled in the Macondo prospect of Mississippi Canyon 252 in the outer continental shelf of the Gulf of Mexico (the "Macondo well").   The Macondo well is located approximately forty-eight miles from the nearest shoreline, and approximately 130 miles southeast of New Orleans, Louisiana.   (*See* Figure 1.)



**Figure 1.** Geographic Location of the Lease and Well

19.     On March 19, 2008, BP submitted its bid application to lease lot #252 in the Mississippi Canyon (MC 252) to the Minerals Management Service ("MMS"), a bureau within the United States Department of the Interior.  The MMS issued the lease (Lease OCS-G 32306) to BP on June 1, 2008.  The MMS has since been renamed as the Bureau of Ocean Energy Management, Regulation and Enforcement ("BOEMRE").

20.     After acquiring the leasehold in the Macondo prospect, BP exchanged portions of its interest in the Macondo prospect with other companies.  MOEX Offshore 2007 LLC became a 10% owner and Anadarko Petroleum Corporation became a 25% owner.

## WELL PLANNING AND DESIGN

21.     The Macondo well was designed so that it could later be completed to be a production well if sufficient hydrocarbons were found.

22.     The BP Macondo well engineering team worked in conjunction with the BP subsurface team and selected specialist contractors to develop the Macondo well design. The teams estimated the pore pressures and strengths of the geologic formations and used these estimates in developing the design basis for the well.

23.     In October 2009, BP began drilling the Macondo well with the *Transocean Marianas* rig. After Hurricane Ida damaged the *Transocean Marianas*, BP planned to use the Transocean *Deepwater Horizon* rig to resume drilling operations on the well.

### THE *DEEPWATER HORIZON* MOBILE OFFSHORE DRILLING UNIT

24.     The *Deepwater Horizon* was a fifth-generation, RBS-8D design (*i.e.*, model type), deepwater dynamically positioned, column-stabilized, semi-submersible mobile offshore drilling unit, designed to drill subsea wells for oil exploration and production using an 18.75 in (476 mm), 15,000 psi (100,000 kPa) blowout preventer, and a 21 in (530 mm) outside diameter marine riser. The vessel was capable of operating in waters up to 8,000 feet deep, to a maximum drill depth of 30,000 feet.

25.     The *Deepwater Horizon* was owned and operated by Transocean and had been under contract to BP in the GoM for approximately nine years. During this time, it drilled approximately thirty wells, two-thirds of which were exploration wells. The rig was chosen to finish the Macondo well after completing its previous project (the Kodiak appraisal well).

26.     In February 2010, the *Deepwater Horizon* recommenced drilling operations on the Macondo well.

**BP HIRES HALLIBURTON TO DESIGN AND CEMENT ITS WELLS, AND TO BE
THE SENTINEL ON GUARD FOR WELL FLOW TO PREVENT A BLOWOUT.**

27.    Like other operators in the Gulf of Mexico, BP relies upon and hires
specialists and experts to perform operations associated with offshore drilling.  Halliburton is one
of the companies that provide specialized and expert support to operators such as BP.

28.    Halliburton holds itself out as the leader in cementing services:

a.   "Halliburton, the industry leader in cementing innovation, offers proven
solutions for every cement job."

b.   "Halliburton originated the cementing process and remains today the world
leader in market position and customer perception."

c.   "While the majority of wells drilled can be cemented with standard slurries
and equipment, Halliburton has also distinguished itself as a reliable provider
of cementing solutions to meet challenging downhole and environmental
conditions."

d.   "From Halliburton, the cementing and drilling fluids pioneer, comes another
innovative, fit-for purpose cementing first:   our **Tuned Cementing
Solutions**™ approach. Halliburton's **Tuned** systems deliver the best solution
for any given set of wellbore conditions....  For reliability and ingenuity, the
one to call is Halliburton.  Whatever your cementing challenge."

e.   "Foam cement helps improve mud displacement, helps prevent gas migration
and helps protect the formation:

The compressed gas bubbles in foam cement shrink or
expand, but they don't move around or coalesce....Result:

8

virtually no gas migration into the cement, ever—while the

cement is being placed or while it sets."

29.     Halliburton made the aforementioned representations and others with the

intention that operators like BP would rely upon them and hire Halliburton as a contractor to

provide cementing and other services.

30.     BP relied on the many Halliburton representations as part of its decision to

enter into an agreement with Halliburton to provide cementing, mud logging and other services.

BP paid Halliburton significant sums of money for the specialized and expert services

Halliburton provided to BP.  BP also relied upon Halliburton with respect to the cementing and

mud logging services Halliburton provided to BP in connection with and for the Macondo well.

### UNDER THE WELL SERVICES CONTRACT, HALLIBURTON PROMISED AND REPRESENTED THAT IT WOULD PROVIDE AN ARRAY OF PROFESSIONAL SERVICES IN SUPPORT OF BP'S OPERATIONS IN THE GULF OF MEXICO, INCLUDING CEMENTING AND MUD LOGGING SERVICES

31.     On April 15, 2009, BP Exploration & Production and Halliburton entered

into a written contract for Offshore Well Services in the Gulf of Mexico ("Well Services

Contract").

32.     The Well Services Contract covered a number of professional services,

including cementing and mud logging, that Halliburton would provide to BP in support of its

drilling operations in the Gulf of Mexico.  The services are referred to in the contract by the

defined term "WORK."

33.     Under the Well Services Contract, Halliburton promised and represented

to BP that it would "carry out all of its obligations under the contract and shall execute the

WORK with all due care and diligence and with the skill to be expected of a reputable contractor

experienced in the types of work to be carried out under the contract."  BP reasonably believed

and relied upon Halliburton's representations in this regard with respect to the operations at the Macondo well.

34.     Under the Well Services Contract, Halliburton promised and represented to BP that it "shall take full responsibility for the adequacy, stability, health, safety and environmental protection of all its operations and methods necessary for the performance of the WORK."  BP reasonably believed and relied upon Halliburton's representations in this regard with respect to the operations at the Macondo well.

35.     Under the Well Services Contract, Halliburton agreed to comply with BP's requests, "except to the extent" they "create a hazard to safety."  Thus, under the contract, Halliburton was empowered to refuse any task or request that created a safety hazard.

36.     Under the Well Services Contract, Halliburton represented and promised to BP that "all personnel employed on the WORK shall, for the WORK they are required to perform, be competent, properly qualified, skilled and experienced in accordance with good industry practice."  BP reasonably believed and relied upon Halliburton's representations in this regard with respect to the operations at the Macondo well.

37.     Under the Well Services Contract, Halliburton warranted, promised, represented, and guaranteed to BP that it would "exercise all reasonable skill, care and diligence in the performance of the WORK and shall carry out the WORK in accordance with the requirements of the CONTRACT and to internationally recognized good oilfield practices and standards."  BP reasonably believed and relied upon Halliburton's representations in this regard with respect to the operations at the Macondo well.

38.     Under the Well Services Contract, Halliburton represented and promised to BP that it "shall ensure that its personnel are aware of and carry out their own obligations with

regard to health, safety and the environment including the strict obligation to report unsafe working conditions, hazards…and environmental issues."  BP reasonably believed and relied upon Halliburton's representations in this regard with respect to the operations at the Macondo well.

## CEMENTING SERVICES UNDER THE WELL SERVICES CONTRACT

39.     Halliburton's cementing services were covered in Section 3, Appendix 5 (A) to the Well Services Contract.   Pursuant to the contract, Halliburton promised and represented to BP that it would provide an onshore engineer to work at BP's offices and be a member of the BP well planning team with the following roles and responsibilities:

(a)     Provide Safety Leadership training to all [Halliburton] personnel performing work under the contract;

(b)     Participate in all [BP's] safety initiatives and setting of safety targets and goals for all [Halliburton] personnel performing work under the contract;

(c)     Take full accountability for the technical quality, safety and environmental performance of all sub-contracted services managed by [Halliburton];

(g)     Apply risk based engineering processes to prepare the BOD, individual well programs and all associated engineering and documentation;

(i)     Provide engineering support for all aspects of the service provided and fully competent in running all engineering software models offered to support the service, including the ability to run [Halliburton's] cementing software from [BP']s office;

(j)     Provide solutions where conventional cement design and procedures are not suitable, such as blend and foam cement;

(k)     Make recommendations on fit for purpose slurry designs to meet agreed specification;

(l)     Participate in the review of the previous days drilling activities with [BP's] onsite and offsite drilling management as required;

(w)     [Halliburton's] Onshore Engineer shall ensure the equipment is fit to perform the planned work;

11

(x)      Produce or ensure the following documents are prepared, approved, and issued:

**Cement Program**

- Specific well details which impact cementing design (depths/ casing sizes/temperatures (static and circulating), hole sizes, proposed excess)
- Agreed Drilling and Completions SPM score card objectives as found in Attachment D - Global Drilling and completions SPM Score Card.
- Slurry designs and expected properties
- Proposed spacers (volumes/formulations/properties)
- Assumed mud properties
- Temperature simulation results
- Predicted circulating densities and pressures at any potential loss zones
- Centralizer details (type and placement)
- Logistical, bulk and additive requirement
- Cementing hardware needed on location (cement head/water bushings etc.)
- Commercial breakdown of program covering:
  - i.     Cement and chemicals
  - ii.    Rental equipment
  - iii.   Consumables
  - iv.   Third party equipment being supplied
  - v.    Personnel changes
- Recommended procedures and techniques
- Agreed contingencies

**Detailed Cement Report**

- Actual well details
- Slurry recipes
- Laboratory test results on rig materials
- Spacer design, volumes and recommended properties
- Equipment requirements
- Job execution procedures, including chemical handling bulk transfers and surface lines pressure testing
- Pumping schedule
- Displacement simulation and ECD prediction
- Frequency - Per cement job - 24 hours prior to execution

BP reasonably believed and relied upon Halliburton's representations in this regard with respect to the operations at the Macondo well.

40.     Paragraph 8.3.5 of the contract between Halliburton and BP states that Halliburton must "Provide detailed program and work instructions and ensure all hazards are adequately debated prior to commencing operations.  Participate in all COSHH and risk assessments associated with the casing and cement operation."  BP reasonably believed and relied upon Halliburton's representations in this regard with respect to the operations at the Macondo well.

## MUD LOGGING SERVICES UNDER THE WELL SERVICES CONTRACT

41.     Section 3, Appendix 5 (C) sets forth Halliburton's contractual responsibilities for the mud logging services that it provided on the Macondo well.

42.     Paragraph 10.1 "defines the minimum level of service that the COMPANY requires from any [Halliburton] Mud logging Unit": "CONTRACTOR is deemed to have an expert knowledge and capability" and BP "expects… (b) The maintenance and calibration of all sensors to ensure that they are always providing accurate data to assist real time decision making, and for processing to aid post-well analysis."  BP reasonably believed and relied upon Halliburton's representations in this regard with respect to the operations at the Macondo well.

43.     Paragraph 10.2 on the Well Services Contract states that the "Principal objectives of the mud logging service" are to "Monitor the drilling operations parameters…understand their significance to the downhole conditions and advise COMPANY and Drilling Contractor personnel of any situation developing with safety or efficiency implications.  Where the situation is judged to be of a serious potential impact, logging personnel should contact the rig floor directly if COMPANY representative cannot immediately be contacted."  BP reasonably believed and relied upon Halliburton's representations in this regard with respect to the operations at the Macondo well.

13

44.     Paragraph 10.5.1 of the parties' contract provides that Halliburton must have a "Drilling Monitor Program" capable of monitoring, "in graphical and textual form," "Mud flow rate in," "Mud flow rate out," and "standpipe pressure." Paragraph 10.5.2 states that Halliburton must have a "Pit Volume Totalization and Monitor Program" capable of monitoring "trends of the total and individual pit volumes, and trends in the active circulating volume" to "allow for totalizing in any combination to give resultant active and reserve volumes" of the mud pits.   And, Paragraph 10.5.4 states that Halliburton must have a "Kick and Kill Monitor Program" to monitor "When the well is shut-in, or whilst killing the well" parameters including: "Casing pressure"; "Standpipe pressure"; "Total pit volume"; "Mud weight in/out"; "Mud flow in"; "Total barrels displaced"; and "Total strokes pumped."   Under the Parties' contract, Halliburton agreed, promised and represented that it would provide all of these services and equipment to BP with respect to the Macondo well.  BP reasonably believed and relied upon Halliburton's representations in this regard with respect to the operations at the Macondo well.

45.     Paragraph 10.7.3 titled "Data Sampling, Processing, and Storage Specifications" specifies "the recording specifications to ensure that accurate, pertinent data is obtained in a reliable manner to aid the real time decision making process and for post well analysis."   Specifically, Halliburton's mud logging services must meet the following specifications, among others:

      a.     Dynamic drilling parameter measurements (including block/kelly position, rig heave, hookload, torque, rotary speed, stand-pipe pressure) shall be filtered to minimize the effects of data aliasing;

      b.     Parameters shall all be sampled at a consistent frequency.   A minimum sampling frequency of 10Hz is required;

      c.     Each of the critical variables shall be allocated low and high level alarms and the setting of these discussed with BP Drilling Representative/Engineer at the start of the well; and

14

      d.     Placement of mud logging sensors shall allow all measurements to be made independently of other CONTRACTOR equipment.

BP reasonably believed and relied upon Halliburton's representations in this regard with respect to the operations at the Macondo well.

46.     Paragraph 10.10 states that the "prime responsibility of the [Halliburton] Mud Logging service [is] well monitoring and safety" and "defines Mud Logging activities that are to take precedence during each type of activity … to avoid ancillary function acting to the detriment of the prime responsibility."  Paragraph 10.10.1 expressly states that the "Primary responsibilities [of Halliburton] during Drilling/Circulating" are "Well monitoring, including total gas levels, circulating system volumes, mud flow, mud weight/temperature, mud losses"; "Monitoring for indications of drilling problems, e.g., poor hole cleaning, pipe sticking, bit balling, excessive cavings"; and "Monitoring and display of all logged parameters."  BP reasonably believed and relied upon Halliburton's representations in this regard with respect to the operations at the Macondo well.

## HALLIBURTON'S CONDUCT IN CONNECTION WITH THE CEMENTING JOB BEFORE, ON AND AFTER, APRIL 19-20, 2010

47.     To obtain a cement slurry and placement design that would make zonal isolation possible, Halliburton designed and recommended to BP a nitrified foam cement slurry to cement the production casing in the Macondo well.  Foamed slurries can be used to reduce the cement slurry density and prevent gas migration.  Halliburton's recommended plan for cement placement in the Macondo well called for pumping base oil, spacer, bottom wiper plug, cap cement, foamed cement, tail cement, top wiper plug and spacer.  BP accepted, and reasonably relied upon, Halliburton's written recommendations for the cement slurry design and the cement plan for the Macondo well.

48.     The intended purpose of the nitrified foam cement was to isolate the formation and form a protective barrier to flow.  The intended purpose of the tail cement was to fill the shoe track and likewise form a barrier preventing flow into the casing.

49.     The ingredients designed and recommended by Halliburton to BP for the Macondo well cement slurry were:

| Fluid 4: Foamed Tail Cement – **Foamed to average density of 14.5 ppg** | | |
|---|---|---|
| Premium Cement | Fluid Weight | 16.74 lbm/gal |
| 94 lbm/sk  Premium Cement (Cement) | Slurry Yield: | 1.37 ft³/sk |
| 0.07 %  Halliburton EZ-FLO (Bulk Flow Enhancer) | Total Mixing Fluid: | 5.04 Gal/sk |
| 0.25 %  D-AIR 3000 (Defoamer) | Top of Fluid: | 17400 ft |
| 1.88 lbm/sk  KCL (Additive Material) | Calculated Fill: | 904 ft |
| 20 %  SSA-1 (Additive Material) | Volume: | 55.41 bbl |
| 15 %  Common White-100 Mesh, SSA-2 | Calculated Sacks: | 191.44 sks |
| 0.2 lbm/sk  SA-541 (Additive Material) | Proposed Sacks: | 200 sks |
| 0.11 Gal/sk  Zonesealant 2000 (Foamer) | | |
| 0.09 Gal/sk  SCR-100L (Retarder) | | |
| **1 lbm/bbl  WellLife 734 (Additive Material) – added by hand to down hole side** | | |

50.     On information and belief, Halliburton's EZ-FLO, D-AIR 3000, KCl, and SCR-100L additives are dispersing agents that can destabilize foamed cement slurry.

51.     At the time Halliburton recommended the use of its EZ-FLO, D-AIR 3000, KCl, and SCR-100L additives and pumped the cement slurry in the production interval of the Macondo well, Halliburton knew or should have known of the properties of these additives and that they should not be used with foamed cement slurries.

52.     Specifically, Halliburton knows and indeed warns that defoamers such as D-AIR 3000 should not be used with foamed cement slurry.

53.     Further, Halliburton knows and indeed warns that salts such as potassium chloride (KCl) and dispersants such as SCR-100L should not be used with foamed cement slurry.

54.     At no time prior to the *Deepwater Horizon* explosion on April 20, 2010 did Halliburton inform or warn BP that any of the additives in its cement slurry design would

16

destabilize the foamed cement slurry that it recommended using at the Macondo well.  To the

contrary, Halliburton recommended that BP use the cement slurry that it designed that contained

these defoamer and dispersant additives.

## HALLIBURTON'S FEBRUARY CEMENT SLURRY TESTING

55.     On February 12, 2010, Halliburton conducted a foam stability test on a

pilot cement slurry that was similar to the final slurry design but used more retarder additive.

The cement slurry was foamed at 14.496 pounds per gallon ("ppg") or 1.737 specific gravity

("sg").  According to Halliburton, the slurry was then poured into a PVC pipe to cure at 180°F

for 48 hours.  The laboratory worksheet indicates that no conditioning was done on the slurry

before foaming, and the test resulted in a cured cement density of 2.02 sg (or 16.8 ppg) on the

top and 2.11 sg (or 17.6 ppg) on the bottom.  The test results give two indications that the cement

slurry did not form a stable foam:  the cured cement density was greater than the foamed cement

density indicating gas breakout; and the difference in density from top to bottom indicates

settling within the foamed cement slurry.  These results were not provided to BP before the

cement job.  Moreover, Halliburton never reported to BP these foam stability test results

indicating that the foamed cement slurry was not stable.

56.     In addition, the February 12, 2010 laboratory worksheet indicates that a

crush compressive strength test on the foam slurry was abandoned because it was observed that

the "slurry is settling."  Settling is an indication that the foam slurry is not stable.  Again,

Halliburton did not provide these test observations to BP before the cement job was performed or

even after the blowout.

57.     On February 16, 2010, Halliburton conducted a second set of tests.  The

laboratory worksheet indicates that Halliburton conditioned the cement slurry at 180°F for two

hours before foaming.  As noted above, the Halliburton cement slurry contains a temperature-

17

activated suspension additive, SA-541.   SA-541 begins thickening the cement slurry at temperatures of 140°F.  The purpose of the additive is to prevent the cement from settling while it is curing at its intended location.  Activating the suspension agent makes the cement more viscous and increases the foam stability.

58.     However, this laboratory condition is not representative of field conditions.   Specifically, the cement on the rig is not conditioned for hours at an elevated temperature before foaming.

59.     Using the more viscous cement slurry prepared under modified conditions, Halliburton was able to generate a foam stability test result with a uniform density on the top and bottom of 1.91 sg (15.9 ppg).  However, the density was still greater than the target of 14.5 ppg, indicating the cement slurry was not stable.

60.     Further, on this February 16, 2010 laboratory worksheet, Halliburton noted additional problems with the crush compressive strength test on the foam slurry it had designed.  The lab worksheet states that after 60 hours of cure time the foam cube is "hard on bottom; soft on top" and after 96 hours the cube is "hard on bottom; firm on top."  Despite these indications that the foam slurry was unstable and not curing properly, Halliburton performed a crush compressive strength test.

61.     Neither the February 12th nor the February 16th laboratory worksheets containing Halliburton's test results and observations were provided to BP.

62.     On March 8, 2010, Halliburton provided a materially false and fraudulent laboratory report to BP.   In the communication attaching the report, Jesse Gagliano of Halliburton misrepresented to BP that he had "attached the lab test for your review."  The same laboratory report was transmitted again on April 1, 2010 with a further materially false and

18

fraudulent misrepresentation from Mr. Gagliano of Halliburton to BP that he had "a pilot test run, see attached."

63.     The materials transmitted to BP on March 8, 2010 and again on April 1, 2010 were not the entirety of the February pilot slurry testing.  The transmitted materials were not as Mr. Gagliano represented, and they omitted several test results and observations that indicated that the cement slurry was not stable.  Specifically, Halliburton failed to report the foam stability testing results from the February 12th lab worksheet that strongly indicated foam instability.  Rather, Halliburton reported only the test results from the February 16th lab worksheet that could suggest foam stability.

64.     Halliburton made further misrepresentations and omissions in the report itself.  Specifically, when reporting the foam stability test results on March 8, 2010 and April 1, 2010, Halliburton misrepresented the conditions under which those results had been achieved: Halliburton falsely reported to BP that the slurry had been conditioned for 0 hours when in fact it had been conditioned for 2 hours.

65.     In the report transmitted on March 8, 2010 and April 1, 2010, Halliburton also reports the crush compressive strength test in a fraudulent and incomplete manner. Halliburton's report suggests that there was a successful crush test when, in fact, there were known problems with the test.  Specifically, the laboratory report provided to BP reports only the crush compressive strength result and omits information regarding the conditioning time or the physical observations indicating slurry instability.

66.     Put most simply, Halliburton affirmatively and falsely represented material facts to BP including (i) that it was transmitting all the test results for the pilot cement slurry; and (ii) that the pilot slurry had passed the tests.  In fact, Halliburton had not transmitted

19

the entire test results and, instead, concealed the test results that clearly indicated foam instability. Further, with knowledge of these undisclosed facts, Halliburton did not inform BP that the cement slurry it recommended did not form a stable foam.

67.    On March 23, 2010, BP engineers participated in a meeting with Halliburton engineer Mr. Gagliano where they discussed casing options and whether to run a foamed cement slurry. A BP engineer suggested running conventional cement slurry to avoid the added equipment associated with using foamed cement slurry. At that time, Halliburton did not inform BP of or discuss the stability issues with recommended foamed cement.

68.    Thus, as of March 23, 2010, Halliburton knew that there were serious problems with its cement slurry design but intentionally withheld and concealed that information from BP. Halliburton knew that BP was considering using conventional cement slurry and did not reveal the known risks with using the Halliburton foam slurry. At the same time, Halliburton provided BP with data and information suggesting that the slurry was stable and that there were no problems with the cement slurry. BP, unaware of the problems with the cement design, continued to work toward completing the well. BP reasonably believed and relied upon Halliburton to tell it the truth and to disclose all material facts and information with respect to Halliburton's laboratory testing of the slurry it was designing.

## HALLIBURTON'S APRIL CEMENT SLURRY TESTING

69.    After the February testing, Halliburton did not redesign the cement slurry. Instead, on April 13, 2010, Halliburton conducted a foam stability test on a similar slurry (with only a change in the concentration of retarder) that was conditioned at 180°F for 1.5 hours. Once again, Halliburton's laboratory worksheets show that the foam was not stable: 1.88 sg (or 15.7 ppg) at the top; and 1.82 sg (or 15.1 ppg) at the bottom. These foam stability test results were never reported to BP.

70.     On April 14, 2010, BP engineers and Halliburton engineer Mr. Gagliano met to discuss Halliburton's modeling for the upcoming cement job at the Macondo well.  Mr. Gagliano assured BP engineers that the well could be successfully cemented with a foamed cement slurry even if BP chose to cement a long-string production casing.  On April 14, 15, 17, and 18, 2010, Mr. Gagliano sent BP engineers OptiCem models and cement plans for the cement job at the Macondo well.  Despite discussing the cement slurry with BP engineers and later sending recommendations to use the foamed cement, Mr. Gagliano did not disclose the foam stability test results from April 13, 2010 or the prior failed stability tests.  Nor did Mr. Gagliano raise any concerns with using a foamed cement slurry.

71.     On April 16, 2010, a laboratory worksheet was generated for cement testing on the exact cement slurry that was ultimately pumped in the Macondo well, incorporating 0.09 gps of retarder.  The listed tests included a foam stability test.  However, that test was not run.  Instead, there is an internal Halliburton note to "cancel foamed stability as per Jesse."  Indeed, no foam stability test was ever completed on the exact cement slurry pumped into the Macondo well.  Neither this laboratory worksheet nor the fact that the foam stability test was cancelled was ever provided or disclosed to BP before the April 20, 2010 incident.

72.     On April 17, 2010, Halliburton provided another materially false and fraudulent report to BP.  Mr. Gagliano set another laboratory report and falsely stated and misrepresented to BP that he had "[a]ttached the lab tests."  But that report did not include the pilot cement tests from February or April indicating that Halliburton had been unable to generate a stable foam cement despite numerous different attempts to do so.

73.     As recorded on a laboratory worksheet dated April 17, 2010, Halliburton performed a repeat foam stability test.  Halliburton conditioned the cement slurry at 180°F for 3

hours for this test.  The test results in a specific gravity of 1.8 on top and 1.799 on bottom—equivalent to 15.0 ppg and still above the target of 14.5 ppg.  The conditions for the test conducted on this laboratory worksheet were also unrepresentative of the field conditions because the cement slurry is not conditioned at elevated temperatures for three hours before foaming on the rig.  Further, Mr. Gagliano and the Halliburton cement team did not have these test results before beginning the cement job on April 19, 2010.

74.     On April 18, 2010, Mr. Gagliano sent BP a "recommended procedure for cementing the casing strings in the referenced well."  By this time, Halliburton had performed three foam stability tests on the cement slurry that it was recommending for use in sealing the bottom of the Macondo well.  In each foam stability test that Halliburton had performed, the cement slurry had failed the test and indicated instability.  Despite this, Halliburton sent BP a job recommendation to pump this slurry:

> Enclosed is our recommended procedure for cementing the casing strings in the referenced well. The information in this proposal includes well data, calculations, materials requirements, and cost estimates.  This proposal is based on information from our field personnel and previous cementing services in the area.

75.     Under the heading "Job Recommendation," Halliburton recommended the unstable foamed cement slurry.

76.     Halliburton further provided the Job Procedure, including Detailed Pumping Schedule and Foam Design Specifications.  Nowhere in this Job Recommendation did Halliburton inform BP that all of the Halliburton foam stability testing to date had indicated that the recommended foamed cement slurry was unstable.  Likewise, Halliburton did not tell BP that it had never tested the foam stability of this particular recommended cement slurry.

77.     Hallibuton never informed BP engineers of the instability of the foam slurry nor did it redesign the slurry.  Instead, Halliburton recommended that BP proceed with the final operations to temporarily abandon the well.

78.     On April 19, 2010, based on Halliburton's representations and recommendations, BP gave Halliburton the go-ahead to perform the cement job that was intended to achieve zonal isolation and form a cement barrier that would keep the well from flowing.

79.     Halliburton, using its own cementing personnel, began the cement job at approximately 8:00 p.m. on April 19, 2010.  Halliburton's mud loggers were charged with monitoring the flow data during the cement job.  The cement job took approximately four and one half hours to complete.  At the conclusion of the cement job, Halliburton reported to BP that the cement job was a success.  Halliburton reported that there were full returns (*i.e.*, no cement losses) and lift pressure during the cement operation.  Based on this information, BP personnel on the rig communicated to BP personnel onshore that the cement job was a success.

80.     On the morning of April 20, 2010, BP held its morning Macondo meeting.  Members of the BP onshore team attended in person and rig personnel attended by phone.  In addition, Mr. Gagliano of Halliburton and various contractors attended the morning meeting in person and by phone.  A Halliburton cement engineer on the rig gave an overview of the cement job and indicated that it was executed successfully.  At the meeting, BP announced its intention not to run a cement bond log in light of Halliburton's report that there were full returns during the cement job and that the cement job was successful.  At that time, the various parties and contractors involved with the Macondo well were invited to comment on this decision.  Despite having unique information about the stability of the cement slurry, Halliburton did not request

23

that a cement bond log be run or notify BP that the improperly-designed Halliburton cement could fail even if it were pumped correctly.

81.     BP continued operations without performing a cement bond log and the rig crew proceeded with a negative pressure test that underbalanced the well without ever knowing what Halliburton knew—that the cement at the bottom of the well was highly unstable. Less than 24 hours after Halliburton finished its work, the cement on the bottom of the well allowed hydrocarbons to flow uncontrolled, resulting in the blowout and explosion, loss of life and personal injuries, and subsequent flow of oil into the Gulf of Mexico.

82.     Thus, from February 2010 until April 19, 2010 when Halliburton performed the cement job to isolate the reservoir, Halliburton repeatedly misrepresented the results and nature of its testing, reported false and misleading test results, and concealed unfavorable test data.  At no time before April 20, 2010 was BP aware that Halliburton had information showing that the cement slurry it pumped on April 19-20, 2010 was unstable.  Based on Halliburton's fraudulent misrepresentations and omissions, BP allowed Halliburton to pump the cement slurry that it recommended to BP.  Halliburton has only recently admitted that its cement failed to achieve zonal isolation and permitted hydrocarbon flow.

**CHEVRON FOUND THAT HALLIBURTON'S CEMENT DESIGN WAS DEFECTIVE**

83.     The problems with the cement slurry that Halliburton designed, recommended and pumped were also confirmed by Chevron.   Following the incident, Halliburton provided cement and additive samples similar to those used at the Macondo well to Chevron for testing.  On October 26, 2010, Chevron stated that it was unable to generate a stable foam cement using the same components and design parameters that Halliburton used to produce the cement slurry for the Macondo well production casing.  Among other things, Chevron identified numerous problematic issues with the Halliburton cement:

○ First, the unfoamed cap and shoe cement slurry had poor fluid loss properties. And, despite its poor fluid loss qualities, the Halliburton-designed cement slurry did not incorporate a fluid loss additive.

○ Second, the crush compressive strength test could not be performed on the foam slurry cubes because, after the appropriate cure time, the samples were removed from the molds and were observed to have lost approximately one-half inch of their original two-inch height.

○ Third, FYSA Viscosity Profile testing on the foamed cement could not be performed because a stable foam could not be formed.

○ Fourth, foam stability testing showed that the Halliburton-designed slurry did not generate a stable foam. Specifically, Chevron stated that a series of nine tests were conducted under varying conditions but none of the tests produced a stable foam.

○ Fifth, the foam stability tests on cement slurry contaminated with mud or spacer were canceled due to the inability to generate stable foams.

○ Finally, static gel strength testing showed that the Halliburton-designed slurry had poor gel transition time and would not be suitable for controlling gas migration.

## HALLIBURTON, WHO WAS THE SENTINEL FOR THE WELL, FAILED TO DETECT AND ALERT THE CREW TO THE IMPENDING BLOW OUT

84.    On April 20, 2010, once the cement job was finished, the *Deepwater Horizon* crew then began taking the next steps to temporarily abandon the well. This included running a negative pressure test and displacing the heavy drilling mud with seawater. As the heavy drilling mud was displaced, the well bore would become underbalanced relative to the pore pressure exerted from the formation over three miles below the surface. A critical barrier standing between a pressurized reservoir of oil and gas and the crew on the *Deepwater Horizon* was the cement designed and pumped by Halliburton. If that cement failed to isolate the hydrocarbon layers, for whatever reason, it fell to the Halliburton mud loggers, whose "prime responsibility" was "well monitoring and safety," to monitor the sensors for indications of a kick and alert the Transocean drilling crew in time for steps to be taken to prevent a blowout.

85.    The Halliburton mud logger on duty on April 20, 2010 at all relevant times during the displacement of the riser was Joseph Keith. Mr. Keith began his shift at approximately 5:30 p.m. on April 20, 2010. To perform his duties, Mr. Keith was stationed at the mud loggers shack or office, where he monitored both real time graphical readouts of data on large computer monitors as well as closed circuit television screens that allowed him to monitor a number of essential parameters, including flow in versus flow out, drill pipe pressure and mud level changes in the trip tanks

86.    From approximately 7:00 p.m. until 8:52 p.m., the Transocean crew was engaged in steps to temporarily abandon the well. At approximately 8:00 p.m., the crew began displacing the drilling mud in the well with seawater. The well was now being deliberately underbalanced. If the cement barrier had failed to isolate the hydrocarbon layers, the well would begin to flow posing a safety risk to the crew on the *Deepwater Horizon*. Halliburton knew and

understood that, at critical junctures like this, continuous monitoring of the well by its mud loggers was essential to prevent a blowout. However, Mr. Keith either abandoned his post during this critical time period or he missed the indicators that the well was flowing. Significantly, post-incident, Mr. Keith represented and told BP's Internal Investigation Team that at no time did he leave his position. Only months later did Mr. Keith finally reveal that, in fact, he did leave his post unattended around 9:00 p.m. for the purpose of having a smoke, getting some coffee, and using the bathroom.

87.     At 8:52 p.m., the data available to the Halliburton mud loggers indicated that the well had begun to flow. By 8:58 p.m., the data indicators that the well had begun flowing were evident to any competent mud logger. But Halliburton's mud loggers did not inform anyone about these indications.

88.     By 9:08 p.m., the trip tank had gained 39 barrels, another indicator that the well was flowing. Also at or near this time a visible alarm showing that there had been an abnormal gain in the tanks appeared on the Halliburton mud logger's monitor. It required manual acknowledgment to turn it off. Mr. Keith either missed this alarm or had turned off his alarms without BP's knowledge.

89.     By 9:08 p.m., the drill pipe pressure, which should have been decreasing during the displacement, had reversed course and climbed from 1,250 psi to 1,350 psi. Halliburton's mud logger, Mr. Keith, did not see this signal indicating a kick either.

90.     At 9:08 p.m., the spacer returned to the surface and the pumps were shut down in order to allow sheen testing of the spacer.

91.     From 9:08 p.m. to 9:14 p.m., while the sheen test was being conducted and the rig's pumps were shut off, the pressure on the drill pipe increased another 250 psi.  Mr. Keith missed this kick signal also.

92.     Having determined that the sheen test was satisfactory, the *Deepwater Horizon* crew restarted the pumps to continue displacing the riser with seawater.

93.     From 9:14 p.m. to 9:25 p.m., the drill pipe pressure increased to over 2,500 psi.  Halliburton's mud logger, Mr. Keith, claims that he was at his station but did not see that the well was now experiencing a large kick and on its way to blowing out.  By now the gas was rapidly expanding in the riser.

94.     At approximately 9:41 p.m. the Halliburton mud logger, Mr. Keith, finally noticed that the well was flowing.  But it was not because of the computer displays that he was charged with monitoring.  It was because the well had blown out and mud was literally raining down on the mud loggers shack where he was sitting.  Minutes later, the first explosion occurred.

## AFTER THE *DEEPWATER HORIZON* INCIDENT

95.     Post-job report:  On April 23, 2010, Halliburton sent to BP a post-job report purporting to summarize the results of the April 19, 2010 cement operation on Macondo. In the report, Halliburton represented to BP that the cement job had been completed successfully:

- Cement job pumped as planned.

- Chemical straps determined that additives were pumped at planned volumes.

- Rig completed displacement and both plugs were bumped.

- Full returns seen throughout entire job.

28

- Estimated 100 psi of lift pressure (350 psi circulating to 450 psi circulating), before bumping top plug.

- Floats held after job.

Nowhere in the April 23, 2010 transmission did Halliburton indicate that the cement job had failed or that the cement slurry had stability issues.

96.    Halliburton, in its April 23, 2010 transmission to BP, additionally represented that there was no mud lost during cementing, no annular flow, and that MMS requirements for top of cement ("TOC") were achieved:

- Returns While Cementing?  Yes.

- Mud Lost While Cementing?  No.

- Annular Flow Before/After Cementing?  No.

- Estimated TOC:  17,300 ft.

- MMS. Req. met:  Yes.

97.    Halliburton's representations were made with no foundation in fact and, on information and belief, with the intent to continue to conceal its defective cement.

98.    On April 26, 2010, four days after the *Deepwater Horizon* sank, Halliburton sent the partial results from its April testing in a laboratory report.  Mr. Gagliano wrote in the e-mail transmitting the report:  "See attached, Lab test not captured in Post-job report."  The report, however, does not contain the failed foam stability test results from the April 13, 2010 laboratory worksheet or the earlier February tests.  Once again, even after the explosion, Halliburton concealed the failed test results.

99.    Further, the laboratory report sent on April 26, 2010 misrepresents the composition of the cement slurry tested.  Although the report indicates that it is for the cement

29

slurry pumped into the Macondo well with 0.09 gallon per sack ("gps") of retarder, many of the results are for cement tests on a slurry with 0.080 gps of retarder.

100.     Specifically, the foam stability test reported for the slurry with 0.09 gps of retarder was actually performed on a slurry with less retarder as shown in a laboratory worksheet dated April 17, 2010.

101.     On April 26, 2010, a BP engineer requested information about the cement operation from Jessie Gagliano.  The purpose of the request was to obtain relevant data and information about the cement slurry and its properties and the cement operation in order to assist in the relief well efforts.  After receiving some of the reports and test reports previously provided to BP, the BP engineer noticed that the cement slurry design included D-AIR 3000 defoamer additive.  The BP engineer asked Mr. Gagliano if there were any problems with the foamed cement stability, Mr. Gagliano misrepresented that Halliburton had tested the cement slurry with the defoamer and there were no stability problems.   In addition to this affirmative misrepresentation that there were no stability problems, Mr. Gagliano provided the BP engineer with the April 26, 2010 laboratory report, which did not report or include information about the unstable foam stability test results.

102.     On April 30, 2010, Halliburton issued a press release that suggests its cement worked as intended and that its cement slurry did not have any involvement in the Macondo blowout.  Among other things, Halliburton stated:  "Halliburton had completed the cementing of the final production casing string in accordance with the well design approximately 20 hours prior to the incident.  The cement slurry design was consistent with that utilized in other similar applications."

103.    On September 26, 2010, Halliburton told the public, the financial markets, its shareholders, BP and United States governmental officials that "Using rig cement, additives, and rig water, a stable foam cement system was designed, tested, delivered and quality assured on location."   Halliburton further stated that its "Foam slurry passed all API 10B-4 9.3.4 requirements" because "[t]he density of the cured foam slurry, using the Archimedes principle, was identical at top and bottom," indicating "no free water" and "no settling." This statement, however, was materially misleading because it ignored the settling and foam instability observed in the cement tests.

104.    Shortly after the casualty, BP formed an Internal Investigation Team.  Its purpose and charge was to determine the cause of the casualty.  On May 14, 2010, BP's investigation team interviewed Jesse Gagliano.  Mr. Gagliano did not tell the investigation team that the cement slurry that Halliburton had designed, recommended and pumped had instability issues.  To the contrary, he told the investigation team that Halliburton had completed the testing and it all looked good.  On August 24, 2010, Mr. Gagliano publicly repeated that statement.

105.    Further, on at least July 7, 2010, BP's Internal Investigation Team requested all of Halliburton's test results for the foamed cement slurry pumped at the Macondo well.  This information was needed for the investigation that would result in the September 8, 2010 public report issued by BP's Internal Investigation Team.   Halliburton represented to investigation team that it had provided all of the results from its laboratory testing.   This statement was later demonstrated to be false when it was shown on November 8, 2010 that Halliburton had additional test results showing foam instability.

106.    In brief, even following the blowout and sinking of the *Deepwater Horizon*, Halliburton continued to conceal its role in designing, recommending and pumping a

defective cement slurry.  On April 23, 2010, Halliburton falsely told BP that the cement job was completed successfully.  On April 30, 2010, Halliburton repeated those false assertions to the world.  Around April 26, 2010, Jesse Gagliano told BP that Halliburton had tested the cement slurry with the defoamer additive and it was stable.  And, on May 14, 2010, Halliburton cement engineer Jesse Gagliano stated falsely and misrepresented to the BP Internal Investigation Team that all of the test results looked good.  Halliburton likewise falsely told the BP Internal Investigation Team that it had provided all of the test results to the team.  On August 24, 2010, a Halliburton cement engineer falsely stated to the public that Halliburton had conducted cement testing and the results looked good.  On September 26, 2010, Halliburton representatives again falsely represented to the public that it had successfully tested the cement slurry.  Even as BP, government agencies and scientists were working around the clock to determine the cause of the *Deepwater Horizon* incident in order to stop to flow of hydrocarbons and prevent similar incidents in the future, Halliburton continued to conceal and make false statements to prevent BP and others from learning the truth about the defective cement slurry that it designed, recommended and pumped at the Macondo well.

107.    Halliburton possessed unique knowledge and expertise concerning cement slurry, design, formulation and ingredients, and foam cement design, formulation and ingredients for the production string at the Macondo well.

108.    Halliburton knew before it began the cementing operation that it had not tested the foam stability of the cement slurry that it was pumping into the Macondo well but that foamed cement slurries with similar composition had failed the foam stability tests.

109.    As such, Halliburton knew that even if its slurry was pumped as planned and resulted in full returns as envisioned in BP's decision tree, there was still a significant risk of

32

failure of the cement to isolate the hydrocarbons because of the foamed cement slurry was unstable in laboratory testing.

110.    Despite Halliburton's unique knowledge of the foam cement slurry that it designed and pumped into the production interval of the Macondo well, Halliburton did not inform BP of any risks to the well, and did not warn BP or any of the other parties or the drilling crew of the potential risk of blow out.  As such, BP and the other parties were not able to take additional precautions in light of the added risk of an unstable foamed cement slurry.

## THE CLAIMS, LAWSUITS, AND EXPENSES ASSERTED AGAINST BP AS RESULT OF THE *DEEPWATER HORIZON* INCIDENT

111.    Oil and gas flowed from the Macondo well into the Gulf of Mexico until July 15, 2010.  The scale of the response program was massive and unprecedented.  From the outset of the *Deepwater Horizon* incident, BP has expressed its commitment to pay all legitimate OPA claims, while always reserving its right to seek reimbursement, contribution, and indemnification from other responsible parties.

112.    Plaintiffs have named BP as a defendant in hundreds of lawsuits arising out of the *Deepwater Horizon* incident pending before this Court and in other courts.

113.    The DOJ Complaint seeks, *inter alia*, "a declaratory judgment that is binding in this action and any subsequent action or actions against Defendants BP, Anadarko Exploration, Anadarko Petroleum, MOEX, Triton, Transocean Holdings, Transocean Offshore, and Transocean Deepwater, jointly and severally and without any limitation, and Lloyd's, the latter up to the amount of its COFR guarantee, that said Defendants are liable for removal costs and damages in this action and in any such subsequent action or actions."

114.    The DOJ Complaint also alleges that: "'natural resources,' as that term is defined in OPA, 33 U.S.C. § 2701(2), have been injured, destroyed, or lost;" the "amount of

33

damages and the extent of injuries sustained by the United States as a result of the Deepwater Horizon Spill are not yet fully known, but far exceed $75,000,000" and that "[a]s a result of the Deepwater Horizon Spill, the United States has expended and/or sustained and/or will expend or sustain, *inter alia*, 'removal costs' and 'damages,' within the meaning of OPA, 33 U.S.C. § 2702(b)."

115.    The total amounts that ultimately will be paid by BP in any form relating to the incident are subject to significant uncertainty. The ultimate exposure and cost to BP will depend on many factors, including the amount of claims that become payable by BP, the outcome of lawsuits, and any costs arising from any longer-term environmental consequences of the oil spill.

116.    As of the end of 2010, BP's incurred costs relating to the incident were $17.7 billion. BP's group income statement for 2010 reflects a pre-tax charge of $40.9 billion in relation to the Gulf of Mexico oil spill.

### HALLIBURTON'S FRAUDULENT CONDUCT

117.    Halliburton made at least the following affirmative material false statements and misrepresentations to BP:

    a. On March 8, 2010, Mr. Gagliano told BP that he was sending "the lab test for your review" when, in fact, he did not send all of the pilot test results nor did he send the test results showing that the cement slurry had failed the tests;

    b. On April 1, 2010, Mr. Gagliano wrote to BP that "I already have a pilot test run, see attached" when, in fact, he did not send all of the pilot testing results nor did he send the test results showing that the cement slurry had failed the tests;

c. The pilot test results sent on March 8th and April 1st indicated that no conditioning had been done on the foamed cement slurry when, in fact, the slurry had been conditioned for two hours;

d. The pilot test results indicated that the crush compressive strength test was successfully conducted when, in fact, one test was cancelled due to settling and the other test had indications of foam instability;

e. On April 17, 2010, Mr. Gagliano told BP that he had "[a]ttached the lab tests" when, in fact, he had not attached all of the test results nor did he send the test results which showed failures of the tests;

f. On April 23, 2010, Mr. Gagliano transmitted a post-job report to BP that stated that "Cement job pumped as planned," "Full returns seen throughout entire job," "Mud Lost While Cementing: No," " Estimated TOC: 17,300 ft.," and "MMS. Req. met: Yes"—even though Halliburton could not verify this information;

g. On April 26, 2010, Mr. Gagliano told BP to "See attached.  Lab test not captured in Post-job report" when, in fact, he had not attached all of the lab tests not captured in the post-job report nor did he attach any failed test results;

h. The laboratory report transmitted on April 26, 2010 to BP indicated that Halliburton had tested the foam stability of the cement slurry poured at the Macondo well when, in fact, Halliburton had not tested that slurry;

    i.   On or around April 26, 2010, Mr. Gagliano told a BP engineer that the cement slurry containing a defoamer had no stability problems when, in fact, it did have stability problems based on Halliburton's testing; and

    j.   On April 30, 2010, Halliburton issued a press release informing BP and others that "Halliburton had completed the cementing of the final production casing string in accordance with the well design approximately 20 hours prior to the incident. The cement slurry design was consistent with that utilized in other similar applications" but at no time did Halliburton tell or inform BP or anyone else about any failed test results.

118.   The testing information that Halliburton misrepresented was material—indeed, it was critical. Had Halliburton disclosed the failed test results to BP, BP would not have proceeded with the cement job on April 19-20, 2010. Moreover, BP would not have authorized the pouring of an unstable foamed cement slurry into the Macondo well and it would have taken significant mitigating steps, such as running additional tests to ensure well bore integrity.

119.   Halliburton knew and understood it was misrepresenting material information, knew that BP was relying upon those representations, and did so knowing that BP was relying upon Halliburton to provide professional cementing services. But for Halliburton's false statements and misrepresentations, BP would not have authorized the pouring of the unstable slurry. Halliburton's misconduct and false statements induced BP to proceed with the cement job, believing that the cement slurry design recommended by Halliburton had passed the necessary tests, when in fact it had not.

120.    Following the incident, Halliburton continued to deceive BP and others. Thus, its intent to deceive BP both before and after the casualty was evident in its continued efforts to misrepresent and conceal the results of the slurry testing from BP.

121.    Had BP been informed of the testing information that Halliburton misrepresented it would have never authorized the pouring of the cement on April 19, 2010.

122.    Had BP been informed of the testing information that Halliburton misrepresented, it would have taken significant mitigating steps to address the risk on April 20, 2010 following the cementing operations.  BP also would have alerted its own personnel onboard and the crew of the *Deepwater Horizon* to be particularly vigilant had Halliburton given BP any reason to believe that the cement slurry Halliburton designed was unstable or would not work.

123.    Halliburton's knowing misrepresentations were a cause-in-fact and also a legal cause of BP's injuries.  As a result of Halliburton's knowing misrepresentations, BP allowed Halliburton to pour the unstable foamed cement slurry and did not detect the failure of the cement through the additional precautions that it would have taken had it known the results of Halliburton's testing.  But for Halliburton's multiple acts of material misrepresentations of fact, that is fraud, the casualty would not have occurred, the well would not have become uncontrollable, the explosion would not have happened, and the resulting deaths, injuries and oil spill would have been avoided.

## HALLIBURTON'S FRAUDULENT CONCEALMENT

124.    From February 2010 to April 20, 2010 Halliburton concealed from BP the results of testing that it had performed that showed that the cement was unstable.  Specifically, Halliburton concealed from BP at least the following material facts:

a.  Mr. Gagliano and others at Halliburton concealed from BP known problems with the stability of the foam cement slurry that Halliburton recommended to BP for the Macondo well;

b.  Mr. Gagliano and others at Halliburton concealed from BP the results of the foam stability test reported on the laboratory worksheet dated February 12, 2010;

c.  Mr. Gagliano and others at Halliburton concealed from BP the cancelled crush compressive strength test and the observations of settling in the foam cement reported on the laboratory worksheet dated February 12, 2010;

d.  Mr. Gagliano and others at Halliburton concealed from BP the cement slurry preparation conditions on the laboratory worksheet dated February 16, 2010;

e.  Mr. Gagliano and others at Halliburton concealed from BP the observations of foam instability in the crush compressive strength test reported on the laboratory worksheet dated February 16, 2010;

f.  Mr. Gagliano and others at Halliburton concealed from BP the results of the foam stability test reported on the laboratory worksheet dated April 13, 2010;

g.  Mr. Gagliano and others at Halliburton concealed from BP the cancellation of the foam stability test reported on the laboratory worksheet dated April 16, 2010; and

h.  Mr. Gagliano and others at Halliburton concealed from BP that the foam stability test reported on the report sent April 26, 2010 was not for the slurry poured at the Macondo well.

125.    The testing information that Halliburton concealed was material, indeed, it was critical.  Had Halliburton provided the failed test results to BP, BP would not have proceeded with the cement job on April 19-20, 2010.  Moreover, as BP would not have authorized the pouring of an unstable foamed cement slurry into a pressurized reservoir and it would have taken significant mitigating steps, such as running additional tests to ensure well bore integrity.

126.    Halliburton knew and understood it was concealing material information, knew that BP was relying upon its expertise, and did so knowing that BP was relying upon Halliburton to do its job under the parties' contract.  But for Halliburton's concealment, BP would not have authorized the pouring of the unstable slurry.  Halliburton's misconduct and concealment induced BP to proceed with the cement job, believing that the cement slurry design recommended by Halliburton had passed the necessary tests when, in fact, it had not.

127.    Had BP been informed of the testing information that Halliburton concealed it would have never authorized the pouring of the cement on April 19, 2010.

128.    Had BP been informed of the testing information that Halliburton concealed, it would have taken significant mitigating steps to address the risk on April 20, 2010 following the cementing operations.  BP also would have alerted its own personnel onboard and the crew of the *Deepwater Horizon* to be particularly vigilant had Halliburton given BP any reason to believe that the cement slurry Halliburton designed was unstable or would not work.

129.    Halliburton's knowing concealment was a cause-in-fact and also a legal cause of BP's injuries.    As a result of Halliburton's knowing concealment, BP allowed Halliburton to pour the unstable foamed cement slurry and did not detect the failure of the cement through additional precautions that it would have taken had it known the results of Halliburton's testing.  But for Halliburton's multiple acts of fraudulent concealment, the casualty would not have occurred, the well would not have become uncontrollable, the explosion would not have happened, and the resulting deaths, injuries and oil spill would have been avoided.

## HALLIBURTON'S NEGLIGENCE AND FAULT

130.    Halliburton had a duty to use reasonable care in the design, testing, mixing and pumping of the cement and in the monitoring of the well.  As described above, Halliburton breached that duty of reasonable care with respect to, among other things, its provision of professional services.  Moreover, Halliburton was negligent by, among other things:

a.    Failing to properly run the OptiCem model, including failing to make the proper assumptions and inputs.  In this regard, Halliburton made numerous basic mistakes in the OptiCem model, including inputting demonstrably wrong information when it had the correct information to input into the model;

b.    Failing to properly design the cement for the on-site conditions, including designing a cement slurry that was unstable and prone to nitrogen breakout;

c.    Adding a defoamer that destabilized the foam cement slurry;

d.    Failing to add appropriate fluid loss control additives;

e.    Failing to properly test the cement slurry design;

f.    Failing to report to BP the results of the cement testing;

40

g.  Failing to run the minimum tests required under the BP-Halliburton contract;

h.  Failing to follow Halliburton's own cementing guidelines;

i.  Pouring a cement that it knew was unstable;

j.  Failing to properly evaluate the success of the cement job;

k.  Failing to provide competent cementing personnel;

l.  Failing to provide competent mud logging personnel;

m.  Abandoning the mud logging station at a critical time;

n.  Missing or ignoring data indicators that the well was flowing; and

o.  Missing or ignoring alarms that indicated that the well was flowing.

131.  Halliburton's negligence, or if established based upon the evidence at trial that Halliburton's conduct constituted gross fault and/or gross negligence, was a cause-in-fact and also a legal cause of BP's injuries.  But for Halliburton's multiple acts of negligence, the casualty would not have occurred, the well would not have become uncontrollable, the explosion would not have happened, and the resulting deaths, injuries and oil spill would have been avoided.

## COUNT I:  CONTRIBUTION

132.  BP realleges and incorporates by reference each allegation contained in the preceding paragraphs as if fully set forth herein.

133.  The Oil Pollution Act of 1990 ("OPA") states that "A person may bring a civil action for contribution against any other person who is liable or potentially liable under this Act or another law."  33 U.S.C. § 2709.

134.  The DOJ Complaint alleges that, as a result of the *Deepwater Horizon* incident, natural resources have been injured, destroyed, or lost; the amount of damages and the

41

extent of injuries sustained by the United States are not yet fully known; and the United States has expended and/or sustained and/or will expend or sustain, *inter alia*, "removal costs" and "damages," within the meaning of OPA, 33 U.S.C. § 2702(b). The DOJ Complaint also seeks a declaratory judgment that BP and the other defendants are liable for removal costs and damages in this action and in any such subsequent action or actions.

135.   If the United States successfully obtains and/or will obtain a monetary recovery from BP pursuant to OPA as a result of the release of oil and hazardous substances in connection with the *Deepwater Horizon* incident, including but not limited to the removal costs and damages alleged in the DOJ Complaint, such OPA financial liabilities to the United States on the part of BP would not primarily be due to any fault or negligence on the part of BP.

136.   In addition to the claims in the DOJ Complaint, plaintiffs have initiated hundreds of suits naming BP as a defendant under federal, state and common law claims.

137.   Halliburton is liable under "[OPA] or another law" for the alleged damages related to the oil spill resulting from the *Deepwater Horizon* incident for the reasons explained above.

138.   If BP is held liable to the United States or plaintiffs for any monetary recovery "under [OPA] or another law," including but not limited to the removal costs and damages alleged in the DOJ Complaint, Halliburton is liable in contribution to BP under Sections 1009 and 1017 of OPA, 33 U.S.C. §§ 2709 and 2717.

139.   To the extent other laws are applicable, Halliburton is further liable for contribution.

140.   Furthermore, BP for its part is *not* liable to Halliburton for contribution, indemnification or otherwise for liabilities arising from the *Deepwater Horizon* incident.   In

42

particular and based on, among other things, the allegations set forth above, BP is not liable in such fashion to Halliburton under OPA, the terms and conditions of the Well Services Contract, or under any applicable law.

141.    An actual controversy currently exists between BP and Halliburton with regard to Halliburton's liability to BP for any monetary recovery from BP obtained and/or to be obtained by the United States and plaintiffs in connection with the *Deepwater Horizon* incident. A declaratory judgment is therefore appropriate to define Halliburton's liability in contribution to BP for BP's liabilities, if any, to the United States and plaintiffs and also to bind Halliburton in any subsequent action or actions that BP may bring.

## PRAYER FOR RELIEF

Wherefore, Defendant/Third-Party Plaintiff BP respectfully asks of this Court:

1.    Enter judgment in BP's favor against Halliburton.

2.    Order that the United States assert its claims for OPA financial liability directly against Halliburton.

3.    Award BP damages equal to, or in the alternative proportional to Halliburton's fault, the amount of any OPA financial liability for which BP is determined to be liable, if any, plus interest.

4.    Declare pursuant to 28 U.S.C. § 2201 that Halliburton caused or contributed to the *Deepwater Horizon* incident and subsequent oil spill and is responsible in whole or in part for all damages incurred under OPA by BP relating to the *Deepwater Horizon* incident and subsequent oil spill.

5.    Further, declare pursuant to 28 U.S.C. § 2201 that BP is not liable in contribution, indemnification or otherwise to Halliburton with regards to

liabilities arising from the *Deepwater Horizon* incident under OPA, the Well Services Contract, or under any applicable law.

6.   Award the reasonable costs and attorneys' fees incurred by BP in prosecuting this action.

7.   Award such other relief as the Court may deem appropriate and just.

Dated:  April 20, 2011                              Respectfully submitted,

                                                    By: *s/ Don K. Haycraft*
                                                            Don K. Haycraft (Bar #14361)
                                                            R. Keith Jarrett (Bar #16984)
                                                            LISKOW & LEWIS
                                                            701 Poydras Street, Suite 5000
                                                            New Orleans, Louisiana 70139-5099
                                                            Telephone: (504) 581-7979
                                                            Facsimile: (504) 556-4108

                                                            and

                                                            Richard C. Godfrey, P.C.
                                                            J. Andrew Langan, P.C.
                                                            KIRKLAND & ELLIS LLP
                                                            300 North LaSalle Street
                                                            Chicago, Illinois 60654
                                                            Telephone: (312) 862-2000
                                                            Facsimile: (312) 862-2200

                                                            and

                                                            Robert C. "Mike" Brock
                                                            COVINGTON & BURLING LLP
                                                            1201 Pennsylvania Avenue, NW
                                                            Washington, DC 20004-2401
                                                            Telephone: (202) 662-5985
                                                            Facsimile: (202) 662-6291

                                                            Attorneys for BP Exploration & Production Inc.

## CERTIFICATE OF SERVICE

I hereby certify that the above and foregoing pleading has been served on All Counsel by electronically uploading the same to Lexis Nexis File & Serve in accordance with Pretrial Order No. 12, and that the foregoing was electronically filed with the Clerk of Court of the United States District Court for the Eastern District of Louisiana by using the CM/ECF System, which will send a notice in accordance with the procedures established in MDL 2179, on this 20th day of April, 2011.

/s/ Don K. Haycraft