## UNITED STATES DISTRICT COURT
### EASTERN DISTRICT OF LOUISIANA

| | | |
|---|---|---|
| In re:  Oil Spill by the Oil Rig | * | MDL No. 2179 |
| "Deepwater Horizon" in the Gulf | * | |
| of Mexico, on April 20, 2010 | * | SECTION: J |
| | * | |
| Applies to: B1 Master Complaint | * | JUDGE BARBIER |
| | * | |
| | * | MAGISTRATE JUDGE SHUSHAN |
| | * | |
| | * | |

* * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * *

### ORDER AND REASONS

### [As to Motions to Dismiss the B1 Master Complaint]

This multi-district litigation ("MDL") consists of hundreds of consolidated cases, with thousands of claimants, pending before this Court.  These cases arise from the April 20, 2010 explosion, fire, and sinking of the DEEPWATER HORIZON mobile offshore drilling unit ("MODU"), which resulted in the release of millions of gallons of oil into the Gulf of Mexico before it was finally capped approximately three months later.  The consolidated cases include claims for the death of eleven individuals, numerous claims for personal injury, and various claims for environmental and economic damages.

In order to efficiently manage this complex MDL, the Court consolidated and organized the various types of claims into several "pleading bundles."  The "B1" pleading bundle includes all claims for private or "non-governmental economic loss and property damages."  There are in excess of 100,000 individual claims encompassed within the B1 bundle.

In accordance with Pretrial Order No. 11 (Case Management Order No.1), the Plaintiffs' Steering Committee ("PSC") filed a B1 Master Complaint (Rec. Doc. 879) and a First Amended

1

Tab 11

Master Complaint (Rec. Doc. 1128) (collectively "B1 Master Complaint"). Before the Court are various Defendants' Motions to Dismiss the B1 Master Complaint (Rec. Docs. 1440, 1390, 1429, 1597, 1395, 1433, 1414, and 2107) and their Replies (Rec. Docs. 2312, 2188, 2298, 2216, 2191, 2212, 2217, and 2208), as well as Plaintiffs' Oppositions (Rec. Docs. 1803, 1804, 1808, 1821, and 2131).

## I. <u>PROCEDURAL HISTORY</u>

In the B1 Master Complaint, the PSC identifies a number of categories of claimants seeking various types of economic damages, including Commercial Fishermen Plaintiffs, Processing and Distributing Plaintiffs, Recreational Business Plaintiffs, Commercial Business Plaintiffs, Recreation Plaintiffs, Plant and Dock Worker Plaintiffs, Vessel of Opportunity ("VoO") Plaintiffs, Real Property Plaintiffs, Real Property/Tourism Plaintiffs, Banking/Retail Business Plaintiffs, Subsistence Plaintiffs, Moratorium Plaintiffs, and Dealer Claimants.

Plaintiffs named the following as Defendants in their B1 Master Complaint: BP Exploration & Production Inc., BP America Production Company and BP p.l.c. (collectively "BP"); Transocean Ltd., Transocean Offshore, Transocean Deepwater, Transocean Holdings (collectively "Transocean"); Halliburton; M-I; Cameron; Weatherford; Anadarko, Anadarko E&P (collectively "Anadarko"); MOEX Offshore, MOEX USA (collectively "MOEX"); and MOECO. All of the Defendants, with the exception of MOECO, have filed Motions to Dismiss. Additionally, Dril-Quip, which was not named as a Defendant in the Master Complaint, has filed a Motion to Dismiss (Rec. Doc. 2107) because of the procedural effect of the Rule 14(c) tender in Transocean's Third-Party Complaint.

Plaintiffs allege claims under general maritime law, the Oil Pollution Act of 1990 ("OPA"),

33 U.S.C. § 2701, et seq., and various state laws.   Under general maritime law, Plaintiffs allege claims for negligence, gross negligence, and strict liability for manufacturing and/or design defect. Under various state laws, Plaintiffs allege claims for nuisance, trespass, and fraudulent concealment, and they also allege a claim for strict liability under the Florida Pollutant Discharge Prevention and Control Act, Fla. Stat. § 376.011, et seq.   Additionally, Plaintiffs seek punitive damages under all claims and request declaratory relief regarding any settlement provisions that purport to affect the calculation of punitive damages.

## II.  LEGAL STANDARD ON MOTIONS TO DISMISS

To survive a Rule 12(b)(6) motion to dismiss, a plaintiff must plead enough facts "'to state a claim to relief that is plausible on its face.'" *Ashcroft v. Iqbal*, -- U.S. --, 129 S. Ct. 1937, 1949 (2009) (quoting *Bell Atlantic Corp. v. Twombly*, 550 U.S. 544, 547 (2007)).   A claim is facially plausible when the plaintiff pleads facts that allow the court to "draw the reasonable inference that the defendant is liable for the misconduct alleged." *Id.* at 1949.   A court "must . . . accept all factual allegations in the complaint as true" and "must draw all reasonable inferences in the plaintiff's favor." *Lormand v. U.S. Unwired, Inc.*, 565 F.3d 228, 232 (5th Cir. 2009).   The Court is not, however, bound to accept as true legal conclusions couched as factual allegations. *Iqbal*, 129 S. Ct. at 1949-50.

## III.  PARTIES' ARGUMENTS AND DISCUSSION

The subject Motions to Dismiss go to the heart of Plaintiffs' claims in this case.   Various Defendants advance somewhat different arguments as to why some or all of the B1 bundle claims should be dismissed.   At bottom, however, all Defendants seek dismissal of all non-OPA claims for

purely economic damages resulting from the oil spill.[1]  Essentially, Defendants move to dismiss all claims brought pursuant to either general maritime law or state law.  All parties advance a number of arguments regarding the law that should apply to the Plaintiffs' claims for economic loss.  The Defendants' Motions raise a number of issues involving choice of law, and especially the interplay among admiralty, the Outer Continental Shelf Lands Act ("OCSLA"), 43 U.S.C. § 1301, *et seq.*, OPA, and various state laws.

### A.  Vessel status

Although it was unclear prior to oral argument, it is now apparent that only Defendant Cameron suggests that the DEEPWATER HORIZON MODU was not a vessel in navigation at the time of the casualty on April 20, 2010.  Plaintiffs and all other Defendants agree that the DEEPWATER HORIZON MODU was at all material times a "vessel" as that term is defined and understood in general maritime law.  Cameron argues that although the DEEPWATER HORIZON may have been a vessel during the times it was moved from one drilling location to another, at the time of the casualty it was stationary and physically attached to the seabed by means of 5,000 feet of drill pipe.  Cameron relies on a line of cases beginning with *Rodrigue v. Aetna Casualty Co.*, 395 U.S. 352 (1969), for the proposition that a drilling platform permanently or temporarily attached to the seabed of the Outer Continental Shelf is considered an "fixed structure" and not a vessel.  Accordingly, argues Cameron, admiralty jurisdiction is absent and general maritime law does not apply.  Cameron contends that no state law, other than that of Louisiana law used as surrogate federal law under OCSLA, governs Plaintiffs' claims.

---

[1] Additionally, Defendants move to dismiss all OPA claimants who have not complied with OPA's "presentment" requirement. They also question whether Plaintiffs can properly sue parties under OPA who have not been named as Responsible Parties, as well as whether VoO Claimants and Moratorium Claimants have stated viable OPA claims.

The Court is not persuaded by Cameron's arguments. Under clearly established law, the DEEPWATER HORIZON was a vessel, not a fixed platform. Cameron's arguments run counter to longstanding case law which establishes conclusively that the Deepwater Horizon, a *mobile* offshore drilling unit, was a vessel.

In the seminal case of *Offshore Co. v. Robison*, the Fifth Circuit held that a "special purpose vessel, a floating drilling platform" could be considered a vessel. 266 F.2d 769, 779 (5th Cir. 1959). Specifically, the defendants in that case, who claimed that the floating platform should not be considered a vessel, argued that "[t]he evidence shows that Offshore 55 was a platform designed and used solely for the purpose of drilling oil wells in offshore waters—in this instance, the Gulf of Mexico. That the platform was not self-propelled and when moved from one well to another, two large tugs were used. Further, when an oil well was being drilled the platform was secured to the bed of the Gulf in an immobilized position with the platform itself raised forty to fifty feet above the water level . . . ." *Id.* at 773 n.3. Nonetheless, the Fifth Circuit held that such a "floating drilling platform" can be a vessel, though secured to the seabed while drilling a well.

Cameron's argument is also foreclosed by more recent Fifth Circuit precedent in *Demette v. Falcon Drilling Co., Inc.*, 280 F.3d 492, 498 n.18 (5th Cir. 2002) ("This circuit has repeatedly held that special-purpose movable drilling rigs, including jack-up rigs, are vessels within the meaning of admiralty law."), *overruled in part, on other grounds by, Grand Isle Shipyard, Inc. v. Seacor Marine, LLC*, 589 F.3d 778, 788 & n.8 (5th Cir. 2009) (en banc). In fact, in *Demette*, the Fifth Circuit expressly rejected the very same argument that Cameron makes in this case. *Id.* More recently, the Supreme Court held "a 'vessel' is any watercraft practically capable of maritime transportation." *Stewart v. Dutra Constr. Co.*, 543 U.S. 481, 497 (2005). Noting that "a watercraft

5

need not be in motion to qualify as a vessel . . . ," the Supreme Court explained that "[l]ooking to whether a watercraft is motionless or moving is the sort of 'snapshot' test that we [previously] rejected . . . . Just as a worker does not 'oscillate back and forth between Jones Act coverage and other remedies depending on the activity in which the worker was engaged while injured, neither does a watercraft pass in and out of Jones Act coverage depending on whether it was moving at the time of the accident." *Id.* at 495-96 (internal citation omitted).

The B1 Master Complaint alleges that the DEEPWATER HORIZON was a dynamically-positioned semi-submersible deepwater drilling vessel. It employed a satellite global positioning device and complex thruster technology to stabilize itself. At all material times, the vessel was afloat upon the navigable waters of the Gulf of Mexico. Unlike the jack-up drilling rig in *Demette*, the DEEPWATER HORIZON had no legs or anchors connecting it to the seabed. Its only physical "attachment" to the wellhead was the 5,000 foot string of drill pipe. Again, this is no more of a connection than the casing that was being hammered into the seabed by the casing crew in *Demette*. 280 F.3d at 494-95. The DEEPWATER HORIZON was practically capable of maritime transportation, and thus is properly classified as a vessel. *See also Herb's Welding v. Grey*, 470 U.S. 414, 417 n.2 (1985) ("Offshore oil rigs are of two general sorts: fixed and floating. Floating structures have been treated as vessels by the lower courts." (citations omitted)); *Diamond Offshore Co. v. A&B Builders, Inc.,* 302 F.3d 531, 545 (5th Cir. 2002) ("because the *Ocean Concorde* is a semi-submersible drilling rig, which is undisputably a vessel . . . ."), *overruled in part, on other grounds by, Grand Isle Shipyards, Inc.*, 589 F.3d at 788 & n.8.

Cameron argues that its blowout preventer ("BOP") was physically attached to the wellhead, located on the seabed some 5,000 feet below the surface of the water, and that the oil spill occurred

Case 2:10-md-02179-CJB-SS   Document 3830   Filed 08/26/11   Page 7 of 39

at the wellhead, not from the DEEPWATER HORIZON. This does not persuade the Court to reach a different conclusion. The B1 Master Complaint alleges that both the BOP and the drill string were part of the vessel's gear or appurtenances. Maritime law "ordinarily treats an 'appurtenance' attached to a vessel in navigable waters as part of the vessel itself." *Grubart, Inc v. Great Lakes Dredge & Dock Co.*, 513 U.S. 527, 535 (1995).

**B. OCSLA jurisdiction**

All parties agree that at the time of the spill, the DEEPWATER HORIZON was operating in the Gulf of Mexico approximately fifty miles offshore, above the Outer Continental Shelf, triggering OCSLA jurisdiction. Indeed, this Court has already held in this MDL that it has OCSLA jurisdiction pursuant to 43 U.S.C. § 1349 because "(1) the activities causing the injuries in question could be classified as an operation on the OCS involving exploration or production of minerals, and (2) because the case arises in connection with the operation." *In re Oil Spill by the Oil Rig Deepwater Horizon in the Gulf of Mexico, on April 20, 2010*, 747 F. Supp. 2d 704 (E.D. La. 2010). In that previous decision, this Court did not address choice-of-law questions, explaining that "having determined that a decision that admiralty jurisdiction applies would not affect the Court's jurisdiction determination, a decision on whether state, admiralty, or other law applies does not need to be addressed at this time." *Id.* at 709.

**C. Admiralty jurisdiction**

The test for whether admiralty jurisdiction exists in tort cases was outlined by the Supreme Court in *Grubart, Inc v. Great Lakes Dredge & Dock Co.*:

> [A] party seeking to invoke federal admiralty jurisdiction pursuant to 28 U.S.C. § 1333(1) over a tort claim must satisfy conditions both of location and of connection with maritime activity. A court applying the location test must determine whether the tort occurred on navigable water. The connection test raises two issues. A court, first,

must assess the general features of the type of incident involved to determine whether the incident has a potentially disruptive impact on maritime commerce. Second, a court must determine whether the general character of the activity giving rise of the incident shows a substantial relationship to traditional maritime activity.

513 U.S. 527, 534 (1995)(citations and internal quotations omitted).

The location test, which is satisfied when the tort occurs on navigable water, is readily satisfied here. The B1 Master Complaint alleges that the blowout, explosions, fire, and subsequent discharge of oil, occurred on or from the DEEPWATER HORIZON and its appurtenances, which was operating on waters overlying the Outer Continental Shelf; i.e., navigable waters. The connection test is also met. First, there is no question that the explosion and resulting spill caused a disruption of maritime commerce, which exceeds the "potentially disruptive" threshold established in *Grubart*. Second, the operations of the DEEPWATER HORIZON bore a substantial relationship to traditional maritime activity. *See Theriot v. Bay Drilling Corp.*, 783 F.2d 527, 538-39 (5th Cir. 1986) ("oil and gas drilling on navigable waters aboard a vessel is recognized to be maritime commerce"). Further, injuries incurred on land (or in the seabed) are cognizable in admiralty under the Admiralty Extension Act, 46 U.S.C. § 30101.

This case falls within the Court's admiralty jurisdiction. With admiralty jurisdiction comes the "application of substantive admiralty law." *Grubart*, 513 U.S. at 545. "[W]here OCSLA and general maritime law both could apply, the case is to be governed by maritime law." *Tenn. Gas Pipeline v. Houston Cas. Ins. Co.*, 87 F.3d 150, 154 (5th Cir. 1996).

**D.  Plaintiffs' state law claims**

Plaintiffs designated their B1 Master Complaint as "an admiralty or maritime case" under Rule 9(h) of the Federal Rules of Civil Procedure. Although Plaintiffs acknowledge that admiralty jurisdiction applies to this case, they insist that substantive maritime law does not preempt their

8

state-law claims because state law can "supplement" general maritime law, either where there is a substantive gap in maritime law or where there is no conflict with maritime law. Plaintiffs also argue that OPA contains a state-law savings provision, which preserves these claims. However, Plaintiffs do *not* argue that state law applies as surrogate federal law through OCSLA, and, in fact, argue against this position.

Relative to OCSLA, some Defendants argue that the only state law that could apply to the B1 Plaintiffs' claims is Louisiana law, because OCSLA permits the application of only the adjacent state's law. On these grounds it is urged that the laws of all non-adjacent states must be dismissed.

The OCSLA provision that allows adjacent-state law to be adopted as surrogate federal law is § 1333(a)(2)(A):

> To the extent that they are applicable and not inconsistent with this subchapter or with other Federal laws and regulations of the Secretary now in effect or hereafter adopted, the civil and criminal laws of each adjacent State, now in effect or hereafter adopted, amended, or repealed are declared to be the law of the United States for that portion of the subsoil and seabed of the outer Continental Shelf, *and artificial islands and fixed structures erected thereon*, which would be within the area of the State if its boundaries were extended seaward to the outer margin of the outer Continental Shelf . . . .

43 U.S.C. § 1333(a)(2)(A) (emphasis added). It is argued that § 1333(a)(2)(A) does not apply, because the DEEPWATER HORIZON was not an "artificial island" or a "fixed structure." Based on the language of § 1333(a)(2)(A), this argument has appeal. *See also Herb's Welding*, 470 U.S. at 417 n.2 (noting the distinctions between "fixed" and "floating" platforms). However, since 1990 the Fifth Circuit has employed the *"PLT test"* to determine whether state law may be adopted as surrogate federal law under OCSLA:

> For state law to apply as surrogate federal law, three conditions must be met: "(1) The controversy must arise on a situs covered by OCSLA (i.e., the subsoil, seabed,

9

or artificial structures permanently *or temporarily attached* thereto). (2) Federal maritime law must not apply of its own force. (3) The state law must not be inconsistent with Federal law."

*Grand Isle Shipyard, Inc.*, 598 F.3d at 783(emphasis added) (quoting *Union Tex. Petroleum Corp. v. PLT Eng'g, Inc.*, 895 F.2d 1043, 1047 (5th Cir. 1990)).   As the emphasized language indicates, the first prong of the *PLT* test ("situs prong") is not limited to artificial islands and fixed structures. Instead, the *PLT* test incorporates into § 1333(a)(2)(A) the locations referenced in § 1333(a)(1),[2] specifically "temporarily attached" structures. *See Demette*, 280 F.3d at 496 ("[Section 1333(a)(1)] creates a 'situs' requirement for the application of other sections of the OCSLA, including sections 1333(a)(2) and 1333(b).").   This test has been applied to contract cases and tort cases.  *See Grand Isle, supra* (contract); *Strong v. B.P. Exploration & Prod., Inc.*, 440 F.3d 665, 668 (5th Cir. 2006) (tort).[3]

Assuming the DEEPWATER HORIZON met the *PLT* test's situs prong,[4] the second prong

---

[2] Section 1333(a)(1) states:

> The Constitution and laws and civil and political jurisdiction of the United States are extended to the subsoil and seabed of the outer Continental Shelf and to all artificial islands, and *all installations and other devices permanently or temporarily attached to the seabed,* which may be erected thereon for the purpose of exploring for, developing, or producing resources therefrom, or any such installation or other device (other than a ship or vessel) for the purpose of transporting such resources, to the same extent as if the outer Continental Shelf were an area of exclusive Federal jurisdiction located within a State.

43 U.S.C. § 1333(a)(1) (emphasis added).

[3] At least one commentator has argued that Congress intended that state law would only apply to "fixed" platforms, while "temporarily attached structures" (jack-up rigs, semi-submersible drilling rigs, etc.) would remain the province of federal law, particularly maritime law. *See* David W. Robertson, *The Outer Continental Shelf Lands Act's Provisions on Jurisdiction, Remedies, and Choice of Law: Correcting the Fifth Circuit's Mistakes*, 38 J. Mar. L & Com. 487, 534-35, 541-42 (2007).

[4] It is questionable whether the DEEPWATER HORIZON would satisfy *PLT*'s situs prong.  The Fifth Circuit has explained that the situs prong consists of three locations:  (1) the subsoil and seabed of the OCS; (2) any artificial island, installation, or other device if (a) it is permanently or temporarily attached to the seabed of the OCS, and (b) it has been *erected on the seabed* of the OCS, and (c) its presence on the OCS is to explore for, develop, or produce resources from

(continued...)

of the *PLT* test still precludes application of state law under OCSLA.  As discussed, admiralty jurisdiction was invoked by this incident, *see supra* Section C.  Therefore, general maritime law applies to the claims of the B1 Plaintiffs.  Moreover, OPA applies of its own force, because that act governs, *inter alia*, private claims for property damage and economic loss resulting from a discharge of oil in navigable waters.  *See* 33 U.S.C. § 2702(a), (b)(2)(B), (b)(2)(C), (b)(2)(E).  Because OPA and/or general maritime law applies to the B1 Plaintiffs' claims,[5] state law may not be adopted as surrogate federal law under OCSLA § 1333(a)(3)(A).  *See Rodrigue v. Aetna Cas. & Sur. Co.*, 395 U.S. 352 (1969) ("for federal law to oust adopted state law federal law must first apply.").  Consequently, adjacent-state law is not adopted under § 1333(a)(2)(A), nor does that Section preempt non-adjacent state law.

The focus turns, then, to the relationship between federal maritime law and state law.  As mentioned, with the admiralty jurisdiction comes substantive maritime law.  This means that general maritime law—an amalgam of traditional common law rules, modifications of those rules, and newly created rules—applies to this matter to the extent it is not displaced by federal statute.  *E. River S.S. Corp. v. Transamerica Delaval, Inc.*, 476 U.S. 858, 864 (1986).  This framework, established by the Constitution,[6] intends that a consistent, uniform system will govern maritime commerce.  *See*

---

[4](...continued)
the OCS; (3) any artificial island, installation, or other device if (a) it is permanently or temporarily attached to the seabed of the OCS, and (b) it is not a ship or vessel, and (c) its presence on the OCS is to transport resources from the OCS. *Demette*, 280 F.3d at 497.  The first and third locations are not applicable.  *See Diamond*, 302 F.3d at 544 n.13.  Under the second location, a question arises whether the DEEPWATER HORIZON could be said to be "erected on the seabed of the OCS," given that it floated above the seabed.  Regardless, the Court does not reach this issue since it finds that the second prong of the *PLT* test precludes the application of state law under OCSLA, as discussed in the main text.

[5]How OPA affects general maritime law is discussed later.

[6] Article III, § 2 extends the judicial power to "all cases of admiralty and maritime jurisdiction."  Congress legislates in this area by virtue of the Interstate Commerce Clause and Necessary and Proper Clause. U.S. Const. Art. I, § 8.  The
(continued...)

*The Lottawanna*, 88 U.S. 558, 575 (1874) ("It certainly could not have been the intention to place the rules and limits of maritime law under the disposal and regulation of the several States, as that would have defeated the uniformity and consistency at which the Constitution aimed on all subjects of a commercial character affecting the intercourse of the States with each other or with foreign states.").[7] Admiralty does not entirely exclude state law, however, and States may "create rights and liabilities with respect to ***conduct within their borders***, when the state action does not run counter to federal laws or the essential features of an exclusive federal jurisdiction." *Romero v. Int'l Terminal Operating Co.*, 358 U.S. 354, 375 n.42 (1959) (emphasis added; internal quotations and citations omitted).

But this case does not concern conduct within state borders (waters). This casualty occurred over the Outer Continental Shelf—an area of "exclusive federal jurisdiction"—on waters deemed to be the "high seas." 43 U.S.C. §§ 1332(2), 1333(a)(1)(A). The Admiralty Extension Act, though not itself a grant of exclusive jurisdiction, *see Askew, infra*, nevertheless ensures that damages incurred on land are cognizable in admiralty. *See Grubart*, 513 U.S. at 531. Citizens from multiple states have alleged damage, and multiple states' laws are asserted. While it is recognized that States

---

[6](...continued)
Supremacy Clause, Article VI, ensures federal maritime law supercedes state law. *See* 1 Thomas J. Schoenbaum, *Admiralty and Maritime Law* §§ 4-1 to 4-2 (4th ed. 2004).

[7] *See also Knickerbocker Ice Co. v. Stewart*, 253 U.S. 149, 157 (1920) ("The Constitution itself adopted and established, as part of the laws of the United States, approved rules of the general maritime law and empowered Congress to legislate in respect of them and other matters within the admiralty and maritime jurisdiction. Moreover, it took from the states all power, by legislation or judicial decision, to contravene the essential purposes of, or to work material injury to, characteristic features of such law or to interfere with its proper harmony and uniformity in its international and interstate relations. To preserve adequate harmony and appropriate uniform rules relating to maritime matters and bring them within control of the federal government was the fundamental purpose; and to such definite end Congress was empowered to legislate within that sphere."); Schoenbaum, *supra* note 6, § 4-1 at 158 (stating that a desire for national uniformity drove the drafters to vest the federal courts with jurisdiction over admiralty cases). Although *Knickerbocker Ice* and its predecessor, *Southern Pacific Co. v. Jensen*, 244 U.S. 205 (1916), have certainly been limited by later decisions, they still retain "vitality." *See Askew v. Am. Waterways Operator, Inc.*, 411 U.S. 325, 344 (1973).

Case 2:10-md-02179-CJB-SS   Document 3830   Filed 08/26/11   Page 13 of 39

have an interest to protect their citizens, property, and resources from oil pollution, to subject a discharger to the varying laws of each state into which its oil has flowed would contravene a fundamental purpose of maritime law: "[t]o preserve adequate harmony and appropriate uniform rules relating to maritime matters." *Knickerbocker Ice Co.*, *see supra* note 7. Thus, to the extent state law could apply to conduct outside state waters, in this case it must "yield to the needs of a uniform federal maritime law." *Romero*, 358 U.S. at 373. (citing *S. Pac. Co. v. Jensen*, 244 U.S. 205 (1916)).

Plaintiffs argue that state law is not preempted in this instance because state law can supplement maritime law. Plaintiffs rely heavily on *Yamaha Motor Corp. v. Calhoun*, which involved a young girl killed in a jet ski accident in state territorial waters, where there is no federal statute providing a remedy for wrongful death. 516 U.S. 199 (1996). The decedent's parents attempted to sue under the state wrongful death statute. The question in *Yamaha* was whether general maritime law's wrongful death action, often called the "*Morange* action" (named for the case that created it, *Moragne v. States Marine Lines, Inc.*, 398 U.S. 375 (1970)), preempted state law.

The Court held that state law was not preempted. The *Yamaha* Court noted that before the *Morange* action was created in 1970, courts permitted state wrongful death statutes to fill the substantive gap in the law. It also noted that the *Morange* Court was focused on curing an anomaly that existed for seafarers (generally speaking, seamen and longshoremen): When killed outside territorial waters, seafarers could base a wrongful death claim on unseaworthiness (because the Death on the High Seas Act ("DOHSA") incorporates unseaworthiness for seafarers), but not when killed within state waters (because DOHSA does not apply there; thus seafarers could only use state

law, which was negligence-based).  Although *Morange* ended this anomaly, it specifically left in place the seafarer's ***pre-existing*** ability to bring a wrongful death action under state law.  Thus,  the *Morange* action was "in many respects a gap-filling measure to ensure that seamen (and their survivors) would all be treated alike," irrespective of whether death occurred within or beyond state waters," and "showed no hostility to concurrent application of state wrongful death statues."  *Id.* at 214 (quotations omitted).[8]  Accordingly, *Yamaha* does not support using state law to supplement maritime law in this case, since there is no substantive gap for state law to fill (as contrasted with the situation in state waters before the creation of the *Morange* action); remedies are available under both OPA and general maritime law.  Also significant is the *Yamaha* Court's observation that maritime law had long accommodated States' interests in regulating maritime affairs that occurred ***within their territorial waters****.  Id.* at 215 n.13.  Again, this casualty occurred beyond state waters, so *Yamaha* is also distinguishable for this reason.

Louisiana v. M/V Testbank*, 752 F.2d 1019 (5th Cir. 1985) (applying maritime law and rejecting state-law claims for nuisance by plaintiffs seeking to recover for economic losses sustained in connection with an oil spill from a vessel on the Mississippi River), and *Marastro Compania Naviera, S.A. v. Canadian Maritime Carriers, Ltd.*, 959 F.2d 49 (5th Cir. 1992) (using general common law rather than state law to supplement maritime law in order to promote uniformity of maritime law) provide further support for the conclusion that Plaintiffs' state-law claims are not viable.

Plaintiffs' contention that OPA's savings provisions preserves its state-law claims is also

_____

[8] The *Morange* Court did not apply the *Morange* action to nonseafarers.  This was done by subsequent courts.  *See Yamaha*, 515 U.S. at 210 n.7.

14

Case 2:10-md-02179-CJB-SS   Document 3830   Filed 08/26/11   Page 15 of 39

unavailing.  These provisions state:

> (a) Preservation of State authorities; Solid Waste Disposal Act
>
> Nothing in this Act or the Act of March 3, 1851 shall—
>
>> (1) affect, or be construed or interpreted as preempting, the authority of any State or political subdivision thereof from imposing any additional liability or requirements with respect to—
>>
>>> (A) the discharge of oil or other pollution by oil within such State; or
>>>
>>> (B) any removal activities in connection with such a discharge; or
>>
>> (2) affect, or be construed or interpreted to affect or modify in any way the obligations or liabilities of any person under the Solid Waste Disposal Act (42 U.S.C. 6901 et seq.) or State law, including common law.
>
> . . .
>
> (c) Additional requirements and liabilities; penalties
>
> Nothing in this Act, the Act of March 3, 1851 (46 U.S.C. 183 et seq.), or section 9509 of title 26, shall in any way affect, or be construed to affect, the authority of the United States or any State or political subdivision thereof—
>
>> (1) to impose additional liability or additional requirements; or
>>
>> (2) to impose, or to determine the amount of, any fine or penalty (whether criminal or civil in nature) for any violation of law;
>
> relating to the discharge, or substantial threat of a discharge, of oil.

33 U.S.C. § 2718.  These provisions evince Congress' intent to preserve the States' police power to govern pollution discharges within their territorial waters.  The Court does not read them as giving States the power to govern out-of-state conduct affecting multiple states.  "The usual function of a saving clause is to preserve something from immediate interference—not to create; and the rule is that expression by the Legislature of an erroneous opinion concerning the law does not alter it." *Knickerbocker Ice*, 253 U.S. at 162.  In other words, although Congress has expressed its intent to not preempt state law, this intent does not delegate to the States a power that the Constitution vested

in the federal government.[9]

This conclusion is consistent with the Supreme Court's rationale in *International Paper Co. v. Ouellette*, 479 U.S. 481 (1987). There the Court addressed the question of "whether the [Clean Water] Act preempts a common-law nuisance suit filed in a Vermont court under Vermont law, when the source of the alleged injury is located in New York." *Id.* at 483. The Clean Water Act ("CWA") contained two provisions relating to state-law remedies:

> Except as expressly provided . . . nothing in this chapter shall . . . be construed as impairing or in any manner affecting any right or jurisdiction of the States with respect to the waters (including boundary waters) of such States.
>
> . . .
>
> Nothing in this section [Citizen Suits] shall restrict any right which any person (or class of persons) may have under any statute or common law to seek enforcement of any effluent standard or limitation or to seek any other relief . . . .

*Id.* at 485 (quoting 33 U.S.C. §§ 1370, 1365(e)). Notwithstanding these provisions, the *Ouellette* Court determined that ". . . when a court considers a state-law claim concerning interstate water pollution that is subject to the CWA, the court must apply the law of the State in which the point source is located." *Id.* at 487. According to the Court, "[a]pplication of an affected State's law to an out-of-state source would . . . undermine the important goals of efficiency and predictability in the permit system." *Id.* at 496. The Court also noted that prohibiting an action under the affected State's laws did not leave the plaintiffs without a remedy, as they could avail themselves of either

---

[9]After oral arguments and the Motions were taken under advisement, the States' Coordinating Counsel raised what it considered a new argument: Prior to OPA's enactment, OCSLA previously contained a savings provision purporting to preserve the States' ability to enact pollution laws respecting oil spills on the Outer Continental Shelf, and this provision was essentially moved to OPA. Counsel contends that in light of this, OPA's savings provisions should be interpreted in line with the former OCSLA provision. The Court has considered this argument, but is not persuaded. Even if the OCSLA savings provision was not repealed, it, like the OPA savings provisions, cannot grant to the states a right that is not permitted by the framework established by Constitution.

the source State's law or the CWA's citizen suit provision. *Id.* at 497-98 & n.18. Although this matter may not immediately concern a permitting process, similar goals exist in maritime law (uniformity), as discussed above. Thus, just as the Supreme Court limited the state-law claims preserved by the CWA savings clause, this Court finds it appropriate to limit state-law claims purportedly saved by OPA.

Plaintiffs' reliance on *Askew v. American Waterways Operators, Inc.* is unpersuasive despite that Court's observance that ship-to-shore pollution control is "historically within the reach of the police power of the States," and "not silently taken away from the States by the Admiralty Extension Act." 411 U.S. 325, 337 (1973). *Askew* involved a challenge to the constitutionality of the Florida Oil Spill Prevention and Pollution Control Act, which governed state and private damages incurred as a result of an oil spill in the State's ***territorial*** waters. The Court also noted that previous decisions "gave broad 'recognition of the authority of the States to create rights and liabilities with respect to ***conduct within their borders . . . .***'" *Id.* at 340 (emphasis added). Thus, *Askew* does not suggest that state laws could apply to an out-of-state polluter. *Askew* is also distinguishable on the grounds that there was no overlap between the relevant federal and state statutes at issue, as there is with OPA. The federal statute in *Askew* addressed federal cleanup costs; the state statute addressed state and private damages. Thus, there was no available federal statutory remedy for the damages sought in *Askew*, as there is here.

The Court's analysis is also not in tension with *United States v. Locke*, which held that OPA did not save Washington's tanker-design statutes. 529 U.S. 89 (2000). Plaintiffs emphasize the Supreme Court's point that "[p]lacement of the savings clauses in Title I of OPA suggests that Congress intended to preserve state laws of a scope similar to the matters contained in Title I of

OPA . . . . The evident purpose of the savings clauses is to preserve state laws which, rather than imposing substantive regulation of a vessel's primary conduct, establish liability rules and financial requirements relating to oil spills." *Id.* at 105. Plaintiffs use this point to advance the argument that if the statute at issue in *Locke* dealt with liability rather than tanker design, it would have been preserved under OPA. This is an overly broad interpretation. The Washington statute governed tankers operating in Washington state waters. Although the Supreme Court observed that the savings clause in OPA preserved state statutes relative to liability, it did not declare a rule so broad as to allow state liability statutes to apply to oil spills outside of state waters.

Plaintiffs also insist that under *Curd v. Mosaic Fertilizer, LLC*, 39 So. 3d 1216 (Fla. 2010), "any person" can recover for damages suffered as a result of pollution under the Florida Pollutant Discharge Prevention and Control Act ("FPDPCA"). *Curd* involved commercial fishermen who made claims for economic damages resulting from an oil spill caused by a vessel operating in Tampa Bay, i.e., Florida territorial waters. As with the cases above, this case is distinguishable from a discharge occurring over the Outer Continental Shelf.

Accordingly, Plaintiffs' state common-law claims for nuisance, trespass, and fraudulent concealment, as well as Plaintiffs' FPDPCA claims are dismissed. Because the Court finds that state law is inapplicable to this case, Plaintiffs' arguments regarding the economic-loss doctrines of various states are moot.

**E.  General maritime law claims**

Defendants seek to dismiss all general maritime claims, contending that when Congress enacted OPA, it displaced pre-existing federal common law, including general maritime law, for claims covered by OPA. Defendants argue that OPA provides the sole remedy for private, non-

18

governmental entities asserting economic loss and property damage claims.  They urge that when Congress enacts a comprehensive statute on a subject previously controlled by federal common law, the federal statute controls and displaces the federal common law.  Defendants further argue that under OPA, Plaintiffs are allowed to pursue their claims for economic damages solely against the designated "Responsible Party" and that OPA does not allow claims directly against non-Responsible Parties.

Prior to the enactment of OPA in 1990, a general maritime negligence cause of action was available to persons who suffered physical damage and resulting economic loss resulting from an oil spill.  General maritime law also provided for recovery of punitive damages in the case of gross negligence, *Exxon Shipping Co. v. Baker*, 554 U.S. 471 (2008), and strict product liability for defective products, *E. River S.S. Corp., Inc.*, 476 U.S. 858 (1986).  However, claims for purely economic losses unaccompanied by physical damage to a proprietary interest were precluded under *Robins Dry Dock & Repair Co. v. Flint*, 275 U.S. 303 (1927).  The Fifth Circuit has continuously reaffirmed the straightforward application of the *Robins Dry Dock* rule, explaining that "although eloquently criticized for its rigidity, the rule has persisted because it offers a bright-line application in an otherwise murky area." *Mathiesen v. M/V Obelix*, 817 F.2d 345, 346-47 (5th Cir. 1987) (citing *Louisiana v. M/V Testbank*, 752 F.2d 1019 (5th Cir. 1985)); *see also Wiltz v. Bayer CropScience, Ltd.*, --- F.3d ---, 2011 WL 2535552 (5th Cir. 2011); *Catalyst Old River Hydroelectric Ltd. v. Ingram Barge Co.*, 639 F.3d 207 (5th Cir. 2011) (both reaffirming the applicability of *Robins Dry Dock*).

One relevant exception to the *Robins Dry Dock* rule applies in the case of commercial fishermen. *See Louisiana v. M/V Testbank*, 524 F. Supp. 1170, 1173 (E.D. La. 1981) ("claims for [purely] economic loss [resulting from an oil spill and subsequent river closure] asserted by the

commercial oystermen, shrimpers, crabbers, and fishermen raise unique considerations requiring separate attention . . . seamen have been recognized as favored in admiralty and their economic interests require the fullest possible legal protection."). A number of other courts have recognized that claims of commercial fishermen are sui generis because of their unique relationship to the seas and fisheries, treating these fishermen as akin to seamen under general maritime law. *See Yarmouth Sea Prods. Ltd. v. Scully*,131 F.3d 389 (4th Cir. 1997); *Union Oil Co. v. Oppen*, 501 F.2d 558 (9th Cir. 1974).

Accordingly, long before the enactment of OPA, this was the state of general maritime law. Persons who suffered physical damage to their property as well as commercial fisherman had a cause of action under general maritime law to recover losses resulting from unintentional maritime torts. In the case of gross negligence or malicious, intentional conduct, general maritime law provided a claim for punitive or exemplary damages. *Baker*, 554 U.S. 471. And, in the case of a defective product involved in a maritime casualty, maritime law imposed strict liability. *E. River S.S. Corp.*, 476 U.S. 858 (1986).

In the wake of the EXXON VALDEZ spill in 1989, there were large numbers of persons who suffered actual economic losses but were precluded from any recovery by virtue of the *Robins Dry Dock* rule. At that time, an oil spill caused by a vessel on navigable water was governed by a web of different laws, including general maritime law, the CWA, and the laws of states affected by the spill in question. Various efforts had been made in the past to enact comprehensive federal legislation dealing with pollution from oil spills. With impetus from the EXXON VALDEZ incident, Congress finally enacted OPA in 1990.

OPA is a comprehensive statute addressing responsibility for oil spills, including the cost of

clean up, liability for civil penalties, as well as economic damages incurred by private parties and public entities. Indeed, the Senate Report provides that the Act "builds upon section 311 of the Clean Water Act to create a single Federal law providing cleanup authority, penalties, and liability for oil pollution." S. Rep. 101-94, at 730 (1989). One significant part of OPA broadened the scope of private persons who are allowed to recover for economic losses resulting from an oil spill. OPA allows recovery for economic losses "resulting from" or "due to" the oil spill, regardless of whether the claimant sustained physical damage to a proprietary interest. OPA allows recovery for "[d]amages equal to the loss of profits or impairment of earning capacity due to the injury, destruction, or loss of real property, or natural resources, which shall be recoverable by *any claimant*." 33 U.S.C. § 2702(b)(2)(E) (emphasis added). Furthermore, the House Report noted that "[t]he claimant need not be the owner of the damaged property or resources to recover for lost profits or income." H.R. Conf. Rep. 101-653, at 781 (1990).

Clearly, one major remedial purpose of OPA was to allow a broader class of claimants to recover for economic losses than allowed under general maritime law. Congress was apparently moved by the experience of the Alaskan claimants whose actual losses were not recoverable under existing law. Another obvious purpose of OPA was to set up a scheme by which a "Responsible Party" (typically the vessel or facility owner) was designated and made strictly liable (in most instances) for clean up costs and resulting economic damages. The intent is to encourage settlement and reduce the need for litigation. Claimants present their claims to the Responsible Party, who pays the claims and is then allowed to seek contribution from other allegedly liable parties. 33 U.S.C. §§ 2709, 2710, 2713. If the Responsible Party refuses or fails to pay a claim after ninety days, the claimant may either pursue its claim against the government-created Oil Spill Liability Trust Fund

or file suit in court. *Id.* § 2713. There was much debate in Congress about whether or not this new federal statute should completely preempt or displace other federal or state laws. Ultimately, the statute included two "saving" provisions, one relating to general maritime law[10] and the other to state laws (discussed above). The question arises in this case as to whether, or to what extent, OPA has displaced any claims previously existing under general maritime law, including claims for punitive damages.

Only a handful of courts have had the opportunity to address whether OPA displaces general maritime law. For example, the First Circuit in *South Port Marine, LLC v. Gulf Oil Limited Partnership*, 234 F.3d 58 (1st Cir. 2000), held that punitive damages were not available under OPA. The First Circuit began by noting that in enacting OPA "Congress established a comprehensive federal scheme for oil pollution liability" and "set[] forth a comprehensive list of recoverable damages." *Id.* at 64. "Absent from that list of recoverable damages is any mention of punitive damages." *Id.*

The First Circuit found that the Supreme Court decision of *Miles v. Apex Marine*, 498 U.S. 19 (1990), led to the conclusion that OPA did not allow for punitive damages. "The Court [in *Miles*] refused to allow recovery for loss of society when such damages were not provided in [Death on the High Seas Act], reasoning that 'in an area covered by statute, it would be no more appropriate to prescribe a different measure of damage than to prescribe a different statute of limitations, or a different class of beneficiaries.'" *Id.* at 65-66 (internal citations omitted). Likewise, the First Circuit determined that OPA's absence of an allowance for punitive damages was conclusive. In *Clausen*

---

[10] "Except as otherwise provided in this Act, this Act does not affect— (1) admiralty and maritime law; or (2) the jurisdiction of the district courts of the United States with respect to civil actions under admiralty and maritime jurisdiction, saving to suitors in all cases all other remedies to which they are otherwise entitled." 33 U.S.C. § 2751(e).

*v. M/V New Carissa*, the district court adopted the First Circuit's rationale and held that punitive damages were not allowable under OPA. 171 F. Supp. 2d 1127 (D. Or. 2001).

In *Gabarick v. Laurin Maritime (America) Inc.*, 623 F. Supp. 2d 741, 747 (E.D. La. 2009), the district court determined that OPA preempted maritime law claims for economic loss, using the four factors articulated in *United States v. Oswego Barge Corp.*, 664 F.2d 327 (2d Cir. 1981), to analyze whether OPA displaced general maritime law: "(1) legislative history; (2) the scope of legislation; (3) whether judge-made law would fill a gap left by Congress's silence or rewrite rules that Congress enacted; and (4) likeliness of Congress's intent to preempt 'long established and familiar principles of the common law or the general maritime law.'"

However, more recent Supreme Court precedents cause this Court to question the notion that long-standing federal common law can be displaced by a statute that is silent on the issue. *See Exxon Shipping Co. v. Baker*, 554 U.S. 471 (2008) (holding that the CWA did not displace a general maritime remedy for punitive damages) and *Atlantic Sounding Co. v. Townsend*, -- U.S. --, 129 S. Ct. 2561 (2009) (holding that the Jones Act did not displace the availability of punitive damages for a seaman's maintenance and cure claim).

In *Baker*, the Court employed a three-part analysis to determine if a statute preempts or displaces federal common law. First, is there a clear indication that Congress intended to occupy the entire field? Second, does the statute speak directly to the question addressed by the common law? Third, will application of common law have a frustrating effect on the statutory remedial scheme? 554 U.S. at 489. The question presented in *Baker* was whether the CWA preempted or displaced general maritime punitive damages for economic loss. The Court first stated that it saw no clear indication of congressional intent to occupy the entire field of pollution remedies. Next,

23

the Court noted that the CWA made no mention of punitive damages, and that "[i]n order to abrogate a common-law principle, the statute must speak directly to the question addressed by the common law. Finally, the Court did not perceive that punitive damages for private harms would have any frustrating effect on the CWA remedial scheme. Accordingly, the Court concluded that the CWA did not preempt punitive damages under general maritime law.

In *Townsend*, the Supreme Court revisited its prior holding in *Miles v. Apex Marine*, 498 U.S. 19 (1990), on which the *South Port Marine* court hinged its analysis. The *Townsend* Court explained that *Miles* did not allow punitive damages for wrongful death claims because it was ***only*** as a result of federal legislation that a wrongful death cause of action existed. 129 S.Ct. at 2572-73. Accordingly, "to determine the remedies available under the common-law wrongful-death action, 'an admiralty court should look primarily to these legislative enactments for policy guidance.' It would have been illegitimate to create common-law remedies that exceeded those remedies statutorily available under the Jones Act and DOHSA." *Id.* at 2572 (citing *Miles*, 498 U.S. at 27). The Court contrasted the situation in *Miles* with the question before it in *Townsend*, and it concluded that "both the maritime cause of action (maintenance and cure) and the remedy (punitive damages) were well established before the passage of the Jones Act." *Id.* In other words, the Court limited the application of *Miles* when it concluded that punitive damages were available to the seaman asserting a cause of action for maintenance and cure.

The B1 Master Complaint alleges economic loss claims on behalf of various categories of claimants, many of whom have not alleged physical injury to their property or other proprietary interest. Pre-OPA, these claimants, with the exception of commercial fishermen, would not have had a viable cause of action and would be precluded from any recovery by virtue of *Robins Dry*

24

Case 2:10-md-02179-CJB-SS   Document 3830   Filed 08/26/11   Page 25 of 39

*Dock*. Accordingly, claims under general maritime law asserted by such claimants are not plausible and must be dismissed.

However, the Court finds that the B1 Master Complaint states a viable cause of action against the non-Responsible Parties under general maritime law on behalf of claimants who either allege physical damage to a proprietary interest and/or qualify for the commercial fishermen exception to *Robins Dry Dock*. In brief, these claims are saved and not displaced by OPA for the following reasons.

First, when reading OPA and its legislative history, it does not appear that Congress intended to occupy the entire field governing liability for oil spills, as it included two savings provisions—one that preserved the application of general maritime law and another that preserved a State's authority with respect to discharges of oil or pollution within the state. 33 U.S.C. §§ 2718, 2751.

Second, OPA does not directly address or speak to the liability of non-Responsible Parties to persons who suffer covered losses. Although OPA contains provisions regarding the Responsible Party's ability to seek contribution and indemnification, *Id.* §§ 2709, 2710, it is silent as to whether a claimant can seek redress directly from non-Responsible Parties. Prior to OPA's enactment, commercial fisherman and those who suffered physical damage had a general maritime law cause of action against these individuals.

Third, there is nothing to indicate that allowing a general maritime remedy against the non-Responsible Parties will somehow frustrate Congress' intent when it enacted OPA. Under OPA, a claimant is required to first present a claim to the Responsible Party. If the claim is not paid within ninety days, the claimant may file suit or file a claim against the Oil Spill Liability Trust Fund. A Responsible Party is strictly liable and damages are capped unless there is gross negligence or

violation of a safety statute or regulation that proximately caused the discharge. To allow a general maritime claim against the Responsible Party would serve to frustrate and circumvent the remedial scheme in OPA.

Thus, claimants' maritime causes of action against a Responsible Party are displaced by OPA, such that all claims against a Responsible Party for damages covered by OPA must comply with OPA's presentment procedure. However, as to the non-Responsible Parties, there is nothing in OPA to indicate that Congress intended such parties to be immune from direct liability to persons who either suffered physical damage to a proprietary interest and/or qualify for the commercial fishermen exception. Therefore, general maritime law claims that existed before OPA may be brought directly against non-Responsible parties.

## F.  Claims for punitive damages

OPA is also silent as to the availability of punitive damages. Plaintiffs who could assert general maritime claims pre-OPA enactment may plausibly allege punitive damages under general maritime law for several reasons. First, "[p]unitive damages have long been available at common law" and "the common-law tradition of punitive damages extends to maritime claims." *Townsend*, 129 S. Ct. at 2569. Congress has not occupied the entire field of oil spill liability in light of the OPA provision preserving admiralty and maritime law, "[e]xcept as otherwise provided." OPA does not mention punitive damages; thus, while punitive damages are not available under OPA, the Court does not read OPA's silence as meaning that punitive damages are precluded under general maritime law. Congress knows how to proscribe punitive damages when it intends to, as it did in the commercial aviation exception under the Death on the High Seas Act, 46 U.S.C. § 30307(b) ("punitive damages are not recoverable").

There is also nothing to indicate that allowing a claim for punitive damages in this context would frustrate the OPA liability scheme. As stated above, claims against the Responsible Party must comply with OPA's procedure, regardless of whether there is also cause of action against the Responsible Party under general maritime law. However, the behavior that would give rise to punitive damages under general maritime law–gross negligence–would also break OPA's limit of liability. *See* 33 U.S.C. § 2704(a). Thus, the imposition of punitive damages under general maritime law would not circumvent OPA's limitation of liability.

Finally on this issue, the Court notes Justice Stevens' concurrence in *Baker* in which he wrote that the Trans-Alaska Pipeline Authorization Act ("TAPAA"), which provided "the liability regime governing certain types of Alaskan oil spills, imposing strict liability but also capping recovery," "did not restrict the availability of punitive damages." 554 U.S. at 518. Although the issue of whether TAPAA precluded an award of punitive damages was not squarely before the Court in *Baker*, Justice Stevens' concurrence adds further support for this Court's conclusion. OPA, like TAPAA, creates a liability regime governing oil spills, imposes strict liability on the Responsible Parties, includes liability limits, and is silent on the issue of punitive damages.

Thus, OPA does not displace general maritime law claims for those Plaintiffs who would have been able to bring such claims prior to OPA's enactment. These Plaintiffs assert plausible claims for punitive damages against Responsible and non-Responsible parties.

## G. Negligence claims against Anadarko and MOEX

Anadarko and MOEX, the non-operating lessees for the Macondo well, have joined in the

arguments made by other Defendants.[11]   However, these two Defendants advance additional, independent reasons supporting their Motions to Dismiss.  In essence, Defendants argue that under the Joint Operating Agreement ("JOA") existing between BP and themselves, BP was the operating partner, responsible for the drilling of the Macondo well.  Anadarko or MOEX had no personnel present aboard the DEEPWATER HORIZON and assert they had no right to control BP's conduct.

*Ainsworth v. Shell Offshore, Inc.* lays out the analysis for evaluating Plaintiffs' negligence claim against Anadarko and MOEX .  829 F.2d 548 (5th Cir. 1987).  "[A] principal generally is not liable for the offenses an independent contractor commits in the course of performing its contractual duties." *Id.* at 549.  There are two recognized exceptions to this general principle, in the case of an ultra-hazardous activity, or when the principal retains or exercises operational control. *Id.* at 550.  Offshore drilling operations are not considered ultra-hazardous.  *Id.*  As to operational control, the Court in *Ainsworth* did not find that this exception was met even when the principal had a company man present on the platform.  In this case, it is not alleged that either Anadarko or MOEX had anyone present on the DEEPWATER HORIZON.  Under the JOA, BP was solely responsible for the drilling operations.  Any access to information that Anadarko and MOEX may have had did not give rise to a duty to intercede in an independent contractor's operations—especially because Plaintiffs have not alleged in their Complaint that Non-Operating Defendants had access to any information not already available to BP and Transocean personnel either onshore or on the rig.

Plaintiffs attempt to avoid dismissal by suggesting that they do not argue for vicarious liability of the Non-Operating Defendants, but rather that Anadarko and MOEX were directly

---

[11] Although minority interest lessees, Anadarko and MOEX contest their status as Responsible Parties. Neither has been formally named as a Responsible Party at this time.

Case 2:10-md-02179-CJB-SS   Document 3830   Filed 08/26/11   Page 29 of 39

negligent. However, adding a "direct-duty" label to their claims does not add merit to them. *See Dupre v. Chevron U.S.A. Inc.*, 913 F. Supp. 473, 483 (E.D. La. 1996) (rejecting plaintiffs' attempt to disguise a vicarious liability claim as one of direct duty because doing so "would amount to an end-run around a large body of Fifth Circuit precedent finding no 'operational control' despite some knowledge of risk or involvement with safety issues and the presence of 'company men' on the contractor's rig"). Simply put, Plaintiffs have failed to allege a plausible general maritime negligence claim against the two Non-Operating Defendants. All general maritime negligence claims against Anadarko and MOEX must be dismissed.[12]

## H. Presentment under OPA.

Defendants also seek to dismiss all OPA claims because the B1 Master Complaint does not properly allege that the B1 Claimants have complied with the "presentment" requirements of OPA. Defendants argue that presentment to the Responsible Party is either a jurisdictional requirement or, alternatively, a mandatory condition precedent before filing suit.

The Court finds that the text of OPA clearly requires that OPA claimants must first "present" their OPA claim to the Responsible Party before filing suit. The "Claims Procedure" section of OPA reads:

(a) Presentation

Except as provided in subsection (b) of this section, *all claims for* removal costs or *damages shall be presented first to the responsible party* or guarantor of the source designated under section 2714 (a) of this title. . . .

(c) If a claim is presented in accordance with subsection (a) of this section and—

---

[12] Because it is plausible that Anadarko and MOEX will be found to be Responsible Parties and thus liable under OPA, OPA claims are not dismissed.

(1) each person to whom the claim is presented denies all liability for the claim, or

(2) the claim is not settled by any person by payment within 90 days after the date upon which

(A) the claim was presented, or

(B) advertising was begun pursuant to section 2714 (b) of this title, whichever is later,

the claimant may elect to commence an action in court against the responsible party or guarantor or to present the claim to the Fund.

33 U.S.C. § 2713 (emphasis added).

The text of the statute is clear. Congress intended presentment to be a mandatory condition precedent to filing suit. *See Boca Ciega Hotel, Inc. v. Bouchard Transp. Co., Inc.*, 51 F.3d 235 (11th Cir. 1995) (presentment is a mandatory condition precedent to filing suit under OPA); *Gabarick v. Laurin Maritime (America), Inc.*, 2009 WL 102549 (E.D. La. 2009) (noting that the purpose of the claim presentation procedure is to promote settlement and avoid litigation).

Defendants argue that the B1 Master Complaint does not sufficiently allege that claimants have presented their claims to BP as the Responsible Party. There are likely large numbers of B1 claimants who have completely bypassed the OPA claim presentation requirement, others who have attempted to present their claims but may not have complied with OPA, and others who have properly presented their claims but have been denied for various reasons.[13] Claimants who have not complied with the presentment requirement are subject to dismissal without prejudice, allowing them to exhaust the presentment of their claims before returning to court. In the ordinary case, the Court would simply dismiss those claims without prejudice. However, as the Court has previously noted, this is no ordinary case. A judge handling an MDL often must employ special procedures and

---

[13] Counsel for BP acknowledged at oral argument that at least *some* of the B1 claimants have properly presented their claims.

case management tools in order to have the MDL operate in an orderly and efficient manner.[14]  In this massive and complex MDL, the Court is faced with a significant practical problem.  It would be impractical, time-consuming, and disruptive to the orderly conduct of this MDL and the current scheduling orders if the Court or the parties were required to sort through in excess of 100,000 individual B1 claims to determine which ones should be dismissed at the current time.  Moreover, such a diversion at this time would be unproductive and would not advance towards the goal of allowing the parties and the Court to be ready for the limitation and liability trial scheduled to commence in February 2012.  No matter how many of the individual B1 claims might be dismissed without prejudice, the trial scheduled for February would still go forward with essentially the same evidence.

In summary on this issue, the Court finds that presentment is a mandatory condition-precedent with respect to Plaintiffs' OPA claims.[15]  The Court finds that Plaintiffs have sufficiently alleged presentment in their B1 Master Complaint, at least with respect to some of the Claimants.  For the reasons stated above, the Court does not intend to engage in the process of sorting through thousands of individual claims at the present time to determine which claims have or have not been properly presented.[16]

---

[14] *See, e.g., In re Oil Spill by the Oil Rig Deepwater Horizon in the Gulf of Mexico, on April 20, 2010*, No. 10-md-2179, (Rec. Doc. 676) (E.D. La. Nov. 15, 2010) (Pretrial Order 15, continuing all pending and future motions); *see also* Fed. Judicial Ctr., *Manual for Complex Litigation, Fourth* §§ 10.1 (2004) (explaining that Fed. R. Civ. Proc. 16 (c)(12) authorizes a judge to adopt special procedures for managing complex litigation).

[15] Of course, there is no presentment requirement for Plaintiffs to pursue any general maritime law claims which survive the present Motions to Dismiss.

[16] The Court does not decide today what constitutes "presentment." OPA requires a claimant to present his or her claim for a "sum certain" to the Responsible Party.  How this requirement can be applied in the context of the BP oil spill is unclear.  The long term effects on the environment and fisheries may not be known for many years.

## I. **Vessel of Opportunity and Moratorium claims**

The parties disagree as to whether the Vessel of Opportunity ("VoO") and Moratorium Plaintiffs have stated plausible B1 claims.  Plaintiffs argue that OPA may apply to some of the claims presented by VoO claimants because OPA provides for liability on the part of Responsible Parties for damages that *"result from"* discharges of oil.  At least some of the VoO claimants allege property damage to their vessels.  Moratorium Plaintiffs argue that they have stated a viable OPA claim because there are some losses that would have been incurred regardless of the Moratorium and further because the Moratorium was a foreseeable response to the spill.  Defendants counter that OPA does not apply to claims alleged by VoO Plaintiffs because their injuries occurred as a result of their participation in the VoO program, not as a result of the spill.  Defendants also argue that Moratorium claims must be dismissed for failure to state an OPA claim because the imposition of the Moratorium was an intervening or superseding cause of damage that could not reasonably have been anticipated.

Few courts have had occasion to address the question of OPA causation. *See, e.g., Gatlin Oil Co. v. United States*, 169 F.3d 207 (4th Cir. 1999) (holding that a plaintiff could not recover for fire damage because the evidence did not show that the fire caused the discharge of oil into navigable waters); *In re Settoon Towing LLC*, 2009 WL 4730969 (E.D. La. Dec. 4, 2009) (explaining that it was potentially possible for an injured party to recover for damages incurred as the result of a shutdown of the Gulf Intracoastal Waterway in the wake of a spill).  The parties acknowledge that these claims are fact specific and present a more attenuated causation analysis than the other claims for economic loss, and they compare and contrast the instant Moratorium claims and VoO claims with the facts in the few cases that have been decided.

The Court reminds the parties that the issue before the Court on a Motion to Dismiss is simply whether Plaintiffs have stated a plausible claim for relief. A claim is facially plausible when the plaintiff pleads facts that allow the court to "draw the reasonable inference that the defendant is liable for the misconduct alleged." *Iqbal*, 129 S.Ct. at 1949. A court "must . . . accept all factual allegations in the complaint as true" and "must draw all reasonable inferences in the plaintiff's favor." *Lormand*, 565 F.3d at 232.

The Court notes that OPA does not expressly require "proximate cause," but rather only that the loss is "due to" or "resulting from" the oil spill. While the Court need not define the precise contours of OPA causation at this time, it is worth noting that during oral argument both counsel for BP and the PSC conceded that OPA causation may lie somewhere between traditional "proximate cause" and simple "but for" causation. *See CSX Transp. Inc. v. McBride*, 131 S. Ct. 2630, 2642-43 (2011) ("Congress, it is true, has written the words 'proximate cause' into a number of statutes. But when the legislative text uses less legalistic language, *e.g.*, 'caused by,' 'occasioned by,' 'in consequence of,' . . . and the legislative purpose is to loosen constraints on recovery, there is little reason for courts to hark back to stock, judge-made proximate-cause formulations.").

The Court need not define causation under OPA—necessarily a highly factual analysis— at this stage of the pleadings. The Court is satisfied that the VoO and Moratorium Plaintiffs have alleged sufficient facts to state plausible claims in the B1 bundle.

**J.   <u>Dril-Quip as 14(c) Defendant</u>**

Dril-Quip, which was not named as a Defendant in the Master Complaint, has filed a Motion to Dismiss (Rec. Doc. 2107) because of the procedural effect of the Rule 14(c) tender in Transocean's Third-Party Complaint. Although the Court has dismissed all state-law claims alleged

33

by Plaintiffs in their B1 Master Complaint, Dril-Quip remains a 14(c) Defendant with respect to Plaintiffs' claims saved by this Order.

## K. Claims for declaratory relief

Plaintiffs seek a declaratory judgment that "any settlement provisions [with Defendants] that purport, directly or indirectly, to release or to affect the calculation of punitive damages without a judicial determination of fairness, adequacy, and reasonableness are ineffective as contrary to law, equity, and public policy." (Rec. Doc. 1128 at 193.) Plaintiffs also seek a declaration that "the conduct of BP and its agents and representatives, including the Gulf Coast Claims Facility ("GCCF"), in obtaining releases and/or assignments of claims against other parties, persons, or entities is not an obligation of BP under OPA." (*Id.* at 193-94.)

The Court finds Plaintiffs' claims for declaratory relief fatally problematic in at least two respects. First, Plaintiffs do not identify any cause of action entitling them to declaratory relief. Under the Declaratory Judgment Act, "a party's legal interest must relate to an actual 'claim arising under federal law that another asserts against him . . . .'" *Collin County, Tex. v. Homeowner's Ass'n for Values Essential to Neighborhoods (HAVEN)*, 915 F.2d 167, 171 (5th Cir. 1990). Accordingly, because "it is the underlying cause of action of the defendant against the plaintiff that is actually litigated in a declaratory judgment action, a party bringing a declaratory judgment action must have been a proper party had the defendant brought suit on the underlying cause of action." *Id.* Here, the Court agrees with BP that Plaintiffs have not identified a cause of action that would entitle them to their requested relief.

The second obvious flaw in Plaintiffs' request for declaratory relief is that nothing prohibits Defendants from settling claims for economic loss. While OPA does not specifically address the

use of waivers and releases by Responsible Parties, the statute also does not clearly prohibit it.  In fact, as the Court has recognized in this Order, one of the goals of OPA was to allow for speedy and efficient recovery by victims of an oil spill. The Court finds that Plaintiffs' declaratory relief claim fails on this ground as well.

**L.  OPA claims against Anadarko E&P**

One of the Anadarko entities, Anadarko E&P, urges dismissal of Plaintiffs' OPA claim, arguing that Anadarko E&P did not hold a lease interest in the Macondo Prospect at the time of casualty.  Plaintiffs allege Anadarko E&P held a 22.5% ownership interest in the lease of the Macondo Prospect at all relevant times, including at the time of the blowout and oil spill.  The Court concludes Plaintiffs have stated a colorable OPA claim against Anadarko E&P and accordingly this claim survives Anadarko E&P's Motion to Dismiss.

**M.  Claims for attorneys' fees**

Plaintiffs argue that attorneys' fees are available under general maritime law.  Plaintiffs cite cases in which courts have allowed attorneys' fees for bad faith failure to pay maintenance and cure, claims that are not present in the B1 Master Complaint.  The line of cases relied upon go back to *Vaughan v. Atkinson*, 369 U.S. 527 (1962), where a seaman was forced to hire a lawyer and go to court to recover benefits plainly owed under what the Court referred to as "laws that are centuries old."  The default was willful and persistent, and since it was a maintenance and cure claim, there was no defense.  Under these circumstances the Supreme Court allowed a claim for attorneys' fees. This rule has generally been limited to maintenance and cure cases.

Pursuant to the "American Rule" in the United States, the prevailing litigant is ordinarily not

entitled to collect attorneys' fees from the losing party. *Alyeska Pipeline Serv. Co. v. Wilderness Society*, 421 U.S. 240 (1975); *see also Delta Steamship Lines, Inc. v. Avondale Shipyards, Inc.*, 747 F.2d 995, 1011 (5th Cir. 1984) ("The general rule in admiralty is that attorneys' fees are not recoverable by the prevailing party"). Generally, litigants must pay their own attorneys' fees absent statute or enforceable contract. Plaintiffs allege a claim for attorneys' fees under the so-called "bad-faith exception" to the "American Rule."

Plaintiffs misread the bad-faith exception, which is designed to cover situations in which the defendants have "acted in bad faith, vexatiously, wantonly, or for oppressive reasons." *Galveston County Navigation Dist. No. 1 v. Hopson Towing Co., Inc.*, 92 F.3d 353, 356 (5th Cir. 1995). In that case, the Fifth Circuit reversed an award of attorneys' fees in a maritime allision case because there was "no evidence that the defendants took this [legal] position maliciously or in bad faith, nor that they failed to comply with discovery requests, filed frivolous pleadings, or otherwise abused the litigation process." *Id.* at 359.

A more recent case from the Sixth Circuit discussed the older line of cases and the bad faith exception in some detail. In *Shimman v. International Union of Operating Engineers*, the Sixth Circuit held that a person who harms another in bad faith is nonetheless entitled to defend a lawsuit. 744 F.2d 1226, 1228-34 (6th Cir. 1984) (en banc). *Shimman* made clear that the focus of the inquiry is not the actions that precipitated the law suit, but rather the manner in which the litigation itself is carried out. That is, the rule is intended to penalize the litigant who brings to court a frivolous suit or defense, or abuses the process so as to create an injury separate from the underlying claim. The Fifth Circuit has adopted this same reasoning. In *Guidry v. International Union of Operating Engineers*, the Court rejected a claim for attorneys' fees because there was no evidence that the

36

defendants in the case had either brought a frivolous defense or pursued the litigation in a vexatious manner. 882 F.2d 929 (5th Cir. 1989).

Even more to the point, the Fifth Circuit seems to have ratcheted up the standard for a bad faith attorneys' fee claim since *Guidry*. "A court should invoke its inherent power to award attorneys' fees only when it finds that 'fraud has been practiced upon it, or that the very temple of justice has been defiled.'" *Boland Marine v. Rinher*, 41 F.3d 997, 1005 (1995). In *Boland*, the Fifth Circuit held that a determination that the defendant instituted the proceedings, or required the proceedings to be instituted, without reasonable grounds is not the equivalent to a finding that fraud was perpetrated on the Court or that the "very temple of justice has been defiled which is required for a court to assess attorney's fees through its inherent powers." *Id.*

The Court concludes that plaintiffs' complaint does not allege a plausible claim for attorneys' fees under either general maritime law or the bad faith exception, and this claim must be dismissed.[17]

## IV. SUMMARY

In summary, the Court finds as follows:

1.    The DEEPWATER HORIZON was at all material times a vessel in navigation.

2.    Admiralty jurisdiction is present because the alleged tort occurred upon navigable waters of the Gulf of Mexico, disrupted maritime commerce, and the operations of the vessel bore a substantial relationship to traditional maritime activity.   With admiralty jurisdiction comes the application of substantive maritime law.

---

[17] This ruling is not intended to preclude possible claims for attorneys' fees available by statute or federal rule, or some other non-statutory exception to the American Rule, such as common-fund fees, or situations where a party willfully violates a court order. See Boland, 41 F.3d at 1005.

Case 2:10-md-02179-CJB-SS   Document 3830   Filed 08/26/11   Page 38 of 39

3.   OCSLA jurisdiction is also present because the casualty occurred in the context of exploration or production of minerals on the Outer Continental Shelf.

4.   The law of the adjacent state is not adopted as surrogate federal law under OCSLA, 43 U.S.C. § 1333(a)(2)(A).

5.   State law, both statutory and common, is preempted by maritime law, notwithstanding OPA's savings provisions.  All claims brought under state law are dismissed.

6.   General maritime law claims that do not allege physical damage to a proprietary interest are dismissed under the *Robins Dry Dock* rule, unless the claim falls into the commercial fishermen exception.  OPA claims for economic loss need not allege physical damage to a proprietary interest.

7.   OPA does not displace general maritime law claims against non-Responsible parties. OPA does displace general maritime law claims against Responsible Parties, but only with regard to procedure (i.e., OPA's presentment requirement).

8.   Presentment under OPA is a mandatory condition precedent to filing suit against a Responsible Party.

9.   There is no presentment requirement for claims against non-Responsible Parties.

10.   Claims for punitive damages are available for general maritime law claimants against Responsible Parties (provided OPA's presentment procedure is satisfied) and non-Responsible Parties.

11.    All general maritime negligence claims against Anadarko and MOEX are dismissed, as Plaintiffs have failed to state a plausible claim against the Non-Operating lessees/Defendants.

12.    Plaintiffs have plausibly alleged OPA claims for VoO claimants and Moratorium claimants.

13.    Dril-Quip remains a 14(c) Defendant.

14.    Plaintiffs' claims for declaratory relief are dismissed.

15.    Plaintiffs have plausibly alleged OPA claims against Anadarko E&P.

16.    Plaintiffs' claims for attorneys' fees under general maritime law are dismissed.

Accordingly,

**IT IS ORDERED** that Defendants' Motions to Dismiss the B1 Master Complaint (Rec. Docs. 1440, 1390, 1429, 1597, 1395, 1433, 1414, and 2107) are hereby **GRANTED IN PART** and **DENIED IN PART**, as set forth above.

New Orleans, Louisiana, this 26th day of August, 2011.

UNITED STATES DISTRICT JUDGE

39