# UNITED STATES DISTRICT COURT
# EASTERN DISTRICT OF LOUISIANA

| | |
|---|---|
| In re:  **Oil Spill by the Oil Rig "DEEPWATER HORIZON" in the Gulf of Mexico, on April 20, 2010**<br><br>**These Pleadings apply to:** *All Cases*<br><br>(Including Nos. 10-2771 and 10-4536) | **MDL No. 2179**<br><br>**SECTION: J**<br><br>**JUDGE BARBIER**<br><br>**MAGISTRATE SUSHAN** |

## POST-TRIAL BRIEF

**Submitted by the Plaintiff Steering Committee
On Behalf of Plaintiffs and Claimants-in-Limitation
For the Phase One Limitation and Liability Trial**

Plaintiffs and Claimants-in-Limitation, through Plaintiffs' Co-Liaison Counsel, the Plaintiffs' Steering Committee, and the PSC Phase One Trial Team, respectfully submit the following Post-Trial Brief, in accordance with the Court's Order of April 24, 2013 [Doc 9536], to address specific legal and factual issues raised by the Court and otherwise by the parties based on the evidence admitted during the Phase One Limitation and Liability Trial: [1]

## MAY IT PLEASE THE COURT:

---

[1] Consistent with the Court's Order, the Plaintiffs Steering Committee will also be submitting a PROPOSED FINDINGS AND CONCLUSIONS jointly with the State of Alabama and the State of Louisiana. Plaintiffs respectfully incorporate such PROPOSED FINDINGS in further support of the legal and factual issues addressed in this Post-Trial Brief.

Tab 24

## TABLE OF CONTENTS

|                                                                                 | Page(s) |
|---------------------------------------------------------------------------------|---------|
| Table of Contents                                                               | i       |
| Table of Authorities                                                            | iv      |

**Overview of Legal Issues**

| | |
|---|---|
| The Ultimate Issues to be Addressed by the Court | 1 |
| General Discussion regarding "Gross Negligence" / "Wanton and Willful" / Etc. | 2 |
| General Observations regarding *P&E Boat Rentals* | 4 |

**Answers to Specific Legal Questions Posed by the Court**

1. What is the standard for finding "gross negligence" or "willful misconduct" under the Clean Water Act ("CWA"), 33 U.S.C. § 1321(b)(7)(D), and the Oil Pollution Act of 1990 ("OPA"), 33 U.S.C. 2704(c)(1)(A)? . . 6

2. What is the standard for a finding of punitive damages under general maritime law?  Is this a different standard than under the CWA or OPA, and if so, how? . . 10

3. In order to find that a party acted with gross negligence [or willful misconduct or wanton or reckless disregard], is it necessary to find that there be at least one single act or omission that equates to gross negligence [etc], or can such a finding be based upon an accumulation or a series of negligent acts or omissions? . . 13

4. Can an act or omission that is not itself causal of the accident nevertheless be considered in determining whether a party engaged in conduct constituting gross negligence [etc]? . . 14

5. In order to find gross negligence [etc], is it sufficient if only employees on the rig are guilty of such conduct, or is it necessary to find that this level of conduct was attributable to shore-based or management-level employees? . 18

6. Does compliance with MMS (or other applicable) regulations preclude a finding of gross negligence regardless of whether a defendant knew or should have known that its conduct or equipment was unsafe, or violated accepted engineering standards? . . 21

7.  Does the fact that a party acted in accordance with "industry standards" preclude a finding of gross negligence [etc]?   .   .   .   .   . 7

**Key Material Factual Questions Disputed by the Parties at Trial**

There was a "dual command" structure on the DEEPWATER HORIZON, which violated the ISM Code.   .   .   .   .   .   . 26

There is no conflict between the ISM Code and the MODU Code.   .   . 28

Captain Kuchta was not adequately trained and otherwise qualified to serve as the Master of the DEEPWATER HORIZON.   .   .   .   . 28

Jimmy Harrell was not licensed to serve as the Person in Charge of the DEEPWATER HORIZON, or even the OIM.   .   .   .   . 30

The weekly drills and other training of the DEEPWATER HORIZON Crew did not include EDS training.   .   .   .   .   . 31

The deficiencies noted in the 2009 Rig Audit (and previously) were not closed out prior to the blowout and explosion.   .   .   .   . 31

The battery in the Blue Pod was already dead (or at least too low to function) when it was called upon to activate the BSR at "AMF Time".   .   .   . 35

The General Alarm on the DEEPWATER HORIZON did not sound before the first (or even the second) explosion.   .   .   .   .   . 37

An acoustic trigger is a reliable mechanism that could have been and should have been added to the BOP   .   .   .   .   . 37

When they knew that hydrocarbons had entered the riser, the Transocean Crew diverted to the Mud-Gas Separator, and not overboard.   .   . 38

OMS was applied differently, and later, to contractor-owned rigs in the Gulf.   . 38

There was, at the time of the blowout, no "bridging document" that identified and addressed the gaps between BP's OMS and the Transocean Safety Management System with respect to the Macondo Well or the DEEPWATER HORIZON.   .   .   .   .   .   . 42

In determining the "Safe Drilling Margin" for MMS purposes, (and the
"Kick Margin" for Good Oilfield Practices purposes), the operator is not always
allowed to rely on the measurement that is taken at the Casing Shoe, but must
calculate from the lowest known Fracture Gradient that's found in the relevant
drilling interval or section.                                           .  44

The "fast drilling" that occurred with little or no regard for the drilling margin
from October 2009 thru April 9, 2010 caused or contributed to the blowout.   .  46

The "Every Dollar Counts" culture at BP affected operations;  it affected safety;
and it is evidenced in the specific decisions that increased risks on Macondo.   .  47

Maximum Anticipated Surface Pressure (MASP) should have been calculated
using 100% gas column to surface, (rather than 50% mud, 50% gas).       .   .  50

Was the Sperry Mudlogger, Joe Keith, monitoring the well on the evening in
question?  How long was he on "break"?  Did he review the data when he returned
from break?  Did he see the data changes and disregard them, or did he fail to
notice them in the first place? .       .       .       .       .       .       .       .   51

Sperry (and Transocean and/or BP) could have placed the Flow-Out Sensors
– or a second set of Flow-Out Sensors – in a location that would have allowed the
Mudlogger to effectively monitor the Flow-Out even when fluids were being
diverted overboard   .       .       .       .       .       .       .       .       .   53

Halliburton did not develop a Basis of Design for the production casing
cement job.   .       .       .       .       .       .       .       .       .   54

The cement slurry designed and formulated by Halliburton for the production
casing interval was unstable. .       .       .       .       .       .       .   .  56

Did Halliburton intentionally conceal or destroy evidence after the blowout?   .  57

**Conclusion**   .       .       .       .       .       .       .       .       .   .  60

**Certificate of Service**.       .       .       .       .       .       .       .   .  63

# TABLE OF AUTHORTIES

**Page(s)**

Adams v. Phillips, No.01-3803, 2002 WL 31886737,
2002 U.S. Dist. LEXIS 24888 (E.D.La. Dec. 19, 2002)   .   .   .   14

Aetna Causualty & Surety Co. v. Marshall, 699 S.W.2d 896 (Tex. App. 1985)   .   14

American Airlines, Inc. v. Ulen, 186 F.2d 529 (D.C. Cir. 1949)   .   .   .   9, 23

American Society of Mechanical Engineers v. Hydro Level Corp.,
456 U.S. 556 (1982)   .   .   .   .   .   .   .   19

The Amiable Nancy, 16 U.S. (3 Wheat.) 546 (1818) .   .   .   .   .   19

Apache Corp. v. Moore, 891 S.W.2d 671 (Tex. App. 1994) .   .   .   .   14

Atlantic Sounding Co. v. Townsend, 557 U.S. 404 (2009)   .   .   .   .   10

Baker v. S/S Christobal, 488 F.2d 331 (5th Cir. 1974)   .   .   .   .   26

Bergeson v. Dilworth, 959 F.2d 245 (10th Cir. 1992) (table),
1992 WL 64887   .   .   .   .   .   .   .   16

Brister v. A.W.I., Inc., 946 F.3d 350 (5th Cir. 1991) .   .   .   .   19

BMW v. Gore, 517 U.S. 559 (1996)  .   .   .   .   .   .   17

Burk Royalty Co. v. Walls, 616 S.W.2d 911 (Tex. 1981)   .   .   .   .   14, 15

Cape Flattery Ltd v. Titan Marine, 607 F.Supp.2d 1179 (D.Haw. 2009),
aff'd, 647 F.3d 914 (9th Cir. 2011)   .   .   .   .   .   11

In the Matter of Cameron Boat Rentals, 683 F.Supp. 577 (W.D.La. 1988)  .   .   10, 11

Clements v. Steele, 792 F.2d 515 (5th Cir. 1986)   .   .   .   .   11, 12, 13, 14-15

CEH Inc v. F/V Seafarer, 70 F.3d 694 (1st Cir. 1995)   .   .   .   .   10, 11, 19

Coale v. Dow Chem. Co., 701 P.2d 885 (Colo.App.1985)   .   .   .   .   16

Denton v. DaimlerChrysler Corp., 2008 WL 5111222 (N.D.Ga. Dec. 2, 2008)   .   23

Dorsey v. Honda Motor Co., 655 F.2d 650 (5th Cir.1981)   .   .   .   .   23

Durham v. Cnty. of Maui, 692 F.Supp.2d 1256 (D.Haw. 2010)   .   .   .   23, 25

Eaves v. Penn, 587 F.2d 453 (10th Cir. 1978). . . . . . 16

Energy XXI v. New Tech Engineering, 845 F.Supp.2d 770 (S.D.Tex. 2012) . 12

Epling v. M.T. Epling Co., 435 F.2d 732 (6th. Cir. 1970) . . . . 19

Exxon Shipping Co. v. Baker, 554 U.S. 471 (2008) . . . . 4, 10, 11, 12, 17, 19

In re Exxon Valdez, 236 F.Supp.2d 1043 (D. Alaska 2002) . . . . 17

Ferguson v. Ferguson, 181 S.E.2d 648 (Va. 1971) . . . . 14

Flax v. DaimlerChrysler Corp., 272 S.W.3d 521 (Tenn.2008) . . . 24

Folks v. Kansas Power & Light, 755 P.2d 1319 (Kan. 1988). . . . 26

Geftman v. Boat Owners Ass'n, No.02-1461-18,
        2003 WL 23333312 (D.S.C. Dec. 2, 2003) . . . . . 11

Granite Const. Co. v. Mendoza, 816 S.W.2d 756 (Tex. App. 1991) . . 14

Gryc v. Dayton-Hudson Corp., 297 N.W.2d 727 (Minn. 1980) . . 26

In re Hellenic, Inc., 252 F.3d 391 (5th Cir. 2001) . . . . 5, 20

Hilliard v. A.H. Robins Co., 148 Cal.App.3d 374 (1983) . . . 16

Hoppe v. G.D. Searle & Co., 779 F.Supp. 1413 (S.D.N.Y. 1991) . . 16

Houston Exploration v. Halliburton, 269 F.3d 528 (5th Cir. 2001) . . 11, 12

International Armament Corp. v. King, 674 S.W.2d 413 (Tex. App. 1984) . 14

Jimenez v. Chrysler Corp., 74 F.Supp.2d 548 (D.S.C. 1999),
        rev'd, in part, 269 F.3d 439 (4th Cir. 2001) . . . . 16

Jowers v. BOC Group, Inc., 608 F.Supp.2d 724 (S.D.Miss. 2009) . . 26

Kahumoku v. Titan Maritime, LLC, 486 F.Supp.2d 1144 (D.Haw. 2007) . 11

Koninklijke Luchtvaart Maatschappij N.V. KLM v. Tuller,
        292 F.2d. 775 (D.C. Cir. 1961) . . . . . 9

Kuroshima Shipping S.A. Act of God Defense & Limit of Liability Analysis,
        2003 AMC 1681 (NPFC June 23, 2003) . . . . . 7, 12

Kuykendall v. Young Life, 261 F.App'x 480 (4th Cir. 2008) .     .     .     .     13, 15

Lake Shore & M.S. Ry. Co. v. Prentice, 147 U.S. 101 (1893)     .     .     .     19

Lobegeiger v. Celebrity Cruises, Inc., No.11-21620, 2011 WL 3703329
        (S.D.Fla. Aug. 23, 2011)     .     .     .     .     .     .     .     11

In Re Marine Sulphur Queen, 460 F.2d 89 (2d Cir. 1972)     .     .     .     12

Maxey v. Freightliner Corp., 665 F.2d 1367 (5th Cir. 1982) .     .     .     .     24, 25

The Complaint of Merry Shipping, 650 F.2d 622 (5th Cir. 1981)     .     .     .     10, 11, 12

Morris v. Cessna Aircraft Co., 833 F.Supp.2d 622 (N.D. Tex. 2011)     .     .     23

In re Tug OCEAN PRINCE, 584 F.2d 1151 (2d Cir. 1978) .     .     .     . 7-8, 9, 13-14

O'Gilvie v. Int'l Playtex, Inc., 821 F.2d 1438 (10th Cir. 1987)     .     .     .     23

Operaciones Tecnicas Marinas SAS v. Diversified Marine Services,
        No.12-1979, 2012 WL 6632509 (E.D.La. Dec. 19, 2012)     .     .     .     10, 11

Palmer v. A.H. Robins Co., 684 P.2d 187 (Colo. 1984)     .     .     .     .     16

In the Matter of P&E Boat Rentals, 872 F.2d 642 (5th Cir. 1989)     .     .     3, 4-6, 10, 18-20

Pekelis v. Transcontinental & Western Air, Inc.,
        187 F.2d 122 (2d Cir. 1951)     .     .     .     .     .     .     .     9

Philip Morris v. Williams, 549 U.S. 346 (2007)     .     .     .     .     .     17

Reid v. BMW of N. Am., 430 F.Supp.2d 1365 (N.D.Ga. 2006)     .     .     .     24

Reynolds v. General Motors Corp., 2007 WL 2908564 (N.D.Ga. Sept. 28, 2007) .     24

Schlichter v. Port Arthur Towing Co., 288 F.2d 801 (5th Cir. 1961) .     .     .     26

Silkwood v. Kerr-McGee Corp., 464 U.S. 238 (1984)     .     .     .     .     23

Steuart Transp. Co. v. Allied Towing Corp., 596 F.2d 609 (4th Cir. 1979) .     .     9

Submersible Systems Inc v. Perforadora Central, No.98-251,
        1999 WL 33456914 (S.D.Miss. July 19,1999),
        vacated, on other grounds, 249 F.3d 413 (5th Cir. 2001)     .     .     .     11

Taylor v. Mooney Aircraft Corp., 464 F.Supp.2d 439 (E.D. Pa. 2006),
    *aff'd,* 265 F. App'x 87 (3d Cir. 2008) .   .   .   .   .   .   23

The T.J. Hooper, 60 F.2d 737 (2d Cir. 1932) .   .   .   .   .   25

U.S. Steel Corp. v. Fuhrman, 407 F.2d 1143 (6th Cir. 1969),
    *cert. denied,* 398 U.S. 958 (1970) .   .   .   .   .   4, 6, 18

Water Quality Ins. Syndicate (re Barge Morris J. Berman) v. United States,
    522 F.Supp.2d 220 (D.D.C. 2007) .   .   .   .   .   7-8, 9, 13-14

Water Quality Ins. Syndicate (re Tug Victoria Rose Hunt) v. United States,
    632 F.Supp.2d 108 (D. Mass. 2009) .   .   .   .   .   7, 12

Wilcox v. Kerr-McKee, 706 F.Supp. 1258 (E.D. La. 1989) .   .   .   .   11

Williams v. Steves Industries, 699 S.W.2d 570 (Tex. 1985) .   .   .   .   12, 15

Wolfe v. McNeil-PPC Inc, 773 F.Supp.2d 561 (E.D.Pa. 2011) .   .   .   16

CLEAN WATER ACT, 33 U.S.C. §§1251, *et seq.*

    33 U.S.C. §1321(b)(7)(D) .   .   .   .   .   .   8

    33 U.S.C. §1321(c)(4)(B) .   .   .   .   .   .   8

    33 U.S.C. §1321(f) .   .   .   .   .   .   9

OIL POLLUTION ACT OF 1990, 33 U.S.C. §§2701, *et seq.*

    33 U.S.C. §2704(a)(3) .   .   .   .   .   .   2

    33 U.S.C. §2704(c)(1)(A) .   .   .   .   .   2, 3, 6, 7, 13, 20, 22-23

    33 U.S.C. §2704(c)(1)(B) .   .   .   .   .   2, 13, 20, 22-23

    33 U.S.C. §2716(f)(1)(C) .   .   .   .   .   6, 7

MMS REGULATION: Responsibility for Leasehold Obligations

    30 C.F.R. ¶250.146(c). .   .   .   .   .   5

RESTATEMENT (THIRD) OF TORTS:
    LIABILITY FOR PHYSICAL AND EMOTIONAL HARM §2, comment b .   .   11

RESTATEMENT (THIRD) OF TORTS:
LIABILITY FOR PHYSICAL AND EMOTIONAL HARM §2, comment c   .   .   12

RESTATEMENT (SECOND) OF TORTS §295A, Comment c   .   .   .   .   25

RESTATEMENT (SECOND) OF TORTS § 909(b) (1977) .   .   .   .   .   4, 6

RESTATEMENT (SECOND) OF TORTS § 909(c) (1977) .   .   .   .   .   19

RESTATEMENT (SECOND) OF TORTS § 909(d) (1977) .   .   .   .   .   18

FIFTH CIRCUIT PATTERN JURY INSTRUCTIONS: Civil §4.4 (2006)   .   .   .   26

FIFTH CIRCUIT PATTERN JURY INSTRUCTIONS: Civil §4.10 (2006)   .   .   .   10, 11, 12

FIFTH CIRCUIT PATTERN JURY INSTRUCTIONS (CIVIL CASES),
Damages Instructions, Part 8 (1980) .   .   .   .   .   .   10, 11

Prosser & Keeton, THE LAW OF TORTS §34, p.212 (5th ed. 1984)   .   .   .   10

Prosser & Keeton, THE LAW OF TORTS §36, p.233 (5th ed. 1984)   .   .   .   22, 23

Prosser, LAW OF TORTS 12 (4th ed. 1971)   .   .   .   .   .   .   19

Dan B. Dobbs, THE LAW OF TORTS §383, p.1071 (Hornbook ed. 2000)   .   .   17-18

MARTIN, The BP Spill and the Meaning of "Gross Negligence
and Willful Misconduct" 71 La.L.Rev. 957 (Spring 2011)   .   .   14

Michael L. Rustad, How the Common Good Is Served by
the Remedy of Punitive Damages, 64 Tenn.L.Rev. 793 (1997)   .   .   25

10 Fletcher, CYCLOPEDIA OF THE LAW OF CORPORATIONS §4906 (Sept. 2012 update)   5, 19

## OVERVIEW OF LEGAL ISSUES

Based on the evidence submitted at trial, the Court has dismissed defendants Cameron and M1-Swaco.[2] Two of the three remaining defendants, Transocean and BP, have pled guilty to ordinary negligence,[3] and, as a practical matter, the ordinary negligence of the third remaining defendant, Halliburton, would likely not afford any suing plaintiff or claimant-in-limitation with meaningful relief.[4]   Accordingly, Plaintiffs suggest that the Court focus first and foremost on whether the employees of each of the primary defendants, Transocean, Halliburton and BP, acted with willful or reckless disregard, which will simultaneously answer the three critical questions of: **(i)** whether compensatory damages are subject to the OPA cap; **(ii)** whether the contractual releases entered between and among the defendants prior to the incident are void as a matter of public policy; and **(iii)** whether a general predicate has been established for the potential imposition of punitive damages.   With respect to each defendant for whom the Court concludes an employee acted with willful or reckless disregard, Plaintiffs suggest the Court turn next to the question of whether such willful or reckless conduct was either the result of a corporate policy or was otherwise known to, made by, or subsequently ratified by an official with policymaking

---

[2] *See* Rec. Docs. 8969, 9024, and 9136.

[3] *See* TREX-52673 (Guilty Plea Agreement entered by BP Exploration & Production Inc, BP Corporation North America Inc, and BP plc to eleven counts of Misconduct or Neglect of Ship Officers, one count of Obstruction of Congress, a violation of the Clean Water Act, and violation of the Migratory Bird Treaty Act in Case No. 2:12-cr-00292, Doc. 2, Nov. 15, 2012), *and,* TREX-63213 (Cooperation Guilty Plea Agreement entered by Transocean Deepwater Inc and Transocean Ltd to negligent discharge of oil in violation of the Clean Water Act in Case No. 2:12-cr-00001, Doc. 3, Jan. 3, 2013).

[4] Because BP is strictly liable for all economic compensatory damages as the OPA "responsible party" and is further responsible for indemnifying Halliburton (and Transocean) for all compensatory damages under the BP-Halliburton Services Agreement (and the BP-Transocean Drilling Contract), as a practical matter, Plaintiffs can and will likely collect all of their compensatory damages from BP.  Accordingly, the Court can direct its focus to the issue of willful and reckless disregard, as set forth herein.  Nevertheless, the ordinary negligence of Halliburton, (as well as BP and Transocean), is implicitly sought, and noted in the PROPOSED FINDINGS, out of an abundance of caution.  (For example, Plaintiffs with *Robins Dry Dock* standing should be able to collect compensatory damages from Halliburton (or Transocean) under the general maritime law in the event that BP were to become insolvent or file for Bankruptcy.)

authority.  This general framework, it is respectfully suggested, will allow the Court to address the ultimate questions to be answered for private plaintiffs and local government entities asserting claims in the Limitation, namely:

- The seaworthiness of DEEPWATER HORIZON.

- Whether Transocean has established the absence of privity or knowledge for limitation purposes.

- Whether Transocean's conduct exposes the company to punitive damages.

- Whether Transocean's conduct invalidates its pre-suit release from liability by BP.

- Whether BP's conduct exposes the company to punitive damages.[5]

- Whether Halliburton's conduct exposes the company to punitive damages.

- Whether Halliburton's conduct invalidates its pre-suit release from liability by BP.

*See generally,* PLAINTIFFS' OPPOSITION TO TRANSOCEAN'S MOTIONS FOR PARTIAL JUDGMENT ON THE PLEADINGS [Rec. Doc. 10186], pp.5-6, *and,* PLAINTIFFS' OPPOSITION TO HALLIBURTON'S MOTIONS FOR PARTIAL JUDGMENT ON THE PLEADINGS [Rec. Doc. 10187], pp.4-5.

## General Discussion regarding "Gross Negligence" / "Wanton and Willful" / Etc.

First, it is important to state at the outset that Plaintiffs believe that a case for punitive damages has been established against each of the defendants under the most stringent and exacting standards.  Plaintiffs have therefore, at times, framed their PROPOSED FINDINGS or other briefing in those terms.  This should not, however, be deemed as any type of concession or admission that the most stringent or exacting legal standard does, or should, apply.  Plaintiffs

---

[5] BP has formally waived the $75 million limitation of liability under the Oil Pollution Act, 33 U.S.C. §2704(a)(3). *See* Rec. Doc. 559.  Plaintiffs, out of an abundance of caution, suggest in their PROPOSED FINDINGS that the Court conclude that BP is guilty of "gross negligence or willful misconduct" under §2704(c)(1)(A) and/or "violation of an applicable Federal safety, construction or operation regulation" under §2704(c)(1)(B), in the event that BP might, at some point, with respect to some claim, attempt to repudiate or challenge the applicability of its prior stipulation.

respectfully reserve the right to argue for the application of a different or lesser legal standard to be applied to one or more of the PROPOSED FINDINGS, the answers to this Court's specific questions, or the ultimate issues outlined above.

Second, and along the same lines, where Plaintiffs propose findings or otherwise argue that the evidence satisfies the most stringent or exacting standard, Plaintiffs implicitly propose, and respectfully reserve the argument that such evidence also – or alternatively – satisfies any lesser standard that the Court may (for the same or any other purpose) apply.

Third, it is important to note, in this regard, the potentially critical distinction between the conduct arguably necessary to satisfy a claim against a corporation for punitive damages versus the conduct necessary to invalidate an exculpatory clause or release.  While, arguably, Plaintiffs must satisfy the *P&E Boat Rentals* [6] requirement for corporate knowledge, direction or ratification in order to hold a defendant liable for punitive damages, Plaintiffs believe that *any* grossly negligent or reckless conduct, (*i.e.* "operational" gross negligence), will render a release invalid, as a matter of public policy.  Hence, even where the Court might conclude that a defendant's conduct does not rise to the *P&E Boat Rentals* standard for the imposition of punitives, Plaintiffs nevertheless implicitly assert and respectfully reserve any argument that such conduct is nevertheless sufficient to invalidate the BP-Transocean or BP-Halliburton release. [7]

---

[6] *See* In the Matter of P&E Boat Rentals, 872 F.2d 642 (5th Cir. 1989).

[7] Plaintiffs would also suggest that only "operational" gross negligence or willful misconduct is necessary to effect a waiver of the OPA cap under 33 U.S.C. §2704(c)(1)(A) (referring to "the responsible party, an *agent* or *employee* of the responsible party, or a person acting pursuant to a contractual relationship with the responsible party") (emphasis supplied).

**General Observations regarding *P&E Boat Rentals*** [8]

     While respectfully reserving the right to argue for a different or lesser standard, Plaintiffs

accept that the Court will likely apply *P&E Boat Rentals* to the punitive damage claims asserted

herein.[9]  Nevertheless, the distinctions between the *P&E Boat Rentals* case and the present

situation bear some discussion.

     In *P&E Boat Rentals,* the question was whether a corporation could be held liable for

punitive damages based on "the wrongful acts of the simple agent or lower echelon employee."[10]

The U.S. Fifth Circuit held that:

> ...punitive damages may not be imposed against a corporation when one or more
> of its employees decides on his own to engage in malicious or outrageous
> conduct.  In such a case, the corporation itself cannot be considered the
> wrongdoer.[11]

     In reaching the ultimate conclusion, it made sense, in that case, to ask the question

whether a "policymaking official" either had knowledge of, directed, or subsequently ratified the

foreman's reckless conduct.[12]  After all, the injuries arose out of what was essentially a routine

transit from the mouth of the river to a drilling platform, made one afternoon at high speeds in

heavy fog.  The events in question took place over a relatively limited time period, and the scope

of the crew boat shuttle operation was only a narrow function within the overall scheme of

---

[8] In the Matter of P&E Boat Rentals, 872 F.2d 642 (5ᵗʰ Cir. 1989).

[9] The Supreme Court, in *Exxon v. Baker,* recognized the state of uncertainty in the law regarding this issue.
However, because the Court was equally divided, (Justice Alito did not participate), the Ninth Circuit's holding was
left undisturbed, and the issue was left unresolved. Exxon Shipping Co. v. Baker, 554 U.S. 471, 482-484 (2008).

[10] P&E Boat Rentals, 872 F.2d at 652.

[11] P&E Boat Rentals, 872 F.2d at 652.

[12] P&E Boat Rentals, 872 F.2d at 652-653. The Court indicated that a corporation can also be held liable for
the actions of an unfit master whom the owner recklessly employs. *Id.,* at 652; *citing,* U.S. Steel Corp. v. Fuhrman,
407 F.2d 1143, 1148 (6ᵗʰ Cir. 1969), *cert. denied,* 398 U.S. 958 (1970); *see also,* RESTATEMENT (SECOND) OF TORTS
§ 909(b) (1977).

Chevron's business activities. *See* P&E Boat Rentals, 872 F.2d at 653 (describing the foreman as "a first level supervisor operating out of the remote Venice area").

The operation of the DEEPWATER HORIZON at the Macondo Well was, by contrast, a significant and substantial operation, requiring the full commitments and attentions of the defendant companies involved.[13]  Given the extensive pre-operation research, planning, development and authorization of the project;  the seven month time period over which drilling operations were conducted;  the significant commitment of monetary resources;  the size and complexity of the vessel and equipment utilized;  the number of people involved in the various decision-making processes;  the filings and other representations made by the organizations to governmental authorities;[14]  and the number of people aboard the vessel at any given time, whose lives and safety were in the defendants' hands;  it would be very difficult to conclude that BP and Transocean, if not also Halliburton, were not directly involved and implicated, as companies, in the major decisions that were made in carrying out the drilling operations that led to the blowout and fire in question.  Irrespective of the extent to which various participants might

---

[13] Plaintiffs note, in this regard, that one of the questions courts look to in making the admittedly separate but similar inquiry into whether an employee's knowledge should be imputed to the vessel owner for limitation purposes is "the relative significance of this field of operations to the business of the corporation." In re Hellenic, Inc., 252 F.3d 391, 397 (5th Cir. 2001).

[14] Plaintiffs note, in this regard, that the "official" question is particularly inappropriate in the context of representations, (or particularly misrepresentations), to the Federal Government in formal applications, filings or other submissions.  When BP makes a representation to the MMS about drilling margins, or a proposed casing plan, it shouldn't matter whether the individual making the submission is characterized as an "officer" or an attorney, or a clerical assistant, or an engineer.  These are the filings of the corporation. *See* 30 C.F.R. ¶250.146(c) ("Whenever the regulations … require the lessee to meet a requirement or perform an action, the lessee, the operator (if one has been designated), and the person actually performing the activity to which the requirement applies are jointly and severally responsible for complying with the regulation"); *see also, e.g.,* In re Hellenic, Inc., 252 F.3d at 396 (in the context of determining whether an employee's knowledge is imputed to the vessel owner for limitation purposes, "it is the extent of the employee's responsibility, not his title" that counts); *see also, e.g.,* 10 Fletcher CYCLOPEDIA OF THE LAW OF CORPORATIONS §4906 at nn. 18 & 38 (Sept. 2012 update) (a basis for punitive damages against the corporate principal may exist when the tort-committing agent was engaged in the performance of an "absolute" or "nondelegable" duty).

or might not be classified as "official policymakers" for one or more purposes, this is clearly not a situation where a rogue employee decided, on his own, to engage in reckless conduct.

BP has characterized the Macondo deepwater drilling operation as a project on the order of exploring in outer space.[15]  When BP or Transocean, and even Halliburton, entrusted critical decisions to low-level, unsupervised or untrained personnel in a project of such inherent magnitude and risk, such delegation was in and of itself willful and reckless.[16]

## ANSWERS TO SPECIFIC LEGAL QUESTIONS POSED BY THE COURT

### 1. What is the standard for finding "gross negligence" or "willful misconduct" under the Clean Water Act ("CWA"), 33 U.S.C. § 1321(b)(7)(D), and the Oil Pollution Act of 1990 ("OPA"), 33 U.S.C. 2704(c)(1)(A)?

While this question seems directed primarily to the United States,[17]  Plaintiffs note that the disjunctive word "or" used by Congress in 33 U.S.C. §2704(c)(1)(A) signals an intent that the two terms have different meanings.[18]

The National Pollution Funds Center recognizes the distinction.  In order for the OPA responsible party to proceed against the Coast Guard's National Pollution Funds Center (NPFC) for reimbursement of expenditures exceeding the statutory cap, the responsible party must demonstrate that the incident giving rise to its liability was not proximately caused by the

---

[15] Hayward Deposition, p.863; TREX-23 p.3.

[16] See P&E Boat Rentals, 872 F.2d at 652; citing, U.S. Steel Corp. v. Fuhrman, 407 F.2d 1143, 1148 (6th Cir. 1969), cert. denied, 398 U.S. 958 (1970) (a corporation can also be held liable for the actions of an unfit master whom the owner recklessly employs); see also, RESTATEMENT (SECOND) OF TORTS § 909(b) (1977) (indicating that punitive damages are proper when "the agent was unfit and the principal or a managerial agent was reckless in employing or retaining him").

[17] As noted, BP has formally waived the $75 million OPA cap. See Rec. Doc. 559.

[18] See, e.g., Reiter v. Sonotone Corp., 422 U.S. 330, 339 (1979) ("Canons of [statutory] construction ordinarily suggest that terms connected by a disjunctive be given separate meanings"). It should also be noted that §2704(c)(1)(A) subjects responsible parties to full responsibility for compensatory damages where there is "gross negligence or willful misconduct" whereas §2716(f)(1)(C) (enumerating guarantors' defenses to liability) lists only "willful misconduct of the responsible party" without any mention of gross negligence.

responsible party's "gross negligence or willful misconduct" within the meaning of 33 U.S.C.

§2704(c)(1)(A).[19]   The NPFC has, in this context, developed its own separate definitions for

these terms:

> Gross negligence:  Negligence is a failure to exercise the degree of care, which a person of ordinary caution and prudence would exercise under the circumstances.  A greater degree of care is required when the circumstances present a greater apparent risk.  Negligence is "gross" when there is an extreme departure from the care required under the circumstances or a failure to exercise even slight care.

> Willful misconduct:  An act, intentionally done, with knowledge that the performance will probably result in injury, or done in such a way as to allow an inference of a reckless disregard of the probable consequences.[20]

The court in *Water Quality (Tug Victoria)*  analyzed the meaning of the term "gross

negligence" under §2704(c)(1)(A).  Accepting the parties' agreement that the NPFC definition of

gross negligence – quoted above – controlled, the court concluded that a series of mistakes made

by the master of the tug that capsized and spilled fuel oil added up to "an extreme departure from

the care required under the circumstances."[21]

The term "willful misconduct" under OPA was analyzed in *Water Quality Ins. Syndicate

(re Barge Morris J. Berman) v. United States*, 522 F.Supp.2d 220 (D.D.C. 2007), in which an

OPA guarantor sought to avoid responsibility by invoking "the defense that the incident was

caused by the willful misconduct of the responsible party." 33 U.S.C. §2716(f)(1)(C).  The court

took its definition of willful misconduct from *OCEAN PRINCE,* a Clean Water Act case, which

set forth a comprehensive definition of "willful misconduct" as follows:

---

[19] Water Quality Ins. Syndicate (re Tug Victoria Rose Hunt) v. United States, 632 F.Supp.2d 108, 113-114 (D. Mass. 2009).

[20] Kuroshima Shipping S.A. Act of God Defense & Limit of Liability Analysis, 2003 AMC 1681, 1701 (NPFC June 23, 2003).

[21] Water Quality (Tug Victoria), 632 F.Supp.2d at 112, 114-115.

[T]his circuit has established the following criteria for a finding of willful misconduct: an act, intentionally done, with knowledge that the performance will probably result in injury, or done in such a way as to allow an inference of a reckless disregard of the probable consequences. If the harm results from an omission, the omission must be intentional, and the actor must either know the omission will result in damage or the circumstances surrounding the failure to act must allow an implication of a reckless disregard of the probable consequences. The knowledge required for a finding of willful misconduct is that there must be either actual knowledge that the act, or the failure to act, is necessary in order to avoid danger, or if there is no actual knowledge, then the probability of harm must be so great that failure to take the required action constitutes recklessness.[22]

Working with the *OCEAN PRINCE* definition, the *Water Quality (Morris Berman)* court held that the NPFC had erred "in concluding that 'willful misconduct' must be a single act 'intentionally done' and that a series of negligent acts can never constitute willful negligence." 522 F.Supp.2d at 229. The court explained that the NPFC position was wrong for two reasons: it had ignored "the 'reckless disregard' portion of the definition of 'willful misconduct',"[23] and it had also failed to recognize that "the court in *OCEAN PRINCE* made clear that its conclusion that there was willful misconduct was based on no single proximate cause, but on an 'accumulation of acts,' 'a chain of circumstances which [were] a contributing cause even though not the immediate or proximate cause of the casualty.'"[24]

The Clean Water Act uses the phrase "gross negligence or willful misconduct" in 33 U.S.C. §1321(b)(7)(D) to set the criteria for an enhanced penalty, and uses a virtually identical phrase in §1321(c)(4)(B) to exclude "a person [who] is grossly negligent or engages in willful misconduct" from the benefit of an exemption from liability. The Act uses a similar phrase

---

[22] Water Quality (Morris Berman), 522 F.Supp.2d at 229 (quoting In re Tug OCEAN PRINCE, 584 F.2d 1151, 1163 (2d Cir. 1978)). (The *OCEAN PRINCE* court referred to the Clean Water Act as the Federal Water Pollution Control Act. The two titles are often referenced interchangeably.)

[23] Water Quality (Morris Berman), 522 F.Supp.2d at 229.

[24] Water Quality (Morris Berman), 522 F.Supp.2d at 230 (*quoting* OCEAN PRINCE, 584 F.2d at 1158).

"willful negligence or willful misconduct" in §1321(f)(1), (f)(2), (f)(3), and (g) to exclude those guilty of such conduct from the benefit of statutory caps on liability for removal costs.

In *OCEAN PRINCE, supra,* the issue was whether a company whose tug pushed an oil-laden barge into a charted rock outside a navigable channel in the Hudson River was exposed to full removal costs because of its "willful negligence or willful misconduct" under 33 U.S.C. §1321(f)(1). In the course of concluding that the company was indeed guilty of such conduct, the Second Circuit noted that the phrase "willful misconduct" had been defined with reference to cases arising under the Warsaw Convention,[25] and went on to extract from the Warsaw Convention jurisprudence the "willful misconduct" criteria quoted in *Water Quality (Morris Berman), supra.* It held that the towboat company was guilty of willful misconduct because of a series of negligent omissions that, taken together, aggregated into reckless disregard:

> It is ... the combination of factors which together indicate a probable consequence of damage resulting from several failures to act, and by continuing to fail to act in the face of that probability, that indicates a reckless disregard of the consequences. While any one of the faults ... alone ... may not constitute "willful misconduct," on the entire record the various inactions and gross disregard of the potential harm amount ... to willful misconduct within the meaning of the statute.[26]

---

[25] OCEAN PRINCE, supra, 584 F.2d at 1162. *See, e.g.,* Pekelis v. Transcontinental & Western Air, Inc., 187 F.2d 122, 127, 130 (2d Cir. 1951) (indicating that the combined negligence of two airline mechanics—one of whom incorrectly hooked up the plane's altimeter and then failed to conduct a required inspection, and the second who failed to carry through on a required follow-up inspection while signing sheets claiming that he had—probably constituted willful misconduct of the air carrier for Warsaw Convention purposes); Koninklijke Luchtvaart Maatschappij N.V. KLM v. Tuller, 292 F.2d. 775, 779 (D.C. Cir. 1961) (inferring the carrier's willful misconduct on the basis of the crew's failure to properly instruct passengers on the location and proper use of life vests, the crew's failure to broadcast an emergency message, the crew's failure to take appropriate steps after the crash to protect the passengers, and a ground agent's failure to realize that he had lost radio contact with the plane and to initiate prompt search and rescue operations); American Airlines, Inc. v. Ulen, 186 F.2d 529, (D.C. Cir. 1949) (holding that summary judgment establishing the carrier's willful misconduct was appropriate when the plane crashed into a 3910-foot-high mountain, the carrier's flight plan called for an altitude of only 4000 feet, and CAB regulations required a flight plan at least 1000 feet above the highest obstacle on the course).

[26] OCEAN PRINCE, 584 F.2d at 1164. Six months after the Second Circuit's decision in *OCEAN PRINCE,* the Fourth Circuit decided *Steuart Transport v. Allied Towing,* another CWA §1321(f)(1) case. Here, the court defined the CWA term "willful negligence" to mean "reckless disregard for the probable consequences of a voluntary act or omission." Steuart Transp. Co. v. Allied Towing Corp., 596 F.2d 609 (4th Cir. 1979).

**2. What is the standard for a finding of punitive damages under general maritime law?  Is this a different standard than under the CWA or OPA, and if so, how?**

Courts have found punitive damages warranted under general maritime law when the defendant's conduct arises from a "willful" or "wanton" or "reckless" indifference to the rights of others.  *See generally,* Exxon Shipping Co. v. Baker, 554 U.S. 471, 493 (2008);[27] Atlantic Sounding Co. v. Townsend, 557 U.S. 404, 409 (2009) ("wanton, willful or outrageous conduct"); CEH Inc v. F/V Seafarer, 70 F.3d 694, 699 (1st Cir. 1995) ("intentional or wanton and reckless conduct"); Operaciones Tecnicas Marinas SAS v. Diversified Marine Services, No.12-1979, 2012 WL 6632509 at *6 (E.D.La. Dec. 19, 2012) ("gross, willful, and wanton negligence").[28]

While a number of different descriptions and definitions have been used to define these terms in various different ways, virtually all of the decisions embrace the concept that where the defendant proceeds in the face of a known risk, with conscious disregard for the safety or

---

[27] *See also,* Exxon Shipping Co. v. Baker, 554 U.S. 471, 482-484 (2008) (leaving undisturbed the jury instruction that a corporation "is responsible for the *reckless* acts of … employees … in a managerial capacity while acting in the scope of their employment") (emphasis supplied); *id.,* at 493-494 ("Under the umbrellas of punishment and its aim of deterrence, degrees of relative blameworthiness are apparent. Reckless conduct is not intentional or malicious, nor is it necessarily callous toward the risk of harming others…. Action taken or omitted in order to augment profit represents an enhanced degree of punishable culpability, as of course does willful and malicious action, taken with a purpose to injure"); *id.,* at 510-511 (tortious action "worse than negligent but less than malicious" … "a case of reckless action, profitless to the tortfeasor").

[28] Prior to the *Exxon v. Baker* decision, the Fifth Circuit referred to "willful and wanton" conduct. *See* P&E Boat Rentals, supra, 872 F.2d at 650; The Complaint of Merry Shipping, 650 F.2d 622, 626 (5th Cir. 1981). However, courts within the Circuit had recognized that: "'Willful' and 'wanton' are roughly synonymous, at least in legal effect, with each other and with 'reckless'." In the Matter of Cameron Boat Rentals, 683 F.Supp. 577, 585 (W.D.La. 1988); *citing,* Prosser & Keeton, THE LAW OF TORTS §34, at 212 (1984); *see also,* Cameron Boat Rentals, 683 F.Supp. at 585 n.11 (the use of the conjunctive "willful *and* wanton" did not imply two different states of mind, both of which were required); *citing,* FIFTH CIRCUIT PATTERN JURY INSTRUCTIONS (CIVIL CASES), Damages Instructions, Part 8 (1980) ("malice, willfulness or callous and reckless indifference to the rights of others"); *see also,* FIFTH CIRCUIT PATTERN JURY INSTRUCTIONS: Civil §4.10 (2006) ("A person acts willfully or wantonly if he acts in a reckless or callous disregard of, or with indifference to, the rights of the plaintiff").

property of others, the standards of "recklessness" or "willful and wanton" misconduct justifying

a punitive damage award will have been satisfied. [29, 30]

---

[29] *See, e.g.,* Exxon Shipping, *supra*, 554 U.S. at 493-494 (punitive damages warranted where "the actor knows, or has reason to know … of the facts which create a high degree of risk of … harm to another, and deliberately proceeds to act, or to fail to act, in conscious disregard of, or indifference to, that risk"); Houston Exploration v. Halliburton, 269 F.3d 528, 532 (5th Cir. 2001) (a release will be void on public policy grounds where a party commits "an act of unreasonable character in reckless disregard of the risk known to him"); Clements v. Steele, 792 F.2d 515, 516-517 (5th Cir. 1986) (referring to conduct resulting from a "conscious indifference" to the rights or welfare of others as sufficient for the imposition of punitive damages); CEH Inc v. F/V Seafarer, 70 F.3d 694, 699 (1st Cir. 1995) (stating that conduct amounting to a "conscious disregard" of the rights of others warranted a punitive damage award); In re Merry Shipping, Inc., 650 F.2d 622, 625 (5th Cir. 1981) (finding that the defendant had acted willfully and with "gross disregard" for the plaintiff's rights); Operaciones Tecnicas Marinas SAS v. Diversified Marine Services, No.12-1979, 2012 WL 6632509 at *4 (E.D.La. Dec. 19, 2012) (indicating that conduct caused by the "reckless disregard" for the safety of others would be sufficient for the imposition of punitive damages); Lobegeiger v. Celebrity Cruises, Inc., No.11-21620, 2011 WL 3703329 at *7 (S.D.Fla. Aug. 23, 2011) (stating that punitive damages are warranted when an extreme departure from reasonable care is coupled with a "conscious awareness" of the risk of harm); Cape Flattery Ltd v. Titan Marine, 607 F.Supp.2d 1179, 1189 (D.Haw. 2009) (stating that the intentional failure to perform a manifest duty "in reckless disregard of the consequences" is sufficient for the imposition of punitives), *aff'd,* 647 F.3d 914 (9th Cir. 2011); Kahumoku v. Titan Maritime, LLC, 486 F.Supp.2d 1144 (D.Haw. 2007) (stating that punitive damages were allowed under the general maritime law for "conduct which manifests reckless … disregard for the rights of others"); Geftman v. Boat Owners Ass'n, No.02-1461-18, 2003 WL 23333312 at *4 (D.S.C. Dec. 2, 2003) (describing the general maritime standard as requiring "conscious disregard"); Submersible Systems Inc v. Perforadora Central, No.98-251, 1999 WL 33456914 at *15 (S.D.Miss. July 19,1999) (referring to conduct amounting to a "conscious disregard" of the rights of others), *vacated, on other grounds,* 249 F.3d 413 (5th Cir. 2001); Wilcox v. Kerr-McKee, 706 F.Supp. 1258, 1264 (E.D. La. 1989) ("Punitive damages are recoverable under the general maritime law where there is willful and wanton misconduct, reflecting a reckless disregard for the safety of the crew"); In the Matter of Cameron Boat Rentals, 683 F.Supp. 577, 585 (W.D.La. 1988) (stating that punitive damages are warranted where acts or omissions are taken with "reckless indifference" to the knowledge that such act or omission will likely cause harm) (*citing* FIFTH CIRCUIT PATTERN JURY INSTRUCTIONS (CIVIL CASES), Damages Instructions, Part 8 (1980) ("reckless indifference to the rights of others")). *See also,* RESTATEMENT (THIRD) OF TORTS: LIABILITY FOR PHYSICAL AND EMOTIONAL HARM §2, comment b ("the standard for awarding punitive damages commonly refers to the defendant's reckless conduct—or reckless indifference to risk, or reckless disregard for risk"); FIFTH CIRCUIT PATTERN JURY INSTRUCTIONS: Civil §4.10 (2006) ("A person acts willfully or wantonly if he acts in a reckless or callous disregard of, or with indifference to, the rights of the plaintiff").

[30] Although some courts have applied a lesser standard to the term "gross negligence", it seems clear that where the defendant, or one of its employees, proceeds in the face of a known risk with conscious disregard for the safety or property of others, a finding of "gross negligence" will also be justified. Hence, as noted above, where the Court finds willful or reckless disregard, it will simultaneously answer not only the question of **(i)** whether a general predicate has been established for the potential imposition of punitive damages, but also **(ii)** whether compensatory damages are limited under the OPA cap, and **(iii)** whether the contractual releases entered between and among the defendants prior to the incident are void as a matter of public policy.

Plaintiffs respectfully note, and reserve the right to argue, that one or more less stringent standards may apply. Specifically, for example:

a. An extreme departure from the standard of care;[31]

b. Knowledge of, or reason to know, the facts, but failure to appreciate the high degree of risk involved, (although a reasonable man in the same position would do so);[32]

c. Acts or omissions motivated by profit.[33]

At the same time, to the extent that the defendants' conduct can be considered intentional or malicious, the caselaw uniformly recognizes that the standard has been satisfied.

Yet the central concept seems to be one of conscious disregard.[34]

With respect to the Clean Water Act and OPA, there is likely more support for the notion that "gross negligence" can be satisfied by merely an extreme departure from the standard of care.[35] Moreover, enhanced penalties under the Clean Water Act and invalidation of the OPA

---

[31] *See, e.g.,* Energy XXI v. New Tech Engineering, 845 F.Supp.2d 770, 778 (S.D.Tex. 2012); Water Quality Ins. Syndicate (re Tug Victoria Rose Hunt) v. United States, 632 F.Supp.2d 108 (D.Mass. 2009); Kuroshima Shipping S.A. Act of God Defense & Limit of Liability Analysis, 2003 AMC 1681, 1701 (NPFC June 23, 2003). *See also,* Exxon v. Baker, 554 U.S. at 512 (referring to "the least blameworthy conduct triggering punitive liability, from malice and avarice, down to recklessness, and even gross negligence in some jurisdictions") (implying a level of "gross negligence" that is simply higher than ordinary negligence, but does not reach the level of willful or reckless, much less intentional, conduct); *see also, e.g.,* In re Merry Shipping, Inc., 650 F.2d 622, 624 (5th Cir. 1981) (*quoting,* In Re Marine Sulphur Queen, 460 F.2d 89, 105 (2d Cir. 1972)).

[32] Exxon v. Baker, 554 U.S. at 494; RESTATEMENT (THIRD) OF TORTS: LIABILITY FOR PHYSICAL AND EMOTIONAL HARM §2, comment c; *see also,* FIFTH CIRCUIT PATTERN JURY INSTRUCTIONS: Civil §4.10 (2006) ("An actor is indifferent to the rights of another, regardless of the actor's state of mind, when he proceeds in disregard of a high and excessive danger that is known to him or was apparent to a reasonable person in his position"); Houston Exploration v. Halliburton, 269 F.3d 528, 532 (5th Cir. 2001) (a release will be void on public policy grounds where a party commits "an act of unreasonable character in reckless disregard of the risk … so obvious that he must be taken to have been aware of it"); Clements v. Steele, 792 F.2d 515, 516 (5th Cir. 1986) (*quoting,* Williams v. Steves Industries, 699 S.W.2d 570 (Tex. 1985)) ("a plaintiff may objectively prove a defendant's gross negligence by proving that under the surrounding circumstances a reasonable person would have realized that his conduct created an extreme degree of risk to the safety of others").

[33] Exxon v. Baker, 554 U.S. at 494; *see also,* 554 U.S. at 510 (the most egregious conduct includes "dangerous activity carried on for the purpose of increasing a tortfeasor's financial gain"); *id.,* 544 U.S. at 512 (referring to "avarice" as a trigger for punitive damages).

[34] *See* Footnote 29, *supra.*

[35] *See, e.g.,* Kuroshima Shipping S.A. Act of God Defense & Limit of Liability Analysis, 2003 AMC 1681, 1701 (NPFC June 23, 2003).

cap are applicable to the gross negligence or willful misconduct of any agent or employee,[36]

whereas a party seeking to impose punitive damages on a corporate employer under the general

maritime law arguably has to establish that the willful or reckless decisions either emanated from

corporate policy or were otherwise known to, directed by, or ratified by corporate officials with

policymaking authority.

**3. In order to find that a party acted with gross negligence [or willful misconduct or
wanton or reckless disregard], is it necessary to find that there be at least one single act or
omission that equates to gross negligence [etc], or can such a finding be based upon an
accumulation or a series of negligent acts or omissions?**

It seems clear from the caselaw that an accumulation or series of negligent acts or

omissions can and should be viewed together in order to determine whether the defendant has

acted out of gross negligence, willful misconduct, or a wanton or reckless disregard. *See, e.g.,*

Clements v. Steele, 792 F.2d 515, 517 (5th Cir. 1986) (recognizing that gross negligence may be

established where the defendant's acts of ordinary negligence demonstrated that the defendant

was consciously indifferent); Kuykendall v.Young Life, 261 F.App'x 480, 489 (4th Cir. 2008)

(multiple acts of simple negligence can amount to gross negligence where the cumulative effect

of the negligent acts demonstrates an utter disregard of prudence amounting to an indifference to

others' health and safety); Water Quality Ins. Syndicate (re Barge Morris J. Berman) v. United

States, 522 F.Supp.2d 220, 228-230 (D.D.C. 2007) (it was wrong "to focus on any one

occurrence, event or cause as the proximate cause of the spill.  It should have looked at the

'series of occurrences' or events that together constitute the 'incident' that led to the spill.... The

court in *OCEAN PRINCE* made clear that its conclusion that there was willful misconduct was

based on no single proximate cause, but on an 'accumulation of acts,' 'a chain of circumstances

---

[36] *See* 33 U.S.C. §2704(c)(1) (referring to the gross negligence, willful misconduct, or violation of a
regulation by "the responsible party, an *agent* or *employee* of the responsible party, or a person acting pursuant to a
contractual relationship with the responsible party") (emphasis supplied).

which [were] a contributing cause even though not the immediate or proximate cause of the casualty'") (*citing,* OCEAN PRINCE, *supra,* 584 F.2d at 1158); Adams v. Phillips, No.01-3803, 2002 WL 31886737 at *4, 2002 U.S. Dist. LEXIS 24888 at **9-10 (E.D.La. Dec. 19, 2002) (defendant's "pattern of brazen misconduct" and the "entirety of his actions" were grounds for imposing punitive damages); MARTIN, *The BP Spill and the Meaning of "Gross Negligence and Willful Misconduct"* 71 La.L.Rev. 957, 997-998 (Spring 2011) ("The existence of gross negligence need not rest upon a single act or omission, but may result from a combination of negligent acts or omissions, and many circumstances and elements may be considered in determining whether an act constitutes gross negligence").[37]

### 4. Can an act or omission that is not itself causal of the accident nevertheless be considered in determining whether a party engaged in conduct constituting gross negligence [etc]?

As outlined above, the egregiousness of a defendant's conduct generally turns on the defendant's state of mind. In many cases, there will be acts, omissions, statements and other evidence that are either directly or circumstantially probative of the defendant's state of mind at the time of the injury-producing conduct, even where such acts or omissions do not cause damage in and of themselves.

As observed by the Fifth Circuit in *Clements*:

> The "mental attitude of the defendant" is what turns ordinary negligence into gross negligence…. [T]he defendant's state of mind may be inferred from actions and circumstances. Proof by direct evidence is not always required.

---

[37] *See also,* Ferguson v. Ferguson, 181 S.E.2d 648, 652 (Va. 1971) ("the cumulative effect of several acts of negligence may constitute gross negligence… not because of the acts of simple negligence, but because the cumulative acts, when taken together and considered under the facts and the circumstances of the case…constitute gross negligence"); Aetna Causualty & Surety Co. v. Marshall, 699 S.W.2d 896, 903 (Tex. App. 1985) ("A defendant's single action may be no more than ordinary negligence; however, when considered along with other negligent acts, it may become an element of what collectively constitutes gross negligence"); *see also, e.g.,* Burk Royalty Co. v. Walls, 616 S.W.2d 911, 922 (Tex. 1981); Apache Corp. v. Moore, 891 S.W.2d 671, 682-83 (Tex. App. 1994); Granite Const. Co. v. Mendoza, 816 S.W.2d 756, 763-64 (Tex. App. 1991); International Armament Corp. v. King, 674 S.W.2d 413, 416-17 (Tex. App. 1984).

<u>Clements v. Steele</u>, <u>supra</u>, 792 F.2d at 516; *citing,* <u>Burk Royalty Company v. Walls</u>, 616 S.W.2d 911, 922 (Tex. 1981).[38]  Indeed, the string of cases cited above for the proposition that the entire accumulation or series of negligent acts or omissions can and should be viewed together in order to determine whether the defendant's conduct rises to the level of "gross" or "wanton" or "reckless" or "willful"  conduct supports the notion that not each and every such act or omission must have independently resulted in some direct physical harm or damage – as the ultimate inquiry turns, not on damages, but on whether the defendant was acting with a conscious disregard of the risks of harm or indifference to the safety or property of others.[39]

In this particular case, there is substantial evidence of post-incident "wanton" and "willful" (if not intentional) misconduct on Halliburton's part.[40]  Presumably, Halliburton will argue that this evidence should not be considered by the Court, as it had no direct causal impact on the events giving rise to the damages in question.  Nevertheless, it is clear that evidence of Halliburton's post-incident disregard for the rights of others is probative, relevant, admissible, and indeed compelling evidence that Halliburton had a reckless and indifferent attitude prior to the incident – in failing to property design, test and formulate the cement slurry;  to develop a formal Basis of Design or apply a formal Management of Change; to disclose significant pre-job test results;  to adequately staff and equip the testing lab;  to place the Flow-Out Sensors where fluids could be monitored even when diverted;  and to monitor the well during the displacement

---

[38] *See also,* <u>Clements v. Steele</u>, 792 F.2d at 516; *quoting,* <u>Williams v. Steves Industries</u>, 699 S.W.2d 570 (Tex. 1985) ("a plaintiff may objectively prove a defendant's gross negligence by proving that under the surrounding circumstances a reasonable person would have realized that his conduct created an extreme degree of risk to the safety of others").

[39] *See, e.g.,* <u>Clements v. Steele</u>, <u>supra</u>, 792 F.2d at 517 (recognizing that gross negligence may be established where the defendant's acts of ordinary negligence demonstrated that the defendant was consciously indifferent); <u>Kuykendall</u>, <u>supra</u>, 261 F.App'x at 489 (multiple acts of simple negligence can amount to gross negligence where the cumulative effect of the negligent acts demonstrates an utter disregard of prudence amounting to an indifference to others' health and safety).

[40] *See* Pages 57-59, *infra* (discussing Halliburton's post-incident non-responsiveness, evasiveness, and spoliation).

procedure – which all did cause and contribute to the blowout, the fire, and the spill of April 20, 2010.[41]

Several decisions, in this regard, support the proposition that Halliburton's post-incident conduct (although not directly causal) is relevant.  *See, e.g.,* Bergeson v. Dilworth, 959 F.2d 245 (table), 1992 WL 64887 at *3 (10th Cir. 1992) ("subsequent conduct is admissible on the issue of punitive damages when it is probative of the defendant's state of mind at the time of the event giving rise to liability");[42] Eaves v. Penn, 587 F.2d 453, 464 (10th Cir. 1978) (evidence of defendant's subsequent conduct admissible under Rule 404(b) to show defendant's intent at the time of the alleged breach of fiduciary duty); Wolfe v. McNeil-PPC Inc, 773 F.Supp.2d 561, 575-576 (E.D.Pa. 2011) (post-incident concealment of information from the FDA relevant to the question of defendant's state of mind relative to the imposition of punitive damages); Jimenez v. Chrysler Corp., 74 F.Supp.2d 548 (D.S.C. 1999) (post-incident conduct was admissible on the issue of punitive damages where it demonstrated the manufacturer's initial motive and intent for marketing the defective product), *rev'd, in part,* 269 F.3d 439 (4th Cir. 2001); Hilliard v. A.H. Robins Co., 148 Cal.App.3d 374, 398-401 (1983) (concluding that evidence of post-injury conduct should have been admitted into evidence because it tended to prove that the defendant acted willfully); Coale v. Dow Chem. Co., 701 P.2d 885, 890 (Colo.App.1985) (explaining that evidence of post-injury conduct was admissible for purposes of showing that the defendant acted wantonly in connection with a claim of punitive damages); Palmer v. A.H. Robins Co., 684 P.2d 187, 204 (Colo.1984) (observing that post-injury conduct is relevant for purposes of determining punitive damages); Hoppe v. G.D. Searle & Co., 779 F.Supp. 1413, 1424–1425 (S.D.N.Y. 1991)

---

[41] Plaintiffs, of course, believe that Halliburton's *pre-incident* willful and reckless disregard is sufficient to warrant the imposition of punitive damages, irrespective of the company's post-incident conduct, as further set forth in the PROPOSED FINDINGS and further herein.

[42] *See also,* Bergeson, 1992 WL 64887 at *3 ("subsequent conduct is admissible on the issue of punitive damages when it is probative of the defendant's state of mind at the time of the event giving rise to liability").

(admitting evidence of post-injury conduct in connection with the removal of an intrauterine contraceptive device because such evidence was relevant to pre-injury evidence supporting an award of punitive damages).   In each of these cases, the post-incident conduct was found to be relevant and admissible, going to the defendant's state of mind, even though the acts or omissions could not have lead to the damages suffered by plaintiffs, in and of themselves.

Moreover, while the U.S. Supreme Court has been somewhat inconsistent in its pronouncements of the extent to which the issues of potential harm and actual harm to persons or entities not before the court should be considered in assessing the appropriate amount of punitive damages (under either a legal or a constitutional standard), there is certainly support for the proposition that the magnitude of the *risk* of harm (even where the actual harm turns out to be less) or the magnitude of the total harm (even where some of the damages were suffered by others) should be considered by the Court. *See, e.g.,* Exxon, *supra,* 554 U.S. at 515;[43]  Philip Morris v. Williams, 549 U.S. 346, 355 (2007) ("counsel may argue in a particular case that conduct resulting in no harm to others nonetheless posed a grave risk to the public");[44]  BMW v. Gore, 517 U.S. 559, 582 (1996) (discussing a formula "that compares actual *and potential* damages to the punitive award");  *see also,* Dan B. Dobbs, THE LAW OF TORTS §383, p.1071 (Hornbook ed. 2000) (courts should be allowed "to consider the full breadth of the *potential*

---

[43] In *Exxon v. Baker,* the Court adopting the district court's calculation of the total relevant compensatory damages, which included not only the plaintiff class' compensatory jury verdict, but a series of settlements made by both Exxon and third parties to individuals, groups, and entities both inside and outside of the class. Exxon v. Baker, 554 U.S. at 515; *affirming, in pertinent part,* In re Exxon Valdez, 236 F.Supp.2d 1043, 1058-1060 (D. Alaska 2002).

[44] In *Philip Morris v. Williams,* the question was whether a State could impose punitive damages for injuries caused to people beyond the State's borders.  The Court explained that: "Respondent argues that she is free to show harm to other victims because it is relevant to a different part of the punitive damages constitutional equation, namely, reprehensibility. That is to say, harm to others shows more reprehensible conduct. Philip Morris, in turn, does not deny that a plaintiff may show harm to others in order to demonstrate reprehensibility. Nor do we. Evidence of actual harm to nonparties can help to show that the conduct that harmed the plaintiff also posed a substantial risk of harm to the general public, and so was particularly reprehensible – although counsel may argue in a particular case that conduct resulting in no harm to others nonetheless posed a grave risk to the public, or the converse." Philip Morris v. Williams, 549 U.S. at 355.

harm when considering [both] whether the [defendant] acted reprehensibly and also when considering the [appropriate] ratio of punitive damages to [compensatory] damages") (emphasis supplied).

Finally, (as addressed both above and further below), a company's liability for punitive damages can be established where the decision, conduct or policy in question is "ratified" by either a managerial agent or an official with policymaking authority.[45] The evidence to establish such ratification, although not causal to the injuries, is implicitly admissible and relevant to the defendant's state of mind, and liability therefore.

**5. In order to find gross negligence [etc], is it sufficient if only employees on the rig are guilty of such conduct, or is it necessary to find that this level of conduct was attributable to shore-based or management-level employees?**

Again, Plaintiffs note the distinction between "willful" or "reckless" conduct necessary for the imposition of punitive damages, versus the "gross negligence" or "willful" or "reckless" conduct necessary for the invalidation of the releases BP executed within the Transocean Drilling Contract and Halliburton Services Agreement, as a matter of public policy.

With respect to the imposition of punitive damages, Plaintiffs respectfully suggest, and reserve the right to argue, that a less exacting standard be adopted by the Courts.[46] Specifically, for example:

> a. The ordinary *respondeat superior* standard, with respect to any acts or omissions by an agent or employee within the course and

---

[45] *See* P&E Boat Rentals, 872 F.2d at 651-652; *quoting,* U.S. Steel v. Fuhrman, 407 F.2d 1143, 1148 (6th Cir. 1969) (must be shown that "the owner authorized or ratified the acts of the master *either* before *or after the accident*") (emphasis supplied), *cert. denied,* 398 U.S. 958 (1970); RESTATEMENT (SECOND) OF TORTS § 909(d) (1977) ("the principal or a managerial agent of the principal ratified or approved the act").

[46] As noted, the Supreme Court, in *Exxon v. Baker,* recognized the state of uncertainty in the law regarding this issue; but, because the Court was equally divided, the Ninth Circuit's holding was left undisturbed, and the issue was left unresolved. 554 U.S. at 482-484.

scope of his or her employment;[47]

    b.  The Restatement standard, which general looks to whether the agent or agents in question were employed in a "managerial" capacity;[48] or,

    c.  When an agent or employee is engaged in the performance of an absolute or nondelegable duty.[49]

Nevertheless, as outlined above, Plaintiffs would expect the Court to apply the standard articulated by the Fifth Circuit in *P&E Boat Rentals,* which is often interpreted as requiring that the conduct stem from a corporate policy or with the knowledge, direction or subsequent ratification of the conduct at issue by an official with policymaking authority.[50]  Again, Plaintiffs suggest, in this regard, that the Court's focus should be on "whether the defendant corporation

---

[47] *See, e.g.,* P & E Boat Rentals, supra, 872 F.2d at 650 (noting that a majority of courts have held "that the vicarious liability of the master for acts within the scope of employment extends to punitive as well as compensatory damages, even in the absence of approval or ratification"); *citing,* American Society of Mechanical Engineers v. Hydro Level Corp., 456 U.S. 556, 575 n.14 (1982); Prosser, LAW OF TORTS 12 (4th ed. 1971); *see also, e.g.,* CEH Inc v. F/V Seafarer, 70 F.3d 694, 702-705 (1st Cir. 1995) (noting that most courts outside of the maritime context do not follow the *Lake Shore* decision, (*citing* PROSSER & KEETON 13 (5th ed. 1984)), and commenting that "this growing body of precedent is significant because we discern no reason, and defendants point to none, why vicarious liability should be treated differently on sea than on land").

[48] RESTATEMENT (SECOND) OF TORTS § 909(c) (1977).  *See* Exxon v. Baker, 554 U.S. at 482-484 (Court equally divided on the question, and hence upholding Ninth Circuit's application of the Restatement standard); *see also, e.g.,* CEH Inc v. F/V Seafarer, 70 F.3d 694, 702-705 (1st Cir. 1995).

[49] *See, e.g.,* 10 Fletcher CYCLOPEDIA OF THE LAW OF CORPORATIONS §4906 at. nn.18 & 38 (Sept. 2012 update) (an additional basis for corporate complicity (for punitive damages purposes) may exist when the tort-committing corporate agent was engaged "in the performance of nondelegable or absolute duties of the" corporate principal).  With respect to Transocean, in particular, it is often said that the duty to furnish a seaworthy vessel and safe workplace are nondelegable duties. *See, e.g.,* Brister v. A.W.I., Inc., 946 F.3d 350, 359 (5th Cir. 1991) ("shipowner's absolute, nondelegable duty to provide a seaworthy vessel"); Epling v. M.T. Epling Co., 435 F.2d 732, 736 (6th. Cir. 1970) ("the sweeping non-delegable duty imposed by the Jones Act upon the employer to provide his employees with a safe place to work").  While there may be no overt support in *P&E* and its progeny for the "nondelegable duty" concept, it is broadly consistent with the reasoning in *P&E* and of the Supreme Court cases cited in support of its formulation.  *See* The Amiable Nancy, 16 U.S. (3 Wheat.) 546, 559 (1818) (noting that the tortfeasors were a privateer crew at sea, far from the reach of any communication by the owner-defendant, who did not participate in the tort "in the slightest degree" and who "punished ... the said crew, or some of them" (*id.* at 550)); (the *Nancy* Court also relied significantly on the policies  "of [this] country [which chooses] to authorize the employment of privateers in its public wars," *id.* at 559); Lake Shore & M.S. Ry. Co. v. Prentice, 147 U.S. 101, 106 (1893) (noting that the tortfeasor employee was a mere "conductor of one of [defendant railroad's] trains, that there was no evidence "that the conductor was known to the defendant to be an unsuitable person in any respect, or that the defendant in any way participated in, approved, or ratified" his behavior (*id.* at 117), and that the Supreme Court's earlier cases had approved corporate liability for punitive damages when the perpetrator's conduct could in any way be "brought home to the corporation" (*id.* at 111).)

[50] P & E Boat Rentals, 872 F.2d at 652-653.

itself can be considered the wrongdoer" – within the context of the Macondo / DEEPWATER HORIZON enterprise, as opposed to the limited and routine crew boat operation at issue in the *P&E Boat Rentals* case.[51]

With respect to the enforceability of the pre-suit contractual releases of Transocean and Halliburton from first-party liability, Plaintiffs believe that gross or egregious conduct on the part of any employee is sufficient to void the release as a matter of public policy – and are aware of no caselaw suggesting otherwise.   Indeed, the underlying concerns are distinct.  The invalidation of a pre-suit exculpatory clause or release is not intended to "punish" the contracting party.  It is born out of the principles of equity, and to discourage companies from creating contractual disincentives to acting responsibly.  As a matter of public policy, there is no reason to foster a situation wherein the agents and employees of a corporation are free to engage in egregious conduct resulting in injury to another, and the corporation that hired and enabled such agent or employee does not have to worry about facing *any* potential responsibility for the damages caused.

Finally, with respect to the invalidation of the OPA cap, the Act is clear that the responsible party will be liable for all compensatory damages where an "agent" or "employee" (or even "a person acting pursuant to a contractual relationship with the responsible party") is guilty of gross negligence, willful misconduct, or regulatory violation. 33 U.S.C. §2704(c)(1).

---

[51] *See, e.g.,* In re Hellenic, supra, 252 F.3d at 396-397 (in making the admittedly different but similar determination of whether an employee's knowledge should be imputed to the vessel owner for limitation purposes, "it is the extent of the employee's responsibility, not his title" that counts, and one of the relevant factors is "the relative significance of this field of operations to the business of the corporation").

**6. Does compliance with MMS (or other applicable) regulations preclude a finding of gross negligence [etc] regardless of whether a defendant knew or should have known that its conduct or equipment was unsafe, or violated accepted engineering standards?**

Initially, it is important to point out that, despite various implications and contentions by the defendants that some conduct or equipment had been "approved" by the MMS, the Coast Guard, or some other regulatory agency, the evidence in the trial record establishes that:

- The MMS, Coast Guard, or other agency relied largely on information that was provided (or not provided) by the defendant;[52]

- The MMS or Coast Guard officials or agents were frequently overtaxed, understaffed, of limited training, and frequently unable to access the equipment in question;[53]

- There were several instances where the defendant did not follow what had actually been approved by the regulatory agency;[54]

- There were several instances where the defendant's conduct (or failure to act) went beyond the scope of what was ostensibly permitted under the specific regulation, application, or approval in question;

---

[52] *See, e.g.,* Patton Deposition, pp.41-43, 85-86, 292-294, 434-435; R. Neal Deposition, pp.84-88; Douglas Deposition, p.25.

[53] *See, e.g.,* Huffman Testimony, pp.778-779 ("The inspectors… are going around the Gulf of Mexico inspecting rig after rig.… [T]hey only are on the rig one day a month for two to four hours, at which time they are expected to go through all of this information that…. [T]hey are not trained engineers. They are not experts in the field. To assimilate a month's worth of operational data in a two- to four-hour visit, when they are also doing tests of equipment and other things, is a daunting task. I, as an expert, would have a hard time in two hours analyzing a month's worth of operational data"); Patton Deposition, pp.404-406 (conceding that you can't do much of an investigation when approving exemptions in five minutes) (*see also, generally* Patton Deposition, pp.35, 42-43, 76, 434-435); Odom Deposition, pp.15-17, 36-39, 42-44, 86-87, 101, 122, 186-188, 210, 215, 241 (Coast Guard only gives foreign-flagged vessels a limited "examination"; does not conduct independent evaluation of whether vessel is in compliance with ISM Code; does not include subsurface equipment such as the BOP; does not include examination of any of the gas detection systems or whether the alarm was overridden); Mitchell Testimony, p.9485 (discussing the difference between an "inspection" and an "examination"); E. Neal Deposition, pp.19-20 (did not check PP/FG reports on a normal inspection; wasn't sure he had even ever seen one before), p.47 (was not concerned with issues that had not been previously marked INC), p.148 (did not have access to eWell system); R. Neal Deposition, p.85 (do not have the means to inspect the qualifications and the competency of BP or Transocean engineers), p.225 (did not examine BOP maintenance or repair records), pp.225-226 (limited examination); Webster Testimony, pp.3870-3871 (the 2009 inspection was an UWILD Inspection); Davis Testimony, p.2900 (at the time of the 2010 ModuSpec Audit, the BOP was subsea); Mitchell Testimony, pp.9528-9529 (and TREX-3163 p.3) (an audit is only a "snapshot" and does not relieve the vessel owner from continuing obligation); Odom Deposition, pp.221, 227-229, 233-234 (only saw around 50% of the rig; examination was just a "spot check").

[54] *See, e.g.,* Patton Deposition, pp.339-349; Huffman Testimony, pp.2112-2115; Barnhill Testimony, pp.4329-4330 (and TREX-570)) (the negative pressure test performed was not the one approved by MMS); TREX-37031 p.42 (discussed in Robinson Testimony, pp.7964-7968) (BP decided that MMS did not have to be notified regarding changes to the APD).

- There were several instances where the defendant provided insufficient, inaccurate or misleading information to the regulatory agency;[55] and,

- There were several instances where the defendant clearly violated an MMS, or Coast Guard, or other applicable regulation.[56]

Accordingly, as a factual matter, the mere fact that a regulatory agency may not have enjoined, or may have even "approved" of some equipment or activity, does not necessarily establish that the defendant indeed "complied" with the applicable MMS or other regulation.[57]

Nevertheless, and as a matter of law, to the extent the Court may conclude that a defendant did comply with an MMS, Coast Guard, or other applicable regulation, in some respect, such compliance will not preclude a finding of gross or egregious conduct. "While compliance with a statutory standard is evidence of due care, it is not conclusive on the issue. Such a standard is no more than a minimum, and it does not necessarily preclude a finding that the actor was negligent in failing to take additional precautions." PROSSER & KEETON §36, p.233 (5th ed. 1984).

The structure of the relevant OPA provision reflects this view, as the claimants can break the OPA cap by establishing that the incident caused by: (A) gross negligence or willful

---

[55] *See, e.g.,* Patton Deposition, pp.325-333, 458-461; Huffman Testimony, pp.664, 672-677 (discussing TREX-3727), pp.681-682 (playing a "rounding game"), p.746 (no evidence that information was shared with MMS).

[56] *See, generally,* Huffman Testimony (BP violations of MMS Regulations); Webster Testimony (Transocean violations of ISM Code); *see also, e.g.,* Mitchell testimony, pp.9442-9443 (ISM Code violations); Bourgoyne Testimony, pp.7651-7652 (conceding that BP may have violated MMS Regs on Safe Drilling Margin); Huffman Report, p.5 (TREX-7510 pdf p.10) (BP violated MMS reporting requirements); Stevick Report (TREX-61123) pp.6, 21-26 (BOP did not comply with MMS Best and Safest Technology (BAST) requirements); Douglas Deposition, pp.38-39, 52, 64, 69 (the BOP was not in compliance with MASP Regulations); Douglas Deposition, pp.285-286 *and* Powell Deposition, pp.195-196 (although required by MMS Regulation, did not submit BOP shearing capacity with APD); Perkin Report (TREX-7535) p.21 (violation of MMS Regulations in failing to provide adequate training regarding BOP operation).

[57] *See, e.g.,* Patton Deposition, pp.306-310 (although Regulations require that the cement plug be set no more than 1,000 feet below the mudline, Patton approved BP's placement of 3,000 feet below the mudline, based on information provided and representations made by BP).

misconduct, _or_  (B) the violation of an applicable Federal Regulation. 33 U.S.C. §2704(c)(1).

Hence, the "gross negligence" or "willful misconduct" can occur even where there is compliance

with the regulations.

With respect to punitive damages, violations of applicable regulations will often

constitute willful misconduct,[58] but the converse has not been accepted.  As a matter of common

sense, a person who drives at the posted highway speed when visibility has been reduced to near-

zero by a snowstorm is behaving recklessly if not worse.  Almost always, a statutory standard is

"no more than a minimum,"[59] and will not preclude the imposition of punitive damages where

egregious conduct is involved. Silkwood v. Kerr-McGee Corp., 464 U.S. 238, 245 (1984)

(rejecting the contention that compliance with federal regulations precluded an award of punitive

damages); O'Gilvie v. Int'l Playtex, Inc., 821 F.2d 1438, 1443 (10th Cir.1987) ("Compliance

with FDA standards is not dispositive under Kansas law if a reasonable manufacturer would have

done more"); Dorsey v. Honda Motor Co., 655 F.2d 650, 656–557 (5th Cir.1981) (rejecting

under Florida law that compliance with government regulations precludes a finding of punitive

damages as a matter of law); Taylor v. Mooney Aircraft Corp., 464 F. Supp. 2d 439, 448 (E.D.

Pa. 2006) ("Compliance with the regulations will not prevent the imposition of punitive damages

if other evidence is presented showing culpable behavior"), aff'd, 265 F. App'x 87 (3d Cir. 2008);

Morris v. Cessna Aircraft Co., 833 F. Supp. 2d 622, 640-41 (N.D. Tex. 2011) (proof of

regulatory compliance does not foreclose, as a matter of law, an award of punitive damages).[60]

---

[58] _See, e.g.,_ American Airlines, Inc. v. Ulen, 186 F.2d 529 (D.C. Cir. 1949); Harris v. Decker Truck Line, Inc., No.12-1598, 2013 WL 1769095 at *5 (E.D. Mo. Apr. 24, 2013).

[59] PROSSER & KEETON §36, p.233 (5th ed. 1984).

[60] Other courts have found that a defendant's compliance with government regulations is relevant, but not conclusive, as to punitive damages. Durham v. Cnty. of Maui, 692 F.Supp.2d 1256, 1262 (D.Haw. 2010); _see, e.g.,_ Denton v. DaimlerChrysler Corp., 2008 WL 5111222 at *2 n.3 (N.D.Ga. Dec. 2, 2008) ("The Court must conclude that compliance with standards or regulations does not insulate a defendant from compensatory or punitive

### 7. Does the fact that a party acted in accordance with "industry standards" preclude a finding of gross negligence [etc]?

Again, it is important to point out that, despite various implications and contentions by the defendants that some conduct or equipment fell within some type of "industry standards", the evidence in the trial record establishes that:

- Many of these statements about alleged "industry standards" were vague characterizations, without concrete support, by lay witnesses, (many of whom were associated with the party whose counsel was eliciting the testimony in question);

- There were several instances where the defendant's conduct (or failure to act) went beyond the scope of the specific alleged "standard";

- There were several instances where no evidence established a prevailing industry standard;[61] and,

- There were several instances where a defendant clearly violated an industry standard.[62]

*See, e.g.,* Maxey v. Freightliner Corp., 665 F.2d 1367, 1376 (5th Cir. 1982) (when considering whether a defendant has complied with an industry standard, "a district court must limit its consideration to evidence actually presented at trial").

---

damages"); Reynolds v. General Motors Corp., 2007 WL 2908564, at *12 (N.D.Ga. Sept. 28, 2007) ("Compliance with applicable safety regulations does not preclude an award of punitive damages where "there is other evidence showing culpable behavior"); Reid v. BMW of N. Am., 430 F.Supp.2d 1365, 1374 (N.D.Ga.2006) (finding that evidence that BMW defendants knew of an alleged defect in the radiator and failed to warn others of it was sufficient for punitive damages issues to go to the jury, despite defendants' compliance with regulations and/or standards); Flax v. DaimlerChrysler Corp., 272 S.W.3d 521, 536 (Tenn.2008) (upholding jury verdict for punitive damages even though defendant complied with federal regulations because the evidence presented supports the conclusion that defendant was aware that compliance was insufficient).

[61] *See, e.g.,* Hurst Testimony, pp.1605, 1619-1620 (citing TREX-7508) (hard to define "industry standards"); Bourgoyne Rebuttal Report (TREX-8174) p.22 (wide variation in the industry regarding Temporary Abandonment plans); Stevick Testimony, pp.7017-7018 (generally multiple ways to solve an engineering problem).

[62] *See, e.g.,* Childs Report (TREX-7687) p.40 (neither BP nor Transocean complied with API RP 53); Bea Testimony, p.331 (BP's "Best of the Best" was below industry standards); Huffman, pp.663, 669-670 (repeated violations of the industry-recognized Kick Margin); Heenan, p.2091 (negative pressure test a "gross and extreme departure"); R. Sepulvado Testimony, p.2010 (BOP beyond API certification); Bourgoyne Testimony, p.7571 (proceeding with displacement not in conformity with industry standards); Benge Testimony, pp.2364-2371, 2508 (*see also* TREX-6235) (Halliburton (and BP) did not conduct tests in conformity with API and ISO); Newman Testimony, pp.4693-4700 (it was "industry standard" to create a bridging document); Bea/Gale Report (TREX-20001) at pdf pp.12, 18, 83-84 (BP violated industry standards in the auditing of contractor-owned MODUs); O'Bryan Testimony, pp.9294-9297 (discussing TREX-4232) (others in the industry, including Shell, had systematic approaches to the identification, study and application of lessons learned, which BP did not follow).

Nevertheless, and as a matter of law, to the extent the Court may conclude that a defendant did comply with an "industry standard" applicable, in some respect, to an activity or equipment in question, such compliance will not preclude a finding of gross or egregious conduct, nor the imposition of punitive damages.

Since at least as early as *The T.J. Hooper*, 60 F.2d 737, 740 (2d Cir. 1932), the pronouncement by the Honorable Learned Hand, writing for the Court, has been a widely quoted truism of tort law:

> Indeed in most cases reasonable prudence is in fact common prudence; but strictly it is never its measure; a whole calling may have unduly lagged in the adoption of new and available devices.  It never may set its own tests, however persuasive be its usages.  Courts must in the end say what is required; there are precautions so imperative that even their universal disregard will not excuse their omission.

Commentators have noted, in this regard, that:  "No group of individuals and no industry or trade can be permitted, by adopting careless and slipshod methods to save time, effort, or money, to set its own uncontrolled standard at the expense of the rest of the community. If the only test is to be what has always been done, no one will ever have any great incentive to make any progress in the direction of safety."  Michael L. Rustad, *How the Common Good Is Served by the Remedy of Punitive Damages*, 64 Tenn.L.Rev. 793, 831-832 (1997); *cirting*, RESTATEMENT (SECOND) OF TORTS §295A, Comment c.

The U.S. Fifth Circuit, in 1982, observed that compliance with industry custom was not a complete defense to a claim of gross negligence under Texas law, and directed that such evidence be considered together with all of the evidence in determining whether a finding of conscious indifference was warranted. Maxey v. Freightliner, supra, 665 F.2d at 1376.  Other courts have found that a defendant's compliance with industry standards is relevant, but not conclusive, as to punitive damages. Durham v. Cnty. of Maui, 692 F.Supp.2d 1256, 1262 (D.

Haw. 2010); *see also, e.g.,* <u>Baker v. S/S Christobal</u>, 488 F.2d 331, 333 (5th Cir. 1974) (*quoting* <u>Schlichter v. Port Arthur Towing Co.</u>, 288 F.2d 801 (5th Cir. 1961)) ("compliance with the customs and practices of an industry is not in itself due care"); <u>Jowers v. BOC Group, Inc.</u>, 608 F.Supp.2d 724, 767 (S.D.Miss.2009) ("conformity with established industry standards, while evidence of whether a product is reasonably safe, may never be conclusive on the point"); <u>Folks v. Kansas Power & Light</u>, 755 P.2d 1319, 1326 (Kan. 1988) (punitive damages imposed against a utility company despite compliance with an industry safety standard); <u>Gryc v. Dayton-Hudson Corp.</u>, 297 N.W.2d 727, 733 (Minn. 1980) (punitive damages assessed against the manufacturer of highly flammable cotton nightwear, despite the compliance with regulatory and industry standards); FIFTH CIRCUIT PATTERN JURY INSTRUCTIONS: Civil §4.4 (2006) ("The fact that the defendant conducted its operations in a manner similar to that of other companies is not conclusive as to whether the defendant was negligent or not").[63]

## KEY MATERIAL FACTUAL QUESTIONS DISPUTED BY THE PARTIES AT TRIAL

### There was a "dual command" structure on the DEEPWATER HORIZON, which violated the ISM Code.

The ISM Code requires that the Captain and Master shall be the designated Person in Charge aboard the vessel, with overriding authority and responsibility, at all times.[64]  Both Webster and Mitchell testified that there was a "dual command" structure aboard the DEEPWATER HORIZON on April 20, 2010, which violated the Code.[65]

---

[63] *See also,* FIFTH CIRCUIT PATTERN JURY INSTRUCTIONS: Civil §4.4 ("A long accepted practice may be an unsafe practice").

[64] TREX-50361 p.2; Webster Testimony, p.3747.

[65] Webster Testimony, pp.3747, 3779, 3963, 3972-3973; Mitchell Testimony, pp.9442-9443. *See also,* TREX-5483; Webster Testimony, pp.3778-3779 (an ISM Ship Audit Report for the DEEPWATER HORIZON dated May 2002 advised that Transocean's designation of the OIM as the primary person in charge was contrary to the designation of the Master as Person in Charge, in command, and responsible for all emergency response activities).

Specifically, the DEEPWATER HORIZON Operations Manual designates the Offshore Installation Manager (OIM) as the Person in Charge while on station; designates the Master as the Person in Charge while in transit; and, in an emergency, suggests that either the OIM can turn the vessel over to the Master, or the Master can assume control of the vessel from the OIM.[66] As explained by Captain Young, when the vessel is in "Drilling Mode" – *i.e.* when connected to the well head, (as it was on April 20, 2010) – the OIM is the Person in Charge.[67] The Captain or Master becomes the Person in Charge at the time of an "emergency situation" – which is a "judgment call" by whoever decides that it is an emergency.[68]

Transocean's CEO, Mr. Newman, conceded that, under the statutory framework, the Master always has overriding authority, particularly in the event of an emergency.[69]  Young also testified that, as the Captain, he has overriding authority under the ISM Code.[70]  However, Newman personally approved a 2007 Memorandum addressing the integration of Global Santa Fe, in which the company specifically decided and directed that the OIM would remain responsible.[71]  Young conceded that "the Person in Charge was split between the Captain and the OIM."[72]

This type of divided command structure creates both delay and confusion during an emergency, as happened on the DEEPWATER HORIZON.[73]  Indeed, Captain Young himself appeared to be confused about whether the Master or the OIM was in charge.[74]  Guide also

---

[66] TREX-671; Webster Testimony, pp.3973-3974.
[67] Young Testimony, pp.5828-5829; Winslow Deposition, p.484; Ezell Testimony, p.1852.
[68] Young Testimony, pp.5829-5830.
[69] Newman Testimony, pp.4720-4721.
[70] Young Testimony, p.5800 ln.6-7.
[71] TREX-5643 p.4; Newman Testimony, pp.4721-4722; *see also,* Webster Testimony, p.4213.
[72] Young Testimony, p.5792 ln.20-21.
[73] Webster Testimony, pp.3974-3975; Mitchell Testimony, pp.9443-9444.
[74] Young Testimony, pp.5628-5629 ("The OIM would make the call to abandon well control or drill floor – on the drill floor, and then the OIM – or the master would either make the decision to abandon or just to go to alternate emergency stations").

testified that he was confused about who was in charge; Guide always thought the OIM was in charge, (even though he recognized at trial that the Station Bill indicated that it was the Captain).[75]   When asked who was in charge of the rig at the time of the explosion, Young testified that: "The master was in charge for the emergency response, and the OIM would have been advising on any of the well control events." But an "emergency" had not yet been declared.[76]   This dysfunctional set-up violated the ISM Code, and directly resulted in confusion, inaction, and delay.[77]

**There is no conflict between the ISM Code and the MODU Code.**

Although Webster initially indicated that there might superficially be a "conflict" between the ISM Code and the MODU Code, he explained, in response to questioning by BP, that MODUs include semi-submersibles and jack-up rigs, as well as dynamically positioned vessels such as the DEEPWAER HORIZON.  On a stationary MODU, there would only be an OIM, and not a marine Captain.  Hence, there is no conflict.[78]

**Captain Kuchta was not adequately trained or otherwise qualified to serve as the Master of the DEEPWATER HORIZON.**

The night of April 20, Williams made his way to the bridge, where he observed Captain Kuchta "overwhelmed", "dazed and confused", and like a "deer in the headlights".[79]

Captain Kuchta, in Webster's opinion, was not properly trained to respond to emergencies as Captain.  Nor was he qualified to serve as the Person in Charge on the vessel.

---

[75]Guide Testimony, p.8855.
[76]Young Testimony, p.5859.
[77]*See, e.g.,* TREX-4472 (post-incident interview with Andrea Fleytas reflecting that she took it upon herself to activate the mayday after the explosion, and "the captain turned to her and cursed and said, 'Did I give you authority to do that?'" and that "Captain Kuchta wanted permission from Jimmy Harrell to disconnect (operate the EDS)"; TREX-5629 (interview notes with Chris Pleasant, who said "F* you" when the captain said, "We are not EDS"); O'Bryan Testimony, pp.9286-9287 (After the explosion, you could see from the bridge that the rig floor was on fire, but Captain Kuchta was "emphatic" that he could not activate the EDS without permission from the OIM); Young Testimony, p.5873 (Young did not ever recall anyone suggesting that the EDS be activated).
[78] Webster Testimony, pp.4201-4203; TREX-44072; TREX-5033 p.2.
[79] Williams Deposition, pp.191-193.

Kuchta was not trained or certified to operate the Emergency Disconnect System (EDS), nor was he properly trained with respect to the vessel's emergency response plan, the Kongsberg Fire & Gas System, or the Emergency Shut Down (ESD) system.[80]

O'Bryan confirmed that none of the Transocean crew on the evening of April 20 ordered or attempted to activate the Blowout Preventer (BOP) before calling the DAMON BANKSTON and telling them to move away from the rig.[81] Shortly thereafter, you could see from the bridge that the rig floor was on fire, but Captain Kuchta was "emphatic" that he could not activate the EDS without permission from the OIM.[82] O'Bryan described the scene on the bridge as:

> Very excited. There was lots going on, a lot of people coming in to the bridge. I remember Captain Kuchta saying, "What's going on? This can't be right. We've lost power." It was just lots of excitement going on on the bridge. Captain Kuchta actually told us several times to stay inside on the bridge. And at some point, as I said, out these windows on the right side of the bridge, I had – I could see people were moving out of the – below the rig onto the escape boats. And I could tell that they were getting close to being loaded because the trickle of folks coming out was down. And I told – I looked at David and I said, "We've got to go."[83]

It appeared to O'Bryan that Captain Kuchta wasn't quite sure what to do.[84]

Captain Kuchta was, in Captain Mitchell's opinion, "completely inadequate."[85] Based on Mitchell's review of the facts, "There was no evidence that Captain Kuchta had received the

---

[80] Webster Testimony, p.3937.
[81] O'Bryan Testimony, p.9285.
[82] O'Bryan Testimony, pp.9286-9287.
[83] O'Bryan Testimony, pp.9287-9288.
[84] O'Bryan Testimony, p.9291. *See also, e.g.,* Brown Deposition, p.90 ("chaos and mayhem on the bridge" … "shouts, directions yelled that weren't being enacted"); TREX-5629 p.4 (discussed in Young Testimony, p.5865 and Mitchell Testimony, p.9428) (Kutcha instructs Pleasant not to activate the EDS, and Pleasant says "F* You"); TREX-4472 p.5 (Kutcha criticized Fleytas when she finally signaled Mayday, and when the power went out said "[expletive] it, let's leave"); Young Testimony, pp.5720-5721 (Kutcha told him to "put a hose on it"); TREX-5629 p.4 (Kutcha refused to EDS); Williams Deposition, pp.78, 194 (upon suggestion that they needed to abandon ship, Kutcha told Williams to "sit down and shut the [expletive] up").
[85] Mitchell Testimony, pp.9431-9432.

major emergency management training, nor did he have well control certification, nor had he been assessed competent as a person in charge."[86]

Even Transocean's own expert, Jeff Wolfe, admitted that Captain Kutcha had no EDS training, had no Transocean's Major Emergency Management certification, and delayed the activation of the EDS on the night of April 20.[87]

Captain Kuchta was simply not fit to be Master of the DEEPWATER HORIZON.[88]

### Jimmy Harrell was not licensed to serve as the Person in Charge of the DEEPWATER HORIZON, or even to serve as the OIM.

In Mitchell's opinion, Jimmy Harrell was the person who was actually in command on April 20, 2010.[89] Jimmy Harrell did not have a license or certificate to command a MODU, nor was he properly trained on Transocean's safety management system. He simply was not qualified to be Master or command the bridge of the DEEPWATER HORIZON.[90]

Indeed, he was not even licensed to serve as the OIM. As explained by Captain Mitchell, Harrell's OIM license from the Marshall Islands only authorized him to serve as an OIM on a jack-up rig or a moored semi-submersible;[91] Harrell was not legally entitled to serve as the OIM on a self-propelled vessel like the DEEPWATER HORIZON.[92]

---

[86] Mitchell Testimony, p.9436 ln.9-12.
[87] Wolfe Deposition, pp.193, 196-197, 328, 344.
[88] Mitchell Testimony, p.9472.
[89] Mitchell Testimony, p.9444; see also, Winslow Deposition, p.484; Ezell Testimony, p.1852.
[90] Webster Testimony, p.3936.
[91] Section 4.5 of MI-118 [TREX-44013 p.27].
[92] Mitchell Testimony, pp.9444-9447; TREX-44013 p.27.

**The weekly drills and other training of the DEEPWATER HORIZON Crew did not include training on EDS.**

Captain Mitchell reviewed all of the Daily Drilling Reports, including the 79 reports submitted for the DEEWATER HORIZON at Macondo, and the 81 sources to the Transocean Demonstrative (D-6591), and found no evidence of any EDS drills being performed.[93]

Additionally, Ezell conceded that the emphasis of the Daily Start Think Reports was on personal safety, not well control.[94]  Neither Captain Young nor the DPOs sat in a real-life simulator;  rather, it was clear that the focus of the EDS training they had was on *how* to function the EDS, (and how long it would take), as opposed to *when* the EDS *should* be functioned.[95] Captain Young's rejection of this notion was simply not credible.   Indeed, when asked whether the Deck Crew participated in the drills identified in the Transocean Demonstrative (D-6591), Captain Young could not state whether the Deck Crew participated in the underlying drills, (*e.g.* TREX-571), nor could Young personally recall whether or when the Deck Crew had participated in either well control drills or EDS drills.[96]

Dr. Bourgoyne further opined that, while the training materials may have been appropriate, "What may have been lacking were adequate emergency drills simulating high flow rate conditions."[97]  The inescapable conclusion was that the Transocean Crew "either were not trained or were disregarding their training."[98]

---

[93] Mitchell Testimony, pp.9439-9441.
[94] Ezell Testimony, pp.1901-1902.
[95] *See* Trial Transcript, pp.5788-5791.
[96] Young Testimony, pp.5806-5810.
[97] Bourgoyne Testimony, p.7586; Bourgoyne Report (TREX-8173) p.68. *See also* Bourgoyne Testimony, p.7581 (An adequately trained Drill Crew and Toolpusher would not have missed the kick on April 20 and failed to seal in the well).
[98] Bourgoyne Testimony, p.7588.

Even Transocean's own expert, Mr. Wolfe, admitted that he had not found a document or a witness to validate the fact that EDS drills were conducted weekly on the DEEPWATER HORIZON.[99]

### The deficiencies noted in the 2009 Rig Audit (and previously) were not closed out prior to the blowout and explosion.

The great weight of the evidence establishes that a substantial number of material deficiencies noted in the September 2009 BP Rig Audit[100] – and previously – had not been closed out prior to the blowout on April 20, 2010.   Captain Young, for example, specifically acknowledged that various maintenance items were still open at the time of the explosion.[101] Ronnie Sepulvado testified that the BP Auditors were recommending that Transcoean "expedite overhaul" but Transocean was "challenging" the recommendation.[102]   Murray Sepulvado likewise testified that there were still "many deficiencies which had not been corrected."[103]   Even Paul Johnson, a Rig Manger whose deposition testimony Transocean relies upon, conceded that (at least) 25 items identified in the BP 2009 Rig Audit had not been closed out as of March 2010.[104]

In addition, there is a mountain of circumstantial evidence to further support the conclusion that significant issues remained at the time of the fire.   Mike Williams, for example, testified that when he discussed maintenance issues with his supervisors, they told him to just

---

[99] Wolfe Deposition, p.266; (*see also,* Mitchell Testimony, pp.9441-9442).

[100] TREX-3405.

[101] Young Testimony, p.5663.  Captain Young further stated that the vessel was not planned to be out of service until 2011. *See* Young Testimony, p.5666. With respect to the February 2010 e-mail from Mr. Dow indicating that all of the dampers needed to be replaced, (TREX-5295), Young confirmed that no dampers were replaced between February 2010 and the date of the explosion. *See* Young Testimony, pp.5748-5749.

[102] R. Sepulvado Testimony, p.2011. Mr. Sepulvado further testified that, in the eight years he was assigned to the vessel, it never went into dry dock. *See* R. Sepulvado Testimony, p.1924.  And that the rotary table had been broken for two or three years. *See* R. Sepulvado Testimony, p.1928.

[103] M. Sepulvado Deposition, p.99.

[104] Johnson Deposition, pp.273-274.

"deal with it."[105]  Williams testified that he had been called to the Drilling Shack to fix equipment numerous times,[106] and that preventative maintenance on the rig was continuously behind schedule.[107]

In October of 2009, there were a series of e-mails from Steve Bertone, the Maintenance Supervisor on the rig, recounting the continuing history of maintenance issues, and characterized the rig as "limping along" with equipment failures "due to lack of proper maintenance."[108] Bertone noted that, just on the rig floor, they were experiencing issues with the drawworks brakes, riser skate, gantry crane, rotary skid, and back slips. "The rotary skid has been an issue for several years."[109]  Bertone also indicated that the new RMS maintenance system had an overloaded amount of work which could not be completed even by doubling the workers on the rig, and was causing "extreme confusion" among the crew who "struggled to grasp" how to find the information or what to do with it.[110]  Randy Ezell did not recall any special effort made by anyone off the rig to address Mr. Bertone's or other concerns about the chronic problem with maintenance issues on the DEEPWATER HORIZON.[111]

Dr. Davis testified that there was inadequate maintenance, as evidenced by the condition of the blue and yellow pods themselves; the dead battery, he said, is a perfect example of a "critical check" that was missed, and should have been detected.[112]  Davis also noted that, at the time of the Moduspec Audit in April of 2010, the BOP was subsea;  hence, Moduspec was

---

[105] Williams Deposition, p.43.
[106] Williams Deposition, pp.56-57.
[107] Williams Deposition, pp.39-40.
[108] TREX-5618.
[109] TREX-5618.
[110] TREX-5618. *See also, generally,* Webster Testimony, pp.3895-3902.
[111] Ezell Testimony, pp.1889-1891; TREX-5618.  *See also,* Winslow Deposition, pp.143-144 (Most maintenance periods were only "band aid fixes";  the rig had equipment that needed to be taken out of service for repair).
[112] Davis Testimony, pp.2666-2667.

prevented from doing a complete and thorough evaluation.[113]   Similarly, Neal testified that

during his 2010 inspections of the vessel, he did not examine any records related to: periodic

maintenance of the BOP; physical inspections of the BOP or its components; servicing or repair

of the BOP; or modifications of the BOP.[114]   While Dr. Davis conceded that BP and Transocean

were closing out some audit items at the end of 2009, he testified that because there were so

many issues lingering for so long, there were omissions that didn't have a chance to be

corrected.[115]

      Consider the following time-line:

- The November 2009 follow-up to the September 2009 Rig Audit noted the same Emergency Shut Down (ESD) and Fire & Gas alarm issues that had been identified 21 months before.[116]

- On February 21, 2010, Buddy Trahan, who was part of the Transocean Management Team in Houston, sent an e-mail to James Kent, the Rig Manager, requesting the maintenance program.[117]   But there was no evidence of specific follow-up to address his concerns.[118]

- A February 22, 2010 e-mail string indicated that all of the dampers needed to be replaced.[119]

- The April 2010 audit noted problems in the Riser Recoil System.[120]

- On April 15, 2010, BP and Transocean agreed not to change the annular elements or the drill line until after the Nile Well was completed, (which Transocean's own expert admitted was an example of "deferred maintenance" in order to keep the rig working).[121]

---

[113] Davis Testimony, pp.2900-2901.
[114] R. Neal Deposition, pp.225-226.  *See also,* D. McKay Deposition, p.264 (there were maintenance tasks that were overdue, including some that were deemed "safety critical").
[115] Davis Testimony, pp.2831-2832.
[116] TREX-47221 Section 3.3.5; Webster Testimony, pp.3893-3894.
[117] TREX-3420 ("When I started looking at this a couple of years ago, it was obvious they didn't keep track of maintenance"); Childs Testimony, pp.5319-5320.
[118] Kent Deposition, Vol. II, p.84.
[119] TREX-5295; Webster Testimony, pp.4214-4215.
[120] TREX-3285 p.45; Webster Testimony, pp.3905-3907 (and pp.3912-3913 clarifying date).
[121] Childs Testimony, pp.5321-5322; TREX-680.

- "Run it, break it, fix it" was a characterization of the Transocean maintenance program, as reflected in the Lloyd's Register Report dated July 2, 2010.[122]

Finally, the RMS II Morning Report dated April 19, 2010 documented 222 overdue maintenance tasks, requiring 2,761.5 man-hours to complete.  Moreover, there were 115 additional jobs, including 76 "high priority" issues, that were awaiting parts.[123]  The Life Raft Annual Certificate was 139 days overdue.[124]

All of this evidence leads to the inescapable conclusion that a significant number of material items identified in the BP 2009 Rig Audit – and, in several cases, for months and years prior to that – had not been addressed in the seven months prior to the explosion.

### The battery in the Blue Pod was already dead (or at least too low to function) when it was called upon to activate the BSR at "AMF Time".

The overwhelming majority of evidence indicates that the 27-volt battery in the Blue Pod was effectively "dead" on April 20th.  This was the conclusion of the Bly Investigation,[125] and every expert who testified in Phase One, except for Transocean's.[126]

Dr. Davis, for example, after looking at all of the evidence, concluded that conditions for the AMF ("Deadman") were satisfied at or very shortly after the time of the explosion, but the Blind Shear Ram (BSR) did not activate due to: (i) a dead battery in the Blue Pod; and (ii) a mis-wired Solenoid in the Yellow Pod.[127]  Dr. Davis believes that, had the 27-volt battery in the Blue Pod been properly charged, the BSR would have closed in the well at that time.[128]

---

[122] TREX-929, p.93; Webster Testimony, p.3932.
[123] TREX-664 p.25; Webster Testimony, pp.3957-3958; D-3098 (Summary: Significant Overdue Maintenance).
[124] TREX-664 p.9; Webster Testimony, p.3941.
[125] Bly Testimony, pp.991-997.
[126] *See* Childs Testimony, p.5454; D4603A; D-3592.
[127] Davis Testimony, pp.2649-2650; *see also,* D4603A.
[128] Davis Testimony, p.2652.

Davis found no evidence that the 27-volt battery was tested before the BOP was "splashed" in February of 2010.[129]   Cameron recommends that the batteries be changed after one year of "on-time operation" – which Transocean's expert Childs conceded meant one year from when the batteries were first installed, according to Cameron.[130]   In this case, the batteries on the Blue Pod had not been changed since November of 2007, two and a half years prior to the blowout.[131]

Childs' lone opinion that the battery was sufficiently charged at the time of the event is not credible.  While Transocean had representatives on the joint technical working group, whose results Childs disputes,[132] no other parties were involved in or present for the Transocean testing.[133]   Childs is not an electrical engineer, nor is he trained in software, and hence parts of the testing were (by his own admission) "over his head".[134]   Childs relied on Mr. Tolleson's notes that Transocean's counsel admitted had never been produced in the litigation; nor did Transocean produce the videotapes of the testing.[135]   Comparing the Activity Reports to Childs' Summary, some of the reports were inaccurate.[136]   Moreover, Tolleson sent an e-mail (in huge font) admonishing that testing "could mean the AMF did not function" – which fact did not make it into Childs' Report.[137]   Finally, Childs conceded that data from the testing was "massaged" for use in his report.[138]   Hence, there is no credibility to his outlier opinion that the battery was fully charged at the time of the explosion.

---

[129] Davis Testimony, p.2688.
[130] Childs Testimony, pp.5326-5328; TREX-3785 p.5; TREX-36708.  *See also*, Davis Testimony, pp.2843-2844.
[131] Childs Testimony, p.5326.
[132] Childs Testimony, pp.5350-5351.
[133] Childs Testimony, pp.5329-5330.
[134] Childs Testimony, pp.5331-5332.
[135] *See* Trial Transcript, pp.5333-5339.
[136] *See* Childs Testimony, pp.5340-5341; TREX-7708; TREX-50378.
[137] Childs Testimony, pp.5344-5346; TREX-5662.
[138] Childs Testimony, p.5347; TREX-7708 p.25.

**The General Alarm on the DEEPWATER HORIZON did not sound before the first (or even the second) explosion.**

Captain Young, who was serving as Chief Mate on the DEEPWATER HORIZON on the evening in question, gave the most reliable testimony regarding the operation of the General Alarm – after the fateful explosions had already occurred.  Young conceded that he never ordered or heard anyone else call even a Yellow Alert, much less a Red Alert, prior to the first explosion.[139]   Young personally hit the General Alarm after there had already been at least one explosion.  He was pretty confident that the alarm had not sounded prior to that point in time, and was not completely certain that he heard the General Alarm sound thereafter.[140]  Both Young and Mike Williams – who also testified that he did not hear the general alarm or see blinking lights before the explosion[141] – admitted that the General Alarm required manual activation, as the automatic function was generally overridden.[142]   Transocean's own formal investigation concluded that the General Alarm was not sounded until after the explosion.[143]

**An acoustic trigger was a reliable mechanism that could have been and should have been added to the BOP.**

Both the Plaintiffs' expert, Mr. Perkin, and Mr. Gaude, from the Cameron Controls Group, testified that Transocean could have utilized an acoustic system that would have allowed the crew to activate the BOP stack after the MUX Cables ("a single point of failure") were destroyed in the explosion.[144]   Indeed, a DEEPWATER HORIZON Design Risk Assessment

---

[139] Young Testimony, pp.5768-5769.
[140] Young Testimony, pp.5785-5786.  *See also,* Young Testimony, pp.5793-5795, 5858-5859.
[141] Williams Deposition, pp.191-193.
[142] Young Testimony, pp.5769, 5771 ln.5-6; Williams Deposition, pp. 22 (was told: "The entire fleet runs on the bypass. Leave it the hell alone"), pp.137-138 (Transocean kept the general alarm in the "inhibited" mode because they didn't want to wake people up at night); TREX-3749 at pdf p.23 (DWH Bridge Procedures Guide) ("During normal operations, we override all Outputs Common from the SVC. This is to prevent false alarms"); Webster Testimony, pp.3825-3826 (alarms on the bridge were being inhibited to prevent a general alarm).
[143] Ambrose Testimony, p.6072.
[144] Perkin Testimony, pp.3348-3353; TREX-25199, p.76; D-2077. *See also,* Perkin Report (TREX-7535) pp.7, 8, 13, 18, 19; Webster Testimony, p.3775; Stevick Report (TREX-61123) pp.24-26.

prepared in January of 2002 advised Transocean to "ensure that the EH-MUX BOP control has at least one alternative operation panel that can be operated independently from the one located at the driller's workstation" and to "ensure that it is possible to operate the acoustic control system from a portable unit which can be handled by one person in the event of evacuation from the vessel."[145]   While Transocean (who never followed this recommendation) suggested at trial that acoustic triggers were unreliable, it was established that other Transocean and BP rigs utilized them.[146]  Moreover, both Mr. Gaude and William LeNormand, a Cameron Service Representative, testified that they were not aware of complaints or problems.[147]

**When they knew that hydrocarbons had entered the riser, the Transocean Crew diverted to the Mud-Gas Separator, (instead of overboard).**

Both BP's Bly Investigation and the Transocean Investigation concluded that the Drilling Crew closed the diverter, and directed the flow to the Mud-Gas Separator (MGS).[148]  While Mr. Young indicated that the fire appeared to be coming out of the diverter line, he acknowledged that there is a relief valve for the Mud-Gas Separator unit in the same area as the diverter line.[149] Further, Ezell testified that the default was set to the Mud-Gas Separator.[150]

**OMS was applied differently, and later, to contractor-owned rigs in the Gulf.**

Following a major process safety disaster in 2005, BP's Group Operations Risk Committee (GORC), chaired by Tony Hayward personally, undertook the responsibility of replacing the outdated process safety systems, such as Beyond the Best (BtB) and Major Projects

---

[145] TREX-3134 p.40; Webster Testimony, pp.3774-3775.
[146] *See, e.g.,* Newman Testimony, p.4660; Perkin Testimony, p.3349 (every Transocean and BP rig off the coast of Brazil and in the North Sea was equipped with an acoustic trigger).
[147] Perkin Testimony, pp.3348-3349; Childs Testimony, pp.5280-5283; LeNormand Deposition, p.95; Gaude Deposition, pp.77-78 (admitted as TREX-25199 p.3). *See also,* LeNormand Deposition, pp.91-92, 99-100, 104-105; Gaude Deposition, pp.76-80.
[148] TREX-00001 (Bly Report) p.104; TREX-3808 pdf p.199 (Transocean Investigation Report, Vol. I, p.215); Ambrose Testimony, pp.6125-6126.
[149] Young Testimony, p.5878.
[150] Ezell Testimony, p.1787.

Common Process (MPCP), with an overarching new and improved Operating Management System called "OMS".[151]   According to the OMS Governance document dated November 2008, OMS would be the control process for "all projects, facilities, sites and operations."[152]   The OMS Manual dated January 2009 defines both "facility" and "entity" very broadly, which O'Bryan conceded would encompass him, as Vice-President, John Guide, the Wells Team Leader, the BP Well Site Leaders and the BP Drilling Engineers.[153]   With respect to Contractors, in particular, the OMS Governance document instructed that:

> Where BP relies on a contractor to carry out work, BP shall, as needed, include and apply contract provisions such that the work is carried out in a way that supports and is consistent with BP's application of OMS to BP's operating activities.  Where such contract provisions are not included in existing contract, BP shall endeavor to amend the contract as needed, immediately or on renewal.[154]

And:

> A decision by a BP Entity to deviate from the complete application of BP OMS … shall be based on a risk assessment (including defining and documenting the risk reduction measures that are to be applied) and shall be formally justified, recorded and authorized by the line Executive Vice President or Group Head of Function after consultation and approval from the Group Head of Operations.[155]

O'Bryan confirmed that this OMS Governance document refers to the "contract" between BP and the drilling company, not the contractor's safety management system, and directed that OMS would apply, unless someone specifically documented and proved that the contractor's alternative process or procedure was sufficient.[156]

BP presented essentially three different stories about the extent to which OMS was or wasn't implemented on contractor-owned rigs in the Gulf prior to the explosion:

---

[151] Hayward Deposition, pp. 41, 145, 163-164, 731; *see also, e.g.,* Baxter Deposition, p.193; Guide Testimony, p.8836; O'Bryan Testimony, pp.9305-9307; TREX-1975 p.14.
[152] TREX-45006 pdf p.6; *see also,* TREX-45006 pdf p.8; TREX-45006 pdf p.15.  *See also,* Bea Testimony, p.308; TREX-2352 p.2.
[153] TREX-6205 pdf p.194; O'Bryan Testimony, pp.9304-9305.
[154] TREX-45006 pdf p.16.
[155] TREX-45006 pdf p.16.
[156] O'Bryan Testimony, pp.9319-9320.

1. Implementation of OMS was complete on April 20th, 2010;[157]

2. Implementation of OMS was not complete, but was intended to be completed sometime after April 20th, 2010;[158] and,

3. It was never intended that OMS apply to contractor-owned rigs, as the contractor's safety management system would continue to govern.[159, 160]

On the last day of trial, BP attempted to "synthesize" these stories with a demonstrative graphic presented through O'Bryan.[161]  On cross-examination, O'Bryan conceded that the demonstrative (D4943) had been created by BP's counsel for trial purposes after-the-fact; it was not available to the Well Site Leaders or Drilling Engineers who would have been responsible for putting the actual policies and procedures into practice prior to the explosion.[162]

Nevertheless, and in any event, it is clear that BP's Management made the conscious and intentional decision – despite recognizing a Macondo like blowout as one of the highest risks in the entire organization[163] – to apply OMS differently, and at a slower pace, on contractor-owned rigs in the Gulf of Mexico.[164]

---

[157] *See* L. McKay Testimony, pp.532-534; Shaw Testimony, p.8047.

[158] *See* Hayward Deposition, pp.154-156 (implementation "throughout BP" due to have started by the end of 2010; will be adopted "at all operations" by the end of 2010), pp.183-194 (at time of Congressional testimony "was not complete across company" ... plans to include MODUs in the future), p.304 (were in the process of moving OMS into the Gulf), pp.662-664 (was "all" "applicable" in the Gulf, but he doesn't know the precise status of the date of implementation), p.788 (as of April 20, 2010, was in the middle of "company wide implementation" and on target to complete in Gulf by end of 2010), pp.793-794 (it is "undoubtedly" possible that the disaster would have been avoided had OMS been applied).

[159] *See* Cross-Examination of Dr. Bea, pp.402-405; Shaw Testimony, pp.8054-8056.

[160] *See generally,* Trial Transcript, p.9297.

[161] O'Bryan had previously testified in his deposition that: "We do not operate drilling rigs under a BP OMS.... [W]hen the rigs belong to the drilling contractor, we operate the rigs...under the drilling contractor's safety management system. The only drilling rig that we had in our fleet that would fall under BP OMS is BP-owned rig the PDQ on the Thunder Horse." *See* Shaw Testimony, p.8156; O'Bryan Testimony, pp.9250-9251; D-3175.

[162] O'Bryan Testimony, pp.9324-9325.

[163] *See, e.g.,* Hayward Depo, pp.196, 782; Baxter Deposition, pp.276-278; Bea Testimony, pp.302-304; TREX-1736 (SEEAC Brief); TREX-7192 at pdf p.19 (Blowout and Well Release Frequencies, SINTEF Database, 2009, p.12) (the risk of a blowout in the Gulf of Mexico was nine times higher than in other parts of the world); D-2868; D-2887; *see also, e.g.,* L. McKay Testimony, pp.506, 517-518 (a deepwater blowout is a foreseeable event; "the whole safety management system, which includes process safety, is integral in trying to prevent blowouts" like Macondo).

[164] *See generally,* Bea Testimony, pp.294-296, 304, 306-307; D-2874; Shaw Testimony, p.8156-8157 (and D-3175); *see also, e.g.,* TREX-1736 pp.1-2 (SEEAC Brief, May 2010) ("The focus ... has been on the existing assets as opposed to drilling from MODUs" .... "MODUs have not bee included in the GoM MAR analyses to

John Baxter, who served with Hayward and Bly on the Group Operations Risk Committee (GORC), testified that BP Management did not implement OMS on deepwater rigs that were owned by drilling contractors.[165]  Randy Ezell testified that, in nine years aboard the DEEPWATER HORIZON, he had never heard of "OMS";  that the Transocean Well Control Handbook governed on the rig;  and that he had never received any BP "rules" or "regulations".[166]  Murray Sepulvado testified that he had never participated in a risk management process with respect to the Macondo well or the DEEPWATER HORIZON.[167]  Ronnie Sepulvado testified that they used Transocean's Well Control Manual.[168]

The cross-examination of Mr. Shaw demonstrated that the implementation of OMS was extremely gradual, and phased, with gaps identified in December of 2008 still being discussed, but not addressed, in January of 2010.[169]  Thierens also conceded that the risk management program they started discussing in June of 2009 had still not been implemented when he was transferred to London, and that, to his knowledge, the BP Risk Assessment Tool was never utilized for Macondo.[170]  O'Bryan similarly conceded that the "Implementation Draft" for OMS within the Drilling & Completions Unit (TREX-1975) was not formally issued as of March

---

date"); Hayward  Deposition, pp.183-194 (at time of Congressional testimony, OMS "was not complete across company" ... plans to include MODUs in the future); Baxter Deposition, pp.175, 192, 210-211, 234-236 (discussed *infra*); *see also, e.g.,* TREX-6025.c. and TREX-6025.g. (OMS Gap Assessments); TREX-866 p.38 (GoM SPU Operating Plan) (re OMS Handbook, notes that process safety risks not well understood and procedures incomplete).

[165] Baxter Deposition, p.175 (BP did not require contractor-owned MODUs to comply with BP's OMS); *see also,* Baxter Deposition, pp.192, 210-211 (BP did not require contractor-owned MODUs to comply with BP's Integrity Management standard); Baxter Deposition, p.175 (BP did not conduct Major Accident Risk assessments on contractor-owned MODUs); Baxter Deposition, pp.234-236 (BP did not conduct Safety & Operations audits on contractor-owned MODUs).

[166] Ezell Testimony, pp.1643-1644, 1718.

[167] M. Sepulvado Deposition, pp.397-398.

[168] R. Sepulvado Testimony, p.2052 ln.1-5.

[169] *See generally,* Shaw Testimony, pp.8157, 8166, 8175-8178, 8195-8197; TREX-2908 p.38; TREX-2514; TREX-2919; (*including,* TREX-2514 pp.7, 9; Shaw Testimony, pp.8186-8193 (in June of 2009, the "solutions" which had been identified, after six months, were to develop a "checklist" and to have hazard recognition training two years later;  BP was planning, at that point, to look at 35 or 40 risk assessments in August, and then start to identify root causes; the "Solutions" were still to be decided ("TBD"))).

[170] Thierens Deposition, pp.129-130, 148.  Thierens further confirmed that, as of October 2009, BP had no risk-based data-informed plan for safety culture. *See* Thierens Deposition, pp.134-136; TREX-6090.

2010, and, to his knowledge, not ever.[171]   Guide similarly admitted that there was no local OMS module for Drilling & Completions prior to the explosion, and his previous deposition testimony made clear that there was no formal OMS training until 2011.[172]  Bly testified – contrary to the direction provided in the OMS Governance document[173] – that OMS generally deferred to the contractor's safety management policy on contractor-owner assets, such as MODUs, and tried to bring about changes in the event that the contractor's policies were insufficient.[174]  Bly further conceded that had OMS been applied to the Macondo project, it would have prevented the dysfunctionality among people in charge of the operations, such as Guide.[175]  Hayward testified that it is "undoubtedly" possible that, had OMS been applied prior to April 20, 2010 in the Gulf of Mexico, the terrible catastrophe would have been averted.[176]

**There was, at the time of the blowout, no "bridging document" that identified and addressed the gaps between BP's OMS and the Transocean Safety Management System with respect to the Macondo Well or the DEEPWATER HORIZON.**

While BP pointed to Section 17.1 of the 1998 Drilling Contract between Vastar (later BP) and R&B Falcon (later Transocean) for the proposition that Transocean would have primary responsibility for safety and that, in the event of conflict, the Transocean manual would prevail,[177] Section 3.1 of Amendment No. 38 to the Drilling Contract, dated September 28, 2009, requires that Transocean's safety management system be compatible with BP's safety management system;  Section 3.2 requires Transocean to perform all services in compliance with

---

[171] O'Bryan Testimony, pp.9301-9302, 9305-9306, 9311-9312. Mr. Jassal, who was the Custodian/Owner of the Implementation Draft (TREX-1975), testified that there was still not a final draft released as of the date of his deposition, July 21, 2011. *See* Jassal Deposition, p.269.
[172] Guide Testimony, pp.8831-8836; *see also,* Guide Testimony, p.8837 (they were still operating under the old DWOP). *See also,* Bly Testimony, pp.1021-1022, 1027-1028, 1036 (to Bly's knowledge, there was no Local OMS Manual, no OMS training, and is not familiar with identification of process safety gaps).
[173] *See* TREX-45006 pdf p.16, *supra.*
[174] Bly Testimony, pp.1185-1186.
[175] Bly Testimony, pp.1066-1067.
[176] Hayward Deposition, pp.793-794. *See also,* Bly Testimony, p.1002.
[177] *See* Trial Transcript (Newman), pp.4692-4693; TREX-1356A pdf pp.22-23.

BP's management system; and Section 3.3 requires the establishment of an "Interface Document" to address any inconsistencies.[178]

In addition, the BP OMS Governance Document, dated November 3, 2008, provides that BP shall "include and apply contract provisions in such a way that supports and is consistent with BP's application of OMS to BP's Operating activities."[179] Any deviation "shall be based on a risk assessment (including defining and documenting the risk reduction measures that are to be applied) and shall be formally justified, recorded, and authorized."[180]

However, the "bridging document" that BP contended was in place between BP and Transocean at the time of the incident, (*see* D4943), is a five-page document dated September 2008, (TREX-948), which:

- Precedes the November 2008 OMS Governance Document;[181]

- Precedes the September 2009 Contractual Amendment;[182]

- Precedes the January 2010 "Implementation Draft" for BP Gulf of Mexico Drilling & Completions;[183]

- Indicates that the parties will manage the resolution of gaps, and review and implement new programs;[184]

- Is only five pages long;

- Does not reference or address anything specific to the DEEPWATER HORIZON;

- Does not reference or address anything specific to the Macondo Well;

- Does not address any specific process safety issues; and,

- Specifically addresses only a limited number of issues, which all deal with personal safety.[185]

---

[178] TREX-1356A pdf p.429 (also TREX-1488 pdf p.21).
[179] TREX-45006 pdf p.16.
[180] TREX-45006 pdf p.16; *see generally,* O'Bryan Testimony, pp.9316-9320.
[181] *See* TREX-45006 (OMS Governance Document) (Nov. 2008).
[182] *See* TREX-1356A (also TREX-1488) (Amendment No. 38) (Sept. 2009).
[183] *See* TREX-1975 (Implementation Draft) (Jan. 2010).
[184] TREX-948 pdf p.4.
[185] *See* TREX-948 pdf p.3.

*See generally,* TREX-948, *and,* O'Bryan Testimony, pp.9324-9330, 9353-9360; *see also,*

Jackson Deposition, pp.93-95.[186]

O'Bryan, who was the BP Vice-President of Drilling & Completions for the Gulf of

Mexico from late 2009 through the date of the explosion, ultimately admitted that he had never

seen a bridging document specific to the DEEPWATER HORIZON or to the Macondo well.[187]

Nor did any witness testify that there existed an "Interface Document" as required under Section

3.3 of the Amendment to the Drilling Contract.[188]

**In determining the "Safe Drilling Margin" for MMS purposes, (and the "Kick Margin" for
Good Oilfield Practices purposes), the operator cannot always rely on the measurement
that is taken at the Casing Shoe, but must calculate from the lowest known Fracture
Gradient that's found in the relevant drilling interval or section.**

The MMS, and Good Oilfield Practices, require that the differential between the highest

Mud Weight and the weakest Fracture Gradient be at least 0.5 lbs.[189]  "Kick Margin" is the term

generally used by the industry, while "Safe Drilling Margin" is the term generally used in

connection with the MMS Regs.  Maintaining this margin is a proactive requirement to prevent

losing control of the well.[190]

---

[186] *See also, e.g.,* TREX-2523 p.7 (and O'Bryan Testimony, pp.9322-9324) (January 2010 communication
noting that "a majority of our bridging documents … are outdated and/or poorly understood").

[187] O'Bryan Testimony, p.9330 ln.2-8. *See also, id.,* at p.9320 (from the time he became Vice-President
thru the date of the explosion, there was no process safety audit conducted on Macondo – or, to O'Bryan's
recollection, on any of their operations); *id.,* at pp.9323-9324; TREX-2523 p.7 ("A majority of our bridging
documents linking BP and drilling contractor safety systems are outdated and/or poorly understood"); Bly
Testimony, pp.1031-1032, 1039-1040, 1072-1073 (bridging would have required someone with an understanding of
OMS at BP to review and critique, the Transocean safety management system; yet Bly is not familiar with
Transocean's safety management system, and doesn't know, nor did the investigation look at, what gaps did or
didn't exist within the relevant systems at the time of the explosion); Ezell Testimony, pp.1643-1644, 1718 (in nine
years aboard the DEEPWATER HORIZON, he had never heard of "OMS", nor had he ever received any BP "rules"
or "regulations"); Guide Testimony, p.8640; TREX-757 (the Macondo Risk Register was last updated on June 20,
2009); M. Sepulvado Deposition, pp.397-398  (had never participated in a risk management process with respect to
the Macondo well or the DEEPWATER HORIZON).

[188] *See also, e.g.,* Bea/Gale Report, pp. v, xxiii, 73 (TREX-20001 at pdf pp.6, 24, 100) (there was no
bridging document).

[189] *See generally,* Huffman Testimony, pp.654, 665-666; Douglas Deposition, p.108; TREX-3732; TREX-
4201.

[190] Huffman Testimony, pp.653-654.

BP attempted to argue for the notion that the operator could rely on a Casing Shoe measurement for the weakest Fracture Gradient, irrespective of the other measurements taken or information obtained during the drilling interval or section in question.[191]

However, Dr. Huffman credibly explained that, while the beginning assumption is that the weakest Fracture Gradient is at the Casing Shoe, the margin, and sometimes the Mud Weight, must be adjusted when new information is learned while drilling.[192]  (Stated another way, the operator is looking for the "weakest link".  You assume that the Casing Shoe is the weakest link. But if it isn't, you use the weakest link, as determined through the information gained while drilling.[193])

This is supported by the then-existing MMS Regulations.  Specifically, Section 250.427(a) provided that: "You must use the pressure integrity test and related hole behavior observations … to adjust the drilling fluid program and the setting depth of the next casing string."[194]  Section 250.428(a) further directs that if you "have unexpected formation pressures or conditions that warrant revising your casing design," you must "submit a revised casing program to the district manager for approval."[195]

While Bourgoyne contends that Huffman is alone in his interpretation, Bourgoyne was confronted with the deposition testimony of Mr Trocquet, from the MMS, who testified – consistent with Dr. Huffman – that you measure from the weakest Fracture Gradient, which is only presumed to be at the shoe.[196]  Mr. Saucier, an MMS supervisor, agrees with Huffman as well.[197]  Finally, BP's own senior Regulatory Advisor testified that operators "have to use the

---

[191] *See, e.g.,* Bourgoyne Testimony, pp.7620-7621.
[192] Huffman Testimony, pp.652, 656-657.
[193] Huffman Testimony, p.824. *See also, generally,* D-3554.
[194] TREX-4022.
[195] TREX-5837.
[196] *See* Bourgoyne Testimony, pp.7621-7623; Trocquet Deposition, pp.186, 183, 257-258.
[197] *See* Bourgoyne Testimony, pp.7624-7627; Saucier Deposition, pp.289-290, 306-307.

data they have, the real hole data they have, to adjust their either drilling fluid program or where they set their casing."[198]

Regardless of whether the MMS Regulations were actually enforced as a matter of practice, BP's contention that it is "safe" to determine the drilling margin based solely upon a measurement at the Casing Shoe, and despite the existence of information to the contrary, defies logic and is untenable as a matter of basic common sense.

## The "fast drilling" that occurred with little or no regard for the drilling margin from October 2009 thru April 9, 2010 caused or contributed to the blowout.

Although Total Depth was called, and the drilling phase may have been technically completed, Dr. Huffman stated that BP was leaving the well in such a "critical condition" and "so delicate and so fragile that anything else they did from that point forward had to be done with extreme care at the risk of losing the well completely."[199]   Benge similarly explained, in the context of the cement job, that because the well was "very fragile", BP's design "was driven by the singular desire to minimize Equivalent Circulation Density (ECD)."[200]   Beck also testified that the narrow margins created a wellbore that was unsuitable for the casing and cement job.[201] The well, as drilled, was "dangerously unstable".[202]   Finally, Mr. Ambrose, (after recounting all of the changes to the drilling plan, and the fact that over 1,800 feet of collapsed or lost hole occurred),[203] explained that BP used 7-inch casing instead of 9⅞-inch casing for the last interval,

---

[198] Douglas Deposition, pp.170-171.
[199] Huffman Testimony, pp.718-719.
[200] Benge Testimony, p.2257. *See also, e.g.,* Barnhill Report, p.23 (TREX-7676 at pdf p.13) (the lack of sufficient drilling margin drove many of the decisions that ultimately played a role in the blowout); Tabler Deposition, p.316 ln.7-11 (the reason they wanted to pump at a slow rate was because they knew they had a "weak formation").
[201] Beck Rebuttal Report (TREX-61117) pp.27-29
[202] Beck Testimony, p.7171 (it was an "unreasonably risky" well design).
[203] Ambrose Testimony, pp.6092-6093; D-3157.

which caused them to pump at a lower rate.[204]   Also contributing to the blowout were: reducing the cement density with nitrogen foam; using a lesser quantity of cement than that specified in the BP procedures; and deciding not to perform a complete bottoms-up before cementing.[205]

### The "Every Dollar Counts" culture at BP affected operations; affected safety; and is evidenced in the specific decisions that increased risk on Macondo.

Contrary to Hayward's claims that cost reductions did not affect drilling operations,[206] Kevin Lacy testified that that there was "tremendous pressure" to cut costs, including hundreds of millions of dollars within the Gulf of Mexico Drilling & Completions organization.[207]   Shaw further confirmed that the "every dollar counts" culture was embraced within the Gulf of Mexico Strategic Performance Unit, and that in 2009 BP safety personnel were pulled off of the MODUs including the MARIANIS and the DEEPWATER HORIZON.[208]   Bonuses at BP were tied to reductions in non-productive time (NPT), but did not reward employees for effective process safety measures or results.[209]   Lee Lambert, as a potential Well Site Leader of the Future, was graded on his commitment to cost control.[210]   And John Guide bragged that the DEEPWATER

---

[204] Ambrose Testimony, pp.6094-6096.  *See also,* Guide Testimony, pp.8667-8668 (BP decided to call Total Depth earlier than originally planned, which required changes in the casing configuration, to accommodate the hole size).

[205] Ambrose Testimony, pp.6096-6097; TREX-3808 pdf p.196 (Transocean Investigation Report, Vol. I, p.212).

[206] Hayward Deposition, p.121.

[207] K. Lacy Deposition, pp.773-774, 792-796; *see also, id.,* p.711 ln.4-7 ("not explicitly" told to cut costs for safety).

[208] Shaw Testimony, pp.8052, 8075-8076, 8137-8141; TREX-5678 p.2; TREX-6020.

[209] Bea/Gale Report, p.viii (TREX-20001 pdf p.9). *See also, e.g.,* O'Bryan Testimony, pp.9294-9297 (discussing TREX-4232) (evidencing a focus, not on safety or the environment, but reductions in non-productive time and other economic issues to BP); Perkin Testimony, p.3298 (discussing TREX-1741 at pdf p.4) (Risk Register for Macondo identifying the "event" relating to BOP stack as "NPT" (non-productive time) and "impact type" as "Schedule").

[210] Lambert Testimony, pp.8288-8289; TREX-2159.

HORIZON team had embraced the "'Every Dollar Matters' culture" in the 18 months since he had arrived.[211]

Transocean witnesses further established that BP's "every dollar counts" culture filtered down to the operational activities.  Mr. McMahan, for example, testified that BP provided a performance award to Transocean employees for completion within 75 days, with a maximum bonus awarded for completion in 52 days.[212]  Mike Williams testified that there was "always" pressure to speed up operations on the well.[213]  And Meinhardt testified that Transocean rig personnel felt pressure to get the Macondo well completed as fast as possible.[214]

There was, on Macondo, every incentive to save additional time and money.  As of April 9, 2010, BP was $60 million (60-70%) over budget and 54 days behind schedule on the well.[215]  Moreover, the DEEPWATER HORIZON was under pressure to get to the Nile well, and then to the Kaskida, which BP needed to "spud" by May 16th or face losing the lease.[216]

Several of the defense experts, in fact, supported Dr. Bea's conclusions that the cost-cutting attitude at the BP Management level filtered down to the operational level on Macondo during the days and hours leading up to the blowout, as evidenced by:

- Not using a sufficient number of centralizers;
- Not waiting for the foam stability test;
- Not running a cement bond log;
- Using a spacer made from lost circulation material;

---

[211] Guide Testimony, p.8629; TREX-6294 p.2; *see also,* Guide Testimony, p.8632; TREX-7062 ("We have saved BP millions and no one had to tell us").
[212] McMahan Deposition, pp.153, 160-161; TREX-07098.
[213] Williams Deposition, p.51 ln.13-15.
[214] Meinhardt Deposition, pp.148-149, 301-302.
[215] Bea Testimony, pp.329–330; D-2730. *See also,* Barnhill Testimony, p.4385 (when a vessel is on a Day Rate, you save money with each and every day you get off the well); *see also,* Bourgoyne Testimony, pp.7552-7553 (believes that rig was on cost-per-day basis).
[216] O'Bryan Testimony, pp.9293-9294; *see also,* Sims Deposition, pp.556-557; TREX-119E; Bea/Gale Report, p.71 (TREX-20001 pdf p.98).

- Displacing the riser before setting the cement plug;

- Displacing the well to over 3,000 feet below the mud line;

- Not installing additional physical barriers;

- Not circulating bottoms-up prior to the cement job;

- Using long string casing instead of a liner;

- Performing simultaneous operations during displacement;

- Converting the lower ram on the BOP to a test ram.

*See* Bea Testimony, pp.326-327; D-2445; Bea/Gale Report, pp.xviii – xxi, 58, 64 (TREX-20001 at pdf pp.19-22, 58, 64).[217]   Transocean expert, Calvin Barnhill, testified that the 35 decisions summarized in Appendix A to his report include a number of decisions made by BP, based on a desire to save time and money.[218]   Halliburton expert, Gene Beck, was shown the Bea summary, (D-2445), and, with the exception of the conversion of the lower ram to a test ram, (on which he expressed no opinion), and not waiting for the foam stability test, Beck agreed that, the other nine decisions increased the risk of a blow-out on Macondo;  and, in each event, "the decision that was made did result in a time and cost savings."[219]   Additionally, Huffman testified that BP drilled ahead to save time and money by extending the casing string;[220] Roth testified that BP

---

[217] *See also,* Bea Testimony, pp.321-323; D-2739; D-2895; D-2896; D-2897; D-2898 (the "every dollar counts" culture at BP was embraced by people working on Macondo, including John Guide).

[218] Barnhill Testimony, pp.4385-4386; Barnhill Report, Attachment A (TREX-7685 pdf pp.53-55). Transocean's lead investigator, Mr. Ambrose, also agreed that: using fewer centralizers increased risk while saving BP time; not waiting for the foam stability test increased risk while saving BP time; not running the Cement Bond Log saved BP time and money; using spacer made from Lost Circulation Material increased risk while saving BP money; displacing the riser before setting the cement plug increased risk; not having a second barrier increased risk and saved time; not circulating a full bottoms-up increased risk while saving BP time; using a long-string casing instead of a liner increased risk while saving BP $7 to $10 million; and converting the lower ram on the BOP to a test ram was intended to save time. Ambrose Testimony, pp.6120-6123; D-2445.

[219] Beck Testimony, pp.7181-7184; D-2445.

[220] Huffman Testimony, p.681; TREX-1337.

saved money by using the old Kodiak cement blend;[221] and Childs conceded that the conversion of the Lower Bore Ram to a Test Ram increased risk while saving time and money.[222]

The Bly Investigation Team interview notes confirm that BP was "behind on well" and "because of culture" no Full Bottoms-Up was done.[223] With respect to the Cement Bond Log, the interview notes confirm that Guide "shut down" the test in order to save time.[224] And a formal Management of Change document confirms that BP saved $7 to $10 million by choosing the Long-String Casing over the Liner.[225]

Hayward himself, moreover, linked the concept of cost savings with operational and safety issues when he indicated that, in his opinion, the company had become "overcautious" due to previous incidents when he first took over as CEO and started talking about "slashing" management in 2007.[226] Indeed, the Macondo Risk Register identified "Cost" as the impact associated with well control risk, (including the potential for an "uncontrolled situation"), and the other major risks identified therein.[227]

**Maximum Anticipated Surface Pressure (MASP) should have been calculated using 100% gas column to surface, (rather than 50% mud, 50% gas).**

The worst-case scenario is gas column to surface.[228] Despite, therefore, BP's defense of its calculation of Maximum Anticipated Surface Pressure (MASP) based on 50% mud and 50% gas, MASP should have been calculated based on 100% gas. Indeed, the Transocean Well Control Manual indicates that MASP is determined by calculating "worst case scenario" with

---

[221] Roth Testimony, p.3054.
[222] Childs Testimony, pp.5292-5294; TREX-6120.
[223] TREX-37031 p.40 (discussed in Robinson Testimony, p.7962).
[224] TREX-37031 p.39 (discussed in Robinson Testimony, pp.7958-7961).
[225] TREX-901 at pdf p.1; see also, Beck Testimony, p.7962.
[226] Hayward Deposition, pp.108-109.
[227] TREX-1741 at pdf pp.4-5 (Macondo Risk Register identifying the "impact" of all risks and events as either "Cost" or "Schedule") (discussed in Bly Testimony, pp.1058-1059).
[228] Perkin Testimony, p.3360.

full evacuation of drilling fluid (*i.e.* gas column).[229]  The BP DWOP similarly indicates that

MASP should account for gas column to surface.[230]  As does the BP Group Practice.[231]   A BP

casing design document indicated that it was important to plan for a 100% gas column to surface

as the worst case scenario.[232]   Yet, as evidenced by an e-mail string discussing BP's Kodiak

Well, a calculation of MASP, if done in the correct way, would exceed the BOP's Pressure

Rating.  Hence, MASP was re-calculated using 50% mud and 50% gas.[233]

**Was the Sperry Mudlogger, Joe Keith, monitoring the well on the evening in
question?  How long was he on "break"?  Did he review the data when he returned from
break?  Did he see the data changes and disregard them, or did he fail to notice them in the
first place?**

Mr. Keith admittedly missed the pre-tower meeting, because he was either getting ready

in his room or was sleeping.[234]  On May 4, 2010, Keith told a BP investigator that he never left

his post during the entire 4-hour period that he was supposed to be on duty.  That same day,

however, Keith received a settlement.[235]  After the settlement, Keith's story changed, to the

effect that he took an 8-10 minute break sometime between 8:30 and 9:00.  (Keith claimed that

his recollection of this returned to him in therapy.)[236]  According to his prior deposition

testimony, Keith never observed any indication that the well was taking a kick.  He claimed at

trial, however, (initially), that he noticed a few things, such as an increase in the Flow-Out, and

made a few calls to the Rig Floor.[237]  Keith testified at trial that he noticed a 100 psi increase on

---

[229] Perkin Testimony, pp.3369-3372; TREX-1454.
[230] Perkin Testimony, p.3372; TREX-93 Section 15.2.3 p.47.
[231] Perkin Testimony, p.3373;  TREX-215 Section 6.1.3 p.10.
[232] Perkin Testimony, pp.3374-3375; TREX-1861 p.9.
[233] Perkin Testimony, pp.3377-3380; TREX-26011 ("On the MASP, for purposes of BOP test pressures, we'll only be testing to 9500 psi max (might even reduce it to 9300 psi).  Even when we calculate a MASP that's higher, we have been running with the philosophy that (a) something else will break down before we ever reach that pressure, and (b), we don't want to put unnecessary wear and tear on the stack").
[234] Keith Testimony, pp.3531-3532.
[235] Keith Testimony, pp.3534-3537. While Keith testified that the settlement was paid by Halliburton, the release reflected a release of BP. TREX-969.
[236] Keith Testimony p.3537.
[237] Keith Testimony, pp.3539-3540.

the drill pipe from 9:01 to 9:08, although he had testified in his deposition that he didn't notice the increase.[238]   Keith acknowledged at trial that there was a rise in drill pipe pressure of 246 psi from 9:08 to 9:14 with the pumps turned off, but claimed that he could not see it on his monitor the night of the explosion.[239]   Under cross-examination by BP, Keith indicated that his break was as much as a half-hour: taking the break around 8:30 and returning between 8:58 and 9:08.[240]

Keith testified (again) that he saw the 100 psi increase the night of the blowout, but did not call the Driller Shack.[241]   He claimed that he saw the drill pipe pressure increase by 250 psi with the pumps off, but he did not call the driller's shack as it was not (in his mind) an indication of a kick.[242]   Yet, he had testified in his deposition that if he had seen the drill pipe pressure increase by 100 psi, he would have called the Drill Floor.[243]

According to Heenan, Keith should have been able to detect the increase in pressure, which was a "pretty definitive" indication of inflow.[244]   Mr. Heenan acknowledges that Keith testified that he checked the flow line (on the monitor) around 9:08 after the pumps were shut down, saw that it stopped flowing, and diverted.   But, according to Heenan, there is other evidence which calls this account into question.[245]

Based on Heenan's review, the Halliburton-Sperry Mudlogger may have had access to the Transocean Hitec Data as well as the Sperry Insite Data.   In any event, Keith testified that there was nothing going on on the rig that prevented him from consistently and accurately

---

[238] Keith Testimony, pp.3547-3548 (it didn't "stand out" as an anomaly, (or he would have called the rig floor)).

[239] Keith Testimony, p.3549; D-2104.

[240] Keith Testimony, p.3678.

[241] Keith Testimony, p.3680.

[242] Keith Testimony, pp.3682-3683.

[243] Keith Testimony, pp.3686-3688 (He only would have reported the increase "if it would have stood out as a kick to me," but his prior deposition testimony indicated that he would have told them that he had seen a change, (if, in fact, he had noticed it), and it would have been up to the Drilling Crew to make a decision).

[244] Heenan Testimony, pp.2157-2158.

[245] Heenan Testimony, pp.2159-2160.

monitoring the well.[246]  Dr. Bourgoyne agreed with Heenan that the well started flowing at 8:30, and that the kick could have been detected between 9:01 and 9:08.  Bourgoyne believes that there was a strong indication between 9:08 to 9:14.  Pressure was increasing even though the pumps were turned off.[247]

Wherever he was, and whatever he was doing, it is clear that Keith was not paying any attention to what was going on with the well, as he should have been, during the most critical time in the entire drilling operation.[248]

**Sperry (and Transocean and/or BP) could have placed the Flow-Out Sensors – or a second set of Flow-Out Sensors – in a location that would have allowed the Mudlogger to effectively monitor the Flow-Out even when fluids were being diverted overboard.**

Mr. Probert, who once performed services as a mudlogger, confirmed that a mudlogger would typically be expected to monitor flow-in and flow-out.[249]  Section 2.1.1 of the Sperry Sun Drilling Services Contract with BP required Sperry to provide "a complete MWD system with sufficient backup equipment to ensure continuity of quality service."[250]  Section 2.1.2 additionally required Sperry to provide "two surface computer systems with necessary interfaces," including software and cabling.[251]

While there was a lot of testimony to the effect that the Sperry Flow-Out Sensors were, because of their placement, rendered ineffective when the hydrocarbons entered the riser due to the fact that the fluids were being diverted overboard, no Halliburton (or other) witness really disputed that the sensors could have been moved, or that a second set of sensors could have been

---

[246] Heenan Testimony, pp.2210-2211.
[247] Bourgoyne Testimony, pp.7529-7535.
[248] *See, e.g.,* Ezell Testimony, pp.1672-1673, 1784.
[249] Probert Testimony, p.3002.
[250] TREX-2007 p.7; Probert Testimony, pp.3002-3003.
[251] TREX-2007 p.7; Probert Testimony, p.3003.

placed, such that the Flow-Out could have been monitored even when fluids were being diverted.[252]

Indeed, Halliburton employee John Gisclair testified in his deposition that Sperry, with Transocean's approval, decided where to place the sensors, and indicated that they could have positioned the sensor, or a second sensor, in another place.[253]  Barnhill similarly testified that, in his experience, the placement of the Flow-Out Sensor would have been a joint discussion between the Sperry Mudlogger, the Transocean OIM, and the BP Company Man.[254]  Barnhill agreed that the equipment should have been set up by Sperry and Transocean in a way that enabled the Mudlogger and Drilling Crew to monitor a 250 psi increase while the pumps were shut off.[255]

**Halliburton did not develop a Basis of Design for the production casing cement job.**

The BP-Halliburton contract requires Halliburton to:

- Produce and update a basis of design document for the project…. to record the major decisions and their process of determination…. [Section F]

- Apply risk-based engineering processes to prepare the basis of design, individual well programs, and all associated engineering and documentation. [Section G]

- Provide solutions where conventional cement design and procedures are not suitable, such as blend and foam cement. [Section J] [256]

The Scope of Work for this Basis of Design includes consideration of:

What needs to be achieved?  What objective would incur cementing NPT if not achieved?  What are the design limits that need to be considered?  Fracture gradient or local legislative requirements? What engineering decisions have already been made?  Mud weight, casing size, and setting depths? **What are the key risks? How**

---

[252] This would have also likely been helpful to the Transocean Drill Crew (and the BP Well Site Leader), as the Sperry Flow-Out Sensors were generally more precise than the sensors associated with the Transocean Hitec system. *See* Keith Testimony, pp.3508-3509, 3517, 3640.
[253] Gisclair Deposition, pp.431-432, 530.
[254] Barnhill Testimony, pp.4394-4396.
[255] Barnhill Testimony, pp.4461-4462.
[256] Probert Testimony, pp.2920-2921; TREX-4477 at pdf pp.86-87 (BP-Halliburton Services Agreement, pp.B-30, B-31).

**can the major risks be managed? What cement design options exist? What are the best solutions for the project?**[257]

Halliburton contended, through the testimony of Gagliano, that this responsibility had been satisfied by the initial June 2009 Basis of Design document, which Gagliano claimed was updated along the way with various OptiCem inputs or reports. It is clear, however, that no true Basis of Design, as contemplated by the contract, was ever completed, updated or finalized with respect to the production casing cement job, prior to the blowout.

Indeed, a Halliburton presentation developed after the explosion in connection with the company's testimony to Congress acknowledged that the Basis of Design was intended to "provide means to continually assess fitness of purpose of cementing, recommendation by engineering interpretation against client challenges and well hazards (red flags) encountered while drilling," but that: "No formal basis of design standard exists today."[258]

The BoD that Halliburton provided was dated June 2009, and did not include the Production Casing Cement Job. Gagliano conceded that there was never another subsequent document entitled "Basis of Design" for the Macondo Well.[259] Rather, what Gagliano referred to as a "Basis of Design" was simply taking information from BP on the well design, and incorporating it into his document. Halliburton did not actually change, or update, or assess the risk or design of the cement or the cement job itself. The only risk that was identified in the OptiCem reports was the risk of gas flow based on the number and location of centralizers. No

---

[257] Probert Testimony, pp.2921-2922; TREX-4477 at pdf pp.89 (BP-Halliburton Services Agreement, pp.B-32) (emphasis supplied).

[258] TREX-4357 p.5; Probert Testimony, pp.2923-2924; Roth Testimony, pp.3084-3086. Comparing the 2010 Halliburton U.S. Land Offshore Cement Manual (TREX-989) to the 2011 Halliburton U.S. Land Offshore Cement Manual (TREX-48008), a section was added regarding the need for Management of Change (MoC) and Basis of Design (BoD). Probert Testimony, pp.2925-2927. *See also,* Probert Testimony, p.2922 (Probert has no knowledge of whether a Basis of Design (BoD) was prepared for the Macondo cement job prior to the explosion); Roth Testimony, pp.3092-3094 (Roth is not aware of any); Gagliano Testimony, pp.6713-6715 (there was no formal procedure or requirement for a formal written Management of Change (MoC); rather, (according to Gagliano), it would occur thru informal discussions. To the extent there was "oversight" by management, it would come through the Testing Lab in Broussard).

[259] Gagliano Testimony, pp.6710-6712, 6716; TREX-4357 p.5; TREX-7469.

other risks associated with the cement job were identified or addressed within the OptiCem Reports.[260]

Benge, in his review of materials, was unable to locate a Basis of Design for the cement that was pumped on April 19th.[261] And Roth acknowledged that if Halliburton had followed the specific obligations of the contract (*i.e.* identification of risks, mitigation of risks, determining what designs should be used), there would not have been a blowout.[262]

**The cement slurry that Halliburton designed and formulated for the production casing interval was unstable.**

It is clear from the evidence that the cement slurry provided by Halliburton was not stable. Halliburton's own Head of Cement acknowledged on the stand that the mixture had a "very low probability of success."[263] The pre-incident testing repeatedly revealed instability.[264] The post-incident testing conducted by Chevron, OTC and Halliburton itself all revealed instability.[265] Both the Transocean Investigation and the Bly Investigation concluded that the cement failed.[266] Halliburton did not even call a cement expert to contend that the cement slurry was stable.

---

[260] Gagliano Testimony, pp.6702-6706; TREX-4357.
[261] Benge Testimony, p.2546. *See also,* Benge Testimony, p.2338 (could find no evidence that Halliburton had any standards or procedures to ensure that minimum required testing was actually conducted).
[262] Roth Testimony, p.3089 ln.11-16. *See also,* Roth Testimony, pp.3092-3094 (had Halliburton engaged in a proper Basis of Design for the Macondo slurry, it would have analyzed the risks of using the D-Air 3000 de-foaming agent; had Halliburton followed its contractual requirements, the risks associated with the use of D-Air 3000 and SCR-100 would have been identified along with plans for mitigating those risks within the Halliburton reports).
[263] Roth Testimony, pp.3138, 3141, 3215, 3221.
[264] *See* D-4309A; Gagliano Testimony, pp.6791-6796; Benge Testimony, pp.2513-2515, 2520-2521, 2330-2332; Roth Testimony, p.3131; TREX-808 p.2; TREX-809 p.2; TREX-48195.
[265] *See generally,* D-4309A; Benge Testimony, pp.2545-2546; Roth Testimony, pp.3056, 3069, 3131, 3252-3253; Quirk Testimony, pp. 4761, 4764; Morgan Deposition, pp.20-21, 29; Garrison Deposition, pp.23-24, 28-29, 149-150, 159, 207-208 (re OTC testing for the Presidential Commission); Gardner Deposition, pp.90-95, 101-102, 110-111, 118, 123, 125, 163-164, 186, 237-238, 301; TREX-4572 pp.4-5. 9-12 (re Chevron testing in connection with BP investigation); TREX-7718 (re Haliburton's secret internal testing).
[266] TREX-00001 (Bly Report), pp.10, 33; TREX-3808 at pdf pp.60, 197 (Transocean Investigation Report, Vol. I, pp.72, 213) (the "precipitating cause" of the blowout was the failure of the cement); Bly Testimony, pp.915-916, 934-936; Ambrose Testimony, pp.6049, 6213; D-2022.

**Did Halliburton intentionally conceal or destroy evidence after the event?**

It is undisputed that Halliburton conducted post-incident testing at its Duncan, Oklahoma lab without documenting the results.[267] It is undisputed that Halliburton conducted post-incident testing at its Broussard, Louisiana lab, but "off the side" and throwing the notes into the trash.[268] It is undisputed that Halliburton conducted post-incident 3-D modeling without documenting the results.[269] It is undisputed that John Gisclair destroyed the notes he made in re-creating logs that were lost in the fire.[270] Halliburton concedes that it made misrepresentations to Congress and the public about the pre-incident testing.[271] Halliburton concedes that it made misrepresentations to Congress and to the public regarding its experience with similar foam cement jobs.[272] Halliburton concedes that it made misrepresentations to Congress and to the public regarding the slurry's conformance to industry, BP and Halliburton Best Practices.[273] Halliburton concedes that it did not comply with the *subpoena* from the U.S. Department of Justice, failing to turn over left-over samples of cement and additives that were used on Macondo.[274] Halliburton concedes that – despite its representations to Congress,[275] and despite industry best practices and corporate policies regarding an investigation of root causes and lessons learned to prevent other incidents

---

[267] Roth Testimony, pp.3060, 3255-3257; Quirk Testimony, pp.4763-4764; Morgan Deposition, pp.22-23; D-4309A, D379.

[268] Roth Testimony. pp.3060, 3265; Quirk Testimony, pp.4766-4767, 4769-4770; Faul Deposition, p.705; D-4309A, D379.

[269] Roth Testimony, pp.3066, 3255-3257, 3279-3280.

[270] Gisclair Deposition, p.171.

[271] Roth Testimony, pp.3249-3251, 3260-3262, 3266-3267; TREX-982; TREX-48098; D379, D-4309A.

[272] Probert Testimony, pp.3025-3026, 3236-3238, 3043; TREX-2013; TREX-75074; TREX-7491A.

[273] Roth Testimony, p.3263; Benge Testimony, pp.2483-2486; TREX-982.

[274] Quirk Testimony, pp.4796-4806, 4826-4841, 4926-4927, 4965-4966; TREX-48002 pp.1-2; TREX-5595; TREX-3110; D-3257. BP also had difficulty obtaining information and samples from Halliburton after the blowout. Bly Testimony, pp. 917, 924-929; D-4269A; Benge Testimony, pp.2514-2515; TREX-48195; TREX-47541; TREX-47549. *See also,* Probert Testimony, pp.2956, 3029-3030; TREX-4477, p.B-36.

[275] *See* TREX-2016 pdf pp.51, 66-67 (Hearing before Committee on Energy and National Resources, May 11, 2010, pp.47, 62-63) ("we will of course share any information" gained from Halliburton's own investigation "and hopefully use it as a basis for ensuring that the industry is safe and environmentally sound…into the future"); *see also,* Probert Testimony, pp.2939-2941, 3005; TREX-02017 (Probert Statement to Committee on Environment and Public Works, May 11, 2010) p.1; TREX-2019 (Subcommittee Inquiry into the DEEPWATER HORIZON Gulf Coast Oil Spill, May 12, 2010) p.60.

of this kind[276] – any such investigation was cloaked behind attorney-client privilege.[277]  It is clear that Halliburton's key witness, Jesse Gagliano, invoked the Fifth Amendment and refused to testify until after every other Phase One fact witness had already testified and every Phase One expert had already issued his or her report.[278]  And it is clear that critical custodial documents were not produced until after the custodian's deposition, despite the fact that such documents had been turned over to Halliburton's in-house legal department months before.[279]  Halliburton apparently wants the Court to believe that this was just a series of unconnected, disconnected, immaterial misunderstandings and innocent mistakes.  Halliburton also disputes the notion that the company conducted post-incident testing on the actual cement and/or additives that were actually used on Macondo.  But the evidence at trial demonstrates that Halliburton did in fact test Macondo materials, and the reasonable conclusion to be drawn from the totality of the circumstances is that Halliburton concealed or destroyed evidence intentionally after the explosion.[280]

     While there was admittedly some confusion among Probert, Roth, Quirk and Gagliano regarding the precise source of the materials that were tested by Quirk and Rickey Morgan after the explosion, what emerges is the fact that Halliburton periodically takes actual samples of cement blend, additives and water from the rig, brings them back to the lab, and keeps them in the lab, so that they can best tested.

     Halliburton, according to practice, identifies the actual materials used on the rig with a Sample ID Number, as well as the manufacturer's Lot Number.  The sample will also generally

---

[276] Probert Testimony, pp.2951-2954; TREX-5277 p.2.
[277] Probert Testimony, pp.3007 ln.14-15, 3029.
[278] *See, e.g.,* Benge Testimony, p.2334.
[279] Roth Testimony, pp.3252, 3280-3281.
[280] *See generally,* D-4379.

be identified by the date it was collected from the vessel.   By looking at the lab Weigh-Up

Sheets associated with a particular test, one can confirm the specific materials that were tested.[281]

In this particular case, the Weigh-Up Sheets that were presented to Probert, Roth, and

ultimately Quirk, (as well as Gagliano), establish that SCR-100L was taken from the rig on or

around October 22, 2009, and identified with Sample ID No. 54573, as well as Lot No. 6264.

Quirk, who claimed to be "confused" on the stand, effectively admitted that he tested these

actual samples from the Macondo mixture, ultimately conceding that "there is a missing piece to

this puzzle."[282]

With respect to the issue of intent, the conclusion that Halliburton's conduct was willful

is primarily inferential, but there is a mountain of circumstantial evidence in this regard.

Moreover, there is (at least) one significant piece of direct evidence:  An e-mail from

Halliburton's CFO on April 27, 2010 indicated that "we should not comment on what caused the

accident;  but, instead, need to say that Transocean and BP are conducting the investigation into

what happened and we don't know anything further."[283]  Particularly when contrasted with the

statements that Halliburton was making to Congress and to the public around the same time,[284]

one must infer an intent to conceal the truth – which itself evidences a conscious disregard for

public safety within Halliburton's culture that existed prior to (and, indeed, contributed to) the

event itself.

---

[281] Roth Testimony, pp.3121-3128.

[282] Quirk Testimony, pp.4773-4782; TREX-4566; TREX-5593 pp.3, 5. *See also,* Roth Testimony, pp.3120-3124.

[283] Probert Testimony, pp.3022-3023; TREX-1897. Mr. Probert admitted, in this regard, that there was some information exclusively within the possession of Halliburton. Probert Testimony, p.3023.

[284] Probert Testimony, pp.2939-2941, 3005; TREX-2016 pdf pp.51, 66-67 (Hearing before Committee on Energy and National Resources, May 11, 2010, pp.47, 62-63); Probert Testimony, pp.2939-2941, 3005; TREX-02017 (Probert Statement to Committee on Environment and Public Works, May 11, 2010) p.1 ("Halliburton has and will continue to fully support, and cooperate with, the ongoing investigations into how and why this tragic event happened"); TREX-2019 (Subcommittee Inquiry into the DEEPWATER HORIZON Gulf Coast Oil Spill, May 12, 2010) p.60 ("We will continue to work with you and your staff to collect factual data that will enable an understanding of what took place and what we can collectively do to ensure that domestic oil and gas production is undertaken in the safest, most environmentally responsible manner possible").

## Conclusion

For the above and foregoing reasons, and for the reasons set forth in Plaintiffs' PROPOSED FINDINGS AND CONCLUSIONS, Plaintiffs respectfully pray that the Court enter Final Judgment and Reasons against Defendants as set forth in the PROPOSED FINDINGS submitted contemporaneously herewith.

This 21st day of June, 2013.


Respectfully submitted,


   /s/  Stephen J. Herman                               /s/ James Parkerson Roy

**Stephen J. Herman**, La. Bar No. 23129           **James Parkerson Roy**, La. Bar No.11511

**HERMAN HERMAN & KATZ LLC**              **DOMENGEAUX WRIGHT ROY**

820 O'Keefe Avenue                                **& EDWARDS, LLC**

New Orleans, Louisiana 70113            556 Jefferson Street, Suite 500

Telephone: (504) 581-4892               Lafayette, Louisiana 70501

Fax. No. (504) 569-6024                  Telephone: (337) 233-3033

Email: sherman@hhklawfirm.com        Fax No. (337) 233-2796

*Plaintiffs Liaison Counsel*               E-Mail: jimr@wrightroy.com

                                           *Plaintiffs Liaison Counsel*

### PLAINTIFFS' STEERING COMMITTEE

Brian H. Barr
LEVIN, PAPANTONIO, THOMAS,
MITCHELL, ECHSNER & PROCTOR, PA
316 South Baylen St., Suite 600
Pensacola, FL 32502-5996
Office: (850) 435-7045
Telefax: (850) 436-6187
E-Mail: bbarr@levinlaw.com

Jeffrey A. Breit
BREIT, DRESCHER & IMPREVENTO
Towne Pavilion Center II
600 22nd Street, Suite 402
Virginia Beach, Virginia 23451
Office: (757) 670-3888

Robin L. Greenwald
WEITZ & LUXENBERG, PC
700 Broadway
New York, NY 10003
Office: (212) 558-5802
Telefax: (212) 344-5461
E-Mail: rgreenwald@weitzlux.com

Rhon E. Jones
BEASLEY, ALLEN, CROW, METHVIN,
PORTIS & MILES, P.C.
218 Commerce St., P.O. Box 4160
Montgomery, AL 36104
Office: (334) 269-2343
Telefax: (334) 954-7555

Telefax: (757) 670-3895
E-Mail: jbreit@bdbmail.com

Elizabeth J. Cabraser
LIEFF, CABRASER, HEIMANN &
BERNSTEIN, LLP
275 Battery Street, 29th Floor
San Francisco, CA  94111-3339
Office: (415) 956-1000
Telefax: (415) 956-1008
E-Mail: ecabraser@lchb.com

Philip F. Cossich, Jr.
COSSICH, SUMICH, PARSIOLA &
TAYLOR
8397 Highway 23, Suite 100
Belle Chasse, LA  70037
Office: (504) 394-9000
Telefax: (504) 394-9110
E-Mail: pcossich@cossichlaw.com

Robert T. Cunningham
CUNNINGHAM BOUNDS, LLC
1601 Dauphin Street, P. O. Box 66705
Mobile, AL  36660
Office: (251) 471-6191
Telefax: (251) 479-1031
E-Mail: rtc@cunninghambounds.com

Alphonso Michael "Mike" Espy
MORGAN & MORGAN, P.A.
188 East Capitol Street, Suite 777
Jackson, MS 39201
Office: (601) 949-3388
Telefax: (601) 949-3399
E-Mail: mike@mikespy.com

Calvin C. Fayard, Jr.
FAYARD & HONEYCUTT
519 Florida Avenue, SW
Denham Springs, LA  70726
Office: (225) 664-4193
Telefax: (225) 664-6925
E-Mail: calvinfayard@fayardlaw.

E-Mail: rhon.jones@beasleyallen.com

Matthew E. Lundy
LUNDY, LUNDY, SOILEAU LLP
501 Broad Street
Lake Charles, LA  70601
Office: (337) 439-0707
Telefax: (337) 439-1029
E-Mail: mlundy@lundylawllp.com

Michael C. Palmintier
deGRAVELLES, PALMINTIER,
HOLTHAUS & FRUGE'
618 Main Street
Baton Rouge, LA  70801-1910
Office: (225) 344-3735
Telefax: (225) 344-0522
E-Mail: mpalmintier@dphf-law.com

Paul M. Sterbcow
LEWIS, KULLMAN, STERBCOW &
ABRAMSON
601 Poydras Street, Suite 2615
New Orleans, LA  70130
Office: (504) 588-1500
Telefax: (504) 588-1514
E-Mail: sterbcow@lksalaw.com

Scott Summy
BARON & BUDD, P.C.
3102 Oak Lawn Avenue, Suite 1100
Dallas, TX  75219
Office: (214) 521-3605
Telefax: (214) 599-1172
E-Mail: ssummy@baronbudd.com

Conrad S.P. "Duke" Williams
WILLIAMS LAW GROUP
435 Corporate Drive, Suite 101
Maison Grand Caillou
Houma, Louisiana 70360
Office: (985) 876-7595
Fax No. (985) 876-7594
E-Mail: duke@williamslawgroup.org

Ervin A. Gonzalez
COLSON HICKS EIDSON
255 Alhambra Circle, Penthouse
Coral Gables, FL 33134
Office: (305) 476-7400
Telefax: (305) 476-7444
E-Mail:  ervin@colson.com

Joseph F. Rice
MOTLEY RICE LLC
28 Bridgeside Blvd.
Mount Pleasant, SC 29464
Office: (843) 216-9159
Fax No. (843) 216-9290
E-Mail: jrice@motleyrice.com

## ADDITIONAL PSC PHASE ONE TRIAL TEAM MEMBERS

Johnny deGravelles
deGRAVELLES, PALMINTIER,
HOLTHAUS & FRUGE'
618 Main Street
Baton Rouge, LA  70801-1910
Office:  (225) 344-3735
Telefax: (225) 344-0522
E-Mail:  jdegravelles@dphf-law.com

Walter J. Leger, Jr.
LEGER & SHAW
600 Carondelet St., 9th Floor
New Orleans, LA 70130
Phone: (504) 588-9043
Fax: (504) 588-9980
E-Mail: wleger@legershaw.com

Jimmy Williamson
WILLIAMSON & RUSNAK
Texas State Bar No. 21624100
4310 Yoakum Blvd.
Houston, TX 77006
Phone: (713) 223-3330
Fax: (713) 223-0001
E-Mail: Jimmy@JimmyWilliamson.com

Tom W. Thornhill
THORNHILL LAW FIRM, APLC
1308 Ninth Street
Slidell, Louisiana 70458
Phone: (985) 641-5010
Fax: (985) 641-5011 fax
E-Mail: tom@thornhilllawfirm.com

Anthony Irpino
IRPINO LAW FIRM
2216 Magazine Street
New Orleans, LA 70130
Tel: (504) 525-1500
Fax: (504) 525-1501
E-Mail: airpino@irpinolaw.com


## CERTIFICATE OF SERVICE

WE HEREBY CERTIFY that the above and foregoing Post-Trial Brief has been served on All Counsel by electronically uploading the same to Lexis Nexis File & Serve in accordance with Pretrial Order No. 12, and that the foregoing was electronically filed with the Clerk of Court of the United States District Court for the Eastern District of Louisiana by using the CM/ ECF System, which will send a notice of electronic filing in accordance with the procedures established in MDL 2179, on this 21st day of June, 2013.

s/ Stephen J. Herman and James Parkerson Roy