**IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF LOUISIANA**

| | | |
|---|---|---|
| In Re: Oil Spill by the Oil Rig *"Deepwater Horizon"* in the Gulf of Mexico, on April 20, 2010 | * | MDL NO. 2179 |
| | * | SECTION: J |
| | * | HONORABLE CARL J. BARBIER |
| This Document Relates to: | * | MAGISTRATE JUDGE SHUSHAN |
| Nos. 12-970, 15-4143, 15-4146, and 15-4654 | * | |

---

### *DEEPWATER HORIZON* ECONOMIC AND PROPERTY DAMAGES SETTLEMENT AGREEMENT "OLD CLASS" STATEMENT TO THE HALLIBURTON AND TRANSOCEAN PUNITIVE DAMAGES AND ASSIGNED CLAIMS SETTLEMENT AGREEMENT ALLOCATION NEUTRAL

 /s/ Thomas L. Young
Thomas L. Young, FL Bar No. 231680
Law Office of Thomas L. Young, P.A.
209 South Howard Avenue
Tampa, Florida 33606
Phone: (813) 251-9706
Fax: (813) 364-1908
tyoung@tlylaw.com

*Counsel for Deepwater Horizon Economic and Property Damages Settlement Agreement "Old Class" – Scope of representation limited to this Allocation Proceeding.*

### CERTIFICATE OF SERVICE

I hereby certify that the above and foregoing *Deepwater Horizon* Economic and Property Damages Settlement Agreement "Old Class" Statement to the Allocation Neutral will be served on all Counsel by electronically uploading the same to File & ServeXpress in accordance with Pretrial Order No.12, and that the foregoing will be electronically filed with the Clerk of the Court of the United States District Court for the Eastern District of Louisiana by using the CM/ECF System, which will send a notice of electronic filing in accordance with the procedure established in MDL 2179, on this 13th day of November, 2015.

 /s/ Thomas L. Young

The *Deepwater Horizon* Economic and Property Damages Settlement Class (hereinafter Old Class) submits this memorandum to suggest the most efficient and fair way to divide the $1,239,750,000 fund established by the Punitive Damages and Assigned Claims Settlement Agreements (hereinafter New Settlement) with Transocean and Halliburton (hereinafter the Defendants).[1] Old Class has the right to a material portion of that New Settlement fund (and as explained below, perhaps all of that fund) because significant rights of BP were assigned to Old Class as a result of the *Deepwater Horizon* Economic and Property Damages Settlement Agreement (hereinafter Old Settlement).[2]  Those assignments give Old Class the right to enforce certain BP first-party losses (BP's own damages related to the repair, replacement, and/or redrilling of the well; all economic damages for loss of the well, such as lost profits and diminished value of the leasehold; losses associated with controlling the well and all clean-up costs; and BP's own punitive damages) as well as losses BP incurred to third parties as a result of the spill (such as payments made through the GCCF, the Court Supervised Settlement Program's claims process, and other settlements).[3] The value of BP's total losses likely exceeds $55 billion.[4] Recovering only a fraction of the value of the claims BP assigned to Old Class would result in Old Class recovering well in excess of $1.24 billion, and as a result, consuming the entire fund.

---

[1] Old Class acknowledges that the $1.24 billion settlement was not funded equally by Transocean and Halliburton. Discussion about the percentages of that contribution and impact of same on the division of the fund is not reasonable as it relates to the duties of the Allocation Neutral. Old Class reserves its right to address those issues in its Reply Brief if needed and argued by others.

[2] *Deepwater Horizon* Economic and Property Damages Settlement Agreement, Rec. Doc. 6430-1, approved on December 19, 2012, Rec. Docs. 8138, 8139.

[3] *See* Exhibit 21 of the *Deepwater Horizon* Economic and Property Damages Settlement Agreement, Rec. Doc. 6430-39 and Plaintiffs' [PSC] Opposition to Transocean's Motions for Partial Judgment on the Pleadings, Rec. Doc. 10186.

[4] *See* BP's 2015 Q3 Report showing an income statement charge since the incident exceeding $55 billion, http://www.bp.com/content/dam/bp/pdf/investors/bp-third-quarter-2015-results.pdf, Page 16, Paragraph 2(a). Notably, this $55 billion figure does not include amounts for obligations that BP considers are not possible to estimate, which include hundreds of thousands of still pending Court Supervised Settlement Program payments and thousands of other non-settled claims (moratoria, excluded claims, opt-outs, etc).

Of course, there are other claimants to this fund.[5] And because it is a fixed pie, one class's recovery necessarily diminishes the recovery of the other. It is up to the Allocation Neutral, therefore, to divine an appropriate division of the $1.24 billion between Old Class and New Class.

Old Class submits this proposed roadmap for that determination:

- If left standing, neither class recovers under the District Court's current rulings regarding release, indemnity, and punitive damages. The Allocation Neutral must therefore fashion a division with an assumption that some or all of those rulings would not survive appellate scrutiny;

- Old Class had numerous appellate routes to recovery against either or both Defendants, including under theories of breach of contract, gross negligence, willful and wanton disregard, recklessness, strict liability (unseaworthiness), and OPA contribution;

- New Class was limited to one path on appeal – a finding of liability for punitive damages against the Defendants, which requires that New Class show, at a minimum, gross negligence and that the requirements described in *Matter of P & E Boat Rentals, Inc.* are met;[6]

- The <u>only way</u> that *both* classes recover is a finding that the Defendants were at a minimum grossly negligent, negating at least the release that BP agreed to (benefiting Old Class) and opening the door *to the possibility* of punitive damages (benefiting

---

[5] The class created pursuant to New Settlement is referred to herein as New Class and consists of those Gulf Coast Area plaintiffs with standing under *Robins Dry Dock & Repair Co. v. Flint*, 275 U.S. 303 (1927).

[6] "…punitive damages are not recoverable against the owner of a vessel for the act of the master unless it can be shown that the owner authorized or ratified the acts of the master…" *Matter of P & E Boat Rentals, Inc.*, 872 F.2d 642, 651-52 (5th Cir. 1989).

*both* New Class *and* Old Class). With this preliminary assumption of gross

negligence made — indeed it must be made if *both* classes are eligible to recover —

consideration should be given to the value of each classes' claims *at that point*. With

just that single assumption made, Old Class has a ripe claim for one-third of BP's

assigned first-party losses,[7] yet New Class's claim for punitive damages, absent

compliance with *P&E Boat*, remains wanting;[8]

- If further analysis is done and additional assumptions are made — as they must be for

  New Class to recover anything (*See* fn. 8) — then the value of the assignment to Old

  Class grows exponentially, either through an award of punitive damages for BP's

  first-party losses, and/or more significantly, a contribution from the Defendants for

  BP's third-party losses.

- Finally, if New Class recovers, so must Old Class. The converse is not true; however,

  as Old Class has numerous paths to recovery in which New Class recovers nothing. In

  addition, Old Class's myriad of recovery opportunities, when considered in light of

  New Class's single avenue (which requires New Class to meet a two-part test),

  suggest that Old Class should receive the lion's share – if not all of – the $1.24 billion

  fund.

As shown in greater detail below, this proposed road map is reasonable, consistent with the facts,

and supported by controlling law.

---

[7] The District Court found that the Defendants were 33% at fault for the disaster.
[8] In order to recover punitive damages, New Class must show (*in addition to* gross negligence) that the Defendants "authorized or ratified the acts" of their employees.

## A. <u>THE DISTRICT COURT'S RULINGS CANNOT BE ENFORCED IN THIS UNIQUE CONTEXT</u>

A preliminary decision that the Allocation Neutral must make is the weight it gives to the District Court's previous legal rulings.[9] The sum of those rulings was that (1) BP agreed to indemnify (for third-party losses) and likewise release (for its own, first-party losses) the Defendants, and (2) that the Defendants, being merely negligent, were not subject to punitive damages. As such, if any funds are to be distributed under the New Settlement, the Allocation Neutral must assume that there would have been some appellate modification of the District Court's findings.

For instance, an appellate finding of gross negligence (a minimal condition precedent to any recovery for New Class) would, as a matter of law, invalidate at least the release as to BP's first-party losses (benefitting Old Class).[10] And certain breaches of contract and/or other alternate appellate determinations might likewise invalidate the release *and indemnity* (making contribution for third-party losses also available to Old Class).[11] Finally, the District Court found that the Defendants were collectively 33% at fault for the spill.[12]

The PSC, stepping into BP's shoes for purposes of the assignment, and prosecuting an independent appeal against the Defendants (had New Settlement not been confected), would argue that some or all of the District Court's findings were in error. In this unique exercise, the Allocation Neutral must recognize that if the District Court's findings were followed literally,

---

[9] Most notably the January 26, 2012 "Transocean Indemnity Order," (Rec. Doc. 5446, 841 F. Supp.2d 988), the January 31, 2012 "Halliburton Indemnity Order," (Rec. Doc. 5493, 2012 WL 273726) as well as the September 9, 2014 "Findings of Fact and Conclusions of Law - Phase One Trial," (Rec. Doc. 13381-1).

[10] *See* Order & Reasons, Rec. Doc. 5446 "… gross negligence will invalidate a **release** …" (Judge Barbier, emphasis original, citing *Houston Exploration Co. v. Halliburton Energy Servs., Inc.*, 269 F.3d 528, 531 (5th Cir. 2001)).

[11] *See* BP's Memorandum in Opposition to Transocean's Motion for Partial Summary Judgment and in Support of BP's Cross-Motion for Partial Summary Judgment Relating to Alleged Contractual Indemnities, Rec. Doc. 4826.

[12] *See* Findings of Fact and Conclusions of Law – Phase One Trial, Rec. Doc. 13381-1 at 136.

then neither Old Class nor New Class would recover anything – an unreasonable outcome in this settlement fund allocation context. The Allocation Neutral must therefore consider the likelihood of reversal on appeal of various legal findings and otherwise develop a sensible allocation and division between the classes.

As discussed above and further below, Old Class enjoyed several appellate possibilities for a meaningful recovery, where New Class only had one.

### B. NEW CLASS HAS *NO EXCLUSIVE* ROUTE TO RECOVERY

There are no sets of circumstances, findings, conclusions or appellate determinations which allow New Class to recover while excluding recovery for Old Class.[13] The *only way* in which New Class has any claim whatsoever to a recovery is if Old Class does as well.

New Class must hope for an appellate finding that the Defendants were, at a minimum, grossly negligent. In the event of a finding of gross negligence, it must then follow that, as further described below, Old Class also recovers. New Class thus has no exclusive rights to the Settlement Fund.

### C. OLD AND NEW CLASSES HAVE *ONE JOINT* ROUTE TO RECOVERY

There is only one way that Old Class *and* New Class *both* recover - a finding of gross negligence "on appeal."[14] Such gross negligence is detailed in the PSC's Proposed Findings and Conclusions, Rec. Doc. 10459, pages 75 – 114 and 170 – 180, and includes Transocean's failing to reasonably assess the suitability of the blowout preventer for the Macondo well, failing to upgrade and otherwise maintain the blowout preventer, making changes that made the blowout

---

[13] It is not within the scope of the Allocation Neutral's task to consider the assignability of BP's claims to Old Class. Old Class reserves its right to respond to any such argument in its Reply Brief.

[14] New Class needs an additional finding to recover punitive damages - satisfaction of the *P&E Boat* test requirement that the Defendants authorized or ratified the acts of their employees - or reversal of that Fifth Circuit precedent.

preventer less effective, and the other acts of gross negligence as articulated in great detail by the PSC.  Halliburton's gross negligence includes its refusal to utilize properly designed and tested cement, concealment of failed cement slurry tests, ignoring signs that the well was flowing but failing to warn the drill crew, and other acts of gross negligence. Once that finding of gross negligence is made, Old Class's claim to BP's assigned first-party damages is ripe and becomes immediately compensable as a matter of law.[15] As discussed below, the value of BP's first-party losses, applying the District Court's factual determination of comparative fault, consumes the entire $1.24 billion fund.

### 1.  BP's Own First-Party Losses Are Significant.

Even assuming New Class satisfies both prongs of the punitive damages test, the ratio of the value of Old Class's first-party assigned claims to New Class's punitive damages is decidedly and overwhelmingly in favor of awarding the vast majority - if not all of - the $1.24 billion to Old Class.

Exhibit 21 to Old Settlement details the first-party claims BP assigned to Old Class as part of the company's consideration for that settlement. Despite requests, BP has not made available to counsel for Old Class the company's internal valuation of such claims. As such, undersigned counsel engaged the services of a financial analyst to estimate the value using publicly available information from BP's quarterly and annual reports. There are likely additional first-party costs which are known only to BP. With that caveat, Old Class estimates that the value of BP's first-party claims assigned to Old Class, based on the District Court's comparative fault allocation of 33% to the Defendants, exceeds $6.76 billion.[16]

---

[15] Public policy invalidates any contractual agreement purporting to release a tortfeasor for gross negligence. *See* Order & Reasons, Rec. Doc. 5446. *See also Houston Exploration Co.* 269 F.3d at 531.

[16] This $6.76 billion is the product of the Defendants' 33% comparative fault and BP's total first-party assigned losses, estimated to exceed $20.5 billion, which includes the $14.3 billion BP spent on controlling the blowout and

**2. Any Further Revisions Made To The District Court's Findings Result In Old Class's Recovery Only Growing.**

If New Class is successful in showing that Defendants' corporate conduct merits punitive damages under *P&E Boats*, or reverses that precedent on appeal, then BP's first-party claim is further enhanced by a proportionate award of punitive damages to Old Class. Thus, if the Allocation Neutral finds that New Class may recover, then BP's first-party punitive claim could be worth $6.76 billion, resulting in a total Old Class first-party assigned claim value exceeding $13.5 billion.[17]

The Allocation Neutral has expressed concern that the doctrine of unclean hands may prohibit recovery of punitive damages by BP and Old Class. While the District Court assigned 67% of the fault for the disaster to BP, the company was nevertheless not subjected to punitive damages. The only parties against whom punitive damages are being levied are the Defendants (based on the assumptions being made herein). As such, between two actors, one whose behavior did not rise to a level that resulted in the imposition of exemplary damages (BP) and another whose behavior did (Defendants), the equitable doctrine of unclean hands should not inure to the benefit of the latter. Finally, punitive damages are not meant to compensate the victim, rather

---

effectuating the subsequent clean-up, and $6.2 billion for loss of the oil in the reservoir. The control and clean-up costs are estimated by referencing BP's 2014 Annual Report at Page 38 (http://www.bp.com/content/dam/bp/pdf/investors/bp-annual-report-and-form-20f-2014.pdf). The value of the oil lost and/or remaining in the well is the product of the price of Louisiana Light Sweet Crude in April 2010, $82.65 (http://www.eia.gov/dnav/pet/hist/LeafHandler.ashx?n=PET&s=F003075773&f=M) multiplied by 75 million barrels. This is a conservative estimate of reservoir size as Tony Hayward, BP CEO at the time, told the Houston Chronicle that the well contained between 50 and 100 million barrels of oil (http://www.chron.com/business/energy/article/New-tactic-might-seal-leaking-well-sooner-BP-CEO-1704283.php). Other estimates put the reservoir in excess of one billion barrels (http://www.washingtonsblog.com/2010/06/experts-bp-lowballing-size-of-leaking-oil-reservoir.html). As noted, counsel for Old Class has not been provided with BP's internal figures and thus must rely on a back-of-the-envelope calculation. As such, these figures likely underestimate BP's ultimate assigned first-party losses.

[17] A 1:1 punitive-to-comparative ratio as per *Exxon Ship. Co. v. Baker*, 554 U.S. 471, 512 (2008).

they are to serve as a punishment and deterrent to the tortfeasor (Defendants).[18] As such, the actions of the victim should have no bearing on the application of punitive damages.

### D. OLD CLASS HAS *NUMEROUS EXCLUSIVE* ROUTES TO RECOVERY

Worse for New Class, there are at least four other scenarios - *in addition to those described above* - in which Old Class recovers all of the fund and New Class recovers nothing. On appeal, BP, the PSC and/or Old Class may have been successful in showing that BP's indemnity clauses were, in fact, unenforceable, under theories of OPA statutory contribution, breach of contract, unseaworthiness (strict liability), and/or other public policy arguments. In addition to invalidating the release for its first-party damages as described above, any such finding would entitle Old Class to contribution for BP's payments made to third-parties, such as GCCF claimants, Court Supervised Settlement Program claimants, and other plaintiffs.

If any one of these several legal arguments were accepted on appeal, BP -- and the Old Class -- would be entitled to recover tens of billions of dollars from the Defendants.[20] As opposed to New Class with only one route to recovery, there are several sets of circumstances, findings, conclusions, appellate determinations, permutations and combinations which allow Old Class to recover *all* $1.24 billion while New Class recovers $0.

#### 1. Defendants' Breaches of Contract Released BP from Any Duty To Indemnify.

In its two "Indemnity Orders" the District Court recognized that "a breach of contract can, in some circumstances, invalidate an indemnity clause."[21] It is a bedrock principle of

---

[18] "Regardless of the alternative rationales over the years, the consensus today is that punitives are aimed not at compensation but principally at retribution and deterring harmful conduct." *Id.* at 492.

[20] Relying only on publicly available data, and without the benefit of BP's internal analysis, counsel for Old Class estimate the value of the third-party contribution claims assigned to Old Class exceeds $10.5 billion, which represents 33% of the amount BP has paid to various plaintiffs as per the company's 2015 Q3 Report, http://www.bp.com/content/dam/bp/pdf/investors/bp-third-quarter-2015-results.pdf, Page 20, "Litigation and claims cost" line item. This figure does not include substantial additional liabilities still being litigated.

[21] The District Court ruled that it could not make such a determination at that pre-trial stage, however. *See* Order & Reasons as to Transocean and BP's Cross-Motions for Partial Summary Judgment Regarding Indemnity, Rec. Doc.

contract law that, as a general matter, "if one party to a contract breaches, there is no obligation for the non-breaching party to continue performance."[23] Contracts for indemnity are interpreted using the same principles of law that apply to all contracts.[24] Thus, the Southern District of Texas applying maritime law to an indemnity contract has concluded that a breach of a material provision will release a party from its duty to indemnify.[25]

On appeal, BP, the PSC and/or Old Class may have been successful in showing that the Defendants breached their respective contracts and thus were not entitled to the protections provided under either the release or indemnity. This would exclusively benefit Old Class.

**2. Any Indemnity Obligation Was Discharged Because Defendants' Actions Materially Increased the Risks to BP.**

As the Fifth Circuit has explained, it is a "general rule of law that any act on the part of an indemnitee which materially increases the risk, or prejudices the rights, of the indemnitor, will discharge the indemnitor under the contract of indemnity."[26] For example, where an indemnitee bail bondsman failed to supervise a bailee to ensure his appearance, the Seventh Circuit held that the bondsman had "increased ... risk under [an] indemnity agreement" with the underwriter of the bond and thereby "extinguished" its obligation.[27]

The rule is grounded in policy considerations related to the moral hazard that would be created if indemnities were applied without regard to the way an indemnitee increased risks of

---

5446 at 24. But in the subsequent Phase One Findings, the District Court gave short shrift to any analysis of that claim and simply ruled that, "In light of the conclusions above, the court finds that Transocean and Halliburton contractual indemnity and releases are valid and enforceable against BP." *See* Findings of Fact and Conclusions of Law – Phase One Trial, Rec. Doc. 13381-1. Arguably the District Court's finding ignored the laundry list of contractual errors that both Defendants committed.

[23] *U.S. for use of Wallace v. Flintco Inc.*, 143 F.3d 955, 968 (5th Cir. 1998).

[24] *See, e.g.*, *Corbitt v. Diamond M. Drilling Co.*, 654 F.2d 329 at 332-33 (5th Cir. 1981).

[25] *See Jackson v. Lloyd Brasileirs Patrimonio Nacional*, 324 F. Supp. 556, 562 n.9 (S.D. Tex. 1970).

[26] *Hiern v. St. Paul-Mercury Indem. Co.*, 262 F.2d 526, 529 (5th Cir. 1959); *see also Hudson v. Forest Oil Corp.*, 2003 WL21276385, at *4 (E.D. La. June 2, 2003) (Barbier, J.) (maritime law).

[27] *Rochelle Bail Agency, Inc. v. Md. Nat'l Ins. Co.*, 484 F.2d 877, 879 (7th Cir. 1973).

loss. Concern for such moral hazard is particularly acute here given that maritime law seeks to deter conduct that may result in injuries to seamen.[28]

Phase One & Two trial findings demonstrate that the Defendants greatly increased the risk of a blowout by numerous acts, including not properly monitoring the well, failing adequately to train their employees, providing a vessel with poorly maintained equipment, and using inadequate cementing techniques. BP, the PSC and/or Old Class would have made such arguments on appeal. If successful, both the release and indemnity protections would be voided. This would exclusively benefit Old Class.

### 3. The Release and Indemnity Provisions are Voided Due to the Unseaworthy Condition of the Vessel.

Under the terms of the Drilling Contract, BP did not release Transocean with respect to damages caused by the unseaworthiness of the vessel.[29]  In particular, Article 24.2 of the Drilling Contract provides as follows:

> COMPANY SHALL ASSUME FULL RESPONSIBILITY FOR AND SHALL PROTECT, RELEASE, DEFEND, INDEMNIFY, AND HOLD CONTRACTOR HARMLESS FROM AND AGAINST ANY LOSS, DAMAGE, EXPENSE, CLAIM, FINE, PENALTY, DEMAND, OR LIABILITY FOR POLLUTION OR CONTAMINATION, INCLUDING CONTROL AND REMOVAL THEREOF, ARISING OUT OF OR CONNECTED WITH OPERATIONS UNDER THIS CONTRACT HEREUNDER AND NOT ASSUMED BY CONTRACTOR IN ARTICLE 24.1 ABOVE, **WITHOUT REGARD FOR** NEGLIGENCE OF ANY PARTY OR PARTIES AND SPECIFICALLY WITHOUT REGARD FOR WHETHER THE POLLUTION OR CONTAMINATION IS CAUSED IN WHOLE OR IN PART BY THE **NEGLIGENCE OR FAULT** OF CONTRACTOR. (emphasis added)

Unseaworthiness is a strict liability claim which attaches liability irrespective of negligence or fault.[30] This longstanding tenet of maritime law certainly was known by the parties

---

[28] *See, e.g.*, *Italia Societa per Azioni di Navigazione v. Oregon Stevedoring Co.*, 376 U.S. 315, 324 (1964).

[29] While the strict liability theory of unseaworthiness applies to Transocean, for the purposes of this allocation exercise, New Settlement comingles the settlement benefits provided by both Transocean and Halliburton.

[30] *Miles v. Apex Marine Corp.*, 498 U.S. 19, 25 (1990) ("The revolution in the law began with *Mahnich v. Southern S.S. Co.*, 321 U.S. 96 (1944), in which this Court transformed the warranty of seaworthiness into a strict liability obligation" and the ship owner "became liable for failure to supply a safe ship irrespective of fault...").

at the time the Drilling Contract was executed in 1998. Thus, by its very terms, Article 24.2 cannot apply to the unseaworthiness of the Deepwater Horizon because unseaworthiness involves neither negligence nor fault.

The District Court, it is respectfully submitted, erred as a matter of law when it held to the contrary. The release and indemnity provisions, as defined in the next section, Article 25.1 of the Drilling Contract, do not expand the scope of BP's responsibility in Article 24.2, as Article 25.1 expressly carves out an exception where "any such obligation is specifically limited to certain causes elsewhere in this contract."

Because BP's obligation for damages is specifically limited elsewhere in the contract to "negligence or fault," there is no release or indemnity for strict liability causes such as unseaworthiness. As such, Old Class collects on *both* BP's first-party and third-party losses. New Class is not benefitted in any fashion, as strict liability does not lead to punitive damages.

### 4. <u>Contribution Under the Oil Pollution Act</u>

Finally, BP argued that OPA provided a statutory right of contribution from the Defendants, pursuant to 33 U.S.C. Section 2709. That section of OPA provides that a person may bring a civil action for contribution against any other person who is liable or potentially liable. BP made the argument that a "full release" requirement would impermissibly rewrite the statute in language that Congress did not include.[31] BP also argued that the allocation of liability under maritime law is based on different principles than OPA. BP argued that under OPA, each liable party does not pay its own share of liability directly to plaintiffs, as under maritime law, but instead the responsible party pays costs of removal and damages and then is able to seek contribution under Section 2709. BP argued that:

---

[31] *See* BP's Combined Opposition to Defendants' Motion for Partial Summary Judgment, Rec. Doc. 10203, Page 8.

Given OPA's structure, there is no reason to assume that when a responsible party pays damages to claimants it is paying only its own share. Just the opposite: as required by OPA, the responsible party is paying both its own share of liability (if any) as well as that of codefendants or third parties. Limitations on contribution from a body of law based on radically different premises should not be imposed on OPA, particularly in the absence of any statutory language indicating that Congress intended such limitation. Instead, consistent with OPA's purpose and fundamental fairness, responsible parties should be able to recover contribution in accord with OPA's plain language.[32]

Unquestionably, the PSC would share this argument on appeal, as it did with the District Court, "[Defendants are] also responsible, under OPA's scheme, for contribution with respect to the compensatory damages paid to plaintiffs. *See* USC Section 2709 and 2715 (a)."[33]

## CONCLUSION

Old Class should receive all or the vast majority of the $1.24 billion fund created by the New Settlement. Old Class can recover BP's first-party losses, along with punitive damages, (and in certain circumstances contribution for third-party losses) under numerous theories, most of which result in New Class receiving nothing.[34] New Class can only recover in one way – through the imposition of punitive damages which requires satisfying a two-prong test – a scenario which also results in Old Class recovering substantially more than New Class. In no circumstance can New Class recover exclusive of Old Class.

---

[32] Id. at 11.
[33] *See* Plaintiffs' Opposition to Transocean's Motions for Partial Judgment on the Pleadings, Rec. Doc. 10186, Page 11; Plaintiffs' Opposition to Halliburton's Motions for Partial Judgment on the Pleadings, Rec. Doc. 10187, Page 10.
[34] Old Class's theoretical appellate recovery from Defendants exceeds $24 billion. *See* fn 16, 17, 20.