UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF LOUISIANA

| | |
|---|---|
| In re: Oil Spill by the Oil Rig "Deepwater Horizon" in the Gulf of Mexico, on April 20, 2010 | MDL 2179<br><br>SECTION "J" |
| This Document Relates to:<br>Nos. 12-970, 15-4143, 15-4146 & 15-4654 | JUDGE BARBIER<br>MAG. SHUSHAN |

**PLAQUEMINES PARISH SUBMISSION REGARDING THE
ALLOCATION OF HESI AND TRANSOCEAN SETTLEMENT PROCEEDS**

Plaquemines Parish, a putative "New Class" claimant in the class settlements of HESI and Transocean, together with the Plaquemines Parish Port, Harbor and Terminal District, The Cameron Parish Police Jury and The Town of Grand Isle, Louisiana, and on behalf of the similarly aligned parties described in **Exhibit A**, and in answer to the inquiry before Magistrate Judge Wilkinson, sitting as an Allocation Neutral, offers the following analysis of the division of settlement funds in the respective HESI and Transocean settlements.[1]

I.      **Summary of Analysis.**

Upon review of the underlying the respective settlements, this analysis weighs the legal and factual bases of the relative merits of each set of claims without regard to the numerosity of the classes. The overwhelming potential liability exposure facing HESI and Transocean at the time of their respective settlements was to the punitive damages claims under general maritime law asserted by the "New Class" as opposed to BP's assigned "first party" claims (the "Old Class").

---

[1] Rec. Doc. 15322-1 and Rec. Doc. 14644-1, respectively.

1

While a finding of gross negligence[2] may have arguably subjected HESI and Transocean to direct "first party" claims by BP (the "assigned claims") due to the argument that all underlying release or exculpatory provisions within the drilling contracts would have been nullified, BP was equally, if not more so, engaged in conduct which caused the losses encompassed by BP's assigned claims. As set forth herein, BP's own unclean hands eviscerate any equitable or contractual claim BP may have had to assign to the "Old Class."[3]

Moreover, sophisticated parties such as HESI and Transocean were undoubtedly aware of the implausible success of BP's assigned "first party" claims at the time of their respective settlements, even in the face of the possibility of being found grossly negligent. Therefore, the overwhelming majority – if not all – of settlement funds should be allocated to the "New Class."

## II.     Overview of BP's Assigned Claims to the "Old Class."

BP's assigned claims are as follows:[4]

1.  BP's claims for its own compensatory damages suffered by BP, including claims for BP's own direct "first-party" damages against HESI and Transocean, such as loss of the Macondo well, loss of production, lost profits, the costs of drilling the relief wells, clean-up and response costs incurred; and

---

[2]For the purposes of this memorandum, the standard needed to impose punitive damages will be deemed "gross negligence." The undersigned is aware of the "willful" or "wanton" or "reckless" language used by the courts. See generally *Exxon Shipping Co. v. Baker*, 554 U.S. 471, 493 (2008); *Atlantic Sounding Co. v. Townsend*, 557 U.S. 404, 409 (2009) ("wanton, willful or outrageous conduct"); *CEH Inc. v. F/V Seafarer*, 70 F.3d 694, 699 (1st Cir. 1995) ("intentional or wanton or reckless conduct"); *Operaciones Tecnicas Marinas SAS v. Diversified Marine Services*, No. 12-1979, 2012 WL 6632509 at *6 (E.D. La. Dec. 19, 2012) ("gross, willful, and wanton negligence"); see also **Exhibit B**, PSC Post-Trial Brief, pp. 10-13. However, the undersigned does not think the difference demands a distinction. See specifically **Exhibit B**, p. 11, fn. 30.

[3]This is evidenced in part by its failure to conduct a proper negative pressure test which likely would have prevented this disaster. See Section **III(A)(2)**, below.

[4]**Exhibit C**, Rec. Doc. No. 6430-39, Exhibit 21 to PSC-BP Amended Settlement Agreement, pp. 5-7; **Exhibit D**, Rec. Doc. 10186, pp. 5-6; **Exhibit E**, Rec. Doc. 10187, pp. 4-5.

    2.    BP's claims for punitive damages against HESI and Transocean.

Despite BP's attempt to assign claims for contribution or indemnification for third party claims, as far back as January 2012 the Court found that it was required to indemnify Transocean and HESI for compensatory damages asserted by third parties related to pollution that did not originate on or above the surface of the water based on substantially similar indemnity provisions in the parties' respective contracts.[5] The Court, in ruling on the extent of that drilling contract, went so far as to state that even actions of <u>gross negligence</u> by HESI and Transocean would not set aside the indemnity protections offered under the contract as to third party claims.[6] Thus, any purported assignment of BP's claims for contribution or indemnification for third party claims is moot.

For the reasons that follow, and based on the law, facts, and circumstances facing HESI and Transocean at the time of the respective settlements, both classes of BP's assigned claims possessed little to no value due to BP's complicit actions in bringing about those damages.

**III.**    **BP's Assigned Claims as to "First Party" Damages Should Be Afforded Little to No Value.**

    **A.**    **The Overwhelming Majority If Not All of HESI's $1,028,000,000.00 Settlement Funds Reflect HESI's Concerns over "New Class" Punitive Damages Liability.**

The law, facts, circumstances, and even HESI's own public filings show that HESI's impetus for settling on the eve of the Phase One ruling was to "hedge its bet" against a punitive

---

[5]Transocean accepted responsibility for claims related to pollution or contamination originating on or above the surface of the land or water. For example, Transocean indemnified BP for claims related to above the water pollution (i.e. diesel tank falls off burning rig into the ocean).

[6]*In re Oil Spill by the Oil Rig Deepwater Horizon in the Gulf of Mexico, on Apr. 20, 2010*, 841 F. Supp. 2d 988, 1003,1009 (E.D. La. Jan. 26, 2012); *In re Oil Spill by Oil Rig DEEPWATER HORIZON in Gulf of Mexico, on Apr. 20, 2010*, No. 10-2771, 2012 WL 273726, at *2 (E.D. La. Jan. 31, 2012).

damages finding by the Court in favor of those claimants with *Robins Dry Dock* standing (i.e. the "New Class"), as opposed to any concerns over liability for BP's assigned claims (in favor of the "Old Class").[7]

### 1. HESI and Transocean Were Aware BP's Claims for "First Party" Damages Were Contingent upon a Finding of Gross Negligence Against Them.

Prior to the Phase One ruling, the parties were aware that only upon a finding of gross negligence on behalf of HESI or Transocean could the assigned claims even come into play. As pointed out by the PSC, BP's contracts with HESI and Transocean contain substantially identical release or exculpatory provisions which provide that no first party claims exist in favor of BP in the absence of gross negligence of HESI or Transocean.[8] An examination of HESI's 10-K Filing with the Security and Exchange Commission as of December 31, 2013 indicates HESI perceived only a finding of "fraud" on its part would abrogate its indemnity.[9]

Unquestionably, HESI was concerned about its punitive damages exposure and a finding of gross negligence when it settled on the eve of the Court's Phase One ruling. The evidence, as argued by the PSC, posited the accumulation of bad acts by HESI culminating in the destruction of the cement samples and computer simulations, which rose to the level of conduct subject to punitive

---

[7] The settlement of HESI occurred some 2 days prior to the Court's findings on the Phase One trial that determined the relative liabilities and punitive damages exposure of BP, Transocean and HESI. The finding of the Court that HESI was 3% at fault without punitive damage liability (i.e. lack of gross negligence) has no bearing on HESI's state of mind when it entered into settlement and should not control the appointed Neutral's findings as to the disposition of HESI settlement funds.

[8] **Exhibit D**, pp. 11-12; **Exhibit E**, pp. 10-11; see also *In re Oil Spill by the Oil Rig Deepwater Horizon in the Gulf of Mexico, on Apr. 20, 2010*, 841 F. Supp. 2d 988, 1000 (E.D. La. Jan. 26, 2012).

[9] **Exhibit F**, HESI's 10-K filing to the SEC dated December 31, 2013, pp. 5-6, which is found at http://www.sec.gov/Archives/edgar/data/45012/000004501214000069/hal-12312013x10k.htm

damages.[10] A finding of gross negligence could have exposed HESI to liability for punitive damages for *Robins Dry Dock* claimants (as well as commercial fishermen) and some potentially for BP's "first party" claims.[11] However, while HESI was undoubtedly concerned about a finding of gross negligence as it pertained to punitive damages liability for *Robins Dry Dock* claimants (i.e. the "New Class"), HESI's fear of liability for BP's assigned "first party" claims is not so certain.

### 2. Prior to Settlement, HESI Was Aware That the Doctrine of "Unclean Hands" Would Foreclose BP's Assigned "First Party" Claims.

BP's assigned "first party" claims arise under the General Maritime Law and thus sound in equity. In filing the "assigned claims" against HESI and Transocean, BP clearly invoked admiralty/maritime jurisdiction and pled that its claims against Transocean and HESI arise under general maritime law.[12] [13] BP then, as part of a settlement with one class of plaintiffs (which, incidentally, excluded other classes represented under the umbrella of the MDL) represented by the Plaintiffs' Steering Committee, assigned these claims – including those for lost profits, lost hydrocarbons, and repair to the MC-252 Well – to the "Old Class."[14] The equitable considerations inherent under the general maritime law with a court sitting in admiralty compel a legal and common-sense conclusion that HESI knew that BP could not receive compensation stemming

---

[10]**Exhibit B**, PSC Post-Trial Brief, pp. 14-18, 57-59.

[11]See **Exhibit B**, p. 10-13.

[12] See **Exhibit G**, BP Parties' Counter-Complaint, Cross-Complaint and Third Party Complaint Against Transocean and Claim in Limitation, p. 4, ¶ 13; **Exhibit H**, BP's Cross-Complaint and Third-Party Complaint Against Halliburton, p. 4, ¶ 10.

[13]In HESI's settlement agreement, BP's assigned claims were even referred to as the "assigned general maritime law claims alleged against HESI." **Exhibit I**, HESI Punitive Damages and Assigned Claims Settlement Agreement, Rec. Doc. 13346-1, p. 2, ¶ B.

[14]**Exhibit C**

5

from a claim that BP's own wrongdoing first created. A sophisticated party such as HESI was certainly aware that BP's assigned "first party" claims against HESI would likely be precluded under the doctrine of unclean hands.

Prior to the Phase One decision, HESI was aware of ample evidence of BP's unclean hands. First, BP acknowledged its status and accepted its designation as a "responsible party" under OPA less than two weeks after disaster struck.[15] Further, the record was replete with multiple instances of BP's grossly negligent conduct.[16]

In fact, in its post-trial brief HESI even argued that BP's failed negative pressure test and BP's failure to properly configure, maintain, and operate the BOP each constituted a "superseding, intervening cause" of the disaster.[17]

Where the parties to this case do not ground their claims in contractual agreements or statutory law, they allege general maritime law claims sounding in this Court's admiralty jurisdiction and thus subject to its equitable discretion. A party who has "dirtied its hands" in the acquisition of a right accordingly loses that right in a maritime court. "A court of admiralty is, as to all matters falling within its jurisdiction, a court of equity," adjudicating general maritime law disputes with a conscience unconstrained by formality.[18] While admiralty courts may dispense equitable and

---

[15] See **Exhibit J**, BP's May 3, 2010 Letter to U.S. Coast Guard.

[16] **Exhibit K**, PSC's Proposed Findings, Rec. Doc. 10459, pp. 129-130, et seq.

[17] See **Exhibit L**, HESI's Post-Trial Brief, Rec. Doc. 10469, p. 8-15 (p. 13 "Here, as in *Lone Star*, the failure of both BP and Transocean to properly interpret the negative pressure tests operate as a superseding, intervening cause, breaking the causal link between any actions taken by HESI and the Incident."; p. 14 "Finally, BP's and Transocean's failures to properly configure, maintain, and operate the BOP were unforeseeable actions that constitute a third superseding, intervening cause.")

[18] *Pizani v. M/V Cotton Blossom*, 669 F.2d 1084, 1089 (5th Cir. 1982)(*quoting Cates v. U.S.*, 451 F.2d 411, 414 (5th Cir. 1971)); *Compania Anonima v. A.J. Perez Export Co.*, 303 F.2d 692, 699 (5th Cir.

punitive damages, they must also remain amenable to equitable doctrines.[19] Specifically, courts of equity are afforded wide discretion in "closing their doors" to the claims of a litigant with unclean hands.[20]

The MDL 2179 Court has already exercised its inherent equitable power by citing public policy to bar Transocean's and HESI's invocation of contractual indemnity against punitive damages stemming from their own putatively egregious conduct.[21] Counsel for both HESI and Transocean undoubtedly knew that this reasoning applied with equal force to BP's assigned general maritime law claims.[22]

BP's actions cited above and referenced in Transocean, HESI and the PSC's post-trial briefs clearly evince a pattern of behavior, activity, and actions which demonstrate unclean hands. As

---

1962)("The Chancellor is no longer fixed to the woolsack. He may stride the quarter-deck of maritime jurisprudence and, in the role of admiralty judge, dispense, as would his landlocked brother, **that which equity and good conscience impels**."), *cert. denied*, 371 U.S. 942 (1962) (Emphasis added).

[19]"[H]e who comes into equity must come with clean hands…is a self-imposed ordinance that closes the doors of a court of equity to one tainted with inequitableness or bad faith relative to the matter in which he seeks relief…" *Precision Instrument Mfg. Co. v. Automotive Maintenance Machinery Co.*, 324 U.S. 806, 815 (1945).

[20]*Precision Instrument*, 324 U.S. at 815; *Princess Cruises v. U.S.*, 397 F.3d 1358, 1369 (D.C. Cir. 2005) (acknowledging admiralty courts' unfettered discretion to "close its doors" to one with unclean hands).

[21]*In re Oil Spill by the Oil Rig Deepwater Horizon in the Gulf of Mexico, on Apr. 20, 2010*, 841 F. Supp. 2d 988, 1003(E.D. La. Jan. 26, 2012)(citing *Daughdrill v. Ocean Drilling and Exploration Co.*, 665 F.Supp. 477, 481-82 (E.D.La. 1987)("To require a party, without recompense, to shoulder the burden of egregious conduct by another and hence permit that other to avoid punitive damage liability would make a mockery of the very concept.")); *In re Oil Spill by Oil Rig DEEPWATER HORIZON in Gulf of Mexico, on Apr. 20, 2010*, No. 10-2771, 2012 WL 273726, at *2 (E.D. La. Jan. 31, 2012).

[22]Further, the MDL Court has clearly employed the notions of "equity and good conscience" in other facets of this litigation. See *In re Oil Spill by the Oil Rig Deepwater Horizon in the Gulf of Mexico, on Apr. 20, 2010*, 2015 WL 5822828 (E.D. La. Oct. 6, 2015); *Thonn* Order, Rec. Doc. 12794; *Burrle* Order, Rec. Doc. 14747.

such, BP's unclean hands would render any such assigned "first party" claims against HESI worthless. Thus, when it settled on the eve of the Phase One ruling, a sophisticated party such as HESI was undoubtedly aware that the impending finding of gross negligence on behalf of BP would render any of BP's assigned "first party" claims worthless based on BP's unclean hands.

For those reasons, HESI was fully aware at the time it entered into settlement that BP's assigned "first party" claims did not present any plausible impending liability.

### B. Transocean Knew Definitively that BP Had Unclean Hands at the Time of its Settlement.

Transocean, unlike HESI, had the hindsight of the Court's Phase One findings. Significantly, at the time Transocean decided to enter into settlement, as it pertains to BP's assigned "first party" claims, Transocean was armed with the Court's finding that BP was grossly negligent and that Transocean was not. BP was adjudged to have caused the conditions which form the basis of the claims which it later assigned to the PSC. Its conduct, under principles of the general maritime law, foreclosed any possibility that Transocean would be liable to BP for any damages it suffered in the Macondo disaster.[23]

Transocean's settlement occurred moments before the PSC was to appeal the MDL Court's finding that Transocean was not liable for punitive damages. It also faced the threat of similar punitive damages from the appeals of the States of Louisiana, Alabama, Mississippi, and Texas. We admit that in order to even breathe life into a claim for punitive damages against Transocean, the PSC would have had to argue to the Fifth Circuit that the findings of a Judge sitting in judgment in a Limitation of Liability case – a Judge who had presided over a multi-month trial and

---

[23] Section **III(A)(2)**, *supra*.

sifted through hundreds of thousands of pages of exhibits and depositions– were clearly erroneous.[24] Accomplishing that task, the PSC would have had to then reconcile the legal standards of the Fifth and Eleventh Circuits for punitive conduct. While this legal task was a possibility, it was much more likely – if not a certainty – that BP's status as a actor with unclean hands would persist and foreclose the possibility of recovery of BP's assigned "first party" claims.

Putative Claimants suggest to the Neutral that Transocean at this point was buying peace in this extensive litigation and that the possibility of punitive exposure, while remote and reflected in Transocean's settlement, was the only viable claim to which Transocean was exposed.

### IV.  BP's Assigned Claims as to BP's Punitive Damages Should Be Afforded Little to No Value.

Although the Court found that public policy barred HESI and Transocean's invocation of contractual indemnity from BP against punitive damages stemming from HESI and Transocean's gross negligence, the above analysis regarding BP's unclean hands applies with equal force as to BP's assigned "first party" claims for punitive damages against HESI and Transocean.[25] Therefore, based on the analysis above, those claims possessed little to no value at the time of the settlements.

---

[24] *Matter of P & E Boat Rentals, Inc.*, 872 F.2d 642, 646 (5th Cir. 1989) (citing *Marathon Pipe Line Co. v. M/V Sea Level II*, 806 F.2d 585, 589 (5th Cir. 1986)).

[25] *In re Oil Spill by the Oil Rig Deepwater Horizon in the Gulf of Mexico, on April 20, 2010*, 841 F.Supp.2d 988, 1003 (E.D.La. 2012)(citing *Daughdrill v. Ocean Drilling and Exploration Co.*, 665 F.Supp. 477, 481-82 (E.D.La. 1987)("To require a party, without recompense, to shoulder the burden of egregious conduct by another and hence permit that other to avoid punitive damage liability would make a mockery of the very concept.")).

V.  **Estimate of the "New Class" Members Previously Excluded From the "Old Class."**[26]

New Class Putative Claimants are unaware of any database which would differentiate opt-outs and excluded claimants by *Robins Dry Dock* impact.[27]  There were some 400 local governmental entities who settled with BP, many of whom were coastal entities having impact claims.  Additionally, Plaquemines Parish and the towns of Grand Isle and Lafitte, Louisiana and some 10 others did not settle their claims but represent thousands of heavily oiled coastal properties.  However, as set forth in our argument below, consideration of the actual numbers of claimants in either class is not dispositive of the allocation between the New and Old Classes.  Instead, we believe that the allocation should focus more on the legal plausibility of the two underlying claims, GML punitive damages ("New Class") and BP's assigned claims ("Old Class").

VI.  **Reliance upon *ex Parte* and *in Camera* Inspection of Exhibits to Defendants' Allocation Briefs Would Violate Due Process.**

Finally, the procedures employed by the parties to the class action settlements are indeed unique as they seek to appoint a Neutral to separate over $1.2 billion and do so partially by reference to sealed evidence.  Unlike a typical class settlement where putative class members may object to the settlement itself, there has been no preliminary or final fairness hearing in this matter and therefore no opportunity for putative claimants to voice objections to any allocation methodology of the over $1.2 billion.

The right to a full and fair hearing as guaranteed by the Due Process Clause encompasses

---

[26] The Neutral requested an estimate of the number of qualifying "New Class" members who were excluded from the "Old Class" such as local governments, oil and gas interests, and "Old Class" opt-outs, etc. See **Exhibit M**, October 13, 2015 Letter from Magistrate Judge Wilkinson.

[27] BP's receipt of OPA presentments may be the best source to answer the Neutral's inquiry.

a party's right to "be aware of and refute the evidence against the merits of his case."[28] Thus, it is firmly established law that a party generally may not ask the court to dispose of the merits of a civil case based on *ex parte, in camera* submissions.[29] Exceptions to the general rule against *ex parte, in camera* inspections are "few and tightly contained."[30]

We clearly understand the Magistrate Judge was appointed as "Allocation Neutral," making his role akin to that of the "special master" contemplated by Federal Rule 53.[31] While acknowledging that the settlement agreement and the order appointing "Allocation Neutral" permit *ex parte* communications between the parties and the Neutral, a review of case law in which special masters were appointed reveals that *ex parte* communications between parties and a special master are generally limited to exclude *ex parte* communications for disposition of substantive matters.[32] As such, we contend that the use of *ex parte, in camera* "work product" submissions for a determination on the merits is not only unprecedented, but would also

---

[28] *Application of Eisenberg*, 654 F.2d 1107, 1112 (5th Cir. 1981).

[29] *Id.* (citing *Kinoy v. Mitchell*, 67 F.R.D. 1, 15 (S.D.N.Y. 1975) ("Our system of justice does not encompass *ex parte* determinations on the merits of cases in civil litigation."). *See also Abourzek v. Reagan*, 785 F.2d 1043, 1060-61 (D.C. Cir. 1986), *aff'd*. 484 U.S. 1 (1987) ("a court may not dispose of the merits of a case on the basis of *ex parte, in camera* submissions").

[30] The courts have recognized three instances in which *in camera* inspection is allowed: (i) a party asserts an evidentiary privilege, (ii) there are compelling national security concerns, (iii) a statutory directive for *ex parte* proceedings exists. *Abourzek*, 785 F.2d at 1061.

[31] Rec. Doc. 15398. See also Rec. Doc. 13346-1, p. 18 (referring to an "Allocation Special Master" appointed by the court).

[32] *See e.g.* In re *Toyota Motor Corp. Unintended Acceleration Marketing, Sales Practices, Products Liability Litigation*, 2010 WL 3260180, *4 (C.D. Cal. 2010) (prohibiting *ex parte* communications on substantive matters unless the parties consented in writing, but allowing *ex parte* communications on administrative matters); *In re FEMA Trailer Formaldehyde Products Liability Litigation*, 2011 WL 5038849, *4 (E.D. La. 2011) (allowing *ex parte* communications, but not to address merits of substantive issues); *In re Oral Sodium Phosphate Solution-Based Products Liability Action*, 2009 WL 2601395 *3 (N.D. Ohio 2009); E.E.O.C. v. U.S. Steel Corp., 2012 WL 1150799 *2 (W.D. Penn. 2012).

11

jeopardize our rights to refute the substance of allocation evidence offered by BP, HESI, and Transocean.

VII. **Consideration of HESI and Transocean Arguments as to the Allocation of Funds May Represent a Conflict of Interest as the Allocation May Affect Their Corporate Tax Liabilities.**

The IRS has taken the position that damage payments classified as punitive to government entities are not tax deductible.[33] The allocation of monies to certain members of the "New Class" would thereby create an unfavorable tax position for HESI and Transocean. This potential conflict of interest may preclude the participation of HESI and Transocean in the allocation process.

VIII. **Conclusion**

The pall of BP's unclean if not dirtied hands extends to every element of the underlying case. This fact is iterated throughout the depositions, documents and testimony and confirmed in the Phase One ruling by the MDL Court. The tarred first party assigned claims should be accorded little to no value by the Allocation Neutral. The "New Class" should be assigned all but the nuisance value of the assigned claims.

                **Respectfully submitted:**

                **MARTZELL & BICKFORD, A.P.C.**

---

[33] See 26 C.F.R. 1.162-21; *see also Fresnius v. Medical Care Holdings, Inc.*, 763 f.3d 64 (1st Cir. 2014), which arose when the IRS took the position that all damages beyond single (and qui tam) are punitive and thus non-deductible. The case explored the dichotomy between compensatory damages and punitive damages. The court ruled that there are additional damages beyond compensatory which are not necessary punitive, but that the line is sometimes hazy (and affirmed the lower court ruling). That line is precisely what the court is determining here. Thus, due to the large number of government entities claiming punitive damages, TO and HESI have every incentive to allocate as much as possible to BP's assigned claims.

/s/ Scott R. Bickford
**SCOTT R. BICKFORD (T.A. #1165)**
**LAWRENCE J. CENTOLA III (# 27402)**
**JASON Z. LANDRY (#33932)**
usdcedla@mbfirm.com
338 Lafayette Street
New Orleans, LA 70130
(504) 581-9065
(504) 581-7635 Fax
**Counsel for Plaquemines Parish, Louisiana, Plaquemines Port, Harbor and Terminal District and Co-Counsel for the Town of Grand Isle, Louisiana, Co-Counsel for Cameron Parish Police Jury, Louisiana,**

**KING, KREBS & JURGENS, P.L.L.C.**
HENRY A. KING (#7393)
MICHAEL L. VINCENZO (#23965)
201 St. Charles Ave, 45th Floor
New Orleans, LA 70170
(504) 582-3800
(504) 582-1233
E-mail: Hking@kingkrebs.com
**Counsel for Plaquemines Parish, Louisiana, and Plaquemines Port, Harbor and Terminal District**

**The Law Office of David L. Landry**
DAVID L. LANDRY (#7978)
1214 Parasol Place
Pensacola, Florida 32507
(850) 492-7240
E-mail: 2landry@cox.net
**Counsel for Plaquemines Parish, Louisiana, and Plaquemines Port, Harbor and Terminal District**

## CERTIFICATE OF SERVICE

I hereby certify that the above and foregoing Plaquemines Parish Submission Regarding the Allocation of HESI and Transocean Settlement Proceeds will be served on All Counsel by electronically uploading the same to Lexis Nexis File & Serve in accordance with Pretrial Order No. 12, and that the foregoing was electronically filed with the Clerk of Court of the United States District Court for the Eastern District of Louisiana by using the CM/ECF System, which will send a notice of electronic filing in accordance with the procedures established in MDL 2179, on this 13th day of November, 2015.

/s/ *Scott R. Bickford*
SCOTT R. BICKFORD