UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF LOUISIANA

| | |
|---|---|
| In re: Oil Spill by the Oil Rig "DEEPWATER HORIZON" in the Gulf of Mexico, on April 20, 2010<br><br>These Pleadings apply to: *All Cases*<br><br>(Including Nos. 10-2771 and 10-4536) | MDL No. 2179<br><br>SECTION: J<br><br>JUDGE BARBIER<br><br>MAGISTRATE SUSHAN |

<u>POST-TRIAL BRIEF</u>

**Submitted by the Plaintiff Steering Committee
On Behalf of Plaintiffs and Claimants-in-Limitation
For the Phase One Limitation and Liability Trial**

Plaintiffs and Claimants-in-Limitation, through Plaintiffs' Co-Liaison Counsel, the Plaintiffs' Steering Committee, and the PSC Phase One Trial Team, respectfully submit the following Post-Trial Brief, in accordance with the Court's Order of April 24, 2013 [Doc 9536], to address specific legal and factual issues raised by the Court and otherwise by the parties based on the evidence admitted during the Phase One Limitation and Liability Trial: [1]

**MAY IT PLEASE THE COURT:**

---

[1] Consistent with the Court's Order, the Plaintiffs Steering Committee will also be submitting a PROPOSED FINDINGS AND CONCLUSIONS jointly with the State of Alabama and the State of Louisiana. Plaintiffs respectfully incorporate such PROPOSED FINDINGS in further support of the legal and factual issues addressed in this Post-Trial Brief.


EXHIBIT B

## 2. What is the standard for a finding of punitive damages under general maritime law? Is this a different standard than under the CWA or OPA, and if so, how?

Courts have found punitive damages warranted under general maritime law when the defendant's conduct arises from a "willful" or "wanton" or "reckless" indifference to the rights of others. *See generally,* Exxon Shipping Co. v. Baker, 554 U.S. 471, 493 (2008);[27] Atlantic Sounding Co. v. Townsend, 557 U.S. 404, 409 (2009) ("wanton, willful or outrageous conduct"); CEH Inc v. F/V Seafarer, 70 F.3d 694, 699 (1st Cir. 1995) ("intentional or wanton and reckless conduct"); Operaciones Tecnicas Marinas SAS v. Diversified Marine Services, No.12-1979, 2012 WL 6632509 at *6 (E.D.La. Dec. 19, 2012) ("gross, willful, and wanton negligence").[28]

While a number of different descriptions and definitions have been used to define these terms in various different ways, virtually all of the decisions embrace the concept that where the defendant proceeds in the face of a known risk, with conscious disregard for the safety or

---

[27] *See also,* Exxon Shipping Co. v. Baker, 554 U.S. 471, 482-484 (2008) (leaving undisturbed the jury instruction that a corporation "is responsible for the *reckless* acts of … employees … in a managerial capacity while acting in the scope of their employment") (emphasis supplied); *id.,* at 493-494 ("Under the umbrellas of punishment and its aim of deterrence, degrees of relative blameworthiness are apparent. Reckless conduct is not intentional or malicious, nor is it necessarily callous toward the risk of harming others…. Action taken or omitted in order to augment profit represents an enhanced degree of punishable culpability, as of course does willful and malicious action, taken with a purpose to injure"); *id.,* at 510-511 (tortious action "worse than negligent but less than malicious" … "a case of reckless action, profitless to the tortfeasor").

[28] Prior to the *Exxon v. Baker* decision, the Fifth Circuit referred to "willful and wanton" conduct. *See* P&E Boat Rentals, supra, 872 F.2d at 650; The Complaint of Merry Shipping, 650 F.2d 622, 626 (5th Cir. 1981). However, courts within the Circuit had recognized that: "'Willful' and 'wanton' are roughly synonymous, at least in legal effect, with each other and with 'reckless'." In the Matter of Cameron Boat Rentals, 683 F.Supp. 577, 585 (W.D.La. 1988); *citing,* Prosser & Keeton, THE LAW OF TORTS §34, at 212 (1984); *see also,* Cameron Boat Rentals, 683 F.Supp. at 585 n.11 (the use of the conjunctive "willful *and* wanton" did not imply two different states of mind, both of which were required); *citing,* FIFTH CIRCUIT PATTERN JURY INSTRUCTIONS (CIVIL CASES), Damages Instructions, Part 8 (1980) ("malice, willfulness or callous and reckless indifference to the rights of others"); *see also,* FIFTH CIRCUIT PATTERN JURY INSTRUCTIONS: Civil §4.10 (2006) ("A person acts willfully or wantonly if he acts in a reckless or callous disregard of, or with indifference to, the rights of the plaintiff").

property of others, the standards of "recklessness" or "willful and wanton" misconduct justifying a punitive damage award will have been satisfied. [29, 30]

---

[29] *See, e.g.,* Exxon Shipping, *supra*, 554 U.S. at 493-494 (punitive damages warranted where "the actor knows, or has reason to know … of the facts which create a high degree of risk of … harm to another, and deliberately proceeds to act, or to fail to act, in conscious disregard of, or indifference to, that risk"); Houston Exploration v. Halliburton, 269 F.3d 528, 532 (5th Cir. 2001) (a release will be void on public policy grounds where a party commits "an act of unreasonable character in reckless disregard of the risk known to him"); Clements v. Steele, 792 F.2d 515, 516-517 (5th Cir. 1986) (referring to conduct resulting from a "conscious indifference" to the rights or welfare of others as sufficient for the imposition of punitive damages); CEH Inc v. F/V Seafarer, 70 F.3d 694, 699 (1st Cir. 1995) (stating that conduct amounting to a "conscious disregard" of the rights of others warranted a punitive damage award); In re Merry Shipping, Inc., 650 F.2d 622, 625 (5th Cir. 1981) (finding that the defendant had acted willfully and with "gross disregard" for the plaintiff's rights); Operaciones Tecnicas Marinas SAS v. Diversified Marine Services, No.12-1979, 2012 WL 6632509 at *4 (E.D.La. Dec. 19, 2012) (indicating that conduct caused by the "reckless disregard" for the safety of others would be sufficient for the imposition of punitive damages); Lobegeiger v. Celebrity Cruises, Inc., No.11-21620, 2011 WL 3703329 at *7 (S.D.Fla. Aug. 23, 2011) (stating that punitive damages are warranted when an extreme departure from reasonable care is coupled with a "conscious awareness" of the risk of harm); Cape Flattery Ltd v. Titan Marine, 607 F.Supp.2d 1179, 1189 (D.Haw. 2009) (stating that the intentional failure to perform a manifest duty "in reckless disregard of the consequences" is sufficient for the imposition of punitives), *aff'd*, 647 F.3d 914 (9th Cir. 2011); Kahumoku v. Titan Maritime, LLC, 486 F.Supp.2d 1144 (D.Haw. 2007) (stating that punitive damages were allowed under the general maritime law for "conduct which manifests reckless … disregard for the rights of others"); Geftman v. Boat Owners Ass'n, No.02-1461-18, 2003 WL 23333312 at *4 (D.S.C. Dec. 2, 2003) (describing the general maritime standard as requiring "conscious disregard"); Submersible Systems Inc v. Perforadora Central, No.98-251, 1999 WL 33456914 at *15 (S.D.Miss. July 19,1999) (referring to conduct amounting to a "conscious disregard" of the rights of others), *vacated, on other grounds,* 249 F.3d 413 (5th Cir. 2001); Wilcox v. Kerr-McKee, 706 F.Supp. 1258, 1264 (E.D. La. 1989) ("Punitive damages are recoverable under the general maritime law where there is willful and wanton misconduct, reflecting a reckless disregard for the safety of the crew"); In the Matter of Cameron Boat Rentals, 683 F.Supp. 577, 585 (W.D.La. 1988) (stating that punitive damages are warranted where acts or omissions are taken with "reckless indifference" to the knowledge that such act or omission will likely cause harm) (*citing* FIFTH CIRCUIT PATTERN JURY INSTRUCTIONS (CIVIL CASES), Damages Instructions, Part 8 (1980) ("reckless indifference to the rights of others")). *See also,* RESTATEMENT (THIRD) OF TORTS: LIABILITY FOR PHYSICAL AND EMOTIONAL HARM §2, comment b ("the standard for awarding punitive damages commonly refers to the defendant's reckless conduct—or reckless indifference to risk, or reckless disregard for risk"); FIFTH CIRCUIT PATTERN JURY INSTRUCTIONS: Civil §4.10 (2006) ("A person acts willfully or wantonly if he acts in a reckless or callous disregard of, or with indifference to, the rights of the plaintiff").

[30] Although some courts have applied a lesser standard to the term "gross negligence", it seems clear that where the defendant, or one of its employees, proceeds in the face of a known risk with conscious disregard for the safety or property of others, a finding of "gross negligence" will also be justified. Hence, as noted above, where the Court finds willful or reckless disregard, it will simultaneously answer not only the question of **(i)** whether a general predicate has been established for the potential imposition of punitive damages, but also **(ii)** whether compensatory damages are limited under the OPA cap, and **(iii)** whether the contractual releases entered between and among the defendants prior to the incident are void as a matter of public policy.

Plaintiffs respectfully note, and reserve the right to argue, that one or more less stringent standards may apply. Specifically, for example:

a. An extreme departure from the standard of care;[31]

b. Knowledge of, or reason to know, the facts, but failure to appreciate the high degree of risk involved, (although a reasonable man in the same position would do so);[32]

c. Acts or omissions motivated by profit.[33]

At the same time, to the extent that the defendants' conduct can be considered intentional or malicious, the caselaw uniformly recognizes that the standard has been satisfied.

Yet the central concept seems to be one of conscious disregard.[34]

With respect to the Clean Water Act and OPA, there is likely more support for the notion that "gross negligence" can be satisfied by merely an extreme departure from the standard of care.[35] Moreover, enhanced penalties under the Clean Water Act and invalidation of the OPA

---

[31] *See, e.g.,* Energy XXI v. New Tech Engineering, 845 F.Supp.2d 770, 778 (S.D.Tex. 2012); Water Quality Ins. Syndicate (re Tug Victoria Rose Hunt) v. United States, 632 F.Supp.2d 108 (D.Mass. 2009); Kuroshima Shipping S.A. Act of God Defense & Limit of Liability Analysis, 2003 AMC 1681, 1701 (NPFC June 23, 2003). *See also,* Exxon v. Baker, 554 U.S. at 512 (referring to "the least blameworthy conduct triggering punitive liability, from malice and avarice, down to recklessness, and even gross negligence in some jurisdictions") (implying a level of "gross negligence" that is simply higher than ordinary negligence, but does not reach the level of willful or reckless, much less intentional, conduct); *see also, e.g.,* In re Merry Shipping, Inc., 650 F.2d 622, 624 (5th Cir. 1981) (*quoting,* In Re Marine Sulphur Queen, 460 F.2d 89, 105 (2d Cir. 1972)).

[32] Exxon v. Baker, 554 U.S. at 494; RESTATEMENT (THIRD) OF TORTS: LIABILITY FOR PHYSICAL AND EMOTIONAL HARM §2, comment c; *see also,* FIFTH CIRCUIT PATTERN JURY INSTRUCTIONS: Civil §4.10 (2006) ("An actor is indifferent to the rights of another, regardless of the actor's state of mind, when he proceeds in disregard of a high and excessive danger that is known to him or was apparent to a reasonable person in his position"); Houston Exploration v. Halliburton, 269 F.3d 528, 532 (5th Cir. 2001) (a release will be void on public policy grounds where a party commits "an act of unreasonable character in reckless disregard of the risk … so obvious that he must be taken to have been aware of it"); Clements v. Steele, 792 F.2d 515, 516 (5th Cir. 1986) (*quoting,* Williams v. Steves Industries, 699 S.W.2d 570 (Tex. 1985)) ("a plaintiff may objectively prove a defendant's gross negligence by proving that under the surrounding circumstances a reasonable person would have realized that his conduct created an extreme degree of risk to the safety of others").

[33] Exxon v. Baker, 554 U.S. at 494; *see also,* 554 U.S. at 510 (the most egregious conduct includes "dangerous activity carried on for the purpose of increasing a tortfeasor's financial gain"); *id.,* 544 U.S. at 512 (referring to "avarice" as a trigger for punitive damages).

[34] *See* Footnote 29, *supra.*

[35] *See, e.g.,* Kuroshima Shipping S.A. Act of God Defense & Limit of Liability Analysis, 2003 AMC 1681, 1701 (NPFC June 23, 2003).

cap are applicable to the gross negligence or willful misconduct of any agent or employee,[36] whereas a party seeking to impose punitive damages on a corporate employer under the general maritime law arguably has to establish that the willful or reckless decisions either emanated from corporate policy or were otherwise known to, directed by, or ratified by corporate officials with policymaking authority.

### 3. In order to find that a party acted with gross negligence [or willful misconduct or wanton or reckless disregard], is it necessary to find that there be at least one single act or omission that equates to gross negligence [etc], or can such a finding be based upon an accumulation or a series of negligent acts or omissions?

It seems clear from the caselaw that an accumulation or series of negligent acts or omissions can and should be viewed together in order to determine whether the defendant has acted out of gross negligence, willful misconduct, or a wanton or reckless disregard. *See, e.g.,* Clements v. Steele, 792 F.2d 515, 517 (5th Cir. 1986) (recognizing that gross negligence may be established where the defendant's acts of ordinary negligence demonstrated that the defendant was consciously indifferent); Kuykendall v.Young Life, 261 F.App'x 480, 489 (4th Cir. 2008) (multiple acts of simple negligence can amount to gross negligence where the cumulative effect of the negligent acts demonstrates an utter disregard of prudence amounting to an indifference to others' health and safety); Water Quality Ins. Syndicate (re Barge Morris J. Berman) v. United States, 522 F.Supp.2d 220, 228-230 (D.D.C. 2007) (it was wrong "to focus on any one occurrence, event or cause as the proximate cause of the spill. It should have looked at the 'series of occurrences' or events that together constitute the 'incident' that led to the spill.... The court in *OCEAN PRINCE* made clear that its conclusion that there was willful misconduct was based on no single proximate cause, but on an 'accumulation of acts,' 'a chain of circumstances

---

[36] *See* 33 U.S.C. §2704(c)(1) (referring to the gross negligence, willful misconduct, or violation of a regulation by "the responsible party, an *agent* or *employee* of the responsible party, or a person acting pursuant to a contractual relationship with the responsible party") (emphasis supplied).

which [were] a contributing cause even though not the immediate or proximate cause of the casualty'") (*citing,* OCEAN PRINCE, supra, 584 F.2d at 1158); Adams v. Phillips, No.01-3803, 2002 WL 31886737 at *4, 2002 U.S. Dist. LEXIS 24888 at **9-10 (E.D.La. Dec. 19, 2002) (defendant's "pattern of brazen misconduct" and the "entirety of his actions" were grounds for imposing punitive damages); MARTIN, *The BP Spill and the Meaning of "Gross Negligence and Willful Misconduct"* 71 La.L.Rev. 957, 997-998 (Spring 2011) ("The existence of gross negligence need not rest upon a single act or omission, but may result from a combination of negligent acts or omissions, and many circumstances and elements may be considered in determining whether an act constitutes gross negligence").[37]

### 4. Can an act or omission that is not itself causal of the accident nevertheless be considered in determining whether a party engaged in conduct constituting gross negligence [etc]?

As outlined above, the egregiousness of a defendant's conduct generally turns on the defendant's state of mind. In many cases, there will be acts, omissions, statements and other evidence that are either directly or circumstantially probative of the defendant's state of mind at the time of the injury-producing conduct, even where such acts or omissions do not cause damage in and of themselves.

As observed by the Fifth Circuit in *Clements*:

> The "mental attitude of the defendant" is what turns ordinary negligence into gross negligence.... [T]he defendant's state of mind may be inferred from actions and circumstances. Proof by direct evidence is not always required.

---

[37] *See also,* Ferguson v. Ferguson, 181 S.E.2d 648, 652 (Va. 1971) ("the cumulative effect of several acts of negligence may constitute gross negligence... not because of the acts of simple negligence, but because the cumulative acts, when taken together and considered under the facts and the circumstances of the case...constitute gross negligence"); Aetna Causualty & Surety Co. v. Marshall, 699 S.W.2d 896, 903 (Tex. App. 1985) ("A defendant's single action may be no more than ordinary negligence; however, when considered along with other negligent acts, it may become an element of what collectively constitutes gross negligence"); *see also, e.g.,* Burk Royalty Co. v. Walls, 616 S.W.2d 911, 922 (Tex. 1981); Apache Corp. v. Moore, 891 S.W.2d 671, 682-83 (Tex. App. 1994); Granite Const. Co. v. Mendoza, 816 S.W.2d 756, 763-64 (Tex. App. 1991); International Armament Corp. v. King, 674 S.W.2d 413, 416-17 (Tex. App. 1984).

Page | 14

Clements v. Steele, supra, 792 F.2d at 516; *citing,* Burk Royalty Company v. Walls, 616 S.W.2d 911, 922 (Tex. 1981).[38] Indeed, the string of cases cited above for the proposition that the entire accumulation or series of negligent acts or omissions can and should be viewed together in order to determine whether the defendant's conduct rises to the level of "gross" or "wanton" or "reckless" or "willful" conduct supports the notion that not each and every such act or omission must have independently resulted in some direct physical harm or damage – as the ultimate inquiry turns, not on damages, but on whether the defendant was acting with a conscious disregard of the risks of harm or indifference to the safety or property of others.[39]

In this particular case, there is substantial evidence of post-incident "wanton" and "willful" (if not intentional) misconduct on Halliburton's part.[40] Presumably, Halliburton will argue that this evidence should not be considered by the Court, as it had no direct causal impact on the events giving rise to the damages in question. Nevertheless, it is clear that evidence of Halliburton's post-incident disregard for the rights of others is probative, relevant, admissible, and indeed compelling evidence that Halliburton had a reckless and indifferent attitude prior to the incident – in failing to property design, test and formulate the cement slurry; to develop a formal Basis of Design or apply a formal Management of Change; to disclose significant pre-job test results; to adequately staff and equip the testing lab; to place the Flow-Out Sensors where fluids could be monitored even when diverted; and to monitor the well during the displacement

---

[38] *See also,* Clements v. Steele, 792 F.2d at 516; *quoting,* Williams v. Steves Industries, 699 S.W.2d 570 (Tex. 1985) ("a plaintiff may objectively prove a defendant's gross negligence by proving that under the surrounding circumstances a reasonable person would have realized that his conduct created an extreme degree of risk to the safety of others").

[39] *See, e.g.,* Clements v. Steele, supra, 792 F.2d at 517 (recognizing that gross negligence may be established where the defendant's acts of ordinary negligence demonstrated that the defendant was consciously indifferent); Kuykendall, supra, 261 F.App'x at 489 (multiple acts of simple negligence can amount to gross negligence where the cumulative effect of the negligent acts demonstrates an utter disregard of prudence amounting to an indifference to others' health and safety).

[40] *See* Pages 57-59, *infra* (discussing Halliburton's post-incident non-responsiveness, evasiveness, and spoliation).

procedure – which all did cause and contribute to the blowout, the fire, and the spill of April 20, 2010.[41]

Several decisions, in this regard, support the proposition that Halliburton's post-incident conduct (although not directly causal) is relevant. *See, e.g.,* Bergeson v. Dilworth, 959 F.2d 245 (table), 1992 WL 64887 at *3 (10th Cir. 1992) ("subsequent conduct is admissible on the issue of punitive damages when it is probative of the defendant's state of mind at the time of the event giving rise to liability");[42] Eaves v. Penn, 587 F.2d 453, 464 (10th Cir. 1978) (evidence of defendant's subsequent conduct admissible under Rule 404(b) to show defendant's intent at the time of the alleged breach of fiduciary duty); Wolfe v. McNeil-PPC Inc, 773 F.Supp.2d 561, 575-576 (E.D.Pa. 2011) (post-incident concealment of information from the FDA relevant to the question of defendant's state of mind relative to the imposition of punitive damages); Jimenez v. Chrysler Corp., 74 F.Supp.2d 548 (D.S.C. 1999) (post-incident conduct was admissible on the issue of punitive damages where it demonstrated the manufacturer's initial motive and intent for marketing the defective product), *rev'd, in part,* 269 F.3d 439 (4th Cir. 2001); Hilliard v. A.H. Robins Co., 148 Cal.App.3d 374, 398-401 (1983) (concluding that evidence of post-injury conduct should have been admitted into evidence because it tended to prove that the defendant acted willfully); Coale v. Dow Chem. Co., 701 P.2d 885, 890 (Colo.App.1985) (explaining that evidence of post-injury conduct was admissible for purposes of showing that the defendant acted wantonly in connection with a claim of punitive damages); Palmer v. A.H. Robins Co., 684 P.2d 187, 204 (Colo.1984) (observing that post-injury conduct is relevant for purposes of determining punitive damages); Hoppe v. G.D. Searle & Co., 779 F.Supp. 1413, 1424–1425 (S.D.N.Y. 1991)

---

[41] Plaintiffs, of course, believe that Halliburton's *pre-incident* willful and reckless disregard is sufficient to warrant the imposition of punitive damages, irrespective of the company's post-incident conduct, as further set forth in the PROPOSED FINDINGS and further herein.

[42] *See also,* Bergeson, 1992 WL 64887 at *3 ("subsequent conduct is admissible on the issue of punitive damages when it is probative of the defendant's state of mind at the time of the event giving rise to liability").

(admitting evidence of post-injury conduct in connection with the removal of an intrauterine contraceptive device because such evidence was relevant to pre-injury evidence supporting an award of punitive damages). In each of these cases, the post-incident conduct was found to be relevant and admissible, going to the defendant's state of mind, even though the acts or omissions could not have lead to the damages suffered by plaintiffs, in and of themselves.

Moreover, while the U.S. Supreme Court has been somewhat inconsistent in its pronouncements of the extent to which the issues of potential harm and actual harm to persons or entities not before the court should be considered in assessing the appropriate amount of punitive damages (under either a legal or a constitutional standard), there is certainly support for the proposition that the magnitude of the *risk* of harm (even where the actual harm turns out to be less) or the magnitude of the total harm (even where some of the damages were suffered by others) should be considered by the Court. *See, e.g.,* Exxon, supra, 554 U.S. at 515;[43] Philip Morris v. Williams, 549 U.S. 346, 355 (2007) ("counsel may argue in a particular case that conduct resulting in no harm to others nonetheless posed a grave risk to the public");[44] BMW v. Gore, 517 U.S. 559, 582 (1996) (discussing a formula "that compares actual *and potential* damages to the punitive award"); *see also,* Dan B. Dobbs, THE LAW OF TORTS §383, p.1071 (Hornbook ed. 2000) (courts should be allowed "to consider the full breadth of the *potential*

---

[43] In *Exxon v. Baker,* the Court adopting the district court's calculation of the total relevant compensatory damages, which included not only the plaintiff class' compensatory jury verdict, but a series of settlements made by both Exxon and third parties to individuals, groups, and entities both inside and outside of the class. Exxon v. Baker, 554 U.S. at 515; *affirming, in pertinent part,* In re Exxon Valdez, 236 F.Supp.2d 1043, 1058-1060 (D. Alaska 2002).

[44] In *Philip Morris v. Williams,* the question was whether a State could impose punitive damages for injuries caused to people beyond the State's borders. The Court explained that: "Respondent argues that she is free to show harm to other victims because it is relevant to a different part of the punitive damages constitutional equation, namely, reprehensibility. That is to say, harm to others shows more reprehensible conduct. Philip Morris, in turn, does not deny that a plaintiff may show harm to others in order to demonstrate reprehensibility. Nor do we. Evidence of actual harm to nonparties can help to show that the conduct that harmed the plaintiff also posed a substantial risk of harm to the general public, and so was particularly reprehensible – although counsel may argue in a particular case that conduct resulting in no harm to others nonetheless posed a grave risk to the public, or the converse." Philip Morris v. Williams, 549 U.S. at 355.

harm when considering [both] whether the [defendant] acted reprehensibly and also when considering the [appropriate] ratio of punitive damages to [compensatory] damages") (emphasis supplied).

Finally, (as addressed both above and further below), a company's liability for punitive damages can be established where the decision, conduct or policy in question is "ratified" by either a managerial agent or an official with policymaking authority.[45] The evidence to establish such ratification, although not causal to the injuries, is implicitly admissible and relevant to the defendant's state of mind, and liability therefore.

### 5. In order to find gross negligence [etc], is it sufficient if only employees on the rig are guilty of such conduct, or is it necessary to find that this level of conduct was attributable to shore-based or management-level employees?

Again, Plaintiffs note the distinction between "willful" or "reckless" conduct necessary for the imposition of punitive damages, versus the "gross negligence" or "willful" or "reckless" conduct necessary for the invalidation of the releases BP executed within the Transocean Drilling Contract and Halliburton Services Agreement, as a matter of public policy.

With respect to the imposition of punitive damages, Plaintiffs respectfully suggest, and reserve the right to argue, that a less exacting standard be adopted by the Courts.[46] Specifically, for example:

    a. The ordinary *respondeat superior* standard, with respect to any acts or omissions by an agent or employee within the course and

---

[45] *See* P&E Boat Rentals, 872 F.2d at 651-652; *quoting,* U.S. Steel v. Fuhrman, 407 F.2d 1143, 1148 (6th Cir. 1969) (must be shown that "the owner authorized or ratified the acts of the master *either* before *or after the accident*") (emphasis supplied), *cert. denied,* 398 U.S. 958 (1970); RESTATEMENT (SECOND) OF TORTS § 909(d) (1977) ("the principal or a managerial agent of the principal ratified or approved the act").

[46] As noted, the Supreme Court, in *Exxon v. Baker,* recognized the state of uncertainty in the law regarding this issue; but, because the Court was equally divided, the Ninth Circuit's holding was left undisturbed, and the issue was left unresolved. 554 U.S. at 482-484.

**Did Halliburton intentionally conceal or destroy evidence after the event?**

It is undisputed that Halliburton conducted post-incident testing at its Duncan, Oklahoma lab without documenting the results.[267] It is undisputed that Halliburton conducted post-incident testing at its Broussard, Louisiana lab, but "off the side" and throwing the notes into the trash.[268] It is undisputed that Halliburton conducted post-incident 3-D modeling without documenting the results.[269] It is undisputed that John Gisclair destroyed the notes he made in re-creating logs that were lost in the fire.[270] Halliburton concedes that it made misrepresentations to Congress and the public about the pre-incident testing.[271] Halliburton concedes that it made misrepresentations to Congress and to the public regarding its experience with similar foam cement jobs.[272] Halliburton concedes that it made misrepresentations to Congress and to the public regarding the slurry's conformance to industry, BP and Halliburton Best Practices.[273] Halliburton concedes that it did not comply with the *subpoena* from the U.S. Department of Justice, failing to turn over left-over samples of cement and additives that were used on Macondo.[274] Halliburton concedes that – despite its representations to Congress,[275] and despite industry best practices and corporate policies regarding an investigation of root causes and lessons learned to prevent other incidents

---

[267] Roth Testimony, pp.3060, 3255-3257; Quirk Testimony, pp.4763-4764; Morgan Deposition, pp.22-23; D-4309A, D379.
[268] Roth Testimony. pp.3060, 3265; Quirk Testimony, pp.4766-4767, 4769-4770; Faul Deposition, p.705; D-4309A, D379.
[269] Roth Testimony, pp.3066, 3255-3257, 3279-3280.
[270] Gisclair Deposition, p.171.
[271] Roth Testimony, pp.3249-3251, 3260-3262, 3266-3267; TREX-982; TREX-48098; D379, D-4309A.
[272] Probert Testimony, pp.3025-3026, 3236-3238, 3043; TREX-2013; TREX-75074; TREX-7491A.
[273] Roth Testimony, p.3263; Benge Testimony, pp.2483-2486; TREX-982.
[274] Quirk Testimony, pp.4796-4806, 4826-4841, 4926-4927, 4965-4966; TREX-48002 pp.1-2; TREX-5595; TREX-3110; D-3257. BP also had difficulty obtaining information and samples from Halliburton after the blowout. Bly Testimony, pp. 917, 924-929; D-4269A; Benge Testimony, pp.2514-2515; TREX-48195; TREX-47541; TREX-47549. *See also,* Probert Testimony, pp.2956, 3029-3030; TREX-4477, p.B-36.
[275] *See* TREX-2016 pdf pp.51, 66-67 (Hearing before Committee on Energy and National Resources, May 11, 2010, pp.47, 62-63) ("we will of course share any information" gained from Halliburton's own investigation "and hopefully use it as a basis for ensuring that the industry is safe and environmentally sound…into the future"); *see also,* Probert Testimony, pp.2939-2941, 3005; TREX-02017 (Probert Statement to Committee on Environment and Public Works, May 11, 2010) p.1; TREX-2019 (Subcommittee Inquiry into the DEEPWATER HORIZON Gulf Coast Oil Spill, May 12, 2010) p.60.

of this kind[276] – any such investigation was cloaked behind attorney-client privilege.[277] It is clear that Halliburton's key witness, Jesse Gagliano, invoked the Fifth Amendment and refused to testify until after every other Phase One fact witness had already testified and every Phase One expert had already issued his or her report.[278] And it is clear that critical custodial documents were not produced until after the custodian's deposition, despite the fact that such documents had been turned over to Halliburton's in-house legal department months before.[279] Halliburton apparently wants the Court to believe that this was just a series of unconnected, disconnected, immaterial misunderstandings and innocent mistakes. Halliburton also disputes the notion that the company conducted post-incident testing on the actual cement and/or additives that were actually used on Macondo. But the evidence at trial demonstrates that Halliburton did in fact test Macondo materials, and the reasonable conclusion to be drawn from the totality of the circumstances is that Halliburton concealed or destroyed evidence intentionally after the explosion.[280]

While there was admittedly some confusion among Probert, Roth, Quirk and Gagliano regarding the precise source of the materials that were tested by Quirk and Rickey Morgan after the explosion, what emerges is the fact that Halliburton periodically takes actual samples of cement blend, additives and water from the rig, brings them back to the lab, and keeps them in the lab, so that they can best tested.

Halliburton, according to practice, identifies the actual materials used on the rig with a Sample ID Number, as well as the manufacturer's Lot Number. The sample will also generally

---

[276] Probert Testimony, pp.2951-2954; TREX-5277 p.2.
[277] Probert Testimony, pp.3007 ln.14-15, 3029.
[278] *See, e.g.,* Benge Testimony, p.2334.
[279] Roth Testimony, pp.3252, 3280-3281.
[280] *See generally,* D-4379.

be identified by the date it was collected from the vessel. By looking at the lab Weigh-Up Sheets associated with a particular test, one can confirm the specific materials that were tested.[281]

In this particular case, the Weigh-Up Sheets that were presented to Probert, Roth, and ultimately Quirk, (as well as Gagliano), establish that SCR-100L was taken from the rig on or around October 22, 2009, and identified with Sample ID No. 54573, as well as Lot No. 6264. Quirk, who claimed to be "confused" on the stand, effectively admitted that he tested these actual samples from the Macondo mixture, ultimately conceding that "there is a missing piece to this puzzle."[282]

With respect to the issue of intent, the conclusion that Halliburton's conduct was willful is primarily inferential, but there is a mountain of circumstantial evidence in this regard. Moreover, there is (at least) one significant piece of direct evidence: An e-mail from Halliburton's CFO on April 27, 2010 indicated that "we should not comment on what caused the accident; but, instead, need to say that Transocean and BP are conducting the investigation into what happened and we don't know anything further."[283] Particularly when contrasted with the statements that Halliburton was making to Congress and to the public around the same time,[284] one must infer an intent to conceal the truth – which itself evidences a conscious disregard for public safety within Halliburton's culture that existed prior to (and, indeed, contributed to) the event itself.

---

[281] Roth Testimony, pp.3121-3128.

[282] Quirk Testimony, pp.4773-4782; TREX-4566; TREX-5593 pp.3, 5. *See also,* Roth Testimony, pp.3120-3124.

[283] Probert Testimony, pp.3022-3023; TREX-1897. Mr. Probert admitted, in this regard, that there was some information exclusively within the possession of Halliburton. Probert Testimony, p.3023.

[284] Probert Testimony, pp.2939-2941, 3005; TREX-2016 pdf pp.51, 66-67 (Hearing before Committee on Energy and National Resources, May 11, 2010, pp.47, 62-63); Probert Testimony, pp.2939-2941, 3005; TREX-02017 (Probert Statement to Committee on Environment and Public Works, May 11, 2010) p.1 ("Halliburton has and will continue to fully support, and cooperate with, the ongoing investigations into how and why this tragic event happened"); TREX-2019 (Subcommittee Inquiry into the DEEPWATER HORIZON Gulf Coast Oil Spill, May 12, 2010) p.60 ("We will continue to work with you and your staff to collect factual data that will enable an understanding of what took place and what we can collectively do to ensure that domestic oil and gas production is undertaken in the safest, most environmentally responsible manner possible").