10-K 1 hal-12312013x10k.htm DECEMBER 31, 2013 FORM 10-K

UNITED STATES SECURITIES AND EXCHANGE COMMISSION
Washington, D.C. 20549
FORM 10-K

(Mark One)

[X]  Annual Report Pursuant to Section 13 or 15(d) of the Securities Exchange Act of 1934
**For the fiscal year ended December 31, 2013**

OR

[ ]  Transition Report Pursuant to Section 13 or 15(d) of the Securities Exchange Act of 1934
For the transition period from _____ to _____

Commission File Number 001-03492

# HALLIBURTON COMPANY

(Exact name of registrant as specified in its charter)

| **Delaware** | **75-2677995** |
|---|---|
| (State or other jurisdiction of incorporation or organization) | (I.R.S. Employer Identification No.) |

**3000 North Sam Houston Parkway East**
**Houston, Texas  77032**
(Address of principal executive offices)
Telephone Number – Area code (281) 871-2699

Securities registered pursuant to Section 12(b) of the Act:

| **Title of each class** | **Name of each exchange on which registered** |
|---|---|
| Common Stock par value $2.50 per share | New York Stock Exchange |

Securities registered pursuant to Section 12(g) of the Act: None

Indicate by check mark if the registrant is a well-known seasoned issuer, as defined in Rule 405 of the Securities Act.
Yes  [X]  No  [ ]

Indicate by check mark if the registrant is not required to file reports pursuant to Section 13 or Section 15(d) of the Act.
Yes  [ ]  No  [X]

Indicate by check mark whether the registrant (1) has filed all reports required to be filed by Section 13 or 15(d) of the Securities Exchange Act of 1934 during the preceding 12 months (or for such shorter period that the registrant was required to file such reports), and (2) has been subject to such filing requirements for the past 90 days.
Yes  [X]  No  [ ]

Indicate by check mark whether the registrant has submitted electronically and posted on its corporate Web site, if any, every Interactive Data File required to be submitted and posted pursuant to Rule 405 of Regulation S-T (§ 232.405 of this chapter) during the preceding 12 months (or for such shorter period that the registrant was required to submit and post such files).
Yes  [X]  No  [ ]

Indicate by check mark if disclosure of delinquent filers pursuant to Item 405 of Regulation S-K (§229.405 of this chapter) is not contained herein, and will not be contained, to the best of registrant's knowledge, in definitive proxy or information statements incorporated by reference in Part III of this Form 10-K or any amendment to this Form 10-K. [X]

Indicate by check mark whether the registrant is a large accelerated filer, an accelerated filer, a non-accelerated filer, or a smaller reporting company. See the definitions of "large accelerated filer," "accelerated filer," and "smaller reporting company" in Rule 12b-2 of the Exchange Act.

Large accelerated filer  [X]   Accelerated filer  [ ]
Non-accelerated filer  [ ]   Smaller reporting company  [ ]

EXHIBIT F

**Item 1(a). Risk Factors.**

The statements in this section describe the known material risks to our business and should be considered carefully.

*We, among others, have been named as a defendant in numerous lawsuits and there have been numerous investigations relating to the Macondo well incident that could have a material adverse effect on our liquidity, consolidated results of operations, and consolidated financial condition.*

The semisubmersible drilling rig, Deepwater Horizon, sank on April 22, 2010 after an explosion and fire onboard the rig that began on April 20, 2010. The Deepwater Horizon was owned by Transocean Ltd. and had been drilling the Macondo exploration well in Mississippi Canyon Block 252 in the Gulf of Mexico for the lease operator, BP Exploration (BP Exploration), an indirect wholly owned subsidiary of BP p.l.c. (BP p.l.c., BP Exploration, and their affiliates, collectively, BP). There were eleven fatalities and a number of injuries as a result of the Macondo well incident. Crude oil escaping from the Macondo well site spread across thousands of square miles of the Gulf of Mexico and reached the United States Gulf Coast. We performed a variety of services for BP Exploration, including cementing, mud logging, directional drilling, measurement-while-drilling, and rig data acquisition services.

We are named along with other unaffiliated defendants in more than 1,800 complaints, most of which are alleged class-actions, involving pollution damage claims and at least eight personal injury lawsuits involving four decedents and at least 10 allegedly injured persons who were on the drilling rig at the time of the incident. At least six additional lawsuits naming us and others relate to alleged personal injuries sustained by those responding to the explosion and oil spill. Other defendants in the lawsuits have filed claims against us seeking subrogation, indemnification, including with respect to liabilities under the Oil Pollution Act of 1990 (OPA), contribution and direct damages, and alleging negligence, gross negligence, fraudulent conduct, willful misconduct, and fraudulent concealment. See Note 8 to the consolidated financial statements. Additional lawsuits may be filed against us, including civil actions under federal statutes and regulations, as well as criminal and civil actions under state statutes and regulations. Those statutes and regulations could result in criminal penalties, including fines and imprisonment, as well as civil fines, and the degree of the penalties and fines may depend on the type of conduct and level of culpability, including strict liability, negligence, gross negligence, and knowing violations of the statute or regulation.

In addition to the claims and lawsuits described above, several regulatory agencies and others have investigated or are investigating the cause of the explosion, fire, and resulting oil spill. Reports issued as a result of those investigations have been critical of BP, Transocean, and us, among others. For example, one or more of those reports have concluded that primary cement failure was a direct cause of the blowout, cement testing performed by an independent laboratory "strongly suggests" that the foam cement slurry used on the Macondo well was unstable, and that numerous other oversights and factors caused or contributed to the cause of the incident, including BP's failure to run a cement bond log, BP's and Transocean's failure to properly conduct and interpret a negative-pressure test, the failure of the drilling crew and our surface data logging specialist to recognize that an unplanned influx of oil, natural gas, or fluid into the well was occurring, communication failures among BP, Transocean, and us, and flawed decisions relating to the design, construction, and testing of barriers critical to the temporary abandonment of the well.

In October 2011, the Bureau of Safety and Environmental Enforcement (BSEE) issued a notification of Incidents of Noncompliance (INCs) to us for allegedly violating federal regulations relating to the failure to take measures to prevent the unauthorized release of hydrocarbons, the failure to take precautions to keep the Macondo well under control, the failure to cement the well in a manner that would, among other things, prevent the release of fluids into the Gulf of Mexico, and the failure to protect health, safety, property, and the environment as a result of a failure to perform operations in a safe and workmanlike manner. According to the BSEE's notice, we did not ensure an adequate barrier to hydrocarbon flow after cementing the production casing and did not detect the influx of hydrocarbons until they were above the blowout preventer stack. We understand that the regulations in effect at the time of the alleged violations provide for fines of up to $35,000 per day per violation. We have appealed the INCs to the Interior Board of Land Appeals (IBLA). In January 2012, the IBLA, in response to our and the BSEE's joint request, suspended the appeal pending certain proceedings in the multi-district litigation (MDL) trial. Once the MDL court issues a final decision in the trial, we expect to file a proposal for further action in the appeal. The BSEE has announced that the INCs will be reviewed for possible imposition of civil penalties once the appeal has ended. The BSEE has stated that this is the first time the Department of the Interior has issued INCs directly to a contractor that was not the well's operator.

Our contract with BP Exploration relating to the Macondo well generally provides for our indemnification by BP Exploration for certain potential claims and expenses relating to the Macondo well incident. BP Exploration, in connection with filing its claims with respect to the MDL proceeding, asked the court to declare that it is not liable to us in contribution, indemnification, or otherwise with respect to liabilities arising from the Macondo well incident. Other defendants in the litigation have generally denied any obligation to contribute to any liabilities arising from the Macondo well incident. In January 2012, the court in the MDL proceeding entered an order in response to our and BP's motions for summary judgment regarding certain indemnification matters. The court held that BP is required to indemnify us for third-party compensatory claims, or actual damages, that arise from pollution or contamination that did not originate from our property or equipment located above the surface of the land or water, even if we are found to be grossly negligent. The court also held that BP does not owe us indemnity for punitive damages or for civil penalties under the Clean Water Act (CWA), if any, and that fraud could void the indemnity on public policy grounds. The court in the MDL proceeding deferred ruling on whether our indemnification from BP covers penalties or fines under the Outer Continental Shelf Lands Act, whether our alleged breach of our contract with BP Exploration would invalidate the indemnity, and whether we committed an act that materially increased the risk to or prejudiced the rights of BP so as to invalidate the indemnity.

The rulings in the MDL proceeding regarding the indemnities are based on maritime law and may not bind the determination of similar issues in lawsuits not comprising a part of the MDL proceeding. Accordingly, it is possible that different conclusions with respect to indemnities will be reached by other courts.

Indemnification for criminal fines or penalties, if any, may not be available if a court were to find such indemnification unenforceable as against public policy. In addition, certain state laws, if deemed to apply, would not allow for enforcement of indemnification for gross negligence, and may not allow for enforcement of indemnification of persons who are found to be negligent with respect to personal injury claims. We may not be insured with respect to civil or criminal fines or penalties, if any, pursuant to the terms of our insurance policies.

BP's public filings indicate that BP has recognized in excess of $40 billion in pre-tax charges, excluding offsets for settlement payments received from certain defendants in the MDL, as a result of the Macondo well incident. BP's public filings also indicate that the amount of, among other things, certain natural resource damages with respect to certain OPA claims, some of which may be included in such charges, cannot be reliably estimated as of the dates of those filings.

We are currently unable to fully estimate the impact the Macondo well incident will have on us. We cannot predict the outcome of the many lawsuits and investigations relating to the Macondo well incident, including orders and rulings of the court that impact the MDL, the results of the MDL trial, the effect that the settlements between BP and the Plaintiffs' Steering Committee (PSC) in the MDL and other settlements may have on claims against us, or whether we might settle with one or more of the parties to any lawsuit or investigation. The first two phases of the MDL trial have concluded, and the MDL court could begin issuing rulings at any time. A determination that the performance of our services on the Deepwater Horizon constituted gross negligence could result in substantial liability to the numerous plaintiffs for punitive damages and potentially to BP with respect to its direct claims against us.

As of December 31, 2013, our loss contingency reserve for the Macondo well incident, relating to the MDL, remained at $1.3 billion, which represents a loss contingency that is probable and for which a reasonable estimate of loss can be made. We have participated in intermittent discussions with the PSC regarding the potential for a settlement that would resolve a substantial portion of the claims pending in the MDL trial. BP, however, has not participated in any recent settlement discussions with us.

Reaching a settlement involves a complex process, and there can be no assurance as to whether or when we may complete a settlement. In addition, the settlement discussions we have had to date do not cover all parties and claims relating to the Macondo well incident. Accordingly, there are additional loss contingencies relating to the Macondo well incident that are reasonably possible but for which we cannot make a reasonable estimate. Given the numerous potential developments relating to the MDL and other lawsuits and investigations, which could occur at any time, we may adjust our estimated loss contingency reserve in the future. Liabilities arising out of the Macondo well incident could have a material adverse effect on our liquidity, consolidated results of operations, and consolidated financial condition.