UNITED STATES DISTRICT OF COURT
FOR THE EASTERN DISTRICT OF LOUISIANA

| | | |
|---|---|---|
| IN RE: OIL SPILL by the OIL RIG "DEEPWATER HORIZON" in the GULF OF MEXICO, on APRIL 20, 2010 | § § § § § § | MDL No. 2179 SECTION: J JUDGE BARBIER MAG. JUDGE SHUSHAN |
| Applies to: No. 10-2771, and All Cases | § § § § | |

## BRIEF REGARDING POST-TRIAL MATTERS



Likewise, any alleged failure by Keith to alert the drill floor to an increase in drill pipe pressure did not proximately cause the blowout. The evidence is undisputed that the most Keith could do as a mudlogger was to report any anomaly he saw and interpreted as a kick.[14] But any such report from Keith on the night of April 20, 2010 would have changed nothing, because the evidence is also undisputed that the Transocean drill crew, who bore responsibility for well control, was aware of an anomaly in the well prior to the time that hydrocarbons reached the BOP.[15] Had the Transocean drill crew acted in accordance with Transocean's policies and procedures, they would have shut the well in, then investigated the anomaly, and "we wouldn't be here." Instead, they chose to shut down the pumps and investigate, leaving the wellbore open to flow. These fateful decisions break any alleged causal link between Keith's alleged failure to report an increase in standpipe pressure and the Incident.

> b. *The Failure to Properly Interpret the Negative Pressure Tests, the Failure to Maintain Well Control, and the Failure to Properly Configure, Maintain, and Operate the BOP are Superseding, Intervening Causes for the Incident.*

According to the Fifth Circuit, "[t]he superseding cause doctrine applies where the defendant's negligence in fact substantially contributed to the plaintiff's injury, but the injury was actually brought about by a later cause of independent origin that was not foreseeable. *Stolt Achievement, Ltd. v. Dredge B.E. Lindholm*, 447 F.3d 360, 367-68 (5th Cir. 2006). "It is predicated on the notion that 'there must be a terminus somewhere, short of eternity, at which the second party becomes responsible in lieu of the first.'" *Id.*

In *Exxon Co. v. Sofec, Inc.*, 517 U.S. 830, 832 (1996), the United States Supreme Court "affirm[ed] that the requirement of legal or 'proximate' causation, and the related 'superseding

---

[14] *See* HESI FOFs at §§ IV.A.11, XXI.A.2.
[15] *See* HESI FOFs at §§ IV.A.9, 12, 13, 15.

cause' doctrine, apply in admiralty notwithstanding our adoption of the comparative fault principle" in *United States v. Reliable Transfer Co.*, 421 U.S. 397 (1975) "for allocating damages among parties responsible for an injury." The Supreme Court noted that the superseding cause doctrine "operate[d] to cut off the liability of an admittedly negligent defendant," where "the injury was actually brought about by a later cause of independent origin that was not foreseeable." *Id.* at 837-38 (quoting 1 Thomas J. Shoenbaum, ADMIRALTY & MAR. LAW §5-3, at 165-66 (2d ed. 1994)). "The problem is 'one of whether the defendant is to be held liable for an injury to which he has in fact made a substantial contribution, when it is brought about by a later cause of independent origin, for which he is not responsible.'" *Nunley v. M/V Dauntless Colocotronis*, 727 F.2d 455, 464 (5th Cir. 1984) (en banc) (quoting William L. Prosser, THE LAW OF TORTS 270 (4th ed. 1971)); *see also Tidewater Marine, Inc. v. Sanco Int'l, Inc.*, 113 F. Supp. 2d 987, 998 (E.D. La. 2000) (quoting *Nunley*, 727 F.2d at 464).

"The intervening act supersedes the first actor's liability only if the court determines that the second act broke the causal connection between the first action and the result." Kelsey L. Joyce Hooke, *Collision at Sea: The Irreconcilability of the Superseding Cause and Pure Comparative Fault Doctrines in Admiralty*, 74 WASH. L. REV. 159, 170 (Jan. 1999) (citations omitted). Section 442 of the RESTATEMENT (SECOND) OF TORTS sets forth the factors to be examined to determine whether an intervening force supersedes prior negligence, and thus satisfies the superseding cause doctrine:

> (a) the fact that its intervention brings about harm different in kind from that which would otherwise have resulted from the actor's negligence;
>
> (b) the fact that its operation or the consequences thereof appear after the event to be extraordinary rather than normal in view of the circumstances existing at the time of its operation;

(c) the fact that the intervening force is operating independently of any situation created by the actor's negligence, or, on the other hand, is or is not a normal result of such a situation;

(d) the fact that the operation of the intervening force is due to a third person's act or to his failure to act;

(e) the fact that the intervening force is due to an act of a third person which is wrongful toward the other and as such subjects the third person to liability to him;

(f) the degree of culpability of a wrongful act of a third person which sets the intervening force in motion.

*Donaghey v. Ocean Drilling & Exploration Co.*, 974 F.2d 646, 652 n.11 (5th Cir. 1992) (quoting *Nunley*, 727 F.2d at 464 and RESTATEMENT (SECOND) OF TORTS § 442 (1965)); *Stolt Achievement, Ltd.*, 447 F.3d at 368 n.25 ("Many courts, including this one, rely upon the factors set forth in RESTATEMENT (SECOND) OF TORTS § 442 for guidance in this inquiry.").

Further, Section 447 of the RESTATEMENT (SECOND) OF TORTS provides that "[t]he fact that an intervening act of a third person is negligent in itself or is done in a negligent manner does not make it a superseding cause of harm to another which the actor's negligent conduct is a substantial factor in bringing about, if"

(a) the actor at the time of his negligent conduct should have realized that a third person might so act, or

(b) a reasonable man knowing the situation existing when the act of the third person was done would not regard it as highly extraordinary that the third party had so acted, or

(c) the intervening act is a normal consequence of a situation created by the actor's conduct and the manner in which it is done is not extraordinarily negligent.

RESTATEMENT (SECOND) OF TORTS § 447 (1965); *see Donaghey*, 974 F.2d at 652 (quoting section 447); *Nunley*, 727 F.2d at 464-65 (same). "For the subsequent negligence of a third party to absolve the initial wrongdoer of liability for all of the damages suffered by the injured party,

the subsequent negligence of the third party must be so extraordinary that a reasonably prudent person could not have foreseen its occurrence." *Tidewater Marine,* 113 F. Supp. 2d at 999.

*Lone Star Indus. v. Mays Towing Co.*, 927 F.2d 1453 (8th Cir. 1991) is helpful on this point.[16] On December 23, 1983, Mays Towing took under tow the Lone Star barge *LS 1501*, and delivered the barge to Lone Star on December 25, 1983. *Id.* at 1454. The district court found that when Mays Towing took the *LS 1501* under tow, the barge was undamaged. *Id.* "The LS 1501, full of cement, sat at Lone Star's dock for three days, and then, during unloading on December 28, 1983, with most of its cargo still onboard, it sank." *Id.*

Lone Star employees were responsible for unloading the barge and, on December 27, "Lone Star employees attempted to conduct a standard pre-unloading inspection, which normally involved opening all the hatches and entering the void compartments to look for water or hull damage." *Id.* at 1455. The Eighth Circuit Court noted that "because the barge is unloaded bow to stern, so that part of the stern necessarily submerges during unloading, an inspection of the stern compartments is especially critical." *Id.* While Lone Star employees did open the forward hatches of the barge for inspection, they were unable to open the stern hatches due to an accumulation of ice, which they unsuccessfully attempted to hack away from the hatches with sledgehammers. *Id.* Lone Star's employees waited until the next day, but due to continuing bad weather, they were still unable to open the stern hatches. *Id.* "Under some financial pressure to unload the barges, and knowing that the LS 1502 had been unloaded without incident, Lone Star took, by its own admission, a calculated risk, and decided to unload the LS 1501 without inspection of the stern compartments." *Id.* As unloading progressed, the *LS 1501* began taking on water at the stern, and the barge sank. *Id.*

---

[16] *See Donaghey*, 974 F.2d at 652-53 (5th Cir. 1992) (citing *Lone Star* favorably).

11

"Later, when the LS 1501 was raised, marine surveyors found a vertical crack in its stern log—the heavy steel at the stern of the barge to which tugboats face up." *Id*. "The crack was eight or ten inches above the waterline, but, because the barge is unloaded bow to stern, it became submerged during unloading." *Id*. The district court found both Lone Star and Mays Towing negligent, concluding "that the negligence of Mays Towing Company caused the damage to the LS 1501, resulting in the loss of the barge and its cargo." *Id*. (quoting *Lone Star Indus. v. Mays Towing Co.*, 725 F. Supp. 440, 444 (E.D. Mo. 1989)). The court assessed fault at sixty percent to Mays Towing and forty percent to Lone Star. 927 F.2d at 1455.

Against these facts, the Eight Circuit analyzed the Restatement superseding cause factors. Key to the court's analysis was the factor that the intervening force "brings about harm different in kind from that which would otherwise have resulted from the actor's negligence." *Id*. at 1459 (citations and quotations omitted). The Court held that "the intervening force, Lone Star's negligence in not inspecting before unloading, brought about a harm—sinking—different in kind than would otherwise have occurred—the barge incurring a fracture in its stern log." *Id*. at 1459. As the Court noted, the evidence established that the *LS 1501* "likely did not take on water en route to Memphis because the fracture was above the waterline and frozen over with ice," and that "the fully loaded barge sat at Lone Star's dock in Memphis for several days over the Christmas holiday without listing." *Id*. "The barge sank only because it took on water during unloading when the stern became submerged and the ice covering the fracture melted, allowing water to enter the stern compartments." *Id*. at 1459-60. The Court determined that "[a]bsent Lone Star's negligence in failing to inspect prior to unloading, the barge could have sat at the dock indefinitely and would not have sunk." *Id*. at 1460.

The Court of Appeals also held that "the intervening force was not a normal result of the situation created by the negligence of Mays Towing," in that "Lone Star's negligence in failing to inspect was an affirmative act unrelated to any negligence of Mays Towing." *Id.* According to the Court, "it is clear that Lone Star's negligence was not sufficiently related to the negligence of Mays Towing to impose liability on Mays Towing. The Lone Star negligence could not have been reasonably anticipated by Mays Towing and Mays Towing was not negligent in failing to forecast such acts." *Id.* The Court of Appeals concluded that Lone Star's negligence was a superseding cause that relieved Mays Towing of liability for loss of the barge and its cargo. *Id.* at 1460-61; *see also Sinram v. Pennsylvania R.R.*, 61 F.2d 767, 769 (2d Cir. 1932) (finding superseding cause cut off liability of tug operator under similar facts).

Here, as in *Lone Star*, the failure of both BP and Transocean to properly interpret the negative pressure tests operate as a superseding, intervening cause, breaking the causal link between any actions taken by HESI and the Incident. After HESI completed the production casing cement job, the well remained in a stable condition for approximately 20 hours.[17] The negative pressure tests were intended to be the ultimate tests to determine whether the well was sealed or whether it could flow. In fact, the negative pressure tests invite the well to flow (not unlike the unloading of the barge in *Lone Star* which submerged the existing hull crack, allowing the flow of water into the ship). Also as in *Lone Star*, the foreseeable risk of an inadequate cement job on the Macondo well was entirely different (squeeze job) from the risk ultimately experienced (well blowout). More importantly, it was not foreseeable that BP and Transocean would misinterpret the safety-critical negative pressure tests. Absent BP's and Transocean's misinterpretation of the negative pressure tests, which directly led to the replacement of drilling

---

[17] *See* HESI FOFs at §§ III.A; III.A.1, 4, 5; III.B; IV.A.9; IX.B; XI.A.2, 3; XII.A.

13

mud with much lighter seawater (drastically reducing the hydrostatic head that was the principal form of well control in place), the Macondo well could have sat static indefinitely without experiencing a blowout. In short, BP's and Transocean's failure to properly interpret the safety-critical negative pressure tests was an extraordinary, unforeseeable affirmative act unrelated to any alleged act of negligence by HESI, thus satisfying the standards for superseding, intervening cause and relieving HESI from any liability.

Likewise, Transocean's failure to maintain well control on the night of the Incident was not foreseeable and operates as a second superseding, intervening cause.[18] Transocean's policies and procedures, as well as industry standards, required that upon detection of an anomaly, the well should be shut in before conducting any other activities. On April 20, 2010, the Transocean drill crew acted in contravention of this clear and direct policy, choosing to shut down the pumps and investigate the anomaly without shutting in the well. Further, Transocean's failure to divert flow from the blowout overboard once the volume of flow was obvious was not foreseeable. Gagliano could not have foreseen such a departure from established oilfield practice. And Keith, assuming he had a duty to report an increase in standpipe pressure, would have fulfilled his duty upon reporting the same. The existence of an anomaly was known to the Transocean drill crew in time to prevent the blowout, regardless of any notification from Keith, and Transocean's failure to properly respond to the situation precludes any finding that the actions of HESI and/or its employees was a causal factor in the Incident.

Finally, BP's and Transocean's failures to properly configure, maintain, and operate the BOP were unforeseeable actions that constitute a third superseding, intervening cause.[19] The BOP is intended to prevent blowouts and to control them once they occur. Despite the safety-

---

[18] *See* HESI FOFs at §§ IV.A.9, 11, 12, 13, 14, 15; IV.B; XXI.A.2.
[19] *See* HESI FOFs at §§ V.A, B.

critical nature of this equipment, BP failed to configure the *Deepwater Horizon* BOP with the best available and safest technology and failed to ensure that the BOP was appropriate for use at the Macondo well. Moreover, Transocean failed in its duty to properly maintain the BOP and, on the night of the Incident, failed to properly operate the BOP such that it could perform its intended function. The combination of BP's and Transocean's failures to properly configure, maintain, and operate the *Deepwater Horizon* BOP were unforeseeable, especially given the safety critical nature of the equipment, and serve as another superseding, intervening cause that severs any causal link between HESI's actions and the Incident.

### C. HESI is Not Liable for Products Liability.

General maritime law recognizes a cause of action for strict products liability. *E. River S.S. Corp. v. Transamerica Delaval, Inc.*, 476 U.S. 858, 865 (1986); *Employers Ins. of Wausau v. Suwannee River Spa Lines, Inc.*, 866 F.2d 752, 758 (5th Cir. 1989). Admiralty courts look to the Restatement of Torts and state law, where applicable, for strict liability standards. *Krummel v. Bombardier Corp.*, 206 F.3d 548, 552 (5th Cir. 2000); *In re: Parker Drilling and Offshore USA, L.L.C.*, No 03-2611, 2006 U.S. Dist. LEXIS 4332, at *12 (E.D. La. Feb. 3, 2006). "One . . .who sells or distributes a defective product is subject to liability for harm to persons or property caused by the defect."[20] RESTATEMENT (THIRD) OF TORTS: PRODUCTS LIABILITY §1 (1998).

Louisiana, Alabama, and the Local Government Entities assert both manufacturing and design defects. (Dkt. Nos. 2031 at ¶283; 1510 at ¶619; 1872 at ¶187). A product "contains a manufacturing defect when the product departs from its intended design even though all possible care was exercised in the preparation and marketing of the product." RESTATEMENT (THIRD) OF TORTS: PRODUCTS LIABILITY §2(a) (1998). Examples of common manufacturing defects include

---

[20] Strict liability applies only where there is direct harm to persons or property, but can include economic loss where such direct harm has occurred. RESTATEMENT (THIRD) OF TORTS: PRODUCTS LIABILITY §§1, cmt. d; 21.