**IN THE UNITED STATES DISTRICT COURT**
**FOR THE EASTERN DISTRICT OF LOUISIANA**

| | |
|---|---|
| In re:  **Oil Spill by the Oil Rig "Deepwater Horizon" in the Gulf of Mexico, on April 20, 2010** | **MDL 2179** |
| | **SECTION "J"** |
| **Applies to:** | **DISTRICT JUDGE BARBIER** |
| | **MAG. JUDGE SHUSHAN** |
| *Case No: 12-968 BELO* | **MAG. JUDGE WILKINSON** |
| **LEROY G. WILSON**, | **CIVIL ACTION** |
| **VERSUS** | **CASE NO.: 1:15-cv-300** |
| **BP EXPLORATION & PRODUCTION, INC. AND BP AMERICA PRODUCTION CO.,** | **DISTRICT JUDGE GRANADE** |
| | **MAG. JUDGE CASSADY** |
| **Applies to:** | |
| *Case No: 12-968 BELO; E.D. La. Case No: 14-2730 (transferred to S.D. Ala.; renumbered as 15-300)* | |

Mr. Wilson's Brief in Support of the "MSA XXVII Motion"
Requiring BP Pay All Settlement Costs Reasonably
Associated with both his SPC Claim and BELO Lawsuit.

Plaintiff Leroy Wilson ("Mr. Wilson") moves this Court to rule on a dispute relating to the interpretation, implementation, administration, and enforcement of the *Deepwater Horizon* Medical Benefits Settlement Agreement, as Amended on May 1, 2012 ("MSA").[1] Mr. Wilson first identified a problem when he was required to pay a filing fee as part of the administration by this Court for the implementation of his Back End Litigation Option ("BELO") Lawsuit. Since that day, Mr. Wilson's BELO Lawsuit has been administered by both this Court and the Southern District of Alabama, a transferee court, resulting in substantial costs. These costs must

---

[1] Deepwater Horizon *Medical Benefits Class Action Settlement Agreement, as Amended on May 1, 2012* ("*MSA*"), MDL 2179, Rec. Doc. 6427-1 (May 3, 2012); *see also Exhibits to the Deepwater Horizon Medical Benefits Class Action Settlement Agreement* ("*MSA Ex.*"), No. 10-MD-2179, Rec. Doc. 6427-2 (E.D. La. May 3, 2012).

be timely paid for by the defendants BP Exploration & Production, Inc. and BP America Production Co. (collectively "BP" or "BELO Defendants"). The MSA explains BP shall pay all Settlement Costs and the trustee must pay all Settlement Costs from Administrative Funds.[2] The *Medical Settlement Trust Agreement* ("*MST*") requires the trustee to pay for Settlement Costs from these trust funds and names class members as express beneficiaries.[3] Mr. Wilson has in good faith met and conferred with BP to resolve this dispute to no avail and seeks to resolve this dispute by asking this Court to interpret, implement, administer, and enforce the MSA both to his facts and, at its discretion, to those similarly situated.[4]

Mr. Wilson, this Court, and the transferee court are owed Settlement Costs by BP. Part I of this memorandum explains this Court's retained subject matter is limited to what existed on January 11, 2013. Part II explains why a settlement agreement binding a settlement purpose class is unenforceable if the agreement puts a class member today in a position inferior to their position at the time of class certification. Part III discusses the plain and ordinary meaning doctrine (Part III.A) and provides the relevant rules of construction for the MSA (Part III.B).

Part IV discusses the *Settlement Costs Test*. In Part IV.A we discuss as a threshold matter how the word "and" has been construed. Part IV.B (1–3), explains the three elements of the *Settlement Costs Test*. The first and broadest element is "*all other costs and compensation*;" the second more restricting element explains that any cost and compensation must also be "*associated with implementation and administration of the MSA*;" and the third element explains

---

[2]     *MSA*, §§ IV.E, XXII.D(3). The MSA never says *all* payments must be made solely at the direction of the Claims Administrator ("GRG"). It merely says the trustee ("Mr. Garretson" or "trustee") shall transfer funds from the MST at the direction of GRG and GRG shall have signatory authority. *Id.* § XXII.D. Expenses not agreed to by GRG may still be paid by the trustee at the trustee's discretion pursuant to the trustee's fiduciary duties to pay the express beneficiaries of the trust. If GRG directs Mr. Garretson not to make a payment, then GRG is overreaching its authority as it may *only* direct the trustee to transfer, not to restrict payments. The ultimate decision maker is the trustee. As the administrative agent of this Court, the trustee must make decisions through the lens of Rule 23 superiority. *See Kokkonen v. Guardian Life Ins. Co. of Am.*, 511 U.S. 375, 377 (1994); *see also supra* Parts I & II.

[3]     No. 10-MD-2179, Rec. Doc. 6399-3, Recital & § 1.1–.2 (E.D. La. May 1, 2012).

[4]     Class Members manifesting SPC Matrix chronic conditions first diagnosed after April 16, 2012.

how such cost and compensation must be "*reasonably associated with*" any implemented and administered MSA term. Part V explains Settlement Costs are the material consideration that binds the class and BP; as such Mr. Wilson's LMPC associated costs are not exempt or released from the MSA. Part VI explains most class members seeking compensation for SPC Matrix chronic conditions impermissibly face litigation in lopsided negative value suits.

### PART I. LIMITED SUBJECT MATTER JURISDICTION

Mr. Wilson brings this MSA § XXVII Motion pursuant to this Court's expressly retained, exclusive, and continuing jurisdiction to interpret, implement, administer, and enforce the terms of the MSA ("Retained Jurisdiction") as explained in the MSA, adopted in its entirety in this Court's Order.[5] This authority was preserved in order to meet the jurisdictional limitations described in the holding of *Kokonnen v. Guardian Life Ins. Co. of Am.*[6], On January 11, 2013, when this Court ordered final approval of the MSA, it limited the scope of its authority for any Retained Jurisdiction such that future "judicial decrees" must be within the confines of its then existing jurisdictional limitations. As Federal Rule of Civil Procedure ("FRCP") rule 23 explains, no class can be certified for settlement purposes if the settlement proposed would place the class in a position inferior to what existed before certification.[7]

An issue of first impression now before this Court deals with the retained "*Jurisdictional Authority*" to interpret, implement, administer, and enforce the terms of this MSA, binding on this class certified only for settlement purposes, when jurisdictional authority has been properly retained pursuant to the holding in *Kokonnan*[8]. Where this Court has retained such ongoing and

---

[5]     *Order and Judgment Granting Final Approval of Medical Benefits Class Action Settlement and Confirming Certification of the Medical Benefits Settlement Class* ("*Final Fairness Order*"), MDL 2179, Rec. Doc. 8218, ¶ 10 (E.D. La. Jan. 11, 2013); *MSA*, § XXVII (emphasis added).

[6]     511 U.S. 375, 377 (1994) (explaining that a Court possesses "only that power authorized by Constitution and statute which is not to be expanded by judicial decree").

[7]     *Steering Comm. V. Exxon Mobil Corp.*, 461 F.3d 598, 601 (5th Cir. 2006).

[8]     *Kokkonen*, 511 U.S. at 181-82. (holding ancillary jurisdiction does not stretch beyond existing jurisdiction).

exclusive *Jurisdictional Authority, does it, its agents, and/or the transferee courts that administer and implement terms as allowed within the scope of this MSA, have the authority to interpret, implement, administer, and/or enforce this settlement in a manner that puts all (or substantially all) chronically injured class members in a position inferior to what was available at the time of class certification for settlement purposes?* Mr. Wilson argues that since this Court could only retain the *Jurisdictional Authority* that existed at the time of the ruling, it lacks *Jurisdictional Authority* over the settlement purpose class to put those chronically injured class members in a position inferior to what existed at the time of certification now that all counts raised by the certified class have been dismissed with prejudice.[9] Lastly, the transferee court is also limited to the extent defined in the transfer order.[10]

## PART II. UNENFORCEABILITY OF AN INFERIOR MSA

Lack of predominance or superiority "dooms class certification under FRCP rule 23(b)(3)."[11] "A class action may be *maintained* if Rule 23(a) is satisfied and if . . . the court finds that the questions of law or fact common to class members predominate over any questions affecting only individual members, and *that a class action is superior* to other available methods for fairly and efficiently adjudicating the controversy."[12]

---

[9]     Should Mr. Wilson defeat the presumption against subject matter jurisdiction such that this Court is convinced it only has the jurisdiction over the subject matter actually retained and that any subsequent interpretation, implementation, administration, and/or enforcement of the MSA relying on the Retained Jurisdiction must remain within the limitations of FED. R. CIV. P. 23(b)(3), the burden to establish the contrary shifts to BELO Defendants. *See Kokkonen*, 511 U.S. at 377. Because of the limitations of retained jurisdiction, this MSA is unenforceable on this class, certified for settlement purposes, so long as its terms are interpreted, implemented, administered, and/or enforced in a manner that puts the Class in an inferior position to what existed at the time of signing.

[10]     *See id.* Mr. Wilson's transfer order does not expressly indicate that this Court has relinquished any of its Retained Jurisdiction over the MSA. *See [Transfer] Order*, No. 14-2730, Rec. Doc. 23 (E.D. La. June 5, 2015).

[11]     *Steering Comm.*, 461 F.3d at 601.

[12]     FED. R. CIV. P. 23(b)(3) (emphasis added). *Amchem Prods., Inc. v. Windsor* ("*Amchem*") advised,
[I]n each case, courts would consider the interests of individual members of the class in controlling their own litigations and carrying them on as they see fit. . . .The interests of individuals in conducting separate lawsuits may be so strong as to call for denial of a class action. On the other hand, these interests may be theoretic rather than practical; the class may have a high degree of cohesion and prosecution of the action through representatives would be quite unobjectionable, or the amounts at stake for individuals may be so small that separate suits would be impracticable.

"The policy at the very core of the class action mechanism is to overcome the problem that small recoveries do not provide the incentive for any individual to bring a solo action prosecuting his or her rights."[13] Therefore, "[t]he most compelling rationale for finding superiority in a class action [is] the existence of negative value suits . . ." with the understanding that the class action mechanism overcomes the aforementioned problem.[14] *Castano v. Am. Tobacco Co.*,[15] considers the factors of high damage value individual claims, the availability of punitive damages, and prevailing party attorney fees statutes when deciding superiority.[16] These factors are non-exhaustive but certainly pertinent to this Court's close look at the predominance and superiority criteria. "The primary procedural difficulty created by immature torts is the inherent difficulty a district court will have in determining whether the requirements of rule 23 have been met."[17] This is especially true when the option of subclasses does not exist.[18]

In its current state, class certification would not survive the superiority prong of rule 23. Mr. Wilson is not free to control his own litigation without MSA imposed restraints. These include limiting the pool of named defendants to BP[19] and the unavailability of punitive damages[20] which, when combined with the lack of a high damage value claim, and an express bar

---

521 U.S. 591, 616 (1997) (internal quotations omitted).

[13]     *Id.* at 617; *Young v. Nationwide Mut. Ins. Co.*, 693 F.3d 532, 545 (6th Cir. 2012).

[14]     *See Castano v. Am. Tobacco Co.*, 84 F.3d 734, 748 (5th Cir. 1996).

[15]     84 F.3d 734 (5th Cir. 1996).

[16]     *Id.* at 748–50. Prevailing attorney fees only exists for enforcing Released Claims. *MSA*, § XX.E.

[17]     *Castano*, 84 F.3d at 749.

[18]     *See id.* at 750. By disallowing subclass bundling under Rule 23 for chronic SPC Matrix related claims otherwise appropriate as mass, aggregate, or class action processing, Mr. Wilson urges this Court to consider class certification would not survive under the predominance prong as well in this current post LMPC ruling climate.

[19]     *BELO Cases Initial Proceedings Case Management Order* ("*Wilkinson CMO*"), Rec. Doc. 14,099, ¶ I(4) (Jan. 30, 2015); *MSA*, § VIII.B(ii). *But see Def. Answer to 2d Am. Compl.*, No. 15-300, *Wilson v. BP Exploration & Prod Inc.*, Rec. Doc. 41, at 7–11 (S.D. Ala. Aug. 11, 2015) (raising defenses blaming other alleged tortfeasors including federal, state, or local governments). BP raises these defenses even though it is jointly and severally liable for 100% of all Mr. Wilson's compensatory damages and all Settlement Costs pursuant to the MSA. *See MSA*, §§ II.QQQQ (viii), IV.E, XXII.A. If BP is not jointly and severally liable for torts by Released Parties, then this would be an example of how this MSA again puts the class members in a worse position than before the agreement.

[20]     *MSA*, § VIII.G(2)(c).

against mass, class, or aggregate action BELO complaints,[21] make it impossible to cover expert costs from witnesses[22] that are required as a matter of law to prove a case at toxic tort.[23] Like Mr. Wilson, the vast majority of claimants seeking compensation for chronic conditions did not receive a "chronic" diagnosis until after April 16, 2012[24] and, as such, will be denied recovery because the stake of the individual is so small that each separate suit is impracticable. Requiring individual filings essentially bars the filing bundle.[25] In baring subclasses, certain costs, such as filing fees, cannot be divided among a large number of class members that share common issues of law/fact such as class members with similar LMPCs (chronic sinusitis), state law elements (causation), or factual requirements (amount, location, and timing of toxic chemicals). Instead each must incur filing costs. *Castano* pointed out subclasses are much better suited and designed to manage the difficult if not impossible task of joining hundreds if not thousands of class members for trial, a procedural privilege denied through this MSA.[26]

Further, Mr. Wilson's Chronic Rhinosinusitis is not itself what one would call a high damage value individual claim since he is a much older man (age 70).[27] Certainly the pain and suffering associated with his respiratory injury is substantial, but Mr. Wilson feels that his

---

[21]     *Id.* § VIII.G(1)(d).

[22]     FED. R. CIV. P. r. 54; 28 U.S.C. §§ 1821, 1920 (explaining limits for taxable expert costs at $40.00 daily). *But see Crawford Fitting Co. v. J.T. Gibbons, Inc.*, 482 U.S. 437, 444 (1987) (holding express contractual language removes these limitations); *see infra* note 80–82 and accompanying text.

[23]     *Seaman v. Seacor Marine, LLC.*, 564 F. Supp. 2d 598, 603 (E.D. La. 2008); *see Moore v. Ashland Chem. Inc.*, 151 F.3d 269, 278-79 (5th Cir. 1996); *see Coffee Decl.*, MDL No. 2179, Rec. Doc. 7113-2, ¶ 40.  *But see Moore*, 151 F.3d at 278, (adopting *Cavallo v. Star Enter.*, 892 F. Supp. 756, 773-74 (E.D. Va 1995) (), *aff'd in part, rev'd in part on other grounds*, 100 F.3d 1150 (4th Cir. 1996)).

[24]     *Status Report from the* Deepwater Horizon *Medical Benefits Settlement Claims Administrator*, MDL No. 2179, Rec. Doc. 14980,  (Aug. 12, 2015) (showing a dreadful 3 out of 1,758 approved SPCs to date as meeting the chronic definition in the SPC; less than 1/10th of 1% of approved claims).

[25]     *MSA*, § VIII.G(1)(d). *But see id.* ("[N]othing in this MSA is intended to preclude consolidation or joinder of matters at issue or actions consistent with the Federal Rules of Civil Procedure."); *see, e.g.*, *Acevedo v.. Allsup's Convenience Stores, Inc.*, 600 F.3d 516, 520–21 (5th Cir 2010); *Avance v. Kerr-McGee Chems. LLC.*, 241 F.R.D. 585, 587 (E.D. Tx. 2006).

[26]     *MSA*, § VIII.G(1)(d). For example, in the likely event that hundreds of class members share a common issue of law or fact sufficient to meet Rule 20 joinder requirements for trial, without the Rule 23 notice requirement of a subclass, these class members would likely remain unaware of each other's common issues of law/fact, allowing BP to cherry pick which plaintiffs it chooses to joinder.

[27]     Mr. Wilson was born December 15, 1944. Calculating damages pursuant to age is formulaic in nature.

allowable compensatory damages may just reach six figures.[28] In expert costs alone, Mr. Wilson is looking at anywhere between $320,000 and $640,000.[29] Consider this very condition was compensable at $60,700 in Exhibit 8 in the SPC Matrix. Based on those benchmarks alone, his case is a deep negative value claim.

Pre-MSA, Mr. Wilson would have been able to file for punitive damages, for the wanton and careless disregard associated with BELO Defendants' tortious actions.[30] Post-MSA, Mr. Wilson is forbidden to recover punitive damages.[31] Since the MSA bars this remedy against BP defendants, and BP was the only Defendant subsequently held to have acted with the requisite mental state of willful misconduct, this essentially bars any chance of receiving punitive damages.[32] Under principals of *Collateral Estoppel* and *Res Judicata*, Mr. Wilson could have used these findings to his advantage in demonstrating liability for punitive damages[33] increasing the amount of recoverable damages that may have helped offset expert costs. Any chance of recovery is now upside down.[34] Further, even if he wanted to joinder to cost share experts, this would be impossible without "ready to file" litigants timely and jointly surviving GRG's LMPC verification and mediation process.

If this MSA is to restore the balance so that the claim is no longer negative value, or at least superior to the claim as it stood without the MSA as required by FRCP 23(b)(3), then the

---

[28]     An expert will generate more accurate figures for Mr. Wilson's damages.

[29]     *See infra* note 85–96 and accompanying text.

[30]     ALA. CODE § 6-11-20 (2015).

[31]     *MSA*, §§ VIII.G(2)(c), XVI.C.

[32]     *Findings of Fact and Conclusions of Law, Phase One*, No. 2179, Rec. Doc 13,355, ¶ 480 (Sept. 4, 2014).

[33]     In the alternative, Mr. Wilson may have proven what is required for punitive damages even without the joint findings of fact as he was expressly and repeatedly instructed by BP not to use safety equipment while publicly performing response activities. *But see Coffee Decl.*, *supra* note 23, ¶ 39.

[34]     *In re Oil Spill by the Oil Rig "Deepwater Horizon" in the Gulf of Mexico, on April 20, 2010* (*In re Deepwater Horizon*). 295 F.R.D. 112, 145 (E.D. La. 2013). This Court explained, "[T]he Medical Class is largely composed of "negative value claims," and thus there are compelling reasons to justify class treatment." *Id.*; *Decl. of Robert H. Klonoff*, MDL No. 2179, Rec. Doc. 7116–2, ¶ 45 (Aug. 14, 2012); *Coffee Decl.*, *supra* note 23, ¶¶ 8, 9(d), 38–40 ("[E]xpert medical testimony [involving exposure to toxic substances] . . . is generally expensive and thus precludes individual cases for smaller amounts. One need not here attempt to specify the exact cutoff point at which a claim is too small to litigate in order to conclude that much of the class is below that level.").

heightened cost requirements for LMPCs first diagnosed post April 16, 2012 need to be addressed.[35] Presently, this MSA reduces the value of Mr. Wilson's case compared to the damages ordinarily available through common law and statute in the State of Alabama. Specifically, without MSA restrictions, Mr. Wilson would have access to both punitive damages in order to cover expert costs and access to form a subclass allowing cost-sharing.[36] Presuming that an individual's claim was negative value before the MSA, class certification should theoretically convert the negative value claim into a positive value claim (or at least substantially less negative value) therefore demonstrating its superiority.[37] Yet these MSA restrictions render it impossible for Mr. Wilson to receive sufficient remedies to pay for his costs.

For Mr. Wilson and those similarly situated, this MSA has resulted in the exact opposite of curing the negative value problem. This class was certified for settlement purposes[38] and now the entire class with an initial diagnosis post April 16, 2012 finds itself facing litigation having never received the benefit of litigation purpose certification. *Amchem* advised:

> Confronted with a request for settlement-only class certification, a district court need not inquire whether the case, if tried, would present intractable management problems, see Fed. Rule Civ. Proc. 23(b)(3)(D), ***for the proposal is that there be no trial***. But other specifications of the Rule— ***those designed to protect absentees by blocking unwarranted or overbroad class definitions***—demand undiluted, even heightened, attention in the settlement context. *Such attention is of vital importance, for a court asked to certify a settlement class **will lack the opportunity, present when a case is litigated, to adjust the class, informed by the proceedings as they unfold**.*[39]

---

[35]    Transcript of Scheduling Conference at 14:4-10, 17:2-6 ("*Wilson Ex. C*"), *Wilson v. BP Exploration & Prod., Inc*, (S.D. Ala. Aug 12, 2015) (No. 15-cv-300) ("I'm getting a little proportionality problem here in my mind. . . . It seems to me that there was a lot of thought and effort put into this . . . Back-End Litigation Option process. And I would assume that the thought process would include litigation costs for these class members.").

[36]    *See* ALA. R. CIV. P. 23(c)(4).

[37]    *Id.*; *see also* FED. R. CIV. P. 23(c)(5) ("When appropriate, a class may be divided into subclasses that are each treated as a class under this rule.").

[38]    *MSA*, § X.D.

[39]    *Amchem*, 521 U.S. at 620 (emphasis added). In this present case, *Amchem*'s prophetic warnings ring true as evidenced by this Court's own statement, "[T]he interpretation [of Later Manifested Physical Conditions] may not be what the Court envisioned at the time of the fairness hearing nor what Class Counsel apparently thought . . . ." *[Order] Regarding Class Counsel's Motion for Reconsideration (Rec. doc. 13303) of the Court's Order of July 23, 2014 Regarding Chronic Specified Physical Conditions (Rec. doc. 13179)*, No. MDL 2179, Rec. Doc. 13733, at 5 (E.D. La. Nov. 26, 2014) (Barbier, J.).
    The *Amchem* Court further warned:

Had BP been forthcoming with its intentions, this matter would have been thoroughly discussed and resolved prior to the fairness hearing. Instead we are left with a staged performance.[40] If this Court who was actively reviewing the proceedings as they occurred did not see this coming,[41] certainly the public could not. How is this class to have proper notice on this issue such that it could have reacted accordingly when BP was holding out an entirely different position in its joint motions? How can this class certification be superior for settlement purposes if the vast majority of damages may only be resolved through litigation of negative value claims in Federal Courts without adequate remedies to offset costs?[42] This Court, the class as noticed, Mr. Wilson, and Class Counsel ("the PSC") were led to believe this class as certified was superior to individual suits. Now the opposite is true. Today individual suits are required and the outcome is inferior to pre-certification. As a result, Mr. Wilson and all class members seeking LMPC compensation will need to bleed and suffer enough to pay for experts necessary to prove a BELO case. This is not superior to a state cause of action (or class action) in Alabama where punitive damages would still be available. For this MSA to be enforceable against a class certified for settlement purposes today, it must now be superior to the Class Member's pre MSA position.

**PART III.A.** THE PLAIN MEANING DOCTRINE AND RELEVANT RULES OF CONSTRUCTION.

Both maritime and Louisiana law require all contracts construed by the Courts to be "read

---

[I]f a fairness inquiry under Rule 23(e) controlled certification, eclipsing Rule 23(a) and (b), and permitting class designation despite the impossibility of litigation, both class counsel and court would be disarmed. Class Counsel confined to settlement negotiations could not use the threat of litigation to press for a better offer and the court would face a bargain proffered for its approval without benefit of adversarial investigation [where] parties "***may even put one over on the court, in a staged performance***."

*Amchem*, 521 U.S. at 620–21 (emphasis added), *quoting Kamilewicz v. Bank of Boston Corp.*, 100 F.3d 1348, 1352 (7th Cir. 1996).

[40]   *See id.* at 621.

[41]   *[Order] Regarding Class Counsel's Motion for Reconsideration (Rec. doc. 13303) of the Court's Order of July 23, 2014 Regarding Chronic Specified Physical Conditions (Rec. doc. 13179)* ("*Order re: Chronic SPCs*"), No. MDL 2179, Rec. Doc. 13733, at 5 (E.D. La. Nov. 26, 2014) (Barbier, J.).

[42]   Ten thousand Davids facing two armed Goliaths, absent sling or stone, one at a time.

9

as a whole and its words given their plain meaning unless the provision is ambiguous."[43] "A basic principle of contract interpretation in admiralty law is to interpret, to the extent possible, all the terms in a contract without rendering any of them meaningless or superfluous."[44] So long as the term is not ambiguous and as a whole the language is "clear, explicit, and leads to no absurd consequences" it should receive only one reasonable interpretation.[45] When interpreting maritime contracts, general rules of interpretation and contract construction apply.[46] "To the extent that it is not inconsistent with admiralty principles, state contract law may be applicable to maritime contracts."[47] Each contractual term and/or provision must be read in light of others, giving each the meaning reflected by the entire contract as a whole.[48]

The Parties have expressly agreed to the following terms regarding the construction and meaning of terms used in the MSA. The MSA, its exhibits, attachments, and appendices included at the time of signing, constitute the entire MSA superseding all prior proposals, negotiations, agreements, and understandings.[49] Excluding Exhibits 8, 9, and 12, inconsistencies between the MSA and any attachments, other exhibits, or appendices must be construed in favor of the MSA[50] and its terms cannot be construed against any drafter.[51]

**PART III.B.** THE MSA'S LANGUAGE.

---

[43]    *Becker v. Tidewater, Inc.*, 586 F.3d 358, 369 (5th Cir. 2009); *Fontenot v. Mesa Petroleum Co.*, 791 F.2d 1207, 1214 (5th Cir. 1986) ("The contract should be read as whole, and a court should not look beyond the written language of the contract to determine the intent of the parties unless the disputed language is ambiguous.").

[44]    *Chembulk Trading LLC v. Chemex Ltd.*, 393 F.3d 550, 555 n.6 (5th Cir. 2004).

[45]    *Id.*

[46]    *See Marine Overseas Services, Inc. v. Crossocean Shipping, Co. Inc.*, 791 F.2d 1227, 1234 (5th Cir. 1986); *Cashman Equip. Corp. v. M/V GODFATHER*, No. 05-cv-6271, 2007 WL 934537, at *2 (E.D. La. Mar. 23, 2007).

[47]    *Orgeron Bros. Towing, LLC v. Higman Barge Lines, Inc.*, 939 F. Supp. 2d 604, 608 (E.D. La. 2013) (Shushan, Mag.) (citing *Fitch Marine Transp., LLC v. Am. Commercial Lines, LLC*, No. CIV.A. 09-4450, 2010 WL 5057516, at *2 (E.D. La. Dec. 3, 2010) (Lemmon, J)).

[48]    *Sw. Eng'g Co. v. Cajun Elec. Power Co-op., Inc.*, 915 F.2d 972, 980 (5th Cir.1990).

[49]    *MSA*, § XXX.A. *See Id. at* §XXX.C (stipulating that the MSA is not subject to change, modification, amendment, or addition without express written consent of all Parties that must be signed by the PSC and BP Counsel).

[50]    *Id.* § XXX.D.

[51]    *Id.* § XXX.G (explaining all MSA terms and conditions were negotiated at arms' length).

"The . . . CLASS REPRESENTATIVES, by and through . . . CLASS COUNSEL, and BP agree that, in consideration for the RELEASE described in Section XVI and the dismissal with prejudice of RELEASED CLAIMS, and subject to the terms of this MEDICAL SETTLEMENT AGREEMENT, BP will . . . **Pay All Settlement Costs**."[52] "SETTLEMENT COSTS shall mean . . . _all other costs and compensation reasonably associated with the implementation and administration of this [MSA]_."[53] BELO Defendants are jointly and severally liable for Settlement Costs.[54]

The Settlement Costs shall be paid through the Administrative Fund pursuant to Section XXII.D.3 of the MSA.[55] BP must timely pay pursuant to Section XXII.H.[56] "BP has agreed to pay . . . all costs of the Settlement administration, which may reasonably be expected to be substantial"[57] _This is a significant benefit to Class Members that does not reduce any other compensation or benefits provided._[58] By its plain and ordinary meaning, all Settlement Costs, including those detailed in Mr. Wilson's MSA Section XXVII Motion,[59] must be paid by BP. The MSA has relevant terms that require substantial resources to be spent by different persons and/or entities to properly administer and implement the settlement of claims for both SPCs and LMPCs. For Mr. Wilson to receive a determination by the transferee court for allowable compensatory damages, he must implement certain terms. Once implemented, these terms trigger

---

[52]   _Id._ § IV.E (emphasis added).

[53]   _Id._ § II.QQQQ(viii) (emphasis added).

[54]   _Id._ § XXII.A (emphasis added).

[55]   "The [MST] shall be comprised of the FUNDS. . . . These FUNDS shall constitute a single qualified settlement fund . . . [including the] ADMINISTRATIVE FUND, which shall be used to pay all SETTLEMENT COSTS other than the payments described in Sections XXII.D.1 and XXII.D.2, which shall constitute ADMINISTRATIVE EXPENSES . . . ." _Id._ § XXII.D.3. "Administrative Expenses shall mean the Settlement Costs described in section XXII.D.3". _Id._ § II.D.

[56]   _Id._ § XXII.H ("BP and the CLAIMS ADMINISTRATOR shall adjust the monthly payment amounts accordingly to ensure that sufficient funds are on deposit in the ADMINISTRATIVE FUND to cover the ADMINISTRATIVE EXPENSES on a timely basis."). Since all Settlement Costs must be paid out of the Administrative Fund pursuant to Section XXII.D.3 and all payments issued from the Administrative Fund constitutes Administrative Expenses as defined by Section II.D, then all Settlement Costs paid out of Administrative Funds must be timely paid.

[57]   _See MSA_, §§ II.QQQQ, XXII.A.

[58]   _In re Oil Spill by the Oil Rig "Deepwater Horizon" in the Gulf of Mexico, on April 20, 2010_ (_In re Deepwater Horizon_), 295 F.R.D. 112, 125–26 (E.D. La. 2013) (emphasis added).

[59]   See attached _MSA § XXVII Motion_, ¶ 6, which this memorandum supports.

GRG's administrative authority for the SPC and this Court's (and/or the transferee court's) administrative authority over the LMPC.[60] Without implementing these terms, there is no claim related administrative cost.

### PART IV. THE PLAIN AND ORDINARY MEANING OF THE *SETTLEMENT COSTS TEST*.

Pursuant to the *Final Fairness Order* and the *MSA*, the definition of "Settlement Costs" has a total of eight possible definitions.[61] Section II.QQQQ(viii) provides one definition for "Settlement Costs" with three elements that gives us the "*Settlement Costs Test*." The *Settlement Costs Test* reads, "all other costs and compensation reasonably associated with the implementation and administration of this MSA."[62] The *Settlement Cost Test* acts as a catchall provision that includes any MSA related expenses not specifically enumerated.

### PART IV.A. THE MEANING OF "AND" IN THE CONTEXT OF THIS MSA.

As a threshold matter, the parties use the word "and" to separate each of the eight definitions within the conjunctive clause.[63] The word "and" in this context means "and other things" or "and others or more of the same or similar kind."[64] Section II.QQQQ(i) and Section II.QQQQ(iii) have nothing to do with each other if considered independently, but costs incurred under each definition are nonetheless compensable.[65] A cost need not be compensable under both the SPC Matrix and the Gulf Region Health Outreach Program ("GRHOP").

---

[60]     These "implementation triggers" are how class members begin the process of settling allowable claims. All other past, present, *and future claims have been released. Order and Judgment Granting Final Approval of Medical Benefits Class Action Settlement and Confirming Certification of the Medical Benefits Settlement Class* ("*Final Fairness Order*"), No. 10-MD-2179, Rec. Doc. 8218, ¶¶ 11–17 (E.D. La. Jan. 11, 2013). Section VIII details a settlement process which acts as the only vehicle available to administer Mr. Wilson's LMPC claim. Therefore his claim must reach its natural conclusion through this process.

[61]     *MSA*, § II.QQQQ; *Final Fairness Order*, MDL 2179, Rec. Doc. 8218, at 21 (incorporating the MSA).

[62]     *MSA*, § II.QQQQ(viii).

[63]     *Id.* § II.QQQQ(i)–(viii).  Part IV.A should be read with *Wilson Ex. A* (parsing out II.QQQQ(i) )–(viii)).

[64]     Merriam-Webster defines "and" as a conjunction clause in the following context, "1. And others or more of the same or similar kind, 2. Further in the same or similar manner, 3. And the rest, 4. And other things." *And*, MERRIAM-WEBSTER'S DICTIONARY, ¶ 4, http://www.merriam-webster.com/dictionary/and (last visited Aug. 20, 2015).

[65]     *Compare MSA* § II.QQQQ(i) ("[A]ll compensation for [SPC]s as provided in [§] VI and [Ex.] 8. . . ."), *with id.* § II.QQQQ(iii) ("[A]ll costs associated with the [GRHOP] as provided in [§] IX . . . .").

Looking at definition II.QQQQ(viii) in comparison to the other eight definitions, "any *other* cost and compensation" essentially references expenses associated with the implementation and administration of any terms not yet enumerated in the Settlement Cost definition. Therefore when deciding any expense associated with any part of the MSA not detailed in Sections VI, VII, IX, V, XXI, III.C, VIII.E, XI, and Exhibit 8, the trustee must look to Section II.QQQQ(viii). This includes expenses associated with subsections A, B, and G of Section VIII of the MSA.[66] The plain meaning of the words "any other" must be read such that each delineated subsection[67] is independent of every other unspecified subsection[68] not itemized in the definition.

The word "and" carries the same meaning *within* each subsection. The trustee, the Parties, and the Court have authorized payments made to GRG pursuant to Section II.QQQQ(v) even though mediation for LMPCs has nothing to do with Guardian ad Litem expenses. Also, as GRG has received compensation for processing Notices of Intent to Sue for the four existing LMPCs and the 350 Notices of Intent to Sue that have been (or are currently being) considered,[69] the *Settlement Cost Test* was applied here because the definition of Section II.QQQQ(v) does not allow for these expenses.

### PART IV.B(1). FIRST ELEMENT: "ALL OTHER COSTS AND COMPENSATION."

The definition begins with the broadest of the elements, "*all other costs and compensation*." "Cost" has many definitions. Black's Law Dictionary defines "cost" as:

1. The amount paid or charged for something; price or expenditure.
2. The charges or fees taxed by the court, such as filing fees, jury fees, courthouse fees,

---

[66]    *See, e.g.*, *MSA* § II.QQQQ(v). When referencing Section VIII in Section II.QQQQ(v), only subsection VIII.E is described. As there is more to section VIII than simply subsection E, the *Settlement Costs Test* must be applied to the other subsections. Subsection E only refers to mediators and the process of mediation. No other subsection of Section VIII is included in subsection II.QQQQ(v) or any other subsection, except in the catchall provision of Subsection II.QQQQ(viii), the *Settlement Costs Test*.

[67]    Sections VI, VII, IX, V, XXI, III.C, VIII.E, XI, and Exhibit 8 are delineated.

[68]    Subsections A, B, and G of Section VIII of the MSA are unspecified.

[69]    *Status Report from the* Deepwater Horizon *Medical Benefits Settlement Claims Administrator*, MDL No. 2179, Rec. Doc. 14980, Table 11 (Aug. 12, 2015) (hereinafter "*Wilson Ex. B*").

and reporter fees. – Also termed court costs.

3. The expenses of litigation, prosecution, or other legal transaction, especially those allowed in favor of one party against the other. • Some but not all states allow parties to claim attorney's fees as a litigation cost. – Also termed (in sense 3) litigation costs.[70]

The word "all" is not ambiguous.[71] The MSA does not contain any expert cost exclusions. Ordinarily when discussing costs in Federal Courts, we look at "taxable costs" as detailed in FRCP r. 54.[72] Since the word "all" was used, the word "costs" includes "taxable" and "non-taxable costs."

Likewise, "compensation" means:

1. Remuneration and other benefits received in return for services rendered; esp., salary or wages. . . . "Compensation consist of wages and benefits in return for services. It is payment for work. If the work contracted for is not done, there is no obligation to pay. [Compensation] includes wages, stock option plans, profit-sharing, commissions, bonuses, golden parachutes, vacation, sick pay, medical benefits, disability, leaves of absence, and expense reimbursement.

2. Payment of damages, or any other act that a court orders to be done by a person who has caused injury to another. In theory, compensation makes the injured person whole.[73]

*Nero v. Indus. Molding Corp.*[74] provides us with insight into distinguishing between different types of compensation. In *Nero*, the 5th Circuit considered whether out-of-pocket expenses can be characterized as "other compensation denied or lost" when interpreting a statute.[75] We note with particular interest the absence of the word "all" in the statutory language being analyzed.

---

[70]     BLACK'S LAW DICTIONARY 397 (9th ed. 2009).

[71]     Merriam-Webster defines "all" as "2. Every member or individual component of <*all* men will go> <*all* five children were present>. . . . 4. Every <*all* manner of hardship>, 5. Any whatever <beyond *all* doubt>." *All*, MERRIAM-WEBSTER'S DICTIONARY ¶¶ 2, 4, 5, http://www.merriam-webster.com/dictionary/all (last visited Aug. 14, 2015). Given this meaning, "all" would translate to "Every member or individual component of" *costs* or "Every" cost or "Any whatever" costs. Given any of these meanings, the same result occurs. The plain and ordinary meaning of "all" means "every" in every sense of the word.

[72]     *Compare* 28 U.S.C. § 1920 (2015), *with* 28 U.S.C. § 1821 (2015). *But see Crawford Fitting Co. v. J.T. Gibbons, Inc.*, 482 U.S. 437, 444 (1987) ("Title 28 U.S.C. §§ 1920 and 1821. . . are still law, and when not overridden by contract or explicit statutory authority, they control a federal court's power to hold a losing party responsible for the opponent's witness fees.").

[73]     BLACK'S LAW DICTIONARY 322 (9th ed. 2009) (quoting Kurt H. Decker & H. Thomas Felix II, *Drafting and Revising Employment Contracts* § 3.17, at 68 (1991)).

[74]     167 F.3d 921, 930 (5th Cir. 1999).

[75]     *Id.* at 930.

Black's Law Dictionary defines "compensation" as "remuneration for services rendered, whether in salary, fees, or commissions" and more generally, as "payment for damages." These definitions suggest there is a spectrum of meanings for the term 'compensation.'  It is unclear which meaning should prevail and so our constructional problem is resolved by reference to the doctrine of *noscitur a sociis*, . . ."a word is known by the company it keeps."[76]

The *Nero* court applies the principal of *noscitur a sociis* when interpreting the Family Medical Leave Act ("FMLA") and finds that the term "other compensation appearing as it does with the other terms, implies a *quid pro quo* exchange for services rendered."[77]

In application, Section II.QQQQ(i) describes compensation to any person (including class members) as provided in Section VI; Section II.QQQQ(v) refers to compensation specifically by GRG (including GRG's staff and contractors as allowed in Sections VI and XXI), the Guardian ad Litem as detailed in Section III.C, and mediators pursuant to Section VIII.E; Section II.QQQQ(vi) refers to compensation to the Notice Agent for services rendered detailed in Section XI; and Section II.QQQQ(vii) discusses compensation by anyone associated with the operations and administration of the MST.[78] Together, the definitions of "cost" and "compensation" all deal with an expense or monetary amount associated with a debt or obligation of some kind. The thing that makes them similar to each other is that an obligation to pay exists for services, a remuneration for an injury, or a purchase. Needing to pick one form of definition versus another is not necessary because "all" means "every."[79] Therefore so long as an expense meets one of the five definitions listed above, this element is met.

*Crawford Fitting Co. v. J.T. Gibbons, Inc.*[80] explains "[A]bsent explicit statutory or contractual authorization for the taxation of the expenses of a litigant's witness as costs, federal

---

[76]   *Id.* (quoting BLACK'S LAW DICTIONARY 283 (6th ed. 1990)); *Gustafson v. Alloyd Co., Inc.*, 513 U.S. 561, 575 (1995)).

[77]   *Nero*, 167 F.3d at 930.

[78]   *MSA*, § II.QQQQ; *see also Wilson Ex. A* (parsing out Settlement Cost Definition).

[79]   *All*, MERRIAM-WEBSTER'S DICTIONARY ¶ 4, http://www.merriam-webster.com/dictionary/all (last visited Aug. 14, 2015).

[80]   482 U.S. 437, 445 (U.S. 1987).

courts are bound by the limitations set out in 28 U.S.C. § 1821 and § 1920."[81] Looking at the company it keeps, all expert costs and compensation fall within the definition. For example, GRG directs the trustee to pay experts necessary to administer SPC claims implemented by class members. When looking at the plain and unambiguous nature of the word "all," LMPC related expert costs are clearly compensable as payable throughout the Settlement Costs definition.[82]

Certain Settlement Cost definitions restrict who may incur a payable expense. For example, Section II.QQQQ(v) restricts the persons and/or entities that can incur an expense payable as a Settlement Cost to GRG (including staff and contractors), the Guardian ad Litem, and mediators that are performing their duties as listed in certain sections.   After all, that subsection expressly states, "all reasonable compensation to and all reasonable out-of-pocket costs and expenses incurred by the Claims Administrator . . . , the Guardian ad Litem  . . . , and mediators . . . ."[83] No such restriction of whom can claim for a Settlement Cost exists in section II.QQQQ(viii).  *Anyone* incurring expenses for implementing terms administered must be paid.[84]

Experts provide a service and these services are expensive. Mr. Wilson has sought

---

[81]    *Id.*;  *see* 28 U.S.C. §§ 1821, 1920 (2015).

[82]    We know the Parties contemplated Settlement Costs included paying for medical doctors to work in tandem with the BELO process. *Compare MSA,* § II.QQQQ(ii) (defining costs in relation to the PMCP); *MSA*, §VII.B ("The medical consultation visits and services provided herein shall be done under the supervision of a licensed medical doctor. *The Parties agree that such visits and services are intended to establish a physician/patient relationship.*" (emphasis added)), *with In re Deepwater Horizon*, 295 F.R.D. 112, 145 (E.D. La. 2013) (Barbier, J.) ("This program will continue for 21 years. . . .  [T]he Periodic Medical Consultation Program and the Back End Litigation Option work in tandem to protect Class Members who may fall ill at some future point because of their past exposure to oil and/or dispersants."). We also know that GRG requires the use of medical experts to determine if a valid diagnosis exists for LMPCs, *see MSA* § VIII.A-B, and if more likely than not medical records exist to support the SPC claim made by a class member.  *See id.* § V.J.
        The Parties expressly intended diagnosticians be compensable as a Settlement Cost or the PMCP could never pay diagnosticians. Should these very diagnosticians be required to testify because they "first" diagnosed the condition, they most certainly should receive expert fee compensation for such testimony. *Compare* 7*id.* § II.QQQQ(ii), *with id.* § II.QQQQ(v), *and id.* § V.J.

[83]    *Id.* § II.QQQQ(v).  Other terms restrict compensation to certain individuals or entities such as subsection II.QQQQ(i) to qualifying class members, subsection II.QQQQ(vi) by the Class Notice Agent, and subsection II.QQQQ(vii) by anyone associated with the operations and administration of the MST.

[84]    *See infra* note 55-59 and accompanying text for how an individual incurs a payable expense.

assistance from a wide variety of experts ranging from his initial diagnostician;[85] diagnostic specialists of the ear, nose, and throat to corroborate his LMPC diagnosis;[86] environmental toxicologists familiar with the location, amount, timing, and types of crude oil and other toxic chemicals used in and around Dauphin Island, Alabama, where much of his exposure took place;[87] general/specific causation toxicologists for both response activities related to crude oil, dispersants, and other toxic chemicals.[88] Mr. Wilson also needs the assistance of an expert for determining his compensatory damages (earning capacity and life care plans).[89] Depending on what experts BELO Defendants choose to use, an additional environmental toxicologist may be required.[90] Experts recommended by the PSC quoted the average price close to $500 an hour.[91]

Experts are anticipated for each sub-element of the "issues to be litigated" if, but only if, BELO Defendants contest the issue raised by the Plaintiff in the four corners of the complaint. To the extent Mr. Wilson has filed his complaint, BELO Defendants have contested every "issue to be litigated" and raised an affirmative defense that will likely require a mold expert as well.[92]

---

[85] This cost is realistically necessary to prove he was "first diagnosed after April 16, 2012" with Chronic Rhinousinusitis. *MSA,* § VIII.G(3)(a)(i). *See infra* Part IV.B(3) discussing the *Settlement Cost Test*'s third element.

[86] This cost is reasonably realistically necessary to prove the diagnosis, as given, is correct; a fact BELO Defendants are presently contesting as allowed in MSA Section VIII.G(3)(a)(i). This expert will also be necessary to refute the BP's IME experts who will certainly seek to invalidate the initial diagnosis.

[87] This cost is realistically necessary to prove the issues of the amounts, location, and timing of the toxic chemicals released and or used in connection with Response Activities during the *Deepwater Horizon* Incident and Mr. Wilson's response activities as required in MSA Section VIII.G(3)(a)(ii). In addition to eye witness testimony, a second expert may be required to prove Mr. Wilson's exposure level and duration in performing his response activities as allowed in MSA Section VIII.G(3)(a)(iii).

[88] This cost is realistically necessary to prove specific and general causation as required by MSA Section VIII.G(3)(a)(iv), essential elements to receive compensation without which it is all but impossible to prove causation. *Seaman v. Seacor Marine, LLC.*, 564 F. Supp. 2d 598, 603 (E.D. La. 2008); *see Moore v. Ashland Chem. Inc.*, 151 F.3d 269, 278–79 (5th Cir. 1996).

[89] This cost is realistically necessary to prove the total damages. *See MSA* § VIII.G(3)(a)(vi).

[90] Mr. Wilson worked in mold remediation; a mold expert may be required. *MSA* § VIII.G(3)(a)(v).

[91] An expert diagnostician testifying for the Class was quoted at $625 an hour. The least expensive expert we were able to find was the second expert recommended by class counsel costing between $300 and $400 an hour. Other expert prices vary, but some leading experts in the field of toxicology and epidemiology have quoted upwards of $1,000 an hour. Almost all experts quoted "portal to portal" rates.

[92] See BP's Second, Third, and Fourth affirmative defense to Mr. Wilson's second amended complaint. *Def. Answer to 2d Am. Compl.*, No. 15-300, *Wilson v. BP Exploration & Prod Inc.*, Rec. Doc. 41, at 7 (S.D. Ala. Aug. 11, 2015).

Mr. Wilson's will need a bare bones minimum of five (5) different experts.[93] Each expert will be required to work approximately 128 hours.[94] At the aforementioned average rate, each expert will require approximately $64,000 in fees if Mr. Wilson's case goes to verdict, estimating anywhere between $320,000 through $640,000 in expert fees for a single LMPC excluding demonstratives, travel, room, and board.[95] This cost and compensation acts as an insurmountable problem. The cost to allowable damages ratio incurred by Mr. Wilson is approximately 3:1 before attorney fees and costs— the very definition of negative value.[96]

**PART IV.B(2).** SECOND ELEMENT: "ASSOCIATED WITH IMPLEMENTATION AND ADMINISTRATION."

The second element narrows the scope of the first element. When looking at the second element, the trustee must ask if the cost and compensation is "*associated with the implementation and administration of the MSA*." Black's Law Dictionary defines "administration" as "A judicial action in management and distribution of property."[97] Here, the Court has retained "continuing and exclusive jurisdiction . . . to . . . administer . . . the [MSA] in accordance with its terms."[98] The Court appointed GRG as the Claims Administrator and Mr. Garretson as the trustee.[99] Because this Court retained exclusive and continuing jurisdiction to administer all matters relating to *Plaisance, et al. v. BP Exploration & Production Inc., et al.*, these

---

[93]   The minimum five experts are (i) diagnostician, (ii) environmental toxicologist with knowledge of location, amount, and timing of toxic chemicals, (iii) general and specific causation toxicologist, (iv) damages expert, (v) alternate cause mold specialist/expert. We believe BP estimates six to seven experts. Transcript of Scheduling Conference at 13:23-25 ("*Wilson Ex. C*"), *Wilson v. BP Exploration & Prod., Inc*, (Aug 12, 2015) (No. 15-cv-300).

[94]   Two hours for the intake, twelve hours for the report generation, sixteen hours (2 days) for deposition, forty eight hours for *Daubert* hearing as most experts will need to be flown in to testify, and forty eight hours to testify. Mr. Wilson is estimating time through to verdict. Mr. Wilson recognizes that this cost substantially decreases if settled prior to verdict.

[95]   Mr. Wilson originally believed the cost was significantly lower because the first expert he sought out was the least expensive expert suggested by the PSC. *Id.* at 15:8–10. But that expert could not testify as to the other elements of his case and as he continues to discover, these prices are certainly cost prohibitive.

[96]   *Amchem,* 521 U.S. at 616 (defining negative value cases as ones where "the amounts at stake for individuals may be so small that separate suits would be impracticable").

[97]   BLACK'S LAW DICTIONARY 49 (9th ed. 2009).

[98]   *Final Fairness Order*, *supra* note 5, ¶ 22.

[99]   *Id.* ¶¶ 7, 9; *MST*, MDL No. 2179, Rec. Doc. 6399-3 (May 1, 2012).

persons and/or entities are acting, to a limited degree, as agents of this Court, subject to its control, and acting through the express and/or implied scope of authority retained to administer each settlement claimed by a Class Member.[100] Mr. Wilson's LMPC is currently being administered before the transferee court in the Southern District of Alabama. The interpretation, implementation, administration, and enforcement orders rendered in this Court are controlling in all matters before the Southern District of Alabama. That court does not have the authority to interpret, implement, administer, and enforce the terms of the MSA but only to administer it through the lens created by this Court.[101]

Merriam-Webster defines the adjective "associate" to mean "closely connected (as in function . . .) with another."[102] To construe how the term "associated with" should apply to "cost and compensation" and "implementation and administration of the MSA," we look at the "close connection" which exists between the two clauses. A close connection (association) exists when any person or entity that may implement a term requiring administration by this Court, or its agent, triggers an event that incurs any cost and compensation. Thus, the question of association

---

[100]   *See, e.g.*, *U.S. v. Logan*, 505 F.2d 35, 37 (5th Cir. 1974) (showing how under certain circumstances, it is appropriate to view a person and/or entity as a designated agent of the Court for a limited purpose); *King v. U.S.*, 379 U.S. 329, 330, 337 (1964) (showing as a limited purpose a distributing agent dividing assets acts as an agent of the court); *Lewis v. La. State Bar Assoc.*, 792 F.2d 493, 497 (5th Cir. 1986) (explaining that a bar association is the agent of the court when the court retains "exclusive rulemaking authority" and retains the ultimate authority to enforce rules). This agency relationship is for a limited purpose: to administer this Court's settlement order in some fashion. *See Final Fairness Order*, *supra* note 5, ¶ 21. This Court is extending administrative authority to Mr. Garretson and GRG through a limited agency relationship requiring all to act within the limits of this Court's Retained Jurisdiction. All claims raised by class members must first be raised through GRG. *MSA*, § VIII.G(1)(c). Both the Proof of Claim Form ("PoCF") and the Notice of Intent to Sue ("NoIS") explain, "This form is an official court document sanctioned by the Court that presides over the class actions arising from the Deepwater Horizon Incident. Submitting this document to the Claims Administrator *is equivalent to filing it with the Court* . . . ." *MSA Ex.4*, Rec. Doc. 6427-6, at 10 (emphasis added); *see also MSA Ex.5*, Rec. Doc. 6427-7, at 20. To the extent that this Court has Retained Jurisdiction, all decisions made by GRG and Mr. Garretson under authority extended to them by the *Final Fairness Order* must be measured with the hand of limited jurisdictional jurisprudence. This Court is not the sole entity and/or person whom can implement a term of the MSA. This Court cannot, by illustration, implement a SPC or LMPC claim on behalf of a class member pursuant to Section V.A or Section VIII. The choice to submit a claim belongs to the qualifying class member alone, and he/she triggers the implementation of the term by "filing" the PoCF and/or the NoIS with this Court through its agent GRG in a timely and detailed process.

[101]   *Compare [Transfer] Order*, No. 14-2730, Rec. Doc. 23, at 1 (E.D. La. June 5, 2015), *with Final Fairness Order*, *supra* note 5, ¶¶ 10, 21–22.

[102]   *Associate*, MERRIAM-WEBSTER'S DICTIONARY ¶ 1, http://www.merriam-webster.com/dictionary/associate.

activates when any person or entity implements a term requiring administration. Once triggered, the trustee looks to any costs and compensation *closely connected* with said implementation and administration.

Mr. Wilson is implementing Sections V.A, VIII.B, and VIII.G(3), settling his SPC through GRG and his LMPC through a BELO Lawsuit before the Southern District of Alabama. Without implementing Section VIII(G), Mr. Wilson may not receive compensation for his LMPC. Proving/disproving "issues to be litigated" incurs costs.[103] Any cost associated with proving/disproving issues and elements that *are not* listed under Section VIII.G(3) cannot be a Settlement Cost because no term is being implemented.[104]

Any person and/or entity seeking to *implement* a term in the MSA in order to further their settlement may incur a cost. Merriam-Webster's Dictionary defines implementation through its root word "implement" which is defined in relevant part as "to begin to do or use (something, such as a plan): to make (something) active or effective. . . . ([e.g.] *implementation* of the plan)."[105] Any person and/or entity that may *begin to do or use* any MSA term or *to make* (a provision of the MSA) *active or effective* may begin to "implement" a term in the MSA. When such person or entity's *cost and compensation* is *associated/connected with the making of a term or provision active or effective*, they are implementing terms and Settlement Costs may ensue.

When construing the second element of the *Settlement Costs Test*, the MSA requires BP to pay for any *cost and compensation* reasonably *associated/connected* with any person and/or entity's implementation of a MSA term that must be administered by this Court or an authorized

---

[103]     The issues/elements to be litigated include proving causation in negligence and strict liability.

[104]     Proving that oil drilling and transportation is an ultra-hazardous activity under the theory of strict liability may have an expert cost but nowhere in the MSA has Mr. Wilson discovered a term that expressly permits or disallows this issue to be litigated. Therefore, this element's costs may not be Settlement Costs.

[105]     *Implement*, MERRIAM-WEBSTER'S DICTIONARY, http://www.learnersdictionary.com/definition/ implement (last visited Aug. 15, 2015).

administrator.[106] Implementing a term for settlement occurs when a person or entity begins, uses, and/or makes a provision of the MSA active or effective. If the provision is dormant (as in issues to be litigated), then the moment BELO Defendants contest an issue, that issue becomes "active". When the part(ies) implementing the term incur costs and/or compensations they may be reimbursed for Settlement Costs under the *Settlement Costs Test*.

BP certainly will claim the right to implement the MSA Section XVI Release against class members. Class Members may also assert and implement the MSA Section IV.E provision against BP. Section IV.E, when read in harmony with subsection A, B, and G of Section VIII of the MSA, creates a contractual right to the Settlement Cost free administration of a class member's BELO. BP raised the Release as a defense against Mr. Wilson's BELO, so too does Mr. Wilson raise his right to a Settlement Cost free administration of his claim. All SPC and BELO Lawsuits are administered through this Court, including its administrative agents.[107] When such administration is a result of a class member implementing a term, any cost and compensation associated with the administration and implementation meets the second element.

### PART IV.B(3). THIRD ELEMENT: "REASONABLY ASSOCIATED WITH".

The third element deals with the reasonableness of the association. The *cost and/or compensation* must be <u>*reasonably associated with*</u> the *implementation and administration* of any term in the MSA. Certainly a cost and/or a compensation is reasonably associated with the *implementation and administration* of the MSA if the term cannot realistically be implemented by a Party, a Class Member, BP, any trustee, the Court, and/or the Claims Administrator without

---

[106] The administrative methods chosen by the Parties and approved by this Court are fixed. A claim is approved for administration by GRG for SPC purposes if a PoCF was received within one year of the effective date. A claim is approved for administration by GRG for LMPC purposes if a NoIS is filed within 4 years of initial post April 16, 2012 diagnosis. If an LMPC survives the NoIS and Mediation Information Form process, then, so long as the claim is timely filed, the BELO Lawsuit is administered by this Court and/or its transferee court.

[107] The Courts agents include General Magistrates Shushan and Wilkinson, BELO transferee courts, GRG, Mr. Garretson, and any other person and/or entity assigned by this Court to interpret, administer, implement, and enforce any term of the MSA.

paying the expense. Therefore to determine if a *cost and/or compensation* is <u>*reasonably associated with*</u> the implementation, the trustee must first look to see if *it* is necessary. If so, the trustee has discretion to determine any "amount" realistically necessary to implement a term.[108]

Although every cost incurred by a person *implementing* a MSA term must be considered as a possible Settlement Cost, not every cost incurred is a Settlement Cost. For example, mediation costs incurred by class members seeking LMPC compensation are only considered Settlement Costs if the standards set forth in Section VIII.E are met. Therefore, if the BELO parties agree to mediate <u>*after the case is filed*</u>, such costs are not Settlement Costs because no term is being implemented. The same can be said for travel and board costs incurred by non-local attorneys appearing before any court administering the MSA. No term that may be implemented requires a non-local attorney to try the case when "willing and able" competent attorneys exist within the relevant jurisdictional venue. As such, although all costs must be considered when applying the *Settlement Cost Test*, not all costs are Settlement Costs; only those costs <u>*reasonably associated with*</u> an implementable MSA term.

Also, Mr. Wilson has never suggested that it is appropriate for the trustee to pay any cost and/or compensation to any class member filing a claim without merit. It would be improper to do so. Likewise, it would be improper for any expert fees to be paid for by the trustee if said expert's methodology would not survive a *Daubert* challenge. Therefore Mr. Wilson suggests that expert fees require a vetting process created by the Claims Administrator, approved of by the Parties (BP and the PSC) or ordered by the Court, whereby experts proposed by the Class Members are approved by the trustee. If said "vetted" expert is relied upon by the Class Member, then the expert fees should be paid by the trustee as Settlement Costs. This gives the trustee a

---

[108]     A cost is necessary if it cannot realistically be implemented/administered without the expense. *See MSA*, § XXII.I; *id.* § II.QQQQ. <u>*BP may not simply outspend class members.*</u> Therefore the trustee must look at the totality of the circumstances including CV, price, and time when deciding reasonableness of expert fees.

bargaining position to lower the price for suggested experts. An objective vetting process by a third party independently verifies all qualifications detailed in the proposed expert's CV. That expert would only be subject to one *Daubert* challenge. If the proposed methodology is approved after a *Daubert* hearing before General Magistrate Wilkinson, then the costs associated with the use of that expert to prove an element described in the "issues to be litigated" can be timely and contemporaneously paid by the trustee. If the class member elects not to utilize vetted experts, he or she has that right. Never the less, expert fees will not be compensable until he or she prevails at the verdict stage of the BELO. Clearly if a verdict occurs where the class member receives at least $0.01 in compensatory damages, payments made for the administration of the BELO claim is vindicated and appropriate. This vetting process removes unnecessary *Daubert* hearings, provides an ease in mass processing of experts, and provides a streamlined approach that saves BP money while eliminating the risk of paying class members for meritless BELO claims.

**PART V.** SETTLEMENT COSTS ARE THE MATERIAL CONSIDERATION BINDING THE CLASS AND BP; THEREFORE LMPC ASSOCIATED COSTS CANNOT BE EXEMPT OR RELEASED

The MSA is just that, a Settlement Agreement that binds both the BELO Defendants and Mr. Wilson to its terms. Unlike in *Evans v. Tin, Inc.*[109] where "Later-Manifested Bodily Injury" was expressly excluded from the Settlement and the Class Release, this MSA does not exclude LMPC claims.[110] The MSA explains that in consideration for enumerated benefits, damages

---

[109]   No. 11-2067 CW, 2013 WL 4501061 (E.D. La. Aug. 21, 2013).

[110]   *Compare Amended Settlement Agreement, Evans v. Tin, Inc.*, No.11-2067, Rec. Doc. 628-3, § VI.B (E.D. La. Dec. 19, 2012) ("Excluded from the Settlement and the Class Release are ***any future claims asserting damages*** for a Later-Manifested Bodily Injury caused by the Incident." (note: no conditions or restrictions)), *with MSA*, § XVI.B ("[A]ny and all claims . . . relating to, arising from, or as a result of a [LMPC] are released and forever discharged . . . if, but only if, one or both of the following conditions occur as to [the filing class member] . . . .") *and MSA*, § XVI.C ("In further consideration of the benefits described . . . any and all claims for damages or remedies . . . for . . . other non-compensatory damages or penalties of any kind, that relate to, arise from, or are a result of any [LMPC] are released and forever discharged . . . ."); *MSA*, §II.H. Although this MSA does exclude LMPCs from the release rendering the lawsuit "essentially a new action", *Order as to whether BELO Cases May Be Tried to a Jury* ("*BELO Jury Order*"), No. 14-cv-2730, Rec. Doc. 19, at 3 (E.D. La. Apr. 27, 2015) ( J. Barbier), the MSA does not exclude LMPCs from the settlement as ***BOTH*** class members and BP are bound by its terms.

other than compensatory damages are released.[111] The enumerated benefits are BP's consideration, which can never be released, as it is the agent that binds the Parties.[112]

BELO Lawsuits are still part of the Settlement Agreement.[113] The MSA, especially Section VIII, describes with particularity how the claim is to be administered, where it can be administered, by whom, includes a restrictive release, and provides limitations on damages. Pursuant to the MSA's terms and plain meaning, Mr. Wilson seeks to follow the administrative path created by it and is entitled to derive all the benefits bargained for in its terms; including costs and compensation reasonably associated with his implementation of BELO terms administered by this Court and the transferee court. All court costs, jury pay, filing fees, and expert costs must be paid by BP as the consideration that binds Mr. Wilson to the terms of the release as described in Sections IV.E and XVI. All these costs are "relating to, arising from, or as a result of" Mr. Wilson's LMPC and are therefore NOT released pursuant to Sections XVI.B, XVI.C, or *MSA Ex.* 5.[114] As such, Mr. Wilson agreed to the Release in exchange for the benefits offered including Settlement Costs. BP cannot derive this benefit without paying this detriment.

Mr. Wilson and those similarly situated are in the untenable position where no affordable remedy at law exists. BELO Defendants are hoping negative value claims deter lawyers from taking these cases. To date, BP has refused to mediate any claimant's filed Notice of Intent to Sue[115] evidencing that BP has no incentive or intent to mediate. This is an illusory remedy at best. Just because GRG is no longer administering Mr. Wilson's LMPC does not mean this Court or the transferee court is not administering his claim. Mr. Wilson may have the burden of evidentiary proof, but the plain meaning of the MSA does not also require he bare the sole

---

[111]    *See MSA*, § XVI.B, .C.
[112]    *Id.* § IV.A-E.
[113]    The BELO Option expressly includes the right to file a lawsuit administered by this Court. *MSA*, § II.H.
[114]    *MSA*. § XVI.B, .C; *MSA Ex.5*, MDL No. 2179, Rec. Doc. 6427-7, § 10.B, .C (May 3, 2012).
[115]    *Wilson Ex. A*, at 26, n. 18, Table.

financial burden of proving his case, given the restraints imposed on his BELO Lawsuit.

### PART VI. CONCLUSION: BP MUST PAY FOR ALL SETTLEMENT COSTS, AND EXPENSES REASONABLY ASSOCIATED WITH THE IMPLEMENTATION OF THE MSA TERMS.

In closing, Mr. Wilson recalls the words issued by this Court.

> As far as leading to absurd results, the interpretation [of Later Manifested Physical Conditions] may not be what the Court envisioned at the time of the fairness hearing nor what Class Counsel apparently thought, but the Court cannot say the result is absurd. Claimants who allege a chronic condition that was not diagnosed until after April 16, 2012 are not without a remedy.[116]

For a viable remedy to exist, BP must pay for all Settlement Costs. The plain meaning of Settlement Costs must include not some but all other costs and compensation reasonably associated with the implementation and administration of the MSA. A settlement that requires class members to pay three times more than the remedy available, before attorney fees, is the very definition of absurd. This Court noted, this MSA "doesn't sound like much of a settlement. Frankly, I've never heard of a settlement which requires you to file another lawsuit."[117]

Filed this 23rd day of November, 2015.

Respectfully Submitted by,

Ramon Guillen /s/
Co-Counsel for LeRoy Wilson

**Ramon Guillen, Jr., Esq.**
Fla. Bar. No. 99789
rguillen@downslawgroup.com along with

**Craig T. Downs**
Fla. Bar. No. 801089
cdowns@downslawgroup.com of the
*Downs Law Group*
3250 Mary Street, Suite 307
Miami, FL 33133
Telephone: (305) 444-8226
Facsimile: (305) 444-6773 and

**David D. Kervin, Jr.**
La. Bar. No. 28374
david@kervinlaw.com of the
Law Office of David D. Kervin, Jr., LLC
201 St. Charles Avenue, Suite 2500
New Orleans, LA 70170
Telephone: (504) 599-5906
Facsimile: (504) 754-7514

---

[116]   *[Order] Regarding Class Counsel's Motion for Reconsideration (Rec. doc. 13303) of the Court's Order of July 23, 2014 Regarding Chronic Specified Physical Conditions (Rec. doc. 13179)*, No. MDL 2179, Rec. Doc. 13733, at 5 (E.D. La. Nov. 26, 2014) (Barbier, J.).

[117]   *Official Transcript*, MDL No. 2179, Rec. Doc. 13450, 41:9–11 (Sept. 30, 2014).