# IN THE UNITED STATES DISTRICT COURT
## FOR THE EASTERN DISTRICT OF LOUISIANA

| | | |
|---|---|---|
| In re: Oil Spill by the Oil Rig "Deepwater Horizon" in the Gulf of Mexico, on April 20, 2010, | * * * | MDL 2179 |
| | * | |
| | * | SECTION J |
| This Document Applies To: | * | |
| | * | |
| No. 10-4536, United States of America v. BP Exploration & Production, Inc., et al. | * | JUDGE CARL BARBIER |
| | * | |
| | * | MAG. JUDGE SALLY SHUSHAN |
| | * | |
| | * | |

---

## FINDINGS OF FACT AND CONCLUSIONS OF LAW

## PENALTY PHASE

# CONTENTS

I.   **Introduction** .................................................................................................................. **3**

   A.   Factual Background ................................................................................................ 3

   B.   The Government's Complaint .............................................................................. 4

   C.   Relevant Prior Rulings ......................................................................................... 6

   D.   The CWA's Civil Penalty Factors ..................................................................... 7

II.  **Findings of Fact** ........................................................................................................... **8**

   A.   Factor 1: Seriousness ........................................................................................... 8

   B.   Factor 2: Economic Benefit ............................................................................. 11

   C.   Factor 3: Culpability ......................................................................................... 13

   D.   Factor 4: Other Penalties for Same Incident ............................................... 14

   E.   Factor 5: Prior Violations ................................................................................. 16

   F.   Factor 6: Mitigation .......................................................................................... 17

   G.   Factor 7: Economic Impact on the Violator ................................................ 20

   H.   Factor 8: Other Matters ................................................................................... 21

III. **Analysis and Conclusions of Law** ....................................................................... **21**

   A.   Purpose of the CWA Civil Penalty ................................................................ 21

   B.   Legal Standard and Methodology .................................................................. 25

   C.   Analysis of the Penalty Factors ...................................................................... 26

   D.   Conclusion ........................................................................................................... 34

## I.   INTRODUCTION

1.      Pursuant to Federal Rule of Civil Procedure 52(a), the Court enters these Findings of Fact and Conclusions of Law respecting the "Penalty Phase," a bench trial held over eight days between January 20 and February 2, 2015.  The Court determines here the amount of civil penalties to be paid by defendant Anadarko Petroleum Corporation ("Anadarko") under the Clean Water Act ("CWA"), 33 U.S.C. § 1321(b)(7).[1]

2.      If any finding of fact is in truth a conclusion of law or any conclusion actually a finding of fact, it shall be treated as such, labels notwithstanding.

### A.    Factual Background

3.      This multidistrict litigation and the referenced member case arise from the April 20, 2010, blowout, explosions, fire, and subsequent oil spill involving the mobile offshore drilling unit DEEPWATER HORIZON (sometimes referred to as "HORIZON") and the well, known as Macondo, it had drilled in Block 252, Mississippi Canyon ("MC252"), on the Outer Continental Shelf approximately fifty miles from the Louisiana coast.[2]

4.      Eleven of the one hundred twenty-six people aboard the HORIZON died in the explosions and fire; at least seventeen others were seriously injured.  The survivors evacuated to a nearby supply vessel, the M/V DAMON BANKSTON.

5.      Fueled by hydrocarbons from the well, the HORIZON burned continuously until it capsized and sank on the morning of April 22.  As the rig descended, the marine riser—the

---

[1] Citations to statutes or regulations are to the version in effect on April 20, 2010, unless the citation or context indicates otherwise.  When referencing a particular section of the CWA, the Court will refer to the number codified in the United States Code, rather than the section number of the Act (e.g., "§ 1321" rather than "Section 311").

[2] The events leading up to and immediately following the blowout and explosions are discussed extensively in the Phase One Findings of Fact and Conclusions of Law ("Phase One Findings"), Rec. Doc. 13381-1, 21 F. Supp. 3d 657 (E.D. La. 2014), *appeal docketed sub. nom*, *In re Deepwater Horizon*, No. 14-31374 (5th Cir. Dec. 16, 2014).

approximately 5,000 feet of pipe that connected the rig to the subsea blowout preventer and well—collapsed and fractured.

6.      Each day for nearly three months, thousands of barrels of oil and gas from the MC252 reservoir flowed into and up the Macondo Well, through the blowout preventer and broken riser, and into the Gulf of Mexico.

7.      After several attempts failed to stop the flow of hydrocarbons, a device known as a capping stack was attached to the top of the blowout preventer and, on July 15, 2010, halted the discharge.  By that time, approximately 3.19 million barrels of oil had spilled into the Gulf.[3]  In mid-September, a relief well intercepted and sealed Macondo with cement.[4]

8.      It was not long after the blowout that the first lawsuits were filed.  Since that time, over 3,000 cases, with well over one hundred thousand claimants/plaintiffs, have been filed. On August 10, 2010, the Judicial Panel on Multidistrict Litigation consolidated most[5] federal cases arising from these events into Multidistrict Litigation 2179 ("MDL 2179"), pending before this Court.[6]

**B.      The Government's Complaint**

9.      On December 15, 2010, the United States filed in this Court a complaint captioned *United States v. BP Exploration & Production, et al.* (C.A. no. 10-4536), which was consolidated with MDL 2179.

---

[3] Another 0.81 million barrels of oil released from the reservoir, but was collected before it could enter the marine environment.

[4] The efforts to cap and seal the Macondo Well are discussed more extensively in the Phase Two Findings of Fact and Conclusions of Law ("Phase Two Findings"), Rec. Doc. 14021, 77 F. Supp. 3d 500 (E.D. La. 2015), *appeal docketed sub. nom, In re Deepwater Horizon*, No. 15-30139 (5th Cir. Feb. 13, 2015).

[5] Shareholder derivative suits and other securities-related cases were consolidated into MDL 2185, pending in the Southern District of Texas.  *See BP p.l.c. Sec. Litig.*, 734 F. Supp. 2d 1376 (J.P.M.L. 2010).

[6] *In re: Oil Spill by the Oil Rig "Deepwater Horizon" in the Gulf of Mexico, on April 20, 2010*, 731 F. Supp. 2d 1352 (J.P.M.P. 2010).

10.     The Government's complaint sought two forms of relief: civil penalties under the CWA and a declaratory judgment of liability under the Oil Pollution Act of 1990 (sometimes referred to as "OPA").  Only the CWA claim is at issue here.

11.     The CWA prohibits the discharge of "harmful" quantities of oil into or upon covered waters or adjoining shorelines, in connection with activities under the Outer Continental Shelf Lands Act or Deepwater Port Act of 1974, or which may affect certain natural resources.[7] Certain persons who violate this prohibition are subject to civil penalties:  "Any person who is the owner, operator, or person in charge of any vessel, onshore facility, or offshore facility from which oil . . . is discharged in violation of [the CWA], shall be subject to a civil penalty . . . ."[8]

12.     The Government's complaint sought civil penalties against BP Exploration & Production, Inc. ("BPXP"), Anadarko,[9] MOEX Offshore 2007 LLC ("MOEX"), and various Transocean entities (collectively, "Transocean").

13.     For all times relevant to these Findings of Fact and Conclusions of Law, BPXP, Anadarko, and MOEX co-owned the Macondo Well.  BPXP owned a 65% interest in the well and was the designated "operator."[10] Anadarko and MOEX owned 25% and 10% interests,

---

[7] 33 U.S.C. § 1321(b)(3).  A "harmful" quantity of oil is one that "[v]iolate[s] applicable water quality standards" or "[c]ause[s] a film or sheen upon or discoloration of the surface of the water or adjoining shorelines or cause a sludge or emulsion to be deposited beneath the surface of the water or upon adjoining shorelines."  40 C.F.R. § 110.3(b).

[8] 33 U.S.C. § 1321(b)(7)(A).

[9] The Government initially sued two Anadarko entities, Anadarko Petroleum Corporation and Anadarko Exploration & Production LP, but later stipulated that the CWA claim was asserted against only the former.  Rec. Doc. 5930.

[10] The "operator" is "the person the lessee(s) designates as having control or management of operations on the leased areas or a portion thereof."  30 C.F.R. § 250.105; *see also* Macondo Prospect Offshore Deepwater Operating Agreement ("Joint Operating Agreement"), TREX 280000 at 28, 34.  Citations to "TREX" refer to a "trial exhibit" from the Penalty Phase trial. When a TREX citation refers to a specific page, the page number is the "pdf" page number (i.e., page "1" is the very first page of the exhibit), which may be different from the page number printed on the exhibit.

respectively, and both were "non-operators."[11]    Transocean owned the DEEPWATER HORIZON, which was hired by another BP entity to drill the Macondo Well.

14.    The Government settled its CWA claims with MOEX and Transocean before the Penalty Phase trial.[12]    After the Penalty Phase trial, the Government reached a tentative settlement with BPXP.[13]   Consequently, only the CWA claim against Anadarko remains at issue.

## C.    Relevant Prior Rulings

15.    On February 22, 2012, the Court held on partial summary judgment that Anadarko is liable for civil penalties under the CWA, because it was an "owner" of an "offshore facility" (i.e., the Macondo Well) "from which" a harmful quantity of oil discharged.[14]   This ruling has been affirmed on appeal.

16.    The Court has also issued several decisions that, when combined, establish the maximum amount of the penalty that could be imposed against Anadarko under the CWA.

17.    The CWA, as codified following the 1990 amendment, states that a person found liable for a harmful discharge of oil "shall be subject to a civil penalty in an amount up to $25,000 per day of violation or an amount up to $1,000 per barrel of oil," except where the discharge "was the result of gross negligence or willful misconduct," in which case the penalty "shall be . . . not less than $100,000, and not more than $3,000 per barrel of oil."[15]

---

[11] *See* Joint Operating Agreement, TREX 280000; Stipulated Order re Anadarko Entities at 2, Rec. Doc. 5930.
[12] *See* Consent Decree Between U.S. and MOEX, Rec. Docs. 6698; Partial Consent Decree Between U.S. and Transocean Entities, Rec. Doc. 8608.
[13] *See* Rec. Docs. 15443, 15436-1.  The Government's settlement with BPXP is subject to, inter alia, a public comment period.
[14] Order and Reasons [As to Cross-Mots. for Partial Summ. J. Re Liability under the CWA and OPA] at 23-24, Rec. Doc. 5809, 844 F. Supp. 2d 746, 761 (E.D. La. 2012), *aff'd sub nom.*, *In re Deepwater Horizon*, 753 F.3d 570 (5th Cir. 2014), *and*, 772 F.3d 350 (5th Cir. 2014) (per curiam), *en banc reh'g denied*, 775 F.3d 741 (5th Cir. 2015), *cert. denied*, 135 S. Ct. 2891 (2015), *and*,135 S. Ct. 2893 (2015).
[15] 33 U.S.C. § 1321(b)(7)(A), (D).

18.     On August 26, 2011, while ruling on motions to dismiss the "B1" Master Complaint, the Court held that Anadarko was not negligent as a matter of law with respect to the loss of well control, blowout, explosions, or the oil spill.[16]   From this ruling it follows that Anadarko is not subject to the enhanced civil penalty for gross negligence or willful misconduct.

19.     On February 19, 2015, the Court ruled that a federal regulation[17] adjusting the maximum amount of the CWA civil penalty was valid.[18]   Thus, the maximum per-barrel penalty that may be imposed upon Anadarko is $1,100 per barrel, not $1,000 per barrel as stated in the United States Code.

20.     Also, and as mentioned above, the Court determined in Phase Two that 3.19 million barrels of oil discharged into the Gulf of Mexico.[19]

21.     In light of these rulings, the maximum civil penalty that could be assessed against Anadarko is $3,509,000,000 or approximately $3.5 billion (3,190,000 x $1,100).

**D.     The CWA's Civil Penalty Factors**

22.     To determine the actual amount of the civil penalty, not simply the maximum, the CWA states that the Court "shall consider" eight factors:

[1] the seriousness of the violation or violations,
[2] the economic benefit to the violator, if any, resulting from the violation,
[3] the degree of culpability involved,
[4] any other penalty for the same incident,
[5] any history of prior violations,
[6] the nature, extent, and degree of success of any efforts of the violator to minimize or mitigate the effects of the discharge,
[7] the economic impact of the penalty on the violator, and
[8] any other matters as justice may require.[20]

---

[16] Order [As to Motions to Dismiss the B1 Master Complaint] at 28-29, Rec. Doc. 3830, 808 F. Supp. 2d 943, 963 (E.D. La. 2011).
[17] *See* 40 C.F.R. § 19.4.
[18] Order [As to the Maximum CWA Per-Barrel Civil Penalty] at 7, Rec. Doc. 14206, 2015 WL 729701, at *4 (E.D. La. Feb. 19, 2015).
[19] Phase Two Findings ¶¶ 273, 277, Rec. Doc. 14021, 77 F. Supp. 3d at 525.
[20] 33 U.S.C. § 1321(b)(8).

23.     Between January 20 and February 2, 2015, the Court conducted a "Penalty Phase" trial where the parties presented evidence on these factors.  Afterwards, the parties submitted post-trial briefing and proposed findings, and the Court took the matter under advisement.[21]

24.     The Court has considered all of the evidence, counsels' briefs and proposed findings, and the applicable law.

## II.     FINDINGS OF FACT

25.     Here the Court considers each penalty factor, alone and without reference to the others, and makes certain findings.  In the Analysis and Conclusions of Law section below, the Court weighs the factors against one another and determines the amount of the penalty.

### A.     Factor 1: Seriousness

26.     The first factor to consider is "the seriousness of the violation or violations."[22]

27.     The Government argues that the oil spill was extremely serious—that it was a massive disaster which resulted in actual and potential harm to the environment, human health, the Gulf Coast economy, and the social fabric of Gulf Coast.

28.     Anadarko admits that the oil spill "was extremely 'serious' by any measure" and offered no evidence at trial relating to the seriousness factor.[23]

29.     Given that the parties agree that the oil spill was extremely serious, the Court need not list each piece of evidence or statistic reflecting the spill's seriousness.  Nevertheless, it is appropriate to recount some of the relevant facts.

---

[21] U.S. Post-Trial Br. & Reply, Rec. Docs. 14341, 14473; U.S. Proposed Findings & Conclusions, Rec. Docs. 14338, 14339; Anadarko Post-Trial Br. & Reply, Rec. Docs. 14343, 14476; Anadarko Proposed Findings & Concl., Rec. Doc. 14342.
[22] 33 U.S.C. § 1321(b)(8).
[23] Anadarko Post-Trial Br. at 14, Rec. Doc. 14343; *see also* Anadarko Proposed Findings & Conclusions ¶ 23, Rec. Doc. 14342 ("Anadarko admits that the discharge was extremely serious when it occurred." (footnote omitted)).

30.     There is no prescribed set of facts that must be analyzed under the seriousness factor.  Courts have considered a variety of factors including the size of the discharge,[24] its duration,[25] the size of the response effort,[26] the amount of compensation paid to victims,[27] and whether there was harm to the environment or public.  As to "harm," courts have considered not only whether there was actual harm,[28] but also whether potential harm or a significant threat of harm resulted from the discharge.[29]  On a related note, the Government need not quantify the harm to the environment, etc., in order for a discharge to be deemed serious, very serious, etc.[30]

31.     This was the largest oil spill in American waters.  This Court has determined that approximately 4.0 million barrels of oil exited the MC252 reservoir, 3.19 million of which entered Gulf waters.

32.     By comparison, the EXXON VALDEZ oil spill in 1989—the event that prompted Congress to dramatically increase the civil penalties available under the CWA[31]—was approximately 257,000 barrels, one-twelfth the size of this spill.

33.     Between 45,000 and 68,000 square miles of surface waters were oiled at one point or another.

---

[24] *See United States v. Citgo Petroleum Corp.*, 723 F.3d 547, 553 (5th Cir. 2013) ("The district court found the spill [of approximately 54,000 barrels of oil] was 'massive,' 'excessive,' and a 'tragedy.'  Both parties agree with this assessment, as do we.").

[25] *See United States v. Gulf Park Water Co.*, 14 F. Supp. 2d 854, 859 (S.D. Miss. 1998) (§ 1319(d) penalty) ("In determining the seriousness of the violations, the court looks to several factors, including, but not limited to: . . . the duration of noncompliance . . . ." (quotations omitted)).

[26] *See United States v. Egan Marine Corp.*, No. 08-3160, 2011 WL 8144393, at *7 (N.D. Ill. Oct. 13, 2011) ("The violation is undoubtedly serious, as evidenced by the extent of the cleanup efforts and the compensation that both parties have paid out as a result.").

[27] *See id.*

[28] *See Citgo*, 723 F.3d at 549, 553; *Gulf Park*, 14 F. Supp. 2d at 859; *United States v. Smith*, No. 12-00498, 2014 WL 3697223, at *12 (S.D. Ala. July 24, 2014) (§ 1319(d) penalty) (noting that "[t]he seriousness can be mitigated if the environmental impact of the unpermitted action only affects the immediate area.").

[29] *Gulf Park*, 14 F. Supp. 2d at 860; *see also Smith*, 2014 WL 3687223, at *13 ("[T]here has been no evidence of harm (*or even potential harm*) to human life, nor any specific evidence of harm to animal or aquatic life." (emphasis added)).

[30] *Gulf Park*, 14 F. Supp. 2d at 860.

[31] Antonio J. Rodriguez & Paul A.C. Jaffe, *The Oil Pollution Act of 1990*, 15 Tul. Mar. L.J. 1, 11, 18-19 (1990).

34.     According to the Shoreline Cleanup Assessment Technique—a technique used during the response to assess the shoreline and determine where response actions were appropriate—approximately 1,100 miles of the coast were visibly oiled to some extent, 220 miles of which were categorized as "heavily" oiled and another 140 miles as "moderately" oiled. Four years later, 393 miles of shoreline were still visibly oiled to some extent, fourteen miles of which were moderately or heavily oiled.

35.     In response to the spill, recreational and commercial fishing grounds were closed. At the peak of closures, 88,552 square miles of fishing grounds were closed.

36.     The oil caused actual harm to organisms.  For example, approximately 4,400 visibly-oiled birds were collected during the response, 2,303 of which were dead.  Four hundred seventy-four visibly-oiled sea turtles were collected, eighteen of which were dead.  Twelve visibly-oiled dolphins were collected, though many others were observed swimming in oiled waters.

37.     The response to this oil spill was unprecedented in size and complexity.

38.     The spill was declared a "spill of national significance" under the National Contingency Plan, meaning that it was "so complex that it require[d] extraordinary coordination of federal, state, local, and responsible party resources to contain and clean up the discharge."[32] This was the first time such a spill had been declared.

39.     Approximately $14 billion was spent on the response.

40.     An enormous number of people were involved in the response.   At its peak, some 48,000 workers were involved.  As many as 90,000 response workers were involved at one

---

[32] 40 C.F.R. § 300.5.

point or another.   More than 90 different organizations assisted in the response, including regulatory, academic, military, and industry.

41.     The response required the use of 6,300 vessels.

42.     The seriousness of this violation cannot be overstated.   The oil spill was extremely serious.  It was gravely serious.  It was a massive and severe tragedy.[33]

43.     Could this oil spill have been worse?  Yes.  Could there be an oil spill in the future that is worse than this one?  Unfortunately, the answer to that question is also yes. However, the fact that this spill was not as bad as it could have been and may be eclipsed by a future catastrophe does not diminish the seriousness of this spill.

**B.      Factor 2: Economic Benefit**

44.     The second penalty factor is "the economic benefit to the violator, if any, resulting from the violation."[34]

45.     The purpose of this factor is to ensure that the violator does not wrongfully profit from its misconduct.  The goal is to remove or neutralize the economic incentive to violate the law.[35]

46.     The Fifth Circuit requires that this Court make a "reasonable approximation" of economic benefit.[36]  While the Circuit did not specify how this should be done, it did note that

---

[33] *Cf. Citgo*, 723 F.3d at 553 (agreeing with the district court's finding that an oil spill of approximately 54,000 barrels and which caused a 10-day closure of a navigation channel, weeks-long restriction of recreational activities on impacted waterways, damage to 100 acres of marsh habitat, adverse impacts to fish and other aquatic life, and the death of several birds was "massive," "excessive," and a "tragedy").

[34] 33 U.S.C. § 1321(b)(8).

[35] *United States v. Mun. Auth. of Union Twp. (Dean Dairy)*, 150 F.3d 259, 263-64 (3d Cir. 1998) (§ 1319(d) penalty); *see also Citgo*, 723 F.3d at 552 ("[The district court] stated that the purpose of this penalty factor is to recoup any benefit gained by the polluter in failing to comply with the law, which indicates the court was defining the factor as do we.").

[36] *Citgo*, 723 F.3d at 552.

courts generally consider "the financial benefit to the offender of delaying capital expenditures and maintenance costs on pollution-control equipment."[37]

47.   Other courts have similarly commented that economic benefit is difficult to prove with precision[38] and that the plaintiff's burden is to establish a reasonable approximation or rational estimate of the benefit, with uncertainties resolved in favor of a higher estimate.[39]

48.   Here, the parties roughly agree over the amount of economic benefit Anadarko received from the violation.  The Government states that "the Defendants [i.e., Anadarko and BPXP] obtained an economic benefit of hundreds of thousands to somewhere in the low millions of dollars" and that Anadarko's economic benefit was 25% of this total, given its status as 25% owner of the well.[40]   Anadarko argues that the Government has failed to show that Anadarko received any economic benefit or, alternatively, that "the most Anadarko could have realized in possible cost savings likely would not exceed $4 million."[41]

49.   In the Phase One Findings, Court found there were several unreasonable and cost-saving decisions that contributed to the blowout.  These included not running a cement bond log, which avoided approximately $1.5 million in costs and extra rig time,[42] and using lost circulation material as a spacer during well displacement, which avoided approximately $10 million in costs and extra rig time.[43]   The Court also found that the negative pressure test—the test used to determine if the well was secure following the placement of a cement plug—was misinterpreted

---

[37] *Id.* (citing *United States v. Smithfield Foods, Inc.*, 191 F.3d 516, 530 (4th Cir. 1999); *Atl. States Legal Found., Inc. v. Tyson Foods, Inc.*, 897 F.2d 1128, 1141 (11th Cir. 1990)).  There may be other methods for calculating economic benefit.  *See Dean Dairy*, 150 F.3d at 266.

[38] *Pub. Interest Research Grp. of New Jersey, Inc. v. Powell Duffryn Terminals Inc.*, 913 F.2d 64, 80 (3d Cir. 1990) (§ 1319(d) penalty).

[39] *Gulf Park*, 14 F. Supp. 2d at 863-64.

[40] U.S. Proposed Finding of Fact ¶ 577, Rec. Doc. 14338; U.S. Proposed Concl. of Law ¶ 72, Rec. Doc. 14339.

[41] Anadarko Proposed Finding of Fact ¶ 79, Rec. Doc. 14342.

[42] Phase One Findings ¶ 195 & n.74, Rec. Doc. 13381-1, 21 F. Supp. 3d 657, 693 (E.D. La. 2014), *appeal docketed sub. nom, In re Deepwater Horizon*, No. 14-31374 (5th Cir. Dec. 16, 2014).

[43] *Id.* ¶¶ 298-99, 21 F. Supp. 3d at 709-10.

and that failure was a substantial cause of the blowout.[44]  Had the test been interpreted properly, the proper response would have been to remediate the cement job.[45]  This would have resulted in additional costs of approximately $2 million.

50.    The sum of these avoided costs is $13.5 million.  Because Anadarko is a 25% owner, its share of this amount is $3.375 million.

51.    The Court finds that a reasonable approximation of Anadarko's economic benefit resulting from the violation is $3.4 million.

52.    The Court further finds that the amount of economic benefit is low in the context of this case.  By comparison, Anadarko's share of the total cost incurred in drilling the Macondo Well to total depth was $38.5 million.  Moreover, Anadarko's economic benefit was far eclipsed by the $4 billion it eventually paid to settle compensatory claims arising from the spill.

**C.    Factor 3: Culpability**

53.    The third factor is the "degree of culpability involved."[46]

54.    Anadarko held a ***non-***operating, minority (25%) ownership interest in the Macondo Well.[47]  This is in contrast to BPXP, which was the operator and majority (65%) owner.[48]

55.    Under the Joint Operating Agreement between BPXP and Anadarko, BPXP had "the exclusive right and duty to conduct (or cause to be conducted) all activities or operations under this Agreement."  The agreement further states that BPXP is "an independent contractor,

---

[44] *Id.* ¶¶ 248, 252, 21 F. Supp. 3d at 702-03.
[45] *See id.* ¶ 192 n.70, 21 F. Supp. 3d at 692 n.70.
[46] 33 U.S.C. § 1321(b)(8).
[47] Joint Operating Agreement, TREX 280000 at 01, 22; *see also* Stipulated Order at 2, Rec. Doc. 5930.
[48] Joint Operating Agreement, TREX 280000 at 01, 28.

and not subject to the control or direction of Non-Operating Parties;" i.e., Anadarko and MOEX.[49]

56.     Based on the Joint Operating Agreement, the Court ruled in 2011 that Anadarko was not negligent with respect to the loss of well control, blowout, explosions, or oil spill.  The Court explained that "[a]ny access to information that Anadarko . . . may have had did not give rise to a duty to intercede in an independent contractor's operations . . . ."[50]

57.     Based on the 2011 ruling, the Court granted Anadarko's motion *in limine* to exclude evidence of Anadarko's purported culpability from the Penalty Phase trial.[51]

58.     Consistent with these rulings, the Court finds that Anadarko is not culpable, in the traditional tort sense, for the discharge.

59.     Nevertheless, the Court notes that this case is unlike those where the discharge was caused by unknown third persons or vandals.[52]  Here, the parties that caused the oil spill were Anadarko's co-owner, BPXP, and two of BPXP's contractors.[53]

## D.     Factor 4: Other Penalties for Same Incident

60.     The fourth factor is "any other penalty for the same incident."[54]

61.     The parties entered stipulations respecting this factor.[55]

---

[49] Joint Operating Agreement, TREX 280000 at 34.
[50] Order [As to Motions to Dismiss the B1 Master Complaint] at 28-29, Rec. Doc. 3830, 808 F. Supp. 2d 943, 963 (E.D. La. 2011).
[51] Minute Entry, Rec. Doc. 12592; Transcript of Mar. 21, 2014 Status Conf. at 43:6-14, Rec. Doc. 12809.  The Court similarly excluded evidence of Anadarko's knowledge or access to information from the Phase One trial, finding such evidence to be irrelevant to any issue in that trial.  Rec. Doc. 5836.
[52] *Cf. United States v. Coastal States Crude Gathering Co.*, 643 F.2d 1125, 1126-28 (5th Cir. Unit A 1981) (§ 1321(b)(6) penalty, pre-OPA) (reducing penalty from $5,000 (maximum) to $1,000 when defendant's pipeline was struck by a vessel owned by an unknown third party); *United States v. Gen. Motors Corp.*, 403 F. Supp. 1151, 1152 (D. Conn. 1975) (§ 1321(b)(6) penalty, pre-OPA) (reducing  penalty of $1,200 to $1 where the defendant was "completely free from material negligence or fault in connection with the acts of vandalism which resulted in the discharge of oil").
[53] *See* Phase One Findings ¶ 544, Rec. Doc. 13381-1, 21 F. Supp. 3d at 746.
[54] 33 U.S.C. § 1321(b)(8).

62.     Anadarko has not paid any penalties for the DEEPWATER HORIZON/Macondo incident.

63.     Parties other than Anadarko have paid or have agreed to pay penalties for this incident.

64.     Under a proposed consent decree filed on October 5 2015, BPXP agreed to pay $5.5 billion in civil penalties under the CWA.[56]  On November 15, 2012, the United States and BPXP entered into a plea agreement, which was accepted by Judge Vance, pursuant to which BPXP paid $1.15 billion for criminal violations of the CWA,[57] $100 million for violating the Migratory Bird Treaty Act,[58] $5.5 million for eleven counts of seaman's manslaughter,[59] and $500,000 for one count of Obstruction of Congress.[60]  The November 2012 plea agreement also required BPXP to pay $350 million to the National Academy of Sciences and $2.394 billion to the National Fish and Wildlife Foundation, but stated that these payments "shall have no effect on, and shall not be argued by [BPXP] . . . to reduce in any way, any civil claims by any party arising out of the *Deepwater Horizon* blowout, explosion, oil spill and response, including but not limited to natural resource damage claims."[61]

65.     Pursuant to a consent decree entered by this Court on February 19, 2013, the Transocean entities paid $1 billion in civil penalties to resolve alleged violations of the CWA. Around the same time, one of the Transocean entities entered a separate plea agreement, which was accepted by Judge Milazzo, pursuant to which Transocean paid $100 million in criminal

---

[55] Rec. Doc. 13725.  These stipulations were filed in November 2014 and consequently do not reflect the tentative settlement between the Government and BPXP that was reached after the Penalty Phase trial.
[56] Rec. Doc. 15436-1 ¶ 10.
[57] 33 U.S.C. §§ 1319(c)(1)(A) & 1321(b)(3).
[58] 16 U.S.C. §§ 703 & 707(a).
[59] 18 U.S.C. § 1115.
[60] 18 U.S.C. § 1505.
[61] Rec. Doc. 13725 at 2.

penalties under the CWA.  The plea agreement also required Transocean to pay $150 million to the National Academy of Sciences and $150 million to the National Fish and Wildlife Foundation.

66.     Pursuant to a consent decree entered by this Court on June 18, 2012, MOEX has paid $45 million in civil penalties under the CWA to the United States and $25 million in civil penalties to the five Gulf Coast states.  The consent decree also required MOEX to implement supplemental environmental projects at a cost of at least $20 million.

**E.     Factor 5: Prior Violations**

67.     The fifth factor is "any history of prior violations."[62]

68.     The Government and Anadarko entered stipulations respecting this factor.

69.     Specifically, the parties stipulated that Anadarko has at least ten prior CWA violations between 2004 and 2010.[63]   The Court notes, however, that most of these violations were minor.

70.     Four of the ten prior violations involved discharges of one gallon or less of oil and penalties of $250 per violation.

71.     Two other prior violations involved discharges of two gallons of oil and penalties of $500 per violation.

72.     Two other prior violations involved discharges of three barrels (126 gallons) and fifteen barrels (630 barrels) of synthetic based mud, for which Anadarko was penalized $1,000 and $5,334.58, respectively.

---

[62] 33 U.S.C. § 1321(b)(8).
[63] Rec. Doc. 13808.  The Government does not stipulate that Anadarko had only ten prior violations, but it does not present evidence of any violations beyond those in the stipulation.

73.     Another violation concerned "alleged permit violations occurring on a facility offshore in the Gulf of Mexico in 2004 and 2005."[64]  The only other details provided in the stipulation are that Anadarko paid $4,500 in penalties and $17,500 for a supplemental environmental project in connection with this violation.

74.     The tenth and most serious prior violation involved an unknown quantity of oil that discharged from onshore facilities in Wyoming and Montana.  Pursuant to a consent decree, Anadarko paid a penalty of slightly over $1 million related to this discharge.[65]

## F.     Factor 6: Mitigation

75.     The sixth factor is "the nature, extent, and degree of success of any efforts of the violator to minimize or mitigate the effects of the discharge."[66]

76.     As mentioned above, the response effort was unprecedented in size and complexity.

77.     However, Anadarko played a very minor role in response activities.

78.     Anadarko sent two vessels to assist with fighting the fire aboard the HORIZON. The firefighting efforts, of course, did not succeed.  Furthermore, Anadarko's vessels were not far from the HORIZON when the distress signal was sent, and, as Anadarko's senior vice president of deepwater operations acknowledged at trial, any vessel in the area would have similarly responded.

79.     Anadarko seconded five individuals to BP to assist in source control efforts.  No doubt the work of these individuals was useful, or at the very least, appreciated.  However, it should also be recognized that the response, at its peak, involved some 48,000 workers.

---

[64] Rec. Doc. 13808 ¶ 1.
[65] Anadarko argues that this violation is irrelevant because it did not occur in the Gulf of Mexico and it involved on shore facilities.  The Court concludes these facts do not make this violation irrelevant under the CWA.
[66] 33 U.S.C. § 1321(b)(8).

Furthermore, four of the five individuals worked on source control for only a short period of time—between one and three weeks.

80.     Anadarko provided some equipment requested by BP to assist in source control efforts.  However, Anadarko charged BP $3.5 million for this equipment, and it was not used in the source control effort.  Anadarko did agree to buy the unused equipment back from BP, although at a reduced cost as it had been modified.

81.     No one from Anadarko participated in the Unified Command.

82.     Anadarko did not participate in booming, skimming, dispersant application, in-situ burning or other response-related efforts.

83.     The Court recognizes, however, that Anadarko's limited participation was largely due to the fact that Anadarko did not have authority under the Incident Command System to force its involvement in response efforts.  The Court also notes that Anadarko communicated to BP and the Secretary of the Department of the Interior its willingness to assist.

84.     Therefore, the Court does not fault Anadarko for its limited role in the response. At the same time, the Court finds that Anadarko's limited participation does not warrant a reduction of the penalty.

85.     As for the cost of the response, the Coast Guard sent invoices jointly to BP, Anadarko, MOEX, and Transocean.  Under the Oil Pollution Act, each of these parties was liable, jointly and severally, to the Government for these costs.[67] However, as between BP and

---

[67] *See* 33 U.S.C. §§ 2702, 2704(a)(3), (c)(3); Order and Reasons [As to Cross-Mots. for Partial Summ. J. Re Liability under the CWA and OPA] at 14-15, Rec. Doc. 5809, 844 F. Supp. 2d 746, 755-56 (E.D. La. 2012); Phase One Findings ¶ 609, Rec. Doc. 13381-1, 21 F. Supp. 3d at 756.

Anadarko, the Joint Operating Agreement made BP initially responsible for the invoices, which would then seek partial reimbursement from Anadarko.[68]

86.     BP promptly paid the Coast Guard's invoices.  Anadarko initially resisted BP's efforts to be reimbursed for Anadarko's share of the costs associated with the oil spill, including response costs.  Anadarko took the position that the oil spill resulted from BP's gross negligence, which, under the terms of the operating agreement, relieved Anadarko of its reimbursement obligation.  In October 2011, some 18 months after the blowout, Anadarko and BP settled their dispute.  Anadarko paid $4 billion to BP, and BP released all of its claims against Anadarko and agreed to indemnify Anadarko against future compensatory damage claims (but not for penalties or punitive damages).  The settlement also included a condition that BP would use the $4 billion "to pay the claims of Persons whose injuries and damages arise out of or relate to the Deepwater Horizon Incident."[69]

87.     There is no evidence that the $4 billion Anadarko paid to BP was used in a way that did not comply with the condition.  Therefore, the Anadarko's payment likely did help mitigate some of effects of the oil spill.  Of course, this help was indirect—in that it went to BP—and delayed.

88.     Anadarko also made two donations to mitigate damages from this incident. Anadarko donated $1.1 million to a memorial fund that was established to assist the families of the eleven men who died on the DEEPWATER HORIZON.   Anadarko also provided $21,855,000 to establish a fund for Gulf Coast communities, which distributed $20 million to 125 support organizations serving distressed communities directly affected by the disaster.

---

[68] Joint Operating Agreement, TREX 280000 at 39.
[69] TREX 50473 at 3.

89.     In the context of this spill, the Court finds Anadarko's efforts to minimize or mitigate the effects of the discharge were, at best, adequate.  Perhaps Anadarko did not shirk its responsibilities, but it could hardly be called a willing participant in the response.  Anadarko's strongest point on this factor is the $4 billion it paid in settlement, but any relief provided by this amount was indirect and delayed.

## G.    Factor 7: Economic Impact on the Violator

90.     The seventh factor is "the economic impact of the penalty on the violator."[70]

91.     There are two sides to the economic impact coin.  This factor can reduce a penalty that would otherwise be "ruinous" or "disabling" to the defendant.[71]  It is the defendant's burden to make such a showing.[72]  On the other hand, the economic impact factor may weigh in favor of a substantial penalty when deterrence and/or punishment is desired.[73]

92.     Anadarko contends that any penalty would have a negative economic impact on its business operations.  Ultimately, though, Anadarko admits that "it could pay the maximum penalty (if required)."[74]

93.     As noted above, the statutory maximum civil penalty that could be imposed is $3.5 billion.  Furthermore, the United States seeks a penalty "substantially less than $3.5 billion."[75]

94.     The Court finds that the maximum civil penalty would not be ruinous or disabling to Anadarko.  Therefore, the economic impact factor does not warrant a reduction of the penalty.

---

[70] 33 U.S.C. § 1321(b)(8).

[71] See Gulf Park, 14 F. Supp. 2d at 868.

[72] Id.

[73] See Tull v. United States, 481 U.S. 412, 423 (1987) (§ 1319(d) penalty); see also United States v. Chevron U.S.A., Inc., 639 F. Supp. 770, 779 (W.D. Tex. 1985) (Clean Air Act) ("Chevron is a major corporation; one of the largest in the United States.  Only a substantial penalty would have any economic impact or serve as any deterrent.").

[74] Anadarko Post-Trial Br. at 18, Rec. Doc. 14343.

[75] U.S. Post-Trial Br. at 31-32, Rec. Doc. 14321.

Whether this factor warrants an increase or otherwise supports a high penalty will be addressed in the Analysis and Conclusions of Law section, below.

**H.    Factor 8: Other Matters**

95.    The eighth and final factor is "any other matters as justice may require."[76]

96.    The Court will discuss this factor in the Analysis and Conclusions of Law, below.

### III.    ANALYSIS AND CONCLUSIONS OF LAW

97.    The Government urges the Court to impose a penalty that is "significantly greater than $1 billion but substantially less than [the maximum amount of] $3.5 billion."[77]

98.    Anadarko contends that "the Court should impose no more than a nominal penalty."[78]

**A.    Purpose of the CWA Civil Penalty**

99.    Because the Court's assessment is guided in part by the purposes of the CWA and the civil penalty, it is appropriate to review them.

100.    The overarching purpose of the CWA is "to achieve the result of clean water as well as to deter conduct causing spills."[79]  Indeed, § 1321 begins by declaring: "[I]t is the policy of the United States that there should be no discharges of oil . . . into or upon the navigable waters of the United States . . . ."[80]

101.    The civil penalty in § 1321(b)(7) has multiple purposes.

---

[76] 33 U.S.C. § 1321(b)(8).
[77] U.S. Post Trial. Br. at 31-32, Rec. Doc. 14341.
[78] Anadarko Post-Trial Reply Br. at 10, Rec. Doc. 14476.
[79] *United States v. Coastal States Crude Gathering Co.*, 643 F.2d 1125, 1228 (5th Cir. Unit A April 1981) (§ 1321(b)(6) penalty, pre-OPA) (quoting *United States v. Marathon Pipe Line Co.*, 589 F.2d 1305, 1309 (7th Cir. 1978)).
[80] 33 U.S.C. § 1321(b)(1).

102.    Two objectives, certainly after the amendments by the Oil Pollution Act of 1990, are to punish polluters and deter future oil spills by the violator and potential violators.  In *Tull v. United States*, the Supreme Court, discussing penalties under § 1319(d), stated:

> Subsection (d) does not direct that the "civil penalty" imposed be calculated solely on the basis of equitable determinations, such as the profits gained from violations of the statutes, but simply imposes a maximum penalty of $10,000 per day of violation.  The legislative history of the Act reveals that Congress wanted the district court to consider the need for retribution and deterrence, in addition to restitution, when it imposed civil penalties.  A court can require retribution for wrongful conduct based on the seriousness of the violations, the number of prior violations, and the lack of good-faith efforts to comply with the relevant requirements.  It may also seek to deter future violations by basing the penalty on its economic impact.  Subsection 1319(d)'s authorization of punishment to further retribution and deterrence clearly evidences that this subsection reflects more than a concern to provide equitable relief.[81]

These statements are equally applicable to the civil penalty in § 1321(b)(7).  Furthermore, a congressional report on OPA—the Act that, *inter alia*, significantly increased the penalties in § 1321—explained that "[c]ivil penalties should serve primarily as an additional incentive to minimize and eliminate human error and thereby reduce the number and seriousness of oil spills. There are strong operational and economic incentives within the Conference substitute that should encourage responsible parties to prevent oil spills."[82]

103.    Another purpose of the penalty is to place the "financial burden for achieving and maintaining clean water upon those who would profit by the use our navigable waters and adjacent areas, and who pollute same"; i.e., the "polluting enterprise."[83]  Hence, liability for a

---

[81] *Tull v. United States*, 481 U.S. 412, 422-23 (1987).  *See also* Order & Reasons [as to Transocean and BP's Cross-Mots. For Partial Summ. J. Re Indemnity] at 20-21, Rec. Doc. 5446, 841 F. Supp. 2d 988, 1004-05 (E.D. La. 2012) (collecting authorities).

[82] H.R. Rep. No. 101-653, Sec. 4301, at 52 (1990) (Conf. Rep.), *reprinted in* 1990 U.S.C.C.A.N. 779, 833; *see also* S. Rep. No. 112-100, 2011 WL 6155734, at *15 (Dec. 8, 2011) ("Clean Water Act penalties are punitive in nature and serve a deterrent purpose, while [natural resource damages under OPA] are intended to compensate the public for natural resource injuries resulting from an oil spill.").

[83] *Coastal States*, 643 F.2d at 1228; *United States v. Tex-Tow, Inc.*, 589 F.2d 1310, 1314-15 (7th Cir. 1978) (§ 1321(b)(6) penalty, pre-OPA).

civil penalty is strict, arising irrespective of knowledge, intent, or fault.[84]  As explained by the

Seventh Circuit:

> [D]eterrence is not the sole purpose of the civil penalty, or for that matter of strict
> liability in general.   Strict liability, though performing a residual deterrent
> function, is based on the economic premise that certain enterprises ought to bear
> the social costs of their activities. In the [CWA] in general, Congress has made a
> legislative determination that polluters rather than the public should bear the costs
> of water pollution.   In section 1321, the clean-up, liquidated damages, and civil
> penalty liabilities all serve to shift the cost of oil and hazardous substance
> pollution onto the private sector. . . .
>
> . . . The civil penalty serves the Act's goal of pollution-free water by providing a
> means of funding the administration and enforcement of the Act.  Under section
> 1321(k) the proceeds of civil penalty collections are to be deposited in a revolving
> fund which is to be used to finance a National Contingency Plan for the
> containment, dispersal, and removal of spills; the clean-up of maritime disaster
> discharges; the reimbursement of clean-up costs incurred by owners or operators
> who are able to establish one of the four defenses; and the administration of the
> act.  The principle of financing regulation through a penalty or forfeiture imposed
> on regulatees is not novel, nor is basing such penalty or forfeiture on ownership of
> the offending thing, regardless of fault, violative of due process.[85]

104.   *Marathon Pipe, Coastal States*, and *Tex-Tow* were decided before OPA amended

the CWA in 1990.  Anadarko argues that the CWA's civil penalty no longer serves a remedial

purpose because OPA repealed the revolving fund in § 1321(k) and created a comprehensive

federal scheme for recovery of oil spill cleanup costs and compensation.  The Court does not

agree.  While OPA repealed the § 1321(k) revolving fund, it directed that CWA civil penalties be

paid into the more robust Oil Spill Liability Trust Fund ("OSLTF").[86]  The OSLTF is available

to finance or reimburse the same things that the old revolving fund did.[87]  For example, the

---

[84] *In re Deepwater Horizon*, 753 F.3d 570, 575 (5th Cir. 2014).  The Fifth Circuit further described the civil penalty as "an absolute liability system with limited exceptions" and explained that "any culpability on the part of [others] does not exempt the well owners from the liability at issue here," though it might be a "mitigating factor at penalty calculation." *Id.* (citations omitted).

[85] *United States v. Marathon Pipe Line*, 589 F.2d 1305, 1309 (7th Cir. 1978) (citations and footnotes omitted) (§ 1321(b)(6) penalty, pre-OPA), *cited with approval in Coastal States*, 643 F.2d at 1127-28.

[86] Pub. L. No. 101-380, §§ 2002 and 4304, 104 Stat. at 507 & 540 (partially codified at 33 U.S.C. § 1321(s)).

[87] *See* 33 U.S.C. §§ 2712, 1321(s).

OSLTF may be used for "the payment of Federal administrative, operational, and personnel costs and expenses reasonably necessary for and incidental to the implementation, administration, and enforcement of [OPA] . . . and subsections (b), (c), (d), (j), and (l) of section 1321 [i.e., the CWA] with respect to prevention, removal, and enforcement related to oil discharges . . . ."[88] The OSLTF is also available to pay for new costs that former § 1321(k) did not, such as a third party's loss of profits when compensation from the responsible party is not available or forthcoming.[89] Furthermore, penalties paid into the OSLTF may be used in connection with *future* oil spills; thus, even if all of the costs and damages for this oil spill were paid in full (and the Court does not find that this has or will occur), penalties paid today can fund the response to tomorrow's oil spill. This is consistent with the principle, expressed not only in the pre-OPA cases but also in OPA's legislative history,[90] that the costs associated with oil pollution should be internalized within the oil industry, not borne by the tax payer. In short, the civil penalties in § 1321(b) still serve remedial and regulatory purposes that were not made obsolete by OPA.[91]

105.    Nevertheless, the Court acknowledges that the maximum penalty at issue in *Coastal States*, *Tex-Tow*, and *Marathon Pipe* was only $5,000. In light of this, and considering

---

[88] *Id.* § 2712(a)(5).

[89] *Id.* §§ 2712(a)(4), 2713(d), 2702(b)(2)(E).

[90] *See* H.R. Rep. No. 101-242, at 28 (1989) ("[33 U.S.C. § 1321] does not impose liability for economic losses and the cleanup fund is authorized at only $35 million and it is funded primarily through appropriations. Recent events indicate that a much larger fund is necessary and that [it] should be funded by the oil industry and not by general revenues."); S. Rep. No. 101-94, at 3 (1989), *reprinted in* 1990 U.S.C.C.A.N. 722, 725 (same).

[91] The Court's conclusion is not changed by the RESTORE Act, which directed that 80% of penalties from the DEEPWATER HORIZON/Macondo incident be sent to Gulf Coast States. *See* Pub. L. No. 112-141, Subtitle F, Secs. 1602(b) & 1603(3), 126 Stat. 405, 588, 590-91 (2012) (codified at 33 U.S.C. § 1321(t) & note). Twenty percent of the CWA penalty is still directed to the OSLTF. As to the 80% sent to the Gulf States, those amounts must be used in specified ways related to restoring or protecting natural resources, ecosystems, fisheries, marine and wildlife habitats, beaches, wetlands, and economy of the Gulf Coast Region. Furthermore, the RESTORE Act specifically states that it does not "supersede[] or otherwise affect[] any other provision of Federal law, including, in particular, laws providing recovery for injury to natural resources under [OPA] . . . ." *Id.* sec. 1606, 126 Stat. at 606; *see also* 33 U.S.C. § 1321(t)(1)(B)(iii)(II). Thus, contrary to Anadarko's contention, the civil penalty still serves a remedial purpose that was not made redundant or obsolete by OPA.

*Tull* and the other authorities cited, it seems clear that punishment and deterrence are the penalty's major objectives, which is what this Court held in 2012.[92]

106.    To state this point another way:  Because the punitive and deterrent effects of a penalty will, in theory, increase with the size of a penalty; *severe* penalties should be reserved for those circumstances when punishment and deterrence are strongly desired.  When the goal is not to punish or deter, the remedial/regulatory purposes of the CWA will still support a civil penalty, but are insufficient to justify a severe penalty.

**B.      Legal Standard and Methodology**

107.    Other than stating that the Court "shall consider" the factors listed in § 1321(b)(8), the CWA does not prescribe a specific method for determining the civil penalty.

108.    "The assessment of civil penalties under the CWA is left to the district court's discretion."[93]  On appeal, a district court's factual findings in support of the penalty calculation are reviewed for clear error, while the "determination of the amount of the penalty to be assessed is reviewed under the highly deferential abuse-of-discretion standard."[94]

109.    Furthermore, the Fifth Circuit has observed that a "calculation of discretionary penalties is not an exact science, and few courts could comply with [a defendant's] request that the importance of each factor be precisely delineated."[95]  In a similar vein, other district courts have stated that they

> can conceive of no mathematical formula which can be applied to the overall effort of assessing a fair penalty. Each case must be decided on its own facts. While the experts offered calculations on the ability to pay as well as the

---

[92] 841 F. Supp. 2d at 1004-05.
[93] *United States v. Citgo Petroleum Corp.*, 723 F.3d 547, 551 (5th Cir. 2013) (citation omitted).
[94] *Id.* (citation omitted).
[95] *Id.* (quoting *United States v. Marine Shale Processors*, 81 F.3d 1329, 1338 (5th Cir. 1996)).

economic benefit, to these findings there must be applied a degree of reason and common sense without the benefit of precise mathematical equations . . . .[96]

110. In *United States v. Citgo Petroleum Corp.*, the Fifth Circuit described two approaches to calculating a penalty: top-down and bottom-up.[97]  Under the top-down method, the maximum penalty is set ($3.5 billion in this case), and then the penalty is reduced as appropriate considering the other factors.  Under the bottom-up method, economic benefit is established first, and then the other factors are used to adjust the figure upwards or downwards. These are perhaps not the only methods of determining a penalty.

111. However, the Fifth Circuit "has never held that a particular approach must be followed."[98]

112. The Court exercises its discretion and elects to use the top-down method.[99]

## C.    Analysis of the Penalty Factors

113. In this case, seriousness and culpability are the factors most significant to determining Anadarko's penalty.   The Court has considered the other factors, as it must, but

---

[96] *United States v. Smith*, No. 12-00498-KD-C, 2014 WL 3687223, at *10 (S.D. Ala. July 24, 2014) (§ 1319(d) penalty) (quoting *United States v. Gulf Park Water Co., Inc.*, 14 F. Supp. 2d 854, 868-69 (S.D. Miss. 1998)).

[97] *Citgo*, 723 F.3d at 552 (citing *United States v. Allegheny Ludlum Corp.*, 366 F.3d 164, 178 n.6 (3d Cir. 2004)).

[98] *Id.*  The Court acknowledges that *Citgo* begins its discussion with a statement that, when read in isolation, appears to require the bottom-up method.  *See id.* at 551 ("[B]ecause economic benefit serves as the starting point for calculating the civil penalty and is adjusted based on the remaining statutory factors, on remand the district court should consider its analysis of the factors afresh after making a reasonable approximation of economic benefit."). However, the rest of the opinion makes clear that the Court did not adopt one method over another.  *See id.* at 552-54 ("This circuit has never held that a particular approach must be followed, and we do not decide otherwise today. Regardless of the mathematics, we conclude that a district court generally must 'make a 'reasonable approximation' of economic benefit when calculating a penalty under the CWA.' . . . Whether the economic benefit is a floor, adjusted by a court's analysis of the other factors, or helps determine how much to lower the ceiling established in other ways, it should not be ignored. . . .  Regardless of how the district court then exercises its discretion, within a top-down, a bottom-up, or some other analytical framework, the economic benefit factor creates a nearly indispensable reference point.").

[99] *See Gulf Park*, 14 F. Supp. 2d at 858 (§ 1319(d) penalty) (noting that the Fifth Circuit's *Marine Shale* decision tended to support its decision to use top-down); *United States v. Egan Marine Corp.*, No. 08-C-3160, 2011 WL 8144393, at *6 (N.D. Ill. Oct. 13, 2011) (finding the bottom-up approach was inapposite when no party contended that the defendant gained an economic benefit).

finds they have comparatively little or no effect on the calculation.  Each factor is discussed below.

114.    The seriousness of this oil spill weighs in favor of a maximum penalty.

115.    As to culpability, Anadarko's lack of fault weighs heavily in favor of a minimum penalty.

116.    The economic benefit to Anadarko resulting from its violation—approximately $3.4 million—was low in the context of this case, and it pales in comparison to the $4 billion Anadarko eventually paid to settle compensatory claims arising from the spill.  Therefore, considering that the purpose of this factor is to ensure that Anadarko does not profit from its violation—which it clearly has not—this factor does not justify imposing a penalty, much less the maximum penalty.  However, the fact that there is little or no economic benefit does not mean that no penalty may be imposed, nor does it necessarily warrant a reduced penalty.  The Court views this factor as neutral.[100]

117.    To the extent Anadarko contends that *Citgo* requires different treatment of economic benefit, this Court does not agree.  In *Citgo*, the district court imposed a penalty of $6 million, although the statutory maximum was approximately $60 million.[101]  As to the economic benefit factor, the district court found that the defendant decided, in an effort to minimize costs

_____

[100] *Accord Catskill Mountains Chapter of Trout Unlimited v. City of New York*, 451 F.3d 77, 88 (2d Cir. 2006) (§ 1319(d) penalty) (holding district court did not abuse its discretion when it determined economic benefit was neither a mitigating factor nor a cause for increased penalties); *Egan Marine Corp.,* 2011 WL 8144393, at *6-7 (imposing near-maximum penalty ($100,000 out of possible $112,000) despite no economic benefit); *cf. United States v. Scruggs*, No. G-06-776, 2009 WL 500608, at *5 (S.D. Tex. 2009) (§ 1319(d) penalty) ("Because neither party alleges that the defendant benefitted financially [from its violation,] . . . the court does not consider this factor in determining the amount of the civil penalty. The court does note that the fact that the defendant did not benefit financially from the violation suggests that a severe penalty is not appropriate in the instant case.").

[101] *Citgo*, 723 F.3d at 551, 556.  The $60 million figure is based on the district court's findings that 54,000 barrels of oil discharged and that the defendant was only negligent, not grossly negligent (54,000 x $1,100 = $59,400,000).  The latter finding was vacated by the Fifth Circuit.  *Id.* at 556.  Therefore, if the defendant was grossly negligent, then the maximum penalty would have been $232.2 million (54,000 x $4,300).

and increase profits, to forgo certain maintenance projects that would have prevented the spill.[102] However, rather than provide a reasonable approximation of economic benefit, the district court stated it as a range between $719.00 and $83 million.[103]   On appeal, the Fifth Circuit explained that the economic benefit factor "creates a nearly indispensable reference point" and that "[p]roper consideration of economic benefit is integral to arriving at an appropriate damage award."[104]   The range provided by the district court "left economic benefit as a non-factor" which "made [appellate] review more difficult."[105]   Consequently, the Fifth Circuit vacated the penalty and remanded the case for re-evaluation.[106]

118.      As this Court understands *Citgo*, the reason the Fifth Circuit viewed the economic benefit factor as a "nearly indispensable reference point" is because this factor ensures that the defendant will not profit from the violation, which is important to promoting compliance with the law and consequently deterring pollution.[107]   For example, if the economic benefit to the defendant in *Citgo* was $83 million, then a $6 million penalty would appear inappropriately low—at least before considering any other factor—as the benefit to the defendant from not performing spill-prevention maintenance would far outweigh the burden imposed by the penalty. On the other hand, if economic benefit was less than $6 million, then a $6 million penalty might be appropriate.  Thus, economic benefit was the "critical factor"[108] in *Citgo* because the district court's finding prevented the appellate court from performing this basic check.  This Court does

---

[102] *Id.* at 553.
[103] *Id.* at 552.
[104] *Id.* at 554, 553.
[105] *Id.* at 553.
[106] *Id.* at 554.
[107] *See* Part II.B., *supra*.
[108] *Citgo*, 723 F.3d at 552.

not, however, interpret *Citgo* as requiring that economic benefit will always be critical to every penalty assessment.[109]  "Each case must be decided on its own facts."[110]

119.    The Court has provided a reasonable approximation of economic benefit and has considered it along with all the other factors, but concludes that economic benefit has no effect on the penal amount.

120.    As to other penalties for the same incident, Anadarko has paid no penalties in connection with this incident, and therefore this factor does not weigh in favor of a reduction. This factor also does not weigh in favor of a high penalty.  It is neutral.

121.    As to Anadarko's prior violations, this factor weighs slightly in favor of a significant penalty, but is mostly neutral.  Most of the prior violations were very minor, particularly when considered with the breath of Anadarko's operations.  Furthermore, because the Court's main objective vis-à-vis Anadarko is not punishment or deterrence (as explained below), this factor has reduced importance.  By contrast, if Anadarko was culpable for the incident, then its pollution history would be relevant to determining an appropriate punishment and deterrent.

122.    As for Anadarko's mitigation efforts, this factor weighs slightly in favor of a reduced penalty, but is mostly neutral.  As a non-operating owner, Anadarko was permitted to play only a limited role in the Government-led response.  The Court does not increase the penalty for this, but Anadarko's limited actions do not warrant a reduction.[111]  The $4 billion Anadarko paid to settle compensatory claims somewhat favors a low penalty, as it arguably

---

[109] To take an obvious example, suppose a defendant purposefully discharges a large quantity of oil into a navigable body of water, intending only to cause harm to others and the environment and receiving no economic benefit from the discharge.  In that circumstance, the defendant's penalty under the CWA should not be mitigated by the fact that the defendant received no economic benefit.

[110] *Smith*, 2014 WL 3687223, at *10 (quoting *Gulf Park*, 14 F. Supp. 2d at 868-69).

[111] By comparison, had BPXP not settled with the Government, the Court would be inclined to find that BPXP's mitigation efforts warrants a significant reduction of its penalty.

mitigated some of the spill's damage and/or economic impact.  However, the Court is mindful that (1) Anadarko resisted BPXP's claims for reimbursement for a year-and-a-half, meaning that any mitigation attributable to Anadarko's payment was delayed by at least that long, and (2) any mitigation because of this payment was indirect, as Anadarko's payment went to BPXP, not to individuals harmed by the spill, the Coast Guard, etc.  In light of these points, Anadarko somewhat resembles other responsible parties who, in the words of Coast Guard Rear Admiralty Meredith Austin, come "kicking and screaming into the response."[112]   Anadarko did make roughly $23 million in voluntary donations, but these amounts, while perhaps appreciated by the recipients, pale in comparison to the blowout and spill's impacts on the environment, the Gulf economy, and individual lives.

123.   The Court pauses here to determine the penalty before moving to the seventh and eighth factors.  Given that seriousness and culpability are the two most significant factors, the crucial question is, how do they weigh against one another?   To determine this, the Court looks to the purposes of the CWA's civil penalty.

124.   As discussed above, the main purpose of the CWA's civil penalty is punishment and deterrence.[113]  Because Anadarko bears no culpability, in a traditional tort sense, for this incident, there is seemingly no reason to punish Anadarko.   Likewise, a high penalty against a non-culpable, non-operating co-owner of an offshore oil well might deter only more investment in offshore mineral operations by non-operators, which is not an outcome Congress or the CWA necessarily desires.  On the other hand, a substantial penalty might make Anadarko and other non-operators more selective when choosing an operator with whom to invest, which is consistent with the goal of deterring conduct causing spills.  On balance, Anadarko's lack of

---

[112] Penalty Phase Transcript, Jan. 20, 2015, at 112:20-24.
[113] *See* Part III.A., *supra*.

culpability largely, though not entirely, negates the punishment and deterrence functions of the penalty.

125.    The penalty also serves remedial and regulatory purposes by shifting the financial burden of achieving and maintaining clean water from the public to the polluting enterprise, even in the absence of fault.  The seriousness factor is relevant to these purposes.[114]  Anadarko, as 25% owner of the Macondo well, was part of the polluting enterprise.  Furthermore, it was the acts and omissions of the polluting enterprise (i.e., BPXP and its contractors) that proximately caused this disaster, not some unknown third party or vandal.[115]

126.    As explained, the Court believes punishment and deterrence are the CWA's primary objectives and are necessary to justify a severe penalty; the remedial and regulatory purposes are secondary.  Therefore, Anadarko's lack of culpability weighs more heavily in favor of a low penalty than seriousness weighs in favor of the maximum penalty.

127.    The maximum penalty the Court may impose here is $1,100 per barrel of oil discharged, or approximately $3.5 billion dollars. Considering the first six factors, the Court determines that Anadarko should be assessed a penalty of $50 per barrel, or $159.5 million.

128.    Although this amount is high when viewed out of context, it is only 4.5% of the maximum penalty, and therefore on the low end of the spectrum.  The Court finds that this amount strikes the appropriate balance between Anadarko's lack of culpability and the extreme seriousness of this spill, considering the purposes of the CWA and § 1321(b)(7)'s civil penalty.

---

[114] This is not to say that seriousness is only relevant to the remedial and regulatory purposes.  If Anadarko were culpable, then the seriousness factor would also be relevant to the punishment and deterrence goals.

[115]   Thus, this case is unlike those where courts severely reduced the penalty when spill was caused by an unknown third party.  *See Coastal States*, 643 F.2d at 1126-28 (amending penalty from $5,000 (maximum) to $1,000 where the discharge resulted solely from acts of unknown third party who struck defendant's pipeline while traveling well outside navigational channel); *United States v. Gen. Motors Corp.*, 403 F. Supp. 1151, 1152 (D. Conn. 1975) (§ 1321(b)(6) penalty, pre-OPA) (reducing  penalty of $1,200 to $1 where the defendant was "completely free from material negligence or fault in connection with the acts of vandalism which resulted in the discharge of oil").

This reduced penalty also reflects to some extent the fact that Anadarko has already paid $4 billion to settle compensatory claims arising from the spill.  The Court also notes that had the discharge not been proximately caused by the actions of the polluting enterprise in which Anadarko was engaged—for example, had the discharge been caused by the unforeseeable actions of total stranger—then the penalty would be reduced even further.

129.    The Court further observes that $159.5 million is roughly in step with the $90 million MOEX paid pursuant to the June 2012 consent decree.[116]  Like Anadarko, MOEX was also a non-operating, minority owner of the Macondo well.  MOEX, however, owned a smaller share of the well than Anadarko.  Contrariwise, Anadarko's penalty is far less than the $1 billion Transocean paid to settle its CWA civil penalty liability, which is appropriate given that Transocean bears 30% of the fault for the blowout and oil spill.[117]

130.    Picking up with the seventh factor, "the economic impact of the penalty on the violator," a $159.5 million penalty will not be ruinous to Anadarko's business.  Therefore, this factor does not warrant further reduction.  Furthermore, because the Court is largely unconcerned with punishment and deterrence, this factor also does not warrant increasing the penalty.

131.    As to the eighth factor, "any other matters as justice may require," this factor should be applied sparingly, when not considering a matter would result in a manifest injustice.[118]

---

[116] *See* Part II.D, *supra.*  MOEX's settlement consisted of $45 million in CWA civil penalties to the Government, $25 million in civil penalties to the Gulf Coast States, and $20 million in environmental projects.  For comparison purposes, however, the Court finds that MOEX paid the equivalent of $90 million in CWA civil penalties.  *See* 63 Fed. Reg. 24796 (May 5, 1998); RESTORE Act, Pub. L. No. 112-141, Subtitle F, § 1602(b), 126 Stat. 405, 488 (2012) (codified at 33 U.S.C. § 1321(t), note)).

[117] See Phase One Findings ¶ 544, Rec. Doc. 13381-1, 21 F. Supp. 3d 657, 746 (E.D. La. 2014), *appeal docketed sub. nom, In re Deepwater Horizon*, No. 14-31374 (5th Cir. Dec. 16, 2014).

[118] *See Catalina Yachts v. EPA*, 112 F. Supp. 2d 965, 970 (C.D. Cal. 2000) (considering a penalty under the Emergency Planning and Community Right-to-Know Act).

132.     Anadarko makes several arguments under this factor.   First, it asserts that imposing a penalty on it will have negative effects on offshore safety.   Even if the Court accepts the general premise of this argument (that increased involvement by non-operators will negatively impact safety), the Court is not persuaded that the amount of the penalty imposed here would cause an operator to become so involved.   And, as noted above, a penalty of this size might encourage non-operators to avoid investing with careless operators.

133.     Anadarko also argues that penalizing it will serve no rational economic purpose. The Court already considered this argument when it discussed the purposes of the CWA penalty. The Court agrees with Anadarko insofar as it argues that the penalty's deterrent functions are largely unneeded here.   In this respect, Anadarko's point has already been considered in the penalty assessment.   However, the Court also explained that deterrence is not completely irrelevant here.   Furthermore, deterrence is not the only relevant purpose.   Thus, Anadarko's argument is not entirely persuasive.   To the extent the Court has not discussed all of Anadarko's arguments regarding economic theories of deterrence, the Court finds justice does not require their consideration.

134.     Finally, Anadarko argues it significantly and positively contributes to the economies of the Gulf States.   In *Citgo*, the district court considered the fact that the defendant was a major employer in the community and had a positive impact on the state's economy as mitigating factors.[119]   The Fifth Circuit briefly discussed this factor and simply held that the district court's analysis was not clear error.[120]   Consequently, this Court is not required to consider Anadarko's economic contribution and, furthermore, finds that justice does not require it to consider Anadarko's economic contribution.   Even if the Court were to consider Anadarko's

---

[119] *Citgo*, 723 F.3d at 553.
[120] *Id.* at 554.

economic contribution to the Gulf States, the Court would find that such contribution does not warrant further reduction of the penalty.

**D.      Conclusion**

135.      The Court finds that Anadarko is liable to the United States for civil penalties under the Clean Water Act, 33 U.S.C. § 1321(b)(7), in the amount of $159.5 million ($159,500,000.00).


New Orleans, Louisiana, this 30th day of November, 2015.

_____
United States District Judge