UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF LOUISIANA

IN RE: OIL SPILL by the OIL RIG            MDL NO. 2179
"DEEPWATER HORIZON"in the
GULF OF MEXICO on APRIL 20, 2010        JUDGE BARBIER

This document relates to:            MAG. JUDGE WILKINSON
Nos. 12-970, 15-4143,
15-4146 and 15-4654

## NEUTRAL ALLOCATION AND REASONS
### (Halliburton and Transocean Settlements)

Class counsel for plaintiffs, together with Halliburton Energy Services, Inc. ("Halliburton"), Triton Asset Leasing GmbH, Transocean Deepwater, Inc., Transocean Offshore Deepwater Drilling Inc. and Transocean Holdings LLC (collectively "Transocean"), have submitted for the court's approval two separate, but identical in numerous important respects, settlement agreements (hereinafter collectively "the Halliburton and Transocean Settlement Agreements"). Both proposed settlements provide for payments to an identically defined "New Class," which the Notice of the Transocean settlement describes as "a new punitive damages settlement class." Record Doc. No. 14644 at p. 1.

The Halliburton and Transocean Settlement Agreements, however, are not limited to resolving the punitive damages claims of this New Class. Instead, they extend to settlement of certain "Assigned Claims." Material to this Assigned Claims component of their own agreements, the proposed Halliburton and Transocean Settlement Agreements specifically refer to the separate Deepwater Horizon Economic and Property

Damages Settlement (DHEPDS) (hereinafter "the BP Settlement"). The BP Settlement resolved all claims of a broadly defined class (hereinafter "the Old Class") against BP Exploration & Production Inc. and BP America Production Company (hereinafter collectively "BP"). The BP Settlement included an assignment from BP to the Old Class of certain claims possessed and/or asserted by BP against Halliburton and Transocean (the "Assigned Claims").

To settle these two general kinds of claims, the Halliburton and Transocean Settlement Agreements provide for Aggregate Payments to be made to claimants. These Aggregate Payments are $211,750,000.00 (two hundred eleven million, seven hundred fifty thousand dollars) from Transocean, and $1,028,000,000.00 (one billion, twenty-eight million dollars) from Halliburton, for a total of $1,239,750,000.00 (one billion, two hundred thirty-nine million, seven hundred fifty thousand dollars).

The Halliburton and Transocean Settlement Agreements both provide that the court shall appoint an "Allocation Neutral" who will "allocate the Aggregate Payment[s] . . . between the New Class and the [Old] Class with finality, subject to the terms of [the Halliburton and Transocean Settlement Agreements] and the Court's determination that the Allocation Neutral appropriately performed the assigned function." Record Doc. No. 14644-1 at ¶ 7(a), p. 18; Record Doc. No. 15322-1 at ¶ 7(a), p. 19 (emphasis added). The Allocation Neutral's function does not extend beyond the limited task specified in the Halliburton and Transocean Settlement Agreements: a simple

2

designation of two amounts from the total $1,239,750,000.00 Aggregate Payments, (a) one to the Old Class, and (b) another to the New Class.  The Allocation Neutral's function does <u>not</u> include determining what particular claimants or categories of claimants in either class may receive what particular payments from the lump sums allocated to each of the two classes or how those particular amounts paid to specific claimants will be calculated.  Instead, "[a] Claims Administrator appointed by the Court shall develop a Distribution Model for the Court-supervised Claims Program."  Record Doc. No. 14644-1 at p. 20, ¶ 8(a); Record Doc. No. 15322-1 at p. 21, ¶ 8(a).

By order dated September 29, 2015, Record Doc. No. 15398, Judge Barbier granted the parties' request and appointed me to serve as Allocation Neutral.  Contrary to the suggestions in some of the subsequent written submissions of the parties, the appointment order is clear that I was <u>not</u> appointed to act as a special master under Fed. R. Civ. P. 53 or as a magistrate judge under Fed. R. Civ. P. 73.  <u>Id.</u> at p. 1, n.2.  Since my appointment, I have conducted an open status conference, studied the record, and solicited and received written submissions on behalf of various interests advocating their views as to an appropriate allocation of the Aggregate Payments between the Old Class and the New Class.  Although the Halliburton and Transocean Settlement Agreements specifically authorize the Allocation Neutral to conduct ex parte oral communications in furtherance of his work, Record Doc. No. 14644-1 at pp. 18-19; Record Doc. No. 15322-

1 at pp. 19-20, I have done so only with representatives of the Office of the Claims Administrator for the BP Settlement and not with any parties or their counsel.

Having reviewed the parties' written submissions, some of which were submitted confidentially and in camera as authorized by the Halliburton and Transocean Settlement Agreements; the record of this matter, including especially Judge Barbier's Findings of Fact and Conclusions of Law after the Phase I trial, In re Oil Spill by the Oil Rig "Deepwater Horizon", 21 F. Supp. 3d 657 (E.D La. 2014); the periodic reports of the Claims Administrator concerning the claims of and payments made to members of the Old Class by BP; the three subject settlement agreements themselves; and the cited legal authorities, and for the following reasons, I find that a reasonable allocation is that $902,083,250 (nine hundred two million, eighty-three thousand, two hundred fifty dollars), representing 72.8% of the Aggregate Payments, should be apportioned to the New Class, and that $337,666,750 (three hundred thirty-seven million, six hundred sixty-six million, seven hundred fifty dollars), representing 27.2 % of the Aggregate Payments, should be apportioned to the Old Class.

## ANALYSIS

I.   Punitive Damages Claims of the New Class

(A)   Higher Priority of the New Class

Unlike the uncapped payments available to Old Class claimants under the BP Settlement, the Aggregate Payments of the Halliburton and Transocean Settlement

4

Agreements are limited.  Moreover, the fixed amount of the Aggregate Payments is much less than the total amounts of punitive damages and Assigned Claims sought by claimants in the Old Class and the New Class.  I have determined that pro rata division of the Aggregate Payments, based upon either value of the claims or raw numbers of claimants in the two competing classes, is not the appropriate allocation.  Instead, like a maritime law court ranking and prioritizing competing asserted liens against a seized vessel with claimed amounts that exceed the vessel's fixed value, I find that a similar kind of ranking of the competing interests of the Old and New Classes is appropriately applied to my allocation function.

The Halliburton and Transocean Settlements encompass settlement of all claims for punitive damages against these two defendants and create a New Class expressly for that purpose.  Record Doc. No. 14644-1 at pp. 4, 17; Record Doc. No. 15322-1 at pp. 4, 18.  I find that reasonable compensation for the punitive damages claims of the New Class should be given the highest rank, top priority or first call on funds to be paid from the Aggregate Payments.  The present circumstances of the subject settlements in the overall context of the Deepwater Horizon litigation dictate that the interests of the Old Class should be subordinated to the higher priority interests of the New Class in allocating the Aggregate Payments for the following reasons.

The members of the New Class are plaintiffs who were most directly, seriously and obviously damaged by the explosion and oil spill for which BP, Halliburton and

Transocean were jointly responsible. Specifically, the only interest holders in real property and/or moveable property qualified to be members of the New Class are those who are

> (a) alleged to have been <u>touched or physically damaged by oil, other hydrocarbons, or other substances</u> from the MC252 Well or the Deepwater Horizon MODU and its appurtenances (including the riser and blowout preventer), (b) alleged to have been <u>touched or physically damaged by substances used in connection with the Deepwater Horizon Incident,</u> or (c) classified as <u>having or having had the presence of oil</u> thereupon in the database of the Deepwater Horizon Unified Command Shoreline Cleanup Assessment Team.

Record Doc. No. 14644-1 at ¶¶ 4(a)(1), 4(a)(2), p. 5; Record Doc. No. 15322-1 at ¶¶ 4(a)(1), 4(a)(2), pp. 5-6 (emphasis added). The New Class also includes commercial fishermen or charter boat operators and subsistence hunters and fishers who worked, lived or operated in specifically identified Gulf Coast waters and other areas that were heavily, directly and obviously impacted by the explosion, oil spill and resulting response efforts. These New Class members are those whose very sources of their livelihoods and the bases of their way of life – the oiled and dispersant-contaminated open sea and bays, marshes and shorelines – were directly and devastatingly affected.

Thus, the New Class is restricted to those who were on the front lines of damage clearly caused by the subject explosion, oil spill and cleanup efforts. Their property was oiled or otherwise exposed to the contaminating aftermath of the Deepwater Horizon incident. Their livelihoods and way of life were directly impacted. They are entities and/or individuals of the type noted by Judge Barbier in his Phase One trial findings of

fact and conclusions of law "who could satisfy the 'physical injury' threshold of the Robins Dry Dock rule" and therefore "would be entitled to" a punitive damages award. In re Oil Spill, 21 F. Supp. 3d at 750 n.264.

New Class members also fit the same categories of claimants identified by the trial court in the case of the oil spill from the supertanker Exxon Valdez, whose punitive damages recovery was permitted to stand by the United States Supreme Court.  See Exxon Shipping Co. v. Baker, 554 U.S. 471, 476, 479 (2008) ("commercial fishermen and native Alaskans . . . [who are] individuals dependent on Prince William Sound for their livelihoods" and "commercial fishermen, Native Alaskans, and landowners" whose property was damaged by the oil spill); In re Exxon Valdez, 236 F. Supp. 2d 1043, 1058-59 (D. Alaska 2002), vacated by Sea Hawk Seafoods, Inc. v. Exxon Corp., No. 03-35166 (9th Cir. Aug. 18, 2003), as stated in In re Exxon Valdez, 490 F.3d 1066, 1073 (9th Cir. 2007), vacated sub nom. Exxon Shipping Co. v. Baker, 554 U.S. 471 (2008) (calculating "the best indicators of actual, compensatory damages" from verdicts and settlements for commercial fishermen and seafood processors, Native Alaskans dependent on the oil spill area for their livelihoods, villages, municipalities and other landowners).

In addition, the New Class includes many claimants whose property suffered direct physical damage from the explosion and oil spill, but who were excluded from the Old Class.  Among others, these include local governments of coastal communities and oil and gas interests operating in the contaminated areas.  See Record Doc. No. 6430-1, BP

Settlement Agreement at pp. 11, 13-14, 105 (excluding from the BP Settlement "governmental organizations," which are defined to include "local government," and "oil and gas industry" entities); Record Doc. Nos. 14644-1 and 15322-1, at p. 12 (definition of "governmental organization" for purposes of exclusion from the Halliburton and Transocean Settlement Agreements "does not include any Local Government") (emphasis added). Thus, all of these additional members of the New Class are directly-impacted claimants who received nothing in the way of compensatory payments that the Old Class received from the particular BP Settlement cross-referenced in the Halliburton and Transocean Settlement Agreements.

In contrast, many of the members of the Old Class were inland businesses or others whose economic activities were less directly affected by the Deepwater Horizon incident. Such Old Class members were eligible to recover compensation under the lenient causation provisions of the BP Settlement, even if they did not suffer direct physical impact like oiling or other contamination or physical damage to their property or businesses from the spill or cleanup effort, because BP contractually obligated itself to compensate them.

As the United States Court of Appeals for the Fifth Circuit has explained in its decisions addressing BP's unsuccessful challenges to its settlement agreement with the Old Class, the elaborate criteria in Exhibit 4B ("Causation Requirements for Businesses Economic Loss Claims") to the BP Settlement Agreement provided a sufficient, although

indirect and permissive, way to establish causation without the need for additional proof

that an Old Class claimant's lost revenue was actually caused by the oil spill.

> Instead of direct evidence of a causal connection between the Deepwater Horizon disaster and the claimant's business losses, the Exhibit [4B] described four geographic zones, several types of businesses, formulae for presenting economic losses, and various presumptions regarding causation that apply to specific combinations of those criteria. The parties agreed that a claimant's satisfaction of those criteria would establish causation for the purposes of the Settlement Agreement. . . .
>
> *   *   *
>
> [T]here is no additional analysis of causation issues beyond those criteria in Exhibit 4B. It is true that the phrase appears that claims will be paid [**"**]**without regard to whether such losses resulted or may have resulted from a cause other than[**"**] the** **<u>Deepwater Horizon</u> disaster**. . . . <u>Once causation is established</u> under the approach of Exhibit 4B, the Claims Administrator will not be concerned with the possibility that a particular claimed injury might have been caused in whole or part by other events.
>
> *   *   *
>
> Exhibit 4B . . . explicitly does not require direct evidence of causation . . . .

<u>In re Deepwater Horizon</u>, 753 F.3d 509, 512, 514-16 (5th Cir.), <u>cert. denied sub nom.</u> <u>BP</u>

<u>Exploration & Prod. Inc. v. Lake Eugenie Land & Dev.</u>, 135 S. Ct. 754 (2014) (bold

emphasis added). "The [BP] Settlement Agreement contained many compromises. One

of them was to provide in only a limited way for connecting the claim to the cause." <u>In</u>

<u>re Deepwater Horizon</u>, 744 F.3d 370, 378 (5th Cir.), <u>cert. denied sub nom.</u> <u>BP</u>

<u>Exploration & Prod. Inc. v. Lake Eugenie Land & Dev.</u>, 135 S. Ct. 754 (2014).

> Thus, the BP Settlement permitted Old Class members to receive compensation

payments because BP contractually obligated itself to do so, even if the claimants were

a golf course and a plastic surgeon in northern Alabama; a dental clinic and an ice cream

9

parlor in northern Louisiana; a soybean farmer and a funeral home in northern Mississippi; and others who neither experienced nor saw oil, dispersants or other flotsam or detritus directly emanating from the Deepwater Horizon disaster on or near their properties or businesses.  When compared to the direct damage and much more obvious causation circumstances of members of the New Class, the indirect, comparatively attenuated causation status of the Old Class prompts me to subordinate the allocation priority of the Old Class below the higher priority of the New Class to the limited settlement funds provided by the Aggregate Payments.

        In addition, the BP Settlement released all compensatory damages claims against BP, Halliburton and Transocean and all punitive damages claims against BP; but reserved punitive damages claims against only Halliburton and Transocean.  Record Doc. No. 6430-1 at pp. 15, 73-74.  The uncapped payments to the Old Class under the BP Settlement were entirely compensatory in nature and included nothing for punitive damages or in the nature of any penalty designed to punish or deter BP, Halliburton or Transocean.  Without allocation by priority of an amount of the Aggregate Payments to punitive damages, the subject settlements will not reflect appropriate value for this significant aspect of plaintiffs' overall claims.  By its very definition, the New Class is a punitive damages class.  It mirrors the kinds and class of claimants found to be entitled to a punitive damages award in the Exxon Valdez litigation.

Finally, I relegate the interests of the Old Class in the Aggregate Payments to secondary, inferior priority when compared to the superior interests of the New Class in light of the nature of the claims of the Old Class to these settlement funds. The interests of members of the Old Class in these funds arise exclusively, not from any claims of their own, but from claims of BP that were assigned to the Old Class as part of the BP Settlement. As BP's assignees, members of the Old Class must stand in the shoes of BP. For the reasons more fully set out below, those shoes are decidedly unattractive.

I recognize that Judge Barbier concluded after the Phase One trial that the wrongful conduct of Transocean and Halliburton was merely "negligent," and thus not rising to the level of "reckless, willful, and wanton conduct" that would warrant a punitive damages award against them. In re Oil Spill, 21 F. Supp. 3d at 746-47, 749. Despite finding that "BP's conduct was reckless," id. at 746 (emphasis added), "that the conduct of BP's employees was egregious enough that exemplary or punitive damages would be appropriate," and that BP was the principal wrongdoer, the court – applying Fifth Circuit precedent – also concluded that even BP could not be held liable for punitive damages. Id. at 747, 749-50 (citing In re P & E Boat Rentals, 872 F.2d 642, 652-53 (5th Cir. 1989)) (emphasis added). While powerfully persuasive, these findings and conclusions – like those of any trial court – were by no means the final judicial word. As discussed below, they provide good reason for the value of the punitive damages claims of the New Class to be deeply discounted for settlement evaluation and present

allocation purposes.  In my view, however, there is nothing in Judge Barbier's findings and conclusions that would undermine the top priority, first call on the Aggregate Payments that I assign to the New Class.

(B)    Calculation of New Class Punitive Damages Allocation

(1)    The Baseline Amount

Every evaluation of the type presented by this neutral allocation exercise requires a starting point.  Thus, I begin by deriving a baseline amount against which other upward or downward adjustments will be applied.

In Baker, in the context of the Exxon Valdez litigation, the United States Supreme Court exhaustively reviewed the history of punitive damages awards in addressing what constitutes an appropriately recoverable amount of punitive damages under the general maritime law.  The Court determined that the best approach to decide the propriety of a punitive damages award is "pegging punitive to compensatory damages using a ratio or maximum multiple. . . .  [T]he potential relevance of the ratio between compensatory and punitive damages is indisputable, being a central feature in our due process analysis." Baker, 554 U.S. at 507.

At the conclusion of its extensive discussion, the Supreme Court held that, "given the need to protect against the possibility (and the disruptive cost to the legal system) of awards that are unpredictable and unnecessary, either for deterrence or for measured retribution, we consider that a 1:1 ratio [of compensatory to punitive damages], which

12

is above the median award, is <u>a fair upper limit</u> in <u>such</u> maritime cases." <u>Id.</u> at 513 (emphasis added). The Court stated that "such maritime cases," meaning the Exxon Valdez matter specifically, included "cases with no earmarks of exceptional blameworthiness within the punishable spectrum (cases like this one, without intentional or malicious conduct, and without behavior driven primarily by desire for gain)." <u>Id.</u>

Applying the foregoing principles, I find that the amounts paid and projected to be paid by BP, through the process managed by the Claims Administrator, to members of the Old Class under the BP Settlement is the best and most appropriate source of establishing the total amount of compensatory damages for purposes of determining the value of the punitive damages claims of the New Class under the ratio analysis described by the Supreme Court. <u>See id.</u> at 515 ("we take for granted the District Court's calculation of the relevant compensatory damages"); <u>In re Exxon Valdez</u>, 236 F. Supp. 2d at 1058-59, 1063 (calculating "the best indicators of actual, compensatory damages" from verdicts and settlements to class members to be $507.5 million). In making this finding, I give controlling weight to the language of the BP Settlement, which specifically provides "that the Settlement Payment(s)" made by BP to members of the Old Class under that agreement, "in addition to constituting consideration from the Released Parties, <u>also constitute full, complete, and total satisfaction of all of their Compensatory Damages against the Transocean Parties and the Halliburton Parties</u>" and that no recovery of any kind of additional compensatory damages may be accepted or

sought by members of the Old Class from those parties.  Record Doc. No. 6430-39, ¶¶ 1.1.1 and 1.1.2.2 at pp. 2-3 (emphasis added).

The deadline for filing claims for payment from the BP Settlement has lapsed.  A total of 381,452 claims have been filed,[1] and almost two-thirds of them have been resolved.  The most recent report of the Claims Administrator indicates that $6,430,122,768 is the amount that includes payments actually made and amounts offered and accepted by (although not yet paid to) claimant members of the Old Class through November 30, 2015.  Record Doc. No. 15614-1 at p. 2.  Although review, processing, award appeals and payment of the remaining claims is ongoing and has not yet been finalized, enough claims have been resolved with finality that reasonably reliable projections of the final amount of payments can be made.

The Claims Administrator was not able to respond to my request that his office provide me with a projection of the expected final amount of BP Settlement payments. Record Doc. No. 15476 (letter of Patrick A. Juneau, dated October 15, 2015).  My own primitive projection is based on an average derived from the Claims Administrator's three most recent reports to the court.  Record Doc. Nos. 15425 (Status Report No. 37 dated September 30, 2015); 15522 (Status Report No. 38 dated October 30, 2015); and 15614 (Status Report No. 39 dated November 30, 2015).  My projections from each

---

[1]As the Claims Administrator consistently notes in his monthly reports to the court, "[t]he total claims received may continue to experience insignificant changes as the [office] continues to process outstanding claims."  Record Doc. No. 15614 at p. 2 n.2.

report were based on the assumption that the remaining percentage of total claims would be paid at the same levels as the percentage of total claims already paid, together with claims on which the Administrator has made offers that have been accepted by Old Class claimants, although not yet paid. For example, Status Report No. 37 and its executive summary provided separately to the court indicated that $6,042,483,986 was the amount of payments actually made, together with offers made and accepted though not yet paid, representing resolution of 57.29% of all claims. Thus, my projection at that time, assuming that the remaining 42.71% of claims would be paid at the same rates, was $10.547 billion. Repeating this exercise using Status Reports Nos. 38 and 39 and averaging my latest three estimates yields $10.87 billion as the total amount I estimate will be paid to the Old Class from the BP Settlement.

More persuasively than my own calculations, BP itself in its filings with the federal Securities Exchange Commission, which the Claims Administrator summarized for me, Record Doc. No. 15476 at p. 2, has provided varying, though steadily increasing, estimates of its liability under the BP Settlement to the Old Class. I have disregarded its 2012 and 2013 Annual Report estimates as unreasonably low and based on insufficient actual claims processing experience. BP's three most recent estimates provided to me were: (a) 2014 Annual Report, $9.9 billion; (b) 2015 first quarter report, $10.3 billion; and (c) 2015 second quarter report, $11.3 billion. These estimates contained the caveat that BP's "[m]anagement believes that no reliable estimate can currently be made of any

business economic loss claims yet processed or processed but not yet paid; except where an eligibility notice has been issued and is not subject to appeal by BP within the claims facility." Id. at pp. 2, 3.

In addition, in connection with the allocation briefing process, I received a thorough and insightful submission from counsel who "represents 900 commercial fishing claimants who participated in the Seafood Compensation Program established by the BP Settlement." Record Doc. No. 15445 at p. 1. These clients probably also are members of the New Class as described in Paragraph 3 of the New Class definition in the Halliburton and Transocean Settlement Agreements. Counsel persuasively calculated that payments to be made to the Old Class from the BP Settlement "will likely range" between "a high-end estimate of $12.1 billion" to "a low-end estimate of $10.7 billion." Record Doc. No. 15570 at pp. 2-3.

For purposes of this allocation exercise, I arrive at the first component of the Baker 1:1 ratio representing compensatory damages by averaging the foregoing projections and estimates. Accordingly, I find that $10.825 billion is a fair and reasonable estimate of the projected payments to the Old Class from the BP Settlement. Employing the Baker 1:1 ratio, I further find that this same $10.825 billion is the best indicator of compensatory damages for use in calculating the potentially recoverable punitive damages amount of $10.825 billion.

However, $10.825 billion would be the total of punitive damages recoverable under the <u>Baker</u> 1:1 ratio from all three responsible defendants, BP, Halliburton and Transocean. Judge Barbier has found that the fault of Halliburton and Transocean was a cause of only one-third of plaintiffs' damages, while BP, the principal wrongdoer, was two-thirds responsible for the Deepwater Horizon disaster. Specifically, Judge Barbier found "that the comparative fault of the Defendants as a percentage of total liability is as follows: BP: 67%; Transocean: 30%; Halliburton: 3%." <u>In re Oil Spill</u>, 21 F. Supp. 3d at 747. Therefore, I find for these allocation purposes that exposure for only one-third of the possible $10.825 billion in punitive damages should be attributed to Halliburton and Transocean. Thus, $3,608,333,000 (three billion, six hundred eight million, three hundred thirty-three thousand dollars) will be the baseline amount of punitive damages to be used for further evaluation in this neutral allocation of the Aggregate Payments.

(2)    <u>Adjustments for Settlement Value and Litigation Risk</u>

The neutral allocation function that has been assigned to me has its foundation in settlement agreements. It is a settlement evaluation function. Settlement evaluation involves consideration of numerous and sometimes complex uncertainties. These include a plaintiff's "expected trial value of the claim;" defendant's "expected loss he avoids by preventing the plaintiff from going to trial;" the fact that "parties can make errors in valuing [litigation] assets," including when "both sides expect to win at trial, a condition known as mutual optimism;" and that, especially in class actions, "process

costs," such as "the costs of litigating and managing a class action, [and] trying a complex case if the class action goes to trial," can be both substantial and unpredictable. Robert G. Bone, Civil Procedure:  The Economics of Civil Procedure 72, 78, 85, 269 (2003).   As the parties themselves recognized in confecting the Halliburton and Transocean Settlement Agreements, reaching a "fair, reasonable, [and] adequate" settlement result involves considerations of "(1) the complexity, expense, and likely duration of the litigation, including delays . . . and the risk of reversal of trial court rulings on appeal; (2) the stage of the litigation . . . ; (3) the burdens of litigation; (4) the potential for [defendants] or Plaintiffs prevailing on the merits; and (5) the range of possible recovery and certainty of damages."  Record Doc. Nos. 14644-1 and 15322-1 at pp. 2-3.

I find that, among the various considerations and uncertainties presented by this allocation exercise, only two factors might support an argument in favor of an upward adjustment of the baseline number calculated above.

First, as to the compensatory damages component of the Baker 1:1 ratio, the projected figure of $10.825 billion calculated above does not include the compensatory damages of members of the New Class who were excluded from the Old Class.  These claimants include local governments and oil and gas interests, among others.  Counsel for some of these parties have stated: "New Class Putative Claimants are unaware of any database which would differentiate opt-outs [from the BP Settlement] and excluded

18

claimants. . . .  There were some 400 local government entities who settled with BP, many of whom were coastal entities having impact claims.  Additionally, Plaquemines Parish and the towns of Grand Isle and Lafitte, Louisiana and some 10 others did not settle their claims but represent thousands of heavily oiled coastal properties."  Record Doc. No. 15574 at p. 10; see Record Doc. No. 15574-1 (Exhibit A listing about 35 similarly situated prospective New Class members excluded from the Old Class). Obviously, if the compensatory damages of these New Class members excluded from the Old Class were included in the ratio calculation made above, a higher figure would result. However, no amounts or estimates of the compensatory damages of these New Class members excluded from the Old Class have been presented to or unearthed independently by me.  I therefore conclude that this contingency cannot reliably be quantified for present allocation purposes.

Second, as noted above, the Supreme Court in Baker expressly limited its finding that a 1:1 ratio constitutes the "upper limit" of punitive damages awards to "such maritime cases," meaning those like the Exxon Valdez matter "with no earmarks of exceptional blameworthiness within the punishable spectrum (cases like this one, without intentional or malicious conduct, and without behavior driven primarily by desire for gain)."  Baker, 544 U.S. at 513 (emphasis added).  Justice Ginsburg's separate opinion in Baker specifically anticipated circumstances in which a wrongdoer's conduct might

exhibit an enhanced degree of blameworthiness warranting punitive damages in excess of the 1:1 ratio.  Id. at 524 (Ginsburg, J., concurring in part and dissenting in part).

Plaintiffs in this case have substantial arguments that the 1:1 "upper limit" on punitive damages emanating from the Exxon Valdez grounding should be exceeded in the case of the demonstrably more serious Deepwater Horizon disaster.  Unlike in the 1:1 punitive damages-capped Exxon Valdez incident, eleven (11) deaths and many serious personal injuries resulted from the Deepwater Horizon disaster.  The evidence adduced in the Phase Two and Penalty Phase trials conducted by Judge Barbier establishes that the amount of polluting oil released into the Gulf of Mexico as a result of the Deepwater Horizon disaster exceeded the size of the Exxon Valdez oil spill by a multiple of more than twelve (12) times the number of barrels of oil.  See In re Oil Spill by the Oil Rig "Deepwater Horizon", 77 F. Supp. 3d 500, 525 (E.D. La. 2015) (3.19 million barrels of oil discharged into the Gulf of Mexico as a result of the Deepwater Horizon explosion); In re Exxon Valdez, 270 F.3d 1215, 1246 (9th Cir. 2001) (grounding of the Exxon Valdez spilled 261,905 barrels into Prince William Sound, Alaska).

Perhaps more significantly, unlike the Exxon Valdez incident, which was caused by Exxon's single wrongful decision to retain as its employee a ship's captain prone to drunkenness on the job, the Deepwater Horizon explosion and oil spill  have been found to have resulted from a series of several acts and omissions motivated at least in part by a desire for financial gain.  Financial incentive was one of the factors identified by Justice

Ginsburg as a basis for exceeding the 1:1 ratio for punitive damages.  <u>Baker</u>, 554 U.S. at 524.

At the time of the Deepwater Horizon incident, "BP and the Macondo Well were almost six weeks behind schedule and more than $58 million over budget."  National Commission on the BP Deepwater Horizon Oil Spill and Offshore Drilling, <u>Deep Water: The Gulf Oil Disaster and the Future of Offshore Drilling Report to the President</u> 2 (January 2011).[2]  In his Phase One trial findings, Judge Barbier identified a series of unreasonable decisions made during the drilling of the Macondo Well that were motivated by financial gain.  <u>See</u> Record Doc. No. 13381-1 at pp. 19, 50, 53, 76.  For example, the Macondo Well was drilled faster than critical information could be gathered and analyzed, as part of a "'we can get away with this' attitude."  <u>In re Oil Spill</u>, 21 F. Supp. 3d at 674 n.22 (quoting trial exhibit 1136).  A decision reflecting this attitude made on April 9, 2010, to drill the final 100 feet of the well was found to be "the initial link in a chain that concluded with the blowout, explosion and oil spill."  <u>Id.</u> at 675.  Judge Barbier found that this decision, which initiated the chain reaction of events leading to the oil spill, "was dangerous and . . . <u>motivated by profit</u>."  <u>Id.</u> at 674 (emphasis added).  The court also found that an unreasonable choice <u>not</u> to run a "cement bond log (CBL)" test that could have indicated that well cement was improperly placed and needed some kind of remediation, <u>id.</u> at 691-93, "was primarily driven by a "desire

---

[2]http://permanent.access.gpo.gov/gpo2978/DEEPWATER_ReporttothePresident_FINAL.pdf.

to save time <u>and money</u>, rather than ensuring that the well was secure." <u>Id.</u> at 693 (emphasis added). Similarly, the court also found that a decision to cut materials costs by using leftover and less cement than would typically be used contributed to improper placement of the cement and "had a financial incentive." <u>Id.</u> at 695, 695-99.

Of course, all of the foregoing financial motivating factors outlined above were attributed by the court to BP, not Transocean or Halliburton. For the New Class to have any chance of success on appeal or in further litigation on the precise punitive damages claims now being settled would require that BP's "reckless, willful, and wanton conduct" motivated by financial gain somehow be imputed or extrapolated to apply to Transocean and Halliburton. As with the factors outlined below, the chances of the New Class succeeding on such a theory are low.

While the two factors outlined above provide some basis for arguing that the amount of potentially recoverable punitive damages could be higher than the $3.6 billion baseline calculated above, I find that other factors dictate a severe downward adjustment of this number for settlement evaluation and allocation purposes. These downward pointing factors substantially outweigh any countervailing upward calibration considerations.

First and foremost, Judge Barbier's Phase One trial ruling finds <u>no</u> liability for punitive damages arising from either the "reckless" wrongdoing of BP or the much less culpable, merely "negligent" conduct of Transocean and Halliburton. <u>In re Oil Spill</u>, 21

F. Supp. 3d at 746-47.   An appeal of that decision has been lodged, but appellate proceedings are stayed pending court review and approval or rejection of the subject settlements.   In Re: Deepwater Horizon, Fifth Circuit Case No. 14-31374, Record Doc. No. 00513124514 at p. 2.   If that ruling were affirmed on appeal, a prospect which I find much more probable than not, the claims of the New Class would be valueless.

On the other hand, I cannot discount to zero the possibility of reversal or modification of the trial court's rulings on appeal.   Though unlikely, there is some possibility that the Fifth Circuit could conceivably reverse 26 years of precedent set in P&E Boat Rentals, perhaps using the blueprint for distinguishing P&E laid out in plaintiffs' previously asserted arguments, which Judge Barbier himself found were "not without merit."   In re Oil Spill, 21 F. Supp. 3d at 749-50.

Beyond the Fifth Circuit, the paucity of cases in which the United States Supreme Court annually grants petitions for writs of certiorari is well known.   See website of the Supreme Court of the United States, "Frequently Asked Questions (FAQ)" http://www.supremecourt.gov/faq.aspx#faqgi9 ("The Court receives approximately 10,000 petitions for a writ of certiorari each year.   The Court grants and hears oral argument in about 75-80 cases.") (visited December 7, 2015).   The high Court has thus far rejected every request that it review previous rulings in the Deepwater Horizon MDL proceedings.

However, circuit splits on significant legal issues of national importance, such as the standard for imposing corporate liability for punitive damages under the general maritime law, are certainly grounds of the type on which the Court has historically granted certiorari petitions. As Judge Barbier noted in his Phase One trial conclusions of law, other circuits, including the Ninth and First, employ more lenient standards than the Fifth Circuit in determining corporate liability for punitive damages. In re Oil Spill, 21 F. Supp. 3d at 751. Judge Barbier found that if "the standards of the First Circuit or Ninth Circuit would apply [. . . ,] BP would be liable for punitive damages under those rules." Id. at 757 n.300. At my request, the Claims Administrator has advised that about 44% of all claimants to the BP Settlement reside in Florida and Alabama within the Eleventh Circuit. Record Doc. No. 15560 (letter of Patrick A. Juneau, dated November 9, 2015). One advocate for probable members of the New Class notes that the Eleventh Circuit "has not addressed whether [corporate] ratification [of the type mandated under Fifth Circuit law, In re Oil Spill, 21 F. Supp. 3d at 749] is required for an award of punitive damages," Record Doc. No. 15570 at p. 12, and argues that the Eleventh Circuit could adopt the more lenient First and Ninth Circuit view. When coupled with the notoriety and seriousness of the Deepwater Horizon disaster, the foregoing are reasons the Supreme Court might grant certiorari after any Fifth Circuit appellate decision.

Weighing heavily against this prospect is the fact that the Supreme Court declined to resolve this same circuit split a mere seven years ago when it divided evenly on the

question in <u>Baker</u> and therefore allowed the punitive damages liability finding under Ninth Circuit law to stand.  <u>Baker</u>, 554 U.S. at 484.  Weighing somewhat in favor of the prospect of Supreme Court review is the fact that the makeup of the Court has changed since that time in a way that hints that Justice Ginsburg's view might now find increased favor.

Another factor also militates heavily in favor of a downward adjustment of the baseline figure calculated above.  Specifically, a strong argument could be made by Halliburton and Transocean that the compensatory damages component of the 1:1 ratio should be limited only to those BP Settlement payments received by claimants who might also be members of the New Class, rather than all claimants included in the Old Class.  As noted above, the <u>Baker</u> Court derived its compensatory damages component of the 1:1 ratio from the trial court's "best indicators of actual, compensatory damages," consisting of verdicts and settlements for commercial fishermen and seafood processors, Native Alaskans dependent on the oil spill area for their livelihoods, villages, municipalities and other landowners whose properties were damaged by oil.  In terms of the subject Deepwater Horizon incident settlements, this description applies only to members of the New Class, not <u>all</u> members of the Old Class, all of whose payments and projected payments I have considered in reaching the baseline number calculated above.

Comparing the "Damage Categories" definitions classifying Old Class claimant types contained in the BP Settlement, Record Doc. No. 6430-1 at pp. 8-9, with the New

Class definition contained in the Halliburton and Transocean Settlement Agreements indicates that only Old Class claimants in the Seafood Compensation, Subsistence, Vessel Physical Damage, Coastal Real Property and Wetlands Real Property damage categories will also qualify as members of the New Class.  The reports of the Claims Administrator establish that of the approximately 380,000 total claimants, only about 162,500 (about 43%) are in these five Old Class categories that probably also qualify as New Class members and that claimants in those damages categories have been paid or accepted payment offers amounting to only about one-third of the total payments and accepted offers.  See, e.g., Record Doc. No. 15522-1 at p. 2 (as of September 30, 2015, of $6,210,673,333 actually paid, together with offers accepted but not then paid, $2,019,038,263 was for claimants in the Seafood Compensation, Subsistence, Vessel Physical Damage, Coastal Real Property and Wetlands Real Property damage categories).  My projection of end-of-program total payments to these five categories of claimants, based on payments already made and offers accepted, as reflected in the Claims Administrator's reports, is only about $2.45 billion.  An advocate for commercial fishermen whose clients probably will qualify as New Class members has calculated that "$3.2 billion is the total of estimated . . . payments to the five categories."  Record Doc. No. 15570 at p. 6 n.9, p. 10 n.13.  Using these estimates and applying the one-third responsibility of Transocean and Halliburton adjudicated by Judge Barbier would yield

a range of $816 million to $1.067 billion for each component of the 1:1 ratio, as opposed to the much higher figures calculated above.

I am persuaded by (1) the clear language of the BP Settlement quoted above that the BP Settlement payments "constitute full, complete, and total satisfaction of all of [Old Class claimants'] Compensatory Damages against the Transocean Parties and the Halliburton Parties" and (2) the Baker Court's emphasis on punitive damages as a reflection of overall compensatory damages arising from a discrete wrongful occurrence, that the higher compensatory damages figure calculated above is the appropriate baseline number. Nevertheless, I recognize the strength of the foregoing argument as a substantial basis for a significant downward departure from that number for settlement evaluation and allocation purposes.

Weighing and balancing the foregoing factors, I find that the prospect of recovery of the full baseline amount of $3,608,333,000 (three billion, six hundred eight million, three hundred thirty-three thousand dollars) in punitive damages calculated above is low, presenting no more than a 25% (twenty-five percent) possibility of success through further litigation. Thus, I find that a reasonable allocation of the Aggregate Payments to the New Class for its punitive damages claims is 25% of the baseline amount, $902,083,250 (nine hundred two million, eighty-three thousand, two hundred fifty dollars), representing 72.8% of the total Aggregate Payments.

II.     The Assigned Claims of the Old Class

As part of its settlement with BP, the Old Class received on assignment from BP certain claims possessed and/or asserted by BP against Transocean and Halliburton. Although the Assigned Claims are described in a long list of separately enumerated items, Record Doc. No. 6430-39 at pp. 6-8, they may fairly be characterized and summarized as falling into three (3) general categories, the first two of which are compensatory in nature and the third of which is punitive in nature:

(1) BP's claims for indemnity and/or contribution against Halliburton and Transocean to recover the amounts paid by BP to members of the Old Class;

(2) BP's claims against Halliburton and Transocean to recover BP's own damages resulting from the explosion and oil spill, and

(3) BP's punitive damages claims against Halliburton and Transocean.

Having determined above that the New Class justifiably should be given top priority or first call on funds from the Aggregate Payments, while also finding that appropriate value of the punitive damages claims of the New Class for allocation purposes equals almost three-quarters of the Aggregate Payments, I conclude that not much discussion is required to allocate the remaining approximately one-quarter of the Aggregate Payments to the subordinated, inferior claims of the Old Class.

(A)     Compensatory Aspects of the Assigned Claims

On paper, the first two compensatory categories of Assigned Claims have substantial value.  Unlike the calculations set out above based upon the Claims

Administrator's reports concerning the BP Settlement, I have no independent means of estimating the value of these claims myself.  Thus, I rely exclusively on the parties' estimates, which vary widely.  Since some have been submitted confidentially for my in camera consideration only, I set out the range of all such estimates of the parties here without attribution as follows:  $20.5 billion; $28.2 billion; a range between $25 billion and $37 billion; $31.8 billion; $14.5 billion; and a range between $31.6 billion and $33 billion.  Most of these estimates make no calculation of BP's assigned claims for lost profits it may have earned if the Deepwater Horizon disaster and resulting lack of production from the platform and its well had not occurred.  A simple averaging of these estimates, without reference to any claim BP may have had for its lost profits, yields a figure of about $27.7 billion.

Appropriate valuation of these claims for allocation purposes must account for a substantial reduction from their gross value attributable to the same kinds of settlement evaluation factors and considerations employed above.  The first and foremost reducing factor is the high percentage of fault attributed by Judge Barbier to BP itself as principal wrongdoer and primary cause of those losses.  Specifically, as to the first two categories set out above, I find that the estimated value of the compensatory Assigned Claims must be reduced by 67% (sixty-seven percent), the percentage of fault assigned to BP itself by Judge Barbier in his Phase One findings of fact and conclusions of law.  Applying the

average of estimated values summarized above, 33% (thirty-three percent) of that amount would yield a reduced potential recovery of compensatory damages of $9.233 billion.

In addition, BP – and therefore the Old Class assignees of its claims against Halliburton and Transocean – face the same kinds of high hurdles to recovery posed by Judge Barbier's motion rulings and Phase One trial findings and conclusions.  They also face the same unlikely prospects of reversal or modification on appeal as discussed above in connection with the punitive damages claims of the New Class.  In short, Judge Barbier  specifically held, in light of the other findings and conclusions contained in his Phase One ruling, that BP was grossly negligent and had engaged in willful and reckless misconduct while the other defendants were merely negligent, and that "the court finds that Transocean's and Halliburton's contractual indemnities and releases are valid and enforceable against BP." In re Oil Spill etc., 21 F. Supp. 3d at 752.  As one advocate for the Old Class summarized it:  "Neither class recovers under the District Court's rulings regarding release, indemnity, and punitive damages . . . .  The sum of those rulings was that (1) BP agreed to indemnify (for third-party losses) and likewise release (for its own, first-party losses) the [Halliburton and Transocean] Defendants, and that the Defendants [Halliburton and Transocean], being merely negligent, were not subject to punitive damages."  Record Doc. No. 15572 at p. 5.

For future litigation risk reasons similar to those discussed above, I find that the prospect of recovery of the full amount of the estimated $9.233 billion in BP's

compensatory damages calculated above and assigned to the Old Class is low, presenting no more than a 25% (twenty-five percent) possibility of success through further litigation. One quarter of $9.233 billion is $2,308,250,000 (two billion, three hundred eight million, two hundred fifty thousand dollars). This amount is more than sufficient to support the allocation of what remains of the Aggregate Payments to the Old Class as the second-ranking claims, subordinated to the higher preference and top priority of the New Class.

(B)     Doctrine of Unclean Hands: Application to Punitive and Compensatory Damages Aspects of the Assigned Claims

As previously noted, a final significant factor influences my conclusions both that (a) the punitive damages claims of the New Class should be given top priority or first call on funds to be allocated from the Aggregate Payments, while the Assigned Claims of the Old Class should be subordinated to secondary, inferior rank and (b) the punitive damages Assigned Claims of BP against Halliburton and Transocean to the Old Class have no value whatsoever. That factor is the application of the doctrine of unclean hands to BP and to its assignees in the Old Class, whose only current standing is in BP's unattractive shoes.

Whether under federal common law or general maritime law, the principle is "well established . . . that the assignee is placed in the same position as the assignor." Tango Transp. v. Healthcare Fin. Servs. LLC, 322 F.3d 888, 893 (5th Cir. 2003). That "same position," often referred to as "standing in the shoes" of the assignor, includes all of the

assignor's characteristics and prior actions, both positive and negative, that affect the right assigned. "[A]n assignee, by following in the footsteps of the assignor, acquires not only all the rights and priorities of the assignor, but also any burdens and limitations on [the right] that were incumbent on the assignor." ICEE Distribs., Inc. v. J&J Snack Foods Corp., 325 F.3d 586, 593 (5th Cir. 2003); accord Cadle Co. v. 1007 Joint Venture, 82 F.3d 102, 104-05 (5th Cir. 1996); Fed. Deposit Ins. Corp. v. Bledsoe, 989 F.2d 805, 810 (5th Cir. 1993); United States v. Currency Totalling $48,318.08, 609 F.2d 210, 215 (5th Cir. 1980).

When the prior actions of the assignor constitute a "breach of its duty . . . , deception, concealment or other sharp practices," Florida Bahamas Lines, Ltd. v. Steel Barge Star 800, 433 F.2d 1243, 1244 (5th Cir. 1970), the court will not ignore those actions to allow the assignee to gain an advantage, even if the law ordinarily would allow the assignee that advantage. In Custom Fuel Servs., Inc. v. Lombas Indus., Inc., 805 F.2d 561, 565 (5th Cir. 1986), the Fifth Circuit explained that its earlier precedent in Florida Bahamas Lines illustrates how an assignee stands entirely in the shoes of its assignor and cannot avoid the assignor's negative traits, particularly when the court is exercising its "historic equity jurisdiction" derived from admiralty. In Florida Bahamas Lines, the late and much respected Fifth Circuit Chief Judge John R. Brown stated: "Since a valid and unqualified assignment operates to transfer to the assignee no greater right or interest than was possessed by the assignor, the most [the assignee] can claim is that it stands in

the shoes of [the assignor] which at best, were ill-fitting if not worn out from the [prior,

deceptive] dealings" between the interrelated companies of assignor and assignee.

Florida Bahamas Lines, 433 F.2d at 1246 (citation omitted).

> In Florida Bahamas Lines . . . , this Court denied the priority of a maritime
> lien for wharfage on equitable grounds, holding:
>
> > The nature of the facts in this case–which need no
> > embellishment–"make the entire transaction subject to the
> > sharpest scrutiny." . . . Indeed, the circumstances of this case
> > are peculiarly attuned to the gentle strains of admiralty's
> > equity jurisdiction which, in "its traditional liberality seeks
> > out the intrinsic justice of a cause." This Court has repeatedly
> > given fullest play to the concept that admiralty jurisdiction
> > embraces the resources of equity whenever the need arises.

Custom Fuel Servs., Inc., 805 F.2d at 565-66 (quoting Florida Bahamas Lines, 433 F.2d

at 1248-49).  Thus, the assignee "took the assignment with all of its built-in deficiencies.

What [the assignor] in good equity could not assert is equally foreclosed to [the

assignee]."  Florida Bahamas Lines, 433 F.2d at 1252 (citations omitted).

The reply brief filed by counsel for some Old Class members makes the erroneous

assertions that "Defendants' [Halliburton and Transocean] hands are as dirty, if not more

so, than BP's" and that "[t]here has been no finding that BP acted in such a way as to

warrant punitive damages being assessed against it."  Record Doc. No. 15631 at p. 4.  On

the contrary, Judge Barbier found that BP "was reckless," that the Deepwater Horizon

incident "was the result of [BP's] gross negligence and . . . willful misconduct," and that

"the conduct of BP's employees was egregious enough that exemplary or punitive

damages <u>would</u> <u>be</u> <u>appropriate</u>."  <u>In re Oil Spill</u>, 21 F. Supp. 3d at 747, 757 (emphasis added).  Allowing the Old Class assignees of BP's claims, who stand completely in BP's shoes, to recover punitive damages would undermine the purposes of and legal justification for punitive damages: <u>i.e.</u>, to punish and deter egregious conduct.  Punitive damages awards "are aimed not at compensation but principally at retribution and deterring harmful conduct."  <u>Baker</u>, 554 U.S. at 492; <u>see</u> <u>Atl. Sounding Co. v. Townsend</u>, 557 U.S. 404, 409 (2009) (quoting <u>Wilkes v. Wood</u>, Lofft 1, 18-19, 98 Eng. Rep. 489, 498-99 (C.P. 1763)) (describing punitive damages "'as a punishment to the guilty, to deter from any such proceeding for the future, and as a proof of the detestation of the jury to the action itself'").  BP was primarily at fault, and its gross negligence and willful misconduct are that which should principally be punished and deterred.  Permitting BP's assignees to recover punitive damages, while standing in BP's shoes, against parties who were merely negligent would indirectly reward, rather than punish, BP.

The doctrine of unclean hands is an ancient equitable principle that requires a party who seeks a remedy to come to court with "clean hands;" <u>i.e.</u>, without having violated "conscience, or good faith, or other equitable principles, in his prior conduct." <u>Keystone Driller Co. v. General Excavator Co.</u>, 290 U.S. 240, 244-45 (1933). This doctrine precludes a court from "'lend[ing] the aid of its extraordinary powers to a plaintiff who himself is guilty of reprehensible conduct in the controversy.'"  T. Leigh Anenson, <u>Treating Equity Like Law:  A Post-Merger Justification of Unclean Hands</u>, 45

Am. Bus. L.J. 455, 462 (2008) (quoting Zechariah Chafee, Jr., <u>Foreword</u> to <u>Selected Essays on Equity</u> iii, iv (Edward D. Re, ed., 1955)).

Almost a century after the merger of all formerly recognized forms of action (law, equity and admiralty) into "one form of action–the civil action," Fed. R. Civ. P. 2, although "adjudications in state and federal courts evidence the expansion of unclean hands into matters of legal relief . . . , the United States Supreme Court has avoided the question of whether a court has authority to invoke an equitable defense like unclean hands to bar an action for damages."  T. Leigh Anenson, <u>Limiting Legal Remedies:  An Analysis of Unclean Hands</u>, 99 Ky. L.J. 63, 65 (2010) (footnotes omitted).  Nonetheless, numerous federal courts in recent years have expanded application of the doctrine of unclean hands from its roots in equity to claims and issues founded in both law and admiralty.  <u>See, e.g.</u>, <u>State of Israel v. Motor Vessel Nili</u>, 435 F.2d 242, 248-49 (5th Cir. 1970) (considering unclean hands of ship's owner in determining liability in maritime lien case); <u>Max v. Sax</u>, 134 F.2d 2, 5 (7th Cir. 1943) (applying unclean hands doctrine to case involving treble damages); <u>Boca Raton Cmty. Hosp., Inc. v. Tenet Healthcare Corp.</u>, 238 F.R.D. 679, 694 (S.D. Fla. 2006) (applying doctrine hands to civil claim for damages).

As the Fifth Circuit stated in <u>Florida Bahamas Lines</u>, "admiralty jurisdiction embraces the resources of equity whenever the need arises.  The Chancellor is no longer fixed to the woolsack.  He may stride the quarter-deck of maritime jurisprudence and, in

the role of admiralty judge, dispense, as would his landlocked brother, that which equity and good conscience impels." <u>Florida Bahamas Lines</u>, 433 F.2d at 1249 (quotation and citations omitted). "The integrity of the court is no less worthy of protection in action[s] at law, than in actions in equity." Anenson, <u>Limiting Legal Remedies: An Analysis of Unclean Hands</u>, 99 Ky. L.J. at 106 (quotation omitted).

Counsel for some New Class members have argued thoroughly and persuasively that the doctrine of unclean hands should be applied to this allocation function such that "[t]he tarred [BP] first party assigned claims should be accorded little to no value. . . . The 'New Class' should be assigned all but the nuisance value of the assigned claims." Record Doc. No. 15574 at p. 12; <u>see generally</u> <u>id.</u> at pp. 5-9. Counsel for Old Class members who are not included in the New Class have countered that, under a combined reading of Judge Barbier's ruling and the Halliburton and Transocean Settlement Agreements,

> BP . . . was . . . not subjected to punitive damages. The only parties against whom punitive damages are being levied [through these subject settlements and allocation process] are the Defendants [Halliburton and Transocean] (based on the assumptions being made herein). As such, between two actors, one whose behavior did not rise to a level that resulted in the imposition of exemplary damages (BP) and another whose behavior did (Defendants) [Halliburton and Transocean], the equitable doctrine of unclean hands should not inure to the benefit of the latter. . . . [P]unitive damages are not meant to compensate the victim, rather they serve as a deterrent to the tortfeasor (Defendants) [Halliburton and Transocean]. As such, the actions of the victim should have no bearing on the application of punitive damages.

Record Doc. No. 15572 at pp. 8-9 (footnote omitted).

I find that this counter-argument of the Old Class and what appears to be its characterization of BP as a "victim" of the conduct of Halliburton and Transocean (at least for present hypothetical purposes) are strained and unpersuasive given Judge Barbier's clear findings.  In my view, there is nothing inequitable about applying the doctrine of unclean hands to the Assigned Claims, all of which emanate from BP, the assignor and adjudicated principal wrongdoer.  The Old Class has obtained handsome payment of its compensatory damages claims through the uncapped BP Settlement, in which the Old Class expressly released its own claims for punitive damages against BP and obtained an extremely lenient damages causation standard.  By accepting the Assigned Claims, the New Class agreed to stand in BP's shoes, including any worn heels, scuffed leather and holey soles of those shoes.  I find that the doctrine of unclean hands is a substantial impediment to recovery of any of the Assigned Claims, particularly the Assigned Claims for any punitive damages that could have been asserted by BP, and a significant basis on which the interests of the Old Class in the Aggregate Payments should be downwardly valued, subordinated and rendered secondary to the higher ranking, top priority of the New Class.

## **CONCLUSION**

For all of the foregoing reasons, I find that a reasonable allocation of the Aggregate Payments provided in the Halliburton and Transocean Settlement Agreements is as follows:

Case 2:10-md-02179-CJB-JCW   Document 15652   Filed 12/11/15   Page 38 of 38

$902,083,250 (nine hundred two million, eighty-three thousand, two hundred fifty dollars), representing 72.8% of the total Aggregate Payments, should be apportioned to the New Class; and

$337,666,750 (three hundred thirty-seven million, six hundred sixty-six million, seven hundred fifty dollars), representing 27.2% of the total Aggregate Payments, should be apportioned to the Old Class.

As noted above, the Halliburton and Transocean Settlement Agreements provide that this allocation is made "with finality, subject to . . . the Court's determination that the Allocation Neutral appropriately performed the assigned function." Record Doc. No. 14644-1 at p. 18 ¶ 7(a); Record Doc. No. 15322-1 at p. 19 ¶ 7(a).

New Orleans, Louisiana, this ___11th___ day of December, 2015.

_____
JOSEPH C. WILKINSON, JR.
UNITED STATES MAGISTRATE JUDGE;
COURT-APPOINTED ALLOCATION NEUTRAL

CLERK TO NOTIFY:
HON. CARL BARBIER