# UNITED STATES DISTRICT COURT
## FOR THE EASTERN DISTRICT OF LOUISIANA

| | | |
|---|---|---|
| In re: Oil Spill by the Oil Rig | * | MDL No. 2179 |
| "Deepwater Horizon" in the Gulf | * | |
| Of Mexico, on April 20, 2010 | * | SECTION J |
| | * | |
| This Filing Applies to: | * | JUDGE BARBIER |
| | * | |
| Nos. 13-706, 13-810, | * | MAGISTRATE JUDGE |
| 13-1143, 13-1185, 13-1222, | * | SHUSAN |
| 13-1386 and 13-2006 | * | |
| | * | |

\* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \*

## MEMORANDUM IN SUPPORT OF RENEWED MOTION TO STRIKE AFFIRMATIVE DEFENSES AND MOTION *IN LIMINE* REGARDING POTENTIAL THIRD-PARTY FAULT, INCLUDING APPLICATION OF ANY ALLEGED "SUPERSEDING" CAUSE DEFENSE PREMISED ON GOVERNMENTAL ACTION OR INACTION FOLLOWING THE SPILL

The OPA Causation Test Case Plaintiffs, by and through the Plaintiffs' Steering Committee, respectfully submit the following memorandum in support of their renewed motion to strike affirmative defenses and motion *in limine* to exclude evidence of potential third-party fault, including the application of any alleged "superseding" cause defense premised on Governmental action or inaction following the Spill:

**MAY IT PLEASE THE COURT:**

# TABLE OF CONTENTS

Table of Contents . . . . . . . . . 2

Table of Authorities . . . . . . . . . 4

Central Questions to be Answered by the Test Cases . . . . 10

Plaintiffs' Basic Statement of the Case . . . . . . 11

Plaintiffs Initial Motion to Strike and Renewed Motion . . . . 12

Principal Elements of OPA . . . . . . . . 14

OPA Rejects the Concept of "Proximate Cause" with Respect to
Economic Loss Damages Sought by Claimants under 33 U.S.C. §2702 . . 15

The Statutory Defenses Under OPA Are Extremely Narrow, and
Require BP to Prove that a Third Party Was the "Sole" Cause of the Discharge . 19

     The Sole Cause Defense Requires that the Third Party be the
     Sole Cause of the "Discharge" . . . . . . 21

     The Sole Cause Defense under OPA is an Affirmative Defense,
     on which BP Carries the Burden of Proof . . . . . 22

BP's Either/Or Construction is a Fallacy, as Multiple Legal and
Factual Causes Can and Commonly Do Combine to Bring About a
Particular Event or Loss . . . . . . . . 23

To the Extent that BP Attempts to Escape Liability by Alleging that Damages
Were Caused by the "Fault" of the United States Government, Neither OPA
Nor the General Maritime Law Allows for the Quantification of Fault
Against an Immune or Absent Third Party . . . . . 27

     The United States is Expressly Excluded from the Definition of an
     OPA "Responsible Party" . . . . . . 28

     Unlike the Clean Water Act, the Statutory Defenses under OPA
     Do Not Include the Fault of the United States . . . . 28

     The United States is Expressly Immune for Post-Spill Conduct . . 29

     The United States Cannot be at "Fault" under the Suits in Admiralty Act
     or under the FTCA . . . . . . . . 30

BP's Other Affirmative Defenses Regarding BP's Alleged Lack of Fault and/or
The Potential Fault of Third Parties Should Also Be Stricken . . . 33

Conclusion . . . . . . . . . . 34

Certificate of Service . . . . . . . . . 36

Exhibits

A. INCREASED SAFETY MEASURES FOR ENERGY DEVELOPMENT ON THE OCS (May 27, 2010)

B. NTL No. 2010-N05 (June 8, 2010)

C. NTL No. 2010-N06 (June 18, 2010)

D. DECISION MEMORANDUM [Second Moratorium] (July 12, 2010)

E. STATEMENT OF JAMES WATSON, DIRECTOR OF BSSE (March 7, 2012)

F. BOEMRE TESTIMONY (30(b)(6) Deposition of Lars Herbst), pp.260-262, 351-353
(with Secretary Bromwich, THE INSUFFICIENCY OF OIL SPILL
RESPONSE RESOURCES (Sept. 10, 2010) [TREX-9096])

## TABLE OF AUTHORITIES

**Page(s)**

American Cargo Transp., Inc. v. United States, 625 F.3d 1176 (9th Cir. 2010)   .   29-30

Apex Oil Co., Inc. v. United States, 208 F.Supp.2d 642 (E.D.La. 2002)   .   .   19, 34

Becker v. Tidewater, Inc., 586 F.3d 358 (5th Cir. 2009)   .   .   .   .   12

Block v. North Dakota ex rel. Bd. of Univ. & Sch. Lands, 461 U.S. 273 (1983)   .   29

Central Airlines, Inc. v. United States, 169 F.3d 1174 (8th Cir. 1999)   .   .   30

Century Exploration of New Orleans v. United States, 745 F.3d 1168 (Fed. Cir. 2014)   25, 31

Commonwealth Ins. Co. v. Am. Global Mar. Inc., No.00-868, 2001 WL 333148
   (E.D.La. April 4, 2001)   .   .   .   .   .   .   28

CSX Transp., Inc. v. McBride, 131 S.Ct. 2630 (2011)   .   .   .   .   17-18

In re: Deepwater Horizon, 808 F.Supp.2d 943 (E.D.La. 2011)   .   .   .   14, 17, 18

Donaghey v. Ocean Drilling & Exploration Co., 974 F.2d 646 (5th Cir. 1992)   .   12, 23

Doyle v. Graske, No.05-21, 2008 WL 824276 (D.Neb. March 20, 2008)   .   .   22

Dunham-Price Group LLC v. Citgo Petroleum Corp., No.07-1019, 2010 WL 1285446
   (W.D.La. March 31, 2010)   .   .   .   .   .   .   26

Ebanks v. Great Lakes Dredge & Dock Co., 688 F.2d 716 (11th Cir. 1982).   .   28

Edmonds v. Compagnie Generale Transatlantique, 443 U.S. 256 (1979)   .   .   28

EMCASCO Ins. Co. v. Am. Int'l Specialty Lines Ins. Co., 438 F.3d 519 (5th Cir. 2006)   12

Ensco Offshore v. Salazar, 786 F.Supp.2d 1151 (E.D.La. 2011)   .   .   .   25, 31

Ensco Offshore v. Salazar, 781 F.Supp.2d 332 (E.D.La. 2011)   .   .   .   25, 31

Ensco Offshore v. Salazar, No.10-1941, 2011 WL 1790838 (E.D.La. May 10, 2011)   25, 31

Ensco Offshore v. Salazar, No.10-1941, 2011 WL 121936 (E.D.La. Jan. 13, 2011).   25, 31

Ensco Offshore v. Salazar, No.10-1941, 2010 WL 4116892 (E.D.La. Oct. 19, 2010)   25, 31

Exxon v. Sofec Inc., 517 U.S. 830 (1996)   .   .   .   .   .   15, 23

FGDI, LLC v. M/V Lorelay, 193 Fed.Appx. 853 (11th Cir. 2006)   .   .   .   26

Filer v. Foster Wheeler LLC, No.12-60034, 2014 WL 345221 (E.D.Pa. Jan. 29, 2014)   22

Gatlin Oil Co. v. United States, 169 F.3d 207 (4th Cir. 1999)   .   .   .   28

In re Great Lakes Dredge & Dock, LLC, 624 F.3d 201 (5th Cir. 2010)   .   .   24

Hornbeck Offshore Transp., LLC v. United States, 569 F.3d 506 (D.C. Cir. 2009) .   30

Hornbeck Offshore Serv. v. Salazar, 713 F.3d 787 (5th Cir. 2013)   .   .   .   25, 31

International Marine Carriers v. Oil Spill Liability Trust Fund, 903 F.Supp. 1097
        (S.D.Tex. 1994)   .   .   .   .   .   .   .   .   .   20, 28

Johnson v. Sawyer, 47 F.3d 716 (5th Cir. 1995)   .   .   .   .   .   30

La. ex. rel. Guste v. M/V TESTBANK, 752 F.2d 1019, 1050 (5th Cir. 1985)
        (Wisdom, J., dissenting)   .   .   .   .   .   .   .   .   27

Lexmark Int'l, Inc. v. Static Control Components, Inc., 134 S.Ct. 1377 (2014)   .   18

Mazant v. Visoneering, Inc., 250 Fed.Appx. 60 (5th Cir. 2007)   .   .   .   15

McPherson v. Union Oil Co. of Cal., 628 F.Supp. 265 (S.D. Tex. 1985)   .   .   30

In re Complaint of MetLife Capital Corp., 132 F.3d 818 (1st Cir. 1997)   .   .   34

Myers v. United States, 17 F.3d 890 (6th Cir. 1994) .   .   .   .   .   30

Norfolk & Western v. Ayers, 538 U.S. 135 (2003)   .   .   .   .   .   28

North and South American Shipping v. U.S., 352 F.Supp.2d 734 (E.D.La. 2005)   .   28

Orleans Parish Communication District v. Federal Emergency Management Agency,
        No.11-209, 2011 WL 4829887 (E.D.La. Oct. 12, 2011)   .   .   .   31

Pacific Operators Offshore LLP v. Valladolid, 132 S.Ct. 680 (2012)   .   .   18

Public Citizen Health Resource Group v. Young, 909 F.2d 546 (D.C. Cir. 1990)   .   23

Russello v. United States, 464 U.S. 16 (1983)   .   .   .   .   .   17, 29

Sekco Energy v. M/V Margaret Chouest, 820 F.Supp. 1008 (E.D.La. 1993)   .   26

Sekco Energy v. M/V Margaret Chouest, 1993 WL 322942
    (E.D.La. Aug. 13, 1993) . . . . . . 26

In re Petition of Settoon Towing LLC, 722 F.Supp.2d 710 (E.D.La. 2010) . . 33

In re Settoon Towing, No.87-1263, 2009 WL 4730969 (E.D.La. Dec. 4, 2009) . 26

Sun Oil Co. v. United States, 572 F.2d 786 (Ct. Claims 1978) . . . 12, 31

Sosa v. Alvarez–Machain, 542 U.S. 692 (2004) . . . . . 24

Staub v. Proctor Hosp., 131 S.Ct. 1186 (2011) . . . . . 24

Taira Lynn v. Jays Seafood Inc., 444 F.3d 371 (5th Cir. 2006) . . . 26

United States v. American Commercial Lines LLC, No.11-2076, 2013 WL 1182963
    (E.D.La. March 21, 2013) . . . . . 21, 33

United States v. Bodenger, No.03-272, 2003 WL 22228517 (E.D.La. Sept. 25, 2003) 33, 34

United States v. English, No.00-00016, 2001 WL 940946 (D.Haw. Mar. 28, 2001). 19

United States v. Reliable Transfer Co., 421 U.S. 397 (1975). . . . 23, 24

United States v. Vertac Chemical Corp., 364 F.Supp.2d 941 (E.D.Ark. 2005) . 27

United States v. West of England Ship Owner's Mut. Protection &
    Indemnity Assn. (Luxembourg), 872 F.2d 1192 (5th Cir. 1989) . . 21

United States v. Wong Kim Bo., 472 F.2d 720 (5th Cir. 1972) . . . 17

Walls Indus. Inc. v. United States, 958 F.2d 69 (5th Cir. 1992) . . 28

Williamson v. U.S. Dep't of Agric., 815 F.2d 368 (5th Cir. 1987) . . 29

The Clean Water Act (CWA), 33 U.S.C. §§1251, *et seq.*

    33 U.S.C. §1321(c)(1)(A) . . . . . . . 32

    33 U.S.C. §1321(c)(2)(A) . . . . . . . 32

    33 U.S.C. §1321(c)(4)(B)(i) . . . . . . 29

    33 U.S.C. §1321(f) . . . . . . . . 21, 28

    33 U.S.C. §1321(j)(8) . . . . . . . 29

The Oil Pollution Act of 1990 (OPA), 33 U.S.C. §§2701, *et seq.*

    33 U.S.C. §2701(14) . . . . . . . . 12

    33 U.S.C. §2701(32)(B)-(C) . . . . . . . 28

    33 U.S.C. §2702(a) . . . . . . . 10, 33, 34

    33 U.S.C. §2702(b)(2)(E) . . . . . . . 10, 16

    33 U.S.C. §2702(d)(1)(A) . . . . . . . 21, 22, 23

    33 U.S.C. §2702(d)(1)(B) . . . . . . . 21, 22, 23

    33 U.S.C. §2703(a) . . . . . . 13, 19, 22, 23, 28, 29, 33

    33 U.S.C. §2703(b) . . . . . . . . 19

    33 U.S.C. §2704(c)(1). . . . . . . . 17

    33 U.S.C. §2710(a) . . . . . . . . 13

    33 U.S.C. §2710(c) . . . . . . . . 21, 33

    33 U.S.C. §2715 . . . . . . . . 21

    S. REP. NO. 101-94, at 11-15 (1989)
    (reprinted in 1990 U.S.C.C.A.N. 722, 732-736) . . . 21, 33

Outer Continental Shelf Lands Act (OCSLA), 43 U.S.C. §§1331, *et seq.*

    43 U.S.C. §1334(a)(1). . . . . . . . 30

    43 U.S.C. §1334(a)(2)(A) . . . . . . . 31

    30 C.F.R. §250.103 (2010) . . . . . . . 30-31

Federal Torts Claims Act (FTCA), 28 U.S.C. §§1346(b)(1) and 2674 . . 29

    28 U.S.C. §2680(a) . . . . . . . . 32

Suits in Admiralty Act (SIAA), 46 U.S.C. §§30901-30918 . . . . 29

RESTATEMENT (THIRD) OF TORTS: PHYS. & EMOT. HARM §26, cmt. c (2010) . 23-24

RESTATEMENT (THIRD) OF TORTS: PHYS. & EMOT. HARM 6 SPEC. NOTE (2010)   .   18, 24

RESTATEMENT (THIRD) OF TORTS: PHYS. & EMOT. HARM §29, cmt. b (2010)   .   18, 24

RESTATEMENT (THIRD) OF TORTS: PHYS. & EMOT. HARM §29, cmt. m (2010)   .   24

RESTATEMENT (THIRD) OF TORTS: PHYS. & EMOT. HARM §29, cmt. o (2010)   .   25

RESTATEMENT (THIRD) OF TORTS: PHYS. & EMOT. HARM §34, cmt. a (2010)   .   15, 28, 24

RESTATEMENT (THIRD) OF TORTS: PHYS. & EMOT. HARM §34, cmt. f (2010)   .   18

RESTATEMENT (SECOND) OF TORTS §442   .   .   .   .   .   .   12

RESTATEMENT (SECOND) OF TORTS §447   .   .   .   .   .   .   12

RESTATEMENT (SECOND) OF TORTS §879, cmt. a   .   .   .   .   .   28

Force and Davies, *Deepwater Horizon: Removal Costs, Civil Damages, Civil Penalties, and State Remedies in Oil Spill Cases,* 85 TUL. L. REV. 889 (March 2011)   . 19-20, 21, 33

Goldberg, *OPA and Economic Loss: A Reply to Professor Robertson,* 30 MISS. C. L. REV. 203 (2011)   .   .   .   .   .   .   26

Vernon Palmer, *The Great Spill in the Gulf … and a Sea of Pure Economic Loss: Reflections on the Boundaries of Civil Liability,* 116 PENN. STATE L. REV. 105 (2011) .   .   .   .   16, 17, 20, 27, 33, 34

Amy Paul, *Rethinking Oil Spill Compensation Schemes: The Causation Inquiry,* 9 LOY. MAR. L.J. 137 (2011)   .   .   .   .   .   .   25

David W. Robertson, *OPA and Economic Loss: A Response to Professor Goldberg,* 30 MISS. C. L. REV. 217 (2011)   .   .   .   .   .   16-17

David W. Robertson, *Criteria for Recovery of Economic Loss under the Oil Pollution Act of 1990,* 7 TEX. J. OIL GAS ENERGY 241 (2012)   .   .   17, 25

Antonin Scalia & Bryan A. Garner, *Reading Law* 252 (2012)   .   .   .   29

Department of the Interior, INCREASED SAFETY MEASURES FOR ENERGY DEVELOPMENT ON THE OUTER CONTINENTAL SHELF (May 27, 2010) [Exhibit A]   .   .   25

Department of Interior, MMS, NATIONAL NOTICE TO LESSEES AND OPERATORS: *Increased Safety Measures for Energy Development on the OCS,* NTL No. 2010-N05 (June 8, 2010) [Exhibit B]   .   .   .   .   14, 25

Department of Interior, BOEMRE, NATIONAL NOTICE TO LESSEES AND OPERATORS:
   *Information Required for Exploration Plans, Development and Production
   Plans, and Development Operations coordination documents,*
   NTL No. 2010-N06 (June 18, 2010) [Exhibit C]   .   .   .   .   14, 25

Secretary of the Interior, DECISION MEMORANDUM RE THE SUSPENSION OF CERTAIN
   OFFSHORE PERMITTING AND DRILLING ACTIVITIES ON THE OUTER
   CONTINENTAL SHELF (July 12, 2010) [Exhibit D]   .   .   .   .   14, 25, 32

STATEMENT OF JAMES WATSON, DIRECTOR OF BUREAU OF SAFETY AND
   ENVIRONMENTAL ENFORCEMENT, TO THE COMMITTEE ON APPROPRIATIONS,
   SUBCOMMITTEE ON INTERIOR, ENVIRONMENT AND RELATED AGENCIES,
   HOUSE OF REPRESENTATIVES (March 7, 2012) [Exhibit E]   .   .   .   25

PHASE ONE FINDINGS AND CONCLUSIONS (corrected) [Doc 13381-1] (Sept. 4, 2014)   15, 24, 33, 34

FINDINGS AND CONCLUSIONS – PENALTY PHASE [Doc 15606] (Nov. 30, 2015)
   pp.9-11, ¶¶31-42   .   .   .   .   .   .   .   .   14, 25

BP PHASE TWO POST-TRIAL BRIEF [Doc 12045] (Dec. 20, 2013), p.39   .   .   12

BP PROPOSED PHASE TWO FINDINGS [Doc 12047] (Dec. 20, 2013),
   pp.463-467, ¶¶1966-1976   .   .   .   .   .   .   .   12

BP OPPOSITION TO PLAINTIFFS' MOTION TO STRIKE AFFIRMATIVE DEFENSES
   [Doc 13269] (Aug. 8, 2014)   .   .   .   .   .   .   .   13

UNITED STATES' STATEMENT IN SUPPORT OF PLAINTIFFS' MOTION TO STRIKE
   [Doc 13208] (July 29, 2014), p.2 fn.2 .   .   .   .   .   .   25

## Central Questions to be Answered by the Test Cases

The plaintiffs' case is very straight-forward:  Each and all of the OPA Causation Test Case Plaintiffs will establish that they suffered a loss of profit and/or impairment of earning capacity due to a substantial threat of and/or injury, destruction or loss to real property, personal property and/or natural resources as a result of the Macondo / *Deepwater Horizon* Spill.[1]

BP has indicated, however, that it will raise a defense that Government action and inaction following the Spill is a "superseding" cause with respect to some or all of those damages.[2]  Hence, the question: Assuming one or more Test Case Plaintiffs is found to have suffered an economic loss as a result of the Spill, is a "superseding" cause defense available to BP, *as a matter of law*?

In the event that such a defense is found to be legally available, the Court will then be asked by the Plaintiffs to determine whether BP can carry its burden to establish, *as a matter of fact,* that a superseding cause relieves BP from liability with respect to:

- The Deepwater Moratorium?

- The post-Spill evaluation and/or imposition of requirements and/or processes regarding the submission and approval of Shallow-Water Permits (as well as Deepwater Permits) with respect to oil and gas exploration and production in the Gulf of Mexico?  And/or,

- Economic loss caused in whole or part as a result of the physical presence and/or substantial threat of oil where projects are ongoing or planned?

---

[1] *See* 33 U.S.C. §§ 2702(a) and 2702(b)(2)(E).

[2] *See generally* LETTER FROM BP COUNSEL TO JUDGE SHUSHAN (May 15, 2014) [Doc. 12887] pp.6-8, and Sixth Affirmative Defense, Seventh Affirmative Defense and Twenty-Third Affirmative Defense, as stated in BP'S ANSWER TO THE B1 MASTER COMPLAINT (Sept. 27, 2011) [Doc. 4130] pp.330, 332.  *In particular, see* Third, Fifth, Sixth, Seventh,  Nineteenth and Twenty-First Defenses in *Bisso v. BP*, No.13-706 [Doc 13058]; Third, Fifth, Sixth, Seventh, Nineteenth and Twenty-First Defenses in *Black Elk v. BP,* No.13-2006 [Doc 13059]; Third, Fifth, Sixth, Seventh, Nineteenth and Twenty-First Defenses in *Certified v. BP,* No.13-1143 [Doc 13061]; Third, Fifth, Sixth, Seventh, Nineteenth and Twenty-First Defenses in *Blake v. BP*, No.13-1185 [Doc 13060]; Third, Fifth, Sixth, Seventh, Nineteenth and Twenty-First Defenses in *Seahawk v. BP,* No.13-1386 [Doc 13064]; Third, Fifth, Sixth, Seventh, Nineteenth and Twenty-First Defenses in *Trinity v. BP*, No.13-1222 [Doc 13062]; and Third, Fifth, Sixth, Seventh,  Nineteenth and Twenty-First Defenses in *Wadleigh v. BP*, No.13-810 [Doc 13063].

### Plaintiffs' Basic Statement of the Case

The Spill – either alone or in combination with other factors, including the Deepwater Moratoria and other material slow-downs and changes in deepwater and shallow-water permitting – substantially caused and contributed to a loss of profit and/or impairment of earning capacity to each of the Test Case Plaintiffs.[3]

Where a spill causes or contributes to an economic loss, in whole or in part, the Responsible Party is liable for 100% of that loss. As a matter of causation, OPA does away with the traditional "proximate cause" concepts of "superseding" or "intervening" cause. OPA, rather, only allows the Responsible Party to avoid liability where it first proves that the discharge in question was caused "*solely*" by the fault of a third party. And, to the extent that BP attempts to escape liability by alleging that the damages were caused by the "fault" of the United States Government, (not only is this factually unsupportable,[4] but) neither OPA nor the general maritime law allows for the quantification of fault against an immune or absent third party.

Nevertheless, and assuming *arguendo* that a traditional "superseding" cause defense might be legally available, a change in permitting requirements in the wake of a Macondo-like

---

[3] One of the primary fallacies in BP's position is that BP attempts to set up a factually and legally erroneous either/or construct, under which economic losses are caused by either the Spill or by the Moratorium – but not both. As a factual matter, however, this is simply incorrect, as much of the damages complained of by the Test Case Plaintiffs were caused by *both* the Spill and the resulting changes in permitting. Indeed, the Spill both factually and legally *caused* the Moratorium (and other changes in offshore permitting), and hence also logically *caused* the economic losses resulting from the Moratorium and other regulatory changes.

[4] Again, the actions taken by the U.S. Government were the result of the BP Oil Spill. The damages at issue were not caused "solely" by the U.S., but by a combination of factors, including, most prominently, the Spill itself. Indeed, some of the OPA Test Case Plaintiffs suffered damages that were caused solely by the Spill, and would have occurred irrespective of any regulatory action or inaction on the part of the U.S.

event was not only foreseeable,[5] but indeed likely,[6] and hence – and for other reasons [7] –  BP cannot establish that either the formal Moratoria or related permitting issues were a "superseding" cause of damages suffered by the Test Case Plaintiffs as a result of the *Deepwater Horizon* incident.[8]

## Plaintiffs' Initial Motion to Strike and Renewed Motion

On July 7, 2014, Plaintiffs filed a Motion to Strike Affirmative Defenses and Motion *in Limine* to answer the question of whether, at the trial of these OPA Causation Test Cases:  BP, in any attempt to avoid or reduce liability for the damages found to be caused, in whole or in part, due to a substantial threat of and/or injury, destruction or loss to real property, personal property

---

[5] *See* BP PHASE TWO POST-TRIAL BRIEF [Doc 12045] p.39 ("the doctrine of superseding cause is narrow, and applies only in the unusual circumstance where a subsequent tortfeasor caused injury in a manner 'sufficiently unforeseeable' to the original tortfeasors that it may be deemed 'to interrupt the chain of causation') (*citing,* EMCASCO Ins. Co. v. Am. Int'l Specialty Lines Ins. Co., 438 F.3d 519, 526 n.10 (5th Cir. 2006)); *see also, generally,* Becker v. Tidewater, Inc., 586 F.3d 358, 372 (5th Cir. 2009); Donaghey v. Ocean Drilling & Exploration Co., 974 F.2d 646, 652 (5th Cir. 1992); RESTATEMENT (SECOND) OF TORTS §447.

[6] *See, e.g.,* Sun Oil Co. v. United States, 572 F.2d 786, 797, 804 (Ct. Claims 1978) ("As a result of the Union Oil blow out [in 1969], Interior suspended drilling and production operations on federal leased tracts in the Channel….   [I]t was not only reasonable, but also the legal obligation of the Secretary to employ procedures different from those followed prior to the blow out to assure that such disasters would not occur").

[7] In addition to establishing that the U.S. Government's reaction was not foreseeable, BP would also need to establish, for example, that **(a)** the intervening "fault" of the U.S. brings about harm that is different *in kind,* **(b)** the intervening "fault" was operating *independently* of any situation created by BP's negligence, and **(c)** the intervening "fault" of the U.S. was wrongful *toward BP*.  (*See* BP PROPOSED PHASE TWO FINDINGS [Doc 12047] pp.463-467, ¶¶1966-1976; *citing,* RESTATEMENT (SECOND) OF TORTS §442; Donaghey, supra, 974 F.2d at 652 & n.11.)

[8] OPA defines "incident" as "any occurrence or series of occurrences having the same origin, involving one or more vessels, facilities, or any combination thereof, resulting in the discharge or substantial threat of discharge of oil." 33 U.S.C. §2701(14).   While not binding on the Court for these purposes, it seems worth noting that the *Deepwater Horizon* Incident is broadly defined in the Economic & Property Damages Settlement to include not only "(i) the blowout of the MC252 WELL; (ii) the explosions and fire on board the *Deepwater Horizon* on or about April 20, 2010; (iii) the sinking of the *Deepwater Horizon* on or about April 22, 2010" and "(iv) the release of oil, other hydrocarbons and other substances from the MC252 Well and/or the *Deepwater Horizon* and its appurtenances," but also "(v) the efforts to contain the MC252 Well" and "(vi) Response Activities," which are defined to include "the clean up, remediation efforts, and all other responsive actions (including the use and handling of dispersants) relating to the releases of oil, other hydrocarbons and other pollutants from the MC252 Well and/or the *Deepwater Horizon* and its appurtenances."  SETTLEMENT AGREEMENT, Sections 38.43 and 38.123.

or natural resources as a result of the BP Oil Spill, will be permitted to invoke a "superseding" cause defense with respect to the actions or inaction of the United States Government?[9]

In its Opposition, the BP Defendants conceded that: **(i)** BP has no viable statutory defense under OPA Section 2703;[10] and **(ii)** BP cannot avoid OPA liability as the Responsible Party under Section 2702 by pointing to the fault or alleged "fault" of unnamed and/or immune third parties.[11] BP nevertheless argued that the plaintiffs' motion was premature, as the issue of OPA causation needed to be determined based upon an evidentiary record, in a fact-specific setting.

The Court initially agreed with BP, denying the plaintiffs' motion as premature, and directing the parties to engage in discovery, and to later re-urge the issues, if and as appropriate, *via* the summary judgment procedure.[12] Upon further consideration, however, the Court has now directed Plaintiffs to re-urge their previous motion.[13]

Notably, aside from the prematurity issue, BP's Opposition was largely dedicated to the conclusory and somewhat dubious contention that the OPA Test Case Plaintiffs will not be able to establish that either the Governmental response or their economic losses were due to the destruction of natural resources and other property resulting from the Macondo / *Deepwater Horizon* Spill.

---

[9] *See* REC. DOC. 13108.

[10] BP conceded that it "has never invoked Section 2703, which deals with a narrow set of complete defenses to spill liability addressing situations where a responsible party asserts it has no fault whatsoever for a spill." BP OPPOSITION [Doc 13269, at 23] (Aug. 8, 2014), at p.15.   "Section 2703 establishes an affirmative defense where the 'discharge or substantial threat of a *discharge of oil* and the resulting damages [are solely caused by an act of God, etc.]' … BP has never argued that *the oil spill* was caused solely by any of the Section 2703(a)(1)-(4) situations." BP OPPOSITION, p.31 (emphasis in original).

[11] "OPA does not provide for the apportionment of damages among multiple responsible parties." BP OPPOSITION, p.8; *citing,* 33 U.S.C. §2710(b) (OPA does not permit the transfer of liability).  BP "has never asserted, despite Halliburton's and Transocean's role in causing the spill, that BPXP should be wholly exonerated from OPA liability for spill caused injuries compensable under Section 2702." BP OPPOSITION, p.31.

[12] ORDER (Sept. 15, 2014) [Doc. 13393].

[13] ORDER (Nov. 19, 2015) [Doc. 15582] p.2.

Plaintiffs, of course, believe and plan to prove that the Governmental actions following the Macondo disaster and the economic losses suffered by the OPA Test Cases Plaintiffs were due, at least in part, to the Spill's substantial and continuing damages and threats of damage to natural resources and other property throughout the Gulf of Mexico.[14]

The focus of this Motion, however, is a distinct and separate inquiry – *i.e.* whether BP will be afforded an *additional* opportunity to escape liability for some or all of Plaintiffs' damages by attempting to argue that the Moratoria, or permitting changes, or other Governmental action or inaction was "unforeseeable" or "unreasonable" or even "illegal", thereby breaking the chain of causation as a "superseding" cause of Plaintiffs' loss.

Such defenses, Plaintiffs respectfully suggest, are unavailable to BP as a matter of law.

## **Principal Elements of OPA**

As this Court has previously recognized, the Oil Pollution Act of 1990 "broadened the scope of private persons who are allowed to recover for economic losses resulting from an oil spill." In re: Deepwater Horizon, 808 F.Supp.2d 943, 959 (E.D.La. 2011).

---

[14] BP ignores, for example, the Third Key Reason provided in the Second Moratorium. *See* DECISION MEMORANDUM (July 12, 2010) [Exhibit D] pp. 4-5, 14-16 (explaining that the Moratorium was necessary because of the resources that were tied up responding to the destruction of natural resources and other property arising from the Macondo Spill). *See also, e.g.,* NTL No. 2010-N05 (June 8, 2010) [Exhibit B] p.1 (the President requested the Department of the Interior to develop this report "as a result of" the Deepwater Horizon incident; NTL No. 2010-N06 (June 18, 2010) [Exhibit C] p.2 ("Due to the explosion and sinking of the Deepwater Horizon….") (emphasis supplied). *See also, generally,* FINDINGS AND CONCLUSIONS – PENALTY PHASE [Doc 15606] (Nov. 30, 2015) pp.9-11 ¶¶31-42 (3.19 barrels of oil entered Gulf waters; between 45,000 and 68,000 square miles of surface waters were oiled; approximately 1,100 miles of coastline were visibly oiled; 88,552 square miles of fishing grounds were closed; the response was unprecedented in size and complexity). *See also, e.g.,* DEPOSITION OF LARS HERBST, (BOEMRE 30(b)(6) Representative), pp.260-262, 351-353 (and TREX-9096) [Exhibit F] (suspension was due, in part, to the massive response effort).

Under the Act's compensation structure:

- The OPA Responsible Party is liable for 100% of the damages arising from the spill, irrespective of fault.[15]  While the Responsible Party retains subrogation and/or contribution rights, the compensation scheme renders the Responsible Party liable, in the first instance, to all plaintiffs.

- The scope of available compensation is expanded to encompass all persons or businesses suffering economic loss.  There is no requirement that the plaintiff have a proprietary interest in the real property, personal property or natural resources directly affected by the oil.  In addition, traditional "proximate cause" concepts are rejected in favor of a more liberal standard of factual causation.

- Limited defenses: the OPA Responsible Party can only exonerate itself from liability by first demonstrating that the discharge in question was caused "*solely*" by an Act of God, an Act of War, or the fault of a third party (who is unrelated and whose conduct is unforeseeable); or by the gross negligence of the plaintiff.

Under this statutory framework, BP can avoid liability only by proving that the discharge was caused *solely* by the unforeseeable "fault" of the United States Government, an immune and unnamed party.[16]

## OPA Rejects the Concept of "Proximate Cause" with Respect to Economic Loss Damages Sought by Claimants under 33 U.S.C. §2702

The "superseding" cause defense is a component of the traditional concept of proximate cause,[17] which was specifically rejected by Congress in the relevant provisions of the Oil Pollution Act of 1990.

---

[15] In the absence of gross negligence, willful misconduct, or the violation of a Federal standard, this liability is generally limited to $75 million; in this particular case, however, such limitation has been waived. *See* ORDER (Dec. 23, 2010) [Doc. 925].  Moreover, the Court has found BP guilty of gross negligence and willful misconduct. PHASE ONE FINDINGS AND CONCLUSIONS (corrected) [Doc 13381-1] (Sept. 4, 2014) pp.121-130 ¶¶499-521; *see also* pp.147-148 ¶¶595-602.

[16] As noted, some of the damages suffered by the OPA Test Case Plaintiffs were caused by the physical presence and/or substantial threat of oil, clean-up or response activities, and/or other effects of the Macondo / *Deepwater Horizon* Incident having nothing to do with the formal action or inaction of the U.S. Government.

[17] *See, e.g.,* Exxon v. Sofec Inc., 517 U.S. 830, 836 (1996) (addressing "the proximate cause requirement, and the related superseding cause doctrine"); Mazant v. Visoneering, Inc., 250 Fed.Appx. 60, 66 (5th Cir. 2007) (the superseding cause doctrine is a facet of proximate causation); *see also, e.g.,* RESTATEMENT (THIRD) OF TORTS: PHYS. & EMOT. HARM §34, cmt. a (2010).

"The language and structure of the OPA support a unitary cause-in-fact analysis" and "logically exclude the use of proximate cause as a limiting device." Vernon Palmer, *The Great Spill in the Gulf ... and a Sea of Pure Economic Loss: Reflections on the Boundaries of Civil Liability,* 116 PENN. STATE L. REV. 105, 137 (2011).  At least four statutory features support this conclusion:

- First, the one-time and only reference to "proximate cause" appears in an exceptional provision dealing with the removal of the liability cap. This affirmative resort is in glaring contrast to the words "due to" and "resulting from" and strongly suggests that they were meant in the sense of factual causation only.

- Secondly, it is clear that "unforeseen damage" plays no part among the permitted "complete" defenses of the responsible party. That party's only defenses are perfected when causation arises solely from an external cause that has no connection to the party's acts.

- Thirdly, Congress did provide an explicit limit on cause-in-fact liability: monetary caps.  A proximate cause standard would effectively introduce a "second cap" on liability that Congress did not intend.

- Fourthly, the statute uses the same formulas of causation ("resulting from," "due to") for each of the six heads of recoverable damages. To insert implied foreseeability limitations for one type of damage without reading it in for all the other damages governed by the same causal mechanism would be incoherent.

Palmer, *The Great Spill,* 116 PENN. STATE L. REV. at 137-138.  With respect to economic damage claims under 33 U.S.C. §2702(b)(2)(E) in particular:

> The plain meaning of this provision is that damages for lost profits or earnings "due to" the destruction of natural resources "shall be recoverable by any claimant." There is no room in this language for superimposing "proximate cause." The effect would be to choose and limit the classes of claimants, whereas the provision expressly mandates recovery by "any claimant."

Palmer, *The Great Spill,* 116 PENN. STATE L. REV. at 139.  This strict liability provision "enables economic-loss plaintiffs to recover monetarily capped damages and *does not* expressly include

proximate cause among the required elements of proof." David W. Robertson, *OPA and Economic Loss: A Response to Professor Goldberg,* 30 MISS. C. L. REV. 217, 231 (2011); *see also,* <u>Deepwater Horizon</u>, 808 F.Supp.2d at 966 ("The Court notes that OPA does not expressly require 'proximate cause,' but rather only that the loss is 'due to' or 'resulting from' the oil spill").  As observed by Professor Palmer, the provision allowing plaintiffs to go beyond strict liability and make a showing of fault in order to recover damages above the monetary caps does expressly require a showing of proximate cause. 33 U.S.C. §2704(c)(1).[18] "The presence of the proximate cause requirement in the liability-enhancing provision together with its conspicuous absence in the strict-liability capped-damages provision seems a quite strong indication that Congress did not want to require proximate causation for strict liability purposes." Robertson, *OPA and Economic Loss,* 30 MISS. C. L. REV. at 231.  The well-established rules of statutory construction in this regard are clear:

> Where Congress includes particular language in one section of a statute, [as the OPA Congress did by including the "proximate cause" requirement in 33 U.S.C. §2704], but omits it from another section of the same Act, [as the OPA Congress did by leaving "proximate cause" language out of 33 U.S.C. §2702], it is "generally presumed that Congress acts intentionally and purposely in the disparate inclusion or exclusion."

David W. Robertson, *Criteria for Recovery of Economic Loss under the Oil Pollution Act of 1990,* 7 TEX. J. OIL GAS ENERGY 241, 246 (2012) (quoting <u>Russello v. United States</u>, 464 U.S. 16, 23 (1983) (citing <u>United States v. Wong Kim Bo.</u>, 472 F.2d 720, 722 (5th Cir. 1972))).

This argument for excluding the concept of proximate cause from any interpretation of Section 2702 is further supported by the Supreme Court's decision in *CSX v. McBride*:

> Congress, it is true, has written the words "proximate cause" into a number of statutes. But when the legislative text uses less legalistic language, *e.g.,* "caused by," "occasioned by," "in consequence of," or (as

---

[18] In this particular case, of course, BP has formally waived the $75 million statutory cap provided under 33 U.S.C. §2704(a)(3). *See* ORDER (Dec. 23, 2010) [Doc. 925].

> in FELA) "resulting in whole or in part from," and the legislative purpose
> is to loosen constraints on recovery, there is little reason for courts to hark
> back to stock, judge-made proximate-cause formulations.

CSX Transp., Inc. v. McBride, 131 S.Ct. 2630, 2642-2643 (2011) (quoted in Deepwater Horizon, 808 F.Supp.2d at 966); *see also,* Pacific Operators Offshore LLP v. Valladolid, 132 S.Ct. 680 (2012) (rejecting "proximate cause" in favor of a "substantial nexus" test when applying the statutory "as the result of" language from OCSLA).[19]  Further, as "the phrase 'proximate cause' is shorthand for the policy-based judgment that not all factual causes contributing to an injury should be legally cognizable causes," Congress' decision to specifically exclude proximate cause from Section 2702 indicates its policy-based determination that a broader scope of factual causes would be covered under the statute. McBride, supra, 131 S.Ct. at 2642.  Indeed, and as addressed more fully *infra,* the law has moved away from the notion of "proximate cause" because it implies, falsely, that only the cause that is closest in time or geography falls within the scope of legal responsibility.[20]

---

[19] The majority in *Valladolid* explains that the "substantial nexus" standard best reflects the text of the OCSLA statute, "which establishes neither a situs-of-injury nor a 'but for' test," and describes it as a "significant causal link between the injury he suffered and his employer's on-OCS extractive operations." Valladolid, 132 S.Ct. at 691. BP has previously argued that Justice Scalia's concurring opinion, in which he unsuccessfully argued for the application of "proximate cause" (*see Valladolid,* 132 S.Ct. at 691-692 (Scalia, J., concurring)) was ultimately adopted by the Court in Lexmark Int'l, Inc. v. Static Control Components, Inc., 134 S.Ct. 1377 (2014).  In *Lexmark,* however, the Court was called upon "to decide whether respondent, Static Control Components, Inc., may sue petitioner, Lexmark International, Inc., for false advertising under the Lanham Act, 15 U.S.C. §1125(a)." Lexmark, 134 S.Ct. at 1383.  Justice Scalia's *Valladolid* concurrence is cited only for the proposition that "the proximate cause inquiry is not easy to define" and "has taken various forms" and "there is a wealth of precedent" to draw upon. Lexmark, 134 S.Ct. at 1390.  Neither OCSLA nor the *Valladolid* decision is cited as an example of an instance in which the Court has "construed federal causes of action … to incorporate a requirement of proximate causation." *See* Lexmark, 134 S.Ct. at 1390.  Finally, and most importantly, Justice Scalia confirms that "proximate-cause analysis is controlled by the nature of the statutory cause of action." Lexmark, 134 S.Ct. at 1390.

[20] *See generally* RESTATEMENT (THIRD) OF TORTS: PHYS. & EMOT. HARM 6 SPEC. NOTE (2010); RESTATEMENT (THIRD) OF TORTS: PHYS. & EMOT. HARM §29, cmt. b (2010); RESTATEMENT (THIRD) OF TORTS: PHYS. & EMOT. HARM §34, cmt. f (the use of "sole proximate cause" is confusing because "it incorrectly implies that there can be only one proximate cause of harm"). *See also* RESTATEMENT (THIRD) OF TORTS §34, cmt. a ("Despite the continuing influence of the Second Restatement of Torts, much of the formalism of its treatment of superseding causes has been supplanted in the latter part of the 20th century with a recognition that there are always multiple causes of an outcome and that the existence of intervening causes does not ordinarily elide a prior actor's liability").

**The Statutory Defenses Under OPA Are Extremely Narrow, and Require BP to Prove that a Third Party Was the "Sole" Cause of the Discharge**

OPA allows the Responsible Party to avoid liability for the damages enumerated in Section 2702 only where it first "establishes, by a preponderance of the evidence, that the discharge or substantial threat of a discharge of oil and the resulting damages or removal costs were caused _solely_ by –

> (1) an act of God;
>
> (2) an act of war;
>
> (3) an act or omission of a third party, other than an employee or agent of the responsible party or a third party whose act or omission occurs in connection with any contractual relationship with the responsible party (except where the sole contractual arrangement arises in connection with carriage by a common carrier by rail), if the responsible party establishes, by a preponderance of the evidence, that the responsible party –
>
>> (A) exercised due care with respect to the oil concerned, taking into consideration the characteristics of the oil and in light of all relevant facts and circumstances; and
>>
>> (B) took precautions against foreseeable acts or omissions of any such third party and the foreseeable consequences of those acts or omissions;

33 U.S.C. §2703(a) (emphasis supplied).  The Act also provides a defense as to specific plaintiffs "to the extent that the incident is caused by the gross negligence or willful misconduct of the claimant." 33 U.S.C. §2703(b).

The three defenses set forth in Section 2703(a) "are narrowly construed and only in the situation where the discharge was totally beyond the control of the discharging vessel would the responsible party be excused from liability." Apex Oil Co., Inc. v. United States, 208 F.Supp.2d 642, 654 (E.D. La. 2002) (quoting United States v. English, No.00-00016, 2001 WL 940946 at *4 (D.Haw. Mar. 28, 2001)).  "Importantly," commentators have noted, "the external circumstance giving rise to the defense must have been the 'sole cause' of the discharge. If the

conduct of the responsible party contributed to the discharge in the slightest degree, the defense may not be invoked." Force and Davies, *Deepwater Horizon: Removal Costs, Civil Damages, Civil Penalties, and State Remedies in Oil Spill Cases,* 85 TUL. L. REV. 889, 899 (March 2011). As explained further by Professor Palmer:

> Typical of many strict liability statutes, the OPA narrows down the defenses available to a responsible party. The narrowing here, however, is exceptional by any standard. The Act distinguishes between "complete" defenses which arise from irresistible and superseding causes, and partial defenses which may be asserted against "particular claimants" who played a highly culpable role in the discharge of the oil. As to the opportunity to establish a complete defense, the responsible party must essentially prove the discharge was not really caused by him and that it occurred solely because of an act of God, an act of war, or the act or omission of a third party. A complete defense in this last instance is deliberately restricted, both by the way "third party" is defined as well as a series of further conditions that serve as predicates. No one having a contractual relation with the responsible party is deemed a third party. Thus it is no defense for BP to show that acts or omissions by co-contracting parties Transocean or Halliburton were the sole cause of the discharge (though such proof would be relevant to actions in contribution between them or as partial defenses), nor could the defense be set up against a BP supplier or agent. Furthermore, even when the defense is established, the responsible party still remains initially obliged to pay removal costs and the damages of all those who direct their claims against him. The "defense" in such circumstances is rather illusory in that it actually amounts to subrogated rights of recoupment against the third party.

Palmer, *The Great Spill,* 116 PENN. STATE L. REV. at 129-130; *see also, e.g.,* International Marine Carriers v. Oil Spill Liability Trust Fund, 903 F.Supp. 1097, 1106 (S.D.Tex. 1994) ("The contractual relationship element to the OPA section 2703 third-party defense is intended to prevent otherwise responsible parties from avoiding liability by pointing to the conduct of foreseeable third parties" (citing 1990 U.S.CODE CONG. & ADMIN.NEWS 722, 734)).

In a Clean Water Act case that preceded the passage of OPA, the Fifth Circuit found that the vessel owner's non-negligent decision was a contributing cause of the oil discharge, and that the vessel owner had therefore failed to prove that the discharge was caused 'solely' by the act or

omission of a third party. *See* <u>U.S. v. West of England Ship Owner's Mut. Protection &Indemnity Assn. (Luxembourg)</u>, 872 F.2d 1192 (5th Cir. 1989).[21]

It is also important to note that the Responsible Party must affirmatively "*establish*" that the discharge was caused solely by a third party under Section 2702(d)(1)(A).  If the responsible party merely "alleges" that the discharge was caused solely by a third party, then the responsible party must pay for the damages. *See* 33 U.S.C. §2702(d)(1)(B).  "[N]o contribution rights or indemnification agreement may transfer a responsible party's liability under the Act to another person." Force and Davies, *Deepwater Horizon,* 85 Tul. L. Rev. at 905-906 (citing 33 U.S.C. §2710(c));[22]  *see also, e.g.,* 33 U.S.C. §2715 ("Any person … who *pays* compensation pursuant to this act to any claimant for removal costs or damages shall be subrogated") (emphasis supplied); <u>United States v. American Commercial Lines LLC</u>, No.11-2076, 2013 WL 1182963 at *4 (E.D.La. March 21, 2013) ("even when [the Responsible Party] asserts its ability to seek contribution from a third party, [the Responsible Party] is still responsible for initially paying out cleanup and removal costs").

<u>*The Sole Cause Defense Requires that the Third Party be the Sole Cause of the "Discharge"*</u>

BP's defense is premised on the argument that actions and/or inaction of the U.S. Government in the wake of the Spill caused or contributed to some of the economic damages in question.  However, the statutory defense requires the Responsible Party to establish that the acts or omissions of a third party were the sole cause of the "*discharge*" itself.

---

[21] To exonerate itself under the Clean Water Act, the owner or operator must "prove that a discharge was caused solely by (A) an act of God, (B) an act of war, (C) negligence on the part of the United States Government or (D) an act or omission of a third party without regard to whether any such act or omission was or was not negligent." 33 U.S.C. §1321(f).

[22] *See also* S. Rep. No. 101-94, at 14-15 (1989) (reprinted in 1990 U.S.C.C.A.N. 722, 736).

Specifically, Section 2703 provides a defense where the Responsible Party establishes that "the discharge or substantial threat of a discharge of oil *and* the resulting damages or removal costs were caused solely by" the unforeseeable acts or omissions of a third party. 33 U.S.C. §2703(a)(3) (emphasis supplied).   Similarly, Section 2702(d) discusses the situation where the Responsible Party establishes that "a discharge or threat of a discharge and the resulting removal costs and damages were caused solely by an act or omission of one or more third parties." 33 U.S.C. §2702(d)(1)(A).[23]

Therefore, in order to prevail on its defense, BP would have to establish that the U.S. Government was the "sole" cause of the Spill itself, and not simply some or all of the damages thereafter occasioned.

### *The Sole Cause Defense under OPA is an Affirmative Defense, on which BP Carries the Burden of Proof*

To the extent that a "proximate cause" analysis were superimposed over the express terms and provisions of OPA Section 2702, (which, for the reasons stated *supra,* should be rejected), it could conceivably be argued that the absence of a "superseding" cause is an element of the plaintiffs' case-in-chief.

*However*: **(i)** Courts have frequently characterized a superseding cause defense as an affirmative defense;[24]  **(ii)** BP itself characterized the argument as an "affirmative defense";[25] and **(iii)** OPA clearly and expressly places the affirmative burden on the Responsible Party to

---

[23] The provision regarding a Responsible Party's right to subrogation is limited to the sole cause of "the discharge or threat of a discharge," and does not even refer to the damages sustained. *See* 33 U.S.C. §2702(d)(1)(B).

[24] *See, e.g.,* Doyle v. Graske, No.05-21, 2008 WL 824276 at *3 (D.Neb. March 20, 2008) ("The operation of an intervening or superseding cause to cut off a defendant's liability is an affirmative defense on which the defendant will have the burden at trial"); Filer v. Foster Wheeler LLC, No.12-60034, 2014 WL 345221 at *10 (E.D.Pa. Jan. 29, 2014).

[25] *See* LETTER FROM BP COUNSEL TO JUDGE SHUSHAN (May 15, 2014) [Doc. 12887] pp.6-8; BP'S ANSWER TO B1 MASTER COMPLAINT (Sept. 27, 2011) [Doc. 4130] pp.330, 332.

establish sole and unforeseeable third-party fault, by a preponderance of the evidence. 33 U.S.C.

§§ 2702(d)(1)(A) and 2703(a)(3).

### BP's Either/Or Construction is a Fallacy, as Multiple Legal and Factual Causes Can and Commonly Do Combine to Bring About a Particular Event  or Loss

It is well-settled, both as a matter of cause-in-fact and as a matter of legal cause, that

many different potentially responsible causative agents can and frequently do concur to bring

about a casualty or the damages resulting therefrom.[26]

BP's defense, in this case, seems premised on the fallacy that damages suffered by the

OPA Causation Test Case Plaintiffs must have been caused by _either_ the Spill _or_ the

Moratorium[27] – but _not_ both.  This either/or construct is both legally and factually false.

Under the general maritime law, for example, multiple contributing causes are routinely

recognized. _See, e.g.,_ Donaghey v. Ocean Drilling & Exploration Co., 974 F.2d 646, 651 (5th Cir.

1992) (citing U.S. v. Reliable Transfer Co., 421 U.S. 397, 411 (1975)).[28]  As noted in the Third

Restatement:

> An actor's tortious conduct need only be _a_ factual cause of the other's
> harm. The existence of other causes of the harm does not affect whether

---

[26] Indeed, "Ever since the first cause brought the world into being, no event has had a single cause." Public Citizen Health Resource Group v. Young, 909 F.2d 546, 550 (D.C. Cir. 1990).

[27] The term "Moratorium" is frequently used as a short-hand for not only the two formal moratoria on deepwater drilling, but also the associated changes in regulatory requirements and permitting approval processes with respect to both deepwater and shallow-water exploration and production in the Gulf of Mexico following the Macondo / _Deepwater Horizon_ Spill.  While not binding on the Court for these purposes, the term "Moratoria Loss" is defined in the Economic & Property Damages Settlement Agreement to be "any loss whatsoever caused by or resulting from federal regulatory action or inaction directed at offshore oil industry activity – including shallow water and deepwater activity – that occurred after May 28, 2010, including the federal moratoria on offshore permitting and drilling activities imposed on May 28, 2010 and July 12, 2010 and new or revised safety rules, regulations, inspections or permitting practices." SETTLEMENT AGREEMENT, Section 38.91. While claims for such Moratoria Losses are excluded from the settlement and expressly reserved, as a matter of contract, this definition notably starts from the premise that such damages are indeed a sub-set of the total economic losses caused by the _Deepwater Horizon_ Incident, and in no way implies a mutual exclusivity in terms of the causative sources.

[28] The U.S. Supreme Court, in _Exxon v. Sofec,_ confirmed that multiple contributing causes-in-fact are recognized under the general maritime law, although affirming the lower courts' finding that the defendants were not liable where the _plaintiff's_ own "extraordinary" negligence was the "_sole_ proximate cause" of the damages sustained. Exxon v. Sofec, _supra_, 517 U.S. at 835-838 (emphasis supplied).

> specified tortious conduct was a necessary condition for the harm to occur. Those other causes may be innocent or tortious, known or unknown, influenced by the tortious conduct or independent of it, but so long as the harm would not have occurred absent the tortious conduct, the tortious conduct is a factual cause…. Tortious conduct by an actor need be only one of the causes of another's harm.

RESTATEMENT (THIRD) OF TORTS: PHYS. & EMOT. HARM §26, cmt. c (2010) (while also recognizing that: "An actor's tortious conduct may occur well before the other person suffers harm and may require a number of subsequent events to produce the harm").

Even as a matter of legal cause, "it is common for injuries to have multiple proximate causes." Staub v. Proctor Hosp., 131 S.Ct. 1186, 1192 (2011); Sosa v. Alvarez–Machain, 542 U.S. 692, 704 (2004) ("a given proximate cause need not be, and frequently is not, the exclusive proximate cause of harm").[29] Indeed, the American Law Institute has moved away from the term "proximate cause" in the Third Restatement, because:

> Employing the term "proximate cause" implies that there is but one cause – the cause nearest in time or geography to the plaintiff's harm – and that factual causation bears on the scope of liability. Neither of those implications is correct. *Multiple factual causes always exist… and multiple proximate causes are often present. An actor's tortious conduct need not be close in proximity in space or time to the plaintiff's harm to be a proximate cause.* And proximate cause is only remotely related to factual causation.

RESTATEMENT (THIRD) OF TORTS: PHYS. & EMOT. HARM §29, cmt. b (2010) (emphasis supplied);[30] *see also, e.g.,* RESTATEMENT (THIRD) OF TORTS §29, cmt. m (2010) ("some tortious conduct may threaten, in a very clear way, massive harm and merely the fact that the scope of

---

[29] *See also* PHASE ONE FINDINGS, p.136 ¶547 (recognizing that more than one party may be the legal cause of the harm, and employing the "substantial factor" test) (*citing* In re Great Lakes Dredge & Dock, LLC, 624 F.3d 201, 213-214 (5th Cir. 2010) *and* Reliable Transfer, *supra*, 421 U.S. at 411).

[30] *See also, e.g.,* RESTATEMENT (THIRD) OF TORTS: PHYS. & EMOT. HARM 6 SPEC. NOTE (2010) (Special Note on Proximate Cause); RESTATEMENT (THIRD) OF TORTS §29, cmt. b ("the term 'proximate cause' is a poor one to describe limits on the scope of liability. It is also an unfortunate term to employ for factual cause or a combination of factual cause and scope of liability"); RESTATEMENT (THIRD) OF TORTS §34, cmt. a ("Despite the continuing influence of the Second Restatement of Torts, much of the formalism of its treatment of superseding causes has been supplanted in the latter part of the 20th century with a recognition that there are always multiple causes of an outcome and that the existence of intervening causes does not ordinarily elide a prior actor's liability").

liability is huge is not, of itself, a ground for imposing limits on it").[31]

In this particular context, BP asks the Court to ignore two key and indisputable facts: BP caused the Spill, and the Spill *caused* the Moratorium.[32]   Because the Spill caused the

---

[31] *See also, e.g.,* RESTATEMENT (THIRD) OF TORTS §29, cmt. o ("Every outcome is a unique combination of many causes that occur to bring it about. Many varied, odd, and extraordinary acts, forces, and events may concur to produce a given harm, such that it can readily be said that the manner of harm was unusual, extraordinary or unforeseeable. Such a statement is unhelpful in a scope-of-liability analysis, which focuses on the risks that make the conduct tortious and the type of harm"); *see also, generally,* Robertson, *Criteria for Recovery of Economic Loss,* 7 TEX. J. OIL GAS ENERGY at 257-258; Amy Paul, *Rethinking Oil Spill Compensation Schemes: The Causation Inquiry,* 9 LOY. MAR. L.J. 137, 154 (2011).

[32] *See, e.g.,* Century Exploration of New Orleans v. United States, 745 F.3d 1168, 1170 (Fed. Cir. 2014) ("As a result of the [Macondo] spill, the government imposed new regulatory requirements"); Hornbeck Offshore Serv. v. Salazar, 713 F.3d 787, 789 (5th Cir. 2013) ("This case arises from the 2010 Deepwater Horizon accident in the Gulf of Mexico…. At Presidential direction, those events prompted the Department of the Interior to prohibit all new and existing oil and gas drilling operations on the Outer Continental Shelf for six months…."); Ensco Offshore v. Salazar, No.10-1941, 2011 WL 1790838 at *1 (E.D.La. May 10, 2011) ("the government's administrative decisions arising out of the disastrous Deepwater Horizon oil spill suspended deepwater drilling in the Gulf of Mexico"); Ensco Offshore v. Salazar, 781 F.Supp.2d 332, 333 (E.D.La. 2011) ("After Deepwater Horizon's explosion and the catastrophic oil spill that followed, the Secretary of Interior twice in succession imposed a blanket moratorium on deepwater drilling in the Gulf of Mexico"), and 333 n.2 ("permitting for shallow water drilling also has suffered delays"); Ensco Offshore v. Salazar, No.10-1941, 2011 WL 121936 at *1 (E.D.La. Jan. 13, 2011) (this is "the second lawsuit that arises from the government's response to the appallingly catastrophic BP oil spill in the Gulf of Mexico"); INCREASED SAFETY MEASURES FOR ENERGY DEVELOPMENT ON THE OCS (May 27, 2010) p.26 ("Immediately following the BP Oil Spill, the MMS and the U.S. Coast Guard issued a joint Safety Alert to compel operators and drilling contractors to inspect their drilling equipment (both surface and subsea), review their procedures to ensure the safety of personnel and protection of the environment, and review all emergency shutdown and dynamic positioning procedures"); NTL No. 2010-N05 (June 8, 2010) p.1 ("The President requested that the Department of the Interior develop this report *as a result of* the Deepwater Horizon incident on April 20, 2010") (emphasis supplied); NTL No. 2010-N06 (June 18, 2010) p.2 ("*Due to* the explosion and sinking of the Deepwater Horizon, the resulting deaths of 11 people, and changing conditions caused by the blowout of the BP Macondo prospect well that was being drilled by the Deepwater Horizon, the BOEM requires additional information concerning your planned activities") (emphasis supplied); DECISION MEMORANDUM [Second Moratorium] (July 12, 2010) pp. 4-5, 14-16 (explaining that the Moratorium was necessary because of the assets that were tied up responding to the destruction of natural resources and other property arising from the Macondo Spill); STATEMENT OF JAMES WATSON, DIRECTOR OF BSEE (March 7, 2012) (referring to "reform efforts begun in the aftermath of the *Deepwater Horizon* tragedy";  "enhanced safety standards put in place after the *Deepwater Horizon* explosion and oil spill"; and "the Interim Drilling Safety rule, which was issued shortly after the *Deepwater Horizon* spill"; and observing that "the permitting environment is completely different now than it was before Deepwater Horizon. Comparing the pace of permitting pre- and post-Deepwater Horizon does not consider the current realty that applications must now meet a suite of new requirements that receive extremely close scrutiny by the bureau's engineers"). *See also, e.g.,* UNITED STATES' STATEMENT IN SUPPORT OF PLAINTIFFS' MOTION TO STRIKE [Doc 13208] (July 29, 2014), p.2 fn.2 ("The moratorium and permitting changes, in fact, resulted from BP and its co-defendants' catastrophic discharge").  *See also, generally,* FINDINGS AND CONCLUSIONS – PENALTY PHASE [Doc 15606] (Nov. 30, 2015) pp.9-11 ¶¶31-42 (the Macondo disaster was the largest spill in American waters; 3.19 barrels of oil entered Gulf waters; between 45,000 and 68,000 square miles of surface waters were oiled; approximately 1,100 miles of coastline were visibly oiled; 88,552 square miles of fishing grounds were closed; the response was unprecedented in size and complexity; it was a "spill of national significance" under the National Contingency Plan).

Moratorium, it follows logically that the Spill also caused any and all economic damages that resulted from the Moratorium.  Or stated another way:  The OPA Causation Test Case Plaintiffs suffered economic damages that were caused by *both* the Moratorium *and* the originating *Deepwater Horizon* Incident.[33]

Indeed, such claims have frequently been recognized by the courts in interpreting and applying OPA.  For example, a cause of action was recognized with respect to potential "shutdown suits" alleging economic damages arising from the closure of the Gulf Intracoastal Waterway following a spill.  In re Settoon Towing, No.87-1263, 2009 WL 4730969 at *4 (E.D.La. Dec. 4, 2009) (also allowing a claim for damages suffered as a result of plaintiff's inability to access its production platform while the oil spill clean-up was in progress).  In the Eleventh Circuit, a grain elevator was permitted to recover demurrage and other delay damages resulting from the Coast Guard's closure of its loading berth following an oil spill. FGDI, LLC v. M/V Lorelay, 193 Fed.Appx. 853, 855 (11th Cir. 2006).  Similarly, the owner of a concrete facility located on the Calcasieu River was able to claim economic losses under OPA that were incurred as a result of the Coast Guard's closure of the river due to an oil spill several miles away. Dunham-Price Group LLC v. Citgo Petroleum Corp., No.07-1019, 2010 WL 1285446 at **2-3 (W.D.La. March 31, 2010).[34, 35]

---

[33] As noted, some OPA Test Case Plaintiffs suffered damages as a result of the physical presence and/or substantial threat of oil and other direct effects of the Spill that would have occurred irrespective of any action or inaction on the part of the Government.

[34] At the pleading stage, Judge Livaudais also recognized a cause of action for loss of production revenues to a platform owner whose well was shut in by the MMS following a subsea release. Sekco Energy v. M/V Margaret Chouest, 820 F.Supp. 1008, 1012 (E.D.La. 1993).  While, after a full trial on the merits, the OPA claim was dismissed "for the reasons cited above in the proximate cause section", the case was primarily decided as a maritime negligence case under the general maritime law. *See* Sekco Energy v. M/V Margaret Chouest, 1993 WL 322942 (E.D.La. Aug. 13, 1993).

[35] It is also likely worth noting that even BP's own expert, Professor Goldberg, admits that Taira Lynn v. Jays Seafood Inc., 444 F.3d 371 (5th Cir. 2006) "is indeed not particularly instructive in this context." Goldberg, *OPA and Economic Loss: A Reply to Professor Robertson,* 30 MISS. C. L. REV. 203, 215 (2011).  In that opinion, the Court assumed that OPA did not apply to a gaseous release, (as opposed to a spill), but noted in *dicta* that the gas itself (unlike Macondo oil) caused no damage to natural resources or other property under Section 2702(b).

Interestingly, the test proposed by Judge Wisdom in his dissent to *TESTBANK* was: "whether their business of supplying a vital commodity or service to those engaged in the maritime industry has been interrupted by the collision, the closure, or the embargo." La. ex. rel. Guste v. M/V TESTBANK, 752 F.2d 1019, 1050 (5th Cir. 1985) (Wisdom, J., dissenting). Although Judge Wisdom's proposed "particularly"-damaged requirement was more stringent than what is required under OPA, the scope of liability under his formulation would have nevertheless extended to, not only those damages occasioned by the collision itself, but also those damages occasioned by the "closure" or the "embargo".  As in this case, the Macondo Spill is the logical cause of such damages, because the Spill caused the Moratorium.

**To the Extent that BP Attempts to Escape Liability by Alleging that Damages were Caused by the "Fault" of the United States Government, Neither OPA nor the General Maritime Law Allows for the Quantification of Fault against an Immune or Absent Third Party.**

The structure of OPA's compensation scheme precludes an attempt by the Responsible Party to quantify fault against an immune or absent third party in connection with a claim for economic damages under Section 2702(b).  As noted by Professor Palmer:

> The Act 'channels' liability in this predetermined way, *without asking whether that party was at fault, should have foreseen injury to another, or indeed whether any person's fault caused the spill.* Channeling means that responsibility is automatically imputed to the party who fits the description, and all claims are initially directed to that party.

Palmer, *The Great Spill,* 116 PENN. STATE L. REV. at 128 (emphasis supplied).[36]  This is further supported by the general maritime law, which does not provide for the allocation of fault to a

---

[36] *See also, e.g.,* U.S. v. Vertac Chemical Corp., 364 F.Supp.2d 941, 953 (E.D.Ark. 2005) ("Recognizing a 'superseding cause' theory in this situation 'would not be compatible' with the strict liability provisions of CERCLA").

non-party or an immune party.[37]

### *The United States is Expressly Excluded from the Definition of an OPA "Responsible Party"*

The United States is specifically excluded from the definition of "Responsible Party" under the Oil Pollution Act. *See* 33 U.S.C. §2701(32)(B)-(C); Gatlin Oil Co. v. United States, 169 F.3d 207, 214 (4th Cir. 1999) ("The federal government is not included in the definition of responsible party"). *See also* International Marine Carriers, *supra*, 903 F.Supp. at 1102 ("Nothing in OPA … can be construed as a waiver of sovereign immunity").

### *Unlike the Clean Water Act, the Statutory Defenses under OPA Do Not Include the Fault of the United States*

To exonerate itself under the Clean Water Act, the owner or operator can "prove that a discharge was caused solely by (A) an act of God, (B) an act of war, (C) negligence on the part of the United States Government or (D) an act or omission of a third party without regard to whether any such act or omission was or was not negligent." 33 U.S.C. §1321(f).  Notably, this provision differs from the OPA defenses found in Section 2703(a) – which do *not* include a

---

[37] *See, e.g.,* Edmonds v. Compagnie Generale Transatlantique, 443 U.S. 256, 260 (1979) (the general maritime law allows "an injured party to sue a tortfeasor for the full amount of damages for an indivisible injury that the tortfeasor's negligence was a substantial factor in causing, even if the concurrent negligence of others contributed to the incident"); *id.* at 260 n.8 (quoting Restatement (Second) of Torts §879, cmt. a ("One whose tortious conduct is otherwise one of the legal causes of an injurious result is not relieved from liability for the entire harm by the fact that the tortious act of another responsible person contributes to the result. Nor are the damages against him diminished")); Ebanks v. Great Lakes Dredge & Dock Co., 688 F.2d 716, 722 (11th Cir. 1982) (holding that it was error for the trial court to distract the jury's attention by requiring it to allocate the degree of fault between the defendant and a non-party); Commonwealth Ins. Co. v. Am. Global Mar, Inc., No.00-868, 2001 WL 333148 at **5-6 (E.D.La. April 4, 2001) (denying motion for partial summary judgment brought by a defendant regarding the potential fault of third parties who were not named defendants and who were contractually immune); *see also* Norfolk & Western v. Ayers, 538 U.S. 135, 161-164 (2003) (in FELA action, apportionment between and among potentially liable unnamed tortfeasors was not required).  *See also, e.g.,* Walls Indus. Inc. v. U.S., 958 F.2d 69, 71-72 (5th Cir. 1992); North and South American Shipping v. U.S., 352 F.Supp.2d 734, 743-744 (E.D.La. 2005) (there can be no third-party suit for contribution or indemnity where the third party is immune viz-a-vis the first-party plaintiff).

provision for "negligence on the part of the United States Government."[38]

### The United States is Expressly Immune for Post-Spill Conduct

With respect to post-spill acts and omissions, the Clean Water Act expressly exempts the United States from any liability. 33 U.S.C. §1321(j)(8).[39]

### The United States Cannot be at "Fault" under the Suits in Admiralty Act or under the FTCA

An action may be brought against the U.S. only to the extent that the Government waives its sovereign immunity by consenting to be sued. Block v. North Dakota ex rel. Bd. of Univ. & Sch. Lands, 461 U.S. 273, 287 (1983); Williamson v. U.S. Dep't of Agric., 815 F.2d 368, 373 (5th Cir. 1987).   If the allegations against the Government lie under the Court's admiralty jurisdiction, these claims may be brought pursuant to the Suits in Admiralty Act, 46 U.S.C. §§ 30901-30918 ("SIAA").   Otherwise, the claims must be brought under the Federal Torts Claims Act, 28 U.S.C. §§ 1346(b)(1) and 2674 ("FTCA").   These statutes do not create a cause of action, but merely serve as vehicles for subjecting the United States to liability as if it were a private person.

In this particular case, the United States could not be held liable under either the SIAA or the FTCA, because the presumptive alleged "fault" for "improper permitting" or "regulation" has no private party analogue. See, e.g., American Cargo Transp., Inc. v. United States, 625 F.3d

---

[38] Two canons of statutory construction emphasize the significance of OPA's exclusion of the Government-negligence defense.  First, "statutes *in pari materia* are to be interpreted together, as though they were one law." Antonin Scalia & Bryan A. Garner, *Reading Law* 252 (2012).   Second: "Where Congress includes particular language in one section of a statute but omits it in another section of the same Act, it is generally presumed that Congress acts intentionally and purposely in the disparate inclusion or exclusion." Russello, supra, 464 U.S. at 23. The inclusion of the language "without regard to whether any such act or omission was or was not negligent" in the Clean Water Act, which is *not* found in OPA's 33 U.S.C. §2703(a)(3), also supports the proposition that BP would have to establish that the U.S. Government was not only the "sole" cause of the discharge and damages, but was also at *fault*.

[39] *See also,* 33 U.S.C. §1321(c)(4)(B)(i) (responsible parties remain liable).

1176 (9th Cir. 2010) (admiralty) (holding that the U.S. was not liable because a private party could not be found liable for violating federal cargo-preference regulations under general maritime law); <u>Central Airlines, Inc. v. United States</u>, 169 F.3d 1174 (8th Cir. 1999) (non-admiralty) (no state law private party liability analogue for federal agency's erroneous regulatory enforcement actions); <u>Johnson v. Sawyer</u>, 47 F.3d 716 (5th Cir. 1995) (non-admiralty) (the United States cannot be found liable unless a private entity would owe a duty under state law); <u>Myers v. United States</u>, 17 F.3d 890, 899 (6th Cir. 1994) ("where a governmental actor merely fails to ensure a private party's compliance with federal safety regulations, no comparable state law liability exists, and therefore, sovereign immunity is not waived under the FTCA"); *see also, e.g.,* <u>Hornbeck Offshore Transp., LLC v. United States</u>, 569 F.3d 506 (D.C. Cir. 2009) (the U.S. Coast Guard could not be held liable for the decision to phase out single-hulled vessels "too early" under OPA).  Any argument by BP that the Department of Interior improperly withheld permits or imposed irresponsible regulations is barred, since private parties do not issue permits or hand down regulations.[40]

Under OCSLA, Congress conferred upon the Secretary of the Interior broad discretion and responsibility regarding the "suspension or temporary prohibition of any operation or activity, including production, pursuant to any lease or permit," 43 U.S.C. §1334(a)(1), and, according to the regulations promulgated thereunder, the authority to issue Notices to Lessees and Operators (NTLs) that "clarify, supplement, or provide more detail about certain

---

[40] *See also, e.g.,* <u>McPherson v. Union Oil Co. of Cal.</u>, 628 F.Supp. 265 (S.D. Tex. 1985) (the U.S. has no duty under general maritime law to promulgate or enforce federal regulations).

requirements," 30 C.F.R. §250.103 (2010);[41] *see generally* <u>Century Exploration of New Orleans</u> <u>v. United States</u>, 745 F.3d 1168, 1172-1174 (Fed. Cir. 2014) (holding that the United States did not breach its lease agreements with offshore operators and lessees by imposing additional regulatory requirements due to the Macondo disaster); *see also, e.g.,* <u>Sun Oil Co. v. United</u> <u>States</u>, 572 F.2d 786, 804 (Ct. Claims 1978) (following the Santa Barbara oil spill, "it was not only reasonable, but also the legal obligation of the Secretary to employ procedures different from those followed prior to the blow out to assure that such disasters would not occur"). Moreover, "decisions regarding the feasibility, safety, and benefit of mobilizing federal resources in the aftermath of a national disaster are grounded in social, economic, and public policy." <u>Orleans Parish Communication District v. Federal Emergency Management Agency</u>, No.11-209, 2011 WL 4829887 at *6 (E.D.La. Oct. 12, 2011).

In the *Hornbeck / Ensco* Litigation, Judge Feldman agreed that "OCSLA confers broad regulatory authority and discretion upon Interior"; the limitations he ultimately imposed derived from "the procedural requirements imposed by the APA and the NEPA." <u>Ensco Offshore v.</u> <u>Salazar</u>, 786 F.Supp.2d 1151, 1160 n.9 (E.D.La. 2011); *see also* <u>Ensco Offshore v. Salazar</u>, No.10-1941, 2010 WL 4116892 at *5 (E.D.La. Oct. 19, 2010) ("OCSLA authorizes the government to issue the NTL-05"). Further, Judge Feldman rejected challenges to the Development Operations Coordination Document (DOCD) requirements. <u>Ensco Offshore</u>, <u>supra</u>, 786 F.Supp.2d at 1160-1161. *See also,* ORDER & REASONS, *Ensco Offshore v. Salazar,* No.10-1941 (Nov. 3, 2010) [Doc. 129] at p.10 ("the ravages of government's bureaucracy do not equate with violations of the APA").

---

[41] The Secretary also has the authority and responsibility to cancel any lease or permit at any time upon the determination that continued activity is likely to cause serious harm or damage to life, property, or the environment; that the threat of harm or damage will not disappear or decrease to an acceptable extent within a reasonable time period; and that the advantages of cancellation outweigh the advantages of continuing such lease or permit in force. 43 U.S.C. §1334(a)(2)(A).

Indeed, the Executive Branch has been granted significant authority to prepare for and address hazardous material discharges and threats of discharges. *See* 33 U.S.C. §1321(c). "The President *shall* . . . ensure effective and immediate removal of a discharge, and mitigation or prevention of a substantial threat of a discharge, of oil. . . ." 33 U.S.C. §1321(c)(1)(A) (emphasis added). In the case that a discharge, or threat of a discharge, poses a substantial threat to the public health of the United States – as this Spill clearly did – "the President shall direct *all* Federal, State, and private actions to remove the discharge or to mitigate or prevent the threat of the discharge." 33 U.S.C. §1321(c)(2)(A).

The statutory scheme comprised by the Clean Water Act, OPA and the OCSLA collectively vest the Federal Government with the authority and responsibility to step in and contain a catastrophic discharge, and work to mitigate the threat of further discharges and damages. The Department of the Interior clearly was working in that vein when it issued the Second Moratorium on July 12, 2010, which made clear that the ongoing damages to natural resources and other property consumed most of the available containment assets, and thereby necessitated a shut-down.[42]

Ultimately, not only is the United States Government immune from any alleged "fault" in this case, but its action (and/or inaction) in the wake of this unprecedented and catastrophic Spill was eminently foreseeable.[43]

---

[42] *See* EXHIBIT D, pp.4-5 and 14-16. (*See also, e.g.,* EXHIBIT F.) (*See generally* Footnote 32, *supra.*)

[43] Moreover, and in any event, to the extent Judge Feldman or the U.S. Fifth Circuit might have concluded that the U.S. Government had exceeded its authority or discretion with respect to offshore regulation and permitting in the wake of the Macondo disaster, the immunity applies regardless of "whether or not such statute or regulation be valid" and "whether or not the discretion involved be abused." 28 U.S.C. §2680(a).

**BP's Other Affirmative Defenses Regarding BP's Alleged Lack of Fault and/or The Potential Fault of Third Parties Should Also Be Stricken**

BP's Second Defense (unseaworthiness), Ninth Defense (comparative negligence), Nineteenth Defense (conduct of other entities), and Twentieth Defense (negligence of contractors or subcontractors) attempt to reduce BP's liability to the OPA Test Case Plaintiffs on the basis that third parties, such as Transocean and/or Halliburton, are also at fault in causing and/or contributing to the Macondo / *Deepwater Horizon* Incident.[44]   Clearly, however, an OPA Responsible Party must seek contribution or subrogation from such third parties, and cannot avoid liability to the plaintiffs unless and until BP first establishes that the third party was "solely" at fault in causing the discharge and the damages.[45] Because BP has not, and cannot, exonerate itself from Responsible Party liability in this manner,[46] such defenses and associated evidence are legally and factually irrelevant to the claims by the OPA Test Case Plaintiffs against BP.

Additionally, BP's Fourth Affirmative Defense to each of these actions reads as follows:

> The events culminating in the injuries and damage to Plaintiff were not the result of any negligence, fault, or want of due care on the part of the BP Parties. Furthermore, Plaintiff has the burden of proof on this issue, and Plaintiff cannot meet that burden.

---

[44] *See* Second, Ninth, Nineteenth and Twentieth Defenses in *Bisso v. BP,* No.13-706 [Doc 13058]; Second, Ninth, Nineteenth and Twentieth Defenses in *Black Elk v. BP,* No.13-2006 [Doc 13059]; Second, Ninth, Nineteenth and Twentieth Defenses in *Certified v. BP,* No.13-1143 [Doc 13061]; Second, Ninth, Nineteenth and Twentieth Defenses in *Blake v. BP,* No.13-1185 [Doc 13060]; Second, Ninth, Nineteenth and Twentieth Defenses in *Seahawk v. BP,* No.13-1386 [Doc 13064]; Second, Ninth, Nineteenth and Twentieth Defenses in *Trinity v. BP,* No.13-1222 [Doc 13062]; and Second, Ninth, Nineteenth and Twentieth Defenses in *Wadleigh v. BP,* No.13-810 [Doc 13063].

[45] *See generally,* 33 U.S.C. §§ 2702(a), 2702(d)(1)(B), 2703(a) and 2710(c); United States v. American Commercial Lines LLC, No.11-2076, 2013 WL 1182963 at **3-4 (E.D.La. March 21, 2013); In re Petition of Settoon Towing LLC, 722 F.Supp.2d 710, 714 (E.D.La. 2010); Palmer, *The Great Spill,* 116 PENN. STATE L. REV. at 128-130; Force and Davies, *Deepwater Horizon,* 85 TUL. L. REV. at 905-906; U.S. v. Bodenger, No.03-272, 2003 WL 22228517 at *2 (E.D.La. Sept. 25, 2003) (liability under OPA, like the Clean Water Act, "has been determined repeatedly to be strict, joint and several liability"); *see also* S. REP. NO. 101-94, at 11 (1989) (reprinted in 1990 U.S.C.C.A.N. 722, 732-733).

[46] Indeed, BP has been found negligent, grossly negligent, reckless, and guilty of willful misconduct, and has been assessed with a majority of the fault. *See* PHASE ONE FINDINGS AND CONCLUSIONS [Doc 13381-1].

Even putting aside the Court's liability findings and conclusions,[47] a plaintiff is not required to show that an OPA Responsible Party such as BP exhibited negligence, fault, or a want of due care.[48]  This affirmative defense should also be stricken.

### Conclusion

For the above and foregoing reasons, the Court should strike BP's affirmative defenses and issue an *in limine* ruling precluding evidence of potential third-party fault, including the application of any alleged "superseding" cause defense based on the actions or inaction of the U.S. Government to the OPA Causation Test Cases, as a matter of law.

This <u>14th</u> day of <u>December</u>, <u>2015</u>.


Respectfully submitted,

  /s/  Stephen J. Herman                      /s/  James Parkerson Roy
**Stephen J. Herman**, La. Bar No. 23129     **James Parkerson Roy**, La. Bar No. 11511
**HERMAN HERMAN & KATZ LLC**                 **DOMENGEAUX WRIGHT ROY & EDWARDS LLC**
820 O'Keefe Avenue                           556 Jefferson Street, Suite 500
New Orleans, Louisiana 70113                 Lafayette, Louisiana 70501
Telephone: (504) 581-4892                    Telephone: (337) 233-3033
Fax No. (504) 569-6024                       Fax No. (337) 233-2796
E-Mail: sherman@hhklawfirm.com               E-Mail: jimr@wrightroy.com
*Plaintiffs Liaison Counsel*                 *Plaintiffs Liaison Counsel*

---

[47] *See* PHASE ONE FINDINGS AND CONCLUSIONS [Doc 13381-1].

[48] *See generally* 33 U.S.C. §2702(a); <u>Apex Oil</u>, <u>supra</u>, 208 F.Supp.2d at 652 (citing <u>In re Complaint of MetLife Capital Corp.</u>, 132 F.3d 818, 820-821 (1st Cir. 1997)); <u>Bodenger</u>, <u>supra</u>, 2003 WL 22228517 at *2; *see also*, Palmer, *The Great Spill*, 116 PENN. STATE L. REV. at 128-130.

## PLAINTIFFS' STEERING COMMITTEE

Conrad S.P. "Duke" Williams
WILLIAMS LAW GROUP
435 Corporate Drive, Suite 101
Maison Grand Caillou
Houma, Louisiana 70360
Office: (985) 876-7595
Fax No. (985) 876-7594
E-Mail: duke@williamslawgroup.org

Brian H. Barr
LEVIN, PAPANTONIO, THOMAS,
MITCHELL, ECHSNER & PROCTOR, PA
316 South Baylen St., Suite 600
Pensacola, FL 32502-5996
Office:  (850) 435-7045
Telefax: (850) 436-6187
E-Mail: bbarr@levinlaw.com

Jeffrey A. Breit
BREIT DRESCHER & IMPREVENTO
Towne Pavilion Center II
600 22nd Street, Suite 402
Virginia Beach, Virginia 23451
Office:  (757) 670-3888
Telefax: (757) 670-3895
E-Mail: jbreit@bdbmail.com

Elizabeth J. Cabraser
LIEFF, CABRASER, HEIMANN &
BERNSTEIN, LLP
275 Battery Street, 29th Floor
San Francisco, CA  94111-3339
Office:  (415) 956-1000
Telefax: (415) 956-1008
E-Mail:  ecabraser@lchb.com

Philip F. Cossich, Jr.
COSSICH, SUMICH, PARSIOLA
8397 Highway 23, Suite 100
Belle Chasse, LA  70037
Office:  (504) 394-9000
Telefax: (504) 394-9110
E-Mail:  pcossich@cossichlaw.com

Robin L. Greenwald
WEITZ & LUXENBERG, PC
700 Broadway
New York, NY  10003
Office:  (212) 558-5802
Telefax: (212) 344-5461
E-Mail:  rgreenwald@weitzlux.com

Rhon E. Jones
BEASLEY, ALLEN, CROW, METHVIN,
PORTIS & MILES, P. C.
218 Commerce St., P.O. Box 4160
Montgomery, AL 36104
Office:  (334) 269-2343
Telefax: (334) 954-7555
E-Mail:  rhon.jones@beasleyallen.com

Matthew E. Lundy
LUNDY, LUNDY, SOILEAU & SOUTH
501 Broad Street
Lake Charles, LA  70601
Office:  (337) 439-0707
Telefax: (337) 439-1029
E-Mail:  mlundy@lundylawllp.com

Michael C. Palmintier
deGRAVELLES, PALMINTIER,
HOLTHAUS & FRUGE'
618 Main Street
Baton Rouge, LA  70801-1910
Office:  (225) 344-3735
Telefax: (225) 344-0522
E-Mail:  mpalmintier@dphf-law.com

Paul M. Sterbcow
LEWIS, KULLMAN, STERBCOW &
ABRAMSON
601 Poydras Street, Suite 2615
New Orleans, LA  70130
Office:  (504) 588-1500
Telefax:  (504) 588-1514
E-Mail:  sterbcow@lksalaw.com

Robert T. Cunningham
CUNNINGHAM BOUNDS, LLC
1601 Dauphin Street, P. O. Box 66705
Mobile, AL  36660
Office:  (251) 471-6191
Telefax: (251) 479-1031
E-Mail:  rtc@cunninghambounds.com

Alphonso Michael "Mike" Espy
MORGAN & MORGAN, P.A.
188 East Capitol Street, Suite 777
Jackson, MS 39201
Office: (601) 949-3388
Telefax: (601) 949-3399
E-Mail: mike@mikespy.com

Calvin C. Fayard, Jr.
FAYARD & HONEYCUTT
519 Florida Avenue, SW
Denham Springs, LA  70726
Office:  (225) 664-4193
Telefax: (225) 664-6925
E-Mail:  calvinfayard@fayardlaw.

Scott Summy
BARON & BUDD, P.C.
3102 Oak Lawn Avenue, Suite 1100
Dallas, TX  75219
Office:  (214) 521-3605
Telefax: (214) 599-1172
E-Mail:  ssummy@baronbudd.com

Ervin A. Gonzalez
COLSON HICKS EIDSON
255 Alhambra Circle, Penthouse
Coral Gables, FL 33134
Office: (305) 476-7400
Telefax: (305) 476-7444
E-Mail:  ervin@colson.com

Joseph F. Rice
MOTLEY RICE LLC
28 Bridgeside Blvd.
Mount Pleasant, SC 29464
Office: (843) 216-9159
Fax No. (843) 216-9290
E-Mail: jrice@motleyrice.com

## CERTIFICATE OF SERVICE

**WE HEREBY CERTIFY** that the above and foregoing Memorandum will be served on All Counsel by electronically uploading the same to Lexis Nexis File & Serve in accordance with Pretrial Order No. 12, and that the foregoing will be electronically filed with the Clerk of Court of the United States District Court for the Eastern District of Louisiana by using the CM/ECF System, which will send a notice of electronic filing in accordance with the procedures established in MDL 2179, this 14th day of December, 2015.

/s/ Stephen J. Herman and James Parkerson Roy