**UNITED STATES DISTRICT COURT**
**EASTERN DISTRICT OF LOUISIANA**

| | |
|---|---|
| In re: Oil Spill by the Oil Rig "Deepwater Horizon" in the Gulf of Mexico on April 20, 2010.<br><br>This Filing Applies to Nos. 13-706, 13-810, 13-1143, 13-1185, 13-1222, 13-1386, and 13-2006 | MDL No. 2179<br><br>Section J<br><br>Judge Barbier<br>Magistrate Judge Shushan |

<u>**MEMORANDUM IN SUPPORT OF**</u>
<u>**BPXP'S MOTION TO DISMISS MORATORIA/PERMITORIA CLAIMS**</u>

*Counsel Listed On Signature Block*

# TABLE OF CONTENTS

Page

INTRODUCTION.................................................................................................................1

BACKGROUND .................................................................................................................3

I.    THE GOVERNMENT'S DISCRETIONARY IMPOSITION OF
MORATORIA AND PERMITTING DELAYS....................................................3

II.   PLAINTIFFS' CLAIMS AND THE OIL POLLUTION ACT ..........................5

STANDARD OF REVIEW ................................................................................................7

ARGUMENT ......................................................................................................................7

I.    OPA DOES NOT IMPOSE LIABILITY FOR MORATORIA LOSSES. ...................7

    A.    Moratoria/Permitoria Losses Did Not "Result From" the Discharge of Oil............8

    B.    The Moratoria and Permitoria Do Not Qualify as OPA "Incidents." ....................14

    C.    Moratorium Losses Are Not "Due To" Injury to Property or Natural
Resources. ......................................................................................................15

    D.    OPA Independently Permits the Recovery of Damages Only If the
Proximate Cause Standard Is Met...............................................................18

II.   DENYING RECOVERY FOR MORATORIUM LOSSES IS ENTIRELY
CONSISTENT WITH CONGRESSIONAL INTENT AND PUBLIC
POLICY. ...............................................................................................................22

    A.    Moratorium Claims Are Inconsistent with Congressional Purpose in
Enacting OPA. ..............................................................................................22

    B.    Moratorium Claims Are Inconsistent with the Public Interest. ............................24

CONCLUSION ................................................................................................................25

# <u>TABLE OF AUTHORITIES</u>

**Page(s)**

**Cases**

*Adkins v. Trans-Alaska Pipeline Liab. Fund*,
    101 F.3d 86 (9th Cir. 1996) ....................................................................................................19

*Apex Oil Co. v. United States*,
    208 F. Supp. 2d 642 (E.D. La. 2002) ......................................................................................15

*Ashcroft v. Iqbal*,
    556 U.S. 662 (2009) ..................................................................................................................8

*Associated Gen. Contractors v. Cal. State Council of Carpenters*,
    459 U.S. 519 (1983) ................................................................................................................20

*Ballard Shipping Co. v. Beach Shellfish*,
    32 F.3d 623 (1st Cir. 1994) .....................................................................................................19

*Bell Atlantic Corp. v. Twombly*,
    550 U.S. 544 (2007) ..................................................................................................................8

*Benefiel v. Exxon Corp.*,
    959 F.2d 805 (9th Cir. 1992) ..................................................................................................19

*Buffalo Marine Servs. Inc. v. United States*,
    663 F.3d 750 (5th Cir. 2011) .............................................................................................14, 15

*Clark v. Morrison*,
    No. 08-4253, 2009 WL 3254149 (E.D. La. Oct. 7, 2009) .......................................................21

*CSX Transp., Inc. v. McBride*,
    131 S. Ct. 2630 (2011) ............................................................................................................20

*Ensco Offshore Co. v. Salazar*,
    No. 10-1941, 2011 WL 12675678 (E.D. La. June 16, 2011) ...................................................5

*Ensco Offshore Co. v. Salazar*,
    No. 10-1941, 2011 WL 1790838 (E.D. La. May 10, 2011) ......................................................5

*Exxon Corp. v. Amoco Oil Co.*,
    875 F.2d 1085 (4th Cir. 1989) ................................................................................................22

*Gatlin Oil Co. v. United States*,
    169 F.3d 207 (4th Cir. 1999) ........................................................................................ *passim*

*Holmes v. Sec. Inv'r Prot. Corp.*,
    503 U.S. 258 (1992) (Scalia, J., concurring in the judgment) ...........................................19, 20

*Hornbeck Offshore Servs. v. Salazar*,
    696 F. Supp. 2d 627 (E.D. La. 2010) ........................................................................3, 4, 6, 21

*Hornbeck Offshore Servs. v. Salazar*,
    713 F.3d 787 (5th Cir. 2013) ...........................................................................................4, 5

*Hornbeck Offshore Servs. v. Salazar*,
    No. 10-1663, 2010 WL 3523040 (E.D. La. Sept. 1, 2010).....................................4, 5, 12, 21

*Hornbeck Offshore Servs. v. Salazar*,
    No. 10-1663, 2011 WL 454802 (E.D. La. Feb. 2, 2011) .........................................................5

*In re Deepwater Horizon*,
    808 F. Supp. 2d 943 (E.D. La. 2011) ...........................................................................*passim*

*In re Taira Lynn Marine Ltd. No. 5*,
    444 F.3d 371 (5th Cir. 2006) ......................................................................................*passim*

*Louisiana ex rel. Guste v. M/V Testbank*,
    752 F.2d 1019 (5th Cir. 1985) .........................................................................................22

*Pac. Operators Offshore v. Valladolid*,
    132 S. Ct. 680 (2012) ..................................................................................................20, 21

*Pan Am. World Airways v. Aetna Cas. & Sur. Co.*,
    505 F.2d 989 (2d Cir. 1974).............................................................................................20

*Paroline v. United States*,
    134 S. Ct. 1710 (2014)....................................................................................................20

*R2 Invests. v. Phillips*,
    401 F.3d 638 (5th Cir. 2005) ..............................................................................................8

*Robins Dry Dock & Repair Co. v. Flint*,
    275 U.S. 303 (1927)....................................................................................................22, 23

*Rodriguez v. United States*,
    480 U.S. 522 (1987)....................................................................................................22, 23

*SeaRiver Mar. Fin. Holdings, Inc. v. Mineta*,
    309 F.3d 662 (9th Cir. 2002) ..............................................................................................25

*Sekco Energy, Inc. v. Chouest*,
    No. 92-0420, 1993 WL 322942 (E.D. La. Aug. 13, 1993) ...................................................18

*Skidmore v. Swift & Co.*,
    323 U.S. 134 (1944) ....................................................................................................15

*United States v. Conoco, Inc.*,
    916 F. Supp. 581 (E.D. La. 1996) ..............................................................................15

**Statutes**

33 U.S.C. § 2701(14) ...............................................................................................9, 13

33 U.S.C. § 2701(32) .....................................................................................................7

33 U.S.C. § 2701 *et seq* ................................................................................................6

33 U.S.C. § 2702(a) ........................................................................................... *passim*

33 U.S.C. § 2702(b) ....................................................................................................7, 9

33 U.S.C. § 2702(b)(2) ..................................................................................................9

33 U.S.C. § 2702(b)(2)(B) ...........................................................................................11

33 U.S.C. § 2702(b)(2)(E) .................................................................................. *passim*

33 U.S.C. § 2713(c) ........................................................................................................8

43 U.S.C. § 1653(c)(1) .................................................................................................19

46 U.S.C. § 3703a ........................................................................................................25

**Legislative History**

135 Cong. Rec. H7954-02 (Nov. 2, 1989) ...................................................................17

H.R. Rep. No. 101-653 (1990) ....................................................................................23

S. Rep. No. 101-94 (1990) ...........................................................................................17

**Regulatory Materials**

75 Fed. Reg. 63,346 (Oct. 14, 2010) .............................................................................5

National Pollution Funds Center, Deepwater Horizon Claimant FAQs,
    http://www.uscg.mil/npfc/claims/DWH_faqs.asp#faq-4 ...........................................14

Press Release, DOI, Salazar: *Deepwater Drilling May Resume for Operators Who
    Clear Higher Bar for Safety*, Environmental Protection (Oct. 12, 2010),
    *available at* http://on.doi.gov/1SG7iCI; ..................................................................................5

**Secondary Sources**

John C. Goldberg, *Liability for Economic Loss in Connection with the Deepwater
    Horizon Spill* (Nov. 22, 2010), http://nrs.harvard.edu/urn-
    3:HUL.InstRepos:4595438 ..........................................................................................16

David W. Robertson, *The Oil Pollution Act's Provisions on Damages for
    Economic Loss*, 30 Miss. C. L. Rev. 157 (2011) .....................................................11

Schoenbaum's Admiralty & Mar. Law § 18-4 ...............................................16, 20

Steven Shavell, *Should BP Be Liable for Economic Losses Due to the Moratorium
    on Oil Drilling Imposed After the Deepwater Horizon Accident?*, 64 Vand. L.
    Rev. 1995 (2011) ......................................................................................................24

## INTRODUCTION

The Oil Pollution Act ("OPA") imposes *three separate* causation requirements. Moratoria and permitoria claims fail *all three*. First, only damages that "result from" the discharge of oil into the navigable waters or shorelines can be sought. Second, those damages must result from an "incident" as defined in the statute. Third, claimants may recover only economic losses "due to" an injury to property or natural resources. As a matter of law, Plaintiffs cannot recover for economic losses due to the alleged reduction in demand for their services resulting from the 2010 government-mandated moratoria on Gulf deepwater drilling and an ensuing slowdown in permit issuance. Indeed, these government actions do not even qualify as an OPA "incident." For these three reasons, then, OPA does not impose liability for such losses on BPXP or any other party, and Plaintiffs fail to state a claim.

*First*, the Fifth Circuit has interpreted OPA's "result from" language to require a direct causal relationship between the discharge and resulting loss. Thus, in the pivotal Circuit precedent (*Taira Lynn*), where government officials ordered an evacuation in response to a release, the Fifth Circuit held that any damages caused by the evacuation did not "result from" the release and so plaintiffs' claims failed. Here, claims for moratoria losses must be rejected because the causal relationship to the oil spill is even more attenuated than the harms caused by the government action in *Taira Lynn*. The moratoria were not an unavoidable mandatory response to the oil spill but *newly crafted* measures designed to facilitate an *industry-wide* review of drilling practices and thus were *discretionary acts aimed at avoiding future spills*.

*Second,* moratoria losses do not qualify under the statutory definition of an "incident" because the moratoria did not "result[] in the discharge or substantial threat of discharge of oil." Thus, in addition to the "result from" OPA requirement applied in *Taira Lynn* to bar imposing liability for government action, the definition of an "incident" imposes yet another such bar.

1

***Third***, moratoria losses are not "due to" an injury to property or natural resources. Both the Fifth Circuit and the Coast Guard have held that when a claimant alleges he suffered economic losses when government regulatory action following a spill disrupts his business, the losses are due to those regulatory acts and not due to spill-caused property or resource damage. Plaintiffs cannot meet this standard because their alleged losses were due to the market slowdown caused when the government stopped the drilling on which their businesses rely.

***Fourth***, and independently, OPA's liability provisions impose at least a typical (and likely a heightened) proximate cause requirement.[1] This Court need not define OPA's causation standard because this Motion can be resolved by recognizing that moratoria claims conflict with the controlling OPA textual-construction precedent of the Fifth Circuit and Coast Guard. Nevertheless, in addition to those basic barriers to moratoria claims, OPA employs language that has generally been understood to trigger application of proximate cause doctrine. And in this case the oil spill was not even the proximate cause of the moratoria. Rather, the government made deliberate decisions to impose those industry-wide restrictions in full awareness of the likely economic consequences. The government was even ***enjoined*** by Louisiana's Eastern District from imposing the moratoria precisely because the oil spill could not justify those government policies, making them ***unlawful***.

***Finally***, denying moratoria claims is consistent with the congressional purpose behind OPA and the legal principle that government action taken to promote public safety is not a "harm" compensable in damages. On all these grounds, Plaintiffs' claims must be dismissed.[2]

---

[1] This Court has suggested that "OPA causation may lie somewhere between traditional 'proximate cause' and simple 'but for' causation," though it did "not define the precise contours of OPA causation at th[at] time." B1 Order, Rec. Doc. 3830 at 33 (Aug. 26, 2011). One purpose of the Court's more recent November 19, 2015 order was to allow reconsideration and final resolution of this issue. *See* Order, Rec. Doc. 15582 at 2 (Nov. 19, 2015).

[2] As described in BPXP's Motion to Dismiss, the moratoria/permitoria claims in all operative OPA Test Plaintiff Complaints should be dismissed. Excerpts from the complaints this Court instructed the Parties to focus on are

## BACKGROUND

**I.     The Government's Discretionary Imposition of Moratoria and Permitting Delays**

In response to the *Deepwater Horizon* spill, the President formed the National Commission on the *BP Deepwater Horizon* Oil Spill and Offshore Drilling to investigate the genesis of the explosion.  At the same time, the President ordered the Secretary of the Interior to review the incident and to report "what, if any, additional precautions and technologies should be required to improve the safety of oil and gas exploration and production operations on the outer continental shelf."  *Hornbeck Offshore Servs. v. Salazar*, 696 F. Supp. 2d 627, 630 (E.D. La. 2010).  Accordingly, on May 6, 2010, the Department of the Interior ("DOI") instructed the Minerals Management Service ("MMS") to stop issuing permits for new wells pending the report's completion. Inspections at the 33 deepwater rigs in the Gulf (operated by a variety of entities) revealed "only minor problems" at two wells.[3]  Nevertheless, DOI recommended "a six-month moratorium on permits for new wells being drilled using floating rigs" and "an immediate halt to drilling operations on the 33 permitted wells."  *Hornbeck*, 696 F. Supp. 2d at 631.

On May 28, 2010, the Secretary issued a memorandum directing MMS to implement the moratorium on permits and drilling.   The Secretary justified the moratorium based on his findings that "***offshore drilling of <u>new</u> deepwater wells poses an unacceptable <u>threat</u>*** of serious and irreparable harm to wildlife and the marine, coastal, and human environment" and "the installation of additional safety or environmental protection equipment is necessary to prevent

---

quoted as examples to show that "moratoria claims" — the term used by the Court — have been advanced in this OPA Test litigation.  *See* Order, Rec. Doc. 15582 at 2 ¶ 4.a.  Despite this focus, BPXP moves more broadly for the dismissal of all moratoria/permitoria claims including those advanced in the Amended B1 Master Complaint.

[3] *See* Hornbeck's Memorandum of Law in Support of Its Motion for Preliminary Injunction at 2, *Hornbeck Offshore Servs. v. Salazar*, 696 F. Supp. 2d 627 (E.D. La. 2010) (No. 10-1663), 2010 WL 2380480 ("[T]he facts uncovered during on-site investigations conducted within the last month of 29 of the 33 wells affected by the Moratorium show that 27 of the wells were full in compliance with the governing regulations and their existing permits and that there were only minor problems at the other two wells.").

injury or loss of life and damage to property and the environment." *Id.* (emphasis added).

Offshore businesses challenged the moratorium as a violation of the Administrative Procedure Act.  On June 22, 2010, the Eastern District of Louisiana issued a preliminary injunction blocking the moratorium.  Because the Court was "unable to divine or fathom a relationship between the findings and the immense scope of the moratorium," *id.* at 637, the Court concluded the moratorium was unjustified.  Thus, the plaintiffs had a likelihood of "showing that the Administration acted arbitrarily and capriciously in issuing the moratorium." *Id.* at 638.  DOI "immediately took steps to avoid the effect of the injunction." *Hornbeck Offshore Servs. v. Salazar*, 713 F.3d 787, 789 (5th Cir. 2013).  On July 12, 2010, DOI rescinded the first moratorium and imposed a new moratorium that "was the same 'in scope and substance.'" *Id.* at 791; *see also Hornbeck Offshore Servs. v. Salazar*, No. 10-1663, 2010 WL 3523040, at *1 (E.D. La. Sept. 1, 2010) ("[T]he new moratorium covers precisely the same rigs and precisely the same deepwater drilling in the Gulf of Mexico as did the first moratorium.").

Though DOI claimed that the new moratorium was based on new evidence, the Court concluded that DOI had not identified any evidence that had not been available at the time of the first moratorium.  *See id.* at *6 ("[N]early every statement in the July 12 decision memorandum is anticipated by documents in the May 28 record.").  Hence, the case was not moot:

> Because this Court has determined that the process leading to the first moratorium lacks probity; … determined that ***no rational nexus exists between the fact of the tragic Deepwater Horizon blowout and placing an attainder of universal culpability on every other deepwater rig operator in the Gulf of Mexico***; … determined that the first moratorium is invalid in law; and because the Interior Secretary's second moratorium arguably fashions no substantial changes from the first moratorium, the government has failed to circumvent the voluntary cessation exception to mootness.

*Id.* at *7 (emphasis added).  In fact, the District Court held the Secretary in civil contempt for his "defiance" of the Court's order.  *Hornbeck Offshore Servs. v. Salazar*, No. 10-1663, 2011 WL

454802, at *3 (E.D. La. Feb. 2, 2011) ("Such dismissive conduct, viewed in tandem with the reimposition of a second blanket and substantively identical moratorium …, provide this Court with clear and convincing evidence of the government's contempt of this Court's preliminary injunction Order."). The Fifth Circuit held the challenge moot and reversed the contempt holding. *Hornbeck*, 713 F.3d at 791, 795. But the Fifth Circuit agreed with the District Court's characterization of the government's conduct. *Id.* at 794 (noting that evidence "support[s] the district court's factual finding … that Interior was intent on reinstating a moratorium that imposed the same limitations as the May Directive from the moment the court enjoined it").

On October 12, 2010, DOI ended the second moratorium, allowing drilling at new wells subject to enhanced safety rules.[4] Nevertheless, permit delays continued to prevent drilling activity. *See Ensco Offshore Co. v. Salazar*, No. 10-1941, 2011 WL 1790838, at *1 (E.D. La. May 10, 2011) (noting "the government's unreasonable delays in its processing of nine deepwater drilling permit applications"). A Court in this District again held the government's conduct unlawful. *See id.* at *7 ("[T]he government has unlawfully and improperly delayed a non-discretionary function."). Permit approvals returned to pre-2010 levels toward the end of 2011. *Cf. Ensco Offshore Co. v. Salazar*, No. 10-1941, 2011 WL 12675678, at *1 (E.D. La. June 16, 2011) (vacating earlier order against government to remedy permitting delays).

## II.    Plaintiffs' Claims and the Oil Pollution Act

When it preliminarily enjoined the first moratorium, the District Court in *Hornbeck* found that "[t]he effect on employment, jobs, loss of domestic energy supplies caused by the moratorium as the plaintiffs (and other suppliers, and the rigs themselves) lose business … will

---

[4] Press Release, DOI, Salazar: *Deepwater Drilling May Resume for Operators Who Clear Higher Bar for Safety, Environmental Protection* (Oct. 12, 2010), *available at* http://on.doi.gov/1SG7iCI; *see also* Oil and Gas and Sulphur Operations in the Outer Continental Shelf — Increased Safety Measures for Energy Development on the Outer Continental Shelf, 75 Fed. Reg. 63,346 (Oct. 14, 2010).

clearly ripple throughout the economy in this region." *Hornbeck*, 696 F. Supp. 2d at 639. Plaintiffs here are businesses that seek recovery from BPXP for such consequential economic losses caused by the government's moratoria and permitting delays.[5]

All Plaintiffs seek damages for these economic losses under OPA, 33 U.S.C. § 2701 *et seq*. *See, e.g.,* Bisso Compl. ¶ 34; Wadleigh Compl. ¶ 19; Blake Compl. ¶ 61.[6]  OPA makes "responsible part[ies]" liable for certain oil-pollution damages. *See* 33 U.S.C. § 2701(32) (defining "responsible party"); *id.* § 2702 (defining OPA damages).  The U.S. Coast Guard, which administers OPA, has designated BPXP as a responsible party for oil from MC252.  *See Gatlin Oil Co. v. United States*, 169 F.3d 207, 209 (4th Cir. 1999) ("The Coast Guard administers the [Oil Pollution] Act.").  As a responsible party, BPXP has long expressed its willingness to pay legitimate OPA claims, including through the economic-loss class-action settlement it negotiated.  Yet OPA includes two separate limitations on the liability of responsible parties like BPXP that Plaintiffs seek to ignore.  ***First***, OPA limits the liability of a responsible party to pay only those damages resulting from the discharge of oil:

> Notwithstanding any other provision or rule of law, and subject to the provisions of this Act, each responsible party for a vessel or a facility from which oil is discharged, or which poses the substantial threat of a discharge of oil, into or upon the navigable waters or adjoining shorelines or the exclusive economic zone is liable for the removal costs and damages specified in subsection (b) of this section ***that result from such incident***.

33 U.S.C. § 2702(a) (emphasis added); *see also id.* § 2701(14).  ***Second***, OPA limits the recovery

---

[5] Blake International USA Rigs, LLC alleges that because of the "moratorium that ceased drilling activity in the Gulf of Mexico, Blake was forced to take their rigs out of commerce."  Blake Compl. ¶ 60.  Bisso Marine, LLC alleges it was "prohibited … from engaging in its marine salvage and commercial diving operations, which includes all pipeline, offshore construction activity, and other related services" and thereby suffered "economic damages in the form of past and future lost revenues, lost business opportunities and diminution in asset values."  Bisso Compl. ¶ 33, 35.  Wadleigh Industries, Inc. alleges that as a "heavy metal handling equipment inspection, maintenance and service company primarily operating on drilling rigs in the Gulf of Mexico," it sustained "substantial losses to its customer base, overall revenues and profitability" because of "greater competition for fewer available jobs and projects in the Gulf area."  Wadleigh Compl. ¶ 15.

[6] Bisso has conceded that it is an economic settlement class member, did not opt out, has claims in the CSSP, and thus that its only claims in this OPA Test Case process are for its reserved moratoria/permitoria losses.

of economic losses to those losses due to the destruction of property or natural resources:

> The damages referred to in subsection (a) of this section are … [d]amages equal to the loss of profits or impairment of earning capacity ***due to the injury, destruction, or loss of real property, personal property, or natural resources***, which shall be recoverable by any claimant.

33 U.S.C. § 2702(b)(2)(E) (emphasis added).   Thus, a plaintiff seeking to recover economic losses of the types the OPA test plaintiffs seek here under OPA must show that its losses (1) "result from such incident" under § 2702(a) and (2) are "due to the injury, destruction, or loss of real property, personal property, or natural resources" under § 2702(b)(2)(E).

## STANDARD OF REVIEW

The standard of review applicable to motions to dismiss is well known and need not be belabored.  *In re Deepwater Horizon*, 808 F. Supp. 2d 943, 948 (E.D. La. 2011) (setting out current state of this law after the Supreme Court's decisions in *Ashcroft v. Iqbal*, 556 U.S. 662 (2009) and *Bell Atlantic Corp. v. Twombly*, 550 U.S. 544, 547 (2007)).  *See also R2 Invests. v. Phillips*, 401 F.3d 638, 642 (5th Cir. 2005) (court should not "strain to find inferences favorable to the plaintiffs" or "accept conclusory allegations, unwarranted deductions, or legal conclusions").

## ARGUMENT

### I.    OPA DOES NOT IMPOSE LIABILITY FOR MORATORIA LOSSES.

The Fifth Circuit has interpreted OPA's two causation provisions to require a more direct causal relationship than Plaintiffs can establish between the *Deepwater* spill and their moratoria/permitoria losses.  Additionally, the U.S. Coast Guard's National Pollution Funds Center, the adjudicatory body that evaluates claims under OPA's Oil Spill Liability Trust Fund, has interpreted the statute to preclude damages for moratorium losses.[7]  The Fifth Circuit has

---

[7] Claimants can elect either to litigate or to present an administrative claim to the Coast Guard under OPA.  *See* 33

held that the Coast Guard's interpretations of OPA expressed in such adjudications are entitled to deference.  Thus, both controlling precedent and agency interpretations of OPA require that claims for moratorium losses be dismissed.  Additionally, the two DOI moratoria and the follow-on permitoria fall outside the definition of an OPA "incident."  For that reason alone, no OPA recovery for moratoria/permitoria-caused losses is possible.  Defining the precise standard of causation under OPA is not necessary to resolve this case.  Nevertheless, OPA employs language generally understood to require proximate cause — a standard that also cannot be met where, as here, Plaintiffs' losses were caused by a series of discretionary government decisions.

### A.    Moratoria/Permitoria Losses Did Not "Result From" the Discharge of Oil.

The Fifth Circuit interpreted the key damages provisions of OPA in *In re Taira Lynn Marine Ltd. No. 5*, 444 F.3d 371 (5th Cir. 2006).  In that case, a tugboat and its tow allided with a bridge, and the allision resulted in the discharge of a gaseous mixture of propylene and propane from the barge's cargo.  As a consequence, the Louisiana State Police ordered a mandatory evacuation of all businesses and residences around the bridge and "law enforcement officials shut off the electricity during the evacuation."  *Id.* at 377.  Businesses sought recovery under OPA for economic losses resulting from the mandatory evacuation and loss of power.  As in this case, the businesses sought to hold the responsible party liable under 33 U.S.C. § 2702(a) for economic losses identified in § 2702(b)(2)(E).  *Taira Lynn*, 444 F.3d at 382.  The Fifth Circuit assumed "that OPA applies" and held that such losses are not compensable under OPA because the economic losses did not "result from" the pollution incident but instead only from the law enforcement decisions in question.  *Id.* at 383.

The businesses had not shown that "any property damage was caused by the pollution

---

U.S.C. § 2713(c).  But whichever path is chosen, both courts and the Coast Guard remain bound to apply the self-same statutory liability terms established in OPA.

incident, *i.e.*, the release of the gaseous cargo." *Id.*  The Court explained that "[a] party is liable under OPA if, inter alia, the claimant's damages '*result from such incident*,' i.e., the discharge or threatened discharge of oil." *Id.* (emphasis in original).  The *Taira Lynn* businesses could not meet that standard because they had not shown that "their economic losses are due to damage to property **resulting from** the discharge" and thus "[a]ny property damage upon which Claimants must rely to recover under § 2702(b)(2)(E) did not **result from** the discharge or threatened discharge of oil." *Id.* (emphases added).  Instead, "[t]he claims at issue here are for economic losses **resulting from** the evacuation." *Id.* at 382 (emphasis added).  That was insufficient.

Importantly, the Fifth Circuit applied this reasoning not only to those claimants alleging pure economic losses but also to those claimants who alleged that their property had been physically damaged.  A seafood business claimed that its stock of crabs had spoiled when the electricity had shut off, and a factory claimed it had lost materials when its manufacturing runs were prematurely terminated in order to comply with the evacuation.  *Id.* at 380.  Yet the Fifth Circuit concluded that "neither of these claimants suffered physical damage **as a result of** the allision." *Id.* (emphasis added).  The "crabs spoiled because the electricity was turned off during the evacuation, not because of contact with the barge, the bridge, or the gaseous cargo" and the factory had claimed "losses from its inability to sell products that were in the process of being manufactured; it is not claiming that its property was damaged **as a direct result of the allision**." *Id.* (emphasis added).  Because the "result from" requirement applies also to damages for personal property, *see id.* at 382 ("In order to recover under § 2702(b)(2)(B) a plaintiff must show that her property was damaged as a result of a release or threatened release of oil."), the Fifth Circuit concluded that even those plaintiffs that had identified concrete property damage could not recover under OPA.  *Id.* ("Claimants have not raised an issue of fact as to whether **the**

***gaseous cargo caused*** damage to their property; accordingly, they are not entitled to recover under § 2702(b)(2)(B).") (emphasis added).  In this way, the Fifth Circuit made clear that the causal connection between the incident and the damages was too attenuated.  Losses resulting from the evacuation did not "result from" the allision and were not compensable under OPA.[8]

The Fifth Circuit's holding in *Taira Lynn* controls the outcome here because the causal connection between the mandatory evacuation and the allision there was closer than the causal connection between the moratoria and the *Deepwater Horizon* spill here.  Certainly, the allision in *Taira Lynn* was a but-for cause of the mandatory evacuation: The evacuation would not have occurred without the accidental release of propylene/propane, and yet the Fifth Circuit found that relationship to be insufficient for evacuation-related losses to be OPA compensable.  The allision in *Taira Lynn* was much closer to the proximate cause of the evacuation than the *Deepwater* spill was to that of the moratoria.  The mandatory evacuation was ordered specifically to address the pollution caused by the allision, and for that reason one might argue it was a foreseeable result of such a pollution incident.  The moratoria, by contrast, was aimed at ***future, industry-wide*** risks, as found in the moratoria litigation in this District.  It is not enough, as plaintiffs suggest, to assert that causation is met because without the *Deepwater* spill, there would have been no moratorium.  Such "but for" links do not suffice under OPA.  As this Court has previously suggested, the moratorium "wasn't a direct cause of the spill, because … they weren't trying to clean up anything.  They weren't doing it in direct response to the spill.  They were trying to

---

[8] An academic retained in this case by the PSC (as he has disclosed) has suggested that *Taira Lynn* was really about the plaintiffs' failure to identify harm to property or natural resources.  *See* David W. Robertson, *The Oil Pollution Act's Provisions on Damages for Economic Loss*, 30 MISS. C. L. REV. 157, 191 (2011) (suggesting that the plaintiffs in *Taira Lynn* "should have been arguing that the discharge of the gas polluted the air" and thereby identified an injury to natural resources "within the meaning of Section 2702(b)(2)(E)").  But, as the Fifth Circuit made clear by way of its treatment of those claimants who ***had*** identified concrete property damage, the problem was not simply the failure to identify harm to property but the lack of a causal connection between the allision creating the discharge and the economic loss where the mandatory evacuation and power shut-off were the direct causes of that loss.

prevent future spills, as I appreciate the purpose of the moratorium."  5/26/11 Tr. 94:16-21 (Rec. Doc. No. 2702).  Indeed, another Judge in this District found "no rational nexus" between the *Deepwater* spill and the moratorium.  *Hornbeck*, 2010 WL 3523040, at \*7.  If, as the Fifth Circuit has said, the mandatory evacuation in *Taira Lynn* does not satisfy the "result from" standard in 33 U.S.C. § 2702(a), it necessarily follows that the far more attenuated connection between the *Deepwater* spill and the moratoria does not satisfy that standard either.

Further support for this conclusion comes from *Gatlin Oil Co. v. United States*, 169 F.3d 207 (4th Cir. 1999), the reasoning of which the Fifth Circuit adopted in *Taira Lynn*.  *See Taira Lynn*, 444 F.3d at 383 (endorsing *Gatlin Oil*'s interpretation of OPA).[9]  In *Gatlin Oil*, a vandal opened Gatlin's fuel storage tanks, causing an oil spill.  In turn, vapors from the discharged oil ignited a fire that caused further damage.  The Coast Guard, as administrator of the Oil Spill Liability Trust Fund, determined that Gatlin was entitled to compensation for property damage and economic losses that resulted directly from the oil spill ***but not those resulting from the fire***. *Gatlin Oil*, 169 F.3d at 210.  The Fourth Circuit adopted the Coast Guard's reasoning that OPA provides "that only removal costs and damages that '***result from such incident***' are compens[a]ble" and "[t]he antecedent of 'such incident' is the discharge or substantial threat of discharge into navigable waters or adjacent shorelines."  *Id.* at 210-11 (emphasis added). Accordingly, the Fourth Circuit held that compensable damages under OPA "are those that ***result from*** a discharge of oil or from a substantial threat of a discharge of oil into navigable waters or the adjacent shoreline."  *Id.* at 211 (emphasis added).  The Fourth Circuit agreed with the Coast Guard that damages resulting from the fire did not meet this standard.  *Id.* at 212.

As in *Taira Lynn*, the Fourth Circuit's reasoning demonstrates that the statutory phrase

---

[9] The Fifth Circuit's endorsement of the reading of OPA in *Gatlin Oil* precludes the argument that *Gatlin Oil* can be deemed wrongly decided.  Thus, the reasoning in that case reflects the law of this Circuit.

"result from" requires a direct causal relationship between the alleged damages and the discharge (or threatened discharge) of oil.  A responsible party is liable only for damages that "result from" the discharge of oil and not from any other intervening cause.  Again, the causal relationship held insufficient in *Gatlin Oil* was closer than the causal relationship in this case.  If a fire, ignited by vapors from an oil spill, breaks the necessary OPA causal chain such that the ensuing damages do not "result from" the oil spill, then certainly so does a cause with these four features which have the effect of interjecting even more remoteness between claimed damage and the oil spill: (1) the cause was a ***discretionary*** government decision; (2) it was imposed ***industry-wide***; (3) it was a ***future-oriented, prophylactic regulatory*** decision; and (4) it was an ***unlawful*** decision.

As noted, the Coast Guard originated the interpretation of OPA causation standard that has since been adopted by the Fifth and Fourth Circuits.  The Coast Guard has continued to apply that standard as administrator of the Oil Spill Liability Trust Fund, and it has squarely held that moratorium claims are not compensable under OPA.  The Coast Guard has articulated that position in claims adjudication proceedings identical to the proceeding afforded deference in *Gatlin Oil.  See Gatlin Oil*, 169 F.3d at 211 (deferring to the Coast Guard's interpretation of OPA in an Oil Spill Liability Trust Fund adjudication).  Indeed, as particularly relevant to this dispute, the Coast Guard routinely denies claims for economic losses that are "a direct result of the moratorium, not a direct result of an oil discharge" because such claims are "not compensable under the OPA."  Claim No. N10036-0035 (Nov. 8, 2010).[10]  The Coast Guard has denied claims such as those Plaintiffs assert here, in which a "loss of profits was allegedly ***the result of the moratorium***, a directive issued by the Department of the Interior to suspend permitting and drilling activities on the Outer Continental Shelf in order that safety regulations

---

[10] The Coast Guard's claim determinations are available at http://www.uscg.mil/npfc/Claims/deepwater.asp.

could be implemented, and **not the result of the Deepwater Horizon incident**."   Claim No.
N10036-0322 (Jan. 6, 2011).   Throughout these opinions, the Coast Guard has consistently
maintained that moratorium claims are not compensable under OPA because economic losses
caused by the moratorium did not "result from" the *Deepwater* oil spill:

> The moratorium and its regulatory implications for corporate entities and their employees
> **is not the result of** the injury, destruction or loss of property or natural resources **as a
> result of** a discharge or substantial threat of discharge of oil but rather due to permitting
> requirements therefore, the Claimant's loss is not a damage that may be compensated ….

Claim No. N10036-0290 (Mar. 17, 2011).  The Court Guard tells all claimants that OPA does not
allow compensation for damages "sustained because of the moratorium on offshore drilling."[11]

The Fifth Circuit has held that interpretations of OPA articulated by the Coast Guard's
National Pollution Funds Center in claims-adjudication proceedings being subjected to judicial
review are entitled to deference.  *Buffalo Marine Servs. Inc. v. United States*, 663 F.3d 750, 754
(5th Cir. 2011) ("NPFC's interpretation of the OPA deserves deference").   In this case, the Coast
Guard has interpreted the statutory phrase, "result from," to include only direct results.   If this
Court were reviewing an adjudication by the Coast Guard's National Pollution Funds Center, it
would be bound to defer to that interpretation.  *See, e.g.*, *Apex Oil Co. v. United States*, 208
F. Supp. 2d 642, 650 (E.D. La. 2002) (applying *Chevron* deference to an interpretation of OPA
articulated in an NPFC adjudication); *United States v. Conoco, Inc.*, 916 F. Supp. 581, 585 (E.D.
La. 1996) (same).  And even in this direct-litigation context, the Coast Guard's views are entitled
to respect especially when they carry persuasive force.  *See Apex Oil*, 208 F. Supp. 2d at 656
("[T]he construction of the statutory scheme by the very same agency entrusted to administer it
is entitled to considerable weight where it is a rational construction."); *see generally Skidmore v.*

---

[11] National Pollution Funds Center, Deepwater Horizon Claimant FAQs, http://www.uscg.mil/npfc/claims/DWH_
faqs.asp#faq-4 ("Under the law that governs the NPFC's determinations, the NPFC will not pay a loss or damage
that is a direct result of the moratorium on offshore drilling.").

*Swift & Co.*, 323 U.S. 134, 140 (1944) (courts should defer to agency decisions with the "power to persuade").  Plaintiffs cannot contend that the Coast Guard's construction of "result from such incident" is irrational — especially where it has already been adopted by the Fifth and Fourth Circuits.  There is no question that under the Coast Guard's interpretation, moratorium claims are not compensable under OPA because the damages do not "result from" the discharge of oil.

### B.      The Moratoria and Permitoria Do Not Qualify as OPA "Incidents."

Under Fifth and Fourth Circuit precedent, the "incident" referenced in 33 U.S.C. § 2702(a) is "the discharge or threatened discharge of oil," *Taira Lynn*, 444 F.3d at 383, and the moratoria and permitoria cannot be said to "result from such incident."  Even if one relies instead on the consistent statutory definition of "incident" in OPA, Plaintiffs' claims still fail because the moratoria and permitoria do not qualify as an OPA "incident" under the statute.  *See* 33 U.S.C. § 2701(14) (defining "incident" as "any occurrence or series of occurrences having the same origin, involving one or more vessels, facilities, or any combination thereof, ***resulting in the discharge or substantial threat of discharge of oil***") (emphasis added).[12]  In the abstract, the moratoria and permitoria are "occurrences" but they nevertheless fail to qualify as part of the *Deepwater Horizon* "incident" because the moratoria and permitoria did not "result[] in the discharge or substantial threat of discharge of oil."  The "series of occurrences" that this Court explored in the Phase I trial, going to the genesis of the spill, surely qualify as a liability-creating OPA "incident."  But the moratoria and permitoria did not give rise to the discharge of oil and hence are wholly divorced from OPA's definition of an "incident."

As noted, OPA creates liability only as to "damages specified in subsection (b) of this

---

[12] The argument that the moratoria do not fit within the definition of an OPA "incident" has been advanced previously by both BP and Transocean.  *See* Rec. Doc. 1390 at 12 (Feb. 28, 2011) (Transocean); Rec. Doc. 2312 at 20 & n.21 (May 9, 2011) (BP).  This Court did not reach this issue in the B1 Order.

section *that result from such <u>incident</u>*."  33 U.S.C. § 2702(a) (emphasis added).  Applying the statutory definition would require that damages have to be predicated on an OPA Section 2701(14) "incident" to be recoverable.  *See* 33 U.S.C. § 2702(b)(2) ("The damages *referred to in subsection (a)* of this section are the following: …").  But moratoria/permitoria losses are not predicated on such an incident and are therefore not recoverable.  The *Gatlin Oil* court recognized that its understanding of § 2702(a) was consistent with the statutory definition when it held that, "[a]s a matter of law, Gatlin Oil cannot recover … for fire damage because the evidence did not establish that the fire *caused the discharge of oil* into navigable waters or posed a substantial threat to do so."  *Gatlin Oil*, 169 F.3d at 212 (emphasis added).  Thus, the fire was not part of the OPA "incident."  The same reasoning applies to the moratoria/permitoria here.

### C.   Moratorium Losses Are Not "Due To" Injury to Property or Natural Resources.

Even if Plaintiffs could somehow satisfy the "result from" standard of § 2702(a) or meet the "incident" definition in § 2701(14), they would still need to show that their losses are "due to the injury, destruction, or loss of real property, personal property, or natural resources" in order to satisfy the causation requirement of § 2702(b)(2)(E).  In this way, "Section 2702(b)(2)(E)'s 'due to' clause imposes a second-layer causation requirement on top of the initial 'result from' requirement set by Section 2702(a)."[13]  The twofold causation requirement for economic-loss claims (coupled with the precise term "incident") precludes reading OPA as erecting a mere but-for causation standard.[14]  Rather, the second-layer causation requirement distinguishes OPA even

---

[13] *See* John C. Goldberg, *Liability for Economic Loss in Connection with the Deepwater Horizon Spill* 17 (Nov. 22, 2010), http://nrs.harvard.edu/urn-3:HUL.InstRepos:4595438.  As the Court is aware, Professor Goldberg was retained by the GCCF Administrator Ken Feinberg to analyze OPA causation.

[14] *See id.* at 21 n.42 (proximate cause may be inferred from "fact that OPA explicitly sets two distinct causation-related requirements for claims seeking recovery for economic loss"); *id.* at 23 ("[T]he only function that can possibly be ascribed to the 'due to' clause is that of setting an additional filter on liability beyond actual cause."); 2 SCHOENBAUM'S ADMIRALTY & MAR. LAW § 18-4 (5th ed.) ("Whereas the 'result from' language of the latter

from statutes that have been held to require proximate cause and thereby indicates that Congress sought to cabin liability for purely economic losses to avoid runaway causal chains.[15]   Congress could have simply provided for damages equal to lost profits that "result from" an oil discharge. Instead, Congress provided that even if losses "result from" a discharge, such losses must additionally be closely connected with harm to property or resources to be compensable.

The controlling case law indicates that Plaintiffs' claims for economic losses do not satisfy the "due to" requirement.  In *Taira Lynn*, the Fifth Circuit dismissed claims for economic losses because the claimants had "not raised an issue of fact as to whether their economic losses are due to damage to property resulting from the discharge of the gas." *Taira Lynn*, 444 F.3d at 383.  Instead, the alleged economic losses were "due to the evacuation." *Id.* at 377.  Under Fifth Circuit precedent, therefore, a claimant must show that it suffered economic losses as a direct result of harm to property or natural resources.  It is not enough to allege that harm to natural resources prompted a response from the government that affected the regional economy, and thus in turn affected the profitability of one's business.  The evacuation/power shut-off in *Taira Lynn* is directly analogous to the moratoria here.  For that reason, the Coast Guard has consistently held that the "moratorium and its regulatory implications for business entities and their employees is not the result of the injury, destruction or loss of property or natural resources" and are therefore not compensable in damages under 33 U.S.C. § 2702(b)(2)(E).

OPA's legislative history indicates that the "due to" clause was intended to limit economic loss damages to losses associated with the inability to use oil-damaged property or

---

section requires that the damage suffered by the claimant must be proximately caused by the actual or threatened discharge of oil, the 'due to' language of Section 2702(b)(2)(E) requires that the claimant's lost profits or earning capacity damages must be proximately caused, in addition, by injury, destruction, or loss of property or natural resources. This double proximate cause provision is unique to OPA and is designed to filter out remote claims.").

[15] *See* Goldberg, *supra* note 13, at 22 ("Neither CERCLA nor TAPAA (statutes interpreted to require proximate cause) contains a second-layer causation requirement comparable to Section 2702(b)(2)(E)'s 'due to' clause.").

natural resources.  The Senate Report explained that "economic damages include both loss of use and loss of subsistence use of natural resources.  Under this provision, fisherm[e]n, for example, would not only receive the equivalent of unemployment compensation, but would also receive compensation to prevent loss of a boat."   S. Rep. No. 101-94, at 12 (1990).  Section 2702(b)(2)(E) is not open-ended but seeks to ensure only "full compensation for **_direct, proven damages_**.  This includes governmental cleanup costs, natural resource damages, and economic damages to third parties such as fishermen and beachfront property owners."   135 Cong. Rec. H7954-02 (Nov. 2, 1989) (statement of Rep. Stangeland) (emphasis added).

Plaintiffs here do not allege the sort of economic losses that a fisherman or beachfront property owner might suffer due to contaminated fish or a polluted beachfront — that is, the inability to put a particular property or natural resource to commercial use.[16]  Rather, Plaintiffs allege economic losses "due to" limited demand for their services that "resulted from" the discretionary decisions of the federal government to halt drilling activity in the Gulf of Mexico. _See, e.g._, Wadleigh Compl. ¶ 15 ("Plaintiff's market was significantly impacted due to greater competition for fewer available jobs and projects in the Gulf area.").  Plaintiffs do not contend that their economic losses flowed from the inability to utilize property or natural resources that was oiled.  Even DOI did not contend that its industry-wide moratorium was necessitated by damage to natural resources.  Rather, DOI sought to prevent **_future_** harm to natural resources as part of an optional suite of precautionary measures.  _See supra_ Background, Section I.  Under such circumstances, it cannot be said that the moratoria were "due to" injury to natural resources — let alone that moratoria losses were due to such an injury.  Plaintiffs' economic losses were plainly due to regulatory decisions fashioned by DOI, not harm to property or resources.

---

[16] _See_ Goldberg, _supra_ note 13, at 36 ("There are plausible reasons for limiting recovery for economic loss to persons who can establish that their losses resulted from harm to property or resources that interferes with their right to put that property or those resources to commercial use.").

**D.      OPA Independently Permits the Recovery of Damages Only If the Proximate Cause Standard Is Met.**

This Court need not resolve the precise level of causation required by OPA.  It is enough that the causal link between the *Deepwater* spill and the moratoria is more attenuated than the insufficient link the Fifth Circuit rejected in *Taira Lynn*.  *See supra* Argument, Sections I.A-C. The Coast Guard's interpretation that OPA requires a direct relationship between the oil spill and alleged damages is also persuasive here as a basis for holding moratoria/permitoria losses non-recoverable.  *See supra* pp. 12-13.  Not only the Fifth Circuit in *Taira Lynn* but the Fourth Circuit in *Gatlin Oil* have either independently adopted reasoning identical to the Coast Guard's (Fifth Circuit) or have formally deferred to it (Fourth Circuit).  *Gatlin Oil*, 169 F.3d at 211 (adopting "Coast Guard's construction of section 2702(a) [a]s permissible because it is grammatically correct and … accommodates the purpose of the Act.").

Nevertheless, the best statutory reading is that OPA imposes a requirement of proximate causation.  *See, e.g.*, *Sekco Energy, Inc. v. Chouest*, No. 92-0420, 1993 WL 322942, at *6 (E.D. La. Aug. 13, 1993) ("proximate cause" is required under 33 U.S.C. § 2702(b)(2)(E)).  Further, as a general matter, it is presumed that a liability statute such as OPA incorporates a proximate-cause requirement unless the legislature provides otherwise.[17]  For that reason, "even when confronted with statutory liability provisions that use variants on the phrase 'result from' as a **stand-alone** causation requirement, courts have read into that phrase both an actual causation requirement and a proximate cause limitation."  *See* Goldberg, *supra* note 13, at 20.  For example, the Ninth Circuit considered the liability provision of the Trans-Atlantic Pipeline Authorization Act, which authorizes recovery of damages "sustained by any person … **as the**

---

[17] *See Holmes v. Sec. Inv'r Prot. Corp.*, 503 U.S. 258, 287 (1992) (Scalia, J., concurring in the judgment) ("[I]t has always been the practice of common-law courts (and probably of all courts, under all legal systems) to require as a condition of recovery, unless the legislature specifically prescribes otherwise, that the injury have been proximately caused by the offending conduct.  Life is too short to pursue every human act to its most remote consequences.").

*result of* discharges of oil from such vessel." *Benefiel v. Exxon Corp.*, 959 F.2d 805, 807 (9th Cir. 1992) (quoting 43 U.S.C. § 1653(c)(1) (1992)) (emphasis added).  The Ninth Circuit affirmed dismissal of a claim thereunder because "the spill itself did not *directly cause* any injury to the appellants.  Rather, plaintiffs alleged the spill triggered a series of intervening events, including the decision of the United States Coast Guard to close the Port of Valdez to facilitate clean-up efforts." *Id.* (emphasis added).[18]  In another case arising out of the *Valdez* oil spill, the Ninth Circuit similarly held that the "as a result of" language barred claims by "businesses who suffered losses because the impact of the oil spill on their customers caused patronage to decline" because such claims were "too remote."  *Adkins v. Trans-Alaska Pipeline Liab. Fund*, 101 F.3d 86, 89 (9th Cir. 1996).

Other courts have reached similar conclusions.  The First Circuit held that a provision extending liability to loss of income "*as a result of* damage to the natural resources of the state" incorporated "the familiar tort limitations of foreseeability and proximate cause."  *Ballard Shipping Co. v. Beach Shellfish*, 32 F.3d 623, 630 (1st Cir. 1994).  The Second Circuit has held that the language "loss or damage due to or resulting from" is "a phrase that clearly refers to the proximate cause of the loss."  *Pan Am. World Airways v. Aetna Cas. & Sur. Co.*, 505 F.2d 989, 1006 (2d Cir. 1974).  The U.S. Supreme Court has held that the Clayton Act and the federal RICO statute, both of which authorize damages where a claimant is injured "by reason of" proscribed conduct, incorporate proximate cause requirements.  *Associated Gen. Contractors v. Cal. State Council of Carpenters*, 459 U.S. 519, 535 (1983); *Holmes*, 503 U.S. at 268.

---

[18] *Benefiel* also rebuts one of the arguments BPXP anticipates that Plaintiffs will make — proximate-cause issues invariably involve fact issues that cannot be resolved on this motion to dismiss.  Not so.  "While proximate or legal causation normally presents an issue for the trier of fact to resolve, both California and federal law recognize that where causation can't reasonably be established under the facts alleged by a Plaintiff, the question of proximate cause is one for the court."  959 F.3d at 808 (and thus holding "complaint was properly dismissed").

As noted, the Fifth Circuit, Fourth Circuit, and the Coast Guard have long understood the "result from" language in OPA in the same way — as have other authorities.[19]  To be sure, the Supreme Court has said a statutory provision that uses a phrase other than "proximate cause" does not necessarily employ traditional tort formulations.  *CSX Transp., Inc. v. McBride*, 131 S. Ct. 2630, 2643 (2011).  The analysis is highly contextual.[20]  *See id.* at 2639.  But where a provision (1) is of the type that generally requires proximate cause; (2) adopts a phrase understood to reference proximate-cause principles; ***and then*** (3) ***doubles down by adding a second-layer causation requirement***, there is no reasonable reading of the text that fails to incorporate the venerable doctrine of proximate causation.  As the Supreme Court has more recently clarified, "[p]roximate cause is a standard aspect of causation in criminal law and the law of torts" and, "[g]iven proximate cause's traditional role in causation analysis, this Court has more than once found a proximate-cause requirement built into a statute that did not expressly impose one."  *Paroline v. United States*, 134 S. Ct. 1710, 1720 (2014).  Certainly, OPA's language does not ***exclude*** a proximate-cause requirement, and its twofold causation requirements call for the sort of direct causal relationship proximate cause is designed to require.

Claims for moratorium losses do not satisfy a standard of proximate cause or even a lesser standard of direct causation such as the "substantial nexus" test described in *Valladolid* (*see supra* note 20).  This District has even held that "no rational nexus exists" between the *Deepwater* spill and an industry-wide moratorium.  *Hornbeck*, 2010 WL 3523040, at *7.  That is because the moratoria were not necessitated by the spill or even directly responsive to the spill.

---

[19] *See* 2 SCHOENBAUM'S ADMIRALTY & MAR. LAW § 18-4 ("The best way to understand this language is to interpret it as requiring proximate causation in addition to actual causation as a condition to liability . . . .  In any case Section 2702(a) should be interpreted to embody proximate causation.").

[20] Under statute-specific analysis, proximate cause may apply or an intermediate standard can control.  *See, e.g., Pac. Operators Offshore v. Valladolid*, 132 S. Ct. 680, 691 (2012) (declining to use the terminology of "proximate cause" but nevertheless requiring a "substantial nexus" or "significant causal link" for OCSLA claims).

Rather, the moratoria were discretionary policy choices based on the government's assessment of how best to review industry-wide practices.  One can imagine a different Administration facing the same circumstances **not** implementing similar moratoria.  And the fact that the two moratoria imposed in 2010 were held unlawful also renders the imposition of any moratorium far from an ineluctable step.  For those reasons, the spill was neither a direct nor proximate cause of the moratoria.

When an injury is caused by "deliberate action, constituting disregard of a known risk, a determination that those acts … were the sole proximate cause of the subsequent injury can certainly be justified."  *Clark v. Morrison*, No. 08-4253, 2009 WL 3254149, at *3 (E.D. La. Oct. 7, 2009).  Here, the government acted deliberately to implement the moratoria.  The risk of economic harm was not only **known** to the government; the government was actually **enjoined** from implementing its moratoria policies on the ground that it would cause irreparable economic harm.  *Hornbeck*, 696 F. Supp. 2d at 639 ("The effect on employment, jobs, loss of domestic energy supplies caused by the moratorium … will clearly ripple throughout the economy in this region."); *id.* ("An invalid agency decision to suspend drilling of wells in depths of over 500 feet simply cannot justify the immeasurable effect on the plaintiffs, the local economy, the Gulf region.").  The government not only disregarded that known risk, it acted deliberately **in the face of an injunction issued by the Judiciary**.  Those deliberate decisions by the government were the "sole proximate cause" of the moratoria and surely the direct cause.

Claims conceptually similar to those here were rejected in *Exxon Corp. v. Amoco Oil Co.*, 875 F.2d 1085 (4th Cir. 1989).  There, the county regulators denied Exxon's permit applications to build a gas station in light of contamination on Exxon's land.  Exxon challenged these denials in court and they were ruled unlawful, which had the effect of barring Exxon from seeking tort

damages from Amoco (the cause of the contamination) for harms caused by the permit denial:

> To hold Amoco liable for the permit damages would be to hold that Amoco should have realized that the Health Department would take advantage of the opportunity created by Amoco's negligent pollution to arbitrarily deny Exxon's building permit. … [This] was simply not reasonably foreseeable to Amoco …. *It is one thing to extend proximate causation, and with it legal liability, to encompass the intentionally or criminally harmful acts of members of the general public; it is quite another to extend the legal liability of private citizens to encompass the arbitrary acts of government bureaucracy. Private citizens cannot be made the guarantors of government.*

*Id*. at 1089 (emphasis added).  BPXP similarly cannot be held liable here.

## II.   DENYING RECOVERY FOR MORATORIUM LOSSES IS ENTIRELY CONSISTENT WITH CONGRESSIONAL INTENT AND PUBLIC POLICY.

Plaintiffs' claims are barred by the statutory text and controlling precedent.  To the extent Plaintiffs argue that recognizing claims for moratoria losses would be consistent with OPA's *general purpose*, however, it is also clear that such claims conflict with Congress's *specific purpose* here (as made manifest in the text of Sections 2701(14) and 2702(a)-(b)).  *See, e.g.*, *Rodriguez v. United States*, 480 U.S. 522, 525-26 (1987) ("[N]o legislation pursues its purposes at all costs.").  Moratorium claims also conflict with the public interest, which benefits from imposing liability for only direct harm rather than for harm caused by government policies.

### A.   Moratorium Claims Are Inconsistent with Congressional Purpose in Enacting OPA.

Plaintiffs have previously argued that enforcing OPA's causation requirements to preclude moratoria claims would be inconsistent with OPA's broad remedial purpose.  But OPA's economic-loss provision actually has a relatively modest purpose that would be gutted by expanding the universe of compensable claims to include moratoria losses.

Section 2702(b)(2)(E) allows recovery "by any claimant" in order to alter the rule under general maritime law that "claims for economic loss unaccompanied by physical damage to a proprietary interest [are] not recoverable in maritime tort."  *Louisiana ex rel. Guste v. M/V*

*Testbank*, 752 F.2d 1019, 1021 (5th Cir. 1985); *see generally Robins Dry Dock & Repair Co. v. Flint*, 275 U.S. 303, 307 (1927).   The House Conference Report makes clear that under the economic-loss provision, "[t]he claimant need not be the owner of the damaged property or resources to recover for lost profits or income. For example, a fisherman may recover lost income due to damaged fisheries resources, even though the fisherman does not own those resources."   H.R. Rep. No. 101-653, at 4 (1990).   But as the example of a fisherman demonstrates, Congress sought to modify the *Robins Dry Dock* rule in order to protect persons whose livelihood depends on access to natural resources or property susceptible to pollution who would otherwise be unable to recover for pollution damage because they do not own the resources or property.   This is the relatively limited class of persons Congress sought to bring within the ambit of the economic-loss provision: "OPA's economic loss provisions are best understood as expanding liability for economic loss beyond owners and lessees of property that has been damaged to any person whose business's profitability depends on his or her ability to exercise a right physically to obtain or use property or resources that are damaged or lost because of an oil spill."   Goldberg, *supra* note 13, at 32.   That Congress had a limited class of persons in mind is further demonstrated by the size of the Oil Spill Liability Trust Fund:

> [I]t is simply not plausible to believe that Congress supposed that the liability provisions of OPA, backed by the Fund, would be sufficient to handle all the adverse economic ripple-effects flowing from a catastrophic spill. Rather, legislators' expectation of full compensation for valid claims must have rested on a more circumscribed conception of the type of claims that are eligible for compensation.

*Id.* at 24.   Expanding liability to embrace economic losses which are only indirectly related to oil pollution would undermine the ability of OPA's structure to compensate those persons, such as fishermen, that Congress aimed to protect.   The analysis deployed in *Rodriguez* is again instructive:   "Deciding what competing values will or will not be sacrificed to the achievement

of a particular objective is the very essence of legislative choice — and it frustrates rather than effectuates legislative intent simplistically to assume that *whatever* furthers the statute's primary objective must be the law."  *Rodriguez*, 480 U.S. at 526.  By describing the purpose of OPA compensation at too high a level of abstraction, Plaintiffs miss that the whole carefully crafted OPA regime would be subverted if OPA's stopping points were not carefully observed.

### B.   Moratorium Claims Are Inconsistent with the Public Interest.

The *Deepwater* spill can be said to have "caused" the moratoria only in the sense that accidents often prompt new safety measures: the spill focused public attention on deepwater drilling and, as a result, regulators undertook a review and reform of safety precautions.[21]  In this way, "an accident not only causes direct harm, but it also generates new information about the dangers of the activity and added precautions that can be exercised to lower the dangers at other locations where the activity is undertaken."[22]  The information generated as an accident's byproduct is not a harm but can be beneficial if it helps avert future accidents.  Holding a party liable not just for the consequences of the harm caused by its accident but also for the consequences of the information generated thereby would create perverse incentives because a regulated party's interest would then no longer align with the public interest; instead, incentives would be created for cutting off public access to information, resisting regulatory reform efforts, and the taking of more than the economically efficient level of precautions.  Congress did not design such a self-defeating system.

Liability rules do not generally impose liability based on precautionary steps taken as a

---

[21] *See* Steven Shavell, *Should BP Be Liable for Economic Losses Due to the Moratorium on Oil Drilling Imposed After the Deepwater Horizon Accident?*, 64 VAND. L. REV. 1995, 1997 (2011) ("[T]he stated justification for the moratorium was that it would reduce the danger of ***additional oil spills***, a danger that seemed more serious in light of the BP spill.") (emphasis added).

[22] Shavell, *supra* note 21, at 2003.

result of an accident.  A clear example is found in OPA itself.  OPA was passed in response to the 1989 *Exxon Valdez* incident.  The aim of OPA was "increasing the penalties for oil pollution and instituting a regulatory regime aimed at improving oil tanker safety, preventing future oil spills, and enhancing oil spill response."  *SeaRiver Mar. Fin. Holdings, Inc. v. Mineta*, 309 F.3d 662, 666 (9th Cir. 2002).  Yet the owners of the *Exxon Valdez* were not held liable for the increased costs associated with greater penalties and safety standards.  Section 2737 of OPA, for instance, prohibits vessels that have spilled more than one-million gallons of oil from operating in Prince William Sound.  But though the *Exxon Valdez* spill was a but-for cause of that new restriction, no claim for damages was ever brought against the *Exxon Valdez* because the new restriction is a public policy that serves the public interest.  *See SeaRiver*, 309 F.3d at 666 (noting "legitimate purpose of protecting the Sound's environment from future oil spills").  Similarly, because the *Valdez* was single-hulled and therefore more vulnerable, OPA required all tankers operating in the United States to be double-hulled by 2015.  46 U.S.C. § 3703a.  Yet such increased costs are not compensable in damages, even though this safety measure (1) was a but-for result of the conduct of the *Exxon Valdez* and (2) caused lost profits to other parties.

The government's restrictions on deepwater drilling were implemented with the express purpose of avoiding future accidents and imposing new safety measures — just like the double-hull requirement.  It is inconsistent with the public interest to treat such safety measures as social harms compensable in damages.  Thus, it is unremarkable that OPA does not do so.

## CONCLUSION

For the foregoing reasons, this Court should dismiss for failure to state an OPA claim all OPA Test Trial Plaintiffs' claims for economic losses resulting from the moratoria/permitoria.

Dated: December 16, 2015

*/s/ Don K. Haycraft*
Don K. Haycraft (Bar #14361)
LISKOW & LEWIS
701 Poydras Street, Suite 5000
New Orleans, LA
Telephone:  (504) 581-7979

Emily Johnson Henn
COVINGTON & BURLING LLP
333 Twin Dolphin Drive, Suite 700
Redwood Shores, CA 94065-1418
Telephone:  (650) 632-4715

Neil K. Roman
COVINGTON & BURLING LLP
The New York Times Building
620 Eighth Avenue
New York, NY 10018-1405
Telephone: (212) 841-1221

Respectfully submitted,

Richard C. Godfrey, P.C.
J. Andrew Langan, P.C.
Matthew T. Regan, P.C.
KIRKLAND & ELLIS LLP
300 North LaSalle Street
Chicago, IL 60654
Telephone: (312) 862-2200

Robert C. "Mike" Brock
Jeffrey Bossert Clark
KIRKLAND & ELLIS LLP
Washington, DC 20005
Telephone: (202) 879-5000

Steven J. Menashi
KIRKLAND & ELLIS LLP
601 Lexington Avenue
New York, NY 10022
Telephone: (212) 446-4800

Martin R. Boles
KIRKLAND & ELLIS LLP
333 South Hope Street
Los Angeles, CA 90071
Telephone:  (213) 680-1400

Christopher W. Keegan
KIRKLAND & ELLIS LLP
555 California Street
San Francisco, CA 94104
Telephone:  (414) 439-1400

*Attorneys for Defendant BP Exploration &*
*Production Inc.*

**<u>CERTIFICATION OF SERVICE</u>**

I hereby certify that the above and foregoing pleading has been served on All Counsel by electronically uploading the same to Lexis Nexis File & Serve in accordance with Pretrial Order No. 12, and that the foregoing was electronically filed with the Clerk of Court of the United States District Court for the Eastern District of Louisiana by using the CM/ECF System, which will send a notice of electronic filing in accordance with the procedures established in MDL2179, on this 16th day of December 2015.

<u>/s/ Don K. Haycraft</u>
Don K. Haycraft