# UNITED STATES DISTRICT COURT
## FOR THE EASTERN DISTRICT OF LOUISIANA

| | | |
|---|---|---|
| In re: Oil Spill by the Oil Rig | * | MDL No. 2179 |
| "Deepwater Horizon" in the Gulf | * | |
| Of Mexico, on April 20, 2010 | * | SECTION J |
| | * | |
| This Filing Applies to: | * | JUDGE BARBIER |
| | * | |
| Nos. 13-706, 13-810, | * | MAGISTRATE JUDGE |
| 13-1143, 13-1185, 13-1222, | * | SHUSAN |
| 13-1386 and 13-2006 | * | |
| | * | |

* * * * * * * * * * * * * * * * * * * * * * * * *

## OPPOSITION TO
## BP'S RENEWED MOTION TO DISMISS THE SO-CALLED
## "MORATORIA" AND "PERMITORIA" CLAIMS

The OPA Causation Test Case Plaintiffs, by and through the Plaintiffs' Steering Committee, respectfully submit the following memorandum in opposition to BP's Renewed Motion to Dismiss so-called "Moratoria" or "Permitoria" Claims [Rec. Doc. 15663]:

MAY IT PLEASE THE COURT:

# TABLE OF CONTENTS

Table of Contents   .   .   .   .   .   .   .   .   .   .   2

Table of Authorities   .   .   .   .   .   .   .   .   .   4

The OPA Test Case Plaintiffs' Damages Were Caused by the Macondo Spill   .   8

      OPA Does Not Impose either a "Direct" or "Foreseeable" or "Proximate"
      Cause Requirement   .   .   .   .   .   .   .   .   9

      Nevertheless:

      The Discharge of Oil and the Damages to Natural Resources and Other
      Property Arising therefrom was Massive and Unprecedented   .   .   10

      A Shutdown in Drilling by the Government was Direct and Foreseeable   .   11

      One of the Expressly Stated Bases of the Moratorium Was the Ongoing and
      Continuing Damages and Substantial Threats of Damages to Natural
      Resources and Other Property Posed by the Macondo Discharge   .   .   13

      Even under a "Proximate" Cause Standard, the Law Does Not Require that
      the Responsible Party, the Incident, or the Damages and/or Substantial Threats
      of Damage to Natural Resources be the Sole, Exclusive or Only Cause   .   14

      The Responsible Party, the Incident, and the Damages and/or Substantial
      Threats of Damage to Natural Resources were Certainly Substantial
      Factors in Bringing About the Moratorium, the Permitorium and the
      Economic Losses Suffered by Plaintiffs   .   .   .   .   .   15

      Under BP's Proffered Interpretation of the Statute, Large Swaths of Economic
      Losses that were Clearly Intended to be Compensated under OPA would
      Arguably be Denied Recovery Based on Additional Contributing Causative
      Decisions and/or Factors   .   .   .   .   .   .   .   17

The OPA Test Case Plaintiffs Are Not Required to Allege or Establish that the
Moratoria or Permitoria Qualify as OPA "Incidents".   .   .   .   .   20

The Economic Losses Suffered by the OPA Test Case Plaintiffs "Resulted From" the
Discharge of Oil   .   .   .   .   .   .   .   .   .   20

The Economic Losses Suffered by the OPA Test Case Plaintiffs Were "Due To"
the Ongoing and Continuing Damages and Substantial Threats of Further Damage to
Natural Resources and/or other Property    .    .    .    .    .    .    23

Unlike the Relatively Minor Incidents at Issue in the *Taira Lynn* and *Gatlin Oil*
Cases Relied Upon by BP, the Macondo Discharge Triggered the Authority and
Responsibility of the Government to Take Action under the Clean Water Act
and the OCSLA    .    .    .    .    .    .    .    .    24

The Coast Guard Rulings upon Which BP Relies Have No Precedential Weight
or Authority    .    .    .    .    .    .    .    .    27

The *Hornbeck* and *Ensco* Decisions Underscore the Causal Nexus Between the
Macondo Discharge and the Moratoria / Permitoria    .    .    .    .    28

Other Caselaw Establishes a Responsible Party's Liability for Damages Caused by
Governmental Action or Inaction in Response to a Spill    .    .    .    29

BP's Policy-based Proximate Cause Arguments Are Simply an Attempt to Recast a
Superseding Cause Defense    .    .    .    .    .    .    30

Conclusion    .    .    .    .    .    .    .    .    .    .    33

Certificate of Service .    .    .    .    .    .    .    .    .    35

Addenda

    A. OPA Legislative History

    B. Notices to Mariners

Other Exhibits

1. Congressional Research Service, Outer Continental Shelf Moratoria on Oil and Gas
   Development (May 6, 2011)

2. Mackay Depo Testimony (July 16, 2011), pp.34-38.

3. BP Risk Framework – Business Impact Levels (Oct 2009) [TREX 2245, p.4]

4. BP Major Hazard Risk Summary (Oct 2009) [TREX-4164]

5. BP Guidance on Practice for Major Hazard and Risk Register Development
   (March 2010) [TREX-2701, p.39]

6. Suttles Depo Testimony (May 19, 2011), p.361.

7. Hayward Depo Testimony (June 6-8, 2011), pp.318-319, 511.

**TABLE OF AUTHORITIES**

**Page(s)**

Blue Shield of Virginia v. McCready, 457 U.S. 465, 477 n.13 (1982)   .   .   19

Century Exploration of New Orleans v. United States, 745 F.3d 1168 (Fed. Cir. 2014)   16, 21

Christensen v. Harris County, 529 U.S. 576 (2000)   .   .   .   .   .   28

In re: Deepwater Horizon, 808 F.Supp.2d 943 (E.D.La. 2011)   .   .   .   18

Donaghey v. Ocean Drilling & Exploration Co., 974 F.2d 646 (5th Cir. 1992)   .   30-31

Dunham-Price Group LLC v. Citgo Petroleum Corp., No.07-1019, 2010 WL 1285446
     (W.D.La. March 31, 2010)   .   .   .   .   .   .   .   .   12, 29

Ensco Offshore v. Salazar, 786 F.Supp.2d 1151 (E.D.La. 2011)   .   .   .   29

Ensco Offshore v. Salazar, 781 F.Supp.2d 332 (E.D.La. 2011)   .   .   .   16, 28

Ensco Offshore v. Salazar, No.10-1941, 2011 WL 1790838 (E.D.La. May 10, 2011)   16, 21, 28

Ensco Offshore v. Salazar, No.10-1941, 2011 WL 121936 (E.D.La. Jan. 13, 2011)   16, 21, 28

Ensco Offshore v. Salazar, No.10-1941, 2010 WL 4116892 (E.D.La. Oct. 19, 2010)   29

FGDI, LLC v. M/V Lorelay, 193 Fed.Appx. 853 (11th Cir. 2006)   .   .   .   12, 29

Gatlin Oil Co. v. United States, 169 F.3d 207 (4th Cir. 1999)   .   .   .   22, 26, 28

Gonzales v. Oregon, 546 U.S. 243 (2006)   .   .   .   .   .   .   27

Hornbeck Offshore Serv. v. Salazar, 713 F.3d 787 (5th Cir. 2013)   .   .   16, 21, 28

La. ex. rel. Guste v. M/V TESTBANK, 752 F.2d 1019, 1050 (5th Cir. 1985)
     (Wisdom, J., dissenting)   .   .   .   .   .   .   .   .   30

Lanasa Fruit Steamship & Importing Co. v. Universal Ins. Co. 302 U.S. 556 (1938)   24

Lexmark Int'l, Inc. v. Static Control Components, Inc., 134 S.Ct. 1377 (2014)   .   19

Nguyen v. American Commercial Lines, Inc., 805 F.3d 134 (5th Cir. 2015) .   .   27

Sekco Energy v. M/V Margaret Chouest, 820 F.Supp. 1008 (E.D.La. 1993)   .   12, 30

Sekco Energy v. M/V Margaret Chouest, 1993 WL 322942
    (E.D.La. Aug. 13, 1993)   .   .   .   .   .   .   .   12, 30

In re Settoon Towing, No.07-1263, 2009 WL 4730969 (E.D.La. Dec. 4, 2009)   .   12, 29

Sun Oil Co. v. United States, 572 F.2d 786 (Ct. Claims 1978)   .   .   .   11, 12

Staub v. Proctor Hosp., 562 U.S. 411 (2011) .   .   .   .   .   .   19, 31

Taira Lynn v. Jays Seafood Inc., 444 F.3d 371 (5th Cir. 2006)   .   .   .   21-22, 26

United States v. Coastal States Crude Gathering Co., 643 F.2d 1125
    (5th Cir. Unit A April 1981)   .   .   .   .   .   .   .   32

United States v. Marathon Pipe Line Co., 589 F.2d 1305 (7th Cir. 1978)   .   .   32

United States v. Mead Corp., 533 U.S. 218 (2001)   .   .   .   .   .   27-28

The Clean Water Act (CWA), 33 U.S.C. §§1251, et seq.

    33 U.S.C. §1321(b)(1)   .   .   .   .   .   .   .   32

    33 U.S.C. §1321(c)   .   .   .   .   .   .   .   .   10, 24, 31

    33 U.S.C. §1321(c)(2)(A)   .   .   .   .   .   .   .   25

    33 U.S.C. §1321(d)   .   .   .   .   .   .   .   24

    40 C.F.R. ¶300.5   .   .   .   .   .   .   .   14

The Oil Pollution Act of 1990 (OPA), 33 U.S.C. §§2701, et seq.

    33 U.S.C. §2701(14)   .   .   .   .   .   .   .   20

    33 U.S.C. §2702(a)   .   .   .   .   .   .   .   8, 20, 31

    33 U.S.C. §2702(b)(1)(A)   .   .   .   .   .   .   24, 31

    33 U.S.C. §2702(b)(2)(E)   .   .   .   .   .   .   8, 9

Outer Continental Shelf Lands Act (OCSLA), 43 U.S.C. §§1331, et seq.

    43 U.S.C. §1334(a)   .   .   .   .   .   .   .   10, 25

    43 U.S.C. §1334(a)(1).   .   .   .   .   .   .   25

    43 U.S.C. §1334(a)(2)(A)   .   .   .   .   .   .   25

RESTATEMENT (THIRD) OF TORTS: PHYS. & EMOT. HARM §29, cmt. b (2010)     .     19

RESTATEMENT (SECOND) OF TORTS §442     .     .     .     .     30-31

Goldberg, *Liability for Economic Loss in Connection with the Deepwater Horizon Spill,* 30 MISS. C. L. REV. 335 (2011)     .     .     13, 18, 19, 23-24, 30

Goldberg, *OPA and Economic Loss: A Reply to Professor Robertson,* 30 MISS. C. L. REV. 203 (2011)     .     .     .     .     .     22

David W. Robertson, *Criteria for Recovery of Economic Loss under the Oil Pollution Act of 1990,* 7 TEX. J. OIL GAS ENERGY 241 (2012)     .     .     23

Department of the Interior, INCREASED SAFETY MEASURES FOR ENERGY DEVELOPMENT ON THE OUTER CONTINENTAL SHELF (May 27, 2010) [Rec. Doc. 15655-2]   .     15, 24

Department of Interior, MMS, NATIONAL NOTICE TO LESSEES AND OPERATORS: *Increased Safety Measures for Energy Development on the OCS,* NTL No. 2010-N05 (June 8, 2010) [Rec. Doc. 156552-3]     .     .     .     16, 21

Department of Interior, BOEMRE, NATIONAL NOTICE TO LESSEES AND OPERATORS: *Information Required for Exploration Plans, Development and Production Plans, and Development Operations coordination documents,* NTL No. 2010-N06 (June 18, 2010) [Rec. Doc. 156552-4]   .     .     16, 21

Secretary of the Interior, DECISION MEMORANDUM RE THE SUSPENSION OF CERTAIN OFFSHORE PERMITTING AND DRILLING ACTIVITIES ON THE OUTER CONTINENTAL SHELF (July 12, 2010) [Rec. Doc. 156552-5] .     .     13, 15, 17, 21, 23

STATEMENT OF JAMES WATSON, DIRECTOR OF BUREAU OF SAFETY AND ENVIRONMENTAL ENFORCEMENT, TO THE COMMITTEE ON APPROPRIATIONS, SUBCOMMITTEE ON INTERIOR, ENVIRONMENT AND RELATED AGENCIES, HOUSE OF REPRESENTATIVES (March 7, 2012) [Rec. Doc. 156552-6]     .     16-17

Congressional Research Service, OUTER CONTINENTAL SHELF MORATORIA ON OIL AND GAS DEVELOPMENT (May 6, 2011) [Exhibit 1]   .     .     .     .     11

FINDINGS AND CONCLUSIONS – PENALTY PHASE [Rec. Doc. 15606] (Nov. 30, 2015), pp.9-11, ¶¶31-42     .     .     .     .     10, 14, 21, 23, 32

BP PROPOSED PHASE TWO FINDINGS [Rec. Doc. 12047] (Dec. 20, 2013), pp.463-467, ¶¶1966-1976     .     .     .     .     .     30-31

BP OPPOSITION TO PLAINTIFFS' MOTION TO STRIKE AFFIRMATIVE DEFENSES [Rec. Doc. 13269] (Aug. 8, 2014)     .     .     .     .     .     27

UNITED STATES' STATEMENT IN SUPPORT OF PLAINTIFFS' MOTION TO STRIKE
[Rec. Doc. 13208] (July 29, 2014), p.2 fn.2   .        .        .        .        .     17, 21, 23

OMNIBUS MEMO IN OPPOSITION TO MOTIONS TO DISMISS B1 BUNDLE FIRST
AMENDED MASTER COMPLAINT (March 30, 2011) [Rec. Doc. 1821], pp.66-74      .      9, 19

MEMO IN SUPPORT OF RENEWED MOTION TO STRIKE AFFIRMATIVE DEFENSES
(Dec. 14, 2015) [Rec. Doc. 15655-1] .        .        .        .        .        .     9, 14, 19, 31

## THE OPA TEST CASE PLAINTIFFS' DAMAGES WERE CAUSED BY THE MACONDO SPILL

Each and all of the OPA Test Case Plaintiffs suffered a loss of profit and/or impairment of earning capacity due to a substantial threat of and/or injury, destruction or loss to real property, personal property and/or natural resources as a result of the Macondo Spill, as required by 33 U.S.C. §§ 2702(a) and 2702(b)(2)(E).

OPA does not require the plaintiffs to establish that the Government response to the spill was either "mandatory" or "unavoidable".[1]  Nor does OPA require the plaintiffs to establish that BP's conduct or the Macondo discharge was the "proximate" cause of plaintiffs' damages or loss.[2]  Nor does OPA even require that either the response by the Government or the ultimate damages to the plaintiffs be "foreseeable".[3]

Nevertheless, it cannot be reasonably disputed that at least some regulatory response to an incident the size and scope of the Macondo Spill would have occurred.  Indeed, the executive branch is compelled, under both the Clean Water Act and the Outer Continental Shelf Lands Act to remove the discharge, to mitigate and prevent the threat of discharge, to provide for the conservation of natural resources, and to suspend activities where there is a threat of serious, immediate or irreparable harm.  There had been a long history of closures, suspensions, and shut-downs, of varying scope and duration, in response to numerous prior incidents – including incidents that occurred while the Oil Pollution Act was being considered and enacted by Congress.  BP's own Risk Review documents predicted regulatory and licensing changes by the government, including particularly the U.S. Government, in the event of a major incident.  Given

---

[1] *See* BP Brief in Support of Renewed Motion to Dismiss [Rec. Doc. 15663-1], at p.1.

[2] *See* BP Brief, pp.18-22.

[3] *See* BP Brief, p.22.

the magnitude of the unprecedented Macondo Spill, it was not only foreseeable, but almost a certainty, that at least some suspension of drilling activities in the region would occur.

Unlike the relatively limited discharges at issue in the *Taira Lynn* and *Gatlin Oil* cases, the Macondo Spill was an unprecedented incident, which posed actual and substantial threats and damages to natural resources and other property throughout the Gulf of Mexico, and triggered the authority and responsibility of the United States Government to remove the discharge and to mitigate damage to public safety, private property, and the environment, under both the Clean Water Act and the OCLSA.

If required, the plaintiffs could likely prove that the discharge of oil from the Macondo Well was a direct, foreseeable and proximate cause of their losses.  It may not have been the sole or exclusive cause of such damages.  And the OPA statute does not require that either the Responsible Party or the Spill be a "direct", "foreseeable" or "proximate" cause.  (Indeed, the OPA statute was clearly and expressly enacted to remove those and other barriers to traditional recovery under the general maritime law.)  But, however viewed, the Macondo Oil Spill *caused* the damages at issue in these OPA Test Cases.

*OPA Does Not Impose either a "Direct" or "Foreseeable" or "Proximate" Cause Requirement*

As extensively briefed in Plaintiffs' MEMO IN SUPPORT OF RENEWED MOTION TO STRIKE AFFIRMATIVE DEFENSES[4] as well as Plaintiffs' OMNIBUS MEMO IN OPPOSITION TO MOTIONS TO DISMISS B1 BUNDLE FIRST AMENDED MASTER COMPLAINT at pp.66-74,[5]  OPA does not impose either a "direct" or "foreseeable" or "proximate" cause requirement with respect to the economic losses owed by the Responsible Party under 33 U.S.C. §2702(b)(2)(E).[6]

---

[4] Rec. Doc. 15655-1.

[5] Rec. Doc. 1821, at 67-75.

[6] *See also, generally*: OPA LEGISLATIVE HISTORY (submitted herewith as Addendum A).

*The Discharge of Oil and the Damages to Natural Resources and Other Property Arising therefrom was Massive and Unprecedented*

As the Court has already found, based on an extensive body of evidence, after fifteen weeks of trial, in three phases, the Macondo incident:

- was the largest oil spill in American waters;

- was the first and only "spill of national significance" under the National contingency plan;

- released 3.19 million barrels of oil into Gulf waters;

- oiled between 45,000 and 68,000 square miles of surface waters;

- visibly oiled approximately 1,100 miles of coastline;

- caused actual harm to living organisms;

- resulted in the closure of 88,552 square miles of fishing grounds; and

- necessitated a response that was unprecedented in size and complexity.[7]

The incident triggered the Government's responsibility and authority to prevent, stop, mitigate, and otherwise respond to discharges creating a substantial threat to the public health and welfare of the United States, including fish, shellfish, wildlife, shorelines, beaches, and other natural resources, under both the Clean Water Act ("CWA"), 33 U.S.C. §1321(c), and the Outer Continental Shelf Lands Act ("OCSLA"), 43 U.S.C. §1334(a).

The spill also directly interfered with the ability of offshore oil and gas exploration companies, suppliers, and other service providers to access certain waters for ongoing and/or potential projects.[8]

---

[7] FINDINGS AND CONCLUSIONS – PENALTY PHASE [Rec. Doc. 15606] (Nov. 30, 2015) pp.9-11 ¶¶31-42.

[8] *See generally* NOTICES TO MARINERS (submitted herewith as Addendum B).

Both the direct effects of the oil and the foreseeable prevention of access to both navigable waterways and the outer continental shelf itself constitute a loss of natural resources as contemplated by OPA.

### A Shutdown in Drilling by the Government was Direct and Foreseeable

It is almost impossible to imagine that there would not have been at least some Governmental shut-down, slow-down or other change in the wake of such a massive, destructive and long-running uncontrolled discharge of oil.  While BP and others have questioned the appropriate extent, scope and/or administrative procedures associated with the specific deepwater moratoria and associated permitting changes that occurred, some action by the Government was not only foreseeable, but, as a practical matter, almost certain.

Both legislative and executive drilling "moratoria" have been enacted every year from 1982 through 2008.[9]  After the 1969 Santa Barbara spill, there was a temporary shut-down, and associated regulatory changes.[10]   After the *Exxon Valdez* spill, the Port of Valdez was temporarily closed;  the Trans-Alaska Pipeline System was temporarily shut down;  and President Bush issued a moratorium on offshore drilling covering Bristol Bay, Alaska, parts of California, Oregon, the eastern Gulf of Mexico, southern Florida, and the North Atlantic states.[11] A moratorium was imposed after the *Ocean Odyssey* blowout in the North Sea in 1988.[12]   In 1990, the U.S. Coast Guard closed the Santa Barbara shipping channel in response to the *American Trader* spill off Huntington Beach.[13]   Similarly, the MMS ordered a platform in the

---

[9]   Congressional Research Service, OUTER CONTINENTAL SHELF MORATORIA ON OIL AND GAS DEVELOPMENT (May 6, 2011) (submitted herewith as Exhibit 1), at p.2.

[10]   *See, e.g.,* Sun Oil Co. v. United States, 572 F.2d 786 (Ct. Claims 1978).

[11]   *See* OPA LEGISLATIVE HISTORY [Addendum A], at pp.8-9.

[12]   ANDREW MACKAY DEPO. pp.34-38, (submitted herewith as Exhibit 2).

[13]   *See* OPA LEGISLATIVE HISTORY, pp.8-9.

Gulf to be shut in, subject to inspection, following a spill in 1991;[14] the Coast Guard closed the area surrounding a spill in the port of Mobile in 2002;[15] the Gulf Intracoastal Waterway was closed following an oil spill in 2007;[16] and the Calcasieu River was closed that same year due to a different spill.[17] These spills were much smaller than the Macondo disaster. Given the size and scope of the discharge, it was not only eminently foreseeable, but "the legal obligation of the Secretary"[18] to suspend drilling activity on at least some basis, in order to evaluate the policies and practices that may have led to the blowout, to assess the ongoing and potential effects of hydrocarbons in the water, and to evaluate the availability of and potential need for assets tied up in the response.

Indeed, BP's own internal Risk Reviews identified the potential consequences of a blowout as the loss of a license or permit to operate, "the intervention of a major government, such as the United States,"[19] effect on "international regulation,"[20] and "likely to lead to change of regulations on a national level."[21] BP imposed a moratorium on its own drilling operations after the spill.[22] And BP's own CEO, Tony Hayward, testified that the moratorium was "not an unreasonable thing to have done."[23]

---

[14] *See* Sekco Energy v. M/V Margaret Chouest, 820 F.Supp. 1008 (E.D.La. 1993) (*later proceeding* Sekco Energy v. M/V Margaret Chouest, 1993 WL 322942 (E.D.La. Aug. 13, 1993)).

[15] *See* FGDI, LLC v. M/V Lorelay, 193 Fed.Appx. 853 (11th Cir. 2006).

[16] *See* In re Settoon Towing, No.07-1263, 2009 WL 4730969 (E.D.La. Dec. 4, 2009).

[17] *See* Dunham-Price Group LLC v. Citgo Petroleum Corp., No.07-1019, 2010 WL 1285446 (W.D.La. March 31, 2010).

[18] Sun Oil, 572 F.2d at 804.

[19] BP Risk Framework – Business Impact Levels (Oct 2009) [TREX 2245, p.4] (submitted herewith as Exhibit 3).

[20] BP Major Hazard Risk Summary (Oct 2009) [TREX-4164] (submitted herewith as Exhibit 4).

[21] BP Major Hazard Risk Summary; *and* BP Guidance on Practice for Major Hazard and Risk Register Development (March 2010) [TREX-2701, p.39] (submitted herewith as Exhibit 5).

[22] *See, e.g.,* SUTTLES DEPO, p.361 (submitted herewith as Exhibit 6).

[23] HAYWARD DEPO, pp.318-319, 511 (submitted herewith as Exhibit 7).

BP now argues that one can imagine a different Administration not implementing "similar" moratoria in the wake of a Macondo-like disaster.[24]  Perhaps.  But that is not the legal or factual question under OPA.  And, particularly given the size and duration of the spill, it seems impossible to imagine *any* Administration not implementing *some* moratorium, and making at least *some* permitting and/or other regulatory changes.

Even assuming, *arguendo,* that the scope or duration of the moratorium and associated permitting changes were "unreasonable" or "unforeseeable" or even "illegal", wouldn't BP still be liable to the extent that the Government's response was reasonable, lawful, and foreseeable?  Indeed, where a spill causes or contributes to an economic loss, in whole or in part, doesn't OPA render the Responsible Party liable for 100% of that loss, without any quantification or reduction with respect to the contributing "fault" of an immune, absent, or other third party?

*One of the Expressly Stated Bases of the Moratorium Was the Ongoing and Continuing Damages and Substantial Threats of Damages to Natural Resources and Other Property Posed by the Macondo Discharge*

Putting aside the question of whether the moratoria themselves constitute the "injury, destruction, or loss" of natural resources for OPA purposes,[25] BP completely ignores the fact that the Third Key Reason for the formal Deepwater Moratorium was that assets and resources necessary for containment were all tied up responding to the ongoing and continuing destruction of natural resources and other property arising from the Macondo Spill.[26]  BOEMRE's 30(b)(6) Representative confirmed that the moratorium was due, in part, to the massive response effort.[27]

---

[24] BP's Brief, p.21.

[25] *See, e.g.,* Goldberg, *Liability for Economic Loss in Connection with the Deepwater Horizon Spill,* 30 Miss. C. L. Rev. 335, 353 n.40 (2011).

[26] Decision Memorandum [Rec. Doc. 156552-5] pp. 4-5, 14-16.

[27] Herbst Depo, pp.260-262, 351-353 (and TREX-9096) [Rec. Doc. 15655-7].

And BP itself acknowledged as much, by voluntarily suspending its own drilling operations in the Gulf so that the rigs could be deployed to assist with the response effort.[28]

But even absent these express recognitions, can anyone doubt that the magnitude of damage and threats to natural resources and other property emanating from the Macondo Spill was a substantial factor in prompting the moratoria and shaping the scope and extent of both the moratoria and the associated permitting changes?

As noted by the Court, this was the first and only spill to be declared a "spill of national significance" under the National Contingency Plan, "meaning that it was 'so complex that it require[d] extraordinary coordination of federal, state, local, and responsible party resources to contain and clean up the discharge.'"[29]  The response was "unprecedented in its size and complexity," involving 90 different organizations, 90,000 response workers, and 6,300 vessels.[30]

*Even under a "Proximate" Cause Standard, the Law Does Not Require that the Responsible Party, the Incident, or the Damages and/or Substantial Threats of Damage to Natural Resources be the Sole, Exclusive or Only Cause*

As set forth in Plaintiffs' MEMO IN SUPPORT OF RENEWED MOTION TO STRIKE AFFIRMATIVE DEFENSES at pp.23-27, the law recognizes that multiple factual and legal "proximate" causes frequently combine to bring about a given consequence or harm.[31]

BP's entire Motion is based on the fallacy that Plaintiffs' damages must have been caused by either the Macondo Spill, or Government action, but not both.[32]

---

[28] SUTTLES DEPO, p.361 [Exhibit 6].

[29] PENALTY PHASE FINDINGS AND CONCLUSIONS, p.10, ¶38 (*quoting* 40 C.F.R. ¶300.5).

[30] PENALTY PHASE FINDINGS AND CONCLUSIONS, pp.10-11, ¶¶37-41.

[31] *See* REC. DOC. 15655-1, at 23-27.

[32] And/or the similar fallacy that the Moratorium must have been motivated by either the damages caused by the Macondo Spill, or the prevention of potential other future spills, but not both.

Whether viewed under OPA's "due to" and "arising from" standard, or OCSLA's "substantial nexus" standard, or the common law general maritime "substantial factor" test, the discharge of oil from the Macondo Well was an OPA "incident" which caused massive damage and substantial threats of further damage to natural resources and other property;  which was, among other considerations, a substantial factor in the existence, nature and scope of the moratoria and associated permitting changes;  which were, perhaps among other factors, a substantial cause of the economic losses suffered by the OPA Test Case Plaintiffs.[33]

*The Responsible Party, the Incident, and the Damages and/or Substantial Threats of Damage to Natural Resources Were Certainly Substantial Factors in Bringing About the Moratorium, the Permitorium and the Economic Losses Suffered by Plaintiffs*

In addition to the Third Key Reason for the Moratorium,[34] and the other authority and evidence cited above, it is almost beyond dispute that the moratoria and associated permitting changes were due to, arising from, and otherwise caused by the discharge of oil from the Macondo Well and the associated damages and substantial threats of further damage to natural resources and other property:

- "Immediately following the BP Oil Spill, the MMS and the U.S. Coast Guard issued a joint Safety Alert to compel operators and drilling contractors to inspect their drilling equipment (both surface and subsea), review their procedures to ensure the safety of personnel and protection of the environment, and review all emergency shutdown and dynamic positioning procedures."[35]

---

[33] BP incorrectly suggests that "Plaintiffs do not contend that their economic losses flowed from the inability to utilize property or natural resources that was oiled." BP BRIEF, p.17.  As Plaintiffs previously noted: "some of the OPA Test Case Plaintiffs suffered damages that were caused solely by the Spill, and would have occurred irrespective of any regulatory action or inaction on the part of the U.S."  And: "some of the damages suffered by the OPA Test Case Plaintiffs were caused by the physical presence and/or substantial threat of oil, clean-up or response activities, and/or other effects of the Macondo / *Deepwater Horizon* Incident having nothing to do with the formal action or inaction of the U.S. Government." MEMO IN SUPPORT OF RENEWED MOT TO STRIKE DEFENSES, p.11 fn.4 *and* p.15 fn.16.  *See also, generally*: NOTICES TO MARINERS [Addendum B].

[34] *See* DECISION MEMORANDUM [Rec. Doc. 156552-5] pp. 4-5, 14-16.

[35] INCREASED SAFETY MEASURES FOR ENERGY DEVELOPMENT ON THE OCS (May 27, 2010) [Rec. Doc. 15655-2]  p.26.

- "The President requested that the Department of the Interior develop this report *as a result of* the Deepwater Horizon incident on April 20, 2010."[36]

- "*Due to* the explosion and sinking of the Deepwater Horizon, the resulting deaths of 11 people, and changing conditions caused by the blowout of the BP Macondo prospect well that was being drilled by the Deepwater Horizon, the BOEM requires additional information concerning your planned activities."[37]

- "*As a result of* the [Macondo] spill, the government imposed new regulatory requirements."[38]

- "This case arises from the 2010 Deepwater Horizon accident in the Gulf of Mexico…. At Presidential direction, those events prompted the Department of the Interior to prohibit all new and existing oil and gas drilling operations on the Outer Continental Shelf for six months…."[39]

- "the government's administrative decisions arising out of the disastrous Deepwater Horizon oil spill suspended deepwater drilling in the Gulf of Mexico"[40]

- "After Deepwater Horizon's explosion and the catastrophic oil spill that followed, the Secretary of Interior twice in succession imposed a blanket moratorium on deepwater drilling in the Gulf of Mexico"[41]

- *Ensco* is "the second lawsuit that arises from the government's response to the appallingly catastrophic BP oil spill in the Gulf of Mexico"[42]

- The Bureau of Safety and Environmental Enforcement refers to "reform efforts begun in the aftermath of the *Deepwater Horizon* tragedy"; "enhanced safety standards put in place after the *Deepwater Horizon* explosion and oil spill"; and "the Interim Drilling Safety rule, which was issued shortly after the *Deepwater Horizon* spill"; and observing that "the permitting environment is completely different now than it was before Deepwater Horizon. Comparing the pace of permitting pre- and post-

---

[36] NTL No. 2010-N05 (June 8, 2010) [Rec. Doc. 15655-3]  p.1.

[37] NTL No. 2010-N06 (June 18, 2010) [Rec. Doc. 15655-4]  p.2.

[38] Century Exploration of New Orleans v. United States, 745 F.3d 1168, 1170 (Fed. Cir. 2014).

[39] Hornbeck Offshore Serv. v. Salazar, 713 F.3d 787, 789 (5th Cir. 2013).

[40] Ensco Offshore v. Salazar, No.10-1941, 2011 WL 1790838 at *1 (E.D.La. May 10, 2011).

[41] Ensco Offshore v. Salazar, 781 F.Supp.2d 332, 333 (E.D.La. 2011);  *see also* 333 n.2  ("permitting for shallow water drilling also has suffered delays").

[42] Ensco Offshore v. Salazar, No.10-1941, 2011 WL 121936 at *1 (E.D.La. Jan. 13, 2011).

Deepwater Horizon does not consider the current realty that applications must now meet a suite of new requirements that receive extremely close scrutiny by the bureau's engineers."[43]

- "The moratorium and permitting changes, in fact, _resulted from_ BP and its co-defendants' catastrophic discharge."[44]

The fact that the moratorium may have been motivated, in part, to "facilitate an industry-wide review of drilling practices … aimed at avoiding future spills",[45] does not, as BP falsely suggests, exclude the possibility that the moratorium was _also_ motivated by the need to devote the available public and private assets and resources to the capping and containment of the discharge and spread of oil from the Macondo Well.  As a matter of plausibility under the _Iqbal/Twombly_ standard, and as a matter of fact,[46] the ongoing and continuing damages to natural resources and other property was a substantial factor in bringing about the moratoria, the permitoria, and the economic damages to the plaintiffs.[47]

_Under BP's Proffered Interpretation of the Statute, Large Swaths of Economic Losses that were Clearly Intended to be Compensated under OPA would Arguably be Denied Recovery Based on Additional Contributing Causative Decisions and/or Factors_

BP attempts to distinguish the OPA Test Case Plaintiffs from "a fisherman or beachfront property owner,"[48] and to essentially avoid responsibility for any damages that arise, in part, from "deliberate decisions" by the government in response to a spill or other discharge.

---

[43] STATEMENT OF JAMES WATSON, DIRECTOR OF BSEE (March 7, 2012) [Rec. Doc. 15655-6].

[44] UNITED STATES' STATEMENT IN SUPPORT OF PLAINTIFFS' MOTION TO STRIKE [Rec. Doc. 13208] (July 29, 2014), p.2 fn.2.

[45] BP BRIEF, p.1.

[46] _See, e.g.,_ DECISION MEMORANDUM [Rec. Doc. 156552-5] pp. 4-5, 14-16; HERBST DEPO, pp.260-262, 351-353 (and TREX-9096) [Rec. Doc. 15655-7]; SUTTLES DEPO, p.361 [Exhibit 6].

[47] And, irrespective of the motivation for such Government action, the Government action itself deprived the OPA Test Case Plaintiffs and others of the use of the Outer Continental Shelf, which can and should be considered a "loss" of natural resources under OPA.

[48] BP BRIEF, p.17.

But OPA was clearly enacted to expand the scope of responsibility beyond commercial fishermen and beachfront property owners, who would have been entitled to recover under the traditional maritime *Robins Dry Dock* standard.  In re: Deepwater Horizon, 808 F.Supp.2d 943, 958-959 (E.D.La. 2011).  And almost all damages can be framed in such a way that they arise, at least in part, from deliberate decisions by the government or others.

For example, BP's expert, Professor Goldberg, opines that (i) the commercial fisherman deprived of access to fish because of a spill, (ii) the hotel owner who loses profits because neighboring beaches and waters that his customers tend to use are polluted, and (iii) the employee of that hotel who loses wages because of the hotel's loss of business, are "clearly" entitled to recover under OPA;  that (iv) the barge owner denied access to the river on which the barge normally operates is "probably" entitled to recover under OPA;  and that (v) the restaurant owner, (vi) the real estate agent, and (viii) the furniture store operator, while arguably not entitled to recover under OPA, nevertheless have commercial activities "very closely bound up with local economies that revolve around the use of resources and property that have been damaged," and there "is some reason to suppose that Congress, acting with the *Exxon Valdez* spill very much in mind, was especially focused on the adverse economic effects of spills on the residents of shoreline communities." Goldberg, *Liability for Economic Loss in Connection with the Deepwater Horizon Spill,* 30 MISS. C. L. REV. 335, 374-376 (2011).  Yet, taking BP's current arguments to their logical conclusion, none of these plaintiffs would arguably be entitled to recover: The Government makes deliberate decisions about which areas are closed to commercial fishermen;  tourists and other travelers ultimately decide whether they will make or cancel travel plans;  hotel operators decide whether they will lay off employees, cut hours, or reduce wages;  the Coast Guard makes deliberate decisions about whether to suspend navigation

on a river;  and different potential purchasers are motivated by numerous considerations when they decide whether, where, and at what price to buy or lease property, frequent restaurants, or obtain new furniture.

To focus solely and exclusively on the actions of the Government or would-be customers, while completely ignoring the fact that such actions and decisions are substantially influenced by the loss, destruction and significant threats to natural resources and other properties, would violate not only OPA, but traditional causation analysis. *See, e.g.,* Staub v. Proctor Hospital, 562 U.S. 411, 419-420 (2011) ("We do not think that the ultimate decisionmaker's exercise of judgment automatically renders the link to the supervisor's bias 'remote' or 'purely contingent.' ….it is common for injuries to have multiple proximate causes"); RESTATEMENT (THIRD) OF TORTS: PHYS. & EMOT. HARM §29, cmt. b (2010) ("Multiple factual causes always exist… and multiple proximate causes are often present.  An actor's tortious conduct need not be close in proximity in space or time to the plaintiff's harm to be a proximate cause").[49]

Proximate cause is a question of policy.[50]   And the extremely narrow reading of "incident", "due to", and "arising from" proffered by BP in its motion cannot be reconciled with the OPA Congress' broad and liberal intent and expression of public policy.[51]

---

[49] *See also, e.g.,* Goldberg, *Liability for Economic Loss,* 30 MISS. C. L. REV. at 354 n.41 ("The mere fact that a careless act happens to cause harm hundreds of miles away from the place of the act, or years after the act takes place, does not automatically entail the conclusion that the actor should not be held responsible").

[50] *See, e.g.,* Blue Shield of Virginia v. McCready, 457 U.S. 465, 477 n.13 (1982) (quoting *Palsgraf v. Long Island R. Co.,* 248 N.Y. 339, 351-352 (1928) (Andrews, J., dissenting)) ("'What we do mean by the word 'proximate' is, that because of convenience, of public policy, of a rough sense of justice, the law arbitrarily declines to trace a series of events beyond a certain point'").

[51] *See generally* OPPOSITION TO B1 MOTIONS TO DISMISS [Rec. Doc. 1821] pp.66-74; MEMO IN SUPPORT OF RENEWED MOT TO STRIKE AFFIRMATIVE DEFENSES [Rec. Doc. 15655-1] pp.15-18; OPA LEGISLATIVE HISTORY [Addendum A].  *See, e.g.,* Lexmark Int'l, Inc. v. Static Control Components, Inc., 134 S.Ct. 1377, 1390 (2014) ("proximate-cause analysis is controlled by the nature of the statutory cause of action"); Blue Shield v. McReady, 457 U.S. at 477 n.13 ("It bears affirming that in identifying the limits of an explicit statutory remedy, legislative intent is the controlling consideration").  *See also, e.g.,* Goldberg, *Liability for Economic Loss,* 30 MISS. C. L. REV. at 353 n.40 ("Denying recovery for economic losses resulting from threatened discharges would also exclude recovery for lost profits in situations in which Congress seems to have contemplated recovery").

## THE OPA TEST CASE PLAINTIFFS ARE NOT REQUIRED TO ALLEGE OR ESTABLISH THAT THE MORATORIA OR PERMITORIA QUALIFY AS OPA "INCIDENTS"

The question is not whether the moratoria or permitoria "qualify as an OPA 'incident' under the statute."[52]  The question is whether the plaintiffs suffered damages resulting from a discharge or "substantial threat of a discharge of oil, into or upon the navigable waters or adjoining shorelines or the exclusive economic zone." 33 U.S.C. §2702(a).  In this particular case, the Macondo blowout, explosions, fire, and spill certainly qualifies as an "incident" under the OPA statute, which is defined as "any occurrence or series of occurrences having the same origin, involving one or more vessels, facilities, or any combination thereof, resulting in the discharge or substantial threat of discharge of oil." 33 U.S.C. §2701(14).[53]  The moratoria, the permitoria, and the economic losses suffered by the OPA Test Case Plaintiffs all "result from" that Macondo "incident" and associated "discharge and substantial threat of discharge of oil."

## THE ECONOMIC LOSSES SUFFERED BY THE OPA TEST CASE PLAINTIFFS "RESULTED FROM" THE DISCHARGE OF OIL

As outlined above, there are numerous facts and evidence demonstrating that the economic losses suffered by the plaintiffs resulted,  at least in part,  from the unprecedented

---

[52] BP BRIEF, p.14.

[53] While, of course, not binding on the Court for these purposes, the *Deepwater Horizon* Incident is broadly defined by BP in the Economic & Property Damages Settlement to include not only "(i) the blowout of the MC252 WELL; (ii) the explosions and fire on board the *Deepwater Horizon* on or about April 20, 2010; (iii) the sinking of the *Deepwater Horizon* on or about April 22, 2010" and "(iv) the release of oil, other hydrocarbons and other substances from the MC252 Well and/or the *Deepwater Horizon* and its appurtenances," but also "(v) the efforts to contain the MC252 Well" and "(vi) Response Activities," which are defined to include "the clean up, remediation efforts, and all other responsive actions (including the use and handling of dispersants) relating to the releases of oil, other hydrocarbons and other pollutants from the MC252 Well and/or the *Deepwater Horizon* and its appurtenances." SETTLEMENT AGREEMENT [Rec. Doc. 6276-1], Sections 38.43 and 38.123.

discharge of Macondo oil.[54]

BP relies almost exclusively on the *Taira Lynn* and *Gatlin Oil* decisions.

As discussed more fully *infra,* these incidents were unique, and much more limited in size, scope, and duration.

The *Taira Lynn* incident was a gaseous release; there was no discharge of oil.  Assuming, *arguendo,* that OPA might be applicable, the court found that none of the plaintiffs had raised a question of fact as to whether "<u>any</u>" property damage was caused by the pollution incident, "*i.e.,* the release of gaseous cargo." BP Brief, pp.8-9; *quoting,* <u>Taira Lynn v. Jays Seafood Inc.</u>, 444 F.3d 371, 383 (5th Cir. 2006).

In this case, by contrast, it is clear that massive, significant, ongoing damage to natural resources and other property occurred.[55]

BP, moreover, relies heavily upon that portion of the *Taira Lynn* decision which addresses traditional maritime claims for physical damage under the *Robins/TESTBANK* rule.

---

[54] *See, e.g.,* <u>Century Exploration</u>, 745 F.3d at 1170 ("*As a result of* the [Macondo] spill, the government imposed new regulatory requirements") (emphasis supplied); <u>Hornbeck</u>, 713 F.3d at 789 ("This case arises from the 2010 Deepwater Horizon accident in the Gulf of Mexico…. At Presidential direction, those events prompted the Department of the Interior to prohibit all new and existing oil and gas drilling operations on the Outer Continental Shelf for six months…."); <u>Ensco</u>, 2011 WL 1790838 at *1 ("the government's administrative decisions arising out of the disastrous Deepwater Horizon oil spill suspended deepwater drilling in the Gulf of Mexico"); <u>Ensco</u>, 2011 WL 121936 at *1 (this is "the second lawsuit that arises from the government's response to the appallingly catastrophic BP oil spill in the Gulf of Mexico"); NTL No. 2010-N05 [Rec. Doc. 15655-3] p.1 ("The President requested that the Department of the Interior develop this report *as a result of* the Deepwater Horizon incident on April 20, 2010") (emphasis supplied); NTL No. 2010-N06 [Rec. Doc. 15655-4] p.2 ("*Due to* the explosion and sinking of the Deepwater Horizon, the resulting deaths of 11 people, and changing conditions caused by the blowout of the BP Macondo prospect well that was being drilled by the Deepwater Horizon, the BOEM requires additional information concerning your planned activities") (emphasis supplied); United States' Statement in Support of Plaintiffs' Motion to Strike [Rec. Doc. 13208] (July 29, 2014), p.2 fn.2 ("The moratorium and permitting changes, in fact, resulted from BP and its co-defendants' catastrophic discharge").

[55] *See, e.g.,* Penalty Phase Findings and Conclusions, pp.9-11 ¶¶31-42 (the Macondo disaster was the largest spill in American waters; 3.19 million barrels of oil entered Gulf waters; between 45,000 and 68,000 square miles of surface waters were oiled; approximately 1,100 miles of coastline were visibly oiled; 88,552 square miles of fishing grounds were closed; the response was unprecedented in size and complexity); Notices to Mariners [Addendum B]; Decision Memorandum [Rec. Doc. 15655-5] pp. 4-5, 14-16 (the Moratorium was necessary because of the assets that were tied up responding to the destruction of natural resources and other property arising from the Macondo Spill).

*See* Taira Lynn, 444 F.3d at 380 (quoted in BP's BRIEF, at p.9) ("neither of these claimants suffered *physical damage*" "*as a direct result of the allision*").

Finally, BP's own expert, Professor Goldberg, admits that *Taira Lynn* "is indeed not particularly instructive in this context."[56]

In *Gatlin Oil,* a vandal opened several above-ground storage tanks, causing an oil spill. While, apparently, a total of approximately 10 gallons managed to seep through the property dikes and into the north prong of a nearby river, virtually all of the oil appears to have been contained within the Gatlin Oil property.  Vapors from some of this oil ignited, and a fire destroyed a Gatlin warehouse, bulk plant, several vehicles, a loading dock, and other property. *See* Gatlin Oil Inc. v. U.S., 169 F.3d 207, 209 (4ᵗʰ Cir. 1999).  The U.S. Fourth Circuit Court of Appeals held that Gatlin, the OPA Responsible Party, could recover from the Oil Spill Liability Trust Fund "full compensation for loss of earnings and earning capacity caused by the necessity to carry out the directions of the federal coordinator." Gatlin Oil, 169 F.3d at 212.  The court, however, would not allow the Responsible Party to recover from the Trust Fund for its fire loss damages "because the evidence did not establish" in that case that the fire either caused or was caused by "the discharge of oil into navigable waters." Gatlin Oil, 169 F.3d at 212.  This unique and fact-specific claim, made by the OPA Responsible Party, against the Oil Spill Liability Trust Fund, for an event occurring almost exclusively on private land, could hardly be more distinguishable from the claims for economic loss asserted against the OPA Responsible Party by these Test Case Plaintiffs.

---

[56] Goldberg, *OPA and Economic Loss: A Reply to Professor Robertson,* 30 MISS. C. L. REV. 203, 215 (2011).

**THE ECONOMIC LOSSES SUFFERED BY THE OPA TEST CASE PLAINTIFFS WERE "DUE TO" THE ONGOING AND CONTINUING DAMAGES AND SUBSTANTIAL THREATS OF FURTHER DAMAGE TO NATURAL RESOURCES AND/OR OTHER PROPERTY**

As outlined above, Plaintiffs believe, allege and have presented evidence supporting the fact that the moratorium, the permitorium, and their economic losses, were all "due to" the ongoing and continuing destruction and substantial threats of further destruction to natural resources and other property.[57]

Some of these damages incurred by some of the OPA Test Case Plaintiffs was due to the inability to access existing, planned and/or potential projects, due to oil and/or a substantial threat of oil actually in the water, and would have occurred irrespective of any Government action or inaction.

Moreover, the Governmental shut-down itself can and should be considered a "loss" of natural resources. *See, e.g.,* David W. Robertson, *Criteria for Recovery of Economic Loss under the Oil Pollution Act of 1990,* 7 TEX. J. OIL GAS ENERGY 241, 250 n.61 (2012); Goldberg, *Liability for Economic Loss,* 30 MISS. C. L. REV. at 353 n.40 ("[S]uppose a threatened discharge that does not materialize were to induce authorities to close an area to commercial fishing for a month. It seems likely that OPA is intended to authorize recovery by any adversely affected fishermen. **Their lost profits, after all, would be 'due to' a (temporary) 'loss' of 'natural**

---

[57] *See, e.g.,* PENALTY PHASE FINDINGS AND CONCLUSIONS, pp.9-11 ¶¶31-42 (the Macondo disaster was the largest spill in American waters; 3.19 million barrels of oil entered Gulf waters; between 45,000 and 68,000 square miles of surface waters were oiled; approximately 1,100 miles of coastline were visibly oiled; 88,552 square miles of fishing grounds were closed; the response was unprecedented in size and complexity; it was the first and only first and only "spill of national significance" under the National Contingency Plan, meaning that it was "so complex that it require[d] extraordinary coordination of federal, state, local, and responsible party resources to contain and clean up the discharge";  it required the involvement of 90 different organizations, 90,000 response workers, and 6,300 vessels); NOTICES TO MARINERS [Addendum B]; DECISION MEMORANDUM [Rec. Doc. 15655-5] pp. 4-5, 14-16 (the Moratorium was necessary because of the assets that were tied up responding to the destruction of natural resources and other property arising from the Macondo Spill); DEPOSITION OF LARS HERBST, (BOEMRE 30(b)(6) Representative), pp.260-262, 351-353 (and TREX-9096) [Rec. Doc. 15655-7] (suspension was due, in part, to the massive response effort); SUTTLES DEPO, p.361 [Exhibit 6] (BP self-imposed its own moratorium after the spill to ensure that it had enough assets and resources to contain the discharge); UNITED STATES' STATEMENT IN SUPPORT OF PLAINTIFFS' MOTION TO STRIKE [Rec. Doc. 13208] (July 29, 2014), p.2 fn.2 ("The moratorium and permitting changes, in fact, resulted from BP and its co-defendants' catastrophic discharge").

resources' that has 'result[ed] from' a 'substantial threat of discharge of oil' into navigable waters") (emphasis supplied).

Nevertheless, the causative agents are not mutually exclusive. The Government could have been, and in fact was, motivated by _both_ the desire to prevent other future potential incidents _and_ to mitigate, contain and otherwise respond to the ongoing spill at Macondo. The lost revenues, profits and other business opportunities were due to and arising from the Macondo Spill, _and_ the resulting damages and threats to natural resources and other property, _and_ the resulting Government moratoria and permitoria.[58]

### UNLIKE THE RELATIVELY MINOR INCIDENTS AT ISSUE IN THE _TAIRA LYNN_ AND _GATLIN OIL_ CASES RELIED UPON BY BP, THE MACONDO DISCHARGE TRIGGERED THE AUTHORITY AND RESPONSIBILITY OF THE GOVERNMENT TO TAKE ACTION UNDER THE CLEAN WATER ACT AND THE OCSLA

The plain text of OPA makes the Responsible Party liable for, not only damages, but also "all removal costs incurred by the United States . . . under subsection (c), (d), (e), or (l) of section 1321 of this title. . . ." 33 U.S.C. §2702(b)(1)(A). Section 1321 is that section of the Clean Water Act which vests the Executive Branch with broad authority and responsibility to coordinate and direct all actions to "ensure effective and immediate removal of a discharge, and mitigation or prevention of a substantial threat of a discharge," and to effectuate a National Contingency Plan to coordinate action among government and private actors to "minimize damage from oil and hazardous substance discharges…." 33 U.S.C. §1321(c) and (d). Where a discharge poses a "substantial threat to the public health or welfare of the United States

---

[58] _See, e.g.,_ Lanasa Fruit Steamship & Importing Co. v. Universal Ins. Co. 302 U.S. 556, 562-563 (1938) (quoting Lord Shaw in _Leyland Shipping Company v. Norwich Union Fire Insurance Society,_ (1918) A.C. 350, 368-371) ("'To treat proxima causa as the cause which is nearest in time is out of the question. Causes are spoken of as if they were as distinct from one another as beads in a row or links in a chain, but—if this metaphysical topic has to be referred to—it is not wholly so. The chain of causation is a handy expression, but the figure is inadequate. Causation is not a chain, but a net. At each point influences, forces, events, precedent and simultaneous, meet; and the radiation from each point extends infinitely'").

(including but not limited to fish, shellfish, wildlife, other natural resources, and the public and private beaches and shorelines of the United States)," the Executive Branch is *required* to direct the cleanup and mitigation efforts in the wake of such a disaster. 33 U.S.C. § 1321(c)(2)(A).

At the same time, Congress also vested the Secretary of the Interior with authority and responsibility "for the prevention of waste and conservation of the natural resources of the outer Continental Shelf" under the OCSLA, 43 U.S.C. §1334(a). In particular, the Secretary "may at any time" make rules and regulations which "shall include" provisions "for the suspension or temporary prohibition of any operation or activity, including production, . . . if there is a threat of serious, irreparable, or immediate harm or damage to life (including fish or other aquatic life), to property, to any mineral deposits or to the marine, coastal or human environment." 43 U.S.C. §1334(a)(1).  In addition, the Secretary has the authority and responsibility to cancel any lease or permit where continued activity would probably cause serious harm or damage to life, property, or natural resources;  the threat of harm or damage will not disappear or decrease to an acceptable extent within a reasonable period;  and the advantages of cancellation outweigh the advantages of continuing such lease or permit in force. 43 U.S.C. §1334(a)(2)(A).

The Macondo incident was a "spill of national significance" under the National Contingency Plan, which clearly posed a substantial threat to the public health or welfare of the United States, including but not limited to fish, shellfish, wildlife, beaches, shorelines, and other natural resources in, on, and surrounding the outer Continental Shelf, invoking the authority and responsibility of the Government under the CWA, OPA and the OCSLA.

By contrast, the *Taira Lynn* and *Gatlin Oil* incidents were relatively minor in magnitude, scope and duration.

Indeed, *Taira Lynn* was not even a spill.  It was simply a release of noxious gas, which never implicated executive authority under the Clean Water Act or the OCSLA.  The evacuation in question was ordered by the Louisiana State Police.[59]  The court, doubtful that OPA even applied,[60] found that there was no evidence of any damage to any property or natural resources resulting from the gaseous release.[61]

In *Gatlin Oil,* a total of only 20,000 to 30,000 gallons of oil was released.[62]  Of those, only 10 gallons of oil reached a navigable waterway.[63]  Almost all of the oil, and damages in question, occurred on the Responsible Party's own property.  A Federal On-Scene Coordinator was appointed by the Coast Guard, but only to prevent the approximately 5,500 gallons of oil remaining in the Gatlin property ditches after the fire from escaping into navigable waterways.[64]  As noted above, the lawsuit involved claims by the Responsible Party against the Oil Spill Trust Fund for fire loss damage on the Responsible Party's own property.

To compare an utterly predictable, if not statutorily mandated, suspension on drilling in the Gulf, imposed during the largest spill in American history, to the modest and local responses to relatively short, minor, unique, and self-contained incidents at issue in *Gatlin Oil* and *Taira Lynn,* is not sound as a matter of either OPA statutory construction or broader public policy.

---

[59] Taira Lynn, 444 F.3d at 376.

[60] Taira Lynn, 444 F.3d at 383 ("Even assuming arguendo that OPA applies….")

[61] Taira Lynn, 444 F.3d at 383.

[62] Gatlin Oil, 169 F.3d at 209.

[63] Gatlin Oil, 169 F.3d at 209.

[64] Gatlin Oil, 169 F.3d at 209.

**THE COAST GUARD RULINGS UPON WHICH BP RELIES HAVE NO PRECEDENTIAL WEIGHT OR AUTHORITY**

The National Pollution Funds Center administered by the Coast Guard only determines whether to approve claims against the Oil Spill Liability Trust Fund.[65]  The Coast Guard is not delegated with any authority under OPA to interpret the statute or to adjudicate private claims against the Responsible Party.  As the Fifth Circuit recently held:

> ….ACL misreads the OPA by conflating the requirements for filing claims against the Fund with the requirements for presenting claims to a responsible party. The plain language of 33 U.S.C. §2713(e) makes clear that 33 C.F.R. §136.105 applies only to claims filed against the Fund and not to claims presented to responsible parties. Section 2713(e) empowers the "President [to] promulgate ... regulations for the presentation, filing, processing, settlement, and adjudication of claims under this Act *against the Fund*." 33 U.S.C. §2713(e) (emphasis added).

Nguyen v. American Commercial Lines, Inc., 805 F.3d 134, 140-141 (5th Cir. 2015).  Even if Section 2702(b)(2)(E) were arguably ambiguous with respect to so-called "Moratorium claims" against the Responsible Party, *Chevron* deference "is not accorded merely because the statute is ambiguous and an administrative official is involved….  The rule must be promulgated pursuant to authority Congress has delegated to the official." Gonzales v. Oregon, 546 U.S. 243, 258 (2006).  Here, neither the President, nor the Coast Guard, nor the National Pollution Funds Center, has been delegated such authority.

Neither the FAQ nor the NPFC decisions are Regulations that have undergone a formal notice-and-comment rulemaking process.  There is nothing in OPA which evidences a Congressional intent to explicitly or implicitly delegate authority to the Coast Guard to fill a particular gap in the statute with the force of law. *See, e.g.,* United States v. Mead Corp., 533

---

[65] As BP itself previously noted, the NPFC is motivated by a desire to protect a limited body of public funds. *See* BP OPPOSITION TO MOTION TO STRIKE (Aug. 8, 2014) [Rec. Doc. 13269] p.35 (the desire to shield "government discretionary acts from monetary damages liability is almost certainly part of what motivated the Coast Guard to declare … that it would pay no moratoria related claims under OPA").

U.S. 218 (2001) (Custom Service's "ruling letter" was not entitled to *Chevron* deference); Christensen v. Harris County, 529 U.S. 576, 587 (2000) (agency interpretations in opinion letters, policy statements, agency manuals, and enforcement guidelines do not warrant *Chevron*-style deference).

Nor is this Court confronted, (as the U.S. Fourth Circuit was confronted in *Gatlin Oil*[66]), with a direct appeal or other challenge to an agency determination or formal adjudication with regard to the specific economic loss claims of any particular OPA Test Case Plaintiff.

### THE *HORNBECK* AND *ENSCO* DECISIONS UNDERSCORE THE CAUSAL NEXUS BETWEEN THE MACONDO DISCHARGE AND THE MORATORIA / PERMITORIA

As noted above, the *Hornbeck / Ensco* decisions underscore the strength of the causal nexus between the Macondo discharge and the moratoria / permitoria. *See, e.g.,* Hornbeck, 713 F.3d at 789 ("This case arises from the 2010 Deepwater Horizon accident in the Gulf of Mexico…. At Presidential direction, those events prompted the Department of the Interior to prohibit all new and existing oil and gas drilling operations on the Outer Continental Shelf for six months…."); Ensco, 2011 WL 1790838 at *1 ("the government's administrative decisions arising out of the disastrous Deepwater Horizon oil spill suspended deepwater drilling in the Gulf of Mexico"); Ensco, 781 F.Supp.2d at 333 ("After Deepwater Horizon's explosion and the catastrophic oil spill that followed, the Secretary of Interior twice in succession imposed a blanket moratorium on deepwater drilling in the Gulf of Mexico"), *and* 333 n.2 ("permitting for shallow water drilling also has suffered delays"); Ensco, 2011 WL 121936 at *1 (this is "the second lawsuit that arises from the government's response to the appallingly catastrophic BP oil spill in the Gulf of Mexico").

---

[66] *See* Gatlin Oil, 169 F.3d at 210.

Judge Feldman agreed that "OCSLA confers broad regulatory authority and discretion upon Interior"; the limitations he ultimately imposed derived from "the procedural requirements imposed by the APA and the NEPA." Ensco Offshore v. Salazar, 786 F.Supp.2d 1151, 1160 n.9 (E.D.La. 2011); *see also* Ensco Offshore v. Salazar, No.10-1941, 2010 WL 4116892 at *5 (E.D.La. Oct. 19, 2010) ("OCSLA authorizes the government to issue the NTL-05").

Further, Judge Feldman rejected challenges to the Development Operations Coordination Document (DOCD) requirements. Ensco Offshore, 786 F.Supp.2d at 1160-1161. *See also,* ORDER & REASONS, *Ensco Offshore v. Salazar,* No.10-1941 (Nov. 3, 2010) [Rec. Doc. 129] at p.10 ("the ravages of government's bureaucracy do not equate with violations of the APA").

## OTHER CASELAW ESTABLISHES A RESPONSIBLE PARTY'S LIABILITY FOR DAMAGES CAUSED BY GOVERNMENTAL ACTION OR INACTION IN RESPONSE TO A SPILL

As set forth in Plaintiffs' Renewed Motion to Strike Affirmative Defenses, a cause of action was recognized with respect to potential "shutdown suits" alleging economic damages arising from the closure of the Gulf Intracoastal Waterway following a spill. In re Settoon Towing, No.87-1263, 2009 WL 4730969 at *4 (E.D.La. Dec. 4, 2009) (also allowing a claim for damages suffered as a result of plaintiff's inability to access its production platform while the oil spill clean-up was in progress).

In the Eleventh Circuit, a grain elevator was permitted to recover demurrage and other delay damages resulting from the Coast Guard's closure of its loading berth following an oil spill. FGDI, LLC v. M/V Lorelay, 193 Fed.Appx. 853, 855 (11th Cir. 2006).

Similarly, the owner of a concrete facility located on the Calcasieu River was able to claim economic losses under OPA that were incurred as a result of the Coast Guard's closure of the river due to an oil spill several miles away. Dunham-Price Group LLC v. Citgo Petroleum Corp., No.07-1019, 2010 WL 1285446 at **2-3 (W.D.La. March 31, 2010).

At the pleading stage, Judge Livaudais recognized a cause of action for loss of production revenues to a platform owner whose well was shut in by the MMS following a subsea release. Sekco Energy v. M/V Margaret Chouest, 820 F.Supp. 1008, 1012 (E.D.La. 1993).[67]

And, in his pre-OPA *TESTBANK* decision, Judge Wisdom would have extended the inquiry not only to those damages occasioned by the collision itself, but also to those damages occasioned by the "closure" and the "embargo". La. ex. rel. Guste v. M/V TESTBANK, 752 F.2d 1019, 1050 (5th Cir. 1985) (Wisdom, J., dissenting).

Finally, BP's own expert, Professor Goldberg, opines that barge owner denied access to the river on which the barge normally operates is "probably" entitled to recover his or her economic losses under the Oil Pollution Act. Goldberg, *Liability for Economic Loss,* 30 MISS. C. L. REV. at 374.[68]

## BP's POLICY-BASED PROXIMATE CAUSE ARGUMENTS ARE SIMPLY AN ATTEMPT TO RECAST A SUPERSEDING CAUSE DEFENSE

BP attempts to argue that the moratoria and associated permitted changes are the sole and exclusive "proximate" cause of Plaintiffs' damages based on the fact that the Government deliberately disregarded the known risk that Plaintiffs would be economically harmed.[69]   This, however, is nothing more than an attempt to recast a "superseding cause" defense.

As BP itself has acknowledged, in order to invoke the defense, BP would have to establish, not only that **(i)** the U.S. Government's reaction was unforeseeable, but also **(ii)** the intervening "fault" of the U.S. brought about harm that was different *in kind,* **(iii)** was operating

---

[67] While, after a full trial on the merits, the OPA claim was dismissed "for the reasons cited above in the proximate cause section", the case was primarily decided as a maritime negligence case under the general maritime law. *See* Sekco Energy v. M/V Margaret Chouest, 1993 WL 322942 (E.D.La. Aug. 13, 1993).

[68] *See also* Goldberg, *Liability for Economic Loss,* 30 MISS. C. L. REV. at 353 n.40.

[69] *See* BP BRIEF, p.21.

*independently* of any situation created by BP's own negligence, and **(iv)** was wrongful *toward BP.*[70]   BP cannot satisfy any of these requirements.[71]

OPA clearly contemplates that the government may act in the event of a spill and, in the case of a serious environmental disaster, that it *must* act pursuant to the CWA to address the discharge of oil and mitigate the risk and threat of the discharge.   It states that the Responsible Party for a facility from which oil is discharged "is liable for removal costs and damages specified in subsection (b) of this section *that result from* such an incident," (33 U.S.C. §2702(a)), then referencing section 1321 of Clean Water Act, (33 U.S.C. §2702(b)(1)(A)), which mandates that the Government act "to remove the discharge or mitigate or prevent the threat of the discharge" where the discharge is a "substantial threat to the public health or welfare of the United States." 33 U.S.C. §1321(c).

Accordingly, not only does OPA contemplate that the Executive Branch is required to act in response to a catastrophic spill that threatens the United States, but it plainly states that such action *results from* the incident. Under BP's proposed analysis, government action in the wake of the spill could not be said to have resulted from the spill. The plain text of OPA and the CWA clearly contradict such a notion. Government action in the wake of the spill was mandated by the CWA and that action, under the plain language of OPA, was performed as a result of the Macondo spill. Accordingly, any damages incurred by Plaintiffs as a result of the government action occurred as a result of the spill as well. After all, and even though proximate cause is not contemplated by OPA, "it is common for injuries to have multiple proximate causes." Staub, supra, 562 U.S. at 419-420.

---

[70] *See* BP Proposed Phase Two Findings [Rec. Doc. 12047] pp.463-467, ¶¶1966-1976; *citing*, Restatement (Second) of Torts §442; Donaghey v. Ocean Drilling & Exploration Co., 974 F.2d 646, 652 & n.11 (5th Cir. 1992).

[71] Nor is a superseding cause defense available to BP for all of the additional reasons set forth in Plaintiffs' Memo in Support of Renewed Motion to Strike Affirmative Defenses [Rec. Doc. 15655-1].

It is the policy of the United States "that there should be no discharges of oil or hazardous substances into or upon the navigable waters of the United States, adjoining shorelines, . . . or which may affect natural resources belonging to . . . the United States." 33 U.S.C. §1321(b)(1). The purpose of the Act is "to achieve the result of clean water *as well as to deter conduct causing spills.*" United States v. Coastal States Crude Gathering Co., 643 F.2d 1125, 1128 (5th Cir. Unit A April 1981) (emphasis added) (quoting United States v. Marathon Pipe Line Co., 589 F.2d 1305, 1309 (7th Cir. 1978)).[72]   In the wake of such an unprecedented drilling disaster, the United States acted in accordance with its policy that there be no discharges of oil and issued a moratorium to allow the industry and its regulators the necessary time to appropriately assess the situation.

The fact that the moratorium was performed with one eye toward prospective spills in no way changes the fact that it was instituted as a result of the Macondo Spill.  Indeed, the other eye was firmly planted on the assets necessary to cap, contain, and otherwise mitigate the ongoing and continuing damages and substantial threats to natural resources and other property due to Macondo Oil.

The damages suffered by the OPA Test Case Plaintiffs were clearly foreseeable.  They were substantially caused by the Macondo Spill, and its associated damages to property and natural resources.  While BP's conduct may not have been the sole cause, the exclusive cause, or the last and most immediate cause of such economic losses, it was certainly a substantial cause of such losses, and satisfies the "due to" and "resulting from" language found in OPA.

---

[72] Along these lines, prospective damages are not foreign to the CWA, as civil payments made by dischargers of oil into the Oil Spill Liability Trust Fund "paid today can fund the response to tomorrow's oil spill." PENALTY PHASE FINDINGS AND CONCLUSIONS, p.24, ¶104.

## Conclusion

For the above and foregoing reasons, for the reasons stated in MEMO IN SUPPORT OF RENEWED MOTION TO STRIKE AFFIRMATIVE DEFENSES,[73] and for the reasons stated in Plaintiffs' OMNIBUS MEMO IN OPPOSITION TO MOTIONS TO DISMISS B1 BUNDLE FIRST AMENDED MASTER COMPLAINT at pp.66-74,[74] the Court should deny BP's Renewed Motion to Dismiss, strike BP's affirmative defenses, and issue an *in limine* ruling precluding evidence of potential third-party fault, including the application of any alleged "superseding" cause defense based on the actions or inaction of the U.S. Government to the OPA Causation Test Cases, as a matter of law.

This 6th day of January, 2016.


Respectfully submitted,


   /s/  Stephen J. Herman          |    /s/  James Parkerson Roy
**Stephen J. Herman**, La. Bar No. 23129 | **James Parkerson Roy**, La. Bar No. 11511
**HERMAN HERMAN & KATZ LLC** | **DOMENGEAUX WRIGHT ROY & EDWARDS LLC**
820 O'Keefe Avenue | 556 Jefferson Street, Suite 500
New Orleans, Louisiana 70113 | Lafayette, Louisiana 70501
Telephone: (504) 581-4892 | Telephone: (337) 233-3033
Fax No. (504) 569-6024 | Fax No. (337) 233-2796
E-Mail: sherman@hhklawfirm.com | E-Mail: jimr@wrightroy.com
*Plaintiffs Liaison Counsel* | *Plaintiffs Liaison Counsel*

---

[73] Rec. Doc. 15655-1.

[74] Rec. Doc. 1821, at 67-75.

## PLAINTIFFS' STEERING COMMITTEE

Conrad S.P. "Duke" Williams
WILLIAMS LAW GROUP
435 Corporate Drive, Suite 101
Maison Grand Caillou
Houma, Louisiana 70360
Office: (985) 876-7595
Fax No. (985) 876-7594
E-Mail: duke@williamslawgroup.org

Brian H. Barr
LEVIN, PAPANTONIO, THOMAS,
MITCHELL, ECHSNER & PROCTOR, PA
316 South Baylen St., Suite 600
Pensacola, FL 32502-5996
Office: (850) 435-7045
Telefax: (850) 436-6187
E-Mail: bbarr@levinlaw.com

Jeffrey A. Breit
BREIT DRESCHER & IMPREVENTO
Towne Pavilion Center II
600 22nd Street, Suite 402
Virginia Beach, Virginia 23451
Office: (757) 670-3888
Telefax: (757) 670-3895
E-Mail: jbreit@bdbmail.com

Elizabeth J. Cabraser
LIEFF, CABRASER, HEIMANN &
BERNSTEIN, LLP
275 Battery Street, 29th Floor
San Francisco, CA 94111-3339
Office: (415) 956-1000
Telefax: (415) 956-1008
E-Mail: ecabraser@lchb.com

Philip F. Cossich, Jr.
COSSICH, SUMICH, PARSIOLA
8397 Highway 23, Suite 100
Belle Chasse, LA 70037
Office: (504) 394-9000
Telefax: (504) 394-9110
E-Mail: pcossich@cossichlaw.com

Robin L. Greenwald
WEITZ & LUXENBERG, PC
700 Broadway
New York, NY 10003
Office: (212) 558-5802
Telefax: (212) 344-5461
E-Mail: rgreenwald@weitzlux.com

Rhon E. Jones
BEASLEY, ALLEN, CROW, METHVIN,
PORTIS & MILES, P. C.
218 Commerce St., P.O. Box 4160
Montgomery, AL 36104
Office: (334) 269-2343
Telefax: (334) 954-7555
E-Mail: rhon.jones@beasleyallen.com

Matthew E. Lundy
LUNDY, LUNDY, SOILEAU & SOUTH
501 Broad Street
Lake Charles, LA 70601
Office: (337) 439-0707
Telefax: (337) 439-1029
E-Mail: mlundy@lundylawllp.com

Michael C. Palmintier
deGRAVELLES, PALMINTIER,
HOLTHAUS & FRUGE'
618 Main Street
Baton Rouge, LA 70801-1910
Office: (225) 344-3735
Telefax: (225) 344-0522
E-Mail: mpalmintier@dphf-law.com

Paul M. Sterbcow
LEWIS, KULLMAN, STERBCOW &
ABRAMSON
601 Poydras Street, Suite 2615
New Orleans, LA 70130
Office: (504) 588-1500
Telefax: (504) 588-1514
E-Mail: sterbcow@lksalaw.com

Robert T. Cunningham
CUNNINGHAM BOUNDS, LLC
1601 Dauphin Street, P. O. Box 66705
Mobile, AL  36660
Office:  (251) 471-6191
Telefax: (251) 479-1031
E-Mail:  rtc@cunninghambounds.com

Alphonso Michael "Mike" Espy
MORGAN & MORGAN, P.A.
188 East Capitol Street, Suite 777
Jackson, MS 39201
Office: (601) 949-3388
Telefax: (601) 949-3399
E-Mail: mike@mikespy.com

Calvin C. Fayard, Jr.
FAYARD & HONEYCUTT
519 Florida Avenue, SW
Denham Springs, LA  70726
Office:  (225) 664-4193
Telefax: (225) 664-6925
E-Mail:  calvinfayard@fayardlaw.

Scott Summy
BARON & BUDD, P.C.
3102 Oak Lawn Avenue, Suite 1100
Dallas, TX  75219
Office:  (214) 521-3605
Telefax: (214) 599-1172
E-Mail:  ssummy@baronbudd.com

Ervin A. Gonzalez
COLSON HICKS EIDSON
255 Alhambra Circle, Penthouse
Coral Gables, FL 33134
Office: (305) 476-7400
Telefax: (305) 476-7444
E-Mail:  ervin@colson.com

Joseph F. Rice
MOTLEY RICE LLC
28 Bridgeside Blvd.
Mount Pleasant, SC 29464
Office: (843) 216-9159
Fax No. (843) 216-9290
E-Mail: jrice@motleyrice.com

## CERTIFICATE OF SERVICE

**WE HEREBY CERTIFY** that the above and foregoing Opposition will be served on All Counsel by electronically uploading the same to Lexis Nexis File & Serve in accordance with Pretrial Order No. 12, and that the foregoing will be electronically filed with the Clerk of Court of the United States District Court for the Eastern District of Louisiana by using the CM/ECF System, which will send a notice of electronic filing in accordance with the procedures established in MDL 2179, this 6th day of January, 2016.

/s/ Stephen J. Herman and James Parkerson Roy