

# Outer Continental Shelf Moratoria on Oil and Gas Development

**Curry L. Hagerty**
Specialist in Energy and Natural Resources Policy

May 6, 2011

Congressional Research Service

7-5700
www.crs.gov
R41132

**CRS Report for Congress**
*Prepared for Members and Committees of Congress*

# Summary

Moratoria measures for the outer continental shelf (OCS) establish bans or restrictions on oil and gas exploration and development in federal ocean areas. With some exceptions for marine sanctuaries and monuments, no portion of the federal OCS has a permanent moratorium on oil and gas leasing and development. While some areas are under temporary development bans, such as suspensions or moratoria directed by either legislative or executive powers, most of the OCS is free of such restrictions and is considered permissible for offshore leasing activity.

Aspects of moratorium policy (either establishing or lifting temporary bans on oil and gas exploration and development) are derived from legislative and executive powers to direct offshore leasing activities. A shift in both legislative and executive moratorium policy during the 111th Congress signaled an end to measures that had banned development in some OCS areas since the early 1980s. Legislative moratoria enacted annually by Congress for about 27 years as part of the Department of the Interior appropriations acts expired on September 30, 2008. In areas where OCS leasing restrictions were changed, some preliminary oil and gas leasing activity has commenced, but no lease sales have been held.

Support for three national objectives coalesced in 2009, resulting in the removal of most congressional and executive constraints on oil and gas exploration and development: (1) promoting domestic energy production to improve the nation's energy security, (2) enhancing federal revenue, and (3) spurring innovation and diversification in ocean energy technologies to help create new jobs. The shift in moratorium policy, along with two other developments—the start of federal offshore renewable ocean energy projects (e.g., offshore wind farms) and expanded oil and gas prospecting in deepwater areas—increased the responsibilities of the federal offshore energy program.

Around the world, changing ocean energy policies are affecting how nations govern offshore areas. Economic pressures and technological advances are driving changes in moratorium policy as the global search for energy reaches into deeper ocean waters. A number of countries are revisiting policies about offshore areas, and some countries are making claims to expand their reach for offshore resources. One venue for claims of this nature is the United Nations Convention on the Law of the Sea (UNCLOS). Although the United States has not ratified UNCLOS, the State Department has taken measures to address the U.S. extended continental shelf areas in a manner not inconsistent with the UNCLOS process. These measures signal changes in U.S. policies about moratorium areas.

In the aftermath of the *Deepwater Horizon* oil spill, the regulatory context is unsettled, and policymakers are considering many different options to restore regulatory and economic normalcy in the Gulf region. Congress is considering the role moratorium policy may play in this context. In the 112th Congress, moratorium policy is addressed in H.R. 1231, which was reported by the House Committee on Natural Resources on May 2, 2011.

# Contents

Background on Offshore Oil and Gas Development ................................................................... 1
   Economic Feasibility ............................................................................................................. 3
   Environmental Risk .............................................................................................................. 3
   Offshore Technology ............................................................................................................ 4
Sources of U.S. Moratorium Policy ............................................................................................ 5
   Legislative Authority ............................................................................................................ 5
      Annual Congressional OCS Moratoria .......................................................................... 5
      Gulf of Mexico Energy Security Act of 2006 (GOMESA) ............................................ 7
   Executive Authority ............................................................................................................. 7
      Bureau of Ocean Energy Management, Regulation and Enforcement (BOEMRE) ........... 9
      Marine Sanctuaries and Marine Monuments .................................................................. 9
Background on Ocean Governance ........................................................................................... 10
   Outer Continental Shelf Lands Act (OCSLA) .................................................................... 10
   United Nations Convention on the Law of the Sea (UNCLOS) ........................................... 11
U.S. Moratoria in International Areas ....................................................................................... 11
Issues for Congress .................................................................................................................. 13
   Federal Revenues ............................................................................................................... 13
      OCSLA Amendments of 1986 Created the § 8(g) Zone ............................................... 13
      Coastal Impact Assistance Program (CIAP) ................................................................ 14
      Gulf of Mexico Energy Security Act of 2006 (GOMESA) .......................................... 14
   International Ocean Policy for Energy Development .......................................................... 14
      UNCLOS and Extended Continental Shelf (ECS) Claims ........................................... 14
      Transboundary OCS Resources ................................................................................... 15
Conclusion ............................................................................................................................... 16

# Figures

Figure 1. BOEMRE Map of OCS Oil and Gas Development Locations ....................................... 8
Figure 2. Marine Boundary Areas Between the United States and Mexico ................................. 12

# Tables

Table 1. Chronology of Annual Congressional Moratoria Enacted in DOI Appropriations ............ 5

# Contacts

Author Contact Information ...................................................................................................... 16

Moratoria, as a policy option, play a key role in the administration of the nation's ocean energy programs. In the aftermath of the April 20, 2010, *Deepwater Horizon* explosion and oil spill in the Gulf of Mexico, questions emerged about the federal offshore oil and gas program generally, and about the risks of deepwater drilling in particular. Heightened attention to concerns about the adequacy of safety measures for regulated offshore oil and gas operations has led to official review of the offshore program. Where concerns about safety were greatest, options to place limitations on oil and gas activity, including moratoria, were revisited as options for regulating activity on the outer continental shelf (OCS) in the Gulf of Mexico and in Alaska.

On March 31, 2010, and on December 1, 2010, the Secretary of the Interior announced an updated Administration policy for OCS oil and gas development.[1] Pursuant to authority granted by the Outer Continental Shelf Lands Act (OCSLA),[2] the President established an executive moratorium on oil and natural gas leasing in the Bristol Bay area of the North Aleutian Basin of Alaska.[3] This constraint on OCS leasing activity runs through June 30, 2017, and is the only executive moratorium currently in force.[4]

In addition to the Administration's moratorium in Alaska, the federal government temporarily suspended certain OCS permitting and drilling operations in response to the Gulf oil spill.[5] These suspensions are different from moratoria. While both measures (suspension and moratoria) have some similar policy implications, the legal implications can differ widely.[6] Among the legislative proposals that address moratorium policy in the 112th Congress, one proposal (H.R. 1231) was reported by the House Committee on Natural Resources on May 2, 2011.

## Background on Offshore Oil and Gas Development

The OCS is a federal offshore area from the edge of state waters, usually starting at 3 nautical miles from shore, seaward to a distance of about 200 nautical miles.[7] Energy leasing on the OCS takes place in four regions: the Gulf of Mexico region, the Atlantic region, the Pacific region, and the Alaska region.

---

[1] Department of the Interior strategy for exploring and developing oil and gas resources on the OCS press releases, posted on March 31, 2010, and December 1, 2010. The Revised OCS Oil & Gas Leasing Program for 2007- 2012 became effective December 23, 2010.

[2] 43 U.S.C. 1331 et. seq.

[3] *Memorandum on the Withdrawal of Certain Areas of the United States Outer Continental Shelf from Leasing Disposition*, March 31, 2010.

[4] 2017 is the anticipated end of the current BOEMRE leasing plan, which typically are proposed in five-year periods (e.g. 2012-2017).

[5] U.S. Department of the Interior, decision memorandum regarding the suspension of certain offshore permitting and drilling activities on the outer continental shelf, July 12, 2010, and October 12, 2010. Outer Continental Shelf Lands Act (OCSLA; 43 U.S.C. 1331 et. seq.) and 30 CFR 250.173 provide the statutory and regulatory basis for drilling suspensions in the Gulf of Mexico.

[6] For this reason, recent suspensions in the Gulf are not addressed in this report.

[7] "OCS" has both a geographical definition and a legal definition. For the purpose of this report, "OCS" is used as defined in OCSLA; 43 U.S.C. 1331 et. seq. A geographical or nautical mile is 6,080.20 feet, as compared to the statute mile, which is 5,280 feet.

From 1982 until the end of FY2008, Congress enacted annual measures to restrict spending of appropriated funds for certain OCS oil and gas leasing and drilling activities. Pursuant to executive moratoria, additional restrictions were placed on OCS leasing, similar in some cases to aspects of the annual moratoria imposed by Congress.[8]

Congress allowed the annual congressional moratoria on offshore oil and gas leasing and drilling to expire on September 30, 2008,[9] and the President lifted executive moratoria on offshore leasing activity in the same year.[10] These developments changed federal policies in the OCS in a number of ways. In the absence of moratoria measures, policymakers in the federal government and the states revisited economic and environmental issues related to OCS energy projects.[11] For example, in OCS areas where federal oil and gas leasing had been banned for many years, consideration of drilling activity was a permissible alternative. Concurrent with changes in moratorium policy are other changes in offshore leasing activity: the emergence of renewable energy leasing; the introduction of advanced drilling technologies; international policy changes; and other developments.

This report discusses OCS moratorium policy in the context of the long-standing debate about domestic offshore drilling.[12] The drilling debate reflects tensions stemming from disagreements about fiscal policy, energy policy, and federal regulatory policies for administering ocean resources. The remainder of this section summarizes some OCS moratoria measures in the context of (1) the economic feasibility of oil and gas development activities in the OCS; (2) the environmental risk of OCS activities; and (3) new OCS technology. Later sections identify authorities for the OCS moratoria and discuss issues of ocean sovereignty.[13]

---

[8] A presidential directive issued by President George H. W. Bush in 1990 (and extended by President Clinton until 2012) banned offshore oil and gas development in much of the OCS.

[9] The Continuing Appropriations Resolution, 2009 (P.L. 110-329), did not extend the annual congressional moratoria on oil and gas leasing activities. On March 11, 2009, the Omnibus Appropriations Act, 2009 (P.L. 111-8), was enacted without moratorium provisions, thus effectively lifting in FY2009 the oil and gas development moratoria that had been in place since 1982 in the OCS along the Atlantic and Pacific coasts, in parts of Alaska, and in the Gulf of Mexico.

[10] On July 14, 2008, President George W. Bush lifted some executive bans on OCS leasing and drilling. See "Memorandum on Modification of the Withdrawal of Certain Areas of the United States Outer Continental Shelf from Leasing Disposition," *Weekly Compilation of Presidential Documents,* vol. 44 (July 14, 2008). Around the same time, the Minerals Management Service (MMS), now known as the Bureau of Ocean Energy Management, Regulation and Enforcement (BOEMRE), published draft regulations at 73 *Fed. Reg.* 39376 (July 9, 2008), pursuant to the Energy Policy Act of 2005 (P.L. 109-58), establishing OCS leasing for other than oil and gas by final rule on April 29, 2009.

[11] Development of specific areas is still prohibited by statute, by regulation, and by international treaty. Different types of coastal development bans may or may not be affected by the expiration of the annual congressional moratoria. This report does not provide a comprehensive focus on state-to-state or federal-state coordination on OCS policies. See CRS Report RL33404, *Offshore Oil and Gas Development: Legal Framework*, by Adam Vann.

[12] The OCS drilling debate is a combination of several discrete debates about oil and gas leasing activity in the OCS. In the context of the OCS drilling debate, Congress addresses multiple OCS activities (research, exploration, drilling, operations, and decommissioning).

[13] This report focuses on key OCS oil and gas leasing moratorium policy options of interest to Congress. Numerous other ways to constrain or promote oil and gas development are not covered. For more information on OCS oil and gas development, see CRS Report RS22928, *Oil Development on Federal Lands and the Outer Continental Shelf*, by Marc Humphries.

## Economic Feasibility

Congress has consistently found that domestic oil and gas development is vital to the nation, despite debate over the economic feasibility of specific oil and gas projects.[14] The potential for federal revenue from OCS development drives economic aspects of the drilling debate. At issue is whether OCS oil and gas production has sufficient fiscal benefits to warrant development, and if so, what economic factors (in additional to fiscal impacts) affect the size, timing, and location of OCS development. The economic feasibility of OCS development depends on oil prices, future projections about oil markets, physical access to development areas, and economic values assigned to competing ocean uses such as renewable energy development, fishing, tourism, and conservation, as well as other factors.[15]

The economic feasibility of development options is always based on estimation and forecasts. In the absence of predictable regulatory directives, it is more difficult to estimate the economic feasibility of development options. Development proponents contend that the economic feasibility of development in the Gulf of Mexico and the Arctic, which have substantial proven oil and gas deposits, is especially unpredictable during a time when DOI is overhauling the regulatory framework to reorganize subdivisions of the federal bureaucracy for offshore development.[16]

Global economic factors play a major role in deliberations about OCS drilling activity. At the end of FY2008, annual moratoria expired amid global economic turmoil and calls for greater stability in the national economy.[17] From this perspective, economic arguments—specifically claims that other coastal countries are allowing greater access to offshore resources and that the United States should not fall behind in the international race to develop offshore resources—influenced moratorium policy. Economic events are a significant part of how moratoria are considered as a tool for OCS policy development.

## Environmental Risk

The potential for an oil spill to harm U.S. marine and coastal areas has been a central concern of the moratoria debate. Given data suggesting that significant oil and gas reserves exist in U.S. waters, and that past spills have had serious impacts, it is not surprising that environmental risk is a concern.[18]

---

[14] The Outer Continental Shelf Lands Act (43 U.S.C. § 1337) and the accompanying Congressional Declaration of Policy state, "The OCS is a vital national resource reserve held by the federal government for the public, which should be made available for expeditious and orderly development." The Energy Policy Act of 2005 (P.L. 109-58) was enacted in part to encourage domestic energy investment in new offshore leasing and development.

[15] Global demand for oil and gas and global prices affect the economic feasibility of OCS development. Offshore activity depends on sustained capital investment by oil companies and independent producers. Periods of tight credit and uncertain projections for oil and gas demand can significantly affect capital investment.

[16] Letter from BOEMRE Director Michael Bromwich to House Natural Resources Committee and Senate Committee on Energy and Natural Resources, February 25, 2011, outlining agency reorganization. CRS Report R41485, *Reorganization of the Minerals Management Service in the Aftermath of the Deepwater Horizon Oil Spill*, by Henry B. Hogue.

[17] The moratoria expired during a period of economic crisis in late 2008, when a liquidity shortfall in the U.S. banking system resulted in congressional action to halt the crisis.

[18] The ways in which other countries with OCS development goals address environmental risk vary widely and are beyond the scope of this report. The Department of State is a source for learning about actions by other countries (continued...)

Opinions on the environmental risks associated with OCS development vary widely. Those who oppose drilling cite numerous examples of environmental risks inherent in OCS activity. The list of potential threats includes air and water degradation, oil spills, seabed disturbances, and harm to marine life. Those who support drilling counter that while certain environmental risks are unavoidable, improvements in offshore oil and gas operations and compliance with laws and regulations sufficiently mitigate these risks. Federal efforts to prevent oil spills and to improve oil spill response include passage of the Oil Pollution Act of 1990 (OPA90; P.L. 101-380), which established penalties for oil spills and established U.S. Coast Guard prepositioned oil-spill response equipment sites, vessel and facility response plans, and contingency planning. Under OPA90, oil-carrying vessels operating in U.S. waters are to have double hulls by 2015.[19]

Discussions of environmental risk are often accompanied by observations that federal regulators lack clear and comprehensive approaches to assess environmental risks in the marine environment. It is widely acknowledged that federal ocean management authorities operate in fragmented, compartmentalized units, that overlapping areas of agency authority are common, and that sometimes gaps in authority are possible.[20] From this perspective, there is a heightened concern about the capacity of federal regulators to address environmental issues in ocean areas.

Opponents of OCS oil and gas development also often associate oil and gas consumption with greenhouse gas emissions and other global climate change concerns. From this perspective, permanently restricting offshore development of fossil fuel resources would most fully address risks to the domestic and global environment. This perception of an absolute solution complicates efforts to forge a consensus on permissible OCS development. Some advocates in favor of OCS drilling view environmental risk on a different scale and largely reject global climate change as a basis for defining environmental risk. They contend that compliance with current environmental laws and regulations can be an adequate substitute for moratoria.

## Offshore Technology

Technological advancements are emerging that affect OCS operations and arguably can improve operational performance, environmental protection, and other aspects of OCS activity. Advances in geophysical resource assessment, drilling technology, platform and pipeline design, communications, operational monitoring, and training can change environmental impacts.

Technology is widely recognized as an important feature of the moratoria debate. Changes in technology affect OCS policy by introducing new alternatives for OCS operations farther and farther from shore. Some argue that improvements in offshore technology are driving global development options and a global review of moratorium policy. From this perspective, some see U.S. involvement in international consultations as a feature in moratorium policy. The option to ratify the United Nations Convention on the Law of the Sea (UNCLOS) is a closely related policy alternative. (UNCLOS is discussed in more detail in the section on "United Nations Convention on the Law of the Sea (UNCLOS)," below.)

---

(...continued)

related to addressing environmental risk. See http://www.state.gov/g/oes/env/.

[19] Numerous federal regulations also exist to implement pollution control laws. See CRS Report RL34384, *Federal Pollution Control Laws: How Are They Enforced?*, by Robert Esworthy.

[20] See CRS Report RL33603, *Ocean Commissions: Ocean Policy Review and Outlook*, by Harold F. Upton and Eugene H. Buck.

# Sources of U.S. Moratorium Policy

## Legislative Authority

Congress sets policy for OCS activity and determines legislative incentives and restrictions for OCS development. Congress enacted OCS moratoria provisions annually between 1982 and 2008 in Department of the Interior appropriations acts. Outside of the annual appropriations process, Congress also enacts legislation and approves treaties that affect leasing, exploring for, developing, or producing oil and gas in OCS areas. For example, Congress designates national marine sanctuaries and enacts other laws that may restrict or encourage development in certain areas of the OCS.

### Annual Congressional OCS Moratoria

Moratoria provisions were enacted by Congress each year for 27 years to address specific interests and to cover specific areas. See **Table 1**. Most aspects of OCS policy recognize planning horizons of five or more years.[21] The Department of the Interior appropriations legislation between 1982 and 2008 addressed OCS programs one year at a time, and was generally considered inconsistent with longer OCS planning horizons.

**Table 1. Chronology of Annual Congressional Moratoria Enacted in DOI Appropriations**

| Fiscal Year | Public Law | Alaska Region | Pacific Region | Gulf of Mexico | Atlantic Region |
|---|---|---|---|---|---|
| 1982 | P.L. 97-100 |  | X |  |  |
| 1983 | P.L. 97-394 |  | X |  | X |
| 1984 | P.L. 98-146 |  | X | X | X |
| 1985 | P.L. 98-473 |  | X |  | X |
| 1986 | P.L. 99-190 |  |  |  | X |
| 1987 | P.L. 99-591 |  | X |  | X |
| 1988 | P.L. 100-202 |  |  |  | X |
| 1989 | P.L. 100-446 | X | X | X | X |
| 1990 | P.L. 101-121 | X | X | X | X |
| 1991 | P.L. 101-512 | X | X | X | X |
| 1992 | P.L. 102-154 | X | X | X | X |
| 1993 | P.L. 102-381 | X | X | X | X |
| 1994 | P.L. 103-138 | X | X | X | X |
| 1995 | P.L. 103-332 | X | X | X | X |
| 1996 | P.L. 104-134 | X | X | X | X |

---

[21] A five-year leasing plan governs federal offshore leasing. For more information on the legal framework of federal leasing, see CRS Report RL33404, *Offshore Oil and Gas Development: Legal Framework*, by Adam Vann.

| Fiscal Year | Public Law | Alaska Region | Pacific Region | Gulf of Mexico | Atlantic Region |
|---|---|---|---|---|---|
| 1997 | P.L. 104-208 | X | X | X | X |
| 1998 | P.L. 105-83 | X | X | X | X |
| 1999 | P.L. 105-277 | X | X | X | X |
| 2000 | P.L. 106-113 | X | X | X | X |
| 2001 | P.L. 106-291 | X | X | X | X |
| 2002 | P.L. 107-63 | X | X | X | X |
| 2003 | P.L. 108-7 | X | X | X | X |
| 2004 | P.L. 108-108 | X | X | X | X |
| 2005 | P.L. 108-447 | X | X | X | X |
| 2006 | P.L. 109-54 | X | X | X | X |
| 2007 | P.L. 110-329 | X | X | X | X |
| 2008 | P.L. 110-161 | X | X | X | X |

**Source:** CRS. Table represents moratoria provisions established in DOI appropriations by region. The restrictions varied widely by fiscal year in terms of the amount of acreage, the specific location of moratoria, and the specific activities restricted.

Thus, one legacy of congressional moratoria is their impact on the cycle time of OCS development.[22] From a developer's point of view, the cycle time of each OCS development project is key to strategic business decisions. From a regulator's point of view, cycle time is a critical component to meeting regulatory requirements. From both points of view, predictability is key to meeting program timetables set by Congress. Needless to say, the unpredictability of enacting an annual congressional moratorium (because it varied from year to year, and from region to region, as reflected in **Table 1**) had a disruptive effect on the cycle times of many OCS projects.

Annual changes to the permissibility of OCS leasing[23] were a basis for litigation over many years, as some leaseholders sued the federal government to buy back leases in moratorium areas. Leaseholders argued that once moratoria were established, the disruptive effect on an OCS project was unfair. Many projects affected by the moratoria were prevented from going forward.[24]

---

[22] Cycle time is the length of time it takes for a project to progress from first discovery to first production, and longer development cycle times could result in lower rates of return on OCS investments.

[23] A sampling of development bans from 1983 to 2005 is as follows: 35 million acres were withdrawn in 1983 in Central and Northern California and the mid-Atlantic; 54 million acres were withdrawn in 1984 in California planning areas, the North Atlantic, and the Eastern Gulf of Mexico; 45 million acres were withdrawn in 1985 in California planning areas and the North Atlantic; 8 million acres in the North Atlantic were withdrawn from 1986 to 1988; 33 million acres were withdrawn in 1989 in Northern California, the North Atlantic, and the Eastern Gulf; and 84 million acres were withdrawn in 1990 in California planning areas, the North and Mid-Atlantic, the Eastern Gulf, and all of the North Aleutian Basin. (U.S. Energy Information Administration, Office of Oil and Gas, September 2005 Overview of U.S. Legislation and Regulations Affecting Offshore Natural Gas and Oil Activity). See **Figure 1** for locations of these planning areas.

[24] See DOI testimony before the Subcommittee on Energy and Mineral Resources, August 5, 1999, describing litigation related to OCS moratorium policy, specifically about the relinquishment of certain leases in the North Aleutian Basin, in areas of the Gulf of Mexico, and areas offshore of North Carolina.

### Gulf of Mexico Energy Security Act of 2006 (GOMESA)

In addition to those in the annual appropriations process, Congress has also enacted other moratoria provisions. For example, the Gulf of Mexico Energy Security Act of 2006 (GOMESA, P.L. 109-432) restricts oil and gas leasing in portions of the Gulf of Mexico until 2022.[25] The moratorium went into effect in 2006, and is scheduled to end in 2022. GOMESA moratorium areas are depicted in **Figure 1**.

Upon enactment of GOMESA, leases within designated moratorium areas became eligible for exchange for a bonus or royalty credit[26] that could be used against other leasing obligations in the Gulf of Mexico.[27] The aggregate value of relinquishing leases in GOMESA moratorium areas is estimated at slightly more than $60 million.

## Executive Authority

The President can determine some activities on the OCS and has done so under the authority to direct OCS leasing moratoria in the OCSLA,[28] and under authority of the Antiquities Act of 1906.[29] In contrast to annual moratoria in appropriations legislation, presidential directives usually authorize restrictions for durations of several years.

On January 9, 2007, President George W. Bush modified the executive directive on OCS leasing withdrawal to reflect congressional moratoria in two areas—the North Aleutian Basin planning area offshore Alaska, and areas of the eastern Gulf of Mexico.[30] On July 14, 2008, President Bush issued another executive order lifting constraints that generally matched the annual congressional moratoria (which also expired in September of that year).[31]

---

[25] GOMESA restricts leasing in areas of the eastern Gulf of Mexico within 125 miles of Florida, including areas in the Gulf of Mexico east of the Military Mission Line and certain areas in the central Gulf of Mexico within 100 miles of Florida. Also, although the enactment of P.L. 109-432 placed areas of the eastern Gulf of Mexico off-limits, it contained provisions that opened 5.8 million acres in the Gulf of Mexico previously under moratoria.

[26] GOMESA established a process to exchange existing leases in the new moratorium areas for bonus or royalty credits. Regulations for bonus or royalty credits authorized under GOMESA are found in the final rule titled Bonus or Royalty Credits for Relinquishing Certain Leases Offshore, RIN 1010–AD44, published September 12, 2008 (73 *Fed. Reg.* 52917).

[27] Of a total of 85 leases eligible to apply for the credit, some leases have expired with no credit being issued, some leases have been relinquished for credits, and other leases are not yet responsive. The requests for credit must be received prior to the expiration date of the lease; the last day to apply for a credit is October 14, 2010.

[28] 43 U.S.C. § 1341(a).

[29] 16 U.S.C. §§ 431-433.

[30] In 2003, Congress did not extend the moratoria in the North Aleutian Basin at the request of the Alaska delegation. When Congress enacted GOMESA in 2006, a new moratorium on leasing activities in most of the new Eastern Gulf Planning Area as well as a portion of the Central Gulf Planning Area within 100 miles of the coastline of Florida was established until June 30, 2022.

[31] On July 14, 2008, a modification of the presidential withdrawal of areas of the U.S. outer continental shelf from leasing disposition was announced by President Bush in the following statement, ''Under the authority vested in me as President of the United States, including section 12(a) of the Outer Continental Shelf Lands Act, 43 U.S.C. 1341(a), I hereby modify the prior memoranda of withdrawals from disposition by leasing of the United States Outer Continental Shelf issued on August 4, 1992.''

**Figure 1. BOEMRE Map of OCS Oil and Gas Development Locations**



**Source:** Bureau of Ocean Energy Management, Regulation and Enforcement (BOEMRE) maps, adapted by CRS.

CRS-8

Case 2:10-md-02179-CJB-DPC   Document 15704-3   Filed 01/06/16   Page 12 of 19

*Outer Continental Shelf Moratoria on Oil and Gas Development*

### Bureau of Ocean Energy Management, Regulation and Enforcement (BOEMRE)[32]

As mentioned above, regulated oil and gas activities on the OCS are administered pursuant to the Outer Continental Shelf Lands Act (OCSLA). The chief agency for administering the oil and gas leasing program is the Bureau of Ocean Energy Management, Regulation and Enforcement (BOEMRE) in the Department of the Interior.

To clarify, BOEMRE is authorized to administer the leasing program, but it is not required to lease specific areas. BOEMRE can opt to defer oil and gas development in any OCS area, even when such action may appear to be inconsistent with other federal policies. BOEMRE has deferred offering OCS areas numerous times over the years in response to recommendations from state governors, stakeholders, and others.[33]

In rare cases, BOEMRE has designated OCS leasing in moratorium areas. In the current Five-Year Plan, which took effect on July 1, 2007, BOEMRE (then the Minerals Management Service, or MMS) proposed a lease sale in an area under moratorium offshore of the commonwealth of Virginia.[34] Sale 220 was proposed while the area was under a moratorium prohibiting leasing activities; by 2009, however, the area was no longer under moratorium, and was eligible for leasing consideration. Since that time Sale 220 has been removed from the lease sale schedule.

### Marine Sanctuaries and Marine Monuments

Marine sanctuaries and national marine monuments (see **Figure 1**) are protected areas that encompass more than 300,000 square miles of ocean.[35] These protected areas have some policy implications similar to moratorium areas, but the legal implications can differ widely.[36] For this reason, sanctuaries and monuments are not addressed in this report except to note that non-development areas such as sanctuaries and monuments can be located within moratorium areas.[37]

---

[32] BOEMRE is a bureau in the U.S. Department of the Interior that manages the nation's oil, gas, renewable, and other mineral resources on the outer continental shelf (OCS). Secretarial Order 3299, "Establishment of the Bureau of Ocean Energy Management, the Bureau of Safety and Environmental Enforcement, and the Office of Natural Resources Revenue," issued May 19, 2010, renamed the Minerals Management Service (MMS) as BOEMRE. This order was amended on June 18, 2010, to extend the deadline for development of a schedule for implementing agency reorganization from "within thirty (30) days," or by June 19, 2010, to "by July 9, 2010."

[33] In 1997, for example, DOI deferred offering 336 blocks in the Gulf of Mexico during treaty negotiations with Mexico. In 2001, Lease Sale 176 was deferred based upon insufficient time to complete review of an environmental analysis. In 2003, Lease Sale 186 in the Beaufort Sea was modified by deferrals recommended by Alaska governor Frank Murkowski.

[34] DOI prepares a five-year leasing plan, subject to annual revisions, that governs any offshore leasing that takes place during the period of plan coverage. The 2007-2012 Five-Year Oil and Gas Program Plan took effect on July 1, 2007. The Plan is available on BOEMRE's website at http://www.BOEMRE.gov/offshore/PDFs/OMMStrategicPlan2007-2012.pdf.

[35] See CRS Report RL32486, *Marine Protected Areas (MPAs): Federal Legal Authority*, by Adam Vann.

[36] The Secretary of Commerce delegates administration to National Oceanic and Atmospheric Administration (NOAA) under the National Marine Sanctuaries Act (NMSA).

[37] In 1998, President Clinton withdrew indefinitely all national marine sanctuaries at that time: Washington-Oregon (Olympic Coast); Central California (Cordell Bank, gulf of Farallones and Monterey Bay); Southern California (Channel Islands); Western Gulf of Mexico (Flower Garden Banks); Straits of Florida (Florida Keys); South Atlantic (Gray's Reef); Mid-Atlantic (Monitor); and North Atlantic (Stellwagen Bank).

Federal administration of marine sanctuaries and marine monuments can include co-management responsibilities with the states and the Department of the Interior.[38]

# Background on Ocean Governance

Moratorium policies in the U.S. EEZ and beyond are determined pursuant to the Outer Continental Shelf Lands Act (OCSLA) and other federal statutes. With few exceptions, coastal nations exercise jurisdiction over marine areas within approximately 200 nautical miles of their coasts. This area is recognized as a nation's exclusive economic zone (EEZ) under most domestic laws and is generally consistent with international law.[39] The U.S. EEZ is a zone where the United States applies sovereign rights, and third party nations are allowed limited rights of passage. From this perspective, sometimes international measures such as the United Nations Convention on the Law of the Sea (UNCLOS) influence domestic moratorium policies as well.

## Outer Continental Shelf Lands Act (OCSLA)[40]

The chief statute permitting drilling and leasing activity is the OSCLA. This act grants the Secretary of the Interior authority over OCS energy and mineral leasing activities. The OCSLA, in conjunction with other statutes, extends broad powers to the President and federal agencies (such as BOEMRE) over leasing activities on the OCS. BOEMRE conducts oil and gas lease sales and executes leases under the OCSLA, and within a framework of numerous other federal and state authorities.[41] Renewable energy projects are also managed in conjunction with numerous other federal and state authorities; however, under OCSLA, federal planning does not integrate oil and gas leasing with renewable energy leasing. Expiration of moratoria restrictions affects all programs (conventional and renewable) because the development bans were lifted for broad geographic areas. This signals a shift away from resource-specific bans and toward a more comprehensive approach to examining options for all types of ocean energy projects.

---

[38] President George W. Bush's Proclamation 8031, June 15, 2006, expanded on President Clinton's 2000 Executive Order 13178 to establish the Marine National Monument in the Northwestern Hawaiian Islands, including the Mariana Trench and associated active underwater volcanoes and hydrothermal vents; Rose Atoll in American Samoa; and seven remote U.S. islands in the Central Pacific—Kingman Reef and Palmyra Atoll, Howland and Baker islands, and Jarvis, Johnston Atoll and Wake Island. President Clinton established the Northwestern Hawaiian Islands Coral Reef Ecosystem Reserve in the area in 2000, directing steps to be taken to bring this site into the National Marine Sanctuary System.

[39] The United States declared its EEZ in Presidential Proclamation No. 5030, 48 *Fed. Reg.* 10605 (March 14, 1983). This declaration is consistent with the United Nations Convention on the Law of the Sea (UNCLOS). UNCLOS provides a comprehensive international legal framework intended for building consensus on actions related to the world's ocean spaces, uses, and resources. See United Nations Convention on the Law of the Sea, opened for signature December 10, 1982, in force November 16, 1994, 1833 U.N.T.S. 396, reprinted in *United Nations, the Law of the Sea: United Nations Convention on the Law of the Sea* (UN Pub. Sales No. E.83.V.5). For additional information, see CRS Report RS21890, *The U.N. Law of the Sea Convention and the United States: Developments Since October 2003*, by Marjorie Ann Browne.

[40] 43 U.S.C. §1341. Outer Continental Shelf Lands Act of 1953 (43 U.S.C. 1331-1356, August 7, 1953, 67 Stat. 462) as amended by P.L. 93-627, January 3, 1975, 88 Stat. 2130; P.L. 95-372, September 18, 1978, 92 Stat. 629; and P.L. 98-498, October 19, 1984, 98 Stat. 2296.

[41] In addition to the OCSLA, several federal environmental and safety statutes apply to OCS leasing activity. OSCLA provides for regulations and procedures for leasing federal OCS areas, and procedures for environmental analysis of affected areas. OCSLA directs that the government receive fair market value for oil and gas production and establishes that rents and royalties are to be collected from OCS leasing activities.

### United Nations Convention on the Law of the Sea (UNCLOS)[42]

As moratoria restrictions expire or are lifted, ocean areas that were formerly closed have the potential to open for energy development. U.S. leasing policy recognizes certain areas under continued moratoria pursuant to bilateral treaty agreements and customary international law.[43] Despite not ratifying UNCLOS, the United States seems to generally align domestic OCS policy with UNCLOS.

U.S. moratorium policy can affect the development of transboundary reserves near U.S. waters. The issue of transboundary reserves near U.S. waters arises in the context of ECS claims and in the context of the UNCLOS ratification debate. The United States has not ratified UNCLOS, but alignment with some UNCLOS principles is a long-standing factor in U.S. ocean policy. As territorial claims of the United States and other nations evolve, U.S. efforts to address extended continental shelf (ECS) areas[44] become significant features of moratorium policy.

Currently, leasing options are under consideration near international marine boundaries. Issues likely to arise in these areas include jurisdictional issues and issues associated with joint development. UNCLOS is broadly viewed as the international framework within which to consider joint development in OCS areas. From the perspective of the United States, joint development areas would be near Canada in the North Atlantic, near several countries in the Arctic, and near Mexico and other nations in the Gulf of Mexico. Joint development in these areas is of interest for diplomatic and security reasons, with economic and environmental policy implications as well.

## U.S. Moratoria in International Areas

In the Gulf of Mexico, the Arctic, and other international marine areas, U.S. offshore activity is determined by a number factors, including conformance to customary international law. Despite a long history of established customs, an issue emerging in international areas with no basis in history is a coastal nation's claim for an extended continental shelf (ECS). Such a claim, for which there is no parallel or precedent in customary international law, signals a change in the use of moratorium policy in the international context. In the past international custom was undefined with respect to how nations claim natural resources beyond 200 miles from shore. As a result, moratorium policy was a likely tool to settle boundaries and claims in these areas. Today the ESC process plays a more central role than moratorium policy. The ECS claims process is administered under UNCLOS and is intended to provide dispute resolution options to avoid conflicts over ECS areas.

---

[42] United Nations Convention on the Law of the Sea, opened for signature December 10, 1982, in force November 16, 1994, 1833 U.N.T.S. 396, reprinted in *United Nations, the Law of the Sea: United Nations Convention on the Law of the Sea* (UN Pub. Sales No. E.83.V.5).

[43] The governance of OCS areas can be approached a number of ways. The use of bilateral agreements and the exercise of unilateral rights and duties relative to an international framework of recognized ocean jurisdictions are two approaches that have been used by the United States.

[44] ECS areas are rights to the continental shelf beyond the 200-nautical-mile limit, potentially up to 350 miles in certain cases. As of mid-2009, 51 claims by 44 countries had been made to extend their continental shelf. Some countries have multiple submissions and joint submissions with other countries. There are numerous benefits to ECS areas, including benefits related to military operations and resource development.

For many years policymakers have focused on governance of deepwater areas far from shore. These areas, adjacent to the United States beyond the 200-mile EEZ, are a prevailing concern for policymakers because they may hold valuable resources. In 1978, the United States and Mexico signed a treaty establishing maritime boundaries in the Gulf of Mexico.[45] As discussed above, at that time there was no international consensus for nations to claim natural resources in areas beyond the 200-mile EEZ.[46] The governance of deepwater areas was of particular interest in 1978 in part because areas prone to oil and gas resources included two geographical areas or "gaps" beyond 200 miles from each nation's respective coastlines[47] (see **Figure 2**). The Mexican parliament ratified the treaty in 1979. However, it was not until 18 years later, in 1997, that the U.S. Senate ratified a maritime boundary treaty.

**Figure 2. Marine Boundary Areas Between the United States and Mexico**



**Source:** Adapted by CRS from International Boundaries Research Unit (IBRU) Boundary and Security Bulletin Autumn 1997.

---

[45] Treaty on Maritime Boundaries between the United Mexican States and the United States of America (Caribbean Sea and Pacific Ocean), May 4, 1978; http://www.un.org/Depts/los/LEGISLATIONANDTREATIES/PDFFILES/ TREATIES/MEX-USA1978MB.PDF. For more information see S.Rept. 105-4, *U.S.–Mexico Treaty on Maritime Boundaries*, October 22, 1997, Committee on Foreign Relations.

[46] UNCLOS established a process for countries to submit claims to a special UNCLOS commission which reviews the evidence related to ECS recognition. This UNCLOS review and determination is governed by Article 76 of UNCLOS and is the subject of some controversy.

[47] One gap area is located in front of the Mexican coastline of Tamaulipas and the United States coast of Texas. This area is known as the Western Gap, while the other one, the Eastern Gap is in front of the Mexican coast of Yucatan, the coast of New Orleans and the coast of Cuba.

Treaty provisions between the United States and Mexico established a 1.4 nautical mile buffer zone on each side of the marine boundary, and both countries agreed to a 10-year moratorium on oil and gas exploitation in the buffer zone.[48] When the treaty was ratified, it was generally understood that after the 10-year period, each country could determine drilling and exploitation of oil and gas in its respective buffer zone.[49] The intended moratorium has since been extended.

# Issues for Congress

Shifts in moratorium policy change options for oil and gas exploration and production in federal areas of the Atlantic and Pacific Coasts, parts of Alaska, and the Gulf of Mexico. In the absence of bans on ocean energy development, numerous policy alternatives have emerged for Congress and for the states.

## Federal Revenues

Fiscal concerns impact moratorium policy alternatives with pressure on policymakers not to diminish OCS receipts, which are a significant source of federal revenue. Moratoria reduce the potential for federal and state revenues from OCS development.[50] Where OCS oil and gas leasing is currently underway, and states participate in specific revenue-sharing policies, revenue management programs seem to have broad support.[51]

Federal funds from offshore production are deposited in the General Treasury, the Land and Water Conservation Fund, and the National Historic Preservation Fund,[52] and go to some states. Revenue sharing between the states and the federal government is established by statute. Congress has enacted three OCS revenue-sharing programs that disburse receipts to coastal states. These programs are discussed in the following sections.

### OCSLA Amendments of 1986 Created the § 8(g) Zone

Section 8(g) of the OCSLA amendments of 1986 mandated that the federal government share with affected coastal states 27% of revenues generated from oil and natural gas leases located in the federal zone. The § 8(g) zone is 3 miles wide and is located directly adjacent to a state's

---

[48] Moratorium is the subject of Article 4 of the Treaty which reads, "Due to the possible existence of oil or natural gas reservoirs that may extend across the boundary set forth in Article I (hereinafter referred to as "trans-boundary reservoirs"), the Parties, during a period that will end ten (10) years following the entry into force of this Treaty, shall not authorize or permit oil or natural gas drilling or exploitation of the continental shelf within one and four-tenths (1.4) nautical miles of the boundary set forth in Article I. (This two and eight-tenths (2.8) nautical mile area hereinafter shall be referred to as "the Area" (…)."

[49] U.S. Department of the Interior, Minerals Management Service, Gulf of Mexico OCS Region press release on July 13, 2000 available at http://www.gomr.BOEMRE.gov/homepg/whatsnew/newsreal/2000/000713.html.

[50] In FY2008 DOI collected approximately $18 billion from OCS leases. BOEMRE statistics, http://www.BOEMRE.gov/ooc/PDFs/BOEMREFastFactsApr09.pdf.

[51] Royalty payments are established in leases. At the time the lease is executed, the federal government typically receives a bonus payment for the grant of the lease and during the primary term of the lease may receive periodic payments of rentals. If production occurs, royalties likely accrue to the federal government.

[52] Both of these funds provide money to all 50 states.

seaward boundary.[53] The Energy Policy Act of 2005 (EPAct05; P.L. 109-58) expanded revenue sharing in the § 8(g) zone to include 27% of the revenues generated from renewable energy leases.

### Coastal Impact Assistance Program (CIAP)

CIAP grants funds to states pursuant to EPAct05. States with an approved CIAP State Plan are eligible to receive a portion of $250 million for each of FY2007 through FY2010. This revenue is shared among Alabama, Alaska, California, Louisiana, Mississippi, and Texas.[54]

### Gulf of Mexico Energy Security Act of 2006 (GOMESA)

GOMESA established a revenue-sharing program for four coastal producing states in the Gulf of Mexico—Alabama, Louisiana, Mississippi, and Texas—and their coastal counties and parishes. There are two phases: (1) starting in FY2007, these four states would receive 37.5% of the oil and gas revenues generated from leases issued in two areas of the Gulf of Mexico where sales were mandated in the Eastern and Central Gulf of Mexico Planning Areas; and (2) beginning in FY2017, the four states will share 37.5% of qualified OCS revenues from Gulf of Mexico leases issued after December 20, 2006. Payments to states are made annually. In March 2009, $25 million of GOMESA qualified revenues were disbursed from bonuses and first year rental payments from leases issued in FY2008.[55]

## International Ocean Policy for Energy Development

### UNCLOS and Extended Continental Shelf (ECS) Claims

With changes in annual congressional moratoria, and changes in executive moratoria, certain international marine boundary areas gain greater attention from policymakers. Depending on whether the areas are prone to oil and gas resources, the permissibility of development can be a key factor in looking at international marine boundaries.

The United States and some other coastal nations are engaged in efforts to establish ECS areas beyond a customary 200-mile EEZ. Among the coastal nations that have ratified UNCLOS, recognition of an ECS would likely be addressed under UNCLOS rules. As the United States has not ratified UNCLOS, UNCLOS rules would likely not apply to U.S. claims. Nevertheless, the State Department indicates its efforts related to ECS areas are not intended to be inconsistent with the UNCLOS process.

---

[53] According to DOI, in FY2008, DOI disbursed $103.6 million in 8(g) oil and gas revenues to seven coastal states. Alabama: $15.0 million; Alaska: $17.8 million; California: $11.0 million; Louisiana: $45.8 million; Texas: $13.3 million; Mississippi: $564,068; Florida: $83. Disbursements to Mississippi and Florida show a remarkable difference in scale, which reflects adherence to each state's state coastal planning requirements. These totals have been verified for accuracy. See http://www.BOEMRE.gov/ooc/PDFs/BOEMREFastFactsApr09.pdf.

[54] For more information, see http://www.BOEMRE.gov/offshore/ciapmain.htm.

[55] According to DOI, funds were disbursed to Alabama: $7.7 million; Louisiana: $7.9 million; Mississippi: $6.8 million and Texas: $2.6 million. See http://www.BOEMRE.gov/ooc/PDFs/BOEMREFastFactsApr09.pdf.

The United States has relied on its general conformance to international law as a substitute for ratifying UNCLOS in its approach to certain international ocean matters.[56] However, the difference between choosing to align with UNCLOS and choosing to ratify UNCLOS is becoming increasingly more pronounced, especially with respect to the process to establish U.S. ECS jurisdiction.

Establishing OCS policies that allow for extended marine boundaries and establishing international recognition of U.S. ECS areas are emerging as significant concerns absent UNCLOS ascension. Some argue that UNCLOS ratification is the most sound approach to establishing international recognition for U.S. jurisdiction in an ECS area. Others contend that ratification of UNCLOS could diminish U.S. sovereignty in ocean areas. It is unclear whether there is an available substitute for ratifying UNCLOS to establish broad international recognition for ECS areas. These types of concerns are before the U.S. Senate Committee on Foreign Relations as it considers UNCLOS accession.

## Transboundary OCS Resources

In the late 1990s, petroleum resources were discovered in progressively deeper water in the Gulf of Mexico. Over the two decades that the United States negotiated, signed and eventually ratified the Delimitation Treaty with Mexico, both countries recognized the possibility that trans-boundary oil and gas reservoirs may exist.[57]

### *United States and Mexico—Gulf of Mexico Moratorium Areas*

In the case of the marine boundary between the United States and Mexico, shown in **Figure 2**, a moratorium established by bilateral treaty was extended past its 2010 expiration target. If the United States' and Mexico's constitutional and legal frameworks allow, potential options exist for oil sharing, joint development, or unitization schemes.

Marine development activities in the Gulf of Mexico are of interest to the United States, Mexico, and Cuba.[58] Concerns associated with governing transboundary resources such as those in the Gulf of Mexico are increasingly evident. Despite various attempts within each nation to establish governance within their own jurisdictions, there is little to indicate progress among the United States, Mexico, and Cuba in developing coordinated maritime policies.[59]

---

[56] Mutual adherence to UNCLOS has been instrumental in the diplomatic discussions to set marine boundaries between the United States and Mexico. It is typical that countries attempt to adhere to the same customary definitions when settling marine boundaries, and determining the sovereignty of marine areas. For example, when Mexico and the United States negotiated a marine boundary each country adhered to the position that the continental shelf of each country would extend past the 200 nautical mile boundary, pursuant to Article 76(1) of UNCLOS. This was a fundamental principle of the delimitation of marine areas between Mexico and the United States. It was by each country's adherence to this principle that both countries were able to agree.

[57] Trans-boundary resources are prospective marine resources that straddle marine boundaries of two or more national territories. The legal and policy issues associated with trans-boundary reservoirs have not been fully analyzed. Countries tend to consider mutual policy options, including moratoria alternatives, to address trans-boundary resources.

[58] See U.S. Geological Survey report titled "Assessment of Undiscovered Oil and Gas Resources of the North Cuba Basin 2004," published in February 2005, which estimated a mean of 4.6 billion barrels of undiscovered oil and 9.8 trillion cubic feet of undiscovered natural gas along Cuba's north coast. See also CRS Report R41522, *Cuba's Offshore Oil Development: Background and U.S. Policy Considerations*, by Neelesh Nerurkar and Mark P. Sullivan

[59] The United States negotiated a boundary with Cuba but has not ratified the Cuba boundary treaty. The boundary (continued...)

### *United States and Canada—Georges Bank Moratorium Areas*

The Georges Bank straddles the U.S.-Canada border off southwest Nova Scotia in the North Atlantic. On the U.S. side, the West Georges Bank Basin had been under moratoria until 2008. With the expiration of the annual congressional moratoria, U.S. areas of the West Georges Bank Basin may be considered for oil and gas leasing.

On the Canadian portion of Georges Bank a general leasing ban for the East Georges Bank Basin has been in effect for many years. BP Canada Energy Company and Chevron Canada Limited hold three large exploration concessions there, indicating potential development interests. These permits were issued by the government of Canada in 1964. Exploration rights belonging to these companies are suspended while the moratorium is in place. On May 13, 2010, the governments of Canada and Nova Scotia announced the extension of the moratorium until December 31, 2015.

# Conclusion

Changes in domestic moratorium policy correspond in some ways to changes in international policies about moratoria. In both domestic and international contexts, questions seem to be widespread over economic and environmental consequences of shifts in moratorium policy. A prevailing view among parties on all sides of the "moratoria debate" is that clarifying moratorium policy leads to more predictable approaches to OCS development.

Moratorium policy options remain a significant aspect of ocean energy policy. Legislative measures, in conjunction with executive measures, can effect moratorium areas. The use of moratoria as a policy alternative for ocean energy development can affect national fiscal policy. In theory, greater development bans reduce options for generating federal OCS revenue; diminished development bans increase options for generating federal OCS revenue.

Moratorium policy has been of interest to some policymakers in the past. However, it remains to be seen how, if at all, moratoria measures are considered as policy alternatives during the 112th Congress.

## Author Contact Information

Curry L. Hagerty
Specialist in Energy and Natural Resources Policy
chagerty@crs.loc.gov, 7-7738

---

(...continued)
treaty with Cuba was submitted to the Senate on January 23, 1979. On September 17, 1980, the Senate unanimously returned the boundary treaty with Cuba to the executive calendar. See 126 *Cong. Rec.* S25722–23 (Sept. 17, 1980).