## UNITED STATES DISTRICT COURT
## EASTERN DISTRICT OF LOUISIANA

| | | |
|---|---|---|
| | * | **MDL NO. 2179** |
| **IN RE:  OIL SPILL by the OIL RIG** | * | |
| **"DEEPWATER HORIZON" in the** | * | |
| **GULF OF MEXICO, on** | * | |
| **APRIL 20, 2010** | * | **SECTION: J** |
| | * | |
| **THIS DOCUMENT RELATES TO:** | * | |
| | * | |
| ***ALL CASES IN PLEADING BUNDLE B3*** | * | **JUDGE BARBIER** |
| | * | **MAG. JUDGE SHUSHAN** |

\*   \*   \*   \*   \*   \*   \*   \*   \*   \*   \*   \*   \*

### ORDER AND REASONS

#### [As to the B3 Claims Against the Clean-Up Responder Defendants]

Before the Court are the Clean-Up Responder Defendants'[1] motions for summary

judgment, seeking dismissal with prejudice of all remaining claims asserted against them in the

First Amended Master Complaint in Accordance with Pretrial Order No. 11 Section III.B(3)

("B3 Master Complaint") (Rec. Doc. 1812), and related briefing.  (Rec. Docs. 6536, 6538, 6546,

6547, 6551, 6553, 6557, 6559, 6597, 6696, 6842, 6843, 6845, 6849, 6852, 6854, 6859, 6878,

6897).  Also before the Court is the Plaintiffs' Steering Committee ("PSC") and the Clean-Up

Responder Defendants' Joint Report Regarding Claimants' Compliance with Pretrial Order No.

57 ("Joint Report") (Rec. Doc. 13667) as well as the submissions in connection with the Court's

Order to Show Cause of January 7, 2016 as to the B3 Claims Against the Clean-Up Responder

Defendants.

---

[1]  O'Brien's Response Management, L.L.C. (formerly known as O'Brien's Response Management, Inc.), National Response Corporation, Marine Spill Response Corporation, Dynamic Aviation Group, Inc., Airborne Support, Inc., Airborne Support International, Inc., DRC Emergency Services, LLC, International Air Response, Inc., Lynden, Inc., Lane Aviation, Inc., Tiger Rentals, Ltd., The Modern Group, Ltd., and The Modern Group GP-SUB, Inc.

**EXHIBIT "A"**

I.     BACKGROUND AND PROCEDURAL HISTORY

A.     The Incident and Resultant Oil Spill

On April 20, 2010, a loss of well control and one or more fires and explosions occurred on the *Deepwater Horizon* rig, which had been engaged in drilling activities in Mississippi Canyon Block 252 – the location known as "Macondo"– on the Outer Continental Shelf off the coast of Louisiana.  The *Deepwater Horizon* sank two days later, oil began to discharge into the Gulf of Mexico, and the flow of oil continued for three months until the well was capped on July 15, 2010 and subsequently sealed with the completion of a relief well on September 19, 2010. Clean-up activities and efforts to minimize the impact of the spill continued for months thereafter.

This complex response effort included a variety of federal and state government entities and officials, BP Exploration & Production, Inc. and/or its affiliated entities (collectively, "BP"), who had been designated the "responsible party" for the oil spill under the Oil Pollution Act of 1990 ("OPA"), 33 U.S.C. § 2701 *et seq.*, and a variety of other entities and individuals that were engaged to respond to the oil spill, including the Clean-Up Responder Defendants.  Response activities included skimming oil from the surface of the water, conducting controlled *in situ* burning of oil, placing containment and sorbent boom, onshore and beach clean-up, decontaminating vessels that engaged in various response efforts, and the application of dispersants to the surface of the Gulf of Mexico.  Dispersants "are chemical agents that emulsify, disperse, or solubilize oil into the water column or promote the surface spreading of oil slicks to facilitate dispersal of the oil into the water column," 40 C.F.R. § 300.5, and are used in oil spill response operations to reduce the impact of the spill.

B.        The B3 Master Complaint

On August 10, 2010, the Judicial Panel on Multidistrict Litigation transferred cases arising from the *Deepwater Horizon* incident to this Court for consolidated or coordinated pretrial proceedings pursuant to 28 U.S.C. § 1407.  *In re: Oil Spill by the Oil Rig "Deepwater Horizon" in the Gulf of Mexico, on April 20, 2010*, 731 F. Supp. 2d 1352 (J.P.M.L. 2010).  In order to facilitate the effective administration of this multidistrict litigation and the prosecution of the coordinated actions herein, the Court established eight separate "pleading bundles" for different categories of cases and claims, including the "B3" pleading bundle, defined to concern claims relating to the post-explosion clean-up efforts, including personal injury and/or medical monitoring claims for exposure or other injury occurring after the explosion and fire of April 20, 2010.  (Rec. Doc. 569 at 1-5, Rec. Doc. 983 at 2).  Pursuant to Pretrial Order No. 11 (Rec. Doc. 569), the PSC filed a "B3" Master Complaint on December 15, 2010 (Rec. Doc. 881), which was amended on March 30, 2011 (Rec. Doc. 1812) and remains the operative Master Complaint. Plaintiffs were permitted to join in the B3 Master Complaint by filing short forms pursuant to Pretrial Orders 20, 24, and 25.  (Rec. Docs. 904, 982, 983).  Plaintiffs could also file individual petitions or complaints and be deemed "B3" Plaintiffs.  (Rec. Doc. 983 at 2).

The B3 Master Complaint asserted various claims for relief on behalf of five categories of Plaintiffs: (1) boat captains and crew involved in the Vessels of Opportunity ("VoO") Program ("VoO Plaintiffs"); (2) workers involved in decontaminating vessels; (3) other vessel captains and crew who were not involved in the VoO program; (4) clean-up workers and beach personnel who were involved in the onshore clean-up activities; and (5) residents "who live and work in close proximity to coastal waters or who otherwise allege that they were exposed to oil and/or dispersants (e.g., while on vacation)."  (Rec. Doc 1812 at ¶21).  Specifically, it asserted

negligence, gross negligence, negligence *per se*, nuisance, and battery claims, and also sought medical monitoring for Florida Plaintiffs, punitive damages, and declaratory relief.  Generally, the B3 Master Complaint alleges that Plaintiffs engaged in a variety of clean-up activities and were exposed to oil, dispersants, and other chemicals while doing so as a result of various actions or omissions of, among others, the Clean-Up Responder Defendants.  Further, it alleges that the Defendants "failed to use reasonably safe dispersant chemicals or other chemicals in their attempts to respond to the Oil Spill, and thereby exacerbated the pollution of the Gulf of Mexico and injury to Plaintiffs," "ignored worker safety concerns," and failed to supply workers with appropriate equipment such as respirators.  *Id.* at ¶¶ 150, 156, 184, 189, 190.  The Clean-Up Responder Defendants are all named defendants in the B3 Master Complaint.  *Id.* at ¶¶ 62-72.

### C.    The Court's Ruling on the Clean-Up Responder Defendants' Motions to Dismiss

Various Clean-Up Responder Defendants and the manufacturer of the dispersants used in the *Deepwater Horizon* response, Nalco,[2] moved to dismiss the claims asserted against them in the B3 Master Complaint, arguing, among other things, that they are entitled to derivative immunity under the Clean Water Act ("CWA"), 33 U.S.C. § 1321(j)(8), entitled to discretionary function immunity under the Federal Tort Claims Act ("FTCA"), 28 U.S.C. § 2680(a), and that Plaintiffs' claims are preempted as a matter of law.

On September 30, 2011, the Court issued its Order and Reasons (Rec. Doc. 4159) granting in part and denying in part these motions to dismiss.  *See In re Oil Spill by the Oil Rig "Deepwater Horizon" in the Gulf of Mexico*, MDL No. 2179, 2011 WL 4575696 (E.D. La. Sept.

---

[2]  "Nalco" refers to Nalco Company, Nalco Holdings LLC, Nalco Finance Holdings LLC, and Nalco Holding Company.  Nalco manufactured both dispersants used during the *Deepwater Horizon* response, Corexit EC9500A and Corexit EC9527A (collectively, "Corexit").

30, 2011).  An Amended Order and Reasons was issued on October 4, 2011 to address several

non-substantive changes.  (Rec. Doc. 4209).

In that Order, the Court recognized the availability of derivative immunity to private

parties, "irrespective of contractual privity" with the federal government.  *In re Oil Spill*, 2011

WL 4575696, at *6-7, 12.  Despite finding that derivative immunity was "not established on the

face of the Complaint," the Court noted that "it seems at this point that if the facts revealed that

the Clean–Up [Responder] Defendants were using dispersants as directed by the federal

government, then they would be entitled to derivative governmental immunity."  *Id.* at *7, 12.

The Court further held that the preemption arguments were "not established on the face of the

Complaint," but found them to be "certainly plausible."  *Id.* at *8, 12.  The Order and Reasons

made clear that such defenses were preserved and expressly permitted them to be re-asserted at a

later time.  *Id.* at *12.

As a result of that Order, only two "B3" causes of action under maritime law –

negligence and gross negligence – remained against the Clean-Up Responder Defendants.  *See*

*id.* at *12.  All state law claims were deemed preempted by maritime law and dismissed,

including Plaintiffs' medical monitoring claim under Florida law; Plaintiffs' request for

declaratory relief and claims of nuisance, battery, and negligence *per se* under maritime law were

also dismissed.[3]

### D.     Limited B3 Discovery

Following the issuance of the Court's Order and Reasons, a "Schedule for Limited B3

Discovery" was designed to develop "the facts necessary" for the Clean-Up Responder

Defendants to "file motions renewing their preemption [and] derivative immunity arguments."

---

[3]  The Court also held that non-seamen may seek punitive damages and that "all Plaintiffs that have alleged an
'injury' under general maritime law may seek medical monitoring as an element of their damages." *Id.* at *9, 11.

(Rec. Docs. 4472, 5000).  During that time, the Clean-Up Responder Defendants served written discovery to the B3 Plaintiffs and to the United States regarding preemption and immunity issues, responded to written discovery served by the PSC, produced thousands of documents, and entered into joint stipulations of fact with the United States regarding issues relevant to their derivative immunity and implied preemption arguments.  The PSC responded to the Clean-Up Responder Defendants' written discovery but did not produce any documentation which may have been in the possession of individual plaintiffs or their counsel in response to these requests. The PSC (who, at that time, was engaged in confidential settlement negotiations with BP, but not the Clean-Up Responder Defendants, with respect to the B3 claims) did not request or notice any 30(b)(6) depositions of United States or Clean-Up Responder Defendant witnesses, or any other depositions, relevant to the Clean-Up Responder Defendants' derivative immunity or preemption defenses during the B3 discovery period.[4]  On February 16, 2012, the PSC filed a motion to dismiss the Clean-Up Responder Defendants from the B3 Master Complaint *without* prejudice, reserving the right of any individual plaintiff to later proceed with such claims.  (Rec. Doc. 5718).  The Clean-Up Responder Defendants objected the PSC's motion, unless dismissal was *with* prejudice.  (Rec. Doc. 5828).  After receiving additional statements from interested parties, the Court ruled on April 16, 2012, that it would not dismiss, with or without prejudice, the Clean-Up Responder Defendants at that time.  (Rec. Doc. 6247).

 E.     **The Clean-Up Responder Defendants' Motions for Summary Judgment**

 Following the permitted B3 discovery period, and in accordance with the Schedule set forth by the Court (Rec. Docs. 4472, 5000), the Clean-Up Responder Defendants filed individual motions for summary judgment, seeking dismissal with prejudice of all remaining claims

---

[4]  The PSC did, however, take the 30(b)(6) deposition of Nalco.

6

asserted against them in the B3 Master Complaint.  (Rec. Docs. 6536, 6538, 6546, 6547, 6551, 6553, 6557, 6559, 6597).   The Clean-Up Responder Defendants reasserted their derivative immunity defenses and argued that they were entitled to dismissal because they performed their actions in responding to the *Deepwater Horizon* oil spill pursuant to the authorization, direction, and ultimate control of the federal government.  They also reasserted their arguments that the Plaintiffs' remaining claims should be dismissed because they conflict with the comprehensive federal response scheme set forth in the CWA, the Oil Pollution Act of 1990 ("OPA"), and the National Contingency Plan ("NCP") codified at 40 C.F.R. pt. 300., because the Clean-Up Responder Defendants were compelled by law to obey the federal directives issued.

On June 18, 2012, the PSC filed an Omnibus Opposition to the summary judgment motions.  (Rec. Doc. 6696).  Among other things, the PSC argued that the Clean-Up Responder Defendants are not entitled to derivative immunity because it is disputable whether they complied with the federal government's instructions and authorizations during the clean-up.  The PSC submitted thirteen affidavits and declarations in support of their opposition brief, which contained certain allegations concerning the response activities.  (Rec. Docs. 6696-15 – 6696-27).  The PSC also argued that preemption is inapplicable, citing the CWA and OPA savings clauses, as well as the CWA immunity provision for responders, 33 U.S.C. § 1321(c)(4)(B).  In addition, the PSC maintained that additional discovery is necessary to develop the factual record and that the Court should not consider the stipulations the Clean-Up Responder Defendants entered into with the federal government.  (Rec. Doc. 6696 at 25-26).

In their reply briefs, the Clean-Up Responder Defendants highlighted the Court's previous ruling that derivative immunity and implied preemption were available in this context and reiterated why they are entitled to these defenses based on the undisputed facts submitted.

(Rec. Docs. 6842, 6843, 6845, 6849, 6852, 6854, 6859, 6878, 6897).   The reply briefing also argued  that the affidavits and declarations submitted by the PSC failed to raise a genuine issue of material fact, that the PSC had a full and fair opportunity to conduct additional discovery, but made the strategic decision not to do so, and that the request for further discovery should be rejected.  The Clean-Up Responder Defendants similarly noted that the PSC did not provide any objections to the stipulations between the Clean-Up Responder Defendants and the United States at the time set forth in the Court's discovery schedule, and failed to offer any competent evidence to refute their contents.

The United States also submitted a statement of interest in connection with the PSC's Omnibus Opposition, highlighting that the United States "undertook significant efforts to review the documentary evidence available and canvass the relevant witnesses to assemble stipulations that were eventually served on the other parties."  (Rec. Doc. 6851 at 1).  Among other things, the United States noted that it "responded to a large number of Requests for Admission served by BP and other parties that relate to dispersant use," and that "[t]he limited B3 discovery order . . . allowed all parties, not just defendants, to request documents and/or depositions, . . .  [such that] the PSC had the opportunity to contest the stipulations with written discovery or deposition requests . . . but did not do so."  (Rec. Doc. 6851 at 1-2).

Oral argument was held in connection with the Clean-Up Responder Defendants' summary judgment motions on July 13, 2012 and the Court took them under advisement.

F.    **The Medical Benefits Class Action Settlement**

On January 11, 2013, the Court issued its approval order and judgment (Rec. Docs. 8217, 8218), granting final approval of the Medical Benefits Class Action Settlement ("Medical Benefits Settlement"), which resolved certain claims of individuals engaged as clean-up workers

and residents of particular geographical boundaries in the Gulf of Mexico related to their exposure to oil and/or dispersants arising from the *Deepwater Horizon* incident and subsequent response efforts. *In re Oil Spill by the Oil Rig "Deepwater Horizon" in the Gulf of Mexico*, 295 F.R.D. 112 (E.D. La. 2013). The Medical Benefits Settlement became effective on February 12, 2014.

Medical Benefits Settlement class members ("Medical Class") who did not wish to be bound by the Medical Benefits Settlement were required to exclude themselves, or "opt out," pursuant to the procedures set forth in Section XI.E of the Medical Benefits Settlement (Rec. Doc. 6427-1) and Paragraph 29 of the Court's Preliminary Approval Order concerning the Medical Benefits Settlement (Rec. Doc. 6419), as amended by the Court's Order extending the opt-out deadline to November 1, 2012. (Rec. Doc. 7176). Thus, any Plaintiff who is a member of the Medical Class and did not opt out by the deadline set by the Court is now bound by the Medical Benefits Settlement. As all of the Clean-Up Responder Defendants are released parties under the Medical Benefits Settlement (Rec. Doc. 6427-8), only opt-out Plaintiffs may proceed with exposure-based claims, including claims of personal injury, medical monitoring, loss of consortium, or wrongful death, against the Clean-Up Responder Defendants.

G.     **Pretrial Order No. 57**

At the June 27, 2013 Status Conference, the Court addressed the Clean-Up Responder Defendants' pending motions for summary judgment and stated that the Clean-Up Responder Defendants would be entitled to derivative immunity for the actions that are the subject of the B3 Master Complaint if they acted pursuant to the direction of the federal government during the *Deepwater Horizon* response. The Court also noted that the affidavits and declarations submitted by the PSC in opposition to the Clean-Up Responder Defendants' motions for

summary judgment contained only vague and generalized statements. Nevertheless, the Court indicated that it may be possible that some B3 claimants have evidence that the Clean-Up Responder Defendants acted beyond, or outside, the authority conferred by the federal government during these clean-up response operations. Accordingly, the Court instructed Plaintiffs' Liaison Counsel and Defense Liaison Counsel for the Clean-Up Responder Defendants to develop a protocol akin to a *Lone Pine* Order whereby B3 claimants would be required to provide basic evidence to support their claims, ultimately permitting the Court to rule on the Clean-Up Responder Defendants' pending summary judgment motions ("the B3 protocol").

Following the efforts of Liaison Counsel for the parties, on July 17, 2014, the Court entered Pretrial Order No. 57 ("PTO 57"), formally establishing the B3 protocol. (Rec. Doc. 13158). PTO 57 made clear that the purpose of the B3 protocol was, among other things, to give Plaintiffs an opportunity to come forward with specific evidence, should they have any, demonstrating that the actions of the Clean-Up Responder Defendants were not performed "pursuant to the authorization, direction, and ultimate control of the federal government." (*Id.* at 1-2). Plaintiffs who (1) properly opted out of the Medical Benefits Settlement or are not a member of the Medical Class, (2) desired to pursue a claim against any Clean-Up Responder Defendant(s) arising out of the clean-up, including personal injury and/or medical monitoring claims alleging exposure to oil, dispersants, chemicals, and/or toxic substances used during the clean-up, whether by joinder in the B3 Master Complaint, individual complaint, or otherwise, and (3) had evidence that any Clean-Up Responder Defendant(s) acted beyond or outside of the authority conferred by the federal government, were instructed to serve Liaison Counsel for the Clean-Up Responder Defendants and Plaintiffs' Liaison Counsel with a sworn statement setting

10

forth certain information by September 22, 2014.  (Rec. Doc. 13158 at 6).  The form for such a sworn statement, or "Questionnaire," was attached to PTO 57 as Exhibit A.  (Rec. Doc. 13158-1).

PTO 57 required that Plaintiffs provide: (1) certain employment-related information, if they served as a clean-up worker during the *Deepwater Horizon* oil spill response; (2) a specific explanation of the circumstances of alleged exposure, including the pathway of exposure, the date(s), time(s), and location(s) of exposure, the duration of exposure, and the Clean-Up Responder Defendant(s) alleged to be responsible for the exposure; (3) a specific description of the alleged injury, illness, or medical condition sustained as a result of such exposure; (4) the basis for the identification of each Clean-Up Responder Defendant alleged to be responsible for such exposure, the act(s) or omission(s) that caused Plaintiff's injury, illness, or medical condition as well as the date(s), time(s), and location(s) of such act(s) or omission(s) and the circumstances under which it/they arose, and how the act(s) or omission(s) caused their injury, illness, or medical condition; and (5) details and specific evidence regarding how the previously-identified act(s) or omission(s) violated or exceeded the federal government's instruction(s) or order(s), or was/were undertaken without any such instruction(s) or order(s), and led to the alleged injury, illness, or medical condition.  (Rec. Doc. 13158 at 6-9).

PTO 57 was to be sent to all counsel of record via File & ServeXpress and posted on the Court's website along with its accompanying notice. (Rec. Doc. 13158 at 10-11).  Defense Liaison Counsel was ordered to mail PTO 57 and the accompanying notice to all unrepresented Plaintiffs who purportedly opted out of the Medical Benefits Settlement, as identified in the exhibit to the Joint Filing of the Declaration of Matthew Garretson (Rec. Doc. 7989).  Finally, the PSC and Defense Liaison Counsel were ordered to commission Epiq Systems, Inc. to mail

PTO 57 and the accompanying notice to all B3 Plaintiffs in their database for this multidistrict litigation, and to the extent practicable, the PSC was ordered to email PTO 57 to known counsel of record for B3 Plaintiffs.

On September 22, 2014, several Plaintiffs who had previously filed B3 individual actions against various Clean-Up Responder Defendants moved for an extension of time to file a response to PTO 57.  (Recs. Docs. 13422, 13426).  Specifically, these Plaintiffs requested an extension of time to respond until the discovery stay in their individual cases is lifted and they can conduct "adequate discovery," or in the alternative, 60 days from the date they received information responsive to their pending Freedom of Information Act requests.  The Court held that such relief would "negate[] the purpose of the PTO 57 protocol," denied the motions, and instructed these Plaintiffs to comply with PTO 57 within fourteen calendar days. (Rec. Doc. 13439).

Pursuant to PTO 57, the PSC and the Clean-Up Responder Defendants, by and through Plaintiffs' Liaison Counsel and Defense Liaison Counsel, developed the Joint Report and submitted it to the Court on November 14, 2014.  (Rec. Doc. 13667).  In the Joint Report, the parties advised the Court that they complied with the notice procedures set forth in PTO 57 and that they had received 102 Questionnaires.  The parties also advised the Court that they had agreed to several groupings with respect to compliance with PTO 57, namely those Questionnaires that: (1) were served past the deadline; (2) were submitted by clean-up workers who did not opt out of the Medical Benefits Settlement; (3) were "blank," in that they did not provide information in response to any of the questions posed in the Questionnaire; (4) provided information in response to some, but not all, of the questions posed in the Questionnaire; and (5)

provided a written response to all questions posed in the Questionnaire.   Listings of such Plaintiffs were attached to the Joint Report at Exhibit 2.  (Rec. Doc. 13667-2).

The Declaration of Matthew Garretson, the Court-appointed Claims Administrator of the Medical Benefits Settlement, accompanied the Joint Report.   (Rec. Doc. 13667-3).   In this Declaration, Mr. Garretson confirmed the status of certain Plaintiffs who had submitted Questionnaires with respect to the Medical Benefits Settlement.

On January 7, 2016, the Court issued the Order to Show Cause ("OSC"), indicating that it had considered the briefing related to the Clean-Up Responder Defendants' summary judgment motions, as well as the Joint Report, and was prepared to dismiss certain Plaintiffs' B3 claims with prejudice.   The OSC directed Plaintiffs opposed to the dismissal of their B3 claims(s) with prejudice to show cause in writing on or before January 28, 2016, why the Court should not dismiss their claim(s).

## II.   LEGAL STANDARDS

### A.   Summary Judgment

Summary judgment is proper if "there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law."  Fed. R. Civ. P. 56(a).  A party moving for summary judgment "must demonstrate the absence of a genuine issue of material fact, but need not *negate* the elements of the nonmovant's case."  *Little v. Liquid Air Corp.*, 37 F. 3d 1069, 1075 (5th Cir. 1994) (quoting *Celotex Corp. v. Catrett*, 477 U.S. 317, 323-25 (1986)).  "Factual controversies are construed in the light most favorable to the nonmovant, but only if both parties have introduced evidence showing that an actual controversy exists."  *Edwards v. Your Credit, Inc.*, 148 F. 3d 427, 432 (5th Cir. 1998).  Once a moving party has carried its burden, the nonmoving party must do more than create "some metaphysical doubt as to the

material facts, by conclusory allegations, by unsubstantiated assertions, or by only a scintilla of evidence." *Little*, 37 F. 3d at 1075; *see also, e.g., Ramsey v. Henderson*, 286 F. 3d 264, 269 (5th Cir. 2002) (cautioning that "conclusory allegations, speculation, and unsubstantiated assertions are inadequate to satisfy the nonmovant's burden [on] summary judgment").

### B.     *Lone Pine* Case Management Orders and Dismissal Under the Federal Rules

The United States Court of Appeals for the Fifth Circuit has looked favorably upon *Lone Pine* case management orders that are employed to "handle the complex issues and potential burdens on defendants and the court in mass tort litigation." *Acuna v. Brown & Root Inc.*, 200 F. 3d 335, 340-41 (5th Cir. 2000). The "basic purpose of a *Lone Pine* order is to identify and cull potentially meritless claims and streamline litigation in complex cases." *In re Vioxx Products Liability Litigation*, 557 F. Supp. 2d 741, 743 (E.D. La. 2008) (*quoting Baker v. Chevron USA, Inc.*, No. 1:05-CV-227, 2007 WL 315346, at *1 (S.D. Ohio. Jan. 30, 2007)). A *Lone Pine* order can be employed at a court's discretion. *See* Fed. R. Civ. P. 16(c)(2)(L) (permitting the court to adopt[] special procedures for managing potentially difficult or protracted actions that may involve complex issues, multiple parties, difficult legal questions, or unusual proof problems").

Federal Rule of Civil Procedure 16(f) authorizes the dismissal of a claim or action due to a Plaintiff's failure to adhere to a pretrial order issued by a district court. Fed. R. Civ. P. 16(f), by reference to Fed. R. Civ. P. 37(b)(2)(A); *see also Callip v. Harris County Child Welfare Dept.*, 757 F.2d 1513, 1518 (5th Cir. 1985) (*citing Link v. Wabash R. Co.*, 370 U.S. 626 (1962)) (noting that Rule 16(f) "merely makes explicit a discretionary power to control the expeditious disposition of docketed cases that appellate courts have long recognized to be an inherent attribute of federal district courts"). Accordingly, the Fifth Circuit has affirmed judgments dismissing claims with prejudice pursuant to Rule 16(f) due to Plaintiffs' failure to satisfy a *Lone*

14

*Pine* order's conditions. *Acuna*, 200 F. 3d at 340-41; *see also, e.g., In re Vioxx Prod. Liab. Litig.*, MDL No. 1657, 2009 WL 1158887, at *3-6 (E.D. La. Apr. 28, 2009), *aff'd* No. 09-30446, 388 Fed. Appx. 391, 2010 WL 2802352 (5th Cir. July 16, 2010) (dismissing with prejudice claimants who failed to provide requisite disclosures pursuant to a *Lone Pine* order).   An action or claim may also be dismissed with prejudice pursuant to Rule 41(b) when a Plaintiff has failed to prosecute his or her claim(s) or has failed to comply with a court order.  Fed. R. Civ. P. 41(b); *Link*, 370 U.S. at 629-32; *Long v. Simmons*, 77 F. 3d 878, 879 (5th Cir. 1996) (*citing McCullough v. Lynaugh*, 835 F. 2d 1126, 1127 (5th Cir. 1988)).  As multidistrict litigation is a "special breed of complex litigation" wherein case management serves as the "engine that drives disposition on the merits," and accordingly, the need for compliance with the Court's orders is "essential," greater deference is afforded to the MDL Court in connection with administrating the proceedings.  *In re Asbestos Products Liability Litigation (No. VI)*, 718 F. 3d 236, 246-47 (3d Cir. 2013) (*quoting In re Phenylpropanolamine (PPA) Prods. Liab. Litig.*, 460 F. 3d 1217, 1232 (9th Cir. 2006)).

## III.   DISCUSSION AND ANALYSIS

### A.   Objections to Evidence Submitted by the Clean-Up Responder Defendants

In support of their summary judgment motions, the Clean-Up Responder Defendants submitted, among other things, stipulations with the United States.  (Rec. Doc. 6545-7).  The PSC objected to the use of these stipulations and urged the Court to disregard them.  (Rec. Doc. 6696 at 32-33).  The PSC also raised hearsay objections to some of the other evidence submitted by the Clean-Up Responder Defendants.  (Rec. Doc. 6696-1 at ¶¶ 4, 63, 66, 76, 108).  For the same reasons articulated in the Court's Order & Reasons granting Nalco's motion for summary judgment, these objections are overruled.  *See In re Oil Spill by the Oil Rig "Deepwater*

*Horizon" in the Gulf of Mexico*, MDL No. 2179, 2012 WL 5960192, at *4-5 (E.D. La. Nov. 28, 2012).  The stipulations of fact entered into with the United States, and the other evidence cited by the Clean-Up Responder Defendants, will be considered by the Court.

### B.       Statutory and Regulatory Background

The Court has previously discussed the statutory and regulatory framework with respect to responding to oil spills on navigable waters of the United States, namely the CWA, OPA, and NCP, as well as the National Response System response strategy that is consistent with the NCP, the role of the Federal On-Scene Coordinator ("FOSC"), and the role of the National Incident Commander ("NIC"), in connection with ruling on Nalco's motion for summary judgment.  *See In re Oil Spill*, 2012 WL 5960192, at *6-7, 13.  In the same opinion, the Court also provided an overview of the dispersant pre-approval process, as required by statute, and the process for the pre-authorization of Corexit prior to its use in the *Deepwater Horizon* oil spill response effort.  *Id.* at *8-9, 14.  These portions of the Court's opinion dismissing the B3 claims against Nalco with prejudice are equally applicable here.  This information was also included by the Clean-Up Responder Defendants in their summary judgment briefing.

### C.       Overview of Evidence Submitted Jointly by the Clean-Up Responder
####            Defendants

The Incident Command System ("ICS") was the organizational structure used by the United States Department of Homeland Security to execute the *Deepwater Horizon* oil spill response efforts.  Clean-Up Responder Defendants' Joint Statement of Undisputed Material Facts in Support of Their Individual Motions for Summary Judgment ("Joint SUMF") at ¶ 21 (Rec. Doc. 6545-49).  Per this structure and NCP requirements, the Unified Area Command ("UAC") operated as the headquarters for the response under the leadership and direction of the FOSC.  Joint SUMF at ¶ 30.

Although the UAC system is "intended to create consensus" among all of the different stakeholders when making decisions, the FOSC had the "final word."  Joint SUMF at ¶¶ 34, 109. Indeed, ultimate decision-making power during the *Deepwater Horizon* response was held by the FOSC and no action could be taken without his or her approval.  Joint SUMF at ¶¶ 27, 108. Coast Guard captains were appointed as FOSC representatives during the response and stationed at each of the five Incident Command Posts ("ICPs"), which served as the "operational units" of the various response operations, in order to manage the activities being coordinated out of each post.  Joint SUMF at ¶¶ 35-40.  The Clean-Up Responder Defendants participated in the *Deepwater Horizon* spill response efforts in accordance with the roles, if any, assigned to them within the UAC system and at the ICPs.  Joint SUMF at ¶ 52.

Beginning on April 21, 2010 and continuing throughout the *Deepwater Horizon* spill response, Incident Action Plans ("IAPs") were prepared on a daily basis that contained detailed instructions concerning the response activities that were to occur each day, including health and safety instructions.  Joint SUMF at ¶ 53.  Each IAP was reviewed, signed, and approved by the FOSC and/or the FOSC's representative(s) and then delivered to the ICPs for execution by, among others, various Clean-Up Responder Defendants.  Joint SUMF at ¶ 54.  The United States also authorized and/or directed all activities set forth in the IAPs as of the time each IAP was issued, and monitored the execution of the IAP's instructions.  Joint SUMF at ¶¶ 55, 82.

Dispersant use was specifically authorized by the FOSC and/or the FOSC's representatives at various times and in various amounts, and these authorizations contained both maximum volumes as well as restrictions concerning the location and manner of the approved applications.  Joint SUMF at ¶¶ 56, 65-67, 69, 71-73, 76, 85-86.  Aerial dispersant operations were managed by the Dispersant Group at the ICP in Houma, Louisiana, and this Group plotted

and tracked the spray of dispersants, reported all dispersant data to the UAC and ultimately to the

FOSC, and documented all of its operations in daily status reports.  Joint SUMF at ¶¶ 57, 63, 70.

Federal officials also engaged in real-time monitoring of the dispersant operations using the

approved Special Monitoring of Applied Response Technologies protocol as well as on-the-

ground monitoring of the execution of IAP instructions.  Joint SUMF at ¶¶ 78-82.  The evidence

submitted by the Clean-Up Responder Defendants demonstrates that they complied with the

FOSC dispersant authorizations.  Joint SUMF at ¶ 74.

The FOSC also had the "ultimate responsibility for . . . addressing worker health and

safety concerns," with the support of the U.S. Occupational Safety and Health Administration

("OSHA").  Joint SUMF at ¶¶ 87-91.  OSHA personnel were "quickly deployed" and "fully

integrated" into the ICS in order to provide "technical assistance and support to the FOSC."

Joint SUMF at ¶89.  "By way of example, OSHA provided support to the FOSC by reviewing

training programs for incoming clean-up workers, helping to determine the appropriate level of

personal protective equipment ("PPE") to be worn by clean-up workers, preparing safety and

health related guidance materials for print and electronic distribution, and engaging in daily site

visits all over the Gulf Coast."  Joint SUMF at ¶ 91.  Among other things, OSHA assisted in

determining the "Respiratory Protection" policy for the clean-up efforts that was developed by

the UAC and based on air sampling results, agreeing that "respirators should be considered the

protection of last resort, as they can be physically taxing on the body, particularly for workers

who have not used them before and in conditions of extreme heat."  Joint SUMF at ¶¶ 94, 97.

### D.       The Clean-Up Responder Defendants' Entitlement to CWA Derivative Immunity

In *Yearsley v. W.A. Ross Constr.,* 309 U.S. 18 (1940), the United States Supreme Court established the concept of derivative immunity for parties acting under the direction and control of the federal government in the exercise of legitimate federal authority.  Private entities are entitled to this immunity when they perform work pursuant to the authorization and direction of the federal government and the acts of which Plaintiffs complain fall within the scope of those directives.  *Id.* at 20-21.  That is, if the federal government "validly conferred" its authority to private parties and this authority was not exceeded, these parties are entitled to derivative immunity.  *See Ackerson v. Bean Dredging, LLC*, 589 F. 3d 196, 206-07 (5th Cir. 2009) (finding the defendants immune under *Yearsley*, highlighting that it is still good law).

Relevant here, the CWA states that the President, via the FOSC, is to direct all oil spill response efforts on navigable waters of the United States, including those actions undertaken by private parties.  *See* 33 U.S.C. § 1321 (c)(1)(A), 33 U.S.C. § 1321 (c)(2)(A), 33 U.S.C. § 1321(d)(2)(K); *see also* 40 C.F.R. § 300.322(b); 40 C.F.R. § 300.120; 40 C.F.R. § 300.135. These mandatory provisions, along with all of the factual evidence submitted by the Clean-Up Responder Defendants, make clear that the federal government directed and led the *Deepwater Horizon* response in the exercise of its legitimate authority.  Accordingly, the federal government validly conferred authority upon the Clean-Up Responder Defendants to carry out various oil spill response activities.  As a result, and as the Court has previously indicated, the Clean-Up Responder Defendants are immunized under the CWA, 33 U.S.C. § 1321(j)(8), for any damages resulting from their actions or omissions during the *Deepwater Horizon* response so long as they adhered to, and acted within the scope of, the federal government's directives.

The Clean-Up Responder Defendants' joint and individual summary judgment briefing contains evidence sufficient to demonstrate that they did not exceed or disobey the authority conferred by the federal government in connection with the response operations.  And, as noted above, the materials submitted by the PSC in opposition to these motions contained only nonspecific and generalized allegations, and without more, are not sufficient to refute the Clean-Up Responder Defendants' *prima facie* showing of entitlement to summary judgment.  Thus, PTO 57 was designed to provide yet another opportunity for certain Plaintiffs[5] to come forward with specific evidence to support their claims and the basis for their argument(s) that the Clean-Up Responder Defendants are not entitled to derivative immunity for their actions in responding to the *Deepwater Horizon* oil spill.

E.     **The Clean-Up Responder Defendants' Entitlement to Discretionary Function Immunity**

In addition to being entitled to derivative immunity under the CWA, the Clean-Up Responder Defendants are also entitled to discretionary function immunity under the FTCA, *see* 28 U.S.C. § 2680(a), dismissing the B3 claims, unless any material facts stemming from the PTO 57 disclosures refute the Clean-Up Responder Defendants' showing of entitlement to summary judgment.

The record is clear that the decisions made by the federal government during the *Deepwater Horizon* response and clean-up effort "involve[d] an element of judgment or choice," *Berkovitz v. United States*, 486 U.S. 531, 536 (1988), and were "based on considerations of public policy."  *Id.* at 537.  For example, the materials submitted demonstrate that the federal government engaged in a comprehensive analysis before deciding that the use of dispersants to

---

[5]  As the Clean-Up Responder Defendants are all listed on the Release to the Medical Benefits Settlement, only those Plaintiffs who validly opted out or are not members of the Medical Class can pursue B3 claims against the Clean-Up Responder Defendants and were thus subject to PTO 57.  (Rec. Doc. 13158 at 2, 4, 6).

mitigate the impact of the oil spill was appropriate. *See, e.g.,* Excerpts from the On-Scene

Coordinator Report - Deepwater Horizon Oil Spill (Sept. 2011), at 33-34 (Ex. 3 to Joint SUMF,

Rec. Doc. 6545-3) (noting that the federal government's "decision to use dispersants required a

robust assessment of net environmental benefits and monitoring activities at the wellhead, in the

benthos, water column, water surface, and along the shoreline," and a "trade-off analysis

determined the appropriateness of dispersant use"); Joint Stipulations of Fact Between the Clean-

Up Responder Defendants and the United States of America (Jan. 31, 2012) at ¶ 35 (Ex. 7 to

Joint SUMF, Rec. Doc. 6545-7) ("Pursuant to the RRT VI Pre-Approval Guidelines, the FOSC

and/or the FOSC's representative(s) completed the 'Dispersant Pre-Approval Initial Call

Checklist' and 'FOSC Dispersant Use Checklist' on April 21, 2010 and specifically authorized

the use of dispersants in response to the [*Deepwater Horizon*] spill at that time . . . the FOSC

and/or the FOSC's representative(s) determined that the use of dispersants in response to the

[*Deepwater Horizon*] spill would likely provide a net environmental benefit if used under

the appropriate circumstances as delineated in the Pre-Approval Guidelines and pursuant to any

further direction from the FOSC and/or the FOSC's representative(s)."); *see also* Joint SUMF ¶

110.

      The Court has previously expressed its views on this analysis, as well as the FOSC's

decision to use Corexit in particular, in ruling on Nalco's motion for summary judgment and they

are equally applicable to the Clean-Up Responders' motions. *See In re Oil Spill*, 2012 WL

5960192, at *14. These are precisely the types of governmental decisions that are afforded

discretionary function immunity and shielded from "second-guessing" via an action in tort. *See*

*Berkovitz*, 486 U.S. at 536-37 (*quoting United States v. Varig Airlines*, 467 U.S. 797, 814

(1984)) (relaying the basis for the discretionary function exception). As the government would

be entitled to discretionary function immunity under the FTCA, it follows that this immunity extends to the Clean-Up Responder Defendants. *See Hix v. U.S. Army Corps of Engineers*, 155 Fed. Appx 121, 125 (5th Cir. 2005) (citing *Yearsley*, 308 U.S. at 21, and *Bynum v. FMC Corp.*, 770 F. 2d 556, 564 (5th Cir. 1985)) (stating that the discretionary function immunity under the FTCA "extends to contractors who work to implement programs as agents of the federal government").

As the *Yearsley* principles also govern the Clean-Up Responder Defendants' entitlement to derivative discretionary function immunity under the FTCA, the same analysis described above in connection with CWA derivative immunity is applicable here.[6]

## F.   Applicability of the Implied Conflict Preemption Doctrine

Pursuant to the Supremacy Clause, U.S. Const. art. VI, cl. 2, federal law may preempt state law. *Arizona v. United States*, 567 U.S. --, 132 S. Ct. 2492, 2500 (2012). Under the doctrine of implied conflict preemption, state law will be preempted when it conflicts with federal law, which "includes cases where compliance with both federal and state regulations is a physical impossibility, and those instances where the challenged state law stands as an obstacle to the accomplishment and execution of the full purposes and objectives of Congress." *Id.* at 2501 (citations and quotations omitted). More importantly in this multidistrict litigation, "[p]ositive federal law also may displace judicially-created federal maritime law, i.e. general

---

[6]  The three-part test articulated in *Boyle v. United Technologies Corp.*, 487 U.S. 500 (1988), a state law products liability suit asserting defective design claims, is not applicable here. *See, e.g., Chesney v. Tennessee Valley Auth.*, 782 F. Supp. 2d 570, 581-82 (E.D. Tenn. 2011) (citations omitted) (applying *Yearsley* and highlighting that "the context in which [*Yearsley* and *Boyle*] immunities apply is different," namely that the *Boyle* test is applicable when the party seeking immunity manufactured a particular product or item per government specifications or design, which implicates "different" issues from situations whereby the general *Yearsley* defense would be applied). As the Clean-Up Responder Defendants did not manufacture any product(s) in the *Deepwater Horizon* response, the *Yearsley* test governs their entitlement to derivative discretionary function immunity. The Court further notes that the PSC has not argued otherwise in its opposition to the Clean-Up Responder Defendants' summary judgment motions.

maritime law," which the Court has already held preempts state law.  *In re Oil Spill*, 2012 WL 5960192, at *10-11; *see also In re: Oil Spill*, 2011 WL 4575696, at *3.  Here, the Clean-Up Responder Defendants argue that the B3 tort claims conflict with the comprehensive federal response regime set forth in the CWA, OPA, and the NCP.

As the Court has previously recognized, critical objectives of the CWA and NCP are to ensure "effective and immediate removal of a discharge" and "efficient, coordinated, and effective action to minimize damage from oil," respectively.  *In re: Oil Spill*, 2012 WL 5960192, at *13 (*citing* 33 U.S.C. § 1321(c)(1)(A) and 33 U.S.C. § 1321(d)(2)).  Per the CWA/OPA, when an oil spill is designated substantial, such as in the case of the *Deepwater Horizon* spill, the first-designated Spill of National Significance, "Congress determined that these objectives are best achieved if the President directs all levels of the response – federal, state and private . . . [so as to] eliminate confusion that impeded past oil spill responses by establishing a clear chain of command and responsibility."  *Id.* at *13 (citing 33 U.S.C. § 1321(c)(2)(A) and H.R. Rep. No. 101-653, at 45 (1990)).  Under the NCP, the FOSC is the delegate for such responsibilities; comments made by the EPA accompanying its post-OPA revisions to the NCP "similarly reflect that when the FOSC directs a response, States and private parties cannot deviate from this direction."  *Id.* at *13.

The effect of law, rather than its purpose, governs this preemption analysis, and the Court's previous finding that the "B3 claims . . . stand as an obstacle to the accomplishment and execution of the full purposes and objectives of Congress" in connection with Nalco's motion for summary judgment applies with equal force here.  *In re Oil Spill*, 2012 WL 5960192, at *15.  Just as permitting the B3 claims to proceed against Nalco could cause dispersant manufacturers to refuse or hesitate to provide their product to mitigate a future spill's impact, despite the

FOSC's choice to use dispersants, *see id.*, permitting the B3 claims to proceed against the Clean-Up Responder Defendants could cause private responders to think twice before participating in other clean-up efforts.  It is precisely this second-guessing of the government's decisions that would "stand as an obstacle" to federal law.

Further, because this comprehensive federal oil spill response regime imposes a duty on private entities such as the Clean-Up Responder Defendants to obey the FOSC's direction during a response effort, it would be physically impossible for the Clean-Up Responder Defendants to comply with these federal directives, as well as state or maritime law, if the actions that are the subject of the B3 claims are deemed to be in violation of the directives.  As the evidence submitted indicates that the clean-up activities undertaken by the Clean-Up Responder Defendants were executed pursuant to the authorization, direction, and ultimate control of the federal government, the Clean-Up Responder Defendants have established a *prima facie* basis for dismissal of the B3 claims based on conflict preemption.  And, as noted, PTO 57 provided the B3 claimants a further opportunity to identify facts indicating that the Clean-Up Responder Defendants disobeyed these federal directives.[7]

### G.    Results of B3 Protocol

Following the issuance of PTO 57, the PSC and Defense Liaison Counsel implemented the procedure for disseminating notice of the B3 protocol, as approved by the Court.  (Rec. Doc. 13158 at 10-11).  Plaintiffs were provided with sufficient time to submit the requisite disclosures and in total 102 Questionnaires were received in connection with PTO 57.

---

[7]   The Court has already deemed the PSC's savings clause arguments in its Omnibus Opposition unpersuasive and, despite the PSC's arguments to the contrary, that a finding of implied conflict preemption is "consistent with the purpose of the CWA's immunity provision for responders," 33 U.S.C. § 1321(c)(4).  *In re Oil Spill*, 2012 WL 5960192, at *15.

(Rec. Doc. 13667-2 at 1-3).  The Questionnaires generally can be divided into four categories, discussed below.

### 1.   *Plaintiffs Who Did Not Submit Disclosures Pursuant to PTO 57*

The overwhelming majority of individual Plaintiffs did not submit a Questionnaire pursuant to PTO 57, thus indicating that they do not have any specific information or evidence that would raise a genuine issue of fact material to the Clean-Up Responder Defendants' pending motions for summary judgment.  The Clean-Up Responder Defendants' summary judgment motions (Rec. Docs. 6536, 6538, 6546, 6547, 6551, 6553, 6557, 6559, 6597) are hereby granted with respect to these Plaintiffs.

PTO 57 was clear that "[a]ny claim brought against any Clean-Up Responder Defendants(s) by a Claimant who satisfies the three criteria listed on page 6 of this Order but fails to comply with this Order is subject to dismissal."  (Rec. Doc. 13158 at 9-10).  At this juncture, these Plaintiffs have had sufficient time and opportunity to submit a Questionnaire clarifying the basis for their B3 claims against the Clean-Up Responder Defendants and their failure to do so justifies dismissal.  *See* Fed. R. Civ. P. 16(f); Fed. R. Civ. P. 41(b).  Further, the OSC provided Plaintiffs with an opportunity to object to the dismissal of their B3 claims with prejudice.

Consequently, the B3 claims of those Plaintiffs who did not submit a Questionnaire are dismissed with prejudice, including, but not limited to, the claims of those Plaintiffs listed on Exhibit 1 to the Joint Report (Rec. Doc. 13667-1).

### 2.   *Plaintiffs Who Submitted Disclosures Pursuant to PTO 57 but Did Not Opt Out of the Medical Benefits Settlement*

The Joint Report submitted to the Court states that thirty-eight (38) of the one-hundred and two (102) Questionnaires received pursuant to PTO 57 were submitted by Plaintiffs who:

25

indicated on the face of their Questionnaires that they were (1) boat captains or crew members involved in the Vessels of Opportunity Program, (2) workers involved in decontaminating vessels that came into contact with oil and/or chemical dispersants, (3) vessel captains or crew members who were not involved in the Vessels of Opportunity Program but who were otherwise purportedly exposed during the post-explosion clean-up activities, and/or (4) clean-up workers or other beach personnel involved in clean-up activities along shorelines and intercoastal and intertidal zones, or otherwise described themselves as clean-up workers as defined by the [Medical Benefits] Settlement.   (Rec. Doc. 6427-1, Sections II.Q, II.OOOO).

(Rec. Doc. 13667 at 3).  These 38 Plaintiffs were listed on Exhibit 2(B) to the Joint Report

(Rec. Doc. 13667-2 at 5) and are listed below:

1. Allen, Keenan
2. Antone, Jakobie
3. Battley, Murphy
4. Blanchard, Quentin
5. Bonner, Michael
6. Bourque, George
7. Clausell, Calvin
8. Corriveau, Steve
9. Crumedy, Joe
10. Davis, Mario
11. Dore, Christopher
12. Dukes, Aneesah
13. Edvenson, Debra
14. Goins, Artis
15. Gray, Nathan
16. Handy, LaTonya
17. Hebert, Carl Emanuel
18. Houston, Valisa
19. Hughey, Drameko
20. Irwin, David
21. Lischke, Matthew
22. Long, Steven
23. Martin, Eugene
24. Melerine, Craig
25. Miller, Tabitha
26. Mobley, Stephen
27. Nguyen, Muoi
28. Peters, Henry
29. Reed, Al Brisco
30. Simmons, Melissa

26

31. Smith, Deon
32. Stelly, Gary
33. Stokes, Shamerial
34. Tinsley, Jacqueline
35. Tran, Can
36. Walker, Ashley
37. Weston, Charles
38. Wilkins, Elmer

The Medical Class is defined to include, among others, "all NATURAL PERSONS who

resided in the United States as of April 16, 2012, and who . . . [w]orked as CLEAN-UP

WORKERS at any time between April 20, 2010 and April 16, 2012."  (Rec. Doc. 6427-1,

Section I.A.1).  The term "CLEAN-UP WORKERS" is defined as

> all NATURAL PERSONS who performed RESPONSE ACTIVITIES, including:
> (1) Captains, crew and other workers employed under the Vessels of Opportunity
> Program ("VoO") who performed RESPONSE ACTIVITIES; (2) Workers
> employed to perform the decontamination of vessels involved in RESPONSE
> ACTIVITIES; (3) Captains,  crew, and other workers on vessels other than VoO
> who performed RESPONSE  ACTIVITIES; (4) Onshore personnel employed to
> perform RESPONSE ACTIVITIES; and (5) Persons involved in the recovery,
> transport, and decontamination of wildlife  affected  by  the  *DEEPWATER*
> *HORIZON* INCIDENT.

(Rec. Doc. 6427-1, Section II. Q).  Further, the term "RESPONSE ACTIVITIES" is defined to

include "the clean-up, remediation efforts, and all other responsive actions (including the use and

handling of dispersants."  (Rec. Doc. 6427-1, Section II. OOOO).  These 38 Plaintiffs were

therefore members of the Medical Class and were required to timely and properly opt out of the

Medical Benefits Settlement in order to assert any "RELEASED CLAIMS"[8] against any

"RELEASED PARTIES," including any "OTHER RELEASED PARTIES" such as the Clean-

Up Responder Defendants.  (Rec. Doc. 6427-1, Sections II.MMMM, II.ZZZ, XI.F, Rec. Doc.

6427-8).

---

[8]  The term "RELEASED CLAIMS" is defined in Section XVI.A of the Medical Benefits Settlement.  (Rec. Doc.
6427-1 at 103).

The November 13, 2014 Declaration of Matthew Garretson, the Court-appointed Claims Administrator for the Medical Benefits Settlement, accompanied the Joint Report.  (Rec. Doc. 13667-3).  In that Declaration, Mr. Garretson confirmed that all 38 Plaintiffs listed on Exhibit 2(B) to the Joint Report did not validly opt out of the Medical Benefits Settlement.

As these 38 Plaintiffs are members of the Medical Class, and the Medical Benefits Settlement approved by the Court is now effective, these Plaintiffs are bound by the terms set forth in the Medical Benefits Settlement.  Consequently, these 38 Plaintiffs are barred from pursuing their B3 claims against the Clean-Up Responder Defendants, and their claims are dismissed with prejudice.

### 3.    *Plaintiffs Who Failed to Comply with the Requirements of PTO 57*

Pursuant to Exhibit 2(A) of the Joint Report, the following five (5) Plaintiffs who submitted Questionnaires failed to do so in a timely fashion:

1. Dardar, Lanny
2. Gonzalez, Hector
3. Gonzalez, Keoka
4. McNeal, Alfred
5. Ross, Frederick

(Rec. Doc. 13667 at 3, Rec.Doc. 13667-2 at 4).  One additional Questionnaire has been received since the Joint Report was filed, such that the following Plaintiff has also failed to comply with the Court's deadline for service:

Landry, David Edward[9]

Further, per Exhibit 2(C) to the Joint Report, the following sixteen (16) Plaintiffs who submitted Questionnaires did not provide information in response to any of the questions posed (i.e., are "blank"):

---

[9] Of the six Questionnaires just mentioned as being untimely, five of those were also "blank" or "incomplete." The names of these five Plaintiffs will be italicized when they are subsequently referred to in this Order.

1. Brazzle, Velma
2. Brown, Leslie
3. *Dardar, Lanny*
4. Dunlap, David
5. Felarise, Penny
6. Jones, Ronda
7. Love, Chris
8. Maas, Robbie
9. Martinez, Nelson
10. Nolan, James
11. Saunders, Ralph
12. Snow, Dwight
13. Tran, Ngoc
14. Wiley, Joan
15. Wiley, Traxavius
16. Wiley, William

(Rec. Doc. 13667 at 4-5, Rec.Doc. 13667-2 at 6).  The Questionnaire received since the Joint

Report was filed is also "blank":

Landry, David Edward

Finally, Exhibit 2(D) to the Joint Report makes clear that the following thirty-six (36) Plaintiffs

who submitted Questionnaires provided information in response to some, but not all, of the

questions posed in the Questionnaire (i.e., are "incomplete"):

1. Agee, Shaconda
2. Banks, Charles and Diana
3. Bemis, Roger
4. Binder, Sammie
5. Brister, Courtney
6. Bruton, Joseph
7. Caronia, Anthony
8. Carr, Patricia
9. DeBose, Chrishawn
10. DeBose, Christopher
11. DeBose, Jimmy
12. DeBose, Karen
13. Dockery, Bonita
14. Farley, Philip
15. *Gonzalez, Hector*
16. Hill, Doris
17. Horn, Mildred

29

18. Jackson, Marcus
19. Kaiser, Lani
20. Landry, James Dean
21. Langley, Lauren
22. Lee, Henry
23. Lincoln, Kerry
24. Lindley, Katherine
25. Link, Paul
26. Martin, Belinda
27. McCall, Hermina
28. McCrea, Michelle
29. *McNeal, Alfred*
30. Morgan, Alijah
31. Nguyen, Khanh
32. *Ross, Frederick*
33. Sanders, Patricia
34. Sigler, Elizabeth
35. Simpson, James
36. Smith, Temeka

(Rec. Doc. 13667 at 5, Rec. Doc. 13667-2 at 7). All of these Plaintiffs' claims are hereby dismissed for the reasons set forth below.

With respect to the Plaintiffs who failed to comply with the Court's deadline for service of their Questionnaires, no explanation has been provided for the delay and no extension was sought or granted. These Plaintiffs have not complied with the requirements of PTO 57 and their failure to do so justifies dismissal. *Acuna*, 200 F. 3d at 340-41; *see also* Fed. R. Civ. P. 16(f); Fed. R. Civ. P. 41(b).

With respect to the Plaintiffs who have provided Questionnaires with no or insufficient content, as the Court noted in the Vioxx litigation, there is "little practical difference" between not submitting a disclosure at all and submitting a disclosure that is insufficient. *In re Vioxx Products Liability Litigation*, MDL No. 1657, 2012 WL 1398622, at *4 (E.D. La. Apr. 23, 2012). Indeed, "in both instances, a plaintiff has not made the minimal required showing of a potentially meritorious claim." *Id.* As the purpose of PTO 57 was to screen those Plaintiffs who

can clarify the basis for their B3 claims against any Clean-Up Responder Defendant(s) from those who cannot, it is appropriate to grant summary judgment and dismiss, with prejudice, the claims of Plaintiffs who have failed to provide all of the required details in their Questionnaires. Indeed, "[o]therwise, a *Lone Pine* order has no teeth."  *Id.* at *4.

The Plaintiffs who have submitted "blank" or "incomplete" questionnaires identified above have failed to raise genuine issues of material fact sufficient to survive summary judgment.  Further, those Plaintiffs who have submitted "blank" or "incomplete" questionnaires have failed to adhere to the content requirements of PTO 57.  Their failure to provide this essential information despite the Court's order that they do so also warrants dismissal with prejudice.  *Acuna*, 200 F. 3d at 340-41; *see also* Fed. R. Civ. P. 16(f); Fed. R. Civ. P. 41(b).

For the foregoing reasons, the claims of the Plaintiffs listed on sections A, C, and D of Exhibit 2 to the Joint Report (Rec. Doc. 13667-2 at 4, 6, 7) against the Clean-Up Responder Defendants are dismissed with prejudice.

**4.      *Plaintiffs Who Submitted Written Responses to the Questions Posed in the Questionnaire***

The Joint Report confirms that the following eleven (11) Plaintiffs have provided a timely written response to all of the questions posed in the Questionnaire:

1. Barlow, Torrey
2. Brown, Joseph
3. Burrage, Scea
4. Causey, Roy
5. Danos, Jorey
6. Fitzgerald, Nathan
7. Hines, Thomas
8. Howell, Frank
9. Maurras, Doug
10. Prest, Kirk
11. Wunstell, John

(Rec. Doc. 13667 at 6, 13667-2 at 8).  The Clean-Up Responder Defendants contend that these Questionnaires are insufficient to defeat their motions for summary judgment and do not raise genuine issues of material fact.  The PSC, on the other hand, contends that these Questionnaires are sufficient and raise material issues of fact in connection with the Clean-Up Responder Defendants' summary judgment motions.  The Court will reserve judgment in connection with these 11 Plaintiffs.

## **CONCLUSION**

For the foregoing reasons, IT IS ORDERED that all B3 claims against the Clean-Up Responder Defendants are dismissed with prejudice, whether by joinder in the B3 Master Complaint, individual complaint, or otherwise, with the exception of the claims asserted by the 11 Plaintiffs listed on section E of Exhibit 2 to the Joint Report.  (Rec. Doc. 13667-2 at 8).

New Orleans, Louisiana this _____ day of _____, 2016.


_____
CARL J. BARBIER
United States District Judge