UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF LOUISIANA

| | | |
|---|---|---|
| **In re: Oil Spill by the Oil Rig** | * | MDL No. 2179 |
| **"Deepwater Horizon" in the Gulf** | * | |
| **of Mexico, on April 20, 2010** | * | SECTION J |
| | * | |
| This document relates to: | * | JUDGE BARBIER |
| | * | |
| Nos. 15-4143 and 15-4146 | * | MAG. JUDGE SHUSHAN |
| | * | |

\* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \*

SUBMISSION BY CO-LIAISON COUNSEL
AND PROPOSED CO-LEAD CLASS COUNSEL
<u>IN RESPONSE TO CLAIMS ADMINISTRATOR'S NOTICE</u>

Now come James Parkerson Roy and Stephen J. Herman, Plaintiffs' Co-Liaison Counsel and Proposed Co-Lead Class Counsel, who respectfully respond to the Halliburton and Transocean Settlement Claim's Administrator's December 15, 2015 Notice [Rec. Doc. 15657] as follows:

**TO MICHAEL J. JUNEAU, CLAIMS ADMINISTRATOR:**

As intended, agreed to, and memorialized in Section 8(a) of the HESI Punitive Damages and Assigned Claims Settlement Agreement ("HESI Settlement Agreement") [Rec. Doc. 15322-1, at 21] and Section 8(a) of the Transocean's Punitive Damages and Assigned Claims Settlement Agreement ("Transocean Settlement Agreement") [Rec. Doc. 14644-1, at 20], the Distribution Model shall be developed, neutrally and independently, by the Court-appointed Claims Administrator.

The undersigned cannot and do not advocate for or against any specific eligibility requirements or proposed elements or levels of compensation. We simply desire to provide the Claims Administrator with the benefit of our general understanding and recollection, based on our participation in the HESI and Transocean Settlement negotiations, as well as the BP Economic & Property Damages Class Settlement negotiations, implementation, and approval process, with the

hope that such insight might be helpful to the Claims Administrator in developing the Distribution Model for the HESI and Transocean Class Settlements.

Initially, we note that the Settlements are intended to resolve and release any potential exposure that HESI and/or Transocean may have faced with respect to the imposition of punitive or exemplary damages only.  None of the settlement funds in question are intended to compensate any particular putative classmember or group of putative classmembers for the loss of any particular property rights or interests;  but are, rather, intended to deter potentially reckless or willful conduct by other companies who may be engaged in offshore drilling activities, to prevent other future blowouts, explosions, fires, and associated oil spills or other disasters.

Secondly, we think it is important to recognize that there is no one, single, "correct" way to internally allocate and distribute the available settlement proceeds between and among the putative classmembers.  There are, rather, a panoply of numerous different potential distribution models, each of which could be reasonable, equitable, and fair.

Finally, we note that it is in the common and collective interest of the putative class as a whole to develop and utilize a Distribution Model that can be implemented and administered in a relatively cheap, easy, and efficient way, in order to conserve Administrative Expenses, and thereby maximize the total and collective distribution of benefits to the class as a whole.

With that background and introduction, Liaison Counsel respectfully offer the following insights and perspectives with respect to the specific issues that have been raised:

**Should eligibility for the Coastal Real Property claim type under the Deepwater Horizon Economic & Property Damages Settlement automatically result in eligibility for recovery under the New Class?**

From a purely administrative standpoint, it would likely maximize efficiencies to utilize BP Settlement Program Coastal Real Property Claim Eligibility Determinations as a basis for eligibility and compensation in the HESI / Transocean Class Settlement.

**Should such eligibility be limited to the "oiled" classifications of Coastal Real Property claims?**

It is our recollection from the BP Settlement that the entire eligible compensation zones were presumed to have been at least potentially affected by Macondo oil.  The "oiled" designation under that settlement resulted in enhanced compensation based on documentation of the visible presence of oil by a SCAT team member.  But the fact that the SCAT process did not happen to reflect the presence of oil on a particular stretch of beachfront did not mean that the property was definitively, or even likely, not oiled.  The presumption under the BP Settlement, at least to the best of our recollection and understanding, was that other coastal properties falling within the compensable zones would have had at least colorable maritime claims, as they were also at least potentially, if not likely, to have also been oiled.

**Should eligibility for the Wetlands Real Property claim type under the Deepwater Horizon Economic & Property Damages Settlement automatically result in eligibility for recovery under the New Class?**

From a purely administrative standpoint, it would likely maximize efficiencies to utilize BP Settlement Program Wetlands Real Property Claim Eligibility Determinations as a basis for eligibility and compensation in the HESI / Transocean Class Settlement.

**Should such eligibility be limited to the "oiled" classification of Wetlands claims?**

It is our recollection from the BP Settlement that the entire eligible compensation zones were presumed to have been at least potentially affected by Macondo oil.  The "oiled" designation under that settlement resulted in enhanced compensation based on documentation of the visible presence of oil by a SCAT team member.  But the fact that the SCAT process did not happen to reflect the presence of oil on a particular stretch of wetlands did not mean that the property was definitively, or even likely, not oiled.  The presumption under the BP Settlement, at least to the best of our recollection and understanding, was that other wetlands properties falling

within the compensable zones would have had at least colorable maritime claims, as they were also at least potentially, if not likely, to have also been oiled.

**Do subsistence fishermen have standing to recover punitive damages under the *Robins Dry Dock* line of cases?**

It is our recollection that, at the time the settlement was initially negotiated and agreed to with HESI, it was our general understanding and belief that recreational or other subsistence fishermen – who were not *also* commercial fishermen, and/or the owners of real property and/or vessels that were directly physically damaged by Macondo oil – did not have "valid maritime law standing to make a Punitive Damages Claims under general maritime law,"[1] based on the *Robins/TESTBANK* line of cases.[2]

However, because there was a question as to whether such subsistence fishermen might have recovered compensatory and/or punitive damages in the *Exxon Valdez* case, either pursuant to voluntary settlements paid by Exxon and/or by entry of judgment, the Parties agreed to be potentially over-inclusive in the proposed class definition, in order to ensure that all potential punitive claims against Halliburton would be released, out of an abundance of caution.[3]

---

[1] HALLIBURTON SETTLEMENT AGREEMENT, Section 3; TRANSOCEAN SETTLEMENT AGREEMENT, Section 3.

[2] *See* Robins Dry Dock & Repair Co. v. Flint, 275 U.S. 303, 48 S.Ct. 134, 72 L.Ed. 290 (1927), Louisiana ex rel. Guste v. M/V TESTBANK, 752 F.2d 1019 (5th Cir.1985) (en banc), *and* In re Deepwater Horizon, 808 F.Supp.2d 943, 958-961 (E.D.La. 2011).

[3] It is our general understanding and belief that a class may and often will be defined to include persons or entities who are not, based on their individual facts and circumstances, ultimately deemed to be eligible or otherwise entitled to any recovery under the terms of a class judgment or settlement, though included for notice, opt out, and *res judicata* purposes as members of the class. In this particular case, a subsistence fisherman under Section 4(a)(4) of the HESI and Transocean Settlement Agreements who could not independently establish *Robins/TESTBANK* standing, (*i.e.* due to his or her status as either a commercial fisherman and/or as a landowner and/or vessel owner whose property was physically damaged by the oil), would, in our opinion, be distinguishable from, for example, the appellees in *In re: Chinese Manufactured Drywall Lit.,* No.14-31355, 2015 WL 5771919 (5th Cir. Oct. 2, 2015), in that: **(i)** the *Chinese Drywall* class release, if enforced against those appellees, would have deprived them of vested due process property rights; whereas a suing party's interest in the potential recovery of punitive or exemplary damages would seem to be much less clear; **(ii)** the pure subsistence fisherman, in this case, would be deemed by the Claims Administrator to have no *Robins/TESTBANK* standing, and would therefore, as a practical matter, be deprived of no rights or interests by virtue of the class release; and **(iii)** given the Court's Phase One Findings, neither HESI nor Transocean has any realistic exposure to the pure subsistence fishermen for punitive or exemplary damages, and hence he or she is, as a practical matter, deprived of no practical interests by virtue of the class release.

We respectfully note, for the Claims Administrator's consideration, that the recovery of subsistence damages in Alaska following the *Exxon Valdez* case may have been limited to Native Americans, under the Alaska National Interest Lands Conservation Act, 16 U.S.C. §3111, and not an established exception to the *Robins Dry Dock* Rule.

**Do Charterboat Operators have standing to recover punitive damages under the *Robins Dry Dock* line of cases?**

It is our recollection that, at the time the settlement was initially negotiated and agreed to with HESI, it was our general understanding and belief that Charterboat Operators – who were not *also* commercial fishermen, and/or the owners of real property and/or vessels that were physically damaged by the oil – likely did not have maritime standing under the *Robins/TESTBANK* line of cases. However, because of some of the objections by Charterboat Operators to the BP Settlement, (and because, as a practical matter, it was understood and believed that many Charterboat Operators had participated in the Vessel of Opportunity "VoO" program and/or had otherwise suffered direct physical damages to their vessels in the wake of the spill), the Parties agreed to be potentially over-inclusive in the proposed class definition, in order to ensure that all potential punitive claims against Halliburton would be released, out of an abundance of caution.

**Who owns the actual beach / the actual waterfront land bordering the Gulf of Mexico under the laws of the respective states? The states? Local governments? Individual property owners? Individual condominium owners in adjoining high-rise beachfront condo complexes? Condominium associations?**

For strictly administrative purposes, it would likely make sense to compensate all waterfront property owners along the "SCAT line" as having colorable maritime property damage claims, without attempting to make potentially time-consuming and/or expensive property-specific factual, legal, or evidentiary determinations, which might vary according to the state, the parish, the county;

the condominium association or subdivision governing documents;  where against the average water-line the oil may have travelled;  etc.

**What factors should be considered / how should values be assigned to claims under the New Class, particularly in a way that promotes efficiency and limits administrative costs?**

From an administrative standpoint, for all HESI / Transocean Settlement Class Members who are also members of the BP Economic & Property Damages Settlement Class, it likely makes sense to simply utilize the final Coastal Real Property, Wetlands Real Property, Seafood, Real Property Sales, and/or Vessel Physical Damage Eligibility Determinations (*i.e.* the gross Compensation Amounts, if any, (either with or without the applicable RTP), prior to the deduction of any offsets for GCCF emergency, interim, VoO charter, and/or other previous Spill-related payments).[4]

This 15th day of January, 2016.

Respectfully submitted,


|  /s/  Stephen J. Herman | /s/ James Parkerson Roy |
|---|---|
| Stephen J. Herman, La. Bar No. 23129 | James Parkerson Roy, La. Bar No. 11511 |
| HERMAN HERMAN & KATZ LLC | DOMENGEAUX WRIGHT ROY |
| 820 O'Keefe Avenue |   EDWARDS & COLOMB LLC |
| New Orleans, Louisiana 70113 | 556 Jefferson Street, Suite 500 |
| Telephone: (504) 581-4892 | Lafayette, Louisiana 70501 |
| Fax No. (504) 569-6024 | Telephone: (337) 233-3033 |
| E-Mail: sherman@hhk.com | E-Mail: jimr@wrightroy.com |
| *Plaintiffs Co-Liaison Counsel, and* | *Plaintiffs Co-Liaison Counsel, and* |
| *Proposed Co-Lead Class Counsel* | *Proposed Co-Lead Class Counsel* |

---

[4] In the event that the Claims Administrator decides to include either Charterboat Operators and/or pure Subsistence fishermen in the Distribution Model, it would likely make sense, from a purely administrative standpoint, to rely on the final BP Economic & Property Damages Settlement Program Business Economic Loss "BEL" (for Charterboat Operators) and/or Subsistence Eligibility Determinations.  It may also make sense to provide pure Subsistence claimants who received and/or may hereinafter receive final Subsistence Eligibility Determinations from the BP Economic & Property Damages Settlement Program with a single, standard distribution amount, (*e.g.* $100).

**CERTIFICATE OF SERVICE**

      WE HEREBY CERTIFY that the above and foregoing submission will be served *via* E-Mail and by U.S. Mail upon:

> Michael J. Juneau
> Claims Administrator
> P.O. Box 51268
> Lafayette, LA 70505-1268

and will further be served on All Counsel by electronically uploading the same to Lexis Nexis File & Serve in accordance with Pretrial Order No. 12, and will be electronically filed with the Clerk of Court of the United States District Court for the Eastern District of Louisiana by using the CM/ECF System, which will send a notice of electronic filing in accordance with the procedures established in MDL 2179, on this 15th day of January, 2016.

                                           /s/  Stephen J. Herman and James Parkerson Roy