**UNITED STATES DISTRICT COURT**
**EASTERN DISTRICT OF LOUISIANA**

| | |
|---|---|
| **In re:  Oil Spill by the Oil Rig** | **MDL No. 2179** |
| **"DEEPWATER HORIZON" in the Gulf** | |
| **of Mexico, on April 20, 2010** | |
| | **SECTION: J** |
| Applies to: | |
| | **JUDGE BARBIER** |
| ***Wadleigh Industries v. BP Exploration &*** | |
| ***Production*** | **MAGISTRATE SHUSHAN** |
| **No. 2:13-cv-00810** | |

<u>**WADLEIGH INDUSTRIES INC'S**</u>
<u>**SECOND SUPPLEMENTAL, AMENDED AND RESTATED**</u>
<u>**ANSWERS TO DEFENDANTS' FIRST SET OF INTERROGATORIES**</u>

**NOW INTO COURT**, through undersigned counsel, comes Plaintiff, Wadleigh Industries, Inc., who serves upon counsel for BP the following Second Supplemental, Amended and Restated Answers to Defendants' First Set of Interrogatories:

## <u>Introduction</u>

On January 8, 2013, Wadleigh provided BP with a letter of presentment, which included a preliminary damage estimate and supporting documentation, (Bates Nos. 000337-000522). (*see also* Bates Nos. 000523-000529)

On June 30, 2014, Wadleigh provided BP with Initial Disclosures, including an initial damage calculation, and supporting documentation, including tax returns, financial statements, GCCF and presentment documentation, SBA loan documentation, etc. (Bates Nos. 000001-000998).

On July 7, 2014, the OPA Test Case Plaintiffs, including Wadleigh, filed a Motion to Strike Affirmative Defenses, with Memorandum in Support and Exhibits, (Rec. Doc. 13108 thru 13108-5, and Rec. Doc. 2400-1 at 44-72), which set forth Plaintiffs' basic theory of the case, and articulation of how BP, as the Responsible Party, and the Macondo incident and spill caused the damages suffered by the OPA Test Case Plaintiffs, including Wadleigh.  A Reply Brief further addressing these issues was filed on August 20, 2014, (Rec. Doc. 13302).

In the Fall of 2014, Wadleigh provided BP with initial Responses to Interrogatories, and produced thousands of pages of documents in response to BP's Requests for Production.  At some point, it was decided by the Court that the Parties should focus on completing the Bisso discovery first.

During the Fall of 2015, the Court indicated that discovery should be generally completed with respect to Bisso, Wadleigh, and Blake, with an eye towards Cross-Motions for Summary Judgment, to be submitted no later than April of 2014.  The purpose of these cross-motions for summary judgment, from the Court's perspective, is to resolve:

> whether, as a matter of law, there is a cause of action or a claim for damages caused by the government's imposition of the drilling moratorium or for the government's failure to issue permits.[1]

On December 14, 2015, the OPA Test Case Plaintiffs, including Wadleigh, filed a renewed Motion to Strike Affirmative Defenses, Memorandum in Support and Exhibits, (Rec. Doc. 15655 thru 15655-7), as well as their Opposition to BP's Renewed Motion to Dismiss, with supporting Exhibits, (Rec. Doc. 15704 thru 15704-9), filed on January 6, 2016, further articulating BP's responsibility to the OPA Test case Plaintiffs, including Wadleigh, for economic losses incurred

---

[1] Rec. Doc. 15664, at p.3, ¶8.

due to and as a result of the Macondo incident under the Oil Pollution Act of 1990, with factual, legal, and some general, common, evidentiary support.

Plaintiff's expert declaration / damage model / report is due to be served on BP no later than January 29, 2016.

In the meantime, BP has not yet provided to Plaintiffs BP's own pre-Spill projections regarding planned, expected and/or potential projects in the Gulf of Mexico, and the expected profits, revenues, and expenditures associated therewith, or the corresponding / contrasting post-Spill actual data.

Plaintiffs further reiterate and incorporate the general comments of plaintiff's counsel at Pages 15-29 of the Transcript from the December 16, 2015 Status Conference, and the E-Mail exchange between plaintiff's counsel's counsel for BP on December 22, 2015.

Incorporating this background and all of these documents and information by reference, Wadleigh now supplements and/or amends such documents and information with the following supplemental, amended and restated answers to interrogatories, subject to and without waiving the plaintiff's general and specific objections:

## **General Objections**

1. Plaintiffs object to Defendants' Requests to the extent they are not directly related to the OPA Test Case issues.

2. Plaintiffs object to the "Definitions" and "Instructions" set forth in Defendants' Requests to the extent they differ from the requirements set forth in the Federal Rules of Civil Procedure, the Local Rules of the Eastern District of Louisiana, or the Orders of this Court.[1]

---

[1] *See generally,* PRE-TRIAL ORDERS NOS. 1, 8, 11, 24 and 25; ORDER [Doc 2291] (May 9, 2011), ¶7.

3. Plaintiffs object to Defendants' Requests to the extent they seek information or documents outside the scope of discovery permissible under the Federal Rules of Civil Procedure, or the Orders of this Court.[2]

4. Plaintiffs object to Defendants' Discovery Requests to the extent that they seek documents or information covered by the attorney-client privilege, the work product doctrine, expert and/or consultant work product privileges, or any other applicable privilege or immunity, including the Joint-Prosecution and/or Common-Interest Privilege.[3] None of Plaintiffs' Responses are intended, or should be construed, as a waiver or relinquishment of any part of the protections afforded by the attorney-client privilege, the work product doctrine, or any other applicable privileges or immunities. Plaintiffs reserve the right to withdraw and recover any documents covered by such privileges or immunities if Plaintiffs' Steering Committee inadvertently or mistakenly produces such document or information in response to Defendants' Discovery, in accordance with Pre-Trial Order No. 14, or as otherwise may be ordered by the Court or permitted by law.

5. Plaintiffs object to Defendants' Discovery to the extent it seeks information or documents that are not in the possession, custody or control of the OPA Test Case plaintiffs.

6. Plaintiffs object to Defendants' Discovery to the extent that it contains vague or ambiguous terms or are overly broad, unduly burdensome and oppressive, and/or not reasonably calculated to lead to the discovery of admissible evidence.

7. Plaintiffs object to Defendants' Discovery to the extent that Defendants have equal or greater access to the documents or other information requested, than do Plaintiffs. For example, and in particular, BP is presumed to be in possession of, but has not yet provided to Plaintiffs, BP's own pre-Spill projections regarding planned, expected and other potential projects in the Gulf of Mexico or elsewhere, and the anticipated profits, revenues, and expenditures associated therewith, or with the corresponding / contrasting post-Spill data. BP is also in a superior position to Plaintiffs with respect to knowledge and information about the pre-Spill permitting and regulatory climate and processes generally; what was foreseeable by BP in particular and within the industry prior to the Spill; the post-Spill response effort; and the post-Spill regulatory and/or permitting moratoria, processes, discussions, decisions, and/or changes.

---

[2] *See generally,* PRE-TRIAL ORDERS NOS. 1, 8, 11, 24 and 25; ORDER [Doc 2291] (May 9, 2011), ¶7.

[3] *See generally,* FED. RULE EVID. 502; FED. R. CIV. PRO. 26(b)(3); FED. R. CIV. PRO. 26(b)(4). *See also,* PRE-TRIAL ORDER NO. 1, ¶ 20; PRE-TRIAL ORDER NO. 14, ¶ 2; PRE-TRIAL ORDER NO. 18; ORDER [Doc 3916] (Sept. 2, 2011), p.1 fn.1.

8. Plaintiffs object to Defendants' Discovery to the extent it seeks to establish (or discover) second-hand, legal, technical and/or scientific knowledge, opinions, theories and/or conclusions – as opposed to *facts*.[2]

9. Plaintiffs object to Defendants' Discovery as it is in the nature of contention interrogatories and requests for production, which, if proper at all, should be answered at the completion of discovery.[4]   For example, and in particular, BP is presumed to be in possession of, but has not yet provided to Plaintiffs, BP's own pre-Spill projections regarding planned, expected and other potential projects in the Gulf of Mexico or elsewhere, and the anticipated profits, revenues, and expenditures associated therewith, or with the corresponding / contrasting post-Spill data.  BP is also in a superior position to Plaintiffs with respect to knowledge and information about the pre-Spill permitting and regulatory climate and processes generally; what was foreseeable by BP in particular and within the industry prior to the Spill; the post-Spill response effort; and the post-Spill regulatory and/or permitting moratoria, processes, discussions, decisions, and/or changes. Moreover, Plaintiff's expert declaration / damage model / report is not due to be served on BP until January 29, 2016.

10. Plaintiffs object to Defendants' Discovery relating to Defendants' own documents (or other information) as beyond the scope of legitimate and permissible discovery, because it does not seek to "discover" documents or information, but only to determine what documents or information Plaintiffs have discovered or obtained or deems to be relevant. Because the second-hand knowledge of the Plaintiffs' Steering Committee is not relevant nor reasonably calculated to lead to admissible evidence, it is: (i) protected as Work Product;[5] (ii) unduly burdensome to request the Plaintiffs' Steering Committee to conduct the same type of review and analysis that could be as easily conducted by Defendants and/or their counsel; and (iii) beyond the scope and objectives of legitimate discovery.[6]

---

[2] *See, e.g.,* E-MAIL FROM S. HERMAN TO M. REGAN, Dec. 22, 2015 ("I am not aware of any procedural or substantive requirement for a party to articulate under oath the exact amount and/or cause of damages. These OPA Test Case Plaintiffs' owners, officers and/or employees may have some factual knowledge and/or opinions about that, which may well be admissible under 601 and/or 701 and/or 702. But, more often than not, plaintiffs rely on their attorneys and/or experts to put forth those numbers, arguments, positions and/or other articulations. (And defendants frequently object to what the parties themselves put forward under 702 and/or calls for speculation grounds - which may or may not be well-founded)").

[4] FED. RULE CIV. PRO. 33(a)(2); M.A. Everett v. U.S. Air Group, Inc., 165 F.R.D. 1, 3 (D.D.C. 1995); B. Braun Medical v. Abbott Labs, 155 F.R.D. 525, 527 (E.D.Pa. 1994); In re Convergent Technologies Securities Litigation, 108 F.R.D. 328, 334 (N.D.Cal. 1985).

[5] *See* Gould v. Mitsui Mining & Smelting, 825 F.2d 676, 680 (2nd Cir. 1987); Shelton v. American Motors, 805 F.2d 1323, 1328-1329 (8th Cir. 1986); Sporck v. Peil, 759 F.2d 312, 316 (3rd Cir. 1985); James Julian v. Raytheon, 93 F.R.D. 138, 144 (D.Del. 1982); Smith v. Florida Power & Light, 632 So.2d 696 (Fla. App. 3rd Dist. 1994).

[6] *See, e.g.,* Smith v. BIC Corp, 121 F.R.D. 235, 244-245 (E.D.Pa. 1988), *rev'd, in part,* BIC v. Smith, 869 F.2d 194 (3rd Cir. 1989). In the relevant portion of *Smith,* the U.S. Third Circuit denied BIC the production of information "since they were allegedly internal documents from BIC – *the documents were already in their possession.*" 869 F.2d at 197 (emphasis supplied).  At the same time, BIC sought a protective order to prohibit the plaintiff from disseminating trade secret information, regarding the design, safety, and quality tests of the product, and to limit discovery of other accident or claims information.  This part of the trial court's ruling was reversed, in part, by the Third Circuit, which granted BIC a protective order with respect to its trade secrets, but affirmed the trial court's ruling compelling BIC to produce information regarding other injuries or claims. *See* BIC v. Smith, 869 F.2d at 201-202.

11. Plaintiffs object to Defendants' Discovery Requests to the extent they seek confidential settlement negotiations or communications or other information which would not be admissible under Federal Rule of Evidence 408.

12. Plaintiffs object to discovery to the extent that it seeks to discover, confirm or otherwise assert alleged "fault" of non-parties and/or immune parties, including, but not limited to, the United States.[3]

13. Plaintiffs object to the extent these Discovery Requests seek admissions, contentions, facts and/or documents relating to the alleged or potential "fault" of the U.S. or other third parties.[4]

14. Plaintiffs reserve all objections as to the admissibility of written responses and/or documents until such time as they are sought to be introduced into evidence and/or otherwise used in these proceedings.

**AND NOW,** incorporating the Introduction into, and subject to, and without waiving, each and every one of the General Objections, which apply to each and every one of Defendants' Interrogatories as though restated in full therein, Plaintiffs respectfully supplement, amend and restate their responses as follows:

## SUPPLEMENTAL, AMENDED AND RESTATED ANSWERS TO INTERROGATORIES

### INTERROGATORY NO. 1:

Describe in full detail the damages you claim in this lawsuit, including the basis, amounts and calculations thereof.

---

[3] *See generally* MOT TO STRIKE AFFIRMATIVE DEFENSES (Rec. Doc. 13108) and MEMO IN SUPPORT (Rec. Doc. 13108-1), and RENEWED MOT TO STRIKE AFFIRMATIVE DEFENSES (Rec. Doc. 15655) and MEMO IN SUPPORT (Rec. Doc. 15655-1).

[4] *See generally* MOT TO STRIKE AFFIRMATIVE DEFENSES (Rec. Doc. 13108) and MEMO IN SUPPORT (Rec. Doc. 13108-1), and RENEWED MOT TO STRIKE AFFIRMATIVE DEFENSES (Rec. Doc. 15655) and MEMO IN SUPPORT (Rec. Doc. 15655-1).

**ANSWER TO INTERROGATORY NO. 1:**

Incorporating the INTRODUCTION, and subject to and without waiving the General Objections, including particularly GENERAL OBJECTIONS NOS. 8 and 9, Plaintiff respectfully supplements, amends and restates its previous response as follows:

Wadleigh claims damages that were caused by a combination of the uncontrolled discharge of the Macondo well, the resulting damages to natural resources and/or other property, the substantial threat to natural resources and/or other property, and the moratorium and resulting cessation in offshore exploration permitting, all of which were caused or substantially contributed to by BP's gross negligence.  As the responsible party strictly liable to Wadleigh under OPA, BP is liable for damages for the following:

(1) Loss of Profits; and

(2) Loss of Earning Capacity.

At the time of the Macondo Spill, Wadleigh performed the following services in the Gulf of Mexico:

a.  Crane repair, maintenance, and servicing/inspection;

b.  Heavy equipment and rig component repair, maintenance, and servicing/inspection;

c.  Crane manufacturing, sales and installation;

d.  Engineering and designing of rig components.

Wadleigh maintains Master Service Agreements with many of its clients.  Based upon those agreements, Wadleigh generally performed its services on a work-order basis.  On a case by case basis, Wadleigh would also bid on a project.

As a result, Wadleigh's lost profits/revenues and earning capacity impairment from its core operations caused by the Macondo discharge and its aftermath were determined based on

(1) the loss of expected profits/revenues from new or renewed crane, heavy equipment and rig component repair, maintenance and servicing/inspection during the period following the Macondo discharge as well as (2) lost profits/revenues from lost crane sales, servicing and installation.

Near the time of the Macondo discharge, Wadleigh had completed expansion of its facilities to allow for increased production. Due to the reduction in offshore drilling operations following the Macondo discharge, Wadleigh was unable to replace existing agreements or work for servicing and repair of offshore equipment in the period following the discharge through 2011. Wadleigh's lost profits/revenues for these services are calculated by review of the revenue from 2012 and 2013 to determine the expected profits/revenues in 2010 and 2011 (then compared to the actual profits/revenues during that period).

Wadleigh's lost profits/revenues related to the manufacturing, sales and installation of offshore cranes is determined based on expected execution of contracts for the sales and installation of cranes at the time of the discharge to begin in 2012. Due to delays caused by the Macondo discharge, sales and/or manufacture of those cranes did not begin until 2014. Wadleigh's lost profits related to these cranes is determined based on the loss of sales during that period.

Based on the above analysis, Wadleigh sustained lost net profits from its core operations for the period 2010 through 2013 ranging from $4 million to $14 million with approximately $3 million to $4 million in lost profits/earning capacity from the loss of expected profits/revenues from new or renewed crane, heavy equipment and rig component repair, maintenance and servicing/inspection and approximately $1 million to $10 million in lost profits/revenues from delayed crane sales, servicing and installation.

*See also* Response to Interrogatory No. 6.

Further detail of the calculation of Wadleigh's losses will be provided with the Declaration of Harold Asher, CPA by January 29, 2016.

## INTERROGATORY NO. 2:

Identify each item or subset of your damages in terms of event, lost opportunity, cancelled or delayed contract, lost sales, or other unit or category, including a detailed description of when and how each such loss occurred.

## AMENDED ANSWER TO INTERROGATORY NO. 2:

*See* Objections and Responses to Interrogatories Nos. 1, 6, 15, 16, 19 and 22.

## INTERROGATORY NO. 3:

Describe in full detail the damages caused you by the First Deepwater Moratorium including how any specific events caused any damages and in what amount.

## AMENDED ANSWER TO INTERROGATORY NO. 3:

Incorporating the INTRODUCTION, and subject to and without waiving the General Objections, including particularly GENERAL OBJECTIONS NOS. 6, 7, 8, 9, 12 and 13, Plaintiff respectfully supplements, amends and restates its previous response as follows:

*See* Responses to Interrogatory Nos. 1 and 6.

*See also, generally* Pages 8-24 of Plaintiffs' Opposition to BP's Renewed Motion to Dismiss (Rec. Doc. 15704) (and the exhibits and other materials referenced or cited therein), and Pages 10-12 and 23-26 of Plaintiffs' Memorandum in Support of Renewed Motion to Strike Affirmative Defenses (Rec. Doc. 15655-1) (and the exhibits and other materials referenced or cited therein).

## INTERROGATORY NO. 4:

Describe in full detail the damages caused you by the Second Moratorium including how any specific events caused any damages and in what amount.

## AMENDED ANSWER TO INTERROGATORY NO. 4:

*See* Objections and Responses to Interrogatory No. 3.

**INTERROGATORY NO. 5:**

Describe in full detail the damages caused you by the Deepwater Regulatory Activities including how any specific events caused any damages and in what amount.

**AMENDED ANSWER TO INTERROGATORY NO. 5:**

*See* Objections and Responses to Interrogatory No. 3.

**INTERROGATORY NO. 6:**

Describe in full detail the damages caused you by the *Deepwater Horizon* Incident including how any specific events caused any damages and in what amount.

**AMENDED ANSWER TO INTERROGATORY NO. 6:**

Incorporating the INTRODUCTION, and subject to and without waiving the General Objections, including particularly GENERAL OBJECTIONS NOS. 8 and 9, Plaintiff respectfully supplements, amends and restates its previous response as follows:

*See* Response to Interrogatory No. 1.  In addition:

Wadleigh, including its corporate predecessors/successors, is a family-run business that has been operating in Louisiana since 1984.  Wadleigh's current CEO, Scott Wadleigh, is the second generation of Wadleigh family to operate the family business.  The company is operationally headquartered in Slidell, Louisiana.  The headquarters is located directly across from its crane manufacturing site as well as several yards and repair facilities it maintains along its property.

Wadleigh provides a variety of services to the offshore industry in the Gulf of Mexico, including, but not limited to, its core competencies:

      a.    Crane repair, maintenance, and servicing/inspection;

      b.    Heavy equipment and rig component repair, maintenance, and servicing/inspection;

      c.    Crane manufacturing, sales and installation;

      d.    Engineering and designing of rig components.

Wadleigh's business is primarily driven by drilling activity.  The uncontrolled Macondo discharge compelled the U.S. government to shut down offshore oilfield production to protect life, property and the environment.  The official moratorium covered only deepwater, but the entirety of the Gulf of Mexico offshore operations suffered, particularly due to the plummeting of permits for new wells (APDs).

This drop in drilling activity cannot be explained by general economic conditions, Gulf Coast economic conditions, or commodity prices.  The per barrel price of oil went from $70.24 on September 30, 2009 to $82.07 on March 31, 2010 to $94.37 on December 31, 2010.  The price rose to a high of $126.04 on April 29, 2011 and remained above $100 through 2013 (the two lone exceptions were $94.88 (6/29/12) and $97.13 (11/29/13)).

Leading up to April 20, 2010, Wadleigh expected forthcoming sales of its on-site designed and manufactured cranes at their newly built crane manufacturing facility.  Wadleigh was active and planning for additional work.  Examples of Wadleigh's plans for a strong future include:

a.  Wadleigh's total work force 1 year before the spill as opposed to 1 year after:

    1.  12 months average before—69 employees;

    2.  12 months average after—54 employees;

b.  Wadleigh's investment in its crane manufacturing site was significant;

The Macondo well uncontrolled discharge and its aftermath changed the Gulf of Mexico drilling and exploration industry.  The federal government ceased operations for all deepwater wells and stopped issuing permits for new water wells as part of its overall effort to get a handle on the Macondo disaster and address the grave risk to life, property and the environment posed

by the ongoing Macondo disaster and the threat of a subsequent uncontrolled discharge. A review of Wadleigh's business (core competencies) demonstrates why Wadleigh lost profits and suffered impaired earning capacity due to the injury, destruction and loss of real property and natural resources that resulted from the uncontrolled Macondo discharge and compelled the federal government's response.

Once a well owner/operator needs servicing of a rig component or heavy equipment, such as a crane, an offshore service provider is contacted to work the repair. When that piece of equipment is due for servicing or repair, the offshore service provider is called to come out to the rig to repair the job on-site or, if needed, back at their facility. Here, Wadleigh acts as that offshore contractor servicing and repairing that equipment, or, more recently, in the design, manufacture, and sale of that piece of equipment such as a crane.

During a Master Service Agreement with a client, an offshore facility may contact Wadleigh for their experience in performing maintenance-related services to cranes or other rig components. These services include but are in no way limited to "crane repair, maintenance, and servicing/inspection, heavy equipment and rig component repair, maintenance, and servicing/inspection, crane manufacturing, sales, and installation, and the engineering and designing of rig components."

All of these productive activities stopped or significantly decreased after the Macondo discharge and its aftermath. For reasons previously stated herein, economic conditions and international and domestic commodity prices do not explain or account for Wadleigh's lost profits and diminished earning capacity in its offshore servicing/repair industry.

Finally, the severe impact on Wadleigh's Gulf of Mexico offshore service lines caused by the Macondo disaster and its aftermath as described herein compelled Wadleigh to reduce its

workforce, cut entertainment expenses, and procure an SBA loan.  Wadleigh, with no prospect for future business activity and to insure Wadleigh's future financial stability and survive the devastating market effects of the Macondo disaster, took multiple steps to stave off a downturn. However, the significant decrease in Wadleigh's core operation projects and resulting significant revenue decrease as compared to the costs of its operations forced the company to take jobs at reduced profit margins, including job opportunities in Brazil.

*See also* Responses to Interrogatories Nos. 15, 16, 19 and 22.

## INTERROGATORY NO. 7:

Describe in full detail any attempts you made to mitigate your alleged damages.

## AMENDED ANSWER TO INTERROGATORY NO. 7:

Wadleigh heavily pursued business in Brazil and elsewhere in an attempt to mitigate damages.  Wadleigh accepted jobs with lower profit margins in order to stave off revenue decline and job losses.  Wadleigh incurred an SBA Loan for cash flow purposes and to avoid high bank fees and interest rates.  Wadleigh attempted to file a GCCF claim, but was denied.  Wadleigh reduced its workforce steadily during the decline in order to cut costs while revenues were down.

## INTERROGATORY NO. 8:

Identify as precisely as possible the location of any real property, personal property or natural resources whose injury, destruction, or loss caused any of your damages, and describe as precisely as possible how any part of your damages flowed from each such injury, destruction or loss.

## AMENDED ANSWER TO INTERROGATORY NO. 8:

Incorporating the INTRODUCTION, and subject to and without waiving the General Objections, including particularly GENERAL OBJECTIONS NOS. 6, 7, 8, 9, 12 and 13, Plaintiff respectfully supplements, amends and restates its previous response as follows:

*See* Pages 8-24 of Plaintiffs' Opposition to BP's Renewed Motion to Dismiss (Rec. Doc. 15704) (and the exhibits and other materials referenced or cited therein).[5]

Wadleigh further directs BP to the April – October of 2010 Invoice Register, (Bates No. 000302-000316), among the other financial documents previously produced, which identifies Gulf of Mexico drilling customers and clients whose revenues declined and/or were forced to relocate their business ventures elsewhere as a result of the April 20, 2010 oil spill.  The Gulf of Mexico itself is a natural resource that was injured and caused loss to Plaintiff's business.  Plaintiff's business services cranes and other heavy equipment and rig components that work in the Gulf, both in the deepwater and shallow water environments.  The damage to the Gulf and its clients caused loss of revenue and business.

*See also* Response to Interrogatory No. 15.

**INTERROGATORY NO. 9:**

Describe in full detail the bases for your contention that the First Deepwater Moratorium was a foreseeable result of the *Deepwater Horizon* Incident or the Oil Spill.

**AMENDED ANSWER TO INTERROGATORY NO. 9:**

Incorporating the Introduction, and subject to and without waiving the General Objections, including particularly General Objections Nos. 6, 7, 8, 9, 12 and 13, Plaintiff states that "foreseeability" is legally and factually irrelevant to the claims asserted in this lawsuit; moreover, BP has taken the position that the term "foreseeable" is ambiguous and/or incomprehensible (*see* BP Responses to Plaintiffs' Requests for Admission Nos. 25, 35, 36, 37, 38 and 39); nevertheless, plaintiff respectfully further supplements, amends and restates its previous response as follows:

Employing the dictionary form of "foreseeable," federal law, including but not limited to OPA, OCSLA, and the CWA, mandates federal action in response to a worst-case catastrophic discharge event, such as the uncontrolled Macondo Well discharge, which posed an immediate and extreme threat to, and actually resulted in, severe damages to life, property, natural

---

[5] *See also* Pages 10-12 and 23-26 of Plaintiffs' Memorandum in Support of Renewed Motion to Strike Affirmative Defenses (Rec. Doc. 15655-1) (and the exhibits and other materials referenced or cited therein).

resources, and the environment generally, and continues to pose said threats and cause said damage today.  Consistent with this mandate, the Government, on numerous occasions, both prior to and during Congress' consideration of OPA, and between the passage of OPA and the Macondo incident, has responded to oil spills (and other industrial disasters) with closures of various waters, lands, fisheries, and/or shipping channels, and with moratoria on exploration, drilling, pipeline and/or other associated activities.  *See* Pages 11-13 of Plaintiffs' Opposition to BP's Renewed Motion to Dismiss (Rec. Doc. 15704) (and the exhibits and other materials referenced or cited therein, including, but not limited to, Pages 8-9 of Addendum A (OPA Legislative History) (Rec. Doc. 15704-1), and Exhibits 3, 4 and 5 (Rec. Docs. 15704-5, -6 and -7)).[6]

**INTERROGATORY NO. 10:**

Describe in full detail the bases for your contention that the Second Moratorium was a foreseeable result of the *Deepwater Horizon* Incident or the Oil Spill.

**AMENDED ANSWER TO INTERROGATORY NO. 10:**

*See* Objections and Response to Interrogatory No. 9.

**INTERROGATORY NO. 11:**

Describe in full detail the bases for your contention that the Deepwater Regulatory Activities were a foreseeable result of the *Deepwater Horizon* Incident or the Oil Spill.

**AMENDED ANSWER TO INTERROGATORY NO. 11:**

*See* Objections and Response to Interrogatory No. 9.

**INTERROGATORY NO. 12:**

Identify each of your shareholders and their ownership shares.

---

[6] *See also, generally* Plaintiffs' Memorandum in Support of Renewed Motion to Strike Affirmative Defenses (Rec. Doc. 15655-1) (and the exhibits and other materials referenced or cited therein), *and* Plaintiffs' Opposition to BP's Renewed Motion to Dismiss (Rec. Doc. 15704) (and the exhibits and other materials referenced or cited therein).

**AMENDED ANSWER TO INTERROGATORY NO. 12:**

Incorporating the INTRODUCTION, and subject to and without waiving the General Objections, including particularly GENERAL OBJECTIONS NOS. 1 and 3, Plaintiff respectfully further supplements, amends and restates its previous response as follows:

Scott Wadleigh owns 100 shares for a 100% ownership interest.

**INTERROGATORY NO. 13:**

Identify each entity in which you hold an ownership stake.

**AMENDED ANSWER TO INTERROGATORY NO. 13:**

Incorporating the INTRODUCTION, and subject to and without waiving the General Objections, including particularly GENERAL OBJECTIONS NOS. 1 and 3, Plaintiff respectfully further supplements, amends and restates its previous response as follows:

Scott Wadleigh has ownership stakes in several corporations and companies, not all of which are active: (1) Wadleigh Industries, Inc.; (2) Wadleigh Offshore, Inc.; (3) Whipstock Investments, LLC; (4) Hydra Gulf Industries, LLC (formerly Marshall Industries, LLC); (5) Wadleigh Construction, LLC; (6) Red Zone Realty, LLC; (7) CKRS Bonanza, LLC; and (8) KRS, LLC.

**INTERROGATORY NO. 14:**

Describe in full detail all business interruption, performance risk, and any other insurance covering disrupted business operations in effect at the time of the *Deepwater Horizon* Incident, including, without limitation, (a) the type of policy, (b) the issuing insurance carrier, (c) the policy number, (d) the policy period, (e) the policy limits and (f) any applicable exclusions or deductibles and state whether you made a claim under that policy(ies) and, if so, the result of that claim, and, if not, why you did not make a claim.

**ANSWER TO INTERROGATORY NO. 14:**

Incorporating the INTRODUCTION, and subject to and without waiving any and all substantive, procedural and/or evidentiary objections under the Collateral Source Rule, Plaintiff respectfully further supplements, amends and restates its previous response as follows:

None.

## INTERROGATORY NO. 15:

Identify each of your customers that exited, or were prohibited from working in, the Gulf of Mexico following the *Deepwater Horizon* Incident, and for each customer identified in response to Interrogatory No. 18, describe in full detail any contracts, contemplated contracts, or negotiations between you and each customer, including, but not limited to your claimed or projected costs and profit margins for such contracts.

## ANSWER TO INTERROGATORY NO. 15:

Plaintiff understands and believes that the following customers were directly and/or indirectly prohibited from working in the Gulf of Mexico following and as a result of the Macondo / *Deepwater Horizon* incident that commenced on April 20, 2010:

1- Hercules Drilling

2- Noble Drilling

3- Atwood Oceanics

4- Apache Corporation

5- Parker Drilling

6- Devon Energy Production (acquired by Apache)

7- Energy Partners Limited

8- Freeport McMoran (surviving company of merger with PXP)

9- Petroleum Supply (through PXP MSA)

10-Seahawk Drilling (later went into bankruptcy)

11-PXP (Plains Exploration) (merged with Freeport McMoran)

12-Fieldwood Energy

13-Diamond Offshore

14-Pride (acquired by Ensco)

15-Frontier Drilling

16-Port of NO

17-Atlantic Marine Services

18-Southern Technology

19-GoM Shelf

20-Seadrill

21-Blue Stream

Wadleigh provided its Master Service Agreement with its primary customer, Diamond, on or about December 16, 2015, (Bates No. 50000001 – 50000012).   The Master Service Agreements (and/or hold harmless agreements) for the companies, Apache Corporation, Atwood, Devon Energy, Energy Partners, Ltd., Fieldwood, Hercules, Noble Drilling, Parker Drilling, Plains Exploration and Production Company, were provided on January 7, 2016, (Bates Nos. 50040346 – 50040524).

*See also* Response to Interrogatory No. 8.

*See also, generally* Responses to Interrogatories Nos. 1, 6, 16, 19 and 22.

## INTERROGATORY NO. 16:

Explain in full detail your statement that "Wadleigh's commercial maintenance, inspection, and manufacturing crews were prohibited from working in certain waters in the Gulf of Mexico due to the presence of or threat of oil from the Macondo Well and/or the dispersants utilized to combat the spread of oil," including the identity of Wadleigh's commercial maintenance, inspection and manufacturing crews and the exact dates on which you claim they were prohibited from working in certain waters in the Gulf of Mexico.

## AMENDED ANSWER TO INTERROGATORY NO. 16:

Incorporating the INTRODUCTION, and subject to and without waiving the General Objections, including particularly GENERAL OBJECTIONS NOS. 6, 7, 8, 9, 12 and 13, Plaintiff respectfully supplements, amends and restates its previous response as follows:

BP caused the largest oil spill in history in the Gulf of Mexico.   Wadleigh conducts offshore maintenance, inspection, and manufacturing work for drilling companies with rigs in the

Gulf of Mexico.  The oil from BP's April 20, 2010 spill forced those same customer/client rigs to discontinue work while the spill was ongoing and even afterwards.  In the meantime, Wadleigh's work from those vital customers in the Gulf of Mexico decreased.

*See also generally* Pages 8-24 of Plaintiffs' Opposition to BP's Renewed Motion to Dismiss (Rec. Doc. 15704) (and the exhibits and other materials referenced or cited therein).[7]

## INTERROGATORY NO. 17:

Explain in full detail your statement that "[f]ollowing the *Deepwater Horizon* explosion on April 20, 2010 and subsequent oil spill, Wadleigh implemented internal cost-cutting measures, including a reduction in its workforce and reduced entertainment expenses," including the specific cost cutting measures, including but not limited to the number of employees affected by the claimed reduction in force, and the amount and type of reduced entertainment expenses.

## AMENDED ANSWER TO INTERROGATORY NO. 17:

The reduction in Wadleigh's workforce was a steady decline over almost a year period, but, generally, between 1-20 employees were terminated as a result of the April 20, 2010 oil spill.  The termination process was as follows: Scott Wadleigh and George Tohme would look at the workload, do informal projections for the upcoming month/quarter/year, determine a profitable business model, ascertain who was nonessential to the company based on those models, and, if needed, George Tohme would be the likely person to handle the termination process in his office.  Regarding the reduced entertainment expenses, it is Wadleigh's contention that its CEO, Scott Wadleigh, would simply instruct all of the employees (especially the sales people) to reduce their entertainment expenses in order to save costs during the revenue/profit downturn as a result of the April 20, 2010 oil spill.

---

[7] *See also* Pages 10-12 and 23-26 of Plaintiffs' Memorandum in Support of Renewed Motion to Strike Affirmative Defenses (Rec. Doc. 15655-1) (and the exhibits and other materials referenced or cited therein).

**INTERROGATORY NO. 18:**

Describe in full detail any contracts, contemplated contracts, or negotiations between you and Diamond Offshore including, but not limited to your claimed or projected costs and profit margins for such contracts.

**AMENDED ANSWER TO INTERROGATORY NO. 18:**

*See* Diamond Master Service Agreement (Bates No. 50000001 – 50000012)

**INTERROGATORY NO. 19:**

Describe in full detail your heavy equipment handling, equipment inspection, crane services, and maintenance business relating to drilling rigs in the Gulf of Mexico, including the services that your business performs, the clients that your business serves and revenues generated.

**AMENDED ANSWER TO INTERROGATORY NO. 19:**

*See generally* Introduction (including Presentment and Initial Disclosure documents (Bates Nos. 000001-000998)), and Responses to Interrogatories Nos. 1, 6, 8 and 15.

Wadleigh notes its core competencies as follows:.

      a.  Crane repair, maintenance, and servicing/inspection;

      b.  Heavy equipment and rig component repair, maintenance, and servicing/inspection;

      c.  Crane manufacturing and sales;

      d.  Engineering and designing of rig components.

Wadleigh offers a range of services on several rig components and locations, including but not limited to: on the derrick, above and below the drill floor, transverse and cantilever structure, deck crane, and the rig jacking system. Wadleigh delivers services and parts for all crane, heavy equipment, hydraulic, pneumatic, electrical and mechanical components. In addition, Wadleigh provides third party crane inspection, certification, repairs, consultation, refurbishment, and new sales for all types of equipment and power systems.

*See also, e.g.,* "Samples of Products and Services from Offshore Equipment Solutions" powerpoint (enclosed herewith).

## INTERROGATORY NO. 20:

Describe in full detail any sources of revenue generated by Wadleigh through customers outside of the Gulf of Mexico.

## AMENDED ANSWER TO INTERROGATORY NO. 20:

Wadleigh refers Defendant to the April – October of 2010 Invoice Register (Bates No. 000302-000316).  Wadleigh also notes its Job Folders may contain relevant information, such as jobs in Brazil, Africa, and Australia, and can be found as Bates Nos. 10188733–10189092. Further documentation could be found in mechanic ticket timesheets.

*See also, generally,* Presentment and Initial Disclosure documents (Bates Nos. 000001-000998)), and Response to Interrogatory No. 15.

## INTERROGATORY NO. 21:

Describe in full detail any bids submitted by you for equipment maintenance or inspection, and crane services, maintenance or repair in the Gulf of Mexico.

## AMENDED ANSWER TO INTERROGATORY NO. 21:

A customer would either call-in a work order or ask for a bid on larger projects. Wadleigh, along with other competitors, would then provide an estimate of their costs to perform the job.  The client would choose which company did, or did not, win the bid.

*See also, generally,* Presentment and Initial Disclosure documents (Bates Nos. 000001-000998)), and Responses to Interrogatories Nos. 1, 6 and 15.

**INTERROGATORY NO. 22:**

Describe in full detail your manufacturing business including but not limited to the date on which you began your manufacturing business, the type of manufacturing that your business performs, contracts entered by you for manufacturing services, and revenue generated by your manufacturing business.

**AMENDED ANSWER TO INTERROGATORY NO. 22:**

Wadleigh has maintained a "manufacturing" business for some time .

Wadleigh manufactures a diverse line of rig component equipment including hydraulic elevators, rig skidding systems and jacks, walking claws, and pinions, Hydraulic Power Units ("HPUs"), Finger Boards systems, oil/water separators, BOP handling systems, and overhead crane units. Wadleigh's hydraulic shop offers (and repairs) Iron roughnecks, RBS, Hydraulic pumps, Drive Pipe Tensioner cylinders, Pipe handlers Pipe tongues Easy Torque Cylinders and Controls, and Trash Compacters.

Due to the April 20, 2010 oil spill, crane manufacturing at Wadleigh's new production facility was delayed until the 2013-2014 timeframe. In that timeframe, Wadleigh entered into an agreement to construct a set of four (4) cranes for Hercules with a possibility of extending to an additional six (6) cranes thereafter. Each crane represents approximately $1.3 million in revenue, with an expected gross profit percentage of between 15% and 40% (increasing as the manufacturing aspects and costs are improved).

*See also* Responses to Interrogatories Nos. 1, 6, 15 and 19.

**INTERROGATORY NO. 23:**

List all individuals who were consulted or involved in preparing responses to these interrogatories.

**ANSWER TO INTERROGATORY NO. 23:**

Subject to and without waiving GENERAL OBJECTIONS No. 4:

Scott Wadleigh, George Tohme, Frank Alquist, Plaintiff's counsel.[8]

**INTERROGATORY NO. 24:**

Describe in full detail the basis for your failure to admit any of BP's Requests for Admissions.

**ANSWER TO INTERROGATORY NO. 24:**

Incorporating the INTRODUCTION, and subject to and without waiving the General Objections, including particularly GENERAL OBJECTIONS NOS. 4, 5, 6, 7, 8, 9, 12 and 13, Plaintiff respectfully supplements, amends and restates its previous response as follows:

Plaintiffs Co-Liaison Counsel and representatives of the Plaintiffs' Steering Committee are working with Counsel for BP to come to an agreement, to the extent possible, regarding appropriate stipulations with respect to these OPA Test Cases, or at least the Cross-Motions for Summary Judgment.

In the meantime, Plaintiffs' previously asserted Objections and Responses to Requests for Admissions speak for themselves.

This 8th day of January, 2016.

Respectfully submitted,

    /s/   Stephen J. Herman
**Stephen J. Herman**, La. Bar No. 23129
**Soren E. Gisleson**, La. Bar No. 26302
**John S. Creevy**, La. Bar No. 30879
**Craig M. Robinson**, La. Bar No. 32934
**HERMAN HERMAN & KATZ LLC**
820 O'Keefe Avenue
New Orleans, Louisiana 70113

---

[8] Plaintiff's counsel also solicited and received clarification on a few points from Harold Asher.

Telephone: (504) 581-4892
Fax. No. (504) 569-6024
Email: sherman@hhklawfirm.com
*Plaintiffs Liaison Counsel, and*
*Counsel for Wadleigh Industries, Inc.*

## CERTIFICATE OF SERVICE

I HEREBY CERTIFY that the above of the foregoing Supplemental, Amended and Restated Answers to Interrogatories have been served on Counsel for BP *via* E-Mail this 8th day of January, 2016.

/s/  Stephen J. Herman