**UNITED STATES DISTRICT COURT**
**EASTERN DISTRICT OF LOUISIANA**

| | |
|---|---|
| **In re: Oil Spill by the Oil Rig "Deepwater Horizon" in the Gulf of Mexico, on April 20, 2010** | **MDL No. 2179** |
| | **SECTION: J** |
| **Relates To:** *13-01143* | **JUDGE BARBIER** **MAGISTRATE JUDGE SHUSHAN** |

**BLAKE INTERNATIONAL USA RIGS USA LLC'S THIRD AMENDED ANSWERS TO DEFENDANTS' FIRST SET OF INTERROGATORIES**

**NOW INTO COURT**, through undersigned counsel, comes Plaintiff, Blake International USA Rigs, LLC, (hereinafter "Blake") who provides its Third Amended Answers to Defendants' First Set of Interrogatories to Blake as follows:[1]

**INTERROGATORY NO. 1**

Describe in full detail the damages You claim in this lawsuit, Including when and how, the type, the basis, amounts, and calculations of each such loss.

**RESPONSE TO INTERROGATORY NO. 1**

Blake incorporates by reference its First and Second Amended Answers to Defendants' First Set of Interrogatories to Blake and further supplements as follows:

Blake's damages were caused by a combination of the Uncontrolled discharge of oil from the Macondo well, the resulting damages to natural resources and/or other property, the substantial threat to natural resources and/or other property, and the moratorium and resulting cessation in offshore exploration permitting, all of which were caused or substantially

[1] Blake incorporates by reference and reserves *all* objections previously set forth in its First and Second Amended Answers to Defendants' First Set of Interrogatories to Blake International USA Rigs, LLC.

contributed to by BP's gross negligence (hereinafter referred to as the "The Spill and its Aftermath"). As the responsible party under OPA, BP is strictly liable to Blake for its business losses attributable to The Spill and its Aftermath. These losses include the lost profits and impaired earning capacity Blake sustained relating to five (5) of its drilling rig assets, comprised of the following:

- Former Rig 1501E – current Rig 2001
- Former Rig 1502E – current Rig 2003
- Former Rig 1005 – current Rig 1505
- Former Rig 1002 – current Rig 1007
- Rig 1006

In addition to the loss of profits and impaired earning capacity relating to the rigs enumerated above, Blake incurred increased costs preparing and mobilizing its rigs to Mexico in an attempt to mitigate its damages, the stacking of rigs because of lack of work and the loss of income incurred as a result. Blake also was forced, in order to mitigate its damages, to borrow money at above market interest rates in order to raise the capital required to prepare and send its rigs to Mexico to work for PEMEX.

## I. <u>Background</u>

In 2008, Michael Blake formed Blake International USA Rigs LLC by purchasing Pride International Inc.'s platform rig fleet that included (at the time) nine (9) rig assets. Blake is locally headquartered in Houma, Louisiana. Michael Blake has over 35 years of experience in the industry, and led the company until 2012 when Michael "Beau" Blake, Jr., was installed as President/CEO though he remains active as Chairman of the Board. Blake is the only privately

held drilling company in the Gulf of Mexico and operates primarily in shallow water. Blake however, developed its own "DART" stabilizing kit that allowed its rigs to work in deeper water. Blake intended to roll out DART in 2010, yet, due to The Spill and its consequences, the rollout of DART was delayed until the following year.

Prior to the Spill, many of the rigs in Blake's fleet were on contracts and/or nearing the end of contracts originally entered into by Pride, some of which were based in Mexico. By late 2009, most of the rigs had completed their original Pride contracts and were either demobilized or were in the process of demobilizing back to the Gulf of Mexico. Drawing on Michael Blake's years of industry experience, Blake heavily marketed its rigs in the Gulf of Mexico in 2009 for work in 2010. Blake gained significant traction when it entered into contract negotiations with Energy XXI prior to the Deepwater Horizon Oil Spill. However, the Spill and its Aftermath occurred and drastically changed the landscape for work in the Gulf of Mexico and certainly Blake's operations. Not only was the Energy XXI contract negatively affected, Blake's ability to find work generally in the Gulf of Mexico became difficult at best, forcing a restructuring of Blake's rig fleet. As more fully set forth below and as will be detailed from a damages standpoint in Blake's expert report, the measures Blake undertook in the wake of the Deepwater Horizon Oil Spill were required to mitigate its damages and were measures that Blake would not have undertaken in the absence of the Deepwater Horizon Oil Spill.

## II. <u>Energy XXI</u>

Prior to the Spill and its Aftermath, Blake entered into contract negotiations with representatives from Energy XXI for the use of two (2) of Blake's 1500 Horsepower (HP) rigs, former rigs 1501 and 1502. The Energy XXI projects were located at Main Pass 72 "C" and

South Pass 49 in the Gulf of Mexico with an anticipated start date of late 2010 and were reasonably expected to continue through 2013.

The Deepwater Horizon disaster and ensuing uncontrolled and catastrophic discharge of hydrocarbons from the well compelled the U.S. government to shut down offshore oilfield production to protect life, property and the environment. The formal Deepwater Moratoria and other regulatory changes, were, at least in part, and substantially due to and arising from the ongoing and continuing damages and substantial threats of damage to natural resources and/or other property from the oil spill. Although the official moratoria covered only deep water permitting, shallow water permitting virtually ceased as well.

Energy XXI was ultimately unable to secure the necessary permit(s) to drill despite attempts by representatives of Energy XXI and Blake to work with MMS representatives to get the permits issued. Mark Magner of Energy XXI sent Blake a letter on February 4, 2011 indicating that because of the uncertainty as to when the permit would be reviewed, Energy XXI could not move forward with the use of Blake's rigs. Prior to this, Energy XXI and Blake had agreed on the important contract terms for the employment of the rigs and were prepared to proceed with the execution of the contracts.

As a result of being unable to proceed with the Energy XXI projects, the slowdown in the issuance of permits and the lack of demand for 1500 HP rigs in the Gulf of Mexico in late 2010 as a result of the Spill and its Aftermath, Blake was forced to look for work outside of the Gulf of Mexico in order to mitigate its damages and save the company. Blake negotiated a contract with PEMEX for the use of its two 1500 HP rigs (intended for fulfillment of the Energy XXI contract) and was awarded two long-term contracts for work in offshore Mexico in mid-2011.

Due to the urgency Blake faced in putting these rigs in service, the terms of the PEMEX contracts were less than favorable to Blake, including lower day rates, financial penalties, high interest rates on loans, mobilization costs and upgrade and conversion costs, all of which will be extensively detailed in Blake's expert report.

## III. **Damages Model and Calculation**

Blake's damage calculation is based primarily on what each of the above named five (5) rig assets would have earned had the spill not occurred.

The specific factors considered in the damage calculations for each of the rigs will include the following:

- The revenues that each rig would have earned if the Spill and its Aftermath had not occurred including each rigs day rates and utilization rates;
- The variable costs of operating the rigs if the Spill and its Aftermath had not occurred;
- The additional costs Blake incurred as a result of the Spill and its Aftermath associated with Blake's attempts to put its rigs to work, including fixed asset costs and financing costs incurred by Blake to mitigate its damages that it otherwise would not have incurred had the Spill not occurred.
- The damage model and calculation will recognize any and all saved General and Administrative (G&A) expenses incurred by Blake to mitigate its damages.
- On or before January 29, 2016, in addition to the information provided herein, Blake will provide an expert economic analysis and total of all elements of claimed damages.

**INTERROGATORY NO. 2**

Describe in full detail any attempts You made to mitigate Your alleged damages Including how any specific mitigation attempt prevented or minimized any damages and in what amount.

**RESPONSE TO INTERROGATORY NO. 2**

Please see Blake's Original and Second Amended Answer to Interrogatory No. 2 as well as the answer as supplemented to Interrogatory No. 1. Blake further provides as follows:

Blake instituted a variety of cost-cutting measures after drilling activity was suspended in the Gulf of Mexico due to the Spill and its Aftermath. As will be detailed in Blake's economic expert report and loss calculation, Blake sought and found work for its rig assets outside of the Gulf of Mexico, incurred substantial debt in the financing and re-financing of loans to modify its rigs, and restructured its rig fleet – all in an effort to ensure that as many of Blake's rigs as possible remained in service in the wake of the Spill and its Aftermath. All mitigation and cost-cutting measures are accounted for and embedded in Blake's financial documentation that has been previously produced or will be forthcoming in Blake's ongoing documentation production and/or expert report.

**INTERROGATORY NO. 3**

Describe in full detail the damages caused You by the *Deepwater Horizon* Incident Including how any specific events caused any damages and in what amount.

**RESPONSE TO INTERROGATORY NO. 3**

Please see Blake's Third Amended Answer to Interrogatory No. 1 and Blake's Second Amended Answer to Interrogatory No. 3. Blake further provides as follows:

The specific events that caused the damage are set forth in the findings of fact and judgment rendered by the court in this matter after the Phase 1 trial. The loss of well control and the failure to staunch the flow of hydrocarbons from the well are the primary specific events that caused the damages complained of.

**INTERROGATORY NO. 4**

Describe in full detail the damages caused You by the Oil Spill Including how any specific events caused any damages and in what amount.

**RESPONSE TO INTERROGATORY NO. 4**

Please see Blake's Third Amended Answer to Interrogatory No. 1 and Blake's Second Amended Answer to Interrogatory No. 4. Blake further provides as follows:

The "specific events" that caused the damage are set forth in the findings of fact and judgment rendered by the court in this matter after the Phase 1 trial. Additionally, the "specific events" that caused the damages were the loss of well control by BP and the immediate and long lasting sequalae of the Spill, including the historically unprecedented uncontrolled release of hydrocarbons into the waters of the Gulf of Mexico, the consequent damage to natural resources, the closure of those areas of the Gulf of Mexico that were affected, wide-ranging cleanup operations on sea, air and land, airspace restrictions over the GOM, substantial and continuing

damage to wildlife, the waters and the coast line of the littoral states, and regulatory action taken by the government all as a direct result of the Spill.

**INTERROGATORY NO. 5**

Describe in full detail the damages caused You by the First Deepwater Moratorium Including how any specific events caused any damages and in what amount.

**RESPONSE TO INTERROGATORY NO. 5**

Please see Blake's Third Amended Answer to Interrogatory No. 1 and Blake's Second Amended Answer to Interrogatory No. 5. Blake further provides as follows:

The "specific events" that caused the damage are set forth in the findings of fact and judgment rendered by the court in this matter after the Phase 1 trial. Additionally the "specific events" that caused the damages were the loss of well control by BP and the immediate and long lasting sequalae of the Spill, including the historically unprecedented uncontrolled release of hydrocarbons into the waters of the Gulf of Mexico, the consequent damage to natural resources, the closure of those areas of the Gulf of Mexico that were affected, wide-ranging cleanup operations on sea, air and land, airspace restrictions over the GOM, substantial and continuing damage to wildlife, the waters and the coast line of the littoral states, and regulatory action taken by the government all as a direct result of the Spill.

**INTERROGATORY NO. 6**

Describe in full detail the damages caused You by the Second Moratorium Including how any specific events caused any damages and in what amount.

**RESPONSE TO INTERROGATORY NO. 6**

Please see Blake's Third Amended Answer to Interrogatory No. 1 and Blake's Second Amended Answer to Interrogatory No. 6. Blake further provides as follows:

The "specific events" that caused the damage are set forth in the findings of fact and judgment rendered by the court in this matter after the Phase 1 trial. Additionally the "specific events" that caused the damages were the loss of well control by BP and the immediate and long lasting sequalae of the Spill, including the historically unprecedented uncontrolled release of hydrocarbons into the waters of the Gulf of Mexico, the consequent damage to natural resources, the closure of those areas of the Gulf of Mexico that were affected, wide-ranging cleanup operations on sea, air and land, airspace restrictions over the GOM, substantial and continuing damage to wildlife, the waters and the coast line of the littoral states, and regulatory action taken by the government all as a direct result of the Spill.

**INTERROGATORY NO. 7**

Describe in full detail the damages caused You by Deepwater Regulatory Activities Including how any specific events caused any damages and in what amount.

**RESPONSE TO INTERROGATORY NO. 7**

Please see Blake's Third Amended Answer to Interrogatory No. 1 and Blake's Second Amended Answer to Interrogatory No. 7. Blake further provides as follows:

The "specific events" that caused the damage are set forth in the findings of fact and judgment rendered by the court in this matter after the Phase 1 trial. Additionally the "specific events" that caused the damages were the loss of well control by BP and the immediate and long

lasting sequalae of the Spill, including the historically unprecedented uncontrolled release of hydrocarbons into the waters of the Gulf of Mexico, the consequent damage to natural resources, the closure of those areas of the Gulf of Mexico that were affected, wide-ranging cleanup operations on sea, air and land, airspace restrictions over the GOM, substantial and continuing damage to wildlife, the waters and the coast line of the littoral states, and regulatory action taken by the government all as a direct result of the Spill.

**INTERROGATORY NO. 8**

Describe in full detail the damages caused You by Shallow Water Regulatory Activities and how any specific events caused any damages and in what amount.

**RESPONSE TO INTERROGATORY NO. 8**

Please see Blake's Third Amended Answer to Interrogatory No. 1 and Blake's Second Amended Answer to Interrogatory No. 8. Blake further provides as follows:

The "specific events" that caused the damage are set forth in the findings of fact and judgment rendered by the court in this matter after the Phase 1 trial. Additionally the "specific events" that caused the damages were the loss of well control by BP and the immediate and long lasting sequalae of the Spill, including the historically unprecedented uncontrolled release of hydrocarbons into the waters of the Gulf of Mexico, the consequent damage to natural resources, the closure of those areas of the Gulf of Mexico that were affected, wide-ranging cleanup operations on sea, air and land, airspace restrictions over the GOM, substantial and continuing damage to wildlife, the waters and the coast line of the littoral states, and regulatory action taken by the government all as a direct result of the Spill.

**INTERROGATORY NO. 9**

Describe in full detail the damages caused You by the inability of persons other than You to obtain — Including any delay in obtaining — any permit needed for offshore oil and gas industry activity, Including a description of each such permit sufficient for a third party to identify the permit from public records and how any specific events caused any damages and in what amount.

**RESPONSE TO INTERROGATORY NO. 9**

Please see Blake's Third Amended Answer to Interrogatory No. 1 and Blake's Second Amended Answer to Interrogatory No. 9. Blake further provides as follows:

As a direct result of the Spill and its Aftermath, including the subsequent moratoria and slowdown in shallow and deep water permitting, Energy XXI was unable to secure the requisite permit(s) to begin drilling in the Gulf of Mexico at Main Pass 72 "C" and South Pass 49. *See* letter of February 4, 2011 from Mark Magner to Jeff Kessler, which has been previously produced and for ready reference is attached hereto as Exhibit "A".

The slow pace of review and the uncertainty surrounding when the October 2010 permit(s) would be reviewed by the BOEM (which were caused by the Spill) were the primary causes of Energy XXI's inability to move forward with the use of Blake's rigs.

**INTERROGATORY NO. 10**

Identify as precisely as possible the location of any real property, personal property, or natural resources whose injury, destruction, or loss caused any of Your damages, and describe as

precisely as possible how any part of Your damages flowed from each such injury, destruction or loss.

**RESPONSE TO INTERROGATORY NO. 10**

Please see Blake's Third Amended Answer to Interrogatory No. 1 and Second Amended Answer to Interrogatory No. 10. Blake further provides as follows:

The destruction to natural resources that was widespread, historically unprecedented and included damage to the seabed ecosystem, the waters of the GOM, aquatic and shore based wildlife is a matter of record in this case as set forth in plea agreements and associated documents and pleadings, the findings of fact and judgments from the Phase One and Phase Two Penalty Phase trials. The Spill caused damage as explained throughout these answers to Interrogatories, and the nature and scope of that damage crippled the offshore oil and gas business, including Blake and BP among many others. The moratoria and permitting slowdown were a direct result of the Spill and its wide-ranging consequences. As a result, Blake suffered damages to its business notwithstanding attempts to mitigate its damages. These damages unfolded and increased over time, including but not limited to the period of the moratoria and the slowdown in shallow water permitting, all of which occurred as a result of the Spill.

**INTERROGATORY NO. 11**

Identify all Documents supporting Your contention that the Deepwater Moratoria were due to the *Deepwater Horizon* Incident or the Oil Spill.

**RESPONSE TO INTERROGATORY NO. 11**

Please see Blake's Second Amended Answer to Interrogatory No. 11.

**INTERROGATORY NO. 12**

Describe in full detail the bases for Your contention that the First Moratorium was a foreseeable result of the *Deepwater Horizon* Incident or the Oil Spill.

**RESPONSE TO INTERROGATORY NO. 12**

Please see Blake's Second Amended Answer to Interrogatory No. 12. *See also* the detailed discussion contained in the PSC's Renewed Motion to Strike Affirmative Defenses (Rec. Doc. 15655 through 15655-7) and Memorandum In Opposition TO BP's Renewed Motion to Dismiss The So-Called "Moratoria" and "Permitoria" Claims (Rec. Doc. 15704 through 15704-9), all of which is adopted herein by reference.

Additionally, BP's own Risk Documents pre-dating the spill indicated that government intervention and risk to license to operate were foreseeable consequences of a catastrophic spill/pollution event involving damage to the environment and loss of life. Additionally, in other serious spill events pre-dating Macondo, there was historical precedent for government intervention. Finally, inasmuch as the Macondo disaster and subsequent uncontrolled release of hydrocarbons was of such epic and historically unprecedented scale, some sort of government intervention ought to have been clearly foreseeable to BP.

**INTERROGATORY NO. 13**

Describe in full detail the bases for Your contention that the Second Deepwater Moratorium was a foreseeable result of the *Deepwater Horizon* Incident or the Oil Spill.

**RESPONSE TO INTERROGATORY NO. 13**

Please see Blake's Second Amended Answer to Interrogatory No. 13. *See also* the detailed discussion contained in the PSC's Renewed Motion to Strike Affirmative Defenses (Rec. Doc. 15655 through 15655-7) and Memorandum In Opposition TO BP's Renewed Motion to Dismiss The So-Called "Moratoria" and "Permitoria" Claims (Rec. Doc. 15704 through 15704-9), all of which is adopted herein by reference.

Additionally, BP's own Risk Documents pre-dating the spill indicated that government intervention and risk to license to operate were foreseeable consequences of a catastrophic spill/pollution event involving damage to the environment and loss of life. Additionally, in other serious spill events pre-dating Macondo, there was historical precedent for government intervention. Finally, inasmuch as the Macondo disaster and subsequent uncontrolled release of hydrocarbons was of such epic and historically unprecedented scale, some sort of government intervention ought to have been clearly foreseeable to BP.

**INTERROGATORY NO. 14**

Describe in full detail the bases for Your contention that the Deepwater Regulatory Activities were a foreseeable result of the *Deepwater Horizon* Incident or the Oil Spill.

**RESPONSE TO INTERROGATORY NO. 14**

Please see Blake's Second Amended Answer to Interrogatory No. 14. *See also* the detailed discussion contained in the PSC's Renewed Motion to Strike Affirmative Defenses (Rec. Doc. 15655 through 15655-7) and Memorandum In Opposition TO BP's Renewed Motion

to Dismiss The So-Called "Moratoria" and "Permitoria" Claims (Rec. Doc. 15704 through 15704-9), all of which is adopted herein by reference.

Additionally, BP's own Risk Documents pre-dating the spill indicated that government intervention and risk to license to operate were foreseeable consequences of a catastrophic spill/pollution event involving damage to the environment and loss of life. Additionally, in other serious spill events pre-dating Macondo, there was historical precedent for government intervention. Finally, inasmuch as the Macondo disaster and subsequent uncontrolled release of hydrocarbons was of such epic and historically unprecedented scale, some sort of government intervention ought to have been clearly foreseeable to BP.

**INTERROGATORY NO. 15**

Describe in full detail the bases for Your contention that the Shallow Water Regulatory Activities were a foreseeable result of the *Deepwater Horizon* Incident or the Oil Spill.

**RESPONSE TO INTERROGATORY NO. 15**

Please see Blake's Second Amended Answer to Interrogatory No. 15. *See also* the detailed discussion contained in the PSC's Renewed Motion to Strike Affirmative Defenses (Rec. Doc. 15655 through 15655-7) and Memorandum In Opposition TO BP's Renewed Motion to Dismiss The So-Called "Moratoria" and "Permitoria" Claims (Rec. Doc. 15704 through 15704-9), all of which is adopted by reference.

Additionally, BP's own Risk Documents pre-dating the spill indicated that government intervention and risk to license to operate were foreseeable consequences of a catastrophic spill/pollution event involving damage to the environment and loss of life. Additionally, in other

serious spill events pre-dating Macondo, there was historical precedent for government intervention. Finally, inasmuch as the Macondo disaster and subsequent uncontrolled release of hydrocarbons was of such epic and historically unprecedented scale, some sort of government intervention ought to have been clearly foreseeable to BP.

**INTERROGATORY NO. 16**

Describe in full detail all business interruption, performance risk, and any other insurance covering disrupted business operations in effect at the time of the *Deepwater Horizon* Incident, Including, without limitation, (a) the type of policy, (b) the issuing insurance carrier, (c) the policy number, (d) the policy period, (e) the policy limits, and (f) any applicable exclusions or deductibles, and state whether You made a claim under that policy(ies) and, if so, the result of that claim, and, if not, why You did not make a claim.

**RESPONSE TO INTERROGATORY NO. 16**

Please see Blake's Second Amended Answer to Interrogatory No. 16.

**INTERROGATORY NO. 17**

Identify each of Your owners and their share of ownership.

**RESPONSE TO INTERROGATORY NO. 17**

Please see Blake's Second Amended Answer to Interrogatory No. 17.

**INTERROGATORY NO. 18**

Identify the share of ownership You hold in each person in whom You hold an ownership stake.

**RESPONSE TO INTERROGATORY NO. 18**

Please see Blake's Second Amended Answers to Interrogatories No. 17 and 18.

**INTERROGATORY NO. 19**

Identify all Your competitors in the offshore oil and gas industry since May 2008.

**RESPONSE TO INTERROGATORY NO. 19**

Please see Blake's Second Amended Answer to Interrogatory No. 19.

**INTERROGATORY NO. 20**

Describe in full detail any contracts, contemplated contracts, or negotiations for contracts between You and Your customers, Including Your claimed expenses, revenues, and profits for such contracts.

**RESPONSE TO INTERROGATORY NO. 20**

Please see Blake's Third Amended Answer to Interrogatory No.1 and Blake's Second Amended Answer to Interrogatory No. 20.

**INTERROGATORY NO. 21**

Describe in full detail any bids or contemplated bids for contracts between You and Your customers, Including Your claimed expenses, revenues, and profits expected if such bids were accepted.

**RESPONSE TO INTERROGATORY NO. 21**

Please see Blake's Third Amended Answer to Interrogatory No. 1 and Blake's Second Amended Answer to Interrogatory No. 21.

**INTERROGATORY NO. 22**

List all individuals who were consulted or involved in preparing responses to these Interrogatories.

**RESPONSE TO INTERROGATORY NO. 22**

All individuals listed in Blake's Second Amended Answer to Interrogatory No. 22 were consulted in the preparation of its Third Amended Answers to Defendants' Interrogatories. Plaintiff's counsel also solicited and received clarification on a few points from Harold Asher.

**INTERROGATORY NO. 23**

Describe in full detail the basis for Your failure to admit any of BP's Requests for Admissions.

**RESPONSE TO INTERROGATORY NO. 23**

Plaintiff has not failed to improperly respond to any of the requests for admissions from BP. Plaintiff's denials and admissions are appropriately explained in those responses as allowed under the Federal Rules.

**DATED: January 8, 2016**

Respectfully submitted,

**WILLIAMS LAW GROUP, LLC**

/s/ *Conrad S.P. Williams, III*
**Conrad S.P. Williams, III** (#14499)
**Meredith R. Durham** (#33112)
909 Poydras Street, Ste. 1625
New Orleans, LA 70112
Telephone: (985) 876-7595
Fax: (985) 876-7594
Email: Duke@Williamslawgroup.org
Email: Meredith@Williamslawgroup.org
Counsel for Blake International Rigs, LLC

## CERTIFICATE OF SERVICE

I HEREBY CERTIFY that the above and foregoing Plaintiff's Third Amended Answers has been served on Counsel for BP via E-mail this 8th day of January, 2016.

/s/ *Conrad S.P. Williams, III*

STATE OF LOUISIANA

PARISH OF Terrebonne

VERIFICATION

I, Michael "Beau" Blake, Jr., as President and CEO of Blake International Rigs, LLC, have participated in the preparation of and reviewed the final Responses to the Third Amended Answers to Defendants' First Set of Interrogatories, and hereby certify that, to the best of my knowledge, information, and belief, the foregoing response accurately reflects the information available to Blake International Rigs, LLC as specified therein.

DATED this 8th day of January, 2016 in Houma, Louisiana.

Michael "Beau" Blake, Jr.,
Blake International Rigs, LLC
PLAINTIFF







1021 Main (One City Centre)
Suite 2626
Houston, TX 77002
Tel 713.351.3000 Fax 713.351.3300
www.energyxxi.com

February 04, 2011

Mr. Jeff Kessler
Blake International
1235 North Loop West, Suite 919
Houston, TX 77008

Dear Jeff,

In regard to Blake International's request for Energy XXI to pay a standby rate on your platform rigs, we respectfully decline. Energy XXI appreciates all of your efforts in preparation for our proposed work and standing by to go to work, but at this time there is too much uncertainty in obtaining our permits from the BOEM to make any substantial monetary commitments.

As you are aware, the platforms that the proposed work is to be conducted on are mudslide platforms. In 2008, the MMS required all mudslide platforms to be reassessed based on new met-ocean criteria dictated by the MMS. Energy XXI performed the reassessments and submitted to the MMS at that time. The permit for the first well to be drilled from one of the platforms was submitted in August 2010 and then re-submitted in October 2010 to satisfy new regulatory requirements. To date, February 2011, we are still waiting for the BOEM to sign off on the platform reassessments (submitted in 2008) so that the drilling permit can progress through their system. Further, we have no information from the BOEM to enable us to determine where the BOEM currently stands in its review of our assessment and submissions and, therefore, cannot predict when the BOEM may conclude its review. We can only state that we have no indication that the review will be concluded in the foreseeable future. As a direct result of this uncertainty, we cannot commit to a standby rate not knowing when our first permits may or may not be approved. Once we get a permit approved, we will see what the status of the rig and personnel are and move forward from there.

I hope that Blake International can understand that Energy XXI has been making every effort to get our permits approved but at this point, the timing of permit approval is not in our control.

Sincerely,

Mark Magner
Energy XXI
Drilling Manager