```
 1                    UNITED STATES DISTRICT COURT
                      EASTERN DISTRICT OF LOUISIANA
 2
     *************************************************************
 3   IN RE:  OIL SPILL BY THE
     OIL RIG DEEPWATER HORIZON
 4   IN THE GULF OF MEXICO ON
     APRIL 20, 2010                      MDL NO. 2179
 5                                       Section J
                                         New Orleans, Louisiana
 6                                       February 23, 2016

 7   Applies to:  13-706, 13,810
                  13-1143, 13-1185
 8                13-1386, 13-2006

 9   *************************************************************

10                    STATUS CONFERENCE BEFORE THE
                       HONORABLE SALLY SHUSHAN
11                   UNITED STATES MAGISTRATE JUDGE

12
     APPEARANCES:
13
     FOR THE PLAINTIFFS:            HERMAN, HERMAN & KATZ, LLC
14                                  BY:  STEPHEN J. HERMAN
                                    820 O'KEEFE AVENUE
15                                  NEW ORLEANS, LA  70113

16
                                    WILLIAMS LAW GROUP
17                                  BY:  CONRAD S. P. WILLIAMS
                                    435 CORPORATE DRIVE, SUITE 101
18                                  HOUMA, LA  70360

19
                                    WILLIAMSON & RUSNAK
20                                  BY:  CYNDI M. RUSNAK
                                    4310 YOAKUM
21                                  HOUSTON, TX  77006

22

23

24

25
```

```
 1   FOR BP AMERICA INC.,           KIRKLAND & ELLIS
     BP AMERICA PRODUCTION          BY:  CHRISTOPHER W. KEEGAN
 2   COMPANY, BP COMPANY            555 CALIFORNIA STREET
     NORTH AMERICA INC.,            SAN FRANCISCO, CA 94104
 3   BP CORPORATION NORTH
     AMERICA INC.,
 4   BP EXPLORATION &
     PRODUCTION INC.,               KIRKLAND & ELLIS
 5   BP HOLDINGS NORTH              BY:  J. ANDREW LANGAN
     AMERICA LIMITED,               300 N. LASALLE
 6   BP PRODUCTS NORTH              CHICAGO, IL 60654
     AMERICA INC.:
 7

 8

 9

10   OFFICIAL COURT REPORTER:       LANIE M. SMITH, RPR, CRR
                                    500 POYDRAS STREET, B-275
11                                  NEW ORLEANS, LOUISIANA 70130
                                    (504) 589-7782
12

13

14

15

16

17

18

19

20

21

22

23

24          Proceedings recorded by mechanical stenography,
     transcript produced via computer.
25
```

|   |                                         |          |
|---|-----------------------------------------|----------|
| 1 | **EXAMINATION INDEX**                   |          |
| 2 |                                         | PAGE NO. |
| 3 | Bisso Depositions                       | 4        |
| 4 | Wadleigh and Blake Document Production  | 4        |
| 5 | Wadleigh and Blake Depositions          | 10       |
| 6 | Stipulations                            | 10       |
| 7 | BP Depositions                          | 11       |
| 8 | Expert Discovery                        | 17       |
| 9 | Any Other Matters                       | 19       |
| 10| Next Conference                         | 19       |

## P R O C E E D I N G S

THE COURT: Good morning, everyone. We have a new court reporter who is not familiar with your voices; so, if you would please tell her who you are, that would be helpful to her.

How are you doing?

MR. KEEGAN: Good, Your Honor.

THE COURT: Good. Well, let's rock and roll through it. Let's see. How do we stand on getting Mr. Loeb served with a subpoena for his deposition in Dallas?

MR. KEEGAN: Your Honor, this is Chris Keegan from Kirkland. I believe that subpoena went out at the end of the week last week; so, we are in good shape there.

THE COURT: Good. All right.

Let's see. Last week with regard to Wadleigh, you reported, Chris, that there was an issue regarding documents relating to Hercules Drilling. Can you give me an update?

MR. KEEGAN: Sure. Yes, Judge. This is Chris again. We sent Steve a letter -- Neil Roman sent Steve a letter outlining some of the document categories we thought were still missing from Wadleigh's production. Specifically -- and I think most significant, although there's a couple of other categories -- in Mr. Asher's report on January 29, we had a new theory about $10 million worth of damages up front, two or

1     three million related to a Hercules issue.  And we just don't
2     see any documents related to the contract, the negotiations,
3     the discussions; and we want to make sure and confirm that
4     there either are no documents or they will be produced.
5         THE COURT:  Okay.
6         MR. HERMAN:  Your Honor, this is Steve Herman.  And
7     we've been working on this diligently since we got BP's letter.
8     We had several discussions and meetings with the client and
9     we're trying to track down everything possible that we think we
10    can.  We thought we had already produced the purchase order;
11    but if not, that is apparently coming to us right now, which
12    will get produced immediately and we're following up to see
13    what other associated things they have with that contract,
14    which is really kind of post the loss period.  But in any
15    event, they've talked to a number of employees.  Most of this
16    was apparently done orally.  There's actually not a formal
17    contract.  What I was told is it was a long purchase order and
18    that's what we're getting right now.
19            We've talked to the employees and even tried to
20    track down some former employees that had discussions with
21    Hercules; and if one searches through their computers and just
22    don't or haven't found yet -- there's one more person they're
23    trying to track down -- I think it's a former employee -- to
24    see if he might have anything on his personal computer.
25            Based on my understanding, most of this was done

1  orally and they haven't been able to locate e-mails or other
2  documents.
3       THE COURT:  How was the information then communicated
4  to Asher?  Did he speak to someone and does he have any
5  documents relating to this in his work file?
6       MR. HERMAN:  Well, I'll certainly find that out.  I
7  thought that all of that, whatever Mr. Asher had, was produced;
8  but I can get a better response on that.
9       THE COURT:  Okay.  Well, let's find out.  Chris, have
10 you-all gotten Asher's work file?
11      MR. KEEGAN:  We have some of the work files for Blake.
12 We don't have them for Wadleigh or Bisso, at least not as of
13 last I checked yesterday.
14      THE COURT:  Okay.  All right.  So, if any documents are
15 in the work papers of Harold Asher, Steve, those need to be
16 produced along with, of course, the work file.
17      MR. HERMAN:  Sure.  I mean, I haven't been directly
18 involved in that; but I kind of thought that Mr. Asher's
19 reliance documents were produced.  In fact, I thought BP
20 referred to some of them in their letter.  But I'll follow up
21 again with Duke and with Avansic on Mr. Asher's stuff as well
22 as the Wadleigh stuff.
23           The other thing I wanted to report is that BP
24 raised in their letter most of the categories, to the best of
25 their knowledge, they think they've produced what they have.

1  The one thing that BP requested last week that we have put
2  together -- it took a little bit of time, but it just went to
3  Gavin a half an hour ago; so, hopefully it will be getting to
4  BP today and tomorrow -- is the general ledger.
5      THE COURT:  Got you.  Okay.  And then let's be clear.
6  Chris, do you have the reliance documents of Asher as opposed
7  to the work files of Asher?
8      MR. KEEGAN:  Your Honor, I think the reliance
9  documents, anything cited by Mr. Asher with a Bates number has
10 been produced; so, yes, I would say that we have those
11 materials.
12     THE COURT:  Good.
13     MR. KEEGAN:  We do not have the work files, which are
14 his accounting spread sheets, his calculations, to go from
15 things like the annual and monthly financials that have certain
16 revenue numbers and cost numbers to his calculations.  That's
17 what we're missing, that bridge; and we can't tie out his
18 analysis to the facts that have been produced by the parties.
19     THE COURT:  Okay.  And with regard to the reliance
20 documents, are any Hercules drilling documents in that package?
21     MR. KEEGAN:  Your Honor, my understanding is that there
22 are very few Hercules-related documents produced by Wadleigh.
23     THE COURT:  Okay.
24     MR. KEEGAN:  In the 29th declaration there are
25 references to -- I think the Court has reviewed them -- where

1  he says things like, "I was told by Wadleigh X."
2              There's no citation to documents; so, on the
3  Hercules -- and I'm going off memory here.  But I don't think
4  there's any reference to Hercules documents in Mr. Asher's
5  declaration.  That's just sort of his blanket statement of "I
6  was told X."
7              THE COURT:  Okay.  Got you.
8              MR. HERMAN:  Your Honor, I don't want to belabor the
9  point or waste time; but I think this might be helpful to BP.
10 Very quickly, in addition to the purchase order, which we're
11 getting to them, if we haven't gotten it already, I just got an
12 e-mail of our Volume 504.  The first Bates number I'm looking
13 at is 50040525, which is the job register apparently for the
14 Hercules job or part of the Hercules job.  That might be
15 helpful to BP in the meantime while we're tracking down the
16 rest of the stuff.
17             THE COURT:  Good.  Thank you.  I appreciate that.
18             MR. KEEGAN:  And, Your Honor, just for the record, I
19 appreciate Steve's efforts on this.  We are now three days away
20 from the Wadleigh depositions.  We have a new 10-million-dollar
21 claim asserted on January 29th and we're just now getting key
22 documents.  So, I think we do have some concerns.  We're going
23 to do everything we can on our end to make sure that those
24 depositions go smoothly; but if we're getting key materials
25 like the general ledger and the job and the purchase order two

1  and three days before the deposition, we may need to revisit
2  that next week.
3          THE COURT:  Okay.
4          MR. HERMAN:  We're happy to do whatever is reasonable
5  and required.  I'd just like to point out that this is not a
6  contract, at least as I understand, during what I would call
7  the loss period where if you see the -- we tried to do our best
8  to explain this in the supplemental interrogatory responses
9  that I circulated this morning.  But this is kind of
10 circumstantial or indirect proof that Mr. Asher is using and I
11 guess Wadleigh is using to circumstantially prove damages that
12 occurred during the loss period by pointing to a contract that
13 occurred after the loss period.
14         THE COURT:  Okay.  Yes.  I looked at the responses and
15 I did think that they were helpful, Steve, in explaining where
16 Wadleigh is coming from; so, I appreciate your getting that
17 out.
18         MR. HERMAN:  Sure.
19         THE COURT:  Okay.  So, you know, obviously with the
20 depositions three days away, if you could expedite whatever
21 else is out there related to the document production, to
22 Asher's work file or any other documents that are related to
23 Hercules, time is of the essence.
24         MR. HERMAN:  Absolutely, Your Honor.  It's been a
25 priority since we received BP's letter.

1         THE COURT: Great. Thank you.

2         Let's see. We have the week of March 14th

3 reserved for Blake depositions. Has any of that been

4 scheduled?

5         MR. WILLIAMS: Your Honor, this is Duke Williams for

6 Blake and class counsel, I guess. We've got -- Chris and I

7 exchanged e-mails on this yesterday, trying to figure out what

8 the lineup is going to be; but we are holding those days

9 sacrosanct and Chris also suggested yesterday, and I agree,

10 that we're going to reserve a couple days the week before just

11 in case we've got to backfill. But I really believe that we

12 can accomplish all of the Blake depositions on the week --

13 during the week of the 14th. We've just got to figure out

14 exactly what the lineup is going to be based on, you know, what

15 they've got going on operationally. They're all going to be

16 available that week. You know, Mr. Blake, for instance,

17 instead of Monday, might have to go on Tuesday, depending on

18 what's going on with the business; but it's not going to be a

19 problem.

20         THE COURT: Okay. Great. Thank you.

21         Chris, how do we stand on the stipulations? You

22 had gotten them back out to the plaintiffs' steering committee.

23         MR. KEEGAN: Yes, Judge. This is Chris. We sent those

24 out, I think, a week ago last Friday, ten days or so ago. We

25 received some responses from Steve related to the Wadleigh

1	stipulations, some responses from Paul related to the Bisso
2	stipulations.  We are waiting for an overall review.  I think
3	the original stips from the plaintiffs was 30 or 35.  We made
4	comments on those.  We added another 90 or so that we thought
5	were important.  And, so, that process is still in place.  My
6	understanding is that there may be some additional proposed
7	stipulations tied to the 30(b)(6) and we're willing to hear
8	what those are, but we don't have any specific language yet.
9	          THE COURT:  Okay.  Good.
10	           And, plaintiffs, I assume you-all are continuing
11	to work on that, huh?
12	          MR. HERMAN:  Yes, Your Honor.  This is Steve.  Yes,
13	Your Honor.
14	          THE COURT:  Thank you.  Okay.
15	           Let's see.  We've got the 30(b)(6) issues.  Have
16	any of the issues been resolved through meet and confer, or do
17	we just take it up?
18	          MR. HERMAN:  Well, this is Steve Herman again.  We
19	basically have three issues; and one of the issues I think BP
20	has kind of indicated that the Court needs to resolve, which is
21	the last issue regarding BP's own experience.  The two issues
22	that we're still working on and I guess kind of in conjunction
23	with the stipulations, because we're trying to avoid a lot of
24	these -- parts of these depositions, if not topics entirely,
25	with stipulations if we can.  So, two of the issues I think

1  Your Honor will see we're still talking about, I have to admit
2  I'm a little bit pessimistic.  I know Your Honor is extremely
3  busy and I am loathe and reluctant to even suggest this, but I
4  kind of think that if maybe we spent a little bit of time with
5  Your Honor and we could maybe, you know, hash out, A, the
6  stipulations and, B, the 30(b)(6) topics to the extent that
7  they're necessary.  I know you have a lot on your plate; but it
8  seems like, you know, we're kind of getting close to the end
9  and maybe we're digging in a little bit more than we should be.
10 I'm saying, "we" collectively, not just we plaintiffs.
11          THE COURT:  No, I understand.  It's we, the royal we.
12          MR. HERMAN:  Right.
13          THE COURT:  Well, I mean, we can certainly talk about
14 that, guys.  I have -- I don't believe I've seen the draft
15 stipulations, have I?
16          THE LAW CLERK:  No.
17          MR. KEEGAN:  No, Your Honor.  This is Chris.
18          THE COURT:  I guess would one of you undertake to
19 e-mail me what you've got so far, and I'll go through them and
20 look at them in conjunction with the 30(b)(6) topics and then
21 maybe schedule something?  Do you think we can do this by
22 phone, Steve; or do you need an in-person?
23          MR. HERMAN:  We may be able to do it by phone.
24          THE COURT:  Okay.  Why don't you-all get those to me,
25 and I'll take a look at them in conjunction with the 30(b)(6)

1 topics. I'll try to do that, say, by tomorrow or Thursday
2 morning and then get back in touch with the royal we.
3     MR. HERMAN: Yeah. This is Steve Herman again. The
4 only thing I'm just noting -- and I think BP counsel kind of
5 mentioned this as well -- the stipulations that we're talking
6 about with respect to mooting the 30(b)(6) topics, are not
7 necessarily included within the same batch of the other
8 proposed stipulations.
9     THE COURT: Got you.
10     MR. HERMAN: So, we kind of have to look at both
11 together, although some of them are obviously overlap.
12     THE COURT: Right. And some of them are presumably
13 contained in the letter you sent this morning, huh?
14     MR. HERMAN: Correct.
15     THE COURT: Okay. Got it.
16     MR. KEEGAN: And, Your Honor, this is Chris. In our
17 February 11th letter that we sent to the plaintiffs regarding
18 the 30(b)(6) topics, we identified a whole number of pieces of
19 information, of parts of the prior record, of frankly
20 admissions by BP, for example, in its post-trial penalty phase
21 or Phase 3 briefing that we think in lieu of, for example, a
22 topic on the extensive oiling across the entire Gulf of Mexico
23 for two and a half years, that we think that there's evidence
24 in the record. So, I don't know that we have formally heard
25 back from the plaintiffs on what pieces of evidence that we put

1   in that February 11th letter would be appropriate or not; but
2   that's a whole list of information that is available for the
3   parties as well.
4           THE COURT:  Okay.  Well, I'll look at that when I
5   review the 30(b)(6) topics, the draft stipulations and Steve's
6   letter of this morning.  And then, plaintiffs, if you-all want
7   to weigh in on that letter, feel free; and I'll look at that as
8   well.
9           MR. KEEGAN:  Thanks, Your Honor.
10          MR. HERMAN:  Thanks, Your Honor.  I think we were
11  trying to narrow it down further than what BP has suggested.
12  I'll look again at the evidence that BP cited.  Some of the
13  things that BP cited, it's not really BP evidence.  It's things
14  that experts said or things that third parties have found,
15  et cetera; and if BP will stipulate to that, that's great.  If
16  BP is just going to say, "We shouldn't have to produce anybody
17  because there's all this information out there," that's where I
18  think we're trying to get something that we can provide to the
19  Court as, quote, unquote, undisputed to get past the summary
20  judgment issue.
21          THE COURT:  Let's ask that question.  Chris, in your
22  letter you say that this evidence is in the record.  Is BP at
23  this point in a position to stipulate to whatever that
24  information is?  For example --
25          MR. KEEGAN:  Your Honor --

1      THE COURT:  I'm sorry.  Go ahead.
2      MR. KEEGAN:  Your Honor, this is Chris for the record.
3          I think some of the items that we've identified
4  are admissions by BP, whether they're BP's public statements or
5  its filings or materials that BP's own experts have previously
6  produced.  Some of it is, for example, the SCAT maps from the
7  penalty phase.  Those are all in the record, and we would
8  stipulate to, you know, sort of their admissibility and use by
9  the plaintiffs.
10     THE COURT:  And their authenticity.
11         So, yeah, so that in your view would take care
12 of, for example, the extent of the oiling?
13     MR. KEEGAN:  And the impact and the remediation efforts
14 and a number of those topics.
15     THE COURT:  Okay.  All right.  So, I'll take a look at
16 that letter; and, Steve, when you look at it again, it sounds
17 like most of it, BP is willing to say, "This is the record
18 evidence.  It is what it is."
19     MR. HERMAN:  Well, yeah, I mean, that would be fine.  I
20 don't want to -- I don't want to fight about little things that
21 we don't need to be fighting about.  Let us take another look
22 at it.
23     THE COURT:  Okay.
24     MR. HERMAN:  Because not to belabor it too much, but
25 what we did or what I thought we did -- and maybe this will be

1  clarified in a couple of days.  I don't know if it's tomorrow
2  or Thursday when Mr. Crowsey's deposition is taken; but what
3  Mr. Crowsey did, I thought, or at least attempted to do was to
4  take that information and put it in, you know, one very clear
5  set of succinct maps that the Court can look at very easily as
6  an exhibit that identifies, you know, eight or ten different,
7  you know, things that we think are significant and, you know,
8  in a very -- in a very visual and efficient and straightforward
9  way, without having to go through gobs and gobs and gobs of
10 information.  If BP would give us, you know, either -- if they
11 don't agree with those maps, give us the maps that they think
12 are correct.  We could probably stipulate to those; and that
13 would probably make it a lot easier for the Court in terms of
14 honing down these exhibits rather than making the Court go
15 through, you know -- wade through a whole bunch of record
16 materials.
17          THE COURT:  Okay.  Well, I think that sounds reasonable
18 as well.  And it sounds like, Chris, you-all are willing to
19 look at an exhibit and say, "Yep, that's it," huh?
20          MR. KEEGAN:  Yes, Your Honor.
21          THE COURT:  Okay.  So, let's all look at that again;
22 and I will try to get through this by, let's just say,
23 Thursday, okay?
24          MR. HERMAN:  Thank you, Your Honor.
25          THE COURT:  No problem.  I'll get back in touch.

```
 1              Okay.  Let's see.  We had talked about Mr. Asher
 2   and the possibility of delaying his deposition as well as the
 3   BP expert's deposition based on production of work papers.
 4   Anybody want to weigh in on that?
 5              MR. WILLIAMS:  Your Honor, this is Duke Williams.  I'll
 6   just weigh in briefly and let Chris respond or add.
 7              The first thing I'd like to say, I got an e-mail
 8   earlier this morning.
 9              Chris, maybe -- this might be helpful.
10              But the Asher work papers were, I am told by
11   Avansic, uploaded Friday as part of the Volume 511 production.
12   What I don't -- and I -- it sounds to me like there were other
13   documents uploaded in that production; so, perhaps -- I mean, I
14   don't think they got mixed up; but perhaps they weren't
15   identified as Asher's work papers/reliance documents.  So,
16   maybe Tony Soto could just double-check that.
17              MR. KEEGAN:  Well, we will definitely double-check
18   that.  I know there was a production on Friday of documents
19   specifically identified as Asher work papers and those we
20   pulled out, but I don't think our team has seen anything else.
21   But we'll double-check.  You said Volume 511?
22              MR. WILLIAMS:  Yes, Volume 511.  So, maybe you have
23   them already.  I just threw that out there just in case there
24   was some confusion.
25              THE COURT REPORTER:  Was that Mr. Keegan or someone
```

1  else?
2         THE COURT:  That was Chris Keegan replying to Duke
3  Williams.
4         THE COURT REPORTER:  Thank you.
5         THE COURT:  All right.  So, we're just going to kind of
6  hang loose with regard to the scheduling of Asher's depo until
7  we clear up the work papers, huh?
8         MR. KEEGAN:  Yes, Your Honor, although I think from the
9  work papers that we saw on Friday for Blake, the likelihood of
10 having Asher next week is pretty low from BP's perspective; and
11 so, I think I'd like to talk with Duke and others sometime
12 early the following week and then we'll see what that does to
13 the overall schedule.  I think we can compress BP's expert
14 response time by maybe a couple of days to keep that schedule
15 as tight as we can.
16        THE COURT:  Okay.  I'll tell you what let's do just for
17 the sake of making sure we're in gear.  Would someone for the
18 plaintiffs contact Asher and see what his schedule looks like
19 for early the week after next so if we need to do it, we'll go
20 there?
21        MR. WILLIAMS:  This is Duke Williams.  That's fine,
22 Your Honor.
23            And, Chris, I've got in my lap the work papers,
24 Asher's work papers for Blake.  I'm going to bring them to
25 Crowsey's deposition tomorrow morning and after we knock out

1  Crowsey, maybe we can spend a few minutes talking about what we
2  gave you and what you think is missing.  I'm not an accountant
3  and I mean, it seems like it's a pretty specific and complete
4  analysis, but maybe we can spend some time talking about it
5  tomorrow after Crowsey's depo.
6              MR. KEEGAN:  I would be happy to do that.
7              MR. WILLIAMS:  Okay.
8              THE COURT:  Okay.  Let's see.  I think that's all I
9  have.  What else do you-all have?
10             MR. WILLIAMS:  Your Honor, this is Duke Williams.  Just
11 a quick update on Blake.  We thought we'd be done with the
12 production of the -- I'm sorry -- yes, the privilege log.
13 We're almost there, but it has not been uploaded yet.  It
14 should be in the next day or two.
15             THE COURT:  Got you.  Okay.
16                  Anything anyone else wants to raise?
17             MR. KEEGAN:  Your Honor, this is Chris.  Nothing from
18 me.
19             THE COURT:  Okay.  You want to get together for a
20 further conference next week?
21             MR. KEEGAN:  Yes, Your Honor.  This is Chris again.
22             THE COURT:  Okay.  Let's see.  How about next Tuesday?
23 Are you-all in depositions next Tuesday?
24             MR. WILLIAMS:  This is Duke, Your Honor.  Actually I
25 think Tuesday is an open day.  It's probably the only open day

```
 1   that week.
 2           THE COURT:  Okay.  Do you want to go for 9:30 next
 3   Tuesday, the 1st?
 4           MR. WILLIAMS:  I think that would work for the
 5   plaintiffs, Your Honor.  This is Duke.
 6           MR. KEEGAN:  For Chris, that works for us at 9:30 on
 7   Tuesday.
 8           THE COURT:  Good enough.  Okay, guys.  Well, we all
 9   have homework assignments; and let's keep each other updated,
10   okay?
11           MR. WILLIAMS:  Yes, Your Honor.
12           THE COURT:  Okay.  Thank you.  Have a good day.
13           MR. WILLIAMS:  You too.  Thanks.
14                      (Proceedings adjourned.)
15                            * * * * *
16                       REPORTER'S CERTIFICATE
17              I, Lanie M. Smith, CRR, RPR, Official Court
18   Reporter, United States District Court, Eastern District of
19   Louisiana, do hereby certify that the foregoing is a true and
20   correct transcript, to the best of my ability and
21   understanding, from the record of the proceedings in the
22   above-entitled and numbered matter.
23
24                                  /s/ Lanie M. Smith
25                                 Official Court Reporter
```