IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF LOUISIANA



| | | |
|---|---|---|
| In Re:  Oil Spill by the Oil Rig "Deepwater Horizon" in the Gulf of Mexico, on April 20, 2010 | * <br> * <br> * <br> * | MDL NO. 2179 <br><br> SECTION J |
| This document relates to all actions | * <br> * <br> * <br> * <br> * | HONORABLE CARL J. BARBIER <br><br> MAGISTRATE JUDGE SHUSHAN |

| | | |
|---|---|---|
| Bon Secour Fisheries, Inc., et al., on behalf of themselves and all others similarly situated, | * <br> * <br> * <br> * | Civil Action No. 12-970 <br><br> SECTION J |
| Plaintiffs, | * <br> * | |
| v. | * <br> * | HONORABLE CARL J. BARBIER |
| BP Exploration & Production.: BP America Production Company; BP p.l.c., | * <br> * <br> * | MAGISTRATE JUDGE SHUSHAN |
| Defendants. | * | |

## MOTION To ASCERTAIN VALIDITY OF EXHIBIT 4E
## OF THE DEEPWATER HORIZON SETTLEMENT AGREEMENT
## AND CONSTITUIONALITY OF CHANGES MADE TO THE FINAL DOCUMENT
## PRESENTED AS THE ECONOMIC AND PROPERTY DAMAGES SETTLEMENT
## AGREEMENT
## AND
## MOTION OF INTERVENTION

**NOW INTO COURT** comes the claimant, H. Freddie Boothe, Jr., Architect, in

proper person, who brings this MOTION To ASCERTAIN VALIDITY OF EXHIBIT 4E OF

THE      DEEPWATER      HORIZON      SETTLEMENT      AGREEMENT      AND

CONSTITUIONALITY  OF  CHANGES  MADE  TO  THE  FINAL  DOCUMENT

RESENTED  AS  THE  ECONOMIC  AND  PROPERTY  DAMAGES  SETTLEMENT

**TENDERED FOR FILING**

| | |
|---|---|
| ___ Fee_____ | |
| ___ Process_____ | |
| X Dktd_____ | |
| ___ CtRmDep._____ | |
| ___ Doc. No._____ | |

AGREEMENT AND MOTION OF INTERVENTION  which is verifiable and documented by the recorded documents, inclusive of, but, not necessarily limited to the Final Certified Settlement Agreement, underlying laws which govern, and the actions of the parties. Claimant files this Motion in accordance with the terms and conditions of Court Document 6430 in which the Court maintains supervisory[1] capacity over the Settlement Process; the Fourteenth Amendment, 28 U.S.C. § 1983; and, as *pro se* petitioner under Fed. R. Civ. P. 8, to wit:

PURSUANT to Federal Rule(s) of Civil Procedure stated above, Claimant/Plaintiff, H. Freddie Boothe, Jr., Architect files this motion to ascertain validity of the Deepwater Horizon Settlement Agreement, Exhibit 4E as issued by the Court on May 3, 2012 [2] (as amended on May 2, 2012 and as Preliminarily Approved by the Court on May 2, 1012) as the final court ruling in the captioned case "Bon Secour Fisheries,Inc., et al., on behalf of themselves and all others similarly situated (Plaintiffs) vs BP Exploration & Production. : BP American Production Company; Vp p.l.c., (Defendants) as a direct result of the Deepwater Horizon Spill in the Gulf of Mexico. As cause therefore, the Claimant, H. Freddie Boothe, Jr., Architect submits the this memorandum and exhibits in support of this Motion.

### BACKGROUND

In June of 2012 the claimant, H. Freddie Boothe, Jr., Architect, [Claimant ID: 100011039] filed claims [No. 5095, No. 9327 and No. 9328] with the assistance of the claims center in New Orleans east for damages sustained as a direct result of the Deepwater Horizon

---

1    Court Doc. 6430-1 (18) (18.1) Continuing Jurisdiction.   &  Case 2:10-md-02179-CJB-SS Document 6418, Page 6 : "The Proposed Settlement would replace the GCCF with a "Court Supervised Settlement Program" ("Settlement Program").

2    The filing includes the executed signature pages for the original April 18, 2012 Agreement as well as the May 2, 2012 First Amendment.

Spill which directly lead to the cancellation of multiple architectural contracts[3] for projects along the Gulf Coast. These claims were originally filed with the GCCF and subsequently transferred to the Deepwater Horizon Settlement Program after the abandonment of the GCCF claims initiative. During review the claims were consolidated into one claim identified as Claim No. 9327.

Claim 5095 represents architectural services for a condominium project located at the waters edge in Perdido Key, Florida, 16581 Perdido Key Drive, Escambia County[4], St. Road 292. There are two contracts for architectural services relative to this claim; 1) for architectural services regarding the shell of the building and 2) one for architectural services for the interior. This site has protected vegetation and a protected mouse by US Dept of Interior Wildlife and Fisheries Division.

Claim 9327 represents architectural services for a casino (with) hotel project located at the waters edge in Biloxi, Mississippi at 659 East Beach Boulevard. This contract is contract documents for the multiple buildings and parking facility.

Claim 9328 represents architectural services for a condominium project which extends into the waters of the Gulf of Mexico at 1300 West Beach Boulevard (now 4th Street) in Long Beach, Mississippi. There are two contracts for architectural services for this project, 1) for development of the shell and 2) for development of the interiors contract documents.

## PROCEDURAL REVIEW

The claimant filed a Motion of Review – Motion of Clarification with the Eastern

---

3   All contracts are "cost explicit" wherein the architect sustains no "loss".
4   This site is inhabited by the Protected Escambia Beach Mouse and the vegetation located at the site is Protected Habitat. The site was inundated with oil deposits after the Spill. U.S. Dept of Interior – Wildlife and Fisheries Division. Consequently, a "take" is required under ESA 16 USC § 1538(a)(1) & (B).

District Court on January 29, 2013, which was followed by a Response by Claims Administrator to Motion of Clarity filed on April 4, 2013, followed by a Response to Claims Administrators Response on April 9, 2013, a7 Notice to Appeal to U. S. Court of Appeals For the Fifth District on June 24, 2013.  The Motion of Review and Motion of Clarification was denied by the Eastern District Court and accordingly not appealable to the Fifth Circuit Court of Appeals.   However, in the Response (Doc.9150, Filed 04/04/2013) the Claims Administrator gave testimony the claim of Claimant ID 100011039 was being "correctly processed under S.A. Exhibit 4E".

The following time line establishes a record of when the events leading to a re-write of the Settlement Agreement occurred.

| | |
|---|---|
| 10/2/13 | BEL Panel's initial Order on Matching |
| 10/3/13 | Judge Barbier Orders suspension of issuance of any BEL final determination notices or payments; Orders parties to provide proposed Matching Policy language. |
| 10/18/13 | Judge Barbier issues Preliminary Injunction related to BEL Claims |
| 11/21/13 | BP and Class Counsel submit their proposed Matching Policies |
| 12/2/13 | BEL Panel issues Order remanding issues relating to BEL causation to Judge Barbier for further consideration |
| 12/5/13 | Judge Barbier issues Amended Preliminary Injunction relating to BEL claims |
| 12/24/13 | Judge Barbier issues Order relating to remand of BEL claims and providing Juneau additional direction regarding Matching issue.[5] |
| 1/7/14 | BP and Class Counsel provide Matching proposals to Juneau and Settlement Program accountants |
| 2/12/14 | Juneau issues a draft of Policy 495 to BP and Class Counsel for review and comment |
| 2/27/14 | BP and Class Counsel provide their comments and objections to Policy 495 |
| 3/3/14 | BEL Panel affirms Judge Barbier's 12/24/13 Order, rejects BP's attack on BEL causation, orders end of payment stay 3/7/14 Juneau issues updated version of Policy 495 |
| 3/13/14 | Juneau formally issues Policy 495 |
| 3/19/14 | Class Counsel files appeal |

---

5   See Doc. 12055 Filed 12/24/13

Despite the clear language of the settlement agreement and BP's prior acknowledgment to the merits of the agreement and attesting to content fairness, BP completely changed course once it realized that its total claims liability would greatly exceed what BP initially expected. Instead of abiding by the terms of the settlement it agreed to, in late 2013 BP went back to the district court, seeking a ruling that claimants must affirmatively prove that their damages were a result of the oil spill. After the district court denied BP's request to re-write the settlement agreement, BP appealed to the Fifth Circuit Court of Appeals, which likewise ruled that BP must abide by the terms of the settlement agreement in terms of causation and business payments. Still unsatisfied, BP appealed to the U.S. Supreme Court, but the Supreme Court denied certiorari in December 2014, effectively stamping out BP's challenges to the settlement agreement.

The settlement agreement did not mandate the type of accounting procedure that a claimant must use in submitting its financial statements; this resulted in variations in the ways annual revenues and expenses were presented in claims made to the claims center. BP took issue with these variations, specifically with the way some financial statements were not sufficiently "matched," meaning a claimant's financial records did not "match" revenue with corresponding variable expenses. BP took its complaint to court, and Judge Barbier, the district court judge overseeing the settlement agreement, ordered that Claims Administrator Patrick Juneau come up with a policy to be used by the claims center to ensure "matching" of financial records. The result was Policy 495, which was approved by Judge Barbier in May 2014, and which dramatically altered the way the claims center assessed submitted claims.

This motion is not for the purpose of assessment of the claims identified herein, but,

is born from recent request, from the third accountant reviewer assigned to process the claim, for imformation pertinent to processing under Policy Rule 495 which is contradictory to the testimony to the Court by the Claims Administrator[6] regarding the processing of these claims under S.A. Exhibit 4E venue of the Settlement Agreement. Actually, this claimant has never received any documentation attesting to a determination by any claims reviewer as to the integrity of the filed claim even though the Claims Administrator attest in his response (Doc. 9150, Filed 04/04/2013) to a motion filed questioning the claims process, "The Claims Administrator has processed Mr. Boothe's claim correctly." No evidence exist to verify this statement on the Web Portal, consequently, this claim is barred from filing an appeal of issues within the framework of the Settlement Agreement to the appeals panel.

## THE ORDER OF FINALITY

The order of finality has long been discussed and abused in the court system(s). Federal appellate courts have jurisdiction to hear appeals only from "final decisions" of the district courts. (See U.S.C. § 1291) Subject to limited exceptions, an appeal is timely if the litigant seeking review of he final decision files a notice of appeal within thirty (30) days after its entry. (See 28 U.S.C. § 2107 (a), Fed. R. App. P.4(a)(1)(A)). Sometimes a district court, after ruling on the merits of a case, will "retain jurisdiction" for purposes of enforcing an injunction or entertaining a motion for attorney's fees. However, in the recent Fourth Circuit case of Hudson v Pittsylvania County, No. 13-2160, 2014 WL 7210330 (4th Cir. Dec. 17, 2014) the court was faced with this very issue and held decisively that in federal court, retaining jurisdiction to consider attorney's fees does not affect the finality of the underlying

---

6    Doc. 9150 filed 04/04/2013.

judgment or toll the 30-day appeal period.

In class actions, finality is urged because of the class's size and fear that repeated litigation will undermine the social purpose of the class suit, yet barring collateral attack seems to encourage collusive settlements and to deprive absent litigants of their own day in court. In order to reach finality in the instant case, the court ordered a fairness hearing for all participants. After careful review of the fairness hearing and with plaintiff attorney's and the defendant attorney's agreeing without recourse to the terms and conditions established in litigation entitled "Deepwater Horizon Economic and Property Damages Settlement Agreement" the District Court entered final approval of the Economic and Property Damages Settlement on November 8, 2012 and the Fifth Circuit Court of Appeals three (3) judge panel affirmed the District Court's Order on January 10 2013.

Finality of the Deepwater Horizon Economic and Property Damages Settlement Agreement, and, thus, the Deepwater Horizon Economic and Property Damages Settlement Program was represented within the "four corners" theory of the pages of the Court's ruling, in that, the class was established, the damages were established, the elements of litigation were resolved, the fairness of the context of the document was established and all parties were in agreement to the issues and solutions presented within the final court document. Why was there ever a need to issue no less than four hundred and ninety five (495) policy rules to an approved document. Particularly, when the document is explicit in it's entirety concerning the issues surrounding the litigation and final judgment as binding all economic class members as stated in S.A. 8.2.4 below:

> 8.2.4   All Economic Class Members who do not timely and
> properly Opt Out shall in all respects be bound by all terms of

7

this Agreement and the Final Order and Judgment, shall be entitled to all procedural opportunities and protections described herein and provided by the Court, and all compensation for which they qualify under its terms, and shall be permanently and forever barred from commencing, instituting, maintaining or prosecuting any action based on any Released Claim against any Released Parties in any court of law or equity, arbitration tribunal or administrative or other forum.

The final Deepwater Horizon Economic and Property Damages Settlement Program contained Exhibit 4E which was established to provide a means of determining losses sustained by a canceled contract. Policy Rule 495[7] does not address the issue of canceled contracts within the context of the entire document, thus, the professional with a justified claim who is a class member with a properly filed claim no longer has an avenue clearly established within the modified, altered, changed court document to be properly compensated for the loss established by the contractual provisions of the professional contract which forms the basis of the claim. In essence, finality of the court order and judgment did not include all class members. Thus, when a claimant is informed of the procedural avenues being undertaken to process the claim a lapse of time may have eliminated "opt-out" options barring the claimant with a just claim established under a canceled contract venue to alternatives available and/or a proper means of establishing true losses sustained as a result of the "oil spill" which forms the basis of the original litigation.

Consequently, the adoption of Policy Rule 495 being applied to process all BEL claims changes and/or alters the meaning of the Final Order of the Court has, without question, denied the "Settlement Class" of due process[8]. Using a policy procedural rule is

---

[7]   Final BEL Policy for "Matching" Revenue and Expenses *Policy Keeper No. 495 (dated 3/13/2014)*.
[8]        Ofcourse, due process law is flexible, but, it should not be invisible. The settlement agreement certifications of the Economic Class under *Fed. R. Civ. P. 23(a) and 23(b)(3)* for the sole purpose of

not a proper avenue to amend a final ruling of the court.   Here, in this petition the due process violation may only extend to one member of the class, however, the right to due process can extend to only one or to many whether the litigation affects one or many is irrelevant.   Further, the violation of due process in this case extends far beyond the simple adoption of a policy rule.   The affected class member may not be informed of the policy rule under which a submitted claim is to be processed to well after the adoption of the policy rule. The petitioner established a claim based on the Deepwater Horizon Settlement Agreement Exhibit 4E, wherein, a claim would be processed entirely within the criteria of S.A. Exhibit 4E without having to adhere to an accounting system established after finality of the court document and explained in Policy Rule 495[9] and confirmed to petitioner/claimant on Feb. 16, 2016 the claim was being processed under Rule 495.   In essence, S.A. Exhibit 4E is entirely removed from the final court document approved by all parties thereto prior to court release. This action alone constitutes a failure of "due process" guarantees established by the Fifth and Fourteenth Amendments, as there are no provisions for processing claims based on canceled contract with explicit cost in the Rule 495 venue.

Consequently, the issue of "finality" of the final court document comes into play and/or the question arises as to the strength of adopting a policy procedure rule in the absence of due  process which seriously changes the merits and integrity of what is presented to the world as a final court document.   Post issuance of a final document discussions in

effectuating this Agreement under its terms and conditions is binding on all the parites.   The Constition's demand for adequacy is, in fact, the same as Rule 23's.   Obviously, the latter cannot demand less than the former, but it just as obviously can demand more.   *See Issacharoff, supra note 23, at 353* ("there is no reason to believe ... that the concept of adequate representation present in the rules is anything other than the level of constitional protection of absent class member interest necessary to deem their virtual participation in litigation fundamentally fair.")

9   Policy Rule 495 initiates from the defendant (BP) by contesting the merits of the Final Court Document, in effect, becomes the intervenor seeking to control the accounting methods to be utilized which are in contrast to the Settlement Agreement.

"back room meetings[10]" between the parties does not constitute a fair meaning of "due process" when the original final court document is issued by the court after all fairness hearings and agreement between the parties as to the fairness of the original final court document. Perhaps a prudent question would be, "where is American justice in the Federal Judicial System?". The group of participants described in Policy Rule 495 participating in the establishment of new accounting and processing procedures collectively constitute an informal tribunal which lacks the integrity to make changes to a court document, particularly, when the informal tribunal is extremely biased against the "class member" who is improperly protected by the Court after due process of all the issues included in the final court ruling. The class members (individually) were not given a notice of the proposed action and the grounds asserted for it, nor an opportunity to present reasons why the proposed action should not be taken. Actually, after the policy rule was developed by the defendant's and the Claims Administrator hesitated in its release (BP) begain publicly threatening the claims administrator position, repeatedly asking for his removal. Subsequent thereto, the policy rule was presented and adopted by the court which gave rise to an unsolicited appraisal as to the integrity of the claims administrator by the defendant (BP).

In view of the foregoing,  and the text of Policy Rule 495 in comparison to the final court document it is clear the intent of the Policy is to eliminate the use of S.A. Exhibit 4E of the Settlement Agreement in analyzing claims which comply with the Court doctrine established in S.A. Exhibit 4E. This deliberate indifference is further recognized with the assertion of all business economic claims for professional service(s) to be processed from the

---

10   See attached Memorandum from Claim Counsel to Claim Administrator – attached as Appendix A.- as an
     example of the transfer of ideologies being exchanged between the parties.

context of Policy Rule 495 which requires adherence to S.A. Exhibit 4C of the Deepwater Horizon Settlement Agreement Program. The final court doctrine established a method of remediation of losses under S.A. Exhibit 4E and then deprived the class member of remediation of losses under S.A. Exhibit 4E by adopting procedural Policy Rule 495 which eliminated processing of claims under S.A. Exhibit 4E to the detriment of all class members with a canceled contract claim fitting the criteria established in S.A. Exhibit 4E of the final Deepwater Horizon Settlement Agreement Program. Here, the petitioner is not seeking merely a post-deprivation remedy to a loss sustained as a direct result of the Deepwater Horizon Spill in the Gulf of Mexico, but, rather is seeking the provisions of the final court doctrine as it existed prior to the issuance and adoption of Policy Rule 495. As I have previously stated, "back room negotiations" between limited parties in preparation of a procedural policy rule which alters amends and/or changes a final court document does not constitute "due process". The individual class members have a vested right of interest and property equating to "security interest" and "legitimate entitlement" within the context of the original court final ruling which the Court has an ongoing duty to protect.

Under the terms and conditions set-forth in the Deepwater Horizon Settlement Agreement Program the petitioner had a right to file a claim for contract cancellation under the terms and conditions of the document. In an answer to a Motion of Review and Motion of Clarity filed (filed by the claimant) with the Eastern District Court the claims administrator acknowledged the claim of the petitioner as being properly processed under the terms and conditions established within the final Court Document. Subsequent thereto, the claim process has changed, has been altered, and intentionally modified to remove S.A.

11

Exhibit 4E from the context of claim review and procedure causing a manifestation of a complete different review of the claim as presented to consider the procedural merits established in Policy Rule 495 for accounting format and limiting the claim review to Exhibit 4C, thus, the right of the claimant which existed under the final court doctrine has been removed. The processing of the claim continues to exist, but, exist under provisions which are forced on the claimant while depriving the claimant of "due process" in the changing of the final court doctrine without sufficient representation of the class members. The petitioners right for processing the claim within the context of the underlying laws and the Amended Settlement Agreement under the "canceled contract" provisions of the Court Doctrine have vanished.

The Deepwater Horizon Settlement Agreement on page 78 included the following text;

> 13.4. Plaintiffs and Proposed Economic Class Counsel expressly acknowledge and represent that they (a) have performed an independent investigation of the allegations of fact and law made in connection with the Deepwater Horizon Economic Litigation; and (b) may hereafter discover facts in addition to, or different from, those that they now know or believe to be true with respect to the subject matter of this Agreement and/or the actions or matters covered by the Release. Nevertheless, the Parties intend to resolve their disputes pursuant to the terms of this Agreement and thus, in furtherance of their intentions, the Agreement shall remain in full force and effect notwithstanding the discovery after the date of this Agreement or at any other time of any additional facts or law, or changes in law, and this Agreement shall not be subject to rescission or modification by reason of any change or difference in facts or law.

And further states,

> 26.1. Plaintiffs, the Economic Class, and each Economic Class Member and the BP Parties expressly and each agree that the terms of this

12

> Agreement, and all provisions hereof, including all representations, promises, agreements, covenants and warranties, and including the Exhibits thereto, are contractual and not a mere recital and shall survive the execution of this Agreement. This Agreement and its exhibits, attachments, and appendices shall constitute the entire agreement and understanding among the Parties and supersedes all prior proposals, negotiations, agreements, and understandings relating to the subject matter of this Agreement. This Agreement shall be binding upon and shall inure to the benefit of the Parties hereto and their representatives, heirs, successors and assigns.

In other words, not withstanding a miss-interpretation of the plain English used to fabricate the foregoing paragraphs the document as certified stands alone and cannot be changed, as per agreement of all parties.

The contract for professional services as an architect are the basis of and a part of the claim properly filed with the Deepwater Horizon Settlement Agreement Program.  The contracts represent the property, with definable "security interest", of the architect and, thus, the property of the architect is represented by the profit which can be earned in pursuit of the completion of the contract obligations of the architect.  As a direct result of the Deepwater Horizon Spill and the cancellation of the contract as a result thereof, the petitioner (claimant) has been deprived of his ability to full fill the obligations of the contract, and, consequently, deprived of his property and his liberty to earn the property represented by the contract.   In accord to the terms and conditions set forth in the final court doctrine the architect had a right and liberty established therein to recover the property represented by the contract which was lost resulting from the adoption of Policy Rule 495 which removed the "canceled contract" provisions (S.A. Exhibit 4E) of the court doctrine without due process.

This claimant does not intend to "re-litigate" the issues surrounding the enactment of the Final Settlement Agreement, nor is this intended to be a collateral attack to undermine the

integrity of the Final Document to which all parties are bound. This filing is simply for a determination(s) in regards to the violation(s) perpetrated by amending, through Policy Rule adoptions, the final Court document to which all parties are bound when the affect of the Rule deteriorates the legal and constitutional standing of class members, whether individually or viewed as a whole entity. In respect, continued issuance of Policy Rules which are not based solely on "proceedural issues confined within the merits of the final document" negates all finality. Finality of class actions carries more merit when considering the infinite number of class members grouped under the thousands of NASIC Code "sub-group" catagories of class members who have chosen not to "opt out" of the Agreement and abide by all of the relative boundaries which have been adjudicated in the final Certified Settlement Agreement.

Finality, in law, is the concept in which certain disputes must achieve a resolution from which no further appeal may be taken, and from which no collateral proceedings may be permitted to disturb the resolution. Finality is considered to be important because, without finality there would be no certainty as to the meaning of the law, or the outcome of any legal process. Consequently, without finality, "What is the value of the Federal Judicial System"?

## APPLICABLE LAW

S.A. § 36.1. Notwithstanding the law applicable to the underlying claims, which the Parties dispute, this Agreement and the Release and Individual Releases hereunder shall be interpreted in accordance with General Maritime Law, as well as, in a manner intended to

comply with Oil Pollution Act (OPA).

To this regard the OPA states, "Profits and Earning Capacity"

> Damages "equal to the loss of profits or impairment of earning
> capacity due to the injury, destruction, or loss of real property,
> personal property, or natural resources" are recoverable by any
> claimant against the responsible party under OPA, (33 U.S.C. §
> 2702(b)(2)(E).

Under the terms and conditions established in the Settlement Agreement and in particular S.A. Exhibit 4E containing "exclusive compensation methodology" for business claimant providing appropriate documentation and which establish pertinent causation certain "canceled contract" claimants are processed exclusively[11] from within Exhibit 4E. Policy Rule 55[12] which states,

> "Businesses that establish causation by demonstrating a Spill-
> Related cancellation are compensated solely pursuant to
> Exhibit 4E and are not entitled to any compensation pursuant
> to Exhibit 7 (the Framework for Start-Up Businesses).

On the Web Portal entitled "Deepwater Horizon Claims Center – Economic & Property Damage Claims (MDL 2179 In re: Oil Spill by the Oil Rig "Deepwater Horizon" in Gulf of Mexico on April 20, 2010 – Official Court-Authorized Website under the category "FAQs" one finds "Frequently Asked Questions[13], Article, V. Summary of the Settlement

---

11   Exclusive – is something which prevents other things from being true or something which is limited in number or the only source of something; not allowing something else, incompatible, mutually exclusive conditions; not shared with others, etc.

12   Policy 55 – Business Economic Loss Claims, Active Date 5/24/2012, Policy Impact – All Claims Regardless of Active Date, Settlement Agreement Reference – Exhibit 4E, Affected Claim Types and/or Review Processes – BEL.

13   *These Frequently Asked Questions and Answers (FAQs) were prepared by the Parties and the Claims Administrator to assist claimants who might submit to the Court Supervised Settlement Program. The information contained in these FAQs is based on the Settlement Agreement, which was granted Final Approval on December 21, 2012. However these FAQs are not a substitute for and do not constitute the official Class Notice, and they are not approved by the Court. Any term or information in these FAQs that is found in the Amended Settlement Agreement will have the meaning set forth in the Settlement Agreement. If there is any conflict between these FAQs and the Amended Settlement Agreement, the Amended Settlement Agreement controls.

Claim Categories finding question 48 which reads:

> 48.   What is an Economic Damage Claim?
>
> Economic Damage is a loss of profits, income, or earnings suffered by Natural Persons or Entities as a result of the Deepwater Horizon Incident.  Economic Damage does not include loss of profits or earnings or damages for injury that are related to other types of damages.

This philosophy coherent to damage assessment is also found in Exhibit 4E of the Amended Settlement Agreement which states;

> 1. Determine lost revenue from the Canceled Contract or Canceled Reservation
>
> a. "Lost Contract Revenue" shall be the amount that a claimant would have been paid by a customer between April 21, 2010 and December 31, 2010 in connection with a Canceled Contract, had that contract not been canceled as a result of the DWH Spill.
>
> Lost Contract Revenue shall be determined based on information set forth in the Canceled Contract, and, if necessary, other contemporaneous documentation provided by the claimant, such as purchase orders or shipping schedules. Lost Contract Revenue may include any food, beverage, or other ancillary revenue that the claimant can demonstrate would have been expected in connection with the Canceled Contract.
>
> 2. Determine lost profit associated with the Canceled Contract or Canceled Reservation
>
> a. Canceled Contracts or Canceled Reservations with Explicit Cost Information.
>
> For Canceled Contracts and/or Canceled Reservations with explicit cost information, Lost Contract Profit and Lost Reservation Profit shall be determined as follows:
>
> i.     Identify the variable expenses that would have been incurred (but were not actually incurred) by the claimant in carrying out the Canceled Contract or Canceled reservation according to either (i) the information set forth in the Canceled Contract or Canceled Reservation documentation, or (ii) documentation provided by the claimant regarding variable expenses incurred in connection with

prior events which were comparable in terms of type, size and revenue and took place after January 1, 2007. The total revenue expenses shall also include any commissions or bonuses that would have been paid to sales or other staff had the Canceled Contract or Canceled Reservation not been canceled.

ii. Sum (a) total variable expenses associated with the Canceled Contract or Canceled reservation and (b) any cancellation fees, non-refundable deposits or other amounts received by the claimant in connection with the Canceled Contract or Canceled Reservation and (c) the liquidation or salvage value of any product which remains unsold as of the claim filing date.

iii. Subtract the sum of (ii) from the Lost Contract Revenue or Lost Reservation Revenue as applicable.

3.    Not Applicable.

4.    Determine profit associated with the Replacement Contract or Replacement Reservation.

5.    Calculate Total Compensation Related to the Canceled Contract or Canceled Reservation.

"Spill-Related Cancellation Compensation" shall be compensation for the Canceled Contract or Canceled Reservation, net of amounts received in connection with any Replacement Contract(s) or Replacement Reservation(s), as applicable, and shall be calculated as follows:
   a.   The claimant's Lost Contract Profit/Lost Reservation Profit (calculated in Step 2), less
   b.   Any Replacement Contract Profit or Replacement Reservation Profit (calculated in Step 4), less
   c.   Any payments received by the claimant from BP or the GCCF pursuant to BP's OPA claims process compensating for the loss, as well as VoO Settlement Payment Offset and VoO Earned Income Offset related to the Canceled Contract or Canceled Reservation.

An RTP shall apply to claimant's Spill-Related Cancellation Compensation consistent with the claimants industry and/or zone.

Strict adherence to the Amended Settlement Agreement and all underlying laws[14]

---

14   "A basic principle of contract interpretation in admiralty law is to interpret, to the extent possible, all the terms in a contract without rendering any of them meaningless or superfluous." *Chembulk Trading LLC v. Chemex Ltd.*, 393 F.3d 550, 555 (5th Cir. 2004).

which govern and/or applicable to the final agreement combine to create a legitimate entitlement for all claimants similarly situated. S.A. Exhibit 4E, again is, "exclusive methodology" established for processing damage assessment and value of loss for canceled contracts and does not, within the four corners doctrine, require any assessment under S.A. Exhibit 4C and/or 4D of the certified Amended Settlement Agreement. Consequently, the Amendment[15] S.A. Exhibit 4E is consistent with the "Profits and Earnings Capacities" of the Oil Pollution Act, OPA, 33 U.S.C. § 2702(b)(2)(E). Any alienation of pertinent legitimate entitlements established under the exclusivity of Amendment S.A. Exhibit 4E would be outside the context of applicable laws which govern and, thereby, establish a breach to the protections warranted against all claimants similiarly situated. Intrusions under S.A. Exhibit 4C, 4D and/or any policy rule which conflict in any manner to the merits of the Amendment S.A. Exhibit 4E cannot be allowed to stand without completed litigation of the issues involved. Interpretations of the Claims Administrator and the Defendants associated to the inclusion of elements contained within S.A. Exhibit 4C and 4D have no standing to attack the exclusivity of S.A. Exhibit 4E when there is no reference to and/or requirement in S.A. Exhibit 4E for "canceled contracts with explicit cost" to consider elements found within each of these exhibits and when such inclusions are alien to the underlying laws which govern. Due process also animates the common rule that class action procedure may not be used in a way that alters the underlying substantive law. The Rules Enabling Act, in giving authority to the Advisory Committee to establish procedural rules, limited that authority to *procedural* rather than *substantive* rulemaking. 28 W.S.C. 2072 (2009). Accordingly, any

---

15  The modification of materials by the addition of supplemental information, the deletion of unnecessary, undesirable, or outdated information; or the correction of errors existing in the text. An amendment is a change, addition, or rephrasing of something, most often with the intention of improvement. The act or process of revising something.

18

procedural rule, such as Rule 495, that changes the *substantive* law is in violation of this key limit in the Rules Enabling Act, *Stonebridge Life Ins. Co. v. Pitts*, 236 S.W.3d 201, 205 (Tex. 2007); *Compaq Computer Corp. v. Albanese*, 153 S.W.3d 254, 261 n.6 (Tex. App. 2004); *City of San Jose v. Superior Court*, 525 P.2d 701, 711 (Cal. 1974).  One can also argue, in addition to the Rules Enabling Act's prohibition on changing substantive law, the due process clause precludes the certification of a class that would prevent a defendant from raising defenses it otherwise would have been able to assert in an individual action.  The Supreme Court has held that "the fundamental requisite of due process of law is the opportunity to be heard." And a litigant's "right to litigate the issues raised" is "guaranteed . . . by the Due Process Clause,"  including the right "to present every available defense." And a class action which would have the effect of changing the substantive law applicable to plaintiffs' claims not only is impermissible by virtue of the Rules Enabling Act but is barred by the due process clause as well.

S.A. Exhibit C was thoroughly discussed and scrutinized prior to the release of the Final Certified Settlement Agreement (See Exhibit 2 and Exhibit 3 of Doc. 11818 Filed 11/07/13) and after reading of whole there is no discussion of claims supported by canceled contracts with cost explicit language for professional services.  In fact, Doc. 11818 concerns itself with BEL claims consisting of general claims for businesses and Exhibit 1 authored by Ms. Wendy L. Bloom, Esq. in paragraph 12 includes, "During that session, BP-s Global Head of Litigation James Neath responded that compenstion for business economic loss would need to be based on lost profits. Mr. Neath explained that lost profits is the accepted methodology for proving economic loss and is proven in court every day." This exact logic forms the basis of S.A. Exhibit 4E for canceled contracts with explicit cost determinates and

therefore, requires no further matching nor is the process addressed to include computations under S.A. Exhibit 4C of the Settlement Agreement.  This logic is also supported by the underlying laws which govern the creation of the Class Action and consequently, the Settlement Agreement.  In the same exhibit authoried by Ms. Wendy L. Bloom in paragraph 11 the text, "At a meeting in London on June 9th 2011, Mr. Fyard expressed that his job and that of Mr. Rice was not to seek a "windfall" for claimant's, but rather seek full compensation for losses incurred."  Again, this logic supports S.A. Exhibit 4E and the underlying laws which govern.  This petitioner has found no reference to claims for canceled contracts in any of the meetings and discussions from which Policy Rule 495 is derived.  All discussions seem to center around common BEL claims which are not based on any type of contract, but, rather general business issues.  First comes the Settlement Agreement, then Exhibit 4A, then Exhibit 4B, then Exhibit 4C, then Exhibit 4D, and, then Exhibit 4E which is an addendum creating a claims evaluation ideology unique unto it's self for processing professional services contracts with canceled contracts not general business activities.  Correspondingly, the ideology of Mr. Neath and Mr Fyard is not supported by Rule 495, wherein there is no system in place to establish the lost profits, economic loss, and compensation for losses incurred by claimants with canceled contracts with explicit cost parameters.

Class Action Fairness Act (CAFA) Section 2 (b)(1) – The purposes of this Act are to, (1) assure fair and prompt recoveries for class members with legitimate claims..... (prompt does not mean – 2010, 2012, 2014, 2016 and counting ...... for this reason Admirity and Maritime Law requires interest payments added to the claim amount).  This petitioner has not seen a Policy Rule addressing this issue, resultingly, it seems the underlying laws upon

which this Settlement Agreement declares it is based have vanished along with S.A. Exhibit

4E.  The Settlement Agreement written in plan English is as easy to comprehend as St. John

11:35 "Jesus wept".

## Economic Damages

The Settlement Agreement is very specific in terms of defining economic damages.

> 38.57. Economic Damage shall mean loss of profits, income and/or
> earnings arising in the Gulf Coast Areas or Specified Gulf Waters
> allegedly arising out of, due to, resulting from, or relating in any way to,
> directly or indirectly, the Deepwater Horizon Incident; provided,
> however, that Economic Damage does not include (1) loss of profits or
> earnings, or damages for injury relating to real property or personal
> property that constitutes any part of the Seafood Compensation
> Program, Coastal Real Property Damage, Real Property Sales Damage,
> Wetlands Real Property Damage, Vessel Physical Damage, or (2) VoO
> Charter Payment, or (3) damages for loss of Subsistence use of natural
> resources, which constitutes Subsistence Damage.

Determinations for calculating loss of profits, income and/or earnings arising from

the Deepwater Horizon Spill are also carefully thought out and determined within the text of

the final settlement agreement document issued by the court after all due-diligence regarding

litigation was complete.  For instance, S.A. Exhibit 4E[16] was an addendum to the settlement

agreement to cover losses sustained by "canceled contracts" with instructions to determine

"causation" and methods of determining losses completely within the text of S.A. Exhibit 4E.

With the adoption of Policy Rule 495 the terms and conditions for determining loss under

"canceled contracts" no longer exist within the boundary of the Amended Settlement

Agreement, which constitutes a radical change to the final court doctrine and the Deepwater

Horizon Settlement Agreement without proper "due process".  The sole initiative of the

---

16    The compensation methodology for Business Economic Loss Claims generally is set forth in Exhibits 4C-4E as
applicable.

adoption of Policy Rule 495 was simply to circumvent the findings of and ruling of the court in regards to the certified final Settlement Agreement to the detriment of the claimants.

Further, the underlying laws which provide for "impairment of earning capacity due to the injury[17]" constituting a means of establishing a legitimate entitlement are essentially ignored under the guidelines for value assessment found in Policy Rule 495.  Canceled contracts which are "cost explicit" leave little room for adjustments alien thereto, particularly, contracts for professional architectural services.   Contracts which are canceled solely resulting from the Deepwater Horizon Spill represent an impairment of earning capacity which constitutes an infringement of the right of liberty to perform an occupation and/or services under the conditions established within the context of the canceled contract. The right of liberty to engage in an occupation is protected under the Constitution of the United States of America, and, thus, an opportunity to establish a right of legitimate entitlement represented by the contractual obligation exist under the terms of the contract - canceled contract.  Further, the canceled contracts with explicit cost parameters establishes a "security interest" to all claimants similarly situated.  The term "security interest" includes a right under a mortgage, deed of trust, assignment judgment lien, pledge, security agreement, factoring agreement, or lease and any other right accruing to a person to secure the repayment of money, the performance of duty, or any other obligation by a non-affiliated person,  42  USC  §  9601(20)(G)(vi)  –  (Comprehensive  Environmental  Response, Compensation and Liability Act of 1980, 101 (20(G)(vi)).

Policy Rule 495 Attachment F, page F1 includes the following language,

In considering options to resolve professional services claims that are not

---

17   *(33 U.S.C. § 2702(b)(2)(E)*

sufficiently matched, a deviation from the Annual Variable Margin Methodology described in Attachment B was required, due to the nature of a professional services firm's business and how this translates into matching revenue with expenses in a way that reflects economic reality. The methodology requires adjustments to a claimants contemporaneous P&Ls if they are deemed not to be sufficiently matched.' After making such adjustments, the restated P&Ls are utilized in calculating compensation applying a methodology consistent with Exhibit 4C of the Settlement Agreement. The approach outlined below does not alter the structure as to how compensation is calculated but does, if matching issues are identified, amend the P&Ls utilized in such calculations

The professional services contract for one project has nothing to do with the contract for another project in the architect's office. The profit of one contract has no bearing at all to the profit of another project under a separate contract.   So just what are we trying to "match".   Further, "Policy Rule 495 does not consider outstanding invoices to subtantiate losses and does not consider the unpaid invoices as damages due to the Spill, in that, the ideology is the money has not been realized and/or paid which constitutes nothing more than an unpaid invoice.  This unpaid invoice in accordance with 495 methodology does not constitute losses,"[18] This ideology is completely alien to the terms and conditions established in the Settlement Agreement.   In essence the Rule 495 is a completely worthless methodology for establishing damages which manifest as a direct result of the Deepwater Horizon Incident (the Spill) and under the Settlement Agreement and underlying laws which govern.   The invoices shown for the months preceding the Spill which testify to the work being performed  .... "would not count as a loss  and/or damages as the amount was not paid and, again, simply constitutes an outstanding invoice under Rule 495,"   the foregoing is exactly what I was told in a telephone converstion with the accountant on February 24, 2016

---

18   This information taken from telephone conversation with William Colton, Accountant with PwC 2/4/2016.  Mr. Colton was assigned to process the claim of the petitioner/claimant 100011039.

in regards to the ideology of Rule 495.  The ideology of Rule 495 is nothing more than a Houdini act based on illusions of alien mathematical assumptions which have no relationship to canceled contracts with explicit cost parameters.  A contract for placement of fiber optic cabling on a large college campus would require development of a site plan locating the buildings, a drawing which may take 40 working hours to develope, and then placing a line on the map representing the fiber optic cabling which may take 1 hour to delineate.  The map is of little or no value while the line represents a cost of five million dollars to install the fiber optic cable.  The fee is based on the total cost of the project, there is no "intelligent" method to match this revenue with expenses, much less compare it to another contract project.  In the United States of America the Internal Revenue Service, a branch of the Federal Government, does not require a taxpayer to include a value for time spent in a particular time period as a value for taxes owed the Government, instead the value of taxes owed the Government is triggered by the date the value, in money, was received.  Likewise, the delivery of an invoice for payment of fees under a contract does not indicate a receipt of money earned in a particular time period if the invoice was not honored and payment was not made, thus, the outstanding indebtness is still owed and consequently becomes lost revenue under the terms of conditions established in the canceled contract.  This debt becomes damages in context with OPA, (33 U.S.C. § 2702(b)(2)(E) and/or  33 U.S.C. § 2702 & 2713.  Of course, this ideology is contradicted by the manipulations of Policy Rule 495 which is alien to all known practices of accounting in regards to damages  or lost revenue under canceled contracts with explicit cost arrangements. During the conversation on  February 24, 2016 with Mr. Colton of PwC, I was advised to call the claims center and speak with an

accountant processing claims for canceled contracts as this claim did not fit under Rule 495. This ideology contradicts the underlying meaning of Rule 495, in that, all BEL claims in the listed catagories are to be processed under the new Rule 495, inclusive of professional services claims.  The reference to "all BEL claims" can only reference those BEL claims which exist outside the exclusive methodology of Settlement Agreement Exhibit 4E.

After adoption of the new Rule 495 there was no notice tendered to the established class members as to how the adopted Rules and procedures thereunder would affect any claim presented by the claimant and/or if the claim would be processed under the new Rule as opposed to existing criteria established in the certified Settlement Agreement.  This is important, more so, in this particular instance, as the Claims Administrator had previously attested to the Court the particular claim was being processed under a procedure existing in the original certifed Settlement Agreement.   The affected claimant was not given a second chance to "opt out", consequently, is bound to the Settlement Agreement as amended, which in fact causes undue and unnessary harm to the claimant by reducing the legitimate entitlement and produces a question under "due process" responsibilities.  S.A. Exhibit 4E was well rooted within the Context of the Settlement Agreement long before the Fairness Hearing affording BP ample opportunity to raise objections, and, thus, has lost opportunity to raise any objections post certification of the Settlement Agreement when no cause exist warranting objections.  Simply not "liking" the Agreement which BP agreed to is not a just and viable reason to sustain an attack against the merits of the Settlement Agreement.

Further, The objective of development of Rule 495 is clearly stated in Document 12055, Filed 12/24/13 in addition to "develop a more complete factual record regarding the

meaning of Exhibit 4C ..... whether or not Exhibit 4C requires the revenues and expenses to be matched for all claims, or only some claims." Also the document states, "it is clear the parties did discuss and were in agreement that similar situated claimants must be treated alike, and that in order to achieve a class settlement agreement, it is necessary that there be a transparent, objective methodology adopted to determine lost profits." A claim based on a canceled contract with explicit cost parameters should be treated similiarly to other claims with canceled contracts with explicit cost parameters, particularly when the claims are from like professionals under NASIC 54 as opposed to being treated like general business claims which are not based on the same professional contracts being processed under Rule 495, this is not an example of treating similar situated claiants alike. To this regard, the Final Settlement Agreement provided a means of determining losses under Exhibit 4E of the Agreement and thusly, treated similar situated claimants alike.

## INTERVENTION

The Claimant petitioner herein has been known to the Claims Administrator since filing of the claims in June of 2012. Each claim contained the full name of petitioner, current address, and phone number and was further identified in the claims process and Claimant ID 100011039. Prior to and after adoption of Policy Rule 495 the claimant was not given notice as to the adverse affects of the alien mathematics and procedural changes in determining damages of claims and these changes would affect claimants with claims pertinent to processing under Exhibit 4E of the Settlement Agreement. The claimant petitioner did not know of or suspect the claims presented were being processed under Rule 495 until after correspondence from an accountant making demands for additional information in November

and December of 2015.  Which demands were in line with the requirements of Rule 495. However, suspensions were confirmed in receipt of an email[19] on Feb. 11, 2016 stating, ...."why it is necessary to review your claim under Policy 495 and the Professional Services Methodology."  The purpose of intervention is to formally object to changes made to the Certified Final Settlement Agreement through the adoption of Rule 495 as these changes adversely affect the claimant, and, in particular since the Class Administrator gave testimony to the Court the claims of the claimant petitioner were being processed within the S. A. Exhibit 4E venue.  Class settlement affects legal rights of unnamed parties and therefore unnamed parties have standing to appeal, (*Marshall v. Holiday Magic, Inc.*, 550 F.2d 1173, 1176 (9th Cir. 1977).  Class members were not given the opportunity to review the conditions established in Rule 495 until well after the adoption of the Rule, a Rule authored by the Claims Administrator with technical information supplied to the Claims Administrator by the defendant, BP.  The Claims Administrator is under no direct Court order to provide legal advice to class members as to the legal implications affecting claims and is not the "protector" of the class.  The Eleventh Circuit held in 1987 a non-named class member does not have standing to appeal the final judgment in a class action.  That Court reasoned Fed.R.CivP. 23 provides the only avenue for representation of the class, and that that route ensures that the interest of the class will be fairly and adequately protected.  Well, the certified Settlement Agreement has not been fairly protected nor has the interest of class members.  The timing of the adoption of Rule 495 is carefully arranged and manipulated by the defendant BP who clearly wants to change the methodology for processing certain claims

---

19   See Appendix B for copy of email received from William M. Colton an accountant with PwC Advisory Services LLC.

in a fashion not consistent with the Certified Settlement Agreement while concurrently continuing to bind the class members under the terms and conditions of the Settlement Agreement and to do so without due process.

## ARGUMENT AND STANDARD OF REVIEW

The incorporation of Policy Rule 495 into the Deepwater Horizon Settlement Agreement occurs long after the fairness hearing, agreement of all parties as to the fairness of the court ruling and after establishment of the Class and, therefore, becomes nothing more than a collateral attack to the class action or judgment.

When a court considers a collateral attack to a class action settlement or judgment, it must first determine how much difference to assign to the manner in which the initial court resolved the relevant issue when it first approved the class settlement. Historically, courts have disagreed over what standard of review to apply.

The Ninth Circuit has adopted an approach grounded in claim preclusion principles and procedural due process. If a collateral attack plaintiff had a full and fair opportunity to raise the alleged defect in the class settlement court, that plaintiff may not raise the defect now by way of collateral attack (*Epstein v. MCA, Inc.*). Unlike *Stephenson v. Dow Chemical Co* wherein the injury had not manifested prior to the time of the earlier settlement agreement, the injuries involved in the Deepwater Horizon Settlement Agreement involving the class must have been a direct result of the Deepwater Horizon Oil Spill. The presentation of Policy Rule 495, it's adoption by the court after all issues were litigated, a fairness hearing held, all parties thereto in complete agreement with the context of the court ruling and certification of the class simply constitutes a collateral attack as the inherent purpose of the

28

rule is to change, alter, and/or amend the final court ruling.  The Third Circuit has also reviewed this area of law, holding no collateral review is available when class members have had a full and fair hearing and have generally had their procedural rights protected during the approval of the Settlement Agreement.  The Third Circuit has also stated, "collateral review is only available when class members are raising an issue that was not properly considered by the District Court at an earlier stage in the litigation".

In this case, the defendant (BP) had a clear and undisputed avenue to raise the issues presented in Policy Rule 495 long before the certification of the class.  By failing to raise these arguments in a timely fashion, waiting until long after the final certification of the Settlement, BP has essentially waived any position to bring these, or any other, arguments to modify the Settlement Agreement.  This same waiver position applies to all parties of the class action, (*See Joel A. v. Giuliani, 218 F.3d 132, 140 C2d Cir. 2000*).  The accounting measures and means are clearly defined in the final court Settlement Agreement, as well as, the rights of all class members to file claims within certain parameters established in the Settlement Agreement.  Once issues of due process protections for class members have been decided by a court, they may not be re-litigated.  Under Fed. R. Civ. P. 59(e), a party may request "to alter or amend a judgment."  Fed. R. Civ. P. 59(e).  "Such motions serve the narrow purpose of allowing a party to correct manifest errors of law or fact to present newly discovered evidence."  *Waltman v. Int'l Paper Co.*, 875 F.2d 468, 473 (5th Cir. 1989).  The adoption of Rule 495 far exceeds the limitations established in Fed. R. Civ. P 59(e) when the adoption of the rule makes numerous changes to the policies established through litigation of the case and, consequently, the final court doctrine to the detriment of certain class members

with a properly filed claim under the terms and conditions established in the final court ruling.   Policy Rule 495 explains the "Policy Development Process", commencing on page 1 thereof, in which there is no evidence of, nor requirement of any order of recognized "due process" to guard against attacks which are detriment to the established methodology of certain provisions existing in the final Settlement Agreement and without insurance against negligence to prevent alteration of the integrity of the final court ruling. There is no evidence which establishes the Administrator of the Settlement Agreement as an "advisory jury". Nothing contained in the final Deepwater Horizon Settlement Agreement Program can be defined as "clearly erroneous", therefore, the need to alter, amend and/or change the final court ruling is not warranted.   This ideology is supported and explained by the Class Counsel in the Memorandum attached hereto as Appendix C.

The Settlement Agreement requires all claims to identify themselves in regards to industry through the use of the NASIC Code[20] to clearly identify the industry within which each may work, perform a service, fish, and/or operate a business.   Among other things, NASIC identifier establishes if there is a right to file a claim, a particular industry to determine tourism[21] or non-tourism status, and to identify industries bared from the "class membership".   The first two (2) numbers (54) of the NASIC Code indicate the professional, scientific, and technical services category.   The Settlement Agreement suggest and mandates in Section 4.4.7  the Compensation Criteria for each of the Claims Categories "will apply equally to all Claimants." Identifying claimants under the categories within the NASIC Code creates "Sub-Classes" within the "Class".   Thus, insures "similarly  situated" claimants are

---

20    See Settlement Agreement Section 4.4.7.1.
21    Exhibit 2 of the Settlement Agreement.

treated equally during the evaluation and damage determination of each claim. Rule 23 (*7.2 Rule 23 Class Certification Requirements 7.2.A.2 Commonality*) does not require that all questions of law or all questions of fact be common to all class members. In fact, only one question of law or fact must be common to the proposed class (*See. e.g., Wal-Mart Stores*, 131 S. Ct. at 2556). Some factual differences among class members do not defeat commonality (*D.G.*, 594 F.3d at 1195; *Lightfoot*, 246 F.R.D. at 337; *Bynum v. District of Columbia*, 214 F.R.D. 27, 32 (D.D.C. 2003). Consequently, a class member with industry classification of 541310 Architectural Services would be grouped with other class members of 541310 industry designation and treated alike during the evaluation of respected claims. In March, BP said in a regulatory filing that "no reliable estimate can be made of any business economic loss claims". This statement is utterly ridiculous, especially when a claim for professional services is presented under the venue established in S.A. Exhibit 4E[22] with cost explicit contracts which were canceled as a direct result of the Spill. Not only can the exact loss be mathematically calculated to determine damages value under the Settlement Agreement a sum certain amount can be calculated to insure the security interest and legitimate entitlement represented by the canceled contracts. Not wanting to accept this ideology BP had S.A. Exhibit 4E removed from the Settlement Agreement an act which constitutes a deprivation of legal and constitutional rights of the claimant. The Settlement Agreement states on page 63 paragraph 7.3.2,

> "Regardless of whether the Agreement becomes effective, Claims with a sum
> certain and some documentation and/or other proof that are submitted to the

---

22   See Settlement Agreement (4E.C.2a) for sum certain calculation method for canceled contracts with explicit cost language.

Settlement Program shall be deemed to satisfy presentment and all requirements of 33 U.S.C. § 2713."

The claims submitted, individually or collectively, by this claimant fall into compliance with S.A. 7.3.2 and other laws and regulations of underlying governance laws which the Settlement Agreement is based upon and in particular conditions established in S.A. Exhibit 4E of the Settlement Agreement.

Policy Rule 495 also addresses the use of NASIC Code designation to address certain issues regarding matching within a footnote which reads:

"A claimant with a given NASIC code will not automatically be assigned to a given methodology by virtue of the NASIC code if, in the judgment of the Claims Administrator's office, there are factors that indicate that revenues and expenses would be more sufficiently matched by applying an alternative methodology. As a result, some business within a certain three-digit NASIC Subsector may be treated under a different methodology from others within the same Subsector."

Just how many "alternate methodologies" are there? Is a dart being thrown at a list hanging on the accountant's wall? The Settlement Agreement requires the claims review method which will yield the highest damage available to the claimant, (Section 4.3.8). Further, it is highly unlikely this type of ambiguity will survive scrutiny under any portion of Rule 23 and certainly cannot be nested under OPA, (33 U.S.C. § 2702(b)(2)(E). The questions of law or fact common to the class predominate over the questions affecting individual members, this does not mean a canceled contract shall be treated the same as a

32

claim void of a contract to establish sum certain damage claims.  It is only where this predominance exist that economies can be achieved by means of the class-action device. *Oppenheimer v. F. J. Young & Co., Inc.*, 144 F.2d 387 (2d Cir. 1944); *Miller v. National City Bank of N.Y.*, 166 F.2d 723 (2d Cir. 1948); and for like problems in other contexts, see *Hughes v. Encyclopaedia Brittanica*, 199 F.2d 295 (7th Cir. 1952); *Sturgeon v. Great Lakes Steel Corp.*, 143 F.2d 819 (6th Cir. 1944).See *Pennsylvania R.R. v. United States*, 111 F.Supp. 80 (D.N.J. 1953); cf. Weinstein, supra, 9 Buffalo L.Rev. At 469.   The question of mathematical or accounting methodologies are not questions of law or fact, but, merely procedural questions.  The Court is to consider the interest of individual members of the class in controlling their own litigation's and carrying them on as they see fit, (See Weels v Bareco Oil Co., 125 F.2d 84, 88-90, 93-94 (7th Cir. 1941)).   In this class action there are many types of damage issues to be addressed, contractual damages, labor damages and loss of profit damages to identify a few, producing class members with an array of damage assessment avenues and to think all will fit into a particular type of accounting methodology is ludicrous at best. The commonality issues does not arise from the type of accounting, but, from the common act affecting all claimants – the Spill. Rule 23 Subdivision (c)(4) …. Two or more classes may be represented in a single action.  Where a class is found to include subclasses divergent in interest, the class may be divided correspondingly, and each subclass treated as a class. As stated elsewhere within, this petitioner believes this is precisely what has transpired within the class resulting from the frequent use of the NASIC Code to divide the classes into subclasses through their individual industries, thus, the claimants were treated alike through the elements of the Settlement Agreement which specifically determined the method of

computing the loss damages. However, the entire Policy Rule 495 is written in hypothetical terms, i.e., "will likely fall", "most likely fall into", "will most likely", "may fall into", "may have commenced", "may extend", "factor that indicate", in the judgment of", etc. Wherein the hypothetical conclusion is solely at the discretion of the Claims Administrator's office not the Settlement Agreement and/or the Court which retains jurisdiction. In effect blinders have been placed over the eyes of the class members who cannot ascertain the merits of the claims being presented on a mathematical basis and, thus, remain in the dark as to the true meaning and value of the entire Settlement Agreement. The mathematical basis which, "Mr. Ted Martens from PWC acknowledged that the Professional Services Framework was not based on the Settlement Agreement (nor any accepted Accounting Methodology), but rather, constituted a new methodology", (taken from Memorandum to Patrick Juneau, Claims Administrator from Class Council, dated March 19, 2014 and attached hereto as Appendix C, page 2 of 10, footnote 9. attached hereto as Appendix C.). A new accounting methodology was not warranted for evaluations of claims with cost explicit professional service contracts as the evaluation established in S.A. Exhibit 4E is consistent with the ideology of Admiralty and Maritime Law (33 U.S.C. 2713) and Oil Pollution Act (SEC. 1002 (b)(2)(E).

Further, Rule 23[23] (a)(4) requires a class representative to represent fairly and adequately the interest of absent class members. As with other aspects of Rule 23, due process governs the determination of adequacy of representation. By assuring adequacy of representation, Rule 23 permits class judgments to bind absent class members. The requirement of adequate representation applies to both the plaintiffs and counsel, (43. See

---

23 See Doc 12055 page 30 & 31 for requirements of Rule 23 and analysis pertinent to the Settlement Ruling.

*generally* Rubenstein, Conte & Newberg, *supra* note 13, § 1.03 (notice and adequacy of representation are touchstones of due process in class actions). *See also In re Am. Med. Sys. Inc.*, 75 F.3d at 1083 and *Broussard v. Meineke Disc. Muffler Shops Inc.*, 155 F.3d 331, 338 (4th Cir. 1998) (explaining the class action premise that, because "litigation by representative parties adjudicates basic due process rights of all class members, named plaintiffs must possess undivided loyalty to absent class members"). In this regard, the claimant (an absent class member) filed a Motion in the Eastern District Court and served all parties requiring service to inform each of the merits at issue delineated within the Motion. This Motion was simply denied by the Court. Some of the issues contained therein have become issues forming the basis of this petition which involve the statutory and constitutional rights of this claimant and all others similarly situated. Consequently, all plaintiffs and defendants of the Settlement Agreement were made aware of the existence of these issues prior to the adoption of Rule 495 which alters the original certified Settlement Agreement. Adoption of Policy Rule 495 has completely eliminated S.A. Exhibit 4E and the processing of canceled contracts with explicit cost determinations from the Settlement Agreement. Although the Settlement Agreement offers numerous protections to the claimant in actuality the claimant has little or no rights under the Settlement Agreement as long as Policy Rules can be implemented which change, alter and amend the final Agreement through "piecemeal litigation". Historically, the Federal Courts have guarded against "piecemeal" litigation. The Settlement Agreement was finalized in 2012 and since has been modified no less than 500 times with numerous appeal attempts by the defendants and Policy Rules by the claims administrator. These attempts to modify, alter and/or change the Settlement Agreement have no foundational basis

as the document is complete in itself and should be limited to the "four corners" theory, wherein, "what you read is what you get" particularly when the document itself and all parties thereto have attested to the documents fairness, adequacy and in the best interest of the parties. Therefore, for this and other reasons the final document presented to all third party readers must stand alone without challenges which alter, amend or change the meaning and/or intent of the original document to protect the Class Members who depended on the authentication of the document as presented. To disregard the merits of the final Settlement Agreement and continuously offered Policy Rules which alter, amend and change the original documents destroys the merits of the original document and eliminates any security of justice for the claimant – Class Member.

## REASONS FOR GRANTING THE PETITION

The claimant filed a claim in June of 2012 for processing under the Notice of Filing of the Economic and Property Damages Settlement Agreement as Amended on May 2, 2012, and Preliminarily Approved By the Court on May 2, 2012 and subsequently the Deepwater Horizon Economic and Property Damages Settlement Agreement as Amended on May 2, 2012. A Fairness Hearing was held on November 8, 2012. The Fifth Circuit District Court entered Final Approval of the Economic and Property Damages Settlement Agreement on November 8, 2012

The Fifth Circuit District Court issued an Order on December 12, 2012 certifying the Economic and Property Settlement Class and granting final approval of the Economic and Property Damages Settlement Agreement. The Fifth Circuit Court of Appeals three (3) judge panel affirmed the District Court's Order on January 10 2013. Although the Court retained

jurisdiction over the Agreement the time for presenting arguments contrary to the ideology of the agreement had passed, further, all parties thereto had firmly agreed on the contents of the Agreement attesting to the fairness and integrity of the contents constrained by the "four corners" of the document.

The context integrity of the document is above reproach in all necessary aspects in regards to who a claimant is and how a claimant is grouped. This grouping whether intentional or accidental exist within the context of the Settlement Agreement. Inclusion of the NASIC Code in the agreement insures individuality of all claimant's within a group of "like" claimant's for the purpose of complying to pertinent provisions of the Agreement requiring "like claimant's" to be processed alike. Within NASIC an engineer is not grouped with an architect nor is the draftsperson grouped with either an engineer or an architect. The different NAISC Code for each sets them apart and at the same time considers all factors relative thereto in determining damage factors and multipliers relative to each profession as a group. S.A. Exhibit 4E broadens this grouping by asserting the assessment of the type of contract the professional may have executed, "cost explicit", time and materials contract, contract based on a percentage of value, etc.

Provisions with the final Settlement Agreement also intelligently considered canceled contracts under an exclusive methodology and processing procedure. Most architects use an American Instituted of Architect's contract and/or a derivative thereof for contractual purposes with clients to establish a specific methodology under which the practice of architecture will be performed contractually and sets a value of the practice of architecture. A similar contractual obligation exist with engineers and their clients. However related, the

two different disciplines do not generally share a contract ideology.   Architect's do not provide architectural services on an hourly basis, instead utilizes a percentage multiplier to the total construction budget.   The provisions of S.A. Exhibit 4E acknowledged this difference and provided ideologies for "cost explicit contracts".   Thus the guarantees existing within S.A. Exhibit 4E extend far beyond the determination of entitlements and, or inclusive of, but, not necessarily limited to, the fact that all like canceled contract claimant's will be and are treated alike within the framework of the venue of canceled contracts.

In essence, a need based avenue is not available for adopting a rule which would eliminate, alter, and/or amend the ideologies established with S.A. Exhibit 4E.   Particularly when the "proposed need basis" avenue is a derivative of an alien accounting and income manipulation ideology not consistent with the "exclusive methodology" established for canceled contract with explicit cost claims through a particular NASIC Code designation.   In essence Rule 495 re-defines the class long after final judgment which is contrary to Rule (23(c)(1)(C).[24]   The re-defining of the class and removing the merits of S.A. Exhibit 4E constitutes and unlawful discrimination act perpetrated against class members utilizing the benefits contained in the final Settlement Agreement Exhibit in question to implement the provisions of the canceled contract through a properly filed claim.   Subdivision (b)(3) encompasses those cases in which a class action would achieve economies of time, effort, and expense, and promote, uniformity of decision as to persons similarly situated, without sacrificing procedural fairness or bringing about other undesirable results, (CF. Chafee, supra, at 201).   These ideologies exist primarily through the provisions of S.A. Exhibit 4E

---

24   This Court (Eastern District Court) has ruled the Settlement is not defective under Article III, Rule 23, or the Rules Enabling Act.  See Doc. 12055 page 36.

and NASIC Code designations which define the sub-groups. The common core issues of the class in general is the results of the negligence leading to the Deepwater Horizon Incident, the "spill".

The adoption of Policy Rule 495 clearly establishes an enormous lack of trust in regards to the class affiliated Settlement Agreement Trust document and a total degradation of the Settlement Agreement as a class action litigation. Consequently, S.A. Exhibit 4E should be re-established as an Exhibit which exist as part of the Class Action, inclusive of all Trust associated therewith and contained within the body of the Economic and Property Damages Settlement Agreement.

**Finally**, the claimant, H. Freddie Boothe, Jr., Architect, prays upon the Honorable Court to intervene, and after full review of the documents, grant any equitable relief deemed appropriate, and, 1) determine if S.A. Exhibit 4E contained plausibility standards through exclusivity to determine a legitimate entitlement, 2) determine the context of S.A. Exhibit 4E if indeed fair as the fairness hearing so concluded, 3) to determine the underlying protections afforded all claimants in regards to their constitutional rights and privileges, 4) to ascertain validity of S.A. Exhibit 4E under Rule 23, 5) to ascertain the relationship of the NASIC Code to the "class", 6) assessment of the legality of removing Exhibit 4E from the certified final Settlement Agreement. 7) how can Policy Rule 55 be totally ignored?, 8) if class members are bound to the agreement, why are the defendants not bound thereto?, 9) to resurrect S.A. Exhibit 4E to its proper place in the Settlement Agreement,or, in the alternative a modification of the Court Ruling establishing and adopting Policy Rule 495 to comply in verbatim with the provisions established within S.A. Exhibit 4E for canceled contracts with

cost explicit parameters.  10) have the constitutional rights of the petitioner been violated by the removal of S.A. Exhibit 4E, 11) have the constitutional rights of the petitioner been violated by any action resulting from changing the final Certified Settlement Agreement under the conditions established within the Class Action, 12)  and for such other and further relief as this court may deem appropriate, just and proper.

Respectfully Submitted,

/s/ H. Freddie Boothe, Jr., Architect
In proper person
14248 Highway 1077
Folsom, Louisiana   70437
504-248-8220

Order

It is Ordered that the Motion is granted on this _____ day of _____ in the Year _____.


_____
Judge

Certificate of Service

I, hereby certify that I have served a copy of this document to all counsel listed below either in person, or by electronic transfer, or by mailing it postage prepaid on this ___2___ day of *March* 20*16* ___.

H. Freddie Boothe, Jr., Pro Se.

Stephen J. Herman
Herman Herman Katz & Cotlar
820 O'Keefe Avenue
New Orleans, Louisiana 70113
Sherman@hhkc.com

James P. Roy
Domengeaux Wright Roy & Edwards
556 Jefferson Street
Lafayette, La. 70502
jimr@wrightroy.com

Richard C. Godfrey
Kirkland & Ellis LLP
300 North LaSalle Blvd
Chicago, IL 60654
rgodfrey@kirkland.com

R. Keith Jarrett
Liskow & Lewis
Suite 5000 One Shell Square
701 Poydras Street
New Orleans, La. 70139
rkjarrett@liskow.com

James J. Neath
Kirkland & Ellis LLP
300 North LaSalle Blvd
Chicago, IL 60654
jneath@kirkland.com