UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF LOUISIANA

| | | |
|---|---|---|
| In Re: Oil Spill by the Oil Rig "Deepwater Horizon" in the Gulf of Mexico, on April 20, 2010 | * * * * | MDL No. 2179 SECTION: J JUDGE BARBIER |
| This Document Relates to: Nos. 13-706, 13-810, 13-1143, 13-1185, 13-1386, 13-2006 (OPA Test Cases) | * * | MAG. JUDGE SHUSHAN |

**ORDER & REASONS**
[As to the OPA Test Cases/Moratorium Claims]

Before the Court is BP Exploration & Production, Inc.'s ("BP") "Motion to Dismiss Moratoria/Permitoria Claims" (Rec. Doc. 15663), the OPA Test Case Plaintiffs' "Renewed Motion to Strike Affirmative Defenses and Motion *in Limine* Regarding Potential Third-Party Fault, Including Application of any Alleged 'Superseding' Cause Defense Premised on Governmental Action or Inaction Following the Spill" (Rec. Doc. 15655), and related briefing. At issue is whether a "responsible party" is liable under the Oil Pollution Act of 1990 ("OPA"), 33 U.S.C. § 2702(a), (b)(2)(E), for a claimant's economic loss that resulted from the moratorium on offshore drilling imposed by the federal government in the aftermath of the DEEPWATER HORIZON/Macondo Well blowout and oil spill. Because the Court answers this question in the negative, it will grant BP's motion and deny the OPA Test Case Plaintiffs' motion(s).

## I. BACKGROUND

**A.    The HORIZON/Macondo Incident and the Moratorium**

On the evening of April 20, 2010, a blowout, explosions, and fire occurred aboard the mobile offshore drilling unit DEEPWATER HORIZON as it was in the process of temporarily abandoning an exploratory well, known as Macondo, it had drilled in the Gulf of Mexico, some 50 miles from the Louisiana coast and in 5,000 feet of water. Eleven men died in the incident and

at least seventeen others were seriously injured. At the time of the blowout, a 5,000 foot-long pipe, called a marine riser, connected the HORIZON to the well. Hydrocarbons from the well travelled up the riser to the rig, fueling the massive fire until the HORIZON capsized and sank on April 22. As it descended, the marine riser collapsed and fractured. Oil and gas then poured into the Gulf via breaks in the riser near the seafloor. BP, the majority owner and operator of the Macondo Well, is a "responsible party" for this incident under OPA, 33 U.S.C. §2702(a).

These events triggered a massive response—unprecedented in size and complexity—to combat the oil spill. On April 29, 2010, the incident was declared a "Spill of National Significance" under the National Contingency Plan.[1] This was the first oil spill to receive such a designation. Efforts to regain control of the well and stop the source of the discharge finally succeeded on July 15, 2010, nearly three months after initial blowout. By that time, approximately 3.19 million barrels of oil had entered the Gulf.[2] *In Re: Oil Spill by the Oil Rig "Deepwater Horizon,"* 77 F. Supp. 3d 500, 525 (E.D. La. 2015), *appeal docketed sub. nom, In Re Deepwater Horizon*, No. 15-30139 (5th Cir. Feb. 13, 2015).

The HORIZON/Macondo incident also provided the impetus for certain regulatory actions that would affect the offshore drilling industry. Ten days after the blowout, the President ordered the Secretary of the Interior to review the incident and report "what, if any, additional precautions and technologies should be required to improve the safety of oil and gas exploration and production operations on the outer continental shelf." *Hornbeck Offshore Servs. v. Salazar*, 713 F.3d 787,

---

[1] A "Spill of National Significance" may be declared when a spill is "so complex that it requires extraordinary coordination of federal, state, local, and responsible party resources to contain and clean up the discharge." 40 C.F.R. § 300.5. In accordance with that declaration, Coast Guard Commandant Admiral Thad Allen was appointed National Incident Commander.

[2] A barrel is 42 gallons. Approximately 4.0 million barrels released from the Macondo reservoir, but 810,000 barrels were collected at the wellhead and did not enter the marine environment.

2

789 (5th Cir. 2013) (internal quotations omitted).  On May 6, 2010, the Secretary announced that "as a result of the Deepwater Horizon explosion and spill . . . no applications for drilling permits [would] go forward for any new offshore drilling activity" pending his report to the President.  *Id.* (internal quotations omitted).  On May 27, the Secretary issued his report, "Increased Safety Measures for Energy Development on the Outer Continental Shelf," which recommended immediate and long term reforms to improve drilling safety.  *Id.*  The report also recommended "(1) a six-month moratorium on permits for new wells being drilled using floating rigs and (2) an immediate halt to drilling operations on the 33 permitted wells that [were] currently being drilled using floating rigs in the Gulf of Mexico."  *Id.* (internal quotations omitted).  The report stated, "The moratorium would allow for implementation of the measures proposed . . . and for consideration of the findings from ongoing investigations . . . ."  (Pls. Mot., Ex. 1 at 3, Rec. doc. 15655-2).  The next day, May 28, the Secretary issued the so-called "May Directive," wherein he found that, under then-existing conditions, "offshore drilling of new deepwater wells poses an unacceptable threat of serious and irreparable harm to wildlife and the marine, coastal, and human environment" and directed

> a six month suspension of all pending, current, or approved offshore drilling operations of new deepwater wells in the Gulf of Mexico and the Pacific regions. . . . .  For those operators who are currently drilling new deepwater wells, they shall halt drilling activity . . . [and] the [Mineral Management Service ("MMS")] shall not process any new applications for permits to drill consistent with this directive.

*Hornbeck*, 713 F.3d at 790.  The May Directive was executed by way of a Notice to Lessees, which explained that "MMS would not consider any new drilling applications for six months in 'deepwater,' defined as depths greater than 500 feet."  *Id.*  MMS also notified the operators of the 33 wells that were being drilled at the time that their activities were temporarily suspended.  *Id.*

Certain offshore businesses challenged the moratorium as violative of the Administrative Procedure Act.  On June 22, 2010, another judge of this Court agreed and issued a preliminary

3

injunction blocking the moratorium. *Hornbeck Offshore Servs. V. Salazar*, 696 F. Supp. 2d 627 (E.D. La. 2010) (Feldman, J.). Judge Feldman noted that he was "unable to divine or fathom a relationship between the [Secretary's] findings and the immense scope of the moratorium," *id.* at 637, and concluded that the plaintiffs had established a likelihood of successfully showing that the Secretary's decision to issue the moratorium was arbitrary and capricious. *Id.* at 638. On July 12, the Secretary rescinded the May Directive and issued a new moratorium that "was the same in scope and substance," but contained a more thorough explanation of reasons and referred to more evidentiary support. *Hornbeck*, 713 F.3d at 791. On September 29, the Fifth Circuit held that the rescission of the May Directive mooted the preliminary injunction of the first moratorium. *Id.* On October 12, 2010, the Secretary lifted the second moratorium, mooting the *Hornbeck* case. *Id.* at 792. Nevertheless, permit delays continued to impede drilling activity. *See Ensco Offshore Co. v. Salazar*, No. 10-1941, 2011 WL 1790838, at *7 (E.D. La. May 10, 2011) (Feldman, J.) ("Because all nine permit applications have encountered delays ranging from four months to over one year, the government has unlawfully and improperly delayed a non-discretionary function . . . ."), *vacated per consent decree and settlement,* 2011 WL 12675678 (E.D. La. June 16, 2011). Permit approvals returned to pre-2010 levels toward the end of 2011.

This Order and Reasons will refer to the government-imposed suspensions and delays of offshore drilling and permitting as the "Moratorium."

**B.      Moratorium Claims in the B1 Master Complaint**

Early on in this multidistrict litigation, the Court instructed the Plaintiffs' Steering Committee ("PSC") to file several master complaints, including the "B1 Master Complaint" on behalf of private individuals and business who claimed to suffer economic loss or property damage. (Pretrial Order No. 11, Rec. Doc. 569). The B1 Master Complaint asserted multiple

claims on behalf of different types of individuals and businesses. Relevant here are the "Moratorium Plaintiffs," described as "deepwater drilling rig workers, rig support personnel, transport personnel, . . ." and others who "suffered losses and damages as the result of the Six-Month Deepwater Drilling Moratorium issued by the United States Department of Interior on May 28, 2010, in response to the Spill." (Amend. B1 Master Compl. ¶ 521, Rec. Doc. 1128). The Master Complaint alleged that the Moratorium was imposed "as a direct, proximate and foreseeable result of the Deepwater Horizon/Macondo Well blow-out and spill." (*Id*. ¶ 522). Defendants subsequently moved to dismiss the B1 Master Complaint, raising numerous and complex legal arguments. The Court's Order and Reasons of August 26, 2011 ruled on many of these issues. (Rec. Doc. 3830) Relative to the Moratorium Plaintiffs' claims, however, the Court declined at that time (the pleading stage) to define the precise contours of OPA causation and simply held that the Moratorium Plaintiffs had alleged sufficient facts to state plausible claims under OPA. *In re Oil Spill by the Oil Rig "Deepwater Horizon,"* 808 F. Supp. 2d 943, 966 (E.D. La. 2011).

C.   **The OPA Test Case Plaintiffs and the Instant Motions**

In June 2014—after two massive class settlements and two major trial proceedings—the Court issued an "Agreed Upon Scheduling Order for OPA Test Case Trials," which established a case management procedure for six[3] "OPA Test Case Plaintiffs" (sometimes referred to as "Plaintiffs"). (Rec. Doc. 12972). The OPA Test Case Plaintiffs are Bisso Marine, LLC ("Bisso," No. 13-706), Blake International Rigs USA, LLC and its affiliated entities ("Blake," No. 13-1185), Certified Platform Services, LLC ("Certified Platform" No.13-1143), Black Elk Energy Offshore

---

[3] There initially were seven OPA Test Case Plaintiffs. One of these recently voluntarily dismissed its lawsuit. (Rec. Doc. 15798) (dismissing No. 13-1222, *Trinity Offshore v. BP Exploration & Production, et al*).

Operations, LLC ("Black Elk," No. 13-2006), Seahawk Liquidating Trust, successor to Seahawk Drilling, Inc. and its subsidiaries ("Seahawk," No. 13-1386), and Wadleigh Industries, Inc. ("Wadleigh," No. 13-810).

According to its complaint, Bisso "was engaged in the marine salvage and commercial diving business, which includes all pipeline and offshore construction activity, performing salvage, diving and other related services in the navigable waters in the Gulf of Mexico in water depths of typically 300 feet or less." (Bisso First Amend. Compl. ¶ 5, Rec. Doc. 12988). Bisso alleges that the blowout and "consequent explosion, fire, vessel sinking and massive oil spill prohibited [it] from engaging in its marine salvage and commercial diving operations." (*Id.* ¶ 7). Bisso is a class member in the Economic and Property Damages Settlement, one of the two class settlements mentioned above. Although the terms of the settlement required that Bisso release most of its claims relating to the oil spill, it specifically reserved to Bisso any claims for "Moratoria Losses," defined as

> any loss whatsoever caused by or resulting from federal regulatory action or inaction directed at offshore oil industry activity -- including shallow water and deepwater activity -- that occurred after May 28, 2010, including the federal moratoria on offshore permitting and drilling activities imposed on May 28, 2010 and July 12, 2010 and new or revised safety rules, regulations, inspections or permitting practices.

(Settlement §§ 3.3, 38.93 Rec. Doc. 6430-1). Consequently, Bisso's only remaining claims are for "Moratoria Losses."

Blake "was a privately-held offshore platform rig provider in the business of contracting and negotiating the use of their drilling rigs to oil and gas companies who operate and drill oil wells in the Gulf of Mexico." (Blake Compl. ¶ 2, No. 13-1185, Rec. Doc. 1). Blake alleges, "As a result of the April 20, 2010 blowout of the Macondo well and consequent explosion, fire, vessel sinking, massive oil spill, and resulting moratorium that ceased drilling activity in the Gulf of

Mexico, Blake was forced to take their rigs out of commerce." (*Id.* ¶ 60). Consequently, Blake claims it "has suffered and will continue to suffer extensive economic and formidable monetary damages." (*Id.* ¶ 62).

Certified Platform claims it "was engaged in the business of purchasing salvaged offshore jackets, piling, decks and related production equipment from companies who have ceased production from their shallow water Gulf of Mexico installations. Similarly, Certified [Platform], at all material times, was engaged in the business of refurbishing such equipment to meet the needs of oil and gas companies who operate in Gulf of Mexico." (Certified Platform Compl. ¶ 2, No. 13-1143, Rec. Doc. 1). Certified Platform asserts that the "blowout of the Macondo well and consequent explosion, fire, vessel sinking and massive oil spill prohibited Certified [Platform] from engaging in its business of purchasing, refurbishing, and reselling salvaged offshore jackets, piling, decks and related production equipment from oil and gas companies with exclusive production operations in the navigable waters of the Gulf of Mexico." Certified Platform does not explicitly mention the moratorium in its complaint or two amended complaints.

Black Elk "is an oil and gas exploration and production company" with "many interests in the Gulf of Mexico." (Black Elk Second Amend. Compl. ¶ 33, Rec. Doc. 13722). Black Elk alleges that prior to the oil spill, it held a partial interest in three potential wells to be drilled in the Gulf of Mexico. (*Id.* ¶ 34). It further claims that "[d]ue to the BP Oil Spill and resultant moratorium on offshore oil and gas exploration and production . . . , [Black Elk] and the other interest-holders could not obtain the necessary permits to begin drilling the wells in question. However, all interest holders were still contractually obligated to pay their respective pro rata shares of the daily rate for the drilling rig." (*Id.*). Therefore, Black Elk claims it "suffered significant financial damages by paying for a drilling rig that did not drill a well." (*Id.*)

Seahawk's complaint states that it "provided contract drilling services to the oil and natural gas exploration and production industry exclusively in the Gulf of Mexico." (Seahawk Second Amend. Compl. ¶ 1, Rec. Doc. 13721). Seahawk alleges,

> Had it not been for the massive environmental catastrophe emanating from the Macondo Disaster, (a) the federal government would not have imposed a moratorium on deepwater drilling and/or taken other action that slowed the permitting process and created regulatory uncertainty for the entire drilling industry; (b) financial institutions and other investors would not have recoiled from investing in offshore drilling entities with operations in the Gulf of Mexico; and (c) the market for Seahawk's drilling services and its stock price would not have declined.

(*Id.* ¶ 45). Seahawk claims that the reduced demand for drilling services led to reductions in the number of Seahawk drilling rigs in operation and reduced day rates for those rigs that could find work. (*Id.* ¶ 31). Ultimately, Seahawk filed bankruptcy and liquidated its assets in February 2011. (*Id.* ¶ 33).

Wadleigh is "a heavy material handling equipment inspection, maintenance and service company primarily operating on drilling rigs in the Gulf of Mexico." (Wadleigh Compl. ¶ 15, No. 13-810, Rec. Doc. 1). Wadleigh claims that "[a]s a result of the oil spill, [its] market was significantly impacted due to greater competition for fewer available jobs and projects in the Gulf area. Of note, [Wadleigh's] largest customers were forced to leave the Gulf of Mexico, further negatively impacting [Wadleigh's] operations and severing relationships that [it] had built and fostered for many years." (*Id.* ¶ 15).

The OPA Test Case Plaintiffs only assert claims under OPA against BP. (Rec. Doc. 12972 ¶¶ 1-2). After BP answered the Test Case Plaintiffs' individual complaints, the Plaintiffs filed a combination motion to strike/motion *in limine* that essentially sought to preclude BP from arguing that economic losses caused by the Moratorium are not compensable under OPA or that the Moratorium is a defense to liability under OPA, etc. (Rec. Doc. 13108). The Court denied the

8

motion as premature and directed the parties to re-urge their arguments at the summary judgment stage. (Rec. Doc. 13393). After further consideration, the Court instructed Plaintiffs to re-urge their motion and BP to file a motion to dismiss. (Rec. Doc. 15582). These motions have been fully briefed and are ripe for resolution. [4]

## II. SUMMARY OF PARTIES' ARGUMENTS

BP argues in its motion to dismiss that the Moratorium was not an unavoidable mandatory response to the oil spill, but instead newly crafted measures designed to facilitate an industry-wide review of drilling practices and, therefore, discretionary acts aimed at avoiding future spills. BP describes the OPA Test Case Plaintiffs' claims as consequential economic losses caused by the government-imposed Moratorium. Citing OPA's liability provisions, 33 U.S.C. § 2702(a), (b)(2)(E), and *In re Taira Lynn Marine Ltd. No. 5*, 444 F.3d 371 (5th Cir. 2006), BP urges that such claims are not compensable under OPA because they did not "result from" the discharge of oil, nor was the Moratorium an OPA "incident," nor were the losses "due to the injury, destruction, or loss of real property, personal property, or natural resources." Additionally, BP interprets OPA as only compensating losses that are proximately caused by the oil spill, and further asserts that Plaintiffs do not satisfy this standard because the proximate cause of their claims was the federal government's decision to impose the Moratorium, not the oil spill.[5] Finally, BP argues that policy reasons support denying Plaintiffs' claims. (*See* BP Mot. pp.22-25, Rec. Doc. 15663-1).

Plaintiffs counter that OPA does not impose a "proximate cause" or similar requirement. They point out that OPA only uses "proximate cause" in § 2704, concerning the removal of liability

---

[4] BP Mot., Rec. Doc. 15663; Pls. Opp'n, Rec. Doc. 15704; BP Reply, Rec. Doc. 15778. Pls. Mot., Rec. Doc. 15655; BP Opp'n, Rec. Doc. 15705; Pls. Reply, Rec. Doc. 15752. USA Stmt., Rec. Doc. 15702.

[5] However, BP states that the Court need not reach the issue of what causation standard applies under OPA in order to rule its favor.

caps, but employs broader language in § 2702, concerning liability. Plaintiffs also urge that *Taira Lynn*, relied upon by BP, is distinguishable because it involved a gaseous release that did not cause any property damage. Plaintiffs contend that BP's interpretation is contrary to OPA's purpose of expanding the scope of liability beyond traditional maritime standards and would exclude entire categories of claims that were clearly intended to be compensated under OPA. Plaintiffs also note that a responsible party may avoid liability under OPA only in the narrow instances listed in § 2703, which BP admits are not applicable here. Arguing in the alternative, Plaintiffs state that even if OPA does require proximate cause (or that damages be "foreseeable" or "direct"), their claims would still meet the test. Plaintiffs note that the government has imposed some type of drilling moratorium every year from 1982 to 2008. In light of that fact and given the severity of this oil spill, Plaintiffs contend that the 2010 Moratorium was not only foreseeable, but practically certain. Plaintiffs also propose that one of the reasons for the Moratorium was that assets and resources necessary for containment were tied up responding to the HORIZON/Macondo spill. In terms of OPA's language, then, Plaintiffs argue that "the discharge of oil from the Macondo Well was an OPA 'incident' which caused massive damage and substantial threats of further damage to natural resources and other property; which was, among other considerations, a substantial factor in the existence, nature and scope of the moratoria and associated permitting changes; which were, perhaps among other factors, a substantial cause of the economic losses suffered by the Plaintiffs." (Pls.' Opp'n p.15, Rec. Doc. 15704).[6]

---

[6] *See also* Pls.' Mot. at 25-26 (Rec. Doc. 15655-1) ("BP caused the Spill, and the Spill caused the Moratorium. Because the Spill caused the Moratorium, it follows logically that the Spill also caused any and all economic damages that resulted from the Moratorium. Or stated another way: The OPA Causation Test Case Plaintiffs suffered economic damages that were caused by both the Moratorium and the originating *Deepwater Horizon* Incident.").

### III.  LEGAL STANDARDS

On a motion to dismiss, "[t]he central issue is whether, in the light most favorable to the plaintiff, the complaint states a valid claim for relief."  *Gentilello v. Rege*, 627 F.3d 540, 544 (5th Cir. 2010) (citations and quotations omitted).  More specifically:

> To avoid dismissal, a plaintiff must plead sufficient facts to state a claim to relief that is plausible on its face.  A claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged.  We do not accept as true conclusory allegations, unwarranted factual inferences, or legal conclusions.

*Id.* (citations and quotations omitted).  Furthermore, "[d]etermining whether a complaint states a plausible claim for relief will . . . be a context-specific task that requires the reviewing court to draw on its judicial experience and common sense."  *Ashcroft v. Iqbal*, 556 U.S. 662, 679 (2009).

A motion to strike a defense is generally disfavored.  *Kaiser Aluminum & Chemcial Sales, Inc. v. Avondale Shipyards, Inc.*, 677 F.2d 1045, 1057 (5th Cir. 1982).  "Striking an affirmative defense is warranted if it cannot, as a matter of law, succeed under any circumstance."  *United States v. Renda*, 709 f.3d 472, 479 (5th Cir. 2013); *see also Augustus v. Bd. Of Pub. Instruction of Escambia Cty.*, 306 F.2d 862, 868 (5th Cir. 1962) ("[T]he action of striking a pleading should be sparingly used by the courts. . . . It is a drastic remedy to be resorted to only when required for the purposes of justice. . . . The motion to strike should be granted only when the pleading to be stricken has no possible relation to the controversy." (citation and quotations omitted)).

### IV.  DISCUSSION

The parties disagree over the nature of each other's arguments and the associated burdens.  Plaintiffs describe BP's arguments as an affirmative defense—superseding cause—for which BP bears the burden of establishing and, moreover, is not a defense to OPA liability.  BP urges that, although some of its arguments are affirmative defenses, the issue it raises here concerns a key

element to Plaintiffs' *prima facie* case—causation—which is Plaintiffs' burden to establish. BP contends that Plaintiffs' motion is an attempt to excuse themselves from establishing this element.

A plaintiff bears the burden of proving each element of its claim. A defendant, in turn, bears the burden of establishing any affirmative defenses, but this does not include the simple argument that a plaintiff has failed to plausibly allege a *prima facie* case in its complaint. While some of BP's arguments could be viewed as affirmative defenses, its motion to dismiss largely asks whether Plaintiffs have plausibly alleged claims that satisfy OPA's causation standard. Because causation is an indispensable element of Plaintiffs' claims, it is Plaintiffs' burden to establish its existence.

OPA's general liability provision is § 2702(a). It states,

> [E]ach responsible party for a vessel or a facility from which oil is discharged, or which poses the substantial threat of a discharge of oil, into or upon the navigable waters . . . is liable for the removal costs and damages specified in subsection (b) of this section that ***result from*** such ***incident***.

33 U.S.C. § 2702(a) (emphasis added). BP is a "responsible party" under § 2702(a). Therefore, BP is liable for the damages listed in § 2702(b) "if, inter alia, the claimant's damages 'result from such incident,' i.e., the discharge or threatened discharge of oil." *Taira Lynn*, 444 F.3d at 383 (emphasis omitted). Section 2702(b) lists six categories of damages, (A) through (F). The only relevant one is (E), "Profits and earning capacity," defined as:

> Damages equal to the loss of profits or impairment of earning capacity ***due to*** the injury, destruction, or loss of real property, personal property, or natural resources, which shall be recoverable by any claimant.

33 U.S.C. § 2702(b)(2)(E) (emphasis added). This provision requires that a plaintiff's lost profits or diminished earning capacity be "due to" the injury, destruction, or loss of property or natural resources, though the plaintiff need not own or lease the property or resources. *Taira Lynn*, 444 F.3d at 382.

Reading § 2702(a) and § 2702(b)(2)(E) together, Plaintiffs must establish that their economic losses were "due to" the injury, destruction, or loss of property or natural resources that "result[ed] from" the discharge or threatened discharge of oil from the HORIZON/Macondo well (i.e., the "incident"). *See id.* at 383.

There can be no doubt that the Government would not have imposed the Moratorium had the HORIZON/Macondo blowout and oil spill not occurred. However, the Moratorium addressed the risk of possible ***future*** blowouts and oil spills from wells ***other*** than Macondo and was motivated by perceived weaknesses of industry-wide safety measures.[7] But the perceived threats of discharge from other wells are different OPA "incidents" (if these are OPA incidents at all[8]) than the HORIZON/Macondo incident for which BP is a responsible party. In OPA terms, then—and putting aside the question of whether Plaintiffs' claims are due to the injury, destruction, or loss of property or natural resources—the OPA Test Case Plaintiffs' losses did not result from the discharge or substantial threat of discharge of oil from the Macondo Well; they resulted from the perceived threat (whether substantial or not) of discharge from other wells.

Thus, this matter is distinguishable from the "shutdown" cases cited by Plaintiffs. For example, in *Dunham-Price Group v. Citgo Petroleum Corp.*, the district court denied the defendant's motion for summary judgment against a concrete facility's claim for business

---

[7] *See* Part I(A), *supra*. Plaintiffs point out that the Secretary memorandum of July 12, 2010 states that the "third key reason" for the Moratorium was that assets and resources necessary for oil spill containment were tied up in the response to the HORIZON/Macondo spill. However, that memorandum makes clear that the Secretary's concern ultimately related to potential oil spills from other wells. (*See* Pls.' Mot., Ex. D at 4-5, Rec. Doc. 15655-5) ("The third key reason for my decision is that the unprecedented deployment of spill response equipment and cleanup crews to address the massive BP Oil Spill raises serious legal and practical questions about whether other deepwater operators would be able to employ adequate quantities of skimmers, boom, and other oil spill response resources to address another spill if it occurs. Simply put, there may be insufficient resources available to respond should another deepwater spill occur while the BP Oil Spill containment and clean-up efforts are at their peak.") (footnote omitted).

[8] For one thing, it seems doubtful that the government's concerns about industry-wide safety measures would qualify as a "substantial threat of a discharge of oil" under OPA. *See* 33 U.S.C. §§ 2701(14), 2702(a).

13

interruption losses allegedly caused by the Coast Guard's decision to close a portion of a river following an oil spill. No. 2:07-CV-1019, 2010 WL 1285446 (W.D. La. Mar. 31, 2010). Significantly, and unlike the Moratorium, the river closure was part of the effort to contain and clean up the spill from the defendant's facility. *Id*. at *1.

The Court's conclusion is also consistent with the outcome in *Taira Lynn*, *supra*, a Fifth Circuit decision from 2006. That case involved an allision between a barge and a bridge, which caused the barge to discharge into the air a gaseous mixture of propylene and propane. 444 F.3d at 375-76. Consequently, the Louisiana State Police ordered a mandatory evacuation of all businesses and residences within a certain radius of the allision. *Id.* at 376. Several hundred claims were filed as a result of these events; among them were claims by fourteen businesses that suffered, as described by the Fifth Circuit, "economic losses resulting from the evacuation." *Id.* at 382; *see also* 377 (describing claims). Twelve of the fourteen businesses suffered no physical damage to their property. *Id.* at 377-79.[9] One business did lose eighty-eight boxes of crab that spoiled in a freezer when law enforcement shut off electricity during the evacuation, and another business lost materials when it had to prematurely terminate two manufacturing runs. *Id.* at 377, 380. The Fifth Circuit held that none of the fourteen claims were compensable under OPA:

> [N]one of the claimants has raised an issue of fact as to whether any property damage was caused by the pollution incident, i.e., the release of the gaseous cargo. A party is liable under OPA if, inter alia, the claimant's damages "*result from such incident*," i.e., the discharge or threatened discharge of oil. Any property damage upon which Claimants must rely to recover under § 2702(b)(2)(E) did not result from the discharge or threatened discharge of oil. Claimants have not raised an issue of fact as to whether their economic losses are due to damage to property resulting from the discharge of the gas.

---

[9] For example, a pile driving business claimed the mandatory evacuation prevented it from performing work on its contracts.

*Id.* at 383 (citations omitted; emphasis in original).[10] Admittedly, *Taira Lynn* does not align perfectly with the cases at hand because the gaseous discharge caused no direct damage to property or resources (whether owned by the plaintiffs or not), whereas the HORIZON/Macondo spill caused extensive damage to property and resources. Nevertheless, because the connection between the HORIZON/Macondo incident and the Moratorium is even more attenuated than the gaseous release and mandatory evacuation in *Taira Lynn*, which was ordered specifically to deal with the gases emitting from the allision, the Court's conclusion here is certainly consistent with *Taira Lynn*.

Additional reasons support denying the OPA Test Case Plaintiffs' claims. Plaintiffs assert that the Government has imposed drilling moratoria every year from 1982 through 2008, yet Plaintiffs cite no cases in which a private party has been held liable (under OPA or other law) for losses caused by a moratorium. The absence of such cases suggests that Plaintiffs' claims are not recoverable. *See also* Steven Shavell, *Should BP Be Liable for Economic Losses Due to the Moratorium on Oil Drilling Imposed after the Deepwater Horizon Accident*, 64 Vand. L. Rev. 1995, 2006 (2011) ("It may also be useful to observe that in contexts other than the BP oil spill, firms engage in activities that occasionally produce information leading to government actions that impose losses on other parties, yet no one contemplates imposing liability on the firms for this reason."). On a similar note, while OPA's legislative history makes clear that Congress intended the Act to loosen or remove some of the restrictions on recovery that existed under maritime law, there is nothing to suggest that Congress intended OPA to go so far as to hold a discharger liable for the financial consequences of subsequent government actions aimed at preventing similar

---

[10] The parties in *Taira Lynn* disputed whether OPA even applied to the gaseous discharge. *Id.* at 382. The court did not rule on this issue and simply assumed for the sake of argument that OPA did apply. *Id.* at 383.

tragedies in the future and which broadly affect an entire industry.[11]  Finally, the United States Coast Guard, as part of its administration of the Oil Spill Liability Trust Fund, has denied claims that are "a direct result of the moratorium, not a direct result of an oil discharge." [12]

For these reasons, the OPA Test Case Plaintiffs have failed to plausibly allege valid claims for relief under OPA.  Accordingly, the Court will grant BP's motion to dismiss and deny Plaintiffs' motion to strike/motion *in limine.*  The Court makes clear that it need not and does not decide whether or not § 2702(a) and/or § 2702(b)(2)(E) incorporates a proximate causation standard, etc.

## V.    CONCLUSION

IT IS ORDERED that BP's Motion to Dismiss Moratoria/Permitoria Claims (Rec. Doc. 15663) is GRANTED;

IT IS FURTHER ORDERED that the OPA Test Case Plaintiffs' Renewed Motion to Strike Affirmative Defenses and Motion *in Limine* Regarding Potential Third-Party Fault, Including Application of any Alleged "Superseding" Cause Defense Premised on Governmental Action or Inaction Following the Spill (Rec. Doc. 15655) is DENIED;

---

[11] *See, e.g.,* H.R. Rep. 101-653 (1990) (Conf. Rep.), *reprinted in* 1990 U.S.C.C.A.N. 779,781 ("[T]he liability provisions of this Act [OPA] would govern compensation for removal costs and damages notwithstanding any limitations under existing statutes such as the act of March 3, 1851 [46 U.S.C. §§ 30501-12], or under existing requirements that physical damage to the proprietary interest of the claimant be shown. . . .  For example, a fisherman may recover lost income due to damaged fisheries resources, even though the fisherman does not own those resources.").

[12] *See* Claim No. N10036-0035 (Nat'l Pollution Funds Center Nov. 8, 2010) ("All documentary evidence submitted by [Claimant] indicates that his loss directly resulted from a directive issued by the Department of the Interior imposing a six month offshore drilling moratorium in order to implement new safety requirements.  As a result, [Claimant's] claim is determined to be a direct result of the moratorium, not a direct result of an oil discharge.  The claim is not compensable under the OPA."); Claim No. N10036-0322 (Nat'l Pollution Funds Ctr. Jan. 6, 2011) (same); Claim No. N10036-0290 (Nat'l Pollution Funds Ctr. March 11, 2011) (same). These decisions are available at http://www.uscg.mil/npfc/Claims/deepwater.asp.

The parties dispute whether the Coast Guard's interpretation of OPA is entitled to deference.  The Court need not decide this issue, because it has independently reached the same conclusion without giving any deference to the Coast Guard's decision.

IT IS FURTHER ORDERED that the claims asserted in the OPA Test Cases (Nos. 13-706, 13-810, 13-1143, 13-1185, 13-1386, 13-2006) are DISMISSED with prejudice.

New Orleans, Louisiana, this 10th day of March, 2016.

_____
United States District Judge