# IN THE UNITED STATES DISTRICT COURT
## FOR THE EASTERN DISTRICT OF LOUISIANA

| | | |
|---|---|---|
| IN RE: OIL SPILL BY THE OIL RIG | * | MDL NO. 2179 |
| "DEEPWATER HORIZON" IN THE GULF | * | |
| OF MEXICO, ON APRIL 20, 2010 | * | SECTION J |
| | * | |
| THIS DOCUMENT RELATES TO: | * | |
| ALL CASES AND NO. 12-970 | * | HONORABLE CARL J. |
| | * | BARBIER |
| | * | |
| | * | MAJISTRATE JUDGE |
| | * | SHUSHAN |
| | * | |

## CLAIMANT'S MEMORANDUM IN OPPOSITION TO BP's MOTION TO VACATE AND STAY PAYMENT OF AWARDS

# I.  TABLE OF CONTENTS

I.  TABLE OF CONTENTS...................................................................i

II.  TABLE OF CASES AND AUTHORITIES.....................................ii

III.  LIST OF EXHIBITS.....................................................................vi

IV.  CLAIMANT'S MEMORANDUM IN OPPOSITION TO BP'S MOTION
TO VACATE AND STAY PAYMENT OF AWARDS......... ....................................

Introduction ............................................................................1

Factual Background.................................................................1

Summary of Argument.............................................................4

Law and Analysis.....................................................................7

A.    BP is bound by the actual language of Exhibit 12A "Compensation Framework
For Wetlands Real Property Claims.

B.    The Claims Administrator was absolutely correct in adopting Policy 443.........12

C.    BP should now be legally prohibited from raising any challenge
to Policy 443............................................................................16

D.    Policy 443 did not change and had no effect on the awards for oiled and
Non-oiled Eligible Parcels.  Oiled Eligible Parcels receive a much larger
Award than non-oiled Eligible Parcels......................................18

E.    The Claims Administrator correctly determined that BP has no right to
Appeal each of the Claimant's Eligibility Notices.....................20

F.    BP has no legitimate right to a preliminary injunction or a stay.....................22

Conclusion.................................................................................26

V.    CERTIFICATE OF SERVICE................................................................28

## II.  TABLE OF AUTHORITIES

**CASES**

*Basham v. Freda,* M.D. Fla. 1992, 805 F. Supp 930,
Affirmed 985 F.2d 579.............................................................22

*Caveness v. Norton,* 694 So.2d 1174 (La. 1st Cir. 1997)...................................1

*Cherokee Pump & Equip, Inc. v. Aurora Pump,*
38 F.3d. 246, 249 (5th Cir. 1994)...................................................23

*City of Willacoochee v. Satilla Rural Elec. Membership Corp.,*
283 Ga. 137, 657 S.E.2d 232 (2008).................................................22

*Construction Mach. Co. v. Willard & Rodman, Inc.,*
208 Cal. App.2d 31, 38, 25 Cal.Rptr. 13 (1962)...................................24

*Garrett v. Pioneer Production Corporation, et. al.,* 390 So.2d 851 (La. 1980)......................1

*Harris v. Spinali Auto Sales, Inc.,* 202 Cal. App. 2d 215,
20 Cal. Rptr. 586 (1962)..........................................................24

*Hughes v. United States,* 342 U.S. 353. 357,
72 S.Ct. 306, 96 L.Ed. 394 (1952).................................................7

*In re Deepwater Horizon,* 732 F.3d 326, 353 (5th Cir. 2013)............................7

*Northwest Airlines, Inc. v. Alaska Airlines, Inc.,*
351 F.2d 253, 256 (9th Cir.1965)..................................................24

*National Ass'n of Letter Carriers, AFL-CIO v. Sombrotto,*
C.A.2 (N.Y.) 1971, 449 F.2d 915...................................................23

*National Nutritional Foods Ass'n v. Goyan,* S.D.N.Y. 1980, 493 F.Supp. 1044...................25

*Marylands National Capiutal Park and Planning Commissions v. U.S. Postal*
*Service,* C.A.D.C. 1973, 487 F.2d 1029, 159 U.S. App. D.C. 158..........................25

*Metairie Park, Inc. v. Currie,* 168 La. 58 (La. 1929)......................................1

*Schade v. Maryland State Bd. Of Elections,* 401 Md. 1, 930 A.2d 304 (2007).....................23

*Sierra Club v. Hickel,* C.A.9 (Cal.) 1970, 433 F2d 24,
*Certiorari granted* 91 S.Ct. 870, U.S. 907, 27 L.Ed. 805,
*Affirmed* 92 S.Ct. 1361, 405 U.S. 727, 31 L.Ed.2d 636.................................25

*United States v. Armour & Co.*, 402 U.S. 673,
91 S.Ct. 1752, 29 L.Ed.28 256 (1971)...................................................................7

*United States v. Atl. Ref. Co.*, 360 U.S. 19, 23,
79 S.Ct 944, 3 L.Ed.2d 1054 (1959)...................................................................7

*White v. Carlucci,* 862 F.2d 1209, 1211 (5th Cir. 1989), (quoting *Holland Am. Ins. Co. v. Succession of Roy*, 777, F.2d 992. 997 (5th Cir. 1989)...........................................22

*Young v. FDIC,* 103 F.3d 1180, 1195 (4th Cir. 1997)...................................................24

## OTHER AUTHORITIES

LSA-R.S. 33.5051...................................................................................................1

## III.  LIST OF EXHIBITS

**EXHIBITS**

Exhibit A          Complete copy of plat map of Long Beach Subdivision

Exhibit B          Judgment of Possession

Exhibit C          Act of Sale and Donation

Exhibit D          Claimant's Tax Assessments

Exhibit E          Tax Assessor's Plat Card and Tax Map

Exhibit F          Map Showing Long Beach Subdivision correctly imposed on the property and beyond BP's Tobin Parcel

Exhibit G          Affidavit of Mona Kelley, Cameron Parish Tax Assessor

Exhibit H          Tax Assessor Map from Cameron Parish Tax Assessor Website showing Long Beach Subdivision

Exhibit I          Index of Cameron Subdivisions in the Zone with Plat Maps and Tax Assessor Plat Cards for each Subdivision

Exhibit J          Wetlands Claim Form Instructions

## INTRODUCTION

Now into Court, through undersigned counsel, comes Claimant 100261254 who with respect files this Opposition to BP's Motion to Vacate and Stay Payment of Awards for the following reasons:

## FACTUAL BACKGROUND

In 1927, Long Beach Subdivision located on the coast in Cameron Parish, Louisiana was formally and statutorily created with the filing of a formal legal plat.[1] The plat contains a specific property description of the subdivision. The plat was prepared by a formal surveyor, C.E. Mandell.[2] As was required at that time, the plat contains the name of the subdivision and contains the sections, township, and range, "Long Beach, A Subdivision of parts of Section 27, 28, 29, 30, 31, and 32, T15S, R13W, La. Mer. Cameron Parish". The dimensions of the lots are included on the plat. The streets are specifically designated on the plat. The plat was duly filed in Plat Book 1, Page 8 of the Conveyance Records of Cameron Parish, Louisiana. The creation, filing, and statutory dedication of Long Beach Subdivision is a legal fact which cannot be disputed.[3]

The filing of the subdivision plat specifically divided the property into Blocks 1-34. In Blocks 1 through 26, there are thirty (30) separate and distinct numbered lots per Block. In Block 27, there are fifteen (15) separate and distinct numbered lots. In Block 28, there are seven (7)

---

[1] LSA-R.S. 33:5051: *Metairie Park, Inc. v. Currie*, 168 La. 58 (la. 1929); *Cavaness v. Norton*, 694 So.2d 1174 (la. 1st Cir. 1997); *Garrett v. Pioneer Production Corporation, et. al.*, 390 So.2d 851 (La. 1980).

[2] See Exhibit A, A complete copy of the plat map of Long Beach Subdivision. BP attaches an incomplete copy of the actual Plat of Long Beach Subdivision as Exhibit 7 to its brief. BP's map cuts off the date and the surveyor information.

[3] BP's assertion in its brief that this is not a subdivision but one single parcel is meritless. BP states that the plat was "hand drawn". Claimant submits that all of the subdivisions created in Cameron Parish and every other parish in 1927 were "hand drawn." Claimant is unaware of any platting computer program available in 1927. All streets on the plat are public rights of way dedicated to public use simply by the filing of the plat, regardless of whether they were actually developed or not.

separate and distinct numbered lots. In Blocks 29 through 34, there are thirty (30) separate and distinct numbered lots per Block. Thus, in 1927 this large parcel of property was legally and actually subdivided into 982 separate and distinct parcels, 982 lots.

Following the creation of the subdivision, lots within the subdivision were sold and certain residents built homes within the subdivision. In 1999, Claimant inherited a one-half (½) interest in a large number of the lots of Long Beach Subdivision.[4] The Claimant's one-half (½) interest in each block and lot that was inherited was specifically described on the Judgment of Possession. In 2003, Claimant purchased the other one-half (½) interest in those lots, again all lots were specifically described in the Act of Sale.[5] Since 2003, Claimant has owned one hundred percent (100%) of all of these separate and distinct Parcels. Since 2003, Claimant's separate lots (parcels) have been used by the Cameron Parish Tax Assessor for taxing purposes.[6] Each lot is listed on the tax assessment. This is just like every lot in every other subdivision in Cameron Parish. These lots are no different than any other lot in any other Parish of Louisiana.

Over time, Claimant has sold certain lots within the subdivision. Some of those lots were developed with camps/homes. In 2005, Hurricane Rita hit the coast of Cameron Parish. Nearly all of the homes and camps in Long Beach Subdivision were destroyed. This had no effect, however, on the legal fact that every lot is a separate and distinct legal parcel.

After the implementation of the Deepwater Horizon Settlement and the establishment of the Deep Water Horizon Claims portal, the Claimant filed separate claims for each lot and each tract of land that she owned located on the Wetlands Real Property Claims: Area of Potential Eligibility Map within Cameron Parish, Louisiana. The Claimant was required to file separate

---

[4] See Exhibit B, Judgment of Possession, Item "8".
[5] Exhibit C, Act of Sale and Donation.
[6] Exhibit D, Claimant's Tax Assessments.

claims for each lot that she owned pursuant to Policy 443 and Policy 502. The Claimant owned separate and distinct lots in numerous subdivisions in the western part of Cameron Parish including Gulf Terrace Subdivision, Pleasant Beach Subdivision, and Long Beach Subdivision. Claimant has had a large number of lots within certain subdivisions denied by the Claims Administrator as not being within the Wetlands Real Property Claim Zone, and therefore not eligible. In fact, some of Claimants lots within Long Beach Subdivision have been rejected as not eligible because they are not within the Wetlands Real Property Claim Zone.

Claimant has also had a large number of lots approved, paid, and settled in other subdivisions in Cameron Parish including Gulf Terrace Subdivision and Pleasant Beach Subdivision. Those approved, paid, and settled claims are factually and legally identical to the 839 claims approved for lots owned in Long Beach Subdivision. BP paid and settled all of those claims without objection and without seeking review or appeal.

Beginning in February of 2016, the Claims Administrator began issuing eligibility notices for the 839 lots owned by the Claimant in Long Beach Subdivision within the Wetlands Claim Zone. BP sought to appeal each of the 839 claims. However, the Claims Administrator rightfully denied the request for appeal because each claim was not appealable under the terms of the settlement because each claim is valued at only $4,500.00 plus the RTP, or $15,750.00. The minimum threshold for an appeal as detailed in the settlement and agreed to by BP for each claim is $25,000.00 per claim pre-RTP. This Motion to Vacate and Stay filed by BP followed. Only now, because of the number of lots owned by the Claimant in Long Beach Subdivision and because of the cumulated amount of money involved, does BP object.

## SUMMARY OF ARGUMENT

BP's Motion for Stay and to Vacate should be denied. BP's argument that the Claimant owns one "taxing parcel" and not 839 separate lots is a complete and total legal and factual fiction. BP's arguments are wrong for the following reasons:

1. **The land within "BP's Tobin lines" is not and cannot be a single, physically identifiable tax parcel. It is nearly one thousand (1000) different legal parcels as recognized by the Cameron Parish Tax Assessor and by Louisiana law.** Each lot is specifically listed on the Claimant's title documents and on the Claimant's tax assessments. Each lot or parcel is a "plot of land that can be sold or purchased".

2. **The different lots within "BP's Tobin lines" are not owned solely by the Claimant, but instead are owned by nearly one hundred (100) different persons.**[7] All of the Claimant's lots are not contiguous. Other landowners own some lots in different blocks of the subdivision.

3. The land within the "BP's Tobin lines" does not include only Long Beach Subdivision. Within "BP's Tobin lines" is land that is not part of the subdivision and which is not owned by the Claimant.[8]

4. Long Beach Subdivision, and thus Claimant's Lots, do not fit within BP's single "taxing parcel" Tobin lines. BP includes in the text of its Memorandum and as an Exhibit a newly created map which is completely inaccurate. BP has shrunk Long Beach Subdivision and moved Long Beach Subdivision on its map to fit within its Tobin Parcel. First, Long Beach Subdivision does not extend west of Long Beach

---

[7] Exhibit E, Tax Assessor's Plat Card and Tax Map.
[8] Exhibit F, Map Showing Long Beach Subdivision correctly imposed on the property and beyond BP's Tobin Parcel.

Road. Second, Long Beach Subdivision extends beyond BP's Tobin Parcel on the East and into Section 32. Third, Long Beach Subdivision has road right of way on the original plat. Fourth, Long Beach Subdivision extends south of BP's Tobin Parcel. Yet, BP's map moves the subdivision to the west and to the north and deletes all of the road rights. BP moves and shrinks Long Beach Subdivision to fit its argument. Without this manipulation of the map, BP would have to admit that Long Beach Subdivision cannot represent one "taxing parcel." Certainly, BP's newly created map was never presented to Class Counsel.

5. The Claims Administrator has approved, paid, and settled claims for other landowners within "BP's Tobin lines" who own lots in Long Beach Subdivision on a per lot basis. BP obviously never claimed that this subdivision was one "taxing parcel" when these claims were settled. BP never challenged, sought review, or objected to the payment of all of these other lots on a per lot basis in Long Beach Subdivision. All of these other claims paid on a per lot basis in Long Beach Subdivision are fully and finally paid and settled.

6. The land within "BP's Tobin lines" has never been treated by the Cameron Parish Tax Assessor or any other legal entity as one single "taxing parcel".[9] The Cameron Parish Tax Assessor recognizes and specifically describes each distinct lot on the Claimant's tax assessments. The Cameron Parish Tax Assessor specifically recognizes each of the Claimant's distinct lots on its physical, paper plat map. The Cameron Parish Tax

---

[9] Exhibit G, Affidavit of Mona Kelley, Cameron Parish Tax Assessor.

Assessor specifically recognizes each of Claimant's distinct lots on its website and interactive map.[10]

7. The Compensation Framework for Wetlands Real Property Claims (Exhibit 12A) does not use the term "tax parcel" for Cameron Parish. It uses the term "parcel". It would have been impossible for the parties to agree as to any type of "tax parcel" for Cameron Parish as suggested by BP, as admittedly neither party had access to the tax assessments for Cameron Parish at the time of the settlement. This is exactly why the parties included language in the settlement that deferred to the Claims Administrator giving him the authority and the obligation to supplement and use the most accurate data to determine all "Eligible Parcels" within the Wetlands Real Property Claim Zone Map.

8. The Wetland Claims Form Instructions agreed to by BP and distributed to Claimants has a definition of Parcel. In the Form Instructions, "parcel" is defined as "a plot of land that can be sold or purchased." The Form Instructions also defines "Eligible Parcel" as "A Parcel located within the Wetlands Real Property Claim Zone." There is no definition in the settlement or in the Claim Form Instructions for "taxing parcel".

9. The Claims Administrator correctly applied the specific language of the settlement and the actual and most accurate data to implement and adopt Policy 443. BP deferred to the Claims Administrator's adoption and implementation of Policy 443. Since the adoption of Policy 443 on September 18, 2013, BP has paid literally thousands of eligible lot claims identical to this Claimant's without objection and without seeking judicial review. Those claims encompass over ten (10) different subdivisions along the

---

[10] Exhibit H, Tax Assessor Map from Cameron Parish Tax Assessor Website showing Long Beach Subdivision.

beach in Cameron Parish, none of which are any different than Long Beach Subdivision, and all of which have been treated identically by the Claims Administrator.[11] The Claims Administrator has paid each separate parcel or lot as detailed in Policy 443. All of those claims are fully and finally settled.

## LAW AND ANALYSIS

A.    **BP is bound by the actual language of Exhibit 12A "Compensation Framework for Wetlands Real Property Claims."**

In reviewing a settlement agreement, the primary rule of interpretation is the "four corners" doctrine, under which the settlement is construed according to its terms, not on the basis of "what might satisfy the purpose of one of the parties to it." *See United States v. Armour & Co.,* 402 U.S. 673, 682, 91 S.Ct. 1752, 29 L.Ed.2d 256 (1971) A consent decree, a settlement, is the product of negotiation between the parties and embodies a compromise struck among various factors, including the parties' competing goals and the time, expense, and risk of litigation. *See id.* at 681, 91 S.Ct. 1752. In this way, "the decree itself cannot be said to have a purpose; rather the parties have purposes, generally opposed to each other, and the resultant decree embodies as much of those opposing purposes as the respective parties have the bargaining power and skill to achieve." *Id.* at 681–82, 91 S.Ct. 1752. By consenting to a decree, the parties have waived their rights under the Due Process Clause to litigate the issues raised by a complaint. *Id.* at 682, 91 S.Ct. 1752. A court should not later modify the decree by interposing terms not agreed to by the parties or not included in the language of the decree. *See id.; see also United States v. Atl. Ref. Co.,* 360 U.S. 19, 23, 79 S.Ct. 944, 3 L.Ed.2d 1054 (1959); *Hughes v. United States,* 342 U.S. 353, 357, 72 S.Ct. 306, 96 L.Ed. 394 (1952);. <u>In re Deepwater Horizon</u>, 732 F.3d 326, 353 (5th Cir. 2013).

---

[11] Exhibit I, Index of Cameron Subdivisions in the Zone with Plat Maps and Tax Assessor Plat Cards for each Subdivision.

The "Four Corners Doctrine" is applicable as a jurisprudential rule, but its principles are also actually part of the language of the actual Deepwater Horizon Settlement. Part 26 entitled "BINDING AND ENTIRE AGREEMENT" states:

> "Plaintiffs, the Economic Class, and each Economic Class Member and the BP Parties expressly and each agree that the terms of this Agreement, and all provisions hereof, including all representations, promises, agreements, covenants and warranties, and including the Exhibits thereto, are contractual and not a mere recital and shall survive the execution of this Agreement. (**This Agreement and its exhibits, attachments, and appendices shall constitute the entire agreement and understanding among the Parties and supersedes all prior proposals, negotiations, agreements, and understandings relating to the subject matter of this Agreement.**) This Agreement shall be binding upon and shall inure to the benefit of the Parties hereto and their representatives, heirs, successors, and assigns." **(Emphasis added).**

BP's argument about the definition of the word "parcel" is directly contradicted by the actual written terms of the settlement. Perhaps this is why BP's Memorandum fails to point out or discuss the actual written terms of the applicable agreement, Exhibit 12A "Compensation Framework for Wetlands Real Property Claims". Exhibit 12A acknowledges in two separate locations that the parties knew they did not have the appropriate tax data for Cameron Parish and that the P2 Energy Solutions Tobin Data was likely inaccurate. This is specifically why Exhibit 12A "Compensation Framework for Wetlands Real Property Claims" gives the Claims Administrator directives and authority on how to include all "Eligible Parcels" within the designated Wetlands Real Property Claim Zone. The following language is included in parts 12A.1.F:

> "F. The **Administrator's Database** contains the best available parcel boundary data for the real property in the **Wetlands Real Property Claim Zone. In some instances, this data may be incomplete or out of date.** Accordingly, real property located in the **Wetlands Real Property Claim Zone** not identified as a parcel shall nonetheless be classified by the Claims Administrator as an **Eligible Parcel** provided the claimant documents the following:

    i.    Actual presence of the parcel in the **Wetlands Real Property Claim Zone**. Documentation of actual presence of a parcel in the **Wetlands Real Property Claim Zone** must consist of an official document provided by the paris tax assessor (such as a 2010 parish tax notice), Clerk of Court, Registrar of Lands, or other governmental lands office or agency, or a professional survey of the parcel." **(Emphasis added)**.

Additionally, the following language is included parts 12A.1.G:

"G. The **Administrator's Database** contains the best available parcel boundary data for real property in the **Wetlands Real Property Claim Zone**. In some instances, the named owner(s) of a parcel may be inaccurate or out-of-date. Accordingly, a claimant not listed in the **Administrator's Database** will be treated as an **Eligible Claimant** if the claimant provides the following to demonstrate **Eligible Claimant's** ownership of the **Eligible Parcel**: **(emphasis added)**

i. An official copy of the deed for the **Eligible Parcel**

AND

    ii.    The 2010 property tax assessment notice for the eligible parcel or an official document from the Clerk of Court, Registrar of Lands or other governmental land office or agency showing proving ownership of the **Eligible Parcel** during the time period April 20, 2010 to [the date of the Settlement Agreement.]

    iii.    To the extent a state, parish, municipality or other governmental agency agrees to provide the Claims Administrator with access to an official database sufficient for the Claims Administrator to confirm the claimant owned the parcel for which they are seeking compensation, the Claims Administrator need not require from the **Eligible Claimant** an official copy of the deed or official copy of the 2010 property tax assessment notice for the parcel for which they are seeking compensation. Rather, the Claims Administrator is authorized to accept from the claimant the street address and tax identification number or parcel identification number for the **Eligible Parcel** for which they are seeking compensation as sufficient to satisfy the subpart, and the Claims Administrator will use the database to confirm the claimant's valid ownership during the time period April 20, 2010 to [the date of the Settlement Agreement].

As is detailed above, The P2 Tobin Data for all of Cameron Parish including the location of Long Beach Subdivision and all other subdivisions in lower Cameron Parish was incomplete and out of date. The parties knew that the P2 Tobin Data did not accurately reflect the number of

owners with Eligible Parcels within the Wetlands Real Property Claim Zone. The P2 Tobin Data was only used as a guide to establish the Wetlands Real Property Claim Zone. All parties knew that in Cameron Parish, the Claims Administrator would have to determine the number of owners and the number of Eligible Parcels. In these instances, the Claims Administrator was required by the specific language of the settlement to include all "Eligible Parcels" if (1.) the parcel is in the Wetlands Real Property Claim Zone and (2.) the Claimant produces proof of ownership. These are the only two requirements in the 12A Wetland's Compensation Framework.

The Claimant has absolutely proven her entitlement to payment of the 839 claims by complying with the terms of the settlement. The claimant filed 839 separate claims, one for each lot that she owns in Long Beach Subdivision that is within the applicable claim zone. There can be no dispute that each of the 839 parcels approved by the Claims Administrator is squarely within the Wetlands Real Property Claim Zone. There can be no dispute that the Claimant has provided the requisite ownership documents to satisfy the requirements of the Wetlands Real Property Framework detailed in Exhibit 12A. BP does not dispute that the Claimant owns the lots. Claimant supplied the applicable tax assessments and the title documents proving her ownership of the 839 Eligible Parcels. Accordingly, no further inquiry is allowed or required by the Claims Administrator to approve, pay, and settle the claims.

The terms and conditions of the Wetlands Real Property Settlement are contained exclusively in Exhibit 12 A. The title of Exhibit 12 A is "Compensation Framework for Wetlands Real Property Claims". Part 1 details the eligibility requirements. To be eligible, a Claimant must own an eligible parcel (12.A.1.C) within the designated Wetlands Real Property Claim Zone (12.A.1.B.). Eligible Parcel is specifically defined in the Wetland's Framework as follows:

> "C.    **Eligible Parcels** shall be defined as parcels located within the Wetlands Real Property Claim Zone."

BP did not suggest nor require in any part of 12A Compensation Framework for Wetlands Real Property Claims that the word "parcel" be defined as "taxing parcel". The word "parcel" as used in the text of the Wetlands Settlement does not mention, refer to, or in any way use the words "taxing parcel" as asserted by BP. The words "taxing" and "parcel" do not ever appear together in Exhibit 12A, 12B, 12C, or 12D. In fact, the words "taxing" and "parcel" do not ever appear in sequence together in any part of the entire settlement agreement, including the Coastal Real Property Framework.

As part of the Wetlands Compensation Framework, BP and Class Counsel had to develop particular forms to be distributed to Claimants. The Wetlands Real Property Claim Form (White Form) was created and approved by BP and Class Counsel. The White Form includes Instructions for Completing the Wetlands Real Property Claim Form.[12]  These instructions include definitions for certain applicable terms. Therein, "Parcel" is defined as "a plot of land that can be sold or purchased." The Form Instructions also defines "Eligible Parcel" as "A Parcel located within the Wetlands Real Property Claim Zone". There is no definition in the settlement or in the Claim Form Instructions for "taxing parcel" as suggested by BP.

The concept of limiting eligibility in this case to one fictional "tax parcel" as suggested by BP is wrong, illogical, inaccurate, and unfair.  BP never required and the Plaintiffs did not agree to treat Long Beach Subdivision as one parcel. No such language is included in the settlement as to Long Beach Subdivision or any of the numerous subdivisions in Cameron Parish located squarely within the Wetlands Real Property Claim Zone. **Identifying Long Beach Subdivision as one "taxing parcel" would be factually and legally impossible since there are nearly one**

---

[12] Exhibit J, Wetlands Claim Form Instructions.

thousand (1000) different lots and nearly one hundred (100) different owners of those lots in **Long Beach Subdivision**. Additionally, BP and Class Counsel clearly knew that they did not have the "most accurate" data and information of the Cameron Parish Tax Assessor at the time of the settlement. This is exactly why Exhibit 12A gives the Claims Administrator the authority and the obligation to update the data and allow all Claimants, like this Claimant, to prove their parcel ownership and resulting eligibility.[13] It is undisputed that the Cameron Parish Tax Assessor did not treat this parcel as a single "taxing parcel" as suggested by BP. There is no plausible real definition of a "single taxing parcel" that could be applied to the Claimants ownership of these lots in Long Beach Subdivision. The fact that BP had to inaccurately create a fictional map and try to make Long Beach fit in its taxing parcel is simply the best burden against BP's argument.

**B.    The Claims Administrator was absolutely correct in adopting Policy 443.**

Final Policy 443 was implemented by the Claims Administrator on September 18, 2013. The Claims Administrator implemented the policy to insure uniform treatment of all Wetlands Claimants throughout the Wetlands Real Property Framework. Section 4.3.7 of the Settlement Agreement directs the Settlement Program to "use its best efforts to provide Economic Class Members with assistance, information, opportunities and notice so that the Economic Class Member has the best opportunity to be determined eligible for and receive the Settlement Payment(s) to which the Economic Class Member is entitled under the terms of the Agreement." In other words, the Claims Administrator was required to act fairly and reasonably to approve all "Eligible Parcels" within the Wetlands Zone.

---

[13] While BP argues in its brief that the parties specifically discussed this particular tract of property, there is clearly no evidence in the record that this is correct. In fact, the Declaration of Chris Esbrook, does not support this allegation.

Upon the initial processing and review of claims, it became clear that the Cameron Parish Tax Assessor often lists multiple tracts, lots, and/or parcels on a single Tax Assessment Notice and identified by one single tax assessment number. Unlike Terrebonne Parish and Counties in other States, Cameron Parish Real Estate Assessments do not indicate a separate tax assessment for each tract, lot, and/or parcel. Nor do Cameron Parish Assessments indicate a separate tax assessment number or value for each tract, lot, and/or parcel. The purpose behind the policy of listing multiple tracts, lots, and parcels of land on a single Real Estate Assessment is for administrative efficiency and because landowners want to receive one, not multiple, tax bills. Over ninety percent (90%) of all Real Estate Assessments in Cameron Parish list multiple tracts, lots, or parcels.[14]

As a result of the this practice by the Cameron Parish Tax Assessor, one landowner may have each and every tract they own in Cameron Parish on one tax assessment. These tracts may include non-contiguous tracts, tracts in separate sections, and tracts in different townships. The one assessment may include tracts purchased at different times or may include both purchased and inherited land. The one assessment may include property in Cameron, Grand Chenier, Grand Lake, Hackberry, and Johnson Bayou. The one assessment may include property on the east and west side of the Calcasieu or the Mermentau River. The one assessment may include one parcel, five parcels, or hundreds of parcels depending on what the taxpayer owns. The one assessment may include two lots, five lots, or eight hundred and thirty-nine (839) lots owned by a single taxpayer. The goal of these single assessments is to allow a taxpayer to receive one assessment which lists all of his tracts of property owned in Cameron Parish, and to allow the taxpayer to make one payment for his yearly taxes when possible.

---

[14] See Exhibit G.

By February of 2013, it was clear that a Policy would have to be drafted and implemented to address this issue. Fundamental fairness in implementation and approval of Wetlands Claims required Policy 443. A reasonable hypothetical reveals the dilemma of the Claims Administrator. For example, Landowner A owns twenty separate lots in a subdivision within the Wetlands Zone in Terrebonne Parish. Landowner B owns twenty separate lots in a subdivision within the Wetlands Zone in Cameron Parish. Landowner A has twenty separate tax assessments and twenty separate tax assessment numbers. Landowner B has one tax assessment and one tax assessment number for all twenty lots, although all twenty lots are individually listed on the one tax assessment. Without Policy 443, the Claims Administrator would potentially approve and pay twenty (20) separate claims of $15,750.00 per lot for Landowner A, but only one for Landowner B. Certainly, there is no legitimate rationale that can be seriously asserted by BP for such disparate treatment of identically situated claimants.

During the course of the next seven (7) months, the Claims Administrator met with both BP and Class Counsel to adopt an appropriate and fair policy. As is detailed by the Claims Administrator's submission herein dated February 24, 2016 and made part of this record, the parties were invited to comment and provide input on the draft policy. There were meetings, emails, and a panel hearing. On September 6, 2013, the Claims Administrator circulated to BP and Class Counsel the draft of the Final Policy 443. The Claims Administrator then directed both BP and Class Counsel as follows:

> "Mr. Juneau asks that if any Party objects to a policy and intends to refer such policy to the Court for resolution pursuant to Section 4.3.4 of the Settlement Agreement, that you do so on or before Monday, 9/16/13."

Both parties responded by not objecting and by officially deferring to the Claims Administrator Decision. Most importantly, BP did not refer Policy 443 to the Court for resolution. Accordingly, the Claims Administrator issued the Final Policy Announcement 443 on September

18, 2013. The Claims Administrator then began implementing the terms of the settlement and the terms of the policy without any further objection for the next two and one-half (2.5) years.

In those 2.5 years, BP allowed thousands of claims to be approved, paid, and settled for each eligible lot in subdivisions all across the coast of Louisiana. BP specifically allowed the approval and payment of individual lots in subdivisions within the Wetlands Zone in Cameron Parish. This includes thousands of payments for individual lots in Holly Beach Subdivision, Gulf Terrace Subdivision, Rutherford Beach Subdivision, Ocean View Subdivision, and Pleasant Beach Subdivision, just to name a few.[15] Pursuant to Policy 443, claimants were required to file a separate claim for each lot they owned in the subdivisions, and each claim was paid $15,570.00. Claimants were paid on a per lot basis whether they owned one lot, ten lots, fifty lots, or more than a hundred lots, all without BP objecting or seeking Court review. **Most interestingly, BP actually paid and settled numerous claims of other landowners who owned multiple lots in Long Beach Subdivision, each receiving $15,750.00 per lot.**

Now, BP seeks to unfairly treat this Claimant differently from the other thousands of Wetland Claimants whose claims have been approved and paid solely because of the number of valid claims she has and because of the total amount of money that she is entitled to collect. Essentially, BP is saying (1.) yes we agreed to the language in Section 12A, (2.) yes we agreed to the Wetland Real Property Claim Zone, (3.) yes we know that we did not have the Cameron Parish Tax Assessor information at the time of the settlement, (4.) yes we knew that the data had the potential to be inaccurate and would need to be properly supplemented, changed, and corrected, (5.) yes we authorized the Claims Administrator to obtain and supplement the data to properly

---

[15] See Exhibit I, Index of Cameron Subdivisions in the Zone with Plat Maps and Tax Assessor Plat Cards for each Subdivision.

administer the claims, (5.) yes we agree that the Claimant has followed the requirements of 12A and Policy 443, (5.) yes we officially deferred to the Claim's Administrator on Policy 443 in September 2013 knowing that all eligible claims in all subdivisions in Cameron Parish would be paid on a per lot basis, (6.) yes we did not object to the implementation of Policy 443 for over two and one-half years, (7.) yes we settled and paid thousands of claims on a per lot basis throughout Cameron Parish in numerous subdivisions based on Policy 443 without appealing and never seeking Court review, (8.) yes, we acknowledge that under Policy 443, the Claimant was required to file 839 separate claims on a per parcel, per lot basis, (9.) yes, we acknowledge that under Policy 443, the Claims Administrator was required to approve all 839 claims for Claimant's lots because they are in the Wetlands Real Property Claim Zone, (10.) yes, we agreed that we would have no right of appeal for any claim less than $25,000.00, and each of the Claimant's separate claims are only worth $15,750.00 each, and (11.) yes, we paid and settled other Claimants claims within Long Beach Subdivision on a per lot basis, BUT NOW, it is unfair because it is simply too much money.

## C.    BP should now be legally prohibited from raising any challenge to Policy 443.

BP has legally waived its right to object to Policy 443 and implementation of Policy 443 as to this Claimant. BP tacitly ratified Policy 443 by deferring to the Claims Administrator and not timely objecting. BP sat back in silence and allowed the Claims Administrator to implement Policy 443 to effectively settle fully and finally thousands of Claims on its behalf for over thirty (30) months. BP accepted Policy 443 by ratifying all of the payments for each lot in all of the subdivisions in Cameron Parish without seeking any Court review and without any objection. Now, BP should be estopped from challenging the legal position it affirmed for over two and one-half years.

Tacit Ratification results when a person, with knowledge of an obligation incurred on his behalf by another, accepts the benefit of that obligation. Louisiana Civil Code art. 1843. The acquiescence or long silence of the principal touching an unauthorized or illegal act of his agent is a ratification of the act or the contract of the agent. *Lafitte, Dufilho & Co. v. Godchaux*, 35 La. Ann. 1161, 1163 (1883).

The Supreme Court of the United States has generally described judicial estoppel as an equitable doctrine designed to protect the integrity of the judicial process by prohibiting parties from deliberately changing positions according to the exigencies of the moment. *New Hampshire v. Maine,* 532 U.S. 742, 749-50, 121 S.Ct. 1808, 1814-15, 149 L.Ed.2d 968 (2001). Because it is an equitable doctrine, it is invoked at the court's discretion. *Id.* at 750, 121 S.Ct. at 1815. Although the *New Hampshire* Court discussed some factors previous courts employed in determining whether the doctrine was applicable, it also observed that the "circumstances under which judicial estoppel may appropriately be invoked are not reducible to any general formulation of principle" and "[a]dditional considerations may inform the doctrine's application in specific factual contexts." *Id.* at 750-51, 121 S.Ct. at 1815 (internal quotations omitted).

In the Wetland Settlement, BP agreed to specific language and the Compensation Framework for these claims in Exhibit 12A. BP agreed that each eligible parcel within the approved zone would be approved and paid. BP gave the Claims Administrator authority and obligations to fairly institute and administer the Wetlands Framework.  BP officially deferred to the Claims Administrator on Policy 443. BP failed to seek Court review as requested by the Claims Administrator prior to September 16, 2013.

For the next thirty (30) months, BP then acquiesced in the implementation of the framework and Policy 443. BP then agreed to the approval, payment, and settlement of thousands

of claims on a per lot basis throughout Cameron Parish and throughout the State of Louisiana. BP had full knowledge that the Claims Administrator was settling the claims on a per lot basis and settling the claims on BP's behalf, yet BP took no steps whatsoever to object or seek review of the thousands of claims that were approved, paid, and settled in these subdivisions. BP's acquiescence, its silence, its acceptance, and its tacit ratification for over two and one-half years constitutes a legal waiver of its right to object now. BP's actions and inactions should prevent or estop BP from raising these arguments now.

BP's position now is in direct odds with its actions and silence for the past thirty months. BP is now seeking to deliberately change its position according to the exigencies of the moment, i.e. BP's realization as to the amount of money it is obligated to pay the Claimant. If BP really believed that Policy 443 "is at odds with and misinterprets the Wetlands Framework", why did BP defer to the Claims Administrator and fail to take the issue up with this Honorable Court in September of 2013? If BP really objected to the definition of "parcel" used by the Claims Administrator, why did BP not immediately seek judicial review instead of allowing thousands of claims to be paid on a per parcel, per lot basis? If BP really only agreed to one payment each within its P2 Tobin Parcels all along the coast of Cameron, why did BP allow payment and settlement of hundreds, if not thousands, of claims within each alleged P2 Tobin Parcel over the past two and one-half years without ever objecting, appealing, or seeking judicial review? By saying nothing, by doing nothing, and by accepting the benefits of the settlements approved by the Claims Administrator, BP waived its legal right to object now.

**D.** **Policy 443 did not change and had no effect on the awards for oiled and non-oiled Eligible Parcels. Oiled Eligible Parcels receive a much larger award than non-oiled Eligible Parcels.**

BP suggests that somehow the implementation of Policy 443 has resulted in non-oiled eligible parcels receiving more compensation than oiled eligible parcels. This is a complete red herring and is completely false. Exhibit 12A is divided into four numbered subparts, namely 12A.1 Eligibility Requirements, 12A.2 Compensation for Wetlands Real Property, 12A.3 Physical Damage to Real or Personal Property, 12A.4 Federal and State Regulatory Requirements.

This Honorable Court need look no further than to the actual language of subpart 12A.2 to see that BP's argument is completely without merit. Subpart 12.A.2 clearly distinguishes between oiled and non-oiled eligible parcels. Oiled Eligible Parcels are included in Compensation Category A (The Eastern Louisiana Coast) and are compensated for an Oiled Primary Area ($25,000.00 per acre) and Buffer Area at ($10,000.00 per acre). Oiled Parcels are entitled to a minimum payment of $35,000.00 plus an RTP. Non-Oiled Parcels in Compensation Category B (The Western Coast of Louisiana) are entitled to minimum payment of $4500.00 plus an RTP.

All of the coastline of Cameron Parish is in Compensation Category B.  All of the Claimants lots in Long Beach Subdivision in Cameron Parish are in Compensation Category B and were not oiled. Accordingly, she is entitled to $4500.00 per lot plus an RTP. Had the Claimant's 839 lots been oiled and been placed in Compensation Category A, the Claimant would have been entitled under 12A to $35,000.00 per lot plus an RTP. Policy 443 has no effect whatsoever on subpart 12.A.2 Compensation for Wetlands Real Property. Policy 443 caused no change whatsoever in the amount of the claimants award per lot, per Eligible Parcel.

BP's real issue in this case is that it obligated itself to pay all Eligible Parcels within the Claim Zone, and this Claimant owns a huge number of Eligible Parcels. Without dispute, the Claimant owns more different tracts, more parcels, and more lots than any other landowner in Cameron Parish. However, this fact does not disqualify her from receiving a payment for each

Eligible Parcel. To the contrary, the fact that she owns all of these lots entitles her to more awards and more money than any other landowner who filed eligible claims in the Wetlands Settlement. If BP's argument is adopted, landowners with less parcels and with less lots will have received more awards than the Claimant. Certainly, this arbitrary and illogical result was not contemplated by the settlement. If each of the 839 lots that the Claimant inherited and purchased was owned by multiple lot owners, BP would have no argument and would be raising no objection. BP could have negotiated for and agreed to a cap on the amount of claims and a cap on the amount of money a single individual claimant receives. BP did not do so. There are no caps for Eligible Parcels, and there is no cap on the amount of money this Claimant is entitled to receive.

This Claimant owns lots in nearly every subdivision located on the western side of the Calcasieu River in Cameron Parish. She filed separate claims for every lot she owns in Long Beach Subdivision, Gulf Terrace Subdivision, Pleasant Beach Subdivision, and other subdivisions located in Cameron Parish. All of the lots in Gulf Terrace were paid on a per lot basis. In Pleasant Beach, the Claimant owns numerous lots, parcels. All of her Eligible Parcels in Pleasant Beach were paid and settled on a per lot basis without objection by BP, without any appeal by BP, and without any request for Court review by BP. In Gulf Terrace Subdivision, the Claimant owns a one-fourth (¼) interest in hundreds of lots. All of her Eligible Parcels (over 125) were paid and settled on a per lot basis in Gulf Terrace Subdivision without objection by BP, without any appeal by BP, and without any request for Court review by BP. Claimant's lots in Long Beach Subdivision are factually and legally identical to her other lots. The only difference herein is that she has 839 Eligible Parcels, and BP simply does not want to pay that much money, regardless of her eligibility.

**E.     The Claims Administrator correctly determined that BP has no right to appeal each of the Claimant's Eligibility Notices.**

On February 11, 2016, BP determined that the amount of money to be awarded to the Claimant on her 839 claims was simply too much money. BP sent a letter to the Claims Administrator asking that the processing of the claims be stopped, and BP be allowed to Appeal. The Claims Administrator formally responded by email on February 12 as follows:

"Good afternoon, Dan,

Our office has reviewed your letter dated February 11, 2016. The Settlement Program has analyzed each of the referenced claims under Policy 443, which was previously enacted on September 18, 2013, and issued these Eligibility Notices accordingly. In light of the fact that the Compensation Amount (as defined in Section 38.35 of the Settlement Agreement) of each of these separate claims is below $25,000, under the express terms of Section 6.1.2.4 of the Settlement Agreement and Rule 7(b) of the Rules Governing the Appeals Process, BP is prohibited from appealing any or all of the referenced claims. As such, we will be unable to allow the claims to proceed on appeal as BP has requested. Since we are obliged to proceed in accordance with the Settlement Agreement and applicable rules, we intend to continue to process these claims, absent any stay, injunction or other contrary instruction from the Court.

Sincerely,
Patrick Hron
Office of the Appeals Coordinator"

Part 6.1.2.4 of the Settlement Agreement deals with BP's rights to appeal. In the settlement, BP agreed as follow:

"BP. Appeal. The BP Parties may appeal a final compensation award determination **only** where the Compensation Amount determined by the Settlement Program is in excess of $25,000." (Emphasis added)

Rule 7(b) of the Rules Governing the Appeal Process states:

(b) Appeals by BP: BP may appeal to the Appeal Panel any Eligibility Notice where the Compensation Amount awarded in such Notice, before the application of any Risk Transfer Premium, is in excess of $25,000. **BP may not appeal any Denial Notice or any Eligibility Notice where the Compensation Amount awarded in such Notice, before the application of any Risk Transfer Premium, is $25,000 or less.** (Emphasis Added)

The language of Part 6.1.2.4 of the Settlement and Rule 7(b) of the Rules Governing the Appeal Process are clear and unambiguous. BP agreed to give up any and all appeal rights on individual Eligibility Notices with a pre-RTP value of less than $25,000.00. The Claimant herein received 839 separate Eligibility Notices because she filed 839 separate claims as was required. Each Eligibility Notice she received was for $4,500.00 plus the RTP. Accordingly, BP waived its right to appeal on each and every Eligibility Notice of the Claimant. Nothing in the settlement agreement gives BP the right to aggregate multiple claims filed by one Claimant to meet the threshold amount for appeal of $25,000.00. Had BP reserved such a right, it most certainly would have included such language in the Settlement Agreement. There is no such reservation. The Claims Administrator correctly determined that BP has no right to appeal.

**F.     BP has no legitimate right to a preliminary injunction or a stay.**

BP sought and the Court granted a preliminary injunction barring the Claims Administrator from continuing to process and pay the claims at issue.   Claimant avers that the preliminary injunction should be lifted.

Any injunctive relief is considered "an extraordinary and drastic remedy, not to be granted routinely, but only when the movant, by a clear showing, carries the burden of persuasion." *White v. Carlucci*, 862 F.2d 1209, 1211 (5th Cir.1989) (quoting *Holland Am. Ins. Co. v. Succession of Roy*, 777 F.2d 992, 997 (5th Cir.1985)). "A preliminary injunction is preliminary to a hearing on the merits." *City of Willacoochee v. Satilla Rural Elec. Membership Corp.*, 283 Ga. 137, 657 S.E.2d 232 (2008).

A district court may grant a preliminary injunction only if the movant establishes four requirements:

> First, the movant must establish a substantial likelihood of success on the merits. Second, there must be a substantial threat of irreparable injury if the injunction is not granted. Third, the threatened injury to the plaintiff must outweigh the

threatened injury to the defendant. Fourth, the granting of the preliminary injunction must not disserve the public interest.

*Cherokee Pump & Equip., Inc. v. Aurora Pump*, 38 F.3d 246, 249 (5th Cir. 1994).

Preliminary injunction will not be granted unless movant clearly carries burden of persuasion as to all prerequisites, since it is an extraordinary and drastic remedy. *Basham v. Freda*, M.D.Fla.1992, 805 F.Supp. 930, affirmed 985 F.2d 579. "Failure to prove even one factor necessary for a preliminary injunction will preclude such relief." *Schade v. Maryland State Bd. of Elections*, 401 Md. 1, 930 A.2d 304 (2007).

BP correctly set forth the four factors for preliminary injunction in its brief to the Court; however, BP fails to establish the requisite proof of each element of this "extraordinary and drastic remedy."

First, BP argues that it has a substantial likelihood of success on the merits. Ordinarily, the party seeking preliminary injunction must carry the burden of showing likelihood of success on merits and preponderance of harm running against him by denial of application. *National Ass'n of Letter Carriers, AFL-CIO v. Sombrotto*, C.A.2 (N.Y.) 1971, 449 F.2d 915. Claimant would argue that BP has very little chance of success on the merits, falling far short of the requisite proof of "substantial likelihood of success on the merits." The Court must not avoid viewing the present motions through the correct lenses, i.e. that BP seeks yet again to improperly welsh on a very extensively negotiated, memorialized, and vetted settlement agreement. Applied to this specific Claimant, BP seeks to vitiate both Policy 443 and Policy 502 despite the clear language of these provisions and the fact that the Claims Administrator has been following and applying these Policies for roughly two years under facts materially indistinguishable from those at hand, with no objection from BP. Furthermore, as discussed in greater detail elsewhere in Claimant's brief

herein, Policy 443 and Policy 502 are very clear in how they are to be applied to wetlands claims like this one. BP stands little chance of succeeding on the merits.

Secondly and thirdly, BP argues that there is a very substantial threat of irreparable harm if the preliminary injunction were not granted, and that the harm of *not* issuing the injunction far outweighs any harm from the issuance of the injunction. BP focuses solely on its own pocketbook and the fact that its own agreed upon Settlement Agreement is no longer to its liking after roughly two years of at the least tacitly accepting the application of Policy 443 and Policy 502 to wetlands claims just like these. This is a very self-concerned and myopic view that BP takes – one that is not supported by the law. Once again, we are dealing with the enforcement of a binding Settlement Agreement, which is the law between the parties on this issue. "[H]aving second thoughts about the results of a valid settlement agreement does not justify setting aside an otherwise valid agreement." *Young v. FDIC*, 103 F.3d 1180, 1195 (4th Cir.1997). It is essential to society's commercial welfare that there be no undermining of the desirable stability of contracts. When their terms are reasonably explicit and plain, as we believe those before us to be, the courts should enforce them. See *Construction Mach. Co. v. Willard & Rodman, Inc.*, 208 Cal.App.2d 31, 38, 25 Cal.Rptr. 13 (1962); *Harris v. Spinali Auto Sales, Inc.*, 202 Cal.App.2d 215, 20 Cal.Rptr. 586 (1962). 'It is, of course, * * * desirable that competent parties be protected in their rights to make and enforce agreements between themselves.' *Northwest Airlines, Inc. v. Alaska Airlines, Inc.*, 351 F.2d 253, 256 (9th Cir.1965). The Court cannot ignore the harm to Claimant and the thousands of other litigants if the terms of the Settlement Agreement become merely advisory for BP, to be accepted by and enforced against BP on an as-applied basis depending on BP's tolerance or whim.

Lastly, BP boldly argues that the public interest would be best served by allowing it to back out of the Settlement Agreement. An order granting a preliminary injunction must be based upon

established equitable grounds. *Sierra Club v. Hickel*, C.A.9 (Cal.) 1970, 433 F.2d 24, certiorari granted 91 S.Ct. 870, 401 U.S. 907, 27 L.Ed.2d 805, affirmed 92 S.Ct. 1361, 405 U.S. 727, 31 L.Ed.2d 636.  Equitable remedies depend not only on determination of legal rights and wrongs, but on such matters as laches, good or bad faith, and an appraisal of public interest.  *Maryland-National Capital Park and Planning Commission v. U.S. Postal Service*, C.A.D.C.1973, 487 F.2d 1029, 159 U.S.App.D.C. 158.  Plaintiff's burden of showing entitlement to preliminary injunctive relief is especially heavy where public interest is implicated.  *National Nutritional Foods Ass'n v. Goyan*, S.D.N.Y.1980, 493 F.Supp. 1044.  BP cannot meet the ordinary burden it bears to get a preliminary injunction, much less the "especially heavy" burden that applies here because the public interest is implicated.  What would have a more adverse effect on the public interest?  BP having to pay under the clear and already accepted terms of the binding Settlement Agreement, or BP succeeding in having this Court throw out an established part of the Settlement Agreement that has been applied consistently for two years to appease BP's settlor's remorse?  The adverse effect on the public interest in the case of the former, if any, pales in comparison to that of the latter.

BP represents to this Court that halting the processing and payment of the valid 800 plus wetlands claims of Claimant 100261264, allowing BP to undo the Settlement Agreement, and allowing BP to circumvent the agreed upon appeals procedure would be to "maintain the status quo." To the contrary, what BP seeks to do here is to alter the status quo, not maintain it.  "Status quo" would be for the Settlement Program to continue processing and paying properly documented and vetted claims, such as the wetlands claims of Claimant 100261264, all as per the Settlement Agreement.  "Status quo" would be upholding and enforcing a legally binding Settlement Agreement.  BP has in fact interrupted the status quo with this preliminary injunction.

Moreover, this is nothing more than a back-door attempt by BP to have a right to appeal that it gave up in the settlement agreement. BP expressly agreed that it would not and could not appeal any individual claims valued at less than $25,000.00 pre RTP. Every single one of the 800 plus claims filed by Claimant 100261264 is valued at less than $25,000.00 – each one is valued at $4500.00 RTP or $15,750.00 total. This is the precise reason why the Settlement Program properly refused to allow BP's attempted administrative appeal to proceed. This Court should do the same with respect to the preliminary injunction. At the least, any injunctive relief or stay should not continue beyond the hearing or submission on the merits.

BP has benefited from Policy 443. BP has a global settlement wherein it has obtained immunity through settlement of thousands of lots for future liability. Should damage occur in the future from oil washing onto these lots, all settled claimants will be prevented from asserting liability against BP. As a result, there is no inequity, and BP is not entitled to the injunctive relief sought.

## CONCLUSION

For the foregoing reasons, Claimant respectfully requests that the Motion to Vacate and Stay Payment of Awards be denied and for the entry of an Order lifting the stay. Further, Claimant requests the entry of an order directing the Claims Administrator to proceed with the processing and payment of Claimant's Wetland claims.

Respectfully submitted:

_____

DAVID P. BRUCHHAUS #24326
M. KEITH PRUDHOMME #14336
MATTHEW P. KEATING #30911
MUDD & BRUCHHAUS, L.L.C.
410 E. College Street
Lake Charles, LA 70605
Telephone: (337) 562-2327
Facsimile: (337) 562-2391

**Attorney for Claimant 100261254**

## CERTIFICATE OF SERVICE

I HEREBY CERTIFY that I filed a copy of the above and foregoing pleading electronically with the Court's CM/ECF system on March 21, 2016.  I further certify that I delivered a copy of the above and foregoing pleading to the following via File & Serve Express and electronic mail, on March 21, 2016:

James P. Roy
Domengeaux, Wright, Roy & Edwards
P.O. Box 3668
556 Jefferson Street
Lafayette, LA 70502-3668
Email: jimr@wrightroy.com

Stephen J. Herman
Herman, Herman, Katz & Cotlar, LLP
820 O'Keefe Avenue
New Orleans, LA 70113
Email: sherman@hhkc.com

Allison Rumsey
Arnold & Porter, LLP
601 massachusetts Avenue, NW
Washington, DC 20001
Email: Allison.rumsey@aporter.com

S. Gene Fendler
Don K. Haycraft
R. Keight Jarrett
Devin C. Reid
Liskow & Lewis
701 Poydras Street, Suite 5000
New Orleans, LA 70139-5099
Email:  dkhaycraft@liskow.com
         rkjarrett@liskow.com
         dcreid@liskow.com

_____
DAVID P. BRUCHHAUS