**UNITED STATES DISTRICT COURT**
**EASTERN DISTRICT OF LOUISIANA**

| | | |
|---|---|---|
| In Re: Oil Spill By The Oil Rig | * | MDL No. 2179 |
| "Deepwater Horizon" in the Gulf | * | |
| of Mexico, on April 20, 2010 | * | Section J |
| | * | |
| This Document Relates To: | * | Judge Barbier |
| No. *10-4536,* and: | * | |
| 10-3059, 10-4182, 10-4183, 11-516, | * | |
| 13-2645, 13-2646, 13-2749, 13-2813, | * | Magistrate Judge Shushan |
| 13-4677, and 14-0614 | * | |

_____

<u>**MEMORANDUM IN SUPPORT OF**
**UNOPPOSED MOTION BY THE UNITED STATES**
**FOR ENTRY OF CONSENT DECREE WITH BP**</u>

*Table of Contents*

I.      Introduction..............................................................................................................1

II.     Legal Standard for Judicial Review of a Consent Decree ..................................3

III.    Description of the Public Comments and Process ...............................................4

IV.     The Settlement Punishes BP, Deters Future Violations in the Industry, and
        Funds Billions of Dollars in Gulf Coast Restoration ..........................................6

        A.      The Settlement is Fair ..............................................................................6

        B.      The CWA Settlement is Reasonable and Advances Purpose of the Statute ..........7

                1.      Settlement of Injunctive Relief ................................................8

                2.      Settlement of the Civil Penalty ................................................9

        C.      The NRD Settlement Compensates for Harm Caused by the Oil Spill, and
                Provides for Decades of Restoration of the Gulf Ecosystem..............................11

                1.      NRD Background and Status, C.D. Terms, and the DARP......................11

                2.      The Amount and Allocation of NRD are Reasonable and Consistent
                        with OPA, Public Comments Notwithstanding ........................................13

                3.      Comments Re: Governance and Administration Going Forward in the
                        NRD Restoration Process ..........................................................17

                        *Governance Structure* ..............................................................17

                        *Administrative Costs from Open Ocean* ....................................18

        D.      There is No Concern Regarding the Remaining $600 Million for Costs,
                Royalties and False Claims Act Recovery ............................................19

        E.      A Payment Schedule is Appropriate in this Particular Case...............................20

        F.      The Settlement Treats Tax Implications Consistent with the Tax Code .............21

        G.      General Concerns or Fears About Human and Environmental Health
                and Safety Do Not Justify Rejecting the Consent Decree ...................................23

        H.      Comments that are not Pertinent to this Consent Decree ...................................24

V.      Conclusion ....................................................................................................25

*Table of Exhibits*

1.      Collection of five Letters from five State Attorney General Offices supporting entry of C.D.

2.      Department of Justice "Summary" of C.D. (also available at https://www.justice.gov/enrd/deepwater-horizon)

3.      Department of Justice "Fact Sheet" on C.D. (also available at https://www.justice.gov/enrd/deepwater-horizon)

4.      Comments received by DOJ, in four batches:

   4A.      Print out from "Web Portal" showing all comments to DOJ that were submitted using that portal.

   4B - 4D:  Letters and e-mails that were sent to DOJ directly (*i.e.*, not via the Web Portal)
   - with personal information redacted
   - divided into three batches to meet ECF requirements.

5.      Department of Justice "Response to Comments" received by DOJ. (also available at https://www.justice.gov/enrd/deepwater-horizon)

6.      Excerpts from Damage Assessment and Restoration Plan ("DARP") prepared by State and federal Natural Resource Trustee Agencies (entire DARP available at http://www.gulfspillrestoration.noaa.gov/restoration-planning/gulf-plan/), excerpts from Chapters 1, 5, 6, 7 & 8 attached.

7.      NRD Trustees' "Fact Sheet" on DARP (also available at http://www.gulfspillrestoration.noaa.gov/restoration-planning/gulf-plan/)

*Table of Authorities*

<u>Cases</u>

*Acushnet River & New Bedford Harbor, Proceedings re: Alleged PCB Pollution*,
 712 F. Supp. 1019 (D. Mass. 1989) ........................................................................ 16

*Cotton v. Hinton*, 559 F.2d 1326 (5th Cir. 1977)............................................................ 4

*Gulf Restoration Network v. Jewell, et al.*, No. 15-191 (S.D. Ala. Feb. 16, 2016), Doc. 64.......14

*In re: Oil Spill by Oil Rig Deepwater Horizon*, 21 F. Supp. 3d 657 (E.D. La. 2014) ............. 9, 20

*In re: Tutu Water Wells CERCLA Litig.*, 326 F.3d 201 (3d Cir. 2003) ........................................ 4

*Ruiz v. McKaskle*, 724 F.2d 1149 (5th Cir. 1984)............................................................ 4

*United States v. Akzo Coatings of Am., Inc.*, 949 F.2d 1409 (6th Cir. 1991) ................................ 4

*United States v. BPXP*, No. 12-cr-292 (E.D. La. Jan. 30, 2013), Doc. 65...................................8

*United States v. Browning-Ferris Indus. Chem. Servs., Inc.*,
 704 F. Supp. 1355 (M.D. La. 1988) ........................................................................ 3

*United States v. Cannons Eng'g Corp.*, 899 F.2d 79 (1st Cir. 1990) ............................................ 4

*United States v. City of Alexandria*, 614 F.2d 1358 (5th Cir. 1980)........................................ 4

*United States v. City of Miami*, 664 F.2d 435 (5th Cir. 1981) ............................................ 3

*United States v. Tex. Educ. Agency*, 679 F.2d 1104 (5th Cir. 1982) ............................................ 4

*United States v. Wallace*, 893 F. Supp. 627 (N.D. Tex. 1995) .................................................. 4, 7

<u>Federal Statutes</u>

26 U.S.C. § 162(f).............................................................................................. 22

30 U.S.C. § 1756.............................................................................................. 20

31 U.S.C. § 3729(a)(1)(A) .................................................................................. 20

31 U.S.C. § 3729(a)(1)(B) .................................................................................. 20

33 U.S.C. § 1321(b)(7)(D)................................................................................... 9

33 U.S.C. § 1321(b)(8) .................................................................................................. 9, 10

33 U.S.C. § 1321(t) ............................................................................................................ 1

33 U.S.C. § 2702(b)(2)(A) ............................................................................................... 20

33 U.S.C. § 2706(b) ......................................................................................................... 11

33 U.S.C. § 2706(d) ......................................................................................................... 11

42 U.S.C. § 9622(f)(6)(A) ............................................................................................... 16

42 U.S.C. § 4321, et seq. ................................................................................................ 13

<u>Federal Regulations</u>

15 C.F.R. § 990.10 ........................................................................................................... 11

15 C.F.R. § 990.14(d) ...................................................................................................... 18

15 C.F.R. § 990.23 ........................................................................................................... 13

15 C.F.R. § 990.23(c)(2)(ii)(C) ................................................................................... 5, 18

15 C.F.R. § 990.25 ..................................................................................................... 13, 14

15 C.F.R. § 990.55 ....................................................................................................... 3, 11

15 C.F.R. § 990.56(b)(1)(i) ............................................................................................. 18

15 C.F.R. § 990.62 ........................................................................................................... 11

26 C.F.R. § 1.162-21(b)(1)(iii) ....................................................................................... 22

28 C.F.R. § 50.7 ................................................................................................................. 4

I.    **Introduction.**

This Court described the oil spill – which resulted from BP's gross negligence and willful

misconduct – as follows:

> The seriousness of this violation cannot be overstated. The oil spill was extremely
> serious. It was gravely serious. It was a massive and severe tragedy.[1]

Such an unprecedented disaster calls for an unprecedented settlement. The proposed Consent

Decree with BP is just that, requiring BP to perform injunctive relief and make monetary

payments of about $14.9 billion, as follows:

- A $5.5 billion civil penalty under the Clean Water Act ("CWA"), plus interest, C.D. ¶ 10
  – 14, to be distributed by operation of the Resources and Ecosystems Sustainability,
  Tourist Opportunities and Revived Economies of the Gulf Coast States Act, ("RESTORE
  Act"), Pub. L. No. 112-141, 126 Stat. 405. (Partially codified at 33 U.S.C. § 1321(t) &
  note). Thus, $4.4 billion (80%) will be allocated to projects in the Gulf Coast region, on
  top of the amounts available under the prior $1 billion settlement with Transocean and
  the $159.5 million judgment against Anadarko.[2]

- Public reporting of BP's mandatory efforts to improve its drilling safety practices and
  other elements of its operations. C.D. ¶¶ 35 - 38.

- Up to $8.8 billion (but not less than $8.332 billion) for natural resource damages
  ("NRD") under the Oil Pollution Act ("OPA"), C.D. ¶¶ 15-18, which includes $7.1
  billion in payments over 15 years; $1 billion that BP pledged under a prior agreement;
  and up to $700 million for unknown conditions and adaptive management. C.D. ¶ 21.
  This money will be spent to restore natural resources injured or lost as a result of the
  spill. ¶ 19

- $600 million more for various federal claims: $350 million for state and federal NRD
  assessment costs under OPA; $167.4 million for removal and other costs under OPA
  incurred by the Coast Guard-administered Oil Spill Liability Trust Fund ("OSLTF");
  $82.6 million under the False Claims Act ("FCA"), which includes the amount that will
  be paid for royalties on the oil that was wasted. C.D. ¶ 22-24.

---

[1] Findings of Fact and Conclusions of Law, Penalty Phase [Doc. 15606].

[2] Various governmental entities, including the Treasury Department, the Gulf States, NOAA, and the
RESTORE Act Council (an independent federal entity created by the RESTORE ACT) are charged with
overseeing or spending the funds in accordance with the directives of the RESTORE Act. The Consent
Decree determines the amount available to these entities, and the payment schedule, but has no impact on
the procedures or regulations these entities may put in place, or the projects they may select.

- A payment schedule that can be accelerated in case of corporate takeover or insolvency and that is guaranteed by both the North American and UK parents of BPXP, and other mechanisms to ensure compliance by BP. C.D. ¶¶ 30 – 32, 54-59; Apps. 8 & 9.

*See* Consent Decree ("Decree" or "C.D.") [Doc. 15436-1]. If approved, the settlement will be the largest civil penalty ever paid by any defendant under any environmental statute, and the largest recovery of damages for injuries to natural resources.[3] Considered along with its related agreement – the so-called "Gulf States Settlement Agreement" [Doc. 15435-2], which requires BP to pay approximately $5.9 billion to the States and Local Governmental Entities ("LGEs") for economic damages – BP would pay over $20 billion, the largest settlement with a single entity in the history of federal law enforcement.[4] No settlement could undo all of the harm to lives, families, communities, and the environment caused by the spill. But the size, scope, and content of this settlement make it a fair and appropriate resolution of the governments' claims.

However, entry of the proposed Decree was conditioned on the United States' (and States') review of any public comment. C.D. ¶¶ 80 & 81; 28 C.F.R. § 50.7. The federal government provided two separate extensive, 60-day public comment periods, and held 8 public meetings, including meetings in each Gulf State and the District of Columbia. In all, the United States received comments from over 34,000 commenters.[5] This memorandum addresses the most significant of the comments, many of which support the settlement.

---

[3] Exhibits 2 and 3 are a "Fact Sheet" and a "Summary" of the C.D. terms, which have also been available to the public on the DOJ website. https://www.justice.gov/enrd/deepwater-horizon.

[4] The two settlements are related, because if the Decree is not approved, then the economic settlement will become void. Doc. 15435-2 ¶ 6.1. The Decree is also conditioned on the entry of the Gulf States Settlement Agreement. C.D. ¶ 75. However, the Decree has no impact on how any State or Local government chooses to allocate or use the monies received under the Gulf States Settlement Agreement.

[5] The Comments received by the Department of Justice are attached as Exhibit 4, DOJ's "Response" to the comments is attached as Exhibit 5. Other federal and State agencies accepted comments on the "Damage Assessment and Restoration Plan" ("DARP") called for under OPA's NRD regulations. 15

A court should enter a consent decree if it is fair, adequate, reasonable, and consistent with the objectives of the law (here, CWA and OPA). *See* Part II, *infra*, for citations. The proposed Decree plainly meets this standard, because it punishes BP, sends a clear deterrent message to the entire industry, and fully compensates the public for harm caused to natural resources. None of the comments discloses any fact or condition suggesting that the proposed Decree is anything other than extraordinarily favorable and in the public interest.

This Motion is unopposed. BP has consented to entry of the proposed Decree without further notice. C.D. ¶ 83. Representatives of the five Gulf Coast States have confirmed that they also support entry of the Decree. *See* Exhibit 1 (letters from five States). Therefore, the United States, the plaintiff in Civil Action 10-4536, requests that this Court execute page 61 of the proposed Decree, [Doc. 15436-1 at ECF page 64 of 90] (which was attached to the Notice of Lodging of Consent Decree) and enter the proposed Decree as a final judgment.

## II.     Legal Standard for Judicial Review of a Consent Decree.

In reviewing any proposed consent decree, a court is to ascertain whether the decree is fair, adequate, and reasonable, *Cotton v. Hinton*, 559 F.2d 1326, 1330 (5th Cir. 1977), and consistent with the objectives of the statute under which the action was brought. *United States v. City of Miami*, 664 F.2d 435, 441 (5th Cir. 1981) (Rubin, J. concurring) (citation and internal quotations omitted). *See also United States v. Browning-Ferris Indus. Chem. Servs., Inc.,* 704 F. Supp. 1355, 1356 (M.D. La. 1988) (consent decree under several environmental statutes approved as "fair, adequate and reasonable"). "The trial court in approving a settlement need not inquire into the precise legal rights of the parties nor reach and resolve the merits of the claims or controversy." *City of Miami*, 664 F.2d at 441 n.13 (Rubin, J. concurring). The court does not

C.F.R. § 990.55. Excerpts of the DARP are attached as Exhibit 6, and specifically, Chapter 8 of the DARP includes those agencies' responses to comments.

"substitute its judgment for that of the parties to the decree." *United States v. Wallace*, 893 F. Supp. 627, 631 (N.D. Tex. 1995) (citation and internal quotations omitted).[6]

The presumption in favor of settlement "is particularly strong where a consent decree has been negotiated by the Department of Justice on behalf of a federal administrative agency like EPA which enjoys substantial expertise in the environmental field." *United States v. Akzo Coatings of Am., Inc.*, 949 F.2d 1409, 1436 (6th Cir. 1991) (citing *United States v. Cannons Eng'g Corp.*, 899 F.2d 79, 84 (1st Cir. 1990)). *Accord, United States v. City of Alexandria*, 614 F.2d 1358, 1362 (5th Cir. 1980) ("a consent decree proposed by a private defendant and government agency . . . carries with it a presumption of validity"). Similarly:

> [t]he Justice Department and the [defendant] have been in a genuinely adversary posture, . . . there is no hint that the settlement has been motivated by any improper considerations[,] . . . it appears to have been arrived at after mature, deliberate and informed consideration on both sides[,] [and] [i]t has been approved by the Department of Justice and the [defendant]. . . . Such a settlement is entitled to a presumption of validity, which ordinarily may be overcome only if its provisions are not within reasonable bounds or are illegal, unconstitutional or against public policy.

*United States v. Tex. Educ. Agency*, 679 F.2d 1104, 1108 (5th Cir. 1982).

## III.     Description of the Public Comments and Process.

*Comments Received by the Department on the Decree.* The Department of Justice must hold a 30-day comment period on certain proposed consent decrees, and must withdraw from the proposed decree if the comments disclose facts or considerations which indicate that it is inappropriate, improper or inadequate. 28 C.F.R. § 50.7. The Department must file the comments with the court, *id.*, to help the court ensure that the settlement is in the public interest. Here, the

---

[6] *See also, Ruiz v. McKaskle*, 724 F.2d 1149, 1152 (5th Cir. 1984) (quoting *Cotton v. Hinton*, 559 F.2d at 1330) (in the absence of fraud or collusion, the court should be hesitant to substitute its own judgment for that of counsel); *In re: Tutu Water Wells CERCLA Litigation*, 326 F.3d 201, 209 (3rd Cir. 2003) (quoting *United States v. Cannons Eng'g Corp.*, 899 F.2d 79, 84 (1st Cir. 1990) (relevant standard is not whether settlement is one which the court itself might have fashioned, or considers as ideal, but whether the proposed decree is fair, reasonable, and faithful to the objectives of the governing statute.)

Department extended the comment period to a full 60 days to assure that citizens had an adequate opportunity to present their views. 80 Fed. Reg. 60180 (Oct. 5, 2015).

The Department received comments in various forms, including email, oral statements at meetings, and (mostly) through an internet-based portal that collects comments. Some included multiple concerns, some were signed by multiple people, and some were signed by organizations with multiple members (including groups of organizations). The Department received communications from almost 29,000 separate commenters. More than 99% of those commenters submitted form letters addressing one issue: concern about the issue of tax deductibility of payments due under the Decree. Additionally, 96 commenters discussed their own personal descriptions of injury or private claims resulting from the spill, including physical injury or economic losses. Approximately 30 commenters expressed concern that the amounts in the settlement were not enough, 10 with respect to the civil penalty. Twenty commenters raised questions about criminal fines, and approximately 35 asked for an extension to the comment period. Approximately 20 others thanked the Department for its work and expressed support for the Decree. Finally, a number (about 25) of distinct, in-depth comments were received from a number of non-profit environmental groups, and other community groups. In general, these groups supported the Decree (and the DARP), although they did raise specific concerns, chiefly related to how the Trustee agencies would administer NRD restoration going forward. The Department of Justice prepared a "Response to Comments" related to the Decree, addressing the comments expressly directed to the Department, and is attached as Exh. 4 (in four batches).

*Comments Received by the Trustees on the DARP*. Under the OPA NRD regulations, the Trustees must hold a 45-day comment period regarding the draft DARP. 15 C.F.R. § 990.23(c)(2)(ii)(C). The Trustees held a 60-day comment period. 80 Fed. Reg. 60126 (Oct. 5,

2015). The NRD Trustees received approximately 6,370 submissions. Chapter 8 of the DARP (Exh. 6) comprises the Trustees' "Response to Comments."[7] Many of the comments to the Trustees related to "Governance" of the Trustees in the future, including costs of administration, organization of the agencies, and future options for public input.

 *How this Memorandum Addresses the Comments*. Both comment periods are closed.[8] In this memorandum, we will address the most substantive concerns that have been raised.[9] Thus, for the Court's convenience we have grouped and summarized the comments, in both the Response to Comments (Exh. 5) and this memorandum. But we have used some discretion to refrain from addressing in this memorandum concerns that are not legally relevant to the question before this Court, or otherwise do not rise to a level that requires the Court's attention.

## IV. The Settlement Punishes BP, Deters Future Violations in the Industry, and Funds Billions of Dollars in Gulf Coast Restoration.

 After reviewing the comments in detail, the United States remains convinced that the proposed Decree is fair, reasonable, adequate, and consistent with the purposes of the CWA, OPA, and other applicable laws. The "presumption of validity" stands, and the proposed Decree should be entered as a final order of the Court.

### A. The Settlement is Fair.

 We start with "fairness" because the cases setting out the legal standard all start with

---

[7] All of the comments can be viewed and searched on the Trustees' website, labelled "Online Comments Received" at http://www.gulfspillrestoration.noaa.gov/restoration-planning/gulf-plan/.

[8] There were various requests to extend the comment periods, as well as various complaints about the location, notice of, and dates of the 8 public meetings. Both comment periods exceeded the legal minimum time, and the Trustees and the Department also held 8 public meetings, where fact sheets, posters, power-point presentations, and summaries of the DARP and Decree were provided, including Vietnamese translations for certain documents. *See* Exh. 5 (DOJ response to comments).

[9] Between the DOJ Response (Exh. 5) and Chapter 8 of the DARP (Exh. 6), we believe that every substantive concern has been addressed.

fairness. But in this settlement, fairness is not meaningfully at issue. Procedural fairness calls for

consideration of the "candor, openness, and bargaining balance" of the negotiations. *Wallace*,

893 F. Supp. at 632. The negotiations leading up to this settlement were undoubtedly adversarial,

arms-length negotiations. C.D. ¶ T (ECF page 10 of 90). The Court is well-aware that BP was

represented by sophisticated outside counsel and in-house personnel. *See,* proposed Decree at 62

(signature of outside counsel for BP) (ECF page 65). Each State was also represented by Trustee

representatives and counsel. Above all, the negotiations were conducted under the auspices of

Judge Shushan and the other Court-appointed Neutrals. Docs. 14821 & 15466. There is no doubt

that there were "arms length settlement negotiations conducted in good faith by experienced

legal counsel[.]" *Wallace*, 893 F. Supp. at 632. Some opinions also address "substantive"

fairness, which requires that a consent decree apportion liability fairly across multiple

defendants. *See, e.g.*, *Wallace*, 893 F. Supp. at 632 (again citing *Cannons*). Substantive fairness

comes into play in multiple-defendant environmental matters when non-settlors object that a

settlement leaves them too large a share of liability. Here, however, no non-settling entity (*e.g.*,

Anadarko) will be left holding the bag for NRD; they all are protected by the indemnification.[10]

C.D. ¶ 63.

   **B.    The CWA Penalty is Reasonable and Advances Purpose of the Statute.**

   The proposed Decree includes both a civil penalty and injunctive relief under the CWA,

and both elements further the goals of the CWA. No background discussion regarding the CWA

---

[10] Some LGEs submitted comments seeking to confirm that the Decree does not cut off their claims,
which arguably relate to substantive fairness. These commenters are correct: any legal claims held by
"counties, parishes, municipalities, or any other local governmental or local political subdivisions
authorized by law to perform local governmental functions" are unaffected by the Decree or any of the
covenants therein. C.D. ¶ 74 (covenants by the States do not include local governmental entities). *See also*
Exh. 5 (DOJ Response) at Comment # 21.

is provided because this Court is fully aware of the CWA statutory requirements and the prior procedures and rulings in this case, many of which inform the analysis of the CWA settlement.[11]

### 1.      Settlement of Injunctive Relief.

The United States, prior to this settlement, already had implemented two robust measures to improve both BP's drilling practices and ethics. BP's criminal plea agreement requires a safety monitor and an ethics monitor, safety and environmental audits, and strict drilling-specific requirements such as blowout preventer requirements and a real-time operations monitoring center. *See* App. 5 to C.D. (Doc. 15436-8), and related Implementation Plan at App. 6 (Doc. 15436-9). As Judge Vance stated, the purpose was to make sure that BP could not "return to business as usual while on probation." Reasons for Accepting Plea Agreement, *U.S. v. BPXP*, No. 12-cr-292 (E.D. La. Jan. 30, 2013), Doc. 65, at 18. Separately, further monitoring and reporting requirements were imposed when BP entered into an administrative agreement with EPA to resolve potential suspension and debarment claims relating to the Macondo well spill and other, prior BP conduct. App. 4 to C.D. (Doc. 15436-5). Meanwhile, in 2011, this Court dismissed the "D Bundle" for claims seeking injunctive relief (and the Fifth Circuit affirmed). Doc. 2784.

Under this Decree, BP acknowledges compliance with the requirements of the prior two agreements as well as their continuing force. BP must also post on a publicly-available web site information about the company's ongoing performance under those agreements. C.D. ¶¶ 34 – 39;

---

[11] *E.g.*, Doc. 5809 (Summary judgment on CWA liability); Doc. 5446 ((1) a penalty must be tailored to the specific defendant and its situation, (2) contractual indemnity does not cover penalties, (3) but contractual indemnity can cover compensatory damages); Doc. 13381 (Findings of Fact and Conclusions of Law after the Phase One trial, finding BP liable for enhanced civil penalties due to gross negligence and willful misconduct, and otherwise describing the CWA scheme and procedural status of the case); Doc. 14021 (3.19 million barrels of oil were discharged). Further, after the Decree was lodged, the Court issued its Findings of Fact and Conclusions of Law regarding Anadarko's penalty amount ($159.5 million), analyzing the 8 penalty factors. Doc. 15606.

App. 4-6, 10, 11. These postings should allow the public greater insight into BP's performance under these agreements.

*Comments Received.* Several commenters feared that another spill like this would happen again, and suggested an offshore drilling ban. Some argued that BP should be prohibited from leasing or contracting until all payments were made or other probationary requirements are in place. Others commended the requirements for BP to publicly report on its efforts to improve drilling safety in the Gulf of Mexico. The injunctive relief provisions of the Decree – taken with the prior requirements – relate to just such concerns. *See* Exh. 5 (DOJ Response) ¶ 1.

### 2.    Settlement of the Civil Penalty.

To arrive at the $5.5 billion civil penalty amount, the United States thoroughly weighed the statutory penalty factors set forth in the CWA, 33 U.S.C. § 1321(b)(8), against the litigation risks and evidence. In litigating to judgment, the United States ultimately might secure either a larger or a smaller civil penalty against BP. The $5.5 billion figure is a reasonable settlement that sufficiently punishes BP and sends a clear deterrent message to the entire industry, and also shields the public from the various risks of continued litigation.[12]

*Phase One Appellate Issues.* In Phase One, the Court expressly found that the discharge of oil resulted from BP's gross negligence and willful misconduct, and thus the per-barrel multiplier of $4,300/barrel is to be used in calculating the maximum penalty. 21 F. Supp. 3d 657 (E.D. La. 2014). Using the results of Phases One and Two, the maximum penalty is $13.7 billion. 33 U.S.C. § 1321(b)(7)(D). However, BP has appealed the Court's Phase One ruling. If the finding of gross negligence and willful misconduct were to be reversed, then the maximum

---

[12] Neither party was proceeding with an interlocutory appeal of Phase Two at the time of settlement, so the issues in that Phase are not discussed here.

penalty would revert to $3.5 billion. If the Phase One decision were affirmed, the $5.5 billion settlement would represent 40% of the available statutory maximum, but if that decision were reversed, $5.5 billion would exceed the available statutory maximum by 50%.

*Phase Three Issues*. Regardless of whether the maximum available penalty remains at $13.7 billion or reverted to $3.5 billion, the Court might not award the maximum penalty, after considering the eight factors set out at 33 U.S.C. § 1321(b)(8). The parties have tried and rested on these issues, and the factors have been fully briefed, including whether the penalty should be based on a "top down" analysis. Docs. 14341 & 14473. The United States expressly conceded that the Court should award a penalty somewhat lower than the maximum penalty; BP vigorously argued that the penalty should be substantially lower than that. The United States thus faced a realistic predicted litigation outcome less than the maximum. As part of a comprehensive settlement that resolves the NRD and other claims, $5.5 billion is soundly within the litigation value of the claim and is, in any regards, an enormous civil penalty – exceeding all prior civil penalties under the environmental laws.[13]

*Comments Received*. During the comment period, only 10 commenters expressed disappointment in the civil penalty amount. Exh. 5 (DOJ Response) ¶ 1. However, many of these commenters also agreed that as part of the "package deal" with the NRD claims, the penalty was acceptable. *Id.* Moreover, each of the five Gulf States – who are the beneficiaries of $4.4 billion

---

[13] After the Consent Decree was lodged, the Court issued its Penalty Phase findings for Anadarko. Doc. 15606. The Court adopted a "top down" approach, and found that the violations were "extremely serious," "gravely serious," and "a massive and severe tragedy." *Id.* ¶ 42. The Court also indicated that low economic benefit did not require a low penalty. *Id.* ¶ 52. On the other hand the Court considered various expenditures on response and compensation, in setting a penalty for Anadarko, *id.* ¶¶ 37-41, 52, 76, 86 & 122, and noted that "BP promptly paid the Coast Guard's invoices." *Id.* ¶ 86. More pointedly, the Court stated that "had BPXP not settled with the Government, the Court would be inclined to find that BPXP's mitigation efforts warrants a significant reduction of its penalty." *Id.* at 29 n.111. Thus, the Court's ruling confirms that settling for less than the maximum is reasonable, but requiring a substantial and severe penalty is also appropriate.

(80%) of the penalty amount – also approved the settlement, indicating that the salutary purposes of the RESTORE Act are also satisfactorily furthered.

*Conclusion as to Penalty.* The penalty settlement is consistent with the CWA and is in the public interest, given the possible outcomes in litigation and the associated uncertainties. An enormous, fixed sum of money in an interest-bearing payment stream is a reasonable outcome and is consistent with the CWA, punishes BP, and deters BP and all future potential violators.

**C.      The NRD Settlement Compensates for Harm Caused by the Oil Spill, and Provides for Decades of Restoration of the Gulf Ecosystem.**

**1.      NRD Background and Status, C.D. Terms, and the DARP.**

This Court is familiar with OPA's NRD provisions, whereby State and federal "Trustee" agencies conduct a Natural Resource Damage Assessment ("NRDA"), 33 U.S.C. § 2706(d); 15 C.F.R. § 990.10, seek to recover damages from the responsible party, and then use the damages to restore, replace, or acquire the equivalent of the damaged natural resources. Doc. 4845 (12/09/11), at 7 n.5 (Order Re: Master Complaint for Bundle C). However, because the United States sued for a declaration of liability for NRD but did not seek any sum certain amount of damages – and the Court approved of this approach, *Summary Judgment Order* [Doc. 5809] – most of the activity on the NRD case has not yet reached the Court.

The "Trustees" under OPA, selected by the President and the Governors of the Gulf States, 33 U.S.C. § 2706(b), formed a "Trustee Council" to oversee the Damage Assessment, and to develop the DARP under OPA's NRD regulations, 15 C.F.R. § 990.55, which would then be "presented" under OPA to BP for settlement.[14] *Id.* § 990.62. Absent settlement, a new (or

---

[14] Various documents related to these processes can be found at: http://www.gulfspillrestoration.noaa.gov. The Trustees and BP also negotiated a "Framework for Early Restoration Addressing Injuries Resulting from the Deepwater Horizon Oil Spill" [Doc. 2239-1], which was filed with the Court. [Doc. 2239].

amended) civil action would be filed to recover NRD, using the declaratory judgment of liability from Phase One. The exact timing of the completion of the NRDA process was never stated, but as this Court had noted previously, the "as we all know [it] could be years away before a NRDA case is ready to be tried. And it may not even be tried in this Court. It could be tried somewhere else." Transcript of 3/31/14 hearing at 66. And any such civil action would be subject to uncertainty and litigation risk. [15]

The Decree requires BP to pay up to $8.8 billion for NRD as follows: (1) $7.1 billion in new payments over 15 years; (2) $1 billion that had been previously pledged under an early restoration agreement with BP; and (3) $232 million in the 16th year, which – combined with the accrued interest of approximately $468 million – will yield up to $700 million to deal with uncertainties and adaptive management.[16] The Decree allocates these moneys by location and type. *See* C.D. App. 2 Table 1 (Doc. 15436-3 at ECF page 8 of 11). First, the NRD is divided into 7 geographic Restoration "Areas" across the five Gulf States and also into "Region-wide" and "Open Ocean" areas (these are the columns in Table 1). Next, within these geographic areas, funds are sub-allocated to Restoration "Types" (such as fish, birds, and shoreline) that further the Restoration "Goals" of the Trustees (these are the rows).

---

Under that Agreement, the Trustees selected certain "early" restoration projects, and BP agreed to fund such projects, not to exceed $1 billion, in exchange for "credit" against its ultimate liability for NRD. As projects were selected, stipulated credits were reached and were filed with the Court. *See e.g.*, Doc. 15378. All told, those 65 projects amounted to approximately $877 million of the $1 billion. Under the Consent Decree, the remainder of the $1 billion will be paid but will no longer be subject to the stipulation of credits under the Framework agreement. C.D. ¶ 17.

[15] For example, BP's witnesses in Phase Three tended to argue that there was not long lasting environmental harm and that the risks of future harms were limited. BP proposed FOFs (Doc. 14345) at 74-113.

[16] However, the Trustees may elect to collect the interest any time after the 10th year. In such a case, the total interest paid by BP would be less than $468 million. If the Trustees exercise the option for early payment, they would have the money that much earlier to reap the time-value of money.

In light of the settlement, the Trustees have completed and published a final DARP.[17] The DARP describes at length the NRDA and explains the Trustees' restoration plan. The same allocations in Appendix 2 are in the proposed DARP as the preferred restoration program. The DARP does not select any particular *projects*, but rather lays out a *program* by which specific projects will be selected in the future.[18] The Trustees can change the DARP subject to review and comment, but re-allocating money from one restoration Goal to another can occur only with Court approval.[19] C.D. App. 2 § 3.6.

### 2. The Amount and Allocation of NRD are Reasonable and Consistent with OPA, Public Comments Notwithstanding.

The judgment of NRD trustees can set the amount necessary to settle an NRD claim:

> the settlement is *adequate in the judgment of the trustees* to satisfy the goal of OPA and is fair, reasonable, and in the public interest, with particular consideration of the adequacy of the settlement to restore, replace, rehabilitate, or acquire the equivalent of the injured natural resources and services.

15 C.F.R. § 990.25 (emphasis added). How do we know whether these amounts and allocations are reasonable and consistent with OPA? In this case, the duly-appointed Trustees, acting as a coordinated State-federal Council, after years of NRD Assessment, stated:

> *The Trustees believe that both the settlement and the programmatic plan are appropriate* for the following reasons. The Trustees have jointly *examined and assessed the extent of injury and the proposed restoration alternatives with particular consideration of approaches to*

---

[17] Excerpts are attached as Exh. 6. Exh. 7 is a 4-page summary of the DARP, also available at http://www.gulfspillrestoration.noaa.gov/restoration-planning/gulf-plan/. Thousands of key documents considered by the Trustee Council in developing the DARP are available in the Administrative Record. https://www.doi.gov/deepwaterhorizon/adminrecord. The DARP also functions as an environmental impact statement under the National Environmental Policy Act ("NEPA"), 42 U.S.C. § 4321 *et seq.*, as contemplated under the OPA NRD regulations. 15 C.F.R. § 990.23. Consistent with these requirements the Trustees also signed a final Record of Decision adopting the DARP, available at the same websites.

[18] Accordingly, public comment regarding specific projects are premature at this time.

[19] Thus, comments received by the Trustees related to the amount of and allocation of NRD can be considered comments on Appendix 2 of the Decree. Exh. 5 (DOJ Response to Comments), largely incorporates by reference the Trustees' Responses (Exh. 6, Chapter 8) on these topics.

*restoring, replacing, rehabilitating, or acquiring the equivalent of the injured natural resources and services. . . . the Trustees are satisfied that the resulting efforts (together with the work flowing from the [Early Restoration] Framework Agreement) will make the public whole for the loss in natural resources and services suffered.* In reaching this conclusion, the Trustees have considered, among other things . . . nature and extent of the specific injuries that have been identified and studied and the uncertainties attached . . . Uncertainties as to other injuries not fully studied . . . potential benefits (and detriments) of ecosystem-level habitat restoration . . . Potential benefits (and detriments) from other approaches to restoration, such as shifting the focus of restoration away from ecosystem restoration to restoration of specific, well-studied resources . . . The benefits of starting restoration sooner rather than litigating. The Trustees conclude that the settlement provides a *reasonable approach to achieving the goals of OPA to make the public and the environment whole*, is a fair and reasonable result, and advances the public interest.

Exh. 6 (DARP excerpts) § 1.6 (emphasis added).[20] While these findings are based on the injury assessment from the DARP (Ch. 4), the Phase Three record also includes evidence of extensive ecological harm. Testimony of Drs. Donald Boesch & Stanley Rice; U.S. proposed FOFs (Doc. 14338) at 123-157. Thus, the trial evidence – while limited – supports the Trustees' conclusions.

*Comments Preferring One Particular Species, Resource, or Area.* Some commenters objected to the specific allocations of funds among the Restoration Types and Areas. For example, some commenters wanted more money allocated to dolphins or birds. A related set of comments called for restoration of fisheries, including crab and shrimp fisheries. Some dislike spending NRD on enhancing opportunities for recreational use of the resources.[21]

---

[20] A few comments stated that the dollar amounts for the NRD settlement were not sufficient. However, these comments were, generally speaking, not supported by specific details, or documentary evidence. The List of Preparers of the DARP, Exh. 6 (DARP Excerpts) § 6.19, shows that numerous environmental professionals and expert agencies were involved in the conclusion from the DARP set out above.

[21] In Appendix 2 Table 1 (and the DARP), the Restoration Goal of Recreational Opportunities (Goal 4) in the Alabama Restoration Area sets out $85.5 million for "Early" restoration. This number is shaded in green, because these numbers come from "early" restoration, while the black numbers are money added by this settlement. The Southern District of Alabama has enjoined spending about $58 million of that unless certain additional steps are taken. *Gulf Restoration Network v. Jewell, et al.*, No. 15-191 (S.D. Ala. Feb. 16, 2016), Doc. 64. Thus, there might (depending on how the Trustees respond to the injunction) be a need to move some of the "early" (green) restoration money into the "black" font. This has no impact on

**First**, for some of the specific comments, the DARP, as written, provides for exactly the types of restoration requested. For example, some commenters wanted restoration of fisheries (including crabs and shrimp). While no specific projects have been selected, fishery restoration, including shrimp, crabs, oysters and fin fish, are all types of projects that could be selected under the "Replenish and Protect Living Coastal and Marine Resources" Restoration Goal. Indeed, the DARP specifically lists fish and oysters as types of restoration that could be performed. *See* Exh. 6, § 5.4, Fig. 5.4-1 (Goals & Restoration types diagram). The same is so, for example, with birds.

**Second**, while these comments set out appropriate suggestions for alternative ways to allocate the funds, the allocation in the C.D. and DARP is also an entirely logical and appropriate way to allocate the funds. The Trustees specifically considered allocating more NRD monies to specific, narrow categories (known as Alternative "B"), but decided in their judgment that a more ecosystem- or habitat-based approach (Alternative "A") is preferable:

> Alternative A will employ an *ecosystem approach* toward implementing the integrated restoration portfolio with the intent of enh*ancing the connectivity and productivity of habitats and resources* . . . key role of coastal habitats in the interconnected Gulf of Mexico ecosystem helps ensure that *multiple resources will benefit* from restoration and that reasonably inferred but *unquantified injuries are likely to be addressed*. . . . emphasizing coastal habitat restoration . . . maximizes the likelihood of providing long-term benefits to all resources . . . .

> Alternative B would implement more direct, resource-specific restoration, shifting the restoration emphasis . . . However, since Alternative B emphasizes living coastal and marine resources and, correspondingly, reduces the emphasis on coastal habitat restoration, the Trustees are *less certain that Alternative B would successfully restore for the reasonably inferred but unquantified injuries* . . . The strong, but indirect*, ecological linkages between habitats and species injured by the spill* would be ancillary, rather than primary, benefits under Alternative B.

DARP (Exh. 6) § 5.9.2 (emphasis added). Due to the complexity and magnitude of the harm to the ecosystem, the Trustees prefer to allocate more for ecosystem-level restoration rather than

the settlement between the governments and BP, and merely represents an accounting to move the money as appropriate, but staying within the allocation for Alabama Recreational Opportunities.

focusing on specific species, because ecosystem restoration will also restore unknown or unquantified harms.[22] It is not surprising that some commenters have a different opinion about preferring Alternative B over A; each alternative is a reasoned one. But, the Trustees – the officials who assessed the injury here and considered restoration alternatives – exercised their statutorily sanctioned judgment to pick the more advantageous alternative. The Court should defer to their expertise.

 *Allocation to Unknown Conditions and Adaptive Management.* Major pollution sites can be complex to study, and ecological conditions can change over time, with new information revealing unknown conditions.[23] Often, large NRD settlements will include a "re-opener" whereby the plaintiffs can re-open a settled case if unknown conditions come to light, and can seek to prove the new conditions and additional damages. In this case, the parties elected for a specific amount to be paid for unknown conditions (as set out above) rather than a re-opener. Some commenters objected to the lack of a re-opener, or found the amounts too low. But the approach in the C.D. to dealing with unknown injuries has advantages relative to settlements in which a "re-opener" exists: BP is obligated to pay the agreed amounts without the need for the governments to prove the existence of a spill-related injury unknown at settlement or any other requirement that might apply before the re-opener can be used. And, BP must pay the amount even if there are no new, unanticipated injuries to natural resources. Providing a large, certain

---

[22] Several environmental groups expressed support on this issue. These comments weigh in favor of entry of the Decree. The Trustees' conclusions are also consistent with the Court having noted that in an NRD case, the value of the damage is established by looking at the affected ecosystem as a whole rather than simply counting up dead organisms. Doc. 4845, at 7 n.5.

[23] While some statutes require a re-opener, *see* CERCLA 42 U.S.C. § 9622(f)(6)(A), OPA contains no such requirements, but a re-opener is an appropriate matter for consideration in any major NRD settlement. *See, e.g., In re Acushnet River & New Bedford Harbor: Proceeding re Alleged PCB Pollution*, 712 F. Supp. 1019, 1037-1038 (D. Mass. 1989).

payment for unknown injuries but foregoing the opportunity to pursue a new claim for an unlimited amount, is appropriate and advantageous here: proving damages beyond what will be covered by this settlement in such a massive, complex ecosystem – the Gulf of Mexico – would present a more problematic litigation challenge than one might normally face when employing a re-opener in less complex circumstances. The likely outcome – given the ecosystem-wide restoration that will be implemented with the stream of NRD payments – is that $700 million will exceed any amount of NRD for "unknown conditions" that the Trustees could prove "result from" this incident, in litigation 15 years from now.

### 3. Comments Re: Governance and Administration Going Forward in the NRD Restoration Process.

*Governance Structure.* Appendix 2 to the Decree sets up a "Governance" structure whereby the State and federal Trustee agencies will work to select specific restoration actions and projects (consistent with the DARP). Specifically, each restoration "Area" has certain agencies assigned to a Trustee Implementation Group ("TIG"):



For example, decisions about restoration in the Louisiana Area will be made by a TIG comprising Louisiana and the federal agencies, but not the other states. This structure allows, *e.g.*, the Texas TIG to proceed without requiring approval by Florida, so long as the Texas TIG projects conform to the Decree and the DARP. The Regionwide TIG also ensures a big-picture

view because that TIG includes all five states and the federal agencies. The full Trustee Council will also remain in place for cross-cutting issues, overview, and long term management, and will meet with all TIGs annually to foster a Gulf-wide ecosystem view.

Several environmental groups objected to the governance structure, concerned that its decentralized form could impede coordination among the TIGs, thereby compromising the "ecosystem approach" to restoration or impairing public engagement. The Trustees responded to this comment as follows:

> First . . . [a]ll of the Trustees are obligated to meet the restoration requirements . . . based on an ecosystem perspective. Second, the participation of the federal Trustees in all TIGs will provide continuity in the ecosystem perspective . . . . Third, all of the Trustees will participate in the Regionwide TIG, which is intentional to promote ecosystem connectivity across resources and living coastal and marine resource Restoration Types. . . . Fourth . . . the Trustee Council will commit to a minimum of an annual public meeting, which will serve as a formal forum for TIGs to convene. Fifth, the Trustee Council [Standard Operating Procedures] will detail the common accountability and reporting requirements of each TIG, which will be made publicly available through the Trustee Council website. Finally, other mechanisms for cross-TIG coordination exist, including particularly strategic framework development and coordination of monitoring and adaptive management through a Cross-TIG Monitoring and Adaptive Management Work Group.

DARP (Exh. 6) § 8.3.7.1, Response 7-7. OPA, NEPA, and other applicable law – state and federal – will be in place to ensure public input – and Trustee accountability – going forward.[24]

*Administrative Costs from Open Ocean.* A number of commenters support the concept of an "Open Ocean" Restoration Area and supported the significant allocation of funds to that Area ($1.2 billion). The United States agrees that Open Ocean restoration is important in this case, where so much of the harm took place in that area. But, a few commenters worried that using

---

[24] Many commenters asked about opportunities for public input in project selection going forward. The C.D. does not speak to that issue. Rather, applicable laws mandating public input (15 C.F.R. §§ 990.14(d), 990.23(c)(2)(ii)(C), and 990.56(b)(1)(i)) set minimum standards for such issues. The DARP (Exh. 6) at § 7.7.1 calls for even more.

$150 million of that to cover administrative costs was too high. In response, the Trustees have provided additional information about the uses of administrative funding and the sources of administrative funding for both the Federal and State Trustees. DARP (Exh. 6) § 8.3.7.2, Response 7-38, at 8-125 through 8-126. The Trustees also explained that placing all of the administrative cost funding for the Federal Trustees in the Open Ocean Restoration Area was administratively correct (because the Open Ocean TIG consists solely of the Federal Trustees) and did not affect the dollar amounts allocated to the various Restoration Types in any of the Restoration Areas. DARP (Exh. 6) § 8.3.7.2, Response 7-36, at 8-123 through 8-124. After clarifying this funding structure, the Trustees concluded that:

> the proposed governance structure provides the efficiency and effectiveness needed to achieve sound restoration planning consistent with the goals established in the Final PDARP/PEIS, and that the costs of program administration were adequately considered in establishing the allocations.

DARP § 8.3.7.2, Response 7-38, at 8-126. Thus, the comments do not require any change in the Consent Decree.

### D. There is No Concern Regarding the Remaining $600 Million for Costs, Royalties, and FCA Recovery.

The remaining monetary sum of $600 million is distributed to various claim components. There is no reason to question these amounts because no comments were received[25] and because the Decree was approved and signed by the authorized State and federal officials familiar with the merits of the claims.

- *NRD Assessment Costs*. BP must pay $350 million, C.D. ¶¶ 22 - 23, which is the amount that the State and federal NRD Trustees believed is reasonably sufficient to reimburse all outstanding NRD assessment costs, and fund the completion of the final DARP as required by OPA. 33 U.S.C. § 2702(b)(2)(A).

---

[25] There were comments of general dissatisfaction with the settlement, and comments that BP should pay more money in general. None were specific to these three categories of recovery.

- *Royalties and FCA*. The Federal Oil and Gas Royalty Management Act ("FOGRMA") requires lessees to pay royalties to DOI for "oil or gas lost or wasted . . . due to negligence . . . ." 30 U.S.C. § 1756. In this case, royalties are owed on 3.19 million barrels of "lost or wasted" oil.[26] Separately the FCA provides penalties and damages for persons who make false claims for property owned by the United States. 31 U.S.C. § 3729(a)(1)(A) and (B). The Phase One findings show BP did not correctly report to DOI about its "safe drilling margin," and that improper drilling without maintaining a safe drilling margin left the well in a fragile state, which became the first link in a causal chain that resulted in the blowout. Phase One Findings of Fact, 21 F. Supp. 3d 657, 675 ¶ 71 (E.D. La. 2014). Accordingly, a FCA recovery is appropriate. Under the Decree, BP must pay $82.6 million to resolve both the FCA and FOGRMA claims. C.D. ¶ 24(b).

- *OSLTF Costs*. $167 million goes to the OSLTF. C.D. ¶ 24(a). This amount represents the Coast Guard's reasonable estimate of all outstanding, unreimbursed OSLTF costs.

Put another way, the $600 million is approximately a 100% recovery of reasonable NRD Assessment, Royalties, and OSLTF costs, along with an additional FCA recovery on top.

### E.    A Payment Schedule is Appropriate in this Particular Case.

The other major term of the Decree that deserves inspection is the pay-out schedule, both because it extends over a 16 year period and because there were comments on the issue. It is reasonable for the following reasons. ***First***, as to civil penalty, the Court itself indicated that there was some prospect of a judgment for a civil penalty "structured to be paid over a number of years." Transcript of Trial, January 20, 2015, at 62-63. Further, any such judgment would likely have been subject to appeal, further delaying restoration projects under RESTORE or NRD. ***Second***, as to NRD, the assessment process, coupled with the inherent time-line of litigation (and appeals), means that any NRD judgment would be years away. ***Third***, the payment plan is justified by BP's financial position. There was in-depth evidence presented regarding BP's

---

[26] BP had previously paid royalties on the "collected oil," that was the subject of a Phase Two Stipulation. Phase Two Findings of Fact, Doc. 14021, at 39 ¶ 225. Under the private settlement agreements between BP and MOEX, and between BP and Anadarko, BP owes 75% of the royalties and Anadarko owes the remainder. This settlement does not impact in any way Anadarko's share of the royalties.

ability to pay the penalty. BP's expert opined that the entire equity of BPXP was less than $5.1 billion, TREX 247596, while the expert for the United States testified that BPXP could secure needed funding from other BP entities, via loan or capital injection or otherwise. There was also testimony and evidence regarding the recent fall in oil prices. In light of these issues, it is reasonable to stagger the penalty payment over many years.[27] **_Fourth_**, there are benefits to the governments of a long payout schedule. Some of the CWA penalty (under RESTORE) and all of the NRD money (under OPA), will be used to select and fund restoration projects. To consider, evaluate, select, plan and implement billions of dollars in projects will take many years. A planning horizon of 10 – 15 years for such an effort is not only reasonable, but indeed represents sound administrative and engineering practices. A predictable payment plan also allows the agencies to establish appropriate systems for management of such large amounts of funding, including financial accountability systems. Further, basic negotiation practice also informs that a defendant will pay a higher dollar amount if allowed to do so over a longer period of time; as part of the give-and-take of negotiation, $14.9 billion over a long payout period is a reasonable accommodation.[28]

### F.    The Settlement Treats Tax Implications Consistent with the Tax Code

The vast majority (more than 99%) of comments were form letters stating that the Decree should mandate that BP cannot seek a tax deduction for any amounts paid under the Decree.

---

[27] However, BPXP's obligations to pay are guaranteed by its U.S. and U.K. parents, C.D. ¶ 32, Apps. 8 & 9. If BPXP goes insolvent an acceleration clause kicks in, ¶ 30-31, and late payments are subject to penalty. ¶ 44.

[28] For smaller pollution cases, the United States rarely accepts payment plans, and when doing so – justified by a defendant's limited financial wherewithal – generally limits payment terms to 3 years. This settlement deviates from that practice, and is not intended to signal a change in enforcement policy. Rather, the specifics of this case – and the absolute magnitude of the sums paid – justify this payout plan.

This Decree prohibits any BP entity from taking as a tax deduction any portion of the civil penalty, consistent with the Tax Code, which expressly bars such deductions. The approach in the Decree follows the Department's longstanding practice in settlement of civil penalty claims that arise under federal pollution control laws (like the CWA). The practice compels a settling defendant to recognize the express prohibition of such deductions under the Tax Code.[29] By prohibiting BP from taking any tax deduction from its penalty amount, the consent decree fully abides by existing law, is consistent with all other federal consent decrees of this type, and assures full compliance with the law.

Also consistent with the Department's practice is this Decree's silence as to whether natural resource damage and cost payments required by the Decree can be deducted in any fashion. These type of damages and costs are not penalties, and should be examined consistent with tax law requirements based on their unique character.

Some commenters argued that natural resource damages and cost payments should explicitly be made non-deductible in the Consent Decree because of BP's gross negligence and willful misconduct. Again, this argument mistakenly finds natural resource damages and cost payments to depend on the conduct of the individual.  In fact, the CWA penalties in the Decree are already based on the statutory amounts for that gross negligence and willful misconduct.[30] It should be repeated that the Consent Decree clearly does not prevent appropriate tax authorities

_____

[29] The U.S. Tax Code provides that: "No deduction shall be allowed . . . for any fine or similar penalty paid to a government for the violation of any law." 26 U.S.C. § 162(f). The Treasury Regulations further define a "fine or similar penalty" as including amounts "Paid in settlement of the taxpayer's actual or potential liability for a fine or penalty (civil or criminal). . . ." 26 C.F.R. § 1.162-21(b)(1)(iii).

[30] The commenters assume that payments will be deductible absent a term barring such deductions. That could be but is not necessarily so. If and when BP entities seek tax advantage from any payment under the Consent Decree (other than penalty payments), BP and the relevant tax authority can take up this legal question under the applicable tax law.

from disallowing any deduction sought for natural resource damages or cost payments. If and when BP entities present their position on the taxable status of any payment under the Consent Decree (other than penalty payments), the relevant tax authority will make a determination in accordance with applicable law. This is the consistent process taken in all similar consent decrees.

And, it should be noted that had this case been litigated instead of settled, the outcome concerning tax liability would have been the same. After a lengthy civil action, likely followed by appeals, when the Court eventually awards damages, BP would be in the same position it is now, concerning the tax liability. That is, BP would have to comply with clear law preventing deduction of penalties but need a specific examination of non-penalty payments by the relevant taxation authority before any deductibility decisions could be made.

> **G.     General Concerns or Fears About Human and Environmental Health and Safety Do Not Justify Rejecting the Consent Decree.**

Several commenters raised concerns about residual oil in the environment, residual dispersants, and lingering health or safety issues. Others gave personal descriptions of the adverse impacts on the environment that they observed.

There is no doubt that some oil remains in the environment in some form. However, this Decree (and DARP) is a reasonable approach to address such oiling for these reasons. **First**, long before this settlement the United States Coast Guard decided to stop actively removing oil based on a cost-benefit analysis concluding that further removal could cause more harm than benefit. *See* Phase Three Trial Transcript, Jan. 20, 2015. **Second**, the Decree does not prevent the Coast Guard from undertaking any needed response actions in the future. For example, if new Macondo oil appears in coastal areas or elsewhere in the environment the Decree does not prevent a response. Moreover, the Decree allows the Coast Guard to recoup the costs of any such

actions from BP if the oil causing the response came from Macondo. C.D. ¶ 65(a). **Finally**, the

DARP specifically addresses on-going and future ecological risks, and thus the settlement will

allow the Trustees to fix and restore those conditions. And, the Trustees can, if they choose,

perform shoreline restoration that includes removal of residual oils.

### H.      Comments that are not Pertinent to this Consent Decree.

As explained, a number of commenters raised issues that are not legally relevant to the

question before this Court, because the Decree has no impact on the issues raised:

- Individuals or businesses with claimed economic losses, or personal injury claims
  (Decree does not foreclose any individual, non-governmental claim); [31]

- Individuals, businesses, or local governmental entities commenting on how the States
  should use or allocate any "economic damages" under the Gulf States Settlement
  Agreement (Decree, while contingent on that Agreement, does not mandate how such
  damages should be used or how);

- Comments on how the RESTORE Council should fund or allocate the $4.4 billion (*i.e.*,
  80% of the $5.5 billion penalty) (C.D. decides the *amount and schedule* for the civil
  penalty; but has no other impact on RESTORE Council);

- Comments regarding specific NRD Restoration projects in particular areas (not ripe
  because neither the Decree nor the DARP select particular projects; the DARP only
  selects, programmatically, Restoration Goals, Types, Areas and allocations);

- Comments generally evincing distrust of the government, or expressing general
  dissatisfaction with the state of society.

Exh. 5 (DOJ Response) and DARP Chapter 8 (Exh. 6) respond to these types of comments,

which are not discussed in this memorandum.

---

[31] It is not the province of the Justice Department to represent individual claimants. There are already
several class action settlements handling the interests of individual persons or businesses. Moreover, the
Consent Decree does not limit, impede, or settle any rights of such claimants. No matter how compelling
these individuals' situations may be, these comments are, respectfully, not relevant to this Consent
Decree.

**V.        Conclusion**

For the reasons stated above, the settlement is thus fair, reasonable, adequate, and consistent with the purposes of the CWA, OPA, FOGRMA, and the FCA. The United States respectfully requests that the Court sign page 61 of the proposed Decree, [Doc. 15436-1 at ECF page 64 of 90] (which was attached to the Notice of Lodging of Consent Decree) and enter the proposed Consent Decree in the docket as a final Decree. A proposed judgment is also attached.

Respectfully Submitted,

BENJAMIN C. MIZER                     JOHN C. CRUDEN
Principal Deputy Assistant Attorney   Assistant Attorney General
General                               Environment & Natural Resources Division
Civil Division

                                      WILLIAM BRIGHTON
R. MICHAEL UNDERHILL, T.A             THOMAS A. MARIANI, Jr.
Attorney in Charge, West Coast Office Assistant Chiefs
                                      PATRICK CASEY
KENNETH A. POLITE, JR.                SARAH HIMMELHOCH
United States Attorney                JAMES NICOLL
Eastern District of Louisiana         MICHAEL ZEVENBERGEN
                                      Senior Counsel

                                      /s/ Steve O'Rourke
                                      STEVEN O'ROURKE
                                      Environmental Enforcement Section
                                      U.S. Department of Justice
                                      P.O. Box 7611, Washington, D.C. 20044
                                      Telephone: 202-514-2779
                                      E-mail: steve.o'rourke@usdoj.gov


Attorneys for the UNITED STATES OF AMERICA



## CERTIFICATE OF SERVICE

I hereby certify that the above and foregoing document has been served on all counsel by electronically uploading the same to Lexis Nexis File & Serve in accordance with Pretrial Order No. 12, and that the foregoing was electronically filed with the Clerk of Court of the United States District Court for the Eastern District of Louisiana by using the CM/ECF System, which will send a notice of electronic filing in accordance with the procedures established in MDL 2179, on March 22, 2016.

                                      /s/ Steve O'Rourke
                                      U.S. Department of Justice