EXHIBIT 4A

# PEPC Project ID: 60777, DocumentID: 68455
# Correspondence: 1

## Author Information

| | |
|---|---|
| Keep Private: | No |
| Name: | Richard Londeree |
| Organization: | Tampa Bay Saltwater |
| Organization Type: | I - Unaffiliated Individual |
| Address: | 1720 Eldred dr. |
| | Tampa, Florida |
| | Tampa, FL,FL 33603 |
| | USA |
| E-mail: | liverock1@verizon.net |

## Correspondence Information

Status: Reviewed                    Park Correspondence Log:

Date Sent: 10/06/2015               Date Received: 10/06/2015

Number of Signatures: 1             Form Letter: No

Contains Request(s): No             Type: Web Form

Notes:

## Correspondence Text

As a victim of BP's oil spill it is a travesty that those of us that were impacted the most have been waiting for over five years now with no help from BP.

Days after the spill BP was more than ready to help us, providing some money to the affected business. They acknowledged my claim as I am a live rock farmer with a five acre lease in the Gulf of Mexico in BP's designated area "A", that of the most impact from the oil spill.

However since them myself and thousands of others have been hung out to dry by BP, with no assistance and no help from the courts as opt out cases are still in limbo and have been for five years. I feel this is criminal, they acknowledged their guilt, and everybody down the chain from states to organizations have been paid or are in the process of being paid, except for us little guys that were impacted the most, yet we have NO assistance from BP or our courts in this country.

How many more years are the real victims of this disaster expected to wait, until we die?

Richard Londeree
www.tbsaltwater.com

## PEPC Project ID: 60777, DocumentID: 68455
## Correspondence: 2

### Author Information

Keep Private:            No
Name:                    Richard Londeree
Organization:            Tampa Bay Saltwater
Organization Type:       I - Unaffiliated Individual
Address:                 1720 Eldred dr.
                         Tampa, Florida 33603
                         Tampa, FL,FL 33603
                         USA
E-mail:                  liverock1@verizon.net

### Correspondence Information

Status: Reviewed                    Park Correspondence Log:
Date Sent: 10/06/2015               Date Received: 10/06/2015
Number of Signatures: 1             Form Letter: No
Contains Request(s): No             Type: Web Form
Notes:

### Correspondence Text

As a victim of BP's oil spill it is a travesty that those of us that were impacted the most have been waiting for over five years now with no help from BP.
Days after the spill BP was more than ready to help us, providing some money to the affected business. They acknowledged my claim as I am a live rock farmer with a five acre lease in the Gulf of Mexico in BP's designated area "A", that of the most impact from the oil spill.
However since them myself and thousands of others have been hung out to dry by BP, with no assistance and no help from the courts as opt out cases are still in limbo and have been for five years. I feel this is criminal, they acknowledged their guilt, and everybody down the chain from states to organizations have been paid or are in the process of being paid, except for us little guys that were impacted the most, yet we have NO assistance from BP or our courts in this country.

How many more years are the real victims of this disaster expected to wait, until we die?


Richard Londeree
Tampa Bay Saltwater

# PEPC Project ID: 60777, DocumentID: 68455
# Correspondence: 3

## Author Information

Keep Private:                No
Name:                        Katie Owens
Organization:
Organization Type:           I - Unaffiliated Individual
Address:                     1515 NW 52nd Street
                             Seattle, WA 98107
                             USA
E-mail:                      katie.owens4@gmail.com

## Correspondence Information

Status: Reviewed                 Park Correspondence Log:
Date Sent: 10/06/2015            Date Received: 10/06/2015
Number of Signatures: 1          Form Letter: No
Contains Request(s): No          Type: Web Form
Notes:

## Correspondence Text

News articles have been published following the announcement of this seemingly incredible settlement with BP and the US Government which detail that BP will be able to write off 3/4 of the penalty, effectively offsetting the CWA penalty of $5 billion. It seems unfathomably that DOJ, EPA or any part of the government would allow such a wealthy corporation - who didn't consider the environment - to have any part of the $20 billion settlement to be tax deductible. Several senior agency officials commented on deterrence in the DOJ press release touting that this will cause other companies to think about repercussions. If a company can write off any part of a penalty as "the cost of doing business" which is ultimately passed on to all U.S. citizen and reduces money which is needed to balance our U.S. budge and reduce debt; it doesn't seem to be more than a small slap on the wrist. Certainly nothing that a massive conglomerate or oil company would take seriously. It would pull a VW and budget for future non-compliance instead of feeling the full burden or seriousness of its actions. It seems like U.S. Government holds all the cards in this particular scenario and that it shouldn't need to make such big concessions to settle this case. Perhaps this was done to get a larger number overall, but it's done in such a sneaky, opaque manner that ultimately undermines the government, enforcement efforts and U.S. citizens. If possible, the government should revise the consent decree, to reflect that the public is NOT OKAY with any portion of the penalty being tax deductible. It's not the governement's job to bow to industry in a case where the company is fully (and self-admittedly) at fault - especially considering the scale of the "error." Make them pay all of it and don't reimburse them or subsidize the error.

# PEPC Project ID: 60777, DocumentID: 68455
# Correspondence: 4

## Author Information

| | |
|---|---|
| Keep Private: | No |
| Name: | William Price |
| Organization: | |
| Organization Type: | I - Unaffiliated Individual |
| Address: | 438 N. Cove Blvd |
| | Panama City, FL 32401 |
| | USA |
| E-mail: | bill@billpricelaw.com |

## Correspondence Information

| | |
|---|---|
| Status: Reviewed | Park Correspondence Log: |
| Date Sent: 10/07/2015 | Date Received: 10/07/2015 |
| Number of Signatures: 1 | Form Letter: No |
| Contains Request(s): No | Type: Web Form |
| Notes: | |

## Correspondence Text

Not a single victim has seen the inside of the courthouse in this case. The Government should hold these funds and use it to pay the victims, including failed businesses, unemployed and displaced workers, and sick clean-up workers.

# PEPC Project ID: 60777, DocumentID: 68455
# Correspondence: 5

## Author Information

| | |
|---|---|
| Keep Private: | No |
| Name: | Christina F. jeffrey |
| Organization: | |
| Organization Type: | I - Unaffiliated Individual |
| Address: | 801.Palmetto at |
| | Spartanburg, SC,SC 29302 |
| | USA |
| E-mail: | christinakfjeffrey@gmail.com |

## Correspondence Information

| | |
|---|---|
| Status: Reviewed | Park Correspondence Log: |
| Date Sent: 10/07/2015 | Date Received: 10/07/2015 |
| Number of Signatures: 1 | Form Letter: No |
| Contains Request(s): No | Type: Web Form |
| Notes: | |

## Correspondence Text

Would it not be better to allow a really good case to get to court so we can learn what really happened? Isn't that the purpose of a civil case like this - not to absolve the guilty but to resolve the losses that have resulted from bad behavior. Or maybe BO will prove its innocence - but the are not acting innocent.

# PEPC Project ID: 60777, DocumentID: 68455
# Correspondence: 6

## Author Information

| | |
|---|---|
| Keep Private: | No |
| Name: | Frank w. Truax |
| Organization: | |
| Organization Type: | I - Unaffiliated Individual |
| Address: | 399 Pristine Water Ln |
| | Mary Esther, FL,FL 32569 |
| | USA |
| E-mail: | frankwt1@gmail.com |

## Correspondence Information

| | |
|---|---|
| Status: Reviewed | Park Correspondence Log: |
| Date Sent: 10/08/2015 | Date Received: 10/08/2015 |
| Number of Signatures: 1 | Form Letter: No |
| Contains Request(s): No | Type: Web Form |
| Notes: | |

## Correspondence Text

I have an unpaid personal claim to BP and with this settlement to help the States not the people all of us with individual claims not paid will be left unsatisfied. Make BP settle the individual claims first.

**PEPC Project ID: 60777, DocumentID: 68455**
**Correspondence: 7**

## Author Information

| | |
|---|---|
| Keep Private: | No |
| Name: | CHARLES J. GIAMBRA |
| Organization: | GIAMBRA VENDING |
| Organization Type: | I - Unaffiliated Individual |
| Address: | 1726 FRANKFORD AVE PANAMA CITY FL 32405 |
| | PANAMA CITY, FL,FL 32405 |
| | USA |
| E-mail: | giambravending@comcast.net |

## Correspondence Information

| | |
|---|---|
| Status: Reviewed | Park Correspondence Log: |
| Date Sent: 10/08/2015 | Date Received: 10/08/2015 |
| Number of Signatures: 1 | Form Letter: No |
| Contains Request(s): No | Type: Web Form |
| Notes: | |

## Correspondence Text

Its been 7 years and while some persons collected $5,000 - 25,000 quick funds within the first 12 months. Other business like our have yet to see a dime. Who is holding the funds? Why aren't they being dispersed in a timely manner?

# PEPC Project ID: 60777, DocumentID: 68455
# Correspondence: 8

## Author Information

Keep Private:             No
Name:                     Rollin W. Ryan
Organization:
Organization Type:        I - Unaffiliated Individual
Address:                  3116 Wood Valley Rd
                          Panama City Beach, FL 32405
                          USA
E-mail:                   rollinryan1@gmail.com

## Correspondence Information

Status: Reviewed              Park Correspondence Log:
Date Sent: 10/08/2015         Date Received: 10/08/2015
Number of Signatures: 1       Form Letter: No
Contains Request(s): No       Type: Web Form
Notes:

## Correspondence Text

To whom it may concern:

I had a business in the beginning stages when the oil spill happened but I didn't claim a loss because I didn't think it was right to do so.

But, the fishing claim I made does reflects a true loss for me and my family.

Please pay those who lost first before taking a big handful of the money and give it to politicians to spend.

Please pay the fishing claims and any other persons who lost before giving the money to politicians to spend so they look good.

Thanks,

Rollin

# PEPC Project ID: 60777, DocumentID: 68455
# Correspondence: 9

## Author Information

| | |
|---|---|
| Keep Private: | No |
| Name: | Jerry L. Adams |
| Organization: | First Response Inc DBA Green Air Technology Inc |
| Organization Type: | I - Unaffiliated Individual |
| Address: | 3625 Florida ave Panama city Fl |
| | Panama City, FL,FL 32405 |
| | USA |
| E-mail: | Disasterrental@att.net |

## Correspondence Information

Status: Reviewed                     Park Correspondence Log:

Date Sent: 10/08/2015                Date Received: 10/08/2015

Number of Signatures: 1             Form Letter: No

Contains Request(s): No             Type: Web Form

Notes:

## Correspondence Text

You promise to step in and help my small business and we supplied all documentation to show damages and the Government throws money to every non effected person that had no losses or put any thing back into the system, or pays taxes, but I expected this from corrupted organization as you are.sincerely Jerry Adams..Green Air Technology Inc.

# PEPC Project ID: 60777, DocumentID: 68455
# Correspondence: 10

## Author Information

| | |
|---|---|
| Keep Private: | No |
| Name: | James W. Bower III |
| Organization: | |
| Organization Type: | I - Unaffiliated Individual |
| Address: | 7769 Betty Louise dr |
| | Panama city, FL 32404 |
| | USA |
| E-mail: | Jboweriii@aol.com |

## Correspondence Information

| | |
|---|---|
| Status: Reviewed | Park Correspondence Log: |
| Date Sent: 10/08/2015 | Date Received: 10/08/2015 |
| Number of Signatures: 1 | Form Letter: No |
| Contains Request(s): No | Type: Web Form |
| Notes: | |

## Correspondence Text

This is bull crap. People with bogus claims got paid. I spent a $100,000 on my boat to Pelagic fish. You shut the gulf down and my fishing I like to do was taken from me. The fish I catch help off set my expenses. BP should have made my boat payment for the year. I could have lied and got $35,000 to $50,000. A lot of the crack heads and people just flat out lying got the check. I had a copy of what to write to get the check. I should have done it. 5 years later and nobody check out there claims! You need to do something for us or face losing your job like the rest of our no good congress. Keep messing with people and you will be looking for a new job. Facebook and tweeter will give you all the negative attention you want. Do your job or get replaced by more competent individual. Social media is on our side.

# PEPC Project ID: 60777, DocumentID: 68455
# Correspondence: 11

## Author Information

| | |
|---|---|
| Keep Private: | No |
| Name: | Larry Horton |
| Organization: | |
| Organization Type: | I - Unaffiliated Individual |
| Address: | 10520 Brooks Road |
| | Fountain, FL 32438 |
| | USA |
| E-mail: | yelojacit51@yahoo.com |

## Correspondence Information

| | |
|---|---|
| Status: Reviewed | Park Correspondence Log: |
| Date Sent: 10/08/2015 | Date Received: 10/08/2015 |
| Number of Signatures: 1 | Form Letter: No |
| Contains Request(s): No | Type: Web Form |
| Notes: | |

## Correspondence Text

Why does the Gov think they should be paid first a lot of us rec anglers have been waiting like myself over 3yrs. I have jumped through every hoop and went through all your red tape for 3yrs with the last being just a few months back so tell me why you think you deserve yours before mine Please!! Sorry BP but had friends that got paid a year ago, but I have had to prove myself over and over just saying!

# PEPC Project ID: 60777, DocumentID: 68455
# Correspondence: 12

## Author Information

Keep Private:               No
Name:                       Veronica M. Roberson
Organization:
Organization Type:          I - Unaffiliated Individual
Address:                    121 north berthe ave
                            Panama City , FL 32404
                            USA
E-mail:                     Ronihog@comcast.net

## Correspondence Information

Status: Reviewed                Park Correspondence Log:
Date Sent: 10/08/2015           Date Received: 10/08/2015
Number of Signatures: 1         Form Letter: No
Contains Request(s): No         Type: Web Form
Notes:

## Correspondence Text

Before awarding large form of government agencies hoe about taking care of the residents. We
are the people at the low in the waiting.

# PEPC Project ID: 60777, DocumentID: 68455
# Correspondence: 13

## Author Information

Keep Private:                No

Name:                        Leroy A. Parsons

Organization:

Organization Type:           I - Unaffiliated Individual

Address:                     9218 n. Holland rd
                             Panama city, FL 32409
                             USA

E-mail:

## Correspondence Information

Status: Reviewed                    Park Correspondence Log:

Date Sent: 10/08/2015               Date Received: 10/08/2015

Number of Signatures: 1             Form Letter: No

Contains Request(s): No             Type: Web Form

Notes:

## Correspondence Text

It's bad enough that this happened but the government is payed for with tax money. We know that corrupt officials will get most of it anyway. You should be ashamed.

# PEPC Project ID: 60777, DocumentID: 68455
# Correspondence: 14

## Author Information

| | |
|---|---|
| Keep Private: | No |
| Name: | N/A N/A |
| Organization: | |
| Organization Type: | I - Unaffiliated Individual |
| Address: | |
| | apalachicola, FL 32320 |
| | USA |
| E-mail: | |

## Correspondence Information

| | |
|---|---|
| Status: Reviewed | Park Correspondence Log: |
| Date Sent: 10/08/2015 | Date Received: 10/08/2015 |
| Number of Signatures: 1 | Form Letter: No |
| Contains Request(s): No | Type: Web Form |
| Notes: | |

## Correspondence Text

when did this become justice. why does government take the whole loaf and leave the people most deserveing are left with crumbs,if any.

# PEPC Project ID: 60777, DocumentID: 68455
# Correspondence: 15

## Author Information

| | |
|---|---|
| Keep Private: | No |
| Name: | Connie Turner |
| Organization: | Sugar beach weddings |
| Organization Type: | I - Unaffiliated Individual |
| Address: | 206 Sandy cay drive |
| | Destin, FL,FL 32550 |
| | USA |
| E-mail: | Sugarbeachweddings@gmail.com |

## Correspondence Information

Status: Reviewed                              Park Correspondence Log:

Date Sent: 10/08/2015                      Date Received: 10/08/2015

Number of Signatures: 1                    Form Letter: No

Contains Request(s): No                     Type: Web Form

Notes:

## Correspondence Text

I am the owner of a beach wedding service called Sugar Beachweddings. My website is Sugar Beachweddings.com. I have been in business for over 11 years. I suffered a terrible blow when the BP oil spill happen and still have not fully recovered from it as far as my business and also my mental and physical health. I truly cannot believe that I am still waiting for my settlement and the money owed to me for a terrible loss in my business due to something that a big company like BP had full control of and was negligent in their safety. My husband passed away two years after the BP oil spill and I am sure it was due to the stress of the oil spill ruining our business.

The money has been given to the big government and I can't understand why the small businesses are still waiting and suffering. I am asking you to please look into this matter and make it happen for us to be compensated for what BP did to our health business and mental health.

Thank you

# PEPC Project ID: 60777, DocumentID: 68455
# Correspondence: 16

## Author Information

Keep Private:          No
Name:                  Kenneth C. Trosclair
Organization:
Organization Type:     I - Unaffiliated Individual
Address:               2659 south why 71
                       WEWAHITCHKA, FL 32465
                       USA
E-mail:                cajunman.kenny@gmail.com

## Correspondence Information

Status: Reviewed                 Park Correspondence Log:
Date Sent: 10/08/2015            Date Received: 10/08/2015
Number of Signatures: 1          Form Letter: No
Contains Request(s): No          Type: Web Form
Notes:

## Correspondence Text

It has been over two years since I filed a fisherman claim . I really think that the little people has suffered just as much as the big people since the little people depend on fishing for a living . I think that it is time to pay up . Kenneth Trosclair

# PEPC Project ID: 60777, DocumentID: 68455
# Correspondence: 17

## Author Information

| | |
|---|---|
| Keep Private: | No |
| Name: | Michael E. Burton |
| Organization: | |
| Organization Type: | I - Unaffiliated Individual |
| Address: | 918 Mulberry Ave. |
| | Panama City, FL 32401 |
| | USA |
| E-mail: | mike_b56@yahoo.com |

## Correspondence Information

Status: Reviewed                    Park Correspondence Log:

Date Sent: 10/08/2015               Date Received: 10/08/2015

Number of Signatures: 1             Form Letter: No

Contains Request(s): No             Type: Web Form

Notes:

## Correspondence Text

Hello,

I put a claim in over two and half years ago and I still haven't heard anything back from it except I'm in review. I have met all criteria and filed all paperwork that was requested and in some cases refiled the paperwork because it was over a year and it needed updating and I'm still "in review". How long does it take to review this and get an answer?? Why are all the government entities getting their money and simple people can't get anything? All my attorney can tell me is, is that you qualify and your in review. Please, make this decision and settle with everyone and not just the government entities.

Michael Burton

**PEPC Project ID: 60777, DocumentID: 68455**
**Correspondence: 18**

## Author Information

Keep Private:              No
Name:                      Johnny R. Landingham
Organization:
Organization Type:         I - Unaffiliated Individual
Address:                   1552 E 10TH CT
                           LYNN HAVEN, FL 32444
                           USA
E-mail:                    BIGJOHN6X5@KNOLOGY.NET

## Correspondence Information

Status: Reviewed                    Park Correspondence Log:
Date Sent: 10/08/2015               Date Received: 10/08/2015
Number of Signatures: 1             Form Letter: No
Contains Request(s): No             Type: Web Form
Notes:

## Correspondence Text

THE SPILL ADVERSELY AFFECTED MY ABILITY TO FISH IN THE PLACES THAT I
USUALLY FISHED. I DIDN'T FISH AS OFTEN AS I WOULD AND WHEN I DID, I WAS
FORCED TO FISH IN AREAS THAT I COULD NOT CATCH THE FISH THAT I
NORMALLY WOULD CATCH. MANY OF THE FISHERMEN THAT HAD THE SAME
EXPERIENCE ,GOT COMPENSATION. FOUR FISHERMEN THAT FISHED WITH ME ON
MY BOAT GOT COMPENSATION BUT I HAVE NOT RECEIVED ANY. I HOPE THAT IT
WONT END TILL ALL THAT WAS ADVERSELY AFFECTED GETS SOME
COMPENSATION.


THANKS FOR YOUR CONSIDERATION, JOHNNY LANDINGHAM

## PEPC Project ID: 60777, DocumentID: 68455
## Correspondence: 19

### Author Information

| | |
|---|---|
| Keep Private: | No |
| Name: | Christopher G. Walsingham |
| Organization: | |
| Organization Type: | I - Unaffiliated Individual |
| Address: | |
| | Panama City , FL,FL 32404 |
| | USA |
| E-mail: | Walsingham3@hotmail.com |

### Correspondence Information

| | |
|---|---|
| Status: Reviewed | Park Correspondence Log: |
| Date Sent: 10/08/2015 | Date Received: 10/08/2015 |
| Number of Signatures: 1 | Form Letter: No |
| Contains Request(s): No | Type: Web Form |
| Notes: | |

### Correspondence Text

Please consider the fishermen who spent hard earned money to fish and feed their families. Many of the individuals who have received settlements were commercial fishermen or business owners. Many were making good money prior to the accident. The middle to low income fishermen who suffered from a hurt economy, higher food prices and for a long period, had no way to subsidize their food cost are still digging out of a never ending hole. They need to get relief before they have to start a never ending government hand out that they don't want. Just settle their claims so they can recover some of what they lost by investing in our country's God given natural resources, via licenses, fuel, boats, bait and time. In most cases they need compensation sooner than those at the front of the line.
Thank you for you time,
Christopher Walsingham

# PEPC Project ID: 60777, DocumentID: 68455
# Correspondence: 20

## Author Information

Keep Private:           No
Name:                   John W. Wick
Organization:
Organization Type:      I - Unaffiliated Individual
Address:                2501 Joan Avenue
                        Panama City Beach, FL 32408
                        USA
E-mail:                 johnandcarriewick@yahoo.com

## Correspondence Information

Status: Reviewed                    Park Correspondence Log:
Date Sent: 10/08/2015               Date Received: 10/08/2015
Number of Signatures: 1             Form Letter: No
Contains Request(s): No             Type: Web Form
Notes:

## Correspondence Text

I filed for fishing almost 1 year ago and still have recieved no word at all as to compensation. I still don't fish in these gulf waters anymore because I don't feel it is safe for my family and I to eat. This has put a huge damper on my lifestyle and cost me a lot of money. I need to be compensated. The government shouldn't even get any money but as usual they come FIRST.

**PEPC Project ID: 60777, DocumentID: 68455**
**Correspondence: 21**

## Author Information

| | |
|---|---|
| Keep Private: | No |
| Name: | Kelly J. Ison |
| Organization: | Nanny Can LLC |
| Organization Type: | I - Unaffiliated Individual |
| Address: | 210d S Hway 79 |
| | Panama City Beach, FL,FL 32413 |
| | USA |
| E-mail: | nanny@nannycan.com |

## Correspondence Information

Status: Reviewed                    Park Correspondence Log:

Date Sent: 10/09/2015               Date Received: 10/09/2015

Number of Signatures: 1             Form Letter: No

Contains Request(s): No             Type: Web Form

Notes:

## Correspondence Text

I lost a $140,000 in gov contracts without tourisem losses that I cannot quantify. I never received a penny. But what I did do is get a massive amount of debt over $50,000 to keep ,y business afloat. Nannies that work for me got paid out, but not me the company that supplied the work. How can that be I never asked for more than I lost. But to date nothing.

**PEPC Project ID: 60777, DocumentID: 68455**
**Correspondence: 22**

## Author Information

| | |
|---|---|
| Keep Private: | No |
| Name: | Ryan j. Ison |
| Organization: | Little Rascals kid shop and rentals |
| Organization Type: | I - Unaffiliated Individual |
| Address: | 210d S Hway 79 |
| | Panama City Beach, FL,FL 32413 |
| | USA |
| E-mail: | nannycan@knology.net |

## Correspondence Information

Status: Reviewed                    Park Correspondence Log:

Date Sent: 10/09/2015               Date Received: 10/09/2015

Number of Signatures: 1             Form Letter: No

Contains Request(s): No             Type: Web Form

Notes:

## Correspondence Text

our business had to close we could not keep afloat we provided crib rentals car seat rental etc for holiday makers, and childrens clothes on consignment. Before the spill we made a comfortable living about $4,000 a month. We now have no business we could not stay afloat, time after time we got denied yet our place of business was 2 blocks back from the beach. How is that a salaried worker for Lowes in Callaway 20 miles from the beach got compensation but we lost everything, and got nothing. Thanks BP for ruining our life.

# PEPC Project ID: 60777, DocumentID: 68455
# Correspondence: 23

## Author Information

| | |
|---|---|
| Keep Private: | No |
| Name: | Ashley L. Horner |
| Organization: | |
| Organization Type: | I - Unaffiliated Individual |
| Address: | 587 e shipwreck road |
| | Santa Rosa Beach, FL 32459 |
| | USA |
| E-mail: | C_rosamond@yahoo.com |

## Correspondence Information

Status: Reviewed                         Park Correspondence Log:

Date Sent: 10/10/2015                  Date Received: 10/10/2015

Number of Signatures: 1              Form Letter: No

Contains Request(s): No              Type: Web Form

Notes:

## Correspondence Text

I along with countless others that were affected by this horrible and tragic event, have been far too patient with the BP company and everyone else involved. It is time to pay for the wrong doings they have caused. I am just one person that has suffered from the oil spill, but it has affected me in some very major ways. I was forced to move from my home because I could not afford it after my wages and hours were cut as a direct result of this event. I was working as a seafood restaurant employee in April 2010 when this happened, everyone was too scared to eat fish and shrimp from the gulf so our restaurant was empty during the time it otherwise would have been packed with people waiting at the door. Practically every person asked if the food was "ok" or safe to eat. I myself actually witnessed first hand how bad the situation was when I popped open an oyster from our local market (Apalachacola Florida) and it smelled so horrid, it was filled with black tar gunk. Nothing I wanted to eat. Nothing that looked "ok" or safe to eat AT ALL. Never have I seen this before, we usually get exceptional products from these people. As I opened more and more the entire box was covered in this slimy, thick, bad smelling substance which could have only been one thing, the crude oil that had made its way into not only the oyster beds and white sandy beaches this area is known for but who knows what else. I also, with my own two eyes witnessed the tar balls covering the beach big and small. It smelled bad like before and you could feel it on your skin as well as see it in the water. This area survives on the tourist industry. People did not want to waste money on a vacation where they didn't feel safe. Adults and children were sick from just going to the beach my child included. It was not a safe place at all, and probably still isn't. Just a year ago I found the same tar balls in the sand washed ashore. I know this because there were millions and it was the same thing I witnessed when it had just occurred. What is going to happen when a hurricane comes ashore and stirs up

all that's settled to the bottom? I believe the same thing. People will not want to vacation here again and it will be a nother few years until people come back. I tried to get another job to make up for my lost wages and was denied several times. I then was forced to move into a much smaller place because that's all I could afford. My son got sick from going to the beach and I was stuck trying to pay those medical bills as well. I filed a claim with Gulf Coast Claims Facility and received $1,200. That was it. That did not even make a dent in what I feel was taken from me. It is wrong for the government to take money from U.S. citizens who desperately need it, and that have been struggling since this all occurred. We are not asking for much just what was taken from us. We have waited long enough. Pay the people who got hurt the most first! Then take your share. I hope my voice is heard and taken into consideration. Thank you for your time.

# PEPC Project ID: 60777, DocumentID: 68455
# Correspondence: 24

## Author Information

| | |
|---|---|
| Keep Private: | No |
| Name: | James M. Bennett |
| Organization: | |
| Organization Type: | I - Unaffiliated Individual |
| Address: | 192 Garnett bayou |
| | Miramar beach, FL 32459 |
| | USA |
| E-mail: | Lafondaismysoulmate@yahoo.com |

## Correspondence Information

| | |
|---|---|
| Status: Reviewed | Park Correspondence Log: |
| Date Sent: 10/10/2015 | Date Received: 10/10/2015 |
| Number of Signatures: 1 | Form Letter: No |
| Contains Request(s): No | Type: Web Form |
| Notes: | |

## Correspondence Text

This is an outrage. The people who were directly affected by the oil spill should be compensated first! The people who lost their jobs and had to move and got sick and suffered the most from this preventable event. There is absolutely no excuse for how long this has taken. People are still suffering from the oil spill and what consequences came from it. Pay the people first! Citizens first! Why would it even be done any other way!? We have all waited long enough and have been far to patient!!

# PEPC Project ID: 60777, DocumentID: 68455
# Correspondence: 25

## Author Information

| | |
|---|---|
| Keep Private: | No |
| Name: | Camilla W. Stewart |
| Organization: | |
| Organization Type: | I - Unaffiliated Individual |
| Address: | 2203 Westover Dr |
| | Panama City, FL,FL 32405 |
| | USA |
| E-mail: | camnlarry@comcast.net |

## Correspondence Information

| | |
|---|---|
| Status: Reviewed | Park Correspondence Log: |
| Date Sent: 10/11/2015 | Date Received: 10/11/2015 |
| Number of Signatures: 1 | Form Letter: No |
| Contains Request(s): No | Type: Web Form |
| Notes: | |

## Correspondence Text

It appears that the settlement resulting from the Oil Spill by the Oil Rig "Deepwater Horizon" in the Gulf of Mexico, April 20, 2012 will be handled as all matters are when the government is in full control. Yes the environment and damages must be restored. The problem with the settlement is the individual citizen who suffered economic loss due to the spill is pushed aside we probably will not received our share based on claims filed. Our claim was a small one, but it is just as important to our family as the billion dollar claims filed by large corporations and governmental entities; all of which received millions from tax considerations or tax monies all paid by people like me. When will the powers to be in this matter realize that "we the people" suffered losses that feel no smaller than the corporations losses. Payment of the SMALL claims should be first and foremost in the minds of Justice Department. The individuals who filed legitimate claims should have their claims paid first.

# PEPC Project ID: 60777, DocumentID: 68455
# Correspondence: 26

## Author Information

Keep Private:            No
Name:                    Douglas G. Forehand
Organization:
Organization Type:       I - Unaffiliated Individual
Address:                 1005 S Kimbrel AV
                         Panama City , FL,FL,FL 32404
                         USA
E-mail:                  Cjforehand71@msn.com

## Correspondence Information

Status: Reviewed                 Park Correspondence Log:
Date Sent: 10/11/2015            Date Received: 10/11/2015
Number of Signatures: 1         Form Letter: No
Contains Request(s): No         Type: Web Form
Notes:

## Correspondence Text

I think it is very important that the individuals and private companies should receive their just compensations before the states or federal government gets the money you on anything. Compensate individuals first!

# PEPC Project ID: 60777, DocumentID: 68455
# Correspondence: 27

## Author Information

Keep Private:           No
Name:                   Gary D. Gibbens
Organization:
Organization Type:      I - Unaffiliated Individual
Address:
                        Panama City, FL,FL 32404
                        USA
E-mail:

## Correspondence Information

Status: Reviewed                Park Correspondence Log:
Date Sent: 10/12/2015           Date Received: 10/12/2015
Number of Signatures: 1         Form Letter: No
Contains Request(s): No         Type: Web Form
Notes:

## Correspondence Text

Its not right to take peoples money and pay the state. Peoples lives were impacted in a Big way because of the oil spill and still have not received anything fot their lost wages and lost of business! All the state is doing is looking for a reason to say you dont qualify over some clerical error or another excuse. You should be be ashamed of yourselves!!!!!!!!!!

# PEPC Project ID: 60777, DocumentID: 68455
# Correspondence: 28

## Author Information

Keep Private:              No
Name:                      James W. Harris
Organization:              Jim Harris & Associates, Inc.
Organization Type:         I - Unaffiliated Individual
Address:                   351 Mary Esther Blvd.
                           Mary Esther, FL,FL 32569
                           USA
E-mail:                    jim@jimharrisandassociates.com

## Correspondence Information

Status: Reviewed                 Park Correspondence Log:
Date Sent: 10/12/2015            Date Received: 10/12/2015
Number of Signatures: 1          Form Letter: No
Contains Request(s): No          Type: Web Form
Notes:

## Correspondence Text

I am very concerned that government is taking care of government. Individuals and businesses that were directly harmed have been ignored. My business is an excluded business from the settlement. I suffered losses of about $100,000 that because of my business type (Insurance Agency) I was excluded from payments. The people and businesses on the Gulf Coast were the harmed parties and are being ignored. I am represented by legal council. I would appreciate some help in having the process move forward after five years of trying to overcome the losses my business sustained. I know that many others are being ignored as we struggle with overcoming our devastation. Please have individuals and businesses moved up the chain of settlements.

# PEPC Project ID: 60777, DocumentID: 68455
# Correspondence: 29

## Author Information

| | |
|---|---|
| Keep Private: | No |
| Name: | robert mcdonald |
| Organization: | independent |
| Organization Type: | I - Unaffiliated Individual |
| Address: | 20813 ne mcdonald lane |
| | blountstown, FL,FL 32424 |
| | USA |
| E-mail: | rm013056@yahoo.com |

## Correspondence Information

| | |
|---|---|
| Status: Reviewed | Park Correspondence Log: |
| Date Sent: 10/13/2015 | Date Received: 10/13/2015 |
| Number of Signatures: 1 | Form Letter: No |
| Contains Request(s): No | Type: Web Form |
| Notes: | |

## Correspondence Text

i think if the federal government and states settle and pending claims of individuals have not been settled then it is the government responsibilty to pay these claims from the settlement they receive from BP. The payment should be within the BP guide lines and should be part of the settlement if BP will not pay mthe pending claims

## PEPC Project ID: 60777, DocumentID: 68455
## Correspondence: 30

## Author Information

Keep Private:              No
Name:                      Michael P. Monahan
Organization:
Organization Type:         I - Unaffiliated Individual
Address:                   208 Palm Circle
                           Panama City Beach, FL 32413
                           USA
E-mail:                    piratedvr@hotmail.com

## Correspondence Information

Status: Reviewed                   Park Correspondence Log:
Date Sent: 10/14/2015              Date Received: 10/14/2015
Number of Signatures: 1           Form Letter: No
Contains Request(s): No           Type: Web Form
Notes:

## Correspondence Text

I have to say that most residents of NW Florida have been pretty screwed by BP and our Government over the handling of all settlements from the Spill. In fact, the results have been CRIMMINAL! The Gulf Coast States and municipalities have all been paid by BP and have hid the money from the public. Many of those directly effected by the spill both economically & spiritually have received NOTHING! This has been going on for years now and we are still dealing with duress from the frikin spill! I have had a Business Claim going now for a few years because nobody handling my claim even understands what I'm saying! They keep telling my I qualify, but show no economic loss. I have suffered economically dearly since the spill as a Realtor. They are wrong! I also have stopped fishing & diving in the Gulf, and parked my fishing boat due to the spill. Fishing & Diving is why I moved to Florida in 1992! BP has ruined the whole thing with that frikin spill, and devalued my life experience and property values to date! I have a Fishing Sustenance Claim too that is being ignored! Something has to be done about this Foreign Corporation and the power they hold within our boarders assisted by US Attorney Firms!!! Frikin disgraceful! We need to prohibit BP from conducting business and making a frikin dime until this is resolved for all Americans directly effected by the spill! Why can't you all do something for the people rather than just sitting back as part of the problem! Do something!

## PEPC Project ID: 60777, DocumentID: 68455
## Correspondence: 31

### Author Information

| | |
|---|---|
| Keep Private: | No |
| Name: | Melissa D. Hilgenberg |
| Organization: | |
| Organization Type: | I - Unaffiliated Individual |
| Address: | 322 Porter Drive |
| | Lynn Haven, FL 32444 |
| | USA |
| E-mail: | mhilgenb1@gmail.com |

### Correspondence Information

| | |
|---|---|
| Status: Reviewed | Park Correspondence Log: |
| Date Sent: 10/14/2015 | Date Received: 10/14/2015 |
| Number of Signatures: 1 | Form Letter: No |
| Contains Request(s): No | Type: Web Form |
| Notes: | |

### Correspondence Text

It is unfortunate that the government is putting themselves before the people. Is it forgotten that the government is in place for the people not to be against its people. My family used the gulf waters in our everyday life. I taught my sons how to fish and navigate the waters in the Gulf of Mexico. Not only for sport but as a way of life. I hope that the people elected into office by us, the people of the areas so hard hit by this disaster, will not forget that they are where they are because of us.

# PEPC Project ID: 60777, DocumentID: 68455
# Correspondence: 32

## Author Information

| | |
|---|---|
| Keep Private: | No |
| Name: | Scott A. Barron |
| Organization: | |
| Organization Type: | I - Unaffiliated Individual |
| Address: | 749 North 9th Street |
| | Panama City, FL 32404 |
| | USA |
| E-mail: | scmbarron@knology.net |

## Correspondence Information

Status: Reviewed                Park Correspondence Log:

Date Sent: 10/14/2015           Date Received: 10/14/2015

Number of Signatures: 1         Form Letter: No

Contains Request(s): No         Type: Web Form

Notes:

## Correspondence Text

My comment concerns the individuals who have filed a claim. I fill there are more people requesting settlements for less money than the government and the states. Which should be paid out first. Individuals do not have the advantage of high cost lawyers or the backup in funds that the government or states have. Majority of the individuals are low income families that need the boost from this settlement to purchase products and services, which in turn they will pay more taxes on and the receiving of these funds they will be paying more federal taxes. I fill the little man deserves it.

## PEPC Project ID: 60777, DocumentID: 68455
## Correspondence: 33

### Author Information

Keep Private:            No
Name:                    Michael J. Kalinowski
Organization:
Organization Type:       I - Unaffiliated Individual
Address:
                         Pahoa, HI 96778
                         USA
E-mail:

### Correspondence Information

| | |
|---|---|
| Status: Reviewed | Park Correspondence Log: |
| Date Sent: 10/15/2015 | Date Received: 10/15/2015 |
| Number of Signatures: 1 | Form Letter: No |
| Contains Request(s): No | Type: Web Form |
| Notes: | |

### Correspondence Text

While it is well and good that BP is stepping up and paying the fines and penalties for the environmental catastrophe Deepwater Horizon, the company should be specifically prohibited from reducing their tax burden in using those funds as a business deduction. Environmental, and criminal penalties are NOT the cost of doing business, they are the cost of breaking laws and acts of negligence.

Criminals convicted of federal crimes do not get to write off federally mandated monetary penalties determined by court judgments or plea deals, and neither should British Petroleum. The agreement signed by BP and the various federal and state agencies is not a business expense in any legal context. It is a civil and / or criminal settlement for violations of law, negligence and recompense for those acts or omissions.

BP should not get to reduce their penalties or expenses by using them as a business tax deduction. If the federal government allows BP to deduct these penalties to reduce their tax costs, it is giving tacit approval for BP and other big oil companies to continue with business as usual in poisoning our environment and ruining the livelihood of local business owners.

# PEPC Project ID: 60777, DocumentID: 68455
# Correspondence: 34

## Author Information

| | |
|---|---|
| Keep Private: | No |
| Name: | JoAnn M. Kalinowski |
| Organization: | |
| Organization Type: | I - Unaffiliated Individual |
| Address: | 13-3448 Alapai Street |
| | Pahoa, HI,HI 96778 |
| | USA |
| E-mail: | mkalinowski@hawaii.rr.com |

## Correspondence Information

| | |
|---|---|
| Status: Reviewed | Park Correspondence Log: |
| Date Sent: 10/15/2015 | Date Received: 10/15/2015 |
| Number of Signatures: 1 | Form Letter: No |
| Contains Request(s): No | Type: Web Form |
| Notes: | |

## Correspondence Text

Dear Sir/Madam,

Are the fines levied against BP for this crime against the planet tax deductible? If so this makes shoddy construction practices a cost of doing business. This is unacceptable in the extreme. The management that allowed, approved, and installed flawed equipment should be deemed criminals and prosecuted as such. In our United States, every state has prisons full of individuals for selling harmful chemicals for human consumption. There are people serving sentences up to 30 years for significantly less harm to society than this egregious global crime. Why haven't these BP corporate criminals received similar criminal penalties? The "big picture" is this; kill and poison ocean's that feed and provides resources for millions, receive a corporate tax deductible fine; sell drugs to a few and go directly to jail. Is this justice? Eleven counts of manslaughter convictions resulted from this incident, but no management individuals served prison time. Again, is this justice? I think not.

Our justice system allows corporate fraud, corruption, and the rape of the planet to be an acceptable business practice. Does this make crime on global scale too big to prosecute? Similar to the bail out of wall street banks, if a crime is large enough, our government deems it too egregious to punish. Even communist China punishes corporate criminals with personal accountable consequences.

Correspondences - Department of Justice - Consent Decree - PEPC ID: 60777

# PEPC Project ID: 60777, DocumentID: 68455
# Correspondence: 35

## Author Information

| | |
|---|---|
| Keep Private: | No |
| Name: | Kay Williams |
| Organization: | Williams Consulting and Research |
| Organization Type: | I - Unaffiliated Individual |
| Address: | 9905 Wire Rd |
| | Ocean Springs, MS,MS 39565 |
| | USA |
| E-mail: | K1951@att.net |

## Correspondence Information

| | |
|---|---|
| Status: Reviewed | Park Correspondence Log: |
| Date Sent: 10/19/2015 | Date Received: 10/19/2015 |
| Number of Signatures: 1 | Form Letter: No |
| Contains Request(s): No | Type: Web Form |
| Notes: | |

## Correspondence Text

We were asked to submit proposals but unless you know someone on the council to submit your proposal it is not considered.
The monies are not being spent to help the resource as designed to do. The states should not be in control of the funding. I have been involved in
Fisheries management and many of the issues being blamed on the oil spill had nothing to do with the oil spill. The National park service is now in charge of these comments yet they will not fund projects that support research to protect our Gulf Resources. I find that in direct conflict.

## PEPC Project ID: 60777, DocumentID: 68455
## Correspondence: 36

### Author Information

| | |
|---|---|
| Keep Private: | No |
| Name: | George A. Orphanos |
| Organization: | FKA: Andy's Motel and Apartments |
| Organization Type: | I - Unaffiliated Individual |
| Address: | 8101 Surf Drive |
| | Panama City Beach, FL 32408 |
| | Panama City Beach, FL,FL 32408 |
| | USA |
| E-mail: | greekly@aol.com |

### Correspondence Information

Status: Reviewed                    Park Correspondence Log:

Date Sent: 10/22/2015               Date Received: 10/22/2015

Number of Signatures: 1             Form Letter: No

Contains Request(s): No             Type: Web Form

Notes:

### Correspondence Text

To Whom It May Concern:
My family and I owned a small 'mom and pop' business formally known as Andy's Motel located directly on the beach in Panama City Beach, FL. This business and property has been in our family since 1956. In 1996 a hurricane wiped out about 80% oour property and we had to rebuild causing us to use a mortgage. The oil spill of 2010 caused us to lose the business and property due to a lack of business that summer. We tried approaching banks, including ours, for some relief but to no avail. In October of 2010 we were told that we were in default for lack of mortgage payments which we couldn't make. Our attorney was unable to help us. Our new attorney said at least we can file a claim against BP et all. Now we are told state and federal government entities are filing and their claims and will go ahead of ours. More delays.
What happened to the statement that the small 'mom and pop' businesses will be taken care of first? Our credit has taken a beating since then, we have struggled to pay debt and taxes, and now our youngest is preparing for college next year. I doubt I will be able to send him to one of the larger schools that he is capable of handling because of finances. My wife has fallen ill with unknown causes, which she believes is from the disbursements she accidentally handled but the doctors here don't or won't, get involved with. BP has refused her claim because she accidentally left one page out of her claim. We have been living off our savings, but now it's depleted. I've had to file for Social Security, a year earlier than I planned, just to stay 'afloat'. Neighbors tell us that the new owners of Andy's, now Sunset Inn, inc., have filed numerous claims that included our business (when we were the owners) as part of their claims (they were next door neighbors). There is no way for me to check on this. We are struggling to proceed with everyday life. Our

attorney has offered no advice but to wait.

If the person(s) reading this has any advice, I will be greatly indebted to you to hear it.

Sincerely, George Orphanos

current address and phone:

525 Oakline Drive - Birmingham, AL 35226

phone: 205-979-9999

# PEPC Project ID: 60777, DocumentID: 68455
# Correspondence: 37

## Author Information

| | |
|---|---|
| Keep Private: | No |
| Name: | Brian Lee |
| Organization: | |
| Organization Type: | I - Unaffiliated Individual |
| Address: | 402 Missouri Ave |
| | Lynn Haven, FL 32444 |
| | USA |
| E-mail: | brian.lee@kalinc.com |

## Correspondence Information

Status: Reviewed                    Park Correspondence Log:

Date Sent: 10/28/2015              Date Received: 10/28/2015

Number of Signatures: 1            Form Letter: No

Contains Request(s): No           Type: Web Form

Notes:

## Correspondence Text

It seems that all the federal and state entities have taken all the money set aside for the spill and a lot of the individuals who were affected by the spill are still struggling five years later. Where is the relief for them?

# PEPC Project ID: 60777, DocumentID: 68455
# Correspondence: 38

## Author Information

| | |
|---|---|
| Keep Private: | No |
| Name: | Jill Jensen |
| Organization: | |
| Organization Type: | I - Unaffiliated Individual |
| Address: | 1 Renaissance Pl |
| | Unit 500 |
| | Palatine, IL 60068 |
| | USA |
| E-mail: | Jillj72000@yahho.com |

## Correspondence Information

Status: Reviewed                          Park Correspondence Log:

Date Sent: 10/28/2015                      Date Received: 10/28/2015

Number of Signatures: 1                    Form Letter: No

Contains Request(s): No                    Type: Web Form

Notes:

## Correspondence Text

Please allocate funds for restoration. Thank you.

# PEPC Project ID: 60777, DocumentID: 68455
# Correspondence: 39

## Author Information

| | |
|---|---|
| Keep Private: | No |
| Name: | David Gauthe |
| Organization: | Bayou Interfaith Shared Community Organizing   ⊙ Official Rep. |
| Organization Type: | R - Churches, Religious Groups |
| Address: | N/A |
| | Thibdaux, LA N/A |
| | USA |
| E-mail: | |

## Correspondence Information

| | |
|---|---|
| Status: Reviewed | Park Correspondence Log: |
| Date Sent: | Date Received: 10/19/2015 |
| Number of Signatures: 1 | Form Letter: No |
| Contains Request(s): No | Type: Transcript |
| Notes: | |

## Correspondence Text

Great. David Gauthe. I live in Thibodaux, Louisiana, with BISCO, Bayou Interfaith Shared Community Organizing. Thank you all for being here. You all really put this thing together real good. I really admire it. I think Louisiana is a step ahead as far as making sure things are done correctly.

What I do want to mention - - and my wife's not here, who's the Director of BISCO, so - - there's only person in here that could get me in trouble, and that's Donald, and he promised me he wouldn't tell my wife I said anything.

We are non-profit. We worked extremely hard on many issues before the oil spill and we worked more extremely hard, if you can imagine, when the oil spill occurred. We held forums. We were a voice to the community. We were a vessel of opportunity. We were trying to make sure that the people on the coast were treated fairly.

When asked for help, funding-wise, because we are a group of organizers, non-profit faith-based organizers, BP calmly told us that "really we can't give you any money because you didn't have to do what you did." This is a great plan, but I know of several non-profits, including BISCO, who are financially strapped right now, to the point that we most probably won't be here next year. Several others besides that.

We had asked several times and I'm just going to ask one more time, if there's any way that you could put non-profits, who really worked hard, and you all know it, into this plan, I'd really appreciate it. Thank you.

## PEPC Project ID: 60777, DocumentID: 68455
## Correspondence: 40

### Author Information

| | |
|---|---|
| Keep Private: | No |
| Name: | Derek Brockbank |
| Organization: | American Shore and Beach Preservation Association ⊙ Official Rep. |
| Organization Type: | L - Non-Governmental |
| Address: | N/A |
| | N/A, UN N/A |
| | USA |
| E-mail: | |

### Correspondence Information

| | |
|---|---|
| Status: Reviewed | Park Correspondence Log: |
| Date Sent: | Date Received: 10/19/2015 |
| Number of Signatures: 1 | Form Letter: No |
| Contains Request(s): No | Type: Transcript |
| Notes: | |

### Correspondence Text

Hi. Thank you. Derek Brockbank with American Shore and Beach Preservation Association, ASBPA. Thank you for coming and presenting tonight. Again, it's a really good plan. I appreciate it. I wanted to make a couple specific comments on the NRDA piece and then a quick comment on the Consent Decree. American Shore and Beach Preservation Association is a national organization, an organization that works on coastal restoration, emerging science and public policy to enhance our coastlines. I think this document is a great example of merging science and public policy to enhance our coastline, so I appreciate the work that went into that. Our focus is beaches and dunes. We believe there are sort of four main reasons to have beaches and dunes, recreation, ecological, protection and economic, and I think the NRDA plan really addresses some of the recreational and ecologic issues, so I appreciate that. Protection, it doesn't, but I understand that that probably is - - we got very lucky that we didn't have a hurricane in 2010 to really make the spill much worse, in economic damages or in other parts.

So to the NRDA piece, I haven't fully read the 1400-page document, so it may be in there somewhere, but I wanted to make the - - encourage you guys to think about how operation or maintenance aspects of restoration can be funded through the NRDA dollars, and this might be part of the adaptive management, but restored systems are often not as resilient to future damages as initial systems were, so if there is damage - - if there's a future storm, as these projects are being put in, it could have more harmful effects than if the system was there to begin with, so it will be interesting to see how NRDA dollars can be spent on that. Likewise, if there is a possibility of establishing a trust fund or something that would allow for operation and maintenance beyond the 15 years, as some of these systems are taking hold, so as dune systems are setting root, wetlands systems are setting root, is there long-term planning for that. Likewise,

when we are looking at replacing areas that are facing sea level rise and facing ongoing erosion, are there areas to use the NRDA money that is looking at natural resources damage and potentially leveraging it with other available funds for the sort of gray infrastructure to support the shoreline so we can really be able to blend some of the gray protective infrastructure with the green ecological infrastructure. Again, that might be in there somewhere, but I do think it's an important piece.

To the Consent Decree, I just wanted to sort of state that I was disappointed that the 5.5 billion in Clean Water Act fines is a lot closer to the simple negligence than gross negligence, as Judge Barbier had stated, that BP was guilty of gross negligence, so disappointed in that. However, I understand the need to move forward and we certainly appreciate the need to begin restoration now, so we'd like to see the DOJ approve or have the Consent Decree approved, despite what we feel are low Clean Water Act damages. Thank you.

Correspondences - Department of Justice - Consent Decree - PEPC ID: 60777

## PEPC Project ID: 60777, DocumentID: 68455
## Correspondence: 41

### Author Information

| | |
|---|---|
| Keep Private: | No |
| Name: | Scott Eustis |
| Organization: | Gulf Restoration Network ● Official Rep. |
| Organization Type: | L - Non-Governmental |
| Address: | N/A |
| | N/A, UN N/A |
| | USA |
| E-mail: | |

### Correspondence Information

| | |
|---|---|
| Status: Reviewed | Park Correspondence Log: |
| Date Sent: | Date Received: 10/19/2015 |
| Number of Signatures: 1 | Form Letter: No |
| Contains Request(s): No | Type: Transcript |
| Notes: | |

### Correspondence Text

Good evening. My name is Scott Eustis. I'm with the Gulf Restoration Network or Clean Water Act Advocacy Group in all five Gulf states. Thanks for having this hearing tonight and the information available. Although we do think, as we saw with the Phase III, that having hearings on two very different complicated documents does confuse the public, we do think it lowers turnout when you combine meetings. So generally, we like to have comment periods on one thing at a time.

We are still digesting a lot of the documents of the Consent Decree and the Draft Plan. There's some initial things. You know, the Consent Decree, when we heard about it, it definitely didn't seem like enough. I think we were expecting a lot more in Clean Water Act penalties, given all of the talk and the communication that many groups, non-profits, governments, have done around the importance of the Clean Water Act penalties, and to have them come in on the lower side seems regrettable. However, we understand that settling allows us to move forward quicker than not.

We do think that the next time that something like this happens in the offshore environment, spills, tank barges, collisions, that the Department of Justice should consider dismantling the company. There are many other offshore companies that have better safety records and better environmental compliance records than BP, and without the threat of being dismantled, I do think that negotiations comes in on the lower end. That the company can just do this to the United States, and do this to Louisiana, and can walk away, I think, I think sends the wrong message about what we want to have happen on the Gulf Coast and in the United States. On the

Draft Plan, we're still digesting it. There's a lot of good and a lot of good that will happen faster because we're moving into the restoration phase. We do think that there are a lot of problems with the government structure in that although there's a lot of effort and a lot of claims about a move toward comprehensive restoration, I do think that the silos that have been created to kind of separate things by state instead of by flow of the water, it's just going to create some confusion and probably duplicative efforts.

You know, we saw - - we've seen before with certain NRDA claiming efforts, including in Barataria and Terrebonne Parish, a large NRDA planning effort, it's best to do it by watershed anyway, you know, in Barataria. Terrebonne has that. The Restore Council needs to organize by watershed and so when we're considering damages to the water and damages to the Gulf, we do think that organizing things by watersheds is a better way to govern restoration of the Gulf of Mexico.

We're concerned that the majority of the damages were received in the open ocean, in the deep water, but we've seen this before with NRDA in certain offshore incidents, where damages are to the deep water environment, to corals, to reefs that would be offshore and restoration happens inland with a very remote and possibly not even documentable connection to the marine environment. So we're concerned that both the governance structure, as set up, where every state kind of gets their money and goes home, and then we have a region-wide silo, and then the open ocean's by itself, we're concerned that that's - - there's no - - there's no integrative effort. There's no forum for all the Trustees to come together and we feel a different governance structure would ensure a comprehensive integrated ecosystem restoration, especially because most of the damages were in the deep water, in the offshore environment. And if we - - we haven't finished reading it, of course, but, you know, we are concerned that, you know, things in the open ocean category cannot be best placed there. We're concerned about the large administrative cost that's been taxed and that the open ocean category has been tasked with in comparison to the other groups.

So we do think that the Trustees should consider kind of the structural limitations of organizing the governance structure this way. But we're looking forward to digging in a little bit deeper and we'll prepare a written comment for December, so - - thank you very much.

## PEPC Project ID: 60777, DocumentID: 68455
## Correspondence: 42

### Author Information

| | |
|---|---|
| Keep Private: | No |
| Name: | Thao Vu |
| Organization: | Mississippi Coalition for Vietnamese Fisherfolk and Families ⊙ Official Rep. |
| Organization Type: | L - Non-Governmental |
| Address: | N/A |
| | N/A, UN N/A |
| | USA |
| E-mail: | |

### Correspondence Information

| | |
|---|---|
| Status: Reviewed | Park Correspondence Log: |
| Date Sent: | Date Received: 10/19/2015 |
| Number of Signatures: 1 | Form Letter: No |
| Contains Request(s): No | Type: Transcript |
| Notes: | |

### Correspondence Text

Good evening. Can everyone hear me? Yes, good evening, again. My name is Thao Vu. I represent currently the Director of the Mississippi Coalition for Vietnamese Fisherfolk and Families. I'm here not only in my state of Mississippi, but here in Houma, Louisiana, because fishing and healthy fisheries, there's no state boundaries for it. It's critically important that there is genuinely good restoration for these focus areas and objectives are met to really restore fisheries, to really help fishing communities who have been greatly impacted, disproportionately impacted, that bore the brunt of the losses and have been suffering greatly the past five years. It has not only been a huge environmental pollution disaster and all, but it's caused economic hardship, extreme economic hardship for these fishermen, and right now it's in the middle of shrimping season, and that many fishermen who should be here are not here. In fact, there are many nereby docks and harbors and processing plants and fishing infrastructure - - and fishing contributes greatly, not only here on the coast, but the region, all across the region - - and that needs to factored in to restoration.

I would like to really share my perspective on the format of this meeting. This is critically important, probably the most important meeting for the past five years for restoration, and the proposed BP settlement should be a separate meeting. First of all, it was only formally announced two weeks ago. A two-week notice is not a sufficient act of public notice, it's really unacceptable, and that's why the turnout is low. In fact, people who definitely are the most impacted by this are not aware of it. And posting documents on the Federal Registry is not adequate outreach. It's not outreach at all. What it is is basically fulfilling your basic responsibilities, you know, as Representatives of the Trustee Councils or Agencies, Federal or State Agencies.

We need more time. From the time you actually post documents on the Federal Register to the time of the public meetings, we need at least five to six weeks, at least five to six weeks, moving forward, and it should be a separate independent process. The Natural Resource Damage Assessment Trustee Councils and their over 1000-page document should be a separate meeting, and I am requesting, on behalf of the fishing communities, that we extend the public comment deadline, first of all, for the settlement, all the way to next year, to at least February of 2016, and afterwards, at least to March or April 2016 for the NRDA Trustee Council deadline.

December 4th is unacceptable, not adequate for us to fully review everything, to disseminate it to our constituency, and for my population, which has limited English proficiency is not enough time. There is just - - there's not enough time. We need more time and we greatly appeal to the Department of Justice as well to the NRDA Trustee Councils to give us this additional time. And my other comments about the settlement is that we have some concerns about some of the elements. One of the missing key elements that is greatly needed is a Regional Citizen Advisory Council. We will be submitting comments that there is a great need to establish that, to prepare for the future, for not only spills, but these are disasters, huge disasters. It's not a mere spill.

We need to have that to prepare for future disasters, for preparedness, as well as we don't think that the proposed amount is adequate, particularly for future damages, and that the Department of Justice, as well as the Trustee Councils, need to really go back and assess the total amount of all their effort so far and what they quantify and what haven't they and what they haven't quantified, because we don't believe that that's adequate in that there's much more that needs to be allocated for future damages.

In regards to the Draft Programmatic Environmental Plan, Draft Plan right now, we know this, that in terms of restoration goals or types, one of the key missing fisheries is crabs or shell fish. Oysters is in there, but there's no mention of crabs, nor shrimp. We're appealing to you that you add those two. And that it's not only oysters that have been greatly impacted, but it's also crab fisheries as well, and shrimp, and if there was an adequate time, more fishermen would be able to acknowledge and express this.

There is great need for it, that you really focus on fisheries restoration, and give these fishermen the opportunity to do some of this restoration work. They already have the equipment. They have the traditional ecological knowledge. They have the boats. They know the waters. They know the fisheries. It's a matter of choosing the right types of projects and scaling down the projects to meet some of the fishermen and - - but at the end of the day, they may just need modest training from some scientist. They could greatly help in collecting data that you need in order to really assess, you know, what's happening, whether it is doing any real restoration out there, inshore or offshore. So thank you for the opportunity to comment.

## PEPC Project ID: 60777, DocumentID: 68455
## Correspondence: 43

### Author Information

Keep Private:            No
Name:                    Sharon Hayes
Organization:
Organization Type:       I - Unaffiliated Individual
Address:                 N/A
                         N/A, UN N/A
                         USA
E-mail:

### Correspondence Information

Status: Reviewed                  Park Correspondence Log:
Date Sent:                        Date Received: 10/20/2015
Number of Signatures: 1           Form Letter: No
Contains Request(s): No           Type: Transcript
Notes:

### Correspondence Text

Hi. I'm Sharon Hayes. I'm an ecological economist, recently retired from the federal EPA and have worked on issues of the Gulf of Mexico for over a dozen years.

I very much appreciate the opportunity to - - for the trustees to hear me tonight, and I especially appreciate the presentations from Steve and also - - oh, my good friend, Jean, who I've worked with before. I understand this stuff in more detail than I ever have.

Two brief comments. Oh, it's so difficult to hear these damages again, I swear. But since the BP - - oh, gosh. The materials provided and the documents state that Mississippi will receive about 2.2 million of the $8.8 billion awarded for damages, and my first comment is that is way too low. We heard in some detail from Jean all the about the injuries that have been estimated or included in the report, but it's very incomplete. As a matter of fact, one of the - - as an example, one of the biggest damages that incurred to people on the Mississippi Coast is that ever since the BP oil spill, residents - - and I live here in Gulfport. Residents here along the Mississippi Coast no longer go in the water. We are afraid to go in the water. We're afraid that the oil, in combination with the dispersants and that with the bacteria and the other toxins, are going to make us very ill and or we might lose a limb as a result of flesh eating disease, which has happened. And so there are - - most residents of the Coast will not even wade in the water. This is a example of an ecosystem service, that the damaged resources give to the people along the Coast that has not been incorporated in the damage assessment.

And, of course, everybody knows about the dolphins, the dead baby dolphins who washed ashore, and that's another loss to the people not only of the Coast, but of the nation who value the baby dolphins' lives, and it's not incorporated in the damage assessment.

I have mentioned ecosystem services and ecosystem service valuation. That is the way in which

Correspondences - Department of Justice - Consent Decree - PEPC ID: 60777

the report is incomplete. It's - - geez. What is the cost of people, for example, of not being able to swim along the Coast or these baby dolphins? What ecosystem services or the value of those services are provided that have been lost? There - - in the Exxon Valdez oil spill, Kenneth Arrow, a renowned economist, pioneered these economic techniques, which are well known, in estimating the damages for Exxon Valdez, and he won a Nobel Prize for doing that. These techniques are not used in this damage assessment. Also, the National Academy of Sciences prepared a report, convened of a high-level group of experts to discuss an approach to the valuing of ecosystem services that could be used by the trustees in developing their damage and their injury assessments. The report was completed and it's not even mentioned in the report on injuries. And that - - those two - -

MR. FRANKLIN: I'd like to ask you to please go ahead and wrap up.

MS. HAYES: Okay. And, you know, I just about made it.

# PEPC Project ID: 60777, DocumentID: 68455
# Correspondence: 44

## Author Information

Keep Private:            No
Name:                    James Miller
Organization:
Organization Type:       I - Unaffiliated Individual
Address:                 N/A
                         N/A, UN N/A
                         USA
E-mail:

## Correspondence Information

Status: Reviewed                Park Correspondence Log:
Date Sent:                      Date Received: 10/20/2015
Number of Signatures: 1         Form Letter: No
Contains Request(s): No         Type: Transcript
Notes:

## Correspondence Text

My name is James Miller. I'm a Gulf Coast fishermen all my life. I've been affected by this BP oil spill health-wise, water-wise. I'm still living it today. I think our water quality is very terrible. I'm afraid to get in the water. I break out with rashes, zits, bumps all over my body. I'm still fishing today in it.

And I think the state has hid enough from us by not telling us the truth, you know, about the dispersants when they sprayed it out here on us. And I'm very disturbed about our fishing industry, the oyster reefs. I don't think the state of Mississippi is going to spend our money wisely for fishermen to put us back to work. We've been suffering since 2010 from the oil spill. Plus the Bonnet Carré Spillway has destroyed our oyster reefs.

I just left a meeting today with the DMR, Jamie Miller, Richard Gollott and had a terrible time with these nasty people about explaining about restructuring our reef out here. They want to go drudge our reef, and there's no resource there. Why don't we just close the season? I tried to explain to these people how, let's transfer oysters from other areas that's never been oystered in other years.

We're having problems with this money that's allocated to us, fishermen. They don't want to spend it on us. I think we have problems with money exchanging amongst Mississippi and our governors. I don't think you're going to come down here and spend this money wisely, restructuring our Gulf. I really don't.

I've been lied from - - about the dispersants. I've been in the hospital 52 times, 108 days total. I've been detoxed four times, benzene, hyaline in my blood stream. I've been lied to. Didn't have respirators on the job. I worked 100-and-something days for the VU program. State totally lied to us. BP lied to us.

I'm living a nightmare. I'm seeing a psychiatrist, asking them if this is for real, what I'm going through, economical loss. I've lost all my oyster money. I usually make $60,000 a year oystering. I made $10,000 last year. I mean, and it's been closed for years due to the oil spill and Bonnet Carré Spillway.

I think we need to look at economically rebuilding our Gulf Coast out here with the money we have. And our politicians are not doing a very good job. I'm a fisherman and sadly, I've got to go and argue with these people that's got those jobs, high-paying jobs and degree jobs. And I'm just a fisherman, been in business all my life and got to argue with the money that's been handed down to restructure these oyster reefs that's been destroyed by the - - the dispersants still in the water.

I can bring you out there today on my boat, drop my anchor and give you a life of - - go down and dive in the water and come up with a mayonnaise jar of whatever you want to see. You would be amazed the water quality. I mean, it's terrible. And this is - - our state has acknowledged it. It's been a lie from 2010 to this day. I live it every day right now. I'm 50 years old and I'm breaking outs with pimples, rashes. I'm afraid of the water and I work every day in it. I've got to feed my family and it's been a struggle. It truly has. Economically, it's been a disaster. And I just don't feel like our government, federal or state, has stepped to the plate and showed us something. We're still starving to death. And there's money allocated from NOAA right now to help us fishermen restructure our ecosystem out there. I just want to know what's wrong with these people? Why don't they want to do the right thing with this money and put us back to work?

I mean, I've got a $200,000 vessel that's capable of catching $100,000 worth of product and they keeping it tied to the dock. They've got the resources and the money. I'm sad that Jamie Miller at the DMR and Phil Bryant, our governor, with this panel of people like y'all, that's - - I'm glad y'all are listening to me. Y'all are really focusing because I have a rough time with these people. They very arrogant. They nasty. And I think our governor needs to reweigh our DMR board down here because we're dealing with people who don't want to issue the money out correctly and restructure our reefs. And this is terrible. I've been going through this for years with them since the oil spill. This ain't something that's come about. And I got invited to this meeting tonight because they thought that my input here would be very knowledgable to y'all. I mean, I've been doing this since I was four years old, fishing. I ain't never had another job.

MR. FRANKLIN: If I can have you wrap up, Mr. Miller, I'd appreciate it.

MR. MILLER: All right. I thank y'all for listening to me. I just need - - I just know that someone in this world needs to come alive and understand that our oyster programs, our shrimp programs, our estuaries, our sanctuaries needs to be addressed with this millions and millions of dollars that's being handed down and not misspend it and put it in the wrong direction. Thank y'all for listening.

# PEPC Project ID: 60777, DocumentID: 68455
# Correspondence: 45

## Author Information

Keep Private:            No
Name:                    Yolanda Ferguson
Organization:
Organization Type:       I - Unaffiliated Individual
Address:                 N/A
                         N/A, UN N/A
                         USA
E-mail:

## Correspondence Information

Status: Reviewed                Park Correspondence Log:
Date Sent:                      Date Received: 10/20/2015
Number of Signatures: 1         Form Letter: No
Contains Request(s): No         Type: Transcript
Notes:

## Correspondence Text

Hi. I'm Yolanda Ferguson, and my husband is a commercial net maker. He makes the nets for all
these gentlemen you see. Well, he was toxified because of this and nobody bothered to tell us. I
had to go through what you wouldn't believe to find out what you were poisoning my husband
with. He wouldn't go to the doctor because he wouldn't create medical bills because he couldn't
pay them because he has to feed us and our children.

Well, now we're being told we don't know what we're doing. He had to stop making nets.
Nobody wants to take my nets because he can't repair them. Because when he gets out there and
repairs them, he gets sick, very sick, like to the point of everything you can think. That's horrible.
You know, if you're going to have a lot of money - - you know, we've got a really bad dispersant
problem. Nobody talks about it, but every one of our fishermen is suffering from it, every one of
them. Ask them. The money is not going to be sent where it needs to go. I bet you. The same
reason they didn't tell us about the dispersant. And wives like me, who got their families
completely toxified, had to figure it out on their own.

We still don't have answers. Y'all don't have the answers. We don't have the answers. The long-
term effects of this, does anybody know? Does any one of y'all have any idea what chemically
poisoned really means from a dispersant firsthand? It's the most horrible experience. They sit
here and they do this (demonstrating). They throw up. They sweat. They like to have died. And
you know how I found out? Somebody had the courtesy to tell me as my husband was suffering.
Then I couldn't get him to go to the doctor. He finally had to quit. We had a discussion. He no
longer makes used gear. If he makes new nets, he cannot touch them. Would you buy a new car
you couldn't service, any one of you up there? The point we're making is the water is toxic.
You have a spill that y'all talk about your loss, the Clean Water Act, I've read it. All these laws

y'all talk about, how many of these laws do they cover? They sunk the oil. They sunk it because they pay by the barrel of oil, not by how many barrels they clean up, how many barrels they sunk. I was told they have a tarmac around the oil well, 10 miles, the size of Rhode Island. Do you realize that every time they put a net in there, they go through there and they pull it through the net again? Some person like my husband that fixes it, gets it again. It is toxic. I would hope and I pray that y'all don't ever let this happen again, that they spray this. Please don't give the spiller the right to control the spill again because when he does, he damages everybody else. We all live here. They destroyed our Gulf. They destroyed our way of life and our livelihood. My husband leaves now just so he can support his family so I don't lose my husband. I have a choice, being my financial security or losing my family. Which one is more important? That's all I have to say.

**PEPC Project ID: 60777, DocumentID: 68455**
**Correspondence: 46**

## Author Information

| | |
|---|---|
| Keep Private: | No |
| Name: | Joseph Ferguson |
| Organization: | |
| Organization Type: | I - Unaffiliated Individual |
| Address: | N/A |
| | N/A, UN N/A |
| | USA |
| E-mail: | |

## Correspondence Information

Status: Reviewed      Park Correspondence Log:

Date Sent:      Date Received: 10/20/2015

Number of Signatures: 1      Form Letter: No

Contains Request(s): No      Type: Transcript

Notes:

## Correspondence Text

Hello. My name is Joseph Ferguson. I have my own business and I'm a commercial net maker. It's Joseph's Trawl.

My wife summed it up pretty good. Let me explain a little bit to you so that you understand about trawls. Trawls go along the bottom. They're like a plow. They stir it up. Okay? You know, and this stuff goes up and comes through the net. Well, this stuff is getting back on these nets. And when it gets on these nets, the dispersant, this oil sticks to the stuff. Okay? And it sticks to everything it touches. So when it comes to me, I'm working it with my hands. Well, like you might come up and touch it or the fisherman touch it, they're getting sick, but you wouldn't know it because, you know, you just touched it for a few minutes. And it might make you sick. It might not. You really wouldn't know it made you sick. But me, I touch it for eight hours or longer. It depends on, you know, what needs to be done to it. And it like to have killed me. I laid on the sofa and like to have died from it. So that's just, you know, part of it.

BP denied me. I'm a business. They denied me. I know this doesn't have nothing to do with the businesses. I've been explained this, but they denied me and denied me. They said, oh, you have no claim for 2010, which is correct. This stuff didn't start showing up at my house until 2011 because the 2010 nets were from 2009. The 2011 nets were from 2010. And so I got denied across the board, so I got no economic settlement from this, none at all, and probably won't get none.

But the point is, it's still out there. It still is coming in. I take a sample from these fishermen random every year to see if it's still making me toxic, still making me sick and it does. So I don't know want to say.

You know, that's good that you - - the government is settling with them. That's good. Put the

money to good use. Washington - - the government, make them spend it where it's supposed to be spent. Don't let them siphon it off over here and over there because that's what they'll do. All the money they sent down after the storm, that come through here, they siphoned off over half of it to some other thing that really didn't even involve the storm. They didn't give it to the people like the government wanted them to. They took it and spent it on their pet projects. So don't let them do this to y'all's money. And I hope that, you know, you have oversight over your settlement that you're getting so that, you know, it goes - - the money goes where it belongs. I want to thank you for listening to me. Like I said, it's not the benefit for me. My business will get nothing out of this. And, you know, I appreciate your time and like I say, thank y'all again.

# PEPC Project ID: 60777, DocumentID: 68455
# Correspondence: 47

## Author Information

Keep Private:                      No
Name:                              N/A N/A
Organization:
Organization Type:                 I - Unaffiliated Individual
Address:
                                   Plantation , FL 33324
                                   USA
E-mail:

## Correspondence Information

Status: Reviewed                        Park Correspondence Log:
Date Sent: 10/30/2015                   Date Received: 10/30/2015
Number of Signatures: 1                 Form Letter: No
Contains Request(s): No                 Type: Web Form
Notes:

## Correspondence Text

This amount of money to pay for the awful horrible horrendous spill is not enough.

# PEPC Project ID: 60777, DocumentID: 68455
# Correspondence: 48

## Author Information

Keep Private:           No
Name:                   N/A N/A
Organization:
Organization Type:      I - Unaffiliated Individual
Address:
                        Fairfield , CT 06810
                        USA
E-mail:

## Correspondence Information

Status: Reviewed                Park Correspondence Log:
Date Sent: 11/01/2015           Date Received: 11/01/2015
Number of Signatures: 1         Form Letter: No
Contains Request(s): No         Type: Web Form
Notes:

## Correspondence Text

The value of the settlement should be represented in present value so that the public can have a
more meaningful estimate of what they are getting.

## PEPC Project ID: 60777, DocumentID: 68455
## Correspondence: 49

### Author Information

| | |
|---|---|
| Keep Private: | No |
| Name: | Howard Page |
| Organization: | Gulf Restoration Network ● Official Rep. |
| Organization Type: | L - Non-Governmental |
| Address: | N/A |
| | N/A, UN N/A |
| | USA |
| E-mail: | |

### Correspondence Information

| | |
|---|---|
| Status: Reviewed | Park Correspondence Log: |
| Date Sent: | Date Received: 10/20/2015 |
| Number of Signatures: 1 | Form Letter: No |
| Contains Request(s): No | Type: Transcript |
| Notes: | |

### Correspondence Text

Good evening. I'm Howard Page. I'm making comments for the Gulf Restoration Network.  And the first comment I'd like to make is to extend the request for a 15-day extension of the comment period. We've already put that down in writing. But we think that there is some really good work that's been done here, but there's just a lot to digest. And we really appreciate the desire to move along expeditiously and to get this done. But at the same time, given the kind of - - the size of the information, the volume of information needs to be digested, 15 additional days is kind of - - you know, kind of prudent and reasonable and it's also significant. You know, that's a lot more time to make thoughtful comments and to digest this information.

Another comment I'd like to make is about the governance structure. We have some concern about - - of course, a project of this scope, there is going to be no easy answer to how do you govern this and - - with the adaptive management, and this is really kind of the first time something like this of this scale has ever happened. And we appreciate that this is - - there is no easy answer for a governance structure. But one concern we have is that all of  the administrative costs are coming out of the open ocean element, and we feel that - - and that's, of course, where the damages originally occurred and it's where a lot of damages did occur. So we thought it would be more fair if something that was more equitable across all of the groups where all of the groups contributed to the administrative costs, we would prefer that.

Also, there's just a general concern about the governance structure, that although I know that you do recognize the need for consistency across the groups, that actually is one of our concerns, is as you have these siloed groups, that it's going to be a real challenge to be consistent. And then

the another concern that we have is - - in addition to consistency, is the public and nongovernmental organizations interfacing and the fact that we would have to interface with each of these elements, you know, and there's kind of no one place for the public to interface if they wanted to offer a comment on the whole process.

So thank you very much. I don't need all of the time, which is unusual. But thank you very much and we appreciate what you're doing.

## PEPC Project ID: 60777, DocumentID: 68455
## Correspondence: 50

### Author Information

| | |
|---|---|
| Keep Private: | No |
| Name: | Jill Mastrototuro |
| Organization: | National Wildlife Federation ⦿ Official Rep. |
| Organization Type: | L - Non-Governmental |
| Address: | N/A |
| | N/A, UN N/A |
| | USA |
| E-mail: | |

### Correspondence Information

| | |
|---|---|
| Status: Reviewed | Park Correspondence Log: |
| Date Sent: | Date Received: 10/20/2015 |
| Number of Signatures: 1 | Form Letter: No |
| Contains Request(s): No | Type: Transcript |
| Notes: | |

### Correspondence Text

Good evening. I'm Jill Mastrototuro with the National Wildlife Federation, policy specialist, working on Gulf restoration issues in Mississippi and Alabama.

And as the worst environmental disaster in our nation's history, it's very clear that the trustees were handed no simple task in responding to the Deepwater Horizon oil disaster. The National Wildlife Federation wants to thank the trustees for their tremendous effort over the last five plus years in responding to the disaster and developing a damage assessment and the restoration plan that we now have in front of us.

We recognize that the release of this Draft Programmatic DARP and the Consent Decree represent a crucial milestone and the long road to Gulf restoration. And we are seeing funding flowing for project implementation. At the same time, decisions made at this juncture will impact restoration actions and the intended success of those outcomes for decades to come.

And allowing adequate public time for review and comment of the documents are critically important in that regard. And so while we appreciate the 60-day comment period, I do want to also acknowledge the 15-day extension request that you have in front of you.

To that end, we're culling through the documents, and I just had a couple of points to offer. In particular, we wanted to commend the trustees' commitment to investing upwards of 95 percent of the NRDA dollars to restore the Gulf's urgent ecological needs, rather than focusing on the recreating and public access portion of potential projects. We believe that the best way to impact

offsets from the disaster is to focus on our resources, our wetlands, our wildlife, our marine life, our water quality, and also to support critical pillars of our economy here, like tourism and seafood.

We're also pleased to see monitoring included as one of the fundamental pieces of the plan's five goals. A robust scientific process is essential to plan for and measure the future  success of this restoration effort. It's particularly encouraging to see the trustees commit $37 million to establish and maintain a Gulf-wide environmental data management system, and this system should be publicly accessible and it should also be part of a formal data sharing plan that the trustees should develop.

It will take a significant amount of proactive planning and coordination among the trustees, the restore council, the Gulf Environmental Benefit Fund and other decision-makers in order to maximize the dollar value of every potential project, every potential restoration opportunity that we have to invest in.

And we hope that many of you who serve on the restore council will look at the updated comprehensive planning effort to come to provide this clarity and ensure an inspiring and detailed roadmap for Gulf restoration.

We also wanted to re-enforce that the PDARP and Consent Decree should explicitly prohibit the use of any funds for projects or programs that damage our resources in the Gulf, that includes directly, indirectly, or cumulative.

And so in closing, we know that  restoration efforts are only beginning to get underway and we have a long process for finalization and implementation of this plan. We look forward to providing written comments shortly. Thank you.

Correspondences - Department of Justice - Consent Decree - PEPC ID: 60777

# PEPC Project ID: 60777, DocumentID: 68455
# Correspondence: 51

## Author Information

Keep Private:          No
Name:                  Thao Vu
Organization:          Mississippi Coalition for Vietnamese Fisherfolks and Families
Organization Type:     L - Non-Governmental
Address:               N/A
                       N/A, UN N/A
                       USA
E-mail:

## Correspondence Information

Status: Reviewed            Park Correspondence Log:

Date Sent:                  Date Received: 10/20/2015

Number of Signatures: 1     Form Letter: No

Contains Request(s): No     Type: Transcript

Notes:

## Correspondence Text

Good evening, everyone. My name is Thao Vu. I'm a representative of the Mississippi Coalition for Vietnamese-American Fisher Folks and Families.

And it's good to see some familiar faces from the last night. I did have the opportunity to attend the first public meeting in Houma, Louisiana. I'm here again to reiterate, emphasize and add some additional comments, which I feel will be - - you know, I think it's very - - really critically important, particularly that impacts and affects fishing communities and the sustainability of fishing.

The first comment I would like to share is that, first of all, the proposed BP settlement - - and this is reiterating from last night, as well as this proposed draft plan from the trustee council - - is two very separate or supposed to be two very separate, complex complicated processes that involve many regulations and policies. Therefore, these public meetings should have been scheduled separately, not in tandem.

The second point I would like reiterate is that both was formally announced at the same time about two weeks ago. That does not give the public adequate time, and I think the low turnout here is reflective of that. We've had previous meetings here where over half of the seats were filled, and today, really, it's very low turnout, considering this is probably critically - - the most critically important meeting, you know, in restoration for our Gulf, its ecosystems, marine life. So I'm very disappointed, more than disappointed that we did not get sufficient notice to actually have more folks show up.

Correspondences - Department of Justice - Consent Decree - PEPC ID: 60777

The point I would like to make is that in reviewing the proposed settlement - - I want to go back to the Exxon Valdez, and what I and many fishermen have learned, that several years after the Exxon Valdez, the herring fish population, which was a very valuable fish for many of the commercial fishermen there, that fish, it collapsed. And to this day, over 25 years later, it has not returned.

And in this proposed settlement there is a re-opening clause and it was after the Exxon Valdez that the federal government took a lead in making sure there was a re-opening clause for future unknown damages.

We don't think - - and I want to bring back what the first attendee speaker said, that was Ms. Hayes over there. She mentioned that there was some critically important valuation, particularly economic valuations that have not been used, even though it was developed by the Nobel Prize winner. It has not been sufficiently used or comprehensively used by the trustees to really fully assess all the damages and loss in terms of the full ecosystem benefits of all the resources.

And if that has not been adequately evaluated, this is not a fair settlement. This is not a matter of greed or demand anymore. This is a matter of fair restitution. Our Gulf, this ecosystem is invaluable. You cannot put any dollars to it. You cannot quantify it. You cannot. And particularly for our fishermen, their livelihoods, it has been in serious danger. They're losing their livelihoods with each passing season, day, year.

MR. FRANKLIN: I've got to ask you to please wrap up, please.

MS. VU: Yes. My last comment regarding the NRDA is that we are particularly asking the NRDA trustees to designate someone to work with the Vietnamese fishing community since we comprise over half of the commercial fishing in this region.

Number two, we are asking that in terms of the program types, you specifically write the word "crab" and "shrimp restoration." There is oyster restoration as a type, but we would like you to write crab and shrimp.

Thank you for the opportunity to comment.

# PEPC Project ID: 60777, DocumentID: 68455
# Correspondence: 52

## Author Information

Keep Private:              No
Name:                      Cao Bai
Organization:
Organization Type:         I - Unaffiliated Individual
Address:                   N/A
                           N/A, UN N/A
                           USA
E-mail:

## Correspondence Information

Status: Reviewed              Park Correspondence Log:
Date Sent:                    Date Received: 10/20/2015
Number of Signatures: 1       Form Letter: No
Contains Request(s): No       Type: Transcript
Notes:

## Correspondence Text

Good evening. My name Bao Cai. My family has been commercial fishermen in Mississippi for over 25 years.
MS. CAO: (Speaking in Vietnamese.)
MS. VU: Due to the BP oil drilling disaster, my livelihood has been greatly impacted. Particularly, there is a high number of dead oysters and closed oyster reefs and has caused great financial hardship for my family in the past five years.
MS. CAO: (Speaking in Vietnamese.)
MS. VU: Regarding the proposed BP settlement, it's critically important - - and this is what I had also reiterated last night - - to extend the public comment deadline to at least February of 2015. Right now, it is still in the middle of shrimping season. Many fishermen are not aware of this proposed settlement, and it's only fair that we give them additional time to be notified of this, which critically affects their livelihoods. The second recommendation is to really focus on fisheries restoration and to hire locally displaced fishermen because they have a lot of the skill sets ready to help restore the fisheries. Her last recommendation is the great need to establish a Regional Citizen Advisory Council, or known as ACRC, that was set up after the Exxon Valdez and is at the Prince William Sound. And we should be modeling that critically - - and there is a great need to establish that.
MS. CAO: (Speaking in Vietnamese.)
MS. VU: Her last comment is regarding the NRDA proposed draft programmatic plan, which is please add restoration of crabs and shrimp fisheries. My comments are extremely important to my livelihood. Thank you for the opportunity to comment. Thank you.

Correspondences - Department of Justice - Consent Decree - PEPC ID: 60777

## PEPC Project ID: 60777, DocumentID: 68455
## Correspondence: 53

### Author Information

| | |
|---|---|
| Keep Private: | No |
| Name: | Tony Le |
| Organization: | |
| Organization Type: | I - Unaffiliated Individual |
| Address: | N/A |
| | N/A, UN N/A |
| | USA |
| E-mail: | |

### Correspondence Information

| | |
|---|---|
| Status: Reviewed | Park Correspondence Log: |
| Date Sent: | Date Received: 10/20/2015 |
| Number of Signatures: 1 | Form Letter: No |
| Contains Request(s): No | Type: Transcript |
| Notes: | |

### Correspondence Text

Good evening. My name is Tony Le, and I was - - I shrimp and oyster for 20 years. (Speaking in Vietnamese.)

MS. VU: My name is Tony Le, and I am a longtime commercial fisherman. I'm a shrimper, as well as an oyster harvester.

Due to the BP oil drilling disaster, my livelihood has been destroyed. Many of the oyster reefs here in Mississippi remain closed - - mostly closed. And since - - in the past five years, it hasn't even been open a whole year for us. And before BP, it was open at least six, seven months a season, as well as my shrimp catch has been extremely low, and I actually go shrimping inshore waters.

MR. LE: (Speaking in Vietnamese.)

MS. VU: Okay. Regarding his comments for the proposed BP settlement, also critically important just like the previous speaker is to extend this public comment deadline. The fishing - - fishermen here would like to make sure there's adequate time Good evening. My name is Tony Le, and I was - - I shrimp and oyster for 20 years. (Speaking in Vietnamese.)

MS. VU: My name is Tony Le, and I am a longtime commercial fisherman. I'm a shrimper, as well as an oyster harvester.

Due to the BP oil drilling disaster, my livelihood has been destroyed. Many of the oyster reefs here in Mississippi remain closed - - mostly closed. And since - - in the past five years, it hasn't even been open a whole year for us. And before BP, it was open at least six, seven months a season, as well as my shrimp catch has been extremely low, and I actually go shrimping inshore waters.

MR. LE: (Speaking in Vietnamese.)

Correspondences - Department of Justice - Consent Decree - PEPC ID: 60777

MS. VU: Okay. Regarding his comments for the proposed BP settlement, also critically important just like the previous speaker is to extend this public comment deadline. The fishing - - fishermen here would like to make sure there's adequate time for them to share this with other fishermen. It's critically important.

The second recommendation is to really, again, focus on fisheries restoration. After Hurricane Katrina, there was a number of projects Gulf-wide where fisherman were employed, including collecting fisheries data, oyster relay, transplant projects and other projects where local fishermen were hired. He's asking for the same thing, to really help restore the fisheries. The third recommendation is regarding the natural resource damage assessment programmatic draft plan, to make sure, again, that you include shrimp, restore shrimp and crab. It is critically important to fishing communities and our livelihoods. Please implement our recommendations. Thank you.

# PEPC Project ID: 60777, DocumentID: 68455
# Correspondence: 54

## Author Information

Keep Private:          No
Name:                  Gilbert Ramsey
Organization:
Organization Type:     I - Unaffiliated Individual
Address:               N/A
                       N/A, UN N/A
                       USA
E-mail:

## Correspondence Information

Status: Reviewed              Park Correspondence Log:
Date Sent:                    Date Received: 10/20/2015
Number of Signatures: 1       Form Letter: No
Contains Request(s): No       Type: Transcript
Notes:

## Correspondence Text

Good evening, my name is Gilbert Ramsey. I'm a concerned citizen and veteran.
I like to initiate opportunities to break down the barriers for the disabled community, meaning that I'd like employment opportunity for the disabled community, meaning that I'd like recreational opportunity for the disabled community, meaning I'd like tourist opportunity for the disabled community.
I've been internationally recognized for  this opportunity through the World Leisure Congress of 2014 in Mobile, Alabama. I reached out to independent living organizations. All these countries came back to me and inquired what type services the Hospitality State has to offer, which is me because I reached out to them. So I have a portal for my PP contract, Project 1273. It introduces education, stewardship opportunities. Dr. Graham and Dr. Snyder at Gulf Research Laboratory introduced me to this opportunity of inclusion people. So I recognized this venture and this vision to incorporate this vision.
So I'm just an old country boy with a passion and opportunity for a composite industry, meaning that I will develop this appropriately. I'm going to Walter Reed Medical Center October 23rd to introduce this opportunity for wheelchair accessibility technology. Meaning that we have this opportunity to recognize this venture, meaning that I have to have sponsorship to enable myself to enjoy this opportunity up there with these scientists, professors and everything to enable me to come back to the University of Southern Mississippi to partner up  with the University of Southern Mississippi and all the universities that they've accomplished - - with the Restore Act they're accomplishing, because - - Dr. Rikard and Dr. - - I lost my concept vision.
But all of them recognized me, the governor and everybody. I'm not here to try to toot my horn, blow my horn, whistle, nothing. I'm just trying to initiate an opportunity for sponsorship to

enable me to get to Walter Reed Medical facility to enable me come back to introduce this opportunity with the disabled community. And I'm here to help us. I'm here to recognize this venture for economic, commercial development that recognizes strategically and appropriately for employment opportunities for scientists, professors, biologists. NOAA even recognizes me because of the volunteer organization that they're trying to recognize. How many disabled people would volunteer their time to commit themselves for scientific research? Come on. It's a win-win situation here.

So please recognize what I'm trying to accomplish and identify this appropriately for all of us. Because I'm not the average. I've been told I'm unique, I'm a genius, I'm a noblest man, and passionate man. I understand this, but I've had open heart surgery twice.

And I'm being recognized for the mis-clusterings, all the marine technologies and everything else. They reached out for observation opportunities. So here we go, Ladies and Gentlemen, unique opportunity here, and I'm here to recognize and represent it appropriately. I'm concerned, and I'm here to handle it appropriately with everybody's best interest.

Thank you very much for your time. Have a blessed day.

## PEPC Project ID: 60777, DocumentID: 68455
## Correspondence: 55

### Author Information

| | |
|---|---|
| Keep Private: | No |
| Name: | Chris Legarde |
| Organization: | |
| Organization Type: | I - Unaffiliated Individual |
| Address: | N/A |
| | N/A, UN N/A |
| | USA |
| E-mail: | |

### Correspondence Information

| | |
|---|---|
| Status: Reviewed | Park Correspondence Log: |
| Date Sent: | Date Received: 10/20/2015 |
| Number of Signatures: 1 | Form Letter: No |
| Contains Request(s): No | Type: Transcript |
| Notes: | |

### Correspondence Text

Good evening, once again.

The - - I guess I have to ask a question of the Justice Department. Can we comment on the Consent Decree? Is that also a part of what's going on here? And then the NRDA folks are taking comment on that?

And this is a selfish point of view, state, federal agencies are exempt from filing a claim? That is a fact, I believe.

MR. FRANKLIN: Subject-matter experts will be here following the comment portion in the lobby to answer any specific questions. This is your opportunity to offer comment.

MR. LAGARDE: Okay. All right. My question is: Why were state agency and federal agency people exempted from filing a claim?

MR. FRANKLIN: And they can address that in the lobby.

MR. LAGARDE: Okay. My comment would be, I think that needs to be looked at before this Consent Decree is signed, so that's that comment.

NRDA folks, living shoreline, my favorite project, I was here last night, Sound Science, the USM people, presented their ideas about what they're going to do to try help the oystering industry, a lot of science, a lot of Ph.D.'s. Good stuff.

Today at the marine resource commission meeting, all those recommendations of Sound Science were cast away. And because of a political decision, what they decided to do actually is open up an area where early NRDA money put down cultch material and is now called spat. They want to go in and catch what ever little oysters are there and bring them to harvest. Okay? That's how short-sided...

You folks on federal side, I applaud you for what you do. You're giving up your time. I

understand that. What happens, we get down to the local level and there's a disconnect and I don't know how you deal with that. Because you do the best you can to make sure that the money is being spent properly. And then we get a decision like we got today, which, in my opinion - - well, I'll just leave it at that.

Living shoreline, it was conceived, as I understand, by federal agencies and BP early on in the process, early NRDA money. It was a bad project that's becoming a better project because of public comment. It actually had to go out for two - - a proposed change, and the change is substantial enough from the first project permit  application that they had to have another go at it. And we just - - the commission was going to vote on that today, but they voted to uphold it. The problem is the federal agencies decided that this was a project that had to go, and now the states are having to deal with making this thing work. And it's a lot of money, it's 50 million. It's not enough money. I told a commissioner today, you've got to go back to the till. If you going to do this project, you need to do it right. 50 million is not enough to do this project, and that's another whole issue. But my concern is if we start up this way from the very beginning, it's going to be hard for us to get back on track.

Water quality, we've got to do something about water quality. I'm not afraid to go in the Gulf because of dispersants. I'm afraid of going in the Gulf because of failing sewage treatment and raw sewage. We've got to do something about that.

Thank y'all very much.

## PEPC Project ID: 60777, DocumentID: 68455
## Correspondence: 56

### Author Information

| | |
|---|---|
| Keep Private: | No |
| Name: | Chris Legarde |
| Organization: | |
| Organization Type: | I - Unaffiliated Individual |
| Address: | N/A |
| | N/A, UN N/A |
| | USA |
| E-mail: | |

### Correspondence Information

Status: Reviewed      Park Correspondence Log:

Date Sent:      Date Received: 10/20/2015

Number of Signatures: 1      Form Letter: No

Contains Request(s): No      Type: Transcript

Notes:

### Correspondence Text

Good evening, once again.

The - - I guess I have to ask a question of the Justice Department. Can we comment on the Consent Decree? Is that also a part of what's going on here? And then the NRDA folks are taking comment on that?

And this is a selfish point of view, state, federal agencies are exempt from filing a claim? That is a fact, I believe.

MR. FRANKLIN: Subject-matter experts will be here following the comment portion in the lobby to answer any specific questions. This is your opportunity to offer comment.

MR. LAGARDE: Okay. All right. My question is: Why were state agency and federal agency people exempted from filing a claim?

MR. FRANKLIN: And they can address that in the lobby.

MR. LAGARDE: Okay. My comment would be, I think that needs to be looked at before this Consent Decree is signed, so that's that comment.

NRDA folks, living shoreline, my favorite project, I was here last night, Sound Science, the USM people, presented their ideas about what they're going to do to try help the oystering industry, a lot of science, a lot of Ph.D.'s. Good stuff.

Today at the marine resource commission meeting, all those recommendations of Sound Science were cast away. And because of a political decision, what they decided to do actually is open up an area where early NRDA money put down cultch material and is now called spat. They want to go in and catch what ever little oysters are there and bring them to harvest. Okay? That's how short-sided...

You folks on federal side, I applaud you for what you do. You're giving up your time. I

understand that. What happens, we get down to the local level and there's a disconnect and I don't know how you deal with that. Because you do the best you can to make sure that the money is being spent properly. And then we get a decision like we got today, which, in my opinion - - well, I'll just leave it at that.

Living shoreline, it was conceived, as I understand, by federal agencies and BP early on in the process, early NRDA money. It was a bad project that's becoming a better project because of public comment. It actually had to go out for two - - a proposed change, and the change is substantial enough from the first project permit  application that they had to have another go at it. And we just - - the commission was going to vote on that today, but they voted to uphold it. The problem is the federal agencies decided that this was a project that had to go, and now the states are having to deal with making this thing work. And it's a lot of money, it's 50 million. It's not enough money. I told a commissioner today, you've got to go back to the till. If you going to do this project, you need to do it right. 50 million is not enough to do this project, and that's another whole issue. But my concern is if we start up this way from the very beginning, it's going to be hard for us to get back on track.

Water quality, we've got to do something about water quality. I'm not afraid to go in the Gulf because of dispersants. I'm afraid of going in the Gulf because of failing sewage treatment and raw sewage. We've got to do something about that.

Thank y'all very much.

# PEPC Project ID: 60777, DocumentID: 68455
# Correspondence: 57

## Author Information

Keep Private:              No
Name:                      Spencer Doody
Organization:              Plaquemines Parish        ⊙ Official Rep.
Organization Type:         C - County Government
Address:                   N/A
                           N/A, UN N/A
                           USA
E-mail:

## Correspondence Information

Status: Reviewed                    Park Correspondence Log:
Date Sent:                          Date Received: 10/22/2015
Number of Signatures: 1             Form Letter: No
Contains Request(s): No             Type: Transcript
Notes:

## Correspondence Text

Hi. Good evening. I'm Spencer Doody. I'm Special Counsel for Plaquemines Parish government.
We have reviewed, as a parish, the damage assessment and feel it is evident that Plaquemines
Parish received the major brunt of oiling to its wetlands and had the highest levels of oiling.
This document raises more questions for us than it answers. But in particular, here are a few of
our questions.

First, we can tell from the assessment how many miles and acres of, quote, state lands were
oiled, and I'm referring to Table 4.6-18 and Figure 4.6-56. Does the Figure 4, quote, "state lands"
include lands owned by local governmental entities?

Second. Of the 656 miles of oiled wetlands the assessment found that were located in Louisiana,
the parish cannot tell which percentage of this occurred in Plaquemines. Does this information
exist, and if so, where can we find it?

Third. Assuming this information exists, how do we translate that information  into acreage,
since much of the restoration plan describes remedies and costs, as in earlier restoration plans,
per acre.

Fourth. With the investigation cited in the assessment, it was obvious that erosion of marsh was
extensive and ongoing throughout the studies. With the direct loss of marsh vegetation ongoing,
does the assessment account for future losses that will occur, particularly in Plaquemines Parish,
and are they targeted for restoration?

And then finally, how does the funding of NRD in Plaquemines Parish line up with the
restoration needs identified in the assessment? Is it equitable and will Plaquemines Parish receive
enough restoration efforts from the allocations to remedy the extensive harm done to its wetland
resources and marshlands? For example, are there any projects currently planned for Bay Jimmy,

which is still impacted by the intense oiling it received?
Until we have answers to these questions, we do not know, as a parish, whether we can support
the settlement.

# PEPC Project ID: 60777, DocumentID: 68455
# Correspondence: 58

## Author Information

| | |
|---|---|
| Keep Private: | No |
| Name: | Joel Loeffelholz |
| Organization: | Plaquemines Parish   ⊙ Official Rep. |
| Organization Type: | C - County Government |
| Address: | N/A |
| | N/A, UN N/A |
| | USA |
| E-mail: | |

## Correspondence Information

| | |
|---|---|
| Status: Reviewed | Park Correspondence Log: |
| Date Sent: | Date Received: 10/22/2015 |
| Number of Signatures: 1 | Form Letter: No |
| Contains Request(s): No | Type: Transcript |
| Notes: | |

## Correspondence Text

Good evening. My name is Joel Loeffelholz. I'm the Parish Attorney in Plaquemines Parish. We are attending this meeting and others because we feel, in Plaquemines, and are concerned that the Settlement Agreement reached by the state is inadequate. Even when just measured against the tens of thousands, actually 54,000 acres of parish-owned, in fee simple, the same as you own your home, land, marshland, which were - - of which 10,000 were heavily oiled and are basically lost and 44,000 - - or 34,000, forgive me, were more lightly oiled, the state is directing a very small part of this settlement to what we consider to be our parish, Ground Zero of the spill. Literally, Ground Zero. And those funds are to repair several barrier islands.

However, miles of interior marshland within Plaquemines Parish that we own have been severely contaminated and thousands of acres have been lost to the spill. We have also spent millions of dollars of our own funds combating the disaster. The economic impact on our parish was amazing, and you can just imagine - - that's where all the activity took place, so all of our services, everything like that.

Experts estimated upwards of 18 to $30 million just alone, just that; forget about the marsh itself, none of which has been addressed by this settlement. That's our question.

The diversion plan, long on the drawing boards, does not address the thousands of acres we're talking about and the loss of mineral rights, because once those acres are now gone, the oil has ruined the acres, and now instead of having any land, the marshland, it's now going to be water. Those mineral rights will revert somewhere else away from our parish.

Also, and finally, the diversion plan itself is uncertain whether it will actually create acreage in the marsh. There's no scientific evidence that that diversion plan will create acreage that's being lost because of the heavy oiling, every day, and in the future.

Correspondences - Department of Justice - Consent Decree - PEPC ID: 60777

That is the reason that we have these questions. That is the reason that we chose not to participate in the settlement, and that is the reason we are going to soldier on with our claims. Thank you.

## PEPC Project ID: 60777, DocumentID: 68455
## Correspondence: 59

### Author Information

Keep Private:            No
Name:                    David Colvin
Organization:            Grand Isle and Lafitte Levee Districts      ⊙ Official Rep.
Organization Type:       C - County Government
Address:                 N/A
                         N/A, UN N/A
                         USA
E-mail:

### Correspondence Information

Status: Reviewed                    Park Correspondence Log:
Date Sent:                          Date Received: 10/22/2015
Number of Signatures: 1             Form Letter: No
Contains Request(s): No             Type: Transcript
Notes:

### Correspondence Text

Thank you. My name's David Colvin. I'm a lawyer. I represent Grand Isle and Lafitte and their
respective Levee Districts, okay, with relation to the claim for the Deepwater Horizon Oil Spills
and the issues that evolved from there. My clients' concern with the settlement that the state has
reached is that it does not provide adequate compensation for the damage to their property or
resources, the  cost of recovery or removal of the oil.
Grand Isle, as we all know, the barrier island, which is Ground Zero for the spill, has 1200 full-
time residents who have been fighting for their livelihood since the spill that engulfed their
community in April of 2010.
Even today, this proud community continues to deal with offshore submerged tar balls which are
constantly degrading and bombarding the shore with tar balls. You can go out there today and
pick up all the tar balls you want.
Who's going to clean up the beach and pay for this cleanup over the next 10, 20, 30 years or
longer? Or who knows how long? The settlement is not adequate because there's not enough to
remove the millions of barrels of oil from the marsh, from the Gulf floor, and all that will
continue to wash up on our shorelines and marsh for years to come.
The Lafitte Levee District covers about 1300 acres in the Barataria Basin, all marshland,
including Raccoon Island, a pelican  preserve, a vital piece for the pelican survival. Most of the
property owned by the Levee District was oiled. Some of it was covered with oil, it was severely
contaminated, and the settlement does not adequately provide for the removal of that oil, the
removal of the contamination or to rebuild the marsh that was lost as a result of the oil spill.
The settlement is not enough to make these communities and entities whole. Thank you.
Appreciate your time.

Correspondences - Department of Justice - Consent Decree - PEPC ID: 60777

## PEPC Project ID: 60777, DocumentID: 68455
## Correspondence: 60

### Author Information

| | |
|---|---|
| Keep Private: | No |
| Name: | Thao Vu |
| Organization: | Mississippi Coalition for Vietnamese-American Fisherfolks and Families Official Rep. |
| Organization Type: | L - Non-Governmental |
| Address: | N/A |
| | N/A, UN N/A |
| | USA |
| E-mail: | |

### Correspondence Information

| | |
|---|---|
| Status: Reviewed | Park Correspondence Log: |
| Date Sent: | Date Received: 10/22/2015 |
| Number of Signatures: 1 | Form Letter: No |
| Contains Request(s): No | Type: Transcript |
| Notes: | |

### Correspondence Text

Good evening, again. This is Thao Vu. I'm with the Mississippi Coalition for Vietnamese-American Fisherfolks and Families. I initially did not sign the comment form, but I really want to piggyback on some of the very, very critically important comments made by the previous three speakers, specifically the attorneys, legal counsel.

First of all, the impacts to Plaquemines Parish, the resources, the natural resources there, it cannot be ever understated. The magnitude is just beyond devastating. I was just there, down there yesterday. In fact.

First of all, this type of meeting should be held in a more accessible location, particularly for those residents in Plaquemines Parish, in Venice, in Empire and Buras.

There are many fishing villages and communities down there, in Plaquemines Parish, and it is a far drive for them to drive all the way here to downtown New Orleans to attend this meeting, but yet this is - - this meeting  and the topic of this meeting critically, critically impacts those communities. Please do a much better job of selecting locations for these types of meetings. The voices of those residents must be heard, okay, and it has to be a process that is very accessible for them, okay. That was my first.

The second point is that, again, because many of those folks in Plaquemines Parish are not here, we urgently need for you to extend the comment deadline. We urgently need that. I've expressed that already at the first two meetings, in Houma, as well as in Long Beach, Mississippi. Thank you for the opportunity to comment.

# PEPC Project ID: 60777, DocumentID: 68455
# Correspondence: 61

## Author Information

Keep Private:            No
Name:                    Kara Lankford
Organization:            Ocean Conservancy        ⦿ Official Rep.
Organization Type:       L - Non-Governmental
Address:                 N/A
                         N/A, UN N/A
                         USA
E-mail:

## Correspondence Information

Status: Reviewed                Park Correspondence Log:
Date Sent:                      Date Received: 10/26/2015
Number of Signatures: 1         Form Letter: No
Contains Request(s): No         Type: Transcript
Notes:

## Correspondence Text

Hello. My name is Kara Lankford and
I'm with Ocean Conservancy, and we will be
providing detailed written comments to you as
well, but we respectfully request a 15-day
extension on the comment period, please.
Gunter's smiling at me. But we do believe
that the PR and the PEIS do provide a strong
vision and rationale for undertaking an
ecosystem approach to restoration of the Gulf,
following the BP oil disaster.
But we are concerned that the
proposed governance structure greatly weakens
the ability of the trustees to follow through
on the commitments they have made within the
PR.
Though our analysis is not yet
complete, we do commend the trustees on the
results and the injuries assessment. We
recognize the vast amount of time and work
that went into this effort and believe that
the injuries assessment and restoration
approach recommended represent a good start to

the restoration of the damaged Gulf resources.
We also applaud the trustees for
their commitment to monitoring and adaptive
management. We're pleased to see an
allocation of $1.24 billion to restoration
within the open ocean, where the disaster
occurred, and where impacts continue to this
day; however, we are disappointed with the
broad definition in terms of funding for the
open ocean allocation.

The open ocean allocation will be
charged with providing all federal
administrative and preliminary planning
activities across restoration of the areas.
We do not dispute that some funds must be
utilized for administrative planning purposes,
but taking all federal administrative costs
from the allocation dedicated to open ocean is
inappropriate.

In addition, four of the early
restoration projects to address lost
recreational use have been classified as open
ocean projects. These projects include
roadway and trail enhancements and the
purchase of boat ferries. None of these
projects, totally over 22 million, occur in
the open ocean, and none of it meets the
Consent Decree's definition of open ocean.
We believe that allocating any open
ocean funds to recreational use projects, past
or present, sets a bad precedent that will
allow trustees to pull from this account for
restoration activities that do not primarily
benefit ocean resources.

We believe these projects are better
suited for the region-wide, for state-based
allocations in the states where the projects
occur. And the PR also provides for a
governance structure that creates eight
trustee bodies, called trustee implementation
groups, which are composed of various subsets
of trustees. The subdivision of the central
decision-making authority will undermine the
effectiveness of local and ecosystem-wide
restoration and the functionality of the
restoration governance system, as a whole.

We strongly recommend that the
trustees reconsider this governance approach.
We also ask that all TIG governance documents
and SOPs be made available to the public for
comment. Thank you.

# PEPC Project ID: 60777, DocumentID: 68455
# Correspondence: 62

## Author Information

Keep Private:             No
Name:                     David Underhill
Organization:             Sierra Club        ⊙  Official Rep.
Organization Type:        L - Non-Governmental
Address:                  N/A
                          N/A, UN N/A
                          USA
E-mail:

## Correspondence Information

Status: Reviewed              Park Correspondence Log:
Date Sent:                    Date Received: 10/26/2015
Number of Signatures: 1       Form Letter: No
Contains Request(s): No       Type: Transcript
Notes:

## Correspondence Text

My name is David Underhill and I'm
the Conservation Chair of the Mobile Bay and
Alabama Sierra Club, and it might sound to you
like my remarks are outside the legal bounds
of your responsibility. I hope to convince
you otherwise.
Two days ago, the strongest reliably
recorded hurricane hit the coast of Mexico and
the remnants of it are now buffeting this
city, which accounts both for the traffic jam
outside here earlier this evening and the
sparse crowd here.
In July, the world recorded the
highest average monthly temperature ever,
since reliable records began in the 1880s,
according to NOAA and various other geological
agencies, for six months of the year, a record
of all time, last year was the highest average
world temperature. This year is on course to
be another record.
For the past 30 years, every month
has been like a Lake Wobegon; they have all

been above average in global temperature for
that month, 30 years running. These are the
consequences of the fossil fuel economy that
brought us the oil volcano that has us here
this evening.
We've got to change paths rather
than try to restore and remediate the damage
done by this. You are constrained by the law
in what you may propose, but I am going to
urge you to push the boundaries of your
authority in every possible way to make sure
that, in the future, these accidents that are
trying to turn our world into - - slowly in a
crockpot - - are not repeated, and that's the
course we need to take rather than restoring
the damage already done. Please use your
authority in that direction as much as
possible.
The things that can be done are
somewhat simple, as programs that hire people
to weatherize houses, to put solar collectors
on the roof, to build transportation systems
that don't rely on individual SUVs burning up
more and more oil, requiring people to drill
more and more offshore.
All of these things need to be done,
and to the extent that you can push the
boundaries of your authority in public
awareness in that direction, rather than
trying to undo damages that I suspect we
cannot really undo, you will be serving the
public and the future generations. Thank you.

Correspondences - Department of Justice - Consent Decree - PEPC ID: 60777

# PEPC Project ID: 60777, DocumentID: 68455
# Correspondence: 63

## Author Information

Keep Private:            No
Name:                    Patricia Hall
Organization:            Operation Home Care   ;  ⦿  Member
Organization Type:       L - Non-Governmental
Address:                 N/A
                         N/A, UN N/A
                         USA
E-mail:

## Correspondence Information

Status: Reviewed                    Park Correspondence Log:
Date Sent:                          Date Received: 10/26/2015
Number of Signatures: 1             Form Letter: No
Contains Request(s): No             Type: Transcript
Notes:

## Correspondence Text

Good evening. I am Patricia Hall.
I am a community activist and volunteer with
Operation Home Care. My concerns are
community engagement and outreach. We work
with the communities of Grand Bay, Cogehan,
St. Elmo and Pearlington. We are the only
group in any of these communities providing
the process of what you all are trying to do.
I live on the water, and as I heard
Ms. Cowan, and saw the illustration, the map
that she had; whereas, I could go in my
backyard and catch fish, now my husband and I
cannot fish there; there are no more fish.
There are no more crabs. There is nothing.
It's gone.
As a child, I grew up in this city,
with my mother, fishing, two and three times a
week. Her youngest grandchild was seven years
old. Does not have beach access. It's all
gone. You all have taken it away. There are
no public areas where we can take her fishing.
We worked with the very last black

fishermen group. They're gone. This disaster
caused many to lose their boats, to lose their
livelihoods, to move away from the area.
I'm asking you, please, please do
not spend this money on trivial things like
hotels and other things that were not there.
This says "restore." Restore what was there.
Place these monies in the areas that were
impacted. Help to restore those people who do
not have the access and the livelihoods that
they once had. Thank you.

# PEPC Project ID: 60777, DocumentID: 68455
# Correspondence: 64

## Author Information

Keep Private:           No
Name:                   Jackie Antalan
Organization:
Organization Type:      I - Unaffiliated Individual
Address:                N/A
                        N/A, UN N/A
                        USA
E-mail:

## Correspondence Information

Status: Reviewed                Park Correspondence Log:
Date Sent:                      Date Received: 10/26/2015
Number of Signatures: 1         Form Letter: No
Contains Request(s): No         Type: Transcript
Notes:

## Correspondence Text

Hello. I see so many new faces here
tonight. A lot of you all may remember me.
I'm not going to kill the messenger yet. We
have serious concerns.
First and foremost, this is not
community engagement. This is a public
meeting. The community is not engaged. It's
significant. We have been saying it over and
over and over and over and over and over and
over again and we will continue to say it.
The most impacted communities, the most
impacted people in this area are not here.
They are not getting the information from the
trustees. It is not being provided in a
timely manner.
Engagement, as we defined in the
earlier public meetings - - that should be a
matter of record - - information that is given
today should have already been provided to the
community at least 30 to 45 days ago. That
information should have been taken out to the
impacted communities and explained to them.

Correspondences - Department of Justice - Consent Decree - PEPC ID: 60777
Page 86 of 342

1400 pages. Oh, my God. Really? 1400 pages?
And you expect the general community
to be able and the small NGOs that work with
the communities to be able to interpret that
when you guys are having problems with it? My
head is about to explode.
I've been here forever and I think I
know as much about this as everybody else, but
my mind and my head is exploding.
We have - - we have to - - if you are
serious about doing what's right and what is
best for the community, we have to get serious
about it and this is not serious.
My recommendation is, one, my public
comment is, again, this is not community
engagement. This is a public meeting and we
are getting into what you have already done.
We have not been informed. We don't know what
we need to know. It's important to make a
credible comment. We are, again, concerned
about the public good being served. Y'all
know, Alabama, Mississippi, yeah, we don't
have any money. We've got to do better. Good
is not enough. We've got to make this impact.
The urgency of this just seems to have just
disappeared.
This isn't - - this is no job. This
is no job. This is our home. This is our
backyard. This is our great-grandchildren.
Our children has forgotten about it. Our
children don't go - - my kids go to Miami.
They don't go in our backyard any more. That
doesn't happen. We are requesting clearer
definitions.
Again, we have asked over and over
and over and have commented over and over
again that the definitions are too vague and
broad.
We are also requesting that the
council considers increasing the unknown. The
urgency of the 1 billion for early
restoration, the urgency of what the unknown
is, we're asking, at a minimum, that the
unknown be increased from 700 million to 1
billion, at the minimum, 1 billion.
The second matter is that we

strongly recommend that, again, and we
recommended this over and over and over again,
a Citizens Advisory Council, form a Citizen
Advisory Council. That is the linkage. What
we are doing, we're trying to get as much
information out to the public, but that is not
our role. That's you guys' role. That's your
role to identify how to - - how do you get this
to the impacted - - this information to the
most impacted community.
You would think that there was no
fishermen in Alabama. Yeah, they are. But
they're not going to come to this meeting.
For what? I'm not going to get up there and
try to talk about something that - - you've got
this big old thing and they got all this
information and we're trying to dissect it and
we've got five other groups trying to dissect
it for us - -
MR. FRANKLIN:
If I could ask you to wrap up,
please.
MS. ANTALAN:
Pardon?
MR. FRANKLIN:
If you could go ahead and wrap up.
MS. ANTALAN:
Okay. And finally, we're asking for
an extension of the comment period to
February 2016. Thank you.

# PEPC Project ID: 60777, DocumentID: 68455
# Correspondence: 65

## Author Information

| | |
|---|---|
| Keep Private: | No |
| Name: | Casi Callaway |
| Organization: | Mobile Baykeeper   ⊙ Official Rep. |
| Organization Type: | L - Non-Governmental |
| Address: | N/A |
| | N/A, UN N/A |
| | USA |
| E-mail: | |

## Correspondence Information

| | |
|---|---|
| Status: Reviewed | Park Correspondence Log: |
| Date Sent: | Date Received: 10/26/2015 |
| Number of Signatures: 1 | Form Letter: No |
| Contains Request(s): No | Type: Transcript |
| Notes: | |

## Correspondence Text

Thank you so much for having this
time. I appreciate it very much. I clearly
also haven't also read the 1400 pages at this time,
but need more time, and we support the two
previous requests for extensions of time. I'm
sorry, I'm Casi Callaway. I'm Director of
Mobile Baykeeper.
A couple of quick points just in
beginning to glance through everything that I
do want to highlight is - - No. 1 is we need to
ensure that the additional $25 million that is
set aside in public access and recreational
activities is not put forward to the Gulf
State Park area. There's currently $135
million that's going to that area alone. We
do have public access problems. I think Ms.
Hall outlined that as well, all over our
community, and our park recreation, we need to
make sure we're spreading that money around to
lots of different areas.
I also want to highlight in here - -
this is the first time we've gotten to hear

the federal, all of the feds, the trustees
really talk about the actual impact, and
though frightening and awful and terrible, it
really feels good to know that you actually
know what we are worrying about.
So I do want to stress that. It's
important that we start to tell the public
what is going on, what went on, that there
were injuries, that there was traumatic
injury, and while we, of course, believe this
should be about a bazillion dollars instead of
just this much, it's good to see the
discussion change to talk about impacts.
One of the questions that we have
about that $700 million is, is there interest.
Does the $700 million go into the bank today
so that that $700 million can become something
big? The fear always will be the "what if."
What if we have the same thing happen as Exxon
VALDEZ, and in 20 years, we lose a species?
700 million won't cut it. So let's make sure
that funding especially gets put in early and
that it adds interest. Interest, yeah,
that's - -
Planning. So there's $20 million
put aside for Alabama for planning here. We
commend planning. Alabama has not done it
well enough. We are now finally focusing on
it. It's exciting to see and hear. It gives
us such an ability to catch up on what other
states have done and around the country, and
it gives us a clear run and a clear direction.
The thing we want to really caution
on is that the natural resource damage and the
NRDA Trustees are focused the same with the
National Fish and Wildlife Foundation funding
and with the TOP-2 (phonetic) money that just
came out, that FDL money that just came out
for planning as well.
Let's make sure we are looking at
that in a comprehensive fashion and it's not
lots of separate plans and events.
And then I do want to agree, also,
with Kara Lankford about making all planning
documents available. All of the information
should be publicly available as quickly as

Correspondences - Department of Justice - Consent Decree - PEPC ID: 60777

possible.
And then I'll just reiterate what
Ms. Hall said, is that we absolutely need to
make sure that what we spend these funds on is
a generational change, not on something
trivial, but something real and lasting for
our community. You have worked a very long
time these last five years, countless hours,
and we are grateful and we are willing to
stick in there with you all as well.

## PEPC Project ID: 60777, DocumentID: 68455
## Correspondence: 66

### Author Information

Keep Private:             No
Name:                     Thao Vu
Organization:             Mississippi coalition for Vietnamese-American Fisherfolks and Families
Organization Type:        L - Non-Governmental
Address:                  N/A
                          N/A, UN N/A
                          USA
E-mail:

### Correspondence Information

Status: Reviewed                  Park Correspondence Log:
Date Sent:                        Date Received: 10/26/2015
Number of Signatures: 1           Form Letter: No
Contains Request(s): No           Type: Transcript
Notes:

### Correspondence Text

Good evening. I'm Thao Vu. I'm
Director of the Mississippi Coalition for
Vietnamese-American Fisherfolks and Families,
and I think most of the folks on the stage
have heard me. This is the fourth time. I've
attended all the meetings thus far all around
the region.
Good evening, Commissioner Gunter.
I think you're the only individual that I
haven't had an opportunity to make the
comments to.
I really want to reiterate, on some
of the previous comments that were made
earlier, one of the first questions that was
made to you when I entered this building was,
is there any fishermen that will attend this
meeting? No, I don't think any fishermen are
here.
Actually, the closest fishing
communities in Alabama, they're in Bayou La
Batre and Coden, about 30 minutes away.
As someone who has attended all of

these public meetings, that is the one group,
the fishing communities, that have not really
been able to effectively attend because of the
short public notice regarding these public
meetings, with the exception of Mississippi,
where we had the highest number of oyster
fishermen, specifically Vietnamese-American
fishermen, where my organization is based.
That has only been the one where we had some
attendance and some engagement. That is
unacceptable.
First of all, these communities bore
the impact, a disproportionate impact.
They're the ones whose livelihoods are
critically dependent on healthy ecosystems,
healthy wildlife, healthy fisheries.
Yet these meetings are not
accessible to them and this has - - this is a
point that I have raised in previous meetings.
They need more notice, at least a minimum of
one month notice. They are not aware of the
Federal Register. In fact, many people are
not aware of the Federal Register. There
needs to be a list of more accessible venues
for these communities.
There are community centers in some
of these fishing communities that would
definitely be more accessible for them to
attend these meetings versus meetings that are
held in downtown areas, in hotels. There are
a lot very accessible for them. This needs to
be changed immediately. It's not acceptable.
Therefore, for those reasons, again,
I implore the Department of Justice and the
Trustee Councils to extend the public comment
deadline for the BP proposed settlement, to
extend it to February 2016. For the NRDA
Trustee public comments and the Draft Plan, to
extend it to at least March of 2016.
And again, for the BP proposed
settlement, that we're requesting, urgently
requesting the formation of a Regional
Citizens Advisory Council; that is greatly
needed, and to ensure that commercial
fishermen and/or their designees are
adequately represented at the RCAC level.

Correspondences - Department of Justice - Consent Decree - PEPC ID: 60777

Another point I would like to
mention, too, is regarding the settlement and
the amount proposed for the settlement. In
particular, it's very unacceptable for future
damages, that is for around $700 million,
which includes adaptive management. That is
greatly inadequate.

As we have learned from previous
disasters mentioned earlier, such as Exxon
VALDEZ, and the potential for fisheries to
collapse, we should not accept $700 million.

In fact, $700 million is not going
towards unknown damages when there is a great
possibility it could be used all for adaptive
management and there will not be any funds
left for future damages, or an insufficient
amount; therefore, that is not an acceptable
figure. Thank you for the opportunity to come
and speak.

# PEPC Project ID: 60777, DocumentID: 68455
# Correspondence: 67

## Author Information

Keep Private:               No
Name:                       Mark Berte
Organization:               Alabama Coastal Foundation      ⦿ Official Rep.
Organization Type:          P - Conservation/Preservation
Address:                    N/A
                            N/A, UN N/A
                            USA
E-mail:

## Correspondence Information

Status: Reviewed                    Park Correspondence Log:
Date Sent:                          Date Received: 10/26/2015
Number of Signatures: 1             Form Letter: No
Contains Request(s): No             Type: Transcript
Notes:

## Correspondence Text

Good evening. My name is Mark
Berte. I'm Executive Director of the Alabama
Coastal Foundation and we have a mission to
improve and protect our coastal environment
through cooperation, education and
participation. I appreciate you all letting
us have this public comment period tonight and
I do want to start off by thanking you all not
only for taking the comprehensive approach in
your proposal, but also for setting aside the
funds for adaptive management, which I know
that other plans have not done that, so I like
the foresight, and if there is additional
funds to be able to put into that, as you all
know, you know, things do come up, so the more
funds that are there, the more we will be able
to handle that.
I just wanted to give you three very
small recommendations that I think could have
a very large impact, the first of which is to
amend the plan to either require or to
strongly encourage every single project that

gets funding for this, through this effort, to
put a public education or outreach component,
even though - - the ocean, you know,
information that's for the - - you know, just
the hardcore scientist, even asking them, to
encourage them to take the time to think
about, you know, before the project starts,
during the project, and then afterwards, what
can the public learn from this resource that
we are so blessed to have here locally.
And then so the second very small
tweak is in your - - the trustees' restoration
goals, that middle column, provide monitoring,
adaptive management and administrative
oversight to support restoration
implementation. Just put a slash after
"monitoring" and put "reporting" as well. We
want to hear from you all. You know, we know
that you all are going to have this
information and you're going to put it on the
website, but think about how you can - - you
know, to really put it into layman's terms so
that they can understand, you know, what you
all are doing with these funds, these funds
that are going to be generational funds, these
things that will be passed down, so that those
stories could be told as well.
And then the final thing, again,
this is something, you know, very small, and
it involves the process, extend it at least 15
days. It sounds like other folks need a
little bit more time, so just consider at
least doing a 15-day extension, at a minimum,
I think, to allow more folks to be engaged in
this process.
This is such an important thing and
you all have taken so much time to develop
this plan and we want to make sure that as
many voices get a chance to be heard as
possible. So thank you all for your time.

# PEPC Project ID: 60777, DocumentID: 68455
# Correspondence: 68

## Author Information

Keep Private:             No
Name:                     Janet Bowman
Organization:             Nature Conservancy         ⊙ Official Rep.
Organization Type:        L - Non-Governmental
Address:                  N/A
                          N/A, FL N/A
                          USA
E-mail:

## Correspondence Information

Status: Reviewed                  Park Correspondence Log:
Date Sent:                        Date Received: 10/29/2015
Number of Signatures: 1           Form Letter: No
Contains Request(s): No           Type: Transcript
Notes:

## Correspondence Text

I'm Janet Bowman with the Nature
Conservancy, the Florida chapter. Thank you for this
opportunity to provide public comment. Certainly, we
appreciate the Herculean effort that went into negotiating
the Consent Decree and preparing the PDARP. We really
appreciate the public service of everyone involved.
As far as specific comments, one of the areas that
we're focusing on is the operation and structure of the
trustee implementation group. And one of the things that
we think could benefit from some further clarification is
setting forward public participation opportunities in
addition to commenting on proposed plans.
Since the process will no longer be in sort of the
NRDA litigation mode, we would hope that there's some
opportunities for public participation, project selection
that are a little more generous than what could be
provided in the NRDA structure.
But that being said, we certainly appreciate the
opportunity that we've been afforded with our Florida
trustees to suggest projects. So you know, that's been
fabulous. But just across the board, particularly with
the federal trustees, I know particularly you're more in a

noticing comment kind of mode. We just think there's an opportunity for more interaction with stakeholders and the public.

In addition to setting forth the structure, I think one of the things that we would like to see is maybe some specific discussion of how decisions are made in terms of saving up money for projects that require large expenditures of funds beyond the yearly allocation and ensuring that there's the opportunity to sort of stage funding for projects over time. Also, the opportunity to perhaps contribute both from federal pots and from the state-based TIG to contribute money for larger projects. Another comment I'd like to make is I really appreciate in the restoration description part of the PDARP, the identification of some adaptive management, really, some signs that's been indicated from the damage assessment that really informs project selection. I notice particularly the oyster restoration, which is very well-known in Florida, identifying the importance of nursery, larval enhancement projects as a type of restoration, that might be more important than some of the shell placement that had been done in the past. So I think that's just a good example of how the restoration science that's identified in the PDARP can be used to move forward in project selection.

And finally, one suggestion the Nature Conservancy has is with the open ocean portion, that that particular category is going to be difficult to come up with projects. It's a large amount of money. One suggestion for perhaps changing the Consent Decree is to have a provision that if it's difficult to spend that money for tangible projects, allowing that money to be reallocated for more inland fisheries, related habitat projects.

Thank you.

# PEPC Project ID: 60777, DocumentID: 68455
# Correspondence: 69

## Author Information

Keep Private:          No
Name:                  Peter Quasius
Organization:          Audubon of the Western Everglades    ⊙ Official Rep.
Organization Type:     L - Non-Governmental
Address:               N/A
                       N/A, N/A N/A
                       USA
E-mail:

## Correspondence Information

Status: Reviewed            Park Correspondence Log:
Date Sent:                  Date Received: 10/29/2015
Number of Signatures: 1     Form Letter: No
Contains Request(s): No     Type: Transcript
Notes:

## Correspondence Text

It's close enough. I'm Pete Quasius
with the Audubon of the Western Everglades. I'm also the
vice chair of the Snook and Gamefish Foundation. And I'd
like to echo Ms. Bowman's comments.
This is one huge ecosystem, and of the importance the
estuaries in southwest Florida is vital to the overall
issues of the Gulf. Those tarpon that made Boca Grande
famous continue to go north past Homosassa and spend quite
a bit of time in the open ocean. We wish we knew where
the aggregation area for those tarpon were, and that may
be one of the opportunities to use that deep ocean money.
The blue crabs that used to fund or provide one
quarter of the blue crabs that are sold in Annapolis used
to come out of the Caloosahatchee River. We've lost most
of the sea grass in that estuary and most of the
productivity.
Those southwest Florida estuaries are key to the
overall productivity of the Gulf, and while the northern
estuaries may be damaged, we have an opportunity with
restoration further south, where we did not see oil on our
beaches but nonetheless suffered significant damages to
our ecosystem, that we can perhaps augment and replace

that.
We used to have a tremendous pink shrimp industry.
It was an important element within the overall shrimping
industry where they go from one species to another in the
course of the year. We've lost a bunch of that, but we
are on the cusp, we hope, of recovering. If we start
restoring the coast from the Picayune Strand down to the
10,000 Islands, if we get the reservoirs built in the
Caloosahatchee, we can restore the sea grasses and renew
that productivity that made the Gulf famous.
So again, while we did not suffer direct oil on our
beaches, we did not see a slick on our waters, we
nonetheless realized some very significant impacts because
those huge tarpon that went north, we want them to come
back hail and hardy the following year and be able to
provide that small school of fish that spends a
significant part of their lifecycle in the southwest
Florida warm waters. So please keep that in mind as we
move forward.
Thank you.

# PEPC Project ID: 60777, DocumentID: 68455
# Correspondence: 70

## Author Information

Keep Private:            No
Name:                    Brad Cornell
Organization:            Audubon Florida        ⦿  Official Rep.
Organization Type:       L - Non-Governmental
Address:                 N/A
                         N/A, N/A N/A
                         USA
E-mail:

## Correspondence Information

Status: Reviewed                Park Correspondence Log:
Date Sent:                      Date Received: 10/29/2015
Number of Signatures: 1         Form Letter: No
Contains Request(s): No         Type: Transcript
Notes:

## Correspondence Text

Good evening. I'm Brad Cornell. I'm
here on behalf of Audubon Florida, and I appreciate the
opportunity to address you all.
I've had a chance to talk to a couple of you
beforehand in the warm-up time, and I want to first say
for the Consent Decree, Audubon is pleased that it has
been drafted. We are very supportive of it moving
forward. One of the aspects of it, the 15-year
implementation of the payout time, while that sounds like
a long time, frankly, I think it's a good thing because
I'm not sure that we're ready to spend money really,
really fast right now. And adaptation and adaptive
management will be an important part of this process.
Regarding the PDARP restoration plan, Audubon
supports the proposed ecosystem and restoration plan that
you've got. $300 million for Florida is a substantial
amount of money. I would suggest that one component of
that be land acquisition. When you look at the watersheds
for these estuaries, that's one part of this restoration.
We also need to have - - and I've shared this with a
couple of you. We need to have detailed coordination of
the PDARP restoration plan, this restoration plan, and the

comprehensive restoration plan. These are big restoration plans and a lot of overlap. I know that there are separate criteria; but nevertheless, as I've shared with a couple of you, I think you have the opportunity to staff on a project-specific basis ways to monitor and coordinate to make sure we get a good outcome and not conflict with each other.

I also wanted to flag the issue of the burden impact estimates that are in the restoration plan. I did have a good conversation and recognize that there have been some additional data that have been collected, but the Haney, et al. study, the Marine Ecology Progress, it's a whole order of magnitude different estimate. We'd love to see that resolved to some better accuracy.

Nevertheless, Audubon clearly supports a robust restoration funding for restoration of fledging and coastal birds in the Gulf of Mexico.

The final point I want to make is a sort of programmatic one, which is that we - - Audubon really strongly supports this idea. It's also seen in the comprehensive restoration plan of getting significant Gulf ecological lift by restoring coastal estuary and watershed all around the Gulf.

If you want to restore - - and my colleague, Pete Quasius, touched on this as well. If you want to restore fisheries, you've got to look at the estuaries. You've got to look at where the fisheries are born and hatched and then migrate from. So that would indicate that you could gain significant lift by looking even in places like southwest Florida, even as far down as Florida Bay, which is heavily impacted right now.

The Caloosahatchee estuary, the Charlotte Harbor estuary, projects like the C43 reservoir, Mercury Bay watershed restoration - - Mercury Bay is a really important estuary. It's a research reserve. We should be investing and figuring out how do those estuaries feed and fuel the fisheries that are the subject of commercial and recreational fishing all around the Gulf.

Thank you very much.

# PEPC Project ID: 60777, DocumentID: 68455
# Correspondence: 71

## Author Information

| | |
|---|---|
| Keep Private: | No |
| Name: | Jessica Koelsch |
| Organization: | National Wildlife Federation    ⊙ Official Rep. |
| Organization Type: | L - Non-Governmental |
| Address: | N/A |
| | N/A, N/A N/A |
| | USA |
| E-mail: | |

## Correspondence Information

| | |
|---|---|
| Status: Reviewed | Park Correspondence Log: |
| Date Sent: | Date Received: 10/29/2015 |
| Number of Signatures: 1 | Form Letter: No |
| Contains Request(s): No | Type: Transcript |
| Notes: | |

## Correspondence Text

Hello. Jessica Koelsch, National
Wildlife Federation. You know how on Facebook when
somebody puts something that you like, you put "times
two." So I just wanted to "times two" for all of the
speakers that just went.
I know that I spoke to you on Tuesday night, but I
ran out of time, so I have a couple of other points that I
just wanted to mention. One was related to Gulf sturgeon.
I thought the PDARP did a really good job of highlighting
impacts to those as well as the types of restoration that
they were looking at and the importance of the spawning
rivers.
And I noticed that the sturgeon fell under the Open
Ocean category; however, they talked about the restoration
efforts that were going to happen in the spawning rivers,
which are obviously not open ocean. And in fact, six of
the major river systems that are known to support the
reproducing subpopulations are in Florida. So I would ask
that the trustees consider allocating some of that
sturgeon restoration fund specifically to Florida. And
that is a comment I guess more on behalf of myself as the
Florida person for NWF, not NWF as a whole.

I also want to highlight, as we've heard, the estuaries of southwest Florida, especially Charlotte Harbor, Tampa Bay, Sarasota Bay, that they have other important roles to the fisheries throughout the Gulf of Mexico. And again, a lot of work has been identified specific to the open ocean, but there are opportunities to kind of crosscut restoration categories. If you address the water quality in, say, Charlotte Harbor, then that's going to benefit the fisheries and the open ocean areas as well. So look for opportunities, perhaps, to leverage among restoration categories.

The last point I wanted to make actually touches on that same issue of kind of crosscutting across restoration categories and across geographic areas. You know, the TIGs are identified by region, but some restoration categories absolutely crosscut regions and need a solid means of coordinating efforts that do crosscut those regions and/or categories, for instance, sea turtles, marine mammals, birds. And those may take place in specific states, in the open ocean and Gulf wide. Likewise, there may be intersections or crosscutting across categories like an open ocean or fish restoration project is going to have impacts - - and like I said, crosscutting is the term that comes to mind - - the deep water reefs and benthic habitats as well.

So I really urge you in the final version in the PDARP to give a lot of thought to how those efforts will be well coordinated. One of my Audubon counterparts, who's not here today, loves to use the phrase air traffic control, and definitely need to see a lot of that.

There also could be a role for the community, for the public, for NGO organizations, such as myself and some of the other folks here, who kind of see a lot of that going on as well and just ask to continue to be involved in the process throughout the way.

Thank you.

# PEPC Project ID: 60777, DocumentID: 68455
# Correspondence: 72

## Author Information

Keep Private:            No
Name:                    Darryl Boudreau
Organization:            Nature Conservancy    ⊙  Official Rep.
Organization Type:       I - Unaffiliated Individual
Address:                 N/A
                         N/A, N/A N/A
                         USA
E-mail:

## Correspondence Information

Status: Reviewed                    Park Correspondence Log:
Date Sent:                          Date Received: 10/29/2015
Number of Signatures: 1             Form Letter: No
Contains Request(s): No             Type: Transcript
Notes:

## Correspondence Text

Awesome. My nickname is Boo-Boo. My
teachers could never pronounce it. They'd go Darryl Bou
- - Bou. So Darryl Boudreau of the Nature Conservancy.
So first off, thank you all very much for coming down
here and - - seriously, true story. I'm trying to help you
out here.
So I want to start off by staying thank you very
much. We have a 1,400-page document to document the
injury as best you can. It was a tremendous amount of
work. Really appreciate you and all the people that
you're representing that were out in the field collecting
samples. Tremendously important work. Thank you.
More importantly, I want to thank you for the Cliff
Note version, which in high school I wish I would have
read and made better grades and gotten into a better
college.
So that Cliff Note version that you all did that
summarized the injury, summarized the restoration plan,
incredibly important. We've been working with our
counties, and we've actually shown it to several counties,
and they have been tremendously helpful. So I wanted to
thank you for that, because it's a way to assimilate or

absorb that information in a very quick manner and get
good perspectives. So thank you. They're very helpful.
In Florida, I want to thank FWC and DEP because they
have been working other sources of money to invest in
planning, which is going to be very important, obviously.
So trying to lessen your workload, if you could leverage
the Surface Water Management plans that are being
developed and updated as a way to jumpstart your
restoration plans. Where there's AEP, you can use CCMPs;
where in north Florida, EPA was very EPA, was very awesome
about submitting the estuary program information under Pot
2. So I would suggest leveraging those investments in
creating one organization to have many of you seeing as
part of those leverage that as a way to develop your
restoration plans. You know, don't reinvent the wheel,
save yourselves some time and effort. It can be very
helpful.
And I want to thank you for making that happen, all
three of you. It's awesome. I know more of you all did,
but the poster children - - I mean, adults.
So the last thing is I know you guys - - I came to DEP
and was always beat up because we couldn't issue permits
fast enough. And the reason for that was lack of flood
mitigation in the panhandle, but also, there's just
demand; the number of permit applications coming in far
exceed the permitter's ability to process them quickly.
So I think comments were made early on as far as
beefing up the permitting process and streamlining it.
The ability to permit those in a timely manner, to get the
on-the-ground restoration going is going to be very
important. So I think trying to put a little bit of
advocacy for picking up MIMs would be incredibly helpful.
I think that a lot of these processes are going to involve
permit review.
And I think that's it. I want to thank you all again
very much for coming, and make sure you tip the
waitresses, and you have a wonderful night in Tampa.
Thank you.

## PEPC Project ID: 60777, DocumentID: 68455
## Correspondence: 73

### Author Information

| | |
|---|---|
| Keep Private: | No |
| Name: | Jeff Helms |
| Organization: | |
| Organization Type: | I - Unaffiliated Individual |
| Address: | N/A |
| | N/A, N/A N/A |
| | USA |
| E-mail: | |

### Correspondence Information

Status: Reviewed                    Park Correspondence Log:

Date Sent:                          Date Received: 10/27/2015

Number of Signatures: 1             Form Letter: No

Contains Request(s): No             Type: Transcript

Notes:

### Correspondence Text

Thank you very much. I am
Jeff Helms. I'm with Atkins. We're the RESTORE
consultant for Santa Rosa County. I really appreciate
all of you being here. It's so important for us to
hear what you have, and I learn something every time I
do bring the road show, as I call it, back to
Pensacola. It's very important.
My comment was regarding the economic damages
settlement. I understand that the settlement, as
I heard it tonight, was separate. It's not a part of
the consent decree that we're talking and discussing
tonight. Is that a correct and fair statement? Okay.
The other thing I noticed, it's not a question, but
is there - - and maybe from Mimi - - is there an
opportunity to comment on the settlement agreement
on the economic damages part of that? That may
be something - -
MR. FRANKLIN: If you'll just go ahead and
make your public comments.
MR. HELMS: Okay. I'm very happy about the
$700 million in adaptive management. I think that's
very important as you go through, and we appreciate

you doing that. We can even see it being higher,
because as things go you're going to see the things
you need to change and adapt as you more forward.
So I'm really happy about that.
To go back to the original intent of being
here, I wanted to comment on the consent decree, which
it's not part of the consent decree, the economic
development damages. The State of Florida passed a
law directing $2 billion to go to the state;
$1.5 billion of that, 75 percent, will go to the
(inaudible) fund, and I think that's very important.
There was basically almost a unanimous vote in the
state legislature. The problem we have is the
legislature is under term limits in the State of
Florida, unlike a lot of other states, and the folks
that understand the impacts from the Deepwater Horizon
and the economic impacts to our Northwest Florida
counties probably will be termed out within the next
two, three, four years. And so what we were trying to
do is memorialize current state statute in the
settlement agreement so that we would have that
understanding the urgency to perpetuate for the full
30 years of the impact on economic damages.
The $1.5 billion in Northwest Florida can
go a long way. It makes generational impact appear;
whereas, it will not make the same type impacts, say,
in Miami or a high urban area around the state. We
were just trying to make sure that it was focused.
But I do, back on the topic, really appreciate all of
the work that's gone into it. Fourteen hundred pages,
I expected it to be 3,000 pages, the amount of effort
that goes in this NEPA. It's a difficult situation,
but I do appreciate your being here and sharing your
information. Thank you.

## PEPC Project ID: 60777, DocumentID: 68455
## Correspondence: 74

### Author Information

| | |
|---|---|
| Keep Private: | No |
| Name: | Barbara Albrecht |
| Organization: | Panhandle Watershed Alliance ⊙ Official Rep. |
| Organization Type: | L - Non-Governmental |
| Address: | N/A |
| | N/A, N/A N/A |
| | USA |
| E-mail: | |

### Correspondence Information

| | |
|---|---|
| Status: Reviewed | Park Correspondence Log: |
| Date Sent: | Date Received: 10/27/2015 |
| Number of Signatures: 1 | Form Letter: No |
| Contains Request(s): No | Type: Transcript |
| Notes: | |

### Correspondence Text

Thank you. I am
Barbara Albrecht, and thank you for hosting this
public meeting and providing me the opportunity to
address you. I'm representing today the Panhandle
Watershed Alliance, the Florida Audubon and the
Francis M. Weston Audubon Society, the Bream
Fishermen's Association, the Native Plant Society, and
that's just to name a few. Collectively we're really
glad to see the consent decree was released and is
moving forward.
As Audubon, we believe that the Florida
estimates for the bird losses are woefully
underestimated for Florida.
As the Panhandle Watershed Alliance, we find
it interesting that Florida is the only state to
receive water quality, nutrient reduction,
sedimentation, and hydrologic restoration funding,
for which we are incredibly grateful, but we also
recognize that these impairments are a direct result
of the development in low-lying areas which is
incentivized by counties which receive the largest sum
of their general funds from property taxes. So we'd

like to have some sort of balance there. To that end,
we'd like to see sensitive lands acquired, encourage
local governments to incentivize combination easements
along creeks, streams, rivers, to buffer these systems
and enhance watersheds by improving water quality for
the bay and the Gulf.

As president of the Bream Fishermen's
Association, an organization which became active when
all the seagrass meadows began to disappear in the
1970s, we would hope to see funding towards the basics
of the food chain in our habitat, which I believe was
covered by your previous speaker. As we understand
it, Florida will not be receiving money for the fish
and water column invertebrates. The SAV hopefully,
when water quality improves, will come back. And our
deep sea organisms that we have, especially in Texas,
we have the Texas flower banks, we hope that they're
in good shape, but we haven't heard about it, so we're
curious.

As the Native Plant Society, we understand
the complexities between healthy uplands and healthy
water. We value each species and we would hope that
efforts to replace basic species of plants and animals
would be coordinated via the adaptive management
comprehensive plan. Currently we recognize that
lionfish are terrifying to our fisheries, but we feel
the very same way about cogongrass, popcorn trees, and
Japanese climbing fern. We are also very grateful for
the expenditure plan for NRDA and would like to
request special attention to the coordination, i.e.,
air traffic control opportunities.

The adaptive management comprehensive plan
must be better coordinated, and at this point I'd like
to make a personal suggestion that we have oversight
to the long-standing citizens groups that have been in
this area, including the St. Andrews management areas,
the Choctaw Bay Alliance, Bream Fishermen Association,
and the Friends of Perdido Bay. These groups have
been together and have been active in our area for
over 25 years and up to 50 years. They have never
received formal funding, but they dig into their own
pockets for the opportunity to protect and monitor,
so they should be supported.

Lastly, coordination is important so we can
avoid bad conservation or bad stewardship decisions.
Examples of these would be the Round 2 NRDA funded - -

Round 2 funded Audubon to monitor shorebirds along the coast. Round 3 NRDA moneys funded a parking lot in an area known as a colony for snowy pluggers. Groups that are on the ground from the ground up can give you this information. Groups from the top down might not have that information.

Currently in Escambia County there are a number of large parcels that are being eyed for high density development. Several creeks that drain these landscapes flow into the Perdido River, which is known as an outstanding Florida water, and it has an added designation as being special waters of the state. Shoe-horning 13,500 homes into 1,400 acres will have a negative impact on these creeks. This is a call to increase coordination by multiple orders of magnitude and allow citizens a role in this process. Speaking of processes, the documents being discussed at this meeting are well over 1,000 pages. Would there be a better way to get public input? Thank you for your time and attention.

# PEPC Project ID: 60777, DocumentID: 68455
# Correspondence: 75

## Author Information

Keep Private:              No
Name:                      Jessica Koelsch
Organization:              National Wildlife Federation
Organization Type:         L - Non-Governmental
Address:                   N/A
                           N/A, N/A N/A
                           USA
E-mail:

## Correspondence Information

Status: Reviewed                    Park Correspondence Log:
Date Sent:                          Date Received: 10/27/2015
Number of Signatures: 1             Form Letter: No
Contains Request(s): No             Type: Transcript
Notes:

## Correspondence Text

Hello. Thank you,
Perry, for pronouncing my name right. Jessica Koelsch
with the National Wildlife Federation. And I'd like
to thank the trustees, and definitely the staff - - I
think they're sometimes overlooked - - for all the
effort that went into preparing the document that we
have before us and for convening these public
meetings. Given the unprecedented scope and nature of
the Deepwater Horizon disaster, we appreciate the
undertaking of this damage assessment and producing
the draft programmatic. It was no minor task.
The release of the DARP and the consent
decree represents a critical milestone on the road to
restoration, and we're very eager to see the funding
start to flow into project implementation. The
decisions that happen now at this juncture, as well as
the next step when the projects and programs are
selected, are going to determine the direction and
outcomes of restoration for decades to come. So it's
really important to get it right, and if that means
taking a little bit more time, so be it. But this is
a really critical step.

Although the National Wildlife Federation's
analysis of the documents is ongoing, and we'll be
providing more detailed written comments, I wanted to
touch on a couple of major points. First of all, we
support comprehensive integrated ecosystem restoration
as is described throughout this PDARP. We would like
to see that through every step of the process, and
every source of oil spill-related funding, we
generally support the council's approach.
We also really commend the trustees for their
commitment to investing the vast majority of the NRDA
dollars to address the ecological restoration rather
than the recreational and public access projects. In
fact, really want to commend Florida as the one state
that specifically recognizes that the best way to
address the loss of recreational use is by improving
water quality. And I think that in the plan or in the
overview under the water quality goal, you say it
really well. The goal recognizes intricate linkages
between water quality and health and resilience of the
coastal and marine habitat marine resources. If we
get the water right, then the benefits are going to be
magnified throughout the system, enhanced recreation,
healthier habitat, more productive ecosystems, more
abundant fish, wildlife, seafood. We get it, and you
guys get it, and I just really want to applaud you.
We recognize that the draft plan does not
specifically identify projects, rather deciding
allocations across regions and restoration activities
providing a higher level of guidance, and that there
will be opportunities to speak to the projects and
programs and comment on them at a future time.
However, throughout the documents, they do provide
examples of the types of projects covered under the
restoration goals. Therefore, open the door to
provide some comment on the types of restoration
activities we'd like to see. And as we've kind of
discussed, sometimes it's easier to get in front of
things rather than responding after things are
already published.
So I wanted to highlight some of the examples
that were mentioned in the document that we feel are
really critical restoration projects. Under Restore
Water Quality and Nutrient Reduction, we would like to
reiterate creating and enhancing wetlands, coastal and
repairing stream and river/bay conservation; erosion

control practices such as rigging the shoreline's
designated buffers and restoring natural hydrologic
flow.

Under Goal 2 for oysters, you guys mentioned
restoring, and I want to reiterate, restoring reef
habitat and enhancing oyster reef productivity.

Under Provide and Enhance Recreational
Opportunities, you cite activities that include
acquiring land along the coast.

And I see I'm out of time, so I'm going to
just wrap up just want to say with the billions of
dollars set to flow into the region over the next
decade and a half, we have a tremendous opportunity to
heal, but maximizing impact with every available
dollar, whether NRDA, RESTORE, or another source, it's
going to require practice, planning, and coordination.
Everyone recognizes the importance and opportunity
of leveraging these dollars, but it's unclear what
concrete steps the trustees, RESTORE council, and
other decision makers will attempt to take to maximize
that. Understand that kind of the next step of the
process is for the RESTORE council to undertake a
comprehensive plan update, and hope in that plan
you'll spell out some of the details of how this
coordination will take place. Thank you very much.

# PEPC Project ID: 60777, DocumentID: 68455
# Correspondence: 76

## Author Information

| | |
|---|---|
| Keep Private: | No |
| Name: | Jim Mueller |
| Organization: | Bay County ● Official Rep. |
| Organization Type: | C - County Government |
| Address: | N/A |
| | N/A, N/A N/A |
| | USA |
| E-mail: | |

## Correspondence Information

| | |
|---|---|
| Status: Reviewed | Park Correspondence Log: |
| Date Sent: | Date Received: 10/27/2015 |
| Number of Signatures: 1 | Form Letter: No |
| Contains Request(s): No | Type: Transcript |
| Notes: | |

## Correspondence Text

Thank you. I'm Jim Mueller
with the Bay County RESTORE Act coordinator. I
appreciate the opportunity to comment here tonight.
I know that a tremendous amount of time and effort has
gone into preparing all these documents, and a lot of
coordination of people with diverse opinions on what
should happen with them, and know that it was quite
an undertaking, and I think the documents that came
out of that are excellent. The advantage that I see
to having this in front of us now, it's the grand
settlement. We can see the entire landscape; you know
who's what getting what money, when, for what
purposes, and it allows for coordination between the
different funding sources. And that's a tremendous
advantage as we go into this undertaking.
Talk about the consent decree. I'm not going
to recommend any changes on that because I know it's
five states and six federal agencies and sitting down
for months and months, and it's unlikely to get much
change in that. But related to that, I think that the
pace of Gulf restoration should be driven by the
environmental and economic restoration needs, not the

payout schedule determined by BP's economic abilities.
And so I'm not suggesting a change in their payout
schedule, but asking that people look for a way in
which the payout can be accelerated to the parties
that are receiving the funds, especially in RESTORE in
Florida Pop One for the counties, and then Pop
Three - - Pop One being the direct component, Pop Three
being the impact component, through something similar
perhaps to a bonding process that is used in certain
transportation grant systems.
And so I think an effort talking with
congress and the treasury and others to see if there
is a way, realizing there is a cost to getting money
earlier, but to weigh the cost of getting that money
earlier with the benefits of starting restoration
efforts earlier, and I think most of our restoration
efforts are going to be compounded over time. So
then, yes, we get less money, but if we can get it
seven years, five years earlier and have the
restoration projects in place for that much longer,
then I think it actually will be beneficial to do
that. So at least 12 of Florida's 23 coastal counties
have requested this, and talking with our
congressional representatives and having also talked
to treasury on this, but seeing that there are ways.
And not necessarily everybody will want to accelerate
their access to the money, but to have the option to
do that if they wish.
As structured right now with RESTORE Act for
Pop One, of the 23 counties, seven of those counties
are going to get less than $300,000 a year; 14 of them
will get less than $600,000 a year. That's not a lot
of money, and particularly if you want to do a
significant restoration project, it's hard to do it
with that scale. So this would open up the options to
where if they wanted to be able to do more faster,
they could, not that it would be mandated.
And then getting on to the natural resource
restoration, we particularly like the emphasis on
water quality for Florida, both nutrient reduction and
water quality in general, and we recognize the
importance for the other restoration types of Florida
and all the Gulf. Just as an aside, we think it's
kind of odd to put the sturgeon work within the open
ocean considering the worth that's being considered is
all in the rivers. So I know it may be the same work

Correspondences - Department of Justice - Consent Decree - PEPC ID: 60777

getting done, but the perception of where that money
is allocated, to me, it's not an open ocean project.
So you might want to do that. I think it's a great
idea, but it's where to put the category.
The other thing I'll say is that I'd like the
opportunity for public input before plans and projects
get to the stage that we're getting today. In the
future, I'm hoping there will be opportunity to have
more scoping meetings and getting ideas earlier,
because I know from having worked on stuff like this,
by the time it gets to this stage, you know, you've
worked on it a lot, you're kind of committed to it,
this is what your ideas are, and it takes a lot more
to move the needle at this point than if the exact
same information had been presented earlier in the
process. So as much as possible, if you can open it
up, get public comments, however formally or
informally, earlier in the process to have a better
chance to actually make suggestions to consider as you
go forward. And we look forward to working with
everybody on this. Thank you very much.

# PEPC Project ID: 60777, DocumentID: 68455
# Correspondence: 77

## Author Information

| | |
|---|---|
| Keep Private: | No |
| Name: | Thao Vu |
| Organization: | Mississippi Coalition for Vietnamese American Fisherfolks and Families Official Rep. |
| Organization Type: | L - Non-Governmental |
| Address: | N/A |
| | N/A, N/A N/A |
| | USA |
| E-mail: | |

## Correspondence Information

Status: Reviewed

Park Correspondence Log:

Date Sent:

Date Received: 10/27/2015

Number of Signatures: 1

Form Letter: No

Contains Request(s): No

Type: Transcript

Notes:

## Correspondence Text

Good evening, everyone. This
is actually my - - I've attended all the meetings
across the region, and I want to say a special hello
to the people representing Florida. I think they're
the only people I really haven't had an opportunity to
express my perspective and comments on this.
My name is Thao Vu. I am currently the
director of Mississippi Coalition for Vietnamese
American Fisher Folks and Families. We're a
non-profit organization based in Biloxi, Mississippi.
For the past almost 11 years I've been doing a great
deal of disaster response and recovery work at the
community level. Obviously this BP oil drilling
disaster was a huge disaster, particularly on my
constituency, but not only on fishing activity, but
all across the region.
There are many, many fishing communities that
have not been able to attend these meetings because of
the short public notice. Please work with us in terms
of improving, greatly improving, your process to make
sure these communities who bore the personal economic

impact, livelihoods have been devastated. And through
your (inaudible) you've already stated that there is
so much damage and losses to the fisheries and the
fishermen. In my travels, they're all suffering.
Decimated oyster reefs, reduced catch for shrimp
fishermen. Those communities have suffered in terms
of economic hardship because they have not been able
to harvest what they used to.
Regarding this BP proposed settlement, it is
critically important, I am stating this again, that we
need an extended public comment deadline to February
of 2016, particularly for fishing communities to have
an opportunity to comment on it. Right now, as I
expressed earlier, many are still shrimping or
crabbing or getting ready for the oyster season and
they are not aware of this, because this was only
announced two weeks ago on the Federal Registry, which
is not well known to the general public. That is not
an ideal way to disseminate very, very critically
important information that has to do with the
livelihoods or long-term sustainability of these
fishing communities.
Breaking down the settlement, we don't think
that under the NRDA nor RESTORE nor the future damages
is actually accurate, because we don't think that a
full, comprehensive valuation of losses has been fully
quantified. To use an example, oyster reefs provide
many consistent benefits, but one of the benefits it
does provide is a livelihood for many commercial
fishermen. We don't think those types of benefits
have been quantified, and therefore, we don't think
that the proposed amount is really adequate to address
any major potential fisheries. As well as we also
have some comments in terms of missing elements from
this BP proposed settlement, is the great need to
establish a regional citizens advisory council where
there is actually representation coming from
commercial fishermen or their designees. That's
something we're also critically asking for.
Regarding the NRDA draft programmatic plan
and the trustees here, we do have some comments right
now. It's been stated that this is proposed as the
ecosystem comprehensive plan, but in terms of early
restoration, it doesn't seem to be very comprehensive.
And I'll go back to the oyster reef example. In
Mississippi, we proposed a Mississippi oyster cultch

project in 2012-2013, and it was one of the earliest
oyster restoration projects proposed in the Gulf, but
it doesn't make much sense because the proper way of
restoring oyster reefs, and this has been shared to me
from oyster experts and biologists, is actually you
start in Florida. You actually have to restore those
first, and then Alabama, Mississippi, and Louisiana,
and in that order. So it doesn't seem to be a
well-coordinated comprehensive plan in terms of
restoring these resources until there's much better
communication, and we haven't seen those restoration
methods met. Thank you for the opportunity to
comment.

# PEPC Project ID: 60777, DocumentID: 68455
# Correspondence: 78

## Author Information

| | |
|---|---|
| Keep Private: | No |
| Name: | Grover Robinson |
| Organization: | Escambia County Commissioner |
| Organization Type: | C - County Government |
| Address: | N/A |
| | N/A, N/A N/A |
| | USA |
| E-mail: | |

Official Rep.

## Correspondence Information

| | |
|---|---|
| Status: Reviewed | Park Correspondence Log: |
| Date Sent: | Date Received: 10/27/2015 |
| Number of Signatures: 1 | Form Letter: No |
| Contains Request(s): No | Type: Transcript |
| Notes: | |

## Correspondence Text

How are you
doing? Good to see everybody. Good to see Mimi and
all our people from Florida. We're certainly glad to
have you. I should have welcomed you beforehand, but
I had another meeting earlier tonight. It seems
everybody wanted to go. But again, I wanted to thank
you-all for being here. More importantly, I wanted to
make several comments. This is the first time I've
had a chance to see this, and the little bit I've
gazed over it, I am very impressed with some of the
planning that has come through it. I also, in
addition to being an Escambia County Commissioner,
serve as the Chairman of the Florida Gulf Consortium
dealing with Component 3. So seeing and knowing what
large-scale planning having to do, I'm very impressed
by what I see as the opportunity.
I did want to comment, and several other
comments were made, I appreciate Florida certainly
being the leader in water quality. I was glad to see
a large portion of the settlement was allocated toward
improving the water quality within our state. It's
certainly one of the things that we've worked hard to

try to strive to do, so I was glad to see that as a
part of it.

I also just kind of wanted to echo a couple
of comments that I did hear tonight. Certainly a
comment by Jim Mueller, any way that can be done,
I know you-all are here to talk about NRDA, but other
projects, any ways to allocate or make the allocation
easier in some way for somebody to discount back to a
present value will be important, because there's no
way you can do some of these projects without that.
We've seen that within our own local. We've seen
projects come forward that took more that enough money
that we had just within our local component to deal
with some of those things, but they were well within
reach of what our total cumulative would be over the
entire payout. And certainly that's going to happen
within the State of Florida within Component 3, and
that's certainly something I will say I can see the
results are going to be within some of these issues of
NRDA as well. So anything that could be done to deal
with that would be appreciated in how we handle it
going forward.

The other issue is just talking about I do
want to follow up on what Jeff Helms said earlier.
Certainly the issue of settlement, the consent decree,
just to make the comment essentially that certainly we
appreciate and worked hard within the State of Florida
to set some applicable law to some of these things,
and we certainly believe that some of those damages,
while maybe not specific to this consent decree now,
certainly we'd like to see some of those issues of
Florida law apply and believe it is to impact those
areas that were truly impacted the most by the
Deepwater Horizon spill. Certainly those areas of
Northwest Florida that took a more immediate and
significant impact from what occurred, we certainly
look at that in the consent decree.

But overall, I certainly appreciate what's
been done here with NRDA. Local governments are
looking to ways that they can work with you as the
trustees in the implementation across geographical and
jurisdictional boundaries to make for regional
projects. I think we're all excited and we're
certainly trying to work together to make that happen.
There's a lot of things moving forward and I
appreciate your willingness to be a part of this

Correspondences - Department of Justice - Consent Decree - PEPC ID: 60777

process. There's certainly a lot of common effort, and I'm very impressed at least on what I see at first glance. So thank you very much for your time and all the energy you put into this.

**PEPC Project ID: 60777, DocumentID: 68455
Correspondence: 79**

## Author Information

| | |
|---|---|
| Keep Private: | No |
| Name: | Steve Shippee |
| Organization: | |
| Organization Type: | I - Unaffiliated Individual |
| Address: | N/A |
| | N/A, N/A N/A |
| | USA |
| E-mail: | |

## Correspondence Information

Status: Reviewed      Park Correspondence Log:

Date Sent:      Date Received: 10/27/2015

Number of Signatures: 1      Form Letter: No

Contains Request(s): No      Type: Transcript

Notes:

## Correspondence Text

First off, thank you for
coming in and meeting with us tonight. I'm a member
of the public, so I don't represent any particular
entity. My name is Steve Shippee. I own a small
business that is a consulting company and I work with
marine mammals. That's my background. I was for the
period of 2010 until last year involved with the NRDA
data collection on marine mammals stranding response
and other work with wild animal health assessment and
visual observation of marine mammals in Florida. So
I worked under letter of agreement with NOAA and
participated in a lot of the NRDA data collection here
in the State of Florida and Panhandle of Florida.
I'm concerned in the numbers that are being
put down here for budgeting for marine mammals in
Florida and Alabama where there's $5 million set aside
for restoration of marine mammals in these two states,
relative to $50 million for Louisiana, and then
$55 million for open ocean. And I think part of that
is there is less known about the impacts on marine
mammals in Florida and Alabama, primarily bottle-nose
dolphins, but also Florida manatees. Some of the data

is insufficient to justify or explain what happened to
that particular tax budget in our local waters. So I
would urge you to perhaps review that a little bit
more thoroughly and make sure that the dollars are
adequately allocated to address marine mammal injuries
in Florida and Alabama specifically since those are
the two that received the lower amount of funding.
And again, I thank you for coming and letting us speak
to you, and I look forward to being able to work on
this in the future. Thank you.

# PEPC Project ID: 60777, DocumentID: 68455
# Correspondence: 80

## Author Information

Keep Private:              No
Name:                      Quinn A. Breland
Organization:              Island towers
Organization Type:         I - Unaffiliated Individual
Address:                   2658 Renee dr
                           Theodore, AL,AL 36582
                           USA
E-mail:                    Towersi@bellsouth.net

## Correspondence Information

Status: Reviewed                    Park Correspondence Log:

Date Sent: 11/07/2015               Date Received: 11/07/2015

Number of Signatures: 1             Form Letter: No

Contains Request(s): No             Type: Web Form

Notes:

## Correspondence Text

Need help , health bad now , no business now ,

# PEPC Project ID: 60777, DocumentID: 68455
# Correspondence: 81

## Author Information

| | |
|---|---|
| Keep Private: | No |
| Name: | Jasper T. Dorsey |
| Organization: | Baldwin County Commission |
| Organization Type: | I - Unaffiliated Individual |
| Address: | 22251 Palmer Street |
| | Robertsdale, AL,AL 36567 |
| | USA |
| E-mail: | tdorsey@baldwincountyal.gov |

## Correspondence Information

Status: Reviewed                    Park Correspondence Log:

Date Sent: 11/09/2015              Date Received: 11/09/2015

Number of Signatures: 1            Form Letter: No

Contains Request(s): No            Type: Web Form

Notes:

## Correspondence Text

As a member of the Baldwin County Commission and the Alabama Gulf Coast Recovery Council, I am very disappointed in several details in the settlement agreement. First and foremost, the 15 year period over which these funds are paid is unacceptable. The US Treasury has given feedback that the RESTORE council may not borrow against these funds, because todays council may not allocate tomorrows councils funds. This is appalling for several reasons. First of all, the impact of the spill was immediate, but our ability to restore our ecology and economy will be spread out over years. Secondly, because these tranches are divided over so many years, we will not really be able to accomplish anything of significant regional impact for the Coastal Alabama communities affected by the Deepwater Horizon incident. The spill had significant regional impact and restoration should be significant. As it is written now, we will watch the money go to 'sidewalks and boatramps' while BP takes tax credits for years to come. Please reconsider the amount of time given for these funds to be useful to the Coastal Alabama community. Thank you for your consideration.

J. Tucker Dorsey
Baldwin County Commission, Chairman

# PEPC Project ID: 60777, DocumentID: 68455
# Correspondence: 82

## Author Information

Keep Private:          No
Name:                  Peter J. Sadlo
Organization:
Organization Type:     I - Unaffiliated Individual
Address:               2306 Island Shore Dr.
                       Dauphin Island, AL 36528
                       USA
E-mail:                Petesadlo@charter.net

## Correspondence Information

Status: Reviewed                 Park Correspondence Log:
Date Sent: 11/12/2015            Date Received: 11/12/2015
Number of Signatures: 1         Form Letter: No
Contains Request(s): No         Type: Web Form
Notes:

## Correspondence Text

Please consider allocating funds from the Deepwater Horizon Spill to restore the barrier islands that protected much of the mainland. I had Hummers & National Guardsman driving in my backyard & erecting barriers. It destroyed all of my vegetation at the water's edge. It still has not recovered. We also still have vehicle tracks & blight from the staging areas. They damaged areas around the boat ramps. Please consider funds for beautification of the island.

## PEPC Project ID: 60777, DocumentID: 68455
## Correspondence: 83

### Author Information

| | |
|---|---|
| Keep Private: | No |
| Name: | Holly R. Wood |
| Organization: | |
| Organization Type: | I - Unaffiliated Individual |
| Address: | 7400 Mulberry Lane |
| | Navarre, FL 566 |
| | USA |
| E-mail: | hollyr@perdidoproperty.com |

### Correspondence Information

Status: Reviewed              Park Correspondence Log:

Date Sent: 11/12/2015         Date Received: 11/12/2015

Number of Signatures: 1       Form Letter: No

Contains Request(s): No       Type: Web Form

Notes:

### Correspondence Text

I own a lot on Daughin Island that is sound front. We had planned to build our retirement home there until the BP disaster hit. There was quite a bit of damage to DI and we no longer want to build there until things change for the better. My eyes waters from the oil when i visited the Island during the spill. Dauphin Island took a big hit from the spill. Was way worse than a lot of areas that have collected money in Florida where I now liveWe are in Navarre on the sound and hear people speak about how little flounder there are even here miles away from the spill, since BP spill. All these funds coming in and I have heard so little about them going to an area that was hit the hardest. Problems on DI and the sea life needs to be addressed. tired of hearing about companies in Huntsville Al getting BP money and the people living on the coast and the gulf and coast line are still seeing the bad effects of the oil. This money should go primarily to areas hit the hardest to support and rebuild the coastlines and improve the waters. Seems pretty obvious to most people. I do not understand why money from fines would go anywhere else. Please do the right thing and help areas like Dauphin Island instead of letting politics get into the mix and the money going elsewhere to address things that have nothing to do with damage from the oil spill. More should have been collected from BP in the first place. Do not know why they paid such a small amount when the fines could and should have been much higher. Please use the money to rebuild Dauphin Island Coastline and improve the waters around it and insure future protection of the island.

Thank you,
Holly R Wood

# PEPC Project ID: 60777, DocumentID: 68455
# Correspondence: 84

## Author Information

Keep Private:            No
Name:                    Mary K. Loper
Organization:            Resident of Dauphin island
Organization Type:       I - Unaffiliated Individual
Address:                 317 polaris dr Dauphin island, al
                         3830 Patricia dr, mobile al. Mailing address
                         Dauphin island, AL,AL 36528
                         USA
E-mail:                  Kevinloperrealtor@gmail.com

## Correspondence Information

Status: Reviewed                Park Correspondence Log:
Date Sent: 11/12/2015           Date Received: 11/12/2015
Number of Signatures: 1         Form Letter: No
Contains Request(s): No         Type: Web Form
Notes:

## Correspondence Text

Dauphin island is a barrier island to the state of Alabama. It is a residential community and a
resort area. Charter fishing is one of its prime functions. There have also been a reduction in
several species in the Gulf of Mexico. Very much impacted by the oil spill due to loss in
revenue, oil contamination, and beach a Rosian, it always amazes me that this island gets
neglected. It is a necessary component of the ecosystem in the Gulf of Mexico. It gets neglected
very often because of its size. It is small. However the Gulf oil spill impacted this island far more
than any of the other areas of the state of Alabama. It should be getting the lions share of any
funds necessary for restoration. It amazes me that it gets neglected. Please consider the
importance of this island. It was Mcguay more affected than anything inland and it gets way less
money. The money that was dispersed in the rest of the state for the oil spill amazes me. Please
help

# PEPC Project ID: 60777, DocumentID: 68455
# Correspondence: 85

## Author Information

| | |
|---|---|
| Keep Private: | No |
| Name: | Joan P. Rommes |
| Organization: | |
| Organization Type: | I - Unaffiliated Individual |
| Address: | 6671 Old Pascagoula Rd. |
| | Theodore, AL 36582 |
| | USA |
| E-mail: | Buttonsjpr@bellsouth.net |

## Correspondence Information

Status: Reviewed      Park Correspondence Log:

Date Sent: 11/12/2015      Date Received: 11/12/2015

Number of Signatures: 1      Form Letter: No

Contains Request(s): No      Type: Web Form

Notes:

## Correspondence Text

The communities and people that were impacted by this disaster and will continue to be affected should receive this settlement monies.

# PEPC Project ID: 60777, DocumentID: 68455
# Correspondence: 86

## Author Information

Keep Private:           No
Name:                   john d. cox
Organization:
Organization Type:      I - Unaffiliated Individual
Address:
                        rocky mount, VA 24151
                        USA
E-mail:

## Correspondence Information

Status: Reviewed                Park Correspondence Log:
Date Sent: 11/13/2015           Date Received: 11/13/2015
Number of Signatures: 1         Form Letter: No
Contains Request(s): No         Type: Web Form
Notes:

## Correspondence Text

Please make BP pay out the claims. This is taking way too long.

# PEPC Project ID: 60777, DocumentID: 68455
# Correspondence: 87

## Author Information

Keep Private:              No
Name:                      STEVE MATTUTAT
Organization:              BUSINESS DYNAMICS OF NW FLORIDA
Organization Type:         I - Unaffiliated Individual
Address:                   14 N J STREET
                           PENSACOLA, FL,FL 32502
                           USA
E-mail:                    SHMPENS@GMAIL.COM

## Correspondence Information

Status: Reviewed                    Park Correspondence Log:
Date Sent: 11/13/2015               Date Received: 11/13/2015
Number of Signatures: 1             Form Letter: No
Contains Request(s): No             Type: Web Form
Notes:

## Correspondence Text

Dear Sir/Madam:

I was a victim of the BP Oil Disaster. As a result I lost a number of clients who went out of business as a result of the Oil Disaster. I lost the home that my children and I lived in since 1998 and had to move into a rental property.

Our lives will never be the same. Please force BP to fulfill its committments.

Thank you,

Steve Mattutat

# PEPC Project ID: 60777, DocumentID: 68455
# Correspondence: 88

## Author Information

| | |
|---|---|
| Keep Private: | No |
| Name: | Patricia Picascio |
| Organization: | Eurospa of Naples. 34109 |
| Organization Type: | I - Unaffiliated Individual |
| Address: | 9306 Quarry Drive Naples Fl 34120 |
| | Naples, FL,FL,FL,FL 34109 |
| | USA |
| E-mail: | Ppicascio@comcast.net |

## Correspondence Information

Status: Reviewed                     Park Correspondence Log:

Date Sent: 11/13/2015               Date Received: 11/13/2015

Number of Signatures: 1             Form Letter: No

Contains Request(s): No             Type: Web Form

Notes:

## Correspondence Text

When will this nightmare end. B P has plenty of money to take care of this mess with interest !
How rude !

## PEPC Project ID: 60777, DocumentID: 68455
## Correspondence: 89

### Author Information

Keep Private:          No
Name:                  Richard Londeree
Organization:          Tampa Bay Saltwater
Organization Type:     I - Unaffiliated Individual
Address:               1720 Eldred dr.
                       Tampa, FL,FL 33603
                       USA
E-mail:                liverock1@verizon.net

### Correspondence Information

Status: Reviewed                    Park Correspondence Log:
Date Sent: 11/13/2015               Date Received: 11/13/2015
Number of Signatures: 1             Form Letter: No
Contains Request(s): No             Type: Web Form
Notes:

### Correspondence Text

BP

Why have you let the real victims of your disaster hung out to dry and not receive a dime compensation, when we, the little guys and the real victims of the oil spill are uncompensated.

All you PR says you would make us whole again, EVERYBODY but the real victims like me have been paid. Is truly a transitivity, a testament to you leaving us to die on the vine, those of us who actually made out living from the Gulf.

You have ruined my business of 40 years, refuse to do as you said and compensate us, you should be very ashamed, but us victims know you are truly a greedy corporate evil empire.

How can our government allow you to kill, us the little guys, while the lawyers and everybody else has been paid, and we the people of the oil spill are dying. You should be barred from doing business in the united states until you take care of us...the commercial fisherman who were devastated by you negligence.

The way you have ignored us is truly lower than pond scum, SHAME ON YOU...where is our court system and why has it not ever allowed ONE case against you to be heard and tried?????

Richard Londeree
Tampa Bay Saltwater

www.tbsaltwater.com

# PEPC Project ID: 60777, DocumentID: 68455
# Correspondence: 90

## Author Information

| | |
|---|---|
| Keep Private: | No |
| Name: | Luther E. Carrier |
| Organization: | |
| Organization Type: | I - Unaffiliated Individual |
| Address: | 479 Bayview Dr NE |
| | St Petersburg, FL,FL 33704 |
| | USA |
| E-mail: | tech@absolutetankcleaning.com |

## Correspondence Information

Status: Reviewed    Park Correspondence Log:

Date Sent: 11/14/2015    Date Received: 11/14/2015

Number of Signatures: 1    Form Letter: No

Contains Request(s): No    Type: Web Form

Notes:

## Correspondence Text

I can understand BP taking a hit for their errors, but why must the thousands of small business owners around the Gulf of Mexico suffer?

My tax records clearly show a new business with a stead growth path taking a major setback after BP's oil spill.

Have we recovered? Not fully, there was time, energy and income loss. None at the fault of the small business owners around the Gulf of Mexico.

# PEPC Project ID: 60777, DocumentID: 68455
# Correspondence: 91

## Author Information

| | |
|---|---|
| Keep Private: | No |
| Name: | William F. Fuselier |
| Organization: | Delta Steel Case/ Rep by BCA |
| Organization Type: | I - Unaffiliated Individual |
| Address: | PO Box 575, Berwick, La 70342 |
| | Berwick, LA,LA 70342 |
| | USA |
| E-mail: | bfuselier2@yahoo.com |

## Correspondence Information

| | |
|---|---|
| Status: Reviewed | Park Correspondence Log: |
| Date Sent: 11/14/2015 | Date Received: 11/14/2015 |
| Number of Signatures: 1 | Form Letter: No |
| Contains Request(s): No | Type: Web Form |
| Notes: | |

## Correspondence Text

We the victim's of the BP Deepwater Horizon Oil Spill who are represented by Brent Coon and associates have been waiting patiently for over 5 yrs, And we believe it is time for our claims to be paid, It is with the understanding that most other claims have been settled, And yet we haven't been offered a dime on ours, We have waited long enough, It's time for our cases to be settled, Sincerely William F Fuselier Jr

## PEPC Project ID: 60777, DocumentID: 68455
## Correspondence: 92

### Author Information

| | |
|---|---|
| Keep Private: | No |
| Name: | Jeff H. Tobey |
| Organization: | Scuba West |
| Organization Type: | I - Unaffiliated Individual |
| Address: | 6815 Tower Drive |
| | Hudson, FL,FL 34667 |
| | USA |
| E-mail: | JeffTobey@scubawest.net |

### Correspondence Information

Status: Reviewed                     Park Correspondence Log:

Date Sent: 11/14/2015              Date Received: 11/14/2015

Number of Signatures: 1           Form Letter: No

Contains Request(s): No           Type: Web Form

Notes:

### Correspondence Text

My business, Scuba West, has all but been destroyed by the BP Oil Spill.

We waited patiently throughout the claims process to no avail. We were advised by our attorney that our case would move forward on or about June 2015. Five months after that, and almost 6 years after the spill, my business is on the brink of bankruptcy with no end in sight.

The state and federal governments have put their interests first and, with the help of the courts, have delayed and prevented my company and thousands more from their day in court.

I am not a number. I am 56 years old and disabled. I have a 21 year old son who is disabled. I run a business that has been around and successful since 1968. I employ 3 people, and I also use 9 contractors regularly.

I am now earning 50% owhat I was before the spill. However, I am required to pay all the mortgage, utilities, payroll and other bills I receive without BP compensating me for the tremendous damage they've done.

I am in the scuba business and close to the Gulf of Mexico. Mny of my clients dive locally, and through the state of Florida. Many are spearfish. Many divers used to visit Florida all year long. Most have stopped coming.

Could you imagine my business not being damaged by BP?

Correspondences - Department of Justice - Consent Decree - PEPC ID: 60777

I'd like to know why the real victims have been ignored so long?

I'd like to know why the government believes they should be paid first?

I'd like to know why the courts are so lenient to allow what is obviously many stall tactics that BP has used while proudly stating they are paying for the problems they have caused?

My company deserves TIMELY compensation for our loss, not if and when BP believes they should pay.

Sincerely,

Jeff Tobey

# PEPC Project ID: 60777, DocumentID: 68455
# Correspondence: 93

## Author Information

| | |
|---|---|
| Keep Private: | No |
| Name: | Richard G. Boyer |
| Organization: | |
| Organization Type: | I - Unaffiliated Individual |
| Address: | |
| | Horn Lake, MS 38637 |
| | USA |
| E-mail: | |

## Correspondence Information

| | |
|---|---|
| Status: Reviewed | Park Correspondence Log: |
| Date Sent: 11/14/2015 | Date Received: 11/14/2015 |
| Number of Signatures: 1 | Form Letter: No |
| Contains Request(s): No | Type: Web Form |
| Notes: | |

## Correspondence Text

The Department of Justice is accepting comments for the next 60 days on the federal-and-state Consent Decree, in which BP will pay a Clean Water Act penalty of $5.5 billion (plus interest), $8.1 billion in natural resource damages (this includes $1 billion BP already committed to pay for early restoration), up to an additional $700 million (some of which is in the form of accrued interest) to address injuries to natural resources that are presently unknown but may come to light in the future and adaptive management, and $600 million for other claims, including claims under the False Claims Act, royalties, and reimbursement of natural resource damage assessment costs and other expenses due to this incident. I feel we have waited lonf enough to be compensated for our losses due to BP'S negligence

# PEPC Project ID: 60777, DocumentID: 68455
# Correspondence: 94

## Author Information

| | |
|---|---|
| Keep Private: | No |
| Name: | Edwin R. Soule |
| Organization: | YouthBuild Katrina Rebuilding Project |
| Organization Type: | I - Unaffiliated Individual |
| Address: | 42798 Scarlett Circle |
| | Hammond, LA 70403 |
| | Biloxi, MS,MS 39530 |
| | USA |
| E-mail: | bishopsoule@gmail.com |

## Correspondence Information

| | |
|---|---|
| Status: Reviewed | Park Correspondence Log: |
| Date Sent: 11/15/2015 | Date Received: 11/15/2015 |
| Number of Signatures: 1 | Form Letter: No |
| Contains Request(s): No | Type: Web Form |
| Notes: | |

## Correspondence Text

Good day,

Our program was shut-down because of the BP Oil Spill in July 2010. Revenues that would have been available to continue our work were then shifted to respond to this disaster. I have provided independent, reliable third party statement to support this claim.

It has now been 5 years; I have lost my home, a car, health insurance and many other tangible and intangible quality of life factors. It is a shame that we who were harmed by no fault of our own and now being cast away by the US Government. So, as long as the US government get it monies and becomes whole - - the hell with everybody else seems to be the sentiment.

Walk in our shoes; families have been broken, dreams destroyed, life savings vanished, health in despair and you sit there in your cushy, lofty corner suites and posh board rooms - - taking the cream off the top - - while we continue to suffer. Hoping that justice will prevail someday!

We look to you to be Leaders, not politicians!

Sincerely,

Edwin R. Soule'
Claimant

Correspondences - Department of Justice - Consent Decree - PEPC ID: 60777

# PEPC Project ID: 60777, DocumentID: 68455
# Correspondence: 95

## Author Information

Keep Private:               No
Name:                       Hugh K. Parmer
Organization:               Giuseppi's Wharf inc.
Organization Type:          I - Unaffiliated Individual
Address:                    821 Bayshore Drive
                            Niceville, FL 32578
                            Destin, FL,FL 32541
                            USA
E-mail:                     parmer9@cox.net

## Correspondence Information

Status: Reviewed                    Park Correspondence Log:
Date Sent: 11/15/2015               Date Received: 11/15/2015
Number of Signatures: 1             Form Letter: No
Contains Request(s): No             Type: Web Form
Notes:

## Correspondence Text

Because of the slow movement of BP to make restitution to us, we have lost our business, our property and we have had to declare bankruptcy. Our credit is ruined and we no longer have funds to send our children to college. It appears that the judge is overwhelmed and is not able to see the cases in a timely manner and we need to have our day in court as soon as possible.

**PEPC Project ID: 60777, DocumentID: 68455**
**Correspondence: 97**

## Author Information

| | |
|---|---|
| Keep Private: | No |
| Name: | Humberto Carcamo |
| Organization: | |
| Organization Type: | I - Unaffiliated Individual |
| Address: | 821 cameron ct kenner la 70065 |
| | Kenner , LA 70065 |
| | USA |
| E-mail: | Hcarcamo2007@hotmail.com |

## Correspondence Information

Status: Reviewed                    Park Correspondence Log:

Date Sent: 11/16/2015               Date Received: 11/16/2015

Number of Signatures: 1             Form Letter: No

Contains Request(s): No             Type: Web Form

Notes:

## Correspondence Text

My name is Humberto Carcamo and iam asking the court why then can proceed with bp first iam so upset because all this year i been so stress out do to this bp cause so many problems financially since then know iam asking the court they are making us to wait for something that this company should pay all the damages financial and also healthy because after of the oil spill 2 months later i was diagnosed with diabetes it stress mi so much because my wife lost her job i use all my savings in order for me to support all ours needs i lost all my savings 10000 that i have at that time to buy my house i work offshore with survival system int and for 3 long years we suffer and strugle for work all this along with my problem with diabetes dont the people from the court see all the strees cause to each and every one in my fam because know i have to deal with this signess my question is to the people of the court when they are going to rule in favor of the single family who was afected by this oil spill i depend of the work offshore until this year 2015 i steel struggling with this our job since then decrease 60% m income decrease tremendous to the judges at the court if you have one minute to read this small paragraph i will appreciate and you fine out how we small people been affected with this problem Bp have the money to paid us Trans ocean place his shareHalliburton same why againg this company is playing with the court first and second with us third this compani is not american company broke ours safety rules damage our environment and still doing damages and lying how far this is going to go iam begin to the court to ended once for all this iam getting frustrated with the court our court american court to rule in our favor like i exsplain before if you read my case thank you in advance my family and i we sicking for justice against us my health is been damage do to this stress thank you so much God Bless America my home my country your truly Humberto Carcamo

## PEPC Project ID: 60777, DocumentID: 68455
## Correspondence: 98

### Author Information

| | |
|---|---|
| Keep Private: | No |
| Name: | John Jackson |
| Organization: | |
| Organization Type: | I - Unaffiliated Individual |
| Address: | 212 Congress dr |
| | Westwego , LA 70094 |
| | USA |
| E-mail: | JJACK34855@GMAIL.COM |

### Correspondence Information

| | |
|---|---|
| Status: Reviewed | Park Correspondence Log: |
| Date Sent: 11/16/2015 | Date Received: 11/16/2015 |
| Number of Signatures: 1 | Form Letter: No |
| Contains Request(s): No | Type: Web Form |
| Notes: | |

### Correspondence Text

My name is John Jackson i filed a claim back in 12/17/2010 for the bp oil spill and as of to day i have not receive any payment.my claim number with the Gccf Claimant Identification Number: 1062073.
I Opt Out Of The Deepwater Horizon Settlements and my case is with Brent Coon & Associates the law firm I used to file a lawsuit.
Befor the oil spill my financial condition was fine but after the oil spill on 4/20/2010 my financial condition went to hell the company i worked for could not get any work because of the oil spill. A moratorium was placed on the gulf by the federal government because of the spill i am sure this was done to help them get control of what was happening in the gulf.
I am still waiting as of this day praying that the court will here all of the opt outs case that is still waiting for a trial date.
It seems that we are being punished because we had chosen to opt-out of a settlement that was unfair to those who had major damage to their lives.
I am trying to understand why did the goverment get paid before the people.
Is it not that the government is supposed to represent the people in items like this when big corporations think they can push people around it is the government that is supposed to make sure that these things are done correctly and fairly. It is for this reason why laws or put in place to keep people and corporations in check when things are done unfairly to others.
Bp said they would make things right but it has not happen for the people.
We are still setting in a dark room waiting for someone to turn on the light.
I know it takes time for somethings to happen and not everything happens over night but it has been over five years and still not a word from BP or the courts here in New Orleans.

Am i not a American citizen do I not deserve justice do I not deserve my day in court to be heard
is it wrong to ask for justice in two days society.

# PEPC Project ID: 60777, DocumentID: 68455
# Correspondence: 100

## Author Information

Keep Private:               No
Name:                       Thant Nguyen
Organization:
Organization Type:          I - Unaffiliated Individual
Address:                    n/a
                            n/a, UN n/a
                            USA
E-mail:

## Correspondence Information

Status: Reviewed                    Park Correspondence Log:
Date Sent:                          Date Received: 11/10/2015
Number of Signatures: 1             Form Letter: No
Contains Request(s): No             Type: Transcript
Notes:

## Correspondence Text

My name is Thant Nguyen. I've been fisherman since 1994. And I speak Vietnamese, so Ms. Vu will translate for me. Thank you.

MS. VU: So his name is Thant Nguyen, and he's a commercial fisherman. He's been a commercial fisherman, an oyster harvester and shrimper since 1994, and he actually comes from a nearby fishing community in Dickinson, which is about 30 or 40 minutes from here. As he stated, he's been a commercial fisherman since 1994. And when the BP oil drilling disaster happened, you know, they noticed in the past five years there's been a really great impact to the fisheries, particularly to the oysters. Right? And it's been really very devastating to their livelihoods. The past several years they're seeing less and less oysters and shrimp. Right? And they're very concerned about it. And this year there's no oysters. This year there's no oysters. The season actually just started here in Texas, I think, just days ago; and they basically explained that it's been a lot of dead, empty oyster shells. Right? And the oysterers are very concerned. That's one of the reasons why they're here because they should be harvesting oysters, you know. They're here because they're not harvesting what they typically were harvesting.

# PEPC Project ID: 60777, DocumentID: 68455
# Correspondence: 101

## Author Information

Keep Private:           No
Name:                   Mai Lam
Organization:
Organization Type:      I - Unaffiliated Individual
Address:                n/a
                        n/a, UN n/a
                        USA
E-mail:

## Correspondence Information

Status: Reviewed                    Park Correspondence Log:
Date Sent:                          Date Received: 11/10/2015
Number of Signatures: 1             Form Letter: No
Contains Request(s): No             Type: Transcript
Notes:

## Correspondence Text

MS. VU: Her name is Mai Doan. D-O-A-N is her last name. And she would- - oh, I'm sorry. Her name is Mai, M-A-I, last name Lam, L-A-M. And she wants to extend her greetings to the Trustee Councilors. Her family has been commercial fishermen for over 25 years. For many years before the BP oil drilling disaster, they were able to harvest, you know, shrimp. Right? And it was good. It was enough to support and provide for her family. Right? But since then, it's been really dramatically reduced in terms of the harvest and catch and it's really greatly impacted their livelihoods and they're very concerned. She's actually sharing some context and background for the Trustees to have a better understanding of the plight of the fishermen in that, you know, post-BP disaster, many of the fishermen were never fairly compensated for, you know, their individual economic losses. Right? And it's not just that. You know, the - - but she was mentioning the challenges of sometimes just because they live one place doesn't mean - - and they dock one place doesn't mean that's the place they actually fish. Right? And post-BP, there was a lot of misunderstanding, you know, in terms of that there was this expectation that boats who - - for example, shrimping - - were shrimping in Galveston, that they were always there, they would always shrimp in Galveston Bay. No, that's not true. Sometimes they would go all the way out to the Gulf of Mexico. Sometimes they would shrimp in other areas. Right? It's a vast ecosystem. And those kind of challenges, because - - because some decision-makers or entities, institutions does not understand that fishermen, they go to different sites, right, locations to fish, not where they dock, right, or they may sell their catch at a different location, not only where they normally dock. Right? That has led to a lot of challenges and issues where they have not been fairly compensated for their damages, and they - - she has seen that a lot of - - the catch and harvest is not what it used to be, and they're very concerned about how to ensure that restoration

efforts are focussing on the fisheries. It's very, very difficult for her and many other fishermen. You know, if they were never fairly compensated for future damages, right, or long-term damages or, you know, closed fisheries or greatly reduced harvest and they don't see, you know, any of the fisheries being restored; and it's more and more difficult, right, how can they provide - - support their families and help contribute to the local economy or the regional economy? And the earlier point she made was that we all have to pay taxes. Right? Well, you know, it's difficult to contribute to growing your local economy or your regional economy if you can't - - it's very hard to actually make a living. Right? And she wanted to share her story about - - about not only the impacts to her livelihood but how the claims process was not set up in the right manner to fairly compensate the fisherman, and they're seeing that they're not seeing a restoration of the fisheries yet. And all of this combined has been very challenging.

MR. FRANKLIN: Wrap it up. Thank you.

MS. VU: She expressed concern that, you know, for the past several years with the restoration efforts, you know, the fishing communities here, near here, they have not been adequately informed about this and there needs to be a better process set up so - - of disseminating the information to them. And actually, I arrived in town Sunday night and I did some outreach at the local docks, and that's how they knew about this meeting. But this was a very last-minute, you know, outreach to them and they're saying that there needs to be a better process of disseminating this information to the fishing communities.

# PEPC Project ID: 60777, DocumentID: 68455
# Correspondence: 102

## Author Information

| | |
|---|---|
| Keep Private: | No |
| Name: | Song Vo |
| Organization: | |
| Organization Type: | I - Unaffiliated Individual |
| Address: | n/a |
| | n/a |
| | n/a, UN n/a |
| | USA |
| E-mail: | |

## Correspondence Information

| | |
|---|---|
| Status: Reviewed | Park Correspondence Log: |
| Date Sent: | Date Received: 11/10/2015 |
| Number of Signatures: 1 | Form Letter: No |
| Contains Request(s): No | Type: Transcript |
| Notes: | |

## Correspondence Text

SPEAKER SONG VO: Hello, everybody.
MS. VU: This is Mr. Song, S-O-N-G, last name V-O. And he's been a commercial fisherman here - - he lives in Houston - - since 1986. He's saying before he used to shrimp till January or February, but right now his boat is down because in the past he used to be able to troll shrimp and be very full. Right? But in the past five years, it hasn't been. And before he used to be able to harvest shrimp, like I said, early January or February, but right now because it's such a limited harvest and catch that he's docked right now.

# PEPC Project ID: 60777, DocumentID: 68455
# Correspondence: 103

## Author Information

| | |
|---|---|
| Keep Private: | No |
| Name: | Amanda Fuller |
| Organization: | National Wildlife Foundation    ⊙ Official Rep. |
| Organization Type: | L - Non-Governmental |
| Address: | n/a |
| | n/a, UN n/a |
| | USA |
| E-mail: | |

## Correspondence Information

| | | |
|---|---|---|
| Status: | Reviewed | Park Correspondence Log: |
| Date Sent: | | Date Received: 11/10/2015 |
| Number of Signatures: 1 | | Form Letter: No |
| Contains Request(s): No | | Type: Transcript |
| Notes: | | |

## Correspondence Text

Hi. Amanda Fuller, I work for the National Wildlife Federation as a Deputy Director of Gulf of Mexico Restoration Program, and I'm based in Austin. So, on behalf of NWF, I'd like to thank you all for the effort that went into preparing the documents that we have before us for comment today and also for convening the series of public meetings across the Gulf. Given the unprecedented scope and nature of Deepwater Horizon, we appreciate the undertakings that this damage assessment and producing the Draft Programmatic, DARP, was an enormous endeavor. The release of the Draft PDARP and the Consent Decree represents a critical milestone on the road to restoration. We're eager to see funding flow for project implementation; however, the decisions made at this juncture will obviously determine restoration actions and outcomes for decades to come.

So, MWF will be submitting a comment letter, but I do want to make a couple of in-person comments tonight. We commend the Trustees for commitment - - for their commitment to investing upwards of 95 percent of NRDA dollars to restore the Gulf's urgent ecological needs rather than on recreational and public access projects, and that's because MWF believes that the best way to offset the impacts from the Deepwater Horizon oil disaster is to implement projects that repair the damaged wildlife and marine habitats, improve water quality, restore the Gulf's estuaries, and support key sectors of our coastal economy, like tourism and seafood.

Some specific comments on the governance chapter of the PDARP. There's a lot of important details about the governance structure currently lacking from this document. Much of the structure seems to depend on the standard operating procedures which in the current version are not yet fully developed, which makes it difficult to comment on them now in a meaningful way. Additionally, it's not obvious in the document that once these procedures are developed that

they'll then be made available for public comment.

A Texas-specific comment which we'll expand upon in our written comments is that MWF agrees with the Trustees' chosen alternative to establish an integrated restoration portfolio that emphasizes the broad ecosystem benefits that can be realized through coastal habitat restoration. To that end, MWF encourages the Trustees, as you move forward in developing restoration plans, to consider projects that will sustainably restore habitats, such as restoring adequate freshwater inflows into our basin estuaries in Texas that so desperately need the water to support important nursery grounds for the Gulf's wildlife and fisheries.

And finally, with billions of dollars set to flow to the region over the next 17 years, the Gulf Coast has a tremendous opportunity here to heal; but maximizing the impact of every dollar available, whether from NRDA, Restore or NFWF or other sources that will require proactive planning and coordination, everyone recognizes the importance of leveraging these dollars but it's unclear what concrete steps the Trustees, the Restore Council, and other decision-makers intend to take together to maximize collective benefits.

MWF hopes that the Restore Council's updated comprehensive plan will provide this clarity and set forth an inspiring detailed road map for restoring the Gulf and that the NRDA Trustees will somehow be involved in that process. Thank you very much.

Correspondences - Department of Justice - Consent Decree - PEPC ID: 60777

# PEPC Project ID: 60777, DocumentID: 68455
# Correspondence: 104

## Author Information

| | |
|---|---|
| Keep Private: | No |
| Name: | Diane Olson |
| Organization: | Galveston Island Nature Tourism Counsel |
| Organization Type: | L - Non-Governmental |
| Address: | n/a |
| | n/a, UN n/a |
| | USA |
| E-mail: | |

## Correspondence Information

| | |
|---|---|
| Status: Reviewed | Park Correspondence Log: |
| Date Sent: | Date Received: 11/10/2015 |
| Number of Signatures: 1 | Form Letter: No |
| Contains Request(s): No | Type: Transcript |
| Notes: | |

## Correspondence Text

Good evening. My name is Diane Olsen, and I'm the immediate past president of the Galveston Island Nature Tourism Counsel. I want to thank all of the Trustees and all of the members here tonight for this public comment period. It's been very enlightening and very interesting to learn all about. It's quite the complex deal, and I respect all of you for being able to handle that.

I think the plan overall is a very good one. I do have a few comments that I would like to make. I want to encourage the Trustees to consider that the coastal communities are the ones that take the brunt of oil spills predominantly. They're generally small communities that service millions of people. So when you're looking at the priorities, please consider that the coastal communities are the ones that are really in need of assistance when these kind of events happen. There's great emphasis or restoration which I am fully in support of. We do need to restore the natural habitats, but also the recreational opportunities are also an economic benefit to environments - - or to areas such as ours. Galveston heavily relies on tourism, and we know everybody comes here because we have the great natural resources to draw them here.

I was dismayed to see that Texas was left out of the "Provide and enhance recreational opportunities" line item. I was very surprised and a little dismayed. And also I find it a little ironic that the picture here is a Texas Park but we can't have any of the funding. So, just a little piece of irony there. So, I encourage you to maybe reconsider that allocation and to just focus on the coastal communities as we are the ones that are going to take - - have taken the brunt and continue to take the brunt of oil spills, and we face the biggest economic challenges. Thank you very much.

# PEPC Project ID: 60777, DocumentID: 68455
# Correspondence: 105

## Author Information

| | |
|---|---|
| Keep Private: | No |
| Name: | Park Smith |
| Organization: | American Youth Works    ◉ Official Rep. |
| Organization Type: | L - Non-Governmental |
| Address: | n/a |
| | n/a |
| | n/a, UN n/a |
| | USA |
| E-mail: | |

## Correspondence Information

| | |
|---|---|
| Status: Reviewed | Park Correspondence Log: |
| Date Sent: | Date Received: 11/10/2015 |
| Number of Signatures: 1 | Form Letter: No |
| Contains Request(s): No | Type: Transcript |
| Notes: | |

## Correspondence Text

Hi. My name is Parc Smith. I'm with American Youth Works and the Texas Conservation Corps. I'm the executive director for that group, and we've been a nonprofit providing jobs, training, education, and service opportunities in Texas for 35 years.

We're very happy to see the focus of the draft plan on restoration of wildlife, habitat, water quality, and recreational activities. These types of restoration projects are well suited to provide opportunities to engage young adults entering the workforce through conservation corps and service programs, such as the Texas Conservation Corps. We hope that the Trustees will encourage the use of the conservation corps to work in close partnership with public land managers to achieve conservation goals such as habitat restoration, coastal resiliency, freshwater inflows that help marine ecosystems and wildlife, and the recreation opportunities that get people out there to have a chance to grant a better appreciation for the ecosystems we have here in Texas. We stand ready to help and - - by encouraging young adults and vets in the restoration, and we thank you for your service on these boards. Thank you.

# PEPC Project ID: 60777, DocumentID: 68455
# Correspondence: 106

## Author Information

Keep Private:            No
Name:                    Thao Vu

Organization:            Mississippi Coalition for Vietnamese-American Fisherfolk and Families
                         Official Rep.

Organization Type:       L - Non-Governmental
Address:                 n/a
                         n/a, UN n/a
                         USA
E-mail:

## Correspondence Information

Status: Reviewed                  Park Correspondence Log:

Date Sent:                        Date Received: 11/10/2015

Number of Signatures: 1           Form Letter: No

Contains Request(s): No           Type: Transcript

Notes:

## Correspondence Text

Good evening. Again, my name is Thao Vu, and I'm representing the Mississippi Coalition for
Vietnamese-American Fisherfolk & Families. And I would actually like to greet the folks
representing the State of Texas. I've attended most of these public meetings. In fact, almost all
except for the last one in St. Petersburg, Florida. This is really critically important, particularly
for coastal communities and fishing communities. And that's one of the primary reasons why I
am traveling all over the Gulf for this, to make sure that fishing communities are at least
informed, educated, and aware about this. Right? And because, you know, many of the
fishermen here are actually nearby, they're from Dickinson, Kemah, right? Seabrook, San Leon.
But earlier today I was actually in some other fishing communities in Calhoun County which
consist of Seadrift, for example, Palacios, Port Lavaca. And many of those communities have not
been adequately informed about this, and they were not able to attend this meeting. And the
distance is too far for them. It's about a two to two and a half hours drive from here. You know,
we must develop a better process of really informing and engaging the public. And precisely
because of those reasons, again, I would like to reiterate the importance of extending the public
comment deadline.
And I want to really separate my comments. This is really on two major complex topics. One is
the proposed settlement, and one is on the Natural Resource Damages Assessment Draft Plan. In
terms of the public comment deadline for the settlement, we critically ask that the Department of
Justice extend it to February of 2016 to give adequate time for fishing communities to be
informed of this. Many of them are not aware of this. And No. 2, it's still shrimping season, and
they need time to review it and to be able to comment on it. And I think that is a very fair request

that we are making. And this is the fifth time I'm making this request.

There is a great need to establish and endow a Regional Citizens Advisory Council modeled after the Prince William Sound RCAC after the Exxon Valdez oil spill, to prepare for and respond to future oil drilling disasters. We are actually requesting that some funds be set aside from the Oil Spill National Trust Fund to establish and endow this RCAC.

Further, we are asking that future unknown damages should be at least $2 billion and not $700 million, you know, because I've been reading more research studies that cite the impacts to, for example to mammals, to dolphins. Right? And there are serious impacts to - - to the marine life. Therefore, the future unknown damages should be much higher, and it should be separated from the adaptive management component. Those two should not be commingled.

Regarding my comments for the NRDA draft plan is there is, again, a great need to focus on fishery restoration and a need for cooperative research, utilizing some of the traditional ecological knowledge fishing communities possess, and to actually implement projects where you actually give opportunities for displaced fishermen to work on various restoration projects. And the other comment I would like to make is that the proposed governance structure seems very cumbersome. And actually, it was very difficult to interpret because there was so many - - there was a NRDA Council followed by technical working groups, followed by regional groups. We think that's very cumbersome, and we actually need more information on the development of that, as well as we have concerns about the proposed administrative funds for the council, as well as the technical implementation groups to carry out the restoration work.

MR. FRANKLIN: If you can go ahead and wrap it up, Ms. Vu.

MS. VU: Yes. And the last comment is that standard operating procedures should be made available for public review and comment. And thank you again for accepting my comments.

# PEPC Project ID: 60777, DocumentID: 68455
# Correspondence: 107

## Author Information

Keep Private:           No
Name:                   Karla Klay
Organization:
Organization Type:      I - Unaffiliated Individual
Address:                n/a
                        n/a, UN n/a
                        USA
E-mail:

## Correspondence Information

Status: Reviewed                Park Correspondence Log:

Date Sent:                      Date Received: 11/10/2015

Number of Signatures: 1         Form Letter: No

Contains Request(s): No         Type: Transcript

Notes:

## Correspondence Text

One, I think that you should just - - I can't repeat everything that Ms. Vu said, but I think that she
had a lot of really compelling points. And I've been to a lot of public meetings, and I wanted to
thank the fishing community for coming. We all love the Gulf, and I'm glad to see so many
people are here from the fishing communities.

The first thing I wanted to comment on - - I might run out of time; I don't know if I'm allowed to
have two three minutes, one for me and one for the marine mammals, but I will try to finish in
three minutes. I think it's very sad that we would allocate over $400 million for lost user days,
recreational days on the Gulf; that's all for humans. But we have populations of marine mammals
that will take over 69 years to recover. And we know that marine mammals are like us: They
have families, they have matriarchal societies. We have sperm whales that are resident in the
Gulf and their males leave and go all the way to Antarctica and it will take over 21 years for
them to recover. I want to know - - and I think the public deserves to know - - how could that be
worth $140 million? It's shocking to read that. And I know that I'm emotional, but it's just not
acceptable to me that marine mammals would receive so little and humans, who lay on the beach
and litter, would receive so much. But anyway, that's a separate issue, the litter.

So, I think that that should be looked at. We cannot undervalue marine mammals. They are the
top apex of our ecosystem. And if they're not restored, no other species is going to be restored.
And when you protect them, you protect everything underneath them. So, the - - more to the
point of what I should be talking about, related to humans, is I think that land acquisition on
barrier islands may be one of the best ways to assure beach dunes and marshes and uplands are
protected on the barrier islands because these fragile ribbons of sand provide very valuable
habitat, food, and homes for avian species, terrestrial species, and fish. And for the small area

that barrier islands take up, there's a huge rate of biodiversity in a very small landmass. And so I think that those projects should be top priority when we're talking about restoration of barrier islands.

And then regarding the communities, as Diane said, we're small communities; so, if there's any way that NRDA can work more closely with the smaller communities on barrier islands and also places like the boot of Louisiana, on Barataria-Terrebonne Bay, to really work with those communities and figure out how these communities can be restored and help restore the natural ecosystems, I think that the money will be better spent in a longer term that way, if you work with the smaller coastal communities.

And then I still question that the scale of the damage was very tremendous and I know we need to restore the Gulf and if we wait to settle, we won't move on. But it just - - when you look at the numbers and then when you especially read about the marine mammals, you think - - I just think: How can they know $140 million is going to restore the populations of sperm whales or the female dolphins in the Barataria-Terrebonne Bay. I mean, the picture is one dolphin has had two failed pregnancies since 2013. What would we do if women had that experience in our neighborhoods after this kind of impact?

# PEPC Project ID: 60777, DocumentID: 68455
# Correspondence: 108

## Author Information

| | |
|---|---|
| Keep Private: | No |
| Name: | Alice O'Donell |
| Organization: | |
| Organization Type: | I - Unaffiliated Individual |
| Address: | n/a |
| | n/a, UN n/a |
| | USA |
| E-mail: | |

## Correspondence Information

| | |
|---|---|
| Status: Reviewed | Park Correspondence Log: |
| Date Sent: | Date Received: 11/10/2015 |
| Number of Signatures: 1 | Form Letter: No |
| Contains Request(s): No | Type: Transcript |
| Notes: | |

## Correspondence Text

I'm Alice Anne O'Donell. And Karla is always a tough act to follow, and I should have, you know, had my Kleenex in hand. And I was going to put my plug in for birds because that's my passion - - birds and habitat - - but now I guess I'll have to throw my vote for marine mammals because I didn't know what a tragedy that was and how little they were getting. And it's when people like myself come to a meeting like this, we find out a lot of things that we didn't know and we want to support.

I think my - - I certainly support the idea of the whole project. I think what you-all called it is alternative aid, comprehensive integrated ecosystems restoration. That's a mouthful and you have to read it to say it. But it's the coastal communities, it's the small communities, it's the little places. I feel like Houston, who is real close to me, I think they could gobble us up when you start to apply for grants and things. The fishermen who are here tonight, what a plight that they are in because they didn't even know about it. Little communities like Galveston, we've been planning for this meeting and what we can do; and we are still behind. So I just hope that when the grants come in and the ratings are made, that you find some way to find out how to give the littler, smaller communities extra points or something for their effort. And how can you compare, you know - - well, it's just apples and oranges. But I do thank all of you-all for coming tonight. And welcome to Galveston. And we hope to see you back soon. And we'll be using some of your resources to make it an even better place.

# PEPC Project ID: 60777, DocumentID: 68455
# Correspondence: 109

## Author Information

| | |
|---|---|
| Keep Private: | No |
| Name: | Jordan Macha |
| Organization: | Gulf Restoration Network ⊙ Official Rep. |
| Organization Type: | L - Non-Governmental |
| Address: | n/a |
| | n/a, UN n/a |
| | USA |
| E-mail: | |

## Correspondence Information

| | |
|---|---|
| Status: Reviewed | Park Correspondence Log: |
| Date Sent: | Date Received: 11/10/2015 |
| Number of Signatures: 1 | Form Letter: No |
| Contains Request(s): No | Type: Transcript |
| Notes: | |

## Correspondence Text

Hi. My name is Jordan Macha. I'm the senior policy analyst for the Gulf Restoration Network. We're headquartered in New Orleans, but I am based here in Austin. And we appreciate the opportunity to make comments this evening. We recognize the immense effort that was put in by the representing agencies in the five Gulf states for both the Consent Decree and the NRDA Restoration Plan. And we really appreciate and thank you for those efforts.

While we will be submitting more thorough comments by the deadline, we appreciate the thorough restoration analysis and generally agree with the environmental assessments made with the NRDA Programmatic Damage Assessment and Restoration Plan and believe that this provides important rationale as to why we must strive for an integrated, comprehensive restoration. However, we are troubled by the proposed governance structure composed of the eight trustee implementation groups, essentially dividing the Gulf ecosystem to eight distinct silos. This structure breaks down the need for consistency in restoration implementation and does not honor the goals of comprehensive ecosystem restoration by putting up political boarders across the Gulf.

Additionally, we are very concerned that the open-ocean component is bearing the burden of all the administrative costs. The ocean environment has yet to receive any restoration in it's open waters, and by shouldering the administration costs of the five Gulf states, this proposed structure could absorb most of the fines that would go towards meaningful marine restoration. Our ocean environment is where the disaster was first hit and it deserves more. We encourage the Trustees to redirect the administrative costs to its respective components. This is an opportunity that we shouldn't squander, and I thank you for this opportunity.

**PEPC Project ID: 60777, DocumentID: 68455**
**Correspondence: 110**

## Author Information

| | |
|---|---|
| Keep Private: | No |
| Name: | Kelly deSchaun |
| Organization: | Galveston Island Park Board of Trustees |
| Organization Type: | O - Civic Groups |
| Address: | n/a |
| | n/a, UN n/a |
| | USA |
| E-mail: | |

## Correspondence Information

| | |
|---|---|
| Status: Reviewed | Park Correspondence Log: |
| Date Sent: | Date Received: 11/10/2015 |
| Number of Signatures: 1 | Form Letter: No |
| Contains Request(s): No | Type: Transcript |
| Notes: | |

## Correspondence Text

Good evening and thank you. My name is Kelly de Schaun. I am the Executive Director for the Galveston Island Park Board of Trustees, a local governmental entity charged with stewardship and management of our coastline and tourism promotion here on the Island. Like the previous speakers, I'd like to thank the Trustees for their effort in bringing both the Consent Decree and the draft proposal forward. It obviously represents a tremendous amount of work, and we're appreciative of all the time and effort that's been undertaken so far to get you to the point where we are.

We did have a couple of comments, however, we'd like to underscore. The first is in regards to a comment that's been expressed already. Galveston is a small barrier island. Not only with the Deepwater Horizon oil spill but with others, because of our proximity to the Houston Ship Channel, we are in constant alert with opportunities to improve our environmental stewardship to minimize impact.

We are also recently coming out of Hurricane Ike which has dominated recovery efforts here on the Island for the last eight years. And I say this in the context of previous comments that we might not be as prepared as some of our other communities that have large, nongovernmental organizations and conservation organizations that work on these issues. And we feel that because of the importance of the barrier islands and because of the constant threat that we're under, that barrier islands, in general, deserve some special type of consideration or callout; and we'd like to ask you to consider that.

Also, I'd like - - while we appreciate and understand the need for the comprehensive integrated approach to restoration for the ecosystems, we do want to call out that Texas did not receive - - after the initial restoration funding for reaction - - any additional funding for recreation along the

Texas Coast. I understand that the calculations for lost restoration - - or lost user days is a complicated calculation to make; we appreciate that. We'd also say in context of the Hurricane Ike hitting here in 2008, at the end of 2008, that visitation along the coast and in Galveston was already down because of the previous natural disaster, and so the lack of any type of additional funding for recreational opportunities along the Texas Coast and in Galveston, in particular, is going to be problematic. As the local governmental entity, the way we pay for conservation along the coast for the City of Galveston is through user fees; and those fees are generated through the provision of recreational opportunities. If there's not recreational opportunities provided, there's no way to create revenue streams to conserve. And so I would say to you while the initial goal of encouraging conservation is achieved, the long-term goal of sustaining it might not be achieved if there's not recreational opportunities incorporated that are going to create economic return on those investments and conservation over the long period.

Lastly - - and I'd just like to reiterate, as well, that we saw that Florida had additional water quality money attributed to it. We'd like for consideration for the same reasons as Florida. We have major tourism beaches. The fishing in this area, of course, as well, could be impacted by freshwater inflows, and that was not considered.

And I'll just finalize by saying that we would also like to add our voice to the issues of the governance and the administrative fees to ensure that the largest portion possible of funds is allocated to the sites that were impacted and that those are made - - those fees are made transparent and that governance is made transparent. Thank you for the opportunity to speak.

# PEPC Project ID: 60777, DocumentID: 68455
# Correspondence: 111

## Author Information

Keep Private:              No
Name:                      Van Nguyen
Organization:
Organization Type:         I - Unaffiliated Individual
Address:                   n/a
                           n/a, UN n/a
                           USA
E-mail:

## Correspondence Information

Status: Reviewed                    Park Correspondence Log:
Date Sent:                          Date Received: 11/10/2015
Number of Signatures: 1             Form Letter: No
Contains Request(s): No             Type: Transcript
Notes:

## Correspondence Text

This is Van Nguyen - - Van Trung Nguyen, and he is a commercial fisherman. He lives in Texas City, and he's been a fisherman since 1987 - - 1988. And at the beginning, he wanted to extend his greeting and welcome everyone here.

Particularly this is - - you know, through the Natural Resource Damage Assessment, the assessment of all the damages, the NRDA Trustee Council surely knows that all the impacting - - all the devastating impacts to the natural resources that has - - therefore, it has critically, you know, impacted the livelihoods of fishermen. Fishermen are very worried about their livelihoods and the possibility of any kind of future fisheries collapse. It is critically important that you really focus on your restoration in terms of really trying to restore the fisheries. That's so important to the sustainability of our livelihoods and for us to help contribute to our local and regional economy.

He and many other fishermen are urgently appealing to the Trustee Council the great need - - you know, the great need to really focus on the right restoration priorities and types. And it's been devastating to their livelihoods, the loss of economic security, a way of life. You know, that is very, very troubling and deeply concerning to him and many of the fishermen that their livelihoods are just eroding from them. Again, thank you for the opportunity to comment.

# PEPC Project ID: 60777, DocumentID: 68455
# Correspondence: 113

## Author Information

Keep Private:              No
Name:                      N/A N/A
Organization:
Organization Type:         I - Unaffiliated Individual
Address:
                           mobile, AL 36601
                           USA
E-mail:

## Correspondence Information

Status: Reviewed                    Park Correspondence Log:

Date Sent: 11/18/2015               Date Received: 11/18/2015

Number of Signatures: 1             Form Letter: No

Contains Request(s): No             Type: Web Form

Notes:

## Correspondence Text

I need help in understanding the consent decree. The handouts distributed to my community did not give the dates of the meetings.

Please extend the deadline for comment to 90 days. I live on the coast and this is for the future of my family.

## PEPC Project ID: 60777, DocumentID: 68455
## Correspondence: 114

### Author Information

Keep Private:            No

Name:                    Bien Do

Organization:

Organization Type:       I - Unaffiliated Individual

Address:                 1990 Southern Ave.
                         Biloxi, MS 39531
                         USA

E-mail:                  mscvaff.comments2015@gmail.com

### Correspondence Information

Status: Reviewed                 Park Correspondence Log:

Date Sent: 11/18/2015            Date Received: 11/18/2015

Number of Signatures: 1         Form Letter: No

Contains Request(s): No         Type: Web Form

Notes:

### Correspondence Text

Dear Department of Justice:

I am an experienced commercial fisherman, boat owner, and captain. The name of my boat is the Lee Bien 1. For decades, I having been dredging oysters and harvesting shrimp on the MS Gulf Coast. Before the BP Oil Drilling Disaster, I was able to dredge twenty five sacks of oysters a day for six days a week, in a season that typically lasted seven months, from September/October to April/May. Since the disaster, oyster reefs have been destroyed and remained mostly closed to commercial harvesting. My livelihood has been greatly impacted and causing tremendous financial hardship for my family. It is almost six years now, and the oyster reefs have not been properly restored. Collectively, in almost the six years (over 66 months), the oyster reefs have not even been open to dredging for nine months. Fishing communities are greatly concerned about the sustainability of our livelihoods.

Further, I am greatly concerned that fishing communities, particularly those that speak limited English, have not been properly informed regarding the Proposed BP Settlement/Consent Decree. Again, numerous fishermen have not been properly informed due to the shrimping season that started earlier this summer. It is critically important that the Department of Justice grant a sixty day comment deadline extension, to allow fishing communities' sufficient time to review and comment on the Proposed BP Settlement/Consent Decree.

This is vital to the sustainability of our livelihoods. Please extend the comment deadline. Thank

you for the opportunity to comment.

# PEPC Project ID: 60777, DocumentID: 68455
# Correspondence: 115

## Author Information

| | |
|---|---|
| Keep Private: | No |
| Name: | Tuat Nguyen |
| Organization: | |
| Organization Type: | I - Unaffiliated Individual |
| Address: | P.O. BOX 6491 |
| | Biloxi, MS 39540 |
| | USA |
| E-mail: | mscvaff.comments2015@gmail.com |

## Correspondence Information

Status: Reviewed                    Park Correspondence Log:

Date Sent: 11/18/2015               Date Received: 11/18/2015

Number of Signatures: 1             Form Letter: No

Contains Request(s): No             Type: Web Form

Notes:

## Correspondence Text

I am a boat owner & captain for the vessel, Lee Bien III (commercial fishing, specifically dredging oysters & shrimping).Before the BP Oil Disaster, I dredged twenty-five sacks of oysters a day for six days a week, in a seven month season. Since the disaster, dispersed oil destroyed the reefs and these once harvestable reefs have remained mostly closed . My livelihood has been greatly impacted and caused tremendous financial hardship for my family. It is now almost six years and the oyster reefs have not been properly restored. In almost six years (combined over 66 months), the oyster reefs have not even been open to dredging for nine months. I am greatly concerned about the sustainability of my livelihood.

Due to significant language barriers, great lack of outreach, and inadequate public notice to Vietnamese-American fishing communities, I am strongly requesting that the Department of Justice grant a minimum sixty day public comment extension deadline to February 2016. It is critically important that all Gulf residents have equal access to relevant information.

This is critical to my livelihood. Please implement my recommendation & thank you for the opportunity to comment.

# PEPC Project ID: 60777, DocumentID: 68455
# Correspondence: 116

## Author Information

| | |
|---|---|
| Keep Private: | No |
| Name: | Thanh Nguyen |
| Organization: | |
| Organization Type: | I - Unaffiliated Individual |
| Address: | 23340 Enchanted Ave. |
| | Pass Christian, MS 39571 |
| | USA |
| E-mail: | mscvaff.comments2015@gmail.com |

## Correspondence Information

| | |
|---|---|
| Status: Reviewed | Park Correspondence Log: |
| Date Sent: 11/18/2015 | Date Received: 11/18/2015 |
| Number of Signatures: 1 | Form Letter: No |
| Contains Request(s): No | Type: Web Form |
| Notes: | |

## Correspondence Text

Dear Department of Justice:

I am a long-time, commercial fisherman, boat owner, and captain on the MS Gulf Coast (oyster dredging & shrimping). Before the BP Oil Disaster, I earned approximately $40K during the seven month oyster season (this did not include other fishing income). This was sufficient to provide and support my family. Since the disaster, the reefs have been mostly closed and caused great economic hardship and livelihood sustainability concerns for my family and hundreds of other oyster harvesters.

Due to significant language barriers and inadequate public notice to Vietnamese-American fishing communities, I am requesting that the Department of Justice grant a minimum sixty day public comment extension deadline to February 2016. It is critically important that all Gulf residents have equal access to relevant information.

This is critical to my livelihood & thank you for the opportunity to comment.

**PEPC Project ID: 60777, DocumentID: 68455
Correspondence: 117**

## Author Information

| | |
|---|---|
| Keep Private: | No |
| Name: | Bai Cao |
| Organization: | |
| Organization Type: | I - Unaffiliated Individual |
| Address: | 23340 Enchanted Ave. |
| | Pass Christian, MS 39571 |
| | USA |
| E-mail: | mscvaff.comments2015@gmail.com |

## Correspondence Information

Status: Reviewed                    Park Correspondence Log:

Date Sent: 11/18/2015               Date Received: 11/18/2015

Number of Signatures: 1             Form Letter: No

Contains Request(s): No             Type: Web Form

Notes:

## Correspondence Text

To Department of Justice(DOJ):

My family has been commercial fishermen (dredging oysters and shrimping) for over 25 years in South Mississippi. The BP Oil Disaster greatly impacted my livelihood (decimated oyster reefs) and caused tremendous financial hardship.

It is very important that DOJ extend the comment deadline to February 2016 to allow fishing communities' sufficient time to review and comment on the BP Proposed Settlement/Consent Decree.

My comments are very important for the sustainability of my livelihood. Thank you.

# PEPC Project ID: 60777, DocumentID: 68455
# Correspondence: 118

## Author Information

| | |
|---|---|
| Keep Private: | No |
| Name: | Xuan Nguyen |
| Organization: | |
| Organization Type: | I - Unaffiliated Individual |
| Address: | 1611 McClaurin St. |
| | Waveland, MS 39576 |
| | USA |
| E-mail: | mscvaff.comments2015@gmail.com |

## Correspondence Information

| | |
|---|---|
| Status: Reviewed | Park Correspondence Log: |
| Date Sent: 11/18/2015 | Date Received: 11/18/2015 |
| Number of Signatures: 1 | Form Letter: No |
| Contains Request(s): No | Type: Web Form |
| Notes: | |

## Correspondence Text

Dear Department of Justice:

My family are long-time commerical fishermen on the MS Gulf Coast and our livelihoods was greatly impacted by the BP Oil Disaster.Over the years, closed fisheries and reduced catches have caused serious economic hardship for many fisher folks.

Vietnamese-American fisher folks have not been adequately informed about the BP Proposed Settlement/Consent Decree and we are greatly asking for a 60 day comment extension to sufficiently review and comment. Please grant the extension and thank you for the opportunity to comment.

# PEPC Project ID: 60777, DocumentID: 68455
# Correspondence: 119

## Author Information

| | |
|---|---|
| Keep Private: | No |
| Name: | Keo Nguyen |
| Organization: | |
| Organization Type: | I - Unaffiliated Individual |
| Address: | 1611 McClaurin St. |
| | Waveland, MS 39576 |
| | USA |
| E-mail: | mscvaff.comments2015@gmail.com |

## Correspondence Information

Status: Reviewed                    Park Correspondence Log:

Date Sent: 11/18/2015              Date Received: 11/18/2015

Number of Signatures: 1           Form Letter: No

Contains Request(s): No           Type: Web Form

Notes:

## Correspondence Text

Dear Department of Justice:

I am a commerical fishermen, boat owner, and captain on the MS Gulf Coast(dredge oysters & shrimper). My livelihood,like numerous other fisher folks have been devastated by the BP Oil Disaster. Mainly closed fisheries (mostly closed oyster reefs) and reduced catches have caused serious economic hardship for many of us.

Vietnamese-American fisher folks have not been properly informed about the BP Proposed Settlement and we are greatly asking for a sixty day comment extension to February 2016 to sufficiently review and comment. Please grant the extension and thank you for the opportunity to comment.

# PEPC Project ID: 60777, DocumentID: 68455
# Correspondence: 120

## Author Information

| | |
|---|---|
| Keep Private: | No |
| Name: | Trong V. Phan |
| Organization: | |
| Organization Type: | I - Unaffiliated Individual |
| Address: | 334 Hunter Ave. |
| | Pass Christian, MS 39571 |
| | USA |
| E-mail: | mscvaff.comments2015@gmail.com |

## Correspondence Information

Status: Reviewed                     Park Correspondence Log:

Date Sent: 11/18/2015                 Date Received: 11/18/2015

Number of Signatures: 1               Form Letter: No

Contains Request(s): No               Type: Web Form

Notes:

## Correspondence Text

To Department of Justice:

I have resided in South Mississippi for many years. I am both an oyster harvester (dredging) and shrimper. When the BP Oil Disaster occurred, my family and fishing community has experienced great hardship. Because of fisheries closures (for example, oyster reefs that were once harvestable have remained mostly closed), many of us are very concerned about livelihood sustainability.

First, please address language access needs for the Vietnamese-American population (many of us did not receive a higher education. We settled in the Gulf Region to continue our livelihoods (in Vietnam, many of us came from coastal fishing villages and fishing is a way of life for us). Importantly, we need to be informed in advance through better outreach methods and to receive translated documents in a timely manner. Because fisher folks haven't been properly informed, I am requesting DOJ grant an extended comment deadline to February 2016, for us to adequately review and comment on the BP Proposed Settlement/Consent Decree.

Thank you for the opportunity to comment.

# PEPC Project ID: 60777, DocumentID: 68455
# Correspondence: 121

## Author Information

| | |
|---|---|
| Keep Private: | No |
| Name: | Tony Le |
| Organization: | |
| Organization Type: | I - Unaffiliated Individual |
| Address: | 324 Keller Ave. |
| | Biloxi, MS 39530 |
| | USA |
| E-mail: | mscvaff.comments2015@gmail.com |

## Correspondence Information

Status: Reviewed                    Park Correspondence Log:

Date Sent: 11/18/2015               Date Received: 11/18/2015

Number of Signatures: 1            Form Letter: No

Contains Request(s): No            Type: Web Form

Notes:

## Correspondence Text

Dear Department of Justice:

I have been a commercial fisherman (shrimping and oyster dredging) for decades on the MS Gulf Coast. Due to the BP Disaster, my livelihood has been devastated, with closed fisheries (mainly closed oyster reefs) reduced catch (shrimping inshore) causing great financial hardship & livelihood concerns.

Vietnamese-American fishermen have not been properly engaged & informed about the BP Proposed Settlement/Consent Decree. Further,this was announced during our shrimping season. Its vitally important to extend the public comment deadline to February 2016.

It's critically important to our livelihoods that our recommendations are implemented.

Thank you for the opportunity to comment.

**PEPC Project ID: 60777, DocumentID: 68455
Correspondence: 122**

## Author Information

Keep Private:           No
Name:                   Hoang Tran
Organization:
Organization Type:      I - Unaffiliated Individual
Address:                17189 Coventry Estate Blvd.
                        D'Iberville, MS 39540
                        USA
E-mail:                 mscvaff.comments2015@gmail.com

## Correspondence Information

Status: Reviewed                Park Correspondence Log:
Date Sent: 11/18/2015           Date Received: 11/18/2015
Number of Signatures: 1         Form Letter: No
Contains Request(s): No         Type: Web Form
Notes:

## Correspondence Text

Dear Department of Justice:

I am a commercial fisherman (oyster dredging & shrimping) & boat captain.
The BP Oil Disaster devastated my livelihood with mostly oyster reefs & reduced
catch/harvest causing great hardship & livelihood concerns.

Vietnamese-American fishermen have not been properly informed about the BP Proposed
Settlement/Consent Decree. It is critical to extend the public comment deadline to February
2016.

Thank you for the opportunity to comment.

# PEPC Project ID: 60777, DocumentID: 68455
# Correspondence: 123

## Author Information

| | |
|---|---|
| Keep Private: | No |
| Name: | Phi Nguyen |
| Organization: | |
| Organization Type: | I - Unaffiliated Individual |
| Address: | 17189 Coventry Estate Blvd. |
| | D'Iberville, MS 39540 |
| | USA |
| E-mail: | mscvaff.comments2015@gmail.com |

## Correspondence Information

| | |
|---|---|
| Status: Reviewed | Park Correspondence Log: |
| Date Sent: 11/18/2015 | Date Received: 11/18/2015 |
| Number of Signatures: 1 | Form Letter: No |
| Contains Request(s): No | Type: Web Form |
| Notes: | |

## Correspondence Text

To Department of Justice,

I am the owner of the Phi Nguyen, a boat that dredge oysters and trawl shrimp.
My family livelihood has been devasted by the BP Oil Disaster. We have great livelihood concerns.

Vietnamese-American fishing communities have not been engaged and informed about the BP Proposed Settlement/Consent Decree. We have signifcant Language Access needs that have not been properly addressed. It is very important, please extend the public comment deadline to February 2016.

Thank you for the opportunity to comment.

# PEPC Project ID: 60777, DocumentID: 68455
# Correspondence: 124

## Author Information

Keep Private:          No
Name:                  Lam Dang
Organization:
Organization Type:     I - Unaffiliated Individual
Address:               100 Espana Park
                       Waveland, MS 39576
                       USA
E-mail:                mscvaff.comments2015@gmail.com

## Correspondence Information

Status: Reviewed                Park Correspondence Log:

Date Sent: 11/18/2015           Date Received: 11/18/2015

Number of Signatures: 1         Form Letter: No

Contains Request(s): No         Type: Web Form

Notes:

## Correspondence Text

Dear Department of Justice:

I am a commercial fisherman, the captain of a shrimp and oyster (dredging) boat. I have been fishing for numerous years in the Gulf and because of the BP Oil Disaster, I am very concerned about my livelihood. For the past five years, it's taken a tremendous toll on fishermen, causing great economic hardship, as we earned very little or no fishing income due to various fisheries closures and/or greatly reduced catches.

The Vietnamese-American fishing community has great language access needs. Many of us did not obtain a higher education nor do we have computers/email accounts. Please provide translated documents and there should be targeted outreach when disseminating information. Qualified interpreters should be available at all public meetings. Because of the listed reasons and we have not been adequately informed, we are greatly asking for a extended comment period to February 2016. This will allow us more time to review and comment on the BP Proposed Settlement/Consent Decree. Thank you.

# PEPC Project ID: 60777, DocumentID: 68455
# Correspondence: 125

## Author Information

Keep Private:          No
Name:                  Siriporn Hall
Organization:
Organization Type:     I - Unaffiliated Individual
Address:               7361 Clover Dr.
                       Irvington, AL 36544
                       USA
E-mail:                mscvaff.comments2015@gmail.com

## Correspondence Information

Status: Reviewed                  Park Correspondence Log:
Date Sent: 11/18/2015             Date Received: 11/18/2015
Number of Signatures: 1           Form Letter: No
Contains Request(s): No           Type: Web Form
Notes:

## Correspondence Text

Dear Department of Justice:

I am a boat owner and captain of a crabbing boat. I have been crabbing for numerous years along the Gulf Coast. The BP Oil Drilling Disaster greatly devastated my livelihood and caused severe economic hardship. In the past several seasons, I have seen severe losses/ decline in the crab fisheries, particularly female crabs. In the past, I would harvest female, sponge crabs, particularly, in the summer; however, I haven't harvested those crabs near the volume/amount harvested prior to the disaster.

Fishing communities with have not received adequate notice and haven't been properly engaged and informed about the BP Proposed Settlement/Consent Decree. Therefore, we are strongly asking for an additional 60 days to February 2016, to review and comment.


Thank you for the opportunity to comment.

# PEPC Project ID: 60777, DocumentID: 68455
# Correspondence: 126

## Author Information

Keep Private:          No
Name:                  Dung Nguyen
Organization:
Organization Type:     I - Unaffiliated Individual
Address:               2911 Leroy
                       Bacliff, TX 77518
                       USA
E-mail:                mscvaff.comments2015@gmail.com

## Correspondence Information

Status: Reviewed                    Park Correspondence Log:
Date Sent: 11/18/2015               Date Received: 11/18/2015
Number of Signatures: 1             Form Letter: No
Contains Request(s): No             Type: Web Form
Notes:

## Correspondence Text

Dear Department of Justice:

I am a commercial fisherman. My livelihood,like many other fisher folks,have been greatly
impacted by the BP Oil Drilling Disaster.

We are very concerned about the lack of engagement with the Vietnamese-American fishing
communities regarding the BP Proposed Settlement. This is critically important to our
livelihoods. We greatly urge and request a sixty day extension to sufficiently
review and comment on the BP Proposed Settlement.

Thank you for the opportunity to comment.

# PEPC Project ID: 60777, DocumentID: 68455
# Correspondence: 127

## Author Information

Keep Private:              No
Name:                      Kiet Le
Organization:
Organization Type:         I - Unaffiliated Individual
Address:                   1000 22 St.
                           San Leon, TX 77539
                           USA
E-mail:                    mscvaff.comments2015@gmail.com

## Correspondence Information

Status: Reviewed                    Park Correspondence Log:
Date Sent: 11/18/2015               Date Received: 11/18/2015
Number of Signatures: 1             Form Letter: No
Contains Request(s): No             Type: Web Form
Notes:

## Correspondence Text

Dear Department of Justice:

I am a commercial fisherman. My livelihood,like many other fisher folks,have been greatly
impacted by the BP Oil Drilling Disaster.

We are very concerned that the Vietnamese-American fishing communities have not been
properly notified regarding the BP Proposed Settlement. This is vitally important and will greatly
affect our livelihoods. We strongly request a sixty day extension to sufficiently
review and comment on the BP Proposed Settlement.

Thank you for the opportunity to comment.

# PEPC Project ID: 60777, DocumentID: 68455
# Correspondence: 128

## Author Information

Keep Private:                No
Name:                        Quang Nguyen
Organization:
Organization Type:           I - Unaffiliated Individual
Address:                     4208 Parkview Terrace Ln
                             Dickinson, TX 77539
                             USA
E-mail:                      mscvaff.comments2015@gmail.com

## Correspondence Information

Status: Reviewed                    Park Correspondence Log:
Date Sent: 11/18/2015               Date Received: 11/18/2015
Number of Signatures: 1             Form Letter: No
Contains Request(s): No             Type: Web Form
Notes:

## Correspondence Text

Dear Department of Justice,

I am a commercial fisherman who lives in Dickinson, TX. My fishing community like numerous others, are very concerned about the BP Oil Disaster and its impact to our livelihoods.

Vietnamese-American fishing communities do not speak fluent English & have not been adequately informed regarding the BP Proposed Settlement. This is very important to our livelihoods. We respectfully request a sixty day extension to fully review and comment on the BP Proposed Settlement.

Thank you for the opportunity to comment.

# PEPC Project ID: 60777, DocumentID: 68455
# Correspondence: 129

## Author Information

Keep Private:            No
Name:                    Tai Ly
Organization:
Organization Type:       I - Unaffiliated Individual
Address:                 149 Emmett Morel Lane
                         Buras, LA 70041
                         USA
E-mail:                  mscvaff.comments2015@gmail.com

## Correspondence Information

Status: Reviewed                  Park Correspondence Log:
Date Sent: 11/18/2015             Date Received: 11/18/2015
Number of Signatures: 1          Form Letter: No
Contains Request(s): No          Type: Web Form
Notes:

## Correspondence Text

Dear Department of Justice:

I am a experienced commericial fishermen(shrimper)& boat owner who lives in Buras,
Louisiana.

Fishing communities here have been greatly impacted, suffered great hardships, as a result of the
BP Oil Disaster.

We have not been adequately notified and informed of the BP Proposed Settlement. This is very
important for our livelihood and we ask for a sixty day extended deadline to February 2016 to
sufficiently review and comment.


Thank you for giving me the opportunity to comment.

# PEPC Project ID: 60777, DocumentID: 68455
# Correspondence: 130

## Author Information

| | |
|---|---|
| Keep Private: | No |
| Name: | Nancy Mueller |
| Organization: | |
| Organization Type: | I - Unaffiliated Individual |
| Address: | 2850 N. Prospect Ave |
| | Milwaukee, WI,WI 53211-3770 |
| | USA |
| E-mail: | nancymomma@gmail.com |

## Correspondence Information

| | |
|---|---|
| Status: Reviewed | Park Correspondence Log: |
| Date Sent: 11/18/2015 | Date Received: 11/18/2015 |
| Number of Signatures: 1 | Form Letter: No |
| Contains Request(s): No | Type: Web Form |
| Notes: | |

## Correspondence Text

Please close the loop hole that would allow BP to deduct part of the costs of the clean up from their taxes. Taxpayers should not have to pay for this and the country should not lose that tax money.

## PEPC Project ID: 60777, DocumentID: 68455
## Correspondence: 131

### Author Information

Keep Private:        No
Name:                humberto carcamo
Organization:
Organization Type:   I - Unaffiliated Individual
Address:             821 cameron ct
                     kenner, LA 70065
                     USA
E-mail:              hcarcamo2007@hotmail.com

### Correspondence Information

Status: Reviewed              Park Correspondence Log:
Date Sent: 11/19/2015         Date Received: 11/19/2015
Number of Signatures: 1       Form Letter: No
Contains Request(s): No       Type: Web Form
Notes:

### Correspondence Text

my name is Humberto carcamo my gccf claim number is 03267781 i up out because as american citizen I am asking the grand jury why we are waiting so long about our cases each and every one who work in the industry oil lost incomes until today we hardly recuperate first we as to be first not the government i lost my savings for almost 3 years i been struggling to keep up with my incomes not only that stress i work for a company that our work is base the oil industry and 5 years are passing and still struggling i been diagnose with diabetes why because the stress I am asking to our court when you are going to rule our cases my case is also one of then my wife was laid out of her work because of the oil spill not only that they denied any help so all of this problems when we are going to heard from damage is been done because British petroleum or BP is denied to rewards my loses not only that my healt is been damage already there is not turn back in that this is my case my family is been suffering because of thai am asking the judge when we are going to have justice as american citizen i deserve justice i need justice every one who struggling we deserve justice i am beging our judges to take care of my needs not only my on also each and every one who their jobs because of this spill i dyrect my plea to the grand jury to take care of our needs thank you so much for read this letter and god bless america because i steel believe in justice your truly HUMBERTO CARCAMO

# PEPC Project ID: 60777, DocumentID: 68455
# Correspondence: 132

## Author Information

Keep Private:            No
Name:                    Caren L. Caldwell
Organization:
Organization Type:       I - Unaffiliated Individual
Address:                 124 Ohio Street, Ashland OR 97520
                         Ashland, OR 97520
                         USA
E-mail:                  caren97520@yahoo.com

## Correspondence Information

Status: Reviewed                    Park Correspondence Log:
Date Sent: 11/21/2015               Date Received: 11/21/2015
Number of Signatures: 1             Form Letter: No
Contains Request(s): No             Type: Web Form
Notes:

## Correspondence Text

U.S. v. BP Exploration and Production et al, Civil No. 10-4536 (E.D. La.) (centralized in MDL 2179: In Re: Oil Spill by the Oil Rig "Deepwater Horizon" in the Gulf of Mexico, April 20, 2012), D.J. Ref. 90-5-1-1-10026.

In regards to Civil No. 10-4536, deny BP tax deductions for Deepwater Horizon settlement

This settlement, as written, allows BP to claim $15.3 billion of the total payment as a tax deduction, and ultimately allows the oil company to take a $5.35 billion tax windfall for its gross negligence.

The settlement agreement forces taxpayers to continue to shoulder the burden of BP's actions.

The language of the agreement should be adjusted to prevent the corporation from claiming "ordinary cost of doing business" tax deductions for what has been found to be its gross negligence in connection with the Deepwater Horizon disaster.

The tragedy of the Deepwater Horizon oil spill must be answered with justice for the people, economy, and wildlife of the Gulf Coast-not further tax benefits for BP.

# PEPC Project ID: 60777, DocumentID: 68455
# Correspondence: 133

## Author Information

| | |
|---|---|
| Keep Private: | No |
| Name: | Theresa Graff |
| Organization: | |
| Organization Type: | I - Unaffiliated Individual |
| Address: | 2600 Wagon Tongue Drive |
| | Mobile, AL 36695 |
| | USA |
| E-mail: | the_white-rabbit@live.com |

## Correspondence Information

| | |
|---|---|
| Status: Reviewed | Park Correspondence Log: |
| Date Sent: 11/22/2015 | Date Received: 11/22/2015 |
| Number of Signatures: 1 | Form Letter: No |
| Contains Request(s): No | Type: Web Form |
| Notes: | |

## Correspondence Text

In light of the recently announced settlement between the Justice Department, British Petroleum (#BP), and the five states of the Gulf Coast, we write to you with deep concerns about the tax status of BP's proposed financial obligations. The tragedy of the Deepwater Horizon must be answered with justice for the people, economy, and wildlife of the Gulf Coast-not further tax benefits for BP.

We applaud the fact that the proposed consent decree forbids the deduction of $5.5 billion in fines levied under the Clean Water Act. Nevertheless, we are concerned that without strict language to the contrary, BP will seek to claim the remaining $15.3 billion as a business expense, displacing the burden of that uncollected revenue onto every other taxpayer while securing a tax windfall worth $5.35 billion for itself.

The "gross negligence" that led to perhaps the worst environmental disaster in US history should not be an opportunity to game the tax code. Challenging fiscal choices may lie ahead, and every dollar we lose in revenue is a dollar cut from much needed programs, raised from another source, or added to the national debt. As the comment period for the consent decree continues, we ask you to protect both taxpayers and the environment by pursuing a final settlement that clearly specifies no amount of BP's settlement costs may be treated as a tax deduction.

# PEPC Project ID: 60777, DocumentID: 68455
# Correspondence: 134

## Author Information

| | |
|---|---|
| Keep Private: | No |
| Name: | Kim R. White |
| Organization: | self |
| Organization Type: | I - Unaffiliated Individual |
| Address: | Hobart, TAS |
| | Australia |
| | Hobart, UN,UN 7000 |
| | AUS |
| E-mail: | kimberly.r.white@icloud.com |

## Correspondence Information

| | |
|---|---|
| Status: Reviewed | Park Correspondence Log: |
| Date Sent: 11/22/2015 | Date Received: 11/22/2015 |
| Number of Signatures: 1 | Form Letter: No |
| Contains Request(s): No | Type: Web Form |
| Notes: | |

## Correspondence Text

Was this not a crime against Humanity in its scale and repercussions?
Shouldnt the international courts be brought to bear?

# PEPC Project ID: 60777, DocumentID: 68455
# Correspondence: 135

## Author Information

| | |
|---|---|
| Keep Private: | No |
| Name: | Susan M. Lovett |
| Organization: | |
| Organization Type: | I - Unaffiliated Individual |
| Address: | |
| | Kingsland, GA 31548 |
| | USA |
| E-mail: | dancingwinddesigns@gmail.com |

## Correspondence Information

| | |
|---|---|
| Status: Reviewed | Park Correspondence Log: |
| Date Sent: 11/23/2015 | Date Received: 11/23/2015 |
| Number of Signatures: 1 | Form Letter: No |
| Contains Request(s): No | Type: Web Form |
| Notes: | |

## Correspondence Text

BP has forever ruined the Gulf. It will never be the same, and those who think that the sea life swimming in it are safe to eat, need to think again. Please don't let BP take write offs for any portion of the fines that has been levied on them. They need to somewhat pay for what they did.

# PEPC Project ID: 60777, DocumentID: 68455
# Correspondence: 136

## Author Information

| | |
|---|---|
| Keep Private: | No |
| Name: | william m. fairley |
| Organization: | |
| Organization Type: | I - Unaffiliated Individual |
| Address: | 12786 Mabel Lane |
| | Lakeland, LA 70752 |
| | USA |
| E-mail: | b.belle70802@gmail.com |

## Correspondence Information

Status: Reviewed                          Park Correspondence Log:

Date Sent: 11/23/2015                     Date Received: 11/23/2015

Number of Signatures: 1                   Form Letter: No

Contains Request(s): No                   Type: Web Form

Notes:

## Correspondence Text

These dollar amounts are a disgraceful pittance that will never even begin to address the damages (past, present, and continuing into the future) caused by BP's negligence. Just disgraceful!

# PEPC Project ID: 60777, DocumentID: 68455
# Correspondence: 137

## Author Information

| | |
|---|---|
| Keep Private: | No |
| Name: | Maureen V. Dauphinee |
| Organization: | Real Coastal Warriors |
| Organization Type: | I - Unaffiliated Individual |
| Address: | |
| | Rochester, NY,NY 14609 |
| | USA |
| E-mail: | maureendauphinee@aol.com |

## Correspondence Information

| | |
|---|---|
| Status: Reviewed | Park Correspondence Log: |
| Date Sent: 11/23/2015 | Date Received: 11/23/2015 |
| Number of Signatures: 1 | Form Letter: No |
| Contains Request(s): No | Type: Web Form |
| Notes: | |

## Correspondence Text

Dear Attorney General Lynch:

In light of the recently announced settlement between the Justice Department, British Petroleum (#BP), and the five states of the Gulf Coast, we write to you with deep concerns about the tax status of BP's proposed financial obligations. The tragedy of the Deepwater Horizon must be answered with justice for the people, economy, and wildlife of the Gulf Coast-not further tax benefits for BP.

We applaud the fact that the proposed consent decree forbids the deduction of $5.5 billion in fines levied under the Clean Water Act. Nevertheless, we are concerned that without strict language to the contrary, BP will seek to claim the remaining $15.3 billion as a business expense, displacing the burden of that uncollected revenue onto every other taxpayer while securing a tax windfall worth $5.35 billion for itself.

The "gross negligence" that led to perhaps the worst environmental disaster in US history should not be an opportunity to game the tax code. Challenging fiscal choices may lie ahead, and every dollar we lose in revenue is a dollar cut from much needed programs, raised from another source, or added to the national debt. As the comment period for the consent decree continues, we ask you to protect both taxpayers and the environment by pursuing a final settlement that clearly specifies no amount of BP's settlement costs may be treated as a tax deduction.

# PEPC Project ID: 60777, DocumentID: 68455
# Correspondence: 138

## Author Information

| | |
|---|---|
| Keep Private: | No |
| Name: | Maureen V. Dauphinee |
| Organization: | Real Coastal Warriors |
| Organization Type: | I - Unaffiliated Individual |
| Address: | |
| | Rochester, NY,NY 14609 |
| | USA |
| E-mail: | maureendauphinee@aol.com |

## Correspondence Information

| | |
|---|---|
| Status: Reviewed | Park Correspondence Log: |
| Date Sent: 11/23/2015 | Date Received: 11/23/2015 |
| Number of Signatures: 1 | Form Letter: No |
| Contains Request(s): No | Type: Web Form |
| Notes: | |

## Correspondence Text

Dear Attorney General Lynch,

For five plus years, every free moment of our time has been spent fighting for the truth and for publication of the facts related to the BP Oil Disaster in the Gulf. Even typing that, from the start I realized that the use of the word "spill" was intentional, a method by which to start to diminish the extent of the damage BP has created.

This never was intended to become a full time effort. Like many Americans, we were angered originally at the sight of dead and dying oiled sea life on the national news and outraged as the clocked ticked on to 87 days of an open "well from hell" that BP could not seem to control. Nor could the US government it appeared. How could this much oil, and this much of a disaster become anything BUT the worst environmental disaster in the history of the US?
Seeing their commercials, many went to the BP Facebook page so prominently published on television and on the radio - over and over and over. "We care" was not apparent in anything BP was representing, and it became a lesson in tenacity to go to the BP Facebook page and not be further aggravated and outraged.

There are basic facts that no person needs a degree in chemistry or science to understand. Oil - this much oil - millions of barrels spewing into the Gulf was an environmental disaster. To add insult to injury, Corexit, the dispersant used by BP was being sprayed at the well head directly had never been used before, and if application had, it was unknown to many within the industry who were shocked as ROV's displayed BP's futile attempts to cap the well.

Individuals within the industry stood in horror and watched as BP continuously fumbled. Not only in the ocean attempting to cap the runaway well, but on land, as BP corporate executives promised that they "cared about the little people". Shortly thereafter Tony Hayward, pleading "I'd like my life back", which sent shockwaves through PR firms internationally as the pompous and arrogant side of BP's ugly corporate culture was being witnessed for the first time to the world.

But the arrogance did not stop at the shoreline. From within the claims centers, crying fishermen, on their knees were pleading to then Claims Administrator Kenneth Feinberg for mercy, for help - Christmas was coming and they were losing their homes.

We watched as oystermen and shrimpers - including some of the biggest exporters of shrimp in the USA take to YouTube to plead for help in promoting the truth - that BP was downplaying the severity of the disaster - that seafood was reported damaged, with lesions, tumors and burns. No fisherman with a conscience would sell them, especially in light of BP's own refusal to grant them a waiver of liability if it turned out later that the seafood was not safe, and people got sick or worse.

Week after week of visiting the BP Facebook page I watched in horror as fishermen, mothers, business owners, children, and generations of families raised on fishing begged BP for answers. For many, fishing is all they know - all they will ever know, not having finished school, but instead heading out on family trawlers at age 12 or 14 to start and carry on the family business. Instead they received harassment, humiliation, accusation, threats, attacks, stalkers, and more. Many of these people were the first to admit they didn't know how to type or use social media, lacked in the skills necessary to protect themselves from the assault, but knew that even if they went to a library to log on and at least ask BP for help, that perhaps BP would listen. That couldn't have been farther from the truth.

From the start, and having skills in web and internet use, I could see it was important that the assault from the BP Facebook page had to be countered. People needed a place they could go and see photos of what was really occurring. Videos would be posted multiple times daily from those who would walk the shorelines from Florida to Texas, and give reports and updates. Most of what we saw and reported was grim at best, and stories continued to come in about dying dolphins, dead sea life, endangered species being wiped out, shorelines coated with BP's oil... all the while BP was representing the exact opposite.

Our Facebook page was created in April of 2010 after the disaster struck, and it fulfilled the missing link between BP's lies and the truth being reported directly from ground zero. People from all over the world came and joined the conversation, reporting that they had never seen any of the damage and death we were reporting on in their countries, and that media control and public relations had taken control of access. Even CBS news and CNN were told they were not allowed to film in zones established by BP and enforced by local police and the US Coast Guard. Some individual activists were arrested and charged with trespass for being on a public beach, or threatened with arrest for digging a hole to prove that BP had just "buried" the oil under the sand of the beaches.

We used search engines and posted news source coverage both locally, nationally and

Correspondences - Department of Justice - Consent Decree - PEPC ID: 60777

internationally and posted them around the clock. We watched as a pattern seemed to develop, not only on the BP Facebook page, but on our own page as well.

We saw a trend, where personal attacks became threats, where personal information became publicized, and where social media became an attack on your real world.

We ourselves had our initial page stolen from us on Facebook in an attempt to shut us down. We immediately regrouped when it became apparent that Facebook would do nothing except support BP and its efforts, and started another page which has over 25,000 members now. It was during that period of time that we identified a specific group of individuals who seemed to spend 24 hours a day, 7 days a week on the BP America Facebook page, always supporting BP as doing wonderful things to make good on the disaster, but also attacking each and every person who had anything to say about BP that didn't fit the obvious agenda of the page. That agenda: LIE.

Personal medical information was obtained and thrown out on BP's Facebook page by these "BP Trolls" as they have grown to be known. Information that could have only been obtained through the claims process and submissions of records and releases required in that process. Historical information on individuals past was used as a weapon to lash out against those who would post on BP's page that their claims were wrongfully denied. Threats of turning people into the IRS, to Child Welfare, Child Support, local police authorities, and state investigative units were daily. Worse, they were effective in silencing many whose only crime was that they were fishermen and women, put out of business by BP's cavalier and negligent drilling operations.

Some individuals who were VOO (Vessels of Opportunity) clean-up workers were reporting of illnesses, and were ridiculed and shamed in public as accusations were made by these same individuals of drug and substance abuse, personal information about prior arrests or court records hashed out to extinguish their voices. Even individuals with cancers, who were diagnosed after the disaster and came to the BP America Facebook page looking for answers or even trying to find out if others had the same symptoms and diagnoses were harassed, some of the trolls even indicating that they deserved to die. No one was exempt from their actions and threats. But it didn't stop on the BP Facebook page.

Once the "BP Trolls" realized they were effective in harassing individuals, they took it a step further. If you didn't retreat and remain silent after the public flogging on the BP Facebook page, they would come to YOUR Facebook page, and report posts and people to Facebook for abuse. The reporting mechanism is automated, and there is no way to contact a real person at Facebook. Even after we ourselves disclosed over 30 accounts they had established, in clear violation of the terms of service of Facebook itself, did a real person email us, but told us that there was nothing they could or would do.

It wasn't long after that that Facebook introduced "pages" utilizing their "Timeline" format, which was incorporated across the site. Facebook "Pages" which unfortunately cannot be banned, so trolls established and created multiple identities under the new format that would allow them to read pages of individuals or activist groups, report the postings, and get people and pages shut down with no ability to "block" these people from your content. One by one the BP Troll team systematically banned voices by utilizing Facebook's reporting mechanism as a

Correspondences - Department of Justice - Consent Decree - PEPC ID: 60777

weapon to silence voices.

When people were suspended from Facebook, initially it would be for 10 days. The trolls would persist and 30-60 days suspensions would be levied against them. Some threatened with a permanent ban from Facebook if they were reported again, which of course happened, and their accounts were permanently closed and banned.

Individuals would attempt to create a new account and come back to Facebook, only to be immediately shut down, identified as having already established an account, and that multiple accounts were not allowed. They would email other people, or speak to others along the Gulf to pass their messages on.

While individual and group accounts were being attacked and eliminated, individuals attempted to reverse the tide by reporting the troll pages to Facebook. Hundreds of people spent hours and hours reporting the same account to Facebook. Not ONCE did Facebook take action against them, even after being provided the multiple accounts established by these same trolls, with account identification numbers provided, and screenshots of their blatant posts of "try to stop me" acknowledging that they had multiple accounts.

The only way one could be considered "safe" was to NOT comment on the BP America Facebook page, but also not to comment ANYWHERE on Facebook about BP. On our page, we received messages that individuals received warnings and suspensions for just typing a benign comment on our page in response to a national news story. No one was exempt from their onslaught.

Once the suspensions became effective, they would target "administrators" of Facebook pages. In silencing an administrator account, the page could not be updated. If they could knock you out for 30 days, it further allowed BP to continue their "everything is A-OK" PR machine.

We have posted every single day, without stopping since the rig blew. We get up early before our day jobs start, come home and post for hours at night - 7 days a week. We have back-up members who we relay for posting in between. We also use back up members to help post during the time we are suspended, for doing nothing more than sharing published news stories covering the BP disaster.

When the trolls and/or BP still couldn't silence the pages, they took it a step further, threatening to call employers, and they did. They would target a particular commenter, and look them up using LinkedIn.com and call the individuals at work, threatening them that they would get them fired. I myself was the recipient of one of those calls. I work for a county government office, and received a "Skype User" call stating that I had ignored a summons and was going to be placed under arrest. When I heard the callers tone, and saw the "Skype User" ID on my phone, I knew it was not the sheriff. I asked the individual who they were, and they gave me a bogus name and said they were an "official with the court". When I asked them to provide me a number I could call to verify their identity with (all county offices are connected), he hung up. It only took a few hours for this same core group of BP Trolls to laugh and chide online in public about how they had called my employer.

Some are not so fortunate. In some cases, people were fired due to the "allegations" made by BP trolls to employers. Other individuals were mistaken for Facebook activists and had THEIR employers called. They would go to the BP Facebook America page to report this, and we were able to see the level and depth of their methods. All of this data, threats, mockery, harassment, libel, and more have been captured through an extensive library of screen captures we have kept.

In desperation, we contacted the Government Accountability Project, or "GAP" who we supplied data that was used in their findings against BP of an extensive investigation of how the manipulation, control and lies ended up impacting the health of clean-up workers who were denied proper safety equipment. As well, they were able to ascertain through interviews with workers that BP lied about the quantities of dispersants that were being used, lied about covering up the amount of sea life that had perished, and threatened these same individuals with the same actions the trolls were threatening others with in the social media environment.

GAP filed a complaint with the BP Ombudsman, who during the course of their exchanges with BP, disclosed that certain "individuals" were working and had been established in strategic locations across the country that would provide them with 24/7 a week coverage on their page. BP took no responsibility for these individuals' actions, even when their wrath spread to other personal pages and accounts, employers and lives. To this date, the trolls deny ever having been "paid" by BP, and that they remain dedicated to the "wonderful work BP has done to restore the coastline".

Their fury unfortunately does not end there. After GAP was successful in changing BP's online social media policies, with written rules that could easily be referenced by users of the BP America Facebook page, the trolls ceased attacks for about 2 weeks, and slowly came back into the fold, but also concentrating more on attacking through their multiple user accounts and pages. They claim that detractors have destroyed the entire Gulf economy due to our existence, and have threatened us with multiple law suits for stalking, harassment, and more. They insinuate that they have "protections" and that we should have much to be afraid of.

Your law firm is not immune from their attacks. Neither is Stuart Smith, or Dr. Riki Ott, Dr. Wilma Subra or anyone who reports on the truth of the severity of this disaster.
I have identified these individuals by tracking back through their own connections to find conversations and people they are friends with. Some of them we have no idea how they got involved with BP to begin with as they are a 69 year old dog trainer out of the East Coast of Florida, who never saw oil, and others who have stated they have "family" in the US Coast Guard, and who use alias names and make changes to Wikipedia pages involving Corexit, or BP's history in the disaster online.

These same people remark on EVERY news story posted defending BP on site after site after site. This was no "casual" pro BP individual - these were paid trolls, who spent every hour of every day, or as BP said, strategically covered online posts 24 hours a day, 7 days a week.

They seem to have no fear, and have even taken over posting on now US Senator Markey's Facebook page, still commenting to this day and trying to provoke and anger individuals in an

attempt to get a response they can report to Facebook for deletion of the account.
One of the disturbing facts we learned during the GAP investigation is that Facebook, who is paid advertising money from BP, has their own dedicated Facebook account representatives. We now realize that this is how the reporting of the trolls went unpunished by Facebook, and how certain things said in private messages were suddenly public information. Facebook has been aiding and assisting BP in this onslaught through their marketing and PR firm Ogilvy & Mathers, who also have employees who were on the BP Facebook page attacking individuals, using the powers of Facebook at their will to eliminate any voices of dissention.

BP has become the corporate poster child for all things bad in the world of Big Oil, and all things wrong with corporate control of social media. Even Google admitted to controlling the amount and type of information that was displayed using a search of the words "BP Oil Spill". Wikipedia has admitted that BP accounts were used to change the official history of the disaster on their pages. And we have the same troll personalities attached to "corrections" about the dangerous toxins in Corexit. And yet they escape all of these manipulative and criminal actions unscathed.

BP must now become the poster child for Corporate CORRECTION and ACCOUNTABILITY. They MUST be made accountable for their manipulation and control, and destruction of people's lives and livelihoods. The methods BP, and through their agents and public relations firms must be challenged or the "freedom of speech" we are supposed to have as a protected right is forever doomed through corporate control and silencing. The trust one places in filing a legitimate claim and signing a waiver should never result in having a person's health history displayed on a corporate page and used as a tool to mock and humiliate a person. The death of an individual who worked cleaning up the spill should NEVER be allowed to be laughed at and chided as "deserved" by any individual. The color of a man's skin should never be allowed to be assaulted and attacked in a hate-crime type fashion, indicating by BP Trolls that Martin Luther King, Jr. got what he deserved, and the black fishermen who didn't pay taxes are now getting theirs.

It is beyond my scope and reason that BP has gained so much power and control, not only over our government officials, but over our own right to free speech. The ability to freely organize, protest, and share information between others should NOT be dictated by BP or any corporation that decides that the impact of that may reflect poorly on its shares, or its reputation.

BP is corrupt. BP needs to be stopped. If making BP the example by which all other corporations will be judged, then so be it. We cannot accept nor allow this type of corporate activity to exist and not be challenged. As insulting as it is still to this day to see a BP commercial on TV and have them tell the world that it's the "Best tourism season in years!" or that the "seafood couldn't be finer" turns the stomach of every person who called the Gulf home.

To know the extent of their damage by firsthand accounts of individuals who gave of themselves to walk through the toxins to capture and record this history is a double edged sword. With new reports out showing elevated toxins in blood, talking with and recording the illnesses impacting people across the gulf - not just the workers - but all people across the Gulf is a sickening, churning inside, knowing that while these trolls profited while sitting in Texas, Eastern Florida, Indiana, California, people were literally putting their lives on the line to fight for the truth.

Correspondences - Department of Justice - Consent Decree - PEPC ID: 60777

Their suffering needs to be exposed. We cannot allow BP to think that this behavior is acceptable, and without attached liability. We need justice for the PEOPLE they have harmed, and new rules that create an equal and level playing field for all those who suffer at the hand of corporate gross negligence.

Those 11 men that died on the Deepwater Horizon were silenced forever. We continue to fight for the truth, and respectfully and humbly ask for your help in righting this terrible wrong, and in that process, creating new laws to protect the freedoms that many have died for in this country. It's OUR country - not a foreign owned US based operation that could give a damn what happens to any of the "little people" that get in their way.

Please consider making their 20.8 Billion dollar sanction NON-TAX DEDUCTIBLE. It's not fair after all endured to ask the taxpayers to pay the fine. That's added insult to injury.

Thank you.

# PEPC Project ID: 60777, DocumentID: 68455
# Correspondence: 140

## Author Information

Keep Private:              No
Name:                      PATRICIA R. SPRINGSTEAD
Organization:
Organization Type:         I - Unaffiliated Individual
Address:                   3890 N TIMUCUA PT
                           CRYSTAL RIVER, FL,FL,FL 34428
                           USA
E-mail:                    trishaspringstead@gmail.com

## Correspondence Information

Status: Reviewed                    Park Correspondence Log:
Date Sent: 11/23/2015               Date Received: 11/23/2015
Number of Signatures: 1             Form Letter: No
Contains Request(s): No             Type: Web Form
Notes:

## Correspondence Text

I am an RN who has worked with the People of the Gulf. Not only did BP destroy an Ecosystem they also via the use of toxic dispersants destroyed the health and livelihoods of thousand upon thousands of fishermen, first responders and residents.

Early on we sent letters to Vice President Joseph Biden and to the CDC and recived a tepid response on the health issues that we predicted were going to occur in the Gulf of Mexico.

Studies by Independent scientists and Scientist Samantha Joye say it is not over. I would like to direct your attention to the work of Scott Porter, Bellona International an NGO out of Norway and Shanna Devine of the Governmental Accountability Project.

http://bellona.no/assets/BP_rapport.pdf

Above is a link to Bellona International.

We the people of the Gulf Formally request that you demand that clinics be opened for the treatment of Chemical Toxicity. The NIH and the CDC must rise to this occasion and help these people.

http://whistleblower.org/sites/default/files/GAP Addendum Report Final.pdf

People are being treated as mentally ill and this is not the case they are Chemically toxic and

many have died due to the spraying of toxic dispersants.

We have been trolled here in the Gulf and this is becoming a HUMAN RIGHTS ISSUE. Make BP LIABLE FOR EVERY SINGLE ILLNESS and EVERY SINGLE injustice that has occured in the Gulf of Mexico.

Sincerly
Trisha Springstead RN

# PEPC Project ID: 60777, DocumentID: 68455
# Correspondence: 143

## Author Information

Keep Private:             No
Name:                     Karen M. Mayer
Organization:             Dean Blanchard Seafood
Organization Type:        I - Unaffiliated Individual
Address:                  P.O.Box 1
                          Grand Isle, LA,LA 70358
                          USA
E-mail:                   grandislekaren@yahoo.com

## Correspondence Information

Status: Reviewed                 Park Correspondence Log:
Date Sent: 11/24/2015            Date Received: 11/24/2015
Number of Signatures: 1          Form Letter: No
Contains Request(s): No          Type: Web Form
Notes:

## Correspondence Text

5 1/2 years later I have still not been paid by BP. Worked 7 days a week for 8 years as the office manager for this seafood dock. My heart and soul, lost because of BP. 5 1/2 YEARS LATER I HAVE NOTHING!

# PEPC Project ID: 60777, DocumentID: 68455
# Correspondence: 144

## Author Information

| | |
|---|---|
| Keep Private: | No |
| Name: | Jessica Ritter |
| Organization: | National Wildlife Federation  ⊙ Official Rep. |
| Organization Type: | L - Non-Governmental |
| Address: | N\A |
| | N\A |
| | N\A, N\A  N\A |
| | USA |
| E-mail: | |

## Correspondence Information

| | |
|---|---|
| Status: Reviewed | Park Correspondence Log: |
| Date Sent: | Date Received: 11/18/2015 |
| Number of Signatures: 1 | Form Letter: No |
| Contains Request(s): No | Type: Transcript |
| Notes: | |

## Correspondence Text

Hi, good evening. My name is Jessie Ritter. I'm the Federal Policy Specialist with the National Wildlife Federation for the Gulf Restoration Program.

On behalf of NWF, I would like to thank you all for the effort that's gone in preparing the documents that we have before us for comment today and for convening a series of public meetings across the Gulf and here in D.C.

Given the unprecedented scope and nature of the Deepwater Horizon disaster, we appreciate that undertaking this damage assessment and producing the draft Programmatic DARP was no minor task.

The release of the draft PDARP and the consent decree represent a critical milestone on the road to restoration. And we are eager to see funding flow to project implementation.

We're in the process of preparing more detailed written comments, but I did want to offer a few points tonight.

NWF applauds the trustee preferred comprehensive integrated ecosystem approach to addressing these ecosystem-level injuries and the emphasis that's been placed in the PDARP by restoration of important coastal habitats that provide benefits to a large variety of species and ecological services.

We also commend the trustees for investing upwards of 95 percent of energy dollars to restore the Gulf's urgent ecological injuries rather than on recreational and public access projects.

NWF believes the best way to offset the impacts from the Deepwater Horizon disaster is to implement projects that repair damaged wildlife and marine habitats, improve water quality and restore the Gulf's estuaries which support key sectors of our coastal economy.

On the topic of governance of NRDA funds, we have many unanswered questions. We note that many restoration planning and implementation details hinge on the development of the trustee council's standard operating procedures. However, the content of this document is not elaborated in the PDARP and it does not appear to us that the document will be subject to any public comment period.

This is a major source of concern for us. And we urge the trustees to provide additional details about the anticipated content of the SOPs and provide an opportunity for public comment before those documents are finalized.

Finally, with billions of dollars set to flow to the region over the next 17 years, the Gulf Coast has a tremendous opportunity to heal. But maximizing the impact of every available dollar, whether from NRDA or RESTORE or NFWF or other sources, will require proactive planning and coordination.

Everyone recognizes the importance of this and acknowledges that coordination is essential. But it is still unclear in the PDARP what concrete steps the trustees intend to take to maximize collective benefits.

In our view, the decentralized decisionmaking structure for NRD funds necessitates the establishment of formal channels for communication and coordination both between the trustee implementation group and between restoration programs so that a Gulf-wide perspective on restoration is maintained.

We look forward to additional details on the topic of coordination and the final PDARP as well as the standard operating procedures as those are finalized.

Thank you so much again, both for the opportunity to comment and for all of the hard work that has gone into this process.

## PEPC Project ID: 60777, DocumentID: 68455 Correspondence: 145

### Author Information

Keep Private:           No
Name:                   Michelle Surka
Organization:           United States Public Interest Research Group       ● Official Rep.
Organization Type:      L - Non-Governmental
Address:                N/A
                        N/A, N/A N/A
                        USA
E-mail:

### Correspondence Information

Status: Reviewed                        Park Correspondence Log:
Date Sent:                              Date Received: 11/18/2015
Number of Signatures: 1                 Form Letter: No
Contains Request(s): No                 Type: Transcript
Notes:

### Correspondence Text

Hi. My name is Michelle Surka. I am a Program Associate with the United States Public Interest Research Group.

First of all, I just want to say thank you for the opportunity to come and comment both here and in your hearings across the country and, obviously, online.

The United States Public Interest Research Group is a nonpartisan, nonprofit consumer group that stands up for powerful interests wherever they threaten our health and our safety, our financial security or our right to fully participate in our democratic society.

I'm here today representing 3,448 members and supporters across the country who will be submitting their public comments regarding this consent decree calling on the Department of Justice to adjust the settlement to deny BP tax deductions for its wrongdoing across the board. Obviously, I know that the civil penalty portion of a payment is nondeductible, which, again, I commend you for that and for making that explicit in the settlement as well. However, this settlement as written allows BP to claim 15.3 billion of the total payment, that's the consent decree presented today and the agreement between local states and governments, as a tax deduction, an ordinary, cost-of-doing-business tax deduction, and, ultimately, allows the company to claim a 5.35 billion dollar tax windfall for the settlement.

By leaving the door open for BP to claim these deductions for its wrongdoing, the settlement agreement both sends the wrong message and forces taxpayers to continue to shoulder the burden of BP's actions.

The language of the agreement should be adjusted to prevent the corporation from claiming these ordinary, cost-of-doing-business tax deductions for what has been found to be its gross negligence in connection with the Deepwater Horizon disaster.

The tragedy of the Deepwater Horizon oil spill should be answered with justice for the people, the economy and wildlife of the Gulf Coast and not with further tax benefits for BP. Again, thank you so much for the opportunity to comment.

## PEPC Project ID: 60777, DocumentID: 68455
## Correspondence: 146

### Author Information

| | |
|---|---|
| Keep Private: | No |
| Name: | Lukas Ross |
| Organization: | Friends of the Earth     ⦿ Official Rep. |
| Organization Type: | L - Non-Governmental |
| Address: | N/A |
| | N/A, N/A N/A |
| | USA |
| E-mail: | |

### Correspondence Information

| | |
|---|---|
| Status: Reviewed | Park Correspondence Log: |
| Date Sent: | Date Received: 11/18/2015 |
| Number of Signatures: 1 | Form Letter: No |
| Contains Request(s): No | Type: Transcript |
| Notes: | |

### Correspondence Text

It's a little awkward. I'm actually here to talk about the same thing.

Thank you for the opportunity to speak tonight and for your service negotiating on behalf of the American people. My name is Lukas Ross, and I'm a Climate and Energy Campaigner, Friends of the Earth, speaking here on behalf of our nearly half a million members and activists.

You heard this earlier today from Ranking Member Raul Grijalva and 52 other members of Congress, and I imagine you will hear it again before the evening is over, but I come here tonight to press you on a crucial matter, the tax status of BP's proposed obligations.

As the Justice Department continues support to hold BP accountable for the tragedy of Deepwater Horizon, there is a unique opportunity to ensure that the cost of BP's gross negligence are not borne by taxpayers. Unfortunately, the consent decree proposed in October could still allow BP to garner major tax benefits for its settlement costs.

We implore you to correct this in the final agreement, it is a strong first step, but the proposed deal for business deduction of 5.5 billion in Clean Water Act funds.

Included in this language is an important reminder of an existing statute, but it is becoming unfortunately necessary to emphasize that fees paid to satisfy penalties are meant to be nondeductible.

Thanks to an increasingly complex universe of case law, you are entering an environment in which corporations subjected to fines may try to deduct even the criminal costs of their wrongdoing unless they are specifically told they cannot.

This need for clarity is why we urge you to go further and include language specifically stating that no part of the proposed settlement may be treated as a tax deduction.

Unless it is specifically forbidden, BP is likely to expense the remaining 15.3 billion, shrinking

the total payments in after-tax returns, submitting a handsome tax windfall of 5.35 billion for itself.

The tax code allows for the deduction of ordinary and necessary business expenses. Neither of those two adjectives should ever apply to BP's Deepwater Horizon. Those costs are not a line item on a budget. They are the cost of a tragedy that a Federal Court found to be the result of gross negligence.

Paying for the aftermath of the worst oil spill in U.S. history is not simply the cost of doing business. And if the Justice Department treats it as such, it runs the risk of normalizing tragedy in creating a moral hazard for when the next spill inevitably comes.

Precedence for including stricter settlement terms already exists. For example, when BP settled for its share of criminal liability for Deepwater Horizon, the agreement made it clear that none of the 4 billion could be treated as a deduction.

As a final consent decree emerges, the Justice Department is well within its right to pursue language that is similarly precise for the benefit of both taxpayers and the environment.

Fossil fuel subsidies are expected to cost taxpayers 135 billion over the coming decade. These incentives which run the gamut from century old tax credit to royalty relief on public lands make the production and consumption of fossil fuels more economical, thereby encouraging the use of energy sources that are ultimately detrimental to our economy and society.

While ending many of these subsidies will require an act of Congress, the Justice Department has the discretion to pursue a final agreement with BP that ensures an additional 5.35 billion is not added to this already considerable tab. We encourage you to use it.

Thank you again for this opportunity to speak. We will be submitting technical comments further developing these themes we hope you will consider.

## PEPC Project ID: 60777, DocumentID: 68455
## Correspondence: 147

### Author Information

| | |
|---|---|
| Keep Private: | No |
| Name: | Jackie Antalon |
| Organization: | Operation Home Care    ⦿ Official Rep. |
| Organization Type: | L - Non-Governmental |
| Address: | N/A |
| | N/A, N/A N/A |
| | USA |
| E-mail: | |

### Correspondence Information

| | |
|---|---|
| Status: Reviewed | Park Correspondence Log: |
| Date Sent: | Date Received: 11/18/2015 |
| Number of Signatures: 1 | Form Letter: No |
| Contains Request(s): No | Type: Transcript |
| Notes: | |

### Correspondence Text

Good evening, everyone. Gulf Coast in the house. Jackie Antalon from Operation Home Care serving Mobile County, Alabama, and Jackson County, Mississippi.

We must agree, yes, this is a good settlement, but it is not the best. And we deserve the best. The consent decree is very, very complicated. So we are, again - - as most of the stakeholders and citizens across the Gulf communities have asked during the last five public meetings in the Gulf states for an extension to the comment period for specifically the Department of Justice on the consent decree.

We strongly support an increase from the 700 million to 2 billion to address natural resource injuries that are unknown. And this is basically because of the lack of the interrelationship between communities that were directly impacted with the nexus of the injury not actually being a part of the assessment process.

Further, on the consent decree, Item Number 5, monitoring adaptive management and administrative oversight, we recommend reducing that administrative oversight and comprehensive planning, open oceans, from 100 million to 50 million with the balance being transferred to the restoration of fishing communities, specifically, the products of shrimp, crab and also to doing science and research for long-term sustainability and build the capacity of those areas.

As previously commented, we strongly oppose, which is part of the consent decree, the 85.5 million that is allocated for the Alabama State Park Hotel, which did not exist and was not damaged and does not bring public increase or enhance public recreational activities.

We strongly support and recommend that these funds be used to enhance and provide public assets throughout Mobile County, the closest nexus to the axis of injury.

We further recommend that 20 percent of the proposed 1.1 billion payment into the OSLTF, which is approximately 225 million, be set aside to use exclusively for the establishment and funding of the Gulf Coast Regional Citizen Advisory Council.

This interest could be offset by using the annual support - - this amount of money could be used to support the operation's continual and long-term sustainability.

Specific to the draft proposed plan, the decision by the Natural Resource trustees in assessment of the injuries on behalf of the public and public interest and the public good lack transparency and clear accountability for communicable public input and engagement.

Therefore, we strongly oppose approval, adoption of the PDARP, PEIS presented during the public meetings held October the 19th through November the 18th, and recommend that the trustees revisit and reengage the impacted communities.

Also, we really have asked several times for the trustees to give clear definitions to the term, "relevant comment." But when we comment, the responses is (sic) determined by you what is relevant, and we have asked for clearer definition of what merits relevancy.

So with you not providing the details of it, how can we ensure that our comments are relevant? We are a grass roots organization. We don't have a staff. We don't have lawyers. So for us to even try to attempt to do this kind of work, we need the support, we need the details from you, we need the specifics in order to have a better understanding.

And there are best practices in place that federal agencies use all the time to engage communities to give them detailed information so the community can either buy in or actually have - - really have knowledge of what is being done and how decisions are being made.

MR. FRANKLIN: If you can come to your summary, Ms. Antalon. Thank you.

MS. ANTALON: Okay. We will be submitting additional comments because of so many documents we have to review. Thank you.

## PEPC Project ID: 60777, DocumentID: 68455
## Correspondence: 148

### Author Information

| | |
|---|---|
| Keep Private: | No |
| Name: | Thao Vu |
| Organization: | Mississippi Coalition for Vietnamese-American Fisherfolks and Families Official Rep. |
| Organization Type: | L - Non-Governmental |
| Address: | N/A |
| | N/A, N/A N/A |
| | USA |
| E-mail: | |

### Correspondence Information

| | |
|---|---|
| Status: Reviewed | Park Correspondence Log: |
| Date Sent: | Date Received: 11/18/2015 |
| Number of Signatures: 1 | Form Letter: No |
| Contains Request(s): No | Type: Transcript |
| Notes: | |

### Correspondence Text

Good evening, everyone. My name is Thao Vu, and I'm the Director of the Mississippi Coalition for Vietnamese-American Fish Folks and Families, a community-based organization in Biloxi, Mississippi. I'm actually requesting at least five to six minutes to comment considering this involved two separate processes. So again, I'm requesting additional time to comment.
And I would like to say hello again. I have a special greeting to folks I haven't had an opportunity to meet or express my comments. But most of the - - I think at least three of the attendees that are sitting here have seen me numerous times in the past several weeks. I have attended - - I have actually attended most of the public meetings. I have attended six of the seven public meetings held from October 19 through November the 10th across the Gulf states. I did not, unfortunately, have the opportunity to attend the meeting in Saint Petersburg, Florida.
The reason why I'm here is to reiterate my previous comments as well as to share my observations and concerns from attending so many of the public meetings.
My organization and fishing communities, in particular, have very serious concerns about the structure and format of the structure of these meetings, and, more particularly, the outreach, the public engagement and the public notice.
The Department of Justice posted the proposed consent decree on October the 5th on the Federal Register, which is something that the majority of residents are not familiar with.
It was 14 days later that the first public meeting was held in Homer, Louisiana. That was October 19th. Considering the significant resources, time managing staff to negotiate a proposed settlement with BP and the time to plan and organize these public meetings across the Gulf as well as here in Washington, D.C., we think that the first public meeting held in Homer,

Louisiana, was extremely inadequate and unacceptable public notice.

In attending all these meetings, the turnout public attendance was really very sparse considering that this was - - in the past five and a half years, what is being proposed now is the most important thing, processes, and attendance was very lacking all across the Gulf. It should have been much higher. And the reason why it wasn't higher is because public notice was woefully inadequate.

Again, this is two separate independent complex processes, and there are two separate portals to submit comment.

We don't think that these meetings should have been held in tandem. Particularly, the first few meetings, and, particularly, the first meeting in Homer, Louisiana. It led to a very confusing process where some of the attendees who made comments before I did they were not assured and they actually had to ask permission what processes could they comment on. Could they comment on this proposed consent decree or could they comment on the NRDA draft plan. There should have been two sets of public meetings. First on the proposed consent decree and later on on the NRDA draft plan.

Further, the meeting venues were mostly held in hotels, not accessible locations for communities or impacted communities who bore this unfortunate impact of this disaster such as fishing communities who critically depend on a healthy Gulf and ecosystem, habitats and fisheries for their livelihoods.

Additional comment I would like to make is at the last public meeting in Galveston, Texas, over 25 Vietnamese-American fish folks attended. This is a population that settled in the Gulf to really continue their livelihoods. Many have come from fishing communities in Vietnam. They have limited English proficiency because they arrived as older adults and did not have the opportunity to attain a higher education. But at that meeting there was no interpreter. There was no interpreter that was provided.

My population was the majority of the folks at that meeting. We took over one half, one side of that building. That is not acceptable. I was asked to be their impromptu interpreter. That is not my role, to fulfill the responsibility of federal and state agencies who have failed to fulfill their responsibilities as intended by law.

A sign language interpreter was provided at all the meetings in the Gulf. How do I know? Because I attended most of those meetings. So how come a Vietnamese interpreter was not provided at the meeting where a significant number of attendees needed language access services?

MR. FRANKLIN: Ms. Vu, if you can go ahead and come to a conclusion.

MS. VU: We think this is exclusionary, unacceptable and in noncompliance with Title VI. Title VI states the need to provide relevant information for a diverse, limited-English-proficiency population in a language they understand.

We think it is very ironic that Department of Justice has the Office of Civil Rights that actually addresses language access and the lack of compliance with Title VI, yet its own division, Environmental Enforcement Division, did not abide by Title VI.

For those list of reasons, we are greatly imploring DOJ to grant us a 60-day extended public comment deadline, particularly, to allow the minority Vietnamese fishing communities who have these language access needs sufficient time to review and comment on the consent decree.

MR. FRANKLIN: That's been six minutes, Ms. Vu. Thank you very much.

MS. VU: Okay. Thank you for the opportunity to comment.

Correspondences - Department of Justice - Consent Decree - PEPC ID: 60777

# PEPC Project ID: 60777, DocumentID: 68455
# Correspondence: 149

## Author Information

| | |
|---|---|
| Keep Private: | No |
| Name: | Elizabeth Dorsey |
| Organization: | |
| Organization Type: | I - Unaffiliated Individual |
| Address: | N/A |
| | N/A, N/A N/A |
| | USA |
| E-mail: | |

## Correspondence Information

Status: Reviewed          Park Correspondence Log:

Date Sent:                    Date Received: 11/18/2015

Number of Signatures: 1       Form Letter: No

Contains Request(s): No      Type: Transcript

Notes:

## Correspondence Text

Good evening. I'm Elizabeth Dorsey. I'm representing myself. No group. But I really did like to hear the comments from the groups before me. Particularly, the environmental groups that I'm a member of many of them, as my husband refers to all of them, My green buddies.

And for me, I came tonight, and I really enjoyed this because this was a learning process and to see where we were as a nation and how we all came together. Because, as all of us, we sat in front of the TV or - - and read in horror as to what was happening to the Gulf Coast from this spill.

And so I do appreciate all the work from all the different agencies and all the individuals that have gone into the comprehensive plan.

My concern is also just wondering how these agencies with the states and the trustees really work together and how that is all going to be outlined so that they work together so that there is overlap but that the projects really do get done. And so that is one concern.

And I do - - the last speaker kind of reiterated - - because I didn't know of the public meetings that were going on or how you were announcing them, it was word of mouth tonight, and that the populations, particularly having lived in the Gulf Coast, you know, and the results - - and the shrimpers there that are - - so many are originally from Vietnam, that they do need to have their voices heard. And that an interpreter needed to be there.

And I hope that you will take that into account and provide them with that ability for them because this is their livelihood. And that livelihood is what brings a lot of people to the Gulf Coast for vacations and the restaurants and all of that.

So I do appreciate all the work that you have done. And I do ask that there is a real clear path going forward so that this all works together.

And I am concerned that, even though the Justice Department feels that we got a good settlement, that this really isn't going to cover the costs. Thank you.

# PEPC Project ID: 60777, DocumentID: 68455
# Correspondence: 150

## Author Information

Keep Private:              No
Name:                      N/A N/A
Organization:
Organization Type:         I - Unaffiliated Individual
Address:
                           tiburon, CA 94920
                           USA
E-mail:

## Correspondence Information

Status: Reviewed                  Park Correspondence Log:
Date Sent: 11/24/2015             Date Received: 11/24/2015
Number of Signatures: 1          Form Letter: No
Contains Request(s): No          Type: Web Form
Notes:

## Correspondence Text

Please set aside funding for endangered sea turtle recovery efforts by December 4.

# PEPC Project ID: 60777, DocumentID: 68455
# Correspondence: 151

## Author Information

Keep Private:           No
Name:                   Elizabeth F. Hestnes
Organization:
Organization Type:      I - Unaffiliated Individual
Address:                2 Sudbury Road
                        Weston, MA 02493-1333
                        USA
E-mail:                 TwoHFarm@aol.com

## Correspondence Information

Status: Reviewed                 Park Correspondence Log:
Date Sent: 11/24/2015            Date Received: 11/24/2015
Number of Signatures: 1          Form Letter: No
Contains Request(s): No          Type: Web Form
Notes:

## Correspondence Text

The terrible oil spill in the Gulf of Mexico in April of 2010 was horrific in its destruction of habitat and breeding grounds for many different species of wildlife. Truly a devastation beyond belief as to the many species who rely on the water and the surrounding land mass to survive. How can restoration take place in just a few years? It will take many years to bring it back. Please continue to bring it back, as much as possible, to its natural state for the well-being of wildlife but the human lives whose livelihoods were destroyed. May you see this accomplished until it is fully restored.

# PEPC Project ID: 60777, DocumentID: 68455
# Correspondence: 152

## Author Information

Keep Private:               No
Name:                       N/A N/A
Organization:
Organization Type:          I - Unaffiliated Individual
Address:
                            the sea ranch, CA 95497
                            USA
E-mail:

## Correspondence Information

Status: Reviewed                Park Correspondence Log:
Date Sent: 11/24/2015           Date Received: 11/24/2015
Number of Signatures: 1         Form Letter: No
Contains Request(s): No         Type: Web Form
Notes:

## Correspondence Text

Dear Trustees,

Please do not forget about the world's smallest turtle - the endangered Kemp's ridley sea turtle.
These sea turtles are fighting for survival post BP-oil spill and are in desperate need of help.

An infusion of funds into sea turtle recovery and restoration efforts, and sea turtle recovery plans
is needed in the Gulf of Mexico.

I urge you to prioritize funding sea turtle projects!

Sincerely,

Deborah Filipelli, Ph.D.

# PEPC Project ID: 60777, DocumentID: 68455
# Correspondence: 153

## Author Information

| | |
|---|---|
| Keep Private: | No |
| Name: | Steve Tyler |
| Organization: | |
| Organization Type: | I - Unaffiliated Individual |
| Address: | 2564 Franki |
| | Orange, CA 92865 |
| | USA |
| E-mail: | abc3dtd@gmail.com |

## Correspondence Information

Status: Reviewed                      Park Correspondence Log:

Date Sent: 11/25/2015            Date Received: 11/25/2015

Number of Signatures: 1         Form Letter: No

Contains Request(s): No         Type: Web Form

Notes:

## Correspondence Text

Funding is desperately needed for endangered sea turtles. Please ensure that it is done.

# PEPC Project ID: 60777, DocumentID: 68455
# Correspondence: 154

## Author Information

Keep Private:           No
Name:                   Susanna Sikorski
Organization:
Organization Type:      I - Unaffiliated Individual
Address:
                        Braunschweig, UN 38124
                        DEU
E-mail:                 Susanna.Sikorski@t-online.de

## Correspondence Information

Status: Reviewed                    Park Correspondence Log:
Date Sent: 11/25/2015               Date Received: 11/25/2015
Number of Signatures: 1             Form Letter: No
Contains Request(s): No             Type: Web Form
Notes:

## Correspondence Text

Dear Trustees,


Please do not forget about the world's smallest turtle - the endangered Kemp's ridley sea turtle. These sea turtles are fighting for survival post BP-oil spill and in desperate need of help. An infusion of funds into sea turtle recovery and restoration efforts, and sea turtle recovery plans is needed in the Gulf of Mexico. I urge you to prioritize funding sea turtle projects!

Sincerely,

Susanna Sikorski and Jens Strohkirch from Germany

# PEPC Project ID: 60777, DocumentID: 68455
# Correspondence: 155

## Author Information

| | |
|---|---|
| Keep Private: | No |
| Name: | Aimee Benton-Wing |
| Organization: | |
| Organization Type: | I - Unaffiliated Individual |
| Address: | 119 Aspen drive |
| | Everson , WA 98247 |
| | USA |
| E-mail: | benton.aimee@gmail.com |

## Correspondence Information

| | |
|---|---|
| Status: Reviewed | Park Correspondence Log: |
| Date Sent: 11/25/2015 | Date Received: 11/25/2015 |
| Number of Signatures: 1 | Form Letter: No |
| Contains Request(s): No | Type: Web Form |
| Notes: | |

## Correspondence Text

Thank you for taking the time to care for a simpler creature. Who cannot defend itself from a man mad disaster which you have created. It is important that you restore his habitat to its original state so that his species will survive. We are all connected to the food chain and this disaster effects everyone.

# PEPC Project ID: 60777, DocumentID: 68455
# Correspondence: 156

## Author Information

| | |
|---|---|
| Keep Private: | No |
| Name: | Jeff Thayer |
| Organization: | Sierra Club |
| Organization Type: | I - Unaffiliated Individual |
| Address: | |
| | San Diego, CA,CA 92117 |
| | USA |
| E-mail: | scubapong@yahoo.com |

## Correspondence Information

| | |
|---|---|
| Status: Reviewed | Park Correspondence Log: |
| Date Sent: 11/25/2015 | Date Received: 11/25/2015 |
| Number of Signatures: 1 | Form Letter: No |
| Contains Request(s): No | Type: Web Form |
| Notes: | |

## Correspondence Text

I am an avid SCUBA diver, and have had many beautiful encounters with sea turtles over the decades.

Please consider the recovery of sea turtles, including the endangered Kemps Ridley sea turtle. Funds are being allocated for projects up to 200 miles inland, as well as boat ramps, piers, and parks. None of those things will help sea turtles, and may well hinder their recovery. Funds need to be made available immediately for care for sea turtles in the event of another oil spill in the Gulf.

The needs of animals killed and damaged in the oil spill should come first, and piers, ramps, and parks should be secondary considerations.

Please prioritize funding for sea turtles.

Thank you for your time and consideration,

Sincerely,

Jeff Thayer

# PEPC Project ID: 60777, DocumentID: 68455
# Correspondence: 157

## Author Information

Keep Private:              No
Name:                      Janet Davis
Organization:
Organization Type:         I - Unaffiliated Individual
Address:
                           Weatherly, PA 18255
                           USA
E-mail:

## Correspondence Information

Status: Reviewed                    Park Correspondence Log:
Date Sent: 11/26/2015               Date Received: 11/26/2015
Number of Signatures: 1             Form Letter: No
Contains Request(s): No             Type: Web Form
Notes:

## Correspondence Text

Dear Trustees,

Please do not forget about the world's smallest turtle - the endangered Kemp's ridley sea turtle.
These sea turtles are fighting for survival post BP-oil spill and in desperate need of help. An
infusion of funds into sea turtle recovery and restoration efforts, and sea turtle recovery plans is
needed in the Gulf of Mexico. I urge you to prioritize funding sea turtle projects!

Sincerely,
Janet M. Davis

# PEPC Project ID: 60777, DocumentID: 68455
# Correspondence: 158

## Author Information

Keep Private:            No
Name:                    N/A N/A
Organization:
Organization Type:       I - Unaffiliated Individual
Address:
                         ketchum, ID 83340
                         USA
E-mail:

## Correspondence Information

Status: Reviewed                    Park Correspondence Log:
Date Sent: 11/28/2015               Date Received: 11/28/2015
Number of Signatures: 1             Form Letter: No
Contains Request(s): No             Type: Web Form
Notes:

## Correspondence Text

what happened to the protection of human and animal life?

# PEPC Project ID: 60777, DocumentID: 68455
# Correspondence: 159

## Author Information

Keep Private:            No
Name:                    Julie Glenn
Organization:
Organization Type:       I - Unaffiliated Individual
Address:                 8741 Garfield Drive
                         Whitmore Lake
                         Whitmore Lake, MI 48189
                         USA
E-mail:                  jglenn@umich.edu

## Correspondence Information

Status: Reviewed                Park Correspondence Log:
Date Sent: 11/30/2015           Date Received: 11/30/2015
Number of Signatures: 1         Form Letter: No
Contains Request(s): No         Type: Web Form
Notes:

## Correspondence Text

Any monies required for the clean up of all oil spills should be redirected back to the rebuilding of the natural habitats that were affected by the spill!

# PEPC Project ID: 60777, DocumentID: 68455
# Correspondence: 161

## Author Information

Keep Private:              No
Name:                      Kelsey Fisher
Organization:
Organization Type:         I - Unaffiliated Individual
Address:                   4848 S. Alameda St. Apt. 1104
                           Corpus Christi, TX 78412
                           USA
E-mail:                    kfisher2@islander.tamucc.edu

## Correspondence Information

Status: Reviewed                    Park Correspondence Log:

Date Sent: 12/01/2015               Date Received: 12/01/2015

Number of Signatures: 1             Form Letter: No

Contains Request(s): No             Type: Web Form

Notes:

## Correspondence Text

In chapter 4, it is outlined that the plan is to focus on "representative" organisms to assess damages/impacts of the oil spill. Also it is stated "ecosystem processes" will also be considered in that the ecosystem continues to play a beneficial role in the environment/habitat. Are one of these goals more important than the other. For example, if a habitat is still functioning, but has lost "representative" organisms will the area still be restored to the fullest extent? Also, what are the baseline assessment standards for areas which are already highly impacted an degraded by human practices, but were also subjected to damage from the oil spill as well? Lastly, I was very happy to see the sections of chapter 4 which covered assessment errors and that they were recognized and reconciled as much as possible.

# PEPC Project ID: 60777, DocumentID: 68455
# Correspondence: 162

## Author Information

Keep Private:              No
Name:                      Rhea Aker
Organization:
Organization Type:         I - Unaffiliated Individual
Address:
                           cincinnati, OH 45255
                           USA
E-mail:                    Rheacares@yahoo.com

## Correspondence Information

Status: Reviewed                    Park Correspondence Log:
Date Sent: 12/02/2015               Date Received: 12/02/2015
Number of Signatures: 1             Form Letter: No
Contains Request(s): No             Type: Web Form
Notes:

## Correspondence Text

Dear Attorney General Lynch:

In light of the recently announced settlement between the Justice Department, British Petroleum (#BP), and the five states of the Gulf Coast, we write to you with deep concerns about the tax status of BP's proposed financial obligations. The tragedy of the Deepwater Horizon must be answered with justice for the people, economy, and wildlife of the Gulf Coast-not further tax benefits for BP.

We applaud the fact that the proposed consent decree forbids the deduction of $5.5 billion in fines levied under the Clean Water Act. Nevertheless, we are concerned that without strict language to the contrary, BP will seek to claim the remaining $15.3 billion as a business expense, displacing the burden of that uncollected revenue onto every other taxpayer while securing a tax windfall worth $5.35 billion for itself.

The "gross negligence" that led to perhaps the worst environmental disaster in US history should not be an opportunity to game the tax code. Challenging fiscal choices may lie ahead, and every dollar we lose in revenue is a dollar cut from much needed programs, raised from another source, or added to the national debt. As the comment period for the consent decree continues, we ask you to protect both taxpayers and the environment by pursuing a final settlement that clearly specifies no amount of BP's settlement costs may be treated as a tax deduction.

Correspondences - Department of Justice - Consent Decree - PEPC ID: 60777

# PEPC Project ID: 60777, DocumentID: 68455
# Correspondence: 163

## Author Information

| | |
|---|---|
| Keep Private: | No |
| Name: | Cameron Smith |
| Organization: | R Street Institute |
| Organization Type: | I - Unaffiliated Individual |
| Address: | 1050 17th St. NW |
| | Suite 1150 |
| | Washington, DC,DC 20036 |
| | USA |
| E-mail: | csmith@rstreet.org |

## Correspondence Information

Status: Reviewed                    Park Correspondence Log:
Date Sent: 12/02/2015               Date Received: 12/02/2015
Number of Signatures: 1             Form Letter: No
Contains Request(s): No             Type: Web Form
Notes:

## Correspondence Text

On Monday, Oct. 5, 2015, the U.S. Department of Justice announced a final settlement with BP stemming from its role in the 2010 Deepwater Horizon/Macondo Well oil spill. BP agreed to pay $20.8 billion for its role, in what amounts to the largest civil settlement with any single company in American history.

While we are encouraged that states now have the clarity needed to make planning, restoration and investment decisions related to the Gulf Coast recovery, the consent decree raises a number of concerns.

In 2012, Congress passed the Resources and Ecosystem Sustainability, Tourist Opportunities, and Revived Economies of the Gulf Coast States (RESTORE) Act. The law redirects 80 percent of federal fines and penalties from the oil spill in a manner that affords local and regional officials significantly more control over restoring the economic and environmental damage inflicted on their communities.

Toward that end, the consent decree provides for $5.5 billion in Clean Water Act (CWA) civil penalties. That means the actual penalty assessed ($1,724 per barrel of oil) is 60 percent less than the maximum available penalty ($4,300 per barrel). In other words, the consent decree reduces the maximum funds available through the RESTORE Act process from $10.97 billion to $4.40 billion. Control over billions of restoration dollars appears to have shifted away from the impacted communities to state governments, in the form of economic damage payments, and to

Correspondences - Department of Justice - Consent Decree - PEPC ID: 60777

the federal government, through natural-resources damages.

While any settlement requires compromise, such a significant CWA penalty reduction against a party with clear culpability for damages raises significant questions.

In spite of our concerns about the consent decree, the resources available through the Natural Resource Damage Assessment (NRDA) process, RESTORE Act, economic-damage settlements and other revenue streams represent a tremendous opportunity for the Gulf Coast.
Each Gulf Coast state has responded differently to the oil spill, but each must develop a ready list of priority projects, if they haven't done so already. Each project should have clear objectives, define measures of success and be based on the best available science.
As each state develops its own coastal master plan, it must work with other states in a coordinated approach to Gulf Coast conservation. Rather than relying on distant federal authorities and mechanisms, Gulf Coast states must assume the responsibility to ensure both economic prosperity and environmental stewardship at the water's edge.

Louisiana's "Comprehensive Master Plan for a Sustainable Coast" is an exceptional model for coastal planning. Updated every five years, the plan focuses on prioritizing projects necessary to ensure the continued environmental and economic well-being of the state's coast. As funding becomes available, projects are initiated. Louisiana's plan demonstrates and effectively articulates the crucial interplay between the economy and the environment. Politicians, trade associations, landowner groups and environmental advocates across the political spectrum all contributed to the plan's framework. In that respect, it transcends politics, while focusing on the challenges facing the state's coast.
Gulf Coast states without comprehensive coastal plans would be wise to use the research and planning opportunities afforded by the recovery process to develop their own visions for the coast.

As states consider the types of economic and environmental projects to fund with resources derived from the Deepwater Horizon/Macondo Well spill, we urge decision-makers to consider the following questions for each project:
[OBJ]
1. Does the project provide public benefit? RESTORE Act funds should be used to provide public goods: products and services, such as infrastructure, that are used by most or all people and for which use by one person doesn't preclude use by others.
[OBJ][OBJ]
2. Is there a direct connection to areas impacted by the spill? The RESTORE Act was passed to direct funds for economic and environmental projects in areas affected by the Deepwater Horizon oil spill.
[OBJ][OBJ]
3. Does the project confer economic benefit by reducing the impact of future natural or man-made environmental disasters? RESTORE Act funds provide a tremendous opportunity for projects that prepare coastal regions for costly events, such as hurricanes and floods, which carry significant economic consequences.
[OBJ][OBJ]
4. Does the project reduce future environmental harm or ameliorate current damage? Projects

Correspondences - Department of Justice - Consent Decree - PEPC ID: 60777

should mitigate future environmental harm by restoring wetlands and barrier islands or ameliorating current environmental harms.

[OBJ][OBJ]

5. Does the project require future funding once RESTORE Act funds are exhausted? The RESTORE Act should not create ongoing financial burdens for state and local governments or develop projects with uncertain future costs.

[OBJ][OBJ]

6. Does the project offer a positive benefit-cost ratio, based on sound accounting and economic projections? The measure here should be the value created for citizens and taxpayers, not the number of jobs created.

[OBJ][OBJ]

7. Are there measurable impacts and accountability metrics for the project? To preserve public faith in the RESTORE Act's implementation process, decisions about project funding, and all expenditures made utilizing RESTORE Act money, should be completely transparent, measurable and accountable.

The consent decree provides finality, but also creates new issues that must be resolved before proceeding. At the same time, we shouldn't wait for another natural or man-made disaster to quicken our focus on common-sense ways to better preserve and protect our natural resources and Gulf Coast economies.

## PEPC Project ID: 60777, DocumentID: 68455
## Correspondence: 166

### Author Information

| | |
|---|---|
| Keep Private: | No |
| Name: | Barbara Kirkpatrick |
| Organization: | Gulf of Mexico Coastal Ocean Observing System Regional Association |
| Organization Type: | I - Unaffiliated Individual |
| Address: | 3318 Fair Oaks Place |
| | Sarasota, FL 34239 |
| | Sarasota, FL,FL 34239 |
| | USA |
| E-mail: | barb.kirkpatrick@gcoos.org |

### Correspondence Information

Status: Reviewed                    Park Correspondence Log:

Date Sent: 12/02/2015               Date Received: 12/02/2015

Number of Signatures: 1            Form Letter: No

Contains Request(s): No            Type: Web Form

Notes:

### Correspondence Text

December 1, 2015

To Whom It May Concern,

We applaud the efforts of all the Trustees in the Draft Programmatic Damage Assessment and Restoration Plan and Draft Programmatic Environmental Impact Statement (EIS).
The Gulf of Mexico Coastal Ocean Observing System (GCOOS) Regional Association is a 501(c)3 organization responsible for developing a network of business leaders, marine scientists, resource managers, non-governmental organizations and other stakeholder groups that combine their data to provide timely information about our oceans - similar to the information gathered by the National Weather Service to develop weather forecasts.
The GCOOS Regional Association includes members from Texas, Louisiana, Mississippi, Alabama and Florida, seeks to establish a sustained observing system for the Gulf of Mexico to provide observations and products needed by users in this region for:
" Detecting and predicting climate variability and consequences,
" Preserving and restoring healthy marine ecosystems,
" Ensuring human health,
" Managing resources,
" Facilitating safe and efficient marine transportation,
" Enhancing national security, and
" Predicting and mitigating against coastal hazards.

We support the choice of Alternative A,Comprehensive Integrated Gulf Ecosystem Restoration, and we offer the following comments on the proposed Plan and EIS.

1. The governance structure proposed in Chapter 7 will be extremely cumbersome, inhibit comprehensive Gulf restoration, and will be expensive to administer. It will draw too many funds away from the ultimate public goal of Gulf restoration. The single Trustee Council established for the Exxon Valdez oil spill cost $2M/year for the first few years with decreasing costs to $700K/year by the end of the 20-year agreement (pers. communication, Executive Director of the Exxon Valdez Oil Spill Trustee Council). We propose that one Trustee Council be established for the NRD component vs. the Council and eight Trustee Implementation Groups (i.e., nine governing bodies) currently proposed.

2. While we appreciate that monitoring with adaptive management is a feedback loop, and an overall Trustee goal in supporting comprehensive Gulf restoration, we do not think that funds for monitoring and adaptive management should be grouped with administrative costs and public education with no specific budget. Having no specific budget for monitoring and adaptive monitoring - and having it grouped with funds for the very expensive nine Trustee Councils/Implementation Groups, along with education and adaptive management - means that very little funding will likely go to monitoring the Gulf. One of the National Academy of Sciences important post-Deepwater Horizon findings was that insufficient baseline information was available to assess the impacts to the Gulf of Mexico. A specific, sufficient monitoring fund would help alleviate this problem in the future. In the agreement for the Exxon Valdez oil spill, 30% othe funds were specifically allocated for monitoring. Considering the greater need for restoration projects in the Gulf of Mexico vs. the post-spill needs in Alaska, we still urge the Parties to specifically allocate at least 15% othe NRD funds to comprehensive Gulf monitoring.

3. With regard to monitoring, data sharing, and Quality Assurance/Quality Control, we encourage the Trustees to use well-established, effective, existing standards, as much as possible. GCOOS-RA Staff are available to share knowledge of those standards with the Trustees. To help facilitate consistent monitoring and data sharing across all post-Deepwater Horizon activities, we also encourage the Trustees to consider the recommendations soon to be published by the National Academy of Sciences Gulf Research Program - Committee on Effective Approaches for Monitoring and Assessing Gulf of Mexico Restoration Activities.

4. The NRDA component includes $1.24 B to Open Ocean Projects, which is the only post-DWH funding that is focused on deeper ocean restoration to reefs and deep benthic habitats, and federally protected species, such as marine mammals, sea turtles, Gulf sturgeon, and sea birds. However, this definition is still too loose with some ill-fitting early restoration projects already being funded through this category (e.g., Bike and Pedestrian Lane in Davis Bayou, MS - $7M, Ferry Project, Pensacola, FL - $4M, Trail Enhancement at Bon Secour National Wildlife Refuge, AL - $545K). For more effective and efficient use of the restoration funds for this category, we recommend the Open Ocean Projects definition be abbreviated to, Open Ocean consists of restoration activities for resources primarily in the ocean with all funded projects clearly fitting this definition.

Thank you for the opportunity to comment on these critical documents for comprehensive restoration of the Gulf of Mexico. Please contact Dr. Barbara Kirkpatrick, Executive Director of the GCOOS Regional Association (941-724-4320 or barb.kirkpatrick@gcoos.org) for further information and/or discussion.

Correspondences - Department of Justice - Consent Decree - PEPC ID: 60777

Best regards,

Dr. Barbara Kirkpatrick, Executive Director
On behalf of the GCOOS-RA Board of Directors

# PEPC Project ID: 60777, DocumentID: 68455
# Correspondence: 167

## Author Information

| | |
|---|---|
| Keep Private: | No |
| Name: | Barbara Kirkpatrick |
| Organization: | Gulf of Mexico Coastal Ocean Observing System Regional Association |
| Organization Type: | I - Unaffiliated Individual |
| Address: | 3318 Fair Oaks Place |
| | Sarasota, FL 34239 |
| | Sarasota, FL,FL 34239 |
| | USA |
| E-mail: | barb.kirkpatrick@gcoos.org |

## Correspondence Information

Status: Reviewed                      Park Correspondence Log:

Date Sent: 12/02/2015                  Date Received: 12/02/2015

Number of Signatures: 1                Form Letter: No

Contains Request(s): No                Type: Web Form

Notes:

## Correspondence Text

Please redact the previous letter I sent.

December 1, 2015

To Whom It May Concern,

We applaud the efforts of all the Parties in the U.S. v. BP Exploration and Production et al, Civil No. 10-4536 (E.D. La.) in reaching a relatively rapid agreement. The Gulf of Mexico Coastal Ocean Observing System (GCOOS) Regional Association is a 501(c)3 organization responsible for developing a network of business leaders, marine scientists, resource managers, non-governmental organizations and other stakeholder groups that combine their data to provide timely information about our oceans - similar to the information gathered by the National Weather Service to develop weather forecasts.
The GCOOS Regional Association includes members from Texas, Louisiana, Mississippi, Alabama and Florida, seeks to establish a sustained observing system for the Gulf of Mexico to provide observations and products needed by users in this region for:
" Detecting and predicting climate variability and consequences,
" Preserving and restoring healthy marine ecosystems,
" Ensuring human health,
" Managing resources,
" Facilitating safe and efficient marine transportation,

" Enhancing national security, and
" Predicting and mitigating against coastal hazards.
We offer the following comments on the proposed Consent Decree.

1. The governance structure proposed for the Natural Resources Damage (NRD) component of the agreement will be extremely cumbersome, inhibit comprehensive Gulf restoration, and will be expensive to administer. It will draw too many funds away from the ultimate public goal of Gulf restoration. The single Trustee Council established for the Exxon Valdez oil spill cost $2M/year for the first few years with decreasing costs to $700K/year by the end of the 20-year agreement (pers. communication, Executive Director of the Exxon Valdez Oil Spill Trustee Council). We propose that one Trustee Council be established for the NRD component vs. the Council and eight Trustee Implementation Groups (i.e., nine governing bodies) currently proposed.

2. The agreement shifts a good portion of the funds from the Clean Water Act fund (from $10.97 B to $5.5B - with $4.4B of that to RESTORE), which would go to states, Centers of Excellence, NOAA RESTORE Science Program, and coastal communities, to the NRD fund ($8.8 B), which goes to state and federal trustees and includes more for economic damages. Removing funds from impacted community-based restoration projects, as well as restoration science and monitoring is not a sound strategy for Gulf restoration. More funds should be allocated through RESTORE as originally intended vs. re-allocating them through the NRD process.

3. Although monitoring is incorporated in the agreement (17.2% oNRD component), it is grouped with administrative costs, public education, and adaptive management with no specific budget. Having no specific budget for monitoring - and having it grouped with funds for the very expensive nine Trustee Councils/Implementation Groups, along with education and adaptive management - means that very little funding will likely go to monitoring the Gulf. One of the National Academy of Sciences important post-Deepwater Horizon (DWH) findings was that insufficient baseline information was available to assess the impacts to the Gulf of Mexico. A specific, sufficient monitoring fund would help alleviate this problem in the future. In the agreement for the Exxon Valdez oil spill, 30% othe funds were specifically allocated for monitoring. Considering the greater need for restoration projects in the Gulf of Mexico vs. the post-spill needs in Alaska, we still urge the Parties to specifically allocate at least 15% othe NRD funds to comprehensive Gulf monitoring. We would like to add that although we are an advocate for ocean and coastal monitoring, we do not, nor propose to conduct the monitoring as a part of restoration. We advocate for our members who are well qualified in all facets of water quality and habitat monitoring.

4. The NRD component includes $1.24 B to Open Ocean Projects, which is the only post-DWH funding that is focused on deeper ocean restoration to reefs and deep benthic habitats, and federally protected species, such as marine mammals, sea turtles, Gulf sturgeon, and sea birds. However, this definition is still too loose with some ill-fitting early restoration projects already being funded through this category (e.g., Bike and Pedestrian Lane in Davis Bayou, MS - $7M, Ferry Project, Pensacola, FL - $4M, Trail Enhancement at Bon Secour National Wildlife Refuge, AL - $545K). For more effective and efficient use of the restoration funds for this category, we recommend the Open Ocean Projects definition be abbreviated to, Open Ocean consists of

Correspondences - Department of Justice - Consent Decree - PEPC ID: 60777

restoration activities for resources primarily in the ocean with all funded projects clearly fitting this definition.

Thank you for the opportunity to comment on this critical agreement for comprehensive restoration of the Gulf of Mexico. Please contact Dr. Barbara Kirkpatrick, Executive Director of the GCOOS Regional Association (941-724-4320 or barb.kirkpatrick@gcoos.org) for further information and/or discussion.

Best regards,

Dr. Barbara Kirkpatrick, Executive Director
On behalf of the GCOOS-RA Board of Directors

# PEPC Project ID: 60777, DocumentID: 68455
# Correspondence: 168

## Author Information

| | |
|---|---|
| Keep Private: | No |
| Name: | N/A N/A |
| Organization: | |
| Organization Type: | I - Unaffiliated Individual |
| Address: | |
| | New Orleans, LA 70130 |
| | USA |
| E-mail: | rguillory@oceanconservancy.org |

## Correspondence Information

Status: Reviewed                    Park Correspondence Log:

Date Sent: 12/02/2015               Date Received: 12/02/2015

Number of Signatures: 1            Form Letter: No

Contains Request(s): No            Type: Web Form

Notes:

## Correspondence Text

December 2, 2015

Honorable John C. Cruden
Assistant Attorney General for the Environment and Natural Resources Division
U.S. Department of Justice
950 Pennsylvania Avenue, NW
Washington, DC 20530-0001

RE: Comments on U.S. v. BP Exploration and Production et al, Civil No. 10-4536 (E.D. La.)
(centralized in MDL 2179: In Re: Oil Spill by the Oil Rig "Deepwater Horizon" in the Gulf of
Mexico, April 20, 2012), D.J. Ref. 90-5-1-1-10026.

Dear Mr. Cruden:

The undersigned organizations thank the Department of Justice for its leadership in securing a
settlement with BP and the Gulf states regarding natural resource damage claims and Clean
Water Act civil claims. Overall, we believe this settlement is fair and, when combined with past
settlements with MOEX, Transocean and BP, provides the funding needed to address impacts
from the BP Deepwater Horizon oil disaster and make important investments toward
comprehensive restoration of the Gulf ecosystem.

Our organizations provided a letter in August outlining some of our concerns regarding the

agreement in principle and requesting further clarification on several important details to ensure a fair and just settlement for the Gulf ecosystem and people. We appreciate the inclusion of more information about the reserve account for unknown conditions and about the allocation of natural resource damage (NRD) payments as well as the structure for governance of the NRD allocation.

This settlement marks an important milestone for Gulf communities and we appreciate the opportunity to provide formal comments on the consent decree. We have outlined some of our outstanding concerns and recommendations for clarification and improvement below. Additionally, each of our organizations is submitting a more detailed comment letter consistent with the recommendations below.

After careful review of the consent decree and the draft Programmatic Damage Assessment Restoration Plan/Programmatic Environmental Impact Statements (PDARP/PEIS), we have a number of questions and concerns about the governance structure proposed for the administration of NRD funds.

While we appreciate the outline of the governance structure that was provided in the consent decree and the PDARP, many of the details regarding how this structure will ultimately be operationalized hinge upon Standard Operating Procedures (SOPs) developed by the full Trustee Council and the proposed Trustee Implementation Groups (TIGs). The content of these SOPs has not been finalized, and the PDARP/PEIS does not require the SOPs to be made available to the public for review and comment. We understand that prior to this settlement there were legal justifications for the Trustees to operate in secrecy. However, this settlement removes any barriers to transparency and creates an opportunity for more information to be shared with the public and to increase the public's role in restoration planning going forward, including making meetings open to the public. We encourage the Trustee Council to ensure transparency and public engagement opportunities for the duration of NRD restoration, including a public comment period in response to the SOPs.

Additionally, consistency in administration, implementation, and long-term management of restoration across the Gulf is important. We recommend that the Trustee Council develop one set of SOPs for adoption by the TIGs, and make them available for public review and comment. Once finalized, each TIG should adopt and implement these SOPs, and any additional procedures established by a TIG for a particular restoration area should be consistent with the Trustee Council SOP.

Under the proposed governance structure, all restoration planning and project implementation activities are delegated to the eight TIGs. This structure necessitates proactive and formalized efforts to coordinate between TIGs and across other restoration programs (e.g., RESTORE and NFWF), to ensure that a Gulfwide perspective on restoration is not lost. Successful implementation of the restoration approaches that the Trustees have identified in the PDARP/PEIS will require continual consideration of what is best for the ecosystems and injured resources independent of political boundaries. The full Trustee Council is responsible for ensuring this coordination, and the PDARP provides for the Council to "designate dedicated support staff, as necessary, for conducting its business."[4] However, it fails to articulate the specific channels or processes that the Trustees will employ to promote coordination and ensure

Correspondences - Department of Justice - Consent Decree - PEPC ID: 60777

that restoration activities are not siloed.

We believe that there are multiple means of enhancing crucial regional coordination and awareness, operating within the governance structure proposed in the PDARP. For example, restoration plans could be shared with the full Trustee Council on a regular and defined basis. This would provide an opportunity for TIGs to exchange ideas, share best management practices, and consider how their intended activities fit into the larger restoration landscape. This would also provide a defined opportunity for sharing of information with other Gulf of Mexico restoration programs. Additionally, the Trustee Council should be responsible for completion of program reviews that examine whether projects are adequately coordinated and on track to meet goals. The PDARP directs the Trustee Council to undertake such reviews approximately every five years, but a biennial review may help to prevent
missed coordination opportunities and would provide for more nimble adaptive management. The Trustees should also commit to communicating the outcomes of these biennial program reviews and restoration investments to the public in a manner that synthesizes the information for greater comprehension. This will not only secure the integrity of this process, but it will also build the public's trust in how funding allocations are dispersed. Finally, the Trustee Council should develop a set of monitoring standards and protocols for adoption across all TIGS. This will minimize duplication of effort and ensure that data and information collected is consistent across the Gulf. We encourage the Trustees
to work with other restoration processes to develop these monitoring standards and protocols to encourage as much consistency as possible for all restoration activities currently underway in the Gulf.

Another area where the draft PDARP lacks essential detail is the intended usage of the administrative oversight and comprehensive planning allocation within each TIG. We note that the Federal Trustees have already incurred significant administrative expenses for early restoration planning and for leadership, management and oversight of the Trustee Council.5 For example, the claims submitted to BP in 2014 alone by EPA, DOI and NOAA for the administrative costs (staff time and travel) of coordination and oversight of restoration planning totaled approximately $35 million.6 Using this annual expenditure
as an approximate guide, we believe that the cost of implementing the proposed governance structure could exceed the $150 million allocated to Federal Administrative Oversight and Comprehensive Planning in the open ocean account.

We recommend that the first restoration plans developed in each TIG include a financial plan that details how the TIGs will use the administrative and planning allocation over the lifetime of the program. These financial plans should make clear whether staff payments will be derived only from this allocation, or if the Trustees are envisioning charging staff time directly to projects. Further, the consent decree should explicitly cap federal administrative costs at $150 million from the open ocean account; any additional expenditures should come from the administrative oversight allocations in the states in which the federal Trustees are operating. While we believe the Trustees have developed a sound vision for restoration, we emphasize that restoration approaches and strategies should be accompanied by monitoring and adaptive management plans to track and maximize project success. Additionally, restoration plans should adequately account for climate change impacts, including sea-level rise, storm surge, and other

scientifically predictable
impacts, to ensure restoration activities are designed to be resilient and sustainable. Each restoration area is allocated funding for monitoring and adaptive management and should budget appropriately for these activities rather than viewing the unknown conditions funds as a way to supplement the adaptive management process. Further, we believe additional detail is needed regarding the process that the Trustees will use to identify and prioritize unforeseen needs as they accrue.

In summary, we support the effort that the Department of Justice has made to seek a fair and reasonable settlement with BP, and we believe the consent decree should be finalized. Additionally, we support the Trustees' commitment to an ecosystem-wide approach to restoration that provides resources for restoration of coastal and marine resources as well as monitoring and adaptive management. However, we are concerned by the lack of detail provided on critical aspects of governance, including the content of the SOPs, mechanisms for coordination among TIGs and between other Gulf of Mexico restoration programs, and plans for operating within the stated administrative and planning allocations. We recommend that as many details as possible are finalized in the consent decree and PDARP and that others should be addressed in the SOPs and as implementation proceeds.

Summary of Recommendations

- Standard operating procedures (SOPs) developed by the Trustee Council should be made available for public review and comment and should be adopted and implemented across TIGs to ensure consistency;
- The Trustee Council should formalize coordination between TIGs and with other Gulf of Mexico Restoration Programs, including through biennial program reviews;
- To the extent possible meetings of the TIGs should be open to the public;
- The Trustee Council should regularly communicate outcomes of restoration activities to the public;
- TIGs should develop and make public financial plans that detail intended usage of administrative and planning allocation over the lifetime of the program;
- Explicitly limit the open ocean funding dedicated to Federal administrative costs to $150 million;
- The Trustee Council should ensure the adoption of monitoring standards and protocols across all TIGs;
- Ensure decisions for making claims on the allocation for unknown conditions and adaptive management are based on monitoring data that documents and characterizes currently unknown conditions; and
- The consent decree should provide more information about how Trustees will make determinations that conditions have presented a rationale for accessing the unknown conditions reserve account.

Thank you for your consideration of these comments as you move toward finalizing the consent decree.

Regards,

Correspondences - Department of Justice - Consent Decree - PEPC ID: 60777

National Audubon Society
Environmental Defense Fund
National Wildlife Federation
Ocean Conservancy
The Nature Conservancy

## PEPC Project ID: 60777, DocumentID: 68455
## Correspondence: 169

### Author Information

| | |
|---|---|
| Keep Private: | No |
| Name: | Bill Hightower |
| Organization: | Alabama State Senate |
| Organization Type: | I - Unaffiliated Individual |
| Address: | 5501 Regency Oaks Drive North, Mobile, AL 36609 |
| | Mobile, AL,AL 36609 |
| | USA |
| E-mail: | bill@billhightower.com |

### Correspondence Information

Status: Reviewed              Park Correspondence Log:

Date Sent: 12/03/2015         Date Received: 12/03/2015

Number of Signatures: 1       Form Letter: No

Contains Request(s): No       Type: Web Form

Notes:

### Correspondence Text

Dear Judge Barbier,

Thank you for your service to Alabama and the other coastal states in sorting through the issues surrounding the BP Deep Water Horizon Oil Spill. We know it is a challenging job.

Today we, the Alabama State Senate Coastal Delegation (5 members of a 35 member body), are writing you to advocate for more structure in the payout of the Alabama settlement, which was recently publicized. Most Alabamians are delighted to see this effort by BP to compensate the state for its losses; a loss of which we will not recover for years.

In this letter we want to make our case to you regarding how these funds will be distributed. There are many questions at present about the timing and direction of the payments. Some officials of my state want all these funds to go into the general budget of the state, with no deference to the two coastal counties that were more adversely affected. We believe that is wrong.

Fortunately for Florida, they have a law, which requires at least 75% othe funds from a catastrophic event to go the affected counties. We do not have that law in Alabama. Because of this, 100% othese funds will go to the whole state and be used to pay internal transfer debts from one budget to another. We believe that is the wrong approach, and that a significant portion of these funds should come exclusively to the coastal counties and be applied to economic development and infrastructure projects, via the Restore Counsel framework; a counsel

established by Federal Law to manage all the BP settlement funds.

Here is why a significant portion of the total settlement should come to the Coastal Counties:

1. The original suit filed from the state of Alabama was a $167 mil. claim for the economic damages to the state. Even doubled for rounding errors, that would be a little over $300 mil. in lost state tax revenue due to the catastrophe. The largest loss of all was located in the two coastal counties, and it far exceeds this amount.
2. The real losses were to the citizens in Alabamas coastal counties of Mobile and Baldwin; loss of income and jobs of the citizens who live in those counties, the continued health issues which are a result of the dispersant, and the unknown impact upon our coast, as we are seeing rapid, unexplainable decreases in our sea life along the Alabama coast. The losses of those citizens far exceed any lost tax revenue to the state, and those coastal citizens can never be wholly compensated for their pain and suffering as a consequence of the disaster. At the very least the bulk of the monies from the oil company should be spent on the affected counties to enhance their lives, if not 100%.3 A settlement does not take into account the pain and suffering and anguish everyone experienced during that period of time. It is hard to imagine, but activity just stopped; there was fear of the unknown, people didnt buy houses and people with houses on the market took them off the market, businesses closed or severely reduced employment or services. Many of these people were already in financial distress because of the 2008 economic recession. The oil spill only added to their burden.
4. Mobile/Baldwin Counties (the coastal counties of Alabama) have not been fully compensated through their individual claims. Some have even refused to settle because the offer is not close to their actual losses. All settlements are short of full compensation, by definition. The state settlement includes the coastal counties and presently there is no deference to the exponential higher impact upon their coastal region.
5. Lastly, most of the claimants (particularly business economic losses) have not yet been paid. Of the 61,379 total claims filed from Alabama, about 28% he been paid. For businesses that number drops to 18%. he compensation gap to the coastal county region is significant.

There has been a disproportionate share of damage to the coast, yet these funds will at present go to the state general budget, with exception to the $50 mil. set aside for a state park. We are asking that at least 50%+ these funds go to the coastal counties of Baldwin and Mobile, with this directive to be included in your coming consent decree.

When I have discussed how the court could do this, I was told the court does not want to get involved in state politics of how the money is to be spent within the state, however, with the $50 mil. set-aside for the state park, the court is already involved in calling the shots.

Would you please give this your consideration as you define how the settlement dollars are to be directed, and include this requirement in your consent decree? For more information I have attached more details as to the damage along our coast.

Best Regards,

Correspondences - Department of Justice - Consent Decree - PEPC ID: 60777

Mobile & Baldwin County Senate Delegation:
Senator Bill Hightower
Senator Rusty Glover
Senator Trip Pittman
Senator Vivian Figures
Senator Greg Albritton

Details on the Losses Experienced by Mobile & Baldwin County

Economic loss:
1. Home values in Alabama have fallen an average of 15% aa direct result of the BP Oil Spill (Housing Predictor Researchers, 2015).
2. There have been a 26% dline in the number of commercial fishing jobs in Mobile County alone (2011).
3. In Alabama shrimp fishing jobs were down 11% a fin fishing jobs down 70% (11).
4. 227 jobs were lost in the first year in commercial fishing, processing and wholesale industry as many small processors went out of business or severely cut back.
5. Total coastal economy lost 794 jobs overall between 2010 and 2011 and thats just one year.
6. Because of the loss of sales, lodging and gas tax income, many infrastructure projects were delayed, halted, or abandoned because of concern of the revenue drop and future revenue decreases.
7. Realtors saw their business decline (even greater than what the recession had caused) as people took their homes off the market as there was very little interest in buying a new home at the time.
8. Damage to tourism over the last 3 years varies in estimates anywhere from $7 billion to $23 billion.

Environmental Damage 5 years after the spill:
1. Studies so far have shown a variety of negative impacts on wildlife, which still remain. Most long-term scientific studies on environmental disasters take longer than the 5 years that have passed to be adequately assessed.
2. Please remember that more than 8,000 birds, sea turtles and marine mammals were found injured or dead in the 6 months following the spill. Sea Turtle Stranding and Salvage Network indicates that sea turtles are today stranding (or beached) at 5 times the normal rate since the spill.
3. Dolphins are dying at an accelerated rate along the Gulf Coast and even more so in Louisiana where the oil hit the hardest.
4. Oil still remains on the sea floor, estimated to be about $10 million gallons, which affects the microbial community of organisms that exist in the Gulf.
5. Tumors, lesions and oil traces are found in the internal organs of Red Snapper and King Snake Eels as bottom-feeding fish are more impacted by oil on the sea floor.
6. Seaside sparrows in the Gulf are showing signs of strain.
7. There are numerous studies being conducted and will continue to be conducted on the environmental impact to the Gulf and the coastal areas. As we learned with the 1989 Exxon Valdez Oil Disaster, it wasnt until 4 years after the event that the herring population collapsed. More than 20 years later it has still not recovered. As the oils toxicity affects egg and larval

organisms, population dips and cascading food web effects may become evident in the years ahead.

# PEPC Project ID: 60777, DocumentID: 68455
# Correspondence: 171

## Author Information

Keep Private:              No
Name:                      Christopher Lish
Organization:
Organization Type:         I - Unaffiliated Individual
Address:
                           San Rafael, CA 94903
                           USA
E-mail:

## Correspondence Information

Status: Reviewed                    Park Correspondence Log:
Date Sent: 12/04/2015               Date Received: 12/04/2015
Number of Signatures: 1             Form Letter: No
Contains Request(s): No             Type: Web Form
Notes:

## Correspondence Text

Friday, December 4, 2015

U.S. Department of Justice
P.O. Box 7611
Washington, D.C. 20044-7611

Subject: Deny BP Tax Deductions for Deepwater Horizon Settlement - - Consent Decree in U.S.
v. BP Exploration and Production, et al, Civil No. 10-4536 (E.D. La.) (centralized in MDL 2179:
In Re: Oil Spill by the Oil Rig "Deepwater Horizon" in the Gulf of Mexico, on April 20, 2010.),
D.J. Ref. 90-5-1-1-10026

Dear Attorney General Lynch,

I strongly urge you to include strict language in the final the consent decree (Civil No. 10-4536)
between BP, the Justice Department, and the five states of the Gulf Coast that bars BP from
claiming any portion of its settlement costs as a tax deduction. The tragedy of the Deepwater
Horizon oil spill must be answered with justice for the people, economy, and wildlife of the Gulf
Coast- -not further tax benefits for BP.

"These temple destroyers, devotees of ravaging commercialism, seem to have a perfect contempt
for nature, and, instead of lifting their eyes to the God of the Mountains, lift them to the almighty
dollar."

Correspondences - Department of Justice - Consent Decree - PEPC ID: 60777

- - John Muir

This settlement, as written, allows BP to claim $15.3 billion of the total payment as a tax deduction, and ultimately allows the oil company to take a $5.35 billion tax windfall for its gross negligence. By leaving the door open for BP to claim these deductions for its wrongdoing, the settlement agreement both sends the wrong message and forces taxpayers to continue to shoulder the burden of BP's actions.

"Our duty to the whole, including to the unborn generations, bids us to restrain an unprincipled present-day minority from wasting the heritage of these unborn generations. The movement for the conservation of wildlife and the larger movement for the conservation of all our natural resources are essentially democratic in spirit, purpose and method."
- - Theodore Roosevelt

The language of the agreement should be adjusted to prevent the corporation from claiming "ordinary cost of doing business" tax deductions for what has been found to be its gross negligence in connection with the Deepwater Horizon disaster.

"Businesses that fully comply with federal environmental laws are harmed when those who fail to comply are not subject to enforcement action. If the laws are not enforced, dishonest competitors can put honest businesses out of business simply by continuing to pollute while avoiding the expenses associated with preventing pollution that are incurred by honest competitors."
- - Edward J. Markey

The tragedy of the Deepwater Horizon must never be repeated and taxpayers should not be left paying the cost of it.

"Do not suffer your good nature, when application is made, to say 'Yes' when you should say 'No'. Remember, it is a public not a private cause that is to be injured or benefited by your choice."
- - George Washington

Thank you for your consideration of my comments. Please do NOT add my name to your mailing list. I will learn about future developments on this issue from other sources.

Sincerely,
Christopher Lish
Olema, CA

Correspondences - Department of Justice - Consent Decree - PEPC ID: 60777

## PEPC Project ID: 60777, DocumentID: 68455
## Correspondence: 172

### Author Information

Keep Private:          No
Name:                  Ron Busby
Organization:          U.S. Black Chambers, Inc.
Organization Type:     I - Unaffiliated Individual
Address:               1050 17th Street, NW
                       Suite 810
                       Washington, DC,DC 20036
                       USA
E-mail:                ron@usblackchambers.org; remery@madisongr.com; tenasha@usblackchambers.org

### Correspondence Information

Status: Reviewed                    Park Correspondence Log:
Date Sent: 12/04/2015               Date Received: 12/04/2015
Number of Signatures: 1             Form Letter: No
Contains Request(s): No             Type: Web Form
Notes:

### Correspondence Text

U.S. BLACK CHAMBERS, INC.
The National Voice of Black Business
*Not affiliated with the National Black Chamber of Commerce


Comments for the BP Oil Consent Decree
From
The U. S. Black Chambers, Inc.

The U.S. Black Chambers, Inc (USBC) provides visionary leadership and advocacy in the
realization of economic empowerment. Through collaboration and innovative initiatives, we
support African American Chambers of Commerce and business organizations that develop and
grow black enterprises. The lack of representation, access to capital and financial education
necessitated the need for a national advocacy organization whose mission was to expand the
reach of black entrepreneurship.

USBC established five pillars of service as the cornerstone of our policy platform. The five
pillars consist of the following principals: 1) USBC fights for legislation that promotes small
business growth, particularly policies that address the challenges of black business owners; 2)
access to capital remains the most important factor limiting the establishment, expansion and
growth of Black-owned businesses; 3) at the USBC, our goal is to level the playing field by

helping members gain access to business opportunities in the private and public sectors; 4) USBC is committed to helping black business leaders achieve stellar performance and growth through entrepreneur and business management training; and 5) the growth and development of black chambers of commerce is a core focus of the U.S. Black Chambers, Inc.

Our five pillars of service form the foundation of the USBCs agenda. Since our founding USBC has been a clearinghouse for African American businesses to access expertise, education and capital in the formation, maintenance and sustainability of those businesses. These principals represent issues that greatly impact the growth of black-owned businesses in America and consequently, to that end, USBC has been a driving force in the development of communities throughout the country.

On December 15, 2010 the United States sued BP Exploration and Production Inc. (BP) as well as other defendants, for civil penalties under the Clean Water Act and sought a declaration that BP was liable for natural resource damages and response costs under the Oil Pollution Act for this tragic oil spill. As a result, BP, the United States, and the five Gulf states most affected have agreed to a settlement resolving claims for federal civil penalties and natural resource damages related to the Deepwater Horizon BP Spill. Under the RESTORE Act, which Congress enacted in 2012 in response to the spill, 80 percent of the penalty is allocated for environmental restoration, economic recovery projects, tourism and seafood promotion in the five Gulf states.

USBC is uniquely qualified to assist in facilitating the distribution and allocation of these funds because of our unique knowledge of these communities and our relationships within them assures a seamless process. Further, USBC incorporates best practices in educating our members so that increased proficiencies, increased production and increased efficiencies result in greater economic gain.

The BP Oil Spill was a tragic episode for our nation, and in particular, the Gulf Coast communities. The spill was devastating for the local environment and economy. Many black-owned businesses, including farming, fishing, transportation and others were destroyed as a result of this disaster. Many of these impacted communities have never recovered, and as such, access to funds made available through the RESTORE Act will go a long way in helping these communities move forward. Ensuring the equitable and effective distribution of these funds is consistent with our organizations principle of increasing access to capital for black-owned businesses. The participation of minority lending institutions in this process will help facilitate the growth of black-owned businesses and in turn the growth of black chambers of commerce.

In order to effectively facilitate the distribution of these funds, Minority Depository Institutions (MDIs) can be a valuable resource in utilizing its vast network to get those funds into the hands of those negatively impacted. Given their demonstrated track record of success within these communities and their very purpose, we support the utilization of MDIs in assisting in the distribution of these funds for the communities they serve.
Dating back to 1866, MDIs were created to provide credit to consumers and small businesses when no other financial institutions would provide services for individuals without banking accounts. These institutions have long been instrumental in providing banking services for minority and underserved communities. In addition, these institutions have served as training

Correspondences - Department of Justice - Consent Decree - PEPC ID: 60777

grounds for minority and women bankers. Finally, these institutions have provided the education and financial literacy programs that illustrated the importance of saving, investing and maintaining checking accounts. In sum, these institutions have played a vital role in the establishment of local economies in these communities.

Existing federal laws such as the Consumer Protection Act of 1968, Equal Credit Opportunity Act of 1974 and the Community Reinvestment Act of 1977 all encourage depository institutions to meet the credit and development needs of their respective communities. Furthermore, the Commerce and Treasury departments established the Minority Bank Deposit Program in 1969 and 1971 to meet and preserve the banking needs of minority communities. The Treasury Secretary, the Chair of the Board of Governors of the Federal Reserve System, the Comptroller of the Currency (OCC), the Chair of the National Credit Union Administration and the Chairman of the Board of Directors of the Federal Deposit Insurance Corporation (FDIC) have each established programs to promote the sustainability of MDIs.

The 166 MDIs that currently exist represent almost 1,800 banking offices and collectively manage over $181 billion dollars in assets. As with all banks to maintain leverages, balance sheets are built on core deposits. In the case of MDIs, their core deposits represent 70% of their total assets. Of these assets, 44% lent to their local business community. The Treasury Department has reported the majority of MDIs leverage funds 4 to 1, which translates into their ability to maximize every dollar invested. This fact alone proves the value of MDIs in minority and underserved communities. MDIs provide an invaluable service with regard to net interest income and noninterest income, with the return on assets in 2013 being 1.07%, e same return on investment (ROA) as other FDIC insured banking institutions. Finally, it must be highlighted that of the 166 MDIs in the nation, 36 of these institutions are located in the Gulf Coast region.

MDIs provide a seamless distribution of funds to the communities they serve. Without question, the distribution of funds from the RESTORE Act will greatly serve the existing and future needs of the Gulf Coast region. Directing funds as core deposits from the RESTORE Act to MDIs will increase their respective balance sheets and lending portfolios, thereby increasing economic opportunities in these communities. We believe this action will support MDIs to issue loans locally and help accelerate and maintain the success of minority communities, entrepreneurs and the ecosystem affected. Black-owned businesses will also greatly benefit from this access to capital. Sustaining and growing black-owned businesses results in jobs creation and additional revenue for local communities. Thus, supporting the growth of black-owned businesses is an investment in the revitalization of the Gulf coast region.

It is current law that all states and localities must certify that project selections are consistent with procurement rules for comparable projects in that state and that a state or locality may give preference to those that reside in, are headquartered in, or are principally engaged in the business in the State. It is our recommendation that the same law apply to depositing funds for distribution into these local communities. We respectfully submit that MDIs are best positioned to accomplish this goal on behalf of black-owned businesses and local communities.

Correspondences - Department of Justice - Consent Decree - PEPC ID: 60777

# PEPC Project ID: 60777, DocumentID: 68455
# Correspondence: 173

## Author Information

Keep Private:          No
Name:                  Bethany C. Kraft
Organization:          Ocean Conservancy
Organization Type:     I - Unaffiliated Individual
Address:               307 Tchoupitoulas St.
                       Suite 300
                       New Orleans, LA,LA 70130
                       USA
E-mail:                bkraft@oceanconservancy.org

## Correspondence Information

Status: Reviewed                   Park Correspondence Log:
Date Sent: 12/04/2015              Date Received: 12/04/2015
Number of Signatures: 1           Form Letter: No
Contains Request(s): No           Type: Web Form
Notes:

## Correspondence Text

December 4, 2015

Honorable John C. Cruden
Assistant Attorney General for the Environment and Natural Resources Division
U.S. Department of Justice
950 Pennsylvania Avenue, NW
Washington, DC 20530-0001

RE: Ocean Conservancy Comments on U.S. v. BP Exploration and Production et al, Civil No.
10-4536 (E.D. La.) (centralized in MDL 2179: In Re: Oil Spill by the Oil Rig "Deepwater
Horizon" in the Gulf of Mexico, April 20, 2012), D.J. Ref. 90-5-1-1-10026.

Dear Mr. Cruden:

Ocean Conservancy thanks the Department of Justice for its leadership in securing a settlement
with BP and the Gulf states regarding natural resource damage claims and Clean Water Act civil
claims. Overall, we believe this settlement is fair and, when combined with past settlements with
MOEX, Transocean and BP, provides the funding needed to address impacts from the BP
Deepwater Horizon oil disaster and make important investments toward comprehensive of the
Northern Gulf of Mexico ecosystem.

Correspondences - Department of Justice - Consent Decree - PEPC ID: 60777

Ocean Conservancy, along with several of our partners, provided a letter in August 2015, outlining some of our concerns regarding the agreement in principle and requesting further clarification on several important details to ensure a fair and just settlement for the Gulf ecosystem and people. Ocean Conservancy appreciates the inclusion of more information about the reserve account for unknown conditions. The consent decree includes important new requirements that BP must fulfill to monitor and publicly report on its efforts to improve the safety of drilling operations in the Gulf of Mexico. Additionally, we applaud the Department of Justice for providing additional information in the consent decree regarding the allocation of natural resource damage (NRD) payments as well as the structure for governance of the NRD allocation.

However, we are concerned that the proposed governance structure for the administration of NRD funds and execution of restoration plans could undermine the Trustees' implementation of this comprehensive ecosystem approach, will be costly to administer and will make coordination across restoration areas difficult and cumbersome. Taken together, we believe that these challenges significantly outweigh the benefits of streamlined decision-making.

This settlement marks an important milestone for Gulf communities, and we appreciate the opportunity to provide formal comments on the consent decree. We have outlined some of our outstanding concerns and recommendations for clarification and improvement below.

Ocean Conservancy makes the following recommendations for the consent decree (additional recommendations are outlined in the body of this letter):

• The consent decree and Trustees should revise the definition of the term "open ocean" and ensure that the open ocean allocation cannot be accessed for activities that do not restore or enhance marine resources;

• Federal planning and administrative costs from the open ocean fund must be explicitly capped at $150 million;

• The Trustee Council must continue to play a role in reviewing, approving and/or revising restoration plans;

• Standard operating procedures (SOPs) developed by the Trustee Council must be developed with public input, made available for public review and comment and must be adopted and implemented across TIGs to ensure consistency; and

• The consent decree must ensure decisions for making claims on the allocation for unknown conditions and adaptive management are based on long-term monitoring data that documents and characterizes currently unknown conditions.

I. The Natural Resource Damage allocation for open ocean projects must be used for restoration of resources in the ocean.

Ocean Conservancy is pleased that $8.1 billion has been allocated toward NRD, and applauds the

Correspondences - Department of Justice - Consent Decree - PEPC ID: 60777

Trustees for proposing to earmark $1.24 billion for projects in the open ocean. The BP Deepwater Horizon oil disaster originated offshore, more than 40 miles off the Louisiana coast and 5,000 feet below the Gulf of Mexico's surface. Living marine resources, such as finfish, sea turtles, marine mammals, and seabirds, were exposed to oil and dispersants. The injury assessment and emerging information regarding impacts to natural resources continues to paint a troubling picture for the marine environment, underscoring the importance of restoration in the open ocean. Inclusion of the open ocean allocation in the settlement will allow for restoration and enhancement of not only the bays, marshes, and wetlands that were impacted by the BP oil disaster, but also restoration of the world-class fisheries and ocean habitats that are the backbone of the Gulf region's economy.

Ocean Conservancy has repeatedly recommended dedicated funds for restoration in the offshore waters of the Gulf of Mexico. However, we are disappointed with the broad definition and terms of funding for the open ocean allocation. The consent decree defines open ocean as "restoration activities for resources primarily in the ocean and Federal Trustee administrative and preliminary planning activities across Restoration Areas." This definition will allow funds to be drawn from this account for projects and costs that do not address ocean resources, which is an unacceptable proposition considering the extent of damage detailed in the draft PDARP/PEIS for ocean resources and habitats.

The NRD Final Allocation table, found at Table 5.10-1 of the PDARP, provides additional details on where the NRD money will be spent. Administrative oversight and comprehensive planning accounts for $150 million of the open ocean funding. Ocean Conservancy does not support funding dedicated for open ocean restoration being spent on overhead costs for other restoration areas and we are concerned that the costly administration of the proposed governance structure will not provide adequate funding to develop and implement a comprehensive restoration plan for the open ocean resources.

Is this $150 million the entire allocation for federal Trustee planning and oversight? Could additional funding from other portions of the open ocean allocation also be used for federal Trustee planning and oversight? If the federal administrative and planning costs exceed $150 million, where will the funding come from? With the costly administration of the proposed governance structure, discussed in more detail below, how will the Trustees ensure there will be adequate funding to develop and implement a comprehensive suite of restoration projects for the open ocean resources? Ocean Conservancy urges the Department of Justice to revise the definition of open ocean in the consent decree to ensure the proper use of the funds in that allocation. Further, the consent decree must make explicit that administrative costs must not exceed the $150 million allocated.

Ocean Conservancy does not support the reclassification of previously approved, land-based recreational projects. Four of the early restoration projects to address lost recreational use have been reclassified as open ocean projects. These projects include nearly $7 million for roadway enhancements (bike and pedestrian lanes) at Davis Bayou in Mississippi, $545,000 for trail enhancement at Bon Secour National Wildlife Refuge in Alabama, more than $10 million for a "beach enhancement project which involves removing fragments of asphalt and road-based material that are scattered widely over the Fort Pickens, Santa Rosa, and Perdido Key areas of

Gulf Islands National Seashore, in Florida," and more than $4 million for the "purchase of up to three pedestrian visitor ferries for use between the City of Pensacola, Pensacola Beach, and the Fort Pickens area of Gulf Islands National Seashore in Florida."

How are these projects-which do not occur in the open ocean and do not fit the definition-able to be reclassified and accounted for as open ocean projects? The consent decree's definition of open ocean is: "Restoration activities for resources primarily in the ocean and Federal Trustee administrative and preliminary planning activities across Restoration Areas." While we acknowledge that these projects were part of early restoration and that no further funding from this account is allocated for recreational use activities, we believe that allocating any open ocean funds to recreational use projects, past or present, sets a precedent allowing restoration activities that do not primarily benefit ocean resources to be paid from this account. Of the $832 million allocated for early restoration, only $20 million has been allocated to restoring marine resources injured in this oil disaster. Reclassifying these recreational use projects reduces the amount of funding available for restoration and enhancement of the offshore marine environment, where the disaster took place and where significant injuries to natural resources occurred. While these projects may be worthy of restoration funding from other allocations, they are not suitable for the open ocean allocation. We recommend that the Trustees consider a more appropriate allocation for these projects, either from the states in which the projects are implemented or from the regionwide allocations.


Summary of Recommendations
• Define "open ocean" to consist of restoration activities occurring in the ocean or activities that create, enhance, or improve marine resource management, scientific research, or monitoring of natural resources in the ocean; and federal Trustee administrative activities, capped at $150 million, across restoration areas.

• Reclassify early restoration recreational use projects currently allocated to the open ocean fund to the regionwide allocation or to the states in which the projects are implemented.

II. Process for allocation of funds dedicated to Natural Resource Damages

A "trust" is a legal relationship in which a person or entity (the "trustee") manages a property or resource for the benefit of another person or group. Trustees are legally bound to preserve the assets of the trust, allowing only judicious use of the assets and repairing the trust should it be harmed. The trustee must also manage the trust exclusively in the interests of the beneficiaries. Based on these legal principles, the Oil Pollution Act of 1990 created a system by which the federal and state government trustees must restore natural resources following an oil spill and must do so in the best interest of their citizens, to whom these resources belong. The NRD Trustees owe legally binding duties to the public as beneficiaries. As such, the Trustee Council at hand has a duty to use settlement funds in the most efficient and effective way possible. Though we recognize the potential benefit of streamlined decision-making at the state level, we are concerned that the creation of eight Trustee Implementation Groups with decentralized decision-making authority could result in inefficient use of funds could undermine the Trustees' own stated goal of ecosystemwide restoration.

Correspondences - Department of Justice - Consent Decree - PEPC ID: 60777

A. Governance and TIGs: The Trustee Council must approve TIG restoration plans

Appendix 2 of the consent decree provides a description of the governance structure proposed to administer and allocate NRD monies through the creation of eight Trustee Implementation Groups (TIGs), which are composed of a subset of Trustees. Under this proposal, the eight TIGs will take on all primary planning and decision-making responsibility. "Each TIG will make all restoration decisions for the funding allocated to its restoration area." In essence, the proposal creates eight Trustee Councils in addition to the existing Council. The subdivision of central decision-making authority will undermine the effectiveness of local and ecosystemwide restoration and the functionality of the restoration governance system as a whole. We recognize that some of the Trustees may wish to streamline decision-making and that, given purported difficulties in achieving consensus for funding early restoration projects in some areas, there is a reluctance to continue with a centralized model. However, the overall commitment to a coordinated, comprehensive approach outlined in the PDARP/PEIS requires a thoughtful governance approach based on what is best for the ecosystem, which does not recognize political boundaries. The hurdles to reaching consensus encountered during early restoration should be overcome easily with now that funding is allocated by resource to specific political subdivisions.

First, developing and implementing restoration plans according to the priorities of political subdivisions is unlikely to comprehensively address the impacted resources and achieve the goals of the draft PDARP/PEIS. The proposed structure distances decision-makers from one another and allows for plans and projects to be developed and implemented in silos without consideration of one another and without a process that can evaluate and approve these plans and projects in the context of the ecosystem-scale vision the Trustees have set forth in the draft PDARP/PEIS. The Management Structure section (section 7.2) acknowledges that the "magnitude and geographic scale of the restoration in this draft PDARP/PEIS is far greater than in any other prior undertaking by natural resource trustees," but uses this fact as a rationalization for the creation of eight new Trustee bodies. It is exactly the magnitude and geographic scale of this restoration effort that requires a unified Trustee Council to ensure the funding achieves the "Comprehensive Integrated Ecosystem Restoration" using an "ecosystem-level approach," as chosen by the Trustees as the preferred alternative. The Trustees identify coordination and collaboration across stakeholders, states and resource agencies as critical to the successful implementation of the restoration approaches identified in the draft PDARP/PEIS. However, the proposed structure, which promotes independent restoration planning, implementation and monitoring among the TIGs, would make that level of coordination unlikely, if not impossible.

Second, Ocean Conservancy believes the Trustee Council must have a meaningful role in administration, planning, implementation, and long-term management of restoration. We are concerned that the proposed structure will result in excessive and inefficient use of funds and could undermine the goal of ecosystemwide restoration. Operating and coordinating the activities of nine Trustee Councils, rather than one, multiplies the functional administrative needs and substantially increases costs of the decision-making system. All four federal Trustees (DOI, NOAA, USD and EPA) will sit on all eight TIGs and each must be prepared to staff all eight TIGs, plus the primary Trustee Council, for the next decade and a half. How will the federal and state Trustees cover the costs of maintaining the functionality of nine Trustee bodies, instead of

Correspondences - Department of Justice - Consent Decree - PEPC ID: 60777

one, for well over a decade? What will happen if and when the administrative costs exceed the amount allocated in the consent decree?

The federal Trustees have already incurred significant administrative expenses for early restoration planning they have conducted and for leadership, management and oversight of the Trustee Council. For example, the claims submitted to BP in 2014 alone by EPA, DOI and NOAA for the administrative costs (staff time and travel) of coordination and oversight of restoration planning totaled approximately $35 million. Multiplying those costs by nine provides some indication of the extraordinary cost of implementing this proposed governance structure-a cost that will likely exceed the $150 million allocated to administrative oversight and comprehensive planning in the open ocean account. Ocean Conservancy is extremely concerned that federal Trustee planning and administrative costs could significantly impinge upon the funding available for open ocean projects and for restoration implementation in general, regardless of where the administrative and planning expenses are allocated. While we believe that federal Trustee participation in restoration planning and coordination is critical, we do not believe that the entire burden of costs for the federal Trustees to participate in this inefficient structure should be deducted from the open ocean account. The Trustees and the consent decree should explicitly cap the administrative costs from the open ocean allocation at $150 million, after which any additional costs must come from the state allocations in which the Trustees are operating.

Third, the Trustees have identified a preferred restoration approach that will require extensive coordination and collaboration for successful implementation. We are concerned that without dedicated staff to serve the Trustee Council, the Council's ability to provide the level of coordination and oversight envisioned by this restoration plan will be significantly impaired. Therefore, the Council must formalize coordination across restoration areas and across other restoration programs (e.g., RESTORE and NFWF) and seek opportunities for collaboration and leveraging restoration funding for greater impact. An independent, dedicated staff is the most efficient way to accomplish this effort. We believe the Gulf Coast Ecosystem Restoration Council provides a good model. We recognize that creating a staff component increases the initial administrative burden of the Council, but we believe that this is ultimately a more cost-effective approach that could actually result in cost-savings in the long term, particularly if the Trustees rethink their proposed distributed governance approach.

This settlement will provide greater certainty for restoration decision-makers and will allow planning to move forward toward ecosystemwide recovery and restoration. The settlement is an enormous opportunity for ecosystem restoration, and that is why we must commit to decision-making processes that have the best chance of achieving the goals of the settlement. The proposed structure sets the system up for cost overruns, a lack of coordination between decision-makers, and a complicated and burdensome relationship with the public whom the Trustees serve. In the event that the proposed structure moves forward, we are recommending areas to strengthen coordination, ensure consistency across TIGs and address restoration needs at an ecosystem scale. We do believe, however, that the proposed structure sets a troubling precedent for future large NRDAs and undermines the DWH Trustees' own stated goals of a comprehensive, ecosystem approach.

Correspondences - Department of Justice - Consent Decree - PEPC ID: 60777

Summary of recommendations

• Federal planning and administrative costs from the open ocean fund must be explicitly capped at $150 million, and any costs exceeding $150 million must be drawn from the state allocations in which the federal Trustees are operating;

• The Trustee Council must provide adequate staff capacity including an executive director and a science coordinator to fulfill their responsibilities in planning, implementing and monitoring restoration plans, programs and projects; and

• The Trustee Council must have express authority to approve, disapprove, partially approve or suggest revisions for all TIG restoration plans.

B. Ensure greater transparency and more public engagement

While the Trustees outlined public review and comment procedures for restoration plans and included a commitment to public reporting, the creation and operation of nine Trustee Councils has troubling implications for public participation. For more than five years, Gulf communities have actively engaged in the recovery and restoration processes, attending dozens of meetings, reviewing restoration plans and providing public comments at each opportunity. For many members of the public, this has become increasingly difficult with multiple processes unfolding, a lack of coordination among them, insufficient time provided for review and comment, and barriers to language and literacy accessibility. Throughout, the public has consistently called for restoration of the Gulf ecosystem, understanding that the resources are interconnected. For example, people in Mississippi understand that improving water quality in Mississippi not only benefits living resources important to coastal residents, such as oysters, but also contributes to the health and recovery of these resources across the Gulf. Establishing a process that requires the public to engage with nine restoration planning efforts creates unnecessary challenges and barriers to participation, especially among the most vulnerable populations. This proposed process places a great burden on the American public and some may view this structure as an effort to decrease transparency and public participation. The Trustees must provide a consistent restoration planning process across TIGs that will not require enormous expenditures of time and treasure from the public to participate.

The details regarding how this proposed governance structure will be implemented hinge upon standard operating procedures (SOPs) developed by the full Trustee Council and the proposed Trustee Implementation Groups (TIGs). The content of these SOPs has not been finalized, and the PDARP/PEIS does not require the SOPs to be made available to the public for review and comment. We understand that prior to this settlement there were legal justifications for the Trustees to operate in secrecy. However, this settlement removes any barriers to transparency and creates an opportunity for more information to be shared with the public and to increase the public's role in restoration planning going forward, including making meetings open to the public. Indeed, engaging the public in restoration planning is a hallmark of other credible regional restoration programs, and we would like to see the same level of commitment by the Trustees. We encourage the Trustee Council to ensure transparency and public engagement opportunities for the duration of NRD restoration, including a public comment period in response

Correspondences - Department of Justice - Consent Decree - PEPC ID: 60777

to the SOPs.

Additionally, consistency in administration, implementation and long-term management of restoration across the Gulf is important. We recommend that the Trustee Council develop one set of SOPs for adoption by all TIGs, and make them available for public review and comment. The SOPs developed by the Trustee Council must provide sufficient detail regarding the operation of the TIGs and the Council to assure the public that restoration will be closely coordinated and avoid random acts of restoration. Once finalized, each TIG should adopt and implement these SOPs, and any additional procedures established by a TIG for a particular restoration area should be consistent with and build on the Trustee Council SOPs.
The Trustees should also communicate the outcomes of restoration by reporting on progress toward meeting restoration goals and objectives to the public and other interested entities every three years. This reporting will not only ensure the integrity of this process but it will also build the public's trust in how funding allocations are dispersed.

Summary of Recommendations

• The consent decree should require that Trustee Council SOPs are available for public review and comment;

• The consent decree should require that each TIG adopt and implement the Trustee Council SOPs;

• The consent decree should ensure meetings of the Trustee Council and TIGs are open to the public; and

• The consent decree should require the Trustee Council to report the outcomes of restoration activities to the public.

III. Ensure science-based decision-making for accessing the unknown conditions and adaptive management allocation ($700 million reserve)

Ocean Conservancy greatly appreciates the inclusion of the reserve funding for unknown conditions. This reserve account is critically important to address restoration from injuries that are discovered or more fully understood subsequent to the effective date of the settlement (e.g., latent, chronic, delayed manifestation in long-lived species). As we continue to learn more about the long-term impacts of the oil disaster, this account will provide the much-needed flexibility and adaptability to ensure restoration success into the distant future. However, the consent decree does not outline a clear process for accessing that account. The consent decree states, "At any time between January 1, 2026 and the anniversary of the Effective Date in the assumed year 2032, the United States and all of the Gulf States may jointly demand payment of all or a part of the accrued and previously unpaid interest on the amount required [...]"

The consent decree does not include any guidance on the scientific justification that would be needed for the U.S. and all five Gulf States to bring a joint demand of payment from this account to address lingering or new injuries. Further, this demand of payment may be brought prior to the

Correspondences - Department of Justice - Consent Decree - PEPC ID: 60777

completion end of the payment period, reducing or potentially depleting funds available to address new injuries or unknown conditions after the effective date of the finalized consent decree. We are concerned that the lack of guidance and criteria for properly accessing these funds could unintentionally incentivize a demand at an earlier date, thus shortchanging the potential for the full accrual of $700 million.

A. Unknown Conditions

The consent decree provides a broad definition for the use of funds from this account: "to address unknown injuries and/ or losses to Natural Resources" or "to adapt, enhance, supplement, or replace restoration projects or approaches initially selected by the Trustees." Ocean Conservancy agrees that addressing unknown injuries and adaptive management are both critical to the long-term recovery of natural resources. However, the consent decree must provide a clearer definition of unknown conditions and guidance for the type of documentation or evidence that will be needed to access the allocation for unknown conditions and adaptive management and avoid misuse of these funds.
Ocean Conservancy supports the Trustees' decision to initiate restoration now; however, the Trustees have indicated that for many resources, including fish and water column invertebrates, sea turtles and birds, additional injuries likely occurred but were not quantified or underestimated. Further, the Trustees indicate injuries to benthic communities are likely to adversely affect the marine food web. Chronic or new injuries and any population-level or food web impacts cannot be ruled out. Ocean Conservancy is concerned that without some reasonable safeguards in place, this account could be zeroed out before the long-term impacts on natural resources are fully known. Therefore, the Trustees must conduct additional monitoring and supporting science needed to document and characterize injuries not accounted for in the draft PDARP/PEIS and to track recovery of injured resources. This monitoring data must be used to inform decisions for making claims on this account.

B. Adaptive Management

The Trustees have specifically allocated funding for monitoring and adaptive management across restoration areas in the draft PDARP/PEIS. The Trustees reasonably recognize that restoration will occur over more than a decade and that the dynamic ecosystem of the Gulf of Mexico is likely to change over time. Each of the restoration areas identifies funding for monitoring and adaptive management which will allow Trustees to track changing conditions, understand how ecosystem change is helping or hindering restoration and make necessary adjustments to underperforming restoration approaches. This is commendable.

An undertaking this large is bound to encounter uncertainties, and while Ocean Conservancy believes the Trustees have developed a sound vision for restoration, we continue to be concerned about how restoration approaches and strategies will be implemented. A number of the approaches included in the PDARP/PEIS have a degree of uncertainty, including "a limited scientific understanding of target resources, the use of novel approaches and/or techniques, restoration at large spatial scales and/or long time scales, and strong socioeconomic influence, among other factors." Monitoring and adaptive management plans should be developed concurrent with implementation of the restoration approaches for each area, and the Trustees

must ensure sufficient funding for these activities. Additionally, restoration plans must adequately account for climate change impacts and ensure restoration activities are designed to be resilient and sustainable with consideration of sea level rise, storm surge and other climate-related impacts that are predictable using best available science. Trustees should not, therefore, be able to access the funding allocated for unknown conditions and adaptive management to react to scenarios that were reasonably foreseeable in the planning process but that Trustee Implementation Groups failed to consider. Each restoration area is allocated funding for monitoring and adaptive management and should budget appropriately for these activities rather than viewing the unknown conditions funds as a way to supplement the adaptive management process.

Summary of Recommendations

• The consent decree must provide more information about how the Trustees will make determinations that conditions have presented a rationale for accessing this account;

• The consent decree must provide a definition for unknown condition;

• The consent decree must ensure claims on the allocation for unknown conditions and adaptive management are based on monitoring data that documents and characterizes currently unknown conditions; and

• The consent decree must ensure the funding allocated for unknown conditions and adaptive management is not used to supplement the adaptive management process of TIGs.

IV. Conclusion

In summary, Ocean Conservancy supports the effort that the Department of Justice has made to seek a fair and reasonable settlement with BP. Additionally; we support the Trustees' commitment to an ecosystemwide approach to restoration that provides resources for the open ocean, coastal restoration, monitoring and adaptive management. However, we have serious concerns that the proposed distributed governance structure of the Trustee Council subdivides responsibility for achieving ecosystem restoration in a way that decreases accountability and threatens the Trustees' ability to coordinate, threatens the funding available for ecological restoration in the open ocean, and places an unfair burden on the public by increasing the time and effort required to meaningfully engage and participate in restoration planning and implementation.

Thank you for your consideration of these comments as you move toward finalizing the consent decree. Please contact me at 504.208.5814 or Ivy Fredrickson at 503.505.6575 with questions or to discuss these comments in more detail.

Sincerely,

Bethany Carl Kraft
Director, Gulf Restoration Program

Correspondences - Department of Justice - Consent Decree - PEPC ID: 60777

Ocean Conservancy

Attachment:
Letter from Ocean Conservancy, National Audubon Society, Environmental Defense Fund and
National Wildlife Federation to the Department of Justice (August 4, 2015)

August 4, 2015

Honorable John C. Cruden
Assistant Attorney General for the Environment and Natural Resources Division
U.S. Department of Justice
950 Pennsylvania Avenue NW Washington, DC 20530-0001

RE: Recommendations for Details of BP Consent Decree

Dear Mr. Cruden:

On behalf of our organizations, we would like to thank the Department of Justice for its
leadership in securing a settlement in principle with BP and the Gulf states to settle natural
resource damage claims, Clean Water Act civil claims and economic claims. This agreement,
when finalized, along with past settlements with MOEX, Transocean and BP, provides the
funding needed to address impacts from the BP Deepwater Horizon oil disaster and to make
important investments toward comprehensive restoration of the Gulf ecosystem.

While our understanding is that the consent decree will not be available for public review and
comment for several months, our organizations are concerned about several important details
that should be included or further clarified in the consent decree to ensure a fair and just
settlement for the Gulf ecosystem and people. We have outlined some of these outstanding issues
below and look forward to providing a formal public comment when the consent decree is
finalized and fully accessible.

1. Inclusion of a Natural Resource Damage (NRD) allocation for open ocean projects

The BP oil disaster originated offshore, more than 40 miles off the Louisiana coast. Living
marine resources, such as finfish, sea turtles, marine mammals and seabirds, were exposed to oil
and dispersants. Emerging information regarding impacts to natural resources continues to paint
a troubling picture for the marine environment. We applaud the Department for proposing to
earmark $1.24 billion for projects in the open ocean. We recommend the following clarifying
definition of open ocean and use of funds provision.

Suggested definition of "Open Ocean"
"Open Ocean" means the area seaward of the barrier islands in the Gulf of Mexico, including but
not limited to the benthic and pelagic environments, species, and ecosystem services of the
continental shelf, continental slope, and abyssal plain, as well as species inhabiting the open

Correspondences - Department of Justice - Consent Decree - PEPC ID: 60777

ocean that also spend part of their life cycle in state territorial waters or coastal environments of the Gulf of Mexico.

Open ocean funds must-
(a) be used to restore or enhance the condition of species, habitats, or ecosystems in the Open Ocean injured as a result of the Deepwater Horizon oil spill, or to replace or acquire the

equivalent of injured resources, or to eliminate or reduce risk of future harm from other stressors that may interfere with the long-term health or recovery of injured resources,
(b) enhance or improve the condition of natural resources of the Open Ocean, or
(c) create, enhance or improve marine resource management, scientific research, or monitoring of natural resources of the Open Ocean.

2. Natural Resource Damage Allocations to Gulf States

In addition to its impacts on open ocean ecosystems, the BP oil disaster had devastating consequences for the wildlife and natural resources of coastal ecosystems. The BP Macondo well spewed 210 million gallons of oil into the Gulf, affecting over 1,000 miles of delicate shoreline and thousands of acres of coastal marsh. The disaster's long-term effects will continue to impact coastal habitats and their natural resources for decades to come.

The state allocations for natural resource damages will help to restore critical coastal habitats and species all around the Gulf Coast. We are pleased to see $5 billion reserved for Louisiana, the state where the most severe natural resource damages occurred.

To achieve the greatest benefit for the Gulf Coast, we recommend that state natural resource damage funds:
(a) be used to restore or enhance the condition of species, habitats, or ecosystems in the coastal zone injured as a result of the Deepwater Horizon oil spill, or to replace or acquire the equivalent of injured resources, or to eliminate or reduce risk of future harm from other stressors that may interfere with the long-term health or recovery of injured resources,
(b) be expended on projects that produce lasting results, and that promote overall coastal resilience, in the face of natural hazards and climate change impacts, and
(c) to the extent practicable, complement and build on existing state or regional plans and ecosystem restoration projects that have been funded through Early Restoration dollars and other funding streams.

3. Process for allocation of funds dedicated to Natural Resource Damages

The consent decree should provide detailed guidance and clarity about the structure and process that will be used to evaluate, select and approve projects funded with the NRD allocation. The Trustee Council should continue to provide oversight, consultation and coordination between the states and federal agencies on the use of these funds. To maximize coordination and leveraging opportunities, funding decisions should be made by unanimous consent whenever possible. At a minimum, funding decisions should be made by the unanimous consent of the federal trustees and the state trustees where the project is implemented.

Correspondences - Department of Justice - Consent Decree - PEPC ID: 60777

Tremendous resources, both time and funding, have gone into collecting the data that will ultimately steer the NRD funding. In order for the public to fully understand impacts and participate in the NRD process, we believe that these data should be made accessible to the public. This will help ensure a stronger open and public process. The Trustee Council's role, as well as guidance for greater public transparency, should be described in the consent decree.

4. BPXP will set aside an additional amount of $232 million (Reserve) at the end of the payment period to cover any further natural resource damages that are unknown at this time.

We greatly appreciate the inclusion of the Reserve funding for unknown future damages. We suggest the following additional language to clarify the use of the Reserve account:

Further natural resource damages that are unknown at this time should include: injury to an affected population, habitat, or species that was not manifest or could not reasonably have been documented scientifically from any information in the possession of or reasonably available to any Trustee on the Effective Date, or to an injury documented before the Effective Date that persists or has worsened and is preventing a full recovery at the end of the 15-year payment period.

Additionally, the consent decree should outline:
• How the funds from the Reserve account can be accessed and allocated;
• What documentation or evidence of additional injury will be required to access Reserve account;
• How ongoing injury assessments and recovery monitoring will be conducted and funded (e.g., will some of the $7.1 billion NRD allocation be utilized for ongoing injury study and assessment); and
• What role, if any, BP will play in determining whether and when to access the Reserve account (In the experience of the Exxon Valdez oil spill, relying on the concurrence of the Responsible Party [Exxon] to pay for post-settlement damage claims has proven unworkable, with claims rejected by Exxon sent back to court, where they remain unresolved.).

5. The critical role of long-term monitoring and research in demonstrating new, continuing or worsening injury after 15 years

Oil released into sensitive coastal and marine environments can persist for decades, and the resulting environmental impacts can last just as long or longer. Ecosystem monitoring and research should be conducted and funded under an oil spill restoration program for as long as oil and its chronic effects could linger in the environment. Studies of the Exxon Valdez oil spill show that some oil remained in Prince William Sound two decades later, and some injured resources had not fully recovered.1, 2 Using the Exxon Valdez oil spill as an analog, an oil spill recovery monitoring program spanning a minimum of
20 to 25 years is a necessary and appropriate component of Gulf restoration, particularly for a spill as large and complex as the BP oil disaster.

Correspondences - Department of Justice - Consent Decree - PEPC ID: 60777

The Trustees' ability to document injury that was not known at the time of the Effective Date or that persists or has worsened at the end of the 15-year payment period and beyond will not be possible without the necessary science and data to substantiate those injuries or lack of recovery. The consent decree should explicitly dedicate an amount of funding sufficient to implement a robust long-term monitoring and research program to be managed by the Trustee Council. At the end of the 15-year period, the National Academy of Sciences (NAS) should be asked by the court to establish an independent panel of experts to assess the results of studies conducted to date to determine whether new, continuing or worsening injury has been sufficiently documented. The NAS panel findings should

1 Exxon Valdez Oil Spill Trustee Council, "Report on Lingering Oil Studies," available at http://www.evostc.state.ak.us/Universal/documents/LingeringOilReport.pdf.
2 Exxon Valdez Oil Spill Trustee Council, Exxon Valdez Oil Spill Restoration Plan, "2014 Update: Injured Resources and Services," available at http://www.evostc.state.ak.us/static/PDFs/2014IRSUpdate.pdf.

be used by the court to guide its decision on accessing the Reserve fund for additional restoration funding.

6. Resolution of Economic Claims

The BP oil disaster profoundly impacted the economies of the five Gulf states, which serve as an economic engine for the rest of the country. We support the resolution of these claims, with the recommendation that the consent decree should explicitly prohibit the use of funds for projects or programs which will result in adverse environmental impacts or which will directly, indirectly or cumulatively impact the resources and ecosystems that are currently being restored in the Gulf region.

7. Length of comment period

Given the complicated nature of the settlement agreement and the anticipated simultaneous release of the Natural Resource Damage Assessment and Restoration Plan, we recommend a minimum of 90 days for public review and comment on the consent decree. Ninety days or more are appropriate and will allow sufficient time for interested members of the public to be informed and provide meaningful input for the court to consider.

Thank you for your consideration of these comments as you move toward finalizing the consent decree. Please feel free to contact us via Bethany Carl Kraft at 504.208.5816 with questions or to discuss these comments in more detail.

Regards,

Ocean Conservancy
National Audubon Society

Correspondences - Department of Justice - Consent Decree - PEPC ID: 60777

Environmental Defense Fund
National Wildlife Federation

# PEPC Project ID: 60777, DocumentID: 68455
# Correspondence: 174

## Author Information

Keep Private:          No
Name:                  Lukas Ross
Organization:          Friends of the Earth
Organization Type:     I - Unaffiliated Individual
Address:               1101 15th Street NW
                       11th Floor
                       Washington DC, DC,DC 20005
                       USA
E-mail:                lross@foe.org

## Correspondence Information

Status: Reviewed                    Park Correspondence Log:
Date Sent: 12/04/2015               Date Received: 12/04/2015
Number of Signatures: 1             Form Letter: No
Contains Request(s): No             Type: Web Form
Notes:

## Correspondence Text

December 4, 2015

Assistant Attorney General
Environment and Natural Resources Division
P.O. Box 7611
U.S. Department of Justice
Washington, DC

Comments Re: U.S. v. BP Exploration and Production et al, Civil No. 10-4536, D.J. Ref. 90-5-1-1-10026

Dear Assistant Attorney General Crudman:

As the Justice Department continues its work to hold BP accountable for the tragedy of Deepwater Horizon, it has a unique opportunity to ensure that the costs of BP's "gross negligence" are not borne by taxpayers. Unfortunately, the consent decree proposed on 5 October 2015 could still allow BP to garner major tax benefits from its settlement costs. We implore you to correct this in the final agreement.

It is a strong first step that the proposed consent decree forbids the deduction of $5.5 billion in Clean Water Act fines. Although including this language is an arguably redundant reminder that

26 USC 162(f) is still the law of the land, it is becoming unfortunately necessary to emphasize that fines are meant to be non-deductible. Thanks to an increasingly complex universe of case law, we are entering an environment in which corporations party to settlement agreements may try to deduct even the punitive costs of their wrong-doing unless they are told specifically they cannot.

This need for clarity is why we urge you to include language specifically stating that no part of the proposed $20.8 billion settlement be treated as a tax deduction. Unless it is specifically forbidden, BP is likely to expense the remaining $15.3 billion, shrinking the total payment in after-tax terms and netting a handsome windfall of $5.35 billion.

The tax code allows for the deduction of "ordinary and necessary" business expenses, but neither of those adjectives should apply to any of the costs flowing from Deepwater Horizon. Paying for the aftermath of the worst oil spill in US history is not simply the cost of doing business, and if the Justice Department treats it as such it runs the risk of normalizing tragedy and creating a moral hazard for when the next spill inevitably comes.

Precedent for including stricter settlement terms already exists-for example, when BP settled for its share of criminal liability for Deepwater Horizon, the agreement made it clear that none of $4 billion could be treated as a deduction. As a final consent decree emerges, the Justice Department is well within its rights to pursue language that is similarly precise-to the benefit of both taxpayers and the environment.

Fossil fuel subsidies are expected to cost taxpayers $135 billion over the coming decade. These incentives, which run the gamut from century-old tax breaks to royalty-relief on public lands, make the production and consumption of fossil fuels more economical, thereby encouraging the use of energy sources that are ultimately detrimental to our economy and society. While ending many of these subsidies would require an act of Congress, the Justice Department has the discretion to pursue a final agreement with BP that ensures an additional $5.35 billion is not added to this already considerable tab. We encourage you to use it.

Respectfully,

Lukas Ross
Climate and Energy Campaigner
Friends of the Earth US
1101 15th Street NW
11th Floor
Washington DC 2005
202-222-0724
lross@foe.org

# PEPC Project ID: 60777, DocumentID: 68455
# Correspondence: 175

## Author Information

Keep Private:              No
Name:                      N/A N/A
Organization:
Organization Type:         I - Unaffiliated Individual
Address:
                           Mobile, AL 36509
                           USA
E-mail:

## Correspondence Information

Status: Reviewed                    Park Correspondence Log:
Date Sent: 12/04/2015               Date Received: 12/04/2015
Number of Signatures: 1             Form Letter: No
Contains Request(s): No             Type: Web Form
Notes:

## Correspondence Text

I OPPOSE the current proposed consent decree, it is too complex, too broad and unclear, it allows for too many diverse interpretations and implementation.

Citizen and Public Input, basically does not exist, I support the establishment and funding of a "Gulf of Mexico Regional Citizen Advisory Council.

Support GAO and Court Oversight should be mandatory.

$700M for unknown is not enough recommend increase to no less than $2B.

# PEPC Project ID: 60777, DocumentID: 68455
# Correspondence: 176

## Author Information

Keep Private:        No
Name:                N/A N/A
Organization:
Organization Type:   I - Unaffiliated Individual
Address:
                     Washington , DC 20005
                     USA
E-mail:              lross@foe.org

## Correspondence Information

Status: Reviewed              Park Correspondence Log:
Date Sent: 12/04/2015         Date Received: 12/04/2015
Number of Signatures: 1       Form Letter: No
Contains Request(s): No       Type: Web Form
Notes:

## Correspondence Text

Alaska Inter-Tribal Council * Atchafalaya Basinkeeper * Center for Biological Diversity * Defenders of Wildlife * Energy Action Coalition * Environment America * Friends of the Earth US * Greenpeace USA * Labor Network for Sustainability * Louisiana Bucket Brigade * Ocean Conservation Research * Public Citizen * Rainforest Action Network * Save the Manatee Club * South Florida Wildlands Association * SustainUS * US Public Interest Research Group

The Honorable Loretta Lynch U.S. Department of Justice
950 Pennsylvania Avenue, NW
Washington, DC 20530-0001

December 4, 2015

Dear Attorney General Lynch:

On behalf of our millions of members and supporters nationwide, we are concerned that the recently announced settlement between British Petroleum (BP), the Department of Justice, and the five states of the Gulf Coast would allow BP to push the costs of its recklessness onto taxpayers. As a final agreement emerges, BP must not be allowed to capture additional tax breaks from the ongoing tragedy of Deepwater Horizon.

The consent decree proposed on October 5, 2015 indicated that BP would be responsible for an estimated $20.8 billion. However, the proposal only explicitly forbids the tax deduction of $5.5

billion in Clean Water Act fines. Unless it is specifically forbidden in the final agreement, BP is likely to deduct the remaining $15.3 billion as a business expense, thereby reducing its taxes by as much as $5.35 billion. This would be an unacceptable giveaway for a disaster that a federal court found to be the result of "gross negligence."

Too many of our tax dollars have already gone to subsidize BP's disaster. For example, the $32 billion it incurred in cleanup costs netted the company a tax windfall of $10 billion. This need not be the case. When BP settled its share of the criminal liability for Deepwater Horizon, the Department of Justice clarified that no part of the $4 billion fine could be claimed as a tax deduction. As you move towards finalizing the current settlement, we urge you to include language that is similarly precise.

Although the task of ending polluter subsidies in our tax code ultimately falls to Congress, the Department of Justice has wide latitude to pursue a settlement that specifically forbids the deduction of these payments. We encourage you to use it.

Respectfully,

Alaska Inter-Tribal Council

Atchafalaya Basinkeeper

Center for Biological Diversity

Defenders of Wildlife

Energy Action Coalition

Environment America

Friends of the Earth US

Greenpeace USA

Labor Network for Sustainability

Louisiana Bucket Brigade

Ocean Conservation Research

Public Citizen

Rainforest Action Network

Save the Manatee Club

South Florida Wildlands Association

Correspondences - Department of Justice - Consent Decree - PEPC ID: 60777

SustainUS

US Public Interest Research Group

## PEPC Project ID: 60777, DocumentID: 68455
## Correspondence: 177

### Author Information

Keep Private:               No
Name:                       N/A N/A
Organization:
Organization Type:          I - Unaffiliated Individual
Address:
                            Coden, AL 36523
                            USA
E-mail:

### Correspondence Information

Status: Reviewed                Park Correspondence Log:
Date Sent: 12/04/2015           Date Received: 12/04/2015
Number of Signatures: 1         Form Letter: No
Contains Request(s): No         Type: Web Form
Notes:

### Correspondence Text

I Overwhelmingly OPPOSE the current consent decree- -- -- -- --DOJ negotiation appears to be based solely on what the State's provided. Please be informed that the States have systematically excluded restoration for shrimp, crabbing and historically Black communities damages and injuries.

Additionally, input from communities closest to the nexus of injury should be required consideration of DOJ with the submission of an amended decree.

GAO and Court Oversight should be mandatory.

I OPPOSE the Governance Structure, creates barriers to access and very, very, very,very costly!

I fully support an amended consent decree should establish and fund a Gulf of Mexico Regional Citizen Advisory Council.

## PEPC Project ID: 60777, DocumentID: 68455
## Correspondence: 178

### Author Information

| | |
|---|---|
| Keep Private: | No |
| Name: | John F. Young |
| Organization: | Jefferson Parish President's Office |
| Organization Type: | I - Unaffiliated Individual |
| Address: | 1221 Elmwood Park Blvd., Suite 1002 |
| | Jefferson, LA 70123 |
| | Jefferson Parish, LA,LA 70123 |
| | USA |
| E-mail: | mwinter@jeffparish.net |

### Correspondence Information

Status: Reviewed                    Park Correspondence Log:

Date Sent: 12/04/2015               Date Received: 12/04/2015

Number of Signatures: 1             Form Letter: No

Contains Request(s): No             Type: Web Form

Notes:

### Correspondence Text

The tragic explosion of the Deepwater Horizon on April 20, 2010, and the subsequent 87-day long gush of oil and methane gas into the waters of the Gulf of Mexico will be forever remembered as one of the most devastating environmental disasters in history. The damage inflicted upon the residents, wildlife, fisheries, and coastal habitats of the Gulf Coast will take decades to repair, with some areas remaining permanently beyond recovery. The Natural Resources Damage Assessment process and the Federal Water Pollution Control Act are meant to assure the American people that in the event of such a disaster, the parties responsible for the damages will be equally responsible for remediation. Upon review of the proposed Consent Decree referenced above, however, it is clear that the settlement conditions currently under review for this incident will profoundly impede Louisianas ability to recover from this event in a timely manner.

Section IV of the Consent Decree concerns the monetary penalty to be incurred by BP Exploration & Production, Inc., outlining the terms of payment of the proposed $5.5 billion settlement. While we are disappointed that the proposed penalty amount is significantly lower than anticipated, we are even more disappointed at the proposed 15-year installment schedule set forth in the Consent Decree. The damages of the oil spill were felt immediately in not only Jefferson Parish, but across the entire Gulf Coast. Remediation of damages and restoration of habitat should be experienced just as swiftly.

In accordance with the terms provided for in the Resources and Ecosystems Sustainability,

Correspondences - Department of Justice - Consent Decree - PEPC ID: 60777

Tourist Opportunities, and Revived Economies of the Gulf Coast States (RESTORE) Act, Jefferson Parish will receive 11.95309% othe 30% oLouisianas Direct Allocation Share that will be distributed to Louisiana Parishes according to a weighted formula accounting for population, land area, and miles of oiled shoreline. When considering the proposed payment schedule outlined in the Consent Decree, this amounts to a mere $761,700 per year allocated to Jefferson Parish for each of the 15 years of repayment, except for year two, at which time Jefferson Parish will receive only $380,850.

While any amount of funding for coastal restoration efforts is certainly helpful, the current payment framework makes it impossible to construct effective and worthwhile projects in a timely fashion. Most significant restoration efforts come with price tags of over $50 million, while larger programmatic approaches incur costs of hundreds of millions of dollars. Less than $1 million per year being allocated directly to Jefferson Parish will not be a sufficient to carry out effective restoration work necessary to ensure the recovery and sustainability of Jefferson Parish. For this reason, we vehemently oppose the 15-year payment schedule and strongly recommend that it be stricken from the settlement conditions, in favor of a lump sum payment to be paid before the anniversary of the Effective Date of the Consent Decree. In addition to this revision, we recommend that the $7.1 billion payment for Natural Resource Damages be paid in one lump sum, as well, as opposed to the 15-year payment schedule provided for in the Consent Decree. The ability to pool financial resources between local, state, and federal entities will ensure an exponentially higher degree of success for projects undertaken in connection with these penalty payments.

The window of opportunity to ensure that our environment can recover from this devastating event as holistically as possible diminishes with each passing hour. We cannot allow such a disservice to the American people as this proposed 15 year payment schedule to be approved as part of the final settlement in this case. We strongly urge all plaintiffs to refuse to accept the payment schedule provision as proposed, and ensure that a lump sum payment is mandated by the final judgment.

I thank you for the opportunity to comment on this Consent Decree and look forward to working with the Federal Government and our fellow Gulf Coast states to ensure this historic restoration opportunity is responsibly managed and is successful in the timely mitigation of oil spill damages.

Correspondences - Department of Justice - Consent Decree - PEPC ID: 60777

# PEPC Project ID: 60777, DocumentID: 68455
# Correspondence: 179

## Author Information

Keep Private:              No
Name:                      N/A N/A
Organization:
Organization Type:         I - Unaffiliated Individual
Address:
                           Grand Bay, AL 36541
                           USA
E-mail:

## Correspondence Information

Status: Reviewed                    Park Correspondence Log:
Date Sent: 12/04/2015               Date Received: 12/04/2015
Number of Signatures: 1             Form Letter: No
Contains Request(s): No             Type: Web Form
Notes:

## Correspondence Text

NO!
Do not approve this! What a Public "DISSERVICE"
It should be rejected and renegotiated!
It further harms the "Public" and perpetuate the distrust of our government
I reside in coastal Mobile County, Alabama, I feel that my voice as well as my concerns have
been ignored, to the point where I stopped trying to keep up with the so-called Public
Meetings/Hearing. Yet, I refuse to let BP, the State and Now the DOJ official "hold us hostages"
deny us due process "justice and equity" for restoration funding in coastal Mobile County.

The information provided was confusing, complex and required legal interpretations, that I
cannot afford.
Looking at the funding it appears to be a waste of funds for Monitoring ,Adaptive Management,
Admin. Oversight.

I support the legal action that has been taken against the $85M HOTEL (which did not exist in
2010) Early Restoration of Recreational Loss. These funds should redirected to southwest
Mobile County for mitigation and sustainability to restore and enhance "public use and public
access.

If the Trustees had established the Citizens Advisory Committees as proposed by the former
EPA Secretary Lisa Jackson, I believe a better settlement would have been negotiated.

Correspondences - Department of Justice - Consent Decree - PEPC ID: 60777

The initial funds should go to establishing and funding Citizens Advisory Committees, along funding allocations to be used exclusively for the establishment a Gulf of Mexico Regional Citizens Advisory Council.

I support a negotiated settlement, BUT NOT THIS ONE!

**PEPC Project ID: 60777, DocumentID: 68455**
**Correspondence: 181**

## Author Information

| | |
|---|---|
| Keep Private: | No |
| Name: | Jayeesha R. Dutta |
| Organization: | Gulf Future Coalition |
| Organization Type: | I - Unaffiliated Individual |
| Address: | 541 Julia Street, Suite 300 |
| | New Orleans, LA 70130 |
| | New Orleans, LA,LA,LA 70130 |
| | USA |
| E-mail: | jayeesha@gulffuture.org |

## Correspondence Information

Status: Reviewed            Park Correspondence Log:
Date Sent: 12/04/2015       Date Received: 12/04/2015
Number of Signatures: 1     Form Letter: No
Contains Request(s): No     Type: Web Form
Notes:

## Correspondence Text

The Honorable John C. Cruden
Assistant Attorney General for the Environment and Natural Resources Division
U.S. Department of Justice
950 Pennsylvania Avenue NW
Washington, DC 20530-0001

The Honorable Samuel D. Rauch III
Deputy Assistant Administrator for Regulatory Programs
National Marine Fisheries Service
1315 East-West Hwy, Silver Spring, MD 20910

RE: Joint Comments on the BP Consent Decree

Dear Mr. Cruden and Mr. Rauch:

On behalf of the undersigned members of the Gulf Future Coalition, we would like to thank the
Department of Justice for its leadership in securing a settlement with BP and the Gulf states
regarding natural resource damage claims and Clean Water Act civil claims. This settlement
marks an important milestone for Gulf communities, and provides significant opportunities for
comprehensive ecosystem restoration. We appreciate the opportunity to provide formal
comments on the consent decree and the Draft Programmatic Damage Assessment Restoration

Plan/Programmatic Environmental Impact Statement (PDARP/PEIS).

Public Engagement and Restoration

We appreciate the inclusion of important new requirements that BP must fulfill to monitor and publicly report on its efforts to improve the safety of drilling operations in the Gulf of Mexico. These requirements are critical to ensure that our coastal communities, and those that rely on the health of the Gulf for their livelihood, are provided with safeguards from future disasters.

While we appreciate your timely response to our request for an extension of the comment period, we disagree that it is has been in the best interest of the public keep the deadline as planned. Being there are two long and complex documents for interested parties across the Gulf to read, comprehend, and provide comment on, the 60-day comment period is unreasonable. Additionally, for individuals who make their living shrimping in Gulf Coast waters, the chosen comment period was at the height of the season. We are very concerned with the lack of translated materials provided at all meetings, particularly the failure to provide translation services at the Texas meeting in Galveston. These oversights do a tremendous disservice to the citizens of the Gulf Coast, of whom these restoration dollars are meant to benefit. These funds, particularly those related to the Natural Resource Damages are public funds. It is a disservice to the public when our trustees don't provide adequate opportunities for communities who were most impacted by the disaster.

We have significant concerns that the proposed governance structure in the Consent Decree and the PDARP/PEIS will prevent meaningful participation from Gulf Coast communities. In its current form, eight newly created Trustee Implementation Groups (TIGs) creates substantial hurdles for public engagement and participation in the TIG's planning process. As each TIG will develop its own engagement strategies, the public will be forced to follow eight individual NRD processes - each with their own timeline and decision-makers. Such a dispersed system may seriously prevent wide-ranging public engagement among rural, low-income, communities of color, and limited English members of the public. These individuals have an important stake in the outcomes of these proceedings, however, with the additional hurdles of tracking eight different processes with minimal resources, this system may not be able to support their engagement.

This proposed unstructured and uncoordinated process places a enormous burden on the American public. It can reasonably be perceived that this proposed structure is an effort to decrease transparency and public participation. The Trustees must provide a consistent restoration planning process across TIGs that will not require enormous expenditures of time and treasure from the public to participate.
In response, we suggest the consent decree and DRDARP be revised to support a multi-tiered approach to public engagement:
• The Trustee Council should develop strong standard operating procedures (SOPs) requiring each Trustee Implementation Group to develop common approaches, coordinated timelines and resources for engaging the public in developing draft restoration plans, in order to ensure inclusive participation. SOPs should promote steps to reach populations such as low income, minority, rural and limited English proficient communities and commercial and subsistence

Correspondences - Department of Justice - Consent Decree - PEPC ID: 60777

fishers across the coast which face hurdles to accessing public engagement opportunities and are disproportionately impacted by the health of coastal ecosystems. The public should be able to review and provide input on the Trustee Council's SOPs, including procedures for public engagement.

• The Trustee Council should require the Government Accountability Office to audit the restoration activities and monies spent by federal, state, and local municipalities to ensure compliance of expenditures under the Consent Decree.

• The Trustee Council should promote engagement strategies beyond public meetings to support comprehensive dialogue about restoration. In particular, the consent decree and DRDARP should create a public advisory committee to facilitate sustained input from representatives of the public at-large and key stakeholder groups on the planning, evaluation, fund allocation, and conduct of restoration activities. Such a committee, and relevant sub-committees could ensure key interests across the Gulf Coast states including commercial and subsistence fishers, conservationists, recreational users, socially vulnerable and native stakeholders relevant to the various TIGs are informed, involved and can help educate broader constituencies about the decision making process going forward.

• Terms should be added to the Consent Decree to promote the use of local workers and firms within NRD restoration. As cited in the DRDARP, local hiring is one of the top concerns of local residents during previous phases of public hearings on NRD. Terms should include a requirement to post new job opportunities created by contractors, or relevant subcontractors, as a part of NRD funded restoration work with relevant state and local workforce development agencies nearest the site of such work if state law does not already require such postings. Additionally, contractors should be required to consider workers referred to contractors and subcontractors by these local workforce agencies. Such terms would align with the language under the RESTORE Act, recent state laws in Florida, Louisiana and Mississippi and examples in federal contracting.
• The Trustee Council and TIGs should ensure adequate funding for public engagement. In particular, the Council should consider allocating a portion of the resources currently committed for administration under the regional restoration TIG to promoting public engagement across TIGs.
There is substantial concern that the proposed governance structure segments the responsibility of achieving ecosystem restoration that threatens the Trustees' ability to coordinate and reduces accountability. This proposal places an unjust burden on the public by increasing the time and effort required to meaningfully engage and participate in restoration planning and implementation.

Open Ocean Allocation

We are pleased that $8.1 billion has been allocated toward NRD, and that $1.24 billion of the NRD allocation is dedicated to restoration and enhancement of the open ocean. The BP oil disaster began off the shore of Louisiana, 5,000 feet below sea level. The sea life that depends on our the health of our oceans, such as sea turtles, marine mammals, finfish, and sea birds, were all exposed to massive amounts of oil and dispersants. The oil disaster began in our coastal waters,

Correspondences - Department of Justice - Consent Decree - PEPC ID: 60777

and the open ocean is in dire need of comprehensive restoration. Emerging information regarding the impacts to our ecosystem signifies troubling outcomes for our marine environment, which emphasizes the need for meaningful restoration in the open ocean. Inclusion of the open ocean allocation will allow for restoration of the Gulf Coast's premier fisheries and ocean habitats, both of which are essential to the health of the economy in the region.

However, we are concerned that the proposed governance structure for the administration of Natural Resource Damage (NRD) funds and implementation of restoration under the Draft Programmatic Damage Assessment Restoration Plan/Programmatic Environmental Impact Statement (PDARP/PEIS) will be extremely costly and make it difficult to plan and implement restoration activities to achieve the Gulf-wide and ecosystem-scale goals set by the Trustees.

While we appreciate the dedicated funding for blue water restoration, we are disappointed with the broad definition and terms of funding for the open ocean allocation. The consent decree defines Open Ocean as "restoration activities for restoration primarily in the ocean and Federal Trustee administrative and preliminary planning activities across Restoration Areas." By this definition, projects and associated costs that do not address ocean resources will be able to be drawn from this account. This is proposal is unjustifiable considering the plethora of damages specified in the PDARP/PEIS for ocean resources and habitats.

Additionally, four of the early restoration projects that address lost recreational use have been reclassified as open ocean projects. These projects include nearly $7 million for roadway enhancements (bike and pedestrian lanes) at Davis Bayou in Mississippi, $545,000 for trail enhancement at Bon Secour National Wildlife Refuge in Alabama, more than $10 million for a "beach enhancement project which involves removing fragments of asphalt and road-based material that are scattered widely over the Fort Pickens, Santa Rosa, and Perdido Key areas of Gulf Islands National Seashore, in Florida," and more than $4 million for the "purchase of up to three pedestrian visitor ferries for use between the City of Pensacola, Pensacola Beach, and the Fort Pickens area of Gulf Islands National Seashore in Florida."

As we examine and evaluate the types of projects conducted in previous phases of restoration, we are alarmed that these four projects have been reclassified as open ocean projects. None of the above listed projects occur in the open ocean and do not fit the definition provided by consent decree. This sets a dangerous precedent for future funding of projects in any component, where Trustees are able to pull funds from restoration accounts that do not benefit the stated resources. Additionally, of the Of the $832 million allocated for early restoration, only $20 million has been allocated to restoring marine resources injured in this oil disaster. Classifying recreational use projects as one that address injuries to the open ocean reduces the amount of funding available to restore and improve the our marine environment. The offshore ecosystem is where the disaster occurred and where resources to address significant injuries must still be directed. Funding these projects may be suitable under different allocations; however, they are inappropriate for the open ocean allocation. We recommend that the consent decree and its related documents consider an alternative, applicable allocation for these projects, either from their respective implementation state or from the region-wide allocations.
The NRD Final Allocation table provides additional details on where the NRD money will be spent. "Administrative Oversight and Comprehensive Planning" accounts for $150 million of the

open ocean funding. It is unclear if the $150 million amounts to the total allocation for "Federal Trustee administrative and preliminary planning activities across Restoration Areas," as explained in the open ocean definition. This clarification is crucial as it could indicate additional monies are removed offshore restoration. Is the $150 million the final allocation total for Federal Trustee planning and oversight? Could additional funding from other portions of the open ocean allocation also be used for Federal Trustee planning and oversight? Should federal administrative and planning costs exceed $150 million, where will the funding be derived from? With the costly administration expenditures of the proposed governance structure, how will the Trustees ensure there will be adequate monetary support to develop and implement a comprehensive suite of restoration projects for the open ocean resources?

Due to the significant concerns outlined above, we are frustrated and troubled that funding for open ocean restoration will be spent on overhead costs for other restoration components and on reclassified, previously approved, land-based recreational projects. We implore the Department of Justice to revise the definition of Open Ocean in the consent decree to guarantee the proper use of the funds in that allocation. Further, the consent decree must make explicit that administrative costs should absolutely not exceed the $150 million allocated, and should only pertain to costs related to staffing and travel. The open ocean allocation must not be used for Federal Trustee planning costs across restoration areas.

Suggested definition of "Open Ocean":
"Open Ocean" consists of restoration activities occurring in the ocean or activities that create, enhance, or improve marine resource management, scientific research, or monitoring of natural resources in the ocean and Federal Trustee administrative activities, capped at $150 million, across Restoration Areas.


Thank you for your consideration of these requests; please let us know if we can provide additional information or assistance. For additional information, please contact Jordan Macha at the Gulf Restoration Network (jordan@healthygulf.org).

Sincerely,

The undersigned organizations from the Gulf Future Coalition:

Action Communication and Education Reform Inc., Duck Hill, MS
Alliance Institute, New Orleans, LA
Earth Ethics, Pensacola, FL
Galveston Baykeeper, Galveston, TX
Gulf Islands Conservancy Inc., Biloxi, MS
Gulf Restoration Network, New Orleans, LA
Louisiana Environmental Action Network, Baton Rouge, LA
Lower Mississippi Riverkeeper, Baton Rouge, LA
Mind Power Collective, New Orleans, LA
Mobile Bay Sierra Club, Mobile, AL
Mondo Bizarro, New Orleans, LA

Correspondences - Department of Justice - Consent Decree - PEPC ID: 60777

Oasis Earth, Anchorage, AK
On Wings of Care, New Orleans, LA
Operation Homecare, Mobile, AL
Pelican Coast Conservancy, Mobile, AL
Public Lab, New Orleans, LA
Synergy Strategic Communications, Mobile, AL
Vanishing Earth, New Orleans, LA

REFERENCES:

[1] The Gulf Future Coalition is a diverse gulf-wide network of conservation, community, human rights, and social justice organizations working together to ensure the Gulf of Mexico environment and communities are made whole from the BP Deepwater Horizon oil disaster.

[2] TBD

[3] "Resources and Ecosystem Sustainability, Tourist Opportunities, And Revived Economies of the Gulf Coast States Act of 2011". Senate Report 112-100. http://www.gpo.gov/fdsys/pkg/CRPT-112srpt100/html/CRPT-112srpt100.htm; "Mississippi Jobs First Act of 2012", Mississippi Code 800.00-800.04 http://www.sos.ms.gov/ACProposed/00019129b.pdf; "Louisiana First Hiring Act", Chapter 27 of Subtitle III of Title 39 of the Louisiana Revised Statutes of 1950, R.S. 39:2211 through 2214 http://www.legis.la.gov/legis/ViewDocument.aspx?d=877313; "Job Orders- Department of Economic Opportunity" Florida Department of Economic Opportunity http://www.floridajobs.org/PDG/TrainingPresentations/wp_basics/Job_Orders_Part1.ppt

[4] Consent Decree, Appendix 2 at §2.1.1.

[5] Bike & Ped Lane GUIS MS ($6,996,751), Bon Secour NWR Trail, AL ($545,110), Beach Enhancement G.I. National Seashore ($10,836,055), Gulf Islands National Seashore Ferry Project ($4,020,000). See Appendix 2 Table 2 of Consent Decree at: http://www.justice.gov/enrd/file/780686/download

[6] Phase III Early Restoration Fact Sheet, Gulf Islands National Seashore Beach Enhancement Project, available at http://www.gulfspillrestoration.noaa.gov/wp-content/uploads/BeachEnhancementFactsheet4.pdf.

[7] Phase III Early Restoration Fact Sheet, Gulf Islands National Seashore Ferry Project, available at http://www.gulfspillrestoration.noaa.gov/wp-content/uploads/FerryFactsheet4.pdf.

[8] "Restoration activities for resources primarily in the ocean and Federal Trustee administrative and preliminary planning activities across Restoration Areas." Consent Decree, Appendix 2 at §2.1.1.

[9] In September 2015, Trustees approved Phase IV of early restoration bringing the total approved to be spent to $832 million from the $1 billion BP pledged for early restoration. See

http://www.gulfspillrestoration.noaa.gov/2015/09/latest-round-of-early-restoration-projects-approved/.

[10] Early restoration included a bycatch-reduction project estimated to cost $20 million. Consent Decree, Appendix 2, Table 2.

[11] Consent Decree at Appendix 2.1; Table 5.10-1 Draft PDARP/PEIS at page 5-103.

[12] Consent Decree, Appendix 2: Agreement Among the United States and the Gulf States Relating to Natural Resource Restoration; Draft PDARP/PEIS at page 7-4.

**PEPC Project ID: 60777, DocumentID: 68455**
**Correspondence: 182**

## Author Information

| | |
|---|---|
| Keep Private: | No |
| Name: | Lisa Tennyson |
| Organization: | Monroe County Board of County Commissioners |
| Organization Type: | I - Unaffiliated Individual |
| Address: | 1100 Simonton Street |
| | Key West, Florida 33040 |
| | Key West, FL,FL 33040 |
| | USA |
| E-mail: | tennyson-lisa@monroecounty-fl.gov |

## Correspondence Information

Status: Reviewed                    Park Correspondence Log:

Date Sent: 12/04/2015               Date Received: 12/04/2015

Number of Signatures: 1             Form Letter: No

Contains Request(s): No             Type: Web Form

Notes:

## Correspondence Text

December 4, 2015

Via web: http://www.justice.gov/enrd/deepwater-horizon
http://parkplanning.nps.gov/doj

U.S. Department of Justice
P.O. Box 7611
Washington, D.C. 20044-7611

Re: Monroe County, FL Comments on U.S. v. BP Exploration and Production et al, Civil No. 10-4536 (E.D. La.) (centralized in MDL 2179: In Re: Oil Spill by the Oil Rig Deepwater Horizon in the Gulf of Mexico, April 20, 2012), D.J. Ref. 90-5-1-1-10026

Dear Sir or Madam:

Please accept the following comments by Monroe County, Florida regarding the Consent Decree for consideration consistent with 80. The Consent Decree represents the settlement of claims for liability associated with the Deepwater Horizon Incident including, but not limited to, Section 311(b) of the Clean Water Act, 33 U.S.C. 1321(b), and a declaration of liability for natural resource damages under the Oil Pollution Act, 33 U.S.C. 2702, against BP Exploration and Production Company, Inc. (BP).

Correspondences - Department of Justice - Consent Decree - PEPC ID: 60777

Proposed in the Consent Decree, BP will pay:
(1) $5.5 billion civil penalties under the Clean Water Act;
(2) $8.1 billion for natural resource damages under the Oil Pollution Act (including the $1 billion that BP had previously pledged under a prior agreement), plus up to $700 million additional for unknown conditions and adaptive management;
(3) $350 million for State and federal natural resource damage assessment costs; and
(4) $250 million for other federal costs, including removal costs under the Oil Pollution Act, royalties, and a False Claims Act penalty.

Monroe County, FL is one of the non-disproportionately impacted counties in Florida affected by the Deepwater Horizon Incident, and as such, will be the recipient of certain settlement funds. The focus of our comments is on the practical implications with receiving, managing and administering these funds. We are seeking flexibility with the distribution of funds that will match amounts and timeframes that meet project implementation needs.

Civil Penalties

Section R. of the Consent Decree identified 3.19 million barrels of oil discharged into the Gulf of Mexico and Section IV.10 states Civil Penalties will include $5.5 Billion or a penalty of $1,724/barrel. Those Penalties are paid according to a schedule (Table 1) on an annual basis of $379,310,345 with the exception of payments of $189,655,172 in 2018 and $379,310,343 in year 2031. Essentially, this provides a level payment schedule for Civil Penalties by BP.

The RESTORE Act and Funds Distribution

The Resources and Ecosystems Sustainability, Tourist Opportunities, and Revived Economies of the Gulf Coast States Act of 2012 (RESTORE Act or Act) (Public Law 112-141 (July 6, 2012), codified at 33 U.S.C. 1321(t)), is the vehicle that distributes 80% ol administrative and civil penalties paid by responsible parties pursuant to a court order, negotiated settlement, or other instrument in accordance with section 311 of the Federal Water Pollution Control Act (33 U.S.C. 1321). The Act outlines the funds distribution process, supplemented by Regulations by the U.S. Department of Treasury (31 C.F.R. Part 34) and the Gulf Coast Ecosystem Restoration Council (40 C.F.R. Part 1800). Thirty-five percent of those funds are allocated to the Direct Component (equally across all five (5) states) with further formula allocations within the State of Florida for the 23 counties receiving funds pursuant to that Component. Note that while Monroe County may receive other funds related to environmental damages or otherwise, it is only the Direct Component that Monroe County will be directly responsible for administering and managing. As part of that process, Monroe County will receive Direct Component funds of approximately $7,550,270. If the various components of funds (and their distribution formulas) are taken equally and annually, this could result in Monroe County having to design and maintain an expenditure program for fifteen (15) years at $424,356.29 per year (not including the $1,184,925.53 in Transocean settlement funds available as of October 1, 2015).

The Challenges of a Level and Equal Payout

While Table 1 in the Consent Decree seems to indicate a level and equal payment schedule by

Correspondences - Department of Justice - Consent Decree - PEPC ID: 60777

BP, nothing limits the distribution from the Trust Fund to that same schedule. The RESTORE Act states:
Amounts in the Trust Fund, including interest earned on advances to the Trust Fund and proceeds from investment under subsection (d), shall-
(1) be available for expenditure, without further appropriation, solely for the purpose and eligible activities of this subtitle and the amendments made by this subtitle; and
(2) remain available until expended, without fiscal year limitation. Pub. L. 112-141 (H.R. 4348), 1602(c) (2012).

Given that BP settlement funds will be managed as a Federal granting program, this adds a specific administrative and management effort to the funds distribution process. Additionally, larger scale projects may not fit neatly into a level and equal payout distribution system. As the funds distribution process occurs, it is clear that early years will be focused on planning and feasibility of projects. But after that initial ramping up period concludes, local governments will be ready to implement projects which may in some years be larger scale or require phasing.

The challenge will be to maintain a flow of funds that matches project needs in terms of scale and complexity. Limiting project expenditures to $424,356.29 per year could 1) prohibit expenditure for projects in years when more than that amount is required and 2) artificially extend a $7.5 million county restoration initiative longer than necessary, increasing administrative cost. Examples of these unintended consequences include:
" A group of foundational projects that may need to be implemented before others can be implemented may easily require more than $424,356.29 per year, yet without them, larger projects cannot move forward.
" From an efficiency standpoint, construction costs could be reduced if projects could be packaged or phased when they relate to one another (again exceeding the need of $424,356.29 per year).
" Such a level distribution requirement may force project planning that results in smaller projects sacrificing the restoration benefits of larger scale projects. In many cases it is likely that earlier implementation of environmental and economic restoration projects will accelerate and compound the benefits over time and reduce administration costs, thus making more funds available to restore our damaged resources.
How the Challenges Can be Addressed

To address these funding stream needs, this flexibility could take multiple forms, including but not limited to:
1. Establishing program and/or project thresholds that would provide for a shorter duration in funds distribution based on a set of standards. Example: If a project can be implemented over a shorter timeframe, but it requires higher funding in early years, then perhaps a standard can be established that allows funds to be released for that project at the level needed over a two (2) or three (3) year timeframe.
2. A local government that does not receive a high amount of settlement funds should not be required to keep a program in place for fifteen (15) years if they can spend their funds more efficiently over a shorter timeframe. Example: For total payouts under a certain dollar amount, the distribution is over five (5) years instead of fifteen (15).
3. Local governments could utilize alternatives to allow for needed flexibility which may include

Correspondences - Department of Justice - Consent Decree - PEPC ID: 60777

a mechanism to borrow against future settlement funds that will be received by the local government for a few upfront payments tracking payment need. Examples: Use of Grant Anticipation Revenue Vehicle (GARVEE)-like bonds , Grant Anticipation Notes (GANs) , and other conduit sources of financing or pooled programs. Specific legal authority will likely be needed to expend settlement funds for debt services under some of these types of mechanisms.

(GARVEE bonds are used to fund major capital projects with debt backed by future Federal-aid disbursements in highway projects (Title 23 grants). Section 311 of the National Highway System Designation Act of 1995 significantly expanded the eligibility of bond and other debt instrument financing costs for Federal-aid reimbursement.

GANs are revenue bonds backed by anticipated grant receipts. They are most frequently used by transit agencies to borrow against future Federal formula or grant funding (Federal Transit Administration Title 49 grants). GANs have also been used (less frequently) in hospital and school construction financing. Examples of their use:

" New Jersey Transit - First state to issue bonds backed solely or primarily by anticipated Federal formula funding in 1997. Since 1997, over $3.2 billion in GANs have been issued with terms ranging from 3-15 years and principals ranging from $18-450 million.

" Fort Myers, FL - This municipality, through Chapter 22, Article II, Division 7, 22-161 of its Code of Ordinances, provides express authorization of the use of GANs for the purpose of meeting expenses of the City (up to $10 million aggregated) in exchange for a revolving loan.)

There appear to be no limitations in the RESTORE Act or the Interim Treasury or Gulf Coast Ecosystem Restoration Council regulations preventing use of these tools. Additionally, there are only limited references to use of bonds (or debt financing) in the Uniform Guidance Administrative Requirements, Cost Principles, and Audit Requirements for Federal Awards (2 C.F.R. Part 200) which does not reveal any express prohibition on the use of bonding against for future grant revenues. This is consistent with the fact that such practices are already being used in other federal granting programs (Title 23 and 49), programs which would also be subject to the Uniform Guidance. Note though that in both instances, express federal authorization was provided to permit fund expenditures for debt services. Though not prohibited in the Uniform Guidance, such federal authorization will likely be required to expend funds for debt services under the RESTORE Act.

An example where some of this flexibility already exists within the Consent Decree can be found in Appendix 2 which establishes the Agreement Among the United States and the Gulf States Relating to Natural Resource Restoration. Section 2.3.2 in this Agreement provides a basis for allowing this type of flexibility. It states, [t]he Trustee Implementation Group for each Restoration Area may agree on a different allocation of funds to the Restoration Types, consistent with fully funding all of the Restoration Type allocations over the life of the payment schedule. Basically, this allows for discretion in how money will flow within the various Restoration Types as long as the total amounts in each given Type are not modified overall. Additionally, Section 3.6 contemplates that money can be shifted between Restoration Goals with consensus of the Trustee Implementation Group and Court approval. The Trustee Council is also required to develop Standard Operating Procedures.

Finally, several places in the Consent Decree provide the opportunity for further direction by the

Court to encourage or require this type of flexibility:
" The Court could simply amend Table 1 to account for the real needs of project implementation which are likely not to be static over time or require less than a fifteen (15) year payout.
" Section VIII, 29 allows BP (at its sole option) to pay any of the Civil Penalties in Section IV before they are due. While unlikely, the Consent Decree contemplates that advancing these payments is permissible upon BPs initiation.
" Section XIV could be amended to add language requiring Treasury and the Gulf Coast Ecosystem Restoration Council to develop guidance that allows for the type of flexibility sought in these comments with Standard Operating Procedures (like those required for the Trustee Council) or amending current guidance to incorporate these concepts. This guidance or these procedures should address how interest on financing can be treated in any of these repayment mechanisms, as well address any federal income tax treatment on interest earned on debt.

Monroe County respectfully requests that the Consent Decree be modified to provide specific legal authority to authorize the flexibility requested in these comments. We feel that including these types of concepts in the Consent Decree is important because there may be more specific legal authority needed to implement them. These issues are important to consider because addressing them means a more efficient program that does not needlessly waste precious settlement dollars on administration and allows for levels of funding commensurate with the need to cost-effectively implement these important projects. The ecosystems and the economy of the Gulf have been suffering for five (5) years and it is our sincere hope that we can move quickly to implement projects so that our environment and economies can recover from this tragedy. We appreciate your consideration of these issues.

Respectfully,

Lisa Tennyson
Director of Legislative Affairs
Monroe County, Florida,
Board of County Commissioners

Correspondences - Department of Justice - Consent Decree - PEPC ID: 60777

# PEPC Project ID: 60777, DocumentID: 68455
# Correspondence: 183

## Author Information

| | |
|---|---|
| Keep Private: | No |
| Name: | Marc H. Morial |
| Organization: | National Urban League |
| Organization Type: | I - Unaffiliated Individual |
| Address: | 120 Wall Street |
| | New York , NY,NY 10005 |
| | USA |
| E-mail: | kwilliams@nul.org |

## Correspondence Information

Status: Reviewed                    Park Correspondence Log:

Date Sent: 12/04/2015               Date Received: 12/04/2015

Number of Signatures: 1             Form Letter: No

Contains Request(s): No             Type: Web Form

Notes:

## Correspondence Text

December 4, 2015

Loretta Lynch
Attorney General
U.S. Department of Justice
950 Pennsylvania Ave.
Washington, D.C. 20530

Re: Consent Decree in U.S. v. BP Exploration and Production, et al, Civil No. 10-4536 (E.D. La.) (centralized in MDL 2179: In Re: Oil Spill by the Oil Rig "Deepwater Horizon" in the Gulf of Mexico, on April 20, 2010.), and

Re: U.S. v. BP Exploration and Production et al, Civil No. 10-4536 (E.D. La.) (centralized in MDL 2179: In Re: Oil Spill by the Oil Rig "Deepwater Horizon" in the Gulf of Mexico, April 20, 2012), D.J. Ref. 90-5-1-1-10026

Dear Attorney General Lynch:

Thank you for affording the National Urban League the opportunity to provide public comments to the Department of Justice's proposed consent decree with BP Exploration and Production, Inc. (BP), related to the Deepwater Horizon Macondo Well oil spill (BP oil spill). We owe it to the people of the Gulf, especially the residents, workers, and small business owners in the most

vulnerable coastal communities to heal both the environmental and economic wounds of this tragedy.

National Urban League

The National Urban League's mission is to enable communities of color to secure economic self-reliance, parity, power and civil rights. We have 93 affiliates in 35 states and the District of Columbia who provide workforce development, health services, education training, and housing counseling to over 2 million people annually. We also have 12 Entrepreneurship Centers, at select affiliates, that focus on the 3 Cs of entrepreneurism: capital, counseling, and contracting. Last year, we assisted over 12,000 small business owners and helped to save or create over 1,200 jobs, nationwide.

Introduction

In our view, it is important that the civil penalties resulting from the BP oil spill, and the ecological recovery that follows, are equitable, and focus on: (1) investments in local minority banks; (2) government contracting opportunities with local small businesses of color; and (3) training and hiring of local workers from underserved communities. We must not miss the opportunity to leverage the investments garnered from the settlement to create local jobs, career pathways, and the ability to build wealth, especially for those struggling to bounce back from the disaster, particularly communities of color who were disproportionately impacted. To this end, economic inclusion must play a significant role in the settlement agreement.

Background

As the former Mayor of the City of New Orleans, I was devastated by the destruction wrought by the BP oil spill. Five years after Hurricanes Katrina and Rita decimated the Gulf Coast, the BP oil spill added insult to injury as the region had to endure yet another setback and longtime recovery. According to the Urban League of Greater New Orleans' (ULGNO) State of Black America, 10 Years Post-Katrina report, misfortunes weigh heavy on the families in the region, especially New Orleanians who have traditionally lagged behind others in a number of economic indicators, including:

• While the African American unemployment rate in New Orleans is approximately 13 percent, more than double the unemployment rate of Whites in the City, the unemployment rate for African American men in New Orleans is over 50 percent;

• The median income for African American families in New Orleans is approximately $25,000, compared to White Americans whose median income is $60,000;

• Approximately, 44 percent of the African American families in New Orleans make less than $20,900 annually;

• While the share of white families who earn more than $105,000 per year has grown by 50

Correspondences - Department of Justice - Consent Decree - PEPC ID: 60777

percent since 2005, the figure for African-American families has remained unchanged;

• At approximately 47 percent, New Orleans' homeownership rate is drastically lower than the State's homeownership rate, which is approximately 67 percent;

• Nearly 30 percent of the small businesses in New Orleans are operated by African Americans, but less than 5 percent have paid employees.

Discussion

Various policy goals should and must be satisfied with the settlement funds. To address the disparities listed above, every new initiative and project that comes to fruition from the settlement funds should have an economic inclusion component to it. Investments in local minority banks, contracting opportunities with local businesses of color, and training and hiring initiatives for local workers from underserved communities should be codified to ensure all Gulf Coast residents have the opportunity to benefit from the settlement funding, not only large corporations or out-of-town prospectors. To ensure an equitable recovery, the distribution of the settlement funds should adhere to basic minimum standards, such as:

1) Require a certain percentage of the settlement funds be deposited at local minority banks;

2) Require a certain percentage of the funds be set aside for local minority and disadvantaged small businesses, or those located in Historically Underutilized Business Zones;

3) Require a certain percentage of the settlement funds be provided to local workforce development and training providers located in communities of color.

We encourage the Department of Justice to require the Gulf States who receive the settlement funds to establish, and / or adhere to the statutes and regulations, designed to ensure all eligible parties have opportunities to partner with their respective State governments. For example, Louisiana's Hudson Initiative is a certification program that provides small business owners greater access to procurement opportunities with the Louisiana State government. Since a large portion of the settlement funds will go directly to the Gulf States, State governments should be required to follow the dictates of affirmative programs, such as the Hudson Initiative, to ensure communities of color have the same opportunities as other demographic groups.

Every effort should be made to ensure economic inclusion is a part of the settlement agreement. The Department of Justice has the opportunity and ability to create new incentives to jump start a local restoration economy that can be a win-win for everyone in the Gulf.

Urban League of Greater New Orleans and the Houston Area Urban League

We have several local affiliates in the Gulf Coast region. Here, I would like to highlight our

Correspondences - Department of Justice - Consent Decree - PEPC ID: 60777

Urban League of Greater New Orleans (ULGNO) and Houston Area Urban League (HAUL). Both affiliates are fixtures in the community with unparalleled workforce development programs and Entrepreneurship Centers to help underemployed and unemployed people of color find living-wage jobs, participate in workforce training initiatives, and grow their businesses to scale by accessing business capital and government contracts.

Our New Orleans and Houston affiliates are playing pivotal roles preparing and training workers for the influx of coastal recovery jobs that will be created from the settlement funds. ULGNO's Coastal Restoration Empowerment Program provides River Parish residents soft skills training and introductory courses in welding to prepare them for hard skills in coastal restoration. HAUL's National Center for Construction Education and Research (NCCER) Construction Training program provides training for a number of construction trades that help with coastal restoration. We are helping to ensure the Gulf Coast has a diverse pool of coastal recovery workers prepared, trained, and ready to be deployed.

We encourage the development of partnerships with our local Urban League affiliates. Together we can help secure the economic future of the region.

Conclusion

We applaud the Department of Justice for securing the settlement agreement to help in the ecological and economic recovery of the Gulf Coast after the BP oil spill. In our view, economic inclusion must be at the forefront of the agreement. Given the large influx of coastal recovery dollars resulting from the settlement funds, affirmative efforts should be made to ensure investments are made in local minority banks, contracting opportunities are provided to local small businesses of color, and training and hiring initiatives are afforded to local workers from underserved communities.

The National Urban League, along with its local Gulf Coast affiliates will continue to lead the charge and help in the efforts to rebuild the coast and its local economies. Please consider us a partner and resource throughout the process.

Sincerely,

Marc Morial
President and CEO
National Urban League

# PEPC Project ID: 60777, DocumentID: 68455
# Correspondence: 184

## Author Information

| | |
|---|---|
| Keep Private: | No |
| Name: | Terese P. Collins |
| Organization: | Gulf Islands Conservancy, Inc. |
| Organization Type: | I - Unaffiliated Individual |
| Address: | PO Box 676 |
| | Biloxi, MS,MS 39533 |
| | USA |
| E-mail: | teresec@bellsouth.net |

## Correspondence Information

Status: Reviewed                    Park Correspondence Log:

Date Sent: 12/04/2015               Date Received: 12/04/2015

Number of Signatures: 1             Form Letter: No

Contains Request(s): No             Type: Web Form

Notes:

## Correspondence Text

December 4, 2015

Honorable John C. Cruden
Assistant Attorney General for the Environment and Natural Resources Division
U.S. Department of Justice
950 Pennsylvania Avenue, NW
Washington, DC 20530-0001

The Honorable Samuel D. Rauch III
Deputy Assistant Administrator for Regulatory Programs
National Marine Fisheries Service
1315 East-West Hwy, Silver Spring, MD 20910

RE: Comments on U.S. v. BP Exploration and Production et al, Civil No. 10-4536 (E.D. La.)
(centralized in MDL 2179: In Re: Oil Spill by the Oil Rig "Deepwater Horizon" in the Gulf of
Mexico, April 20, 2012), D.J. Ref. 90-5-1-1-10026. Public Comments on the BP Oil Spill
Consent Decree

Dear Mr. Cruden and Mr. Rauch,

Gulf Islands Conservancy, Inc. (GIC) thanks you for the opportunity to comment on this issue. We request that the group and individual comment letters of the following groups be made part of our official comment record:

National Audubon Society
Environmental Defense Fund
National Wildlife Federation
Ocean Conservancy
The Nature Conservancy
Environmental Law Institute
Gulf Future Coalition
Gulf Restoration Network

Summary of Recommendations
• Standard operating procedures (SOPs) developed by the Trustee Council should be made available for public review and comment and should be adopted and implemented across TIGs to ensure consistency;
• The Trustee Council should formalize coordination between TIGs and with other Gulf of Mexico
Restoration Programs, including through biennial program reviews;
• To the extent possible meetings of the TIGs should be open to the public;
• The Trustee Council should regularly communicate outcomes of restoration activities to the public;
• TIGs should develop and make public financial plans that detail intended usage of administrative
and planning allocation over the lifetime of the program;
• Explicitly limit the open ocean funding dedicated to Federal administrative costs to $150 million;
• The Trustee Council should ensure the adoption of monitoring standards and protocols across all TIGs;
• Ensure decisions for making claims on the allocation for unknown conditions and adaptive management are based on monitoring data that documents and characterizes currently unknown conditions; and
• The consent decree should provide more information about how Trustees will make determinations that conditions have presented a rationale for accessing the unknown conditions reserve account.

Thank you.

Regards,

Terese P. Collins, Board Member
Gulf Islands Conservancy, Inc.
PO Box 676

Correspondences - Department of Justice - Consent Decree - PEPC ID: 60777

Biloxi MS 39533

# PEPC Project ID: 60777, DocumentID: 68455
# Correspondence: 185

## Author Information

| | |
|---|---|
| Keep Private: | No |
| Name: | Jordan Macha |
| Organization: | Gulf Restoration Network |
| Organization Type: | I - Unaffiliated Individual |
| Address: | 330 Carondelet |
| | 3rd Floor |
| | New Orleans, LA,LA,LA 70130 |
| | USA |
| E-mail: | jordan@healthygulf.org |

## Correspondence Information

Status: Reviewed                    Park Correspondence Log:

Date Sent: 12/04/2015               Date Received: 12/04/2015

Number of Signatures: 1             Form Letter: No

Contains Request(s): No             Type: Web Form

Notes:

## Correspondence Text

4 December 2015

Honorable John C. Cruden
Assistant Attorney General for the Environment and Natural Resources Division
U.S. Department of Justice
950 Pennsylvania Avenue, NW
Washington, DC 20530-0001

RE: Comments on U.S. v. BP Exploration and Production et al, Civil No. 10-4536 (E.D. La.)
(Centralized in MDL 2179: In Re: Oil Spill by the Oil Rig "Deepwater Horizon" in the Gulf of
Mexico, April 20, 2012), D.J. Ref. 90-5-1-1-10026.

Dear Mr. Cruden:

On behalf of the undersigned organizations, we would like to thank the Department of Justice for
its leadership in securing a settlement with BP and the Gulf states regarding Natural Resource
Damage (NRD) claims and Clean Water Act civil claims. This settlement marks an important
milestone for Gulf communities, and provides significant opportunities for comprehensive
ecosystem restoration. We appreciate the opportunity to provide formal comments on the consent
decree.

As organizations that care deeply for the health of the oceans, we appreciate the inclusion of important new requirements that BP must fulfill to monitor and publicly report on its efforts to improve the safety of drilling operations in the Gulf of Mexico. However, we have concerns that the proposed governance structure for the administration of NRD funds and implementation of restoration under the Draft Programmatic Damage Assessment Restoration Plan/Programmatic Environmental Impact Statement (PDARP/PEIS) will be extremely costly and make it difficult to plan and implement restoration activities to achieve the Gulf-wide and ecosystem-scale goals set by the Trustees.

We are pleased that $8.1 billion has been allocated toward NRD, and that $1.24 billion of the NRD allocation is dedicated to restoration and enhancement of the open ocean. The BP oil disaster began off the shore of Louisiana, 5,000 feet below sea level. The sea life that depends on the health of our oceans, such as sea turtles, marine mammals, finfish, and sea birds, were all exposed to massive amounts of oil and dispersants. The oil disaster began in our marine waters, and the open ocean is in dire need of comprehensive restoration. Emerging information regarding the impacts to our Gulf of Mexico ecosystem points to troubling outcomes for our marine environment, which underscores need for meaningful restoration in the open ocean. Inclusion of the open ocean allocation will allow for restoration of the Gulf Coast's premier fisheries and ocean habitats, both of which are essential to the health of the economy in the region.

While we appreciate the dedicated funding for blue water restoration, we are disappointed and very concerned with the broad definition and terms of funding for the open ocean allocation. The consent decree defines open ocean as "restoration activities for resources primarily in the ocean and Federal Trustee administrative and preliminary planning activities across Restoration Areas."(1) This language raises two principal concerns. First is the potential that projects that do not address open ocean resources could be drawn from this account. This proposal is unjustifiable considering the extensive damages to ocean resources and habitats outlined in the PDARP/PEIS.

This concern is underscored by the fact that four of the early restoration projects that have nothing to do with restoring ocean resources have been reclassified as open ocean projects.(2) These projects include nearly $7 million for roadway enhancements (bike and pedestrian lanes) at Davis Bayou in Mississippi, $545,000 for trail enhancement at Bon Secour National Wildlife Refuge in Alabama, more than $10 million for a "beach enhancement project which involves removing fragments of asphalt and road-based material that are scattered widely over the Fort Pickens, Santa Rosa, and Perdido Key areas of Gulf Islands National Seashore, in Florida,"(3) and more than $4 million for the "purchase of up to three pedestrian visitor ferries for use between the City of Pensacola, Pensacola Beach, and the Fort Pickens area of Gulf Islands National Seashore in Florida."(4)

As we examine and evaluate the types of projects conducted in previous phases of restoration, we are alarmed that these four projects have been reclassified as open ocean projects. None of the above listed projects occurs in the open ocean. This sets a dangerous precedent for future funding of projects from this account. Classifying recreational use projects as projects that address injuries to the open ocean also reduces the amount of funding available to restore and improve the marine environment. Already, only $20 million of the $832 million(5) allocated for

Correspondences - Department of Justice - Consent Decree - PEPC ID: 60777

early restoration has been allocated to restoring marine resources injured in this oil disaster.(6) The offshore ecosystem is where the disaster occurred and where resources to address significant injuries are sorely needed. Funding these four projects may be suitable under different allocations; however, they are inappropriate for the open ocean allocation. We recommend that the consent decree and its related documents consider an alternative, applicable allocation for these projects, either from their respective implementation state or from the region-wide allocations.

The second concern relates to money from this category going to fund all of the Federal Trustees administrative and planning functions across all restoration areas. The NRD Final Allocation table provides additional details on where the NRD money will be spent. "Administrative Oversight and Comprehensive Planning" accounts for $150 million of the open ocean funding.(7) What is the rationale for taking all these costs out of just this one pot? Moreover, it is unclear if the $150 million amounts to the total allocation for "Federal Trustee administrative and preliminary planning activities across Restoration Areas". Is $150 million the maximum amount that can be taken from the open ocean account for these general administrative and planning activities that are not limited to open ocean restoration? With the costly administration expenditures of the proposed governance structure,(8) how will the Trustees ensure there will be adequate monetary support to develop and implement a comprehensive suite of restoration projects for open ocean resources?

Due to the significant concerns outlined above, we object to funding for open ocean restoration being spent on overhead costs for other restoration components and on reclassified, previously approved, land-based recreational projects. We ask the Department of Justice to revise the definition of open ocean in the consent decree to guarantee the proper use of the funds in that allocation. Further, the consent decree must make explicit that administrative costs may not exceed the $150 million allocated. The open ocean allocation must not be used for Federal Trustee planning and administrative costs across all restoration areas.

Suggested definition of "Open Ocean":
"Open Ocean" consists of restoration activities occurring in the ocean or activities that create, enhance, or improve marine resource management, scientific research, or monitoring of natural resources in the ocean and Federal Trustee administrative activities.

Thank you for your consideration of this request, and please let us know if we can provide additional information or assistance. For additional information, please contact Cynthia Sarthou at Gulf Restoration Network (cyn@healthygulf.org).

Sincerely,

Sarah Chasis
Director, Oceans Initiative
Natural Resources Defense Council

Stephen D. Mashuda
Managing Attorney for Oceans

Correspondences - Department of Justice - Consent Decree - PEPC ID: 60777

EarthJustice

Cynthia Sarthou
Executive Director
Gulf Restoration Network

...
1) Consent Decree, Appendix 2 at §2.1.1. (Emphasis Added)
2) Bike & Ped Lane GUIS MS ($6,996,751), Bon Secour NWR Trail, AL ($545,110), Beach
Enhancement G.I. National Seashore ($10,836,055), Gulf Islands National Seashore Ferry
Project ($4,020,000). See Appendix 2 Table 2 of Consent Decree at:
http://www.justice.gov/enrd/file/780686/download
3) Phase III Early Restoration Fact Sheet, Gulf Islands National Seashore Beach Enhancement
Project, available at http://www.gulfspillrestoration.noaa.gov/wp-
content/uploads/BeachEnhancementFactsheet4.pdf.
4) Phase III Early Restoration Fact Sheet, Gulf Islands National Seashore Ferry Project, available
at http://www.gulfspillrestoration.noaa.gov/wp-content/uploads/FerryFactsheet4.pdf.
5) In September 2015, Trustees approved Phase IV of early restoration bringing the total
approved to be spent to $832 million from the $1 billion BP pledged for early restoration. See
http://www.gulfspillrestoration.noaa.gov/2015/09/latest-round-of-early-restoration-projects-
approved/.
6) Early restoration included a bycatch-reduction project estimated to cost $20 million. Consent
Decree, Appendix 2, Table 2.
7) Consent Decree at Appendix 2.1; Table 5.10-1 Draft PDARP/PEIS at page 5-103.
8) Consent Decree, Appendix 2: Agreement Among the United States and the Gulf States
Relating to Natural Resource Restoration; Draft PDARP/PEIS at page 7-4.

## PEPC Project ID: 60777, DocumentID: 68455
## Correspondence: 186

### Author Information

| | |
|---|---|
| Keep Private: | No |
| Name: | N/A N/A |
| Organization: | |
| Organization Type: | I - Unaffiliated Individual |
| Address: | |
| | Coden, AL 36523 |
| | USA |
| E-mail: | |

### Correspondence Information

| | |
|---|---|
| Status: Reviewed | Park Correspondence Log: |
| Date Sent: 12/04/2015 | Date Received: 12/04/2015 |
| Number of Signatures: 1 | Form Letter: No |
| Contains Request(s): No | Type: Web Form |
| Notes: | |

### Correspondence Text

I do not support the terms of the current proposed consent decree, the information presented, was confusing. I cant afford to print out this huge document, so how do you expect me to comment on such complex and overwhelming technical information. This process was so UNFAIR to me and the PUBLIC at large.

BP should not be allowed to get any more tax breaks by claiming $15.3 billion as a business expense.

The Gulf South, specifically Alabama and Mississippi are states were coastal communities (historically Black and people of color) closest to the nexus of injury and most vulnerable to future disasters would benefit greatly from a $5.35 Billion trust that would support local capacity building, mitigation and long term sustainability.

I support an amendment of the proposed consent decree that address the above and 1) establish and fund a Citizens Advisory Committee , 2) Increase unknown to $2Billion 3) Use twenty (20% )f the proposed $1.1 billion payment into the OSLTF (or $225 million) exclusively for the establishment and funding of the Gulf of Mexico Regional Citizens Advisory Council. And 4) Eliminates the proposed TIG structure.

## PEPC Project ID: 60777, DocumentID: 68455
## Correspondence: 187

### Author Information

| | |
|---|---|
| Keep Private: | No |
| Name: | Jeffrey Buchanan |
| Organization: | Oxfam America, and 53 undersigned Gulf Coast community, development, tribal, and conservation orgs |
| Organization Type: | I - Unaffiliated Individual |
| Address: | 1101 17th St NW #1300 |
| | Washington, DC,DC 20036 |
| | USA |
| E-mail: | jbuchanan@oxfamamerica.org |

### Correspondence Information

Status: Reviewed                    Park Correspondence Log:

Date Sent: 12/04/2015          Date Received: 12/04/2015

Number of Signatures: 1        Form Letter: No

Contains Request(s): No        Type: Web Form

Notes:

### Correspondence Text

December 4th, 2015

The Honorable John C. Cruden
Assistant Attorney General for the Environment and Natural Resources Division
U.S. Department of Justice
950 Pennsylvania Avenue NW
Washington, DC 20530-0001

The Honorable Samuel D. Rauch III
Deputy Assistant Administrator for Regulatory Programs
National Marine Fisheries Service
1315 East-West Hwy, Silver Spring, MD 20910

RE: Public Comments on the BP Oil Spill Consent Decree and Draft Programmatic Damage
Assessment and Restoration Plan

Dear Mr. Cruden and Mr. Rauch:

On behalf the undersigned organizations, we would like to thank the Department of Justice and the
State and Federal Trustees for their leadership in advancing a settlement with BP for natural
resource damage claims, Clean Water Act civil claims and economic claims. Given the resources at
stake and the impacted coastal communities reliance on healthy ecosystems, it is critical that this

Correspondences - Department of Justice - Consent Decree - PEPC ID: 60777

agreement ensures effective, accountable governance and inclusive, meaningful public engagement to harness the full potential of these resources on behalf of the public.

We are concerned that the governance structure proposed in Consent Decree and in the Draft Programmatic Damage Assessment and Restoration Plan for implementing the Natural Resource Damage claims may hinder Gulf Coast communities ability to play a significant role in restoration without significant improvements.(i) By distributing restoration decision-making across eight newly created Trustee Implementation Groups (TIGs) as opposed to a single Trustee Council, this agreement creates significant hurdles for the publics ability to having a meaningful voice across each TIGs planning process. With each TIG developing its own engagement strategies, the public must follow eight individual NRD processes, each with its own timelines and decision-makers. We are concerned this approach could create inefficiencies for the trustee agencies implementing public engagement and the public tracking the process. Such a diffuse governance structure threatens the inclusivity of public engagement among low income, rural, minority and limited English proficient members of the public, as well as those engaged in commercial fishing enterprises, who have interests across multiple TIGs but face additional hurdles to tracking all these different processes over time without greater coordination and additional resources and policies to support their engagement.

Currently the consent decree and DRDARP provides few detail about how the Trustee Council and TIGs will approach public engagement beyond generalized commitments to hold periodic open meetings at the discretion of TIGs and developing a web portal. Despite significant hurdles to engagement outlined above, the agreement takes no real steps to mitigate these challenges and support broader community involvement in restoration. Given the scale of the resources becoming available under this consent decree, the significant interest of Gulf Coast communities in ensuring they are used properly to restore coastal ecosystems, and the limited opportunity to weigh in on NRD restoration proceeding the development of the consent decree, it will be important to develop coherent and sustained public engagement strategies going forward. The limited engagement and secrecy from federal and state trustee agencies to date continues to be a source of frustration by stakeholders and members of the public. Gulf Coast communities want a more authentic, sustained two way conversation about restoration with decision-makers going forward to be able to have greater understanding about developing plans and provide more significant and detailed input, based on the deep traditional ecological knowledge and interests of communities and stakeholder groups.

In response, we suggest the consent decree and DRDARP be revised to support a multi-tiered approach to public engagement:

" The Trustee Council should develop strong standard operating procedures (SOPs) requiring each Trustee Implementation Group to develop common approaches, coordinated timelines and resources for engaging the public in developing draft restoration plans, in order to ensure inclusive participation. SOPs should promote steps to reach populations such as low income, minority, rural and limited English proficient communities and commercial and subsistence fishers across the coast which face hurdles to accessing public engagement opportunities and are disproportionately impacted by the health of coastal ecosystems. The public should be able to review and provide input on the Trustee Councils SOPs, including procedures for public engagement.

" The Trustee Council should promote engagement strategies beyond public meetings to support a two way dialogue about restoration. In particular, the consent decree and DRDARP should create a public advisory committee to facilitate sustained input from representatives of the public at-large and key stakeholder groups on the planning, evaluation, fund allocation, and conduct of restoration activities. Such a committee, and relevant sub-committees could ensure key interests across the Gulf Coast states including commercial and subsistence fishers, conservationists, recreational users, socially vulnerable and native stakeholders relevant to the various TIGs are informed, involved and can help educate broader constituencies about the decision making process going forward. The Exxon Valdez Consent Decree and Memorandum of Agreement between Alaska and the United States similarly required meaningful public participation in the injury assessment and restoration process, which shall include establishment of a public advisory group&. (ii) The public advisory committee has been a critical part of informing restoration in Alaska. Subsequently, President Obamas National Commission on the BP Deepwater Horizon Oil Spill and Offshore Drilling recommended that if a settlement of NRD claims with BP is reached by the Trustee Council, that a public advisory committee should be created in the Gulf.(iii) The consent decree and DRDARP should require the creation of such a committee by the Trustee Council with appropriate public input on its makeup.

" Terms should be added to the Consent Decree to allow federal and state trustees and related agencies to give a preference in contracting and grantmaking decisions to promote the use of local workers and firms within NRD restoration. As cited in the DRDARP, local hiring has continued to be one of the top concerns of local residents during previous phases of public hearings on NRD.(iv) Terms on the consent decree should also include a requirement to post new job opportunities created by contracts or grants related to NRD restoration, or relevant subcontracts or subgrants, with state and/or local workforce development agencies nearest the site of such work, if state law does not already require such postings. Additionally, contractors should be required to consider workers referred to contractors and subcontractors by these local workforce agencies. Such terms should align with the language under the RESTORE Act, recent state laws in Florida, Louisiana and Mississippi and examples in federal contracting.(v)

" The Trustee Council and TIGs should ensure adequate funding for public engagement. In particular, the Council should consider allocating a portion of the resources currently committed for administration under the regional restoration TIG to promoting public engagement across TIGs.

We thank you for the opportunity to comment on the consent decree and DRDARP to build a more vibrant, productive future for the Gulf of Mexico, its ecosystems and its communities. Thank you for your consideration of this request, and please let us know if we can provide additional information or assistance. For additional information, please contact Jeffrey Buchanan, Senior Domestic Policy Advisor at Oxfam America at (202) 299-7930 or jbuchanan@oxfamamerica.org.

Sincerely,

A Community Voice - Louisiana (New Orleans, LA)
Air Alliance Houston (Houston, TX)
Alabama Appleseed Center for Law & Justice, Inc. (Montgomery, AL)

Correspondences - Department of Justice - Consent Decree - PEPC ID: 60777

Alabama Coast United (Orange Beach, AL)
Alabama Rivers Alliance (Birmingham, AL)
Alliance Institute (New Orleans, LA)
Apalachicola Riverkeeper (Apalachicola, FL)
Atchafalaya Basinkeeper (Baton Rouge, LA)
Back Bay Mission (Gulfport, MS)
Boat People SOS (Bayou La Batre, AL)
Brighter Future Foundation
Calhoun County Resource Watch (Seadrift, TX)
Center for Fair Housing (Mobile, AL)
Commission on Stewardship of the Environment of the
Louisiana Interchurch Conference (Baton Rouge, LA)
Deep South Center for Environmental justice (New Orleans, LA)
Disaster Accountability Project
Earth Ethics (Pensacola, FL)
Florida Clean Water Network (Navarre, FL)
Florida Conference United Church of Christ (Orlando, FL)
Galveston Baykeeper (Galveston, TX)
Gulf Islands Conservancy (Gulfport, MS)
Gulf Restoration Network (New Orleans, LA)
Hijra House (Biloxi, Mississippi)
Homeowners' Hurricane Insurance Initiative (Mobile, AL)
Interfaith Sponsoring Committee, BISCO (Thibodaux, LA)
Latino Forum of New Orleans (New Orleans, LA)
Levees.Org (New Orleans, LA)
Limitless Vistas, Inc. (New Orleans, LA)
Louisiana Environmental Action Network (LEAN) (Baton Rouge, LA)
Louisiana Language Access Coalition (New Orleans, LA)
Louisiana Shrimp Association (Grand Isle, LA)
Lower Mississippi Riverkeeper (Baton Rouge, LA)
Mary Queen of Viet Nam CDC (New Orleans, LA)
Mind Power Collective (New Orleans, LA)
Mississippi Center for Justice (Jackson, MS)
Mobile Bay Sierra Club (Mobile, AL)
Mobile County Training School Alumni Association, Inc (Mobile, AL)
Mondo Bizarro (New Orleans, LA)
Moore Community House (Biloxi, MS)
Operation Homecare, Inc (York, AL)
Oxfam America
Rural Training and Research Center, Federation of
Southern Cooperatives/Land Assistance Fund (Epes, AL)
San Antonio Bay Waterkeeper (San Antonio, TX)
Southeastern Fisheries Association (Tallahassee, FL)
Steps Coalition (Biloxi, MS)
Texas Injured Workers (Seadrift, TX)
The Repair S.H.O.P. (Hattiesburg, MS)

Correspondences - Department of Justice - Consent Decree - PEPC ID: 60777

The Urban Conservancy (New Orleans, LA)
TRAC (Thibodaux, LA)
TruFund Financial Services (Belle Chase, LA)
Turkey Creek Community Initiatives (Gulfport, MS)
United Houma Nation (Houma, LA)
Vanishing Earth (New Orleans, LA)
Zion Travelers Cooperative Center (Phoenix, LA)


- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - -

ENDNOTES:

(i) Consent Decree, Appendix 2,U.S. v. BP Exploration and Production et al, Civil No. 10-4536
(E.D. La.) (centralized in MDL 2179: In Re: Oil Spill by the Oil Rig Deepwater Horizon in the
Gulf of Mexico, April 20, 2012), D.J. Ref. 90-5-1-1-10026; Deepwater Horizon Oil Spill Draft
Programmatic Damage Assessment and Restoration Plan and Draft Programmatic Environmental
Impact Statement, Chapter 7
(ii) Memorandum of Agreement and Consent Decree at pg. 11. United States v. State of Alaska,
No. A91-081 CIV (D. Alaska, filed Aug. 23, 1991).
(iii) Deepwater: Recommendations to the National Commission on the Deepwater Horizon Oil Spill
and Offshore Drilling, January 2011 Available at:
http://cybercemetery.unt.edu/archive/oilspill/20121210200707/http://www.oilspillcommission.gov/
sites/default/files/documents/OSC_Deep_Water_Summary_Recommendations_FINAL.pdf; Staff
Paper: Long-term Regional Restoration in the Gulf: Funding Sources, Governance and Structure,
National Commission on the Deepwater Horizon Oil Spill and Offshore Drilling, January 2011,
Available at:
http://cybercemetery.unt.edu/archive/oilspill/20121211011552/http://www.oilspillcommission.gov/
sites/default/files/documents/Long-Term Regional Restoration in the Gulf_Funding Sources and
Governance Structures.pdf;
(iv) Deepwater Horizon Oil Spill Draft Programmatic Damage Assessment and Restoration Plan
and Draft Programmatic Environmental Impact Statement, Chapter 5, page 13; 134; 146-147; 193.
(v) Resources and Ecosystem Sustainability, Tourist Opportunities, And Revived Economies of the
Gulf Coast States Act of 2011. Senate Report 112-100. Available at
http://www.gpo.gov/fdsys/pkg/CRPT-112srpt100/html/CRPT-112srpt100.htm; Mississippi Jobs
First Act of 2012, Mississippi Code 800.00-800.04
http://www.sos.ms.gov/ACProposed/00019129b.pdf; Louisiana First Hiring Act, Chapter 27 of
Subtitle III of Title 39 of the Louisiana Revised Statutes of 1950, R.S. 39:2211 through 2214
http://www.legis.la.gov/legis/ViewDocument.aspx?d=877313; Job Orders- Department of
Economic Opportunity Florida Department of Economic Opportunity
http://www.floridajobs.org/PDG/TrainingPresentations/wp_basics/Job_Orders_Part1.ppt

## PEPC Project ID: 60777, DocumentID: 68455
## Correspondence: 188

### Author Information

Keep Private:            No

Name:                    Jeffrey Buchanan

Organization:            Oxfam America, and 53 undersigned Gulf Coast community, development, tribal, and
                         conservation orgs

Organization Type:       I - Unaffiliated Individual

Address:                 1101 17th St NW #1300
                         Washington, DC,DC 20036
                         USA

E-mail:                  jbuchanan@oxfamamerica.org

### Correspondence Information

Status: Reviewed                    Park Correspondence Log:

Date Sent: 12/04/2015               Date Received: 12/04/2015

Number of Signatures: 1             Form Letter: No

Contains Request(s): No             Type: Web Form

Notes:

### Correspondence Text

December 4th, 2015
The Honorable John C. Cruden
Assistant Attorney General for the Environment and Natural Resources Division
U.S. Department of Justice
950 Pennsylvania Avenue NW Washington, DC 20530-0001

The Honorable Samuel D. Rauch III
Deputy Assistant Administrator for Regulatory Programs
National Marine Fisheries Service
1315 East-West Hwy, Silver Spring, MD 20910

RE: Public Comments on the BP Oil Spill Consent Decree and Draft Programmatic Damage
Assessment and Restoration Plan

Dear Mr. Cruden and Mr. Rauch:

On behalf the undersigned organizations, we would like to thank the Department of Justice and the
State and Federal Trustees for their leadership in advancing a settlement with BP for natural
resource damage claims, Clean Water Act civil claims and economic claims. Given the resources
at stake and the impacted coastal communities reliance on healthy ecosystems, it is critical that
this agreement ensures effective, accountable governance and inclusive, meaningful public
engagement to harness the full potential of these resources on behalf of the public.

We are concerned that the governance structure proposed in Consent Decree and in the Draft Programmatic Damage Assessment and Restoration Plan for implementing the Natural Resource Damage claims may hinder Gulf Coast communities ability to play a significant role in restoration without significant improvements.(i) By distributing restoration decision-making across eight newly created Trustee Implementation Groups (TIGs) as opposed to a single Trustee Council, this agreement creates significant hurdles for the publics ability to having a meaningful voice across each TIGs planning process. With each TIG developing its own engagement strategies, the public must follow eight individual NRD processes, each with its own timelines and decision-makers. We are concerned this approach could create inefficiencies for the trustee agencies implementing public engagement and the public tracking the process. Such a diffuse governance structure threatens the inclusivity of public engagement among low income, rural, minority and limited English proficient members of the public, as well as those engaged in commercial fishing enterprises, who have interests across multiple TIGs but face additional hurdles to tracking all these different processes over time without greater coordination and additional resources and policies to support their engagement.

Currently the consent decree and DRDARP provides few detail about how the Trustee Council and TIGs will approach public engagement beyond generalized commitments to hold periodic open meetings at the discretion of TIGs and developing a web portal. Despite significant hurdles to engagement outlined above, the agreement takes no real steps to mitigate these challenges and support broader community involvement in restoration. Given the scale of the resources becoming available under this consent decree, the significant interest of Gulf Coast communities in ensuring they are used properly to restore coastal ecosystems, and the limited opportunity to weigh in on NRD restoration proceeding the development of the consent decree, it will be important to develop coherent and sustained public engagement strategies going forward. The limited engagement and secrecy from federal and state trustee agencies to date continues to be a source of frustration by stakeholders and members of the public. Gulf Coast communities want a more authentic, sustained two way conversation about restoration with decision-makers going forward to be able to have greater understanding about developing plans and provide more significant and detailed input, based on the deep traditional ecological knowledge and interests of communities and stakeholder groups.

In response, we suggest the consent decree and DRDARP be revised to support a multi-tiered approach to public engagement:

* The Trustee Council should develop strong standard operating procedures (SOPs) requiring each Trustee Implementation Group to develop common approaches, coordinated timelines and resources for engaging the public in developing draft restoration plans, in order to ensure inclusive participation. SOPs should promote steps to reach populations such as low income, minority, rural and limited English proficient communities and commercial and subsistence fishers across the coast which face hurdles to accessing public engagement opportunities and are disproportionately impacted by the health of coastal ecosystems. The public should be able to review and provide input on the Trustee Councils SOPs, including procedures for public engagement.

* The Trustee Council should promote engagement strategies beyond public meetings to support a

two way dialogue about restoration. In particular, the consent decree and DRDARP should create a public advisory committee to facilitate sustained input from representatives of the public at-large and key stakeholder groups on the planning, evaluation, fund allocation, and conduct of restoration activities. Such a committee, and relevant sub-committees could ensure key interests across the Gulf Coast states including commercial and subsistence fishers, conservationists, recreational users, socially vulnerable and native stakeholders relevant to the various TIGs are informed, involved and can help educate broader constituencies about the decision making process going forward. The Exxon Valdez Consent Decree and Memorandum of Agreement between Alaska and the United States similarly required meaningful public participation in the injury assessment and restoration process, which shall include establishment of a public advisory group&. (ii) The public advisory committee has been a critical part of informing restoration in Alaska. Subsequently, President Obamas National Commission on the BP Deepwater Horizon Oil Spill and Offshore Drilling recommended that if a settlement of NRD claims with BP is reached by the Trustee Council, that a public advisory committee should be created in the Gulf.(iii) The consent decree and DRDARP should require the creation of such a committee by the Trustee Council with appropriate public input on its makeup.

* Terms should be added to the Consent Decree to allow federal and state trustees and related agencies to give a preference in contracting and grantmaking decisions to promote the use of local workers and firms within NRD restoration. As cited in the DRDARP, local hiring has continued to be one of the top concerns of local residents during previous phases of public hearings on NRD.(iv) Terms on the consent decree should also include a requirement to post new job opportunities created by contracts or grants related to NRD restoration, or relevant subcontracts or subgrants, with state and/or local workforce development agencies nearest the site of such work, if state law does not already require such postings. Additionally, contractors should be required to consider workers referred to contractors and subcontractors by these local workforce agencies. Such terms should align with the language under the RESTORE Act, recent state laws in Florida, Louisiana and Mississippi and examples in federal contracting.(v)

* The Trustee Council and TIGs should ensure adequate funding for public engagement. In particular, the Council should consider allocating a portion of the resources currently committed for administration under the regional restoration TIG to promoting public engagement across TIGs. We thank you for the opportunity to comment on the consent decree and DRDARP to build a more vibrant, productive future for the Gulf of Mexico, its ecosystems and its communities. Thank you for your consideration of this request, and please let us know if we can provide additional information or assistance. For additional information, please contact Jeffrey Buchanan, Senior Domestic Policy Advisor at Oxfam America at (202) 299-7930 or jbuchanan@oxfamamerica.org.

Sincerely,

A Community Voice - Louisiana (New Orleans, LA)
Air Alliance Houston (Houston, TX)
Alabama Appleseed Center for Law & Justice, Inc. (Montgomery, AL)
Alabama Coast United (Orange Beach, AL)
Alabama Rivers Alliance (Birmingham, AL)

Correspondences - Department of Justice - Consent Decree - PEPC ID: 60777

Alliance Institute (New Orleans, LA)
Apalachicola Riverkeeper (Apalachicola, FL)
Atchafalaya Basinkeeper (Baton Rouge, LA)
Back Bay Mission (Gulfport, MS)
Boat People SOS (Bayou La Batre, AL)
Brighter Future Foundation Calhoun County Resource Watch (Seadrift, TX)
Center for Fair Housing (Mobile, AL)
Commission on Stewardship of the Environment of the Louisiana Interchurch Conference (Baton Rouge, LA)
Deep South Center for Environmental justice (New Orleans, LA)
Disaster Accountability Project Earth Ethics (Pensacola, FL)
Florida Clean Water Network (Navarre, FL)
Florida Conference United Church of Christ (Orlando, FL)
Galveston Baykeeper (Galveston, TX)
Gulf Islands Conservancy (Gulfport, MS)
Gulf Restoration Network (New Orleans, LA)
Hijra House (Biloxi, Mississippi)
Homeowners' Hurricane Insurance Initiative (Mobile, AL)
Interfaith Sponsoring Committee, BISCO (Thibodaux, LA)
Latino Forum of New Orleans (New Orleans, LA)
Levees.Org (New Orleans, LA)
Limitless Vistas, Inc. (New Orleans, LA)
Louisiana Environmental Action Network (LEAN) (Baton Rouge, LA)
Louisiana Language Access Coalition (New Orleans, LA)
Louisiana Shrimp Association (Grand Isle, LA)
Lower Mississippi Riverkeeper (Baton Rouge, LA)
Mary Queen of Viet Nam CDC (New Orleans, LA)
Mind Power Collective (New Orleans, LA)
Mississippi Center for Justice (Jackson, MS)
Mobile Bay Sierra Club (Mobile, AL)
Mobile County Training School Alumni Association, Inc (Mobile, AL)
Mondo Bizarro (New Orleans, LA)
Moore Community House (Biloxi, MS)
Operation Homecare, Inc (York, AL)
Oxfam America
Rural Training and Research Center, Federation of Southern Cooperatives/Land Assistance Fund (Epes, AL)
San Antonio Bay Waterkeeper (San Antonio, TX)
Southeastern Fisheries Association (Tallahassee, FL)
Steps Coalition (Biloxi, MS)
Texas Injured Workers (Seadrift, TX)
The Repair S.H.O.P. (Hattiesburg, MS)
The Urban Conservancy (New Orleans, LA)
TRAC (Thibodaux, LA)
TruFund Financial Services (Belle Chase, LA)
Turkey Creek Community Initiatives (Gulfport, MS)

United Houma Nation (Houma, LA)
Vanishing Earth (New Orleans, LA)
Zion Travelers Cooperative Center (Phoenix, LA)
- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - -

ENDNOTES:

(i) Consent Decree, Appendix 2,U.S. v. BP Exploration and Production et al, Civil No. 10-4536 (E.D. La.) (centralized in MDL 2179: In Re: Oil Spill by the Oil Rig Deepwater Horizon in the Gulf of Mexico, April 20, 2012), D.J. Ref. 90-5-1-1-10026; Deepwater Horizon Oil Spill Draft Programmatic Damage Assessment and Restoration Plan and Draft Programmatic Environmental Impact Statement, Chapter 7

(ii) Memorandum of Agreement and Consent Decree at pg. 11. United States v. State of Alaska, No. A91-081 CIV (D. Alaska, filed Aug. 23, 1991).

(iii) Deepwater: Recommendations to the National Commission on the Deepwater Horizon Oil Spill and Offshore Drilling, January 2011 Available at: http://cybercemetery.unt.edu/archive/oilspill/20121210200707/http://www.oilspillcommission.gov/sites/default/files/documents/OSC_Deep_Water_Summary_Recommendations_FINAL.pdf; Staff Paper: Long-term Regional Restoration in the Gulf: Funding Sources, Governance and Structure, National Commission on the Deepwater Horizon Oil Spill and Offshore Drilling, January 2011, Available at: http://cybercemetery.unt.edu/archive/oilspill/20121211011552/http://www.oilspillcommission.gov/sites/default/files/documents/Long-Term Regional Restoration in the Gulf_Funding Sources and Governance Structures.pdf;

(iv) Deepwater Horizon Oil Spill Draft Programmatic Damage Assessment and Restoration Plan and Draft Programmatic Environmental Impact Statement, Chapter 5, page 13; 134; 146-147; 193.

(v) Resources and Ecosystem Sustainability, Tourist Opportunities, And Revived Economies of the Gulf Coast States Act of 2011. Senate Report 112-100. Available at http://www.gpo.gov/fdsys/pkg/CRPT-112srpt100/html/CRPT-112srpt100.htm; Mississippi Jobs First Act of 2012, Mississippi Code 800.00-800.04 http://www.sos.ms.gov/ACProposed/00019129b.pdf; Louisiana First Hiring Act, Chapter 27 of Subtitle III of Title 39 of the Louisiana Revised Statutes of 1950, R.S. 39:2211 through 2214 http://www.legis.la.gov/legis/ViewDocument.aspx?d=877313; Job Orders- Department of Economic Opportunity Florida Department of Economic Opportunity http://www.floridajobs.org/PDG/TrainingPresentations/wp_basics/Job_Orders_Part1.ppt

# PEPC Project ID: 60777, DocumentID: 68455
# Correspondence: 189

## Author Information

Keep Private:            No
Name:                    Teresa H. Chan
Organization:            Environmental Law Institute
Organization Type:       I - Unaffiliated Individual
Address:                 1730 M St. NW
                         Suite 700
                         Washington, DC,DC 20036
                         USA
E-mail:                  chan@eli.org

## Correspondence Information

Status: Reviewed                Park Correspondence Log:
Date Sent: 12/04/2015           Date Received: 12/04/2015
Number of Signatures: 1         Form Letter: No
Contains Request(s): No         Type: Web Form
Notes:

## Correspondence Text

December 4, 2015

The Honorable John C. Cruden
Assistant Attorney General, Environment and Natural Resources Division
U.S. Department of Justice
950 Pennsylvania Avenue NW
Washington, DC 20530-0001

The Honorable Samuel D. Rauch III
Deputy Assistant Administrator for Regulatory Programs
National Marine Fisheries Service
1315 East-West Hwy, Silver Spring, MD 20910

RE: Environmental Law Institute Comments on the Proposed BP Consent Decree and Draft
PDARP/PEIS

Dear Mr. Cruden and Mr. Rauch:

Thank you for the opportunity to provide information to assist the U.S. Department of Justice
and the Trustees in finalizing the BP Consent Decree (Consent Decree) and the Programmatic
Damage Assessment and Restoration Plan and Programmatic Environmental Impact Statement

(PDARP/PEIS). The substantial effort to design an effective approach to Gulf restoration following the Deepwater Horizon oil spill is evident from the depth and breadth of these documents. Our comments focus on ways to improve public participation in the proposed natural resource restoration program.

As the program is currently structured, it is unclear to what extent the public will be able to meaningfully participate. We see two main barriers to the public's involvement: (1) limited participation mechanisms; and (2) a complicated governance structure that could deter public participation.

Limited Participation Mechanisms

While the PDARP/PEIS sets out some ways that the public can participate in the restoration program, it provides few opportunities for the public to meaningfully engage:

• Meetings: the PDARP/PEIS notes that the Trustees will hold public meetings "to provide information to, and to receive comment from, the public on restoration activities" (PDARP/PEIS, 7-27). It is unclear, however, whether these meetings will take place on a regular basis. At the same time, it is unclear whether any of the Trustee Council or Trustee Implementation Group (TIG) meetings will be open to the public.

• Review and comment: the PDARP/PEIS indicates that the public will have the opportunity to review and provide comments on proposed and revised restoration plans. A similar opportunity does not, however, exist in regard to other key documents, including the Trustee Council standard operating procedures (SOP) or any TIG SOP.

• Information sharing: the PDARP/PEIS sets out a robust system for information sharing, which will include the current Trustee Council website, the restoration planning and implementation administrative record(s), and a Restoration Management Portal. While the public will be able to access information from these sources, it is unclear whether this information will be provided in a usable and understandable format. In addition, it is unclear what the public can do with this information. For example, as it is currently drafted, the PDARP/PEIS does not include any mechanism for the public to engage in the monitoring and adaptive management processes, unless those processes lead the Trustees to make changes that require a new or revised restoration plan.

Complicated Governance Structure

The PDARP/PEIS puts in place a "distributed governance structure" that includes a Trustee Council and eight different Trustee Implementation Groups (TIGs), with each TIG responsible for decision-making for a defined restoration area. As the restoration program is currently structured, each TIG has the flexibility to determine its own timetable for restoration planning, and to determine whether to put in place its own additional memorandum of understanding (MOU) and standard operating procedures (SOP). Depending on the timing and degree of coordination among the TIGs, this complexity could make it very difficult for the public to keep track of the TIGs' various procedures and actions. This in turn will make it difficult for the public

to meaningfully participate in the restoration program.

Recommendations

In light of these potential barriers to meaningful public participation, we offer the following recommendations:

• Create a citizen advisory group: we recommend creating a citizen advisory group for the Trustee Council and each TIG. This would enable public participation throughout the restoration program, including during restoration planning, implementation, and monitoring and adaptive management. Such an approach could be outlined in the Consent Decree and PDARP/PEIS, and developed as part of the public participation provisions of the SOP. Note that a number of public comments have already called for the creation of a citizens' advisory council (see PDARP/PEIS, 5-146 to 5-147).

• Establish additional mechanisms for the public to participate: the Trustees should establish additional mechanisms or points in the program for the public to participate. Some examples include:

*Seek public input on SOP: the SOP will guide Trustee Council, TIG, and individual trustee agency activities. A process should be put in place that allows public input into development of the Trustee Council SOP and any TIG SOP.

*Schedule regular public meetings: the Trustees should commit to scheduling regular public meetings, where the Trustees would update the public on the status of the restoration program and seek public input.

*Open Trustee Council and TIG meetings to the public: the Trustees should open Trustee Council and TIG meetings to the public.

• Commit to providing useable and understandable information: given the amount of data that will likely be generated, the Trustees will need to ensure that data that are released to the public are aggregated in a way that is understandable and usable by members of the public, so that they are able to follow and contribute information to the restoration program.

• Ensure coordination among the TIGs: the TIGs should ensure that their work is sufficiently coordinated so as to decrease the burden to the public in participating in the various TIGs. This could include, for example, TIGs coordinating on timing of decisions, issuing joint restoration plans, and/or holding joint meetings. Such coordination mechanisms appear to be authorized by the PDARP/PEIS, but could be expressly required and further developed as part of the SOP.

Again, thank you for this opportunity to comment on the proposed BP Consent Decree and draft PDARP/PEIS.

Regards,

Correspondences - Department of Justice - Consent Decree - PEPC ID: 60777

Teresa H. Chan
Senior Attorney, Environmental Law Institute

# PEPC Project ID: 60777, DocumentID: 68455
# Correspondence: 190

## Author Information

| | |
|---|---|
| Keep Private: | No |
| Name: | Ken Kramer |
| Organization: | Sierra Club - Lone Star Chapter |
| Organization Type: | I - Unaffiliated Individual |
| Address: | P. O. Box 1931 |
| | Austin, TX,TX 78767 |
| | USA |
| E-mail: | kenwkramer@aol.com |

## Correspondence Information

Status: Reviewed  Park Correspondence Log:
Date Sent: 12/04/2015  Date Received: 12/04/2015
Number of Signatures: 1  Form Letter: No
Contains Request(s): No  Type: Web Form
Notes:

## Correspondence Text

Assistant Attorney General U. S. Fish & Wildlife Service
Environment & Natural Resources Division P. O. Box 49567
P. O. Box 7611 Atlanta, GA 30345
U. S. Department of Justice
Washington, DC 20044-7611

RE: U.S. v. BP Exploration and Production et al, Civil No. 10-4536 (E.D. La.)(centralized in MDL 2179: In Re: Oil Spill by the Oil Rig "Deepwater Horizon" in the Gulf of Mexico, April 20, 2012), D. J. Ref. 90-5-1-1-10026.

RE: "Deepwater Horizon Programmatic Damage Assessment and Restoration Plan/Programmatic Environmental Impact Statement ("PDARP/PEIS")

To Whom It May Concern:

Please accept this letter as comments by the Lone Star Chapter of the Sierra Club on the two topics referenced above: the proposed "BP Consent Decree" and the Draft PDARP/PEIS, which are separate documents but with interrelated and intertwined issues. Our comments serve to address both these topics and should be considered as submissions for the respective comment opportunities.

The Lone Star Chapter of the Sierra Club is the state-level arm of the nation environmental

organization in Texas. Our organization has a long history (50 years as an organized entity in Texas) in working on coastal, fish and wildlife, water, and many other related environmental and natural resource issues along our state's coast and in the Gulf of Mexico.

First, we support the approval of the proposed "BP Consent Decree" as described and referenced in the "Notice of Lodging of Proposed Consent Decrees Under the Comprehensive Environmental Response, Compensation, and Liability Act" in the Federal Register/Vol. 80, No. 192/Monday, October 5, 2015. While we had hoped for a larger monetary settlement in this critical case in order to assure that all of the short-term and long-term impacts (direct and indirect) of the Deepwater Horizon oil spill in 2010 would be conclusively addressed for this and future generations, we recognize the practical benefits of avoiding a long-term trial and possible appeals and reaching a settlement that may start providing funds to address those impacts as expeditiously as possible.

However, we share and support the concerns raised by a number of other environmental and conservation organizations in comments on the proposed BP Consent Decree and the related Draft PDARP/PEIS regarding issues of transparency, governance structure, and funding for administrative costs in carrying out the efforts to restore the Gulf of Mexico. These concerns were expressed most recently in the December 2, 2015 joint letter to the Justice Department by National Audubon Society, Environmental Defense Fund, National Wildlife Federation, Ocean Conservancy, and The Nature Conservancy. The Lone Star Chapter of the Sierra Club supports and endorses the recommendations made in that letter, including but not limited to the following:

• The Trustee Council should develop Standard Operating Procedures (SOPs) for the Trustee Implementation Groups (TIGs), and these SOPs should be open to public review and comment before adoption and should be applicable to all TIGs.

• The Trustee Council should develop and implement other procedures to ensure formal coordination and consistency among the TIGs in carrying out restoration responsibilities (these should include adoption of monitoring standards and protocols).

• Meetings of the TIGs should be open to the public to the extent possible.

• The amount of "open ocean" funding dedicated to Federal administrative costs should be limited to $150 million.

• Efforts to address currently "unknown conditions" such as the impacts of climate change on the marine environment in the Gulf of Mexico and on natural resources (including fish and wildlife) along the Gulf coast should be based on monitoring data and other information that documents and characterizes those conditions as part of the adaptive management process.

The bottom line is that in keeping with the stated intention of the Trustee Council to address the needs of restoration in the Gulf of Mexico in a comprehensive and consistent manner, the BP Consent Decree and the final PDARP/PEIS must establish a framework for governance and public input that supports such an intention.

Correspondences - Department of Justice - Consent Decree - PEPC ID: 60777

Thank you for the opportunity to submit these comments on these historic and critical documents.

Respectfully,

Ken Kramer, Water Resources Chair
Sierra Club - Lone Star Chapter
Austin, Texas

# PEPC Project ID: 60777, DocumentID: 68455
# Correspondence: 191

## Author Information

Keep Private:               No
Name:                       N/A N/A
Organization:
Organization Type:          I - Unaffiliated Individual
Address:
                            Mobile, AL 36617
                            USA
E-mail:

## Correspondence Information

Status: Reviewed                Park Correspondence Log:
Date Sent: 12/04/2015           Date Received: 12/04/2015
Number of Signatures: 1         Form Letter: No
Contains Request(s): No         Type: Web Form
Notes:

## Correspondence Text

I support RENEGOTIATING AND AMENDING this complex, multi-state, multi-agency proposed consent for the best interest of Southwest Mobile, County Alabama, citizens.

I DO NOT SUPPORT the proposed TIG governance structure, waste of needed coastal mitigation and sustainability within areas that has been systematically ignored, such as our historical Black legacy community clusters.

# PEPC Project ID: 60777, DocumentID: 68455
# Correspondence: 192

## Author Information

| | |
|---|---|
| Keep Private: | No |
| Name: | Taylor Kirschenfeld |
| Organization: | Escambia County |
| Organization Type: | I - Unaffiliated Individual |
| Address: | 3363 West Park Place |
| | Pensacola, FL 32505 |
| | Pensacola, FL,FL 32505 |
| | USA |
| E-mail: | jtkirsche@myescambia.com |

## Correspondence Information

Status: Reviewed                    Park Correspondence Log:

Date Sent: 12/04/2015               Date Received: 12/04/2015

Number of Signatures: 1            Form Letter: No

Contains Request(s): No            Type: Web Form

Notes:

## Correspondence Text

December 4, 2015


U.S. Department of Justice
P.O. Box 7611
Washington, D.C. 20044-7611

Dear Sir or Madam:

Please accept the following comments by Escambia County, Florida regarding the Consent Decree for consideration. The Consent Decree represents the settlement of claims for liability associated with the Deepwater Horizon Incident including, but not limited to, Section 311(b) of the Clean Water Act, 33 U.S.C. § 1321(b), and a declaration of liability for natural resource damages under the Oil Pollution Act, 33 U.S.C. § 2702, against BP Exploration and Production Company, Inc. ("BP").

Proposed in the Consent Decree, BP will pay:

(1) $5.5 billion civil penalties under the Clean Water Act;
(2) $8.1 billion for natural resource damages under the Oil Pollution Act (including the $1 billion that BP had previously pledged under a prior agreement), plus up to $700 million additional for

unknown conditions and adaptive management;
(3) $350 million for State and federal natural resource damage assessment costs; and
(4) $250 million for other federal costs, including removal costs under the Oil Pollution Act, royalties, and a False Claims Act penalty.


Escambia County, FL is one of the disproportionately affected counties in Florida impacted by the Deepwater Horizon Incident, and as such, will be the recipient of certain settlement funds. The focus of our comments is on the practical implications with receiving, managing and administering these funds. We are seeking flexibility with the distribution of funds that will match amounts and timeframes that meet project implementation needs.

Through the RESTORE Act, Escambia County will receive Direct Component funds of approximately $68 million. If the various components of funds (and their distribution formulas) are taken equally and annually, this could result in Escambia County having to design and maintain an expenditure program for fifteen (15) years at $3.9 million per year (not including the $10.6 million in Transocean settlement funds available as of October 1, 2015).

The Challenges of a Level and Equal Payout:

While Table 1 in the Consent Decree seems to indicate a level and equal payment schedule by BP, nothing limits the distribution from the Trust Fund to that same schedule. The RESTORE Act states:

Amounts in the Trust Fund, including interest earned on advances to the Trust Fund and proceeds from investment under subsection (d), shall-
(1) be available for expenditure, without further appropriation, solely for the purpose and eligible activities of this subtitle and the amendments made by this subtitle; and
(2) remain available until expended, without fiscal year limitation. Pub. L. 112-141 (H.R. 4348), § 1602(c) (2012).

Given that BP settlement funds will be managed as a Federal granting program, this adds a specific administrative and management effort to the funds distribution process. Additionally, larger scale projects may not fit neatly into a level and equal payout distribution system. As the funds distribution process occurs, it is clear that early years will be focused on planning and feasibility of projects. But after that initial "ramping up" period concludes, local governments will be ready to implement projects which may in some years be larger scale or require phasing.

The challenge will be to maintain a flow of funds that matches project needs in terms of scale and complexity. Limiting project expenditures to $3.9 million per year could 1) prohibit expenditure for projects in years when more than that amount is required and 2) artificially extend a $68 million county restoration initiative longer than necessary, increasing administrative cost. Examples of these unintended consequences include:
• A group of foundational projects that may need to be implemented before others can be implemented may easily require more than $3.9 million per year, yet without them, larger projects cannot move forward.

Correspondences - Department of Justice - Consent Decree - PEPC ID: 60777

• From an efficiency standpoint, construction costs could be reduced if projects could be packaged or phased when they relate to one another (again exceeding the need of $3.9 million per year).
• Such a level distribution requirement may force project planning that results in smaller projects sacrificing the restoration benefits of larger scale projects. In many cases it is likely that earlier implementation of environmental and economic restoration projects will accelerate and compound the benefits over time and reduce administration costs, thus making more funds available to restore our damaged resources.

How the Challenges Can be Addressed:

To address these funding stream needs, this flexibility could take multiple forms, including but not limited to:

1. Establishing program and/or project thresholds that would provide for a shorter duration in funds distribution based on a set of standards. Example: If a project can be implemented over a shorter timeframe, but it requires higher funding in early years, then perhaps a standard can be established that allows funds to be released for that project at the level needed over a two (2) or three (3) year timeframe.
2. A local government that does not receive a high amount of settlement funds should not be required to keep a program in place for fifteen (15) years if they can spend their funds more efficiently over a shorter timeframe. Example: For total payouts under a certain dollar amount, the distribution is over five (5) years instead of fifteen (15).
3. Local governments could utilize alternatives to allow for needed flexibility which may include a mechanism to borrow against future settlement funds that will be received by the local government for a few upfront payments tracking project need. Examples: Use of Grant Anticipation Revenue Vehicle ("GARVEE")-like bonds , Grant Anticipation Notes ("GANs") , and other "conduit" sources of financing or pooled programs. Specific legal authority will likely be needed to expend settlement funds for debt services under some of these types of mechanisms.
There appear to be no limitations in the RESTORE Act or the Interim Treasury or Gulf Coast Ecosystem Restoration Council regulations preventing use of these tools. Additionally, there are only limited references to use of bonds (or debt financing) in the Uniform Guidance Administrative Requirements, Cost Principles, and Audit Requirements for Federal Awards (2 C.F.R. Part 200) which does not reveal any express prohibition on the use of bonding against for future grant revenues. This is consistent with the fact that such practices are already being used in other federal granting programs (Title 23 and 49), programs which would also be subject to the Uniform Guidance. Note though that in both instances, express federal authorization was provided to permit fund expenditures for debt services. Though not prohibited in the Uniform Guidance, such federal authorization will likely be required to expend funds for debt services under the RESTORE Act.

An example where some of this flexibility already exists within the Consent Decree can be found in Appendix 2 which establishes the Agreement Among the United States and the Gulf States Relating to Natural Resource Restoration. Section 2.3.2 in this Agreement provides a basis for allowing this type of flexibility. It states, "[t]he Trustee Implementation Group for each

Restoration Area may agree on a different allocation of funds to the Restoration Types, consistent with fully funding all of the Restoration Type allocations over the life of the payment schedule." Basically, this allows for discretion in how money will flow within the various Restoration Types as long as the total amounts in each given Type are not modified overall. Additionally, Section 3.6 contemplates that money can be shifted between Restoration Goals with consensus of the Trustee Implementation Group and Court approval. The Trustee Council is also required to develop Standard Operating Procedures.

Finally, several places in the Consent Decree provide the opportunity for further direction by the Court to encourage or require this type of flexibility:

• The Court could simply amend Table 1 to account for the real needs of project implementation which are likely not to be static over time or require less than a fifteen (15) year payout.
• Section VIII, ¶ 29 allows BP (at its sole option) to pay any of the Civil Penalties in Section IV before they are due. While unlikely, the Consent Decree contemplates that advancing these payments is permissible upon BP's initiation.
• Section XIV could be amended to add language requiring Treasury and the Gulf Coast Ecosystem Restoration Council to develop guidance that allows for the type of flexibility sought in these comments with Standard Operating Procedures (like those required for the Trustee Council) or amending current guidance to incorporate these concepts. This guidance or these procedures should address how interest on financing can be treated in any of these repayment mechanisms, as well address any federal income tax treatment on interest earned on debt.

Escambia County respectfully requests that the Consent Decree be modified to provide specific legal authority to authorize the flexibility requested in these comments. We feel that including these types of concepts in the Consent Decree is important because there may be more specific legal authority needed to implement them. These issues are important to consider because addressing them means a more efficient program that does not needlessly waste precious settlement dollars on administration and allows for levels of funding commensurate with the need to cost-effectively implement these important projects. The ecosystems and the economy of the Gulf have been suffering for five (5) years and it is our sincere hope that we can move quickly to implement projects so that our environment and economies can recover from this tragedy. We appreciate your consideration of these issues.

Respectfully,

J. Taylor "Chips" Kirschenfeld, Interim Director
Department of Natural Resources Management
Escambia County, Florida

# PEPC Project ID: 60777, DocumentID: 68455
# Correspondence: 193

## Author Information

| | |
|---|---|
| Keep Private: | No |
| Name: | Nashid A. Rushdan |
| Organization: | Africatown Community Development Corporation |
| Organization Type: | I - Unaffiliated Individual |
| Address: | P.O.Box 161221 Mobile, AL 36616 |
| | Mobile, AL 36616 |
| | Mobile, AL,AL 36618 |
| | USA |
| E-mail: | africatowncdc@gmail.com |

## Correspondence Information

| | |
|---|---|
| Status: Reviewed | Park Correspondence Log: |
| Date Sent: 12/04/2015 | Date Received: 12/04/2015 |
| Number of Signatures: 1 | Form Letter: No |
| Contains Request(s): No | Type: Web Form |
| Notes: | |

## Correspondence Text

Amend the proposed consent decree to order establishing a Citizens Advisory Committee that is diverse. Reject the TIG governance which is a duplication of work and too expensive. The proposed consent decree is complex and difficult to understand. It does not provide supportive information for the purposed funding allocations.

An allocation of $100 millions to support restoration of Fishing Communities for shrimp and crabs "mitigation and long term sustainability". Allocate $50 millions to Reduce Open Ocean.

Change the $700 millions to $2 billions for addressing Natural Resources injuries that are currently not known. Allocate an additional $1.3 millions coastal area identified by communities but not assessed by State/Federal teams.

## PEPC Project ID: 60777, DocumentID: 68455
## Correspondence: 194

### Author Information

Keep Private:           No
Name:                   Jayeesha Dutta
Organization:           Gulf Future Coalition
Organization Type:      I - Unaffiliated Individual
Address:                541 Julia Street Suite 300
                        New Orleans, LA 70130
                        New Orleans, LA,LA 70119
                        USA
E-mail:                 jayeesha@gulffuture.org

### Correspondence Information

Status: Reviewed                Park Correspondence Log:
Date Sent: 12/04/2015           Date Received: 12/04/2015
Number of Signatures: 1         Form Letter: No
Contains Request(s): No         Type: Web Form
Notes:

### Correspondence Text

The Honorable John C. Cruden
Assistant Attorney General for the Environment and Natural Resources Division
U.S. Department of Justice
950 Pennsylvania Avenue NW
Washington, DC 20530-0001

The Honorable Samuel D. Rauch III
Deputy Assistant Administrator for Regulatory Programs
National Marine Fisheries Service
1315 East-West Hwy, Silver Spring, MD 20910

RE: Joint Comments on the BP Consent Decree

Dear Mr. Cruden and Mr. Rauch:

On behalf of the undersigned members of the Gulf Future Coalition, we would like to thank the
Department of Justice for its leadership in securing a settlement with BP and the Gulf states
regarding natural resource damage claims and Clean Water Act civil claims. This settlement
marks an important milestone for Gulf communities, and provides significant opportunities for
comprehensive ecosystem restoration. We appreciate the opportunity to provide formal
comments on the consent decree and the Draft Programmatic Damage Assessment Restoration

Plan/Programmatic Environmental Impact Statement (PDARP/PEIS).
Public Engagement and Restoration
We appreciate the inclusion of important new requirements that BP must fulfill to monitor and
publicly report on its efforts to improve the safety of drilling operations in the Gulf of Mexico.
These requirements are critical to ensure that our coastal communities, and those that rely on the
health of the Gulf for their livelihood, are provided with safeguards from future disasters.
While we appreciate your timely response to our request for an extension of the comment period,
we disagree that it is has been in the best interest of the public keep the deadline as planned.
Being there are two long and complex documents for interested parties across the Gulf to read,
comprehend, and provide comment on, the 60-day comment period is unreasonable.
Additionally, for individuals who make their living shrimping in Gulf Coast waters, the chosen
comment period was at the height of the season. We are very concerned with the lack of
translated materials provided at all meetings, particularly the failure to provide translation
services at the Texas meeting in Galveston. These oversights do a tremendous disservice to the
citizens of the Gulf Coast, of whom these restoration dollars are meant to benefit. These funds,
particularly those related to the Natural Resource Damages are public funds. It is a disservice to
the public when our trustees don't provide adequate opportunities for communities who were
most impacted by the disaster.
We have significant concerns that the proposed governance structure in the Consent Decree and
the PDARP/PEIS will prevent meaningful participation from Gulf Coast communities. In its
current form, eight newly created Trustee Implementation Groups (TIGs) creates substantial
hurdles for public engagement and participation in the TIG's planning process. As each TIG will
develop its own engagement strategies, the public will be forced to follow eight individual NRD
processes - each with their own timeline and decision-makers. Such a dispersed system may
seriously prevent wide-ranging public engagement among rural, low-income, communities of
color, and limited English members of the public. These individuals have an important stake in
the outcomes of these proceedings, however, with the additional hurdles of tracking eight
different processes with minimal resources, this system may not be able to support their
engagement.
This proposed unstructured and uncoordinated process places a enormous burden on the
American public. It can reasonably be perceived that this proposed structure is an effort to
decrease transparency and public participation. The Trustees must provide a consistent
restoration planning process across TIGs that will not require enormous expenditures of time and
treasure from the public to participate.
In response, we suggest the consent decree and DRDARP be revised to support a multi-tiered
approach to public engagement:
• The Trustee Council should develop strong standard operating procedures (SOPs) requiring
each Trustee Implementation Group to develop common approaches, coordinated timelines and
resources for engaging the public in developing draft restoration plans, in order to ensure
inclusive participation. SOPs should promote steps to reach populations such as low income,
minority, rural and limited English proficient communities and commercial and subsistence
fishers across the coast which face hurdles to accessing public engagement opportunities and are
disproportionately impacted by the health of coastal ecosystems. The public should be able to
review and provide input on the Trustee Council's SOPs, including procedures for public
engagement.

• The Trustee Council should require the Government Accountability Office to audit the restoration activities and monies spent by federal, state, and local municipalities to ensure compliance of expenditures under the Consent Decree.

• The Trustee Council should promote engagement strategies beyond public meetings to support comprehensive dialogue about restoration. In particular, the consent decree and DRDARP should create a public advisory committee to facilitate sustained input from representatives of the public at-large and key stakeholder groups on the planning, evaluation, fund allocation, and conduct of restoration activities. Such a committee, and relevant sub-committees could ensure key interests across the Gulf Coast states including commercial and subsistence fishers, conservationists, recreational users, socially vulnerable and native stakeholders relevant to the various TIGs are informed, involved and can help educate broader constituencies about the decision making process going forward.

• Terms should be added to the Consent Decree to promote the use of local workers and firms within NRD restoration. As cited in the DRDARP, local hiring is one of the top concerns of local residents during previous phases of public hearings on NRD. Terms should include a requirement to post new job opportunities created by contractors, or relevant subcontractors, as a part of NRD funded restoration work with relevant state and local workforce development agencies nearest the site of such work if state law does not already require such postings. Additionally, contractors should be required to consider workers referred to contractors and subcontractors by these local workforce agencies. Such terms would align with the language under the RESTORE Act, recent state laws in Florida, Louisiana and Mississippi and examples in federal contracting.
• The Trustee Council and TIGs should ensure adequate funding for public engagement. In particular, the Council should consider allocating a portion of the resources currently committed for administration under the regional restoration TIG to promoting public engagement across TIGs.
There is substantial concern that the proposed governance structure segments the responsibility of achieving ecosystem restoration that threatens the Trustees' ability to coordinate and reduces accountability. This proposal places an unjust burden on the public by increasing the time and effort required to meaningfully engage and participate in restoration planning and implementation.
Open Ocean Allocation
We are pleased that $8.1 billion has been allocated toward NRD, and that $1.24 billion of the NRD allocation is dedicated to restoration and enhancement of the open ocean. The BP oil disaster began off the shore of Louisiana, 5,000 feet below sea level. The sea life that depends on our the health of our oceans, such as sea turtles, marine mammals, finfish, and sea birds, were all exposed to massive amounts of oil and dispersants. The oil disaster began in our coastal waters, and the open ocean is in dire need of comprehensive restoration. Emerging information regarding the impacts to our ecosystem signifies troubling outcomes for our marine environment, which emphasizes the need for meaningful restoration in the open ocean. Inclusion of the open ocean allocation will allow for restoration of the Gulf Coast's premier fisheries and ocean habitats, both of which are essential to the health of the economy in the region.

However, we are concerned that the proposed governance structure for the administration of

Natural Resource Damage (NRD) funds and implementation of restoration under the Draft Programmatic Damage Assessment Restoration Plan/Programmatic Environmental Impact Statement (PDARP/PEIS) will be extremely costly and make it difficult to plan and implement restoration activities to achieve the Gulf-wide and ecosystem-scale goals set by the Trustees.

While we appreciate the dedicated funding for blue water restoration, we are disappointed with the broad definition and terms of funding for the open ocean allocation. The consent decree defines Open Ocean as "restoration activities for resources primarily in the ocean and Federal Trustee administrative and preliminary planning activities across Restoration Areas." By this definition, projects and associated costs that do not address ocean resources will be able to be drawn from this account. This is proposal is unjustifiable considering the plethora of damages specified in the PDARP/PEIS for ocean resources and habitats.

Additionally, four of the early restoration projects that address lost recreational use have been reclassified as open ocean projects. These projects include nearly $7 million for roadway enhancements (bike and pedestrian lanes) at Davis Bayou in Mississippi, $545,000 for trail enhancement at Bon Secour National Wildlife Refuge in Alabama, more than $10 million for a "beach enhancement project which involves removing fragments of asphalt and road-based material that are scattered widely over the Fort Pickens, Santa Rosa, and Perdido Key areas of Gulf Islands National Seashore, in Florida," and more than $4 million for the "purchase of up to three pedestrian visitor ferries for use between the City of Pensacola, Pensacola Beach, and the Fort Pickens area of Gulf Islands National Seashore in Florida."

As we examine and evaluate the types of projects conducted in previous phases of restoration, we are alarmed that these four projects have been reclassified as open ocean projects. None of the above listed projects occur in the open ocean and do not fit the definition provided by consent decree. This sets a dangerous precedent for future funding of projects in any component, where Trustees are able to pull funds from restoration accounts that do not benefit the stated resources. Additionally, of the Of the $832 million allocated for early restoration, only $20 million has been allocated to restoring marine resources injured in this oil disaster. Classifying recreational use projects as one that address injuries to the open ocean reduces the amount of funding available to restore and improve the our marine environment. The offshore ecosystem is where the disaster occurred and where resources to address significant injuries must still be directed. Funding these projects may be suitable under different allocations; however, they are inappropriate for the open ocean allocation. We recommend that the consent decree and its related documents consider an alternative, applicable allocation for these projects, either from their respective implementation state or from the region-wide allocations.

The NRD Final Allocation table provides additional details on where the NRD money will be spent. "Administrative Oversight and Comprehensive Planning" accounts for $150 million of the open ocean funding. It is unclear if the $150 million amounts to the total allocation for "Federal Trustee administrative and preliminary planning activities across Restoration Areas," as explained in the open ocean definition. This clarification is crucial as it could indicate additional monies are removed offshore restoration. Is the $150 million the final allocation total for Federal Trustee planning and oversight? Could additional funding from other portions of the open ocean allocation also be used for Federal Trustee planning and oversight? Should federal administrative and planning costs exceed $150 million, where will the funding be derived from? With the costly

administration expenditures of the proposed governance structure, how will the Trustees ensure there will be adequate monetary support to develop and implement a comprehensive suite of restoration projects for the open ocean resources?

Due to the significant concerns outlined above, we are frustrated and troubled that funding for open ocean restoration will be spent on overhead costs for other restoration components and on reclassified, previously approved, land-based recreational projects. We implore the Department of Justice to revise the definition of Open Ocean in the consent decree to guarantee the proper use of the funds in that allocation. Further, the consent decree must make explicit that administrative costs should absolutely not exceed the $150 million allocated, and should only pertain to costs related to staffing and travel. The open ocean allocation must not be used for Federal Trustee planning costs across restoration areas.

Suggested definition of "Open Ocean":

"Open Ocean" consists of restoration activities occurring in the ocean or activities that create, enhance, or improve marine resource management, scientific research, or monitoring of natural resources in the ocean and Federal Trustee administrative activities, capped at $150 million, across Restoration Areas.

Thank you for your consideration of these requests; please let us know if we can provide additional information or assistance. For additional information, please contact Jordan Macha at the Gulf Restoration Network (jordan@healthygulf.org).

Sincerely,

The undersigned organizations from the Gulf Future Coalition:

Action Communication and Education Reform Inc., Duck Hill, MS
Alliance Institute, New Orleans, LA
Artspot Productions, New Orleans, LA
Atchafalaya Basinkeeper, Baton Rouge, LA
Earth Ethics, Pensacola, FL
Galveston Baykeeper, Galveston, TX
Gulf Islands Conservancy Inc., Biloxi, MS
Gulf Restoration Network, New Orleans, LA
Idle No More, Gulf Coast, Rayne, LA
Louisiana Environmental Action Network, Baton Rouge, LA
Lower Mississippi Riverkeeper, Baton Rouge, LA
Mind Power Collective, New Orleans, LA
Mobile Bay Sierra Club, Mobile, AL
Mondo Bizarro, New Orleans, LA
Mothers for a Sustainable Energy, Rayne, LA
Oasis Earth, Anchorage, AK
On Wings of Care, New Orleans, LA

Correspondences - Department of Justice - Consent Decree - PEPC ID: 60777

Operation Homecare, Mobile, AL
Pelican Coast Conservancy, Mobile, AL
Public Lab, New Orleans, LA
Synergy Strategic Communications, Mobile, AL
Vanishing Earth, New Orleans, LA

Notes:
The Gulf Future Coalition is a diverse gulf-wide network of conservation, community, human
rights, and social justice organizations working together to ensure the Gulf of Mexico
environment and communities are made whole from the BP Deepwater Horizon oil disaster.
TBD
"Resources and Ecosystem Sustainability, Tourist Opportunities, And Revived Economies of the
Gulf Coast States Act of 2011". Senate Report 112-100. http://www.gpo.gov/fdsys/pkg/CRPT-
112srpt100/html/CRPT-112srpt100.htm; "Mississippi Jobs First Act of 2012", Mississippi Code
800.00-800.04 http://www.sos.ms.gov/ACProposed/00019129b.pdf; "Louisiana First Hiring
Act", Chapter 27 of Subtitle III of Title 39 of the Louisiana Revised Statutes of 1950, R.S.
39:2211 through 2214 http://www.legis.la.gov/legis/ViewDocument.aspx?d=877313; "Job
Orders- Department of Economic Opportunity" Florida Department of Economic Opportunity
http://www.floridajobs.org/PDG/TrainingPresentations/wp_basics/Job_Orders_Part1.ppt
Consent Decree, Appendix 2 at §2.1.1.
Bike & Ped Lane GUIS MS ($6,996,751), Bon Secour NWR Trail, AL ($545,110), Beach
Enhancement G.I. National Seashore ($10,836,055), Gulf Islands National Seashore Ferry
Project ($4,020,000). See Appendix 2 Table 2 of Consent Decree at:
http://www.justice.gov/enrd/file/780686/download
Phase III Early Restoration Fact Sheet, Gulf Islands National Seashore Beach Enhancement
Project, available at http://www.gulfspillrestoration.noaa.gov/wp-
content/uploads/BeachEnhancementFactsheet4.pdf.
Phase III Early Restoration Fact Sheet, Gulf Islands National Seashore Ferry Project, available at
http://www.gulfspillrestoration.noaa.gov/wp-content/uploads/FerryFactsheet4.pdf.
"Restoration activities for resources primarily in the ocean and Federal Trustee administrative
and preliminary planning activities across Restoration Areas." Consent Decree, Appendix 2 at
§2.1.1.
In September 2015, Trustees approved Phase IV of early restoration bringing the total approved
to be spent to $832 million from the $1 billion BP pledged for early restoration. See
http://www.gulfspillrestoration.noaa.gov/2015/09/latest-round-of-early-restoration-projects-
approved/.
Early restoration included a bycatch-reduction project estimated to cost $20 million. Consent
Decree, Appendix 2, Table 2.
Consent Decree at Appendix 2.1; Table 5.10-1 Draft PDARP/PEIS at page 5-103.
Consent Decree, Appendix 2: Agreement Among the United States and the Gulf States Relating
to Natural Resource Restoration; Draft PDARP/PEIS at page 7-4.

Correspondences - Department of Justice - Consent Decree - PEPC ID: 60777