# EXHIBIT 5

RESPONSE TO COMMENTS ON THE CONSENT DECREE

The Department of Justice (Department) held a 60-day comment period on the proposed

Consent Decree. 80 Fed. Reg. 60180 (October 5, 2015). The Department, in conjunction with the

Natural Resource Damage Trustees (Trustees), also held 8 public meetings during the 60-day

period, in the following locations: Galveston, Texas; Houma, Louisiana; New Orleans,

Louisiana; Long Beach, Mississippi; Mobile, Alabama; Pensacola, Florida; St. Petersburg,

Florida; and Washington D.C. Fact sheets, posters, power-point presentations, and summaries of

the Proposed Consent Decree and Draft Programmatic Damage Assessment and Restoration

Plan/Programmatic Environmental Impact Statement (Draft PDARP) were provided, including

Vietnamese translations for certain summaries. The comment period on the Consent Decree

closed December 4, 2015.  The Trustees released a Notice of Availability of the Deepwater

Horizon Oil Spill Final Programmatic Damage Assessment and Restoration Plan and Final

Programmatic Environmental Impact Statement (PDARP) on February 19, 2016, and a Record of

Decision on March 22, 2016.

The Department received 25,404 correspondence (letters, emails, submissions via the

portal, or orally at hearings) detailing comments regarding the settlement.[1] The overwhelming

majority of comments (over 25,000) related to the issue of tax deductibility of payments due

under the Decree. The Department received a set of 25,205 individual letters collected by Friends

of the Earth raising the issue of tax deductibility. (Out of those 25,000 or so letters, about 500

added some variation to the standard form.) An additional 3,510 individuals collectively signed

one letter on the tax issue from the Public Interest Research Group. Excluding the tax

---

[1] It is difficult to determine how many individual comments these encompass since some comments were submitted
on behalf of multiple organizations and each correspondence raised multiple concerns. Based on signatures
submitted into the online comment portal, there were 28,932 signatures to the correspondence although some
individuals and organizations sent in more than one.

deductibility issue, the highest number of comments (96) related to commenters' personal descriptions of injury or private claims resulting from the spill, including injury or economic losses. Approximately 30 commenters expressed concern that the amounts in the settlement were not enough, ten with respect to the civil penalty specifically. Approximately 20 others commended the Department for its work and expressed support for the Consent Decree. Twenty commenters raised questions about criminal fines, and approximately 35 commenters asked for an extension to the comment period.

A small number of distinct in-depth correspondence (approximately 25) were received from a number of non-profit environmental groups, other community activist groups, and individuals. These groups represent numerous constituents, and their various comments were generally detailed and thoughtful. In general, the environmental groups supported the Proposed Consent Decree (and the Draft PDARP), although they did raise specific concerns, chiefly related to how the Trustees will administer restoration going forward, including public engagement, and concerns about the allocations to the Open Ocean Restoration Area.

The following are the Department's responses to the concerns raised by the comments.

1.  **Consent Decree Comment.** Of the thousands of comments received, 10 commenters expressly raised concerns that the civil penalty (or fine) was too low, arguing the penalty should be closer to the maximum statutory penalty. Some expecting the benefit of RESTORE funds saw the lower penalty figure as shifting funds away from RESTORE in favor of natural resource damages.

**Response:**

To arrive at the penalty amount, the Department bargained at length with BP, ultimately under the supervision of a Magistrate Judge and a Special Master appointed by the District Court. The Department weighed the statutory penalty factors set forth in § 311(b)(8) of the Clean Water Act (CWA), 33 U.S.C. § 1321(b)(8), against the evidence and risks of litigation. In litigating to judgment, the United States ultimately might secure a larger civil penalty against BP; but it also is possible that the United States could secure smaller sums by litigating to judgment. Even if a larger amount were secured, payment may not have been received for years while the case made

its way through the appeals process. The $5.5 billion civil penalty is the largest ever paid under any environmental statute and is a reasonable settlement that sufficiently punishes BP and sends a clear deterrent message to the entire industry. Even if the amount is lower than what potentially could be achieved through litigation, the Department must weigh that risk against both the fact that payments would likely not be recovered for years during costly litigation and the possibility of being awarded a lower penalty in litigation. Weighing all these factors, the Consent Decree provides a fair and reasonable resolution of these matters.

2. **Consent Decree Comment.** Some commenters expressed concern that the amount provided for natural resource damages was not sufficient, for example one comment stated "I am concerned that, even though the Justice Department feels that we got a good settlement that this really isn't going to cover the costs."

**Response:**

The Trustees have provided a sufficient basis to support the conclusion that the settlement amounts allocated for natural resource damages satisfy the goals of the Oil Pollution Act (OPA), and amount to a resolution that is fair, reasonable, and in the public interest. The Trustees assessed natural resource damages and developed a programmatic restoration plan for those damages under their trusteeship as required by OPA, 33 U.S.C. § 2706. In addition to considering the analysis of the Trustees, in determining whether to accept a settlement, the Department must weigh the benefits of the settlement against the risks of proceeding with litigation. In this case, while higher amounts of damages may have been recovered in litigation if the Court agreed with the expert testimony presented by the Trustees, it is also the case that the Court might determine a damage amount, based on testimony given by BP's expert witnesses, well below the amount in the Consent Decree. By accepting the settlement, the United States not only avoids these risks from litigation but also benefits from payment now rather than after years of additional litigation in the District Court and potential appeals.

In responding to comment on the Draft PDARP, the Trustees addressed similar comments. See excerpts from Chapter 8.3.1.3 of the PDARP (these responses and the cited explanations in Chapter 7 can be found at http://www.gulfspillrestoration.noaa.gov/restoration-planning/gulf-plan/).

**1-20 Draft PDARP Comment**: Several comments were received expressing that the amount for natural resource damages was too low, for example stating, "This settlement should only be considered payment for the first 15 years, the total sum should be 1 trillion dollars because the harm will last a century," or "$8 billion - amount BP is offering $44 billion - amount BP made in 2014 5 trillion - estimated number of larval fish killed in the oil spill, fish that would have become food for the ecosystem and humans had they survived If BP paid just one penny for each of those fish (completely discounting the economic effects of the region and other environmental damage already estimated to be in the many millions), that's 50 billion."

**Trustee Response**: Several commenters suggested that the overall settlement for natural resource damages is too low. None of the commenters provided any scientific or legal basis or justification for their position. Based on the Trustees' injury assessment and proposed ecosystem restoration approach, the Trustees are satisfied that if the settlement

3

money is expended in conformance with the programmatic plan proposed in the PDARP/PEIS, the public will be made whole for the loss of natural resources and services suffered as a result of the DWH incident. Accordingly, the Trustees believe the settlement is fair, reasonable, and in the public interest. OPA regulations allow the Trustees to settle claims for natural resource damages "… at any time, provided that the settlement is adequate in the judgment of the trustees to satisfy the goals of the OPA and is fair, reasonable, and in the public interest" (15 CFR § 990.25). In this case, the Trustees have concluded that the settlement provides a reasonable approach to achieving the goals of OPA to make the public and the environment whole, is a fair and reasonable result, and advances the public interest. To reach this conclusion, the Trustees followed requirements set forth in the OPA to assess the injured natural resources and the impact of restoration planning. Following OPA regulations, the Trustees determined whether the DWH incident injured natural resources or impaired their services (15 CFR § 990.51) and quantified the degree and the spatial and temporal extent of those injuries and loss of services (15 CFR § 990.52). The assessment process and the determination and quantification of injuries and service losses are described in Chapter 4 of the PDARP/PEIS. The Trustees used a variety of standard scientific approaches, appropriate to the nature of the resource and injury being studied, and relied on years of sampling, modeling, and analysis to determine that the DWH incident caused injuries to virtually all marine and estuarine habitats impacted by the oil, from the deep sea to the shoreline. The Trustees developed and evaluated alternatives for comprehensive restoration planning and determined the impact of the alternatives (15 CFR § 990 and 42 USC § 4321, et seq.). As a result, the Trustees determined that a comprehensive ecosystem-wide programmatic restoration plan was warranted. That plan is designed to achieve five overarching goals: restoring and conserving habitat; restoring water quality; replenishing and protecting coastal and marine resources; providing and enhancing recreational opportunities; and providing for monitoring, adaptive management, and oversight of restoration. The Trustees particularly considered the early investment of the funds toward ecosystem-wide restoration and avoidance of further degradation of resources in determining the adequacy of the settlement. Taken all together, the Trustees are satisfied that the plan will achieve restoration goals and requirements. The consideration of alternatives and identification of the preferred programmatic plan is described in Chapter 5 of the PDARP/PEIS.

3.  **Consent Decree Comment.** Several commenters expressed general dissatisfaction with the Consent Decree. Some commenters suggested it was too complicated, others suggested the amounts were not sufficient. Some expressed a preference that the case be litigated in Court rather than settled.

    For example "I OPPOSE the current proposed Consent Decree, it is too complex, too broad and unclear, it allows for too many diverse interpretations and implementation" or "this amount of money to pay for the awful horrible horrendous spill is not enough" or "Would it not be better to allow a really good case to get to court so we can learn what really happened? Isn't that the purpose of a civil case like this - not to absolve the guilty but to resolve the losses that have resulted from bad behavior?"

**Response**:

The Consent Decree reflects a settlement that is fair and reasonable, in the public interest, and consistent with the objectives of the CWA and OPA. Settlement provides a valuable tool in allowing cases to be resolved rather than facing years of expensive litigation. While the United States and BP had already completed three phases of trial relating to CWA claims when the settlement was reached, no judgment on the penalty had yet been rendered by the Court. Any decision would then be subject to years of potential appeals. Litigation regarding natural resource damages under OPA had not yet begun, and a result would not have been expected for years to come. This Consent Decree brings resolution and allows important restoration to begin now, rather than wait years for litigation to conclude.

The settlement also appropriately addresses issues of health, safety and the environment resulting from the incident. The Consent Decree seeks deterrence of future incidents both with injunctive relief and the amounts paid for penalty. The $5.5 billion civil penalty, the largest ever paid under any environmental statute, is a reasonable settlement in light of the litigation risks. Combined with the other amounts paid by BP related to this incident, this penalty sufficiently punishes BP and sends a clear deterrent message to the entire industry. Furthermore, the United States Coast Guard (Coast Guard) has completed response actions to address health and safety resulting from the incident, concluding that the consequences of further removal outweigh the benefits of such removal. OSAT-I Report, TREX-012237.052; OSAT-II Report, TREX-012238.003, .007-.008, .033-.034; OSAT-III Report, TREX-011826. However, the Consent Decree allows the Coast Guard to recoup from BP the costs of any response or removal actions from BP after July 2, 2015, as long as the oil can be proven to be from Macondo. Consent Decree ¶ 65(a). Moreover, the Consent Decree provides for reimbursement of state and federal costs, including response and removal actions, ensuring the goals of public safety have been addressed. Lastly, it requires BP to pay natural resource damages in an amount that the state and federal Trustees have found "will make the public whole for the loss in natural resources and services suffered." PDARP 1.6. Remedying the natural resource damages from the incident will benefit the Gulf community as a whole. Weighing all these factors, the Department believes the Consent Decree provides a fair and reasonable resolution of these matters.

4. **Consent Decree Comment.** By far the largest number of comments received concerned the ability of BP to deduct from its taxes payments made under the Consent Decree, as well as other spill related costs. More than 25,000 comments were received on this issue. Commenters expressed many reasons for their concerns, but most argued that in light of its gross negligence and willful misconduct or its criminal conduct, BP should not receive any tax benefit from the damages it must now pay to redress the results of that bad conduct. Many saw tax deductions as a subsidy of such payments or a burden being shifted to other taxpayers, and strongly opposed the idea that damages or clean-up cost payments for these types of violations should be considered a "cost of doing business." They stated that BP would not feel the full effect of deterrence if it did not end up paying the full amount because of deductions. Some felt that taxpayers should not subsidize fossil fuels companies or those contributing to climate change. Others argued that BP could afford to pay and therefore should be held responsible for the entire amount. It is argued that the Department of Justice has broad discretion in how it settles claims and could bargain for a no-tax-deductibility term that would apply to all payments made under the Consent Decree.

**Response:**

This Consent Decree prohibits any BP entity from taking as a tax deduction any portion of the civil penalty, just as the tax code expressly bars such deductions.[2] The approach in the Consent Decree follows the Department's longstanding practice in settlement of civil penalty claims that arise under federal pollution control laws (like the CWA). The practice compels a settling defendant to recognize the express prohibition of such deductions under the tax code. By prohibiting BP from taking any tax deduction from its penalty amount, the consent decree fully abides by existing law, is consistent with all other federal consent decrees of this type, and assures full compliance with the law.

Also consistent with the Department's practice is this Consent Decree's silence as to whether natural resource damage and cost payments required by the Consent Decree can be deducted in any fashion. These types of damages and payments are not penalties, and should be examined consistent with tax law requirements based on their unique character. Some commenters may not have considered this distinction, referring to all payments under the Consent Decree as fines or penalties.

Commenters assume that such payments will be deductible absent a settlement term barring such deductions. That could be but is not necessarily so. If and when BP entities seek tax advantage from any payment under the Consent Decree (other than penalty payments), BP and the relevant tax authority can take up this legal question under the applicable tax law.

The nature of damage claim resolved here also suggests leaving questions of tax deductibility to the generally applicable law rather than to a special settlement provision. The commenters argue for extension of the "no deduction" provision to damages and costs on the basis of BP's gross negligence and willful misconduct. Again, this argument mistakenly finds natural resource damages and cost payments to depend on the conduct of the individual. In fact, Congress has already decreed that a person is exposed to much greater liability for penalties and damages under OPA – indeed, unlimited liability for damages – if that person acted with gross negligence or willful misconduct. 33 U.S.C. § 2704(c)(1)(A) (gross negligence or willful misconduct overcome limits on defendants' liability set under § 2704(a) and increases the maximum penalties under § 1321(b)(7)). It should be repeated that the consent decree clearly does not prevent appropriate tax authorities from disallowing any deduction sought for natural resource damages or cost payments. If and when BP entities present their position on the taxable status on any payment under the Consent Decree (other than penalty payments), the relevant tax authority will make a determination in accordance with applicable law. This is the consistent process taken in all similar consent decrees. In such circumstances a consent decree that does not establish the

---

[2] The U.S. Tax Code provides that: "No deduction shall be allowed . . . for any fine or similar penalty paid to a government for the violation of any law." 26 U.S.C. § 162(f) ("Trade or business expenses"). The Treasury Regulations further define a "fine or similar penalty" as including amounts:

> (ii) Paid as a civil penalty imposed by Federal ... law .... [or]
> (iii) Paid in settlement of the taxpayer's actual or potential liability for a fine or penalty (civil or criminal)....

26 C.F.R. § 1.162-21(b)(1)(ii), (iii).

tax effect of damages payments remains a prudent exercise of the Department's discretion as to the appropriate settlement terms.

And, it should be noted that had this case been litigated instead of settled, the outcome concerning tax liability would have been the same. After a lengthy civil action, likely followed by appeals, when the Court eventually awards damages, BP would be in the same position it is now concerning tax liability. That is, they would have to comply with, with the clear law preventing deduction of penalties but need a specific examination of non-penalty payments by the relevant taxation authority before any deductibility decisions could be made.

5.  **Consent Decree Comment.** Several commenters raised concerns or objected to the payment schedule of 16 years. Some asked that the Consent Decree provide terms that would allow the Trustees flexibility to manage and leverage the money by borrowing against the terms, bonds, or other financial mechanisms. Similarly, concerns over the ability to spend RESTORE funds given this payment schedule were raised. Similar language was requested to allow flexibility in how RESTORE funds are managed.

**Response:**

Pursuant to the CWA, one of the factors a court should evaluate in determining an appropriate penalty is the economic impact of the penalty on the violator. Based on the billions of dollars spent on the response, private claims, and other matters related to the spill, as well as BP's current economic condition, the Department believes that the payment schedule for the $14.9 billion at issue in the Consent Decree is fair, reasonable, and in the public interest.

In negotiating the payment schedule, the Department considered the litigation risk associated with trial of the claims, as well as the many years of trial and appeals that would likely occur before a payment were received. At the time the parties proposed this Consent Decree – after five years of litigation – the litigation over natural resource damages claim had yet to begin, nor had the trial Court ruled on the appropriate amount of a civil penalty. Resolution of these issues could easily consume several more years. This Consent Decree, while allowing payment over time, also provides for significant payments to be made well in advance of when any payments could have been expected if the case was litigated to conclusion. A $14.9 billion principal paid over time – with interest – is a reasonable term in these circumstances.

Furthermore, some of the harms of payments over time are offset by benefits that may accrue through implementing restoration over time. To consider, evaluate, and implement $8.8 billion in natural resource damage restoration will take significant time in any case. Planning for future projects will benefit from monitoring and adaptive management on current projects. Moreover, damages that are not apparent at this point in time may become apparent in the future. Payments over time allow for the Trustees to respond to unknown conditions that only manifest themselves later. Therefore, as a practical matter payment over time syncs up with the anticipated timeline needed for restoration planning.

With respect to the Consent Decree's effect on how the Trustees manage the funds over the years, the Consent Decree does not limit any otherwise legally available methods of leveraging funds for natural resource damages. Therefore, no additional language in the Consent Decree is required, as the Consent Decree does not limit what is otherwise legally available.

Several comments, including some from counties, cities, and parishes that stand to benefit from RESTORE funds, raised concerns about the effect of the payment schedule on the ability to do large scale projects under the RESTORE Act. Many of these commenters requested that the Consent Decree be altered to allow flexibility in how funds are managed or to allow payouts over the short term to some municipalities and projects. However, the Consent Decree does not guide how RESTORE funds are spent or managed. Penalty payments are subject to the requirements of the RESTORE Act, 33 U.S.C. § 1321(t), as laid out by Congress, and the Consent Decree does not alter those requirements. Nothing in the Consent Decree affects what methods are otherwise legally available for spending and managing RESTORE funds. Therefore, no change to the Consent Decree is warranted.

6. **Consent Decree Comment.** Information on the present value of the settlement was requested: "I know you-all are here to talk about NRDA [natural resource damage assessment], but other projects, any ways to allocate or make the allocation easier in some way for somebody to discount back to a present value will be important, because there's no way you can do some of these projects without that" and "The value of the settlement should be represented in present value so that the public can have a more meaningful estimate of what they are getting."

**Response:**

In the course of negotiations with BP, the federal and state governments tested the extent to which changing various factors (*e.g.*, discount rate, interest accrual, payment stream duration and distribution) would affect the value of the settlement. The governments did not calculate an official or consensus present value for the settlement. While most people would likely agree with the basic principle of present value – that a dollar in hand today is of greater value than a dollar received at a later time – many would disagree over the best way to measure that difference in value. Present value calculations are used for many different purposes, and even experts in the field hold varying views over how best to set one of the parameters that often drives a present value calculation – the discount rate. In general, the lower the discount rate, the higher the present value of future receipts (and *vice versa*).

The discount rate employed will often vary with who makes the calculation and its purpose. Should one apply a constant discount rate or reduce the rate over time? Practice varies. *See* Kenneth J. Arrow et al., *Should Governments Use a Declining Discount Rate in Project Analysis?*, Review of Environmental Economics and Policy, vol. 8, issue 2, 145-163 (2014). Should the discount rate differ depending upon whether one is evaluating public projects instead of private investments? Some think so. *See* Dima Jawad & Kaan Ozbay, *The Discount Rate in Life Cycle Cost Analysis of Transportation Projects*, 85th Annual Meeting of the Transportation Research Board, National Academy of Science (2006). Should one use a discount rate at the lower or higher end of the typical range for such analysis? The U.S. Office of Management and Budget suggests the answer may vary with the circumstances. *See* U.S. Office of Mgmt. and Budget, *Informing Regulatory Decisions: 2003 Report to Congress on the Costs and Benefits of Federal Regulations and Unfunded Mandates on State, Local, and Tribal Entities* (2003). Regardless of the rate-setting approach one employs, where the rates of inflation, interest, and return on monies held by the federal government are low by historical standards – as they have been here for some time – the difference in value between a dollar received today and one received sometime in the future tends to be less.

In any event, after analyzing as part of settlement negotiation the concerns captured by the concept of present value, along with many other factors, the governments concluded that BP's settlement payments meet key settlement objectives: sufficient punishment and deterrence (specific and general), appropriate funding for restoration of natural resources injured by the spill, and proper repayments for other sums owed the governments (*e.g.*, assessment and removal costs).

7. **Consent Decree Comment.** Several commenters noted that in spite of concerns, they supported and approved the Consent Decree moving forward and being finalized so that restoration could begin. Multiple commenters thanked the Department, and federal and state agencies for their hard work in securing a fair settlement.

**Response:**

We agree that the settlement is fair, reasonable, and in the public interest and agree that moving forward with the Consent Decree will allow the important work of restoring the Gulf to move forward.

8. **Consent Decree Comment.** Several commenters expressed a desire to see offshore drilling banned and a concern that another spill like this would happen again. Some suggested BP should be prohibited from leasing or contracting until the Consent Decree payments were made, or other probationary requirements are in place. Other commenters commended the important new requirements for BP to publicly report on its efforts to improve the safety of drilling in the Gulf of Mexico.

**Response:**

As for a ban on offshore drilling, such steps fall outside the scope of this civil enforcement action, which focused on the conduct of one of several major operators in the Gulf of Mexico. As for the adequacy of punishment, the civil penalties in this case are reasonable and sufficient to deter companies from future behavior that could lead to another incident like this one. This is especially true when viewed in light of the other expenses BP incurred associated with the response. In addition to the deterrence the amounts paid provide, the Consent Decree also contains injunctive relief which builds upon prior agreements with BP designed to deter future inappropriate behavior and improve the safety of BP's drilling by increasing transparency into BP's compliance with required changes.

The United States and BP negotiated a criminal plea agreement, which was approved by the District Court, see Consent Decree App. 5 (MDL 2179, Rec. Doc. 15436-8), and related Implementation Plan at App. 6 (MDL 2179, Rec. Doc. 15436-8). The Plea Agreement included various "conduct" requirements such as requiring a safety monitor and an ethics monitor, performance of safety and environmental audits, and drilling-specific requirements such as blowout preventer (BOP) requirements and a real-time operations monitoring center. As the Court stated when accepting the plea, the purpose was to make sure that BP could not "return to business as usual while on probation." Reasons for Accepting Plea Agreement, *U.S. v. BP*, 12-cr-292, Rec. Doc. 65 at 18 (E.D. La. Jan. 30, 2013). Separately, BP entered into an administrative agreement with EPA to resolve potential suspension and debarment claims relating to the Macondo well oil spill and other, prior BP conduct. Consent Decree App. 4 (MDL 2179, Rec.

Doc. 15436-5). Under this Consent Decree, BP acknowledges compliance with the requirements of the prior two agreements as well as their continuing force. The Consent Decree also requires that BP post on a publicly-available web site information about the company's ongoing performance under those agreements. Consent Decree ¶¶ 34-39; App. 4-6, 10, 11. These transparency requirements allow the public greater insight into BP's performance under these agreements.

9.   **Consent Decree Comment.** Several commenters raised concerns that BP and other responsible parties should be held accountable for all damages. For example, "Make them pay for the disaster they created- -and whose results are still poisoning the Gulf and its wildlife and sealife." or "BP put profit before any concern for life or the Gulf. Why should they not have to pay for all the misery they caused? It will be generations before the ocean will be restored if ever. They need to pay and pay dearly. They can learn a lesson and maybe the other oil companies will take more precautions." Others raised concerns that the other parties responsible, Transocean, Anadarko and MOEX, should also be held accountable.

**Response:**

The Consent Decree, by funding the PDARP, is intended to address the injuries to natural resources legally attributable to this massive oil spill. That sum will not address injuries to the Gulf which stem from causes unrelated to the spill, but should redress all natural resource injuries resulting from the spill; precisely what the law – the Oil Pollution Act – provides for here: damages for injury, destruction, or loss of use of natural resources resulting from the spill or other incident in question. 33 U.S.C. §§ 2702(a) and (b)(2)(A). Based on the extensive damage assessment performed as part of the PDARP, the Trustees concluded that the funds recovered will address the injuries to natural resources caused by the spill. This includes a reserve fund of up to $700 million for injuries or conditions unknown now that might manifest later.

The PDARP and Consent Decree thereby hold BP accountable for resulting natural resource injuries that the oil spill caused in the Gulf by funding the cost of restoration over time and provide an effective means to address harm to natural resources identified in the future.

In addition to the very significant damages that BP is obligated to pay, it must also pay a large civil penalty. The civil penalty proposed here, $5.5 billion, is the largest civil penalty ever secured under an environmental statute and is substantial enough that both BP and all in its industry are likely to note in their future operations. One of the purposes of a civil penalty is to deter violations of the law in the future. We believe that the proposed civil penalty will have a significant deterrent effect.

Moreover, the Consent Decree must be viewed in the context of all the other money that BP spent. It is estimated that BP spent about $14 billion on the response to the spill (largely during 2010). Beyond that BP also has paid billions of dollars to private claimants (including individuals and businesses) through claims processes and through two class action settlements. Also, BP entered a criminal plea in which it pled guilty to certain crimes and is required to pay $4 billion.

Finally, the other owner and operators of the Macondo well have been held accountable. On June 18, 2012, the Court entered a Consent Decree between the United States and MOEX. That Consent Decree provided for the recovery of $70 million in civil penalties for violations of the CWA and for violations of laws of the five Gulf Coast States (Alabama, Florida, Louisiana, Mississippi, and Texas). That Consent Decree also required MOEX to perform supplemental environmental projects valued at $20 million in the five Gulf Coast States. MDL 2179, Rec. Doc. 6698. On February 19, 2013, the Court entered a Consent Decree settling the United States' claims against Transocean and requiring the Transocean Defendants to pay a $1 billion civil penalty under the CWA and comply with certain injunctive terms related to drilling safety. MDL 2179, Rec. Doc. 8608. Finally, on November 30, 2015, the Court issued its Findings of Fact and Conclusions of Law regarding Anadarko's penalty amount and assessed a civil penalty of $159.5 million. MDL 2179, Rec. Doc. 15606. With respect to natural resource damages, BP has indemnified many other parties involved in the Macondo well; therefore, what they would owe is covered in this settlement. Consent Decree ¶ 63.

10. **Consent Decree Comment.** Commenters raised concerns that a decentralized Trustee Implementation Group (TIG) structure would lead to lack of coordination among the TIGs, thereby compromising the ecosystem approach to restoration and impairing public engagement. While some commenters sought procedures to protect against these problems, others requested the TIG structure be removed or altered to provide the Trustee Council with authority to approve, disapprove, or revise restoration plans. (Requests for procedural changes are addressed separately.)

**Response:**

Considerable thought was devoted to designing a decision-making structure for restoration that will be as efficient and effective as practicable without sacrificing the benefits of coordination across the Gulf. The Trustees explained why the structure laid out in the Consent Decree will allow for efficient use of funds while at the same time promoting both public engagement and cooperation and coordination among the various TIGs. Rather than restate the explanations, the Trustees' responses are repeated below because they adequately address why the TIG structure will lead to efficient and effective decision making, without compromising the ecosystem approach to restoration.

The following are excerpted from Chapter 8.3.7 of the PDARP (these responses and the cited explanations in Chapter 7 can be found at http://www.gulfspillrestoration.noaa.gov/restoration-planning/gulf-plan/).

**7-1 Draft PDARP Comment**: Commenters expressed general concern about the governance structure and, in some comments, strongly recommended that the Trustees reconsider the governance approach described in the PDARP/PEIS (e.g., that one Trustee Council be established versus the Trustee Council and eight TIGs currently proposed), urging the Trustees to give thought to how the efforts will be well-coordinated. Commenters expressed concern that the structure will be extremely cumbersome, inefficient, expensive, and burdensome to administer; that it could inhibit Gulf restoration; that the structure significantly outweighs the benefits of streamlined decision-making; and that it will be difficult to achieve consistency and coordination across the TIGs. Additional concerns included potential for disconnects when decision-making is

delegated to a local level. Commenters requested that the Final PDARP/PEIS better outline how the federal and state Trustees will develop the structure and get the work done.

**Trustee Response**: The Trustees considered commenters' assessment of the proposed governance structure. The Trustees believe that restoration decisions and priorities are best decided by the entities that have the most knowledge of and jurisdiction over resources in each Restoration Area. Separating the governance structure to include five Restoration Areas that are specific to Gulf State boundaries will ensure that restoration decisions are made in an efficient manner. Each TIG's restoration decisions must be consistent with integrated ecosystem restoration described in the preferred alternative, which helps ensure that restoration decisions are made in an effective manner consistent with and supporting the goals established in the PDARP/PEIS. Further, the inclusion of Regionwide and Open Ocean Restoration Areas acknowledges that many resources cross-cut political jurisdictions and that the Trustees will need to coordinate on restoration decisions that best benefit the injured resources and contribute to the ecosystem goals identified in Alternative A. The available administrative funds to support the structure were anticipated by the Trustees as part of the necessary costs of restoration on such a large ecosystem scale, and those administrative funds are part of the proposed settlement and were defined in the proposed Consent Decree and in Chapter 5, Section 5.10, of the released Draft PDARP/PEIS. The Trustees' development of more specific mechanisms for administering and implementing the PDARP/PEIS will appropriately be developed in the SOP described in Chapter 7 of the Final PDARP/PEIS. The Trustees believe the level of detail in the governance chapter, including the commitment to ensure all subsequent restoration plans are consistent with the Final PDARP/PEIS, is sufficient to describe an effective and efficient structure for implementing the defined restoration.

**7-3 Draft PDARP Comment:** Commenters recognized that the decentralized decision-making structure proposed in the Draft PDARP/PEIS will increase efficiency in decision-making and accelerate implementation of critical restoration efforts around the Gulf, and that the structure has potential to serve as a good foundation for restoration decision-making. Commenters agreed with the flexibility for TIGs to phase decision-making given the 15-year payment schedule. However, commenters urged refinements be made to the PDARP/PEIS to provide for effective governance, efficient delivery and optimal coordinated use of NRDA funds. Specific recommendations are addressed in other statements and responses (e.g., additional comment period on SOPs and MOUs, proactive and formalized efforts to coordinate between TIGs and across other restoration programs (e.g., RESTORE and NFWF), program reviews, project selection criteria, and strategic restoration planning).

**Trustee Response:** The Trustees appreciate the comments that the governance structure is a good foundation for restoration decision-making. The Trustees agree with and recognize the need for, and benefit of, on-going regional collaboration both within this governance structure and with external restoration programs. One of the primary roles of the Trustee Council is to establish common procedures in restoration planning, public engagement, communications, monitoring and adaptive management, and reporting that will be practiced by each TIG. As noted, the need for flexibility is also paramount to

efficiency in restoration decision-making and implementation, so TIGs are provided some individuality, fully consistent with the Trustee Council MOU and SOP, to operationalize restoration within their Restoration Area to create efficiencies and expedite implementation. Given this, the Trustee Council remains the central coordinator of the Final PDARP/PEIS, responsible for establishing the framework in which the TIGs will operate. The Council is considering several means of integration across the TIGs, as well as with other restoration programs in the Gulf, including, but not limited to, strategic framework development, data sharing, public engagement, and science coordination. These topics are more thoroughly addressed in subsequent response to comments, below. While the Trustees agreed that some clarifications and additions to Chapter 7 are helpful and were incorporated in the Final PDARP/PEIS, the Trustees do not agree that every refinement must be made to the PDARP/PEIS to provide for effective governance. Rather, as noted by commenters, the PDARP/PEIS provides a good foundation for governance. The Trustees agree that it is necessary to ensure the Trustees' subsequent restoration planning decisions are fully consistent with the PDARP/PEIS and appropriately vetted with the public. The details of operationalizing this structure are appropriately made in the subsequent SOPs and MOUs, which may evolve over time as needed to optimize effective administration of this restoration effort.

**7-7 Draft PDARP Comment:** Commenters raised concern over the decentralized governance structure, which creates eight TIGs for specific Restoration Areas, is established on political boundaries rather than a holistic ecosystem approach. Commenters suggested that this decentralization would create a 'silo effect' and would not allow the Trustees to meet the ecosystem restoration goals as described for the integrated ecosystem restoration approach (Alternative A) of this PDARP/PEIS. A commenter stated that creation of eight TIGs to minimize difficulties of reaching consensus was unnecessary because restoration funding is allocated by resource to specific political subdivisions, and that the Trustee Council should have authority to approve or disapprove TIG restoration decisions. Some commenters suggested organizing by watershed boundary and were concerned that there was no forum for all Trustees to come together. Commenters provided recommendations to strengthen coordination, consistency, and accountability across TIGs and to address restoration an ecosystem scale in the event the proposed structure moves forward. Commenters expressed concern that the proposed structure sets a troubling precedent for future large NRDAs.

**Trustee Response:** The Trustees devoted considerable thought to designing a decision-making structure for restoration that will be as efficient as practicable without sacrificing the benefits of coordination across the Gulf. Having experienced four years of making decisions on early restoration projects through consensus by all five Gulf States and four federal Trustees, the Trustees believe that the full restoration plan can best be implemented by the Trustees through the proposed TIG structure, in which most TIGs include a subset of all Trustees, while the Regionwide and Unknown Conditions and Adaptive Management TIGs, as well as the Trustee Council itself, include all Trustees. There are several mechanisms in the PDARP/PEIS to ensure the integrated ecosystem restoration approach developed by the Trustees in the PDARP/PEIS will be achieved. First, the preferred alternative in the PDARP/PEIS was developed by all of the Trustees after significant consideration as explained in the PDARP/PEIS. All of the Trustees are

obligated to meet the restoration requirements presented in the Consent Decree and PDARP/PEIS, which is based on an ecosystem perspective. Second, the participation of the federal Trustees in all TIGs will provide continuity in the ecosystem perspective across all the Trustee organizational structure. Third, all of the Trustees will participate in the Regionwide TIG, which is intentional to promote ecosystem connectivity across resources and living coastal and marine resource Restoration Types. The TIGs are only a function of administration and cannot alter the body of work mandated in the Final PDARP/PEIS, future Record of Decision, and final approved Consent Decree. Fourth, as discussed in other responses herein (see 7-29), the Trustee Council will commit to a minimum of an annual public meeting, which will serve as a formal forum for TIGs to convene. Fifth, the Trustee Council SOP will detail the common accountability and reporting requirements of each TIG, which will be made publicly available through the Trustee Council website. Finally, other mechanisms for cross-TIG coordination exist, including particularly strategic framework development and coordination of monitoring and adaptive management through a Cross-TIG Monitoring and Adaptive Management Work Group.

11. **Consent Decree Comment.** Having raised concerns about the proposed governance structure (as noted above), commenters also requested the Consent Decree include a number of measures designed to ensure coordination among the TIGs and ensure public participation. For example, commenters requested the Consent Decree require Standard Operating Procedures (SOPs) for the Trustee Council be adopted by each TIG and available for public comment, noting the details of how this governance structure would operate in the future hinges on these SOPs. Some were concerned that each TIG may develop its own engagement strategies, making it difficult for the public to follow and participate in restoration decisions. To address this concern commenters requested a Citizen Advisory Council be required to ensure public input. These requests and others essentially seek to add governance procedures and requirements for future restoration decisions and work by the Trustees into the Consent Decree. Other examples of these requests include public reporting requirements, procedures for coordination among the TIGs and other restoration programs such as RESTORE, public meeting requirements, staff requirements, and Government Accountability Office or Court oversight.

**Response:**

The Consent Decree and PDARP contain a programmatic decision for future restoration, outlining specific Restoration Areas and Restoration Types that have been selected. The Consent Decree also sets out a basic framework for how future work will be conducted, including who will make decisions, and any future projects selected within these specifications are subject to the requirements of OPA, National Environmental Policy Act (NEPA), and other applicable law – state and federal. The Consent Decree does not alter the requirements that these laws, and associated regulations, impose for public engagement, comment, and project selection. Indeed, Appendix 2 specifies that each TIG will have procedures in place for developing projects, in accordance with OPA regulations and other applicable requirements. See Consent Decree App. 2, Sections 3.3, 3.3.2.

These comments offer suggestions for how the TIG structure might operate in the future. The Department believes, however, this is a matter for the Trustees to address going forward; we do

not agree that the Consent Decree is the best place to address issues such as coordination among the TIGs or the details of restoration plans. The Trustees have explained in the PDARP and response to comments that not only will they comply with legal requirements, they will also issue SOPs that outline steps for project selection and public engagement during that process. See PDARP/PEIS Section 8.3.7. The Trustees are in the best position to determine how best to facilitate work under the TIG structure, or what changes to make in the future. The Consent Decree outlines the basic framework for restoration, leaving the Trustees the necessary flexibility to operate as they determine best, within the confines of the law.

As the Trustees' future work is governed by applicable law, the Department does not believe that this Consent Decree with BP should outline additional procedures and requirements for the Trustees as they move forward with restoration.

12. **Consent Decree Comment.** There was concern over the placement of federal Trustee administrative costs in the Open Ocean Restoration Area in Consent Decree, Appendix 2, Table 1, and questions raised about the extent to which these costs would come from this Restoration Area. Some commenters felt the TIG structure would lead to larger inefficiencies and therefore higher administrative costs. Questions were raised about whether funding could be taken from other sources if the administrative costs allocation were depleted, and some requested a cap on costs to prevent that from occurring. Several commenters requested the amount for administrative costs be lowered.

**Response:**

The primary concerns raised in these comments were to minimize administrative costs and to not reduce the amount of restoration done in the Open Ocean Restoration Area by funding more federal Trustee administrative costs from other Restoration Areas, rather than from the Open Ocean administrative costs allocation. Appendix 2 to the Consent Decree was crafted recognizing the importance of an efficient decision-making structure. The Department agrees with the Trustees that, contrary to some of the comments received, the allocation of administrative costs and framework laid out in the Consent Decree and the PDARP does in fact provide for the most efficient structure for decisions. The Trustees have effectively responded to concerns and questions regarding administrative costs and explained why no changes are necessary to the Consent Decree. Rather than restate those explanations, which adequately address the comments raised, the Trustees' responses are excerpted below.

The following are excerpted from Chapter 8.3.7 of the PDARP (these responses and the cited explanations in Chapter 7 can be found at http://www.gulfspillrestoration.noaa.gov/restoration-planning/gulf-plan/).

> **7-36 Draft PDARP Comment:** Numerous commenters expressed concern that restoration of Open Ocean resources will be undermined by allowing funds to be spent on unrelated projects and administrative matters. Commenters expressed concern that all federal administrative, oversight, and preliminary planning activities in all Restoration Areas will be expended from the $150 million in administration and oversight funds allocated to the Open Ocean TIG, and further requested that all federal administration and oversight be capped at $150 million, or even be reduced.

Commenters requested a more equitable distribution of administrative costs across all TIGs. Commenters were generally pleased that $1.24 billion is allocated to the Open Ocean Restoration Area, but requested the Final PDARP/PEIS better define "Open Ocean" and ensure that Open Ocean funds are used for the purpose of restoring offshore ocean marine life and ecosystems. Other commenters felt it may be challenging to develop projects for the Open Ocean, and that there should be an allowance for reallocation to inland fisheries.

**Trustee Response:** The Trustees agree with the importance of creating an efficient decision-making structure that will use all available restoration funds efficiently and effectively, including funds allocated for administrative costs. The Consent Decree and the PDARP/PEIS specifically describe and allocate funds to administrative oversight to ensure that funds for restoration and for program administration are sufficient. The Trustees are committed to maintaining administrative costs within the provision of their respective administrative allocations, working to streamline efforts and employ efficiencies across Restoration Area operations. In many cases, the Trustees expect to utilize the same core support staff for many Trustee Council and TIG operations to bring continuity and efficiency to restoration implementation across the Restoration Areas. While it is not possible to know at the beginning of this multi-year restoration process exactly how much administrative funding will be required over the lifespan of the Trustees' work, the Trustees anticipate that the present administrative allocations are sufficient for the duration of the program. In the event that an allocation adjustment is considered necessary, Trustees, upon consensus agreement, may amend the Restoration Plan, as provided in Consent Decree Appendix 2, Section 3.6. Such changes are subject to public review and comment according to the OPA regulations and may also require court approval, depending on the change. The Trustees believe the administrative oversight and comprehensive planning allocation in the Draft PDARP/PEIS is equitable and did not make changes to this funding in the Final PDARP/PEIS. The definition of "Open Ocean" likewise remains unchanged, as the Trustees believe this Restoration Area was sufficiently described in the Draft PDARP/PEIS. Regarding the concern of federal administrative funding drawing from the Open Ocean allocation, the federal Trustees prefer the proposed construct, given that the Open Ocean Restoration Area is composed of only federal Trustees. The total amount of Trustee administrative funds was added to the total funding required to complete the body of restoration work presented within this PDARP/PEIS. Where the administrative funds are reflected within the Consent Decree, Appendix 2, Table 1, is a matter of financial tracking efficiency and in no way affects or reduces the funding purposed for Restoration Types within any of the Restoration Areas. The Trustees believe that this funding structure allows for efficiency by the federal Trustees.

**7-38 Draft PDARP Comment:** Commenters expressed concern that administrative costs will be extremely costly. Commenters requested the Final PDARP/PEIS clarify the intended use of the administrative oversight and comprehensive planning allocations. Commenters raised concerns and confusion on the extent of administrative support for "other" TIGs that will come out of the Open Ocean Restoration Area and questioned whether all administrative funding is coming out of the Open Ocean TIG. Specific concerns raised by commenters noted that operating and coordinating the activities of

nine Trustee Councils, rather than one, multiplies the functional administrative needs and substantially increases the costs of the decision-making system. Additionally, commenters noted that all four federal Trustees (DOI, NOAA, USDA, and EPA) will sit on all eight TIGs, and each must be prepared to staff all eight TIGs, plus the primary Trustee Council, for the next decade and a half. Commenters asked how the federal and state Trustees will cover the costs of maintaining the functionality of nine Trustee bodies, instead of one, for well over a decade, and requested a description of what will happen if and when the administrative costs exceed the amount allocated in the Consent Decree. Commenters also requested an administrative and oversight breakdown from the Trustees to ensure that each federal and state Trustee would be able to meaningfully participate in each TIG over the duration of the restoration program. Specifically, some commenters requested that the first restoration plans developed in each TIG include a financial plan that details how the TIGs will use the administrative and planning allocation over the lifetime of the program. Commenters recommended that these financial plans make clear whether staff payments will be derived only from this administrative allocation, or if the Trustees are envisioning charging staff time directly to projects. Commenters also recommended that the administrative funding be examined carefully throughout the restoration process to determine if more of the funding can be allocated to actual restoration activity.

**Trustee Response:** Chapter 7 states that the administrative funding for the federal Trustees will be from the Open Ocean Administrative Oversight and Comprehensive Planning allocation, which will be used to fund federal Trustee non-project-specific responsibilities on all TIGs and the Trustee Council. Chapter 7 also states that the state Trustees' non-project-specific responsibilities on all TIGs and the Trustee Council will be funded from the state TIG Administrative Oversight and Comprehensive Planning allocation, not from the Open Ocean allocation. Section 7.2 was modified to reflect that federal Trustee involvement for certain administrative functions on behalf of the Trustee Council—such as the administrative record, coordinating Trustee Council meetings, data management, Trustee Council staffing, the Trustee Council website, and coordination with other Gulf of Mexico restoration programs—would be funded out of the Regionwide TIG, not the Open Ocean Administrative Oversight and Comprehensive Planning allocation. The Trustees believe that the proposed governance structure provides the efficiency and effectiveness needed to achieve sound restoration planning consistent with the goals established in the Final PDARP/PEIS, and that the costs of program administration were adequately considered in establishing the allocations.

Both federal and state Trustees will participate in project planning activities within their respective Restoration Areas, as defined in Chapter 7. Project-specific planning activities may be funded out of the Restoration Type allocations in which the project applies and not out of general Trustee administrative allocations. The point at which Trustee participation in a project may be considered a project cost and no longer supported from Trustee administration has been clarified in Section 7.3.1.

The Trustees acknowledge that the budget for administrative work is a stringent one and will require careful management. But, unless and until events demonstrate otherwise, this course fosters the Trustees' goal of funding as much on-the-ground restoration as

practicable. While the new Trustee organizational structure is more complex than a single trustee council, it is more efficient because every Trustee is no longer required to participate in the development and implementation of every restoration project. The Trustees do not intend to make detailed financial plans available in each TIG's first restoration plan; however, those subsequent restoration plans and the Trustee Council website will provide the public with information on expenditures to date to provide financial context for restoration decisions. At certain points during implementation of this restoration program, the Trustees will evaluate the use of administrative funds to adjust as needed to account for 15 or more years of program implementation. Section 7.3.3 has been revised to reflect that the Trustees will evaluate progress of the Monitoring, Adaptive Management, and Administrative Oversight goal to consider whether adjustments to Trustee agency resources and expenditures are needed to accomplish the requirements of the PDARP/PEIS.

13. **Consent Decree Comment.** Commenters expressed concern with some of the specific Restoration Types included in the Open Ocean Restoration Areas, for example some early restoration addressing recreational loss, given that all injury stemmed from the open ocean. First, commenters expressed a concern that the grouping of several Early Restoration projects ($22M) aimed at Enhanced Recreational Opportunities in the allocation for the Open Ocean TIG could set a precedent for conducting future recreational use projects being considered using funds allocated to the Open Ocean TIG. Second, some commenters stated that certain Restoration Types (i.e., Gulf sturgeon) do not fit into the category of Open Ocean. Third, commenters raised concerns that administrative costs were inappropriately included in Open Ocean. Fourth, some commenters requested a change in the definition of the Open Ocean Restoration Area if the aforementioned projects were not accounted for in a different Restoration Area.

**Response:**

First, issues regarding administrative costs and their inclusion in the Open Ocean Restoration Area are addressed in response 12 above. Second, Appendix 2 of the Consent Decree sufficiently limits the use of funds allocated to the Open Ocean Restoration Area, such that a modification to the Consent Decree is unnecessary. Furthermore, the projects and costs allocated to Open Ocean are appropriately allocated. The Trustees have addressed these concerns, and the Department adopts the responses provided in Chapter 8 of the PDARP, as follows:

**7-37 Draft PDARP Comment**: Commenters expressed concern with some of the specific Restoration Types included in the Open Ocean Restoration Areas. First, commenters expressed a concern that several Early Restoration projects ($22 million) aimed at Enhanced Recreational Opportunities were grouped into the Early Restoration allocation for the Open Ocean TIG, because this could set a precedent for future recreational use projects being considered using funds allocated to the Open Ocean TIG. Second, some commenters stated that certain Restoration Types (i.e., Gulf sturgeon) do not fit into the category of Open Ocean. Further, some commenters requested a change in the definition of the Open Ocean Restoration Area if the aforementioned projects were not accounted for in a different Restoration Area.

**Trustee Response:** As stated in Section 5.10.4 (footnote #10) of the Draft PDARP/PEIS, "The Open Ocean Restoration Area includes four Early Restoration projects that were approved in Phases III and IV for $22,397,916 million for restoration on federally managed lands. These projects are reflected in Open Ocean for purposes of Early Restoration accounting. For purposes of subsequent project identification and selection associated with this Draft PDARP/PEIS, the remaining Open Ocean funding is allocated to fish and water column invertebrates, sturgeon, sea turtles, marine mammals, birds, and mesophotic and deep benthic communities." The accounting for these projects against the Open Ocean Restoration Area will not establish a precedent for future recreational projects by the Open Ocean TIG because there has been no additional funding allocated to that Restoration Type within the Open Ocean Restoration Area. Further, the Early Restoration projects in question are all on federally managed lands or sanctuaries that were injured by the spill. Those injuries were not only to the natural resources themselves; the Trustees also documented adverse impacts on the public's use and enjoyment of those areas. For that reason, it is appropriate to account for projects in the Open Ocean Restoration Area to enhance public access or enjoyment of those resources. In addition, because the injuries occurred on federally managed areas and federal Trustees are taking the lead on the restoration projects in question, it is appropriate, in terms of efficiency, to implement these projects through the Open Ocean TIG, which consists of the federal Trustees. Similarly, Gulf sturgeon is included in this allocation due to the federal management responsibility for this species in both marine and freshwater environments.

It should also be noted that the Open Ocean Restoration Area does not allocate any funding for recreational enhancement projects other than those selected in Early Restoration. This is also reflected in the definition of the Open Ocean Restoration Area, which is for resources "primarily," but not "exclusively," "in the ocean." See Consent Decree Appendix 2, Section 2.1.1. Finally, the location of the injury to natural resources does not always correspond to the location of appropriate projects for restoring those resources. While this settlement does not include any decisions about particular projects, some portion of Open Ocean restoration projects to address offshore injuries may be partially or entirely implemented in nearshore or shoreline areas, owing to the complex interactions between natural resources offshore and close to shore.

The Trustees believe that the Final PDARP/PEIS and the allocation table set sufficient limits on the proper use of funds allocated to the Open Ocean Restoration Area, and that additional or modified definition of this TIG is not required.

14. **Consent Decree Comment.** Some commenters objected to the specific allocations of funds among the resource categories, or geographic areas. For example, some commenters wanted more money allocated to dolphins and less to recreational use, and some wanted more money for birds, while others sought funding for specific species that are covered by Restoration Types such as crab and shrimp fisheries.

For example, "Mississippi will receive about 2.2 million of the $8.8 billion awarded for damages, and my first comment is that is way too low," and "you specifically write the word 'crab' and 'shrimp restoration.' There is oyster restoration as a type, but we would like you to write crab and shrimp" or "I'm concerned in the numbers that are being put down here for

budgeting for marine mammals in Florida and Alabama where there's $5 million set aside for restoration of marine mammals in these two states, relative to $50 million for Louisiana, and then $55 million for open ocean. And I think part of that is there is less known about the impacts on marine mammals in Florida and Alabama, primarily bottle-nose dolphins, but also Florida manatees. Some of the data is insufficient to justify or explain what happened to that particular tax budget in our local waters. So I would urge you to perhaps review that a little bit more thoroughly and make sure that the dollars are adequately allocated to address marine mammal injuries in Florida and Alabama specifically since those are the two that received the lower amount of funding."

**Response:**

As explained above, in addressing comments in the course of finalizing the PDARP, the Trustees have explained the allocation of settlement amounts intended for natural resource damages. This is true both for the amounts as a whole, and for each of the various Restoration Areas, and Restoration Types. Following the procedures established under OPA, the Trustees have determined that the best way to restore all of the injuries that occurred as a result of the DWH incident is a comprehensive, integrated ecosystem approach with the intent of enhancing the connectivity and productivity of habitats and resources. This approach – selected as the best of several alternatives – should help sustain restoration gains over the long term. The recognition of the key role of coastal habitats in the interconnected Gulf of Mexico ecosystem helps to ensure that multiple resources, including marine mammals and crab and shrimp, will benefit from restoration and that reasonably inferred but unquantified injuries are likely to be addressed. The Trustees have explained why each of the Restoration Types and Restoration Areas will work cohesively to address the ecosystem injury identified in the PDARP. Accordingly, no change to the allocation in the Consent Decree is necessary.

The Trustees have responded in more detail to concerns raised over the allocation and requests for specific restoration types in Chapter 8 of the PDARP, Section 8.3.5, by explaining why the current selection of Restoration Types is designed to work cohesively, making changes unnecessary. These can be found at http://www.gulfspillrestoration.noaa.gov/restoration-planning/gulf-plan/.

15. **Consent Decree Comment.** Questions were raised about whether the $700 million provided for unknown conditions and adaptive management is sufficient. Some suggested that the amount should be closer to $2 billion, while others suggested the amount should be left unlimited or that the Consent Decree include a reopener for such situations. Others asked for a more detailed definition of unknown conditions in the Consent Decree, expressing concern that the Trustees might tap into those amounts too early. Some asked what role BP will have in determining unknown conditions, and recommended a third party be tasked with determining what unknown conditions exist.

**Response:**

Some commenters expressed that there should be a "reopener," rather than a set amount for unknown conditions. In negotiating settlements, the United States often includes a "reopener" provision that allows the government to file a claim for additional damages if it later discovers an injury to natural resources of a type that was unknown, or of a magnitude or duration

substantially greater than was known, at the time of the settlement. This provision is especially common where the injury is linked to chronic or longstanding contamination. The exact terms of such reopeners (also known as reservations of rights) in federal natural resource damage settlements vary, and some natural resource damage settlements do not include any provision of this kind.

The proposed Consent Decree with BP in this case provides for potential unknown injuries in a different way than using a reopener clause. The Consent Decree carves out a portion of BP's natural resource damage payments for the specific purpose of addressing unknown injuries, using a total of up to $700 million from two sources: a payment of $232 million that BP is required to make on the 16th anniversary of the Effective Date of the Consent Decree, see Consent Decree ¶ 21.b., and interest accrued on the deferred natural resource damage payments, see Consent Decree ¶ 21.a., which will amount to approximately $468 million if paid on the 16th anniversary of the Effective Date. This fund for unknown injuries will be administered by a TIG that includes representatives of each of the States and the four federal Trustees. Consent Decree ¶ 23; App. 2. The Consent Decree provides for two forms of flexibility favorable to the Trustees that a reopener provision would not:

- First, if all five States and the United States agree, they may require BP to pay all or a part of the accrued interest as early as January 1, 2026, or at any time between that date and the 16th anniversary of the Effective Date. This allows the Trustees to tap into the unknown conditions money early if they believe there is a time-sensitive need for it.

- Second, because it is entirely possible that some or all of the up to $700 million will not be needed to address unknown conditions, the Consent Decree allows the Trustees to use it "to adapt, enhance, supplement, or replace restoration projects or approaches initially selected by the Trustees." Consent Decree ¶ 21.

This approach to dealing with unknown injuries has both advantages and disadvantages in comparison with a typical uncapped "reopener." On the positive side, BP is obligated to pay the agreed amounts, up to a total of $700 million, without the need for the government to prove the existence of a spill-related injury unknown at settlement or to meet any other burden of proof that would apply before the reopener can be used. And BP must pay the amounts, even if there are no new unanticipated injuries.  Providing a large, certain payment for unknown injuries but foregoing the opportunity to pursue a new claim for an unlimited amount – is appropriate and advantageous here. Proving damages beyond what will be covered by these settlement payments in the Gulf of Mexico's massive, complex ecosystem would present a much more problematic litigation challenge than one might normally face in electing whether to employ a reopener.

Furthermore, the Trustees have explained that they are satisfied that the settlement amounts for restoration provided in the Consent Decree when expended in conformance with the programmatic plan proposed in the PDARP, will make the public whole for the loss of natural resources and services. In reaching this conclusion, the Trustees have considered, among other things the nature and extent of the specific injuries that have been identified and studied and the uncertainties attached to those injuries, uncertainties as to other injuries not fully studied, potential benefits (and detriments) of ecosystem-level habitat restoration, and the uncertainties attached to those restoration options. PDARP Chapter 1.6.

With respect to the adequacy of the $700 million provided for Unknown Conditions, the Consent Decree provides the required flexibility to allow restoration to adapt and respond to injury conditions as they arise. The Department agrees with the responses provided by the Trustees to concerns regarding the amount for unknown conditions, reproduced below:

**7-31 Draft PDARP Comment:** Commenters urged the Trustees to consider increasing the amount allocated to the Unknown Conditions TIG.

**Trustee Response:** The allocation of $700 million to the Unknown Conditions and Adaptive Management TIG is intended as a minimum reservation of funds for those purposes. This allocation is not the only mechanism the Trustees have to respond to unexpected circumstances that impair the ability to meet restoration objectives. The Trustees intend to employ adaptive management in implementing restoration projects, and agree that funds allocated to any Restoration Type may also be used for that purpose. Further, the structure of the restoration program—involving implementation over 15+ years—facilitates the Trustees' ability to recognize, adapt to, and respond to changing or previously unknown conditions as they arise. The Trustees consequently believe that the minimum allocation of $700 million to Unknown Conditions and Adaptive Management, when combined with this broader ability to address conditions that are currently unknown or undeveloped, provides the funds reasonably needed to address these circumstances.

**7-32 Draft PDARP Comment**: Commenters request that the Trustees clearly define what constitutes an "unknown condition." Commenters also urged the Trustees to develop criteria for access to funding in the Unknown Conditions and Adaptive Management TIG and better describe how decisions will be made about the use of those funds. Commenters urged the Trustees to base decisions about the use of Unknown Conditions and Adaptive Management TIG funds on scientific information, including restoration or other long-term monitoring outcomes that provide evidence of unforeseeable conditions, such as additional injury, that could not be accounted for during restoration planning. Commenters expressed concern that a lack of clear scientifically based criteria to access funds may incentivize their early use, thus preventing them from accumulating all possible interest. Early use may also deplete funds available to address new injuries or unknown conditions before they are fully understood. Commenters urged the Trustees not to rely on Unknown Conditions and Adaptive Management funds to account for reasonably foreseeable future environmental conditions as they are currently understood. Commenters suggested that the Trustees specify the process that this TIG will use to identify and prioritize unforeseen needs as they accrue.

**Trustee Response:** Section 7.2 states that unknown conditions are injuries or conditions that were unanticipated or unknown when this PDARP/PEIS was finalized, and the Trustees believe this definition is sufficient at this time. The Trustees recognize there are existing conditions that can foreseeably be incorporated into restoration planning and decision-making (e.g., relative sea level rise). The Unknown Conditions and Adaptive Management funding is therefore set aside for the purpose of addressing conditions that are not currently known and that may be identified through monitoring and analysis conducted under this restoration program. Under the Consent Decree, the Trustees may begin seeking payment from BP for unknown conditions no earlier than January 1, 2026.

In addition, the Trustees agree with the commenter that in order to properly address previously unknown conditions, sufficient information and data would be required, including monitoring data gathered by the other TIGs, to adequately understand the previously unknown conditions before selecting restoration measures.

The Trustees will incorporate the best available science into project selection, design, and implementation, including consideration of reasonably foreseeable future environmental conditions. By doing so, the Trustees will strive to ensure that funds from the Unknown conditions TIG are not needed to address or adaptively manage for future environmental conditions that could reasonably be predicted at the time of project implementation. Decisions on utilizing funds under the Unknown Conditions and Adaptive Management TIG will be informed by monitoring data gathered across TIGs and by reviewing any available scientific and/or supporting information that documents unforeseen conditions. Specific procedures will be developed in the future to guide Trustees' decisions on the use of the Unknown Conditions and Adaptive Management allocation, and they are expected to be part of a future Trustee Council SOP update. Unknown Conditions funds would not be accessed until such time that those procedures are developed, which has been clarified in Section 7.5.3.

16. **Consent Decree Comment.** Several commenters are concerned about residual oil, residual dispersants, and lingering health or safety issues associated with the spill. Some local governments commented that oil remained in the environment in their jurisdictions. Some noted that no oil should be left behind. For example, "There needs to be a removal of the toxins, a restoration of the delicate habitat, and payment to the small and large fishermen who lost their ability to continue their commerce in the area. Investigate remedies using biologic petroleum eating organisms, or remove the sunken toxic substances and allow the area to get to a point where it tests clean," or "The settlement is not adequate because there's not enough to remove the millions of barrels of oil from the marsh, from the Gulf floor, and all that will continue to wash up on our shorelines and marsh for years to come."

**Response:**

There is no doubt that some Macondo oil remains in the environment, in some form or another. However, the question for today is whether this settlement takes a reasonable approach to address such oiling, in light of all the previous removal and restoration. For at least three reasons, the Consent Decree (and PDARP) appropriately address the concerns raised in the comments.

First, the Coast Guard has completed active removal of oil in large part. Phase Three Trial Transcript, Jan. 26, 2015, at 1335. Part of this decision was a net environmental-benefit analysis: removal actions can themselves cause harm to the environment. As Admiral Meredith Austin testified in the Penalty Phase trial:

In oil spill response there is trade-offs and sometimes -- well, the easiest thing to do would be, I am going to go in there and take steam and blast everything away to make it look nice and pretty, that might not be the best for the environment, for the then environmental benefit.

See Phase Three Trial Transcript, Jan. 20, 2015, at 83. The Coast Guard has concluded that the consequences of further removal outweigh the benefits of removing additional oil. That decision was made long before this settlement. OSAT-I Report, TREX-012237.052; OSAT-II Report, TREX-012238.003, .007-.008, .033-.034; OSAT-III Report, TREX-011826.

Second, nothing in the Consent Decree prevents the Coast Guard from undertaking any needed removal or response actions to an oiling event in the future. For example, if new tar mats appear in coastal areas or elsewhere in the environment the Consent Decree does not prevent a response. Indeed, the Consent Decree allows the Coast Guard to recoup the costs of any such actions from BP if the oil causing the response came from Macondo. Consent Decree ¶ 65(a).

Third, the natural resource damage injury assessment demonstrates that there are, indeed, on-going and future ecological risks, so the commenters are certainly correct in raising the issue of such losses. But the Restoration Plan specifically addresses those very problems, and thus the settlement will allow the Trustees to fix and restore those conditions. Further, the Trustees can, if they choose, perform shoreline restoration that includes removal of residual oils. Accordingly, the settlement adequately addresses any oil remaining in the environment in accordance with the law.

17. **Consent Decree Comment.** The PDARP and Consent Decree should explicitly prohibit the use of any funds for projects or programs that damage our resources in the Gulf directly, indirectly, or cumulatively.

**Response:**

The restoration decisions using natural resource damage monies in both the Consent Decree and the Trustees' PDARP are programmatic, meaning that the natural resource damage settlement funding is allocated to defined Restoration Areas and Restoration Types, but the Consent Decree contains no determinations regarding which restoration projects to build within that funding framework. Once the Trustees reach the point of weighing which restoration projects to implement, an analysis of environmental impacts and benefits, including cumulative impacts, will be considered as required by law. As explained in response to concern statement 11, the Department does not believe it would be appropriate to prescribe additional requirements to the Trustees' decisions which are governed by OPA, as well as other laws.

18. **Consent Decree Comment.** Commenters expressed concern that restoration would focus on recreational use projects such as boat ramps and piers or projects inland far from where the spill occurred rather than restoring habitats and wildlife. Some expressed concern that restoration should not occur outside the coastal zone.

**Response:**

OPA provides for the recovery not only of damages for injury to, or loss of natural resources, but also for the "loss of use" of those natural resources. 33 U.S.C. § 2702. In this case, the Trustees have determined that this spill caused not only injuries, but also losses to the recreational services associated with those natural resources. The Trustees have explained (1) why the comprehensive, integrated, ecosystem approach outlined in the PDARP is the most reasonable way of addressing these injuries, as well as the other injuries documented from the spill; and (2) the role of recreational use projects:

**5-4 PDARP Comment:** Commenters expressed concern that restoration would focus on recreational use projects such as boat ramps and piers or projects inland far from where the spill occurred rather than restoring habitats and wildlife. Some expressed concern that restoration should not occur outside the coastal zone.

**Trustee Response:** As part of the comprehensive, integrated, ecosystem restoration portfolio, the Trustees allocated restoration funds across Restoration Types, making investments Regionwide, in the Open Ocean, and in each of the five Gulf state Restoration Areas to restore coastal and nearshore habitats, improve water quality in priority watersheds, protect and restore living coastal and marine resources, and enhance recreational use opportunities. By making investments across resource groupings and supporting habitats, the Trustees will ensure that the public is appropriately compensated for all the resources and services injured by the spill. However, the identification and selection of restoration projects and locations are decisions that will be part of subsequent project-specific restoration plans which will also be available for public review and comment. The trustees must evaluate and select the proposed restoration projects, based on the OPA evaluation standards, which includes the ability of the restoration project to provide comparable resources and services; that is, the nexus between the project and the injury is an important consideration in the project selection process.

Marine and coastal natural resources of the Gulf of Mexico provide recreational services to individuals from across the United States and around the world. The injuries to these natural resources caused by the DWH incident also caused losses to the recreational services associated with natural resources. Therefore, in order to fully compensate for all of the injuries caused by the spill, restoration also needs to compensate for lost recreational opportunities. For more information on lost recreational use, please refer to Chapter 4, Section 4.10. The Trustees understand that recreational losses can be addressed through ecological restoration strategies or other actions that restore or enhance the resources available to be enjoyed by the public. Yet because recreational losses caused by the spill are widespread and substantial, the Trustees considered it important to also consider projects that could address these losses more directly and expeditiously. However, it is worth noting that of the up to $8.8 billion allocated across Restoration Types, less than 5 percent of the total allocation is for the Restoration Type "Provide and Enhance Recreational Opportunities." The majority of the funds are for restoration of marine and coastal habitats as well as specific natural resources such as marine mammals, sea turtles, birds, and sturgeon. For additional information on the allocation of funds, please refer to Section 5.10.

19. **Consent Decree Comment.** The Department received comments opposing the allocation of $85.5 million to the Gulf State Park "hotel" project during early restoration.

**Response:**

We believe that the word "hotel" is intended to refer to the "Gulf State Park Enhancement Project," a project aimed at enhancing Gulf State Park, a recreational destination along the Gulf coast in Baldwin County, Alabama. The Project includes dune restoration, trail improvements, interpretative and education centers, and a rebuilt lodge and conference center. The expectation is that the improvements will draw additional visitors to the Alabama coast and improve the

quality of visits for all, thus compensating the public for opportunities lost to use natural resources as a result of the oil spill. The Project will dedicate $85.5 million to improve Gulf State Park, increasing public access to the Park's varied natural resources to partially compensate for recreational services lost due to natural resource injuries in Alabama. The Project and associated allocation were selected in the June 2014, Phase III Early Restoration Plan and Early Restoration Programmatic Environmental Impact Statement, which was issued as part of the "Early Restoration" in accordance with the early restoration planning process described in that Phase III plan. The Project was already subject to a public comment period as part of preparing the Phase III Early Restoration Plan and Early Restoration Programmatic Environmental Impact Statement. A response to those comments was previously prepared as well, and is included as Chapter 13 of the Phase III Plan, specifically part "13.17.5.2 Gulf State Park Enhancement Project," which can be found here: http://www.gulfspillrestoration.noaa.gov/restoration/early-restoration/phase-iii/.

The Gulf Restoration Network has sued the federal and Alabama Trustees regarding the Project in a civil action filed in the United States District Court for the Southern District of Alabama, *Gulf Restoration Network v. Sally Jewell, et al.,*15-cv-191 (S.D. Ala). The district court recently issued a decision on February 16, 2016, in this matter, and the Trustees are currently studying this opinion and will decide how to move forward.

However, it should be noted that the Consent Decree and PDARP are both programmatic in nature, and allocate funding to Restoration Areas and Restoration Types rather than specific projects. The funding of any specific project does not affect the appropriateness or reasonableness of the allocation to each Restoration Type and Restoration Area.

20. **Consent Decree Comment.** Some commenters raised concerns about the money being mismanaged, and not spent appropriately by politicians and government officials. For example, "We know that corrupt officials will get most of it anyway" or "The monies are not being spent to help the resource as designed to do. The states should not be in control of the funding."

**Response:**

Both the Consent Decree and PDARP establish a process for overseeing how natural resource damage funds will be spent. The Consent Decree outlines these provisions in Appendix 2. With the exception perhaps of some response or assessment costs which are being refunded to both the United States and Gulf States by BP, none of the funds allocated for natural resource damages under the settlement will go into the General Fund of any Trustee. Rather, payments will be made to a special fund managed by the Department of the Interior on behalf of all Trustees, and that may be distributed further into smaller funds for the benefit and use of the TIGs. See Consent Decree ¶ 18; App. 2.

Furthermore, no single Trustee has authority to determine how funds will be spent. Rather, the Consent Decree establishes a governance structure that assigns a TIG for each of eight restoration areas (restoration in each of the five Gulf States, Open Ocean, Region-wide, and Unknown Conditions and Adaptive Management.) Multiple Trustees, either state or federal, will have representatives on each TIG (federal and state on each State TIG, Regionwide, and Unknown Conditions, while Open Ocean is federal only). Each TIG will generate future restoration plans that identify specific projects, consistent with the funding allocation in the

Consent Decree, PDARP and the OPA. TIGs will make decisions by consensus and document their decisions in the administrative record. Moreover, the Consent Decree requires that independent financial auditing be performed on a regular basis for funds dispersed to each TIG. Consent Decree App. 2, Section 4.1.

Some of the monies paid for civil penalty will be allocated under the Resources and Ecosystem Sustainability, Tourist Opportunities and Revived Economies of the Gulf Coast States Act of 2012 (RESTORE), Public Law 112-141, Subtitle F. However, because this Act was passed by Congress, the Consent Decree does not play any role in allocation of these funds or decisions on how those funds will be spent.

21.  **Consent Decree Comment.** Some local government entities requested clarifying language in several places in the Consent Decree to clarify that local government entities were not included in the Consent Decree or in the covenants provided.

**Response:**

Paragraph 74 of the Consent Decree provides that:

> "Instrumentalities. All references to the Gulf States in this Section XIII and Paragraph 5 shall include each and every of the five Gulf States and, respectively, all State Trustees, all branches, agencies, associations, authorities, boards, bureaus, councils, departments, educational institutions or systems, components, public benefits corporations, or other instrumentalities of any kind, administrators, elected or unelected officials, officers or delegates (other than in their individual capacities), attorneys, or other agents of any kind of each of the Gulf States, ***provided however that a reference to a Gulf State shall not include counties, parishes, municipalities, or any other local governmental or local political subdivisions authorized by law to perform local governmental functions***." (Emphasis added.)

Section XIII of the Consent Decree covers covenants not to sue and reservations, and paragraph 5 outlines which parties are bound by the terms of the Consent Decree. These provisions demonstrate that any legal claims held by "counties, parishes, municipalities, or any other local governmental or local political subdivisions authorized by law to perform local governmental functions" are unaffected by the Consent Decree or any of the covenants therein.

22.  **Consent Decree Comment.** Some commenters wanted to know why more severe criminal penalties, including jail time, were not imposed against either individuals or the company. Some stated their belief that such penalties were appropriate.

**Response:**

This Consent Decree resolves only civil claims related to the *Deepwater Horizon* oil spill. Each federal plea agreement in this matter would have been subject to, among other things, approval by a federal district court. Information on criminal cases related to the spill can be found on the Department of Justice website at http://www.justice.gov/criminal-vns/case/bpexploration (last accessed 2/16/16).

23. **Consent Decree Comment.** Many comments received on the Consent Decree pertained not to natural resources damages or the penalty, but to claims and damages suffered by many individuals and businesses across the Gulf as a result of the spill. Commenters underscored the extent to which this spill impacted and damaged their businesses, health or those of family members. Others highlighted the many environmental damages that have been documented or that they may have personally witnessed. Many sought assistance with their personal claims, while others argued that the government should not be able to recover before individuals or that the funds recovered should go to victims. Others wondered whether this settlement interfered with or impacted their own claims, and why individual victims had not had their claims litigated.

**Response:**

First, and foremost, the Department recognizes that the impact on communities in the Gulf from this disaster cannot be overstated and expresses sorrow for the economic, social, and physical destruction of health, family, and livelihood reported by many commenters. Many of these tragedies fall outside the authority of the Government to redress here in this Consent Decree, but we hope that restoration of natural resources found in the Gulf will eventually help restore, directly or indirectly, the livelihoods and communities that were significantly harmed by the spill.

This Consent Decree resolves claims seeking penalties pursuant to CWA, 33 U.S.C. § 1321, and natural resource damages under OPA, 33 U.S.C. § 2701, *et. seq*. In OPA, Congress has created a private right of action – claims – for damages for injury to, or economic loss resulting from destruction of real or personal property, as well as loss of profits or impairment of earning capacity due to injury or damage. 33 U.S.C. § 2702(b)(2). Federal and state officials serve as Trustees to act on behalf of the public in seeking recovery for damages to natural resources belonging to, managed by, controlled by, or appertaining to the United States or States. In this role, Trustees assess natural resource damages and develop and implement a plan for the restoration, rehabilitation, replacement, or acquisition of the equivalent, of the natural resources under their Trusteeship.

While the Trustees are not authorized to seek damages on behalf of private claimants, through their restoration actions they seek to make the public whole for damages impacting public resources. These restoration actions are for the benefit of the entire Gulf community, not simply private claimants. Furthermore, through the RESTORE Act, 33 U.S.C. § 1321(t), Congress has provided that 80% of the CWA penalty will be allocated for environmental restoration, economic recovery projects, and tourism and seafood promotion in the five Gulf States (Alabama, Florida, Louisiana, Mississippi, and Texas). For these reasons, resolution of these claims benefits communities across the Gulf.

This Consent Decree does not affect those who continue to have personal claims against BP.

24. **Consent Decree Comment.** Some commenters expressed concerns about the ability of the public to understand the documents and comment productively because of the length of time for comment, the location of public meetings, that meetings included both the Consent Decree and Draft PDARP, the time meetings were held and their announcement, and/or the lack of translation at one meeting in Galveston, Texas.

**Response**:

The Department understands the importance of the Consent Decree and the matters which it resolves not just to the Gulf States, but the public as a whole. However, in setting the time for comment these concerns must be weighed against the effect that delay has on proceedings before the Court and in moving forward with the matters addressed in the Consent Decree. Keeping these concerns in mind, the Department doubled the required period of 30 days typically provided for public comment to 60 days. *See e.g.,* 28 C.F.R. § 50.7. Furthermore, upon release of the Consent Decree the Department established a website providing access to the Consent Decree, fact sheets summarizing key points in the Consent Decree, and the Trustees' Draft PDARP.

At the time the Consent Decree was released, the Department also announced a series of public meetings held in each of the Gulf States and Washington, D.C., to answer questions about the proposed Consent Decree and Draft PDARP. Pursuant to 42 U.S.C. § 6973(d), the Department was only required to offer a single public meeting in the affected area. However, because of the importance of the Consent Decree in funding and setting out requirements for the PDARP and the importance of the proposed settlement to the public, the Department decided that presenting information and accepting comments on both of these documents would be the best means of communicating to the public. Having combined meetings allowed the Department and the Trustees to explain how these documents were connected without requiring members of the public to attend two different meetings. These meetings were announced in the Federal Register, posted on both the Department's and the Trustees' websites, and each meeting was announced in a local news publication. The meetings were held early in the comment period in order to provide the public with information and still allow sufficient time to digest and submit comments. Meetings were held in each Gulf State, with two each being held in the larger states of Florida and Louisiana. Every attempt was made to pick locations and meeting times convenient for as many as possible in the affected communities. Complaints were made that some locations were not as accessible to specific communities as some would have liked. Unfortunately, this spill's impact spans the entire Gulf. Meetings in every local community impacted by the spill were simply not feasible, but locations were selected in an effort to allow as much access as possible to hose affected.

The Department and the Trustees sought to provide reasonable accommodations when such need could be anticipated. Fact sheets on the settlement documents were provided in English and in Vietnamese, as well. Vietnamese translators were provided at public meetings where the need was anticipated based on prior experience from Trustee meetings.

When some who attended the public meeting in Galveston, Texas, needed Vietnamese translation and it was not available, the Trustees allowed a volunteer (from a Local Vietnamese Fishers Organization) to translate for attendees. We believed this to be a reasonable accommodation, but a week later received a comment that the lack of translation amounted to discrimination under Title VI. The Department strongly disagrees. Having received the comment, however, on November 30, 2015, the Department and Trustees also (1) had presentations from the Galveston meeting translated into Vietnamese, (2) provided the translations to attendees who supplied contact information, and (3) posted the translations on Trustees' websites.

The Department and the Trustees also sought to make the process for submitting comments as easy as possible. Comments could be made at public meetings orally or in writing. Additionally, both the Department and the Trustees accepted comments through web portals and by mail.

The Department and the Trustees made every effort to allow for effective public participation in the process of deciding whether to accept the proposed Consent Decree and Draft PDARP. Indeed, the Department received more than 25,000 comments on the proposed Consent Decree.

25. **Consent Decree Comment.** Several commenters who were dissatisfied with the Consent Decree expressed concern that government parties were corrupted by money and influence.

**Response:**

Nothing in the circumstances of the proposed Consent Decree suggests corruption of the proper goals of the governments by dint of either money or influence. The civil penalties in this Consent Decree are the highest ever paid in any environmental case and the natural resource damage payments are also the most in any settlement of its kind. The agreement was reached after five years of intensive litigation, including three long phases of trial. Negotiation of the Consent Decree was conducted under the auspices of United States Magistrate Judge Sally Shushan and other Court-appointed neutrals. MDL 2179, Rec. Docs. 14821, 15466. Their involvement further shows that the government personnel were not acting in collusion with BP. Given the possible outcomes in litigation and the uncertainties attendant to those outcomes, the Department believes that settlement for this sum of money in a planned payment stream is a reasonable outcome and is consistent with the goals of the CWA and OPA, appropriately punishes BP, and deters both BP and other potential violators.

26. **Consent Decree Comment.** The Department received many suggested uses for the restoration funds or recommended protocols for project selection. For example, some recommended that funds be spent on beach and dune restoration, fisheries, or estuaries in South Florida. Some wanted requirements for minority and small business owners, non-profits, or local fisherman to be part of project implementation.

**Response:**

The Consent Decree and PDARP contain a programmatic decision for future restoration, outlining specific Restoration Areas and Restoration Types which have been selected, but no decisions have been made about which restoration projects to select within that funding framework. Specific project selection will be done in the future with the opportunity for public comment. Any future projects selected within the Restoration Types are subject to the requirements of OPA, NEPA, and other state and federal laws. Therefore, no amendment to the Consent Decree is necessary.

The Trustees received similar comments on the Draft PDARP, and have provided responses that address this topic. The commenters are referred to http://www.gulfspillrestoration.noaa.gov/restoration-planning/gulf-plan/, where the Trustees have provided their responses to specific proposals.

27. **Consent Decree Comment.** Commenters at public meetings did not always distinguish whether their comments were on the Draft PDARP or the proposed Consent Decree. A few

commenters also submitted comments which were specific to the Draft PDARP, and not the Consent Decree, to the Department of Justice.

**Response:**

The Trustees have provided responses to comments on the Draft PDARP which are found in Chapter 8 of the PDARP at http://www.gulfspillrestoration.noaa.gov/restoration-planning/gulf-plan/. The Department refers commenters to those responses for any questions and concerns on the PDARP.

28. **Consent Decree Comment.** Two commenters stated that the Draft PDARP is incomplete because it does not value ecosystem services. The commenter mentioned the "cost of people, for example, not being able to swim along those coast or these baby dolphins." The commenter referred to the work of economist Kenneth Arrow and to a report by the National Academies of Science regarding valuation of ecosystem services for the Gulf of Mexico. It seems that the commenter is referring to economic techniques for assessing the economic value of lost ecosystem services such as recreational loss studies and contingent valuation studies.

**Response:**

OPA requires that the Trustees measure natural resource damages, but does not require that a specific methodology for evaluation be used. 33 U.S.C § 2706(d). As explained by the Trustees in the PDARP, in determining the injury, the Trustees evaluated not only the extent of injuries to natural resources, but also the services those resources provide (Section 4.1, Executive Summary). These comments are more appropriately directed to the Trustees, who are responsible for selecting methods used for the assessment of natural resource damages. The Department adopts the Trustees response which can be found in Chapter 8 of the PDARP at http://www.gulfspillrestoration.noaa.gov/restoration-planning/gulf-plan/.

> **4-12 Draft PDARP Comment:** Commenters stated that the PDARP/PEIS is incomplete because it does not value ecosystem services. The commenter mentioned the "cost of people, for example, not being able to swim along those coast or these baby dolphins." The commenter referred to the work of economist Kenneth Arrow[3] and to a report by the National Academies regarding valuation of ecosystem services for the Gulf of Mexico.[4] It seems that the commenter is referring to economic techniques for assessing the

---

[3] The commenter stated that economist Kenneth Arrow "pioneered" economic techniques for estimating the damages from the Exxon Valdez oil spill and that he won a Nobel Prize for that work. In fact, Dr. Arrow received the Bank of Sweden Prize in Economic Sciences in Memory of Alfred Nobel in 1972 – over 16 years before the Exxon Valdez oil spill – for "pioneering contributions to general economic equilibrium theory and welfare theory." Dr. Arrow was a co-chair of the NOAA Blue Ribbon Panel on the use of contingent valuation for valuing natural resource damages.

[4] It appears that the commenter was referring to the Interim Report Approaches for Ecosystem Services Valuation for the Gulf of Mexico after the Deepwater Horizon Oil Spill by the Committee on the Effects of the Deepwater Horizon Mississippi Canyon-252 Oil Spill on Ecosystem Services in the Gulf of Mexico, Ocean Studies Board, Division on Earth and Life Studies, National Research Council of the National Academies.

economic value of lost ecosystem services such as recreational loss studies and contingent valuation studies.

**Trustee Response**: As stated in the PDARP/PEIS, in determining the injury, the Trustees evaluated not only the extent of injuries to natural resources, but also to the services those resources provide (Section 4.1, Executive Summary). To quantify the degree and extent of the injuries, the Trustees compared the injured resources or services to baseline conditions. Based on the vast scale of the incident and potentially related resources, the Trustees employed an ecosystem approach to the assessment (Section 4.1, Executive Summary). Among the methods used by the Trustees was one mentioned in the National Academies report—a revealed preference economic "travel-cost" approach to assess the lost value of recreational use of the Gulf of Mexico ecosystem, which quantified the value of, among other recreational activities, one of those specifically noted by the commenter—the value of not being able to swim in the Gulf (Section 4.10).

As described in Chapter 5 (Restoring Natural Resources), the Trustees have used the assessment results presented in Chapter 4 (Injury to Natural Resources) to formulate restoration approaches targeted to restoring the full range of resources and ecosystem services injured from this incident (Section 4.1). The Trustees' programmatic goals as stated in the PDARP/PEIS are to: restore and conserve habitat, restore water quality, replenish and protect living coastal and marine resources, provide and enhance recreational opportunities, and provide for monitoring, adaptive management, and administrative oversight to support restoration implementation (Section 5.3.1). The Trustees created these goals with the specific intent to restore and compensate for ecosystem services impacted by the spill.

The commenter is correct that the Trustees did not use a contingent valuation approach to value ecosystem services here, but the commenter's proposed approach is not required by law or regulations. In fact, the Oil Pollution Act regulations contain a clear preference for basing the amount of natural resource damages sought from the responsible parties on the costs of implementing a restoration plan that would repair or replace injured natural resources where practicable and compensate the public for interim losses of natural resource and ecosystem services until the ecosystem has fully recovered. That is the primary approach to damage assessment that the Trustees adopted in response to the *Deepwater Horizon* spill and the basis for the preparation of this PDARP/PEIS. However, the regulations also give Trustees discretion to use economic methods to place a value on natural resource injuries, as an alternative way to determine the scale of restoration actions needed to address those injuries. One of those authorized methods is known as a total value study, which is an economic study designed to measure the total economic value of a natural resource—use value, indirect use value, option value, and nonuse value. The Oil Pollution Act regulations allow Trustees to base damages on total value studies when it is impractical to address the natural resource injuries by providing natural resources and/or natural resource services of the same type and quantity as those that were lost. See 15 CFR § 990.53(c)(3).

The Trustees performed a contingent valuation total value study for the *Deepwater Horizon* incident. However, because the Trustees concluded that natural resource injuries and ecosystem service losses in this case can be addressed by the preferred ecosystem-

wide restoration alternative described in the Final PDARP/PEIS, the Trustees did not complete that study and did not rely on it (Section 5.2.1).

29. **Consent Decree Comment.** We received several comments pertaining to the adequacy or use of funds paid under agreements resolving state economic damage claims with BP.

**Response:**

The Gulf States have entered into a parallel-but-separate agreement with BP regarding economic damages and other costs incurred during the spill. This agreement with the Gulf States is related to the Consent Decree in that each of the agreements is dependent on the other being finalized and entered by the Court. However, the United States is not a party to the Gulf States' economic damages settlement, and it thus falls outside the ambit of settlement terms that are to be analyzed in considering the adequacy of the federal-and-state Consent Decree that resolves a Clean Water Act claim for civil penalty and Trustees' claims for natural resource damages. Therefore, it would be inappropriate for the Department to seek public comment regarding that agreement between the Gulf States and BP.

30. **Consent Decree Comment.** One commenter expressed concern that the Responsible Party should not be in control of response actions, stating, "They sunk the oil. They sunk it because they pay by the barrel of oil, not by how many barrels they clean up, how many barrels they sunk. I was told they have a tarmac around the oil well, 10 miles, the size of Rhode Island. Do you realize that every time they put a net in there, they go through there and they pull it through the net again? Some person like my husband that fixes it, gets it again. It is toxic. I would hope and I pray that y'all don't ever let this happen again, that they spray this. Please don't give the spiller the right to control the spill again because when he does, he damages everybody else."

**Response:**

First, and foremost, the Department expresses sorrow for the economic, social, and physical destruction of health, family, and livelihood reported by the commenter. Many of these tragedies fall outside the authority of this Consent Decree to redress, but the Department and the Trustees hope that restoration of natural resources found in the Gulf will eventually, if only indirectly, help restore the way of life and kinds of livelihood described by the commenter.

Second, while many of the Trustees play some role in the response advisory or otherwise, this is separate and apart from their role as Trustees. In the role of Trustees, they do not set policy regarding future response actions. Furthermore, neither the Trustees nor anyone else entrusted BP or any other liable party with control of the response to the spill; rather, BP's vast economic wherewithal was directed to implement the response choices authorized by the relevant government authority using its broad authority as on-scene coordinator for off-shore spills. Supported by many federal and state agencies (including some of the Trustees) and drawing on BP and others who were integrated into the federal response structure, the Coast Guard authorized and directed response actions based on the information and other resources that were available. See PDARP, Chapter 8.3.1.3, 1-24. As the district court recognized in the litigation of this matter, the on-scene coordinator is "the federal official designated by the Coast Guard to coordinate and direct response efforts and coordinate all other efforts at the scene of a discharge

33

or release of oil." Phase Two Findings of Fact and Conclusions of Law, ¶ 24 (MDL 2179, Rec. Doc. 14021).

Third, some of these decisions were challenging because no "all-good" options existed. For example, given the volume of the discharge, the Coast Guard might have to choose between approving the dispersion of oil in the open ocean or allowing even more oil to reach and destroy marsh and other coastal habitats. Indeed, one of the objectives of the response was to keep oil off of sensitive beaches and shorelines. Phase Three Trial Transcript, Jan. 20, 2015, at 111:11-14 (USCG Admiral Meredith Austin). Selecting among response options can mean weighing the benefits and harms of those options: "In oil spill response there [are] trade-offs . . . ." *Id.* at 83:7. Similarly, as one expert witness from the Coast Guard explained at trial, once the oil has been spilled, many factors work against a good result no matter how effectively mounted the response might be:

> Q. Do you make a distinction between organizational success and response effectiveness?
>
> A. Yes. I -- I'm generally of the opinion that once we've had a spill, we've lost. Basically, my -- my preference is prevention, as I think everybody's would be. The problem is once the oil spills, you're fighting gravity, physics and everything else, and trying to re-corral that oil and get it picked up or even effectively burn it or anything like that is extremely difficult. So I think in this event, contrary to the Exxon Valdez response organization, all of the logistics, all of that stuff worked very well. But, again, as we saw in the end, we only recovered 5 percent of the oil, which shows that we can have a great organization, but we still can't do much better.

Phase Three Trial Transcript, Jan. 21, 2015, at 678:12-25 (USCG Captain Mark VanHaverbeke).

Fourth, the use of dispersants did not dissuade the federal government from trying to estimate the total amount of oil discharged. The government aimed to calculate the total amount of oil discharged from Macondo Well, before any dispersants were applied. See, e.g., expert reports of Ronald Dykhuizen (TREX-011452; TREX-011463) and Stewart Griffiths (TREX-011485R; TREX-011486R). Thus, after adjusting for changes in pressure between the sea floor and the surface, the government's estimate would include all oil discharged from the well, regardless of whether that oil reached the surface and the shore, remained in the water column, or ultimately settled to the sea floor.

31. **Consent Decree Comment.** The Department received several comments that were unrelated to the Consent Decree with BP or the related PDARP, but regarding other matters with Exxon, Chevron, or contract disputes for response actions.

**Response:**

The Department does not believe these comments are appropriately directed to the Consent Decree. Therefore, no response is provided.