**IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF LOUISIANA**

| | | |
|---|---|---|
| **In Re: Oil Spill by the Oil Rig "Deepwater Horizon" in the Gulf Of Mexico, on April 20, 2010** | * * * * | **MDL NO. 2179** **SECTION: J** |
| *This document relates to*: | * * | |
| Nos. 12-970, 15-4143, 15-4146 and 15-4654 | * * * | **HONORABLE CARL J. BARBIER** **MAGISTRATE JUDGE SHUSHAN** |
| | * * * * * | |

---

### MEMORANDUM OF LAW IN SUPPORT OF PRELIMINARY APPROVAL OF HESI AND TRANSOCEAN PUNITIVE DAMAGES AND ASSIGNED CLAIMS CLASS ACTION SETTLEMENTS; PRELIMINARY CERTIFICATION OF THE PROPOSED NEW PUNITIVE DAMAGES SETTLEMENT CLASS; APPROVAL OF CLASS NOTICE AND CLASS NOTICE PLAN; AND SCHEDULING OF FINAL FAIRNESS HEARING

# TABLE OF CONTENTS

**Page**

I.  Introduction and Background ............................................................................. 1

    A.  The Halliburton and Transocean Settlements and the New Punitive
        Damages Settlement Class ........................................................................ 1

    B.  Two Classes; Two Claims ........................................................................ 4

    C.  The Allocation Process and the Allocation Neutral's Determination ........ 5

    D.  The HESI and Transocean Settlement in the Context of the
        *Deepwater Horizon* Blowout, Fire Explosion, and Litigation ................. 10

II.  Key Features of the Proposed HESI and TransOcean Settlements ..................... 15

    A.  Monetary Terms:  Aggregate Payments and Class Benefits ................... 15

    B.  Structure and Allocation ........................................................................ 16

    C.  The Proposed Punitive Damages Settlement Class ("New Class")
        Definition ............................................................................................... 17

    D.  Sequence and Methodology of Allocation and Distribution of
        Settlement Benefits ................................................................................ 18

        1.  Establishment of a Court-Supervised Claims Program for
            the New Class ........................................................................... 18

        2.  Distribution of Settlement Benefits for the DHEPDS Class ........ 19

        3.  Timing of Distributions to New Class Members and
            DHEPDS Class ......................................................................... 19

        4.  Appeal. ..................................................................................... 19

    E.  Attorneys' Fees and Costs ...................................................................... 20

III.  The Proposed Settlements were Negotiated at Arm's Length over a Period
    of Many Months ......................................................................................... 20

    A.  The HESI Settlement .............................................................................. 20

    B.  The Transocean Settlement ..................................................................... 24

IV.  The Class Action Settlement Mechanism is Ideally Suited to the
    Comprehensive Resolution of Punitive Damages Claims Arising From
    The *Deepwater Horizon* Incident and the Certification of the New Class ......... 27

    A.  The Purpose and Policy of Punitive Damages Resonate with and
        Enable Resolution Via Rule 23(e) .......................................................... 27

# TABLE OF CONTENTS
## (continued)

Page

B. The Maritime Punitive Damages Common Law Made by the Supreme Court In *Exxon Shipping* Supports the Certification of and Allocation to the New Class and Preliminary Approval of the Halliburton and Transocean Settlements .................................................. 32

C. Additional Federal Caselaw Supports the Settlement-Purposes Certification of the Punitive Damages Class ........................................... 35

V. The Proposed Punitive Damages Settlement Class ("New Class") Merits Provisional Certification for Settlement Approval Purposes .............................. 36

A. The New Class Meets Rule 23(a)(1)'s "Numerosity" Requirement, and Is Readily Ascertainable ................................................................. 37

B. Common Questions of Law and Fact Predominate in Significance over Individual Questions in the Context of the Proposed Settlements under Rule 23(a)(2) and (b)(3) ............................................. 38

C. The Proposed New Class Representatives' Claims are Typical of those of the Class under Rule 23(a)(3) ................................................ 39

D. The New Class is Adequately Represented by Class Representatives and Counsel in Satisfaction of Rule 23(a)(4) ............... 40

E. The Proposed New Class Satisfies the Rule 23(b)(3) Predominance and Superiority Tests ............................................................................... 40

VI. The Proposed HESI and Transocean Settlements Merit Preliminary Approval, Dissemination of Class Notice, and Scheduling of a Formal Fairness/Final Approval Hearing Under Rule 23(e) ........................................... 44

A. The Allocations to "New Class" on its Punitive Damages Claims and to the BP Class ("Old Class") on its Assigned Claims are Fair, Reasonable, and Adequate and Merit Preliminary  Approval ................ 45

B. The Proposed Class Notices and Notice Plan Meet and Exceed Rule (c)(2)(B) and (e)(1) Criteria Regarding Notice and Should be Approved ........................................................................................................ 51

C. The Parties" Proposal on Procedures and Deadlines for Objecting, Opting Out, and Appearing at the Fairness Hearing ............................... 55

VII. Conclusion ........................................................................................................... 58

## I.     INTRODUCTION AND BACKGROUND

### A.     The HESI and Transocean Settlements and the New Punitive Damages Settlement Class

The undersigned members of the Plaintiffs' Steering Committee ("PSC"), as appointed Class Counsel for the *Deepwater Horizon* Economic & Property Damages Settlement Class and as proposed Class Counsel for the New Punitive Damages Settlement Class, respectfully submit this Memorandum, pursuant to Fed. R. Civ. P. 23(a)(1)-(4); 23(b)(3); and 23(e); in support of their Motion for an Order:  1) granting preliminary approval to the proposed HESI[1] and Transocean Punitive Damages and Assigned Claims Class Action Settlements, (as amended), filed herein on September 4, 2015, and May 29, 2015 (Rec. Docs. 15322-1 through 15322-6, and Rec . Docs. 14644-1 through 14644-5); 2) granting preliminary or provisional certification, for settlement purposes only, of the proposed New Punitive Damages Settlement Class; 3) approving the accompanying forms of Class Notice and Class Notice Plan; and 4) scheduling further events, dates, and deadlines, in the Rule 23(e) settlement approval process, including deadlines for objections by Class members; exclusions ("opt-out") by members of the New Punitive Damages Settlement Class; and the date, time and place of the Fairness Hearing.

Settling defendants HESI and Transocean do not oppose the PSC's motion for preliminary approval of the proposed Settlements, including the Allocation Neutral's final Allocation recommendation; and for approval of the Class Notice and Class Notice Plan.  They do not oppose preliminary certification of the proposed Punitive Damages Settlement Class, for settlement purposes only, to effectuate their Settlement Agreements.

---

[1] For purposes of the proposed Settlements, "HESI" means and includes Halliburton Energy Services, Inc. and Halliburton Company; and "Transocean" means and includes Triton Asset Leasing GmbH, Transocean Deepwater Inc., Transocean Offshore Deepwater Drilling Inc., and Transocean Holdings LLC.

The proposed New Punitive Damages Settlement Class ("New Class") is defined as:

(1)     All Natural Persons, businesses, trusts, non-profits, or any other Entity who, anytime between April 20, 2010 through April 18, 2012, owned, leased, rented, or held any proprietary interest in Real Property (a) alleged to have been touched or physically damaged by oil, other hydrocarbons, or other substances from the MC252 Well or the *Deepwater Horizon* MODU and its appurtenances (including the riser and blowout preventer), (b) alleged to have been touched or physically damaged by substances used in connection with the *Deepwater Horizon* Incident, or (c) classified as having or having had the presence of oil thereupon in the database of the *Deepwater Horizon* Unified Command Shoreline Cleanup Assessment Team ("SCAT" database).

(2)     All Natural Persons, businesses, trusts, non-profits, or any other Entity who, anytime between April 20, 2010 through April 18, 2012, owned, chartered, leased, rented, or held any proprietary interest in Personal Property located in Gulf Coast Areas or Identified Gulf Waters, alleged to have been touched or physically damaged by (a) oil, other hydrocarbons, or other substances from the MC252 Well or the *Deepwater Horizon* MODU and its appurtenances (including the riser and blowout preventer), or (b) substances used in connection with the *Deepwater Horizon* Incident.

(3)     All Commercial Fishermen or Charterboat Operators who, anytime from April 20, 2009 through April 18, 2012, (a) owned, chartered, leased, rented, managed, operated, utilized or held any proprietary interest in commercial fishing or charter fishing Vessels that were Home Ported in or that landed Seafood in the Gulf Coast Areas, or (b) worked on or shared an interest in catch from Vessels that fished in Specified Gulf Waters and landed Seafood in the Gulf Coast Area.

(4)     All Natural Persons who, anytime between April 20, 2009 through April 18, 2012, fished or hunted in the Identified Gulf Waters or Gulf Coast Areas to harvest, catch, barter, consume or trade natural resources including Seafood and game, in a traditional or customary manner, to sustain basic family dietary, economic security, shelter, tool, or clothing needs.

Cumulatively excluded from the proposed New Punitive Damages Settlement Class are

the following:

(1)     Any New Class Member who timely and properly elects to opt out of the New Class under the procedures established by the Court;

(2)     Defendants in MDL 2179;

(3)     The Court, including any sitting judges on the United States District Court for the Eastern District of Louisiana, their law clerks serving during the pendency of MDL 2179, and any immediate family members of any such judge or law clerk;

(4)     Governmental Organizations, meaning **(i)** the government of the United States of America; **(ii)** the state governments of Texas, Louisiana, Mississippi, Alabama, and Florida (including any agency, branch, commission, department, unit, district or board of the state); and **(iii)** officers or agents of the U.S., states, and/or Indian tribes appointed as "Natural Resource Damages Trustees" pursuant to the Oil Pollution Act of 1990 as a result of the *Deepwater Horizon* Incident.  Governmental Organizations do *not* include any local government such as a county, parish, municipality, city, town, or village (including any agency, branch, commission, department, unit, district or board of such local government);

(5)     Any Natural Person or Entity who or that made a claim to the GCCF, was paid, and executed a valid GCCF Release and Covenant Not to Sue, provided, however, that a GCCF Release and Covenant Not to Sue covering only Bodily Injury Claims shall not be the basis for exclusion of a Natural Person;

(6)     BP Released Parties and individuals who were employees of BP Released Parties during the Class Period;

(7)     HESI and Individuals who were employees of HESI during the Class Period; and

(8)     Transocean and individuals who were employees of Transocean during the Class Period.

The PSC, HESI, and Transocean have submitted for the Court's approval two separate, but essentially structurally identical Settlement Agreements (hereinafter, collectively, "the HESI and Transocean Settlement Agreements").  Each of the proposed settlements provides for an allocation between, and payments to, two groups:  1) the above-defined "New Class," functionally described as "a new punitive damages settlement class"; and 2) the previously-certified Settlement Class from the now-final BP Economic Settlement.  The Parties to the HESI and Transocean Settlement Agreements respectfully move for the Court's preliminary review and

approval of the class action settlement process, including notice to the two Classes, and culminating in a formal, final settlement approval determination.

### B.   Two Classes; Two Claims

The HESI and Transocean Settlement Agreements are not limited to resolving the punitive damages claims of the New Class against these defendants.  They also extend to the liquidation and settlement of certain "Assigned Claims," which were assigned by previously-settling defendant BP to the previously-certified *Deepwater Horizon* Economic and Property Damages Settlement Class ("DHEPDS Class" or "Old Class") in a separate, earlier, and now-final class action settlement.[2]  These "Assigned Claims," while a benefit of the BP Settlement, were contingent and unspecified as to value at the time of the DHEPDS Settlement approval: moreover, no guarantee was made that these Assigned Claims would yield any additional compensation, or specific dollar value, when the settlement was approved.  They were, in a sense, potential lagniappe.  Now they have yielded real dollars.

To settle these two species of claims (BP's Assigned Claims and the punitive damages claims against HESI and Transocean), for the benefit of the Old and New Classes, the HESI and Transocean Settlement Agreements provide for each defendant to make an Aggregate Payment.  These two Aggregate Payments are:  1) $1,028,000,000.00 (one billion, twenty-eight million dollars) from HESI,; and 2) $211,750,000.00 (two hundred eleven million, seven hundred fifty

---

[2] The DHEPDS Class was defined and formally certified by the Court in its Order and Judgment of December 21, 2012 (Rec. Doc. 8139).  This class certification and the class action settlement for which it was certified have been affirmed on appeal and are final and effective for the purposes of the DHEPDS Agreement, as amended on May 2, 2012, including exhibits thereto (Rec. Docs. 6430 through 6430-45) which provide for the assignment, to the DHEPDS Class, of the claims against HESI that are proposed to be resolved by the HESI Settlement Agreement. *See In re Deepwater Horizon*, 739 F.3d 790 (5th Cir. 2014), *cert. denied*, 135 S.Ct. 754 (2014).  The class definition of the DHEPDS Class, as set forth in said December 21, 2012 Order and Reasons; [Granting Final Approval of the Economic and Property Damages Settlement Agreement]; Order and Judgment Granting Final Approval of Economic and Property Damages Settlement and Confirming Certification of the Economic and Property Damages Settlement Class, and Appendices thereto (Rec. Docs. 8138 and 8139) is hereby incorporated by reference and as fully set forth in this Memorandum.

-4-

thousand dollars) from Transocean, for a total of $1,239,750,000.00 (one billion, two hundred thirty-nine million, seven hundred fifty thousand dollars). The Settlement Agreements do not purport to allocate the Aggregate Payments as between the two classes.

Instead, the HESI and Transocean Settlement Agreements both provided for the Court's appointment of an "Allocation Neutral" to "allocate the Aggregate Payment[s] . . . between the New Class and the Old Class <u>with finality</u>, subject to the terms of [the Settlement Agreements] and the Court's determination that the Allocation Neutral appropriately performed the assigned function." Rec. Doc. No. 14644-1 at ¶ 7(a), p. 18; Rec. Doc. No. 15322-1 at ¶ 7(a), p. 19 (emphasis added). Thus, while the Settlements each generate the maximum Aggregate Payment that could be obtained through many months of intensive negotiations between the PSC and the respective defendants, the Settlements <u>additionally</u> provide for the safeguard of a third-party neutral evaluation to allocate the Settlements' funds between the two Classes. The process of analyzing and determining the relative merit and value of the assigned and punitive damages claims in the specific context of this litigation, both as it has unfolded to date, and how it could potentially develop, has now been completed. This Court may now determine: 1) whether the Allocation Neutral has performed his assigned function; and 2) whether the class action settlement approval process, commencing with preliminary review/approval and notice to the Classes, may proceed. The Parties respectfully submit that the answer to both questions is <u>yes</u>.

C.    **The Allocation Process and the Allocation Neutral's Determination**

By Order dated September 29, 2015, Rec. Doc. No. 15398, Judge Barbier appointed Magistrate Judge Joseph C. Wilkinson, Jr. to serve as Allocation Neutral for the HESI and Transocean Settlements. Since his appointment, Judge Wilkinson has conducted an open status conference, studied the record, including claims information from the BP Settlement, and solicited and received written submissions on behalf of various interests advocating their views

as to an appropriate allocation of the Aggregate Payments between the Old Class and the New Class.  Although the HESI and Transocean Settlement Agreements specifically authorize the Allocation Neutral to conduct ex parte oral communications in furtherance of his work, Rec. Doc. No. 14644-1 at pp. 18-19; Rec. Doc. No. 15322-1 at pp. 19-20, he has, as his December 11, 2015 Neutral Allocation and Reasons (Halliburton and Transocean Settlements) (Rec. Doc. 15652) ("Neutral Allocation") indicates, done so only with representatives of the Office of the Claims Administrator for the BP Settlement, and not with any Parties or their counsel.

The 38-page Neutral Allocation describes in detail the meticulous fact-finding process and legal analysis conducted by Judge Wilkinson to determine an appropriate inter-class allocation, grounded in the history of this *Deepwater Horizon* litigation.  His factual and legal touchstones included the BP Economic Settlement, the findings derived from the multi-phase trial by this Court, and the application of pertinent jurisprudence, including Supreme Court and Fifth Circuit decisions, governing both punitive damages and assigned claims.  In so doing, the Neutral Allocation explains, with cogency and transparency, the basis of the allocation, and this analysis implicitly addresses the factors prescribed by the *Manual for Complex Litigation* and this district's caselaw for the preliminary review of class action settlements.  Accordingly, in subsequent sections of this brief, the observations and findings in the Neutral Allocation will be referenced to assist this Court in its own independent evaluation of the fairness, adequacy and reasonableness of these settlements under Fed. R. Civ. P. 23(e).

Having reviewed the Parties' written submissions, some of which were submitted confidentially and *in camera* as authorized by the HESI and Transocean Settlement Agreements; the record of this matter, including this Court's Findings of Fact and Conclusions of Law after the Phase I trial, *In re Oil Spill by the Oil Rig "Deepwater Horizon*," 21 F. Supp. 3d 657 (E.D.

La. 2014); the periodic reports of the Claims Administrator concerning the claims of and payments made to members of the Old Class by BP; the three pertinent settlement agreements (BP, HESI, and Transocean) themselves; the relevant legal authorities, Judge Wilkinson found, for the reasons set forth in his detailed Neutral Allocation, that a reasonable allocation is $902,083,250 (nine hundred two million, eighty-three thousand, two hundred fifty dollars), representing 72.8% of the Aggregate Payments, to be apportioned to the "New Class", and $337,666,750 (three hundred thirty-seven million, six hundred sixty-six million, seven hundred fifty dollars), representing 27.2% of the Aggregate Payments, to be apportioned to the DHEPDS Class, or "Old Class."

As explained more fully in the Neutral Allocation itself, Judge Wilkinson determined that simple *pro rata* apportionment between Old and New Classes was not appropriate.  Instead, he adopted the long-established maritime court model, guided by pertinent Supreme Court and Fifth Circuit jurisprudence, to rank and prioritize competing claims against a *res* of fixed value, here, the $1,239,750.00 combined settlement fund.  He gave the punitive damages claims "the highest rank, top priority or first call on funds to be paid from the Aggregate Payments" (Rec. Doc. 15652-5).  He then "subordinated" the "Assigned Claims" interests of the Old Class to the "higher priority" interests of the New Class, and did so, as the Neutral Allocation explains in more detail, for essentially five reasons:

1.     The members of the New Class were those most directly, seriously and obviously damaged by the explosion and oil spill for which BP, HESI and Transocean were jointly responsible.  This is so because, as the Neutral Allocation explains, the New Class is restricted to those who were on the front lines of damage most clearly caused by the subject explosion, oil spill and cleanup efforts, because their property was oiled or otherwise exposed to the

contaminating aftermath of the *Deepwater Horizon* Incident, or their seafood-related livelihoods and way of life were directly impacted.  The New Class consists of the entities and/or individuals of the type noted by Judge Barbier in his Phase One trial findings of fact and conclusions of law "who could satisfy the 'physical injury' threshold of the *Robins Dry Dock* rule" and therefore "would be entitled to" a punitive damages award.  *In re Oil Spill*, 21 F. Supp. 3d at 750 n.264.

2.      The New Class members fit the same categories of claimants identified by the federal district court in the class action litigation arising from the oil spill from the grounding of the vessel the *Exxon Valdez*, whose punitive damages recovery was permitted to stand by the United States Supreme Court.  *See Exxon Shipping Co. v. Baker*, 554 U.S. 471, 476, 479 (2008) ("commercial fisherman and native Alaskans . . . [who are] individuals dependent on Prince William Sound for their livelihoods" and "commercial fishermen, Native Alaskans, and landowners" whose property was damaged by the oil spill); *In re Exxon Valdez*, 236 F. Supp. 2d 1043, 1058-59 (D. Alaska 2002), *vacated by Sea Hawk Seafoods, Inc. v. Exxon Corp.*, No. 03-35166 (9th Cir. Aug. 18, 2003), *as stated in In re Exxon Valdez*, 490 F.3d 1066, 1073 (9th Cir. 2007), *vacated sub nom. Exxon Shipping Co. v. Baker*, 554 U.S. 471 (2008) (calculating "the best indicators of actual, compensatory damages" from verdicts and settlements for commercial fishermen and seafood processors, Native Alaskans dependent on the oil spill area for their livelihoods, villages, municipalities and other land owners).

3.      The New Class also includes claimants whose property suffered direct physical damage from the *Deepwater Horizon* explosion and oil spill, but who were *excluded* from the definition of the Old Class, including local governments of coastal communities and oil and gas interests operating in the contaminated areas.  *See* Rec. Doc. No. 6430-1, BP Settlement Agreement at pp. 11, 13-14, 105 (excluding from the BP Settlement "governmental

organizations," which are defined to include "local government," and "oil and gas industry" entities); Rec. Doc. Nos. 14644-1 and 15322-1, at p. 12 (definition of "governmental organization" for purposes of exclusion from the HESI and Transocean Settlement Agreements "does not include any Local Government").

4.      The Allocation Neutral took account of the fact that many of the members of the Old Class were inland businesses or others whose economic activities were less directly affected by the *Deepwater Horizon* Incident.  Such Old Class members were eligible to recover compensation under the causation provisions of the BP Settlement, even if they did <u>not</u> suffer <u>direct</u> physical impact like oiling or other contamination or physical damage to their property or businesses from the spill or cleanup effort, because their claims derived from OPA, and were not required to be *Robins Dry Dock* qualified claims, and because BP contractually obligated itself to compensate them.[3]

5.      The interests of the Old Class in the Aggregate Payments are of secondary priority compared to the interests of the New Class in light of the nature of the claims of the Old Class to these settlement funds.  The interests of members of the Old Class in these funds arise <u>not</u> from any claims of their own, but from claims of BP that were assigned to the Old Class as part of the BP settlement.  As BP's assignees, members of the Old Class must stand in the shoes of BP, whose rights to recover from HESI and Transocean were undermined by the trial findings of this court, which determined BP to be primarily at fault for the spill and its damage.[4]

---

[3] *In re Deepwater Horizon*, 753 F.3d 509, 5112, 514-16 (5th Cir.), *cert. denied sub nom. BP Exploration & Prod. Inc. v. Lake Eugenie Land & Dev.*, 135 S. Ct. 754 (2014) (bold emphasis added).  "The [BP] Settlement Agreement contained many compromises.  One of them was to provide in only a limited way for connecting the claim to the cause."  *In re Deepwater Horizon*, 744 F.3d 370, 378 (5th Cir.), *cert. denied sub nom. BP Exploration & Prod. Inc. v. Lake Eugenie Land & Dev.*, 135 S. Ct. 754 (2014).

[4] As this Court found, "the comparative fault of the Defendants as a percentage of total liability is as follows:  BP: 67%; Transocean:  30%; Halliburton:  3%."  *In re Oil Spill*, 21 F. Supp. 3d at 747; <u>Neutral Allocation</u> at 17.  Simply put, this finding challenges the value of Assigned Claims *from* BP *against* Transocean and HESI.

As Judge Wilkinson concluded, "By its very definition, the New Class is a punitive damages classes.  It mirrors the kinds and class of claimants found to be entitled to a punitive damages award in the *Exxon Valdez* litigation" (Rec. Doc. 15652-10).

The Allocation Neutral's underlying analysis in constructing a value range for the New Class' "priority" claims and in determining the reasonableness of the Old Class' "Assigned Claims" share will be revisited in this brief, as this analysis parallels and reflects the same considerations that inhere in a Rule 23(e) determination of fairness, adequacy and reasonableness:  that is, comparing the amounts offered to each class in this Settlement with the possible litigation outcome in the absence of Settlement.  While the Neutrals' analysis does not substitute for this Court's independent settlement approval assessments, its depth and rigor, its utilization of the best available claims information and financial data, and its grounding in both maritime procedure and the Supreme Court's punitive damages doctrine, not only foreshadows the analysis this Court must make, but also provides a robust factual, legal, and policy basis for preliminary approval.

### D.     The HESI and Transocean Settlement in the Context of the *Deepwater Horizon* Blowout, Fire Explosion, and Litigation

The Proposed HESI and Transocean Settlements submitted to this Court on September 4, 2015, and May 15, 2015, respectively, are each the product of arm's length negotiations.  The concept for these settlements arose in the context of negotiations for what became the now-final *Deepwater Horizon* Economic and Property Damages ("DHEPDS") Class settlement with BP, following (and then continuing in parallel with) periods of intense discovery, pretrial activity, and a phased trial in the *Deepwater Horizon* proceedings.  The result is a substantial fund, totaling nearly $1.24 billion, earmarked for two classes of claimants.  These are:  1) the previously-certified DHEPDS class (which took BP's claims against HESI and Transocean by

-10-

assignment); and 2) "Punitive Damages Settlement Class," also called the "New Class" comprised of individuals and entities with punitive damages claims under maritime law.  To begin at the now-familiar beginning:

On April 20, 2010, a blowout, explosion, and fire occurred aboard the *Deepwater Horizon*, a semi-submersible offshore drilling rig, as it was engaged in drilling activities on the "Macondo Well" on the Outer Continental Shelf off the coast of Louisiana.  These events led to eleven deaths, dozens of injuries, and a massive discharge of oil into the Gulf of Mexico that continued for nearly three months, causing property damages and creating a crippling ripple effect on the Gulf Coast economy, impacting both businesses and individuals.  On August 10, 2010, the Judicial Panel on Multidistrict Litigation centralized all federal actions (excluding securities suits) in this Court pursuant to 28 U.S.C. § 1407.  Eventually, hundreds of cases with thousands of individual claimants would be consolidated with this Multidistrict Litigation ("MDL").

On October 19, 2010, the Court issued Pretrial Order 11 (Rec. Doc. 569) ("PTO 11"), creating pleading bundles for various types of claims. Relevant here is the "B1 bundle," which encompasses all private claims for economic loss and property damage, as well as "Bundle C," which includes public claims for damages brought by local government entities.  (PTO 11 ¶ III(B1) and (C)).  In accordance with PTO 11, the PSC filed the B1 Master Complaint on December 15, 2010 (Rec. Doc. 879), a First Amended B1 Master Complaint on February 9, 2011 (Rec. Doc. 1128), and, in accordance with PTO 33, a voluntary Local Government Entity Master Complaint (Rec. Doc. 1510). Numerous Defendants filed motions to dismiss the First Amended B1 Complaint and the Local Government Master Complaint.  On August 26, 2011, and December 9, 2011, the Court issued Orders and Reasons granting in part and denying in part

these motions (Rec. Docs. 3830, 4845).  Phase one of a multi-phase trial in Transocean's

Limitation and Liability Action, Case No. 10-2771, was originally scheduled for February 27,

2012.

In the 20 months that passed from the JPML's centralization order, to the initial Class

Settlement between the DHEPDS Class and the BP Defendants, the Parties engaged in extensive

discovery and motion practice, including taking 311 depositions, producing approximately

90 million pages of documents, and exchanging more than 80 expert reports on an intense and

demanding schedule.  Depositions were conducted on multiple tracks and on two continents.

Discovery was kept on course by weekly discovery conferences before Magistrate Judge

Shushan.  The Court also held monthly status conferences with the Parties.  During and after the

approval process for the DHEPDS Settlement, the Court conducted bench trials and issued

Findings of Fact and Conclusions of Law on Phases One and Two of its multiphase trial plan

(Rec. Docs. 13381-1, and 14021).

In February 2011, settlement negotiations began regarding two distinct class action

settlements between plaintiffs and BP:  a Medical Benefits Settlement and the Economic and

Property Damages Settlement ("DHEPDS").  On February 26, 2012, the eve of Phase One of the

Limitation and Liability Trial, the Court adjourned proceedings for one week to allow the Parties

to make further progress on their settlement talks.  (Rec. Doc. 5887).  On March 2, 2012, the

Court was informed that BP and the PSC had reached an Agreement-in-Principle on the

proposed settlements. Consequently, the Court adjourned Phase One of the trial, because of the

potential for realignment of the Parties in this litigation and substantial changes to the current

trial plan.  (Rec. Doc. 5955).

The Parties continued to work on finalizing the details of the settlements.  On March 8, 2012, at the Parties' request, the Court entered an Order creating a process to facilitate the transition from the Gulf Coast Claims Facility ("GCCF") to the "Court Supervised Settlement Program" envisioned by the settlement.  (Rec. 5995).  The Order also appointed a Transition Coordinator and Claims Administrator.  In a separate Order, the Court appointed a neutral party to preside over the seafood component of the proposed settlement. (Rec. Doc. 5998).  In April 2012, the PSC filed a new class action complaint to serve as the vehicle for the proposed Economic and Property Damage Settlement, *See* No. 12-970, *Bon Secour Fisheries, Inc., et al. v. BP Exploration & Production Inc., et al*, and submitted the proposed Settlement for preliminary approval, which was granted by Order dated May 2, 2012 (Rec. Doc. 6148).  The class notice and settlement approval process continued throughout 2012, culminating, after full hearing and consideration, in the Court's Order and Reasons (Rec. Doc. 8138) and Final Order and Judgment (Rec. Doc. 8139) granting final approval of the DHEPDS.  Appellate challenges followed, including some by the settling defendant BP, and the DHEPDS became final in 2014.  The DHEPDS claims deadline occurred on June 8, 2015, and the Claims Administration process continues.  To date over 123,000 of DHEPDS claims have been approved, and  over $6.7 billion has been paid. (Rec. Doc. 16064-1)  As the Neutral Allocation notes, analyzing data of public statements from the Class office and BP, approximately $10.825 Billion is projected to be paid by the time the Claims Administration process is complete.  Neutral Allocation at 16.

The DHEPDS included an unusual and additional benefit for the DHEPDS Class.  While claimants were required to release all of their compensatory damage claims against all defendants to recover under the DHEPDS, the DHEPDS class received a substantial benefit in return:  an assignment provision, described more fully below, that assigned the damages claims

-13-

of BP against HESI and Transocean to the DHEPDS Class.  As noted in the Joint Motion for Preliminary Approval of the DHEPDS, "The intent of the Agreement is for BP to pay all compensatory damages but to allow the plaintiffs to continue to seek punitive damage recoveries from Halliburton and Transocean, which is the sole basis for the exclusion of those defendants from the release.  The plaintiffs, moreover, have agreed with BP to a set of special rules to effectuate the Parties' intent to allow the plaintiffs to seek exclusively punitive damages against Halliburton and Transocean, including the plaintiffs' (1) agreement not to seek compensatory damages against Halliburton or Transocean; and (2) agreement, among other protections to BP, not to execute on any compensatory damages that might be awarded to plaintiffs against Halliburton and Transocean."  (Memo. in Supp. of Joint Mot. for Prel. Approval p.11 n.6, Rec. Doc. 6266-1 at 21 n.6; *see also* Proposed Settlement Ex. 21, Rec. Doc. 6430-39).

Meanwhile, throughout the period of the approval and administration of the DHEPDS, and the unfolding of the Phase One and Phase Two trials, as described in greater detail in the Settlement Negotiations section below, discussions and negotiations between the PSC and HESI, and later in time between the PSC and Transocean, were ongoing, even as the *Deepwater Horizon* litigation proceeded through the phased trials, findings, and cross-appeals therefrom.

On September 7, 2014, HESI filed its Original Settlement Agreement resolving claims assigned to the DHEPDS Settlement Class and punitive damages claims made by the New Class. HESI's original settlement agreement was most recently amended and filed on September 4, 2015, which amendment is referenced throughout this pleading.

On September 9, 2014, the Court issued its Phase One Findings (Rec. Doc. 13381-1), which: 1) held, on the question of punitive damages, that under the facts of this case, the conduct exhibited by BP's employees would make an award of punitive damages inappropriate under

Fifth Circuit law, although it might support such an award under the law of other Circuits; 2) granted Triton Asset Leasing GmbH's 502(c) motion; 3) found BP's conduct to be reckless, and Transocean's and 'HESI's conduct to be negligent;[5] and 4) made other findings as set forth more fully therein, that foreclosed, at the district court level, punitive damages against any defendant. Appeals and cross-appeals followed and are pending.

Due to the uncertainty of litigation, Transocean ultimately reached a similar settlement agreement to that made by HESI, resolving the same sets of claims made against Transocean. The Proposed HESI and Transocean Settlements described below, feature 1) a combined Aggregate Payment of $1,239,750,000 for both the DHEPDS Class and proposed Punitive Damages Settlement Class; 2) inter-class allocation by a court-appointed Allocation Neutral, 3) claims administration and distribution under this Court's auspices; and 4) attorneys' fees payments to Class and Common Benefit Counsel in addition to the Class benefits.

## II.   KEY FEATURES OF THE PROPOSED HESI AND TRANSOCEAN SETTLEMENTS

### A.   Monetary Terms:  Aggregate Payments and Class Benefits

The Proposed HESI Settlement releases all claims against HESI held by the DHEPDS Class and the Punitive Damages Claims[6] against HESI of the proposed Punitive Damages Settlement Class ("New Class") in return for an Aggregate Payment of $1.028 billion

---

[5] Fault was apportioned as follows:

|              |     |
|--------------|-----|
| BP:          | 67% |
| Transocean:  | 30% |
| Halliburton: | 3%  |

  (Rec. Doc. 13381-1 at p. 132.)

[6] As defined in the Settlement Agreements, Punitive Damages Claims means any claim, counterclaim, cross-claim, demand, charge, dispute, controversy, action, cause of action, suit, proceeding, arbitration, alternative dispute resolution, inquiry, investigation or notice, whether of a civil, administrative, investigative, private or other nature, and whether pending, threatened, present or initiated in the future, and whether known or unknown, suspected or unsuspected, under any current or future local, state, federal, foreign, tribal, supranational or international law, regulation, equitable principle, contract or otherwise, for Punitive Damages whether brought directly, by subrogation, by assignment or otherwise.

-15-

($1,028,000,000) (the "Aggregate Payment"). Administrative costs (for class notice, claims administration and taxes) are to be paid from the $1.028 billion Aggregate Payment.

The Proposed Transocean Settlement similarly releases the same Classes' punitive damages and assigned claims against Triton Asset Leasing GmbH, Transocean Deepwater Inc., Transocean Offshore Deepwater Drilling Inc., and Transocean Holdings LLC (collectively, "Transocean") for an Aggregate Payment of $211.75 million ($211,750,000). The two settlements are presented for court approval, have been allocated by the Allocation Neutral, and are to be administered, together.

### B.   Structure and Allocation

An Allocation Neutral, Magistrate Judge Joseph C. Wilkinson, Jr., was appointed by the Court to allocate the Aggregate Payments as between the New Class and the DHEPDS Class, subject to the terms of the Settlement Agreements and the Court's determination that the Allocation Neutral appropriately performed the assigned function.[7] The Parties agreed that they could not cancel or terminate the Settlement Agreements based on the Allocation Neutral's allocation, and that the defendants would have no responsibility or liability for the allocation of the Aggregate Payments by Magistrate Judge Wilkinson. The Court's September 29, 2015 Order (Rec. Doc. 15398) instructed Magistrate Judge Wilkinson to schedule a status conference to receive input from counsel and issue an appropriate scheduling order for the allocation process.

The New Class, New Class Members, PSC, New Class Counsel, DHEPDS Class, DHEPDS Class Counsel, Transocean and HESI, all agreed that all documents and communications relating to the Allocation Neutral's development of the allocation would (i) be kept confidential, subject to valid legal process; (ii) not be used by them for any purpose other

---

[7] *See* September 29, 2015 *Order Appointing Magistrate Judge Joseph C. Wilkinson, Jr. As Allocation Neutral* (rec. Doc. 15398).

than the allocation; and (iii) be inadmissible and not used in any litigation, arbitration, mediation, settlement discussions, or other communications or procedures.  Such confidential and protected documents and communications 'included any and all material relating to DHEPDS Settlement Program data used to process claims of New Class Members or DHEPDS Class Members for purposes of allocating the Aggregate Payment or distributing Settlement Benefits.  No calculation or conclusions generated during the allocation process was binding on any party outside the Allocation process.  In other words, the Allocation process has been, and remains, a Settlement-purposes process, informed by the data and information adduced during the now-mature *Deepwater Horizon* proceedings.

### C.   The Proposed Punitive Damages Settlement Class ("New Class") Definition

Plaintiffs seek settlement-purposes certification of a "New Class", comprised of individuals or entities who potentially have maritime standing to make claims for punitive damages under general maritime law, consistent with the *Robins Dry Dock* and *Testbank* decisions and their progeny, (including the previous "B1 Order" and "Bundle C Order" in this multi-district litigation).[8]  In order to capture such potential individuals and private or local government entities who may have standing to bring such punitive damage claims by objectively ascertainable criteria, the proposed Punitive Damages Settlement Class (the "New Class") is defined in Section I.A above.

---

[8] *See Robins Dry Dock & Repair Co. v. Flint*, 275 U.S. 303, 48 S. Ct. 134, 72 L.Ed. 290 (1927) ("*Robins Dry Dock*"), *Louisiana ex rel. Guste v. M/V Testbank*, 752 F.2d 1019 (5th Cir. 1985) (en banc), and *In re Deepwater Horizon*, 808 F. Supp. 2d 943, 958-961 (E.D. La. 2011).

-17-

D.    **Sequence and Methodology of Allocation and Distribution of Settlement Benefits**

1.    **Establishment of a Court-Supervised Claims Program for the New Class**

Subject to the terms and conditions herein, the PSC has undertaken to establish a Court-supervised claims program for the New Class.  Michael Juneau has been appointed as Claims Administrator by the Court to develop a Distribution Model for the Court-supervised Claims Program.  [*See* Order dated October 23, 2015, Rec. Doc. 15481.]  The PSC, as Class Counsel, will consult with HESI and Transocean on the Claims Program, including on issues such as periodic reporting to settling defendants by the Claims Administrator of summary claims data, and receipt of electronic copies of executed Individual Releases.  HESI and Transocean shall be entitled to standard reports of claims data.  The Claims Program will treat all claims on a fair and transparent basis.  The Claims Program for the New Class is intended to distribute funds remaining from the portion of the Aggregate Payment allocated to the New Class after relevant Administrative Costs have been paid.  The plan for distribution of payments to the New Class recommended by the Claims Administrator may, at his discretion, include a standard to establish a claim for Real Property damage, a standard to establish a claim for Personal Property damage, including Vessel damage, a standard to establish a claim for commercial fishing loss, a standard to establish a claim for charter fishing loss, a standard to establish a claim for subsistence loss, and other standards as necessary to distribute the New Class Funds.  Prior to distribution of any New Class Funds, the Effective Date must have occurred and the Distribution Model must be approved by a Final order of the Court.  Settling Defendants shall not have any responsibility or liability whatsoever for, the distribution or method of distribution of the Aggregate Payments.

## 2.      Distribution of Settlement Benefits for the DHEPDS Class

The occurrence of the Effective Date is a condition precedent to distribution of any funds to the DHEPDS Class.  After the Effective Date, the portion of the Aggregate Payments allocated to the DHEPDS Class, minus any relevant previously-incurred Administrative Costs will be placed in a sub-fund of the Settlement Fund created for the DHEPDS Class subject to further order of the Court.

## 3.      Timing of Distributions to New Class Members and DHEPDS Class

After the Effective Date, distributions of the New Class Funds shall occur as soon as practicable, or in a timeframe ordered by the Court, consistently with the terms and conditions of the Settlement Agreements.  After the Effective Date, a Final order approving the Distribution Model for the New Class is a condition precedent to distribution of any funds to the New Class Members, but does not affect the timing of any distribution to the DHEPDS Class.  After the Effective Date, any order with respect to distribution of funds allocated to the DHEPDS Class is not a condition precedent to and does not affect the timing of any distribution to the New Class.

## 4.      Appeal.

In developing the Court Supervised Claims Program for the New Class, the Claims Administrator shall establish rules for appealing the determinations of the Claims Administrator to the Court.  The Settlement Agreements provide that the Court's decision on any such appeal involving the amount of any payment to any individual claimant (other than a determination that a claimant is not entitled to any payment due to a failure to meet the class definition) is final and binding, and there shall be no appeal to any other court including the U.S. Court of Appeals for the Fifth Circuit.

### E.   Attorneys' Fees and Costs

The PSC, DHEPDS Class Counsel, and defendants had no fee discussions until after the Parties reached closure on the economic terms of the Settlement Agreements and received permission from the Court to discuss fees.  Under Rule 23(h) the agreements subsequently reached for the Settling Defendants to pay attorneys' fees and costs in addition to the Class benefits is subject to approval by the Court.

HESI and Transocean have agreed not to contest any request by the DHEPDS Class Counsel and the PSC, or New Class Counsel, as appropriate (collectively, the "Class Counsel") for, nor oppose an award by the Court for, a maximum award of $99,950,000 as to HESI, and $23,000,000 as to Transocean, as a payment of all common benefit and/or Fed R. Civ. P. 23(h) attorneys' fees and costs incurred at any time, for the common benefit of members of the DHEPDS Class and the New Class, with respect to the Released Claims.  Class Counsel agrees not to request an award of common benefit and/or Fed. R. Civ. P. 23(h) attorneys' fees and costs greater than these amounts, and the Settling Defendants would not, in any event, be required to pay it.  If the Court awards less than these amounts, defendants will be liable only for the lesser amount awarded by the Court.  The common benefit and/or Rule 23(h) attorneys' fees, costs and expenses awarded by the Court, subject to the limitations in the preceding sentence, are collectively referred to as the "Common Benefit Fee and Costs Award."

### III.   THE PROPOSED SETTLEMENTS WERE NEGOTIATED AT ARM'S LENGTH OVER A PERIOD OF MANY MONTHS

#### A.   The HESI Settlement

The Proposed HESI Settlement was negotiated at arm's length over a period of many months.  In early 2012, members of the court-appointed Plaintiffs' Steering Committee ("PSC") began holding meetings with counsel for HESI and Transocean in an attempt to engage them in

settlement discussions that would run simultaneously with an anticipated resolution with BP. They attempted, at that time, to persuade HESI and Transocean to join the class-action settlement with BP, and contribute funds at that time to obtain a parallel release and a parallel resolution, in the nature of a global settlement with the major defendants. These efforts included meeting with Transocean's General Counsel and its litigation counsel. Transocean, however, was in a period of flux and was not prepared to engage in significant negotiations.

HESI counsel did engage in negotiations, and multiple meetings and phone conferences were held by the PSC with counsel for HESI during the spring of 2012. Up until the night before finalization of the "DHEPDS" Agreement, the PSC was still in active negotiations with HESI counsel. Ultimately, however, the negotiators ran out of time, and mutually agreeable terms were not reached.

The PSC went forward with the DHEPDS Class settlement, and the DHEPDS Agreement received preliminary approval on May 2, 2012. *See* Rec. Doc. 6418. After preliminary approval, discussions continued in the fall of 2012 with both HESI and Transocean. This occurred against the unfolding BP Settlement approval process, as well as a backdrop of intensive discovery and pretrial proceedings, and even while the court was trying the Limitation and Liability ("Phase One") trial.[9]

As part of the DHEPDS Agreement, the PSC required BP to assign certain of BP's claims against Transocean and HESI to the DHEPDS Class as a single, juridical entity. This Assignment, set forth in Exhibit 21 to the DHEPDS, was of unknown specific value at the time but has now proven to be a significant additional monetary benefit for the DHEPDS Class:

---

[9] The Court had initially set the Phase One trial to begin on February 27, 2012, but adjourned in service of judicial efficiency and in light of the settlement negotiations, as the Court recognized that the resolution with BP "would likely result in a realignment of the parties in this litigation and require substantial changes to the current Phase One trial plan," and "in order to allow the parties to reassess their respective positions." Rec. Doc. 5887; 5955. The Phase One trial ultimately began February 25, 2013.

-21-

approximately $337.7 million of additional recovery for the DHEPDS Class.  BP, which had

committed to make sufficient payments through the Claims process to make each DHEPDS class

member fully whole for compensatory damages claims settled under the Agreement, had no legal

obligation to also provide the Assignment.  BP wanted the release of HESI and Transocean for

compensatory damages covered by the DHEPDS Agreement due to the risk of the

indemnification presented to BP.  If compensatory damage claims against HESI and Transocean

had not been part of the DHEPDS Class release, HESI and Transocean could have pursued

substantial claims back against BP.  In order for the PSC to agree to that release, the PSC

required BP to assign to the DHEPDS Class all the claims that BP had against HESI and

Transocean that were not indemnified.  The PSC required this concession so that the DHEPDS

Class Counsel would be in a position to attempt to negotiate an additional class-wide benefit by

the use of the Assignment, since they were benefitting HESI and Transocean by including them

in the release of compensatory damages claims.

However, BP insisted that it have approval of the ultimate language used in a settlement

of Assigned Claims to be certain that the settlement of these claims did not increase BP's

indemnification risk.  Accordingly, paragraph 1.1.2.5 of Exhibit 21 to the DHEPDS includes

protection of BP in this regard and allows BP the right to approve language in a settlement with

HESI or Transocean memorializing this protection, with the caveat that "such approval shall not

be unreasonably withheld."  Rec. Doc. 6430-39 at 3-4.  Notwithstanding the added benefit of the

Assignment, the PSC also insisted that all DHEPDS Class Members' Claims for punitive

damages against HESI and Transocean be expressly preserved, leaving DHEPDS Class Members

free to pursue these claims.

The Court granted Final Approval of the DHEPDS Agreement and final certification of the DHEPDS Class on December 21, 2012, *see* Rec. Doc. 8138 & 8139, as the PSC continued to pursue potential resolution with HESI and Transocean.

As part of these efforts, the Parties spent substantial time discussing resolution possibilities. The Parties were working against the deadline of the Court's ruling on the Phase One trial and continued to press for potential resolution.

One of the major hurdles to achieving a resolution was obtaining language to which all Parties would agree that satisfied HESI that it was getting as close as possible to full and complete resolution, and, at the same time, satisfied BP that it was not being presented with additional risk of claims that would be subject to indemnity.

To achieve close to full-resolution, the Parties needed to address both the potential for punitive damages and the claims assigned to the DHEPDS Class.[10] Therefore, the PSC agreed to a dollar amount that would be allocated by a court–appointed Neutral, who would take into consideration at the appropriate time the legal and factual bases for the punitive damages claims and the risk they presented to HESI, and the legal and factual bases of the Assigned Claims and the risk they presented to HESI. This neutral party would conduct an independent investigation and analysis, hear from proponents of both Classes, and make the allocation called for in the Settlement Agreement. Then, the Punitive Damage Class would undertake a distribution process for its allocated amount, and the DHEPDS Class would do likewise.

After many meetings and exchanges of proposals, and with the tenacious and able assistance of Magistrate Judge Shushan, the PSC and HESI were able to forge an agreement that

---

[10] Given the nature and extent of the punitive damages claims, the mutually perceived need for ongoing judicial supervision, and the procedural due process protections unique to Rule 23, the class action was selected early on as the most appropriate structure to resolve such claims. Seeking to maximize value to the class members, the PSC sought to limit the class to only injured parties who had potential standing to assert punitive damages claims under this Court's interpretation of *Robins Dry Dock*, in its earlier pre-trial rulings.

provided for an aggregate payment of $1.028 billion to resolve both the Assigned Claims against HESI and a punitive-damages class-action. The Parties filed the Settlement Agreement, which they understood to satisfy any obligations that might be owed BP under paragraph 1.1.2.5 of Exhibit 21 to the DHEPDS Agreement, with the Court on September 2, 2014. *See* Rec. Doc. 13346.

Even after the Parties reached agreement on the Settlement's terms, the PSC ran into complications in achieving final agreement and sign-off by BP on the language of the Settlement Agreement pursuant to Exhibit 21 to the DHEPDS Agreement. After numerous additional meetings, the Parties were able to narrow this gap, and again with the help of Judge Shushan, the language was ultimately agreed to by both HESI and BP. This language is currently reflected in the Settlement Agreement. *See* Rec. Doc. 15322-6 (Administrative Cost Addendum).

### B.    The Transocean Settlement

The Proposed Transocean Settlement was similarly negotiated at arm's length, with a favorable Settlement being achieved in the Spring of 2015.

In early 2012, members of the PSC began holding meetings with counsel for Transocean in an attempt to engage them in settlement discussions that would run simultaneously with an anticipated resolution with BP. They attempted to have Transocean join the class-action settlement with BP and contribute funds at that time to obtain a parallel release and a parallel resolution. Transocean, however, was in a period of flux and was not prepared to engage in significant negotiations, and there were no further discussions with Transocean through the spring of 2012.

After preliminary approval of the DHEPDS, discussions continued in the fall of 2012 with both HESI and Transocean, in an attempt to again engage them in resolution discussions.

This occurred against a backdrop of intensive discovery and pretrial proceedings, and even while the court was trying the Limitation and Liability ("Phase One") trial. [11]

These efforts took place against a background in which Transocean continued to experience changes in key leadership roles.  In 2013, the PSC hired counsel in Zurich, Switzerland to advise its members on Swiss law as it relates to transfer of assets.  This decision coincided with the time that Transocean's board was considering mandatory distributions of assets and dividends.

Meanwhile, as described in Section III.A. above, the PSC was also negotiating with HESI regarding a potential resolution.  The PSC and HESI ultimately reached agreement, and on September 2, 2014, filed the HESI Punitive Damages and Assigned Claims Settlement Agreement with the Court.  *See* Rec. Doc. 13346.  Working against the deadline of the Court's ruling on the Phase One trial, the PSC reached out to Transocean in an effort to have Transocean join the settlement.  Transocean, however, declined to do so.

The Court issued its Findings of Fact and Conclusions of Law from the Phase One trial on September 4, 2014.  Rec. Doc. 13355.[12]  While it found both Transocean and HESI negligent, it found that only BP engaged in gross negligence and willful misconduct.  *Id.*

Thereafter, the PSC was successful in reaching an overall settlement with Transocean, and, on May 29, 2015, the Parties filed the Transocean Assigned Claims and Punitive Damages Settlement Agreement.  *See* Rec. Doc. 14644.

---

[11] The Court had initially set the Phase One trial to begin on February 27, 2012, but adjourned in service of judicial efficiency and in light of the settlement negotiations, as the Court recognized that the resolution with BP "would likely result in a realignment of the parties in this litigation and require substantial changes to the current Phase One trial plan," and "in order to allow the parties to reassess their respective positions."  Rec. Doc. 5887; 5955.  The Phase One trial ultimately began February 25, 2013.

[12] The Court slightly modified the Phase One Findings on September 9, 201 5.  *See* Rec. Doc. 13381-1.

The PSC negotiated intensively and at length to obtain the best possible outcome of settlement negotiations with both HESI and Transocean, as recounted above, and thus to obtain the largest possible aggregate sum for the resolution of the claims of the Old and New Classes. To preserve the integrity of these settlements, and of the settlement approval process, and to ensure advocacy for the members of both Classes, the Settlement Agreements both provided that the settlement fund be allocated, as between the Old and New Classes, by a court-appointed Neutral, who would conduct an independent investigation and analysis of the claims of both Classes, and their relative value, to make recommendations regarding allocation as between the two Classes. This process ensures that both the settlement negotiations themselves were non-collusive and at arm's length; and that the resulting aggregate payment is also allocated in a fair and neutral manner, with the Neutral taking full account of the claims, suggestions, and opinions, of representatives and members of both the Old and New Classes in making this allocation.

The process used by Judge Wilkinson as Court-appointed Allocation Neutral is set forth, in detail, in his <u>Neutral Allocation</u>, and is not repeated here. Suffice it to say that, based on his analysis as described earlier in this Memorandum, the outcome of this rigorous evaluation and analysis, is that:

> 1.    $902,083,250 (nine hundred two million, eighty-thousand, two hundred fifty dollars), representing 72.8% of the total Aggregate Payments, should be apportioned to the New Class; and

> 2.    $337,666,750 (three hundred thirty-seven million, six hundred sixty-six million, seven hundred fifty dollars), representing 27.2% of the total Aggregate Payments, should be apportioned to the Old Class;

This analysis, we submit, is demonstrably fair, adequate, and reasonable, and merits this Court's preliminary approval, for the purposes of moving forward with the Class notice and settlement approval process.

-26-

IV.    **THE CLASS ACTION SETTLEMENT MECHANISM IS IDEALLY SUITED TO THE COMPREHENSIVE RESOLUTION OF PUNITIVE DAMAGES CLAIMS ARISING FROM THE *DEEPWATER HORIZON* INCIDENT AND THE CERTIFICATION OF THE NEW CLASS**

A.    **The Purpose and Policy of Punitive Damages Resonate with and Enable Resolution Via Rule 23(e)**

The utilization of the class action mechanism to allocate sums paid in resolution of punitive damages claims between defined groups, and to distribute them to individual claimants within those groups, is in harmony with the purpose of punitive damages, and the Constitutional principles governing their imposition and calculation, as articulated by the Supreme Court in a series of recent cases comprising an integrated body of contemporary controlling punitive damages jurisprudence.  *BMW of N. Am., Inc. v. Gore*, 517 U.S. 559 (1996) ("*Gore*"); *State Farm Mut. Auto. Ins. Co. v. Campbell*, 538 U.S. 408 (2003) ("*Campbell*"); *Cooperman Indus., Inc. v. Leatherman Tool Group*, 532 U.S. 424 (2001) ("*Leatherman*"); *Philip Morris USA v. Williams*, 549 U.S. 346 (2007) ("*Williams*"); and *Exxon Shipping Co. v. Baker*, 554 U.S. 471 (2008) ("*Exxon Shipping*").

Punitive damages often accompany, but dramatically differ, from compensatory or actual damages.  Punitive damages have a societal purpose:  to effectuate punishment, deterrence, and retribution when private actors violate the social contract.  *See* Catherine M. Sharkey, "*Punitive Damages as Societal Damages*," 113 Yale L.J. 347 (Nov. 2003); Benjamin C. Zipursky, "*A Theory of Punitive Damages*," 84 Tex. L. Rev. 105 (Nov. 2005); Anthony J. Sebok, "*Punitive Damages:  From Myth to Theory*," 92 Iowa L. Rev. 957 (Mar. 2007).  "Punitive damages may properly be imposed to further a State's legitimate interests in punishing unlawful conduct and deterring its repetition."  *Gore*, 517 U.S. at 568.  Private plaintiffs are the agents of enforcement of these societal interests, and are incentivized in this role by common law or statutes that enable

-27-

them to keep all or part of the punitive damages awarded in the cases they bring; however, it is generally recognized that plaintiffs have no property right in them.

Because punitive damages have societal impact and vindicate and protect public interests, and because they are the civil litigation equivalent of criminal penalties or sentences, they have acquired, through the series of Supreme Court decisions cited above, a Constitutional dimension. These decisions announce and embody a jurisprudential recognition that defendants have a due process right to protection from imposition of punitive damages that are disproportionate to the level of the reprehensibility of the wrongdoing at issue and its resulting actual or potential harm.

The three guideposts to ensuring that punitive damages are proportional to the wrong, that is, are sufficient to perform the societal roles of punishment and deterrence, while avoiding over-deterrence, are:  "(1) the degree of reprehensibility of the defendant's misconduct; (2) the disparity between the actual or potential harm suffered by the plaintiff and the punitive damages award; and (3) the difference between the punitive damages awarded by the jury and the civil penalties authorized or imposed in comparable cases."  *Campbell*, 538 U.S. at 418; *Gore*, 517 U.S. at 575.

The degree of reprehensibility of the defendant's conduct is the "most important indicium of the reasonableness of a punitive damages award."  *Gore*, 517 U.S. at 575.  The degree of reprehensibility is measured by "considering whether the harm caused was physical as opposed to economic; the tortuous conduct evinced an indifference to or a reckless disregard of the health or safety of others; the target of the conduct had financial vulnerability; the conduct involved repeated actions or was an isolated incident; and the harm was the result of intentional malice, trickery, or deceit, or mere accident.  *Gore*, 517 U.S. at 576-577; *Campbell*, 538 U.S. at 419.

Punitive damages may scale upward with the degree of reprehensibility:  the more egregious the conduct, the higher the "ratio" between actual harm and the punitive award.  The Supreme Court has repeatedly declined to reduce this multi-factor relationship, or the range of allowable ratios, to a hard-and-fast formula.  *See Gore,* 517 U.S. at 581 and *Campbell*, 538 U.S. at 424-25, declining "to impose a bright-line ratio which a punitive damages award cannot exceed."  *Id.*

The *Gore* and *Campbell* cases imposed a constitutional overlay on punitive damages awards made in state courts on state law claims.  In *Exxon Shipping*, the Supreme Court reviewed a classwide award of punitive damages in an area of federal rather than state common law for the first time.  The *Exxon Shipping* punitive damages award was reviewed "under federal maritime law jurisdiction," and was thus evaluated "for conformity with maritime law rather than the outer limit allowed by due process."  554 U.S. at 502.  *Exxon Shipping*, while thus an exception to the Supreme Court's punitive damages jurisprudence, which superimposed constitutional limits on state law and practice, is the decision of most immediate relevance to the use of the class action mechanism in this Court, enabling it, in the Rule 23(e) context, to evaluate the fairness and adequacy of a classwide resolution of maritime punitive damages claims.  In *Exxon Shipping*, the Supreme Court was able to use its subject matter jurisdiction to prescribe an actual 1:1 compensatory-to-punitive damages formula for maritime cases—at least maritime cases similar to *Exxon Shipping* itself, in which no deaths or personal injuries occurred, the losses were purely environmental and economic, and the Supreme Court did not view profit as an animating motivator of the conduct.  *Exxon Shipping*, 554 U.S. at 513.[13]

---

[13] The Supreme Court characterized the conduct of Exxon in the *Exxon Valdez Oil Spill* as having "no earmarks of exceptional blameworthiness within the punishable spectrum (cases like this one, without intentional or malicious conduct, and without behavior driven primarily by desire for gain, for example) and cases  (again like this one) without the modest economic harm or odds of detection that have opened the door to higher awards."  *Id.*

Indeed, the Neutral Allocation uses the *Exxon Shipping* ratio analysis as the foundation of its own evaluation–using "the best available indicators of active, compensatory damages," *In re Exxon Valdez*, 236 F. Supp. 2d at 1063 (accepted by *Exxon Shipping*, 554 U.S. at 515) in determining the value of the punitive damages Class of the New Class, and finding that $10.825 billion (projected payments to the Old Class under the BP Settlement) "is the best indicator of compensatory damages for use in calculating the potentially revocable punitive damages." *Id*. at 16.  *See* Neutral Allocation at pp. 12-16.

The class action mechanism is uniquely suited to the resolution of groupwide punitive damages claims because the initial imposition of punitive damages by the fact-finder at trial, and the *de novo* review of the award on appeal (which *Leatherman* mandates),[14] focuses on an evaluation of the reprehensibility of the defendant's conduct, a common question, as the Neutral Allocation itself demonstrates.  The calculation itself must relate to actual or potential harm to those before the court (as *Williams* held), and *Campbell* notes that the "inclusion" of groups harmed is appropriate to avoid multiple, inconsistent, or disproportionate awards.[15]  *Exxon Shipping* itself involved a jury's determination of punitive damages in the class action context.  It is thus apparent that the determination or resolution of punitive damages and the class action are a natural fit.  The individualized issues that might complicate the integration of multiple determinations of actual damages in a single disaster context are vastly simplified for punitive damages.

---

[14] *Leatherman*, 552 U.S. at 437-440 (the "level of punitive damages is not really a fact tried by a jury" and "appellate review of the district court's determination that an award is consistent with due process does not implicate the Seventh Amendment. . . ." *Id*. at 438.

[15] 538 U.S. at 522 (proper adjudication of conduct that harmed persons other than the named plaintiffs would require their "inclusion").

The ratio between compensatory damages and punitive awards, while circumscribed by the soft cap of due process is, within those limits, flexible.[16]  There is no Seventh Amendment right that attaches to punitive damages, as the *Leatherman* decision held:  courts, not juries, have the final say, on *de novo* judicial review, on the calculation of punitive damages.  *Leatherman*, 532 U.S. at 437-440.  Thus, the allocation of an aggregate settlement to a punitive damages class is, regardless of the individual or class context, or the trial or settlement context, an inherently judicial function, calling for a similar degree of judicial involvement and evaluation as do class action settlements themselves.  Equity allocation by the court, not some fundamental right of the claimants, is the operative principle.  The New Class, after all is taking its share not to compensate damages to its members, but as a bounty for extracting damages to vindicate the public interest.

As this Memorandum summarizes, the controlling federal jurisprudence on punitive damages focuses on the non-compensatory, punitive and deterrent purposes of these damages, and hence the nature and quality of the defendants' conduct is the predominating concern.  In the context of a single incident disaster caused by allegedly reprehensible conduct, as in both *Exxon Valdez* and *Deepwater Horizon*, inclusion of all claimants in the punitive damages adjudication (or resolution) is profoundly consistent with the Supreme Court's due process and public policy concerns.  Among available joinder or inclusion procedures, the class action mechanism is superior.  It has already demonstrated its efficacy in the DHEPDS Settlement with BP, which included the resolution of punitive damages claims against BP, and the assignment of certain of BP's claims against HESI and Transocean to the Class as an entity.  This alone makes it the

---

[16] As Judge Posner famously stated in a punitive damages decision following closely upon the issuance of *Campbell*, the function of the courts in reviewing punitive damages is to "police a range, not a point."  *Mathias v. Accor Econ. Lodging*, 347 F.3d 672, 675-76, 678 (7th Cir. 2003).

mechanism of choice for approval and administration of a settlement arising out of the same

incident and involving the conduct—completely identical as to conduct impacting the class—of

the remaining major participants, HESI and Transocean.

> **B.     The Maritime Punitive Damages Common Law Made by the Supreme Court In *Exxon Shipping* Supports the Certification of and Allocation to the New Class and Preliminary Approval of the HESI and Transocean Settlements**

Despite subsequent attempts by defendants in non-maritime cases to add *Exxon Shipping*

to the line of Supreme Court authority addressing Constitutional limitations on punitive damages

exposure, *Exxon Shipping* was a rare instance of the Supreme Court making federal punitive

damages common law.  Ironically, the major reason for the post-verdict ping-ponging of the

$5 billion punitive damages award between the *Exxon Valdez* district court and the Ninth Circuit

had been caused by the issuance, during the same timeframe, of Supreme Court decisions

addressing due process limitations on punitive damages in non-maritime cases.  As the Supreme

Court itself acknowledged "with respect to the size of the punitive-damages award . . . the

[Ninth] Circuit remanded twice for adjustments in light of this Court's due process cases before

ultimately itself remitting the award to $2.5 billion.  *See* 270 F.3d at 1246-1247; 472 F.3d 600,

601, 625 (2006) (per *curiam*), and 490 F.3d 1066, 1068 (2007)."  *Exxon Shipping*, 554 U.S.

at 481.

By the time the case finally reached the Supreme Court, however, the issue was narrower:

"whether the punitive damages awarded against Exxon in this case were excessive as a matter of

maritime common law."  *Id*.  As *Exxon Shipping* observes, "[T]oday's inquiry differs from due

process review because the case arises under federal maritime jurisdiction, and we are reviewing

a jury award for conformity with maritime law, rather than the outer limit allowed by due

process; we are examining the verdict in the exercise of federal maritime common law authority,

which precedes and should obviate any application of the constitutional standard." 554 U.S. at 501-502.

The Supreme Court had approached, but never reached, the point of prescribing an absolute numerical or proportional limit on punitive damages in the Constitutional context, perhaps seeing a bright-line limit as antithetical to the notion of fundamental fairness, or despairing of the ability to come up with a limit that would preserve the deterrent and punitive functions of punitive damages.[17]   Maritime law, however, offered such an opportunity for a specific limitation.  As Justice Souter noted in *Exxon Shipping*,

> "[O]ur review of punitive damages today, then, considers not their intersection
> with the Constitution, but the desirability of regulating them as a common law
> remedy for which responsibility lays with this Court as a source of judge-made
> law in the absence of statute.  Whatever may be the constitutional significance of
> the unpredictability of high punitive award, this feature of happenstance is
> intention with the function of the awards as punitive, just because of the
> implication of unfairness that an eccentrically high punitive verdict carries in a
> system whose commonly held notion of law rests on a sense of fairness in dealing
> with one another.  Thus, a penalty should be reasonably predictable in its
> severity . . . " 554 U.S. at 502.

Given this opportunity to make the law rather than interpret the Constitution, what was the limit the Supreme Court set in maritime cases, and is it absolute?  This has been a matter of considerable controversy, with some arguing that the 1:1 ratio set by the Court in *Exxon Shipping* is absolute.  As this Court is well aware, other appellate authority would preclude punitive damages at all.  Against this jurisprudential backdrop, not only is settlement class certification appropriate and in harmony with punitive damages doctrine, but the amount allocated to the New Class, just over $902 million (*without* deduction for attorneys' fees or costs), is extraordinary and

---

[17] As the Court declared in *State Farm*, reviewing its earlier punitive damages decisions, "We decline again to impose a bright-line ratio which a punitive damages award cannot exceed.  Our jurisprudence and the principles it has now established demonstrate, however, that in practice, awards exceeding a single-digit ratio [e.g. exceeding 9:1] between punitive and compensatory damages might be close to the line of constitutional impropriety." 538 U.S. at 425.

deserving of preliminary approval under Rule 23(e) as fair, adequate and reasonable, in this case where no punitive damages liability was found against HESI and Transocean at trial, and the high "reprehensibility" findings were reserved for BP only.

Justice Souter's majority opinion in *Exxon Shipping* closes with this comment:  "In *State Farm*, we said that a single-digit maximum is appropriate in all but the most exceptional of cases, and '[w]hen compensatory damages are substantial, then a lesser ratio, perhaps only equal to compensatory damages, can reach the outermost limit of the due process guarantee.'"  554 U.S. at 515, citing *State Farm v. Campbell*, 538 U.S. at 425.  The court then drops this footnote:

> "The criterion of 'substantial' takes into account the role of punitive damages to induce legal action when pure compensation may not be enough to encourage suit, a concern addressed by the opportunity for a class action when large numbers of potential plaintiffs are involved.  In such cases, individual awards are not the touchstone, for it is the class option that facilitates suit, and a class recovery of $500 million [the amount the Supreme Court allowed the *Exxon Valdez* class] is substantial.  In this case, then, the Constitutional outer limit may well be 1:1."

The <u>Neutral Allocation</u> took its cue from *Exxon Shipping*.  While recognizing that some of the conduct described in the trial findings could increase the punitives-to-compensatory ratio above the presumptive 1:1 ratio of *Exxon Shipping*, Judge Wilkinson also recognized that the share of compensatory damages that could be used in a ratio exercise involving only HESI and Transocean was 33%, about one-third, of the projected compensatory total of $10.825 billion.  Thus the "baseline" was reduced to about $3.608 billion.  *Id*. at p. 17.  Then, that baseline was adjusted–that is, further reduced, for litigation risk.  This is where *Deepwater Horizon* diverges most obviously from *Exxon Shipping*.  The Supreme Court, in determining the ratio factors to be applied in maritime cases, was reviewing a classwide trial verdict that *awarded* punitive damages.  In this case, the *Deepwater Horizon* liability trial findings *denied* punitive damages, and yielded findings regarding the conduct and relative fault of the two settling defendants that

-34-

would foreclose punitive damages even were the Fifth Circuit to clarify or alter its jurisprudence to allow them.  So, these steep appellate challenges "dictate a severe downward adjustment … for settlement evaluation and allocation purposes."  Neutral Allocation at 22.

Applying these considerable risks to the portion of the Old Class that also qualifies for *Robins Dry Dock* punitive damage as New Class Members ("about 43%), and application of the 1/3 share of responsibility of HESI and Transocean, yields "a range of $816 million to $1.067 billion for each component of the 1:1 ratio."  Neutral Allocation, at 26-27.  Concluding his calculus and analysis, the Neutral finds "that the prospect of recovery of the full baseline amount of $3,608,333,000 (three billion, six hundred eight million, three hundred thirty-three thousand dollars) in punitive damages calculated above is low, presenting no more than a 25% (twenty-five percent) possibility of success through further litigation . . .[and] that a reasonable allocation of the Aggregate Payments to the New Class for its punitive damages claims is 25% of the baseline amount, $902,083,250 (nine hundred two million, eighty-three thousand, two hundred fifty dollars), representing 72.8% of the total Aggregate Payments."  *Id*. at 27.

C.     **Additional Federal Caselaw Supports the Settlement-Purposes Certification of the Punitive Damages Class**

While questions of trial manageability and trial-context due process are absent from the settlement-purposes class certification analysis under *Amchem*, it is noteworthy that the Fifth Circuit has approved the certification of punitive damages classes in a variety of procedural circumstances, including phased trials in long–term mass torts, such as asbestos exposures, involving more individualized issues than this single disaster case.  The Fifth Circuit cases include *Jenkins v. Raymark Industries, Inc.*, 782 F.2d 468, 470–71 (5th Cir. 1986)[18] and

---

[18] *See also*:  *Jenkins v. Raymark Indus., Inc.*, 109 F.R.D. 269, 283 (E.D. Tex. 1985) *aff'd*, 782 F.2d 468 (5th Cir. 1986) ("The approach adopted today by this Court would protect the individual claims of plaintiffs by permitting them to proceed as individuals after the class-wide issues have been determined, and the approach avoids any

*Footnote continued on next page*

*Watson v. Shell Oil Co.*, 979 F.2d 1014, 1019 (5th Cir. 1992) on *reh'g*, 53 F.3d 663 (5th Cir.

1994),[19] as well as the settlement class certification approved in *Deepwater Horizon II*, 739 F.3d

790 (5th Cir. 2014), *rehearing en banc denied,* 756 F.3d 320 (5th Cir. 2014), *cert. denied,* 135

S.Ct. 754 (2014).

## V.    THE PROPOSED PUNITIVE DAMAGES SETTLEMENT CLASS ("NEW CLASS") MERITS PROVISIONAL CERTIFICATION FOR SETTLEMENT APPROVAL PURPOSES

With respect to class certification, Rule 23(a) requires that:

(1)     the class is so numerous that joinder of all members is impracticable;

(2)     there are questions of law or fact common to the class;

(3)     the claims or defenses of the representative parties are typical of the claims or defenses of the class; and

(4)     the representative parties will fairly and adequately protect the interests of the class.

Fed. R. Civ. P. 23(a).  "The first two requirements focus on the characteristics of the class; the

second two focus instead on the desired characteristics of the class representatives."  *Chinese-*

*Manufactured Drywall*, 2012 WL 92498 at *8 (quotations and citations omitted).  This assures

that courts will identify the common interests of class members and evaluate the named

plaintiffs' and class counsel's ability to fairly and adequately protect class interests.  *Id.*  All of

---

*Footnote continued from previous page*

variance in legal standards by limiting the class to the confines of the Eastern District of Texas.  While any punitive fund derivative of the class action certified today would not amount to a single award for all potential punitive claims, it would greatly reduce the number of times the Defendants must defend against the assertion of punitive claims without necessarily diminishing the policy considerations of punishment and deterrence inherent in the law of punitive damages.")

[19] ("Shell accurately notes that the Phase 2 jury will, in making its punitive damages determination, consider a "statistical profile" of the claims asserted by the entire class.  However, we have previously recognized that ascertainment of punitive damage liability in a class action on the basis of evidence concerning the claims of representative plaintiffs and statistical information about the entire class, before litigation of individual damage claims, presents no constitutional infirmity where the court adequately apprises the jury of the nature of the information before it. *See Jenkins*, 782 F.2d at 474.  Because Fibreboard involved use of statistical profiles for quantitative assessment of compensatory damages rather than for determination of a basis on which to assess punitive damages, we cannot conclude, as Shell urges, that *Fibreboard* overruled *Jenkins*.")

Rule 23(a) 's requests, as well as Rule 23(b)(3) 's predominance and superiority requests, are met by the New Class.

A.   **The New Class Meets Rule 23(a)(1)'s "Numerosity" Requirement, and Is Readily Ascertainable**

Under Rule 23(a)(1) 's "numerosity" requirement, the mover typically must show that "joinder is impracticable through 'some evidence or reasonable estimate of the number of purported class members.'" *Id*. at *9 (quoting *In re Vioxx Prods. Liab. Litig.*, 239 F.R.D. 450, 459 (E.D. La. 2006)).  However, "a good-faith estimate of the class size is sufficient when the precise number of class members is not readily ascertainable." 1 William B. Rubenstein, *Newberg on Class Actions* §§ 3:12, 3:13 (5th ed. 2011). Numerosity frequently receives summary treatment and is often uncontested. *Id*. There can be no doubt as to the numerosity of the New Class here, as this Court's exposure with the *Deepwater Horizon* litigation to date will attest.  The New Class consists of thousands of individuals and businesses whose property or fishing operations were involved or harmed by the MC252 substances.  The Neutral Allocation estimates "about 162,500 (about 43%)" of the Old Class claimants are also New Class members and the New Class includes *Robins Dry Dock* claimants such as over 400 governmental entities, who were excluded from the Old Class definition.  Neutral Allocation, at 19, 26.  Thus, New Class numerosity is incontrovertible.

Courts have articulated an implied requirement of Rule 23(a) that the class be adequately defined and clearly ascertainable.  *Union Asset Mgmt. Holding A.G. v. Dell, Inc.*, 669 F.3d 632, 639 (5th Cir. 2012).  The New Class definition meets this test.  The New Class is discrete, objectively defined by reference to geography, businesses and occupations that are known and familiar to notice recipients, and fulfills the function of "ascertainability:"  that is, those receiving the Class Notice can readily determine whether they are, or are not, New Class members.  The

New Class is defined by reference to 1) a precise and specific time frame (from either April 20,

2010 through April 18, 2012, or April 20, 2009 through April 18, 2012 [depending on Class

category]); 2) ownership of real or personal property within Geographical boundaries that were

touched by oil or other MC252 Well or *Deepwater Horizon* Incident-related substances; and

3) specified commercial-fishing or subsistence related activities.  The definition is neither

subjective nor merits-dependent, and complies with *Robins Dry Dock* by including  those with

colorable punitive damages claims..

    **B.**    <u>Common Questions of Law and Fact Predominate in Significance over</u>
<u>Individual Questions in the Context of the Proposed Settlements under</u>
<u>Rule 23(a)(2) and (b)(3)</u>

Rule 23(a)(2) 's "commonality" requirement is met "when there is at least one issue, the

resolution of which will affect all or a significant number of the putative class members."

*Mullen v. Treasure Chest Casino, LLC*, 186 F.3d 620, 625 (5th Cir. 1999) (quotations and

citations omitted).  A single common question will suffice.  *Wal-Mart Stores, Inc. v. Dukes*,

131 S. Ct. 2541 (2011).

The commonality requirement is satisfied because members of the New Class share

numerous common legal and factual questions, the resolution of which would advance the

ultimate determination of punitive damages, which the Supreme Court has emphasized relates

primarily to defendants' conduct.  *See Exxon Shipping*, 554 U.S. 471 at 504.  The most

significant of these questions have already been answered in a common way, by this Court's

multi-phase trial findings, creating clear questions for appeal whose ultimate answers, as *Dukes*

requires, must by definition be common to the New Class.  *Dukes*, 131 S. Ct. at 2551; *Amgen*

*Inc. v. Conn. Ret. Plans and Trust Funds*, 133 S. Ct. 1184, 1197–99 (2013).  This litigation arises

out of a single incident, albeit one that unfolded over months, and what has become a similarly

defined term of art "the *Deepwater Horizon* Incident," in this and the prior BP settlement.  Such

-38-

questions evaluating a defendant under federal maritime law, including the standard under which

punitive damages are available, and the amount if any of such damages, are capable of classwide

resolution, and the answers to these common questions are both critical to the litigation and have

shaped the terms and conditions of the proposed Settlement.  The New Class is united in interest

in the pursuit of and recovery of punitive damages, as was the *Exxon Valdez* trial class.

Accordingly, Rule 23(a)(2) 's commonality requirement is satisfied.

> **C.    The Proposed New Class Representatives' Claims are Typical of those of the Class under Rule 23(a)(3)**

Rule 23(a)(3) 's "typicality" requirement "focuses on the similarity between the named

plaintiffs' legal and remedial theories and the theories of those whom they purport to represent."

*Id*.  The typicality inquiry does not test whether the class members suffered varying harms;

diversity in damages "will not affect their legal or remedial theories, and thus does not defeat

typicality."  *Id*.

The claims of the New Class Representatives are typical of the claims of the New Class.

These Class Representatives' claims arise from the same underlying event and course of conduct;

the Class Representatives share the same maritime legal theories as the claims of the Class

Members; and the Class Representatives include at least one representative asserting each

category (property owners and fishing enterprises) covered by the proposed Settlement.

Typicality "focuses on the similarity between the named plaintiffs' legal and remedial theories

and the theories of those whom they purport to represent."  *Mullen v. Treasure Chest Casino,*

*LLC*, 186 F.3d 620, 625 (5th Cir. 1999).  Both the New Class representatives and the New Class

itself comprise those who can assert punitive damages claims arising from the *Deepwater*

*Horizon* Incident under general maritime law.  By pursuing and achieving approval of this

substantial settlement, especially in the face of long odds to ever achieve punitive damages in a

litigation context, the Class Representatives will advance the interests of all New Class

Members.  Rule 23(a)(3) 's typicality requirement is therefore satisfied.

### D.   The New Class is Adequately Represented by Class Representatives and Counsel in Satisfaction of Rule 23(a)(4)

Rule 23(a)(4) 's "adequacy" requirement is satisfied where:  "(1) the named plaintiffs'

counsel will prosecute the action zealously and competently; (2) the named plaintiffs possess a

sufficient level of knowledge about the litigation to be capable of taking an active role in and

exerting control over the prosecution of the litigation; and (3) there are no conflicts of interest

between the named plaintiffs and the absent class members."  *Hamilton v. First Am. Title Ins.*

*Co.*, 266 F.R.D. 153, 163-64 (N.D. Tex., 2010); *see also Feder v. Elec. Data Sys. Corp.*,

429 F.3d 125, 129 (5th Cir. 2005).

Here, the New Class Representatives have been consulted and participated in the

determination of the settlement terms, will fairly and adequately protect the interests of the Class,

have no conflicts with each other, and are represented by qualified counsel who are competent to

represent the Class and prosecute this litigation.  The Class Counsel regularly engage in complex

litigation similar to the present case and have demonstrated their dedication by devoting

substantial effort, energy, and resources to the prosecution of this action, including discovery,

trials, and appeals; and by negotiating, finalizing, and implementing the BP class settlement, and

now the proposed HESI and Transocean settlements.  *See Stimson v. Exxon Corp.*, 280 F.3d 554,

563 (5th Cir. 2002).  Accordingly, Rule 23(a)(4) 's adequacy requirement is met.

### E.   The Proposed New Class Satisfies the Rule 23(b)(3) Predominance and Superiority Tests

Here, the PSC moves for settlement purposes certification of the New Class under

Rule 23(b)(3), which provides:

A class action may be maintained if Rule 23(a) is satisfied and if:

...

(3)      the court finds that the questions of law or fact common to class members predominate over any questions affecting only individual members, and that a class action is superior to other available methods for fairly and efficiently adjudicating the controversy. The matters pertinent to these findings include:

     1.      the class members' interests in individually controlling the prosecution or defense of separate actions;

     2.      the extent and nature of any litigation concerning the controversy already begun by or against class members;

     3.      the desirability or undesirability of concentrating the litigation of the claims in the particular forum; and

     4.      the likely difficulties in managing a class action.

Fed. R. Civ. P. 23(b)(3).  "To succeed under Rule 23(b)(3), Plaintiffs must sufficiently demonstrate both predominance of common class issues and that the class action mechanism is the superior method of adjudicating the case." *Chinese-Manufactured Drywall*, 2012 WL 92498 at *9 (citations and quotations omitted).  The predominance inquiry tests "whether proposed classes are sufficiently cohesive to warrant adjudication by representation." *Amchem*, 521 U.S. at 623 (citation omitted).  "To predominate, common issues must form a significant part of individual cases." *In re Vioxx*, 239 F.R.D. at 460 (citing *Mullen*, 186 F.3d at 626).  Because class certification is for settlement-only purposes, the Court need not inquire whether the case, if tried, would present intractable management problems. *Amchem*, 521 U.S. at 620; *Deepwater Horizon II*, 739 F.3d at 817-818.  "Together subsection (a) and (b) requirements insure that a proposed class has sufficient unity so that the absent class members can fairly be bound by decisions of the class representatives. *Chinese-Manufactured Drywall*, 2012 WL 92498 at *8 (citations and quotations omitted).

This is, unlike most mass torts, a single-incident disaster, governed predominantly by a single body of federal law and, as to the punitive damage claims, general maritime law.

Common factual and legal questions include liability for punitive damages arising from the operation and blowout of the MC252 Well, the sinking of the *Deepwater Horizon*, and its sequelae. In the absence of settlement, the availability of punitive damages would be argued and ultimately determined on appeal, with a complete factual record—the record in the limitation trial and thorough findings of fact and conclusions of law from this Court. We know from this record that the conduct of HESI and Transocean did not vary among Class members. The facts of what happened, why, and who is liable, and in what relative degrees, are of record. These facts, the degree of responsibility they demonstrate on the part of these two defendants, and legal questions of the allowance of punitive damages to punish and deter defendants under maritime law, are all common. Because Defendants' conduct did not differentiate, in kind or in degree of reprehensibility, among Class members, it would be neither necessary nor appropriate to require or allow their individual adjudication or piecemeal resolution. Such questions are best and properly decided—or resolved—in a single, inclusive scenario—on a class basis. In short, the proposed New Class is sufficiently cohesive to warrant adjudication by representation. The claims are related, cohesive, and all arise out of the same nucleus of operative facts. *See Amchem Prods. v. Windsor*, 521 U.S. 591, 620-21 (1997); *Sullivan v. DB Invs., Inc.*, 667 F.3d 273, 297, 338 (3d Cir. 2011) (en banc), *cert. denied; Murray v. Sullivan*, 132 S. Ct. 1876 (2012); *see also Exxon Shipping*, 554 U.S. at 518. Accordingly, Rule 23(b)(3)'s predominance requirement is satisfied.

This Court need not decide whether a class is superior from the standpoint of trial management, nor need the Parties agree or concede on this point. When confronted with a "request for settlement-only class certification, a district court need not inquire whether the case, if tried, would present intractable management problems . . . for the proposal is that there be no

trial." *Amchem*, 521 U.S. at 620 (citation omitted); *Deepwater Horizon II*, 739 F.3d at 818;

*Billitteri v. Sec. Am., Inc.*, 2011 WL 3586217, at *8 (N.D. Tex. Aug. 4, 2011); *In re Chinese-*

*Manufactured Dry Wall Prods.*, Liab. Litig., 2012 WL 92498 (E.D. La. Jan. 10, 2012).  This is

an appropriate case for class treatment, as the litigation is unusually complex and expensive, and

it involves many thousands of plaintiffs whose claims arise from the same event, under the same

body of law.  Class treatment therefore allows many plaintiffs to recover who might otherwise be

unable to do so.  Moreover, the New Class may be unique in the absolute degree of satisfaction

of Rule 23(b)(3), which tests, functionally, whether a classwide trial is superior to other

mechanisms.  Here, uniquely, the common questions have already been tested at trial.  The

ability of the trial evidence to generate common answers has been proven.

　　This Court has, as a procedural matter, demonstrated the manageability of a unitary

punitive damages determination for HESI and Transocean by adjudicating their level of fault in a

previous trial phase.  Assuming these Defendants' exposure to punitive damages were restored

by decision favorable to plaintiffs on appeal, an aggregate or classwide proceeding to quantify

and allocate punitive damages would be superior to other procedures, all of which would mirror

the determination of common questions in the multi–phase trial far less perfectly.  The settlement

precludes such litigation, and provides a comprehensive, court-supervised, and internally

consistent mechanism for allocating and distributing the punitive damages settlement that is

superior to many thousands of separate determinations of damages.

　　The alternative to New Class settlement–purposes certification and settlement approval—

that is, the litigation or resolution of punitive damages issues on a case-by-case basis—is

demonstrably insufficient and inappropriate given the trial-derived findings to date.  Such

piecemeal litigation would needlessly tax the resources of the judiciary and the Parties.  A class

action procedure, with clearly defined roles for the parties, their counsel, and the Court, and the due process protections for absent class member claimants uniquely afforded by Rule 23, is available here, and it is superior to other available methods for fairly and efficiently resolving the punitive damages controversy.  This is particularly true in the case of punitive damages, to which there is no individual entitlement, and which serve a non-compensatory purpose.  *See Exxon Shipping*, 554 U.S. at 513; Neutral Allocation, at 34.  The class members do have a legitimate common interest in the fair and equitable distribution of a reasonable and proportional punitive damages award—or settlement—among them—and the class action's procedure best serves these goals in the settlement setting.  Rule 23(b)(3) 's superiority requirement is satisfied.

## VI.    THE PROPOSED HESI AND TRANSOCEAN SETTLEMENTS MERIT PRELIMINARY APPROVAL, DISSEMINATION OF CLASS NOTICE, AND SCHEDULING OF A FORMAL FAIRNESS/FINAL APPROVAL HEARING UNDER RULE 23(e)

Federal Rule of Civil Procedure 23(e) and its caselaw governs the requirements for class settlement approval, and settlement-only classes.  "'Before an initial class ruling, a proposed class settlement may be effectuated by stipulation of the parties agreeing to a temporary settlement class for purposes of settlement only.'"  *In re Chinese-Manufactured Drywall Prods. Liab. Litig.*, MDL No. 2047, 2012 WL 92498, at *8 (E.D. La. Jan. 10, 2012) (quoting 4 William B. Rubinstein *et al.*, *Newberg on Class Actions* § 11:22 (4th ed. 2010)); *see also Manual for Complex Litigation (Fourth)* [MCL 4th] § 21.612 (2004) ("Parties quite frequently enter into settlement agreements before a decision has been reached whether to certify a class.").  "Settlement classes—cases certified as class actions solely for settlement—can provide significant benefits to class members and enable the defendants to achieve final resolution of multiple suits."  MCL 4th § 21.612.  However, even in this context the requirements for class certification in Rule 23(a) and (b) must be satisfied, except that a court need not inquire whether

-44-

the case, if tried, would present intractable management problems under Rule 23(b)(3)(D).  *Id*. § 22.921 (citing *Amchem Prods., Inc. v. Windsor*, 521 U.S. 591, 620-21 (1997)).  Additionally, the terms of the proposed settlement must comport with Rule 23(e).

Courts have developed a two-step process when considering a proposed settlement of a class action, which this Court has followed in the DHEPDS Settlement, and which the Parties propose here.  *See Chinese-Manufactured Drywall*, 2012 WL 92498, at *7.  First, if the class was not previously certified, as is the case with the proposed New Class here, the Court "'should make a preliminary determination that the proposed class satisfies the criteria set out in Rule 23(a) and at least one of the subsections of Rule 23(b).'"  *Id*. (quoting MCL 4th § 21.632). This has been done in Section V above.

### A. The Allocations to "New Class" on its Punitive Damages Claims and to the "Old Class" on its Assigned Claims are Fair, Reasonable, and Adequate and Merit Preliminary Approval

The Court must "'make a preliminary determination on the fairness, reasonableness, and adequacy of the settlement terms and must direct the preparation of notice of the certification, proposed settlement, and date of the final fairness hearing.'"  *Id*. (quoting MCL 4th § 21.632). Then, if preliminary approval is granted and following the notice and opt-out period, the Court holds a Rule 23(e)(2) final fairness hearing to decide whether to approve or disapprove the settlement.  *See id*.  Final determination on class certification is also reserved for the final fairness review.

Rule 23(e) places the burden of persuasion on the movers that the proposed settlement is "fair, reasonable, and adequate."  *Id*. at *7.  However, the standards for granting preliminary approval are not as stringent as those applied to a motion for final approval:  "The questions are simpler, and the court is not expected to, and probably should not, engage in analysis as rigorous as is appropriate for final approval."  *In re OCA, Inc. Securities & Derivative Litig.*, No. 05-

-45-

2165, 2008 WL 4681369, at *11 (E.D. La. Oct. 17, 2008) (quotations and citations omitted); *see also In re Traffic Exec. Ass'n-E. R.R.*, 627 F.2d 631, 634 (2d Cir. 1980) (describing preliminary approval as "a determination that there is what might be termed 'probable cause' to submit the proposal to class members and hold a full-scale hearing as to its fairness") (citations omitted).  If the proposed settlement "discloses no reason to doubt its fairness, has no obvious deficiencies, does not improperly grant preferential treatment to class representatives or segments of the class, does not grant excessive compensation to attorneys, and appears to fall within the range of possible approval, the court should grant preliminary approval."  *OCA*, 2008 WL 4681369, at *11 (citations omitted).  "If the Court finds portions of the proposed settlement problematic, it may indicate preliminary disapproval of the agreement and recommend that the parties make certain revisions or modifications."  *Chinese-Manufactured Drywall*, 2012 WL 92498, at *7.

Courts have held that "approval of settlement class actions under Rule 23(e) requires closer judicial scrutiny than approval of settlements reached only after class certification has been litigated through the adversary process."  MCL 4th § 21.612.  However, "[e]xtended litigation between or among adversaries," as occurred here, "might bolster confidence that the settlement negotiations were at arm's length."  *Id*.  "If, by contrast, the case is filed as a settlement class action or certified for settlement with little or no discovery, it may be more difficult to assess the strengths and weaknesses of the parties' claims and defenses, to determine the appropriate definition of the class, and to consider how class members will actually benefit from the proposed settlement."  *Id*.; *see also id*. § 22.921 ("If the case has been litigated extensively, the judge may have sufficient reliable information to determine whether the class should be certified and whether the settlement terms are the fair, reasonable, and adequate result of arms-length negotiations.").  Here, the punitive damages issues have been extensively

discovered, litigated—and tried to completion.  Moreover, the DHEPDS Class has already been

certified, tested on appeal, and survived.  There is no uncertainty about the value and benefit of

the settlements here, in comparison to the alternative of appellate efforts to establish a right to

punitive damages in the *Deepwater Horizon* litigation.

    As Section 21.632 ("Preliminary Fairness Review") of the *Manual for Complex*

*Litigation, Fourth* advises, at the preliminary review/approval stage "the judge can have a court–

appointed expert or special master review the proposed settlement terms, gather information

necessary to understand how those terms affect the absent class members, and assist the judge in

determining whether the fairness, reasonableness, and adequacy requirements for approval are

met." *Id.* at p. 321.  This is essentially what this Court has done in appointing the Allocation

Neutral, and his determination not only provides an explanation of the Neutral's allocation

process and a rationale for his split of the Aggregate Payments into specific shares for the Old

and New Class, it shows why the amount to be received by each Class from these settlements is

fair, adequate and reasonable.

    This allocation need not be the <u>only</u> fair allocation, nor must it be perfect.  Other

allocations might equally pass Rule 23(e) scrutiny, since the evaluation is complex, multifaceted,

and, while data–and–fact–driven, inherently qualitative, dealing with two species of claims,

punitive damages claims and assigned claims, whose valuations are policy–and equity–inflected.

In deciding whether to accept the Neutral Allocation on preliminary review to move the

proposed Settlements forward, the judicial function of this Court is, as Judge Posner famously

said regarding court review of punitive damages, "to police a range, not a point."  *Mathias v.*

*Accor Economy Lodging, Inc.*, 347 F.3d 672, 678 (7th Cir. 2003).  Here, each allocated share of

the HESI and Transocean Settlements, as well as the Aggregate Payments themselves, land squarely within a range meriting approval.

The HESI and Transocean Settlements have all the hallmarks of settlements that achieve preliminary—and final—review.  The Parties engaged in multi-month, extensive, arms-length settlement processes, free of collusion, with each of the settling defendants.  The Parties engaged in substantial discovery and motion practice to evaluate the merits of the punitive damages claims and defenses, and extensively investigated and analyzed the facts and legal issues surrounding those claims and defenses.  Pretrial discovery and trial preparation included well over 300 depositions, the production, review, and analysis of millions of documents; the retention and discovery of numerous scientific, technical, and industry experts; and the extensive associated investigation and analyses of the facts and legal issues surrounding relevant claims and defenses.  The trial of Phases One and Two, occurring over many months, and the resulting detailed Findings of Fact and Conclusions of Law for Phases One and Two, attest to the depth of information possessed by the Parties—and the Court—at this stage of the *Deepwater Horizon* proceedings.

The Settlement Agreements are amply fair, have no obvious deficiencies, do not improperly grant preferential treatment to the Class Representatives or to segments of the Class, and do not grant excessive compensation to attorneys.  Indeed, they consistently provide for a neutral and systematic determination of an equitable distribution of the aggregate settlement amounts, and a claims process supervised by the Court.  As with the DHEPDS settlement with BP, class counsel/common benefit fees and costs will not be deducted from or applied against payments to the class, but are paid separately, over and above, the class fund, by HESI and Transocean, in an amount (equivalent to approximately 10%) of the aggregate Class benefit that

-48-

appears reasonable and compares favorably to settlements of similar magnitude  It thus falls within the range of ultimate final judicial approval.

The Neutral Allocation details and demonstrates a neutral, fair, and well–reasoned allocation between the New Class punitive claims and the Old Class Assigned Claims.  The class certification of the Old Class for purposes of the implementation of the terms of the BP Settlement is final.  The Old Class is an established entity with a vested right in the Assigned Claims.  The sole question for determination under Rule 23(e) as to the Old Class is whether the HESI and Transocean Settlements are fair, adequate and reasonable resolutions of the Assigned Claims, now liquidated, per intensely negotiated Settlement Agreements and the Neutral Allocation, at the sum of $337,666,750.

The Neutral Allocation speaks for itself, in its transparent deliberations, addressing the derivative nature of an assigned claim, the law that governs such claims, and the inescapable bedrock principle that assignees "stand in the shoes" of the assignor.  Neutral Allocation at 31–36.  Here, the shoes in which the Old Class stands, for purposes of allocating, valuing, and determining the fairness of settlement of the Assigned Claims, are those of BP, which has itself been found 2/3 at fault for *Deepwater Horizon* damages.  The Assigned Claims are a benefit, but one which comes with a burden:

> "[A]n assignee, by following in the footsteps of the assignor, acquires not only all the rights and priorities of the assignor, but also any burdens and limitations on [the right] that were incumbent on the assignor." *ICEE Distribs., Inc. v. J&J Snack Foods Corp.*, 325 F.3d 586, 593 (5th Cir. 2003); *accord Cadle Co. v. 1007 Joint Venture*, 82 F.3d 102, 104-05 (5th Cir. 1996); *Fed. Deposit Ins. Corp. v. Bledsoe*, 989 F.2d 805, 810 (5th Cir. 1993).

The Neutral Allocation properly explores the likely fate of these Assigned Claims absent this Settlement, concluding that the prospect is a problematic one.  This analysis both explains

-49-

the allocation and demonstrates that it is a substantial benefit and a superior alternative to litigation.

Unremarkably, in light of:  1) the fact that BP's *Deepwater Horizon*–related conduct has been found to be more reprehensible than that of HESI and Transocean; 2) the principle that the assignee stands in the shoes of the assignor; and 3) the equitable doctrine of unclean hands, the Neutral Allocation does not award the Old Class, as assignee, any sum reflecting a hypothetical award of punitive damages to BP from HESI or Transocean.  The Neutral sees such a scenario as a factual, legal and equitable impossibility.  Neutral Allocation, at pp. 32–36.  Instead, the allocation reflects and generally rewards the possibility that the Old Class, as assignee, might, as counterfactual as it presently seems, recover on some of BP's assigned contractual claims.

The only issue specific to the New Class at this procedural juncture is whether the allocated $902,083,250 is indeed within the range of ultimate approval.  Based on the Phase One and Phase Two Findings, neither HESI nor Transocean is liable to any New Class member for punitive damages, as a factual matter.  Suing plaintiffs would not only have to reverse the District Court's extensive and well-articulated factual findings, but would face the additional hurdles of: **(i)** avoiding reversal of the District Court's legal conclusion that the general maritime law claim for punitive damages is not displaced by OPA; **(ii)** establishing that HESI and/or Transcoean was not only reckless, but that such reckless conduct is attributable to the respective corporation, under *In the Matter of P&E Boat Rentals,* 872 F.2d 642 (5th Cir. 1989); **(iii)** establishing individual *Robins Dry Dock* standing to assert a general maritime law punitive damages claim, as well as a compensatory predicate; and **(iv)** establishing that any punitive damages award is within both constitutional and federal common law limits.

-50-

To say that the New Class settlement is within the range of possible final approval as fair, adequate and reasonable is a dramatic understatement.

**B.      The Proposed Class Notices and Notice Plan Meet and Exceed Rule (c)(2)(B) and (e)(1) Criteria Regarding Notice and Should be Approved**

Where parties seek certification of a settlement class pursuant to Rule 23(b)(3) and approval of a settlement pursuant to Rule 23(e), notice of the class settlement must meet the requirements of both Rule 23(c)(2)(B) and Rule 23(e)(1). *In re CertainTeed Roofing Shingle Prods. Liab. Litig.*, 269 F.R.D. 468, 480 (E.D. Pa. 2010); *accord In re Serzone Prods. Liab. Litig.*, 231 F.R.D. 221, 231 (S.D. W. Va. 2005); *see also* MCL 4th § 21.633 ("For economy, the notice under Rule 23(c)(2) and the Rule 23(e) notice are sometimes combined.").

Rule 23(c)(2)(B) states:

> For any class certified under Rule 23(b)(3), the court must direct to class members the best notice that is practicable under the circumstances, including individual notice to all members who can be identified through reasonable effort.  The notice must clearly and concisely state in plain, easily understood language:
>   (i)      the nature of the action;
>   (ii)     the definition of the class certified;
>   (iii)    the class claims, issues, or defenses;
>   (iv)    that a class member may enter an appearance through an attorney if the member so desires;
>   (v)     that the court will exclude from the class any member who requests exclusion;[20]
>   (vi)    the time and manner for requesting exclusion; and
>   (vii)   the binding effect of a class judgment on members under Rule 23(c)(3).

Fed. R. Civ. Proc. 23(c)(2)(B).  The notice requirements of Rule 23(e)(1) are less stringent:

> The court must direct notice in a reasonable manner to all class members who would be bound by the [settlement] proposal.

---

[20] Rule 23(e)(3) allows a court to extend a second opt-out opportunity for previously certified classes, but this is discretionary; courts are under no obligation to do so.  *Denney v. Deutsche Bank*, 433 F.3d 253, 271 (2d Cir. 2006); Advisory Committee 2003 Notes to Fed. R. Civ. P. 23(e)(3).

Fed. R. Civ. P. 23(e)(1).  Subject to the minimum requirements of due process, notice under Rule (e)(1) gives the Court discretion over the form and manner of notice.  *See Fowler v. Birmingham News Co.*, 608 F.2d 1055, 1059 (5th Cir. 1979).  Significantly, compliance with Rule 23(c)(2)(B) can satisfy the Due Process Clause.  *See In re Enron Corp. Secs., Derivs. & "ERISA" Litig.*, No. MDL-1446, 2008 WL 4178151, at *2 (S.D. Tex. Sept. 8, 2008).

The PSC respectfully asks the Court to approve the proposed Class Notice to be sent directly to all known Old and New Class Members based on the mail and email addresses obtained through earlier Notice and Claims programs in the *Deepwater Horizon* proceedings. The Notice program has been developed in consultation with esteemed and experienced class communications experts Katherine Kinsella and Dr. Shannon Wheatman, who earlier consulted and contributed to the development of the BP Settlement Class Notice Program as well.  They know this case and these Classes well.  Plaintiffs further request that the Court approve Garden City Group, LLC ("GCG") as Notice Administrator, a role which will entail issuing notice to the Settlement Class, maintaining the settlement website, and otherwise administering the Notice program.

For any class certified under Rule 23(b)(3), "the court must direct to class members the best notice that is practicable under the circumstances, including individual notice to all members who can be identified through reasonable effort."  Fed. R. Civ. P. 23(c)(2).  Additionally, Rule 23(e) requires that the court "direct notice in a reasonable manner to all class members who would be bound by the proposal."  Fed. R. Civ. P. 23(e)(1).  Rule 23(h) also requires that notice of class counsel's motion for attorneys' fees and reimbursement of expenses be provided to class members.

The Notice includes all of the information Rule 23 prescribes.  It concisely states—in plain, easily understood language:

(1)     the nature of the lawsuit;

(2)     the definition of the New Class;

(3)     New Class Members' claims and Defendants' asserted defenses as well as the pertinent findings the Court has made at trial;

(4)     that a New Class Member may enter an appearance through an attorney if he/she so desires;

(5)     that the Court will exclude from the New Class any New Class Member that timely and validly requests exclusion from the New Class, and the time and manner for requesting exclusion;

(6)     a description of the terms of the Settlement, including information about Class Members' right to obtain a copy, and reference to the comprehensive Settlement website;

(7)     the right of any Old or New Class Member to object to any aspect of the Settlement, and the time and manner for doing so;

(8)     the binding effect of the Settlement on New Class Members who do not elect to be excluded; and

(9)     the date and time of the Final Approval Hearing.[21]

The content and style of the Notice itself has been developed in consultation with premier class notice experts Katherine Kinsella and Dr. Shannon Wheatman of Kinsella Media.  They have taken care that the Notice communicates the terms of the settlement clearly and plainly, to enable Old and New Class members to know and exercise their rights.  The Notice is thus "reasonably calculated, under all the circumstances, to apprise interested parties of the pendency of the action and afford them an opportunity to present their objections."  *Mullane v. Cent.*

---

[21] *See* Fed. R. Civ. P. 23(c)(2)(B).  The Notice also comports with the "Judges' Class Action Notice and Claims Process Checklist and Plain Language Guide" (2010) included on the Federal Judicial Center's website.  *See* http://www.fjc.gov/public/pdf.nsf/lookup/NotCheck.pdf/$file/NotCheck.pdf.  Lead Plaintiffs have left blank the dates of the Final Approval Hearing in the proposed Notice so that the Court may provide a date and time convenient to it upon entering the Notice Order.  Other dates in the Notice are tied to the date the Notice Order is entered or to the mailing of the Notice, and are thus similarly left blank.

*Hanover Bank & Trust Co.*, 339 U.S. 306, 314, 70 S. Ct. 652, 657 (1950).  It should therefore be approved.

The accompanying Declaration of Shannon R. Wheatman, Ph.D., on Adequacy of Notices and Notice Plan, sets forth the notice plan overview and details.  First and foremost, the plan will provide direct mailed, individual notice to known class members, with email notice to be sent to DHEPDS claimants identified as "Portal Users," that is individuals and entities that have opted to receive all notices electronically.  Mailed notices that are returned as non-deliverable will be re-mailed, and, prior to mailing, all addresses will be checked against the National Change of Address ("NCOA") database, maintained by the United States Postal Service.  In addition to individual mailed and e-mail notice to all known Old and New class members, a paid media program will be implemented to reach Class members.  The paid media program in turn includes a Publication Notice to appear in 22 newspapers covering cities and counties with the highest claimant concentration for commercial fisherman, charter boat operators, and subsistence hunters/fishers, in the Gulf Coast region.  An "earned media" program will also be implemented, including multiple press releases, radio public service announcements and broadcast spots with narrative 15, 30, and 60-second scripts.  These multi-media notices, whether written or broadcast, will include the toll-free telephone number and settlement website address, enabling class members to obtain complete information on the settlements, and their rights and options.

With respect to the form and content of the class Notices, as noted above, they have been written in clear, concise, plain language.  These also include the settlement website and toll-free number.  The Publication Notice, Summary Notice for mailing, Email Notice, and Long Form Notice are attached as Exhibits 3, 4 and 5 to the accompanying Wheatman Declaration.  The

Long Form Notice itself will be posted on the website, and available through the toll-free number (or by mail or email request to the Administrator).  While this Long Form Notice is necessarily lengthy, specific, and detailed, it likewise has been designed to encourage readership, understanding, and interest, utilizing a well-organized and reader-friendly format.

Finally, the PSC will also cause the Settlement Agreement, the Notice, and Publication Notice (together, the "Notices"), and the Notice Order to be posted on a website dedicated to the Settlement's administration.  These efforts—aimed to ensure that Settlement Class Members are apprised of their rights—are faithful to the letter and spirit of Rule 23.

### C.   The Parties' Proposal on Procedures and Deadlines for Objecting, Opting Out, and Appearing at the Fairness Hearing

Any Class Member may present written objections explaining why the Agreement should not be approved as fair, reasonable and adequate; why attorneys' fees and expenses to Class Counsel should not be awarded in the amounts requested; or why judgment should not be entered as to that Class Member.  Specifically, any Class Member wishing to object to any aspect of the Agreement must file a written statement of the objection(s) with the Court, and serve same on Class Counsel, HESI Counsel and Transocean Counsel, by first-class mail, no later than [September 23, 2016].  The written statement of the objection(s) must include (a) a detailed statement of the Class Member's objection(s), as well as the specific reasons, if any, for each objection, including any evidence and legal authority the Class Member has to support each objection and any evidence the Class Member has in support of his/her/its objection(s); (b) the Class Member's name, address and telephone number; (c) written proof that the individual or entity is in fact a Class Member, such as proof of residency, ownership of property and the location thereof, and/or business operation and the location thereof; and (d) any other supporting papers, materials or briefs the Class Member wishes the Court to consider when reviewing the

-55-

objection.  Any Class Member who fails to comply with these provisions shall waive and forfeit any and all rights to object to the Proposed Settlement, shall be forever foreclosed from making any objection to it, and shall be bound by all the terms of the Proposed Settlement and by all proceedings, orders and judgments in this matter.

Any New Class Member who wishes to exclude himself, herself, or itself from the Class must submit a written exclusion request, following the instructions in the Class Notice, which must be received by HESI/TO Punitive Damages & Assigned Claims Settlement, Exclusions Department, P.O. Box 102604, Dublin, Ohio 43017-5760, properly addressed and postmarked no later than [September 23, 2016]. All such written requests must be signed by the Natural Person or Entity seeking to exclude himself, herself or itself from the Class, but may be submitted by attorneys for such Natural Persons or Entities.

New Class Members who do not timely and properly Opt Out shall, in all respects, be bound by all terms of the Settlement Agreements and the Final Order and Judgment, shall be entitled to all procedural opportunities and protections described herein and provided by the Court, and all claims for which they qualify under its terms, and shall be permanently and forever barred from commencing, instituting, maintaining or prosecuting any action based on any Released Claim against any Released Parties in any court of law or equity, arbitration tribunal, administrative proceeding, or other forum.

Within ten days after the deadline for New Class Members to request exclusion from the Class, Class Counsel and Counsel for the Released Parties shall exchange a complete list of all timely and valid requests for exclusion received as of that date.  This list may be supplemented after the Fairness Hearing to the extent any additional timely and valid requests for exclusion are submitted.

Any New Class Member may revoke his, her, or its Opt Out from the New Class and thereby receive the benefit of the Settlement up until three (3) days prior to the Fairness Hearing; or later, if the Parties consent in their sole and unilateral discretion; or otherwise, if the Court so orders on good cause shown.

## VII.    <u>CONCLUSION</u>

Based on the foregoing, the Proposed HESI and Transocean Settlement Agreements, the extensive record on now–final DHEPDS Settlement Agreement, the record in the *Deepwater Horizon* proceedings to date, including the multi–phase trial; the provisions of Fed. R. Civ. P. 23; the recommendations of *Manual For Complex Litigation*; and this Court's and the Fifth Circuit's pertinent jurisprudence on settlement class certification and the class action settlement approval process; the undersigned, on behalf of the previously-certified DHEPDS Class and the proposed New Class, respectfully move and request:  1) preliminary settlement approval; 2) provisional New Class certification; 3) approval of the Class Notices and Notice Plan; 4) appointment of the PSC as Settlement Class Counsel for the New Class; and 5) scheduling of further steps in the settlement approval process, including the scheduling of dates and deadlines are set forth hereinabove and in the accompanying [Proposed] Preliminary Approval Order.

This <u>7th</u> day of <u>April</u>, <u>2016</u>.

Respectfully submitted,


|  |  |
|---|---|
| _____/s/ Stephen J. Herman_____ | _____/s/ James Parkerson Roy_____ |
| Stephen J. Herman, La. Bar No. 23129 | James Parkerson Roy, La. Bar No. 11511 |
| HERMAN HERMAN & KATZ LLC | DOMENGEAUX WRIGHT ROY & |
| 820 O'Keefe Avenue | EDWARDS LLC |
| New Orleans, Louisiana 70113 | 556 Jefferson Street, Suite 500 |
| Telephone:   (504) 581-4892 | Lafayette, Louisiana 70501 |
| Fax No.:      (504) 569-6024 | Telephone:   (337) 233-3033 |
| E-Mail: sherman@hhkc.com | Fax No.:      (337) 233-2796 |
|  | E-Mail: : jimr@wrightroy.com |
| *Plaintiffs Liaison Counsel, DHEPDS Lead Class Counsel and Proposed Punitive Damages ("New") Settlement Lead Class Counsel* | *Plaintiffs Liaison Counsel, DHEPDS Lead Class Counsel and Proposed Punitive Damages ("New") Settlement Lead Class Counsel* |

**PLAINTIFFS' STEERING COMMITTEE
DHEPDS CLASS COUNSEL, AND PROPOSED
HESI AND TRANSOCEAN
("NEW") SETTLEMENT CLASS COUNSEL**

Brian H. Barr
LEVIN, PAPANTONIO, THOMAS,
MITCHELL, ECHSNER & PROCTOR, PA
316 South Baylen St., Suite 600
Pensacola, FL 32502-5996
Office:   (850) 435-7045
Telefax: (850) 436-6187
E-Mail: bbarr@levinlaw.com

Robin L. Greenwald
WEITZ & LUXENBERG, PC
700 Broadway
New York, NY  10003
Office:   (212) 558-5802
Telefax: (212) 344-5461
E-Mail: rgreenwald@weitzlux.com

Jeffrey A. Breit
BREIT DRESCHER IMPREVENTO &
WALKER, P.C.
999 Waterside Drive, Suite 1000
Norfolk, VA 23510
Office:   (757) 670-3888
Telefax: (757) 670-3895
E-Mail: jbreit@bdbmail.com

Rhon E. Jones
BEASLEY, ALLEN, CROW, METHVIN,
PORTIS & MILES, P.C.
218 Commerce St., P.O. Box 4160
Montgomery, AL  36104
Office:   (334) 269-2343
Telefax: (334) 954-7555
E-Mail: rhon.jones@beasleyallen.com

Elizabeth J. Cabraser
LIEFF, CABRASER, HEIMANN &
BERNSTEIN, LLP
275 Battery Street, 29th Floor
San Francisco, CA  94111-3339
Office:   (415) 956-1000
Telefax: (415) 956-1008
E-Mail: ecabraser@lchb.com

Matthew E. Lundy
LUNDY, LUNDY, SOILEAU & SOUTH,
LLP
501 Broad Street
Lake Charles, LA 70601
Office:   (337) 439-0707
Telefax: (337) 439-1029
E-Mail: mlundy@lundylawllp.com

Philip F. Cossich, Jr.
COSSICH, SUMICH, PARSIOLA &
TAYLOR
8397 Highway 23, Suite 100
Belle Chasse, LA 70037
Office:   (504) 394-9000
Telefax: (504) 394-9110
E-Mail: pcossich@cossichlaw.com

Michael C. Palmintier
deGRAVELLES, PALMINTIER,
HOLTHAUS & FRUGÉ
618 Main Street
Baton Rouge, LA 70801-1910
Office:   (225) 344-3735
Telefax: (225) 344-0522
E-Mail: mpalmintier@dphf-law.com

Robert T. Cunningham
CUNNINGHAM BOUNDS, LLC
1601 Dauphin Street, P. O. Box 66705
Mobile, AL 36660
Office:   (251) 471-6191
Telefax: (251) 479-1031
E-Mail:  rtc@cunninghambounds.com

Alphonso Michael "Mike" Espy
MORGAN & MORGAN, P.A.
188 East Capitol Street, Suite 777
Jackson, MS 39201
Office:   (601) 949-3388
Telefax: (601) 949-3399
E-Mail:  mike@mikespy.com

Calvin C. Fayard, Jr.
FAYARD & HONEYCUTT
519 Florida Avenue, SW
Denham Springs, LA 70726
Office:   (225) 664-4193
Telefax: (225) 664-6925
E-Mail:  calvinfayard@fayardlaw.com

Ervin A. Gonzalez
COLSON HICKS EIDSON
255 Alhambra Circle, Penthouse
Coral Gables, FL 33134
Office:   (305) 476-7400
Telefax: (305) 476-7444
E-Mail:  ervin@colson.com

Paul M. Sterbcow
LEWIS, KULLMAN, STERBCOW &
ABRAMSON
601 Poydras Street, Suite 2615
New Orleans, LA  70130
Office:   (504) 588-1500
Telefax: (504) 588-1514
E-Mail:  sterbcow@lksalaw.com

Scott Summy
BARON & BUDD, P.C.
3102 Oak Lawn Avenue, Suite 1100
Dallas, TX 75219
Office:   (214) 521-3605
Telefax: (214) 599-1172
E-Mail:  ssummy@baronbudd.com

Conrad S.P. "Duke" Williams
WILLIAMS LAW GROUP
435 Corporate Drive, Suite 101
Maison Grand Caillou
Houma, Louisiana 70360
Office:   (985) 876-7595
Fax No.: (985) 876-7594
E-Mail: duke@williamslawgroup.org

Joseph F. Rice
MOTLEY RICE LLC
28 Bridgeside Blvd.
Mount Pleasant, SC 29464
Office:   (843) 216-9159
Fax No.: (843) 216-9290
E-Mail: jrice@motleyrice.com

## <u>CERTIFICATE OF SERVICE</u>

WE HEREBY CERTIFY that the above and foregoing Memorandum will be served on All Counsel by electronically uploading the same to Lexis Nexis File & Serve in accordance with Pretrial Order No. 12, and will be electronically filed with the Clerk of Court of the United States District Court for the Eastern District of Louisiana by using the CM/ECF System, which will send a notice of electronic filing in accordance with the procedures established in MDL 2179, on this <u>7th</u> day of <u>April</u>, <u>2016</u>.

<u>/s/  Stephen J. Herman and James Parkerson Roy</u>