UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF LOUISIANA
MULTI-DISTRICT LITIGATION

| | |
|---|---|
| IN RE:<br><br>OIL SPILL BY THE OIL RIG<br>"DEEPWATER HORIZON" IN THE<br>GULF OF MEXICO ON APRIL<br>2010 | )<br>)<br>)<br>)<br>)<br>)<br>)<br>) |

MDL Docket No. 2179          SECTION: J
CASE NO. 2:10-MD-02179-CJB-SS

Hon. Carl Barbier
Magistrate Judge Sally Shushan

**This Document Relates to:**       Case No. 13-2547 (USDC SD AL NO. 1:13-CV-199 KD-B)
*Pleading Bundle B1*                          ALABAMA CASE NO.

LUTHER SUTTER                                                                    PLAINTIFF

VERSUS.                          CASE NO. _____

BP EXPLORATION & PRODUCTION, INC., et al.                          DEFENDANTS

## COMPLAINT

## COVER PAGE

Respectfully submitted,

_____
Luther Sutter
luthersutter.law@gmail.com
310 West Conway Street
Benton, AR 72015
501-315-1910/501-315-1916  Facsmile


EXHIBIT
C

1

JS 44 (Rev. 12/12)

# CIVIL COVER SHEET

The JS 44 civil cover sheet and the information contained herein neither replace nor supplement the filing and service of pleadings or other papers as required by law, except as provided by local rules of court. This form, approved by the Judicial Conference of the United States in September 1974, is required for the use of the Clerk of Court for the purpose of initiating the civil docket sheet. *(SEE INSTRUCTIONS ON NEXT PAGE OF THIS FORM.)*

## I. (a) PLAINTIFFS
LUTHER SUTTER

**DEFENDANTS**
BP EXPLORATION & PRODUCTION, INC et. al.

**(b)** County of Residence of First Listed Plaintiff   PULASKI COUNTY, AR
*(EXCEPT IN U.S. PLAINTIFF CASES)*

County of Residence of First Listed Defendant
*(IN U.S. PLAINTIFF CASES ONLY)*
NOTE:   IN LAND CONDEMNATION CASES, USE THE LOCATION OF
THE TRACT OF LAND INVOLVED.

**(c)** Attorneys *(Firm Name, Address, and Telephone Number)*
SUTTER & GILLHAM, P.L.L.C.
P.O. BOX 2012
BENTOB, AR 72018 (501) 315-1910

Attorneys *(If Known)*

## II. BASIS OF JURISDICTION *(Place an "X" in One Box Only)*

☐ 1  U.S. Government
Plaintiff

☐ 2  U.S. Government
Defendant

☐ 3  Federal Question
*(U.S. Government Not a Party)*

☒ 4  Diversity
*(Indicate Citizenship of Parties in Item III)*

## III. CITIZENSHIP OF PRINCIPAL PARTIES *(Place an "X" in One Box for Plaintiff*
*(For Diversity Cases Only)*                *and One Box for Defendant)*

|  | PTF | DEF |  | PTF | DEF |
|---|---|---|---|---|---|
| Citizen of This State | ☒ 1 | ☐ 1 | Incorporated or Principal Place of Business In This State | ☐ 4 | ☐ 4 |
| Citizen of Another State | ☐ 2 | ☒ 2 | Incorporated and Principal Place of Business In Another State | ☐ 5 | ☐ 5 |
| Citizen or Subject of a Foreign Country | ☐ 3 | ☐ 3 | Foreign Nation | ☐ 6 | ☐ 6 |

## IV. NATURE OF SUIT *(Place an "X" in One Box Only)*

### CONTRACT
☐ 110 Insurance
☐ 120 Marine
☐ 130 Miller Act
☐ 140 Negotiable Instrument
☐ 150 Recovery of Overpayment
& Enforcement of Judgment
☐ 151 Medicare Act
☐ 152 Recovery of Defaulted
Student Loans
(Excludes Veterans)
☐ 153 Recovery of Overpayment
of Veteran's Benefits
☐ 160 Stockholders' Suits
☐ 190 Other Contract
☐ 195 Contract Product Liability
☐ 196 Franchise

### REAL PROPERTY
☐ 210 Land Condemnation
☐ 220 Foreclosure
☐ 230 Rent Lease & Ejectment
☐ 240 Torts to Land
☐ 245 Tort Product Liability
☐ 290 All Other Real Property

### TORTS
**PERSONAL INJURY**
☐ 310 Airplane
☐ 315 Airplane Product
Liability
☐ 320 Assault, Libel &
Slander
☐ 330 Federal Employers'
Liability
☐ 340 Marine
☐ 345 Marine Product
Liability
☐ 350 Motor Vehicle
☐ 355 Motor Vehicle
Product Liability
☐ 360 Other Personal
Injury
☐ 362 Personal Injury -
Medical Malpractice

**CIVIL RIGHTS**
☐ 440 Other Civil Rights
☐ 441 Voting
☐ 442 Employment
☐ 443 Housing/
Accommodations
☐ 445 Amer. w/Disabilities -
Employment
☐ 446 Amer. w/Disabilities -
Other
☐ 448 Education

**PERSONAL INJURY**
☐ 365 Personal Injury -
Product Liability
☐ 367 Health Care/
Pharmaceutical
Personal Injury
Product Liability
☐ 368 Asbestos Personal
Injury Product
Liability
**PERSONAL PROPERTY**
☐ 370 Other Fraud
☐ 371 Truth in Lending
☐ 380 Other Personal
Property Damage
☐ 385 Property Damage
Product Liability

**PRISONER PETITIONS**
**Habeas Corpus:**
☐ 463 Alien Detainee
☐ 510 Motions to Vacate
Sentence
☐ 530 General
☐ 535 Death Penalty
**Other:**
☐ 540 Mandamus & Other
☐ 550 Civil Rights
☐ 555 Prison Condition
☐ 560 Civil Detainee -
Conditions of
Confinement

### FORFEITURE/PENALTY
☐ 625 Drug Related Seizure
of Property 21 USC 881
☐ 690 Other

### LABOR
☐ 710 Fair Labor Standards
Act
☐ 720 Labor/Management
Relations
☐ 740 Railway Labor Act
☐ 751 Family and Medical
Leave Act
☐ 790 Other Labor Litigation
☐ 791 Employee Retirement
Income Security Act

### IMMIGRATION
☐ 462 Naturalization Application
☐ 465 Other Immigration
Actions

### BANKRUPTCY
☐ 422 Appeal 28 USC 158
☐ 423 Withdrawal
28 USC 157

### PROPERTY RIGHTS
☐ 820 Copyrights
☐ 830 Patent
☐ 840 Trademark

### SOCIAL SECURITY
☐ 861 HIA (1395ff)
☐ 862 Black Lung (923)
☐ 863 DIWC/DIWW (405(g))
☐ 864 SSID Title XVI
☐ 865 RSI (405(g))

### FEDERAL TAX SUITS
☐ 870 Taxes (U.S. Plaintiff
or Defendant)
☐ 871 IRS—Third Party
26 USC 7609

### OTHER STATUTES
☐ 375 False Claims Act
☐ 400 State Reapportionment
☐ 410 Antitrust
☐ 430 Banks and Banking
☐ 450 Commerce
☐ 460 Deportation
☐ 470 Racketeer Influenced and
Corrupt Organizations
☐ 480 Consumer Credit
☐ 490 Cable/Sat TV
☐ 850 Securities/Commodities/
Exchange
☒ 890 Other Statutory Actions
☐ 891 Agricultural Acts
☐ 893 Environmental Matters
☐ 895 Freedom of Information
Act
☐ 896 Arbitration
☐ 899 Administrative Procedure
Act/Review or Appeal of
Agency Decision
☐ 950 Constitutionality of
State Statutes

## V. ORIGIN *(Place an "X" in One Box Only)*
☒ 1 Original
Proceeding
☐ 2 Removed from
State Court
☐ 3 Remanded from
Appellate Court
☐ 4 Reinstated or
Reopened
☐ 5 Transferred from
Another District
*(specify)*
☐ 6 Multidistrict
Litigation

## VI. CAUSE OF ACTION
Cite the U.S. Civil Statute under which you are filing *(Do not cite jurisdictional statutes unless diversity)*:

Brief description of cause:

## VII. REQUESTED IN
COMPLAINT:
☐ CHECK IF THIS IS A CLASS ACTION
UNDER RULE 23, F.R.Cv.P.
DEMAND $
CHECK YES only if demanded in complaint:
JURY DEMAND:   ☒ Yes   ☐ No

## VIII. RELATED CASE(S)
IF ANY
*(See instructions):*
JUDGE
DOCKET NUMBER

DATE  4/12/13
SIGNATURE OF ATTORNEY OF RECORD

FOR OFFICE USE ONLY

RECEIPT #           AMOUNT           APPLYING IFP           JUDGE           MAG. JUDGE

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF ALABAMA

LUTHER SUTTER,                                                    PLAINTIFF

V.                              CASE NO. 13 - 199 - KD - B

BP EXPLORATION & PRODUCTION, INC.)                               DEFENDANTS
BP AMERICA PRODUCTION COMPANY; )
BP P.I.C.; TRANSOCEAN LTD.; )
TRANSOCEAN OFFSHORE DEEPWATER )
DRILLING, INC.; TRANSOCEAN )
DEEPWATER, INC.; TRANSOCEAN )
HOLDINGS, LLC; TRITON ASSET LEASING)
GMBH; HALLIBURTON ENERGY )
SERVICES, INC.; SPERRY DRILLING )
SERVICES; M-I, LLC; CAMERON )
INTERNATIONAL CORPORATION f/k/a/ )
COOPER-CAMERON CORPORATION; )
WEATHERFORD U.S. L.P.; ANADARKO )
PETROLEUM CORPORATION, CO.; )
ANADARKO E&P COMPANY LP; )
MOEX OFFSHORE 2007 LLC; MOEX USA )
CORPORATION; MITSUI OIL )
EXPLORATION CO., LTD.; )

## COMPLAINT

Plaintiff, pro se, owns land within the coastal waters of Gulf Shores, Alabama, and has

suffered, or will suffer, damage, destruction, or diminution in value of property, loss of

resources, loss of profits, income and/or use, and/or costs of removal, clean-up, restoration

and/or remediation and/or other damages, losses, and/or costs as a result of the oil spill by the

oil rig Deepwater Horizon in the Gulf of Mexico beginning on April 20, 2010. The Plaintiff made a

presentment claim on the responsible party pursuant to the Oil Pollution Act of 1990. Ninety (90)

days has expired without the responsible party responding to the presentment claim. Plaintiff

sent the documents attached as Exhibit "A" to BP's representatives, so Plaintiff has satisfied the

1

mandatory condition precedent to file this suit. The Plaintiff's complaint against the named Defendants is as follows:

## NATURE OF ACTION

1. On April 20, 2010, a blowout, explosion, and multiple fires occurred aboard the mobile offshore drilling rig *Deepwater Horizon,* resulting in the sinking of the *Deepwater Horizon* and an oil spill in the Gulf of Mexico ("the Spill") that has caused, is causing, and will continue to cause, damage to the Plaintiff. This is an action for damages, penalties, and other relief by the Plaintiff against the parties known to be responsible for the Spill. The Defendants named in this lawsuit collectively and individually engaged in grossly negligent, wanton, and reckless conduct in the drilling and operation of the Macondo well, the operation of the *Deepwater Horizon,* and the containment of the Spill.

2. Defendants' actions resulted in the blowout of the Macondo well, caused the explosion, burning, and sinking of the *Deepwater Horizon* rig, and directly resulted in the release of crude oil and other pollutants into the waters of the Gulf of Mexico and of the Plaintiff. These pollutants have damaged, are damaging, and will continue to damage Plaintiff's coastal environment, property, and economic livelihood. Plaintiff continues to suffer from the effects of the Spill.

3. The image and attractiveness of Plaintiff's property located on West Lagoon Avenue in Gulf Shores, Alabama for development, tourism, and other purposes have suffered, are suffering, and will continue to suffer because of the known impact of the Spill, as well as the uncertainty that will exist for years over the ongoing impact of the Spill on the Gulf of Mexico, the Gulf's natural resources, and Plaintiff's coastal resources and communities. This uncertainty will have lasting economic and other consequences that cannot be measured merely by estimating revenue losses.  Indeed, Plaintiff had agreed to sell his properties, as reflected in Exhibit "A",

2

incorporated by reference herein, and he expended monies to begin building another home, including the construction of a dock.   Further, he has been exposed to fees, costs, and deficiencies that he would not have otherwise incurred, but for this oil spill.  Plaintiff was unable to sell his properties because of the oil spill, has been unable to build his home, has incurred interest he would not have otherwise incurred

4. Plaintiff, pro se, declaratory judgment, to recover the fines and penalties to which the Plaintiff is entitled, as well as for compensatory, punitive, and other damages, to the fullest extent allowed by Alabama and federal law.

5. Investigation of other potential claims, assessment of damage amounts, and additional removal and remediation actions continue. Therefore, the Plaintiff reserves its rights in full to amend this Complaint by, among other things, adding new allegations, new claims, and new defendants.

## PARTIES, JURISDICTION, AND VENUE

*Parties*

6. Plaintiff is a resident of the State of Arkansas who owns three duplexes in Gulf Shores Alabama.  He is engaged in the business of short term rentals.

7. Defendant BP Exploration & Production, Inc. ("BP Exploration") is a Delaware corporation with its principal place of business in Warrenville, Illinois. BP Exploration was a lease holder and the designated operator in the lease granted by the former Minerals Management Service) ("MMS") allowing it to perform oil exploration, drilling, and production-related operations in Mississippi Canyon Block 252, the location known as "Macondo" where the Spill originated. BP Exploration was designated as a "Responsible Party" by the U.S. Coast Guard under the Oil Pollution Act of 1990,33 U.S.c. § 2714. BP Exploration is registered to do business in Alabama, does business in Alabama, and has a registered agent in Alabama.

3

8. Defendant BP America Production Company ("BP America") is a Delaware corporation with its principal place of business in Houston, Texas. BP America was the party to the Drilling Contract with Transocean Ltd. for the drilling of the Macondo well by the *Deepwater Horizon* vessel. BP America is registered to do business in Alabama, does business in Alabama, and has a registered agent in Alabama.

9. Defendant BP p.l.c. is a British public limited company with its corporate headquarters in London, England. BP p.l.c. is the global parent company of the worldwide business operating under the "BP" logo. Defendants BP Exploration and BP America are wholly-owned subsidiaries of BP p.l.c. BP p.l.c. has acknowledged that it is subject to jurisdiction in the United States. BP p.l.c. does business in Alabama.

10. BP Exploration, BP America, and BP p.l.c. are generally referred to herein collectively as "BP." As lease operator of the Macondo prospect site, BP was responsible for assessing the geology of the prospect site, engineering the well design, obtaining regulatory approvals for well operations, and retaining and overseeing the contractors working on the various aspects of the well and the drilling operations.  The MMS, a federal entity that divides the Gulf of Mexico's seafloor into rectangular "blocks," and then auctions the rights to drill for oil and gas beneath those blocks of seafloor, has since been reorganized as the Bureau of Ocean Energy Management, Regulation, and Enforcement (BOEMRE). It shall, however, be referred to as the MMS throughout this Complaint.

11. Defendant Transocean Ltd. ("Transocean Ltd.") is a Swiss corporation that maintains substantial U.S. offices in Houston, Texas, and at all pertinent times was doing business in the State of Alabama. Transocean Ltd. was an owner, managing owner, owner *pro hac vice,* and/or operator of the *Deepwater Horizon.*

4

12. Defendant Transocean Offshore Deepwater Drilling, Inc. ("Transocean Offshore") is a
Delaware corporation with its principal place of business in Houston, Texas, and at all pertinent
times was doing business in the State of Alabama. Transocean Offshore is affiliated with
Transocean Ltd. and was an owner, managing owner, owner *pro hac vice,* and/or operator of
the *Deepwater Horizon.*

13. Defendant Transocean Deepwater, Inc. ("Transocean Deepwater"), is a Delaware
corporation with its principal place of business in Houston, Texas, and at all pertinent times was
doing business in the State of Alabama. Transocean Deepwater is affiliated with Transocean
Ltd. and was an owner, managing owner, owner *pro hac vice,* and/or operator of the *Deepwater
Horizon.*

14. Defendant Transocean Holdings, LLC ("Transocean Holdings") is a Delaware
corporation with its principal place of business in Houston, Texas, and at all pertinent times was
doing business in the State of Alabama. Transocean Holdings is affiliated with Transocean Ltd.
and is a wholly-owned subsidiary of Transocean Offshore. Transocean Holdings is an owner,
managing owner, owner *pro hac vice,* and/or operator of the *Deepwater Horizon* and
participated in the *Deepwater Horizon's* offshore oil drilling operations at the Macondo prospect,
where the
Spill originated. Transocean Holdings is party to the contract with BP regarding the lease of the
*Deepwater Horizon* for drilling operations in the Gulf of Mexico. On April 28, 2010, the U.S.
Coast Guard named Transocean Holdings as a "Responsible Party" under the Oil Pollution Act
for the surface oil spill resulting from the blowout by the *Deepwater Horizon.*

15. Defendant Triton Asset Leasing GmbH ("Triton") is a Swiss limited liability

company with its principal place of business in Zug, Switzerland. Triton is affiliated with Transocean Ltd. and is an owner, managing owner, owner *pro hac vice,* and/or operator of the *Deepwater Horizon.*

16. Defendants Transocean Ltd., Transocean Deepwater, Transocean Offshore,

Transocean Holdings, and Triton are hereinafter referred to collectively as "Transocean." At the Macondo site, Transocean provided the *Deepwater Horizon* vessel and personnel to operate it. At all times relevant to the Spill, Transocean, subject to BP's inspection and approval, was responsible for maintaining well control equipment, such as the blowout preventer and its control systems. Transocean also provided operational support for drilling-related activities on board the *Deepwater Horizon,* as well as onshore supervision and support for those drilling activities at all times relevant to the Spill.

17. Defendant Halliburton Energy Services, Inc. is a Delaware corporation with its

principal place of business in Houston, Texas. Halliburton does business in the State of Alabama. Halliburton provided engineering services, materials, testing, mixing, and pumping for cementing operations on board the *Deepwater Horizon,* as well as onshore engineering support for those operations. Halliburton was responsible for the provision of technical advice about the design, modeling, placement, and testing of the cement that was used in the Macondo well. At and before the time of the blowout, Halliburton was engaged in cementing operations to isolate the hydrocarbon reservoirs and seal the bottom of the well against the influx of hydrocarbons like gas and oil.

18. Halliburton division Sperry Drilling Services (formerly Sperry Sun Drilling

Services) was responsible for mudlogging personnel and equipment on the *Deepwater Horizon,* including downhole drilling tools. Sperry mudlogging personnel were partially responsible for monitoring the well, including mud pit fluid levels, mud flow in and out of the well, mud gas

6

levels, and pressure fluctuations. Throughout this Complaint, "Halliburton" shall refer to both Halliburton Energy Services, Inc. and its Sperry division.

19. Defendant M-I, LLC ("M-I") is a Delaware limited liability company with its

principal place of business in Wilmington, Delaware, and at all relevant times was doing business in Alabama. M-I (also known as M-I SWACO) supplies drilling and completion fluids and additives to oil and gas companies in Louisiana and elsewhere, providing pressure control, vessel instrumentation, and drilling waste management products and services. On the Deepwater Horizon, M-I provided mud products, including drilling fluids and spacers, engineering services, and mud supervisory personnel, such as mud engineers and drilling fluid specialists, to manage the properties of those fluids in the well. M-I employees planned and/or supervised key fluidrelated activities at Macondo, such as the mud displacement that was occurring at the time of the April 20, 2010, blowout.

20. BP, Transocean, Halliburton, and M-I are collectively referred to herein as the

"Drilling Defendants," as they were all involved in the drilling, cementing, and/or other temporary well abandonment activities of the *Deepwater Horizon,* and thus their actions caused and/or contributed to the Spill.

21. Defendant Cameron International Corporation f/k/a Cooper-Cameron Corporation

("Cameron") is a Delaware corporation with its principal place of business in Houston, Texas. Cameron does business in the State of Alabama. Cameron manufactured, designed, supplied,and/or installed the *Deepwater Horizon's* sub-sea emergency well-closure device known as a blowout-preventer ("BOP"), which is, and was at all material times, an appurtenance of the vessel and a part of the vessel's equipment. The Cameron-made BOP that was installed at the Macondo wellhead failed to operate as intended at the time of the blowout on April 20,

2010, was improperly designed, was inappropriate for the intended environment or use, and/or possessed product defects.

22. Defendant Weatherford U.S. L.P. ("Weatherford") is a Louisiana limited partnership that maintains its principal place of business in Houston, Texas, and at all pertinent times was doing business in Alabama. Weatherford designed and manufactured, marketed, sold, and/or distributed the casing components such as the float collar, shoe, and centralizers appurtenant to the vessel, and provided the personnel and equipment for running the casing and casing components into the well bore.

23. Defendant Anadarko Petroleum Corporation Co. ("Anadarko") is a Delaware corporation with its principal place of business in The Woodlands, Texas. Anadarko does business in the State of Alabama. Anadarko is an oil and gas exploration and production company.

24. Defendant Anadarko E&P Company LP ("Anadarko E&P") is a Delaware limited partnership with its principal place of business in The Woodlands, Texas. Anadarko E&P does business in the State of Alabama. Anadarko E&P is an oil and gas exploration and production company.

25. Defendant MOEX Offshore 2007 LLC ("MOEX Offshore") is a Delaware corporation with its principal place of business in Houston, Texas. MOEX Offshore does business in the State of Alabama. MOEX Offshore is a wholly-owned subsidiary of MOEX USA Corporation.

26. Defendant MOEX USA Corporation ("MOEX USA") is incorporated in Delaware and has its principal place of business in Houston, Texas. MOEX USA is the parent company of MOEX Offshore.

27. Defendant Mitsui Oil Exploration Co., Ltd. ("MOECO") is incorporated in Japan and has its principal place of business in Tokyo, Japan. As of June 30, 2010, MOECO identified itself as

having the following U.S. subsidiaries or affiliates: MitEnergy Upstream LLC, MOEX USA Corporation, MOEX Offshore 2007 LLC, MOEX Gulf of Mexico Corporation, MOEX Oil & Gas Texas LLC, and Mitsui E&P USA LLC. Each of these subsidiaries of MOE CO share the same Houston, Texas, address.

28. Neither MOEX Offshore nor MOEX USA are distinct corporate entities that perform autonomous business activities. Instead, both entities are dominated and controlled by their ultimate parent company, MOECO, which wholly owns MOEX USA, which in turn wholly owns MOEX Offshore. Because MOECO is an alter ego of its subsidiaries (MOEX Offshore and MOEX USA), any and all liability of MOEX Offshore and MOEX USA is imputed to MOECO.

29. Defendants MOEX Offshore, MOEX USA, and MOECO are referred to collectively herein as "MOEX."

30. While BP was the sole lease operator of the *Deepwater Horizon*, Anadarko, Anadarko E&P, and MOEX were considered non-operational leaseholders. On October 1, 2009, BP Exploration, as operator, and MOEX Offshore, as non-operator, entered into the Macondo Prospect Offshore Deepwater Operating Agreement. On December 17, 2009, BP Exploration, MOEX Offshore, Andarko E&P, and Andarko executed a "Joinder" of the Operating Agreement. Subsequently, the parties to the Operating Agreement held the following ownership percentages in the Macondo Prospect: **BP** Exploration, 65%; MOEX Offshore, 10%; Anadarko E&P, 22.5%; and, Anadarko, 2.5%. According to the MMS's website, effective April 1, 2010, record title interest in the Macondo prospect was held as follows: **BP** Exploration, 65%; MOEX Offshore, 10%; and, Anadarko, 25%. As joint holders of a leasehold interest in an oil or gas lease on land beneath navigable waters, Defendants Anadarko, Anadarko E&P, and MOEX are jointly, severally, and solidarily liable with their codefendants **BP** pursuant to the Oil Pollution Act. Anadarko, Anadarko E&P, and MOEX also had access to Halliburton/Sperry Sun INSITE

realtime data that was transmitted from the *Deepwater Horizon* on April 20, 2010, and therefore knew or should have known of the red flags indicating a leak in the well in sufficient time to avert the disaster.

31. Drilling Defendants, Cameron, Weatherford, Anadarko, Anadarko E&P, and MOEX are jointly, severally, and solidarily liable under various principles of federal, maritime, and/or applicable State law, and under the Oil Pollution Act.

### *Jurisdiction*

32. The claims presented in sub-Section I of this Complaint are admiralty or maritime claims within the meaning of Rule 9(h) of the Federal Rules of Civil Procedure. Jurisdiction exists pursuant to Article III, Section 2 of the United States Constitution, which empowers the federal judiciary to hear "all Cases of admiralty and maritime jurisdiction." Jurisdiction also exists pursuant to the Admiralty Extension Act, 46 U.S.C. § 30101, which extends the admiralty and maritime jurisdiction of the United States to cases of injury or damage, to person or property, caused by a vessel on navigable waters, even though the Injury or damage is done or consummated on land.

33. The claims presented in sub-Section II invoke the Court's jurisdiction under the Oil Pollution Act, 33 U.S.C. § 2717 (b) (the "OPA"). *See* 28 U.S.C. § 1331.

34. The claims presented in sub-Section III invoke the Court's supplemental jurisdiction. *See* 28 U.S.C. § 1367.

### *Venue*

35. Venue is proper in the United States District Court for the Southern District of Alabama pursuant to 28 U.S.C. §§ 1391(b).

10

36. If the Plaintiff is transferred to the pending MDL, No. 2179, United States District Court, Eastern District of Louisiana, the Plaintiff reserves the right to seek a transfer of any and all issues and claims not resolved in the proceedings before the MDL Court back to the Southern District of Alabama for a jury trial, as discussed in more detail *infra* at ,-r,-r317 -19. The Plaintiff objects to the transfer to the MDL in the event the Defendants attempt to transfer this suit as venue is proper in the United States District Court for the Southern District of Alabama.

## GENERAL ALLEGATIONS

### *The Macondo Lease, and BP's Exploration Plan and Drilling Permit*

37. On June 1, 2008, BP acquired a ten-year lease from the MMS to search for and exploit hydrocarbon reservoirs at the Macondo prospect site in Mississippi Canyon Block 252, a location on the Outer Continental Shelf 48 miles off the coast of Louisiana.

38. In the process of obtaining its lease, BP represented that it had planned and prepared to conduct its proposed activities in a manner that was safe, conformed to applicable regulations and sound conservation practices, and would not cause undue or serious harm or damage to human or marine health, or the coastal environment, including Plaintiff's property.

39. BP represented that it was unlikely that an accidental surface or subsurface oil spill would occur from the proposed activities. In the event that a spill did occur, BP predicted a worst case discharge scenario of 162,000 gallons of oil per day, an amount to which it assured the MMS that it was prepared to respond. BP also claimed the well's distance from the nearest shoreline would preclude any significant adverse impacts from a spill.

40. Based on these assurances, the MMS approved BP's Initial Exploration Plan ("EP") for the Macondo prospect on April 6, 2009, including the approval of a "categorical exclusion" from the full environmental analysis normally required under the National Environmental Policy Act.

41. After its EP was approved, BP sought a permit from the MMS authorizing it to drill up to a total depth of 19,650 feet at the Macondo site.

**The Deepwater Horizon's Poor Safety and Maintenance Record**

42. The *Deepwater Horizon* was a dynamically-positioned, semi-submersible deepwater drilling vessel built for Transocean and put into service in February 2001.

43. At all times relevant herein, the *Deepwater Horizon* was owned by Transocean and leased to BP for drilling exploratory wells at the Macondo prospect site, pursuant to the December 9, 1998, Drilling Contract between Vastar Resources, Inc. and R&B Falcon Drilling Co. for RBS-8D *Deepwater Horizon* ("Drilling Contract"), and later amendments to that agreement.

44. Prior to the Spill, Drilling Defendants had actual and/or constructive knowledge that their safety performance during offshore drilling operations was poor. Drilling Defendants also had actual and/or constructive knowledge of significant problems related to the *Deepwater Horizon's* equipment and maintenance, including problems with the vessel's BOP, electronic alarm systems, ballast systems used to stabilize the vessel in the water, and other significant deficiencies that could lead to loss of life, serious injury, or environmental damage as a result of inadequate use and/or failure of equipment.'

**The Macondo Well**

45. The Macondo prospect site is in the Northern Gulf of Mexico, an area known in the industry for high temperature, high pressure, highly gaseous hydrocarbon reservoirs trapped in weak, brittle rock formations. At the Macondo site, the *Deepwater Horizon* was conducting drilling operations in excess of 18,000 feet deep. Drilling Defendants knew or should have known that

12

the threat of blowouts increases as drilling depths increase, especially in an area with such troublesome geology as the Northern Gulf of Mexico.

46. Drilling Defendants struggled with the Macondo well before the events of April 20, 2010. The problems included varying pressures, varying strengths of formation layers, brittle rock formations, and kicks of natural gas bursting into the well.

47. As the drilling schedule fell farther behind due to these and other problems, Drilling Defendants-BP in particular-increased the pressure on the Deepwater Horizon's crew to speed up the drilling effort at Macondo in an effort to reduce costs. Drilling Defendants repeatedly chose to violate industry guidelines and government regulations and ignore warnings from their own employees and contractors on the Deepwater Horizon to reduce costs and save time on the behind-schedule and over-budget Macondo well.

**Conduct Leading Up to the Explosion**

48. By April 9, 2010, Drilling Defendants had finished drilling the last part of the well bore, after which only casing and cementing the final open-hole section remained. In their rush to complete the well, Drilling Defendants made reckless decisions about well design, cementing, and well integrity testing that prioritized speed and cost-savings over safety and industry best practices.

49. Drilling Defendants chose a "long string" design for the Macondo well with fewer barriers against the risk of hydrocarbon blowouts because the safer "liner/tieback" option (which had been part of their original well design and was recommended by their contractors) would have taken longer to complete and would have added several million dollars in cost.

50. Drilling Defendants used inferior metal well casings for the casing pipe material itself, in violation of BP's own safety policies and design standards.

51. The Weatherford-manufactured float collar installed on the final section of casing may have failed to seal properly, which could have allowed hydrocarbons to leak into the casing, contributing to the April 20, 2010 blowout.

52. Drilling Defendants knowingly used too few centralizers on one or more pieces of casing pipe, with the knowledge or acquiescence of other Defendants.

53. Drilling Defendants failed to fully circulate the drilling mud through the entire length of the well before beginning the cementing job, thus failing to properly clean the well bore and prepare the annular space for cementing, and thus failing to take action that could have revealed other problems that contributed to the weaknesses of the Macondo well.

54. Defendants knew the cementing work the *Deepwater Horizon* was performing was especially risky. BP's mid-April plan review predicted cement failure, stating "[c]ement simulations indicated it is unlikely to be a successful cement job due to formation breakdown." Yet, Defendants made minimal efforts to contain the added risk. To save time and money, Defendants chose not to run a 9 to 12-hour procedure called a cement bond log to assess the integrity of the cement seal. Defendants also failed to secure the wellhead with a lockdown sleeve, a critical apparatus that locks the wellhead and the casing in the seal assembly at the seafloor, before allowing pressure on the seal from below.

55. Based on testing performed before the final cement job at the Macondo well, Halliburton knew that its cement slurry design was unstable. In addition, Halliburton and BP had results in March 2010 showing that a very similar foam sluD"Y design to the one actually pumped at the Macondo well would be unstable, but neither acted upon that data.

56. In addition to increasing the risk of blowouts, deep-sea drilling also increases the failure risk of the chief blowout safety mechanisms, the BOPs. Defendants were aware of the risk of BOPs failing at greater depths, yet did not install a backup BOP activation system or backup BOPs.

14

Drilling Defendants were also aware that the industry and government had major concerns about the reliability of BOPs like the one installed on the *Deepwater Horizon*.

57. Defendants BP, Transocean, and one or more of the other Drilling Defendants, failed to ensure that the BOP present on the Deepwater Horizon possessed reasonably safe, adequate, functional technology to prevent blowouts.

58. Defendants Cameron, BP, and Transocean, and one or more of the other Drilling Defendants, failed to ensure that the *Deepwater Horizon's* BOP had sufficient, functional, builtin redundancy to eliminate single-point failure modes.

59. Defendants Cameron, BP, and Transocean, and one or more of the other Drilling Defendants, failed to ensure that all foreseeable repairs (if any) and foreseeable modifications (if any) to the Deepwater Horizon's BOP were performed, completed, and tested with the drilling vessel's operations shut down and the well secured.

60. Defendants Cameron, BP, Transocean, and one or more of the other Drilling Defendants, failed to ensure that the testing of the *Deepwater Horizon's* BOP was comprehensive, reviewed, and verified, and further failed to check and verify the BOP's entire operating and control system, including but not limited to, checking for leaks at ROV (remotely operated vehicle) connection points, and verifying the functionality of the automated mode function and/or autoshear.

61. Defendant Cameron failed to ensure and verify that the BOP it designed, manufactured, marketed, and sold, and which was appurtenant to the *Deepwater Horizon* drilling vessel, was suitable for the types of drilling conditions, drill pipes, and casing assembly designs that would foreseeably be used during the *Deepwater Horizon's* drilling and exploration operations.

15

62. Defendants BP, Transocean, Cameron, and one or more of the other Drilling Defendants, could have ensured that a BOP and/or back-up BOP with sufficient strength and reliability for deepwater drilling was present and available on the *Deepwater Horizon,* but did not do so.

63. Defendants BP, Transocean, Cameron, and one or more of the other Drilling Defendants, could have installed a back-up acoustic trigger to activate the *Deepwater Horizon's* BOP in the event that the main trigger failed to activate.

64. While some testing has been completed, the investigation of the BOP retrieved from the seafloor, and other matters related to the disaster at the Macondo well, is still ongoing. Thus, the Plaintiff reserves the right to amend this Complaint once further information from that and any other future investigations becomes available.

65. Transocean, the vessel's owner, had a history of postponing and ignoring needed maintenance on the *Deepwater Horizon.* In the weeks before the blowout, the *Deepwater Horizon* suffered power outages, computer glitches, and a balky propulsion system. In some cases, Transocean officials purposely overrode or disabled vital safety mechanisms and alarms. These events contributed to the cause of the disaster, or made it worse.

66. The other Drilling Defendants were all aware of Transocean's poor maintenance of the *Deepwater Horizon* and its practice of disabling or bypassing vital safety systems and alarms, but they continued to operate the vessel and did not report the inadequacies.

67. Upon information and belief, in addition to the examples set forth above, other non-exclusive examples of Defendants' misconduct, negligence and/or wantonness include:

a. Utilizing a defective well casing that was prone to fail when under heavy pressure;
b. Failing to observe dangerous and recurring problems with highly flammable gaseous compounds, and instituting risky cementing and drilling procedures hours before the *Deepwater Horizon* explosion;
c. Failing to institute common industry protective measures necessary to detect the buildup of highly flammable gaseous compounds before and during the cementing process;

16

d. Accelerating drilling operations in an effort to save money and pressuring employees hours before the *Deepwater Horizon* explosion to drill and penetrate the continental shelf faster while ignoring risks associated with dangerous gaseous compounds in the shelf s crust;

e. Using an improperly designed cement mixture ("slurry"), and failing to properly conduct and/or review the results of laboratory testing of the slurry;

f. Failing to deploy a casing hanger lockdown sleeve;

g. Displacing mud in the well with less-dense seawater before cementing had fully set;

h. Using non-standard spacer fluid mixture and volume;

i. Continuing to operate the Macondo Well after the well failed pressure tests;

j. Continuing to operate the Macondo Well without repairing the blowout preventer's annular after chunks of the annular had broken off and floated to the surface, thereby significantly decreasing the blowout preventers , protective measures against a blowout;

k. Failing to disclose or correct the fact that the battery on the blowout preventer was weak and one of its control pods was broken;

l. Consciously electing not to install an acoustically activated remote-control shutoff valve;

m. Ordering drillers to extract drilling mud from the well before all of the concrete plugs were put into place in order to speed up the drilling process thereby creating high pressure instability in the well;

n. Failing to install a deepwater valve to be placed nearly 200 feet under the sea floor;

o. Failing to recognize that pressure and flow data from the well were warning signs of a blowout;

p. Failing to develop sufficient well control procedures for vessel workers to handle larger influxes into the well - for a hydrocarbon influx as large as occurred, flow should have been diverted overboard, not to the mud-gas separator;

q. Failing to properly design, install, or maintain power supply to the blowout preventer ("BOP"), including without limitation the use of only one blind shear ram, faulty maintenance, faulty post-market modifications, and other issues;

r. Failing to properly design, install, or maintain connections from the blowout preventer's control panel to the blow-out preventer;

s. Failing to properly maintain and repair the BOP: Drilling Defendant officials were aware of the faulty solenoid valve, poor battery maintenance, hydraulic fluid leaks, and aftermarket modifications on the Deepwater Horizon's BOP long before the April 20, 2010, but no action was ever taken to address the problems. In addition to posing a significant safety risk, Drilling Defendants' choice to continue drilling with a faulty hydraulic system violated federal regulations, which require companies to disclose problems to the MMS and to stop drilling if either of a BOP's two control systems is not working properly; and

t. Failing to equip the vessel with sufficient safety equipment, including

17

operational gas sensors and a gas alarm system.

68. The Drilling Defendants all knew, or should have known, of the acts and omissions outlined above, and were negligent, wanton, and reckless in continuing to drill in the face of these acts and omissions.

69. In sum, Defendants knew of the dangers associated with deep water drilling, and they knew of unique problems and shortcomings in the Macondo Well and *Deepwater Horizon* vessel. Yet, Defendants failed to take appropriate measures to prevent damage to the Plaintiff, the natural resources of his land, and Plaintiff who is dependent upon the Gulf of Mexico and Plaintiff s property to make a living.

***Post-Explosion Conduct***

70. Defendants' conduct after the explosion was insufficient to minimize damage, and was in some cases just as negligent, wanton, and reckless as the conduct that led to the explosion.

71. Defendants failed to institute proper oil disaster response plans to contain the catastrophic oil release resulting from the *Deepwater Horizon* explosion, and they misrepresented their capability to safely conduct offshore drilling operations and contain oil releases that might occur in connection with such operations.

72. Defendants attempted to downplay and conceal the severity of the oil spill after the explosion. Defendants' leak estimate of 5,000 barrels per day was found by government investigators to be a fraction of the current official leak estimate of 60,000 barrels of oil per day. In addition, the worst case scenario estimate of 100,000 barrels of oil per day is over 100 times BP's initial estimate of 1,000 barrels per day.

73. Defendants were also slow and incomplete in their announcements and warnings to Plaintiffs residents and businesspeople about the severity, forecast, and trajectory of the Spill.

74. Furthermore, the chemical dispersants used by Defendants to accelerate the dispersal of the oil has significant side-effects as well. Corexit EC9500A and Corexit EC9527 A were the

principal dispersants used. These dispersants are composed of several chemicals, including 2-Butoxy Ethanol, which was identified as a causal agent in the health problems experienced by cleanup workers after the 1989 *Exxon Valdez* oil spill. In addition, the Hazardous Substance Fact Sheet for 2-Butoxy Ethanol warns that it may be a carcinogen in humans and that "[t]here may be no safe level of exposure to a carcinogen, so all contact should be reduced to the lowest possible leve1." Further, the OSHA-required Material Safety Data Sheets ("MSDS") for both versions of COl'exit used indicate they may have a potential to bioaccumulate in the tissues of fish or other organisms. Additionally, the MSDSs state that if the product becomes a waste, "it could meet the criteria of a hazardous waste as defined by the Resource Conservation and Recovery Act (RCRA) 40 CFR 261."

75. Corexit EC9500A and Corexit EC9527 A are more toxic and less effective than at least twelve other EPA-approved dispersants and are banned from use on oil spills in the United Kingdom. Defendants stated that they chose to use Corexit because it was available the week of the rig explosion.

76. More than 1.84 million gallons of chemical dispersants were used by July 30, 2010, and additional dispersant use was reported by fishermen in mid-August. Dispersant use continued well after the Spill at the wellhead was stopped. The dispersants were employed both on the surface and at the wellhead 5,000 feet below the surface. Mixing the dispersants with the oil at the wellhead added toxicity to the spill and kept much of the oil below the surface, exposing organisms to widespread concentrations of oil.

77. Oil, dispersants, and other pollutants released by Defendants remam m Gulf waters, the Gulf floor, Alabama waters, and land owned by the Plaintiff, and continue to cause damage. Oil, dispersants, and other pollutants have settled into the sediment on the Gulf floor and the bed underlying waters of Alabama, where it has killed, is killing, and will continue to kill marine life

and will continually discharge into, and cause damage to, the water, land, property, and resources of Plaintiff.

## DAMAGES

***Environmental Damages***

78. The Spill has caused or contributed to, and will continue to cause or contribute to, injuries and damages to the Plaintiff and his land, wildlife, natural resources, economic resources, and residents.

79. The oil released during the Spill contains benzene, toluene, polyaromatic hydrocarbons, and other compounds (collectively referred to as Total Petroleum Hydrocarbons, or "TPH"), all of which are known carcinogens. Discharge of the toxic pollutants, as identified in 40 C.F.R. § 401.15, likely includes, but is not limited to, benzene, toluene, naphthalene, polynuclear aromatic hydrocarbons (including, but not limited to, phenanthrene, benzanthracenes, benzophyrenes, benzofloranthene, chrysenes, dibenzanthracenes, and idenopyrenes), fluoranthene, arsenic, cadmium, copper, mercury, and nickel, all of which are hazardous to the health of humans and marine life.

80. Moreover, the chemical dispersants used by BP during the Spill response is harmful to the health of humans and marine life.

81. As a direct result of the Spill, Plaintiff has suffered past, present, and future harm to, and contamination of, the Plaintiff s waters, property estuaries, seabeds, animals, plants, beaches, shorelines, coastlines, islands, marshlands, and other natural and economic resources.

82. The Spill caused the National Oceanographic and Atmospheric Administration ("NOAA") to restrict commercial and recreational fishing across large areas of the Gulf of Mexico, causing damage to Plaintiff's livelihood.

83. There are a wide variety of commercially valuable fish species in the Gulf of Mexico and its coastal waters that have been and will continue to be harmed by the Spill, including, but not

limited to, shrimp, crabs, oysters, menhaden, tuna, and pelagic fish. As sunken and dispersed

oil resurfaces, additional harm to marine ecosystems will occur and continue.  This will impact

not only the value of Plaintiff's land and revenue from tourism, but also increase his taxes.

***Economic Damages***

84. The Spill and the resulting contamination of the Plaintiff's land have caused,

are causing, and will continue to cause a loss of income for Plaintiff and other individuals and

entities in Baldwin County, including those who rely on the Gulf of Mexico and/or its marine life

for their livelihoods. This loss of income has, is, and will continue to result in a loss of revenue

for the Plaintiff.

85. Moreover, Plaintiff has also seen, and is continuing to see, a dramatic drop in Gulf-related

tourism as a result of the Spill. This decrease in Baldwin County tourism has, is, and will

continue to result in a loss of revenue for the Plaintiff.

86. Plaintiff seeks both compensatory and punitive damages in this action. As discussed

generally above, Plaintiffs compensatory damages as a result of Defendants' acts and

omissions include, but are not limited to, the following:

a. Past, present, and future damages for harm to and contamination of Plaintiff's waters,
property, estuaries, seabed, animals, plants, beaches, shorelines, coastlines,
islands, marshlands, and other natural and economic resources;
b. Past, present, and future damages for physical injury to and destruction of
Plaintiff's resources and property (both real and personal), located in or around the
Gulf of Mexico and adjoining waters and estuaries,;
c. Past, present, and future economic losses resulting from injury to or destruction of Plaintiff s
property;
d. Past, present, and future lost revenues from rents, fees, increased interest or lost profit;
e. Past, present, and future costs expended by the Plaintiff to abate,
remediate, remove, and *lor* clean contaminated waters, land, and property;
f. lost value and increased taxes;
g. Past, present, and future damages associated with the long-term stigma of the oil
disaster, including the loss of use of property, revenues, and other income;
h. Past, present, and future lost revenue and human-use opportunities associated with various
natural resources in the Gulf region, including but not limited to fishing, swimming, beach-going,
and viewing of birds and wildlife;
i. Passive use losses as measured by contingent valuation methods.

87. This list is by no means exhaustive. There are many other forms of harm or damage from the Spill that may be unknown, and the Plaintiff reserves the right to amend this Complaint as additional information becomes available.

CAUSES **OF** ACTION
**I. Claims Under General Maritime Law**
A. *Negligence*
88. The Plaintiff realleges each and every allegation set forth all preceding paragraphs as if fully restated here.

89. At all times material hereto, Drilling Defendants were participating in drilling operations onboard the *Deepwater Horizon* in the Gulf of Mexico.

90. At all times material hereto, Drilling Defendants owed and breached duties of ordinary and reasonable care to the Plaintiff in connection with the drilling operations of the *Deepwater Horizon* and the maintenance of the vessel, its appurtenances and equipment, and additionally owed and breached duties to the Plaintiff to guard against and/or prevent the risk of an oil spill.

91. In addition, Cameron and Weatherford, as designers, manufacturers, and suppliers of the *Deepwater Horizon's* BOP and float collar, respectively, owed and breached duties of ordinary and reasonable care to the Plaintiff in connection with the design, manufacture and supply of the BOP and float collar.

92. Anadarko, Anadarko E&P, and MOEX had access to Halliburton/Sperry Sun INSITE real time feed data that was transmitted from the *Deepwater Horizon* on April 20, 2010. As such, they knew or should have known of the presence of hydrocarbons in the well on the evening of April 20, 2010, and they owed a duty to the Plaintiff to warn of the impending disaster in sufficient time to avert it. Anadarko, Anadarko E&P, and MOEX breached their duties to the Plaintiff by failing to warn the drilling vessel crew of the imminent blowout so that the crew could take evasive action.

93. The existence and breach of these legal duties are established under the general maritime law and state law as deemed applicable herein.

94. The blowout and explosions on the *Deepwater Horizon,* its sinking, and the resulting Spill were caused by the joint and concurrent negligence of Defendants which renders them jointly, severally, and solidarily liable to the Plaintiff.

95. Defendants knew of the dangers associated with deep water drilling and failed to take appropriate measures to prevent damage to the Plaintiff and its marine and coastal environments and estuarine areas.

96. Defendants were under a duty to exercise reasonable care while participating in drilling operations on the *Deepwater Horizon* to ensure that a blowout and subsequent oil spill did not occur as a result of such operations.

97. Defendants were under a duty to exercise reasonable care to ensure that if crude oil discharged in the event of a blowout, that it would be contained, captured and/or stopped within the immediate vicinity of the *Deepwater Horizon* in an expeditious manner.

98. Defendants knew or should have known that the acts and omissions described herein could result in damage to the Plaintiff.

99. Defendants, respectively and collectively, failed to exercise reasonable care to ensure that adequate safeguards, protocols, procedures and resources would be readily available to prevent and/or mitigate the effects of an uncontrolled oil spill into the waters of the Gulf of Mexico, and thereby breached duties they owed to the Plaintiff.

100. The conduct of Defendants with regard to the manufacture, maintenance and/or operation of drilling operations and oil rigs such as the *Deepwater Horizon* and its appurtenances and equipment is governed by numerous state and federal laws and permits issued under the authority of these laws. These laws and permits create statutory standards that are intended to

23

protect and benefit the Plaintiff. One or more of the Drilling Defendants violated these statutory standards. The violations of these statutory standards constitute negligence per se under the law of Alabama and the general maritime law, including (but not limited to) the Clean Water Act, 33 U.S.C. § 1311.

101. At all times material hereto, the *Deepwater Horizon* was owned, navigated, manned, possessed, and managed by Transocean.

102. As the owner and manager of the *Deepwater Horizon,* Transocean owed duties of care to the Plaintiff to, *inter alia,* man, possess, manage, control, navigate, maintain and operate the *Deepwater Horizon* with reasonable and ordinary care.

103. Transocean breached its duties to the Plaintiff by, *inter alia,* failing to properly manage, control, maintain and operate the *Deepwater Horizon* and its safety equipment, including, but not limited to, the gas sensors, air intake valves, emergency shut down systems, and BOP, and in disabling vital alarm systems on the *Deepwater Horizon* before the blowout.

104. Transocean also breached its duties to the Plaintiff by making and/or acquiescing to a series of reckless decisions concerning, *inter alia,* well design, the use of centralizers, mudding operations, cementing, integrity testing, deployment of the casing hanger lockdown sleeve, spacer material, and simultaneous operations causing worker confusion and loss of focus.

105. Defendants also violated the International Safety and Management Code ("ISM"), as adopted by the International Convention for the Safety at Life at Sea ("SOLAS"), which provides rules and standards to ensure that ships are constructed, equipped, and manned to safeguard life at sea, by failing to properly maintain the vessel, train personnel, and perform appropriate risk assessment analyses. *See* 46 USC §§ 3201-3205 and 33 CFR §§ 96.230 and 96.250.

24

106. At all times material hereto, the *Deepwater Horizon* was leased and operated pursuant to a contract between Transocean and BP. Together, Transocean and BP and other Drilling Defendants were responsible for well design and control.

107. BP owed duties to the Plaintiff to, *inter alia,* exercise reasonable care to design, create, manage and control the well and the flow of hydrocarbons therefrom in a safe and prudent manner and to conduct its drilling operations with reasonable and ordinary care.

108. BP breached its duties to the Plaintiff by, *inter alia:*

a. choosing and implementing a less expensive and less time-consuming long string well design, which had few barriers against a gas blowout, instead of a safer liner/tieback design which would have provided additional barriers to gas blowout, despite its knowledge that the liner/tieback design was a safer option;
b. using pipe material that it knew, and which it recognized before the blowout, might collapse under high pressure;
c. using too few centralizers to ensure that the casmg was centered into the wellbore;
d. failing to implement a full "bottoms up" circulation of mud between the running of the casing and the beginning of the cement job in violation of industry standards;
e. failing to require comprehensive lab testing to ensure the density of the cement, and failing to heed the ominous results of negative pressure testing which indicated that the cement job was defective;
f. cancelling the cement bond log test that would have determined the integrity of the cement job;
g. failing to deploy the casing hanger lockdown sleeve to prevent the wellhead seal from being blown out by pressure from below;
h. using an abnormally large quantity of mixed and untested spacer fluid;
i. failing to train drilling vessel workers and/or onshore employees and to hire personnel qualified in risk assessment and management of complex systems like that found on the Deepwater Horizon; and,
j. requiring simultaneous operations in an effort to expedite the project, making it difficult for workers to track fluid volumes in the well bore.
109. All of the foregoing acts and/or omissions by BP proximately caused and/or contributed to the Plaintiffs injuries and damages.

110. At all times material hereto, Halliburton was responsible for cementing the well that was the subject of the Spill, and further was engaged in testing, analysis, and monitoring of the aforementioned well.

111. At all times material hereto, Halliburton owed duties to the Plaintiff to, *inter alia,* exercise reasonable care in conducting its cementing, testing, analysis and monitoring of the *Deepwater Horizon's* well.

112. Halliburton breached its duties to the Plaintiff by, *inter alia,* failing to exercise reasonable care in conducting its cementing, testing, analysis, and monitoring of the *Deepwater Horizon's* well. In addition, Halliburton was negligent by, *inter alia,*

a. failing to use a full "bottoms up" circulation of mud between the running of the casing and the beginning of the cement job in violation of industry standards;
b. failing to require comprehensive lab testing to ensure the density of the cement, and failing to heed the ominous results of negative pressure testing which indicated that the cement job was defective;
c. cancelling, or acquiescing in the cancellation of, the cement bond log test that would have determined the integrity of the cement job; and,
d. failing to deploy, or acquiescing in the decision not to deploy, the casing hanger lockdown sleeve to prevent the wellhead seal from being blown out by pressure from below, all of which proximately caused and/or contributed to the Plaintiffs damages.

113. At all times material hereto, M-I was providing the drilling fluids or "mud" for the drilling operations onboard the *Deepwater Horizon* and was responsible for mud drilling, composition and monitoring, and for the provision of "spacer" solution.

114. At all times material hereto, M-I owed duties of care to the Plaintiff to, *inter alia,* exercise reasonable care in providing, controlling and monitoring the mud and spacer solutions used on the *Deepwater Horizon.*

115. M-I breached its duties to the Plaintiff by, *inter alia,* failing to provide, control, and monitor the mud and spacer solutions used on the *Deepwater Horizon* in a reasonably safe manner, proximately causing and/or contributing to the Plaintiffs injuries and damages.

116. At all times relevant hereto, Cameron designed, manufactured, and supplied the BOP that was, at all times relevant herein, appurtenant to and a part of the vessel's equipment.

117. Cameron owed duties to the Plaintiff to, *inter alia,* exercise reasonable and ordinary care in the design and manufacture and supply of the BOP for the *Deepwater Horizon.*

118. Cameron breached its duties to the Plaintiff by failing to exercise reasonable care in the design, manufacture and supply of the BOP such that it failed to operate to prevent the blowout, thereby proximately causing and/or contributing to the Plaintiff's injuries and damages.

119. Cameron breached its duties to the Plaintiff by, *inter alia,* failing to ensure and verify that the BOP it designed and manufactured was suitable for the types of drill pipe and casing assembly design which would foreseeably be used during the *Deepwater Horizon's* drilling and exploration operations; designing the BOP such that it was vulnerable to a singlepoint failure; failing to install a backup activation system for the BOP; and failing to provide adequate warnings, instructions and guidelines on the permissible uses, modifications, and applications of the BOP appurtenant to the vessel.

120. At all times relevant hereto, Weatherford designed, manufactured and supplied the float collar used in the Macondo well.

121. Weatherford owed duties of care to the Plaintiff to, *inter alia,* exercise reasonable and ordinary care in the design and manufacture of the float collar in the long string casing.

122. Weatherford breached its duties to the Plaintiff in designing and manufacturing a float collar that failed to seal properly and which allowed hydrocarbon backflow into the casing, which proximately caused and/or contributed to the blowout, explosions, fire, and Spill, resulting in the Plaintiff's injuries and damages.

123. Anadarko and MOEX had actual or constructive notice of the potentially disastrous conditions at the well site. Further, having been on actual or constructive notice of those conditions and having negotiated for and obtained the right to be privy to Health, Safety, and Environmental ("HSE") information, conduct HSE inspections, and call HSE meetings, it was incumbent on Anadarko, Anadarko E&P, and MOEX Offshore to perform the important check and balance role that they had carved out for themselves in the both the Operating Agreement

and the Lease Exchange Agreement. Failure to exercise this role given the known history of specific problems at the well site was negligent.

124. Engineers knowledgeable about blowout responses told BP how to kill the well as early as June 2010, but BP, after conferring with its Macondo lease partners Anadarko and MOEX, chose to ignore the engineers' well-kill procedure because BP did not want to damage the well or its chance to make a profit on Macondo. Because BP, along with Anadarko and MOEX, hoped to retap the Macondo Well and the large, valuable reservoirs beneath it, they ignored expert well-kill information that could have stopped the Spill many weeks earlier.

125. In addition to the negligent actions described herein, and in the alternative thereto, the injuries and damages suffered by the Plaintiff were caused by the acts and/or omissions of Defendants that are beyond proof by the Plaintiff, but which were within the knowledge and control of the Defendants, there being no other possible conclusion than that the blowout, explosions, fire, sinking, and Spill resulted from the negligence of Defendants. The blowout, explosions, fire, sinking, and the resulting Spill would not have occurred had the Defendants satisfied the duty of care imposed on them, and the Plaintiff, therefore, pleads the doctrine of *res ipsa loquitur*.

126. In addition to the foregoing acts of negligence, the Plaintiff avers that the blowout, explosions, fire, and resulting Spill were caused by the joint, several, and solidary negligence and fault of Defendants in the following non-exclusive particulars:

a. Failing to properly operate the *Deepwater Horizon;*
b. Operating the Deepwater Horizon in such a manner that a fire and explosions occurred onboard, causing it to sink and resulting in the Spill;
c. Failing to properly inspect the *Deepwater Horizon* to assure that its equipment and personnel were fit for their intended purpose;
d. Acting in a careless and negligent manner without due regard for the safety of others;
e. Failing to promulgate, implement and enforce rules and regulations pertaining to the safe operations of the *Deepwater Horizon* which, if they had been so promulgated, implemented and enforced, would have averted the blowout,

explosions, fire, sinking, and Spill;

f. Operating the *Deepwater Horizon* with untrained and unlicensed personnel;

g. Negligently hiring, retaining and/or training personnel;

h. Accelerating drilling operations in an effort to save money and pressuring employees to work with undue haste in the hours before the blowout, while ignoring or failing to acknowledge the warning signs of the impending disaster;

i. Failing to take appropriate action to avoid or mitigate the accident;

j. Negligently implementing or failing to implement policies and procedures to safely conduct offshore operations in the Gulf of Mexico;

k. Failing to observe dangerous and recurring problems with hydrocarbons in the well, and instituting risky cementing and drilling procedures hours before the blowout;

l. Failing to disclose or correct the fact that the battery on the BOP was weak and one of its control pods was broken;

m. Consciously electing not to install an acoustically activated remote-control shutoff valve;

n. Failing to institute common industry protective measures necessary to detect the buildup of hydrocarbons in the well before and during the cementing process;

o. Using a defective well casing that was prone to failure under heavy pressure;

p. Failing to ascertain that the *Deepwater Horizon* and its equipment were free from defects and/or in proper working order;

q. Failing to warn in a timely manner;

r. Failing to timely bring the oil release under control;

s. Failing to provide appropriate accident prevention equipment;

t. Failing to observe and read gauges that would have indicated excessive pressures in the well;

u. Failing to react to danger signs; and,

v. Such other acts of negligence and omissions as will be shown at the trial of this matter; all of which acts are in violation of the general maritime law.

127. The Plaintiff is entitled to a judgment finding Defendants liable, jointly, severally, and solidarily to the Plaintiff for damages suffered as a result of Defendants' negligence and awarding the Plaintiff adequate compensation in amounts determined by the trier of fact.

128. The injuries to the Plaintiff were also caused by and/or aggravated by the fact that Defendants failed to take necessary actions to mitigate the danger associated with their operations.

129. As a direct and proximate result of Defendants' acts and/or omissions, the Plaintiff has incurred damages, including, but not limited to, the following:

a. Past, present, and future damages for harm to, and contamination of his waters properties, estuaries, sea beds, animals, plants, beaches, shorelines, coastlines, islands, marshlands, and other natural and economic resources;

b. Past, present, and future damages for physical injury to, and destruction of, Plaintiff's resources and property (both real and personal) located in and around the Gulf of Mexico and adjoining waters and estuaries;

c. Past, present, and future economic losses resulting from injury to, or destruction of, Plaintiff's property;

d. Past, present, and future lost Plaintiff's revenues from, rents, or lost profits;

e. Past, present, and future costs expended by the Plaintiff to abate, remediate, and/or clean his contaminated waters, land, and property;

f. Past, present, and future interest and taxes proximately caused by the spill;

g. Past, present, and future damages associated with the long-term stigma of the oil disaster, including the loss of use of Plaintiff's property, revenues, and other income;

h. Past, present, and future lost revenue and human-use opportunities associated with various natural resources in the Gulf region, including but not limited to fishing, swimming, beach-going, and viewing of birds and wildlife;

I. Past, present, and future interest and tax costs proximately caused by the Oil Spill

J. Passive use losses as measured by contingent valuation methods; and,

k. All other damages or relief to which the Plaintiff is entitled when additional information regarding the full extent of the Plaintiff s damages becomes available.

B. *Gross Negligence and Willful Misconduct*

130. The Plaintiff realleges each and every allegation set forth m all preceding paragraphs as if fully restated here.

131. Drilling Defendants and Cameron owed and breached duties of ordinary and reasonable care to the Plaintiff in connection with the maintenance of, and drilling operation on, the Deepwater Horizon, and additionally owed and breached duties to the Plaintiff to guard against and/or prevent the risk of the Spill. The existence and breach of these legal duties are established under the general maritime law and state law as deemed applicable herein.

132. Drilling Defendants and Cameron breached their legal duty to the Plaintiff and failed to exercise reasonable care and acted with reckless, willful, and wanton disregard in the negligent manufacture, maintenance, and/or operation of the *Deepwater Horizon*.

133. Drilling Defendants and Cameron knew or should have known that their wanton, willful, and reckless misconduct would result in a disastrous blowout and oil spill, causing damage to those affected by the Spill.

134. Transocean acted with gross negligence, willful misconduct, and reckless disregard for human life and the safety and health of the environment and the Plaintiff by, *inter alia,* disabling the gas alarm system aboard the *Deepwater Horizon.*

135. BP and Transocean acted with gross negligence, willful misconduct, and reckless disregard for human life and the safety and health of the environment and the Plaintiff by, *inter alia,* failing to use a sufficient number of "centralizers" to prevent channeling during the cement process; failing to run a bottoms up circulation of the drilling mud prior to beginning the cement job; disregarding proper drilling, casing, mudding, and cementing procedures; failing to ensure that that adequate safeguards, protocols, procedures and resources would be readily available to prevent and/or mitigate the effects an uncontrolled oil spill into the waters of the Gulf of Mexico.

136. BP, Transocean, and Halliburton acted with gross negligence, willful misconduct, and reckless disregard for human life and the safety and health of the environment by, *inter alia,* using an inappropriate cement mixture for the well; failing to appropriately test that cement mixture prior to using it in the well; failing to run a cement bond log to evaluate the integrity of the cement job; and failing to deploy the casing hanger lockdown sleeve prior to commencing the mud displacement process in the well.

137. BP, Transocean, and M-I acted with gross negligence, willful misconduct, and reckless disregard for human life and the safety and health of the environment by, *inter alia,* using an untested, abnormally large volume of mixed spacer solutions to avoid having to properly dispose of the two separate spacer substances as hazardous wastes.

138. BP, Transocean, and Cameron acted with gross negligence, willful misconduct, and reckless disregard for human life and the safety and health of the environment and the Plaintiff

by, *inter alia,* defectively designing, recklessly maintaining and altering, and/or wantonly operating and/or using the BOP appurtenant to the *Deepwater Horizon.*

139. Anadarko and MOEX had actual or constructive notice of the potentially disastrous conditions at the well site. Further, having been on actual or constructive notice of those conditions and having negotiated for and obtained the right to be privy to Health, Safety, and Environmental ("HSE") information, conduct HSE inspections, and call HSE meetings, it was incumbent on Anadarko, Anadarko E&P, and MOEX Offshore to perform the important check and balance role that they had carved out for themselves in the both the Operating Agreement and the Lease Exchange Agreement. Failure to exercise this role given the known history of specific problems at the wellsite amounts to gross negligence.

140. Engineers knowledgeable about blowout responses told BP how to kill the well as early as June 2010, but BP, after conferring with its Macondo lease partners Anadarko and MOEX, chose to ignore the engineers' well-kill procedure because BP did not want to damage the well or its chance to make a profit on Macondo. Because BP, along with Anadarko and MOEX, hoped to retap the Macondo Well and the large, valuable reservoirs beneath it, they ignored expert well-kill information that could have stopped the Spill many weeks earlier. This reckless disregard of the experts' opinions amounts to gross negligence.

141. The foregoing acts of gross negligence, willful misconduct, and reckless disregard for human life and the safety and health of the environment on the part of the Drilling Defendants and Cameron directly and proximately caused damage to the Plaintiff, including, but not limited to, damages to natural resources and Plaintiff properties, lost profits and other revenues, and direct and indirect costs proximately caused by the oil spill, for all of which the Plaintiff is entitled to compensatory and punitive damages.

C. *Strict Liability For Manufacturing And/Or Design Defect*
Cameron

142. The Plaintiff realleges each and every allegation set forth m all preceding paragraphs as if fully restated here.

143. The Plaintiff is entitled to recover from Cameron for its defective design and/or manufacture of the BOP that was appurtenant to and a part of the equipment of the *Deepwater Horizon,* pursuant to Section 402A of the Restatement (Second) of Torts as adopted by maritime law.

144. At all times relevant hereto, Cameron was in the business of designing, manufacturing, marketing, selling, and/or distributing the BOP used in connection with the drilling operations onboard the *Deepwater Horizon.*

145. If operating as intended on the night of the disaster, the BOP could have been manually or automatically activated immediately after the explosion, cutting off the flow of oil at the wellhead, and limiting the Spill to a minute fraction of its ultimate severity; thereby sparing the Plaintiff millions of dollars in losses and damage.

146. Cameron sold and delivered the BOP at the *Deepwater Horizon* to Defendant Transocean in 2001.

147. Cameron's BOP failed to operate properly or at all, at the time of or following the blowout, and this failure caused and/or contributed to the Spill.

148. Cameron failed to effectively design the BOP with a backup activation system, or to provide adequate warnings, instructions, and/or guidelines on the permissible uses, modifications and applications of the BOP.

149. The BOP was defectively designed because its emergency modes of system operation did not provide a fully-independent means of closing the BOP, which rendered the BOP abnormally dangerous. For instance, all of the emergency methods for closing the BOP provide different

ways of closing a single blind shear ram, which must seal to isolate the well bore. As such, if the blind shear ram fails to operate for any reason, there is nothing the BOP can do to seal the well. In addition, all emergency methods of operating the BOP, other than the autoshear and ROV hot stab, rely on an operational control pod which, if not functioning, renders those methods useless.

150. In addition, the two emergency methods of closing the BOP that can be activated from the vessel by personnel (the high pressure closure of the blind shear ram and the EDS) require the same communication, electrical and hydraulic components, meaning that if those components are destroyed or damaged, there is no method by which drilling vessel personnel can communicate with the BOP.

151. Moreover, Cameron's BOP was defectively designed and/or manufactured because its blind shear rams were vulnerable to the failure of a single shuttle valve carrying hydraulic fluid to the ram blades. If the shuttle valve fails, the blind shear ram will be unable to seal the well.

152. Cameron's BOP was defectively designed and/or manufactured because it failed to operate as intended, if at all, and thus proximately caused and contributed to the blowout and subsequent Spill.

153. Cameron's BOP was defectively designed and/or manufactured such that it did not operate as intended to prevent or minimize blowouts, which caused and/or contributed to the Spill.

154. Cameron's BOP was in a defective condition and unreasonably dangerous to the Plaintiff when it left Cameron's control.

155. At all times, Cameron's BOP was used in the manner intended, or in a manner reasonably foreseeable and/oractually disclosed to Cameron prior to April 20, 2010.

156. At the time the BOP left Cameron's control, it was in a defective condition unreasonably dangerous to the Plaintiff in that they were designed and manufactured with over 260 known defects and failure modes, including but not limited to:

a. Inadequate, faulty, nonfunctioning and defective battery systems;
b. Inadequate, faulty, nonfunctioning and defective dead man switches and related wrnng;
c. The absence of acoustic triggers;
d. Inadequate, faulty, nonfunctioning and defective emergency disconnect systems (EDS);
e. Improperly sealed, leaky hydraulic systems;
f. Improperly designed, manufactured, and installed annular seals;
g. Insufficiently robust blind shear rams;
h. Insufficient warnings, instructions, and guidelines on permissible, foreseeable uses and modifications to the BOP and its component parts;
i. Insufficient testing and design verification of the BOP and its component parts to ensure the shearing capability of the ram and other functioning of the BOP during reasonably foreseeable uses; and
j. In such other particulars as the evidence may show.

157. At the time the BOP appurtenant to the *Deepwater Horizon* left Cameron's control, Cameron knew, or in light of reasonably available knowledge or in the exercise of reasonable care should have known, about the aforementioned unreasonably dangerous conditions.

158. At the time the BOP appurtenant to the *Deepwater Horizon* left Cameron's control, feasible design alternatives existed which would have to a reasonable probability prevented the harm suffered by the Plaintiff without impairing the utility, usefulness, practicality or desirability of the BOP.

159. At all relevant times, the BOP appurtenant to the *Deepwater Horizon* was used in an intended and/or reasonably foreseeable manner.

160. The Plaintiff was a foreseeable bystander and victim of the manifestation of the defects in the *Deepwater Horizon's* BOP.

161. Cameron had actual and/or constructive knowledge of the facts and circumstances relative to the BOP which caused or contributed to this incident, which in turn caused the Plaintiffs

35

damages and its actions and/or inactions were grossly negligent, reckless, willful, and/or wanton.

162. As a result of manufacturing and/or defects in Cameron's BOP, the Plaintiff has suffered damage to and/or diminution of the value of property, loss of income, loss of business, inconvenience and/or loss of valuable resources, for which it is entitled to actual, compensatory and punitive damages.

**D.** *Strict Liability For Manufacturing And/Or Design Defect*
**Weatherford**

163. The Plaintiff realleges each and every allegation set forth III all preceding paragraphs as if fully restated here.

164. The Plaintiff is entitled to recover from Weatherford for its defective design and/or manufacture of the float collar on the *Deepwater Horizon* pursuant to Section 402A of the Restatement (Second) of Torts as adopted by maritime law.

165. At all times relevant hereto, Weatherford was in the business of designing, manufacturing, marketing, selling, and/or distributing the float collar appurtenant to the vessel and used in connection with the drilling operations by the *Deepwater Horizon.*

166. Weatherford sold and delivered the float collar at the *Deepwater Horizon* to Defendant Transocean in 2001.

167. The float collar is a check valve device that is installed to prevent backflow or ingress of fluids into the casing. Hydrocarbons flowing into the casing from the bottom of the well bore must first pass through the float collar.

168. On April 20, 2010, the Weatherford-manufactured float collar did not seal properly, which allowed hydrocarbons to leak into the casing, contributing to the blowout and subsequent explosions, fire, sinking, and Spill.

169. Weatherford's float collar failed to operate properly or at all, at the time of or following the blowout, and this failure caused or contributed to the Spill.

170. Weatherford's float collar was defective because it failed to operate as intended, if at all, and thus proximately caused and contributed to the blowout and subsequent Spill.

171. The float collar used on the *Deepwater Horizon* was defectively designed and/or manufactured such that it did not operate as intended to prevent or minimize blowouts, which caused and/or contributed to the Spill.

172. Weatherford's float collar was m a defective condition and unreasonably dangerous to the Plaintiff when it left Weatherford's control.

173. At all times, Weatherford's float collar was used in the manner intended, or in a manner reasonable foreseeable and/or actually disclosed to Weatherford prior to April 20, 2010.

174. At the time the float collar used at the *Deepwater Horizon* site left Weatherford's control, Weatherford knew, or in light of reasonably available knowledge or in the exercise of reasonable care should have known, about the aforementioned unreasonably dangerous conditions.

175. At the time the float collar used at the *Deepwater Horizon* site left Weatherford's control, feasible design alternatives existed, which would have to a reasonable probability prevented the harm suffered by the Plaintiff without impairing the utility, usefulness, practicality or desirability of the float collar.

176. At all relevant times, the float collar used on the *Deepwater Horizon* site was used in an intended and/or reasonably foreseeable manner.

177. The Plaintiff was a foreseeable bystander and victim of the manifestation of the defects in the *Deepwater Horizon's* float collar.

178. Weatherford had actual and/or constructive knowledge of the facts and circumstances relative to the float collar that caused or contributed to this incident, which in turn caused the

Plaintiff s injuries and damages, and its actions and inactions were grossly negligent, reckless, willful, and/or wanton.

179. As a result of manufacturing and/or defects in the Weatherford float collar, the Plaintiff has suffered damage to and/or diminution of the value of his property, loss of income, loss of business, inconvenience and/or loss of valuable resources, for which it is entitled to actual, compensatory and punitive damages.

### E. *Strict Liability For Manufacturing And/Or Design Defect*
### Halliburton

180. The Plaintiff realleges each and every allegation set forth III all preceding paragraphs as if fully restated here.

181. Pursuant to Section 402A of the Restatement (Second) of Torts, as adopted by maritime law, the Plaintiff is entitled to recover from Halliburton for its defective design and/or manufacture of the cement mixture, or "slurry," used to seal the well.

182. At all times relevant hereto, Halliburton was in the business of designing, manufacturing, marketing, selling, and/or distributing cement to be used to seal oil wells.

183. Halliburton sold and delivered the cement slurry to be used to seal the Macondo well in April 2010.

184. On April 20, 2010, the Halliburton-designed cement mixture did not seal properly, which allowed hydrocarbons to leak into the casing, causing and/orcontributing to the blowout and subsequent explosions, fire, sinking, and Spill.

185. The cement provided by Halliburton was intended to fill the annulus between the casing and the well bore and seal off the hydrocarbon-filled formations, as well as plug the bottom of the casing pipe to prevent an influx. The composition of the cement mixture that Halliburton chose for the task would have to allow the cement to be effectively placed and fully set within the narrow range of safe operating pressures at the bottom of the well.

38

186. The slurry was required to be light enough to avoid fracturing the brittle formations surrounding the well, but once set, the slurry would have to be strong enough to resist the intense pressure of the hydrocarbon reservoirs within those formations, securely sealing the annular space between the casing and surrounding formations, isolating the hydrocarbon reservoirs from the well.

187. Halliburton defectively designed the cement mixture and failed to thoroughly conduct and/or review the results of laboratory testing of the cement mixture's stability under conditions that would be found in the Macondo well. The foamed cement mixture it provided, which had been injected with nitrogen gas to lower its density, was defectively designed considering the high temperatures and pressures in wells like Macondo, which can have unpredictable effects on the nitrogen in the cement, leading to instability and weakness that prevents the cement from forming a secure seal in the well.

188. The tests conducted by Halliburton in February 2010 on a cement slurry similar to that used to secure the Macondo well showed instability under conditions like those found at the bottom of the Macondo well. Post-explosion testing also revealed that Halliburton's cement mixture was unstable.

189. Halliburton's cement mixture failed to operate properly, or at all, at the time of or following the blowout, and this failure caused or contributed to the Spill.

190. HallibUl10n's cement mixture was defectively designed and/or manl.lfactured such that it did not operate as intended to prevent or minimize blowouts, which caused and/or contributed to the Spill.

191. Halliburton's cement mixture was In a defective condition and unreasonably dangerous to the Plaintiff when it left Halliburton's control.

192. At all times, Halliburton's cement mixture was used in the manner intended, or in a manner reasonable foreseeable and/or actually disclosed to Halliburton prior to April 20, 2010.

193. At the time Halliburton's cement mixture left Halliburton's control, Halliburton knew, or in light of reasonably available knowledge or in the exercise of reasonable care should have known, about the aforementioned unreasonably dangerous conditions.

194. At the time the cement mixture left Halliburton's control, feasible design alternatives existed which would have to a reasonable probability prevented the harm suffered by the Plaintiff without impairing the utility, usefulness, practicality or desirability of the cement mixture.

195. The Plaintiff was a foreseeable bystander and victim of the manifestation of the defects in Halliburton's cement mixture.

196. Halliburton had actual and/or constructive knowledge of the facts and circumstances relative to its cement mixture that caused or contributed to this incident, which in turn caused the Plaintiff's injuries, and its actions and inactions were grossly negligent, reckless, willful, and/or wanton.

197. As a result of manufacturing and/or defects in Halliburton's cement mixture, the Plaintiff has suffered, *inter alia,* a loss of profits resulting from (among other things) a decline in tourism rental revenue, for which the Plaintiff is entitled to actual and compensatory damages.

198. As a result of manufacturing and/or defects in the Halliburton's cement mixture, the Plaintiff has suffered damage to and/or diminution of the value of property, loss of income, loss of business, inconvenience and/or loss of valuable resources, for which the Plaintiff is entitled to actual, compensatory, and punitive damages.

**II. The Oil Pollution Act**
**BP, Transocean, Anadarko, Anadarko E&P, and MOEX**

199. The Plaintiff realleges each and every allegation set forth in all preceding paragraphs as if fully restated here.

200. The Oil Pollution Act, 33 U.S.C. § 2701, *et seq.* (the "OPA"), imposes liability upon a "responsible party for a ... vessel or a facility from which oil is discharged ... into or upon navigable waters or adjoining shorelines" for the damages that result from such incident as well as removal costs. 33 U.S.C. § 2702.

201. The Coast Guard has named BP as the responsible party for the downhole release of oil and Transocean as the responsible party for the release of diesel on the surface.

202. BP and Transocean are responsible parties under the OP A, and they are strictly liable pursuant to Section 2702 of the OP A for all the damages resulting from the Spill.

203. Defendants Anadarko, Anadarko E&P, and MOEX held a leasehold interest in a lease granted by the MMS for Block 252, Mississippi Canyon (the "Macondo lease"), an oil lease on lands beneath navigable waters, before and/or at the time of the Spill. As such, they were lessees of the area within which the well and drilling vessel, both offshore facilities, were located at the time of the Spill and are responsible parties pursuant to Section 2701 (16) and (32) of the OP A. They are therefore strictly liable pursuant to Section 2702 of the OPA for all the damages resulting from the Spill.

204. Defendants BP, Transocean, Anadarko, Anadarko E&P, and MOEX are not entitled to limit their liability under Section 2704(a) of the OPA because the Spill was proximately caused by their gross negligence, willful misconduct, or violation of applicable safety, construction or operating regulations. 33 U.S.C. § 2704(c).

205. In its "Statement Of BP Exploration & Production Inc. Re Applicability Of Limitation Of Liability Under Oil Pollution Act of 1990" filed on October 19, 2010, BP waived the statutory limitation on liability under the OPA.

206. Pursuant to Section 2702(b)(1) of the OP A, the Plaintiff is entitled to all removal costs it has incurred, or will incur, as a result of the Spill.

207. As a result of the Spill, the Plaintiff IS entitled to damages pursuant to 2702(b)(2)(A), which provides for recovery of damages "for injury to, destruction of, loss of, or loss of use of, natural resources, including the reasonable costs of assessing the damage."

208. The Plaintiff is also entitled to damages pursuant to Section 2702(b )(2)(B), which provides for recovery of damages to real or personal property, including "damages for injury to, or economic losses resulting from destruction of, real or personal property, which shall be recoverable by a claimant who owns or leases that property, including the diminution in the value of their property."

209. The Plaintiff is also entitled to damages pursuant to Section 2702(b)(2)(D) "equal to the net loss of taxes, royalties, rents, fees, or net profit shares due to the injury, destruction, or loss of real property, personal property, or natural resources .... "

210. The Plaintiff is further entitled to damages for increased interest and loss of profits.

211. The Plaintiff has satisfied the presentment requirements of 33 U.S.C. §§ 2713(a) and (b). Ninety (90) days have passed, from the presentment, without the Plaintiff receiving full payment on its claim pursuant to 33 U.S.C. § 2713(c)(2). Because the full extent of the Plaintiff's damage is still unknown, and the Plaintiff is presently assessing the breadth of its damages, the Plaintiff may make additional presentments to the Defendants.

212. Pursuant to the Declaratory Judgment Act, 28 U.S.C. § 2201, and the OPA, 33 U.S.C. § 2717(f)(2), the Plaintiff seeks a declaratory judgment that is binding in this action and any subsequent action or actions against Defendants, jointly and severally and without limitation, that said Defendants are liable for removal costs and damages in this action and in any subsequent action or actions.

213. The Plaintiff further seeks all damages available to it pursuant to the OP A.

III. State Law Claims For Relief
A. *Public Nuisance (Drilling Defendants, Cameron, and Weatherford)*

214. The Plaintiff realleges each and every allegation set forth in all preceding paragraphs as if fully restated here.

215. The negligence of Drilling Defendants, Cameron, and Weatherford caused and/or contributed to the blowout and subsequent Spill that invaded and polluted the public waters of the Plaintiff, damaging all persons who came within the sphere of its operation, resulting in a devastating economic and ecological disaster that has interfered, is interfering, and will continue to interfere with the Plaintiff's interests and the use and enjoyment of the Plaintiff's waters, property, estuaries, seabeds, animals, plants, beaches, shorelines, coastlines, islands, marshlands, and other natural and economic resources of the Plaintiff, which constitutes a public nuisance pursuant to Ala Code § 6-5-120, *et. seq.* and/or common law.

216. Drilling Defendants, Cameron, and Weatherford acted in an unreasonable manner in creating the nuisance described herein.

217. As a direct and proximate result of the creation and continuing creation of a public nuisance, the Plaintiff and his family have suffered past, present, and future damages, including, but not limited to, inconvenience, loss of income, loss of revenue for the Plaintiff, and a substantial increase in expenditures by the Plaintiff to combat, abate, and remedy the effects of the nuisance caused by the Defendants.

218. Drilling Defendants, Cameron, and Weatherford were under a duty to take positive action to prevent or abate the interference, including determining the nature and extent of the past, present, and future harm to human, animal, and plant life, and other natural resources caused by the Spill, and appropriate measures needed to abate such harm and threat of harm to the Plaintiff, but failed to do so.

219. As a direct and proximate result of the creation of a public nuisance by Drilling Defendants, Cameron, and Weatherford, and their failure to perform their duties and obligations, the Plaintiff

has suffered and will continue to suffer direct and indirect damages proximately caused by the oil spill

220. Drilling Defendants, Cameron, and Weatherford are liable to the Plaintiff, jointly and severally, to take all appropriate actions to remedy and abate the harm to the environment caused by the public nuisance they created, and any other relief the Court deems just and appropriate.

**B. *Private Nuisance (Drilling Defendants, Cameron, and Weatherford)***

221. The Plaintiff realleges each and every allegation set forth in all preceding paragraphs as if fully restated here.

222. The negligence of Drilling Defendants, Cameron, and Weatherford caused and/or contributed to the blowout and subsequent Spill which directly and proximately caused an invasion that has interfered with the use an enjoyment of the waters, property, estuaries, seabeds, animals, plants, beaches, shorelines, coastlines, islands, marshlands, and other natural and economic resources of the Plaintiff, and have materially diminished and continue to diminish the value thereof, constituting a private nuisance pursuant to Ala. Code § 6-5-120, *et. seq.* and/or common law.

223. Drilling Defendants, Cameron, and Weatherford were under a duty to take positive action to prevent or abate the interference, but failed to do so.

224. The creation of the private nuisance by Drilling Defendants, Cameron, and Weatherford proximately caused past, present, and future damages to the Plaintiff by allowing oil, chemical dispersants, and other materials and substances to contaminate Plaintiffs property.

225. As a direct and proximate result of the creation of the private nuisance, the Plaintiff has suffered past, present, and future damages, including, but not limited to, inconvenience, loss of income, increased interest, loss of beneficial use, enjoyment, and exclusive possession of

44

Plaintiff's property, and diminished value of Plaintiff's properties, for which the Plaintiff is entitled to compensation.

226. Drilling Defendants, Cameron, and Weatherford are liable to the Plaintiff for actual and compensatory damages sustained as the direct and proximate result of the private nuisance alleged herein.

**C. Trespass (Drilling Defendants, Cameron, and Weathetford)**

227. The Plaintiff realleges each and every allegation set forth III all preceding paragraphs as if fully restated here.

228. Drilling Defendants, Cameron, and Weatherford discharged a foreign polluting substance beyond the boundary of the Plaintiff's property which they knew to a substantial certainty would, in due course, invade and intrude upon the Plaintiff's property, interfering with the Plaintiff's exclusive possessory rights and causing damage to the waters, property estuaries, seabeds, animals, plants, beaches, shorelines, coastlines, islands, marshland and other natural and economic resources of the Plaintiff, materially diminishing the value thereof.

229. The invasion and resulting damage to the Plaintiff was reasonably foreseeable by Drilling Defendants, Cameron, and Weatherford when, owing to their gross negligence, willful, wanton and reckless indifference for the rights of others, they intentionally and outrageously failed to exercise reasonable care in the design, execution, and operation of the Macondo well and the manufacture, maintenance, and operation of the *Deepwater Horizon* and its appurtenances and equipment, which conduct resulted in the entry, intrusion, or invasion on the Plaintiff's property.

230. This deliberate invasion and contamination of the property owned by the Plaintiff constitutes a trespass in violation of Alabama law and/or common law.

231. As a direct and proximate result of their unauthorized invasion, entry and contamination, Drilling Defendants, Cameron, and Weatherford have caused and continue to cause damage to

45

the Plaintiff, including property damage, loss of income, the creation of conditions harmful to human health and the environment, loss of exclusive possession of property, loss of profits, and diminished value of Plaintiffs property, for which Drilling Defendants, Cameron, and Weatherford are liable in damages.

232. The intentional outrageous, malicious, oppressive, grossly negligent, willful, reckless, fraudulent, and wanton conduct of Drilling Defendants, Cameron, and Weatherford, as described herein, entitles the Plaintiff to compensatory and punitive damages.

**D. *Alabama Extended Manufacturer's Liability Doctrine (Cameron)***

233. The Plaintiff realleges each and every allegation set forth III all preceding paragraphs as if fully restated here.

234. Defendant Cameron designed, manufactured and/or supplied the *Deepwater Horizon's* BOP.

235. Defendant Cameron's BOP failed to operate properly or at all to prevent the blowout, and this failure caused or contributed to the blowout, explosion, fire, and Spill.

236. Defendant Cameron's BOP was defectively manufactured and/or designed because it failed to operate as intended, either by manual trigger or by automatic trigger.

237. As a result of the BOP product defect, massive amounts of oil were discharged from the Macondo well, causing injury to the Plaintiff.

238. Defendant Cameron's BOP was in a defective condition and unreasonably dangerous to the Plaintiff when the BOP left Defendant Cameron's control.

239. At all times, Defendant Cameron's BOP was used in the manner intended.

240. By reason of the foregoing, the Plaintiff has incurred, and continues to incur,

damages, including, but not limited to, damages to natural resources and Plaintiff properties, lost profits and other revenues, and direct and indirect damages proximately caused by the oil spill, for all of which the Plaintiff is entitled to recover compensatory and punitive damages.

E. *Alabama Extended Manufacturer's Liability Doctrine (Weatherford)*

241. The Plaintiff realleges each and every allegation set forth in all preceding paragraphs as if fully restated here.

242. Defendant Weatherford designed, manufactured and/or supplied the float collar installed near the bottom of the casing string which, if operating properly, prevents the backflow of fluids or cement after the fluids or cement have been pumped through, thereby preventing the influx of hydrocarbons below the float collar from rising farther up the casing.

243. A failure of the float collar appurtenant to the *Deepwater Horizon* would have allowed hydrocarbons to flow up through the casing, towards the riser and the *Deepwater Horizon* at the surface, contributing to the blowout and the subsequent explosions, fire, sinking, and Spill.

244. Defendant Weatherford's float collar failed to operate properly, or at all, to seal the well and prevent the blowout, and this failure caused or contributed to the blowout, explosion, fire, and Spill, which caused injury and damage to the Plaintiff.

245. Defendant Weatherford's float collar was defectively manufactured and/or designed because it failed to operate as intended.

246. Defendant Weatherford's float collar was in a defective condition and unreasonably dangerous to the Plaintiff when it left Defendant Weatherford's control.

247. At all times, Defendant Weatherford's float collar was used in the manner intended.

248. Weatherford consciously or deliberately engaged in oppression, fraud, wantonness, or malice with regard to the Plaintiff.

47

249. By reason of the foregoing, the Plaintiff has incurred, and continues to incur, damages, including, but not limited to, damages to natural resources and Plaintiff s properties, lost profits and other revenues, and direct and indirect damages proximately caused by the oil spill, for all of which the Plaintiff is entitled to recover compensatory and punitive damages.

**F. *Alabama Extended Manufacturer's Liability Doctrine (Halliburton)***

250. The Plaintiff realleges each and every allegation set forth in all preceding paragraphs as if fully restated here.

251. Defendant Halliburton designed, manufactured and/or supplied the cement slurry mixture to be used at the Macondo Well.

252. Defendant Halliburton's cement mixture failed to operate properly or at all to prevent the blowout, and this failure caused or contributed to the blowout, explosion, fire, and Spill.

253. Defendant Halliburton's cement mixture was defectively manufactured and/or designed because it failed to operate as intended, either by manual trigger or by automatic trigger.

254. As a result of the defects in Halliburton's cement mixture, massive amounts of oil were discharged from the Macondo well, causing injury to the Plaintiff.

255. Defendant Halliburton's cement mixture was in a defective condition and unreasonably dangerous to the Plaintiff when the BOP left Defendant Halliburton's control.

256. At all times, Defendant Halliburton's cement mixture was used in the manner intended.

257. By reason of the foregoing, the Plaintiff has incurred, and continues to incur, damages, including, but not limited to, damages to natural resources and Plaintiffs properties, lost profits and other revenues, for all of which the Plaintiff is entitled to recover compensatory and punitive damages.

G. *Fraudulent Concealment or Suppression of Material Facts (BP, Halliburton, and Transocean)*

48

258. The Plaintiff realleges each and every allegation set forth m all preceding

paragraphs as if fully restated here.

259. The Plaintiff is entitled to recovery against Defendants BP, Halliburton and Transocean for

their fraudulent concealment or suppression of material facts concerning the Spill under

Alabama law, general maritime law, and/or common law.

260. After the Spill, Defendant BP attempted to downplay and conceal the severity of the Spill.

BP's initial leak estimate of 1,000 barrels per day was found by government investigators to be

a fraction of the actual leakage amount of 50,000 barrels of oil per day.

261. Moreover, in the aftermath of the explosions, BP did not provide complete and timely

announcements and warnings about the severity, forecast and trajectory of the Spill.

262. In addition, BP misrepresented its capabilities to respond to the Spill. BP overstated its

ability to a handle a blowout in its Exploration Plan, wherein it claimed that in the event of a

blowout resulting in an oil spill, it was "unlikely to have an impact based on the industry wide

standards for using proven equipment and technology for such responses."

263. In fact, BP did not have proven equipment and technology to respond to the Spill; instead,

as stated in the letter to Attorney General Eric Holder by Members of Congress on May 17,

2010, it did not "in any way appear that there was 'proven equipment and technology'

to respond to the spill, which could have tragic consequences for local economies and the

natural resources of the Gulf of Mexico." As noted further in that letter, "much of the response

and implementation of spill control technologies appear[ ed] to be taking place on an ad hoc

basis."

264. BP admitted on May 10, 2010 that "[a]ll of the techniques being attempted or evaluated to

contain the flow of oil on the seabed involve significant uncertainties because they have not

been tested in these conditions before."

265. Despite its inability to respond and to control the Spill, BP resisted requests from scientists to use sophisticated instruments at the ocean floor that would have provided a more accurate picture of the amount of oil that was gushing from the well.

266. The severity, forecast and trajectory of the Spill, and BP's ability to respond to the Spill, were material facts that BP had a duty to communicate because of the dire circumstances of this case and the risks attendant with the failure to disclose.

267. In addition, Defendant Halliburton misrepresented and concealed the stability of the cement used at the Macondo well, despite having performed three tests before the blowout, all of which demonstrated that the foam cement used at Macondo was unstable.

268. The instability of the cement used at the Macondo well and the results of the testing performed before the blowout were material facts that Halliburton had a duty to disclose because of the dire consequences of these facts and the risks attendant with the failure to disclose.

269. Moreover, BP was aware, before the blowout, that Halliburton's testing had revealed that the concrete foam was unstable, yet it concealed this material fact.

270. For its part, Transocean misrepresented, concealed and suppressed the condition of the *Deepwater Horizon* and the known hazards associated with the disabling of, and/or failure to maintain, its safety features and appurtenances, including, *inter alia,* its BOP. Transocean misrepresented, suppressed, and concealed the condition of the BOP rams and failsafe valves, which had not been fully inspected for ten years before the blowout, and at least 36 components and systems on the vessel that were in "bad" or "poor" condition, and which it was aware might lead to loss of life, serious injury, or environmental damage.

271. Transocean also misrepresented and concealed the safety record of the vessel, which was based on false data supplied by its personnel.

272. The foregoing known hazards, poor condition, and maintenance and safety issues associated with the *Deepwater Horizon* and its appurtenances and equipment were material facts that Transocean had a duty to communicate because of the dire circumstances of this case and the risks attendant with the failure to disclose.

273. Defendants Halliburton, BP, and Transocean failed to disclose, suppressed and/or concealed the foregoing material facts, and their failure to do so induced the Plaintiff to act or to refrain from acting to protect its property, the environment, economy of the Plaintiff, businesses, livelihoods, and income.

274. As a direct and proximate result of the fraudulent concealment of the foregoing material facts by Halliburton, BP, and Transocean, the Plaintiff has and will continue to incur damage, including, but not limited to, damages to natural resources and Plaintiff s properties, lost profits and other revenues, and direct and indirect damages proximately caused by the oil spill.

275. Moreover, the conscious or deliberate acts of misrepresentation, suppression, and concealment of the foregoing material facts by Halliburton, BP, and Transocean were willful, wanton, and/or in callous disregard for the safety of others and, accordingly, the Plaintiff is entitled to an award of compensatory and punitive damages.

**H.** *Negligence*

276. The Plaintiff incorporates and re-alleges each and every allegation set forth above herein by reference.

277. Defendants owed a duty to the Plaintiff to exercise reasonable care with respect to the construction, operation, inspection, training of personnel, repair, and maintenance of the *Deepwater Horizon* and Macondo Well; with respect to the disaster's containment and prevention planning prior to the disaster; and with respect to the containment and prevention efforts following the initial oil disaster.

278. Defendants had a heightened duty of care to the Plaintiff because of the great danger and environmental concerns associated with deepwater drilling for oil in the Gulf.

279. Defendants, directly or through agents, breached their legal duties to the Plaintiff by failing to exercise reasonable care and were negligent in their construction, operation, inspection, training of personnel, repair, and maintenance of the *Deepwater Horizon* and the Macondo Well, and in planning and implementing oil containment and prevention activities before and after the oil disaster.

280. Upon information and belief, the Plaintiff avers that the fire, explosion, resulting oil disaster, and damages were caused by the Defendants' negligence in the following nonexclusive particulars:

a. Failing to properly operate the *Deepwater Horizon* and Macondo Well;

b. Failing to install a remote control acoustic switch to prevent the discharge of crude oil into the Gulf of Mexico;

c. Failing to properly inspect the *Deepwater Horizon* and Macondo Well to assure that its equipment and personnel were fit for their intended purposes;

d. Acting in a careless and negligent manner without due regard for the safety of others;

e. Failing to promulgate, implement, follow, and enforce procedures, rules, and regulations pertaining to the safe operations of the *Deepwater Horizon* and Macondo Well which, if they had been so promulgated, implemented, followed, and enforced, would have averted the fire, explosion, sinking and oil disaster;

f. Operating the *Deepwater Horizon* and Macondo Well with untrained

52

and/or unlicensed personnel;

g. Inadequately and negligently training and/or hiring personnel;

h. Failing to take appropriate action to avoid and/or mitigate the accident;

1. Negligently implementing policies and/or procedures to safely conduct offshore operations in the Gulf of Mexico;

J. Failing to ascertain that the *Deepwater Horizon* and Macondo Well and associated equipment were free from defects and/or in proper working order;

k. Failing to take reasonable precautions to prevent and timely warn of the failure of the Macondo Well or drilling rig;

1. Failing to timely bring the oil release under control;

m. Failing to provide appropriate accident prevention equipment;

n. Failing to undertake required tests and measurements of the Macondo Well and to observe or respond to measuring devices that indicated excessive pressures in the Macondo Well;

o. Failing to react to danger signs of catastrophic Macondo Well or drilling rig failure;

p. Using defective BOPs that were improperly installed, maintained, and/or operated;

q. Conducting well and well cap cementing operations improperly;

r. Failing to assure that, once well control initially was lost, well control was regained by proper and adequate well control response;

s. Failing to assure that, once well control initially was lost, well control was regained by proper and adequate surface containment and overboard

discharge and diversion of hydrocarbons;

t. Failing to prepare an adequate oil disaster response plan;

u. Failing to marshal sufficient resources to adequately respond to the oil disaster and protect the waters, property, estuaries, seabed, animals, plants, beaches, shorelines, coastlines, islands, marshlands, and other natural and economic resources of the Plaintiff;

v. Failing to use BOPs appropriate for this drilling operation, and failure to test the BOPs that were used;

w. Failing to follow plans and specifications applicable to the design and construction of the Macondo Well and its components;

x. Failing to use safety devices adequate to arrest the flow of oil in the event of catastrophic failure ofthe Macondo Well or drilling rig;

y. Failing to properly design the *Deepwater Horizon* and Macondo Well;

z. Concealing or misrepresenting the nature, size and extent of the oil disaster;

aa. Using dangerous chemical dispersants of an incorrect nature, type, and amount;

bb. Acting in a manner that justifies imposition of punitive damages;

cc. The knowing use of dangerous dispersants; and

cc. Such other acts of negligence and omissions as will be shown at the trial of this matter.

281. The Defendants were also negligent in their attempts and omissions in trying to plug the Macondo Well, contain the oil, and clean-up the oil disaster on Plaintiffs waters and shores.

54

282. Defendants knew or should have known that their negligent conduct would result in the oil disaster, causing past, present, and future damages to the waters, property, estuaries, seabed, animals, plants, beaches, shorelines, coastlines, islands, marshlands, and other natural and economic resources of the Plaintiff.

283. The past, present, and future injuries to the Plaintiff were also caused by or aggravated by the fact that Defendants failed to take necessary actions to mitigate the danger associated with their operations.

284. In addition, the circumstances surrounding the fire, explosion, and sinking of the *Deepwater Horizon,* and the resulting Spill are such that, according to common knowledge and the experience of mankind, the accident could not have occurred had the Defendants exercised the high degree of care imposed on them. Moreover, the Defendants had full management and control of the instrumentalities that caused the oil spill. The Plaintiff, therefore, pleads the doctrine of *res ipsa loquitur.*

285. As a direct and proximate result of the combining and concurring negligence of all Defendants, the Plaintiff has and will continue to be damaged, including but not limited to, damages to natural resources and Plaintiff's properties, lost profits and other revenues, and direct and indirect damages proximately caused by the oil spill.

286. The Plaintiff demands judgment against all Defendants, jointly and severally, for compensatory damages in an amount to be determined by a jury.

N. *Wantonness*

287. The Plaintiff incorporates and re-alleges each and every allegation set forth above herein by reference.

288. Defendants, directly or through agents, breached their legal duties to the Plaintiff by failing to exercise reasonable care and acted with reckless, willful, and wanton disregard for the

Plaintiff in the construction, operation, inspection, training of personnel, repair, and maintenance of the *Deepwater Horizon* and the Macondo Well, and in planning and implementing oil containment and prevention activities before and after the oil disaster.

289. Upon information and belief, the Plaintiff avers that the fire explosion and sinking of the *Deepwater Horizon,* resulting Spill, and damages were caused by the Defendants' reckless, willful, and wanton conduct as more fully set forth above.

290. Defendants knew or should have known that their willful, wanton, and/or reckless conduct would result in the oil disaster, causing past, present, and future damages to the waters, property, estuaries, seabed, animals, plants, beaches, shorelines, coastlines, islands, marshlands, and other natural and economic resources of the Plaintiff.

291. As a direct and proximate result of the combining and concurring wantonness of all Defendants, the Plaintiff has and will continue to be damaged, including but not limited to, damages to natural resources and Plaintiff's properties, lost profits and other revenues, and direct and indirect damages proximately caused by the oil spill.

292. The Defendants consciously or deliberately engaged in oppression, fraud, wantonness, or malice with regard to the Plaintiff.

293. The Plaintiff demands judgment against all Defendants, jointly and severally, for compensatory and punitive damages in an amount to be determined by a jury.

**IV. Punitive Damages**

294. The Plaintiff realleges each and every allegation set forth III all preceding paragraphs as if fully restated here.

295. Defendants BP, Transocean, and Halliburton engaged in conduct so reckless, willful, wanton, and in such utter and flagrant disregard for the safety and health of the public and the environment in their activities leading up to and/or during the blowout, explosions, fire,

and Spill, as alleged herein, that an award of punitive damages against them at the highest possible level is warranted and necessary to impose effective and optimal punishment and deterrence. The Plaintiff, society as a whole, and the environment cannot afford and should never be exposed to the risks of another disaster of the magnitude caused by Defendants' misconduct herein.

296. BP and Transocean focused primarily on profit while disregarding public and environmental health and safety while undertaking their ultra-hazardous activities on the *Deepwater Horizon* by performing a critical well pressure test with untrained and unqualified personnel and by callously ignoring and/or misinterpreting abnormal "red flag" pressure test results.

297. BP's corporate culture caused and allowed it to disregard the lessons it should have learned and applied from previous incidents at its facilities that resulted in extensive damage and loss of life; instead, it continued to place others at risk in the interests of costcutting, time-saving, and financial gain.

298. Transocean callously and with reckless disregard for human life disabled the flammable gas alarm system aboard the *Deepwater Horizon* and prevented said system from operating properly and preventing or containing the explosions, fire, and loss of life.

299. BP and Transocean focused primarily on profit while disregarding public and environmental health and safety while undertaking their ultra-hazardous activities on the *Deepwater Horizon* by using a long string well design with too few barriers to gas flow.

300. BP and Transocean focused primarily on profit while disregarding public and environmental health and safety while undertaking their ultra-hazardous activities on the *Deepwater Horizon* by failing to use a sufficient number of "centralizers" to prevent channeling during the cement process.

301. BP, Transocean, and Halliburton focused primarily on profit while disregarding public and environmental health and safety while undertaking their ultra-hazardous activities on the *Deepwater Horizon* by failing to run a bottoms up circulation of the drilling mud prior to beginning the cement job.

302. BP, Transocean, and Halliburton focused primarily on profit while disregarding public and environmental health and safety while undertaking their highly dangerous activities on the *Deepwater Horizon* by using an inappropriate cement mixture for the type of rock formation surrounding the well, and by failing to appropriately test that cement mixture prior to using it in the well.

303. BP, Transocean, and Halliburton focused primarily on profit while disregarding public and environmental health and safety while undertaking their highly dangerous activities on the *Deepwater Horizon* by failing to run a cement bond log test to evaluate the integrity of the cement job.

304. BP, Transocean, and Halliburton focused primarily on profit while disregarding public and environmental health and safety while undertaking their highly dangerous activities on the *Deepwater Horizon* by failing to deploy the casing hanger lockdown sleeve prior to commencing the mud displacement process in the well.

305. BP and Transocean focused primarily on profit while disregarding public and environmental health and safety while undertaking their highly dangerous activities on the *Deepwater Horizon* by using an untested, abnormally large volume of mixed spacer solutions to avoid having to properly dispose of the two separate spacer substances as hazardous wastes.

306. BP, Transocean, and Halliburton focused primarily on profit while disregarding public and environmental health and safety while undertaking their highly dangerous activities on the *Deepwater Horizon* by ignoring and/ormisinterpreting abnormal, "red flag" pressure test results.

307. BP and Transocean recklessly, willfully and/or wantonly caused or contributed to the catastrophic Spill by their grossly inadequate maintenance, and reckless and improper operation and use of the BOP appurtenant to the *Deepwater Horizon*.

308. BP and Transocean recklessly, willfully and/or wantonly failed to ensure that oil would expeditiously and adequately be contained within the immediate vicinity of the *Deepwater Horizon* in the event of a blowout.

309. BP and Transocean recklessly, willfully and/or wantonly caused or contributed to the catastrophic Spill through their collective and respective disregard for proper drilling, casing, mudding, and cementing procedures.

310. BP and Transocean willfully and/or wantonly failed to ensure that adequate safeguards, protocols, procedures and resources would be readily available to prevent and/or mitigate the effects an uncontrolled oil spill into the waters of the Gulf of Mexico.

311. BP recklessly, willfully and/or wantonly failed to utilize reasonably safe dispersant chemicals in its haphazard attempts to respond to the Spill, and thereby exacerbated and worsened the pollution of the Gulf of Mexico, and thus the property of the Plaintiff.

312. In addition, after the blowout and before the well was finally sealed, BP was aware of procedures that would immediately block the flow of oil into the Gulf, yet it delayed the implementation of any such procedures, and limited its efforts to plug the well to options that would salvage the well for future use, instead of selecting procedures that would stop the flow of oil as soon as possible regardless of the well's continued functionality. As such, BP increased the magnitude of, and damage caused by, the Spill by willfully and/or wantonly and recklessly choosing its profits over the lives of the workers on the vessel, the safety of the environment, and the health, welfare, and value of the people, businesses, and property of the Plaintiff.

313. The conduct of BP, Transocean, and Halliburton was oppressive, wanton,

malicious, reckless, or grossly negligent because they:

a. failed to properly maintain and/or operate the *Deepwater Horizon;*

b. operated the *Deepwater Horizon* in such a manner that the safety and integrity of the vessel and the well were disregarded to save time and money;

c. ignored warnings that the integrity of the well, the cementing job, and the vessel were in jeopardy;

d. failed to promulgate, implement, and enforce proper rules and regulations to ensure the safe operations of the *Deepwater Horizon;*

e. violated MMS regulations for the safe design and operation of oil wells and drilling rigs in the Gulf of Mexico;

f. failed to take appropriate action to avoid or mitigate the accident;

g. failed to implement policies and procedures to safely conduct offshore operations in the Gulf of Mexico;

h. failed to ensure that the *Deepwater Horizon* and its equipment were free from defects, properly maintained and/or in proper working order;

i. failed to provide appropriate disaster prevention equipment; and,

j. failed to have an appropriate emergency spill response plan or readily available spill response equipment.

314. The conduct of BP, Transocean, and Halliburton, as described more fully hereinabove, is at the highest level of reprehensibility, warranting and necessitating the imposition of punitive damages at the highest level, because their conduct was motivated by financial gain; because it injured and endangered human and environmental health and safety; because it caused devastating damage and loss to the livelihood, business, and properties of the Plaintiff; because it was not isolated or accidental, but part of a culture and ongoing pattern

of conduct that consistently and repeatedly ignored risks to others in favor of their financial gain; and because it has accordingly caused societal harm, moral outrage and condemnation, and the need to punish them and deter further repetition by them or others.

315. The Defendants consciously or deliberately engaged m oppression, fraud, wantonness, or malice with regard to the Plaintiff and his family.

316. Accordingly, the Plaintiff is entitled to an award of punitive damages in an amount to be determined at trial.

## RESERVATION OF RIGHTS

### Right to a Trial by Jury

317. The Plaintiff demands a jury trial for any and all claims pleaded herein in which a jury trial is available by law.

318. The Plaintiff recognizes that, as part of its duty to efficiently manage the thousands of claims arising from the *Deepwater Horizon* explosion and resulting Spill, the MDL Court has set a trial to decide common issues of limitation and liability.

319. Neither the Plaintiff's pleading of general maritime claims, nor its participation in any bench trial(s) on limitation and liability issues common to the MDL amounts to a waiver of the Plaintiff's right to a jury trial. The Plaintiff cannot be forced into a Hobson's Choice. Once the MDL Court determines the common factual and legal issues regarding limitation and liability, the Plaintiff reserves its right to seek a remand of all remaining issues and claims that uniquely apply to the Plaintiff - including, but not limited to, the quantification of the Plaintiff's damages - to the originating transferor district, the Southern District of Alabama, for a trial by Jury.

### Right to File Amendments

320. The full extent of the Plaintiff's damages is yet unknown. The Plaintiff is continuing its assessment of economic and environmental damages.  Indeed, it is likely that any significant

hurricane will create a storm surge that will deposit oil on the property. The Plaintiff reserves the right to amend this complaint and/or file additional complaints to supplement the Plaintiff's present claims or assert additional claims against the Defendants named herein and/or against any additional parties. The Plaintiff also reserves the right to make or alter an election to proceed in admiralty under Rule 9(h). *See* FRCP 15(a)(2).

## PRAYER FOR RELIEF

WHEREFORE, Plaintiff requests judgment against Defendants, jointly, severally, and solidarily, as follows:

1. declaratory and injunctive relief;

2. economic and compensatory damages in amounts to be determined at trial;

3. punitive damages;

4. pre-judgment and post-judgment interest at the maximum rate allowable by law;

5. attorneys' fees and costs of litigation; and,

6. such other and further relief available under all applicable state and federal laws and any relief the Court deems just and appropriate.

Date: April 16th, 2013.

Respectfully Submitted,

Luther Sutter, pro se
P.O. Box 2012
Benton, Arkansas 72018
(501) 315-1910

By

Luther Oneal Sutter
*Luthersutter.law@gmail.com*

*Please serve the Defendants by certified mail:*
BP Exploration & Production, Inc.

c/o CT Corporation System
2 North Jackson Street, Suite 605
Montgomery, AL 36104
BP America Production Company
c/o CT Corporation System
2 North Jackson Street, Suite 605
Montgomery, AL 36104
BP p.l.c.
c/o CT Corporation System
2 North Jackson Street, Suite 605
Montgomery, AL 36104
Transocean Ltd.
c/o Capital Corporate Services Inc.
150 South Perry Street
Montgomery, AL 36104

**Transocean Offshore Deepwater Drilling, Inc.**
*c/a* **Capital Corporate Services Inc.**
150 South Perry SLreet
Montgomery, AL 36 104
**Transocean Deepwater, Inc.**
*c/o* **Capital Corporate Services '-nco**
**150 South I>erry Street**
Montgomery, AL 361 04
**Transocean Holdings, LLC**
*c/o* **Capi tal Corporate Services Inc.**
**150 South Perry Street**
Montgomery, AL 36104
**Triton Asset Leasing GmbH**
*c/o* **Transocean Ltd.**
**Capital Corporate Scrvices Inc.**
**150 SOllth Perry Street**
Montgomery, AL 36 104
**Halli burton Energy** Services. Inc.
*c/o* **CT Corporat ion System**
**2 North Jackson Street. Suite 605**
**Montgomery. Al.. 36104**
**Sperry Drilling Services**
*c/o* **The Prentice Hall Corporation System**
**57 Adams Avenue**
Montgomery, AL 36 104
M-I, LLC
*c/o* **Capitol Corporate Services Inc.**
**ISO South Perry Street**
Montgomery, AL 36104
**Cameron International Corporation rJk/a Cooper·Cameroll Corporation**
*c/a* **CT Corporation System**
**2 North Jackson Street, Sui te 605**

Montgomery, AL 36104
Weatherford U.S., L. P.
**c/o C1' Corporation System**
**2 North Jackson Street, Suite 605**
**Montgomery, AL 36 104**
**Anadarko Petroleum Corporation, Co.**
**c/o CT Corporation System**
**2 North Jackson Strcct, Suite 605**
**Montgomery, AL 36 104**
Anadarko E&P Company LP
**c/o CT Corporation System**
**2 North Jackson St reet, Suite 605**
Montgomery, AL *36 104*
Moex OfTshore *2007* LLC
**9 Greenway Plaza**
Suite *1220*
**Houston, Texas 77046**
**Moex USA Corporat ion**
**9 Greenway Plaza**
Suite *1220*
**Houslon, Texas 77046**
**Mitsui Oil Exploration Co., Ltd.**
**c/o Moex USA Corporation**
**9 Greenway Plaza**
Suite *1220*
**Houston, Texas 77046**

64

## SWORN DECLARATION

COMES Ted Upshaw who, under penalty of perjury of the Laws of the United States of America, declares as follows:

My name is Ted Upshaw, and I am over the age of eighteen (18).  I make this statement under penalty of perjury of the Laws of the United States of America.

Mr. Sutter owns three duplexes on West Lagoon in Gulf Shores, Alabama.  Mr. Sutter presented me with this opportunity, in light of his wife's success at renting these buildings.  I am a real estate agent, and I rent property as well.  In April, 2010, I agreed to buy these three duplexes so that Mr. Sutter could build a house located nearby.  I have attached the three contracts.  Decked Out has over 5000 square feet and has been rented for approximately six thousand dollars a week during the peak season of 16 weeks.  Edgewater has about 3700 square feet, and it rents for about four thousand a week during the peak season of 16 weeks.  SeaBreeze and Suncatcher have eight bedrooms and rents for about five thousand dollars a week.  The purchase price was two million, two hundred twenty-five thousand dollars, with Mr. Sutter agreeing to continue to market and rent the property without charge.  Since the rental income has now substantially decreased, I will not close until the oil spill is cleaned up.

I declare under penalty of perjury of the Laws of the United States of America that the foregoing is true and correct.

Ted Upshaw

Ex A.

## CONTRACT FOR THE SALE OF REAL PROPERTY

THIS AGREEMENT made between Luther Sutter  (the Seller) and Ted Upshaw (the Buyer), WITNESSETH:

1. ...... Agreement of Sale and Purchase. The Seller hereby agrees to sell and the Buyer agrees to purchase the following described real property, for the price, on the terms, and subject to the conditions hereinafter set forth:

**1376 West Lagoon, Gulf Shores, Alabama in Baldwin County Alabama**

2. Purchase Price. The Buyer hereby agrees to pay and the Seller agrees to accept the sum of seven hundred fifty thousand dollars for the subject property on or before 10/1/2010.

3. Title Documents. At Buyer's expense, Seller shall provide Buyer with title insurance. Buyer will bear its share of the closing costs, and Seller will bear its share of the closing costs.

4. Taxes. The Seller agrees to pay the prorated taxes due for 2010 through the date of closing, and all prior years on the property, if any, and the Buyer agrees that Buyer will pay the prorated taxes for 2010 after the date of closing and all subsequent years thereon in addition to the amounts due herein. Should the Buyer fail to pay these taxes when due, Buyer will be in default.

5. Assignment. This contract may not be assigned, transferred, pledged or sold by the Buyer without the written consent of the Seller first obtained, but may be assigned by the Seller without Buyer's consent.

6. Possession. The Buyer shall be entitled to possession of the property as of closing.

7. Contingency. The Buyer shall make all payments in a timely manner. Seller shall market and rent the subject property for three years after closing free of charge. In the event the property does not rent for last year's rents before closing, Buyer can, in his sole discretion, rescind this contract.

8. General. This contract has been mutually drafted. Time is of the essence. Should Buyer breach this agreement, Buyer agrees to pay Seller's attorney's fees and costs. Buyer agrees to give Seller the right of first refusal, should Buyer elect to sell the subject property. The Law of the State of Arkansas applies to this contract.

9. L. Oneal Sutter is an inactive real estate agent and an attorney. He does not represent any party to this transaction. Ted Upshaw is a real estate broker.

1



10.    Should any part of this contract be declared illegal or unenforceable, the remainder of this contract shall be valid.

IN WITNESS WHEREOF, the parties have hereunto set their hands this 18th day of April, 2010.

Luther Sutter Seller

Ted Upshaw

## CONTRACT FOR THE SALE OF REAL PROPERTY

THIS AGREEMENT made between Luther Sutter  (the Seller) and Ted Upshaw (the Buyer), WITNESSETH:

1.      Agreement of Sale and Purchase.  The Seller hereby agrees to sell and the Buyer agrees to purchase the following described real property, for the price, on the terms, and subject to the conditions hereinafter set forth:

### 1332 West Lagoon, Gulf Shores, Alabama in Baldwin County Alabama

2.      Purchase Price.  The Buyer hereby agrees to pay and the Seller agrees to accept the sum of seven hundred thousand dollars for the subject property on or before 10/1/2010.

3.      Title Documents.   At Buyer's expense, Seller shall provide Buyer with title insurance.  Buyer will bear its share of the closing costs, and Seller will bear its share of the closing costs.

4.      Taxes.  The Seller agrees to pay the prorated taxes due for 2010 through the date of closing, and all prior years on the property, if any, and the Buyer agrees that Buyer will pay the prorated taxes for 2010 after the date of closing and all subsequent years thereon in addition to the amounts due herein.  Should the Buyer fail to pay these taxes when due, Buyer will be in default.

5.      Assignment.  This contract may not be assigned, transferred, pledged or sold by the Buyer without the written consent of the Seller first obtained, but may be assigned by the Seller without Buyer's consent.

6.      Possession.  The Buyer shall be entitled to possession of the property as of closing.

7.      Contingency. The Buyer shall make all payments in a timely manner.  Seller shall market and rent the subject property for three years after closing free of charge.  In the event the property does not rent for last year's rents before closing, Buyer can, in his sole discretion, rescind this contract.

8.      General.  This contract has been mutually drafted.  Time is of the essence.  Should Buyer breach this agreement, Buyer agrees to pay Seller's attorney's fees and costs.  Buyer agrees to give Seller the right of first refusal, should Buyer elect to sell the subject property.  The Law of the State of Arkansas applies to this contract.

9.      L. Oneal Sutter is an inactive real estate agent and an attorney.  He does not represent any party to this transaction.  Ted Upshaw is a real estate broker.

1



10.     Should any part of this contract be declared illegal or unenforceable, the remainder of this contract shall be valid.

IN WITNESS WHEREOF, the parties have hereunto set their hands this 18th day of April, 2010.

Luther Sutter Seller

Ted Upshaw

2

CONTRACT FOR THE SALE OF REAL PROPERTY

THIS AGREEMENT made between Luther Sutter  (the Seller) and Ted Upshaw (the Buyer), WITNESSETH:

1.    Agreement of Sale and Purchase. The Seller hereby agrees to sell and the Buyer agrees to purchase the following described real property, for the price, on the terms, and subject to the conditions hereinafter set forth:

### 1328 West Lagoon, Gulf Shores, Alabama in Baldwin County Alabama

2.    Purchase Price. The Buyer hereby agrees to pay and the Seller agrees to accept the sum of eight hundred fifty thousand dollars for the subject property on or before 10/1/2010.

3.    Title Documents.   At Buyer's expense, Seller shall provide Buyer with title insurance.  Buyer will bear its share of the closing costs, and Seller will bear its share of the closing costs.

4.    Taxes. The Seller agrees to pay the prorated taxes due for 2010 through the date of closing, and all prior years on the property, if any, and the Buyer agrees that Buyer will pay the prorated taxes for 2010 after the date of closing and all subsequent years thereon in addition to the amounts due herein.  Should the Buyer fail to pay these taxes when due, Buyer will be in default.

5.    Assignment.  This contract may not be assigned, transferred, pledged or sold by the Buyer without the written consent of the Seller first obtained, but may be assigned by the Seller without Buyer's consent.

6.    Possession.  The Buyer shall be entitled to possession of the property as of closing.

7.    Contingency. The Buyer shall make all payments in a timely manner.  Seller shall market and rent the subject property for three years after closing free of charge.  In the event the property does not rent for last year's rents before closing, Buyer can, in his sole discretion, rescind this contract.

8.    General. This contract has been mutually drafted.  Time is of the essence.  Should Buyer breach this agreement, Buyer agrees to pay Seller's attorney's fees and costs.  Buyer agrees to give Seller the right of first refusal, should Buyer elect to sell the subject property.  The Law of the State of Arkansas applies to this contract.

9.    L. Oneal Sutter is an inactive real estate agent and an attorney.  He does not represent any party to this transaction.  Ted Upshaw is a real estate broker.

1



10.    Should any part of this contract be declared illegal or unenforceable, the remainder of this contract shall be valid.

IN WITNESS WHEREOF, the parties have hereunto set their hands this 18th day of April, 2010.

_____
Luther Sutter Seller


_____
Ted Upshaw

2



**JAMES P. NIX, JR.**
**Baldwin County Revenue Commissioner**
P.O. Box 1389
Bay Minette, AL 36507-1389

**VALUATION NOTICE**

| | |
|---|---|
| NOTICE DATE: | 12/05/2008 |
| PPIN #: | 283242 |
| PARCEL #: | 67-06-24-4-000-018.002-902 |

SUTTER, LUTHER A/K/A SUTTER, LUTHER ONE Ass
P O BOX 26321
LITTLE ROCK AR 72221-6321

| | |
|---|---|
| TAX DISTRICT: | 08 |

---

## Valuation Notice

You are hereby notified that Baldwin County's market value estimate appears below under the heading "**TOTAL APPRAISED VALUE**" (Land and Improvements). Should you determine that this value estimate does not reasonably represent Market Value as of October 1, 2007 and you have information or evidence you would like to present to support your position, you may file an appeal of the County's appraised value and request a hearing for your valuation appeal.

**YOUR APPEAL MUST BE IN WRITTEN FORM, MUST HAVE A CONTACT PHONE NUMBER AND MUST BE FILED WITHIN 30 DAYS OF THIS NOTICE.** IF YOU PREFER, APPEAL FORMS CAN BE FOUND ON THE COUNTY WEB SITE: www.revcomm.co.baldwin.al.us OR AT THE NEAREST REVENUE COMMISSION OFFICE (Bay Minette, Fairhope, Foley or Robertsdale). YOU MAY HAND DELIVER YOUR APPEAL TO A REVENUE COMMISSION OFFICE OR MAIL TO:

> BOARD OF EQUALIZATION
> P. O. BOX 1389
> BAY MINETTE, AL. 36507.

SUGGESTED INFORMATION TO BRING TO YOUR APPEAL HEARING:

A. Purchase of property within one year before October 1, 2007.
B. Professional fee appraisal completed within one year before October 1, 2007.
C. The sale of (3) comparable properties as close as possible to October 1, 2007.
D. Income approach to value for commercial properties.
E. A factual error concerning your property or our value estimate.

### IF YOU HAVE ANY QUESTIONS, PLEASE CALL (251) 937-0245

| | |
|---|---|
| Notice Date | 12/05/2008 |
| Total Appraised Value | 561,000 |
| Total Current Use Value (if applicable) | 0 |
| Total Assessed Value | 56,100 |
| Estimated Tax Amount | 1,851.30 |

**THIS IS NOT A TAX STATEMENT YOUR TAX STATEMENT WILL BE MAILED IN A FEW WEEKS.** 134799 | 1-1   DTA
**TAXES ARE BASED ON THE ASSESSED VALUE MULTIPLIED BY THE MILLAGE RATE.**



**JAMES P. NIX, JR.**
**Baldwin County Revenue Commissioner**
P.O. Box 1389
Bay Minette, AL 36507-1389



Here To Serve

SUTTER, LUTHER A/K/A SUTTER, LUTHER ONEASS
P O BOX 26321
LITTLE ROCK AR 72221-6321

| | |
|---|---|
| NOTICE DATE: | 12/05/2008 |
| PPIN #: | 283241 |
| PARCEL #: | |
| | 67-06-24-4-000-018.002-901 |
| TAX DISTRICT: | 08 |

---

## Valuation Notice

You are hereby notified that Baldwin County's market value estimate appears below under the heading "TOTAL APPRAISED VALUE" (Land and Improvements). Should you determine that this value estimate does not reasonably represent Market Value as of October 1, 2007 and you have information or evidence you would like to present to support your position, you may file an appeal of the County's appraised value and request a hearing for your valuation appeal.

**YOUR APPEAL MUST BE IN WRITTEN FORM, MUST HAVE A CONTACT PHONE NUMBER AND MUST BE FILED WITHIN 30 DAYS OF THIS NOTICE. IF YOU PREFER, APPEAL FORMS CAN BE FOUND ON THE COUNTY WEB SITE: www.revcomm.co.baldwin.al.us OR AT THE NEAREST REVENUE COMMISSION OFFICE (Bay Minette, Fairhope, Foley or Robertsdale). YOU MAY HAND DELIVER YOUR APPEAL TO A REVENUE COMMISSION OFFICE OR MAIL TO:**

> BOARD OF EQUALIZATION
> P. O.BOX 1389
> BAY MINETTE, AL. 36507.

SUGGESTED INFORMATION TO BRING TO YOUR APPEAL HEARING:

A. Purchase of property within one year before October 1, 2007.
B. Professional fee appraisal completed within one year before October 1, 2007.
C. The sale of (3) comparable properties as close as possible to October 1, 2007.
D. Income approach to value for commercial properties.
E. A factual error concerning your property or our value estimate.

### IF YOU HAVE ANY QUESTIONS, PLEASE CALL (251) 937-0245

---

| | |
|---|---|
| Notice Date | 12/05/2008 |
| Total Appraised Value | 561,000 |
| Total Current Use Value (if applicable) | 0 |
| Total Assessed Value | 112,200 |
| Estimated Tax Amount | 3,702.60 |

**THIS IS NOT A TAX STATEMENT YOUR TAX STATEMENT WILL BE MAILED IN A FEW WEEKS.**
**TAXES ARE BASED ON THE ASSESSED VALUE MULTIPLIED BY THE MILLAGE RATE.** 134708 | 1-1   DTA

<u>SWORN DECLARATION</u>

COMES Luther Sutter, who, under penalty of perjury of the Laws of the United States of America, declares as follows:

My name is Luther Sutter, and I am over the age of eighteen (18). I make this statement under penalty of perjury of the Laws of the United States of America.

I own property located in the 1300 block of West Lagoon in Gulf Shores, Alabama. In April of 2010, I entered into an agreement to sell some of my property and build a house located nearby. Mr. Noe had built a house for me in 2006, so I decided to ask him to build another house for me next door. He gave me the quote attached hereto, and I agreed to start building, once the sale of my other property closed. The Buyer for the other property has now refused to close because of the oil spill, and I cannot afford to build the home now, even though Mr. Noe completed the Pier for me.

I declare under penalty of perjury of the Laws of the United States of America that the foregoing is true and correct.

_Luther Sutter_    6/23/10

Luther Sutter
501-952-7140

## SWORN DECLARATION

COMES Kevin Noe, who, under penalty of perjury of the Laws of the United States of America, declares as follows:

My name is Kevin Noe, and I am over the age of eighteen (18). I make this statement under penalty of perjury of the Laws of the United States of America.

Mr. Sutter and his family company own property located in the 1300 block of West Lagoon in Gulf Shores, Alabama. Mr. Sutter asked me to build a pier for him in early 2010 in preparation for building a home. Mr. Sutter told me he could not build the home until some of his other property sold. So, I had to get a variance from the City of Gulf Shores to build Mr. Sutter's pier. I was asked during the meeting on March 30, 2010 when Mr. Sutter planned to build his house, and I told the City that he intended to build this summer. I gave Mr. Sutter the quote attached hereto in April 2010, and he agreed to start building, once the sale of his other property closed. Mr. Sutter has told me the buyer for the other property has now refused to close because of the oil spill, and he cannot afford to build the home now, even though I completed the Pier for him.

I declare under penalty of perjury of the Laws of the United States of America that the foregoing is true and correct.

Kevin Noe

6-23-2010

Cornerstone Construction

# Estimate

P. O. Box 179
Orange Beach,, AL 36561
Office 251-981-9995
Fax   251-981-9996

| Date | Estimate # |
|---|---|
| 4/12/2010 | 210 |

**Name / Address**

Luther Sutter
310 W. Conway
Benton, AR 72035
W: 501-224-1050 F:501-315-1916
1334 W. Lagoon Av

| Item | Description | Total |
|---|---|---|
| Crowne & Chair | 2 piece crown in both master bedroom & baths - downstairs foyer - kitchen - family rooms - one piece crown upstairs bedrooms and baths | 3,000.00 |
| Custom Built Closets | Custom built closets | 1,000.00 |
| Electrical Fixtures | **Allowance** | 8,000.00 |
| Electrical Labor | SET OUTSIDE SERVICE - POOL POWER - UNDERGROUND - GRINDER - TRIM OUT | 13,900.00 |
| Heat and Air | SET UNITS 2 trane 18 seer | 14,300.00 |
| Plumbing Labor | rough in slab - house - trim out fixtures - underground water line - sewer | 14,680.00 |
| Plumbing Fixtures | ALLOWANCE | 8,000.00 |
| Grinder Pump | GRINDER AND WATER TO ROAD AND HOOK UP | 3,000.00* |
| Alarm System | **Allowance** | 1,500.00 |
| Audio System | Nothing figured **add $$$ if needed** | 2,500.00 |
| Cabinets | PROVIDED BY OWNER & INSTALLED BY CONTRACTOR | 20,800.00 |
| Counter Tops | granite  ALLOWANCE | 5,000.00 |
| Appliances | down draft stove - washer - dryer - ice machine - refrigator - microwave - dishwasher - mini referigator ect.  **Allowance** | 9,000.00 |
| Flooring | hardwood - tile carpet - labor & materials ** Allowance**  could vary due to flooring selection | 18,000.00 |
| Tile Shower | Master shower tile labor & materials | 3,000.00 |
| Tile | Tile around whirlpool baths labor & materials | 1,000.00 |
| Tile | Tile upper porch | 850.00 |
| Waterproofing | Under flooring of the up stairs deck area | 600.00 |
| Hardware | door knobs - deadbolts ect. | 1,000.00 |
| Hardware Install | Estimate Labor-Knobs, Handles, Hinges, Accessories etc... | 200.00 |
| mirrors | estimated | 500.00 |
| Shower Door | estimated | 850.00 |
| Bath Accessories | Allowance | 300.00 |
| Bath Access Installation | Towel bar - paper holder - ect. | 100.00 |
| Punch Out | | 500.00 |
| Clean Final | | 800.00 |
| Vents (Dryer, Fan,stove etc...) | dryer vents - stove vents - bath vents | 350.00 |
| Miscellaneous | you should consider a buffer for here if needed | 5,000.00 |
| Landscaping | minor land scaping allowed | 2,500.00 |
| pool | figured into bid | 24,500.00 |
| Boardwalk | from pool across wetlands to peir | 5,650.00 |
| Profit & Overhead | 16% = 8% overhead & 8% profit | 54,085.00 |
| | 2,611 s/f  s/f of total heat & cooled area = $150.17 per s/f | |

| CALL IF YOU HAVE ANY QUESTIONS | **Total** | |
|---|---|---|



Page 2

Cornerstone Construction

P. O. Box 179
Orange Beach,, AL 36561
Office 251-981-9995
Fax    251-981-9996

# Estimate

| Date | Estimate # |
|------|-----------|
| 4/12/2010 | 210 |

| Name / Address |
|----------------|
| Luther Sutter |
| 310 W. Conway |
| Benton, AR 72035 |
| W: 501-224-1050 F:501-315-1916 |
| 1334 W. Lagoon Av |

| Item | Description | Total |
|------|-------------|-------|
| Permits & Fees | Building permit & Impact Fee | |
| Start-Up Draw | | 6,500.00 |
| Electrical Tap | Deposit for power at new house | 1,000.00 |
| Temp Power | Set up for temp power during construction | 50.00 |
| Survey | Boundary - final - elevation cert. - stake out | 250.00 |
| Dumpster | | 1,500.00 |
| Port a Potty | | 1,000.00 |
| Silt Fence | to protect water run off and construction debris | 550.00 |
| Excavation | | 200.00 |
| Dirt or Fill for land | White sand only to fill in  **estimated** | 2,000.00 |
| Layout | | 3,000.00 |
| Piling Labor | Set Pilings 32 x $150.00 + backhoe & set up | 250.00 |
| Tractor Work | Estimate-Tractor Time | 8,600.00 |
| Gravel | 3 loads of crushed limestone - 2 loads of 57 mix | 600.00 |
| Slab | | 2,500.00 |
| Slab Labor | | 5,900.00 |
| Pump truck | If needed | 2,800.00 |
| Extermination | .20 per s/f | 900.00 |
| Building Materials | Estimated to the best of our ability's **(Will vary from actual cost)** | 500.00 |
| | Lumbar - plywood - beams - floor trusses - pilings - decking - nails - bolts - straps - interior trim - doors - windows - drywall - siding - ect.  ect. | 39,500.00 |
| Frame Labor | Frame labor - build ALL decks - EXTERIOR stairs - ALL underpinning -ALL  porch ceilings  - tiki bar - strapping 1st floor system - bolting pilings - X bracing - FIRST FLOOR FRAMING OF FLOOR AREA ABOVE PILINGS ect. ect.  ( DOES NOT INCLUDE THE FRAMING OF 1 & 2ND STORY WALLS - 2ND STORY FLOOR SYSTEM - INTERIOR STAIRS - ANY ROOF FRAMING - SOFFETTS - SIDING - EXTERIOR TRIM - HANDRAILS - | 28,500.00 |
| Equipment Rental | CRANE ESTIMATE | |
| Misc. Carpentry | For what ever is needed ** may or may not be used** | 1,500.00 |
| Handrail | aluminum handrails and screen porch up stairs master deck  *** ALLOWANCE *** Estimated | 1,500.00 |
| Roof Labor & Materials | | 10,000.00 |
| Insulation | R - 38 in attic - R 19 UNDER 1ST FLOOR - r 19 in walls | 12,230.00 |
| Drywall Labor | Orange peel finish ceilings & walls | 3,320.00 |
| Paint Ext | Hardy siding - Gables - Porch ceilings - underpinning - soffetts - ect. | 6,850.00 |
| Paint Int | Walls - Ceilings - trim - Doors - Steps - closet shelving - ect. ect. | 6,300.00 |
| Trim Labor | Set doors - base - aprons - wrap windows | 14,200.00 |
| Stairs | | 4,000.00 |
| | | 1,650.00 |

CALL IF YOU HAVE ANY QUESTIONS

| Total | |
|-------|--|



Page 1

Cornerstone Construction

P. O. Box 179
Orange Beach,, AL 36561
Office 251-981-9995
Fax    251-981-9996

# Estimate

| Date | Estimate # |
|------|-----------|
| 4/12/2010 | 210 |

**Name / Address**

Luther Sutter
310 W. Conway
Benton, AR 72035
W: 501-224-1050 F:501-315-1916
1334 W. Lagoon Av

| Item | Description | Total |
|------|-------------|-------|
| | 257 s/f storage + 253 + 477 + 94 verandas = 1,081 s/f + 2,611 = 3,692 s/f total built space =            $106.20 per s/f 1,848 s/f parking area + 2,611 s/f heat & cooled + 1,081 s/f storage & verandas = 5,540 total built space =          $70.77  per s/f | |

| CALL IF YOU HAVE ANY QUESTIONS | **Total** | $392,115.00 |
|---|---|---|

Page 2

Rx Date/Time          JUL-12-2010(MON) 15:53                        P. 001
Jul 12 10 04:22p                                                        p.1

## Edgewater 1 & 2

| Date: | Name: | Amt PD | Amt Due: |
|---|---|---|---|
| 5/29-6/5 | | | $4506.60 |
| 6/5-6/12 | Armstrong | $3000.00 | |
| 6/12-6/19 | Henry | $3951.60 | |
| 6/19-6/26 | DuCharme | $4062.60 | |
| 6/26-7/3 | Streuber | $4062.60 | cancelled |
| 7/3-7/10 | White | $4062.60 | |
| 7/10-7/17 | Bock | $ 600.00 | $3462.60 |
| 7/17-7/24 | Crabb | $ 600.00 | ($3462.60) |
| 7/24-7/31 | Connally | $4062.60 | |
| 7/31-8/7 | Nichols/Lutes | $600.00 | $3029.70 |

# Decked Out 3 & 4 weeks

| | Date: | Name: | Amt PD | Amt Due: |
|---|---|---|---|---|
| □ | 5/29-6/5 | Sutter | | |
| □ | 6/5-6/12 | Robinson | | $6371.40 |
| □ | 6/12-6/19 | Sommer | $5927.40 | came |
| □ | 6/19-6/26 | Hedenberg | $6371.40 | came |
| □ | 6/26-7/3 | Nash | | $6371.40 |
| □ | 7/3-7/10 | Tucker | $5927.40 | came |
| □ | 710-7/17 | Wright | $4706.40 | came |
| □ | 7/17-7/24 | Gaston | | $6371.40 |
| □ | 7/25-8/1 | Patterson | $ 600.00 | $5771.40 |

Rx Date/Time     JUL-12-2010(MON) 15:53                          P.003
Jul 12 10 04:22p                                                    p.3

## Seabreeze:

| | Date: | Name: | Amt PD | Amt Due: |
|---|---|---|---|---|
| □ | 5/29-6/5 | Townsend | $2852.70 | |
| □ | 6/5-6/12 | Puckett | $2852.70 | |
| □ | 6/12-6/19 | Auciello | $2852.70 | |
| □ | 6/19-6/26 | Flesch | $1300.00 | $1200.00 |
| □ | 6/26-7/3 | Gibson | | $3074.70 |
| □ | 7/3-7/10 | Gibson | | $3074.70 |
| □ | 7/10-7/17 | Boyd | $2747.25 | Cancelled |
| □ | 7/17-7/24 | Vasquez | $2686.20 | |
| □ | 7/24-7/31 | Belknap | $ 600.00 | $2030.70 |
| □ | 7/31-8/7 | Chandler   NC | $ 300.00 | $1964.70 |

## Suncather:

| | Date: | Name: | Amt PD | Amt Loss: |
|---|---|---|---|---|
| □ | 5/29-6/5 | Townsend | $2852.70 | |
| □ | 6/5-6/12 | Puckett | $2852.70 | |
| □ | 6/12-6/19 | Auciello | $2852.70 | |
| □ | 6/19-6/26 | Flesch | $ 300.00 | $2200.00 |
| □ | 6/26-7/3 | Gibson | | $3074.70 |
| □ | 7/3-7/10 | Gibson | | $3074.70 |
| □ | 7/10-7/17 | Boyd | $2747.25 | Cancelled |
| □ | 7/17-7/24 | Vasquez | $2686.20 | |
| □ | 7/24-7/31 | Belknap | $1200.00 | $1430.70 |
| □ | 7/31-8/7 | Chandler | $ 300.00 | $1964.70 |

## SWORN DECLARATION

COMES Bill Whitmore who, under penalty of perjury of the Laws of the United States of America, declares as follows:

My name is Bill Whitmore, and I am over the age of eighteen (18). I make this statement under penalty of perjury of the Laws of the United States of America.

Mr. Sutter owns two duplexes on West Lagoon in Gulf Shores, Alabama. I am Mr. Sutter's banker, and I work at Simmons First. Mr. Sutter has several loans with my bank, and I have known him for several years. In fact, while working at another Bank, I financed the construction of Decked Out for him. In March of 2010, Mr. Sutter contacted me and told me that he had a buyer for some of his property in Gulf Shores, AL. He told me that he intended to apply some of those proceeds to decrease his interest costs. Mr. Sutter is presently paying A rate of 7.5 % in interest.

I declare under penalty of perjury of the Laws of the United States of America that the foregoing is true and correct.

Bill Whitmore

Bill Whitmore

501-771-5310

MAR. 9. 2011  3:17PM   CIRCUIT COURT BILOXI                          NO. 114   P. 2

IN THE CIRCUIT COURT OF HARRISON COUNTY, MISSISSIPPI
FIRST JUDICIAL DISTRICT

THE PEOPLES BANK, BILOXI, MISSISSIPPI                              PLAINTIFF

VS.                                     CIVIL ACTION NO. A2402 2011 12

GP DEVELOPMENT GROUP, LLC,
MICHAEL E. EARL, ROGER L. RAMSEY,
LARRY L. SEWARD, JR., D. CLAYTON HENDRIX,
and LUTHER SUTTER                                                 DEFENDANTS

## COMPLAINT

COMES NOW, the Plaintiff, The Peoples Bank, Biloxi, Mississippi ("Peoples Bank"), and

files its Complaint against Defendants GP Development Group, LLC, Michael E. Earl, Roger L.

Ramsey, Larry L. Seward, Jr., D. Clayton Hendrix, and Luther Sutter, as follows:

### PARTIES

1.  Plaintiff, Peoples Bank, is a Mississippi banking institution, with its principal place of

business in Biloxi, Mississippi.

2.  GP Development Group, LLC ("GP"), is a Mississippi limited liability company and can be

served with process on its registered agent, Charles McKellar, 910 Desoto Ave., Ocean

Springs, Mississippi, 39564.

3.  Michael E. Earl ("Earl") is a resident of Kansas and can be served with process at 4800

College Boulevard, Overland Park, Kansas, 66211.

4.  Roger L. Ramsey ("Ramsey") is a resident of Nevada and can be served with process at 8912

Canyon Springs Drive, Las Vegas, Nevada, 89117.

5.  Larry L. Seward, Jr. ("Seward") is a resident of Kansas and can be served with process at

1130 South 200th Street, Pittsburg, Kansas, 66762.

1

MAR. 9. 2011 3:17PM   CIRCUIT COURT BILOXI                     NO. 114   P. 3

6.    D. Clayton Hendrix ("Hendrix") is a resident of Arizona and can be served with process at
      #1 Carwin Drive, Benton, Arkansas, 72015.

7.    Luther Sutter ("Sutter") is a resident of Arizona and can be served with process at 310
      Natural Resources Drive, Little Rock, Arkansas, 72205.

## JURISDICTION

8.    This Court has jurisdiction of this action pursuant to Miss. Code Ann. § 9-7-81.

9.    All applicable agreements were entered into in Harrison County, Mississippi.

10.   The property that partially secured repayment of indebtedness to Peoples Bank is located in
      First Judicial District, Harrison County, Mississippi.

11.   Venue is proper in this Court pursuant to Miss. Code Ann. § 11-11-3.

## INTRODUCTION

12.   Pursuant to a Promissory Note dated April 19, 2007, Peoples Bank loaned GP Two Million
      Eight Hundred Seventy-one Three Hundred Sixty and 00/100 Dollars ($2,871,360.00),
      secured in part by a Deed of Trust on certain real property in Harrison County, Second
      Judicial District, Mississippi. As additional security, Earl, Ramsey, Seward, Hendrix, and
      Sutter each executed, in favor of Peoples Bank, a Guaranty as to the indebtedness of GP due
      Peoples Bank. GP defaulted, Peoples Bank foreclosed, and Peoples Bank seeks collection
      of the balance of the indebtedness owed to it.

## FACTS

13.   On or about April 19, 2007, GP executed a Promissory Note in favor of Peoples Bank
      ("Note"), which said Note refinanced certain loan indebtedness due Peoples Bank, in the
      principal amount of Two Million Eight Hundred Seventy-one Three Hundred Sixty and
      00/100 Dollars ($2,871,360.00). As partial security for repayment of the indebtedness due

2

Peoples Bank, GP executed a Deed of Trust in favor of Peoples Bank, which is recorded as Instrument No. 2007-8841t-JI.  *See* GP Promissory Note and Deed of Trust attached as Exhibit "A".

14.   As additional security for repayment of the indebtedness, on or about April 19, 2007 Earl, Ramsey, Seward, Hendrix, and Sutter each executed a Guaranty in favor of Peoples Bank wherein Earl, Ramsey, Seward, Hendrix, and Sutter each guaranteed payment of the indebtedness due Peoples Bank arising under the Note. (Earl, Ramsey, Seward, Hendrix, and Sutter are collectively referred to herein as "Guarantors") *See* Guaranty Agreements attached as Exhibits "B", "C", "D", "E", and "F".

15.   That GP failed to make payment of principal and interest due under the Note.  As such, GP defaulted under its obligations under the Note and Deed of Trust.

16.   On November 5, 2010, Peoples Bank exercised its rights under the Deed of Trust and foreclosed on the real property that partially secured repayment of the indebtedness under the Note.  The real property was struck off to Peoples Bank for less than the principal amounts an indebtedness under the Note, which said Deed of Trust secured.

17.   As of November 10, 2010, a principal balance in the amount of $1,297,519.74 remains unpaid.

18.   GP remains in default, and neither GP nor any of the loan Guarantors have paid any of the deficiency due and owing to Peoples Bank.

### COUNT 1 - Collection on Note and Deed of Trust from GP

19.   Peoples Bank incorporates each and every allegation set forth above.

20.   GP and the Guarantors of GP's indebtedness have failed to make payment of the remaining indebtedness due Peoples Bank under the Note.

3

MAR. 9. 2011 3:17PM  CIRCUIT COURT BILOXI                    NO. 114   P. 5

21.    Pursuant to the Note and Deed of Trust, Peoples Bank is entitled to an award of its
       reasonable attorneys' fees and costs in bringing this action and in collecting the indebtedness
       due it.

22.    Pursuant to the Note and Deed of Trust, Peoples Bank demands payment from GP in an
       amount equal to remaining outstanding principal, accrued interest, costs of collection and
       foreclosure, and attorneys' fees incurred in the collection attempts and the foreclosure.

## COUNT II - Collection on Guarantys of Debts for GP

23.    Peoples Bank incorporates each and every allegation set forth above.

24.    Earl is in default under his obligations due Peoples Bank as set forth in the Guaranty he
       executed in which he guaranteed payment of the indebtedness due Peoples Bank under the
       Note.

25.    Ramsey is in default under his obligations due Peoples Bank as set forth in the Guaranty he
       executed in which he guaranteed payment of the indebtedness due Peoples Bank under the
       Note.

26.    Seward is in default under his obligations due Peoples Bank as set forth in the Guaranty he
       executed in which he guaranteed payment of the indebtedness due Peoples Bank under the
       Note.

27.    Hendrix is in default under his obligations due Peoples Bank as set forth in the Guaranty he
       executed in which he guaranteed payment of the indebtedness due Peoples Bank under the
       Note.

28.    Sutter is in default under his obligations due Peoples Bank as set forth in the Guaranty he
       executed in which he guaranteed payment of the indebtedness due Peoples Bank under the
       Note.

4

29.  GP and the Guarantors of GP's indebtedness have failed to make payment of the remaining indebtedness due Peoples Bank under the Note.

30.  Pursuant to the Note and Deed of Trust, Peoples Bank is entitled to an award of its reasonable attorneys' fees and costs in bringing this action and in collecting the indebtedness due it.

31.  Pursuant to the Note and Deed of Trust, Peoples Bank demands payment from GP in an amount equal to remaining outstanding principal, accrued interest, costs of collection and foreclosure, and attorneys' fees incurred in the collection attempts and the foreclosure.

WHEREFORE, PREMISES CONSIDERED, Peoples Bank demands judgment of and from GP, Earl, Ramsey, Seward, Hendrix, and Sutter in the amount of remaining outstanding principal, accrued interest through the date of judgment herein, reasonable attorneys' fees, the costs of foreclosure, and the costs of bringing this litigation.

THE PEOPLES BANK, BILOXI, MISSISSIPPI

BY: _____
David M. Allen

OF COUNSEL: .
DAVID M. ALLEN (MS Bar No. 01355)
Page, Mannino, Peresich & McDermott, PLLC
P.O. Drawer 289
Biloxi, MS 39533
228-374-2100 Telephone
228-432-5539 Facsimile

MAR. 9. 2011  3:17PM     CIRCUIT COURT BILOXI                    _NO. 114____P. 7_

**COVER SHEET**
**Civil Case Filing Form**
*(To be completed by Attorney/Party Prior to Filing of Pleading)*

Mississippi Supreme Court
Administrative Office of Courts

Form AOC/01
(Revised 1/1/2001)

Court Identification
Docket Number: 2 4 8 1 5 3
County# / Judicial Court ID
District (CH, CI, CO): 0 1 / 2 1 / 0

Case Year: 2 0 1 1

Docket Number: 7 7 1 7 2
Local Docket ID

Month / Date / Year

This area to be completed by clerk.

Case Number if filed prior to 1/1/94

IN THE CIRCUIT COURT OF HARRISON COUNTY

Short Style of Case: THE PEOPLES BANK, BILOXI, MISSISSIPPI V. OP DEVELOPMENT GROUP, LLC, ET AL

Party Filing Initial Pleading: Type/Print Name  DAVID M. ALLEN, ESQ.          MS Bar No. 01355

_____ Check (✓) if Not an Attorney      _____ Check (✓) if Pro Hac Vice    Signature _____ D. Allen _____

Compensatory Damages Sought: $ _____   Punitive Damages Sought: $ _____

Is Child Support contemplated as an issue in this suit?  _____ Yes  _✓_ No   If "yes", please submit a completed Child Support Information Sheet with Final Decree/Judgment

PLAINTIFF - PARTY(IES) INITIALLY BRINGING SUIT SHOULD BE ENTERED FIRST (FIRST NAME IN SHORT STYLE) - ENTER ADDITIONAL PLAINTIFFS ON SEPARATE FORM

Individual _____  (_____)
        Last Name              First Name          Maiden Name, if Applicable    Middle Init.    Jr/Sr/III/IV

Address of Plaintiff _____

_____ Check (✓) if Individual Plaintiff is acting in capacity as Executor(trix) or Administrator(trix) of an Estate, and enter style:
        Estate of _____

_____ Check (✓) if Individual Plaintiff is acting in capacity as Business Owner/Operator (d/b/a) or State Agency, and enter entity:
        D/B/A / Agency _____

Business  THE PEOPLES BANK, BILOXI, MISSISSIPPI, 152 LAMEUSE ST., BILOXI, MS 39532
        Enter legal name of business, corporation, partnership, agency - if Corporation, indicate state where incorporated

_____ Check (✓) if Business Plaintiff is filing suit in the name of an entity other than the above, and enter below:
        D/B/A: _____

DEFENDANT - NAME OF DEFENDANT (FIRST NAME IN SHORT STYLE) - ENTER ADDITIONAL DEFENDANTS ON SEPARATE FORM

Individual _____  (_____)
        Last Name              First Name          Maiden Name, if Applicable    Middle Init.    Jr/Sr/III/IV

_____ Check (✓) if Individual Defendant is acting in capacity as Executor(trix) or Administrator(trix) of an Estate, and enter style:
        Estate of _____

_____ Check (✓) if Individual Defendant is acting in capacity as Business Owner/Operator (d/b/a) or State Agency, and enter entity:
        D/B/A / Agency _____

Business  OP DEVELOPMENT GROUP, LLC, A MISSISSIPPI LLC, 910 DESOTO AVE., OCEAN SPRINGS, MS 39564
        Enter legal name of business, corporation, partnership, agency - if Corporation, indicate state where incorporated

_____ Check (✓) if Business Defendant is being sued in the name of an entity other than the above, and enter below:
        D/B/A: _____

ATTORNEY FOR THIS DEFENDANT: _____ Bar No. _____ or   Name: _____          Pro Hac Vice (✓) _____
        (if known)

In left hand column, check one (1) box that best describes the nature of this suit. In right hand column check all boxes which indicate secondary claims.

**Business/Commercial**
- [ ] Accounting (Business)
- [ ] Bankruptcy
- [ ] Business Dissolution - Corporation
- [ ] Business Dissolution - Partnership
- [✓] Debt Collection
- [ ] Employment
- [ ] Examination of Debtor
- [ ] Execution
- [ ] Foreign Judgment
- [ ] Garnishment
- [ ] Pension
- [ ] Receivership
- [ ] Replevin
- [ ] Stockholder Suit
- [ ] Other _____

**Domestic Relations**
- [ ] Child Custody/Visitation
- [ ] Child Support
- [ ] Contempt
- [ ] Divorce: Fault
- [ ] Divorce: Irreconcilable Differences
- [ ] Domestic Abuse
- [ ] Emancipation
- [ ] Modification
- [ ] Paternity
- [ ] Property Division
- [ ] Separate Maintenance
- [ ] Termination of Parental Rights
- [ ] URESA (formerly URESA)
- [ ] Other _____

**Contract**
- [ ] Breach of Contract
- [ ] Installment Contract
- [ ] Insurance
- [ ] Product Liability under Contract
- [ ] Specific Performance
- [ ] Other _____

**Probate**
- [ ] Accounting (Probate)
- [ ] Birth Certificate Correction
- [ ] Commitment
- [ ] Conservatorship
- [ ] Guardianship
- [ ] Heirship
- [ ] Intestate Estate
- [ ] Minor's Settlement
- [ ] Muniment of Title
- [ ] Name Change
- [ ] Power of Attorney
- [ ] Testate Estate
- [ ] Will Contest
- [ ] Other _____

**Statutes/Rules**
- [ ] Bond Validation
- [ ] Civil Forfeiture
- [ ] Declaratory Judgment
- [ ] ERISA
- [ ] Eminent Domain
- [ ] Extraordinary Writ
- [ ] Federal Statutes
- [ ] Injunction or Restraining Order
- [ ] Municipal Annexation
- [ ] Racketeering (RICO)
- [ ] Railroad
- [ ] Seaman
- [ ] Other _____

**Appeals**
- [ ] Administrative Agency
- [ ] County Court
- [ ] Hardship Petition (Driver License)
- [ ] Justice Court
- [ ] MS Employee Security Comm'n
- [ ] Municipal Court
- [ ] Oil & Gas Board
- [ ] Workers' Compensation
- [ ] Other _____

**Children and Minors - Non-Domestic**
- [ ] Adoption - Noncontested
- [ ] Consent to Abortion for Minor
- [ ] Removal of Minority
- [ ] Other _____

**Torts-Personal Injury**
- [ ] Bad Faith
- [ ] Fraud
- [ ] Loss of Consortium
- [ ] Malpractice - Legal
- [ ] Malpractice - Medical
- [ ] Negligence - General
- [ ] Negligence - Motor Vehicle
- [ ] Products Liability
- [ ] Wrongful Death
- [ ] Other _____

**Mass Tort**
- [ ] Asbestos
- [ ] Chemical Spill
- [ ] Dioxin
- [ ] Hand/Arm Vibration
- [ ] Hearing Loss
- [ ] Radioactive Materials
- [ ] Other _____

**Real Property**
- [ ] Adverse Possession
- [ ] Ejectment
- [ ] Eminent Domain
- [ ] Judicial Foreclosure
- [ ] Lien Assertion
- [ ] Partition
- [ ] Receiver Appointment
- [ ] Tax Sale: Confirm/Cancellation
- [ ] Title, Boundary &/or Easement
- [ ] Other _____

**Civil Rights**
- [ ] Elections
- [ ] Habeas Corpus
- [ ] Post Conviction Relief
- [ ] Prisoner
- [ ] Other _____

MAR. 9. 2011  3:18PM  CIRCUIT COURT BILOXI                           NO. 114   P. 8

IN THE CIRCUIT _____ COURT OF HARRISON _____ COUNTY, MISSISSIPPI

Second JUDICIAL DISTRICT, CITY OF: Biloxi

Docket No. 2011 - 18 _____ 242 _____        Docket No. If Filed
              File Yr   Chronological No.   Clerk's Local ID      Prior to 1/1/94.

### DEFENDANTS IN REFERENCED CAUSE - Page 1 of 2 Defendants Pages
### IN ADDITION TO DEFENDANT SHOWN ON CIVIL CASE FILING FORM COVER SHEET

**Defendant #2:**

Individual: EARL _____ MICHAEL _____ ( _____ ) _____ _____
              Last Name              First Name              Maiden Name, If Applicable   Middle Init.   Jr/Sr/III/IV

___Check (✓) if Individual Defendant is acting in capacity as Executor(trix) or Administrator(trix) of an Estate, and enter style:
   Estate of _____

___Check (✓) if Individual Defendant is acting in capacity as Business Owner/Operator (D/B/A) or State Agency, and enter that name below:
   D/B/A _____

Business 4800 COLLEGE BLVD., OVERLAND PARK, KS 66211
              Enter legal name of business, corporation, partnership, agency - if Corporation, indicate state where incorporated

___Check (✓) if Business Defendant is being sued in the name of an entity other than the name above, and enter below:
   D/B/A _____

ATTORNEY FOR THIS DEFENDANT: _____ Bar # or Name: _____ Pro Hac Vice (✓)___ Not an Attorney(✓)___

**Defendant #3:**

Individual: RAMSEY _____ ROGER _____ ( _____ ) L _____
              Last Name              First Name              Maiden Name, If Applicable   Middle Init.   Jr/Sr/III/IV

___Check (✓) if Individual Defendant is acting in capacity as Executor(trix) or Administrator(trix) of an Estate, and enter style:
   Estate of _____

___Check (✓) if Individual Defendant is acting in capacity as Business Owner/Operator (D/B/A) or State Agency, and enter that name below:
   D/B/A _____

Business 8912 CANYON SPRINGS DR., LAS VEGAS, NV 89117
              Enter legal name of business, corporation, partnership, agency - if Corporation, indicate state where incorporated

___Check (✓) if Business Defendant is being sued in the name of an entity other than the name above, and enter below:
   D/B/A _____

ATTORNEY FOR THIS DEFENDANT: _____ Bar # or Name: _____ Pro Hac Vice (✓)___ Not an Attorney(✓)___

**Defendant #4:**

Individual: SEWARD _____ LARRY _____ ( _____ ) L _____ JR _____
              Last Name              First Name              Maiden Name, If Applicable   Middle Init.   Jr/Sr/III/IV

___Check (✓) if Individual Defendant is acting in capacity as Executor(trix) or Administrator(trix) of an Estate, and enter style:
   Estate of _____

___Check (✓) if Individual Defendant is acting in capacity as Business Owner/Operator (D/B/A) or State Agency, and enter that name below:
   D/B/A _____

Business 1130 SOUTH 200TH ST., PITTSBURG, KS 66762
              Enter legal name of business, corporation, partnership, agency - if Corporation, indicate state where incorporated

___Check (✓) if Business Defendant is being sued in the name of an entity other than the above, and enter below:
   D/B/A _____

ATTORNEY FOR THIS DEFENDANT: _____ Bar # or Name: _____ Pro Hac Vice (✓)___ Not an Attorney(✓)___

MAR. 9. 2011  3:18PM    CIRCUIT COURT BILOXI                      NO. 114   P. 9

IN THE CIRCUIT        COURT OF HARRISON       COUNTY, MISSISSIPPI
Second JUDICIAL DISTRICT, CITY OF Biloxi

Docket No. 2011 - 12 - 842        Docket No. If Filed
　　FBs Yr　Chronological No.　Clerk's Local ID      Prior to 1/1/94 _____

DEFENDANTS IN REFERENCED CAUSE · Page 2 of 2 Defendants Pages
IN ADDITION TO DEFENDANT SHOWN ON CIVIL CASE FILING FORM COVER SHEET

**Defendant # 5 :**

Individual: HENDRIX _____ D. CLAYTON _____ ( _____ ) ____ ____
　　　　　　Last Name　　　First Name　　　　Maiden Name, if Applicable　Middle Init.　Jr/Sr/II/IV
__Check (✓) if Individual Defendant is acting in capacity as Executor(trix) or Administrator(trix) of an Estate, and enter style:
　Estate of _____
__Check (✓) if Individual Defendant is acting in capacity as Business Owner/Operator (D/B/A) or State Agency, and enter that name below:
　D/B/A _____
Business #1 CARWIN DR., BENTON, AR 72015
　　　　Enter legal name of business, corporation, partnership, agency - if Corporation, indicate state where incorporated
__Check (✓) if Business Defendant is being sued in the name of an entity other than the name above, and enter below:
　D/B/A _____
ATTORNEY FOR THIS DEFENDANT: _____ Bar # or Name: _____ Pro Hac Vice___ Not an Attorney(✓)___

**Defendant # 6 :**

Individual: SUTTER _____ LUTHER _____ ( _____ ) ____ ____
　　　　　　Last Name　　　First Name　　　　Maiden Name, if Applicable　Middle Init.　Jr/Sr/II/IV
__Check (✓) if Individual Defendant is acting in capacity as Executor(trix) or Administrator(trix) of an Estate, and enter style:
　Estate of _____
__Check (✓) if Individual Defendant is acting in capacity as Business Owner/Operator (D/B/A) or State Agency, and enter that name below:
　D/B/A _____
Business 310 NATURAL RESOURCES DR., LITTLE ROCK, AR 72205
　　　　Enter legal name of business, corporation, partnership, agency - if Corporation, indicate state where incorporated
__Check (✓) if Business Defendant is being sued in the name of an entity other than the name above, and enter below:
　D/B/A _____
ATTORNEY FOR THIS DEFENDANT: _____ Bar # or Name: _____ Pro Hac Vice (✓)___ Not an Attorney(✓)___

**Defendant # ___ :**

Individual: _____ _____ _____ ( _____ ) ____ ____
　　　　　　Last Name　　　First Name　　　　Maiden Name, if Applicable　Middle Init.　Jr/Sr/II/IV
__Check (✓) if Individual Defendant is acting in capacity as Executor(trix) or Administrator(trix) of an Estate, and enter style:
　Estate of _____
__Check (✓) if Individual Defendant is acting in capacity as Business Owner/Operator (D/B/A) or State Agency, and enter that name below:
　D/B/A _____
Business _____
　　　　Enter legal name of business, corporation, partnership, agency - if Corporation, indicate state where incorporated
__Check (✓) if Business Defendant is being sued in the name of an entity other than the name above, and enter below:
　D/B/A _____
ATTORNEY FOR THIS DEFENDANT: _____ Bar # or Name: _____ Pro Hac Vice (✓)___ Not an Attorney(✓)___

File No. 0012350 Page #1



**APPRAISAL OF REAL PROPERTY**

**LOCATED AT:**
1328 West Lagoon Avenue
Unit B (East), Sunrise Lagoon
Gulf Shores, AL 36542

**FOR:**
Luther Sutter
P.O. Box 2012
Benton, AR 72018

**AS OF:**
11/30/2010

**BY:**
Andrew D. Wilcoxon
Bufkin Appraisal Company
Post Office Box 2777
Gulf Shores, Alabama 36547
(251) 968-8235

Bulkin Appraisal Company

File No. 0012330 Page #2

## Individual Condominium Unit Appraisal Report

ADW12330
File # 0012330

The purpose of this summary appraisal report is to provide the lender/client with an accurate, and adequately supported, opinion of the market value of the subject property.

| | |
|---|---|
| Property Address 1328 West Lagoon Avenue | Unit # B   City Gulf Shores   State AL   Zip Code 36542 |
| Borrower N/A | Owner of Public Record Luther Sutter   County Baldwin |
| Legal Description  Unit B (East), Sunrise Lagoon | |
| Assessor's Parcel #  67-06-24-4-000-018.002-902 | Tax Year 2010   R.E. Taxes $ 1,023.66 |
| Project Name  Sunrise Lagoon | Phase #  N/A   Map Reference  Slide 2150-D   Census Tract 114.04 |
| Occupant ☒ Owner ☐ Tenant ☐ Vacant | Special Assessments $  Unknown   HOA $ Assess ☒ per year ☐ per month |
| Property Rights Appraised ☒ Fee Simple ☐ Leasehold ☐ Other (describe) | |
| Assignment Type ☐ Purchase Transaction ☐ Refinance Transaction ☒ Other (describe) Legal Purposes | |
| Lender/Client  Luther Sutter | Address  P.O. Box 2012, Benton, AR 72018 |

Is the subject property currently offered for sale or has it been offered for sale in the twelve months prior to the effective date of this appraisal?   ☐ Yes ☒ No
Report data source(s) used, offering price(s), and date(s).   According to the Baldwin County MLS, the subject is not currently listed and has not been listed within the past twelve months.

I ☐ did ☐ did not analyze the contract for sale for the subject purchase transaction. Explain the results of the analysis of the contract for sale or why the analysis was not performed.  N/A

Contract Price $ N/A   Date of Contract N/A   Is the property seller the owner of public record?  ☐ Yes ☐ No  Data Source(s)  N/A
Is there any financial assistance (loan charges, sale concessions, gift or downpayment assistance, etc.) to be paid by any party on behalf of the borrower?   ☐ YES ☐ NO
If Yes, report the total dollar amount and describe the items to be paid.   N/A

Note: Race and the racial composition of the neighborhood are not appraisal factors.

| Neighborhood Characteristics | | Condominium Unit Housing Trends | | Condominium Housing | | Present Land Use % | |
|---|---|---|---|---|---|---|---|
| Location ☐ Urban ☒ Suburban ☐ Rural | Property Values ☐ Increasing ☒ Stable ☒ Declining | | PRICE | AGE | One-Unit | 40 % |
| Built-Up ☒ Over 75% ☐ 25-75% ☐ Under 25% | Demand/Supply ☐ Shortage ☒ In Balance ☒ Over Supply | | $ (000) | (yrs) | 2-4 Unit | 10 % |
| Growth ☐ Rapid ☒ Stable ☐ Slow | Marketing Time ☐ Under 3 mths ☐ 3-6 mths ☒ Over 6 mths | | 150 Low | 1-2 | Multi-Family | 40 % |
| Neighborhood Boundaries    The neighborhood is bound on the south by the Gulf of Mexico, the west | | | | 500 High | 25 | Commercial | 10 % |
| by Lagoon Pass, the north by the Little Lagoon, and the east by 11th Street. | | | | 300 Pred. | 10 | Other | % |

Neighborhood Description   The subject is located in a resort neighborhood of Gulf Shores which benefits from its proximity to the Gulf of Mexico and Little Lagoon. Development in this vicinity consists primarily of condominiums and single family dwellings which are utilized as second homes along with scattered small resort related commercial uses.
Market Conditions (including support for the above conclusions)   Until mid-2005, demand exceeded supply and prices increased accordingly. Over the past four years an increased supply along with diminished demand has caused prices to decline. Additionally, the Deepwater Horizon oil spill has caused market apprehension for water-front and water-related properties.

| | |
|---|---|
| Topography Basically level/Part Wet   Size  50' x 329' x 57.93' x 299.6'   Density 2 Units/0.36 Acre +/-   View Good/Lagoon-Gulf | |
| Specific Zoning Classification R-2 | Zoning Description Residential Single Family & Duplex |
| Zoning Compliance ☒ Legal ☐ Legal Nonconforming – Do the zoning regulations permit rebuilding to current density? ☒ Yes ☐ No | |
| ☐ No Zoning ☐ Illegal (describe) | |

Is the highest and best use of subject property as improved (or as proposed per plans and specifications) the present use?   ☒ Yes ☐ No  If No, describe

| Utilities | Public | Other (describe) | | Public | Other (describe) | Off-site Improvements – Type | Public | Private |
|---|---|---|---|---|---|---|---|---|
| Electricity | ☒ | | Water | ☒ | | Street Asphalt | ☒ | ☐ |
| Gas | ☐ | None | Sanitary Sewer | ☒ | | Alley None | ☐ | ☐ |

FEMA Special Flood Hazard Area ☒ Yes ☐ No  FEMA Flood Zone AE   FEMA Map # 01003C1076L   FEMA Map Date 07/17/2007
Are the utilities and off-site improvements typical for the market area?   ☒ Yes ☐ No  If No, describe
Are there any adverse site conditions or external factors (easements, encroachments, environmental conditions, land uses, etc.)?   ☐ Yes ☒ No  If Yes, describe
The attached tax assessor's plat depicts the subject site and location of "Lagoon Sunrise." The subject is one half of a duplex building, which is a condominium unit. This is common for duplex buildings in this market area. According to the site map, the northern portion of the site contains wetlands.
Data source(s) for project information   Probate Records, Condominium Declaration Documents, FEMA Flood Maps, City Zoning Ordinances, etc.
Project Description ☐ Detached ☐ Row or Townhouse ☐ Garden ☐ Mid-Rise ☐ High-Rise ☒ Other (describe) Duplex

| General Description | General Description | Subject Phase | | If Project Completed | | If Project Incomplete | |
|---|---|---|---|---|---|---|---|
| # of Stories  3 | Exterior Walls  ComBrd | # of Units | 2 | # of Phases | 1 | # of Planned Phases | N/A |
| ☒ Existing ☐ Proposed | Roof Surface  Metal | # of Units Completed | 2 | # of Units | 2 | # of Planned Units | N/A |
| ☐ Under Construction | Total # Parking  4 | # of Units for Sale | -0- | # of Units for Sale | -0- | # of Units for Sale | N/A |
| Year Built  2007 | Ratio (spaces/units) 2 | # of Units Sold | 1+/- | # of Units Sold | 1+/- | # of Units Sold | N/A |
| Effective Age  3 Years | Type  Assign | # of Units Rented | 1+/- | # of Units Rented | 1+/- | # of Units Rented | N/A |
| | Guest Parking  Avg | # of Owner Occupied Units | -1- | # of Owner Occupied Units | -1- | # of Owner Occupied Units | N/A |

Project Primary Occupancy ☐ Principle Residence ☒ Second Home or Recreational ☐ Tenant
Is the developer/builder in control of the Homeowners' Association (HOA)?   ☐ Yes ☒ No
Management Group - ☒ Homeowners' Association ☐ Developer ☐ Management Agent - Provide name of management company.

Does any single entity (the same individual, investor group, corporation, etc.) own more than 10% of the total units in the project?   ☒ Yes ☐ No  If Yes, Describe
Both units are owned by one entity.

Was the project created by the conversion of existing building(s) into a condominium?   ☐ Yes ☒ No  If Yes, describe the original use and date of conversion.

Are the units, common elements, and recreation facilities complete (including any planned rehabilitation for a condominium conversion)?   ☒ Yes ☐ No  If No, describe

Is there any commercial space in the project?   ☐ Yes ☒ No  If Yes, describe and indicate the overall percentage of the commercial space.

Form 1073 — "TOTAL for Windows" appraisal software by a la mode, inc. — 1-800-ALAMODE

File No. 0012330| Page #3

## Individual Condominium Unit Appraisal Report

ADW12330
File # 0012330

PROJECT INFORMATION

Describe the condition of the project and quality of construction.   The subject is one-half of a duplex which has good construction quality and appeal.

Describe the common elements and recreational facilities.   Grounds; Driveways; Etc.

Are any common elements leased to or by the Homeowners' Association?  ☐ Yes  ☒ No  If Yes, describe the rental terms and options.

Is the project subject to a ground rent?  ☐ Yes  ☒ No  If Yes, $ N/A   per year (describe terms and conditions)

Are the parking facilities adequate for the project size and type?  ☒ Yes  ☐ No  If No, describe and comment on the effect on value and marketability.   The parking facilities are adequate for the subject project.

I ☐ did  ☒ did not analyze the condominium project budget for the current year. Explain the results of the analysis of the budget (adequacy of fees, reserves, etc.), or why the analysis was not performed.   The condominium association dues are by assessment which is typical for this type of project.

Are there any other fees (other than regular HOA charges) for the use of the project facilities?  ☐ Yes  ☒ No  If Yes, report the charges and describe.   None known

Compared to other competitive projects of similar quality and design, the subject unit charge appears  ☐ High  ☒ Average  ☐ Low  If High or Low, describe

Are there any special or unusual characteristics of the project (based on the condominium documents, HOA meetings, or other information) known to the appraiser?
☐ Yes  ☒ No  If Yes, describe and explain the effect on value and marketability.   To the appraiser's knowledge, there are no adverse conditions within the project's documents which would affect values or marketability. The documents have not been fully reviewed.

Unit Charge $   per month X 12 = $  Assess   per year   Annual assessment charge per year per square feet of gross living area = $
Utilities included in the unit monthly assessment  ☒ None  ☐ Heat  ☐ Air Conditioning  ☐ Electricity  ☐ Gas  ☐ Water  ☐ Sewer  ☐ Cable  ☐ Other (describe)

| General Description | Interior | materials/condition | Amenities | Appliances | Car Storage |
|---|---|---|---|---|---|
| Floor # 1st | Floors | Wood, Cpt, Tile/Gd | ☐ Fireplace(s) # | ☒ Refrigerator | ☐ None |
| # of Levels Two | Walls | Drywall/Good | ☐ WoodStove(s) # | ☒ Range/Oven | ☐ Garage ☒ Covered ☐ Open |
| Heating Type A  Fuel Elec. | Trim/Finish | Deluxe,Wood/Good | ☒ Deck/Patio | ☒ Disp ☒ Microwave | # of Cars  Park Under |
| ☒ Central AC ☐ Individual AC | Bath Wainscot | Tile, FG/Good | ☒ Porch/Balcony | ☒ Dishwasher | ☐ Assigned ☐ Owned |
| ☐ Other (describe) | Doors | HC/Good | ☐ Other | ☒ Washer/Dryer | Parking Space # |
| Finished area above grade contains: | 8 Rooms | 3 Bedrooms | 2.5 Bath(s) | 2,557 Square Feet of Gross Living Area Above Grade | |

Are the heating and cooling for the individual units separately metered?  ☒ Yes  ☐ No  If No, describe and comment on compatibility to other projects in the market area.

Additional features (special energy efficient items, etc.)   9' ceilings; Stainless appliance; Granite counter tops; Separate tub and shower in master bath; Custom tile work; Extensive porches and decking; Etc.
Describe the condition of the property (including needed repairs, deterioration, renovations, remodeling, etc.).   The subject is in good condition with no needed repairs apparent.

Are there any physical deficiencies or adverse conditions that affect the livability, soundness, or structural integrity of the property? ☐ Yes  ☒ No  If Yes, describe
There were no deficiencies or adverse conditions noted from the inspection.

Does the property generally conform to the neighborhood (functional utility, style, condition, use, construction, etc.)?  ☒ Yes  ☐ No  If No, describe
The subject does conforms to the neighborhood.

I ☐ did  ☒ did not research the sale or transfer history of the subject property and comparable sales. If not, explain

My research ☐ did  ☒ did not reveal any prior sales or transfers of the subject property for the three years prior to the effective date of this appraisal.
Data source(s)   Baldwin County Multiple Listing Service/Baldwin County Probate Records/Real Estate Activity Reporting System
My research ☒ did  ☐ did not reveal any prior sales or transfers of the comparable sales for the year prior to the date of sale of the comparable sale.
Data source(s)   Baldwin County Multiple Listing Service/Baldwin County Probate Records/Real Estate Activity Reporting System
Report the results of the research and analysis of the prior sale or transfer history of the subject property and comparable sales (report additional prior sales on page 3).

| ITEM | SUBJECT | COMPARABLE SALE #1 | COMPARABLE SALE #2 | COMPARABLE SALE #3 |
|---|---|---|---|---|
| Date of Prior Sale/Transfer | No sales within 3 years. | 03/26/2010 | 12/03/2009 | No other recent sales. |
| Price of Prior Sale/Transfer | N/A | N/A (Foreclosure) | N/A (Foreclosure) | N/A |
| Data Source(s) | MLS/REARS/Probate | Instrument #1232245 | Instrument #1212943 | MLS/REARS/Probate |
| Effective Date of Data Source(s) | 11/2010 | 11/2010 | 11/2010 | 11/2010 |

Analysis of prior sale or transfer history of the subject property and comparable sales.   To the appraiser's knowledge, there have been no sales involving the subject unit within the past three years. Comparables 1-2 and 4 were previously transferred through foreclosure. There are no other known sales of the comparables within the past year.

Form 1073 — "TOTAL for Windows" appraisal software by a la mode, inc. — 1-800-ALAMODE

File No. 0012330| Page #4

## Individual Condominium Unit Appraisal Report

ADW12330
File # 0012330

| There are | N/A | comparable properties currently offered for sale in the subject neighborhood ranging in price from $ | N/A | | to $ | N/A | |
| There are | N/A | comparable sales in the subject neighborhood within the past twelve months ranging in sale price from $ | N/A | | to $ | N/A | |

| FEATURE | SUBJECT | COMPARABLE SALE # 1 | | COMPARABLE SALE # 2 | | COMPARABLE SALE # 3 | |
|---|---|---|---|---|---|---|---|
| Address and Unit # | 1328 West Lagoon Avenue Gulf Shores, AL 36542 | 1384 West Lagoon Avenue Gulf Shores, Alabama 36542 | | 203 West 13th Street Gulf Shores, Alabama 36542 | | 1964 West Beach Boulevard Gulf Shores, Alabama 36542 | |
| Project Name and Phase | Sunrise Lagoon Condominium Unit B | Laguna Sands Condominium Unit B | | Sawgrass Pointe Condominium Unit 3 | | Heron Landing Unit 2 | |
| Proximity to Subject | | 0.1 mile | | 0.4 mile | | 1.5 mile | |
| Sale Price | $ | | $ | 190,000 | $ | 190,000 | $ | 205,100 |
| Sale Price/Gross Liv. Area | $ | sq. ft. $ | 93.83 sq. ft. | | $ | 98.45 sq. ft. | $ | 158.99 sq. ft. |
| Data Source(s) | | MLS #163007 | | Instrument #1227381/ReMax | | MLS #166880/Realty South | |
| Verification Source(s) | | Exit Realty Innovations | | Appraisal Files | | Appraisal Files | |
| VALUE ADJUSTMENTS | DESCRIPTION | DESCRIPTION | +(-) $ Adjustment | DESCRIPTION | +(-) $ Adjustment | DESCRIPTION | +(-) $ Adjustment |
| Sales or Financing Concessions | | Cash No S.C. | | Conventional No S.C. | | Conventional No S.C. | |
| Date of Sale/Time | | 09/15/2010 | -4,000 | 03/31/2010 | -12,700 | 11/19/2010 | |
| Location | Good-Average | Good-Average | | Good-Average | | Good-Average | |
| Leasehold/Fee Simple | Fee Simple | Fee Simple | | Fee Simple | | Fee Simple | |
| HOA Mo. Assessment | Assessment | Assessments | | Assessments | | $262,000 | |
| Common Elements and Rec. Facilities | Grounds/Driveway | Grds/Driveway Pool/Pier | -10,000 | Grounds/Pool Driveway | -10,000 | Pool/Pier/ Beach Access | -40,000 |
| Floor Location | 1st | 1st | | 1st | | 1st | |
| View | Good/Lagoon | Good/Lagoon | | Good/Lagoon | | Good/Lagoon | |
| Design (Style) | Duplex | Duplex | | Duplex | | Duplex | |
| Quality of Construction | Good-Average | Good-Average | | Good-Average | | Good-Average | |
| Actual Age | 3 Years | 4 Years | | 12 Yrs/Eff.10 | +7,000 | 15 Years | +12,000 |
| Condition | Good-Average | Good-Average | | Good-Average | | Good-Average | |
| Above Grade | Total | Bdrms | Baths | Total | Bdrms | Baths | | Total | Bdrms | Baths | | Total | Bdrms | Baths | |
| Room Count | 8 | 3 | 2.5 | 7 | 4 | 3.5 | -5,000 | 6 | 3 | 3 | -2,500 | 6 | 3 | 3 | -2,500 |
| Gross Living Area | 2,557 sq. ft. | 2,025 sq. ft. | +27,000 | 1,930 sq. ft. | +31,000 | 1,290 sq. ft. | +63,000 |
| Basement & Finished Rooms Below Grade | None | None | | None | | None | |
| Functional Utility | Average | Average | | Average | | Average | |
| Heating/Cooling | Central | Central | | Central | | Central | |
| Energy Efficient Items | Standard | Standard | | Standard | | Standard | |
| Garage/Carport | Park Under | Park Under | | Park Under | | Park Under | |
| Porch/Patio/Deck | Porches/Stg. | Porches/Stg | | Porches/Stg | | Decks/Storage Furnished | -10,000 |
| | | | | | | | |
| Net Adjustment (Total) | | ☒ + ☐ - | $ 8,000 | ☒ + ☐ - | $ 12,800 | ☒ + ☐ - | $ 22,500 |
| Adjusted Sale Price of Comparables | | Net Adj. 4.2 % Gross Adj. 24.2 % | $ 198,000 | Net Adj. 6.7 % Gross Adj. 33.3 % | $ 202,800 | Net Adj. 11.0 % Gross Adj. 62.2 % | $ 227,600 |

Summary of Sales Comparison Approach   The comparables are sales of duplex units in the subject's competitive market area. Comparables 1, 2, and 4 are sales of a duplex units with a shared swimming pool; Comparable 3 is located in a project with a swimming pool, pier and deeded beach access; therefore, adjustments were necessary. Comparable 4 has an inferior view, but is in closer proximity to the central sector of Gulf Shores. Adjustments for date of sale were utilized to reflect decreases which have occurred in this market area (at 10% per annum). There have been few sales of duplex units within the past year and significant adjustments were required. There are no other comparable sales which would require less adjustment. After adjustments for dissimilarities, these sales indicate a relatively wide range in value for the subject. Based on this analysis, the subject's current market value is $215,000.

Indicated Value by Sales Comparison Approach $ 215,000

### INCOME APPROACH TO VALUE (not required by Fannie Mae)

| Estimated Monthly Market Rent $ | N/A | X Gross Rent Multiplier | N/A | = $ | | Indicated Value by Income Approach |

Summary of Income Approach (including support for market rent and GRM)   Although rental income may contribute to a purchasing decision for some resort condominium buyers in this market area, it is rarely the primary motivation. A significant percentage of buyers utilize these units as primary residences or second homes. Therefore, the Income Approach is not felt to be a reliable indicator of value for the subject.

Indicated Value by: Sales Comparison Approach $ 215,000     Income Approach (if developed) $

The Market Approach was the only method used in valuing the subject. This method is the most reliable approach in estimating the value of condominiums. Analyzing sales of similar properties provides the best indication of current market value as it measures the motivations of buyers and sellers. As explained above, the Income Approach is not a reliable method of valuation in this circumstance. The Cost Approach is not applicable as the subject is a single unit in a multi-unit project.

This appraisal is made ☒ "as is",  ☐ subject to completion per plans and specifications on the basis of a hypothetical condition that the improvements have been completed,  ☐ subject to the following repairs or alterations on the basis of a hypothetical condition that the repairs or alterations have been completed, or ☐ subject to the following required inspection based on the extraordinary assumption that the condition or deficiency does not require alteration or repair:  The subject has been valued "as is", exclusive of furnishings or other personal property. Refer to the addendum for additional certifications, comments, etc.
Based on a complete visual inspection of the interior and exterior areas of the subject property, defined scope of work, statement of assumptions and limiting conditions, and appraiser's certification, my (our) opinion of the market value, as defined, of the real property that is the subject of this report is
$ 215,000   , as of   11/30/2010   , which is the date of inspection and the effective date of this appraisal.

File No. 0012330| Page #5

## Individual Condominium Unit Appraisal Report

ADW12330
File # 0012330

This report form is designed to report an appraisal of a unit in a condominium project or a condominium unit in a planned unit development (PUD). This report form is not designed to report an appraisal of a manufactured home or a unit in a cooperative project.

This appraisal report is subject to the following scope of work, intended use, intended user, definition of market value, statement of assumptions and limiting conditions, and certifications. Modifications, additions, or deletions to the intended use, intended user, definition of market value, or assumptions and limiting conditions are not permitted. The appraiser may expand the scope of work to include any additional research or analysis necessary based on the complexity of this appraisal assignment. Modifications or deletions to the certifications are also not permitted. However, additional certifications that do not constitute material alterations to this appraisal report, such as those required by law or those related to the appraiser's continuing education or membership in an appraisal organization, are permitted.

SCOPE OF WORK: The scope of work for this appraisal is defined by the complexity of this appraisal assignment and the reporting requirements of this appraisal report form, including the following definition of market value, statement of assumptions and limiting conditions, and certifications. The appraiser must, at a minimum: (1) perform a complete visual inspection of the interior and exterior areas of the subject unit, (2) inspect and analyze the condominium project, (3) inspect the neighborhood, (4) inspect each of the comparable sales from at least the street, (5) research, verify, and analyze data from reliable public and/or private sources, and (6) report his or her analysis, opinions, and conclusions in this appraisal report.

INTENDED USE: The intended use of this appraisal report is for the lender/client to evaluate the property that is the subject of this appraisal for a mortgage finance transaction.

INTENDED USER: The intended user of this appraisal report is the lender/client.

MARKET VALUE: The most probable price which a property should bring in a competitive and open market under all conditions requisite to a fair sale, the buyer and seller, each acting prudently, knowledgeably and assuming the price is not affected by undue stimulus. Implicit in this definition is the consummation of a sale as of a specified date and the passing of title from seller to buyer under conditions whereby: (1) buyer and seller are typically motivated; (2) both parties are well informed or well advised, and each acting in what he or she considers his or her own best interest; (3) a reasonable time is allowed for exposure in the open market; (4) payment is made in terms of cash in U. S. dollars or in terms of financial arrangements comparable thereto; and (5) the price represents the normal consideration for the property sold unaffected by special or creative financing or sales concessions* granted by anyone associated with the sale.

*Adjustments to the comparables must be made for special or creative financing or sales concessions. No adjustments are necessary for those costs which are normally paid by sellers as a result of tradition or law in a market area; these costs are readily identifiable since the seller pays these costs in virtually all sales transactions. Special or creative financing adjustments can be made to the comparable property by comparisons to financing terms offered by a third party institutional lender that is not already involved in the property or transaction. Any adjustment should not be calculated on a mechanical dollar for dollar cost of the financing or concession but the dollar amount of any adjustment should approximate the market's reaction to the financing or concessions based on the appraiser's judgment.

STATEMENT OF ASSUMPTIONS AND LIMITING CONDITIONS: The appraiser's certification in this report is subject to the following assumptions and limiting conditions:

1. The appraiser will not be responsible for matters of a legal nature that affect either the property being appraised or the title to it, except for information that he or she became aware of during the research involved in performing this appraisal. The appraiser assumes that the title is good and marketable and will not render any opinions about the title.

2. The appraiser has provided a sketch in this appraisal report to show the approximate dimensions of the improvements. The sketch is included only to assist the reader in visualizing the property and understanding the appraiser's determination of its size.

3. The appraiser has examined the available flood maps that are provided by the Federal Emergency Management Agency (or other data sources) and has noted in this appraisal report whether any portion of the subject site is located in an identified Special Flood Hazard Area. Because the appraiser is not a surveyor, he or she makes no guarantees, express or implied, regarding this determination.

4. The appraiser will not give testimony or appear in court because he or she made an appraisal of the property in question, unless specific arrangements to do so have been made beforehand, or as otherwise required by law.

5. The appraiser has noted in this appraisal report any adverse conditions (such as needed repairs, deterioration, the presence of hazardous wastes, toxic substances, etc.) observed during the inspection of the subject property or that he or she became aware of during the research involved in performing this appraisal. Unless otherwise stated in this appraisal report, the appraiser has no knowledge of any hidden or unapparent physical deficiencies or adverse conditions of the property (such as, but not limited to, needed repairs, deterioration, the presence of hazardous wastes, toxic substances, adverse environmental conditions, etc.) that would make the property less valuable, and has assumed that there are no such conditions and makes no guarantees or warranties, express or implied. The appraiser will not be responsible for any such conditions that do exist or for any engineering or testing that might be required to discover whether such conditions exist. Because the appraiser is not an expert in the field of environmental hazards, this appraisal report must not be considered as an environmental assessment of the property.

6. The appraiser has based his or her appraisal report and valuation conclusion for an appraisal that is subject to satisfactory completion, repairs, or alterations on the assumption that the completion, repairs, or alterations of the subject property will be performed in a professional manner.

File No. 0012330   Page #6

## Individual Condominium Unit Appraisal Report

ADW12330
File # 0012330

**APPRAISER'S CERTIFICATION:** The Appraiser certifies and agrees that:

1. I have, at a minimum, developed and reported this appraisal in accordance with the scope of work requirements stated in this appraisal report.

2. I performed a complete visual inspection of the interior and exterior areas of the subject property. I reported the condition of the improvements in factual, specific terms. I identified and reported the physical deficiencies that could affect the livability, soundness, or structural integrity of the property.

3. I performed this appraisal in accordance with the requirements of the Uniform Standards of Professional Appraisal Practice that were adopted and promulgated by the Appraisal Standards Board of The Appraisal Foundation and that were in place at the time this appraisal report was prepared.

4. I developed my opinion of the market value of the real property that is the subject of this report based on the sales comparison approach to value. I have adequate comparable market data to develop a reliable sales comparison approach for this appraisal assignment. I further certify that I considered the cost and income approaches to value but did not develop them, unless otherwise indicated in this report.

5. I researched, verified, analyzed, and reported on any current agreement for sale for the subject property, any offering for sale of the subject property in the twelve months prior to the effective date of this appraisal, and the prior sales of the subject property for a minimum of three years prior to the effective date of this appraisal, unless otherwise indicated in this report.

6. I researched, verified, analyzed, and reported on the prior sales of the comparable sales for a minimum of one year prior to the date of sale of the comparable sale, unless otherwise indicated in this report.

7. I selected and used comparable sales that are locationally, physically, and functionally the most similar to the subject property.

8. I have not used comparable sales that were the result of combining a land sale with the contract purchase price of a home that has been built or will be built on the land.

9. I have reported adjustments to the comparable sales that reflect the market's reaction to the differences between the subject property and the comparable sales.

10. I verified, from a disinterested source, all information in this report that was provided by parties who have a financial interest in the sale or financing of the subject property.

11. I have knowledge and experience in appraising this type of property in this market area.

12. I am aware of, and have access to, the necessary and appropriate public and private data sources, such as multiple listing services, tax assessment records, public land records and other such data sources for the area in which the property is located.

13. I obtained the information, estimates, and opinions furnished by other parties and expressed in this appraisal report from reliable sources that I believe to be true and correct.

14. I have taken into consideration the factors that have an impact on value with respect to the subject neighborhood, subject property, and the proximity of the subject property to adverse influences in the development of my opinion of market value. I have noted in this appraisal report any adverse conditions (such as, but not limited to, needed repairs, deterioration, the presence of hazardous wastes, toxic substances, adverse environmental conditions, etc.) observed during the inspection of the subject property or that I became aware of during the research involved in performing this appraisal. I have considered these adverse conditions in my analysis of the property value, and have reported on the effect of the conditions on the value and marketability of the subject property.

15. I have not knowingly withheld any significant information from this appraisal report and, to the best of my knowledge, all statements and information in this appraisal report are true and correct.

16. I stated in this appraisal report my own personal, unbiased, and professional analysis, opinions, and conclusions, which are subject only to the assumptions and limiting conditions in this appraisal report.

17. I have no present or prospective interest in the property that is the subject of this report, and I have no present or prospective personal interest or bias with respect to the participants in the transaction. I did not base, either partially or completely, my analysis and/or opinion of market value in this appraisal report on the race, color, religion, sex, age, marital status, handicap, familial status, or national origin of either the prospective owners or occupants of the subject property or of the present owners or occupants of the properties in the vicinity of the subject property or on any other basis prohibited by law.

18. My employment and/or compensation for performing this appraisal or any future or anticipated appraisals was not conditioned on any agreement or understanding, written or otherwise, that I would report (or present analysis supporting) a predetermined specific value, a predetermined minimum value, a range or direction in value, a value that favors the cause of any party, or the attainment of a specific result or occurrence of a specific subsequent event (such as approval of a pending mortgage loan application).

19. I personally prepared all conclusions and opinions about the real estate that were set forth in this appraisal report. If I relied on significant real property appraisal assistance from any individual or individuals in the performance of this appraisal or the preparation of this appraisal report, I have named such individual(s) and disclosed the specific tasks performed in this appraisal report. I certify that any individual so named is qualified to perform the tasks. I have not authorized anyone to make a change to any item in this appraisal report; therefore, any change made to this appraisal is unauthorized and I will take no responsibility for it.

20. I identified the lender/client in this appraisal report who is the individual, organization, or agent for the organization that ordered and will receive this appraisal report.

Form 1073 — "TOTAL for Windows" appraisal software by a la mode, inc. — 1-800-ALAMODE

File No. 0012330  Page #7

## Individual Condominium Unit Appraisal Report

ADW12330
File # 0012330

21. The lender/client may disclose or distribute this appraisal report to: the borrower; another lender at the request of the borrower; the mortgagee or its successors and assigns; mortgage insurers; government sponsored enterprises; other secondary market participants; data collection or reporting services; professional appraisal organizations; any department, agency, or instrumentality of the United States; and any state, the District of Columbia, or other jurisdictions; without having to obtain the appraiser's or supervisory appraiser's (if applicable) consent. Such consent must be obtained before this appraisal report may be disclosed or distributed to any other party (including, but not limited to, the public through advertising, public relations, news, sales, or other media).

22. I am aware that any disclosure or distribution of this appraisal report by me or the lender/client may be subject to certain laws and regulations. Further, I am also subject to the provisions of the Uniform Standards of Professional Appraisal Practice that pertain to disclosure or distribution by me.

23. The borrower, another lender at the request of the borrower, the mortgagee or its successors and assigns, mortgage insurers, government sponsored enterprises, and other secondary market participants may rely on this appraisal report as part of any mortgage finance transaction that involves any one or more of these parties.

24. If this appraisal report was transmitted as an "electronic record" containing my "electronic signature," as those terms are defined in applicable federal and/or state laws (excluding audio and video recordings), or a facsimile transmission of this appraisal report containing a copy or representation of my signature, the appraisal report shall be as effective, enforceable and valid as if a paper version of this appraisal report were delivered containing my original hand written signature.

25. Any intentional or negligent misrepresentation(s) contained in this appraisal report may result in civil liability and/or criminal penalties including, but not limited to, fine or imprisonment or both under the provisions of Title 18, United States Code, Section 1001, et seq., or similar state laws.

SUPERVISORY APPRAISER'S CERTIFICATION: The Supervisory Appraiser certifies and agrees that:

1. I directly supervised the appraiser for this appraisal assignment, have read the appraisal report, and agree with the appraiser's analysis, opinions, statements, conclusions, and the appraiser's certification.

2. I accept full responsibility for the contents of this appraisal report including, but not limited to, the appraiser's analysis, opinions, statements, conclusions, and the appraiser's certification.

3. The appraiser identified in this appraisal report is either a sub-contractor or an employee of the supervisory appraiser (or the appraisal firm), is qualified to perform this appraisal, and is acceptable to perform this appraisal under the applicable state law.

4. This appraisal report complies with the Uniform Standards of Professional Appraisal Practice that were adopted and promulgated by the Appraisal Standards Board of The Appraisal Foundation and that were in place at the time this appraisal report was prepared.

5. If this appraisal report was transmitted as an "electronic record" containing my "electronic signature," as those terms are defined in applicable federal and/or state laws (excluding audio and video recordings), or a facsimile transmission of this appraisal report containing a copy or representation of my signature, the appraisal report shall be as effective, enforceable and valid as if a paper version of this appraisal report were delivered containing my original hand written signature.

| APPRAISER | SUPERVISORY APPRAISER (ONLY IF REQUIRED) |
|---|---|
| Signature | Signature |
| Name  Andrew D. Wilcoxon | Name  Edward M. Bufkin, SRA |
| Company Name  Bufkin Appraisal Company | Company Name  Bufkin Appraisal Company |
| Company Address  Post Office Box 2777 | Company Address  Post Office Box 2777 |
| Gulf Shores, Alabama 36547-2777 | Gulf Shores, AL  36547-2777 |
| Telephone Number  (251) 968-8235 | Telephone Number  (251) 968-8235 |
| Email Address  bufkinappraisal@gulftel.com | Email Address  bufkinappraisal@gulftel.com |
| Date of Signature and Report  12/06/2010 | Date of Signature  12/06/2010 |
| Effective Date of Appraisal  11/30/2010 | State Certification #  R00049 |
| State Certification # | or State License # |
| or State License #  T01834 | State  AL |
| or Other _____ State # _____ | Expiration Date of Certification or License  9/30/2011 |
| State  AL | |
| Expiration Date of Certification or License  9/30/2011 | SUBJECT PROPERTY |
| | ☐ Did not inspect subject property |
| ADDRESS OF PROPERTY APPRAISED | ☐ Did inspect exterior of subject property from street |
| 1328 West Lagoon Avenue, # B | Date of Inspection _____ |
| Gulf Shores, AL 36542 | ☒ Did inspect interior and exterior of subject property |
| APPRAISED VALUE OF SUBJECT PROPERTY $   215,000 | Date of Inspection  11/30/2010 |
| LENDER/CLIENT | |
| Name _____ | COMPARABLE SALES |
| Company Name  Luther Sutter | ☐ Did not inspect exterior of comparable sales from street |
| Company Address  P.O. Box 2012, Benton, AR 72018 | ☒ Did inspect exterior of comparable sales from street |
| | Date of Inspection  11/30/2010 |
| Email Address  luthersutter@yahoo.com | |

Form 1073 — "TOTAL for Windows" appraisal software by a la mode, inc. — 1-800-ALAMODE

File No. 0012330  Page #6

ADW12330
File # 0012330

## Individual Condominium Unit Appraisal Report

| FEATURE | SUBJECT | COMPARABLE SALE # 4 | | COMPARABLE SALE # 5 | | COMPARABLE SALE # 6 | |
|---|---|---|---|---|---|---|---|
| Address and Unit # | 1326 West Lagoon Avenue  Gulf Shores, AL 36542 | 116 West 5th Avenue  Gulf Shores, Alabama 36542 | | | | | |
| Project Name and Phase | Sunrise Lagoon  Condominium Unit B | Twelve Palms  Condominium Unit B | | | | | |
| Proximity to Subject | | 2.0 miles | | | | | |
| Sale Price | $            N/A | $         209,900 | | $ | | $ | |
| Sale Price/Gross Liv. Area | $        sq. ft. | $      91.16 sq. ft. | | $        sq. ft. | | $        sq. ft. | |
| Data Source(s) | | MLS #166456 | | | | | |
| Verification Source(s) | | Century 21 Meyer Real Estate | | | | | |
| VALUE ADJUSTMENTS | DESCRIPTION | DESCRIPTION | +(-) $ Adjustment | DESCRIPTION | +(-) $ Adjustment | DESCRIPTION | +(-) $ Adjustment |
| Sales or Financing Concessions | | Conventional  No S.C. | | | | | |
| Date of Sale/Time | | 08/31/2010 | -7,500 | | | | |
| Location | Good-Average | Good/5% | -15,000 | | | | |
| Leasehold/Fee Simple | Fee Simple | Fee Simple | | | | | |
| HOA Mo. Assessment | Assessment | Assessments | | | | | |
| Common Elements and Rec. Facilities | Grounds/  Driveway | Pier/Grounds  Drives/Pool | -20,000 | | | | |
| Floor Location | 1st | 1st | | | | | |
| View | Good/Lagoon | Avg/Canal | +20,000 | | | | |
| Design (Style) | Duplex | Duplex | | | | | |
| Quality of Construction | Good-Average | Good-Average | | | | | |
| Actual Age | 3 Years | 4 Years | | | | | |
| Condition | Good-Average | Good-Average | | | | | |
| Above Grade | Total  Bdrms  Baths | Total  Bdrms  Baths | | Total  Bdrms  Baths | | Total  Bdrms  Baths | |
| Room Count | 8   3   2.5 | 9   5   4.5 | -10,000 | | | | |
| Gross Living Area | 2,557 sq. ft. | 3,290 sq. ft. | -37,000 | sq. ft. | | sq. ft. | |
| Basement & Finished Rooms Below Grade | None | None | | | | | |
| Functional Utility | Average | Average | | | | | |
| Heating/Cooling | Central | Central | | | | | |
| Energy Efficient Items | Standard | Standard | | | | | |
| Garage/Carport | Park Under | Park Under | | | | | |
| Porch/Patio/Deck | Porches/Stg. | Porches/Stg | | | | | |
| Net Adjustment (Total) | | ☐ +  ☒ - | $       69,500 | ☐ +  ☐ - | $ | ☐ +  ☐ - | $ |
| Adjusted Sale Price of Comparables | | Net 23.2 %  Gross 36.5 % | $      230,400 | Net        %  Gross        % | $ | Net        %  Gross        % | $ |

Report the results of the research and analysis of the prior sale or transfer history of the subject property and comparable sales (report additional prior sales on page 3).

| ITEM | SUBJECT | COMPARABLE SALE # 4 | COMPARABLE SALE # 5 | COMPARABLE SALE # 6 |
|---|---|---|---|---|
| Date of Prior Sale/Transfer | No sales within 3 years. | 06/07/2010 | | |
| Price of Prior Sale/Transfer | N/A | N/A (Foreclosure) | | |
| Data Source(s) | MLS/REARS/Probate | Instrument #1239086 | | |
| Effective Date of Data Source(s) | 11/2010 | 11/2010 | | |

Analysis of prior sale or transfer history of the subject property and comparable sales

Analysis/Comments

File No. 0012330 | Page #9

| Borrower | N/A | | | | File No. 0012330 |
|---|---|---|---|---|---|
| Property Address | 1328 West Lagoon Avenue | | | | |
| City | Gulf Shores | County Baldwin | | State AL | Zip Code 36542 |
| Lender/Client | Luther Sutter | | | | |

## APPRAISAL AND REPORT IDENTIFICATION

This Appraisal Report is one of the following types:

☐ Self Contained    (A written report prepared under Standards Rule  2-2(a) , pursuant to the Scope of Work, as disclosed elsewhere in this report.)

☒ Summary    (A written report prepared under Standards Rule  2-2(b) , pursuant to the Scope of Work, as disclosed elsewhere in this report.)

☐ Restricted Use    (A written report prepared under Standards Rule  2-2(c) , pursuant to the Scope of Work, as disclosed elsewhere in this report, restricted to the stated intended use by the specified client or intended user.)

### Comments on Standards Rule 2-3

I certify that, to the best of my knowledge and belief:
— The statements of fact contained in this report are true and correct.
— The reported analyses, opinions, and conclusions are limited only by the reported assumptions and limiting conditions and are my personal, impartial, and unbiased profession analyses, opinions, and conclusions.
— I have no (or the specified) present or prospective interest in the property that is the subject of this report and no (or the specified) personal interest with respect to the parties involved.
— I have no bias with respect to the property that is the subject of this report or the parties involved with this assignment.
— My engagement in this assignment was not contingent upon developing or reporting predetermined results.
— My compensation for completing this assignment is not contingent upon the development or reporting of a predetermined value or direction in value that favors the cause of the client, the amount of the value opinion, the attainment of a stipulated result, or the occurrence of a subsequent event directly related to the intended use of this appraisal.
— My analyses, opinions, and conclusions were developed, and this report has been prepared, in conformity with the Uniform Standards of Professional Appraisal Practice that w in effect at the time this report was prepared.
— Unless otherwise indicated, I have made a personal inspection of the property that is the subject of this report.
— Unless otherwise indicated, no one provided significant real property appraisal assistance to the person(s) signing this certification (if there are exceptions, the name of each individual providing significant real property appraisal assistance is stated elsewhere in this report).
— Unless otherwise indicated, I have performed no services regarding the subject property within the prior three years, as an appraiser or in any other capacity.

### Comments on Appraisal and Report Identification
Note any USPAP related issues requiring disclosure and any State mandated requirements:

**APPRAISER:**

Signature:
Name:  Andrew D. Wilcoxon
Designation:
Date Signed:   12/06/2010
State Certification #:
or State License #: T01834
State: AL
Expiration Date of Certification or License: 9/30/2011

Effective Date of Appraisal:   11/30/2010

**SUPERVISORY APPRAISER (only if required):**

Signature:
Name:  Edward M. Bufkin, SRA
Designation:   SRA
Date Signed:   12/06/2010
State Certification #:  R00049
or State License #:
State:  AL
Expiration Date of Certification or License: 9/30/2011
Supervisory Appraiser Inspection of Subject Property:
☐ Did Not    ☐ Exterior-only from street    ☒ Interior and Exterior

Form ID10 — "TOTAL for Windows" appraisal software by a la mode, inc. — 1-800-ALAMODE

**Supplemental Addendum**

File No. 0012330 Page #10

File No. 0012330

| Borrower/Client N/A | | | |
|---|---|---|---|
| Property Address 1328 West Lagoon Avenue | | | |
| City Gulf Shores | County Baldwin | State AL | Zip Code 36542 |
| Lender Luther Sutter | | | |

**SCOPE OF THE APPRAISAL**
This appraisal is based upon information which includes an exterior inspection of the subject property and neighborhood, economic influences, public records, conversations with real estate brokers and other informed individuals, and other sources which are identified. All sources and data are considered reliable. The appraiser has not placed emphasis on any data or sources that are not considered reliable. Data regarding market sales is contained within the report and has been verified by sources as noted.

**PURPOSE AND INTENDED USE OF THE APPRAISAL**
The purpose of this appraisal is to estimate the market value of the subject as defined herein. The function and only intended use of the appraisal is to assist the named lender/client in evaluating the subject for legal purposes. This report is not intended for any other use.

**APPRAISAL REPORT OPTION**
The communication to the client is a Summary Appraisal Report in accordance with Standards Rule 2-2 (b) of the Uniform Standards of Professional Appraisal Practice as developed by the Appraisal Standards Board of The Appraisal Foundation.

**METHODS OF VALUATION**
In estimating the value of residential property, all three of the traditional approaches to value must be considered and utilized if applicable. The final value estimate for the subject property is based upon a reconciliation of the approaches that are utilized with the most emphasis placed on the most relevant and reliable data. In this instance, only the Sales Comparison Approach, or Market Approach, has been utilized.

The Income Approach has not been applied to the subject property as it is located in an area where condominium units are usually owner occupied second homes that are typically purchased for use, and not strictly for their income producing capabilities. The Income Approach is most relevant when appraising properties that are frequently purchased for their income potential where the primary motivation of typical purchasers is to receive income, not personal use. While many units such as the subject are rented on a part time basis, they are also typically used as second homes. The amount of rental income varies widely among units due to differences in owner use and occupancy. Though rental income may contribute to a purchasing decision for some resort condominium buyers in this market area, it is rarely the primary motivation.

The Sales Comparison Approach is a valuation method that is based upon comparisons between the subject and the most similar market sales of comparable properties. When sufficient data is available regarding comparable sales, the Market Approach can usually be considered the best indicator of a property's market value.

Due to the difficulties inherent in estimating the value of the pro-rata share of common elements in a condominium project and the construction cost of an individual unit in a multi-unit building, the Cost Approach is not applicable.

**MARKET CONDITIONS**
Strong demand for property and a limited supply had resulted in increasing values until mid-2005; however, after a period of market inactivity, values have declined substantially in most condominium projects over the past four years.

Substantial new development between 2000 and 2005 has resulted in an oversupply which was largely absorbed by preconstruction purchasers; however, the change in market conditions has resulted in many of these properties being foreclosed or worth less than their original purchase prices. This is a resort area where the majority of the recent purchasers have been speculators which has caused the market to be more volatile than in most traditional residential areas. Analysis of recent and past sales indicates values have declined from 10% to as much as 50% dependent on the project and unit type.

Market activity has increased for those properties whose list prices have been lowered due to the market correction. A large number of foreclosures have been offered for sale and these properties represent a significant percentage of market activity.

**ESTIMATE OF REASONABLE EXPOSURE TIME**
In accordance with Standards Rule 1-2 (c) of the Uniform Standards of Professional Appraisal Practice (USPAP), an opinion of reasonable exposure time linked to an opinion of market value as defined within this report must be developed by the appraiser. Exposure time can be defined as the estimated length of time the property interest being appraised would have been offered on the market prior to the hypothetical consummation of a sale at market value on the effective date of the appraisal; a retrospective opinion based on an analysis of past events assuming a competitive and open market.

An estimate of reasonable exposure time for the subject is approximately six months based upon actual marketing periods for similar properties as well as the appraiser's conversations with real estate brokers and other individuals who are knowledgeable regarding this market area and properties similar to the appraised property. This estimate of typical exposure time is based upon the assumption that the subject had been adequately exposed under competent management and offered for sale at an amount relatively close (10% +/-) to the appraised value shown in this report.

Marketing times in this area vary widely due to variations in listing prices combined with an oversupply of inventory. Properties which are aggressively priced typically have relatively short marketing times while those that are overpriced have extended marketing times due to the abundance of lower priced competitive listings. Properties offered for significantly more than market value will experience long marketing periods due to competition from the current oversupply of inventory.

## Supplemental Addendum

File No. 0012330 Page #11

File No. 0012330

| Borrower/Client | N/A | | | | | |
|---|---|---|---|---|---|---|
| Property Address | 1328 West Lagoon Avenue | | | | | |
| City | Gulf Shores | County | Baldwin | State | AL | Zip Code 36542 |
| Lender | Luther Sutter | | | | | |

Several of the comparables sales in this report experienced lengthy marketing times; however, the units were typically placed under contract in a three to six month period when their listing price was lowered to a competitive level. Marketing time is purely a function of pricing in the current environment. Typically, marketing times are six to twelve months which is a result of overpricing for a period of time prior to lowering to a competitive level.

FINAL RECONCILIATION
The most weight has been placed on the Market Approach, or Sales Comparison Analysis, in arriving at a final value estimate for the subject. This method measures the actions and motivations of buyers and sellers by virtue of direct comparisons between the subject and sales of similar properties. When adjustments are made to the comparable sales to reflect typical market reaction to the differences between the properties, an indication of market value is provided.

APPRAISERS CERTIFICATIONS-ANDREW D. WILCOXON
This assignment was made subject to regulations of the State of Alabama Real Estate Appraisers Board.

APPRAISERS CERTIFICATIONS-EDWARD M. BUFKIN
This assignment was made subject to regulations of the State of Alabama Real Estate Appraisers Board. The state certified appraiser who performed this appraisal has met the requirements of the Board that allow this report to be regarded as a "certified appraisal".

I certify that, to the best of my knowledge and belief, the reported analyses, opinions and conclusions were developed, and this report has been prepared, in conformity with the requirements of the Code of Professional Ethics and the Standards of Professional Appraisal Practice of the Appraisal Institute. I further certify that the use of this report is subject to the requirements of the Appraisal Institute relating to review by its duly authorized representatives.

The Appraisal Institute conducts a mandatory program of continuing education for its designated members. As of the date of this report I, Edward M. Bufkin, SRA, have completed the requirements of the continuing education program of the Appraisal Institute.

SYNOPSIS OF APPRAISER'S QUALIFICATIONS-EDWARD M. BUFKIN
Engaged full time as a real estate appraiser since 1985. Self employed since 1995. Received a Bachelor of Science in Business Administration with a major emphasis in Real Estate and Insurance from the University of Southern Mississippi in 1982. Granted an Alabama Real Estate Brokers License in 1983. Successfully completed numerous courses and seminars over the past twenty-seven years. Clients include virtually all major lending institutions and mortgage brokers in the area. Holds State Certificates R00049 from the Alabama Real Estate Appraisers Board and RD4605 from the Florida Real Estate Appraisers Board. Designated as an SRA member by the Appraisal Institute.

File No. 0012330 Page #12

## Subject Property Photographs

| Borrower/Client | N/A | | | | | |
|---|---|---|---|---|---|---|
| Property Address 1328 West Lagoon Avenue | | | | | | |
| City Gulf Shores | | County Baldwin | | State AL | | Zip Code 36542 |
| Lender Luther Sutter | | | | | | |



**Subject Front**

| | |
|---|---|
| | 1328 West Lagoon Avenue |
| Sales Price | N/A |
| Gross Living Area | 2,557 |
| Total Rooms | 8 |
| Total Bedrooms | 3 |
| Total Bathrooms | 2.5 |
| Location | Good-Average |
| View | Good/Lagoon |
| Site | Duplex |
| Quality | Good-Average |
| Age | 3 Years |



**Subject Rear**



**Subject Street**

File No. 0012330 Page #13

## Subject Property Photographs

| Borrower/Client   N/A | | | |
|---|---|---|---|
| Property Address  1328 West Lagoon Avenue | | | |
| City  Gulf Shores | County  Baldwin | State  AL | Zip Code  36542 |
| Lender  Luther Sutter | | | |



**Subject Interior**

1328 West Lagoon Avenue
| | |
|---|---|
| Sales Price | N/A |
| Gross Living Area | 2,557 |
| Total Rooms | 8 |
| Total Bedrooms | 3 |
| Total Bathrooms | 2.5 |
| Location | Good-Average |
| View | Good/Lagoon |
| Site | Duplex |
| Quality | Good-Average |
| Age | 3 Years |



**Subject Interior**



**Subject Interior**

**Subject Property Photographs**

File No. 0012330 | Page #14

| | | | |
|---|---|---|---|
| Borrower/Client   N/A | | | |
| Property Address  1328 West Lagoon Avenue | | | |
| City   Gulf Shores | County  Baldwin | State  AL | Zip Code  36542 |
| Lender   Luther Sutter | | | |



**Subject Interior**

1328 West Lagoon Avenue

| | |
|---|---|
| Sales Price | N/A |
| Gross Living Area | 2,557 |
| Total Rooms | 8 |
| Total Bedrooms | 3 |
| Total Bathrooms | 2.5 |
| Location | Good-Average |
| View | Good/Lagoon |
| Site | Duplex |
| Quality | Good-Average |
| Age | 3 Years |



**Subject Interior**



**Subject Interior**

File No. 001233D| Page #15

## Subject Property Photographs

| Borrower/Client | N/A | | | | |
|---|---|---|---|---|---|
| Property Address | 1328 West Lagoon Avenue | | | | |
| City   Gulf Shores | | County  Baldwin | | State  AL | Zip Code  36542 |
| Lender   Luther Sulter | | | | | |



### Subject Interior

| | |
|---|---|
| 1328 West Lagoon Avenue | |
| Sales Price | N/A |
| Gross Living Area | 2,557 |
| Total Rooms | 8 |
| Total Bedrooms | 3 |
| Total Bathrooms | 2.5 |
| Location | Good-Average |
| View | Good/Lagoon |
| Site | Duplex |
| Quality | Good-Average |
| Age | 3 Years |



### Subject Interior



### Subject Interior

Form PICPIX.SI — "TOTAL for Windows" appraisal software by a la mode, inc. — 1-800-ALAMODE

File No. 0012330| Page #16

## Subject Property Photographs

| | | | |
|---|---|---|---|
| Borrower/Client N/A | | | |
| Property Address 1328 West Lagoon Avenue | | | |
| City Gulf Shores | County Baldwin | State AL | Zip Code 36542 |
| Lender Luther Sutter | | | |



### Subject Interior

1328 West Lagoon Avenue

| | |
|---|---|
| Sales Price | N/A |
| Gross Living Area | 2,557 |
| Total Rooms | 8 |
| Total Bedrooms | 3 |
| Total Bathrooms | 2.5 |
| Location | Good-Average |
| View | Good/Lagoon |
| Site | Duplex |
| Quality | Good-Average |
| Age | 3 Years |



### View



### View

File No. 001233DT Page #17

## Subject Property Photographs

| Borrower/Client | N/A | | | | |
|---|---|---|---|---|---|
| Property Address | 1328 West Lagoon Avenue | | | | |
| City  Gulf Shores | | County  Baldwin | | State  AL | Zip Code  36542 |
| Lender  Luther Sutter | | | | | |



**View**

| | |
|---|---|
| 1328 West Lagoon Avenue | |
| Sales Price | N/A |
| Gross Living Area | 2,557 |
| Total Rooms | 8 |
| Total Bedrooms | 3 |
| Total Bathrooms | 2.5 |
| Location | Good-Average |
| View | Good/Lagoon |
| Site | Duplex |
| Quality | Good-Average |
| Age | 3 Years |



**View**



**View**

Form PICPIX.SI — "TOTAL for Windows" appraisal software by a la mode, inc. — 1-800-ALAMODE

File No. 0012330 Page #18

## Comparable Sale Photographs

| | |
|---|---|
| Borrower/Client | N/A |
| Property Address | 1328 West Lagoon Avenue |
| City Gulf Shores | County Baldwin | State AL | Zip Code 36542 |
| Lender Luther Sutter | |



**Comparable 1**
1384 West Lagoon Avenue
Prox. to Subject    0.1 mile
Sale Price          190,000
Gross Living Area   2,025
Total Rooms         7
Total Bedrooms      4
Total Bathrooms     3.5
Location            Good-Average
View                Good/Lagoon
Site
Quality             Good-Average
Age                 4 Years



**Comparable 2**
203 West 13th Street
Prox. to Subject    0.4 mile
Sale Price          190,000
Gross Living Area   1,930
Total Rooms         6
Total Bedrooms      3
Total Bathrooms     3
Location            Good-Average
View                Good/Lagoon
Site
Quality             Good-Average
Age                 12 Yrs/Eff.10



**Comparable 3**
1964 West Beach Boulevard
Prox. to Subject    1.5 mile
Sale Price          205,100
Gross Living Area   1,290
Total Rooms         6
Total Bedrooms      3
Total Bathrooms     3
Location            Good-Average
View                Good/Lagoon
Site
Quality             Good-Average
Age                 15 Years

File No. D012330| Page #19

## Comparable Photographs

| | | | | |
|---|---|---|---|---|
| Borrower/Client   N/A | | | | |
| Property Address  1328 West Lagoon Avenue | | | | |
| City  Gulf Shores | County  Baldwin | | State  AL | Zip Code  36542 |
| Lender  Luther Sutter | | | | |



**Comparable 4**

116 West 5th Avenue

| | |
|---|---|
| Prox. to Subject | 2.0 miles |
| Sale Price | 299,900 |
| Gross Living Area | 3,290 |
| Total Rooms | 9 |
| Total Bedrooms | 5 |
| Total Bathrooms | 4.5 |
| Location | Good/5% |
| View | Avg/Canal |
| Site | |
| Quality | Good-Average |
| Age | 4 Years |

**Comparable 5**

| | |
|---|---|
| Prox. to Subject | |
| Sale Price | |
| Gross Living Area | |
| Total Rooms | |
| Total Bedrooms | |
| Total Bathrooms | |
| Location | |
| View | |
| Site | |
| Quality | |
| Age | |

**Comparable 6**

| | |
|---|---|
| Prox. to Subject | |
| Sale Price | |
| Gross Living Area | |
| Total Rooms | |
| Total Bedrooms | |
| Total Bathrooms | |
| Location | |
| View | |
| Site | |
| Quality | |
| Age | |

File No. 0012330 Page #20

## Location Map

| Borrower/Client   N/A | | | | |
|---|---|---|---|---|
| Property Address  1328 West Lagoon Avenue | | | | |
| City   Gulf Shores | County   Baldwin | | State   AL | Zip Code   36542 |
| Lender   Luther Sutter | | | | |



**Flood Map**

File No. 0012330 Page #21

| Borrower/Client   N/A | | | | |
| Property Address  1328 West Lagoon Avenue | | | | |
| City   Gulf Shores | County  Baldwin | | State  AL | Zip Code  36542 |
| Lender   Luther Sutter | | | | |



InterFlood
www.interflood.com • 1-800-252-6633
by a la mode

**Prepared for:**
Bufkin Appraisal Company

Gulf Shores, AL 36542

FLOODSCAPE

Flood Hazards Map

Map Number
01003C1076L

Effective Date
July 17, 2007

Powered by FloodSource
877.77.FLOOD
www.floodsource.com

© 1999-2010 SourceProse and/or FloodSource Corporations. All rights reserved. Patents 6,631,326 and 6,678,615. Other patents pending. For info: info@floodsource.com.

File No. 0012330 Page #22

## Aerial Map

| Borrower/Client | N/A | | | | |
|---|---|---|---|---|---|
| Property Address | 1328 West Lagoon Avenue | | | | |
| City Gulf Shores | | County Baldwin | | State AL | Zip Code 36542 |
| Lender Luther Sutter | | | | | |



File No. 0012330 | Page #23

## Tax Assessor's Map

| Borrower/Client | N/A | | | | | | |
|---|---|---|---|---|---|---|---|
| Property Address 1328 West Lagoon Avenue | | | | | | | |
| City Gulf Shores | | County Baldwin | | State AL | | Zip Code 36542 | |
| Lender Luther Sutter | | | | | | | |



File No. 0012330 Page #24

**Site Map**

| Borrower/Client | N/A |
| Property Address | 1328 West Lagoon Avenue |
| City Gulf Shores | County Baldwin | State AL | Zip Code 36542 |
| Lender Luther Sutter | | | |



File No. 0012330 Page #25

**Building Sketch (Page - 1)**

| | |
|---|---|
| Borrower/Client  N/A | |
| Property Address 1328 West Lagoon Avenue | |
| City  Gulf Shores          County  Baldwin | State  AL          Zip Code  36542 |
| Lender  Luther Sutter | |



Sketch by Apex IV™

Comments:

| AREA CALCULATIONS SUMMARY | | | |
|---|---|---|---|
| Code | Description | Net Size | Net Totals |
| GLA1 | Unit A First Level | 882.8 | |
| | Unit B First Level | 882.8 | |
| | Unit A Second Level | 897.0 | |
| | Unit B Second Level | 897.0 | |
| | Unit A Third Level | 777.4 | |
| | Unit B Third Level | 777.4 | 5114.5 |
| P/P | First Level Porch | 299.0 | |
| | Screened Porch | 144.0 | |
| | Screened Porch | 144.0 | |
| | Second Level Porch | 299.0 | |
| | Third Level Porch | 239.2 | |
| | 3rd Level Pch (Lag) | 149.5 | |
| | Deck | 478.4 | 1753.1 |
| | | | |
| | Net LIVABLE Area | (Rounded) | 5114 |

| LIVING AREA BREAKDOWN | | |
|---|---|---|
| Breakdown | | Subtotals |
| Unit A First Level | | |
| 12.0  x  60.0 | | 720.0 |
| 3.0  x  55.2 | | 162.8 |
| Unit B First Level | | |
| 14.9  x  55.2 | | 825.2 |
| 4.8  x  12.0 | | 57.6 |
| Unit A Second Level | | |
| 14.9  x  60.0 | | 897.0 |
| Unit B Second Level | | |
| 15.0  x  60.0 | | 897.0 |
| Unit A Third Level | | |
| 15.0  x  52.0 | | 777.4 |
| Unit B Third Level | | |
| 14.9  x  52.0 | | 777.4 |
| | | |
| 8 Items | (Rounded) | 5114 |

Form SKT.BldSM — "TOTAL for Windows" appraisal software by a la mode, inc. — 1-800-ALAMODE

File No. 0012330 | Page #26

**FROM:**
Edward M. Bufkin
Bufkin Appraisal Company
Post Office Box 2777
Gulf Shores, AL 36547-2777

Telephone Number: (251) 968-8235      Fax Number: (251) 968-7679

# INVOICE

| INVOICE NUMBER | |
|---|---|
| | 0012330 |
| **DATE** | |
| | 12/06/2010 |

| **REFERENCE** | |
|---|---|
| Internal Order #: | 0012330 |
| Lender Case #: | |
| Client File #: | |
| Main File # on form: | 0012330 |
| Other File # on form: | ADW12330 |
| Federal Tax ID: | 63-1265388 |
| Employer ID: | |

**TO:**

Luther Sutter
P.O. Box 2012
Benton, AR 72018

Telephone Number:                Fax Number:
Alternate Number:                E-Mail: luthersutter@yahoo.com

THANK YOU FOR YOUR BUSINESS!

## DESCRIPTION

| | |
|---|---|
| Lender: Luther Sutter | Client: Luther Sutter |
| Purchaser/Borrower: N/A | |
| City: Gulf Shores | |
| Property Address: 1328 West Lagoon Avenue | |
| County: Baldwin | State: AL         Zip: 36542 |
| Legal Description: Unit B (East), Sunrise Lagoon | |

| FEES | AMOUNT |
|---|---|
| Appraisal Fee - $250 per report ($750 total) | 250.00 |
| | |
| **SUBTOTAL** | 250.00 |

| PAYMENTS | AMOUNT |
|---|---|
| Check #:        Date:        Description: | |
| Check #:        Date:        Description: | |
| Check #:        Date:        Description: | |
| **SUBTOTAL** | |
| **TOTAL DUE** | $      250.00 |

Form NIV5 — "TOTAL for Windows" appraisal software by a la mode, Inc. — 1-800-ALAMODE
Bufkin Appraisal Company

File No. 0012324| Page #1



## APPRAISAL OF REAL PROPERTY

### LOCATED AT:
1324 West Lagoon Avenue
East 1/2 of Lot 5, Carl T. Martin Unit of Gulf Shores
Gulf Shores, AL  36542

### FOR:
Luther Sutter
P.O. Box 2012
Benton, AR  72018

### AS OF:
11/30/2010

### BY:
Andrew D. Wilcoxon
Bufkin Appraisal Company
Post Office Box 2777
Gulf Shores, Alabama 36547
(251) 968-8235
bufkinappraisal@gulftel.com

# LAND APPRAISAL REPORT

File No. 0012324 Page #2
ADW12324
File No. 0012324

**IDENTIFICATION**

Borrower N/A
Property Address 1324 West Lagoon Avenue
City Gulf Shores County Baldwin State AL Zip Code 36542
Legal Description East 1/2 of Lot 5, Carl T. Martin Unit of Gulf Shores
Sale Price $ N/A Date of Sale N/A Loan Term N/A yrs. Property Rights Appraised ☒ Fee ☐ Leasehold ☐ De Minimis PUD
Actual Real Estate Taxes $ 990.00 (yr) Loan charges to be paid by seller $ N/A Other sales concessions N/A
Lender/Client Luther Sutter Address P.O. Box 2012, Benton, AR 72018
Occupant Vacant Appraiser Andrew D. Wilcoxon Instructions to Appraiser Estimate market value

**NEIGHBORHOOD**

Census Tract 114.04 Map Reference Slide 2150-D

| | | | | | Good Avg. Fair Poor |
|---|---|---|---|---|---|
| Location | ☐ Urban | ☒ Suburban | ☐ Rural | | |
| Built Up | ☐ Over 75% | ☒ 25% to 75% | ☐ Under 25% | Employment Stability | ☐ ☒ ☐ ☐ |
| Growth Rate | ☐ Fully Dev. ☐ Rapid | ☐ Steady | ☒ Slow | Convenience to Employment | ☐ ☒ ☐ ☐ |
| Property Values | ☐ Increasing | ☒ Stable | ☒ Declining | Convenience to Shopping | ☐ ☒ ☐ ☐ |
| Demand/Supply | ☐ Shortage | ☒ In Balance | ☐ Oversupply | Convenience to Schools | ☐ ☒ ☐ ☐ |
| Marketing Time | ☐ Under 3 Mos. | ☐ 4-6 Mos. | ☒ Over 6 Mos. | Adequacy of Public Transportation | ☐ ☒ ☐ ☐ |

Present Land Use 50% 1 Family 10% 2-4 Family ___% Apts. 30% Condo 10% Commercial
___% Industrial ___% Vacant ___%
Change in Present Land Use ☒ Not Likely ☐ Likely (*) ☐ Taking Place (*)
(*) From ___ To ___
Predominant Occupancy ☒ Owner ☐ Tenant ___% Vacant
Single Family Price Range $ 100,000 to $ 1,000,000 Predominant Value $ 300,000
Single Family Age 5 yrs. to 50 yrs. Predominant Age 25 yrs.

| | Good Avg. Fair Poor |
|---|---|
| Recreational Facilities | ☐ ☒ ☐ ☐ |
| Adequacy of Utilities | ☐ ☒ ☐ ☐ |
| Property Compatibility | ☐ ☒ ☐ ☐ |
| Protection from Detrimental Conditions | ☐ ☒ ☐ ☐ |
| Police and Fire Protection | ☐ ☒ ☐ ☐ |
| General Appearance of Properties | ☐ ☒ ☐ ☐ |
| Appeal to Market | ☐ ☒ ☐ ☐ |

Comments including those factors, favorable or unfavorable, affecting marketability (e.g. public parks, schools, view, noise): The subject is located in an established resort/residential neighborhood near the Gulf of Mexico and Little Lagoon. Development in the area consists primarily of modest, raised cottages used as both primary and second homes along with commercial uses and high density condominiums concentrated along the main arteries. There are no adverse conditions other than the lack of demand for vacant lots. See comments below.

**SITE**

Dimensions 50' x 308' +/- = 15,400 Sq. Ft. or Acres ☐ Corner Lot
Zoning classification R-2 Residential Single Family and Duplex Present improvements ☐ do ☐ do not conform to zoning regulations
Highest and best use ☐ Present use ☒ Other (specify) Single family/duplex site when demand warrants/currently idle

| | Public | Other (Describe) | OFF SITE IMPROVEMENTS | | Topo Level, Partially wet |
|---|---|---|---|---|---|
| Elec. | ☒ | | Street Access | ☒ Public ☐ Private | Size Typical for area |
| Gas | ☐ | | Surface Asphalt | | Shape Basically square |
| Water | ☒ | | Maintenance | ☒ Public ☐ Private | View Lagoon |
| San. Sewer | ☒ | | ☐ Storm Sewer ☐ Curb/Gutter | | Drainage Appears adequate |
| | ☐ Underground Elect. & Tel. | ☐ Sidewalk ☒ Street Lights | | | Is the property located in a HUD Identified Special Flood Hazard Area? ☐ No ☒ Yes |

Comments (favorable or unfavorable including any apparent adverse easements, encroachments, or other adverse conditions): The attached maps depict the site. The lot is level and has marsh lands between its building site and shoreline. The site fronts directly on a the Little Lagoon. According to FEMA Flood Insurance Rate Map 01003C1076L of Gulf Shores, Alabama, dated July 17, 2007, the site is in Zone AE. The subject site feature a 270' +/- pier leading to 31' X 22' dock with two boat slips.

**MARKET DATA ANALYSIS**

The undersigned has recited three recent sales of properties most similar and proximate to subject and has considered these in the market analysis. The description includes a dollar adjustment, reflecting market reaction to those items of significant variation between the subject and comparable properties. If a significant item in the comparable property is superior to or more favorable than the subject property, a minus (-) adjustment is made thus reducing the indicated value of subject; if a significant item in the comparable is inferior to or less favorable than the subject property, a plus (+) adjustment is made thus increasing the indicated value of the subject.

| ITEM | SUBJECT PROPERTY | COMPARABLE NO. 1 | | COMPARABLE NO. 2 | | COMPARABLE NO. 3 | |
|---|---|---|---|---|---|---|---|
| Address | 1324 West Lagoon Avenue Gulf Shores, Alabama 36542 | State Highway 180 Lot 1, Bay Highlands | | 8483 State Highway 180 Lot 22, Gulf Beach Land/Dev. | | 534 West Canal Drive Canal Division of Gulf Shores | |
| Proximity to Subject | | 9.1 miles | | 9.0 miles | | 2.6 miles | |
| Sales Price | $ N/A | | $ 100,000 | | $ 95,000 | | $ 110,000 |
| Price | $ | $ | | $ | | $ | |
| Data Source | Inspection | MLS #150440/Owen Realty | | MLS #148601/Meyer RE | | MLS #142609/Century 21 Meye | |
| | DESCRIPTION | DESCRIPTION | +/-)$ Adjust | DESCRIPTION | +/-)$ Adjust | DESCRIPTION | +/-)$ Adjust |
| Date of Sale and Time Adjustment | N/A | 10/20/2010 | | 06/14/2010 | | 10/01/2010 | |
| Location | Good-Average | Average/25% | +25,000 | Average/25% | +24,000 | Average/10% | +11,000 |
| Site/View | 50' x 308' +/- | 100' x 117'/Eff Eq. | | 50' x 260'/Eff Eq. | | 50' x 158'/Eff Eq. | |
| Topography | Level/Cleared | Level/Cleared | | Level/Cleared | | Level/Cleared | |
| Frontage/View | Lagoon/Good | Bay/Good | | Bay/Good | | Canal/Good | |
| | Pier/Dock | Bulkhead | +5,000 | None | +10,000 | None | +10,000 |
| Sales or Financing Concessions | N/A | Cash No S.C. | | Cash No S.C. | | Conventional No S.C. | |
| Net Adj. (Total) | | ☒ + ☐ - $ 30,000 | | ☒ + ☐ - $ 34,000 | | ☒ + ☐ - $ 21,000 | |
| Indicated Value of Subject | | Net 30.0 % $ 130,000 | | Net 35.8 % $ 129,000 | | Net 19.1 % $ 131,000 | |

**RECONCILIATION**

Comments on Market Data: The four comparables are sales in the subject's competitive market area. There have been no sales of similar lagoon-front lots within the past year; therefore, the comparables used are considered the best available indicators of value. Based upon this analysis, the subject's current market value is $130,000. Refer to Page 3 for additional comments.

Comments and Conditions of Appraisal: The subject site appears to have been purchased for $250,000 per Baldwin County Probate Instrument #1091448 dated 12/20/2007 (post foreclosure). There have been no other sales involving the subject property within the past year. The subject has not been offered for sale on the local MLS within the past year. Refer to the addendum for additional comments, certifications, etc. There have been no other sales involving the Comparables within the past year.

Final Reconciliation: The Market Approach was the only method utilized in estimating the value of the subject property. This approach measures buyer and seller behavior by virtue of direct comparisons between the subject property and market sales of comparable properties.

I ESTIMATE THE MARKET VALUE, AS DEFINED, OF SUBJECT PROPERTY AS OF 11/30/2010 to be $ 130,000

Andrew D. Wilcoxon
Appraiser(s)

Edward M. Bufkin, SRA
Review Appraiser (if applicable)

☒ Did ☐ Did Not Physically Inspect Property

[Y2K]

## LAND APPRAISAL REPORT
## MARKET DATA ANALYSIS

File No. 0012324 | Page #3

ADW12324
File No. 0012324

| ITEM | SUBJECT PROPERTY | COMPARABLE NO. 4 | | COMPARABLE NO. 5 | | COMPARABLE NO. 6 | |
|---|---|---|---|---|---|---|---|
| Address | 1324 West Lagoon Avenue | 3254 Sea Horse Circle | | | | | |
| | Gulf Shores, Alabama 36542 | Lot 29, Laguna Key | | | | | |
| Proximity to Subject | | 4.5 miles | | | | | |
| Sales Price | $ N/A | $ 225,000 | | $ | | $ | |
| Price | $ | $ | | $ | | $ | |
| Data Source | Inspection | MLS#151800/Beach Bound RE | | | | | |
| Date of sale and | DESCRIPTION | DESCRIPTION | +/−)$ Adjust | DESCRIPTION | +/−)$ Adjust | DESCRIPTION | +/−)$ Adjust |
| Time Adjustment | N/A | 09/23/2009 | -39,000 | | | | |
| Location | Good-Average | Good/10% | -22,500 | | | | |
| Site/View | 50' x 308' +/− | 75' x 418' | -25,000 | | | | |
| Topography | Level/Cleared | Dune/Cleared | -20,000 | | | | |
| Frontage/View | Lagoon/Good | Lagoon/Good | | | | | |
| | Pier/Dock | None | +10,000 | | | | |
| | | | | | | | |
| Sales or Financing | N/A | Cash | | | | | |
| Concessions | | No S.C. | | | | | |
| Net Adj. (Total) | | ☐ + ☒ − $ 96,500 | | ☐ + ☐ − $ | | ☐ + ☐ − $ | |
| Indicated Value | | | | | | | |
| of Subject | | Net -42.9 % $ 128,500 | | Net % $ | | Net % $ | |

Comments: **Comparables 1 and 2 are located on Mobile Bay in Fort Morgan, and while their views are Comparable, proximity to Gulf Shores is considered inferior. Comparable 3 is located on the Intercoastal Waterway, which is superior for boating amenities, but is somewhat distant from the Gulf beaches. Comparable 4 is a Lagoon front lot that is somewhat dated and is located in a highly restricted development. Additionally, this Comparable is larger and has a more favorable "dune" topography which is not in a FEMA Flood Hazard Area. Adjustments for this Comparable were made at 15% per annum to account for differences in market conditions. Adjustments have been made to the Comparables for the contributory value of the pier and boat dock.**

**There have been two relatively recent sales of improved lagoon front properties which have sold for $200,000 or less. 1464 Sandpiper Lane, which is in close proximity to the subject, sold for $172,500 on 03/12/2010 and 402 Minnow Lane sold for $200,000 on 06/17/2010. These examples of sites improved with homes illustrate the overall lack of demand and with market extraction (for the improvements) help support the estimated value for the subject site.**

**Due to the increased supply of foreclosure and short sale properties during the past five years and an overall lack of demand for vacant lots, values have significantly decreased. The market for vacant land has been significantly impacted as a result of the continuous decrease in existing home values, which has also experienced large declines in recent years due to various factors. This situation is impacted by market participants' inability to purchase a vacant site, improve it, and remain competitive with current supply prices which has driven prices below actual costs as foreclosures and short sales continue to be the bulk of the supply. Additionally, the Deepwater Horizon oil spill has caused market apprehension for water-front and water related properties.**

File No. 0012324  Page #4

| Borrower | N/A | | | | | File No. 0012324 | |
| Property Address | 1324 West Lagoon Avenue | | | | | | |
| City | Gulf Shores | | County  Baldwin | | State AL | Zip Code 36542 | |
| Lender/Client | Luther Sutter | | | | | | |

## APPRAISAL AND REPORT IDENTIFICATION

This Appraisal Report is one of the following types:

☐ Self Contained  (A written report prepared under Standards Rule 2-2(a) , pursuant to the Scope of Work, as disclosed elsewhere in this report.)

☒ Summary  (A written report prepared under Standards Rule 2-2(b) , pursuant to the Scope of Work, as disclosed elsewhere in this report.)

☐ Restricted Use  (A written report prepared under Standards Rule 2-2(c) , pursuant to the Scope of Work, restricted to the stated intended use by the specified client or intended user.)

### Comments on Standards Rule 2-3

I certify that, to the best of my knowledge and belief:
— The statements of fact contained in this report are true and correct.
— The reported analyses, opinions, and conclusions are limited only by the reported assumptions and limiting conditions and are my personal, impartial, and unbiased professional analyses, opinions, and conclusions.
— I have no (or the specified) present or prospective interest in the property that is the subject of this report and no (or the specified) personal interest with respect to the parties involved.
— I have no bias with respect to the property that is the subject of this report or the parties involved with this assignment.
— My engagement in this assignment was not contingent upon developing or reporting predetermined results.
— My compensation for completing this assignment is not contingent upon the development or reporting of a predetermined value or direction in value that favors the cause of the client, the amount of the value opinion, the attainment of a stipulated result, or the occurrence of a subsequent event directly related to the intended use of this appraisal.
— My analyses, opinions, and conclusions were developed, and this report has been prepared, in conformity with the Uniform Standards of Professional Appraisal Practice that were in effect at the time this report was prepared.
— Unless otherwise indicated, I have made a personal inspection of the property that is the subject of this report.
— Unless otherwise indicated, no one provided significant real property appraisal assistance to the person(s) signing this certification (if there are exceptions, the name of each individual providing significant real property appraisal assistance is stated in this report.)
— Unless otherwise indicated, I have performed no services regarding the subject property within the prior three years, as an appraiser or in any other capacity.

### Comments on Appraisal and Report Identification
Note any USPAP related issues requiring disclosure and any State mandated requirements:

**APPRAISER:**

Signature: 
Name:  Andrew D. Wilcoxon
Designation: 
Date Signed:  12/06/2010
State Certification #: 
or State License #:  T01834
State:  AL
Expiration Date of Certification or License: 9/30/2011

Effective Date of Appraisal:  11/30/2010

**SUPERVISORY APPRAISER (only if required):**

Signature: 
Name:  Edward M. Bufkin, SRA
Designation:  SRA
Date Signed:  12/06/2010
State Certification #:  R00049
or State License #: 
State:  AL
Expiration Date of Certification or License: 9/30/2011
Supervisory Appraiser Inspection of Subject Property:
☐ Did Not   ☐ Exterior-only from street   ☒ Interior and Exterior

Form ID10 — *TOTAL for Windows* appraisal software by a la mode, inc. — 1-800-ALAMODE

## Supplemental Addendum

File No. 0012324 Page #5
File No.   0012324

| Borrower/Client   N/A | | | |
|---|---|---|---|
| Property Address  1324 West Lagoon Avenue | | | |
| City  Gulf Shores | County  Baldwin | State  AL | Zip Code  36542 |
| Lender   Luther Sutter | | | |

**SCOPE OF THE APPRAISAL**
This appraisal is based upon information which includes the inspection of the subject property and neighborhood, economic influences, public records, conversations with real estate brokers and other informed individuals, and other sources which are identified. All sources and data are considered reliable. The appraiser has not placed emphasis on any data or sources that are not considered reliable. Data regarding market sales is contained within the report and has been verified by sources as noted.

**PURPOSE AND INTENDED USE OF THE APPRAISAL**
The purpose of this appraisal is to estimate the market value of the subject as defined herein. The function and only intended use of the appraisal is to assist the named lender/client in evaluating the subject for legal purposes. This report is not intended for any other use.

**APPRAISAL REPORT OPTION**
The communication to the client is a Summary Appraisal Report in accordance with Standards Rule 2-2 (b) of the Uniform Standards of Professional Appraisal Practice as developed by the Appraisal Standards Board of The Appraisal Foundation.

**ESTIMATE OF REASONABLE EXPOSURE TIME**
In accordance with Standards Rule 1-2 (c) of the Uniform Standards of Professional Appraisal Practice (USPAP), an opinion of reasonable exposure time linked to an opinion of market value as defined within this report must be developed by the appraiser. Exposure time can be defined as the estimated length of time the property interest being appraised would have been offered on the market prior to the hypothetical consummation of a sale at market value on the effective date of the appraisal; a retrospective opinion based on an analysis of past events assuming a competitive and open market.

An estimate of reasonable exposure time for the subject is approximately twelve months based upon actual marketing periods for similar properties as well as the appraiser's conversations with real estate brokers and other individuals who are knowledgeable regarding this market area and properties similar to the appraised property. This estimate of typical exposure time is based upon the assumption that the subject had been adequately exposed under competent management and offered for sale at an amount relatively close (10% +/-) to the appraised value shown in this report. Marketing times are typically influenced by competitive pricing in the current market. Aggressively priced properties often require less exposure time.

**FINAL RECONCILIATION**
The Market Approach was the only method utilized in estimating the value of the subject property. This approach measures buyer and seller behavior by virtue of direct comparisons between the subject property and market sales of comparables properties.

**APPRAISERS CERTIFICATIONS-ANDREW D. WILCOXON**
This assignment was made subject to regulations of the State of Alabama Real Estate Appraisers Board.

**APPRAISERS CERTIFICATIONS-EDWARD M. BUFKIN**
This assignment was made subject to regulations of the State of Alabama Real Estate Appraisers Board. The state certified appraiser who performed this appraisal has met the requirements of the Board that allow this report to be regarded as a "certified appraisal".

Neither the appraiser or any other employee of Bufkin Appraisal Company have performed any services regarding the subject property within the three year period immediately preceding acceptance of the assignment, as an appraiser or in any other capacity.

I certify that, to the best of my knowledge and belief, the reported analyses, opinions and conclusions were developed, and this report has been prepared, in conformity with the requirements of the Code of Professional Ethics and the Standards of Professional Appraisal Practice of the Appraisal Institute. I further certify that the use of this report is subject to the requirements of the Appraisal Institute relating to review by its duly authorized representatives.

The Appraisal Institute conducts a mandatory program of continuing education for its designated members. As of the date of this report I, Edward M. Bufkin, SRA, have completed the requirements of the continuing education program of the Appraisal Institute.

**SYNOPSIS OF APPRAISER'S QUALIFICATIONS-EDWARD M. BUFKIN**
Engaged full time as a real estate appraiser since 1985. Self employed since 1995. Received a Bachelor of Science in Business Administration with a major emphasis in Real Estate and insurance from the University of Southern Mississippi in 1982. Granted an Alabama Real Estate Brokers License in 1983. Successfully completed numerous courses and seminars over the past twenty-seven years. Clients include virtually all major lending institutions and mortgage brokers in the area. Holds State Certificates R00049 from the Alabama Real Estate Appraisers Board and RD4605 from the Florida Real Estate Appraisers Board. Designated as an SRA member by the Appraisal Institute.

File No. 0012324 | Page #5

**DEFINITION OF MARKET VALUE:** The most probable price which a property should bring in a competitive and open market under all conditions requisite to a fair sale, the buyer and seller, each acting prudently, knowledgeably and assuming the price is not affected by undue stimulus. Implicit in this definition is the consummation of a sale as of a specified date and the passing of title from seller to buyer under conditions whereby: (1) buyer and seller are typically motivated; (2) both parties are well informed or well advised, and each acting in what he considers his own best interest; (3) a reasonable time is allowed for exposure in the open market; (4) payment is made in terms of cash in U.S. dollars or in terms of financial arrangements comparable thereto; and (5) the price represents the normal consideration for the property sold unaffected by special or creative financing or sales concessions* granted by anyone associated with the sale.

> *Adjustments to the comparables must be made for special or creative financing or sales concessions. No adjustments are necessary for those costs which are normally paid by sellers as a result of tradition or law in a market area; these costs are readily identifiable since the seller pays these costs in virtually all sales transactions. Special or creative financing adjustments can be made to the comparable property by comparisons to financing terms offered by a third party institutional lender that is not already involved in the property or transaction. Any adjustment should not be calculated on a mechanical dollar for dollar cost of the financing or concession but the dollar amount of any adjustment should approximate the market's reaction to the financing or concessions based on the appraiser's judgement.

## STATEMENT OF LIMITING CONDITIONS AND APPRAISER'S CERTIFICATION

**CONTINGENT AND LIMITING CONDITIONS:** The appraiser's certification that appears in the appraisal report is subject to the following conditions:

1. The appraiser will not be responsible for matters of a legal nature that affect either the property being appraised or the title to it. The appraiser assumes that the title is good and marketable and, therefore, will not render any opinions about the title. The property is appraised on the basis of it being under responsible ownership.

2. The appraiser has provided a sketch in the appraisal report to show approximate dimensions of the improvements and the sketch is included only to assist the reader of the report in visualizing the property and understanding the appraiser's determination of its size.

3. The appraiser has examined the available flood maps that are provided by the Federal Emergency Management Agency (or other data sources) and has noted in the appraisal report whether the subject site is located in an identified Special Flood Hazard Area. Because the appraiser is not a surveyor, he or she makes no guarantees, express or implied, regarding this determination.

4. The appraiser will not give testimony or appear in court because he or she made an appraisal of the property in question, unless specific arrangements to do so have been made beforehand.

5. The appraiser has estimated the value of the land in the cost approach at its highest and best use and the improvements at their contributory value. These separate valuations of the land and improvements must not be used in conjunction with any other appraisal and are invalid if they are so used.

6. The appraiser has noted in the appraisal report any adverse conditions (such as, needed repairs, depreciation, the presence of
hazardous wastes, toxic substances, etc.) observed during the inspection of the subject property or that he or she became aware of during the normal research involved in performing the appraisal. Unless otherwise stated in the appraisal report, the appraiser has no knowledge of any hidden or unapparent conditions of the property or adverse environmental conditions (including the presence of hazardous wastes, toxic substances, etc.) that would make the property more or less valuable, and has assumed that there are no such conditions and makes no guarantees or warranties, express or implied, regarding the condition of the property. The appraiser will not be responsible for any such conditions that do exist or for any engineering or testing that might be required to discover whether such conditions exist. Because the appraiser is not an expert in the field of environmental hazards, the appraisal report must not be considered as an environmental assessment of the property.

7. The appraiser obtained the information, estimates, and opinions that were expressed in the appraisal report from sources that he or she considers to be reliable and believes them to be true and correct. The appraiser does not assume responsibility for the accuracy of such items that were furnished by other parties.

8. The appraiser will not disclose the contents of the appraisal report except as provided for in the Uniform Standards of Professional Appraisal Practice.

9. The appraiser has based his or her appraisal report and valuation conclusion for an appraisal that is subject to satisfactory completion, repairs, or alterations on the assumption that completion of the improvements will be performed in a workmanlike manner.

10. The appraiser must provide his or her prior written consent before the lender/client specified in the appraisal report can distribute
the appraisal report (including conclusions about the property value, the appraiser's identity and professional designations, and references to any professional appraisal organizations or the firm with which the appraiser is associated) to anyone other than the borrower; the mortgagee or its successors and assigns; the mortgage insurer; consultants; professional appraisal organizations; any state or federally approved financial institution; or any department, agency, or instrumentality of the United States or any state or the District of Columbia; except that the lender/client may distribute the property description section of the report only to data collection or reporting service(s) without having to obtain the appraiser's prior written consent. The appraiser's written consent and approval must also be obtained before the appraisal can be conveyed by anyone to the public through advertising, public relations, news, sales, or other media.

Bufkin Appraisal Company
Form ACR  DEFD — "TOTAL for Windows" appraisal software by a la mode, inc. — 1-800-ALAMODE

File No. 0012324 Page #7

**APPRAISER'S CERTIFICATION:** The appraiser certifies and agrees that:

1. I have researched the subject market area and have selected a minimum of three recent sales of properties most similar and proximate to the subject property for consideration in the sales comparison analysis and have made a dollar adjustment when appropriate to reflect the market reaction to those items of significant variation. If a significant item in a comparable property is superior to, or more favorable than, the subject property, I have made a negative adjustment to reduce the adjusted sales price of the comparable and, if a significant item in a comparable property is inferior to, or less favorable than the subject property, I have made a positive adjustment to increase the adjusted sales price of the comparable.

2. I have taken into consideration the factors that have an impact on value in my development of the estimate of market value in the appraisal report. I have not knowingly withheld any significant information from the appraisal report and I believe, to the best of my knowledge, that all statements and information in the appraisal report are true and correct.

3. I stated in the appraisal report only my own personal, unbiased, and professional analysis, opinions, and conclusions, which are subject only to the contingent and limiting conditions specified in this form.

4. I have no present or prospective interest in the property that is the subject to this report, and I have no present or prospective personal interest or bias with respect to the participants in the transaction. I did not base, either partially or completely, my analysis and/or the estimate of market value in the appraisal report on the race, color, religion, sex, handicap, familial status, or national origin of either the prospective owners or occupants of the subject property or of the present owners or occupants of the properties in the vicinity of the subject property.

5. I have no present or contemplated future interest in the subject property, and neither my current or future employment nor my compensation for performing this appraisal is contingent on the appraised value of the property.

6. I was not required to report a predetermined value or direction in value that favors the cause of the client or any related party, the amount of the value estimate, the attainment of a specific result, or the occurrence of a subsequent event in order to receive my compensation and/or employment for performing the appraisal. I did not base the appraisal report on a requested minimum valuation, a specific valuation, or the need to approve a specific mortgage loan.

7. I performed this appraisal in conformity with the Uniform Standards of Professional Appraisal Practice that were adopted and promulgated by the Appraisal Standards Board of The Appraisal Foundation and that were in place as of the effective date of this appraisal, with the exception of the departure provision of those Standards, which does not apply. I acknowledge that an estimate of a reasonable time for exposure in the open market is a condition in the definition of market value and the estimate I developed is consistent with the marketing time noted in the neighborhood section of this report, unless I have otherwise stated in the reconciliation section.

8. I have personally inspected the interior and exterior areas of the subject property and the exterior of all properties listed as comparables in the appraisal report. I further certify that I have noted any apparent or known adverse conditions in the subject improvements, on the subject site, or on any site within the immediate vicinity of the subject property of which I am aware and have made adjustments for these adverse conditions in my analysis of the property value to the extent that I had market evidence to support them. I have also commented about the effect of the adverse conditions on the marketability of the subject property.

9. I personally prepared all conclusions and opinions about the real estate that were set forth in the appraisal report. If I relied on significant professional assistance from any individual or individuals in the performance of the appraisal or the preparation of the appraisal report, I have named such individual(s) and disclosed the specific tasks performed by them in the reconciliation section of this appraisal report. I certify that any individual so named is qualified to perform the tasks. I have not authorized anyone to make a change to any item in the report; therefore, if an unauthorized change is made to the appraisal report, I will take no responsibility for it.

**SUPERVISORY APPRAISER'S CERTIFICATION:** If a supervisory appraiser signed the appraisal report, he or she certifies and agrees that: I directly supervise the appraiser who prepared the appraisal report, have reviewed the appraisal report, agree with the statements and conclusions of the appraiser, agree to be bound by the appraiser's certifications numbered 4 through 7 above, and am taking full responsibility for the appraisal and the appraisal report.

**ADDRESS OF PROPERTY APPRAISED:** 1324 West Lagoon Avenue, Gulf Shores, AL 36542

| APPRAISER: | SUPERVISORY APPRAISER (only if required): |
|---|---|
| Signature: _Andrew D. Wilcoxon_ | Signature: _Edward M. Bufkin_ |
| Name: Andrew D. Wilcoxon | Name: Edward M. Bufkin, SRA |
| Date Signed: 12/06/2010 | Date Signed: 12/06/2010 |
| State Certification #: | State Certification #: R00049 |
| or State License #: T01834 | or State License #: |
| State: AL | State: AL |
| Expiration Date of Certification or License: 9/30/2011 | Expiration Date of Certification or License: 9/30/2011 |
| | ☒ Did ☐ Did Not Inspect Property |

Freddie Mac Form 439 6-93                    Page 2 of 2                    Fannie Mae Form 1004B 6-93

Form ACR_DEFD — *TOTAL for Windows* appraisal software by a la mode, inc. — 1-800-ALAMODE

File No. 0012324| Page #9

## Subject Photos

| Borrower/Client | N/A | | | | |
|---|---|---|---|---|---|
| Property Address | 1324 West Lagoon Avenue | | | | |
| City | Gulf Shores | County | Baldwin | State | AL | Zip Code | 36542 |
| Lender | Luther Sutter | | | | |



**Subject Front**
1324 West Lagoon Avenue



**Subject Rear**



**Subject Street**

File No. 0012324| Page #9

## Subject Photos

| | | | |
|---|---|---|---|
| Borrower/Client   N/A | | | |
| Property Address  1324 West Lagoon Avenue | | | |
| City   Gulf Shores | County  Baldwin | State  AL | Zip Code  36542 |
| Lender   Luther Suiter | | | |



**Additional Rear**
1324 West Lagoon Avenue



**Pier**



**Dock with Slips**

Form PICPIX.TR — "TOTAL for Windows" appraisal software by a la mode, inc. — 1-800-ALAMODE

## Comparables Map

File No. 0012324 Page # 10

| | |
|---|---|
| Borrower/Client N/A | |
| Property Address 1324 West Lagoon Avenue | |
| City Gulf Shores County Baldwin | State AL Zip Code 36542 |
| Lender Luther Sutter | |



File No. 0012324 | Page # 11

## Area Map

| Borrower/Client | N/A | | | | | | |
|---|---|---|---|---|---|---|---|
| Property Address | 1324 West Lagoon Avenue | | | | | | |
| City | Gulf Shores | County | Baldwin | State | AL | Zip Code | 36542 |
| Lender | Luther Sutter | | | | | | |



File No. 00123241 Page #12

**Flood Map**

| | | | | |
|---|---|---|---|---|
| Borrower/Client N/A | | | | |
| Property Address 1324 West Lagoon Avenue | | | | |
| City Gulf Shores | County Baldwin | State AL | Zip Code 36542 | |
| Lender Luther Sutter | | | | |



InterFlood
by a la mode
www.interflood.com • 1-800-252-6633

**Prepared for:**
Bufkin Appraisal Company

Gulf Shores, AL 36542

ZONE VE (EL 12)

Little Lagoon

6

ZONE AE (EL 11)

W. LAGOON AVE

ZONE VE (EL 12)

W. BEACH

ZONE VE (EL 13)

**FLOODSCAPE**

Flood Hazards Map

Map Number
01003C1076L

Effective Date
July 17, 2007

Powered by FloodSource
877.77.FLOOD
www.floodsource.com

0'    300'   600'   900'   1200'

© 1999-2010 SourceProse and/or FloodSource Corporations. All rights reserved. Patents 6,631,326 and 6,678,615. Other patents pending. For info: info@floodsource.com

File No. 0012324l Page #13

**Aerial Map**

| Borrower/Client   N/A | | | | |
| Property Address  1324 West Lagoon Avenue | | | | |
| City   Gulf Shores | County   Baldwin | State   AL | Zip Code   36542 |
| Lender   Luther Sutter | | | | |



File No. 0012324   Page #15

**Site Map**

| Borrower/Client | N/A | | | | |
|---|---|---|---|---|---|
| Property Address | 1324 West Lagoon Avenue | | | | |
| City | Gulf Shores | County | Baldwin | State | AL | Zip Code | 36542 |
| Lender | Luther Sutter | | | | |



File No. 0012324 | Page #16

| FROM: | | **INVOICE** | |
|---|---|---|---|
| Edward M. Bufkin | | | |
| Bufkin Appraisal Company | | INVOICE NUMBER | |
| Post Office Box 2777 | | 0012324 | |
| Gulf Shores, AL 36547-2777 | | DATE | |
| Gulf Shores | | 12/06/2010 | |
| Telephone Number: (251) 968-8235 Fax Number: (251) 968-7679 | | | |

| TO: | | REFERENCE | |
|---|---|---|---|
| | | Internal Order #: | 0012324 |
| Luther Sutter | | Lender Case #: | |
| P.O. Box 2012 | | Client File #: | |
| Benton, AR 72018 | | Main File # on form: | 0012324 |
| | | Other File # on form: | ADW12324 |
| Telephone Number: Fax Number: | | Federal Tax ID: | 63-1265388 |
| Alternate Number: E-Mail: luthersutter@yahoo.com | | Employer ID: | |

**WE APPRECIATE YOUR BUSINESS**

## DESCRIPTION

Lender: Luther Sutter          Client: Luther Sutter
Purchaser/Borrower: N/A
Property Address: 1324 West Lagoon Avenue
City: Gulf Shores
County: Baldwin          State: AL          Zip: 36542
Legal Description: East 1/2 of Lot 5, Carl T. Martin Unit of Gulf Shores

| FEES | AMOUNT |
|---|---|
| Appraisal Fee - $250 per report ($750 total) | 250.00 |
| | |
| **SUBTOTAL** | 250.00 |

| PAYMENTS | | AMOUNT |
|---|---|---|
| Check #: Date: Description: | | |
| Check #: Date: Description: | | |
| Check #: Date: Description: | | |
| **SUBTOTAL** | | |
| **TOTAL DUE** | $ | 250.00 |

Form NIV5 — "TOTAL for Windows" appraisal software by a la mode, inc. — 1-800-ALAMODE
Bufkin Appraisal Company

Mar 24 11 10:47a      TEW PHONE/FAX                          7707889027              p.1

March 24, 2011

Attn: Rick Carruth
        RE/MAX  - Orange Beach

From: Bruce Tew
        404-925-5051 cell

RE: 1376 B Laguna Sands.

        5 pgs. total

Mar 24 11 10:48a     TEW PHONE/FAX                    7707889027                    p.2





**PURCHASE AGREEMENT**

LISTING COMPANY: Realty South OB          SELLING COMPANY: ReMax OB

EFFECTIVE DATE: (To be completed by the last party to sign or Initial acceptance of the final offer.)

Date _____ Initials _____

PLEASE READ CAREFULLY - This is a legally binding agreement. If you have any questions, please seek advice of legal counsel. You may retain legal counsel to review and/or prepare this Purchase Agreement for you. This is a preprinted Purchase Agreement and prior to its signing by all parties is subject to negotiation between the parties to the Agreement. Wherever Purchaser or Seller is mentioned, below if there is more than one Purchaser or more than one Seller party to this agreement, it is understood that the words Purchaser or Seller shall represent all Purchasersor all Sellers.

REAL ESTATE CONSUMER'S AGENCY DISCLOSURE:

THE LISTING COMPANY _____          IS:  THE SELLING COMPANY ReMax OB _____ IS:
                            Print                                               Print

(Two blocks may be checked)                    (Two blocks may be checked)
☐ An agent of the seller                       ☐ An agent of the seller
☐ An agent of the buyer                        ☒ An agent of the buyer
☐ An agent of both the seller and buyer        ☐ An agent of both the seller and buyer
  and is acting as a limited Consensul dual agent.   and acting as a limited consensual dual agent
☐ Assisting the ____ buyer ____ seller as a transaction broker   ☐ Assisting the ____ buyer ____ Seller as a transaction broker
☐ Seller(s) Initials _____          ☐ Purchaser(s) Initials: WBT

PURCHASER'S OFFER:

1. THE UNDERSIGNED, HEREINAFTER CALLED THE PURCHASER, HEREBY OFFERS TO PURCHASE THE PROPERTY
Located in the City of Gulf Shores _____ County of Baldwin _____, Alabama, commonly known as:
Laguna Sands #1376B _____, and legally described as: 1376 West Lagoon Ave
Gulf Shores, Al 36542 #1376B
for the sum of (exactly) ONE HUNDRED EIGHTY THOUSAND _____ Dollars ($) 180,000.00

2. THE TERMS OF THIS PURCHASE SHALL INDICATED BY "X" BELOW (UNMARKED ITEMS DO NOT APPLY):
☒ CASH: The full purchase price upon execution and delivery of Warranty Deed/Bill of Sale.
☒ NEW CONVENTIONAL MORTGAGE: The full purchase price upon execution and delivery of Warranty Deed/Bill of Sale,
contingent upon Purchaser's ability to obtain a 30 ____ year fixed ____ (type) mortgage in the amount of $ 135,000.00
at an annual interest rate not to exceed 6 ____ % of computed monthly, for which Purchaser agrees to apply for immediately and accept promptly if tendered. All prepaid and loan closing costs which lender requires borrower to pay shall be paid by Purchaser. Discount points not to exceed ____ % of mortgage amount to be paid by ☐ Purchaser ☐ Seller. Origination fee not to exceed ____ % of mortgage amount to be paid by ☐ Purchaser ☐ Seller. All other lender fees to be paid by ☐ Purchaser ☐ Seller, unless otherwise specified herein. ☐ Purchaser ☐ Seller to make repairs or replacements as required for mortgage loan purposes, not to exceed
$ _____ not including possible repairs as may be required by paragraphs 5 and 9 below.
☐ PRE-QUALIFICATION: Purchaser has been pre-approved for loan in the amount of $ _____
by _____ loader. Written verification from lender must be attached to this Purchase Agreement
☐ VENDOR'S LIEN DEED: $ _____ upon execution and delivery of Warranty Deed/Bill of Sale reserving a Vendor's
Lien wherein the balance of $ _____ shall be amortized for a period of ____ years and shall be payable in ____
monthly/or ____ annual installments of $ _____ ☐ including ☐ plus interest at ____ % per annum. interest to start on date of closing and the first payment becoming due _____ after closing. There ☐ shall ☐ shall not be a prepayment penalty of ____ % of the unpaid balance. Vendor's Lien ☐ shall ☐ shall not be assumable without written consent of lien holder, and the Vendor's Lien Note ☐ shall ☐ shall not Contain a late charge provision of ____ % of payment due when paid more than ____ days after due date thereof. Purchaser agrees to provide at his/her expense a credit report, verification of income or other financial data satisfactory to Seller. The Vendors Lien shall require Purchaser to pay all ad valorem taxes when due and to furnish hazard insurance coverage on buildings and improvements (and flood insurance if required by Seller) with standard mortgage clause. Purchaser to supply first year's insurance policy at closing and continue insurance coverage on the buildings and improvements for the term of the Vendor's Lien.

☐ FHA/VA MORTGAGE: SEE ATTACHED ADDENDUM
OTHER MORTGAGE PROVISIONS: _____

APPRAISAL This offer ☒ is ☐ is not subject to property appraising for at least the purchase price. The Purchaser shall, however, have the privilege and option of proceeding with the consummation of the contract without regard to the amount of the appraised valuation.

INITIALS BELOW INDICATE RECEIPT OF PAGE I OF 4 OF THIS AGREEMENT.
SELLER(S) INITIALS _____ PURCHASER(S) INITIALS WBT

This Purchase Agreement is for the exclusive use of members
of the Baldwin County Association of REALTORS®

Mar 24 11 10:48a        TEW PHONE/FAX                    7707889027            p.3

3. **ALL IMPROVEMENTS, PERMANENT FIXTURES AND APPURTENANCES ARE INCLUDED IN THE PURCHASE PRICE, EXCEPT:** NO EXCEPTIONS. PROPERTY TO CONVEY AS SEEN ON 3/23/11. FULLY FURNISHED.

4. **NO ITEMS OF PERSONAL PROPERTY** shall be transferred to purchase unless specifically itemized herein. Fixtures and improvements located on Fair hope Single Tax Corporation property shall be part of the property and not considered personal.

_____

_____

**ANY PERSONAL PROPERTY** that does remain is of **NO VALUE** for appraisal and mortgage loan purposes unless otherwise noted.

5. **PURCHASER HAS EXAMINED THIS PROPERTY** and agrees to accept same in its present condition, except as may be specified herein. Heating, cooling and air-conditioning equipment, including window units, plumbing, and electrical systems and all included appliances **shall** be warranted by Seller to be in working order at time of conveyance. Providing utility availability, if necessary, for this inspection is the responsibility of the ☐ Purchaser ☒ Seller. Purchaser may be required to sign a final Walk-through/Systems Check Inspection Form, indicating that the inspection was completed and that the property was acceptable, unless otherwise noted on the form. Purchaser understands that if a Sales Associate accompanies Purchaser on this final inspection it will be as a courtesy only and not as a person qualified to detect any defect. Cost of septic tank inspection and cost of well water testing, if any required, shall be paid for by ☐ Purchaser ☐ Seller.

6. **PURCHASER IS AWARE** that professional inspection of home structure and systems, and any other items of importance to Purchaser, are available by a representative of Purchaser's choosing. Sale ☒ Is ☐ Is not subject to said inspection. If sale is subject to said inspection, Purchaser agrees to pay for same, and if said inspection is found to be unsatisfactory to Purchaser, Seller is to be notified in writing within 10 business days of acceptance of this agreement. Otherwise, this contingency will be considered removed at the expiration of such period.

7. **A HOME WARRANTY** subject to limitations, exclusions, and deductibles, ☐ **shall** ☐ **shall not** be furnished at expense of ☐ Purchaser ☐ Seller.

8. **LEAD-BASED PAINT DISCLOSURE AND CONTINGENCY.** Federal law requires that for all residential dwellings constructed prior to 1978, Purchaser is put on notice of his/her rights to test for lead-based paint. **Check here** ☐ If a lead-based paint warning is **attached** and made part of this Purchaser Agreement.

9. **SELLER SHALL FURNISH WRITTEN EVIDENCE,** from a bonded and licensed termite control company, that a **visual inspection by them** of accessible areas of the **dwelling, carport and garage** indicated that the dwelling, carport and garage are free from active infestation by wood-destroying insects or fungus and damage caused by currently active infestation. The current termite contract if any, is to be transferred to Purchaser at Purchaser's expense. If a Structural Damage Report is required by Lender, the cost shall be paid by ☐ **Purchaser** ☒ **Seller.**

10. **ALL AD VALOREM TAXES, HOMEOWNERS ASSOCIATION DUES AND ANY RENTS** being collected from existing tenants, are to be prorated at time of closing. Purchaser to honor any confirmed rentals booked at time of closing at published rental rates. All security deposits, keys and lease or rental management agreements to be transferred to Purchaser at closing. **NOTE:** Taxes are prorated based upon current information furnished by the Revenue Commissioner's Office. Brokers and Real Estate Associates cannot and do not assume any responsibility for any change, modification or adjustment to the current tax assessment by the Revenue Commissioner's Office. If property is assessed under the CURRENT USE CLASSIFICATION, then any rollback or other additional assessment levied against property as a result of this sale shall be paid by ☐ Purchaser ☒ Seller.

11. **PROPERTY ASSESSMENTS** which become a lien on the property prior to closing date shall be paid by the Seller, without proration. Any public improvements, now installed but not yet a lien, shall be paid by ☐ **Purchaser** ☒ **Seller.** Any Homeowners Association assessments known to the parties at the time of the execution of Purchase Agreement that become due prior to closing shall be paid by ☐ **Purchaser** ☒ **Seller.** Homeowners Association assessments that have been approved by the Association which become due after closing shall be paid by ☒ **Purchaser** ☐ **Seller.**

12. **A CURRENT SURVEY** ☐ **shall** ☐ **shall not** be furnished prior to closing and paid for by ☐ **Purchaser** ☐ **Seller.**

13. A. **PURCHASER** to pay closing agent settlement fee, recording fee and mortgagee title insurance policy required by lender.
    B. **SELLER** to pay for preparation of Warranty Deed/Bill of Sale and Owner's Title Insurance Policy in the amount of the purchase price.

INITIALS BELOW INDICATE RECEIPT OF PAGE 2 OF 4 OF THIS AGREEMENT.
SELLER(S) INITIALS _____ PURCHASER(S) INITIALS _WGT_

This Purchase Agreement is for the exclusive use of members of the Baldwin County Association of REALTORS®

Mar 24 11 10:49a        TEW PHONE/FAX                        7707889027              p.4

14. **SALE SHALL BE CLOSED AND DEED/BILL OF SALE** delivered on <u>APRIL 25</u> ,20 <u>11</u> , or sooner, if mutually agreed upon in writing by Purchaser and Seller. Time shall be of the essence with all terms and conditions and particulars of this agreement. Title is to be taken in the names(s) of <u>WILLIAM BRUCE TEW</u>

☒ with ☐ without right of survivorship, in a form satisfactory to Purchaser. The property is sold and is to be conveyed subject to mineral and mining rights not owned by Seller and subject to present zoning and flood plain classification, utility easements, covenants, restrictions and building set back lines. Seller owned mineral rights ☐ do ☐ do not convey.

15. **A PERIOD OF THIRTY (30) DAYS** from the date of closing, as stated in paragraph 14, shall be allowed for closing if the closing is delayed by reason of title defects that can be readily corrected.

16. **A PERIOD OF TEN (10) DAYS** from date of closing, as stated in paragraph 14, shall be allowed for closing if the terms of purchase require a new mortgage and the lender issues a written unconditional commitment-letter no later than the date of closing in paragraph 14 above but is delayed in consummating the mortgage.

17. **RISK OR LOSS BY FIRE or other casualty, or condemnations shall be on the Seller until title Is conveyed.**

18. **POSSESSION TO BE GIVEN the Purchaser** at closing or ☐ _____ days after closing. In the event Seller retains possession of the property beyond this date, Seller shall pay $ _____ per day as rental, but will vacate by _____ ,20 _____ ☐ a.m. ☐ p.m., without fail. Seller does hereby guarantee that at the date of surrender of occupancy by the Seller, the property shall be in the same condition as on the day of closing. Seller shall provide to Purchaser keys and/or means to operate all property locks, mailboxes and security systems at date of possession.

19. **FOR VALUABLE CONSIDERATION** Purchaser gives the Listing Broker above named until <s>3/28</s> 3/25 ,20 11 <u>5</u> ☐ a.m. ☒ p.m., to obtain the written acceptance of this offer and agrees that this offer, when signed, will constitute a binding agreement between the Purchaser and Seller. Purchaser herewith deposits $ 2,500. in the form of ☐ cash ☒ check evidencing Purchaser's good faith, to be deposited in escrow by **Selling Broker** (herein referred to as Holder) upon acceptance of offer and to be applied to the purchase price at time of closing. If this offer is not accepted, the earnest money deposit is to be returned to the Purchaser. If this offer is accepted and the title is not marketable, or if the terms of purchase are contingent upon ability to obtain a new mortgage or Vendor's Lien or other contingencies as specified which cannot be met, this deposit is to be refunded upon written agreement signed by Purchaser and Seller. The parties to this Agreement **understand and acknowledge** that disbursement of earnest monies held by Holder/Escrow Agent can occur only as follows: (A) at closing; (B) upon written agreement signed by Purchaser and Seller; or (C) upon court order. **In the event a dispute arises between Purchaser and Seller as to the final disposition of the earnest money,** Holder shall be authorized to Interplead the earnest money Into a Court of competent jurisdiction. Holder shall be **entitled to be compensated by the party who does not prevail In the Interpleader Action for Its costs and expenses, Including reasonable attorney's fees incurred In filing said Interpleader.** All parties to this Agreement agree that Holder may deposit the earnest money in an interest - bearing escrow/trust account and that Holder will retain the interest earned on said deposit. In the event Earnest Money check is returned for insufficient funds or otherwise not honored by the bank drawn upon and Purchaser has not delivered good funds to Holder within three (3) days of bank's notice to Holder, then and in that event, the Seller, at his sole discretion shall have the right to terminate this Agreement by giving written notice to the Purchaser.

20. **Other provisions:** <u>PURCHASER TO VIEW AND APPROVE CONDO DOC AND FINANCES.</u>

21. **DEFAULT LEGAL REMEDIES:**
   A. **Default by PURCHASER:** In the event that PURCHASER fails to consummate this Agreement, **SELLER** shall have the right to pursue any remedy available at law or in equity as a result of such breach, including specifically, without limitation, the right (a) to **RETAIN the EARNEST MONEY,** (b) the right to **ENFORCE SPECIFIC PERFORMANCE** of this Agreement, and (c) the right to **TERMINATE this AGREEMENT,** and thereafter **RECOVER DAMAGES** against PURCHASER for breach by PURCHASER thereof.
   B. **Default by SELLER:** In the event that **SELLER** fails to consummate this Agreement, **PURCHASER** shall have the right to pursue any remedy available at law or in equity as a result of such breach, including specifically, without limitation, the right (a) to receive the **RETURN** of the **EARNEST MONEY,** (b) the right to **ENFORCE SPECIFIC PERFORMANCE** of the obligation of Seller to execute the documents required to convey the Real Property to **PURCHASER,** and (c) the right to **TERMINATE this AGREEMENT** and thereafter **RECOVER DAMAGES** against SELLER for breach by SELLER thereof.
   C. **ARBITRATION:** If an Arbitration clause is attached to this Purchase Agreement as an addendum and is signed by all Purchaser and Sellers to this Purchase Agreement, the same shall supersede the remedies provided for elsewhere.

INITIALS BELOW INDICATE RECEIPT OF PAGE 3 OF 4 OF THIS AGREEMENT.
SELLER(S) INITIALS _____     PURCHASER(S) INITIALS _WBT_

This Purchase Agreement is for the exclusive use of members of the Baldwin County Association of REALTORS®

22. **THE PURCHASE PRICE AND TERMS OF THIS SALE MAY BE DISCLOSED**, after closing, by the real estate companies for use in the ordinary conduct of their business. Real Estate Brokers/Sales Associates may benefit financially as a result of recommending real estate-related services to clients and customers. All parties to this Agreement are advised to also seek other services or compare cost of services in these related fields and do business with whomever or wherever is most desirable to them.

23. **PURCHASER AND SELLER** hereby acknowledge and confirm that this Purchase Agreement states the entire agreement between the parties hereto and no modification of this Agreement shall be binding unless attached hereto and signed by both Purchaser and Seller.

24. **THE FACSIMILE TRANSMISSION** of a signed copy hereof or any counteroffer to the other party or his/her Sales Associate, followed by facsimile acknowledgment of receipt, shall constitute delivery of said signed document. The parties agree to affirm such delivery by mailing or personally delivering a signed original copy to the other party or his/her Sales Associate.

25. **ALL PARTIES TO THIS PURCHASE AGREEMENT** understand and acknowledge that Listing Brokers/Selling Brokers and/or Sales Associates are not parties to this Purchase Agreement and as such do not assume any liability for performance or nonperformance of any parties to this agreement.

26. **PURCHASER ACKNOWLEDGES RECEIPT** of a copy of this Agreement and attached addenda, if any, which are made a part of this Purchase Agreement. Date _3/24_ ,20 _11_   _5_   ☐ a.m. ☒ p.m.,

Purchaser X _William Bruce Tew_ _____ (print) _William Bruce Tew_ ___ SS # XXXXXXXXXX

Purchaser X _____ (print) _____ SS # _____

Purchaser's Address _____ Phone: (res) _____ (wk) _____

Witness X _____ Selling Associate: X _RICK CARRUTH SR_ (res) _____ (wk) _752-7663_

27. **SELLER'S ACCEPTANCE OF OFFER/RECEIPT OF ACCEPTANCE:** Date: _____ ,20 ___ _____ ☐ a.m. ☐ p.m.
The above offer is hereby accepted _____

_____

**In the event a counteroffer is made**, it shall expire on _____ ,20 ___ _____ ☐ a.m. ☐ p.m. , if Purchaser has not given prior written acceptance. Seller acknowledges receipt of a copy of this Agreement and attached addenda, if any which are made part of this Purchase Agreement.

Seller X _____ (print) _____ SS # _____
(print name as title is held)

Seller X _____ (print) _____ SS # _____
(print name as title is held)

Seller's Address _____ Phone: (res.) _____ (wk) _____

Witness X _____ Listing Associate: X _____ (res.) _____ (wk) _____

28. **PURCHASER'S ACCEPTANCE OF COUNTEROFFER/RECEIPT OF ACCEPTANCE:**
Purchaser acknowledges receipt of Seller's acceptance of Purchaser's offer. In the event this acceptance was subject to certain changes from the Purchaser's offer, the Purchaser agrees to accept said changes. All other provisions of the original offer remain unchanged.

Date: _____ ,20 _____ ☐ a.m. ☐ p.m., Purchaser X _____

INITIALS BELOW INDICATE RECEIPT OF PAGE 4 OF 4 OF THIS AGREEMENT.
SELLER(S) INITIALS _____ PURCHASER(S) INITIALS _WBT_

This Purchase Agreement is for the exclusive use of members of the Baldwin County Association of REALTORS®



**PRESS FIRMLY** you are writing through 4 copies.

**PURCHASE AGREEMENT
RESIDENTIAL PROPERTY**



**EFFECTIVE DATE: DATE:** _____ **INITIALS:** _____/_____
(To be completed by the last party to sign acceptance of the final offer.)

**PLEASE READ CAREFULLY** - Alabama is a Caveat Emptor State. If you have any questions, please seek advice of legal counsel. This is a legally binding preprinted Purchase Agreement and prior to its signing by all parties is subject to negotiation between the parties to the Agreement. You may retain legal counsel to review and/or prepare this Purchase Agreement for you. Wherever Buyer or Seller is mentioned below, if there is more than one Buyer or more than one Seller party to this Agreement, it is understood that the words Buyer or Seller shall represent all Buyers or all Sellers. Any items left unmarked do not apply and are not material to this transaction.

**REAL ESTATE CONSUMER'S AGENCY DISCLOSURE (RECAD):**
The Listing Company is: REALTY SOUTH ORANGE BEACH          The Selling Company is: REMAX OF GULF SHORES
(Two blocks may be checked)                                (Two blocks may be checked)

[★] An agent of the Seller                          [ ] An agent of the Seller
[ ] An agent of the Buyer                            [★] An agent of the Buyer
[ ] An agent of both the Seller and Buyer, and      [ ] An agent of both the Seller and Buyer, and
is acting as a limited consensual dual agent         is acting as a limited consensual dual agent
[ ] Assisting the ___Buyer ___Seller as a Transaction Broker   Assisting the ___Buyer ___Seller as a Transaction Broker

_____/_____                           PLS___/____
Seller(s) Initials                                  Buyer(s) Initials

Subject to the terms, conditions, addendums, and disclosures contained or referenced herein, the undersigned execute this Purchase Agreement ("Agreement") as follows:

1. **PROPERTY AND PURCHASE PRICE:** Buyer hereby offers to buy and Seller hereby agrees to sell the Property located in or near GULF SHORES _____ Alabama, whose commonly known address is 1376 WEST LAGOON AVENUE and which is legally described as UNIT 1376 A OF LAGUNA SANDS TAX PPIN# 273363 _____("Property") together with all improvements, shrubbery, plantings, fixtures, appurtenances, and subject to any existing building and use restrictions, recorded covenants, deed restrictions, previous mineral exclusions, zoning ordinances, zoning restrictions, zoning designation, the current flood plain and governmental or subdivision regulations and easements, if any, of record, for the sum of ONE HUNDRED NINETY THOUSAND DOLLARS _____ ($ 190,000.00 _____).

2. **THE TERMS OF THE PURCHASE SHALL BE AS MARKED BELOW:**

   A. _X__ CASH. The full Purchase Price upon execution and delivery of Warranty Deed or Warranty Bill of Sale with required Lease.
   B. _____ NEW MORTGAGE. The full Purchase Price upon execution and delivery of Warranty Deed/Warranty Bill of Sale, contingent upon Buyer's ability to obtain a _____ year _____ (type) mortgage in the approximate amount of $_____ or in amount equal to or greater than _____% of the Purchase Price, at an INTEREST RATE NOT TO EXCEED _____%, which Buyer agrees to apply for immediately, use best efforts to obtain, and accept promptly if tendered. All lender required, or related fees and credit report fee shall be paid by the Buyer, unless otherwise agreed upon in writing by all parties. Buyer shall pay all loan closing costs unless otherwise noted, including prepaid items and recording fees. Written notification from the lender that Buyer's ability to obtain financing under the terms of this Agreement is within the lender's guidelines is to be provided within ____ business days of the Effective Date of this Agreement.
   C. _____ VENDOR'S LIEN DEED: SEE ATTACHED ADDENDUM
   D. _____ FHA/VA MORTGAGE: SEE ATTACHED ADDENDUM
   E. _____ OTHER MORTGAGE PROVISIONS: _____

This Purchase Agreement is for the exclusive use of members of the Baldwin County Association of REALTORS®.
The Baldwin County Association of REALTORS®, Inc., and its members, are not engaged in rendering legal, accounting or other professional service by approving this form. This form is published as a service to member real estate professionals and an explanation of its various provisions should be obtained from the appropriate professional. Because of varying state and local laws, competent legal or other advice should be secured before using any form. If a user of this form makes any substantive changes to any portions above, the form will no longer be an approved form. Buyer and Seller are encouraged to seek advice from legal and tax advisors prior to the purchase or sale of any property.

INITIALS BELOW INDICATE RECEIPT OF PAGE 1 OF 6 PAGES OF THIS AGREEMENT.
SELLER(S) INITIALS: ____ ____ PURCHASER(S) INITIALS: PLS ____

10/2009

PROPERTY ADDRESS 1376 WEST LAGOON AVENUE, GULF SHORES, AL 36542

3. **PERSONAL PROPERTY:** No items of personal property shall be transferred to Buyer unless specifically itemized herein: ALL CONVEY AS VIEWED ON 3/15/11 _____, Any items of personal property listed herein or otherwise attached hereto shall be conveyed at no value for appraisal purposes. Fixtures and improvements located on Fairhope Single Tax Corporation property shall be part of the Property and not considered personal.

4. **TERMITE REPORT:** Seller is to furnish at Seller's expense an Alabama Wood Infestation Report issued by a bonded and licensed pest control company stating that a visual inspection of accessible areas of the dwelling and garage and/or carport and any detached buildings given value by an appraisal indicates there is no visible sign of infestation or damage by Formosan and subterranean termites, powder post beetles, wood boring beetles, dry wood termites and wood decaying fungi. If active infestation or fungus is reported, treatment of the entire dwelling will be required unless Property is under a current termite contract in which case a re-treatment of the affected area will be permitted. Treatment will also be required in affected outbuildings if required by lender. A structural inspection by a licensed contractor at __X__ Seller's ____ Buyer's expense may be required by the lender if any evidence of previous infestation and/or damage is found. If not required by the lender, Buyer may order a structural inspection, satisfactory to Buyer at Buyer's expense. Existing termite contract will be kept current and transferred to Buyer at Closing, subject to termite company approval, the cost of the transfer to be at Buyer's expense. If Property is not covered by an existing termite contract, Seller ____ shall ____ shall not provide termite replacement coverage ____ with ____ without Formosan coverage at Seller's expense.

5. **APPRAISAL:** This offer ____ is __X__ is not subject to Property appraising for at least the Purchase Price. If the offer is subject to said appraisal and the Property does not appraise for at least the Purchase Price, Seller is to be notified in writing within ____ business days following the Effective Date of this Agreement or this contingency shall be deemed removed. The Buyer shall, however, have the privilege and option to waive this contingency and proceed with the consummation of this Agreement without regard to the amount of the appraised valuation. (If Fairhope Single Tax Corporation Property, an appraisal is required at the expense of ____ Buyer ____ Seller).

6. **INSURANCE:** This offer ____ is __X__ is not subject to obtain insurance in an amount and for a cost satisfactory to Buyer and Buyer's lender (if applicable). If satisfactory insurance cannot be obtained, Seller is to be notified in writing within ____ business days following the Effective Date of this Agreement or this contingency shall be deemed removed.

7. **INSPECTIONS:** This offer __X__ is ____ is not contingent on inspection(s) satisfactory to Buyer. Any inspections and report, if ordered by Buyer, shall be at Buyer's expense. If any such inspection is not satisfactory, Seller shall be notified in writing within _10_ business days following the Effective Date of this Agreement or this contingency shall be deemed removed. Seller is not obligated to pay for improvements recommended by such inspection other than those that may be required by other provisions of this Agreement. If requested, Buyer shall furnish Seller, at no cost, a copy of any inspection reports. The cost of any septic tank inspection or the cost of well water testing, if required, shall be paid by ____ Buyer ____ Seller. Any connection fees required for said inspections shall be paid by ____ Buyer ____ Seller.

8. **MINERAL RIGHTS:** Subject to the provisions herein, Seller owned mineral rights ____ do ____ do not convey.

9. **SYSTEMS AND COMPONENTS/FIXTURES:** Seller __X__ does ____ does not warrant that the heating, cooling and air conditioning equipment, including window units, plumbing, electrical systems and all included appliances shall be in proper working order at time of Closing.

10. **CONDITION OF PROPERTY:** Upon Closing, Seller shall leave the Property clean and free of debris. **Except to the extent expressly set forth herein,** (1) Neither Seller nor Broker nor any REALTOR® makes any representations or warranties regarding condition of the Property; (2) Buyer has the obligation to determine any and all conditions of the Property material to Buyer's decision to buy the Property, including but not limited to, the condition of the heating, cooling, plumbing and electrical systems and any built-in appliances; the roof and the basement, including leaks therein; the presence of asbestos or toxic mold; the presence of arsenic in treated wood; the size and area of the Property; construction materials and workmanship; the proper construction of the Property by the builder or the developer; structure condition; utility and sewer or septic system availability, condition and location; water service and well water system quality and condition; subsurface and subsoil conditions, sinkholes and mining or other soil conditions, including radon or other potentially hazardous gases or toxic materials; Property access, easements, covenants, restrictions, developments, structures and any matters affecting the character of the neighborhood or subdivision; and (3) **IT IS THE BUYER'S DUTY TO THOROUGHLY INSPECT THE PROPERTY PRIOR TO CLOSING. THIS TRANSACTION IS CONSIDERED AN AS-IS WHERE-IS SALE EXCEPT AS OTHERWISE PROVIDED HEREIN.** Unless otherwise addressed in Paragraph 7 above, Seller will provide utilities and access for Buyer's inspection(s).

This Purchase Agreement is for the exclusive use of members of the Baldwin County Association of REALTORS®.
The Baldwin County Association of REALTORS®, Inc., and its members, are not engaged in rendering legal, accounting or other professional service by approving this form. This form is published as a service to member real estate professionals and an explanation of its various provisions should be obtained from the appropriate professional. Because of varying state and local laws, competent legal or other advice should be secured before using any form. If a user of this form makes any substantive changes to any portions above, the form will no longer be an approved form. Buyer and seller are encouraged to seek advice from legal and tax advisors prior to the purchase or sale of any property.

INITIALS BELOW INDICATE RECEIPT OF PAGE 2 OF 6 PAGES OF THIS AGREEMENT.
SELLER(S) INITIALS: ____ ____   PURCHASER(S) INITIALS: _DLS_ ____

INITIAL

10/2009

PROPERTY ADDRESS 1376 WEST LAGOON AVENUE, GULF SHORES, AL 36542

11. **HOME WARRANTY:** A home warranty subject to limitations, exclusions and deductibles _____ shall _____ shall not be furnished at the expense of _____ Buyer _____ Seller, from _____(warranty company), at a cost not to exceed $_____, and shall be ordered by the _____ Listing Company _____ Selling Company.

12. **LEAD-BASED PAINT DISCLOSURE AND CONTINGENCY:** Federal law requires that for all residential dwellings constructed prior to 1978, Buyer is put on notice of his/her rights to test for lead-based paint. Check here _____ if a lead-based paint warning is attached and made part of this Agreement.

13. **TITLE INSURANCE/CONVEYANCE:** An Owner's policy of title insurance in the amount of the Purchase Price shall be provided at Closing. Closing shall be at a location of Seller's election unless otherwise noted here:_____; Title is to be taken in the name(s) of: PATRICIA LYNETTE SMITH _____ _____ X with _____ without right of survivorship, in a form satisfactory to Buyer. If Fairhope Single Tax Corporation Property is being conveyed it will be subject to a 99 year Lease as referenced above.

14. **PROPERTY TAXES AND LEASE PAYMENTS:** All property taxes and lease payments being collected from existing leases are to be prorated at time of Closing. All security deposits, keys and lease agreements or rental management agreements to be transferred to Buyer at Closing, subject to current lease agreements and management agreements. NOTE: Taxes are prorated based upon current information furnished by the Revenue Commissioner's Office. REALTORS® cannot and do not assume any responsibility for any change, modification or adjustment to the current tax assessment by the Revenue Commissioner's Office. If Property is assessed under CURRENT USE CLASSIFICATION, any roll back or other additional assessment levied against Property as a result of this sale shall be paid by X Buyer _____ Seller. Any additional information regarding tax prorations should be obtained directly from the title company.

15. **UNPAID ASSESSMENTS:** Any Property assessments which become a lien attached to the Property prior to the Closing Date shall be paid by the Seller, without proration. Any public improvements, now installed but not yet filed as a lien, shall be paid by _____ Buyer X _____ Seller. Any Owners Association assessments that are due and payable prior to the Effective Date of this Agreement shall be paid by _____ Buyer X _____ Seller. Any Owners Association assessments known to the parties at the time of the Effective Date of this Agreement that *become* due prior to Closing but after the date of Effective Date of this Agreement shall be paid by _____ Buyer X _____ Seller. Any Owners Association assessments that are approved by the Association prior to the Closing Date but do not become due and payable until after the Closing date shall be paid by X _____ Buyer _____ Seller.

16. **DISCLOSURE:** The Purchase Price and the terms of this sale may be disclosed, after Closing, by the real estate companies for use in the ordinary conduct of their business. REALTORS® may benefit financially as a result of recommending real estate-related services to clients and customers. All parties to this Agreement are advised to also seek other services or compare cost of services in these related fields and do business with whomever or wherever is most desirable to them.

17. **SURVEY:** Select one of the following:
    A. _____ A survey showing all improvements shall be provided to Buyer at _____ Buyer's _____ Seller's expense and ordered by the _____ Listing Company _____ Selling Company.
    B. _____ Seller will provide and Buyer will accept an existing survey or plat.
    C. _____ Buyer has been given the opportunity to request a new survey or to accept an existing survey or plat and has declined.
    D. _____ Additional survey requirements: _____
       _____
       _____

18. **CLOSING AND POSSESSION DATES:** The sale shall be Closed and the Warranty Deed or Warranty Bill of Sale with required Lease delivered on APRIL 29 _____, 20 11 , or sooner if mutually agreed upon in writing by Buyer and Seller. Time is of the essence with respect to all terms, conditions, obligations and particulars of this Agreement. Possession is to be given the Buyer at Closing or within _____ _____ days after Closing, without fail. Unless otherwise provided herein, Seller warrants that the Property shall be in substantially the same condition at the Closing Date as it is as of the Effective Date, and further agrees to be responsible for any move out related damage. In the event Seller retains possession of the Property beyond the Closing Date, Seller does hereby warrant that at the date of surrender of occupancy by Seller, the Property shall be in the same condition as of the Closing Date. NOTE: If Buyer is to be given possession prior to Closing, or if Seller is to remain in possession after Closing, it is recommended that the parties enter into a written occupancy agreement. Seller shall provide to Buyer keys, garage door opener(s) and/or means to operate all Property locks, mailboxes, garage doors and security systems and means of access to all Property amenities at date of possession.

This Purchase Agreement is for the exclusive use of members of the Baldwin County Association of REALTORS®.
The Baldwin County Association of REALTORS®, Inc., and its members, are not engaged in rendering legal, accounting or other professional service by approving this form. This form is published as a service to member real estate professionals and an explanation of its various provisions should be obtained from the appropriate professional. Because of varying state and local laws, competent legal or other advice should be secured before using any form. If a user of this form makes any substantive changes to any portions above, the form will no longer be an approved form. Buyer and seller are encouraged to seek advice from legal and tax advisors prior to the purchase or sale of any property.

INITIALS BELOW INDICATE RECEIPT OF PAGE 3 OF 6 PAGES OF THIS AGREEMENT.
SELLER(S) INITIALS: _____ _____   PURCHASER(S) INITIALS: DLS _____

10/2009

PROPERTY ADDRESS 1376 WEST LAGOON AVENUE, GULF SHORES, AL 36542

19. **CLOSING COSTS:** BUYER to pay Closing agent settlement fee, recording fee, any mortgage title insurance policy required by Lender and all fees required for the transfer of Property pursuant to Fairhope Single Tax Corporation requirements. SELLER to pay for preparation of Warranty Deed or Warranty Bill of Sale and Owner's Title Insurance Policy in the amount of the Purchase Price. All other costs shall be borne as otherwise indicated herein, or as specifically agreed to in writing.

20. **EXTENSION OF CLOSING DATE:** A period of TEN (10) days from the Closing Date in Paragraph 18 above shall be allowed if the Closing is delayed by reason of title defects that can be readily corrected. A period of FIVE (5) days from Closing Date contained in Paragraph 18 above shall be allowed for Closing if the terms of purchase require a new mortgage and the lender has issued a written unconditional commitment letter no later than the date of Closing named above, but is otherwise reasonably delayed in consummating the mortgage as set forth herein.

21. **RISK OF LOSS:** If the Property is destroyed or materially damaged by reason of fire, flood, hurricane, named tropical storm, tornado, or other acts of God between the Effective Date of this Agreement and the Closing Date, and Seller is unable to restore it to its previous condition prior to said Closing Date, the Buyer shall have the option of canceling this Agreement and recovering the Earnest Money pursuant to Paragraph 22 herein, provided that notice of cancellation is received prior to Closing Date or Buyer may otherwise accept the Property in its damaged condition. Risk of loss, as set forth above or by condemnation, shall be on the Seller until title is conveyed.

22. **FOR VALUABLE CONSIDERATION CLAUSE:** Buyer gives the Listing Broker above named until MARCH 18 , 2011 , at ____ a.m. 12 ____ p.m., to obtain the written acceptance of this offer and agrees that this offer, when signed, will constitute a binding Agreement between the Buyer and Seller. Buyer herewith deposits $ 2,000.00 as Earnest Money in the form of ____ cash X ____ check evidencing Buyer's good faith, to be deposited in escrow by Selling Broker (herein referred to as Holder), unless otherwise noted herein below, upon Acceptance of offer and to be applied to the Purchase Price at time of Closing. If this offer is not accepted, the earnest money deposit is to be returned to the Buyer. If this offer is accepted and the title is not marketable, or if the terms of purchase are contingent upon ability to obtain a new mortgage or Seller Financing or other contingencies as specified which cannot be met, and which are not otherwise satisfied or removed, this deposit to be refunded upon written instructions signed by Buyer and Seller. The parties to this Agreement understand and acknowledge that disbursement of earnest monies held by Holder/Escrow Agent can occur only as follows: (A) at Closing; (B) upon written agreement signed by Buyer and Seller; or (C) upon court order. In the event a dispute arises **between Buyer and Seller as to the final disposition of the earnest money, Holder shall be authorized to interplead the earnest money into a Court of competent jurisdiction pending a decision by said court.** Holder shall be entitled to be compensated by the party who does not prevail, or otherwise out of said interplead funds, in the Interpleader action for its costs and expenses, including reasonable attorney's fees incurred in filing said Interpleader. All parties to this Agreement agree that Holder may deposit the earnest money in an interest-bearing escrow/trust account and that Holder will retain the interest earned on said deposit. In the event Earnest Money check is returned for insufficient funds or otherwise not honored by the bank drawn upon, the Buyer shall be required to deliver good funds to Holder within three (3) days of bank's notice to Holder. If Buyer does not deliver said good funds, then and in that event, the Seller, at his sole discretion, shall have the right to terminate this Agreement by giving written notice to the Buyer.

23. **OTHER OFFERS WHILE BUYER'S OFFER IS PENDING:** Buyer hereby acknowledges that offers other than Buyer's offer may have been made or may be made before Seller acts on or while Seller is considering Buyer's offer or counteroffer. While the Buyer's offer or counteroffer is pending, and before this Agreement becomes Effective, Seller hereby expressly reserves the right to reject Buyer's offer or counteroffer or to withdraw any offer previously made by Seller to Buyer relating to the Property, and to accept any other offer or counteroffer. THIS OFFER AND ANY COUNTEROFFER MAY BE WITHDRAWN AT ANY TIME PRIOR TO ACCEPTANCE BY BOTH BUYER AND SELLER.

24. **DEFAULT/LEGAL REMEDIES:**
    A. Default by BUYER: In the event that Buyer fails to consummate this Agreement, Seller shall have the right to pursue any remedy available at law or in equity as a result of such breach, including specifically, without limitation, the right (a) to retain the Earnest Money, (b) the right to enforce specific performance of this Agreement, and (c) the right to terminate this Agreement, and thereafter recover damages against Buyer for breach thereof.
    B. Default by SELLER: In the event that Seller fails to consummate this Agreement, Buyer shall have the right to pursue any remedy available at law or in equity as a result of such breach, including specifically, without limitation, the right (a) to receive the return of the Earnest Money, (b) the right to enforce specific performance of the obligation of this Agreement and thereafter recover damages against Seller for breach by Seller thereof.
    C. Arbitration: If an Arbitration clause is attached to this Agreement as an addendum and is signed by both Buyers and Sellers to this Agreement, the same shall supersede the default remedies provided for herein.

This Purchase Agreement is for the exclusive use of members of the Baldwin County Association of REALTORS®.
The Baldwin County Association of REALTORS®, Inc., and its members, are not engaged in rendering legal, accounting or other professional service by approving this form. This form is published as a service to member real estate professionals and an explanation of its various provisions should be obtained from the appropriate professional. Because of varying state and local laws, competent legal or other advice should be secured before using any form. If a user of this form makes any substantive changes to any portions above, the form will no longer be an approved form. Buyer and seller are encouraged to seek advice from legal and tax advisors prior to the purchase or sale of any property.

INITIALS BELOW INDICATE RECEIPT OF PAGE 4 OF 6 PAGES OF THIS AGREEMENT.
SELLER(S) INITIALS: ____ ____ PURCHASER(S) INITIALS: PLS ____



10/2009

PROPERTY ADDRESS 1376 WEST LAGOON AVENUE, GULF SHORES, AL 36542

25. **ELECTRONIC SIGNATURES:** Electronic signatures or facsimiles of a signed copy, or of any offer or counteroffer to the other party or his/her REALTOR®/Sales Associate/Agent shall constitute delivery of said signed document unless otherwise noted herein: _____

26. **OTHER AGREEMENTS/DISCLAIMER:** It is agreed by the parties that the Buyer in making this offer and in entering into this Agreement has not relied upon any statement, representation, promise, understanding, or agreement whatsoever, whether expressed or implied, by the Seller, or any REALTOR® outside the written parameters of this Agreement. No modification of this Agreement shall be binding unless attached hereto and signed by both Buyer and Seller. All parties to this Agreement understand and acknowledge that REALTORS® are not parties to this Agreement, and as such, do not assume any liability for performance or nonperformance of any parties to this Agreement. Further, Seller and Buyer agree to discharge and release the brokers and sales associates from any claims, demands, damages, actions, causes of actions or suits at law arising in any way from this Agreement related to the Property, and shall include but not be limited to the condition of the heating, cooling, plumbing, water and electrical systems and any built-in appliances; the roof and the basement, including leaks therein; the presence of asbestos, arsenic in treated wood, toxic mold or fungus; the size and area of the Property; the quality of the workmanship or construction materials, including floors; the structural condition; the condition, availability or location of utilities, sewer or septic system; the investment or resale value of the Property; subsurface or subsoil conditions such as sinkholes, mining or other soil conditions, including radon or other potentially hazardous gases or toxic materials; the existence of, or damage from, wood destroying insects and/or fungus, or vermin/pest infestation; Property access, easements, covenants, restrictions, development structure, and appurtenances thereto, and any matters affecting the character of the neighborhood; the past, present, or future financial stability of the property owners' association, builder or developer, or the future insurability of the Property; or the compliance of the builder or developer under any warranty or any related mortgage terms. Seller and Buyer acknowledge and agree that if such matters are of concern to them in the decision to sell or purchase the Property, they have sought and obtained independent advice relative thereto.

_____          _____
Buyer's Initials                                   Seller's Initials

27. **ADDITIONAL PROVISIONS:** Additional provisions to this Agreement are set forth herein or on the attached Addendum(s) which shall be signed by all parties and shall be part of this Agreement: offer subject to final approval of price & terms from the lien holder. Should lien holder approval not be received within 30 days of acceptance of this agreement then at Buyer's discretion, this agreement shall be considered null and void with earnest refunded to Buyer with no further obligation by either party.

28. **OBLIGATION FOR FEES AND EXPENSES:** Buyer and Seller acknowledge that in the event this Agreement is cancelled or said transaction does not close for any reason, fees or costs paid in advance may be non-refundable. REALTORS® are not to be held liable for any conditions or non-performance of this Agreement and have not given any professional, legal or tax advice.

29. **BUYER AND SELLER ACKNOWLEDGE** that they have read this entire agreement and all addendums as itemized in this paragraph 29 and accept the same. _____

BUYER Patricia Lynette Smith (PRINT) PATRICIA LYNETTE SMITH          DATE: 3/15 , 20 11

BUYER_____(PRINT)_____          DATE:_____, 20___

Buyer's Mailing Address _____

_____          Zip Code_____
Home Phone_____ Cell or Work_____          E-mail_____

Selling Agent_____ Cell or Work_____ Home_____ E-mail_____

This Purchase Agreement is for the exclusive use of members of the Baldwin County Association of REALTORS®.
The Baldwin County Association of REALTORS®, Inc., and its members, are not engaged in rendering legal, accounting or other professional service by approving this form. This form is published as a service to member real estate professionals and an explanation of its various provisions should be obtained from the appropriate professional. Because of varying state and local laws, competent legal or other advice should be secured before using any form. If a user of this form makes any substantive changes to any portions above, the form will no longer be an approved form. Buyer and seller are encouraged to seek advice from legal and tax advisors prior to the purchase or sale of any property.

INITIALS BELOW INDICATE RECEIPT OF PAGE 5 OF 6 PAGES OF THIS AGREEMENT.
SELLER(S) INITIALS: ____ ____          PURCHASER(S) INITIALS: PLS ____

10/2009

PROPERTY ADDRESS 1376 WEST LAGOON AVENUE, GULF SHORES, AL 36542 _____

SELLER'S ACCEPTANCE OFFER/COUNTER OFFER: _____ ACCEPTED ___COUNTERED AS FOLLOWS:

_____

_____

_____

In the event a counter offer is made, it shall expire on _____, 20__. ____am ____pm

SELLER _____(PRINT) _____DATE:_____, 20____

SELLER _____(PRINT) _____DATE:_____, 20____

Seller's Mailing Address_____

Zip Code _____ Home Phone _____ Cell or Work _____ E-mail_____

Listing Agent_____ Cell or Work _____ Home _____ E-mail _____

BUYER'S ACCEPTANCE OF COUNTER OFFER: ____ ACCEPTED _____ COUNTERED, AS PER ATTACHED ADDENDUM.
Provisions of the original offer not changed by the counteroffer remain in effect.

BUYER: _____(PRINT) _____DATE:_____, 20____

BUYER: _____(PRINT) _____DATE:_____, 20____

SELLER'S ACCEPTANCE OF COUNTER OFFER: _____ ACCEPTED _____ COUNTERED, AS PER ATTACHED ADDENDUM.
Provisions of the original offer not changed by the counter offer remain in effect.

SELLER: _____(PRINT) _____DATE: _____, 20____

SELLER: _____(PRINT) _____DATE: _____, 20____

PLEASE NOTE: INITIALS AND EFFECTIVE DATE TO BE COMPLETED ON PAGE 1 OF THIS AGREEMENT BY THE LAST
PARTY TO SIGN THE FINAL OFFER OR COUNTER OFFER.

This Purchase Agreement is for the exclusive use of members of the Baldwin County Association of REALTORS®.
The Baldwin County Association of REALTORS®, Inc., and its members, are not engaged in rendering legal, accounting or other professional service by approving
this form. This form is published as a service to member real estate professionals and an explanation of its various provisions should be obtained from the appropriate
professional. Because of varying state and local laws, competent legal or other advice should be secured before using any form. If a user of this form makes any
substantive changes to any portions above, the form will no longer be an approved form. Buyer and seller are encouraged to seek advice from legal and tax advisors
prior to the purchase or sale of any property.

INITIALS BELOW INDICATE RECEIPT OF PAGE 6 OF 6 PAGES OR THIS AGREEMENT.
SELLER(S) INITIALS: ____ ____ PURCHASER(S) INITIALS: PLS ____

10/2009

TED E SMITH      12-09
PATRICIA H SMITH
DREW SMITH
23835 CO RD 85
ROBERTSDALE, AL 36567

1128

63-474/632
37

Pay to the
Order of _____ Re/Max of Gulf Shores _____ | $ 2000.00

Date  3/15/11

Two Thousand + no/100 _____ Dollars

Robertsdale, Alabama 36567
251-947-3101
Vision Bank

For _____

Pati Smith

⑈063 204 746⑈   20 166 19 2⑈   11 28

```
Court Name: Southern District of Alabama
Division: 1
Receipt Number: 46031027339
Cashier ID: Kennedy
Transaction Date: 04/18/2013
Payer Name: Sutter and Gillham
------------------------------------------
CIVIL FILING FEE
  For: Sutter and Gillham
  Amount:        $350.00
------------------------------------------
Paper Check Conversion
  Remitter: Sutter and Gillham
  Check/Money Order Num: 1683
  Amt Tendered: $350.00
------------------------------------------
Total Due:      $350.00
Total Tendered: $350.00
Change Amt:     $0.00

13-199
```

Case 1:13-cv-00199-KD-B   Document 1-2   Filed 04/18/13   Page 1 of 1

```
Court Name: Southern District of Alabama
Division: 1
Receipt Number: 46031027339
Cashier ID: Kennedy
Transaction Date: 04/18/2013
Payer Name: Sutter and Gillham
------------------------------------
CIVIL FILING FEE
 For: Sutter and Gillham
 Amount:        $350.00
------------------------------------
Paper Check Conversion
 Remitter: Sutter and Gillham
 Check/Money Order Num: 1683
 Amt Tendered:  $350.00
------------------------------------
Total Due:      $350.00
Total Tendered: $350.00
Change Amt:     $0.00

13-199
```