**UNITED STATES DISTRICT COURT**
**EASTERN DISTRICT OF LOUISIANA**

IN RE:   OIL SPILL by the OIL RIG
           "DEEPWATER HORIZON" in the
           GULF OF MEXICO, on
           APRIL 20, 2010

THIS DOCUMENT RELATES TO:

*The Remaining Claims in B3 Bundle Against the*
*Clean Up Responder Defendants: Torrey Barlow*
*(12-2248), Joseph Brown (12-2333), Scea*
*Burrage (10-8888, Docs. 89515 & 108885), Roy*
*Causey (10-8888, Doc. 34909), Jorey Danos*
*(13-3747), William Fitzgerald o/b/o Nathan*
*Fitzgerald (13-00650), Thomas Hines (13-2360;*
*10-8888, Doc. 22261 & 84046)), Frank Howell*
*(13-3747), Douglas Maurras (12-2048), Kirk*
*Prest (10-8888, Doc. 89566), John Wunstell, Jr.*
*(10-2543; 10-8888, Doc. 57007).*

MDL NO. 2179

SECTION: J

JUDGE CARL BARBIER
MAG. JUDGE SALLY SHUSHAN

## DECLARATION OF DONALD A. TOENSHOFF, JR. IN SUPPORT OF MARINE SPILL RESPONSE CORPORATION'S MOTION FOR SUMMARY JUDGMENT ON THE REMAINING CLAIMS IN THE B3 BUNDLE

DONALD A. TOENSHOFF, JR., declares under penalty of perjury as follows:

1.   I am the Executive Vice President of the Marine Spill Response

Corporation ("MSRC").   I have held that position since April 1996.

2.   During the course of the DEEPWATER HORIZON response efforts, I

was assigned as the Stennis Airport Staging Manager to provide direct supervision of

MSRC's aerial dispersant operations conducted out of MSRC's Stennis facility.

3.   I submit this declaration in support of MSRC's motion for an order of

summary judgment dismissing with prejudice all remaining claims asserted against

810517.00025/102214378v.1

MSRC in the First Amended B(3) Master Complaint on the grounds that MSRC has immunity from such claims, or alternatively, that such claims are preempted.   I make this declaration based upon my personal knowledge and based upon documents which are under MSRC's custody and control, including documents prepared by the Unified Command during the spill response and subsequently produced by the United States and MSRC in this litigation.

4.      This declaration supplements my prior declarations filed with the Court in support of MSRC's prior motion for summary judgment on May 18, 2012 (Rec. Doc. 6547-2) and July 6, 2012 (Rec. Doc. 6850-2) which are to be deemed incorporated herein.

5.      I have read the Questionnaires filed in response to Pretrial Order No. 57 by Torrey Barlow, Joseph Brown, Roy Causey, Nathan Fitzgerald, Thomas Hines, Kirk Prest, Frank Howell, Doug Maurras, Jorey Danos, and John Wunstell alleging that these individuals were not provided with adequate personal protective equipment ("PPE") while participating in beach and/or coastal clean-up and/or laying and decontaminating booms, vessels and other equipment or were exposed to dispersants during aerial spraying operations or on the surface of the Gulf of Mexico.[1]

6.      MSRC did not employ Messrs. Barlow, Brown, Causey, Fitzgerald, Hines, Prest, Howell, Maurras, Danos, or Wunstell.   MSRC had no role or responsibility in training any of these individuals, providing them with any equipment, including personal protective equipment ("PPE"), or directing or supervising their work.

---

[1] The Questionnaire filed by Scea Burrage alleges that she was a resident living in close proximity to coastal water, and not involved in the Deepwater Horizon response efforts.   I have no further knowledge of Ms. Burrage's circumstances except she was not an employee of MSRC.

7.    During the DEEPWATER HORIZON response, government officials, BP and BP's spill management contractors directed and oversaw any beach and/or coastal cleanup operations.   During the DEEPWATER HORIZON response, MSRC had no role in supervising or directing any beach and/or coastal cleanup or near-shore booming or decontamination operations.

8.    MSRC did not have any role in directing the off-shore patrol by small boats searching for and/or reporting oil slicks mentioned in the Questionnaire filed by Frank Howell, or in deciding where and when such searches would take place.

9.    MSRC's roles in the aerial dispersant operation were to provide dispersants from its inventory, to locate additional dispersant sources, and to provide logistical and other support to the two aircraft contractors under contract with MSRC, to the United States Air Force Reserve ("USAFR"), and to other aircraft operators arranged directly by BP.   MSRC did not apply any dispersant from response resources it directly owned or operated during the response.   Dispersant was applied by third party contractors, including the two contractors under contract to MSRC, the USAFR, and organizations directly under contract to BP.

10.    The dispersants supplied by MSRC were in liquid form, not a powder.  I am not aware of any dispersants used in the Deepwater Horizon response that were in the form of a white powder.

11.    The aircraft used for dispersant operations during the Deepwater Horizon response by MSRC's subcontractors were C-130 spray aircraft and King Air spotter aircraft.   Neither MSRC nor its subcontractors utilized any helicopters as either spray or spotter aircraft.

810517.00025/102214378v.1

12.     During the DEEPWATER HORIZON spill response, no aerial dispersant spray missions were authorized or conducted within 3 nautical miles ("nm") of shore or where the water depth was less than 10 meters.

13.     During the DEEPWATER HORIZON spill response, no aerial dispersant spray operations were authorized or conducted outside of daylight hours, and where weather would preclude the pilots from visibly discerning the horizon and any people or other obstacles in the flight path.   At times, dispersant aircraft transited to or from the authorized spray site outside of daylight hours, but all dispersant spray operations were conducted during daylight hours, in good visibility for reasons as stated above.

14.     During the first few days of aerial dispersant spray operations, dispersant operations were conducted using a minimum 500 foot safety setback from any vessel or platform as governed by Federal Aviation Administration flight rules.   On April 30, 2010, the proximity restrictions were increased to 1 nm.  On May 6, 2010, the safety setback for vessel and platforms was expanded to 2 nm.

15.     Based on documents prepared by the Unified Command and produced by the United States in this litigation that I have reviewed, during the period May 23 to May 28, 2010 mentioned in the Questionnaire filed by John Wunstell, all in-situ burn ("ISB") operations took place within the radius of 5 to 10 miles from the spill source.

16.     During the DEEPWATER HORIZON response, MSRC's role in in-situ burning of Macondo 252 Oil was limited to supplying fire boom and personnel to serve as resources regarding instructions for the fire boom's use.   MSRC had no role in deciding where, when or how to conduct ISB operations or in formulating or implementing any safety procedures for ISB operations.

4

5

17.     Based on the documents prepared by the Unified Command and aerial dispersant flight records that I have reviewed, during the period May 23 to May 28, 2010, all aerial dispersant spray missions conducted by MSRC's subcontractors were conducted greater than 11 nautical miles from the site of the spill.

18.     I am not aware of any aerial dispersant spray mission conducted from the Stennis Airport by MSRC's subcontractors that did not fully comply with all government approvals or directions concerning limitations on the time of spray operations, or the proximity to land, shallow water, vessels, platforms, and/or ISB operations.


I declare under penalty of perjury that the foregoing is true and correct.  Executed at Herndon, Virginia, on April 29, 2016.

DONALD A. TOENSHOFF, JR.