Exhibit 6



# On Scene Coordinator Report Deepwater Horizon Oil Spill

**Submitted to the National Response Team September 2011**

**We would like to thank the agencies listed below and all of the agencies, companies, organizations, and individuals that contributed to the *Deepwater Horizon* response efforts.**



    

   







## The Man in the Arena

*I*t is not the critic who counts; not the man who points out how the strong man stumbles, or where the doer of deeds could have done them better. The credit belongs to the man who is actually in the arena, whose face is marred by dust and sweat and blood; who strives valiantly; who errs, who comes short again and again, because there is no effort without error and shortcoming; but who does actually strive to do the deeds; who knows great enthusiasms, the great devotions; who spends himself in a worthy cause; who at the best knows in the end the triumph of high achievement, and who at the worst, if he fails, at least fails while daring greatly, so that his place shall never be with those cold and timid souls who neither know victory nor defeat.

**Theodore Roosevelt**
**April 23, 1910**













This page intentionally left blank.

The purpose of this report is to document the response to the oil spill that resulted from the explosion on the *Deepwater Horizon* mobile offshore drilling unit on April 20, 2010.

On November 18, 2010, the National Response Team (NRT) requested submission of an On-Scene Coordinator (OSC) Report for the *Deepwater Horizon* spill to the NRT Response Committee, pursuant to the National Contingency Plan (NCP). The NRT's request listed 33 specific topics to be addressed in the report. The list of specific topics addressed in the report expanded to 56 to cover additional focus areas of the Federal On-Scene Coordinators (FOSCs).

## Organization of the Report

The NCP directs that OSC Report record the situation as it developed, the actions taken, the resources committed, and the challenges encountered (40 CFR 300.165(b)). This report consists of ten chapters that generally apply these themes to the 56 topics. The first of the NCP requirements is to account for the situation as it developed. Chapter 1 is a brief summary of significant events. At the end of the report is a much more detailed and comprehensive daily chronology of events to address the situation as it developed. Beginning with Chapter 2, the report is organized by the Incident Command System (ICS) structure: Command (Chapter 2), Operations (Chapter 3), Planning (Chapter 5), Logistics (Chapter 6), and Finance (Chapter 7). There is a separate chapter on Health and Safety (Chapter 4) although health and safety is usually within the Command Section under ICS. The Safety program was a significant FOSC focus. Given the scale of the response, and unique public health aspects, it merited a chapter of its own. Three other chapters that could have been included under existing ICS based chapters were covered in separate chapters. Natural Resources and Wildlife (Chapter 8) normally falls within the operations section, yet there was such a significant component of the response dealing with these issues that the subject stands on its own. This chapter also includes a discussion of Section 106 of the National Historic Preservation Act compliance, normally found under the Planning Section, as trustee agencies central to wildlife activities were also critical to historic preservation efforts. Government Personnel staffing is addressed in Chapter 9 to capture the challenges in sustaining the requisite number of trained personnel for a response of this scope and duration. Finally, Communications (Chapter 10) includes knowledge management and communication with elected officials, the public, and the media, which were a key part of the response given the national and global level of interest in the disaster.

The report relies heavily on the written documentary record and the experiences of subject matter experts directly involved in the response. More than 200 people participating in the response, including Coast Guard members, representatives of other federal and state agencies, and private organizations, provided written input to be used in this report. Where needed, the Report Writing Team, consisting of the Deputy FOSC, four other Coast Guard officers, a petty officer, and three contract technical writers and design specialists, provided research assistance in extracting archived and response generated documents stored on the Homeland Security Information Network, the dedicated response server established by the Coast Guard, and federal government websites such as RestoreTheGulf.gov.

The report covers the period of April 20, 2010, the day the explosion took place on the *Deepwater Horizon* mobile offshore drilling unit, through March 1, 2011. Although the detailed chronology stops at January 31, 2011 and shoreline clean-up operations continue, this report does not capture operations occurring since March 1.

The FOSC is responsible for directing and coordinating actions to remove the oil from the environment. Restoration and recovery action taken to repair damage caused by the spill are outside the scope of the FOSC's responsibility and thus are not covered by this report.

## Chapter 1 and the Chronology: Situation as it Developed

The report addresses the requirement to describe the situation as it developed in two parts. Chapter 1 contains a short timeline of the spill and describes the efforts to contain and finally seal the Macondo well. Appendix I provides a much more detailed chronology, listing major response activities from April 20, 2010 through the end of January 2011. The magnitude of the spill cleanup can be surmised to a certain degree by the number of resources committed, and its impacts. Oil flowed from the well for 87 days. Two drilling ships, numerous oil containment vessels, and a flotilla of support vessels were deployed to control the source of the well, while 835 skimmers and approximately 9000 vessels were involved in

the cleanup. On the single most demanding day of the response, over 6000 vessels, 82 helicopters and 20 fixed wing aircraft and over 47,849 personnel/responders were assigned; 88,522 square miles of fisheries were closed; 168 visibly oiled wildlife were collected; 3,795,985 feet of containment boom was deployed; 26 controlled in situ burns were conducted, burning 59,550 barrels of oil; 181 miles of shoreline were heavily to moderately oiled; 68,530 gallons (1632 barrels) of dispersant were applied, and 27,097 barrels of oil were recovered.

## Chapter 2: Command and Control

The states viewed the spill as a disaster, declared states of emergency, and activated their emergency response agencies. Each of the Gulf Coast states and local governments were accustomed to the Stafford Act process. Emergencies that fall under the Stafford Act give state and local governments a lead role in organizing response, paid largely, but not entirely, by the federal government. The NCP that governs oil spill response, however, gives the federal government lead, impacted states a role in the unified command, and the Responsible Party (RP) a role in cleaning up the spill in terms of funding and participation in the unified command. The difference between these two frameworks was not well known or understood outside of the spill response community, and contributed to challenges and delays in the integration between federal, state, and local response efforts.

The FOSC is the lead federal official for oil removal and response operations in accordance with the NCP. The role of the National Incident Commander (NIC) is described from the perspective of the FOSC and the working relationship between the two. The working relationship between the NIC and the FOSC is designed to unburden the FOSC in the event of a Spill of National Significance (SONS). The SONS exercise process prepared the Coast Guard for the establishment of the National Incident Command, provided an understanding of the role of the NIC, and how the NIC supported the FOSC. From the FOSC perspective, the NIC stand up and assumption of responsibilities was very smooth, although there was constant readjustment of roles as the response progressed.

An exercise environment, however, is not the same as a bona fide Spill of National Significance. Actual establishment of an NIC was unprecedented. The exercise process did not emphasize the federal governance structure for oil spill response. The NCP

process was not familiar to the impacted communities. Through repeated natural disasters and emergency declarations, they were accustomed to a state-centric response organization as outlined under the Stafford Act. The NCP also did not address all of the key issues that came to the forefront during the response. The NIC, interacting with cabinet-level officials, was well positioned to adjudicate some of these issues. An example was seafood sampling and testing to ensure the safety of Gulf of Mexico seafood.

The FOSC served as the Unified Area Commander in accordance with established incident command doctrine, and under the Unified Area Command (UAC) eventually there were five Incident Command Posts (ICPs): Houston, Galveston, Houma, Mobile, and Miami. Houston focused on source control, while Galveston and Miami remained relatively small operations as the impact from the spill on their operating areas was limited. Houma and Mobile, however, became very large incident command posts, with many, large geographic branches reporting to them. The branches became so large that they became incident management teams of their own, and the sheer scale of the operation stretched existing ICS doctrine.

The size of the operation, duration of the spill, and public and political interest in the spill impacted the operation of the incident command structure in other ways. Regional Response Teams (RRTs), and the NRT assist the FOSC during the course of large spills. Because of the involvement of senior officials in each participating agency and the state and federal governments the NRT role was effectively subsumed into a NIC staff element called the Interagency Solutions Group. The RRTs also functioned in a manner different from previous spills due to the need to coordinate agency positions with very senior agency officials. State and local participation also differed, with senior state officials rather than the state spill response agencies often participating in the decision making process. The senior state officials and local officials did not fully integrate into the unified command construct in each case.

## Chapter 3: Operations

Response operations took place in four zones: at the source of the spill, offshore, near shore, and in shore. At the source, the drilling rigs and remotely operated vehicles necessary for deep water drilling were the only means of accessing the well. Offshore, as

close to the source as possible, the response focused on removal of the oil. Key to these operations was large skimmers and in situ burn task forces. Skimmers, storage for the oil recovered by the skimmers, and fire boom were key resources. When oil could not be removed through these means due to environmental conditions (such as sea conditions), aerial application of dispersants was used. Near shore operations focused on skimming and the use of boom to protect sensitive areas, and later the protection of as much of the shoreline as possible. Obtaining as much boom as possible was a central concern of near shore operations. In shore operations used barriers such as Hesco Baskets to minimize shoreline impact. Once oil reached the shore, the long, arduous, labor intensive process of shoreline cleanup began. After the well was capped shoreline cleanup became the focus of continued response operations.

A key to effective response was understanding the oil. The Macondo well released Louisiana sweet crude oil. The term "sweet" refers to the low amount of sulfur. "Light" indicates the oil has many lighter ends, which evaporate quickly. Thus the oil was not as persistent as some other forms of crude oil, making it easier to remove.

**Source Control.** In any oil spill response, one of the first priorities is to secure the source. The NIC and FOSC directly participated in the efforts to stop and contain the oil flowing from the Macondo well, ensuring federal government involvement in the decision-making process for source control efforts in Houston. Next, the National Oceanic and Atmospheric Administration (NOAA) and other agencies applied many modeling techniques to provide the FOSC with information on oil spill trajectory to aid in planning response operations, and the flow rate to estimate the amount being spilled. Those agencies also participated in the development of the Oil Budget, to produce a scientific estimate of the fate of the oil spilled. The source control effort was a whole-of-government and industry response. The Department of Energy (DOE), Department of Interior (DOI), U.S. Geological Survey (USGS), and Coast Guard engaged extensively with the RP in these efforts. Other oil companies, including Shell and Exxon-Mobil, assisted with source control strategy discussions.

**Dispersants.** Dispersant was applied during this spill in three ways:

- subsea, at the source of the spill,

- on the surface, by vessels and support ships working at the well site near the drill rigs in order to control Volatile Organic Compounds (VOCs) that posed a health and safety threat to those crews, and

- aerially, to disperse oil slicks more than five nautical miles from the source control effort.

On May 26, 2010, after discussions with the Environmental Protection Agency (EPA), the FOSC issued Addendum III to existing directives on dispersants that required a significant reduction in dispersant use. The FOSC continued to approve the use of dispersants applied sub-sea, and on the surface by vessels for the control of VOCs in the vicinity of vessels at well site. Aerial applications were pre-authorized by the RRT, and approved by the FOSC on days when weather and sea conditions limited the effectiveness of skimming or in situ burns, or when slicks were headed toward land and alternative response methods would not be able to combat the slick in time. Surface application took place well away from shore. Dispersants effectiveness decreases dramatically within hours of the oil being released. Thus dispersant application near shore would have been ineffective, as the oil would then have been on the surface for days. Additionally, no dispersant was applied within 3 miles of shore in accordance with the existing preapproval criteria.

**In Situ Burning.** Significant in situ burning (411) operations were conducted during the course of the response that removed an estimated 250,000 barrels of oil. The in situ burn operation eventually grew to include three task forces each consisting of a three vessel ignition team, two task force vessels, one supply vessel, a safety team, and five fire boom teams. The task forces were directed to targets by spotter aircraft. There was also a complex process to make sure skimming teams, dispersant operations, and in situ burn teams stayed clear of one another. There were no injuries as a result of in situ burns and air quality testing near the burns was conducted to ensure worker safety.

**Skimming.** Skimming operations were divided into several different types:

- Offshore near the spill source (three nautical miles in the vicinity of the source and the leading edge of any observed oil slicks),

- Near shore (within three nautical miles), and

- Inshore at beaches, bays, and marshes.

Different types of skimming equipment were needed depending on location, sea conditions, and type of operation. Oil skimmers were the most critical oil removal resource at the peak of the response.

Oil coverage was not uniform. Rather than covering large areas of the open ocean as was perceived, recoverable oil away from surface waters just above the source could be found only in a very small percentage of the impacted northern Gulf of Mexico's surface waters. Offshore skimming required aircraft surveillance support and maneuverable vessels to locate and follow the streamers and tendrils of oil. These streamers were anywhere from a meter to several hundred meters in width.

**Shoreline Protection.** Protecting the shorelines of the impacted states was a critical part of the response operation. Containment boom was another critical resource. The desire of state and local governments to obtain and deploy boom led to negotiation of booming plans in the midst of the response. Generally, Area Contingency Plans identify sensitive areas and habitats for booming. The renegotiation process brought beaches used by the public within the scope of areas that had to be boomed. Many other protection strategies were used, including piling projects, water filled boom lined on the shore, and Hesco Baskets filled with sand. Louisiana also obtained funding from the RP at FOSC direction and permitting approval from the Army Corps of Engineers, to build sand berms along barrier islands, at an estimated cost of $360 million dollars. Alabama also obtained funding for smaller berm projects including a barrier for Katrina Cut.

**Search and Respond Standards and Quick Reaction Forces.** The Unified Incident Command developed a system, modeled after launch times for search and rescue assets, to use Coast Guard Maritime Safety and Security Team resources to do an on-scene assessment of new reports of oiling and allow cleanup assets to be prioritized based on that information. In order to ensure the highest priority impacts could be promptly addressed, Houma created Quick Reaction Forces and assigned response resources to them. These teams, mostly consisting of contract Oil Spill Response Organization personnel, could respond wherever most needed and were not tied to specific jurisdictions. Because of the competition among local governments for response assets, the initial work of these forces was complicated. However, once they proved their effectiveness and demonstrated that they kept response assets in reserve

in staging areas outside impacted jurisdictions, they became less problematic to local officials.

**National Guard and Department of Defense Support.** The National Guard provided support in many ways throughout the response, from helping to place barriers along the shoreline, to transportation, and coordinating emergency response communications. The process of obtaining National Guard and other Department of Defense (DOD) support involved arranging for payment of funding in advance, coordination with the Assistant Secretary of Defense for Homeland and America's Defense, the Joint Staff, NORTHCOM, the National Guard Bureau, and each state's Adjutant General. For the National Guard, Oil Spill Liability Trust Fund (OSLTF) funds were provided to fund activation under Title 32, thus the personnel worked for their respective states. This bifurcated process posed a challenge to the establishment of unity of effort within the federally-led Unified Area Command. Navy Supervisor of Diving and Salvage participated significantly. DOD also provided planners, public affairs support, and transportation resources. Tyndall Air Force Base provided the resources necessary to establish and operate the Aviation Coordination Center to prevent confliction within the airspace above response operations, most particularly near the offshore source control efforts.

**Shoreline Cleanup Assessment Technique and Shoreline Cleanup Operations.** Shoreline Cleanup Assessment Technique (SCAT) is the method for determining the most appropriate shoreline cleanup techniques weighing many variables for any given shoreline segment. These variables included amount of oil, type of shoreline, wildlife habitat, types and numbers of species present, archeological or historic properties concerns, etc. The teams consisted of representatives from the Coast Guard, NOAA, Fish and Wildlife Service (FWS) Section 7, National Park Service Section 106 Archeologists, other natural resource trustees, and state representatives. They ensured appropriate stakeholder review during the assessment process. Tribal liaisons and local government representatives participated whenever possible. SCAT experienced two significant challenges during the response: the amount of shoreline impacted, and the duration of the spill. SCAT was divided into three stages. Stage I covered the period while oil still flowed from the well. The primary focus was initial assessment to determine the scope of impact and review for re-oiling. Stage II focused on initial cleanup of bulk oil impacts. Stage III addressed the

entire shoreline in the fall 2010 after oil flow stopped and after initial cleanup efforts were well under way.

Scale created many challenges for SCAT. First, simply because of the amount of shoreline involved, there was significant demand for appropriately trained team members. Second, the breadth of impacted area led to significant challenges. Garnering consensus across five states on best management practices, shoreline treatment recommendations, and recommendations for no further treatment, which was complex. There were also significant logistics challenges to surveying all of the impacted shoreline. Many areas were remote. Some could only be accessed at certain points in the tide cycle. Some unique SCAT methods were also used. Because of the concerns about oil impacts to beaches used by the public, identification of tar mats just off shore was important as a means of identifying beach areas that needed to be closely watched for recurring tar balls. Snorkel SCAT used swimmers in these near shore locations to identify submerged tar mats and thus target shoreline cleanup resources.

Actual shoreline cleanup was a long, arduous process. The cleanup methods and concerns of the public were very different, depending on the type of shoreline. There were two predominant types of shoreline impacted by the oil, sandy beaches and marshes. Beach cleanup involved work crews sifting sand, removing tar balls, and digging out tar mats. Mechanical cleanup devices such as the Sand Shark, a mechanical digger and sifter that scooped sand, sifted tar balls through screens of different sizes, and put clean sand back on the beach, were also used. In beach areas used by the public, the biggest cleanup concern was to remove as much oil as possible in order to encourage the public to return to the beaches. On beach land managed by federal trust agencies the concern was more to ensure cleanup did not damage sensitive habitat.

Marshes posed different cleanup problems. Some marsh areas were heavily oiled. But many cleanup techniques posed significant risk of killing marsh grasses and thus accelerating shoreline erosion. Several minimally invasive techniques, such as swabbing with sorbents or low pressure flushing, were tried. But in certain areas, the environmentally prudent recommendation was "no further treatment" and to leave an oiled marsh alone.

**Alternative Technologies**. During the response more than 3,900 proposals for means of stopping the spill

or cleaning up the oil were presented to the FOSC, NIC, the RP and state leaders. The NIC assembled the Interagency Technology Assessment Program to evaluate these proposals. Ninety-six percent of the proposals were evaluated. The *A Whale*, a 1,100-foot cargo ship, serves as an example of the challenges posed by the process. The *A Whale* owners modified the ship in an attempt to convert it into a giant weir skimmer. They hired a publicist to help generate interest in their proposal. Despite several modifications and attempts to skim oil offshore with government engineers on board to witness the evolution, the concept proved ineffective.

**Concurrent Response and Natural Resource Damage Assessment**. Federal and state natural resource trustees and wildlife agencies played an important role in the spill response. These personnel aided the FOSC in understanding impacts and helped ensure response actions did not cause further damage to wildlife and their habitats. These agencies were the lead agencies in the Natural Resource Damage Assessment (NRDA), the cost of which is reimbursed by the RP. In this spill the NRDA process functioned in parallel with ongoing on-water and shoreline cleanup activities that stretched the resources of trustee agencies.

## Chapter 4: Health and Safety

Health and Safety was the number one strategic goal throughout this response and was reflected in:

1. Efforts made to address potential public health impacts of the spill, and

2. The remarkably low injury rate for responders across the operation.

Air testing and monitoring were done along the Gulf Coast to address concerns about the fumes from oil on the shore lines and other response activities. Waste and air toxicity testing were performed to monitor the potential impacts of in situ burns. NOAA and the Food and Drug Administration closed much of federal fisheries waters in the Gulf of Mexico during the spill out of concern that oil and dispersants might impact the suitability of fish caught in those areas for human consumption. NOAA and FDA conducted a robust seafood safety analysis program and established rigorous protocols for re-opening closed areas on a grid-by-grid basis.

At the peak, there were 47,000 people working on the response, from those drilling relief wells on ships fifty miles off-shore, to those working on skimming

and booming vessels, to work crews cleaning the shoreline. Thousands of personnel also worked to decontaminate oiled boom, vessels, and equipment. A significant safety organization staffed by federal agencies including the Occupational Safety and Health Administration, Public Health Service, Coast Guard, state, and private safety experts oversaw and examined broad aspects of worker safety. Some were not novel, such as awareness of slips, trips, and falls. These types of basic safety measures took on uncommon importance when, for example, vessels working boom and skimmers had their decks covered in oil for days at a time. Some safety measures were unusual, at least in their scale—air quality monitoring for VOCs for those working to control the well source was vitally important. The EPA worked with the State of Louisiana to increase the frequency of air sampling from the Louisiana shoreline air monitoring stations, and provided a website for citizens to be able to review for full transparency of information. Heat was a significant, overarching concern across the response. While the oil flowed from the well and for the first month after the well was capped, the heat index was frequently over 100 degrees Fahrenheit, which required careful planning to minimize heat related injuries.

## Chapter 5: Planning

There were two significant aspects of planning during the course of the response, beyond the daily ICS planning necessary to run such a large response organization. Existing plans, such as the Area Contingency Plans and the Marine Transportation System Recovery (MTSR) plans, were used. As oil reached the shore, and oil continued to flow from the well, the ACPs were modified and enhanced as the response continued. One new strategic plan was the Gulf-Wide Strategy that sought to enhance and replace the One Gulf Plan. The Gulf-Wide Strategy established ICP Miami consolidating operations from ICP St. Petersburg and ICP Key West into one command center. The Strategy also established the large equipment staging sites such as Theodore, Ala., and Gonzales, La. Not all the booming strategies in existing ACPs had been tested and not all plans identified sensitive areas. Containment boom and oil skimmers were critical resources in high demand, and became areas of particular concern. Boom amounts had to be brokered between jurisdictions, each wanting as much boom and other response resources as possible. The MTSR plan was activated, and proactive communication with the industry identifying the location of

oil was carried out, along with prompt establishment of stations to decontaminate vessels. These steps ensured the spill did not cause an unnecessary disruption to the movement of commerce in the marine transportation system.

The response also triggered new plans. Acquiring critical resources such as boom, skimmers and personnel started the strategic planning process, beyond the required ICS planning cycle. Severe weather had to be accounted for, as this was critical to personnel safety during this long response. With such a large operation that had grown dramatically just as hurricane season started, the FOSC had to ensure plans for dealing with severe weather were in place. Once the well was capped, planning was required to enable the orderly transition of response operations to a focus on shoreline cleanup, and to gain acceptance of transition plans from the affected states and communities. After such a protracted spill, reduction in the size of the response required careful coordination with state and local leaders. As part of the appropriate scaling of the response, the five incident command posts were consolidated into a single incident management team. As shoreline cleanup progressed into the winter, the stand down of the Unified Area Command required detailed planning and explanation. As the SCAT process determined which shoreline segments required no further treatment for the winter months, a plan was required to continue monitoring those shorelines for signs of oil exposed by winter storms, as well as a plan of action to respond to such reports.

Development of the administrative record of an oil spill response is required by the NCP. The five command posts and multiple branches and staging areas generated more than 27 million documents. Also, because of the potential for litigation surrounding the spill, federal responders saved all electronically stored information for possible electronic discovery.

## Chapter 6: Logistics

Several logistics matters were instrumental to operational success of the response. Given that BP, as RP, accepted responsibility for oil spill removal, significant logistical commitments and challenges were largely addressed by the RP with federal oversight. The FOSC and Unified Area Command (UAC) initially identified boom, skimmers, and personnel as critical resources. Due to a limited supply of the dispersant Corexit, it became a controversial resource. In addition to seeking those resources, the NIC and FOSC also received offers of assistance, many from overseas. As a result, the NIC and FOSC developed

processes for receiving and processing such offers. When assistance involved foreign flagged vessels, potential conflict arose with the Jones Act, which requires trade between U.S. ports be on U.S. flagged vessels. The requirements of the Jones Act can be waived. In the end, only seven Jones Act waivers were issued, primarily for specialized vessels working to contain oil from the well, and the Jones Act was not an impediment to the response.

**Vessels of Opportunity**. Several thousand Vessels of Opportunity (VOOs) and their crews were employed. These were private vessels hired by the RP to assist with the spill response. They performed duties such as placing boom, skimming oil, and on-water transportation and support services. The size of the VOO fleet required extensive coordination at both ICP Houma and ICP Mobile. Concern over equitable opportunities for work, use of commercial vessels only, and efforts to hire those from the local area to assist response efforts, made management of the VOO fleet complicated. This led to development of a VOO policy issued by the FOSC—a policy that standardized VOO usage and organizational structure, and established training and safety measures and contractual and logistical requirements. Despite these efforts, there were communications challenges with VOO, some due to language barriers and others due to the disparity of communication equipment installed in the vessels. As the response operation contracted, the generous day rates paid by the RP complicated efforts to reduce the size of the VOO fleet.

**Aviation Coordination**. At the height of the spill, aircraft shuttled people and supplies to the small city of vessels working to control the source, overflew skimming and in situ burn operations to direct surface assets onto concentrations of oil, applied dispersants where appropriate, surveyed shoreline impacts, and provided public affairs opportunities. All these operations put a large number of aircraft in close proximity and thus created risks. The FOSC worked with the FAA to develop a Temporary Flight Restriction (TFR) over response operations. Enforcing the TFR required visibility of aircraft in the area, to include those on and near the source. Working with the UAC and the ICPs Air Operations Branch, Tyndall Air Force Base was able to provide the resources and technical expertise to improve aviation coordination over the operating area. ICP Houma and ICP Mobile established the priorities and aircraft tasking through the aircraft branch of the Operations Sections and set out in the Incident Action Plans (IAPs). By late June, the Aviation Coordination Center used the prioritization

set out in the IAPs to safely manage and prevent confliction within the airspace.

**Vessel Decontamination**. More than 9,000 vessels participated in the response. Some never touched oil and could quickly be released when they were no longer needed. Others spent weeks in the midst of oil. To clean vessels that came in contact with oil, the FOSC and RP set up significant vessel and equipment decontamination operating facilities across the Gulf Coast. Some smaller vessels and equipment could be pulled out of the water and pressure washed in containment pools. Larger vessels involved in oil skimming required dry docking with extensive cleaning of hulls, ballast tanks, and salt water service systems. In order to make the process efficient, the FOSC defined standards for decontamination, and employed Coast Guard marine inspectors and other trained personnel, providing a just-in-time training process to certify completion of the decontamination process.

Other logistics concerns had significant impact on response operations. Most logistics matters, including waste management and boom disposal, were handled by the RP. Sustaining government responders fell partly outside the RP's logistics arrangements. Communications and computer connectivity were limited in many areas impacted by the spill. The response operation also set up incident command posts, branches, and staging areas across five states, which required computer connectivity to operate. Communications had to be established with the thousands of vessels and hundreds of aircraft employed. The Coast Guard procured dedicated servers to fulfill its obligations to preserve electronically stored information.

The FOSC established policies for government specific logistics matters beyond communications. The RP provided lodging, transportation, food, limited medical, and command post facilities; government logistics ensured that the needs of government response personnel were taken into account. With the numbers of personnel cycling through the response, systems had to be established to track people when they checked in and methods to demobilize them. Property acquired by the government for the response had to be accounted for just as any other form of government property.

## Chapter 7: Finance

When the spill began, the Oil Spill Liability Trust Fund (OSLTF) had a response expenditure cap of $100 million per incident. Relatively soon, it

became apparent government expenditures would soon exceed that amount, and Congressional action was necessary to increase the per response cap. This was enacted and as of February 2011, the cap for the *Deepwater Horizon* response was $700 million.

It was, however, but a small fraction of the total costs the RP has paid to date. The solvency of the RP was pivotal in sustaining the unprecedented level of response.

The RP reimbursed the OSLTF for expenditures against the fund, although that did not act as a credit against the per incident cap. An RP is also responsible for claims arising from the spill. The National Pollution Funds Center directed the RP to take required steps to advertise the ability to make claims. These advertisements notified the public that if their claim was denied or they were unsatisfied with the RP's offer, injured parties could make a claim to the National Pollution Funds Center (NPFC).

Finance personnel were assigned to the UAC, the ICPs, and the Branches. Decentralized finance sections allowed greater flexibility to the response, but complicated documenting costs. Military Interdepartmental Purchase Requests (MIPRs) and Pollution Removal Funding Authorizations (PRFAs) authorize funding from the OSLTF for federal and state agency participation in a response. The Finance Section negotiated details of the MIPRS and PRFAs during the response, including assessing agency participation when the FOSC so directed. The process of tracking the costs associated with these arrangements required great attention to detail as the daily costs for various categories of government support had to be manually entered into electronic documentation workbooks. Tracking costs associated with credit card expenditures, travel orders, and reserve orders involved development of new, detailed methods and processes to ensure accurate accounting.

## Chapter 8: Natural Resources and Wildlife

**Marine Mammals**. There are 29 species of marine mammals and five species of sea turtles that inhabit the areas impacted by the spill. NOAA and the FWS established the marine Mammal and Sea Turtle Group within the Wildlife Branch of the Operations Section. The group coordinated its activities with existing marine mammal and sea turtle organizations of the Gulf Coast and elsewhere within the United States. Working with these organizations, protocols were developed for handling oiled animals and to

take in reports of marine mammals and sea turtles impacted by oil. In addition, the spill occurred just as the sea turtle nesting season was beginning across the shores of the northern Gulf of Mexico. In order to minimize the threat of losing many nests to oil impacts, sea turtles nests were excavated and relocated to Florida. Although initial observations found few dolphins stranded with externally visible oil, in early 2011 NOAA declared an unusual mortality event (UME) for dolphins in the northern Gulf of Mexico, and they continue to investigate the causes. The role that the spill may have played in the UME is as yet unknown

**Migratory Birds**. Similarly robust operations were established to respond to impacts on migratory birds. The FWS and state agencies coordinated efforts with the Audubon Society and existing networks of organizations working with migratory birds in the region. Coordination of volunteers, and ensuring volunteers had appropriate experience and training to assist with migratory birds eventually was performed by mutual agreement with the Audubon Society. Among the efforts to attempt to lessen the impacts to migratory birds, the Department of Agriculture (USDA) Natural Resource Conservation Service (NRCS) diverted funds for two existing migratory bird habitat initiatives to lease private farmland for flooding and flood appropriate public lands for migratory bird habitat. USDA sought FOSC funding to reimburse the programs for the expenses focused on the Gulf Coast. Ultimately, the FOSC determined not to provide the reimbursement from the OSLTF and the effort was later found to be ineffective in keeping migratory birds from reaching oiled shorelines.

**Endangered Species**. There are 26 endangered or threatened species in the Gulf of Mexico, ranging from sperm whales to the five species of sea turtles. Ensuring compliance with the Endangered Species Act for response operations involved bringing experts from NOAA, FWS, and other sources to develop and disseminate best management practices to adapt response operations, whether in situ burns or cleaning tar balls from beaches, to account for potential endangered species impacts. The work also involved providing trained spotters for skimming and in situ burn operations.

Ensuring adequate numbers of appropriately trained wildlife responders, supplying wildlife teams with necessary logistics support, and communicating wildlife related information across such an enormous organization spread across five states, proved challenging.

**Section 106 Compliance.** Approximately 778 archeological sites, including 113 newly discovered sites, were checked during the course of the response. There are eleven federally recognized tribes with traditional cultural properties and interests in the shorelines impacted by the *Deepwater Horizon* spill. There are also state recognized tribes with interests in the area. Historic preservation and tribal interests were folded into the response from early May, before there were shoreline impacts from the spill. Once the well was capped and the focus of response operations shifted almost exclusively to shoreline cleanup, formal consultations with historic preservation stakeholders took place in August, and the first of several government-to-government consultations took place in September.

## Chapter 9: Government Personnel

Sustaining the number of people required to direct response operations for a spill of this size and long duration, proved difficult for every government agency. Agencies that regularly participate in oil spill response have a cadre of highly trained people experienced in spill response work. The response soon outgrew the number of those people in almost every agency, including the Coast Guard. This posed two interrelated challenges. The first was simply staffing the response itself, given that all the agencies that participated had other missions to fulfill. Finding personnel to support the response effort while still maintaining enough staff to enable agencies to carry out their other missions proved difficult. Second, the number of people required exceeded the number with significant training and experience in spill response. Thus these agencies, including the Coast Guard, had to develop just-in-time training methods to bring in the numbers of personnel required to oversee operations and provide them with the training necessary to perform their functions.

The Coast Guard mobilized 14 percent of its total workforce, active duty and reserve. FWS and NOAA deployed approximately 17 percent of their workforce. For contingencies such as the *Deepwater Horizon* spill, the Coast Guard relies on the Coast Guard Reserve. The Reservists can be, and were, ordered to active duty under Title 14 of the U.S. Code. While this process makes Reservists immediately available, they can only be ordered to active duty in this manner for 60 days at a time. After that period of service, unless the Reservist volunteers for further activation, they cannot be recalled for two years. Due to this limitation, managing the availability of Reservists became a significant challenge; however, the number of Reservists who volunteered to continue to work on the DWH response under different arrangements certainly sustained the effort in a meaningful way.

## Chapter 10: Communications

**Common Operating Picture.** One of the central challenges in communicating about the response was developing a common operating picture that all stakeholders could access. After initially being used to help with oil spill trajectory, on June 5, 2010, the NIC directed that NOAA's Environmental Response Management Application (ERMA) would be the common operating picture (COP) for the Deepwater Horizon response. ERMA provided the ability to use Geographic Information System tools to track every aspect of the response, ultimately growing to thousands of data layers covering a wide array of response operations. It also allowed a scaled version of the COP to be posted on the Internet as GeoPlatform.gov, where the public could view response status information.

**Standard Information Reporting.** As the public and government officials learned of the potential impact of the spill, requests for information about response activities added a requirement for distilled information for distribution and posting. Daily Incident Action Plans, which contained information about response operations, quickly became so large that they were not useful for conveying information to senior officials or to the public. A standard set of measurements of resources and operations was developed, which provided a repeatable set of statistical information reported out from the response organization.

**Interaction with Federal and State Officials and Congressional Affairs.** In April through August 2010, over sixty percent of the Congressional inquiries to the Coast Guard were related to the *Deepwater Horizon*. Seventeen Congressional hearings as well as numerous Congressional Delegation hearings were conducted during the response phase of the incident. To ensure the concerns of local elected officials were accounted for in response operations, DHS hosted a daily call-in for local elected officials, which included a FOSC situation report followed by a question and answer session. In addition, the White House hosted a daily call that included the NIC, the FOSC, and the governors of the five impacted states. The states received the same daily summary as the White House.

To improve information flow, Deputy FOSC Representatives (Deputy FOSCRs) were assigned to the governors of Alabama, Mississippi, and Florida, while the Coast Guard sent a liaison to the staff of the Louisiana government and the FOSC, already located in Louisiana, met with him frequently. FEMA deployed a Governmental Relations Team of 80 people to assist in communications with local government leaders, interested citizens, and businesses.

**Interaction with Local Government and Affected Communities.** Interaction between the response and government leaders did not stop with the governors. An extensive liaison network of approximately 70 officers was established to respond to the needs of local officials. Liaisons, most particularly with the parish presidents of the coastal parishes in Louisiana, improved coordination between the response and local officials. Coast Guard Liaisons were also sent to local and state emergency response operations to improve communications and understanding of response needs. These liaisons filed daily information reports that were communicated to officials in Washington.

The FOSCs and Incident Commanders also reached out to the local communities. They found that expo type meetings, consisting of booths and tables with information and subject matter experts on various issues of concern to the public and specific aspects of response operations, were effective in communicating the status and challenges of the response. This was in contrast to town hall style meetings that were emotionally charged and did not contribute to inspiring public trust.

**Strategic Communications.** Strategic Communications for the response began with the Coast Guard and RP using the Joint Information Center (JIC) model generally used for oil spills. Over time, however, this model became more of a hybrid of the National Response Framework's ESF-15 structure that places media, governmental, and congressional affairs in one federal entity, with a limited JIC embedded.

By June, the NIC took over primary responsibility for addressing the national media on a daily basis about actions and items of interest, while the FOSC remained responsible for dealing with local media and state and local government leaders. The NIC focused on addressing the complexities of the relief well effort and source control. The FOSC addressed oil spill response, removal, and impacts. This large, full service communications structure remained in place until after the well was capped when media interest diminished and allowed reduction in the communications staff, along with scaling back of the rest of the response organization.

As with many other areas of the response organization, it was difficult to sustain the number of staff required with the appropriate skills to handle both traditional public affairs and community and intergovernmental relations. The willingness of other agencies to provide public affairs specialists to assist was a significant help.

## Conclusion

The *Deepwater Horizon* oil spill response was ultimately successful, due to the unity of effort and perseverance of the more than 1000 organizations that contributed to this unprecedented response. The NCP was proven sound, and the Incident Command System's scalable organizational structure proved critical to multiple agencies working with the RP toward common goals under an effective construct. The division of responsibilities between the NIC and staff working at the National level, and the FOSC serving as Unified Area Commander at the regional level, was effective in managing national, regional and local demands of this first "Spill of National Significance."

The *Deepwater Horizon* incident occurred in spite of the presence of a blowout preventer. The oil spill impacted the marine environment and the lives of so many along the Gulf of Mexico. The mitigation effort to secure the well source was a three-month process (87 days), and the resulting spill response effort became extraordinarily large and complex. Based on these facts, we conclude that significant improvements need to be made in preventative technology and requirements, mitigation technology and required capabilities, and oil spill response methods and readiness.

## Table of Contents

Organization of the Report. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . v

Chapter 1 and the Chronology: Situation as it Developed . . . . . . . . . . . . . . . . . . . . . . . . . . . . v

**Executive Summary** . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . v

Chapter 2: Command and Control. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .vi

Chapter 3: Operations . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .vi

Chapter 4: Health and Safety . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .ix

Chapter 5: Planning . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . x

Chapter 6: Logistics . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . x

Chapter 7: Finance . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .xi

Chapter 8: Natural Resources and Wildlife . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . xii

Chapter 9: Government Personnel. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . xiii

Chapter 10: Communications . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . xiii

Conclusion. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .xiv

**Contents**. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . xv

**1. Situation as It Developed** . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 1

**2. Command and Control** . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 3

2.1 Setting the response structure of the *Deepwater Horizon* Response . . . . . . . . . . . . . . . . . . 3

The Role of the Responsible Party under the Oil Pollution Act of 1990 . . . . . . . . . . . . . . . 5

2.2 National Incident Command. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 6

2.3 Unified Area Command. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 9

Regional Response Team Involvement at the Unified Area Command . . . . . . . . . . . . . . . 10

Natural Resource Trustees Involvement at the Unified Area Command . . . . . . . . . . . . . . 11

Tribal involvement at the Unified Area Command . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 12

FOSC Key Points: State Integration into Unified Command. . . . . . . . . . . . . . . . . . . . . . . 12

2.4 Incident Command Posts . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 13

ICP Houma Command Structure . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 13

ICP Mobile Command Structure . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 13

ICP Houston . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 15

Federal Agency involvement at the Incident Command Posts . . . . . . . . . . . . . . . . . . . . . . 16

State involvement at the Incident

Command Posts. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 16

Integration of Local Emergency Entities

at the Incident Command Posts . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 16

2.5 Branches and Staging Areas . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 17

ICP Houma Branch Structure . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 18

ICP Mobile Branch Structure . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 19

**3. Operations** . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 21

3.1 Source Control. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 21

Overview of Source Control Activities (Situation) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 22

Response Organization

in Houston . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 23

Source Control Oversight

(Action and Resources)..........................................................25

Operational Procedure Processing.................................................27

Source Control Challenges.......................................................27

Oil Trajectory and Amount.......................................................29

Background.....................................................................29

Oil Spill Trajectory in Detail....................................................29

The Loop Current...............................................................31

Oil Trajectory Challenges Encountered.............................................31

The Size of the Oil Spill.........................................................31

The Fate of the Oil.............................................................33

**3.2 Dispersant Use and Monitoring**...............................................33

Aerial Application..............................................................36

Sub-sea Dispersant Operations and Sub-Sea Monitoring...............................37

Implementation of Addendum 3 to Reduce Dispersant Application.......................41

Challenges to Dispersant Use.....................................................44

End of Dispersant Use...........................................................44

**3.3 In Situ Burn Operations**....................................................45

Overview of Operations.........................................................45

Offshore Vessel Fleet...........................................................46

Simultaneous Operations........................................................46

Wildlife Monitoring............................................................46

Safety and Smoke Plumes........................................................46

Mega Volume Burns.............................................................47

Burn Volume Calculation........................................................47

**3.4 Skimming**................................................................48

Offshore......................................................................49

Near-shore Zone...............................................................51

Beach, Bays, and Marshes.......................................................52

**3.5 Shoreline Protection**

**(Boom, Berms, Hesco)**..........................................................52

Mobile Bay Booming............................................................54

Louisiana.....................................................................57

**3.6 Search and Respond Standards and Quick Reaction Forces**.........................59

Search and Respond Standards....................................................59

Quick Reaction Forces..........................................................59

**3.7 National Guard and Department of Defense Support**..............................60

Command and Control of National Guard and Department of Defense Assets...........60

Demobilization of National Guard Forces..........................................62

**3.8 Shoreline Assessment, Cleanup, Shoreline Cleanup Assessment Technique**..........62

U.S. Geological Survey Site Sampling..............................................63

Shoreline Cleanup Assessment Technique...........................................64

Shoreline Clean Up Operations...................................................68

Beaches. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 68

Heat and Beach Cleaning. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 69

Operational Science Advisory Team II Report on Remaining Oil on Beaches . . . . . . . . . 69

Marshes. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 70

**3.9 Alternative Technologies** . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 72

Federal Agency Response Research and Development Funding . . . . . . . . . . . . . . . . . . . . . . 72

Coast Guard Oil Spill Research . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 72

Assessment of Alternative Response Technology at the Unified Area Command and

Incident Command Posts . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 72

Interagency Alternative Technology Assessment Program. . . . . . . . . . . . . . . . . . . . . . . . . . . 72

*A Whale*: An Example. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 72

**3.10 Concurrent Emergency Response and Natural Resource Damage Assessment** . . . . . 74

**3.11 FOSC Key Points** . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 78

Response and Restoration, Removal, and Damage Assessment. . . . . . . . . . . . . . . . . . . . . . 78

Ineffective Boom Deployment . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 78

**4. Safety**. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 79

**4.1 Public Health and Safety**. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 79

Fisheries Closures. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 80

Seafood Safety Sampling. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 80

NOAA, FDA and States' Reopening Protocol . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 83

Seafood Safety and Sampling Protocols . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 84

Continued Post Reopening Monitoring of Seafood. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 85

**4.2 Response Personnel Health and Safety** . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 85

Heat and Safety . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 85

Safety Organization . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 86

Monitoring Chemical Exposures . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 87

Protecting Workers from Exposures. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 88

Aviation Safety. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 89

Coast Guard Cutter Safety . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 90

FOSC Key Points: Safety. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 90

**5. Planning**. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 91

**5.1 Existing Plans: Area Contingency Plans** . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 91

**5.2 Existing Plans: The Maritime Transportation System Recovery Plans** . . . . . . . . . . . . . 94

**5.3 Organizational Structure** . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 94

UAC MTSRU. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 94

ICP Houma MTSRU . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 95

ICP Mobile MTSRU . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 95

National Level Support and Outreach . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 95

MTS Recovery Data. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 96

**5.4 Plans Developed During the Response: Severe Weather Plan and Planning for**

**Concurrent Activation of the National Contingency Plans and Stafford Act** . . . . . . . . . . 96

Concurrent Activation of the National Contingency Plan and the Stafford Act . . . . . . . . 96

Development of Severe Weather

Contingency Plans . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 98

Developing a Severe Weather Planning Capability. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 98

Severe Weather Operations Center (SWOC). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 99

Accountability Requirements . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 99

Personnel Accountability Unit (PAU) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 100

Accountability for Boom . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 100

Prevention of Conflict with Local and State Governments Evacuation Plans . . . . . . . . . 101

Training. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 102

Safety First on Reconstitution of Deepwater Horizon Operations. . . . . . . . . . . . . . . . . . . 103

Hurricane Alex, Tropical Depression No. 2, and Tropical Storm Bonnie . . . . . . . . . . . . . 103

**5.5 Plans Developed During the Response: Transition Planning**. . . . . . . . . . . . . . . . . . . . . . 104

Origins of Strategic Planning . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 104

Severe Weather. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 105

Transition Planning. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 105

Incident Command Post Consolidation. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 106

Monitoring and Maintenance Plan and UAC Transition Plan . . . . . . . . . . . . . . . . . . . . . . 107

**5.6 Incident Documentation** . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 108

**5.7 FOSC Key Points** . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 109

Area Contingency Plans . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 109

Local Government Involvement . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 109

Other State Agency Involvement. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 109

**6. Logistics** . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 111

**6.1 Operational Logistics: Critical Resources (Boom, Skimmers, Beach Cleaning**

**Equipment, Personnel)** . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 111

**6.2 Operational Logistics: International Notification, Cooperation, and the Jones Act** . 114

Jones Act, Clarified. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 116

**6.3 Operational Logistics: Vessels of Opportunity** . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 118

**6.4 Operational Logistics: Aviation Operations and Airspace Safety** . . . . . . . . . . . . . . . . . 123

FOSC Key Points: Aviation Coordination Center . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 126

**6.5 Operational Logistics: Vessel Decontamination**. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 127

Establishment of Decontamination Branch . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 127

Cleaning. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 130

Standards and Certification . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 130

Resources Committed . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 131

Decontamination Challenges. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 132

Continuity and Training . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 133

Offshore Vessels . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 133

Pre-assessment Surveys . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 133

**6.6 Operational Logistics: Waste Management** . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 134

**6.7 Operational Logistics: The Severe Weather Contingency Plan** . . . . . . . . . . . . . . . . . . . 136

**6.8 Support Logistics: Command, Control, Communications, Computing and**

**Information Technology (C4IT)** ............................................................ 137

    Tactical Communications: Organization and Personnel ............................... 138

    Vessel Communication ................................................................ 139

    Aviation Communications ............................................................. 140

    Rescue 21 Utilization................................................................. 140

    Information Management: Network connectivity and infrastructure .................. 140

    Electronically Stored Information...................................................... 141

**6.9 Support Logistics: Federal On-Scene Coordinator Logistics Policies** ............... 141

**6.10 Support Logistics: Area Command Critical Resources Unit** ....................... 142

**6.11 Support Logistics: Resource Request Process** .................................... 143

**6.12 Support Logistics: Requests for Assistance (RFA) from the Department of Defense (DOD) and State National Guards** ......................................................... 143

**6.13 Support Logistics: Organization and Facilities** .................................. 144

**6.14 Support Logistics: Vehicles and Transportation** ................................. 145

**6.15 Support Logistics: Lodging and Feeding** ....................................... 145

**6.17 Support Logistics: Personnel Demobilization** .................................... 146

**6.18 Support Logistics: Property and Equipment** .................................... 146

**6.19 FOSC Key Point** ............................................................... 148

    Vessels of Opportunity Protocols...................................................... 148

**7. Finance** ........................................................................ 149

**7.1 Response Funding** .............................................................. 149

**7.2 Responsible Party Liability, Role, and Funding** ................................... 152

**7.3 Payment of Claims and Billing** ................................................... 152

**7.4 Finance Section Organization** .................................................... 153

**7.5 Resource Request and Ordering Process** ......................................... 154

**7.6 Cost Tracking, Resource Tracking, and Financial Reporting** ....................... 156

**7.7 Tracking of Personnel and Resources** ............................................ 156

**7.8 Property Management and Tracking** .............................................. 157

**7.9 Cost Reconciliation** ............................................................. 158

**7.10 Resources Committed** .......................................................... 160

**7.11 FOSC Key Points** .............................................................. 161

    Responsible Party Solvency ........................................................... 161

    OSLTF Caps ......................................................................... 161

**8. Natural Resources and Wildlife** .................................................. 163

**8.1 Marine Mammals and Sea Turtles** ................................................ 163

    Initial Establishment of the Marine Mammal and Sea Turtle Group................... 163

    Response to Oiled and Stranded Marine Mammal and Sea Turtles................... 164

    Sea Turtle Rescue ................................................................... 165

    Relocation of Sea Turtles' Nests ...................................................... 166

    Sea Turtle Rehabilitation Efforts ...................................................... 167

    Dolphins............................................................................. 168

    Marine Mammal Stranding Operations................................................ 168

**8.2 Migratory Bird Activities and Volunteer Wildlife Response Assistance** ............ 169

Migratory Bird Habitat Initiative..................................................... 172

**8.3 Environmental Compliance with the Endangered Species Act** ..................... 172

Endangered Species Act Response Actions  ........................................ 174

Natural Resource Trustee Agency Oversight of Endangered Species Act Requirements in

the Response..................................................................... 174

**8.4 Wildlife Challenges** ............................................................. 177

**8.5 Section 106 of the National Historic Preservation Act Consultations** ............... 178

Situation ........................................................................ 178

First Actions Taken............................................................... 179

Challenges ...................................................................... 179

Resources Used .................................................................. 179

Phase Two Actions Taken.......................................................... 179

**9. Government Personnel**.............................................................. 181

**9.1 Federal Government Personnel Overview** ............................................. 181

**9.2 Staffing the Response** ............................................................. 182

**9.3 Initial Phase**

**(April 20 – May 19, 2010)**............................................................. 182

**9.4 Dynamic Phase**

**(May 20 – 15 August 15, 2010)**........................................................ 183

**9.5 Transitional Phase**

**(August 16, 2010 – December 17, 2010)**................................................. 184

**9.6 Project Phase**

**(December 18, 2010 – Present)**........................................................ 184

**9.7 Coast Guard Personnel Tracking** .................................................... 184

**9.8 Other Federal Agency Personnel Efforts**............................................... 185

**9.9 Training**.......................................................................... 186

**10. Communications**................................................................... 189

**10.1 Information Management** ........................................................... 189

Application of Advances to Communications to Support Information Management—

Development of a Common Operating Picture...................................... 189

**Organizational Changes to Support Information Management** .................... 192

**10.2 Interaction with Federal and State Officials, and Congressional Affairs**........... 193

**10.3 Interaction with Local Government** .................................................. 195

**10.4 Interaction with Affected Communities** .............................................. 198

**10.5 Strategic Communications**......................................................... 199

Situation and Actions............................................................. 199

Resources Committed ............................................................ 200

Challenges Encountered .......................................................... 201

**10.6 FOSC Key Points**................................................................. 202

The Need for a Common Information Reporting Template ........................... 202

Common Operating Picture........................................................ 202

External Affairs .................................................................. 202

**Appendix**............................................................................ 203



*KEY WEST, Fla. – A
staff member from the
Florida Department
of Environmental
Protection demon-
strates how the Neuston
net is one of the
mechanisms being used
to monitor for oil from
the Deepwater Horizon
oil spill. Photo courtesy
of U.S. Coast Guard*

of oil pollution from the marine environment. Rather, dispersants provide a mechanism to alter the fate of the spilled oil's fate, transport, and potential effects. Natural dispersion was occurring at the surface by physical wave action. A trade-off analysis determined the appropriateness of dispersant use. This analysis studied if a particular mitigation strategy would generate a lesser potential for long-term environmental impact relative to conventional response options. Ideally, the best response options would stop the flow of oil, or contain and remove the oil at the source.

Prior to the *Deepwater Horizon* incident, dispersants were used to combat oil spills in the Gulf of Mexico (GOM) as a response tool to mitigate the effects from offshore oil spills on environmentally sensitive coastal habitats. Regional Response Team (RRT) VI developed a pre-approval plan for dispersants using the tools listed in 40 CFR 300.910, Subpart J, FOSC Dispersant Pre-Approval Guidelines and Checklist (2001), Special Monitoring for Applied Response Technologies V. Operationally, the FOSC followed this pre-approval plan during this incident on a daily basis. The FOSCs assigned to the Eighth Coast Guard District were familiar with this tool and were well-versed in its use for spills in the GOM Coastal Zone. In addition, all RRT VI and many National Response Team (NRT) members received briefings on the past uses of dispersants and were aware of the trade-offs associated with the application of dispersants. NOAA and DOI consulted on the use of dispersants in the GOM and the Endangered Species Act (ESA) in 1995.

RRT VI FOSC Dispersant Pre-approval Guidelines and Checklist provided for meaningful, environmentally beneficial, and effective dispersant operation. Both historically and during the response, the programmed checklist approach allowed the FOSC to arrive quickly at a logical go or no-go decision. This allowed dispersant operations to begin in a timely manner to maximize its effectiveness as a countermeasure. The parties requesting approval for use of a dispersant system underwent evaluation criteria for approval for use. In addition to the checklist, parties had to demonstrate the following to the satisfaction of the FOSC:

- That the application system was specifically designed for its intended purpose, and if not specifically designed for dispersant use, had been used previously and deemed to be effective and appropriate; also that it would be used again in a similar manner or by some other specific means, deemed to be effective and appropriate under the circumstances,

- That the design and operation of the application system could reasonably be expected to apply the chemical dispersant in a manner consistent with the dispersant manufacturer's recommendation, especially with regard to dosage rates, and concentrations, and

- That the operation would be supervised or coordinated by personnel with experience, knowledge, specific training, or recognized competence with chemical dispersants and the type of system used.

The effectiveness of dispersants generally decreases as spilled oil weathers. It is therefore best to apply dispersants when the oil is freshest. The pre-approved dispersant area in the GOM includes offshore waters from the ten-meter isobaths and three nautical miles (nm)—whichever is farthest from the shore—to 200 nm offshore, encompassing the Exclusive Economic Zone boundary. This zone extends from the Texas-Mexico border and continues through the states of Texas and Louisiana to the boundary between federal Regions IV and VI. The requirement for dispersant product selection was that the dispersant must be included on the NCP (National Contingency Plan) Product Schedule and considered appropriate by the FOSC for existing environmental and physical conditions. The EPA product schedule listed and approved both COREXIT 9527A and 9500A for use. The *Deepwater Horizon* response effort used both. After responders exhausted the supply of 9527A, the operation used 9500A throughout. In accordance with RRT VI guidelines, the *Deepwater Horizon* RP submitted its first request to use aerial dispersants to the FOSC at Morgan City, La. The FOSC preauthorized its use at approximately 1 p.m. on April 22, 2010, and the RRT received notification a few hours later. Although there was an active search for the survivors of the MODU *Deepwater Horizon*, the FOSC, in concert with the Search and Rescue effort at the Eighth Coast Guard District, approved aerial dispersant use. There were no active searches in the target area,

Operations

## Figure 3.3. Diagram of the Aerial Dispersant Operations Group Structure





**Figure 3.4: Worldwide Dispersant Resource sources for *Deepwater Horizon* spill**



**Figure 3.5: Aerial Dispersant Group Assets**



*HOUMA, La. – The crew of a Basler BT-67 fixed wing aircraft release oil dispersant over an oil slick off the coast of Louisiana. Photo courtesy of U.S. Coast Guard.*

and sufficient safety controls were in place (e.g., spotter aircraft with embarked observers) in the event the Search and Rescue Mission Coordinator detected any survivors. The first aerial application began at 1700, using 1,880 gallons of COREXIT 9527. From aerial observations of the treated slick, the application was effective by employment of Tier I Special Monitoring of Applied Response Technologies (SMART) monitoring. The RRT received notification within the 24-hour period via email on April 22, 2010.

## Aerial Application

Aerial dispersant operations were coordinated through the aerial dispersant operations group located at the ICP in Houma, La. Initially, the operations were small, but expanded within one week to a large and comprehensive operation. The operations consisted of searching for slicks appropriate for dispersant application. This was done late in the day prior to the next day's application. On the day of the operation, the slick target would be reacquired. Communication was made back to the ICP for launching dispersant planes. The group consisted of a spray aircraft and spotter aircraft and sometimes on-water SMART Tier II flourometry boats. The spotter plane guided the spray plane over

the slick. After the spray operation, SMART boats would move in to conduct effectiveness monitoring if necessary.

The aerial application bases of operations were situated in the Stennis Space Center Airport in Mississippi and Houma-Terrebonne Airport, Houma, La. The *Deepwater Horizon* response deployed the largest mobilization of aerial dispersant assets and expertise from around the world.

Several types of aircraft conducted the operations, as noted in Figure 3.5.

During the *Deepwater Horizon* response, ninety-eight percent of the total volume aerially sprayed occurred more than 10 nm offshore. The closest area to land sprayed was just outside three nm from shore, in order to reduce the impact of several slicks from reaching Grand Isle and the Chandeleur Islands. There was no dispersant spraying over any land areas. Dispersants' effectiveness decrease dramatically within hours of the oil being released. Thus dispersant application near shore would have been ineffective, as the oil would then have been on the surface for days.

The shaded area on Figure 3.6 shows boundaries of dispersant operations and does not suggest that the entire area was sprayed with dispersants. Each single, discrete operation applied dispersants to a confined and particular target area or slick. Aerial dispersant spraying operations could occur during daylight hours only. Responders made every

**Figure 3.6: Perimeter of All Aerial Dispersant Operations**



reasonable effort to make the first dispersant application as soon as possible after the oil reached the surface, in order to achieve intended results.

As the *Deepwater Horizon* response was an ongoing major spill each day, the pre-designated FOSC in Morgan City approved dispersant operations daily. Later, the FOSC Representative (FOSCR) at ICP Houma and the FOSC at the UAC approved those operations jointly. After May 27, 2010, daily consultation with the EPA, via a senior representative at the UAC, was part of the required process as well. Throughout the response, limitations on aerial dispersant operations were as follows:

* Wind criteria for aircraft was less than 35 knots, however the RRT 6 *guidance* plan specified 25 knots; the increase in wind speed limit was only allowed when the aircraft could correct for spray drift.

* A 1,500 foot cloud ceiling was required, with 4 nm visibility for aerial applications to commence.

* No spray areas were permitted within 5 nm of the source, 2 nm of any vessel, 3 nm from shore, or where the water depth was less than 33 feet.

* Additional guidelines were in place for NOAA observers to ensure no dispersant operations within 3 nm of visible marine life.

* Each spray system was designed and built specifically for each aircraft.

* Dispersant application rate was 5 gallons per acre, applying a film of approximately 0.0002 inch at an altitude of approximately 50 to 75 feet, at a speed of approximately 150 knots.

* All spray systems were flight-tested at 300 to 500 micron droplet size at a swath width of approximately 60 to 150 feet.

* Candidate slicks had to be continuous to avoid over spraying.

Aerial application of dispersants continued until sub-surface dispersant testing on April 30, 2010 temporarily halted all use of dispersants. The Deputy Area Commander and the NOAA Scientific Support Coordinator (SSC) in Robert, La., requested an operational pause to review procedures, ensure training of oil target spotters, and ensure documentation of the monitoring data was submitted. After a two-day testing period, the operations continued. Operations resumed, and spotter plane assessments continued daily until aerial dispersant operations

were limited upon receipt of the Dispersant Monitoring and Assessment Directive, Addendum 3 of May 26, 2010. This directive limited the use of surface dispersants to rare and unusual circumstances.

From initial application of dispersant on April 22 to May 26, responders used aerial dispersants 28 of 35 days, with an average application of 24,386 gallons.

On May 26, the FOSC issued further instruction to the RP via written directive to reduce the amount of dispersants used. After negotiations with the EPA representative from Region VI and the EPA NRT chair, the FOSC agreed that:

1. The RP would endeavor to reduce the dispersant loading in the Gulf of Mexico by 75 percent, and

2. The RP would eliminate the use of surface dispersants entirely, unless issued a written exception approved the FOSC. This directive limited the use of surface dispersants to rare and unusual circumstances.

Between May 27 and July 19, aerial dispersants were used 33 of 54 days (61 percent), with an average application of 8,892 gallons, a 24 percent reduction in days used and a 64 percent reduction in the amount of dispersant applied as compared to the previous period of application from April 22 to May 26.

Data from the Environmental Unit, established at the UAC in Robert, La., to assist the FOSC with environmental issues, showed a strong correlation between decreased dispersant use and increased shoreline oiling during the period of reduced application.

## Sub-sea Dispersant Operations and Sub-Sea Monitoring

### Feasibility Testing

Prior to *Deepwater Horizon*, the concept of sub-sea dispersant application had only been tested experimentally in shallow water, less than six times anywhere in the



*KRJN, Miss. – A team of U.S. Air Force aerial spray aircraft maintainers from the 910th Aircraft Maintenance Squadron at Youngstown-Warren Air Reserve Station, Ohio, move a chemical pump into position in order to refill a chemical dispersing C-130 aircraft at Stennis International Airport. Photo courtesy of U.S. Air Force*

world. In late April 2010, the RP presented the UAC with the novel concept of applying dispersants directly at the source to mitigate oil in the offshore environment. At this point in the response,

and real-time air monitors, such as multi-gas and photo-ionization detectors. Professional safety and health personnel from both independent contractors and the RP reviewed all data.

Agencies involved in the response cooperated to reach practical solutions to safety concerns. For vessels working offshore in the proximity of dispersant application, safety staff characterized the area and the ambient air of workers closest to the dispersant operations. Through air and water monitoring, safety personnel determined the area was clear for workers to continue operations without respirators. Safety associated with the Volatile Organic Compounds (VOCs) at the surface in vicinity of the well as addressed by sub-sea and surface dispersant applications, as discussed in Chapter 3.

At the outset of the response, significant attention was paid to potential respiratory hazards such as benzene, posed by the evaporation of the hydrocarbons on the surface of the water, and potential toxins released by the burning of natural gas and surface oil at the well site. From the beginning of the response, the RP utilized site safety plans for operations. As part of site safety plans, workers at the spill source used respiratory protection equipment. By May 7, 2010, the UAC released the *Mississippi Canyon 252* Offshore Air Monitoring Plan for Source Control and Skimming Operations, a detailed plan that outlined required monitoring equipment, frequency of measurements, and exposure limits for all response personnel. From the commencement of response operations, industrial hygienists and safety professionals were embedded with response personnel to ensure proper measurements and monitoring were being conducted. At no point during the skimming



*GRAND GOSIER ISLANDS, La. – An Environmental Protection Agency contractor conducts surface water sampling near Grand Gosier Islands, La. Photo courtesy of EPA*

operations did gas readings exceed the Permissible Lower Exposure Limits for any of the identified toxins. Nevertheless, the vapor coming from the top of the portable tanks, combined with the extreme heat, accelerated the fatigue of personnel during pumping and offloading operations. On several occasions, personnel on top of the tanks had to be rotated early or moved to a cooling area because of the combined effects of the heat and fumes.

The principal hazards at work sites were slips, trips, falls, heat stress, sun exposure, fatigue, and motor vehicle accidents. Dermal exposure to the oil products and other chemicals also posed a threat throughout the spill recovery operation. Even minimal exposure to the oil products could result in an uncomfortable skin rash. The only way to prevent dermal exposure was through the consistent wearing of personal protective equipment (PPE) suited to the operations being conducted.

Safety personnel documented specific personal exposures in the post-deployment *Deepwater Horizon* Health-Related Inventory and Reporting Tool. This input was compiled and documented in Industrial Hygiene reports. Mishaps were captured by supervisors and reported to respective ICPs for investigation and documentation.

## Protecting Workers from Exposures

Safety staff monitored worker safety and health protections, including providing required PPE, for all workers involved in the cleanup.

One of the responsibilities of Safety and Environmental Health personnel is to determine which type of PPE is needed, who has to wear it, and what

*GULF OF MEXICO – A contractor monitors the air quality at the Deepwater Horizon site to ensure safety of the workers. Photo courtesy of U.S. Coast Guard*



training and medical qualifications are required to use the PPE. Safety and Environmental Health personnel must also ensure that PPE requirements are known and understood by workers, the correct number, sizes, and types of PPE are ordered, and the PPE is staged in areas where the workers can access it.

Early in response efforts, the RP ordered PPE and established numerous staging areas to deliver the material to the field in a timely manner. Safety plans were drafted and included descriptions of what PPE personnel should wear when conducting specific operations. Personnel were instructed to pick up their PPE at the Staging Areas, and to inform their supervisors if the PPE they needed was not available. A majority of the PPE used was procured and staged by the RP. All responders accessed the PPE at the Staging Areas close to field operations.

## Aviation Safety

One of the most high-risk operations of the *Deepwater Horizon* response was air traffic over the vicinity of the spill. There were a number of aviation safety issues that necessitated the FOSC's attention and closer coordination of aviation safety and operations.

The Federal Aviation Administration (FAA) could provide a flight restriction, but no air traffic radar was available offshore that could guarantee the efficacy of a flight restriction. The FOSC was able to secure the services of the Customs and Border Protection Air Intercept Radar aircraft to provide the air traffic control radar. The Air Force provided skilled controllers. Eventually, the size of the operation grew so large that centralized airspace management operations and airspace confliction prevention services were consolidated to the 601st Air and Space Operations Center located at Tyndall Air Force Base in Panama City, Fla.

Aviation operations utilized numerous air assets from the Coast Guard, as well as federal, state, and local agencies, and private companies to support *Deepwater Horizon* response operations. To support the *Deepwater Horizon* response, the Coast Guard employed Coast Guard Air Station Flight Safety Officers, who were well versed in the safety needs of pilots and air crews. Flight surgeons were employed to ensure flight crews and pilots were medically qualified to fly. Pilots deployed from their home units to assist with the response. Aviation safety and operations are discussed in further depth in Chapter 6 of this report, Logistics.



*PORT FOURCHON, La. – Workers contracted by BP, and under the direction of the U.S. Coast Guard, don personal protective gear before deploying to the beach to clean up oil. Photo courtesy of U.S. Coast Guard*