# Exhibit 29

## UNITED STATES DISTRICT COURT
## EASTERN DISTRICT OF LOUISIANA

| | |
|---|---|
| IN RE:  OIL SPILL by the OIL RIG<br>"DEEPWATER HORIZON" in the<br>GULF OF MEXICO, on<br>APRIL 20, 2010 | MDL NO. 2179<br><br>SECTION: J |
| THIS DOCUMENT RELATES TO: | |
| *ALL CASES IN PLEADING BUNDLE B3* | JUDGE BARBIER<br>MAG. JUDGE SHUSHAN |

\*   \*   \*   \*   \*   \*   \*   \*   \*   \*   \*   \*   \*

## DECLARATION OF ROBERT J. ANDERSON IN SUPPORT OF THE CLEAN-UP RESPONDER DEFENDANTS' MOTION FOR SUMMARY JUDGMENT

1. My name is Robert J. Anderson.  During the course of the *Deepwater Horizon* oil spill response and clean-up, I worked as a Project Manager for O'Brien's Response Management, Inc., now known as O'Brien's Response Management, L.L.C. ("O'Brien's").  I am currently a director of Seassurance Limited, the insurance arm of Witt O'Brien's, LLC, the parent company of O'Brien's.

2. I submit this Declaration in support of the Clean-Up Responder Defendants' Motion for Summary Judgment.  I understand the Clean-Up Responder Defendants to constitute a group of entities that includes O'Brien's.  The facts set forth herein are based on my personal knowledge and/or the books and records of O'Brien's.

3. None of the following Plaintiffs were employed by O'Brien's at any point during the *Deepwater Horizon* response: Torrey Barlow, Joseph Brown, Scea Burrage, Roy Causey, Jorey Danos, Nathan Fitzgerald, Thomas Hines, Frank Howell, Doug Maurras, Kirk Prest, and John Wunstell.

4.  Boom Technology Inc. did not have a direct contractor relationship with O'Brien's during the *Deepwater Horizon* oil spill response.

5.  Moran Environmental Recovery, LLC ("Moran") served as a contractor to O'Brien's during the *Deepwater Horizon* response via a Management Services Agreement dated June 1, 2010, as amended on August 4, 2010.  This Agreement provided that, except as specifically otherwise provided therein, it would be governed by the same terms and conditions of a March 25, 2002 Contractor Services Agreement that Moran had entered into with Marine Spill Response Corporation, a true and correct copy of which is attached hereto as Exhibit A.

6.  The March 25, 2002 Contractor Services Agreement referenced in Paragraph 5 above stated, at Exhibit D-2, that Moran would provide all necessary personal protective equipment to its employees and agents.

7.  The August 4, 2010 amendment to the MSA, a true and correct copy of which is attached as Exhibit B, added an additional paragraph regarding compliance with employment and labor law, stating that Moran Environmental would comply with and be solely responsible for all "applicable provisions of all U.S. Federal, state, and local laws, rules, regulations, ordinances, and other legal requirements of every kind relating to employees, workers, service providers, and/or laborers."

8.  During the *Deepwater Horizon* response, determinations regarding the use of personal protective equipment and respirators were approved and directed by the Unified Area Command ("UAC") and/or the federal government, and O'Brien's complied with all such determinations.

9.  At all times during the *Deepwater Horizon* response, employees of O'Brien's complied

    with all directives, authorizations, and orders issued to them by the federal government

    relating to their functions and operations, including those concerning health and safety

    issues, and did not exceed such directives, authorizations, and orders.

I declare under the penalties of perjury that the foregoing statements made in this declaration are

true and correct.


EXECUTED on the 7th day of May, 2016.

Robert J. Anderson

# Exhibit A

*MORAN ENVIRONMENTAL*

RECEIVED
SEP – 4 2002
CONTRACTS

CONTRACT NUMBER: *22 C O 7 0 0 2*

## CONTRACTOR SERVICES AGREEMENT

THIS CONTRACTOR SERVICES AGREEMENT (this "Agreement") is made as of the date specified on the signature page hereof by and between Marine Spill Response Corporation, a non-profit, non-membership corporation organized under the laws of the state of Tennessee ("Company" or "MSRC"), and the person or entity identified on the signature page hereof ("Contractor").

### BACKGROUND

This Contractor Services Agreement provides the terms and conditions that govern when Contractor is requested to provide services to Company and, upon assignment under Paragraph 6 below, to any Assignee, from time to time.

Accordingly, for good and valuable consideration, the receipt and sufficiency of which is acknowledged, the parties hereto agree as follows:

1. Contract Documents. This Agreement consists of this Contract Document, Exhibits A through E attached hereto, and the Schedules (if any) that are attached to the Exhibits.

The above-referenced Exhibits are as follows:

|  |  |
|---|---|
| Exhibit A | Scope of Services |
| Exhibit B | Compensation |
| Exhibit C | Insurance |
| Exhibit D-1 | Special Terms and Conditions |
| Exhibit D-2 | General Terms and Conditions |
| Exhibit E | Potential Assignees |

If any conflict exists among this signed Contract Document and any of the Exhibits or Schedules to this Contract Document, the conflict will be resolved by reference to the documents in the following priority: this Contract Document; Exhibit D-1; Exhibit D-2; all other Exhibits; all Schedules to any Exhibit. Capitalized terms used in this Agreement have the meaning set forth in Article 10 of Exhibit D-2.

2. Scope of Services. Contractor, in strict conformity with this Agreement, will provide the services described in Exhibit A (the "Services") upon request by Company  and will also furnish in connection with such Services all personnel, material, supplies, equipment, tools, labor, information, management and direction, including those described in Exhibit A, as and when required to perform the Services (the "Contracted Resources").

3. Commencement and Performance of Services. Contractor recognizes and understands that the Services may be requested as a necessary part of an emergency response to an oil spill.  Contractor intends to commit the available Contracted Resources upon request in the event of an Oil Spill Event. Upon its receipt of a Mobilization Notice as provided below for an Oil Spill Event, unless Contractor is prevented from immediately initiating mobilization to perform Services for Company as provided in this Agreement, Contractor agrees to  commence mobilization to perform the Services within the period stated in Exhibit A.  If mobilization to perform the Services cannot be commenced within such period, Contractor will immediately so notify Company.

4. Compensation.  As full and complete consideration for the performance of Contractor's obligations under this Agreement, Company will pay to Contractor the compensation for the requested Services provided in Exhibit B.  The rates set forth in Exhibit B shall be subject to changes by thirty (30) days prior written notice by Contractor to Company, but rates may not be changed during an Oil Spill Event for resources provided to that Oil Spill Event.

5. Notice and Commencement of Performance.

(a) Notice. Company may provide notice orally and promptly confirmed in writing (a "Notice") to Contractor that Company requests all or any part of the  Services.  In each Notice, Company will inform Contractor whether the Notice is a notice for Contractor to prepare and standby as provided herein (a "Standby Notice"), or to immediately initiate the mobilization of the Contracted Resources for the Services requested in the Notice and perform the Services (a "Mobilization Notice").  Every Notice will provide the following information to the extent such information is available to Company:

*CC: D. LAWRENCE, S. BINGHAM 9/4/02*

(i) The Services requested and, if applicable, the number and types of Contracted Resources required to be deployed.

(ii) The approximate location of the site and place(s) where the Services are to be performed and the job identification number to be used in invoices for Services hereunder.

(iii) The Designated Port or point of delivery of the Contracted Resources, if applicable.

(iv) The communication contacts and mode of receiving information relating to the Services.

(v) The person(s) having the overall command and control of the activities for which the Services are to be performed.

(b) <u>Standby Status</u>. Upon receipt of a Standby Notice, unless Contractor notifies Company of Contractor's inability to immediately respond and begin mobilization to perform the Services within the time specified in Exhibit A after its receipt of a Mobilization Notice, the Contracted Resources necessary to perform the Services requested will be on standby status ("Standby Status"), and Contractor will immediately undertake all necessary actions to prepare itself to initiate performance of the Services upon receipt of a Mobilization Notice. As consideration for placing the Contracted Resources necessary to perform the Services requested on Standby Status and dedicating such Contracted Resources for Company's use, Company will pay to Contractor the Standby Rates specified in Exhibit B.

(c) <u>Mobilization Status</u>. Upon receipt of a Mobilization Notice, unless Contractor notifies Company of Contractor's inability to immediately respond and begin mobilization to perform the Services within the time specified in Exhibit A after its receipt of the Mobilization Notice, the Contracted Resources necessary to perform the Services requested will be on mobilization status ("Mobilization Status"), and Contractor will immediately commence mobilization to perform the Services and undertake all necessary actions to make available all Contracted Resources necessary to perform the Services requested.

6. <u>Assignment</u>. In the event of an Oil Spill Event, MSRC intends to assign this Agreement for purposes of that Oil Spill Event to the person requesting MSRC response services within 7 days after MSRC

commences such services, provided that both the Assignee and the Contractor consent to such assignment. MSRC will deliver written notice of assignment (an "Assignment Notice") to Contractor and the Assignee. Upon the consent of Contractor and Assignee to such assignment, this Agreement will be solely and exclusively by and between the Assignee identified in the Assignment Notice and Contractor until this Agreement is terminated as to that Assignee or the Services requested in the Notice are concluded or terminated as provided in this Agreement (the "Assignment Period"). During the Assignment Period all references in this Agreement to "Company" shall refer to the Assignee designated in the Assignment Notice. MSRC will continue to supervise Contractor during the Assignment Period, unless and until Contractor is advised otherwise by the Assignee. During the Assignment Period, (i) the Assignee will be responsible for all obligations and entitled to all rights of Company under this Agreement (except those referring specifically to "MSRC") and will be solely and exclusively responsible under this Agreement with respect to the Oil Spill Event for which such Assignment Notice was given, and (ii) during the Assignment Period, MSRC is acting at the direction and on behalf of the Assignee, and therefore MSRC will have no obligations to Contractor under this Agreement (whether joint or several) during the Assignment period. This does not alter or affect any obligations of MSRC or Contractor prior or subsequent to the Assignment Period. The Assignee shall retain all obligations for payment under this Agreement during the Assignment Period for the Oil Spill Event notwithstanding the conclusion or termination of the Services. This Agreement otherwise shall remain in effect with MSRC except with regard to such Oil Spill Event.

7. <u>Training and Drills</u>. Contractor will, subject to availability of the Contracted Resources, attend and participate in (i) training programs conducted by Company or one or more Assignees, and (ii) "fixed equipment deployment drills," "tabletop drills" and/or "notification drills" at the request of Company using the Training Rate, if any, specified in Exhibit B.

8. <u>Inspection</u>. Contractor agrees to submit to inspection by the appropriate Governmental and Regulatory Bodies and the Company to verify the availability of the Contracted Resources.

9. <u>Reliance</u>.  Contractor agrees (a) to have the Contracted Resources identified in MSRC's contractor classification applications as resources upon which MSRC is entitled to rely, (b) to be identified by reference in MSRC's response contracts as part of MSRC's services and in Response Plans as an available resource to respond pursuant to the terms of this Agreement, and (c) to provide acknowledgment of these facts to appropriate Governmental and Regulatory Bodies.

10. <u>Arbitration</u>.  Any disputes between the parties (including any Assignee) hereto as to matters arising out of or relating to this Agreement which cannot be settled by the parties shall be submitted to binding arbitration under and in accordance with the Rules of the American Arbitration Association, in such location agreed upon by the parties or, absent such agreement, in Washington D.C.  The party seeking arbitration shall give written notice thereof to the other party, describing in reasonable detail the nature of the dispute and naming the arbitrator selected by such party.  The other party shall, by written notice within five (5) days following receipt of such notice, name its arbitrator.  The arbitrators so named shall select another arbitrator, who shall be independent and unrelated to any of the parties, within five (5) days following the appointment of the last arbitrator by a party hereto.  The decision of a majority of the arbitrators shall be final and binding upon the parties and judgment may be entered thereon by any court of competent jurisdiction.  To the extent agreed upon by the parties to this Agreement, third parties may be joined in such arbitration and/or this arbitration otherwise may be combined with arbitration proceedings with such third party.  The arbitration award shall include the allocation among the parties of the costs and expenses of arbitration.

11. <u>Indemnification.</u>

(a) <u>MSRC's and Assignee's Indemnity.</u>  MSRC and the applicable Assignee shall indemnify, defend, protect and hold harmless the Contractor and its directors, officers, employees, agents and representatives from and against any and all Claims for illness, personal injury or death of any director, officer, employee or agent of MSRC or the applicable Assignee as the case may be, regardless of fault, including the sole or concurrent negligence of

Contractor or its directors, officers, employees, agents or representatives.

(b) <u>Contractor's Indemnity</u>.  Contractor shall indemnify, defend, protect and hold harmless MSRC and the applicable Assignee and their respective directors, officers, employees, agents and representatives from and against any and all Claims for illness, personal injury or death of any director, officer, employee or agent of Contractor, regardless of fault, including the sole or concurrent negligence of MSRC or the applicable Assignee, or their respective directors, officers, employees, agents or representatives.

12. <u>Termination by Contractor.</u>  Contractor may terminate Services being performed under this Agreement at any time upon thirty (30) days prior written notice to Company.

13. <u>Governing Law.</u>  This Agreement shall be governed by and construed in accordance with the laws of the State in which the Services primarily are performed.

The parties have executed this Agreement as of the later date set forth below, in duplicate, intending each duplicate copy to serve as an original.

MORAN ENVIRONMENTAL RECOVERY, LLC
[Contractor Name]

By: _____

Name: STEVEN T. JENKINS

Title: PRESIDENT
Its duly authorized representative

Address: P.O. BOX 330569
ATLANTIC BEACH, FL 32233

Attention: STEVEN T. JENKINS
Telephone: 904-241-2200
Telecopy: 904-241-4732
Taxpayer ID #: 26-0016814

Date: _____

16 July 1993                    3

MARINE SPILL RESPONSE CORPORATION

By: _____

Name: _Richard M Johnson_

Title: _Contractor Administrator_

      Its duly authorized representative

980 West Lincoln Road
P.O. Box 4870
Lake Charles, LA 70606-4870

Attention: Richard M. Johnson
Contracts Administrator
Telephone: (337) 475-6400
Telecopy: (337)475-6401

Date: _3/25/02_

16 July 1993

## EXHIBIT A

## SCOPE OF SERVICES

1. Description of Services and Contracted Resources.

The Services consist of the following:

_____
_____
_____
_____

The Contracted Resources required in connection with the Services consist of the following:

_____
_____
_____
_____

The Geographic Area in which the Services may be performed are as follows (specify separately as to particular Contracted Resources and/or Services, as applicable):

_____
_____
_____
_____

2. Availability (Check applicable level of availability):

_____ Guaranteed on _____ hours notice

_____ Subject to Availability (Contractor agrees that, unless its Contracted Resources are engaged in performing services for a third-party (including an Assignee) pursuant to a binding agreement, it will provide such requested Contracted Resources and perform the Services.)

_____ Other (specify): _____

3. Contractor Equipment, Personnel, Materials, Supplies and other items / Mobilization Capability of Contracted Resources:

Location:_____

_____

(a) Equipment:

16 July 1993                                                    2

Type/Number             Time to commence mobilization             Speed of Advance

(b) Personnel:

Type/Number             Time to commence mobilization             Speed of Advance

(c) Materials/Supplies/Other:

Type/Number             Time to commence mobilization             Speed of Advance

Location:_____

(a) Equipment:

Type/Number             Time to commence mobilization             Speed of Advance

(b) Personnel:

Type/Number             Time to commence mobilization             Speed of Advance

(c) Materials/Supplies/Other:

Type/Number             Time to commence mobilization             Speed of Advance

16 July 1993                                    3

[ATTACH ADDITIONAL SHEETS AS NECESSARY FOR EQUIPMENT/PERSONNEL/SUPPLIES AT THESE LOCATIONS AND/OR FOR ADDITIONAL LOCATIONS]

4.    <u>MSRC Response Equipment to be Mounted and/or Installed on Contractor's Vessel(s) or Aircraft</u>:

5.    <u>Special Terms, if any</u>:

16 July 1993                               4

# VACUUM SYSTEMS

| VEHICLE MODEL/MAKE | BODY TYPE | ID# | Size Discharge | GPM | CFM | Storage Cap. | SERIAL NUMBER | OWNER | USER | TAG # | YEAR | LOCATION |
|---|---|---|---|---|---|---|---|---|---|---|---|---|
| CUSCO VACUUM TRAILER | TRAILER HVY | 105 | 6" | 150 | 2100 | 5028 | 2C9TA4726HC005517 | MER | MER | E96WFK | 1987 | JACKSONVILLE |
| FRUEHAUF VACUUM TRAILER | TRAILER HVY | 107 | 4" | 150 | 480 | 5561 | UNV528101 | MER | MER | FH6221 | 1975 | JACKSONVILLE |
| VACUUM TRAILER | TRAILER HVY | 109 | 4" | 150 | 480 | 3692 | FLT3234V | MER | MER | FH6241 | 1983 | JACKSONVILLE |
| LUPKIN FLATBED VACUUM TRAILER | TRAILER HVY | 110 | 4" | 100 | 480 | 5040 | 30213 | MER | MER | FH8251 | 1970 | JACKSONVILLE |
| PORTABLE VACUUM TRAILER | TRAILER HVY | 111 | 4" | 50 | 150 | 1000 | FLT3502Y | MER | MER | F88GCD | 1986 | JACKSONVILLE |
| GMC / SPOUTVAC | TRUCK VAC | 117 | 6" | 150 | 1200 | 2200 | 1G3DM/FHL1603122 | MER | MER | SC P128368 | 1990 | CHARLESTON |
| INTERNATIONAL VACUUM TRUCK | TRUCK VAC | 103 | 4" | 100 | 300 | 1904 | AA195JCA16454 | MER | MER | B4379E | 1978 | JACKSONVILLE |
| INTERNATIONAL VACUUM TRUCK | TRUCK VAC | 108 | 4" | 100 | 300 | 2305 | AA195JCA29340 | MER | MER | B24061 | 1979 | JACKSONVILLE |
| INTERNATIONAL VACUUM TK | TRUCK VAC | 112 | 4" | 100 | 300 | 3413 | 1HT5IHZR5MH333413 | MER | MER | B24031 | 1991 | JACKSONVILLE |
| FORD WET/DRY VACUUM TK | TRUCK VAC | 114 | 6" | 100 | 300 | 3000 | 1FDZS96M5WVA15089 | MER | MER | B24021 | 1997 | JACKSONVILLE |
| FORD WET/DRY VACUUM TK | TRUCK VAC | 115 | 6" | 100 | 300 | 3200 | 1FDZS98M0WVA36097 | MER | MER | A0296D | 1998 | JACKSONVILLE |
| FREIGHTLINER INDUSTRIAL VAC TK | TRUCK VAC | 116 | 4" | 100 | 300 | 3500 | 1FVXJJCB3YHG05732 | MER | MER | A0297D | 1999 | JACKSONVILLE |
| FORD L9000 | TRUCK VAC | 118 | 6" | 150 | 3000 | 3300 | 1FDZY90T1SVA59686 | MER | MER | C34573 | 1995 | SAVANNAH |
| FREIGHTLINER FLD12064ST | TRUCK VAC | 119 | 6" | 100 | 380 | 3150 | 1FYUYDLY85PH47785 | MER | MER | C34575 | 1993 | SAVANNAH |
| | | | | | | 46281 | | | | | | |

GPM Estimate for rotary vane pumps assumes 2" skimmer hose diameter and 100 feet pull.

## TEMPORARY STORAGE

| | | | | | | | | | | | | |
|---|---|---|---|---|---|---|---|---|---|---|---|---|
| HEIL 5000 GALLONS | TRAILER HVY | 309 | 4" | | | 5000 | H38024 | MER | MER | HM826B | 1980 | JACKSONVILLE |
| FRUEHAUF 6200 GALLONS | TRAILER HVY | 310 | 4" | | | 5000 | UNZ611801 | MER | MER | F880LI | 1972 | JACKSONVILLE |
| FRUEHAUF 6000 GALLONS | TRAILER HVY | 311 | 4" | | | 5000 | | MER | MER | | 1986 | JACKSONVILLE |
| FRUEHAUF 6200 GALLONS | TRAILER HVY | 312 | 4" | | | 5000 | OMC201201 | MER | MER | F89DLI | 1982 | JACKSONVILLE |
| UNIROYAL | BLADDER | | 4" | | | 50000 | | MER | MER | | 1993 | SAVANNAH |
| UNIROYAL | BLADDER | | 4" | | | 50000 | | MER | MER | | 1993 | SAVANNAH |
| UNIROYAL | BLADDER | | 4" | | | 20000 | | MER | MER | | 1993 | SAVANNAH |
| UNIROYAL | BLADDER | | 4" | | | 20000 | | MER | MER | | 1993 | SAVANNAH |
| UNIROYAL | BLADDER | | 4" | | | 3000 | | MER | MER | | 1993 | SAVANNAH |
| UNIROYAL | BLADDER | | 4" | | | 3000 | | MER | MER | | 1999 | SAVANNAH |
| ACTION PETROLEUM | BLADDER | | 3" | | | 2500 | | MER | MER | | 2001 | CHARLESTON |
| ACTION PETROLEUM | BLADDER | | 3" | | | 2500 | | MER | MER | | 2001 | CHARLESTON |
| | | | | TOTAL | TEMP STOR | 263582 | | | | | | |

**BOATS**

| #REF! VEHICLE MODEL/MAKE | BODY TYPE | Beam | Draft | Weight | Shallow Water | Min. Crew | SERIAL NUMBER | OWNER | USER | STATE REG. | YEAR | LOCATION |
|---|---|---|---|---|---|---|---|---|---|---|---|---|
| 15' ALLWELD | BOAT JON | 7 | 1 | 200 | | 2 | JBC21426B595 | MER | MER | SC-6553-BB | 1995 | CHARLESTON |
| 24' MONARK LINE 135HP "Rattler" | BOAT RESPONSE | 8 | 2.5 | 2000 | Yes | 2 | MAKO16230873 | MER | MER | SC-8619-UD | 1974 | CHARLESTON |
| 23' MONARK LINE 185HP "Launch Boat" | BOAT RESPONSE | 8 | 2.5 | 2000 | Yes | 2 | MAKO16370873 | MER | MER | SC-0391-NA | 1973 | CHARLESTON |
| 24' MONARK LINE 135HP "Pac Man" | BOAT RESPONSE | 8 | 2.5 | 2000 | Yes | 2 | MAKO17830874 | MER | MER | SC-8620-UD | 1973 | CHARLESTON |
| EVINRUDE OUTBOARD 15HP/PE15RCOB | MOTOR | | | | | | E0498874 | MER | MER | | | CHARLESTON |
| 18' DURACRAFT BOAT/MOTOR/TLR | BOAT JON | 6 | 1 | 600 | Yes | 2 | DUR47229E787 | MER | MER | SVG82L | 1987 | JACKSONVILLE |
| 20' BOSTON WHALER/MOTOR/TRLR | BOAT RESPONSE | 8 | 2 | 3600 | Yes | 2 | BWC562680C686 | MER | MER | FL3172FX | 1987 | JACKSONVILLE |
| 24' MCCLAIN / TC 80991104 | BOAT RESPONSE | 8 | 1.5 | 2200 | Yes | 2 | LOA10893E000 | MER | MER | FL5621LG | 2000 | JACKSONVILLE |
| 14' ALUMACRAFT | BOAT JON | 4 | 1 | 600 | Yes | 2 | ACBB7470A393 | MER | MER | GA0091DJ | 1996 | SAVANNAH |
| 14' ALUMACRAFT | BOAT JON | 4 | 1 | 600 | Yes | 2 | ACBB7480A393 | MER | MER | GA00910E | 1996 | SAVANNAH |
| 16' LOWE | BOAT JON | 4 | 1 | 600 | Yes | 2 | LWNW483678C16LKI | MER | MER | GA6073PD | 1992 | SAVANNAH |
| 16' LANDALE | BOAT JON | 4 | 1 | 600 | Yes | 2 | LBD25915M760 | MER | MER | GA0355FC | 1995 | SAVANNAH |
| 17' SYLVAN "Mini Green" | BOAT JON | 5 | 1 | 800 | Yes | 2 | SYL5521BL697 | MER | MER | GA62560D | 1998 | SAVANNAH |
| 14' LARCHER | BOAT JON | 4 | 1 | 600 | Yes | 2 | MISSING # PLATE | MER | MER | GA6073PD | 1994 | SAVANNAH |
| 14' GILL 1436 | BOAT JON | 4 | 1 | 600 | Yes | 2 | GEN6842JG900 | MER | MER | GA0711FH | 2000 | SAVANNAH |
| 14' GILL 1436 | BOAT JON | 4 | 1 | 600 | Yes | 2 | GEN6849JG900 | MER | SSRC | GA0700NT | 2000 | SAVANNAH |
| 20' CUSTOM CRAFT 2072 "Porpoise | BOAT RESPONSE | 6 | 1.5 | 280 | Yes | 2 | LOA10415A797 | MER | SSRC | GA62560B | 1997 | SAVANNAH |
| 24' MARINE GROUP "Gotta Get It" | BOAT RESPONSE | 8 | 2.5 | 320 | Yes | 2 | MV624DF9793 | MER | SSRC | GA6063PZ | 1993 | SAVANNAH |
| MERCURY 150HP "Gotta Get It" | MOTOR | | | | | | OG693384 | MER | SSRC | | 1998 | SAVANNAH |
| MERCURY 20 LITRE, 115HP "Porpoise" | MOTOR | | | 105 | | | 6405184 | MER | SSRC | | 1997 | SAVANNAH |
| EVINRUDE E30ELERM 30 HP | MOTOR | | | 160 | | | G035342 | MER | MER | | 1994 | SAVANNAH |
| JOHNSON 15HP | MOTOR | | | 105 | | | E5053454 | MER | MER | | 1994 | SAVANNAH |
| JOHNSON J15RSSM | MOTOR | | | 105 | | | G04715713 | MER | SSRC | | 2000 | SAVANNAH |
| JOHNSON 15R788 | MOTOR | | | 105 | | | G04713306 | MER | MER | | 1994 | SAVANNAH |
| JOHNSON J15R5SSM | MOTOR | | | 105 | | | G03594107 | MER | MER | | 1994 | SAVANNAH |
| JOHNSON J15R5SSM | MOTOR | | | 105 | | | E4853631 | MER | SSRC | | 2000 | SAVANNAH |
| JOHNSON 15 HP | MOTOR | | | 105 | | | E5257740 | MER | MER | | 1994 | SAVANNAH |

1 of 2

Fac: C6Equipments...July100021.xls
Tab: Boats

7/21/02  10:50 AM

**Location Details**

| Resp. truck |
| --- |
| Pier U |
| Pier U |
| Marathon |
| Moran |
| MER |
| MER |
| Travis Boat Center |
| Citgo |
| Colonial Oil |
| McIntosh |
| VoPak |
| Moran |
| Brunswick |
| East Coast |
| Kraft |
| Tosco |
| Citgo |
| Citgo |
| Tosco |
| Moran |
| Colonial Oil |
| East Coast |
| Citgo |
| VoPak |
| McIntosh |
| Plant Kraft |

File: OilSpillInvesto...July10021).xls
Tab: Boats

## PUMPING EQIPMENT

| #REF | MAKE/MODEL | TYPE | Size Discharge | Body make | Power | GPM | Weight | OWNER | USER | YEAR | LOCATION |
|---|---|---|---|---|---|---|---|---|---|---|---|
| | Yanmar | Centrifugal | 3" | cast iron | diesel | 348 | | MORAN | | | BRUNSWICK |
| | Yanmar | Centrifugal | 3" | cast iron | diesel | 348 | | MORAN | | | BRUNSWICK |
| | Zohler | Centrifugal | 1" | cast iron | electric | 10 | 30 | MER | | | CHARLESTON |
| | Tuit Hill | Centrifugal | 1" | cast iron | electric | 10 | 20 | MER | | | CHARLESTON |
| | Honda | Centrifugal | 3" | aluminum | gas | 55 | 40 | MER | | | CHARLESTON |
| | Wilden | Diaphram | 3" | aluminum | air | 50 | 60 | MER | | | CHARLESTON |
| | Sandpiper | Diaphram | 2" | aluminum | air | 25 | 50 | MER | | | CHARLESTON |
| | Blackmore | Suction | 1" | plastic | Manuel | 3? | 4 | MER | | | CHARLESTON |
| | Water Ace | 1/6hp Submersible | 3/4" | cast iron | electric | 2.5 | 10lbs | MER | | | JACKSONVILLE |
| | Robinair | A/C Service | 3/8" | cast iron | electric | VAC | 15lbs | MER | | | JACKSONVILLE |
| | Wilden | Diaphram | 2" | aluminum | pneumatic | 150 | 67 lbs | MER | | | JACKSONVILLE |
| | Wilden | Diaphram | 2" | aluminum | pneumatic | 150 | 67 lbs | MER | | | JACKSONVILLE |
| | Wilden | Diaphram | 2" | aluminum | pneumatic | 150 | 67 lbs | MER | | | JACKSONVILLE |
| | Wilden | Diaphram | 2" | aluminum | pneumatic | 150 | 67 lbs | MER | | | JACKSONVILLE |
| | Wilden | Diaphram | 2" | aluminum | pneumatic | 150 | 67 lbs | MER | | | JACKSONVILLE |
| | Wilden | Diaphram | 2" | aluminum | pneumatic | 150 | 67 lbs | MER | | | JACKSONVILLE |
| | Wilden | Diaphram | 2" | stainless steel | pneumatic | 150 | 102 lbs | MER | | | JACKSONVILLE |
| | Wilden | Diaphram | 2" | stainless steel | pneumatic | 150 | 102 lbs | MER | | | JACKSONVILLE |
| | Wilden | Diaphram | 2" | stainless steel | pneumatic | 150 | 102 lbs | MER | | | JACKSONVILLE |
| | Wilden | Diaphram | 2" | stainless steel | pneumatic | 150 | 102 lbs | MER | | | JACKSONVILLE |
| | Wilden | Diaphram | 2" | stainless steel | pneumatic | 150 | 102 lbs | MER | | | JACKSONVILLE |
| | Wilden | Diaphram | 1 1/2 | stainless steel | pneumatic | 70 | 50lbs | MER | | | JACKSONVILLE |
| | Wilden | Diaphram | 1 1/2 | stainless steel | pneumatic | 70 | 500bs | MER | | | JACKSONVILLE |
| | Wilden | Diaphram | 3" | aluminum | pneumatic | 240 | 110 lbs | MER | | | JACKSONVILLE |
| | Wilden | Diaphram | 3" | aluminum | pneumatic | 240 | 110 lbs | MER | | | JACKSONVILLE |
| | Ingersole Rand | Diaphram | 2" | aluminum | pneumatic | 175 | 113 lbs | MER | | | JACKSONVILLE |
| | Ingersole Rand | Diaphram | 2" | aluminum | pneumatic | 175 | 113 lbs | MER | | | JACKSONVILLE |
| | Ingersole Rand | Diaphram | 2" | aluminum | pneumatic | 175 | 113 lbs | MER | | | JACKSONVILLE |
| | Ingersole Rand | Diaphram | 2" | aluminum | pneumatic | 175 | 113 lbs | MER | | | JACKSONVILLE |
| | Ingersole Rand | Diaphram | 2" | aluminum | pneumatic | 175 | 113 lbs | MER | | | JACKSONVILLE |
| | Ingersole Rand | Diaphram | 2" | aluminum | pneumatic | 175 | 113 lbs | MER | | | JACKSONVILLE |
| | Ingersole Rand | Diaphram | 2" | aluminum | pneumatic | 175 | 113 lbs | MER | | | JACKSONVILLE |
| | Ingersole Rand | Diaphram | 1/2" | plastic | pneumatic | 5 | 4lbs | MER | | | JACKSONVILLE |
| | Flux Pumps Co. | Drum Pump | 1" | cast iron | pneumatic | 10 | 15lbs | MER | | | JACKSONVILLE |
| | Baldor | Flush Pump | 1" | cast iron | electric | 30 | 150lbs | MER | | | JACKSONVILLE |
| | Peerless | Flush Pump | 1 1/2" | cast iron | electric | 60 | 150lbs | MER | | | JACKSONVILLE |
| | Peerless | Flush Pump | 1 1/2" | cast iron | electric | 60 | 150lbs | MER | | | JACKSONVILLE |
| | Gas Boy | Fuel Service Pump | 3/4" | cast iron | electric | 5 | 25lbs | MER | | | JACKSONVILLE |
| | Gas Boy | Fuel Service Pump | 3/4" | cast iron | electric | 5 | 25lbs | MER | | | JACKSONVILLE |

1 of 3

File: O3Spillerworks...July10082(1).xls
Tab: Pumping Equipment

7/26/02  10:50 AM

| #REFI | MAKE/MODEL | TYPE | Size Discharge | Body make | Power | GPM | Weight | OWNER | USER | YEAR | LOCATION |
|---|---|---|---|---|---|---|---|---|---|---|---|
| | Gas Boy | Fuel Service Pump | 3/4" | cast iron | electric | 5 | 25lbs | MER | | | JACKSONVILLE |
| | Gas Boy | Fuel Service pump | 3/4" | cast iron | electric | 5 | 25lbs | MER | | | JACKSONVILLE |
| | Gas Boy | Fuel Service Pump | 3/4" | cast iron | electric | 5 | 25lbs | MER | | | JACKSONVILLE |
| | Gas Boy | Fuel Service Pump | 3/4" | cast iron | electric | 5 | 25lbs | MER | | | JACKSONVILLE |
| | Gas Boy | Fuel Service Pump | 3/4" | cast iron | electric | 5 | 25lbs | MER | | | JACKSONVILLE |
| | Gas Boy | Fuel Service Pump | 3/4" | cast iron | electric | 5 | 25lbs | MER | | | JACKSONVILLE |
| | Gas Boy | Fuel Service Pump | 3/4" | cast iron | electric | 5 | 25lbs | MER | | | JACKSONVILLE |
| | Gas Boy | Fuel Service Pump | 3/4" | cast iron | electric | 5 | 25lbs | MER | | | JACKSONVILLE |
| | Gas Boy | Fuel Service Pump | 3/4" | cast iron | electric | 5 | 25lbs | MER | | | JACKSONVILLE |
| | Angola | Fuel Service Pump | 3/4" | cast iron | manual | 5 | 25lbs | MER | | | JACKSONVILLE |
| | Angola | Fuel Service Pump | 3/4" | cast iron | manual | 5 | 25lbs | MER | | | JACKSONVILLE |
| | Angola | Fuel Service Pump | 3/4" | cast iron | manual | 5 | 25lbs | MER | | | JACKSONVILLE |
| | Siemens | Hot Oil Flush Pump | 2" | cast iron | electic | 40 | 200lbs | MER | | | JACKSONVILLE |
| | Roper | Non mounted spare | 4" | cast iron | n/a | 150 | 175lbs | MER | | | JACKSONVILLE |
| | Megator Corp | Pump | 1 1/2" | cast iron | gas | 20 | 660lbs | MER | | | JACKSONVILLE |
| | Roper | Skid mounted pump | 4" | cast iron | diesel | 150 | 175lbs | MER | | | JACKSONVILLE |
| | Roper | Tractor mounted | 4" | cast iron | tractor | 150 | 175lbs | MER | | | JACKSONVILLE |
| | Roper | Tractor mounted | 4" | cast iron | tractor | 150 | 175lbs | MER | | | JACKSONVILLE |
| | Wilden | Trailer Mounted DD | 2" | stainless steel | pneumatic | 150 | 102 lbs | MER | | | JACKSONVILLE |
| | Wilden | Trailer Mounted DD | 2" | stainless steel | pneumatic | 150 | 102 lbs | MER | | | JACKSONVILLE |
| | Koshin | Trash Pump | 1 1/2" | cast iron | gas | 60 | 200lbs | MER | | | JACKSONVILLE |
| | Teel | Trash Pump | 1 1/2" | cast iron | gas | 40 | 200lbs | MER | | | JACKSONVILLE |
| | Teel | Utility Pump | 3/4" | cast iron | electric | 15 | 10lbs | MER | | | JACKSONVILLE |
| | Teel | Utility Pump | 3/4" | cast iron | electric | 15 | 10lbs | MER | | | JACKSONVILLE |
| | Bell & Gosset | Utility Pump | 1" | cast iron | electric | 10 | 20lbs | MER | | | JACKSONVILLE |
| | Yanmar | Centrifugal | 3" | cast iron | diesel | 348 | | MER | | | SAVANNAH |
| | Yanmar | Centrifugal | 3" | cast iron | diesel | 348 | | MER | | | SAVANNAH |
| | Honda | Centrifugal | 3" | cast iron | gas | 343 | | MER | | | SAVANNAH |
| | Honda | Centrifugal | 3" | cast iron | gas | 343 | | MER | | | SAVANNAH |
| | Honda | Centrifugal | 3" | cast iron | gas | 343 | | MER | | | SAVANNAH |
| | Honda | Centrifugal | 2" | cast iron | gas | 170 | | MER | | | SAVANNAH |
| | Hydra-Tech | Centrifugal | 4" | cast iron | hydraulic | 1200 | 54 | MER | SSRC | | SAVANNAH |
| | Hydra-Tech | Centrifugal | 6" | aluminum | hydraulic | 1600 | 195 | MER | SSRC | | SAVANNAH |
| | Yanmar | Centrifugal | 3" | cast iron | diesel | 348 | | MORAN | | | SAVANNAH |
| | Yanmar | Centrifugal | 3" | cast iron | diesel | 348 | | MORAN | | | SAVANNAH |
| | Yanmar | Centrifugal | 3" | cast iron | diesel | 348 | | MORAN | | | SAVANNAH |
| | Elastic E-150 | Centrifugal | 2" | cast iron | hydraulic | 180 | 25 | MER | SSRC | | SAVANNAH |
| | Wilden | Diaphram | 2" | aluminum | air | 155 | 67 | MER | | | SAVANNAH |
| | Wilden | Diaphram | 2" | cast iron | air | 155 | 112 | MER | | | SAVANNAH |
| | Wilden | Diaphram | 3" | stainless steel | air | 208 | 165 | MER | | | SAVANNAH |

File: OilSpillInvento...July00621).xls
Tab: Pumping Equipment

7/31/02  10:50 AM

7/3/1/02  10:59 AM

| #REFI | MAKE/MODEL | TYPE | Size Discharge | Body make | Power | GPM | Weight | OWNER | USER | YEAR | LOCATION |
|---|---|---|---|---|---|---|---|---|---|---|---|
| | Wilden | Diaphram | 3" | cast iron | air | 240 | 181 | MER | | | SAVANNAH |
| | Sykes | Spiral Imp | 6" | cast iron | diesel | 1500 | | MER | | | SAVANNAH |
| | | | | | | 13187 | | | | | |

3 of 3

File: OilSpillInvento...July1002(1).xls
Tab: Pumping Equipment

**BOOM**

| VEHICLE MODEL/MAKE | BODY TYPE | Type | Draft (Inches) | Height (Inches) | Size (Inches) | Length (Ft) | LB/FT | OWNER | YEAR | LOCATION | Location Detail |
|---|---|---|---|---|---|---|---|---|---|---|---|
| Containment Systems | Slide Connect | River Boom | 12 | 18 | 6 | 1,000 | 2.5 | MER/SSRC | 1993 | SAVANNAH | Response Trailer |
| American Boom & Barrier | Slide Connect | River Boom | 12 | 18 | 6 | 1,000 | 2.5 | MER/SSRC | 1993 | SAVANNAH | Response Trailer |
| Containment Systems | Slide Connect | River Boom | 12 | 18 | 6 | 1,000 | 2.5 | MER/SSRC | 1993 | SAVANNAH | Response Trailer |
| American Boom & Barrier | Slide Connect | River Boom | 12 | 18 | 6 | 1,000 | 2.5 | MER/SSRC | 1993 | SAVANNAH | Boom Reel |
| American Boom & Barrier | Slide Connect | River Boom | 12 | 18 | 6 | 1,000 | 2.5 | MER/SSRC | 1993 | SAVANNAH | Boom Reel |
| Containment Systems | Slide Connect | River Boom | 12 | 18 | 6 | 1,000 | 2.5 | MER/SSRC | 1993 | SAVANNAH | Boom Reel |
| American Boom & Barrier | Slide Connect | River Boom | 12 | 18 | 6 | 1,000 | 2.5 | MER/SSRC | 1993 | SAVANNAH | Response Trailer |
| Containment Systems | Slide Connect | River Boom | 12 | 18 | 6 | 1,000 | 2.5 | MER/SSRC | 1993 | SAVANNAH | Response Trailer |
| American Boom & Barrier | Slide Connect | River Boom | 12 | 18 | 6 | 1,000 | 2.5 | MER/SSRC | 1993 | SAVANNAH | Response Trailer |
| Containment Systems | Slide Connect | River Boom | 12 | 18 | 6 | 1,000 | 2.5 | MER/SSRC | 1993 | SAVANNAH | Boom Reel |
| Containment Systems | Slide Connect | River Boom | 12 | 18 | 6 | 1,000 | 2.5 | MER/SSRC | 1993 | SAVANNAH | Boom Reel |
| Parker Systems | Slide Connect | River Boom | 12 | 18 | 6 | 1,000 | 2.5 | MER/SSRC | 1993 | SAVANNAH | Container |
| Parker Systems | Slide Connect | River Boom | 12 | 18 | 6 | 300 | 2.5 | MER | 1993 | SAVANNAH | Container |
| American Boom & Barrier | Slide Connect | River Boom | 12 | 18 | 6 | 600 | 2.5 | MER | 1993 | SAVANNAH | Container |
| Slick Bar | Slide Connect | Permant Boom | 12 | 18 | 6 | 2,200 | 2.5 | MER | 1993 | SAVANNAH | Container |
| Containment Systems | Slide Connect | River Boom | 12 | 18 | 6 | 1,000 | 2.5 | MER | 1993 | SAVANNAH | Container |
| Containment Systems | Slide Connect | River Boom | 12 | 18 | 6 | 2,700 | 1.9 | MER | 1993 | SAVANNAH | Container |
| Containment Systems | Slide Connect | Contractor | 12 | 18 | 7.5 | 250 | 1.7 | MER | 1999 | JACKSONVILLE | Response Trailer |
| Containment Systems | Quick Connect | 4x6 Boom | 6 | 10 | 4 | 400 | 0.9 | MER | 2000 | JACKSONVILLE | Response Trailer |
| Containment Systems | Slide Connect | River Boom | 12 | 18 | 6 | 1,800 | 2.5 | MER | 1993 | CHARLESTON | Pallets |
| Containment Systems | Slide Connect | River Boom | 12 | 18 | 6 | 1,100 | 2.5 | MER | 1993 | CHARLESTON | Ground |
| Containment Systems | Slide Connect | River Boom | 12 | 18 | 6 | 1,100 | 2.5 | MER | 1993 | CHARLESTON | Boom Reel |

Total Length:    24,450

**JACKSONVILLE**
| | |
|---|---|
| Total Length 24" | 0 |
| Total Length 18" | 24,050 |
| Total Length 10" | 400 |
| Total | 24,450 |

**SAVANNAH**
| | |
|---|---|
| Total Length 24" | 0 |
| Total Length 18" | 2,950 |
| Total Length 10" | 400 |
| Total | 3,350 |

**CHARLESTON**
| | |
|---|---|
| Total Length 24" | 0 |
| Total Length 18" | 17,100 |
| Total Length 10" | 0 |
| Total | 17,100 |

**CHARLESTON**
| | |
|---|---|
| Total Length 24" | 0 |
| Total Length 18" | 4,000 |
| Total Length 10" | 0 |
| Total | 4,000 |

24,450

1 of 2

**Location Detail**
Kraft
McIntosh
East Coast
ST Services
TOSCO
Moran Dock
VOPAK
Citgo
Colonial Oil 2
Dixie Crystal
Southern Bulk
Moran Dock
East Coast
East Coast
East Coast
East Coast
Brunswick
MER
MER
MER
MER
MER

File: C:\Spillevents...July10/02('1).xls
Tab: Boom

## SKIMMERS

| MANUFACTURER / MAKE | Model | ID# | Type | Power Source | Weight | GPM | Size | ENV | SERIAL # | OWNER | USER | TAG # | YEAR | LOCATION | Location Detail |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| DOUGLAS ENGINEERING | 2300 | 1085 | Wier / Suction | Vacuum | | 75 | 1.5" | Rivers / Inland | 4200 | MER | | | | JACKSONVILLE | MER |
| DOUGLAS ENGINEERING | 4300 | 1086 | Wier / Suction | Vacuum | | 120 | 2" | Rivers / Inland | 16000 | MER | | | | JACKSONVILLE | MER |
| CUSTOM | DISC | 1437 | Wier / Suction | Vacuum | | 75 | 1.5" | Rivers / Inland | UNKNOWN | MER | | | | JACKSONVILLE | MER |
| CUSTOM | DISC | 1438 | Wier / Suction | Vacuum | | 75 | 1.5" | Rivers / Inland | UNKNOWN | MER | | | | JACKSONVILLE | MER |
| CUSTOM | DISC | 1439 | Wier / Suction | Vacuum | | 75 | 1.5" | Rivers / Inland | UNKNOWN | MER | | | | JACKSONVILLE | MER |
| CUSTOM | DISC | 1440 | Wier / Suction | Vacuum | | 75 | 1.5" | Rivers / Inland | UNKNOWN | MER | | | | JACKSONVILLE | MER |
| SKIM PAK | 18000SH | | Wier / Suction | Vacuum | 28 | 300 | 2" | Rivers / Inland | | MER | SSRC | | 1993 | SAVANNAH | Plant Kraft |
| SKIM PAK | 18000SH | | Wier / Suction | Vacuum | 28 | 300 | 2" | Rivers / Inland | | MER | SSRC | | 1993 | SAVANNAH | Mcintosh |
| SKIM PAK | 18000SH | | Wier / Suction | Vacuum | 28 | 300 | 2" | Rivers / Inland | | MER | SSRC | | 1993 | SAVANNAH | Colonial Oil 2 |
| SKIM PAK | 2200SN | | Wier / Suction | Vacuum | 18 | 38 | 1.5" | Rivers / Inland | | MER | SSRC | | 1993 | SAVANNAH | East Coast |
| SKIM PAK | 18000SH | | Wier / Suction | Vacuum | 28 | 300 | 2" | Rivers / Inland | | MER | SSRC | | 1993 | SAVANNAH | VOPAK |
| SLURP | SLURP | | Wier / Suction | Vacuum | 30 | 44 | 3" | Rivers / Inland | | MER | | | 1993 | SAVANNAH | Citgo |
| ELASTIC | TDS-136 | | O | Hydraulic | 100 | 70 | 3" | Rivers / Inland | | SSRC | SSRC | | 2000 | SAVANNAH | MER |
| ACTION PETROLEUM | 16A | | O | Air | 100 | 35 | 2" | Rivers / Inland | | SSRC | SSRC | | 2000 | SAVANNAH | MER |
| ACTION PETROLEUM | Multi-24 | | O | Hydraulic | 175 | 285 | 2" | Rivers / Inland | | MER | | | 2001 | CHARELSTON | MER |
| DOUGLAS ENGINEERING | Skim Pak 2200 | | Wier / Suction | Vacuum | 20 | 38 | 1.5" | Rivers / Inland | | MER | | | 1993 | CHARELSTON | MER |
| SLICKBAR | Rigid Manta Ray | | A/S | Vacuum | 6 | 120 | 3" | Rivers / Inland | | MER | | | | CHARELSTON | MER |
| | | | | | | 2325 | | | | | | | | | |

## STRAINERS - TYPE

| MANUFACTURER / MAKE | Model | ID# | Type | Power Source | Weight | GPM | Size | ENV | SERIAL # | OWNER | USER | TAG # | YEAR | LOCATION | Location Detail |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| ROSEDALE PRODUCTS | UNKNOWN | 1412 | FILTER STRAINER S/S | | | | | Rivers / Inland | | MER | | | | | |
| ROSEDALE | UNKNOWN | 1413 | FILTER STRAINER S/S | | | | | Rivers / Inland | | MER | | | | | |
| ROSEDALE | UNKNOWN | 1414 | FILTER STRAINER S/S | | | | | Rivers / Inland | | MER | | | | | |
| ROSEDALE | UNKNOWN | 1415 | FILTER STRAINER S/S | | | | | Rivers / Inland | | MER | | | | | |
| CUSTOM | UNKNOWN | 1441 | STRAINER BOX 4" | | | | | Rivers / Inland | | MER | | | | | |
| CUSTOM | UNKNOWN | 1442 | STRAINER BOX 4" | | | | | Rivers / Inland | | MER | | | | | |

7/21/02  10:50 AM

**EXHIBIT B**

**COMPENSATION**

[Schedule of Rates -- Mobilization and Standby and Training Rates (if applicable) to be provided.  The Contractor is not required to have all three types of Rates.]

16 July 1993

Agreement.

**Waiver of Subrogation.**  In regard to all insurance coverage maintained by Contractor under this Agreement, Contractor will use its best efforts to cause its insurers to  waive all rights of subrogation against MSRC and each Assignee, their respective affiliated companies, and the officers, directors, employees, agents and representatives of each of them.  Evidence of such waiver, satisfactory in form and substance to Company, will be exhibited on the face of each certificate of insurance.

**Additional Insured.**  All insurance policies required hereunder, to the extent practicable, will designate Company and, upon assignment, each Assignee for the applicable Assignment Period, as an additional insured.  All policies required hereunder will contain a severability of interest clause, will be primary and non-contributing to any insurance carried by Company or any Assignee and will contain a cross-liability clause so that Company, each Assignee and Contractor are regarded as third parties to each other.  Upon such assignment, Contractor shall provide a certificate of insurance in accordance with Exhibit C evidencing the Assignee as an additional insured.

16 July 1993                                              2

## EXHIBIT C

## INSURANCE

**Insurance Coverage.** Contractor shall maintain at all times during the term of this Agreement policies of insurance with deductibles on standard forms with companies reasonably acceptable to Company for the coverages described below and checked as applicable:

_____ 1.Workers' Compensation and Employer's Liability. Workers' Compensation Insurance in accordance with laws that may be applicable to Contractor's employees engaged in performing the Services and Employer's Liability in the amount of $_____.

_____ 2.Hull and Machinery Insurance. Hull and Machinery Insurance in the amount of $_____ per Vessel or the value per Vessel, whichever is greater, on the American Institute Hull Clauses June 2, 1977 Form, or equivalent.

_____ 3.Protection and Indemnity Insurance. Protection and Indemnity Insurance on the Ocean P & I Clauses SP-23 Form or equivalent with a limit of at least $_____ covering the liabilities of Contractor under this Agreement and which shall include but not be limited to coverage for illness, injury or death of crew members (unless covered under worker's compensation policy), collision and towers liability, pollution, fixed and floating objects, removal of wreck and debris, general average and third party liabilities.

___X___ 4.Commercial General Liability. Commercial General Liability Insurance including Broad Form Comprehensive General Liability Insurance with limits of no less than $_1,000,000_ for Bodily Injury Liability and Property Damage Liability per occurrence, covering all of Contractor's operations under this Agreement, and including contractual liability with appropriate endorsements to cover liability assumed under this Agreement.

_____ 5.Longshoremen's and Harbor Workers' Liability Insurance. Longshoremen's and Harbor Workers' Liability Insurance under the United States Longshoremen's and Harbor Workers' Act, if applicable.

_____ 6.Excess Umbrella Insurance. Excess Umbrella Insurance excess to all the above policies with limits of not less than $_____.

_____ 7.Owned and Non-Owned Aircraft Insurance. [Describe coverage required]

_____
_____
_____

_____ 8.Comprehensive Automobile Liability Insurance. Comprehensive Automobile Liability Insurance with coverage for owned, non-owned and hired vehicles with limits no less than $_____ for bodily injury and property damage per occurrence combined single limit.

**Certificates of Insurance, Etc.** Contractor will purchase such insurance from companies rated no less than "B" as to management and no less than "Class V" as to financial strength by the latest edition of Best's Insurance Guide, published by A.M. Best Company, Oldwick, New Jersey, or an equivalent rating agency. Upon execution of this Agreement and thereafter on or before the expiration of such certificate, Contractor will have its insurance carrier(s) furnish to Company insurance certificates specifying that the Contractor has the coverage required hereunder and that no insurance will be canceled or materially changed while work is in progress without 30 days prior written notice to Company. Contractor further agrees that the minimum insurance requirements set forth herein will not limit nor diminish in any way the respective rights and obligations of the parties under this

16 July 1993

MSRC-DNC-05 [Equipment Lease]

**EXHIBIT D-1**

**SPECIAL TERMS AND CONDITIONS**

Article 1 -- Lease of Equipment.

Section 1.1.  Lease of Equipment.  Contractor will provide the Equipment and all necessary  personnel and accessories described in Exhibit A and specified in a Notice commencing the date and hour such manned Equipment are delivered and placed at the disposal of Company.  Upon the delivery of Notice, the Equipment will be at Company's disposal 24-hours per day, seven days a week, including weekends and holidays.

Section 1.2.  Performance Ability.  Contractor owns (or otherwise has all rights with respect to the Equipment necessary to perform under this Agreement) and possesses the Equipment free and clear of any and all restrictions on lease, use or operation that would interfere with the Company's use of the Equipment, and has the experience and personnel to operate, maintain and man the Equipment and otherwise accomplish the Services in a satisfactory manner.

Section 1.3.  Permits.  Contractor has or will obtain, prior to the start of the Services, all Permits required for the operation of the Equipment, and will ensure that the Equipment,  personnel, and accessories comply with all applicable Laws and Permits.

Section 1.4.  Equipment and Personnel. The descriptions, capacities and capabilities of the Equipment and personnel in Exhibit A are true and correct.  Unless otherwise specifically described in Exhibit A, the Equipment delivered hereunder will be in good working order and repair, fully equipped and ready to operate,  and will comply with all Laws and all manufacturer limitations, inspection schedules, and maintenance and overhaul schedules.  All personnel who will be performing duties associated with the Services are duly qualified and hold valid licenses and evidence of qualification for performing

the duties assigned to them as applicable.  All such personnel also have all of the qualifications and experience required by Company and provided to Contractor.

Article 2 -- Maintenance and Delivery of Equipment.

Section 2.1.  Delivery of Equipment.  Contractor will deliver the Equipment to Company at the place designated by Company, fully operational, and fueled, if applicable, and with all personnel and accessories necessary to perform the Services.

Section 2.2.  Maintenance of Equipment Condition.  Contractor will deliver the Equipment in the condition described in Exhibit A and will maintain it in such condition during the entire term of Services under this Agreement.  Contractor agrees, to the extent possible,  to make repairs and perform maintenance during the time Company does not have work scheduled for the Equipment.

Section 2.3.  Term of Lease.  The term of lease of any Equipment hereunder will commence on the date and hour Contractor delivers such Equipment in accordance with this Agreement and will terminate upon redelivery of the Equipment to Contractor at the point of its delivery to Company or such other location mutually agreed upon by Contractor and Company.

Article 3 -- Operation of Equipment.

Section 3.1.  Contractor's Responsibilities Generally.  The transportation and delivery of the Equipment and the entire performance, operation,  and management of the Equipment and all of Contractor's personnel and subcontractors will be under the exclusive control and command of Contractor.  Company will have the right to give directions as to the Services to be rendered.  Contractor will bear, solely and

May 28, 1993

exclusively, however, the duty to determine at all times whether operations under this Agreement can safely be continued or undertaken under then existing or reasonably foreseeable conditions. Contractor will cause all Contractor personnel to comply with their obligations under this Agreement.

Section 3.2. Personnel. Contractor will furnish for the performance of the Services sufficient and competent personnel as are required and necessary to perform the Services. Contractor will cause the operators of the Equipment, if any are offered by Contractor pursuant to Exhibit A and are requested by Company in the Notice, to carry out their duties with due care and workmanship and the utmost dispatch and diligence during day and night as requested by Company.

Section 3.3. Supply Obligations and Expenses.

    (a) Of Contractor. Contractor will provide and pay for all routine operating expenses incurred in connection with the furnishing of the Equipment and performing the Services and will, at its sole cost and expense, also furnish all necessary spare parts, tools and equipment for proper Equipment operation and maintenance; all fuel, lubrication oil, lube greases, and other supplies incident to the performance of the Services; unless otherwise stated in a Notice, all operators, mechanics, clerks, helpers, and other personnel reasonably necessary for the efficient rendering of the Services; at Company's request, copies of all reports necessary or required by various governmental agencies; copies of all Permits directly required for Contractor's performance under this Agreement; and all necessary training of assigned personnel directly connected with the Services.

The Services also include the provision of all required garage and shop facilities for the repair and maintenance of the Equipment, which shall be furnished and maintained by Contractor at its own cost and expense.

    (b) Of Company. All extraordinary operating fees and expenses identified in Exhibit B shall be paid by the Company.

Section 3.4. Standard of Performance.

Contractor will at all times during the term of this Agreement continuously furnish sufficient and competent supervision and personnel and all necessary Equipment to accomplish the Services in a timely manner. If, for any reason, any Equipment is damaged or destroyed or otherwise requires repair or maintenance while performing the Services, Contractor shall use its best efforts to replace, repair, maintain and/or restore any such Equipment so that the timely performance of the Services is not impaired. In addition, all Services performed by Contractor will conform to the standards of care, skill, methodology, and diligence normally observed by professionals operating in the United States in the provision of similar services at the time Contractor provides the Services.

Article 4 -- Miscellaneous

Section 4.1. Release of Company. An allocated portion of the premium for Contractor's insurance coverage for loss of, or damage to, Contractor's Equipment is considered to be included in the consideration for this Agreement. Contractor agrees not to sue MSRC or any Assignee for, and specifically releases MSRC and each Assignee from, any Claim or Claims for damage to, or loss of the Equipment, including any consequential, special or indirect damages, or loss of anticipated profits, whether caused in whole or in part by the negligence of Contractor, Company, or any other party or parties to the extent of the proceeds of such insurance actually received by Contractor. This release shall survive as to MSRC notwithstanding any assignment of this Agreement or MSRC's rights and obligations hereunder.

Section 4.3. Equipment Owned by Others. Contractor may with the written consent of Company perform the Services under this Agreement by using and supplying Equipment owned by others. Whenever such Equipment is supplied it must be controlled and operated by Contractor. Contractor remains responsible for compliance of all the terms and conditions of this Agreement as if Contractor were the owner of such Equipment.

May 28, 1993

## EXHIBIT D-2

## GENERAL TERMS AND CONDITIONS

**Article 1 -- Performance of the Work.**

**Section 1.1. Representation and Warranty.** Contractor (if not an individual) is validly existing and in good standing; its execution of this Agreement is duly authorized; and this Agreement constitutes its valid and binding obligations.

**Section 1.2. Other Work.** After receipt of any Notice, Contractor will not accept any work from any other person that may (directly or indirectly) prevent or interfere with Contractor's ability to perform the Services for Company under this Agreement unless contracted directly by the company hiring MSRC.

**Section 1.3. Work Direction.** As an independent contractor, Contractor shall provide all necessary supervision and direction for its employees to perform the Services. However, Contractor will strictly comply with and follow the overall coordination and directions given to Contractor by Company in connection with the Oil Spill Event clean-up, including but not limited to such directions as may be described or referred to in this Agreement. Due to the emergency nature of a Oil Spill Event clean up, these directions may be oral and both parties will use their best efforts to document all significant directions in writing as soon as practicable given all the circumstances of the Oil Spill Event.

**Section 1.4. Standard of Performance.** All Services performed by Contractor will conform at least to the standards of care, skill, methodology, and diligence normally observed by professionals operating in the location where the Services are rendered in the provision of similar services at the time Contractor provides the Services.

**Section 1.5. Compliance with Laws.** Contractor will at all times obtain and maintain all necessary Permits (except Permits required solely as a result of the Oil Spill Event) and will comply with all Laws and Permits applicable to Contractor's activities under this Agreement.

**Section 1.6. Liens and Encumbrances.**

Contractor will keep all property and equipment of Company, its agents and contractors and all products of the Services, free and clear of any and all liens and encumbrances.

**Section 1.7. Alcohol and Drug Use.** Contractor will not permit its employees, agents and subcontractors to perform any Services while under the influence of alcohol or any controlled substance. Contractor will not permit its employees, agents and subcontractors to use, possess, distribute or sell alcoholic beverages, illicit or unprescribed drugs or misuse legitimate prescription drugs while performing the Services. Contractor will remove from any work site under this Agreement any of its employees, agents or subcontractors found to have used or possessed alcoholic beverages, illicit or unprescribed drugs or misused legitimate prescription drugs while performing the Services. To the maximum extent permitted by applicable Laws, Contractor will not use an employee, agent or subcontractor to perform the Services who either refuses to take, or tests positive in, any alcohol or drug test.

**Article 2 -- Compensation.**

**Section 2.1. Compensation and Invoicing.** Contractor will submit invoices for the Services rendered under this Agreement at least weekly. All such invoices will be itemized to show line items and prices and will be supported by documentation sufficient to verify the charges thereon. Company will pay all undisputed charges within 14 days of receipt of an invoice and appropriate supporting documentation or such other time specified in Exhibit B; provided, however, that Company may review and dispute any amounts charged to Company at any time within one year from the date of invoice. The payment of any amount will not constitute an acceptance of the validity of such amount, and Company will have the right to offset against future amounts any amount paid that Company later disputes or determines was paid in error. Company will notify Contractor of any discrepancy found in submitted invoices within a reasonable time after the

16 July 1993

discovery of such discrepancy and in any event within one year from the date of invoice, and Contractor will make appropriate corrections and resubmit the disputed invoice to Company.

**Section 2.2.   Right to Withhold.** Company may withhold from payments due Contractor amounts sufficient to protect Company from and against any lien or claim chargeable to Contractor and asserted against the Company or its property, or any damages suffered by Company because of a breach of this Agreement by Contractor. Company may pay any such claim or lien out of monies so withheld or payments thereafter due Contractor unless Contractor timely furnishes Company with an executed release or satisfaction of such lien or claim in recordable form.

**Section 2.3.   Audit Rights.** Company will have access, at all reasonable times during the term of this Agreement and for three years thereafter, to Contractor's personnel and Contractor's books and records to the extent necessary for the purpose of auditing and verifying amounts and costs of Services invoiced and will have the right to copy or reproduce any of such books and records at Company expense.

## Article 3 -- Health and Safety.

**Section 3.1.   General Duties of Contractor.** Contractor will provide and maintain, to the extent under its control or direction, a safe working environment during the performance of the Services and will take such actions as are reasonably required to protect the health and safety of Contractor's agents and subcontractors and their respective employees, the public and other third parties. All tools, equipment, facilities, and other items provided by Contractor and practices employed by Contractor in accomplishing the Services are considered to be part of the working environment.

**Section 3.2.   Safety Procedures.** Contractor will observe and comply with all applicable safety Laws and, while on Company facilities or vessels, all safety policies, procedures and instructions of Company. Contractor will be solely responsible for notifying its employees and agents of all health and safety hazards known to Contractor to which such employees and agents may become exposed, including without limitation any Hazardous Substance. Company will notify Contractor of all health and

safety hazards known to Company to which Contractor's employees and agents may be exposed. In addition, Contractor will provide its employees and agents with all protective equipment and clothing necessary for safe work performance, except to the extent the Company has agreed to provide such protective equipment and clothing as provided in Exhibit A. Contractor will promptly notify Company of the existence of any unsafe work environment known to Contractor around the Oil Spill Event site or in connection with the performance of its obligations hereunder, whether or not Contractor has control over such work environment. Further, Contractor will immediately notify Company orally of all accidents, deaths, injuries and property damage that arise in connection with the performance of Contractor's obligations under this Agreement and promptly will follow up such oral notification in writing. Any subcontract agreement entered into by Contractor will provide that each subcontractor will be subject to this Article 3.

## Article 4 -- Information and Publicity.

**Section 4.1.   Preservation of Confidential Information.** Contractor will not publish or disclose to anyone, except to or at the direction of Company, any Confidential Information made available, directly or indirectly, to Contractor or its employees by Company, its contractors, subcontractors, or their respective employees or agents, during the course of the performance of the Services.

**Section 4.2.   Publicity.** Contractor will not permit its employees or subcontractors or their employees and agents to publish or release (orally or in writing) any public relations material or information of any kind concerning or relating to any Confidential Information, the Services under this Agreement, or any activities of Company or its contractors unless such materials or information have first been reviewed and approved in writing by Company.

**Section 4.3.   Return of Information.** Upon the earlier to occur of (1) completion of the Services rendered in connection with any Oil Spill Event or (2) termination of this Agreement, Contractor will promptly deliver to Company all Confidential Information in Contractor's possession and all copies

16 July 1993                                                    2

thereof, in whatever form, whether or not furnished to Contractor or produced by Contractor.

### Article 5 -- Treatment of Waste.

**Section 5.1.** **Compliance with Laws and Regulations.** Contractor will observe and comply with all applicable Laws regarding the proper management and disposal of Hazardous Substance and non-Hazardous Substance it generates.

**Section 5.2.** **Removal of Non-Hazardous Debris and Trash.** During the performance of the Services and upon termination or completion thereof, Contractor will remove any and all non-hazardous debris and trash material generated by the Contractor and dispose of it properly in accordance with all legal requirements.

### Article 6 -- Default and Remedies.

**Section 6.1.** **Contractor Default.** Contractor is in default of this Agreement ("Contractor Default") if any of the following occurs:

    **(a)** **Performance.** Contractor fails to fully and timely perform any of its obligations, covenants or agreements hereunder.

    **(b)** **Representations and Warranties.** Any representation, warranty or other statement made by Contractor in this Agreement is or becomes false or misleading.

    **(c)** **Involuntary Bankruptcy Proceedings; Insolvency, etc.** A receiver, liquidator, custodian, or trustee of Contractor is appointed by court order, or a petition is filed, a case is commenced, or relief is ordered against Contractor under any bankruptcy, reorganization, arrangement, insolvency, readjustment of debt, dissolution, or liquidation law of any jurisdiction, whether now or hereafter in effect; or if Contractor becomes insolvent, makes an assignment for the benefit of creditors, or fails to pay its debts generally as they become due, or consents to the appointment of a receiver, trustee, custodian, or liquidator of all or substantially all of its property.

    **(d)** **Voluntary Petition.** Contractor files a petition commencing a case in voluntary bankruptcy

or seeking relief under any provision of any bankruptcy, reorganization, arrangement, insolvency, readjustment of debt, dissolution or liquidation law of any jurisdiction, whether now or hereafter in effect, or consents to the filing of any petition or the commencement of any case against it under any such law.

**Section 6.2.** **Contractor Default Remedies.** If a Contractor Default occurs, MSRC, or during any Assignment Period the applicable Assignee, will provide notice of such default to Contractor. If Contractor has not cured such default within 5 days following its receipt of such notice, MSRC may exercise any right, power, or remedy permitted by law and will have, in particular, without limiting the generality of the foregoing, the right to immediately terminate this Agreement, or, if such Contractor Default occurs during an Assignment Period, the applicable Assignee may terminate the Services then being performed in response to an Oil Spill Event for such Assignee and may exercise any right, power, or remedy permitted by law, provided that the Assignee shall have no right to terminate this Agreement as between MSRC and Contractor.

**Section 6.3.** **Company Default.** MSRC, or during an Assignment Period the applicable Assignee, is in default of this Agreement ("Company Default") if any of the following occurs:

    **(a)** **Performance.** MSRC, or during an Assignment Period the applicable Assignee, fails to fully and timely perform any of its obligations, covenants or agreements hereunder.

    **(b)** **Involuntary Bankruptcy Proceedings; Insolvency, etc.** A receiver, liquidator, custodian, or trustee of MSRC, or during an Assignment Period the applicable Assignee, is appointed by court order, or a petition if filed, a case is commenced, or relief is ordered against MSRC or, during an Assignment Period the applicable Assignee, under any bankruptcy, reorganization, arrangement, insolvency, readjustment of debt, dissolution, or liquidation law of any jurisdiction, whether now or hereafter in effect; or if MSRC, or during an Assignment Period the applicable Assignee, becomes insolvent, makes an assignment for the benefit of creditors, or fails to pay its debts generally as they become due, or consents to the

appointment of a receiver, trustee, custodian, or liquidator of all or substantially all of its property.

**(c) Voluntary Petition**. MSRC, or during an Assignment Period the applicable Assignee, files a petition commencing a case in voluntary bankruptcy or seeking relief under any provision of any bankruptcy, reorganization, arrangement, insolvency, readjustment of debt, dissolution or liquidation law of any jurisdiction, whether now or hereafter in effect, or consents to the filing of any petition or the commencement of any case against it under any such law.

**Section 6.4. Company Default Remedies.**
If a Company Default occurs, Contractor will provide notice of such default to MSRC and during an Assignment Period the applicable Assignee. If MSRC, or during an Assignment Period the applicable Assignee, has not cured such default within 5 days following its receipt of such notice, Contractor may exercise any right, power, or remedy permitted by law and will have, in particular, without limiting the generality of the foregoing, the right to immediately terminate this Agreement in whole (if the Company Default occurs with respect to MSRC) or solely with respect to a deactivation of the Services then being performed in response to an Oil Spill Event.

**Article 7 -- Duration of Agreement and Termination.**

**Section 7.1. Term.** This Agreement is made and entered into effective as of the date of the execution and delivery of this Agreement and will continue for a one year term and, thereafter, will be extended each year at the end of the then current term for additional consecutive one-year periods unless earlier terminated as provided herein.

**Section 7.2. Termination by Contractor.**
Contractor may terminate this Agreement effective at the end of the then current term, by providing written notice of termination at least 30 days prior to the expiration of the then current term. Contractor may terminate the Services being performed by Contractor in response to an Oil Spill Event upon thirty (30) days' prior written notice to the Company.

**Section 7.3. Termination by MSRC.**

**(a) In Whole.** MSRC may at any time, without the payment of any penalty, terminate this Agreement by giving written notice to Contractor specifying the effective date of termination. Such termination by MSRC will not effect this Agreement as to the Assignee named in any Assignment Notice in effect on the date of such termination.

**(b) Deactivation of Services Only.**
MSRC, or during an Assignment Period the applicable Assignee, may, without the payment of any penalty, terminate, in whole or in part, the Services then being performed by Contractor in response to an Oil Spill Event, without terminating this Agreement as a whole, by giving written notice to Contractor specifying the effective date of the termination of Services for such Oil Spill Event.

**Section 7.4. Duty of Contractor upon Termination.** If the Contractor or MSRC terminates this Agreement or an Assignee terminates the Services, Contractor will stop performance of all Services on the effective date of termination. Contractor will take all actions necessary to preserve and protect all work in progress. Upon Company's request, Contractor will use its best efforts to assign to Company those subcontracts entered into by Contractor solely for a specific Oil Spill Event. In addition, Contractor will immediately deliver to MSRC all plans, reports, data, information, drawings, specifications and other materials, supplies and property theretofore prepared with respect to the Services provided hereunder. Company will compensate Contractor at the rates specified in Schedule B for the costs of demobilization of the Contracted Resources, except in connection with termination for Contractor Default.. In addition, Company will arrange and pay for, or at Company's option will reimburse Contractor for the cost of, cleaning the equipment used as part of the Contracted Resources and, except as otherwise provided in this Agreement, repairing any damage to such equipment resulting solely from the use of such equipment in the Oil Spill Event to the extent the cost of such repairs exceed the proceeds of Contractor's insurance actually received and such damage does not result from Contractor's willful, reckless or criminal misconduct.

**Article 8 -- Insurance.**

16 July 1993                                        4

**Section 8.1.  Contractor's Insurance**.  At all times during the term of this Agreement, Contractor will maintain in force at least the types and minimum amounts of insurance indicated in Exhibit C.

**Article  9  --  Miscellaneous**.

**Section 9.1.  Notices**.  Any notice required or permitted to be delivered hereunder will be deemed made (a) when delivered in person or (b) 3 days after mailing if addressed by name and title and sent by United States mail.   Except as otherwise provided in this Agreement, all notices shall be in writing and sent to the address or telex or facsimile number, as set forth  under the signature of Contractor and MSRC and as set forth in an Assignment Notice as to the Assignee named therein.  Company or Contractor may designate additional contacts as necessary.  Either party may change the contact information by providing notice to the other as provided herein.

**Section 9.2.  Taxes**.  Contractor will pay all taxes and fees levied or assessed against Contractor and any of its property or otherwise required in order to enable Contractor to perform its obligations hereunder.  Contractor will collect and remit all applicable state and local sales taxes.

**Section 9.3.  Assignment and Subcontracting**.  Contractor will not assign any of its rights or delegate or subcontract any of its duties hereunder without the prior written consent of Company and any Assignee as to which an Assignment Notice is outstanding.

**Section 9.4.  Records**.  Contractor will keep and cause its subcontractors to keep, with sufficient detail to document time and materials charges and in accordance with generally accepted accounting principles, all Records  pertaining to performance of the Services.  Contractor will preserve, and will cause its subcontractors to preserve, said Records during the performance of the Services and for a period of three years after termination of the Services or acceptance thereof.  At Company's request, true copies of the Records will be provided to Company.

**Section 9.5.  Force Majeure**.  Performance of this Agreement will be suspended to the extent that, and only so long as, despite the due care and diligence

of the parties to this Agreement, including any Assignee, it is prevented by reason of Force Majeure. In case of suspension of this Agreement by reason of Force Majeure, the party, including any Assignee, invoking Force Majeure will promptly notify any other party or any Assignee of this Agreement and do all things reasonably practicable to remove such cause and will resume performance hereunder as soon as such cause is removed.

**Section 9.6.  Third-Party Beneficiaries**. This Agreement is for the benefit of MSRC and, upon assignment pursuant to Paragraph 6 of the Contract Document, the Assignee named in the Assignment Notice.  Other than the Assignees, this Agreement will not be deemed to be for the benefit of any third party, nor will it give any person not a party to this Agreement any right to enforce any of its provisions.

**Section 9.7.  Independent Contractor Status**.  The parties intend that an independent contractor relationship between Company and Contractor be created by this Agreement, and Contractor is not to be considered an agent or employee of Company for any purpose.

**Section 9.8.  Survival**.  Notwithstanding the termination of this Agreement, the provisions of Articles 3, 4 , 5 and 6  and Sections 7.4, 9.4 and 9.6 will survive any such termination.

**Section 9.9.  Counterparts; Severability**. This Agreement may be executed in any number of counterparts, each of which will be deemed to be an original.  If any provision of this Agreement is determined to be invalid, illegal, or unenforceable, the validity, legality, and enforceability of the remaining provisions will not in any way be affected or impaired thereby.

**Section 9.10.  Time is of the Essence**. Time is of the essence of each and every obligation in this Agreement.

**Section 9.11.  Entire Agreement**.  This Agreement constitutes the entire agreement among the parties hereto and supersedes all prior agreements, understandings and arrangements, oral or written, among the parties hereto with respect to the subject matter hereof.

16 July 1993                                          5

Company determines that any Executive Orders are
applicable to Contractor because of the contractual
relationship between Contractor and Company,
Company shall promptly consult with Contractor,
and Company and Contractor will determine what
mutually acceptable action, if any, should be taken.

16 July 1993                                                7

# MARINE PRESERVATION ASSOCIATION
## MEMBERSHIP LIST
### EXHIBIT E

ABC Maritime AG
Admanthos Shipping Agency, Inc.
Alaska Tanker Company, LLC
Andriaki Shipping Co., Ltd.
Arab Maritime Petroleum Transport Company
ARAMCO Services Company
Assuranceforeningen Gard-gjensidig, The
Assuranceforeningen Skuld (Gjensidig)
*Benelux Overseas Inc.*
Bergesen d.y. ASA
BHP Petroleum (America) Inc.
BP America Inc.
Britannia Steam Ship Insurance Association Ltd. (The)
Brusco Tug & Barge
Canship Ugland Ltd.
Ceres Hellenic Shipping Enterprise Ltd.
Chandris (Hellas), Inc.
Chartworld Shipping Corporation
Chevron U.S.A. Inc.
Chronos Shipping Company Ltd.
COGEMA S.A.M.
Columbia Shipmanagement Ltd.
Conoco, Inc.
Crowley Marine Services, Inc.
Dampskibsselskabet TORM A/S
Dannebrog Rederi AS
Dorval Tankships PTY LTD
Dubai Shipping Ltd.
Dunya Denizcilik ve Ticaret A.S.
Eletson Corporation
*Energy Maritime LLC*
Equilon Enterprises L.L.C.
Essar Shipping Limited
Executive Ship Management Pte. Ltd.
ExxonMobil Refining and Supply Company
Fairfield-Maxwell Services, Ltd.
First Union Tanker Corporation
Foss Maritime Company
Genesis Maritime (Canada) Ltd.
Glafki (Hellas) Maritime Company
Gulfcoast Transit
Hamakua Energy Partners, L.P.

Harley Marine Services, Inc.
Hawaiian InterIsland Towing, Inc.
HI. Oceanfuel Pte. Ltd.
India Steamship Company Limited
J.A.M. Distributing
Jankovich Corporation (The)
Japan Ship Owners' Mutual Protection and Indemnity
Association (The)
Kent Line Limited
Keystone Shipping Company
Krupp Seeschiffahrt GMBH
Kyklades Maritime Corporation
Laurin Maritime AB
London Steam-Ship Owners' Mutual Insurance
Association Ltd. (The)
LSC Group Ship Management
Luktrans Shipping Company Ltd.
Manson Construction Co.
Marine Net-Work, Ltd.
Marine Transport Lines, Inc.
Maritime - Gesellschaft für maritime Dienstleistungen
mbH.
Metrostar Management Corp.
Mitsui O.S.K. Lines Ltd.
MMS Co. Ltd.
Motiva Enterprises L.L.C.
Murphy Oil USA, Inc.
Neptune Orient Lines Ltd.
Nereus Shipping S.A.
Newport Petroleum, Inc.
North of England Protecting & Indemnity Association (The)
Odfjell ASA
Olympic Shipping & Management S.A
OMI Corporation
Orient Marine Co., Ltd.
OSG Shipmanagement, Inc.
Pan Ocean Shipping Co. Ltd.
Parnassos Navigation SA
Petrolera Transoceanica S.A.
Phillips Petroleum Company
Portland Pipe Line Corporation

Premcor Refining Group (The)
Primorsk Shipping Corporation
Ravenscroft Shipping Inc.
Redina Maritime Ltd.
Roxana Shipping S.A.
Sargeant Marine, Inc.
Sause Bros. Ocean Towing Co., Inc.
Scorpio Ship Management S.A.M.
Seabulk International, Inc.
Sealock Shipping Corporation
Second Union Tanker Corporation
Shell Oil Company
SK Shipping
Standard Steamship Owners' Protection and Indemnity
Association (Bermuda) Ltd. (The)
Steamship Mutual Underwriting Association Limited
Stolt-Nielsen Transportation Group Ltd., Stolt Parcel
Tankers Division
Styga Compania Naviera SA
Sun Enterprises Ltd.
Teekay Shipping (Canada) Ltd.
Tesoro Petroleum Corporation
Texaco, Inc.
Theodora Tankers
Torvald Klaveness & Co. AS
Tow Boat Services & Management, Inc.
TransPetrol Services N.V.
Tsakos Shipping and Trading S.A.
Tschudi & Eitzen AS
Uni-Tankers
United Kingdom Mutual Steam Ship Assurance
Association, The
Universe Tankships (Delaware), Inc.
Valles Steamship (Canada), Ltd.
Vanguard Enterprise Co., Ltd.
Vista Ship Management AS
West of England Ship Owners Mutual Insurance
Association (Luxembourg), The
World-Wide Shipping Managers Pte. Ltd.
Zodiac Maritime Agencies Ltd.

January 10, 2002

# Exhibit D

## FIRST AMENDMENT TO THE
## MANAGEMENT SERVICES AGREEMENT

This First Amendment to the Management Services Agreement ("First Amendment")  is entered into this **4ᵗʰ** day of **August** , 2010 by and between O'Brien's Response Management Inc. ("Company") and Moran Environmental Recovery, LLC ("Contractor"), each of which may be referred to individually as "Party" or collectively as the "Parties."

**WHEREAS**, the Parties entered into a Management Services Agreement ("Management Agreement") on the 1st day of June, 2010 whereby the Contractor agreed to provide Services;

**WHEREAS**, the Parties desire to amend the Management Agreement in accordance with the terms and conditions provided herein.

**NOW THEREFORE**, in consideration of the mutual covenants and agreements herein contained, and other good and valuable consideration, the receipt and sufficiency of which are hereby acknowledged, the Parties agree as follows:

1) The Parties agree that any of the capitalized terms used in this First Amendment shall have the same meaning and effect as provided for in the Management Agreement, except for the terms defined in Paragraph 4 of this First Amendment.  Further, Paragraph 2 of the Management Agreement shall be revised as follows:

> 2.    Except as may be otherwise agreed upon by the Parties in writing, the Contractor agrees to perform the Services for on shore work, **and as of August 2, 2010 at 12:01 AM for near shore work**, for the Oil Spill Event under the management of O'Brien's.

2) The Parties agree that date of November 16, 2005 in the first recital of the Management Agreement shall be removed in its entirety, and shall be replaced with March 25, 2002.

3) The Parties agree that the numerical reference to "11RE05003" in Paragraph 1 of the Management Agreement shall be deleted in its entirety, and shall be replaced with "22C07002".

4) Paragraph 11 (Indemnification) of the Contractor Agreement, and Paragraphs 6, 7,8, 9, and 10 of the Management Agreement shall be removed in their  entirety, and shall be replaced with the following:

> **11.1    DEFINITIONS. WHEN USED IN THIS PARAGRAPH OR ELSEWHERE IN THIS AGREEMENT, THE FOLLOWING TERMS SHALL HAVE THE FOLLOWING MEANINGS:**
>
> **A.    "AFFILIATE" OF A COMPANY MEANS A PERSON OR ENTITY DIRECTLY OR INDIRECTLY CONTROLLING, CONTROLLED BY, OR UNDER COMMON CONTROL WITH SUCH COMPANY. "CONTROL" FOR THIS PURPOSE SHALL, IN**

1

THE CASE OF A CORPORATION WITH OUTSTANDING VOTING STOCK, REQUIRE THE DIRECT OR INDIRECT OWNERSHIP OF OR POWER TO VOTE WITH RESPECT TO THE OUTSTANDING SHARES OF A CORPORATION'S CAPITAL STOCK CONSTITUTING 50% OR MORE OF THE VOTES OF ANY CLASS OF SUCH CORPORATION'S OUTSTANDING VOTING STOCK.

B.   "CLIENT" MEANS BP AMERICAS PRODUCTION COMPANY AND BP EXPLORATION & PRODUCTION INC., AND ANY OTHER ENTITY WHICH COMPANY HAS CONTRACTED WITH TO PROVIDE SERVICES, INDIVIDUALLY AND COLLECTIVELY, AND ITS AFFILIATES, CO-VENTURERS, CO-LESSEES, CO-WORKING INTEREST OWNERS AND THEIR AFFILIATES, AND THE OFFICERS, DIRECTORS, EMPLOYEES, AGENTS, AND REPRESENTATIVES OF ALL OF THOSE ENTITIES.

C. "COMPANY GROUP" MEANS THE FOLLOWING ENTITIES AND PERSONS INDIVIDUALLY AND COLLECTIVELY: COMPANY AND ITS AFFILIATES, ITS SUBCONTRACTORS AND THEIR AFFILIATES, AND THE OFFICERS, DIRECTORS, EMPLOYEES, AGENTS, AND REPRESENTATIVES OF ALL OF THOSE ENTITIES.

D. "CONTRACTOR GROUP" MEANS THE FOLLOWING ENTITIES AND PERSONS INDIVIDUALLY AND COLLECTIVELY: CONTRACTOR AND ITS AFFILIATES, ITS SUBCONTRACTORS AND THEIR AFFILIATES, AND THE OFFICERS, DIRECTORS, EMPLOYEES, AGENTS, AND REPRESENTATIVES OF ALL OF THOSE ENTITIES.

E. "THIRD PARTIES" MEANS ALL PERSONS AND ENTITIES WHICH ARE NOT INCLUDED IN COMPANY GROUP OR CONTRACTOR GROUP.

11.2   <u>CONTRACTOR</u>.   SUBJECT TO THE OTHER TERMS OF THIS <u>PARAGRAPH 11</u>, CONTRACTOR SHALL DEFEND, INDEMNIFY, RELEASE, AND HOLD COMPANY GROUP AND CLIENT HARMLESS FROM AND AGAINST ALL CLAIMS, LIABILITIES, DAMAGES, AND EXPENSES (INCLUDING WITHOUT LIMITATION ATTORNEYS' FEES AND OTHER COSTS OF DEFENSE), IRRESPECTIVE OF INSURANCE COVERAGES, FOR THE FOLLOWING, WHEN ARISING OUT OF OR INCIDENTAL TO THIS AGREEMENT:

1.   (a)   ALL INJURIES TO, DEATHS, OR ILLNESSES OF PERSONS IN CONTRACTOR GROUP; AND

(b)   ALL DAMAGES TO OR LOSSES OF CONTRACTOR GROUP PROPERTY;

2

WHETHER OR NOT OCCASIONED BY OR THE RESULT IN WHOLE OR IN PART OF THE NEGLIGENCE OR FAULT, WHETHER SOLE, CONCURRENT, JOINT, ACTIVE, OR PASSIVE, OF COMPANY GROUP OR ANY OTHER ENTITY OR PERSON OR THE UNSEAWORTHINESS OF ANY VESSEL OR UNAIRWORTHINESS OF ANY AIRCRAFT.

2.    (a)    ALL INJURIES TO, DEATHS, OR ILLNESSES OF THIRD PARTIES; AND

(b)    ALL DAMAGES TO OR LOSSES OF THIRD PARTIES' PROPERTY;

WHEN CAUSED BY OR RESULTING FROM THE NEGLIGENCE OR FAULT OF CONTRACTOR GROUP, PROVIDED THAT, IN THE EVENT OF JOINT OR CONCURRENT NEGLIGENCE OR FAULT OF CONTRACTOR GROUP AND COMPANY GROUP, CONTRACTOR'S INDEMNIFICATION OBLIGATION HEREUNDER SHALL BE LIMITED TO ITS ALLOCABLE SHARE OF SUCH JOINT OR CONCURRENT NEGLIGENCE OR FAULT.

3.    NOTWITHSTANDING THE PROVISIONS OF PARAGRAPH 11.2.2 AND EXCEPT AS PROVIDED BY PARAGRAPH 11.3.1(A), PARAGRAPH 11.3.1(B) AND PARAGRAPH 11.3.3 CONTRACTOR SHALL SAVE, INDEMNIFY, RELEASE, DEFEND AND HOLD HARMLESS COMPANY GROUP AND CLIENT FROM AND AGAINST ANY CLAIM OF WHATSOEVER NATURE ARISING FROM POLLUTION OCCURRING ON THE PREMISES OF CONTRACTOR GROUP OR ORIGINATING FROM THE PROPERTY OR EQUIPMENT OF CONTRACTOR GROUP LOCATED ABOVE THE SURFACE OF THE LAND OR WATER ARISING FROM OR RELATING TO THE PERFORMANCE OF THE CONTRACT;

WHETHER OR NOT OCCASIONED BY OR THE RESULT IN WHOLE OR IN PART OF THE NEGLIGENCE OR FAULT, WHETHER SOLE, CONCURRENT, JOINT, ACTIVE, OR PASSIVE, OF COMPANY GROUP OR ANY OTHER ENTITY OR PERSON OR THE UNSEAWORTHINESS OF ANY VESSEL OR UNAIRWORTHINESS OF ANY AIRCRAFT.

4.    IT BEING THE PARTIES' INTENTION THAT THE INDEMNITIES PROVIDED FOR IN THIS PARAGRAPH 11.2 ARE TO APPLY;

3

(a)    WITHOUT REGARD TO ANY CONFLICTING RULES OF LIABILITY UNDER ANY APPLICABLE LAW OR REGULATION, AND

(b)    WITHOUT REGARD TO ANY SUCCESSFUL LIMITATION OR EXONERATION OF LIABILITY PROCEEDING FILED BY OR ON BEHALF OF CONTRACTOR GROUP PURSUANT TO THE LAWS OF ANY STATE OR COUNTRY OR THE PROVISIONS OF ANY INTERNATIONAL CONVENTION, AND

(c)    WHETHER OR NOT THE CLAIM, LIABILITY, DAMAGE, OR EXPENSE IN QUESTION IS:

> (i)    PREDICATED ON NEGLIGENCE, FAULT, STRICT LIABILITY, STATUTORY DUTY, OR CONTRACTUAL INDEMNITY, OR
>
> (ii)   SOUGHT DIRECTLY OR INDIRECTLY BY WAY OF RECOVERY, INDEMNIFICATION, OR CONTRIBUTION BY ANY PERSON OR ENTITY AGAINST COMPANY GROUP.

11.3    COMPANY. SUBJECT TO THE OTHER TERMS OF THIS PARAGRAPH 11, COMPANY SHALL DEFEND, INDEMNIFY, RELEASE, AND HOLD CONTRACTOR GROUP HARMLESS FROM AND AGAINST ALL CLAIMS, LIABILITIES, DAMAGES, AND EXPENSES (INCLUDING WITHOUT LIMITATION ATTORNEYS' FEES AND OTHER COSTS OF DEFENSE), IRRESPECTIVE OF INSURANCE COVERAGES, FOR THE FOLLOWING, WHEN ARISING OUT OF OR INCIDENTAL TO THIS AGREEMENT:

1.    (a)    ALL INJURIES TO, DEATHS, OR ILLNESSES OF PERSONS IN COMPANY GROUP;

(b)    ALL DAMAGES TO OR LOSSES OF COMPANY GROUP PROPERTY;

WHETHER OR NOT OCCASIONED BY OR THE RESULT IN WHOLE OR IN PART OF THE NEGLIGENCE OR FAULT, WHETHER SOLE, CONCURRENT, JOINT, ACTIVE, OR PASSIVE, OF CONTRACTOR GROUP OR ANY OTHER ENTITY OR PERSON OR THE UNSEAWORTHINESS OF ANY VESSEL OR UNAIRWORTHINESS OF ANY AIRCRAFT.

2.    (a)    ALL INJURIES TO, DEATHS, OR ILLNESSES OF THIRD PARTIES; AND

4

(b)    ALL DAMAGES TO OR LOSSES OF THIRD PARTIES' PROPERTY;

WHEN CAUSED BY OR RESULTING FROM THE NEGLIGENCE OR FAULT OF COMPANY GROUP, PROVIDED THAT, IN THE EVENT OF JOINT OR CONCURRENT NEGLIGENCE OR FAULT OF COMPANY GROUP AND CONTRACTOR GROUP, COMPANY'S INDEMNIFICATION OBLIGATION HEREUNDER SHALL BE LIMITED TO ITS ALLOCABLE SHARE OF SUCH JOINT OR CONCURRENT NEGLIGENCE OR FAULT.

3.    NOTWITHSTANDING THE PROVISIONS OF PARAGRAPH 11.3.2 AND EXCEPT AS PROVIDED BY PARAGRAPH 11.2.1(A), PARAGRAPH 11.2.1(B) AND PARAGRAPH 11.2.3 COMPANY SHALL SAVE, INDEMNIFY, RELEASE, DEFEND AND HOLD HARMLESS CONTRACTOR GROUP FROM AND AGAINST ANY CLAIM OF WHATSOEVER NATURE ARISING FROM POLLUTION AND/OR CONTAMINATION INCLUDING WITHOUT LIMITATION SUCH POLLUTION OR CONTAMINATION FROM THE RESERVOIR OR FROM THE PROPERTY OR EQUIPMENT OF COMPANY GROUP ARISING FROM OR RELATED TO THE PERFORMANCE OF THE CONTRACT;

WHETHER OR NOT OCCASIONED BY OR THE RESULT IN WHOLE OR IN PART OF THE NEGLIGENCE OR FAULT, WHETHER SOLE, CONCURRENT, JOINT, ACTIVE, OR PASSIVE, OF CONTRACTOR GROUP OR ANY OTHER ENTITY OR PERSON OR THE UNSEAWORTHINESS OF ANY VESSEL OR UNAIRWORTHINESS OF ANY AIRCRAFT.

4.    IT BEING THE PARTIES' INTENTION THAT THE INDEMNITIES PROVIDED FOR IN THIS PARAGRAPH 11.3 ARE TO APPLY:

(a)    WITHOUT REGARD TO ANY CONFLICTING RULES OF LIABILITY UNDER ANY APPLICABLE LAW OR REGULATION, AND

(b)    WITHOUT REGARD TO ANY SUCCESSFUL LIMITATION OR EXONERATION OF LIABILITY PROCEEDING FILED BY OR ON BEHALF OF COMPANY GROUP PURSUANT TO THE LAWS OF ANY STATE OR COUNTRY OR THE PROVISIONS OF ANY INTERNATIONAL CONVENTION, AND

(c)     WHETHER OR NOT THE CLAIM, LIABILITY, DAMAGE, OR EXPENSE IN QUESTION IS:

(i)     PREDICATED ON NEGLIGENCE, FAULT, STRICT LIABILITY, STATUTORY DUTY, OR CONTRACTUAL INDEMNITY, OR

(ii)    SOUGHT DIRECTLY OR INDIRECTLY BY WAY OF RECOVERY, INDEMNIFICATION, OR CONTRIBUTION BY ANY PERSON OR ENTITY AGAINST CONTRACTOR GROUP.

11.4.   NOTICE. CONTRACTOR OR COMPANY, AS THE CASE MAY BE, SHALL PROMPTLY GIVE TO THE OTHER PARTY NOTICE IN WRITING OF ANY CLAIM MADE OR PROCEEDINGS COMMENCED FOR WHICH CONTRACTOR OR COMPANY CLAIMS TO BE ENTITLED TO INDEMNIFICATION UNDER THIS AGREEMENT. SUCH NOTICE SHALL STATE, WITH AS MUCH DETAIL AS IS REASONABLY PRACTICABLE, THE FACTS AND CIRCUMSTANCES GIVING RISE TO THE CLAIM AND SHALL BE GIVEN AS SOON AS POSSIBLE AFTER THE PARTY SEEKING INDEMNITY HEREUNDER (REFERRED TO IN THIS PARAGRAPH 11 AS THE "INDEMNITEE") BECOMES AWARE OF SUCH CLAIM OR PROCEEDING. THE PARTY AGAINST WHOM SUCH INDEMNITY IS SOUGHT (REFERRED TO IN THIS PARAGRAPH 11 AS THE "INDEMNITOR") SHALL CONFER WITH THE INDEMNITEE CONCERNING THE DEFENSE OF ANY SUCH CLAIM OR PROCEEDINGS BUT, SUBJECT TO THE REMAINDER OF THIS PARAGRAPH 11, THE INDEMNITOR OR ITS INSURER SHALL RETAIN CONTROL OF THE CONDUCT OF SUCH DEFENSE, INCLUDING, BUT NOT LIMITED TO, THE SELECTION AND MANAGEMENT OF COUNSEL. NOTWITHSTANDING THE FOREGOING, HOWEVER, NEITHER PARTY SHALL EFFECT SETTLEMENT OR COMPROMISE OF ANY CLAIM OR PROCEEDING WITHOUT HAVING OBTAINED THE PRIOR WRITTEN CONSENT OF THE OTHER PARTY, WHICH SHALL NOT BE UNREASONABLY WITHHELD. HOWEVER, IF THE INDEMNITOR'S INSURER(S) HAS AGREED TO PROVIDE DEFENSE AND INDEMNIFICATION OF ANY SUCH CLAIM OR PROCEEDING, THEN UNDERWRITER(S) SHALL RETAIN THE SOLE RIGHT TO EFFECT SETTLEMENT AND COMPROMISE OF ANY SUCH CLAIM OR PROCEEDING. THE INDEMNITEE MAY, UPON WRITTEN NOTICE TO THE INDEMNITOR AND AT THE INDEMNITEE'S SOLE COST AND EXPENSE, SELECT ITS OWN COUNSEL TO PARTICIPATE IN AND BE PRESENT FOR THE DEFENSE OF ANY SUCH CLAIM OR PROCEEDING, PROVIDED SUCH COUNSEL SHALL NOT TAKE ANY ACTION IN THE COURSE OF SUCH CLAIM OR PROCEEDING TO PREJUDICE THE DEFENSE OF SUCH CLAIM OR PROCEEDING.

**11.5**    EXCEPT AS MAY BE OTHERWISE EXPRESSLY PROVIDED IN THIS AGREEMENT, NEITHER PARTY SHALL BE RESPONSIBLE OR HELD LIABLE TO THE OTHER FOR INDIRECT, SPECIAL, INCIDENTAL OR CONSEQUENTIAL DAMAGES, LOSS OF PROFITS, LOSS OF PRODUCTION, OR LOSS OF USE EXCEPT TO THE EXTENT SUCH INDIRECT, SPECIAL, INCIDENTAL OR CONSEQUENTIAL DAMAGES, LOSS OF PROFITS, LOSS OF PRODUCTION, OR LOSS OF USE ARE PART OF A THIRD PARTY CLAIM FOR WHICH A PARTY IS SEEKING CONTRIBUTION OR INDEMNIFICATION PURSUANT TO THIS CONTRACT. EACH PARTY SHALL BE GRANTED AN EXTENSION OF TIME FOR PERFORMANCE OF ITS OBLIGATIONS UNDER THIS CONTRACT IF ITS PERFORMANCE IS DELAYED DUE TO CAUSES BEYOND ITS REASONABLE CONTROL.

**11.6**    MOREOVER, THE INDEMNITY OBLIGATIONS OF CONTRACTOR AS SET OUT IN THIS INDEMNITY PROVISION ARE INDEPENDENT OF ANY INSURANCE REQUIREMENTS AS SET OUT IN EXHIBIT C AND SUCH INDEMNITY OBLIGATIONS SHALL NOT BE LIMITED BY ANY INSURANCE REQUIREMENTS AND SHALL NOT BE LESSENED OR EXTINGUISHED BY REASON OF CONTRACTOR'S FAILURE TO OBTAIN THE REQUIRED INSURANCE COVERAGE OR BY ANY DEFENSES ASSERTED BY CONTRACTOR'S INSURERS.

**11.7**    TO THE FULLEST EXTENT PERMITTED BY LAW, AND NOT WITHSTANDING ANY OTHER PROVISION OF THIS AGREEMENT, THE TOTAL LIABILITY, IN THE AGGREGATE, OF THE COMPANY GROUP TO THE CONTRACTOR AND ANYONE CLAIMING BY OR THROUGH THE CONTRACTOR, FOR ANY AND ALL CLAIMS, LOSSES, COSTS, OR DAMAGES, INCLUDING ATTORNEYS' FEES AND COSTS AND EXPERT-WITNESS FEES AND COSTS OF ANY NATURE WHATSOEVER OF CLAIMS EXPENSES RESULTING FROM OR IN ANY WAY RELATED TO THE AGREEMENT FROM ANY CAUSE OR CAUSES SHALL NOT EXCEED THE AMOUNT OF THE TOTAL COMPENSATION RECEIVED BY THE CONTRACTOR UNDER THIS AGREEMENT.   IT IS INTENDED THAT THIS LIMITATION SHALL APPLY TO ANY AND ALL LIABILITY OR CAUSE OF ACTION HOWEVER ALLEGED OR ARISING, UNLESS OTHERWISE PROHIBITED BY LAW. THE LIMITATIONS IN THIS PARGRAPH 11.7 SHALL NOT APPLY TO THE INDEMNITY OBLIGATIONS IN PARAGRAPH 11.2-11.5.

5) The Parties agree that Paragraph 13 (Governing Law) of the Contractor Agreement, and Paragraphs 4 and 5 of the Management Agreement, shall be deleted in their entirety, and shall be replaced with:

7

"The laws of the State of Texas shall govern the validity, construction, interpretation and effect of this Agreement, excluding any choice of law rules which would require otherwise. Any action or proceeding seeking to enforce any provision of, or based on any right arising out of, this Agreement shall be brought against any of the Parties in either state court of the State of Texas, County of Harris, or the U.S. Federal District Court for the Southern District of Texas, and each of the Parties consents to jurisdiction of such courts (and of the appropriate appellate courts) in any such action or proceeding and waives any objection to venue laid therein. The prevailing Party in any dispute hereunder is entitled to recover its reasonable costs, expenses, attorney's fees, and interest."

6) The following Paragraph 14 (Compliance with Employment and Labor Law) shall be added to the Contractor Agreement:

"The Contractor represents, warrants, and covenants that, as to all personnel and other individuals through whom it provides the Services called for under the Agreement, Contractor shall be solely responsible for complying with, and will at all times comply with, the applicable provisions of all U.S. Federal, state, and local laws, rules, regulations, ordinances, and other legal requirements of every kind relating to employees, workers, service providers, and/or laborers, including but not limited to (as they have been or in the future are amended) the Age Discrimination in Employment Act; the Americans with Disabilities Act; the Civil Rights Act of 1991; Title VII of the Civil Rights Act of 1964; the Civil Rights Act of 1866; Consolidated Omnibus Budget Reconciliation Act; the Contract Work Hours and Safety Standards Act; the Davis-Bacon Act; the Employee Retirement Income Security Act; the Equal Pay Act; the Fair Labor Standards Act; the Family and Medical Leave Act; the Federal Insurance Contributions Act; the Federal Unemployment Tax Act; the Health Insurance Portability and Accountability Act; the National Labor Relations Act; the Occupational Safety and Health Act; the Older Workers Benefits Protection Act; the Rehabilitation Act; the Service Contract Act; the Uniformed Services Employment and Reemployment Rights Act; the Walsh-Healey Act; the Worker Adjustment and Retraining Notification Act; and/or Executive Orders issued by the President of the United States. The Contractor shall defend, indemnify, release, and hold Company Group (as defined in Paragraph 11) and Client harmless from and against all claims, liabilities, damages, and expenses (including without limitation attorney's fees and other costs of defense), irrespective of insurance coverages, arising out of Contractor's breach of this Paragraph 14 of this Agreement."

7) Exhibit D-2 (General Terms and Conditions) of the Contractor Agreement shall be amended to include the provisions underlined and bolded as provided below:

a. Article 2 of Exhibit D-2 (General Terms and Conditions) shall be amended as follows and Paragraph 11 (a) of the Management Agreement shall be deleted in its entirety and shall be replaced with the following:

Section 2.1 Compensation and Invoicing. Contractor will submit invoices for the Services rendered under this Agreement at least weekly. All such invoices will be

8

itemized to show line items and prices and will be supported by documentation sufficient to verify the charges thereon. ~~Company will pay all undisputed charges within 14 days of receipt of an invoice and appropriate supporting documentation of such other time specified in Exhibit B~~ **Any Services provided under this Agreement shall be evidenced in daily job tickets prepared by Contractor and submitted to, and signed by Company and Client's designated representative. Further, unless agreed to by Company, any terms and conditions regarding compensation and invoicing that are referenced in any rate schedules or exhibits hereto shall not be binding upon Company, and the terms in this Paragraph 2.1 shall control.**

**Subject to and on the condition precedent (suspensive condition) that Company has received payment from Client for such Services, and without prejudice to the rights of Company and Client, including but not limited to audit such invoice and adjust such compensation as provided for in Paragraph 2.2, and Paragraph 9.4, Company will pay Contractor for Services rendered, and detailed in an undisputed invoice. Such payment shall be made within thirty (30) days of Company receiving a proper invoice with all appropriate supporting documentation, subject to and on the condition precedent (suspensive condition) that Company has received such respective payment from Client for such Services. The Contractor understands, and agrees, that the payment of invoices shall be on the condition precedent (suspensive condition) that the Company is paid for such Services by the Client. Under no circumstances shall Company be obligated or required to advance or make payment to Contractor for the Services unless and until payment for such Services has been received in full by Company from Client. Notwithstanding the foregoing,** ~~provided, however, that~~ Company may review and dispute any amounts charged to Company at any time within **two (2)**~~one~~ years from the date of invoice. The payment of any amount will not constitute an acceptance of the validity of such amount, and Company **or Client** will have the right to offset against future amounts any amount paid that Company **or Client** ~~later~~ disputes or determines was paid in error.  Company will notify Contractor of any discrepancy found in submitted invoices within ~~a reasonable time after the discovery of such discrepancy and in any event within~~ two  years from the date of invoice, and Contractor will make appropriate corrections and resubmit the disputed invoice to Company.

Section 2.2.  Right to Withhold.  **Without regard to the foregoing, Company may withhold from payments due Contractor an amount up to Ten  percent (10%) of the amount invoiced until all disputes or potential disputes are resolved with Client and/or final acceptance of invoices is documented with Client or until all disputes or potential disputes between Company and Contractor are resolved pursuant to Section 13 of the Contractor Agreement.** Company may **also** withhold from payments due Contractor amounts sufficient to protect Company from and against any lien or claim chargeable to Contractor and asserted against Company or its property, or any damages suffered by Company because of a breach of this Agreement by Contractor.  Company may pay any such claim or lien

9

out of monies so withheld or payments thereafter due Contractor unless Contractor timely furnishes Company with an executed release or satisfaction of such lien or claim in recordable form within thirty (30) of written notification by the Company to the Contractor of the matter requiring attention.

Section 2.3 Audit Rights. Company will have access, at all reasonable times during the term of this Agreement and for three years thereafter, to Contractor's personnel and Contractor's books and records to the extent necessary for the purpose of auditing and verifying amounts and costs of Services invoiced and will have the right to copy or reproduce any of such books and records at Company expense. **If the results of such audit reveal overpayments or underpayments, appropriate adjustments will be made. In the event any audit or inspection of Contractor's records is required by Client, the audit or inspection shall be conducted directly between Client and Contractor, and not withstanding any other provision herein Company shall have no responsibility to Client or Contractor for any such adjustment. The Contractor agrees that the Company's right to audit Contractor shall pass through to Client, and all obligations of Company to Client for such audits shall be contractually imposed upon Contractor.**

b.    Article 4 of Exhibit D-2 (General Terms and Conditions) shall be deleted in its entirety and replaced with the following:

4.1    During Contractor's performance of Services, it may be necessary for Client to provide information and data to Contractor, including reports, solutions and interpretations. As a result of Contractor's Services, Contractor may develop information and data including reports, solutions and interpretations. The information and data developed by the Contractor under this Agreement is the sole property of Client, and will be considered as work done for hire. All such information and data whether provided to or developed by Contractor, will be kept confidential by Contractor, will not be disclosed by Contractor to any third party, and will be used by Contractor only in the performance of the Services. The requirement to maintain information and data in confidence, however, shall not apply to such information and data which Contractor can show either (i) is already known to Contractor other than as a result of the Services performed hereunder and from some other source other than by Client or Client's contractors, (ii) is or becomes a part of the public domain, other than by Contractor's own action; or (iii) as may be required by subpoena or otherwise by law. Upon request at any time, Contractor will return to Company any such information and data, whether provided to or developed by Contractor, which is in written or other physical form.

4.2    Contractor acknowledges and agrees that Client, in its sole discretion, may deliver and/or store confidential information in digital form on the Internet, extranets, and/or through public networks and service providers. Such digital information will be stored on internal or external computers and accessed from public telecommunications networks, and will be accessible by a controlled group of persons (the "Controlled Group"). Contractor agrees that the delivery and storage

10

of such confidential information in this manner must not be deemed as making the information generally available to the public, even if such confidential information is confidential information is accessed by persons who are not within the Controlled Group.

4.3    No press release or other public announcement or public disclosure having or containing any reference, either directly or by implication, to this Agreement or to the transactions herein contemplated, or to Company or Client or any other entities or persons in Company Group, shall be made or used by Contractor or on its behalf, unless first approved in writing by Company. This prohibition specifically includes, but is not limited to, any public release (either through print of broadcast media) articles prepared for internal or external publication, technical papers and discussions with journalists.

c.    Paragraph 9-4 (Records) shall be deleted in its entirety, and replaced with the following:

Contractor shall maintain complete records pertaining to the Services. Contractor understands and agrees that Company and/or Client shall have the right to inspect and audit relevant records relating to the Services and payment within a period of three years after the completion of Services. If the results reveal overpayments or underpayments, appropriate adjustments will be made. In the event any audit or inspection of Contractor's records is required by Client, the audit or inspection shall be conducted directly between Client and Contractor and any adjustment to Contractor's invoices shall be made directly between Client and Contractor and, notwithstanding any other provision herein, Company shall have no responsibility to Client or Contractor for any such adjustment.

d.    Paragraph 9-5 (Force Majeure) shall be deleted in its entirety, and replaced with the following:

Except as otherwise provided herein, the Contractor shall not be required to comply with any request to provide, or continue with any previous deployment of, personnel, equipment, supplies, or materials, upon the occurrence of an event of Force Majeure, or where, in the good faith judgment of the Contractor, circumstances in which the Oil Spill Response activities are to be conducted present an unreasonable risk to life or property. "Force Majeure" means the prevention or delay of performance under this Contract by a cause or causes beyond the reasonable control of either party and not contemplated as a possible circumstance in which Services hereunder are to be performed. Such causes shall include, but not be limited to, acts of God, acts of public enemies, war, rebellion, sabotage, riot, fire, explosion, accident, or flood, governmental laws, regulations, labor trouble, strike or lockout. During such interruption of the provision of Services due to Force Majeure, Company shall not be responsible for the reimbursement of any costs or fees incurred by the Contractor until such Services are reinstated at the request of Company, and costs or fees for such Services are reimbursed by Client.

11

8) Except for the 10% retainage amount referenced in 7(a), which shall apply as of August 2, 2010 at 12:01 AM, the effective date of this First Amendment shall be the Effective Date provided for in the Management Agreement.

9) For near shore work, the Contractor agrees to obtain marine and vessel operations insurance coverage, including hull and machinery insurance for the replacement value of the vessel (s) and protection and indemnity insurance at a minimum of $5,000,000. This coverage requirement shall be added to Exhibit C of the Management Agreement.

10) In the event of any conflict or ambiguity between the First Amendment and the Management Agreement, this First Amendment shall control.


**IN WITNESS WHEREOF,** the parties have duly executed this First Amendment as of the date specified below.

**Contractor**

By:   Brian J House
Title:   President/CEO

Signature: _Brian House_
Date:   August 4, 2010

**O'Brien's Response Management Inc.**

By:   Eric Pairtte
Title:   President

Signature: _[signature]_
Date:   8.4.10

12