UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF LOUISIANA

| | | |
|---|---|---|
| In re: Oil Spill by the Oil Rig "Deepwater | ) | MDL NO. 2179 |
| Horizon" in the Gulf of Mexico | ) | |
| | ) | SECTION J |
| This Document Applies to: | ) | |
| No. 10-2771, In Re: The Complaint | ) | JUDGE BARBIER |
| of Triton Leasing GmbH, et al | ) | |
| | ) | MAG. JUDGE SHUSHAN |
| City of Treasure Island, Florida v. BP | ) | |
| Exploration & Production, Inc., et al | ) | |
| Number 13-5354 | ) | |
| | ) | |
| City of Treasure Island, Florida v. BP | ) | |
| Exploration & Production, Inc., et al | ) | |
| Number 13-5360 | ) | |

FIRST AMENDED, SUPPLEMENTAL, RESTATED, AND
CONSOLIDATED COMPLAINT FOR DAMAGES

The First Amended, Supplemental, Restated, and Consolidated Complaint

("Amended and Supplemental Complaint") of the City of Treasure Island of the State of

Florida, and its subdivisions and districts ("Treasure Island") for damages caused by the

April 20, 2010 blowout, explosions, and resulting oil spill in the Gulf of Mexico

(the "Spill") involving the Mobil Offshore Drilling Unit DEEPWATER HORIZON

("HORIZON") respectfully represents as follows:

**1.**

Made Defendants (collectively "Defendants") herein are:

(a)     BP EXPLORATION AND  PRODUCTION, INC. ("BPXP"), a foreign

corporation doing business in the State of Louisiana;

(b)     BP, PLC ("BPPLC"), a foreign corporation  doing  business  in  the

State  of Louisiana;

1

(c)     BP AMERICA PRODUCTION COMPANY ("BPAPC"), a foreign corporation doing business in the State of Louisiana (BPXP, BPPLC and BPAPC are sometimes collectively referred to as "BP" or the "BP Defendants" herein);

(d)     HALLIBURTON ENERGY SERVICES, INC., ("HESI"), a foreign corporation doing business in the State of Louisiana;

(e)     SPERRY DRILLING SERVICES, ("Sperry") a division of Halliburton, a foreign corporation doing business in the State of Louisiana (HESI and Sperry are sometimes referred to herein as "Halliburton");

(f)     TRANSOCEAN HOLDINGS, INC., a foreign corporation doing business in the State of Louisiana;

(g)     TRANSOCEAN DEEPWATER, INC., a foreign corporation doing business in the State of Louisiana; and

(h)     TRANSOCEAN OFFSHORE DEEPWATER DRILLING, INC., a foreign corporation doing business in the State of Louisiana (the Transocean entities are collectively referred to herein as "Transocean").

**2.**

This Amended and Supplemental Complaint is being brought pursuant to this Court's Order dated August 28, 2015 (Rec. Doc 15269). Treasure Island had previously filed a Complaint for Damages and Demand for Jury Trial in the Middle District of Florida on April 19, 2013, bearing Docket Number 8:13-cv-01008-JSM-MAP, which was transferred to the Eastern District of Louisiana on August 9, 2013, and assigned EDLA Docket Number 13-5354. Treasure Island also previously filed a Complaint for Damages and Demand for Jury Trial ("Original Complaint"), bearing

Docket Number 8:13-cv-01046-MSS-MAP in the Middle District of Florida on April

22, 2013, which was transferred to the Eastern District of Louisiana on August 9, 2013,

and assigned EDLA Docket Number 13-5360.  The purpose of this Amended and

Supplemental Complaint is to consolidate and restate the claims and defenses

previously asserted by Treasure Island in its Original Complaint.  This Amended and

Supplemental Complaint is not intended, nor should it be construed, as a waiver of any

claims or defenses previously asserted by Treasure Island arising from the

DEEPWATER HORIZON Spill.

**3.**

This Court has jurisdiction pursuant to: (1) 28 U. S. C. § 1332 because the matter

in controversy exceeds the sum or value of $75,000.00, exclusive of interest and costs,

and is brought by a citizen of a state that is different from the state where at least one of

the Defendants is incorporated or does business; (2) 28 U.S.C. § 1331, because the claims

asserted herein arise under the laws of the United States of America and pursuant to the

provisions of the general maritime law; and (3) under 33 U.S.C. § 2701 *et seq.,* the Oil

Pollution Act ("OPA").

**4.**

Venue in this district is proper because the events or omissions giving rise to

the claims asserted herein have occurred in this district and pursuant to 28 U.S.C.

§1391. Plaintiff designates this matter as a maritime claim under Rule 9(h) of the Federal

Rules of Civil Procedure.

**5.**

Treasure Island hereby adopts by reference and incorporates herein as if

specifically pled in their entirety paragraphs 164 (and preceding "Introduction"), 173,

178-188, 198-223-226, 227-516, 542-558, 563-567, 581-595, 659-710, 727-737 and 747-769 of the Voluntary Master Complaint, Cross Claim, and Third Party Complaint for Local Governmental Entities filed March 4, 2011 in MDL 2179, bearing docket No. 2:10-cv-02771 in the United States District Court for the Eastern District of Louisiana [R. Doc. 253]. Treasure Island also hereby adopts by reference and incorporates herein as if specifically pled in its entirety the Original Complaint.

**6.**

The BP Defendants, Transocean, and Halliburton are liable to Plaintiff for all damages caused by or resulting from the Spill including, but not limited to, all compensatory damages allowed by law and proven at trial, including payment of costs to restore physical damage to real and personal property; destruction of real and personal property; diminution in value of real and personal property; loss of mineral rights; loss of tax revenue, income and use; costs of response, removal, restoration, and remediation of damaged and contaminated lands; loss of net government revenues, past, present and future revenue, income business, loss of profits and impairment of earning capacity, damages for loss of subsistence use of natural resources, loss of profits and/or impairment of earning capacity, increased cost of coastal protection; stigma damages for the diminution of property value; all investigative costs and future coastal monitoring costs; increased costs of providing services; punitive damages, pre-judgment and post-judgment interest at the maximum rate allowable by law; attorney's fees and costs of litigation; and other damages to be proven at trial pursuant to the provisions of the Oil Pollution Act (33 U.S.C. §§ 2701, *et seq*.) and under the general maritime laws.

**7.**

On the evening of April 20, 2010, the HORIZON was located approximately 50

miles southeast of Venice, Louisiana, and was attempting to temporarily plug and abandon the deep water well known as the MACONDO, when it experienced a blowout, explosions and fire. Over the next eighty-seven (87) days, more than three (3) million barrels of oil discharged from the MACONDO well into the Gulf of Mexico, and caused the worst environmental disaster in the history of the United States. On the surface, the shifting smear of hydrocarbons was visible from outer space, at times covering tens of thousands of square miles, and spread with the wind and currents towards the Gulf of Mexico's coastline, and, in particular, the shores of Florida and Treasure Island.

**8.**

BP was the primary leaseholder of the MACONDO well and its responsibilities included assessing the geology of the site, engineering the well design, obtaining regulatory approvals for well operations, retaining and overseeing the project's contractor's, and working on various aspects of the well and drilling operations.

**9.**

Transocean was contracted by BP to drill the MACONDO well, which was located in approximately 5,000 feet of water. Transocean was also the owner and operator of the HORIZON and participated and directed various aspects of the drilling activities.

**10.**

Halliburton and its Sperry division were contracted by BP to provide cementing and mudlogging services, and their responsibilities included calculating the proper mud weight to drill the well, well monitoring to ensure safe drilling margins were being maintained, and formulating the cement slurry for the production casing and to plug the

well for temporary abandonment.

**11.**

On February 22, 2012, the Court found BPXP to be a "responsible party" under OPA with respect to the subsurface discharge of oil resulting from the HORIZON disaster. (Rec. Doc. 5809).

**12.**

Treasure Island is a political subdivision of the State of Florida. On January 17, 2013, Treasure Island complied with the presentment requirement necessary to state a claim under OPA against the judicially determined Responsible Party, BPXP, as provided in 33 U.S.C. §2713. BP has failed to respond to Treasure Island's presentment, despite the passage of the requisite time period.

**13.**

A "Phase One" trial was held between February 25, 2013 and April 17, 2013 to address fault determinations for the loss of well control and resulting blowout. On September 14, 2014, the Court issued its Findings of Fact and Conclusions of Law from the Phase One Trial and apportioned fault under the general maritime law as follows:

      (a)    67% - BPXP and BPAPC;

      (b)    30% - Transocean; and

      (c)    3% - Halliburton.

The Court also determined that defendants' violations of federal regulations directly led to the blowout and explosions.

**14.**

With respect to the BP Defendants, the Court made a factual finding that

employees of the BP Defendants engaged in willful misconduct and acted recklessly with regard to the level of care required by the circumstances. The Court also found that the BP Defendants committed a series of negligent acts, some of which were designed to cut time and costs at the expense of safety, which taken together amounted to gross negligence. The Court determined that the gross negligence and reckless conduct of the BP Defendants and its employees directly led to the loss of well control, explosions and Spill.

**15.**

By early April 2010, BP was well over-budget and nearly two months behind schedule on the Macondo well. Moreover, the HORIZON was under pressure to quickly complete the Macondo well as BP had to spud the Kaskida well by May 16th or potentially lose the lease. Consequently, management made the decisions to rush critical parts of the operation and completely forego others, which decisions directly caused the blowout and Spill. These decisions, made by BP management, were motivated by the desire to increase profit and made at the expense of safety.

**16.**

Specifically, prior to undertaking the production casing cement job, BP had trouble getting the float collar to convert, a necessary prerequisite to a successful cement job. BP made nine (9) attempts to convert the float collar by repeatedly increasing pressure as mud was pumped down the well. Circulation was finally achieved with 3,142 psi, which is approximately five times the pressure called for by the float collar's manufacturer's specifications. After circulation was achieved, there was a rapid depressurization to 150-200 psi, an anomaly which caused concern among BP personnel about whether the float collar had actually converted or whether the high

circulating pressure resulted in a breach of the casing which, in turn, would result in improper cement placement and a failure to achieve zonal isolation. Nonetheless, the decision was made to run the production casing cement job.

## 17.

The Court made the factual finding that there was indeed a breach in the "shoe track" below the float collar. Consequently, no cement was placed in the annulus below the breach point and, therefore, the hydrocarbon-bearing zones were not isolated from the well and had unrestricted access into the casing through the breach in the shoe track.  Significantly, BP elected not to run a cement bond log ("CBL") after the cement job which test would have given a clear indication that the cement was improperly placed and permitted BP to remediate the cement job before proceeding with abandonment. This is despite BP's suspicions that the cement job would fail and the fact that a Schlumberger team was standing by on the HORIZON available to perform the CBL if requested. BP's decision not to run the CBL is in addition to other risks that BP took in connection with the cement job, including, but not limited to, its decision to use on 6 centralizers rather than the 21 recommended, its decision not to perform a full bottoms up circulation, and its decision to use a low volume of cement compared to previous jobs. The Court found that BP's decision not to run the CBL when the necessary equipment and personnel were on hand to do so was primarily driven by a desire to save time and money and, further, was a substantial cause of the blowout, explosion and oil spill.

## 18.

The BP Defendants were also responsible for interpreting the negative pressure test, which is a straightforward safety-critical "pass" or "fail" test. The Well Site Leader, Don Vidrine, declared the negative pressure test a success, despite

the fact that significant anomalies indicated that the test had failed, specifically the fact that pressure rose to 1400 psi in the drill pipe after it had been bled to zero. In addition, approximately an hour after the test had failed, Mark Hafle, the senior drilling engineer in Houston, spoke to Don Vidrine and told him that the negative pressure test could not be considered a success given the inconsistent pressure readings. Both Vidrine and Hafle, as employees and representatives of the BP Defendants, had authority to shut the well in knowing the negative pressure test was faulty, but did not do so.

**19.**

Vidrine and Hafle were aware of the difficulties encountered with the float collars, the possibility of a failed cement job, and of the decision to forgo the CBL job. The Court concluded this should have increased the level of caution required in interpreting the negative pressure test beyond the "high alert" status already demanded. Accordingly, both Hafle and Vidrine acted recklessly with respect to the negative pressure test, which reckless conduct was a substantial cause of the spill and the damages sustained by Treasure Island.

**20.**

The Court found several instances where the conduct of the Transocean fell below the standard of care, including, but not limited to, the misinterpretation of the negative pressure test, failure to detect pressure anomalies, failure to perform flow check and immediate shutdown, and failure to maintain the blowout preventer. Consequently, the Court concluded that Transocean's failures and negligence resulted in the oil pollution from the facility.

**21.**

Halliburton provided engineering services, materials, testing, mixing, and pumping for cementing operations on board the HORIZON and provided onshore engineering support for those operations. Halliburton was also responsible for monitoring the well, including mud pit fluid levels, mud flow in and out of the well, mud gas levels, pressure fluctuations and other "measurement while drilling" and "surface data logging" monitoring. The Court determined that Halliburton's failures and negligent conduct in connection with its monitoring responsibilities led to the loss of well control and Spill.

**22.**

Treasure Island is a barrier island community consisting of 1.6 square miles of land and beaches, 3.7 square miles of Gulf waters, approximately 144 acres, and approximately 17, 961 linear feet, or 3.4 miles of beach front.  As a result of the Spill, BP oil physically impacted City-owned lands, causing property contamination, varying degrees of significant and, often times, permanent damages.  Treasure Island has a permanent year-round population of approximately 6,700, and has a vacation destination with approximately 3,000 vacation accommodations for U.S. and international tourists.  Tourism is the foundation of Treasure Island's economy, which has been greatly affected.  Treasure Island has also incurred increased administrative costs in responding to the oil spill, as well as damages due to the taking of City resources during the spill response and the diversion of administrative staff normally dedicated to other tasks, loss of revenue, and loss of real and personal property.

**23.**

Under the principals of maritime law, a party suffering injury to property

may recover that which is necessary to restore his damaged property to the same condition which existed before the incident. Treasure Island's property has suffered grievous physical harm as a direct result of the negligence, gross negligence and recklessness of the BP Defendants and negligence of Transocean and Halliburton. As a result, Treasure Island is entitled to recover damages under the general maritime law in an amount necessary to remove the oil from its property and to restore its property to the condition it was in immediately prior to the Spill.

**24.**

Treasure Island is also entitled to recover damages to its property and removal and restoration costs from BP under OPA. Pursuant to OPA, the term "removal costs" is defined in pertinent part as "the costs of removal that are incurred after a discharge of oil has occurred." 33 U.S.C.§ 2701(31).  In turn, "removal" is defined as the "containment and removal of oil or a hazardous substance from water and shorelines or the taking of other actions as may be necessary to minimize or mitigate damage to the public health or welfare, including, but not limited to, fish, shellfish, wildlife, and public and private property, shorelines, and beaches." 33 U.S.C. 2701(30).

**25.**

In addition, undetermined quantities of MACONDA 252 oil remain in the environment, submerged in coastal and Gulf waters in close proximity to City-owned property. Consequently, Treasure Island has and will continue to incur costs to monitor its property for re-oiling events. BP is liable to the City for the costs of implementing and maintaining a coastal monitoring plan as it is consistent with OPA's paramount goal of containing and removing oil or hazardous substances from water and shorelines.

11

This cost is also recoverable from BP, Transocean and Halliburton under the general maritime law as part of the obligation to restore City-owned property to the pre-Spill state.

**26.**

The Spill has also inflicted upon Treasure Island tremendous economic harm in the form of past and future lost tax revenues, lost business opportunities, diminution in asset values, loss, damage, and/or diminution of the value of real and personal property, increased costs of coastal projects due to delay and damage to coastal lands, administrative costs for Defendant's use of City facilities, administrative costs of Treasure Island in response to the disaster, wear and tear on City infrastructure, costs to implement marketing campaign to reverse stigma damages, investigative costs and other economic damages as set forth and categorized in Treasure Island's Original Complaint.  These damages are also more fully set forth in its January 17, 2013 presentment to BP.  The City is entitled to recover its economic losses, increased costs, and damages under both OPA and the general maritime law.

**27.**

Insofar as BP was named the responsible party under the Oil Pollution Act, there were no other events, occurrences, actions on inactions that caused Treasure Island's losses, no superseding or intervening cause(s) of Treasure Island's losses, and no other events, occurrences, actions or inactions that factually or legally relieve or reduce the BP of strict liability for the damages owed by BP to the City under OPA.

**28.**

Defendants' also violated numerous statutes and regulations, including, but not

limited to, statutes and regulations issued by the United States Minerals Management Service (MMS) and the United States Coast Guard, which violations were a direct cause of the explosion occurring on the *Deepwater Horizon*, the resulting spill and the damages sustained by Treasure Island. Accordingly, any liability caps provided by OPA, to the extent not waived by BP, are inapplicable.

**29.**

In addition to the negligent actions described above, and in the alternative thereto, the damages suffered by Treasure Island were caused by the acts and/or omissions of the Defendants that are beyond proof possessed by Treasure Island, but which are within the knowledge and control of the Defendants, there being no other possible conclusion that the explosion and release of oil resulted from the negligence and/or recklessness and/or gross negligence of Defendants.

**30.**

The damages described herein were also caused by or aggravated by Defendants' failure to properly respond to the release of the oil, the use of Corexit, a chemical dispersant with toxic properties, and the failure to take necessary actions to mitigate the danger to the surrounding community, including the City of Treasure Island, and any political subdivision of which it has governing authority, and/or to timely and adequately warn of the release of oil, which were foreseeable results. The continued presence of oil on Treasure Island's property is the source of continuing damage to and loss of City-owned beaches, lands, and water bottoms.

**31.**

These casualties and damages set forth in Treasure Island's Original Complaint

occurred as a direct result of the negligence and/or recklessness and/or gross negligence of BP, Transocean, and Halliburton. These acts of negligence and/or recklessness and/or gross negligence render the Defendants liable to the Plaintiff, Treasure Island, pursuant to the laws of the United States of America, the Oil Pollution Act and the general maritime law.

**WHEREFORE**, based on the foregoing, and after due proceedings be had, the City of Treasure Island, and its subdivisions and districts, pray that judgment be entered against Defendants BP Exploration and Production, Inc., BP America Production Company, BP, plc, Transocean Asset Leasing GmbH, Transocean Deepwater, Inc., Transocean Offshore Deepwater Drilling, Inc., Halliburton Energy Services, Inc., and Sperry Drilling Services awarding:

    (a)    All compensatory damages allowed by law and proven at trial, including payment of costs to restore damaged and contaminated lands to their original unpolluted state;

    (b)    All compensatory damages to real property caused by oil and pollution;

    (c)    Loss of tax revenues, income, and use;

    (d)    Increased cost of coastal protection;

    (e)    Response and removal costs; restoration, and remediation;

    (f)    Damage and/or destruction of real and personal property;

    (g)    Stigma damages for the diminution of property value;

    (h)    All investigative costs and future coastal monitoring costs;

    (i)    Past and future economic damages, including damages for increased costs of providing services;

(j)     Diminution in value of real and personal property;

(k)     Loss of mineral rights;

(l)     Loss of net government revenues;

(m)    Loss of profits and impairment of earning capacity;

(n)     Damages for loss of subsistence use of natural resources,

(o)     All damages allowed under OPA;

(p)     Punitive damages;

(q)     Pre-judgment and post-judgment interest at maximum rate allowable by law;

(r)     Attorneys' fees and costs of litigation; and

(s)     All other just and equitable relief.

THE PENTON LAW FIRM
209 HOPPEN PLACE
BOGALUSA, LOUISIANA  70427
PHONE:      985-732-5651
FAX:          985-735-5579
EMAIL:      fedcourtmail@rgplaw.com


/s/ Ronnie G. Penton
Ronnie G. Penton
Counsel for Plaintiff
Louisiana Bar Roll Number 10462