UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF LOUISIANA

| | | |
|---|---|---|
| In Re: Oil Spill by the Oil Rig "Deepwater Horizon" in the Gulf of Mexico, on April 20, 2010 | * * | MDL 2179 |
| | * | SECTION: J |
| | * | JUDGE BARBIER |
| **This Document Relates To:** *Pleading Bundle B1* | * | MAG. JUDGE SHUSHAN |

| | | |
|---|---|---|
| **PAUL FISHER; GALE FISHER; PGDS PERDIDO PROPERTIES NO.1, LLC; PGDS PERDIDO PROPERTIES NO. 2, LLC; PGDS ORANGE PROPERTIES NO. 1, LLC; PGDS ORANGE PROPERTIES NO.2, LLC; PGDS PERDIDO LOT NO.1, LLC; PGDS PERDIDO LOT NO. 2, LLC, PGDS DESTIN PROPERTIES NO.1, LLC; and PGDS DESTIN PROPERTIES NO. 2, LLC,** | * * * * * * * * * * | **CIVIL ACTION No. _____** SECTION J JUDGE BARBIER MAG. JUDGE SHUSHAN |
| **VERSUS** | * * | |
| **BP EXPLORATION & PRODUCTION, INC., BP AMERICA PRODUCTION COMPANY, and BP p.l.c.** | * * * | |

## COMPLAINT

Plaintiffs bring this action against Defendants BP Exploration & Production, Inc., BP America Production Company, and BP p.l.c., and aver as follows:

### PARTIES, JURISDICTION, AND VENUE

1. Paul Fisher is a resident of Jackson, Mississippi, and an owner of gulf-front property in the state of Florida. Gale Fisher is a resident of Jackson, Mississippi and an owner of gulf-front property in the state of Florida. PGDS Perdido Properties No.1, LLC; PGDS Perdido Properties No. 2, LLC; PGDS Orange Properties No. 1, LLC; PGDS Orange Properties No.2, LLC; PGDS Perdido Lot No.1, LLC; PGDS Perdido Lot No. 2, LLC, PGDS Destin Properties

No.1, LLC; and PGDS Destin Properties No. 2, LLC, are Mississippi limited liability corporations and owners of gulf-front property in the state of Florida (hereinafter referred to collectively as "Plaintiffs").

2. Defendant BP Exploration & Production, Inc. ("BPXP"), is a Delaware corporation with its principal place of business in Illinois.

3. Defendant BP America Production Company ("BP America") is a Delaware corporation with its principal place of business in Texas.

4. Defendant BP p.l.c. is a British public limited company with its corporate headquarters in London, England. BP p.l.c. is the global parent company of all worldwide businesses operating under the "BP" logo.

5. Defendants BPXP and BP America are wholly owned subsidiaries of BP p.l.c. and are sufficiently controlled by BP p.l.c. so as to be BP p.l.c.'s agents in the United States at all times material herein. In BP p.l.c.'s Annual Report for 2009, in which it presents a consolidated financial statement that includes BPXP and BP America, BP p.l.c. states that it "controls" both BPXP and BP America, among other subsidiaries, meaning that it has "the power to govern the financial and operating policies of the [subsidiary] so as to obtain benefit from its activities ...."

6. BPXP and BP America are collectively referred to herein as "BP."

7. This Court has subject-matter jurisdiction over Plaintiff's claim under the Oil Pollution Act of 1990 ("OPA"), 33 U.S.C. §§ 2701 et seq., because the OPA provides that United States District Courts have exclusive original jurisdiction over all controversies arising under the OPA, without regard to the citizenship of the parties or the amount in controversy. This Court has supplemental jurisdiction over the state-law claims presented herein pursuant to 28 U.S.C. § 1367, because the state-law claims are so related to the OPA claim that they form

part of the same case or controversy under Article III of the United State Constitution.

8.  Venue is proper in the United States District Court for the Northern District of Florida pursuant to the OPA, 33 U.S.C. § 2717(b), because the injuries and damages suffered by Plaintiff occurred in that district. Nonetheless, venue is proper in this Court for pretrial proceedings pursuant to 28 U.S.C. § 1407 and this Court's Pretrial Order No. 60 (Doc. 16050).

## FACTUAL BACKGROUND

9.  BPXP acquired a lease from the United States allowing it to perform oil exploration, drilling, and production-related operations on the Outer Continental Shelf compromising Mississippi Canyon Block 252, the location known as "Macondo" where the oil spill made the subject of this Complaint ("the Spill") occurred. The well where the Spill occurred is referred to herein as the "Macondo well." BP was the "operator" of the Macondo well pursuant to regulations of the former Minerals Management Service, meaning it was designated by the lessee as having control or management of operations on the leased area.

10.  BPXP was designated a "Responsible Party" for the Spill by the United States Coast Guard under the OPA, 33 U.S.C. § 2714.

11.  BP America contracted with Transocean Holdings, LLC, to drill the Macondo well. BP America further contracted with Transocean Holdings, LLC, to drill the Macondo well with the mobile offshore drilling unit ("MODU") *Deepwater Horizon*.

12.  The *Deepwater Horizon* began drilling on February 11, 2010. On April 20, 2010, a blowout[1], explosions, and fires occurred aboard the *Deepwater Horizon* as BP was in the process of temporarily abandoning the Macondo well, which resulted in the sinking of the

---

[1] A "blowout" is an uncontrolled flow of fluids from permeable rock, through which the well is drilled, into the bore of the well and possibly to the surface. A blowout involving oil or gas is extremely dangerous because hydrocarbons are flammable.

*Deepwater Horizon* and in the Spill.  Millions of gallons of oil were discharged into the Gulf of Mexico.

13. The negligence, gross negligence, and recklessness of BP caused or contributed to causing the Spill, as hereinafter set out.

14. A federal regulation, 30 C.F.R. § 250.107 required that BP, as the lessee and the operator, "must protect health, safety, property, and the environment by ... [p]erforming all operations in a safe and workmenlike manner."  Another federal regulation, 30 C.F.R. § 250.401, required that BP, and its contractors, "[M]ust take necessary precautions to keep wells under control at all times."

15. The temporary-abandonment procedure undertaken when the disaster occurred involved (1) setting a cement plug at the bottom of the well (known as the "production-casing cement"), (2) displacing some of the mud in the well to seawater and performing a negative-pressure test, (3) displacing all of the mud above 8,367 feet to seawater, and (4) placing a second cement plug between 8,067 feet and 8,367 feet.  When the blowout occurred, steps (1) and (2) were complete and step (3) was underway.

16. The negative-pressure test is a critical safety test that is performed during the temporary-abandonment process.  The goal of the test is to confirm the integrity of the entire system before proceeding further.  The negative-pressure test is a "pass-or-fail" test; inconclusive or contradictory results mean the test has failed.

17. BP, as the operator, was ultimately responsible for interpreting the negative-pressure test and declaring it a success or failure.  Don Vidrine, the BP Well Site Leader on the *Deepwater Horizon*, and BP's top representative on the rig, concluded that the test was successful and instructed the rig crew to continue with the temporary-abandonment procedure,

even though the test had revealed an anomalous pressure reading. No reasonable Well Site Leader would have concluded the test was successful. On the contrary, a reasonable Well Site Leader in Mr. Vidrine's position would have concluded the test was a failure and that it needed to be reconducted before proceeding with the operation.

18. After the test was conducted, Mark Hafle, BP's Senior Drilling Engineer in Houston, told Mr. Vidrine by phone that the test could not be considered a success given the anomalous pressure reading. Nonetheless, Mr. Vidrine ordered that the operation continue, and did not order a second negative-pressure test. Moreover, Mr. Hafle did not order that the negative-pressure test be reconducted. A reasonable Senior Drilling Engineer in Mr. Hafle's position would have ordered that the test be reconducted.

19. Before Mr. Vidrine spoke with Mr. Hafle, Mr. Vidrine probably knew of facts (the anomalous pressures during the negative-pressure test) that would have led a reasonable person in his position in the industry to realize that deeming the negative-pressure test a success and continuing with the operation would probably result in physical injuries, death, and severe property damage. After speaking with Mr. Hafle, Mr. Vidrine did know of facts that would lead a reasonable person in his position in the industry to believe that not stopping the operation and conducting a new test would probably result in physical injuries, death, and severe property damage. By not ordering a new test and by ordering that the operation continue, Mr. Vidrine acted recklessly.

20. Mr. Hafle understood the pressure anomalies indicated that the negative-pressure test had failed, and he understood the danger associated with misinterpreting the test. Therefore, his failure to investigate constituted recklessness.

21. Had the negative-pressure test been reconducted immediately after the phone

conversation between Mr. Vidrine and Mr. Hafle, and properly interpreted, there would have been sufficient time to secure the well and prevent the blowout.

22. As a direct and proximate result of BP's aforesaid recklessness in proceeding with the temporary-abandonment operation, the integrity of the well system was not maintained, and the blowout and explosions and the Spill occurred.

23. BPXP committed other negligent acts that caused or contributed to the blowout, the explosions, and the Spill, including: drilling the final 100 feet of the well with little or no margin, running the production casing with the float collar in unconverted mode and without a shoe filter, failing to verify whether the float collar converted by reverse circulating the well, not conducting a cement-bond-log ("CBL") cement-evaluation technique, using leftover lost circulation material ("LCM") as a spacer for the displacement and negative-pressure test, misinterpreting the negative-pressure test, allowing simultaneous operations to occur during displacement, and failing to provide a displacement schedule to the Transocean drill crew.

24. These incidents of negligence, considered together, constitute recklessness.

25. The matters set out in Paragraphs 9 and 11 through 24 above were found as facts or legal determinations, as the case may be, by the Court in its Findings of Fact and Conclusions of Law from the Phase One Trial (Doc. 13355) in this multidistrict litigation. Those findings are the law of the case in these consolidated pretrial proceedings.

26. The Court previously held on summary judgment that BPXP is a "Responsible Party" under the OPA with respect to the subsurface discharge of oil. (Doc. 5809). That finding is the law of the case in these coordinated pretrial proceedings.

27. In its Findings of Fact and Conclusions of Law from the Phase One Trial (Doc.13355), the Court found, under general maritime law, that BP breached the applicable

standard of care, that BP's conduct was reckless, that there was a causal connection between BP's breach and the blowout, explosions, and the Spill, and that in this respect, BP was 67% at fault, expressed as a percentage of total liability. These findings are the law of the case in these coordinated pretrial proceedings.

28. BP's acts and omissions set out above, if not reckless, constituted at a minimum negligence or gross negligence that directly and proximately caused or contributed to the blowout, the explosions, and the Spill, for the reasons set out above.

29. Plaintiffs were directly damaged by the Spill as follows: Plaintiffs lost substantial rental income on condominium units they held out for rent because potential tourists and vacationers did not want to come to the Florida Gulf Coast after the Spill. Plaintiffs also lost substantial sales commitments from buyers who had agreed to or were considering purchasing fractional share units in condominiums owned by Plaintiffs, and in two duplex units to be build by Plaintiffs on beach front lots owned by Plaintiffs, which resulted in the loss of the revenue from such sales. Plaintiffs also lost substantial monies when they sold properties they owned due to depressed economic conditions cause by the Spill.

30. Plaintiffs have satisfied the statutory prerequisites to suit under the OPA by making timely presentment of its claims to BP.

### COUNT I
### (Negligence)

31. Plaintiff realleges and incorporates herein all preceding allegations.

32. Plaintiff avers that the fire, explosion, and resulting oil spill were directly caused by the negligence and fault of BP as found by the Court and specified above.

33. Plaintiff has been damaged as set out above as a proximate result of the oil spill.

7

34. Plaintiff is entitled to a judgment finding BP and BP p.l.c. liable to Plaintiff for damages suffered as a proximate result of BP's negligence and awarding Plaintiff adequate compensation therefor in an amount to be determined by the trier of fact, but exceeding $75,000, exclusive of interest and costs.

## SECOND CAUSE OF ACTION
### (Wantonness)

35. Plaintiff realleges and incorporates herein paragraphs 1 through 29 hereof.

36. Plaintiff avers that the fire, explosion, and resulting oil spill were directly caused by the wantonness (that is, recklessness) or gross negligence and fault of BP as found by the Court and specified above.

37. Plaintiff has been damaged as set out above as a proximate result of the oil spill.

38. Plaintiff is entitled to a judgment finding BP and BP p.l.c. liable to Plaintiff for damages suffered as a proximate result of BP's wantonness or gross negligence and awarding Plaintiff adequate compensation and punitive damages therefor in an amount to be determined by the trier of fact, but exceeding $75,000, exclusive of interest and costs.

## THIRD CAUSE OF ACTION
### (Strict Liability)

39. Plaintiff realleges and incorporates herein Paragraphs 1 through 29 hereof.

40. The actions and activities of BP as described above, including, but not limited to, drilling for offshore oil and attempting the temporary abandonment of an offshore well in the Gulf of Mexico, constitute an abnormally dangerous and/or ultrahazardous activity that carries with it a high degree of risk of harm to individuals, or land or chattels of others.

41. The injuries and damages suffered by Plaintiff were the kind of harm the possibility of which makes BP's activities abnormally dangerous and/or ultrahazardous.

42. The above-described injuries and damages to Plaintiff were proximately caused by said abnormally dangerous and/or ultrahazardous activity.

43. Plaintiff is entitled to a judgment finding BP and BP p.l.c. liable to Plaintiff for damages suffered as a result of BP's abnormally dangerous and/or ultrahazardous activity and awarding Plaintiff adequate compensation therefor in an amount to be determined by the trier of fact, but exceeding $75,000, exclusive of interest and costs.

## FOURTH CAUSE OF ACTION
### (Oil Pollution Act of 1990)

44. Plaintiff realleges and incorporates herein Paragraphs 1 through 29 hereof.

45. The Oil Pollution Act of 1990 ("OPA") imposes liability upon a "responsible party for a . . . facility from which oil is discharged . . . into or upon navigable waters or adjoining shorelines" for the "damages that result from such incident." 33 U.S.C. § 2702.

46. Pursuant to 33 U.S.C. § 2701(32)(c), BP is the responsible party. Therefore, BP is liable pursuant to Section 2702 for all the damages that resulted from the oil spill.

47. 33 U.S.C. 2702(b)(2)(E) provides for the recovery of "[d]amages equal to the loss of profits or impairment of earning capacity due to the injury, destruction, or loss of real property, personal property, or natural resources, which shall be recoverable by any claimant."

48. As a proximate result of the oil spill, Plaintiff has suffered the type of damages that may be recovered pursuant to Section 2702(b)(2)(E).

49. Plaintiff is entitled to a judgment finding BP and BP p.l.c. liable to Plaintiff for damages suffered by Plaintiff pursuant to the OPA, and awarding Plaintiff adequate compensation therefor in an amount to be determined by the trier of fact.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiff demands judgment against BP and BP p.l.c., jointly and

severally, as follows:

    a.    For damages for lost profits and impaired earning capacity in amounts to be determined at trial;

    b.    For damages of the loss of enterprise value of the company;

    c.    For punitive damages;

    d.    For pre-judgment and post-judgment interest at the maximum rate allowable by law;

    e.    For all expenses and costs of accounting incurred by the Plaintiff in presenting the claims stated in this complaint;

    f.    For diminution in value to the rental home;

    g.    For actual lost damages from a reduced price at the sale of the rental home in 2011;

    h.    For lost rental income from the rental home following the Spill; and

    f.    For such other and further relief the Court deems just and appropriate.

Respectfully submitted,

Dated this the 16th day of May, 2016.

    /s/ Steven A. Martino
    **STEVEN A. MARTINO** (MARTS7433)
    **EDWARD P. ROWAN** (ROWE3430)
    Taylor-Martino, PC
    51 St. Joseph Street
    Post Office Box 894 (36601)
    Mobile, AL 36602
    PH: 251-433-3131
    FX: 251-405-5080
    stevemartino@taylormartino.com
    ed@taylormartino.com

**PLAINTIFF DEMANDS TRIAL BY JURY ON ALL ISSUES SO TRIABLE.**

    /s/ Steven A. Martino
    **STEVEN A. MARTINO**

**SERVE DEFENDANTS VIA FILE & SERVEXPRESS ("F&S"):**

BP, p.l.c.
501 Westlake Park Boulevard
Houston, TX 77079

BP Exploration & Production, Inc.
The Corporation Trust Company
Corporation Trust Center
1209 Orange Street
Wilmington, DE 19801

BP America, Inc.
CT Corporation System
2 North Jackson Street
Suite 605
Montgomery, AL 36104

Counsel for BP
ATTN: J. Andrew Langan
Kirkland & Ellis LLP
300 North LaSalle St, Suite 2400
Chicago, IL 60654

MDL 2179 Plaintiffs' Steering Committee
ATTN: Steve Herman or Jim Roy
The Exchange Centre, Suite 2000
935 Gravier Street
New Orleans, LA 70112