U.S. DISTRICT COURT
EASTERN DISTRICT OF LOUISIANA
FILED    MAY 17 2016
WILLIAM W. BLEVINS
CLERK

UNITED STSTES DISTRICT COURT
EASTERN DISTRICT OF LOUISIANA

IN RE:  OIL SPILL by the OIL RIG          :     MDL NO. 2179
"DEEPWATER HORIZON" in the               :     12-3048
GULF OF MEXICO, on                       :
APRIL 20, 2010                           :     SECTION:  J (1)
                                         :
This Docket Relates to: Joseph Cannistra et, al   :
Plaintiff                                :     JUDGE BARBIER
Nos. 12-3048, 13-2905, 14-2606           :     MAG.  JUDGE SHUSHAN

. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .

## MOTION TO EXPEDITE AND COMPEL FIDUCIARY DUTY

**COMES NOW JOSEPH CANNISTRA,** by and through Joseph Cannistra and

avers as follows:

1. On the 20th day of April, 2010, the Deepwater Horizon accident occurred in the Gulf of Mexico.

2. There is no question that liability rests solely with the BP Deepwater Horizon multi-conglomerate corporations.

3. $20 billion was set aside to compensate claimants for damages as a result of this accident.

4. It was declared that the $20 billion set aside to compensate the claimants for their losses, was alleged to be controlled by the United States Government.

5. These funds were to be distributed to claimants for compensation for losses as a result of the accident.

6. Initially, the Gulf Coast Claims Facility was the fiduciary for this endeavor.

7. In June, 2010, this claimant, Joseph Cannistra, filed an initial claim with the

GCCF, claim number 1101464.

8. After submitting substantiating documentation, and their accountants calculating my losses, I was sent an interim payment check on the 10th day of March 2011, totaling $36,767.94, by the accounting firm of Garden City Group, via the (GCCF).

9. But for some ungodly ridiculous unknown reason, the government of the United States, took-over the fiduciary responsibilities from the GCCF, and took it over themselves.

10. After the Government of the United States, took control and created this unorthodox debacle, I was forced to file pro se litigation in the United States District Court, Middle District of Florida, case number MDL No.:8:12-CV-2791-T-12-TGW, on the 11th day of December 2012, where I lived.

11. The case was transferred to the United States District Court, Eastern District of Louisiana, as a tagalong to the case in chief titled "Oil Spill by the Oil Rig Deepwater Horizon in the Gulf of Mexico on April 20, 2010,

12. Accordingly, I refiled in the Eastern District of Louisiana, an amended complaint, and served each and every defendant named in the case in chief; (i) It must be noted however, that this is not part of any "class action suit".

13. I eventually filed a Motion for Summary Judgment, and sought relief for the money owed to me for damages as a result of the oil spill.

14. The court denied my Motion for Summary Judgment citing Pretrial Order No. 15. Although theses rules were put in play by the attorneys for the class suit and court.

15. After a careful and considerable review of all the facts and circumstances surrounding this incident, whereby an entity, i.e., the Deepwater Horizon Oil Rig caused

damage to individual claimants, and the entity, (Deepwater Horizon et al) concedes liability, and tenders in reserve $20 billion to settle the claims presented, there is absolutely no reason why these funds are not distributed to the claimants immediately, by the fiduciary, the United States of America. My claim is still pending some 5 years later.

16.  United States District Court, in this case, is strictly a fiduciary, and should not act as anything other than a distributor of the funds in its possession to the claimants.

17.  United States District Court has no standing whatsoever in hearing claimants litigation, when there is no dispute between the litigants. They must distribute undisputed funds to claimants, when presented with a claim if they are the agent of the defendant.

18.  Joseph Cannistra, a claimant, submitted a claim against funds in escrow in the amount of $1,358,711.46.

19.  After submitting this claim some four years ago, no party to this litigation has challenged the amount presented for claim, fact!

20.  This claimant moves the United States District Court to **Show Cause** why it shouldn't release these funds immediately to this claimant, (litigant), within 72 hours of this demand, (Motion), as well as state *where* exactly these funds are, and who specifically, has accountability and controls these funds.

21.  For some unknown reason, it appears that the United States District Court took it upon itself to handle the distribution of funds in escrow for a private corporation, or multiple corporations, that had caused damage to other corporations or individuals, outside of the scope of its normal duties as a forum for disputes between parties; this is the function or business of insurance companies or loss prevention entity, such as the initial GCCF or any other qualifying loss-payee, not a District Court in the United States

of America, which has never had experience in paying claims or losses as its role.

22. Notwithstanding the Courts Rule(s) as promulgated to this case, an open-ended unspecified rule regarding time to respond or for hearings is tantamount to denying the claim without cause. Is the Court acting negligent in this case, to this claimant? Is it reasonable or unreasonable this "delay in action" by the Court?  Since 2010, [it is now 2016], when the Court issued its rules, this claimant has not received his due compensation. Is the Court acting reasonable, would a prudent Court have acted under the same or similar circumstances to other claimants, such as with the US Department of Justice, or the National Fish and Wildlife Foundation?    Try not paying taxes to the Government and see how long you can get away with that. In this instance, the phrase *Justice delayed is Justice denied"*, it's just that, plain and simple. Any inordinate delay to urgent litigation that is the interest of the public, {i.e., my catastrophic loss and other unrepresented litigants}, must be reduced if not eliminated. The delay that is. This also applies to other pro- se litigants such as that of Joseph Rainier and Daniel J Levitan, as this court duly noted in its response to my Motion for Summary Judgment.

23. It appears that pro se litigants are not looked upon as desirable's by the Court. Perhaps the court discriminates against the pro-se litigants, possibly rejects them altogether. Discrimination, for whatever reason should not be tolerated, and is unlawful.

24. My son, a businessman in Tampa, Florida, was approached by a law firm last year, 2015, with respect to the possibility of a loss for his business, Re: the BP oil spill. He went with the firm, and has settled his claim, all in less then 10 months. Is it possible that attorneys have priority over pro-se litigants?.   Could this be the discrimination that takes place for the pro-se claimants?

25.  Since there is no insurer, or insurance carrier such as, Lloyd's of London, AIG, Allstate, or State Farm, named for the defendant, "The Deepwater Horizon", and the assumption that on June 16, 2010, after BP executives met with president Obama, BP announced and established the Gulf Coast Claims Facility, a $20 billion fund to settle claims arising from the Deepwater Horizon spill. This fund was set aside for normal resource damages, state and local response costs, an individual compensation, but could not be used for financial penalties...... See exhibit: Spill response fund, attached hereto. The 20 billion dollars that was reserved for this loss was as a self insured entity, the assumption that the government has now took it upon itself to be that agent, or fiduciary, since it took over and close down that facility.

This claimant need not be required to file suit, unless the defendant denies the loss and damages to the claimant. Clearly, this is not the case. This claimant has already been vetted as a business who has sustained a loss as a result of the spill, and as such is entitled to compensation as an individual from this fund. The entity, who has the responsibility to pay the claim, must pay the claim in a reasonable and timely manner, or show good cause why it is not making the settlement. Also, the delay of the settlement can be a *tort,* in and of itself, and damages can be assessed against that entity for that delay.

26.  Upon reading the ruling by the Court on September 4th, 2014, there was "gross negligence" and "willful misconduct" on the part of the defendants..... Again see exhibit attached.... And Judge Carl Barbier also describes these actions as "reckless".

27.  On 14 November 2012, BP and the US Department of Justice reached a settlement. BP will pay $4.5 billion in fines and other payments, the largest of its kind in US history. The settlement includes payments of $2.394 billion to the National Fish and

Wildlife Foundation, $1.15 billion to the Oil Spill Liability Trust Fund, $350 million to

the National Academy of Sciences for oil spill preservation and response research, $100

million to the North American Wetlands Conservation Fund, $6 million to the general

treasury and $525 million to the Securities and Exchange Commission. It doesn't say

anything about Joseph Cannistra, and the Gathering Restaurant in Largo Florida. Why?

On 3 January 2013 the US Justice Department announced "Transocean Deepwater Inc."

has agreed to plead guilty to violating the Clean Water Act and to pay a total of $1.4

billion dollars in civil and criminal fines and penalties. $800 million goes is to Golf Coast

Restoration Trust Fund, $300 million to the Oil Spill Liberty Trust Fund, $ 150 million to

the National Wild Turkey Federation and $150 million to the National Academy of

Sciences. MOEX Offshore 2007 agreed to pay $45 million to Oil Spill Liability Trust

Fund, $25 million to five Gulf states and 20 million to supplemental environmental

projects.    See attached exhibit…. "Civil litigation and settlements"  why not for me?!!!

Once again, that's very nice, but where is the compensation for me, Joseph

Cannistra for the loss of his life savings and restaurant in Largo Florida almost 6 years

later?

**WHEREFORE** and in view of the foregoing, this Plaintiff, Litigant, Claimant, moves this court to:

1., Released to this Plaintiff, Claimant, Litigant, $1,358,711.46, plus interest, costs and penalties since the initial claim was filed in 2010 with the GCCF,

2., Disclose to this Plaintiff, Claimant, Litigant exactly where these funds are, how much is left, and who specifically controls them,

3., Show what standing the Court has in denying the release of these funds immediately, within 72 hours of this Demand, Motion to Expedite etc., when the *defendants* have made no objections, and have set aside the compensation to do so,

4., show good cause why sanctions and/or penalties should not be levied against the government for this delay,

and for such other and further relief that this Court may deem just, proper and equitable.

Joseph Cannistra                May 13th, 2016
1247 East College St.
Pulaski, Tn. 38478
(813) 403-8587 Cell Phone

The U.S. State Department listed 70 assistance offers from 23 countries, all being initially declined but later 8 had been accepted.[295][296] The USCG actively requested skimming boats and equipment from several countries.[297]

# Legal aspects and settlements

## Investigations

In the United States the *Deepwater Horizon* investigation included several investigations and commissions, including reports by the USCG National Incident Commander, Admiral Thad Allen, the National Commission on the BP Deepwater Horizon Oil Spill and Offshore Drilling, Bureau of Ocean Energy Management, Regulation and Enforcement (BOEMRE), National Academy of Engineering, National Research Council, Government Accountability Office, National Oil Spill Commission, and Chemical Safety and Hazard Investigation Board.[60] The Republic of the Marshall Islands Maritime Administrator conducted a separate investigation on the marine casualty.[2] BP conducted its internal investigation.

An investigation of the possible causes of the explosion was launched on 22 April 2010 by the USCG and the Minerals Management Service.[36] On 11 May the United States administration requested the National Academy of Engineering conduct an independent technical investigation.[298] The National Commission on the BP Deepwater Horizon Oil Spill and Offshore Drilling was established on 22 May to "consider the root causes of the disaster and offer options on safety and environmental precautions."[299] The investigation by United States Attorney General Eric Holder was announced on 1 June 2010.[300] Also the United States House Committee on Energy and Commerce conducted a number of hearings, including hearings of Tony Hayward and heads of Anadarko and Mitsui's exploration unit.[81][301] According to the US Congressional investigation, the rig's blowout preventer, built by Cameron International Corporation, had a hydraulic leak and a failed battery, and therefore failed.[302]

On 8 September 2010, BP released a 193-page report on its web site. The report places some of the blame for the accident on BP but also on Halliburton and Transocean.[303] The report found that on 20 April 2010, managers misread pressure data and gave their approval for rig workers to replace drilling fluid in the well with seawater, which was not heavy enough to prevent gas that had been leaking into the well from firing up the pipe to the rig, causing the explosion. The conclusion was that BP was partly to blame, as was Transocean, which owned the rig.[304] Responding to the report, Transocean and Halliburton placed all blame on BP.[305]

On 9 November 2010, a report by the Oil Spill Commission said that there had been "a rush to completion" on the well and criticised poor management decisions. "There was not a culture of safety on that rig," the co-chair said.[306]

The National Commission on the BP Deepwater Horizon Oil Spill and Offshore Drilling released a final report on 5 January 2011.[307][308] The panel found that BP, Halliburton, and Transocean had attempted to work more cheaply and thus helped to trigger the explosion and ensuing leakage.[309] The report stated that "whether purposeful or not, many of the decisions that BP, Halliburton, and Transocean made that increased the risk of the Macondo blowout clearly saved those companies significant time (and money)."[309] BP

released a statement in response to this, saying, that "even prior to the conclusion of the commission's investigation, BP instituted significant changes designed to further strengthen safety and risk management."[310] Transocean, however, blamed BP for making the decisions before the actual explosion occurred and government officials for permitting those decisions.[311] Halliburton stated that it was acting only upon the orders of BP when it injected the cement into the wall of the well.[310][312] It criticized BP for its failure to run a cement bond log test.[311] In the report, BP was accused of nine faults.[310][312] One was that it had not used a diagnostic tool to test the strength of the cement.[309] Another was ignoring a pressure test that had failed.[310] Still another was for not plugging the pipe with cement.[309] The study did not, however, place the blame on any one of these events. Rather, it concluded that "notwithstanding these inherent risks, the accident of April 20 was avoidable" and that "it resulted from clear mistakes made in the first instance by BP, Halliburton and Transocean, and by government officials who, relying too much on industry's assertions of the safety of their operations, failed to create and apply a program of regulatory oversight that would have properly minimized the risk of deepwater drilling."[310][312] The panel also noted that the government regulators did not have sufficient knowledge or authority to notice these cost-cutting decisions.[309]

On 23 March 2011, BOEMRE (former MMS) and the USCG published the forensic examination report on blowout preventer, prepared by Det Norske Veritas.[313] The report concluded that the primary cause of failure was that the blind shear rams failed to fully close and seal due to a portion of drill pipe buckling between the shearing blocks.

The US government report issued in September 2011 stated that BP is ultimately responsible for the spill, and that Halliburton and Transocean share some of the blame.[22][314] The report states that the main cause was the defective cement job, and Halliburton, BP and Transocean were, in different ways, responsible for the accident.[22] The report stated that, although the events leading to the sinking of Deepwater Horizon were set into motion by the failure to prevent a well blowout, the investigation revealed numerous systems deficiencies, and acts and omissions by Transocean and its *Deepwater Horizon* crew, that had an adverse impact on the ability to prevent or limit the magnitude of the disaster. The report also states that a central cause of the blowout was failure of a cement barrier allowing hydrocarbons to flow up the wellbore, through the riser and onto the rig, resulting in the blowout. The loss of life and the subsequent pollution of the Gulf of Mexico were the result of poor risk management, last-minute changes to plans, failure to observe and respond to critical indicators, inadequate well control response, and insufficient emergency bridge response training by companies and individuals responsible for drilling at the Macondo well and for the operation of the drilling platform.[22]

## Spill response fund

On 16 June 2010, after BP executives met with President Obama, BP announced and established the Gulf Coast Claims Facility (GCCF), a $20 billion fund to settle claims arising from the Deepwater Horizon spill.[81][315] This fund was set aside for natural resource damages, state and local response costs, and individual compensation, but could not be used for fines or penalties.[81] Prior to establishing the GCCF, emergency compensation was paid by BP from an initial facility.[316]

The GCCF was administrated by attorney Kenneth Feinberg. The facility began accepting claims on 23 August 2010.[315] On 8 March 2012, after BP and a team of plaintiffs' attorneys agreed to a class-action settlement, a court-supervised administrator Patrick Juneau took over administration.[317][318] Until this more than one million claims of 220,000 individual and business claimants were processed and more than $6.2 billion was paid out from the fund. 97% of payments were made to claimants in the Gulf States.[316] In June 2012, the settlement of claims through the GCCF was replaced by the court supervised settlement program. During this transition period additional $404 million in claims were paid.[319]

The GCCF and its administrator Feinberg had been criticized about the amount and speed of payments as well as a lack of transparency.[320] An independent audit of the GCCF, announced by Attorney General Eric Holder, was approved by Senate on 21 October 2011.[321] An auditor BDO Consulting found that 7,300 claimants were wrongly denied or underpaid. As a result, about $64 million of additional payments was made.[317] The Mississippi Center for Justice provided pro bono assistance to 10,000 people to help them "navigate the complex claims process." In a *New York Times* (http://www.nytimes.com/2013/07/31/opinion/shirking-responsibility-in-the-gulf.html) opinion piece, Stephen Teague, staff attorney at the Mississippi Center for Justice, argued that BP had become "increasingly brazen" in "stonewalling payments." "But tens of thousands of gulf residents still haven't been fully compensated for their losses, and many are struggling to make ends meet. Many low-wage workers in the fishing and service industries, for example, have been seeking compensation for lost wages and jobs for three years."[322]

In July 2013 BP made a motion in court to freeze payments on tens of thousands of claims, arguing inter alia that a staff attorney from the Deepwater Horizon Court-Supervised Settlement Program, the program responsible for evaluating compensation claims, had improperly profited from claims filed by a New Orleans law firm. The attorney is said to have received portions of settlement claims for clients he referred to the firm.[322] The federal judge assigned to the case, Judge Barbier, refused to halt the settlement program, saying he had not seen evidence of widespread fraud, adding that he was "offended by what he saw as attempts to smear the lawyer administering the claims."[323]

## Civil litigation and settlements

By 26 May 2010, over 130 lawsuits relating to the spill had been filed[324] against one or more of BP, Transocean, Cameron International Corporation, and Halliburton Energy Services,[325] although it was considered likely by observers that these would be combined into one court as a multidistrict litigation.[325] On 21 April 2011, BP issued $40 billion worth of lawsuits against rig owner Transocean, cementer Halliburton and blowout preventer manufacturer Cameron. The oil firm alleged failed safety systems and irresponsible behaviour of contractors had led to the explosion, including claims that Halliburton failed to properly use modelling software to analyze safe drilling conditions.[326] The firms deny the allegations.

On 2 March 2012, BP and plaintiffs agreed to settle their lawsuits. The deal would settle roughly 100,000 claims filed by individuals and businesses affected by the spill.[252][327] On 13 August, BP asked US District Judge Carl Barbier to approve the settlement, saying its actions "did not constitute gross negligence or willful misconduct".[328] On 13 January 2013, Judge Barbier approved a medical-benefits portion of BP's proposed $7.8 billion partial settlement. People living for at least 60 days along oil-impacted shores or involved in the clean-up who can document one or more specific health conditions caused by the oil or

dispersants are eligible for benefits, as are those injured during clean-up.[~29] BP also agreed to spend $105 million over five years to set up a Gulf Coast health outreach program and pay for medical examinations.[46] According to a group presenting the plaintiffs, the deal has no specific cap.[330] BP says that it has $9.5 billion in assets set aside in a trust to pay the claims, and the settlement will not increase the $37.2 billion the company budgeted for spill-related expenses.[252] BP originally expected to spend $7.8 billion. By October 2013 it had increased its projection to $9.2 billion, saying it could be "significantly higher."[331]

On 31 August 2012, the US Department of Justice (DOJ) filed papers in federal court in New Orleans blaming BP for the Gulf oil spill, describing the spill as an example of "gross negligence and willful misconduct." In their statement the DOJ said that some of BP's arguments were "plainly misleading" and that the court should ignore BP's argument that the Gulf region is "undergoing a robust recovery". BP rejected the charges saying "BP believes it was not grossly negligent and looks forward to presenting evidence on this issue at trial in January."[332][333] The DOJ also said Transocean, the owner and operator of the Deepwater Horizon rig, was guilty of gross negligence as well.[332][334]

On 14 November 2012, BP and the US Department of Justice reached a settlement. BP will pay $4.5 billion in fines and other payments, the largest of its kind in US history. In addition, the U.S. government temporarily banned BP from new federal contracts over its "lack of business integrity".[335][336] The plea was accepted by Judge Sarah Vance of the United States District Court for the Eastern District of Louisiana on 31 January 2013.[337] The settlement includes payments of $2.394 billion to the National Fish and Wildlife Foundation, $1.15 billion to the Oil Spill Liability Trust Fund, $350 million to the National Academy of Sciences for oil spill prevention and response research, $100 million to the North America Wetland Conservation Fund, $6 million to General Treasury and $525 million to the Securities and Exchange Commission.[25][60]

On 3 January 2013 the US Justice Department announced "Transocean Deepwater Inc. has agreed to plead guilty to violating the Clean Water Act and to pay a total of $1.4 billion in civil and criminal fines and penalties".[338] $800 million goes to Gulf Coast restoration Trust Fund, $300 million to the Oil Spill Liability Trust Fund, $150 million to the National Wild Turkey Federation and $150 million to the National Academy of Sciences. MOEX Offshore 2007 agreed to pay $45 million to the Oil Spill Liability Trust Fund, $25 million to five Gulf state and $20 million to supplemental environmental projects.[60]

On 25 July 2013 Halliburton pleaded guilty to destruction of critical evidence after the oil spill and said it would pay the maximum allowable fine of $200,000 and will be subject to three years of probation.[339]

On 9 July 2013 Alaska inventor and oil field veteran Chris McIntyre filed suit against BP, alleging that the company used his design to cap the Macondo Well without compensation. McIntyre sent BP the design for the capping device on 14 May 2010. BP subsequently used McIntyre's design (or one very similar) to shut in the well on 15 July 2010. BP maintains that its employees first conceived of the design some days before McIntyre. Both parties agree that the device did not exist prior to 20 April 2010. The case, Christopher McIntyre v. BP Exploration & Production is currently on appeal with the United States Court for the Ninth Circuit in San Francisco. McIntyre seeks remand to the District Court of Alaska for a jury trial.

Deepwater Horizon oil spill - Wikipedia, the free encyclopedia

In January 2014, a panel of the U.s. Fifth Circuit Court of Appeals rejected an effort by BP to curb payment of what it described as "fictitious" and "absurd" claims to a settlement fund for businesses and persons affected by the oil spill. BP said administration of the 2012 settlement was marred by the fact that people without actual damages could file a claim. The court ruled that BP hadn't explained "how this court or the district court should identify or even discern the existence of 'claimants that have suffered no cognizable injury.'"[331] The Court then went further, calling BP's position "nonsensical."[340][341] The Supreme Court of the United States later refused to hear BP's appeal after victims and claimants, along with numerous Gulf coast area chambers of commerce, objected to the oil major's efforts to renege on the Settlement Agreement.[342]

In September 2014, Halliburton agreed to settle a large percentage of legal claims against it by paying $1.1 billion into a trust by way of three installments over two years.[343]

## Justice Department lawsuit

BP and its partners in the oil well, Transocean and Halliburton, went on trial on 25 February 2013 in the United States District Court for the Eastern District of Louisiana in New Orleans to determine payouts and fines under the Clean Water Act and the Natural Resources Damage Assessment. The plaintiffs included the U.S. Justice Department, Gulf states and private individuals. Tens of billions of dollars in liability and fines were at stake. A finding of gross negligence would result in a ~~fourfold increase~~ in the fines BP would have to pay for violating the federal Clean Water Act, and leave the company liable for punitive ~~damages for~~ private claims.[344]

he trial's first phase was to determine the liability of BP, Transocean, Halliburton, and other companies, and if they acted with gross negligence and willful misconduct.[345][346] The second phase scheduled in September 2013 focused on the flow rate of the oil and the third phase scheduled in 2014 was to consider damages.[347] According to the plaintiffs' lawyers the major cause of an explosion was the mishandling of a rig safety test, while inadequate training of the staff, poor maintenance of the equipment and substandard cement were also mentioned as things leading to the disaster.[346][347] According to *The Wall Street Journal* the U.S. government and Gulf Coast states had prepared an offer to BP for a $16 billion settlement. However, it was not clear if this deal had been officially proposed to BP and if BP has accepted it.[348]

On 4 September 2014, U.S. District Judge Carl Barbier ruled BP was guilty of gross negligence and willful misconduct. He described BP's actions as "reckless." He said Transocean's and Halliburton's actions were "negligent." He apportioned 67% of the blame for the spill to BP, 30% to Transocean, and 3% to Halliburton. Fines would be apportioned commensurate with the degree of negligence of the parties, measured against the number of barrels of oil spilled. Under the Clean Water Act fines can be based on a cost per barrel of up to $4,300, at the discretion of the judge. The number of barrels was in dispute at the conclusion of the trial with BP arguing 2.5 million barrels were spilled over the 87 days the spill lasted, while the court contends 4.2 million barrels were spilled. BP issued a statement strongly disagreeing with the finding, and saying the court's decision would be appealed.[349]

arbier ruled that BP had acted with "conscious disregard of known risks" and rejected BP's assertion that other parties were equally responsible for the oil spill. His ruling stated that BP "employees took risks that led to the largest environmental disaster in U.S. history," that the company was "reckless," and determined that several crucial BP decisions were "primarily driven by a desire to save time and money, rather than

ensuring that the well was secure.  The ruling means that BP, which had already spent more than $28 billion on cleanup costs and damage claims, may be liable for another $18 billion in damages, four times the Clean Water Act maximum penalties and many times more than the $3.5 billion BP had already allotted. BP strongly disagreed with the ruling and filed an immediate appeal. The size of the ruling "casts a cloud over BP's future," *The New York Times* reported.[29][350]

On 2 July 2015, BP, the U.S. Justice Department and five gulf states announced that the company agreed to pay a record settlement of $18.7 billion.[351] To date BP's cost for the clean-up, environmental and economic damages and penalties has reached $54 billion.[352]

## Criminal charges

In addition to the private lawsuits and civil governmental actions, the federal government charged numerous persons and entities involved with federal crimes.

In April 2012, the Justice Department filed the first criminal charge against Kurt Mix, a BP engineer, for obstructing justice by deleting messages showing that BP knew the flow rate was three times higher than initial claims by the company, and knew that "Top Kill" was unlikely to succeed, but claimed otherwise.[353][354][355] Three more BP employees were charged in November 2012:[356] Donald Vidrine and Robert Kaluza, two site managers were charged with manslaughter for acting negligently in their supervision of key safety tests performed on the rig prior to the explosion and failure to alert onshore engineers of problems in the drilling operation,[356] and David Rainey, BP's former vice-president, for exploration in the Gulf of Mexico, was charged with obstructing Congress.[357] Two employees are charged with obstruction of justice and for lying to federal investigators.[353] Attorney General Eric Holder said that the criminal investigation is not yet over and that more company officials could be charged.[25][356]

In the November 2012 resolution of the federal charges against it, BP also agreed to plead guilty to 11 felony counts related to the deaths of the 11 workers and paid a $4 billion fine.[25]

The settlement resulting in the $1.4 billion Transocean fine also included Transocean's pleading guilty to a misdemeanor charge.

# See also

- List of industrial disasters
- List of oil spills
- Offshore oil and gas in the US Gulf of Mexico
- Timeline of the Deepwater Horizon oil spill

# References

1. United States National Oceanographic and Atmospheric Administration. EMRA Gulf Response. [1] (http://gomex.erma.noaa.gov/erma.html)
2. Deepwater Horizon Marine Casualty Investigation Report (PDF) (Report). Office of the Maritime Administrator. 17 August 2011. Retrieved 25 February 2013.

Joseph Cannistra
1247 E. College ST
Pulaski, TN. 38478

7015 3010 0000 5167 4308

U.S. District Court
Eastern District of Louisiana
500 Poydras St. C 151
New Orleans, LA. 70130

$7.36
U.S. POSTAGE
PAID
PULASKI, TN
38478
MAY 13, 16
AMOUNT
R2304M145528-11