**IN THE UNITED STATES DISTRICT COURT**
**FOR THE EASTERN DISTRICT OF LOUISIANA**

| | | |
|---|---|---|
| In Re:  Oil Spill by the Oil Rig "Deepwater Horizon" in the Gulf of Mexico, on April 20, 2010 | * * * * * * * * * | **MDL NO. 2179** <br><br> **SECTION: J** <br><br><br> **HONORABLE CARL J. BARBIER** <br><br> **MAGISTRATE JUDGE SHUSHAN** |
| Plaisance, *et al.*, individually and on behalf of the Medical Benefits Settlement Class, <br><br> Plaintiffs, <br> v. <br> BP Exploration & Production Inc., *et al.*, <br><br> Defendants. | * * * * * * * * * * * * * * | **NO. 12-CV-968** <br><br> **SECTION: J** <br><br><br> **HONORABLE CARL J. BARBIER** <br><br> **MAGISTRATE JUDGE SHUSHAN** |

**STATUS REPORT FROM THE *DEEPWATER HORIZON***
**<u>MEDICAL BENEFITS SETTLEMENT CLAIMS ADMINISTRATOR</u>**

The Garretson Resolution Group, the Claims Administrator of the *Deepwater Horizon* Medical Benefits Class Action Settlement (the "Settlement"), submits the following quarterly report to apprise the Court of the status of its work in processing claims and implementing the terms of the Medical Settlement Agreement (the "MSA") between January 2, 2016, and April 1, 2016, (the "Reporting Period").[1]  We have published nine reports since Preliminary Approval in

---

[1] Capitalized terms not otherwise defined herein shall have the meanings ascribed to their fully capitalized renderings in the MSA.

May 2012, and this marks the fifth quarterly report filed since the claims filing deadline of February 12, 2015. This report will address the continued processing of claims sets received from 2012 to 2014 (collectively, the "2014 Claims")[2] and the claims received in 2015 and thereafter (the "2015 Claims").

This status report provides:

- an executive summary of claims processed during the Reporting Period;

- a detailed overview of the progression of the 2014 and 2015 Claims;

- a summary of claims for Specified Physical Conditions ("SPC") and significant developments concerning these claims;

- an update on the operations and activities of the Class Member Services Center;

- an account of participation in the Periodic Medical Consultation Program ("PMCP");

- a summary of claims for Later-Manifested Physical Conditions; and

- a summary of the activities of the grantees of the Gulf Region Health Outreach Program ("GRHOP") and the operations of the Gulf Region Health Outreach Program Library.

## I.      <u>EXECUTIVE SUMMARY</u>

The Claims Administrator has received 37,285 unique claims for compensation for an SPC and/or participation in the PMCP through the end of the Reporting Period.[3] This status report will provide an overview of the claims processing forecast for both the 2014 and 2015 Claims, the variables influencing the progression of those claims, and the outcome of claims as they progress through the stages of review. In summary:

- The 2014 Claims are proceeding to final determination.

---

[2] The 2014 Claims include all POCFs received by the Claims Administrator from the entry of Preliminary Approval on May 3, 2012 through December 31, 2014. While the Claims Administrator was approved to receive claims after Preliminary Approval, the Claims Administrator was not approved to process claims beyond the Party-approved RAI process until the Effective Date of the Settlement. Hence, all claims received in 2012, 2013, and 2014 are referred to as the 2014 Claims.

[3] The Claims Administrator continued to receive unique claims during this Reporting Period and in the first quarter of 2016.

- o Through the end of the Reporting Period, seventy-nine percent (79%) of the 2014 Claims have reached a final determination (either approval or denial), and twenty-one percent (21%) require additional processing.

- o Of the seventy-nine percent (79%) reaching a final determination, forty-three percent (43%) were approved for compensation for an SPC, and another thirty percent (30%) were approved to participate in the PMCP. Furthermore, eleven percent (11%) of the 2014 Claims going through the Notice of Defect Process have received an "Approved with Defects" notice, meaning that the Medical Benefits Settlement Class Member ("Class Member") has been approved for at least one compensable SPC.

- o Overall, the 2014 Claims have been and continue to be  impacted by high defect rates, with seventy-nine percent (79%) receiving either a Request for Additional Information ("RAI") or Notice of Defect during the life of the claim.  Additionally, thirty-five percent (35%) are impacted by changes or updates the claimants made to their Proof of Claim Forms or supporting documentation, which require us to re-review the claims.

- o The Claims Administrator currently forecasts that the majority of the twenty-one percent (21%) of the 2014 Claims requiring additional processing will be finalized at an even rate through mid-2016 as responses to defects and deficiencies, as well as changes or updates, undergo re-review.  Some claims, specifically those claims that had not received Notices of Defect by the end of March, are forecasted to be finalized by late 2016.

- The 2015 Claims are progressing through initial review and resulting in determinations for SPC compensation.

  - o Consistent with previous projections, the Claims Administrator completed initial review (meaning the claim was sent an RAI for a missing declaration or was sent to the declaration review stage) of 100% of the 2015 Claims by the end of the Reporting Period.

  - o Through the end of the Reporting Period, forty-two (42%) of the 2015 Claims have reached a final determination (either approval or denial), and fifty-eight percent (58%) require additional processing.

  - o Of the forty-two percent (42%) reaching a final determination, sixty-eight percent (68%) were approved for compensation for an SPC.

  - o Like the 2014 Claims, the 2015 Claims have been and continue to be impacted by substantial defect rates, with seventy percent (70%) receiving either an RAI or a Notice of Defect.  Additionally, fifty-eight percent (58%) are impacted by changes or updates the claimants made to their

Proof of Claim Forms or supporting documentation, which require us to re-review the claims.

o The Claims Administrator continues to forecast that the majority of the fifty-eight percent (58%) of the 2015 Claims requiring additional processing will be finalized at an even rate through late 2016 as responses to defects and deficiencies, as well as changes or updates, undergo re-review.

- The Claims Administrator continues to meet processing objectives to ensure the majority of 2014 and 2015 Claims receive a final determination by the end of 2016.

    o Over ninety-nine percent (99%) of all claims that could require an RAI for a missing declaration received that request prior to the end of 2015.

    o Over ninety-nine percent (99%) of all claims that could require an RAI for an incomplete declaration received that request prior to the end of March 2016.

    o Through the end of month March 2016, over sixty percent (60%) of all claims that could require a Notice of Defect received that notice.  The Claims Administrator forecasts that more than ninety percent (90%) of claims that could require a Notice of Defect will receive that notice by the end of month June 2016.

- The compensation allocated to SPC-determined claims continues to increase.

    o During the Reporting Period, the Claims Administrator approved Class Members for nearly $6.2 million in SPC compensation, bringing the cumulative total to $20.6 million.

    o Additionally, the Claims Administrator determined that another 921 Class Members who had partially defective claims also had at least one valid SPC claim and that the total amount of compensation for which the Class Members were currently eligible on those claims was $6 million.  The Claims Administrator sent those claimants an "Approved with Defects" notice, giving them the option of either attempting to cure the Defects in an effort to get greater compensation or accepting the compensation for which they currently qualify.

    o Between the amounts allocated through SPC-determined claims and the amounts to be allocated through the "Approved with Defects" claims, the total SPC compensation for which Class Members qualified as of the end of the Reporting Period amounted to more than $26.6 million.

- Class Members continue to be approved for enrollment in the PMCP.

4

o During the Reporting Period, we approved  Class Members to participate in the PMCP, bringing the total to 23,223 to date.  We sent PMCP Notices of Determination to 3,291 Class Members during the Reporting Period, for a total of 22,230 over the life of the program.

This information is discussed in greater detail below.

## II.    DETAILED CLAIMS PROGRESSION

### A.    Progression of 2014 Claims

The Claims Administrator received 12,396 2014 Claims.  Over the Reporting Period, the Claims Administrator received 193 changes or updates to those same claims forms.   The additional information must be processed through intake and then re-reviewed at each subsequent processing stage to determine its impact.  The number of 2014 Claims receiving a final determination or clearing lien resolution continued to increase throughout the Reporting Period.  Of the 12,396 2014 Claims, seventy-nine percent (79%) have been processed to a final determination, and twenty-one percent (21%) require additional processing.

Of the claims reaching a final determination,

- forty-three percent (43%) were approved for compensation for a Specified Physical Condition, and sixty-seven percent (67%) of those claims were paid;

- eight percent (8%) did not seek the SPC compensation benefit and instead claimed and qualified for the PMCP benefit only;

- twenty-two percent (22%) proved they were Class Members and qualified to receive the PMCP benefit but failed to prove they qualified for SPC compensation; and

- twenty-seven (27%) were denied because they (a) did not prove they were Class Members, (b) filed a valid opt-out, or (c) did not claim or prove a compensable SPC.

Notably, and consistent with the last reporting period, the percentage of 2014 Claims approved for compensation during this Reporting Period continues to exceed the percentage of those denied.

**Figure 1: Composition of Finalized 2014 Claims**



Of the claims that require additional processing:

- sixteen percent (16%) are pending Declaration Review or RAI processing;

- fifty-seven percent (57%) have already received or are scheduled to receive a Notice of Defect and will need to submit additional information; and

- twenty-seven percent (27%) are undergoing Medical Record Review.

**Figure 2: Composition of Pending 2014 Claims**



Thus, the current overall composition of the 2014 Claims is as follows:

**Figure 3: Overall Composition of 2014 Claims**



### B.    Progression of 2015 Claims

The Claims Administrator received 24,889 2015 Claims to date.[4]  Over the Reporting Period, we received approximately 1,486 changes or updates to 2015 Claims.  As with the 2014 Claims, this additional information must be processed through intake and then be re-reviewed. Of the 24,889 claims, forty-two percent (42%) have been processed to a final determination, and fifty-eight percent (58%) require additional processing.   Of the claims reaching a final determination,

- sixty-eight percent (68%) were approved for compensation for an SPC, and fifty-eight percent (58%) of those claims were paid;

---

[4] Pursuant to Section V.A. of the MSA, any claim submitted to the Claims Administrator more than one year after the Effective Date is untimely and must be denied.

- two percent (2%) did not seek the SPC compensation benefit and instead claimed and qualified for the PMCP benefit only; and

- seven percent (7%) proved they were Class Members and qualified to receive the PMCP benefit but failed to prove they qualified for SPC compensation; and

- twenty-three (23%) were denied because they (a) did not prove they were Class Members, (b) filed a valid opt-out, or (c) did not claim or prove a compensable SPC.

**Figure 4: Composition of Finalized 2015 Claims**



Of the claims that require additional processing:

- twenty-six percent (26%) are pending Declaration Review or RAI processing;

- fifty-four (54%) have already received or are scheduled to receive a Notice of Defect and will need to submit additional information; and

- twenty percent (20%) are actively in the Medical Record Review process.

**Figure 5: Composition of Pending 2015 Claims**



Thus, the current overall composition of the 2015 Claims is as follows:

**Figure 6: Overall Composition of 2015 Claims**

### III.   CLAIMS FOR SPECIFIED PHYSICAL CONDITIONS

#### A.   Claimed Benefits and Compensation Level

For the total 37,285 Proof of Claim Forms ("POCFs") received, Table 1 provides a breakdown of those that sought compensation for an SPC and participation in the PMCP and those that sought only participation in the PMCP.

| TABLE 1: POCF FILINGS AVAILABLE FOR INITIAL CLAIMS REVIEW | |
|---|---|
| | **Total** |
| **Total POCF Filings Available for Initial Claims Review** | **37,285** |
| Claims for Compensation for Both SPCs and Participation in the PMCP | 36,400 |
| Claims for PMCP Only | 885 |

The graphs below provide a breakdown of the compensation levels claimed in the 2014 and 2015 Claims, respectively:

**Figure 7: Compensation Level Composition of 2014 Claims**

**Figure 8: Compensation Level Composition of 2015 Claims**



Table 2, below, compares the composition of the claimed compensation levels in the 2014 Claims with those in the 2015 Claims and shows the percentage change between those two groups of claims.

| Table 2: Claimed Compensation Level | | | | | | | | |
|---|---|---|---|---|---|---|---|---|
| | A1 | A2 | A3 | A4 | B1 | Multiple | None | PMCP Only |
| Percentage of 2014 Claims | 30.61% | 8.39% | 5.50% | 2.12% | 12.67% | 19.89% | 15.85% | 4.96% |
| Percentage of 2015 Claims | 42.00% | 5.61% | 2.85% | .63% | 1.91% | 15.70% | 30.22% | 1.08% |
| Vintage Claim Comparison | 11.38% | (2.78%) | (2.65%) | (1.49%) | (10.77%) | (4.19%) | 14.37% | (3.88%) |

In Table 3 below, we provide statistics of the claimed compensation level in Section VII of the POCF as compared to the awarded compensation level.  In over eighty-eight percent (88%) of claims where the Class Member has claimed and qualified for a single compensation level, that same level of compensation has been awarded.  For the twelve percent (12%) not

awarded the same claimed compensation level, the Claims Administrator has awarded both higher and lower compensation levels based on review of the POCF and supporting documentation provided.  For claims where the Class Member selects multiple compensation levels or no compensation level in Section VII of the POCF, the rate of claims qualifying for A1-only compensation to those qualifying for A2 or higher compensation is approximately three and a half to one (3.5:1), meaning that a greater number of these claims are qualifying for A1 compensation rather than A2 or higher compensation.

| Table 3: Determined Compensation Level | | | | | | | | | | |
|---|---|---|---|---|---|---|---|---|---|---|
| Claimed Compensation Level | A1 | | A2 | | A3 | | A4 | | B1 | | Grand Total |
| Section VII of POCF | Count | % | Count | % | Count | % | Count | % | Count | % | |
| A1 | 8,319 | 98.91% | 30 | 0.36% | 52 | 0.62% | 9 | 0.11% | 1 | 0.01% | 8,411 |
| A2 | 194 | 39.51% | 262 | 53.36% | 33 | 6.72% | 2 | 0.41% | 0 | 0.00% | 491 |
| A3 | 185 | 30.48% | 48 | 7.91% | 343 | 56.51% | 30 | 4.94% | 1 | 0.16% | 607 |
| A4 | 39 | 48.75% | 3 | 3.75% | 7 | 8.75% | 31 | 38.75% | 0 | 0.00% | 80 |
| B1 | 263 | 53.13% | 161 | 32.53% | 57 | 11.52% | 7 | 1.41% | 7 | 1.41% | 495 |
| Multiple | 638 | 75.41% | 124 | 14.66% | 66 | 7.80% | 14 | 1.65% | 4 | 0.47% | 846 |
| None | 282 | 84.18% | 31 | 9.25% | 16 | 4.78% | 6 | 1.79% | 0 | 0.00% | 335 |
| Total | 9,920 | 88.06% | 659 | 5.85% | 574 | 5.10% | 99 | 0.88% | 13 | 0.12% | 11,265 |

### B.    Claims Requiring RAI and/or Notice of Defect

As has been the case historically, the majority of claims have received an RAI and/or a Notice of Defect according to the requirements of the MSA.  During the Reporting Period, the Claims Administrator sent 1,892 RAIs and 2,571 Notices of Defect.  Since the inception of the Settlement, the Claims Administrator sent 28,864 RAIs and 12,628 Notices of Defect.

| TABLE 4: RAIS AND NOTICES OF DEFECT | | |
|---|---|---|
| **RAIs** | **Reporting Period** | **Total** |
| RAIs Sent | 1,892 | 28,864 |
| Responses to RAIs Received | 4,065 | 18,097 |
| **Defects** | **Reporting Period** | **Total** |
| Notices of Defect Sent | 2,571 | 12,628 |
| Defect Cure Materials Received | 756 | 4,202 |

1.      Requests for Additional Information

Of the 1,892 RAIs sent during the Reporting Period, six percent (6%) were RAI-Missing, and ninety-four percent (94%) were RAI-Incomplete.[5]   Five percent (5%) were sent to unrepresented claimants, and ninety-five percent (95%) were sent to claimants represented by counsel.   More than sixty-five percent (65%) of the 2014 Claims have required at least one (1) RAI, and over twenty percent (20%) have required the maximum of two (2) RAIs. Approximately sixty-three percent (63%) of the 2015 Claims have required at least one (1) RAI, and over eleven percent (11%) have required the maximum of two (2) RAIs.   The overall response rate to RAIs was sixty-three percent (63%), with claimants represented by counsel responding at a higher rate (sixty-five percent (65%)) than those who are unrepresented (fifty-five percent (55%)).   The overall cure rate for responding to RAIs for both claimants represented by counsel and those unrepresented is approximately fifty-six percent (56%).

As previously reported, failure to respond to an RAI-Missing within the sixty-day (60-day) response period will not necessarily result in the denial of a claim; rather, the failure to respond to an RAI-Missing by submitting a first-party injury declaration in compliance with the

---

[5] Under the Party-approved RAI process, a claimant may receive an RAI-Missing for failing to submit a first-party injury declaration with his or her original POCF.  If the claimant submits a first-party injury declaration that omits necessary information, either in response to an RAI-Missing or at another point in the claims process, the claimant may receive an RAI-Incomplete.  For each RAI sent by the Claims Administrator, the claimant has sixty (60) days to respond.  A claimant may receive only one (1) RAI-Missing and one (1) RAI-Incomplete, as applicable.

Specified Physical Condition Matrix (the "SPC Matrix") will result in a Defect of "Missing Declaration of Injury Document" on a Notice of Defect.  The claimant would then have 120 days to cure that Defect and any other material Defects listed in the notice.

Similarly, failure to respond to or cure all deficiencies identified within an RAI-Incomplete will not necessarily result in the denial of a claim, because only some of a claimant's claimed or declared conditions may be deficient and included in the RAI.  In that circumstance, even if the claimant fails to respond to the RAI, the claimant might still receive compensation for the valid conditions in his or her declaration (assuming the claimant met the other requirements of the MSA).  These RAI processing standards and distinctions are highlighted in the "Frequently Asked Questions About Declarations and Requests for Additional Information" available on the Claims Administrator's website.  In addition, a copy of this FAQ is included with each RAI sent from the Claims Administrator, and we have call center representatives and firm liaisons available to provide assistance.

### 2. Notices of Defect

Of the 12,628 Notices of Defect sent through the end of the Reporting Period, thirty-one percent (31%) were sent to unrepresented claimants or Class Members, and sixty-nine percent (69%) were sent to claimants or Class Members represented by counsel.  More than seventy-six percent (76%) were sent to Class Members claiming to be or approved as Clean-Up Workers.  Approximately fifty-one percent (51%) of the Notices of Defect sent listed multiple Defects.  More specifically, thirty-two percent (32%) identified two (2) through five (5) Defects, ten percent (10%) identified six (6) through ten (10) Defects, and nine percent (9%) identified more than ten (10) Defects.

Of the 12,628 Notices of Defect sent through the end of the Reporting Period, sixty-five percent (65%) include Defects identified during initial claims review and prior to the Medical Record Review stage.  Fifty-six percent (56%) of the 2,571 Notices of Defect sent during the Reporting Period identified at least one Defect prior to the Medical Record Review stage in the claims process.  The five (5) most common material Defects identified for the population are as follows:

- "Missing Declaration of Injury document";

- "Missing Medical Records documentation";

- "Documentation included with the claim does not establish that the claimant was employed as a Clean Up Worker between the dates of April 20, 2010 and April 16, 2012";

- "Missing Third Party Witness Injury Declaration document"; and

- "Proof Of Residency Documents Failed To Prove Residence For 60 Days Between April 20, 2010 And September 30, 2010 for Zone A."

Of the 12,628 Notices of Defect sent through the end of the Reporting Period, thirty-five percent (35%) include Defects identified during the Medical Record Review process. Forty-four percent (44%) of the 2,571 Notices of Defect sent during the Reporting Period identified at least one Defect subsequent to the Medical Record Review stage in the claims process. The five (5) most common material Defects identified during the Medical Record Review process are as follows:

- "No medical records were submitted or the documentation submitted does not support the claimed SPECIFIED PHYSICAL CONDITION";

- Generally – "The medical records do not meet the criteria set forth in Level A2, A3, A4, and/or B1 of the Specified Conditions Matrix."  Specifically – "The date of first diagnosis for the claimed SPECIFIED PHYSICAL CONDITION occurred on or after April 16, 2012. This claimed condition does not qualify as a SPECIFIED PHYSICAL

CONDITION as set forth on the SPECIFIED PHYSICAL CONDITIONS MATRIX"[6];

- "The documentation submitted does not support the claimed SPECIFIED PHYSICAL CONDITION";

- "The medical records do not meet the criteria set forth in Level A2 of the Specified Conditions Matrix:  The medical records submitted do not support the assertions in the declaration concerning the time of onset of the claimed SPECIFIED PHYSICIAL CONDITION following the alleged exposure as set forth in the SPECIFIED PHYSICAL CONDITIONS MATRIX"; and

- "The third-party declaration does not meet the criteria set forth in Level A1 of the Specified Physical Conditions Matrix:  The third-party declaration was not signed by the individual submitting the third-party declaration."

As of the end of the Reporting Period, the response period had expired for 8,469 (sixty-seven percent (67%)) of claims having received a Notice of Defect.  The overall response rate was forty-five percent (45%).  The response rate for unrepresented claimants or Class Members was thirty-six percent (36%), while the response rate for represented claimants or Class Members was fifty percent (50%).  As previously reported, failure to respond to or cure all Defects identified within a Notice of Defect will not necessarily result in the denial of a claim, because only some aspects of a claimant's claim may be defective and listed in a Notice of Defect.  In that circumstance, even if the claimant failed to respond to the Notice of Defect or to cure all of the Defects listed in it, the claimant might still receive compensation. Specifically, of claimants or Class Members who received a Notice of Defect that included Defects identified during the Medical Record Review process, forty-one percent (41%) were subsequently found to qualify for SPC compensation.  Furthermore, a claimant who has a Defect in his or her claim for

---

[6] This Defect results from the Court's July 23, 2014 Order (Rec. doc. 12862) holding that all conditions first diagnosed after April 16, 2012 must be classified as Later-Manifested Physical Conditions.  Notably, the Claims Administrator does not automatically deny claims where the medical records initially submitted with the claim indicate a date of first diagnosis after April 16, 2012.  Rather, we issue a Notice of Defect to afford the Class Member the opportunity to provide medical record evidence of the diagnosis that pre-dates April 16, 2012.  If the Class Member does not submit any such records, the Class Members claim for SPC compensation would be denied, but the Class Member would be free to pursue compensation for that condition as an LMPC.

compensation for an SPC but has proven that he or she is a Class Member will receive a Notice of Determination for the PMCP benefit.  Hence, such Class Member can take advantage of that benefit while attempting to cure the Defects in his or her claim for SPC compensation.

### C.     Claims Processed Through Each Stage of Claims Review

As discussed above, a significant percentage of the POCFs submitted continue to contain one or more deficiencies or Defects.  These deficiencies and Defects not only increase the amount of time it takes for a claimant to reach the determination stage, but also increase the time it takes the Claims Administrator to process the claims.  The Claims Administrator must wait as long as sixty (60) or 120 days to receive the responses to the RAIs and/or Notices of Defects, respectively, and then must process the responses.

During the Reporting Period, the Claims Administrator has reviewed and/or processed the following numbers of claims through each of the following sequential stages in the claims review process:

| TABLE 5: CLAIM REVIEW PROCESSING | | |
|---|---|---|
| **Processing Stage** | **Number of Claims[7]** | |
| | **Reporting Period** | **Total** |
| Notice of Defect Gate One Process (Which Includes Class Membership Defects)[8] | 1,661 | 8,386 |
| Declaration Review Process[9] | 8,106 | 36,446 |
| RAI Process[10] | 1,892 | 28,864 |
| Medical Record Review Process[11] | 4,386 | 21,924 |
| Notice of Defect Gate Two Process[12] | 910 | 4,242 |

---

[7] Claims can move through Declaration Review (due to responses to RAI), the RAI Process (due to a defective response to an RAI-Missing, resulting in an RAI-Incomplete), and Medical Record Review (due to cure responses to originally defective claims) multiple times.

[8] Total claims with Gate One Defects, including basis of participation Defects, which received a Notice of Defect. Gate One Defects are those such as "Missing Declaration of Injury Document" or "Missing Medical Records Documentation," which prevent a claim from moving to Medical Record Review.

[9] Total claims for which an injury declaration review was completed.

[10] Total claims requiring an RAI that received a RAI.

[11] Total claims that were reviewed by Claims Administrator's Medical Record Review staff.

[12] Total claims that have completed Medical Record Review but that contain Defects preventing a final determination.

The Claims Administrator completed another 4,386 medical record reviews during the Reporting Period, bringing the total initial reviews completed since inception to 21,924.

### D.      Claims Sent Dispositive Correspondence for a Specified Physical Condition

The overall percentage of 2014 Claims and 2015 Claims reaching final determination has increased over the Reporting Period to seventy-nine percent (79%) and forty-two percent (42%), respectively.   The total number of claims approved for SPC compensation over the Reporting Period has continued to increase, due in part to the receipt of responses to previously pending RAIs and Notices of Defect for both the 2014 Claims and 2015 Claims, as well as improved processing speeds.

During the Reporting Period, we sent SPC Notices of Determination to 2,700 Class Members, approving them for $6,141,900 in compensation.   Since the inception of the Settlement, we sent SPC Notices of Determination to 9,399 Class Members, approving them for $20,647,950 in compensation.  Over this Reporting Period, the total percentage of finalized 2014 Claims moving to an approved determination increased to forty-three percent (43%).   Over this Reporting Period, the total percentage of finalized 2015 Claims moving to an approved determination increased to sixty-eight percent (68%).

The Claims Administrator also sent 607 "Approved with Defects" notices during the Reporting Period, bringing the total number of "Approved with Defects" notices sent since inception to 1,390.  An "Approved with Defects" notice is sent to a Class Member who has at least one valid SPC but one or more other SPCs that contain a Defect and might result in an award of higher compensation.   A Class Member receiving this notice can choose either to attempt to cure the Defects and thus possibly receive greater compensation or to waive that opportunity and proceed to determination on his or her valid SPC(s).   Four hundred sixty-nine

(469) of the 1,390 Class Members who received an "Approved with Defects" notice subsequently received an SPC Notice of Determination. The total compensation for the remaining 921 Class Members who received an "Approved with Defects" notice but who have not yet received an SPC Notice of Determination is $6,033,250. Therefore, the total amount allocated (by SPC Notices of Determination) and to be allocated (by "Approved with Defects" letters) is $26,681,200.

The Claims Administrator sent 721 Notices of Denial during the Reporting Period, for a total of 5,844 Notices of Denial from the inception of the Settlement through the end of the Reporting Period. All of these claims have been denied because the claimant did not qualify as a Class Member, because the claimant opted out of the settlement, and/or because the claimant did not meet the criteria established by the MSA to receive compensation for an SPC.

A summary of the dispositive correspondence sent on claims for compensation for an SPC is set forth in Table 6, below.

| TABLE 6: CLAIMS DISPOSITION AND CORRESPONDENCE | | |
|---|---|---|
| **Approvals** | **Reporting Period** | **Total** |
| SPC Notices of Determination Sent — 2014 Claims | 608 | 3,643 |
| SPC Notices of Determination Sent — 2015 Claims | 2,092 | 5,756 |
| SPC Notices of Determination Sent Total | 2,700 | 9,399 |
| **Denials** | **Reporting Period** | **Total** |
| Notices of Denial Sent — 2014 Claims | 216 | 3,870 |
| Notices of Denial Sent — 2015 Claims | 505 | 1,974 |
| Notices of Denial Sent — Total | 721 | 5,844 |

### E.   Claims Approved for SPC Compensation

During the Reporting Period, the amount of SPC compensation for which Class Members were approved increased, as reflected in Table 7, below.

| TABLE 7: APPROVED CLAIMS FOR SPCs[13] | | | | | | |
|---|---|---|---|---|---|---|
| SPC | Reporting Period Number Approved | Total Number Approved to Date | Reporting Period Amount Approved | Total Amount Approved to Date | Total "Approved with Defects" Amount Allocated to Date | Total Compensation Allocated to Date |
| A1 | 2,388 | 8,388 | $3,037,600 | $10,715,600 | $349,000 | $11,064,600 |
| A2 | 108 | 412 | $816,300 | $3,107,900 | $2,921,400 | $6,029,300 |
| A3 | 168 | 506 | $2,074,800 | $6,249,100 | $2,309,450 | $8,558,550 |
| A4 | 34 | 87 | $91,800 | $234,900 | $210,600 | $445,500 |
| B1 | 2 | 6 | $121,400 | $340,450 | $242,800 | $583,250 |
| | | | | | | |
| Total | 2,700 | 9,399 | $6,141,900 | $20,647,950 | $6,033,250 | $26,681,200 |

As set forth in the MSA, Class Members can only be paid once certain potential obligations to third parties are identified and resolved. The resolution of these obligations is dependent upon the responsiveness of both governmental agencies and private interests in replying to the Claims Administrator's requests for information and resolution. The obligations generally fall into two general categories: healthcare-related obligations and other obligations.

The resolution of healthcare obligations involves confirming whether a Class Member received benefits from a governmental payor (such as Medicare, Medicaid, or the Veterans' Administration) or a private healthcare plan for a compensable injury such that the Class Member must now reimburse those entities for the amounts they paid. The processing phases include (1) confirming entitlement with the government agency or private plan, (2) receiving claims from the agency or plan, (3) auditing those claims and disputing any that are unrelated to the Class Member's compensable injury, and (4) final resolution. Pursuant to the terms of the MSA, the Claims Administrator obtained an agreement from CMS establishing capped repayment amounts per SPC for Class Members who are or were beneficiaries of Medicare. The Claims Administrator also negotiated with state Medicaid agencies to cap recovery for Medicaid-

---

[13] Please note that the total volumes and total dollars approved are subject to change in each Reporting Period due to a later received and processed Requests for Review.

entitled Class Members.  Most states agreed to waive recovery rights for Class Members receiving compensation for an A1 claim.  Additionally, most state Medicaid agencies agreed to a twenty percent (20%) cap on and up to a thirty-five percent (35%) offset for fees and costs typically associated with their recovery, thereby allowing partial funding to the Class Member while full resolution is pending.  Processing times for Medicaid-entitled Class Members eligible for payment will vary. Each state has its own processing standards for responding to entitlement requests, producing claims, and finalizing lien amounts.

The resolution of non-healthcare-related obligations involves identifying the various types of obligations and working with the claimant or the claimant's representative to resolve them.  The processing phases include (1) identifying the obligation (through review of claim documents, PACER searches, and searches of the Louisiana Child Support Database), (2) sending correspondence seeking documentation that will resolve the complication, (3) reviewing the submitted documentation for sufficiency, and (4) final resolution.  The Claims Administrator tracks responses to its correspondence and sends a follow-up letter to non-responsive parties after thirty (30) to sixty (60) days have passed (with the length of time depending on the complication).  We will also send follow-up correspondence when the responses contain insufficient documentation.  The resolution time for payment complications varies and remains heavily dependent upon the timeliness and sufficiency of the third parties' responses to our information requests.  Through the end of the Reporting Period, the average age of claims awaiting payment from the date final determination was sent is sixty (60) days.

Once the obligations affecting a given claim are resolved and any liens or reimbursement obligations are paid, the Claims Administrator is able to disburse the balance of the Class Member's compensation.

### F.    Data Disclosure Form Submissions and Results

Data Disclosure Forms may be filed at any time during the claims review process by Natural Persons seeking information from the databases, data fields, and other documentary evidence provided by BP to the Claims Administrator.  Notably, Data Disclosure Forms may continue to be filed *after* the submission of a Proof Claim Form and therefore can be filed *after* the claims filing deadline of February 12, 2015.  Information provided via the submission of a Data Disclosure Form allows the Claims Administrator to make a determination concerning (a) the status of a Natural Person claiming to be a Clean-Up Worker and/or (b) a claim made by a Clean-Up Worker for compensation for a Specified Physical Condition.  *See* MSA § XXI.B.

During the Reporting Period, the Claims Administrator received 717 Data Disclosure Forms, for a total of 26,297 Data Disclosure Forms since the approval of the MSA.  The Claims Administrator responded to 874 Data Disclosure Forms during the Reporting Period, bringing the total number of responses to 31,709 since the approval of the MSA.  Of the 26,297 Data Disclosure Forms received, 20,360 were related to unique claimants, while 5,937 were Data Disclosure Forms with additional information filed by the same claimants.  Among the unique claimants filing Data Disclosure Forms, eighty-four (84%) were confirmed as Clean-Up Workers by finding a match in at least one employer database other than the "Training" database.  Twelve percent (12%) of those unique claimants were matched in the "Medical Encounters" database, while fourteen percent (14%) were matched in a medically relevant database, such as the "Traction" database or the "Injury/Illness" database.

### IV.    CLASS MEMBER SERVICES CENTER ACTIVITY

The Claims Administrator operates a Class Member Services Center located in New Orleans to communicate with Class Members and their attorneys and to assist them with filing

their claims.  During the Reporting Period, the Class Member Services Center received 13,273 telephone calls.  Since opening, the Class Member Services Center has received a total of 164,009 telephone calls.  The Class Member Services Center handled an average of 204 calls per day.  The average length of each telephone call was five minutes and twenty-five seconds, with an average wait time of nineteen (19) seconds.  The Class Member Services Center also received 64 emails during the Reporting Period, and thirteen (13) individuals visited the Class Member Services Center in person.

| TABLE 8: CLASS MEMBER SERVICES CENTER | | |
|---|---|---|
| | **Reporting Period** | **Total** |
| Calls Received | 13273 | 164,009 |
| Average Length of Call (min:sec) | 5:25 | 6:28 |
| Average Wait Time (min:sec) | 0:19 | 0:17 |
| Emails Received | 64 | 2,649 |
| Walk-Ins | 13 | 723 |

## V.  PERIODIC MEDICAL CONSULTATION PROGRAM

### A.  Class Members Eligibility for and Participation in the PMCP

During the Reporting Period, the Claims Administrator approved 997 claims for participation in the PMCP and mailed 3,291 PMCP Notices of Determination.  Since the inception of the Settlement, the total number of Class Members receiving a PMCP Notice of Determination is 22,230.  The Claims Administrator received requests for and scheduled 274 physician visits during the Reporting Period, and Class Members attended 186 appointments in the Reporting Period.

| TABLE 9: PERIODIC MEDICAL CONSULTATION PROGRAM | | |
|---|---|---|
| | **Reporting Period** | **Total** |
| Class Members Approved to Receive Physician Visits[14] | 997 | 23,223 |
| PMCP Notices of Determination Sent | 3,291 | 22,230 |
| Physician Visits Requested and Scheduled | 274 | 2,158 |
| Appointments Attended by Class Members | 186 | 1,943 |
| Annual Update Letters Sent to Class Members | 1,536 | 10,285 |

### B.    Provider Network

During the Reporting Period, the Claims Administrator added thirty-three (33) medical provider organizations, with thirty-three (33) delivery sites, to its network of providers established to provide certain covered services to Class Members who participate in the PMCP, bringing the total number of medical provider organizations to 104.  These medical provider organizations represent 184 service delivery sites.  As a result of these additions, eighty-eight percent (88%) of eligible Class Members resided within twenty-five (25) miles of a network provider at the conclusion of the Reporting Period.  The Claims Administrator continues to expand the medical provider network in its efforts to ensure that no Class Member will have to wait more than thirty (30) days or travel more than twenty-five (25) miles for an appointment.

### VI.    BACK-END LITIGATION OPTION

During the Reporting Period, five (5) Class Members filed Notices of Intent to Sue for compensation for a Later-Manifested Physical Condition, bringing the total number to 392 Class Members to date.  Of the five (5) Notices of Intent to Sue filed in the Reporting Period, none were approved, four (4) contained deficiencies that could be corrected by the Class Member, and one (1) was denied.[15]

---

[14] The total physician visits will exceed the total number of Class Members qualified for the PMCP benefit, as Class Members may be referred to specialists and will eventually be eligible for subsequent primary visits.

[15] Two (2) additional Notices of Intent to Sue received in the reporting period were reviewed and denied during this Reporting Period.

| TABLE 10: CLAIMS FOR LATER-MANIFESTED PHYSICAL CONDITIONS | | |
|---|---|---|
| | Reporting Period | Total |
| Notices of Intent to Sue Filed | 5 | 392 |
| Notices of Intent to Sue Approved | 0 | 36 |
| Notices of Intent to Sue Denied | 1 | 168 |
| Notices of Intent to Sue Deficient[16] | 4 | 188 |

Of the 168 claims denied to date, ninety-eight percent (98%) were denied because the conditions claimed were diagnosed on or before April 16, 2012 and therefore could not be claimed as Later-Manifested Physical Conditions.  The other reasons for denial include that the claim was precluded by previously filed workers' compensation claim and  that the conditions claimed were mental and/or physchological conditions.

Of the 188 defective claims to date, the three (3) most common material Defects identified are as follows:

- "Identification of BP defendants in Section VII is missing";

- "You must provide medical records indicating a date of diagnosis that is after April 16, 2012 or a completed Physician's Certification Form"; and

- "The date on which the claimed Later-Manifested Physical Condition(s) were first diagnosed in Section VI.A.2 is missing."

---

[16] Class Members who cure Defects within their original Notice of Intent to Sue will then be classified as "Approved" or "Denied" in future reporting, based on the responses received.

| TABLE 11: APPROVED NOTICES OF INTENT TO SUE | | |
|---|---|---|
| **Mediation Elections** | **Reporting Period** | **Total** |
| Later-Manifested Physical Condition Claims for Which at Least One BP Defendant Elected Mediation | 0 | 0 |
| Later-Manifested Physical Condition Claims Pending a Decision from One or More BP Defendants Regarding Mediation | 0 | 0 |
| Later-Manifested Physical Condition Claims for Which No BP Defendants Elected Mediation | 0 | 35 |
| | | |
| **TOTAL:** | **0** | **35** |
| | | |
| **Results of Mediation** | **Reporting Period** | **Total** |
| Later-Manifested Physical Condition Claims Settled by Mediation | 0 | 0 |
| Later-Manifested Physical Condition Claims Settled by Mediation as to One but Not All BP Defendants Listed in the Notice of Intent to Sue | 0 | 0 |
| Later-Manifested Physical Condition Claims Mediated but Not Settled | 0 | 0 |
| | | |
| **TOTAL CLAIMS MEDIATED:** | **0** | **0** |
| | | |
| **Back-End Litigation Option Lawsuit** | **Reporting Period** | **Total** |
| Later-Manifested Physical Condition Claims for Which No BP Defendant Elected Mediation | 0 | 35 |
| Later-Manifested Physical Condition Claims Mediated but Not Settled | 0 | 0 |
| | | |
| **TOTAL CLASS MEMBERS ELIGIBLE TO FILE A BACK-END LITIGATION OPTION LAWSUIT**[17] | **0** | **5** |

Out of the thirty-five (35) approved Notices of Intent to Sue to date, the BP Defendants did not

elect to mediate any of the claims.  During the Reporting Period, no Class Members became

---

[17] The total eligible for BELO over the life of the project was thirty-five (35). However, of the thirty-five (35), only eighteen (18) are currently eligible for BELO. The other seventeen (17) claims are no longer within the six-month (6-month) timeframe for properly and timely filing a Back-End Litigation Option Lawsuit.

eligible to file a Back-End Litigation Option Lawsuit, bringing the total number of Class Members eligible to file a Back-End Litigation Option Lawsuit to five (5).

## VII.   GULF REGION HEALTH OUTREACH PROGRAM

### A.   Funding and Coordinating Committee Activities

In accordance with Section IX of the MSA, the Gulf Region Health Outreach Program ("GRHOP") was established in May 2012 to expand capacity for and access to high quality, sustainable, community-based healthcare services, including primary care, behavioral and mental health care and environmental medicine, in the Gulf Coast communities in Louisiana, Mississippi, Alabama, and the Florida Panhandle.  The program consists of five (5) integrated projects: the Primary Care Capacity Project ("PCCP"), Community Involvement ("CI"), the Mental and Behavioral Health Capacity Project ("MBHCP"), the Environmental Health Capacity and Literacy Project ("EHCLP"), and the Community Health Workers Training Project ("CHWTP").  As of the end of the Reporting Period, the Claims Administrator disbursed $93,689,744 to the projects, as detailed in the chart below.

| TABLE 13: GRHOP | |
|---|---|
| **Project** | **Funding to Date** |
| Primary Care Capacity Project | $43,406,841 |
| Community Involvement | $2,473,406 |
| Mental and Behavioral Health Capacity Project ((Louisiana State University Health Sciences Center) | $12,913,418 |
| Mental and Behavioral Health Capacity Project (University of Southern Mississippi) | $7,425,213 |
| Mental and Behavioral Health Capacity Project (University of South Alabama) | $7,425,216 |
| Mental and Behavioral Health Capacity Project (University of West Florida) | $4,519,696 |
| Environmental Health Capacity and Literacy Project | $12,021,670 |
| Community Health Workers Training Project | $3,504,284 |
| | |
| **TOTAL:** | **$93,689,744** |

One additional disbursement is scheduled for May 2016, which will bring the total funding of the GRHOP to $105 million.

The GRHOP is governed by a Coordinating Committee that continues to function in a cooperative and integrated manner, with quarterly in-person meetings around the Gulf Coast, as well as monthly conference calls. These quarterly meetings offer the grantees the opportunity to share their progress, discuss challenges faced, and collaborate with their partners to work through issues that affect the GRHOP as a whole.

The Claims Administrator held a quarterly meeting on February 26, 2016, in Gulfport, Mississippi. This meeting encompassed discussion on a variety of topics, including, but not limited to, the activities of the five (5) GRHOP subcommittees — the Data Sharing Subcommittee, Evaluation Subcommittee, Health Promotions Subcommittee, Newsletter Subcommittee, and Publication Subcommittee — formed during the July 31, 2014 quarterly meeting. These subcommittees work to increase collaboration and effectiveness of the projects, as well as assure positive impacts and sustainability within the communities which the GRHOP

affects.[18]   The monthly conference calls are also held to promote open conversation between projects regarding updates, progression, and collaboration.

The Coordinating Committee also requested the Claims Administrator to establish a GRHOP website.  This website contains detailed descriptions and notable accomplishments of each project, as well as information regarding the GRHOP Coordinating Committee, news/events, and publications.  The website launched on July 3, 2014 and can be publicly accessed at www.grhop.org.

B.    **GRHOP Project Updates**

Each GRHOP project has made substantial progress in achieving the goals set forth in their respective Grant Proposals.  Some notable accomplishments of the projects include:

- The **Primary Care Capacity Project**, led by the Louisiana Public Health Institute ("LPHI"), which has:

    o Worked towards its goal to expand access to integrated high quality, sustainable, community-based primary care with linkages to specialty mental and behavioral health, and environmental and occupational health services in the implicated seventeen (17) Gulf Coast counties and parishes. The key program strategies include:

        ▪ Continuing to build community health center capacity through direct funding and customized group and individual technical assistance through cooperative agreements to seventeen (17) community health center operators (with over eighty (80) site locations) across all seventeen (17) Gulf Coast counties and parishes;

        ▪ Continuing to support and advance health systems development through direct funding for health information exchanges, infrastructure investments and technical assistance; and

        ▪ Enhancing the capacity of communities and building strategic partnerships to improve health through funding, partnership engagement, and technical assistance to non-clinical partners through State Partners Agreements with the four (4) State Primary Care Associations; and the Community-Centered Health

---

[18] The Claims Administrator will hold its next quarterly meeting on June 3, 2016 in New Orleans, Louisiana. The Claims Administrator will report on that meeting in its third quarterly report of 2016.

Home Demonstration Project with five (5) community health centers in partnership with the Prevention Institute.

- **Alliance Institute's** outreach on behalf of the GRHOP and its partners has reached over 1,500 individuals across Louisiana, Mississippi, Alabama, and Florida.   Alliance Institute, the grantee responsible for Community Involvement, has:

  o STEPs Coalition Cherokee Concerned Citizens Group in Bayou Casotte is beginning to monitor air quality and send their findings to the Mississippi Department of Environmental Quality.

  o After having discussions with the Mayor and city of Gulfport, Education, Economics, Environmental, Climate and Health Organization ("EEECHO") was given 2.5 acres to build a community garden and education center. EEECHO is working with Master Gardener James Franklin to develop a plan for their hydroponic garden.

  o In January 2016, the United Houma Nation started a "How's Your Five," a health program that engages clients by asking about how their work, love, play, eating and sleep is going.

  o EEECHO is establishing environmental and emergency preparedness ministries in churches to educate communities on disasters.

  o NAACP Panhandle engaged community members in impoverished areas along the Panhandle of Florida in community gardening. Residents who live in food deserts are learning soil testing and organic gardening skills.

  o Emerging ChangeMakers Network ("ECMN") is working with all local schools to get them to commit to having a garden plot in the ECMN community garden, located on the site of their farmer's market and food truck stop.  Each school will work with the Master Gardener to plan out their garden. The principals from each school come to the park and raise their school flag, which will fly over the farmer's market until the end of the season.

  o Zion Travelers Community Cooperative held a walk event for residents living in Phoenix, LA.

- The **Environmental Health Capacity and Literacy Project**, with its grantee being Tulane University, has achieved the following:

  o EHCLP organized a presentation entitled, "Advancing Health Policy through Public Health Capacity Building in Primary Care, Mental Health, and Environmental Medicine" on GRHOP programs in Louisiana for the Louisiana Public Health Association Meeting on April 1, 2016 in New Orleans, Louisiana.  Representatives from EHCLP, PCCP, MBHCP-Louisiana, Association of Occupational and Environmental Clinics ("AOEC"), and the GRHOP Coordinating Committee presented to an audience of 100 people.

31

o AOEC conducted three environmental and occupational medicine sessions at the Regional Care Collaborative ("RCC") in Gulfport, Mississippi, on February 25. AOEC provided speakers for three (3) back-to-back fifty-minute (50-minute) sessions, offering both CME and CEU credits. Eleven participants attended. AOEC conducted an in-service for PanCare in Panama City, Florida on March 18 on Ergonomics and Health Care Professionals with thirty-six (36) staff members in attendance. Ten (10) patients were seen for clinical evaluation in Alabama.

o The Fussy Baby Network New Orleans & Gulf Coast opened seven new cases, serving a total of twenty-seven (27) families during the quarter, with sixty-four (64) home visits, clinic sessions, and phone sessions. Thirty-two (32) additional families (nine (9) of them new) were served through nine (9) parent support groups.

o The Emerging Scholars Environmental Health Sciences Academies at Tulane, University of South Alabama, and University of West Florida finalized program logistics and started their review of applications for summer programs.

o EHCLP hosted an intensive workshop on cancer for thirty-five (35) placed Community Healthy Workers ("CHW") and their supervisors from Louisiana, Alabama, Mississippi and Florida at Tulane University in February. Local and national cancer experts presented on patient navigation, pain and palliative care, prevention and early detection, policy interventions and in-depth presentations on the four most common types of cancer (lung, breast, colorectal and prostate). Four (4) CHWs also presented on their daily work in the field.

• The **Community Health Workers Training Project**, directed by the University of South Alabama's Coastal Resource and Resiliency Center ("CRRC"), has achieved the following:

o Keith Nicholls, CHWTP Project Leader and CRRC Senior Associate Director, and Brandi Gilliam, CRRC Program Specialist, delivered a paper entitled, "The Role of Community Health Workers in Emergency Management: Conceptions of Community," at the Oil Spill and Ecosystem Science Conference, Marriott Waterfront, Tampa, Florida, February 4, 2016.

o Keith Nicholls, Janel Lowman, CRRC Training and Outreach Coordinator, and Selena Coleman, CRRC Program Specialist, participated in LPHI's 4th Annual Regional Care Collaborative Conference, "Sustaining Patient-Centered Medical Home, Improving Population Health," Gulfport, Mississippi, February 24-25, 2016.

o Selena Coleman facilitated a panel discussion entitled, "Community Health Workers: A View from the Field," at LPHI's Regional Care Collaborative, Gulfport, Mississippi, February 25, 2016.

- o CRRC conducted a two-week (2-week) training session, "Basic Training for Community Health Workers," for twenty (20) trainees, New Orleans Marriott, New Orleans, Louisiana, March 6-18, 2016.

- The **Mental and Behavioral Health Capacity Project**, implemented by a coalition of four (4) academic institutions (Louisiana State University Health Sciences Center ("MBHCP-LA"), the University of Southern Mississippi ("MBHCP-MS"), the University of South Alabama ("MBHCP-AL"), and the University of West Florida ("MBHCP-FL")), has achieved the following:

  - o MBHCP-LA has:

    - Continued to have success in developing and implementing efficient, high quality integrated care services in communities with prior disparities in care, with improvement in mental and physical health symptoms and with high client and clinic satisfaction

    - Provided supportive services in schools with students and consultation with parents, school counselors, teachers, and other school staff leading towards sustainability of helpful services;

    - Continued collaboration with PCCP; made progress toward the long term goal of integrating mental and behavioral health care into electronic medical records at affiliated clinics, even as several clinics are transitioning to a new electronic medical records system;

    - Continued growth of the young child (0-5 year) program in Federally Qualified Health Centers ("FQHCs") and community clinics, schools, and early childhood programs in response to clinician and parental concerns and in issues raised by national and local pediatric and child psychiatry associations and providers;

    - Implemented and presented on a collaborative effort with multiple components of response and recovery, which includes other GRHOP projects, for a full day of presentations at the Gulf of Mexico Oil Spill and Ecosystem Science meeting in February 2016; and

    - Increased emphasis on sustainability through grant writing efforts and contract development. Through evaluation efforts, the project has identified three main areas to increase behavioral health service capacity in rural clinics; these include specialized services, consultation efforts, and coalition building.

  - o MBHCP-MS has:

    - Continued to work with the partnering FQHCs to improve access to mental health services to the residents of coastal Mississippi;

- Developed a Patient Centered Medical Home ("PCMH") compliant integrated care plan in the FQHC's electronic health record for use by all providers;

- Facilitated collaborations between various community agencies and the partnering FQHC to improve information sharing and patient care for individuals with a serious mental illness;

- Participated in both FQHC leadership and clinical level staff meetings to address needs, concerns and service provision;

- Participated in billing workgroups designed to identify mechanisms that can sustain the current service provisions;

- Completed institutional review board approvals to begin research efforts designed to investigate patient outcomes and identify the most effective program components;

- Expanded available client services by implementing programs for children with ADHD and including therapeutic recreation services in the treatment milieu for chronic care patients; and

- Advanced initiatives designed to improve collaboration and data sharing between coastal agencies.

o MBHCP-AL has:

- During this quarter, provided services to over 400 new adult clients and almost thirty (30) new child clients in the FQHCs and its newly added system, the University of South Alabama Family Medicine Clinic.

- Made numerous efforts to create a sustainable Behavioral Health Department at the Mobile County Health Department, including provider presentations, Electronic Health Record ("EHR") standardizations and training, regular staff meetings, and procedure development and implementation.

- Through three (3) of their fifthyear Child Psychiatry Fellows, the project has serviced nearly 200 new clients in these three (3) months. They provide services to most of their clients for multiple sessions.

- Hosted a two-day (2-day) Brief Strategic Family Therapy workshop for thirty (30) people, including visiting psychologists from other Alabama universities, doctoral and undergraduate students, and USA faculty.

- On January 5, 2016, executed a $75,000 sub-award agreement with the Mobile County Public School System ("MCPSS"). This agreement provides funds for the MCPSS to hire a licensed clinical social worker to provide behavioral health services within the school system starting in the fall of 2016.

- Through their contract with The Family Counseling Services of Mobile, Inc. d/b/a/ Lifelines Counseling Center, they have facilitated nineteen (19) Question, Persuade, Refer (QPR) trainings to individuals from both Baldwin and Mobile Counties. Some of the agencies where trainings were held include Chickasaw High School, Mobile Housing Board, Salvation Army Safe Haven, South Baldwin Reginal Center, The University of South Alabama, Volunteers of America, and the Alabama School of Math and Science.

- Held one (1) Mental Health First Aid class and added five (5) upcoming classes to their schedule.

- Added another psychology doctoral student to the field to provide integrated behavioral health services at a new clinic location within one (1) of their FQHCs.

- Given numerous presentations at multiple sites (local, regional, and national venues). See below for those by Dr. Jennifer Langhinrichsen-Rohling, Project Leader:

  - ✓ **Langhinrichsen-Rohling, J.** (2016, March 20th). *Intersections Between Psychology and Environmental Science.* Presentation at the 3rd Annual Emerging Scholars Teacher's Workshop. Mobile, AL.
  - ✓ **Langhinrichsen-Rohling, J.** (2016, March 14th). *Ensuring Family Resiliency.* Developed module and presented as part of the Small Business Resiliency Workshop being created by the American Red Cross. Initial pilot of program, Mobile, AL.
  - ✓ **Langhinrichsen-Rohling, J.,** Friend, J., & Wornell, C. (2016, February 25th). *Sustainable Integrated Health Care: Efforts of the Alabama Mental and Behavioral Health Capacity Project.* Presentation at the LPHI Regional Care Collaborative. Long Beach, MS.
  - ✓ Hughes, J. T., Sarpy, S. A., **Langhinrichsen-Rohling, J.,** & Rosen, J. (2016, February 3rd). *NIEHS/SAMHSA Gulf Responder Resilience Training Initiative: Lessons Learned.* Presentation at the 2016 Gulf of Mexico Oil Spill and Ecosystem Conference. Tampa, FL.
  - ✓ Hughes, J. T., Sarpy, S. A., **Langhinrichsen-Rohling, J.,** & Rosen, J. (2016, February 3rd). *NIEHS/SAMHSA Gulf Responder Resilience Training Initiative: Lessons Learned.* Presentation at the 2016 Gulf of Mexico Oil Spill and Ecosystem Conference. Tampa, FL.
  - ✓ **Langhinrichsen-Rohling, J.,** Wornell, C., & Francois, S. (2016, February 4th). *The Electronic Health Record: The Nexus of Integrated Mental and Behavioral Health Care.* Presentation at the 2016 Gulf of Mexico Oil Spill and Ecosystem Conference. Tampa, FL.

- ○ MBHCP-FL has:

  - Continued Studer Training with all FQHCs in their grant area;

- Worked with an independent provider in Pensacola, Florida, to sustain the position at Pensacola State College;

- Worked with the Children's Home Society to execute an Memorandum of Understanding ("MOU") to sustain services in Santa Rosa County Schools;

- Presented a portion of the MBHCP Sustainability break out at the Regional Care Collaborative hosted by LPHI.

## C. GULF REGION HEALTH OUTREACH PROGRAM LIBRARY

In accordance with Section IX.H of the MSA, the Claims Administrator has established a publicly accessible online library, which exists as a repository of information regarding information related to the health effects of the *Deepwater Horizon* incident, including, but not limited to: (a) the composition, quantity, fate, and transport of oil, other hydrocarbons, and other substances released from the MC252 Well and the *Deepwater Horizon* and the dispersants and contaminants used in Response Activities; (b) health risks and health studies relating to exposure to oil, other hydrocarbons, and other substances released from the MC252 Well and the *Deepwater Horizon* and the dispersants and decontaminants used in Response Activities; (c) the nature, content, and scope of in situ burning performed during the Response Activities; and (d) occupational safety, worker production, and preventative measures for Clean-up Workers.

The library houses 190,357 relevant documents, each tagged with a specific search category based on the type of information identified within the MSA. The Claims Administrator will continue to add Library Materials in accordance with the MSA.

Respectfully submitted,

*DEEPWATER HORIZON* MEDICAL BENEFITS
CLAIMS ADMINISTRATOR


By: /s/ Matthew L. Garretson
       Matthew L. Garretson

36

## <u>CERTIFICATE OF SERVICE</u>

I hereby certify that the above and foregoing document has been served on All Counsel by electronically uploading the same to Lexis Nexis File & Serve in accordance with Pretrial Order No. 12, and that the foregoing was electronically filed with the Clerk of Court of the United States District Court for the Eastern District of Louisiana by using the CM/ECF System, which will send a notice of the electronic filing in accordance with the procedures established in MDL 2179, on this 25th day of May, 2016.

Respectfully submitted,

*/s/ Matthew L. Garretson*
Matthew L. Garretson