UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF LOUISIANA

| | | |
|---|---|---|
| IN RE:  OIL SPILL BY THE OIL RIG | : | MDL 2179 |
| "DEEPWATER HORIZON" IN THE | : | |
| GULF OF MEXICO, ON APRIL 20, 2010 | : | Section J |
| | : | |
| This Document Applies to: | : | Judge Barbier |
| | : | |
| *No. 12-970, Bon Secour Fisheries, Inc., et* | : | Mag. Judge Shushan |
| *al. v. BP Exploration & Production Inc., et al.* | : | |

MEMORANDUM IN SUPPORT OF MOTION OF THE DHECC
FOR RETURN OF PAYMENTS MADE TO MAXIM, LC., BRIANTE PALAZAENO  AND OTHERS

Claims Administrator Patrick Juneau seeks to have Maxim, LC ("Maxim") and its instrumentality, Briante Palazaeno ("Palazaeno"), return payments made by the Deepwater Horizon Economic Claims Center ("DHECC").  Maxim, whose named registered agent for service was actually Palazaeno's deceased dog, filed a Business Economic Loss ("BEL") claim with the DHECC for economic loss incurred by its restaurant, Leonardo Trattoria.  At the time of the claim filing, Shelly Licciardi ("Licciardi") was listed by the Louisiana Secretary of State as the managing member of Maxim, but it was her then dating partner, Palazaeno, who was responsible for filing the BEL claim.  Licciardi had no knowledge of the DHECC claim filing.  Palazaeno submitted forged documents in support of Maxim's claim and provided false financial data that misrepresented the company's profits and losses. This resulted in a significant increase in Maxim's eligible claim amount.

Relying on the misrepresentations by Maxim and Palazaeno, the DHECC paid Maxim $245,796.90.  The DHECC seeks to have Maxim and Palazaeno return this money paid, and to have professionals who benefitted from these unjustified payments similarly return such payments.

Discussions with counsel for Maxim and Palazaeno have not resolved the issues presented in this motion.[1]

## A. *Background*

The Claims Administrator has authority to ensure the integrity of the DHECC by initiating clawback proceedings of fraudulent claims. *See* Order of May 6, 2015 (Rec. Doc. 14543); Settlement Agreement at ¶ 4.3.10. The Court retains continuing jurisdiction over the Settlement Agreement. Settlement Agreement at ¶¶ 4.4.7 and 18.1. Disputes concerning enforcement of the Settlement Agreement are to be resolved by motion to the Court. *Id*.

## B. *The DHECC Claims*

Maxim, organized as a Louisiana limited liability company on June 18, 2007, and located in New Orleans, filed a BEL claim with the DHECC on November 19, 2012. It described its business as "fine dining restaurant, open for lunch and dinner. Italian and Sicilian cuisine. Located in New Orleans' CBD/Warehouse District neighborhood," asserting that its business qualifies within the program's tourism definition. Ex. A. It asked the Claims Administrator to select the optimum benchmark and compensation period for its claim. Maxim's BEL claim form (Purple Form) was electronically signed by "Maxim LC dba

---

[1] In January 2015, the manager of Maxim, as designated by the Secretary of State, was served with a subpoena for financial/corporate records of the entity. No records were produced. In April 2015, Maxim was served again with a subpoena for records. Attorney Richard L. Traina ("Traina") contacted Freeh Group attorneys and said he represented Maxim, and would work with Maxim's management to provide the records subpoenaed. The due date for production passed, but Traina assured that the company was accumulating the records responsive to the subpoena. Shortly after the due date, Freeh Group investigators attempted to serve Palazaeno with a subpoena for a deposition. The next day Traina forwarded an email stating Maxim's management informed him there were no records in their possession responsive to the subpoena. He also said he was no longer representing the entity. Palazaeno was subpoenaed, but never appeared for his deposition, no one contacted Freeh Group on his behalf and no other attorney notified the Freeh Group that they were representing Maxim. On June 11, 2015, Maxim filed a purported affidavit of dissolution, listing Julio Archila ("Archila") as member; Archila had no knowledge he was listed as a member, this issue will later be discussed in further detail.

Leonardo Trattoria."  Ex. B.  Prior to submitting the purple form, Maxim submitted two registration forms, one on July 20, 2012 signed electronically by "Leonardo Trattoria," the other on October 11, 2012, signed electronically by Traina, attorney for Maxim.  Ex. A, Ex. C. Each of the above documents listed Licciardi as the authorized business representative. With her attorney present, DHECC investigators interviewed Licciardi on August 25, 2015; Licciardi proffered that she did not actually sign any of the above referenced documents, nor authorize anyone, including Traina, to sign on her or the company's behalf.

> 1.   <u>General Requirements for Business Economic Loss Claims</u>

The Settlement Agreement requires business claimants to provide the DHECC with, among other documents, federal tax returns and monthly P&Ls for the selected Benchmark Period, 2010, and, at times, 2011.  *See* Settlement Agreement Ex. 4A at ¶¶ 3-4.

The DHECC calculates compensation using the data provided by claimants.  The DHECC permits claimants, and the professionals retained by them, to create monthly P&Ls when the claimants did not maintain such information during their normal course of business.  *See* DHECC Policy 286.  The P&Ls must be based on contemporaneous source documents, such as bank statements, invoices, and purchase orders, and must show the actual monthly revenues and expenses.  *See* DHECC Policy 355 v.2.

The BEL compensation framework has two steps.  The first step compensates claimants for certain reductions in variable profit by comparing variable profits for three or more consecutive months between May and December 2010 with variable profits for those same months during a Benchmark Period.  The second step compensates claimants for the incremental profits they might have generated absent the oil spill relative to revenue from a Benchmark Period.  Claimants also receive a risk transfer premium.  The DHECC

calculates the compensation using data provided by claimants.

2. Business Economic Loss Documentation

In support of its claim, Maxim provided Forms 1040, U.S. Individual Income Tax Returns for the years 2008 through 2011 in the name of Licciardi. Ex D1 – D4.  Each return contained a Schedule C, Profit or Loss from a Business, reporting income and expenses earned from Maxim.  With the exception of 2011, each Schedule C showed a loss from business operations.  None of the returns contained a signature for the taxpayer.  Each return identified David Sewell, CPA ("Sewell") as preparer and listed a preparation date of November 1, 2012, four days before they were uploaded to the DHECC portal.

A Form 1040X, Amended Individual Income Tax Return was included with the 2008 – 2010 returns.  No amended return was submitted for 2011.  "Part II" of Form 1040X requires an explanation for changes made on the return.  Each amended return contained the same explanation: "Income and Expenses for a business [Maxim] were not included on the original return.  A Schedule C has been included on the amended return.  Form 1040, Line 12 has been adjusted to reflect the loss from the Schedule C."  Ex. D1 – D3.

In her aforementioned interview, Licciardi stated she was contacted by Palazaeno, who told her she needed to meet with him to prepare income tax returns for Maxim.[2] Licciardi agreed to authorize IRS Form 4506-T Request for Transcript of Income Tax Returns for 2008 – 2011. Ex. E.  The transcript for 2008 was the only one that identified an amended tax return as being filed.  It was received September 13, 2012, approximately two

---

[2] Licciardi stated she had been trying to remove her name from Maxim corporate records for several years after her relationship with Palazaeno ended sometime prior to 2010.  Although she had no true ownership interest in Maxim, and had not previously filed any returns for Maxim, she agreed to his request so as to remove her name from the company records.  Palazaeno did not tell her the returns were needed to file a claim with the DHECC.

months before the November 5, 2012 date the returns were uploaded to the DHECC Portal. There was no reporting of amended returns filed in either 2009 or 2010.  The transcript reflected no return received for 2011.  However, the transcripts for each of the years 2008 – 2010 reported adjusted gross income losses that matched each of the amended returns submitted.  See Ex. F.

Maxim submitted P&L's for years 2008 through 2011 to support its claim.  Ex. G1 - G4.  Maxim had initially submitted monthly sales reports when then member, Leonardo Danielle ("Danielle"), filed a Gulf Coast Claims Facility ("GCCF") claim on behalf of the company.[3]  When asked by the DHECC about the 2010 reports submitted in the GCCF claim, Traina replied that they were submitted by a rogue former member of Maxim (Danielle), who absconded with the funds.  Ex. H.  Further, Traina advised that "his client" (Palazaeno was not identified) advised him that the information submitted by Danielle to the GCCF was incorrect, and the correct information was shown in the 2010 profit and loss statements. *Id*.  Traina asked CPA Sewell to prepare the P&L's.  The evidence shows that Sewell relied solely on Palazaeno for the information that was entered on the P&L's.

In addition, Maxim also submitted copies of various corporate filings that were sent to the Louisiana Secretary of State to the DHECC portal.  This includes the company's initial report (Ex. I), annual reports (Ex. J), and change of member request filings (Ex. K).  The documents were purportedly signed by Licciardi.

---

[3] Maxim had initially filed an emergency assistance claim with the Gulf Coast Claims Facility ("GCCF").  This filing was made pro se by Leonardo Danielle on behalf of Maxim/Leonardo Trattoria on November 23, 2010. Danielle submitted monthly sales reports for January through September 2010 in support of the GCCF claim. He also submitted IRS correspondence showing Maxim's EIN, a voided business check, Articles of Incorporation, and a copy of Licciardi's driver's license. On December 7, 2010, the GCCF made an emergency advance payment award of $150,000 for six months of lost income. See Ex. H.

3.     DHECC Calculation and Payments

The DHECC relied on the data provided by Maxim, through Palazaeno, to calculate the claims.  The DHECC selected 2009 as the only Benchmark Period, selecting May through December 2010 as the compensation periods for both Step 1 and Step 2.  The DHECC awarded and paid Maxim $245,796.90. Ex. L.  As counsel for Maxim, the law firm of Mollere, Flanagan, & Landry, LLC (through counsel Richard Traina) received attorney's fees totaling $62,614.22 for these claims. Ex. M, Ex. N.

## C. *Evidence of the Fraudulent Claims*

The totality of the record shows there is no genuine issue as to any material fact and that the DHECC is entitled to a judgment as a matter of law.  *See* Order & Reasons on Special Master's Motion for Return of Payment at 19 (Doc. Rec. 12794) ("Order and Reasons").

It is clear from the evidence that Palazaeno is responsible for the fraudulent claim filed on behalf of Maxim.  In other words, but for Palazaeno's actions throughout the filing process, the program would not have incurred damage.  Palazaeno retained Traina to represent Maxim throughout the claims process.  Palazaeno hired Sewell as CPA to prepare the financial documents necessary to file the claim.  Palazaeno also supplied the program with all of Maxim's relevant corporate filings.  In some instances, a forged signature, purporting to be Shelly Licciardi's, appeared on the submitted documents, unbeknownst to her.  Ex. O

The financial statements submitted by Palazaeno falsely represent Maxim's financial status during the benchmark and compensation years.  They are wholly inconsistent with bank records and reported sales tax figures obtained by the DHECC.  Misrepresentations contained within these financial documents significantly inflated Maxim's award amount.

Licciardi was unaware of Maxim's DHECC filing or the award received.  She did not receive any proceeds from it. Ex. O.

1. Palazaeno controlled the corporate existence of Maxim.

The evidence shows that Palazaeno created the entity Maxim in 2007 to open what became the Leonardo Trattoria restaurant in the New Orleans Warehouse District.  In her interview Licciardi, Palazaeno's then girlfriend, stated she filed corporate documents, at Palazaeno's request, listing her name as the managing member of the company.  Palazaeno told her at that time he could not have a liquor license or put his name on any documents regarding the restaurant.  He did not explain why.  It is clear that Licciardi was the owner in name only; Palazaeno controlled and operated the company.  Exerting his control, Palazaeno filed the BEL claim on behalf of Maxim.

An online search of the Louisiana Secretary of State's website shows that Maxim was purportedly dissolved via affidavit of dissolution on June 11, 2015. Ex. P. However, Maxim was not actually dissolved, because its affidavit to dissolve was invalid.[4]  The only purported signature on Maxim's affidavit was an electronic signature of Julio Archila ("Archila"), a patron of the restaurant who was apparently "duped" by Palazaeno, as approving the dissolution. But during his deposition, voluntarily given to the DHECC on January 19, 2016, Archila plainly stated he never signed that document, nor did he authorize anyone to sign it on his behalf; moreover, he had never agreed to become a member of Maxim.  Ex. Q at 78 – 82.[5]

Evidence of Palazaeno's control over Maxim is further shown through his addition

---

[4] In order for a limited liability company in Louisiana to dissolve through affidavit, all members or organizer of the LLC (if no membership interests have been issued) must execute the affidavit.  La. R.S. 12:1335.1.
[5] The use of Archila's name on corporate documents will be discussed later in this memorandum.

as registered agent of the name "Primo Massimiliano", which begins to appear on Maxim's corporate filings as of the July 12, 2013.  When Archila was asked during his deposition whether he recognized that name, he stated that "Primo Massimiliano" <u>was Palazaeno's dog that had passed away two years ago.</u>  Ex. Q (74:15-20). Licciardi confirmed the same recognition of the name "Massimiliano" as being Palazaeno's dog during her interview. "Massimiliano" purportedly agreed to become an agent of Maxim on July 12, 2013 via Notice of Change (Ex. R) and the dog purportedly provided its electronic signature on Maxim's 2014 Annual report, listing its email address to be the same as Palazaeno's, "briante1492@ymail.com."

2. Palazaeno submitted false financial data in order to
   <u>inflate the amount of Maxim's BEL claim award.</u>

Palazaeno submitted fraudulent financial data to the DHECC that was neither accurate, nor a genuine representation of the company's financial earnings.  The fraudulent data over reported the company's sales during the benchmark period, shifted variable profit in order to optimize any award amount received by Maxim, and employed a uniform percentage each year for cost of goods sold to sales.

The BEL program requires that businesses must provide profit and loss statements. The claimants further declare under penalty of perjury that any supporting documents submitted in connection with the claim are true, accurate, and complete.  Maxim submitted profit and loss statements for the years 2008 through 2011, requesting the Claims Administrator to select the optimal benchmark period.

Maxim's P&L's and other financial statements submitted to the program were not a contemporaneous accounting of the company's finances during the relevant years. Evidence of this is illustrated by Exhibit S, a copy of Maxim's 2010 P&L with added DHECC

computations.  Highlighted in red above the "Sales" line is a computation comparing each month's sales as a percentage of the annual total sales (Refer to [A] in Ex. S).  These ratios show that the monthly revenue detailed to the dollar is an even percentage of the annual total revenue, a pattern not indicative of contemporaneous restaurant sales.  Furthermore, during the four non-compensation months of January – April, exactly 70% of Maxim's annual sales were reported (Refer to "Cumulative" computation percentage in [B] of Ex. S). The remaining eight compensation months (May – December) reported a total of exactly 30% of annual sales. (See [B] of Exhibit S).  A substantial sales shift out of the compensation period increases an award amount in most instances.[6]

The annual sales figure as reported on the 2010 P&L, first uploaded to the DHECC portal on October 11, 2012, is $387,617.  This amount matches the gross sales amount on the 2010 Form 1040X Amended Individual Tax Return - Schedule C which lists a preparation date of November 1, 2012 and was first uploaded to the DHECC Portal on November 5, 2012.  Ex. D 1.  As mentioned above, the second page of this amended return states "INCOME AND EXPENSES FOR A BUSINESS WERE NOT INCLUDED ON THE ORIGINAL RETURN. A SCHEDULE C HAS BEEN ADDED TO THE AMENDED RETURN…"  See Ex. D 1.  The addition of the new Schedule C coincides with the period the DHECC claim was filed in the 4th quarter of 2012.

The purported accuracy of the financial statements submitted by Palazaeno on behalf of Maxim is further belied by the obvious manipulation seen within the consistent percentage correlation between sales and cost of goods sold.  In 2010, cost of goods sold is

---

[6] Lower sales during the compensation period tend to magnify the sales differential in comparison to the benchmark period, increasing the overall award.  Other factors also impact the BEL computation including variable expense trends during both the compensation and benchmark periods.

almost exactly 35% of sales for each month of the year (Refer to [C] in Ex. S).  In 2008, although not used in the calculation, monthly cost of goods sold represent 59% of sales; in 2009, cost of goods sold is almost exactly 64% of sales for each month of the year. Ex. T1 – T3.  (Note: cost of goods sold computation highlighted in red).  This implausibly consistent percentage appears to be wholly inconsistent with the multitude of variable expenses customary to the operation of a restaurant.

 As evidenced from emails obtained from CPA Sewell (to be detailed later), Palazaeno was responsible for all of the figures reported to the DHECC.  In an interview with DHECC investigators, Sewell stated that Palazaeno not only provided all of the information he used to prepare the P&L's and tax returns, but Palazaeno also answered any questions Sewell had about the business.  Palazaeno gave him the gross amounts of revenue and expenses to report on Maxim's Schedule C Profit and Loss form attached to Licciardi's Form 1040, U.S. Individual Income Tax Return.  Sewell also stated that Palazaeno completed a monthly financial statement templates that were then submitted to the DHECC.

 To verify the revenues reported on Maxim's P&L's, the DHECC obtained, with Licciardi's consent as a responsible corporate officer at the time, Maxim bank deposit records.  Additionally, the DHECC obtained, via subpoena, City of New Orleans Sales Tax records, which reflect gross sales reported by Maxim during the relevant time period. Ex. U-1, U-2.  Those records are summarized below by year as follows: (beginning on following page)

|  | 2008 | 2009 | 2010 | 2011 |
|---|---|---|---|---|
| Maxim P&L's | $319,112 | $756,175 | $387,617 | $292,989 |
| Bank Records | $   6,169 | $389,290 | $  12,044[7] | $446,288 |
| Sales Tax Records | $  86,490 | $143,013 | $  15,016 | $  68,571 |

Looking further into these sources, Exhibit V compares those records by month for all of the years for which records were obtained, although as noted, 2009 was selected as the benchmark.  For illustrative purposes, the January-September monthly sales records provided by Danielle to the GCCF were also included in Exhibit V, although Maxim renounced those as inaccurate.  See Ex. H.   This clearly shows a very large disparity between revenues reported on the P&L's, with known contemporaneously reported records, i.e. bank statements and sales tax records.  The P&L's show much larger reported revenue figures than those shown on the bank and sales tax records during the same monthly time periods.

The apparent over-reporting of revenue caused damage to the program by significantly inflating Maxim's award amount.  Using the revenue Maxim reported publicly and contemporaneously through the city sales tax figures, even assuming the highest profit margin possible, i.e. zero expenses, the company's final award would be approximately $74,661 (after prior offsets and risk transfer premium), far short of the $245,796.90 it received.

---

[7] Deposits to the known Maxim bank accounts stopped in November 2009 and did not resume until December 2010.  The account was not closed during that time.  It was dormant with no activity.  No transfers were found which indicated any other accounts had been opened.

### 3.  Palazaeno was responsible for filing Maxim's BEL claim

There is no question that Palazaeno was responsible for the filing of Maxim's BEL claim.  Palazaeno, having used Licciardi's name on corporate filings since the company's inception, continued this pattern throughout the claim filing process.  Palazaeno initiated contact with Traina to represent Maxim throughout the claim process.  As will later be discussed in further detail, Licciardi had no knowledge of this arrangement.

Palazaeno approached Sewell to assist with the preparation of the required tax documents and profit and loss statements.  During an interview with DHECC investigators, Sewell recalled meeting Licciardi and Palazaeno for the first time at his H&R Block office. He was subsequently asked to prepare profit and loss statements.  Sewell told DHECC investigators it was clear that Palazaeno was the true owner of the company and that any time Sewell needed more information, he was able to get it from Palazaeno.

The DHECC obtained several emails from Sewell showing conversations with Palazaeno and Traina. Ex. W.  Beginning in October of 2012, these emails evidence a clear line of communication between Palzaeno, Sewell and Traina, further exposing Palazaeno's influence over the claim filing.  The following are key excerpts from the emails sent between the parties during preparation of Maxim's claim.[8]

On October 4, 2012, Palazaeno emailed Sewell's assistant ("Assistant") from his email of "briante1492@ymail.com," inquiring: "Hi – Just seeing when those P&L – Are ready – Thanks."  Ex. W at 1.  Sewell's Assistant replied, "Bri, I have attached your P&L's for 2008 – 2011.  Feel free to call if you have any questions."  Ex. W at 2.  On October 11, 2012,

---

[8] Licciardi was not included, whether directly or by carbon copy, in any of the emails between Palazaeno and his professionals.

in an effort to gather documents Traina emailed Sewell's Assistant the following:

> "I represent Maxim, L.C. d/b/a Leonardo Trattoria and am helping with its BP settlement claim.  Briante Palazaeno tells me that you recently prepared and filed Maxim's federal income tax returns for 2007 – 2011." Ex. W at 3.

Additional evidence of Palazaeno's involvement can be seen in a February 28, 2013 email of Sewell's Assistant: "The spreadsheets we did were based on information given to us by Briante." Ex. W at 4.

Evidence of Palazaeno's manipulation of the claim is shown during the ensuing conversation after Sewell's Assistant  emailed Maxim's P&L's to Palazaeno:

*Assistant, 2/27/2013 at 4:15 p.m.*:   "I have attached the revised P&L's"
*Palazaeno, 2/27/2013 at 5:14 p.m.*: "What is equipment is that suppose to be labor/temps"
*Assistant, 2/27/2013 at 6:08 p.m.*:   "I'm sorry, I think I sent you the old files."
*Palazaeno, 2/27/2013 at 6:37 pm*.: "I think they should vary per mo - So they r not the
                                 same ea mo - Your thoughts"
*See* Ex. W at 5,6.

Palazaeno, not Licciardi, benefitted from the claims award.  Upon receipt of the eligibility notice, Traina promptly accepted the award, purportedly on behalf of Maxim, then executed a disbursement sheet for the award with Maxim. Ex. N.  The release contained a purported signature of Licciardi as representative of Maxim and a signature of Palazaeno as "Witness."  See Ex N.  Pursuant to this release, Mollere issued a check to Maxim for $183,182.68, the amount of the proceeds after the firm deducted its fees.  Ex. X.  Licciardi did not receive any proceeds from the check.  According to Licciardi, her purported signature is a forgery.  She did not receive any of the check proceeds.[9]  Ex. O.

The award check was deposited into a Maxim bank account (ending xx3977) on April 10, 2013.  Ex. Y, at 86.  A review of account records, obtained with Licciardi's

---

[9] The forgery of this and other documents will be further discussed in the next section.

authorization, showed Palazaeno completely controlled this and other Maxim accounts at the time of the award check deposit.  After the deposit of the award check ballooned the account to $187,666.82, it dropped – within [about] a month – to $163.32 (check amount). Ex Y, at 83, 87.  This drop in the account balance was solely at the hand of Palazaeno, as evidenced by deposit and authorized charge records within the account records.  See Ex. Y, 83-90.

Palazaeno opened another account (ending 0886) on May 10, 2013, in the name of Maxim, L.C. d/b/a Cibugnu[10]. See Ex.Y, p. 5.  The only other authorized signer was Archila, whose name and purported signature appeared on a signature card of the application. Ex. Y, p. 6.  Archila testified it was not his signature, but it was a forgery.  Ex. Q, at 45, 46.

4.   Palazaeno submitted fraudulent documents to support Maxim's BEL claim without knowledge of its owner.

In order to substantiate its BEL claim, Maxim was required to submit key documents to the DHECC, including corporate filings, claim registration forms, and supporting financial documents.  On August 25, 2015 DHECC investigators conducted an interview with Licciardi, accompanied by counsel, regarding Maxim's BEL claim and her knowledge of the documents submitted to the DHECC on the Maxim's behalf.

a.   DHECC Claims Forms

The representation contract between Maxim and attorney Traina, sets out a twenty-five percent contingency fee.  The contract is purportedly signed by Licciardi, but the signature is a forgery. See Ex. O.  Further, Licciardi does not know, nor had she ever met Traina.  Licciardi never authorized Traina to represent Maxim regarding any BP claims.

---

[10] After Leonardo Trattoria closed, Cibugnu opened as a new restaurant under the Maxim, L.C. LLC.

Two claim registration forms were electronically submitted by Maxim.  The form dated July 20, 2012 was signed by "Leonardo Trattoria," and a second form, dated October 11, 2012, was signed by Traina. See Ex. A, Ex. B.  Licciardi not aware of, nor did she authorize anyone to submit nor sign these documents on her behalf.

On February 24, 2015, Licciardi signed an affidavit regarding Maxim's DHECC Release and Covenant not to Sue packet, Request for Taxpayer Identification, and Attorney Fee Acknowledgment Form, all forms signed on March 27, 2013.  Ex. O.  Licciardi made the following sworn statement:  "The signatures appearing on pages 3, 14, and 20 of the Release form, along with the signatures appearing on the Request for Taxpayer ID and Attorney Fee Acknowledgement are all forgeries."  She did not authorize anyone to sign her name to any of these documents.  Ex. O.

For example, comparing the forgery on page three of the Attorney Release form to Licciardi's actual signature, the difference is plain.[11]  Licciardi signed IRS form 4506 for production of her tax transcripts (right); the forged signature from the Mollere law firm disbursement sheet appears on the left.  See Ex. N (Disbursement Sheet) and Ex. E. (Form 4506).

| **Forged Signature of Licciardi** | **Signature of Licciardi, Form 4506** |
| --- | --- |
|  |  |

   b.  *Financial Documents*

Maxim submitted its profit and loss statements on October 11, 2012. Ex G.  After

---

[11] A review of Exhibits A through D attached to Licciardi's affidavit (Ex. O) shows additional evidence of forged signatures.

reviewing them, Licciardi stated she had never before seen the statements, nor did she upload any documents into the portal.  She stated further that she had no discussions with Palazaeno regarding these statements.

Licciardi had no knowledge of any filing made with the DHECC.  Ex. O.  She was aware that Palazaeno was heavily involved in the details and the operation of Maxim during that time period.  Licciardi's statements provide further evidence of Palazaeno's control and liability for filing a fraudulent claim with the DHECC.

### c.  *Louisiana Secretary of State Documents submitted to the DHECC*

Maxim submitted the following corporate documents: initial report from 2007, Articles of Incorporation, all annual reports for 2008 through 2012, along with documents requesting changes to members and registered agents.  From Licciardi's interview, the DHECC learned the following: As to the Articles of Incorporation, Initial Report, and 2008 Annual Report, Licciardi signed the documents, but Palazaeno's is the only handwriting that appears on them.[12] See Ex. I, Ex. J, Ex. K.

In 2008, at Palazaeno's request, Maxim filed for change of registered office/agent, adding Daniele as member of Maxim Ex. K.  Licciardi confirmed her signature on the document, but it was Palazaeno's handwriting that populated the remainder of the form. Regarding Maxim's 2009 Annual Report, neither Licciardi's signature nor handwriting appear on it, she believed both to be Daniele's. See Ex. J.  Maxim's 2010 Annual report contains Licciardi's handwriting and signature.  Licciardi informed the DHECC that Palazaeno told her what to write and she complied. See Ex. J.  The company later requested

---

[12] At the time of the formation of the business, Palazaeno asked Licciardi to use her name, informing her that he could not obtain a liquor license, nor could his name appear on any documents involving the restaurant. He did not explain why.

that Daniele be removed as member from Maxim after Palazaeno learned that Daniele had filed a GCCF claim and collected the $150,000 proceeds. Ex. Z.  Licciardi's signature and handwriting appear on this document, but she prepared the document at the direction of Palazaeno.

The company's 2011 and 2012 Annual reports are electronically signed with Licciardi's name, but Licciardi had no recollection of these documents; Palazaeno's email address appears on the 2012 annual report. See Ex. J.  Palazaeno signed on as Member of the company, removing Licciardi as a member, through a "Notice of Change" form submitted by Maxim on June 11, 2013.  Ex. AA.  Archila is listed as a "manager, member" on this form; he also purportedly electronically signed the form.  Archila testified in his deposition that the first time he had seen the form was in July of 2015 during an interview with DHECC investigators, that he never agreed to become a member, manager of Maxim, nor did he sign, nor authorize anyone to sign, any form on behalf of Maxim, L.C.  Ex. Q, 71 – 73.  Archila's name also appeared on notices of change dated April 12, 2013 and July 12, 2013.  Ex. BB, CC.  Additionally, Archila's name appeared on Maxim's annual report dated June 19, 2014 (Ex. DD) and, as discussed earlier, Maxim's affidavit and authorization to dissolve, of June 11, 2015. Ex. P.

### D.  *Legal Analysis*

The Court's power to order appropriate remedies as a result of fraudulent conduct is a broad, flexible and long-standing power. See *Hazel-Atlas Glass Co. v. Hartford Empire Co.*, 322 U.S. 238, 244 (1944) (affirming judicial power to set aside fraudulently begotten judgments as such cases present "a wrong against the institutions set up to protect and safeguard the public, institutions in which fraud cannot complacently be tolerated

consistently with the good order of society"); Order & Reasons at 21. Where the Court has determined that a claimant committed fraud in relation to his claims, "it is both reasonable and proper under the terms of the Settlement Agreement to order [the claimant] to make restitution for the funds that he received as a result of his fraudulent claim." Order & Reasons at 21. Maxim and Palazaeno should make full restitution for the full amount paid to Maxim.

1.    Maxim and Palazaeno Should Make Restitution to the DHECC on Claims Paid
Based on Misrepresentations of Maxim's Financial Documents

To prove fraud in this context, the DHECC must show that (1) Maxim and Palazaeno made a material representation; (2) their representation was false; (3) when Maxim and Palaezeno made the representation, they knew it was false or made it recklessly without any knowledge of the truth and as a positive assertion; (4) the representation was made with the intention that it be acted upon by the DHECC (the other party); (5) the DHECC acted in reliance upon the representation; and (6) the DHECC suffered injury.  Order & Reasons on Motion of the DHECC for Return of Payments Made to Crystal Seafood Company, Inc. and Others at 6 (Rec. Doc. 18456) (citing *In re Deepwater Horizon*, No. 15-30574, 2016 WL 1397663 at *3, -- F. App'x – (5th Cir. April 8, 2016); Alfonso Order at 6-7, Rec. Doc. 15400)).

Here, the evidence shows that Maxim and Palazaeno presented false information to the DHECC to obtain compensation for Maxim.  They made a material representation when they submitted financial data to the DHECC to support their claim.  They knew the information to be false and made it recklessly with the intention that the DHECC to rely upon the representation.  The DHECC acted in reliance on their false representation, which resulted in an inflated claim award that caused injury to the DHECC.  Further, the award was obtained without any knowledge of Licciardi, who received no proceeds of the award. Palazaeno was solely responsible for Maxim's BEL claim and the submission of the

supporting documents that misled the program, resulting in overpayment to the company. Maxim and Palazaeno should be ordered to return these fraudulently obtained funds.

Palazaeno, on behalf of Maxim, submitted the false financial information to his CPA and assisted him in preparation of the Maxim's P&Ls, knowing the P&L's would be relied upon by the DHECC in determining the claim. Maxim and Palazaeno hold an obligation to those they actually knew would rely on the misrepresentations. *First National Bank of Commerce v. Monco Agency Inc.*, 911 F.2d 1053, 1060-62 (5th Cir. 1990) (endorsing application of misrepresentation standard for accountants under Louisiana law and Section 552; Restatement (Second) of Torts § 552 (providing liability for those who fail to exercise reasonable care and, as a result, supply "false information for the guidance of others in their business transactions" and thereby cause a pecuniary loss). Here, Maxim, and/through Palazaeno, knew that the DHECC would rely on the information presented. They knew the information was false, but presented it anyway for the sole purpose of inflating Maxim's claims award.

This Court has ruled in favor of the DHECC when the circumstances show that the individual submitting the claim had knowledge of the DHECC's reliance on his support information. Recently, the Court found that restitution was proper, finding "clear and convincing evidence of Alfonso's fraud," noting communication between Alfonso and his hired professionals established that Alfonso "intended to induce the DHECC to rely on his misrepresentation." Order & Reasons on Motion of the Special Master for Return of Payments Made to Vernon Alfonso and Others at 8, 9 (Rec. Doc. 15400).

Here, it is clear from the email correspondence between Palazaeno, his lawyer, and the accounting professionals that Palazaeno had full knowledge of the importance of his

financial data to his claim.  This leaves no question that Palazaeno (and thus Maxim) intended to induce the DHECC to rely on the misrepresentation.  Palazaeno personally saw to the prompt finalization and submission of the false financial documents and it is evident that he stood to personally benefit from this claim.  As such, restitution by Palazaeno, as well as by Maxim, is proper.

      2.      In addition to being the ultimate beneficiary of the claim award, Palazaeno <u>was the alter ego of Maxim and should be held liable <i>in solido</i> with Maxim.</u>

Though Maxim was the titular claimant and the DHECC award was made payable to Maxim, the facts establish that the funds were actually deposited into an account controlled by Palazeano.  Though Palazeano did not receive the funds through a contingency fee contract and did not receive payments directly from the DHECC, the Court's restitution power can and should extend to Palazeano.  In Thonn, this Court ordered Coastal Claims Group, LLC ("CCG") to disgorge funds received (as a subsequent transferee) from Andry Lerner, since CCG clearly benefitted from the payment.  Order & Reasons on Motion of the Special Master for Return of Payments Made to Casey Thonn and Others (Rec. Doc. 12794). That same rationale should apply with respect to Palazeano.

In addition, based on the facts and fraud established above, Palazeano was clearly the alter ego of Maxim and should be liable for the return of the Maxim ill-begotten gains on that basis as well.  The federal common law on veil piercing [alter ego] "is amorphous and must be flexibly applied".[13]  *Brotherhood of Locomotive Engineer v. Springfield Terminal*

---

[13] Recently, this Court in its Order and Reasons on Crystal Seafood, for reasons asserted by the DHECC in its underlying motion, found it appropriate to pierce the corporate veil, holding those responsible for the fraud personally liable with the corporation. *See* Crystal Order, at 9 (Rec. Doc. 18456).  In Crystal, the DHECC asserted that Crystal's owners should be held personally liable, as one who fraudulently makes a misrepresentation to induce another to act in reliance upon it is subject to liability for the pecuniary loss suffered by that person by his reliance upon the misrepresentation.  *See* Motion of the DHECC for return of

*Railway Co.*, 210 F.3d 18, 26 (1st Cir. 2000).  So not surprisingly, the elements of the federal common law of alter ego liability have been expressed in different ways in various contexts. *E.g.*, *Bridas v. Government of Turkmenistan,* 447 F.3d 411 (5th Cir. 2006); *Thomson-CSF, S.A. v. American Arbitration Association*, 64 F.3d 773 (2nd Cir. 1995); *Orloff v. Allman*, 819 F.2d 904 (9th Cir. 1987).

Some common factors which appear in many of the iterations of "common law alter ego" are fraud or control, or committing a wrong or injustice upon third parties, which are wholly consistent with the elements under Louisiana law.  Under LSA-R.S. 12:1320, the exception to the normal rules of limited liability in the context of limited liability companies (such as Maxim) is where fraud has been practiced by any "member, manager, employee or agent."  Section 1320 is the limited liability analog to LSA-R.S. 12:95, pronouncing essentially the same rule in the case of corporations.  *See, e.g.,* *Bossier Millwork & Supply Co. v. D.&R. Construction Co., Inc.*, 245 So.2d 414 (La. App. 2nd Cir. 1971)(individuals perpetrating fraud through the corporation in procuring loan proceeds had personal liability *in solido* with the corporation under section 95).

Whether under federal common law or Louisiana law, the following facts show that Palazeano was Maxim's instrumentality, controlled Maxim, and committed fraud by submitting fraudulent documents and false financial data on behalf of Maxim in order to gain an inflated claim award.  Though he fabricated the illusory appearance ownership or control elsewhere (Licciardi and Archila, and even his deceased dog), he clearly controlled Maxim. As such, in addition to being the ultimate beneficiary of the funds made payable to

---

Payments Made to Crystal, at 14 (Rec. Doc. 14613-2), citing Restatement (Second) of Torts § 525; *LHC Nashua P'ship, Ltd. V. PDNED Sagamore Nashua, L.L.C.*, 659 F.3d 450, 458-59, 462 (5th Cir. 2011).

Maxim, Palazeano was also its alter ego and should have liability to disgorge on that basis as well, *in solido* with Maxim.

3.      The Court Should Order the Return of All Funds Received
        <u>By Professionals Who Assisted Maxim and Palazaeno to Submit a False Claim</u>

The professionals who helped Palazaeno submit Maxim's claim also should return any payment received based on Maxim's claim. *See* Order & Reasons at 26, *SEC v. Blatt*, 583 F.2d 1325, 1335-36 (5th Cir. 1978). Money paid by contingency fee arrangements may be recouped through restitution where the client's judgment is reversed or voided. *See Mohamed v. Kerr*, 91 F.3d 1124, 1126 (8th Cir. 1996); Order & Reasons at 22-23. Because no fee is due, retaining a payment made on a contingency fee contract under such circumstances would be an unjust enrichment. *Id.* at 24. Whether these professionals knew of the falsity of Maxim and Palazaeno's claim is immaterial to their duty to make restitution of sums that have been received as a result of this improper claim. Order & Reasons at 23; *Schock v. Nash*, 732 A.2d 217, 232-33 (Del. 1999).

Here, Maxim and Palazaeno's lawyers received a percentage of the awards paid to Maxim for its BEL claim based upon a contingency fee contract. The contingency fee would not have been payable to his lawyers if the DHECC had not paid Maxim's fraudulent claims. The contingency fees should be returned to the DHECC.

### E. *Conclusion*

For the reasons stated, the DHECC seeks entry of a judgment requiring Maxim and Palazaeno to make restitution to the DHECC for $245,796.90.  All professionals who benefitted from the unjustified payments similarly should be required to make restitution.

Respectfully submitted,

Patrick Juneau
Claims Administrator

By:   ___/s/  Kevin Colomb_____
Kevin Colomb
Manager of Compliance and Internal Integrity

Dated:  May 26, 2016