# EXHIBIT Q

1
             UNITED STATES DISTRICT COURT
2
             EASTERN DISTRICT OF LOUISIANA

3
    CIVIL ACTION NO. MDL 2179 (JUDGE BARBIER)
4

5
IN RE:  OIL SPILL BY THE OIL RIG
            "DEEPWATER HORIZON"
6

7

8

9
IN RE:  **BRIANTE PALAZAENO**

10

11

12
           Deposition of **JULIO ARCHILA,** ▮

13
▮

14
taken in the offices of the Deepwater

15
Horizon Claims Center, 935 Gravier Street,

16
Suite 1160, New Orleans, Louisiana 7012, on

17
Tuesday, the 19th day of January, 2016.

18

19

20

21

22

23
           ORIGINAL

24

25

1    APPEARANCES:

2

3              FOR DEEPWATER HORIZON CLAIMS CENTER:
               COREY D. MOLL, ESQUIRE
4              935 GRAVIER STREET - SUITE 700
               NEW ORLEANS, LOUISIANA   70112
5

6

7    ALSO PRESENT VIA TELEPHONE:

8
               DAVE LAZARUS
9

10   REPORTED BY:

11
               ROBERT K. TUCKER
12             CERTIFIED COURT REPORTER
               STATE OF LOUISIANA
13

14

15

16

17

18

19

20

21

22

23

24

25

ASSOCIATED REPORTERS, INC./504.529.3355

1                           INDEX

2

3     EXAMINATION BY:

4
      MR. MOLL                            5
5

6

7     EXHIBITS:

8
      1 (ACCOUNT APPLICATION)            43
9
      2 (NOTICE OF CHANGE)               69
10
      3 (NOTICE OF CHANGE)               71
11
      4 (NOTICE OF CHANGE)               73
12
      5 (ANNUAL REPORT)                  76
13
      6 (AFFIDAVIT TO DISSOLVE LIMITED LIABILITY
14    COMPANY)                           78

15    7 (MEMBERS/ORGANIZERS AUTHORIZATION OF
      DISSOLUTION)                       82
16

17

18

19

20

21

22

23

24

25

1         S T I P U L A T I O N

2

3              It is stipulated and agreed by and

4    between counsel for the parties hereto that

5    the deposition of the aforementioned

6    witness is hereby being taken under the

7    Federal Rules of Civil Procedure, for all

8    purposes, in accordance with law;

9              That the formalities of reading,

10   signing, sealing, certification, and filing

11   are specifically waived;

12             That all objections, save those as

13   to the form of the question and the

14   responsiveness of the answer, are hereby

15   reserved until such time as this

16   deposition, or any part thereof, may be

17   used or sought to be used in evidence.

18

19             ROBERT K. TUCKER, Certified Court

20   Reporter, in and for the Parish of Orleans,

21   State of Louisiana, officiated in

22   administering the oath to the witness.

23

24

25

ASSOCIATED REPORTERS, INC./504.529.3355

1              **JULIO ARCHILA**, who, after having

2    been first duly sworn, was examined on

3    testified as follows:

4    EXAMINATION BY MR. MOLL:

5         Q.   Good morning, Mr. Archila.

6         A.   Morning.

7         Q.   Can you please state your full

8    name for the record?

9         A.   Julio E. Archila, Jr.

10        Q.   So my name's Corey Moll and I'm

11   here on behalf of the Deepwater Horizon

12   Economic Claims Center and the claims

13   administrator's office.  So what we do is,

14   we look at certain aspects of BP claims,

15   and so today we're here for your

16   deposition.  And so I just have a couple of

17   instructional type questions before we

18   begin.

19        A.   Okay.

20        Q.   All right.  So the court

21   reporter's taking down everything as we

22   speak, so like he just said, one person

23   speak at a time.  And as, obviously, just

24   wait till I finish my question before you

25   respond.

1              Please respond verbally so he
2    can take down yes or no as opposed to a
3    head nod.
4         A.    Okay.
5         Q.    If you don't understand my
6    question, just feel free to ask it again,
7    repeat it, whatever you need to do so that
8    you make sure you understand it before
9    answering.
10        A.    Okay.
11        Q.    If you do answer my question,
12   I'll understand -- I'll assume that you
13   understood it.
14              If I speak too fast, let me
15   know, just tell me to slow down and I will.
16        A.    Okay.
17        Q.    And you also understand you must
18   answer everything truthfully?
19        A.    Correct.
20        Q.    So as he just read your oath,
21   you are under oath.  The questions that
22   you're giving answers to, those answers may
23   ultimately be used in a court proceeding.
24   Do you understand that?
25        A.    Yes, sir.

1          Q.     Okay.   Is there any reason you'd

2    be unable to answer truthfully today?

3          A.     No.   No, sir.

4          Q.     Is there any reason why you

5    would be unable to remember things today?

6          A.     I'll do the best I can to

7    remember it, whatever you're asking me.

8          Q.     Okay.   Are you taking any

9    medications or substances that might cause

10   you to be unable to tell the truth today?

11         A.     No, sir.

12         Q.     Okay.   Are you taking any

13   medications or substances that might make

14   you unable to remember today?

15         A.     No.   No, sir.

16         Q.     Again, just please answer

17   questions fully, to the best of your

18   knowledge.   If you don't know the answer to

19   a question, just please do not guess.

20         A.     Okay.

21         Q.     Simply tell me that you do not

22   know.

23         A.     Okay.

24         Q.     Have you ever been deposed

25   before?

```
1        A.      Yes.
2        Q.      Okay.  And when was that?
3        A.      When I went through my divorce.
4        Q.      Okay.  And how long ago was
5   that?
6        A.      2007 was the year.  I believe
7   the deposition occurred around October,
8   November.
9        Q.      Okay.  And so that was just
10  purely for the divorce proceeding?
11       A.      Yes, sir, that's correct.
12       Q.      Besides the full name you stated
13  on the record, do you have any other
14  nicknames that you go by?
15       A.      Julio.
16       Q.      First name?
17       A.      That's about it.
18       Q.      Okay.  And, if you could, please
19  identify your date of birth, place of
20  birth, and Social Security Number.
21       A.      Date of birth is            .
22  Place of birth, I was born in Guatemala
23  City, Guatemala, and my Social is
24            .
25       Q.      What's your educational
```

1    background?

2         A.    I have a bachelor of science in

3    marketing.  I achieved that in 2000 from

4    Nicholls State University.

5         Q.    Alrighty.  And what's your

6    employment history?

7         A.    Been employed since graduation

8    in one capacity or another.  I was a

9    teacher for four years and I've been in

10   insurance since 2006.  First few years, I

11   was -- no.  I take that back.  2004.  First

12   couple of years I was in benefits, and then

13   ever since 2007 I've been on the property

14   and casualty side.

15        Q.    Is that with an insurance

16   company?

17        A.    Broker.

18        Q.    Broker?

19        A.    Yes.  I'm currently working with

20   Laris Insurance out of Lockport.  That's

21   where the main office is.

22              When I lived here, I worked

23   with -- when I lived in New Orleans, I

24   worked at Whitney Insurance, which was

25   called J. Everett Eaves at the time, and

1       then they -- Hancock purchased Whitney Bank

2       and we took their name.

3              Q.     Okay.  What was the first name

4       of it?  J.?

5              A.     J. Everett Eaves.

6              Q.     How do you spell that?

7              A.     J period, E-V-E-R-E-T-T-E [sic],

8       E-A-V-E-S.  Those are all separate words.

9              Q.     Oh, okay.

10             A.     Which is located in the Poydras

11      Center.

12             Q.     So that was prior to becoming

13      Whitney?

14             A.     That's correct.

15                    And then in 2012 I left there

16      and went to work for Ellsworth Corporation

17      out of Metairie.  E-L-L-S-W-O-R-T-H.  And

18      I've been a producer, which is a stupid

19      name for outside sales.

20             Q.     And would that be your current

21      title?

22             A.     Correct.

23             Q.     Alrighty.  And what type of, if

24      any, professional licenses or

25      certifications do you hold?

1         A.       Well, I have a state license

2    with the Department of Insurance, both

3    property and casualty, as well as life and

4    health.

5                  As far as -- what was the second

6    part of that?

7         Q.       Any licenses or certifications.

8         A.       Certifications, I have one

9    designation, which is CMIP.  Stands for

10   commercial marine insurance professional.

11        Q.       Alrighty.  And just so the

12   record reflects, in case I didn't mention

13   it earlier, on the line is Dave Lazarus

14   from our office.  And, Mr. Archila, were

15   you aware of this from the beginning of the

16   deposition, that he was on the phone?

17        A.       Yes, that's correct.

18        Q.       Okay.  Alrighty.  I just want to

19   talk a little bit about the preparation, if

20   any, for today.

21        A.       Okay.

22        Q.       Did you prepare for this

23   deposition today?

24        A.       No, sir.

25        Q.       Okay.  Did -- although you may

```
 1     not have prepared, did you at any point

 2     kind of use anything to refresh your

 3     recollection about topics you thought we

 4     might discuss today?

 5          A.     Not at all, no, sir.

 6          Q.     So you didn't review any

 7     documents or anything like that?

 8          A.     I didn't have any documents to

 9     review.

10          Q.     Okay.  Did you speak with

11     anybody about the deposition prior to

12     today?

13          A.     Just my attorney.

14          Q.     So you did speak with your

15     attorney prior to today?

16          A.     Yes, sir.

17          Q.     Okay.  And your attorney was

18     made aware that you were being deposed

19     today?

20          A.     That's correct.

21          Q.     At our office?

22          A.     Yes, sir.

23          Q.     And did you briefly discuss with

24     your attorney the general topics of what

25     would be discussed today?
```

```
1        A.      I told him there's some
2   questions about Maxim Industries, or Maxim
3   L.C.
4        Q.      Uh-huh (Affirmative Response).
5        A.      And that there was some
6   questions as far as a claim that arose with
7   BP quite a few years ago, and that my name
8   was attached to some documentation
9   somewhere and that Mr. Lazarus had visited
10  the house a few months ago.  We spoke.  I
11  gave him whatever information I had at that
12  time, and that they just wanted to conduct
13  a deposition so they could formally, I
14  guess, gain the same information.
15       Q.      Okay.  And after speaking with
16  your attorney, were you satisfied with his
17  advice?
18       A.      I was.
19       Q.      And were you satisfied to the
20  point of feeling free to come in and give
21  your deposition to us today?
22       A.      That's correct.  That's correct.
23       Q.      Okay.  With regard to the Maxim
24  L.C. claim, is there anything that you have
25  kept on file regarding the Maxim claim?
```

ASSOCIATED REPORTERS, INC./504.529.3355

1            A.      Until Mr. Lazarus showed up at

2      my house, I was not aware there was even a

3      Maxim claim.

4            Q.      Okay.  Have you -- have you kept

5      any diaries or calendars reflecting any

6      kind of conversations you've had regarding

7      either the Maxim claim or Maxim as a

8      business?

9            A.      None.

10           Q.      Okay.

11           A.      I had no hand in the business at

12     all, so there was nothing for me to keep.

13           Q.      Okay.  So we already talked

14     about your current employment, employment

15     history.  And you said you'd been in

16     insurance since 2004?

17           A.      That's correct.

18           Q.      Okay.  And just generally,

19     what -- what does your current line of work

20     entail?  You said it was outside sales?

21           A.      Basically.

22           Q.      Okay.

23           A.      I meet with either clients or

24     potential clients.  We'll discuss their

25     insurance program.

```
 1        Q.      Uh-huh (Affirmative Response).
 2        A.      At the end of the day, I'm
 3   basically trying to replace their current
 4   broker with myself, so our job is to go
 5   through and either find gaps in their
 6   coverages now or potentially look at just
 7   replacing the carrier that they have with
 8   one of my own carriers, potentially
 9   including more coverage via endorsement or
10   just better pricing.
11        Q.      Okay.  Alrighty.  Have -- prior
12   to or during your time with insurance, have
13   you ever started your own business?
14        A.      No, sir.
15        Q.      Okay.  Have you ever -- besides
16   being a member on Maxim or your name being
17   on the documents, have you ever owned any
18   other type of business?
19        A.      I've never owned a business at
20   all.
21        Q.      Okay.  All right.
22               I want to move on and just talk
23   about any involvement with Maxim L.C. that
24   you would have had.
25        A.      Okay.
```

```
 1          Q.     When was it that you were first
 2    introduced to the company, Maxim L.C.?
 3          A.     I didn't know the name of the
 4    company for the first little bit of when
 5    the owner and I were friends, became
 6    friends.
 7          Q.     And when you say owner, who are
 8    you referring to?
 9          A.     Briante Palazaeno, Palazaeno.
10          Q.     And I believe that's spelled
11    P-A-L-A-Z-A-E-N-O; is that correct?
12          A.     I think that's right.  Well, I
13    guess around 2000 -- the end of 2011,
14    beginning of '12, I'd started dating a
15    woman here in New Orleans.  Come to find
16    out she was good friends with Bri.
17          Q.     Okay.
18          A.     She introduced us.  He and I
19    became friends.
20          Q.     And just to clarify, when you
21    say Bri, is that short for Briante?
22          A.     Briante.  He typically goes by
23    Bri.
24          Q.     Okay.  And did you refer to
25    Briante Palazaeno as Bri?
```

```
 1          A.      That's correct.
 2          Q.      And so you were saying at the
 3     end of 2011, maybe at the beginning of
 4     2012 --
 5          A.      Correct.
 6          Q.      -- the woman you were dating
 7     knew Bri?
 8          A.      That's correct.
 9          Q.      Okay.  And is that how you first
10     met him?
11          A.      That's how we became friends.
12     That's correct.
13          Q.      Okay.  And you said at first you
14     didn't know the name of the company.  What
15     did you know Briante to own?
16          A.      At the time, the restaurant was
17     called Leonardo's.
18          Q.      Okay.
19          A.      I think trattoria, Leonardo's
20     Trattoria.
21          Q.      And where was that located?
22          A.      On St. Charles Street.  I
23     couldn't give you an address.  I just know
24     it's next to Herbsaint.  And since then,
25     they've built Marcello's on the side.  So
```

1    it's in between the two now.

2         Q.    Okay.  All right.

3               And how did you first learn of

4    Leonardo's Trattoria?

5         A.    Through Regina, through the

6    woman that I was dating.

7         Q.    Was it a place that you-all used

8    to frequent?

9         A.    We went a couple of times

10   together.

11        Q.    Uh-huh (Affirmative Response).

12        A.    And then when I realized that

13   they were friends and where I was working

14   at the Poydras Center was literally a block

15   and a half away, after work, late, if I was

16   working late or whatever, I would go walk

17   down and either have a late dinner by

18   myself or have a drink or two or whatever

19   the case was and I would see Bri more and

20   more.

21        Q.    About how long into or how long

22   after you had met Bri did he start talking

23   to you about any kind of business dealings

24   with the restaurant?

25        A.    I was still living in New

ASSOCIATED REPORTERS, INC./504.529.3355

1    Orleans, so it would have been about a year

2    later.  He just contacted me one day or one

3    day I was in the restaurant, he asked me

4    to -- he had something he wanted to talk to

5    me about, and so we talked and he just

6    asked me if I wouldn't mind putting the

7    liquor license in my name.

8        Q.    Okay.

9              Do you remember about when that

10   was?

11       A.    I would say the end of -- I'm

12   trying to think.  We're in '16 now.  I'd

13   say the end of '12.

14       Q.    Okay.  Around end of 2012.  And

15   that's to your best recollection?

16       A.    That's correct.

17       Q.    And if you could, just describe

18   that conversation when he approached you.

19       A.    He just said that -- he didn't

20   give me a reason.  He just asked me if as a

21   friend I would help him out.  He was in a

22   little bit of a spot.  I think he and his

23   girlfriend at the time, they were business

24   partners, but they had split.

25       Q.    Uh-huh (Affirmative Response).

```
 1        A.      And then there were some other
 2   issues that came up with her brother or
 3   something like that, that, I think,
 4   apparently he was named in the Darren
 5   Sharper investigations.
 6        Q.      And when you say he, who are you
 7   referring to?
 8        A.      I don't know his name.
 9        Q.      Uh-huh (Affirmative Response).
10        A.      But Bri's former partner's
11   younger brother.
12        Q.      Okay.  And do you know the name
13   of his former partner?
14        A.      If you said it, I would confirm
15   it, but I can't remember what it is
16   offhand.  I had never met her under that.
17        Q.      Does the name Shelly Licciardi
18   ring a bell?
19        A.      That's it.  Shelly.
20        Q.      That's her?  So do you know if
21   those issues came up around the same time
22   or did those issues not come up until
23   later?
24        A.      No.  Those are all things that
25   came up around the same time.  That was the
```

1    reason he had given me, that something

2    about they needed to separate, he

3    couldn't -- the brother was named in the

4    suit and because he was partners with her

5    brother, he was fearing that somehow it

6    would get tied to him.

7         Q.    Uh-huh (Affirmative Response).

8         A.    And if his name was on anything

9    or if his name was on the liquor license or

10   something like that, that he was afraid

11   that they would be able to come after his

12   business due to the association.

13        Q.    Okay. And you recall him

14   explaining this to you?

15        A.    That's correct, yes, sir.

16        Q.    Okay. And so he gave you this

17   explanation only in reference to the liquor

18   license and sales?

19        A.    That's correct.

20        Q.    Okay. Was it at this point that

21   he mentioned the legal name of the company?

22        A.    Yes. I think that was the first

23   time he referenced it, it was Maxim.

24        Q.    Okay. And so he -- did you

25   ultimately agree to put your name on the

1    liquor license?

2         A.    I agreed to it.  I did some

3    checking to see if there were any legal

4    ramifications that would come back on me.

5    Being in the insurance business, I was a

6    little bit leery, thinking that if my name

7    was on it and there's some type of accident

8    that could be tied back to a drunken

9    driving or something like that, my name

10   would ultimately be attached to it.  I was

11   given the word that, no, you know, Maxim

12   would be the people that were -- that would

13   be attached to it.  I was just -- they

14   needed a specific person for that.

15        Q.    Okay.  When you said you looked

16   into it, did you just look into it yourself

17   or did you speak with an attorney?

18        A.    I looked into it as far as I

19   contacted another business owner that owned

20   a restaurant from back home.

21        Q.    Okay.

22        A.    Talked to a State Trooper.

23        Q.    Okay.

24        A.    Because I know it actually runs

25   through -- I think it runs through their

1     office, the background check and things

2     like that.

3          Q.    Okay.

4          A.    And also with the insurance

5     carriers, that just gave them a

6     theoretical, hey, if my name's on this,

7     blah, blah, blah, who's responsible, they

8     said no, ultimately it would be the owner.

9     I also wanted to make sure there were no

10    fines that would be -- underage drinking

11    during Mardi Gras, anything like that, I

12    wanted to make sure that my name wouldn't

13    be attached with any fines associated.

14         Q.    And when you said ultimately it

15    would be the owner, they were saying that

16    the owner of the business would be the one

17    responsible?

18         A.    That's correct.

19         Q.    For any of the --

20         A.    For anybody.

21         Q.    -- concerns that you had?

22         A.    That's correct.

23         Q.    Okay.  And so once you agreed

24    and felt comfortable putting your name on

25    the liquor license, how did you go about

```
 1    the process of actually doing that?
 2         A.     Bri filled out the majority of
 3    the paperwork because I know they had some
 4    questions about sales or -- what's the word
 5    I'm looking for -- estimated sales for the
 6    upcoming years.  I think they had no know
 7    what the sales were for the prior year,
 8    what they're estimating they're going to be
 9    next year.  That way, they could also look
10    at the difference between sales revenue of
11    food and sales revenue of liquor.  He
12    filled out mostly everything.
13         Q.     Okay.
14         A.     Then he asked me to meet him at
15    the Lakeside where he had the paperwork
16    notarized.
17         Q.     When you say the Lakeside?
18         A.     Lakeside Mall.
19         Q.     Lakeside Mall?  Okay.
20         A.     They have a notary in the --
21         Q.     There's an office in there?
22         A.     There's a kiosk, yes.
23         Q.     Okay.  So is the kiosk in
24    Lakeside Mall where the required notary was
25    performed?
```

1          A.     That's correct.

2          Q.     Okay.  And was that the liquor

3    license itself that needed to be notarized

4    or was that an application for the license?

5          A.     The application for the license.

6          Q.     Okay.

7          A.     And that was pretty much the

8    extent of my involvement in that.  I don't

9    know.  Do liquor licenses actually need to

10   be notarized before they're displayed or

11   anything like that?

12         Q.     That, I -- at least it won't be

13   relevant to --

14         A.     Right.

15         Q.     -- the procedures of the liquor

16   license shouldn't be relevant to what we're

17   doing here.

18                With regard -- you mentioned

19   that Bri had already filled out the

20   application.  Do you recall about how long

21   that application was, whether -- like how

22   many pages?

23         A.     I want to say potentially, I

24   think a front, back, front, maybe.

25         Q.     So no more than five pages?

1          A.      No, no more than five pages.

2          Q.      And when you mentioned that the

3    application required estimated sales and

4    revenue, did you have any knowledge of the

5    information that was required for that

6    form?

7          A.      No clue.

8          Q.      Okay.  Did -- at any point in

9    that process, or before that, did Briante

10   inform you of what the sales were at the

11   restaurant?

12         A.      No, sir.

13         Q.      And did he ever discuss numbers

14   with you at all?

15         A.      We never spoke about the

16   business aside from the liquor license.

17         Q.      Okay.

18         A.      Normally when I was in his

19   restaurant, it was as a patron.

20         Q.      As a patron.  Sure.

21                 And in the course of obtaining

22   and applying for the liquor license, did

23   you -- you already mentioned that you

24   didn't personally confer with an attorney.

25   Did you and Briante together ever speak

1    with an attorney about the process of

2    filling out the liquor license?

3         A.    Not the first time.  The second

4    time, there was a second time that he came

5    back to me and said it needed to be

6    reapplied for.  We didn't confer with an

7    attorney.  He met me -- I happened to be in

8    town.  I had moved back to Thibodaux by

9    this point.

10        Q.    Okay.

11        A.    I had to come into town to get a

12   passport renewed.

13        Q.    Okay.

14        A.    He knew I was in town, called

15   and asked me if I wouldn't mind meeting him

16   so they could redo the liquor license.  I

17   said no problem.  But this time we met at

18   an attorney's office in the French Quarter.

19   Walked in, we sat in the lobby.  Same basic

20   process.  I signed a piece of paper, it was

21   notarized and then I left.

22        Q.    And when you say you signed a

23   piece of paper, just so I can clarify, was

24   it a piece of paper that was already

25   notarized or a piece of paper that you

1    witnessed being notarized?

2         A.    I witnessed it being notarized.

3    There was a gentleman.   I couldn't even

4    tell you the attorney's name.   From what I

5    gather, it's his attorney.

6         Q.    Okay.

7         A.    But it wasn't with her.   It was

8    during lunchtime, so I don't know if she

9    wasn't there or what have you, but one of

10   her associates came into the lobby, handed

11   me the paperwork, said sign here, sign

12   here, notarized it, and I left.

13        Q.    So are you saying the law

14   offices were of a female attorney but it

15   was a male attorney present with you?

16        A.    That's correct.

17        Q.    Okay.   And these law offices

18   were in the French Quarter, you said?

19        A.    That's correct.

20        Q.    Do you recall about where in the

21   French Quarter, whether it was --

22        A.    I would say further to the west

23   end, barely into the Quarter.

24        Q.    Okay.

25        A.    Maybe the same street as

ASSOCIATED REPORTERS, INC./504.529.3355

```
 1     Johnny's, was it Johnny's Po-Boys on -- the
 2     po-boy shop on this side.
 3          Q.    On the --
 4          A.    Barely into it.  Like right on
 5     the other -- one of the first few streets
 6     closer to Canal, running parallel with
 7     Canal.
 8          Q.    And just to -- so to jump back
 9     ahead to that second time, do you recall
10     when this reapplication took place?
11          A.    It would have been March,
12     February or March of 2015.
13          Q.    Okay.  So just a little --
14          A.    Last year.
15          Q.    Almost exactly a year ago?
16          A.    Right.  And the reason I
17     remember, I was -- Becky and I were going
18     with a bunch of friends down to the Bahamas
19     for an engagement --
20          Q.    Okay.
21          A.    -- renewal, 20th wedding
22     anniversary type thing, and I haven't had
23     my passport renewed in quite a few years,
24     so I had to hurry up and go do that.
25          Q.    So you have a good landmark for
```

ASSOCIATED REPORTERS, INC./504.529.3355

```
 1    frame of reference, when that happened?
 2         A.     That's correct.  And I was
 3    afraid that I wasn't going to get it done.
 4         Q.     Sure.
 5         A.     That I wasn't going to get my
 6    passport in time because I didn't realize
 7    it had actually expired.
 8         Q.     Yeah.  You don't do those at the
 9    right time, you're just kind of out of
10    luck.
11         A.     Yeah.
12         Q.     Okay.  So I want to go back to
13    the first liquor license application.
14         A.     Okay.
15         Q.     You said Briante had filled out
16    the majority of the paperwork or at least
17    the business specific questions?
18         A.     Right.
19         Q.     Would that be a fair assessment
20    of what the --
21         A.     The only thing I would have
22    filled out would have been my personal
23    information, my address.
24         Q.     Sure.
25         A.     I can't remember if it required
```

```
 1    my Social or not, things like that,

 2    personal questions I had to answer because

 3    he didn't know, and that was it.

 4         Q.    Okay.  After you had the

 5    application, after the application was

 6    completed and notarized at Lakeside, what,

 7    if anything, else did you do with regard to

 8    that liquor license application?

 9         A.    Nothing at all.

10         Q.    Okay.  Did you ever go down, see

11    anyone down at City Hall?

12         A.    No.

13         Q.    Or did you ever see the

14    completed application down at the

15    restaurant or anything?

16         A.    No, sir.

17         Q.    Did you ever -- did Briante ever

18    give you a copy of the liquor license

19    itself for your own records?

20         A.    No, sir.

21         Q.    All right.  So that would have

22    been, at least to the best of your

23    recollection, end of 2012 or in the

24    beginning of 2013.  So from 2013 on, did

25    you continue to see Briante at the
```

```
 1    restaurant?
 2         A.    Not as much, because at that
 3    time I had moved home.
 4         Q.    Okay.  When was it that you
 5    moved out of New Orleans?
 6         A.    The end of '13.  We're in 16,
 7    right?
 8         Q.    Uh-huh (Affirmative Response).
 9         A.    Yeah, that's correct.
10         Q.    Okay.
11         A.    The end of '13.
12         Q.    And so at least while you were
13    living here, that would be when you would
14    see Briante, when you went to the
15    restaurant?
16         A.    That's correct.
17         Q.    And such?
18         A.    When I moved home, I did come
19    every once in a while.
20         Q.    Sure.
21         A.    If I would come in for work,
22    because I was still commuting at the time.
23         Q.    Okay.
24         A.    And if I decided to spend the
25    night, if there was a convention, if I had
```

```
 1    a date, anything like that, during Mardi
 2    Gras.
 3         Q.    Sure.
 4         A.    But besides that, it wasn't as
 5    frequent as what it had been in the past.
 6         Q.    Okay.  And when you say I moved
 7    home, is that Thibodaux?
 8         A.    Actually it was Houma.  I moved
 9    to Houma.
10         Q.    Okay.
11         A.    Which is 15 miles from
12    Thibodaux.
13         Q.    Right.  So in your discussions
14    with Briante during that time, besides the
15    liquor license, did you-all have any other
16    discussions about Maxim as the company?
17         A.    No, sir.
18         Q.    Did he mention you signing on to
19    be a member of Maxim L.C.?
20         A.    He did not.
21         Q.    Okay.
22               Did he ever request that you be
23    a member of the LLC?
24         A.    He did not.
25         Q.    In any discussions -- and,
```

1       again, I know it was a little while ago,

2       but in any of those liquor license

3       discussions did he ever insinuate that you

4       would own part of the company?

5              A.     No, sir.  He denied, and I

6       actually specifically brought up that this

7       was a liquor license, liquor license only.

8       I did not want a dime from the company.  I

9       did not want to receive a 1099.  I did not

10      in any way, shape or form have any type of

11      ownership or any type of tax liability.

12             Q.     Sure.

13             A.     Or anything that any type of

14      debt, any type of income would ever be

15      associated with my name.  Quite honestly,

16      because if I'm not going to be involved in

17      the restaurant, I didn't want any of the

18      liability that went along with it.

19             Q.     Sure.

20                    And do you ever recall, again,

21      besides your signature being on the liquor

22      license itself, do you recall signing any

23      other documents for the restaurant itself?

24             A.     No, sir.

25             Q.     You mentioned you met Briante

1    through the woman you were dating at the

2    time?

3         A.     That's correct.

4         Q.     During the time you knew

5    Briante, did you also know his former

6    dating partner, Shelly?

7         A.     No.  I never met Shelly.

8         Q.     You never met her?

9         A.     That's correct.

10        Q.     Did he ever speak of her besides

11   the account you referenced earlier

12   regarding her brother?

13        A.     He would reference her from time

14   to time, about they used to date and I

15   think they may have even lived together for

16   a while.

17        Q.     Okay.

18        A.     I think they each had a dog.

19        Q.     Okay.

20        A.     But besides that, nothing -- I

21   couldn't -- if she walked in the room right

22   now, I wouldn't know it was her.

23        Q.     Okay.  You mentioned they had

24   a -- did they own one dog together or you

25   mean they each had a dog?

```
 1            A.     I think they owned two together.
 2            Q.     Okay.
 3            A.     Funny as it is, when I lived in
 4     the Warehouse District, before I knew who
 5     Bri was, my apartment overlooked his loft,
 6     which had a balcony.
 7            Q.     Okay.
 8            A.     And I remember these two
 9     gigantic dogs being on the balcony.
10            Q.     Sure.
11            A.     Or balcony area and pretty much
12     through all hours of the night they would
13     be quiet and then just absolutely go
14     berserk.  And they were, I think,
15     St. Bernards.
16            Q.     Okay.  So huge dogs?
17            A.     You could ride them, basically,
18     yes.  So I remember seeing two down there,
19     and then all of a sudden there was one.
20     And, of course, this is long before I knew
21     who Bri was.
22            Q.     Okay.  And when you say long
23     before, you mean around what year?
24            A.     This was right when I moved to
25     New Orleans, so 2010, 2011.
```

1          Q.     Okay.  So you-all had been

2     living close to each other, as it would

3     turn out, I guess?

4          A.     That's correct.

5          Q.     Okay.

6          A.     And never -- never said a word

7     to each other, never did anything aside

8     every once in a while I would see his Range

9     Rover, which I know now is his Range Rover.

10    But I would see the Range Rover parked

11    illegally, and it would piss me off.

12         Q.     How is it illegally parked?   In

13    the parking lot?

14         A.     No.   There was no parking lot.

15         Q.     Okay.

16         A.     In the Warehouse District, it's

17    all street parking.

18         Q.     It would be in an illegal zone?

19         A.     Yeah.   It would be like in a --

20    too close to the corner.

21         Q.     Sure.

22         A.     And things like that.  It used

23    to just piss me off, because I think when I

24    lived here I got six or seven tickets, not

25    realizing I was in a bad spot, but you

ASSOCIATED REPORTERS, INC./504.529.3355

```
 1    learn very quickly.

 2         Q.    Absolutely.

 3         A.    And just kind of humorously,

 4    it's funny now that I know who the guy was

 5    that was always parking like that because

 6    it wasn't like it was a Honda Civic,

 7    because there's a gazillion of them around.

 8    It was a black Range Rover.

 9         Q.    What apartment complex was that?

10         A.    I lived in the Annunciation.  I

11    can't remember what the name of them.  It's

12    across from the Cotton Mill.

13         Q.    Okay.

14         A.    That's where he lived, was the

15    Cotton Mill.

16         Q.    So you were in a different

17    building?

18         A.    Yeah.  I think mine was called

19    like Annunciation 523 or 123 or something

20    like that.

21         Q.    Got you.

22         A.    And I was on a corner so when I

23    looked down I could see to the Rusty Nail,

24    I could see all the Cotton Mill.  And I

25    could see down Annunciation further.
```

1        Q.      So you had been living, it was

2    across the street?

3        A.      That's correct.

4        Q.      Okay.  And just to backtrack to

5    the -- so when you -- you signed on for the

6    liquor license, Briante had approached you

7    and essentially needed your help doing

8    that?

9        A.      That's correct.

10        Q.      Did you receive anything in

11    return?  Did you receive any kind of

12    payment for signing on to the liquor

13    license?

14        A.      No payment.  The only thing he

15    had agreed to, which quite honestly wasn't

16    doing a whole bunch different, was whenever

17    I'd come in, I just wouldn't pay to eat.

18        Q.      Okay.

19        A.      And during Mardi Gras, I'd come

20    in and rather than have to pay a fee to get

21    on the grandstand that he had, eat food, I

22    just wouldn't pay and I'd get bracelets for

23    it and everything was comped.

24        Q.      Okay.

25        A.      My only liability was to tip the

```
 1    wait staff at the end of the meal.

 2         Q.   Okay.  So besides the free

 3    meals, besides tips and the Mardi Gras

 4    perks, was there any other kind of

 5    compensation for what you did?

 6         A.   None at all.

 7         Q.   Okay.

 8              Did Briante -- you mentioned

 9    that you specifically -- you told him you

10    did not want to be an owner of the company.

11    Did he give you -- to your knowledge, did

12    he give you any title?

13         A.   None that I knew of.

14         Q.   Okay.

15         A.   I remember his response was no,

16    no, no, no, nothing's -- no, man, all you

17    got is the liquor license, that's it.  None

18    of that other stuff falls on you, you won't

19    ever get paid, you won't ever owe anything

20    for it.

21         Q.   So you recall him specifically

22    telling you that?

23         A.   That's correct.

24         Q.   Okay.

25              As a member -- well, you weren't
```

ASSOCIATED REPORTERS, INC./504.529.3355

1      a member, but do you recall ever, besides
2      the liquor license, signing on to any bank
3      account for Maxim?
4           A.     There was some -- there was
5      some, something that happened with an
6      account, and I don't recall what all
7      transpired but I remember there -- my
8      father banks with Whitney.
9           Q.     Okay.
10          A.     He was a tenant in the Whitney
11     Bank building since 1992 in Houma.
12          Q.     This is your father?
13          A.     This is my dad.
14          Q.     Okay.
15          A.     And the reason being is, he owns
16     an oilfield supply company that brokers
17     equipment to Central and South America, not
18     only oilfield, but geothermal energy,
19     telecommunications, things like that.
20          Q.     Okay.
21          A.     So some of these companies in
22     Central America, they do business via wire
23     transfer.
24          Q.     Okay.
25          A.     So the Whitney Bank building,

1    the Whitney Bank in Houma was basically the

2    only bank that had the facility to do that.

3    And with them having the offices, it was

4    easy for him to go up from his fourth

5    floor, which is the highest building in

6    Houma, by the way.

7        Q.    Makes sense, yeah.

8        A.    He would go down to the lobby,

9    conduct his wire transfer business,

10   whatever he needed to do, and he was good.

11       Q.    Okay.

12       A.    The reason I bring that up is

13   somehow he got a phone call about some

14   account.  He thought I was trying to borrow

15   money from his account.  That wasn't the

16   case.  It was a lady over here on

17   St. Charles Street.  I don't remember her

18   name.  But she had called him looking for

19   me.  I guess she looked in her system,

20   Julio Archila, and it went to my dad.  So

21   he got a phone call.

22       Q.    What is your father's name?

23       A.    Julio Archila as well.  I'm a

24   Junior.

25       Q.    You're a Junior.  Okay.  And so

```
 1      a woman in New Orleans called your father
 2      asking about a Whitney account?
 3           A.    That's correct.
 4           Q.    Okay.
 5           A.    And because I wasn't on either
 6      one of the accounts, I never really got an
 7      answer as far as what that was all about.
 8           Q.    Okay.
 9           A.    But I think my dad looked into
10      it.  It was -- was okay with the answer,
11      that it was a mistake and she shouldn't
12      have contacted him and that the account had
13      nothing to do with him or something like
14      that.
15           Q.    Okay.
16                 Would you recognize your
17      signature if you saw it?
18           A.    Absolutely.
19           Q.    Okay.
20           A.    Very distinct.
21           Q.    Mr. Archila, I'm going to show
22      you what I'm going to ask the court
23      reporter to mark as Exhibit 1.
24           MR. MOLL:
25                 Let the record reflect I'm
```

1    showing Mr. Archila what's been marked

2    Exhibit 1.

3    EXAMINATION BY MR. MOLL:

4        Q.   Do you recognize Exhibit 1?

5        A.   No.

6        Q.   Okay.  Do you see your signature

7    anywhere on Exhibit 1?

8        A.   I see what's supposed to be my

9    signature.

10       Q.   And when you say what's supposed

11   to be your signature, what do you mean?

12       A.   That's not my signature.

13       Q.   Okay.  And when you say that, I

14   notice that --

15      MR. MOLL:

16           Let the record reflect the form

17   has several signature lines with blanks for

18   personal information numbered, numbers 1

19   through 13 in a two-column format.

20   EXAMINATION BY MR. MOLL:

21       Q.   If you could please point out

22   for the record where you're seeing --

23   please point out for the record where, if

24   anywhere, you see your name?

25       A.   Okay.  In column 1 under line

1 item 1 my name is printed and then right

2 above it there's a cursive version of it as

3 well, which is not my signature.

4   Q. Okay. As for the printed

5 letters that spell out your name, is that

6 your handwriting?

7   A. That's not my handwriting, no.

8   Q. Do you ever recall signing

9 anything on behalf of Maxim L.C. for a

10 Whitney Bank account?

11   A. I do not.

12   Q. Did Briante Palazaeno ever

13 mention a Whitney Bank account to you in

14 any of your discussions with him?

15   A. No, sir.

16   Q. Did anybody besides Briante

17 Palazaeno mention anything about a Whitney

18 Bank account?

19   A. No, sir.

20   Q. And did -- was any mention made

21 of any Whitney Bank account during or do

22 you ever -- let me rephrase. Do you ever

23 recall any mention of any Whitney Bank

24 account being made to you?

25   A. No, sir.

```
 1        Q.      With regard to Maxim L.C.?
 2        A.      No, sir.
 3        Q.      All right.  And I just have a
 4   couple of followup questions to the bank
 5   account issue.
 6        A.      That's fine.
 7        Q.      Obviously, you mentioned that --
 8   and so just to clarify for the record, the
 9   signature that appears on Exhibit 1, is
10   that in fact your signature?
11        A.      It's not my signature.
12        Q.      Okay.  Did you ever authorize
13   anybody to sign that document on your
14   behalf?
15        A.      Never.  The ladies in my office
16   do not have the authority to sign my name
17   on a Certificate of Insurance on my behalf,
18   because my name's attached to it.
19        Q.      Sure.
20        A.      So I wouldn't give anybody the
21   authority to sign my name, ever.
22        Q.      It's safe to say you keep a
23   personal policy of not giving out authority
24   to sign your name?
25        A.      That's correct.
```

```
 1          Q.    Okay.  And do you recall --
 2    obviously, you said the ladies at your
 3    office and an insurance certificate, you
 4    were in the insurance industry at the time
 5    of your dealings with Maxim.  So is it safe
 6    to say that at that time, during the time
 7    you knew Briante Palazaeno, no one had
 8    authority to sign your name to anything?
 9          A.    That's correct.
10          Q.    Okay.
11          A.    I refused to put one on file,
12    put under my name so they could
13    electronically sign it.
14          Q.    Okay.  And so to your knowledge,
15    dating back to when you moved to New
16    Orleans, so what would be --
17          A.    2010.
18          Q.    To your knowledge, were you ever
19    a signer on any business checking account
20    within the City of New Orleans?
21          A.    No, sir.
22          Q.    And to your knowledge, were you
23    ever the signer on any account held at the
24    Whitney Bank?
25          A.    No, sir.
```

```
 1          Q.    And on that line of questioning,
 2     with regards to any banking transactions
 3     for Maxim, did you ever have anything to do
 4     with any Maxim banking transactions?
 5          A.    None, never.
 6          Q.    Did you ever write any checks on
 7     behalf of the company?
 8          A.    None.
 9          Q.    And ever make any orders,
10     deposits into -- from Maxim's account or
11     into Maxim's account?
12          A.    No, sir.
13          Q.    Okay.  I want to talk a little
14     bit about the -- what was ultimately the
15     dissolution of Maxim L.C.  Did you ever
16     talk to Briante about him ending the
17     corporation Maxim L.C.?
18          A.    No, sir.
19          Q.    Do you recall him ever -- you
20     mentioned earlier your concerns that
21     Briante had about his, I guess, Shelly
22     Licciardi's --
23          MR. MOLL:
24               Go off the record for a second.
25               (Short Break.)
```

```
 1    EXAMINATION BY MR. MOLL:
 2         Q.    And we're back on the record.
 3    We just had some technical difficulties
 4    with the phone line and Mr. Lazarus.  Dave,
 5    can you confirm you're on the other end?
 6         MR. LAZARUS:
 7              Yeah, I'm still here.
 8         MR. MOLL:
 9              Okay.  Just so you're aware, Mr.
10    Archila, Mr. Lazarus is on the other end of
11    the phone.
12         THE WITNESS:
13              Okay.
14    EXAMINATION BY MR. MOLL:
15         Q.    So you had mentioned, I think,
16    in the beginning of our discussions
17    Briante's concerns with legal troubles of
18    his former dating partner's brother, Shelly
19    Licciardi's brother.  I remember you
20    mentioned that you weren't entirely sure of
21    what timeframe or whether you were sure of
22    what timeframe that occurred during.  But
23    did he reference those legal troubles with
24    any necessity that he felt to shut down the
25    business?
```

```
1        A.     No.

2        Q.     Do you recall?

3        A.     He did not shut down the

4   business.  I know he shut it down for a

5   little while and remodeled the restaurant,

6   kind of rebranded it and opened it up back

7   as a new name.  This time it was called

8   Cibugnù.

9        Q.     Cibugnù.  And, obviously, that

10  was the change from Leonardo Trattoria?

11       A.     To Cibugnù.  I thought it was

12  more out of necessity to compete with

13  Marcello's and Herbsaint, because I know he

14  had revamped the menu, he had brought in a

15  new chef.  They were competing at the -- I

16  don't know what you call them -- the chef

17  games or whatever -- Greater New Orleans

18  restaurant, something.  I don't know.  And

19  I know they won an award, second place or

20  something like that.

21       Q.     Cibugnù did?

22       A.     Cibugnù did, for one of their

23  dishes that they had brought to the -- to

24  the show.  I think it was the food and

25  beverage show or something.  I couldn't
```

1    tell you.

2        Q.    Okay.  So one of the reasons I

3    bring that up is, do you remember having

4    spoken with anybody from my office prior to

5    today?

6        A.    Mr. Lazarus.

7        Q.    Okay.  And do you recall what

8    you had relayed to them when you spoke with

9    them or what Mr. -- was it just Mr. Lazarus

10   you spoke with?

11       A.    No.  There was another gentleman

12   there.  I can't recall his name, but he

13   didn't say a whole bunch.  He was taking

14   notes more than anything.

15       Q.    So Dave did most of the talking?

16       A.    Dave did 95 percent of the

17   speaking.  I did about four percent and the

18   other gentleman did less than that.

19       Q.    Okay.  Do you recall when you

20   spoke with Dave speaking about the

21   dissolution of Maxim L.C.?

22       A.    I'm trying to --

23       Q.    Okay.  If you don't recall, it's

24   okay to say you don't remember.

25       A.    I don't.  I mean, it -- I -- I

```
 1    know that there was always, for lack of a
 2    better term, there was always a BS reason,
 3    always something that just seemed a little
 4    bit odd.  But, you know, I'll do the liquor
 5    license.  And this year, as a matter of
 6    fact, I told him this was the last year
 7    that I wanted -- that I was going to do
 8    that for him.
 9         Q.    Okay.
10         A.    Being in Thibodaux and all those
11    things, I didn't want to be involved.
12         Q.    And when you said there was
13    always a BS reason, what are you referring
14    to?
15         A.    Well, it was always, you know,
16    between him and Shelly breaking up and
17    wanting to separate himself -- separate
18    himself from her and then the
19    brother-in-law -- I don't know
20    brother-in-law -- Shelly's brother being
21    named in the Darren Sharper investigation,
22    it just always seemed a little bit
23    far-fetched.
24         Q.    And just to be clear, when you
25    say him, you're speaking of?
```

1       A.      Briante.

2            Q.      And so when you say the BS

3       reason, it was as though, would you say

4       that his explanations of certain things

5       within the restaurant caused you to

6       question them or --

7            A.      His explanations within certain

8       things within the restaurant, but

9       everything as a whole.  I mean, even the

10      woman that he's dating now, where the one

11      he was dating back then, Hillary Barq, you

12      know, some -- she was related to the Barq

13      family, the root beer, you know.

14           Q.      B-A-R-Q?

15           A.      B-A-R-Q.

16           Q.      Okay.

17           A.      And on her 28th birthday, she

18      was going to get her trust of five million

19      dollars or some crap like that.  It just

20      always seemed like there was --

21           Q.      And did he mention that to you?

22           A.      Yes.

23           Q.      Okay.

24           A.      He was the one that made that

25      known.

1      Q.    Was it something he almost

2    bragged about or was it more just it

3    happened in conversation?

4      A.    Yeah.  Well, you know, like I

5    said, whenever I moved home, I didn't come

6    around as much.  You know, I came into the

7    restaurant one night and was having dinner

8    and he introduced us and apparently now she

9    was on his staff and then, yeah, you know,

10   she's part of the Barq family and this and

11   that.  I just found it a bit far-fetched

12   that anyone that was related to root beer

13   kingpin would be working in a

14   hole-in-the-wall restaurant in downtown New

15   Orleans.

16     Q.    Sure.

17     A.    Driving a piece of crap BMW.

18     Q.    So it caused you to question

19   whether Briante was telling the truth?

20     A.    It made me question whether he

21   was telling the truth about that, but then

22   made me question whether he was a habitual

23   liar as well or if this was just a BS brag

24   story or what, you know.

25     Q.    So just to continue on the topic

1    of the dissolution of Maxim, so, to your

2    knowledge, did -- well, let me rephrase it.

3              Did Briante ever mention ending

4    the LC with you?

5         A.    When I came this last time, when

6    I came for my passport, beginning of last

7    year --

8         Q.    Okay.

9         A.    -- he said that he was in the

10   process of doing that. I don't recall the

11   exact reasons why. I think it was, again,

12   to further himself away from Shelly and her

13   brother. And I think just to -- you know

14   what? I don't want to -- I know you said

15   not to guess.

16        Q.    Uh-huh (Affirmative Response).

17        A.    But I think it was the way for

18   him to finally get Shelly completely off of

19   everything, because I think up to that

20   point there was still some ties to Shelly,

21   even with the changes.

22        Q.    Uh-huh (Affirmative Response).

23        A.    I think she was still somehow

24   included in the paperwork. I've never seen

25   it, so I wouldn't have the slightest clue.

ASSOCIATED REPORTERS, INC./504.529.3355

```
 1        Q.     Okay.
 2        A.     But I think dissolving that LLC
 3   and beginning a new one was his way of, I
 4   guess, starting over without her.
 5        Q.     Okay.  Was it safe to say he
 6   was -- would you say he was trying to
 7   separate from her?
 8        A.     That's what I thought.
 9        Q.     Okay.  That was your --
10        A.     That was my interpretation.
11        Q.     -- interpretation.  Okay.
12               And besides, I guess, his
13   concern, whatever you want to call it, with
14   Shelly's family and the -- Shelly's brother
15   and his legal troubles, did he give any
16   other reasons why he would want to distance
17   himself from Shelly?
18        A.     No, sir.
19        Q.     Okay.
20        A.     Like I say, we didn't talk much
21   about the business aside from the liquor
22   license.
23        Q.     So with regard to any
24   documentation necessary to complete that
25   dissolution of Maxim and start a new
```

```
 1     company, did he ever approach you for help
 2     starting the new company?
 3          A.    No, sir.
 4          Q.    Okay.
 5          A.    I don't know if -- when
 6     Mr. Lazarus came visit me, he produced a
 7     few documents and some changes that were
 8     made on the Secretary of State website that
 9     if you're looking at the paper and you
10     don't know me and I don't confirm that's my
11     signature, there was a few documents in
12     that, what he presented to me saying
13     basically the same, that I didn't sign
14     them, but it was a signature.
15          Q.    Electronic form?
16          A.    Electronic form.
17          Q.    Sure.
18          A.    Or there was also, I think,
19     something done via e-mail as well.
20          Q.    And those are actually something
21     that we will get into.
22          A.    Okay.
23          Q.    In a little bit.  But as far as
24     your recollection of the idea of ending one
25     LLC, starting a new one and/or changing
```

1   business names, did he ever ask you to

2   assist in any way, shape or form with the,

3   I guess, legal documentation behind that?

4        A.     No, sir.

5        Q.     Okay.

6        A.     He did not.  The only

7   involvement I had at any point was the, I

8   guess, liquor license police.

9        Q.     Uh-huh (Affirmative Response).

10  Oh, enforcement?

11       A.     ATF, maybe.

12       Q.     Okay.  And what was that?

13       A.     They sent out a lady to the

14  restaurant to conduct an inspection.

15       Q.     Okay.

16       A.     To give the license.  Initially

17  he thought I was going to need to be there

18  for that since my name was on the liquor

19  license but as it turns out, I didn't.

20       Q.     Is that for the first license or

21  the second one?

22       A.     The second one.

23       Q.     Okay.  And when you say the

24  second license, was that one done under the

25  new restaurant name?

```
 1        A.      I would imagine, yes, sir.
 2        Q.      Okay.
 3        A.      Like I say, I didn't meet with
 4   her.  I didn't -- any of that stuff.
 5        Q.      Sure.
 6                Do you recall, before you
 7   reviewed -- I mean, before you signed the
 8   application for the second liquor license,
 9   do you recall under what -- what L.C. was
10   applying for the license?
11        A.      I couldn't tell you.
12        Q.      Okay.  And so back again to the
13   dissolution of Maxim.  Were you aware of
14   what documentation is necessary to close
15   that company and start a new one?
16        A.      I wouldn't have the slightest
17   clue.
18        Q.      Okay.  Did you ever speak with
19   an attorney about documentation necessary
20   to close out, to dissolve Maxim L.C.?
21        A.      I would have no reason to, so
22   no.  No, sir.
23        Q.      To your knowledge, did Briante
24   Palazaeno ever speak with an attorney about
25   closing up or dissolving Maxim L.C.?
```

1    A.    As far as I know, he did.  As

2    far as I know, he did.  I can't -- I can't

3    remember he -- he would often reference his

4    attorney.

5        Q.    Okay.

6        A.    Because supposedly his attorney

7    was also his landlord.

8        Q.    Okay.  And when you say as far

9    as you know, he did, I guess is that based

10   on a conversation you-all had or is that

11   based on your knowledge of how he conducted

12   business?

13       A.    It would be based on I guess it

14   occurred, you know.  I didn't confer with

15   anybody.

16       Q.    Sure.

17       A.    Like I said, I had no hand in

18   the business so it wouldn't have been my

19   responsibility, nor would I volunteer that

20   service.

21       Q.    Right.

22       A.    But apparently he started a new

23   LLC, so somebody did it.

24       Q.    So it's your -- it's your best

25   guess that he would have spoken to an

1     attorney?

2          A.     That's correct.

3          Q.     Okay.

4          A.     And I would imagine he used her.

5          Q.     Okay.  And you weren't present

6     during any discussions between him and an

7     attorney about setting that thing up?

8          A.     No, sir.

9          Q.     Okay.  And obviously when I say

10    setting it up, you weren't present with any

11    attorney about dissolving one LLC and

12    starting another one?

13         A.     No.  That's correct.

14         Q.     Okay.  So throughout the time

15    that you've known Briante till now, are you

16    aware of who the members of Maxim L.C.

17    were?

18         A.     After Dave came, he informed me

19    that apparently I was.

20         Q.     Uh-huh (Affirmative Response).

21    But I guess prior -- prior to your

22    discussion with anybody from our office,

23    did you have any knowledge of who --

24         A.     No, sir.

25         Q.     -- was a member of the LC?

```
 1        A.      I had assumed it was Bri and
 2    Shelly.
 3        Q.      Okay.  And what led you to that
 4    assumption?
 5        A.      Just due to him wanting to rid
 6    her of any type of control.
 7        Q.      Okay.
 8        A.      Anything like that.  And he
 9    specifically called her his business
10    partner as well.
11        Q.      Okay.  He did call her that?
12                When you would frequent -- when
13    you would frequent the restaurant when you
14    lived here, you had mentioned earlier you
15    wouldn't recognize Shelly Licciardi if you
16    had seen her.  Is it safe to say that you
17    never -- you were never introduced to her
18    at the restaurant?
19        A.      No.
20        Q.      To your knowledge, was she ever
21    there when you were there?
22        A.      Not as far as I know.
23        Q.      Okay.  And as far as the
24    day-to-day operations of the restaurant, to
25    your knowledge, who ran the restaurant?
```

1        A.      There was a couple different
2    people while Bri and I -- when I lived
3    here.  It was Bri most of the time.  One of
4    his head waitresses, I can't remember her
5    name, but they parted ways.  Then I think
6    Chris, his nickname was Cheese.
7        Q.      Okay.
8        A.      I think his last name is
9    Timpone.  He ran it for a while and then as
10   far as I know, he was let go.  And then a
11   guy named Dave.  I couldn't tell you what
12   Dave's last name is but he was one -- at
13   one point he was one of his chefs and he
14   often ran the restaurant.  And as far as I
15   know now, it's Hillary, unless they broke
16   up and he ran her off, too.
17       Q.      And you said Bri was there most
18   of the time.  And when people were let go,
19   was it Briante that was the one making
20   those decisions, to your knowledge?
21       A.      I would assume, yes.
22       Q.      Okay.
23       A.      Like, for example, when I came
24   in one day, when I left to go home, when I
25   moved home, Chris was running the

1     restaurant.

2          Q.     Okay.

3          A.     And then my girlfriend and I

4     came in one night, we went to have dinner

5     and Chris was no longer there and Dave was

6     running the restaurant.  And then about six

7     months, seven months later, we come in and

8     we're like hey, where's Dave.  He's not

9     here any longer.

10         Q.     And when was that most recent

11    time that you were there?

12         A.     Mardi Gras, last year.

13         Q.     Okay.  So about --

14         A.     Almost a year.

15         Q.     -- February 2015, safe to say?

16         A.     Yes, sir.

17         Q.     And when you referenced those

18    other times when somebody else was running

19    things or somebody else was at the

20    restaurant, that would have been in 2014?

21         A.     Yeah, prior to that.

22         Q.     With people coming and going,

23    the Chris that you referenced and Dave that

24    you referenced, was Briante still at the

25    restaurant the entire -- throughout that

```
 1    time period?
 2         A.    Yes, sir.
 3         Q.    Okay.
 4         A.    He's been the only one that's
 5    consistent.
 6         Q.    Okay.  And who would you say,
 7    who would you surmise to be the owner of
 8    the restaurant?
 9         A.    Bri.  Nothing happened in that
10    restaurant without him knowing about it.
11    The menu didn't change, a drink wasn't
12    given away.  I mean, I know that.  That was
13    just from the few times I was there.  He
14    was very, very passionate about being the
15    person that made the decisions.
16         Q.    And you could surmise that just
17    from being around him and --
18         A.    Oh, yes, sir.
19         Q.    Okay.  I guess he would say
20    or -- say different things or act certain
21    ways that would tell you that?
22         A.    There's been a couple of times
23    where Becky and I would go in and have
24    dinner and he would be hanging out with us
25    at the table and something would happen and
```

1    he would drop whatever we were doing,

2    whatever we were eating, and he would go

3    tend to it and a little while later, come

4    back, sit down, get up, go handle something

5    else, you know, things like that.

6         Q.    Okay.  And so shifting to the

7    claim filed with the Deepwater Horizon

8    Economic Claims Center, did Briante ever

9    discuss that with you?

10        A.    No, sir.

11        Q.    Okay.

12              Had you ever been aware of

13   the -- or had anybody ever spoken to you

14   about the business and economic loss claims

15   program?

16        A.    Nobody had ever spoken of it,

17   but being what I do.

18        Q.    Sure.

19        A.    You know, I have some energy and

20   marine accounts, I was aware of what was

21   going on with the BP claim center.

22        Q.    Okay.

23        A.    I never looked more into it, but

24   I knew there was some relief out there for

25   businesses that were hurting due to the

1    lack of oilfield production.

2         Q.    Were you ever involved with any

3    other claims?

4         A.    None, no, sir.

5         Q.    Okay.  So had you ever come to

6    know the requirements of filing a claim for

7    a business?

8         A.    No, sir.

9         Q.    Were you ever made aware of the

10   amounts of any potential awards for any

11   types of business?

12        A.    No, sir.

13        Q.    Were you ever made aware of the

14   award amount potential for a restaurant

15   located within the City of New Orleans?

16        A.    No, sir.

17        Q.    Did Briante ever mention

18   receiving a claims award from the Deepwater

19   Horizon Economic Claims Center?

20        A.    No, sir.

21        Q.    Did he ever discuss an attorney

22   with you by the name of Richard Trainor?

23        A.    No, sir.

24        Q.    Okay.  And even to this day, are

25   you aware of -- are you aware of whether

1    Maxim received any award from the program?

2    Had you been made aware of that?

3        A.      Through Mr. Lazarus and I

4    figured there was a good reason I'm here.

5        Q.      So only from personnel within

6    the claims center --

7        A.      That's correct.

8        Q.      -- office?  Sure.

9            And so by the same token, you

10   wouldn't know what documents needed to be

11   submitted to the program in order to

12   receive an award?

13       A.      I wouldn't know where to begin.

14       Q.      Okay.  All right.  I have a

15   couple of documents that I want to show you

16   and go through with you.

17           Like I did before, I'm going to

18   mark the documents with an exhibit number.

19   When I show it to you, just please review

20   it.

21       A.      Okay.

22       Q.      And we'll be finished.

23       A.      What year was the BP spill

24   again?  The leak.  Everybody calls it a

25   spill.  It was a leak.

1    Q.    I can tell you that the spill

2    occurred in 2010.

3    A.    Okay.

4    Q.    Okay.  I'm going to show you

5    what I will ask the court reporter to mark

6    as Exhibit 2.  And if you would please

7    review it and let me know when you have

8    finished reviewing it.

9    A.    (Witness complies.)  Okay.

10   Q.    Okay.  And so what you have

11   before you is Exhibit 2.  Are you able to

12   identify Exhibit 2?

13   A.    Yes, sir.

14   Q.    And how?  What is Exhibit 2?

15   A.    It's a -- it says Notice of

16   Change, I assume, from the Secretary of

17   State website.

18   Q.    Okay.

19          And what is the date of that

20   document?

21   A.    Electronic signature is

22   4/12/2013.

23   Q.    As of that date, as of

24   4/12/2013, had you seen that document

25   before?

70

1      A.      No, sir.

2      Q.      Okay.  Prior to today, have you

3   seen this document?

4      A.      I think Mr. Lazarus showed it to

5   me when he came to my home.

6      Q.      Okay.  And when he showed you

7   that document, do you recall what your

8   response was to him?

9      A.      I was shocked.

10      Q.      Okay.  And before getting into

11   the reasons for that, do you recognize your

12   name anywhere on that document?

13      A.      I see my name, yes, sir.

14      Q.      Okay.  And what does your name

15   appear as, according to that document?

16      A.      A manager member.

17      Q.      As of the date of that document,

18   April 12th, 2013, were you in fact, to your

19   knowledge, a member manager of Maxim L.C.?

20      A.      I was not.

21      Q.      Okay.  Had you agreed in any

22   way, shape or form to be the -- a member

23   manager of Maxim L.C.?

24      A.      No, sir.

25      Q.      Prior to your first seeing that,

```
 1    as you stated, the first time you had seen
 2    it was when Mr. Lazarus showed you that
 3    document back on what would have been, I
 4    believe, July 7th, 2015, had you seen it
 5    prior to that date?
 6         A.    No, sir.
 7         Q.    Had you ever signed any paper
 8    documents that could have been put into an
 9    electronic format that that document is in?
10         A.    Not that I know of, no, sir.
11         Q.    And you said it was titled
12    Notice of Change.  What is the -- what
13    business is referenced on that document, on
14    Exhibit 2?
15         A.    Maxim L.C.
16         Q.    I'm going to now show you what I
17    will ask the court reporter to mark as
18    Exhibit 3.  If you could please review
19    Exhibit 3 and let me know when you've
20    finished reviewing it.
21         A.    (Witness complies.)  Okay.
22         Q.    And are you able to identify
23    Exhibit 3?
24         A.    I am.
25         Q.    And what do you recognize
```

1    Exhibit 3 to be?

2        A.    It shows it's also a Notice of
3    Change.

4        Q.    Okay.  What is the date of that
5    notices of change?

6        A.    6/11/2013.

7        Q.    Does your name appear on that
8    notice?

9        A.    Twice.

10       Q.    Okay.  And how does it appear?

11       A.    Once as a manager member and
12    then the second place is my electronic
13    signature.

14       Q.    On that date, what would be June
15    11th, 2013, did you authorize anybody to
16    electronically sign your signature?

17       A.    I did not.

18       Q.    Did you electronically sign that
19    document on that date?

20       A.    I did not.

21       Q.    Prior to that date and
22    subsequent to the April 12th, 2013, Notice
23    of Change, did you agree to be a member
24    manager of Maxim L.C.?

25       A.    No, sir.

1      Q.      Between April 12th, 2013, and
2   June 11th, 2013, did you have any
3   discussions at all with Briante Palazaeno
4   about becoming a member of Maxim L.C.?
5      A.      No, sir.
6      Q.      And as you referenced earlier,
7   as of that date, had you ever met Shelly
8   Licciardi?
9      A.      No, sir.
10      Q.      Okay.  Therefore, safe to say
11   you never had any discussions with her
12   about becoming a member?
13      A.      No, sir.
14      Q.      Okay.  And I'm going to show you
15   now what I'm marking as -- ask the court
16   reporter to mark as Exhibit 4.  Please
17   review Exhibit 4 and let me know when you
18   are finished.
19      A.      (Witness complies.)  Okay.
20      Q.      And can you identify Exhibit 4?
21      A.      It's also a Notice of Change.
22      Q.      Okay.  And of what company?
23      A.      Maxim L.C.
24      Q.      Okay.  And what is the date of
25   that document?

```
 1         A.    7/12/2013.
 2         Q.    Okay.  Do you see your name on
 3    this document as well?
 4         A.    Twice again.
 5         Q.    Okay.  And how does your name
 6    appear on this document?
 7         A.    The first time is manager member
 8    and the second place is another electronic
 9    signature.
10         Q.    And do you see any other -- what
11    other names -- do you recognize any of the
12    names on this Notice of Change?
13         A.    Well, two:  First one is
14    Cibugnù, which is the name of the new
15    restaurant, and then another one, Primo
16    Massimiliano.
17         Q.    And what do you recognize that
18    name to be?
19         A.    Bri's dog that passed away a
20    couple years ago.
21         Q.    Okay.  What is the name of Bri's
22    dog listed as according to the Notice of
23    Change?
24         A.    Primo Massimiliano.  He is an
25    agent.
```

1        Q.    Okay.  Did you know the dog's
2    name as of July 12th, 2013?
3        A.    Yes, sir.
4        Q.    Would you have signed a document
5    with the dog's name appearing on the Notice
6    of Change on that date?
7        A.    I would not, no, sir.
8        Q.    Are you aware of any living
9    person or any person that was living as of
10   July 12th, 2013, with the name of Primo
11   Massimiliano?
12       A.    I do not.
13       Q.    And do you recognize the e-mail
14   address that appears after the name of the
15   dog?
16       A.    I don't recognize it, but I
17   can -- I can read it.
18       Q.    Okay.  But, to your knowledge,
19   had you ever received any e-mails from that
20   e-mail address?
21       A.    No, sir.
22       Q.    Okay.
23       A.    No.
24       Q.    I'm going to show you what I'm
25   going to ask the court reporter to mark as

1    Exhibit 5.  I'm handing you Exhibit 5.  Do

2    you recognize or can you identify Exhibit

3    5?

4         A.    It just says Limited Liability

5    Company Annual Report.

6         Q.    Okay.

7         A.    For period ending 6/19/2014 from

8    Maxim L.C.

9         Q.    Have you seen this document

10   before?

11        A.    I have not.

12        Q.    Okay.  And does your name appear

13   on this document?

14        A.    It does.

15        Q.    And what does your name appear

16   as?

17        A.    Manager member.

18        Q.    And what is the date of this

19   document?

20        A.    6 -- 6/25/2014.

21        Q.    As of 6/25/2014, had you agreed

22   with Briante Palazaeno or any other living

23   person to become the member manager of

24   Maxim L.C.?

25        A.    No, sir.

77

1       Q.    And had you agreed as of the

2    date of this document to become member

3    manager of Cibugnù, what we believe to be

4    the new restaurant name of Maxim L.C.?

5       A.    No, sir.

6       Q.    Do you recognize any other names

7    that appear on that document?

8       A.    Yes, sir.

9       Q.    And which names would that be?

10       A.    The dog again, Primo

11    Massimiliano.

12       Q.    And what is he listed as on the

13    document?

14       A.    New registered agent.

15       Q.    Okay.

16       A.    And also he has an electronic

17    signature at the bottom.

18       Q.    And when you say he?

19       A.    I'm sorry, the dog.

20       Q.    So who in fact signed that

21    document?  Who appears to have signed that

22    document?

23       A.    Primo Massimiliano.

24       Q.    Is there a listed e-mail address

25    anywhere on the document?

```
 1        A.      Yes, sir.
 2        Q.      And what is that e-mail address?
 3        A.      Briante1492@ymail.com.
 4        Q.      Do you recognize that e-mail
 5    address?
 6        A.      No, sir.
 7        Q.      Do you recall whether you'd
 8    received any e-mails from that address?
 9        A.      No, sir.
10        Q.      And just one more thing.  Did
11    you ever authorize the filing of this
12    particular document with the Secretary of
13    State?
14        A.      No, sir.
15        Q.      And in reference to Exhibits 2,
16    3 and 4 that you previously reviewed, did
17    you authorize the filing of those with the
18    Secretary of State?
19        A.      No, sir.
20        Q.      I'm going to show you now what
21    I'm marking -- going to ask the court
22    reporter to mark as Exhibit 6.  And can you
23    please identify Exhibit 6?
24        A.      It says State of Louisiana
25    Affidavit to Dissolve Limited Liability
```

1    Company.

2        Q.    And have you seen this document

3    before?

4        A.    No, sir.

5        Q.    Does your name appear on this

6    document?

7        A.    Twice.

8        Q.    And what does your name appear

9    under?

10       A.    It shows as a member and then

11   that there was an electronic signature

12   given 6/11/2015.

13       Q.    And is that in fact the date of

14   that document?

15       A.    I believe so, yes, sir.

16       Q.    Okay.   Did you sign this

17   document on June 11th, 2015,

18   electronically?

19       A.    No, sir.

20       Q.    Did you fill out any other piece

21   of paper or sign any other document on June

22   11th, 2015?

23       A.    No, sir.

24       Q.    Prior to June 11th, 2015, when

25   is the last time you recall meeting with

1    Briante Palazaeno?

2        A.     February, March.

3        Q.     Okay.  And in that time, did

4    you-all have any discussions about

5    dissolving Maxim L.C.?

6        A.     No, sir.

7        Q.     Do you recognize any e-mail

8    addresses that appear on that document?

9        A.     Well, he's got

10   Briante1492@ymail.com.

11       Q.     Okay.  And where is that listed?

12       A.     Next to my name.

13       Q.     Did you ever authorize the

14   filing of this affidavit of dissolution?

15       A.     No, sir.

16       Q.     Were you ever present with a

17   notary to sign an affidavit of dissolution

18   for Maxim L.C.?

19       A.     No, sir.

20       Q.     And so the document states on it

21   Maxim L.C. is no longer doing business,

22   owes no debts and is dissolved by this

23   filing, by filing this affidavit with the

24   Secretary of State, executed by the member

25   or organizer if no membership interests

1    have been issued attesting to such facts.

2              Do you ever recall signing any

3    document after having been read that

4    paragraph?

5         A.    No, sir.

6         Q.    As of the date June 11th, 2015,

7    did you believe to have any authority from

8    which to dissolve Maxim L.C.?

9         A.    I never believed I had any

10   authority to do any of that.

11        Q.    Okay.  And as of that date,

12   going backwards from that date prior, did

13   you ever believe you had any authority to

14   act on behalf of the business?

15        A.    No, sir.

16        Q.    And so as of this date, nobody

17   had ever approached you to sign any

18   affidavit regarding Maxim L.C.?

19        A.    No, sir.

20        Q.    Okay.  And so to your

21   recollection, besides the two liquor

22   licenses that you signed your name to, did

23   you sign your name to any other notarized

24   documents or did you witness any other

25   documents be notarized on behalf of Maxim?

1        A.      No, sir.

2        Q.      Okay.  I'm going to show you

3    what's -- what I'm marking as Exhibit 7.

4    I'm showing Mr. Archila Exhibit 7.  Can you

5    please identify Exhibit 7?

6        A.      Members Organizations

7    Authorization of Dissolution.

8        Q.      Okay.  Have you ever seen this

9    document before?

10       A.      No, sir.

11       Q.      Does your name appear on this

12   document?

13       A.      Twice as well.

14       Q.      Okay.  And what is the date of

15   this document?

16       A.      6/11/2015.

17       Q.      And under what capacity does

18   your name appear on this document?

19       A.      Member organizer and then member

20   organizer signature.

21       Q.      Did you in fact sign this

22   document?

23       A.      No, sir, I did not.

24       Q.      Did you ever authorize anybody

25   to sign your name to this document?

```
 1         A.     No, sir.
 2         Q.     Were you ever made aware that
 3    your name would be used for any -- for this
 4    document?
 5         A.     No, sir.
 6         MR. MOLL:
 7              Just give me one moment.  I'm
 8    going to -- we can go off the record.
 9              (Short Break.)
10    EXAMINATION BY MR. MOLL:
11         Q.     So just to continue, just a
12    couple of just additional questions, you
13    had mentioned the lawyer that -- the
14    lawyer's office you went to for what was
15    the second liquor license that you signed.
16         A.     Uh-huh (Affirmative Response).
17         Q.     And I wanted to ask if the name,
18    whether that was the law office of Darleen
19    Jacobs?  Does that name ring a bell?
20         A.     That might be her.
21         Q.     Okay.  Darleen Jacobs Levy?
22         A.     That might be it.
23         Q.     Okay.  Alrighty.
24         A.     I just remember Bri telling me
25    that her or her family owned a lot of
```

1    property in the French Quarter.

2         Q.    Okay.

3         A.    Warehouse, CBD area.

4         Q.    And was she in fact -- do you

5    recall it actually being on St. Louis

6    Street?  Is that the street?

7         A.    Does it run parallel with Canal?

8         Q.    I believe it does.

9         A.    If so, then that would be it,

10   yeah.

11        Q.    Okay.

12              And you mentioned one of the

13   guys at the restaurant was Dave.  Does the

14   name Dave Marquee ring a bell?

15        A.    I never knew his last name.

16        Q.    Never knew his last name?  Okay.

17   Fair enough.

18        A.    I just remember he was scruffy,

19   kind of a bigger fellow.

20        Q.    Okay.  But he seemed to be more

21   of a manager than an owner?

22        A.    Yes.  Yes.

23        Q.    Okay.

24        A.    I know he was a mechanic for a

25   while.

1          Q.      Okay.

2          A.      He was a cook for Bri for a

3     while, then he left and went, worked

4     somewhere else.   I think he got short on

5     cook staff.   He came back and then he was

6     in the kitchen and then like I said, one

7     day I -- Becky and I show up and --

8          Q.      He was gone?

9          A.      No.   He was there, but more

10    running it than cooking.

11         Q.      I see.

12         A.      He wasn't in the kitchen any

13    longer.   He was wearing a white outfit.

14         Q.      Got you.   And it's safe to say

15    that all along Briante functioned as the

16    owner of the restaurant?

17         A.      That's correct.

18         Q.      So as far as you knew, at the

19    end of the day, if the restaurant did well,

20    he would reap the rewards from that?

21         A.      That's correct.

22         Q.      And if it went under, went bad,

23    then that would be on him at the end of the

24    day?

25         A.      That's correct.

1          Q.     Okay.  Or his responsibility, to

2     say it correctly.

3          A.     Correct.

4          Q.     You had mentioned -- so you

5     mentioned the documents that were -- you

6     identified that you had not in fact signed

7     the documents referenced earlier from

8     Exhibits 2 through 7 and you had mentioned

9     that the last time you had spoken with

10    Briante prior to those -- prior to the date

11    of those documents would have been

12    February, I guess, Mardi Gras of last year,

13    which would have been sometime in February

14    of 2015?

15         A.     I believe it was after Mardi

16    Gras.

17         Q.     After Mardi Gras, yeah?

18         A.     Because we had done Mardi Gras,

19    then I had to come back in to do my

20    passport.

21         Q.     The passport?

22         A.     I went to the office right

23    there, Canal Place.

24         Q.     So since that date, have you had

25    any further contact with Briante?

1        A.      Every once in a while he'll call
2    me out of the blue.  I know most recently
3    he was looking for some insurance for his
4    condo, but I don't do that.
5        Q.      Sure.
6        A.      But very topical conversations.
7    I mean, I've made a pretty good effort to
8    not be around.  In lieu of all the
9    conversation I had with Mr. Lazarus, you
10   can imagine I wasn't very happy finding out
11   that my name was on documents that I didn't
12   sign, bank accounts that I didn't sign for.
13   I mean, it's just a lot of things, good
14   reasons why I don't want to be around the
15   guy.
16       Q.      Sure.
17       A.      But I've never told him why.  I
18   just don't come around.  I just don't come
19   around.
20       Q.      So safe to say you've kept in
21   touch loosely?
22       A.      Before that or since?
23       Q.      Or since.
24       A.      I have not dialed his phone
25   number.

1          Q.     Okay.  Fair.

2          A.     I received a couple phone calls

3     from him.

4          Q.     And do you remember when the

5     last?

6          A.     The last one, he actually called

7     me -- a lady from the city inspector's

8     office called me, wanting to go do an

9     inspection, I guess food, I don't remember

10    which office it was.

11         Q.     Okay.

12         A.     She wanted to go do a

13    walk-through of the restaurant and she

14    called my because my name was on some

15    documents, and I explained to her that I

16    was not an owner and that I would not be

17    conducting, nor did I have keys or any of

18    those good things.

19              And apparently they called his

20    attorney, the landlord, who called him.  He

21    called their office, then he called me a

22    little bit upset that I did not call and

23    give him a heads up that somebody was

24    looking for him, and that was the end of

25    that conversation.

 1          Q.    Okay.

 2          MR. MOLL:

 3                I think that's all I've got.

 4     Dave, do you got anything else?  Dave, you

 5     there?

 6          MR. LAZARUS:

 7                No.   Good.

 8          MR. MOLL:

 9                Thanks for hanging on the line

10     with us, Dave.

11          MR. LAZARUS:

12                Okay.   Thank you, guys.

13          MR. MOLL:

14                I don't have any other questions

15     of you, Mr. Archila.  I appreciate your

16     time.

17          THE WITNESS:

18                No problem.

19          MR. MOLL:

20                And do you have any questions of

21     me?

22          THE WITNESS:

23                No, sir.  I mean, I found out a

24     lot, but that's about it.  So thank you.

25          MR. MOLL:

```
 1                    All right.  Thank you for your
 2   time.  And with that, I'll conclude the
 3   deposition.
 4
 5
 6
 7
 8
 9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
```

1          REPORTER'S CERTIFICATE
2
3          I, ROBERT K. TUCKER, Certified Court
4     Reporter, in and for the State of
5     Louisiana, as the officer before whom this
6     testimony was taken, do hereby certify that
7     the above-mentioned witness, after having
8     been first duly sworn by me upon authority
9     of R.S. 37:2554, did testify as
10    hereinbefore set forth;
11          That the testimony was reported by
12    me in stenotype and transcribed under my
13    personal direction and supervision, and is
14    a true and correct transcript, to the best
15    of my ability and understanding;
16          That the transcript has been
17    prepared in compliance with transcript
18    format guidelines required by statute or by
19    rules of the board;
20          That I have acted in compliance with
21    the prohibition on contractual
22    relationships, as defined by Louisiana Code
23    of Civil Procedure Article 1434 and in
24    rules and advisory opinions of the board;
25          That I am not of counsel, not

ASSOCIATED REPORTERS, INC./504.529.3355

1    related to counsel or the parties herein,

2    nor am I otherwise interested in the

3    outcome of this matter.

4           This certificate is valid only for a

5    transcript accompanied by my original

6    signature and original required seal on

7    this page.

8

9

10

11    ROBERT K. TUCKER
      CERTIFIED COURT REPORTER
12    STATE OF LOUISIANA
      CERTIFICATE NO. 87307
13

14

15

16

17

18

19

20

21

22

23

24

25

**[**

**[sic] (1)**
10:7

**1**

**1 (8)**
43:23;44:2,4,7,18,
25;45:1;46:9
**1099 (1)**
34:9
**11th (6)**
72:15;73:2;79:17,
22,24;81:6
**12 (2)**
16:14;19:13
**123 (1)**
38:19
**12th (5)**
70:18;72:22;73:1;
75:2,10
**13 (3)**
32:6,11;44:19
**15 (1)**
33:11
**16 (2)**
19:12;32:6
**1992 (1)**
41:11

**2**

**2 (7)**
69:6,11,12,14;
71:14;78:15;86:8
**2000 (2)**
9:3;16:13
**2004 (2)**
9:11;14:16
**2006 (1)**
9:10
**2007 (2)**
8:6;9:13
**2010 (3)**
36:25;47:17;69:2
**2011 (3)**
16:13;17:3;36:25
**2012 (4)**
10:15;17:4;19:14;
31:23
**2013 (9)**
31:24,24;70:18;
72:15,22;73:1,2;
75:2,10
**2014 (1)**
64:20
**2015 (8)**
29:12;64:15;71:4;
79:17,22,24;81:6;
86:14
**20th (1)**

29:21
**28th (1)**
53:17

**3**

**3 (5)**
71:18,19,23;72:1;
78:16

**4**

**4 (4)**
73:16,17,20;78:16
**4/12/2013 (2)**
69:22,24
**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 (1)**
8:24

**5**

**5 (3)**
76:1,1,3
**523 (1)**
38:19

**6**

**6 (3)**
76:20;78:22,23
**6/11/2013 (1)**
72:6
**6/11/2015 (2)**
79:12;82:16
**6/19/2014 (1)**
76:7
**6/25/2014 (2)**
76:20,21

**7**

**7 (4)**
82:3,4,5;86:8
**7/12/2013 (1)**
74:1
**7th (1)**
71:4

**8**

**8/18/1977 (1)**
8:21

**9**

**95 (1)**
51:16

**A**

**able (3)**
21:11;69:11;71:22
**above (1)**

45:2
**absolutely (3)**
36:13;38:2;43:18
**accident (1)**
22:7
**accordance (1)**
4:8
**according (2)**
70:15;74:22
**account (17)**
35:11;41:3,6;
42:14,15;43:2,12;
45:10,13,18,21,24;
46:5;47:19,23;48:10,
11
**accounts (3)**
43:6;66:20;87:12
**achieved (1)**
9:3
**across (2)**
38:12;39:2
**act (2)**
65:20;81:14
**actually (9)**
22:24;24:1;25:9;
30:7;33:8;34:6;
57:20;84:5;88:6
**additional (1)**
83:12
**address (8)**
17:23;30:23;
75:14,20;77:24;78:2,
5,8
**addresses (1)**
80:8
**administering (1)**
4:22
**administrator's (1)**
5:13
**advice (1)**
13:17
**Affidavit (5)**
78:25;80:14,17,23;
81:18
**Affirmative (12)**
13:4;15:1;18:11;
19:25;20:9;21:7;
32:8;55:16,22;58:9;
61:20;83:16
**aforementioned (1)**
4:5
**afraid (2)**
21:10;30:3
**again (9)**
6:6;7:16;34:1,20;
55:11;59:12;68:24;
74:4;77:10
**agent (2)**
74:25;77:14
**ago (6)**
8:4;13:7,10;29:15;
34:1;74:20
**agree (2)**

21:25;72:23
**agreed (7)**
4:3;22:2;23:23;
39:15;70:21;76:21;
77:1
**ahead (1)**
29:9
**Almost (3)**
29:15;54:1;64:14
**along (2)**
34:18;85:15
**Alrighty (6)**
9:5;10:23;11:11,
18;15:11;83:23
**although (1)**
11:25
**always (8)**
38:5;52:1,2,3,13,
15,22;53:20
**America (2)**
41:17,22
**amount (1)**
67:14
**amounts (1)**
67:10
**and/or (1)**
57:25
**anniversary (1)**
29:22
**Annual (1)**
76:5
**Annunciation (3)**
38:10,19,25
**apartment (2)**
36:5;38:9
**apparently (5)**
20:4;54:8;60:22;
61:19;88:19
**appear (12)**
70:15;72:7,10;
74:6;76:12,15;77:7;
79:5,8;80:8;82:11,18
**appearing (1)**
75:5
**appears (3)**
46:9;75:14;77:21
**application (11)**
25:4,5,20,21;26:3;
30:13;31:5,5,8,14;
59:8
**applying (2)**
26:22;59:10
**appreciate (1)**
89:15
**approach (1)**
57:1
**approached (3)**
19:18;39:6;81:17
**April (3)**
70:18;72:22;73:1
**ARCHILA (11)**
5:1,5,9;11:14;
42:20,23;43:21;44:1;

49:10;82:4;89:15
**area (2)**
36:11;84:3
**arose (1)**
13:6
**around (13)**
8:7;16:13;19:14;
20:21,25;36:23;38:7;
54:6;65:17;87:8,14,
18,19
**aside (1)**
26:16;37:7;56:21
**aspects (1)**
5:14
**assessment (1)**
30:19
**assist (1)**
58:2
**associated (2)**
23:13;34:15
**associates (1)**
28:10
**association (1)**
21:12
**assume (3)**
6:12;63:21;69:16
**assumed (1)**
62:1
**assumption (1)**
62:4
**ATF (1)**
58:11
**attached (5)**
13:8;22:10,13;
23:13;46:18
**attesting (1)**
81:1
**attorney (21)**
12:13,15,17,24;
13:16;22:17;26:24;
27:1,7;28:5,14,15;
59:19,24;60:4,6;
61:1,7,11;67:21;
88:20
**attorney's (2)**
27:18;28:4
**authority (7)**
46:16,21,23;47:8;
81:7,10,13
**Authorization (1)**
82:7
**authorize (6)**
46:12;72:15;
78:11,17;80:13;
82:24
**award (5)**
50:19;67:14,18;
68:1,12
**awards (1)**
67:10
**aware (15)**
11:15;12:18;14:2;
49:9;59:13;61:16;

column (1)
44:25

comfortable (1)
23:24

coming (1)
64:22

commercial (1)
11:10

commuting (1)
32:22

companies (1)
41:21

company (17)
9:16;16:2,4;17:14;
21:21;33:16;34:4,8;
40:10;41:16;48:7;
57:1,2;59:15;73:22;
76:5;79:1

comped (1)
39:23

compensation (1)
40:5

compete (1)
50:12

competing (1)
50:15

complete (1)
56:24

completed (2)
31:6,14

completely (1)
55:18

complex (1)
38:9

complies (3)
69:9;71:21;73:19

concern (1)
56:13

concerns (3)
23:21;48:20;49:17

conclude (1)
90:2

condo (1)
87:4

conduct (3)
13:12;42:9;58:14

conducted (1)
60:11

conducting (1)
88:17

confer (3)
26:24;27:6;60:14

confirm (3)
20:14;49:5;57:10

consistent (1)
65:5

contact (1)
86:25

contacted (3)
19:2;22:19;43:12

continue (1)
31:25;54:25;83:11

control (1)

62:6

convention (1)
32:25

conversation (5)
19:18;54:3;60:10;
87:9;88:25

conversations (2)
14:6;87:6

cook (2)
85:2,5

cooking (1)
85:10

copy (1)
31:18

Corey (1)
5:10

corner (2)
37:20;38:22

Corporation (2)
10:16;48:17

correctly (1)
86:2

Cotton (3)
38:12,15,24

counsel (1)
4:4

couple (10)
5:16;9:12;18:9;
46:4;63:1;65:22;
68:15;74:20;83:12;
88:2

course (2)
26:21;36:20

Court (9)
4:19;5:20;6:23;
43:22;69:5;71:17;
73:15;75:25;78:21

coverage (1)
15:9

coverages (1)
15:6

crap (2)
53:19;54:17

current (4)
10:20;14:14,19;
15:3

currently (1)
9:19

cursive (1)
45:2

**D**

dad (3)
41:13;42:20;43:9

Darleen (1)
83:18,21

Darren (2)
20:4;52:21

date (25)
8:19;21;33:1;
35:14;69:19,23;
70:17;71:5;72:4,14,

19,21;73:7,24;75:6;
76:18;77:2;79:13;
81:6,11,12,16;82:14;
86:10,24

dating (9)
16:14;17:6;18:6;
35:1,6;47:15;49:18;
53:10,11

Dave (15)
11:13;49:4;51:15,
16,20;61:18;63:11;
64:5,8,23;84:13,14;
89:4,4,10

Dave's (1)
63:12

day (8)
15:2;19:2,3;63:24;
67:24;85:7,19,24

day-to-day (1)
62:24

dealings (2)
18:23;47:5

debt (1)
34:14

debts (1)
80:22

decided (1)
32:24

decisions (2)
63:20;65:15

Deepwater (3)
5:11;66:7;67:18

denied (1)
34:5

Department (1)
11:2

deposed (2)
7:24;12:18

deposition (10)
4:5,16;5:16;8:7;
11:16,23;12:11;
13:13,21;90:3

deposits (1)
48:10

describe (1)
19:17

designation (1)
11:9

dialed (1)
87:24

diaries (1)
14:5

difference (1)
24:10

different (4)
38:16;39:16;63:1;
65:20

difficulties (1)
49:3

dime (1)
34:8

dinner (4)
18:17;54:7;64:4;

65:24

discuss (6)
12:4,23;14:24;
26:13;66:9;67:21

discussed (1)
12:25

discussion (1)
61:22

discussions (10)
33:13,16,25;34:3;
45:14;49:16;61:6;
73:3,11;80:4

dishes (1)
50:23

displayed (1)
25:10

dissolution (8)
48:15;51:21;55:1;
56:25;59:13;80:14,
17;82:7

dissolve (3)
59:20;78:25;81:8

dissolved (1)
80:22

dissolving (4)
56:2;59:25;61:11;
80:5

distance (1)
56:16

distinct (1)
43:20

District (2)
36:4;37:16

divorce (2)
8:3,10

document (41)
46:13;69:20,24;
70:3,7,12,15,17;71:3,
9,13;72:19;73:25;
74:3,6;75:4;76:9,13,
19;77:2,7,13,21,22,
25;78:12;79:2,6,14,
17,21;80:8,20;81:3;
82:9,12,15,18,22,25;
83:4

documentation (5)
13:8;56:24;58:3;
59:14,19

documents (17)
12:7,8;15:17;
34:23;57:7,11;68:10,
15,18;71:8;81:24,25;
86:5,7,11;87:11;
88:15

dog (8)
35:18,24,25;74:19,
22;75:15;77:10,19

dogs (2)
36:9,16

dog's (2)
75:1,5

dollars (1)
53:19

65:24

done (4)
30:3;57:19;58:24;
86:18

down (16)
5:21;6:2,15;18:17;
29:18;31:10,11,14;
36:18;38:23,25;42:8;
49:24;50:3,4;66:4

downtown (1)
54:14

drink (2)
18:18;65:11

drinking (1)
23:10

driving (2)
22:9;54:17

drop (1)
66:1

drunken (1)
22:8

due (3)
21:12;62:5;66:25

duly (1)
5:2

during (11)
15:12;23:11;28:8;
33:1,14;35:4;39:19;
45:21;47:6;49:22;
61:6

**E**

earlier (5)
11:13;35:11;
48:20;62:14;73:6;
86:7

easy (1)
42:4

eat (2)
39:17,21

eating (1)
66:2

Eaves (2)
9:25;10:5

E-A-V-E-S (1)
10:8

Economic (4)
5:12;66:8,14;
67:19

educational (1)
8:25

effort (1)
87:7

either (5)
14:7,23;15:5;
18:17;43:5

Electronic (8)
57:15,16;69:21;
71:9;72:12;74:8;
77:16;79:11

electronically (4)
47:13;72:16,18;
79:18

handed (1)
28:10

handing (1)
76:1

handle (1)
66:4

handwriting (2)
45:6,7

hanging (2)
65:24;89:9

happen (1)
65:25

happened (5)
27:7;30:1;41:5;
54:3;65:9

happy (1)
87:10

head (2)
6:3;63:4

heads (1)
88:23

health (1)
11:4

held (1)
47:23

help (3)
19:21;39:7;57:1

Herbsaint (2)
17:24;50:13

hereby (2)
4:6,14

hereto (1)
4:4

hey (2)
23:6;64:8

highest (1)
42:5

Hillary (2)
53:11;63:15

himself (4)
52:17,18;55:12;
56:17

history (2)
9:6;14:15

hold (1)
10:25

hole-in-the-wall (1)
54:14

home (8)
22:20;32:3,18;
33:7;54:5;63:24,25;
70:5

Honda (1)
38:6

honestly (2)
34:15;39:15

Horizon (3)
5:11;66:7;67:19

Houma (5)
33:8,9;41:11;42:1,
6

hours (1)
36:12

house (2)
13:10;14:2

huge (1)
36:16

humorously (1)
38:3

hurry (1)
29:24

hurting (1)
66:25

**I**

idea (1)
57:24

identified (1)
86:6

identify (7)
8:19;69:12;71:22;
73:20;76:2;78:23;
82:5

illegal (1)
37:18

illegally (2)
37:11,12

imagine (3)
59:1;61:4;87:10

included (1)
55:24

including (1)
15:9

income (1)
34:14

Industries (1)
13:2

industry (1)
47:4

inform (1)
26:10

information (5)
13:11,14;26:5;
30:23;44:18

informed (1)
61:18

Initially (1)
58:16

insinuate (1)
34:3

inspection (2)
58:14;88:9

inspector's (1)
88:7

instructional (1)
5:17

insurance (15)
9:10,15,20,24;
11:2,10;14:16,25;
15:12;22:5;23:4;
46:17;47:3,4;87:3

interests (1)
80:25

interpretation (2)
56:10,11

into (16)
18:21;22:16,16,18;
27:11;28:10,23;29:4;
43:9;48:10,11;54:6;
57:21;66:23;70:10;
71:8

introduced (4)
16:2,18;54:8;
62:17

investigation (1)
52:21

investigations (1)
20:5

involved (3)
34:16;52:11;67:2

involvement (2)
15:23;25:8;58:7

issue (1)
46:5

issued (1)
81:1

issues (3)
20:2,21,22

item (1)
45:1

**J**

Jacobs (2)
83:19,21

job (1)
15:4

Johnny's (2)
29:1,1

Jr (1)
5:9

JULIO (5)
5:1,9;8:15;42:20,
23

July (3)
71:4;75:2,10

jump (1)
29:8

June (6)
72:14;73:2;79:17,
21,24;81:6

Junior (2)
42:24,25

**K**

keep (2)
14:12;46:22

kept (3)
13:25;14:4;87:20

keys (1)
88:17

kind (9)
12:2;14:6;18:23;
30:9;38:3;39:11;
40:4;50:6;84:19

kingpin (1)
54:13

kiosk (2)
24:22,23

kitchen (2)
85:6,12

knew (11)
17:7;27:14;35:4;
36:4,20;40:13;47:7;
66:24;84:15,16;
85:18

knowing (1)
65:10

knowledge (15)
7:18;26:4;40:11;
47:14,18,22;55:2;
59:23;60:11;61:23;
62:20,25;63:20;
70:19;75:18

known (2)
53:25;61:15

**L**

lack (2)
52:1;67:1

ladies (2)
46:15;47:2

lady (3)
42:16;58:13;88:7

Lakeside (6)
24:15,17,18,19,24;
31:6

landlord (2)
60:7;88:20

landmark (1)
29:25

Laris (1)
9:20

Last (14)
29:14;52:6;55:5,6;
63:8,12;64:12;79:25;
84:15,16;86:9,12;
88:5,6

late (3)
18:15,16,17

later (4)
19:2;20:23;64:7;
66:3

law (4)
4:8;28:13,17;
83:18

lawyer (1)
83:13

lawyer's (1)
83:14

Lazarus (15)
11:13;13:9;14:1;
49:4,6,10;51:6,9;
57:6;68:3;70:4;71:2;
87:9;89:6,11

LC (30)
13:3,24;15:23;
16:2;33:19;45:9;
46:1;48:15,17;51:21;

kiosk — continued
55:4;59:9,20,25;
61:16,25;70:19,23;
71:15;72:24;73:4,23;
76:8,24;77:4;80:5,
18,21;81:8,18

leak (2)
68:24,25

learn (2)
18:3;38:1

least (4)
25:12;30:16;
31:22;32:12

led (1)
62:3

leery (1)
22:6

left (5)
10:15;27:21;
28:12;63:24;85:3

legal (6)
21:21;22:3;49:17,
23;56:15;58:3

Leonardo (1)
50:10

Leonardo's (3)
17:17,19;18:4

less (1)
51:18

letters (1)
45:5

Levy (1)
83:21

liability (5)
34:11,18;39:25;
76:4;78:25

liar (1)
54:23

Licciardi (3)
20:17;62:15;73:8

Licciardi's (2)
48:22;49:19

license (36)
11:1;19:7;21:9,18;
22:1;23:25;25:3,4,5,
16;26:16,22;27:2,16;
30:13;31:8,18;33:15;
34:2,7,7,22;39:6,13;
40:17;41:2;52:5;
56:22;58:8,16,19,20,
24;59:8,10;83:15

licenses (4)
10:24;11:7;25:9;
81:22

lieu (1)
87:8

life (1)
11:3

Limited (2)
76:4;78:25

line (6)
11:13;14:19;
44:25;48:1;49:4;
89:9

nothing's (1)
40:16
notice (10)
44:14;69:15;
71:12;72:2,8,22;
73:21;74:12,22;75:5
notices (1)
72:5
November (1)
8:8
Number (3)
8:20;68:18;87:25
numbered (1)
44:18
numbers (2)
26:13;44:18

## O

oath (3)
4:22;6:20,21
objections (1)
4:12
obtaining (1)
26:21
obviously (5)
5:23;46:7;47:2;
50:9;61:9
occurred (4)
8:7;49:22;60:14;
69:2
October (1)
8:7
odd (1)
52:4
off (6)
37:11,23;48:24;
55:18;63:16;83:8
offhand (1)
20:16
office (18)
5:13;9:21;11:14;
12:21;23:1;24:21;
27:18;46:15;47:3;
51:4;61:22;68:8;
83:14,18;86:22;88:8,
10,21
offices (3)
28:14,17;42:3
officiated (1)
4:21
often (2)
60:3;63:14
oilfield (3)
41:16,18;67:1
once (3)
23:23;32:19;37:8;
72:11;87:1
one (43)
5:22;9:8;11:8;
15:8;19:2,2;23:16;
28:9;29:5;35:24;
36:19;43:6;47:7,11;

50:22;51:2;53:10,24;
54:7;56:3;57:24,25;
58:21,22,24;59:15;
61:11,12;63:3,12,13,
13,19,24;64:4;65:4;
74:13,15;78:10;83:7;
84:12;85:6;88:6
only (10)
21:17;30:21;34:7;
39:14,25;41:18;42:2;
58:6;65:4;68:5
opened (1)
50:6
operations (1)
62:24
opposed (1)
6:2
order (1)
68:11
orders (1)
48:9
Organizations (1)
82:6
organizer (3)
80:25;82:19,20
Orleans (12)
4:20;9:23;16:15;
19:1;32:5;36:25;
43:1;47:16,20;50:17;
54:15;67:15
out (27)
9:20;10:17;16:16;
19:21;24:2,12;25:19;
27:2;30:9,15,22;
32:5;37:3;44:21,23;
45:5;46:23;50:12;
58:13,19;59:20;
65:24;66:24;79:20;
87:2,10;89:23
outfit (1)
85:13
outside (2)
10:19;14:20
over (2)
42:16;56:4
overlooked (1)
36:5
owe (1)
40:19
owes (1)
80:22
own (6)
15:8,13;17:15;
31:19;34:4;35:24
owned (5)
15:17,19;22:19;
36:1;83:25
owner (11)
16:5,7;22:19;23:8,
15,16;40:10;65:7;
84:21;85:16;88:16
ownership (1)
34:11

owns (1)
41:15

## P

pages (3)
25:22,25;26:1
paid (1)
40:19
Palazaeno (10)
16:9,9,25;45:12,
17;47:7;59:24;73:3;
76:22;80:1
P-A-L-A-Z-A-E-N-O (1)
16:11
paper (7)
27:20,23,24,25;
57:9;71:7;79:21
paperwork (5)
24:3,15;28:11;
30:16;55:24
paragraph (1)
81:4
parallel (2)
29:6;84:7
Parish (1)
4:20
parked (2)
37:10,12
parking (4)
37:13,14,17;38:5
part (4)
4:16;11:6;34:4;
54:10
parted (1)
63:5
particular (1)
78:12
parties (1)
4:4
partner (3)
20:13;35:6;62:10
partners (2)
19:24;21:4
partner's (2)
20:10;49:18
passed (1)
74:19
passionate (1)
65:14
passport (6)
27:12;29:23;30:6;
55:6;86:20,21
past (1)
33:5
patron (2)
26:19,20
pay (3)
39:17,20,22
payment (2)
39:12,14
people (4)
22:12;63:2,18;

64:22
percent (2)
51:16,17
performed (1)
24:25
period (3)
10:7;65:1;76:7
perks (1)
40:4
person (6)
5:22;22:14;65:15;
75:9,9;76:23
personal (4)
30:22;31:2;44:18;
46:23
personally (1)
26:24
personnel (1)
68:5
phone (7)
11:16;42:13,21;
49:4,11;87:24;88:2
piece (6)
27:20,23,24,25;
54:17;79:20
piss (2)
37:11,23
place (8)
8:19;22;18:7;
29:10;50:19;72:12;
74:8;86:23
please (13)
5:7;6:1;7:16,19;
8:18;44:21,23;68:19;
69:6;71:18;73:16;
78:23;82:5
po-boy (1)
29:2
Po-Boys (1)
29:1
point (10)
12:1;13:20;21:20;
26:8;27:9;44:21,23;
55:20;58:7;63:13
police (1)
58:8
policy (1)
46:23
potential (3)
14:24;67:10,14
potentially (1)
15:6,8;25:23
Poydras (2)
10:10;18:14
preparation (1)
11:19
prepare (1)
11:22
prepared (1)
12:1
present (4)
28:15;61:5,10;
80:16

presented (1)
57:12
pretty (3)
25:7;36:11;87:7
previously (1)
78:16
pricing (1)
15:10
Primo (5)
74:15,24;75:10;
77:10,23
printed (2)
45:1,4
prior (17)
10:12;12:11,15;
15:11;24:7;51:4;
61:21,21;64:21;70:2,
25;71:5;72:21;
79:24;81:12;86:10,
10
problem (2)
27:17;89:18
Procedure (1)
4:7
procedures (1)
25:15
proceeding (2)
6:23;8:10
process (5)
24:1;26:9;27:1,20;
55:10
produced (1)
57:6
producer (1)
10:18
production (1)
67:1
professional (2)
10:24;11:10
program (4)
14:25;66:15;68:1,
11
property (3)
9:13;11:3;84:1
purchased (1)
10:1
purely (1)
8:10
purposes (1)
4:8
put (4)
21:25;47:11,12;
71:8
putting (2)
19:6;23:24

## Q

Quarter (5)
27:18;28:18,21,23;
84:1
quickly (1)
38:1

85:4
**show (12)**
43:21;50:24,25;
68:15,19;69:4;71:16;
73:14;75:24;78:20;
82:2;85:7
**showed (4)**
14:1;70:4,6;71:2
**showing (2)**
44:1;82:4
**shows (2)**
72:2;79:10
**shut (3)**
49:24;50:3,4
**side (3)**
9:14;17:25;29:2
**sign (20)**
28:11,11;46:13,16,
21,24;47:8,13;57:13;
72:16,18;79:16,21;
80:17;81:17,23;
82:21,25;87:12,12
**signature (20)**
34:21;43:17;44:6,
9,11,12,17;45:3;
46:9,10,11;57:11,14;
69:21;72:13,16;74:9;
77:17;79:11;82:20
**signed (11)**
27:20,22;39:5;
59:7;71:7;75:4;
77:20,21;81:22;
83:15;86:6
**signer (2)**
47:19,23
**signing (7)**
4:10;33:18;34:22;
39:12;41:2;45:8;
81:2
**Simply (1)**
7:21
**sit (1)**
66:4
**six (2)**
37:24;64:6
**slightest (2)**
55:25;59:16
**slow (1)**
6:15
**Social (3)**
8:20,23;31:1
**somebody (4)**
60:23;64:18,19;
88:23
**somehow (3)**
21:5;42:13;55:23
**sometime (1)**
86:13
**somewhere (2)**
13:9;85:4
**sorry (1)**
77:19
**sought (1)**

4:17
**South (1)**
41:17
**speak (10)**
5:22,23;6:14;
12:10,14;22:17;
26:25;35:10;59:18,
24
**speaking (4)**
13:15;51:17,20;
52:25
**specific (2)**
22:14;30:17
**specifically (5)**
4:11;34:6;40:9,21;
62:9
**spell (2)**
10:6;45:5
**spelled (1)**
16:10
**spend (1)**
32:24
**spill (3)**
68:23,25;69:1
**split (1)**
19:24
**spoke (5)**
13:10;26:15;51:8,
10,20
**spoken (5)**
51:4;60:25;66:13,
16;86:9
**spot (2)**
19:22;37:25
**St (4)**
17:22;36:15;
42:17;84:5
**staff (3)**
40:1;54:9;85:5
**Stands (1)**
11:9
**start (3)**
18:22;56:25;59:15
**started (3)**
15:13;16:14;60:22
**starting (3)**
56:4;57:2,25;
61:12
**State (11)**
4:21;5:7;9:4;11:1;
22:22;57:8;69:17;
78:13,18,24;80:24
**stated (2)**
8:12;71:1
**states (1)**
80:20
**still (6)**
18:25;32:22;49:7;
55:20,23;64:24
**stipulated (1)**
4:3
**story (1)**
54:24

**Street (7)**
17:22;28:25;
37:17;39:2;42:17;
84:6,6
**streets (1)**
29:5
**stuff (2)**
40:18;59:4
**stupid (1)**
10:18
**submitted (1)**
68:11
**subsequent (1)**
72:22
**substances (2)**
7:9,13
**sudden (1)**
36:19
**suit (1)**
21:4
**supply (1)**
41:16
**supposed (2)**
44:8,10
**supposedly (1)**
60:6
**sure (23)**
6:8;23:9,12;26:20;
30:4,24;32:20;33:3;
34:12,19;36:10;
37:21;46:19;49:20,
21;54:16;57:17;
59:5;60:16;66:18;
68:8;87:5,16
**surmise (2)**
65:7,16
**sworn (1)**
5:2
**system (1)**
42:19

---

## T

**table (1)**
65:25
**talk (6)**
11:19;15:22;19:4;
48:13,16;56:20
**talked (3)**
14:13;19:5;22:22
**talking (2)**
18:22;51:15
**tax (1)**
34:11
**teacher (1)**
9:9
**technical (1)**
49:3
**telecommunications (1)**
41:19
**telling (4)**
40:22;54:19,21;
83:24

**tenant (1)**
41:10
**tend (1)**
66:3
**term (1)**
52:2
**testified (1)**
5:3
**Thanks (1)**
89:9
**theoretical (1)**
23:6
**Therefore (1)**
73:10
**thereof (1)**
4:16
**Thibodaux (4)**
27:8;33:7,12;
52:10
**thinking (1)**
22:6
**though (1)**
53:3
**thought (5)**
12:3;42:14;50:11;
56:8;58:17
**throughout (2)**
61:14;64:25
**tickets (1)**
37:24
**tied (2)**
21:6;22:8
**ties (1)**
55:20
**till (2)**
5:24;61:15
**timeframe (2)**
49:21,22
**times (4)**
18:9;64:18;65:13,
22
**Timpone (1)**
63:9
**tip (1)**
39:25
**tips (1)**
40:3
**title (2)**
10:21;40:12
**titled (1)**
71:11
**today (15)**
5:15;7:2,5,10,14;
11:20,23;12:4,12,15,
19,25;13:21;51:5;
70:2
**together (5)**
18:10;26:25;
35:15,24;36:1
**token (1)**
68:9
**told (4)**
13:1;40:9;52:6;

87:17
**took (2)**
10:2;29:10
**topic (1)**
54:25
**topical (1)**
87:6
**topics (2)**
12:3,24
**touch (1)**
87:21
**town (3)**
27:8,11,14
**Trainor (1)**
67:22
**transactions (2)**
48:2,4
**transfer (2)**
41:23;42:9
**transpired (1)**
41:7
**trattoria (4)**
17:19,20;18:4;
50:10
**Trooper (1)**
22:22
**troubles (3)**
49:17,23;56:15
**trust (1)**
53:18
**truth (3)**
7:10;54:19,21
**truthfully (2)**
6:18;7:2
**trying (5)**
15:3;19:12;42:14;
51:22;56:6
**TUCKER (1)**
4:19
**turn (1)**
37:3
**turns (1)**
58:19
**Twice (4)**
72:9;74:4;79:7;
82:13
**two (7)**
18:1,18;36:1,8,18;
74:13;81:21
**two-column (1)**
44:19
**type (10)**
5:17;10:23;15:18;
22:7;29:22;34:10,11,
13,14;62:6
**types (1)**
67:11
**typically (1)**
16:22

---

## U

**ultimately (6)**

# ACCOUNT APPLICATION
## Signature Card for Additional Signers

| ACCOUNT NUMBER | | |
|---|---|---|
| 0047030886 | BUSINESS CHECKING | 5/10/2013 |

1  MAXIM LC
2  700 ST. CHARLES AVE.
   NEW ORLEANS, LA 70130

SIGNATURE(S)  THE UNDERSIGNED AGREE(S) TO THE TERMS STATED ON THIS PAGE, AND ACKNOWLEDGE(S) RECEIPT OF A COMPLETED COPY ON TODAY'S DATE. THE UNDERSIGNED ALSO ACKNOWLEDGE(S) RECEIPT OF A COPY OF AND AGREE(S) TO THE TERMS OF THE FOLLOWING DISCLOSURE(S)

☐ Electronic Funds Transfer Disclosure    ☐ Funds Availability Disclosure
☐ Truth in Savings Disclosure              ☐ Terms and Conditions

**EXHIBIT**

tabbies

_1_

(1)  X _Julia Archila_
     X  _Julio Archila_  .  DATE _____
     SSN _____ D O B _____
     ID TYPE/# _____
     ISSUE DATE _____ EXP DATE _____

(2)  X _____ DATE _____
     SSN _____ D O B _____
     ID TYPE/# _____
     ISSUE DATE _____ EXP DATE _____

(3)  X _____ DATE _____
     SSN _____ D O B _____
     ID TYPE/# _____
     ISSUE DATE _____ EXP DATE _____

(4)  X _____ DATE _____
     SSN _____ D O B _____
     ID TYPE/# _____
     ISSUE DATE _____ EXP DATE _____

(5)  X _____ DATE _____
     SSN _____ D O B _____
     ID TYPE/# _____
     ISSUE DATE _____ EXP DATE _____

(6)  X _____ DATE _____
     SSN _____ D O B _____
     ID TYPE/# _____
     ISSUE DATE _____ EXP DATE _____

(7)  X _____ DATE _____
     SSN _____ D O B _____
     ID TYPE/# _____
     ISSUE DATE _____ EXP DATE _____

(8)  X _____ DATE _____
     SSN _____ D O B _____
     ID TYPE/# _____
     ISSUE DATE _____ EXP DATE _____

(9)  X _____ DATE _____
     SSN _____ D O B _____
     ID TYPE/# _____
     ISSUE DATE _____ EXP DATE _____

(10) X _____ DATE _____
     SSN _____ D O B _____
     ID TYPE/# _____
     ISSUE DATE _____ EXP DATE _____

(11) X _____ DATE _____
     SSN _____ D O B _____
     ID TYPE/# _____
     ISSUE DATE _____ EXP DATE _____

(12) X _____ DATE _____
     SSN _____ D O B _____
     ID TYPE/# _____
     ISSUE DATE _____ EXP DATE _____

(13) X _____ DATE _____
     SSN _____ D O B _____
     ID TYPE/# _____
     ISSUE DATE _____ EXP DATE _____

DEP SVS
DATE
MAY 17 2013
RECEIVED

**INTERNAL USE ONLY**

Short Name  MAXIM LC

Sys Type  010   COMMERCIAL

Linkage  BUSINESS          MAXIM LC

         Authorized Signer    BRIANTE PALAZAENO

FMP8C74   Rev 10/24/2012

## Notice Of Change

**Charter Number:**                                       36476591 K

**Name:**                                                          MAXIM L.C.

**Mailing Address:**
C/O SHELLY LICCIARDI
709 ST. CHARLES AVE.
NEW ORLEANS, LA  70130

**Registered Office Address in Louisiana:**
709 ST. CHARLES AVE.
NEW ORLEANS, LA  70130

**Agents:**

SHELLY LICCIARDI ()
709 ST. CHARLES AVE.
NEW ORLEANS, LA  70130

**Managers/Members:**

SHELLY LICCIARDI (Member, Manager)
709 ST. CHARLES AVE.
NEW ORLEANS, LA  70130

BRIANTE PALAZAENO (Member)
709 ST.CHARLES AVE.
NEW ORLEANS, LA  70130

JULIO ARCHILA (Manager, Member)
709 ST. CHARLES AVE.
NEW ORLEANS, LA  70130

To be electronically signed by a member or manager.

**Electronic Signature:**                          BRIANTE PALAZAENO
                                                                  (4/12/2013)



## Notice Of Change

**Charter Number:**                    36476591K

**Name:**                              MAXIM L.C.

**Mailing Address:**
C/O SHELLY LICCIARDI
709 ST. CHARLES AVE.
NEW ORLEANS, LA  70130

**Registered Office Address in Louisiana:**
709 ST. CHARLES AVE.
NEW ORLEANS, LA  70130

**Agents:**

SHELLY LICCIARDI (briante1492@ymail.com)
709 ST. CHARLES AVE.
NEW ORLEANS, LA  70130

**Managers/Members:**

BRIANTE PALAZAENO (Member)
709 ST.CHARLES AVE.
NEW ORLEANS, LA  70130

JULIO ARCHILA (Manager, Member)
709 ST. CHARLES AVE.
NEW ORLEANS, LA  70130

To be electronically signed by a member or manager. The filing of a false
public record, with the knowledge of its falsity, is a crime, subjecting the filer
to fine or imprisonment or both under R.S. 14:133.

**Electronic Signature:**                JULIO ARCHILA
                                         (6/11/2013)



## Notice Of Change

**Charter Number:**                              36476591K

**Name:**                                       MAXIM L.C.

**Mailing Address:**
C/O CIBUGNU'
709 ST. CHARLES AVE.
NEW ORLEANS, LA  70130

**Registered Office Address in Louisiana:**
709 ST. CHARLES AVE.
NEW ORLEANS, LA  70130

**Agents:**

PRIMO MASSIMILIANO (by_the_tracks@ymail.com)
IN CARE OF CIBUGNU'
709 SAINT CHARLES AVE
NEW ORLEANS, LA  70130

**Managers/Members:**

JULIO ARCHILA (Manager, Member)
709 ST. CHARLES AVE.
NEW ORLEANS, LA  70130

To be electronically signed by a member or manager. The filing of a false
public record, with the knowledge of its falsity, is a crime, subjecting the filer
to fine or imprisonment or both under R.S. 14:133.

**Electronic Signature:**                    JULIO ARCHILA
                                             (7/12/2013)



| Tom Schedler<br>Secretary of State | **LIMITED LIABILITY COMPANY**<br>**ANNUAL REPORT**<br>**For Period Ending**<br>6/19/2014 | 36476591K<br>2014 |
|---|---|---|

| **Mailing Address Only**   (INDICATE CHANGES TO THIS ADDRESS IN THIS BOX) | (INDICATE CHANGES TO THIS ADDRESS IN THIS BOX) |
|---|---|
| 36476591 K<br>MAXIM L.C.<br><br>C/O CIBUGNU'<br>709 ST. CHARLES AVE.<br>NEW ORLEANS, LA 70130 | Registered Office Address in Louisiana<br>(Do not use P. O. Box)<br>709 ST. CHARLES AVE.<br>NEW ORLEANS, LA 70130<br><br>Federal Tax ID Number |

Our records indicate the following registered agents for the company. Indicate any changes or deletions below. All agents must have a Louisiana address. Do not use a P.O. Box.   **A**
**NEW REGISTERED AGENT REQUIRES A NOTARIZED SIGNATURE.**
PRIMO MASSIMILIANO
   IN CARE OF CIBUGNU' 709 SAINT CHARLES AVE NEW ORLEANS, LA 70130

| I hereby accept the appointment of registered agent(s). | Sworn to and subscribed before me on<br>NOTARY NAME MUST BE TYPED OR PRINTED WITH NOTARY # |
|---|---|
| **New Registered Agent Signature** | **Notary Signature**            **Date** |

This report reflects a maximum of three members/managers for the company. Indicate any changes or deletions below. Include a listing of all names and addresses. Do not use a P.O. Box. If additional space is needed attach an addendum. *Officer titles, such as president or secretary are not acceptable* .

JULIO ARCHILA                                                    Manager, Member
   709 ST. CHARLES AVE.  NEW ORLEANS, LA  70130

The filing of a false public record, with the knowledge of its falsity, is a crime, subjecting the filer to the fine or imprisonment or both under R.S. 14:133.

| **SIGN ➡** | To be signed by a manager, member, or agent<br>PRIMO MASSIMILIANO<br>(SIGNED ELECTRONICALLY) | Title | Phone | Date<br>06/25/2014 |
|---|---|---|---|---|
| | Signee's address | Email Address<br>briante1492@ymall.com | | (For Office Use Only) |

| Enclose filing fee of       $30.00<br>Make remittance payable to Secretary of State<br>**Do Not Send Cash**<br>**Do Not Staple**  '<br>web site:  www.sos.louisiana.gov       **DO NOT STAPLE** | Return by:       6/19/2014<br>To:  **Commercial Division**<br>P. O. Box 94125<br>**Baton Rouge, LA 70804-9125**<br>Phone (225) 925-4704 | 1 |
|---|---|---|

UNSIGNED REPORTS WILL BE RETURNED

**EXHIBIT**
5

## STATE OF LOUISIANA
## AFFIDAVIT TO DISSOLVE LIMITED LIABILITY COMPANY
### (R.S. 12:1335.1)

**MAXIM L.C.**

is no longer doing business, owes no debts, and is dissolved by filing this affidavit with the Secretary of State, executed by the member(s), or organizer(s) if no membership interests have been issued, attesting to such facts.

**Members:**

JULIO ARCHILA (Briante1492@ymail.com)
709 ST CHARLES
NEW ORLEANS, LA 70130

The filing of a false public record, with the knowledge of its falsity, is a crime, subjecting the filer to fine or imprisonment or both under R.S. 14:133.

**Electronic Signature:**

JULIO ARCHILA (6/11/2015)

**Title:** MNGR/MBR

EXHIBIT

C

**SECRETARY OF STATE**



## Members/Organizers Authorization of Dissolution

**Charter Number:** 36476591K

**Charter Name:**   MAXIM L.C.

The Members/Organizers listed below authorize the dissolution on behalf of the Charter Name above.

| Date Responded | Members/Organizers | Members/Organizers Signature |
|---|---|---|
| 06/11/2015 | JULIO ARCHILA | JULIO ARCHILA |



EXHIBIT
7