# UNITED STATES DISTRICT COURT

## EASTERN DISTRICT OF LOUISIANA

| | |
|---|---|
| PEARL RIVER FISHERIES OF LOUISIANA, LLC, BAYOU CARLIN FISHERIES, INC. and BAYOU CADDY FISHERIES, INC. | CIVIL ACTION NO.<br><br>SECTION "J"<br>HONORABLE CARL BARBIER |
| Versus | DIVISION: ( )<br>MAGISTRATE |
| BP EXPLORATION & PRODUCTION, INC.<br>BP AMERICA PRODUCTION COMPANY<br>BP AMERICA, INC.<br>BP CORPORATION NORTH AMERICA, INC., and<br>BP PRODUCTS NORTH AMERICA, INC. | |

## COMPLAINT

**COME NOW**, Pearl River Fisheries of Louisiana, LLC, Bayou Carlin Fisheries, Inc., and Bayou Caddy Fisheries, Inc., Plaintiffs in the above styled and numbered cause, appearing though undersigned counsel, and for their complaint against BP EXPLORATION & PRODUCTION, INC., BP AMERICA PRODUCTION COMPANY, BP AMERICA, INC., BP CORPORATION NORTH AMERICA, INC., AND BP PRODUCTS NORTH AMERICA, INC., (collectively "BP"), respectfully represent:

## THE PARTIES

1.

At all material times, Pearl River Fisheries of Louisiana, LLC ("Pearl River") was and still is a limited liability company organized under, and pursuant to, the laws of the state of Louisiana with its principle place of business in Slidell, Louisiana. Pearl River is a leaseholder and operator of oyster leases.


EXHIBIT B

2.

At all material times, Bayou Carlin Fisheries, Inc. ("Bayou Carlin") was and still is a corporation organized under, and pursuant to, the laws of the state of Louisiana with its principle place of business in Delcambre, Louisiana. Bayou Carlin is an operator of oyster leases, a shrimp dock, and is a wholesaler and retailer of seafood.

3.

At all material times, Bayou Caddy Fisheries, Inc. ("Bayou Caddy") was and still is a corporation organized under, and pursuant to, the laws of the state of Mississippi with its principle place of business in Lakeshore, Mississippi. Bayou Caddy was and still is a leaseholder of oyster beds, an operator of oyster leases and a seafood wholesaler and retailer.

4.

Defendant BP Exploration & Production, Inc. ("BP Exploration") is a Delaware corporation with its principal place of business in Warrenville, Illinois. This Court has personal jurisdiction over BP Exploration, because BP Exploration is registered to do business in Louisiana, does business in Louisiana, and has a registered agent in Louisiana.

5.

Defendant BP America Production Company is a Delaware corporation with its principal place of business in Houston, Texas. This Court has personal jurisdiction over BP America Production Company, because BP America Production Company is registered to do business in Louisiana, does business in Louisiana, and has a registered agent in Louisiana.

6.

Defendant BP America, Inc. is a Delaware corporation with its principal place of business in Houston, Texas. BP America, Inc. owns BP Exploration & Production, Inc. The

Court has personal jurisdiction over BP America, Inc. because it is licensed to do business in Louisiana and conducts business here.

7.

Defendant BP Corporation North America, Inc. is an Indiana corporation with its principal place of business in Houston, Texas. The Court has personal jurisdiction over BP Corporation North America, Inc. because it is licensed to do business in Louisiana and conducts business here.

8.

Defendant BP Products North America, Inc. is a Maryland corporation with its principal place of business in Illinois. The Court has personal jurisdiction over BP Products North America, Inc. because it conducts business in Louisiana.

## JURISDICTION AND VENUE

9.

This Court has jurisdiction over this action pursuant to 28 U.S.C. Section 1332(a)(4) because this case arises from complete diversity of the parties and the amount in controversy exceeds the sum of $75,000.00.

10.

In addition, this Court has jurisdiction over this action pursuant to the Oil Pollution Act of 1990, 33 U.S.C. § 2717 (b) (the "OPA").

11.

Prosecution of this action in this district is proper under 28 U.S.C. § 1391 because the events or omissions giving rise to the claims asserted herein occurred in this district.

12.

Venue is also proper pursuant to the OPA, 33 U.S.C. 2717 (b), as the discharge occurred in this district.

## FACTUAL ALLEGATIONS

13.

BP Exploration was a lease holder and the designated operator in the lease granted by the former Minerals Management Service ("MMS") allowing it to perform oil exploration, drilling, and production-related operations in Mississippi Canyon Block 252, the location known as "Macondo" where the Spill originated.

14.

As the lease holder and designated operator, BP was responsible for all oil exploration, drilling, and production-related operations on the lease, including all operations at the Macondo Well.

15.

On April 20, 2010, as a result of BP's grossly negligent acts and omissions, there was a blowout of the Macondo Well, marking the beginning of what would become the most pervasive and devastating environmental disaster in the history of the United States, with over 200 million gallons of BP's oil being released from the April 20, 2010 blowout until the well was permanently sealed on or around September 19, 2010.

16.

Each day during the course of the Spill, tens of thousands of barrels of crude oil gushed from BP's wellhead on the seafloor, eventually surfacing and forming a widening oil slick so large it was visible from space, as well as spreading out in vast subsurface plumes of oil and

dispersant chemicals that came to rest on the seafloor at many different depths, damaging ecosystems and privately owned and leased sea beds throughout the Gulf of Mexico, including Plaintiffs.

17.

Since the Spill began, unprecedented amounts of raw crude oil and other toxic chemicals have encroached on and contaminated the Gulf of Mexico and the ecologically sensitive shorelines, beaches, marshes, harbors, estuaries, bayous, and bays (the "Coastal Zones") of Louisiana and Mississippi damaging the environment and Plaintiffs' real and personal property.

18.

The oil released during the Spill contains benzene, toluene, polyaromatic hydrocarbons, and other compounds (collectively referred to as Total Petroleum Hydrocarbons, or "TPH"), all of which are known carcinogens. Discharge of the toxic pollutants, as identified in 40 C.F.R. § 401.15, likely includes, but is not limited to, benzene, toluene, naphthalene, polynuclear aromatic hydrocarbons (including, but not limited to, phenanthrene, benzanthracenes, benzophyrenes, benzofloranthene, chrysenes, dibenzanthracenes, and idenopyrenes), fluoranthene, arsenic, cadmium, copper, mercury, and nickel, all of which are hazardous to the health of humans and marine life. Upon information and belief, BP has analyzed and knows the exact concentrations of each of the toxic pollutants present in the oil coming from its wells.

19.

The Spill and the resulting contamination of the Coastal Zone and Plaintiffs' real property including their oyster leases have caused and will continue to cause a loss of revenue for Plaintiffs, who rely on the use of the Gulf of Mexico and its marine life.

20.

Beginning on April 20, 2010, the Spill from BP's Macondo Well prevented Plaintiffs from operating their oyster leases and seafood businesses in Louisiana and Mississippi, and prevented plaintiffs from harvesting their oysters, and operating their wholesale and retail seafood businesses, also causing losses from natural predators and conditions which could be avoided if the oyster crops could have been harvested.

21.

BP's oil migrated to Plaintiffs' oyster leases and caused physical damage and destruction to their oyster crops.

22.

Additionally, BP dispersed chemicals on plaintiffs' oyster leases and thereby destroyed the oyster crops and permanently damaged plaintiffs' ability to plant new oysters for cultivation and develop new oyster crops. The oil and chemicals had the effect of preventing spat from attaching to plaintiffs' cultch, and thus prevented the cultivation of new oysters.

23.

After the spill from the Macondo Well, Bayou Carlin was forced to close its shrimp dock business. After reopening, the volume of supply of shrimp to be purchased and sold by Bayou Carlin was greatly reduced as a consequence of the oil spill.

24.

Historically, Bayou Caddy also operated a shrimp dock in Lakeshore, Mississippi. In early 2010, Bayou Caddy was executing a business plan to reopen its dock which had been shut due to damage suffered in Hurricane Katrina five years earlier. Purchases of equipment had been made, a permit obtained and plans were in place to open the shrimp dock in the spring of 2010.

However, as a consequence of the Spill from the Macondo Well, the burden imposed upon Bayou Caddy from the interruption of its business generally, and the depletion of seafood available for purchase, Bayou Caddy was unable to complete its business plan and reopen its shrimp dock.

25.

BP dispatched equipment to contend with the massive oil spill from its Macondo Well, and to prevent the massive pollution from coming ashore. Some of the marine equipment dispatched by defendants came into oyster beds owned by Plaintiffs, including the Little Bayou Pierre lease in Louisiana, and in the course of their operations, the equipment destroyed Plaintiffs' oyster beds. BP is liable to Plaintiffs for the consequences of the clean-up work performed at BP's request. Additionally, BP agreed to provide liability insurance covering the equipment and the clean-up operations and, as such, is liable to Plaintiffs for the damages incurred.

## CAUSES OF ACTION

### A. THE OIL POLLUTION ACT

26.

Plaintiffs reallege each and every allegation set forth in all preceding paragraphs as if fully restated here.

27.

The Oil Pollution Act, 33 U.S.C. § 2701, et seq. (the "OPA"), imposes liability upon a "responsible party for a ... a facility from which oil is discharged ... into or upon navigable waters or adjoining shorelines" for the damages that result from such incident as well as removal costs. 33 U.S.C. § 2702.

28.

Section 2702(b)(2)(E) provides that "responsible parties" are strictly liable for all damages that result from an oil spill.

29.

OPA also provides that Plaintiffs are entitled to all "removal costs" incurred as a result of the Spill.

30.

The Coast Guard has named BP as the responsible party for the release of oil from the Macondo Well. Therefore, BP is strictly liable pursuant to Section 2702 of the OPA for all the damages resulting from the Spill.

31.

BP is not entitled to limit its liability under Section 2704(a) of the OPA because the Spill was proximately caused by BP's gross negligence, willful misconduct, or violation of applicable safety, construction or operating regulations. 3 U.S.C. § 2704(c).

32.

Moreover, in its "Statement of BP Exploration & Production Inc. Re Applicability of Limitation of Liability Under Oil Pollution Act of 1990," filed on October 19, 2010, BP waived the statutory limitation on liability under the OPA.

33.

As a result of the Spill, Plaintiffs are entitled to damages pursuant to Section 2702(b)(2)(B), which provides for recovery of damages to real or personal property, including "[D]amages for injury to, or economic losses resulting from destruction of, real or personal

property, which shall be recoverable by a claimant who owns or leases that property, including the diminution in the value of their property."

34.

As a result of the Spill, Plaintiffs are entitled to damages pursuant to Section 2702(b)(2)(E), which provides for "[D]amages equal to the loss of profits or impairment of earning capacity due to the injury, destruction, or loss of real property, personal property, or natural resources, which shall be recoverable by any claimant."

35.

To the extent required by law, and/or by consent or stipulation by BP, Plaintiffs have satisfied all of the administrative requirements of 33 U.S.C. §§ 2713(a) and (b), by the submission of their claims to the Gulf Coast Claims Facility (the "GCCF") and/or BP and/or its agents or designees.

### B. NEGLIGENCE AND GROSS NEGLIGENCE AND GENERAL MARITIME LAW

36.

Plaintiffs reallege each and every allegation set forth in all preceding paragraphs as if fully restated here.

37.

At all times material hereto, BP owed and breached duties of ordinary and reasonable care to Plaintiffs in connection with the operations at the Macondo Well and additionally owed and breached duties to Plaintiffs to guard against and/or prevent the risk of an oil spill.

38.

BP was under a duty to exercise reasonable care while participating in and supervising operations at the Macondo Well to ensure that a blowout and subsequent oil spill did not occur as a result of such operations.

39.

BP knew of the dangers associated with deep water drilling, including specifically at Macondo, and failed to take appropriate measures to prevent damage to Plaintiffs and the Gulf of Mexico's marine and coastal environments and estuarine areas.

40.

Plaintiffs, as owners, lessees, and operators of real property at or near the coast of the Gulf of Mexico and as businesses that are dependent upon the Gulf of Mexico's marine and coastal environments for their livelihood and income, were within an appreciable zone of risk and, as such, BP was obligated to protect them.

41.

BP was under a duty to exercise reasonable care to ensure that if crude oil discharged in the event of a blowout, that it would be contained and/or stopped within the immediate vicinity of the Macondo Well in an expeditious manner.

42.

BP knew or should have known that the acts and omissions described herein could result in damage to Plaintiffs.

43.

BP failed to exercise reasonable care while participating in exploration operations to ensure that a blowout and subsequent oil spill did not occur, and thereby breached duties owed to Plaintiffs.

44.

BP failed to exercise reasonable care to ensure that oil would expeditiously and adequately be contained within the immediate vicinity of the Macondo Well in the event of a blowout, and thereby breached duties owed to Plaintiffs.

45.

BP failed to exercise reasonable care to ensure that adequate safeguards, protocols, procedures and resources would be readily available to prevent and/or mitigate the effects an uncontrolled oil spill into the waters of the Gulf of Mexico, and thereby breached duties owed to Plaintiffs.

46.

The Spill was caused by the negligence, fault, gross negligence, and willful misconduct of BP including, but not limited to:

(a) Failing to properly design the Macondo Well;

(b) Failing to properly design the temporary abandonment procedure;

(c) Failing to properly maintain the Macondo Well and its equipment;

(d) Failing to use ordinary and reasonable care in the operations at the Macondo Well;

(e) Failing to properly train and supervise the personnel involved in operations at the Macondo Well;

(f) Failing to exercise ordinary and reasonable care in developing and implementing proper safety procedures to prevent a blowout and oil spill;

(g) Failing to use ordinary care in developing and implementing adequate blowout and oil spill responses plans and procedures;

(h) Failing to take appropriate action to mitigate the damages that resulted from the blowout and oil spill;

(i) Failing to properly design, test, conduct and supervise cementing operations at the Macondo Well;

(j) Acting in a careless and reckless manner and without due regard for the environmental and financial impacts of the oil spill;

(k) Acting in a careless and reckless manner and in utter and flagrant disregard for the safety and health of the public and the environment

(l) Willfully placing concern for BP's profits over and above proper training, design, operations, and the safety of others;

(m) All other acts or fault which may be proven at trial.

47.

All of the foregoing acts and/or omissions by BP proximately caused Plaintiffs' injuries and damages and entitles Plaintiffs to compensatory and punitive damages.

### C. PUNITIVE DAMAGES

48.

Plaintiffs reallege each and every allegation set forth in all preceding paragraphs as if fully restated here.

49.

BP engaged in conduct so reckless, willful, wanton and in such utter and flagrant disregard for the safety and health of the public and the environment in its activities leading up to and/or during the blowout and Spill, as alleged herein, that an award of punitive damages against BP at the highest possible level is warranted and necessary to impose effective and optimal punishment and deterrence. Plaintiffs, society and the environment cannot afford and should never be exposed to the risks of another disaster of the magnitude caused by BP's misconduct herein.

50.

BP focused primarily on profit while disregarding public and environmental health and safety while undertaking its ultra-hazardous activities at the Macondo Well by performing critical operations in a reckless manner and by callously ignoring reports of an imminent blowout.

51.

BP focused primarily on profit while disregarding public and environmental health and safety while undertaking its ultra-hazardous activities at the Macondo Well by using an inadequate well design.

52.

BP focused primarily on profit while disregarding public and environmental health and safety while undertaking their ultra-hazardous activities at the Macondo Well by their grossly inadequate supervision, and reckless and improper operation and use of all necessary equipment to safely engage in operations at the Macondo Well.

53.

BP recklessly, willfully and/or wantonly failed to ensure that oil would expeditiously and adequately be contained within the immediate vicinity of the Macondo Well in the event of a blowout.

54.

BP recklessly, willfully and/or wantonly caused or contributed to the catastrophic Spill through its disregard for proper exploration, casing, mudding, and cementing procedures.

55.

BP willfully and/or wantonly failed to ensure that adequate safeguards, protocols, procedures and resources would be readily available to prevent and/or mitigate the effects an uncontrolled oil spill into the waters of the Gulf of Mexico.

56.

BP recklessly, willfully and/or wantonly failed to utilize reasonably safe dispersant chemicals in its haphazard attempts to respond to the Spill, and thereby exacerbated and worsened the pollution of the Gulf of Mexico.

57.

BP's corporate culture caused and allowed it to disregard the lessons it should have learned and applied from previous incidents at its facilities that resulted in extensive damage and loss of life; instead, it continued to place others at risk in the interests of cost-cutting and financial gain.

58.

In addition, after the blowout and before the well was finally sealed, BP was aware of procedures that would immediately block the flow of oil into the Gulf, yet it delayed the

implementation of any such procedures, and limited its efforts to plug the well to options that would salvage the well for future use, instead of selecting procedures that would stop the flow of oil as soon as possible regardless of the well's continued functionality. As such, BP increased the magnitude of, and damage caused by, the Spill by willfully and/or wantonly and recklessly choosing its profits over the lives of the workers on the vessel, the safety of the environment, and the health, welfare, and value of the people, businesses, and property of the Gulf states, including Plaintiffs.

59.

BP's conduct is at the highest level of reprehensibility, warranting and necessitating the imposition of punitive damages at the highest level, because BP's conduct was motivated by financial gain; because it injured and endangered human and environmental health and safety; because it caused devastating damage and loss to the livelihoods, businesses, and properties of Plaintiffs; because it was not isolated or accidental, but part of a culture and ongoing pattern of conduct that consistently and repeatedly ignored risks to others in favor of financial advantage to BP; and because it has accordingly caused societal harm, moral outrage and condemnation, and the need to punish BP and deter further repetition by BP or others.

60.

Accordingly, Plaintiffs are entitled to an award of punitive damages in an amount to be determined at trial.

## **DAMAGES**

61.

As a result of the actions and omissions of BP, Plaintiffs have been suffered damages that include, but are not limited to, the following:

(a) Past loss of income;

(b) Future loss of income;

(c) Physical damage and destruction to oyster beds;

(d) Loss of business opportunity by Bayou Caddy with respect to its shrimp dock;

(e) Loss of business and business opportunity with respect to Bayou Carlin's shrimp dock;

(f) Past and future loss of market share;

(g) Damage to reputation and risk of future health concerns;

(h) Direct and indirect clean-up costs;

(i) Cost of repairing and re-seeding Plaintiffs' oyster beds;

(j) Loss of natural resources;

(k) Punitive damages;

(l) Other costs and damages not yet identified.

## JURY TRIAL DEMAND

Plaintiffs demand a trial by jury of this matter.

## OPT-OUT

On November 1, 2012, Plaintiffs opted out of the Economic Loss and Property Damage Class Action Settlement in MDL-2179 by submitting a written exclusion request to the Deepwater Horizon Court-Supervised Settlement Exclusions Department, in accordance with the Class Action Settlement Notice.

## PRAYER FOR RELIEF

**WHEREFORE**, Plaintiffs demand judgment against BP as follows:

(a) Economic and compensatory damages in amounts to be determined at trial;

(b) Punitive damages;

(c) Pre-judgment and post-judgment interest at the maximum rate allowable by law;

(d) Attorneys' fees and costs of litigation;

(e) Such other and further relief available under all applicable state and federal laws and any relief the Court deems just and appropriate.

Respectfully submitted,

*/s/ Miles P. Clements*
Miles P. Clements (La. #4814)
**FRILOT, L.L.C.**
1100 Poydras Street
Suite 3700 Energy Centre
New Orleans, LA  70163-2300
Telephone: 504-599-8000
Telefax: 504-599-8100
**ATTORNEY FOR PLAINTIFFS:
PEARL RIVER FISHERIES OF LOUISIANA, LLC, BAYOU CARLIN FISHERIES, INC., and BAYOU CADDY FISHERIES, INC.**