# Oil Pollution Act of 1990

**33 USC 2701** *et seq*

**Claims to BP Exploration & Production, Inc., et al**

**Presentment of Claims of**

**In-Depth Offshore Technologies International, Inc.**

**In-Depth Marine, LLC**

**Hesham El Abrikgy**

**Hesham El Abrikgy**
**18836 Ferncrost Court**
**Baton Rouge, Louisiana 70809**
**Telephone: 504-473-6666**
**heshame@indepthoffshore.com**

**John O. Charrier, 4097**
**Charrier & Charrier**
**7908 Wrenwood Blvd.**
**Baton Rouge, Louisiana 70809**
**Telephone: 225-218-8599**
**Charrier@I-55.com**



**Presentment of Claims**
**Under**
**Oil Pollution Act of 1990**

**Claims of IDO, IDM, and El Abrikgy**
**Supporting Declaration**

I am Hesham El Abrikgy. I make this declaration to support three different claims to BP Exploration & Production, Inc. and its affiliated, related, and subsidiary companies (collectively "BP"). The claims which I make arise out of the April 20, 2010 oil spill in the Gulf of Mexico (hereafter, the "Oil Spill" or the "Deepwater Horizon Incident").

### I. Biographical

1. My name is Hesham El Abrikgy; I am 50 years old; I am a native of Egypt but I am a naturalized citizen of the United States of America (1989).

2. I graduated from AIN Shams University, Cairo, Egypt in 1984 with a degree in business and accounting. Thereafter, I obtained an Associate Degree in Marine Diving Technology from Santa Barbara City College, Santa Barbara, California (completed 1992).

3. For 22 years I have worked in the offshore diving industry. My work has included diving, operation and maintenance of ROVs, serving as ROV System Electronics Technician, and serving as business development manager of diving companies. My experience spans a wide array of activities in offshore-deep-sea work.

4. I am president and chief executive officer of In-Depth Offshore Technologies International, Inc. (IDO) and member-manager of In-Depth Marine, LLC. (IDM) I own of the stock in IDO and all of the interest in IDM.

## II. The Claimants and Their Identities

5. In this document, I present three separate claims against BP under the OPA arising out of the Oil Spill. These, of course, are the claims of IDO, IDM, and my personal claim as Hesham El Abrikgy (hereafter sometimes "HEA" or "El Abrikgy"). In the case of my two businesses the claims are for loss of profits and impairment of earnings capacity. In my individual case, my claim is for loss of income.

6. IDO is a Louisiana corporation having been incorporated on March 16, 2006. Its Articles of Incorporation appear at Tab One of this Presentment.

7. IDM is a Louisiana limited liability company having been chartered on February 29, 2008. Its Articles of Organization appear at Tab Two of this Presentment.

8. I provide this additional identifying information as to each of the claimants:

   1. IDO
      EIN: ▇▇▇▇▇
      1201 Dunn Street
      Houma, Louisiana 70360
      Office: 985-851-6999
      Fax: 866-952-3692
      www.indepthoffshore.com

   2. IDM
      EIN: ▇▇▇▇▇
      1201 Dunn Street
      Houma, Louisiana 70360
      Office: 985-851-6999
      Fax: 866-952-3692
      www. indepthoffshore.com

   3. Hesham El Abrikgy
      SSN: ▇▇▇▇▇
      18836 Ferncrost Court
      Baton Rouge, Louisiana 70809
      Telephone: 504-473-6666
      heshame@indepthoffshore.com

9.  The locus of all operations of the companies is 1201 Dunn Street, Houma, Louisiana 70360. Although I personally maintain a home office for the companies in my Baton Rouge home on Ferncrost Court, as chief executive officer I spent most of my time at IDO's headquarters in Houma, Louisiana when it was a profit making venture.

10. IDO provides deep-sea-bottom services in the Gulf of Mexico. At start-up it based its field operations at Westwego, Louisiana.

11. On March 13, 2008, shortly after its formation, IDM purchased the property at 1201 Dunn Street, Houma, Louisiana from Charlie Hammonds Flying Service, inc. for $540,000. IDM put $40,000 down on the purchase and Hammonds owner-financed the remainder over five years. The IDM-Hammond's Loan Agreement appears at Tab Three. Due to IDM's and IDO's financial distress the Agreement was later amended. This is also shown in the papers at Tab Three.

12. After IDM's purchase of 1201 Dunn Street, IDO then entered an agreement with IDM to lease the premises [the Houma Facility]. Thereupon the Houma Facility became the locus of IDO operations.

13. The Houma Facility provided IDO with a 1.26-acre industrial yard on the Intracoastal Waterway; there two buildings, a storage yard, a work yard, a vessel launch and covered and secure storage all exist.

14. The Houma Facility also became the place where IDO's sat system that I describe below was partially refurbished and re-manufactured. That work was four to six weeks from completion on April 20, 2010. The Oil Spill, as amplified and explained below, stopped the refurbishment and stopped my businesses in their tracks.

**III.   History of Claims Process**

15.   IDO, IDM, and I all made claims arising out of the Oil Spill to the GCCF and we also have pending claims before the Deepwater Horizon Economic Claims Center.  Those bore [bear] the following numbers:

   IDO: GCCF 01091853; DHECC 100017295

   IDM: GCCF 01125499; DHECC 100060783

   HEA: GCCF 01032104; DHECC 100062620

All three claimants filed Short-Form-Joinders in MDL 2179, (U.S.D.C., E.D., La.).

16.   During its era, IDO received an Emergency Payment from GCCF in the amount of $81,700 and a final payment of $165,617 or a total of $247,317.  At my request, the GCCF re-characterized its final payment as an interim payment.

**IV.   Rationale for Claims**

17.   For reasons which I also further explain below the Oil Spill has caused me untold misery and the greatest of financial and personal difficulties.  Because of uncertainty of disposition, I, personally, and my operating company, IDO, opted out of the Settlement Agreement in MDL 2179.  But later both I and IDO opted back into the Settlement.  This out-and-in action was prompted by (i) the delay in claims processing of the DHECC and (ii) the uncertainty that surrounds whether my claim and IDO's claim will be included in the Settlement Agreement.  That uncertainty still exists.  This Presentment and these claims, therefore, are made to preserve all rights which all three claimants have inside, or outside, of the Settlement Agreement.

**V.   IDO's Claim Explained**

18.   IDO, probably due to my reputation and contacts in the industry, was initially

highly successful. Total IDO revenues in 2006 were $56,626; in 2007 they were $3,985,997; in 2008 they were $1,217,895. Gross revenues, therefore, over the three-year-start-up period averaged $1.75 million.

19. In 2008, of course, the U.S. economy went into a tail spin and my industry was also affected. I sought for a means to profit despite the downturn.

20. Therefore, I looked for a niche to propel IDO over its competition. I found it by determining to provide saturation diving services to the oil and gas industry with a portable sat system. By that time (2008-2009) saturation diving systems were all fixed units mated to sophisticated and dedicated dive vessels (DSVs), most of which required large crews and worked at very large day rates; these were ill-suited for northern Gulf of Mexico operations. The advantages that IDO expected to exploit with such a system were mobility or nimbleness. I knew that if IDO could obtain a sat system designed for portability and which would mate temporarily with smaller vessels (such are generally available for charter at much lower rates) IDO would be powerfully positioned to compete in the market. IDO's target market was de-commissioning, an activity required by MMS regulations but one that produced no profits for an operator. Expected day rates for the portable system and its cadre of workers were $50,000.00-$75,000.00 per day. This compared with the DSVs which commanded day rates of $125,000.00-$200,000.00.

21. Because of my knowledge of the diving industry, I knew how and where to obtain a classed and certificated existing saturation diving system that IDO could refurbish and use in the niche. I purchased that system in the 2d quarter of 2008. In much of 2009, IDO diverted its resources and its cash to the in-house refurbishment of that sat system. Therefore, as compared to the years 2007 and 2008, our revenues

declined further.

22. IDO took out a loan in July of 2008 for $1,250,000 and a revolving line-of-credit loan of $500,000 in August 2008. Both were from Chase. The first (Loan 4001) was for the acquisition and construction of the portable sat system and it was secured by a mortgage on the portable sat system. The second (Loan 4002) was for working capital during the refurbishment period and it was secured by a mortgage on my personal residence. A third loan (Loan 4011) was taken out in February 2010 for $254,301.74 for completion of the system's machinery van.

23. In 2009 and early 2010, refurbishment and re-manufacturing of IDO's portable sat system continued apace.

24. In December 2009 with the professional assistance of Roy Franc Baas, IDO prepared a formal Business and Financial Status and Plan (the "Business Plan" or the "Plan). It appears at Tab Four. Also at Tab Four are Professor Baas's C.V. and credentials documenting his qualifications to make the projections described in Paragraph 26.

25. The Plan also includes pictures of the portable sat system and other assets of IDO as of December 2009. These pictures show the sat system for the "sweet-heart" and world class system that it is.

26. As shown in the Plan, based upon company historical earnings, and reasonable assumptions for growth, except for the Oil Spill, projected achievable gross profits were shown as $17,388,750 by the year 2012 (Table Three); conservative gross profits were projected at $9,500,000 (Table Four).

27. The profits described in Paragraph 26 were lost due to the Oil Spill because

a cascade of spill-caused-negative factors up-ended IDO's completion of its portable saturation system. These negative factors included (i) a spill-caused-cash crunch for the IDO vendor constructing the Launch and Recovery System (LARS) for the system and (ii) the drying up of capital from IDO's lender, who refused to advance further capital when IDO could not service its loans. See Tab Five, letter of Chase dated March 3, 2011. (The LAR's vendor, pre-spill, agreed to withhold demand for payment until IDO's sat system was in service and producing revenue.)

28. When these things occurred, IDO began to reduce its costs. It eventually eliminated all pay-roll, reducing its staff of 13 to none and engaging only contract labor thereafter. It also reduced insurance costs by 90%. In the year 2011 it had two part-time workers and by year-end, IDO had neither employees nor contracted labor. At this time, I, alone, remain as "staff". I drew no salary in the years 2010-2012.

29. On April 20, 2010, IDO was four-six weeks from completion of the entire portable sat system and its prospects for the profits projected in the Business Plan were rosy. On that very day, as Chief Executive Officer and President of IDO, I was in Houston, Texas scheduled to meet with BP executives in connection with work IDO expected to get from BP once the sat system was completed. That meeting was cancelled by BP due to the Spill.

30. As a result of the Spill, the sat system was never completed. As already described, IDO's bank would not advance further capital and the small cash flow that IDO was generating from its pick-up surface-diving work dried-up due to the Oil Spill.

31. IDO's losses through May 2012 are captured and explained in the updated work of Professor Roy Franc Baas which appears at Tab Six. (Letter of Roy Franc Baas

dated April 6, 2011 to Kenneth R. Feinberg and Senator David Vitter; BP 2010 Oil-Spill, Claims For Economic Injuries updated 6-21-12, total of five pages.) Using Professor Baas' methodology of 6/21/2012, IDO's lost profits through December 31, 2012 are $11,339,934. (Business Plan projected 2012 profits added to 2010 - 2011 lost profits = $11,339,934.)

32.   At Tab Seven, I provide IDO's tax returns for years 2006 - 2011.

33.   At Tab Eight, I provide IDO's Profit and Loss Statements for the years 2007 - September 2011.

34.   The portable sat system, even in its unfinished state, was appraised for Chase's account on June 1, 2012 for $4,575,000. (See Tab Nine for Appraisal.)

35.   Once Chase Bank ended further advance of capital, I searched far and wide for other sources of capital; I explored bringing in investors to complete the system but no investors and no capital sources were found.

36.   When my search for capital or investors didn't work out, I then tried valiantly to find a buyer for the sat system. My search was long, exhaustive, and worldwide. I continue that search even today.

37.   Nonetheless, Chase Bank has foreclosed on Loans 4001, 4002 and 4011. A sheriff's sale of my home and personal residence and of the sat system is scheduled for February 6, 2013.

VI.   **IDO's Sum Certain Demand**

38.   IDO demands the $11,339,934 reflected in Paragraph 31 above, three years of future profits in the amount of $21,713,031 (projected 2012 profits of $7,237,677 x 3 years = $21,713,031) and $4,575,000, the appraised value of the sat system scheduled

to be sold in the sheriff's sale of February 6, 2013. IDO's total sum certain demand, therefore, is $37,645,965,

## VII. IDM's Claim Explained

39. Once the Houma Facility was acquired by IDM (In-Depth Marine, LLC), IDO and IDM entered an agreement by which IDO rented the premises for $10,000 per month. Subsequently, by agreement of these two entities, IDO paid rent at $9,000 per month.

40. The Houma Facility provided IDO's business an ideal location for the refurbishment of its sat system. Pictures illustrating the sat system on location there are appended to the Appraisal at Tab Nine and to the Business Plan at Tab Four. These pictures explain the necessity of those premises for the refurbishment project and for the continued preservation of the sat system.

41. The rent due to IDM for the Houma Facility on a yearly basis was $108,000 ($9,000/month x 12 = $108,000). I append IDM's Profit and Loss Statements for the years 2008 - 2011 at Tab Ten. (IDM, as an LLC, has no independent tax returns. Its "earnings" are part of my personal returns. See Tab Eleven.) In the 20 month period between the Oil Spill and December 31, 2011, due to its distressed financial condition, IDO paid IDM $114,076 in rent when a total of $180,000 would have been due. Therefore, IDM is due $65,924 in lost rents for that period.

42. No financial data has thus far been prepared for IDM in the year 2012. Therefore, I am unable to assess IDM's lost rent for 2012 but I estimate it at 50% of the yearly amount or $54,000.00.

43. In the 32-month period (May 2010 - December 31, 2012) the sums paid in

rent by IDO were not from IDO income. It was critical that the Houma Facility not be foreclosed upon by IDM's mortgagee because the Facility was needed to preserve IDO's main asset, the sat system. To pay that rent, so that IDM could in turn pay Hammonds, its mortgagee, IDO (i) sold assets mostly at fire-sale prices (ii) maxed out company credit cards and (iii) asked for grace from Hammonds.

## VIII. IDM's Sum Certain Demand

44.  IDM demands the $65,924 reflected in Paragraph 41, the $54,000 reflected in Paragraph 42, and three year future rent of $324,000. Its total sum certain demand is, therefore, $443,924.

## IX. El Abrikgy's Claim Explained

45.  In the years 2010, 2011, and 2012, I received no salary from IDO. My tax returns for the years 2007 - 2011 are at Tab Eleven.

46.  Professor Baas' projection (Tab Four) included projected officer compensation for me of $309,000.00. (Year 2010 - $75,000; Year 2011 - $99,000; Year 2012 - $135,000 = $309,000).

## X. El Abrikgy Sum Certain Demand

47.  I demand the $309,000 reflected in Paragraph 46 plus three years of future compensation at the projected 2012 amount of $135,000 or $405,000.00. My total sum certain demand is, therefore, $704,000.

## XI. Miscellaneous

48.  All three claimants are represented by this attorney:

John O. Charrier, 4097
Charrier & Charrier
7908 Wrenwood Blvd.
Baton Rouge, Louisiana 70809
Office: 225-218-8599
Fax: 225-932-9286
Email: charrier@I-55.com

49. All three claimants reserve the right to demand more than the sum certain demands made here if their claims are denied and litigation follows.

50. I am fully authorized to act for the two business entity claimants. Corporate resolutions to that effect are at Tab Twelve.

## XII. Verification

51. This is a declaration within the meaning of 28 U.S.C. 1746. Under penalty of perjury, I certify that the information provided in this declaration is true and accurate to the best of my knowledge, and that the supporting documents I append are true, accurate, and complete to the best of my knowledge. I consent (i) to the use and disclosure by the BP Claims Program and those assisting the BP Claims Program of any information presented here that they believe necessary and/or helpful to process these claims for compensation and any payment resulting from these claims and (ii) I understand that my claims information may also be provided to the Court Supervised Settlement Program, MDL 2179, or to the Plaintiffs' Steering Committee (PSC) or other Class Counsel for the plaintiffs for the purpose of coordinating the processing and potential payment of claims.

Baton Rouge, Louisiana, this 18th day of January, 2013.

_____
Hesham El Abrikgy

### Certificate

I am the attorney for the three claimants in this Presentment and in their claims against BP Exploration & Production, Inc., et al. I certify that I have served this Presentment, including its supporting documents, on BP, this **18th day of January 2013**, as follows:

1. By Federal Express, Saturday delivery guaranteed, (electronic copy by CD plus hard multiple original verification pages) to:

    J. H. Dupree, President
    BP Exploration & Production, Inc.
    501 Westlake Park Boulevard
    Houston, Texas 77079
    Telephone 281-336-2600

2. By USPS *Express Mail*, guaranteed overnight delivery (electronic [CD] copy plus hard multiple original Verification pages) to:

    BP Claims Program
    P.O. Box 330919
    Houston, Texas 77233-0919

3. By email to BP at bpclaimsprogram@bp.com

4. By serving BP's Louisiana Agent for Service of Process with a hard multiple original of the Presentment and an electronic copy (CD) through:

    CT Corporation System
    5615 Corporate Blvd., Ste 400B
    Baton Rouge, Louisiana 70808.

    _____
    John O. Charrier, 4097