**IN THE UNITED STATES DISTRICT COURT**
**FOR THE EASTERN DISTRICT OF LOUISIANA**
**(Transferred from Southern District of Alabama Civil Action No. 10-293)**

| | | |
|---|---|---|
| In Re: OIL SPILL by the OIL RIG "DEEPWATER HORIZON" in the GULF OF MEXICO on APRIL 20, 2010 | § § § § § | MDL No. 2179 |
| | | Section: J |
| This Document relates to: | § § | |
| Civil Action No. 2:10-cv-03253 - *Moore, et al. v. BP PLC, et al.* | § § | Judge Barbier Magistrate Judge Shushan |

## FIRST AMENDED COMPLAINT

Class representative Sarah H. Moore and the other named plaintiffs, pursuant to Rule 15(a) of the Federal Rules of Civil Procedure, hereby amend and restate their complaint against the Defendants identified below.

COMES NOW, Plaintiffs, Sarah H. Moore, Tommy Henderson, S.J. Henderson, Tim Henderson, Hettie Harrington, Mobile Management, LLC, William Henderson, Bruce Henderson, Lorraine Lee, Laura Woddail, Marilyn Roberts, Newell Robinson, Kathryn Steinemann, Kathryn Dexter Fillippeli, Mary H. Waite, Robert S. Waite III, Mary Ellen Dumas, William Berry Dumas, Jessica Dexter Taylor, Roderick B. Dexter, Helen Dexter McDavid, and William Dexter, individually and as representatives of the classes defined more precisely below (the "Classes" and/or "Class Members"), who are owners and/or lessees of real property on the Gulf Coast bays, and estuaries, including oyster beds and associated marshlands that are and continue to be adversely and negatively impacted and damaged as a result of the explosion, burning and sinking of the semi-submersible drilling vessel *Deepwater Horizon* on or about April 20, 2010, on the outer Continental Shelf off the Gulf coast, that resulted in the release of

120315.1

EXHIBIT "A"

unprecedented amounts of crude oil into the waters of the Gulf of Mexico. Plaintiffs bring this action against the defendants identified below (the "Defendants"), and state as follows:

## INTRODUCTION

1.      This is a Class Action Complaint under Rule 23 of the Federal Rules of Civil Procedure for compensatory damages and exemplary and/or punitive damages for the discharge of crude oil into the Gulf of Mexico, which has caused or will continue to cause or contribute to injuries and damages to Plaintiffs and Class Members. It is the purpose of this Class Action to address and resolve on a class basis the injuries and damages suffered by Plaintiffs and Class Members, whose economic livelihoods and properties have been and will continue to be damaged by the discharge of crude oil caused by the explosion, burning, and sinking of the *Deepwater Horizon* rig and its detrimental impact on the Gulf of Mexico's and Gulf Coast States' marine environments, coastal environments and estuarine areas, which are used by Plaintiffs and the Class Members for different activities, including owning and leasing oyster beds.

## PARTIES

### Plaintiffs

2.      Plaintiff Sarah H. Moore is a resident citizen of the State of Alabama. Plaintiff Moore derives substantial income from the natural resources of the Gulf of Mexico from owning and leasing oyster beds in the Gulf waters along the Alabama coast and, as a result of the events described herein, has suffered damages that are more fully described below. Plaintiff Moore owns property in Mobile County, Alabama including a percentage of 1,660 acres of marshland, which includes Township 8 South, Range 2 West, Sections 20, 21, 28 and 29; parts of Sections 9, 10 and 16; as well as Cat Island (Section 31), collectively referred to as "the Marshland." Plaintiff Moore also owns a percentage of 546 acres at the mouth of the West Fowl River, which

includes Township 8 South, Range 2 West, parts of Sections 3, 4, 9 and 30, collectively referred to as "West Fowl River Property."  Plaintiff Moore owns 6.25 percent of the Marshland and 5.556 percent of the West Fowl River Property.  Plaintiff Moore's Marshland property includes oyster beds, some of which are owned by Plaintiff pursuant to the Code of Alabama, § 9-12-22, which provides that shore owners have riparian rights for oyster cultures that extend out to 600 yards from the shoreline.  Plaintiff Moore leases the oyster beds for a profit.

3.     Plaintiff Tommy Henderson is a resident citizen of the State of Alabama.  Plaintiff Henderson derives substantial income from the natural resources of the Gulf of Mexico from owning and leasing oyster beds in the Gulf waters along the Alabama coast and, as a result of the events described herein, has suffered damages that are more fully described below.  Plaintiff Henderson owns 6.25 percent of the Marshland and 5.556 percent of the West Fowl River Property, described above.  Plaintiff Henderson's Marshland property includes oyster beds, some of which are owned by Plaintiff pursuant to the Code of Alabama, § 9-12-22, which provides that shore owners have riparian rights for oyster cultures that extend out to 600 yards from the shoreline.  Plaintiff Tommy Henderson leases the oyster beds for a profit.

4.     Plaintiff S.J. Henderson is a resident citizen of the State of Alabama.  Plaintiff Henderson derives substantial income from the natural resources of the Gulf of Mexico from owning and leasing oyster beds in the Gulf waters along the Alabama coast and, as a result of the events described herein, has suffered damages that are more fully described below.  Plaintiff Henderson owns 6.25 percent of the Marshland and 5.556 percent of the West Fowl River Property, described above.  Plaintiff Henderson's Marshland property includes oyster beds, some of which are owned by Plaintiff pursuant to the Code of Alabama, § 9-12-22, which provides that shore

owners have riparian rights for oyster cultures that extend out to 600 yards from the shoreline. Plaintiff S.J. Henderson leases the oyster beds for a profit.

5.      Plaintiff Tim Henderson is a resident citizen of the State of Alabama.   Plaintiff Henderson derives substantial income from the natural resources of the Gulf of Mexico from owning and leasing oyster beds in the Gulf waters along the Alabama coast and, as a result of the events described herein, has suffered damages that are more fully described below.  Plaintiff Henderson owns 6.25 percent of the Marshland and 5.556 percent of the West Fowl River Property, described above.  Plaintiff Henderson's Marshland property includes oyster beds, some of which are owned by Plaintiff pursuant to the Code of Alabama, § 9-12-22, which provides that shore owners have riparian rights for oyster cultures that extend out to 600 yards from the shoreline.  Plaintiff Tim Henderson leases the oyster beds for a profit.

6.      Plaintiff Hettie Harrington is a resident citizen of the State of Alabama.   Plaintiff Harrington derives substantial income from the natural resources of the Gulf of Mexico from owning and leasing oyster beds in the Gulf waters along the Alabama coast and, as a result of the events described herein, has suffered damages that are more fully described below.  Plaintiff Harrington owns 25 percent of the Marshland and 11.111 percent of the West Fowl River Property, described above.  Plaintiff Harrington's Marshland property includes oyster beds, some of which are owned by Plaintiff pursuant to the Code of Alabama, § 9-12-22, which provides that shore owners have riparian rights for oyster cultures that extend out to 600 yards from the shoreline.  Plaintiff Harrington leases the oyster beds for a profit.

7.      Plaintiff Mobile Management, LLC is a family owned LLC in the State of Alabama whose members are residents of Alabama.   Plaintiff Mobile Management, LLC derives substantial income from the natural resources of the Gulf of Mexico from owning and leasing

oyster beds in the Gulf waters along the Alabama coast and, as a result of the events described herein, has suffered damages that are more fully described below. Plaintiff Mobile Management, LLC owns 12.50 percent of the Marshland and 8.332 percent of the West Fowl River Property, described above. Plaintiff Mobile Management, LLC's Marshland property includes oyster beds, some of which are owned by Plaintiff pursuant to the Code of Alabama, § 9-12-22, which provides that shore owners have riparian rights for oyster cultures that extend out to 600 yards from the shoreline. Plaintiff Mobile Management, LLC leases the oyster beds for a profit.

8.     Plaintiff William Henderson is a resident citizen of the State of Alabama. Plaintiff Henderson derives substantial income from the natural resources of the Gulf of Mexico from owning and leasing oyster beds in the Gulf waters along the Alabama coast and, as a result of the events described herein, has suffered damages that are more fully described below. Plaintiff Henderson owns 3.125 percent of the Marshland and 2.083 percent of the West Fowl River Property, described above. Plaintiff Henderson's Marshland property includes oyster beds, some of which are owned by Plaintiff pursuant to the Code of Alabama, § 9-12-22, which provides that shore owners have riparian rights for oyster cultures that extend out to 600 yards from the shoreline. Plaintiff William Henderson leases the oyster beds for a profit.

9.     Plaintiff Bruce Henderson is a resident citizen of the State of Alabama. Plaintiff Henderson derives substantial income from the natural resources of the Gulf of Mexico from owning and leasing oyster beds in the Gulf waters along the Alabama coast and, as a result of the events described herein, has suffered damages that are more fully described below. Plaintiff Henderson owns 3.125 percent of the Marshland and 2.083 percent of the West Fowl River Property, described above. Plaintiff Henderson's Marshland property includes oyster beds, some of which are owned by Plaintiff pursuant to the Code of Alabama, § 9-12-22, which provides that

shore owners have riparian rights for oyster cultures that extend out to 600 yards from the shoreline. Plaintiff Bruce Henderson leases the oyster beds for a profit.

10.     Plaintiff Lorraine Lee is a resident citizen of the State of Alabama. Plaintiff Lee derives substantial income from the natural resources of the Gulf of Mexico from owning and leasing oyster beds in the Gulf waters along the Alabama coast and, as a result of the events described herein, has suffered damages that are more fully described below. Plaintiff Lee owns 3.125 percent of the Marshland and 2.083 percent of the West Fowl River Property, described above. Plaintiff Lee's Marshland property includes oyster beds, some of which are owned by Plaintiff pursuant to the Code of Alabama, § 9-12-22, which provides that shore owners have riparian rights for oyster cultures that extend out to 600 yards from the shoreline. Plaintiff Lee leases the oyster beds for a profit.

11.     Plaintiff Laura Woddail is a resident citizen of the State of Alabama. Plaintiff Woddail derives substantial income from the natural resources of the Gulf of Mexico from owning and leasing oyster beds in the Gulf waters along the Alabama coast and, as a result of the events described herein, has suffered damages that are more fully described below. Plaintiff Woddail owns 3.125 percent of the Marshland and 2.083 percent of the West Fowl River Property, described above. Plaintiff Woddail's Marshland property includes oyster beds, some of which are owned by Plaintiff pursuant to the Code of Alabama, § 9-12-22, which provides that shore owners have riparian rights for oyster cultures that extend out to 600 yards from the shoreline. Plaintiff Woddail leases the oyster beds for a profit.

12.     Plaintiff Marilyn "Lynn" Roberts is a resident citizen of the State of Alabama. Plaintiff Roberts derives substantial income from the natural resources of the Gulf of Mexico from owning and leasing oyster beds in the Gulf waters along the Alabama coast and, as a result of the

events described herein, has suffered damages that are more fully described below. Plaintiff Roberts owns 12.5 percent of the Marshland and 8.333 percent of the West Fowl River Property, described above. Plaintiff Roberts' Marshland property includes oyster beds, some of which are owned by Plaintiff pursuant to the Code of Alabama, § 9-12-22, which provides that shore owners have riparian rights for oyster cultures that extend out to 600 yards from the shoreline. Plaintiff Roberts leases the oyster beds for a profit.

13. Plaintiff Dr. Newell Robinson is a resident citizen of the State of New York. Plaintiff Robinson derives substantial income from the natural resources of the Gulf of Mexico from owning and leasing oyster beds in the Gulf waters along the Alabama coast and, as a result of the events described herein, has suffered damages that are more fully described below. Plaintiff Robinson owns 6.25 percent of the Marshland and 4.167 percent of the West Fowl River Property, described above. Plaintiff Robinson's Marshland property includes oyster beds, some of which are owned by Plaintiff pursuant to the Code of Alabama, § 9-12-22, which provides that shore owners have riparian rights for oyster cultures that extend out to 600 yards from the shoreline. Plaintiff Robinson leases the oyster beds for a profit.

14. Plaintiff Kathryn Steinemann is a resident citizen of the State of Georgia. Plaintiff Steinemann derives substantial income from the natural resources of the Gulf of Mexico from owning and leasing oyster beds in the Gulf waters along the Alabama coast and, as a result of the events described herein, has suffered damages that are more fully described below. Plaintiff Steinemann owns 6.25 percent of the Marshland and 4.167 percent of the West Fowl River Property, described above. Plaintiff Steinemann's Marshland property includes oyster beds, some of which are owned by Plaintiff pursuant to the Code of Alabama, § 9-12-22, which

provides that shore owners have riparian rights for oyster cultures that extend out to 600 yards from the shoreline. Plaintiff Steinemann leases the oyster beds for a profit.

15.     Plaintiff Kathryn Dexter Fillippeli is a resident citizen of the State of Alabama. Plaintiff Fillippeli derives substantial income from the natural resources of the Gulf of Mexico from owning real property on the Gulf Coast along the Alabama coast and, as a result of the events described herein, has suffered damages that are more fully described below. Plaintiff Fillippeli owns 5.556 percent of the West Fowl River Property, described above.

16.     Plaintiff Mary H. Waite is a resident citizen of the State of Alabama. Plaintiff Waite derives substantial income from the natural resources of the Gulf of Mexico from owning real property on the Gulf Coast along the Alabama coast and, as a result of the events described herein, has suffered damages that are more fully described below. Plaintiff Mary H. Waite owns 3.704 percent of the West Fowl River Property, described above.

17.     Plaintiff Robert S. Waite III is a resident citizen of the State of Alabama. Plaintiff Waite derives substantial income from the natural resources of the Gulf of Mexico from owning real property on the Gulf Coast along the Alabama coast and, as a result of the events described herein, has suffered damages that are more fully described below. Plaintiff Robert S. Waite owns 3.704 percent of the West Fowl River Property, described above.

18.     Plaintiff Mary Ellen Dumas is a resident citizen of the State of Alabama. Plaintiff Dumas derives substantial income from the natural resources of the Gulf of Mexico from owning real property on the Gulf Coast along the Alabama coast and, as a result of the events described herein, has suffered damages that are more fully described below. Plaintiff Mary Ellen Dumas owns 1.852 percent of the West Fowl River Property, described above.

19.     Plaintiff William Barry Dumas is a resident citizen of the State of Alabama.  Plaintiff Dumas derives substantial income from the natural resources of the Gulf of Mexico from owning real property on the Gulf Coast along the Alabama coast and, as a result of the events described herein, has suffered damages that are more fully described below.  Plaintiff William Barry Dumas owns 1.852 percent of the West Fowl River Property, described above.

20.     Plaintiff Jessica Dexter Taylor is a resident citizen of the State of Alabama.  Plaintiff Taylor derives substantial income from the natural resources of the Gulf of Mexico from owning real property on the Gulf Coast along the Alabama coast and, as a result of the events described herein, has suffered damages that are more fully described below.  Plaintiff Taylor owns 5.556 percent of the West Fowl River Property, described above.

21.     Plaintiff Roderick B. Dexter is a resident citizen of the State of Nevada.  Plaintiff Dexter derives substantial income from the natural resources of the Gulf of Mexico from owning real property on the Gulf Coast along the Alabama coast and, as a result of the events described herein, has suffered damages that are more fully described below.  Plaintiff Roderick B. Dexter owns 3.704 percent of the West Fowl River Property, described above.

22.     Plaintiff Helen Dexter McDavid is a resident citizen of the State of Alabama.  Plaintiff McDavid derives substantial income from the natural resources of the Gulf of Mexico from owning real property on the Gulf Coast along the Alabama coast and, as a result of the events described herein, has suffered damages that are more fully described below.  Plaintiff McDavid owns 3.704 percent of the West Fowl River Property, described above.

23.     Plaintiff William H. Dexter is a resident citizen of the State of Alabama.  Plaintiff Dexter derives substantial income from the natural resources of the Gulf of Mexico from owning real property on the Gulf Coast along the Alabama coast and, as a result of the events described

herein, has suffered damages that are more fully described below. Plaintiff William H. Dexter owns 3.704 percent of the West Fowl River Property, described above.

24.    As a result of the events described herein, Plaintiffs have suffered ascertainable losses and damages.

## Defendants

25.    Defendant BP, PLC is an international corporation doing business in the State of Alabama and throughout the United States of America. BP is one of the world's largest oil companies.

26.    Defendant BP America, Inc. is a BP, PLC affiliated corporation with its principal place of business in Warrenville, Illinois, but doing business in the State of Alabama and throughout the United States. All allegations and claims asserted herein against defendant BP, PLC are incorporated by reference against BP America, Inc.

27.    Defendant BP Products North America, Inc. is a BP, PLC affiliated corporation doing business in the State of Alabama and throughout the United States. All allegations and claims asserted herein against Defendant BP, PLC are incorporated by reference against BP Products North America, Inc.

28.    Defendant BP Exploration and Production, Inc. is a foreign corporation doing business in the State of Alabama and throughout the United States. BP Exploration and Production, Inc. is a BP, PLC affiliated corporation, and all allegations and claims asserted herein against Defendant BP, PLC are incorporated by reference against BP Exploration and Production, Inc.

29.    Defendants BP America, Inc., BP Products North America, Inc., and BP Exploration and Production, Inc. are wholly owned subsidiaries of the global parent corporation, BP, PLC, and they shall be referred to herein collectively as "BP".

30.     BP is the holder of a lease granted by the Minerals Management Service ("MMS") allowing BP to drill for oil and perform oil-production-related operations at the site of the oil spill, and on April 20, 2010, operated the oil well that is the source of the spill.   Upon information and belief, at all times relevant to this Class Action Complaint, BP, PLC was authorized to conduct offshore drilling operations using the semi-submersible drilling rig *Deepwater Horizon* in Mississippi Canyon Block 252 in the Gulf of Mexico.

31.     Defendant Transocean Ltd. is a Swiss corporation doing business in the United States and the State of Alabama.   Transocean, Ltd. is the world's largest offshore drilling contractor and leading provider of drilling management services worldwide.

32.     Defendant Transocean Offshore Deepwater Drilling, Inc. is a Delaware corporation with its principal place of business in Houston, Texas, but doing business in the State of Alabama and throughout the United States.   Transocean Offshore Deepwater Drilling, Inc. is a subsidiary of Transocean Ltd.   All allegations and claims asserted herein against Transocean Ltd. are incorporated by reference against Transocean Offshore Deepwater Drilling, Inc.

33.     Defendant Transocean Deepwater, Inc. is a Delaware corporation with its principal place of business in Houston, Texas, but doing business in the State of Alabama and throughout the United States.   Transocean Deepwater, Inc. is a subsidiary of Transocean Ltd.   All allegations and claims asserted herein against Defendant Transocean Ltd. are incorporated by reference against Transocean Deepwater, Inc.

34.     Defendants Transocean Offshore Deepwater Drilling, Inc. and Transocean Deepwater, Inc. are wholly owned subsidiaries of the global parent corporation, Transocean Ltd., and they shall be referred to herein collectively as "Transocean".

35.     Transocean is the owner and/or operator of the *Deepwater Horizon* semi-submersible oil drilling rig, which was performing drilling completion operations for BP in the Gulf of Mexico on or about April 20, 2010.  The *Deepwater Horizon* was leased to BP through September 2013, and was one of the largest rigs of its kind.  Upon information and belief, at all relevant times relevant to this Class Action Complaint, Transocean was authorized to conduct offshore oil drilling operations using the semi-submersible drilling rig *Deepwater Horizon* in Mississippi Canyon Block 252 in the Gulf of Mexico.

36.     Transocean, or its predecessors, is the designer of the *Deepwater Horizon.*

37.     At all times material hereto, the *Deepwater Horizon* was owned, manned, possessed, managed, controlled, chartered and/or operated by Transocean and/or BP.

38.     Defendant Halliburton Energy Services, Inc. ("Halliburton") is a Delaware corporation doing business in the State of Alabama and throughout the United States.  Halliburton is one of the world's largest providers of products and services to the energy industry and was engaged in the cementing operations of the well and well cap and, upon information and belief, improperly and negligently performed these duties, increasing the pressure at the well and causing and/or contributing to the fire, explosion, and resulting oil spill.

39.     Defendant Cameron International Corporation f/k/a Cooper Cameron Corporation ("Cameron") is a Delaware corporation with its principal place of business in Houston, Texas, but doing business in the State of Alabama and throughout the United States.  Cameron is a global provider of pressure control, processing, flow control and compression systems as well as project management and aftermarket services for the oil & gas and process industries.  Cameron manufactured and/or supplied the *Deepwater Horizon*'s blowout preventer valves ("BOP") that failed to activate at the time of the explosion, which should have prevented the oil spill.   Upon

information and belief, the BOPs were defective because they failed to operate as intended, among other reasons. As such, Cameron is liable to Plaintiffs and the Classes for supplying this defective product in addition to being liable for its negligence.

40.     Defendant Anadarko Petroleum Corp. ("Anadarko") is a Delaware corporation with its principal place of business in The Woodlands, Texas, but doing business in the State of Alabama and within this District. Anadarko is an oil and gas exploration and production company that owns a 25 percent interest in the Macondo well at Mississippi Canyon Block 252.

41.     Defendant Mitsui Oil Exploration Company, Ltd. ("Mitsui") is a Japanese Corporation with its principal place of business in Houston, Texas. Mitsui holds a 10 percent interest in the Macondo well at Mississippi Canyon Block 252.

42.     Defendant MOEX Offshore 2007, LLC is incorporated in Delaware and has its principal place of business in Houston, Texas. MOEX Offshore 2007 holds a 10 percent interest in the Macondo well at Mississippi Canyon Block 252. MOEX Offshore 2007 is a wholly owned subsidiary of Mitsui. All allegations and claims asserted herein against Defendant Mitsui are incorporated by reference against MOEX Offshore 2007.

43.     Defendant M-I, LLC is a Texas corporation with its principal place of business in Houston, Texas, but doing business in the State of Alabama. M-I, also known as M-I SWACO, supplies drilling and completion fluids and additives to oil and gas companies, providing pressure control, rig instrumentation, and drilling waste management products and services. M-I provided the drilling fluids for the *Deepwater Horizon* at the time of the explosion.

44.     Defendants John and Jane Does A; B; C; D; E; F; and G are persons or entities whose identities and/or proper corporate names are currently unknown. All allegations and claims asserted herein against defendants Transocean, Ltd. and BP, PLC are incorporated by reference

against John and Jane Does A through G.  If necessary and appropriate, John Does A through G will be identified by proper name and joined in this action pursuant to the Federal Rules of Civil Procedure when such identities are discovered.

45.     Defendants Corporations W; X; Y; and Z are corporations or companies whose identities and/or proper corporate names are currently unknown. All allegations and claims asserted herein against defendants Transocean, Ltd. and BP, PLC are incorporated by reference against Corporations W through Z.  If necessary and appropriate, Corporations W through Z will be identified by proper name and joined in this action pursuant to the Federal Rules of Civil Procedure when such identities are discovered.

## JURISDICTION AND VENUE

46.     Jurisdiction is proper in this Court under 28 U.S.C. § 1332(d)(2), because the matter in controversy exceeds the sum or value of $5,000,000, exclusive of interest and costs, and this is a Class Action in which the plaintiffs are citizens of a State that is different from the State where at least one of the Defendants is incorporated or does business.

47.     Jurisdiction is also appropriate under 28 U.S.C. § 1332(a), because complete diversity exists among the parties and the amount in controversy exceeds $75,000, exclusive of interest and costs.

48.     Venue is proper in this Court under 28 U.S.C. § 1391 because a substantial part of the events or omissions giving rise to the claims asserted herein occurred in this district.

## FACTS COMMON TO THE CLASSES

### The Macondo Well Blowout and Subsequent Oil Spill

49.     On April 20, 2010, in the process of completing drilling operations at the Macondo Well on the Outer Continental Shelf in the Gulf of Mexico, Defendants engaged in negligent, grossly negligent and/or willful, wanton behavior that resulted in explosive gases and crude oil under extreme pressure blasting up the well casing and the riser pipe connecting the seabed with the *Deepwater Horizon* offshore drilling rig that was working on the well, causing the well to blow up and the rig to explode and sink.

50.     The explosion, which killed eleven people, occurred during the course of cementing work that was being performed to create a cement seal to plug the wellhead as part of the final phases of converting the well from an exploratory well into a production well.  Cementing is delicate work that carries with it a risk of a blowout or the uncontrolled release of oil from the well.  It is believed that the explosion was a blowout, likely caused by cementing work the *Deepwater Horizon* had been performing on the well.

51.     As the *Deepwater Horizon* sank, it broke off the long riser pipe carrying oil to the surface from the seafloor, leaving the pipe gushing oil out of its open end as well as through two breaks upon its length.  Although the well was equipped with an emergency blowout preventer ("BOP") valve designed to seal off the well in the event of a sudden pressure release exactly like the one that occurred during the *Deepwater Horizon* blowout, the BOP failed to activate and seal the wellhead as it should have.  Thereafter, vast amounts of crude oil gushed out of the damaged well in unstoppable and unprecedented volumes, creating a fast-moving oil slick.

52.     This massive discharge from the Macondo Well continued for approximately 87 days. During that time, it is estimated that approximately 53,000 barrels of oil per day leaked into the

Gulf's waters. The oil, as well as other materials and substances including chemical dispersants used by Defendants, have made landfall across the Gulf coast and continues to affect the Gulf coastline by polluting and damaging the waters, air, property, estuaries, seabed, oyster beds, oysters and sea life, animals, plants, beaches, shorelines, coastlines, islands, marshlands, and other natural and economic resources along the coast. Despite mobilization of private and public efforts, the oil, dispersants, and other materials and substances have not been cleaned up, and are continuing to damage Alabama's coastal environment, natural resources, economy, and its residents who rely on the Gulf's resources to make a living.

### Defendants' Negligent Acts and Omissions

53.    The explosion of the Macondo Well and the resulting oil spill were caused by the gross negligence, wantonness, and recklessness of the Defendants, rendering them jointly and severally liable to Plaintiffs and Class Members for all of their damages.

54.    Congress has been investigating the disaster and raising questions about decisions Defendants made in the days and hours before the spill. As part of its investigation, Congress released internal BP documents, one of which quotes a BP drilling engineer describing the Macondo Well as a "nightmare well." Despite this, Defendants repeatedly chose risky procedures and violated industry guidelines and warnings from their own personnel and contractors in order to reduce costs and save time.

55.    The threat of a blowout increases as drilling depth increases. The *Deepwater Horizon* was drilling in 5,000 feet of water, to a total depth of 18,000 feet below the sea floor. Internal BP documents released by Congress indicate that BP was well aware of the risks involved with deepwater drilling and still cut corners to save time and money. BP was paying approximately

$500,000 per day to lease the *Deepwater Horizon* rig from Transocean, and by April 20, the day of the blowout, the rig was already 43 days late for its next drilling location.

56.     Defendants made numerous decisions for economic reasons that increased the danger of a well failure.  For example (but, by no means, a limitation), Defendants chose to use a well design with few barriers to gas flow in order to save $7 to $10 million and 3 days of work.

57.     Defendants also failed to use a sufficient number of centralizers to prevent channeling or gas flow problems during the cementing process.  Specifically, Defendants chose to use 6 centralizers instead of the recommended 21 because the extra centralizers would have taken an additional 10 hours to install, despite results from a cementing modeling report stating that, even with seven centralizers installed, "the well is considered to have a SEVERE gas flow problem."

58.     Defendants knew the cementing work the *Deepwater Horizon* was performing was especially risky.  BP's mid-April plan review predicted cement failure, stating "[c]ement simulations indicated it is unlikely to be a successful cement job due to formation breakdown." Yet, Defendants made minimal efforts to contain the added risk.  To save time and money, Defendants chose not to run a 9- to 12-hour procedure called a cement bond log to assess the integrity of the cement seal, which would cost the company $128,000.  Defendants also failed to secure the wellhead with a lockdown sleeve, a critical apparatus that locks the wellhead and the casing in the seal assembly at the seafloor, before allowing pressure on the seal from below.

59.     In addition to increasing the risk of blowouts, deep-sea drilling also increases the failure risk of the chief blowout safety mechanisms, the BOPs.  Defendants were aware of the risk of BOPs failing at greater depths, yet did not install a backup BOP activation system or backup BOPs.

60.     Defendants acted recklessly to minimize expenses and maximize profits and, in so doing, ignored dangerous risks posed to human health and property.  Upon information and belief, in addition to the examples set forth above, other non-exclusive examples include:

a.      Utilizing a defective well casing that was prone to fail when under heavy pressure;

b.      Failing to observe dangerous and recurring problems with highly flammable gaseous compounds, and instituting risky cementing and drilling procedures hours before the *Deepwater Horizon* explosion;

c.      Failing to institute common industry protective measures necessary to detect the buildup of highly flammable gaseous compounds before and during the cementing process;

d.      Accelerating drilling operations in an effort to save money and pressuring employees to drill and penetrate the continental shelf faster while ignoring risks associated with dangerous gaseous compounds in the shelf's crust just hours before the *Deepwater Horizon* explosion;

e.      Continuing to operate the Macondo well without repairing the blowout preventer's annular after chunks of the annular had broken off and floated to the surface, thereby significantly decreasing the blowout preventer's protective measures against a blowout;

f.      Failing to disclose or correct the fact that the battery on the blowout preventer was weak and one of its control pods was broken;

g.      Consciously electing not to install an acoustically activated remote-control shutoff valve;

h.      Failing to install a deepwater valve to be placed nearly 200 feet under the sea floor; and

i.      Ordering drillers to extract drilling mud from the well before all of the concrete plugs were put into place in order to speed up the drilling process thereby creating high pressure instability in the well.

61.     In sum, Defendants knew of the dangers associated with deep water drilling and failed to take appropriate measures to prevent the injuries and damages to Plaintiffs and other Class Members who are dependent upon the Gulf of Mexico and Alabama's coast to make a living. On June 18, 2010, Jim Hackett, CEO of Anadarko Petroleum Corp, a partial owner of the well,

issued a harsh press release pointing fingers at BP's reckless behavior preceding the April 20 explosion. Hackett stated that "[t]he mounting evidence clearly demonstrates that this tragedy was preventable and a direct result of BP's reckless decisions and actions . . . . BP's behavior and action likely represent gross negligence or willful misconduct and thus affect the obligations of the parties under the operating agreement." Some or all of the Defendants have subsequently admitted responsibility for the oil disaster.

62. BP's has a history of cutting corners in this manner. In 2005, a blast at a Texas refinery killed 15 people and injured more than 170. Federal investigators concluded that the explosion was in part due to cost-cutting and poor facility maintenance. Also in 2005, a large production platform in the Gulf of Mexico began leaking severely due to a defective control system. And in 2006, four years after being warned to check its pipelines, BP had to shut down part of its Prudhoe Bay oil field in Alaska after oil leaked from a corroded pipeline.

63. Defendants conduct after the oil spill likewise was disastrous and acted to intensify the damage. The Defendants failed to institute proper oil disaster response plans to contain the catastrophic oil release resulting from the *Deepwater Horizon* explosion, and misrepresented their capability to safely conduct offshore drilling operations and contain oil releases that might occur in connection with such operations. After the oil disaster began, BP Chief Executive Tony Hayward stated that it was "an entirely fair criticism" to say they had not been fully prepared for a deepwater oil disaster. He said "What is undoubtedly true is that we did not have the tools you would want in your tool-kit." On May 10, 2010, BP Chief Operating Officer Doug Suttles for the first time publicly admitted that BP was woefully unprepared to mitigate the damage of the *Deepwater Horizon* due to its location. Suttles stated, "There's a lot of techniques available to

us. The challenge with all of them is, as you said, they haven't been done in 5,000 feet of water."

64. In early 2009, BP submitted papers to the MMS stating, "[i]n the event of an unanticipated blowout resulting in an oil spill, it is unlikely to have an impact based on the industry wide standards for using proven equipment and technology for such responses, implementation of BP's Regional Oil Spill Response Plan which addresses available equipment and personnel, techniques for containment and recovery and removal of the oil spill."

65. Moreover, Defendants attempted to downplay and conceal the severity of the oil spill after the explosion. Defendants' leak estimate of 5,000 barrels per day was found by government investigators to be a fraction of the current official leak estimate of 53,000 barrels of oil per day. In addition, the worst case scenario estimate of 100,000 barrels of oil per day is over 100 times BP's initial estimate of 1,000 barrels per day. Defendants were also slow and incomplete in their announcements and warnings to Gulf Coast residents and businesspeople about the severity, forecast, and trajectory of the oil spill.

### Oil Spill's Effect on Alabama's Waters and Oyster Beds

66. Over 84,000 square miles of the Gulf of Mexico's waters were closed to fishing as a result of the oil spill, representing 35 percent of the Gulf's federal waters available to Alabama commercial and recreational fishermen. In addition, for a period of time, the Alabama Department of Conservation & Natural Resources only allowed recreational catch-and-release fishing in state waters. Federal and state governments had to establish systems to monitor seafood safety to keep oiled products out of the marketplace. In late November 2010, approximately 4,200 square miles of the Gulf were re-closed to shrimping after tar balls were found in shrimpers' nets.

67.     The Alabama Department of Public Health issued a swimming advisory in Gulf waters off Gulf Shores, Orange Beach, and Fort Morgan, and in bay waters immediately adjacent to Fort Morgan, in Bayou St. John, Terry Cove, Cotton Bayou and Old River.  This included all Gulf waters out to the three-mile state/federal line.  A swimming advisory means that individuals are discouraged from swimming in affected waters due to the presence of oil-related chemicals.

68.     On June 1, 2010, reddish brown globs of oil washed ashore on Dauphin Island, Gulf Shores and Orange Beach, Alabama, bringing with them the noxious smell of oil.  The oil globs were also accompanied by a dense, dark foam with an oily consistency that gathered in pools.  As a result, the Alabama Department of Public Health closed all oyster beds in Alabama due to the presence of oil in Alabama's water.

69.     The Gulf region is the home of the world's last, largely-intact network of oyster reefs.  The region leads the U.S. commercial oyster production, accounting for nearly 70 percent of total national catch.

70.     Damage to the Gulf's oyster beds has and will be felt throughout the Gulf's marine environment, as oyster beds provide shelter and food for several underwater species that are the vital foundation of a commercial and recreational fishing industry, including shrimp, crabs and other shellfish.  In addition, oyster beds protect the land by forming undersea breakwaters that buffer shorelines and wetlands from erosion due to storm surge.

71.     The timing of this disaster makes it even more damaging, as it coincides with the peak spawning season for oysters.

72.     The oil spill has caused, and will continue to cause, severe damage to the delicate wetlands and inter-tidal zones that line the coast of Alabama, destroying oyster beds and other habitats where fish, shellfish, and crustacean breed, spawn, and mature.

73.    The unprecedented amounts of chemical dispersants used by Defendants to accelerate the dispersal of the oil may have significant side-effects as well.  Corexit EC9500A and Corexit EC9527A were the principal dispersants used.  These dispersants are composed of several chemicals, including 2-Butoxy Ethanol, which was identified as a causal agent in the health problems experienced by cleanup workers after the 1989 *Exxon Valdez* oil spill.  In addition, the Hazardous Substance Fact Sheet for 2-Butoxy Ethanol warns that it may be a carcinogen in humans and that "[t]here may be no safe level of exposure to a carcinogen, so all contact should be reduced to the lowest possible level."  Further, the OSHA-required Material Safety Data Sheets ("MSDS") for both versions of Corexit used indicate they may have a potential to bio-accumulate in the tissues of fish or other organisms.  Additionally, the MSDSs state that if the product becomes a waste, "it could meet the criteria of a hazardous waste as defined by the Resource Conservation and Recovery Act (RCRA) 40 CFR 261."

74.    Corexit EC9500A and Corexit EC9527A are more toxic and less effective than at least twelve other EPA-approved dispersants, and are banned from use on oil spills in the United Kingdom.  Defendants stated that they chose to use Corexit because it was available the week of the rig explosion.

75.    More than 1.84 million gallons of chemical dispersants were used by July 30, 2010, and additional dispersant use was reported by fishermen in mid-August.  The dispersants were employed both on the surface and at the wellhead 5,000 feet below the surface.  Approximately 771,000 gallons of chemical dispersants were applied at the wellhead, a procedure that had never previously been tried.  Mixing the dispersants with the oil at the wellhead added toxicity to the spill and kept much of the oil below the surface, exposing organisms to more widespread

concentrations of oil. In addition, scientists believe the use of the underwater injection of Corexit into the leak is responsible for the oil plumes discovered below the surface.

76.     Oil, dispersants, and other pollutants released by Defendants remain in Gulf waters, the Gulf floor, Alabama waters, and land owned and/or within the jurisdiction of the State of Alabama, and continue to cause damage. Oil, dispersants, and other pollutants have settled into the sediment on the Gulf floor and the bed underlying waters of Alabama, where it has killed and will continue to kill oysters and other marine life and will continually discharge into, and cause damage to the natural resources of the Gulf of Mexico and its shorelines, including Alabama's sensitive wetlands, marshlands and estuarine areas. As a result of the events described herein, Plaintiffs and the Class Members have suffered ascertainable losses and damages, including loss of revenues and diminution of property values, as the oil pollutes the oyster beds along the Alabama shoreline.

77.     There are many other potential effects from the oil spill that have not yet become known, and Plaintiffs reserve the right to amend this Complaint once additional information becomes available.

## **CLASS DEFINITION**

78.     Plaintiffs bring this action on behalf of themselves and others similarly situated in accordance with Rule 23 of the Federal Rules of Civil Procedure. The "Gulf Coast" as defined herein shall include, but not be limited to, Alabama, Florida, Louisiana, and Mississippi. The two Classes upon whose behalf this suit is brought are defined as:

> Any person or entity with a property right in an oyster bed on or near the Gulf Coast and its bays and estuaries by virtue of fee ownership, riparian rights, operation of state law, lease, or otherwise who has sustained any losses and/or damages as a result of the April 20, 2010 fire and explosion which occurred aboard the *Deepwater Horizon* drilling rig and the resulting and ongoing oil spill; and

Any owner of real property on the Gulf Coast and its bays and estuaries who has sustained any losses and/or damages as a result of the April 20, 2010 fire and explosion which occurred aboard the *Deepwater Horizon* drilling rig and the resulting and ongoing oil spill.

79.    Excluded from the Classes are:

(a) the officers and directors of any of Defendants;

(b) any judge or judicial officer assigned to this matter and his or her immediate family;

(c) any legal representative, successor, or assign of any excluded persons or entities;

(d) any class counsel or their immediate family members; and

(e) any State or any of its agencies.

## CLASS ALLEGATIONS

80.    The Classes are so numerous that joinder of claims is impracticable.  The disposition of the claims asserted herein through this Class Action will be more efficient and will benefit the parties and the Court.

81.    There are questions of law or fact common to the Classes.

82.    Plaintiffs' claims are typical of the claims of the Classes, because all claims arise from the same operative facts and are based on the same legal theories.

83.    The Plaintiffs will fairly and adequately protect the interests of the Classes.  Plaintiffs have retained competent and experienced counsel in matters such as these.  Plaintiffs and Counsel are committed to prosecuting this action vigorously on behalf of the Classes and have the financial resources to do so.  Neither Plaintiffs nor Counsel have interests adverse to those of the Classes.

84.    Plaintiffs further bring this Class Action pursuant to Federal Rules of Civil Procedure Rule 23(b)(1), because prosecuting separate actions by individual Class Members would create a risk of inconsistent or varying adjudications with respect to individual Class Members that would

establish incompatible standards of conduct for the Defendants; adjudications with respect to individual Class Members that, as a practical matter, would be dispositive of the interest of the other member not parties to the individual adjudications and would substantially impair their ability to protect their interests.

85.     Plaintiffs also bring this Class Action under Rule 23(b)(2), because the parties opposing the Classes have acted or refused to act on grounds that apply generally to the Classes, so that final injunctive relief or corresponding declaratory relief is appropriate respecting the Classes as a whole.  Such injunctive relief includes, but is not limited to, an injunction to require preventative measures to limit the damage to the Class Members' oyster beds and associated marshlands, cleanup and mitigation of the Class Members' oyster beds and associated marshlands, and restocking and/or supplementation of the Class Members' oyster beds.  Such declaratory relief includes, but is not limited to, a declaration that Defendants' liability is not limited by the Limited Liability Act or other statute and that Defendants' acted with negligence, gross negligence, and/or willful, wanton, and careless disregard.

86.     Plaintiffs also bring this Class Action pursuant to Rule 23(b)(3), because there are questions of law and fact common to the Classes that predominate over any questions affecting only individual Class Members.  Some of these common questions of law and fact common to the Classes include, but are not limited to:  whether the Defendants committed negligence, gross negligence, and/or willful, wanton, and careless disregard in the actions and inactions alleged in Paragraph 90; whether the Defendants have trespassed on oyster beds and associated marshlands on the Gulf Coast; and whether Defendants have created a nuisance with respect to oyster beds and associated marshlands on the Gulf Coast.  In addition, a class action is superior to other available methods for the fair and efficient adjudication of the controversy.  The expense and

burden of litigation would substantially impair the ability of many Class Members to pursue individual cases to protect their rights. Absent class treatment, Plaintiffs and the Class Members will continue to suffer harm and damages as a result of Defendants' unlawful and wrongful conduct.

### FIRST CAUSE OF ACTION
### (Negligence, Gross Negligence, and Willful, Wanton and Careless Disregard for Plaintiffs' Rights)

87.    Plaintiffs, on behalf of themselves and the Class Members, incorporate and reallege each and every allegation set forth above herein by reference.

88.    The blowout explosion, fire and resulting oil spill were caused by the concurrent negligence of Defendants.

89.    Defendants, and each of them, were negligent, grossly negligent, and/or acted with willful, wanton, and careless disregard for the rights of Plaintiffs and the Classes with regard to the operation of *Deepwater Horizon.*

90.    Defendants, and each of them, are liable to Plaintiffs and the Classes for:

(a) Negligence, gross negligence, and/or willful, wanton, and careless disregard for failing to properly operate the *Deepwater Horizon*;

(b) Negligence, gross negligence, and/or willful, wanton, and careless disregard for failing to install a remote control acoustic switch, to prevent the discharge of crude oil into the waters of the Gulf of Mexico;

(c) Negligence, gross negligence, and/or willful, wanton, and careless disregard for failing to properly inspect the *Deepwater Horizon* to assure that its equipment and personnel were fit for their intended purpose;

(d) Negligence, gross negligence, and/or willful, wanton, and careless disregard for acting in a careless and negligent manner without due regard for the safety of others;

(e) Negligence, gross negligence, and/or willful, wanton, and careless disregard for failing to promulgate, implement and enforce rules and regulations pertaining to the safe operations of the *Deepwater Horizon* which, if they had been so

promulgated, implemented and enforced, would have averted the fire, explosion, sinking and oil spill;

(f) Negligence, gross negligence, and/or willful, wanton, and careless disregard for operating the *Deepwater Horizon* with untrained and unlicensed personnel;

(g) Negligence, gross negligence, and/or willful, wanton, and careless disregard for inadequately and negligently training and hiring of personnel;

(h) Negligence, gross negligence, and/or willful, wanton, and careless disregard for failing to take appropriate action to avoid or mitigate the accident;

(i) Negligence, gross negligence, and/or willful, wanton, and careless disregard for negligently implementing the policies and procedures to safely conduct offshore operations in the Gulf of Mexico;

(j) Negligence, gross negligence, and/or willful, wanton, and careless disregard for Defendants' failure to ascertain that the *Deepwater Horizon* and its equipment were free from defects and/or in proper working order;

(k) Negligence, gross negligence, and/or willful, wanton, and careless disregard for failing to timely warn;

(l) Negligence, gross negligence, and/or willful, wanton, and careless disregard for failing to timely bring the oil release under control;

(m) Negligence, gross negligence, and/or willful, wanton, and careless disregard for Defendants' failure to provide appropriate accident prevention equipment;

(n) Negligence, gross negligence, and/or willful, wanton, and careless disregard for Defendants' failure to observe and read gauges that would have indicated excessive pressures in the well;

(o) Negligence, gross negligence, and/or willful, wanton, and careless disregard for Defendants' failure to react to danger signs;

(p) Negligence, gross negligence, and/or willful, wanton, and careless disregard for providing BOPs that did not work properly;

(q) Negligence, gross negligence, and/or willful, wanton, and careless disregard for conducting well and well cap cementing operations improperly;

(r) Negligence *per se* for acting in contravention of established Federal and/or Alabama law;

(s) Negligence, gross negligence, and/or willful, wanton, and careless disregard for Defendants' failure to develop and maintain an appropriate plan to respond to a blowout;

(t) Negligence, gross negligence, and/or willful, wanton, and careless disregard for failing to adequately implement an appropriate plan to respond to a blowout;

(u) Negligence, gross negligence, and/or willful, wanton, and careless disregard for failing to develop and maintain an appropriate plan to respond to and contain a massive oil spill;

(v) Negligence, gross negligence, and/or willful, wanton, and careless disregard for failing to adequately implement an appropriate plan to respond to and contain a massive oil spill;

(w) Negligence, gross negligence, and/or willful, wanton, and careless disregard for Defendants' failure to timely bring the oil release under control;

(x) Negligence, gross negligence, and/or willful, wanton, and careless disregard for failing to properly design the *Deepwater Horizon*;

(y) Negligence, gross negligence, and/or willful, wanton, and careless disregard for acting in a manner that justifies imposition of punitive damages; and

(z) Such other acts of negligence and omissions as will be shown at the trial of this matter; all of which acts are in violation of the laws of Alabama and Federal law applicable on the outer Continental Shelf.

91.     In addition, and in the alternative, the fire, explosion, sinking and resulting oil spill were caused by defective equipment, including the BOPs, which were in the care, custody, and control of Defendants.  Defendants knew or should have known of these defects and Defendants are, therefore, liable for them.

92.     The injuries to Plaintiffs and the Class Members were also caused by or aggravated by the fact that Defendants failed to take necessary actions to mitigate the danger associated with their operations.

93.     Furthermore, the disaster would not have occurred had the Defendants exercised a high degree of care.  Plaintiffs, therefore, plead the doctrine of *res ipsa loquitur.*

94.    As a direct and proximate result of the acts or omissions set forth in the preceding paragraphs, the Plaintiffs and the Class Members have suffered and will continue to suffer losses and damages caused and/or contributed to be caused by the Defendants' negligence, gross negligence, and/or willful, wanton, and careless disregard for the rights of Plaintiffs and the Class Members.

95.    Plaintiffs and the Class Members are entitled to a judgment finding Defendants liable to Plaintiffs and the Class Members for damages suffered as a result of Defendants' negligence, gross negligence and/or willful, wanton, and careless disregard and awarding Plaintiffs and the Class Members adequate compensation and punitive damages in amounts determined by the trier of fact, but which is sufficient to punish and deter Defendants and others similarly situated from engaging in similar conduct in the future.

## SECOND CAUSE OF ACTION
### (Trespass)

96.    Plaintiffs, on behalf of themselves and the Class Members, incorporate and reallege each and every allegation set forth above herein by reference.

97.    Defendant's acts and omissions with respect to the explosion, fire and release of crude oil and toxic substances have caused and continue to cause a material, substantial and unreasonable interference with Plaintiffs' and the Class Members' use and enjoyment of their property and businesses, and have materially diminished and continue to diminish the value thereof.

98.    Defendants have trespassed and continue to trespass by allowing oil to escape their facility and contaminate Plaintiffs' and Class Members' property, including the oyster beds.

99.    As a direct and proximate result of Defendants' trespass, Plaintiffs and the Class Members have suffered losses in the form of, but not limited to, loss of income, the creation of conditions harmful to human health and the environment, the loss of beneficial use, enjoyment,

and exclusive possession of their property, diminished value of their oyster beds and property, and emotional distress, for which they are entitled to be compensated.

100.   Defendants are liable to Plaintiffs and Class Members for all injuries and damages resulting from such trespass and for punitive damages.

## THIRD CAUSE OF ACTION
### (Nuisance)

101.   Plaintiffs, on behalf of themselves and the Class Members, incorporate and reallege each and every allegation set forth above herein by reference.

102.   Defendants' acts or omissions have resulted in an invasion by a substance—oil and other pollutants—that has caused and continue to cause a material and substantial interference with Plaintiffs' and the Class Members' use and enjoyment of their properties and businesses, including owning and leasing the oyster beds on their property, and have materially diminished and continue to diminish the value thereof.

103.   Defendants' creation and continuing creation of private nuisance proximately caused and continues to cause damage to Plaintiffs and other Class Members in the form of emotional distress, and property damage of a type special to members of the Classes.

104.   Plaintiffs and the Class Members are entitled to a judgment finding Defendants liable to Plaintiffs and the Class Members for damages suffered as a result of Defendants' nuisance and for punitive damages.

## FOURTH CAUSE OF ACTION
### (Strict Liability)

105.   Plaintiffs, on behalf of themselves and the Class Members, incorporate and reallege each and every allegation set forth above herein by reference.

106.    The actions and activities of Defendants, as described above, including but not limited to, the drilling and transporting of oil and other pollutants in the Gulf of Mexico, constitutes an abnormally dangerous and/or ultrahazardous activity that carries with it a high degree of risk of harm to individuals, land or chattels of others.

107.    The injuries and damages suffered by Plaintiffs were the kind of harm, the possibility of which makes the Defendants' activities abnormally dangerous and/or ultrahazardous.

108.    The above described injuries and damages to the Plaintiffs and the Class Members were proximately caused by Defendants' abnormally dangerous and/or ultrahazardous activity.

109.    Plaintiffs and Class Members are entitled to a judgment finding Defendants liable to Plaintiffs and the Class Members for damages suffered as a result of Defendants' abnormally dangerous and/or ultrahazardous activity and for punitive damages.


## PRAYER FOR RELIEF

WHEREFORE, Plaintiffs and the Class Members demand judgment against Defendants, jointly and severally, as follows:

(a) An order certifying the Classes for the purpose of going forward with any one or all of the causes of action alleged herein; appointing Plaintiffs as Class Representatives; and appointing undersigned counsel as counsel for the Classes;

(b) Economic and compensatory damages in amounts to be determined at trial;

(c) Punitive damages;

(d) Pre-judgment and post-judgment interest at the maximum rate allowable by law;

(e) Attorney's fees and costs of litigation;

(f) Such other and further relief available under all applicable state and federal laws and any relief the Court deems just and appropriate; and

(g) A trial by jury as to all Defendants and on all claims.

RESPECTFULLY SUBMITTED this the 15th day of December, 2010.


  /s Michael D. Freeman
Michael D. Freeman (ASB-6065-F44M)
P. Stephen Gidiere III (ASB-0476-R53P)
BALCH & BINGHAM LLP
Post Office Box 306
Birmingham, AL 35201-0306
Telephone: (205) 251-8100
Facsimile: (205) 226-8799

and

Jonathan P. Dyal (MS Bar No. 99146)
Matthew W. McDade (LSB – 32899)
BALCH & BINGHAM LLP
1310 Twenty Fifth Avenue
Gulfport, MS 39501
Telephone: (228) 864-9900
Facsimile: (228) 864-8221

## CERTIFICATE OF SERVICE

I hereby certify that the above and foregoing First Amended Complaint has been served on All Counsel by electronically uploading the same to Lexis Nexis File & Serve in accordance with Pretrial Order No. 12, on this 15th day of December, 2010.


   /s Michael D. Freeman
Of Counsel