# Exhibit 1

RB   D.C.
ELECTRONIC

**August 26, 2011**

STEVEN M. LARIMORE
CLERK U.S. DIST. CT.
S.D. OF FLA. · MIAMI

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF FLORIDA

CASE NO. _____

ADAGIO, LLC,

      Plaintiff,

v.

TRANSOCEAN, LTD., BP, PLC,
TRANSOCEAN OFFSHORE DEEPWATER
DRILLING, INC., TRANSOCEAN
DEEPWATER, INC., TRANSOCEAN
HOLDINGS,LLC, BP PRODUCTS NORTH
AMERICA, INC., HALLIBURTON ENERGY
SERVICES, INC., CAMERON
INTERNATIONAL CORPORATION f/k/a
COOPER CAMERON CORPORATION, BP
AMERICA, INC., ANADARKO PETROLEUM
CORPORATION, MOEX OFFSHORE 2007,
LLC, M-I, LLC, BP CORPORATION NORTH
AMERICA, INC. BP COMPANY NORTH
AMERICA, INC., and BP EXPLORATION
AND PRODUCTION, INC.,

      Defendants.

_____/

# 11-61900-Civ-Dimitrouleas/Snow

## COMPLAINT

Plaintiff, ADAGIO, LLC, by and through its undersigned counsel, brings this action against Defendants, TRANSOCEAN, LTD., BP, PLC, TRANSOCEAN OFFSHORE DEEPWATER DRILLING, INC., TRANSOCEAN DEEPWATER, INC., TRANSOCEAN HOLDINGS, LLC, BP PRODUCTS NORTH AMERICA, INC., HALLIBURTON ENERGY SERVICES, INC., CAMERON INTERNATIONAL CORPORATION f/k/a COOPER CAMERON CORPORATION, BP AMERICA, INC., ANADARKO PETROLEUM CORPORATION, MOEX OFFSHORE 2007, LLC, M-I, LLC, BP CORPORATION NORTH AMERICA, INC. BP COMPANY NORTH AMERICA, INC., and BP EXPLORATION AND

PRODUCTION, INC., and for its Complaint alleges, upon information and belief and based on the investigation to date of its counsel, as follows:

## INTRODUCTION

1.  This is an action, brought to recover damages suffered by Plaintiff as a result of the oil spill that resulted from the explosion and fire aboard, and subsequent sinking of the oil rig, Deepwater Horizon (hereinafter "Deepwater Horizon" or "Oil Rig") on April 20, 2010, at about 10:00 p.m. central time on the outer Continental Shelf, off the Louisiana coast. Following the sinking of the Oil Rig, approximately 4,000 - 5,000 barrels per day of crude oil were leaking from the oil well upon which the Deepwater Horizon was performing completion operations, and from the pipe connected to it (drill stack). The fast-moving oil slick, which grew to 100 miles long by 45 miles wide, caused detrimental effects upon the Gulf of Mexico's and Florida's marine environments, coastal environments and estuarine areas, as well as Florida's tourism industry.

2.  Defendants, through their actions and inactions, have caused discharges of pollutants from the now destroyed Deepwater Horizon mobile offshore drilling unit, which had drilled the deepest well in the history of the oil industry. According to government estimates, the resulting oil spill is now the worst in U.S. history.

3.  Defendants' negligence has resulted in the greatest environmental catastrophe in a generation. At approximately 10:00 p.m., on April 20, 2010, central time, an explosion occurred on the Deepwater Horizon. The explosion, resulting fire, and oil spill, however, could have been avoided. For example, Defendants disregarded numerous warning signs which should have put them on notice that there was a problem with the well. Defendants then made the decision to prematurely remove drilling mud from the oil well that allowed natural gases to enter

2

the pipe and contribute to the explosion. Moreover, had the Deepwater Horizon's Blow Out Preventer ("BOP") been properly designed and maintained, the BOP could have prevented the resulting blowout from the well. Additionally, had the Deepwater Horizon been equipped with a remote-controlled shut-off switch, as oil rigs operated by nations ranging from Brazil to Norway routinely are, the well could have been closed, and the resulting damage could have been minimized.

4.      Unfortunately for Plaintiff, and all who rely on the Gulf of Mexico for their livelihoods and other lawful resource-based activities, it was not, and the Deepwater Horizon exploded and burned for two days before tipping into the sea. On its way to the seafloor, it bent and broke the long riser pipe carrying oil to the surface from the seafloor. As the Deepwater Horizon sank, it eventually broke off the riser, leaving the pipe leaking oil out of its now-open end as well as through two breaks along its length, and leaving the well spewing oil into the Gulf of Mexico.

5.      By the time the Deepwater Horizon sank on April 22, 2010, it was leaking thousands of barrels of crude a day, creating a thick and viscous oil slick larger than the State of Rhode Island. At one point, an estimated 500,000 to 1 million gallons of crude were believed to be leaking daily. Accordingly, previous estimates indicated that anywhere from 23 to 45 million gallons had escaped into the Gulf of Mexico. These estimates make the Deepwater Horizon disaster at least 2 to 4 times greater than the Exxon Valdez spill in Alaska. The growing, fast-moving, rainbow-colored smear was large enough to be visible from outer space and ultimately made landfall on the Florida, Louisiana, Alabama, and Mississippi coastlines.

6.      On Wednesday, June 2, 2010, the federal government expanded the Gulf's no-fishing zone, to cover 88,502 square miles, which accounts for 37 percent of Gulf waters. The

3

zone was expanded in order to both let cleanup workers capture portions of the moving oil slick and to protect the seafood industry.

7.     The oil slick caused catastrophic damage to the fragile ecosystem of the Gulf of Mexico and threatens local environments for years to come.  Oil has also disrupted the underwater marine ecosystem.  The loss of critical sources of food has potentially devastating consequences for the coastal economies.

8.     Scientists from the University of South Florida previously found signs of a 6-mile-wide plume of invisible oil snaking beneath the surface in the deepest recesses of the Gulf. University of South Florida scientists had discovered yet another plume in the Gulf. Additionally, Philippe Cousteau, and a team of specially trained divers in full hazmat suits, previously conducted a dive to investigate the effects of the oil spill underwater.  He described the experience as one of the most terrible of his life, a "nightmare," in that the divers found themselves in a thick soup of orange particles floating in the water column to a depth of about fifteen feet.  He indicated that the oil would likely follow currents as far as the Arctic Circle via the Gulf Stream.

9.     Onshore, and in coastal wetlands, the legacy of habitat loss has left smaller and smaller areas for birds and other wildlife.  Disruption of the remaining habitat--even as a result of well-intentioned efforts to protect the gulf coast and its barrier islands from oil damage through cleaning and movement of sand and other materials--may disrupt nesting birds and other wildlife, with long term consequences.

10.     Defendants continued to pollute the Gulf of Mexico while attempting to minimize the effects of the oil spill.  Although the Environmental Protection Agency ("EPA") ordered BP to find a "less toxic" chemical dispersant than the one it had been using, Corexit, BP continued

4

to use that same chemical despite the EPA's warnings.  The EPA expressed dissatisfaction with this response as less toxic and more effective products were available.  Corexit dispersants were removed from a list of approved dispersants in Great Britain ten years ago after they were found to be dangerous to animals like limpets near rocky shores.

11.    The oil spill created by Defendants adversely affects the substantial interests of Plaintiff by depriving it of the ability to earn a living.  Pollution of these waters by Defendants adversely affects the substantial interests of Plaintiff.

## THE PARTIES

12.    Plaintiff, ADAGIO, LLC ("Plàintiff" or "Adagio"), is a Texas limited liability company with its principal place of business located at 5100 Westheimer, Suite 115, Houston, TX 77056. Plaintiff was founded in 2005 as a real estate investment company focused—at least prior to the oil spill set forth and described above and below—on the Florida Gulf Coast. Adagio also provides consulting services to the finance world regarding real estate and energy matters.

13.    Defendant BP, PLC ("BP, plc") is a foreign corporation doing business in the State of Florida.

14.    Defendant BP PRODUCTS NORTH AMERICA, INC. ("BP Products") is a foreign corporation doing business in the State of Florida.

15.    Defendant BP AMERICA, INC. ("BP America") is a foreign corporation doing business in the State of Florida.

16.    Defendant BP EXPLORATION AND PRODUCTION, INC. ("BP Exploration") is a foreign corporation doing business in the State of Florida.

5

17.     Defendant BP CORPORATION NORTH AMERICA, INC. ("BP Corporation") is a foreign corporation doing business in the State of Florida.

18.     Defendant BP COMPANY NORTH AMERICA, INC. ("BP Company") is a foreign corporation doing business in the State of Florida.   All of the BP Defendants are collectively referred to as "BP."

19.     Defendant TRANSOCEAN, LTD. ("Transocean, Ltd.") is a foreign corporation doing business in the State of Florida.

20.     Defendant TRANSOCEAN OFFSHORE DEEPWATER DRILLING, INC. ("Transocean Offshore") is a foreign corporation doing business in the State of Florida.

21.     Defendant TRANSOCEAN DEEPWATER, INC. ("Transocean Deepwater") is a foreign corporation doing business in the State of Florida.

22.     Defendant TRANSOCEAN HOLDINGS, LLC ("Transocean Holdings") is a foreign corporation doing business in the State of Florida.   Upon information and belief, Transocean Holdings is a financially responsible party for the conduct of the Transocean entities named herein (collectively "Transocean").

23.     Defendant HALLIBURTON ENERGY SERVICES, INC. ("Halliburton") is a foreign corporation doing business in the State of Florida.

24.     Defendant CAMERON INTERNATIONAL CORPORATION f/k/a COOPER CAMERON CORPORATION ("Cameron") is a foreign corporation doing business in the State of Florida.

25.     Defendant ANADARKO PETROLEUM CORPORATION ("Anadarko") is a foreign corporation doing business in the state of Florida.   Anadarko is an oil and gas

6

exploration and production company that owns a 25% interest in the Macondo well at Mississippi Canyon Block 252.

26. Defendant MOEX OFFSHORE 2007, LLC ("MOEX") is a foreign corporation doing business in the State of Florida. MOEX Offshore 2007 holds a 10% interest in the Macondo well at Mississippi Canyon Block 252.

27. Defendant M-I, LLC ("M-I") is a foreign corporation doing business in the State of Florida. M-I, also known as M-I SWACO, supplies drilling and completion fluids and additives to oil and gas companies, providing pressure control, rig instrumentation, and drilling waste management products and services. M-I provided the drilling fluids for the Deepwater Horizon at the time of the explosion.

## JURISDICTION AND VENUE

28. This Court has jurisdiction over this action pursuant to: (1) 28 U.S.C. § 1332, as the amount exceeds the sum or value of $75,000.00, exclusive of interest and costs, and it is an action brought by a citizen of a State that is different from the State where at least one of the Defendants is incorporated or does business; (2) 28 U.S.C. § 1331, because the claims asserted herein arise under the laws of the United States of America, including the laws of the State of Florida which have been declared, pursuant to 43 U.S.C. § 1331(f)(1) and § 1333(a)(2), to be the law of the United States for that portion of the outer Continental Shelf from which the oil spill originated; and (3) 43 U.S.C. § 1331(a), which extends exclusive Federal jurisdiction to the outer Continental Shelf.

29. Venue in this Judicial District is proper pursuant to 28 U.S.C. § 1391(a) as a substantial part of the events and omissions giving rise to the claim occurred, and a substantial part of property that is the subject of this action, is situated in this Judicial District.

7

## FACTUAL ALLEGATIONS

### A.    Background

30.    The Deepwater Horizon was an ultra-deepwater semi-submersible oil rig built in 2001. It was owned by Transocean and leased to BP through September 2013. It was one of the largest rigs of its kind. BP leased the Deepwater Horizon to drill exploratory wells at the Macondo prospect site in Mississippi Canyon Block 252, a location on the outer continental shelf off the coast of Florida. In fact, the crew of the Deepwater Horizon had just celebrated drilling the deepest well in the history of the oil industry.

31.    BP holds a lease granted by the U.S. Minerals Management Service ("MMS") that allows BP to drill for oil and perform oil-production-related operations at the Macondo site in the Mississippi Canyon Block 252 section. At all times material hereto, the Deepwater Horizon was owned, manned, possessed, managed, controlled, chartered and/or operated by Transocean and/or BP.

32.    On April 20, 2010, the Deepwater Horizon was creating a cement seal and plug of the wellhead as part of the final phases of turning the Macondo well from an exploratory well into a production well. "Cementing" is delicate work that carries the risk of a blowout, which is the uncontrolled release of oil from the well. Halliburton was engaged in cementing operations of the well and well cap and, upon information and belief, improperly and negligently performed these duties, increasing the pressure at the well and contributing to the explosion, fire and resulting oil spill.

33.    Halliburton had been engaged by the BP and/or Transocean Defendants to conduct cementing operations on the well. In fact, Halliburton has stated that it completed the cementation of "the final production string" twenty hours before the accident, and that tests on

8

the integrity of its casing were completed.   But, placement of a final cement plug had not yet occurred at the time of explosion.   Halliburton's improper and negligent conduct in its cementing duties caused and/or substantially contributed to the explosion and resulting oil spill. Moreover, Halliburton used a type of nitrogen charged cement to close off the bottom of the well which was not the typical type of cement used in the industry.

34.     Defendants did not follow the usual protocol in the deepwater drilling industry with respect to the cement plug.   The usual procedure is to place the plug first and then switch out the heavy drilling fluid for seawater.   The heavy drilling fluid is essential, however, because it functions to weigh down the natural gases which are attempting to escape from the well. Defendants, however, started removing the heavy drilling fluid before the cement plug was placed which allowed the gas to shoot up the pipe and explode.

35.     In fact, hours before the explosion, the oil well had failed key pressure tests which should have put Defendants on notice of a problem with the well.   One test indicated that pressure was building up in the well and that oil or gas was seeping into the well and could potentially lead to an explosion.   Specifically, the test revealed uneven buildups of pressure in different lengths of the pipe. Yet, Defendants did not suspend operations at that time.

**B.     The Explosion and Resulting Oil Spill**

36.     During the course of the above-referenced cementing work, an explosion occurred on the Deepwater Horizon causing the deaths and injuries of many workers on the rig.   The resulting fire burned for two days, and the rig began to sink progressively more and more until it finally sank on April 22, 2010.

37.     The Deepwater Horizon had been connected to the wellhead at the seafloor by a 5,000-foot pipe called a riser.   As the Deepwater Horizon sank to the seafloor, it pulled the riser

9

down with it, bending and breaking the pipe before finally tearing away from it completely. The riser, bent into a crooked shape underwater, extended from the well to 1,500 feet above the seabed and then buckled back down. Oil was flowing out from the open end of the riser and from two places along its length.

38.     The wellhead was fitted with a blowout preventer-known as a BOP, consisting of a stack of hydraulically activated valves at the top of the well designed to pinch the pipe closed, cut it, and seal off the well in the event of a sudden pressure release exactly like the one that occurred during the Deepwater Horizon blowout. The BOP was defective, among other things, because it failed to operate as intended.

39.     The BOP is a steel-framed stack of valves, rams, housings, tanks, and hydraulic tubing that are painted industrial yellow and sit atop the oil well. The BOP is approximately sixteen feet wide and sits on the seabed between the well and the pipe that carries oil to the surface, known as the riser. The drilling pipe, which comes down from the rig through the riser, is usually about half a foot in diameter and is surrounded inside the well by a larger pipe that forms a permanent casing for the finished well. Each BOP is configured for a given well. The BOP for the Deepwater Horizon had a series of five hydraulic rams. Some were designed to seal the well by clamping around the drill pipe. Another of the rams, known as the shear ram, was designed to seal the well by shearing off the drill pipe.

40.     According to a news report in the New York Times on Saturday, May 1, 2010, when the explosion and fire ripped through the rig on April 20, 2010, workers threw a switch to activate the BOP, which was supposed to seal the well quickly in the event of a burst of pressure. According to the report, "[i]t did not work, and a failsafe switch on the device also failed to function." Although Defendants knew or should have known that the Deepwater

10

Horizon had a defective BOP and was not equipped with a remote shut-off switch, Defendants used the Deepwater Horizon to drill the deepest oil well in history.

41.     Upon information and belief, the BOP at the Deepwater Horizon had a dead battery in its control pod, leaks in its hydraulic system, had a useless test version of one of the devices that was supposed to close the flow of oil, and a cutting tool that was not strong enough to shear through joints that made up ten percent of the drill pipe.  In fact, the BOP apparently had a significant leak in a key hydraulic system.  This leak was found in the hydraulic system that provides emergency power to the shear rams, which are the devices that are supposed to cut the drill pipe and seal the well.

42.     The BOP had been modified in unexpected ways.  One of these modifications was potentially significant.  The BOP has an underwater control panel.  BP spent a day trying to use this control panel to activate a variable bore ram on the blowout preventer that was designed to seal tight around any pipe in the well.  When they investigated why their attempts failed to activate the bore ram, they learned that the device had been modified.  A useless test ram, not the variable bore ram, had been connected to the socket that was supposed to activate the variable bore ram.  An entire day's worth of precious time had been spent engaging rams that closed the wrong way.

43.     After the accident, drawings of the BOP were requested from Transocean. Because of the modifications, however, the drawings they received did not match the structure on the seafloor.  BP wasted many hours figuring this out.

44.     The BOP was also not powerful enough to cut through joints in the drill pipe. Upon information and belief, the emergency controls on the blowout preventer also failed.  The BOP had two emergency controls.  One is called the emergency disconnect system or EDS.  The

11

EDS was activated on the drill rig before the rig was evacuated. But the signals did not reach the BOP on the seafloor. Defendants were aware of problems with the emergency control but failed to address those problems.

45.     The emergency controls may have also failed because the explosion that caused the emergency also disabled communications to the BOP. Still, the BOP had a "deadman switch" which was supposed to activate the BOP when all else failed. According to Cameron, there were multiple scenarios that could have caused the deadman switch not to activate. One is human oversight: the deadman switch may not have been enabled on the control panel prior to the BOP being installed on the ocean floor. Another is lack of maintenance: the deadman switch will not work if the batteries are dead. The deadman switch is connected to two separate control pods on the BOP. Both rely on battery power to operate. When one of the control pods was removed and inspected after the spill began, the battery was found to be dead.

46.     With respect to design problems, the deadman switch activates only when three separate lines that connect the rig to the BOP are all severed: the communication, power, and hydraulic lines. Cameron has indicated that the power and communication lines were severed in the explosion, but it is possible that the hydraulic lines remained intact, which would have stopped the deadman switch from activating. If this last scenario is true, the acoustic shut-off switch that BP failed to install to save $500,000 would probably have worked to stop the blowout.

47.     If the BOP on the wellhead had been functional, it could have been manually or automatically activated right after the explosion, cutting off the flow of oil at the wellhead, limiting the spill to a minute fraction of its eventual severity and thereby sparing Plaintiff damage.

12

48.   The damages suffered by Plaintiff were caused by Defendants' violations of numerous statutes and regulations, including, but not limited to, statutes and regulations issued by OSHA and the United States Coast Guard, including the requirement to test the sub-sea BOPs at regular intervals.

49.   Upon information and belief, during a 2009 earnings call to investors, Transocean admitted knowledge of BOP problems on at least some of its oil drilling platforms.

50.   Upon information and belief, Cameron manufactured or supplied the Deepwater Horizon's BOP that failed to operate upon the explosion which should have prevented the oil spill.

### C.    The Aftermath

51.   While the media has compared this spill to the 1989 Exxon Valdez disaster, one crucial difference is that the Valdez was a tanker with a limited supply of oil.  Experts estimate that the volume has well eclipsed that of the Valdez spill.

52.   What is worse, the floating booms that BP had set out to block the oil from reaching the coastline were too low and/or may have been placed too far out to sea to be useful. Experts reported that anything higher than a three-foot wave would clear the boom, lifting the oil slick over the barriers with it.  In the past, the Gulf has experienced seven- to ten-foot swells, diminishing the usefulness of the booms.  Additionally, the weathered state of the oil previously approaching land made traditional booming less effective.  Some of the oil was subsurface and the oil could easily go under traditional booms.  Accordingly, the sorbent type of booms would have been much more effective in capturing the toxic material.

13

53.    As the oil continued to make landfall along the Gulf Coast, it caused severe damage to the delicate wetlands and intertidal zones that line the Gulf Coast, destroying the habitats where birds, fish, shellfish, and crustaceans breed, spawn, and mature.

**D.    The Risks of Deepwater Oil Drilling**

54.    The risks of offshore drilling were well known to Defendants, and are especially high in the Gulf of Mexico, where floating rigs are used, unlike the permanent rigs used in other areas such as the North Sea.  Permanent rigs are anchored to the ocean floor and cannot sink, while floating rigs are far more precarious and subject to disastrous results like this incident.

55.    Moreover, Defendants knew the work the Deepwater Horizon was performing was especially risky.  In 2007, the MMS raised concerns about oil rig blowouts associated with the exact type of cementing work the Deepwater Horizon was doing when it exploded.

56.    Defendants were fully aware that deep-water oil drilling is significantly more dangerous than drilling in other areas.  Defendants were fully aware that deep-water drilling cannot be carried out safely using equipment that is inadequately designed or poorly maintained.

57.    Although blowouts due to other causes were on the decline, the MMS study noted that blowouts during cementing work were continuing with regularity, and most frequently in the Gulf of Mexico.  Cementing problems were associated with 18 of 39 blowouts between 1992 and 2006, and 18 of 70 from 1971 to 1991.  Nearly all the blowouts examined occurred in the Gulf of Mexico.

58.    Defendants were aware of the recent August 2009 blowout in the Timor Sea, which was found to have been caused by careless cementing work.  During that incident, which bears a strong resemblance to the Deepwater Horizon blowout, oil leaked from the site for ten weeks, spreading damage over 200 miles from the well site.

14

59.   The threat of blowouts increases as drilling depth increases. The Deepwater Horizon was drilling in 5,000 feet of water, to a total depth of 18,000 feet below the seafloor. Defendants were aware of the high risk of blowouts from such deep drilling.

60.   In addition to increasing the risk of blowouts, deep-sea drilling also increases the failure risk of the chief blowout safety mechanism, the BOP. Defendants were aware of the risk of the BOP failing at greater depths, yet did not install a backup BOP activation system or a backup BOP. Alternatively, Defendants failed to maintain the Deepwater Horizon's BOP in proper working order after being put on notice of various warning signs.

61.   A 2004 study by Federal regulators showed that BOPs may not function in deep-water drilling environments because of the increased force needed to pinch and cut the stronger pipes used in deep-water drilling. Only three of fourteen rigs studied in 2004 had BOPs able to squeeze off and cut the pipe at the water pressures present at the equipment's maximum depth. "This grim snapshot illustrates the lack of preparedness in the industry to shear and seal a well with the last line of defense against a blowout," the study said. Moreover, the study singled out Cameron, the manufacturer of the Deepwater Horizon's BOP, for relying on faulty calculations to determine the needed strength for its BOP equipment to function properly at greater depths.

62.   Defendants could have installed a back up trigger to activate the BOP in the event of the main trigger failing to activate it. In fact, in 2000, the MMS told Defendants and other oil rig operators that it considered a backup BOP activation system to be "an essential component of a deepwater drilling system." Despite that notice, and although the backup trigger is a common drill-rig requirement in other oil-producing nations, including other areas where BP operates, the Deepwater Horizon was not equipped with this back-up remote BOP trigger.

63.    Defendants were aware of the danger posed by not installing a remote-controlled shut-off switch on the Deepwater Horizon.  Specifically, Defendants were aware that failing to install such a device on the Deepwater Horizon would greatly increase the danger of an oil spill that would choke and poison thousands of square miles of marine and coastal ecosystems in the Gulf of Mexico.  Defendants, who have made billions in profits, were also aware that such a device could be installed on the Deepwater Horizon at a negligible cost.  Yet, Defendants failed to install a remote-controlled shut-off switch on the Deepwater Horizon.

64.    Nor was the Deepwater Horizon equipped with a second, backup BOP, as newer rigs increasingly are.  The Deepwater Horizon only had one BOP installed, leaving the wellhead vulnerable to disaster when the single BOP fails.

**E.    Defendants' Ineffective Responses to the Oil Spill**

65.    Considering the inherent risks of deepwater drilling, Defendants should have had more effective plans in place to deal with oil leaks at such depths.  They apparently, however, tried to make it up on an ad hoc basis.

66.    For a long period of time following the accident, a remotely operated vehicle, or "sea robot", attempted to carry out multiple attempts to activate the BOP to stop the well from leaking hundreds of thousands of gallons of crude per day into the Gulf of Mexico.  Those efforts were unsuccessful.

67.    The next proposal by Defendants to stop the gushing oil was to install a "containment dome" over the leaking well with the hopes of placing it over the leaking oil and funneling a substantial portion of it onto a tanker above.  When Defendants attempted to install the dome, however, its opening became clogged with hydrates that form when gas and water

mix under certain temperatures and pressures.   Accordingly, those efforts were also unsuccessful.

68.   Next, Defendants proposed to install a smaller dome, or "top-hat," to perform the same function as the containment dome.  After weeks of unabated oil discharge in the Gulf, BP announced that it may have achieved "some" success in capturing some of the oil by inserting a narrow tube into the damaged pipe from which most of the oil is leaking.  BP could not state, however, how much oil was being captured or what percentage of the oil leaking from the riser pipe was flowing into the narrow tube.

69.   BP also attempted a technique know as a "top kill," which involves jamming up to 50,000 barrels of a heavy-density mud-like liquid into channels leading to the oil well, effectively overpowering the leak before adding cement to seal it off.  This technique, however, had never been used in 5,000 feet of water, and after three days of pumping heavy drilling mud into the crippled well, BP admitted that the effort failed.

70.   Next, BP used a technique known as a "cut and cap," in which it used robot submarines to cut off the damaged riser from which the oil was leaking, and then tried to cap it with a containment valve.   Experts have said that a bend in the damaged riser likely was restricting the flow of oil somewhat, so slicing it off and installing a new containment valve was very risky.   Although BP claimed that this technique achieved limited success, BP did not provided any definitive data regarding the amount of oil being captured.

71.   Incredibly, another contingency plan was called a "junk shot," which would pump materials such as rubber tires, pieces of rope, and even golf balls into the well.

17

72.     Defendants have also been negligent in their public response to the disaster, particularly with respect to downplaying the nature, size, and extent of the leak and failing to employ adequate responders and/or equipment in the field to control the oil spill.

73.     After the explosion, Defendants attempted to downplay and conceal the severity of the oil spill. When the Defendants first learned of the spill, they reported that the well was leaking approximately 1,000 barrels per day. It was later estimated that the oil spill was leaking more than 5,000 barrels, or 210,000 gallons, a day. This number was later estimated to be 500,000 to 1 million gallons of crude daily. Thereafter, estimates indicated that anywhere from 23 to 45 million gallons escaped into the Gulf of Mexico. On information and belief, Defendants impaired the response to the emergency, greatly increasing the danger to the environment, human health, and the Gulf Coast economy, by knowingly understating the amount of oil that was leaking from the well. Moreover, Defendants were slow and incomplete in their announcements and warnings to residents and businesspeople about the severity, forecast, and trajectory of the oil spill. In fact, BP officials took far too long to upgrade the impact of the oil spill from "very modest" to "environmental catastrophe."

74.     On May 20, 2010, the Secretary of Homeland Security, Janet Napolitano, and the Administrator of the EPA, Lisa P. Jackson, wrote to BP's Chief Executive Officer noting that although BP indicated before Congress that it was making every effort to keep the public and government officials informed, such efforts "have fallen short in both their scope and effectiveness." The letter demanded that BP make publicly available any data and other information relating to the Deepwater Horizon that it had collected or would collect in the future. BP has been accused of limiting access to such information.

18

75.    Upon information and belief, the training provided by Defendants with respect to cleaning up the oil spill, did not meet all applicable standards.  Specifically, Defendants did not provide an adequate amount of instructors based on the number of volunteers being trained.  In fact, Defendants even attempted to get general releases from volunteers wanting to clean up the oil spill as a condition precedent to their volunteer efforts.  *See Barisich v. BP*, Case No. 2:10-CV-01316-KDE-JCW (E.D. La. 2010) at D.E. 6.

76.    Although the EPA ordered BP to find a "less toxic" chemical dispersant than the one it had been using, Corexit, BP continued to use that same chemical despite the EPA's warnings.  The EPA expressed dissatisfaction with this response as less toxic and more effective products were available.  Corexit dispersants were removed from a list of approved dispersants in Great Britain ten years ago after they were found to be dangerous to animals like limpets near rocky shores.

**F.    Prior Incidents Involving BP**

77.    BP has a history of cutting corners on safety to reduce operating costs.  The following are just a sampling of incidents of BP's widespread practice of willful, wanton and reckless failures and conduct that demonstrate a pattern and a practice of such conduct:

(a)    In Prudhoe Bay, Alaska, BP has been fined by the State of Alaska and faces civil suits stemming from leaks from more than six miles of corroded pipelines.  Although the Trans-Alaska pipeline is inspected (via a pipeline pig) every fourteen days, BP failed to inspect the corroded pipeline at issue in Prudhoe Bay for decades.

(b)    BP pleaded guilty to a criminal violation of the Clean Water Act and paid a $20 million fine in criminal penalties for a spill from an Alaska pipeline that resulted because BP failed to heed many red flags and warning signs of imminent internal corrosion.

19

(c)    BP even mislead its investors about the integrity of its pipelines, that resulted in a securities class action federal lawsuit that ultimately settled for over $40,000,000.00.

(d)    BP's cost-cutting measures are so wide-spread and prevalent that they led to a fatal explosion at its Texas City, Texas Refinery in 2005, which resulted in a criminal fine of $50,000,000.00 (and much more in civil settlements and verdicts).

78.    Nevertheless, BP continues to fight for less regulation of the oil exploration and production industry.  In 2009, BP spent more than $16 million lobbying the Federal government on issues including encouraging removing restrictions on drilling on the continental shelf, despite its history of spills and explosions and its knowledge of the high risks involved in such drilling.

79.    Moreover, Defendants have actively opposed MMS rules requiring oil rig lessees and operators to develop and audit their own Safety and Emergency Management Plans, insisting that voluntary compliance will suffice.  The Deepwater Horizon incident is a tragic example to the contrary.

G.    **Results of BP's Initial Investigation**

80.    On May 25, 2010, Congressmen Henry A. Waxman and Bart Stupak submitted a memorandum to the Members of the Subcommittee on Oversight and Investigations based on the initial investigation by BP.  The memorandum outlined the following findings:

81.    The information from BP identified several new warning signs of potential problems with the well.  According to BP, there were three flow indicators from the well before the explosion.  One was 51 minutes before the explosion when more fluid began flowing out of the well than was being pumped in.  Another flow indicator was 41 minutes before the explosion

20

when the pump was shut down for a "sheen" test, yet the well continued to flow instead of stopping and drill pipe pressure also unexpectedly increased. Then, 18 minutes before the explosion, abnormal pressures and mud returns were observed and the pump was abruptly shut down. The data suggests that the crew may have attempted mechanical interventions at that point to control the pressure, but soon after, the flow out and pressure increased dramatically and the explosion took place.

82. Further, BP's preliminary findings indicated that there were other events in the 24 hours before the explosion that require further inquiry. As early as 5:05 p.m., almost 5 hours before the explosion, an unexpected loss of fluid was observed in the riser pipe, suggesting that there were leaks in the annular preventer in the BOP. Four hours before the explosion, during efforts to begin negative pressure testing, the system gained 15 barrels of liquid instead of the 5 barrels that were expected, leading to the possibility that there was an "influx from the well." A cementer witness stated that the "well continued to flow and spurted." Having received an unacceptable result from conducting the negative pressure test through the drill pipe, the pressure test was then moved to the kill line where a volume of fluid came out when the line was opened. The kill line was then closed and the procedure was discussed; during this time, pressure began to build in the system to 1400 psi. At this point, the line was opened and pressure on the kill line was bled to 0 psi, while pressure on the drill pipe remained at 1400 psi. BP's investigator indicated that a "fundamental mistake" may have been made here because this was an "indicator of a very large abnormality." The kill line then was monitored and by 7:55 p.m. the rig team was "satisfied that [the] test [was] successful." At that time, the rig started displacing the remaining fluids with seawater, leading to the three flow indicators described above.

21

83.    Several concerns identified by BP related to the cementing process.  Cement work that was supposed to hold back hydrocarbons failed, allowing the hydrocarbons into the well bore.  The float collar used in the cementing process did not initially operate as intended and required 9 attempts with higher than usual pressures to function properly.  Moreover, the float test performed after cementing may not have been definitive, leading to concern that there may have been contamination of the cement due to density differences between the cement and the drilling mud.

84.    In addition, key questions now exist about whether proper procedures were followed for critical activities throughout the day.  Negative pressure testing was initially done on the drill pipe rather than the kill line, even though the drill plan specified that it would be done on the kill line.  After anomalous results, the negative pressure testing was conducted on the kill line and ultimately accepted.  Evidence suggests that spacer fluid used during the displacement of drilling fluid with seawater did not rise above the BOP to the level required by the drilling plan; this increased pressure in the drill pipe and may have interfered with later pressure testing.  In addition, the method of displacing the drilling mud with seawater may have interfered with the monitoring of the flow levels from the well because the mud was transferred to another boat instead of measured in the mud pits.  Moreover, mudloggers were not informed when the offloading of drilling mud to the other boat was stopped.

85.    Several concerns about the blowout preventer were identified by BP including the failure of its emergency disconnect system (EDS), the failure of its automated mode function or deadman switch, the failure of the BOP's shearing functions, and the failure of the remote operated vehicle interventions.   The BP investigation also raised concerns about the maintenance history, modification, inspection, and testing of the BOP.

22

**H.     Anticipated Effects of the Oil Spill**

86.     The spilled oil did not, and will not, simply evaporate off of the surface of the water.  Instead, it formed a vast expanse of thick, poisonous sludge, contaminating an area larger than the state of Rhode Island.

87.     The oil slick threatens hundreds of species of fish, birds, and other wildlife in one of the planet's richest marine ecosystems.  It is likely to cripple, or entirely destroy, one of only two breeding grounds in the world for Atlantic blue fin tuna, greatly increasing the likelihood that this species will go extinct in the near future.  It has already destroyed Louisiana's vulnerable wetlands, which are still recovering from the damage caused by Hurricane Katrina.

88.     A number of studies have linked oil contamination with significantly increased risk of cancer and other illnesses.  Although Florida's tourism industry may never recover to pre-spill levels, millions of Gulf Coast residents and visitors will be exposed to the toxins released by this oil spill.  Whether through fishing, boating, or simply breathing the air in their homes, these Gulf Coast residents and visitors will suffer the consequences of Defendants' negligence for decades to come.

89.     The oil contamination is dangerous.  There are several hundred individual hydrocarbon chemicals defined as petroleum-based and each petroleum product has its own mix of constituents.  Exposure to oil, petroleum products, petroleum constituents, petroleum by-products, and/or toxic and hazardous substances and wastes poses a threat to human health and the environment.  The health effects associated with petroleum are caused by its associated hydrocarbon mixtures.  Exposure to soil, vapors, and water containing petroleum contamination can cause multiple health complications and illnesses such as respiratory conditions and illnesses, gastrointestinal conditions and illnesses, dermatological conditions and illnesses,

23

neurological conditions and illnesses, immunological conditions and illnesses, and a host of other health complications and illnesses. Sensitivity to these effects can vary greatly from one person to the next, with children, the elderly, and people with pre-existing respiratory problems most affected. Long-term exposures pose a risk of cancer and damage to the respiratory tract, gastrointestinal tract, urinary tract, and other organs of the body, as well as immunological and neurological problems and damage to the nervous system. People exposed to petroleum in soil, water, and vapors over a period of time may gradually lose their ability to notice the petroleum, which can lead to greater exposures and health problems over time.

90.    In addition to its effects on the environment and human health, the oil slick is an economic catastrophe for the Gulf States and all of Florida. Given the permanent damage that the oil slick is doing to the tourism industry, and the resulting stigma attached to the area, this loss will be difficult or impossible to recover. Florida's tourism industry was reportedly expected to lose $3 billion.

91.    The oil contamination has affected the property and business of the Plaintiff and is likely to result in the contamination of the Gulf with one or more of the substances described herein.

92.    Faced with an environmental catastrophe of this magnitude, a state of emergency had been declared in affected counties. In fact, then-Governor Charlie Crist and Secretary of Commerce Gary Locke both declared a commercial fishery failure in Florida under the Magnuson-Stevens Fishery Conservation and Management Act. The Department of Homeland Security declared this disaster to be of national significance, and the EPA, the Department of the Interior, and even the Department of Defense all investigated the incident. Federal and state officials have expressed shock and outrage at BP's inadequate response.

93.     Although Defendants earn billions of dollars in profits every year, BP failed to invest sufficient resources and money to maintain, inspect, repair, and properly operate their facilities, all the while knowing that the product that the company handles is a toxic, dangerous and often lethal recipe for disaster.

94.     The overarching corporate culture of the Defendants, as demonstrated above, is one of profits over people.  Defendants littered the road to making billions of dollars of profits annually with lives, livelihoods, property, and wildlife, in conscious disregard for life and safety.

95.     As a result of Defendants' actions and inactions, Plaintiff—which had been formed to invest in the new urbanist communities of the Florida panhandle—saw its work, efforts and anticipated revenues and profits immediately and dramatically affected, in that tourists were unwilling to vacation in Florida, including the Florida Gulf Coast and panhandle, and people were simply unwilling to invest in the formerly attractive and burgeoning residential real market on the Florida Gulf Coast and panhandle and were unwilling to purchase residential real estate on the Florida Gulf Coast and panhandle.

96.     As a result of the oil spill and the detrimental effect it has played and continues to play on the tourism trade and residential real estate market on the Florida Gulf Coast and panhandle, Plaintiff's lost profits and revenue are nothing short of astronomical.  Plaintiff was forced to re-locate its asset-based lending efforts to south Florida.

97.     The oil spill and the contamination have caused and will continue to cause loss of revenue to businesses such as Plaintiff.

98.     There are many other potential effects from the oil spill that have not yet become known, and Plaintiff reserves the right to amend this Complaint once additional information becomes available.

## COUNT I: STRICT LIABILITY PURSUANT TO FLORIDA STATUTE § 376.313

99.   Plaintiff, ADAGIO, LLC, readopts and realleges the allegations set forth in Paragraphs 1 through 98 as though fully set forth herein.

100.   At all relevant times, Defendants owned, operated and/or maintained the mobile offshore drilling unit Deepwater Horizon which exploded and caught fire on April 20, 2010.

101.   Following the explosion and fire, the Deepwater Horizon sunk resulting in the continuous discharge of crude oil from the well upon which the rig had been performing completion operations.

102.   At all relevant times, Defendants had a statutory duty to Plaintiff to maintain and operate the Deepwater Horizon so as to not create or continue hazardous conditions due to the discharge of pollutants as defined by Florida Statute §§ 376.301(10), 376.301(11), and 376.301(13).

103.   At all relevant times, Defendants breached their statutory duty to the Plaintiff by discharging, or allowing to be discharged, crude oil into and upon the Gulf of Mexico and allowing the massive oil spill to migrate into the Florida's marine environments, coastal environments and estuarine areas which are used by Plaintiff for different activities, including but not limited to, commercial purposes, and other income generating endeavors in violation of Florida Statutes 376.30 to 376.317, and Defendants are strictly liable to Plaintiff under Sec. 376.313(3), Florida Statutes, which provides:

> [N]othing contained in ss. 376.30-376.317 prohibits any person from bringing a cause of action in a court of competent jurisdiction for all damages resulting from a discharge or other condition of pollution covered by ss. 376.30-376.317. Nothing in this chapter shall prohibit or diminish a party's right to contribution from other parties jointly or severally liable for a prohibited discharge of pollutants or hazardous substances or other pollution conditions. Except as otherwise provided in subsection (4) or subsection (5), in

any such suit, it is not necessary for such person to plead or prove negligence in any form or manner. Such person need only plead and prove the fact of the prohibited discharge or other pollutive condition and that it has occurred.

104. As the direct and proximate result of Defendants' breach of a statutory duty to the Plaintiff, the oil spill originating from the Deepwater Horizon has resulted in detrimental effects upon the Gulf of Mexico and Florida's marine environments, coastal environments, and estuarine areas, which are used by Plaintiff.

## COUNT II: COMMON LAW NEGLIGENCE, GROSS NEGLIGENCE AND WILLFUL MISCONDUCT

105. Plaintiff, ADAGIO, LLC, readopts and realleges the allegations set forth in Paragraphs 1 through 98 as though fully set forth herein.

106. The explosion, fire, and resulting oil spill were caused by the concurrent negligence of the Defendants. Considering the inherent danger of deepwater oil drilling, Defendants failed to exercise the appropriate degree of care required for such activity. In fact, through their actions and inactions, Defendants' care departed extremely from the care required under the circumstances.

107. Upon information and belief, Plaintiff alleges that the explosion, fire, and resulting oil spill were caused by the joint negligence and fault of the Defendants, by among other things, and including but not limited to the following:

(a)     Failing to properly operate the Deepwater Horizon;

(b)     Operating the Deepwater Horizon in such a manner that an explosion and fire occurred onboard, causing it to sink and resulting in an oil spill;

(c)     Failing to properly inspect the Deepwater Horizon to assure that its equipment and personnel were fit for their intended purpose;

27

(d)    Acting in a careless and negligent manner without due regard for the safety of others;

(e)    Failing to promulgate, implement and enforce rules and regulations pertaining to the safe operations of the Deepwater Horizon which, if they had been so promulgated, implemented and enforced, would have averted the explosion, fire, sinking and oil spill;

(f)    Operating the Deepwater Horizon with untrained and unlicensed personnel;

(g)    Inadequate and negligent training and hiring of personnel;

(h)    Failing to take appropriate action to avoid or mitigate the accident;

(i)    Negligently implementing policies and procedures to safely conduct offshore operations in the Gulf of Mexico;

(j)    Employing untrained or poorly trained employees and failing to properly train their employees;

(k)    Failing to ascertain that the Deepwater Horizon and its equipment were free from defects and/or in proper working order;

(l)    Failing to timely warn;

(m)    Failing to timely bring the oil release under control;

(n)    Failing to provide appropriate accident prevention equipment;

(o)    Failing to observe and read gauges that would have indicated excessive pressures in the well;

(p)    Failing to react to danger signs;

(q)    Providing BOP's that did not work properly;

28

(r)    Conducting well and well cap cementing operations improperly;

(s)    Acting in a manner that justifies imposition of punitive damages;

(t)    Failing to equip the Deepwater Horizon with a remote shut-off switch;

(u)    Impairing the emergency response by understating the extent of the oil leak in the days following April 20, 2010; and

(v)    Such other acts of negligence and omissions as will be shown at the trial of this matter, all of which acts are in violation of the laws of Florida and Federal law applicable on the outer Continental Shelf.

108.   In addition, and in the alternative, the explosion, fire, sinking, and resulting oil spill were caused by defective equipment, including the BOP, which was in the care, custody, and control of Defendants.   Defendants knew or should have known of these defects and Defendants are, therefore, liable for them.

109.   The damages to Plaintiff were also caused by or aggravated by the fact that Defendants failed to take necessary actions to mitigate the danger associated with their operations.

110.   In addition to the negligent actions described above, and in the alternative thereto, the damages suffered by Plaintiff were caused by the acts and omissions of the Defendants that are beyond proof by the Plaintiff, but which were within the knowledge and control of the Defendants, there being no other possible conclusion than that the fire, explosion, sinking and oil spill resulted from the negligence of Defendants.   Furthermore, the explosion, fire, sinking and the resulting oil spill would not have occurred had the Defendants exercised the high degree of care imposed on them.   Plaintiff, therefore, pleads the doctrine of *res ipsa loquitur*.

29

111.    Moreover, Defendants were and are responsible for the foregoing acts and omissions under egregious circumstances, with utter awareness of their placement of innocent persons and properties, including the public at large, at great risk of injury, loss, or damage. Defendants knowingly cut corners to save money and keep revenue streams from the Deepwater Horizon flowing.  They were fully capable and aware of readily available measures to avoid or minimize a disaster of this kind but neglected to do so for profit.  They gambled, and the public, including Plaintiff, has lost.  Therefore, in addition and in the alternative, Defendants' acts and omissions constitute both gross negligence and willful misconduct.

112.    Plaintiff is entitled to a judgment finding Defendants liable to Plaintiff for damages suffered as a result of Defendants' negligence and awarding Plaintiff adequate compensation therefore in amounts determined by the trier of fact.

### COUNT III: LIABILITY UNDER THE FEDERAL OIL POLLUTION ACT, INCLUDING UNCAPPED LIABILITY FOR GROSS NEGLIGENCE AND WILLFUL MISCONDUCT

113.    Plaintiff, ADAGIO, LLC, readopts and realleges the allegations set forth in Paragraphs 1 through 98 as though fully set forth herein.

114.    The Oil Pollution Act imposes liability upon a responsible party for a facility from which oil is discharged into or upon navigable waters or adjoining shorelines for the damages that result from such incident. *See* 33 U.S.C. § 2702.

115.    Section 2702(b)(2)(C) provides for the recovery of "[d]amages for loss of subsistence use of natural resources, which shall be recoverable by any claimant who so uses natural resources which have been injured, destroyed, or lost, without regard to the ownership or management of the resources."

116. The Coast Guard has named BP as the responsible party. Therefore, BP is liable pursuant to Section 2702 for all the damages that result from the oil spill.

117. Section 2702(b)(2)(E) provides for the recovery of "[d]amages equal to the loss of profits or impairment of earning capacity due to the injury, destruction, or loss of real property, personal property, or natural resources, which shall be recoverable by any claimant."

118. The explosion, fire and resulting oil spill were caused by the concurrent negligence of the Defendants. Considering the inherent danger of deepwater oil drilling, Defendants failed to exercise the degree of care required for such activity. In fact, through their actions and inactions, the standard of care of the Defendants departed extremely from the care required under the circumstances.

119. Upon information and belief, Plaintiff alleges that the explosion, fire and resulting oil leak were caused by the joint negligence and fault of the Defendants, by among other things, and including but not limited to the following:

    (a)    Failing to properly operate the Deepwater Horizon;

    (b)    Operating the Deepwater Horizon in such a manner that an explosion and fire occurred onboard, causing it to sink and resulting in an oil spill;

    (c)    Failing to properly inspect the Deepwater Horizon to assure that its equipment and personnel were fit for their intended purpose;

    (d)    Acting in a careless and negligent manner without due regard for the safety of others;

    (e)    Failing to promulgate, implement and enforce rules and regulations pertaining to the safe operations of the Deepwater Horizon which, if they had been so

promulgated, implemented and enforced, would have averted the explosion, fire, sinking and oil spill;

(f)     Operating the Deepwater Horizon with untrained and unlicensed personnel;

(g)     Inadequate and negligent training and hiring of personnel;

(h)     Failing to take appropriate action to avoid or mitigate the accident;

(i)     Negligently implementing policies and procedures to safely conduct offshore operations in the Gulf of Mexico;

(j)     Employing untrained or poorly trained employees and failing to properly train their employees;

(k)     Failing to ascertain that the Deepwater Horizon and its equipment were free from defects and/or in proper working order;

(l)     Failing to timely warn;

(m)     Failing to timely bring the oil release under control;

(n)     Failing to provide appropriate accident prevention equipment;

(o)     Failing to observe and read gauges that would have indicated excessive pressures in the well;

(p)     Failing to react to danger signs;

(q)     Providing B OP's that did not work properly;

(r)     Conducting well and well cap cementing operations improperly;

(s)     Acting in a manner that justifies imposition of punitive damages;

(t)     Failing to equip the Deepwater Horizon with a remote shut-off switch;

32

(u)     Impairing the emergency response by understating the extent of the oil leak in the days following April 20, 2010; and

(v)     Such other acts of negligence and omissions as will be shown at the trial of this matter, all of which acts are in violation of the laws of Florida and Federal law applicable on the outer Continental Shelf.

120.   In addition, and in the alternative, the explosion, fire, sinking and resulting oil leak were caused by defective equipment, including the BOP, which was in the care, custody, and control of Defendants.  Defendants knew or should have known of these defects and Defendants are, therefore, liable for them.

121.   The damages to Plaintiff were also caused by or aggravated by the fact that Defendants failed to take necessary actions to mitigate the danger associated with their operations.

122.   In addition to the negligent actions described above, and in the alternative thereto, the damages suffered by Plaintiff were caused by the acts and omissions of the Defendants that are beyond proof by the Plaintiff, but which were within the knowledge and control of the Defendants, there being no other possible conclusion than that the explosion, fire, sinking, and oil spill resulted from the negligence of Defendants.  Furthermore, the explosion, fire, sinking and the resulting oil leak would not have occurred had the Defendants exercised the high degree of care imposed on them.  Plaintiff, therefore, pleads the doctrine of *res ipsa loquitur*.

123.   Defendants were and are responsible for the foregoing acts and omissions under egregious circumstances, with utter awareness of their placement of innocent persons and properties, including the public at large, at great risk of injury, loss, or damage.  Defendants

knowingly cut corners to save money. Defendants were fully capable and aware of readily available measures to avoid or minimize a disaster of this kind but neglected to do so for profit.

124. Defendants gambled, and the public, including Plaintiff, has lost. Therefore, in addition and in the alternative, Defendants' acts and omissions constitute both gross negligence and willful misconduct.

125. As a result of the oil spill, Plaintiff has suffered the type of damages that may be recovered pursuant to Section 2702(b)(2)(E), and it demands compensation therefore from Defendants in amounts to be determined by the trier of fact.

126. Defendants are therefore liable to Plaintiff under the federal Oil Pollution Act, 33 U.S.C. §§ 2701-2719. Specifically, under 33 U.S.C. § 2702(b)(2)(E), Defendants are liable to Plaintiff for damages equal to the loss of profits or impairment of earning capacity due to the injury, destruction, or loss of real property, personal property, or natural resources. In addition, or in the alternative, the foregoing damages are uncapped under 33 U.S.C. § 2704(c)(1)(A) because the incident was proximately caused by Defendants' gross negligence or willful misconduct.

## COUNT IV: STRICT LIABILITY FOR ABNORMALLY DANGEROUS ACTIVITY

127. Plaintiff, ADAGIO, LLC, readopts and realleges the allegations set forth in Paragraphs 1 through 98 as though fully set forth herein.

128. Defendants, as the owners and/or operators of the Deepwater Horizon, engaged in abnormally dangerous activities by the manner in which they maintained and operated the Deepwater Horizon. Defendants' activities resulted in the intentional, incidental, or accidental explosion, fire, sinking, and resulting oil leak from the Deepwater Horizon mobile offshore drilling unit, which (a) created a high degree of risk of harm to others, and particularly to

34

Plaintiff; (b) created a risk involving a likelihood that the harm threatened by Defendants' activities would be great; (c) created a risk of harm that could not be eliminated by the exercise of reasonable care; (d) were not a matter of common usage; and (e) were inappropriate to the place that they were being carried on, in that they constituted a non-natural use of Defendants' oil lease which imposed an unusual and extraordinary risk of harm to Plaintiff.

129.   As a direct and proximate result of Defendants' conduct in engaging in the abnormally dangerous activities alleged above, substantial amounts of crude oil were released from the well.  The harm sustained by Plaintiff is exactly the kind of harm posed, the possibility of which made Defendants' activities abnormally dangerous.

130.   Plaintiff is entitled to a judgment finding Defendants liable for damages, including punitive damages, suffered as a result of Defendants' abnormally dangerous activities and awarding Plaintiff adequate compensation therefore in amounts determined by the trier of fact.

### COUNT V: STRICT LIABILITY FOR MANUFACTURING DEFECT

131.   Plaintiff, ADAGIO, LLC, readopts and realleges the allegations set forth in Paragraphs 1 through 98 as though fully set forth herein.

132.   Cameron manufactured or supplied the Deepwater Horizon's BOP.

133.   Cameron's BOP failed to operate properly or at all, at the time of or following the explosion, and this failure caused or contributed to the oil spill.

134.   Cameron's BOP was defective because it failed to operate as intended.

135.   As a result of the BOP's product defect, pollutants were released from or at the Deepwater Horizon rig, thereby causing damage to Plaintiff.

136.   Cameron's BOP was in a defective condition and unreasonably dangerous to Plaintiff when the BOP left Cameron's control.

35

137.   At all times, Cameron's BOP was used in the manner intended.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiff, ADAGIO, LLC, demands judgment against Defendants, jointly, severally and *in solido*, as follows:

(a)   Injunctive relief;

(b)   Establishment of a court-administered fund to ensure timely prophylactic remedies are in place to protect Plaintiff;

(c)   Declaratory judgment under 28 U.S.C. § 2201(a) concerning the foregoing laws;

(d)   Further necessary or proper relief under 28 U.S.C. § 2201(b) based on any declaratory judgment or decree which is issued;

(e)   Economic and compensatory damages in amounts to be determined at trial;

(f)   Punitive damages;

(g)   Pre-judgment and post-judgment interest at the maximum rate allowable by law;

(h)   Attorneys' fees and costs of litigation; and

(i)   Such other and further relief available under all applicable state and federal laws and any relief the Court deems just and appropriate.

## JURY DEMAND

Plaintiff, ADAGIO, LLC, hereby demands a trial by jury as to all issues so triable.

DATED: August 25, 2011

_____
Scott J. Topolski, Esq.
Florida Bar No. 0006394
Attorneys for Plaintiff, Adagio, LLC
Buckingham, Doolittle & Burroughs, LLP
5355 Town Center Road, Suite 900
Boca Raton, Florida 33486
Telephone: (561) 241-0414
Facsimile: (561) 241-9766
Email: stopolski@bdblaw.com

«BOCA:265082_v5/73999-0001»

37