# UNITED STATES DISTRICT COURT
# FOR THE EASTERN DISTRICT OF LOUISIANA

| | |
|---|---|
| ALTON ROCKFORD MEADOWS, Individually, and ALTON ROCKFORD MEADOWS d/b/a SOUTHERN APPRAISAL SERVICES, <br><br> Plaintiff, <br><br> vs. <br><br> BP Exploration & Production, Inc.; BP America Production Company; BP p.l.c.; Transocean; Ltd.; Transocean Offshore Deepwater Drilling, Inc.; Transocean Deepwater, Inc.; Transocean Holdings, LLC; Triton Asset Leasing GmbH; Halliburton Energy Services, Inc., and; Sperry Drilling Services, a division of Halliburton Energy Services, Inc., <br><br> Defendants. | CIVIL ACTION NO.: <br><br> SECTION: <br><br> MAGISTRATE: |

## COMPLAINT FOR DAMAGES

NOW COMES PLAINTIFF, through undersigned counsel, and states as follows:

### Nature of the Action

1. On or about April 20, 2010, the *Deepwater Horizon* drilling platform exploded and sank, causing a spill of over 200 million gallons of crude oil from the Macondo Well, MC-252, and resulting in the worst maritime environmental disaster in United States history (the "Oil Spill").

2. Plaintiff and his livelihood have suffered economic injury, personal injury, damages and/or losses as a result of the oil spill.

3. Plaintiff individually, and through his business, has suffered as a result of the exposure to oil and/or oil-disbursing chemicals and/or decontaminants by virtue of his

1

employment as a residential -real estate appraiser living and working in and around the navigable waters of Mississippi.

## THE PARTIES, JURISDICTION AND VENUE

3. Plaintiff, ALTON ROCKFORD MEADOWS, is both an individual, and an individual doing business as SOUTHERN APPRAISAL SERVICES (hereinafter "Plaintiff") that is a resident of the age of majority in Mississippi, whose principal places of residence and business are located in Ocean Springs, Jackson County, Mississippi.

4. Plaintiff brings these claims pursuant to Federal General Maritime Law including/and/or the Oil Pollution Act of 1990 ("OPA"), 33 USC §2701, *et seq.*

5. Jurisdiction exists before this Court pursuant to Article III, Section 2 of the United States Constitution, which empowers the federal judiciary to hear "all Cases of admiralty and maritime jurisdiction."

6. Jurisdiction also exists before this Court, pursuant to the Oil Pollution Act, 33 U.S.C. § 2717(b) (the "OPA").

7. Defendant, BP Exploration & Production, Inc. ("BP Exploration"), is a Delaware corporation with its principal place of business in Warrenville, Illinois. BP Exploration was designated as a "Responsible Party" by the U.S. Coast Guard under the Oil Pollution of 1990, 33 U.S.C. § 2714. This Court has personal jurisdiction over BP Exploration, because BP Exploration is registered to do business in Mississippi, does business in Mississippi, and whose registered agent is CT Corporation Systems at 645 Lakeland East Drive, Suite 101, Flowood, Mississippi, 39232.

8. Defendant, BP America Production Company ("BP America") is a Delaware corporation with its principal place of business in Houston, Texas. This Court has personal

jurisdiction over BP America, because BP America is registered to do business in Mississippi, does business in Mississippi, and whose registered agent is CT Corporation Systems at 645 Lakeland East Drive, Suite 101, Flowood, Mississippi, 39232.

9. Defendant BP p.l.c. is a British public limited company with its corporate headquarters in London, England. BP p.l.c. is the global parent company of the worldwide business operating under the "BP" logo. BP p.l.c. operates its various business divisions, such as the "Exploration and Production" division within BP Exploration and BP America, through vertical business arrangements aligned by product or service groups. BP p.l.c.'s operations are worldwide, including in the United States. Defendants, BP Exploration and BP America, are wholly-owned subsidiaries of BP p.l.c., and are sufficiently controlled by BP p.l.c. so as to be BP p.l.c.'s agents in Mississippi and the U.S. more generally. Plaintiffs further adopt and incorporate by reference all jurisdictional allegations against BP p.l.c. set forth in Paragraphs 212-218 of the Amended B1 Master Complaint, Document No. 1128 filed in MDL No. 2179, *In re Oil Spill by the Oil Rig "Deepwater Horizon" in the Gulf of Mexico, on April 20, 2010.*

10. BP Exploration, BP America, and BP p.l.c. are generally referred to herein collectively as the "BP Defendants" or "BP."

12. Defendant, Transocean Ltd. ("Transocean Ltd.") is a Swiss corporation that maintains substantial offices in the United States in Houston, Texas, and that at all pertinent times was doing business in the State of Mississippi and within this district. According to its Complaint and Petition for Exoneration from or Limitation of Liability in the MDL, Transocean Ltd. was an owner, managing owner, owner *pro hac vice*, and/or operator of the Deepwater Horizon.

12. Defendant, Transocean Offshore Deepwater Drilling, Inc. ("Transocean Offshore") is a Delaware corporation with its principal place of business in Houston, Texas, and at all pertinent times was doing business in the State of Mississippi and within this district. Transocean Offshore is affiliated with Transocean Ltd. and was an owner, managing owner, owner *pro hac vice*, and/or operator of the Deepwater Horizon.

13. Defendant, Transocean Deepwater, Inc. ("Transocean Deepwater"), is a Delaware corporation with its principal place of business in Houston, Texas, and at all pertinent times was doing business in the State of Mississippi and within this district. Transocean Deepwater is affiliated with Transocean Ltd. and was an owner, managing owner, owner *pro hac vice*, and/or operator of the Deepwater Horizon.

14. Defendant, Transocean Holdings, LLC ("Transocean Holdings") is a Delaware corporation with its principal place of business in Houston, Texas, and at all pertinent times was doing business in the State of Mississippi and within this district, and whose registered agent is Capitol Corporate Services, Inc., at 248 East Capitol Street, Suite 840, Jackson, MS 39207. Transocean Holdings is affiliated with Transocean Ltd. and is a wholly-owned subsidiary of Transocean Offshore. Transocean Holdings and party to the contract with BP regarding the lease of the Deepwater Horizon for drilling operations in the Gulf of Mexico. On April 28, 2010, the U.S. Coast Guard named Transocean Holdings as a "Responsible Party" under the Oil Pollution Act for the surface oil spill resulting from the blowout by the Deepwater Horizon.

15. Defendant, Triton Asset Leasing GmbH ("Triton") is a Swiss limited liability company with its principal place of business in Zug, Switzerland. Triton is affiliated with

4

Transocean Ltd. and is an owner, managing owner, owner *pro hac vice*, and/or operator of the Deepwater Horizon.

16. Defendants, Transocean Ltd., Transocean Deepwater, Transocean Offshore, Transocean Holdings, and Triton are hereinafter referred to collectively as "Transocean."

17. Defendant, Halliburton Energy Services, Inc. is a Delaware corporation with its principal place of business in Houston, Texas. Halliburton is registered to do and does business in the State of Mississippi, and whose registered agent is CT Corp Systems at 645 Lakeland East Drive, Suite 101, Flowood, Mississippi, 39232. Halliburton provided engineering services, materials, testing, mixing, and pumping for cementing operations on board the Deepwater Horizon, as well as onshore engineering support for those operations.

18. Halliburton division Sperry Drilling Services (formerly Sperry Sun Drilling Services) was responsible for mudlogging personnel and equipment on the Deepwater Horizon, including downhole drilling tools. Sperry mudlogging personnel were partially responsible for monitoring the well, including mud pit fluid levels, mud flow in and out of the well, mud gas levels, and pressure fluctuations. "Halliburton" shall refer to both Halliburton Energy Services, Inc. and its Sperry division.

19. Venue is proper in this jurisdiction because the Defendants' actions, inactions, and failures directly and proximately caused the damage and harm to the Plaintiff in this jurisdiction.

**Factual Background**

20. Plaintiff adopts and incorporates as if fully restated herein the factual allegations, causes of action, and prayer for relief, raised in the Amended B1 Master Complaint, Document No. 1128 filed in MDL No. 2179, *In re: Oil Spill by the Oil Rig "Deepwater*

5

*Horizon" in the Gulf of Mexico, on April 20, 2010* (the "MDL Complaint").

21. Plaintiff further adopts and incorporates as if restated herein all factual allegations information contained in the Direct Filing Short Form/Short Form Joinder, filed by Plaintiff into No. 10-8888.

22. Plaintiff further adopts and incorporates as if fully restated herein Plaintiffs' Supplemental and Amended Responses to the Phase One Written Discovery Requests, dated October 8, 2011; Amended Response to Phase One Request for Admission No. 76, dated December 27, 2011, and; Supplemental and Amended Responses to Phase One Interrogatories Nos. 6, 7, and 17, dated December 14, 2012.

23. Plaintiff is a Certified and Master Real Estate Appraiser licensed to do residential appraisals in the State of Mississippi. Plaintiff was directly harmed by the Oil Spill, by the clean-up attempts after the Oil Spill (the "Clean-Up"), and by the Defendants' conduct before, during and after the Oil Spill, and these are, in whole or in part, the proximate cause of Plaintiff's damages.

24. Plaintiff's primary work environment is the Mississippi Gulf Coast region and his customers include, but are not limited to, home buyers and sellers, real estate agents and brokers, banks, insurance companies, and home owners seeking refinancing on their homes. The Plaintiff claims damages of the loss of his revenues as a result of the Oil Spill and the Clean-Up attempts, and all compensatory and punitive damages of any type, including all damages by statute or common law based in tort, contract, real property, or any other basis. In addition, the Claimant is also making a cumulative claim for all damages provided in law or equity of at least $1,500,000, plus pre and post judgment interests, costs and attorney's fees.

25. Plaintiff's office is at his home in Ocean Springs, Mississippi, and his

primary residence, place of work and recreation (boat) are located in and/or near the marshes (wetlands) and Gulf Coast waters affected by the BP oil spill disaster and clean-up. Plaintiff's livelihood was initially affected by the aftermath of the Oil Spill and its affect on the real estate market and general economy as a whole on the Gulf Coast. Real and perceived reactions to the Oil Spill and the Clean-Up kept people from buying and selling their homes, and/or kept banks from being willing to refinance them. The real estate industry slowed down and fewer appraisals were needed. Plaintiff's deteriorating health thereafter has adversely affected his living and working conditions to the point that he can barely work and function as a Licensed Residential Real Estate Appraiser, his livelihood, as a result of his related illnesses. In addition, animals, including birds and horses, have died or become ill on Plaintiff's property, and it was necessary for Plaintiff to get in the water to clean oil and other chemicals off of the bottom of his boat. Plaintiff had also started and invested in materials for a fencing company that he had to abandon as a result of becoming ill due to exposures from the Oil Spill.

25. Plaintiff, out of an abundance of caution, timely "Opted-Out" on both his economic and medical loss claims, and made and/or re-made "presentment" of a Claim in accord with 33 USC §§ 2702(b) and 2713, by submitting a description of the claim with a "sum certain" and some supporting documentation to BP as the "responsible party" under OPA on or about April 18, 2013 via email via ShareFile (a filing sharing service), and the same is incorporated herein by reference.

26. Plaintiff previously began the process of asserting claims against the responsible party through the Gulf Coast Claims Facility ("GCCF") before that Claims Program was discontinued. Plaintiff's presentment on or about April 18, 2013, was made (and/or re-made) out of an abundance of caution.

7

27. BP either denied the claims or otherwise failed to respond within 90 days of presentment.

### A. The *Deepwater Horizon* Catastrophe

28. The *Deepwater Horizon* was an ultra-deepwater dynamic positioned semi-submersible oil vessel built in 2001. It was one of the largest vessels of its kind.

29. BP leased the *Deepwater Horizon* through September 2013 to drill exploratory wells at Macondo prospect site in Mississippi Canyon Block 252, a location on the Outer Continental Shelf off the coast of Louisiana.

30. On April 20, 2010, the workers on the *Deepwater Horizon* oil rig lost control of the Mancondo well just after the final cementing work was completed. During the course of the cementing work, an explosion occurred on the *Deepwater Horizon* and it caught fire.

31. The explosion and fire caused the deaths of eleven (11) people and injures of many other workers on the vessel. After burning for two (2) days, the vessel sank to the ocean floor.

32. The *Deepwater Horizon* has been connected to the wellhead at the seafloor by a 5,000-foot pipe called a riser. As the *Deepwater Horizon* tipped into the sea, it pulled the riser down with it, bending and breaking the pipe. Oil flowed from the now-open end of the riser, as well as through two breaks along its length. An emergency valve, installed on the wellhead for just such a disaster, failed to seal the wellhead as it should have, causing the blown-out well to spew oil into the Gulf waters (the "Oil Spill").

### Factual Background

33. Crude oil was discharged before the *Deepwater Horizon* finally sank on April 22, 2010, and the rate of discharge increased once the *Deepwater Horizon* sank to the ocean floor.

34. After the explosions, BP attempted to downplay and conceal the severity of the Oil

Spill. Government investigators have found BP's initial leak estimate of 1,000 barrels per day to be a fraction of its measured leakage amount, which in fact exceeded 50,000 barrels per day. Additionally, an internal BP document from around the time of the spill shows that BP's own analysis had actually estimated that the rate of oil spillage could reach 100,000 barrels, or 4,200,000 gallons per day.

35. Each day during the course of the Oil Spill, tens of thousands of barrels of crude oil gushed from the wellhead and broken riser, bubbling up to the surface and flattening out into a widening slick of oil, as well as spreading out in vast subsurface plumes. On the surface, the shifting mass was large enough to be visible from outer space, at times covering tens of thousands of square miles, and spreading with the wind and currents towards the Gulf States coastlines.

36. Beginning on or about April 30, 2010, oil made landfall along the Gulf Coast on white sand beaches, leased and privately owned subsurface areas, and in ecologically sensitive marshes and estuaries. Under water, immense plumes of oil and dispersant chemicals swirled through the entire water column, damaging ecosystems throughout the Gulf of Mexico.

37. The oil spewed from the well for over twelve (12) weeks until BP finally capped the well on July 15, 2010. Ultimately, almost five million barrels (210 million gallons) of crude oil spilled in the Gulf of Mexico.

38. The crude oil carried with it significant public health risks. Crude oil has many highly toxic chemical ingredients that can damage every system in the body.

### B. The Response Effort and the Use of Chemical Dispersants

39. In the wake of the disaster, and pursuant to its duties, BP began implementing a program to attempt to prevent the gushing oil from reaching the shores of the Gulf states. This

9

disaster response plan had three primary components: offshore containment; shoreline protection, and; subsea response.

40. As part of its offshore containment response program, BP directed the use of vessels to, *inter alia,* recover oil coming to the surface of the Gulf of Mexico; skim oil from the surface of the water; and conduct in-*situ* burning of oil that had reached the surface of the water. BP also employed vessels to tow and deploy booms-floating barriers intended to contain, deflect, or hold back oil floating in the water's surface.

41. In addition, BP's response plan included the use of chemical dispersants that were intended to break down the oil into finely dispersed droplets.

42. The dispersants used by BP are know to cause, *inter alia,* headaches; nausea; vomiting; diarrhea; abdominal pains; dizziness; chest pains and tightness; irritation to the skin, eyes, nose, throat and lung; breathing difficulties and respiratory system damage; asthma attacks; hypertension; damage to the liver and kidneys; central nervous system depression; neurotoxic effects; damage to red blood cells; genetic damage and mutations; reproductive and development damage; immune system damage; cardiac arrhythmia; cardiovascular damage; and increased severity of chronic obstructive pulmonary disease. Plaintiff is suffering from a number of these related ailments and conditions, and medical doctors and test results have connected these ailments and conditions to the Plaintiff's living and working conditions. Plaintiff's initial and ongoing exposure to the harmful effects of the Oil Spill and Clean-Up have caused him a number of health problems and these are preventing Plaintiff from being able to work at his full capacity.

43. To date, BP and its contractors have used more than 1.8 million gallons of chemical dispersants in the Gulf of Mexico in connection with the Oil Spill.

## C. Plaintiff's Exposure to Oil and Harmful Chemicals and His Resulting Injuries and Damages

44. Plaintiff is a Certified and Master Real Estate Appraiser licensed to conduct residential real estate appraisals in the State of Mississippi. At the time of the oil spill, he was also just starting a fencing business, both professions requiring a certain degree of physical exertion and a high level of good health. Plaintiff's did his real estate appraisals under the name of his company, Southern Appraisal Services, and was retained by home sellers and buyers, real estate agents and brokers, banks, mortgage companies, home buyers seeking to refinance, and others in need of residential real estate appraisals. Plaintiff's home and office are located at the same located near the marshes (wetlands) and Gulf Coast in and around the navigable waters of Mississippi. In addition, Plaintiff's appraisals are done on residential properties in and around the navigable waters of Mississippi. Plaintiff also maintains a boat on the water and was forced to get in the water to clean up this boat after the oil spill before realizing the danger to his health. Plaintiff owns and cares for a number of horses on his property, several of which lost their hair and became sick following the oil spill. In these capacities, as an individual and in doing business as a real estate appraiser, Plaintiff was exposed to oil and dispersants that have and continue to harm his health. Prior to the Oil Spill, Plaintiff was a successful and healthy real estate appraiser. Now, he can barely work and medical doctors have reported the cause of Plaintiff's debilitating health conditions as being due to Plaintiff's exposure to harmful oil, disperants and other chemicals due to the Oil Spill.

41. Plaintiff has been unnecessarily exposed to the effects of exposure to crude oil and chemical dispersants in both his home and work capacities, living and working in and around the navigable waters on the Gulf Coast of Mississippi.

42. As a result of his exposure to the harmful effects of crude oil and chemical

11

dispersants, Plaintiff began to suffer from a myriad of physical symptoms including, but not limited to, breathing difficulties, kidney problems, skin peeling, skin rashes, skin irritation, respiratory problems, muscle cramps, muscle spasms, joint pain, swollen testicles, chest pains, heart racing, headaches, vision problems, memory problems, and chronic fatigue requiring frequent rest throughout the days. Since his chemical exposure, Plaintiff continues to suffer from the aforementioned symptoms. The chemical exposure Plaintiff suffered has greatly diminished Plaintiff's opportunities to make a living and enjoy his previous high quality of life.

### D. BP's Willful and Wanton Conduct

43. BP focused primarily on profit and disregarded public and environmental health and safety while undertaking ultra-hazardous activities on the *Deepwater Horizon* by, among other things:

a. failing to perform a critical well pressure test with trained and qualified personnel and callously ignoring and/or misinterpreting abnormal "red flag" pressure test results;

b. failing to use a well design with enough barriers for gas flow;

c. failing to use a sufficient number of "centralizers" to prevent channeling during the cement process;

d. failing to run a bottoms-up circulation of the drilling mud prior to beginning the cement job;

e. failing to run a cement bond log to evaluate the integrity of the cement job;

f. failing to deploy the casing hanger lockdown sleeve prior to commencing the mud displacement process in the well;

g. using an untested, abnormally large volume of mixed spacer solutions to avoid having to properly dispose of the two separate space substances as hazardous wastes;

h.  grossly inadequate maintenance, and reckless and improper operation and use of the blowout preventers appurtenant to the *Deepwater Horizon*;

i.  failing to ensure that oil would expeditiously and adequately be contained within the immediate vicinity of the *Deepwater Horizon* in the event of a blowout;

j.  failing to ensure the adequate safeguards, protocols, procedures and resources would be readily available to prevent and/or mitigate the effects of an uncontrolled oil spill, and;

k.  failing to use reasonably safe dispersant chemicals in the attempt to respond to the oil Spill (the "Clean-Up").

42. BP's corporate culture caused and allowed it to disregard the lessons it should have learned and applied from previous incidents at it facilities that resulted in extensive damage and loss of life; instead, it continued to place others at risk in the interests of cost-cutting and financial gain.

43. In addition, after the blowout and before the well was finally sealed, BP was aware of procedures that would immediately block the flow of oil into the Gulf, yet it delayed the implementation of any such procedures, and limited its efforts to plug the well to options that would salvage the well for future use, instead of selecting procedures that would stop the flow of the oil as soon as possible regardless of the well's continued functionality. As such, BP increased the magnitude of, and the damage caused by, the spill by willfully, wantonly, and/or recklessly choosing its profits over the lives of the workers on the vessel, the safety of the environment, and the health, welfare, and value of the people, businesses, and property of the Gulf states.

44. BP, by its conscious and/or deliberate unreasonable acts and/or omissions complained of herein, displayed gross negligence, reckless indifference, willfulness, and/or

13

wantonness.

## IV. CAUSES OF ACTION

### A. CAUSE OF ACTION - BP (NEGLIGENCE UNDER GENERAL MARITIME LAW)

45. Plaintiff re-alleges each and every allegation set forth in all preceding paragraphs as if fully stated herein.

46. The existence and breach of Defendant BP's legal duties are established under general maritime law.

47. At all times material hereto, BP owed duties of ordinary and reasonable care to Plaintiff in connection with the drilling operations and maintenance of the *Deepwater Horizon*, including it appurtenances and equipment. BP additionally owed duties to guard against and/or prevent the risk of an oil spill and to mitigate the harm if an oil spill did occur.

48. Further, BP owed duty to Plaintiff to exercise due care in the operation, maintenance, handling, design, implementation and execution of the relief and recovery measures.

49. BP had a heightened duty of care to Plaintiff because of the great danger associated with exposure to oil, dispersants and/other hazardous chemicals.

50. The risk of injury and loss to Plaintiff was reasonably foreseeable, and BP knew of the dangers associated with deep water drilling. Specifically, at all time relevant to this litigation, BP knew or should have known that:

    a.    crude oil contains chemicals hazardous to human health;

    b.    chemical dispersants contain chemicals hazardous to human health;

    c.    Plaintiff should have been adequately and timely warned of the harmful effects of crude oil and chemical dispersants, and the hazardous substances that they contain, and;

    d.    a failure to exercise reason able care in the operation, maintenance, handling, design,

implementation and execution of the relief and recovery measures would result in harm to Plaintiff.

51. BP breached its duty of care to Plaintiff in the following non-exclusive respects:

a. failing to prevent the explosion on board the *Deepwater Horizon*;

b. failing to cap the Macondo well in a timely manner;

c. failing to warn Plaintiff, public officials, and government agencies of the harmful effects of crude oil, chemical dispersants and any mixture thereof, and the hazardous chemicals they contain;

d. failing to conform to the provision of the National Contingency Plan relating to the use of aerial chemical dispersants in the proximity of vessels and shallow waters;

e. failing to coordinate and conduct aerial spraying sorties in a manner so as to eliminate the risk of business owners and residents being exposed to aerial chemical dispersants, and;

f. failing to otherwise exercise reasonable care in the operation, maintenance, handling, design, implementation and execution of the relief and recovery measures.

52. Defendants' breach of their duties posed an unreasonable risk of harm to Plaintiff.

53. Plaintiff suffered injury, loss and damages as a direct and proximate result of Defendants' willful, wanton, reckless, and/or grossly negligent breach of their aforementioned duties and, therefore, Plaintiff is entitled to recover actual and punitive damages.

### B. A FOURTH CAUSE OF ACTION AS TO BP
### (GROSS NEGLIGENCE UNDER THE GENERAL MARITIME LAW)

54. Plaintiff realleges each and every allegation set forth in all proceeding paragraphs as if fully restated herein.

55. BP had a heightened duty of care to Plaintiff because of the great danger associated

15

with exposure to oil dispersants, and/or hazardous chemicals.

56. BP breached their legal duty to Plaintiff and failed to exercise reasonable care and acted with reckless, willful, and wanton disregard in their negligent failure to prevent and contain the Oil Spill.

57. BP knew or should have known that its willful, wanton, and reckless conduct would cause injury to Plaintiff.

58. Plaintiff's injury and damages were caused by Defendants' willful, wanton, and reckless, and/or grossly negligent conduct and, therefore, Plaintiff is entitled to recover actual and punitive damages.

### C. FOR A FIFTH CAUSE OF ACTION AS TO BP (NEGLIGENCE PER SE UNDER GENERAL MARITIME LAW AND FEDERAL LAW)

59. Plaintiff re-alleges each and every allegation set forth in all preceding paragraphs as if fully stated herein.

60. BP's conduct with regard to the manufacture, maintenance and/or operation of oil-drilling vessels such as the *Deepwater Horizon*, the release of hazardous and toxic chemicals into the environment, and the application of dispersants and other hazardous chemicals is governed by federal laws and permits issued under the authority of these laws. These laws and permits create statutory and regulatory standards that are intended to protect and to benefit Plaintiff, including, but not limited to, those that govern the National Oil and Hazardous Substances Contingency Plan, *see, e.g.,* 40 C.F.R. § 300.150. BP failed to adhere to the requirements for response actions established by the National Contingency Plan, 29 C.F.R. § 1910.20. BP therefore breached its responsibilities under this regulatory provision.

60. In addition, the federal Bureau of Safety and Environmental Enforcement ("BSEE") found that BP violated the following federal regulations:

16

a. BP failed to protect health, safety, property, and the environment by failing to perform all operations in a safe and workmanlike manner, in violation of 30 C.F.R. § 250.107(a)(1);

b. BP did not take measures to prevent unauthorized discharge of pollutants into offshore waters, in violation of 30 C.F.R. § 250.300;

c. BP failed to take necessary precautions to keep the well under control at all times, in violation of 30 C.F.R. § 250.401(a);

d. BP did not cement the well in a manner that would properly control formation pressures and fluids and prevent the direct or indirect release of fluids from any stratum through the wellbore into offshore waters, in violation fo 30 C.F.R. §§ 250.420(a)(1) and (2);

e. BP failed to conduct an accurate pressure integrity test, in violation of 30 C.F.R. § 250.427;

f. BP failed to maintain the *Deepwater Horizon's* BOP system in accordance with the American Petroleum Institute's Recommended Procedure 53 section 18.10.3, in violation of 30 C.F.R. § 250.446(a);

g. BP failed to obtain approval of the Temporary Abandonment procedures it actually used at the Macondo well, in violation of 30 C.F.R. § 250.1721(1); h. BP failed to conduct an accurate pressure integrity test at the 13-5/8" liner shoe, in violation of 30 C.F.R. § 250.427; and

i. BP failed to suspend drilling operations at the Macondo well when the safe drilling margin identified in the approval application for the permit to drill was not maintained, in four separate violations of 30 C.F.R. § 250.427(b).

61. BP's violations of these statutory and/or regulatory standards constitute negligence *per se* under federal law, as well as general maritime law.

17

62. BP had actual and/or constructive knowledge of the facts and circumstances leading to and causing the incidents described herein, which in turn caused Plaintiff's injuries, and their actions and inactions were grossly negligent, reckless, willful and/or wanton.

63. As a direct and proximate cause of BP's violation of statutory and/or regulatory standards, the Plaintiff has suffered injuries and is entitled to actual and punitive damages.

**PRAYER FOR RELIEF ON ECONOMIC AND ECONOMIC RELATED LOSSES**

Plaintiff adopts and incorporates as if restated herein, all claims for relief raised in the MDL Complaints and the Short Form Joinders against the Defendants as responsible parties under the Oil Pollution Act, 33 USC §2701, *et seq*., which holds responsible parties liable to Plaintiffs for removal costs and damages arising out of the following:

    a. Loss of Natural Resources;

    b. Loss or Damage to Real or Personal Property;

    c. Subsistence Use;

    d. Loss of Revenues;

    e. Loss of Profits and/or Earning Capacity; and

    f. Loss of Public Services.

Plaintiff adopts and incorporates as if restated herein, all claims for relief raised in the MDL Complaints and the Short Form Joinders against all Defendants identifying General Maritime Law causes of action and claims for relief relating to the following:

    a. Negligence, and;

    b. Gross Negligence and Willful Misconduct.

Plaintiff adopts and incorporates as if restated herein, all claims for relief raised in the MDL Complaints and the Short Form Joinders, against all defendants for Punitive Damages

18

arising out of willful and wanton misconduct and/or gross negligence as alleged and described in the MDL Complaint.

WHEREFORE, Plaintiff, ALTON ROCKFORD MEADOWS, LLC, demands judgment against Defendants, jointly, severally, and *in solido,* as follows:

    a.    Economic and compensatory damages in amounts to be determined at trial;

    b.    Punitive Damages;

    c.    Pre-judgment and post-judgment interest at the maximum rate allowable by law;

    d.    Reasonable claims preparation expenses;

    e.    Attorneys' fees;

    f.    Costs of litigation, and;

Such other and further relief available under all applicable state and federal laws and any relief the Court deems just and appropriate.

**PRAYER FOR RELIEF ON THE PERSONAL INJURY/MEDICAL CLAIM**

WHEREFORE, Plaintiff demands judgment against Defendants as follows:

1. Compensatory damages in amounts to be determined at trial;

2. Actual damages including, but not limited to:

    a. Past and future loss wages;

    b. Past future medical expenses;

    c. Past and future loss of personal services, and;

    d. Past and future intangible losses, including those for pain and suffering.

3. Punitive damages;

4. Pre-judgment and post-judgment interest at the maximum rate allowable by law;

5. Attorney's fees and costs of litigation, and;

6. Any other relief this Honorable Court deems just and proper.

**REQUEST FOR TRIAL BY JURY**

Respectfully submitted this the 19th day of April, 2013.

FOR PLAINTIFF

BY**:** **/s/***Elizabeth A. Citrin*
**ELIZABETH A. CITRIN, ESQ.**

**ELIZABETH A. CITRIN, ESQ. (MS BAR NO.: 101368)**
**ELIZABETH A. CITRIN, P.C.**
**28080 HIGHWAY 98, SUITE G**
**DAPHNE, ALABAMA  36526**
**PHONE:  251-626-8808**
**FAX:  251-626-8868**
**CELL;  251-591-6330**
**EMAIL:  elizabeth@elizabethcitrin.com**

**PLEASE SERVE:**

ALL DEFENDANTS AS STATED ON THE SUMMONSES.