UNITED STATES DISTRICT COURT

EASTERN DISTRICT OF LOUISIANA

| | |
|---|---|
| **BAYOU CADDY FISHERIES, INC.** | CIVIL ACTION NO. 2:12-cv-02665 |
| **Versus** | SECTION "J" <br> HONORABLE CARL BARBIER |
| BP EXPLORATION & PRODUCTION, INC. <br> BP AMERICA PRODUCTION COMPANY <br> BP AMERICA, INC. <br> BP CORPORATION NORTH AMERICA, INC., <br> BP PRODUCTS NORTH AMERICA, INC. <br> and <br> HALLIBURTON ENERGY SERVICES, INC. | DIVISION: ( 1 ) <br> MAG. SALLY SHUSHAN |

## FIRST AMENDED COMPLAINT

**COMES NOW**, Bayou Caddy Fisheries, Inc., Plaintiff in the above styled and numbered cause, appearing though undersigned counsel, and for its first Amended Complaint against Defendants BP Exploration & Production, Inc., BP America Production Company, BP America, Inc., BP Corporation North America, Inc., BP Products North America, Inc., and Halliburton Energy Services, Inc., (collectively "Defendants"), which Amended Complaint is intended to substitute for and replace the original Complaint, respectfully represents:

## THE PARTIES

1.

At all material times, Bayou Caddy Fisheries, Inc. ("Bayou Caddy") was and still is a corporation organized under, and pursuant to, the laws of the state of Mississippi with its principle place of business in Lakeshore, Mississippi. Bayou Caddy was and still is a



leaseholder of oyster beds, an operator of oyster leases, an oyster fisher, and a seafood wholesaler and retailer.

2.

Defendant BP Exploration & Production, Inc. ("BP Exploration") is a Delaware corporation with its principal place of business in Warrenville, Illinois. This Court has personal jurisdiction over BP Exploration, because BP Exploration is registered to do business in Louisiana, does business in Louisiana, and has a registered agent in Louisiana.

3.

Defendant BP America Production Company is a Delaware corporation with its principal place of business in Houston, Texas. This Court has personal jurisdiction over BP America Production Company, because BP America Production Company is registered to do business in Louisiana, does business in Louisiana, and has a registered agent in Louisiana.

4.

Defendant BP America, Inc. is a Delaware corporation with its principal place of business in Houston, Texas. BP America, Inc. owns BP Exploration & Production, Inc. The Court has personal jurisdiction over BP America, Inc. because it is licensed to do business in Louisiana and conducts business here.

5.

Defendant BP Corporation North America, Inc. is an Indiana corporation with its principal place of business in Houston, Texas. The Court has personal jurisdiction over BP Corporation North America, Inc. because it is licensed to do business in Louisiana and conducts business here.

6.

Defendant BP Products North America, Inc. is a Maryland corporation with its principal place of business in Illinois. The Court has personal jurisdiction over BP Products North America, Inc. because it conducts business in Louisiana.

7.

The foregoing BP Defendants are hereinafter collectively referred to as "BP."

8.

Defendant Halliburton Energy Services, Inc. ("Halliburton") is a Delaware corporation with its principal place of business in Texas. The Court has personal jurisdiction over Halliburton because it is registered to do business in Louisiana, does business in Louisiana and has a registered agent in Louisiana.

## JURISDICTION AND VENUE

9.

This Court has jurisdiction over this action pursuant to 28 U.S.C. Section 1332(a)(4) because this case arises from complete diversity of the parties and the amount in controversy exceeds the sum of $75,000.00.

10.

In addition, this Court has jurisdiction over this action pursuant to the Oil Pollution Act of 1990, 33 U.S.C. § 2717 (b) (the "OPA").

11.

Prosecution of this action in this district is proper under 28 U.S.C. § 1391 because the events or omissions giving rise to the claims asserted herein occurred in this district.

12.

Venue is also proper pursuant to the OPA, 33 U.S.C. 2717 (b), as the discharge occurred in this district.

## FACTUAL ALLEGATIONS

13.

BP Exploration was a lease holder and the designated operator in the lease granted by the former Minerals Management Service ("MMS") allowing it to perform oil exploration, drilling, and production-related operations in Mississippi Canyon Block 252, the location known as "Macondo" where the Spill originated.

14.

As the lease holder and designated operator, BP was responsible for all oil exploration, drilling, and production-related operations on the lease, including all operations at the Macondo Well.

15.

Under a contract between Halliburton and BP, Halliburton was responsible for making recommendations to BP regarding cement slurry design and job execution.

16.

Halliburton holds itself out as one of the world's leaders in cementing services

17.

The cement slurry Halliburton designed and used in the Macondo well was unstable and failed to seal the well.

18.

Halliburton's grossly negligent acts and omissions resulted in the unstable cement design.

19.

Halliburton knew the cement was unstable based on the results of pre-blowout stability tests that indicated the likelihood of failure.

20.

The cement was improperly placed by Defendants causing and/ or contributing to the failure of the production casing cement job executed by Defendants to achieve zonal isolation.

21.

On April 20, 2010, as a result of Defendants' grossly negligent acts and omissions, there was a blowout of the Macondo Well, marking the beginning of what would become the most pervasive and devastating environmental disaster in the history of the United States, with over 200 million gallons of BP's oil being released from the April 20, 2010 blowout until the well was permanently sealed on or around September 19, 2010 (the "Spill").

22.

Each day during the course of the Spill, tens of thousands of barrels of crude oil gushed from BP's wellhead on the seafloor, eventually surfacing and forming a widening oil slick so large it was visible from space, as well as spreading out in vast subsurface plumes of oil and dispersant chemicals that came to rest on the seafloor at many different depths, damaging ecosystems and privately owned and leased sea beds throughout the Gulf of Mexico, including Plaintiff.

23.

Since the Spill began, unprecedented amounts of raw crude oil and other toxic chemicals have encroached on and contaminated the Gulf of Mexico and the ecologically sensitive

shorelines, beaches, marshes, harbors, estuaries, bayous, and bays (the "Coastal Zones") of Louisiana and Mississippi damaging the environment and Plaintiff's real and personal property.

24.

The oil released during the Spill contains benzene, toluene, polyaromatic hydrocarbons, and other compounds (collectively referred to as Total Petroleum Hydrocarbons, or "TPH"), all of which are known carcinogens. Discharge of the toxic pollutants, as identified in 40 C.F.R. § 401.15, likely includes, but is not limited to, benzene, toluene, naphthalene, polynuclear aromatic hydrocarbons (including, but not limited to, phenanthrene, benzanthracenes, benzophyrenes, benzofloranthene, chrysenes, dibenzanthracenes, and idenopyrenes), fluoranthene, arsenic, cadmium, copper, mercury, and nickel, all of which are hazardous to the health of humans and marine life. Upon information and belief, BP has analyzed and knows the exact concentrations of each of the toxic pollutants present in the oil coming from its wells.

25.

The Spill and the resulting contamination of the Coastal Zone and Plaintiff's real property including its oyster leases, has caused and will continue to cause a loss of revenue for Plaintiff, who relies on the use of the Gulf of Mexico and its marine life.

26.

Beginning on April 20, 2010, the Spill from BP's Macondo Well prevented Plaintiff from operating its oyster leases and seafood businesses in Louisiana and Mississippi, and prevented Plaintiff from harvesting its oysters, and operating its wholesale and retail seafood business, also causing losses from natural predators and conditions which could be avoided if the oyster crops could have been harvested.

27.

BP's oil migrated to Plaintiff's oyster leases and caused physical damage and destruction to its oyster crops.

28.

Additionally, BP dispersed chemicals on Plaintiff's oyster leases and thereby destroyed the oyster crops and permanently damaged Plaintiff's ability to plant new oysters for cultivation and develop new oyster crops. The oil and chemicals had the effect of preventing spat from attaching to Plaintiff's cultch, and thus prevented the cultivation of new oysters.

29.

Historically, Bayou Caddy also operated a shrimp dock in Lakeshore, Mississippi. In early 2010, Bayou Caddy was executing a business plan to reopen its dock which had been shut due to damage suffered in Hurricane Katrina five years earlier. Purchases of equipment had been made, a permit obtained and plans were in place to open the shrimp dock in the spring of 2010. However, as a consequence of the Spill from the Macondo Well, the burden imposed upon Bayou Caddy from the interruption of its business generally, and the depletion of seafood available for purchase, Bayou Caddy was unable to complete its business plan and reopen its shrimp dock.

30.

BP dispatched equipment to contend with the massive oil spill from its Macondo Well, and to prevent the massive pollution from coming ashore. Some of the marine equipment dispatched by BP came into oyster beds owned by Plaintiff, and in the course of their operations, the equipment destroyed Plaintiff's oyster beds. BP is liable to Plaintiff for the consequences of the clean-up work performed at BP's request. Additionally, BP agreed to provide liability

insurance covering the equipment and the clean-up operations and, as such, is liable to Plaintiff for the damages incurred.

## CAUSES OF ACTION

### A. THE OIL POLLUTION ACT
### (BP)

31.

Plaintiff realleges each and every allegation set forth in all preceding paragraphs as if fully restated here.

32.

The Oil Pollution Act, 33 U.S.C. § 2701, et seq. (the "OPA"), imposes liability upon a "responsible party for a ... a facility from which oil is discharged ... into or upon navigable waters or adjoining shorelines" for the damages that result from such incident as well as removal costs. 33 U.S.C. § 2702.

33.

Section 2702(b)(2)(E) provides that "responsible parties" are strictly liable for all damages that result from an oil spill.

34.

OPA also provides that Plaintiff is entitled to all "removal costs" incurred as a result of the Spill.

35.

The Coast Guard has named BP as the responsible party for the release of oil from the Macondo Well. Therefore, BP is strictly liable pursuant to Section 2702 of the OPA for all the damages resulting from the Spill.

36.

BP is not entitled to limit its liability under Section 2704(a) of the OPA because the Spill was proximately caused by BP's gross negligence, willful misconduct, or violation of applicable safety, construction or operating regulations. 3 U.S.C. § 2704(c).

37.

Moreover, in its "Statement of BP Exploration & Production Inc. Re Applicability of Limitation of Liability Under Oil Pollution Act of 1990," filed on October 19, 2010, BP waived the statutory limitation on liability under the OPA.

38.

As a result of the Spill, Plaintiff is entitled to damages pursuant to Section 2702(b)(2)(B), which provides for recovery of damages to real or personal property, including "[D]amages for injury to, or economic losses resulting from destruction of, real or personal property, which shall be recoverable by a claimant who owns or leases that property, including the diminution in the value of their property."

39.

As a result of the Spill, Plaintiff is entitled to damages pursuant to Section 2702(b)(2)(E), which provides for "[D]amages equal to the loss of profits or impairment of earning capacity due to the injury, destruction, or loss of real property, personal property, or natural resources, which shall be recoverable by any claimant."

40.

To the extent required by law, and/or by consent or stipulation by BP, Plaintiff has satisfied all of the administrative requirements of 33 U.S.C. §§ 2713(a) and (b), by the

submission of their claims to the Gulf Coast Claims Facility (the "GCCF") and/or BP and/or its agents or designees.

### B. NEGLIGENCE AND GROSS NEGLIGENCE AND GENERAL MARITIME LAW (BP AND HALLIBURTON)

41.

Plaintiff realleges each and every allegation set forth in all preceding paragraphs as if fully restated here.

42.

At all times material hereto, BP and Halliburton owed and breached duties of ordinary and reasonable care to Plaintiff in connection with the operations at the Macondo Well and additionally owed and breached duties to Plaintiff to guard against and/or prevent the risk of an oil spill.

43.

BP was under a duty to exercise reasonable care while participating in and supervising operations at the Macondo Well to ensure that a blowout and subsequent oil spill did not occur as a result of such operations.

44.

Halliburton was under a duty to exercise reasonable care while designing the cement slurry and executing the cement job at the Macondo Well to ensure that a blowout and subsequent oil spill did not occur as a result of such operations.

45.

Halliburton was under a duty to exercise reasonable care while testing the cement slurry to ensure that it would achieve zonal isolation and ensure that a blowout and subsequent oil spill did not occur as a result of such operations.

46.

Defendants knew of the dangers associated with deep water drilling, including specifically at Macondo, and failed to take appropriate measures to prevent damage to Plaintiff and the Gulf of Mexico's marine and coastal environments and estuarine areas.

47.

Plaintiff, as owner, lessee, and operator of real property at or near the coast of the Gulf of Mexico and as businesses that are dependent upon the Gulf of Mexico's marine and coastal environments for its livelihood and income, was within an appreciable zone of risk and, as such, BP was obligated to protect it.

48.

BP was under a duty to exercise reasonable care to ensure that if crude oil discharged in the event of a blowout, that it would be contained and/or stopped within the immediate vicinity of the Macondo Well in an expeditious manner.

49.

Defendants knew or should have known that the acts and omissions described herein could result in damage to Plaintiff.

50.

Defendants failed to exercise reasonable care while participating in exploration operations to ensure that a blowout and subsequent oil spill did not occur, and thereby breached duties owed to Plaintiff.

51.

Defendants failed to exercise reasonable care to ensure that oil would expeditiously and adequately be contained within the immediate vicinity of the Macondo Well in the event of a blowout, and thereby breached duties owed to Plaintiff.

52.

BP failed to exercise reasonable care to ensure that adequate safeguards, protocols, procedures and resources would be readily available to prevent and/or mitigate the effects an uncontrolled oil spill into the waters of the Gulf of Mexico, and thereby breached duties owed to Plaintiff.

53.

The Spill was caused by the negligence, fault, gross negligence, and willful misconduct of Defendants including, but not limited to:

- (a) Failing to properly design the Macondo Well;
- (b) Failing to properly design the temporary abandonment procedure;
- (c) Failing to properly maintain the Macondo Well and its equipment;
- (d) Failing to use ordinary and reasonable care in the operations at the Macondo Well;
- (e) Failing to properly train and supervise the personnel involved in operations at the Macondo Well;

(f) Failing to exercise ordinary and reasonable care in developing and implementing proper safety procedures to prevent a blowout and oil spill;

(g) Failing to use ordinary care in developing and implementing adequate blowout and oil spill responses plans and procedures;

(h) Failing to take appropriate action to mitigate the damages that resulted from the blowout and oil spill;

(i) Failing to properly design, test, conduct and supervise cementing operations at the Macondo Well;

(j) Acting in a careless and reckless manner and without due regard for the environmental and financial impacts of the oil spill;

(k) Acting in a careless and reckless manner and in utter and flagrant disregard for the safety and health of the public and the environment

(l) Willfully placing concern for Defendants' profits over and above proper training, design, operations, and the safety of others;

(m) All other acts or fault which may be proven at trial.

54.

All of the foregoing acts and/or omissions by Defendants proximately caused Plaintiff's injuries and damages and entitles Plaintiff to compensatory and punitive damages.

### C. PUNITIVE DAMAGES
### (BP and Halliburton)

55.

Plaintiff realleges each and every allegation set forth in all preceding paragraphs as if fully restated here.

56.

Defendants engaged in conduct so reckless, willful, wanton and in such utter and flagrant disregard for the safety and health of the public and the environment in its activities leading up to and/or during the blowout and Spill, as alleged herein, that an award of punitive damages against Defendants at the highest possible level is warranted and necessary to impose effective and optimal punishment and deterrence. Plaintiff, society and the environment cannot afford and should never be exposed to the risks of another disaster of the magnitude caused by Defendants' misconduct herein.

57.

Defendants focused primarily on profit while disregarding public and environmental health and safety while undertaking its ultra-hazardous activities at the Macondo Well by performing critical operations in a reckless manner and by callously ignoring reports of an imminent blowout.

58.

Defendants focused primarily on profit while disregarding public and environmental health and safety while undertaking its ultra-hazardous activities at the Macondo Well by using an inadequate well design.

59.

Defendants focused primarily on profit while disregarding public and environmental health and safety while undertaking its ultra-hazardous activities at the Macondo Well by the reckless and improper use of Halliburton's cement slurry, Halliburton's reckless and improper testing of the cement, and Defendants' reckless and improper placement of the cement.

60.

Defendants focused primarily on profit while disregarding public and environmental health and safety while undertaking their ultra-hazardous activities at the Macondo Well by their grossly inadequate supervision, and reckless and improper operation and use of all necessary equipment to safely engage in operations at the Macondo Well.

61.

Defendants recklessly, willfully and/or wantonly failed to ensure that oil would expeditiously and adequately be contained within the immediate vicinity of the Macondo Well in the event of a blowout.

62.

Defendants recklessly, willfully and/or wantonly caused or contributed to the catastrophic Spill through its disregard for proper exploration, casing, mudding, and cementing procedures.

63.

Defendants willfully and/or wantonly failed to ensure that adequate safeguards, protocols, procedures and resources would be readily available to prevent and/or mitigate the effects an uncontrolled oil spill into the waters of the Gulf of Mexico.

64.

BP recklessly, willfully and/or wantonly failed to utilize reasonably safe dispersant chemicals in its haphazard attempts to respond to the Spill, and thereby exacerbated and worsened the pollution of the Gulf of Mexico.

65.

BP's corporate culture caused and allowed it to disregard the lessons it should have learned and applied from previous incidents at its facilities that resulted in extensive damage and

loss of life; instead, it continued to place others at risk in the interests of cost-cutting and financial gain.

66.

In addition, after the blowout and before the well was finally sealed, BP was aware of procedures that would immediately block the flow of oil into the Gulf, yet it delayed the implementation of any such procedures, and limited its efforts to plug the well to options that would salvage the well for future use, instead of selecting procedures that would stop the flow of oil as soon as possible regardless of the well's continued functionality. As such, BP increased the magnitude of, and damage caused by, the Spill by willfully and/or wantonly and recklessly choosing its profits over the lives of the workers on the vessel, the safety of the environment, and the health, welfare, and value of the people, businesses, and property of the Gulf states, including Plaintiff.

67.

Defendants' conduct is at the highest level of reprehensibility, warranting and necessitating the imposition of punitive damages at the highest level, because Defendants' conduct was motivated by financial gain; because it injured and endangered human and environmental health and safety; because it caused devastating damage and loss to the livelihoods, businesses, and properties of Plaintiff; because it was not isolated or accidental, but part of a culture and ongoing pattern of conduct that consistently and repeatedly ignored risks to others in favor of financial advantage to Defendants; and because it has accordingly caused societal harm, moral outrage and condemnation, and the need to punish Defendants and deter further repetition by Defendants or others.

67.

Accordingly, Plaintiff is entitled to an award of punitive damages in an amount to be determined at trial.

## DAMAGES

68.

As a result of the actions and omissions of Defendants, Plaintiff has suffered damages that include, but are not limited to, the following:

(a) Past loss of income;

(b) Future loss of income;

(c) Physical damage and destruction to oyster beds;

(d) Loss of business opportunity with respect to Plaintiff's shrimp dock;

(e) Past and future loss of market share;

(f) Damage to reputation and risk of future health concerns;

(g) Direct and indirect clean-up costs;

(h) Cost of repairing and re-seeding Plaintiff's oyster beds;

(i) Loss of natural resources;

(j) Punitive damages;

(k) Other costs and damages not yet identified.

## JURY TRIAL DEMAND

69.

Plaintiff demands a trial by jury of this matter.

## OPT-OUT

70.

On November 1, 2012, Plaintiff opted out of the Economic Loss and Property Damage Class Action Settlement in MDL-2179 by submitting a written exclusion request to the Deepwater Horizon Court-Supervised Settlement Exclusions Department, in accordance with the Class Action Settlement Notice.

## COMPLIANCE WITH PRE-TRIAL ORDER 60

71.

On May 2, 2016, Plaintiff submitted a sworn statement as required by Pre-Trial Order 60 ("PTO 60"), identifying the present matter as Plaintiff's previously filed individual complaint. At the time PTO 60 was filed, Bayou Carlin Fisheries, Inc., and Pearl River Fisheries of Louisiana, LLC, had opted-in to the Economic Loss and Property Damage Class Action Settlement in MDL-2179, and therefor were no longer plaintiffs in this suit.

## PRAYER FOR RELIEF

**WHEREFORE**, Plaintiff demands judgment against Defendants as follows:

(a) Economic and compensatory damages in amounts to be determined at trial;

(b) Punitive damages;

(c) Pre-judgment and post-judgment interest at the maximum rate allowable by law;

(d) Attorneys' fees and costs of litigation;

(e) Such other and further relief available under all applicable state and federal laws and any relief the Court deems just and appropriate.

Respectfully submitted,

*Miles P. Clements /s/*
Miles P. Clements (La. #4184)
T. Patrick O'Leary (La. #30655)
Wade B. Hammett (La. #31186)
**FRILOT, L.L.C.**
1100 Poydras Street
Suite 3700 Energy Centre
New Orleans, LA 70163-3700
Telephone: 504-599-8004
Telefax: 504-599-8104
mclements@frilot.com
poleary@frilot.com
whammett@frilot.com
**ATTORNEYS FOR:**
**BAYOU CADDY FISHERIES, INC.**

**CERTIFICATE OF SERVICE**

I hereby certify that the above and foregoing *First Amended Complaint* has been served on Counsel of BP and the Plaintiffs' Steering Committee by electronically uploading the same to Lexis Nexis FileAndServeXpress in accordance with Pretrial Order No. 12, and that the foregoing was electronically filed with the Clerk of Court of the United States District Court for the Eastern District of Louisiana by using the CM/ECF System, which will send a notice of electronic filing in accordance with the procedures established in MDL 2179, on this 8th day of July, 2016.

*Miles P. Clements /s/*