# GCCF WAS 92% DONE
## WHEN THE BP CLASS SETTLEMENT PROGRAMS TOOK OVER

**New York Times**

"From 9/11 to BP to G.M."

June 30, 2014

The other thing about these funds is that they work. Some 97 percent of the families of 9/11 victims opted into that fund, according to Feinberg; the number for BP fund was 92 percent — this despite the best effort of some plaintiffs' lawyers to undermine it.

http://www.nytimes.com/2014/07/01/opinion/joe-nocera-from-9-11-to-bp-to-gm.html?_r=0


**Detroit Free Press**

"Feinberg Lays Out GM Victim Compensation Plan

July 1, 2014

Feinberg acknowledged that substantiating claims will prove to be a "challenge."  In the 9/11 fund, which he administered, 97% of eligible families accepted offers.  In the BP oil spill fund, which he also led, 92% of eligible claimants accepted offers.

http://archive.freep.com/article/20140630/BUSINESS0101/306300160/GM-recall-settlement  (now available at: http://insurancenewsnet.com/oarticle/Feinberg-lays-out-GM-victim-compensation-plan-a-524507 (last visited: June 1, 2016).


**Business First of Buffalo**

"U.S. Tort Expert Feinberg Discusses Compensating for Tragedy and Loss"

October 13, 2014

For the 9/11 fund program, 7,300 claims were received and 5,300 were eligible. Only 94 of those decided to litigate but claims were settled within five years, according to Feinberg. There was never a trial stemming from 9/11, he added.

In the matter of BP, he said 92 percent of eligible claims entered the fund.

"I consider these programs precedence for nothing," he said.  "They're interesting to analyze and study but I don't think they're going to replace the American legal system's tort system, yet here they are."

http://www.bizjournals.com/buffalo/blog/buffalo-law-journal/2014/10/u-s-tort-expert-feinberg-discusses-compensating.html?page=all

**New Orleans Times Picayune**

"Former Claims Czar Kenneth Feinberg Calls BP's $20 Billion Oil Spill Fund an 'Aberration' at Tulane Talk"

April 9, 2015

*[transcript from recording at 1:55]*

We did it.  In six months, we paid the claims. As one commentator noted, 92% of all the estimated claims were paid by the Gulf Coast Claims Facility.  We rejected two thirds of the claims as ineligible.  And either ineligible or lacking proof.

https://www.youtube.com/watch?v=ttmkJyuA_M4
(article at http://www.nola.com/business/index.ssf/2015/04/feinberg_bp_oil_spill_fund.html)

**The Street**

"BP's Gulf Oil Spill Was 'Less of an Environmental Disaster' Than Media Portrayed"

April 20, 2015

During Feinberg's 16-month tenure, 220,000 people were paid about $6.5 billion, resolving about 92% of the eligible claims. Another $5 billion has been paid out since June 2012, according to an April 15 news release from Patrick Juneau, the current Deepwater Horizon property and economic damage settlement claims administrator.

http://www.thestreet.com/story/13116937/1/bps-gulf-oil-spill-was-less-of-an-environmental-disaster-than-media-portrayed.html

**The Opinion Pages** | Op-Ed Columnist

# From 9/11 to BP to G.M.



Joe Nocera JUNE 30, 2014

Continue reading the main story Share This Page
Continue reading the main story

- Share
- Tweet
- Email
- More
- Save

84

The title of Kenneth Feinberg's 2012 book is: "Who Gets What: Fair Compensation After Tragedy and Financial Upheaval." It is part memoir and part meditation on some of the well-known compensation systems he has administered during the course of his career, from the Agent Orange settlement to the 9/11 fund to the Gulf coast compensation fund that Feinberg managed for BP. "Where is it written," he muses at one point, "that the tort system, and the tort system alone, must be the guiding force in determining who gets what?" It's a good question.

On Monday morning, however, Feinberg unveiled his latest effort, a new fund, proposed and paid for by General Motors, to compensate victims of its ignition-switch failures with the Chevy Cobalt, the Saturn Ion and several other G.M. cars. It is very much tied to the tort system, as Feinberg was quick to concede when I spoke to him Monday afternoon. The family of a married father of two who had a $50,000-a-year job — and who died in an ignition-switch accident — would potentially get several million dollars more than, say, the family of an unmarried, out-of-work 29-year-old. An investment banker who was seriously injured would get more than a laborer who was seriously injured because the investment banker's potential earnings were higher than the laborer's. That may not necessarily be fair, but it is the calculation that courts use to compensate people in the tort system.

There is a reason that the G.M. compensation fund is set up to replicate the tort system, of course. Like the 9/11 fund and the BP fund before it, the General Motors fund has as one of its primary goals to keep victims from filing lawsuits. Indeed, the quid pro quo is quite explicit: After Feinberg and his staff have made an offer in an ignition-switch case, the victim has to be willing to sign a document saying he or she won't sue to get the money. There is no cap on the total amount of money G.M. has agreed to spend on victims' payments.

"It is designed to help claimants," Feinberg said flatly. "It is not designed to punish G.M."

Although the fund will pay some money for pain and suffering, punitive damages are not part of the equation. Claimants — and their lawyers — seeking "punis" will have to forego Feinberg's offer of compensation and take their chances in court.

Advertisement

Continue reading the main story

The fund has other features that have become associated with a Feinberg-run fund. On the one hand, it is probably overly generous to certain classes of claimants. "Contributory negligence" — that is drivers who were drinking, say, when they got into an ignition switch accident — will not be a factor in Feinberg's calculations. People with minor scrapes that required a trip to the emergency room will get some money.

On the other hand, Feinberg isn't just giving out cash willy-nilly. He is going to require documentation that the ignition switch was the "proximate cause" of the accident. I remember once asking Feinberg why he insisted on such rigor when he was handing out BP's money. He told me that "if the process has no integrity, then people will begin to question the legitimacy of this alternative to the court system."

The other thing about these funds is that they work. Some 97 percent of the families of 9/11 victims opted into that fund, according to Feinberg; the number for BP fund was 92 percent — this despite the best effort of some plaintiffs' lawyers to undermine it.

In his book, Feinberg says that he thinks funds like the one established by BP should be rare because they set up "special rules for a select few." He adds that "the American legal system, with its emphasis on judges, juries and lawyers all participating in adversarial give-and-take, works well in the great majority of cases."

But I think the country would be better served if they became more frequent. Compensating people while keeping them out of the tort system is a worthy goal. For one thing, such funds can serve as a kind of public atonement for a company, as is the case with General Motors. For another, courts can be a crapshoot. Finally, these funds can pay people quickly, without years of litigation and the anxiety it brings.

"Money is a pretty poor substitute for loss," said Feinberg toward the end of his prepared remarks on Monday morning. He noted that the millions of dollars he is about to parcel out to

ignition-switch victims and their families won't bring back loved ones, or give a permanently injured person back his or her health.

*Write A Comment*

In "Who Gets What," he also points out that other cultures have different ways of offering compensation, and it often doesn't involve money. "It is," he concluded, "the limit of what we can do."

It is also the American way.

A version of this op-ed appears in print on July 1, 2014, on page A21 of the New York edition with the headline: From 9/11 to BP to G.M. Today's Paper|Subscribe



**NEWSWIRES**

June 30, 2014    Newswires    No comments

# Feinberg lays out GM victim compensation plan

Nathan Bomey and Alisa Priddle, Detroit Free Press

> **By Nathan Bomey and Alisa Priddle, Detroit Free Press**
>
> McClatchy-Tribune Information Services

July 01--Families of those killed in crashes involving General Motors' deadly ignition switches will be offered at least $1 million if they can prove the defective part caused the fatal accidents, said the man overseeing a special fund created to pay them.

Kenneth Feinberg, director of the GM Ignition Compensation Fund, said those injured or families of victims who died can begin filing claims Aug. 1 and must file by Dec. 31. He said he will notify owners of 2.6 million small cars recalled earlier this year for defective ignition switches that they may be eligible for settlements.

GM has identified at least 13 deaths and 54 injuries connected to the defective ignition switches, but those figures are expected to grow. Separately, GM announced another 8.4 million recalled vehicles Monday, mostly for ignition-switch issues. GM said three people died and eight were injured in seven crashes in those cars, but the automaker said they may not be directly tied to the defect.

-- PDF: FAQ on GM ignition switch compensation

Feinberg said that the compensation fund is not capped, and he will use actuarial tables and average medical cost data to calculate settlements.

Some families are concerned that they won't have sufficient documentation to qualify for settlements.

**Be in the know. Send me the latest insurance news**

Your email

Submit

AddThis (//www.addthis.com/website-tools/overview?

Jayne Rimer's only child, Natasha, was 18 when she was killed in 2006 in a 2005 Cobalt. Stepfather Ken Rimer said he appreciates that GM is admitting its mistakes cost lives and is trying to make amends, but he doubts the compensation will be sufficient in his family's case.

Rimer said he plans to meet with his Texas lawyer, Bob Hilliard, later this week to discuss the compensation fund, but his initial sense is the family will pursue a lawsuit instead of accepting GM's offer. That could require GM to pay punitive damages, he said.

Natasha was in a coma for 11 days during which the family incurred $210,000 in medical bills before she died. She had no assets at the time of her death.

"She was just getting started in life," Rimer said.

Under the Feinberg plan, Rimer said he believes his family would be eligible for $170,000 in compensation for medical costs. But the family would likely be owed millions because Natasha died.

Feinberg gave examples of payouts under his plan. The survivors of a 25-year-old deceased driver who was married with three children and earning $46,000 would receive about $4 million.

A 10-year-old passenger who became a paraplegic in an accident would be offered $7.8 million.

Compensation for people who needed only outpatient treatment within 48 hours of the crash would be capped at $20,000.

Victims must submit evidence to substantiate their claims -- such as police reports, hospital records, vehicle data, insurance information and even the car involved in the accident if it's still around.

GM can provide evidence to dispute victims' claims, but the company has agreed not to challenge Feinberg's determination. Feinberg said he intended to pay those victims who establish their claims within 90 to 180 days of each filing.

"We are pleased that Mr. Feinberg has completed the next step with our ignition-switch compensation program to help victims and their families," CEO Mary Barra said in a statement. "We are taking responsibility for what has happened by treating them with compassion, decency and fairness."

Feinberg's plan drew criticism from safety advocates.

Be in the know. Send me the latest insurance news

Your email

Submit

AddThis (//www.addthis.com/website-tools/overview?

"It will be difficult, if not impossible, for a consumer to prove that ignition-switch failure caused a crash if all they have is their statement that the ignition switch cut off," said Clarence Ditlow, executive director of the Center for Auto Safety. "At the very least, in processing claims Mr. Feinberg must apply a presumption that if there is record of stalling on a vehicle, the claim is valid."

Feinberg acknowledged that substantiating claims will prove to be a "challenge." In the 9/11 fund, which he administered, 97% of eligible families accepted offers. In the BP oil spill fund, which he also led, 92% of eligible claimants accepted offers.

If families accept a settlement, they must agree not to sue GM. If they choose to sue, GM plans to defend itself.

Lance Cooper, a Georgia lawyer who exposed the defect and represents some families involved in the defect, said the scope of the compensation plan is too limited and will probably prompt most victims to pursue lawsuits.

"There's no punitive component, so I think there are going to likely be a majority of families who decide they want to have their day in court, particularly given GM's conduct," Cooper said in an interview.

General Motors hired Feinberg for this mission in the wake of its February recall of Chevrolet Cobalts, Saturn Ions, Chevrolet HHRs, Saturn Skys, Pontiac G5s and Solstices mostly from the 2003 through 2007 model years. Those cars were equipped with ignition switches that can slip out of position and cut off power to the engine, steering, air bags and other electrical systems.

The company has not disclosed how much it is paying Feinberg.

Engineers discovered the defect more than a decade ago, but a breakdown in communication, incompetence and a lack of urgency failed to fix the problem or order a recall, according to a 325-page investigative report conducted by outside lawyer Anton Valukas on behalf of GM.

-- Tom Walsh: Matt Lauer takes dopey route with inane questions to Barra

Victims' behavior that may have contributed to the accident, including intoxication, speeding or texting while driving, will not be considered, Feinberg said.

Those who settled cases arising from these specific defective ignition switches before the Feb. 13 recall may file either a new lawsuit or a claim to the fund.

"I'm here to compensate victims, not to punish General Motors," he said. "If people want ... to use litigation to go after General Motors, then voluntarily they should not submit a claim to me."

**Be in the know. Send me the latest insurance news**

Your email

Submit

AddThis (//www.addthis.com/website-tools/overview?

Contact Nathan Bomey: 313-223-4743 or nbomey@freepress.com (mailto:nbomey@freepress.com). Follow him on Twitter @NathanBomey.

___

(c)2014 the Detroit Free Press

Visit the Detroit Free Press at www.freep.com

Distributed by MCT Information Services

| Wordcount: | 1003 |
|---|---|

© 2016 InsuranceNewsNet.com, Inc. All rights reserved.

✕

**Be in the know. Send me the latest insurance news**

Your email

Submit

AddThis (//www.addthis.com/website-tools/overview?

**FOR THE EXCLUSIVE USE OF JESCHAUVIN@GMAIL.COM**

From the Buffalo Business First:
http://www.bizjournals.com/buffalo/blog/buffalo-law-journal/2014/10/u-s-tort-expert-feinberg-discusses-compensating.html

# U.S. tort expert Feinberg discusses compensating for tragedy and loss

Oct 13, 2014, 11:25am EDT

U.S. tort law and compensation expert Kenneth Feinberg set the stage for a daylong CLE program with a keynote address that touched on some of the most complex and emotionally fraught mass tort compensation and settlement funds in U.S. history.

The founder of Feinberg Rozen law firm in New York City and Washington, D.C., was in Buffalo on Oct. 6 to discuss recent developments in tort law and practice. He also touched on the rigors of his work, stemming from catastrophic events that resulted in changes in compensation policies for loved ones of the victims.



COURTESY OF SUNY BUFFALO LAW SCHOOL
Though nothing can make up for the tragic loss of a loved one, attorney Kenneth Feinberg says the government and corporations make an effort to answer the needs of survivors. He cited the compensation fund established in the wake of the 9/11 terrorist attacks as an example.

Feinberg has overseen compensation funds established on behalf of the victims of the 9/11 terrorist attacks, the **BP** Deepwater Horizon oil spill, the Boston Marathon bombing and other high-profile tragedies.

"In these cases, policymakers decide there's got to be a better way to compensate innocent victims than the conventional tort system. ... The pressure mounts," said Feinberg, adding that lawyers sometimes criticize the process. "This is not what we learned in law school. This is not the way you do things in this country."

Still, many are opting out of the tort system in favor of such funds. Feinberg surmises it's a matter of efficiency, speed, generosity and certainty.

The compensation programs — funded by taxpayers or by the actual entity responsible, to the tune of billions of dollars, he said — are isolated examples of policymaker response to a legal system that delays compensation, promotes uncertainty and guarantees nothing for the innocent victim.

"What is the contrast between these settlement funds, aberrations as they may be, and conventional tort litigation?" said Feinberg, also a lecturer at Harvard Law School.

His address, co-sponsored by **SUNY** Buffalo Law School and the University at Buffalo School of Management, was part of the Gerald Lippes Speaker Series.

S. Todd Brown, associate professor at SUNY Buffalo Law School and director of the Center for the Study of Business Transactions, organized the event.

"This was an opportunity to host something at the cutting edge of what's going on in this area of law," said Brown, who teamed with the Coalition for Litigation Justice, a business group whose agenda includes legislative proposals for tort law reform.

Eleven days after the 2001 terrorist attacks, Congress enacted a compensation fund for survivors of the victims. He worked on it for 33

months pro bono, developing regulations governing the fund and administering all aspects. That included evaluating applications, determining compensation and disseminating awards, as well as conducting private hearings for those who desired them.

"A fascinating statute, but you'll never see another one like that again," said Feinberg of the fund, which awarded $7 billion.

The BP oil spill in 2010 led to the government-led Gulf Coast Claims Facility as a voluntary alternative to the tort system, he said. In 16 months there were more than 1 million claims arising from the oil spill in the Gulf of Mexico, coming from all 50 states and 35 foreign countries. The total payout was $6.5 billion.

More recently, **General Motors** answered its ignition switch problems, which caused multiple deaths and potential lawsuits, by creating a separate and voluntary compensation program three months ago. Feinberg anticipates the participation rate will be high.

For the 9/11 fund program, 7,300 claims were received and 5,300 were eligible. Only 94 of those decided to litigate but claims were settled within five years, according to Feinberg. There was never a trial stemming from 9/11, he added.

In the matter of BP, he said 92 percent of eligible claims entered the fund.

"I consider these programs precedence for nothing," he said. "They're interesting to analyze and study but I don't think they're going to replace the American legal system's tort system, yet here they are."

He noted that funds created in the wake of such tragedies as the Boston Marathon bombing, the **Virginia Tech** shooting and a movie theater shooting in Colorado were funded by private donations, so there was no release to be signed, stopping the parties receiving them from suing, as well.

While those are similar compensation programs, he said they are not alternatives to the tort system. However, most of the parties have shirked the tort system and not sued after accepting compensation.

In the Virginia Tech case, four of 100 people who received money filed suits, he added. In Colorado, even after distribution of $500 million, he predicted some people still would sue but they did not.

His reservations about such funds are philosophical and practical constitutional issues, he said, adding that these programs set up funds that benefit certain segments, while everyone else must go through the conventional tort system where there are no guarantees.

"You should have read some of my emails during my administration of the 9/11 victim compensation fund," he said. " 'Dear Mr. Feinberg: My son died in the Oklahoma City bombing. Where's my check?' 'Dear Mr. Feinberg: I don't get it. My daughter died in the basement of the **World Trade Center** — in the original 1993 attacks committed by the very same people. Where's my check?' "

Practically speaking, he said, his issue with such programs is that, in the interest of efficiency, they were administered by one person or organization and therefore lacked checks and balances or appeals. The 9/11 fund may have been the right thing to do, but he warns against similar efforts.

"It was sound public policy at the time," he said. "But don't ever do it again. Not with public money."

He described himself as a big believer in the tort system and said it is so ingrained in the fabric of this country that it's not likely to changing. He wonders, however, what was so wrong with the system that alternative ways of determining and granting compensation were more appealing.

"Even if you don't think it works well, get over it. The tort system isn't going anywhere," he said. "I think, frankly, the tort system in every village, city, town or hamlet in this country works pretty well."

The system may fail most in mass aggregated litigation, he said, where it's not a single person involved in an accident but thousands or millions of victims. Aggregation has been consistently rejected in the judicial system, Feinberg added, to the detriment of efficiency and progress.

"If you don't want more 9/11 or **GM** funds, fine. I don't either, but you've got a better idea?" he said. "If you can't aggregate your ideas in one forum in a meaningful way to provide prompt, consistent and certain results, (then what do you have)? ... Any solution that calls for one hearing at a time encourages policymakers to look outside the box and think, 'There's got to be a better way.' And it starts with aggregation."

He pointed to Supreme Court Justice Ruth Bader Ginsburg, who struck down aggregation after questioning whether all victims will be treated fairly and will they get their day in court.

Said Feinberg: "How can due process and procedural processes be welded into efficient aggregation?"

"You can't try cases one at a time. Yeah, that may be right, but you also can't treat people like they're a number. So how do you temper or deal with that tension?"

Regarding bankruptcy, he said there is interesting work going on in the area of aggregate litigation. He added that he hopes that will help create a long-term solution for claims and settlements.

**Michael Petro**
Editor/Reporter Buffalo Law Journal
*Buffalo Business First*



Greater New Orleans

# Former claims czar Kenneth Feinberg calls BP's $20 billion oil spill fund an 'aberration' at Tulane talk



By **Jennifer Larino, NOLA.com | The Times-Picayune**
**Email the author** | **Follow on Twitter**
on April 09, 2015 at 9:00 AM, updated April 09, 2015 at 10:26 AM

The $20 billion victims fund set aside by **BP** during the height of the **2010 Gulf of Mexico oil spill** was an "aberration" and will probably be the first and last of its kind, said **Kenneth Feinberg**, the lawyer who oversaw payments in the months after the disaster. Feinberg spoke Tuesday evening (April 7) at a public lecture at the Tulane University Law School.

Feinberg, who also oversaw payment programs for victims of the Sept. 11 terrorist attacks, the Virginia Tech shootings, and the Boston Marathon bombing, shared stories from the front lines of human tragedy and the process of assigning dollars and cents to lost lives and injury.

Feinberg said the mathematical calculations are straightforward. The tough part is sitting down with people who have lost someone or something -- a loved one, a limb, a business, he said.

One man who lost his wife in the Sept. 11 attacks brought his wedding video to a hearing and insisted Feinberg watch it with him.

"You learn quickly that you better just be quiet and let people say what they want to say," Feinberg said.

Feinberg, appointed by President Barack Obama and BP, oversaw spill payments under the Gulf Coast Claims Facility until the program was replaced by a court-supervised settlement in 2012.

Feinberg said Gulf Coast town halls after the spill were tense. People were angry at the seemingly endless oil washing ashore, at payments that were too small or moving too slow, he said.

But he noted in 18 months the Gulf Coast Claims Facility had paid out $6.5 billion and processed 1.2 million claims.

Feinberg said he was personally surprised when BP agreed to front $20 billion for oil spill victim payments. The number was almost beyond comprehension, he said.

"It was (done with) a handshake, no law," Feinberg said. "A handshake with the White House and the Department of Justice."

> Listen to Feinberg talk about his initial reaction to the BP oil spill fund.

Five years after the oil spill, Feinberg doubts the American public will ever see a compensation fund on that scale again.

"It was an unconventional response to a unique catastrophe," Feinberg said. "Maybe we'll see that again. But $20 billion? I mean that is summa cum laude. I had never seen anything like that."

**LATEST NEW ORLEANS BUSINESS NEWS**

Meet the 10 highest-paid corporate board members in Louisiana

Blind Louisiana man sues McDonald's over car-only drive-thru policy

Inc. magazine profiles multimillionaire tech executive who drives for Uber

See inside the Bywater's trendy new shared workspace

$1M fire damage to Zydeco's restaurant in Boutte; lightning strike suspected

**All Stories**

BP says the 2010 oil disaster has cost it $37.1 billion so far, including $13.9 billion in payments to individuals, businesses and local, state and federal government. As of mid-2013, BP had allocated nearly all of the $20 billion it agreed to set aside in June 2010.

**Listen to Feinberg talk about his time overseeing oil spill payments.**

Registration on or use of this site constitutes acceptance of our **User Agreement** and **Privacy Policy**

© 2016 NOLA Media Group. All rights reserved (**About Us**).

The material on this site may not be reproduced, distributed, transmitted, cached or otherwise used, except with the prior written permission of NOLA Media Group.

**Community Rules** apply to all content you upload or otherwise submit to this site. **Contact interactivity management.**

▷ **Ad Choices**

# BP's Gulf Oil Spill Was 'Less of an Environmental Disaster' Than Media Portrayed

Scott Gamm

Apr 20, 2015 1:13 PM EDT

NEW YORK (**TheStreet**) -- **Five years after** BP's (**BP**) Deepwater Horizon rig exploded, some scientists remain skeptical over just how much damage the oil spill caused.

On April 20, 2010, BP's Macondo oil rig in the Gulf of Mexico, leased from from Transocean (**RIG**), exploded and sent millions of barrels of oil into the Gulf over about three months.

According to the government's 2011 On Scene Coordinator Report, 4.9 million barrels were discharged. After technical arguments from the government and BP, a federal judge ruled in **January** that only 4 million barrels were released and is holding the company responsible for 3.19 million barrels.

BP spokesperson Robert Wine said roughly 800,000 barrels were captured by vessels from the well head and did not enter the sea.

"[**The spill**] was nowhere near as large as the news [media] made it to be, but in certain targeted areas, there was an impact," said Curtis Richardson, professor & director of the Duke University Wetlands Center. "The vast majority of impact would have been in the deeper water and also on the bottom of the Gulf itself, so this oil spill, although massive, was so far out that only a portion of the marshes were hit."

The spill occurred about 42 miles **from** Louisiana shores.

Scientists say the warm weather and bacteria in the Gulf helped break down the oil. That contrasts with oil spilled during the 1989 Exxon Valdez spill, where an oil tanker collided with a reef, sending 257,000 **barrels** of crude oil into Alaska's frigid Prince William Sound. Those cleanup efforts took six months, the government **said**.

"The Exxon Valdez spill hit a lot more shoreline," Richardson said. "With the cold temperatures and [since the oil hit] directly onto the massive fisheries that were there, it had a greater impact than the Gulf one, which was so far offshore," Richardson said.

The Gulf waters are accustomed to oil. Roughly 1.4 million barrels of oil leaks naturally into the Gulf from the ocean floor each year, according to the National Research Council. "These seeps have probably been occurring for millions of years," said Ronald Tjeerdema, associate dean for environmental sciences, college of agriculture & environmental sciences at UC Davis. "It's part of the natural environment."

The natural seeps provide context to the BP tragedy.

"It was much less of an environmental disaster than the media would like to have made of it," said Tjeerdema. "The oil was dispersed and what did come from the surface was degraded rapidly by sunlight and various [microbes.]"

If that's the case, did the government overreact to the spill?

Some 26 state and federal agencies and 200 people were **involved** in the government's response, including the Department of Defense, the Centers for Disease Control and NASA.

The day after the explosion, five federal agencies, along with state officials, created the Regional Response Team (RRT), a comprehensive plan to remedy the damage from the rig. On April 22, 2010, 48 hours after the explosion, the RRT went into effect, restricting air space over the region and adding chemical dispersants to the water to help break down the oil. A staggering 9,000 vessels were used during cleanup. These details were chronicled in a 250-page government **report**.

The BP spill came just about five years after Hurricane Katrina devastated the Gulf coast. The federal government was criticized for not responding fast enough to that storm, especially the Federal Emergency Management Agency, or FEMA, which **reportedly** took days to send help.

"Following Hurricane Katrina five years earlier, [the spill] was a devastating blow not only to the economy of the Gulf Coast, but the fisherman and everyone else who were out of work for so long," said Thad Allen, a former U.S. Coast Guard Admiral who served as National Incident Commander for the BP oil spill. "People suffered and we have to be mindful of that. Any kind of emotion attached to [the spill] was well justified."

BP agreed to setup a victim compensation fund totaling over $20 billion that was initially headed up by attorney Ken Feinberg, founder & managing partner of the Washington D.C.-based firm Feinberg Rozen LLP, which handled payouts for victims of 9/11.

During Feinberg's 16-month tenure, 220,000 people were paid about $6.5 billion, resolving about 92% of the eligible claims. Another $5 billion has been paid out since June 2012, according to an April 15 news release from Patrick Juneau, the current Deepwater Horizon property and economic damage settlement claims administrator.

But some of the claims were far-etched. Feinberg received 1.2 million claims from 50 states and 35 foreign countries. "Anytime you announce a generous compensation program, rest assured people will file claims from all over the world. We had 18,000 suspicious claims," he added.

Five years later, the question of compensation remains unresolved.

"There has been a lot of litigation subsequent to my departure [in February 2012]," Feinberg said. "It mustn't overshadow, five years later, the success of the Gulf Coast claims facility in doing what it was assigned to do. I think it's a model for next time."

The program has received 306,000 claims over the past year. The window for submitting a claim closes on June 8.

Aside from the legal fallout, scientists say the region is beginning to show signs of a comeback.

"A lot of the areas [in the region] are starting to show recovery due to the bacteria and fungi, which has helped to break down the oil," Richardson said. "Some of the marshes that were hit by oil are starting to grow back."

Amid the five year anniversary of the spill, BP has been airing national **television commercials**, shedding light on how the company has changed since the tragedy.