## UNITED STATES DISTRICT COURT
## EASTERN DISTRICT OF LOUISIANA

| | |
|---|---|
| **In re: Oil Spill by the Oil Rig "Deepwater Horizon" in the Gulf of Mexico, on April 20, 2010** | **MDL No. 2179** |
| | **SECTION: J** |
| This Document Relates to: | |
| **ALL CASES** | **JUDGE BARBIER** |
| (including, particularly, Nos. 12-968 and 12-970) | **MAGISTRATE SHUSHAN** |

## PETITION FOR REIMBURSEMENT OF EXPENSES AND COLLECTIVE COMMON BENEFIT FEE AWARD

## Introduction

Co-Liaison Counsel, the Plaintiff Steering Committee members, and eighty-eight additional Common Benefit Law Firms have, since April 20, 2010, dedicated over 527,000 hours and approximately $45 million to the common and collective benefits of plaintiffs in MDL No. 2179 and other persons, businesses, and governmental entities affected by the Macondo / *Deepwater Horizon* disaster, contributing to a total of over $25 billion in recoveries to date – including an estimated $10 to $13 billion in benefits to the members of the BP Economic and Medical Settlement Classes.

Pursuant to the BP Class Settlements, the BP Defendants agree to pay, upon the occurrence of the Effective Date of the Economic & Property Damages Settlement, up to six hundred million dollars in common benefit expenses and attorneys fees, as may be approved and awarded by the Court.[1]   The Effective Date of the BP Economic Settlement occurred on December 8, 2014,[2] when the U.S. Supreme Court denied cert.[3]

The present Fee Petition is therefore respectfully submitted, in accordance with Paragraph 18 of Pre-Trial Order No. 59,[4] for the approval of the $600 million Common Benefit Cost and Fee Award that BP agreed to pay, consisting of:

- $37,597,151.98 in Shared Expenses, which have already been paid to third-party service providers and/or reimbursed to Common Benefit Attorneys, pursuant to previous Court Order;[5]

---

[1] *See* BP ECONOMIC SETTLEMENT AGREEMENT, Exhibit 27 [Rec. Doc. 6276-46], ¶¶ 2 and 4(e); (*see also* BP MEDICAL SETTLEMENT AGREEMENT, Exhibit 19 [Rec. Doc. 6273-21], ¶¶ 2 and 4(e)).

[2] *See* BP ECONOMIC AGREEMENT [Rec. Doc. 6276-1], Section 38.60.

[3] *See* BP Exploration & Production Inc. v. Lake Eugenie Land & Development, Inc., 135 S.Ct. 754 (2014).

[4] Rec. Doc. 14863. (*See also* Rec. Doc. 18641, ¶a.)

[5] *See* Rec. Docs. 8607, 9520, 10796, 11796, 12664, 13342, 13677, 14432, 15644, and 15916.  (This $37,597,151.98 figure includes $1.8 million in current unreimbursed assessments advanced by the Co-Liaison and PSC firms for Shared Expenses which have been and/or are expected to be incurred in accordance with Pre-Trial Order No. 9.)

- Up to $7,187,698.30 in claimed Held Expenses, which have been submitted to Mr. Garrett and the Fee Committee pursuant to Pre-Trial Order No. 9, (as amended), and Pre-Trial Order No. 59; and,

- The remainder of the BP Class Settlements Common Benefit Cost and Fee Award amount, of approximately $555.2 million, to Class Counsel and other Common Benefit Attorneys collectively, for work performed to advance the common and collective interests of the BP Economic Class and the BP Medical Class.

This petition is made pursuant the terms of the Agreements with BP, in light of the District Court's inherent authority to award and to regulate reasonable attorneys' fees in complex cases,[6] and to approve class counsel fees under Federal Rule of Civil Procedure 23(h).

The litigation from which these class action settlements emanate is one of the largest and most complex in history. With just over a year from the formation of the MDL to complete all discovery and otherwise prepare for a massive two-phase comprehensive liability trial, dozens of Common Benefit Attorneys essentially gave up their entire practices to live and work in New Orleans on exclusively the *Deepwater Horizon* Litigation from (at least) the end of 2010 through (at least) the end of the Phase One Trial in April of 2013, and in many cases through the end of the Phase Two Trial in October of 2013, (and beyond). Completing over 300 depositions in just a few months, petitioners were called upon to navigate a complicated and largely untested landscape of competing federal statutory frameworks, potential state law applications, common, environmental and maritime law – not only preparing and defending master pleadings, but also developing and funding a novel court-approved notice program, which allowed over 130,000 businesses, individuals, and local government entities, to file short-form joinders prior to the monition date. In addition to preparing the liability case and managing other legal and administrative matters for these litigants, the PSC and other Common Benefit Attorneys worked

---

[6] *See, e.g.,* ORDER (June 15, 2012) [Rec. Doc. 6684]; *citing,* In re Vioxx, 650 F.Supp.2d 549 (E.D.La. 2009).

closely with the U.S. Government and the States, while also protecting *pro se* and other claimants who were attempting to pursue claims in BP's Gulf Coast Claims Facility (GCCF) and other OPA claims processes.

The landmark settlements themselves were and are uniquely beneficial and complex, providing a wide range of uncapped benefits to broad groups of litigants and other classmembers, under objective and transparent frameworks, with total payouts that are projected to be among the largest, if not the largest, in history.  Indeed, the settlements turned out to be so favorable that Class Counsel and other Common Benefit Attorneys were then called upon to defend them against an unprecedented string of attacks that could not have possibly been foreseen at the time of the Fee Agreement with BP.  Nor did the PSC and other Common Benefit Attorneys shirk from their responsibilities to try the case on liability, to ensure that the settlements were appropriately implemented by the Claims Administrators and Program Vendors, and to assist thousands of attorneys and *pro se* claimants with the submission, support, and appeal of Settlement Program Claims.

The approximate $555.2 million fee award requested herein is only 6.59% of the total benefits paid under the BP Class Settlements to date,[7] and only 4.25% of the total estimated payouts under the two settlements.[8]

---

[7] *See* STATISTICS FOR *DEEPWATER HORIZON* ECONOMIC & PROPERTY DAMAGES SETTLEMENT (May 24, 2016) at p.3 [submitted herewith as Exhibit 11]; ORDER (Sept. 22, 2014) [Rec. Doc. 13424]; ECON. SETTLEMENT AGREEMENT, Section 5.13; HERMAN-ROY DECLARATION (July 14, 2016) [submitted herewith as Exhibit 1] at ¶¶58-60, 67.

[8] BP's Initial estimate, upon which the final settlement approvals were based, was $7.8 billion for both the Economic and Medical Classes together.  The Seafood Claimants' estimates of $10.7 - $12.1 billion and Judge Wilkinson's estimate of $10.825 billion appear to be based solely on projected Economic Claims payouts, and do not seem to include Seafood & Tourism Promotional Grants, TO Insurance Proceeds, the value of the Assigned Claims, Medical Settlement Benefits, Administrative Costs, or Common Benefit Litigation Expenses or Fees.  BP currently estimates that the Economic Settlement is likely to be "significantly higher than" $12.9 billion. *See generally* BP FIRST QUARTER 2016 RESULTS (April 26, 2016) [submitted herewith as Exhibit 12]; ALLOCATION AND REASONS [Rec. Doc. 15652] (Dec. 11, 2015) pp.14-16; KLONOFF DECLARATION [Rec. Doc. 7104-3] (Aug. 13, 2012) p.40 ¶94.  The Medical Claims Administrator estimates an additional $170.3 million in total medical benefits paid. *See* HERMAN-ROY DECLARATION, ¶67.



The relief provided under the BP Class Settlements has already been fully and finally approved as "fair, reasonable, and adequate"[9] to the members of each class,[10] and the BP Defendants have agreed not to contest or oppose the requested approval and award of common benefit cost reimbursements and/or fees in the amounts sought herein.[11]

For these reasons, and for the reasons further outlined below, petitioners' Fee Petition should be granted.

---

[9] Fed. Rule Civ. Pro. 23(e).

[10] *See* In re Deepwater Horizon, 910 F.Supp.2d 891 (E.D.La. 2012), *aff'd,* 739 F.3d 790 (5th Cir. 2014) ("*Deepwater Horizon II*"), *rehearing en banc denied,* 756 F.3d 320 (5th Cir. 2014), *cert. denied,* 135 S.Ct. 754 (2014) (fully and finally approving Economic & Property Damages Class Settlement), *and,* In re Deepwater Horizon, 295 F.R.D. 112 (E.D.La. 2013) (fully and finally approving Medical Benefits Class Settlement) (appeal dismissed).

[11] *See* BP ECONOMIC AGREEMENT, Exhibit 27, ¶¶ 2 and 6(d);  (*see also* BP MEDICAL AGREEMENT, Exhibit 19, ¶¶ 2 and 6(d)).

**Table of Contents**

Introduction . . . . . . . . . 2

Table of Contents . . . . . . . . . 6

Summary of Key Features and Challenges to the Litigation . . . . 8

Factual and Procedural Background and Overview of Common Benefit Efforts . 11

    Efforts Undertaken Prior to the Establishment of the MDL . . . 11

    Establishment of the MDL thru December 2011 . . . . 14

        Initial Structure and Organization . . . . 14

        "War Room" / Document Depository . . . . 21

        Master Pleadings and Briefing . . . . 24

        Short Form Joinders and Notice of Monition Date . . . 25

        Phase One and Two Liability Trial Prep and Discovery . . 26

        Scientific, Environmental and Economic Development . . 30

        Motion to Enjoin and/or Supervise the GCCF . . . 33

    The Initial Establishment of a Hold-Back on Settlements . . . 34

    The BP Economic Settlement, and Approval . . . . 40

    The Medical Benefits Settlement, and Approval . . . . 48

    Post-Settlement Implementation, Assistance to Classmembers, and Dispute . 53

        Assistance to Classmembers . . . . 53

        The "Matching" / BEL Dispute . . . . 56

        BP's Attacks on the Economic Settlement . . . 58

        BP's Dispute over the Medical Indemnity Agreement . . 61

        The Chronic SPC Dispute . . . . 61

Development of the BELO Case-Management Order . . 62

Individual U.S. Fifth Circuit Claims Appeals . . . 63

The Phase One and Phase Two Liability Trials and Appeals . . . 63

The Phase Three Trial . . . . . . . . 70

The Halliburton and Transocean Settlements . . . . . 71

The Government Settlements . . . . . . . 72

The OPA Test Cases . . . . . . . . 73

Other Common Benefit Efforts . . . . . . 75

The Fee Committee Review Process under Pre-Trial Order No. 59 . . . 76

The U.S. Fifth Circuit Has Endorsed a Percentage-of-Benefit Method for Awarding
Common Benefit Fees, with a "Lodestar" Crosscheck . . . 78

The Fee that BP Agreed to Pay is Reasonable under the Percentage-of-Benefit Method 86

The Value of the Benefits to the BP Classes Is Likely to Exceed $13 Billion 88

The Requested Fee Falls Well Within the "Benchmark Percentage" . . 96

The Fee is Further Reasonable when Viewed within the Context
of the Entire Litigation . . . . . . . 102

The Fee is Also Supported by an Hourly "Lodestar" Cross-Check . . . 104

List of Exhibits . . . . . . . . . 124

Conclusion . . . . . . . . . 126

Certificate of Service . . . . . . . . 141

<u>**Summary of Key Features and Challenges to the Litigation**</u>

As outlined and discussed more fully herein, the instant litigation presented a number of significant challenges and hurdles to the Court-appointed PSC and other Common Benefit Attorneys, who developed several unique strategies and approaches to case management, negotiating strategy, and the litigation.   Included among these challenges and features, for example, were:

- **Size and scope.**  The *Deepwater Horizon* MDL would appear to be one of the largest, if not the largest, MDLs in history.  In addition to the 130,000-plus formal civil actions and/or claims-in-limitation filed by private businesses, individuals and local government entities, the litigation also included claims for penalties under state law, and a smattering of privately instituted environmental, injunctive and regulatory claims.  In addition to these formal civil actions and claims-in-limitation, there were hundreds of thousands of additional claimants in BP's former GCCF, and hundreds of thousands of additional class members who brought claims in the Economic and/or Medical Benefits Settlement Programs.   Finally, the United States and the States of Alabama, Mississippi, Louisiana, Texas, and Florida asserted various actions, assessments and/or claims for various different damages and penalties, with which the PSC and Common Benefit Attorneys were called upon to coordinate, collaborate, account for, defer to, respond to, assist with, and/or otherwise accommodate, at various different levels, in a number of different ways.

- **Complexity.**  The actions and claims relating to the *Deepwater Horizon* Incident stood at the center of three Federal Statutory frameworks – the Oil Pollution Act, the Clean Water Act, and the Outer-Continental Shelf Lands Act – as well as the MMS, U.S. Coast Guard, and EPA Regulatory frameworks, the general maritime law, and the civil penalty, criminal penalty, environmental, property, and punitive damage statutes and caselaw of Louisiana, Mississippi, Alabama, Florida and Texas.  Many features of the Oil Pollution Act itself were largely unsettled, and resulted in substantial confusion regarding presentment, causation, displacement, claims against the Oil Spill Trust Fund, and the force and effect of Coast Guard decisions and/or regulations.  The PSC was required to stay abreast of the insurance/indemnity/contribution disputes between and among Transocean, Halliburton and BP;  the "divisibility" and subsurface discharge arguments raised by BP and Anadarko;  the *Hornbeck* and *ENSCO* actions brought under the Administrative Procedures Act;  Transocean's jurisdictional dispute with the Chemical Safety Board;  and the securities actions being litigated in MDL No. 2185.  Common Benefit

Attorneys were also responsible for claims that were initially brought under the Endangered Species Act, the Emergency Planning and Community Right to Know Act, and CERCLA.

- **Sacrifice by Common Benefit Attorneys.** Because of the accelerated trial schedule, the PSC made the decision that Common Benefit Attorneys associated with the trial effort (and other major roles) would not be able to work remotely, (as is prevalent in these types of efforts today), but would be required to focus their full attentions on the *Deepwater Horizon* effort, working together, in New Orleans, from a full-scale "War Room" / Depository. Accordingly, many PSC members and other Common Benefit Attorneys were forced to essentially give up their entire practices, move to New Orleans, and live and work full-time on the BP Oil Spill Litigation. These lawyers spent days and weeks away from their homes and families, and years away from their law practices. This was particularly disruptive to solo practitioners, members of small law firms, and other "rainmakers", who were not only diverted from existing matters, but were also unable to get involved in new projects, develop business, or take advantage of additional opportunities. This structure was not only demanding on the attorneys involved, but was also advantageous to the plaintiffs, due to the high level of collaboration and synergy.

- **Organizational and Communications Challenges.** While the provisions of OPA requiring BP as the Responsible Party to establish an interim claims process were undoubtedly beneficial to many of the affected parties, from a litigation standpoint, the GCCF and BP's other OPA claims processes presented considerable challenges to those attorneys who were responsible for conducting the litigation. Numerous plaintiffs and attorneys who would have otherwise filed suit and joined in the litigation, instead devoted their efforts to the extra-judicial claims processes, diverting resources from the common effort, and creating a significant disconnect from, ignorance of, or confusion regarding the status and requirements of the litigation. Many *pro se* litigants, and even several attorneys, were confused about the distinctions – and the potential presentment, statute of limitations, claims filing deadline, scope and effect of releases, and other substantive and procedural risks and pitfalls – between and among the initial BP OPA Claims Process, the GCCF, the Transocean Limitation Action, other civil actions in the MDL, BP Medical Settlement Program Claims, BP Economic Settlement Program Claims, Claims with the U.S. Coast Guard against the Oil Spill Trust Fund, and the post-settlement BP OPA Claims Process. Common Benefit Attorneys spent a significant amount of time and money on the Notice and Short-Form Joinder program, as well as other mass communications; the action against Mr. Feinberg to enjoin potentially misleading or confusing communications; responses to questions from claimants, attorneys, and

other claims preparers;  the Supplemental Notice Program;  and other assistance, particularly to *pro ses*.

- **Trial Effort and Strategy.**  Despite the settlements, Common Benefit Attorneys engaged in a massive thirteen week two-phase trial effort on behalf of the Economic Class in pursuit of the assigned claims against Halliburton and Transocean, and with respect to the Expressly Reserved Claims of individual Economic and Medical Classmembers.  Yet prior to the Class Settlements, (and contributing, we believe, to their level of success), the insistence, at the outset, of a two-fault allocation maximized the liability of BP with respect to the economic and environmental damages, and allowed the plaintiffs to align themselves with Halliburton and Transocean, which placed even more pressure on BP.  Indeed, undersigned counsel cannot think of another case of this size and nature in which the plaintiffs and some of the defendants sat together at counsel table, as formally Aligned Parties, sharing expert witnesses and submitting joint proposed findings.  In addition, because the Phase Two conduct was, by definition, corporate conduct under the *P&L Boat Rentals* test, a focus on these issues effectively gave the plaintiffs a "second bite at the apple" on punitive damages.  At the same time, the PSC and its Trial Team shifted the Phase One focus to London- and Houston-based conduct, and worked closely with the U.S. and the States to ensure that "gross negligence" and "willful misconduct" was established, thereby placing the maximum amount of litigation pressure on BP.

- **The Settlements Themselves Are Exceptional and Unique.**  As established in the voluminous record and findings on settlement approval, these settlements are, in terms of both their value and their structure, both exceptional and unique.  First and foremost, they are uncapped, providing the classmembers with full compensation for their losses, and in most cases an additional punitive and/or future risk factor.  The Seafood Compensation Fund was, as predicted, more than sufficient to provide the Seafood Program Claimants with full compensation (including RTPs), resulting in a billion additional dollars in distributions to the eligible classmembers.  As to the other claims categories, each class member has or will receive full compensation, irrespective of what any other classmember may or may not receive, and without having to pay any common benefit fees or expenses.  Secondly, the Economic Class Settlement was unique because it allowed claims to be processed and paid beginning in June of 2012, in advance and irrespective of the December 2014 Effective Date.  Both class settlements, moreover, provided significant and beneficial grants to help the entire region rebound economically from the spill and to help build an infrastructure for the better delivery of healthcare to the affected communities.  Finally, in terms of overall value to individual classmembers, the settlements have already

exceeded BP's initial estimates, and are projected to provide the largest
class action payouts in American civil justice history.

- **Unprecedented Level of Post-Settlement Implementation and
Litigation.**  In some class settlements, class counsel are largely discharged
of their responsibilities once the settlement is approved.  In this case, by
contrast, there was an unprecedented level of post-settlement common
benefit effort.  First, Class Counsel devoted numerous hours working with
the Claims Administrators, the Program Vendors, the Special Master, the
Court, and BP, on administrative and interpretive implementation issues.
Second, Class Counsel devoted considerable time, money and effort to the
education and assistance of *pro se* claimants, claims preparers, and other
plaintiffs' attorneys, in submitting and prosecuting settlement program
claims and appeals.  Finally, Class Counsel were called upon to respond to
an unprecedented level of attacks and attempts by BP to back out of the
settlement agreements.   Common Benefit Attorneys devoted countless
hours and considerable expense in responding to motions, injunctions,
appeals, and petitions for certiorari filed by BP, which could not have been
contemplated when the Fee Agreement was negotiated and signed in April
of 2012.

For these reasons, and for the reasons stated below, we respectfully suggest and request
that the Court approve the entire $600 million in common benefit fees and expense
reimbursements to which BP has fully and formally agreed.

### FACTUAL AND PROCEDURAL BACKGROUND
### AND OVERVIEW OF COMMON BENEFIT EFFORTS

Shortly after the spill, various law firms who would eventually become Liaison Counsel,
PSC members, Class Counsel, and other Common Benefit Attorneys, were contacted by existing
clients and others seeking assistance and advice in connection with the Macondo / *Deepwater
Horizon* explosions, fire, sinking, and resulting spill.  Realizing that the effects of this disaster
were likely to be far-reaching and long-lasting, these attorneys, from the beginning, started to
coordinate with one another, and to take actions, not only for the protection of their own
individual clients, but with an eye towards the advancement and protection of the common and
collective interests of others who were likely to become prospective claimants or litigants at
some point in time.

These lawyers monitored, attended, shared information and strategy regarding, and actively participated in:

- The Transocean Limitation Action, originally filed in the United States District Court for the Southern District of Texas,[12] and ultimately transferred, under Rule F(9), on motion of Common Benefit Attorneys, to the Eastern District of Louisiana,[13] where it could be tried as an original action, and consolidated with the MDL.[14]

- The Joint Investigation Team (JIT) / Marine Board of Investigation (MBI) hearings and other proceedings conducted by the U.S. Coast Guard and the Minerals Management Services (MMS) (later the Bureau of Ocean Management, Regulation and Enforcement (BOEMRE)).

- The La. Department of Environmental Quality Investigation.[15]

- The proceedings before the Judicial Panel on Multi-District Litigation (MDL Panel) (JPML).

- The securities-related actions that would eventually be transferred to and coordinated in the Southern District of Texas as MDL No. 2185.

- The *Hornbeck Offshore vs. Salazar* litigation.[16]

- The consolidated actions in Section J of the United States District Court for the Eastern District of Louisiana.

Working together, the lawyers developed a formal Limited Joint-Prosecution Agreement (JPA) to facilitate the coordination and sharing of information, research, and litigation strategy. They, among other things, provided advice and assistance to participants in the Vessel of Opportunity (VoO) program, secured important contractual concessions from BP, and attempted to ensure that such commitments would be formalized and extended to all potential VoO

---

[12] No. 4:10-cv-01721.

[13] No. 10-2771.

[14] Rec. Doc. 62.

[15] Enforcement Tracking Nos. 10-00823 and 10-00825, and Agency Interest No. 170547.

[16] No. 10–1663 (E.D.La. filed June 7, 2010).

participants.[17]   Such attorneys also took efforts to ensure that clean-up workers were being properly protected from hydrocarbons and potentially dangerous dispersants.[18]   The attorneys moved for the immediate and ongoing preservation of documents and physical evidence, and coordinated preliminary environmental sampling and testing in waters, beaches and wetlands along the Gulf Coast, and secured a shared sample of Macondo Oil from BP, for future fingerprinting purposes.[19]   The attorneys conducted, and shared, preliminary legal research, took efforts to ensure that BP's claims process conformed to OPA statutory requirements, including statutory damages cap and presentment issues, and worked in a coordinated way with Mr. Feinberg to attempt to secure fair and reasonable protocols in the Gulf Coast Claims Facility (GCCF).[20]   In addition to the coordinated submissions that were made to the MDL Panel,[21] these attorneys also responded to the motion and petition for mandamus seeking recusal.[22]   In the consolidated Eastern District of Louisiana proceedings, Interim Co-Liaison Counsel were appointed to work with Defense Counsel, Counsel for the U.S., and the Court, on initial preservation of physical evidence issues, as well as other organizational and administrative

---

[17] *See, e.g.,* LTR. FROM J. KLICK TO BP COUNSEL (May 2, 2010); LTR. FROM BP COUNSEL TO J. KLICK (May 3, 2010); CONSENT JUDGMENT, No. 10-1316, Rec. Doc. 6 (May 4, 2010).

[18] *See, e.g.,* TRANSCRIPT (June 4, 2010), pp.45-50 [No.10-1222, Rec. Doc. 108]; MINUTE ENTRY (June 4, 2010) [No.10-1156, Rec. Doc. 100]; BP LTR. RE WORKPLACE SAFETY (June 15, 2010) [No. 10-1156, Rec. Doc. 127-7]; TRANSCRIPT (June 17, 2010), pp.41-46 [Nos.10-1222, et al]; STIPULATION RE WORKER SAFETY (June 22, 2010) [No.10-1156, Rec. Doc. 138]; BP LTR. RE SAFETY-RELATED DOCUMENTS (June 29, 2010) [No. 10-1156, Rec. Doc. 223-1]; LTR. FROM INTERIM LIAISON COUNSEL RE ENVIRONMENTAL AND SAFETY ISSUES (July 3, 2010) [No.10-1156, Rec. Doc. 223-2].

[19] *See, e.g.,* PRESERVATION ORDER (May 5, 2010) [No.10-1229, Rec. Doc. 13]; TRANSCRIPT (May 25, 2010) [No.10-1156, Rec. Doc. 75]; TRANSCRIPT (June 17, 2010), pp.46-47 [Nos.10-1222, et al]; LTR. FROM INTERIM LIAISON COUNSEL CONFIRMING AGREEMENT RE OIL SAMPLES (July 3, 2010) [No.10-1156, Rec. Doc. 223-3]; MOTION TO COLLECT AND PRESERVE OIL SAMPLES (and Exhibits thereto) (July 22, 2010) [No. 10-1156, Rec. Doc. 358].

[20] MOTION FOR COURT SUPERVISION OF CLAIMS PROCESS (May 20, 2010) [No.10-1222, Rec. Doc. 26]; JOINDER IN MOTION FOR COURT SUPERVISION (and Exhibits thereto) (May 21, 2010) [No.10-1234, Rec. Doc. 45]; TRANSCRIPT (June 4, 2010), pp.70-78 [No.10-1222, Rec. Doc. 108]; EXHIBIT FROM BP WEBSITE (June 14, 2010) [No. 10-1156, Rec. Doc. 127-6]; TRANSCRIPT (June 17, 2010), pp.37-41 [Nos.10-1222, et al]; LTR. FROM INTERIM LIAISON COUNSEL TO BP COUNSEL RE NEW TRUST AND CLAIMS FACILITY (July 3, 2010) [No.10-1156, Rec. Doc. 223-4]; MOTION TO COMPEL (and Exhibits thereto) (July 20, 2010) [No.10-1156, Rec. Doc. 329].

[21] *See, e.g.,* Rec. Docs. 27, 165 and 205, filed in MDL No. 2179 (J.P.M.L.).

[22] Fifth Cir. No. 10-30631 (Opposition filed July 19, 2010).

issues, to provide structure and management to the litigation.[23]

## Establishment of the MDL thru December 2011

The MDL Panel transferred the litigation to the Eastern District of Louisiana on August 10, 2010.[24]   A pre-trial order setting the Initial Scheduling Conference was issued,[25] and Co-Liaison Counsel for the Plaintiffs were appointed.[26]   Even prior to the formal appointment of the Plaintiff Steering Committee (PSC), Liaison Counsel collected joint-prosecution agreements and contact information from numerous plaintiffs' attorneys, and started to develop e-mail group service lists, which were constantly tracked, supplemented, and updated.   The firms established and organized all file materials, including pleadings, discovery, correspondence, administrative, and *pro se* materials, both in paper and electronically.   Liaison Counsel secured office space for a Document Depository / "War Room" and began the process of arranging for IT services and full-time personnel.   There were several large meetings between and among Common Benefit Attorneys, who shared information and strategy, and provisional common benefit projects were commenced.

---

[23] *See generally, e.g.,* Transcript (June 4, 2010) (Status Conference) [No.10-1222, Rec. Doc. 108]; Minute Entry (June 4, 2010) [No.10-1156, Rec. Doc. 100]; Minute Entry (June 7, 2010) [No.10-1156, Rec. Doc. 115]; Ltr. Agreement Among Interim Liaison Counsel for Initial BP Document Depository (June 11, 2010) [No.10-1156, Rec. Doc. 277-1]; Interim Status Report (June 14, 2010) [No.10-1234, Rec. Doc. 175]; Status Report (and Exhibits thereto) (June 16, 2010) [No. 10-1156, Rec. Doc. 127]; Transcript (June 17, 2010) (Status Conference) [Nos.10-1222, et al]; Minute Entry (June 17, 2010) [No.10-1156, Rec. Doc. 136]; Order (June 21, 2010) (Preservation Order re Kinked Riser Section) [No.10-1324, Rec. Doc. 180]; Interim Case Management Order (June 21, 2010) [No.10-1156, Rec. Doc. 134]; Amended CMO No. 1 (June 25, 2010) [No.10-1156, Rec. Doc. 141]; Plaintiffs Proposed Interim Protective Order (June 30, 2010) [No.10-1156, Rec. Doc. 148]; Minute Entry (July 2, 2010) [No.10-1156, Rec. Doc. 232]; Status Report (and Exhibits thereto) (July 7, 2010) [No.10-1156, Rec. Doc. 223]; Minute Entry (July 7, 2010) [No.10-1156, Rec. Doc. 331]; Protective Order (July 12, 2010) [No.10-1156, Rec. Doc. 269]; Transcript (July 27, 2010) (Hearing on Mot. for Preservation of Evidence) [Nos.10-1156, et al]; Minute Entry (July 27, 2010) [No.10-1156, Rec. Doc. 442]; Transcript (Sept. 3, 2010) (Hearing on Mot. for Protective Order re BOP) [No. 10-1222, et al].

[24] Rec. Doc. 1.

[25] Pre-Trial Order No. 1 [Rec. Doc. 2] (Aug. 10, 2010).

[26] Pre-Trial Order No. 6 [Rec. Doc. 110] (Aug. 27, 2010).

Liaison Counsel and other Common Benefit Attorneys continued to work with Defense Counsel, Counsel for the U.S. and the States, and the Court, to resolve initial evidence preservation issues, filing and service issues, and OPA-related issues, and to otherwise lay the foundations for what would become the essential administrative and procedural frameworks for the litigation,[27] including:  the duties and responsibilities of the PSC (Pre-Trial Order No. 8),[28] the submission of common benefit hours and expenses (Pre-Trial Order No. 9),[29] the initial Case-Management Order (Pre-Trial Order No. 11),[30] the establishment of a mechanism for formal service *via* Lexis-Nexis File & Serve (LNFS) (Pre-Trial Order No. 12),[31] a confidentiality order (Pre-Trial Order No. 13),[32] an order regarding privilege (Pre-Trial Order No. 14),[33] electronic data and document production (Pre-Trial Order No. 16),[34] the development of the deposition guidelines (Pre-Trial Order No. 17),[35] stipulations regarding expert discovery (Pre-Trial Order No. 18),[36] and location of BP employee depositions (Pre-Trial Order No. 21).[37]

---

[27] *See, e.g.,* Rec. Doc. 66 (Extension of Deadlines to Effectuate Service); Rec. Doc. 80 (Interim Status Report); Aug. 20, 2010 Transcript (re "Fishing Expedition"); Rec. Docs. 99, 107, 109, 125, 167 and Sept. 3, 2010 Transcript (re BOP Removal, Transfer, Storage and Preservation); Rec. Doc. 211 (re Subpoenas: Samples and Testing); Rec. Docs. 215, 230, 444, 474 (re Proposed CMO); Rec. Doc. 312 (re Sept. 16, 2010 Status Conf); and Rec. Doc. 463 (Omnibus Discovery Requests).  *See also, e.g.,* Rec. Doc. 509 (Omnibus Discovery Requests); Rec. Doc. 523 (Proposed Agenda for Oct. 15, 2010 Status Conf); Rec. Docs. 559, 587, 594, 631, 925 (re Presentment, GCCF, and Waiver of the Cap); Rec. Doc. 593 (re initial PTOs); Rec. Docs. 627, 642 (PPFs); and Rec. Doc. 741 (re Depo Protocol).

[28] Rec. Doc. 506.

[29] Rec. Doc. 508.

[30] Rec. Doc. 569.

[31] Rec. Doc. 600.

[32] Rec. Doc. 641.

[33] Rec. Doc. 655.

[34] Rec. Doc. 686.

[35] Rec. Doc. 740.

[36] Rec. Doc. 825.

[37] Rec. Doc. 942.

An experienced Certified Public Accountant (CPA) who had been previously appointed to track common benefit time and expenses in the *Vioxx* and *Chinese Drywall* MDLs,[38] Philip A. Garrett, Sr., was retained and appointed, and a bank account was opened to handle shared expenses. An attorney noted for his experience in legal ethics and professionalism, Basile J. Uddo, was retained as outside ethics counsel.

On October 8, 2010, the Court appointed the Plaintiffs Steering Committee and Executive Committee, charged collectively with the following tasks and responsibilities:

Discovery

(1)     Initiate, coordinate, and conduct all pretrial discovery on behalf of plaintiffs in all actions which are consolidated with the instant multi district litigation.

(2)     Develop and propose to the Court schedules for the commencement, execution, and completion of all discovery on behalf of all plaintiffs.

(3)     Cause to be issued in the name of all plaintiffs the necessary discovery requests, motions, and subpoenas pertaining to any witnesses and documents needed to properly prepare for the pretrial of relevant issues found in the pleadings of this litigation. Similar requests, notices, and subpoenas may be caused to be issued by the PSC upon written request by an individual attorney in order to assist him/her in the preparation of the pretrial stages of his/her client's particular claims.

(4)     Conduct all discovery in a coordinated and consolidated manner on behalf and for the benefit of all plaintiffs.

Hearings and Meetings

(1)     Call meetings of counsel for plaintiffs for any appropriate purpose, including coordinating responses to questions of other parties or of the Court. Initiate proposals, suggestions, schedules, or joint briefs, and any other appropriate matter(s) pertaining to pretrial proceedings.

---

[38] MDL No. 1657 and MDL No. 2047.

    (2)    Examine witnesses and introduce evidence at hearings on behalf of plaintiffs.

    (3)    Act as spokesman for all plaintiffs at pretrial proceedings and in response to any inquiries by the Court, subject of course to the right of any plaintiff's counsel to present non-repetitive individual or different positions.

Trial

    (1)    Coordinate trial team(s)'s selection, management and presentation of any common issue, "bellwether" and/or "test" case trial(s).

Miscellaneous

    (1)    Submit and argue any verbal or written motions presented to the Court or Magistrate on behalf of the PSC as well as oppose when necessary any motions submitted by the defendant or other parties which involve matters within the sphere of the responsibilities of the PSC.

    (2)    Negotiate and enter into stipulations with Defendants regarding this litigation. All stipulations entered into by the PSC, except for strictly administrative details such as scheduling, must be submitted for Court approval and will not be binding until the Court has ratified the stipulation. Any attorney not in agreement with a non-administrative stipulation shall file with the Court a written objection thereto within five (5) days after he/she knows or should have reasonably become aware of the stipulation. Failure to object within the term allowed shall be deemed a waiver and the stipulation will automatically be binding on that party.

    (3)    Explore, develop, and pursue all settlement options pertaining to any claim or portion thereof of any case filed in this litigation.

    (4)    Maintain adequate files of all pretrial matters, including establishing and maintaining a document or exhibit depository, in either real or virtual format, and having those documents available, under reasonable terms and conditions, for examination by all MDL Plaintiffs or their attorneys.

    (5)    Perform any task necessary and proper for the PSC to accomplish its responsibilities as defined by the Court's

> orders, including organizing subcommittees or workgroups comprised of plaintiffs' attorneys not on the PSC and assigning them tasks consistent with the duties of the PSC.
>
> (6)   Perform such other functions as may be expressly authorized by further orders of this Court.[39]

The Executive Committee and PSC enlisted the assistance of respected firms from around the Gulf and throughout the entire country who represented plaintiffs in the MDL and/or claimants in the GCCF process, and organized such Common Benefit Attorneys into Common Benefit Work Groups, including, initially:

**Administrative Work Groups**
Depository
Privilege
Electronic Discovery
Summaries
PR

**Legal Research & Writing Work Groups**
Maritime & Limitation Law & Briefing
Briefing (general)
Master Complaints (oversight)
B1 Master Complaint
RICO Work Group
B3 Master Complaint
Regulatory / Injunctive Work Group

**Written Discovery**
BP/MOEX/Anadarko
Transocean
Halliburton
M1-Swaco
Schlumberger
Weatherford
Cameron
Third Party

**Science, Environmental and Damages Work Groups**
Economic Models / Property Damages
Science & Experts
Sampling & Testing

---

[39] PRE-TRIAL ORDER NO. 8 [Rec. Doc. 506] (Oct. 8, 2010), pp.3-4.

Environmental Impact
Ecological Impact
Medical Monitoring

**Jurisdiction**
BP PLC
Mitsui
Triton

**Deposition and Trial Prep Teams**
Phase One Liability Depo Team
Phase One Liability Expert Teams (by expert)
Phase One Liability Depo Cut Team
Phase Two Liability Depo Team
Document Review Team

**Punitive Damages**
Corporate Culture & History

**Insurance**

**GCCF**
Outreach
Jurisdiction

These working groups were originally comprised of 45 formal Work Group Coordinators, (of whom 33 were from non-PSC firms), and 83 formal Work Group Members, (of whom 69 were from non-PSC firms), who devoted significant time, and incurred significant out-of-pocket expenses, to conduct the common benefit work essential to the prosecution of these MDL proceedings.

Pursuant to the Court's Order, each of these Common Benefit Attorneys were required to record time associated with their common benefit efforts contemporaneously, and to submit such time, along with any common benefit Held Expenses, to Mr. Garrett, who reviewed such time and expenses, under certain criteria, raising questions and rejecting unauthorized entries, on a

monthly basis.[40]   In addition, the PSC, Co-Liaison, and the other Common Benefit Attorneys advanced over thirty-seven million dollars ($37 million) in "assessments" for Shared Expenses, which were generally paid as incurred, in accordance with the provisions of Pre-Trial Order No. 9, out of a Common Benefit Shared Expense Account.[41]

Several additional Work Groups were established, and several additional Common Benefit Attorneys were enlisted, as the litigation progressed.

At the same time, Common Benefit Attorneys worked closely with counsel for the United States and other plaintiffs, including, particularly, Coordinating Counsel for the States and his staff.[42]

In addition to the formal Work Groups, outlined above, the PSC endeavored to reach out to all attorneys handling claims in the GCCF and/or actions in the MDL/Limitation, through various ListServes, CLE programs, and PSC-sponsored meetings to provide updates regarding the body of accumulated information regarding the environmental and economic issues, the GCCF process, liability issues, trial plan, and the progress of the litigation itself.

Among other things, the PSC organized meetings and calls to gather facts and to discuss issues and strategies between and among counsel prosecuting VoO contract claims, oyster claims, real property claims, and other types of claims being prosecuted by GCCF claimants, plaintiffs, and putative classmembers.

---

[40] *See* PRE-TRIAL ORDER NO. 9 [Rec. Doc. 508] (Oct. 8, 2010); (*see also* ORDER (amending PTO 9) [Rec. Doc. 1838] (April 1, 2011), and PRE-TRIAL ORDER NO. 56 (amending PTO 9) [Rec. Doc. 12542] (March 19, 2014)).

[41] Beginning in February of 2013, these Shared Expenses started to be reimbursed, per Court Order, out of the Common Benefit Cost and Fee Account that was established in connection with the BP Economic and Medical Class Settlements.  (Note that, in one or two cases, the Shared Expenses were not technically advanced by Common Benefit Attorneys out of the Shared Expense Account; rather, the bills were incurred by Common Benefit Attorneys, but the vendors were ultimately reimbursed out of the Common Benefit Cost and Fee Account directly.) *See generally*, Rec. Docs. 8607, 9520, 10796, 11796, 12664, 13342, 13677, 14432, 15644, and 15916.

[42] Indeed, the Alabama Attorney General and his staff themselves submitted Common Benefit Time with respect to their common benefit efforts, pursuant to PTO 9.

Subject to the confidentiality provisions of Pre-Trial Order No. 13, Common Benefit Attorneys made the master set of deposition exhibits available to plaintiffs' counsel *via* FTP Site. The PSC also established and maintained a website, for informational purposes, and made its Depository available to Coordinating Counsel for States and his staff, counsel for the United States, and counsel for the State of Louisiana.

*"War Room" / Document Depository*

The PSC unanimously decided at the outset to require document review and analysis, and other essential work, to be done in person, by lawyers, at the Depository, rather than remotely. Particularly given the ambitious deposition and trial schedule established by the Court, it was felt that this would be an important, if not necessary, step to enhance focus, to achieve certain efficiencies, and to gain the advantages of collaborative thought and other synergies.  For those Common Benefit Attorneys contributing to the effort, this decision, at the same time, also required additional levels of sacrifice, which not only pulled them away from their offices, but in many cases required them to effectively re-locate to New Orleans, for a number of months, if not years, at considerable expense, and keeping them away from their homes and families.  Such commitment and sacrifice were not limited to those attorneys responsible for the basic liability effort, but also extended to other Common Benefit Attorneys who worked day-in and day-out at the Depository on the environmental, economic, and other issues, including, ultimately, Phase Two.

The MDL 2179 PSC Depository was located near the Federal Courthouse at the URS Building, 600 Carondelet Street, New Orleans, Louisiana.  The PSC Depository encompassed the entire eighth floor, an area of approximately 15,500 square feet, including conference and

"war" rooms, individual offices, and over 70 dedicated computer workstations staffed on a full-time basis.

A second space on the Sixth Floor was obtained and used for private meetings with Counsel for the States, Counsel for the U.S., Defense Counsel, or others, and to discuss confidential settlement planning and strategy.

Certain Common Benefit Attorneys were trained and certified as Administrators of iConnect, and were responsible for the training and certification of other Common Benefit Document Reviewers and other users.  The PSC set up Trial Director cases which includes uploading all depositions, video files, and exhibits into Trial Director;  as well as all hearing and status conference transcripts; uploaded and indexed numerous document productions; developed and provided instruction and guidance with respect to document and deposition coding for issues;  and were responsible for preparing and maintaining various lists, including:

- Hot Doc List
- Exhibit List
  (and Objections)
- Witness List
- Witness Order
- Witness Exhibits
- Deposition Bundles submitted by all parties [43]

The PSC established various FTP sites for: scientific and environmental articles; liability expert reliance and consideration materials; and other materials for plaintiffs' counsel;  and assisted in administering all users and passwords with access to same.  In addition, PSC Websites, domain names, e-mail groups, and other communication devices were established, updated, administered, and maintained.

---

[43] *See, e.g.,* Rec. Docs. 2284, 2309, 4589, 4715, 4763, 4766, 4998, 5314, 8109, 8221, 8619, 9057, 9196, 9346, 10254, 10315, 10484, 11113, 11299, 11366, 11461, 11944, and 14257.

Attorneys and staff in the Depository assisted Common Benefit Attorneys in preparing for depositions, accumulating exhibits, and making witness outlines and exhibit binders, for both the Phase One and Phase Two Trials;   assisted in the preparation and organization of deposition summaries and two-page summaries of all depositions;   read and summarized almost seventy-five expert reports;   were responsible for tracking of all of the trial exhibits, data entry into database;   bates numbering, cleaning and redacting;   and assisting in logging all admit information on when every exhibit was used and by whom.

Out of the Document Depository, Common Benefit Attorneys tracked deposition designations and the preparation of Deposition Bundles, including marking and editing of approximately 200 depositions and deposition exhibits (Phase One and Two);   tracking and coordinating same with the United States Department of Justice attorneys and the States;   and were also responsible for logging data of trial admit information after all three Phases.

In addition to the Trial Director cases, the Depository staff also set up laptops and 'bricks' with all case information for use at depositions and trial throughout the entire litigation; synced information throughout Phases I, II and III, and the OPA Test Cases;   and tracked all laptops and 'bricks' by users.  The PSC maintained all original depositions and electronic copies, with index, and developed comprehensive Evidence Memos for BP, Halliburton and Transocean for development into potential 'Trial Packages' for any untried and unsettled cases.

Despite the personal, professional, and financial sacrifices of many Common Benefit Attorneys, the collective real time, in-person approach was, we believe, more effective and more efficient; facilitated interaction; promoted the exchange of ideas among the group; yielded better insight and strategies; and enabled document review to maintain the pace required by the Court's schedule.

*Master Pleadings and Briefing*

The Court adopted a series of innovative procedures for the pleading and resolution of the common factual and legal issues that would have to be tried within the Limitation proceeding and otherwise resolved within the pre-trial mandate for the broader Multi-District Litigation. Common Benefit Attorneys played a major role in proposing and implementing key elements of the case management plan, including the proposal for organizing the parties and claims into pleading "bundles";  the preparation and filing of "master" and/or other bundle complaints;  and the briefing and argument of motions to dismiss directed to these master and other complaints.

Common Benefit Attorneys prepared and filed an original and amended "B1" Bundle Master Answer to the Transocean Petition for Exoneration, Master Claim in Limitation, and Third-Party Class Action Complaint for plaintiffs asserting private economic loss and property damages claims,[44] an original and amended "B3" Bundle Master Complaint for clean-up workers and others asserting claims for medical exposure injuries,[45] a RICO Class Complaint and RICO Case Statement,[46] and a "D1" Bundle Master Complaint for injunctive claims for relief against private parties.[47]

Common Benefit Attorneys then also prepared, filed, argued, and in some cases supplemented, Oppositions to the Motions to Dismiss that were filed with respect to these Master

---

[44] Rec. Docs. 879 and 1128.

[45] Rec. Docs. 881 and 1805.  The "B3" Master Complaint also included breach of contract claims by many of these same workers in connection with the Vessel of Opportunity (VoO) Charter Agreements.

[46] Rec. Docs. 1059 (RICO Class Complaint), 1059-1 (RICO Case Statement) and 1787-1 (amended Case Statement).

[47] Rec. Doc. 880.

Complaints, as well as Oppositions to Dismiss the "Bundle A" Claims, and a protective Motion to Strike Jury Demand.[48]

Additionally, the PSC and other Common benefit Attorneys established a process for local governmental entities to join into a voluntary Local Government Master Complaint,[49] which was prepared by Common Benefit Attorneys,[50] and defended on Motions to Dismiss.[51]

Once the Motions to Dismiss were decided, Common Benefit Attorneys then participated in the effort to develop, and ultimately defend, the Trial Plan.[52]

Common Benefit Attorneys additionally organized and managed the VoO Charter Dispute Mediation Program, in which the parties agreed to select a sample of cases for motions, briefing, discovery, and mediation.[53]

*Short Form Joinders and Notice of Monition Date*

In connection with the B1, B3, and Local Government Master Complaints, Common Benefit Attorneys and the Court developed a process by which a *pro se* litigant or other person, business, or local government entity could file, directly, and without the necessity of formal service, a two-page "Short Form Joinder" in one or more of the Master Complaints, at no expense.[54]

---

[48] *See, e.g.,* Rec. Docs. 1610, 1612, 1613, 1704, 1788, 1803, 1804, 1808, 1815, 1819, 1821, 2121, 2400, and 2575.

[49] MOT FOR LEAVE TO FILE VOLUNTARY LOCAL GOVT MASTER COMPLAINT AND SHORT-FORM [Rec. Doc. 1093]; PRE-TRIAL ORDER NO. 33 [Rec. Doc. 1549].

[50] Rec. Doc. 1510.

[51] Rec. Doc. 2110.

[52] *See, e.g.,* Rec. Docs. 1951, 2130, 2658, 3998, and April 25, 2012 *in camera* submission.  *See also,* OPPOSITION TO MANDAMUS PETITION, Fifth Cir. No. 11-30987 (Nov. 7, 2011).

[53] *See, e.g.,* Rec. Doc. 3207 (CMO), and Rec. Docs. 4035, 4474 (MSJ and Reply Brief).

[54] *See generally* MOT. FOR ADOPTION OF SHORT FORM JOINDER [Rec. Doc. 882] (Dec. 15, 2010); PRE-TRIAL ORDER NO. 20 (Direct Filing) [Rec. Doc. 904]; PRE-TRIAL ORDERS NOS. 24 and 25 (Deeming Order, Short-Form Joinders, Plaintiff Profile Forms, Pleading Bundles, Responsive Pleadings, Master Complaints) [Rec. Docs.

Recognizing the importance of ensuring that all affected parties were aware of the Monition Deadline and the availability of the Short Form Joinder and encouraging them to take advantage of the device, the PSC committed approximately $1.7 million of its own money to conduct a Court-approved Notice Plan.[55]  Common Benefit Attorneys made provisions and were themselves available to answer questions, and, at the Court's request, had representatives in the Clerk's Office as the deadline approached, to assist *pro ses.* [56]   At the end of the day, approximately 130,000 individuals, business, and local government entities joined into the Limitation proceeding.[57]

This effort was important to the common and collective interests of the litigation for three primary reasons:  First, it allowed many plaintiffs, including many unrepresented plaintiffs, to protect and preserve their rights.  Second, it provided plaintiffs collectively with more leverage by bringing a "critical mass" to the liability trial.  Finally, it provided all Parties, and the Court, with a better census of and ability to manage the extant claims.

*Phase One and Two Liability Trial Prep and Discovery*

Millions of pages of documents were produced, loaded, and reviewed, for Phase One depositions, liability expert preparation, and trial.  By October 2011, the PSC had already loaded approximately 15.7 million pages of documents into iConnect, with at least 20 million pages of

---

982 and 983]; and Pre-Trial Order No. 33 (Local Government Short Form Joinder) [Rec. Doc. 1549].  Several of these orders were also amended from time to time, many with input from Mr. Herman, Mr. Roy, Coordinating Counsel, and Defense Liaison Counsel.  *See, e.g.,* Pre-Trial Orders Nos. 27, 44 and 52 (amending deposition protocol), Pre-Trial Order Nos. 28, 31 and 32 (amending PTOs 11 and 25), Case Management Orders Nos. 4 and 5 (amending the Trial Plan), Pre-Trial Orders Nos. 47 and 50 (amending PTO 13), Rec. Doc. 1838, Pre-Trial Orders Nos. 56 and 59, and Rec. Doc. 15828 (amending and supplementing PTO 9), and Pre-Trial Orders Nos. 26, 46, 53, 55 (appointing Coordinating Counsel and re-appointing Plaintiffs Liaison, the Executive Committee and the PSC).

[55] *See, e.g.,* Rec. Docs. 1126, 1313, 1352, 1635 (re Court-approved Notice re Monition Deadline and FAQ for OilSpillCourtCase.com).

[56] *See also, e.g.,* Rec. Doc. 2504 (Mot. Leave to File Additional Short Forms).

[57] *See generally,* Civil Action Nos. 10-2771 (Limitation Action), 10-8888 (Short Form Joinders), and 10-9999 (Local Government Short Form Joinders).

additional documents produced by the U.S. yet to be loaded, and additional documents arriving on a daily basis.  (Over the course of the entire litigation, over 90 million pages of documents would ultimately be produced.)  More than 70 document reviewers and analysts, including PSC members, members of their firms, and other Common Benefit Attorneys, reviewed and coded the documents, with a particular emphasis on the review of relevant custodial files produced in preparation for depositions.

In addition, the PSC and other Common Benefit Attorneys collected, indexed and produced over 10,000 articles and other materials, as well as voluminous reliance documents in association with the Phase One Liability Expert Reports.

Judge Shushan presided over weekly Discovery Conferences, where Liaison Counsel, the Phase One Trial Team, and other Common Benefit Attorneys worked collaboratively with Counsel for the U.S., Counsel for the States, Defense Counsel, and the Court, to resolve the hundreds of scheduling, discovery, and other pre-trial issues and disputes – recognizing, at all times, that the "added demands and burdens of this type of litigation place a premium on professionalism," and attempting to act as "advocates in a manner that will foster and sustain good working relationships among fellow counsel and the court," and to communicate "constructively and civilly with one another and attempt to resolve disputes informally as often as possible."[58]  Counsel wrote literally scores of letter briefs to Judge Shushan and/or Opposing Counsel; communicated daily with counsel via e-mail regarding production and other logistical issues;  and otherwise worked, each week, between the Discovery Conferences, to either resolve old issues or follow-up on new ones.[59]

---

[58] PRE-TRIAL ORDER NO. 1, p.2;  MANUAL FOR COMPLEX LITIGATION (Fourth), §10.21, pp 22-23.

[59] *See generally* LIST OF STATUS AND DISCOVERY CONFERENCES [Exhibit 18].

Starting in the early Spring of 2011, an intensive and unrelenting deposition schedule commenced. For approximately six months, there were typically two tracks of depositions, daily, reaching a climax in the summer of 2011, with seven depositions conducted, on two continents, in one day. To facilitate the efficient conduct of the London depositions, for approximately one month in June 2011, the PSC maintained a branch depository office at the London deposition building where the London office of Kirkland & Ellis International, LLP is located and the depositions were taken. By the end of 2011, over 240 fact witness depositions had been taken, with 50 additional depositions of Phase One liability experts.[60]

**PHASE ONE**

**DEPOSITIONS & DAYS OF TESTIMONY**

| MONTH | TOTAL NUMBER OF DEPOSITIONS | CALENDAR DAYS OF TESTIMONY | DEPOSITION DAYS PER MONTH |
|---|---|---|---|
| January 2011 | 4 | 4 | 4 |
| February 2011 | 8 | 13 | 14 |
| March 2011 | 12 | 14 | 22 |
| April 2011 | 22 | 18 | 36 |
| May 2011 | 31 | 19 | 44 |
| June 2011 | 50 | 21 | 79 |
| July 2011 | 54 | 19 | 70 |
| August 2011 | 11 | 8 | 13 |
| September 2011 | 25 | 14 | 30 |
| October 2011 | 17 | 14 | 18 |
| November 2011 | 25 | 16 | 33 |
| December 2011 | 40 | 16 | 56 |
| January 2012 | 9 | 7 | 10 |
| February 2012 | 3 | 4 | 5 |
|  | **311 TOTAL DEPOS** | **187 CALENDAR DAYS OF DEPO TESTIMONY** | **434 DAYS** <br> 1-Day Depos = 188 Days <br> 2-Day Depos = 123 (246 Days) |

---

[60] *See generally* LIST OF DEPOSITIONS [Exhibit 15]. *See also* PHASE ONE (a snapshot) [Exhibit 17].

**EXPERT DEPOSITIONS**

**PHASE ONE EXPERT DEPOSITIONS & DAYS OF TESTIMONY**

| MONTH | NUMBER OF EXPERT DEPOSITIONS | CALENDAR DAYS OF EXPERT TESTIMONY | EXPERT DEPOSITION DAYS PER MONTH |
|---|---|---|---|
| January 2011 | 0 | 0 | 0 |
| February 2011 | 0 | 0 | 0 |
| March 2011 | 0 | 0 | 0 |
| April 2011 | 0 | 0 | 0 |
| May 2011 | 0 | 0 | 0 |
| June 2011 | 0 | 0 | 0 |
| July 2011 | 0 | 0 | 0 |
| August 2011 | 0 | 0 | 0 |
| September 2011 | 0 | 0 | 0 |
| October 2011 | 0 | 0 | 0 |
| November 2011 | 15 | 10 | 22 |
| December 2011 | 40 | 16 | 56 |
| January 2012 | 9 | 7 | 10 |
| February 2012 | 1 | 2 | 2 |
| | 65 EXPERT DEPOS | 35 CALENDAR DAYS OF EXPERT TESTIMONY | 90 Days 1-Day Depos = 40 2-Day Depos = 25 (50 Days) |

**DEPOSITION EXHIBITS, HOURS OF VIDEO & PAGES**

| Exhibits, Video Hours & Pages of Testimony | # |
|---|---|
| Total Deposition Exhibits | 7407 |
| Total Estimated Hours of Video | 2739 |
| Total Deposition Pages | 130,642 |

In addition to the discovery issues, Judge Shushan and the Parties also engaged in substantial efforts in preparation of the then-scheduled February 2012 Phase One Trial. Common Benefit Attorneys selected a "List of 300" key trial exhibits, for the purpose of identifying and briefing a representative group of evidentiary objections that were likely to come

up at trial.[61]   A total of 50 motions *in limine* were filed by the parties between September 30, 2011 and the initially scheduled trial date in 2012, including topical motions, *Daubert* motions, and issues regarding the admissibility, inferences, or other effects of 30(b)(6) depositions and witnesses invoking the Fifth Amendment.[62]   The Parties also worked with Judge Shushan on a set of stipulations.[63]

Liaison Counsel worked with Alabama counsel, Counsel for the U.S., and Counsel for the Defendants to interview potential vendors, and to otherwise arrange for evidence management and in-court presentation.   Common Benefit Attorneys also made designations and counter-designations to over 150 depositions, and assembled "Depo Bundles" for submission to the Court in advance of trial, including a two-page summary that was authored and submitted by the PSC for each deposition witness.

*Scientific, Environmental and Economic Development*

From the outset, dedicated groups of Common Benefit Attorneys focused on the oil spill's environmental and ecological impacts and the damages flowing therefrom.   They retained a robust data collection team of consultants and staff to ensure that all relevant data would be available and accessible for the experts, and ready to take samples in the event of any reported oiling event.   Particularly in light of BP's premature statements that Macondo Oil had been captured, dissipated, or degraded by weather and microorganisms, it was vital to the successful

---

[61] *See, e.g.,* Rec. Docs. 4340-1, 4631.

[62] *See, e.g.,* Rec. Docs. 4158, 4443 (Plaintiffs' Motion in Limine and Reply Brief regarding alleged U.S. Government "Fault"); Rec. Docs. 4340-2, 4484, 4648, 4650-1, 5258, 8357, 8358, 8360, 11193 (Opposition to the Motions *in Limine* on Other Incidents and Prior Bad Acts, the Baxter Investigation, and Hayward Testimony; Rec. Doc. 4886 (Opposition to the Motions *in Limine* re Subsequent Remedial Measures); Rec. Doc. 5597 (Opp. Perkin Mot in Limine); Rec. Doc. 5257 (Opp. Mot. to Exclude Phase Two Evidence from Phase One); Rec. Doc. 5259 (Opposition re Adverse Inferences on Fifth Amendment).

[63] Rec. Docs. 5535, 5927.

prosecution of the cases in the MDL to have world-renowned scientific experts who could credibly, forcefully and with robust scientific backing refute these insupportable statements by BP.

Through the date of the BP Class Settlements and beyond, the team of scientific, environmental, and economic and accounting experts assembled by the PSC worked over the course of years to demonstrate the actual volume of discharge, movement of the oil, and damage caused by that oil to the businesses and properties in and around the Gulf;  to businesses that rely on Gulf products;   to people who rely on the Gulf for subsistence; to the natural resources (including shorelines, sea life, marshes and beaches) shared by citizens of the U.S. and the States;  to local tax revenues;  and to numerous other injured claimants-in-limitation, GCCF claimants, and parties to the MDL pleading bundle complaints.

An overall "Science Group" was established to oversee and coordinate the five science and environmental Work Groups.  The core members of the Group consisted of attorneys from seven law firms, fulfilling numerous roles, including:

- Investigating reports and, where appropriate, documenting, recording, collecting and maintaining samples;

- Identifying potential expert witnesses and/or consultants on myriad science issues;

- Conducting a comprehensive literature and background review of each of the identified potential expert witnesses;

- Interviewing potential experts who passed the vetting process;

- Retaining qualified experts in the dozens of fields relevant to proving the claims in the master bundle complaints;

- Compiling a notebook of qualified and retained experts in myriad fields of expertise relevant to the oil spill for review by any MDL attorney at the PSC depository;

- Evaluating and approving studies relevant to the task of proving environmental and ecological injury and damage to the plaintiffs in the MDL;

- Developing and maintaining a library on all scientific studies and anecdotal articles that address the Macondo Spill's environmental and ecological impacts;

- Reviewing and organizing scientific literature which may validate an expert's methodology, or otherwise provide the basis of his or her reliance list; and,

- Compiling, assimilating, and mapping publicly available and other reports of oiling events, SCAT team data, fishery closures, *in situ* burning, Notices to Mariners, and other evidence regarding the fate and transport of oil;

The Science Group and other Common Benefit Attorneys interviewed over 200 potential scientific experts — leaders in their fields of expertise — to ensure a top-rated group of experts with relevant experience for the MDL. This initial task was particularly challenging, as the list of experts knowledgeable about deepwater oil spills is small. It has required delving into issues such as (1) quantifying the oil that flowed from the riser; (2) quantifying the oil that reached and will continue to reach the surface; (3) determining the effect of the dispersant on oil coming out of the riser; (4) quantifying the oil that remains in the Gulf; (5) determining the likely quantity and location of oil from the oil spill that will surface in the form of oil slicks, tar balls or tar mats in the future; (6) evaluating the oil spill's impacts on the populations and the health of Gulf sea life and the Gulf ecosystem as a whole; and (7) determining the length of time the environmental and ecological impacts will continue. In addition, a Medical Monitoring Work Group not only researched and briefed the legal issues, but collected anecdotal evidence and evaluated more scientific studies and reports regarding the potential health effects of hydrocarbons and dispersants.

Common Benefit Attorneys, at the same time, also attempted to facilitate communications, information and strategy sharing between and among the States, and the scientific library was made available for review by, not only Common Benefit Attorneys, but also other private attorneys, local governments, the U.S., and the States.

In addition to the environmental and ecological effects, Common Benefit Attorneys followed a similar process to identify, vet, interview, and retain experts in economics and accounting, to develop models that would capture, quantify, and provide support for the common and individual economic effects of the Spill, including loss of profits and/or earnings opportunities across many different segments of the economy, and other losses to businesses and/or properties.  As in the case of environmental and ecological issues, Common Benefit Attorneys also reviewed, collected, organized, and compiled studies, articles, and other research regarding the economic effects of the Spill, and other wider economic issues or analyses, which would form the basis of potential economic damage models and/or methodologies.

These efforts by the Science, Environmental, and Economic Work Groups laid the ground work for not only the Frameworks and Matrixes contained within the BP Economic and Medical Settlements, but also the subsequent effort to defend those settlements and methodologies when attacked by BP.

*Motion to Enjoin and/or Supervise the GCCF*

As part of the broader effort to organize and preserve class action claims within the MDL proceedings, Common Benefit Attorneys believed that it was necessary and appropriate to protect the procedural interests of putative class members who were processing claims in the BP Gulf Coast Claims Facility (GCCF) as a statutory condition precedent to the assertion of an OPA claim in court.

The PSC and other Common Benefit Attorneys made substantial efforts to attempt to ensure that the procedures and protocols within the GCCF were both fair and consistent with BP's statutory obligations, and that claimants pursuing claims in the GCCF were aware of the nature of the relationship between Mr. Feinberg and BP.

After substantial briefing by Common Benefit Attorneys,[64] the Court ordered Mr. Feinberg to stop referring to himself as "independent" and to further abide by the prevailing rules and standards imposed on lawyers with respect to communications with adverse and unrepresented parties.[65]

The PSC, through the time of the BP Class Settlements, continued to monitor the GCCF process, and filed a Supplemental Brief in Support of Supervision Over the BP Interim Claim Process, to ensure compliance with OPA, and to make findings and/or recommendations regarding the satisfaction of OPA's presentment requirements and the scope and/or efficacy of releases.[66]

Working with the GCCF, the Court, claimants, and others, to improve the fairness and efficiency of BP's GCCF process, the Common Benefit Work Groups provided a substantial common benefit to all claimants – even those who were not actively engaged in the MDL.

**The Initial Establishment of a Hold-Back on Settlements**

Towards the end of 2011, with the Phase One Trial fast approaching, the PSC submitted a Status Report and Motion to Establish Account and Reserve for Litigation Expenses.[67]  By that time, 340 lawyers from 90 different firms had invested over 230,000 hours and contributed over

---

[64] *See* Rec. Docs. 912, 1021, and 1061.

[65] *See* Rec. Doc. 1098.

[66] *See* Rec. Doc. 1318.

[67] *See* Rec. Doc. 4507-1 (Nov. 7, 2011).

$13 million in out-of-pocket held and shared expenses for the common benefit of claimants and litigants affected by the Macondo / *Deepwater Horizon* disaster.   The PSC had created a voluntary hold-back on GCCF, personal injury, or other settlements involving PSC clients, and was working under agreements with the States of Alabama and Louisiana that entitled Common Benefit Attorneys to be awarded up to 4% of the State of Alabama and Louisiana's recoveries, in recognition and consideration of the common benefit contributions to any judgment or settlement that might be obtained.[68]

Following a number of objections, supplemental briefing, negotiations, and proposed amendments, the Court issued a Hold-Back Order which ultimately directed the defendants to hold back and place into escrow, from any judgment or settlement after December 30, 2011:

- Six Percent (6%) of the recoveries of any private claimants or plaintiffs who, at any time, had an action that was filed in, removed to, or transferred to, the MDL;

- Four Percent (4%) of the economic loss damages payable to the States of Alabama and/or Louisiana;

- Four Percent (4%) of the recoveries of any Local Government Entities located within the State of Alabama and/or the State of Louisiana, that, at any time, had an action that was filed in, removed to, or transferred to the MDL;

- Six Percent (6%) of the recoveries of any Local Government Entities in the States of Mississippi, Florida, and/or Texas, that, at any time, had an action that was filed in, removed to, or transferred to the MDL; and,

---

[68] The PSC was operating under agreements with both the Attorney General and the Governor of the State of Alabama, and an agreement with the Governor of Louisiana, to which the Louisiana Attorney General, at that time, had not agreed.   As noted by the Court, in originally granting the PSC's Motion in December of 2011: "The Court has on multiple occasions encouraged the State of Louisiana to cooperate with the PSC and the State of Alabama insofar as their interests are aligned versus the Defendants in this complex MDL…. Recently, after it became clear that the State of Louisiana was unable to comply with several orders of this Court, the PSC reached out and offered its technical assistance to assist the State with its ESI production obligations. Notably, it apparently required the intervention of the Governor of Louisiana for this to occur. In fact, the Governor's office and the PSC have reached an agreement to work collaboratively to pursue their common interests." HOLD-BACK ORDER [Rec. Doc. 5022], at p.2.

- Six Percent (6%) of the economic loss damages payable to the States of Florida, Mississippi, and/or Texas, should they ever file actions in, be removed to, or be transferred to, the MDL.[69]

In support of its order, the Court noted that the PSC's motion "sets forth in great detail the tremendous amount of work, and the large investment of money that the PSC has advanced since the creation of this MDL in August 2010," and observed that "there can be no question that the PSC has taken seriously its fiduciary obligations in the best interests of all claimants, both private and governmental."[70]

With respect to payments made by the GCCF, the PSC noted at the time that:

While even some of the Oppositions suggest that the PSC and other Common Benefit Attorneys are likely entitled to at least some common benefit fee with respect to the approximately Six Billion Dollars already paid out by the GCCF, (and while reserving any rights to same), the Proposed Order, as currently presented, would only apply to judgments, settlements or other payments occurring after November 7, 2011.

While it is possible that some payments are still being made on a "mechanical" or "strict liability" basis under the OPA scheme, the Responsible Party has had eighteen (18) months to evaluate and recognize OPA claims.

Particularly given the broad GCCF Release, the Court's initial rulings on issues such as the availability of punitive damages under General Maritime Law and the viability of so-called "Moratorium" claims (heretofore not recognized by the GCCF), and the impending February 2012 trial date, it is reasonable to assume that GCCF settlements at this point are at least as much a function of litigation risk as they are a function of voluntarily compliance with OPA.

Nor can it credibly be argued that the efforts of PSC and other Common Benefit Attorneys have not benefited persons and businesses (and

---

[69] AMENDED HOLD-BACK ORDER (Jan. 18, 2012) [Rec. Doc. 5274].  *See also, generally* HOLD-BACK MOTION [Rec. Doc. 4507] and PSC STATUS REPORT AND MEMO IN SUPPORT [Rec. Doc. 4507-1] (Nov. 7, 2011); REPLY BRIEF IN SUPPORT OF HOLD-BACK [Rec. Doc. 4717] (Nov. 23, 2011); SUR-REPLY BRIEF IN FURTHER SUPPORT [Rec. Doc. 4739-1] (Nov. 28, 2011); LA. GOVERNOR'S OFFICE MEMORANDUM IN SUPPORT OF THE PSC's REVISED HOLD-BACK ORDER [Rec. Doc. 4916] (Dec. 14, 2011); ORDER AND REASONS (Dec. 28, 2011) [Rec. Doc. 5022]; AMENDED ORDER (Jan. 4, 2012) [Rec. Doc. 5064]; JOINT MOTION BY ALABAMA, LOUISIANA AND THE PSC [Rec. Doc. 5230] (Jan. 17, 2012).

[70] ORDER AND REASONS [Rec. Doc. 5022], at p.3.

in many cases their attorneys) prosecuting GCCF claims. Among other things, the PSC and other Common Benefit Attorneys:

- Challenged ambiguities in and other problems with the initial BP Claims Process;

- Ensured that BP Claims Process and GCCF forms and information would be provided in Spanish, Cambodian and Vietnamese;

- Ensured, both pre-GCCF and within the GCCF, that payments to Vessel of Opportunity and other Clean-Up Workers would not be used as a set-off against, nor release of, claims for economic loss or other OPA claims;

- Met with Feinberg and others at the GCCF on numerous occasions, to make the claims process and methodologies more fair;

- Pursued motions and orders to assure fairness and accuracy in the communications provided by Feinberg and the GCCF to *pro se* litigants and represented parties;

- Developed and provided legal, scientific and economic information to be used in claims presentation and negotiations;

- Developed and confronted Feinberg and GCCF with legal, scientific and economic information;

- Participated in numerous community outreach and pro bono projects to educate claimants and attorneys regarding the GCCF claims process and assisting them with their claims;

- Pushed for OPA compliance;

- Pushed for the payment of interim claims;

- Challenged the scope and effect of the GCCF releases;

- Investigated, uncovered, documented, confronted the GCCF, and otherwise presented to the public, claimants and the Court delays, denials, inconsistencies, lack of transparency, and other individual and systemic problems or abuses within the GCCF;

- Participated in efforts with the U.S. Department of Justice and the States to audit the GCCF;

- Provided a mechanism for, notice to, and assistance to both represented parties and *pro se* litigants with respect to the Short Forms, in order to preserve their rights in the event that they could not, and/or do not, gain complete relief within the GCCF; and,

- Exerted an enormous litigation pressure, risk, leverage and incentive for BP, through the GCCF, to try to settle its liabilities, in advance of trial.

It would not be fair, it is respectfully submitted, for the plaintiffs who acted responsibly to preserve their rights before the Monition Date to bear the entire common benefit fee burden, (if any), while those who did not file in the MDL, but receive the same benefits, shoulder none of the responsibility.

Nor would it be fair to allow plaintiffs' attorneys, who are relying on the PSC and other Common Benefit Attorneys to develop the case and prepare it for trial, to pocket the entire attorney fee for themselves, by settling their clients' cases with Feinberg through the GCCF on the eve of trial.[71]

The Court agreed that Common Benefit Attorneys had, indeed, conferred a benefit to claimants receiving settlements from the GCCF, (although ultimately concluding that the court only had jurisdiction over GCCF payments with respect to a claimant who had a civil action or claim-in-limitation filed in, removed to, or transferred to, MDL No. 2179).[72]   With respect to the bases for an assessment against settlements paid in the GCCF, the Court held as follows:

The PSC has strongly advocated on behalf of persons submitting claims to the GCCF, continuing to apply public and private pressure to improve the GCCF claims handling operations. For example, the PSC has actively lobbied and argued for increased supervision and monitoring of the GCCF and Kenneth Feinberg/Feinberg Rozen, LLP....

… on February 2, 2011 the Court granted the PSC's motion (in part) and ordered the GCCF and BP to:

[71] REPLY BRIEF (Nov. 23, 2011) [Rec. Doc. 4717], pp.3-5.

[72] In 2015, all pre-BP Class Settlement funds that had been previously held back were released from escrow and refunded to the settling plaintiffs and/or their attorneys.  Nevertheless, and to the extent that it might be relevant to the overall common benefit analysis, the PSC respectfully references its previous SUR-REPLY BRIEF [Rec. Doc. 4739-1] (Nov. 28, 2011) in support of the Court's jurisdiction over the GCCF.

(1) Refrain from contacting directly any claimant that they know or reasonably should know is represented by counsel, whether or not said claimant has filed a lawsuit or formal claim.

(2) Refrain from referring to the GCCF, Ken Feinberg, or Feinberg Rozen, LLP (or their representatives), as "neutral" or completely "independent" from BP. It should be clearly disclosed in all communications, whether written or oral, that said parties are acting for and on behalf of BP in fulfilling its statutory obligations as the "responsible party" under the Oil Pollution Act of 1990.

(3) Begin any communication with a putative class member with the statement that the individual has a right to consult with an attorney of his/her own choosing prior to accepting any settlement or signing a release of legal rights.

(4) Refrain from giving or purporting to give legal advice to unrepresented claimants, including advising that claimants should not hire a lawyer.

(5) Fully disclose to claimants their options under OPA if they do not accept a final payment, including filing a claim in the pending MDL 2179 litigation.

(6) Advise claimants that the "pro bono" attorneys and "community representatives" retained to assist GCCF claimants are being compensated directly or indirectly by BP.[73]

Early on, the PSC successfully advocated on behalf of Vietnamese and other non-English speaking claimants, and convinced the GCCF to employ translated forms, instructions, etc. The PSC also arranged to make translators available to claimants. The PSC has advocated for a full and transparent audit of the GCCF and its claims handling practices, and together with the U.S. Department of Justice, has persuaded Mr. Feinberg to agree to such an audit which is now in progress. The PSC has advocated, again with some success, for the GCCF to employ a more liberal causation standard in evaluating claims and has advanced similar causation arguments in this MDL proceeding.[74] The PSC has successfully argued for the application of general maritime law and the possibility of punitive damages.[75] Although the GCCF does not pay punitive damages, the PSC

---

[73] *See* ORDER AND REASONS [Rec. Doc. 1098] (Feb. 2, 2011), p.14.

[74] *See* B1 ORDER [Rec. Doc. 3830] (Aug. 26, 2011), at pp.32-33.

[75] *See* B1 ORDER, at pp.18-27.

may be able to show that this finding enhances the settlement value of compensatory claims.

> Considering the unique circumstances of this case, it would be unfair to allow parties to benefit from these activities of the PSC, but avoid contributing to the common benefit fund simply because they are able to settle directly with the GCCF and avoid filing a claim in the MDL. Other parties have filed lawsuits or claims in this MDL, but then withdraw their claims once they have settled with the GCCF. Again, such parties have likely benefited from all of the common benefit work performed by the PSC.

ORDER AND REASONS (Dec. 28, 2011) [Rec. Doc. 5022], pp.4-6.  Nevertheless, and while over

$20 million would be collected from GCCF and other settlements over the next few months, the

hold-backs were ultimately released, the funds were returned, and no business, individual, or

local government entity, (nor their own individually retained attorneys), would be required to

make any common benefit cost contribution or pay any common benefit fee in this litigation.[76]


**The BP Economic Settlement, and Approval**

The Court is eminently familiar with the background and the substance of the *Deepwater Horizon* Economic & Property Damages Class Settlement with BP.[77]  In sum, the settlement was intended to resolve most claims by private individuals and businesses for economic loss and

---

[76] *See* ORDER (May 3, 2012) [Rec. Doc. 6428] (eliminating hold-back with respect to BP Class Settlement payments); ORDER (July 10, 2015) [Rec. Doc. 14825] (eliminating hold-back with respect to State and Local Government settlements); ORDER (July 30, 2015) [Rec. Doc. 14946] (refunding 6% hold-backs on Transition Payments); ORDER (Oct. 2, 2015) (amended April 11, 2016) [Rec. Doc. 15427 (amended by Rec. Doc. 16173)] (disbursing remainder of funds from hold-back escrow account to plaintiffs/claimants and their attorneys).

[77] *See generally* Transcript of Preliminary Approval Hearing (April 25, 2012) [Rec. Doc. 6395]; Class Final Approval Brief (Aug. 13, 2012) [Rec. Doc. 7104]; Herman Declaration (July 23, 2012) [Rec. Doc. 7104-5]; Rice Declaration (Aug. 10, 2012) [Rec. Doc. 7104-6]; Issacharoff Declaration (Aug. 13, 2012) [Rec. Doc. 7104-4]; Klonoff Declaration (Aug. 13, 2012) [Rec. Doc. 7104-3]; Godfrey Declaration (Aug. 13, 2012) [Rec. Doc. 7114-9]; Class Reply Brief (Oct. 22, 2012) [Rec. Doc. 7727]; Klonoff Supp. Declaration (Oct. 22, 2012) [Rec. Doc. 7727-4]; Transcript of Fairness Hearing (Nov. 8, 2012) [Rec. Doc. 7892]; Joint Proposed Findings (Nov. 19, 2012) [Rec. Doc. 7945]; Order and Reasons (Dec. 21, 2012) [Rec. Doc. 8138] (*In re Deepwater Horizon,* 910 F.Supp.2d 891 (E.D.La. 2012)); Herman Declaration (April 1, 2013) [Rec. Doc. 9087-3]; Herman Declaration (Nov. 5, 2013) [Rec. Doc. 11804-1]; Rice Declaration (Nov. 6, 2013) [Rec. Doc. 11804-4]; Herman Declaration (Nov. 11, 2013) [Rec. Doc. 11833-1]; Herman Declaration (Nov. 12, 2013) [Rec. Doc. 11833-6]; Herman Declaration (Jan. 17, 2014) [Ex. 4 to Rec. Doc. 12164] (filed Under Seal); Rice Declaration (Jan. 2014) [Ex. 5 to Rec. Doc. 12164] (filed Under Seal); Herman Declaration (Oct. 15, 2014) [Rec. Doc. 13496-1]; Roy Declaration (Oct. 15, 2014) [Rec. Doc. 13496-2]; Fayard Declaration (Oct. 15, 2014) [Rec. Doc. 13496-3]; Herman Declaration (March 9, 2015) [Rec. Doc. 14914-15, at 8-13].

property damages resulting from the Spill.  Memorialized by a 1,000-plus page document, the Parties negotiated and agreed to separate, detailed frameworks for the submission, evaluation and payment of nine basic categories of claims:

(1)    Business Economic Loss (BEL) (including frameworks for Multi-Facility Businesses, Start-Up Businesses, Failed Businesses, and Failed Start-Ups)

(2)    Individual Economic Loss (IEL)

(3)    Coastal Property Damage

(4)    Wetlands Property Damage

(5)    Sales Loss Damage

(6)    Vessel of Opportunity (VoO) Charter Payment Claims

(7)    Vessel Physical Damage and Decontamination

(8)    Subsistence Loss, and

(9)    Commercial Fishing Losses (*i.e.* the Seafood Compensation Program)

Uniquely, and to the benefit of plaintiffs, the Agreement established a Settlement Program and Trust that would begin to process and pay eligible claims, beginning in June of 2012, prior to and irrespective of final class approval, subject to an Individual Release.[78]  Class Members were allowed to submit multiple claims and to receive compensation for multiple categories of damage.[79]

Certain discreet groups of individuals, entities and claims are specifically excluded from the Settlement.  Otherwise, and generally, the individuals and entities located in Louisiana,

---

[78] *See generally*, ECONOMIC AGREEMENT [Rec. Doc. 6276-1], Recital H, Section 4, and Section 21.3.

[79] *See generally* ECONOMIC AGREEMENT, Sections 5.1–5.9 and Exhibits 4-14

Alabama, Mississippi, the coastal counties of Florida, and the southeast corner of Texas, are subject to a broad and binding class-wide release.[80]

Negotiated intensively over an eight-to-ten month period, the Settlement Agreement was intended to improve upon the GCCF, by not only recognizing claims that the GCCF did not pay, but also by requiring that decisions be made pursuant to transparent and objective frameworks, by a Court-appointed administrator, in a claimant-responsive and claimant-friendly way.[81] Indeed, the entire Settlement Agreement is designed to ensure that the Claimants will receive the highest possible level of compensation afforded under the frameworks, based on the documentation provided.[82]

One of the central features of the settlement was and is a guaranteed $2.3 billion Seafood Compensation Fund to compensate commercial fishermen, with internal allocation and distribution frameworks and criteria developed by a Court-appointed neutral.[83]

For existing businesses, economic loss claims are determined using a two-step process. Step One calculates the value of the business's reduction in profit during a claimant-selected loss period (any three or more consecutive months of the eight-month period following the spill). Step Two accounts for expected profits by estimating the business's growth trend along with a general, economy-wide growth factor.   Step One (loss calculation) and Step Two (expected

---

[80] The Class is Defined in Section 1 of the Settlement Agreement; *see also* Exhibit 22 (Map of Gulf Coast Area) [Rec. Doc. 6276-40] and Exhibit 23 (Specified Gulf Waters) [Rec. Doc. 6276-41].  The Class Release is found in Section 10 of the Settlement Agreement.  In addition, any Claimant receiving compensation from the Settlement Program must first execute an Individual Release (Exhibit 26) [Rec. Doc. 6276-45].

[81] ORDER AND REASONS [Rec. Doc. 8138] p.110 (*In re Deepwater Horizon,* 910 F.Supp.2d at 960-961); *see also, generally,* ECONOMIC AGREEMENT, Sections 4.3.1, 4.3.7, 4.3.8, 4.4.7, 4.4.9, 6.1 and 6.1.2.1.1.

[82] ECONOMIC AGREEMENT, Sections 4.3.7 and 4.3.8.

[83] *See generally* ECONOMIC AGREEMENT, Section 5.2 *and* SEAFOOD COMPENSATION PROGRAM (Exhibit 10) [Rec. Doc. 6276-22].  *See also, e.g.,* HERMAN DECLARATION [Rec. Doc. 7104-5] at pp.4-5 ¶11; RICE DECLARATION (re Seafood Program) [Rec. Doc. 7104-6, at 13-18]; PERRY DECLARATION [Rec. Doc. 7110-5]; BALHOFF DECLARATION (Aug. 12, 2012) [Rec. Doc. 7110-2]; BALHOFF SECOND DECLARATION (Oct. 22, 2012) [Rec. Doc. 7726-2].

profit but-for the spill) are both factored into the business claimant's base compensation amount.[84]  This base compensation amount is generally enhanced by a Risk Transfer Premium (RTP), and/or is offset by prior payments received, depending on the type of business and location.  The Settlement also includes additional or alternative frameworks for multi-facility businesses, failed businesses, start-up businesses, and failed start-up businesses.[85]

The Settlement Agreement also provided for a $57 Million Gulf Seafood and Tourism Promotional Fund, which made grants to organizations around the Gulf to promote seafood and tourism.[86]

In addition, BP agreed that classmembers' claims for punitive damages against Halliburton and/or Transocean would be Expressly Reserved, and that BP's own claims against Transocean and Halliburton would be assigned to the BP Economic & Property Damages Class as a whole.  Moreover, BP agreed to turn over insurance proceeds that might be obtained from Transocean's insurers.  At this point, these features have resulted in potential settlements of $337.6 Million for the Class on the Assigned Claims with Halliburton and Transocean,[87] as well as an additional $82 Million in Transocean Insurance Proceeds.[88]

On December 21, 2012, the class settlement was certified under Rule 23(b)(3), and fully and finally approved as fair, reasonable, and adequate to the members of the Class under Rule

---

[84] *See generally* Exhibit 4C  [Rec. Doc. 6276-10].  While the Settlement Program has generally offset a negative Step One calculation against a positive Step Two calculation, it was intended and agreed that these would be separate inquiries, and that a business claimant would be entitled to be compensated based on *either* a loss calculation, *or* an expected profit but-for the spill calculation, *or* (most typically) the sum of both.

[85] *See generally* Exhibits 5-7  [Rec. Docs. 6276-13 thru -15].

[86] *See* ECONOMIC AGREEMENT, Section 5.13.

[87] ALLOCATION AND REASONS [Rec. Doc. 15652] (Dec. 11, 2015).

[88] *See* ORDER [Rec. Doc. 13424] (Sept. 22, 2014) (memorializing deposit of $82.17 million in Transocean Insurance Proceeds into Class Settlement Trust).

23(e). <u>In re Deepwater Horizon</u>, 910 F.Supp.2d 891 (E.D.La. 2012).[89]   The final approval order

was affirmed on appeal by the Fifth Circuit on January 10, 2014. <u>In re Deepwater Horizon</u>, 739

F.3d 790 (5th Cir. 2014) ("*Deepwater Horizon II*").   Rehearing *en banc* was denied in May of

2014. <u>In re Deepwater Horizon</u>, 756 F.3d 320 (5th Cir. 2014).    And the U.S. Supreme Court

denied review in December. <u>BP Exploration & Production v. Lake Eugine Land Development, et

al</u>, 135 S.Ct. 754 (2014).   The "Effective Date" of the Settlement was thereby achieved on

December 8, 2014,[90] establishing June 8, 2015 as the final Claims Deadline, and triggering the

obligation to pay up to Six Hundred Million Dollars, in common benefit costs and attorneys

fees.[91]

    In support of such approval, plaintiffs submitted, among other things, the expert

testimony of Dean Robert Klonoff, who evaluated, among other things, the reasonableness of the

common benefit attorneys' fees provision.

> …counsel have already put 384,000 hours into this case. Assuming
> they do not put in another hour, which is obviously an absurd proposition, and
> assuming the average hourly rate of $456 used in *Enron,* the lodestar amount
> would be $175,104,000; resulting in a lodestar multiplier (with fees of $570
> million) of 3.26, far below the multiplier of 5.2 approved in *Enron.* 586
> F.Supp.2d at 803; *see also, e.g., In re NASDAQ Market-Makers Antitrust
> Litig.,* 187 F.R.D. 465, 489 (S.D.N.Y. 1999) (lodestar multiplier of 3.97 in
> $1.027 billion settlement); *In re WorldCom, Inc. Sec. Litig.,* 388 F. Supp. 2d
> 319, 354 (S.D.N.Y. 2005) (multiplier of 4 in $6.133 billion settlement); *In re
> Cardinal Health Inc. Sec. Litig.,* 528 F. Supp. 2d 752, 767 (S.D. Ohio 2007)
> (multiplier of 5.9 in $600 million settlement). If counsel end up putting in
> 800,000 hours, the lodestar would be $364,800,000, resulting in a lodestar
> multiplier of 1.56, which is dramatically below the multiplier in Enron and far
> below the 3%–4.5% multipliers that are "common" in the largest class
> settlements (over $1 billion, known as super-mega-fund cases, see ¶ 122,
> infra). *In re NASDAQ, supra,* at 489 (citation and internal quotation marks
> omitted). Thus, the lodestar multiplier range here (1.56–3.26) only

---

[89] Found in the MDL docket as Rec. Doc. 8138. (*see also* ORDER AND JUDGMENT [Rec. Doc. 8139] (Dec. 12, 2012))

[90] *See* BP ECONOMIC AGREEMENT, Section 38.60.

[91] BP ECONOMIC AGREEMENT, Exhibit 27, ¶¶ 2, 4(e), and 6(d).

corroborates the reasonableness of the attorneys' fees structure. Indeed, even using the $300 per hour rate…, a lodestar cross-check would raise no concerns. Assuming 384,000 total hours, the lodestar would be $115.2 million and the multiplier would be 4.95….  Because all of these ranges support fees of $570 million, the Court need not await the final total of hours, and need not conduct a lodestar cross-check before giving its blessing to the fee agreement.

*   *   *

Looking beyond the dollar figures, this settlement compares favorably to its peers in a number of respects.

- *Benefit to the Class.* Perhaps the most exceptional feature of this settlement is not its sheer size, but rather the fact that class members can expect to recover full compensation for their injuries. This sort of recovery is virtually unprecedented, and is not a feature in any of the super-mega fund cases cited above, with the exception of *AT&T,* in which the award was 20% of the proceeds available to the class. For example, in *Enron,* the settlement was very large ($7.227 billion), but, as that court noted, the losses suffered by the class members were estimated to be much higher. As such, the Enron settlement, impressive as it was, ultimately recovered only a fraction (8.39%) of the decline in market capitalization resulting from the fraud alleged in that case. 586 F.Supp.2d at 775. Yet the court in *Enron* approved fees of 9.52%. Moreover, *Enron* itself noted that in *WorldCom,* the $6.133 billion settlement amounted to a mere 2.9% recovery in the decline of market capitalization. *See id.* at 775. The court in *WorldCom* awarded 5.5% in fees. In the *Vioxx* non-class aggregate settlement, users of Merck's painkiller *Vioxx* received much less than they could have received if they had been successful at trial…. Almost by definition, settlement means compromise, and a plaintiff who settles will receive less than full compensation. That is why this case is so unusual. Here, class members can expect to be made whole by the settlement's compensatory benefits. Even in litigation, obtaining all of the relief to which a plaintiff is entitled is a challenge under the best of circumstances. For example, in the *Vioxx* litigation, some plaintiffs who went to trial ended up with nothing. But in the settlement context, full recovery is even less likely, because a settlement, by its very nature, usually means agreeing to accept less than full recovery in exchange for prompt and certain payment. Here, class members receive both promptness and full recovery, making this a truly exceptional case.

- *Size of the Settlement.* This estimated $7.8 billion settlement, if approved by the Court, would (according to my research) be the

largest class settlement in history. In my mind, this is a monumental achievement, not one to be denigrated by a mechanical rule that the fee percentage should be low when the settlement is large. Indeed, despite this achievement, the fee award under the proposed agreement is capped at $570 million ($600 million minus $30 million in costs to date), which is less than the $688 million in fees awarded in *Enron* (a case involving both a lower total settlement amount and a much lower percentage of losses recovered).

• ***Unique Aspects of this Case.*** In a literal sense, of course, every case has "unique" features. And certainly, cases in the super-mega-fund range are by definition unusual. Yet even among this rarified group of cases, the instant settlement stands out as unique. Most importantly, a large number of super-mega-fund settlements and other large settlements have been in securities cases. To be sure, securities fraud is a challenging and difficult area of the law, requiring great skill and effort. Yet, the catastrophic oil spill created legal, factual, scientific, and economic issues that were even more complex than those in most other kinds of class actions. And class counsel could not look to precedent to guide their strategy on most issues, because this case was truly unprecedented in magnitude and complexity.

Based on the foregoing discussion, the anticipated award ($570 million based on a settlement worth $7.8 billion) is on the low end, even when examined in light of other mega-fund or super-mega-fund cases. Of course, the percentage could be even lower if the value of the settlement turns out to be greater than $7.8 billion. But even the high theoretical percentage (11.4%), which is very unlikely to occur, is well within the fee percentages in mega-fund and super-mega-fund cases. These ranges are especially reasonable here, given the benefits to the class, the unique complications of this case, and the fact that fees are being paid separately by BP.

As shown above, the pertinent *Johnson* factors overwhelmingly support the proposed fee structure here. The attorneys, all of whom have superb reputations and abilities, have expended considerable time, and are expected to spend much more time, before the claims process is completed. The questions involved are novel and difficult, requiring enormous skill and impeding the lawyers' ability to take on other work. Even the highest theoretical fee percentage of 11.4% is much smaller than the customary 33% in private contingency cases. The fee here is contingent, meaning the lawyers took a risk that they might receive no award. Because the case involved an environmental disaster, time was of the essence. The results obtained, as explained throughout this report, are impressive. And even the highest

theoretical fee award of 11.4% is comfortably within the range of awards in super-mega-fund cases.[92]

At the time of final approval, however, the estimated value of the BP Economic and Medical Settlements was only $7.8 Billion.[93]  In fact, as of this submission, over 120,000 claims totaling over $7.52 billion have been paid from the Economic Settlement alone,[94] plus an additional $57 Million in promotional grants,[95] with an additional $82 Million in Transocean Insurance Proceeds sitting in trust,[96] approximately $634 million remaining in the Seafood Fund,[97] and approximately 89,000 claims still in the process of being analyzed, supplemented, reviewed, reconsidered and/or appealed.[98]   In performing the allocation for the Halliburton/Transocean Settlements, Judge Wilkinson estimated that the total payout would be $10.825 billion, (although his estimate seems based solely on projected Economic Claims payouts, and would not seem to include Seafood & Tourism Promotional Grants, Transocean Insurance Proceeds, the value of the Assigned Claims, Medical Settlement Benefits, Administrative Costs, or Common Benefit Litigation Expenses or Fees).[99]  BP now estimates that the Economic Settlement alone will be "significantly higher" than $12.9 Billion.[100]

---

[92] KLONOFF EXPERT REPORT (Aug. 13, 2012) [Rec. Doc. 7104-3] ¶¶ 107 and 131-133.  *See also* KLONOFF SUPPLEMENTAL REPORT (Oct. 22, 2012) [Rec. Doc. 7727-4] ¶¶ 21, 30-37 and 52-56.

[93] BP 2011 ANNUAL REPORT AND FORM 20-F, p.163 (available at http://www.bp.com/assets/ bp_internet/globalbp/globalbp_uk_english/set_branch/STAGING/common_assets/bpin2011/downloads/BP_Annual _Report_and_Form_20F_2011.pdf) (as of Aug. 5, 2012).

[94] *See* STATISTICS FOR *DEEPWATER HORIZON* ECONOMIC & PROPERTY DAMAGES SETTLEMENT (May 24, 2016) p.3 (Table 4, Line 13) [These Program Statistics are submitted herewith as Exhibit 11].

[95] *See* ECONOMIC AGREEMENT, Section 5.13; HERMAN-ROY DECLARATION ¶60.

[96] ORDER [Rec. Doc. 13424] (Sept. 22, 2014).

[97] *See* PROGRAM STATISTICS (May 24, 2016) p.3 (Table 4, Line 1).

[98] *See* PROGRAM STATISTICS (May 24, 2016) pp.1-3 (*comparing* Table 2, Line 13 (Total Number of Claims) *with* Table 3, Line 13 (Notices Issued) *and* Table 4, Line 13 (for Total Paid and unpaid Eligibility Determinations)).

[99] ALLOCATION AND REASONS [Rec. Doc. 15652] (Dec. 11, 2015), pp.14-16.

[100] BP FIRST QUARTER 2016 RESULTS (dated April 26, 2016) at p.18  (available at: http://www.bp.com/ content/dam/bp/pdf/investors/bp-first-quarter-2016-results.pdf  (last visited: May 30, 2016) [This BP First Quarter 2016 Report is submitted with the Fee Petition as Exhibit 12].

The Court, in 2012, was not called upon to expressly approve class counsel fees, but several objectors argued that the nature or structure of the Common Benefit Cost and Fee Agreement somehow affected the fairness, reasonableness, or adequacy of the relief to the class. These arguments were appropriately rejected:

> …there was no discussion of attorneys' fees until all other terms of the agreement were negotiated, agreed upon, reduced to writing, and submitted to the Court, so Class Counsel could not have engaged in trading off the interests of class representatives or absent class members so as to maximize their fee recovery.
>
> *   *   *
>
> In addition to this direct compensation to individual class members, the Settlement Agreement provides other significant benefits, including paying for a promotional fund, and paying for all costs of settlement administration. BP has also agreed not to oppose a significant award of common benefit attorneys' fees and costs, effectively sparing the class from having to pay for common-benefit fees and expenses.

Deepwater Horizon, 910 F.Supp.2d at 918 and 933-934,[101] *aff'd,* 739 F.3d 790, *reh'g, en banc, denied,* 756 F.3d 320, *cert. denied,* 135 S.Ct. 754 (2014).


**The Medical Benefits Settlement, and Approval**

The BP Medical Benefits Settlement provides four essential benefits to Class Members: (i) compensation for Specified Physical Conditions; (ii) the Periodic Medical Consultation Program; (iii) the Gulf Region Health Outreach Program; and (iv) a Back–End Litigation Option, which preserves the classmembers' ability to sue BP for compensatory damages for Later–Manifested Physical Conditions.[102]

Qualifying classmembers who demonstrate the manifestation of a Specified Physical Condition during the time-frames set forth in the agreement receive different levels of

---

[101] Rec. Doc. 8138, at pp.33 and 60-61.

[102] *See generally* BP MEDICAL SETTLEMENT AGREEMENT [Rec. Doc. 6273-1].

compensation depending on various factors, including whether he or she served as a Clean–Up Worker or was simply a resident, whether the condition was acute or chronic, and the type of proof that he or she is able to present.  The Settlement allows qualifying members to receive compensation for Specified Physical Conditions even without medical records;  however, by providing medical records or showing corroboration in the appropriate database or other data source, he or she will qualify for a larger compensation payment.[103]

The Periodic Medical Consultation Program (PMCP) was made available to all Clean–Up Workers, as well as certain residents who lived right along the water and/or qualified for a Specified Physical Condition.  Under the PMCP, classmembers are entitled to an initial medical consultation followed by additional visits every three years over the 21–year life of the program. To effectuate the benefits, the Medical Claims Administrator has established a network of medical services providers, selected in part based on geographic proximity to classmembers and their ability to provide the consultation services offered by the program. The Medical Claims Administrator communicates annually with participants, utilizing a call center and website to schedule appointments and encourage participation.  Simply establishing a physician-patient relationship with a primary care physician provides a significant and tangible benefit for those who did not have a physician and/or could not afford primary medical services.  The PMCP enables physicians performing the examinations to order certain blood, urine, cardiac, and respiratory tests that can help in the identification and diagnosis of certain conditions.[104]

The Gulf Region Health Outreach Program (GRHOP) has expanded the "capacity for and access to high quality, sustainable community-based healthcare services, including primary care,

---

[103] *See generally* MEDICAL AGREEMENT, Exhibit 8 [6273-10].

[104] *See generally* MEDICAL AGREEMENT, Exhibit 12 [6273-14].

behavioral and mental health care, and environmental medicine, in the Gulf Coast."[105]  Under the

settlement, BP has provided $105 million in grants to a set of integrated projects designed to

improve healthcare capacity and health literacy for Class Members and others in Gulf Coast

communities.   In particular, GHROP includes four projects designed to address the fact that

many Gulf Coast residents lack ready access to effective physical, mental, and behavioral health

care:

    i)   The Primary Care Capacity Project has and will continue to expand access to high quality, sustainable, community-based primary care by focusing on the development of Federally Qualified Health Centers (FQHCs) with links to specialty mental and behavioral health care, as well as environmental and occupational health services.

    ii)   The Mental and Behavioral Health Capacity Project has and will continue to provide mental and behavioral health treatment in the short term. In the longer term, it will provide supportive services to improve the overall well-being of Class Members and other individuals affected by the *Deepwater Horizon* Incident.

    iii)   The Environmental Health Capacity and Literacy Project has and will continue to build environmental health capacity to deliver coordinated specialty care; integrate community health workers with training in environmental health issues into primary care clinics; and create an environmental health science curriculum in public schools and universities across the region to promote environmental health literacy.

    iv)   The Community Health Workers Training Program has and will continue to provide training for Community Health Workers on primary care capacity. It will also assist Class Members and others in obtaining mental and behavioral health services and environmental health care, and expand traditional health capacity by actively engaging community residents as participants to strengthen community resilience, build social capital, and improve overall health literacy.[106]

---

[105] MEDICAL AGREEMENT, § IX.A.

[106] MEDICAL AGREEMENT, § IX.C.

In addition, the settlement calls for the creation of a comprehensive, publicly-accessible, text-searchable, indexed, online electronic resource and library, which has accumulated and will continue to assemble documents regarding:

a) composition, quantity, fate, and transport (including the timing and quantity thereof) of oil and other substances released during the *Deepwater Horizon* Incident and dispersants and decontaminants used in Response Activities;

b) nature, content, and scope of Response Activities;

c) health risks or effects from exposure to substances released during the *Deepwater Horizon* Incident and any of the dispersants and decontaminants used in Response Activities;

d) natural attenuation or decomposition of oil, dispersants, decontaminants, and other substances related to the *Deepwater Horizon* Incident and Response Activities;

e) nature, content, and scope of in situ burning performed during the Response Activities, including any health risks and effects associated with such in situ burning;

f) monitoring, sampling or testing for oil, dispersants, decontaminants, and other substances related to the *Deepwater Horizon* Incident and Response Activities;

g) occupational safety, worker protection, and preventative measures for Clean–Up Workers; and

h) health studies of persons exposed to oil and other substances released during the *Deepwater Horizon* Incident and dispersants and decontaminants used in Response Activities.[107]

The Medical Settlement also provides a mediation/litigation process for Class Members who may seek compensation from BP in the future for a physical condition that is claimed to have manifested after April 16, 2012 and resulted from exposure to oil and/or dispersants due to the *Deepwater Horizon* Incident during the time frames set forth in the Settlement Agreement.

---

[107] MEDICAL AGREEMENT, § IX.H.

Classmembers diagnosed with such Later–Manifested Physical Conditions have the option to seek compensation for that condition through the Back–End Litigation Option (BELO) or, as applicable, pursuant to workers' compensation law or the Longshore and Harbor Workers' Compensation Act.  Classmembers have four years from the latter of diagnosis or the Effective Date to notify BP of their intention to pursue a BELO claim.  If mediation does not resolve the claim, then the BELO action can be filed in which the classmember need not prove: (a) the fact of exposure to oil and/or dispersants during the *Deepwater Horizon* Incident or Response Activities; or (b) the fault of BP for the *Deepwater Horizon* Incident.  Nor can BP raise defenses based on prescription, statute of limitations or repose, laches, and certain other defenses.  As a result, the only issues to be litigated are: (a) the fact of diagnosis; (b) the amount, location, and timing of oil and/or dispersants released and/or used during the *Deepwater Horizon* Incident or Response Activities; (c) the level and duration of the Class Member's exposure; (d) causation, including potential alternative causes; and (e) the amount of compensatory damages.[108]

Like the BP Economic Class Settlement, the BP Medical Benefits Settlement was fully and finally approved as fair, reasonable, and adequate to the members of the class. In re Deepwater Horizon, 295 F.R.D. 112 (E.D.La. 2013).

A group of professional objectors, nevertheless, appealed the settlement approval order, which Class Counsel successfully defended in the Fifth Circuit,[109] and upon remand,[110] after

---

[108] *See generally* MEDICAL AGREEMENT, § VIII.

[109] *See* MOT. TO REQUIRE APPEAL BOND [Rec. Doc. 10924]; MOT. TO DISMISS APPEAL, Fifth Cir. No.13-30221 (Aug. 7, 2013); APPELLEES' BRIEF ON THE MERITS, Fifth Cir. No.13-30221 (Sept. 3, 2013); OPP. APPELLANTS' MOTION TO RESPOND TO NEW ARGUMENTS, Fifth Cir. No. 13-30221 (Sept. 17, 2013).

[110] *See* ORDER, Fifth Cir. No. 13-30221 (Sept. 30, 2013).

deposing the four objectors and providing the Court with a comprehensive submission[111] – at which point the appeal was voluntarily dismissed.[112]

At this point, almost $94 million of the $105 million associated with the GHROP has been paid out in grants, approximately $350,000 has been expended to provide periodic medical treatment, and over $12.7 million has been paid to classmembers with Specified Physical Conditions.[113]

## Post-Settlement Implementation, Assistance to Classmembers, and Dispute

In connection with the implementation of the BP Settlements, a number of Transition Orders were submitted and entered,[114] Class Complaints were perfected,[115] and approval papers were prepared and filed.[116] Class Counsel selected, educated, and otherwise worked with the Class Representatives, while also working with BrownGreer, Garden City, Kinsella, and a team from BP to revise and complete the Class Notice and FAQs, Claim Forms, and Instruction Booklets.

Class Counsel conducted a series of free seminars around the Gulf Coast, from Houston to Miami, in order to educate attorneys and CPAs on the specific terms and provisions of the settlement. A Class Counsel Office (CCO) was opened in the same building where the Claims Administrator's Office had been selected, and Common Benefit Attorneys were available to answer questions about the Settlements, in person and by phone. A Settlement Questions / Class

---

[111] SUBMISSION BY CLASS COUNSEL ON REMAND OF MEDICAL SETTLEMENT (with Incorporated Motion to Strike, Motion to Dismiss, and Motion for Sanctions) [Rec. Doc. 11869] (Nov. 19, 2013).

[112] See MOT. TO DISMISS APPEAL, Fifth Cir. No. 13-30221 (Nov. 26, 2013).

[113] HERMAN-ROY DECLARATION ¶67.

[114] Rec. Docs. 5987, 5988, 5995, 6049, 6085, 6266, 6415, 6567, 6573, 6796, 6822, 7660.

[115] See No. 12-970, Rec. Doc. 1 (Economic Class Complaint); No. 12-968, Rec. Doc. 1 (Medical Class Complaint).

[116] See, e.g., Rec. Docs. 6269, 6272, 6414, 7104, 7116, 7727, 7728, 7946.

Counsel e-mail address was also established, so that a team most familiar with the terms and provisions of the Economic and Medical Settlement Agreements and Policies could respond to questions from potential classmembers, plaintiffs' counsel, claims preparers, and *pro ses*.[117]

At the same time, Class Counsel worked with Dean Klonoff, Professor Issacharoff, Mr. Uddo, Lynn Baker, Dr. Harbut, and others, to ensure that all legal, procedural, ethical, and professional issues were being attended to, and to ensure, along with BP Counsel, the Seafood Neutrals, the Claims Administrator, Brown Greer, Garden City, and the Joint Experts, (Professor John C. Coffee, Jr., Meade Monger, Dr. Goldstein, and Mr. Azari), that the Class Notice was effectuated, that Opt Outs were being collated, and that all appropriate evidence in support of the settlements was prepared and submitted.

Class Counsel also had to address requests by objectors and others for class and settlement-related discovery[118]

Class Counsel reviewed and summarized all of the Objections to both settlements,[119] and coordinated with Dean Klonoff, BP Counsel, the Economic and Medical Claims Administrators, the Seafood Neutrals, the joint experts, and others, with respect to the supplemental evidentiary submissions and Replies.[120]   Class Counsel coordinated with BP to prepare for the Fairness Hearing,[121] as well as the Joint Proposed Findings.[122]

At the same time, Class Counsel were called upon to address numerous interpretive, administrative, and logistical issues with the Claims Administrator, Program Vendors, and

---

[117] Class Counsel later added an additional ccappeals@mdl2179psc.com team of attorneys specifically tasked to provide Economic Classmembers with advice and assistance in the submission of Settlement Program Appeals, (as well as Requests for Discretionary Review, and, ultimately, appeals to the U.S. Fifth Circuit).

[118] *See, e.g.,* Rec. Doc. 7032.

[119] Rec. Docs. 7727-2, 7728-1.

[120] *See* Rec. Docs. 7727 and 7728 (Reply Briefs), and Rec. Docs. 7726, 7730 (Joint Submissions).

[121] *See* Transcript (Nov. 8, 2012).

[122] Rec. Docs. 7945, 7946.

representatives from BP.  Common Benefit Attorneys have made formal and informal written submissions, attended both informal meetings and formal Administrative Panel Meetings, and participated with BrownGreer and BP in an orientation session with the independent Appeal Panelists.  Class Counsel also reviewed the Seafood and Tourism Promotional Grant Applications and selected appropriate recipients with the Claims Administrator and representatives of BP.

As we began to experience more intensive discussions, issues, and disputes, between and among the Parties and the Settlement Program, Class Counsel developed a team of attorneys to attend monthly "workstream", budget, and/or other meetings, and to address issues raised by BP (and/or the Settlement Program), with respect to not only interpretive Policy issues, but also budgetary issues, audit issues, IT issues, potential fraud investigation issues, and other disputes.

On the Medical Settlement side, Class Counsel have attended numerous GHROP Meetings, and participated in routinely scheduled calls and meetings with the Claims Administrator's staff, as well as groups of attorneys who were raising various issues and concerns.  Medical Provider Agreements were developed in coordination with the Claims Administrator and BP representatives, and are continuously reviewed and executed, as additional classmembers from around the Gulf seek Periodic Medical Consultation.  Class Counsel have traveled to the BrownGreer facility in North Carolina, to observe, first hand, how the Claims were being processed.  And Class Counsel also worked with Magistrate Wilkinson and BP to establish the BELO case management protocol.[123]

Class Counsel continue to monitor the individual Settlement Program Appeals, Requests for Discretionary Review, and Appeals to the U.S. Fifth Circuit, of individual Claims, providing insight and materials to Claimants, and in many cases preparing and submitting *amicus* memos

---

[123] *See, e.g.,* Rec. Docs. 13773, 13787, 13880, 13891, 13991, 14097 and 14099.  *See also* Rec. Doc. 14364 (Brief re BELO Plaintiffs' Right to Jury Trial).

or briefs.[124]  In July of 2014, we prepared and submitted a Master *Amicus* to the Program Appeal

Panelists,[125] and we continue to review and routinely circulate redacted Program Appeal

Decisions, and maintain a searchable "Compendium" of Program Appeal Decisions.[126]  We have

prepared and updated a "Master Index" of relevant filings, submissions, briefs, and other

materials, which have been, not only circulated, to the extent practical, but filed into PACER,[127]

so that everyone could access them, and worked with the District Court and the Fifth Circuit's

Clerk's Office to create a "Master" Appeal Record.[128]

Class Counsel continue to respond daily to numerous questions, seek clarification and/or

assistance on Claimants' behalf from the Claims Administrators and their staffs, raise Program-

wide policy or administrative issues, and generally attempt to provide Claimants and their

attorneys with information, suggestions, references and/or materials that may assist them in the

prosecution of their Settlement Program Claims.

*The "Matching" / BEL Dispute*

Around the time of the final district court approval of the Economic Class Settlement, BP

started to complain about the way that Business Economic Loss (BEL) Claims were being

processed by the Claims Administrator and Program Vendors.   Comprehensive *in camera*

submissions were prepared by Class Counsel, including expert declarations from noted

accountants and economists, (including the co-author of an outdated textbook relied upon by

---

[124] *See, e.g.,* Fifth Cir. Nos. 13-31302, 13-31299 and 13-31296 (Non-Profits): Mot. to Dismiss Appeals (Jan. 27, 2014); Reply in Support of Mot. to Dismiss (Feb. 13, 2014); Appellees Brief on the Merits (June 9, 2014). Fifth Cir. No. 15-30798 (*Amicus* Brief filed Nov. 20, 2015). Fifth Cir. No. 15-30805 (*Amicus* Brief filed Dec. 29, 2015). Fifth Cir. No. 15-30860 (*Amicus* Brief filed Jan. 19, 2016).  Fifth Cir. No. 15-30507 (*Amicus* Brief filed Feb. 5, 2016).  Fifth Cir. No. 15-30964 (Amicus Brief filed March 28, 2016).

[125] Rec. Doc. 13496-6.

[126] http://hhklawfirm.com/compendium-of-significant-appeal-panel-decisions/?swpquery=%22%22.

[127] Rec. Doc. 14914. [An updated Master Index dated December 22, 2015 is submitted herewith as Exhibit 13.]

[128] Fifth Cir. No. 15-90087.  *See, e.g.,* Rec. Doc. 15643-2 (Joint Record Designation).

BP), and provided to the Court along with other relevant materials from negotiations, approval, and implementation.[129]   After the Court ruled, BP filed a lawsuit for "breach of contract" against the Claims Administrator, and a Motion to Enjoin the Settlement Program, which were successfully opposed by Common Benefit Attorneys.[130]

Once the U.S. Fifth Circuit Court of Appeals vacated and remanded the matter in October of 2013,[131]   a number of submissions were prepared and filed by Class Counsel both in the District Court and the Court of Appeals.[132]

A "BEL Group" was organized by Common Benefit Attorneys to develop further factual and expert economic and accounting evidence, (a) on the threshold contractual interpretation issue, (b) on the newly-raised causation issue, and (c) regarding the "matching" policy, (Policy No. 495), that was ultimately developed by the Program Accountants and approved by the Court.[133]   This BEL Group addressed not only the expert accounting issues, and the legal briefing, but also potential ethical issues, class issues, and the public relations issues and concerns.

---

[129] *See* Rec. Docs. 8963-26 and 8963-54 thru 8963-87.

[130] *See generally* MOTION TO INTERVENE [Rec. Doc. 8975] and ANSWER [Rec. Doc. 9013] in Civil Action No. 13-492; OPPOSITION TO BP MOT. TO STRIKE [Rec. Doc. 9118]; OPPOSITION TO BP MOTION FOR INJUNCTION [Rec. Doc. 9087]; TRANSCRIPT (April 5, 2013). *See also* OPP. BP MOT. FOR INJUNCTION, Fifth Cir. No. 13-30315 (April 17, 2013); OPP. BP MOT. FOR INJUNCTION, Fifth Cir. No. 13-30329 (April 18, 2013); APPELLEES BRIEF ON THE MERITS, Fifth Cir. No. 13-30315 (May 24, 2013).

[131] In re Deepwater Horizon, 732 F.3d 326 (5th Cir. 2013) ("*Deepwater Horizon I*") ("*BEL Opinion*").

[132] *See generally* Rec. Doc. 14914 (Index).   *In particular, see, e.g.,* Rec. Docs. 11740, 11804, 11833, 11885, 12017, and 12589-16 thru 12589-18;   *and, e.g.,* OPP. EMERGENCY MOT. FOR INJUNCTION, Fifth Cir. No. 13-30315 (Nov. 22, 2013); LETTER BRIEF, Fifth Cir. No. 13-30315 (Jan. 8, 2014); OPP. RENEWED MOT. FOR INJUNCTION, Fifth Cir. No. 13-30315 (Jan. 8, 2014); LETTER BRIEF, Fifth Cir. No. 13-30315 (Jan. 20, 2014); OPP. U.S. CHAMBER MOT. FOR LEAVE TO FILE FOR REHEARING EN BANC, Fifth Cir. No. 13-30315 (March 25, 2014); OPP. MOT. TO STAY MANDATE, Fifth Cir. No. 13-30315 (May 27, 2014).

[133] Experts included noted former UNO economics professor, Dr. Tim Ryan;  the co-author of the outdated textbook relied upon by BP, Dr. Mark Kohlbeck; Professor Sean Michael Snaith; and several Certified Public Accountants, including George Panzeca, Allen Carroll, Robert Wallace, Harold Asher, and Rick Stutes.

Once the final "matching" policy was formally promulgated and approved, Class Counsel sought clarification,[134] reconsideration,[135] and ultimately appeal of Policy No. 495,[136] while also opposing BP's Motion for Restitution,[137] and appeal of that issue to the U.S. Fifth Circuit.[138]

*BP's Attacks on the Economic Settlement*

In conjunction with BP's appeal on the BEL "matching" issues, the BP Defendants increased their other efforts to back out of the Economic Settlement Agreement, including a change in course on the approval of the settlement, repeated motions to enjoin the Program, objections to the budget, attacks on the Claims Administrator, and other efforts, within the Settlement Program, at the District Court, at the U.S. Court of Appeals and Supreme Court, in paid advertisements, and in the press, requiring a significant effort by Common Benefit Attorneys to defend the Settlement Program, oppose motions and appeals, meet with the Claims Administrator and the Special Master, and attempt to manage the statements, concerns, assistance, and/or attacks in the media and by business groups and professional associations. Among other things, Common Benefit Attorneys were called upon to defend the Class and the Settlement with respect to the following:

- Opp. BP Mot. to Suspend Payments (July 18, 2013) [139]

- Opp. Second Motion to Enjoin Program (Aug. 25, 2013) [140]

---

[134] Rec. Doc. 13004.

[135] Rec. Doc. 12941.

[136] Fifth Cir. No. 15-30377:  Appellants' Brief on the Merits (July 20, 2015); Reply Brief (Oct. 13, 2015).

[137] Rec. Doc. 13287.

[138] Fifth Cir. No. 14-31165:  Appellees' Brief (Feb. 9, 2015).

[139] Rec. Doc. 10772.

[140] Rec. Doc. 11117.

- Motion, Memo and Reply Brief to Authorize Claims Administrator to Implement Settlement re Oil & Gas Support Industry Claims (Aug. 27, 2013) [141]

- Appellees' Brief on the Merits, Fifth Cir. No.13-30095 (Sept. 3, 2013)

- Response to BP Objections to 4Q Budget (Sept. 17, 2013) [142]

- Class Counsel's Comments re Freeh Report (Sept. 20, 2013) [143]

- Mot. to Realign, Fifth Cir. No. 13-30095 (Sept. 27, 2013)

- Opp. Emergency Mot. for Injunction, Fifth Cir. No. 13-30315 (Nov. 22, 2013)

- Class Objection to New Evidence from BP in Settlement Program Appeals (Dec. 13, 2013) [144]

- Opp. Renewed Mot. for Injunction, Fifth Cir. No. 13-30315 (Jan. 8, 2014)

- Opp. Motion to Enjoin Seafood Program (Jan. 17, 2014) [145]

- Letter Brief, Fifth Cir. No. 13-30095 (Jan. 18, 2014)

- Letter Brief, Fifth Cir. No. 13-30315 (Jan. 20, 2014)

- Motion to Dismiss Appeal, Fifth Cir. No. 13-30843 (Jan. 29, 2014)

- Motion, Briefs, Stipulation, Opposition to Mot. for Reconsideration, and Certification on Class Counsel's Motion to Protect and Preserve Claimant Confidentiality and to Enforce Orders of the Court [146]

- Opp. Cobb & Allpar Pet. For Rehearing, Fifth Cir. No. 13-30095 (Feb. 6, 2014)

- Opp. BP Mot. for Pet. Rehearing En Banc, Fifth Cir. No.13-30095 (Feb. 6, 2014)

---

[141] Rec. Docs. 11156 and 11470 (filed Sept. 20, 2013).

[142] Rec. Doc. 11402

[143] Rec. Doc. 11463.

[144] Rec. Doc. 11973.

[145] Rec. Doc. 12164.

[146] Rec. Docs. 12413, 12539, 12548, 12987, 12907.

- Opp. Coon Pet. For Rehearing, Fifth Cir. No. 13-30095 (Feb. 6, 2014)

- Opp. BP Mot. for Production of Freeh Investigation Docs (Feb. 10, 2014) [147]

- Reply Brief to Dismiss Appeal, Fifth Cir. No. 13-30843 (Feb. 19, 2014)

- Opp. U.S. Chamber Mot. for Leave to File for Rehearing En Banc, Fifth Cir. No. 13-30315 (March 25, 2014)

- Letter Submission to Judge Shushan re Transition Claims Dispute (May 14, 2014) [148]

- Opp. Mot. to Stay Mandate, Fifth Cir. No. 13-30315 (May 27, 2014)

- Appellee's Original Brief on the Merits, Fifth Cir. No. 13-30843 (June 9, 2014)

- Opposition to BP's Motion for Restitution (Aug. 15, 2014) [149]

- Opposition to BP Motion to Stay filed in U.S. Supreme Court, No.13A1177 (June 2, 2014) [No.14-123]

- Opposition to BP Petition for Certiorari, No.14-123 (Oct. 8, 2014)

- Appellees Brief on the Merits, Fifth Cir. No. 14-30823 (Dec. 8, 2014)

- Opp. Mot. to Remove the Claims Administrator (Oct. 15, 2014) [150]

- Opp. Mot. Expedite Appeal, Fifth Cir. No. 14-31299 (Nov. 26, 2014)

- Response to Mot. to Add Claims Administrator as Party in Interest, Fifth Cir. No. 14-31299 (Dec. 12, 2014)

- Opp. WLF Amicus, Fifth Cir. No. 14-31299 (Dec. 29, 2014)

- Opp. U.S. Chamber Amicus, Fifth Cir. No. 14-31299 (Dec. 29, 2014)

- Appellees Brief on the Merits, Fifth Cir. No. 14-31299 (Jan. 6, 2015)

---

[147] Rec. Doc. 12312.

[148] Rec. Doc. 12942.

[149] Rec. Doc. 13287.

[150] Rec. Doc. 13496.

- Appellees' Brief on the Merits, Fifth Cir. No. 14-31165 (Feb. 2, 2015)
- Class Comments re Claims Administrator Update (May 4, 2015) [151]
- Class Comments re Claw-Back Motions (June 8, 2015) [152]

Following a "re-set" between the Claims Administrator and BP in 2015, Class Counsel continue to monitor the administration of the Program, attending periodic business process, IT, FWA, and budget "workstream" meetings, and to otherwise work with BP Counsel, the Claims Administrator, and the Program Vendors to address issues as they arise.

*BP's Dispute over the Medical Indemnity Agreement*

After months of work to force the professional objectors to dismiss their frivolous appeal, Counsel for BP informed Class Counsel that they were "terminating" the Medical Benefits Settlement, based on the alleged "inability" of the Medical Claims Administrator to obtain a "sufficient" agreement with CMS.[153]   Class Counsel spent months working with the Claims Administrator, Judge Shushan, and BP representatives to secure a final agreement with CMS, and the Effective Date of the settlement.

*The Chronic SPC Dispute*

As the Medical Benefits Settlement started to process claims, a question arose over whether classmembers with conditions specified under the Settlement Agreement that first manifested shortly after the Spill but were not formerly diagnosed until after the date of the Settlement should be treated as "Later Manifested Physical Conditions" under the terms of the Settlement Agreement.  Although the Medical Claims Administrator initially confirmed that such

---

[151] Rec. Doc. 14517.

[152] Rec. Doc. 14693.

[153] HERMAN-ROY DECLARATION ¶65.

claims were clearly intended to be treated as Chronic Specified Physical Conditions (Chronic SPCs), he, after conferring with BP, curiously changed positions, and started requiring such classmembers to pursue Back-End Litigation Option (BELO) claims.

Class Counsel submitted a Memo to Judge Shushan,[154] a Letter formally objecting to the Medical Claims Administrator's Policy Statement with a Request for Oral Argument and Motion to Strike Herzstein's Declaration,[155] a further Submission in Response to the Court's Order,[156] a Motion for Reconsideration and Reply Brief,[157] which was argued on September 24, 2014.[158]

Unable to secure SPC compensation, Class Counsel then worked with the Court and BP Counsel to assist such classmembers in the pursuit of BELO claims.

*Development of the BELO Case-Management Order*

Particularly with the Medical Claims Administrator's classification of many chronic conditions as Later Manifested Physical Conditions, the Court and the Parties recognized the need for a process to deal with BELO actions. Class Counsel worked with other plaintiffs' attorneys, Judge Shushan, Judge Wilkinson, and representatives of BP, to establish a BELO case-management order.[159]

In response to a BP Motion to Strike asserted in one of the earlier filed BELO actions, Class Counsel successfully advocated for the classmembers' option to request a jury trial.[160]

---

[154] Rec. Doc. 12862-1 (March 28, 2014).

[155] Rec. Doc. 12909 (May 21, 2014).

[156] Rec. Doc. 13106 (July 4, 2014).

[157] Rec. Doc. 13303 (Aug. 20, 2014) and Rec. Doc. 13408 (Sept. 19, 2014).

[158] *See* Transcript (Sept. 24, 2014).

[159] BELO INITIAL PROCEEDINGS CASE MANAGEMENT ORDER [Rec. Doc. 14099] (Jan. 30, 2015). *See also generally, e.g.,* Rec. Docs. 13773, 13787, 13880, 13891, 13991, and 14097.

[160] Rec. Doc. 14364. *See also,* Rec. Doc. 18722 (Response to BP Mot. to Amend BELO CMO).

*Individual U.S. Fifth Circuit Claims Appeals*

As noted, Class Counsel continue to monitor Program Appeal filings and decisions, Requests for Discretionary Review and decisions thereon, and individual claims appeals to the U.S. Fifth Circuit.  In most cases, at the Program Appeal and Discretionary Review level, Class Counsel simply offer assistance and guidance to the individual claimant and/or his or her counsel.  However, in some cases, Class Counsel will submit an *amicus* brief.[161]

In addition, and more proactively, since the Fifth Circuit's *Rule 79 Decision*,[162] Class Counsel have created a Master Index,[163] and a Master Record;[164]  routinely monitor the Fifth Circuit notices and filings;  and submit Class Counsel *Amicus* Briefs, in order to provide the Court with additional background and context, which we hope will assist the Court in not only deciding the merits of this particular appeal, but in helping to provide for the appropriate interpretation and application of the Settlement Agreement as to class-wide issues for the benefit of the Class as a whole.[165]

## The Phase One and Phase Two Liability Trials and Appeals

One of the significant early contributions that Common Benefit Attorneys made to the overall litigation strategy was to develop the notion of a two-fault allocation, whereby BP's liability for the predominant economic and environmental damages caused by the Spill would be

---

[161] *See, e.g.,* Class Counsel's *Amicus* Submission in Opposition to BP's Request for Discretionary Review of Claim No. 240218 (Feb. 6, 2016).

[162] In re Deepwater Horizon, 785 F.3d 986 (5th Cir. 2015) ("*Rule 79 Decision*").

[163] The original version was submitted as Rec. Doc. 14914.  It has since been updated, circulated, and posted. *See, e.g.,* Exhibit 13.

[164] Fifth Cir. No. 15-90087.  *See, e.g.,* Rec. Doc. 15643-2 (Joint Record Designation).

[165] *See, e.g.,* Fifth Cir. Nos. 13-31302, 13-31299 and 13-31296 (Non-Profits): Mot. to Dismiss Appeals (Jan. 27, 2014); Reply in Support of Mot. to Dismiss (Feb. 13, 2014); Appellees Brief on the Merits (June 9, 2014). Fifth Cir. No. 15-30798 (*Amicus* Brief filed Nov. 20, 2015). Fifth Cir. No. 15-30805 (*Amicus* Brief filed Dec. 29, 2015). Fifth Cir. No. 15-30860 (*Amicus* Brief filed Jan. 19, 2016).  Fifth Cir. No. 15-30507 (*Amicus* Brief filed Feb. 5, 2016).  Fifth Cir. No. 15-30964 (Amicus Brief filed March 28, 2016).

maximized, separate and apart from, and in addition to, the defendants' joint liability for the personal injuries and wrongful deaths that occurred in the explosions and fire on April 20, 2010. This concept was incorporated into the Trial Plan, and was illustrated by the following:



Because BP would likely bear the entire responsibility for the Failure to Prepare for a Spill and the Failure to Timely Cap the Well, this strategy was intended to maximize the relative fault of BP,[166] and allowed the plaintiffs to align themselves with Transocean and Halliburton against BP with respect to the Phase Two Trial.

After the Class Settlements were announced, the Court solicited, and the PSC (among others) provided, *in camera* submissions regarding the effects of the Settlements on the remaining claims, and a suggested plan forward. Several motions on discreet legal issues were

---

[166] In addition to the fault allocation itself, the PSC realized that all of the Phase Two conduct was, by definition, corporate conduct under the *P&L Boat Rentals* test, thereby giving the plaintiffs a "second bite at the apple" with respect to punitive damages liability.

scheduled, and briefed, and the Court issued an amended Trial Plan, which continued to embrace the same two-phase structure.[167]

The Phase One Trial commenced on February 25, 2013, and concluded on April 17, 2013.  Known as the Incident Phase, it addressed fault determinations relating to the loss of well control, the ensuing explosion and fire, the sinking of the *Deepwater Horizon,* and the initiation of the release of oil from the well. Phase One also considered issues related to Transocean's limitation defense, as well as the various cross-claims, counter-claims, and third-party demands between and among the defendants.[168]

The Phase Two Trial commenced on September 30, 2013, and concluded on October 18, 2013.  This phase was divided into two segments: "Source Control" and "Quantification."  While the United States was responsible for the Quantification segment, the Source Control segment was prosecuted by Common Benefit Attorneys, together with the States, and Defendants Transocean and Halliburton, ("the Aligned Parties").  This segment focused on the conduct or omissions of BP relative to stopping the release of hydrocarbons.  The Quantification segment, on the other hand, pertained to the amount of oil actually released into the Gulf of Mexico, an important factor for determining the amount of civil penalties under the CWA.[169]

In light of the BP Class Settlements, (which included the assignments to the Class of BP's Claims for BP's compensatory and punitive damages against Halliburton and Transocean, and the classmembers' own individual Expressly Reserved punitive damages claims against Halliburton and Transocean, as well as some Expressly Reserved claims by classmembers against BP), Common Benefit Attorneys, in conjunction and coordination with the States and the

---

[167] *See* Second Amended Pre-Trial Order No. 41 [Rec. Doc. 6592] (May 30, 2012).

[168] *See* PHASE ONE FINDINGS [Rec. Doc. 13381-1] p.8 ¶13.

[169] *See* PHASE ONE FINDINGS, p.9 ¶14.

United States, continued to pursue liability findings against BP, Transocean, and Halliburton, representing the interests of the following:

I.   Economic & Property Damage Settlement Class Claims against Halliburton and Transocean

    a.   BP's Claim for Its Own Compensatory Damages suffered by BP

- Including claims for BP's own direct "first-party" damages, such as loss of the well, loss of production, the costs of drilling the relief wells, clean-up and response costs incurred;

- Assigned to and Asserted by the Class (Trust) as a whole; and,

- Available if Class (Trust) Establishes "Gross Negligence" or Fraud and/or "core" Contractual Breach

    b.   BP's Claim for Punitive Damages

- Assigned to and Asserted by the Class (Trust) as a whole; and,

- Available upon Showing of "Gross Negligence"

    c.   Classmembers' Expressly Reserved Punitive Damage Claims

- Asserted by Classmembers with *Robins Dry Dock* Standing Individually; and,

- Available upon Showing of "Gross Negligence"

II.   Private Economic Opt Out, Excluded, and Expressly Reserved Claims against BP, Halliburton and Transocean

- For Compensatory Damages by All Plaintiffs against BP;

- For Compensatory Damages against Halliburton and Transocean by Plaintiffs with *Robins Dry Dock* Standing, but Indemnified by BP;

- Punitive Damages against BP / Halliburton / Transocean Available to Plaintiffs with *Robins Dry Dock* Standing upon Showing of "Gross Negligence"

III.  Personal Injury Claims against BP, Halliburton and Transocean

- Medical Benefits Classmembers' Expressly Reserved Claims for Punitives against Halliburton and Transocean

- Personal Injury Claims of Opt Outs and/or People Not Covered by Class

   ° For Compensatory and Punitive Damages;

   ° Compensatory Damages against Halliburton and Transocean Indemnified by BP;  and,

   ° Punitive Damages Available upon Proof of "Gross Negligence"

IV.  Local Government Claims

- For Compensatory Damages by All Local Governments against BP;

- For Compensatory Damages against Halliburton and Transocean by Local Government Entities with *Robins Dry Dock* Standing, but Indemnified by BP;

- Punitive Damages against BP / Halliburton / Transocean Available to Local Government Entities with *Robins Dry Dock* Standing upon Showing of "Gross Negligence" [170]

The liability trial that commenced on February 25, 2013 was no ordinary trial.  As members of the press reported at the time:

> "A TITANIC COURTROOM SHOWDOWN WITH BILLIONS OF DOLLARS IN THE BALANCE . . ." [171]

---

[170] *See generally* Plaintiffs' Opposition to Transocean's Motions for Partial Judgment on the Pleadings (May 20, 2013) [Rec. Doc. 10186] at pp.5-6, and Plaintiffs' Opposition to Halliburton's Motions for Partial Judgment on the Pleadings (May 20, 2013) [Rec. Doc. 10187] at pp.4-5.

[171] "BP's Billions at Stake as Courtroom Showdown Starts" CNN.com (Feb. 25, 2013).

"TRIAL OF THE CENTURY . . ."[172]


"THIS WILL BE THE MOST SIGNIFICANT TRIAL EVER BROUGHT
UNDER ENVIRONMENTAL LAWS . . ."[173]


". . . THE MAMMOTH TRIAL OVER THE GULF OF MEXICO
OIL SPILL . . ."[174]


"ENVIRONMENTAL 'TRIAL OF THE CENTURY' TO START TODAY . . .
BILLIONS OF DOLLARS AND THE HEALTH OF THE GULF COAST ARE
ON THE LINE . . ."[175]


"THE WORST ENVIRONMENTAL DISASTER IN AMERICAN
HISTORY . . ."[176]


With respect to the overall trial effort, the numbers largely speak for themselves:[177]

- ➢   376   Phase One Depos Taken

- ➢   168   Phase One Depo Bundles Prepared

- ➢   200   Phase One Depo Bundles Submitted

- ➢   6,671   Phase One Exhibits Listed by Plaintiffs

- ➢   3,382   Phase One Exhibits Admitted (by all parties)

- ➢   29   Days of Phase One Trial

- ➢   68   Experts Originally Designated

- ➢   34   Additional May-Call Live Witnesses Listed and Prepared For by PSC

- ➢   39   Live Witnesses Called (by all parties)

---

[172] "Trial of the Century: Can BP Deflect Blame for Gulf Oil Spill?" CSMonitor.com (Feb. 23, 2013).

[173] "BP Trial's First Week Offers Glimpse of Long Fight" USAToday.com (March 2, 2013).

[174] "BP Oil Spill Trial Is Good Business for Hotels, Restaurants, Office Rentals" NOLA.com (Feb. 26, 2012).

[175] "Environmental 'Trial of the Century' to Start Today" PublicNewsService.org (Feb. 24, 2013).

[176] "Trial Against BP to Begin Over 2010 Rig Explosion" NRP.org (Feb. 25, 2013).

[177] *See generally* PHASE ONE (a snapshot) [Exhibit 17].

And, for Phase Two:

- ➢    79     Phase Two Depos Taken

- ➢    108    Phase Two Plaintiff and/or Aligned Party Source Control–related Depo Bundles Prepared

- ➢    34     Phase Two Source Control–related Depo Bundles Submitted

- ➢    1,804   Phase Two Exhibits Listed by Plaintiffs / Aligned Parties

- ➢    1,777   Phase Two Exhibits Admitted (by all parties)

- ➢    4      Days of Phase Two Source Control Segment Trial

- ➢    12     Total Days of Phase Two Trial

- ➢    12     Source Control–related Experts Originally Designated

- ➢    12     Additional Source Control–related May-Call Live Witnesses Listed and Prepared For

- ➢    10     Source Control–related Live Witnesses Called

- ➢    29     Total Phase Two Witnesses Called

In addition to the rigorous in-court and out-of-court trial demands, such as witness, exhibit, demonstrative and cross-examination preparation and presentation, the PSC Trial Teams and their staffs provided logistical and administrative assistance for the collective Plaintiff effort, for the Court itself, and for the Parties as a whole. In addition to staffing and supplying, daily, a PSC inside-the-Courthouse "War Room", Common Benefit Attorneys tracked the admission status of all exhibits, demonstratives and deposition bundles for both plaintiff and defense, and coordinated with all counsel, inData, and the Court regarding same. They participated in nightly calls with defense counsel, counsel for the U.S., Coordinating Counsel, and inData, to review admitted evidence for each day, and took lead responsibility for weekly and final marshalling conferences with the Court. Common Benefit Attorneys organized and directed the production

and providing of Phase One and Phase Two Trial Access Badges for all participants and attendees. And established the www.mdl2179trialdocs.com website, providing public access to daily trial transcripts and exhibits, while continuing to assist with the uploading of materials and other maintenance of the site. Finally, Common Benefit Attorneys monitored the Quantification segment, for potential relevance and/or use in OPA Test Case and/or individual damages trials.

Following each phase, Common Benefit Attorneys spent months preparing proposed findings of fact, conclusions of law, and associated post-trial briefs.[178] Ultimately appeals were filed and briefed on the issue of BP's punitive damages liability.[179] PSC firms also spent time revising, updating, assimilating, and indexing the significant evidence for potential use as a 'Trial Package' or other resource for test cases in the MDL or any unresolved transferred or remanded cases.

**The Phase Three Trial**

While neither private plaintiffs nor local government entities were parties to the Phase Three Trial, Common Benefit Attorneys were asked by the Court to assist with evidentiary and other logistics associated with the trial. In addition, Common Benefit Attorneys attended the Phase Three Trial and reviewed the documentary evidence for potential relevance to any future individual trials by plaintiffs on environmental and/or economic issues generally, and, in particular, for use in the upcoming OPA Test Cases.

---

[178] See Rec. Docs. 10458, 10459 and 10714 (Phase One Post Trial Brief, Proposed Findings and Conclusions, and Reply Brief); Rec. Docs. 12038, 12039, 12214 (Phase Two Post Trial Brief, Proposed Findings and Conclusions, and Reply Brief); Rec. Doc. 12043 (Aligned Parties' Phase Two Proposed Findings); Rec. Docs. 10186 and 10187 (Oppositions to Halliburton and Transocean Motions for Summary Judgement on Assigned Claims); Rec. Doc. 13519 (Opp. PLC Mot. for Entry of Judgment).

[179] See APPELLANTS' BRIEF ON THE MERITS, No. 14-31374 (June 1, 2015); see also, e.g., MOTION TO CONSOLIDATE PHASE ONE TRIAL APPEAL [NO.14-31374] WITH PHASE TWO TRIAL APPEAL [NO.15-30139] (Feb. 19, 2015); MOTION TO RECONSIDER DENIAL OF MOTION TO CONSOLIDATE (March 5, 2015); OPPOSITION TO MOTION TO STRIKE SUPPLEMENTAL RECORD DESIGNATIONS, No. 14-31374 (March 5, 2015).

**The Halliburton and Transocean Settlements**

In addition to the BP Class Settlements, the PSC reached proposed class settlements with Halliburton and Transocean, for a total of approximately $1.24 Billion, including an Aggregate Payment of $1,028,000,000 to be paid by Halliburton[180] and an Aggregate Payment of $211,750,000[181] to be paid by Transocean.  Magistrate Judge Wilkinson was appointed to serve as the Allocation Neutral by the Court, per the terms of the Agreements, to allocate these Aggregate Payments between **(a)** the existing BP Economic & Property Damages Settlement on the Assigned Claims from BP, and **(b)** the Expressly Reserved and/or other claims for punitive damages against Transocean and/or Halliburton.

In addition to submissions to Judge Wilkinson regarding the allocation process,[182] Common Benefit Attorneys have prepared and filed Class Complaints,[183] an Assignment Complaint,[184] and Amended Agreements,[185] arranged for the Escrow Agreements and Accounts,[186] responded to the Claims Administrator regarding the Distribution Model,[187] and moved for Preliminary Approval,[188] including the submission of a Notice Plan.[189]

In the meantime, Judge Wilkinson has allocated $337.6 Million to the BP Economic & Property Damages Settlement Class on the Assigned Claims, and $902,083,250 to a New Punitive Damages Settlement Class.[190]

---

[180] *See* Second Amended Halliburton (HESI) Settlement Agreement (Sept. 4, 2015) [Rec. Doc. 15322-1] Section 6(a) (p.18).

[181] *See* Transocean Settlement Agreement (May 29, 2015) [Rec. Doc. 14644-1] Section 6(a) (p.17).

[182] *See, e.g.,* Rec. Docs. 15459, 15569.

[183] *See* No. 15-4143, Rec. Doc. 1 (Halliburton New Class Complaint); No. 15-4146, Rec. Doc. 1 (Transocean New Class Complaint).

[184] *See* No. 15-4654 (Halliburton Assigned Claims Complaint).

[185] *See, e.g.,* Rec. Docs. 13646, 15322.

[186] *See, e.g.,* Rec. Docs. 13649, 14906, 15979.

[187] *See, e.g.,* Rec. Doc. 15722.

[188] Rec. Doc. 16161.

[189] Rec. Doc. 16161-2.

[190] ALLOCATION AND REASONS [Rec. Doc. 15652] (Dec. 11, 2015).

**The Government Settlements** [191]

During the Summer of 2015, BP announced a "Global Settlement" with the United States, the States, and Local Governments, to resolve Clean Water Act, Natural Resource Damage, and Economic Loss claims, damages, assessments, and penalties.  In particular, the settlement included:

| | |
|---|---|
| $5.5 Billion | Clean Water Act Penalties |
| $8.7 Billion | Natural Resource Damages |
| $4.9 Billion | State Economic Loss Damages [192] |
| $687.4 Million | Local Government Claims [193] |

In order to help facilitate the settlement, the existing hold-back on all State and Local Government recoveries was lifted, and a payment by BP of $40 Million to Common Benefit Attorneys collectively was approved.[194, 195]

---

[191] Of course, Class Counsel do _not_ make any claim for common benefit fees with respect to the Clean Water Act penalties, the NRD assessment, the Local Government Settlements, or the Economic Loss Settlements with the States of Florida, Mississippi, or Texas.  Because, however, the PSC and other Common Benefit Attorneys are receiving fees based on their joint-prosecution agreements with the States of Alabama and Louisiana;  because they acted for the benefit of the Local Governments;  and because they worked cooperatively with the United States in establishing gross negligence and willful misconduct under the Clean Water Act;  petitioners believe that such recoveries are relevant to the overall analysis;  as well as relating the historical background and context.

[192] Including $1 billion to the State of Alabama, $2 billion to the State of Florida, $1 billion to the State of Louisiana, $750 million to the State of Mississippi, and $150 million to the State of Texas.

[193] *See generally* U.S. Dept. of Justice, "U.S. and Five Gulf States Reach Historic Settlement with BP to Resolve Civil Lawsuit Over Deepwater Horizon Oil Spill" (Oct. 5, 2015) (available at: https://www.justice.gov/opa/pr/us-and-five-gulf-states-reach-historic-settlement-bp-resolve-civil-lawsuit-over-deepwater), and "BP to settle federal, state and local Deepwater Horizon claims for up to $18.7 billion with payments to be spread over 18 years" (July 2, 2015) (available at: http://www.bp.com/en/global/corporate/press/press-releases/bp-to-settle-federal-state-local-deepwater-horizon-claims.html); "BP settlement money flows to cities hundreds of miles from Gulf Coast shoreline" Fuel Fix (from the Houston Chronicle) (Aug. 20, 2015) (available at: http://fuelfix.com/blog/2015/08/20/bp-settlement-money-flows-to-cities-hundreds-of-miles-from-gulf-coast-shoreline/#33996101=0). The formal CONSENT DECREE between and among the BP Defendants, the United States, and the States of Alabama, Florida, Louisiana, Mississippi and Texas was approved on April 4, 2016 [Rec. Docs. 16093 and 16095].

[194] *See* ORDER (July 10, 2015) [Rec. Doc. 14825] (lifting hold-back on State and Local Government Claims), *and* CERTIFICATES OF NON-OBJECTION [Rec. Doc. 15437], ORDER [Rec. Doc. 15441], and Ex. A to Order [Rec. Doc. 15441-1] No. 1, (approving payment of $40 Million to Common Benefit Attorneys).

[195] As noted *supra,* the other hold-backs on previous GCCF, local government, personal injury, and wrongful death settlements were lifted, the funds were returned, and no person, business, local government, or other plaintiff or claimant (nor their own individually retained attorneys) would be required to make any common benefit cost contribution or pay any common benefit fee. *See* Rec. Docs. 6428, 14825, 14946 and 15427.

**The OPA Test Cases**

Following the BP Class Settlements and the Limitation and Liability Trial, the Plaintiffs' Steering Committee turned attention to the remaining un-tried and unsettled cases of plaintiffs who might have 'pure OPA' claims against BP as the Responsible Party.  Working with Judge Shushan and the BP Defendants, a group of OPA Test Cases was selected to provide an illustrative set of fact situations that would provide guidance on two primary issues: **(a)** how to interpret and apply OPA causation, in the first instance, for loss of profits and/or earning capacity, under 33 U.S.C. §2704(b)(2)(E);   and **(b)** the extent, if any, to which BP was responsible for losses resulting, at least in part, from the Deepwater Moratoria and other permitting changes caused by the Spill.  After a lengthy review and selection process, the Test Cases were initially selected in August of 2013,[196] and a Scheduling Order was ultimately entered in June of 2014.[197]

By this time, Common Benefit Attorneys had already spent a considerable amount of time and resources researching the OPA legislative history;  factual and legal issues regarding previous oil spills or other casualties, including statutory and/or regulatory suspensions and/or changes, the closure of fisheries, the closure of waterways, the closure of ports, pipelines, roads and/or bridges, etc.;  and other statutory, regulatory, legislative, academic materials and caselaw regarding government action and foreseeability;  and identifying and working with potential and retained experts, consultants and fact witnesses concerning same.

Similarly, the PSC had already commenced working with economic and accounting experts regarding the macro-economic conditions and context within which the Spill occurred, particularly with respect to the oil and gas industry, as well as the potential damage models and loss projections that might be associated with the specific individual selected OPA Test Cases.

---

[196] *See* Rec. Doc. 11031.
[197] Rec. Doc. 12972.

The PSC had continued to work with mapping experts and others to identify the specific areas affected by surface oil and other clean-up and response efforts.

And, finally, the PSC had already started to review all of the Phase One, Phase Two, and Phase Three evidence for potential relevance or use in the OPA Test Cases.

Once the Scheduling Order was entered, the Common Benefit Attorney team assembled for a multi-day intensive planning session to crystalize the issues, theories, and strategies.  It was decided that, once the Answers in the individual test cases were filed, issue would be joined, and Motion to Strike Affirmative Defenses could be filed in the context of specific factual allegations and concrete claims, and would thereby provide the Court with a potential opportunity to resolve core legal issues without any concerns about an alleged "advisory" opinion.  These Motions and Reply Briefs were filed in July of 2014,[198] but were ultimately denied, without prejudice, as premature.

Common Benefit Attorneys thereafter engaged in extensive discovery and continued expert preparation and development relating to both the common issues and the individual seven selected OPA Test Cases.  Initial disclosures, document productions, and interrogatory responses were provided by all seven OPA Test Cases, followed by extensive documentary and electronic discovery relating to Bisso, Wadleigh, and Blake.  Judge Shushan conducted frequent OPA Test Case Status Conferences.  Most Bisso Depositions, all Wadleigh Depositions, and a few expert, consultant, and third-party factual depositions had been taken by March 10, 2016, when the OPA Test Cases were dismissed.

In the meantime, the PSC continued to develop the expert and other associated testimony of Harold Asher, CPA (regarding case-specific damages), former Congressman Jimmy Hayes and former Congressional Staff Attorney Lee Foresgren (regarding OPA Legislative History and experience with previous spills), Dr. Richard Crowsey (mapping the extent of oil), and Capt. Hocks (authenticating Notices to Mariners), whose affidavits had already been submitted to BP,

---

[198] Rec. Docs. 13108, 13302.

(and in some cases, had already been deposed), at the time of the dismissal – as well as Dr. Jacobs, an economist.[199]

Common Benefit Attorneys had also filed extensive briefs, addenda, and exhibits, on Plaintiffs' Renewed Motion to Strike Affirmative Defenses and in Opposition to BP's Renewed Motion to Dismiss "Moratoria" and "Permitoria" Claims.[200]

The PSC has attempted to pursue these causes of action in the U.S. Fifth Circuit, on appeal.[201]

**Other Common Benefit Efforts**

Common Benefit Attorneys also contributed significant time and effort to administrative and other tasks that were necessary, not only for the common and collective benefit of plaintiffs, but also for the overall management of the case, relative to all Parties, and to the Court.  Such time and efforts included, among other things, coordination between and among the Plaintiff Steering Committee, Counsel for the U.S., Counsel for the States, Counsel for the Defendants, Special Master McGovern, Special Master Freeh, Magistrate Judges Shushan and Wilkinson, Claims Administrator Pat Juneau, Claims Administrator Matt Garrettson, Clams Administrator Mike Juneau, Fifth Circuit Conference Attorney Joe St. Amant, and the Liaisons to the Neutrals – as well as various different business, industry, attorney, accountant, environmental, seafood, and other professional and/or advocacy groups, societies, and/or organizations;  government and public officials and agencies;  and members of the press.

---

[199] Note that, subsequent to the dismissal, Dr. Crowsey's Affidavit and Maps have been widely circulated to Plaintiffs Attorneys and others for potential use in further litigation and/or settlement negotiations.  In addition, the Notices to Mariners authenticated by Capt. Hooks and much of the work provided by Congressman Hayes, Mr. Foresgren, and others regarding OPA Legislative History and prior spills was summarized and made publicly available as Addenda to the Opposition to BP's Renewed Motion to Dismiss, Rec. Docs. 15704-1, 15704-2.

[200] Rec. Docs. 15655, 15704, 15752.

[201] *See* Rec. Doc. 16014 (Notice of Appeal), docketed as U.S. Fifth Cir. No. 16-30245.

Common Benefit Attorneys coordinated with individual plaintiff attorneys with respect to motions and briefs on legal and administrative issues, in many cases assisting with the filings. The PSC contributed to a Master Claims Database, and assisted the plaintiffs and the Court with the establishment of a "B3 Protocol" relating to the clean-up and responder defendants (Pre-Trial Order No. 57),[202] and the Pre-Trial Order No. 60 process.[203]

## The Fee Committee Review Process under Pre-Trial Order No. 59

From the time Pre-Trial Order No. 9 was entered on October 8, 2010, through December 31, 2015, a total of 107 Common Benefit Firms submitted over 585,000 hours, and over $7 million in Held Expenses, as well as $37.5 million in Shared Expenses, accepted by the Court-appointed CPA Phil Garrett, on a monthly basis.[204]

On July 15, 2015, the Court entered Pre-Trial Order No. 59, which required Common Benefit Attorneys to audit their time and expense submissions, and to delete any and all submissions that might have been related to individually represented clients, as opposed to common benefit, duplicative, or otherwise inappropriate.[205]

---

[202] *See, e.g.,* Rec. Docs. 5718, 6143, 6192, 6247, 6696, 13158, 13667, 15711, 15723, 15853.

[203] *See* Rec. Doc. 16050 (Pre-Trial Order No. 60). *See also, e.g.,* Rec. Doc. 16443-2 (PSC Certification to motion by certain plaintiffs for reconsideration), Rec. Doc. 17755 (PSC Motion to Extend Deadline for *Pro Ses*), Rec. Doc. 18657 (Joint Motion to Amend Pre-Trial Order No. 60), and Rec. Doc. 18724 (Show-Cause Order).

[204] GARRETT AFFIDAVIT (July 10, 2016) ¶12; HERMAN-ROY DECLARATION (July 14, 2016) ¶117.

[205] *See* PRE-TRIAL ORDER NO. 59 [Rec. Doc. 14863] (July 15, 2015), at pp.4-6, ¶¶9-10. (*See also* FIRST AMENDMENT TO PTO 59 [Rec. Doc. 15828] (Feb. 3, 2016) (extending the "Initial Cut-Off Date" thru December 31, 2015), *and* THIRD AMENDMENT TO PTO 59 [Rec. Doc. 18641] (June 2, 2016) (clarifying deadlines, and authorizing the review and inclusion of time and expenses submitted after December 31, 2015)) [A second amendment to Pre-Trial Order No. 59 allowed common benefit cost and/or fee applicants to waive their in-person Fee Committee Interviews in cases where they had submitted relatively few hours and/or expenses.]

Pursuant to this process, Common Benefit Firms audited their time and expense submissions, and reduced their time by 26,583 hours, while also eliminating over $120,000 in Held Expenses that had been previously claimed.[206]

The Fee Committee and Special Counsel reviewed the time submissions, as well as the Fee Affidavits and Memos submitted by the Common Benefit Firms,[207] and conducted interviews with a representative of each Common Benefit Firm.[208]   The Fee Committee conducted 74 interviews, for a total of 12 business days, over the course of which an additional 6,218 hours and approximately $44,200 in Held Costs were voluntarily withdrawn.[209]

Based on its review of the time submissions, together with the affidavits and interviews, the Fee Committee feels confident that a minimum of 518,250 hours were reasonably expended thru the end of 2015 for the common benefit of class members and others affected by the *Deepwater Horizon* Incident, in accordance with the Court's directives in Pre-Trial Order No. 9 and Paragraph 10 of Pre-Trial Order No. 59.[210]   When the 8,831 hours submitted and accepted

---

[206] GARRETT AFFIDAVIT, ¶13; HERMAN-ROY DECLARATION, ¶¶ 118, 120 and fn.163.

[207] *See* Pre-Trial Order No. 59, ¶¶15-17 and Exhibit A.

[208] Paragraph 29 of Pre-Trial Order No. 59 was amended to allow firms submitting less than 250 hours to waive the Fee Interview, and rely solely upon their time submissions and Fee Affidavits. *See* AMENDMENT TO PTO 59 [Rec. Doc. 16020] (March 22, 2016).

[209] HERMAN-ROY DECLARATION, ¶120 and fn.163. (The Fee Committee continues to follow up with Common Benefit Attorneys regarding voluntary withdrawals of Held Costs and/or hours.)

[210] *See* HERMAN-ROY DECLARATION ¶¶121-122. The Fee Committee and Special Counsel believe that this number of hours is extremely conservative, not only in terms of evaluating the 585,947.65 originally accepted hours in light of the terms and requirements of the Court's Pre-Trial Orders, but also because the 527,081 hours, (*i.e.* the 518,250, plus the accepted Jan-April 2016 hours discussed *infra*), does not include: **(a)** the thousands of hours expended by full-time PSC-employed attorneys Rob Warren (2010-2012) and Dennis Rawlins (2014-2016) and paralegal Cristina Herrington (2010-2014); **(b)** the thousands of hours expended by appellate and other special counsel, such as Samuel Issacharoff, Basile Uddo, and Irwin Fritchie, who were hired by the PSC, and compensated out of the common benefit shared expense assessments; **(c)** additional 2016 hours which have not yet been formally submitted and/or accepted;   and **(d)** hours that were reasonably and necessarily expended by Common Benefit Attorneys, but, due to oversight or mistake, were not submitted timely, and therefore were rejected by Mr. Garrett. (Common Benefit Attorneys have, of course, as a practical matter, already been reimbursed for most of the attorneys' fees expended in connection with the work performed by outside counsel and PSC employees as part of the interim Shared Expense reimbursements, for which final approval is now sought.  Nevertheless, as the Court is attempting to assess the true level of attorney and paralegal hours that were necessary to advance the common benefit effort in this case, it seems appropriate to note that such additional hours were expended on behalf of classmembers, albeit on a guaranteed monthly and non-contingent basis.)

thru April of 2016 are added,[211] petitioners have dedicated at least 527,081 common benefit hours.[212]

When the $79,785.94 accepted 2016 Held Costs (thru April 2016) are factored in,[213] the total potential Common Benefit Held Costs claimed to date are $7,187,698.30.


**The U.S. Fifth Circuit Has Endorsed a Percentage-of-Benefit Method for Awarding Common Benefit Fees, with an Abbreviated "Lodestar" Crosscheck**

For well over a century, the Supreme Court has "recognized consistently that a litigant or a lawyer who recovers a common fund for the benefit of persons other than himself or his client is entitled to a reasonable attorney's fee from the fund as a whole." Boeing Co. v. Van Gemert, 444 U.S. 472, 478 (1980).[214] Under this "common fund doctrine … a private plaintiff, or plaintiffs' attorney, whose efforts create, discover, increase, or preserve a fund to which others also have a claim, is entitled to recover from the fund the costs of his litigation, including attorneys' fees." In re High Sulfur Content Gasoline Prods. Liab. Litig., 517 F.3d 220, 227 n.10 (5th Cir. 2008) (quoting In re General Motors Corp. Pick-Up Truck Fuel Tank Prods. Liab. Litig., 55 F.3d 768, 820 n.39 (3d Cir.), cert. denied, 516 U.S. 824 (1995)). Accordingly, where a class action results in a recovery that has monetary value for class members, the attorneys whose efforts contributed to that recovery are entitled to payment of a reasonable fee from the recovery

---

[211] See GARRETT AFFIDAVIT ¶14.

[212] See HERMAN-ROY DECLARATION, ¶123.

[213] See GARRETT AFFIDAVIT ¶14.

[214] This principle, expressed in the High Court's Boeing decision, was derived from the following line of Supreme Court authority: Alyeska Pipeline Serv. Co. v. Wilderness Soc., 421 U.S. 240, 257 (1975); Mills v. Electric Auto-Lite Co., 396 U.S. 375, 393 (1970); Sprague v. Ticonic Nat'l Bank, 307 U.S. 161, 164-66 (1939); Central R.R. & Banking Co. v. Pettus, 113 U.S. 116, 123-27 (1885); Trustees v. Greenough, 105 U.S. 527, 532-37 (1881).

proceeds.[215] *See, e.g.*, In re Continental Illinois Sec. Litig., 962 F.2d 566, 568 (7th Cir. 1992) ("Having employed their professional skills to create a cornucopia for the class, the lawyers for the class were entitled under the principles of restitution to suitable compensation for their efforts"); Klein v. O'Neal, Inc., 705 F. Supp. 2d 632, 673 (N.D. Tex. 2010) ("The use of a common fund to pay attorney's fees in class action settlements is well established"); In re Vioxx Prods. Liab. Litig., 760 F.Supp.2d 640, 647 (E.D. La. 2010) (the "equitable common fund doctrine was originally, and perhaps still is, most commonly applied to awards of attorneys' fees in class actions"); Turner v. Murphy Oil, 472 F.Supp.2d 830, 856-57 (E.D. La. 2007) (quoting 4 Alba Conte & Herbert B. Newberg, *Newberg on Class Actions* §13:76 (4th ed. 2002)) ("When a plaintiff in an individual or representative capacity creates, increases, or preserves a fund by settlement or judgment, which benefits an ascertainable class, the court in exercising its equity jurisdiction, may grant class counsel fees by directing payment from the fund"); Eldon E. Fallon, *Common Benefit Fees in Multi-District Litigation*, 74 LA. L. REV. 371 (2014). Rule 23(h) of the Federal Rules of Civil Procedure specifically recognizes these principles, providing that, where a case is certified as a class action, "the court may award reasonable attorneys' fees and nontaxable costs authorized by law or by agreement of the parties." Fed. R. Civ. P. 23(h).

While the Fee Agreement with BP – alone or in combination with the Common Fund Doctrine – justifies the award of common benefit fees to the petitioners and establishes the upper limit of any such award, the district court is required to independently analyze the reasonableness

---

[215] The common fund principle also supports the assessment of recoveries by individual plaintiffs in multi-district litigation and the award of attorneys' fees from the fund created by such assessments to compensate the attorneys appointed by the transferee court to assist in management of the litigation for the benefit of the plaintiffs subject to such MDL proceedings. *See, e.g.*, In re Diet Drugs Prods. Liab. Litig., 582 F.3d 524, 546-547 (3d Cir. 2009); In re Vioxx Prods. Liab. Litig., 760 F.Supp.2d 640, 647-649 (E.D. La. 2010). A district court's power to assess recoveries of MDL plaintiffs and to make an award of attorneys' fees from the pool of such assessments is also a necessary incident of its inherent management authority – a court's power to manage consolidated litigation implies a corollary authority to appoint lead, liaison and other common benefit attorneys and to compensate them for their service. *See, e.g.*, ORDER AND REASONS (Dec. 28, 2011) [Rec. Doc. 5022] pp.1-2; *citing* Air Crash Disaster at Florida Everglades, 549 F.2d 1006, 1012-20 (5th Cir. 1977); *see also, e.g.*, Diet Drugs, 582 F.3d at 546-47.

of the requested attorneys' fees. *See, e.g.,* High Sulfur, 517 F.3d at 227-28; Strong v. BellSouth Telecommunications, Inc., 137 F.3d 844, 849-50 (5th Cir. 1998); Evans v. TIN, Inc., No. 11-2067, 2013 WL 4501061 at *5 (E.D. La. 2013).   As the Fifth Circuit Court of Appeals has explained:

> The district court's close scrutiny of fee awards serves to "protect the nonparty members of the class from unjust or unfair settlements affecting their rights as well as to minimize conflicts that may arise between the attorney and the class, between the named plaintiffs and the absentees, and between various subclasses."

High Sulfur, 517 F.3d at 228 (citations omitted).[216]

 For the district courts within the jurisdiction of the Fifth Circuit, the reasonableness of any fee award is adjudicated by reference to the twelve factors first identified in Johnson v. Georgia Highway Express, Inc., 488 F.2d 714 (5th Cir. 1974); *see also* Union Asset Management Holding A.G. v. Dell, Inc., 669 F.3d 632, 642 (5th Cir.), *cert. denied*, 133 S. Ct. 317 (2012) ("Fifth Circuit law requires that when reviewing an attorneys' fee award for abuse of discretion, this Court must determine whether 'the record clearly indicated that the district court has utilized the *Johnson* framework as the basis of its analysis'").

While the *Johnson* Factors represent the considerations that necessarily inform the fee-adjudication process they do not, in and of themselves, furnish a methodology by which those considerations can actually be used to compute a fee award. The Courts have articulated two distinctly different computational approaches to the award of reasonable counsel fees – the

---

[216] While Petitioners believe that District Court approval of the fee award is necessary and appropriate under both Rule 23 and the terms of the Fee Agreement, it should be noted that the present fee petition is somewhat distinguishable and unique.  Most commonly, the request for payment of class counsel or other common benefit fees is considered together with the question of settlement approval, and, as reflected in the above-quoted language, provides protections to the members of the class.  In this case, by contrast, the settlements have already been fully and finally approved as fair, reasonable, and adequate to the members of the class.  The Court has therefore already conclusively determined that the settlement classes and their members have been adequately represented and protected by Class Counsel, and the approval or non-approval of the instant fee petition could not possibly have any direct or indirect effect upon any member of either class.

percentage-of-benefit method and the "lodestar" method. *See, e.g.*, Union Asset, 669 F.3d at 642-43.  Under the percentage-of-benefit method, "the court awards fees as a reasonable percentage of the common fund." Union Asset, 669 F.3d at 643.  *Accord, e.g.*, Vioxx, 760 F.Supp.2d at 650 (using the percentage method "the Court compensates attorneys who recovered some identifiable sum by awarding them a fraction of that sum…").  Under the "lodestar" method, the court multiplies the reasonable number of hours by a reasonable hourly rate, and then adjusts upward or downward by a numeric "multiplier" to account for the court's evaluation of the *Johnson* factors. *See, e.g.,* Union Asset, 669 F.3d at 642-43; In re Fender, 12 F.3d 480, 487 (5th Cir.), *cert. denied*, 511 U.S. 1143 (1994).

From the time the Supreme Court announced its decision in 1885 in Central R.R. & Banking Co. v. Pettus, courts typically based fee awards in common benefit cases on a "reasonable percentage of the fund." *See* Pettus, 113 U.S. at 127; REPORT OF THE THIRD CIRCUIT TASK FORCE: COURT AWARDED ATTORNEY FEES, 108 F.R.D. 237, 242 (1985) ("*Task Force Report*"); Herbert B. Newberg, ATTORNEY FEE AWARDS, §2.02 at 31 (1986); Arenson v. Board of Trade of City of Chicago, 372 F.Supp. 1349, 1357 n.14 (N.D. Ill. 1974).

Use of the percentage method to award attorneys' fees abruptly came to an end in 1973 with the Third Circuit's decision in *Lindy*,[217] in which the court required the use of the lodestar method in both common fund and statutory fee-shifting cases. TASK FORCE REPORT, 108 F.R.D. at 242.  The "lodestar" approach to fee awards from a common fund was rapidly adopted by several of the Circuits.

The courts, however, rapidly recognized that pursing this path had been a mistake.  Less than a dozen years after *Lindy*, the lodestar methodology lost substantially all of its vitality as a

---

[217] Lindy Bros. Builders Inc. of Philadelphia v. American Radiator & Standard Sanitary Corp., 487 F.2d 161, 168 (3d Cir. 1973).

rule of decision for awarding fees in common fund cases, and the percentage method regained its ascendancy as the prevailing template for attorneys' fee awards.  AWARDING ATTORNEYS' FEES AND MANAGING FEE LITIGATION at 63-68 (Fed. Jud. Ctr. 1994).  Two reasons explain this impressive judicial turnabout.

First, the Supreme Court's decision in *Blum v. Stenson* led the courts to question the legal underpinnings for the use of the lodestar rule in common fund cases.  In *Blum*'s often-quoted footnote 16, the Court stated that, "under the common fund doctrine...a reasonable fee is based on a percentage of the fund bestowed on the class...."  Blum, 465 U.S. at 900 n.16.  *See also Task Force Report*, 108 F.R.D. at 250-51 (discussing *Blum* footnote 16); Camden I Condominium Ass'n, Inc. v. Dunkle, 946 F.2d 768, 771 (11th Cir. 1991) (same); In re Unisys Corp. Retiree Medical Benefits ERISA Litig., 886 F. Supp. 445, 458 (E.D. Pa. 1995) ("The 1980s witnessed another major change in the determination of attorneys' fees in common fund cases.  This change was sparked by ... the Supreme Court in *Blum v. Stenson*....").

Second, a decade of experience led the courts to conclude that the legal "cure" prescribed by *Lindy* actually did more harm than good.  Ironically, this view was first crystallized by the Third Circuit itself in a 1985 report issued by a Task Force appointed by the Court to "develop[] … recommendations to provide fair and reasonable compensation for attorneys in those matters in which fee awards are provided by federal statute or by the fund-in-court doctrine..." TASK FORCE REPORT, 108 F.R.D. at 238.  The Third Circuit Task Force, together with the courts and academics, noted a wide range of inequities that attended the use of the lodestar approach in common fund matters, which would be ameliorated by a return to the percentage methodology:

> Recommending the use of the percentage method when a common settlement fund is created, the influential Third Circuit Task Force's Report determined that a lodestar approach (1) "increases the workload of an already overtaxed judicial system"; (2) is

"insufficiently objective and produce[s] results that are far from homogenous"; (3) "creates a sense of mathematical precision that is unwarranted in terms of the realities of the practice of law"; (4) "is subject to manipulation by judges who prefer to calibrate fees in terms of percentages of the settlement fund or the amounts recovered by the plaintiffs or of an overall dollar amount"; (5) "encourages lawyers to expend excessive hours, ... engage in duplicative and unjustified work, inflate their 'normal' billing rate, and include fictitious hours or hours already billed on other matters, perhaps in the hope of offsetting any hours the court may not allow"; (6) "creates a disincentive for early settlement of cases"; (7) "does not provide the district court with enough flexibility to reward or deter lawyers to that desirable objectives, such as early settlement will be fostered"; and (8) "works to the particular disadvantage of the public interest bar" by undermining the efficacy of many of the fee statutes that Congress has enacted because the lodestars in the "money" cases, such as securities, "are set higher than in cases under statutes promoting nonmonetary social objectives such as the Civil Rights Attorneys Fees Awards Act of 1976."

In re Enron Corp. Sec., Derivative & ERISA Litig., 586 F.Supp.2d 732, 746-747 (S.D. Tex. 2008) (citing and quoting *Task Force Report*, 108 F.R.D. at 247-49) (footnotes and emphasis omitted).  *See also* Union Asset, 669 F.3d at 643 ("The percentage method brings certain advantages.  The district court in this case selected it over the lodestar method in part because it allows for easy computation [and] it aligns the interests of class counsel with those of the class members…."); Burford v. Cargill, Inc., No. 05-0283, 2012 WL 5471985 at *1 (W.D. La Nov. 8, 2012) ("the percentage method [is] the most sensible approach in this matter because it is predictable, encourages settlement, and reduces incentives for protracted litigation"); Vioxx, 760 F.Supp.2d at 650-51 ("courts find that the percentage method provides more predictability to attorneys and class members or plaintiffs, encourages settlement, and avoids protracted litigation for the sake of racking up hours, thereby reducing the time consumed by the court and the attorneys"); In re Cabletron Systems, Inc. Sec. Litig., 239 F.R.D. 30, 37 (D.N.H. 2006) (stating that the percentage method "allows courts to award fees from the fund in a manner that rewards

counsel for success and penalizes it for failure."); In re Educational Testing Service Praxis Principles of Learning and Teaching: Grades 7-12 Litig., 447 F.Supp.2d 612, 628-629 (E.D. La. 2006) (citations omitted) ("The lodestar method has been under increasing criticism because of the practical difficulties in applying it.  The method has been called difficult to apply, time-consuming to administer, inconsistent in result, and capable of manipulation.  Furthermore, the lodestar method creates inherent incentive to prolong the litigation until sufficient hours have been expended") (internal quotations and citations omitted); In re Catfish Antitrust Litig., 939 F.Supp. 493, 500-01 (N.D. Miss. 1996) ("'The lodestar method makes considerable demands upon judicial resources since it can be exceptionally difficult for a court to review attorney billing information over the life of a complex litigation and make a determination about whether the time devoted to the litigation was necessary or reasonable. … Resolution of other cases on this court's already crowded docket would be severely delayed if the court had to attack such an administrative behemoth'") (citations omitted); Vaughn R. Walker & Ben Horwich, *The Ethical Imperative of a Lodestar Cross-Check: Judicial Misgivings About "Reasonable Percentage" Fees in Common Fund Cases*, 18 GEO. J. LEGAL ETHICS 1453, 1456-57 (2005) ("*Lodestar Cross-Check*").

For these reasons and others, the vast majority of Courts of Appeal, including the U.S. Fifth Circuit, have approved of (or, in some cases, mandated) the use of the percentage method to award attorneys' fees in common fund cases. Union Asset, 669 F.3d at 644 ("the Fifth Circuit has never reversed a district court judge's decision to use the percentage method, and none of our cases preclude its use.… To be clear, we endorse the district courts' continued use of the percentage method cross-checked with the *Johnson* factors"); *see also, e.g.,* In re Thirteen Appeals Arising out of San Juan Dupont Plaza Hotel Fire Litig., 56 F.3d 295, 307 (1st Cir.

1995); In re Cendant PRIDES, 243 F.3d 722, 732 (3rd Cir.), *cert. denied*, 534 U.S. 889 (2001) ("The percentage-of-recovery method is generally favored in cases involving a common fund...."); Rawlings v. Prudential-Bache Properties, Inc., 9 F.3d 513, 515-16 (6th Cir. 1993) (noting "the recent trend towards adoption of a percentage-of-the-fund method," and permitting use of this method in common fund cases); Continental Illinois, 962 F.2d at 572 (fee award should not be based on "individual hours," but rather on the percentage that counsel "would have received had they handled a similar suit on a contingent fee basis, with a similar outcome, for a paying client"); Johnston v. Comerica Mortg. Corp., 83 F.3d 241, 246 (8th Cir. 1996); In re Washington Public Power Supply System Sec. Litig. ("WPPSS"), 19 F.3d 1291, 1296 (9th Cir. 1994); Six (6) Mexican Workers v. Arizona Citrus Growers, 904 F.2d 1301, 1311 (9th Cir. 1990) ("a reasonable fee under the common fund doctrine is calculated as a percentage of the recovery"); Paul, Johnson, Alston & Hunt v. Graulty, 886 F.2d 268, 272 (9th Cir. 1989) (endorsing use of percentage approach); Gottlieb v. Barry, 43 F.3d 474, 483 (10th Cir. 1994); Brown v. Phillips Petroleum Co., 838 F.2d 451, 454 (10th Cir.), *cert. denied*, 488 U.S. 822 (1988) ("a fee award based on a percentage of a common fund" is appropriate); Camden I Condominium Ass'n, Inc. v. Dunkle, 946 F.2d 768, 774 (11th Cir. 1991); Swedish Hospital Corp. v. Shalala, 1 F.3d 1261, 1271 (D.C. Cir. 1993) (requiring application of the percentage-of-benefit method in common fund cases).

Indeed, virtually all of the recent common fund fee awards made by the district courts within the Fifth Circuit have utilized the percentage method to award fees in common fund cases. *See*, *e.g.*, In re FEMA Trailer Formaldehyde Products Liab. Litig., MDL No. 07-1873, 2013 WL 1867117, *3 (E.D. La. May 2, 2013); Burford, supra, 2012 WL 5471985 at *1; In re OCA, Inc. Sec. and Derivative Litig., No. 05-2165, 2009 WL 512081 at *19 (E.D. La. Mar. 2, 2009);

Enron, 586 F.Supp.2d at 766, 778; Murphy Oil, 472 F.Supp.2d at 859-61; In re Bayou Sorrel

Class Action, No. 04-1101, 2006 WL 3230771 at *3 (W.D. La. 2006); Educational Testing, 447

F.Supp.2d at 628-29; Batchelder v. Kerr-McGee Corp., 246 F.Supp.2d 525, 531 (N.D. Miss.

2003); In re Combustion, Inc., 968 F.Supp. 1116, 1135-36 (W.D. La. 1997); Catfish, 939 F.Supp.

at 499-501.

Accordingly, we respectfully submit that this Court should use the percentage method to

adjudicate the petition for an award of fees in the present litigation.

## The Fee that BP Agreed to Pay is Reasonable under the Percentage-of-Benefit Method

Under the percentage-of-benefit method "the court awards fees as a reasonable

percentage of the common fund." Union Asset, 669 F.3d at 643.  *Accord, e.g.*, Vioxx, 760

F.Supp.2d at 650 (using the percentage method "the Court compensates attorneys who recovered

some identifiable sum by awarding them a fraction of that sum…"); Murphy Oil, 472 F.Supp.2d

at 859 (fees awarded "as a percentage of the common fund").  As deployed by the district courts

within the Fifth Circuit, the percentage of benefit method is effectively a four-step process:

First, in order to award a percentage of a fund, it is obviously necessary to know the

value or amount of the benefits.  For this purpose the settlement fund is considered to be

equivalent to "the actual monetary value conferred to the class members by the settlement."

Burford, supra, 2012 WL 5471985 at *1. *Accord, e.g.*, Vioxx, 760 F.Supp.2d at 652 ("the Court

will first determine the valuation of the benefit received by the claimants"); In re Heartland

Payment Systems, Inc. Customer Data Security Breach Litig., 851 F.Supp.2d 1040, 1075 (S.D.

Tex. 2012); Murphy Oil, 472 F.Supp.2d at 861-62.

Second, "[t]he court then sets the benchmark percentage to be applied to this value."

Heartland, 851 F.Supp.2d at 1075.  *Accord, e.g.*, Burford, 2012 WL 5471985 at *1 (same);

Vioxx, 760 F.Supp.2d at 652 ("[t]he [second] task is to determine an initial benchmark percentage"); Murphy Oil, 472 F.Supp.2d at 862; Educational Testing, 447 F.Supp.2d at 629 ("Many courts begin their fee analysis by determining an initial 'benchmark' percentage, which they then adjust for the particular circumstances of the case.").

Third, "[a]fter setting the benchmark [percentage to be applied to the fund value,] the…court appli[es] the *Johnson* factors to determine whether a positive or negative adjustment of the benchmark [i]s warranted." *See, e.g.*, Heartland, 851 F.Supp.2d at 1075 (citation omitted). *Accord, e.g.*, Murphy Oil, 472 F.Supp.2d at 864 ("The Court will now consider the various *Johnson* factors … to determine whether an adjustment to the initial benchmark percentage … is warranted"); Vioxx, 760 F.Supp.2d at 655 ("It is now appropriate to test this [initial benchmark] percentage in the crucible of the *Johnson* factors to determine whether an adjustment, upwards or downwards, is in order"); Educational Testing, 447 F.Supp.2d at 630 ("The Court will next determine whether the benchmark should be adjusted based on the particular circumstances of this case.  In doing so, the Court will consider the other *Johnson* factors"); Evans, 2013 WL 4501061 at *7 (The Court will … proceed to consider whether this benchmark should be adjusted upwards or downwards based on an analysis of the Johnson factors").

Fourth, while not technically required by the percentage-of-benefit method, several courts that award fees as a percentage of the settlement fund perform an abbreviated lodestar cross-check to test whether the tentative percentage award derived through application of the foregoing percentage award principles is a reasonable one or whether it results in an arguable or perceived "'windfall' over the reasonable value of the work performed." Vioxx, 760 F.Supp.2d at 658 (citing In re Diet Drugs, 553 F.Supp.2d 442, 485-486 (E.D. Pa. 2008), *aff'd*, 582 F.3d 524 (3d Cir. 2009)).  *Accord, e.g.*, Murphy Oil, 472 F.Supp.2d at 867-69 ("many courts began to use the

lodestar method as a cross-check on the percentage method for reasonableness. … [A] lodestar analysis which is rough and more abbreviated is appropriate for a cross check") (citing, *inter alia*, In re Rite Aid Corp. Sec. Litig., 396 F.3d 294, 306 (3rd Cir. 2005)); Enron, 586 F.Supp.2d at 751-53 ("The purpose of a lodestar cross-check of the results of a percentage fee award is to avoid windfall fees, i.e., to 'ensure that the percentage approach does not lead to a fee that represents an extraordinary lodestar multiple'") (quoting In re Cendant Corp. Sec. Litig., 264 F.3d 201, 285 (3rd Cir. 2001) ("*Cendant I*"), *cert. denied*, 535 U.S. 929 (2002) and In re Cendant Corp. Sec. Litig., 404 F.3d 173, 188 (3rd Cir. 2005) ("*Cendant II*")); Heartland, 851 F.Supp.2d at 1086 (same).

### *The Value of the Benefits to the BP Classes Is Likely to Exceed $13 Billion*

The value of a settlement fund includes all monetary amounts actually paid or (irrevocably deposited into a fund for payment) to or for the benefit of class members pursuant to the terms of the class settlement. *See, e.g.*, Murphy Oil, 472 F.Supp.2d at 861 (settlement fund includes amounts paid "to compensate class members directly"); Vioxx, 760 F.Supp.2d at 652 (settlement value equal to "a $4.85 billion fund [created] for the compensation of Vioxx claimants"). Where the settlement provides benefits on a "pay-as-you-go" basis over a period beyond the point that a common benefit fee is to be awarded, the settlement fund also includes a "reasonable estimate" of the amount of future payments that will be made to claiming class members. In re Prudential Ins. Co. of Am. Sales Practices Litig., 148 F.3d 283, 334 (3d Cir. 1998), *cert. denied*, 525 U.S. 1114 (1999) (the percentage-of-benefit method requires that the court first make a "reasonable estimate" of the value of the settlement); G.M., supra, 55 F.3d at 822 ("At the very least, the district court ... needs to make some reasonable assessment of the settlement's value and determine the precise percentage represented by the attorneys' fees");

Murphy Oil, 472 F.Supp.2d at 861 (settlement value includes an "estimated $20,000,000 in future remediation costs").

In addition, the fund amount necessarily includes the monetary value of all intangible benefits provided to class members. Wing v. Asarco, Inc., 114 F.3d 986, 990 (9th Cir. 1997) (estimating value of a settlement that included non-monetary "medical monitoring" benefits); G.M. Truck, 55 F.3d at 822 (requiring court to calculate the value of intangible contract rights provided by class settlement and award fees as a percentage of that value); Camden I Condominium Ass'n, Inc. v. Dunkle, 946 F.2d 768, 775 (11th Cir. 1991) ("factors which will impact upon [fee award include] any non-monetary benefits conferred upon the class by the settlement"); In re Dun & Bradstreet Credit Servs. Customer Litig., 130 F.R.D. 366, 373 (S.D. Ohio 1990) (recognizing importance of "significant non-monetary benefits" in awarding common benefit fees); Cullen v. Whitman Medical Corp., 197 F.R.D. 136, 147 (E.D. Pa. 2000) (finding it appropriate, in valuing a settlement under the percentage-of-recovery methodology, to include value of non-monetary benefits such as debt forgiveness); cf. Strong v. Bellsouth Communications, Inc., 173 F.R.D. 167, 170, 172 (W.D. La. 1997), aff'd, 137 F.3d 844 (5th Cir. 1998) (acknowledging that the settlement's value includes additional "intangible benefits to the class," such as the "economic value of market education," but concluding those benefits were "insubstantial" in that case, i.e., they were worth an additional $281,405.60).

Because the costs of notice and settlement administration are each essential to facilitate the delivery of benefits to class members, the value of the settlement also includes those costs. Staton v. Boeing Co., 327 F.3d 938, 975 (9th Cir. 2003) ("The post-settlement cost of providing notice to the class can reasonably be considered a benefit to the class.… [W]here the defendant pays the justifiable cost of notice to the class…it is reasonable…to include that cost in a putative

common fund benefiting the plaintiffs for all purposes, including the calculation of attorneys' fees."); <u>Burford</u>, 2012 WL 5471985 at *1 ("Th[e] valuation amount includes administrative costs and attorneys' fees, which are generally viewed as an aspect of the class recovery"); <u>Schulte v. Fifth Third Bank</u>, 805 F.Supp.2d 560, 569 & n.8, 597 (N.D. Ill. 2011); <u>Serrano v. Sterling Testing Systems, Inc.</u>, 711 F. Supp. 2d 402, 419 (E.D. Pa. 2010); <u>Heartland</u>, 851 F.Supp.2d at 1078 ("Courts often include the costs of notice in valuing a class-action settlement. … District Courts routinely include such administrative costs in calculating attorneys' fees awards").

Finally, when, as here, the settlement calls for the defendant to fund the payment of attorneys' fees to class counsel, it relieves the class of the burden of paying those fees from the recovery otherwise available to class members.  As such, where a class settlement contains a provision that obliges the defendant to fund the payment of attorneys' fees to class counsel up to a specified amount, that amount is properly included in the value of the settlement for fee award purposes. *See, e.g.*, <u>Johnston</u>, 83 F.3d at 246 ("The award to the class and the agreement on attorney fees represent a package deal.  Even if the fees are paid directly to the attorneys, those fees are still best viewed as an aspect of the class' recovery"); <u>G.M.</u>, 55 F.3d at 802 (noting that the first edition of the M<span style="font-variant:small-caps">ANUAL</span> F<span style="font-variant:small-caps">OR</span> C<span style="font-variant:small-caps">OMPLEX</span> L<span style="font-variant:small-caps">ITIGATION</span> provided that fees "paid by the defendant(s) are properly part of the settlement funds"); <u>Prudential</u>, 148 F.3d at 330 n.99 ("although the class settlement and the attorneys' fee award were negotiated independently, [defendant] was responsible for both and therefore they are drawn from the same 'fund'"); <u>Heartland</u>, 851 F.Supp.2d at 1078 (quoting <u>Johnston</u>, 83 F.3d at 246); <u>In re Domestic Air Transportation Antitrust Litig.</u>, 148 F.R.D. 297, 354 (N.D. Ga. 1993) ("the Court rejects the argument that the calculation of the value of the common fund should exclude all cash used to pay attorneys' fees and the expenses of the claims administration"); <u>Vista Healthplan, Inc. v.</u>

<u>Warner Holdings Co. III</u>, 246 F.R.D. 349, 364 (D.D.C. 2007) (explaining that "because the attorneys' fees are borne by defendants and not plaintiffs, they represent a valuable part of the settlement").

In this case, the BP Class Settlements to-date have secured irrevocable compensation and other benefits of approximately $8,431,832,954, which includes $7,552,132,954 in Economic Claims Payments (thru May 24, 2016), approximately $634 million remaining in the Seafood Compensation Fund for further distribution, a total of $12.73 million in Medical SPC payments (thru March 24, 2016), $57 million in Tourism and Seafood Promotional Grants, $82,170,000 in Transocean Insurance Proceeds being held in trust, and approximately $93,690,000 in medical grants as part of the GHROP program.[218]



<hr>

[218] <i>See</i> STATISTICS FOR <i>DEEPWATER HORIZON</i> ECONOMIC & PROPERTY DAMAGES SETTLEMENT (May 24, 2016) [Exhibit 11] p.3; ORDER [Rec. Doc. 13424] (Sept. 22, 2014); HERMAN-ROY DECLARATION ¶¶58-60, 67.  This does <u>not</u> even include: <b>(a)</b> approximately $830 million in additional Eligibility Determinations (as of May 24, 2016) that have not yet been finalized and paid;  <b>(b)</b> the approximately 74,000 Claims that are still in process and not yet determined;  <b>(c)</b> the potential $338 million allocation for the Assigned Claims from the Halliburton/Transocean Settlements; <b>(d)</b> any of the considerable settlement-related Administrative Expenses; or <b>(e)</b> the up-to $600 million for reimbursement of litigation expenses and common benefit fees.

In terms of estimating the total class benefits, the operative projection at the time of settlement approval was BP's initial estimate of $7.8 billion for both the Economic and the Medical Class Settlements together.[219]

With approximately 89,000 Economic Claims still in process, a number of Medical SPC claims, and a 21-year Periodic Medical Plan outstanding, there are a number of different estimates and projections about the total value of benefits that the Settlements are likely to provide – which can safely be placed within the $10 billion to $13 billion range, with a reasonable projection of over $13 billion.

Judge Wilkinson, for example, estimated the total claims payout at $10.825 billion, noting his initial estimate of $10.547 billion to $10.87 billion, extrapolating from Status Reports Nos. 37, 38 and 39;  an estimate of $11.3 billion contained within BP's 2015 second quarter report;  and a persuasive calculation submitted by counsel ranging from $10.7 billion to $12.1 billion by a group of attorneys representing Commercial Fishermen.[220]

Notably, both the Commercial Fishermen's estimates of $10.7 - $12.1 billion and Judge Wilkinson's own estimate of $10.825 billion appear to be based solely on projected Economic Claims payouts, and do not seem to include Seafood & Tourism Promotional Grants, Transocean Insurance Proceeds, the value of the Assigned Claims, Medical Settlement Benefits, Administrative Costs, or Common Benefit Litigation Expenses or Fees.

---

[219] KLONOFF DECLARATION [Rec. Doc. 7104-3] (Aug. 13, 2012) p.40 ¶94; *citing* BP ANNUAL REPORT AND FORM 20-F (2011) p.163.

[220] ALLOCATION AND REASONS [Rec. Doc. 15652] (Dec. 11, 2015), at pp.14-16; *citing* Rec. Doc. 15570, at pp.2-3 (*see also* Rec. Doc. 15570-4 (Tab 3)).

In a recent BP public disclosure from April of 2016, the company predicted that the Economic Settlement will be "significantly higher" than $12.9 billion.[221]   In addition, the Medical Claims Administrator predicts that approximately $170 million are likely to be paid out from the BP Medical Benefits Settlement, including the $105 million in GHROP grants, approximately $63.5 million in SPC payments, and almost two million in periodic medical benefits.[222]

While the Louisiana Attorney General and others suggested at the time of settlement approval that the BP Economic & Property Damages Settlement was simply a "rebranded GCCF",[223] this was clearly not the case.   Among other things, the Court-Supervised Settlement Program established by Common Benefit Attorneys within MDL No. 2179:

- Compensated class members for Coastal and Wetlands Property Damages, VoO Charter Compensation, Real Estate Sales Losses, Vessel Damage, Subsistence, and other damages which had not been typically compensated by the GCCF;

- Included RTP enhancements that are in virtually all cases equal to or greater than the "multipliers" under the GCCF stated methodology;

- Extended the Claims Filing Deadline from August 23, 2013 to June 8, 2015; and

- Provided classmembers with objective and transparent criteria that were administered by a truly independent Claims Administrator and Trustee, subject to supervision and enforcement by the Court.[224]

---

[221] BP FIRST QUARTER 2016 RESULTS (April 26, 2016) [Exhibit 12] p.18.  While not clear from the BP disclosure, it is possible that this BP estimate includes either a to-date and/or a projected total Administration Costs (which might also include the $600 million in potential reimbursed litigation expenses and/or common benefit fees), in addition to the actual Claims payouts and grants.  But such estimate presumably does not include the $82.2 million in Transocean Insurance Proceeds or the potential $338 million allocated to the BP Economic Class from the Halliburton/Transocean Settlements.

[222] *See* HERMAN-ROY DECLARATION ¶67.  These figures do *not* include approximately $85 million in Administrative Expenses to date, nor an additional projected $30-35 million more over the life of the program.

[223] STATE OF LA. *AMICUS* BRIEF RE FINAL APPROVAL [No.10-7777, Rec. Doc. 227] p.22.

[224] *See generally* REPLY BRIEF IN SUPPORT OF FINAL APPROVAL [Rec. Doc. 7727] (Oct. 22, 2012) pp. ii-iii, 11-14, 14-23.

As the Court previously noted, "the Settlement Program actually improves upon the GCCF in a number of important ways, including that (i) it pays claims that the GCCF would not; (ii) its decisions are made pursuant to transparent and objective frameworks; (iii) its administrator was appointed by this Court; and (iv) its operations are designed to be claimant-responsive and claimant-friendly, and they are subject to the active supervision of this Court." In addition: "The Court notes, in this regard, that numerous Objections and other filings have raised concerns and complaints with the GCCF, and would seem to contradict the claims by some objectors that the GCCF was somehow more favorable." *Deepwater Horizon*, 910 F.Supp.2d at 960-961;[225] *aff'd*, 739 F.3d at 814 (rejecting the Cobb Objectors' arguments regarding claimants who supposedly would have been better off under the GCCF).

As noted in a recent law review article,[226] the scope and level of compensation under the Economic Class Settlement greatly exceed that which had been provided under the GCCF:

TABLE 2: CLASS SETTLEMENT RTPS COMPARED TO GCCF

| Type of Claim | BP Class Settlement RTP Multiplier | GCCF "Future Recovery Factor" Multiplier |
|---|---|---|
| Business Economic Loss Claims | 0.25–3.00 | 1.00 |
| Employee Claims | 0.25–3.00 | 1.00 |
| Individual Periodic Vendors | 1.00 | 1.00 |
| Subsistence Claims | 2.25 | 1.00 |
| Coastal Real Property Claims | 2.50 | N/A (not compensated) |
| Wetlands Real Property Claims | 2.50 | N/A (not compensated) |
| Seafood Compensation Program: Ship Captain Claims | 4.50–7.75 | 1.00–3.00 |
| Seafood Compensation Program: Ship Owner/Lessee Claims (except Oyster Ship Owner/Lessee Claims) | 5.50–8.25 | 1.00–3.00 |
| Seafood Compensation Program: Oyster Ship Owner/ Lessee Claims | 8.75 | 6.00 |

---

[225] Rec. Doc. 8138, at p.110.

[226] Catherine M. Sharkey, *The BP Oil Spill Settlements, Classwide Punitive Damages, and Societal Deterrence*, 64 DEPAUL L. REV. 681, 702 (2015). While the law review article suggests that subsistence claims were compensated by the GCCF, at the time the Class Settlements were announced, the GCCF had only paid a total of $220,197 for subsistence losses. *See* GCCF STATUS REPORT (Feb. 10, 2012) [Exhibit 20] p.6. By contrast, the Settlement Program had, as of May 24, 2016, paid over $193 million, with an additional $42 million in Eligibility Determination, and thousands of claims still yet to be evaluated. *See* PROGRAM STATISTICS (May 24, 2016) [Exhibit 11] p.3 (Table 4, Line 10).

For common benefit evaluation purposes, moreover, the Court had actually determined, as noted *supra,* that the PSC and other Common Benefit Attorneys had indeed created a benefit to claimants who were recovering in the GCCF – at least as of November 7, 2011.   Based on the Court's findings,[227]  the proper valuation of the Class Settlements would include *all* Settlement Program payments and other class benefits, irrespective of whether some of that compensation might have hypothetically been paid by the GCCF in 2012 or beyond.

Nevertheless, and in any event, the simple fact is that the GCCF was in wind-down at the time of the Class Settlements.[228]   Indeed, Mr. Feinberg has repeatedly stated that the GCCF had paid 92% of all claims that GCCF considered to be compensable.[229]   Therefore, taking the approximate $5.76 billion that had been paid out by the GCCF at the time of the Class Settlements,[230] and adding in the approximate $412.5 million in outstanding offers,[231] it can be projected that the GCCF would have paid out only around $536.7 million in additional compensation.[232]

---

[227] ORDER AND REASONS [Rec. Doc. 5022], pp.4-6.  (*See also generally* REPLY BRIEF IN SUPPORT OF HOLD-BACK ORDER [Rec. Doc. 4717], pp.3-5.)

[228] *See, e.g.,* REPLY BRIEF IN SUPPORT OF FINAL APPROVAL [Rec. Doc. 7727] pp.17-18, *and* EXHIBIT D (*in globo*) [GCCF Winding Down] [Rec. Doc. 7727-3].

[229] *See, e.g.,* "From 9/11 to BP to GM" *New York Times* (June 30, 2014); "Fienberg Lays Out GM Victim Compensation Plan" *Detroit Free Press* (July 1, 2014); "U.S. Tort Expert Feinberg Discusses Compensating for Tragedy and Loss" *Business First of Buffalo* (Oct. 13, 2014); "Former Claims Czar Kenneth Feinberg Calls BP's $20 Billion Oil Spill Fund an 'Aberration' at Tulane Talk" nola.com  (April 9, 2015); "BP's Gulf Oil Spill Was 'Less of an Environmental Disaster' Than Media Portrayed" *The Street* (April 20, 2015) [submitted herewith as Exhibit 22 (*in globo*)].

[230] *See* GCCF Overall Program Statistics: Status Report as of Feb. 10, 2012 [Exhibit 20] at pp.5-6.

[231] HERMAN-ROY DECLARATION ¶59.

[232] *See also, generally:*  FITZPATRICK DECLARATION (July 14, 2016) [submitted herewith as Exhibit 3] at ¶¶24, 26 and 33 ("Class counsel found the harm that Mr. Feinberg could not").



### *The Requested Fee Falls Well Within the "Benchmark Percentage"*

Once the court has determined the settlement fund value, the percentage-of-benefit method requires that it then select a reasonable percentage to be applied to this value to produce an appropriate fee award.  "[T]he percentage should not be completely arbitrary, devoid of reality, or inconsistent with the usual fees for the type of case involved.  In short, there is no one percentage that should apply to all cases.  Each case should be analyzed on its own basis." Murphy Oil, 472 F.Supp.2d at 862 (quotation omitted).  Generally speaking, the amount of this percentage is determined by reference to the twelve *Johnson* factors.  *See*, *generally*, Union Asset, 669 F.3d at 644 (requiring that percentage award be "informed by the *Johnson* considerations"); FEMA Trailer, 2013 WL 1867117 at *3 (the percentage-of-benefit approach "entails the use of a percentage, the reasonableness of which is analyzed in light of the *Johnson* factors").  However, as noted by one Court in commenting on the use of list of factors to make a percentage award, "[t]he mere listing of …factors for consideration by the court makes

meaningful review difficult and gives little guidance to attorneys and claimants." Lindy I, 487 F.2d at 166-67.  To make the process more concrete, virtually all district courts within the Fifth Circuit employ a two-step consideration of those factors to select an appropriate fee award percentage.    In the first of these two steps the courts consider *Johnson*'s fifth factor, "the customary fee," and the twelfth *Johnson* factor, "awards in similar cases," to select a "benchmark percentage." Vioxx, 760 F.Supp.2d at 652; Murphy Oil, 472 F.Supp.2d at 862-64; Educational Testing, 447 F.Supp.2d at 629-30; Enron, 586 F.Supp.2d at 745 n.12 ("some courts applying the percentage method have tried to establish a specific 'benchmark' percentage, either a particular number or a range, … depending on the particular facts of the case"); Diet Drugs, 553 F.Supp.2d at 479-80 ("Although the other [fee award] factors can be quite abstract, th[e awards in similar cases] factor affords the court the opportunity to use as a guide the decisions of our fellow federal judges across the country"); Heartland, 851 F.Supp.2d at 1080 ("The next step [after valuing the fund] is to determine the appropriate percentage benchmark").

For purposes of evaluating customary awards in comparable cases, courts frequently (although not always) do so with reference to the size of the recovery. Vioxx, 760 F.Supp.2d at 652-64; Murphy Oil, 472 F.Supp.2d at 862-65; Diet Drugs, 553 F.Supp.2d at 479-80.  Class recoveries of $100 million or less are ubiquitous in the federal judicial system and the case law readily establishes a customary or benchmark percentage-of-benefit award of twenty-five percent of such recoveries. Murphy Oil, 472 F.Supp.2d at 863-64; Educational Testing, 447 F.Supp.2d at 630 (25% is "the 'typical benchmark'"); Enron, 586 F.Supp.2d at 745 n.12 ("A typical benchmark in a common fund case is 25%"); MANUAL FOR COMPLEX LITIGATION §14.121 (25% of a common fund "represents a typical benchmark").  However, as the size of a class recovery

reaches the mega-fund[233] or super-mega-fund[234] range, there are relatively fewer percentage awards to serve as a benchmark. *See, e.g.,* Prudential, 148 F.3d at 339; Carlson v. Xerox Corp., 596 F.Supp.2d 400, 407 (D. Conn.), *aff'd*, 355 Fed.Appx. 523 (2d Cir. 2009); Murphy Oil, 472 F.Supp.2d at 864.

For these reasons, there is more variability in the percentages awarded in mega-fund cases, with the case law producing a range of benchmark recoveries rather than a single benchmark percentage figure. Diet Drugs, 553 F.Supp.2d at 480; Enron, 586 F.Supp.2d at 745 n.12 ("benchmark figures have been quite disparate").  Moreover, several of the cases tend to evince a "scaling effect," in which the percentage awards tend to decrease as the size of the recovery increases.  Vioxx, 760 F.Supp.2d at 652 ("the empirical data shows that as settlement amounts rise, the reasonable percentage of attorneys' fees decreases."); Murphy Oil, 472 F. Supp. 2d at 864 (quoting Theodore Eisenberg & Geoffrey P. Miller, *Attorney Fees in Class Action Settlements: An Empirical Study*, 1 J. EMPIRICAL LEGAL STUD. 27, 28 (2004) (based upon reported settlements between 1993 and 2002)) ("a scaling effect exists, with fees constituting a lower percent of the client's recovery as the client's recovery increases").[235]  Nonetheless, the courts have been careful to avoid embracing a hard and fast arithmetic rule that specifies that the percentage award should decline in proportion to increases in the size of the recovery and have focused instead on the individual facts and circumstances of each case in crafting percentage

---

[233]  "Mega-Fund" cases have been described as those where the recovery exceeds $75 million.  *See*, *e.g.*, Cendant PRIDES, 243 F.3d at 736 (referring to "large settlement cases" as "cases in which the common fund exceeded $100 million."); Rite Aid, 396 F.3d at 298 (using term "mega-fund" to describe settlement funds having a value in excess of $75 million); Enron, 586 F.Supp.2d at 753-54 (referring to very large settlements as "mega-funds.").

[234]  The "Super-Mega-Fund" cases are those where the class recovery is equal to or greater than $1 billion. Diet Drugs, 553 F.Supp.2d at 480; In re Tyco Int'l, Ltd. Multidistrict Litig., 535 F.Supp.2d 249, 266 (D.N.H. 2007).

[235]  *See also* Theodore Eisenberg and Geoffrey P. Miller, *Attorney Fees and Expenses in Class Action Settlements: 1993-2008*, 7 J. EMPIRICAL LEGAL STUD. 248 (2010) (based upon reported settlements between 1993 and 2008); Brian T. Fitzpatrick, *An Empirical Study of Class Action Settlements and their Fee Awards*, 7 J. EMPIRICAL LEGAL STUD. 811 (2010).

awards from mega-fund or super-mega-fund recoveries. Vioxx, 760 F.Supp.2d at 655 ("a reasonable benchmark percentage is a flexible concept"); Enron, 586 F.Supp.2d at 754 ("'[T]here is no rule that a district court must apply a declining percentage reduction in every settlement involving a sizable fund.  Put simply, the declining percentage concept does not trump the fact-intensive … analysis'") (quoting Rite Aid, 396 F.3d at 302).

The class recovery in this case would certainly seem to qualify as a "super-mega-fund" recovery.  Indeed, the class recoveries in the *Deepwater Horizon* Oil Spill Litigation would appear to be the largest in the history of the civil justice system.  Thus, it would seem appropriate to select a benchmark percentage from the rage of percentage awards in super-mega-fund cases:

|  | Case | Fund Value | Percentage Award | Attorney Hours |
|---|---|---|---|---|
| 1. | *In re Enron Corp.*, 586 F. Supp. 2d 732 (S.D. Tex. 2008) | $7.227 Billion | 9.52% | 289,393 |
| 2. | *In re Diet Drugs Prods. Liab. Litig.*, 553 F. Supp. 2d 442 (E.D. Pa. 2008), *aff'd*, 582 F.3d 524 (3rd Cir. 2009) | $6.44 Billion | 6.75% | 553,021 |
| 3. | *In re WorldCom, Inc. Sec. Litig.*, 388 F. Supp. 2d 319 (S.D.N.Y. 2005) | $6.133 Billion | 5.5% | 277,862 |
| 4. | *In re Vioxx Prods. Liab. Litig.*, 760 F. Supp. 2d 640 (E.D. La. 2010) [236] | $4.84 Billion | 6.5% | 560,000 |
| 5. | *In re Visa Check/Mastermoney Antitrust Litig.*, 297 F. Supp. 2d 503 (E.D.N.Y. 2003), *aff'd sub. nom.*, *Wal-Mart Stores, Inc. v. Visa U.S.A., Inc.*, 396 F.3d 96 (2nd Cir.), *cert. denied*, 544 U.S. 1044 (2005) | $3.383 Billion | 6.5% | Not Available |
| 6. | *In re Tyco Int'l, Ltd. Multidistrict Litig.*, 535 F. Supp. 2d 249 (D.N.H. 2007) | $3.3 Billion | 14.5% | 488,000 |

---

[236] While the *Vioxx* settlement was not certified or approved as a class settlement under Rule 23, the percentage-of-benefit approved is nevertheless likely relevant to the Court's consideration.

| 7. | *In re Cendant Corp. Litig.*, 243 F. Supp. 2d 166 (D.N.J. 2003), *aff'd*, 404 F.3d 173 (3rd Cir. 2005) | $3.186 Billion | 1.73% | 35,000 |
|----|----|----|----|----|
| 8. | *In re AOL Time Warner, Inc. Sec. and ERISA Litig.*, 2006 WL 3057232 (S.D.N.Y. Oct. 25, 2006) | $2.65 Billion | 5.9% | 135,186 |
| 9. | *In re Royal Ahold N.V. Sec. and ERISA Litig.*, 461 F. Supp. 2d 383 (D. Md. 2006) | $1.1 Billion | 11.88% | 147,896 |
| 10. | *Shaw v. Toshiba Am. Information Systems, Inc.*, 91 F. Supp. 2d 942 (E.D. Tex. 2000) | $1.07 Billion | 15% | Not Available |
| 11. | *In re NASDAQ Market-Makers Antitrust Litig.*, 187 F.R.D. 465 (S.D.N.Y. 1998) | $1.07 Billion | 14% | 129,629 |
| 12. | *In re Sulzer Hip Prosthesis and Knee Prosthesis Liab. Litig.*, 268 F. Supp. 2d 907 (N.D. Ohio 2003) | $1.045 Billion | 4.8% | 50,987 |
| 13. | *In re AT&T Mobility Wireless Data Services Sales Tax Litig.*, 792 F. Supp. 2d 1028 (N.D. Ill. 2011) | $1 Billion | 20% | Not Available |
| 14. | *DeLoach v. Phillip Morris Cos.*, 2003 WL 23094907 (M.D.N.C. Dec. 19, 2003) | ~$1 Billion | 5.9% | Not Available |
| **Average:** | | | **9.18%** [237] | |

As outlined above, the approximate $555.2 million in common benefit fees which BP agreed to pay to Class Counsel and the other Common Benefit Attorneys in this case represents only 6.59% of the total settlement benefits secured to date, and only 4.2% to 5.5% of an estimated $10 billion to $13 billion total.

---

[237] *See also, e.g.*, Table 1 at pages 20-21 of the Fitzpatrick Declaration (July 14, 2016) [Exhibit 3], the table at page 55 of Dean Klonoff's August 2012 Declaration [Rec. Doc. 7104-3], and the table that was actually referenced during the fee negotiations with BP [Rec. Doc. 7104-6 at 27-28].

In most, if not all, of the other mega-fund settlement cases, moreover, the common benefit costs and fees were deducted from the compensation paid to classmembers. In this case, by contrast, the common benefit fees and expenses are being paid over and above, with the classmembers receiving full compensation. As noted above, the caselaw generally includes the value of common benefit fees and expenses themselves as part of the overall benefit to the class, (*see, e.g.,* Comerica, 83 F.3d at 246; G.M., 55 F.3d at 802; Prudential, 148 F.3d at 330 n.99), which is particularly appropriate in this case. If the $600 million in common benefit fees and expenses were added to the totals, a $555.2 million award of common benefit fees would represent only 6.15% of the total settlement benefits secured to date, and only 4.08% to 5.24% of an estimated $10.6 billion to $13.6 billion total.

As outlined above,[238] and as addressed more fully below,[239] the unique challenges and features in this MDL are relevant to the key *Johnson* factor[240] considerations:

- Size and Scope of the Litigation

- Complexity

- Sacrifice by Common Benefit Attorneys

- Organizational and Communications Challenges

- Trial Effort and Strategy

- The Settlements Themselves Are Exceptional and Unique

---

[238] *See* PAGES 8-11, *supra.*

[239] *See* PAGES 114-119, *infra.*

[240] The twelve "*Johnson* Factors" are: (1) the time and labor required; (2) the novelty and difficulty of the questions; (3) the skill requisite to perform the legal service properly; (4) the preclusion of other employment by the attorney due to acceptance of the case; (5) the customary fee; (6) whether the fee is fixed or contingent; (7) time limitations imposed by the client or the circumstances; (8) the amount involved and the results obtained; (9) the experience, reputation, and ability of the attorneys; (10) the "undesirability" of the case; (11) the nature and length of the professional relationship with the client; and (12) awards in similar cases. Murphy Oil, 472 F.Supp.2d at 859 (citing Johnson, 488 F.2d at 717-19).

- Unprecedented Level of Post-Settlement Implementation, Assistance to Class Members, and Settlement-Related Litigation

When the *Johnson* factors are considered within the totality of the record, the fee that BP agreed to pay is undoubtedly reasonable.[241]

### *The Fee Is Further Reasonable when Viewed within the Context of the Entire Litigation*

Petitioners have analyzed the fees provided under the BP Fee Agreement solely within the context of the BP Class Settlements.  It should be noted, however, that Common Benefit Attorneys will be making an additional fee petition in connection with the approval of the proposed Halliburton and Transocean Class Settlements.  Because the money allocated to the BP Economic Settlement out of the Halliburton/Transocean Settlements based on the assignment could be credited to either the BP Settlement or to the Halliburton/Transocean Settlements;  and because much of the same common benefit work was undertaken for the benefit of both BP Settlement Classmembers and Transocean/Halliburton New Class Members (whose memberships, indeed, tend to largely overlap);    petitioners believe it is also appropriate to provide the Court with an analysis of the collective BP/Transocean/Halliburton Settlement benefits relative to the collectively sought BP/Transocean/Halliburton common benefit fees.[242] When the total estimated payouts of $11.24 billion to $14.24 billion are compared against the total requested fees of $680.35 million, the percentage falls into a range of 4.78% to 6.05%.[243]

In addition, as the Court is aware, Common Benefit Attorneys have been awarded $40 million for the work they performed pursuant to joint-prosecution agreements with the State of

---

[241] *See generally* FITZPATRICK DECLARATION (July 14, 2016) [submitted herewith as Exhibit 3] at ¶¶ 27-37. (*see also* pp.114-119 *infra*)

[242] *See, e.g.,* FITZPATRICK DECLARATION ¶39 and HERMAN-ROY DECLARATION ¶124.

[243] The total estimated payouts of $11.24 billion to $14.24 billion do not include the potential reimbursement of litigation expenses or common benefit fees that may be awarded out of the BP Class Settlements ($600 million) or the Transocean/Halliburton Settlements ($124.95 million).  When that additional $724.95 million in benefits to the classes is factored in, the percentage range drops to 4.54% to 5.67%.

Louisiana and the State of Alabama with respect to their economic loss damage recoveries.[244] When the total BP/Halliburton/Transocean/Alabama/Louisiana recoveries of $13.24 billion to $16.24 billion are compared with the total potential $720.15 million in common benefit fees, the percentage falls into a range of just 4.43% to 5.44%.



Finally, and to be sure, the PSC and other Common Benefit Attorneys are _not_ making any claim for common benefits fees with respect to GCCF payments, Clean Water Act penalties, the Local Government Settlements, or the Settlements with the States of Florida, Mississippi, or Texas.

Nevertheless, petitioners indisputably acted for the benefit of the Local Governments, acted for the benefit of GCCF claimants, and worked cooperatively with the United States and counsel for the States, and therefore believe that such recoveries are relevant to the overall analysis with respect to the reasonableness of the total requested fees.[245]   When such recoveries

---

[244] *See* Certificates of Non-Objection and Order (Oct. 5, 2015) [Rec. Doc. 15437 and 15441].

[245] *See, e.g.,* ORDER AND REASONS (Dec. 28, 2011) [Rec. Doc. 5022], at p.3 ("there can be no question that the PSC has taken seriously its fiduciary obligations in the best interests of all claimants, both private and governmental").

are considered, the total fees amount to only 2.25% to 2.48% of the non-NRD *Deepwater Horizon* related recoveries:



In light of all of the relevant circumstances, the fees that BP agreed to pay with respect to the BP Economic and Medical Class Settlements is extraordinarily reasonable when viewed within the context of the entire *Deepwater Horizon* related litigation.

**The Fee is Also Supported by an Hourly "Lodestar" Cross-Check**

The lodestar method involves two steps and three elements. The first step requires the district court to determine (1) the reasonable number of hours expended on the litigation by the petitioning attorneys and (2) the reasonable hourly rates for those lawyers. To calculate the "lodestar" value, the Court then multiplies the reasonable number of hours by a reasonable hourly rate or rates. In the second step, the lodestar amount is adjusted upward or downward by a numeric "multiplier" to account for the Court's evaluation of the *Johnson* factors. The fee award is the product of multiplying the lodestar by the multiplier. *See generally* Union Asset,

669 F.3d at 642-43; <u>Strong</u>, 137 F.3d at 850; <u>In re Fender</u>, 12 F.3d at 487; <u>Murphy Oil</u>, 472 F.Supp.2d at 859 (citing <u>Copper Liquor, Inc. v. Adolph Coors Co.</u>, 624 F.2d 575, 583 n.15 (5th Cir. 1980)).

The lodestar cross-check "is meant to be a rough analysis." <u>Vioxx</u>, 760 F.Supp.2d at 658-59); *see also, e.g.,* <u>Murphy Oil</u>, 472 F.Supp.2d at 867-69 (conducting a "rough and more abbreviated" lodestar analysis as a cross-check against a percentage-of-benefit fee determination); <u>Educational Testing</u>, 447 F.Supp.2d at 632-33 (referring to a "rough" lodestar cross-check).

> In recognition of the noted disadvantages of the lodestar method as the princip[al] means for determining attorneys' fees, such as the taxing of judicial resources by examining every time entry and billing rate for each attorney, a lodestar analysis which is rough and more abbreviated is appropriate for a cross check:
>
> The lodestar cross-check calculation need entail neither mathematical precision nor bean counting. For example, a court performing a lodestar cross-check need not scrutinize each time entry; reliance on representations by class counsel as to total hours may be sufficient.... Furthermore, the lodestar cross-check can be simplified by use of a blended hourly rate....

<u>Murphy Oil</u>, 472 F.Supp.2d at 867 (citing and quoting Walker & Horwich, *Lodestar Cross-Check*, 18 Geo. J. Legal Ethics at 1463-64 and <u>Rite Aid</u>, 396 F.3d at 306); *see also* <u>Rite Aid</u>, 396 F.3d at 306-07 ("The lodestar cross-check calculation need entail neither mathematical precision nor bean-counting. The district courts may rely on summaries submitted by the attorneys and need not review actual billing records"); <u>Goldberger v. Integrated Resources, Inc.</u>, 209 F.3d 43, 50 (2d Cir. 2000) ("where used as a mere cross-check, the hours documented by counsel need not be exhaustively scrutinized by the district court"); <u>Evans</u>, 2013 WL 4501061 at *9; <u>Educational Testing</u>, 447 F.Supp.2d at 632.

As outlined above, each Common Benefit Firm and then the Fee Committee and its Special Counsel reviewed and amended the contemporaneous time entries that were submitted to Mr. Garrett on a monthly basis over the course of the litigation, and have appropriately excluded "hours that are excessive, redundant, or otherwise unnecessary." Hensley v. Eckerhart, 461 U.S. 424, 434 (1983). *See also, e.g.,* Saizan v. Delta Concrete Products Co., 448 F.3d 795, 799 (5th Cir. 2006). In accordance with the prevailing caselaw, and with the terms and requirements of Pre-Trial Orders Nos. 9 and 59, petitioners respectfully support the present fee petition with a minimum of 527,081 hours,[246] (which is made up of approximately 268,298 Partner Hours, approximately 180,302 Associate Hours, and approximately 78,482 Law Clerk / Paralegal / IT Specialist Hours).[247]

With respect to the hourly rate or rates that may be applicable to such hours, the caselaw generally suggests that a reasonable hourly rate should be in accord with rates "prevailing in the community for similar services by lawyers of reasonably comparable skill, experience and reputation." Blum v. Stenson, 465 U.S. 886, 895-96 n.11 (1984). However, the relevant "community" for determining the reasonableness of hourly rates in massive and diverse cases

---

[246] *See* HERMAN-ROY DECLARATION ¶¶117-122 (re 2010-2015 hours) *and* GARRETT AFFIDAVIT ¶14 (re 2016 hours accepted thru April 2016). Again, the Fee Committee and Special Counsel to the Committee believe that this number of hours is extremely conservative, not only in terms of evaluating the 585,947.65 originally accepted 2010-2015 hours in light of the Court's Pre-Trial Orders, but also because the 527,081 hours (thru April 2016) does not include: **(a)** the thousands of hours expended by full-time PSC-employed attorneys Rob Warren (2010-2012) and Dennis Rawlins (2014-2016) and paralegal Cristina Herrington (2010-2014); **(b)** the thousands of hours expended by appellate and other special counsel, such as Samuel Issacharoff, Basile Uddo, and Irwin Fritchie, who were hired by the PSC, and compensated out of the common benefit shared expense assessments; **(c)** additional 2016 hours which have not yet been formally submitted and/or accepted; and **(d)** hours that were reasonably and necessarily expended by Common Benefit Attorneys, but, due to oversight or mistake, were not submitted timely, and therefore were rejected by Mr. Garrett. (As noted, Common Benefit Attorneys have been reimbursed for the work performed by outside counsel and PSC employees as part of the interim Shared Expense reimbursements, but believe that such hours are nevertheless relevant to the Court's overall assessment of the hours expended on behalf of classmembers, albeit on a guaranteed monthly and non-contingent basis.)

[247] *See* HERMAN-ROY DECLARATION ¶¶ 119, 123 (breakdown of initially submitted and accepted 2010-2015 time, applied by percentages to the Fee Committee's revised 2010-2015 hours; and the break-down of 2016 hours accepted by Mr. Garrett thru April 2016).

has become "more national" where, as here, "attorneys from across the country contributed [to the] common benefit work" that forms the basis of the fee petition. Vioxx, 760 F.Supp.2d at 660; *see* FITZPATRICK DECLARATION ¶41; *see also, e.g.,* In re Agent Orange Prod. Liab. Litig., 818 F.2d 226, 232 (2d Cir. 1987) ("[T]he use of national hourly rates in exceptional multiparty cases of national scope, where dozens of non-local counsel are involved, appears to be the best available method of ensuring adherence to the principles of the lodestar analysis"); Fallon, *Common Benefit Fees in Multi-District Litigation*, 74 LA. L. REV. at 383 ("When the attorneys come from all parts of the country, as is often the case, it is appropriate to use some average of the various rates").  Further, "the Fifth Circuit has noted that a court is itself an expert in attorneys' fees and 'may consider its own knowledge and experience concerning reasonable and proper fees and may form an independent judgment with or without the aid of witnesses as to value.'" Klein v. O'Neal, 705 F.Supp.2d at 680 (quoting In re OCA, Inc. Sec. and Derivative Litig., No. 05-2165,  2009 WL 512081 at *25 (E.D. La. Mar. 2, 2009) and Campbell v. Green, 112 F.2d 143, 144 (5th Cir. 1940)).  *Accord, e.g.,* League of United Latin American Citizens v. Roscoe Independent School District, 119 F.3d 1228, 1234 (5th Cir. 1997).

In lieu of using separate hourly rates claimed by each petitioning law firm, recent fee decisions have accordingly utilized "blended rates" representing either an overall "average of the billing rates for common benefit submitters" or separate average rates for the time logged by partners, associates and paralegals, provided that these blended rates are otherwise reasonable. *See, e.g.*, Rite Aid, 396 F.3d at 306 and n.14 & n.15 (the billing rate should be a "blended billing rate[] that approximate[s] the fee structure of all the attorneys who worked on the matter"); Cabletron, supra, 239 F.R.D. at 37 ("The lodestar method multiplies the hours reasonably spent by counsel by either a single blended hourly rate or several such representative rates for partners,

associates, and paralegals....”); <u>Fisher Scientific Inter., Inc. v. Modrovich</u>, No. 03-0467, 2005 WL 3348901, *10 (S.D. Tex. Dec. 8, 2005) (using blended rates for core team of senior partners, junior or mid-level partners, experienced associates, associates, and legal assistants); <u>OCA</u>, 2009 WL 512081, at *25 (utilizing a blended rate to calculate the lodestar); <u>Enron</u>, 586 F.Supp.2d at 804-05; <u>Murphy Oil</u>, 472 F.Supp.2d at 868-69; <u>Vioxx</u>, 760 F.Supp.2d at 660.

In this case, the PSC and other Common Benefit Attorneys include distinguished attorneys from New York, San Francisco, Boston, Charleston, Philadelphia, Dallas, Miami, and other cities around the Gulf, and include, it seems fair to say, some of the top maritime attorneys in the country, some of the top environmental attorneys in the country, and some of the top class action attorneys in the country.[248]

At the same time, many of the petitioning Common Benefit Attorneys typically work on a contingency fee basis, and have no established hourly rates.  The hourly business that some of the Common Benefit Firms do have is generally limited, or sporadic;  the applicable rates vary widely by the type of matter, and by geography;  and would typically arise in family law, or real estate, or small business commercial matters, or other one-off disputes, which are not very comparable to this type of high-stakes complex litigation.  While some of the Common Benefit Firms have had specific rates submitted and approved in previous class actions, the experience of some of those attorneys has been fairly isolated, and/or occurred in the relatively distant past. And even the rates of more established class action firms tend to vary somewhat according to the type of litigation, the firm's role in the litigation, and, where blended, the rates of the other firms who were participating in the litigation alongside them.  Therefore, the Fee Committee did not attempt to solicit or present what might be claimed to be the Common Benefit Attorneys'

---

[248] *See* FITZPATRICK DECLARATION ¶36.

individual or average blended hourly "rate".   We have, instead, looked to publicly available information regarding hourly billing rates throughout the country, as well as rates which have been approved for plaintiff attorneys working on comparable complex litigation.

In looking to hourly rates that have been made publicly available, petitioners note that:

- According to the 2014 National Law Journal Survey, the average nationwide rate for partners was $604 and the average nationwide rate for associates was $370; [249]

- The State of Louisiana reportedly paid its outside counsel in the *Deepwater Horizon* Litigation $600 per hour; [250]

- Professor Miller, (who served as BP's expert in this case in support of class settlement approval[251]), submitted, in 2014, survey data from bankruptcy matters in which median partner rates of $810 - $980 were reported; [252]

- In 2011, BP's lead trial counsel in this litigation, Kirkland & Ellis, reported hourly rates in a New York bankruptcy proceeding of $580 - $995 for partners, and $340 - $995 for other attorneys; [253]

- It has been reported that BP's lead appeal counsel, Mr. Olson, is typically paid an hourly rate of $1,800, with other Gibson Dunn partners billing at $795 and $925 per hour.[254]

---

[249] FITZPATRICK DECLARATION (July 14, 2016) at ¶41.

[250] *See, e.g.,* David Hammer, "Attorney General Called Out for Giving Contracts to Top Campaign Donors" WWL TV (May 20, 2013) (available at: http://coalitionforcommonsense.com/images/legislation/wwl5-20.pdf) (last visited: June 4, 2016); Kyle Barnett, "Political Contributors Reap Lucrative Legal Contracts in BP Litigation; Biggest Contractor, Caught Napping in Court, Has Reaped $12M" *Louisiana Record* (April 23, 2015) [submitted herewith together as Exhibit 24 (*in globo*)].

[251] *See* Rec. Docs. 7114-16, 7731-6.

[252] *See generally* DECLARATION OF GEOFFREY P. MILLER, *In re U.S. Foodservice Pricing Litigation,* MDL No. 1894, Civ. Action No. 07-1894 [Rec. Doc. 510-5] (D. Conn. Aug. 29, 2014) p.14 [submitted herewith as Exhibit 25].

[253] *See* FIRST INTERIM APPLICATION FOR PAYMENT OF FEES BY KIRKLAND & ELLIS, *In re Great Atlantic & Pacific Tea Company, Inc.,* No.10-24549 [Rec. Doc. 1566] (Bkrtcy. S.D.N.Y. May 11, 2011) [submitted herewith as Exhibit 26].

[254] *See, e.g.,* Staci Zaretsky, "The Biglaw Firms With The Highest Partner Billing Rates (2015)" *Above the Law* (Jan. 6, 2015) (available at: http://abovethelaw.com/2015/01/the-biglaw-firms-with-the-highest-partner-billing-rates-2015/) (last visited May 29, 2016); Zoe Tillman, "Inside Gibson Dunn's Billing Rates in Gay Marriage Case" *National Law Journal* (Feb. 12, 2016) [submitted herewith together as Exhibit 23 (*in globo*)].

Of course, these bankruptcy attorneys, outside counsel to the Louisiana AG, and other litigation counsel for defendants, are generally being paid their hourly fees on a regular and guaranteed basis, without risk of loss or success, at no personal expense, and with no significant uncertainty or delay.  Petitioners, by contrast, have been working since 2010, at considerable risk, substantial uncertainty, and bearing responsibility for advancing and incurring almost $45 million in shared and held litigation expenses for the classes' benefit – millions of which remain unreimbursed to this day.

Accordingly, in addition to the time involved, the customary fee, the result obtained, and the skill of counsel, risk of non-payment arising from contingent fee representation has long been an important consideration in determining the amount of compensation to be awarded to class counsel from the fund created by their professional efforts. *See, e.g.*, Rite Aid, 396 F.3d at 304 (holding that "significant risks of non-payment or non-recovery ... weigh[] in favor of approving" request for award of a fee representing 25% of a mega-fund recovery and 4.07 times lodestar value of time expended); Goldberger v. Integrated Resources, Inc., 209 F.3d 43, 54 (2d Cir. 2000) ("We have ... labeled the risk of success as 'perhaps the foremost' factor to be considered in determining whether to award an enhancement [to the lodestar]"); Continental Illinois, 962 F.2d at 569 (finding that district court erred in failing to provide compensation which "reflect[ed] the risky character of the[] undertaking" by class counsel); Enron, 586 F.Supp.2d at 747 ("'A[n] [hourly fee] cannot fully compensate counsel' in a contingency common fund case 'because the resulting amount does not reflect the risk of nonpayment and thus is not equal to the fair market value of the counsel's services'") (quoting 1 Alba Conte, *Attorney Fee Awards*, §2.10 (2007)); Murphy Oil, 472 F.Supp.2d at 859-60 ("Recognizing the 'contingent risk of nonpayment' in [common fund] cases, courts have found that class counsel

ought to be compensated 'both for services rendered and for risk of loss or nonpayment assumed by carrying through with the case'"); Heartland, 851 F.Supp.2d at 1084 ("District courts within [the Fifth] circuit have found upward adjustments [in a fee award] appropriate if counsel took the case on a contingency basis"); Vioxx, 760 F.Supp.2d at 647, 657 (risk involved in contingent fee representation explicitly considered in awarding fees); In re Combustion, Inc., 968 F.Supp. 1116, 1132 (W.D. La. 1997) ("Because payment is contingent upon receiving a favorable result for the class, an attorney should be compensated both for services rendered and for risk of loss or nonpayment assumed by carrying through with the case").

Indeed, the fee jurisprudence has historically recognized that there is a cardinal difference between the economic value of services performed on a currently billed fee-for-service basis and compensation that is contingent on success. Lindy I, 487 F.2d at 168 ("No one expects a lawyer … whose compensation is contingent upon his success to charge, when successful, as little as he would charge a client who in advance had agreed to pay for his services, regardless of success"); Pennsylvania v. Delaware Valley Citizens' Council for Clean Air, 483 U.S. 711, 735-36 (1987) (Blackmun, J., dissenting on other grounds) ("[L]awyers charge a premium when their entire fee is contingent on winning .... The premium added for contingency compensates for the *risk* of nonpayment if the suit does not succeed and for the *delay* in payment until the end of the litigation-factors not faced by a lawyer paid promptly as litigation progresses") (emphasis in original).  As the authoritative report by the Third Circuit Task Force on the award of counsel fees[255] stated:

> It does not impugn the service that the plaintiffs' class action bar
> provides to note that the driving force in most cases is the
> opportunity to share in the plaintiffs' risk and ultimately in any

---

[255] The Third Circuit Task Force Report is often cited by district courts within the Fifth Circuit when making common fund attorneys' fees awards. *See, e.g.,* Murphy Oil, 472 F.Supp.2d at 857; Enron, 586 F.Supp.2d at 747.

reward they may receive.   Like most prudent individuals, plaintiffs' counsel would not seek involvement in most class action cases ... unless the financial reward justified the risk that counsel undertakes. Because they have abilities that could be put to other uses, plaintiffs' counsel must find something in a class action that signals that it is financially attractive to be class counsel.

It is plaintiffs' counsel who pay the expenses of the lawsuit, and who expect that they will lose much if not all of their out-of-pocket expenses if they are not ultimately successful in having a court certify a class and achieving either a settlement or a litigation victory.   It is plaintiffs' counsel who work to obtain whatever recovery any member of the class who has not opted out of the litigation will receive.   The fact that there will be no payment if there is no settlement or trial victory means that there is greater risk for plaintiffs' counsel in these class action cases than in cases in which an hourly rate or flat fee is guaranteed. The *quid pro quo* for the risk ... is some kind of risk premium if the case is successful.

THIRD CIRCUIT TASK FORCE REPORT ON SELECTION OF CLASS COUNSEL, 208 F.R.D. 340, 342-43 (2002) (footnotes omitted).

Consistent with economic theory, the law uniformly recognizes that "[r]isk ... must be judged as it appeared to counsel at the outset of the case, when they committed their capital (human and otherwise)." In re NASDAQ Market-Makers Antitrust Litig., 187 F.R.D. 465, 488 (S.D.N.Y. 1998) (citing Harman v. Lyphomed, Inc., 945 F.2d 969, 976 (7th Cir. 1991)).   *Accord*, *e.g.*, Enron, 586 F.Supp.2d at 747 ("risk must be assessed *ex ante*, from the outset of the case, not in hindsight.") (citing In re Cardinal Health Inc. Sec. Litig., 528 F.Supp.2d 752, 758 (S.D. Ohio 2007); Diet Drugs, 553 F.Supp.2d at 478 (risk of non-payment must be evaluated as of "the inception of the action and not through the rosy lens of hindsight"); In re Superior Beverage/Glass Container Consolidated Pretrial, 133 F.R.D. 119, 127 (N.D. Ill. 1990) ("Risk must be assessed *ex ante*.  Lawyers make decisions about whether to bring lawsuits on the basis of the risks and rewards they perceive at the beginning and must be compensated on the basis of

the risks as they appeared at the beginning, not as the court perceives them at the end of the litigation").

As to rates which are typically submitted and awarded to plaintiffs' counsel such as Petitioners herein in class action, multi-district and other complex litigation, the Southern District of Texas, in 2008, approved a blended hourly rate of $456 for counsel in the *Enron* litigation.[256]

In Professor Miller's 2014 declaration,[257] he includes a survey of reported class action decisions from the Southern District of New York from 2008-2012 confirming hourly rates within the ranges of $460-$975 for partners and $230-$675 for other attorneys:

| Case | Docket No. | Non-Partner Attorney Rates | Partner Rates |
|---|---|---|---|
| *In re Bear Sterns,* No. 08-cv-2793 (S.D.N.Y) | Doc. Nos. 302-4 and 302-5 (Aug. 2012) | $275-$780 $275-$700 | $595-$780 $725-$975 |
| *Board of Trustees, AFTRA Retirement Fund v. JP Morgan,* No. 1:09-cv-00686 (S.D.N.Y.) | Doc. No. 187-1 (May 2012) | $275-$575 | $625-$735 |
| *In re Wachovia Equity Securities Lit.,* No. 08 Civ. 6171 (S.D.N.Y.) | Doc. No. 106-5 (April 2012) | $280-$600 | $600-$800 |
| *In re Lehman,* No. 1:08-cv-05523 (S.D.N.Y.) | Doc. Nos. 343-12, 343-13 and 343-17 (March 2012) | $310-$675 $275-$500 $275-$650 | $650-$975 $600-$725 $750-$975 |
| *Rubin v. MF Global,* No. 08 Civ. 2233 (S.D.N.Y.) | Doc. No. 198 (Nov. 2011) | $230-$615 | $560-$795 |
| *In re Wachovia Preferred Notes Lit.,* No. 09 Civ. 6351 (S.D.N.Y.) | Doc. Nos. 148-7, 148-8 and 148-9 (Oct. 2011) | $340-$675 $375-$550 $265-$640 | $650-$975 $600-$725 $565-$775 |

---

[256] *See* KLONOFF EXPERT REPORT (Aug. 13, 2012) [Rec. Doc. 7104-3] p.46 ¶107; *citing* <u>Enron</u>, <u>supra</u>, 586 F.Supp.2d at 779-80.

[257] *See generally* MILLER DECLARATION, *In re U.S. Foodservice* (Aug. 29, 2014) [Exhibit 25] at pp.12-17.

| | | | |
|---|---|---|---|
| *Cornwell v. Credit Suisse,* No. 08 Civ. 03758 (S.D.N.Y.) | Doc. No. 117 (July 2011) | $360-$670 | $565-$795 |
| *Lupin v. Goldman Sachs,* No. 04 Civ. 2236 (S.D.N.Y.) | Doc. No. 129 (Nov. 2010) | $275-$600 $325-$575 | $600-$900 $625-$725 |
| *In re MBIA,* No. 08 Civ. 0264 (S.D.N.Y) | Doc. No. 92 (Dec. 2011) | $375-$675 | $700-$975 |
| *In re Refco,* No. 05 Civ. 08626 (S.D.N.Y.) | Doc. No. 738-5 (Sept. 2010) | $250-$620 | $650-$845 |
| *In re Merrill Lynch,* No. 07-cv-09633 (S.D.N.Y.) | Doc. Nos. 246-4, 246-5, 246-6, 246-7 and 246-8 (Jun. 2009) | $255-$500 $290-$450 $295-$440 $385-$550 $350-$550 | $550-$775 $525-$695 $460-$725 $525-$830 $675-$750 |
| *In re Telik,* No. 07 Civ. 04819 (S.D.N.Y) | Doc. No. 72 (Aug. 2008) | $350-$550 | $700-$750 |

In evaluating the "time and labor required" factor, a court is "require[d]…to give appropriate credit to the intensive and sustained efforts of common benefit counsel to bring the[] litigation to a timely resolution." Vioxx, 760 F. Supp. 2d at 656.

In regard to the third *Johnson* factor, "the skill required to perform the legal service properly," this factor is evidenced where, as here, "'counsel performed diligently and skillfully, achieving a speedy and fair settlement, distinguished by the use of informal discovery and cooperative investigation to provide the information necessary to analyze the case and reach a resolution.'" King v. United SA Fed. Credit Union, 744 F. Supp. 2d 607, 614 (W.D. Tex. 2010) (quoting Di Giacomo v. Plains All Am. Pipeline, No. Civ. A. H-99-4137, H-99-4212, 2001 WL 34633373, at *12 (S.D. Tex. Dec. 19, 2001)).  Another "highly important" aspect of a court's evaluation of the skill required of the fee applicants is "[t]he trial judge's expertise gained from

past experience as a lawyer and [her] observation from the bench of lawyers at work[.]" Enron, 586 F. Supp. 2d at 789 (quoting Johnson, 488 F.2d at 718).

*Johnson*'s fourth factor, "preclusion of other employment" was and remains a significant factor for many of the Common Benefit Attorneys involved in this litigation.  As noted above, a number of attorneys essentially gave up their entire practices, in many cases moving to New Orleans, and devoting their full-time efforts to exclusively *Deepwater Horizon* related litigation. This took them away from their homes and their practices, and – particularly for Common Benefit Attorneys who are partners in small firms, or even solo practitioners, and/or who otherwise spend a lot of their time acting as "rainmakers" – meaningful opportunities to work on other cases (even, to some extent, individual BP Oil Spill related claims) were lost, as several of these PSC members are only now able to start rebuilding their practices.

The MDL No. 2179 PSC's unique insistence that attorneys devote their time and energies toward working on the case together, our of the same "War Room" / Depository, was not only a sacrifice for many of the Common Benefit Attorneys, but also an advantage to the members of the class.  As summarized by PSC member and noted class action expert and scholar, Elizabeth Cabraser:

> In this complex litigation, the Court-appointed Co-Leads and PSC members have achieved a profound synergy: the whole of their collective accomplishments, for the benefit of the many thousands of plaintiffs and members of the Settlement Classes, is far greater than the sum of the individual contributors' parts. This is due to several key factors, including the insight of the Court in selecting a diverse array of members with complementary skills and experience. It was also due to the Court's unique prescription for an effective PSC: priority dedication, on site, in New Orleans. The willingness of the PSC members to constitute a functional on-site, *de facto* law firm and to work as a team, striving together with candor and trust to collaboratively develop new ideas and approaches to the unique challenges presented by the *Deepwater Horizon* litigation has created a unique "*esprit de PSC*."  As an observer, participant, and admirer of this spirit in action, I express my hope that

other committees, in other cases, take the *Deepwater Horizon* leadership and PSC as a role model and strive to do likewise.

The PSC's work, performed at the highest levels of legal skill, expertise, and innovation, at high speed, and in difficult circumstances, has paid off at correspondingly highest levels for those economically and medically victimized by the disaster. The seemingly endless days and hours spent by all PSC members and their firms in intensive trial preparation, trial, and settlement-related activity likewise deserve compensation at the highest level, under the equitable common benefit doctrine. Such compensation should include a substantial premium on PSC time. To state that this time was taken away from other efforts, was consistently far greater than a "normal" eight hour day, and was undertaken at high risk, are understatements. By way of direct comparison to a case involving similar challenges and similar efforts, the *Exxon Valdez* case took over 20 years of such efforts, which similar advanced costs and time incurred, and, in the long-deferred end, did <u>not</u> compensate class counsel for all the time expended, nor did it compensate class members at the multi-billion dollar levels achieved thus far, less than six years from the disaster, in *Deepwater Horizon.*

Thus, all the relevant factors that courts in the Fifth Circuit look to for guidance in awarding fair and reasonable fees in class action settlements, as set forth in *inter alia, Johnson v. Georgia Highway Express, Inc.,* and reaffirmed in *Union Asset Mgmt. Holding AG v. Dell, Inc.,* support and militate in favor of robust multipliers here. The time and labor required was intensive and demanding. The issues were novel, difficult, and challenging. The skills required of and exercised by the PSC were of this highest caliber. Dedication to the PSC took all away from work on other cases.[258]

In regard to the eighth *Johnson* factor, "the amount involved and the results obtained," "[t]he United States Supreme Court and the Fifth Circuit have held that [this is] 'the most critical factor' in determining the reasonableness of a fee award…." <u>Enron</u>, 586 F.Supp.2d at 796-97 (citing and quoting <u>Farrar v. Hobby</u>, 506 U.S. 103, 114 (1992) and <u>Hensely v. Eckerhart</u>, 461 U.S. at 436); <u>Migis</u>, 135 F.3d at 1047.  In this regard the success of the litigation is not only determined by the gross amount of the recovery but also by the number of individuals who

---

[258] CABRASER DECLARATION (July 7, 2016) [submitted herewith as Exhibit 4] ¶¶2-4. *See also* FITZPATRICK DECLARATION ¶35.

benefit from the class settlement, the degree to which the settlement provides them with full compensation for their injuries, and the extent to which the settlement benefits the public at large. *See*, *e.g.*, <u>Vioxx</u>, 760 F.Supp.2d at 657-58; <u>Murphy Oil</u>, 472 F.Supp.2d at 866; <u>Educational Testing</u>, 447 F.Supp.2d at 632.  *See also* <u>Diet Drugs</u>, 553 F.Supp.2d at 472-73 ("the vast number of people who have benefitted from the Settlement Agreement and the level of participation among Class Members is a testament to the strength and efficacy of the Settlement Agreement" justifying a 6.75% award from a $6.44 billion settlement).   As noted, the uncapped settlements in this case have provided over 90,000 people and businesses along the Gulf with full compensation for their losses – and in most cases an additional punitive and/or future risk factor.[259]   The Seafood Compensation Fund was able to not only provide full compensation to the commercial fishing industry for its loss, but to also achieve a significant level of security and protection from the future risk which loomed heavily over such classmembers and their families. Such compensation was also provided much more quickly, due to the unique and unprecedented step of paying eligible classmembers prior to final class settlement approval under an individual release.   Both class settlements provided significant and beneficial grants to help the entire region rebound economically from the spill and to help build and infrastructure for the better delivery of healthcare to the affected communities.   A comprehensive library was also established.

In sum, the Economic Settlement was and is so good that BP spent almost three years effectively trying to get out of it, and yet (with the tireless work and dedication of the petitioners)

---

[259] *See, e.g.,* Sharkey, *The BP Oil Spill Settlements,* 64 DEPAUL L. REV. at 699 ("the RTP is designed not only to compensate class members for future injuries (potential future loss and any risk of oil returning), claims with a low likelihood of success (consequential damages), damages based on the temporal nature of the litigation (lost value of money, prejudgment interest), and noneconomic damages (inconvenience, aggravation, and  compensation for emotional distress), but also to encompass some measure of expected punitive damages").

was nevertheless approved, and is on pace to become what may well be the largest class action settlement in history.[260]

As to the tenth *Johnson* factor, "the undesirability of the case," courts have observed that: "Cases may be deemed 'undesirable' when 'the defendant is a large corporation with substantial resources, financial and otherwise, for a vigorous defense; and the legal and factual issues presented risks to recovery absent settlement.'" Burford, 2012 WL 5471985 at *5 (quoting Heartland, 851 F.Supp.2d at 1085). "Where class counsel is 'a relatively small group of attorneys with limited resources pitted against ... [a larger entity] with access to enormous legal resources,' the tenth factor weighs in favor of a substantial fee." *Id.* (quoting Bayou Sorrel, 2006 WL 3230771 at *6).

Finally, with regard to *Johnson*'s eleventh factor, the "nature and length of the professional relationship with the client," "where counsel has been quickly responsive to class members who needed explanations, assistance, and assurances, the eleventh factor weighs in favor of a substantial award." *Id.* at *5 (*quoting* Bayou Sorrel, 2006 WL 3230771 at *6).  The PSC, in this case, prior to the settlements, spent a significant amount of time and money assisting *pro ses* and others with issues in the GCCF and in attempting to ensure that people and businesses knew about the Monition Date and could easily join in the litigation.  Following the settlement, Class Counsel conducted a series of free seminars all over the Gulf, and opened a "Class Counsel Office" with a Website, a SettlementQuestions e-mail address, and a 1-800 number to assist Classmembers with questions regarding the features of the settlements and advice regarding the submission of claims.  At the same time, Class Counsel were heavily involved with the Claims Administrators, the Program Vendors, BP, and in some cases the Court, with settlement implementation, from an interpretive and administrative standpoint.  And,

---

[260] *See generally* FITZPATRICK DECLARATION ¶¶32-33.

as the situation with BP grew more adversarial, Class Counsel took numerous steps to assist individual classmembers with *amicus* and other filings, and to attempt to ensure that the original intent of the Economic and Medical Class Settlements were protected and preserved on behalf of each entire respective Class.  Even into 2016, Class Counsel continue to prosecute appeals in the Fifth Circuit;  to file *amicus* briefs in individual claimants' appeals in order to help give the Fifth Circuit judges better background and context, and to urge the adoption of interpretations for the benefit of the class;  to provide and update an Index of materials to be referenced and utilized by individual classmembers and an Appeal Compendium of significant Program Appeal decisions;  to interface with the Claims Administrators, Program Vendors, and BP regarding ongoing administrative issues;  and to answer questions, liaise with the Claims Administrators' staffs, and/or otherwise offer advice or assistance to claimants, attorneys, and claims preparers with respect to individual Economic and Medical Settlement claims, denials, determinations, notices of defect, request for reconsideration, BELO actions, requests for discretionary review, and/or appeals.

Taking the *Johnson* factors into account for both the appropriate "lodestar" rate and the multiplier, the multiplier is primarily utilized "to account for … the quality of representation, the benefit obtained for the class, the complexity and novelty of the issues presented, and the risks involved." Enron, 586 F.Supp.2d at 752 (citing and quoting In re Global Crossing Sec. and ERISA Litig., 225 F.R.D. 436, 468 (S.D.N.Y. 2004)).  *Accord*, *e.g.*, Rite Aid, 396 F.3d at 305-06 ("multiplier is a device that attempts to account for the contingent nature or risk involved in a particular case and the quality of the attorneys' work"); Lindy Brothers Builders of Philadelphia v. American Radiator & Standard Sanitary Corp., 540 F.2d 102, 117 (3d Cir. 1976) ("*Lindy II*") (multiplier accounts for "the complexity of the case" and "[t]he delay in receipt of payment for

services rendered"). "[M]ultiples ranging from one to four are frequently awarded in common fund cases when the lodestar method is applied." In re Cendant Corp. PRIDES Litig., 243 F.3d 722, 742 (3rd Cir.), *cert. denied*, 534 U.S. 889 (2001) (quoting Prudential, 148 F.3d at 341). *Accord*, *e.g.*, Vizcaino v. Microsoft Corp., 290 F.3d 1043, 1051 n.6 (9th Cir.), *cert. denied*, 537 U.S. 1018 (2002) (Ninth Circuit reviewed a survey of court awarded multipliers and found that they ranged between "0.6 - 19.6, with most (20 of 24, or 83%) from 1.0 - 4.0 and a bare majority (13 of 24, or 54%) in the 1.5 - 3.0 range"); Forbush v. J.C. Penney Co., 98 F.3d 817, 824 (5th Cir. 1996) (affirming district court's use of multiplier of two); Vaughn v. Am. Honda Motor Co., 627 F.Supp.2d 738, 751 (E.D. Tex.) (applying a multiplier of 2.26), *amended on other grounds*, 507 F.3d 295 (5th Cir. 2007); Murphy Oil, 472 F.Supp.2d at 869 ("[T]he Court finds that a lodestar multiplier range of 2.5 to 3.5 would be appropriate and reasonable in this case"); Combustion, 968 F.Supp. at 1133 ("Multipliers ranging from one to four frequently are awarded in common fund cases when the lodestar method is applied").

In formulating such a judgment, "consider[ation of] multipliers used in comparable cases" may be appropriate with the understanding that the multiplier that results from the cross-check analysis "need not fall within any predefined range." Enron, 586 F.Supp.2d at 752; Rite Aid, 396 F.3d at 307 & n.17 (citing Gunter v. Ridgewood Energy Corp., 223 F.3d 190, 195 n.1 (3rd Cir. 2000)). In this regard, the following table provides cross-check multipliers for percentage fee awards in "super-mega-fund" cases, which, as noted earlier, would seem to be "comparable" to the present litigation for fee award purposes:

|   | Case | Fund Value | Hours | Lodestar Multiple |
|---|------|-----------|-------|-------------------|
| 1. | *In re Enron Corp.*, 586 F. Supp. 2d 732 (S.D. Tex. 2008) | $7.227 Billion | 289,393 | 5.21 |

| 2. | *In re Diet Drugs Prods. Liab. Litig.*, 553 F. Supp. 2d 442 (E.D. Pa. 2008), *aff'd*, 582 F.3d 524 (3rd Cir. 2009) | $6.44 Billion | 553,021 | 2.6 to 3.4 |
|---|---|---|---|---|
| 3. | *In re WorldCom, Inc. Sec. Litig.*, 388 F. Supp. 2d 319 (S.D.N.Y. 2005) | $6.133 Billion | 277,862 | 4 |
| 4. | *In re Vioxx Prods. Liab. Litig.*, 760 F. Supp. 2d 640 (E.D. La. 2010) | $4.84 Billion | 560,000 | 1.26 |
| 5. | *In re Visa Check/Mastermoney Antitrust Litig.*, 297 F. Supp. 2d 502 (E.D.N.Y. 2003*), aff'd sub. nom.*, Wal-Mart Stores, Inc. v. Visa U.S.A., Inc., 396 F.3d 96 (2nd Cir. 2005) .), *cert. denied*, 544 U.S. 1044 (2005) | $3.383 Billion | Not Available | 3.5 |
| 6. | *In re Tyco Int'l, Ltd. Multidistrict Litig.*, 535 F. Supp. 2d 249 (D.N.H. 2007) | $3.3 Billion | 488,000 | 2.697 |
| 7. | *In re Cendant Corp. Litig.*, 243 F. Supp. 2d 166 (D.N.J. 2003), *aff'd*, 404 F.3d 173 (3rd Cir. 2005) | $3.186 Billion | 35,000 | 6.875 |
| 8. | *In re AOL Time Warner, Inc. Sec. and ERISA Litig.*, 2006 WL 3057232 (S.D.N.Y. Oct. 25, 2006) | $2.65 Billion | 135,186 | 3.69 |
| 9. | *In re Royal Ahold N.V. Sec. and ERISA Litig.*, 461 F. Supp. 2d 383 | $1.1 Billion | 147,896 | 2.57 |
| 10. | *Shaw v. Toshiba Am. Information Systems, Inc.*, 91 F. Supp. 2d 942 (E.D. Tex., 2000) | $1.07 Billion | Not Available | Not Available |
| 11. | *In re NASDAQ Market-Makers Antitrust Litig.*, 187 F.R.D. 465 (S.D.N.Y. 1998) | $1.07 Billion | 129,629 | 3.97 |
| 12. | *In re Sulzer Hip Prosthesis and Knee Prosthesis Liab. Litig.*, 268 F. Supp. 2d 907 (N.D. Ohio 2003) | $1.045 Billion | 50,987 | 2.4 |
| 13. | *In re AT&T Mobility Wireless Data Services Sales Tax Litig.*, 792 F. Supp. 2d 1028 (N.D. Ill. 2011) | $1 Billion | Not Available | Not Available |

| 14. | *DeLoach v. Phillip Morris Cos.*, 2003 WL 23094907 (M.D.N.C. Dec. 19, 2003) | ~$1 Billion | Not Available | 4.45 |
|---|---|---|---|---|
|  | **Average**: |  |  | **3.64** |

Looking solely at the BP Class Settlements, a cross-check of a conservative 527,081 hours against a $555.2 million common benefit fee award yields a blended rate (including the multiplier) of just $1,053 per hour.

Yet even looking at the BP Class Settlements combined with the proposed Transocean and Halliburton Settlements, a cross-check of 527,081 hours against a potential $680.15 million common benefit fee award yields a blended rate (including the multiplier) of $1,290 per hour. And even looking at the BP Class Settlements, the Halliburton and Transocean Settlements, and the State Settlements, together, a cross-check of 527,081 hours against a potential $720.15 million common benefit fee award yields a blended rate of $1,366 per hour.

At the $456 average hourly rate approved in *Enron* back in 2008,[261] this yields a multiplier of only 2.99 for the total potential collective fee awards, and a multiplier of only 2.31 when applied to the common benefit fees that BP agreed to pay in connection with the BP Class Settlements – well within the 3.6 range in other "super mega-fund" cases outlined above.

At the $600 hourly rate paid to outside counsel for the State of Louisiana, it yields a multiplier of only 1.76.

Such common benefit fee awards are eminently reasonable under the caselaw precedent and litigation-specific analyses outlined above.  *See* FITZPATRICK DECLARATION ¶42 (multiplier

---

[261] *See* Enron, supra, 586 F.Supp.2d at 779-780.

of 2.96 using the NLJ Survey rates, broken down by partner hours, associate hours, and paralegal hours, is "well within the range of reason in light of the *Johnson* factors").[262]

---

[262] *See also, e.g.,* KLONOFF EXPERT REPORT (Aug. 13, 2012) [Rec. Doc. 7104-3] pp.46-47, ¶107 (assuming an ultimate common benefit fee request of $570 million, and opining as follows: "counsel have already put 384,000 hours into this case. Assuming they do not put in another hour, which is obviously an absurd proposition, and assuming the average hourly rate of $456 used in *Enron,* the lodestar amount would be $175,104,000; resulting in a lodestar multiplier (with fees of $570 million) of 3.26, far below the multiplier of 5.2 approved in *Enron.* 586 F.Supp.2d at 803.... [E]ven using the $300 per hour rate proposed by Salvesen, a lodestar cross-check would raise no concerns. Assuming 384,000 total hours, the lodestar would be $115.2 million and the multiplier would be 4.95. Were class counsel to invest 800,000 hours, the lodestar would be $240 million and the multiplier would be 2.37. Because all of these ranges support fees of $570 million, the Court need not await the final total of hours, and need not conduct a lodestar cross-check before giving its blessing to the fee agreement").

## EXHIBITS

**(Including References to Key Materials Already in Record)**

1.   Declaration of Stephen J. Herman and James Parkerson Roy (July 14, 2016).

2.   Affidavit of Phillip A. Garrett, CPA (July 10, 2016).

3.   Declaration of Brian T. Fitzpatrick (July 14, 2016).

4.   Declaration of Elizabeth J. Cabraser (July 7, 2016).

5.   Expert Report of Robert H. Klonoff re Economic Settlement (Aug. 13, 2012)
         [Rec. Doc. 7104-3].

6.   Expert Report of Robert H. Klonoff re Medical Settlement (Aug. 13, 2012)
         [Rec. Doc. 7116-2].

7.   Declaration of Samuel Issacharoff (Aug. 13, 2013) [Rec. Doc. 7104-4].

8.   Declaration of Joseph F. Rice (re Fees) (Aug. 10, 2012) [Rec. Doc. 7104-6, at 21-28].

9.   Supp. Expert Report of Robert H. Klonoff re Economic Settlement (Oct. 22, 2012)
         [Rec. Doc. 7727-4]. (*See also* Supp. Expert Report of Robert H. Klonoff re
         Medical Settlement (Oct. 22, 2012) [Rec. Doc. 7728-2].)

10.  Allocation and Reasons [Rec. Doc. 15652] (Dec. 11, 2015), pp.14-16,
         and Seafood Claimants' Submission [Rec. Docs. 15570 and 15570-4 (Tab 3)].

11.  Statistics for *Deepwater Horizon* Economic & Property Damages Settlement
         (May 24, 2016)

12.  BP First Quarter 2016 Results (April 26, 2016)

13.  Master Index of Economic Settlement Related Materials Assembled for Classmembers
     by Class Counsel (updated Dec. 22, 2015)

14.  List of Pleadings Submitted by Common Benefit Attorneys

15.  List of Depositions

16.  List of BP Settlement Negotiation Meetings and Sessions

17.  Phase One (a snapshot)

18.     List of Status and Discovery Conferences

19.     Total Estimated Class Benefits

20.     GCCF Overall Program Statistics: Status Report as of Feb. 10, 2012.

21.     GCCF Winding Down [EXHIBIT D (*in globo*) to Reply Brief
        in Support of Final Approval] (Oct. 22, 2012) [Rec. Doc. 7727-3].

22.     GCCF Was 92% Done When the BP Class Settlement Programs Took Over.

23.     Gibson Dunn Reported Rates

24.     State of Louisiana *Deepwater Horizon* Outside Counsel Rates

25.     Declaration of Geoffrey P. Miller (Aug. 29, 2014), submitted in *In re U.S. Foodservice Pricing Litigation,* MDL No. 1894, Civ. Action No. 07-1894, pending in the United States District Court of Connecticut [Rec. Doc. 510-5].

26.     Kirkland & Ellis First Interim Application for Allowance and Payment of Compensation for Professional Services, submitted in *In re Great Atlantic & Pacific Tea Company,* No. 10-24549, in the U.S. Bankruptcy Court for the Southern District of New York, [Rec. Doc. 1566] (May 11, 2011).

## Conclusion

For the above and foregoing reasons, the Petition for Reimbursement of Expenses and Collective Common Benefit Fee Award should be granted.

This 15th day of July, 2016.


Respectfully submitted,



  /s/ Stephen J. Herman                          /s/ James Parkerson Roy

**Stephen J. Herman**, La. Bar No. 23129         **James Parkerson Roy**, La. Bar No. 11511

**HERMAN HERMAN & KATZ LLC**            **DOMENGEAUX WRIGHT ROY EDWARDS**

820 O'Keefe Avenue                         **& COLOMB, LLC**

New Orleans, Louisiana 70113            556 Jefferson Street, Suite 500

Telephone: (504) 581-4892               Lafayette, Louisiana 70501

Fax No. (504) 569-6024                  Telephone: (337) 233-3033

E-Mail: sherman@hhklawfirm.com       Fax No. (337) 233-2796

                                          E-Mail: jimr@wrightroy.com

*Plaintiffs Liaison Counsel,*

*Co-Lead Class Counsel, and*             *Plaintiffs Liaison Counsel,*

*Co-Chair of the Fee Committee*        *Co-Lead Class Counsel, and*

                                          *Co-Chair of the Fee Committee*


                                        **Arnold Levin**

                                        **Sandra L. Duggan**

                                        **LEVIN FISHBEIN SEDRAN & BERMAN**

                                        510 Walnut Street, Suite 500

                                        Philadelphia, Pennsylvania 19106

                                        Telephone: (215) 592-1500

                                        Fax No. (215) 592-4663

                                        E-Mail: sduggan@lfsblaw.com

                                        *Special Counsel to the Fee Committee*

**FEE COMMITTEE MEMBERS**

Mr. Brian Barr
Levin Papantonio Thomas Mitchell Raferty & Proctor
316 South Baylen St., Suite 600
Pensacola, FL 32502
Phone: (850) 435-7045
E-mail: bbarr@levinlaw.com

Ms. Dawn Barrios
Barrios, Kingsdorf & Casteix, LLP
701 Poydras St, Suite 3650
New Orleans   LA 70139
Phone:  (504) 524-3300
E-mail: barrios@bkc-law.com

Mr. Robert Cunningham
Cunningham Bounds LLC
1601 Dauphin St.
Mobile, AL 36604
Phone:  (251) 471-6191
E-mail: RTC@Cunninghambounds.com

Mr. Calvin C. Fayard, Jr.
Fayard & Honeycutt, APC
519 Florida Avenue, SW
Denham Springs, LA  70726
Phone: (225) 664-4193
E-mail: calvinfayard@fayardlaw.com

Ms. Robin Greenwald
Weitz & Luxenberg, PC
700 Broadway
New York, NY 10003
Phone: (212) 558-5802
E-mail: rgreenwald@weitzlux.com

**ADDITIONAL PSC / CLASS COUNSEL**

Mr. Jeffrey E. Breit
Breit Drescher Imprevento
600 22nd St., Suite 402
Virginia Beach, VA  23451
Phone:  (757) 670-3888
E-mail: jbreit@bdbmail.com

Ms. Elizabeth Cabraser
Lieff Cabraser Heimann & Bernstein, LLP
275 Battery St., 29th Floor
San Francisco   CA  94111
Phone: (415) 956-1000
E-mail: ecabraser@lchb.com

Mr. Philip F. Cossich, Jr.
Cossich, Sumich, Parsiola & Taylor LLC
8397 Highway 23, Suite 100
Belle Chasse, LA  70037
Phone: (504) 394-9000
E-mail: pcossich@cossichlaw.com

Mr. Michael Espy
Morgan & Morgan
188 East Capitol Street, Suite 777
Jackson, MS  39201
Phone: (601) 949-3388
E-mail: MEspy@forthepeople.com

Mr. Ervin Gonzalez
Colson Hicks Eidson
255 Alhambra Circle, Penthouse
Coral Gables, FL  33134
Phone: (305) 476-7400
E-mail: Ervin@colson.com

Mr. Rhon E. Jones
Beasley, Allen, Crow, Methvin, Portis & Miles, P.C.
250 Commerce St.
Montgomery, AL  36103
Phone: (334)269-2343 Ext. 131
E-mail: Rhon.Jones@beasleyallen.com

Mr. Matthew Lundy
Lundy, Lundy, Soileau & South
501 Broad Street
Lake Charles, LA  70601
Phone: (337) 439-0707
E-mail: mlundy@lundylawllp.com

Mr. Michael C. Palmintier
deGravelles, Palmintier, Holthaus & Fruge
618 Main Street
Baton Rouge, LA 70801
Phone:  (225) 344-3735
E-mail: mpalmintier@dphf-law.com

Mr. Joseph Rice
Motley Rice, LLC
28 Bridgeside Boulevard
Mount Pleasant, SC  29464
Phone: (843) 216-9000
E-mail: jrice@motleyrice.com

Mr. Paul Sterbcow
Lewis, Kullman, Sterbcow & Abramson
601 Poydras Street, Suite 2615
New Orleans, LA 70130
Phone: (504) 588-1500
E-mail: sterbcow@lksalaw.com

Mr. Scott Summy
Baron & Budd, P.C.
3102 Oak Lawn Ave.    Suite 1100
Dallas   TX        75219
Phone: (214) 521-3605
E-mail: ssummy@baronbudd.com

Mr. Conrad S.P. "Duke" Williams, III
Williams Law Group LLC
909 Poydras Street, Suite 1625
New Orleans, LA  70112
Phone: (504) 200-0000
E-mail: duke@williamslawgroup.org

## ADDITIONAL COMMON BENEFIT ATTORNEYS

Mr. Roy F. Amedee, Jr.
Law Offices of Roy F. Amedee, Jr.
3723 Canal St.
New Orleans, LA  70119
Phone: (504) 592-3222
E-mail: ramedeejr@aol.com

Mr. Robert  Horkovich
Anderson Kill, P.C.
1251 Avenue of the Americas
New York, NY  10020
Phone:  (212) 278-1322
E-mail: rhorkovich@andersonkill.com

Mr. Jonathan Andry
Andry Law Group
610 Baronne St.
New Orleans, LA 70113
Phone:  (504) 525-5535
E-mail: jandry@andrylawgroup.com

Mr. David A. Bagwell
400 Fairhope Ave, Suite 2E
Fairhope, AL    36532
Phone: (251) 928-2970
E-mail: david@bagwellesq.com

Mr. Jeremy Hebert
Becker and Hebert
201 Rue Beauregard
Lafayette, LA    70508
Phone: (337) 446-2407
E-mail: jeremy@lawbecker.com

Mr. Wiley J. Beevers
Beevers & Beevers, LLP
210 Huey P. Long Ave.
Gretna, LA        70053
Phone:  (504) 361-4287
E-mail: wbeevers@beeverslaw.com

Mr. Mitchell Widom
Bilzin, Sumberg, Baena, Price & Axelrod
1450 Brickell Avenue, Suite 2400
Miami, FL   33131
Phone:  (305) 375-6127
E-mail: mwidom@bilzin.com

Ms. Kelly Bilek
The Bilek Law Firm, LLP
700 Louisiana St., Suite 3950
Houston, TX 77002
Phone: (713) 227-7720
E-mail: kbilek@bileklaw.com

Mr. Richard Passler
Breazeale, Sachse, & Wilson, LLP
909 Poydras St., Suite 1500
New Orleans, LA 70112
Phone: (504) 584-5454
E-mail: richard.passler@bswllp.com

Mr. Joseph M. Bruno
Bruno and Bruno
855 Baronne St.
New Orleans, LA 70113
Phone: (504) 525-1335
E-mail: jbruno@brunobrunolaw.com

Mr. Marc Fink
Center for Biological Diversity
209 East 7th St.
Duluth, MN 55805
Phone: (218) 464-0539
E-mail: mfink@biologicaldiversity.org

Mr. Rogen K. Chhabra
Chhabra and Gibbs, P.A.
120 N. Congress St., Suite 200
Jackson, MS     39201
Phone: (601) 948-8005
E-mail: rchhabra@cglawms.com

Mr. Lange Clark
Law Office of Lange Clark, PC
301 19th Street North, Suite 550
Birmingham, AL 35203
Phone: (205) 939-3933
E-mail: langeclark@langeclark.com

Ms. Jayne Conroy
Hanly Conroy Bierstein Sheridan Fisher & Hayes, LLP
112 Madison Ave., 7th Floor
New York, NY 10016
Phone: (212) 784-6400
E-mail: jconroy@simmonsfirm.com

Mr. Brent Coon
Brent Coon & Associates, P.C.
215 Orleans
Beaumont, TX  77701
Phone: (409) 835-2666
E-mail: brent@bcoonlaw.com

Mr. Brooks Cutter
Cutter Law PC
401 Watt Ave
Sacramento, CA 95864
Phone: (916) 290-9400
E-mail: bcutter@cutterlaw.com

Mr. Gary A. Davis
Gary A. Davis & Associates
21 Battery Park Ave., Suite 206
Asheville, NC   28801
Phone: (828) 622-0044
E-mail: gadavis@enviroattorney.com

Mr. Gerald J. Diaz, Jr.
Diaz Law Firm, PLLC
208 Waterford Square, Suite 300
Madison, MS    39110
Phone: (601) 607-3456
E-mail: joey@diazlawfirm.com

Mr. Kenneth Hooks, III
Dodson & Hooks APLC
112 Founders Drive
Baton Rouge    LA 70810
Phone: (225) 756-0222
E-mail: Kenny@dodsonhooks.com

Mr. Stanwood Duval
Duval, Funderburk, Sundbery, Richard & Watkins, APLC
101 Wilson Avenue
Houma, LA       70364
Phone: (985)876-6410
E-mail: stan@duvallawfirm.com

Mr. Hiram Eastland, Jr.
Eastland Law Offices
307 Cotton St.
Greenwood, MS  38930
Phone:  (662) 453-1227
E-mail: eastlandlaw1@gmail.com

Ms. Kim Evers
Evers Law Group
2603 Edmund Dr.
Gulf Breeze, FL  32563
Phone:  (850)932-773
E-mail: kevers@everslaw.net

Ms. Mila Bartos
Finkelstein Thompson LLP
1077 30th Street, N.W., Suite 150
Washington, DC  20007
Phone: (202) 337-8000
E-mail: mbartos@finkelsteinthompson.com

Mr. James Swanson
Fishman Haygood, LLP
201 St. Charles Avenue, 46th Floor
New Orleans, LA  70170
Phone: (504) 586-5241
E-mail: jswanson@fishmanhaygood.com

Mr. Jeff Friedman
Friedman, Dazzio, Zulanas & Bowling, P.C.
3800 Corporate Woods Drive
Birmingham, AL  35242
Phone:  (205) 278-7010
E-mail: jfriedman@friedman-lawyers.com

Mr. Gerald Meunier
Gainsburgh, Benjamin, David, Meunier & Warshauer, LLC
1100 Poydras Street, Suite 2800
New Orleans, LA 70163
Phone: (504) 522-2304
E-mail: gmeunier@gainsben.com

Mr. Craig Litherland
Gilbert LLP
1100 New York Ave, NW, Suite 700
Washington, DC 20005
Phone: (202) 772-2277
E-mail: litherlandc@gotofirm.com

Mr. Thomas Girardi
Girardi & Keese
1126 Wilshire Boulevard
Los Angeles, CA 90017
Phone: (213) 262-6777
E-mail: tgirardi@girardikeese.com

Mr. Kevin Goldberg
Goldberg Finnegan & Mester, LLC
8401 Colesville Rd., Suite 630
Silver Springs, MD 20910
Phone: (301) 589-2999
E-mail: kgoldberg@gfmlawllc.com

Mr. Gregory Friedlander
Gregory Friedlander & Associates, PC
11 S. Florida St.
Mobile, AL 36606
Phone: (251) 470-0303
E-mail: Isee3@aol.com

Mr. Stuart Grossman
Grossman Roth Yaffa Cohen, P.A.
2525 Ponce de Leon Blvd., Suite 1150
Coral Gables, FL  33134
Phone: (305) 442-8666
E-mail: szg@grossmanroth.com

Mr. George W. Healy, IV
George W. Healy, IV & Assoc.
1323 28th Avenue, Suite A
Gulfport, MS    39501
Phone: (228) 575-4005
E-mail: gwhealyiv@aol.com

Mr. Anthony Irpino
Irpino Law Firm
2216 Magazine St
New Orleans, LA  70130
Phone: (504) 525-1500
E-mail: airpino@irpinolaw.com

Mr. Neil Johnston, Jr.
Law Office of Neil C. Johnston Jr., LLC
3800 Airport Blvd., Suite 302
Mobile, AL  36608
Phone: (251) 709-8251
E-mail: neilcjohnston@ncjlawoffice.com

Mr. Lynn Swanson
Jones, Swanson, Huddell & Garrison, LLC
601 Poydras Street, Suite 2655
New Orleans, LA 70130
Phone: (504)523-2500
E-mail: lswanson@jonesswanson.com

Mr. Lawrence L. Jones, II
Jones Ward, PLC
Marion E. Taylor Building
312 S 4th St., 6th Floor
Louisville, KY 40202
Phone: (502) 587-2002
E-mail: larry@jonesward.com

Mr. Gary Koederitz
Koederitz Law Firm, LLC
4607 Bluebonnet Blvd., Suite B
Baton Rouge, LA  70809
Phone: (225) 295-9494
E-mail: Gary@kwlawbr.com

Mr. Adam Moskowitz
Kozyak, Tropin & Throckmorton, P.A.
2525 Ponce de Leon Blvd., 9th Floor
Coral Gables, FL  33134
Phone: (305) 372-1800
E-mail: amm@kttlaw.com

Mr. Anthony Tarricone
Kreindler & Kreindler LLP
855 Boylston Streetm Suite 1101
Boston, MA  02116
Phone: (617) 424-9100
E-mail: atarricone@kreindler.com

Mr. Hugh Lambert
The Lambert Firm
701 Magazine St.
New Orleans, LA 70130
Phone: (504) 581-1750
E-mail: hlambert@thelambertfirm.com

Mr. Frank Lamothe, III
Lamothe Law Firm, LLC
400 Poydras St., Suite 1760
New Orleans, LA  70130
Phone: (985) 249-6800
E-mail: felamothe@lamothefirm.com

Mr. Walter Leger, Jr.
Leger & Shaw
935 Gravier St., Suite 2150
New Orleans, LA 70112
Phone: (504) 588-9043
E-mail: wleger@legershaw.com

Mr. Andrew Lemmon
Lemmon Law Firm
15058 River Road
Hahnville, LA 70057
Phone: (985) 783-6789
E-mail: Andrew@lemmonlawfirm.com

Mr. Dewitt Lovelace
Lovelace & Associates, PA
12870 U.S. Highway 98 West, Suite 200
Miramar Beach, FL 32550
Phone: (850) 837-6020
E-mail: dml@lovelacelaw.com

Mr. Scott Bickford
Martzell & Bickford
338 Lafayette Street
New Orleans, LA 70130
Phone: (504) 581-9065
E-mail: srb@mbfirm.com

Mr. Gary Mason
Mason LLP
1625 Massachusetts Avenue, NW, Suite 605
Washington, DC  20036
Phone: (202) 429-2290
E-mail: gmason@wbmllp.com

Mr. Guy Matthews
Matthews, Lawson, McCutcheon, & Johnson, PLLC
2000 Bering Drive
Houston, TX  77057
Phone: (713) 355-4200
E-mail: gmatthews@matthewsfirm.com

Mr. Derriel McCorvey
The Law Office Of Derriel C. McCorvey
117 Caillouett Place
Lafayette, LA   70511
Phone: (337) 291-2431
E-mail: derriel@mccorveylaw.com

Mr. Harry Smith
McKenzie Law Firm, PA
905 East Hatton Street
Pensacola, FL 32503
Phone: (850) 432-2856
E-mail: jmckenzie@mckenzielawfirm.com

Mr. Stephen B. Murray, Sr.
Murray Law Firm
650 Poydras Street, Suite 2150
New Orleans, LA 70130
Phone: (504) 525-8100
E-mail: smurray@murray-lawfirm.com

Mr. Charles B. Musslewhite, Jr.
Musslewhite & Associates, PC
P.O. Box 7886
Houston, TX    77270
Phone: (713) 426-1900
E-mail: cbm@musslewhite-law.com

Mr. Ronnie Penton
Penton Law Firm
503 Georgia Avenue
Bogalusa, LA  70427
Phone: (985) 732-5651
E-mail: fedcourtmail@rgplaw.com

Mr. Drew Ranier
Ranier Law Firm, LLC
1419 Ryan St.
Lake Charles, LA 70601
Phone: (337)494-7171
E-mail: dranier@ranierlaw.com

Mr. Jim Reeves
Reeves & Mestayer
160 Main St., P.O. Drawer 1388
Biloxi, MS 39533
Phone: (228) 374-5151
E-mail: jrr@rmlawcall.com

Mr. Dennis Reich
Reich & Binstock, LLP
4265 San Felipe, Suite 1000
Houston, TX 77027
Phone: (713) 622-7271
E-mail: dreich@reichandbinstock.com

Mr. Matthew D. Shaffer
Schechter, McElwee, Shaffer & Harris, LLP
3200 Travis Street, 3rd Floor
Houston, TX  77006
Phone: (713) 524-3500
E-mail: mshaffer@smslegal.com

Mr. Jeffrey S. Grand
Seeger Weiss
77 Water St., 26th Floor
New York, NY 10005
Phone: (212) 584-0700
E-mail: jgrand@seegerweiss.com

Mr. Robert Roden
Shelby Roden, LLC
2956 Rhodes Circle
Birmingham, AL 35205
Phone: (205) 933-8383
E-mail: RRoden@shelbyroden.com

Mr. Martha Y. Curtis
Sher Garner Cahill Richter Klein & Hilbert, LLC
909 Poydras Street, 28th Floor
New Orleans, LA 70112
Phone: (504) 299-2100
E-mail: mcurtis@shergarner.com

Mr. Frank Spagnoletti
Spagnoletti & Co
401 Louisiana St., 8th Floor
Houston, TX    77002
Phone: (713) 659-0257
E-mail: frank@spaglaw.com

Mr. Willie James Singleton
The Singleton Law Firm
4050 Linwood Avenue
Shreveport, LA  71108
Phone: (318) 631-5200
E-mail: wjsingleton@singletonlaw.com

Attorney General Luther Strange
The State of Alabama
Office Of The Attorney General
501 Washington Avenue
Montgomery, AL 36130
Phone: (334) 353-4336
E-Mail: lstrange@ago.state.al.us

Mr. Charles Tebbutt
Law Offices of Charles M. Tebbutt, P.C.
941 Lawrence St.
Eugene, OR  97401
Phone: (541) 344-3505
E-mail: charlie@tebbuttlaw.com

Mr. Tom Thornhill
Thornhill Law Firm, APLC
1308 Ninth Street
Slidell, LA 70458
Phone: (985) 641-5010
E-mail:  tom@thornhilllawfirm.com

Ms. Evette Ungar
Ungar & Byrne APLC
650 Poydras Street, Suite 2005
New Orleans, LA  70130
Phone: (504) 566-1616
Email:  eungar@ungarlawyers.com

Mr. William S. Vincent, Jr.
Law Office of William S. Vincent, Jr.
2018 Prytania Street
New Orleans, LA  70130
Phone: (504) 522-3220
E-mail: jared@wsvjr.com

Mr. Steve Horner
Waite, Schneider, Bayless & Chesley
1 West Fourth Street
Cincinnati, OH 45202
Phone: (513) 621-0267
E-mail: stevehorner@wsbclaw.com

Mr. Darrel Papillion
Walters, Papillion, Thomas, Cullens LLC
12345 Perkins Road, Building One
Baton Rouge, LA 70810
Phone: (225) 236-3636
E-mail: papillion@lawbr.net

Mr. Joel Waltzer
Waltzer, Wiygul, & Garside, LLC
1000 Behrman Highway
Gretna, LA  70056
Phone:  (504) 340-6300
E-mail: joel@wwglaw.com

Ms. Deborah Waters
Waters Law Firm
150 Boush St., Suite 600
Norfolk, VA 23510
Phone: (757) 446-1434
E-mail: dwaters@waterslawva.com

Mr. Mikal C. Watts
Watts Guerra, LLP
Four Dominion Drive, Bldg. 3, Ste. 100
San Antonio, TX  78257
Phone:  (210) 447-0500
E-mail: mcwatts@wgclawfirm.com

Mr. Joshua D. Wilson
Wiggins, Childs, Pantazis, Fisher & Goldfarb, LLC
5214 Maryland Way, Suite 402
Brentwood, TN  37027
Phone: (615) 964-5215
E-mail: jwilson@wigginschilds.com

Mr. Jimmy Williamson
Williamson, Sears, & Rusnak
4310 Yoakum Boulevard
Houston, TX 77006
Phone: (713) 223-3330
E-mail: jimmy@wsrlawfirm.com

Mr. Tom Young
The Law Office of Thomas Young, PA
209 South Howard Ave.
Tampa, FL 33606
Phone:  (813) 251.9706
Email: tyoung@tlylaw.com

**CERTIFICATE OF SERVICE**

**WE HEREBY CERTIFY** that the above and foregoing Fee Petition will be served on All Counsel by electronically uploading the same to File & ServeXpress in accordance with Pre-Trial Order No. 12, and that the foregoing will be electronically filed with the Clerk of Court of the United States District Court for the Eastern District of Louisiana by using the CM/ECF System, which will send a notice of electronic filing in accordance with the procedures established in MDL 2179, this 15th day of July, 2016.

/s/ Stephen J. Herman and James Parkerson Roy