# UNITED STATES DISTRICT COURT
# DISTRICT OF CONNECTICUT

| | |
|---|---|
| In re: U.S. Foodservice, Inc. Pricing Litigation | Civil Action No. 07-1894 (CFD) MDL No. 1894 (CFD) |
| This Document Relates To: | |
| Waterbury Hospital, *et al.*, | Civil Action No. 06-1657 (CFD) |
| Plaintiffs, | |
| v. | |
| U.S. Foodservice, Inc., | |
| Defendant. | |
| Catholic Healthcare West, | Civil Action No. 08-0004 (CFD) |
| Plaintiff, | |
| v. | |
| Koninklijke Ahold N.V., *et al.*, | |
| Defendants. | |
| Thomas & King, Inc., | Civil Action No. 08-0005 (CFD) |
| Plaintiffs, | |
| v. | |
| Koninklijke Ahold N.V., *et al.*, | |
| Defendants | |

1

## DECLARATION OF GEOFFREY P. MILLER

I, GEOFFREY P. MILLER, declare under penalty of perjury as follows:

1.      I am over 18 years of age, I am competent to make this declaration, and I have personal knowledge of the matters and facts recited herein.

## Scope of Retention

2.      I have been retained to analyze the requested attorneys' fee award in light of empirical data on awards in similar cases.

## Qualifications

3.      I am the Stuyvesant P. Comfort Professor of Law at the New York University Law School.  I am a *magna cum laude* graduate of Princeton University and a 1978 graduate of the Columbia Law School where I was Editor-in-Chief of the Law Review.  I served as a law clerk to the Honorable Carl McGowan of the United States Court of Appeals for the District of Columbia Circuit and to the Honorable Byron R. White, Associate Justice of the United States Supreme Court.  I was an attorney-adviser at the Office of Legal Counsel in the United States Department of Justice from 1980-1982.  After practicing civil litigation with a Washington D.C. law firm, I joined the faculty of the University of Chicago Law School in 1983, where I served as Kirkland & Ellis Professor and Associate Dean.  I moved to New York University in 1995.  A copy of my resume is attached as Appendix A.

4.      I am a founder, board member and former co-president of the Society for Empirical Legal Studies, an organization of researchers in the fields of law, economics, sociology, psychology, business, and political science whose work examines the statistical and empirical bases of legal rules.  I am a 2011 inductee into the American Academy of Arts and

Sciences and am one of HeinOnline Law Journal Library's top-100 most cited authors all time.[1]

A recent empirical study of scholarly influence lists me as one of the top 50 most relevant law

professors in the United States.[2]

5.    I have written extensively over the years on issues relating to attorneys' fees,

particularly in class action cases.  My articles with Professor Macey on class action litigation

have been cited as authority by courts across the United States.[3]  My empirical studies on class

---

[1] See http://www.heinonline.org/HOL/MostCitedAuthors?collection=journals.

[2] John Yoo & James Cleith Phillips, The Cite Stuff: Inventing a Better Law Faculty Relevance Measure, UC Berkeley Public Law Research Paper No. 2140944 (September 3, 2012), available at http://papers.ssrn.com/sol3/papers.cfm?abstract_id=2140944.

[3] *Eubank v. Pella Corporation*, 753 F.3d 718 (7th Cir. 2014); In re *Processed Egg Products Antitrust Litigation*, 2012 WL 2885924 (E.D.Pa. 2012); *Louisiana Municipal Police Employees' Retirement System v. Pyott*, --- A.3d ----, 2012 WL 2087205 (Del.Ch. 2012); *Forsythe v. ESC Fund Management Co.*, 2012 WL 1655538 ( Del.Ch. 2012); *Creative Montessori Learning Centers v. Ashford Gear LLC*, 662 F.3d 913, (7th Cir. 2011); In re *Sauer-Danfoss Inc. Shareholders Litigation*, 2011 WL 2519210 (Del.Ch. 2011); *Thorogood v. Sears, Roebuck and Co.*, 627 F.3d 289 (7th Cir. 2010); *Ehrheart v. Verizon Wireless*, 609 F.3d 590 (3rd Cir. 2010); In re *Revlon, Inc. Shareholders Litigation*, 990 A.2d 940 (Del.Ch. 2010); *Lubin v. Farmers Group, Inc.*, 2009 WL 3682602 (Tex.App. 2009); *Westgate Ford Truck Sales, Inc. v. Ford Motor Co.*, 2007 WL 2269471 (Ohio App. 2007); *Acosta v. Trans Union, LLC*, 243 F.R.D. 377 (C.D.Cal. 2007); *Amalgamated Bank v. Yost*, 2005 WL 226117 (E.D.Pa. 2005); *Official Committee of Unsecured Creditors of Cybergenics Corp. ex rel. Cybergenics Corp. v. Chinery*, 330 F.3d 548 (3rd Cir. 2003); *Fruchter v. Florida Progress Corp.*, 2002 WL 1558220, (Fl. App. 2002); In re *Microstrategy, Inc.*, 172 F.Supp.2d 778 (E.D.Va. 2001); In re *Cendant Corp. Litigation*, 264 F.3d 201 (3rd Cir. 2001); *Scardelletti v. Debarr*, 265 F.3d 195 (4th Cir. 2001); In re *Auction Houses Antitrust Litigation*, 197 F.R.D. 71 (S.D.N.Y. 2000); *Lealao v. Beneficial California, Inc.*, 82 Cal.App.4th 19, 97 Cal.Rptr.2d 797 (2000); *AUSA Life Ins. Co. v. Ernst and Young*, 206 F.3d 202 (2nd Cir. 2000); *Davis v. Carl Cannon Chevrolet-Olds, Inc.*, 182 F.3d 792 (11th Cir. 1999); In re *Baan Co. Securities Litigation*, 186 F.R.D. 214 D.D.C. 1999); In re *Quantum Health Resources, Inc.*, 962 F.Supp. 1254 (C.D. Cal. 1999); *Strong v. BellSouth Telecommunications, Inc.*, 173 F.R.D. 167 (W.D.La. 1997); *Howard v. Globe Life Ins. Co.*, 973 F.Supp. 1412 (N.D.Fla. 1996); *Kamilewicz v. Bank of Boston Corp.*, 100 F.3d 1348 (7th Cir. 1996); In re *Asbestos Litigation*, 90 F.3d 963 (5th Cir. 1996); *General Motors Corp. v. Bloyed*, 916 S.W.2d 949 (Tex. 1996); *Brundidge v. Glendale Federal Bank, F.S.B.*, 168 Ill.2d 235, 659 N.E.2d 909, 213 Ill.Dec. 563 (1995); In re *Thirteen Appeals Arising Out of San Juan Dupont Plaza Hotel Fire Litigation*, 56 F.3d 295 (1st Cir. 1995); In re *General Motors Corp. Pick-Up Truck Fuel Tank Products Liability Litigation*, 55 F.3d 768 (3rd Cir. 1995); *BTZ, Inc. v. Great Northern Nekoosa Corp.*, 47 F.3d 463 (1st Cir. 1995); *Bell Atlantic Corp. v. Bolger*, 2 F.3d 1304 (3rd Cir. 1993); In re *Oracle Securities Litigation*, 829 F.Supp. 1176 (N.D. Ca. 1993); *Gottlieb v. Wiles*, 150 F.R.D. 174 (D.Colo. 1993); *Durr v. Intercounty Title Co. of Illinois*, 826 F.Supp. 259 (N.D.Ill. 1993); *qad. inc. v. ALN Associates, Inc.*, 807 F.Supp. 465 (N.D.Ill. 1992); *Wesley v. General Motors Acceptance Corp.*, 1992 WL 57948 (N.D.Ill. 1992); In re *Verifone Securities Litigation*, 784 F.Supp. 1471 (N.D.Cal. 1992); *Davis v. Coopers & Lybrand*, 1991 WL 154460 (N.D.Ill. 1991).

action cases, co-authored with Professor Theodore Eisenberg of Cornell University, are a leading

authority on that topic.[4]

---

[4] *See In re Colgate-Palmolive Co. Erisa Litigation*, --- F.Supp.2d ---- 2014 WL 3292415 (S.D.N.Y. 2014); *Eubank v. Pella Corporation*, 753 F.3d 718 (7th Cir. 2014); *Haggart v. United States*, 116 Fed.Cl. 131, 2014 WL 2112179 (Ct. Cl. 2014); *Scovil v. FedEx Ground Package System, Inc.*, U2014 WL 1057079 (D.Me. 2014); *Phillips v. Asset Acceptance, LLC*, 736 F.3d 1076 (7th Cir. 2013); *Richardson v. L'Oreal USA, Inc.*, --- F.Supp.2d ----, 2013 WL 5941486 (D.D.C. 2013); *Swift v. Direct Buy, Inc.*, 2013 WL 5770633 (N.D.Ind. 2013); *Singleton v. Domino's Pizza, LLC*, --- F.Supp.2d ----, 2013 WL 5506027 (D.Md. 2013); *In re Schering-Plough Corp. Enhance Securities Litigation*, 2013 WL 5505744 (D.N.J. 2013); *In re Vioxx Products Liability Litigation*, 2013 WL 5295707 (E.D.La. 2013); *Evans v. TIN, Inc.*, 2013 WL 4501061 (E.D.La. 2013) ("The data sets in the empirical study conducted by Professors Eisenberg and Miller are commonly used by district courts in this circuit"); *Silverman v. Motorola Solutions, Inc.*, --- Fed.Appx. ----, 2013 WL 4082893 (7th Cir. 2013); *City of Pontiac General Employees' Retirement System v. Lockheed Martin Corp.*. --- F.Supp.2d ---, 2013 WL 3796658 (S.D.N.Y. 2013); *Gortat v. Capala Bros.*, --- F.Supp.2d ----, 2013 WL 2566622 (E.D.N.Y. 2013); *In re Southeastern Milk Antitrust Litigation*, 2013 WL 2155387 (E.D.Tenn. 2013); *Strawn v. Farmers Ins. Co. of Oregon*, 353 Or. 210, 297 P.3d 439 (Or. 2013); *Heekin v. Anthem, Inc.*, 2012 WL 5878032 (S.D.Ind. 2012); *Espenscheid v. DirectSat USA, LLC*, 688 F.3d 872, 877 (7th Cir. 2012); *In re Trans Union Corp. Privacy Litig.*, 629 F.3d 741, 744 (7th Cir. 2011); *Allapattah Servs., Inc. v. Exxon Corp.*, 362 F.3d 739, 760 (11th Cir. 2004) (Judges Tjoflat and Birch, dissenting from denial of en banc review); *Strawn v. Farmers Ins. Co. of Oregon*, 353 Or. 210, 297 P.3d 439 (2013); *In re Amaranth Natural Gas Commodities Litig.*, No. 07-6377, 2012 U.S. Dist. LEXIS 82599, at *7 n.12 (S.D.N.Y. June 11, 2012); *Board of Trustees of AFTRA Ret. Fund v. JPMorgan Chase Bank, N.A.*, No. 09-686, 2012 U.S. Dist. LEXIS 79418, at *5 n.12 (S.D.N.Y. June 7, 2012); *Lane v. Page*, No. 06-1071, 2012 U.S. Dist. LEXIS 74273, at *161 (D.N.M. May 22, 2012); *Silverman v. Motorola, Inc.*, No. 07-4507, 2012 U.S. Dist. LEXIS 63477, at *15 (N.D. Ill. May 7, 2012); *In re Heartland Payment Sys., Inc. Customer Data Sec. Breach Litig.*, MDL No. 09-2406, 2012 U.S. Dist. LEXIS 37326, at *94, *116 (S.D. Tex. Mar. 20, 2012) ("The tables included in the [Eisenberg and Miller] study are good indicators of what the market would pay for class counsel's services because the tables show what attorneys have been paid in similar cases, and thus what class counsel could have expected when they decided to invest their resources in this case."); *Walsh v. Popular, Inc.*, No. 09-1552, 2012 U.S. Dist. LEXIS 32991, at *24 (D.P.R. Mar. 12, 2012); *Am. Int'l Group, Inc. v. Ace Ina Holdings, Inc.*, No. 07-2898, 2012 U.S. Dist. LEXIS 25265, at *59 (N.D. Ill. Feb. 28, 2012); *Ebbert v. Nassau County*, 05-5445, 2011 U.S. Dist. LEXIS 150080, at *41 (E.D.N.Y. Dec. 22, 2011); *In re Checking Account Overdraft Litig.*, 830 F. Supp. 2d 1330, 1336 n.4 (S.D. Fla. 2011); *Latorraca v. Centennial Techs., Inc.*, No. 97-10304, 2011 U.S. Dist. LEXIS 135435, at *11 (D. Mass. Nov. 22, 2011); *In re Ky. Grilled Chicken Coupon Mktg. & Sales Litig.*, 2011 WL 5599129 (N.D. Ill. Nov. 16, 2011); *Pavlik v. FDIC*, No. 10-816, 2011 U.S. Dist. LEXIS 126016, at *11 (N.D. Ill. Nov. 1, 2011); *In re Puerto Rican Cabotage Antitrust Litig.*, 815 F. Supp. 2d 448, 461 (D.P.R. 2011); *In re AT & T Mobility Wireless Data Servs. Sales Tax Litig.*, 792 F. Supp. 2d 1028, 1033 (N.D. Ill. 2011); *In re Vioxx Prods. Liab. Litig.*, 760 F. Supp. 2d 640, 652 (E.D. La. 2010); *Velez v. Novartis Pharms Corp.*, 04-09194, 2010 U.S. Dist. LEXIS 125945, at *60-61 (S.D.N.Y. Nov. 30, 2010); *Braud v. Transport Serv. Co. of Illinois*, No. 05-1898, 2010 U.S. Dist. LEXIS 93433, at *27-30 (E.D. La. Aug. 17, 2010); *In re Lawnmower Engine Horsepower Mktg. & Sales Prac. Litig.*, 733 F. Supp. 2d 997, 1013 (E.D. Wis. 2010); *Klein v. O'Neal, Inc.*, 705 F. Supp. 2d 632, 675 (N.D. Tex. 2010); *Fiala v. Metro. Life Ins. Co.*, 899 N.Y.S.2d 531, 541 (N.Y. Sup. Ct. 2010); *In re Metlife Demutualization Litig.*, 689 F. Supp. 2d 297, 359 (E.D.N.Y. 2010); *In re Marsh Erisa Litig.*, 265 F.R.D. 128, 149 (S.D.N.Y. 2010); *Strawn v. Farmers Ins. Co.*, 226 P.3d 86, 99 (Or. Ct. App. 2010); *Hall v. Children's Place Retail Stores, Inc.*, 669 F. Supp. 2d 399, 403 n.35 (S.D.N.Y. 2009); *In re Trans Union Corp. Privacy Litig.*, No. 00-4729, 2009 U.S. Dist. LEXIS 116934, at *22-25, *39 (N.D. Ill. Dec. 9, 2009); *Loudermilk Serv., Inc. v. Marathon Petroleum Co. LLC*, 623 F. Supp. 2d 713, 724 (S.D. W.Va. 2009) ("Because the Eisenberg and Miller study was a far more comprehensive analysis of similar cases than this Court could hope to achieve in a reasonable time, the Court accepts their results as a benchmark on which to judge a reasonable fee in this case."); *Rodriguez v. West Publ'g Co.*, 563 F.3d 948, 958 (9th Cir. 2009); *In re OCA, Inc. Sec. and Deriv. Litig.*, No. 05-2165, 2009 U.S. Dist. LEXIS 19210, at *63-66 (E.D. La. Mar. 2, 2009); *In re Enron Corp. Secs., Deriv. & ERISA Litig.*, 586 F. Supp. 2d 732, 800 (S.D. Tex. 2008); *In re Cardinal Health Inc. Sec. Litig.*, 528 F. Supp. 2d 752, 755 n.2 (S.D. Ohio 2007); *In re Tyco Int'l., Ltd. Multidistrict Litig.*, 535 F. Supp. 2d 249, 269 (D.N.H. 2007); *Acosta v. Trans Union, LLC*, 243 F.R.D. 377, 388 (C.D. Cal. 2007); *Turner v. Murphy Oil USA, Inc.*, 472 F. Supp.

6.      I have participated in class action litigation, both as an attorney and more recently as an expert consultant and expert witness, on issues such as class counsel fees and the value of settlements.

7.      I am being compensated for my services in this matter on an hourly basis at my usual billing rate of $750 per hour.

### Materials Relied Upon

8.      I have reviewed an extensive compilation of materials from this case, including the documents described in Appendix B to this declaration.  I have discussed the matter with plaintiffs' counsel, reviewed numerous cases dealing with attorneys' fees in class action settlements, and evaluated the statistical reports and analyses surveying class action legal fee awards set forth in Appendix C to this declaration.

### Summary of Opinion

9. It is my opinion that the requested fee award of one third of the settlement fund is reasonable in light of data on fee awards in cases in this Circuit and across the country.

### Background

10.      This MDL proceeding consolidates three lawsuits filed in federal district courts in Illinois, California and Connecticut.  In each of these lawsuits, plaintiffs complained of pricing practices engaged in by U.S. Foodservice, Inc. ("USF" or "Defendant"), Koninklijke Ahold N.V. ("Ahold") and related parties.

---

2d 830, 853, 862-64, 866, 870 (E.D. La. 2007) ("[T]he Court will look to Eisenberg and Miller's data sets to determine an average percentage for cases of similar magnitude"); *Silberblatt v. Morgan Stanley*, 524 F. Supp. 2d 425, 435 n.6 (S.D.N.Y. 2007); *Fireside Bank v. Superior Court*, 155 P.3d 268, 281 n.7 (Cal. 2007); *In re Cabletron Sys., Inc. Sec. Litig.*, 239 F.R.D. 30, 38, 42 (D.N.H. 2006); *Allapattah Servs., Inc. v. Exxon Corp.*, 454 F. Supp. 2d 1185, 1209, 1211 (S.D. Fla. 2006); *In re Educ. Testing Serv. Praxis Principles of Learning and Teaching Grades 7-12 Litig.*, 447 F. Supp. 2d 612, 629-32 (E.D. La. 2006); *Hicks v. Morgan  Stanley*, No. 01-10071, 2005 U.S. Dist. LEXIS 24890, at *25 (S.D.N.Y. Oct. 24, 2005); *In re Lupron Mktg. and Sales Prac. Litig.*, 01-10861, 2005 U.S. Dist. LEXIS 17456, at *18 (D. Mass. Aug. 17, 2005); *In re HPL Techs., Inc. Sec. Litig.*, 366 F.Supp.2d 912, 914 (N.D. Cal. 2005); *In re Relafen Antitrust Litig.*, 231 F.R.D. 52, 80-81 (D. Mass. 2005); *In re Relafen Antitrust Litig.*, 221 F.R.D. 260, 286 (D. Mass. 2004).

11.    The Consolidated and Amended Complaint alleges that Defendants entered into cost-plus contracts with customers under which the price charged to customers included a component for the supplier's cost plus a mark-up. The complaint alleges that, in a fraudulent scheme to inflate prices, USFUSF sold products to shell companies which then resold the products to USF at inflated prices while secretly kicking back the amount of the price increase. The complaint asserted civil RICO violations, breach of contract, violation of California's Business and Professions Code, unjust enrichment, and imposition of a constructive trust. In 2008 the three lawsuits were consolidated in this Court for pretrial purposes by the Judicial Panel on Multidistrict Litigation.

12.    USF and Ahold both moved to dismiss the complaint.  On December 15, 2009 this Court granted Ahold's motion to dismiss on jurisdictional grounds, a ruling which also removed the claim of unfair competition from the case, and dismissed the claim based on California unfair competition law.  However, the Court declined to dismiss the RICO and breach of contract claims.

13.    On July 31, 2009 Plaintiff moved for class certification. USF opposed the motion, arguing, among other things, that the individual factual issues predominated and precluded certification of a Rule 23(b)(3) class action; that the case was not manageable as a litigation class; that legal variation on issues of state law precluded certification; and that named plaintiffs were disqualified from serving as class representatives because they continued to purchase goods from USF after the alleged fraud came to light.  On November 29, 2011, after extensive briefing, this Court granted the motion to certify the class.

14.    USF petitioned the Second Circuit for leave to appeal this Court's order certifying the class.  On April 3, 2012, after receiving extensive briefing, the Second Circuit granted the

motion for leave to appeal. The parties then engaged in a new round of briefing in which USF again raised multiple objections to class certification. On August 30, 2013, a panel of the Second Circuit affirmed this Court's order certifying the class.

15.     USF petitioned for a writ of certiorari in the United States Supreme Court, arguing that the Second Circuit's opinion conflicted with decisions in other federal courts of appeals with respect to multiple points of law. The parties engaged in extensive briefing on the issues raised in the petition. On April 28, 2014, the Supreme Court denied the petition.

16.     Throughout this litigation class counsel has assiduously sought information pertinent to this case. Counsel undertook preliminary investigations of the underlying facts and law. Once the case was filed, counsel vigorously pursued their right to obtain information through discovery. Counsel reviewed and analyzed more than six million pages of electronic documents and examined thousands of boxes of hard copy documents stored in various warehouses. Counsel also served subpoenas on numerous third parties and reviewed documents obtained in response. Because this case involves a challenge to pricing practices, it was also necessary for counsel to analyze transactional information obtained from USF and third parties – a daunting task involving a review of literally billions of lines of transactional data embodied in electronic media.

17.     The discovery process generated a variety of disputes, including eight motions to compel discovery. Contested issues included the following:

(a)     An issue of particular controversy was the presence of White & Case as defense counsel and the validity of Plaintiffs' claim to obtain discovery from that firm. In April 2013 this Court scheduled a show cause hearing to explore the issue of whether White & Case should

be disqualified from the case. The parties engaged in an extensive round of briefing and argument in response to this Court's order.

(b)     As the case progressed and new sources of documents became known, plaintiffs' counsel repeatedly sought and obtained discovery from additional custodians, often over objections by their adversary. Faced with this resistance, plaintiffs move to compel production from additional custodians. This Court granted the motion on May 16, 2013.

(c)     USF refused to produce documents disclosed in government investigations, arguing that the investigations in question were not related to the present action. Plaintiffs moved to compel production of an index of documents produced in these investigations and to permit inspection and copying of selected documents.

(d)     Plaintiffs applied for the issuance of letters of request pursuant to the Hague Evidence Convention, in order to obtain information in the possession of USF's former parent, Ahold, a Dutch corporation.

(e)     Plaintiffs moved to enforce this Court's order compelling USF to produce electronic data.

18.     Overall, this is one of the most challenging factual cases I have encountered in thirty years of research, practice, and analysis in the area of class action litigation.

## The Settlement

19.     The parties engaged in numerous unsuccessful efforts to settle the underlying claims. Finally, in the wake of the Supreme Court's denial of certiorari, the parties commenced a settlement mediation facilitated by former federal district court judge Layn R. Phillips. At this mediation both parties presented extensive evidentiary documentation and legal briefing on the

settlement value of the case.  After two days of adversarial, arms-length negotiations, the parties reached an agreement in principal on the settlement now pending before this Court.

20.     The proposed settlement provides for payment of $297 million in cash.  Notably, no part of the settlement consideration takes the form of non-pecuniary relief such as coupons, injunctive relief, or rights to purchase products at a discount.

21.     An excellent feature of this settlement is the fact that none of the funds will revert to Defendant.  The settlement contemplates that, after payment of counsel fees, expenses and costs, the entire amount of the fund will be distributed pro rata to class members who file valid claim forms.

22.     I also note that the claims process is remarkably simple.   The proposed independent settlement administrator, Gilardi & Co., will provide a pre-calculated claim amount on the claim form for each class member. If the class member agrees with the calculation, it simply needs to check a box and the claim will be paid. If the class member disagrees with the calculation, it has the opportunity to provide additional information of purchases during the relevant period.

### The Fee Request

23.     The settlement agreement states that class counsel intends to seek a fee award of up to one third of the total settlement fund, plus reimbursement for reasonable costs and expenses. Defendants take no position with respect to the application by class counsel for attorneys' fees and expenses or to the contemplated requests for compensation awards for representative plaintiffs.

24.    I am informed that, as permitted under the settlement agreement, counsel will seek an award of one third of the $297 million cash recovery for the class, plus expenses of approximately $8 million.

### Analysis

25.    *Goldberger v. Integrated Resources, Inc.*, 209 F.3d 43 (2d Cir. 2000), endorses two methodologies to evaluate fee requests in class action settlements: the percentage-of-recovery method, which compares the fee request with the benefit recovered for the class, and the lodestar method, which determines counsel's reasonable hours and hourly rate and adjusts this figure by a "multiplier" to account for special features of the litigation, most importantly the risk assumed by class counsel.  I will review counsel's fee request using both methodologies, beginning first with the lodestar method.

26.    In performing this analysis, I draw on empirical evidence on fee awards in settled class action cases. These data provide objective information about prevailing norms and standards and are employed by courts around the country when evaluating fee petitions in class action cases. See *In re Heartland Payment Sys., Inc. Customer Data Sec. Breach Litig.*, 851 F.Supp.2d 1040, 1080 (S.D.Tex. 2012) (Rosenthal, J.).

## Lodestar Method

27.     The lodestar analysis proceeds in three steps: (a) determining the reasonable number of hours; (b) determining the reasonable hourly rate; and (c) determining the lodestar multiplier.

## Hours

28.     I am informed by counsel that plaintiffs' firms expended approximately 93,068 hours in conducting this litigation, including 20,291 hours of partner time, 60,080 hours of associate time, and 12,697 hours of law clerk, paralegal and senior analyst time over the course of eight years.

29.     While I have not attempted to audit counsel's activities at the level of evaluating the appropriate time or staffing levels for particular tasks, I have considered the reported hours in light of the circumstances of this case and in comparison with other class action settlements.

30.     As noted above, this case was unusually demanding on attorney time.  The nature of the allegations – a concealed scheme to inflate prices through the use of shell corporations and fraudulent invoices – inherently demanded vigorous efforts by counsel to obtain and analyze the relevant data, which included billions of lines of electronic information as well as data contained in millions of pages of documents. USF's consistent pattern of resisting discovery requests and complying only grudgingly with orders to produce documents and other information complicated an already onerous task.

31.     It was only through the persistent efforts of counsel that the factual record of this case could be advanced to the point where a settlement could be informed by reasonable information about USF's liability and damages exposure.  In light of these circumstances, it is my judgment that the hours expended by counsel were reasonable.

32.    I have also considered the allocation of work and responsibility in this case. Counsel's records reflect that partner to non-partner time was in a ratio of approximately 1:3.6. This ratio reflects an appropriate allocation of responsibility with a view towards litigating this case in an efficient and effective manner.

### Hourly Rates

33.    I now turn to an evaluation of the appropriate hourly rates. These rates are determined, under the lodestar analysis, by comparing counsel's rates with those of attorneys in the relevant market who possess similar background, experience and qualifications. In my judgment the relevant market is the market for trial attorneys practicing in the field of complex financial litigation.

34.    Plaintiffs report hourly partner rates ranging from a high of $985/hour to a low of $525/hour. Non-partner (i.e., Counsel and Associate) rates range from a high of $700/hour for counsel to a low of $230/hour for junior attorneys. Billing rates for non-attorney timekeepers (e.g., paralegals, clerks, librarians) ranged from a high of $325/hour to a low of $35/hour.

35.    A variety of sources of information are available to evaluate the reasonableness of these rates. In federal bankruptcy litigation – which resembles the present case in sophistication and complexity – rates for representation can sometimes be obtained from a review of public case filings. The following table, compiled from publicly available sources, illustrates typical billing rates of defense-side firms as reported in bankruptcy cases:

**Table 1: Bankruptcy Fees**

| Case Name | Defense Firm | Citation | Non-Partner Attorneys' Fee Range | Partners' Fee Range |
|---|---|---|---|---|
| *In re Houghton Mifflin Harcourt Publishing Company, et al.,* Debtors, No. 12-12171 (REG) | Paul, Weiss, Rifkind, Wharton & Garrison LLP | (Bkrtcy. S.D.N.Y.) (May 2012) (Dkt. No. 55) | $425 - $760 | $895 - $1,120 |
| *In re Lightsquared Inc., et al., Debtors,* No. 12-12080 (SCC) | Milbank, Tweed, Hadley & McCloy LLP | (Bkrtcy. S.D.N.Y.) (July 2012) (Dkt. No. 206) | $470 - $750 | $950 - $1,140 |
| *In re Eastman Kodak Company, et al., Debtors,* No. 12-10202 (ALG) | Milbank, Tweed, Hadley & McCloy LLP | (Bkrtcy. S.D.N.Y.) (June 2012) (Dkt. No. 1492) | $470 - $795 | $825 - $1,140 |
| *In re 785 Partners LLC, Debtor,* No. 11-13702 (SMB) | Proskauer Rose LLP | (Bkrtcy. S.D.N.Y.) (May 2012) (Dkt. No. 189) | $295 - $700 | $779 - $1,050 |
| *In re Dynegy Holdings, LLC, et al., Debtors,* No. 11-38111 (CGM) | Sidley Austin LLP | (Bkrtcy. S.D.N.Y.) (Apr. 2012) (Dkt. No. 578) | $340 - $950 | $625 - $1,050 |
| *In re Ambac Financial Group, Inc., Debtor,* No. 10-15973 (SCC) | Wachtell, Lipton, Rosen & Katz | (Bkrtcy. S.D.N.Y.) (Nov. 2011) (Dkt. No. 701) | $500 - $600 | $975 |
| *In re The Great Atlantic & Pacific Tea Company, Inc., et al., Debtors,* No. 10-24549 (RDD) | Kirkland & Ellis LLP | (Bkrtcy. S.D.N.Y.) (May 2011) (Dkt. No. 1566) | $340 - $995 | $580 - $995 |
| *In re CIT Group Inc. and CIT Group Funding Co. of Delaware LLC, Debtors,* No. 09-16565 (ALG) | Sullivan & Cromwell, LLP | (Bkrtcy. S.D.N.Y.) (Jan. 2010) (Dkt. No. 229) | $305 - $950 | $850 - $965 |

Sources: Westlaw, LexisNexis

36.     A similar pattern is observed in survey data. According to a December 2009 report, the rates for bankruptcy lawyers at the firms that regularly represent defendants in securities class actions and shareholder litigation had already topped $1,000 per hour five years

ago. *See* Amy Kolz, "Bankruptcy Rates Top $1,000 Mark in 2008-09." Weblog. The Am aw

Daily, 12 Dec. 2009.[5] The reported median billing rates for partners are reflected in the

following table:

### Table 2: Bankruptcy Fee Survey Data

| FIRM | MEDIAN PARTNER RATE* | # PARTNERS FILING |
|---|---|---|
| Simpson Thacher | $980 | 30 |
| Cleary Gottlieb | $960 | 47 |
| Shearman & Sterling | $950 | 17 |
| Davis Polk | $948 | 14 |
| Skadden | $945 | 38 |
| Paul Weiss | $925 | 24 |
| Cadwalader | $900 | 29 |
| Milbank | $900 | 55 |
| Weil Gotshal | $843 | 142 |
| Gibson Dunn | $840 | 29 |
| Latham & Watkins | $830 | 57 |
| White & Case | $825 | 21 |
| Paul Hastings | $810 | 46 |

    37.    On the plaintiffs' side, comparable billing rates can be gleaned from a review of

awards in prior class action settlements in securities and shareholders derivative litigation. The

following table reports on hourly rates approved in cases in the Southern District of New York.

Although these data are not comprehensive or systematically compiled, I believe they reflect

reasonable market rates for qualified plaintiffs' counsel in class action cases nationwide:

---

[5] Available at http://www.law.com/jsp/law/LawArticleFriendly.jsp?id=1202436371636

**Table 3: Plaintiffs' Class Action Attorney Billing Rates**

| Case Name | Plaintiff Firm | Citation | Non-Partner Attorneys' Fee Range | Partners' Fee Range |
|---|---|---|---|---|
| *In re Bear Stearns Companies, Inc. Securities, Derivative and ERISA Litig.*, No. 08-cv-2793 (RWS) | Berman DeValerio | (S.D.N.Y.) (Aug. 2012) (Dkt. No. 302-4) | $275 - $780 | $595 - $780 |
| *In re Bear Stearns Companies, Inc. Securities, Derivative and ERISA Litig.*, No. 08-cv-2793 (RWS) | Labaton Sucharow LLP | (S.D.N.Y.) (Aug. 2012) (Dkt. No. 302-5) | $275 - $700 | $725 - $975 |
| *Board of Trustees of the AFTRA Retirement Fund, et al., v. JPMorgan Chase Bank, N.A.*, No. 1:09-cv-00686 (SAS)(DCF) | Kessler Topaz Meltzer & Check LLP | (S.D.N.Y.) (May 2012) (Dkt. No. 187-1) | $275 - $575 | $625 - $735 |
| *In re Wachovia Equity Securities Litigation*, No. 08 Civ. 6171 (RJS) | Kirby McInerney LLP | (S.D.N.Y.) (Apr. 2012) (Dkt. No. 106-5) | $280 - $600 | $600 - $800 |
| *In re Lehman Brothers Securities and Erisa Litigation*, No. 1:08-cv-05523 (LAK)(GWG) | Bernstein Litowitz & Grossman LLP | (S.D.N.Y) (Mar. 2012) (Dkt. No. 343-12) | $310 - $675 | $650 - $975 |
| *In re Lehman Brothers Securities and Erisa Litigation*, No. 1:08-cv-05523 (LAK)(GWG) | Kessler Topaz Meltzer & Check LLP | (S.D.N.Y) (Mar. 2012) (Dkt. No. 343-13) | $275 - $500 | $600 - $725 |
| *In re Lehman Brothers Securities and Erisa Litigation*, No. 1:08-cv-05523 (LAK)(GWG) | Labaton Sucharow | (S.D.N.Y) (Mar. 2012) (Dkt. No. 343-17) | $275 - $650 | $750 - $975 |
| *Rubin v. MF Global, Ltd., et al.*, No. 08 Civ. 2233 (VM) | Barrack Rodos & Bacine | (S.D.N.Y.) (Nov. 2011) (Dkt. No. 198) | $335 - $455 | $560 - $740 |
| *Rubin v. MF Global, Ltd., et al.*, No. 08 Civ. 2233 (VM) | Cohen Milstein Sellers & Toll PLLC | (S.D.N.Y.) (Nov. 2011).(Dkt. No. 198) | $230 - $615 | $700 - $795 |
| *In re Wachovia Preferred Sec. and Bond/Notes Litigation*, No. 09 Civ. 6351 (RJS) | Bernstein Litowitz Berger & Grossman LLP | (S.D.N.Y.) (Oct. 2011) (Dkt. No. 148-7) | $340 - $675 | $650 - $975 |

| | | | | |
|---|---|---|---|---|
| *In re Wachovia Preferred Sec. and Bond/Notes Litigation*, No. 09 Civ. 6351 (RJS) | Kessler Topaz Meltzer & Check, LLP | (S.D.N.Y.) (Oct. 2011) (Dkt. No. 148-8) | $375 - $550 | $600 - $725 |
| *In re Wachovia Preferred Sec. and Bond/Notes Litigation*, No. 09 Civ. 6351 (RJS) | Robbins Geller Rudman & Dowd LLP | (S.D.N.Y.) (Oct. 2011) (Dkt. No. 148-9) | $265 - $640 | $565 - $775 |
| *Cornwell et al. v. Credit Suisse Group et al.*, No. 08 Civ. 03758 (VM) | Robbins Geller Rudman & Dowd LLP | (S.D.N.Y.) (July 2011) (Dkt. No. 117) | $360 - $670 | $565 - $795 |
| *Lapin v. Goldman Sachs & Co.*, No. 04 Civ. 2236 (RJS) | Kirby McInerney LLP | (S.D.N.Y.) (Nov. 2010) (Dkt No. 129) | $275 - $600 | $600 - $900 |
| *Lapin v. Goldman Sachs & Co.*, No. 04 Civ. 2236 (RJS) | Glancy Binkow & Goldberg LLP | (S.D.N.Y.) (Nov. 2010) (Dkt. No. 129 | $325 - $575 | $625 - $725 |
| *In re MBIA, Inc., Sec. Litigation*, No. 08 Civ. 0264 (KMK) | Bernstein Litowitz Berger & Grossman LLP | (S.D.N.Y.) (Dec. 2011) (Dkt. No. 92) | $375 - $675 | $700 - $975 |
| *In re Refco, Inc. Securities Litigation*, No. 05 Civ. 08626 (JSR) | Grant & Eisenhofer P.A. | (S.D.N.Y.) (Sept. 2010) (Dkt. No. 738-5) | $250 - $620 | $650 - $845 |
| *In re Merrill Lynch & Co. Inc., Securities, Derivatives and ERISA Litigation,* No. 07-cv-09633 (LBS)(AJP)(DFE) | Kaplan Fox & Kilsheimer LLP | (S.D.N.Y.) (Jun. 2009) (Dkt. No. 246-4) | $255 - $500 | $550 - $775 |
| *In re Merrill Lynch & Co. Inc., Securities, Derivatives and ERISA Litigation,* No. 07-cv-09633(LBS)(AJP)(DFE) | Barrack, Rodos & Bacine | (S.D.N.Y.) (Jun. 2009) (Dkt. No. 246-5) | $290 - $450 | $525 - $695 |
| *In re Merrill Lynch & Co. Inc., Securities, Derivatives and ERISA Litigation,* No. 07-cv-09633(LBS)(AJP)(DFE) | Berger & Montague, P.C. | (S.D.N.Y.) (Jun. 2009) (Dkt. No. 246-6) | $295 - $440 | $460 - $725 |
| *In re Merrill Lynch & Co. Inc., Securities, Derivatives and ERISA Litigation,* No. 07-cv-09633(LBS)(AJP)(DFE) | Pomerantz Haudek Grossman & Gross LLP | (S.D.N.Y.) (Jun. 2009) (Dkt. No. 246-7) | $385 - $550 | $525 - $830 |
| *In re Merrill Lynch & Co.* | Murray, Frank Sailer | (S.D.N.Y.) (Jun. | $350 - $550 | |

| | | | | |
|---|---|---|---|---|
| *Inc., Securities, Derivatives and ERISA Litigation,* No. 07-cv-09633(LBS)(AJP)(DFE) | LLP | 2009) (Dkt. No. 246-8) | | $675 - $750 |
| *In re Telik, Inc. Securities Litigation,* No. 07 Civ. 04819 (CM) | Bernstein Liebhard & Lifshitz, LLP | (S.D.N.Y.) (Aug. 2008) (Dkt. No. 72) | $350 - $550 | $700 - $750 |

Sources: Westlaw, LexisNexis

38.  Based on this analysis, it is my opinion that the requested lodestar is within the range of reason when judged in the light of lodestar fees awarded in similar cases.

## Multiplier

39.  I now turn to an evaluation of an appropriate risk multiplier.  Using counsel's estimated lodestar of approximately $44 million, the multiplier associated with the fee request of $99 million is 2.25.  The question is whether this multiplier is appropriate under the circumstances.

40.  To begin with, it is obvious that a multiplier is required if counsel are to have adequate incentives to bring litigation of this sort. The question is what the multiplier should be.

41.  Substantial multipliers are common in federal class action settlements. See, e.g., *In re NASDAQ Market-Makers Antitrust Litig.*, 187 F.R.D. 465, 489 (S.D.N.Y. 1998) ("multipliers of between 3 and 4.5 have become common"); *In re EVCI Career Colleges Holding Corp. Sec. Litig.,* 2007 U.S. Dist. LEXIS 57918, *56 n.7 (S.D.N.Y. 2007) ("multipliers of nearly 5 have been deemed 'common' by courts in this District."); *In re Telik, Inc., Securities Litig.*, 576 F. Supp. 2d 570, 590 (S.D.N.Y. 2008) ("multipliers of over 4 are routinely awarded by courts, including this Court"); *In re Bisys Sec. Litig.,* 2007 WL 2049726  *3 (S.D.N.Y. July 16, 2007) (multiplier of 2.99 "falls well within the parameters set in this district and elsewhere"); *In re Linerboard Antitrust Litig.*, 2004 U.S. Dist. LEXIS 10532, *50 (S.D.N.Y. June 2, 2004) (average multiplier was 4.35); *Maley v. Del Global Technologies Corp.*, 186 F. Supp. 2d 358,

369 (S.D.N.Y. 2002) (multiplier of 4.65 was "well within the range awarded by courts in this Circuit and courts throughout the country"); *In re Sumitomo Copper Litig.*, 74 F. Supp. 2d 393, 399 (S.D.N.Y. 1999) (multipliers of 3 to 4.5 are commonly observed).

42.     Information about class action multipliers is contained in Eisenberg and Miller's study of attorneys' fees in all publicly reported class action cases from 1993 to 2008. As shown in the following table, the mean multiplier across all federal circuits was 1.81 and the mean for the Second Circuit was 1.58:

**Table 4: Multipliers Awarded in Class Action Settlements, 1993-2008**

| Circuit | Mean Multiplier | Number of Cases |
|---------|-----------------|-----------------|
| 1st | 2.10 | 15 |
| 2nd | 1.58 | 97 |
| 3rd | 2.01 | 87 |
| 4th | 2.43 | 7 |
| 5th | 2.07 | 15 |
| 6th | 1.97 | 22 |
| 7th | 1.85 | 16 |
| 8th | 1.20 | 14 |
| 9th | 1.54 | 50 |
| 10th | 1.91 | 14 |
| 11th | 1.19 | 19 |
| D.C. | 2.23 | 11 |
| Federal | 1.54 | 1 |
| Total | 1.81 | 368 |

Source: Theodore Eisenberg and Geoffrey Miller, Attorney Fees and Expenses in Class Action Settlements: 1993-2008, 7 Journal of Empirical Legal Studies 248, 272 Table 14 (2010)

43.     As part of my ongoing research and in connection with my engagement in this litigation, I updated this study for the years 2009-2013, inclusive, generating a data set of 291 class action settlements for which the lodestar values could be determined.  The multipliers awarded by courts ranged from 15.94 to 0.14 across the entire data set.  As shown in the following table, the mean lodestar for the data set as a whole was 1.51; for the Second Circuit, it was 1.95:

**Table 5: Multipliers Awarded in Class Action Settlements, 2009-2013**

| Circuit | Mean Multiplier | Number of Cases |
|---|---|---|
| 1st | 2.52 | 5 |
| 2nd | 1.95 | 74 |
| 3rd | 1.45 | 76 |
| 4th | 1.40 | 11 |
| 5th | 1.75 | 6 |
| 6th | 1.23 | 14 |
| 7th | 1.76 | 7 |
| 8th | 1.56 | 16 |
| 9th | 1.30 | 93 |
| 10th | 1.23 | 8 |
| 11th | 0.57 | 4 |
| D.C. | 2.30 | 2 |
| Federal | 1.04 | 2 |
| Total | 1.51 | 318 |

44.     The requested multiplier of 2.25 can be seen to be reasonable when judged against cases of similar magnitude.  It turns out that there is a pronounced positive relationship between multiplier and the class recovery: multipliers get larger as settlement size increases.  The relationship between multiplier and recovery is set forth in the following table, from Eisenberg and Miller's study of all reported class action settlements between 1993 and 2008:[6]

---

[6] Theodore Eisenberg and Geoffrey Miller, Attorneys' Fees and Expenses in Class Action Settlements: 1993-2008, 7

**Table 6: Multipliers Awarded in Class Action Settlements by Class Recovery, 1993-2008**

| Recovery ($ millions) | Mean | Median | Number of Cases |
|---|---|---|---|
| <=1.1 | 0.88 | 0.74 | 33 |
| >1.1 <=2.8 | 0.95 | 0.77 | 40 |
| >2.8 <=5.3 | 1.44 | 1.25 | 32 |
| >5.3 <=8.7 | 1.59 | 1.25 | 34 |
| >8.7<=14.3 | 1.49 | 1.45 | 37 |
| >14.3<=22.8 | 1.68 | 1.51 | 38 |
| >22.8<=38.3 | 1.83 | 1.44 | 33 |
| >38.3<=69.6 | 1.98 | 1.75 | 38 |
| >69.6<=175.5 | 2.70 | 2.09 | 43 |
| >175.5 | 3.18 | 2.60 | 40 |

Source: Theodore Eisenberg and Geoffrey Miller, Attorney Fees and Expenses in Class Action Settlements: 1993-2008, 7 Journal of Empirical Legal Studies 248, 274 Table 15 (2010)

For cases such as the present litigation with recoveries in excess of $175.5 million, the mean multiplier was 3.18 and the median was 2.60 – well above the average of 1.81 observed for cases generally in this data set.

45.     My follow-up study of all class action settlements in published cases from 2009 to 2013 confirms that multiplier awards rise with class recovery:

---

Journal of Empirical Legal Studies 248 (2010).

**Table 7: Multipliers Awarded in Class Action Settlements by Class Recovery, 2009-2013**

| Class recovery (millions) | Number of cases | Mean | Median |
|---|---|---|---|
| > 88.9 | 29 | 2.51 | 1.50 |
| 27.5-88.9 | 29 | 2.29 | 1.79 |
| 16.5-27.5 | 29 | 1.39 | 1.18 |
| 8.5-16.5 | 29 | 1.78 | 1.66 |
| 5.0-8.5 | 29 | 1.52 | 1.13 |
| 3.0-5.0 | 29 | 1.34 | 1.00 |
| 1.9-3.0 | 29 | 1.22 | 1.05 |
| .85-1.9 | 29 | 1.38 | 1.21 |
| 4.0-8.5 | 29 | 0.81 | 0.76 |
| .03-.40 | 30 | 0.86 | 0.66 |

Sources: LexisNexis, Westlaw, PACER

For cases such as the present litigation with recoveries in excess of $88.9 million, the mean multiplier was 2.51, well above the average of 1.51 observed for cases generally in this more recent data set.

46. Based on the foregoing, it is evident that the requested multiplier of 2.25 is consistent with multipliers awarded in similar cases. Accordingly, it is my opinion that judged in light of similar cases, the fee request is within the range of reason when analyzed under the lodestar method.

**Percentage Method**

47. I now analyze the request for one third of the class recovery using the percentage method. I will begin by providing general information about percentage fees, and then address the particular facts and circumstances of this case.

48. Initial research published in the late 1990s identified basic patterns that remain valid today. A 1996 study by the National Economic Research Associates examined average and median fee awards for settled securities fraud cases. As shown in Table 8, average awards fell

within a narrow range, from 30.73% in the Fifth Circuit to 32.78% in the Fourth Circuit.  The

average fee in the Second Circuit was 31.48% -- very close to the one-third sought in this case.

**Table 8: Plaintiffs' Attorneys Fees by Federal Circuit: NERA Data**

| Circuit | Number of Settlements | Average Attorney Fee as a Percentage of Settlement |
|---------|-----------------------|----------------------------------------------------|
| D.C. | 2 | 31.67 |
| First | 26 | 30.99 |
| Second | 69 | 31.48 |
| Third | 58 | 32.00 |
| Fourth | 12 | 32.78 |
| Fifth | 26 | 30.73 |
| Sixth | 13 | 31.00 |
| Seventh | 18 | 31.83 |
| Eighth | 12 | 32.47 |
| Ninth | 155 | 32.57 |
| Tenth | 13 | 32.13 |
| Eleventh | 29 | 29.92 |
| Total | 433 | 31.84 |

Source:  Denise N. Martin, Vinita M. Juneja, Todd S. Foster, and Frederick C. Dunbar, Recent Trends IV: What Explains Filings and Settlements in Shareholder Class Actions? Table 12b (1996).

49.     Researchers affiliated with NERA updated the 1996 study in 1999.  The 1999

NERA update shows that, exclusive of expenses, attorneys' fee awards in securities class actions

cluster at between 31 and 33% of the common fund recovery and remains virtually constant over

time.  Table 9 shows this in the bottom row:

**Table 9: Fee Awards in Settled Securities Class Actions 1991-1999: NERA Data**

|  | 1991 | 1992 | 1993 | 1994 | 1995 | 1996 | 1997 | 1998 | Jun-99 |
|---|---|---|---|---|---|---|---|---|---|
| Number of Settlements | 48 | 79 | 90 | 101 | 104 | 104 | 98 | 80 | 29 |
| Average Fee as a Percentage of Average Settlement | 33% | 27% | 24% | 34% | 33% | 31% | 32% | 31% | 33% |

Source: Todd S. Foster, Denise N. Martin, Vinita M. Juneja, Frederick C. Dunbar, Trends in Securities Litigation and the Impact of PSLRA, Figure 12 (June 1999).

50.     A 1996 Federal Judicial Center study examined all class actions terminated in four federal district courts between July 1, 1992 and June 30, 1994.  Thomas E. Willging, et al., *Empirical Study of Class Actions in Four Federal District Courts: Final Report to the Advisory Committee on Civil Rules* 4 (1996).  Median fee awards ranged from 27% to 30%, and most awards were between 20% and 40% of the monetary settlement.  As shown in Table 10, fee awards clustered at around 30 percent in all types of class action litigation in the four federal district courts:

Table 10: Percentage Fees in Four Federal District Courts

Figure 72: Mean and Median Fee-Recovery Rates in Certified Cases Using Percentage of Recovery Method and Providing Net Monetary Distribution to Class



*Note:* "Net monetary distribution" is net of attorneys' fees and administrative expenses.

Source: Thomas E. Willging, Laural L. Hooper & Robert J. Niemic, *Empirical Study of Class Actions in Four Federal District Courts: Final Report to the Advisory Committee on Civil Rules* 151 (1996)

51.     During the decade of the 2000s, researchers expanded their investigations to include substantially larger data sets.  The basic findings were entirely consistent with the studies described above.  One large-scale study covering a ten year period in courts around the country is found in the March-April 2003 edition of *Class Action Reports* (CAR).  Table 11 reports the CAR data broken down by type of case:

24

**Table 11:  Fee-Award Percent Summary by Case Category**

| Category | Mean Fee % | Median Fee % | Number |
|---|---|---|---|
| Antitrust | 26.8 | 28.4 | 31 |
| Consumer | 24.3 | 25.0 | 48 |
| Civil rights | 23.5 | 25.5 | 4 |
| Derivative | 33.3 | 33.3 | 1 |
| Employment | 25.5 | 25.7 | 17 |
| Environmental | 30.5 | 30.5 | 2 |
| Government regulation | 29.7 | 29.7 | 1 |
| Labor/wage/ pension | 22.9 | 26.4 | 30 |
| Mass tort | 17.6 | 17.0 | 8 |
| Securities | 27.9 | 30.0 | 483 |
| Taxpayer | 3.5 | 3.5 | 1 |
| Utilities | 20.3 | 20.3 | 2 |
| Social welfare/entitle-ments | 16.9 | 16.9 | 2 |
| Total | 27.0 | 30.0 | 630 |

Sources: Theodore Eisenberg & Geoffrey P. Miller, Attorney Fees in Class Action Settlements: An Empirical Study, 1 *Journal of Empirical Legal Studies* 51(2004), analyzing data from Stuart J. Logan, Jack Moshman & Beverly C. Moore, Jr., Attorney Fee Awards in Common Fund Class Actions, 24 *Class Action Rep.* 169 (2003).

Table 11 discloses that the mean fee across the range of cases in the study was 27.0% and the median fee was 30.0%.

52.    During the decade of the 2000s academic researchers also published analyses of large-scale data sets of class action attorneys' fees. Eisenberg and Miller studied fees in all published class action settlements between 1993 and 2008.  They found that the mean percentage

fee in federal was 24% and the median fee was 25%.[7]

53.     Eisenberg and Miller's data were broad, in the sense that they covered all reported cases over a fifteen year period.  Fitzpatrick, in contrast, examined all federal class action settlements in 2006-2007, including non-reported as well as reported cases.  He found that the mean attorneys' fee was 25.7% and the median fee was 25.0%.[8]

54.     My data base of all published class action settlements between 2009 and 2013 discloses that the mean fee award was 27% and the median was 29%.  For courts in the Second Circuit, the mean fee award was 28% and the median was 30%:

---

[7] Theodore Eisenberg and Geoffrey Miller, Attorneys' Fees and Expenses in Class Action Settlements: 1993-2008, 7 Journal of Empirical Legal Studies 248, 259 table 4 (2010).

[8] Brian Fitzpatrick, An Empirical Study of Class Action Settlements and Their Fee Awards, 7 J. Empirical L. Stud. 811 (2010).

**Table 12: Plaintiffs' Attorneys Fees by Federal Circuit: 2009-2013**

| Circuit | Mean | Median | Number of Cases |
|---------|------|--------|-----------------|
| 1st | .23 | .23 | 8 |
| 2nd | .28 | .30 | 116 |
| 3rd | .27 | .29 | 46 |
| 4th | .29 | .32 | 22 |
| 5th | .26 | .28 | 12 |
| 6th | .26 | .26 | 23 |
| 7th | .29 | .31 | 14 |
| 8th | .25 | .25 | 20 |
| 9th | .27 | .28 | 144 |
| 10th | .24 | .25 | 18 |
| 11th | .22 | .22 | 14 |
| D.C. | .30 | .33 | 6 |
| Federal | .27 | .26 | 6 |
| Total | .27 | .29 | 449 |

Source: Westlaw, LexisNexis, PACER

## The Factor of Scale

55.     Attorney fee percentages display a scaling factor, in that the fee percentage tends to fall as class recovery rises.

56.     The NERA study mentioned above broke the fee awards down by size of the class recovery.  The study found that percentage fees tended to decrease when recoveries become large, but that the reduction is only slight.  This result is reflected in the following table:

**Table 13: Fee Awards in Settled Securities Class Actions 1991-1996: NERA Data**

| Settlement Range ($ millions) | Number of Settlements | Average Attorney Fees as a Percentage of Settlement | Median Attorney Fees as a Percentage of Settlement |
|---|---|---|---|
| 0.00-0.99 | 37 | 30.38 | 30.00 |
| 1.00-1.99 | 66 | 31.88 | 33.33 |
| 2.00-9.99 | 245 | 32.11 | 33.33 |
| 10.00-49.99 | 76 | 31.72 | 33.15 |
| 50+ | 9 | 31.48 | 30.00 |
| Total | 433 | 31.84 | 33.33 |

Source: Denise N. Martin, Vinita M. Juneja, Todd S. Foster, and Frederick C. Dunbar, Recent Trends IV: What Explains Filings and Settlements in Shareholder Class Actions? Table 9 (1996).

Overall, mean fee in the NERA study was 31.84% and median fee was 33.33%. For class recoveries of $50 million or more, the mean fee was 31.48% and the median fee was 30%.

57. Scaling effects are also evident in my analysis of all reported cases from 2009 to 2013: for the ten percent of cases with highest recoveries, mean awards were 22% and median awards were 23%:[9]

---

[9] Other studies also find scaling effects. See Brian Fitzpatrick, An Empirical Study of Class Action Settlements and Their Fee Awards, 7 J. Empirical L. Stud. 811, table 10 (2010); Theodore Eisenberg and Geoffrey Miller, Attorneys' Fees and Expenses in Class Action Settlements: 1993-2008, 7 Journal of Empirical Legal Studies 248, 265 table 7 (2010).

**Table 14: Mean and Median Percentage Fee Awards, 2009-2013**

| Class Recovery ($ millions) | Number of Cases | Mean Award | Median Award |
|---|---|---|---|
| 0 - .04 | 46 | .31 | .33 |
| .04-.75 | 46 | .29 | .30 |
| .75-1.4 | 46 | .29 | .30 |
| 1.4-2.6 | 46 | .26 | .27 |
| 2.6-4.0 | 46 | .28 | .30 |
| 4.0-6.5 | 46 | .27 | .29 |
| 6.5-12.0 | 46 | .26 | .27 |
| 12.0-23.5 | 46 | .26 | .25 |
| 23.5-67.5 | 45 | .24 | .25 |
| >67.5 | 45 | .22 | .23 |

Source: Westlaw, LexisNexis, PACER

58.     The present settlement falls in the class of cases generally associated with this scaling effect.  However, it is in the very nature of an average that some values will be above the mean and some will be below.  A fee request is not objectionable simply because it is higher than the average for all cases of similar size if the facts and circumstances are such as to justify the requested amount. Four features of the present case militate in favor of a fee equal to one third of the settlement amount notwithstanding the size of the class recovery.

59.     *First*, the scaling effect is due to fact that in some but not all large cases, plaintiffs' counsel are able to realize significant economies of scale: they bring a case with large potential damage exposure and then settle it early before they have expended many hours.  The courts take these economies into account when awarding fees in such cases.[10]  Where, however, such economies are not strongly present, the courts appropriately award counsel a suitably

---

[10] For example, in *In re UnitedHealth Group Incorporated PSLRA Litigation*, 643 F.Supp.2d 1094 (D.Minn. 2009), the recovery was $925.5 million and the fee award was only 7%, due to the relatively small amount of time incurred by counsel (evidenced by a lodestar multiplier of 6.49).

compensatory fee percentage even in large cases.[11]

60.     The present case is not one where class counsel could settle a large case after incurring only a small number of hours.  This action has been pending for eight years, far longer than the usual class action case (average time from filing to disposition is about three years), and the discovery process was unusually burdensome and contentious.  The burden of litigating this case is evident in the time expended on the matter so far – a total of over 93,000 hours -- as well as counsel's lodestar of approximately $44 million.  Thus the factors that cause courts to reduce the percentage fee in some large cases are not present here.

61.     *Second*, in evaluating a reasonable fee, the courts properly balance both the fee percentage and the lodestar multiplier: if the multiplier in a given case is below the norm for similar cases, it is appropriate that the percentage fee should be above the norm.  This inference is confirmed in Eisenberg and Miller's data: their study finds a strong negative correlation between the lodestar multiplier and the percentage fee awarded.[12]   In the present case, as noted above, the requested multiplier is substantially below the mean for class actions of similar size (see ¶¶ 44-45 supra).  Given that the requested multiplier is below the norm, it is appropriate and consistent with results in similar cases that the fee calculated as a percentage of the recovery should be above.

62.     *Third*, the risks inherent in this case justify a suitably compensatory fee.  Empirical work confirms that risk is positively associated with fee awards.  Eisenberg and Miller find in a survey of all published class action settlements between 1993 and 2008 that high-risk cases

---

[11] For example, in *In re TFT-LCD (Flat Panel) Antitrust Litigation*, 2013 WL 149692 (N.D. Ca. 2013), the class recovery was $1,081 billion – more than three times the award in the present case – and the fee award was 29%, a result driven by the substantial number of hours incurred by counsel.

[12] Theodore Eisenberg and Geoffrey Miller, Attorneys' Fees and Expenses in Class Action Settlements: 1993-2008, 7 Journal of Empirical Legal Studies 248, 273-74 & Table 7a (2010).

generated higher percentage fees than low-risk cases in 80% of the case categories they examined.[13]  Regression analysis revealed that high-risk cases were significantly associated with higher fee awards as a percentage of the recovery in every specification of the model.

63.     This litigation presented significant risks. Perhaps most important, the alleged pricing scheme was engaged in covertly and not disclosed to customers.  Secret schemes, by their very nature, are concealed from view and, accordingly, are difficult to prove. Moreover, much of the information pertinent to the scheme was in the possession of USF's parent company, which was located in the Netherlands and potentially outside the scope of American legal process, and in the hands of third parties not participating in this litigation. Plaintiffs' counsel took on the risk that it would prove impossible to develop the evidence needed to establish liability.

64.     Class certification was also an issue.  USF fought certification all the way to the U.S. Supreme Court.  If certification had been denied either in this Court or on appeal, the viability of this entire case would have been jeopardized.

65.     *Fourth*, the evidence suggests that a fee equal to one third of the recovery is consistent with market rates for class representation. I have reviewed the retainer agreements entered into by representative plaintiffs Thomas & King, Inc. and Catholic Healthcare West. These agreements specifically contemplated that the clients might serve as representative plaintiffs in class action litigation challenging USF's pricing practices.  Each agreement provides for a 40% contingent fee.

66.     Thomas & King, Inc. and Catholic Healthcare West are sophisticated organizations with substantial amounts at stake in this litigation. Both organizations had a

---

[13] Theodore Eisenberg and Geoffrey Miller, Attorneys' Fees and Expenses in Class Action Settlements: 1993-2008, 7 Journal of Empirical Legal Studies 248, 265 Table 8 (2010).

palpable self interest in bargaining for the lowest percentage fee they could obtain consistent with securing excellent legal representation. These retainer agreements, accordingly, provide valuable evidence of a reasonable market rate for the services provided by counsel in this case.

67.     In light of the fact that privately negotiated retainer agreements established a 40% contingent fee, it is reasonable to conclude that the substantially lower one-third fee requested in this settlement represents appropriate compensation for counsel.

## CONCLUSION

68.     Based on the empirical evidence, it is my opinion that the requested fee falls within the range of reason for similar cases decided both in the Second Circuit and in courts around the country.


I declare under penalty of perjury that the foregoing is true and correct to the best of my knowledge, information and belief.


Executed on this 29th day of August, 2014, at New York, New York.

Geoffrey P. Miller

Appendix A: Resume

# GEOFFREY P. MILLER

New York University Law School
40 Washington Square South Suite 411G
New York, New York 10012
 (212) 998-6329 (office)
(212) 995-4659 (fax)
geoffrey.miller@nyu.edu

## Work Experience

New York University Law School (1995-present)
  Stuyvesant P. Comfort Professor of Law
  Director, NYU Center for the Study of Central Banks and Financial Institutions (1994-present)
  Co-Director, Program in Corporate Compliance and Enforcement (2014-present)
  Co-Director, NYU Center for Law, Economics and Organization (2006-2012)Co-Founder and
        Co-President, Society for Empirical Legal Studies (2006-2007)
  Chair, Academic Personnel Committee (1999-2000; 2004-2006)
  Chair, Promotions and Tenure Committee (2007-2009)

University of Chicago Law School (1983-1995)
  Kirkland & Ellis Professor (1989-1995)
  Editor, Journal of Legal Studies (1989-1995)
  Director, Program in Law and Economics (1994-1995)
  Director, Legal Theory Workshop (1989-1993)
  Associate Dean (1987-1989)
  Professor of Law (1987-1989)
  Assistant Professor of Law (1983-1987)

Visiting Lecturer, University of Frankfurt, 2013
Visiting Lecturer, Collegio Carlo Alberto, Moncalieri Italy, Spring 2011, Spring 2013,
        Spring 2014
Faculty Member, Study Center Gerzensee, Switzerland, Spring 2012
Visiting Lecturer, University of Genoa Department of Law, 2011
Visiting Scholar, European University Institute, Florence Italy, Fall/Winter 2010
Visiting Chair on Private Actors and Globalisation, Hague Institute for the Internationalisation
        of Law, Fall/Winter 2010
Robert B. and Candace J. Haas Visiting Professor of Law, Harvard Law School,
        Fall 2009
Max Schmidheiny Guest Professor, University of St. Gallen, Switzerland
        Summer 2009
Faculty Member, NYU-NUS in Singapore, 2009, 2011, 2013

Fresco Endowed Professor of Law, University of Genoa, Italy, Summer 2008,
    Spring 2009, Summer 2010
Visiting Scholar, University of Minnesota Law School, Spring 2008
Visiting Lecturer, University of Bolzano, Italy, Summer 2007
Commerzbank Visiting Professor, Institute for Law & Finance, University of
    Frankfurt, Germany, Summer 2004, Summer 2005, Summer 2010
Visiting Professor, Columbia Law School, Fall 2001
Visiting Professor, University of Sydney, Australia, Summer 2002; Summer 2006;
    Spring 2009
Zaeslin Visiting Professor, University of Basel, Switzerland, Summer 2001, 2002, 2003,
    2004, 2005, 2007, 2008, 2009, 2010, 2011, 2012, 2013, 2014
Visiting Scholar, CentER for Economic Research, Tilburg, Holland, Summer 1996
John M. Olin Visiting Scholar, Cornell University Law School, Summer 1992,
    Spring 1996; Winter 1997, Summer 2005, Spring 2008, Spring 2009, Spring 2010
Visiting Scholar, Bank of Japan, Spring 1995
Visiting Professor, New York University Law School, Fall 1994
Consultant, Federal Reserve Bank of Chicago, 1992-1994
Visiting Scholar, New York University Law School, Fall 1993
Simpson Grierson Butler White Visiting Professor, University of Aukland,
    New Zealand, Summer 1993

Associate, Ennis, Friedman, Bersoff & Ewing
Washington, D.C. (1982-83)

Attorney Adviser, Office of Legal Counsel
U.S. Department of Justice (1980-82)

Clerk, Hon. Byron R. White
Supreme Court of the United States (1979-80)

Clerk, Hon. Carl McGowan
U.S. Court of Appeals, District of Columbia (1978-79)

## Corporate Service

Member of the Board of Directors, State Farm Bank (2010) – board and committee service for
nontraditional federally chartered thrift institution with $15 billion in assets.

## Education

Columbia Law School, J.D. (1978)
Editor-in-Chief, Columbia Law Review (1977-78)
Princeton University, A.B. *magna cum laude* (1973)

Publications

Books

The Law of Governance, Risk Management and Compliance (Wolters Kluwer Law & Business 2014)

The Governance of International Banking (co-authored with Fabrizio Cafaggi, with Tiago Andreotti, Maciej Borowicz, Agnieszka Janczuk, Eugenia Macchiavello and Paolo Saguato) (Edward Elgar 2013)

Ways of a King: Legal and Political Ideas in the Bible (Vandenhoeck & Ruprecht 2011)

Trust, Risk, and Moral Hazard in Financial Markets (Il Mulino 2011)

The Origins of the Necessary and Proper Clause (with Gary Lawson, Robert Natelson, and Guy Seidman) (Cambridge University Press 2010)

The Economics of Ancient Law (editor) (Edward Elgar 2010)

Bank Mergers and Acquisitions (editor, with Yakov Amihud) (Kluwer Academic Publishers 1998)

La Banca Central en América Latina: Aspectos Económicos y Juridicos [Central Banks in Latin America and Their New Legal Structure] (in Spanish) (editor, with Ernesto Aguirre and Roberto Junguito Bonnet) (Tercer Mundo: Bogotá 1997)

Costly Policies: State Regulation and Antitrust Exemption in Insurance Markets (AEI Press 1993) (with Jonathan R. Macey)

Banking Law and Regulation, Little, Brown & Co. 1992 (with Jonathan R. Macey); Second Edition, Aspen Law & Business 1997 (with Jonathan R. Macey), Third Edition, Aspen Law & Business 2001 (with Jonathan R. Macey and Richard Scott Carnell); Fourth Edition, Aspen Law & Business 2008 (with Richard Scott Carnell and Jonathan R. Macey), under title "The Law of Banking and Financial Institutions"; Fifth Edition, Wolters Kluwer 2013 (with Richard Scott Carnell and Jonathan R. Macey), under title "The Law of Financial Institutions"

Banking Law and Regulation: Statutory and Case Supplement (Little, Brown & Co. 1992; Second Edition, Aspen Law & Business, 1997) (with Jonathan R. Macey), Third Edition, Aspen Law & Business, 2000) (with Jonathan R. Macey and Richard Scott Carnell); Fourth Edition, Aspen Law & Business 2008 (with Richard Scott Carnell and Jonathan Macey); Fifth Edition, Aspen Casebook Series 2011 (with Richard Scott Carnell and Jonathan Macey).

Banking Law and Regulation: Teacher's Manual (1992; Second Edition 1997; Third Edition 2001, Fourth Edition 2008) (with Jonathan R. Macey and Richard Scott Carnell)

Articles

Civil Procedure

A New Procedure for State Court Personal Jurisdiction (manuscript on file with the author)

An Information-Forcing Approach to the Motion to Dismiss, 5 Journal of Legal Analysis 437-465 (2014) (with Samuel Issacharoff)

In Search of the Most Adequate Forum: State Court Personal Jurisdiction, 2 Stanford Journal of Complex Litigation 1 (2014)

Group Litigation in the Enforcement of Tort Law, in Jennifer Arlen, ed., The Economics of Torts (2013)

The Quasi-Class Action Method of Managing Multi-District Litigations: Problems and a Proposal, 63 Vanderbilt Law Review 107 (2010) (with Charles Silver)

Will Aggregate Litigation Come to Europe?, 62 Vanderbilt Law Review 177-210 (2009) (with Samuel Issacharoff)

Preliminary Judgments, 2010 University of Illinois Law Review 165 (2009)

A New Look at Judicial Impact: Attorneys' Fees in Securities Class Actions after Goldberger v. Integrated Resources, Inc., 29 Washington University Journal of Law & Policy 5-35 (2009) (with Theodore Eisenberg and Michael Perino)

Punti cardine in tema di class action negli Stati Uniti e in Italia (Cutting-Edge Issues in U.S. and Italian Class Action Litigation), 2008 Analisi Giuridica dell'Economia 211-230 (2008)

Compensation and Deterrence in Consumer Class Actions in the United States, in Fabrizio Cafaggi and Hans W. Micklitz, eds., New Frontiers in Consumer Protection: The Interplay Between Private and Public Enforcement 263-282 (2009)

Pleading after *Tellabs*, 2009 Wisconsin Law Review 507-534 (2009)

Mandatory Arbitration for Customers But Not For Peers, 92 Judicature 118-123 (2009) (with Theodore Eisenberg and Emily Sherwin)

Arbitration's Summer Soldiers: An Empirical Study of Arbitration Clauses in Consumer and Non-Consumer Contracts, 41 University of Michigan Journal of Law Reform 871-96 (2008) (with Theodore Eisenberg and Emily Sherwin); reprinted in 7 ICFAI University Journal of Alternative Dispute Resolution (Hyderabad, India)

Reversal, Dissent, and Variability in State Supreme Courts: The Centrality of Jurisdictional Source, 89 Boston University Law Review 2009 (2009) (with Theodore Eisenberg)

All-or-Nothing Versus Proportionate Damages, 38 Journal of Legal Studies 345-382 (2009) (with Shmuel Leshem)

Judicial Review of Class Action Settlements, 1 Journal of Legal Analysis 167-205 (2008) (with Jonathan R. Macey)

Do Juries Add Value? Evidence From an Empirical Study of Jury Trial Waiver Clauses in Large Corporate Contracts, 4 Journal of Empirical Legal Studies 539 (2007) (with Theodore Eisenberg)

The Flight from Arbitration: An Empirical Study of *Ex Ante* Arbitration Clauses in Publicly-Held Companies' Contracts, 56 DePaul Law Review 335 (2007) (with Theodore Eisenberg), reprinted in 49 Corporate Practice Commentator323 (2007)

Rethinking Certification and Notice in Opt-Out Class Actions, 74 University of Missouri Kansas City Law Review 637 (2006)

Incentive Awards to Class Action Plaintiffs: An Empirical Study, 53 UCLA Law Review 1303 (2006) (with Theodore Eisenberg)

Review of the Merits in Class Action Certification, 33 Hofstra Law Review 51 (2004)

The Role of Opt-Outs and Objectors in Class Action Litigation: Theoretical and Empirical Issues, 57 Vanderbilt Law Review 1529 (2004) (with Theodore Eisenberg)

Competing Bids in Class Action Settlements, 31 Hofstra Law Review 633-650 (2003)

On the Costs of Civil Justice, 80 University of Texas Law Review 2115 (2002)

Class Actions in the Gulf States: Empirical Analysis of a Cultural Stereotype, 74 Tulane Law Review 681 (2000)

Full Faith and Credit to Settlements in Overlapping Class Actions: A Reply to Kahan and Silberman, 73 New York University Law Review 1167-1178 (1998)

Nonpecuniary Class Action Settlements, 60 Law and Contemporary Problems 97-155 (1997) (with Lori Singer)

Class Actions, in I New Palgrave Dictionary of Economics and the Law 257-262 (Peter Newman, ed., Macmillan Press 1998)

The Legal-Economic Analysis of Comparative Civil Procedure, 45 American Journal of Comparative Law 905-19 (1997)

Overlapping Class Actions, 71 New York University Law Review 514 (1996)

Settlement of Litigation: A Critical Retrospective, in Larry Kramer, ed., Reforming the Civil Justice System 13-37 (NYU Press 1996)

Expanding on the Fifty Percent Hypothesis: A Multimodal Approach to the Selection of Cases for Litigation, 25 Journal of Legal Studies 233 (1996) (with Daniel Kessler and Thomas Meites)

A Market Approach to Tort Reform Via Rule 23, 80 Cornell Law Review 909 (1995) (with Jonathan R. Macey)

Settlement Escrows, 24 Journal of Legal Studies 87 (1994) (with Robert Gertner)

Introduction: Economic Analysis of Civil Procedure, 23 Journal of Legal Studies 303 (1994)

Auctioning Class Action and Derivative Suits: A Rejoinder, 87 Northwestern Law Review 701 (1992) (with Jonathan R. Macey)

The Plaintiffs' Attorney's Role in Class Action and Derivative Litigation: Economic Analysis and Recommendations for Reform, 58 University of Chicago Law Review 1 (1991) (with Jonathan R. Macey), reprinted in Franklin A. Gevurtz, Corporate Law Anthology 186-194 (1997)

Some Thoughts on the Equilibrium Hypothesis, 69 Boston University Law Review 561 (1989)

Some Agency Problems in Settlement, 16 Journal of Legal Studies 189 (1987)

An Economic Analysis of Rule 68, 15 Journal of Legal Studies 93 (1986)

The Public Interest in Attorneys' Fees Awards for Public Interest Litigation, 47 Law and Contemporary Problems 233 (1984) (with Robert V. Percival), reprinted in University of Chicago Law School Record (1989)

Note, Aldinger v. Howard and Pendent Jurisdiction, 77 Columbia Law Review 127 (1977)

<u>Legal Ethics/Legal Profession</u>

The English vs. the American Rule on Attorneys Fees: An Empirical Study of Attorney Fee Clauses in Publicly-Held Companies' Contracts (manuscript 2010) (with Theodore Eisenberg)

Attorneys' Fees and Expenses in Class Action Settlements: 1993-2008, 7 Journal of Empirical Legal Studies 248 (2010) (with Theodore Eisenberg)

Ethical Considerations in Class Action Practice, in Practising Law Institute, Class Action Litigation 2007: Prosecution & Defense Strategies (2007)

From Club to Market: The Evolving Role of Business Lawyers, 74 Fordham Law Review 1105 (2005)

Bad Judges, 83 Texas Law Review 431 (2004)

Attorneys' Fees in Class Action Settlements: An Empirical Study, 1 Journal of Empirical Legal Studies 27 (2004) (with Theodore Eisenberg)

Professional Independence and the Corporate Lawyer (with William T. Allen), in Jay W. Lorsch, Leslie Berlowitz, and Andy Zelleke, Restoring Trust in American Business 113-126 (American Academy of Arts and Sciences 2005)

Conflicts of Interest in Class Action Litigation: An Inquiry into the Appropriate Standard, 2003 University of Chicago Legal Forum 581-630 (2003)

Payment of Expenses in Securities Class Actions: Ethical Dilemmas, Class Counsel, and Congressional Intent, 22 Review of Litigation 557 (2003)

Ethical Considerations in Class Action Practice, in Practising Law Institute, Class Action Litigation: Prosecution & Defense Strategies (2003)

Conflicts of Interest in Negotiation: An After-word and a Reply, 84 Iowa Law Review 1133-1139 (1999) (with Jonathan R. Macey)

Second Opinions in Litigation, 84 Virginia Law Review 1411-1437 (1998)(with Michael Klausner and Richard Painter)

Kaye, Scholer as Original Sin: The Lawyer's Duty of Candor and the Bar's Temptations of Evasions and Apology, 23 Law & Social Inquiry 305-313 (1998)

An Economic Analysis of Conflict of Interest Regulation, 82 Iowa Law Review 965-1005 (1997) (with Jonathan R. Macey), republished in Foundations of the Law and Ethics of Lawyering, George Meredith Cohen and Susan P Koniak, editors. New York: Foundation Press (2004)

Reflections on Professional Responsibility in a Regulatory State, 63 George Washington Law Review 1105 (1995) (with Jonathan R. Macey)

Government Lawyers' Ethics in a System of Checks and Balances, 54 University of Chicago Law Review 1293 (1987)

<u>Corporate, Contract and Securities Law</u>

Damages versus Specific Performance: Lessons from Commercial Contracts, __ Journal of Empirical Legal Studies __ (forthcoming 2014) (with Theodore Eisenberg)

A Modest Proposal for Fixing Delaware's Broken Duty of Care, 2010 Columbia Business Law Review 319 (2010)

Un-manifested Harm in Business-to-Business Cases, 167 Journal of Theoretical and Institutional Economics 80-93 (2011)

Process as Currency with the Courts: Judicial Scrutiny of Directors' Decisions, 1 International Journal of Corporate Governance 337-365 (2010) (with Jonathan R. Macey)

A Simple Theory of Takeover Regulation in the United States and Europe, 42 Cornell International Law Journal 301 (2009) (with Guido Ferrarini), reprinted in 55 Rivista Delle Societá 680 (2010)

Bargains Bicoastal: New Light on Contract Theory, 31 Cardozo Law Review 1475 (2010)

Flight to New York: an Empirical Analysis of Choice of Law and Forum Selection Clauses in Large Commercial Contracts, 30 Cardozo Law Review 1475 (2009) (with Theodore Eisenberg)

The Market for Contracts, 30 Cardozo Law Review 2073 (2009) (with Theodore Eisenberg)

Ex Ante Choices of Law and Forum: An Empirical Analysis of Corporate Merger Agreements, 59 Vanderbilt Law Review 1975 (2006) (with Theodore Eisenberg)

Catastrophic Failures: Enron and Beyond, 89 Cornell Law Review 423-455 (2004)

Capital Markets on the Internet: An Introduction, 5 New York University Journal of Legislation and Public Policy 1 (2001-2002)

Das Kapital: Solvency Regulation of the American Business Enterprise, in Eric Posner, ed., Chicago Lectures in Law and Economics 65-81 (2000)

Takeovers: English and American, 6 European Financial Management 533-542 (2000)

Choice of Law as a Pre-Commitment Device, in F.H. Buckley, ed., The Fall and Rise of Freedom of Contract 357-69 (Duke University Press 1998)

On the Advantages of Defined Contribution Plans, in Samuel Estreicher, ed., Proceedings of the 50th Annual Conference on Labor (Kluwer Academic Press, forthcoming 1998)

Political Structure and Corporate Governance: Some Points of Contrast Between the U.S. and the U.K., 1998 Columbia Business Law Review 51-78 (1998), reprinted in Sloan Project on Corporate Governance at Columbia Law School, Corporate Governance Today 629-648 (1998)

Finance and the Firm, 152 Journal of Institutional and Theoretical Economics [Zeitschrift fur die Gesamte Staatswissenschaft] 89-107 (1996)

Corporate Governance and Commercial Banking: A Comparative Examination of Germany, Japan and the United States, 48 Stanford Law Review 73 (1995) (with Jonathan R. Macey)

Comment on "Brokerage, Market Fragmentation, and Securities Market Regulation," in Andrew W. Lo, ed., The Industrial Organization and Regulation of the Securities Industry, University of Chicago Press (1996)

Corporate Stakeholders: A Contractual Perspective, 43 University of Toronto Law Review 401 (1993) (with Jonathan R. Macey)

The Culture of Capital: Comments on Conley and O'Barr, 71 North Carolina Law Review 201 (1992)

The Economic Efficiency of Close Corporation Law: A Comment, 70 Washington University Law Quarterly 399 (1992)

Lessons from Financial Economics: Materiality, Reliance, and the Utility of Empirical Methodology in Extending the Reach of Basic v. Levinson, 77 Virginia Law Review 1015 (1991) (with Jonathan R. Macey, Jeffrey Netter, and Mark Mitchell)

The Fraud on the Market System Revisited, 77 Virginia Law Review 999 (1991) (with Jonathan R. Macey)

Politics, Bureaucracies, and Financial Markets: Bank Entry into Commercial Paper Underwriting in the United States and Japan, 139 University of Pennsylvania Law Review 369-453 (1990) (with David Litt, Jonathan R. Macey, and Edward L. Rubin)

Good Finance, Bad Economics: An Analysis of the Fraud on the Market Theory, 42 Stanford Law Review 1059 (1990) (with Jonathan R. Macey)

Trans-Union Reconsidered, 98 Yale Law Journal 127 (1988)(with Jonathan R. Macey)

Toward an Interest Group Theory of Delaware Corporate Law, 65 Texas Law Review 469 (1987) (with Jonathan R. Macey)

<u>Constitutional Law</u>

Confederacy, in The Encyclopedia of Political Thought (Wiley-Blackwell) (forthcoming)

The President's Power of Interpretation: Implications of a Unified Theory of Constitutional Law, 56 Law and Contemporary Problems 35 (1993)

The Unitary Executive in a Unified Theory of Constitutional Law: The Problem of Interpretation, 15 Cardozo Law Review 201 (1993)

Liberty and Constitutional Architecture: The Rights-Structure Paradigm, 16 Harvard Journal of Law & Public Policy 87 (1993)

Rights and Structure in Constitutional Theory, 8 Social Philosophy & Policy 196 (1991), reprinted in E. Frankel Paul, ed., Reassessing Civil Rights (1991)

The Appropriations Power and the Necessary and Proper Clause, 68 Washington University Law Quarterly 640 (1990) (panel)

From Compromise to Confrontation: Separation of Powers in the Reagan Era, 57 George Washington Law Review 401 (1989)

Rediscovering Economic Liberties, 41 Rutgers Law Review 773 (1989) (panel)

War Powers and the Constitution: A Middle Ground, 43 University of Miami Law Review 35 (1988) (panel)

The Debate Over Independent Agencies in Light of the Empirical Evidence, 1988 Duke Law Journal 215 (1988)

Independent Agencies, 1986 Supreme Court Review 41 (1986)

<u>Financial Institutions</u>

Intellectual Hazard and the Design of Financial Stability Regulation, in University of St. Gallen Series in Law and Economics, Peter Nobel, ed. (Zurich: Schulthess, 2010) (with Gerald Rosenfeld)

Intellectual Hazard: How Conceptual Biases in Complex Organizations Contributed to the Crisis of 2008, 33 Harvard Journal of Law & Public Policy 807 (2010) (with Gerald Rosenfeld)

Helping Law Catch Up to Markets: Applying Broker-Dealer Law to Subprime Mortgages, 34 Journal of Corporation Law 789 (2009) (with Jonathan Macey, Maureen O'Hara and Gabriel D. Rosenberg)

The Basel Committee, Global Administrative Law, and the Developing World, in Benedict Kingsbury and Richard Stewart, eds, India, the South and the Shaping of Global Administrative Law  (forthcoming, Oxford University Press India 2008) (with Michael Barr)

Comment: Credit Risk Transfer, Hedge Funds, and the Supply of Liquidity, in Peter Nobel and Marina Gets, eds., Law and Economics of Risk in Finance, University of St. Gallen Series in Law and Economics 73 (2008)

Global Administrative Law – The View from Basel, 17 European Journal of International Law 15 (2006) (with Michael Barr)

Three Myths about Central Banks, Federal Reserve Bank of Cleveland Economic Commentary (November 2002)

Central Bank Independence in Ordinary and Extraordinary Times, in Jan Kleiniman, ed., Central Bank Independence: the Economic Foundations, the Constitutional Implications, and Democratic Accountability (Kluwer Academic Press 2000) 31-51 (with Rosa Lastra)

External Review of Central Bank Decisions, in 1 International Monetary Fund, Current Developments in Monetary and Financial Law 535-51 (1999)

Bank Mergers and American Bank Competitiveness, in Yakov Amihud & Geoffrey Miller, eds., Bank Mergers and Acquisitions 175-190 (Kluwer Academic Publishers, 1998) (with Jonathan R. Macey)

Introduction: Bank Mergers and Acquisitions, in Yakov Amihud & Geoffrey Miller, eds., Bank Mergers and Acquisitions vii-xiii (Kluwer Academic Publishers, 1998)

Deposit Insurance for Economies in Transition, in Kluwers Yearbook of International and Financial Law 103-138 (1997) and R. Lastra and H. Schiffman, eds., Bank Failures and Bank Insolvency Law in Economies in Transition 37-70 (Kluwers Academic Press 1998)

Central Bank Independence, Liberalization and Inflation in Transition Economies: An International Perspective, 49 Journal of Monetary Economics 237 (2002) (with Alex Cukierman and Bilin Neyapti)

An Interest-Group Theory of Central Bank Independence, 27 Journal of Legal Studies 433-453 (June 1998)

On the Obsolescence of Commercial Banking, 154 Journal of Institutional and Theoretical Economics [Zeitschrift fur die gesamte Staatswissenschaft] 61-73 (1998)

Banking Crises in Perspective: Two Causes and One Cure, in Gerard Caprio, Jr, William C. Hunter, George G. Kaufman, and Danny M. Leipziger, eds., Preventing Banking Crises: Lessons from Recent Global Bank Failures 279-287 (Federal Reserve Bank of Chicago, 1998)

Universal Banks are Not the Answer to America's Corporate Governance "Problem": A Look at Germany, Japan, and the U.S., 9 Journal of Applied Corporate Finance 57-73 (1997)(with Jonathan R. Macey), republished in The Revolution in Corporate Finance, Joel M Stern and David H. Chew, editors, Marlden, MA: Blackwell (2003)

Cooperation, Conflict, and Convergence in Japanese Finance: Evidence from the "Jusen" Problem, 29 Law and Policy in International Business 1-78 (1998)(pre-published as Washington University School of Law, Working Paper No. 97-3-1) (with Curtis Milhaupt)

Nihon no kin'yu ni okeru jusenmondai hoteki bunsekito keizaiteki bunseki [The Jusen Problem in Japanese Finance: A Legal and Economic Analysis], 1132 Jurisuto 140-49; 1134 Jurisuto 86-92; 1136 Jurisuto 83-89 (1998) (with Curtis Milhaupt) (in Japanese)

A Regulatory Cartel Model of Decisionmaking in Japanese Finance, 4 Zeitschrift fur Japanisches Recht 18-29 (1997)(with Curtis Milhaupt)

Banco de Fondos Mutuos Para América Latina? [Mutual Fund Banking for Latin America?], in La Banca Central en América Latina: Aspectos Económicos y Juridicos [Central Banks in Latin America and Their New Legal Structure], Ernesto Aguirre, Roberto Junguito Bonnet, and Geoffrey Miller, eds. 272-280 (1997) (in Spanish)

The Role of a Central Bank in A Bubble Economy, 18 Cardozo Law Review 1053 (1996)

Decisionmaking at the Bank of Japan, 28 Law and Policy in International Business 1 (1996)

Is Deposit Insurance Inevitable? Lessons From Argentina, 16 International Review of Law and Economics 211 (1996), reprinted in Jagdeep Bandhari and Alan Sykes, eds., Economic Dimensions in International Law: Comparative and Empirical Perspectives 392-404 (Cambridge University Press, 1998)

El Papel del Banco Central en una Economia Especulativa [The Role of a Central Bank in a Speculative Economy], in Miguel Mancera Aguayo, ed., El Banco de México en la Reconstrucción Económica Nacional 137 (Centro Cultural Manuel Gómez Morin, A.C., 1996)

Comments on Rajan and James, in A. Saunders & I. Walter, eds., Universal Banking: Financial System Design Reconsidered 330-333 (Irwin & Co. 1996)

Deposit Insurance, the Regulatory Contract, and the Mismatch in the Term Structure of Banks' Assets and Liabilities, 12 Yale Journal on Regulation 1-50 (1995)(with Jonathan R. Macey), reprinted as L'Assurance Des Depots, Le Contrat Reglementaire Implicite, et la Destruction des Eschances des Actifs et Passifs Bancaires, 6 Journal des Economistes et des Etudes Humaines 531 (1995)

Double Liability of Bank Shareholders: A Look at the New Data, 28 Wake Forest Law Review 933 (1993) (with Jonathan R. Macey)

Politics of Deposit Insurance Reform: The Case of Argentina, Federal Reserve Bank of Chicago, Proceedings of a Conference on Bank Structure and Competition 473 (1993) and 1 University of Chicago Law School Roundtable 129 (1994), republished as "Políticas de Reforma de Seguro de Depósito. El Caso de la Argentina," in Revista de Derecho Bancario y de la Actividad Financiera, Año 4, Enero-diciembre 1994, No. 19/24, at 221-239 (1995) (Argentine journal)

Comment on Universal Banks and Financial Stability, 19 Brooklyn International Law Journal 197 (1993)

Kaye, Scholar, FIRREA and the Desirability of Early Closure: A View of the Kaye, Scholar Case from the Perspective of Bank Regulatory Policy, 66 University of Southern California Law Review 1115 (1993) (with Jonathan R. Macey)

Constitutional Moments, Pre-commitment, and Fundamental Reform: The Case of Argentina, 71 Washington University Law Quarterly 1061 (1993)

Legal Restrictions on Bank Consolidation: An Economic Analysis, 77 Iowa Law Review 1083 (1992)

The Community Reinvestment Act: An Economic Analysis, 79 Virginia Law Review 291 (1993) (with Jonathan R. Macey)

Drunken Sailors on a Sinking Ship? The Rehnquist Court and the Bank Failure Problem, 1993 Public Interest Law Review 83 (1993)

Comments on Calomiris, in M. Klausner & L. White, eds., Structural Change in Banking 212 (1993)

The McCarran-Ferguson Act: A Case Study of Regulatory Federalism, 68 New York University Law Review 13 (1993), republished in 7 National Insurance Law Review 521 (1995)(with Jonathan R. Macey)(study prepared originally under the auspices of the American Enterprise Institute's Project on Federalism)

Bank Failure: The Politicization of a Social Problem, 45 Stanford Law Review 289 (1992) (with Jonathan R. Macey)

Toward Enhanced Consumer Choice in Banking: Uninsured Depository Facilities as Financial Intermediaries for the 1990s, 1991 N.Y.U. Annual Survey of American Law 865 (1992) (with Jonathan R. Macey)

Nondeposit Deposits and the Future of Bank Regulation, 91 Michigan Law Review 237-273(1992) (with Jonathan R. Macey)

America's Banking System: The Origins and Future of the Current Crisis, 69 Washington University Law Quarterly 769 (1991) (with Jonathan R. Macey)

Bank Failures, Risk Monitoring, and the Market for Corporate Control (with Jonathan R. Macey), 88 Columbia Law Review 1153 (1988) (study conducted under the auspices of the Administrative Conference of the United States)

The Future of the Dual Banking System, 53 Brooklyn Law Review 1 (1987)

Public Policy Implications of Legislation Limiting the Growth of Interstate Banks, Federal Reserve Bank of Chicago, Proceedings of a Conference on Bank Structure and Competition 602 (1986)

Interstate Branching and the Constitution, 41 Business Lawyer 337 (1986)

Interstate Banking in the Court, 1985 Supreme Court Review 179 (1985)

<u>Legal History</u>

The Corporate Law Origins of the Necessary and Proper Clause, 79 George Washington University Law Review 1 (2010)

*Meinhard v. Salmon,* in Jonathan R. Macey, ed., Corporate Law Stories (2008)

The Industrial Organization of Political Production: A Case Study, 149 Journal of Institutional and Theoretical Economics [Zeitschrift fur die gesamte Staatswissenschaft] 769 (1993)

Comments on Priest, 36 Journal of Law and Economics 325 (1993)

Toward "Neutral Principles" in the Law: Selections from the Oral History of Herbert Wechsler, 93 Columbia Law Review 854 (1993) (with Norman Silber)

Double Liability of Bank Shareholders: History and Implications, 27 Wake Forest Law Review 31 (1992) (with Jonathan R. Macey)

Origin of the Blue Sky Laws, 70 Texas Law Review 347 (1991) (with Jonathan R. Macey), reprinted in 34 Corporate Practice Commentator 223 (1992)

Public Choice at the Dawn of the Special Interest State: The Story of Butter and Margarine, 77 California Law Review 83 (1989)

The True Story of Carolene Products, 1987 Supreme Court Review 397 (1987), reprinted in Michael J. Glennon, et al., eds., Constitutional Law Anthology (Anderson Publishing 1997), pp. 94-103; reprinted in J. Ely, Property Rights in American History: Reform and Regulation of Property Rights (Garland Publishing 1997), pp. 165-197.

Interviewer, Columbia University Oral History Collection, Life of Herbert Wechsler (1980-1982) (with Norman Silber)

<u>Jurisprudence</u>

The Case of the Speluncean Explorers: Contemporary Proceedings, 61 George Washington Law Review 1798 (1993)

The End of History and the New World Order: The Triumph of Capitalism and the Competition Between Liberalism and Democracy, 25 Cornell International Law Journal 277 (1992) (with Jonathan R. Macey)

The Canons of Statutory Construction and Judicial Preferences, 45 Vanderbilt Law Review 647 (1992) (with Jonathan R. Macey)

Pragmatics and the Maxims of Interpretation, 1990 Wisconsin Law Review 1179 (1990)

Economic Efficiency and the Lockean Proviso, 10 Harvard Journal of Law and Public Policy 401 (1987)

Ancient Law

Taxation, in Oxford Encyclopedia of the Bible and Law (Oxford University Press) (forthcoming)

Logos and Narrative, NYU School of Law, Public Law Research Paper No. 10-78 (2010)

Monarchy in the Hebrew Bible, NYU School of Law, Public Law Research Paper No. 10-76 (2010)

Nationhood and Law in the Hebrew Bible, NYU School of Law, Public Law Research Paper No. 10-57 (2010)

Revelation and Legitimacy in the Hebrew Bible, NYU School of Law, Public Law Research Paper No. 10-52 (2010)

The Book of Judges: The Hebrew Bible's Federalist Papers, NYU School of Law, Public Law Research Paper No. 10-66 (2010)

Consent of the Governed in the Hebrew Bible, NYU School of Law, Public Law Research Paper No. 10-56 (2010)

Nomadism, Dependency, Slavery and Nationhood: Comparative Politics in the Book of Exodus, NYU School of Law, Public Law Research Paper No. 10-49 (2010)

Economics of Ancient Law, in Geoffrey P. Miller, ed., The Economics of Ancient Law (Edward Elgar, forthcoming 2010)

Patriarchy: The Political Theory of Family Authority in the Book of Genesis (manuscript 2010)

The Dark Age: How the Biblical Narratives Demonstrate the Necessity for Law and Government (NYU School of Law, Public Law Research Paper No. 10-18)

Origin of Obligation: Genesis 2:4b-3:24 (NYU School of Law, Public Law Research Paper No. 09-60)

Sovereignty and Conquest in the Hebrew Bible, NYU School of Law, Public Law Research Paper No. 10-61 (2010)

Golden Calves, Stone Tablets, and Fundamental Law: A Political Interpretation of Exodus 32 (NYU School of Law, Public Law Research Paper No. 10-02)

A Riposte Form in the Song of Deborah, in Tikva Frymer-Kensky, Bernard Levinson and Victor Matthews, eds., Gender and Law in the Hebrew Bible and the Ancient Near East 113-27 (1998)

Foreword: The Development of Ancient Near Eastern Law, 70 Chicago-Kent Law Review 1623 (1996)

Why Ancient Law?, 70 Chicago-Kent Law Review 1465 (1995)(with James Lindgrin and Laurent Mayali)

Foreword: Land Law in Ancient Times, 71 Chicago-Kent Law Review 233 (1996)

The Song of Deborah: A Legal-Economic Analysis, 144 University of Pennsylvania Law Review 2293 (1996)

The Legal-Economic Approach to Biblical Interpretation, 150 Journal of Institutional and Theoretical Economics [Zeitschrift fur die gesamte Staatswissenschaft] 755 (1994)

J as Constitutionalist: A Legal-Economic Interpretation of Exodus 17:8-16 and Related Texts, 70 Chicago-Kent Law Review 1829 (1995)

Verbal Feud in the Hebrew Bible: Judges 3:12-30 and 19-21, 55 Journal of Near Eastern Studies 105 (1995)

Contracts of Genesis, 22 Journal of Legal Studies 15-45 (1993)

Ritual and Regulation: A Legal-Economic Analysis of Selected Biblical Texts, 22 Journal of Legal Studies 477 (1993)

Law and Society

Parental Bonding and the Design of Child Support Obligations, in William S. Comanor, ed., The Law and Economics of Child Support Payments 210-240 (Edward Elgar 2004)

The Legal Function of Ritual, 80 Chicago-Kent Law Review 1181 (2005)

Handicapped Parking, 29 Hofstra Law Review 81 (2000) (with Lori S. Singer)

Custody and Couvade: The Importance of Paternal Bonding in the Law of Family Relations, 33 Indiana Law Review 691 (2000)

Norm Enforcement in the Public Sphere: The Case of Handicapped Parking, 71 George Washington Law Review 895-933 (2004)

Norms and Interests, 32 Hofstra Law Review 637 (2003)

Circumcision: A Legal-Cultural Analysis, 9 Virginia Journal of Social Policy and the Law 498-585 (2002), pre-published as New York University Public Law and Legal Theory Working Paper Series, Working Paper 5 (2000)

Law, Pollution, and the Management of Social Anxiety, 7 Michigan Women's Law Journal 221-289 (2001)

<u>Other:</u>

Richard Posner, 61 N.Y.U. Annual Survey of American Law 13 (2004)

Introduction: The Law and Economics of Risk, 19 Journal of Legal Studies 531 (1990) (with Richard A. Epstein)

Law School Curriculum: A Reply to Kennedy, 14 Seton Hall Law Review 1077 (1984) (under pen name of Chris Langdell)

<u>Book Reviews</u>

Defusing the Banks' Financial Time Bomb, BusinessWeek (Mar. 11, 2010) (review of Robert Pozen, Too Big to Save? How to Fix the U.S. Financial System

Love & Joy: Law, Language and Religion in Ancient Israel, by Yochanan Muffs, 58 Journal of Near Eastern Studies 144-45 (1999)

Jesus and the Jews: The Pharisaic Tradition in John; The Trial Of Jesus; Jesus And The Law, by Alan Watson, 1 Edinburgh Law Review 273 (1997)

No Contest: Corporate Lawyers and the Perversion of Justice in America, by Ralph Nader and Wesley J. Smith, Washington Post (October 13, 1996)

The Rise and Fall of the Classical Corporation: Hovenkamp's Enterprise and American Law: 1836-1937, 59 University of Chicago Law Review 1677 (1993)

Property Rights and the Constitution: A Review of James W. Ely, Jr.'s The Guardian of Every Other Right, 37 American Journal of Legal History 378 (1993)

Anatomy of A Disaster: Why Bank Regulation Failed, 86 Northwestern University Law Review 742 (1992)

The Glittering Eye of Law, 84 Michigan Law Review 1901 (1986)

A Rhetoric of Law, 52 University of Chicago Law Review 247 (1985)

<u>Major Lectures</u>

Trust, Risk, and Moral Hazard in Financial Markets (University of Genoa, Fresco Chair Lectures in Law and Finance, June 2010)

A Simple Theory of Takeover Regulation in the United States and Europe; Intellectual Hazard (Commerzebank Lectures, University of Frankfurt, May 2010)

The European Union's Takeover Directive and Its Implementation in Italy (University of Rome III, 2008)

Catastrophic Financial Failures: Enron, HIH and More (Ross Parsons Lecture, Sydney, Australia, 2002)

Das Kapital: Solvency Regulation of the American Business Enterprise (Coase Lecture, University of Chicago Law School, 1993)

Banking in the Theory of Finance; The Simple Economics of Litigation and Settlement; The Economic Structure of Corporation Law (University of Auckland, New Zealand, 1993)

<u>Journal Referee Reports</u>

American Law and Economics Review
Journal of Legal Studies
Journal of Law, Economics and Organization
Review of Law and Economics

<u>Conferences Organized</u>

Regulating Risk Taking in a Post-Crisis Environment (4th Annual Law & Banking/Finance Conference (New York, New York, May 16-17, 2014) (co-organizer with Prof. Gerard Hertig, ETH Zurich)

Fifth Annual NYU Global Economic Policy Forum (New York, New York, November 12, 2012) (co-organizer)

Assessing Ongoing Financial Reforms (3rd Annual Law & Banking/Finance Conference (Zurich, Switzerland, June 7-8, 2013) (co-organizer with Prof. Gerard Hertig, ETH Zurich)

Tackling Systemic Risk: 2nd Annual Law & Banking/Finance Conference (Zurich, Switzerland, April 20-21 2012) (co-organizer with Prof. Gerard Hertig, ETH Zurich)

Judicial Dialogue on Mass Litigation, Florence Italy, October 15-16, 2010 (co-organizer of conference co-sponsored by NYU Law School, the American Law Institute, and the European University Institute)

Banking and Finance: 1st Annual Law and Banking/Finance Conference (Florence, Italy, April 15-16, 2011) (co-organizer with Prof. Gerard Hertig, ETH Zurich)

Finlawmetrics 2010: Central Banking, Regulation & Supervision after the Financial Crisis (co-sponsor and member of steering committee)

Finlawmetrics 2009: After The Big Bang:  Reshaping Central Banking, Regulation and Supervision (Milan, Italy, Spring 2009) (co-sponsor and member of steering committee)

NYU Global Economic Policy Forum 2009: The Future of Regulation and Capital Markets (November 5, 2009) (co-organized with Professor Alan Rechtschaffen and with the NYU Law School Alumni Association)

Third Annual Conference on Empirical Legal Studies (Cornell University, Ithaca, New York, Fall 2008) (co-organizer)

NYU Global Economic Policy Forum (April 14, 2007).  Major conference on economic policy. Keynote address by Jean Claude Trichet, President of the European Central Bank; presentations by Tevi Troy, Deputy Secretary of the Department of Health and Human Services; Kevin Warsh, Member of the Board of Governors of the Federal Reserve System; and Donald B. Marron, Jr., Senior Economic Advisor, President's Council of Economic Advisors.  Co-organized with Professor Alan Rechtschaffen.

Second Annual Conference on Empirical Legal Studies (New York, New York, November 10-11, 2007).  Major conference (425 participants) exploring all aspects of the empirical study of law.  Co-organized with Jennifer Arlen, Bernard Black, Theodore Eisenberg and Michael Heise.

NYU Global Economic Policy Forum (April 11, 2007).  Major conference on economic policy. Keynote address by Ben S. Bernanke, Chairman of the Board of Governors of the Federal Reserve System; presentations by Stanley Druckenmiller, Founder of Dusquesne Capital, Tevi Troy, Domestic Policy Advisor for President George W. Bush, and Jeffrey Rosen, Vice Chair of Lazard.  Co-organized with Professor Alan Rechtschaffen.

First Annual Conference on Empirical Legal Studies (Austin, Texas, October 2006).  Major conference exploring all aspects of the empirical study of law.  Co-organized with Jennifer Arlen, Bernard Black, Theodore Eisenberg and Michael Heise.

Conference on Legal Aspects of the International Activities of Central Banks, Lima Peru, October 1997.  This conference, co-sponsored by the central bank of Peru, brought together leaders in the legal and economic issues facing central banks in the management of their external reserves.

Conference on the Governance of Institutional Investors (New York, New York, February 14, 1997). This conference, sponsored by the NYU Stern School of Business Salomon Center in association with the New York University Law School Center for the Study of Central Banks, brought together top executives, attorneys, scholars and others interested in the management and organization, both economic and legal, of the nation's large institutional investors, including its mutual fund industry.

Conference on Bank Mergers and Acquisitions (New York, New York, October 11, 1996).  This conference, sponsored by the NYU Stern School of Business Salomon Center in association with the New York University Law School's Center for the Study of Central Banks, brought together

leading academics, lawyers, and investment bankers to discuss some of the broader implications of bank mergers and acquisitions. Co-organizer of this conference was Professor Yakov Amihud of the Stern School's Finance Department.

Conference in Central Banks in Latin America (Bogota, Colombia, February, 1996). This conference, co-sponsored by the central bank of Colombia with technical assistance from the Legal Affairs Department of the International Monetary Fund, brought together leaders of Latin American central banks, the international financial community, and scholars from a variety of disciplines, to discuss issues related to the independence of central banks and economic development.

Conference on Central Banks in Asia (Shanghai, China, October, 1995). This conference, co-sponsored with KPMG-Peat Marwick, brought together leaders from commercial banks, investment banks, and industrial firms, as well as central bankers, to discuss Asian central banks to address issues such as the proposed law granting a degree of independence to the central bank of China.

Conference on Ancient Law (Berkeley, California, March 1995). This conference, organized with Professors James Lindgren of Chicago-Kent Law School and Laurent Mayali of the University of California at Berkeley Law School, brought together important figures from a variety of disciplines interested in Ancient Law.

Conference on Central Banks in Eastern Europe and the Newly Independent States (Chicago, Illinois, April 1994). This conference brought together the Prime Minister of Estonia, three present or former Ministers of Finance of Eastern European states (including Boris Fyoderov, former Finance Minister of the Russian Republic), the heads of the central banks of eleven nations in Eastern Europe and the Newly Independent States, together with a wide variety of highly-placed officials from these countries and from the west, to discuss issues related to the independence of central banks and economic development.

## Professional Memberships and Positions

New York State Bar
District of Columbia Bar
American Bar Association
American Law Institute (1988-1996)
Member, Paolo Baffi Centre Scientific Advisory Board, Milan, Italy (2008- present)
Member, International Academic Council, University of St. Gallen,
    Switzerland (2004-present)
Chairman, Section on Business Associations, American Association of Law
    Schools (1995)
Member of the Board of Directors, American Law and Economics Association
    (1995-1998)
Member of the Foreign Advisory Committee, Latin American Law and
    Economics Association (1995-2000)
Member of the Foreign Advisory Board, Universitad Tocurato Di Tella School of Law,

Buenos Aires, Argentina (1992-1999)
Member of the Editorial Board, Supreme Court Economic Review
Member of the Editorial Board, The Independent Review
Member of the Advisory Board, Yearbook of International Financial and
   Economic Law
Member of the Advisory Board, University of Hong Kong Faculty of Law Asian Institute
   of International Financial Law (2001-present)
Member of the Advisory Board, LSN Comparative Law Abstracts

Courses

Legal Profession (1985-93; 1996-98; 2003-2007; 2013 (scheduled))
The Crisis of 2008 (2009, 2010)
Reading Class: Restructuring Finance (2009)
Property (1986-87)
Corporations (1985-88; 1991-93; 1997-2000; 2005; 2008; 2012)
Seminar on Separation of Powers (1985, 1987)
Civil Procedure (1983-84; 2004-2005; 2011)
Federal Regulation of Banking (1983, 1989-93; 1995-97; 2003, 2006-2010; 2012)
Law and Business of Banking (2012; with Gerald Rosenfeld)
Land Development (1984-85)
Securities Law (1990-91)
Workshop in Legal Theory (1989-91)
Seminar on Financial Institutions (1992-93 (with Merton Miller); 1996-97)
Ethics in Class Action Practice (Continuing Legal Education Seminar 2002-2005)
Law and Economics (University of Basel, Switzerland 2005, 2007, 2008; 2009; 2010; 2011;
2012)
Advanced Seminar on Law and Economics (University of Genoa, Italy 2008)
Banking and the Financial Crisis (University of Genoa, Italy 2009)
Trust, Risk, and Moral Hazard in Financial Markets (University of Genoa, Italy, 2010)
International Banking (University of Sydney, Australia, 2002, 2006)
Introduction to Banking Law (University of Basel, Switzerland 2001, 2002, 2003, 2004, 2009,
2010; 2011; 2012
Banking in the Theory of Finance (University of Frankfurt, Germany 2004, 2005)
Banking Regulation in Crisis (University of Frankfurt, Germany, 2010)
Banking: Law and Economics Issues after the Financial Crisis (Study Center Gerzensee, 2012)

Litigation and Alternative Dispute Resolution

Brief and Reply Brief for Plaintiff-Appellant, <u>Glancy v. Taubman Centers, Inc.</u> No. 03-
1609 (6th Cir. 2003).

Amicus Brief for American Bankers Association, et al., <u>In Re: Visa Check/Mastermoney</u>
<u>Antitrust Litigation</u>, 280 F.3d 124 (2d Cir. 2001) (of counsel)

Briefed and argued <u>Moran v. Household Finance Corp.</u> (the "Poison Pill" case) in the Supreme Court of Delaware (1985)

Briefed cases in the U.S. Supreme Court, U.S. Court of Appeals, U.S. District Courts, and state trial and appellate courts. Conducted depositions and other pretrial discovery. (1982-1983)

Briefed and argued <u>Hodges v. Metts</u>, 676 F.2d 1133 (6th Cir. 1982), on behalf of the United States.

Conducted trial of <u>American Psychological Association v. Birch Tree Press, et al.</u> (U.S. District Court, Washington, D.C. 1983).

<u>Deposit Insurance for Thailand</u>. Prepared a draft deposit insurance law for Thailand, at the request of the International Monetary Fund (1999)

<u>Schatz v. Blanchard</u>. Neutral arbitrator in a commercial arbitration (2000)

<u>Expert Witness Testimony (past five years)</u>

<u>EM Ltd. and NML Capital, Ltd. v. The Republic of Argentina and Banco de La Nación Argentina</u>, No. 08 Civ 7974 (TPG), United States District Court for the Southern District of New York (declaration and responsive declaration on whether a state-owned financial institution is an alter-ego of the government) (2009); second supplemental declaration (2010)

<u>Tucker v. Scrushy, et al.</u>, Nos. CIV-02-5212, CV 03-3522, CV 03-2023, CV 03-2420, CV 98-6592, Circuit Court of Jefferson County, Alabama, 2008 (affidavit on fees) (2009)

<u>In Re: 2007 Wildfire Class Litigation</u>, Master Case No. 2008-00093086, Superior Court of California, County of San Diego (2009) (affidavit and deposition on certification)

<u>In re: Columbia Hospital for Women Medical Center, Inc.</u>, Case No. 09-00010 (Teel, J.), United States Bankruptcy Court for the District of Columbia (declaration on fees) (2009)

<u>In re Vioxx Products Liability Litigation</u>, Civil Action No. 2:05-MD-01657-EEF-DEK, United States District Court, Eastern District of Louisiana (affidavit on fee-capping order) (2009)

<u>State of Missouri v. SBC Communications, Inc.</u>, No. No. 044-02645, Circuit Court of the City of St. Louis, Missouri (2009) (affidavit on fees)

<u>Alexander v. Nationwide Mutual Insurance Co.</u>, No. CV-2009-120-3, Circuit Court of Miller County, Arkansas (2009) (affidavit on fees)

Peterman v. North American Company for Life and Health Insurance, Case No. BC357194, Superior Court of the State of California, County of Los Angeles (2009) (declaration on fees)

Holman v. Student Loan Xpress, Inc., Case No. 8:08-cv-00305-SDM-MAP (Middle District of Florida, Tampa Division) (2009) (declaration on fees)

Board of Trustees of the AFTRA Retirement Fund v. JPMorgan Chase, No. 09-00686 (Southern District of New York) (2010) (declaration on class certification)

Polion v. Wal-Mart Stores, Inc., No. 01-03645 (Superior Court of Massachusetts, Commonwealth of Massachusetts) (2010) (declaration on fees; supplemental declaration on fees and motion to strike counsel)

In re MoneyGram International, Inc. Securities Litigation, No. 08-883 (DSD/JJG), United States District Court, District of Minnesota (2010) (declaration on fees)

Board of Trustees of the AFTRA Retirement Fund v. JPMorgan Chase Bank, N.A., No. 09-cv-00686 (SAS) (DF), United States District Court for the Southern District of New York (2010) (declaration and deposition on certification)

Coffey v. Freeport-McMoran Copper & Gold, Inc., No. CJ-2008-68, District Court of Kay County, State of Oklahoma (2010) (affidavit on certification)

In Re Puerto Rican Cabotage Antitrust Litigation MDL Docket No. 3:08-md-1960 (DRD), United States District Court for the District of Puerto Rico (2010) (declaration on fees)

In re XTO Energy Shareholder Class Action Litigation, No. 352-242403-09, District Court of Tarrant County, Texas, 352nd Judicial District (2010) (affidavit on fees)

The Board of Trustees of the Southern California IBEW-NECA Defined Contribution Plan v. Bank of New York Mellon, Civil Action No. 09-Cv-06273, Southern District of New York (2011) (declaration on certification)

Iorio v. Asset Marketing Systems, Inc., Case No.: 05-CV-0633-JLS (CAB), Southern District of California (2011) (declaration in fees)

Villaflor v. Equifax Information Services, LLC, Case No.: 3:09-cv-00329-MMC, Northern District of California (2011) (declaration on fees)

Feely v. Allstate Insurance Company, Case No. CV-2004-294-3A, Circuit Court of Miller County, Arkansas (2011) (affidavit on settlement and fees)

Keegan v. American Honda Motor Co., Inc., Case Number: 2:10-cv-09508-MMM-AJW, United States District Court for the Central District of California (2011) (declaration on certification)

Compusource Oklahoma v. BNY Mellon, N.A., Case No: CIV 08-469-KEW, United States District Court for the Eastern District of Oklahoma (2011) (declaration on certification)

ABN Amro Bank v. Dinallo, Index No.: 601846/09 (New York State Supreme Court) (declaration and deposition on corporate restructuring/administrative law issue)

In re Checking Account Overdraft Litigation, Case No.: 1:09-MD-02036-JLK, United States District Court for the Southern District of Florida (2012) (Bank of America case; declaration and supplemental declaration on fees)

In re Checking Account Overdraft Litigation, Case No.: 1:09-MD-02036-JLK, United States District Court for the Southern District of Florida (2012) (Bank of Oklahoma case; declaration on fairness of settlement and fees)

In re Cell Therapeutics Inc. Securities Litigation, Master Docket No. C10-414 MJP, United States District Court for the Western District of Washington (2012) (declaration on fees)

In Re: Oil Spill by the Oil Rig "Deepwater Horizon" in the Gulf of Mexico, on April 20, 2010, MDL NO. 2179, Eastern District of Louisiana (2012) (declarations on economic and medical benefits class settlements)

Freudenberg v. eTrade Financial Corporation, Case No.: 07-CV-8538, United States District Court for the Southern District of New York (2012) (declaration on fees)

LaCour v. Whitney Bank, Case No. 8:11-cv-1896-VMC-MAP (United States District Court for the Middle District of Florida (2012) (declaration on settlement and fees)

In re Checking Account Overdraft Litigation, Case No.: 1:09-MD-02036-JLK, United States District Court for the Southern District of Florida (2012) (Union Bank case; declaration on fees)

Smith v. American Bankers Insurance Company of Florida, Case No.: 2:11-cv-02113-PKH, Western District of Arkansas (2012) (declaration on class certification)

Blankenship v. RBS Citizens, N.A., Case No. 1:10-cv-22942-JLK, Southern District of Florida (2012) (declaration on fees)

Mazzadra, et al. v. TD Bank, N.A., Case No. 1:10-cv-21870-JLK, Southern District of Florida (2012) (declaration on fees)

In re Citigroup Inc. Securities Litigation, Case No. 07-civ-9901-SHS, Southern District of New York (2013) (declaration on fees)

Rubery v. E*Trade Financial Corporation, Case No. 07-CV-8612 (JPO), Southern District of New York (2013) (declaration and supplemental declaration on fees)

Chieftain Royalty Co. v. QEP Energy Co., Case No. 11-cv-00212-R (Western District of Oklahoma 2013) (declaration on fairness of settlement and fees)

Drummond v. Range Resources Corp., Case No. CJ-2010-510, District Court of Grady County, Oklahoma (2013) (declaration on fairness of settlement and fees)

Landman Partners Inc. v. Blackstone Group LP, Case No. 08 Civ. 3601 (HB)(FM), Southern District of New York (2013) (declaration on fees)

White v. Experian Information Solutions, Inc., Case No. 05-cv-1070 DOC, Central District of California (2013) (declaration on fees)

Berry v. LexisNexis Risk & Information Analytics Group, Inc., Case No. 3:11cv754, Eastern District of Virginia (2013) (declaration on fees)

Dyer v. Wells Fargo Bank, N.A., Case No. C-13 2858, Northern District of California (2014) (declaration on fees)

## Other Activities

Member, Board of Directors, American Law and Economics Association (1996-1999)

Member, Board of Advisors, The Independent Review (1996-present)

Member, Board of Advisors, Asian Institute of International Financial Law (2001-present)

Member, Editorial Advisory Board, Supreme Court Economic Review (1995-present)

Member, Editorial Advisory Board, The Brookings-Wharton Papers on Financial Policy (1997-present)

President, Section on Financial Institutions and Consumer Financial Services, American Association of Law Schools (1999)

President, Section on Business Associations, American Association of Law Schools (1995)

Member, Board of Contributors, American Bar Association Preview of Supreme Court Cases (1985-1993)

Consultant, Administrative Conference of the United States (1988-89; 1991-1992)

Board of Directors and Volunteer Listener, D.C. Hotline (1980-83)

## Awards

1992 Paul M. Bator Award for Excellence in Teaching, Scholarship and Public Service, from the Federalist Society for Law and Public Policy Studies

Languages

Reading knowledge of Spanish, French, and Italian.

Personal

Born October 17, 1950

Children Jason (b. 1986) and Forrest (b. 1987).

Shorter Works

Defusing The Banks' Financial Time Bomb: Without Tough Reforms, Writes Robert Pozen, We'll Probably Face An Ugly Repeat of Recent History (Business Week, March 11, 2010)

Why Interstate Banking is in the National Interest, Testimony Before the Subcommittee on Financial Institutions Supervision, Regulation and Deposit Insurance of the House Committee on Banking, Housing and Urban Affairs (September 29, 1993)

Challenging the Concept of the Common Law as a Closed System, Columbia Law School Report, Autumn, 1993 (with Norman Silber)

The Insurance Industry's Antitrust Exemption: A Longstanding Tradition Faces its Greatest Challenge, 1992-93 ABA Preview of Supreme Court Cases 198 (1993)

Shootout at the Escheat Corral, 1992-93 ABA Preview of Supreme Court Cases (1993)

Choices and Chances for Consumers, Legal Times, Oct. 12, 1992, at 29-30.

Impeachment Procedures: An Unexplored Territory in the Separation of Powers, 1992-93 ABA Preview of Supreme Court Cases 39 (1992)

An (Ex)changing of the Guard, 21 Journal of Legal Studies iii (1992)

Revisiting the Contingency Factor in Fee-Shifting Awards, 1991-92 ABA Preview of Supreme Court Cases 327 (1992)

The Foreign Sovereign Immunities Act and the Market for Public International Debt, 1991-92 ABA Preview of Supreme Court Cases 307 (1992)

Return of the Tenth Amendment?: Federal Control and State Autonomy over Low Level Radioactive Wastes, 1991-92 ABA Preview of Supreme Court Cases 284 (1992)

What are the Limits on Congressional Power to Influence Pending Cases?, 1991-92 ABA Preview of Supreme Court Cases 158 (1991)

RICO Standing for Securities Fraud: Does the Purchaser-Seller Rule of Rule 10b-5 Apply?, 1991-92 ABA Preview of Supreme Court Cases 155 (1991)

Banking and Investment: Introduction to UPA Index and Microfiche Collection (University Publications of America 1991)

Source of Strength in the Court: Can Bank Holding Companies be Required to Support Failing Subsidiary Banks?, 1991-92 ABA Preview of Supreme Court Cases 42 (1991)

Source of Strength: A Source of Trouble, Legal Times, September 30, 1991 (Special Supplement, pp. 22-25)

The Once and Future American Banking Industry, The American Enterprise (with Jonathan R. Macey)(1991)

The Former Stockholder as Plaintiff in Short-Swing Trading Cases, 1990-91 ABA Preview of Supreme Court Cases (1991)

Disposing of Demand Excuse in Derivative Litigation, 1990-91 ABA Preview of Supreme Court Cases (1991)

Up in the Air: Can Congress Require States to Appoint Members of Congress to State Agencies?, 1990-91 ABA Preview of Supreme Court Cases 294 (1991)

The Statute of Limitations under Rule 10b-5, 1990-91 ABA Preview of Supreme Court Cases (1991)

Tort Claims Against Federal Banking Agencies: New Hope For Shareholders and Officers of Failed Depository Institutions?, 1990-91 ABA Preview of Supreme Court Cases 94 (1991)

Punitive Damages Redux: If the Eighth Amendment Doesn't Apply, What About the Due Process Clause?, 1990-91 ABA Preview of Supreme Court Cases 47 (1990)

Quandaries of Causation: Proxy Solicitation in Freeze-Out Mergers, 1990-91 ABA Preview of Supreme Court Cases 57 (1990)

Racial Statesmanship, Legal Times S31 (July 23, 1990)

Eurodollars, Sovereign Risk, and the Liability of U.S. Banks for Deposits in Foreign Branches, 1989-90 ABA Preview of Supreme Court Cases 281 (1990)

When is a Note a Note?, 1989-90 ABA Preview of Supreme Court Cases 18 (1990)

Interstate Banking and the Commerce Clause, 1989-90 ABA Preview of Supreme Court Cases 168 (1990)

Federal Courts, Municipalities, and the Contempt Power, 1989-90 ABA Preview of Supreme Court Cases 37 (1989)

Shoe Could Still Drop on Issue of Punitive Damages, National Law Journal (August 21, 1989)

Punitive Damages and the Constitution, 1988-89 ABA Preview of Supreme Court Cases 391 (1989)

States, Bankruptcy and the Eleventh Amendment, 1988-89 ABA Preview of Supreme Court Cases 412 (1989)

Stockholders, Arbitration, and the Securities Act of 1933, 1988-89 ABA Preview of Supreme Court Cases 383 (1989)

Appropriations Riders, Nondisclosure Agreements, and the Separation of Powers, 1988-89 ABA Preview of Supreme Court Cases 375 (1989)

Judicial Appointments and the ABA: Business as Usual or Brand New World?, 1988-89 ABA Preview of Supreme Court Cases 379 (1989)

S & L Receiverships, State Law, and the Federal Courts, 1988-89 ABA Preview of Supreme Court Cases 255 (1989)

The Non-delegation Doctrine in Taxation: A Different Constitutional Calculus?, 1988-89 ABA Preview of Supreme Court Cases 261 (1989)

Bankruptcy, Tax Liens, and Post-Petition Interest, 1988-89 ABA Preview of Supreme Court Cases (1989)

Federal Courts, State Taxes: A Vexing Dilemma For the Enforcement of Civil Rights in a Federal System, 1989-90 ABA Preview of Supreme Court Cases 95 (1988)

Separation of Powers and the Sentencing Commission, 1988-89 ABA Preview of Supreme Court Cases 23 (1988)

Administering the Savings and Loan Crisis: New Problems for the FSLIC, 1988-89 ABA Preview of Supreme Court Cases (1988)

Federal Procurement and the Separation of Powers, 1988-89 ABA Preview of Supreme Court Cases 26 (1988)

Thinking About a Career in Law, 1988-89 Talbot's Student Planning Book 32 (1988)

Carl McGowan: A Great Judge Remembered, 56 George Washington Law Review 697 (1988)

Separation of Powers: The Independent Counsel Case Tests the Limits, 1987-88 ABA Preview of Supreme Court Cases 390 (1988)

Decisionmaking in Collegial Bodies, Judicature, April/May 1988

The FDIC, Bank Officers and the Due Process Clause, 1987-88 ABA Preview of Supreme Court Cases 326 (1988)

Farm Foreclosures in Bankruptcy, 1987-88 ABA Preview of Supreme Court Cases 199 (1988)

Equal Access to Justice and Government Litigation, 1987-88 ABA Preview of Supreme Court Cases 160 (1988)

The Time Value of Money in Bankruptcy Cases, 1987-88 ABA Preview of Supreme Court Cases 116 (1987)

Getting the Fee First?: Attorneys and the SSI Program 1987-88 ABA Preview of Supreme Court Cases 118 (1987)

The Farmer and the FDIC, 1987-88 ABA Preview of Supreme Court Cases 48 (1987)

Testing the Limits of Securities Fraud: Financial Gossip in the Court, 1987-88 ABA Preview of Supreme Court Cases 26 (1987)

Checks and Balances in the Twenty-First Century, 33 University of Chicago Law School Record 7 (1987)

Separation of Powers May Become Focus Over NSC, Legal Times, Dec. 15, 1986, at 15

If a Bank is a Broker, is a Brokerage a Branch? 1986-87 ABA Preview of Supreme Court Cases 65 (1986)

Attorney's Fees in the Supreme Court, American Bar Association Journal 40 (November, 1986)

The Contingency Factor in Attorney's Fees Reconsidered, 1986-87 ABA Preview of Supreme Court Cases 20 (1986)

Restitution and Bankruptcy in a Federal System, 1986-87 ABA Preview of Supreme Court Cases (1986)

Don't Limit Contingent Fees, Chicago Tribune, June 11, 1986

The Budget and the Separation of Powers: Gramm-Rudman in the Court, 1985-86 ABA Previews of Supreme Court Cases 359 (1986)

Keeping Attorneys Fees in Proportion, 1985-86 ABA Preview of Supreme Court Cases 325 (1986)

Must the Federal Government Pay Interest on Attorneys Fees Awards?, 1985-86 ABA Preview of Supreme Court Cases 241 (1986)

The Contingency Factor in Attorneys Fees Awards, 1985-86 ABA Preview of Supreme Court Cases 243 (1986)

The FCC as Cop: Forcing State Public Service Commissions to Obey Federal Agency Orders, 1985-86 ABA Preview of Supreme Court Cases 191 (1986)

Preemption, Public Utilities, and Power Over Telephone Rate-Setting, 1985-86 ABA Preview of Supreme Court Cases 187 (1986)

A Bank is a Bank is a Bank -- or is it?, 1985-86 ABA Preview of Supreme Court Cases 67 (1985)

Settlement Offers Conditioned on Waiver of Attorneys' Fees: A Legal and Ethical Dilemma Confronts the Court, 1985-86 ABA Preview of Supreme Court Cases 55 (1985)

Bankruptcy and the Environment: The Case of Hazardous Wastes, 1985-86 ABA Preview of Supreme Court Cases 25 (1985)

A Different Approach to Interstate Banking, American Banker (August 8, 1985)

The SEC as Censor: Is Banning an Investment Advice Newsletter a Prior Restraint of the Press?, 1984-85 ABA Preview of Supreme Court Cases 243 (1985)

Enforcing Federal Rights in State Courts, 1984-85 ABA Preview of Supreme Court Cases 277 (1985)

Interstate Banking and the Constitution, 1984-85 ABA Preview of Supreme Court Cases 364 (1985)

The "Sale of Business" Doctrine in the Supreme Court, 1984-85 ABA Preview of Supreme Court Cases 344 (1985)

Sale of Business Revisited: Does the Doctrine Apply to Partial Sales of Corporate Control, 1984-85 ABA Preview of Supreme Court Cases 347 (1985)

Six Cases Shape Business Law, American Bar Association Journal 124 (Jan. 1985)

Offers of Settlement in Civil Rights Cases Pose Attorneys' Fees Question, 1984-85 ABA Preview of Supreme Court Cases 105 (1984)

Using Bankruptcy to Avoid Liability for Cleaning up Toxic Wastes, 1984-85 ABA Preview of Supreme Court Cases 36 (1984)

A Judicial Footnote Cemented the New Deal, Wall Street Journal, September 13, 1984

May Bank Holding Companies Provide Discount Brokerage Savings?, 1984-85 ABA Preview of Supreme Court Cases 575 (1984)

Blum v. Stenson: Fundamental Questions About Attorneys' Fees Awards to Public Interest Lawyers, 1984-85 ABA Preview of Supreme Court Cases 301 (1984)

Myths on the Midway, 30 Chicago Law School Record 13 (1984)

Smith v. Robinson: Another Step Towards Solving the Attorneys' Fees Puzzle? 1983-84 ABA Preview of Supreme Court Cases 437 (1984)

Securities Industry Association v. Board of Governors: Can Banks Distribute Commercial Paper? 1983-84 ABA Preview of Supreme Court Cases 425 (1984)

The "7-Eleven" Case: Arbitration v. Litigation in a Federal System, 1983-84 ABA Preview of Supreme Court Cases 161 (1983)

The Bildisco Case: Reconciling Federal Bankruptcy and Labor Policies, 1983-84 ABA Preview of Supreme Court Cases 169 (1983)

The "Daily Income Fund" Case: What Role Should a Mutual Fund's Board of Directors Play in Disputes over Investment Advisor Fees, 1983-84 ABA Preview of Supreme Court Cases 107 (1983)

Pulliam v. Allen: Should State Judges who Act Unconstitutionally Pay the Plaintiff's Attorneys' Fees?, 1983-84 ABA Preview of Supreme Court Cases 115 (1983)

"Shortsighted" Bill Proposes D.C. Court Divestiture, Legal Time of Washington, August 16, 1982

The Tax Bill May Be Unconstitutional, Baltimore Sun, August 16, 1982 (with Donald N. Bersoff)

## Appendix B: Case Materials Reviewed

1.     Consolidated and Amended Class Action Compliant

2.     Answer to Consolidated and Amended Class Complaint

3.     Ruling on Motion to Dismiss

4.     Plaintiffs' Motion for Class Certification

5.     Defendant's Opposition to Motion for Class Certification

6.     Plaintiffs' Reply in Further Support of Motion for Class Certification

7.     Defendant's Sur-Reply in Opposition to Motion for Class Certification

8.     Plaintiffs' Response to Defendant's Sur-Reply

9.     Ruling on Motion for Class Certification

10.     USF Petition for Review Pursuant to Federal Rule 23(f)

11.     Respondents' Answer to Petition for Permission to Appeal Order Granting Class Certification

12.     Reply in Support of Petition for Review Pursuant to Federal Rule of Civil Procedure 23(f)

13.     Order Granting USF's Petition for Review Pursuant to Federal Rule of Procedure 23(f)

14.     Brief for Defendant-Appellant

15.     Brief for Plaintiffs-Appellees

16.     Reply Brief for Defendant-Appellant

17.     Supplement Authority Letters to Clerk of Court

18.     Second Circuit Opinion on 23(f) Appeal

19.     USF Petition for a Writ of Certiorari

20. Brief in Opposition to Petition for Writ of Certiorari

21. USF's Reply Brief in Support of Petition for Writ of Certiorari

22. Order Denying Petition for Writ of Certiorari

23. Order to Show Cause

24. USF's Memorandum of Law in Response to the Court's April 23, 2013 Order to Show Cause

25. Plaintiffs' Memorandum of Law Pursuant to the Court's April 23, 2013 Order to Show Cause

26. Plaintiffs' Responsive Brief Pursuant to the Court's Order to Show Cause Why White & Case LLP Should Not Be Disqualified from Continuing to Represent USF in this Case

27. USF's Opposition to Plaintiffs' Memorandum of Law Pursuant to the Court's Order to Show Cause

28. USF's Supplemental Submission Regarding Privilege Log Entires in Further Response to the Court's Order to show Cause

29. Plaintiffs' Motion to Supplement the Record of the Court's Order to Show Cause with the Deposition Testimony of Timothy Lee

30. USF's Response to Plaintiffs' Motion to Supplement the Record of the Court's Order to Show Cause

31. Plaintiff's Motion to Compel USF to Produce its Index of Documents Produced in Government Investigations and Related Cases

32.   Motion to Supplement the Record and for Fees, Costs and Other Relief
      Associated with Plaintiffs' Applications for Issuance of letter of Request Pursuant
      to the Hague Evidence Convention

33.   Motion to Enforce Judgment Compelling USF to Produce Electronic Data and for
      Attorney's Fee and Costs

34.   Consent Motion for Preliminary Approval of Class Settlement and Form and
      manner of Class Notice and for Issuance of a Settlement Scheduling Order

35.   Exhibit A: Proposed Settlement Agreement

36.   Exhibit B: Short Form Notice

37.   Exhibit C: Long Form Notice

38.   Order Granting Preliminary Approval

## **Appendix C: Surveys and Analyses Reviewed**

1.  Brian Fitzpatrick, An Empirical Study of Class Action Settlements and Their Fee Awards, 7 J. Empirical L. Stud. 811 (2010)

2.  Theodore Eisenberg & Geoffrey Miller, "Attorney Fees and Expenses in Class Action Settlements: 1993-2008," 7 Journal of Empirical Studies 248-281 (2010) ("Eisenberg & Miller 2010")

3.  Theodore Eisenberg & Geoffrey Miller, "Attorneys' Fees in Class Action Settlements: An Empirical Study," 1 Journal of Empirical Legal Studies 27 (2004)

4.  Theodore Eisenberg, Geoffrey Miller & Michael Perino, A New Look at Judicial Impact: Attorneys' Fees in Securities Class Action After *Goldberger v. Integrated Resources, Inc.*, 29 Washington University Journal of Law & Policy 5 (2009)

5.  Logan, Stuart J., Moshman, Jack & Moore, Beverly C., Jr., Attorney Fee Awards In Common Fund Class Actions, 24 Class Action Rep. 167 (2003)

6.  Kolz, Amy, "Bankruptcy Rates Top $1,000 Mark In 2008-09." Weblog. The Am Law Daily. 12 Dec 2009, available at http://www.law.com/jsp/law/LawArticleFriendly.jsp?id=1202436371636

7.  National Law Journal, "A Nationwide Sampling of Law Firm Billing Rates." Weblog. The National Law Journal. 19 Dec 2011, available at http://www.law.com/jsp/nlj/PubArticleNLJ.jsp?id=1202535946626

8.  National Law Journal, "A Nationwide Sampling of Law Firm Billing Rates." Weblog. The National Law Journal. 6 Dec 2010, available at http://www.law.com/jsp/nlj/PubArticleNLJ.jsp?id=1202475713526&slreturn=1

9.  National Law Journal, "A Nationwide Sampling of Law Firm Billing Rates." Weblog. The National Law Journal. 7 Dec 2009, available at http://www.law.com/jsp/nlj/PubArticleNLJ.jsp?id=1202436068099

10.  National Law Journal, "A Nationwide Sampling of Law Firm Billing Rates." Weblog. The National Law Journal. 8 Dec 2008, available at http://www.law.com/jsp/nlj/PubArticleNLJ.jsp?id=1202436055916&hbxlogin=1

11.  National Law Journal, "A Nationwide Sampling of Law Firm Billing Rates." Weblog. The National Law Journal. 10 Dec 2007, available at http://www.law.com/jsp/nlj/PubArticlePrinterFriendlyNLJ.jsp?id=1197021870294

12.  Richard M. Phillips & Gilbert C Miller, The Private Securities Litigation Reform Act of 1995: Rebalancing Litigation Risks and Rewards for Class Action Plaintiffs, Defendants and Lawyers, 51 BUS. LAW. 1009, 1029 & n.131 (1996)

13.  Bower, Ward. Pricing Legal Services. Report to Legal Management. Newtown Square: Altman Weil, Inc., 2004, available at www.altmanweil.com/.../ce653539-fd49-4cfa-a6fe-2c68136304c3_document.pdf

14.  Brennan, William. New Survey Focuses on Law Firm Economics. Report to Legal Management. Newtown Square: Altman Weil, Inc., 2008, available at www.altmanweil.com/.../41ff6ad2-da67-406e-9999-ca2aaae63539_document.pdf

15.  Ellen M. Ryan & Laura E. Simmons, Securities Class Action Settlements: 2009 Review and Analysis (Cornerstone Research 2010)

16.  Ellen M. Ryan & Laura E. Simmons, Securities Class Action Settlements – 2011 Review and Analysis, (Cornerstone Research, 2012), available at http://www.cornerstone.com/files/Publication/a0e54ba8-2830-4c00-9481-108208ec4ed8/Presentation/PublicationAttachment/f03e4174-ec8a-4eb3-ba22-19bd5162f09e/Cornerstone_Research_Settlements_2011_Analysis.pdf

17.  Thomas E. Willging, Laura L. Hooper & Robert J. Niemic, Empirical Study of Class Actions in Four Federal District Courts; Final Report to the Advisory Committee on Civil Rules 69 (Federal Judicial Center 1996)

18.  Elaine Buckberg, Todd Foster, and Stephanie Plancich, Recent Trends in Securities Class Action Litigation: 2003 Early Update (NERA Feb. 2004), available at http://www.nera.com/extImage/NERA_Recent_Trends_2003_Early_Update.pdf_

19.  Jordan Milev et al., Recent Trends in Securities Class Action Settlements – 2011 Year-End Review, available at http://www.nera.com/nera-files/PUB_Trends_Year-End_1211_final.pdf

20.  Alex Vorro, Law Firm Billing Rates Steadily Climbing Despite Down Economy, Inside Counsel, Apr. 17, 2012, available at http://www.insidecounsel.com/2012/04/17/law-firm-billing-rates-steadily-climbing-despite-d

21.  Ronald I. Miller, Ph.D., Todd Foster, Elaine Buckberg, Ph.D., Recent Trends in Shareholder Class Action Litigation: Beyond the Mega-Settlement, Is Stabilization Ahead? (NERA Apr. 2006)

22.  Valeo Attorney Hourly Rates and Fees Database, 2010, available at http://www.valeopartners.com/reports.html