# EXHIBIT  "3"

IN THE UNITED STATES DISTRICT COURT

FOR THE EASTERN DISTRICT OF LOUISIANA

UNITED STATES OF AMERICA                    :

               v.                                   :          CRIMINAL NO.

BP EXPLORATION & PRODUCTION, INC.           :

## GUILTY PLEA AGREEMENT

Pursuant to Rule 11(c)(1)(C) of the Federal Rules of Criminal Procedure, and in compliance with the holding of Bryan v. United States, 492 F.2d 775 (5th Cir. 1974), the Department, the defendant, and the defendant's counsel enter into the following guilty plea agreement.   Any reference to the Department in this agreement shall mean the United States Department of Justice, including, but not limited to, the *Deepwater Horizon* Task Force, the Criminal Division of the Department of Justice and all of the Criminal Division's sections, and all of the United States Attorney's Offices for each judicial district of the United States.

       1.      The defendant agrees to waive prosecution by indictment and plead guilty to an information charging it with: eleven counts of violations of 18 U.S.C. § 1115 (Misconduct or Neglect of Ship Officers), one count of a violation of 18 U.S.C. § 1505 (Obstruction of Congress), one misdemeanor count of a violation of 33 U.S.C. §§ 1319(c)(1)(A) & 1321(b)(3) (Clean Water Act), and one misdemeanor count of a violation of the 16 U.S.C. §§ 703 and 707(a) (Migratory Bird Treaty Act), all arising from the defendant's conduct relating to the *Deepwater Horizon* blowout, explosion, oil spill and response.   The defendant agrees to the factual allocution contained in Exhibit A to this plea agreement.

1

2.      The defendant, BP plc and any other BP plc entity, including but not limited to any former, present or future parent, affiliate, division and subsidiary (collectively, "any other BP plc entity" or "the other BP plc entities"), and all predecessors, successors and assigns of any of the above, agree to cooperate fully and truthfully with the *Deepwater Horizon* Task Force in any criminal investigation related to or arising from the *Deepwater Horizon* blowout, explosion, oil spill and response.   Cooperation shall include but not be limited to (a) promptly disclosing any and all related criminal or potentially criminal conduct of which the defendant, BP plc or any other BP plc entity are currently aware, (b) promptly producing documents to the *Deepwater Horizon* Task Force upon request, (c) promptly making employees and agents available to the *Deepwater Horizon* Task Force upon request for interview or for testimony in any proceeding, subject to those employees' and agents' own legal rights, and (d) making reasonable efforts to ensure its employees and agents provide full and truthful information; provided, however, that compliance with this paragraph shall not be construed as requiring or affecting a waiver of the attorney-client privilege or work product protections.

3.      The defendant understands, agrees, and has had explained to it by counsel that the Court may impose the following statutory maximum sentences:

(a)      Counts One through Eleven, 18 U.S.C. § 1115 (Misconduct or Neglect of Ship Officers), for each count:

(i)      A fine of $500,000 or twice the gross gain or loss, whichever is greater;

(ii)      Five years of probation; and

(iii)      A $400 special assessment;

2

      (b)    Count Twelve, 33 U.S.C. §§ 1319(c)(1)(A) & 1321(b)(3) (Clean Water Act):

          (i)    A fine of $200,000, or $25,000 per day of the violation, or twice the gross gain or loss, whichever is greater;

          (ii)   Five years of probation; and

          (iii)  A $125 special assessment;

      (c)    Count Thirteen, 16 U.S.C. §§ 703 and 707(a) (Migratory Bird Treaty Act):

          (i)    A fine of $15,000 or twice the gross gain or loss, whichever is greater;

          (ii)   Five years of probation; and

          (iii)  A $50 special assessment;

      (d)    Count Fourteen, 18 U.S.C. § 1505 (Obstruction of Congress):

          (i)    A $500,000 fine;

          (ii)   Five years of probation; and

          (iii)  A $400 special assessment;

4.      The parties agree that this plea agreement is made pursuant to Rule 11(c)(1)(C) of the Federal Rules of Criminal Procedure and that the following specific sentence is the appropriate disposition of this case.   If the Court rejects this plea agreement, it is further agreed that the defendant may withdraw its plea.   If acceptable to the Court, the parties agree to waive the presentence investigation and report pursuant to Fed. R. Crim. P. 32(c), and to request that the

:

defendant be sentenced at the time the guilty plea is entered.   The agreed-upon sentence pursuant to Rule 11(c)(1)(C) is as follows:

(a) Payment of criminal recoveries totaling $4 billion ($4,000,000,000), as set forth below in paragraphs 4(b) and 4(c)(viii).

(b) Payment of criminal fines totaling $1.256 billion ($1,256,000,000), as follows:

(i) Fine allocation.   The fine payments shall be allocated as follows:

(A) As to Counts One through Eleven, the maximum statutory fine pursuant to 18 U.S.C. § 3571(c) of $500,000 per count shall be paid, totaling $5.5 million.

(B) As to Count Twelve, a total of $1.15 billion ($1,150,000,000) shall be paid to the Oil Spill Liability Trust Fund, pursuant to 33 U.S.C. §§ 1319(c)(1)(A) and 1321(b)(3), 18 U.S.C. § 3571(d) and 26 U.S.C. § 9509(b)(8).

(C) As to Count Thirteen, a total of $100 million ($100,000,000) shall be paid to the North American Wetlands Conservation Fund, pursuant to 16 U.S.C. §§ 703, 707 and 4406(b) and 18 U.S.C. § 3571(d), for

4

the purpose of wetlands restoration and conservation projects located in States bordering the Gulf of Mexico or otherwise designed to benefit migratory bird species and other wildlife and habitat affected by the Macondo oil spill.

(D) As to Count Fourteen, the maximum statutory fine of $500,000, pursuant to 18 U.S.C. § 3571(c), shall be paid.

(ii) Schedule. The fines shall be paid according to the following schedule:

(A) As to Counts One through Eleven and Fourteen, all fines shall be paid within 60 days of sentencing.

(B) As to Counts Twelve and Thirteen, fines shall be paid on a pro rata basis as follows: $250 million to be paid within 60 days of sentencing; an additional $250 million to be paid within one year of sentencing; an additional $250 million to be paid within two years of sentencing; an additional $150 million to be paid within three years of sentencing; an additional $150 million to be paid within four years of sentencing; and the remainder to be paid within five years of sentencing.

5

(c)     A statutory-maximum term of five years of probation.   Probation shall include the following mandatory and discretionary special conditions, pursuant to 18 U.S.C. §§ 3563(a) and (b):

       (i)     The defendant shall not commit another federal, state, or local crime.

       (ii)    The defendant shall notify the probation officer within seventy-two hours of any criminal prosecution against the defendant.

       (iii)   The defendant shall answer truthfully all inquires by the probation officer.

       (iv)    The defendant shall provide to the probation officer full access to any of the defendant's business operating locations.

       (v)     The defendant shall give ten days' prior notice to the probation officer of any intended change in principal business location or mailing address.

       (vi)    The defendant shall notify the Court and the probation officer of any material change in the defendant's economic circumstances that might affect the defendant's ability to pay the fines and other financial obligations set forth herein.

       (vii)   The defendant shall pay the fines set forth in paragraph 4(b) above.

       (viii)  Pursuant to 18 U.S.C. § 3563(b)(22), an order, attached

6

bereto as Exhibit B, shall be entered.  The terms of the order shall be enforceable as additional special conditions of probation.

The parties agree and stipulate that the specific discretionary terms of probation enumerated herein are appropriate, and further agree that no additional discretionary terms of probation should be imposed.   The defendant, BP plc and any other BP plc entity shall not capitalize into inventory or basis or take as a tax deduction, in the United States or elsewhere, any portion of the monetary payments made pursuant to this plea agreement.   The defendant, BP plc and any other BP plc entity shall not reference this plea agreement and any payments pursuant hereto or other compliance herewith in any public relations, marketing or advertising; provided, however, that the defendant, BP plc and any other BP plc entity shall be permitted to make required disclosures under applicable securities laws.   The defendant further agrees that payments made pursuant to paragraph 4(c)(viii) above shall have no effect on, and shall not be argued by the defendant, BP plc or any other BP plc entity, to reduce in any way, any civil claims by any party arising out of the *Deepwater Horizon* blowout, explosion, oil spill and response, including but not limited to natural resource damage claims.

(d)     The defendant further agrees to pay the special assessments, totaling $4,975, before the time of sentencing and shall provide a receipt from the Clerk to the Department before sentencing as proof of this payment.

(e)     The defendant shall pay any mandatory restitution specified in 18 U.S.C. § 3663A(b)(3), to the extent applicable, to the Clerk of the Court for the benefit of

7

the families or other designated representatives of the eleven men who died onboard the *Deepwater Horizon*. Restitution is not otherwise authorized for certain offenses in the plea agreement and, pursuant to 18 U.S.C. § 3663(a)(1)(B)(ii), is not otherwise appropriate because (i) restitution need not be addressed in this matter given that compensation for victims has been or is being addressed in other proceedings, including in MDL-2179 and (ii) fashioning of any restitution order would unduly complicate and prolong the sentencing process.

5.      The defendant stipulates that there is a factual basis for the imposition of a criminal fine in the amount of $1,256,000,000 pursuant to 18 U.S.C. § 3571(d) and that the payments made pursuant to paragraphs 4(b) and 4(c)(viii) do not together exceed the statutory-maximum fine available under that statute. The defendant hereby waives any right to jury or bench trial as to those payments.

6.      The defendant will acknowledge acceptance of this plea agreement by the signature of its counsel and shall provide to the Department, as Exhibit C hereto, a certified resolution of the Board of Directors of BP Exploration and Production, Inc. authorizing the defendant to enter a plea of guilty and authorizing an agent to execute this agreement. The defendant will further provide to the Department, as Exhibit D hereto, a certified resolution of the Board of Directors of BP plc providing as follows:

(a)      BP plc and other BP plc entities shall be bound by those specific terms of this agreement that expressly apply to BP plc and other BP plc entities. BP plc shall secure and deliver to the Department from both BP Corporation North America Inc. ("BPCNA") and BP plc guarantees for all payments due from the defendant under this

8

:

agreement, with BPCNA as the primary guarantor and BP plc as the secondary guarantor in the event of a default by BPCNA.   BP plc and BP BPCNA consent to the jurisdiction of U.S. courts solely for purposes of enforcing the guarantees.   Any legal successor or assign of BPCNA or BP plc shall remain liable, as the case may be, for the guarantee of defendant's payment obligations hereunder, and an agreement to so remain liable shall be included by BPCNA or BP plc, respectively, in the terms of any sale, acquisition, or merger of those entities.   Any legal successor or assign of defendant shall remain liable for defendant's obligations in this plea agreement, and an agreement to so remain liable shall be included by defendant in the terms of any sale, acquisition, or merger of defendant.

(b)   The defendant, BP plc and other BP plc entities waive any statute of limitations as of the date of this agreement through the full term of defendant's probation and until all of the defendant's obligations under this agreement have been satisfied with regard to any conduct relating to or arising out of the *Deepwater Horizon* blowout, explosion, oil spill and response.

7.   The Department agrees that, subject to paragraph 2 of this agreement, the Department shall not further prosecute the defendant, BP plc or any other BP plc entity, including all predecessors, successors and assigns of any of the above, for any conduct regarding any matters under investigation by the *Deepwater Horizon* Task Force relating to or arising out of the *Deepwater Horizon* blowout, explosion, oil spill and response.   This agreement shall not apply to individuals.   Should a court determine that the defendant has breached this agreement, the defendant will not be entitled to withdraw its plea of guilty, and the Department may prosecute the defendant, BP plc and any other BP plc entity, and any predecessors, successors and assigns of any

9

of the above, for any conduct relating to or arising out of the *Deepwater Horizon* blowout, explosion, oil spill and response, notwithstanding the expiration of any applicable statute of limitations following the signing of this plea agreement.   In any such prosecution, the Department may use the defendant's admissions of guilt as admissible evidence against the defendant, BP plc and any other BP plc entity.

8.      The Department agrees that, if requested to do so, it will advise any appropriate suspension or debarment authority that, in the Department's view, the defendant has accepted criminal responsibility for its conduct relating to the Deepwater Horizon blowout, explosion, oil spill and response by virtue of this guilty plea, and that BP is obligated pursuant to this agreement to cooperate in any ongoing criminal investigation by the Department relating to the Deepwater Horizon blowout, explosion, oil spill and response.   Nothing in this agreement limits the rights and authority of the United States of America to take further civil or administrative action against the defendant including but not limited to any listing and debarment proceedings to restrict rights and opportunities of the defendant to contract with or receive assistance, loans and benefits from United States government agencies.

9.      In exchange for the undertakings made by the Department in entering this plea agreement, the defendant voluntarily and expressly waives all rights to appeal or collaterally attack the defendant's conviction, sentence, or any other matter relating to this prosecution, whether such a right to appeal or collateral attack arises under 18 U.S.C. § 3742, 28 U.S.C. § 1291, 28 U.S.C. § 2255, or any other provision of law.

10.    The defendant waives any claim under the Hyde Amendment, 18 U.S.C.
§ 3006A (Statutory Note), for attorney's fees and other litigation expenses arising out of the
investigation or prosecution of this matter.

11.    The defendant waives all rights, whether asserted directly or by a
representative, to request or receive from any department or agency of the United States any
records pertaining to the criminal investigation or prosecution of this criminal case, including
without limitation any records that may be sought under the Freedom of Information Act, 5 U.S.C.
§ 552, or the Privacy Act, 5 U.S.C. § 552a.

12.    The defendant is satisfied with the legal representation provided by the
defendant's lawyer; the defendant and its lawyer have fully discussed this plea agreement; and the
defendant is agreeing to plead guilty because the defendant admits that it is guilty.

13.    Both parties agree that the parties' guilty plea agreement contains no
additional promises, agreements, or understandings other than those set forth in this written guilty

plea agreement, and that no additional promises, agreements, or understandings will be entered into unless in writing and signed by all parties.

JIM LETTEN                                    LANNY A. BREUER
United States Attorney                        Assistant Attorney General
Eastern District of Louisiana                 Criminal Division

JOHN D. BURETTA, Director
DEREK A. COHEN, Deputy Director
Deepwater Horizon Task Force

BP EXPLORATION AND PRODUCTION, INC., BP plc and BP Corporation
North America Inc.

BY:   MARK FILIP and JOSEPH WARIN, PC
Counsel for BP Exploration and Production, Inc., BP plc and BP Corporation North
America Inc.

Date:   November 15, 2012

12

# Exhibit A

## Exhibit A

Defendant BP Exploration & Production, Inc. ("BP") agrees that, if the case were to proceed to trial, the Government could establish beyond a reasonable doubt that:

At all relevant times, BP resided in, and engaged in regular business throughout, the states bordering the Gulf of Mexico, including in the Eastern District of Louisiana.  On or about April 20, 2010, BP was the leaseholder and operator of the Macondo Well located off the coast of Louisiana.  In this capacity, BP, as the designated operator under BOEMRE regulations, was ultimately responsible for conducting operations at Macondo in a way that ensured the safety and protection of personnel, equipment, natural resources, and the environment.  BP hired Transocean, Ltd., the owner of the drilling rig *Deepwater Horizon*, a vessel, to provide the rig and drilling crew to implement BP's drilling plan for the Macondo Well.  Transocean was also responsible for conducting safe operations and for protecting personnel onboard.  At all times relevant to the Information, the *Deepwater Horizon* was temporarily attached to and erected on the seabed of the Outer Continental Shelf in the Gulf of Mexico to explore and develop resources from the Outer Continental Shelf, to wit: oil and natural gas.

BP's responsibility as the leaseholder and operator of the Macondo Well and Transocean's responsibility as the rig owner imposed on each a duty to insure that the negative pressure test performed prior to temporarily abandoning the well was done safely, in accordance with the standard of care applicable in the deepwater oil exploration industry.  On the night of the explosion, BP had two Well Site Leaders on the *Deepwater Horizon*, who were BP's employees, agents, and highest-ranking representatives on the rig.  The Well Site Leaders were responsible for supervising the negative pressure test conducted by Transocean.

On or about April 20, 2010, between approximately 5:00 and 8:00 p.m. Central Daylight Time, the negative pressure test performed on the Macondo Well provided multiple indications that the wellbore was not secure. BP's Well Site Leaders negligently supervised the negative pressure test during this time, failed to alert engineers on the shore of these indications, and, along with others, ultimately deemed the negative pressure test a success, all in violation of the applicable duty of care. The negligent conduct of BP's Well Site Leaders is attributable to BP.

BP's negligent conduct, among others, was a proximate cause of the deaths of eleven men and pollution resulting from the Macondo Well blowout. As a result of this negligent supervision and decision-making, BP and the Transocean rig crew proceeded with removing drilling mud from the Macondo well until it became so underbalanced that natural gas and oil migrated through the well, up through the riser, and onto the rig floor. This migration of natural gas and oil in turn caused multiple explosions and a fire which burned for two days, and resulted in the *Deepwater Horizon* sinking on or about April 22, 2010.

On or about April 20, 2010, in the Eastern District of Louisiana and elsewhere, BP, being a charterer of a vessel, to wit: the *Deepwater Horizon*, engaged in neglect through which the lives of the following persons were destroyed: Jason Christopher Anderson; Aaron Dale Burkeen; Donald Neal Clark; Stephen Ray Curtis; Gordon Lewis Jones; Roy Wyatt Kemp; Karl Dale Kleppinger Jr.; Keith Blair Manuel; Dewey Allen Revette; Shane Michael Roshto; and Adam Taylor Weise, in violation of Title 18, United States Code, Section 1115.

On or about April 20, 2010, in the Eastern District of Louisiana and elsewhere, BP did negligently discharge and cause to be discharged oil in connection with activities under the Outer Continental Shelf Lands Act and which may have affected natural resources belonging to, appertaining to, and under the exclusive management authority of the United States, in such

quantities as may be harmful in violation of Title 33, United States Code, Sections 1319(c)(1)(A) and 1321(b)(3).

On or about and between April 20, 2010, and December 31, 2010, in the Eastern District of Louisiana and elsewhere, BP did unlawfully kill and cause to be killed one or more migratory birds, including Brown Pelicans, Laughing Gulls, Northern Gannets, and other protected species, when defendant negligently discharged and caused to be discharged oil from the Macondo well.

All in violation of Title 16, United States Code, Sections 703 and 707(a).

On or about May 24, 2010, in the Eastern District of Louisiana and elsewhere, BP did corruptly, that is, with an improper purpose, endeavor to influence, obstruct, and impede the due and proper exercise of the power of inquiry under which an inquiry and investigation was being had by a Committee of the United States House of Representatives into the amount of oil flowing from the Macondo Well ("flow rate") through the following omissions and false and misleading statements in its May 24, 2010 response ("Markey Response") to the Committee on Energy and Commerce:

1. BP, through a former vice president, withheld information and documents relating to multiple flow-rate estimates prepared by BP engineers that showed flow rates far higher than 5,000 BOPD, including as high as 96,000 BOPD.

2. BP, through a former vice president, withheld information and documents relating to internal flow-rate estimates he prepared using the Bonn Agreement analysis, that showed flow rates far higher than 5,000 BOPD, and that went as high as 92,000 BOPD.

3. BP, through a former vice president, falsely represented that the flow-rate estimates included in the Response were the product of the generally-accepted ASTM methodology. At the time that this false representation was made, BP's former vice president knew that those estimates were the product of a methodology he devised after, among other things, a review of a Wikipedia entry about oil spill estimation.

4. BP, through a former vice president, falsely represented that the flow-rate estimates included in the Markey Response had played "an important part" in Unified Command's decision on April 28, 2010, to raise its own flow-rate estimate to 5,000 BOPD. At the time this false representation was made, BP's former vice president knew that those flow-rate estimates had not played "an important part" in Unified Command's decision to raise its flow-rate estimate and had not even been distributed outside of BP prior to that decision.

5. BP falsely suggested, in its May 24, 2010 letter, that the Unified Command's flow rate estimate of 5,000 barrels of oil per day ("BOPD") was the "most scientifically informed judgment" and that subsequent flow rate estimates had "yielded consistent results." In fact, as set forth above, BP had multiple internal documents with flow rate estimates that were significantly greater than 5,000 BOPD that it did not share with the Unified Command.

6. On or about June 25, 2010, in a BP letter to Congressman Markey, BP's former vice president inserted language that falsely stated that BP's worst case discharge estimate was raised from 60,000 BOPD to 100,000 BOPD after subsequent "pressure data was obtained from the BOP stack." At the time this false representation was made, BP's former vice president knew that the 100,000 BOPD figure was not first derived after

subsequent pressure data had been obtained, but instead, he had been aware of a

100,000 BOPD worst case discharge since as early as on or about April 21, 2010.

BP's former vice president's knowledge and actions are attributable to BP.

All in violation of Title 18, United States Code, Section 1505.

# Exhibit B

:

## UNITED STATES DISTRICT COURT
### FOR THE EASTERN DISTRICT OF LOUISIANA

| | | |
|---|---|---|
| UNITED STATES OF AMERICA | * | |
| | * | |
| v. | * | |
| | * | Case No. _____ |
| BP EXPLORATION & | * | |
| PRODUCTION, INC. | * | |
| | * | |
| | * * * | |

### ORDER

Pursuant to 18 U.S.C. § 3563(b)(22), IT IS HEREBY ORDERED:

#### Monitors

1. **Retention of Monitors and Duties:**

   a. *Process Safety Monitor:* The defendant shall retain, subject to approval by the Assistant Attorney General, Criminal Division, Department of Justice ("DOJ"), or his/her designee, a process safety monitor who shall be experienced in process safety and risk management and familiar with complex industrial operations such as deepwater oil and gas drilling (hereinafter the "Process Safety Monitor"). The Process Safety Monitor's duties will be to review, evaluate and provide recommendations for the improvement of defendant's process safety and risk management procedures, including, but not limited to, the defendant's major accident/hazard risk review of drilling-related process safety barriers and mitigations, for the purpose of preventing future harm to persons, property and the environment resulting from deepwater drilling in the Gulf of Mexico by the defendant and its Affiliates. For the purposes of this Order, the term "Affiliates" shall mean any entity

- 1 -

controlled, directly or indirectly, by BP plc that participates in deepwater drilling in the Gulf of Mexico, whether such entity is in existence now or in the future. The Process Safety Monitor shall among other things participate in defendant's major accident/hazard risk review for drilling, intervention, and completion, including: reviewing of relevant materials, participating in meetings and other deliberations, and making suggestions on the strength and effectiveness of the risk mitigation and prevention measures, and changes in such measures.

b. *Ethics Monitor:* The defendant shall retain, subject to approval by the Assistant Attorney General, Criminal Division, DOJ, or his/her designee, an ethics monitor who shall be familiar with best practices with respect to corporate codes of conduct, including implementation, training and enforcement thereof (hereinafter the "Ethics Monitor"). The Ethics Monitor's duties will be to review and provide recommendations for improvement of BP plc's Code of Conduct and its implementation and enforcement for the purpose of preventing future criminal and ethical violations with respect to dealings with regulatory and enforcement authorities by the defendant and Affiliates, including, but not limited to, violations related to the conduct giving rise to the Information filed in this matter. In the event that any federal suspension and debarment authority requires a monitor with responsibilities related to ethics and compliance in any agreement with a suspension and debarment authority, the defendant may petition DOJ to have the Ethics Monitor replaced by (or have the duties combined with that of) such other monitor.

2. <u>Monitorship Scheduling and Compensation</u>:

  · a.  Within 60 calendar days after the Court imposes sentence (the "Effective Date"), the defendant shall forward to the Assistant Attorney General, Criminal Division, DOJ, or his/her designee, the names of no more than five proposed monitors ranked in order of preference as to each of the two categories of monitorships.  DOJ will promptly review and assess the defendant's proposals.  The defendant shall retain each monitor as soon as possible, but not later than 60 calendar days after the date that DOJ approves each such proposed monitor.

  b.  The monitorships shall exist for a period of four years from the date of the monitor's engagement unless earlier terminated pursuant to paragraph 4(f) herein.

  c.  Each monitor shall have the authority to employ personnel reasonably necessary, and with appropriate professional qualifications, to assist in the proper discharge of the monitor's duties, as specified herein.  The defendant shall have the opportunity to perform routine conflict checks on individuals or entities the monitor proposes to engage, and within two weeks of a proposed engagement, the defendant shall advise the monitor if any conflict exists.  Any disputes in this respect shall be decided by DOJ in its sole discretion.

  d.  The reasonable compensation and expenses of each monitor, and any persons hired by each monitor pursuant to his/her authority hereunder, shall be paid by the defendant.  Each monitor, and any persons hired by each monitor, shall be compensated in accordance with their typical hourly rates or a reasonable fee determined by the monitor based on applicable market rates.

- 3 -

3. <u>Powers of the Monitors</u>:

    a. Each monitor shall have the authority to take such reasonable steps as, in the monitor's view, may be necessary to be fully informed with respect to the monitor's duties.

    b. The defendant, BP plc and Affiliates shall cooperate fully with the monitors to allow each monitor to fulfill his or her respective duties under this Order, including providing each monitor with access to all information, documents, records, facilities and/or employees, as reasonably requested by the monitor.

    c. Each monitor shall maintain as confidential all non-public information, documents and records it receives from the defendant, subject to the monitor's reporting requirements herein. Each monitor shall take appropriate steps to ensure that any of his/her consultants or employees shall also maintain the confidentiality of all such non-public information.

    d. Should any monitor, or staff assisting any monitor in fulfilling his or her responsibilities, be provided access to materials ("Subject Materials") that may be protected by the attorney-client privilege or work product doctrine (or any other legally cognizable privilege or protection), the following conditions shall apply:

        i. Any provision of Subject Materials to a monitor pursuant to this order will not constitute waiver of any applicable privilege.

        ii. In the event the monitors or DOJ seeks disclosure of Subject Materials for any reason, the monitor shall provide the defendant with timely notice of its intention to do so.

     iii.Each monitor shall return all Subject Materials to defendant, BP plc, and Affiliates upon the date the respective monitor is finished using Subject Materials for the purpose of fulfilling his or her responsibilities.

4. <u>Monitors' Reviews and Reports</u>:

    a. Each monitor shall conduct an initial review and prepare an initial report, followed by up to three follow-up reviews and reports as described below. With respect to each review, whether initial or follow-up, after consultation with the defendant and DOJ, each monitor shall prepare a written work plan, which shall be submitted to the defendant and DOJ for review and comment no fewer than 60 calendar days prior to commencing each review. The defendant and DOJ shall provide comment no later than 30 calendar days after receipt of the written work plan. The monitors' work plans for the initial review shall include such steps as are reasonably necessary to conduct an effective initial review. In developing each work plan and in carrying out the reviews pursuant to such plans, the monitors are encouraged to coordinate with the defendant. Any disputes between the defendant and the monitors with respect to the work plan shall be decided by DOJ in its sole discretion.

    b. Each monitor's initial review shall commence no later than 120 calendar days from the date of the engagement of the monitor, unless otherwise agreed between the defendant, the respective monitor and DOJ.

    c. Each monitor shall issue a written report within 120 calendar days of completing the initial review setting forth the monitor's assessment and making recommendations reasonably designed to improve the effectiveness of the defendant's process safety and risk management as to deepwater drilling. Each written report shall set forth the

monitor's assessments, recommendations, and the reasons for the recommendations. The monitors are encouraged to consult with the defendant concerning the monitors' findings and recommendations on an ongoing basis. If a monitor identifies a potential violation of the law, the monitor shall promptly report the potential violation to the Probation Office, DOJ and the defendant. The monitors shall provide the written report to the Probation Officer, the Assistant Attorney General, Criminal Division, Department of Justice, or his/her designee, the Board of Directors of the defendant and the Board of Directors of BP plc. After consultation with the defendant, the monitors may extend the time period for issuance of the written report for up to 60 calendar days with prior written approval of DOJ.

d. Within 120 calendar days after receiving the monitor(s)' report, the defendant, and to the extent set forth in the report, BP plc and Affiliates, shall adopt all recommendations in the report; provided, however, that within 30 calendar days after receiving the report, the defendant shall notify the monitor and DOJ in writing of any recommendations that the defendant, BP plc or Affiliates considers inconsistent with applicable law or regulation or otherwise inadvisable. As to any recommendation on which the defendant and the monitor do not agree, the defendant and the monitor shall attempt in good faith to reach an agreement within 45 calendar days after the defendant serves the written notice. In the event the defendant and the monitor are unable to agree on an acceptable alternative proposal, the defendant shall promptly consult with DOJ, and may request that DOJ consult with the Bureau of Safety and Environmental Enforcement ("BSEE") regarding the dispute. DOJ will submit a written opinion to the defendant as to whether the defendant should adopt the

monitor's recommendation or an alternative proposal, and the defendant shall abide by that determination. Pending such determination, the defendant shall not be required to adopt any contested recommendation(s). With respect to any recommendation that the monitor determines cannot reasonably be adopted within 120 calendar days after receiving DOJ's report, the monitor may extend the time period for adoption with prior written approval of DOJ.

e.  Each monitor shall undertake up to three follow-up reviews. Within 120 calendar days of initiating each follow-up review, the monitors shall complete the review and report on the monitors' findings in the same fashion as set forth above with respect to the initial review. The first follow-up review shall commence one year after the initial review was completed. The second follow-up review shall commence one year after the first follow-up review was completed. The third follow-up review shall commence one year after the second follow-up review was completed. After consultation with the defendant, the monitor(s) may extend the time period for these follow-up reviews for up to 60 calendar days with prior written approval of DOJ.

f.  If, reasonably promptly after completing two follow-up reviews, a monitor and the defendant mutually agree that the defendant's applicable policies and procedures, and implementation and enforcement thereof, are appropriate, and that further monitoring and review is not warranted, then the monitor may apply to DOJ for permission to forego the third follow-up review. If DOJ approves, then DOJ shall make a recommendation to the Probation Officer and the Court to forego the third follow-up review, and, upon approval by the Probation Officer and the Court, the engagement of the monitorship shall terminate.

- 7 -

## Safety and Environmental Management Systems Audits

5. For every contracted drilling rig currently in the defendant's fleet with a remaining contract term of at least three but less than six years as of the Effective Date, the defendant shall conduct at least one Safety and Environmental Management System ("SEMS") audit as described in 30 C.F.R. Part 250 during the remaining contract term. For every contracted drilling rig currently in the defendant's fleet with a remaining contract term of six years or more as of the Effective Date, the defendant shall conduct at least two SEMS audits during the remaining contract term under applicable BSEE regulations. For drilling rigs that are contracted after the Effective Date, the defendant shall comply with applicable BSEE regulations concerning SEMS audits.

6. For its current contracts with rig contractors with respect to deepwater drilling rigs, the defendant shall request that its rig contractors join the Center for Offshore Safety ("COS"), which requires its members to conduct SEMS audits. For new contracts with rig contractors with respect to deepwater drilling rigs, the defendant shall require rig contractors to join COS. The defendant may choose to conduct joint SEMS audits with its contractors for contracted deepwater drilling rigs.

7. The defendant shall conduct one SEMS audit for each of its operated platforms, including BP-owned platform rigs, within five years of the Effective Date.

8. With respect to defendant-operated platforms, the defendant shall follow Third Party SEMS Auditing and Certification of Deepwater Operations Requirements as specified by COS.

### Operational Oversight

9. Third Party Verification of Blowout Preventers. Each time the defendant or its contractors brings a subsea blowout preventer system as referenced in 30 CFR 250.440 ("BOP") into service on a moored or dynamically positioned drilling rig, and each time a subsea BOP from

- 8 -

a moored or dynamically positioned drilling rig is brought to the surface, the defendant or its contractors, through a third party, will verify that all required and recommended testing and maintenance of the BOP were performed in accordance with manufacturer recommendations and API Recommended Practice 53 (and Standard 53 when it becomes final).

10. Deepwater Well Control Competency Assessments. The defendant shall implement the following measures to strengthen its well control competencies:

   a. The defendant shall develop, within 6 months of the Effective Date, a deepwater well control competency assessment plan for the defendant personnel responsible for oversight of deepwater drilling operations on defendant-owned or contracted rigs. The plan shall exceed the competency requirements set forth in 30 CFR §§250.1500-1510 (Subpart O), and shall include, but not be limited to: identifying skill sets and other competencies needed to recognize, evaluate, respond, and remediate well control events; providing for the training, assessment of skills and competencies; and undertaking appropriate corrective actions for personnel who do not demonstrate the identified skills or competencies.

   b. The defendant shall provide to BSEE, on an annual basis, a summary report regarding competency assessment plan implementation, including the types and aggregate number of people assessed, found competent, found in need of further training, and the number who have completed training and reassessment.

11. Cement Design and Competency.

   a. The defendant shall require review and approval by subject matter experts of the defendant, BP plc, or the Affiliates of cement designs used for primary cementing of casing and exposed hydrocarbon-bearing zones during drilling operations at deepwater wells.

- 9 -

   b. The defendant shall require that lab testing of cement slurries for primary cementing of casing and exposed hydrocarbon bearing zones relating to drilling operations of deepwater wells be conducted or witnessed by a defendant engineer competent to evaluate such lab testing or a competent third party independent of the cement provider. The defendant shall provide lab results to the applicable BSEE field office within a reasonable period of time.

   c. The defendant shall develop and provide to BSEE, within 6 months of the Effective Date, a framework document setting forth the defendant's competency requirements for cement subject matter experts, subject to review and approval at BSEE's option.

12. <u>Houston Monitoring Center ("HMC")</u>. The defendant shall maintain a real-time drilling operations monitoring center at its Houston office or other appropriate location. The well control data to be monitored will include, at a minimum, active pit volume, pump pressure, flow rate out, gas units, and trip displacement. The HMC shall monitor such data for all defendant-owned or contracted rigs conducting drilling with a subsea BOP installed on the wellhead. The defendant shall provide BSEE personnel with reasonable access to the HMC.

13. <u>Incident Reporting</u>. The defendant shall provide to BSEE, on an annual basis, a summary report documenting incidents operators are required to report under 30 CFR 250.188. For each item reported, the defendant shall describe the actions implemented to correct the item and/or to prevent recurrence. This report shall be submitted by March 31st of each year covering incidents during the previous calendar year.

<u>Oil Spill Response Training and Drills</u>

14. The defendant shall train each Command Officer and Staff, General Section Chiefs, and Staff including the Oil Spill Response Coordinator and alternates of the GoM Incident

Management organization at least once per year and require their participation in at least one table top oil spill response exercise per year.

15. The defendant shall maintain a crisis management organization, including two crisis management centers, consisting of at least 6 crisis management professionals (including a supervisor) to assist in oil spill response training and drills.

16. The defendant shall conduct annual training with the Marine Well Containment Company ("MWCC"), or a similar organization, for its Operations Section chiefs and Source Control Section chiefs in the Gulf of Mexico.

17. The defendant shall participate in MWCC or industry oil spill response drills at least once per year.

18. The defendant shall, at least once per year, conduct or participate in a table top exercise involving activation of MWCC to simulate mobilization of assets and personnel necessary to cap or cap/contain a subsea loss of well control.

19. The defendant shall invite the United States Coast Guard and BSEE to participate in at least one internal oil spill response drill per year.

### Best Practices

20. Oil Spill Response Plan (OSRP). Within 60 days of entry of this Order, the defendant shall revise its Oil Spill Response Plan as necessary to include:

   a. Provisions to maintain access to a supply of dispersant and fire boom for use in the event of an uncontrolled long-term blowout for the length of time required to drill a relief well;

   b. Contingencies for maintaining an ongoing response for the length of time required to drill a relief well;

    c.  Description of measures and equipment necessary to maximize the effectiveness and efficiency of the response equipment used to recover the discharge on the water's surface, including methods to increase encounter rates;

    d.  Information regarding remote sensing technology and equipment to be used to track oil slicks, including oil spill detection systems and remote thickness detection systems (*e.g.*, X-band/infrared systems);

    e.  Information regarding the use of communication systems between response vessels and spotter personnel;

    f.  Shoreline protection strategy that is consistent with applicable area contingency plans; and

    g.  For operations using a subsea BOP or a surface BOP on a floating facility, a discussion regarding strategies and plans related to source abatement and control for blowouts from drilling.

21. Safety Technology Developed with Industry. The defendant shall collaborate with industry and academic efforts to develop discrete technologies to enhance operational safety with respect to deepwater drilling. Within one year of the Effective Date, the defendant shall propose and initiate collaboration on at least two pilot projects to evaluate technology enhancements over the course of the five year period following the Effective Date of this Order. Upon conclusion of the pilot projects, the defendant will propose to BSEE at least two pilot projects for implementation and implement them unless the defendant demonstrates that one or more pilot projects is technically unsound or economically infeasible.

22. Other Safety Technology Development. Over the course of the three years following the Effective Date of this Order defendant will advance to BSEE three proposals in one or more

of the following categories for pilot projects regarding the development of specific new technology in: (1) enhancing functionality, intervention, testing and activation of BOP systems such as acoustics and subsea communications capabilities; (2) enhancing well design; or (3) enhancing real-time monitoring on rig and onshore.  Upon conclusion of the pilot projects, the defendant will implement at least two pilot projects, unless the defendant demonstrates that one or more pilot projects is technically unsound or economically infeasible.

**Transparency**

23. The defendant will create, within 90 days after the Effective Date, a public website that contains the following information:

    a.  Lessons learned from the Deepwater Horizon incident;

    b.  Annual progress reports on its compliance with the special terms of probation contained in this Order;

    c.  Annual summaries of recordable safety incidents, days away from work, hydrocarbon spills and the volume thereof; and

    d.  An annual list of all incidents of non-compliance with BSEE or BOEM regulations or probation for which the defendant is cited, including corrective actions taken and penalties assessed.

**Rig Equipment: Two Blind Shear Rams**

24. The defendant will use, and require its contractors to use, subsea BOPs equipped with no fewer than two blind shear rams and a casing shear ram on all drilling rigs under contract to the defendant for deepwater drilling operations in dynamic positioning mode.  As to moored drilling rigs under contract to the defendant which use subsea BOPs, the defendant will require that each BOP used in deepwater drilling operations be equipped with two shear

- 13 -

rams, including at least one blind shear ram and either an additional blind shear ram or a casing shear ram.

### Safety Organization

25. The defendant shall maintain a safety organization that has the authority to intervene or stop any operation that it deems unsafe.

### Third-Party Auditor

26. The defendant will enter into a contract with an independent third-party (referred to herein as "the Auditor") who shall review and report to the Probation Officer, DOJ, and the defendant on the defendant's compliance with paragraphs 5 through 25 of this Order. The reasonable compensation and expenses of the Auditor shall be paid by the defendant. The Auditor shall be compensated in accordance with its typical hourly rates or a reasonable fee determined by the Auditor based on applicable market rates

27. The defendant will propose auditor(s) to perform these functions to DOJ within 90 days after the Effective Date, and the selection shall be subject to DOJ's approval.

28. On an annual basis, the Auditor shall perform his/her responsibilities by reviewing documentation and taking such other reasonable measures as may be appropriate to sample or test the defendant's compliance with paragraphs 5 through 25 of this Order. The Auditor shall identify and report annually its findings on the defendant's compliance with the terms of this Order to the Probation Officer, DOJ, and the defendant.

29. If the Auditor finds deficiencies in the defendant's compliance with paragraphs 5 through 25 of this Order, the Auditor will provide the Probation Officer, DOJ, and the defendant prompt notice and the defendant will, within 30 days, provide a plan to address the deficiencies and an opportunity to cure. In the event DOJ finds the defendant's plan to address the

deficiencies unacceptable, DOJ will submit a written opinion to the defendant identifying its objections and advising the defendant of an acceptable means of addressing the deficiencies. Within 30 days of receiving any such objections from DOJ, the defendant will provide an updated plan to the Auditor and DOJ which either provides for implementation of an option suggested by DOJ or an alternative means which DOJ determines to satisfactorily address its objections.

30. In addition to an annual report, the auditor shall periodically evaluate and report to the Probation Officer, BSEE, DOJ, and the defendant whether the defendant has complied with any plan to address deficiencies identified by the Auditor.

31. In the event the Auditor resigns, the defendant will propose to DOJ replacement auditor(s) to perform these functions promptly after such resignation.  Selection of a replacement auditor shall be subject to the same process set forth immediately above.

### Development of Implementation Plan

32. The provisions in Paragraphs 5-31 constitute a framework and outline of the subject areas for the development of more specific measures that the defendant must implement pursuant to this Order.  By no later than 60 days after the Effective Date of this Order, the defendant shall submit a detailed implementation plan for approval by the Probation Officer and DOJ. The defendant shall consult with DOJ or its designee in preparing the implementation plan, and the plan shall include among other things, and as necessary and appropriate, interim milestones covering each of the following areas:  Safety and Environmental Management Systems Audits (Paragraphs 5-8), Operational Oversight (Paragraphs 9-13), Oil Spill Response Training and Drills (Paragraphs 14-19), Best Practices (Paragraphs 20-22), Transparency (Paragraph 23), Rig Equipment: Two Blind Shear Rams (Paragraph 24), Safety

Organization (Paragraph 25) and Third-Party Auditor (Paragraphs 26-31). Upon approval of the implementation plan by the Probation Officer and DOJ, the defendant shall comply with the plan. After approval of the implementation plan, the defendant may request in writing that the Probation Officer and DOJ approve modifications of the implementation plan for good cause. Upon approval of a modification by the Probation Officer and DOJ, the defendant shall comply with the implementation plan as modified. Compliance with the implementation plan's provisions is a special condition of the defendant's probation. The defendant is required to provide prompt notice to the Probation Officer in the event the defendant fails to comply with any of the provisions of the implementation plan, including meeting any of the interim milestones.

<u>Gulf of Mexico Research Initiative</u>

33. The defendant will continue to fulfill its commitment to fund the Gulf of Mexico Research Initiative announced by BP on May 24, 2010, at the level established by the Master Research Agreement of March 14, 2011 between BP and the Gulf of Mexico Alliance.

<u>National Academy of Sciences</u>

34. The defendant shall pay $350 million ($350,000,000.00) to the National Academy of Sciences for the purposes of oil spill prevention and response in the Gulf of Mexico, as provided for in an agreement between the defendant and the National Academy of Sciences attached hereto as Exhibit 1.

<u>National Fish and Wildlife Foundation</u>

35. The defendant shall pay $2.394 billion ($2,394,000,000.00) to the National Fish and Wildlife Foundation ("NFWF"), a nonprofit organization established pursuant to 16 U.S.C. § 3701-3710. With respect to the work described in paragraph 37 below, the defendant shall assume

- 16 -

no responsibilities or obligations other than making the payments described in paragraphs 35 and 36.

36. The defendant's payments to NFWF shall be made according to the following schedule: (a) $100 million to be paid within 60 days of sentencing; (b) an additional $300 million to be paid within one year of sentencing; (c) an additional $300 million to be paid within two years of sentencing; (d) an additional $300 million to be paid within three years of sentencing; (e) an additional $500 million to be paid within four years of sentencing; and (f) the remainder to be paid within five years of sentencing.  Payments shall be made by certified check payable to the National Fish and Wildlife Foundation and mailed to the attention of its Chief Financial Officer at 1133 15th Street, NW, Suite 1100, Washington, DC 20005, and including a reference to the case number in this proceeding; or by electronic funds transfer in accordance with written instructions to be provided to the defendant by NFWF at the time of transfer.

37. NFWF shall use the money it receives from the defendant pursuant to this Order for the following purposes and subject to the following conditions:

  a. To remedy harm and eliminate or reduce the risk of future harm to Gulf Coast natural resources, NFWF shall use approximately half of the payments to conduct or fund projects to remedy harm to resources where there has been injury to, or destruction of, loss of, or loss of use of those resources resulting from the Macondo oil spill.  NFWF shall conduct or fund projects in the following states in approximately the following proportions: (1) Alabama, 28%, (2) Florida, 28%, (3) Mississippi, 28%, and (4) Texas, 16%.  NFWF shall consult with appropriate state resource managers, as well as federal resource managers that have the statutory authority for coordination or

cooperation with private entities, to identify projects and to maximize the environmental benefits of such projects.

b.  To remedy harm and eliminate or reduce the risk of future harm to the State of Louisiana and its natural resources, NFWF will use approximately half of the payments to create or restore barrier islands off the coast of Louisiana and/or to implement river diversion projects on the Mississippi and/or Atchafalaya Rivers for the purpose of creating, preserving and restoring coastal habitat, in order to remedy harm to resources where there has been injury to, or destruction of, loss of, or loss of use of those resources resulting from the Macondo oil spill.  In conducting or funding these projects, NFWF will consult with State resource managers, as well as federal resource managers that have the statutory authority for coordination or cooperation with private entities regarding management or protection for coastal habitat,  to identify the highest priority projects, and to maximize the environmental benefits of such projects.  In identifying projects, NFWF shall consider the State's Coastal Master Plan, as well as the Louisiana Coastal Area Mississippi River Hydrodynamic and Delta Management Study, as appropriate.

c.  In identifying and selecting projects to receive funding pursuant to this Order, NFWF shall not incur liability of any nature in connection with any act or omission, made in good faith, in the administration of the funds or otherwise pursuant to this Order, excepting, however, liability resulting from NFWF's gross negligence or willful misconduct.  In addition, if and to the extent NFWF grants funds to or contracts with any governmental entity to implement any project under this Order: (a) NFWF shall be deemed to act solely as an administrative agent in contracting for, granting to, and

- 18 -

disbursing funds for any such project, and (b) NFWF shall not be deemed to incur any liability of any nature in connection with the design, engineering, construction, operation, or maintenance of any such project, including, without limitation, any impact or consequences of any such project on fish, wildlife, plant, or other natural resources, personal injury or property damage.

d. NFWF's use of funds received pursuant to this Order shall be subject to the reporting requirements of 16 U.S.C. § 3706. In addition, NFWF shall report to the Probation Officer and to the parties regarding the status and disposition of money it has received pursuant to this Order, on at least an annual basis, until all such money has been spent.

### Successors

38. This Order shall be applicable to the defendant, and to the extent specified herein, to BP plc and Affiliates, during the defendant's term of probation.

39. In the event of a sale, assignment or transfer of all of the defendant's stock or assets to an unaffiliated third party pursuant to an arm's-length transaction, the terms of this Order shall continue to apply to the defendant and to any successor of the defendant.

40. With respect to the sale, assignment or transfer of some but not all of defendant's assets to an unaffiliated third party pursuant to arm's-length transaction, including but not limited to the transfer of operational control of a jointly owned asset to an unaffiliated third party, such third party shall not be liable for defendant's obligations, and the defendant and, as necessary, BP plc and Affiliates, shall remain obligated to comply with the obligations in this Order with respect to all non-disposed assets, but not with respect to the sold, assigned or transferred assets.

41. With respect to a sale, assignment, or transfer covered in paragraph 39, a third party purchaser may petition the Court to be relieved from one or more terms of this Order upon a showing that (a) the third party purchaser has a SEMS system compliant with current BSEE regulations; and (b) all applicable regulatory approvals for the transaction have been or will be obtained. The third party purchaser may also petition the Court to be relieved from any particular term in Paragraphs 5 through 25 on the grounds that the particular term creates inconsistent, conflicting, or redundant obligations under the third party purchaser's existing SEMS systems and operational practices and procedures or other reasonable grounds. Prior to petitioning the Court for such relief, the third party will consult with DOJ regarding the requested relief, and DOJ will advise the Court of its conclusion as to whether the requested relief is appropriate.

42. The requirements of this Order are in addition to all other applicable requirements of law. This Order does not operate as a permit under federal, state or local regulations, and the defendant remains responsible for complying with all applicable federal, state and local laws, orders and permits. The defendant may not claim that compliance with this Order is a defense to any action commenced under applicable federal, state or local law. The government does not warrant that BP's compliance with this Order constitutes compliance with other applicable legal requirements, including but not limited to BSEE audit requirements.

43. The defendant's obligations pursuant to this Order expire five years after the Effective Date except as otherwise provided herein or as modified by the Court.

SO ORDERED this __ day of _____, 2012.

_____
UNITED STATES DISTRICT JUDGE

Exhibit _E-1

# AGREEMENT BETWEEN
# BP EXPLORATION AND PRODUCTION, INC. AND
# THE NATIONAL ACADEMY OF SCIENCES

This Agreement is entered into by BP Exploration and Production, Inc. (the "Company") and the National Academy of Sciences of the United States of America, a federally chartered private nonprofit corporation, 36 U.S.C. §§ 150301, *et seq.*, with its principal place of business in Washington, D.C., acting on behalf of its principal component organizations, the National Academy of Sciences, the National Academy of Engineering, the Institute of Medicine, and the National Research Council (collectively, "NAS"). The effective date of this Agreement is November __, 2012.

WHEREAS the *Deepwater Horizon* blowout and oil spill have demonstrated the need for improvement in offshore oil drilling safety, well monitoring, well design, oil-spill containment, oil-spill response strategies and technologies, and environmental monitoring;

WHEREAS the prevention of blowouts and oil spills resulting in harm to life, property, and the environment in the Gulf of Mexico and on the United States' outer continental shelf is a national priority;

WHEREAS reducing the environmental harm, loss of life or injury, and economic damage caused by any future blowout and discharge of oil associated with offshore oil drilling and hydrocarbon production and transportation in the Gulf of Mexico and on the United States' outer continental shelf is also a national priority;

WHEREAS basic and applied scientific and engineering research are essential to enhancing safety and minimizing the risk of future harm from spills from offshore oil drilling and hydrocarbon production and transportation in the Gulf of Mexico and on the United States' outer continental shelf; and

WHEREAS improved environmental monitoring can contribute to increased protection of the environment, human population, and natural resources in the event of future oil spills;

- 1 -

THEREFORE, the Company and NAS agree to the mutual covenants set forth in this Agreement:

## I.   Payments

1.   The Company shall pay $350 million to NAS according to the following schedule:

> a.   $5 million to be funded within 90 days of the date this Agreement becomes effective;
>
> b.   $15 million to be funded within one year of the date this Agreement becomes effective;
>
> c.   $45 million to be funded within two years of the date this Agreement becomes effective;
>
> d.   $80 million to be funded within three years of the date this Agreement becomes effective;
>
> e.   $90 million to be funded within four years of the date this Agreement becomes effective; and
>
> f.   $115 million to be funded within five years of the date this Agreement becomes effective.

2.   The Company shall assume no other responsibilities or obligations under this Agreement other than making the payments described in paragraph 1.

## II.   Purpose

3.   NAS shall use the payments described in paragraph 1 to establish a separate segregated account for a fixed-term endowment (the "Endowment"), the principal and earnings of which will be expended over a period of 30 years, subject to the provisions of paragraphs 28 and 29.

4.   NAS shall use the Endowment to establish a program focused on human health and environmental protection including issues relating to offshore oil drilling and hydrocarbon production and transportation in the Gulf of Mexico and on the United States' outer continental shelf (the "Program"). The Program will carry out studies, projects, and other activities that utilize the scientific, technical, engineering, medical, and health expertise

of the National Academy of Sciences, the National Academy of Engineering, the Institute of Medicine, the National Research Council, and the nation's scientific, engineering, and health-care communities. The Program will seek to advance scientific and technical understanding with the objective of enhancing the safety of offshore oil drilling and hydrocarbon production and transportation in the Gulf of Mexico and on the United States' outer continental shelf. The Program will include the assessment and evaluation of strategies and technologies with the objective of enhancing the protection of human health and environmental resources in the Gulf of Mexico and on the United States' outer continental shelf. The manner in which the studies, projects, and other activities are to be conducted will be determined solely by NAS. In accordance with normal policies and procedures of NAS, the Program will be conducted by NAS based on scientific merit and integrity, with emphasis on freedom of inquiry and independent nonpartisan advice and recommendations.

5.      The Program shall seek to carry out studies, projects, and other activities in the public interest that would not otherwise be adequately funded or supported by private industry.

## III.   Programmatic Objectives

6.      To address the purpose described in paragraph 4, the Program shall fund and carry out studies, projects, and other activities in three basic categories: (a) research and development, (b) education and training, and (c) environmental monitoring. The Program should strive to achieve a balance of studies, projects, and other activities, consistent with paragraphs 4 and 18.

7.      *Research and development.* The Program shall fund and carry out studies, projects, and other activities with the objective of contributing to research and development related to the protection of human health and environmental resources including issues concerning the safety of offshore oil drilling and hydrocarbon production and transportation in the Gulf of Mexico and on the United States' outer continental shelf.

8.      *Education and training.* The Program shall fund and carry out studies, projects, and other activities with the objective of contributing to enhanced education and training for undergraduate, graduate, and professional-school students, private- and public-sector employees, and Gulf Coast regional communities, related to the protection of human health and environmental resources including issues concerning the safety of offshore oil drilling and hydrocarbon production and transportation in the Gulf of Mexico and on the United States' outer continental shelf.

- 3 -

9.    *Environmental monitoring.* The Program shall fund and carry out studies, projects, and other activities with the objective of contributing to the development of advanced environmental monitoring systems related to the protection of human health and environmental resources including issues concerning the safety of offshore oil drilling and hydrocarbon production and transportation in the Gulf of Mexico and on the United States' outer continental shelf.

## IV.   Structure and Organization

10.    NAS shall appoint a Board to provide general oversight for the Program.  The members of the Board shall be scientists, engineers, and other experts whose experience and knowledge can contribute to the oversight of the Program.  No current officer or current employee of the United States Government can serve on the Board.

11.    NAS shall appoint additional committees and panels of volunteer experts and establish or make arrangements with other entities as needed to carry out the Program.  At a minimum, NAS shall appoint committees for the following three topics:  (1) research and development, (2) education and training, and (3) environmental monitoring.  No current officer or current employee of the United States Government can serve on a committee or panel appointed by NAS under this paragraph.

12.    At least once a year, NAS shall seek the recommendations of each of the following entities (or its designees) concerning the administration of the Program, provided that the role of each such entity shall be solely advisory:

  a.  In accordance with its statutory responsibilities and as necessary to meet the statutory requirement that it coordinate a comprehensive program "in cooperation and coordination with industry, universities, research institutions, State governments, and other nations, as appropriate," 33 U.S.C. § 2761, the Interagency Coordinating Committee on Oil Pollution Research (ICCOPR), including the Department of the Interior's Bureau of Safety and Environmental Enforcement (BSEE) and Bureau of Ocean Energy Management (BOEM); and

  b.  The environmental-protection departments and other coastal natural-resource managers for the States of Alabama, Florida, Louisiana, Mississippi, and Texas.

13.     Appointments to the Board, committees, and panels shall be in accordance with (a) principles similar to those underlying section 15 of the Federal Advisory Committee Act, 5 U.S.C. App. 2; and (b) the implementing procedures of NAS, as applicable, including the

- 4 -

Conflicts of Interest Policy for Committees Used in the Development of Reports, and the Policy on Conflicts of Interest for Institutional Oversight and Non-Advisory Services, adopted by the NAS Council on May 12, 2003, and June 11, 2004, respectively, as may be amended or modified in the future.

14.    NAS shall establish periodic reporting procedures for grant recipients, including a statement of project accomplishments and a report on grant expenditures until project completion, as well as a final report after project completion. Each final report shall address the original objectives of the project as identified in the approved proposal, describe any changes in objectives, and provide a final project accounting. The final report of project accomplishments described in this paragraph shall be available to the public.

15.    NAS shall publish an annual report on studies, projects, and other activities funded or carried out by the Program during the preceding year. The annual reports shall be made available to the public and shall be disseminated in print and on the NAS Web site. Each annual report shall contain financial statements for the Program that are consistent with the audited financial statements of NAS, including a full and complete statement of income, expenditures, and investments. The report shall also include a list of each recipient of any grant funded by the Endowment, the amount of the grant, and a summary of the purpose of each grant made during the preceding year.

16.    The Company, its officers, and its employees shall not be involved in any decisions regarding the selection of studies, projects, activities, or award recipients.

## V.   Management of Funds

17.    NAS shall manage the Endowment in accordance with the policies established by the NAS Council, in accordance with the laws of the District of Columbia, including the Uniform Prudent Management of Institutional Funds Act of 2007, D.C. Code, Chapter 16A, as it may be amended from time to time, and any successor acts. NAS will invest the Endowment in a prudent manner for a 30-year fixed-term endowment whose entire principal and earnings will be expended within the 30-year period. NAS shall have the discretion to determine how to invest the funds in accordance with this standard of prudence, provided that at least half of all funds held in the Endowment shall be invested in United States Government securities, United States Government agency securities, and United States Government-backed securities.

18.    Nothing about the list of three categories of studies, projects, and other activities in paragraph 6 is meant to imply a relative priority or a particular funding allocation. NAS

- 5 -

should strive to achieve a balance of studies, projects, and other activities that supports the Program's overall purpose and programmatic objectives.

19.     All expenditures of Endowment funds by NAS for Program studies, projects, and other activities shall comply with OMB Circular A-122, 2 C.F.R. Part 230, as it may be revised from time to time, the NAS indirect-cost recovery rates established by the Office of Naval Research and any successor cognizant administrative contracting office, and the NAS disclosure statement on file with that Office (or an equivalent disclosure requirement).

20.     The funds expended from the Endowment for studies, projects, and other activities shall be audited annually by independent accountants in accordance with U.S. generally accepted accounting principles.

21.     NAS may at any time add to the Endowment using other sources of funding.

22.     NAS may not use the Endowment to support any study, project, or other activity that would expend funds for a purpose for which Congress has prohibited funding.

23.     If carrying out the Program's studies, projects, or other activities requires acquisition of real property, the property shall be located in the Gulf Coast region.

24.     NAS shall not use any money from the Endowment for the purpose of lobbying, attempting to influence legislation, participating in a political campaign, or otherwise influencing the outcome of any public election.

## VI.   Access to and Dissemination of Research

25.     The copyrights in all written materials, photographs, drawings, software, and other works subject to copyright protection created or generated under any grant made using the Endowment shall be owned by the recipient of the grant.  NAS will encourage the publication and dissemination and other use of these materials.  With respect to such copyrighted works, the United States Government and NAS shall have a royalty-free, nonexclusive, and irrevocable license to reproduce, publish, or otherwise use, and to authorize others to use such copyrighted works for Government or NAS purposes.  In addition to any other rights it may have, the United States Government shall have the rights provided in paragraph .36(d) of OMB Circular A-110, as it may be revised from time to time, subject to the terms and conditions set forth in that Circular.

26.     With respect to research data, which shall include the recorded factual material commonly accepted in the scientific community as necessary to validate research findings

- 6 -

(but not any preliminary analyses, drafts of scientific papers, plans for future research, peer reviews, or communications with colleagues), the researcher shall retain all rights in said data but shall provide timely and unrestricted access to the data to NAS and the United States Government. Without limitation of the foregoing, the United States Government and NAS shall have the right to (1) obtain, reproduce, publish, or otherwise use the research data first produced under any grant funded by the Endowment, and (2) authorize others to receive, reproduce, publish, or otherwise use such data for Government or NAS purposes.

27.    The policies on patents outlined in 35 U.S.C. §§ 200-211, in 37 C.F.R. § 401, and in the Presidential Memorandum on Government Patent Policy dated February 18, 1983, will serve as basic guidance on patent rights so as to encourage the maximum participation in the Program by a diverse set of research entities. Grantees will have the right to elect title to the patent rights in inventions resulting from work under any grant, subject to the United States Government and NAS each acquiring a nonexclusive, nontransferable, irrevocable, paid-up license to practice or have practiced for or on behalf of the United States or NAS, but in the case of NAS, solely in connection with the Program, the invention throughout the world in those inventions for which title is elected, and also subject to the "march-in-rights" of the United States Government as set forth in the above-cited statute and regulation. Without limitation of the foregoing, the license provided herein to NAS shall include the right of NAS to sublicense its rights to contractors and grantees that perform studies, projects, or other activities under the Program, except that NAS shall not have the right to commercialize its rights outside the Program.

## VII.   Modification

28.    NAS shall conduct periodic reviews of the Endowment and Program at five-year intervals, to determine whether there is a continuing need for the Endowment and whether there is a need to modify the Agreement. Any modification of the Agreement will be subject to paragraph 29.

29.    This Agreement may be modified only through application by NAS to the appropriate court in the District of Columbia pursuant to § 44-1635(b) or (c) of the Uniform Prudent Management of Institutional Funds Act, D.C. Code Ann. § 44-1635(b) or (c), as it may be amended from time to time, pursuant to comparable authority under a successor statute, or, in the absence of statutory authority, pursuant to principles of equitable deviation or cy pres. This Agreement cannot be modified in a manner that violates paragraph 1, 2, or 22.

## VIII. Miscellaneous Provisions

30.    NAS shall comply with all local, State, Federal, and international laws or requirements that apply in connection with the performance of any studies, projects, or other activities of the Program.

31.    This Agreement shall not be construed to create any rights in, or grant any cause of action to, any person not a party to this Agreement.

32.    This Agreement shall be interpreted according to the laws of the District of Columbia.

33.    The provisions governing the Endowment and Program are severable. Should any portion of the Endowment or Program, or its studies, projects, or other activities, be declared illegal or inoperable, the remaining provisions shall remain in effect so long as there remain valid purposes and continued funding to carry out any study, project, or other activity within the scope of the Program.

34.    This Agreement may be signed in counterparts, each of which shall be an original and all of which together shall constitute the same Agreement.

FOR BP EXPLORATION AND PRODUCTION, INC.

11-15-12
Date


FOR THE NATIONAL ACADEMY OF SCIENCES

- 8 -

# Exhibit C

CERTIFICATION OF RESOLUTIONS ADOPTED BY
THE BOARD OF DIRECTORS OF BP EXPLORATION & PRODUCTION INC.

I, Mary Jane Stricker, a duly authorized representative of BP Exploration & Production Inc., a company incorporated under the laws of Delaware, do hereby certify that the following is a true and correct copy of certain resolutions adopted by the Board of Directors of BP Exploration & Production Inc. at a meeting held on November 15, 2012, at which a quorum of the Board was present and that such resolutions remain in full force and effect as of the date hereof.

Dated: November 15, 2012

_Mary Jane Stricker_

Mary Jane Stricker
Assistant Corporate Secretary

WHEREAS, BP Exploration & Production Inc. (the "Company") has been engaged in discussions with the United States Department of Justice in connection with its investigations into potential criminal violations related to the causes and consequences of the April 20, 2010 explosion of the Deepwater Horizon ("Investigations");

WHEREAS, the Company's board of directors (the "Board") has been advised by executive management and both internal and external counsel on the progress of the Investigations at several meetings;

WHEREAS, the executive management of the Company and its affiliates and both internal and external legal counsel have been negotiating a resolution of the Investigations;

WHEREAS, the executive management of the Company and its affiliates and both internal and external legal counsel have reported to the Board the terms and conditions of a proposed resolution of the Investigations;

WHEREAS, the Board has been advised by executive management and both internal and external legal counsel of the Information and a Plea Agreement, with appendices, as circulated to the Board on November 14, 2012 (collectively the "Plea Agreement"), including, but not limited to, the criminal fine payment schedule, the remediation payments, the restitution payments, the terms of probation, and of two monitorships; and

WHEREAS, the Board acknowledges that the Plea Agreement fully sets forth the Company's agreement with the United States with respect to all criminal violations identified during the Investigations and that no additional promises or representations have been made to the Company by any officials of the United States or the States in connection with the disposition of the Investigations, other than those set forth in the Plea Agreement.

RESOLVED that:

1.  The Board approves and agrees that it is in the best interest of the Company to enter the guilty plea provided for, and agrees to the other terms provided in the Plea Agreement with the United States Department of Justice in substantially the form and substance set forth in the form of Plea Agreement presented to this Board;

2.  The officers of the Company and the Company's internal and external legal counsel are hereby each individually authorized, empowered and directed, on behalf of the Company, to execute and deliver the Plea Agreement, substantially in such form as reviewed by this Board with such changes as such officers or legal counsel may approve;

3.  The officers of the Company and both the Company's internal and external legal counsel are hereby each individually authorized, empowered and directed to take any and all actions as may be necessary or appropriate, and to approve the forms, terms or provisions of any agreement and other documents as may be necessary or appropriate to carry out and effectuate the purpose and intent of the foregoing

resolutions (including execution and delivery of any such agreement or document on behalf of the Company);

4.    All of the actions of the officers of the Company and both internal and external legal counsel for the Company, which actions would have been within the scope of and authorized by the foregoing resolutions except that such actions were taken prior to the adoption of such resolutions, are hereby severally ratified, confirmed, approved and adopted as actions on behalf of the Company; and

5.    The Secretary or any Assistant Secretary of the Company are each individually authorized, empowered or directed, to provide to the United States Department of Justice a certified copy of these resolutions.

# Exhibit D

## CERTIFICATION OF RESOLUTIONS ADOPTED BY BOARD OF DIRECTORS OF BP p.l.c.

I, David J. Jackson, a duly authorized representative of BP p.l.c., a company incorporated in England and Wales, do hereby certify that the following is an accurate excerpt of certain resolutions adopted by the Board of Directors of BP p.l.c. at a meeting held on November 15, 2012, and that such resolutions remain in full force and effect.

15·11·12
_____
[DATE]

_____
David J. Jackson
Company Secretary, BP p.l.c.

### Resolutions of Board of Directors of BP p.l.c.

WHEREAS, BP p.l.c. (the "Company") has been engaged in discussions with the United States Department of Justice in connection with its investigations into potential criminal violations related to the causes and consequences of the April 20, 2010 explosion of the Deepwater Horizon ("Investigations");

WHEREAS, the Board has been advised by executive management and both internal and external counsel, and its own independent counsel, on the progress of the Investigations at several meetings, and has received reports at such meetings from the Board's Gulf of Mexico Committee, which has had numerous meetings with respect to the Investigations and the discussions with the United States Department of Justice;

WHEREAS, the Company's executive management and both internal and external legal counsel has been negotiating a resolution of the Investigations;

WHEREAS, executive management and both internal and external counsel, and independent legal counsel for the Board, has reported to the Board the terms and conditions of a proposed resolution of the Investigations;

WHEREAS, the Board has been advised by executive management and by internal and external counsel, and independent legal counsel for the Board, of the Information and a Plea Agreement, with appendices, as circulated to the Board on November 14, 2012 (collectively the "Plea Agreement"), including, but not limited to, the criminal fine payment schedule, the remediation payments, the restitution payments, the terms of probation, and of two monitorships, potentially to be entered into by BP Exploration & Production, Inc. ("BP E&P") and the United States Department of Justice;

:

WHEREAS, the Company and BP Corporation North America Inc. ("BPCNA") are, by the terms of the Plea Agreement, required to guarantee specified obligations of BP E&P under the Plea Agreement, and the Board of Directors has been briefed on those obligations by executive management, internal and external counsel and by independent legal counsel for the Board;

WHEREAS, the Board has also reviewed the terms of the related civil action against the Company by the United States Securities and Exchange Commission and a consent by the Company to the filing thereof, including certain undertakings set forth in such consent (the "SEC Settlement Agreement");

WHEREAS, the Board has been advised by independent counsel qualified in the applicable laws of the United States and England regarding the satisfaction of its duties prior to approving the Company's entry into the Plea Agreement, its guarantee of the specified obligations of BP E&P as set forth in the Plea Agreement and the execution and delivery by the Company of the SEC Settlement Agreement; and

WHEREAS, the Board has determined it is in the best interest of the Company to enter into the Plea Agreement, to guarantee the specified obligations of BP E&P as set forth in the Plea Agreement and to execute and deliver the SEC Settlement Agreement.

RESOLVED that:

1. The Company will enter into and, upon the execution of the Plea Agreement, have the guarantees and other obligations set forth in paragraph 6 of the Plea Agreement:

   a. BP plc and other BP plc entities shall be bound by those specific terms of this agreement that expressly apply to BP plc and other BP plc entities. BP plc shall secure and deliver to the Department from both BP Corporation North America Inc. ("BPCNA") and BP plc guarantees for all payments due from the defendant under this agreement, with BPCNA as the primary guarantor and BP plc as the secondary guarantor in the event of a default by BPCNA. BP plc and BP BPCNA consent to the jurisdiction of U.S. courts solely for purposes of enforcing the guarantees. Any legal successor or assign of BPCNA or BP plc shall remain liable, as the case may be, for the guarantee of defendant's payment obligations hereunder, and an agreement to so remain liable shall be included by BPCNA or BP plc, respectively, in the terms of any sale, acquisition, or merger of those entities. Any legal successor or assign of defendant shall remain liable for defendant's obligations in this plea agreement, and an agreement to so remain liable shall be included by defendant in the terms of any sale, acquisition, or merger of defendant.

   b. The defendant, BP plc and other BP plc entities waive any statute of limitations as of the date of this agreement through the full term of defendant's probation and until all of the defendant's obligations under this agreement have been satisfied with regard to any conduct relating to or arising

2

out of the *Deepwater Horizon* blowout, explosion, oil spill and response.

2.   Any director of the Company, the Company's Group General Counsel, and the Company's external legal counsel are hereby each individually authorised, empowered and directed, on behalf of the Company, to execute and deliver the Plea Agreement and any guarantee required under the Plea Agreement, and the SEC Settlement Agreement, substantially in such form as reviewed by this Board with such changes as the Group General Counsel of BP p.l.c. may approve;

3.   Any director of the Company, the Company's Group General Counsel, and the Company's external legal counsel are hereby each individually authorised, empowered and directed to take any and all actions as may be necessary or appropriate, and to approve the forms, terms or provisions of any agreement and other documents as may be necessary or appropriate to carry out and effectuate the purpose and intent of the foregoing resolutions (including execution and delivery of any such agreement or document on behalf of the Company);

4.   All of the actions of the Company's directors, executive management and officers, and both internal and external legal counsel for the Company, which actions would have been within the scope of and authorised by the foregoing resolutions except that such actions were taken prior to the adoption of such resolutions, are hereby severally ratified, confirmed, approved and adopted as actions on behalf of the Company; and

5.   The Company Secretary or the Deputy Company Secretary of the Company are each individually authorised, empowered or directed, to provide to the United States Department of Justice and the United States Securities and Exchange Commission certified copies of these resolutions.