| | |
|---|---|
| In Re:  Oil Spill by the Oil Rig "Deepwater Horizon" in the Gulf of Mexico, on April 20, 2010 | MDL NO. 2179<br><br>SECTION:  J |
| *This document relates to*: Nos. 12-970, 15-4143, 15-4146 and 15-4654 | HONORABLE CARL J. BARBIER<br><br>MAGISTRATE JUDGE WILKINSON |

## DECLARATION OF ROBERT H. KLONOFF RELATING TO CLASS CERTIFICATION AND FAIRNESS ISSUES IN THE PROPOSED HALLIBURTON AND TRANSOCEAN SETTLEMENTS

ROBERT H. KLONOFF, under penalty of perjury, declares as follows:

## I.  INTRODUCTION

1.  I am the Jordan D. Schnitzer Professor of Law at Lewis & Clark Law School.  I am submitting this Declaration on the issues of class certification under Rule 23(b)(3) and the fairness of the proposed Halliburton/Transocean class settlements in the *Deepwater Horizon* litigation (MDL No. 2179).  At the end of the Declaration, I also address various attorneys' fees issues.  I am offering my opinions for the Court's consideration based on my background and experience.  I recognize that my role is limited and that the Court will make the ultimate decision.

## II.  QUALIFICATIONS

2.  I have served as the Jordan D. Schnitzer Professor since June 1, 2014.  This is an endowed, tenured position at the rank of full professor.  My areas of expertise include complex civil litigation and civil procedure.  From July 1, 2007, to May 31, 2014, I served as the Dean of Lewis & Clark Law School, and I was also a full professor at Lewis & Clark during that time.  Immediately prior to assuming the deanship at Lewis & Clark, I served for four years as the Douglas Stripp/Missouri Professor of Law at the University of Missouri-Kansas City School of Law (UMKC).  That appointment was an endowed, tenured position at the rank of full professor.

I taught courses on complex litigation, civil procedure, and appellate procedure. Prior to my academic post at UMKC, I served for more than a dozen years as a partner with the international law firm of Jones Day, working in the firm's Washington, D.C. office. For most of that time, I was an equity partner at the firm. While working at Jones Day, I also served for many years as an adjunct professor of law at Georgetown University Law Center, where I taught courses on class actions. Before joining Jones Day, I served as an Assistant United States Attorney and as an Assistant to the Solicitor General of the United States. I also served as a law clerk for Chief Judge John R. Brown of the U.S. Court of Appeals for the Fifth Circuit. I received my law degree from Yale Law School.

3. I am a co-author of the first casebook devoted specifically to class actions (Robert H. Klonoff, Edward K.M. Bilich, and Suzette Malveaux, *Class Actions and Other Multi-Party Litigation: Cases and Materials* (West 3d ed. 2012)). The fourth edition of the casebook will be published in early 2017. As a textbook author in the class action field, I annually supplement my casebook, and thus remain up to date on the latest case law developments. I am also the author of the Nutshell on class actions (Robert H. Klonoff, *Class Actions and Other Multi-Party Litigation in a Nutshell* (West 4th ed. 2012)). The fifth edition of the Nutshell will be published in early 2017. These texts are used at law schools throughout the United States and have been cited by many courts and commentators.[1] I have also authored or co-authored numerous scholarly articles on class actions.[2] In addition, I serve on the advisory board of Class Action Litigation Report, a Bloomberg/BNA publication.

---

[1] *See, e.g., Kolbe v. BAC Home Loans Servicing, LP*, 738 F.3d 432, 468 (1st Cir. 2013) (citing class action *Nutshell* (4th ed.)); *Culver v. City of Milwaukee*, 277 F.3d 908, 913 (7th Cir. 2002) (citing class action *Nutshell* (1st ed.)); Jaime Dodge, *Privatizing Mass Settlement*, 90 NOTRE DAME L. REV. 335, 337 n.12 (2014) (citing class action casebook); Vaughn R. Walker, *Class Actions Along the Path of Federal Rule Making*, 44 LOY. U. CHI. L.J. 445, 449 n.17 (2012) (citing class action *Nutshell* (1st ed.)); Richard A. Nagareda, *The Preexistence Principle and the Structure of the Class Action*, 103 COLUM. L. REV. 149, 151 n.5 (2003) (citing casebook); Kenneth S. Rivlin & Jamaica D. Potts, *Proposed Rule Changes to Federal Civil Procedure May Introduce New Challenges in Environmental Class Action Litigation*, 27 HARV. ENVTL. L. REV. 519, 521 n.10 (2003) (citing class action *Nutshell* (1st ed.)).

[2] For example, my 2013 article, *The Decline of Class Actions*, 90 WASH. U. L. REV. 729 (2013), has been widely cited. *See, e.g., In re National Football League Players' Concussion Injury Litig.*, 775 F.3d 570, 576 (3d Cir. 2014); *Eubank v. Pella Corp.*, 753 F.3d 718, 719 (7th Cir. 2014) (Posner, J.); *In re Johnson*, 760 F.3d 66, 75 (D.C. Cir. 2014); *In re Kosmos Energy Ltd. Secs. Litig.*, No. 3:12-cv-373-B, 2014 WL 1095326, at *2 n.20 (N.D. Tex. Mar. 19, 2014); Claire E. Bourque, Note, *Liability Only, Please—Hold the Damages: The Supreme Court's New Order for Class Certification*, 22 GEO. MASON L. REV. 695, 698 n.29 (2015); Martin H. Redish & Julie M. Karaba, *One Size Doesn't Fit All: Multidistrict Litigation, Due Process, and the Dangers of Procedural Collectivism*, 95 B.U. L. REV. 109, 110 n.2 (2015); Robert G. Bone, *The Misguided Search For Class Unity*, 82 GEO. WASH. L. REV.

4.   I served for five years as an Associate Reporter for the American Law Institute's class action (and other multi-party litigation) project, *Principles of the Law of Aggregate Litigation* ("*ALI Aggregate Litigation*").   I was the principal author of the chapter that addresses class action settlements and attorneys' fees (chapter 3).   The project was unanimously approved by the membership of the American Law Institute at its annual meeting in May 2009, and was published in May 2010.   It has been frequently cited by courts and commentators.[3]

5.   I have extensive experience as a practicing lawyer.   I have had eight oral arguments before the U.S. Supreme Court, and many oral arguments in other federal and state courts throughout the country.   As an attorney at Jones Day, I personally handled more than 100 class action cases.   These cases have included some of the largest and most highly publicized civil cases in U.S. history.    My class action experience includes, among other things, class certification, class discovery, notice, settlement, claims administration, and a variety of appellate issues.   I have handled many types of class actions, including mass torts, antitrust, consumer, insurance, securities fraud, employment discrimination, RICO, and numerous others.

6.   I have given lectures and taught courses on class action issues and other litigation topics throughout the United States and abroad, including presentations at law schools in Cambodia,

---

651, 654 n.6 (2014); David Freeman Engstrom, *Private Enforcement's Pathways: Lessons From Qui Tam Litigation*, 114 COLUM. L. REV. 1913, 1920 n.17 (2014); Howard M. Erichson, *The Problem of Settlement Class Actions*, 82 WASH. U. L. REV. 951, 956 n.20 (2014); Arthur R. Miller, Keynote Address, The Preservation and Rejuvenation of Aggregate Litigation: A Systemic Imperative, 64 EMORY L.J. 293, 294 n.7 (2014); Linda S. Mullenix, *Ending Class Actions As We Know Them: Rethinking the American Class Action*, 64 EMORY L.J. 399, 403 n.14 (2014); Stephen R. Subrin & Thomas O. Main, *The Fourth Era of American Civil Procedure*, 162 U. PA. L. REV. 1839, 1853 n.80 (2014); Erin L. Geller, *The Fail-Safe Class as an Independent Bar to Class Certification*, 81 FORDHAM L. REV. 2769, 2775 n.38 (2013); Arthur R. Miller, *Simplified Pleading, Meaningful Days in Court, and Trials on the Merits: Reflections on the Deformation of Federal Procedure*, 88 N.Y.U. L. REV. 286, 314 n.105 (2013); D. Theodore Rave, *Governing the Anticommons in Aggregate Litigation*, 66 VAND. L. REV. 1183, 1186 n.5 (2013); Brandon L. Garrett, *Aggregation and Constitutional Rights*, 88 NOTRE DAME L. REV. 593, 610 n.82 (2012); Richard Marcus, *Still Confronting the Consolidation Conundrum*, 88 NOTRE DAME L. REV. 557, 560 n.17, 589 n.154 (2012); *Hearing on "The State of Class Actions Ten Years after the Class Action Fairness Act" Before the Committee on the Judiciary, Subcommittee on the Constitution and Civil Justice* (U.S. House of Representatives, Feb. 27, 2015) (statement of Prof. Patricia W. Moore), at 2 n.4.

   [3] *See, e.g., Smith v. Bayer Corp.*, 131 S. Ct. 2368, 2381 n.11 (2011); *Baker v. Microsoft Corp.*, 797 F.3d 607, 615 n.5 (9th Cir. 2015), *cert. granted*, 136 S. Ct. 890 (No. 15-457) (Jan. 15, 2016); *Hill v. State Street Corp.*, 794 F.3d 227, 229, 231 (1st Cir. 2015); *In re BankAmerica Corp. Secs. Litig.*, 775 F.3d 1060, 1063–67 (8th Cir. 2015); *In re Nexium Antitrust Litig.*, 777 F.3d 9, 19–20 (1st Cir. 2015); *In re Trans Union Corp. Privacy Litig.*, 741 F.3d 811, 813 (7th Cir. 2014); *In re Baby Prods. Antitrust Litig.*, 708 F.3d 163, 171–72 (3d Cir. 2013); *Ira Holtzman, CPA v. Turza*, 728 F.3d 682, 689–90 (7th Cir. 2013); *In re Lupron Marketing & Sales Practices Litig.*, 677 F.3d 21, 32–33 (1st Cir. 2012); *Klier v. Elf Atochem N.A., Inc.*, 658 F.3d 468, 474–75 n.14–16 (5th Cir. 2011); *Nachshin v. AOL, LLC*, 663 F.3d 1034, 1039 n.2 (9th Cir. 2011); *Keepseagle v. Vilsack*, 118 F. Supp. 3d 98, 116 (D.D.C. 2015); *In re Checking Account Overdraft Litig.*, 830 F. Supp. 2d 1330, 1355–56 (S.D. Fla. 2011).

Canada, China, Colombia, Croatia, Ecuador, India, Italy, Japan, the Philippines, Russia, South Korea, Taiwan, and Turkey.  Over the years, I have frequently appeared as an invited speaker at class action symposia, conferences, and continuing legal education programs.[4]

7.  In September 2011, Chief Justice John G. Roberts, Jr., appointed me to serve a three-year term as the sole academic voting member of the Judicial Conference Advisory Committee on Rules of Civil Procedure.   That Committee considers and recommends amendments to the Federal Rules of Civil Procedure.  In May 2014, Chief Justice Roberts reappointed me to serve a second three-year term on the Committee.  I also serve on the Advisory Committee's Class Action Subcommittee, which has been working on possible amendments to the federal class action rule, Federal Rule of Civil Procedure 23.

8.   In October 2014, I was elected to membership in the International Association of Procedural Law (IAPL), an organization of preeminent civil procedure scholars from around the world.  I was selected in a competitive process to present a scholarly article on class actions at the May 2015 Congress of the IAPL, an event held once every four years.

9.  I have testified as an expert in numerous class action cases.  Between 2011 and the present, I testified in the following cases: *Ben-Hamo v. Facebook, Inc. and Facebook Ireland Limited* (No. 46065-09-14, Central District Court, Israel) (submitted declaration on Sept. 3, 2015, on behalf of Facebook, Inc. and Facebook Ireland Limited addressing various issues of U.S. civil procedure and class action law); *Skold v. Intel Corp.*, Case No. 1-05-CV-039231 (Super. Ct. of CA, Santa Clara County) (submitted expert declaration on class settlement approval, attorneys' fees, and incentive payments to class representatives) (filed 12/30/14); *In re National Football League Players' Concussion Injury Litigation*, No. 2:12-md-02323-AB (E.D. Pa.) (submitted expert declaration on class certification, class notice, and settlement fairness) (Doc. No. 6423-9) (filed 11/12/14); *In re Oil Spill by the Oil Rig "Deepwater Horizon" in the Gulf of Mexico on April 20, 2010*, No. 2:10-md-02179-CJB-SS (E.D. La.) ("Deepwater Horizon") (submitted expert declarations on class settlements for economic and property damages (Doc. No. 7104-3), and personal injuries (Doc. No. 7111-4) (both filed 08/13/12), and supplemental expert declarations for both class settlements (Doc. No. 7727-4) (economic), (Doc.

---

[4] Examples of those classes and speaking engagements are contained in my attached curriculum vitae (Appendix B).

No. 7728-2) (medical) (both filed 10/22/12)); *MBA Surety Agency, Inc. v. AT&T Mobility, LLC*, Case No. 1222-CC09746 (Mo. 22d Dist.) (submitted expert report on class certification and settlement fairness on Feb. 13, 2013; submitted supplemental expert report on Feb. 19, 2013; and testified in court on Feb. 20, 2013); *Robichaux v. State of Louisiana, et. al* (No. 55,127) (18th Judicial Dist. Ct., Iberville Parish, La.) (submitted written report on class action attorneys' fees on February 20, 2012, gave deposition testimony on March 7, 2012, and testified in court on April 11, 2012); and *In re AT&T Mobility Wireless Data Svcs. Sales Tex Litig.*, MDL No. 2147, Case No. 1:10-cv-02278 (N.D. Ill.) (submitted declarations on the fairness of a proposed settlement (Doc. No. 163-3) and on attorneys' fees and incentive payments (Doc. 164-1) (both filed 03/08/11), and testified in court on March 10, 2011).   Courts reviewing class settlements have relied extensively on my testimony.   In the *Deepwater Horizon* case, for example, this Court cited and quoted my Declarations in its analysis of class certification and fairness.[5] Similarly, in the *AT&T Mobility* litigation, Judge Amy St. Eve cited and quoted my Declarations in upholding a class settlement and awarding attorneys' fees.[6]

10.   With respect to the *Deepwater Horizon* litigation, in addition to my preparation of expert Declarations (discussed above), I have provided expert consultation and assistance to the Plaintiffs' Steering Committee (PSC) and class counsel on appellate issues raised by BP in connection with the approval and implementation of the BP economic and property damages settlement.   I have had no involvement in the Halliburton/Transocean settlements that are the subject of the instant Declaration.

11.   I am being compensated for my work on an hourly basis.   Payment is not contingent on the substance of my opinions.

12.   Additional information regarding my qualifications and experience—including a list of my publications—can be found in my curriculum vitae, attached hereto as Appendix B.

---

[5] *See In re Deepwater Horizon*, 910 F. Supp. 2d 891, 903, 914–16, 918–21, 923–24, 926, 929–33, 938, 941, 947, 953, 955, 960, 962 (E.D. La. 2012) (approving economic and property damages settlement); *In re Deepwater Horizon*, 295 F.R.D. 112, 133–34, 136, 138–41, 144–45, 147 (E.D. La. 2013) (approving medical benefits settlement).

[6] *See In re AT&T Mobility Wireless Data Svcs. Sales Tax Litig.*, 789 F. Supp. 2d 935, 956–59, 961, 963–65 (N.D. Ill. 2011) (approving class settlement); *In re AT&T Mobility Wireless Data Svcs. Sales Tax Litig.*, 792 F. Supp. 2d 1028, 1032 n.3, 1034–35, 1037, 1040, 1042 (N.D. Ill. 2011) (awarding attorneys' fees).

## III. BASIS FOR TESTIMONY

13.  In addition to the myriad documents I reviewed to prepare my prior Declarations in this case, I have reviewed numerous court filings relating specifically to the Halliburton/Transocean settlements.  I have also reviewed press coverage relating to those settlements.  With respect to attorneys' fees, I have reviewed (1) the Petition for Reimbursement of Expenses and Collective Common Benefit Fee Award (Doc. 21024-2), and (2) the Declaration of Brian T. Fitzpatrick (Doc. 21024-5), both filed on July 15, 2016.

## IV.  BACKGROUND

### A.  BP Settlement and Assignment of Claims.

14.    The background of the *Deepwater Horizon* litigation is set forth in my prior Declarations, as well as in the various decisions of this Court and the Fifth Circuit.  In brief, following the blowout, explosion, and fire aboard the *Deepwater Horizon* in April 2010, BP entered into two class action settlements—one involving economic and property damages, and the other involving personal injuries.  This Court approved the economic and property damage settlement in late 2012, and it approved the personal injury settlement in early 2013.[7]  An appeal was taken in the personal injury settlement, but was dismissed.  The economic benefits settlements became final in 2014 following various appellate challenges.[8]  Those settlements were only with BP.  No settlements were reached at that time with the Halliburton entities (hereafter HESI)[9] or the Transocean entities (hereafter Transocean).[10]

15.  Pursuant to the settlement with BP, members of the Economic and Property Damages Settlement Class (DHEPDS Class or Old Class) released their claims against BP and also released their compensatory damages claims (but not their punitive damages claims) against HESI and Transocean.  The BP settlement also assigned to the Old Class BP's claims for

---

[7] *In re Deepwater Horizon*, 910 F. Supp. 2d 891 (E.D. La. 2012) (approving economic and property damages settlement), *aff'd*, 739 F.3d 790 (5th Cir. 2014), *cert. denied*, 135 S. Ct. 754 (2014); *In re Deepwater Horizon*, 295 F.R.D. 112 (E.D. La. 2013) (approving medical benefits settlement).

[8] *In re Deepwater Horizon*, 910 F. Supp. 2d 891 (E.D. La. 2012), *aff'd*, 739 F.3d 790 (5th Cir. 2014), *cert. denied*, 135 S. Ct. 754 (2014); *see also In re Deepwater Horizon*, 785 F.3d 1003, 1008–09 (5th Cir. 2015) (reviewing appellate history of this litigation).

[9] "HESI" refers to Halliburton Energy Services, Inc., and Halliburton Company.

[10] "Transocean" refers to Triton Asset Leasing GmbH, Transocean Deepwater Inc., Transocean Offshore Deepwater Drilling Inc., and Transocean Holdings LLC.

compensatory and punitive damages against HESI and Transocean.  (For those claims, the class would stand in BP's shoes.)  Thus, the BP settlement reduced, but did not eliminate, the exposure that HESI and Transocean faced as a result of the *Deepwater Horizon* litigation.

16.   In entering into the settlement with the Old Class, BP was concerned that if the class successfully sued HESI and/or Transocean, those entities would seek indemnification from BP. To protect BP against such indemnification claims, the agreement provided that the class would not execute on any future damages awards against HESI or Transocean unless and until there was a judicial determination that HESI and Transocean could not recover such damages from BP.

17.   The Old Class did not include all individuals and entities with potential punitive damages claims against HESI and Transocean.  Excluded, for example, were local governments of coastal communities and oil and gas interests.  In part to account for these excluded claimants, the settlements at issue in this Declaration identified two classes: (1) the Old Class, which held the BP assigned claims, and (2) a "New Class," which held potential punitive damages claims that Old Class members, and certain claimants not included in the BP settlement, had against HESI and Transocean.  It is my understanding that most of the members of the New Class are also members of the Old Class.

18.   The definition of the Old Class is the same as that of the economic and business loss class that settled with BP. *See In re Deepwater Horizon*, 910 F. Supp. 2d 891, 965–71 (E.D.La. 2012) (setting out class definition for BP economic loss settlement), *aff'd*, 739 F.3d 790 (5th Cir. 2014), *cert. denied*, 135 S. Ct. 754 (2014).   The definition of the New Class is set forth in Appendix A to this Declaration.

**B.  Settlement Discussions with HESI and Transocean**

19.   I am advised by class counsel that, during the time that class counsel were negotiating settlement terms with BP, they were also negotiating possible settlements with HESI and were attempting to have a dialog with Transocean.  Transocean was in a period of transition, however, including changes in leadership, and thus was not in a position to finalize an agreement in 2012, when BP and class counsel finalized their economic and business loss settlement.   Although

HESI actively engaged in negotiations with class counsel during 2012, no agreement could be reached at that time with HESI either.  Thus, the initial settlement was solely with BP.

20.  I understand that, subsequent to the settlement with BP, class counsel continued its discussions with HESI and Transocean.  The discussions focused on the resolution of the claims of both the Old Class and the New Class.

21.  At the same time that settlement discussions between class counsel, HESI, and Transocean were occurring, the litigation was moving forward, including the trial of various issues in phases.  During the Phase One trial, class counsel had further discussions with HESI, mediated by Judge Shushan.

22.  On September 2, 2014, HESI and class counsel filed a proposed settlement agreement resolving various claims of the Old Class and the New Class.  That agreement, as amended, is discussed *infra*.

23.  On September 9, 2014, this Court issued its Phase One findings. *In re Deepwater Horizon*, 21 F. Supp. 3d 657 (E.D.La. 2014).[11]  Of relevance here, the Court held that the conduct of HESI and Transocean in connection with the *Deepwater Horizon* oil spill did not rise to the level of gross negligence, recklessness, or other egregious conduct.  Rather, the Court found that HESI's and Transocean's conduct was merely negligent.  As a result of those determinations, the Court concluded that no punitive damages against HESI and Transocean were justified.  The Court apportioned fault among the culpable parties as follows: BP—67%; Transocean—30%; HESI—3%.  The Court also ruled that Transocean's and Halliburton's indemnity and release clauses in their contracts with BP were "valid and enforceable." *Id.* at 757. Appeals and cross-appeals were subsequently filed.

24.  The Court's Phase One rulings cast doubt on the validity (and value) of claims held by Old Class members and New Class members against both HESI and Transocean.  Nonetheless, Transocean was not necessarily off the hook, since it was possible that class counsel could convince the Fifth Circuit that this Court committed reversible error.  Given the fact that Transocean was still facing at least some risk, the company determined that it was in its best interests to settle.  Transocean agreed to a settlement with a virtually identical structure to the

---

[11] An earlier version of the Phase One findings had been issued on September 4, 2014. (Rec. Doc. 13355).

September 2, 2014 HESI settlement (although different dollar amounts), which was filed on May 29, 2015.

### C. Settlement Agreements with HESI and Transocean

#### 1. Basic Terms

25.   The proposed HESI and Transocean settlements would resolve two categories of claims against them: (1) the Old Class's claims (assigned by BP), and (2) the New Class's punitive damages claims.  The total of the two settlement funds is $1,239,750,000, with HESI agreeing to pay $1,028,000,000, and Transocean agreeing to pay $211,750,000.   Although the costs to administer the claims proceedings will come from the settlement funds, the settlements provide for a separate fund for attorneys' fees and common benefit costs, also paid for by HESI and Transocean.  HESI and Transocean agree not to oppose any request by class counsel for the Old Class and the New Class for attorneys' fees and common benefit costs up to $124,950,000 ($99,950,000 from HESI and $25,000,000 from Transocean), and class counsel agree not to seek an award greater than that amount.

26.   Under the agreement, the allocation of the $1,239,750,000 as between the Old Class and the New Class was to be determined by Magistrate Judge Joseph Wilkerson, who was designated as the Allocation Neutral under the agreements.  The agreements also provided that a Claims Administrator would be appointed by the Court to develop a distribution model for the New Class claims under the settlements.  That person would submit a distribution model to the Court by June 15, 2016, and would subsequently administer the New Class settlement upon this Court's final approval.  The DHEPDS Class Claims Administrator, who has been administering the BP settlement, would administer the claims process for the Old Class portion of the settlements.

27.   On October 23, 2015, this Court appointed Michael J. Juneau to serve as Claims Administrator for the New Class settlement.   Juneau's experience includes service as special counsel to the court-appointed special master or claims administrator in the *Vioxx* and *Toyota Unintended Acceleration* cases.   Most importantly, he has served in a similar role in the BP settlement in the *Deepwater Horizon* litigation and thus assumes the role of Claims

Administrator for the New Class with substantial knowledge and experience regarding the *Deepwater Horizon* MDL.

28.   The punitive damages claims of the New Class fall under general maritime law.   The scope of punitive damages liability under general maritime law is limited and nuanced. *See*, *e.g.*, *Robins Dry Dock & Repair Co. v. Flint*, 275 U.S. 303 (1927) (hereafter *Robins Dry Dock*); *Louisiana ex rel. Guste v. M/V Testbank*, 752 F.2d 1019 (5th Cir. 1985) (en banc); *In re Deepwater Horizon,* 784 F.3d 1019 (5th Cir. 2015); *In re Deepwater Horizon,* 808 F. Supp. 2d 943, 958–61 (E.D. La. 2011).   Those authorities establish that standing to assert punitive damages claims in connection with the *Deepwater Horizon* incident is given to those who have an ownership or leasehold interest in real or personal property that was physically damaged by oil or other substances (such as chemical dispersants used by BP during the cleanup process). Some courts have also granted standing to commercial fishermen (on the theory that they have, by virtue of their profession, acquired what might be considered a "proprietary interest" in the fish that have been physically damaged), although it does not appear that the Fifth Circuit has ruled on the question.   Charterboat operators and subsistence fishermen also have some argument for punitive damages, but the argument is not as strong as for those whose real or personal property was physically damaged.   Based on these parameters, it is clear that many Old Class members (such as various inland business owners who suffered no property damage) do not have plausible punitive damages claims against HESI or Transocean.   Such individuals do not qualify as New Class members.   Instead, they hold potential claims (as assigned by BP) solely as Old Class members.

29.   As noted, Judge Wilkinson was tasked with allocating the HESI and Transocean settlement funds as between the Old Class and the New Class, and Michael Juneau was responsible for coming up with a distribution model for paying New Class members.   The distribution plan for the Old Class's portions of the settlements was the responsibility of DHEPDS Claims Administrator Patrick Juneau, who brings to the table vast knowledge and experience as Claims Administrator for the BP settlement and other major aggregate cases.

30.   For the New Class portions of the settlements, Michael Juneau will administer the separate HESI and Transocean settlements as one fund.   Patrick Juneau will do the same for the

Old Class portions.  The total fund that each Claims Administrator will handle will be based on Judge Wilkinson's allocation.

31.   Both the HESI and Transocean settlements provide an appeal process for new class members who are not satisfied with the award of the claims administrator.  Appeal is solely to this Court; no appeal to any other court, including the Fifth Circuit, is permitted.

## 2.  Judge Wilkinson's Allocation (filed December 10, 2015)

32.   Pursuant to the settlements, Judge Wilkinson undertook to establish a reasonable allocation between the Old Class and the New Class.  After receiving input from counsel, class members, and other interested parties, he determined that the proper allocation should be $902,083,250 for the New Class (72.8% of the settlement proceeds) and $337,666,750 for the Old Class (27.2% of the settlement proceeds). Neutral Allocation and Reasons (Halliburton and Transocean Settlements) (Doc. 15652) (Neutral Allocation) (filed 12/11/15) at 4.  Neither Co-Liason/Co-Lead/Class Counsel, the PSC, nor any Class Counsel advocated for any particular allocation; it is my understanding that counsel were silent and neutral on the issue to avoid any perceived conflict.

33.   Judge Wilkinson first determined that, as between the Old Class and the New Class, the New Class had a stronger claim of entitlement to settlement funds.  As a result, he did not deem it appropriate simply to divide the proceeds 50/50 between the two classes.  As Judge Wilkinson noted, members of the New Class were the one who were the most seriously and directly damaged by the explosion and oil spill, since that class included holders of real and personal property whose property was physically damaged by oil or other substances as a result of the oil spill and/or cleanup. *Id.* at 5–6.  Such class members are the type who would satisfy the "physical injury" test of *Robins Dry Dock*, and thus be eligible for punitive damages under general maritime law.  The class also included commercial fishermen and subsistence fishermen whose livelihood was directly impacted by the spill.

34.   In arriving at his allocation, Judge Wilkinson recognized that some of the claimants in the New Class had been excluded from the Old Class, such as local governments of coastal communities, and oil and gas interests operating in the contaminated areas. Neutral Allocation at 7.  Those claimants thus had received no compensation through the payments to the Old Class

under the BP settlement. Judge Wilkinson further recognized that many of the Old Class members were not as directly impacted by the spill because they did not suffer physical impact to their property or business from the oil spill or cleanup effort. *Id.* at 8.

35.   In determining the percentage of the settlement funds to allocate to the New Class, Judge Wilkinson reasoned that the amounts paid (and projected to be paid) under the BP settlement to members of the Old Class provided the best source of ascertaining total compensatory damages. That figure would be used to determine the potential value of punitive damages claims of the New Class (using the 1:1 ratio for compensatory to punitives suggested by the Supreme Court in *Exxon Shipping Co. v. Baker*). Neutral Allocation at 13; *see also Exxon Shipping Co. v. Baker*, 128 S. Ct. 2605, 2633 (2008) (holding that a 1:1 ratio of punitive to compensatory damages is "a fair upper limit" in maritime cases not involving "exceptional blameworthiness"). Based on claims already paid ($6,042,483,986) and claim payments that were anticipated, Judge Wilkinson determined that the total payment to the Old Class under the BP settlement would be about $10.825 billion. Neutral Allocation at 15–16.  That number was consistent with BP's own estimates in its SEC reports. *Id.* at 15.  Thus, under a 1:1 ratio, potential punitive damages would also be $10.825 billion. *Id.* at 16.  But because this Court found that BP was 67% at fault, that left $3,608,333,000 for the portion of the $10.825 billion that could be reasonably attributed to HESI and Transocean.  After an extensive discussion of the strengths and weaknesses of the claims, Judge Wilkinson concluded that there was no more than a 25% chance that the class members could succeed in recovering the $3,608,333,000, and he thus concluded that the fair punitive damages figure was $902,083,250—or 72.8% of the total settlement with HESI and Transocean, excluding fees and costs. *Id.* at 17–27.

36.   Judge Wilkinson then determined that the remaining settlement funds—$337,666,750— would be allocated to the Old Class.  In reaching that result, he declined to assume that there was any likelihood that the Old Class—which would stand in BP's shoes—could recover punitive damages from HESI or Transocean.  He relied on the fact that this Court found that BP was grossly negligent and had engaged in willful and reckless conduct, whereas HESI and Transocean were found to have acted only with negligence. *Id.* at 31–37.  As Judge Wilkinson noted, because "BP was primarily at fault," allowing class members who were standing in BP's shoes to obtain punitive damages against HESI and Transocean would "indirectly reward, rather than punish, BP." *Id.* at 34.

37.   Judge Wilkinson's allocation of funds to the Old Class was thus premised entirely on: (1) BP's potential claims for indemnity and/or contribution against HESI and Transocean (to recover amounts paid by BP to Old Class members), and (2) BP's claims against Halliburton and Transocean to recover BP's own actual damages resulting from the spill. *Id.* at 28.   After extensively discussing the substantial hurdles faced by the Old Class in pursuing those two categories of claims, Judge Wilkinson concluded that the chances that the Old Class would prevail on those claims were no greater than 25%. *Id.* at 28–31.   Given his findings, Judge Wilkinson concluded that an allocation of $337,666,750 to the Old Class was reasonable.

### 3.  This Court's Preliminary Approval

38.   On April 12, 2016, this Court entered an order granting preliminary approval of the settlement.   The Court first determined that Judge Wilkinson "has appropriately performed his assigned function" as Allocation Neutral, and the Court "agree[d]" with Judge Wilkinson's allocation. Preliminary Approval Order as to Proposed HESI and Transocean Punitive Damages and Assigned Claims Class Action Settlements (Doc. 16183) (filed 04/12/16) (Preliminary Approval Order) at 9.   According to the Court, Judge Wilkinson's allocation ruling "thoughtfully and comprehensively addressed the issues." *Id.*

39.   With respect to class certification, the Court found that preliminary certification of the New Class for settlement purposes was appropriate.   (The Old Class had already received final approval in the earlier BP settlement and thus certification of that class was not at issue.) According to the Court, the New Class definition was "discrete and ascertainable." *Id.* at 22.   The New Class was sufficiently numerous given that it consisted of thousands of individuals and business who claimed injury to property or fishing interest. *Id.*   There were common questions of law and fact, given the fact that the oil spill involved a single incident governed by general maritime law, and class members were united in their pursuit of punitive damages. *Id.* at 23.   The claims of the representatives were typical of those of the class—given that there was at least one representative for every category of claim.   Likewise, the Court found that both the representatives and class counsel were adequate to protect the interests of the class. *Id.* at 24–25. With respect to Rule 23(b)(3), the Court found that common issues predominated over individual issues, given the fact that this was a single-incident case governed by federal maritime law, *id.* at

25, and the Court found that a class action was superior to other methods for resolving the claims. *Id.* at 26–27.

40.   With respect to fairness, this Court preliminarily found the terms to be fair, reasonable, and adequate. *Id.* at 21.   The Court noted that the parties possessed extensive knowledge of the factual and legal issues, that the Phase I and Phase II trials "attest to the depth of information possessed by the parties—and the Court," and that the parties engaged in "vigorous and arms-length" negotiations, "free of collusion." *Id.* at 28.   Another fact that, in the Court's view, underscored the fairness of the settlement was that fees and common benefit costs are to be paid separately, as opposed to being deducted from the settlement fund. *Id.* at 29.

41.   The Court set dates for objections, opt-outs, and the fairness hearing, approved the proposed class notice, appointed the class notice administrator, and appointed class counsel and the class representatives. *Id.* at 29, 32–35.

### 4.   Claims Administrator Michael J. Juneau's Distribution Model for the New Class

42.   On June 13, 2016, New Class Claims Administrator Michael J. Juneau submitted his proposed distribution model for 72.8% of the combined HESI/Transocean settlement funds, the percentage that Judge Wilkinson allocated to the New Class. (Doc. 18797).   Juneau's proposed model is set forth in a comprehensive document (27 single-spaced pages) that analyzes the issues in great detail.

43.   At the outset, Juneau noted that he looked for guidance to *Robins Dry Dock* and its progeny to identify those persons and entities with standing to pursue punitive damages claims. According to Juneau, that case law makes clear that punitive damages are "afforded to those who had a propriety interest in real or personal property that was physically damaged by oil or substances used in the Deepwater Horizon Incident." *Id.* at 2.   Thus, he concluded that his distribution model should "afford[] the greatest priority" to such claims because they "have the clearest and longest recognized standing to assert claims for punitive damages under the *Robins Dry Dock* line of cases . . . ." *Id.*

44.   In addition to those who satisfied the physical damage requirement, Juneau concluded that certain other categories of claimants should be allowed to participate, albeit with lower priority.   First, he noted that some courts had extended *Robins Dry Dock* standing to commercial

fishermen, although the Fifth Circuit has apparently not applied *Robins Dry Dock* in that context. *Id.* He also noted that an argument for *Robins Dry Dock* standing could also be made for charterboat operators and loss of subsistence fishermen, again at a discounted value. *Id.* In short, Juneau's model encompassed the following claims, in order of priority: (1) those with a proprietary interest in property (real or personal) that was physically damaged; (2) commercial fishermen; (3) subsistence fishermen; and (4) charterboat operators. *Id.* Juneau emphasized that the distribution model provides compensation only for punitive damages under general maritime law, and not for compensatory damages. *Id.* at 3.

45.   The distribution model relies heavily on the experience and infrastructure of the Old Class settlement with BP. Most New Class members received awards under the Old Class settlement with BP, and for them eligibility in the New Class would be based solely on prior submissions to the DHEPDS and the determinations made therein. No new claims forms are necessary for those Old Class members. Those who are in the Old Class but did not file claims have no right to compensatory damages (and thus no right to punitive damages). Those claimants who are *not* in the Old Class (other than opt outs) are allowed to pursue new claims under the distribution model. *Id.* at 3. Unlike Old Class members who had been compensated in the BP settlement, those who were not in the Old Class are required to file claims in order to share in the recovery.

46.   After providing extensive detail regarding the eligible claim categories, *id.* at 4–21, Juneau then proceeded to calculate the specific allocation percentages for various categories of claimants. The purpose was to determine how settlement funds would be distributed among class members, after deducting administrative costs. Based on Juneau's prioritization of claims and his estimated awards by category, he derived the following allocation: real property: 80%; personal property: 0.6%; commercial fishermen: 17.8%; charterboat: 0.2%; and loss of subsistence: 1.4%. *Id.* at 21–26. That allocation was subject to reallocation by as much as 3% based on statistically significant fluctuations in the claim category mix or value. *Id.* at 26–27. With certain exceptions, each claim category's eligible funds were to be divided based on compensation amounts determined in the DHEPDS settlement program (or by the Claims Administrator for those who did not participate in the DHEPDS settlement with BP). For loss of subsistence claims, however, funds were to be divided equally among all claimants based on the allocation of the net settlement fund. *Id.* at 26.

15

### 5. Claims Administrator Patrick A. Juneau's Distribution Plan for the Old Class

47.   Also on June 13, 2016, Old Class Claims Administrator Patrick Juneau filed his report on his proposed plan for distribution of proceeds to the Old Class. (Doc. 18796).  According to Juneau, after payment of administrative costs and expenses, the portion of the aggregate settlement allocated to the Old Class should be distributed on a pro rata basis to each class member based on the amount paid to the particular class member under the DHEPDS settlement. *Id.* at 1.  Claims were capped at $150,000, and the minimum payment would be $100 for those eligible for payment. *Id.* at 2.  Claimants against whom clawback judgments were granted were ineligible for distribution unless such judgments were later reversed on appeal. *Id.* at 2.

## V.  CLASS CERTIFICATION:  NEW CLASS

48.   In this section, I offer my opinion on whether the New Class is suitable for class certification.  In my economic and property damage Declaration in the BP case, I concluded that the Old Class satisfied all of the requirements for class certification.  This Court ultimately certified that class, and that judgment is now final.[12]  Thus, there is no longer any issue regarding the propriety of certifying the Old Class.  Accordingly, this section focuses on class certification issues involving the New Class.[13]

### A. Overarching Opinions

49.   At the outset, I would note that, in my opinion, the class certification issues raised by the New Class are less complicated and difficult than those in the previously certified Old Class. First, whereas the certified Old Class claims in the BP settlement involved a host of compensatory and punitive damages claims, the claims of the New Class are much more focused, as they address solely the question of punitive damages under *Robins Dry Dock* and its progeny. Second, instead of being forced to predict how a classwide trial would unfold, as was necessary in the BP settlement (and most other class settlements), this Court now has the benefit of the Phase One and Phase Two proceedings, which show that the case can be effectively and efficiently adjudicated on a classwide basis.  Thus, in light of the opinions of this Court and the

---

[12] *In re Deepwater Horizon*, 910 F. Supp. 2d 891 (E.D. La. 2012), *aff'd*, 739 F.3d 790 (5th Cir. 2014), *cert. denied*, 135 S. Ct. 754 (2014).

[13] In my discussion, however, I also show that there are no conflicts of interest within the Old Class or between the Old Class and the New Class.

Fifth Circuit approving certification of the BP settlement class, it follows *a fortiori* that class certification is proper here. No further analysis is necessary. But because this Court is required to engage in a rigorous review of class certification,[14] I will analyze the precise class certification issues here in detail, and not simply rely on the prior certification of the Old Class.

### B. Class Certification Standards for Settlement Classes

50. The Supreme Court has made clear that the mere fact that the parties have reached a settlement does not relieve trial courts of their duty to assess whether this case should be certified as a class action. In *Amchem Products, Inc. v. Windsor*, 521 U.S. 591 (1997), the issue was whether a class had been legitimately certified for purposes of a global settlement of current and future asbestos-related claims. To resolve the issue, the Court had to determine whether the standards for certification under Rule 23(b)(3) were less demanding when the case was certified for settlement purposes rather than for trial. The Court held that settlement *was* relevant to one aspect of class certification. In a settlement class, "a district court need not inquire whether the case, if tried, would present intractable management problems, *see* Fed. R. Civ. P. 23(b)(3)(D), for the proposal is that there be no trial." 521 U.S. at 620. The Court concluded, however, that the other requirements of Rule 23—"those designed to protect absentees by blocking unwarranted or overbroad class definitions—demand undiluted, even heightened, attention in the settlement context." *Id.* Thus, under *Amchem*, although this Court is not required to address manageability under Rule 23(b)(3)(D), it *is* required to address all of the other criteria for class certification.

51. To obtain class certification, plaintiffs must satisfy three threshold requirements (a proper class definition, and a representative who is both a member of the class and has a live claim); four explicit requirements under Rule 23(a) (numerosity, commonality, typicality, and adequacy of representation); and all the elements of at least one subdivision of Rule 23(b)— (b)(1)(A), (b)(1)(B), (b)(2), or (b)(3). *See* Robert H. Klonoff, *Class Actions and Other Multi-Party Litigation in a Nutshell* 23–25, 30–133 (West 4th ed. 2012). In this case, plaintiffs seek certification under Rule 23(b)(3), and thus they must show (in addition to the above-mentioned requirements) that common issues predominate over individual issues and that a class action is

---

[14] *See, e.g., Comcast Corp. v. Behrend*, 133 S. Ct. 1426, 1432 (2013) ("a party seeking to maintain a class action must affirmatively demonstrate his compliance with Rule 23" (citation and internal quotation marks omitted)).

superior to other ways of resolving the claims. (As noted, however, the Court need not address manageability in the context of a settlement class.)

52.    This Court is well aware that class certification of large-scale tort claims is the exception, not the rule.  At the same time, the Supreme Court, the Fifth Circuit, and other courts have made clear that certification of such claims may be appropriate in some cases.[15]  Indeed, as I explained in my prior Declarations, the *Deepwater Horizon* litigation is a prime example of a mass tort case that is eminently suitable for class certification.  Accordingly, as I discuss herein, it is my opinion that the New Class satisfies the requirements for certification under Rule 23(b)(3).

53.    I first address the three threshold requirements for certification.  Next, I evaluate the proposed class settlement with respect to the four requirements of Rule 23(a).  Finally, I address Rule 23(b)(3)'s predominance and superiority requirements.

### C. Rule 23's Threshold Requirements

54.    Two of the three threshold requirements can be readily addressed.  The six class representatives clearly fall within the New Class definition and thus are members of the class. Those representatives are property owners or lessees who suffered physical injury to their property or commercial fishermen who own, operate, or work on commercial vessels. *See* Complaint, case 2:15-cv-04143 (Doc. 1) (E.D.La.) (filed 09/04/15), at 3–5 (HESI punitive damages class); and Complaint, case 2:15-cv-04146 (Doc. 1) (E.D.La. (filed 09/04/15), at 3–5 (Transocean punitive damages class).  Moreover, because all of the representatives currently seek punitive damages premised on actual harm suffered by them, their claims are indisputably live, not moot.

---

[15] *See, e.g., Amchem Prods., Inc. v. Windsor*, 521 U.S. 591, 625 (1997) (noting that Rule 23 "does not categorically exclude mass tort cases" and that "mass tort cases arising from a common cause or disaster may, depending upon the circumstances, satisfy the predominance requirement"); *In re Deepwater Horizon*, 739 F.3d 790, 816 (5th Cir. 2014) (explaining that "it is indeed possible to satisfy the predominance . . . requirements of Rule 23(b)(3) in a mass tort or mass accident class action despite the particular need in such cases for individualized damages calculations." (citation and internal quotation marks omitted; ellipsis in original)); *Madison v. Chalmette Ref., L.L.C.,* 637 F.3d 551, 557 (5th Cir. 2011) (while remanding class certification order in case involving release of petroleum coke dust because the district court failed to conduct a rigorous analysis, the court emphasized that it did "not suggest that class treatment [was] necessarily inappropriate," and that "class treatment on the common issue of liability may indeed be appropriate"); *In re Nat'l Football League Concussion Injury Litig.*, No. 15-2206, ___ F.3d ___ (3d Cir. Apr. 18, 2016), at 42 (slip op.) (affirming certification of settlement class alleging personal injuries; court noted that "*Amchem* itself warned that it does not mean mass tort case will never clear the hurdle of predominance" (citation omitted)).

55.  Likewise, I do not have any concerns regarding the class definition.  A class definition is critical to ascertain who is in the class, who is subject to notice, and who is bound by the judgment.  Prior to 2003, the class definition requirement was solely a matter of case law; no such requirement was even mentioned in Rule 23.  In 2003, Rule 23 was amended to state that "[a]n order that certifies a class action must define the class and the class claims, issues, or defenses." Fed. R. Civ. P. 23(c)(1)(B).  The amended Rule, however, does not elaborate on what constitutes a proper class definition.

56.  The *Manual for Complex Litigation (Fourth)* (2004) contains useful guidance in evaluating a class definition.  First, the definition should contain "objective criteria" and "avoid subjective standards (*e.g.*, a plaintiff's state of mind) or terms that depend on resolution of the merits (*e.g.*, persons who were discriminated against)." *MCL(4th)*, *supra*, at § 21.222; *see also Union Asset Mgmt Holding A.G. v. Dell*, 669 F.3d 632, 639 (5th Cir. 2012) ("In order to maintain a class action, the class sought to be represented must be adequately defined and clearly ascertainable.") (citation, alteration, and internal quotation marks omitted).  A definition that turns on the merits is sometimes called a "fail-safe" class, because the class is certified (and a binding judgment entered) only if plaintiff wins the case.  Second, "the class definition should capture[] all members necessary for efficient and fair resolution of common questions of fact and law in a single proceeding." *MCL(4th)*, *supra*, at § 21.222.  Third, "[t]he class definition should describe the operative claims, issues, or defenses." *Id.*  The *Manual* also recognizes that more specificity is needed for (b)(3) classes, which require notice and opt-out rights, than for (b)(1) and (b)(2) classes, which are mandatory. *Id.*; *see also In re Nissan Motor Corp. Antitrust Litig.*, 552 F.2d 1088, 1104–1105 (5th Cir. 1977) (observing that, absent a clear class definition, prospective class members lack adequate notice and cannot exercise their rights under (b)(3) to make an "informed, intelligent decision of whether to opt out or remain a member of the class and be bound by the final judgment").

57.  Here, the class definition is objective and precise and does not turn on the merits.  The proposed definition is very detailed. *See* Preliminary Approval Order (Doc. 16183), at 19–21 (New Class definition).  The definition specifies those entities whose proprietary interest in real property or personal property qualifies them for class membership based on such property having been touched or physically damaged by oil, other hydrocarbons, or other substances from the oil spill. *See id.* at 19–20 (¶¶ 1, 2).  It similarly specifies with precision (and through the use of

detailed definitions of terms) which commercial fishermen, charterboat operators, and subsistence fishermen are members of the class. *See id.* at 20 (¶¶ 3, 4).   And it specifies eight separate categories of individuals and entities that are excluded from the New Class (*e.g.*, E.D. La. judges, law clerks, and their families; government organizations; opt-outs; released parties; and employees of HESI or Transocean). *See id.* at 20–21.   This definition thus allows class members to be readily ascertained.   Moreover, the definition is not subjective and does not turn on the merits.   And it is carefully crafted to encompass only those individuals and entities with plausible punitive damages claims under general maritime law.

### D. Rule 23—Explicit Rule 23(a) Requirements

#### 1. Rule 23(a)(1)—Numerosity

58.   Rule 23(a)(1) requires that the putative class be "so numerous that joinder of all members is impracticable." *Id.*   "To demonstrate numerosity, Plaintiffs must establish that joinder is impracticable through 'some evidence or reasonable estimate of the number of purported class members.'" *Turner v. Murphy Oil USA, Inc.*, 234 F.R.D. 597, 604 (E.D.La. 2006) (quoting *Pederson v. La. State Univ.*, 213 F.3d 858, 868 (5th Cir. 2000)).   According to the Fifth Circuit, numerosity is generally met if a class consists of more than 100–150 members. *See*, *e.g.*, *Mullen v. Treasure Chest Casino, L.L.C.*, 186 F.3d 620, 624 (5th Cir. 1999).   Indeed, "[s]ome courts have suggested that classes of twenty-five or more are generally sufficiently numerous to satisfy Rule 23(a)(1) . . . ." Robert H. Klonoff, *Class Actions and Other Multi-Party Litigation in a Nutshell* 39 (West 4th ed. 2012).

59.   Here, there is no serious dispute about numerosity.   Judge Wilkinson's neutral allocation estimates that "about 162,500" members of the Old Class are members of the New Class, and that the New Class also includes numerous members (such as more than 400 local government entities) that were excluded from the Old Class definition. Neutral Allocation at 19, 26.   Such large numbers indisputably establish numerosity.

#### 2. Rule 23(a)(2)—Commonality

60.   To satisfy Rule 23(a)(2)'s requirement of "questions of law or fact common to the class," the class claims "must 'depend upon a common contention . . . of such a nature that it is capable of classwide resolution—which means the determination of its truth or falsity will resolve an

issue that is central to the validity of each one of the claims in one stroke.'" *M.D. v. Perry*, 675 F.3d 832, 840 (5th Cir. 2012) (quoting *Wal-Mart Stores, Inc. v. Dukes*, 131 S. Ct. 2541, 2551 (2011)).  A single common question satisfying this test will suffice. *Dukes*, 131 S. Ct. at 2556. "The focus in the settlement context should be on the conduct (or misconduct) of the defendant and the injury suffered as a consequence." *In re Heartland Payment Sys.*, 2012 U.S. Dist. LEXIS 37326, at *29–30 (S.D. Tex. Mar. 20, 2012) (citation, alteration, and internal quotation marks omitted).

61.  Here, commonality is easily satisfied.  Every class member's case turns on whether the conduct of HESI and/or Transocean is sufficiently egregious to warrant punitive damages under general maritime law.  And, assuming punitive damages are justified, the determination of the overall amount of punitive damages owed by HESI and/or Transocean to the class raises a common issue.  Moreover, as was true for the BP economic settlement, the claims all arise from the same discrete, single-location, single-event disaster. *In re Deepwater Horizon*, 910 F. Supp. 2d 891, 915 (E.D. La. 2012) ("Importantly, the spill is a single-event, single-location disaster, and so the primary focus of any trial would be BP's conduct and that of its contractors."), *aff'd*, 739 F.3d 790 (5th Cir. 2014), *cert. denied*, 135 S. Ct. 754 (2014).  As the MDL Panel noted in its Transfer Order, these proceedings "indisputably share factual issues concerning the cause (or causes) of the *Deepwater Horizon* explosion/fire and the role, if any, that each defendant played in it." *In re Oil Spill by the Oil Rig "Deepwater Horizon" in the Gulf of Mexico on April 20, 2010*, 731 F. Supp. 2d 1352, 1354 (J.P.M.L. 2010).  The Phase One trial proves beyond question that the punitive damages issues can be tried—and, indeed, already have been tried—on an aggregate basis.[16]

### 3. Rule 23(a)(3)—Typicality

62.  "In order to meet the typicality requirement, 'the claims or defenses of the parties [must be] typical of the claims or defenses of the class.'" *James v. City of Dallas*, 254 F.3d 551, 571 (5th Cir. 2001) (quoting Fed. R. Civ. P. 23(a)(3); alteration by *James* court).  A claim is typical if it arises from the same events, practices, or course of conduct that gives rise to the claims of

---

[16] Issues that have already been decided are still relevant for purposes of commonality (and predominance). *Cf. In re Nassau County Strip Search Cases*, 461 F.3d 219, 228 (2d Cir. 2006) (noting that the fact an issue was resolved by stipulation "does nothing to alter the fundamental cohesion of the proposed class").

other class members, and if the claims are based on the same legal theories. *Id.* "Typicality does not require a complete identity of claims." *Id.* Instead, "the critical inquiry is whether the class representative's claims have the same essential characteristics of those of the putative class." *Id.*

63. In my opinion, typicality is amply satisfied here. The claims of every representative and unnamed class member arise out of the same single-event, single-location disaster, and all of the claims turn on the question of HESI's and Transocean's liability for punitive damages under general maritime law. Importantly, the class representatives are not monolithic but instead consist of a variety of property owner and fishing enterprise claimants encompassed by the class definition.[17]

64. Courts in the Fifth Circuit have held that "[t]he major concern" with respect to typicality is whether "unique defenses against a named plaintiff threaten to become the focus of the litigation." *In re Enron Corp. Secs. Litig.*, 529 F. Supp. 2d 644, 674 (S.D. Tex. 2006) (citation and internal quotation marks omitted). In this case, I know of no unique defenses of any class representative that would "become the focus of the litigation."

### 4. Rule 23(a)(4)—Adequacy of Representation

65. "Rule 23(a)'s adequacy requirement encompasses class representatives, their counsel, and the relationship between the two." *Berger v. Compaq Computer Corp.*, 257 F.3d 475, 479 (5th Cir. 2001) (citation omitted). "In addition to measuring the competence of class counsel and the class representatives' willingness and ability to serve, . . . the Rule 23 adequacy inquiry also uncovers conflicts of interest between the named plaintiffs and the class they seek to represent." *Langbecker v. Electronic Data Systems Corp.*, 476 F.3d 299, 314 (5th Cir. 2007) (citations and internal quotation marks omitted). "Rule 23(a)(4) is satisfied where: (1) the named plaintiffs' counsel will prosecute the action zealously and competently; (2) the named plaintiffs possess a sufficient level of knowledge about the litigation to be capable of taking an active role in and exerting control over the prosecution of the litigation; and (3) there are no conflicts of interest between the named plaintiffs and the absent class members." *Stott v. Capital Fin. Servs.*, 277 F.R.D. 316, 325 (N.D. Tex. 2011) (citations and internal quotation marks omitted). In my

---

[17] *See* Complaint, case 2:15-cv-04143 (Doc. 1) (E.D.La.) (filed 09/04/15), at 3–5 (describing class representatives for HESI punitive damages class); and Complaint, case 2:15-cv-04146 (Doc. 1) (E.D.La. (filed 09/04/15), at 3–5 (describing class representatives for Transocean punitive damages class).

opinion, adequacy is readily satisfied under these criteria.

### a. Zealousness of Class Representatives

66.   My understanding is that the class representatives have zealously pursued the claims. They have also participated in determining the precise terms of the settlement.   To my knowledge, no issues have emerged regarding the willingness, ability, or enthusiasm of the class representatives to serve.

### b. Absence of Conflicts

67.   A significant concern underlying Rule 23(a)(4) is that, absent subclasses or other structural protection, divergent interests among various segments of the class (or between multiple classes) would not be protected.[18]   The risk, then, is that some claimants will be unfairly prejudiced at the expense of other claimants.

68.   Here, the settlement is carefully structured to avoid disabling conflicts.   The decision on how to allocate settlement proceeds is *not* made by class counsel and the class representatives. Instead, the settlement agreements adopt a creative three-part mechanism that, in my view, ensures a fair allocation of settlement proceeds.   As discussed below, those three mechanisms are (1) allocation between the New Class and the Old Class by an objective and insightful federal magistrate judge; (2) allocation among New Class members by an experienced and objective Claims Administrator; and (3) allocation among Old Class members by another experienced and objective Claims Administrator.

69.   First, Judge Wilkinson has performed the critical task of dividing the overall proceeds between the Old Class and the New Class.   He executed that task in his December 10, 2015 Neutral Allocation.   In my opinion, his 37-page decision is carefully reasoned, thorough, and persuasive.   It reflects impressive knowledge of the intricacies of the *Deepwater Horizon* litigation, and the overarching objective of his analysis is to achieve overall fairness.   His conclusion that the New Class, rather than the Old Class, should receive the lion's share of the

---

[18] *See, e.g.*, *Dewey v. Volkswagen Aktiengesellschaft*, 681 F.3d 170, 183 (3d Cir. 2012) ("the linchpin of the adequacy requirement is the alignment of interests and incentives between the representative plaintiffs and the rest of the class." (citation omitted)); *Charron v. Wiener*, 731 F.3d 241, 250 (2d Cir. 2013) ("Where a fundamental conflict exists that goes to the very heart of the litigation, it can be cured by dividing the class into homogeneous subclasses . . . with separate representation to eliminate conflicting interests of counsel." (citations and internal quotation marks omitted)).

settlement proceeds (72.8%) is difficult to quarrel with. His rationale—supported by a rigorous review of maritime principles governing punitive damages—is that New Class members have significantly stronger claims than do the Old Class members. As Judge Wilkinson notes, "[t]he members of the New Class are plaintiffs who were most directly, seriously and obviously damaged by the explosion and oil spill for which BP, Halliburton and Transocean were jointly responsible." Neutral Allocation at 5–6.

70.  One might quibble with the precise allocation numbers: 72.8% for the New Class versus, *e.g.*, 69% or 74%. But that type of argument can be made in virtually every settlement. The key point, in my opinion, is that the allocation mechanism does not raise disabling conflicts of interest. Here, the decision on how to divide the proceeds between the New Class and the Old Class (subject to this Court's approval) was made by someone who indisputably was not biased in favor of any segment of the class. All class members were treated fairly and objectively based on the relative strength (by category) of their punitive damages claims. And class counsel ensured the integrity of the process by declining to advocate for any specific allocation. *See* PSC Submission Regarding the Allocation of Halliburton and Transocean Settlement Proceeds (Doc. 15569) (filed 11/13/15) at 1. Indeed, class counsel, HESI, and Transocean all agreed to be bound by Judge Wilkinson's allocation (assuming approval by this Court). *See* Preliminary Approval Order at 9.

71.  Second, the proposed distribution model for dividing up the individual payments to the members of the New Class comes not from class counsel and the class representatives, but from Michael Juneau, the New Class Claims Administrator (again, subject to this Court's approval). Faced with several categories under the settlements—real and personal property owners who suffered physical damage, commercial fishermen, charterboat operators, and subsistence fishermen—Juneau carefully and objectively analyzed the relative strength of the claims in each category. (Doc. 18797). In my opinion, Juneau's analysis is thorough, careful, and well reasoned. As with Judge Wilkinson's allocation, the crucial fact is that the recommended allocation among the New Class categories comes from someone who is both knowledgeable and objective. Again, one might quibble at the margins—*e.g.*, arguing for 15% or 19% for commercial fishermen as opposed to the 17.8% designated by Juneau—but (as noted) such quibbling is possible in virtually every settlement. Indeed, the justification for quibbling here is far less than in most settlements because, in his recommendation, Juneau reserves the "right to

reallocate as much as 3% of the overall Settlement Funds between the Claim Categories" to take into account any material fluctuations as the actual claims unfold. *Id.* at 26.  Juneau's ability to reassess the allocation based on the actual facts is an important feature of his model that helps ensure fairness to all segments of the class.

72.  Third, the allocation among the Old Class members is the responsibility (subject to this Court's approval) of someone who, like Judge Wilkinson and Michael Juneau, is neutral and is not disposed to favor any category of claimants.  Claims Administrator Patrick Juneau brings not only objectivity but also vast experience, given his role as Claims Administrator for the BP settlement and other major cases.  Here, Juneau proposes a pro-rata distribution scheme based on the amount paid to each claimant in the BP settlement. (Doc. 18796).  That approach makes perfect sense and would be difficult for any segment of the class to oppose.  Moreover, to make the payments meaningful but still enable wide participation, Juneau suggests capping individual payments at $150,000 and providing minimum payments of $100 to every qualifying Old Class member.

73.  Class settlements have occasionally been struck down on the ground that they do not adequately address potential conflicts among class members.  This occurred only weeks ago in *In re Payment Card Interchange Fee and Merchant Discount Antitrust Litigation*, No. 12-4671, ___ F.3d ___ (2d Cir. June 30, 2016).  There, the Second Circuit struck down a class settlement on adequacy of representation grounds because various segments of the class had competing interests, and there were no structural assurances to protect those interests. *See id.* at 29–30 ("Structural defects in this class action created a fundamental conflict between the (b)(3) and (b)(2) classes and sapped class counsel of the incentive to zealously represent the latter.").  Here, by contrast, the multi-layered allocation mechanisms described above provide strong assurance of structural protection to all segments of both the New Class and the Old Class.

### c. Competence of Class Counsel

74.  As I argued in my Declaration in the BP settlement, and as this Court recognized in approving that settlement, counsel here have vigorously and capably pursued this case from its inception.[19]   The PSC includes many of the nation's most prominent and experienced class

---

[19] *See In re Deepwater Horizon*, 910 F. Supp. 2d 891, 916 (E.D. La. 2012) (noting that members of the PSC, "an experienced and diverse group of lawyers selected by the Court, . . . . have diligently prosecuted this litigation,

action attorneys.  They were selected by the Court from among hundreds of applicants.  Their skill and experience are reflected in their crafting of the complaints, their filing of (and opposition to) myriad motions, their thoroughness in approaching discovery, their vigilance in the trial proceedings, and ultimately (as I discuss below) the impressive results they achieved for the class after vigorous and protracted negotiations.

### E. Rule 23(b) Requirements

75.   Rule 23(b)(3) requires the Court to find that "the questions of law or fact common to class members predominate over any questions affecting only individual members" and that "a class action is superior to other available methods for fairly and efficiently adjudicating the controversy." Fed. R. Civ. P. 23(b)(3).  In my opinion, those criteria are readily met here with respect to the New Class, just as they were met for the Old Class in the BP settlement.

### 1. Predominance of Common Questions

76.    "The predominance requirement 'tests whether proposed classes are sufficiently cohesive to warrant adjudication by representation.'" *Gene and Gene, LLC v. BioPay, LLC*, 541 F.3d 318, 326 (5th Cir. 2008) (quoting *Amchem Products, Inc. v. Windsor*, 521 U.S. 591, 623 (1997).  "In the context of mass tort litigation," the Fifth Circuit has held "that a class issue predominates if it constitutes a significant part of the individual cases." *Watson v. Shell Oil Co.*, 979 F.2d 1014, 1022 (5th Cir. 1992) (footnote omitted).

77.   Here, the common issues (which I describe in Section V(D)(2), *supra*) are critical.  The centerpiece of the controversy for the New Class members is the potential liability of HESI and Transocean for punitive damages in connection with the events surrounding the *Deepwater Horizon* oil spill and cleanup.  The reprehensibility of the conduct of HESI and Transocean is unquestionably an important and overarching issue that does not vary by class member.  The Fifth Circuit has recognized, in this litigation and elsewhere, that punitive damages claims are suitable for classwide treatment under analogous circumstances. *See*, *e.g.*, *In re Deepwater Horizon*, 739 F.3d 790, 811 (5th Cir. 2014) (approving certification of settlement class where common issues included "[w]hether punitive damages are available as a matter of law"

consulted widely among class members in negotiating the Settlement, and aggressively represented the interests of their clients"), *aff'd*, 739 F.3d 790 (5th Cir. 2014), *cert. denied*, 135 S. Ct. 754 (2014).

(alteration in original)), *cert. denied*, 135 S. Ct. 754 (2014); *Jenkins v. Raymark Industries, Inc.*, 782 F.2d 468, 471 (5th Cir. 1982) (approving district court's certification of (b)(3) class of asbestos claimants in which the common issues included the amount of punitive damages for which defendants were liable; *Watson v. Shell Oil Co.*, 979 F.2d 1014, 1019 (5th Cir. 1992) (affirming proposed trial plan for single-incident class action involving punitive damages claim).

78. By contrast, the individualized issues are easily managed: They involve merely the mechanical task of allocating punitive damages among New Class members. As myriad courts have stated, mere differences in damages do not defeat class certification.[20]

79. Another factor favoring predominance here is that all of the New Class's claims for punitive damages arise under general maritime law. By contrast, many mass tort cases that have failed the criteria for class certification involved the laws of all 50 states and the District of Columbia, thus creating myriad individualized issues.[21]

80. Furthermore, a finding of predominance is supported by a long line of cases—culminating in the BP settlement in the instant case—finding "single incident" tort cases to be suitable for class certification.[22] *See also In re Deepwater Horizon*, 910 F. Supp. 2d 891, 923

---

[20] *See, e.g.*, *Tyson Foods, Inc. v. Bouaphakeo*, 136 S. Ct. 1036, 1045 (2016) (quoting Wright, Miller & Kane treatise for the proposition that predominance can be satisfied even if individualized damages issues exist); *Bell Atl. Corp. v. AT&T Corp.*, 339 F.3d 294, 306 (5th Cir. 2003) (recognizing that "relatively few motions to certify a class fail because of disparities in the amount of damages suffered by the class members" and that "[e]ven wide disparity among class members as to the amount of damages suffered does not necessarily mean that class certification is inappropriate"); *Messner v. Northshore Univ. HealthSystem*, 669 F.3d 802, 815 (7th Cir. 2012) ("[i]t is well established that the presence of individualized questions regarding damages does not prevent certification under Rule 23(b)(3)") (citations omitted); *Allapattah Servs. v. Exxon Corp.*, 333 F.3d 1248, 1261 (11th Cir. 2003) ("numerous courts have recognized that the presence of individualized damages issues does not prevent a finding that the common issues in the case predominate").

[21] *See, e.g.*, *Amchem Products, Inc. v. Windsor*, 521 U.S. 591, 624 (1997); *Johnson v. Nextel Communications Inc.*, 780 F.3d 128, 132 (2d Cir. 2015); *Matter of Rhone-Poulenc*, 51 F.3d 1293, 1300–1303 (7th Cir. 1995); *Castano v. American Tobacco Co.*, 84 F.3d 734, 741 (5th Cir. 1996); *Zinser v. Accufix Research Institute, Inc.*, 253 F.3d 1180, 1189 (9th Cir. 2001); *In re Paxil Litig.*, 212 F.R.D. 539, 551 (C.D. Cal. 2003); *In re Rezulin Prods. Liab. Litig.*, 210 F.R.D. 61, 70–71 (S.D.N.Y. 2002).

[22] *See, e.g.*, *In re Deepwater Horizon*, 739 F.3d 790, 816 (5th Cir. 2014) (noting that the Fifth Circuit has "previously affirmed class certification in mass accident cases, as in other cases in which virtually every issue prior to damages is a common issue." (footnotes and internal quotation marks omitted); *In re Deepwater Horizon*, 910 F. Supp. 2d 891, 927 (E.D.La. 2012) ("Courts in this District agree that it is appropriate, in circumstances where the underlying facts and nature of the case warrant, to certify class actions in environmental disaster and other toxic exposure cases." (citing cases)); *Watson v. Shell Oil Co.*, 979 F.2d 1014, 1021–22 & n.37 (5th Cir. 1992) (affirming district court's (b)(3) certification of a class alleging injury from an a explosion at defendant's manufacturing facility); *Turner v. Murphy Oil USA, Inc.*, 234 F.R.D. 597 (E.D.La. 2006) (certifying (b)(3) class alleging property damage from an oil spill at defendant's refinery); *In re Train Derailment near Amite, La.*, 2006 U.S. Dist. LEXIS 32839 (E.D.La. May 24, 2006) (certifying (b)(3) class and approving settlement).

(E.D.La. 2012) ("here each class member traces his injury directly to the same genesis—a single well blowout stemming from the same operative causes" (citation omitted)), *aff'd*, 739 F.3d 790 (5th Cir. 2014), *cert. denied*, 135 S. Ct. 754 (2014).  This case is thus a far cry from a mass tort case in which most of the time would be focused on specific causation or other highly individualized inquiries.

### 2. Superiority

81.  Superiority under Rule 23(b)(3) is met when a class action "is superior to other available methods for fairly and efficiently adjudicating the controversy." Fed. R. Civ. P. 23(b)(3).  The Rule provides several criteria for assessing superiority. *See* Fed. R. Civ. P. 23(b)(3)(A)–(D).  In my opinion, the class action device is the superior vehicle for resolving the instant claims.  In this part, I first address the bottom-line question of whether a class action is more efficient and effective than other methods for resolving the claims in this case.  I then address the precise factors set out in Rule 23(b)(3)(A)–(D) that courts should weigh in evaluating superiority.

### a. A Classwide Mechanism is the Most Efficient and Effective Way to Proceed

82.  A class action is certainly not the only vehicle for resolving aggregate claims.  One alternative to a class action is the "quasi class action" adopted by some courts.[23]  Quasi-class actions have arisen in some mass tort cases that do not qualify for Rule 23 certification.  In the *Vioxx* litigation, for example, defendant Merck (a pharmaceutical company) and various plaintiffs' counsel agreed to a $4.85 billion non-class settlement to resolve approximately 50,000 claims of personal injury allegedly caused by defendant's since-recalled painkiller.[24]  Although the non-class approach in *Vioxx* was innovative, and may have been the best approach for

---

[23] *See, e.g., In re Vioxx Prods. Liab. Litig.*, 650 F. Supp. 2d 549, 554 (E.D. La. 2010) ("the Vioxx global settlement may properly be analyzed as occurring in a quasi-class action, giving the Court equitable authority to review contingent fee contracts for reasonableness") (citation omitted); *In re Guidant Corp. Implantable Defibrillators Prods. Liab. Litig.*, 2008 WL 682174, at *18 (D. Minn. Mar. 7, 2008) (court reviewed reasonableness of fees because private settlement "has many of the characteristics of a class action and may properly by characterized as a quasi-class action subject to general equitable powers of the court" (citations and internal quotation marks omitted)); *In re Zyprexa Prods. Liab. Litig.*, 424 F. Supp. 2d 488, 491 (E.D.N.Y. 2006) (to the same effect).

[24] *See* Settlement Agreement Between Merck & Co., Inc. and the Counsel Listed on the Signature Pages Hereto (Nov. 9, 2007) (copy on file with author); Alex Berenson, *Merck Agrees to Settle Vioxx Suits for $4.85 Billion*, N.Y. Times, Nov. 9, 2007, *available at* http://www.nytimes.com/2007/11/09/business/09merck.html (last visited July 7, 2016).

settling *that* litigation, I believe that a similar approach here would be ill-advised.

83.   A Rule 23(b)(3) class action provides a time-tested and procedurally superior vehicle by which to resolve the claims in this case.  It is a vehicle with numerous built-in mechanisms to protect class members, including thorough judicial scrutiny of all class settlements.

84.   By contrast, there are no built-in mechanisms for administering or settling mass torts on a "quasi-class" basis.  A court administering a quasi-class action must make up the rules of the game as it goes along, instead of relying on the time-tested criteria of Rule 23.  As Judge Scirica noted in his concurring opinion in *Sullivan v. D.B. Investments, Inc.*, 667 F.3d 273 (3d Cir. 2011) (en banc), *cert denied*, 132 S. Ct. 1876 (2012):

> [S]ome observers believe there has been a shift in mass personal injury claims to
> aggregate non-class settlements.  This is significant, for outside the federal rules
> governing class actions, there is no prescribed independent review of the
> structural and substantive fairness of a settlement including evaluation of
> attorneys' fees, potential conflicts of interest, and counsel's allocation of
> settlement funds among class members.

667 F.3d at 334 (Scirica, J., concurring) (citations omitted).

85.   Another alternative to a class action is case-by-case adjudication.  That approach, however, would not have been a feasible or sensible alternative in the instant case.  The overarching liability issues were complicated and expensive to prove, even within the Limitation Action, on a consolidated basis.[25]   Even had the Court found a basis for punitive damages, it would have been a herculean task to assess both compensatory and punitive damages, on both an individual and collective basis, in the hopes of ultimately securing, for each plaintiff, a legally and constitutionally permissible punitive damage judgment.  The lack of incentive for most class members to pursue such litigation to its conclusion illustrates precisely the problem to which the class action device supplies a time-tested solution: aggregating similar claims and thereby alleviating the asymmetry between the parties.[26]   The prospect of thousands of lawsuits raising identical punitive damages issues is hardly superior to Rule 23.

---

[25] By way of example, the Phase One trial alone took 29 trial days, and the Court's Findings and Conclusions required 618 paragraphs (153 pages). (Doc. 13381-1; Doc. 14021, ¶ 4).

[26] *See, e.g., Amchem Products, Inc. v. Windsor*, 521 U.S. 591, 617 (1997) ("The policy at the very core of the class action mechanism is to overcome the problem that small recoveries do not provide the incentive for any individual to bring a solo action prosecuting his or her rights.  A class action solves this problem by aggregating the relatively paltry potential recoveries into something worth someone's (usually an attorney's) labor." (citation omitted)).

86.   In some cases, the fear is that a trial would turn into a chaotic and unmanageable proceeding that focused mainly on individualized issues.  Here, it is clear that that scenario will not arise.  Trial Phases One and Two occurred smoothly and efficiently, without any focus on individualized issues among class members.

### b. Superiority Criteria

87.   Apart from the broad inquiry as to whether a class action is better than other mechanisms for resolving the litigation, Rule 23(b)(3) instructs a court to look at four criteria in assessing superiority:

> (A) the class members' interests in individually controlling the prosecution or defense of separate actions;
>
> (B) the extent and nature of any litigation concerning the controversy already begun by or against class members;
>
> (C) the desirability or undesirability of concentrating the litigation of the claims in the particular forum; and
>
> (D) the likely difficulties in managing a class action.

Fed. R. Civ. P. 23(b)(3)(A)–(D).  In my opinion, these criteria are easily satisfied here.

88.   As I explained, *see* ¶ 50, *supra*, under *Amchem*, factor (D) is inapplicable because this is a settlement class.  In all events, factor (D) is a non-issue.  It is clear from the Phase One and Phase Two proceedings that this case is easily managed as a class action.

89.   Regarding factor (A), class members have little interest in controlling their own cases because, as noted, bringing suit on an individual basis is generally cost prohibitive.  And even if a case were theoretically viable as an individual suit, a claimant would be forced to hire an attorney and agree to pay a hefty percentage of any recovery to that attorney.  Here, common attorneys' fees and common benefit costs (up to $124,950,000) will be paid separately by HESI and Transocean, and not out of the $1,239,750,000 settlement fund.

90.   Factor (B) likewise supports the settlements at issue here.  The claims arising out of the *Deepwater Horizon* oil spill have been centralized in this Court by the Multi-District Litigation Panel, so there is no risk of competing litigation (except perhaps by some opt-out plaintiffs).

91.   Regarding factor (C), the MDL Panel has already determined—correctly, in my view— that the cases should be concentrated in one forum for pretrial purposes.  It thus makes perfect

sense for this Court to oversee the HESI/Transocean settlement, just as it has overseen the BP settlement with great skill and expertise.

## C. Conclusion on Class Certification

92.  For the above reasons, it is my opinion that the proposed New Class satisfies all of the requirements for certification of a settlement class under Rule 23(b)(3).

## VI. FAIRNESS OF PROPOSED ECONOMIC AND PROPERTY DAMAGES CLASS SETTLEMENT

93.  In this section, I address the fairness of the proposed settlements under Rule 23(e).  For this discussion, I focus on both the New Class and the Old Class.

94.  "To safeguard the interests of absent class members, district courts must determine whether proposed class-action settlements are fair, adequate, and reasonable." *Union Asset Mgmt Holding A.G. v. Dell*, 669 F.3d 632, 639 (5th Cir. 2012) (citation omitted); *see* Fed. R. Civ. P. 23(e)(2) (a court may approve a settlement "only after a hearing and on finding that it is fair, reasonable, and adequate").   The Fifth Circuit evaluates the fairness of a proposed class settlement with reference to the six factors set forth in *Reed v. General Motors Corp.*, 703 F.2d 170 (5th Cir. 1983).  Ultimately, however, the question of fairness depends upon "the terms of the settlement." *Cotton v. Hinton*, 559 F.2d 1326, 1330 (5th Cir. 1977).  For that reason, before addressing the *Reed* factors, I describe the benefits to the classes.

### A. Benefits to the New and Old Classes

95.  This proposed settlement provides class members with significant benefits:

- New Class members will divide a settlement fund of $902,083,250, minus administrative costs, based on their claim category—physical injury to real or personal property, commercial fishermen, charterboat operators, subsistence fishermen;

- Old Class members will divide a settlement fund of $337,666,750, minus administrative costs, on a pro rata basis (based on their recoveries in the BP settlement), with maximum ($150,000) and minimum ($100) award parameters;

- Class members who were part of the BP Class settlement do not need to submit any paperwork to participate;

- Various individuals and entities who were not part of the Old Class are permitted to participate as New Class members;

- Attorneys' fees for class counsel and common benefit costs will be paid by HESI and Transocean from a separate fund totaling $124,950,000 ($99,950,000 and $25,000,000, respectively);

- Class members who do not want to participate in the settlement are free to opt out, although, as discussed *infra*, the prospects of recovery through contested litigation are slim to none.[27]

96.   As discussed *infra* in the context of the *Reed* factors, the benefits afforded to the New Class and the Old Class under the HESI/Transocean settlements are truly remarkable given the tenuous claims of the two classes.

**B. The "*Reed* Factors"**

97.   The six *Reed* factors are:

(1) the existence of fraud or collusion behind the settlement; (2) the complexity, expense, and likely duration of the litigation; (3) the stage of the proceedings and the amount of discovery completed; (4) the probability of plaintiffs' success on the merits; (5) the range of possible recovery; and (6) the opinions of the class counsel, class representatives, and absent class members.

703 F.2d at 172 (citations omitted). *Accord, e.g.*, *In re Deepwater Horizon*, 910 F. Supp. 2d 891, 912 (E.D.La. 2012), *aff'd*, 739 F.3d 790 (5th Cir. 2014), *cert. denied*, 135 S. Ct. 754 (2014).  I address each *Reed* factor in turn.

**1. Existence of Fraud or Collusion**

98.   The first *Reed* factor is "the existence of fraud or collusion behind the settlement." *Reed*, 703 F.2d at 172.  "Because the parties' interests are aligned in favor of a settlement, the Court must take independent steps to ensure fairness in the absence of adversarial proceedings." *Braud v. Transp. Serv. Co.*, 2010 U.S. Dist. LEXIS 93433, at *9 (E.D.La. Aug. 17, 2010) (citation

---

[27] *See, e.g.*, *Hanlon v. Chrysler Corp.*, 150 F.3d 1011, 1026 (9th Cir. 1998) (rejecting challenge to certification of settlement class where "the notice provided to the absent class members provided each member with the opportunity to opt-out and individually pursue any state law remedies that might provide a better opportunity for recovery"); *In re Prudential Ins. Co. America Sales Litigation*, 148 F.3d 283, 323 (3d Cir. 1998) ("whether class or subclass members are accorded the right to opt out of the settlement" should be considered where appropriate when evaluating settlement's fairness); *In re Deepwater Horizon*, 910 F. Supp. 2d 891, 938 (E.D.La. 2012) ("For those few objectors unhappy with the Settlement, their remedy was simple: opt out."); *aff'd*, 739 F.3d 790 (5th Cir. 2014), *cert. denied*, 135 S. Ct. 754 (2014).

omitted).  At the same time, "[a] strong presumption exists in favor of settlement if the district court determines that the settlement resulted from arms-length negotiations between experienced counsel and was not tainted by fraud or collusion." *Turner v. Murphy Oil USA, Inc.*, 472 F. Supp. 2d 830, 844 (E.D.La. 2007) (citation omitted).

99.   In my review of this proposed HESI/Transocean settlements, I have seen nothing to suggest that the settlements are the result of collusion.  Rather, as with the BP settlement—which was approved by this Court and the Fifth Circuit—these settlements are the result of hard-fought, arm's-length negotiations between experienced counsel.  Prior to the settlements, class counsel litigated this case forcefully, cutting no corners.  It is my understanding that the parties have taken hundreds of depositions, exchanged numerous expert reports, produced millions of pages of documents, engaged in extensive motion practice, and tried Phases One and Two over many months, leading to exhaustive Findings and Conclusions by this Court.  The settlement discussions themselves were protracted, time consuming, and contentious.  They began in 2012, and did not lead to final settlement agreements until the fall of 2014 and the spring of 2015, years after the BP settlement was reached.  The hands-on involvement of Judge Shushan also provides powerful assurance that the proposed settlements are free from any taint of collusiveness.[28]  The *Deepwater Horizon* MDL proceedings have been adversarial from the outset, and there is nothing to suggest collusion.  As this Court noted in approving the BP settlement, "[t]he uncontroverted evidence establishes that the Settlement was reached only after many months of hard-fought negotiations that were conducted simultaneously with adversarial trial preparations." *In re Deepwater Horizon*, 910 F. Supp. 2d 891, 931 (E.D.La. 2012), *aff'd*, 739 F.3d 790 (5th Cir. 2014), *cert. denied*, 135 S. Ct. 754 (2014).

100.   In addition, unlike some class settlements, in which the structure grants enormous benefits to class counsel but virtually nothing to class members, this settlement creates funds for

---

[28] *See, e.g.*, *In re Deepwater Horizon*, 910 F. Supp. 2d 891, 931 (E.D.La. 2012) (fact that Magistrate Judge Shushan "played an important supervisory role in mediating" settlement "weigh[s] in favor of a finding that the Settlement was fairly negotiated"), *aff'd*, 739 F.3d 790 (5th Cir. 2014), *cert. denied*, 135 S. Ct. 754 (2014); *Maywalt v. Parker & Parsley Petroleum Co.*, 67 F.3d 1072, 1079 (2d Cir. 1995) ("the supervision of settlement negotiations by a magistrate judge . . . makes it less likely" that class counsel "promot[ed] their own interests over those of the class"); *Collins v. Sanderson Farms, Inc.*, 568 F. Supp. 2d 714, 725 (E.D.La. 2008) (fact that the parties had engaged in mediation with a magistrate judge demonstrated a lack of collusion behind settlement); *Ridgely v. FEMA*, 2010 U.S. Dist. LEXIS 136368, at *3 (E.D.La. Dec. 13, 2010) (same); *McBean v. New York*, 233 F.R.D. 377, 383 (S.D.N.Y. 2007) (supervision of settlement negotiations by magistrate judge "goes a long way toward assuring that the process was free of collusion or undue pressure") (citation and internal quotation marks omitted).

class members totaling more than a billion dollars.  And most class members do not even need to file claim forms to recover.[29]

101.   The absence of collusion is confirmed by the unique structure of this settlement, which leaves to Judge Wilkinson and the Claims Administrators (Michael Juneau and Patrick Juneau) responsibility for allocating the settlement funds.   Such a multilayered structure ensures transparency and fairness in the distribution of the settlement proceeds.   It confirms that the process here is the antithesis of collusion.

102.   Ultimately, any theory of collusion must be based on the wholly implausible argument that the years of intensive litigation and settlement discussions were merely a subterfuge to hide collusion.  The Sixth Circuit rejected that precise argument in a case in which the parties reached settlement following years of litigation and "months of supervised negotiations, two facilitated mediations and a settlement conference with the court." *Moulton v. US Steel Corp.*, 581 F.3d 344, 351 (6th Cir. 2009).  As the Sixth Circuit wrote:

> It is difficult to maintain that Class Counsel took all of these steps merely to mask its collusion with [defendant], and that the one entity with a bird's eye view of the proceedings—the district court judge—somehow missed the signs that the parties were merely engaged in pretense and posturing.

*Id.* at 351.

103.   Finally, the fact that attorneys' fees and costs were not negotiated until after the settlement was in place—and that attorneys' fees and common benefit costs will be paid separately by HESI and Transocean—provides further assurance that no collusion took place.  As this Court noted in connection with the BP settlement, "there was no discussion of attorneys' fees until all other terms of the agreement were negotiated, agreed upon, reduced to writing, and submitted to the Court, so Class Counsel could not have engaged in trading off the interests of

---

[29] *Contrast, e.g., Eubank v. Pella Corp.*, 753 F.3d 718, 729 (7th Cir. 2014) (striking down class settlement in "a case in which the lawyers support the settlement to get fees; the defendants support it to evade liability; and the court can't vindicate the class's rights because the friendly presentation means that it lacks essential information" (citation and internal quotation marks omitted)); *Redman v. RadioShack Corp.*, 768 F.3d 622, 631–32 (7th Cir. 2014) (striking down class settlement where class counsel's $1 million fee was disproportionate to class recovery consisting of "coupons" with a nominal value of $830,000, and where "[n]o attempt was made by the magistrate judge or the parties to the proposed settlement to estimate the actual value of the nominal $830,000 worth of coupons"); *Pearson v. NBTY, Inc.*, 772 F.3d 778, 782–83 (7th Cir. 2014) (striking down class settlement where it appeared that the parties "structure[d] the claims process with an eye toward discouraging the filing of claims").

class representatives or absent class members so as to maximize their fee recovery."[30]

## 2. Complexity, Expense, and Likely Duration of the Litigation

104.   The second *Reed* factor is "the complexity, expense, and likely duration of the litigation." 703 F.2d at 172.   At bottom, a classwide settlement is especially desirable when the case is complex, expensive, and time-consuming.

105.   As this Court knows, the instant case is exceedingly complicated—factually, legally, and logistically. *In re Deepwater Horizon*, 910 F. Supp. 2d 891, 932 (E.D.La. 2012) (noting that the *Deepwater Horizon* litigation "has been extraordinarily complex and expensive," thus favoring settlement under this factor), *aff'd*, 739 F.3d 790 (5th Cir. 2014), *cert. denied*, 135 S. Ct. 754 (2014).   That complexity is demonstrated by the massive discovery and motions practice, as well as by the Phase One and Phase Two trials.   This litigation has already gone on for six years.   Absent the instant settlements, the next chapter would be appeals and cross-appeals to the Fifth Circuit, challenging various Phase One and Phase Two Findings and Conclusions.   Any relief afforded by the appellate court would then mean further protracted proceedings in this Court.   These facts strongly support approval of the settlements.

## 3. Stage of the Proceedings and Amount of Discovery Completed

106.   The third *Reed* factor is "the stage of the proceedings and the amount of discovery completed." 703 F.2d at 172.   Clearly, a settlement is more likely to pass muster if the Court and the parties can assess it based on substantial information about the strengths and weaknesses of the case.

107.   Here, there has been extensive discovery. *See* ¶¶ 99, 105, *supra*.   Moreover, substantial trial proceedings have taken place: two trial phases—and detailed findings and conclusions— having been completed.   Few class settlements can match this one in terms of the information known to the Court and the parties at the time of settlement.   The vast majority of class actions

---

[30] *In re Deepwater Horizon*, 910 F. Supp. 2d 891, 918 (E.D.La. 2012) (footnote omitted), *aff'd*, 739 F.3d 790 (5th Cir. 2014), *cert. denied*, 135 S. Ct. 754 (2014).   *Accord, e.g.*, *Turner v. Murphy Oil USA, Inc.*, 472 F. Supp. 2d 830, 845 (E.D.La. 2007) (the fact that fees would be paid separately, and that the fee amount was left to the court's discretion, "exponentially decreases the possibility of collusion among counsel"); *McBean v. New York*, 233 F.R.D. 377, 392 (S.D.N.Y. 2007) (where attorneys' fees are "entirely independent of money awarded to the class, the Court's fiduciary role in overseeing the award is greatly reduced, because there is no conflict of interest between attorneys and class members").

settle well before trial.  Indeed, in many instances, a court being asked to approve a settlement prior to class certification will know relatively little about the case until it receives a motion for preliminary approval of a settlement.  In this case, by contrast, this Court has lived with this litigation for more than six years.  In addition to overseeing the Phase One and Phase Two proceedings, this Court (assisted by Judge Shushan) has spent countless hours considering a host of legal, factual, case management, and discovery issues.  It is hard to imagine a court (or a set of litigants) who are better equipped to evaluate the pros and cons of a settlement. *See In re Deepwater Horizon*, 910 F. Supp. 2d 891, 932–33 (E.D.La. 2012) (noting that—even as of 2012—discovery had been "voluminous" and that this case "did not present an 'immature tort' whose legal and factual dimensions and implications had not been fleshed out by judicial decision"), *aff'd*, 739 F.3d 790 (5th Cir. 2014), *cert. denied*, 135 S. Ct. 754 (2014).

### 4. Probability of Plaintiffs' Success on the Merits

108.  The fourth *Reed* factor is "the probability of plaintiffs' success on the merits." 703 F.2d at 172.  As discussed below, plaintiffs have little likelihood of success on the merits.  ***This factor is critical in the instant case, especially in light of the fact that the two settlements would create a fund of well over a billion dollars for class members.***

109.  In my view, the claims that form the basis of the settlements were problematic from the outset.  For the Old Class, when I assessed the value of the assigned claims in my earlier Declaration in the BP case, I did not give significant weight to that aspect of the settlement, since there was no assurance that class members would secure *any* recovery as a result of the assigned claims. *See* Expert Report of Robert H. Klonoff Relating to the Proposed Economic and Property Damages Class Settlement (Doc. 7104-3) (filed 08/13/12) at 30 (noting that "the degree to which [the Old Class's] punitive claims will benefit class members remains unclear at this point . . . ."). There has been no real dispute in this litigation, even prior to this Court's Phase One findings, that BP, not HESI or Transocean, was the primary wrongdoer in the *Deepwater Horizon* incident.  BP's agreement (in 2012) to provide full compensation to Old Class members for actual injuries attests to that fact.  In the words of the late Chief Judge John R. Brown, BP's shoes were "ill-fitting if not worn out." *Florida Bahamas Lines, Ltd. v. Steel Barge Star 800*, 433 F.2d 1243, 1246 (5th Cir. 1970) (quoted in Neutral Allocation at 34).

110.   For the New Class, the success of the punitive damages claims depended entirely on establishing wrongdoing by HESI and Transocean that was serious enough to justify punitive damages.  Punitive damages are designed to address egregious wrongdoing, and, as noted above, BP was clearly the main wrongdoer.  It was anything but certain, even prior to this Court's Phase One Findings and Conclusions, that the New Class would be able to show the requisite level of culpability by HESI and Transocean.

111.   Theoretical concerns about the strength of the Old and New Class members' claims against HESI and Transocean became tangible in light of this Court's Phase One findings.  As noted above (¶¶ 23, 36), this Court concluded that BP was the primary wrongdoer (having engaged in gross negligence), whereas the conduct of HESI and Transocean amounted only to simple negligence.  Those findings—absent reversal on appeal—essentially doomed the claims of both the New Class and the Old Class.  For the New Class, whose claims were based entirely on punitive damages under general maritime law, this Court's findings represented a direct refutation of those claims, given the Court's conclusion that the conduct of HESI and Transocean amounted only to negligence and thus did not give rise to punitive damages.  Similarly, the fact that the Court found BP primarily responsible resulted in a near-fatal blow to the validity of the claims assigned to the Old Class by BP.  Given the Court's findings that BP was 67% at fault, that HESI and Transocean were guilty only of simple negligence, and that there was "no basis to invalidate the BP-HESI or BP-Transocean indemnity agreements and releases," (Doc. 16183), at 5, it is hard to envision—absent reversal on appeal—*BP* having *any* claim against HESI and Transocean.  As one advocate for the Old Class stated, in language quoted by Judge Wilkinson: "Neither class recovers under the District Court's rulings regarding release, indemnity, and punitive damages." Neutral Allocation at 30 (quoting Doc. 15572 at 5).

112.   Moreover, an appeal by the Old and New Classes would be a long shot at best.  This Court—after years of effectively overseeing this litigation, and after conducting extensive trial proceedings—has issued detailed and well-reasoned Findings and Conclusions.  It would be an uphill battle, to say the least, for class members to convince the Fifth Circuit to undo this Court's pertinent Phase One factual or legal rulings.

113.   In the highly unlikely event that class members could successfully challenge this Court's fact finding regarding HESI's and Transocean's lack of recklessness, class members

would also have to establish that the recklessness of HESI and Transocean employees could be attributed to the corporate entities. And they would have to defend the Court's conclusion—attacked by HESI and Transocean—that general maritime punitive damages are not displaced by the Oil Pollution Act, 33 U.S.C. §§ 2701 et seq.[31]

114.   At bottom, class counsel negotiated extremely valuable and impressive settlements, even though (1) this Court would ultimately decimate (with respect to HESI) and had already decimated (with respect to Transocean) the claims of both the New Class and the Old Class, and (2) the two classes were left with what would have been extremely challenging positions on appeal. It is, under the circumstances, nothing short of remarkable that class counsel were able to negotiate settlements worth well in excess of a billion dollars.

### 5. Range of Possible Recovery

115.   The fifth *Reed* factor is "the range of possible recovery" by the class. 703 F.2d at 172. The theoretical range of recovery here was enormous. For instance, Judge Wilkinson noted that potential punitive damages for the New Class were $10.825 billion. (Doc. 15652 at 16). Similarly, Judge Wilkinson received confidential estimates for Old Class claims as high as $37 billion, with an average estimate of $27.7 billion. *Id.* at 29. **But the theoretical recoveries for the two classes are unrealistic "pie in the sky" numbers in light of this Court's findings and conclusions**, as discussed in ¶¶ 23 and 36, *supra*. Given that the pertinent issues have already been adjudicated at trial, and that the two classes are facing an enormous uphill battle on appeal, this *Reed* factor should be given little weight.

### 6. Opinions of Class Counsel, Class Representatives, and Absent Class Members

116.   The sixth and final *Reed* factor is "the opinions of the class counsel, class representatives, and absent class members." 703 F.2d at 172. Here, all of the members of the PSC support the settlement. *See*, *e.g.*, *Cotton v. Hinton*, 559 F.2d 1326, 1330 (5th Cir. 1977) (in reviewing a class settlement, "the trial court is entitled to rely upon the judgment of experienced counsel for the parties") (citation omitted). Likewise, all of the class representatives support the

---

[31] In addition, HESI and Transocean almost certainly would contest *Robins Dry Dock* standing for many class members and also assert Constitutional and common law challenges to any award of punitive damages.

settlement.[32]

### C.  Conclusion on Fairness, Adequacy, and Reasonableness of the Proposed Settlements

117.   For the foregoing reasons, I believe that the proposed class settlements are fair, reasonable, and adequate.

## VII. ATTORNEYS' FEES

118.   On July 15, 2016, a Fee Petition was filed seeking attorneys' fees and the reimbursement of various expenses. (Doc. 21024-2).  That same day, Professor Brian Fitzpatrick filed a Declaration supporting the Fee Petition. (Doc. 21024-5) ("Fitzpatrick Decl.").  Although Professor Fitzpatrick is the main expert on the issue of fees, I thought it would be appropriate to address the issues briefly as well.

119.   In my August 13, 2012 Declaration regarding the proposed Economic and Property Damages Class Settlement, I focused primarily on class certification and fairness issues.  I did, however, also address attorneys' fees based on the facts as I understood them at the time. *See* Expert Report of Robert H. Klonoff Relating to the Proposed Economic and Property Damages Class Settlement (Doc. 7104-3) (filed 08/13/12) at 39–58.  I assumed, based on BP's own estimates, that the value of the BP settlement was $7.8 billion.  Given that the agreement provided for a maximum award for common benefit fees and costs of $600 million, and given that class counsel had already incurred about $30 million in costs, I assumed that the maximum amount of fees that would be sought would be $570 million. *Id.* at 40.  Under that scenario, fees would represent 7.3% of the award. *Id.* at 41.  Applying various other assumptions, I concluded that the percentage could be as low as 5.4% or as high as 11.4%. *Id.* at 41–42.  After addressing the relevant legal criteria, and relying on Professor Fitzpatrick's published empirical studies, I concluded that fees in the range of 5.4% to 11.4% were reasonable. *Id.* at 42–58.

120.   As the case has unfolded, it turns out that I was unduly conservative in the figures I used to value the BP settlement.  As Professor Fitzpatrick explains in his July 15, 2016 Declaration, BP's current estimate of the value of the BP economic settlement is $12.9 billion.

---

[32] Under the Court's schedule, it is too early to know if there will be objections by unnamed class members.

Fitzpatrick Decl. at 14.   When the amount that the Old Class will receive from the HESI/Transocean settlement is added ($337 million), along with funds from Transocean's insurers ($82 million), the total is more than $13.3 billion. *Id.* at 15.   When the value of the BP personal injury settlement ($170 million) is included, the total is $13.5 billion.   Subtracting estimated compensation that would have been paid under the GCCF ($500 million), the total is about $13 billion. *Id.*   Based on the $13 billion figure, the fee percentage is less than 4.3%. *Id.* at 16.   Obviously, since I viewed fee percentages of 5.4%–11.4% as reasonable, I believe that a fee percentage of 4.3% (or less) is eminently reasonable.

121.   As noted (¶ 25, *supra*), the HESI and Transocean settlements yielded not only settlement funds of more than a billion dollars, but also a separate fund for attorneys' fees and common benefit costs up to $124,950,000.   Professor Fitzpatrick analyzes that amount as if it all applies to the New Class portion of the settlement ($902,083,250), thus resulting in a fee award of 12.1% of the benefits obtained by the New Class. Fitzpatrick Decl. at 32–33.   He also calculates the percentage based on the assumption that the fees should be attributed to the *entire* HESI/Transocean settlement—both Old Class and New Class—and under that scenario he calculates the percentage as 9.2%. *Id.* at 33 n.31.   He concludes that fees of 12.1% (and thus, *a fortiori*, fees of 9.2%) are reasonable.

122.   I believe that the more persuasive and realistic assumption is that fees should be attributed to the entire HESI/Transocean settlement, because it all represents new money negotiated years after the BP settlement.   Thus, I believe that the relevant percentage is 9.2%.   In all events, I agree with Professor Fitzpatrick that, whether the percentage is viewed as 12.1% or 9.2%, the amount sought in the Fee Petition is reasonable.   As explained above (¶¶ 108–114, *supra*), neither the Old Class nor the New Class had any realistic prospect of success against HESI or Transocean in light of this Court's Phase One rulings.   As Professor Fitzpatrick notes, 12.1% is below the average fee award, even for cases involving settlements of $1 billion or more. Fitzpatrick Decl. at 33.   That fact is especially compelling because courts are more willing to award higher fee percentages when plaintiffs face a low probability of success.[33]

---

[33] *See, e.g.*, *Johnson v. Georgia Highway Express, Inc.*, 488 F.2d 714, 717–19 (5th Cir. 1974) (factors for courts to consider in reviewing attorneys' fee awards include "[t]he novelty and difficulty of the questions," and "[t]he amount involved and the results obtained" in the litigation); *see also, e.g.*, *In re Enron Corp. Secs.*, 586 F. Supp. 2d

123.   In short, I believe that the fees sought in connection with the HESI/Transocean settlements are reasonable, especially given the extraordinary terms of the settlements and the virtually insurmountable obstacles facing the two classes in the absence of settlement.

**VIII.  CONCLUSION**

124.  In my opinion, this Court should certify the case as a Rule 23(b)(3) class and uphold the HESI/Transocean settlements as fair, reasonable, and adequate.  The Court should also approve the requested common benefit fee award.


I declare the foregoing is based on information known to me and that it is true and accurate to the best of my knowledge, subject to the laws against perjury pursuant to 28 U.S.C. § 1746.


_____

Robert H. Klonoff

August 5, 2016

---

732, 797 (S.D. Tex. 2008) (fact that "the risk of little or no recovery was high" supported fee award of 9.52% of $7.227 billion settlement).

# APPENDIX A

## Definition of New Class [34]

The New Punitive Damages Settlement Class ("New Class") is defined as:

(1)     All Natural Persons, businesses, trusts, non-profits, or any other Entity who, anytime between April 20, 2010 through April 18, 2012, owned, leased, rented, or held any proprietary interest in Real Property (a) alleged to have been touched or physically damaged by oil, other hydrocarbons, or other substances from the MC252 Well or the *Deepwater Horizon* MODU and its appurtenances (including the riser and blowout preventer), (b) alleged to have been touched or physically damaged by substances used in connection with the *Deepwater Horizon* Incident, or (c) classified as having or having had the presence of oil thereupon in the database of the *Deepwater Horizon* Unified Command Shoreline Cleanup Assessment Team ("SCAT" database).

(2)     All Natural Persons, businesses, trusts, non-profits, or any other Entity who, anytime between April 20, 2010 through April 18, 2012, owned, chartered, leased, rented, or held any proprietary interest in Personal Property located in Gulf Coast Areas or Identified Gulf Waters, alleged to have been touched or physically damaged by (a) oil, other hydrocarbons, or other substances from the MC252 Well or the *Deepwater Horizon* MODU and its appurtenances (including the riser and blowout preventer), or (b) substances used in connection with the *Deepwater Horizon* Incident.

(3)     All Commercial Fishermen or Charterboat Operators who, anytime from April 20, 2009 through April 18, 2012, (a) owned, chartered, leased, rented, managed, operated, utilized or held any proprietary interest in commercial fishing or charter fishing Vessels that were Home Ported in or that landed Seafood in the Gulf Coast Areas, or (b) worked on or shared an interest in catch from Vessels that fished in Specified Gulf Waters and landed Seafood in the Gulf Coast Area.

(4)     All Natural Persons who, anytime between April 20, 2009 through April 18, 2012, fished or hunted in the Identified Gulf Waters or Gulf Coast Areas to harvest, catch, barter, consume or trade natural resources including Seafood and game, in a traditional or customary manner, to sustain basic family dietary, economic security, shelter, tool, or clothing needs.

---

[34] The Class Definition includes certain capitalized defined terms, the meaning of which are given in the Settlement Agreements. [Rec. Docs. 15322-1 through 15322-6, and Rec. Doc. 14644-1 through 14644-5].

Excluded from the New Punitive Damages Settlement Class are the following:

(1)     Any New Class Member who timely and properly elects to opt out of the New Class under the procedures established by the Court;

(2)     Defendants in MDL 2179, and individuals who are current employees of Halliburton, or who were employees of Halliburton during the Class Period;

(3)     The Court, including any sitting judges on the United States District Court for the Eastern District of Louisiana, their law clerks serving during the pendency of MDL 2179, and any immediate family members of any such judge or law clerk;

(4)     Governmental Organizations, meaning **(i)** the government of the United States of America; **(ii)** the state governments of Texas, Louisiana, Mississippi, Alabama, and Florida (including any agency, branch, commission, department, unit, district or board of the state); and **(iii)** officers or agents of the U.S., states, and/or Indian tribes appointed as "Natural Resource Damages Trustees" pursuant to the Oil Pollution Act of 1990 as a result of the *Deepwater Horizon* Incident. Governmental Organizations do *not* include any local government such as a county, parish, municipality, city, town, or village (including any agency, branch, commission, department, unit, district or board of such local government);

(5)     Any Natural Person or Entity who or that made a claim to the GCCF, was paid, and executed a valid GCCF Release and Covenant Not to Sue, provided, however, that a GCCF Release and Covenant Not to Sue covering only Bodily Injury Claims shall not be the basis for exclusion of a Natural Person;

(6)     BP Released Parties and individuals who were employees of BP Released Parties during the Class Period;

(7)     HESI and Individuals who were employees of HESI during the Class Period; and

(8)     Transocean and individuals who were employees of Transocean during the Class Period.

## APPENDIX  B

## CURRICULUM VITAE

**ROBERT H. KLONOFF**
Lewis & Clark Law School
10015 SW Terwilliger Blvd.
Portland, Oregon 97219
Tel:  503-768-6601 (Office)
E-Mail:  klonoff@lclark.edu

Date of Birth:  March 15, 1955
Place of Birth:  Portland, Oregon

**EDUCATION:**

> J.D., Yale University, 1979
>
> A.B., University of California, Berkeley, 1976, Majored in Political Science/Economics (Highest Honors)

**WORK EXPERIENCE:**

> **Current Position:**
>
> > Jordan D. Schnitzer Professor of Law, Lewis & Clark Law School (since 2014)
>
> **Prior Positions:**
>
> > Dean of the Law School, Lewis & Clark Law School (2007-2014)
> >
> > Douglas Stripp/Missouri Endowed Professor of Law, University of Missouri-Kansas City School of Law (2003-2007)
> >
> > Jones Day, Washington, D.C. (Partner, 1991-July 2003; Of Counsel, 1989-1991, 2003- 2007)
> >
> > Adjunct Professor of Law, Georgetown University Law Center (class action law and practice) (1999-2003)
> >
> > Visiting Professor of Law, University of San Diego School of Law (1988-1989)
> >
> > Assistant to the Solicitor General of the United States (1986-1988)
> >
> > Assistant United States Attorney (Criminal Division, District of Columbia) (1983-1986)

Associate, Arnold & Porter, Washington, D.C. (1980-1983)

Law Clerk to the Honorable John R. Brown, Chief Judge, United States Court of Appeals for the Fifth Circuit (1979-1980)

Summer Associate, Baker & Botts, Houston, and Arent, Fox, Kintner, Plotkin & Kahn, Washington, D.C. (1978)

Summer Associate, Sidley & Austin, Washington, D.C. (1977)

## SPECIAL HONORS AND ACHIEVEMENTS:

Elected Member, International Association of Procedural Law

Selected in November 2013 for the J. William Fulbright Specialist Roster

Recipient, Oregon Consular Corps Award for Individual Achievement in International Outreach, Portland, Oregon (May 2013)

Member, United States Judicial Conference Advisory Committee on Civil Rules (appointed by Chief Justice John G. Roberts, Jr., in 2011 as the sole voting member from the law school academy; reappointed May 2014 for a second three-year term)

Associate Reporter, American Law Institute's *Principles of the Law of Aggregate Litigation* (class action project; drafts presented at several annual meetings; final version approved by full ALI in May 2009 annual meeting and published in May 2010)

Fellow, American Academy of Appellate Lawyers

Fellow, American Bar Foundation

Academic Fellow, Pound Institute

Elected Member, American Law Institute

Recipient, 2007 Award for Outstanding UMKC Law Professor (based on vote of 3d year class)

2007 UMKC Law School Commencement Speaker (based on vote of 3d year class)

Recipient, 2006 UMKC Law School Elmer Pierson Teaching Award for Most Outstanding Teacher in the Law School (selected by the Dean)

Recipient, 2005 President's Award for Outstanding Service from the UMKC Law School Foundation

Reporter, 2005 National Conference on Appellate Justice (co-sponsored by the Federal Judicial Center, National Center for State Courts, and other organizations)

Co-Recipient, District of Columbia Bar's Frederick B. Abramson Award for Superior Service to the Community (June 1998)

Attorney General's Special Achievement Award for Outstanding Work as an Assistant to the Solicitor General of the United States (1986, 1987)

Attorney General's Special Achievement Award for Outstanding Work as an Assistant United States Attorney (1984, 1985)

The Benjamin N. Cardozo Prize for Best Moot Court Brief for Academic Year 1978-1979, Yale Law School

Semi-Finalist, Moot Court Oral Argument, Yale Law School (Fall, 1978)

Phi Beta Kappa

U.C. Berkeley's Most Outstanding Political Science Student (1976)

The Edward Kraft Award for Outstanding Work as a Freshman Student, U.C. Berkeley (1974)

**MEMBERSHIPS:**

U.S. Supreme Court Bar

Various Federal Circuit and District Courts

District of Columbia Bar

Missouri State Bar

Oregon State Bar

Multnomah County Bar

American Law Institute

American Bar Association

American Bar Association Committee on Class Actions & Derivative Suits (Section of Litigation)

**PUBLICATIONS:**

**Books:**

Klonoff, *Class Actions and Other Multi-Party Litigation: Cases and Materials* (West 4th ed. 2017) (forthcoming)

Klonoff, *Class Actions and Other Multi-Party Litigation in a Nutshell* (West 5th ed. 2017) (forthcoming)

Castanias & Klonoff, *Federal Appellate Practice in a Nutshell* (West Publishing Co. 2d ed. 2017) (forthcoming)

Klonoff, *Introduction to the Study of U.S. Law:  Cases and Materials* (West Publishing Co. 2016)

Klonoff, *Class Actions and Other Multi-Party Litigation in a Nutshell* (Thomson West 4th ed.) (2012)

Klonoff, Bilich & Malveaux, *Class Actions and Other Multi-Party Litigation: Cases and Materials* (West 3d ed.) (2012 and 2013 update) (with teacher's manual)

Klonoff (associate reporter), *Principles of the Law of Aggregate Litigation*, American Law Institute Publications (2010)(along with Samuel Issacharoff, reporter, and associate reporters Richard Nagareda and Charles Silver)

Castanias & Klonoff, *Federal Appellate Practice and Procedure in a Nutshell* (Thomson West) (2008)

Klonoff & Colby, *Winning Jury Trials:  Trial Tactics and Sponsorship Strategies* (NITA 3d ed.) (2007)

Klonoff, *Class Actions and Other Multi-Party Litigation in a Nutshell* (Thomson West 3d ed.) (2007)

Klonoff, Bilich & Malveaux, *Class Actions and Other Multi-Party Litigation: Cases and Materials* (Thomson West 2d ed.) (2006) (with teacher's manual)

Klonoff, *Class Actions and Other Multi-Party Litigation in a Nutshell* (Thomson West 2d ed.) (2004)

Klonoff & Colby, *Winning Jury Trials:  Trial Tactics and Sponsorship Strategies* (Lexis Nexis 2d ed.) (2002)

Klonoff & Bilich, *Class Actions and Other Multi-Party Litigation: Cases and Materials* (West Group 2000)

Klonoff, *Class Actions and Other Multi-Party Litigation in a Nutshell* (West Group 1999)

Klonoff & Colby, *Sponsorship Strategy:  Evidentiary Tactics for Winning Jury Trials* (Michie Co. 1990)

**Articles and Book Chapters:**

*Class Actions in the Year 2025: A Prognosis*, 65 Emory L.J. 1569 (2016)

*Why Most Nations Do Not Have U.S.-Style Class Actions*, 16 BNA Class Action Litigation Report, Vol. 16, No. 10, at 586 (May 22, 2015) (selected for presentation at the May 2015 World Congress of the International Association of Procedural Law, Istanbul, Turkey)

*Federal Rules Symposium:  A Tribute to Judge Mark R. Kravitz -- Introduction to the Symposium*, 18 Lewis & Clark L. Rev. 583 (2014) (co-author)

*Class Actions for Monetary Relief Under Rule 23(b)(1)(A) and (b)(1)(B):  Does Due Process Require Notice and Opt-Out Rights?*, 82 Geo. Wash. L. Rev. 798 (2014)

*The Decline of Class Actions,* 90 Wash. U. (St. Louis) L. Rev. 729 (2013)

*Reflections on the Future of Class Actions,* 44 Loy. U. Chi. L.J. 533 (2013)

*Richard Nagareda: In Memorium,* 80 U. Cin. L. Rev. 289 (2012)

*Introduction and Memories of a Law Clerk,* 47 Houston L. Rev. 529, 573 (2010)

*ALI's Aggregate Litigation Project Has Global Impact,* 33 ALI Reporter 7 (Fall 2010)

Book Review, *In the Public Interest,*  39  Env. Law 1225 (2009)

*The Public Value of Settlement,*  78 Fordham L. Rev.  1177 (2009)(co-author)

*Making Class Actions Work:  The Untapped Potential of the Internet,* 69 U. Pitt. L. Rev. 727 (co-author)(2008), adapted and published in 13  J. Internet Law 1 (2009)

*The Class Action Fairness Act:  An Ill-Conceived Approach to Class Settlements*, 80 Tul. L. Rev. 1695 (co-author) (2006)

*The Twentieth Anniversary of* Phillips Petroleum v. Shutts, *Introduction to the Symposium*, 74 UMKC L. Rev. 433 (2006)

*The Adoption of a Class Action Rule:  Some Issues for Mississippi to Consider*, 24 Miss. C. L. Rev. 261 (2005)

*Antitrust Class Actions:  Chaos in the Courts*, 11 Stan. J. L. Bus. & Fin. 1 (2005), reprinted in Litigation Conspiracy:  An Analysis of Competition Class Actions (Stephen G.A. Pitel ed. Irwin Law 2006), and 3 Canadian Class Action Review 137 (2006)

*The Judiciary's Flawed Application of Rule 23's "Adequacy of Representation" Requirement*, 2004 Mich. St. L. Rev. 671 (2004)

*Class Action Rules — Are They Driven by Substance?*, 1 Class Action Litigation Report 504 (Nov. 10, 2000) (co-author)

*Response to May 2000 Article on Sponsorship Strategy*, 63 Tex. B.J. 754 (Sept. 2000) (co-author)

*A Look at Interlocutory Appeals of Class Certification Decisions Under Rule 23(f)*, 1 Class Action Litigation Report 69 (May 12, 2000) (co-author)

*The Mass Tort Class Action Gamble*, 7 Metro. Corp. Counsel 1, 8 (Aug. 8, 1999) (co-author)

"Legal Approaches to Sex Discrimination" (co-author), in H. Landrine & E. Klonoff, *Discrimination Against Women:  Prevalence, Consequences, Remedies* (Sage Pub. 1997)

*Sponsorship Strategy:  A Reply to Floyd Abrams and Professor Saks*, 52 Md. L. Rev. 458 (1993) (co-author)

*A Trial Lawyer's Roadmap for Handling Bad Facts:  The Role of Credibility*, 16 Trial Diplomacy Journal 139 (July/Aug. 1993) (co-author)

*Opening Statement*, 17 Litigation 1 (ABA Spring 1991) (co-author)

Contributing Editor, *Criminal Practice Institute Trial Manual*, Young Lawyers Section, Bar Ass'n of D.C. (1986)

*The Congressman as Mediator Between Citizens and Government Agencies:  Problems and Prospects*, 15 Harv. J. Legis. 701 (1979)

*A Dialogue on the Unauthorized Practice of Law*, 25 Villanova L. Rev. 6 (1979) (co-author)

*The Problems of Nursing Homes:  Connecticut's Non Response*, 31 Admin. L. Rev. 1 (1979)

## SIGNIFICANT LEGAL EXPERIENCE:

Argued eight cases before the U.S. Supreme Court

Authored dozens of U.S. Supreme Court filings (certiorari petitions, certiorari oppositions, merits briefs, reply briefs)

Briefed and argued numerous cases before various U.S. circuit and district courts and state trial and appellate courts

Tried dozens of cases (primarily jury trials)

Handled more than 100 class action cases as counsel

Worked extensively with testifying and consulting experts on class action issues, including economists, securities experts, medical and scientific experts, and leading academics

Served as a class action expert witness in numerous federal and state cases, including the British Petroleum Deepwater Horizon oil spill class settlement and the National Football League Concussion class action settlement

Presented more than 100 cases to the grand jury while serving as an Assistant U.S. Attorney

Handled hundreds of sentencing hearings, preliminary hearings, and probation revocation hearings

## SIGNIFICANT TEACHING AND SPEAKING ENGAGEMENTS

Selected as Fulbright Scholar, Hong Kong University School of Law (scheduled for September 2016) (teaching courses and workshops on class actions)

Visiting Professor of Law, National Taiwan University, Taipei, Taiwan (June 2016) (taught course on Introduction to United States Law)

Speaker on Class Actions, University of Zagreb Law School, Zagreb, Croatia (May 11, 2016)

Panelist on Civil Litigation, Association of American Law Schools Annual Meeting, New York, New York (January 8, 2016)

Visiting Professor of Law, Bahçeşehir University School of Law, Istanbul, Turkey (December 2015) (taught Introduction to United States Law)

Invited Participant, Conference on Civil Justice (Pound Institute) Emory University Law School, Atlanta, Georgia (October 15, 2015)

Invited Participant, Conference on Class Actions, Duke Law School, Arlington, Virginia (July 23-24, 2015)

Invited Participant, Conference on Class Actions, Defense Research Institute, Washington, D.C. (July 23-24, 2015)

Invited Participant, Civil Procedure Workshop, Seattle University Law School, Seattle, Washington (July 17, 2015)

Panelist on Class Actions, Annual Meeting, American Association for Justice, Montreal, Canada (July 12, 2015)

Speaker on Class Actions, International Association of Procedural Law, Istanbul, Turkey

(May 28, 2015)

Panelist, Subcommittee on Class Actions of U.S. Judicial Conference Advisory Committee on Civil Rules, American Law Institute Annual Meeting, Washington, D.C. (May 17, 2015)

Moderator, Ethical Issues in Class Actions and Non-Class Aggregate Litigation, American Law Institute Annual Meeting, Washington, D.C., (May 17, 2015)

Visiting Professor of Law, University of Trento, Trento, Italy (March 2015) (taught U.S. Class Actions)

Speaker on Class Actions, European University Institute, Fiesole, Italy (February 23, 2015)

Visiting Professor of Law, University of Notre Dame, Fremantle Australia (January 2015) (taught course on U.S. Civil Rights and Civil Liberties)

Visiting Professor of Law, Universidad Sergio Arboleda, Bogota and Santa Marta, Colombia (December 2014) (taught course on Introduction to United States Law)

Visiting Professor of Law, National Taiwan University, Taipei, Taiwan (November 2014) (taught course on Introduction to United States Law)

Panelist, American Bar Association, National Institute on Class Actions, Chicago, Illinois (October 23, 2014)

Visiting Professor of Law, East China University of Political Science and Law, Shanghai, China (October 2014) (taught U.S. Class Actions)

Visiting Professor of Law, Herzen State Pedagogical University of Russia, St. Petersburg, Russia (September 2014) (taught U.S. Class Actions)

Visiting Professor of Law, Royal University of Law and Economics, Phnom Penh, Cambodia (July 2014) (taught Introduction to United States Law)

Speaker on U.S. Legal Education, Universidad Sergio Arboleda School of Law, Bogota, Colombia (June 3 and 5, 2014)

Speaker on Class Actions, Superintendencia de Industria y Comercio, Bogota, Colombia (June 3, 2014)

Speaker on Class Actions and the Fukushima Nuclear Accident, Waseda University School of Law, Tokyo, Japan (January 24, 2014)

Speaker on Class Actions, Osaka Bar Association, Osaka, Japan (January 23, 2014)

Speaker on Class Actions, East China University of Political Science and Law, Shanghai, China (January 15, 2014)

Speaker on Class Actions, AmCham Shanghai, Shanghai, China (January 14, 2014)

Speaker on Development of Animal Law in the Legal Academy, 2013 Animal Law Conference, Stanford Law School, Palo Alto, California (November 25, 2013)

Speaker on U.S. Law and Legal Education, Royal University of Law and Economics, Phnom Penh, Cambodia (October 1, 2013)

Speaker on U.S. Law and Legal Education, Paññāsāstra University of Cambodia, Phnom Penh, Cambodia (October 1, 2013)

Speaker on U.S. Legal Education, International Association of Law Schools International Deans' Forum, National University of Singapore Law School, Singapore (September 26, 2013)

Speaker on Class Actions, Japan Federation of Bar Associations, Tokyo, Japan (September 19, 2013)

Speaker on Class Actions, Waseda University School of Law, Tokyo, Japan (September 19, 2013)

Speaker on Ethics of Aggregate Settlements, American Association for Justice Annual Meeting, San Francisco, California (July 22, 2013)

Speaker on the British Petroleum Class Action Settlement, International Water Law Conference, National Law University of Delhi, Delhi, India (May 31, 2013)

Speaker on U.S. Supreme Court Confirmation Process, Jewish Federation of Greater Portland's Food for Thought Festival, Portland, Oregon  (April 21, 2013)

Speaker on Class Actions, Class Action Symposium, George Washington University Law School, Washington, D.C. (March 8, 2013)

Speaker on Class Actions, Impact Fund Class Action Conference, Oakland, California (March 1, 2013)

Speaker on Class Actions, Hong Kong University Department of Law (November 15, 2012)

Speaker on Class Actions, Fudan University Law School (Shanghai, China) (November 13, 2012)

Keynote Speaker, National Consumer Law Center Symposium, Seattle, Washington (October 28, 2012)

Speaker, American Bar Association, National Institute on Class Actions, Chicago, Illinois (October 25, 2012)

Speaker, Conference on Class Actions, Washington University St. Louis School of Law and the Institute for Law and Economic Policy (April 27, 2012)

Speaker, Conference on Class Actions, Loyola Chicago School of Law (April 13, 2012)

Panelist on leadership and world peace with Former South African President F.W. De Klerk, University of Portland (February 29, 2012)

Panelist on class actions before the Standing Committee on Rules of Practice and Procedure, Phoenix, Arizona (January 5, 2012)

Speaker on Class Actions Lawsuits in the U.S., University of the Philippines, College of Law, Quezon City, Philippines (August 2011)

Speaker on Environmental Class Actions, Kangwon University Law School, Chuncheon, South Korea (August 2011)

Speaker on Class Actions, Federal Judicial Center Conference on Class Actions, Duke University School of Law (May 20, 2011)

Speaker, Conference on Aggregate Litigation, University of Cincinnati College of Law (April 1, 2011)

Speaker on Class Actions, Seoul National University School of Law (May 18, 2010)

Keynote Speaker (addressing US Supreme Court confirmation process), Alaska Bar Annual Meeting (April 28, 2010)

Speaker, Conference on the Future of Animal Law, Harvard Law School (April 11, 2010)

Speaker, Conference on Aggregate Litigation: Critical Perspectives, George Washington University Law School (Mar. 12, 2010)

Speaker, U.S. Supreme Court Confirmation Process, Multnomah County Bar Association and City Club of Portland, (Sept. 30, 2009)

Speaker on Class Actions, American Legal Institutions, and American Legal Education at National Law Schools of India in Bangalore, Hyderabad, Calcutta, Jodhpur, and Delhi (August 2009)

Speaker, China/U.S. Conference on Tort and Class Action Law, Renmin University of China School of Law, Beijing, China (July 11-12, 2009)

Speaker on Class Actions, Southeastern Association of Law Schools annual meeting, Palm Beach, Florida (August 1, 2008)

Speaker on Class Actions, National Foundation for Judicial Excellence (meeting of 150 state appellate court judges), Chicago, Illinois (July 12, 2008)

Speaker on Class Actions, Practising Law Institute, New York, NY (July 10, 2008)

Speaker at Conference on Class Actions in Europe and North America, sponsored by New York University School of Law, the American Law Institute, and the European University Institute, Florence, Italy (June 13, 2008)

Speaker on Class Actions at the American Bar Association Tort and Insurance Section Meeting, Washington, D.C. (Oct. 26, 2007)

Speaker on Antitrust Class Actions at the American Bar Association's Annual Antitrust Meeting, Washington D.C. (April 18, 2007)

Chair, Organizer, and Moderator of Class Action Symposium at UMKC School of Law (April 7, 2006) (other speakers (26 in all) included, *e.g.*, Professors Arthur Miller, Edward Cooper, Sam Issacharoff, Geoffrey Miller, and Linda Mullenix, as well as several prominent federal judges and practicing lawyers)

Speaker on Class Actions, Missouri CLE (Nov. 18, 2005)

Speaker on Class Actions, Practising Law Institute (July 29, 2005)

Speaker on Class Actions, Kansas CLE (June 23, 2005)

Speaker on Class Actions at Bureau of National Affairs Seminar on the Class Action Fairness Act of 2005 (June 17, 2005)

Visiting Lecturer on Class Actions, Peking University (May 30-June 3, 2005)

Speaker on Oral Argument, American Bar Association 2005 Section of Litigation Annual Conference (April 22, 2005) (part of panel including Second Circuit Chief Judge Walker and several others)

Speaker on Class Actions, Federal Trade Commission/Organization for Economic Co-operation and Development, Workshop on Consumer Dispute Resolution and Redress in the Global Marketplace (April 19, 2005)

Speaker at Antitrust Class Action Symposium, University of Western Ontario College of Law (April 1, 2005)

Speaker at Class Action Symposium, Mississippi College of Law (February 18, 2005)

Speaker on Class Actions, Practising Law Institute (July 30, 2004)

Visiting Lecturer on Class Actions, Peking University (June 2004)

Visiting Lecturer on Class Actions, Tsinghua University (June 2004)

Speaker at Class Action Symposium, Michigan State University (April 16-17, 2004)

Speaker on U.S. Supreme Court advocacy, David Prager Advanced Appellate Institute (Kansas City Metropolitan Bar Association) (Feb. 27, 2004)

Speaker on Class Actions, Institute of Continuing Legal Education in Georgia (Oct. 24, 2003)

Speaker on Class Actions, Practising Law Institute (July 31, 2003)

Speaker on Class Actions, Practising Law Institute (Aug. 5, 2002)

Speaker on Class Actions, Practising Law Institute (Aug. 16, 2001)

Speaker on many occasions throughout the country on "Sponsorship Strategy" (1990-present) and advocacy before the U.S. Supreme Court (1988-present)

## OTHER LEGAL ACTIVITIES:

Member of American Bar Association Group Evaluating Qualifications of Merrick Garland to serve on the U.S. Supreme Court

Advisory Board Consulting Editor, *Class Action Litigation Report* (BNA)

Member, Advisory Committee, Lawyers' Campaign for Equal Justice (Portland, Oregon)

Advisory Board, The Flawless Foundation (an organization that serves troubled children)

Member, Board of Directors, Citizens' Crime Commission (Portland, Oregon) (2007-2011)

Served on numerous UMKC School of Law committees, including Programs (Chair), Promotion and Tenure, Appointments, and Smith Chair Appointment

Chair of pro bono program for all 27 offices of Jones Day (2000-2004); also previously Chair of Washington office pro bono program (1992-2003)

Member, Board of Directors, Bread for the City (a D.C. public interest organization providing medical, legal, and social services) (2001-2003)

Master, Edward Coke Appellate Practice Inn of Court in Washington, D.C. (other participants include Ted Olson, Seth Waxman, Ken Starr, Walter Dellinger, and several sitting appellate judges) (2001-2003)

Member, Board of Directors, Washington Lawyers' Committee for Civil Rights and Urban Affairs (2000-2003); Advisory Board Member (2003-present)

Member, D.C. Court of Appeals Committee on Unauthorized Practice of Law (1997-2000)

Handled and supervised numerous pro bono matters (*e.g.*, death penalty and other criminal defense, civil rights, veterans' rights)

Helped to develop walk-in free legal clinic in Washington, D.C.'s Shaw neighborhood

**VOLUNTEER WORK:**

Guest speaker appearances at public schools and retirement homes; volunteer at local soup kitchen; volunteer judge for Classroom Law Project.