# UNITED STATES DISTRICT COURT
# EASTERN DISTRICT OF LOUISIANA

|  |  |
|---|---|
| **In re: Oil Spill by the Oil Rig "Deepwater Horizon" in the Gulf of Mexico, on April 20, 2010**<br><br>This Document Relates to:<br><br>**ALL CLAIMS**<br><br>(including, particularly, Nos. 12-968, 12-970, 15-4143, 15-4146, and 15-4654) | **MDL No. 2179**<br><br>**SECTION: J**<br><br>**JUDGE BARBIER**<br><br>**MAGISTRATE SHUSHAN** |

## DECLARATION OF
## STEPHEN J. HERMAN and JAMES PARKERSON ROY

**[in support of the Petition for Reimbursement of Expenses and Collective Common Benefit Fee Award, and in support of Final Approval of Halliburton and Transocean Settlements (including, but not limited to, the request for approval of class counsel fees)]**

We, the undersigned,

STEPHEN J. HERMAN and JAMES PARKERSON ROY

respectfully declare, under penalty of perjury, that the following are true and correct, to the best of our knowledge, information, recollection, and belief:

1.  We are licensed to practice law in the State of Louisiana, in the United States District Court for the Eastern District of Louisiana, the U.S. Fifth Circuit Court of Appeals, and the United States Supreme Court.

2.  We were appointed Interim Co-Liaison Counsel for the plaintiffs in the consolidated cases that were pending in Section J of the Eastern District of Louisiana on or around June 4, 2010.[1]  We were appointed Plaintiffs' Co-Liaison Counsel in MDL No. 2179 on or around

---

[1] *See* No.10-1222, Rec. Doc. 108, and No.10-1156, Rec. Doc. 100.

August 27, 2010.[2]  We were also appointed Interim Co-Class Counsel for the BP Economic and Medical Settlement Classes on or around March 5, 2012,[3] and Co-Lead Class Counsel on or around May 2, 2012.[4]  We were appointed Lead Settlement Class Counsel for the Halliburton/Transocean Settlement Classes on or around April 12, 2016.[5]  And we were appointed to serve as Co-Chairs of the Common Benefit Fee and Cost Committee (FCC) on or around July 15, 2015.[6]

3.    We have previously submitted declarations regarding the background, negotiation, implementation, fairness, approval, interpretation, and/or application of the BP Settlement Classes and associated Settlement Programs on July 23, 2012, April 1, 2013, November 5, 2013, November 11, 2013, January 17, 2014, October 10, 2014, October 15, 2014, and March 9, 2015,[7] which are respectfully incorporated by reference herein.

4.    We have also previously submitted declarations regarding the submission, approval, payment, and/or reimbursement of Shared Expenses advanced and/or incurred by Class Counsel and other Common Benefit Attorneys in accordance with Pre-Trial Order No. 9 on February 2, 2013, April 19, 2013, July 8, 2013, November 2, 2013, April 7, 2014, August 12, 2014, October 20, 2014, March 20, 2015, December 5, 2015, and February 22, 2016,[8] which are also incorporated by reference herein.

5.    This declaration is respectfully submitted in support of the Petition for Reimbursement of Expenses and Collective Common Benefit Fee Award, pursuant to the Common Benefit Fee Agreement with BP,[9] for the collective benefit of all attorneys and firms who have submitted common benefit time and/or expenses in accordance with Pre-Trial Order No. 9 (as amended) and Pre-Trial Order No. 59, for the approval of the $600 million Common Benefit Cost and Fee Award that BP agreed to pay in common benefit costs and/or fees, consisting of:

- $37,597,151.98 in Shared Expenses, which have already been paid to third-party service providers and/or reimbursed to Common Benefit Attorneys, pursuant to previous Court Order;[10]

---

[2] Rec. Doc. 110.  [Unless otherwise indicated, Rec. Doc. numbers refer to the Documents filed in the docket for MDL No. 2179 in the Eastern District of Louisiana, No. 10-md-2179.]

[3] Rec. Doc. 5960.

[4] Rec. Docs. 6418, 6419.

[5] Rec. Doc. 16183.

[6] Rec. Doc. 14863.

[7] Rec. Docs. 7104-5, 9087-3, 11804-1, 11833-1, 12164 Ex. 4 (filed Under Seal), 13496-1, 13496-2, and 14914-15 at 8-13.

[8] Rec. Docs. 8472-2, 9436-2, 10679-2, 11775-2, 12639-2, 13281-2, 13522-1, 14321-2, 15639-2, and 15915-2.

[9] *See* BP ECONOMIC SETTLEMENT AGREEMENT, Exhibit 27 [Rec. Doc. 6276-46], ¶¶ 2 and 4(e); (*see also* BP MEDICAL SETTLEMENT AGREEMENT, Exhibit 19 [Rec. Doc. 6273-21], ¶¶ 2 and 4(e)).

[10] *See* Rec. Docs. 8607, 9520, 10796, 11796, 12664, 13342, 13677, 14432, 15644, and 15916.  (This $37,597,151.98 figure includes $1.8 million in current assessments from the Co-Liaison and PSC firms for Shared Expenses which have been and/or are expected to be incurred in accordance with Pre-Trial Order No. 9.)

- Up to $7,187.698.30 in claimed Held Expenses, which have been submitted to Mr. Garrett and the Fee Committee pursuant to Pre-Trial Order No. 9, (as amended), and Pre-Trial Order No. 59;  and,

- The remainder of the potential BP Class Settlements Common Benefit Cost and Fee Award, of approximately $555.2 million, to Class Counsel and other Common Benefit Attorneys collectively, for work performed to advance the common and collective interests of the BP Economic Class and the BP Medical Class.

This declaration is also submitted in support of final approval of the Halliburton and Transocean Punitive Damages and Assigned Claims Settlements, (including, but not limited to, approval of the request for an award of agreed-to class counsel fees).[11]

### Initial Post-Spill Coordination

6.  Shortly after April 20, 2010, attorneys and firms who would eventually become Liaison Counsel, PSC members, Class Counsel, and other Common Benefit Attorneys were contacted by existing clients and others seeking assistance and advice in connection with the Macondo / *Deepwater Horizon* explosions, fire, sinking, and resulting spill.  Realizing that the effects of this disaster were likely to be far-reaching and long-lasting, these attorneys, from the beginning, started to coordinate with one another, and to take actions, not only for the protection of their own individual clients, but with an eye towards the advancement and protection of the common and collective interests of others who were likely to become prospective claimants or litigants at some point in time. These lawyers monitored, attended, shared information and strategy regarding, and actively participated in:

- The Transocean Limitation Action, originally filed in the United States District Court for the Southern District of Texas,[12] and ultimately transferred, under Rule F(9), on motion of Common Benefit Attorneys, to the Eastern District of Louisiana,[13] where it could be tried as an original action, and consolidated with the MDL.[14]

- The Joint Investigation Team (JIT) / Marine Board of Investigation (MBI) hearings and other proceedings conducted by the U.S. Coast Guard and the Minerals Management Service (MMS) (later the Bureau of Ocean Management, Regulation and Enforcement (BOEMRE)).

---

[11] *See* Rec. Docs. 15322-1 thru 15322-6 (Second Amended HESI Settlement Agreement) (Sept. 2, 2015), Rec. Docs. 14644-1 thru 14644-5 (Transocean Settlement Agreement) (May 29, 2015), Rec. Doc. 16183 (Preliminary Approval Order) (April 12, 2016), and Rec. Doc. 16900 (Rescheduling Deadlines and Fairness Hearing) (May 6, 2016).  *See also, e.g.,* Rec. Doc. 15569 (PSC Submission re Allocation) (Nov. 13, 2015); Rec. Doc. 15652 (Allocation and Reasons) (Dec. 11, 2015); Rec. Doc. 15722 (Co-Liaison Submission re Distribution Model) (Jan. 15, 2016); Rec. Docs. 18796 and 18797 (Distribution Models) (June 13, 2016).

[12] No. 4:10-cv-01721.

[13] No. 10-2771.

[14] Rec. Doc. 62.

- The La. Department of Environmental Quality Investigation.[15]

- The proceedings before the Judicial Panel on Multi-District Litigation (MDL Panel) (JPML).

- The securities-related actions that would eventually be transferred to and coordinated in the Southern District of Texas as MDL No. 2185.

- The *Hornbeck Offshore vs. Salazar* litigation.[16]

- The consolidated actions in Section J of the United States District Court for the Eastern District of Louisiana.

7.    Working together, we developed a formal Limited Joint-Prosecution Agreement (JPA) to facilitate the coordination and sharing of information, research, and litigation strategy. We provided advice and assistance to participants in the Vessel of Opportunity (VoO) program, secured important contractual concessions from BP, and attempted to ensure that such commitments would be formalized and extended to all potential VoO participants.[17]    We also took efforts to ensure that clean-up workers were being properly protected from hydrocarbons and potentially dangerous dispersants.[18]    We moved for the immediate and ongoing preservation of documents and physical evidence, and coordinated preliminary environmental sampling and testing in waters, beaches and wetlands along the Gulf Coast, and secured a shared sample of Macondo Oil from BP, for future fingerprinting purposes.[19] We conducted and shared preliminary legal research, took efforts to ensure that BP's claims process conformed to OPA statutory requirements, including statutory damages cap and presentment issues, and worked in a coordinated way with Mr. Feinberg to attempt to

---

[15] Enforcement Tracking Nos. 10-00823 and 10-00825, and Agency Interest No. 170547.

[16] No. 10–1663 (E.D.La. filed June 7, 2010).

[17] *See, e.g.,* LTR. FROM J. KLICK TO BP COUNSEL (May 2, 2010); LTR. FROM BP COUNSEL TO J. KLICK (May 3, 2010); CONSENT JUDGMENT, No. 10-1316, Rec. Doc. 6 (May 4, 2010).

[18] *See, e.g.,* TRANSCRIPT (June 4, 2010), pp.45-50 [No.10-1222, Rec. Doc. 108]; MINUTE ENTRY (June 4, 2010) [No.10-1156, Rec. Doc. 100]; BP LTR. RE WORKPLACE SAFETY (June 15, 2010) [No. 10-1156, Rec. Doc. 127-7]; TRANSCRIPT (June 17, 2010), pp.41-46 [Nos.10-1222, et al]; STIPULATION RE WORKER SAFETY (June 22, 2010) [No.10-1156, Rec. Doc. 138]; BP LTR. RE SAFETY-RELATED DOCUMENTS (June 29, 2010) [No. 10-1156, Rec. Doc. 223-1]; LTR. FROM INTERIM LIAISON COUNSEL RE ENVIRONMENTAL AND SAFETY ISSUES (July 3, 2010) [No.10-1156, Rec. Doc. 223-2].

[19] *See, e.g.,* PRESERVATION ORDER (May 5, 2010) [No.10-1229, Rec. Doc. 13]; TRANSCRIPT (May 25, 2010) [No.10-1156, Rec. Doc. 75]; TRANSCRIPT (June 17, 2010), pp.46-47 [Nos.10-1222, et al]; LTR. FROM INTERIM LIAISON COUNSEL CONFIRMING AGREEMENT RE OIL SAMPLES (July 3, 2010) [No.10-1156, Rec. Doc. 223-3]; MOTION TO COLLECT AND PRESERVE OIL SAMPLES  (and Exhibits thereto) (July 22, 2010) [No. 10-1156, Rec. Doc. 358].

secure fair and reasonable protocols in the Gulf Coast Claims Facility (GCCF).[20] In addition to the coordinated submissions that were made to the MDL Panel,[21] we also responded to the motion and petition for mandamus seeking recusal.[22]

## Appointment of Interim Co-Liaison Counsel

8.   In the consolidated Eastern District of Louisiana proceedings, Interim Co-Liaison Counsel were appointed on June 4, 2010 to work with Defense Counsel, Counsel for the U.S., and the Court, on initial preservation of physical evidence issues, as well as other organizational and administrative issues, to provide structure and management to the litigation.[23]

9.   Even prior to the MDL Panel's formal transfer of the litigation to the Eastern District of Louisiana on August 10, 2010,[24] the appointment of Co-Liaison Counsel for the Plaintiffs on August 27, 2010,[25] and the formal appointment of the Plaintiffs' Steering Committee (PSC) and Executive Committee on October 8, 2010,[26] we continued to collect joint-prosecution agreements and contact information from numerous plaintiffs' attorneys, and started to develop e-mail group service lists, which were constantly tracked, supplemented, and updated.   We established and organized all file materials, including pleadings, discovery, correspondence, administrative, and *pro se* materials, both in paper and electronically.   We secured office space for a Document Depository / "War Room" and began the process of arranging for IT services and full-time personnel.   There were several large meetings between and among Common Benefit Attorneys, who shared information

---

[20] MOTION FOR COURT SUPERVISION OF CLAIMS PROCESS (May 20, 2010) [No.10-1222, Rec. Doc. 26]; JOINDER IN MOTION FOR COURT SUPERVISION (and Exhibits thereto) (May 21, 2010) [No.10-1234, Rec. Doc. 45]; TRANSCRIPT (June 4, 2010), pp.70-78 [No.10-1222, Rec. Doc. 108]; EXHIBIT FROM BP WEBSITE (June 14, 2010) [No. 10-1156, Rec. Doc. 127-6]; TRANSCRIPT (June 14, 2010), pp.37-41 [Nos.10-1222, et al]; LTR. FROM INTERIM LIAISON COUNSEL TO BP COUNSEL re NEW TRUST AND CLAIMS FACILITY (July 3, 2010) [No.10-1156, Rec. Doc. 223-4]; MOTION TO COMPEL (and Exhibits thereto) (July 20, 2010) [No.10-1156, Rec. Doc. 329].

[21] *See, e.g.,* Rec. Docs. 27, 165 and 205, filed in MDL No. 2179 (J.P.M.L.).

[22] Fifth Cir. No. 10-30631 (Opposition filed July 19, 2010).

[23] *See generally, e.g.,* TRANSCRIPT (June 4, 2010) (Status Conference) [No.10-1222, Rec. Doc. 108]; MINUTE ENTRY (June 4, 2010) [No.10-1156, Rec. Doc. 100]; MINUTE ENTRY (June 7, 2010) [No.10-1156, Rec. Doc. 115]; LTR. AGREEMENT AMONG INTERIM LIAISON COUNSEL FOR INITIAL BP DOCUMENT DEPOSITORY (June 11, 2010) [No.10-1156, Rec. Doc. 277-1]; INTERIM STATUS REPORT (June 14, 2010) [No.10-1234, Rec. Doc. 175]; STATUS REPORT (and Exhibits thereto) (June 16, 2010) [No. 10-1156, Rec. Doc. 127]; TRANSCRIPT (June 17, 2010) (Status Conference) [Nos.10-1222, et al]; MINUTE ENTRY (June 17, 2010) [No.10-1156, Rec. Doc. 136]; ORDER (June 21, 2010) (Preservation Order re Kinked Riser Section) [No.10-1324, Rec. Doc. 180]; INTERIM CASE MANAGEMENT ORDER (June 21, 2010) [No.10-1156, Rec. Doc. 134]; AMENDED CMO NO. 1 (June 25, 2010) [No.10-1156, Rec. Doc. 141]; PLAINTIFFS PROPOSED INTERIM PROTECTIVE ORDER (June 30, 2010) [No.10-1156, Rec. Doc. 148]; MINUTE ENTRY (July 2, 2010) [No.10-1156, Rec. Doc. 232]; STATUS REPORT (and Exhibits thereto) (July 7, 2010) [No.10-1156, Rec. Doc. 223]; MINUTE ENTRY (July 7, 2010) [No.10-1156, Rec. Doc. 331]; PROTECTIVE ORDER (July 12, 2010) [No.10-1156, Rec. Doc. 269]; TRANSCRIPT (July 27, 2010) (Hearing on Mot. for Preservation of Evidence) [Nos.10-1156, et al]; MINUTE ENTRY (July 27, 2010) [No.10-1156, Rec. Doc. 442]; TRANSCRIPT (Sept. 3, 2010) (Hearing on Mot. for Protective Order re BOP) [No. 10-1222, et al].

[24] Rec. Doc. 1.

[25] Rec. Doc. 110.

[26] Rec. Doc. 506.

and strategy, and provisional common benefit projects were commenced.  We additionally continued to work with Defense Counsel, Counsel for the U.S. and the States, and the Court, to resolve initial evidence preservation issues, filing and service issues, and OPA-related issues, and to otherwise lay the foundations for what would become the essential administrative and procedural frameworks for the litigation,[27]  including:  the duties and responsibilities of the PSC (Pre-Trial Order No. 8),[28] the submission of common benefit hours and expenses (Pre-Trial Order No. 9),[29] the initial Case-Management Order (Pre-Trial Order No. 11),[30] the establishment of a mechanism for formal service *via* Lexis-Nexis File & Serve (LNFS) (Pre-Trial Order No. 12),[31] confidentiality order (Pre-Trial Order No. 13),[32] order regarding privilege (Pre-Trial Order No. 14),[33] electronic data and document production (Pre-Trial Order No. 16),[34] the development of the deposition guidelines (Pre-Trial Order No. 17),[35] stipulations regarding expert discovery (Pre-Trial Order No. 18),[36] and location of BP employee depositions (Pre-Trial Order No. 21).[37]

10.     An experienced Certified Public Accountant (CPA) who had been previously appointed to track common benefit time and expenses in the *Vioxx* and *Chinese Drywall* MDLs,[38]  Philip A. Garrett, Sr., was retained and appointed, and a bank account was opened to handle shared expenses.

11.     An attorney noted for his experience in legal ethics and professionalism, Basile J. Uddo, was retained as outside ethics counsel.  (Lynn Baker, noted class action/mass tort ethicist, would later be retained to further advise the PSC / Class Counsel in connection with the BP Settlements, the MDL litigation generally, and the negotiations with Halliburton and Transocean.)

---

[27] *See, e.g.,* Rec. Doc. 66 (Extension of Deadlines to Effectuate Service); Rec. Doc. 80 (Interim Status Report); Aug. 20, 2010 Transcript (re "Fishing Expedition"); Rec. Docs. 99, 107, 109, 125, 167 and Sept. 3, 2010 Transcript (re BOP Removal, Transfer, Storage and Preservation); Rec. Doc. 211 (re Subpoenas: Samples and Testing); Rec. Docs. 215, 230, 444, 474 (re Proposed CMO); Rec. Doc. 312 (re Sept. 16, 2010 Status Conf); and Rec. Doc. 463 (Omnibus Discovery Requests).  *See also, e.g.,* Rec. Doc. 509 (Omnibus Discovery Requests); Rec. Doc. 523 (Proposed Agenda for Oct. 15, 2010 Status Conf); Rec. Docs. 559, 587, 594, 631, 925 (re Presentment, GCCF, and Waiver of the Cap); Rec. Doc. 593 (re initial PTOs); Rec. Docs. 627, 642 (PPFs); and Rec. Doc. 741 (re Depo Protocol).

[28] Rec. Doc. 506.

[29] Rec. Doc. 508.

[30] Rec. Doc. 569.

[31] Rec. Doc. 600.

[32] Rec. Doc. 641.

[33] Rec. Doc. 655.

[34] Rec. Doc. 686.

[35] Rec. Doc. 740.

[36] Rec. Doc. 825.

[37] Rec. Doc. 942.

[38] MDL No. 1657 and MDL No. 2047.

**Appointment of the Plaintiffs' Steering Committee
and Establishment of Common Benefit Work Groups**

12.   On October 8, 2010, the Court appointed the Plaintiffs' Steering Committee and Executive Committee.[39]   An intensive two-day working organizational meeting for the PSC members and their "second chairs" was called, at the conclusion of which the Executive Committee and PSC formally enlisted the assistance of respected firms from around the Gulf and throughout the entire country who represented plaintiffs in the MDL and/or claimants in the GCCF process, and organized such Common Benefit Attorneys into Common Benefit Work Groups, including, initially: *Administrative Work Groups:* Depository; Privilege; Electronic Discovery; Summaries; PR. *Legal Research & Writing Work Groups:* Maritime & Limitation Law & Briefing; Briefing (general); Master Complaints (oversight); B1 Master Complaint; RICO Work Group; B3 Master Complaint; Regulatory / Injunctive Work Group. *Written Discovery Work Groups:* BP/MOEX/Anadarko; Transocean; Halliburton; M1-Swaco; Schlumberger; Weatherford; Cameron; Third Party. *Science, Environmental and Damages Work Groups:* Economic Models / Property Damages; Science & Experts; Sampling & Testing; Environmental Impact; Ecological Impact; Medical Monitoring. *Jurisdictional Work Groups:* BP PLC; Mitsui; Triton. *Punitive Damages Work Group,* including a sub-group on: Corporate Culture & History. An *Insurance Work Group.* Two *GCCF Work Groups:* Outreach; Jurisdiction.  These working groups were originally comprised of 45 formal Work Group Coordinators, (of whom 33 were from non-PSC firms), and 83 formal Work Group Members, (of whom 69 were from non-PSC firms), who devoted significant time, and incurred significant out-of-pocket expenses, to conduct the common benefit work essential to the prosecution of these MDL proceedings.

13.   Commencing shortly thereafter, and as the Phase One Liability effort progressed, we also created a number of *Deposition and Trial Prep Teams:* Phase One Liability Depo Team; Phase One Liability Expert Teams (by expert); Phase One Liability Depo Cut Team; Phase Two Liability Depo Team; and a Document Review Team.  (Several additional Work Groups would be established, and several additional Common Benefit Attorneys would be enlisted, as the litigation continued to progress.)

14.   Pursuant to the Court's Order, each of these Common Benefit Attorneys and/or Firms were required to record time associated with their common benefit efforts contemporaneously, and to submit such time, along with any common benefit Held Expenses, to Mr. Garrett, who reviewed such time and expenses, under certain criteria, raising questions and rejecting unauthorized entries, on a monthly basis.[40]   In addition, the PSC, Co-Liaison, and the other Common Benefit Attorneys advanced over thirty-seven million dollars ($37 million) in "assessments" for Shared Expenses, which were generally paid as incurred, in accordance with the provisions of Pre-Trial Order No. 9, out of a Common Benefit Shared

---

[39] PRE-TRIAL ORDER NO. 8 [Rec. Doc. 506].

[40] *See* PRE-TRIAL ORDER NO. 9 [Rec. Doc. 508] (Oct. 8, 2010); (*see also* ORDER (amending PTO 9) [Rec. Doc. 1838] (April 1, 2011), and PRE-TRIAL ORDER NO. 56 (amending PTO 9) [Rec. Doc. 12542] (March 19, 2014)).

Expense Account.[41]

15. At the same time, we worked closely with counsel for the United States and other plaintiffs, including, particularly, Coordinating Counsel for the States and his staff.

16. In addition to the formal Work Groups, we endeavored to reach out to all attorneys handling claims in the GCCF and/or actions in the MDL/Limitation, through various ListServes, CLE programs, and PSC-sponsored meetings to provide updates regarding the body of accumulated information regarding the environmental and economic issues, the GCCF process, liability issues, trial plan, and the progress of the litigation effort. The PSC, among other things, organized meetings and calls to gather facts and to discuss issues and strategies between and among counsel prosecuting VoO contract claims, oyster claims, real property claims, and other types of claims being prosecuted by GCCF claimants, plaintiffs, and putative classmembers. Subject to the confidentiality provisions of Pre-Trial Order No. 13, we made the master set of deposition exhibits available to plaintiffs' counsel *via* an FTP Site. We also established and maintained a website, for informational purposes, and made the Depository available to Coordinating Counsel for States and his staff, counsel for the United States, and counsel for the State of Louisiana.

17. During this eighteen month time period, Co-Liaison Counsel and many other Common Benefit Attorneys frequently worked 12 to 18 hours a day, in New Orleans or elsewhere, while juggling numerous different balls in the air simultaneously.

### "War Room" / Document Depository

18. The PSC unanimously decided at the outset to require document review and analysis, and other essential work, to be done in person, by lawyers, at the Depository, rather than remotely. Particularly given the ambitious deposition and trial schedule established by the Court, it was felt that this would be an important, if not necessary, step, to enhance focus, to achieve certain efficiencies, and to gain the advantages of collaborative thought and other synergies. For those Common Benefit Attorneys contributing to the effort, this decision, at the same time, also required additional levels of sacrifice, which not only pulled them away from their offices, but in many cases required them to effectively re-locate to New Orleans, for a number of months, if not years, at considerable expense, keeping them away from their homes and families. Such commitment and sacrifice were not limited to those attorneys responsible for the basic liability effort, but also extended to other Common Benefit Attorneys who worked day-in and day-out at the Depository on the environmental, economic, and other issues, including, ultimately, Phase Two.

---

[41] Beginning in February of 2013, these Shared Expenses started to be reimbursed, per Court Order, out of the Common Benefit Cost and Fee Account that was established in connection with the BP Economic and Medical Class Settlements. (It should be noted, for clarification, that, in one or two cases, the Shared Expenses were not technically advanced by Common Benefit Attorneys out of the Shared Expense Account; rather, the bills were incurred by Common Benefit Attorneys, but the vendors were ultimately reimbursed out of the Common Benefit Cost and Fee Account directly.) *See generally,* Rec. Docs. 8607, 9520, 10796, 11796, 12664, 13342, 13677, 14432, 15644, and 15916.

19.   The MDL 2179 PSC Depository was located near the Federal Courthouse at the URS
      Building, 600 Carondelet Street, New Orleans, Louisiana.   The PSC Depository
      encompassed the entire Eighth Floor, an area of approximately 15,500 square feet,
      including conference and "war" rooms, individual offices, and over 70 dedicated computer
      workstations staffed on a full-time basis.

20.   A second space on the Sixth Floor was obtained and used for private meetings with
      Counsel for the States, Counsel for the U.S., Defense Counsel, or others, and to discuss
      confidential settlement planning and strategy.

21.   Certain Common Benefit Attorneys were trained and certified as Administrators of
      iConnect, and were responsible for the training and certification of other Common Benefit
      Document Reviewers and other users.  The PSC set up Trial Director cases which included
      uploading all depositions, video files, and exhibits into Trial Director;   as well as all
      hearing and status conference transcripts;   uploaded and indexed numerous document
      productions;   developed and provided instruction and guidance with respect to document
      and deposition coding for issues;   and were responsible for preparing and maintaining
      various lists, including:
                  •    Hot Doc List
                  •    Exhibit List
                          (and Objections)
                  •    Witness List
                  •    Witness Order
                  •    Witness Exhibits
                  •    Deposition Bundles submitted by all parties [42]

22.   The PSC and other Common Benefit Attorneys and staff established various FTP sites for:
      scientific and environmental articles; liability expert reliance and consideration materials;
      and other materials for plaintiffs' counsel;   and assisted in administering all users and
      passwords with access to same.  In addition, PSC Websites, domain names, e-mail groups,
      and other communication devices were established, updated, administered, and maintained.

23.   Attorneys and staff in the Depository assisted Common Benefit Attorneys in preparing for
      depositions,  accumulating exhibits, and making witness outlines and exhibit binders, for
      both the Phase One and Phase Two Trials;   assisted in the preparation and organization of
      deposition summaries and two-page summaries of all depositions;   read and summarized
      almost seventy-five expert reports;   were responsible for tracking of all of the trial exhibits,
      data entry into database;  bates numbering, cleaning and redacting;  and assisting in logging
      all admit information on when every exhibit was used and by whom.

24.   Out of the Document Depository, we tracked deposition designations and the preparation of
      Deposition Bundles, including marking and editing of approximately 200 depositions and
      deposition exhibits (Phase One and Two);   tracking and coordinating same with the United

---

[42] *See, e.g.,* Rec. Docs. 2284, 2309, 4589, 4715, 4763, 4766, 4998, 5314, 8109, 8221, 8619, 9057, 9196,
9346, 10254, 10315, 10484, 11113, 11299, 11366, 11461, 11944, and 14257.

States Department of Justice attorneys and the States; and were also responsible for logging data of trial admit information after all three Phases. In addition to the Trial Director cases, the Depository staff also set up laptops and 'bricks' with all case information for use at depositions and trial throughout the entire litigation; synced information throughout Phases I, II and III, and the OPA Test Cases; and tracked all laptops and 'bricks' by users. The PSC maintained all original depositions and electronic copies, with index, and developed comprehensive Evidence Memos for BP, Halliburton and Transocean for development into potential "Trial Packages" for any untried and unsettled cases.

25.    Despite the personal, professional, and financial sacrifices of many Common Benefit Attorneys, the collective real time, in-person approach was, we believe, more effective and more efficient; facilitated interaction; promoted the exchange of ideas among the group; yielded better insight and strategies; and enabled document review to maintain the pace required by the Court's schedule.

## **Master Pleadings and Briefing**

26.    The Court adopted a series of innovative procedures for the pleading and resolution of the common factual and legal issues that would have to be tried within the Limitation proceeding and otherwise resolved within the pre-trial mandate for the broader Multi-District Litigation. We played a major role in proposing and implementing key elements of the case management plan, including the proposal for organizing the parties and claims into pleading "bundles"; the preparation and filing of "master" and/or other bundle complaints; and the briefing and argument of motions to dismiss directed to these master and other complaints.

27.    We prepared and filed an original and amended "B1" Bundle Master Answer to the Transocean Petition for Exoneration, Master Claim in Limitation, and Third-Party Class Action Complaint for plaintiffs asserting private economic loss and property damages claims,[43] an original and amended "B3" Bundle Master Complaint for clean-up workers and others asserting claims for medical exposure injuries,[44] a RICO Class Complaint and RICO Case Statement,[45] and a "D1" Bundle Master Complaint for injunctive claims for relief against private parties.[46]

28.    We then also prepared, filed, argued, and in some cases supplemented, Oppositions to the Motions to Dismiss that were filed with respect to these Master Complaints, as well as

---

[43] Rec. Docs. 879 and 1128.

[44] Rec. Docs. 881 and 1805. The "B3" Master Complaint also included breach of contract claims by many of these same workers in connection with the Vessel of Opportunity (VoO) Charter Agreements.

[45] Rec. Docs. 1059 (RICO Class Complaint), 1059-1 (RICO Case Statement) and 1787-1 (amended Case Statement).

[46] Rec. Doc. 880.

Oppositions to Dismiss the "Bundle A" Claims, and a protective Motion to Strike Jury Demand.[47]

29.    Additionally, the PSC and other Common Benefit Attorneys established a process for local governmental entities to join into a voluntary Local Government Master Complaint,[48] which was prepared by Common Benefit Attorneys,[49] and defended on Motions to Dismiss.[50]

30.    Once the Motions to Dismiss were decided, we then participated in the effort to develop, and ultimately defend, the Trial Plan.[51]

31.    We additionally organized and managed the VoO Charter Dispute Mediation Program, in which the parties agreed to select a sample of cases for motions, briefing, discovery, and mediation.[52]


### Short Form Joinders and Notice of Monition Date

32.    In connection with the B1, B3, and Local Government Master Complaints, we, working with the Court, developed a process by which a *pro se* litigant or other person, business, or local government entity could file, directly, and without the necessity of formal service, a two-page "Short Form Joinder" in one or more of the Master Complaints, at no expense.[53]

33.    Recognizing the importance of ensuring that all affected parties were aware of the Monition Deadline and the availability of the Short Form Joinder, and encouraging them to

---

[47] *See, e.g.,* Rec. Docs. 1610, 1612, 1613, 1704, 1788, 1803, 1804, 1808, 1815, 1819, 1821, 2121, 2400, and 2575.

[48] MOT FOR LEAVE TO FILE VOLUNTARY LOCAL GOVT MASTER COMPLAINT AND SHORT-FORM [Rec. Doc. 1093]; PRE-TRIAL ORDER NO. 33 [Rec. Doc. 1549].

[49] Rec. Doc. 1510.

[50] Rec. Doc. 2110.

[51] *See, e.g.,* Rec. Docs. 1951, 2130, 2658, 3998, and April 25, 2012 *in camera* submission.  *See also,* OPPOSITION TO MANDAMUS PETITION, Fifth Cir. No. 11-30987 (Nov. 7, 2011).

[52] *See, e.g.,* Rec. Doc. 3207 (CMO), and Rec. Docs. 4035, 4474 (MSJ and Reply Brief).

[53] *See generally* MOT. FOR ADOPTION OF SHORT FORM JOINDER [Rec. Doc. 882] (Dec. 15, 2010); PRE-TRIAL ORDER NO. 20 (Direct Filing) [Rec. Doc. 904]; PRE-TRIAL ORDERS NOS. 24 and 25 (Deeming Order, Short-Form Joinders, Plaintiff Profile Forms, Pleading Bundles, Responsive Pleadings, Master Complaints) [Rec. Docs. 982 and 983]; and PRE-TRIAL ORDER NO. 33 (Local Government Short Form Joinder) [Rec. Doc. 1549].  Several of these orders were also amended from time to time, many with input from Mr. Herman, Mr. Roy, Coordinating Counsel, and Defense Liaison Counsel.  *See, e.g.,* Pre-Trial Orders Nos. 27, 44 and 52 (amending deposition protocol), Pre-Trial Order Nos. 28, 31 and 32 (amending PTOs 11 and 25), Case Management Orders Nos. 4 and 5 (amending the Trial Plan), Pre-Trial Orders Nos. 47 and 50 (amending PTO 13), Rec. Doc. 1838, Pre-Trial Orders Nos. 56 and 59, and Rec. Doc. 15828 (amending and supplementing PTO 9), and Pre-Trial Orders Nos. 26, 46, 53, 55 (appointing Coordinating Counsel and re-appointing Plaintiffs Liaison, the Executive Committee and the PSC).

take advantage of the device, the PSC committed approximately $1.7 million of its own money to conduct a Court-approved Notice Plan.[54]

34.  Common Benefit Attorneys made provisions and were themselves available to answer questions, and, at the Court's request, had representatives in the Clerk's Office as the deadline approached, to assist *pro ses.* [55]

35.  At the end of the day, approximately 130,000 individuals, business, and local government entities joined into the Limitation proceeding.[56]

### Phase One and Two Liability Trial Prep and Discovery

36.  Millions of pages of documents were produced, loaded, and reviewed, for Phase One depositions, liability expert preparation, and trial.  By October 2011, the PSC had already loaded approximately 15.7 million pages of documents into iConnect.

37.  We are advised by those Common Benefit Attorneys and staff responsible for the Document Depository and CCO that, over the course of the entire litigation, over 90 million pages of documents were ultimately produced.

38.  More than 70 document reviewers and analysts, including PSC members, members of their firms, and other Common Benefit Attorneys, reviewed and coded the documents, with a particular emphasis on the review of relevant custodial files produced in preparation for depositions.

39.  In addition, the PSC and other Common Benefit Attorneys collected, indexed and produced over 10,000 articles and other materials, as well as voluminous reliance documents in association with the Phase One Liability Expert Reports.

40.  Judge Shushan presided over weekly Discovery Conferences, where we as Liaison Counsel, the Phase One Trial Team, and other Common Benefit Attorneys, worked collaboratively with Counsel for the U.S., Counsel for the States, Defense Counsel, and the Court, to resolve the hundreds of scheduling, discovery, and other pre-trial issues and disputes.[57]  We wrote literally scores of letter briefs to Judge Shushan and/or Opposing Counsel; communicated daily with counsel via e-mail regarding production and other logistical issues;  and otherwise worked, each week, between the Discovery Conferences, to either resolve old issues or follow-up on new ones.

---

[54] *See, e.g.,* Rec. Docs. 1126, 1313, 1352, 1635 (re Court-approved Notice re Monition Deadline and FAQ for OilSpillCourtCase.com).

[55] *See also, e.g.,* Rec. Doc. 2504 (Mot. Leave to File Additional Short Forms).

[56] *See generally,* Civil Action Nos. 10-2771 (Limitation Action), 10-8888 (Short Form Joinders), and 10-9999 (Local Government Short Form Joinders).

[57] A summary of the MDL-related status, discovery, working group, and other conferences is submitted with the Fee Petition as Exhibit 18.

41.   Commencing in the early Spring of 2011, an intensive and unrelenting deposition schedule began.  For approximately six months, there were typically two tracks of depositions, daily, reaching a climax in the summer of 2011, with seven depositions conducted, on two continents, in one day.  To facilitate the efficient conduct of the London depositions, for approximately one month in June 2011, the PSC maintained a branch depository office at the London deposition building where the London office of Kirkland & Ellis International, LLP is located and the depositions were taken.

42.   Over 240 fact witness depositions had been taken by the end of 2011, with 50 additional depositions of Phase One liability experts.

43.   In addition to the discovery issues, Judge Shushan and the Parties also engaged in substantial efforts in preparation of the then-scheduled February 2012 Phase One Trial. Common Benefit Attorneys selected a "List of 300" key trial exhibits, for the purpose of identifying and briefing a representative group of evidentiary objections that were likely to come up at trial.[58]   A total of 50 motions *in limine* were filed by the parties between September 30, 2011 and the initially scheduled trial date in 2012, including topical motions, *Daubert* motions, and issues regarding the admissibility, inferences, or other effects of 30(b)(6) depositions and witnesses invoking the Fifth Amendment.[59]   The Parties also worked with Judge Shushan on a set of stipulations.[60]

44.   Along with Alabama counsel, Counsel for the U.S., and Counsel for the Defendants, we interviewed potential vendors, and worked to otherwise arrange for evidence management and in-court presentation.

45.   We made designations and counter-designations to over 150 depositions, and assembled "Depo Bundles" for submission to the Court in advance of trial, including a two-page summary that was authored and submitted by the PSC for each deposition witness.

### Scientific, Environmental and Economic Development

46.   From the outset, dedicated groups of Common Benefit Attorneys focused on the oil spill's environmental and ecological impacts and the damages flowing therefrom.  They retained a data collection team of consultants and staff to ensure that all relevant data would be available and accessible for the experts, and ready to take samples in the event of any reported oiling event.

---

[58] *See, e.g.,* Rec. Docs. 4340-1, 4631.

[59] *See, e.g.,* Rec. Docs. 4158, 4443 (Plaintiffs' Motion in Limine and Reply Brief regarding alleged U.S. Government "Fault"); Rec. Docs. 4340-2, 4484, 4648, 4650-1, 5258, 8357, 8358, 8360, 11193 (Opposition to the Motions *in Limine* on Other Incidents and Prior Bad Acts, the Baxter Investigation, and Hayward Testimony; Rec. Doc. 4886 (Opposition to the Motions *in Limine* re Subsequent Remedial Measures); Rec. Doc. 5597 (Opp. Perkin Mot in Limine); Rec. Doc. 5257 (Opp. Mot. to Exclude Phase Two Evidence from Phase One); Rec. Doc. 5259 (Opposition re Adverse Inferences on Fifth Amendment).

[60] Rec. Docs. 5535, 5927.

47. Through the date of the BP Class Settlements and beyond, the team of scientific, environmental, and economic and accounting experts assembled by the PSC worked over the course of years to demonstrate the actual volume of discharge, movement of the oil, and damage caused by that oil to the businesses and properties in and around the Gulf;  to businesses that rely on Gulf products;  to people who rely on the Gulf for subsistence; to the natural resources (including shorelines, sea life, marshes and beaches) shared by citizens of the U.S. and the States;  to local tax revenues;  and to numerous other injured claimants-in-limitation, GCCF claimants, and parties to the MDL pleading bundle complaints.

48. An overall "Science Group" was established to oversee and coordinate the five science and environmental Work Groups.  The core members of the Group consisted of attorneys from seven law firms, fulfilling numerous roles, including:

- Investigating reports and, where appropriate, documenting, recording, collecting and maintaining samples;

- Identifying potential expert witnesses and/or consultants on myriad science issues;

- Conducting a comprehensive literature and background review of each of the identified potential expert witnesses;

- Interviewing potential experts who passed the vetting process;

- Retaining qualified experts in the dozens of fields relevant to proving the claims in the master bundle complaints;

- Compiling a notebook of qualified and retained experts in myriad fields of expertise relevant to the oil spill for review by any MDL attorney at the PSC depository;

- Evaluating and approving studies relevant to the task of proving environmental and ecological injury and damage to the plaintiffs in the MDL;

- Developing and maintaining a library on all scientific studies and anecdotal articles that address the Macondo Spill's environmental and ecological impacts;

- Reviewing and organizing scientific literature which may validate an expert's methodology, or otherwise provide the basis of his or her reliance list; and,

- Compiling, assimilating, and mapping publicly available and other reports of oiling events, SCAT team data, fishery closures, *in situ*

burning, Notices to Mariners, and other evidence regarding the fate and transport of oil.

49.   The Science Group and other Common Benefit Attorneys interviewed over 200 potential scientific experts — leaders in their fields of expertise — to ensure a top-rated group of experts with relevant experience for the MDL.   This initial task was particularly challenging, as the list of experts knowledgeable about deepwater oil spills is small.  It has required delving into issues such as (1) quantifying the oil that flowed from the riser; (2) quantifying the oil that reached and will continue to reach the surface; (3) determining the effect of the dispersant on oil coming out of the riser; (4) quantifying the oil that remains in the Gulf; (5) determining the likely quantity and location of oil from the oil spill that will surface in the form of oil slicks, tar balls or tar mats in the future; (6) evaluating the oil spill's impacts on the populations and the health of Gulf sea life and the Gulf ecosystem as a whole; and (7) determining the length of time the environmental and ecological impacts will continue.  In addition, a Medical Monitoring Work Group not only researched and briefed the legal issues, but collected anecdotal evidence and evaluated more scientific studies and reports regarding the potential health effects of hydrocarbons and dispersants.

50.   The Common Benefit Economic and Property Damage Models Work Group followed a similar process as the environmental Science Group to identify, vet, interview, and retain experts in economics and accounting, to develop models that would capture, quantify, and provide support for the common and individual economic effects of the Spill, including loss of profits and/or earnings opportunities across many different segments of the economy, and other losses to businesses and/or properties.  They reviewed, collected, organized, and compiled studies, articles, and other research regarding the economic effects of the Spill, and other wider economic issues or analyses, which would form the basis of potential economic damage models and/or methodologies.

51.   These efforts by the Science, Environmental, and Economic Work Groups laid the ground work for not only the Frameworks and Matrixes contained within the BP Economic and Medical Settlements, but also the subsequent effort to defend those settlements and methodologies when attacked by BP.

52.   We and other Common Benefit Attorneys also attempted to facilitate communications, information and strategy sharing between and among the States, and the scientific library was made available for review by, not only Common Benefit Attorneys, but also by other private attorneys, local governments, the U.S., and the States.

**Motion to Enjoin and/or Supervise the GCCF**

53.   As part of the broader effort to the organize and preserve class action and/or other claims within the MDL proceedings, we believed that it was necessary and appropriate to protect the procedural interests of putative class members who were processing claims in the BP

Gulf Coast Claims Facility (GCCF) as a statutory condition precedent to the assertion of an OPA claim in court.

54.     While the provisions of OPA requiring BP as the Responsible Party to establish an interim claims process was undoubtedly beneficial to many of the affected persons and businesses, from a litigation standpoint, the GCCF and BP's other OPA claims processes presented considerable challenges to those of us who were responsible for conducting the litigation. Numerous plaintiffs and attorneys who would have otherwise filed suit and joined in the litigation, instead devoted their efforts to the extra-judicial claims processes, diverting resources from the common effort, and creating a significant disconnect from, ignorance of, and/or confusion regarding the status and requirements of the litigation.   Many *pro se* litigants, and even many attorneys, were confused about the distinctions – and the potential presentment, statute of limitations, claims filing deadline, scope and effect of releases, and other substantive and procedural risks and pitfalls – between and among the initial BP OPA Claims Process, the GCCF, the Transocean Limitation Action, other civil actions in the MDL, BP Medical Settlement Program Claims, BP Economic Settlement Program Claims, Claims with the U.S. Coast Guard against the Oil Spill Trust Fund, and the post-settlement BP OPA Claims Process.   Moreover, it was the perception of many that some of the confusion among the putative class / claimant universe was the result of, (among other things), the GCCF's seeming to encourage affected parties not to retain counsel; seeming to imply that the filing of a formal suit or claim-in-limitation would be unnecessary; and making what were sometimes perceived to be vague, incomplete, confusing and/or misleading suggestions (and/or omissions) regarding the potential satisfaction (or non-satisfaction) of presentment, the "independence" of Mr. Feinberg and the GCCF determinations, and/or the scope and effect of the release, in terms of what specifically was or was not being conclusively settled, compensated, and/or reserved.

55.     We therefore made substantial efforts to attempt to ensure that the procedures and protocols within the GCCF were both fair and consistent with BP's statutory obligations, and that claimants pursuing claims in the GCCF were aware of the nature of the relationship between Mr. Feinberg and BP.  After substantial briefing,[61] the Court ordered Mr. Feinberg to stop referring to himself as "independent" and to further abide by the prevailing rules and standards imposed on lawyers with respect to communications with adverse and unrepresented parties.[62]  The PSC, through the time of the BP Class Settlements, continued to monitor the GCCF process, and filed a Supplemental Brief in Support of Supervision Over the BP Interim Claim Process, to ensure compliance with OPA, and to make findings and/or recommendations regarding the satisfaction of OPA's presentment requirements and the scope and/or efficacy of releases.[63]

---

[61] *See* Rec. Docs. 912, 1021, and 1061.

[62] *See* Rec. Doc. 1098.

[63] *See* Rec. Doc. 1318.

## The BP Economic Settlement

56.   Co-Liaison Counsel and other PSC representatives were engaged in approximately ten months of intensive negotiations with the BP Defendants in multiple U.S. cities and in London, culminating in two landmark settlements, one economic and one medical.   Co-Lead Counsel and others have already submitted voluminous evidence, briefing, and other materials into the record regarding the terms, provisions, background, negotiations, implementation, application, intent, fairness, legality, and approval of the Deepwater Horizon Economic & Property Damages Class Settlement, which are respectfully incorporated by reference herein.[64]

57.   At the time of final approval, BP publicly estimated value of the BP Economic and Medical Settlements together as $7.8 Billion.[65]

58.   Based on the May 24, 2016 Public Statistics for the Deepwater Horizon Economic and Property Damages Settlement made publicly available by the Claims Administrator on the Program Website, 120,591 claims filed by 90,410 claimants have been paid a total of $7,522,132,954, and an additional 14,328 claims have been issued Eligibility Determinations totaling an additional $398,831,223.[66] Based on the $1,666,167,291 in Seafood Compensation Program payments, there are approximately $634 million remaining in the $2.3 billion Seafood Fund yet to be distributed to Seafood Program Claimants.[67]   Finally, by comparing the total 384,507 Claim Forms Submitted against

---

[64]   *See generally* Index of Significant Class Submissions, Pleadings, Orders and Rulings Relating to the Interpretation and Application of the Economic Settlement Agreement (July 18, 2015) [Rec. Doc. 14914].   The Settlement Agreement itself was filed into the record on April 18, 2012, as Rec. Doc. 6276, and, as amended, on May 2, 2012, as Rec. Doc. 6430.   The Class Settlement was approved on December 21, 2012 [Rec. Doc. 8138] (reported as In re Deepwater Horizon, 910 F.Supp.2d 891 (E.D.La. 2012)), and affirmed on appeal. *See* Deepwater Horizon II, 739 F.3d 790 (5th Cir. 2014), *rehearing en banc denied,* 756 F.3d 320 (5th Cir. 2014), *cert. denied,* 135 S.Ct. 754 (2014).   *See also, generally,* Transcript of Preliminary Approval Hearing (April 25, 2012) [Rec. Doc. 6395]; Class Final Approval Brief (Aug. 13, 2012) [Rec. Doc. 7104]; Herman Declaration (July 23, 2012) [Rec. Doc. 7104-5]; Rice Declaration (Aug. 10, 2012) [Rec. Doc. 7104-6]; Issacharoff Declaration (Aug. 13, 2012) [Rec. Doc. 7104-4]; Klonoff Declaration (Aug. 13, 2012) [Rec. Doc. 7104-3]; Godfrey Declaration (Aug. 13, 2012) [Rec. Doc. 7114-9]; Class Reply Brief (Oct. 22, 2012) [Rec. Doc. 7727]; Klonoff Supp. Declaration (Oct. 22, 2012) [Rec. Doc. 7727-4]; Transcript of Fairness Hearing (Nov. 8, 2012) [Rec. Doc. 7892]; Joint Proposed Findings (Nov. 19, 2012) [Rec. Doc. 7945].   *See also, e.g.,* Herman Declaration (April 1, 2013) [Rec. Doc. 9087-3]; Herman Declaration (Nov. 5, 2013) [Rec. Doc. 11804-1]; Rice Declaration (Nov. 6, 2013) [Rec. Doc. 11804-4]; Herman Declaration (Nov. 11, 2013) [Rec. Doc. 11833-1]; Herman Declaration (Nov. 12, 2013) [Rec. Doc. 11833-6]; Herman Declaration (Jan. 17, 2014) [Ex. 4 to Rec. Doc. 12164] (filed Under Seal); Rice Declaration (Jan. 2014) [Ex. 5 to Rec. Doc. 12164] (filed Under Seal); Herman Declaration (Oct. 15, 2014) [Rec. Doc. 13496-1]; Roy Declaration (Oct. 15, 2014) [Rec. Doc. 13496-2]; Fayard Declaration (Oct. 15, 2014) [Rec. Doc. 13496-3]; Herman Declaration (March 9, 2015) [Rec. Doc. 14914-15, at 8-13].

[65]   BP 2011 ANNUAL REPORT AND FORM 20-F, p.163 (available at http://www.bp.com/assets/ bp_internet/globalbp/globalbp_uk_english/set_branch/STAGING/common_assets/bpin2011/downloads/BP_Annual _Report_and_Form_20F_2011.pdf) (as of Aug. 5, 2012).

[66]   *See* Statistics for *Deepwater Horizon* Economic & Property Damages Settlement (available at: http://www.deepwaterhorizoneconomicsettlement.com/docs/statistics.pdf) (May 24, 2016) at p.3 (Table 4, Line 13) [These Program Statistics are submitted with the Fee Petition as Exhibit 11.]

[67]   Program Statistics (May 24, 2016) at p.3 (Table 4, Line 1).

those that have been Denied (129,139), Withdrawn (15,946), Closed (20,326), were filed by Opt Outs (4,020), and which received Eligibility Notices (140,443), it would appear that there are approximately 74,633 claims still being evaluated or waiting to be processed.[68] These figures do not include the $57 million that were paid out in promotional grants,[69] the $82.17 million in Transocean Insurance Proceeds,[70] or the potential $337,666,750 in funds allocated to the assigned claims from the proposed Halliburton and Transocean Settlements.[71]

59.   While we do not believe that there should be any 'credit' or 'offset' for any post-November 7, 2011 settlements, payments and/or offers that the GCCF either actually made or hypothetically might have made to Class Members for the reasons stated in the PSC's November 23, 2011 filing[72] and the Court's Order of December 28, 2011,[73] we contacted members of the Claims Administrator's Staff in preparation of the present Fee Petition in order to determine the extent to which the May 24, 2016 Total Payments Made number of $7,522,132,954 might be attributed to outstanding GCCF Offers, for completeness of the record, and out of an abundance of caution.   After speaking to members of the Claims Administrator's Staff on or around April 11, 2016, we were advised that there were a total of $412.5 million in outstanding GCCF offers at the time the BP Class Settlements were announced and the Transition Order was entered, (including likely several offers to personal injury or wrongful death claimants, to claimants outside of the Gulf Coast Area, and/or to Excluded claimants).   Sixty percent (60%) of those outstanding offers were paid out as "GCCF" payments in accordance with Section 4.2 of the Settlement Agreement, and is not included in the $7,522,132,954 ("Totals on DWH Releases") figure.   Only the other forty percent (40%), or $165 million, might potentially overlap with the existing or ultimate Total Payments Made by the Economic Class Settlement Program.   However, as of May 24, 2016, $56,871,404 had been paid to those who had opted out of the Class Settlement in order to take the residual 40%, and were accounted for separately from the $7,522,132,954 figure.[74]   Therefore, it would seem that, at the very most, only $108.1 million in outstanding GCCF offers could possibly ever be included in the Class Settlement Program's Total Payments Made on DWH Releases.

60.   We also confirmed with the Claims Administrator's Staff that the $57 million paid out in Seafood and Tourism Promotional Grants is not included within the Table 4, Line 13 (Totals on DWH Releases) or Table 4, Line 16 (Total Payouts) statistics.

---

[68] Program Statistics (May 24, 2016) at pp.1-2 (*comparing* Table 2, Line 13 (Total Number of Claims) *with* Table 3, Line 13 (Notices Issued)).

[69] *See* Economic Agreement, Section 5.13.

[70] *See* ORDER [Rec. Doc. 13424] (Sept. 22, 2014).

[71] ALLOCATION AND REASONS [Rec. Doc. 15652] (Dec. 11, 2015), p.4.

[72] Rec. Doc. 4717, at 3-5.

[73] Rec. Doc. 5022, at 4-6.

[74] *See* Statistics (May 24, 2016) at p.3 (*contrasting* Table 4, Line 14 (40% Request) *from* Table 4, Line 13 (Totals on DWH Releases)).

61.   In performing the allocation for the Halliburton/Transocean Settlements, Judge Wilkinson estimated that the total payout from the Economic & Property Damages Class Settlement would be $10.825 billion.[75]   This estimate seems based solely on projected claims payouts, and does not seem to include Seafood and Tourism Promotional Grants, Transocean Insurance Proceeds, the value of the Assigned Claims themselves, Administrative Costs, or Common Benefit Litigation Expenses or Fees.

62.   BP now estimates that the Economic Settlement alone will be "significantly higher" than $12.9 Billion.[76]

### The Medical Benefits Settlement

63.   Like the BP Economic Class Settlement, the BP Medical Benefits Settlement was fully and finally approved as fair, reasonable, and adequate to the members of the class. In re Deepwater Horizon, 295 F.R.D. 112 (E.D.La. 2013).[77]

64.   Some professional objectors, nevertheless, appealed the settlement approval order, which Class Counsel successfully defended in the Fifth Circuit,[78] and upon remand,[79] after deposing the four objectors and providing the Court with a comprehensive submission[80] – at which point the appeal was voluntarily dismissed.[81]

65.   Almost immediately, BP advised Class Counsel, by correspondence dated November 27, 2013, that BP was "terminating" the Medical Settlement Agreement based on the Medical Claims Administrator's alleged failure to "obtain an agreement in writing with CMS that complies with the terms of Section XXIX.A.1 to BP's satisfaction."[82]

---

[75] ALLOCATION AND REASONS [Rec. Doc. 15652] (Dec. 11, 2015), at pp.14-16.

[76] BP FIRST QUARTER 2016 RESULTS (dated April 26, 2016) at p.18  (available at: http://www.bp.com/content/dam/bp/pdf/investors/bp-first-quarter-2016-results.pdf  (last visited: May 30, 2016) [This BP First Quarter 2016 Report is submitted with the Fee Petition as Exhibit 12.]

[77] The Settlement Agreement was filed on April 18, 2012, as Rec. Doc. 6273, and, as amended on May 1, 2012, as Rec. Doc. 6427.  See also, generally Class Final Approval Brief [Rec. Doc. 7116] (Aug. 13, 2012); Harbut Declaration [Rec. Doc. 7116-1]; Goldstein Declaration [Rec. Doc. 7113-3]; Klonoff Declaration [Rec. Doc. 7116-2]; Greenwald Declaration [Rec. Doc. 7116-2]; Herman Declaration [Rec. Doc. 7116-2];  Issacharoff Declaration [Rec. Doc. 7116-2]; Class Reply Brief [Rec. Doc. 7728] (Oct. 22, 2012); Supp. Harbut Declaration [Rec. Doc. 7728-3]; Supp. Klonoff Declaration [Rec. Doc. 7728-2]; Joint Proposed Findings [Rec. Doc. 7946] (Nov. 19, 2012).

[78] See MOT. TO REQUIRE APPEAL BOND [Rec. Doc. 10924]; MOT. TO DISMISS APPEAL, Fifth Cir. No.13-30221 (Aug. 7, 2013); APPELLEES' BRIEF ON THE MERITS, Fifth Cir. No.13-30221 (Sept. 3, 2013); OPP. APPELLANTS' MOTION TO RESPOND TO NEW ARGUMENTS, Fifth Cir. No. 13-30221 (Sept. 17, 2013).

[79] See ORDER, Fifth Cir. No. 13-30221 (Sept. 30, 2013).

[80] SUBMISSION BY CLASS COUNSEL ON REMAND OF MEDICAL SETTLEMENT (with Incorporated Motion to Strike, Motion to Dismiss, and Motion for Sanctions) [Rec. Doc. 11869] (Nov. 19, 2013).

[81] See MOT. TO DISMISS APPEAL, Fifth Cir. No. 13-30221 (Nov. 26, 2013).

[82] Letter from BP Managing Attorney Mark Holstein to Co-Lead Class Counsel and Medical Claims Administrator (Nov. 27, 2013).

66. Class Counsel thereafter worked with the Medical Claims Administrator, BP Counsel, and the Court, to secure an agreement with CMS, and to achieve an Effective Date of the settlement.

67. In preparation of this Fee Petition, we contacted members of the Medical Administrator's Staff to determine what the current and projected payouts were with respect to the total Medical Class Settlement Benefits, and, by e-mail dated April 4, 2016, were advised by Hilary Cummings of Garretson Resolution Group,[83] as follows:

| | |
|---|---|
| ➢ GHROP Grants to Date | $93,689,744 |
| ➢ Total GHROP Grants | $105 million |
| | |
| ➢ Periodic Medical Consultation Program to Date | $341,193.79 |
| ➢ Total Projected PMCP Benefits | $1.808 million |
| | |
| ➢ Specified Medical Condition Payments (thru March 24, 2016) | $12,729,004.97 |
| ➢ Total Projected SPC Payments | $63.5 million |
| | |
| ➢ Administrative Expenses thru 2015 | $85 million |
| ➢ Total Projected Administrative Expenses | $115-$120 million |

### Post-Settlement Implementation, Assistance to Classmembers, and Dispute

68. In connection with the implementation of the BP Settlements, a number of Transition Orders were submitted and entered,[84]  Class Complaints were perfected,[85]  and approval papers were prepared and filed.[86]  Class Counsel selected, educated, and otherwise worked with the Class Reps, while also working with BrownGreer, Garden City, Kinsella, and a team from BP, to revise and complete the Class Notice and FAQs, Claim Forms, and Instruction Booklets.

69. Class Counsel conducted a series of free seminars around the Gulf Coast, from Houston to Miami, in order to educate attorneys and CPAs on the specific terms and provisions of the settlement.  A Class Counsel Office (CCO) was opened in the same building where the Claims Administrator's Office had been selected, and Common Benefit Attorneys were available to answer questions about the Settlements, in person and by phone.  A Settlement Questions / Class Counsel e-mail address was also established, so that a team most familiar with the terms and provisions of the Economic and Medical Settlement Agreements and

---

[83] A copy of Ms. Cummings' e-mail is attached to this Declaration as Exhibit A.

[84] Rec. Docs. 5987, 5988, 5995, 6049, 6085, 6266, 6415, 6567, 6573, 6796, 6822, 7660.

[85] *See* No. 12-970, Rec. Doc. 1 (Economic Class Complaint); No. 12-968, Rec. Doc. 1 (Medical Class Complaint).

[86] *See, e.g.,* Rec. Docs. 6269, 6272, 6414, 7104, 7116, 7727, 7728, 7946.

Policies could respond to questions from potential classmembers, plaintiffs' counsel, claims preparers, and *pro ses*.[87]

70.   At the same time, Class Counsel worked with Dean Klonoff, Professor Issacharoff, Mr. Uddo, Lynn Baker, Dr. Harbut, and others, to ensure that all legal, procedural, ethical, and professional issues were being attended to, and to ensure, along with BP Counsel, the Seafood Neutrals, the Claims Administrator, Brown Greer, Garden City, and the Joint Experts, (Professor John C. Coffee, Jr., Meade Monger, Dr. Goldstein, and Mr. Azari), that the Class Notice was effectuated, that Opt Outs were being collated, and that all appropriate evidence in support of the settlements was prepared and submitted.

71.   Class Counsel also had to address requests by objectors and others for class and settlement-related discovery.[88]

72.   Class Counsel reviewed and summarized all of the Objections to both settlements,[89] and coordinated with Dean Klonoff, BP Counsel, the Economic and Medical Claims Administrators, the Seafood Neutrals, the joint experts, and others, with respect to the supplemental evidentiary submissions and Replies.[90]  Class Counsel coordinated with BP to prepare for the Fairness Hearing,[91] as well as the Joint Proposed Findings.[92]

73.   At the same time, Class Counsel were called upon to address numerous interpretive, administrative, and logistical issues with the Claims Administrator, Program Vendors, and representatives from BP.  We have made formal and informal written submissions, attended both informal meetings and formal Administrative Panel Meetings, and participated with BrownGreer and BP in an orientation session with the independent Appeal Panelists.  We also reviewed the Seafood and Tourism Promotional Grant Applications and participated in the selection process for appropriate recipients with the Claims Administrator and representatives of BP.

74.   As we began to experience more intensive discussions, issues, and disputes, between and among the Parties and the Settlement Program, Class Counsel developed a team of attorneys to attend monthly "workstream", budget, and/or other meetings, and to address issues raised by BP (and/or the Settlement Program), with respect to not only interpretive Policy issues, but also budgetary issues, audit issues, IT issues, potential fraud investigation issues, and other disputes.

---

[87]  Class Counsel later added an additional ccappeals@mdl2179psc.com team of attorneys specifically tasked to provide Economic Classmembers with advice and assistance in the submission of Settlement Program Appeals, (as well as Requests for Discretionary Review, and, ultimately, appeals to the U.S. Fifth Circuit).

[88]  *See, e.g.,* Rec. Doc. 7032.

[89]  Rec. Docs. 7727-2, 7728-1.

[90]  *See* Rec. Docs. 7727 and 7728 (Reply Briefs), and Rec. Docs. 7726, 7730 (Joint Submissions).

[91]  *See* Transcript (Nov. 8, 2012).

[92]  Rec. Docs. 7945, 7946.

75.   On the Medical Settlement side, Class Counsel have attended numerous GHROP Meetings, and participated in routinely scheduled calls and meetings with the Claims Administrator's staff, as well as groups of attorneys who were raising various issues and concerns.  Medical Provider Agreements were developed in coordination with the Claims Administrator and BP representatives, and are continuously reviewed and executed, as additional classmembers from around the Gulf seek Periodic Medical Consultation.  Class Counsel have traveled to the BrownGreer facility in North Carolina, to observe, first hand, how the Claims were being processed.  And Class Counsel also worked with Magistrate Wilkinson and BP to establish the Back-End Litigation Option (BELO) case management protocol.[93]

76.   We continue to monitor the individual Settlement Program Appeals, Requests for Discretionary Review, and Appeals to the U.S. Fifth Circuit, of individual Claims, providing insight and materials to Claimants, and in many cases preparing and submitting *amicus* memos or briefs.[94]  In July of 2014, we prepared and submitted a Master *Amicus* to the Program Appeal Panelists,[95] and we continue to review and routinely circulate redacted Program Appeal Decisions, and maintain a searchable "Compendium" of Program Appeal Decisions.[96]  We have prepared and updated a "Master Index" of relevant filings, submissions, briefs, and other materials, which have been, not only circulated, to the extent practical, but filed into PACER,[97] so that everyone could access them, and worked with the District Court and the Fifth Circuit's Clerk's Office to create a "Master" Appeal Record.[98]  Class Counsel respond daily to numerous questions, seek clarification and/or assistance on Claimants' behalf from the Claims Administrators and their staffs, raise Program-wide policy or administrative issues, and generally attempt to provide Claimants and their attorneys with information, suggestions, references and/or materials that may assist them in the prosecution of their Settlement Program Claims.

*The "Matching" / BEL Dispute*

77.   Around the time of the final district court approval of the Economic Class Settlement, BP started to complain about the way that Business Economic Loss (BEL) Claims were being processed by the Claims Administrator and Program Vendors.   Comprehensive *in camera* submissions were prepared by Class Counsel, including expert declarations from noted accountants and economists, (including the co-author of an outdated textbook relied upon by BP), and provided to the Court along with other relevant materials from negotiations,

---

[93] *See, e.g.,* Rec. Docs. 13773, 13787, 13880, 13891, 13991, 14097 and 14099.  *See also* Rec. Doc. 14364 (Brief re BELO Plaintiffs' Right to Jury Trial).

[94] *See, e.g.,* Fifth Cir. Nos. 13-31302, 13-31299 and 13-31296 (Non-Profits): Mot. to Dismiss Appeals (Jan. 27, 2014); Reply in Support of Mot. to Dismiss (Feb. 13, 2014); Appellees Brief on the Merits (June 9, 2014). Fifth Cir. No. 15-30798 (*Amicus* Brief filed Nov. 20, 2015). Fifth Cir. No. 15-30805 (*Amicus* Brief filed Dec. 29, 2015). Fifth Cir. No. 15-30860 (*Amicus* Brief filed Jan. 19, 2016).  Fifth Cir. No. 15-30507 (*Amicus* Brief filed Feb. 5, 2016).  Fifth Cir. No. 15-30964 (Amicus Brief filed March 28, 2016).

[95] Rec. Doc. 13496-6.

[96] http://hhklawfirm.com/compendium-of-significant-appeal-panel-decisions/?swpquery=%22%22.

[97] Rec. Doc. 14914.

[98] Fifth Cir. No. 15-90087.  *See, e.g.,* Rec. Doc. 15643-2 (Joint Record Designation).

approval, and implementation.[99] After the Court ruled, BP filed a lawsuit for "breach of contract" against the Claims Administrator, and a Motion to Enjoin the Settlement Program, which were successfully opposed by Common Benefit Attorneys.[100]

78. Once the U.S. Fifth Circuit Court of Appeals vacated and remanded the matter in October of 2013,[101] a number of submissions were prepared and filed by Class Counsel both in the District Court and the Court of Appeals.[102]

79. A "BEL Group" was organized to develop further factual and expert economic and accounting evidence, (a) on the threshold contractual interpretation issue, (b) on the newly-raised causation issue, and (c) regarding the "matching" policy, (Policy No. 495), that was ultimately developed by the Program Accountants and approved by the Court.[103] This BEL Group addressed not only the expert accounting issues, and the legal briefing, but also potential ethical issues, class issues, and the public relations issues and concerns.

80. Once the final "matching" policy was formally promulgated and approved, Class Counsel sought clarification,[104] reconsideration,[105] and ultimately appeal of Policy No. 495,[106] while also opposing BP's Motion for Restitution,[107] and appeal of that issue to the U.S. Fifth Circuit.[108]

*BP's Attacks on the Economic Settlement*

81. In conjunction with BP's appeal on the BEL "matching" issues, the BP Defendants increased their other efforts to back out of the Economic Settlement Agreement, including

---

[99] *See* Rec. Docs. 8963-26 and 8963-54 thru 8963-87.

[100] *See generally* MOTION TO INTERVENE [Rec. Doc. 8975] and ANSWER [Rec. Doc. 9013] in Civil Action No. 13-492; OPPOSITION TO BP MOT. TO STRIKE [Rec. Doc. 9118]; OPPOSITION TO BP MOTION FOR INJUNCTION [Rec. Doc. 9087]; TRANSCRIPT (April 5, 2013). *See also* OPP. BP MOT. FOR INJUNCTION, Fifth Cir. No. 13-30315 (April 17, 2013); OPP. BP MOT. FOR INJUNCTION, Fifth Cir. No. 13-30329 (April 18, 2013); APPELLEES BRIEF ON THE MERITS, Fifth Cir. No. 13-30315 (May 24, 2013).

[101] In re Deepwater Horizon, 732 F.3d 326 (5th Cir. 2013) ("*Deepwater Horizon I*") ("*BEL Opinion*").

[102] *See generally* Rec. Doc. 14914 (Index). *In particular, see, e.g.,* Rec. Docs. 11740, 11804, 11833, 11885, 12017, and 12589-16 thru 12589-18; *and, e.g.,* OPP. EMERGENCY MOT. FOR INJUNCTION, Fifth Cir. No. 13-30315 (Nov. 22, 2013); LETTER BRIEF, Fifth Cir. No. 13-30315 (Jan. 8, 2014); OPP. RENEWED MOT. FOR INJUNCTION, Fifth Cir. No. 13-30315 (Jan. 8, 2014); LETTER BRIEF, Fifth Cir. No. 13-30315 (Jan. 20, 2014); OPP. U.S. CHAMBER MOT. FOR LEAVE TO FILE FOR REHEARING EN BANC, Fifth Cir. No. 13-30315 (March 25, 2014); OPP. MOT. TO STAY MANDATE, Fifth Cir. No. 13-30315 (May 27, 2014).

[103] Experts included noted former UNO economics professor, Dr. Tim Ryan; the co-author of the outdated textbook relied upon by BP, Dr. Mark Kohlbeck; Professor Sean Michael Snaith; and several Certified Public Accountants, including George Panzeca, Allen Carroll, Robert Wallace, Harold Asher, and Rick Stutes.

[104] Rec. Doc. 13004.

[105] Rec. Doc. 12941.

[106] Fifth Cir. No. 15-30377: Appellants' Brief on the Merits (July 20, 2015); Reply Brief (Oct. 13, 2015).

[107] Rec. Doc. 13287.

[108] Fifth Cir. No. 14-31165: Appellees' Brief (Feb. 9, 2015).

a change in course on the approval of the settlement, repeated motions to enjoin the Program, objections to the budget, attacks on the Claims Administrator, and other efforts, within the Settlement Program, at the District Court, at the U.S. Court of Appeals and Supreme Court, in paid advertisements, and in the press, requiring a significant effort by Common Benefit Attorneys to defend the Settlement Program, oppose motions and appeals, meet with the Claims Administrator and the Special Master, and attempt to manage the statements, concerns, assistance, and/or attacks in the media and by business groups and professional associations.  Among other things, Common Benefit Attorneys were called upon to defend the Class and the Settlement with respect to the following:

- Opp. BP Mot. to Suspend Payments (July 18, 2013) [109]
- Opp. Second Motion to Enjoin Program (Aug. 25, 2013) [110]
- Motion, Memo and Reply Brief to Authorize Claims Administrator to Implement Settlement re Oil & Gas Support Industry Claims (Aug. 27, 2013) [111]
- Appellees' Brief on the Merits, Fifth Cir. No.13-30095 (Sept. 3, 2013)
- Response to BP Objections to 4Q Budget (Sept. 17, 2013) [112]
- Class Counsel's Comments re Freeh Report (Sept. 20, 2013) [113]
- Mot. to Realign, Fifth Cir. No. 13-30095 (Sept. 27, 2013)
- Opp. Emergency Mot. for Injunction, Fifth Cir. No. 13-30315 (Nov. 22, 2013)
- Class Objection to New Evidence from BP in Settlement Program Appeals (Dec. 13, 2013) [114]
- Opp. Renewed Mot. for Injunction, Fifth Cir. No. 13-30315 (Jan. 8, 2014)
- Opp. Motion to Enjoin Seafood Program (Jan. 17, 2014) [115]
- Letter Brief, Fifth Cir. No. 13-30095 (Jan. 18, 2014)
- Letter Brief, Fifth Cir. No. 13-30315 (Jan. 20, 2014)
- Motion to Dismiss Appeal, Fifth Cir. No. 13-30843 (Jan. 29, 2014)
- Motion, Briefs, Stipulation, Opposition to Mot. for Reconsideration, and Certification on Class Counsel's Motion to Protect and Preserve Claimant Confidentiality and to Enforce Orders of the Court [116]
- Opp. Cobb & Allpar Pet. For Rehearing, Fifth Cir. No. 13-30095 (Feb. 6, 2014)
- Opp. BP Mot. for Pet. Rehearing En Banc, Fifth Cir. No.13-30095 (Feb. 6, 2014)

---

[109] Rec. Doc. 10772.

[110] Rec. Doc. 11117.

[111] Rec. Docs. 11156 and 11470 (filed Sept. 20, 2013).

[112] Rec. Doc. 11402

[113] Rec. Doc. 11463.

[114] Rec. Doc. 11973.

[115] Rec. Doc. 12164.

[116] Rec. Docs. 12413, 12539, 12548, 12987, 12907.

- Opp. Coon Pet. For Rehearing, Fifth Cir. No. 13-30095 (Feb. 6, 2014)
- Opp. BP Mot. for Production of Freeh Investigation Docs (Feb. 10, 2014) [117]
- Reply Brief to Dismiss Appeal, Fifth Cir. No. 13-30843 (Feb. 19, 2014)
- Opp. U.S. Chamber Mot. for Leave to File for Rehearing En Banc, Fifth Cir. No. 13-30315 (March 25, 2014)
- Letter Submission to Judge Shushan re Transition Claims Dispute (May 14, 2014) [118]
- Opp. Mot. to Stay Mandate, Fifth Cir. No. 13-30315 (May 27, 2014)
- Appellee's Original Brief on the Merits, Fifth Cir. No. 13-30843 (June 9, 2014)
- Opposition to BP's Motion for Restitution (Aug. 15, 2014) [119]
- Opposition to BP Motion to Stay filed in U.S. Supreme Court, No.13A1177 (June 2, 2014) [No.14-123]
- Opposition to BP Petition for Certiorari, No.14-123 (Oct. 8, 2014)
- Appellees Brief on the Merits, Fifth Cir. No. 14-30823 (Dec. 8, 2014)
- Opp. Mot. to Remove the Claims Administrator (Oct. 15, 2014) [120]
- Opp. Mot. Expedite Appeal, Fifth Cir. No. 14-31299 (Nov. 26, 2014)
- Response to Mot. to Add Claims Administrator as Party in Interest, Fifth Cir. No. 14-31299 (Dec. 12, 2014)
- Opp. WLF Amicus, Fifth Cir. No. 14-31299 (Dec. 29, 2014)
- Opp. U.S. Chamber Amicus, Fifth Cir. No. 14-31299 (Dec. 29, 2014)
- Appellees Brief on the Merits, Fifth Cir. No. 14-31299 (Jan. 6, 2015)
- Appellees' Brief on the Merits, Fifth Cir. No. 14-31165 (Feb. 2, 2015)
- Class Comments re Claims Administrator Update (May 4, 2015) [121]
- Class Comments re Claw-Back Motions (June 8, 2015) [122]

82. Following a "re-set" between the Claims Administrator and BP in 2015, Class Counsel continue to monitor the administration of the Program, attending periodic business process, IT, FWA, and budget "workstream" meetings, and to otherwise work with BP Counsel, the Claims Administrator, and the Program Vendors to address issues as they arise.

*The Chronic SPC Dispute*

83. As the Medical Benefits Settlement started to process claims, a question arose over whether classmembers with conditions specified under the Settlement Agreement that first manifested shortly after the Spill but were not formerly diagnosed until after the date of the

---

[117] Rec. Doc. 12312.

[118] Rec. Doc. 12942.

[119] Rec. Doc. 13287.

[120] Rec. Doc. 13496.

[121] Rec. Doc. 14517.

[122] Rec. Doc. 14693.

Settlement should be treated as "Later Manifested Physical Conditions" under the terms of the Settlement Agreement.  Although the Medical Claims Administrator initially confirmed that such claims were clearly intended to be treated as Chronic Specified Physical Conditions (Chronic SPCs), he, after conferring with BP, curiously changed positions, and started requiring such classmembers to pursue Back-End Litigation Option (BELO) claims. Class Counsel submitted a Memo to Judge Shushan,[123] a Letter formally objecting to the Medical Claims Administrator's Policy Statement with a Request for Oral Argument and Motion to Strike Herzstein's Declaration,[124] a further Submission in Response to the Court's Order,[125] a Motion for Reconsideration and Reply Brief,[126] which was argued on September 24, 2014.[127]

84.   Unable to secure SPC compensation, Class Counsel then worked with the Court and BP Counsel to assist such classmembers in the pursuit of BELO claims.

*Development of the BELO Case-Management Order*

85.   Particularly with the Medical Claims Administrator's classification of many chronic conditions as Later Manifested Physical Conditions, the Court and the Parties recognized the need for a process to deal with Back-End Litigation Option (BELO) actions.  Class Counsel worked with other plaintiffs' attorneys, Judge Shushan, Judge Wilkinson, and representatives of BP, to establish a BELO case-management order.[128]

86.   In response to a BP Motion to Strike asserted in one of the earlier filed BELO actions, Class Counsel successfully advocated for the classmembers' option to request a jury trial.[129]

*Individual U.S. Fifth Circuit Claims Appeals*

87.   As noted, Class Counsel continue to constantly monitor Program Appeal filings and decisions, Requests for Discretionary Review and decisions thereon, and individual claims appeals to the U.S. Fifth Circuit.  In most cases, at the Program Appeal and Discretionary Review level, Class Counsel simply offer assistance and guidance to the individual

---

[123] Rec. Doc. 12862-1 (March 28, 2014).

[124] Rec. Doc. 12909 (May 21, 2014).

[125] Rec. Doc. 13106 (July 4, 2014).

[126] Rec. Doc. 13303 (Aug. 20, 2014) and Rec. Doc. 13408 (Sept. 19, 2014).

[127] *See* Transcript (Sept. 24, 2014).

[128] BELO INITIAL PROCEEDINGS CASE MANAGEMENT ORDER [Rec. Doc. 14099] (Jan. 30, 2015).  *See also generally, e.g.,* Rec. Docs. 13773, 13787, 13880, 13891, 13991, and 14097.

[129] Rec. Doc. 14364.

claimant and/or his or her counsel.  However, in some cases, Class Counsel will submit an *amicus* brief.[130]

88.    In addition, and more proactively, since the Fifth Circuit's *Rule 79 Decision*,[131] Class Counsel have created a Master Index,[132] and a Master Record;[133]  routinely monitor the Fifth Circuit notices and filings;  and submit Class Counsel *Amicus* Briefs, in order to provide the Court with additional background and context, which we hope will assist the Court in not only deciding the merits of this particular appeal, but in helping to provide for the appropriate interpretation and application of the Settlement Agreement as to class-wide issues for the benefit of the Class as a whole.[134]


## The Phase One and Phase Two Liability Trials and Appeals


89.    In our view, one of the significant contributions that we had made to the overall litigation strategy was to develop the notion of a two-fault allocation, whereby BP's liability for the predominant economic and environmental damages caused by the Spill would be maximized, separate and apart from, and in addition to, the defendants' joint liability for the personal injuries and wrongful deaths that occurred in the explosions and fire on April 20, 2010.[135]   Because BP would likely bear the entire responsibility for the Failure to Prepare for a Spill and the Failure to Timely Cap the Well, this strategy was intended to maximize the relative fault of BP, and allowed the plaintiffs to align themselves with Transocean and Halliburton against BP with respect to the Phase Two Trial.  In addition, because all of the Phase Two conduct was, by definition, corporate conduct under the *P&L Boat Rentals* test, we believed that focusing on this piece would effectively give the plaintiffs a "second bite at the apple" on punitive damages.

90.    After the Class Settlements were announced, the Court solicited, and we (among others) provided, *in camera* submissions regarding the effects of the Settlements on the remaining claims, and a suggested plan forward.  Several motions on discrete legal issues were

---

[130] *See, e.g.,* Class Counsel's *Amicus* Submission in Opposition to BP's Request for Discretionary Review of Claim No. 240218 (Feb. 6, 2016).

[131] In re Deepwater Horizon, 785 F.3d 986 (5th Cir. 2015) ("*Rule 79 Decision*").

[132] The original version of the Master Index was filed into the record as Rec. Doc. 14914.  The Master Index has since been updated with additional materials, cross-referenced to the as-filed Rec. Doc. Nos., and cross-referenced to the U.S. Fifth Circuit Master Record Docket No. 15-90087 ROA page citations. [The updated Master Index dated December 22, 2015 is submitted with the Fee Petition as Exhibit 13.]

[133] Fifth Cir. No. 15-90087.  *See, e.g.,* Rec. Doc. 15643-2 (Joint Record Designation).

[134] *See, e.g.,* Fifth Cir. Nos. 13-31302, 13-31299 and 13-31296 (Non-Profits): Mot. to Dismiss Appeals (Jan. 27, 2014); Reply in Support of Mot. to Dismiss (Feb. 13, 2014); Appellees Brief on the Merits (June 9, 2014). Fifth Cir. No. 15-30798 (*Amicus* Brief filed Nov. 20, 2015). Fifth Cir. No. 15-30805 (*Amicus* Brief filed Dec. 29, 2015). Fifth Cir. No. 15-30860 (*Amicus* Brief filed Jan. 19, 2016). Fifth Cir. No. 15-30507 (*Amicus* Brief filed Feb. 5, 2016).  Fifth Cir. No. 15-30964 (Amicus Brief filed March 28, 2016).

[135] A graph that we used to help better illustrate and understand the concept and proposed structure is attached hereto as Exhibit B.

scheduled, and briefed, and the Court issued an amended Trial Plan, which continued to embrace the same two-phase structure.[136]

91.    While the MDL / Limitation pre-trial and trial records largely speak for themselves, we have asked our lead trial paralegals to assemble the relevant data, and believe that the following numbers generally summarize the scope and extent of common benefit work that went into the trial:

*Phase One*

> 376    Phase One Depos Taken
> 168    Phase One Depo Bundles Prepared
> 200    Phase One Depo Bundles Submitted
> 6,671   Phase One Exhibits Listed by Plaintiffs
> 3,382   Phase One Exhibits Admitted (by all parties)
> 29     Days of Phase One Trial
> 68     Experts Originally Designated
> 34     Additional May-Call Live Witnesses Listed and Prepared For by PSC
> 39     Live Witnesses Called (by all parties)

*Phase Two*

> 79     Phase Two Depos Taken
> 108    Phase Two Plaintiff and/or Aligned Party Source Control–related Depo Bundles Prepared
> 34     Phase Two Source Control–related Depo Bundles Submitted
> 1,804   Phase Two Exhibits Listed by Plaintiffs / Aligned Parties
> 1,777   Phase Two Exhibits Admitted (by all parties)
> 4      Days of Phase Two Source Control Segment Trial
> 12     Total Days of Phase Two Trial
> 12     Source Control–related Experts Originally Designated
> 12     Additional Source Control–related May-Call Live Witnesses Listed and Prepared For by PSC
> 10     Source Control–related Live Witnesses Called
> 29     Total Phase Two Witnesses Called

*See also, generally* PHASE ONE (a snapshot), LIST OF DEPOSITIONS, and STATUS AND DISCOVERY CONFERENCES, submitted with the Fee Petition as Exhibit 17, Exhibit 15, and Exhibit 18.

92.    In addition to the rigorous in-court and out-of-court trial demands, such as witness, exhibit, demonstrative and cross-examination preparation and presentation, the PSC Trial Teams and their staffs provided logistical and administrative assistance for the collective Plaintiff effort, for the Court itself, and for the Parties as a whole.  In addition to staffing and supplying, daily, a PSC inside-the-Courthouse "War Room", Common Benefit Attorneys

---

[136] *See* Second Amended Pre-Trial Order No. 41 [Rec. Doc. 6592] (May 30, 2012).

tracked the admission status of all exhibits, demonstratives and deposition bundles for both plaintiff and defense, and coordinated with all counsel, inData, and the Court regarding same. They participated in nightly calls with defense counsel, counsel for the U.S., Coordinating Counsel, and inData, to review admitted evidence for each day, and took lead responsibility for weekly and final marshalling conferences with Court.

93.   We organized and directed the production and providing of Phase One and Phase Two Trial Access Badges for all participants and attendees.

94.   We established the www.mdl2179trialdocs.com website, providing public access to daily trial transcripts and exhibits, while continuing to assist with the uploading of materials and other maintenance of the site.

95.   We monitored the Quantification segment, for potential relevance and/or use in OPA Test Case and/or individual damages trials.

96.   Following each phase, we spent months preparing proposed findings of fact, conclusions of law, and associated post-trial briefs.[137]   Ultimately appeals were filed and briefed on the issue of BP's punitive damages liability.[138]

97.   Our firms and other PSC attorneys also spent time revising, updated, assimilating, and indexing the significant evidence for potential use as a "Trial Package" or other resource for test cases in the MDL or any unresolved transferred or remanded cases.


**The Phase Three Trial**

98.   While neither private plaintiffs nor local government entities were parties to the Phase Three Trial, we were asked by the Court to assist with evidentiary and other logistics associated with the trial.

99.   In addition, Common Benefit Attorneys attended the Phase Three Trial and reviewed the documentary evidence for potential relevance to any future individual trials by plaintiffs on environmental and/or economic issues generally, and, in particular, for use in the upcoming OPA Test Cases.

---

[137] *See* Rec. Docs. 10458, 10459 and 10714 (Phase One Post Trial Brief, Proposed Findings and Conclusions, and Reply Brief); Rec. Docs. 12038, 12039, 12214 (Phase Two Post Trial Brief, Proposed Findings and Conclusions, and Reply Brief); Rec. Doc. 12043 (Aligned Parties' Phase Two Proposed Findings); Rec. Docs. 10186 and 10187 (Oppositions to Halliburton and Transocean Motions for Summary Judgement on Assigned Claims); Rec. Doc. 13519 (Opp. PLC Mot. for Entry of Judgment).

[138] *See* APPELLANTS' BRIEF ON THE MERITS, No. 14-31374 (June 1, 2015); *see also, e.g.,* MOTION TO CONSOLIDATE PHASE ONE TRIAL APPEAL [No.14-31374] WITH PHASE TWO TRIAL APPEAL [No.15-30139] (Feb. 19, 2015); MOTION TO RECONSIDER DENIAL OF MOTION TO CONSOLIDATE (March 5, 2015); OPPOSITION TO MOTION TO STRIKE SUPPLEMENTAL RECORD DESIGNATIONS, No. 14-31374 (March 5, 2015).

## The Halliburton and Transocean Settlements

100. In addition to the BP Class Settlements, the PSC reached proposed class settlements with Halliburton and Transocean, for a total of approximately $1.24 Billion, including an Aggregate Payment of $1,028,000,000 to be paid by Halliburton[139] and an Aggregate Payment of $211,750,000[140] to be paid by Transocean.

101. Magistrate Wilkinson was appointed to serve as the Allocation Neutral by the Court, per the terms of the Agreements, to allocate these Aggregate Payments between **(a)** the existing BP Economic & Property Damages Settlement on the Assigned Claims from BP, and **(b)** the Expressly Reserved and/or other claims for punitive damages against Transocean and/or Halliburton.

102. In addition to submissions to Judge Wilkinson regarding the allocation process,[141] Common Benefit Attorneys have prepared and filed Class Complaints,[142] an Assignment Complaint,[143] Amended Agreements,[144] arranged for the Escrow Agreements and Accounts,[145] responded to the Claims Administrator regarding the Distribution Model,[146] and moved for Preliminary Approval,[147] including the submission of a Notice Plan.[148]

103. In the meantime, and as noted *supra,* Judge Wilkinson has allocated $337.6 Million to the BP Economic & Property Damages Settlement Class on the Assigned Claims, and $902,083,250 to a New Punitive Damages Settlement Class.[149]

104. We believe that the Halliburton and Transocean Assigned Claims and Punitive Damages Settlements are fair, reasonable, and adequate to the BP Economic & Property Damages Class and to the members of the New Halliburton/Transocean Punitive Damages Settlement Class.  Because, under the Court's Phase One and Phase Two Trial Findings, neither Halliburton nor Transocean has any exposure for punitive damages nor any liability for damages in connection with the assigned claims, any relief to the BP Economic Class

---

[139] *See* Second Amended Halliburton (HESI) Settlement Agreement (Sept. 4, 2015) [Rec. Doc. 15322-1] Section 6(a) (p.18).

[140] *See* Transocean Settlement Agreement (May 29, 2015) [Rec. Doc. 14644-1] Section 6(a) (p.17).

[141] *See, e.g.,* Rec. Docs. 15459, 15569.

[142] *See* No. 15-4143, Rec. Doc. 1 (Halliburton New Class Complaint); No. 15-4146, Rec. Doc. 1 (Transocean New Class Complaint).

[143] *See* No. 15-4654 (Halliburton Assigned Claims Complaint).

[144] *See, e.g.,* Rec. Docs. 13646, 15322.

[145] *See, e.g.,* Rec. Docs. 13649, 14906, 15979.

[146] *See, e.g.,* Rec. Doc. 15722.

[147] Rec. Doc. 16161.

[148] Rec. Doc. 16161-2.

[149] ALLOCATION AND REASONS [Rec. Doc. 15652] (Dec. 11, 2015).

and/or to a New Punitive Damages Class Member, is, almost by definition, fair, reasonable, and adequate, under the facts and the law of this case.[150]

## The OPA Test Cases

105. Following the BP Class Settlements and the Limitation and Liability Trial, we turned attention to the remaining un-tried and unsettled cases of plaintiffs who might have 'pure OPA' claims against BP as the Responsible Party. Working with Judge Shushan and the BP Defendants, a group of OPA Test Cases was selected to provide an illustrative set of fact situations that would provide guidance on two primary issues: **(a)** how to interpret and apply OPA causation, in the first instance, for loss of profits and/or earning capacity, under 33 U.S.C. §2704(b)(2)(E); and **(b)** the extent, if any, to which BP was responsible for losses resulting, at least in part, from the Deepwater Moratoria and other permitting changes caused by the Spill. After a lengthy review and selection process, the Test Cases were initially selected in August of 2013,[151] and a Scheduling Order was ultimately entered in June of 2014.[152]

106. By this time, we had already spent a considerable amount of time and resources researching the OPA legislative history; factual and legal issues regarding previous oil spills or other casualties, including statutory and/or regulatory suspensions and/or changes, the closure of fisheries, the closure of waterways, the closure of ports, pipelines, roads and/or bridges, etc.; and other statutory, regulatory, legislative, academic materials and caselaw regarding government action and foreseeability; and identifying and working with potential and retained experts, consultants and fact witnesses concerning same.

107. Similarly, the PSC had already commenced working with economic and accounting experts regarding the macro-economic conditions and context within which the Spill occurred, particularly with respect to the oil and gas industry, as well as the potential damage models and loss projections that might be associated with the specific individual selected OPA Test Cases. The PSC had also continued to work with mapping experts and others to identify the specific areas affected by surface oil and other clean-up and response efforts.

108. The PSC had also already started to review all of the Phase One, Phase Two, and Phase Three evidence for potential relevance or use in the OPA Test Cases.

---

[150] With respect to the internal distribution, moreover, we have previously noted that: **(i)** because the primary purpose of punitive or exemplary damages is to punish and/or deter wrongful conduct, and not necessarily to compensate plaintiffs, their Due Process rights and/or interests in the recovery would at least arguably not seem to be the same; **(ii)** there is no one single 'correct' way to internally allocate settlement proceeds; but rather a number of different ways in which such proceeds could be reasonably allocated, each of them equitable, reasonable, and fair; and **(iii)** by allocating and distributing settlement proceeds in a way that reduces administrative expenses, the Claims Administrator will conserve resources for the benefit of the Class as a whole. *See, e.g.,* Co-Liaison Counsel's Submission re Distribution Model [Rec. Doc. 15722] (Jan. 15, 2016) at p.2.

[151] *See* Rec. Doc. 11031.

[152] Rec. Doc. 12972.

109. Once the Scheduling Order was entered, the OPA Test Case Team assembled for a multi-day intensive planning session to crystalize the issues, theories, and strategies.  It was decided that, once the Answers in the individual test cases were filed, issue would be joined, and Motion to Strike Affirmative Defenses could be filed in the context of specific factual allegations and concrete claims, and would thereby provide the Court with a potential opportunity to resolve core legal issues without any concerns about an alleged "advisory" opinion.  These Motions and Reply Briefs were filed in July of 2014,[153] but were ultimately denied, without prejudice, as premature.

110. We thereafter engaged in extensive discovery and continued expert preparation and development relating to both the common issues and the individual seven selected OPA Test Cases.  Initial disclosures, document productions, and interrogatory responses were provided by all seven OPA Test Cases, followed by extensive documentary and electronic discovery relating to Bisso, Wadleigh, and Blake.  Judge Shushan conducted frequent OPA Test Case Status Conferences.  Most Bisso Depositions, all Wadleigh Depositions, and a few expert, consultant, and third-party factual depositions had been taken by March 10, 2016, when the OPA Test Cases were dismissed.

111. In the meantime, we continued to develop the expert and other associated testimony of Harold Asher, CPA (regarding case-specific damages), former Congressman Jimmy Hayes and former Congressional Staff Attorney Lee Foresgren (regarding OPA Legislative History and experience with previous spills), Dr. Richard Crowsey (mapping the extent of oil), and Capt. Hocks (authenticating Notices to Mariners), whose affidavits had already been submitted to BP, (and in some cases, had already been deposed), at the time of the dismissal – as well as Dr. Jacobs, an economist.[154]

112. We had also filed extensive briefs, addenda, and exhibits, on Plaintiffs' Renewed Motion to Strike Affirmative Defenses and in Opposition to BP's Renewed Motion to Dismiss "Moratoria" and "Permitoria" Claims.[155]

113. The PSC continues to pursue these causes of action in the U.S. Fifth Circuit, on appeal.[156]

## Other Common Benefit Efforts

114. Common Benefit Attorneys also contributed significant time and effort to administrative and other tasks that were necessary, not only for the common and collective benefit of plaintiffs, but also for the overall management of the case, relative to all Parties, and to the

---

[153] Rec. Docs. 13108, 13302.

[154] Note that, subsequent to the dismissal, Dr. Crowsey's Affidavit and Maps have been widely circulated to Plaintiffs Attorneys and others for potential use in further litigation and/or settlement negotiations.  In addition, the Notices to Mariners authenticated by Capt. Hooks and much of the work provided by Congressman Hayes, Mr. Foresgren, and others regarding OPA Legislative History and prior spills was summarized and made publicly available as Addenda to the Opposition to BP's Renewed Motion to Dismiss, Rec. Docs. 15704-1, 15704-2.

[155] Rec. Docs. 15655, 15704, 15752.

[156] See Rec. Doc. 16014 (Notice of Appeal), docketed as U.S. Fifth Cir. No. 16-30245.

Court.  Such time and efforts included, among other things, coordination between and among the Plaintiff Steering Committee, Counsel for the U.S., Counsel for the States, Counsel for the Defendants, Special Master McGovern, Special Master Freeh, Magistrate Judges Shushan and Wilkinson, Claims Administrator Pat Juneau, Claims Administrator Matt Garretson, Claims Administrator Mike Juneau, Fifth Circuit Conference Attorney Joe St. Amant, and the Liaisons to the Neutrals – as well as various different business, industry, attorney, accountant, environmental, seafood, and other professional and/or advocacy groups, societies, and/or organizations;  government and public officials and agencies;  and members of the press.

115. Common Benefit Attorneys coordinated with individual plaintiff attorneys with respect to motions and briefs on legal and administrative issues, in many cases assisting with the filings.

116. The PSC contributed to a Master Claims Database, and assisted the plaintiffs and the Court with the establishment of a "B3 Protocol" relating to the clean-up and responder defendants (Pre-Trial Order No. 57),[157] and the Pre-Trial Order No. 60 process.[158]

### The Fee Committee Review Process under Pre-Trial Order No. 59

117. From the time Pre-Trial Order No. 9 was entered on October 8, 2010, through December 31, 2015, a total of 107 Common Benefit Firms submitted 585,947.65 hours and $7,268,882.42 in Held Costs that were accepted by the Court-appointed CPA Phil Garrett and his staff.[159]

118. On July 15, 2015, the Court entered Pre-Trial Order No. 59, which required Common Benefit Attorneys to audit their time and expense submissions, and to delete any and all submissions that might have been related to individually represented clients, as opposed to common benefit, duplicative, or otherwise inappropriate.[160]  Pursuant to this process, Common Benefit Firms audited their time and expense submissions, and reduced their time by 26,582.65 hours, while also eliminating $160,970.06 in Held Expenses that had been previously claimed.[161]

---

[157] *See, e.g.,* Rec. Docs. 5718, 6143, 6192, 6247, 6696, 13158, 13667, 15711, 15723, 15853.

[158] *See* Rec. Doc. 16050 (Pre-Trial Order No. 60). *See also, e.g.,* Rec. Doc. 16443-2 (PSC Certification to motion by certain plaintiffs for reconsideration), and Rec. Doc. 17755 (PSC Motion to Extend Deadline for *Pro Ses*); Rec. Doc. 18657 (Joint Motion to Amend Pre-Trial Order No. 60); Rec. Doc. 18724 (Show-Cause Order).

[159] *See* GARRETT AFFIDAVIT (July 10, 2016) ¶12.

[160] *See* PRE-TRIAL ORDER NO. 59 [Rec. Doc. 14863] (July 15, 2015), at pp.4-6, ¶¶9-10. (*See also* FIRST AMENDMENT TO PTO 59 [Rec. Doc. 15828] (Feb. 3, 2016) (extending the "Initial Cut-Off Date" thru December 31, 2015), *and* THIRD AMENDMENT TO PTO 59 [Rec. Doc. 18641] (June 2, 2016) (clarifying deadlines, and authorizing the review and inclusion of time and expenses submitted after December 31, 2015)) [A second amendment to Pre-Trial Order No. 59 allowed common benefit cost and/or fee applicants to waive their in-person Fee Committee Interviews in cases where they had submitted relatively few hours and/or expenses.]

[161] GARRETT AFFIDAVIT, ¶13.  (*See* Footnote 163 *infra* for more detailed and additional information.)

119. When those 559,365 hours (thru the end of 2015) are broken down into partner vs. associate vs. law clerk and/or paralegal and/or IT specialist support staff, etc., it yields:

> ➤ 284,736.67 Partner Hours (50.90%)
> ➤ 192,121.57 Associate Hours (34.35%)
> ➤ 82,506.76 Law Clerk / Paralegal / IT Specialist Hours (14.75%)

120. Commencing March 29, 2016, the Fee Committee conducted a series of interviews with 74 potential common benefit fee applicants in accordance with Pre-Trial Order No. 59 over the course of 12 business days. (In several cases, potential fee applicants with less than 250 hours elected to stand on their written submissions and forego the formal interview.)[162] Over the course of this interview process, an additional 6,218.15 hours and $3,704.90 in Held Costs were voluntarily withdrawn.[163]

121. At the conclusion of the interview process, based on a review of the actual time and expense records by the Fee Committee and Special Counsel; based on the Affidavits and associated Memoranda submitted; and based on the Fee Interviews and associated follow-up and clarifications; the Fee Committee determined that we could confidently represent to the Court that a minimum of 518,250 hours were reasonably expended thru the end of 2015 for the common benefit of class members and others affected by the *Deepwater Horizon* Incident, in accordance with the Court's directives in Pre-Trial Order No. 9 and Paragraph 10 of Pre-Trial Order No. 59.

122. We believe that this number of hours is extremely conservative, not only in terms of evaluating the 585,947.65 originally submitted hours in light of the terms and requirements of the Court's Pre-Trial Orders, but also because this 518,250 hours does not include: **(a)** any 2016 hours; **(b)** the thousands of hours expended by full-time PSC-employed attorneys Rob Warren (2010-2012) and Dennis Rawlins (2014-2016) and paralegal Cristina Herrington (2010-2014); **(c)** the thousands of hours expended by appellate and other special counsel, such as Samuel Issacharoff, Basile Uddo, and Irwin Fritchie, who were hired by the PSC, and compensated out of the common benefit shared expense assessments; and **(d)** hours that were reasonably and necessarily expended by Common Benefit Attorneys, but, due to oversight or mistake, were not submitted timely, and were therefore rejected by Mr. Garrett.[164]

---

[162] Paragraph 29 of Pre-Trial Order No. 59 was amended to allow firms submitting less than 250 hours to waive the Fee Interview, and rely solely upon their time submissions and Fee Affidavits. *See* AMENDMENT TO PTO 59 [Rec. Doc. 16020] (March 22, 2016). In a few other instances, potential claims to any allocation of common benefit fees were formally waived.

[163] More specifically, approximately $120,000 in Held Expenses were withdrawn during the initial PTO 59 deletion process. Then, approximately $44,200 in Held Costs were additionally withdrawn during the Fee Committee Interview Process, of which approximately $40,500 have been formally deleted. This additional $3,704.90 in withdrawn Held Costs have been communicated to the Fee Committee, but have not yet been formally processed in or reflected on Mr. Garrett's system.

[164] Of course, we have, as a practical matter, already been reimbursed for most of the attorneys' fees expended in connection with the work performed by outside counsel and PSC employees (**(b)** and **(c)** above) as part of the interim Shared Expense reimbursement process, (for which final approval is now sought). At the same time, as the Court is attempting to assess the true level of attorney and paralegal hours that were necessary to advance the common benefit effort in this case, it seems appropriate to note that such additional hours were expended on behalf of classmembers, albeit on a guaranteed monthly and non-contingent basis.

123. Applying the break-down percentages from Paragraph 119 to the 518,250 number of minimum hours (thru the end of 2015) that the Fee Committee believes, with confidence, reliably supports the fee petition, the appropriate break-down for common benefit hours thru the end of 2015 is:

> ➢ 263,789.25 Partner Hours
> ➢ 178,018.88 Associate Hours
> ➢ 76,441.87 Law Clerk / Paralegal / IT Specialist / etc. Hours

With respect to the 8,831.20 hours submitted to and accepted by Mr. Garrett for the period of January – April 2016,[165] Special Counsel to the Fee Committee has reviewed and reported the break-down to be:

> ➢ 4,508.30 Partner Hours
> ➢ 2,283.20 Associate Hours
> ➢ 2,039.70 Law Clerk / Paralegal / IT Specialist / etc. Hours

For a Total, (thru April of 2016), of 527,081.20 hours, including approximately:

> ➢ 268,297.55 Partner Hours
> ➢ 180,302.08 Associate Hours
> ➢ 78,481.57 Law Clerk / Paralegal / IT Specialist / etc. Hours

124. The Fee Committee did not attempt to assign or associate particular time entries or expenses with a particular settlement or result.  First and foremost, this did not seem practical or feasible, in light of the overlapping work, the overlapping benefits, and the overlapping memberships of the classes.  The pre-trial efforts through April of 2012 were undertaken for the benefit of, not only the members of the BP Economic Class, the BP Medical Class, and the Halliburton / Transocean Class, but also GCCF claimants, Local Government Entities, other unsettled Opt-Out and/or Excluded plaintiffs, and, to some extent, the States.  The post-April 2012 trial and appeal efforts continued to benefit the BP Economic Class as a whole with respect to the Assigned Claims against Transocean and Halliburton;  the individual members of the BP Economic and/or Medical Benefits Classes with respect to their individually reserved punitive damages claims against Transocean and Halliburton;  and the individual members of the BP Economic and/or Medical Benefits Classes with respect to their Expressly Reserved claims against BP.  As a matter of fairness, moreover, we believe that the Court should evaluate and compensate hours that were reasonably necessary at the time they were expended, irrespective of whether, in hindsight, they can be directly traced to a particular benefit or result.  Not only is this supported as a matter of law,[166] but is also important, we believe, as a matter of policy: In

---

[165] GARRETT AFFIDAVIT, ¶14.

[166] *See, e.g.,* In re Woerner, 783 F.3d 266, 274 (5th Cir. 2015) (en banc) (reversing reduction of debtor attorney's fees under the Bankruptcy Code, which "explicitly contemplates compensation for attorneys whose services were reasonable when rendered but which ultimately may fail to produce an actual, material benefit. 'Litigation is a gamble, and a failed gamble can often produce a large net loss even if it was a good gamble when it was made.' *In re Taxman Clothing Co.,* 49 F.3d 310, 313 (7th Cir. 1995). The statute permits a court to compensate an attorney not only for activities that were 'necessary,' but also for good gambles—that is, services that were objectively reasonable at the time they were made—even when those gambles do not produce an 'identifiable, tangible, and material benefit.' What matters is that, prospectively, the choice to pursue a course of action was reasonable").

each of these MDLs and other similar complex cases, the PSC and/or other common benefit attorneys are generally appointed by the Court and/or otherwise asked to prosecute, protect, advance, defend, and/or otherwise pursue all actions, theories, and claims that have been reasonably stated by any of the suing plaintiffs – as well as tasks which are administrative in nature, for the benefit of all parties and/or the Court;  if fee committees, and/or courts, only reward common benefit time that is traced, in retrospect, to direct and concretely perceived benefits, when the next MDL comes along, the court-appointed attorneys and/or other volunteers will not be incentivized to undertake the more difficult or risky projects that are necessary to the collective interests of the plaintiffs, and/or in the furtherance of judicial economy.  Finally, it should be noted that not one GCCF claimant, settlement classmember, plaintiff, claimant-in-limitation, and/or other litigant in MDL No. 2179 has been required to make any contribution towards common benefit expenses or common benefit fees.  And it is our understanding and belief, in this regard, that the Court lifted the previous hold-backs on post-December 30, 2011 GCCF recoveries, Local Government recoveries, State recoveries, and the recoveries of other opt-out, excluded, and/or expressly reserved claims, (and ordered the return of all funds previously placed in escrow), in consideration, at least in part, of the common benefit fees that BP, Halliburton, and Transocean had already agreed to pay in connection with the four class settlements.

## Overall Communication and Management Effort

125. For general and illustrative purposes, Co-Liaison Counsel maintain a number of outlook e-mail inbox folders, which, at present, include over 247,000 items in the BP Oil folder, over 16,600 items in the BP Oil LNFS folder, over 22,700 items in the BP Oil PACER folder, over 20,000 items in the BP Oil MDL 2010 folder, and over 8,800 items in the BP Oil Pre-MDL folder.[167]

126. Co-Liaison Counsel also maintain an EDLA MDL Docket Filings folder, which includes over 3,400 of the most relevant filed pleadings and orders, which have been organized for internal reference and external response and circulation purposes.

127. On the settlement side, Co-Liaison Counsel have similarly maintained a master set of materials for internal reference and external response and circulation purposes;  created and updated a Master Index, with some of the most significant materials, which were filed into PACER, and then cross-referenced for the convenience of classmembers, counsel, claims preparers, and CPAs, as well as the establishment of a Master Docket / Record in the U.S. Fifth Circuit Court of Appeals.[168]

---

[167] Of course, many of these e-mails actually originated from Co-Liaison Counsel.  And while there are a fair number of duplicates, and while there are some *Wisner* and a few other HHK and/or DWREC client-specific communications in the folders, the overwhelming majority of these messages relate to common benefit / class-wide / MDL issues.  In addition, there are likely thousands (if not tens of thousands) additional unique BP MDL related items in Co-Liaison Counsel's Sent folders, as well as in the folders of other HHK and DWREC attorneys and staff.

[168] The original version of the Master Index was filed into the record as Rec. Doc. 14914.  The Master Index has since been updated with additional materials, cross-referenced to the as-filed Rec. Doc. Nos., and cross-referenced to the U.S. Fifth Circuit Master Record Docket No. 15-90087 ROA page citations. [The updated Master Index dated December 22, 2015 is submitted with the Fee Petition as Exhibit 13.]

Signed, under penalty of perjury, this <u>14th</u> day of <u>July</u>, <u>2016</u>:

_____
Stephen J. Herman

_____
James Parkerson Roy

**From:** Hilary Cummings
**Sent:** Monday, April 04, 2016 10:52 AM
**To:** Steve Herman
**Cc:** Matt Garretson
**Subject:** Summary for Fee Petition


Steve – Matt forwarded this to me to provide responses.  Please find attached our 2015 annual section K for reference as well.

GHROP (page 13 of attached)
    (a)  total grants to date - $93,689,744
    (b) total expected over life of Program - $105,000,000 (final installment to reach this total is scheduled for May 2016; please note per approval of Parties and GRHOP committee members, some of the final installment will be paid as accrued to GRG to provide administrative support through 2018)

Periodic
    (a)  total value of benefits to date (through EOM February 2016) - $341,193.79 (in Provider Reimbursement and Travel Expenses)
    (b) projected value of benefits over life of Program - $1,808,374.26 (we will prepare to present on how this analysis is performed at our in-person meeting tentatively scheduled for 4/28/16).

Specified Conditions
    (a)  total compensation to date - $12,729,004.97 (through 3/24/16 paysweep)
    (b) projected compensation over life of Program - $63,535,384.22 (we will prepare to present on how this analysis is performed at our in-person meeting tentatively scheduled for 4/28/16).

Administrative
    (a)  expenses to date – $85,001,325.34 through EOY 2015
    (b) projected expenses over life of Program – 2016 is estimated at $20M (but could increase based on LMPC claims to be filed); 2017 is very speculative – we currently estimate approximately $2-3M/year for Call Center, SPC benefit (mainly lien resolution and payment complications management), PMC benefit, GRHOP benefit and IT Support (exclusive of LMPC claims to be filed).  We anticipate Call Center and PMC costs to drop substantially over remaining years through 2036.  We continue to receive anecdotal information from firms (namely Nations/Downs) that there will be 10-15k LMPC claims filed.  At a conservative cost of $350/claim, the range for processing LMPCs is estimated between $3.5-5.25M (heaviest in late 2016-2017); this could be much higher depending on mediation and payment processing.  Therefore, we currently estimate $115-120M in Admin expenses over life of Program.

Please feel free to email me if you have any other questions.

Hilary



**Hilary Cummings-Iyer | Director of Complex Settlement Administration (DWH)**
hcummings@garretsongroup.com

Garretson Resolution Group | www.garretsongroup.com
4064 Colony Road, 2nd Floor, Charlotte, NC 28211
**P** 704.559.4300   **F** 704.559.4331   **C** 352.464.4803

     

