**UNITED STATES DISTRICT COURT**
**EASTERN DISTRICT OF LOUISIANA**

*In re: Oil Spill by the Oil Rig "Deepwater Horizon" in the Gulf of Mexico on April 20, 2010*

*MDL No. 2179*

## DECLARATION OF BRIAN T. FITZPATRICK

I.  Background and qualifications

1.      My name is Brian Fitzpatrick and I am a Professor of Law at Vanderbilt University in Nashville, Tennessee.  I joined the Vanderbilt law faculty in 2007, after serving as the John M. Olin Fellow at New York University School of Law in 2005 and 2006.  I graduated from Harvard Law School in 2000.  After law school, I served as a law clerk to The Honorable Diarmuid O'Scannlain on the United States Court of Appeals for the Ninth Circuit and to The Honorable Antonin Scalia on the United States Supreme Court.  I also practiced law for several years in Washington, D.C., at Sidley Austin LLP.  My C.V. is attached as Appendix 1.

2.      Like my research at New York University before it, my teaching and research at Vanderbilt have focused on class action litigation.  I teach the Civil Procedure, Federal Courts, Complex Litigation, and Comparative Class Actions courses at Vanderbilt.  In addition, I have published a number of articles on class action litigation in such journals as the University of Pennsylvania Law Review, the Journal of Empirical Legal Studies, the Vanderbilt Law Review, the NYU Journal of Law & Business, and the University of Arizona Law Review.  My work has been cited by numerous courts, scholars, and media outlets such as the New York Times, USA Today, and Wall Street Journal.  I have also been invited to speak at symposia and other events about class action litigation, such as the ABA National Institute on Class Actions in 2011, 2015 and 2016, and the ABA Annual Meeting in 2012.  Since 2010, I have also served on the

1

Executive Committee of the Litigation Practice Group of the Federalist Society for Law & Public Policy Studies.

3.          In December 2010, I published an article in the Journal of Empirical Legal Studies entitled *An Empirical Study of Class Action Settlements and Their Fee Awards*, 7 J. Empirical L. Stud. 811 (2010) (hereinafter "Empirical Study").  Unlike other studies of class actions, which have been limited to certain subject areas or have been based on samples of cases that were not intended to be representative of the whole (such as settlements approved in published opinions), my study sought to examine *every* class action settlement approved by a federal court over a two-year period, 2006-2007.  *See id*. at 812-13.  As such, not only is my study not biased toward particular settlements, but the number of settlements included in my study is several times the number of settlements per year that has been identified in any other empirical study of class action settlements: over this two-year period, I found 688 settlements, including 43 from the Fifth Circuit alone.  *See id*. at 817.  This study has been relied upon by a number of courts, scholars, and testifying experts.  *See*, *e.g.*, *Silverman v. Motorola Solutions, Inc.*, 739 F.3d 956, 958 (7th Cir. 2013) (relying on article to assess fees); *In re Credit Default Swaps Antitrust Litig.*, 2016 WL 1629349, at * 17 (S.D.N.Y. Apr. 24, 2016) (same); *In re Pool Products Distribution Mkt. Antitrust Litig.*, 2015 WL 4528880, at *19-20 (E.D. La. July 27, 2015) (same); *Craftwood Lumber Co. v. Interline Brands, Inc.*, 2015 WL 2147679, at *2-4 (N.D. Ill. May 6, 2015) (same); *Craftwood Lumber Co. v. Interline Brands, Inc.*, 2015 WL 1399367, at *3-5 (N.D. Ill. Mar. 23, 2015) (same); *In re Capital One Tel. Consumer Prot. Act Litig.*, 2015 WL 605203, at *12 (N.D. Ill. Feb. 12, 2015) (same); *In re Neurontin Marketing and Sales Practices Litigation*, 2014 WL 5810625, at *3 (D. Mass. Nov. 10, 2014) (same); *Tennille v. W. Union Co.*, 2014 WL 5394624, at *4 (D. Colo. Oct. 15, 2014) (same); *In re Colgate-Palmolive*

*Co. ERISA Litig.*, 36 F.Supp.3d 344, 349-51 (S.D.N.Y. 2014) (same); *In re Payment Card Interchange Fee and Merchant Discount Antitrust Litigation*, 991 F.Supp.2d 437, 444-46 & n.8 (E.D.N.Y. 2014) (same); *In re Federal National Mortgage Association Securities, Derivative, and "ERISA" Litigation*, 4 F.Supp.3d 94, 111-12 (D.D.C. 2013) (same); *In re Vioxx Products Liability Litigation*, 2013 WL 5295707, at *3-4 (E.D. La. Sep. 18, 2013) (same); *In re Black Farmers Discrimination Litigation*, 953 F.Supp.2d 82, 98-99 (D.D.C. 2013) (same); *In re Southeastern Milk Antitrust Litigation*, 2013 WL 2155387, at *2 (E.D. Tenn., May 17, 2013) (same); *In re Heartland Payment Sys., Inc. Customer Data Sec. Breach Litig.*, 851 F. Supp. 2d 1040, 1081 (S.D. Tex. 2012) (same); *Pavlik v. FDIC*, 2011 WL 5184445, at *4 (N.D. Ill. Nov. 1, 2011) (same); *In re Black Farmers Discrimination Litig.*, 856 F. Supp. 2d 1, 40 (D.D.C. 2011) (same); *In re AT & T Mobility Wireless Data Servs. Sales Tax Litig.*, 792 F. Supp. 2d 1028, 1033 (N.D. Ill. 2011) (same); *In re MetLife Demutualization Litig.*, 689 F. Supp. 2d 297, 359 (E.D.N.Y. 2010) (same).

4.      I have been asked by class counsel to opine on whether the attorneys' fees they have requested and will request in this litigation are reasonable.  In order to formulate my opinion, I reviewed a number of documents provided to me by class counsel; I have attached a list of these documents (and noted how I refer to these documents herein) in Appendix 2.  As I explain, based on my study of settlements across the country and in the Fifth Circuit in particular, I believe the fees are well within the range of reason.


II.  Case background

5.      These lawsuits were filed against several BP entities, Transocean, and Halliburton by plaintiffs seeking compensation for economic and physical harms caused by the April 20,

2010, Deepwater Horizon offshore drilling disaster.  They arose out of the consolidation of related cases before this court by the Judicial Panel on Multidistrict Litigation on August 10, 2010.  After nearly two years of discovery and motions practice, the plaintiffs and the BP entities (hereinafter "BP") came to agreement on two settlements, one for the class of plaintiffs with economic harms and one for the class of plaintiffs with physical harms.  The court preliminary approved these settlements on April 25, 2012.

6.      Before these settlements were reached, BP already had in place a process to pay some claims resulting from the disaster known as the Gulf Coast Claims Facility ("GCCF").[1] The GCCF had planned to accept claims until August 23, 2013, but, once these settlements were preliminarily approved, the GCCF was terminated early and payments were instead immediately distributed from the settlement in anticipation of the court's final approval.  On December 21, 2012, the court granted final approval and certified settlement-only economic and physical harms classes.

7.      Despite agreeing to the economic harms settlement, BP nonetheless appealed the court's final approval of it to the Fifth Circuit and the United States Supreme Court.  *See Deepwater Horizon II,* 739 F.3d 790 (5th Cir. 2014), *rehearing en banc denied,* 756 F.3d 320 (5th Cir. 2014), *cert. denied,* 135 S.Ct. 754 (2014).  BP also challenged various interpretations of the settlement by the settlement administrator before this court and the Fifth Circuit.  *See, e.g., Deepwater Horizon I,* 732 F.3d 326 (5th Cir. 2013); *Deepwater Horizon III,* 744 F.3d 370 (5th Cir. 2014), *rehearing denied,* 753 F.3d 509 (5th Cir. 2014), *rehearing en banc denied,* 753 F.3d 516 (5th Cir. 2014); *In re Deepwater Horizon,* 785 F.3d 986 (5th Cir. 2015) ("*Rule 79*

---

[1] Although the GCCF was voluntarily established by BP to satisfy its statutory obligations under the Oil Pollution Act of 1990, the court has recognized that class counsel's efforts here enhanced even the recoveries in the GCCF. *See* Account and Reserve Order pp. 4-6.

*Decision*"); *In re Deepwater Horizon,* 785 F.3d 1003 (5th Cir. 2015) ("*Non-Profits Decision*"); *In re Deepwater Horizon,* 793 F.3d 479 (5th Cir. 2015) ("*Data Access Appeal*").  Almost all of this additional litigation has now concluded.[2]

8.       The persons included in the economic and physical harms settlement classes are set forth in detail in the settlement agreements.  *See* BP Economic Settlement Agreement § 1; BP Medical Settlement Agreement § I.  In exchange for the release of their claims against BP, *see* BP Economic Settlement Agreement § 10, BP agreed to pay all economic harm claims received within six months of that settlement's effective date (which became June 8, 2015, after BP's appeals were rejected) according to various formulas depending on the type of class member injury.  *See* BP Economic Settlement Agreement §§ 4.4.4, 4.4.8.  Similarly, BP agreed to pay all physical harm claims received within one year of the effective date of that settlement (which became February 12, 2014).  *See* BP Medical Settlement Agreement § V.A.  There are no limits in the settlements to the amount of money BP is obligated to pay (with the exception of claims for economic harm incurred by commercial fishermen, for which BP will pay $2.3 billion, *see* BP Economic Settlement Agreement § 5.2).  The economic harms settlement further obligated BP to fund a $57 million advertising campaign to promote economic activity in the Gulf region. *See* BP Economic Settlement Agreement § 5.13.  It also assigned to the economic harms class BP's claims against Halliburton and Transocean, *see* BP Economic Settlement Agreement Ex. 21; those claims were settled during a thirteen-week, two-phase trial for $337 million, *see* Neutral Allocation p. 4 (allocating $337 million of total settlements against Haliburton and Transocean to the economic harms class).  BP also agreed to turn over to the economic harms

_____

[2] The economic harms class still has an appeal pending (currently stayed) on an interpretive issue that was remanded to this court in October 2013.  In addition, there continue to be adversarial disputes between BP and class counsel (generally as *amicus*) on interpretative issues with regard to appeals of individual awards.

class any proceeds it received from Transocean's insurer, *see* BP Economic Settlement Agreement § 5.14, which it has now done in the amount of $82 million, *see* Transocean Insurance Order p. 1. The physical harms settlement further obligated BP to pay for medical evaluations for class members and to fund a $105 million health outreach program; it also permits class members to sue BP for physical harms that manifest in the future. *See BP Medical Settlement Agreement §§ VIII, IX.* In addition to all of these obligations, BP has agreed to pay all costs of administering the settlements and to pay class counsel up to $600 million in attorneys' fees and expenses. *See BP Economic Settlement Agreement § 5.12 & Ex. 27; BP Medical Settlement Agreement § XXI & Ex. 19.*

9.      As of May 24, 2016, BP had already paid claims to individual class members pursuant to the economic harms settlement of $7.5 billion. *See* Public Statistics for the Deepwater Horizon Economic and Property Damages Settlement (May 24, 2016), *available at* http://www.deepwaterhorizoneconomicsettlement.com/docs/statistics.pdf (hereinafter "Public Statistics"). On April 26, 2016, BP told its shareholders that its total obligations pursuant to the economic harms settlement agreement *alone* would be "significantly" more than $12.9 billion. BP p.l.c., Group results, First quarter 2016 (April 26, 2016) p.18, *available at* https://www.bp.com/content/dam/bp/pdf/investors/bp-first-quarter-2016-results.pdf. In addition, as of March 24, 2016, BP had already paid individual class members over $12 million to compensate them for their physical harms. *See* Cummings Email. The administrator of the physical harms settlement predicts those payments will grow to $63.5 million with an additional $2 million eventually going to medical evaluations for class members. *See id.*

10.     At the time class counsel pursued the economic harms class's assigned claims from BP against Transocean and Halliburton, class counsel simultaneously pursued punitive

damages claims on behalf of a new class of plaintiffs against those defendants.  All these claims were settled under one structure (albeit at different times by Halliburton and Transocean) during a two-phase trial.  *See generally* Halliburton Settlement Agreement; Transocean Settlement Agreement.  The Transocean/Halliburton settlement agreement will pay the new class $902 million.  *See* Neutral Allocation p. 4 (allocating $902 million of total settlements against Haliburton and Transocean to the new class).  The court preliminarily approved this settlement on April 12, 2016.

11.    Class counsel are now moving for an award of fees of approximately $555.2 million in the economic and physical harms settlements—the estimated amount that will be remaining after expenses are reimbursed from the $600 million BP agreed to pay in fees and expenses—and they intend to seek an award of fees of $124.95 million in the Transocean/Halliburton settlement.  In this declaration, I will give my opinion on whether each of these requests is reasonable.  As I explain below, the request in the economic and physical harms settlements is equal to less (probably much less) than 4.3% of the approximate benefits class counsel generated for the classes in these settlements.  In the Transocean/Halliburton settlement, the request will be equal to 12.1% of the benefits generated for the new class (and 9.2% of the benefits generated there for both the new class and the economic harms class).  Based on my study of class action settlements across the country and in the Fifth Circuit in particular, it is my opinion that these requests are well within the range of reason.

III. Assessment of the reasonableness of the request for attorneys' fees in the economic and physical harms settlements

12.     The economic and physical harm settlements are so-called "common fund" settlements where the efforts by attorneys for the plaintiffs have created settlement funds for the benefit of class members.  Although BP agreed to pay class counsel's fees separately and on top of its payments to class members, because these are class actions, the court still must approve the fees as reasonable.  *See* Fed. R. Civ. P. 23(h).  When a fee-shifting statute is inapplicable in such cases (as it is here), courts usually evaluate the fees as if they were to come from the common fund instead of separately from the defendant.  That is, courts in such cases create a so-called "hypothetical" or "constructive" common fund by adding together 1) the fees the defendant agreed to pay separately and 2) the value of the fund created for the benefit of the class.  The court then evaluates whether it would be reasonable to "award" the fees from this "fund" in the same way it would fees in any common fund class action.  *See, e.g.*, *In re Heartland Payment Sys., Inc. Customer Data Security Breach Litig.*, 851 F.Supp.2d 1040, 1072 (S.D. Tex. 2012).

13.     At one time, courts that awarded fees in common fund class action cases did so using the familiar "lodestar" approach.  *See* Brian T. Fitzpatrick, *Do Class Action Lawyers Make Too Little*, 158 U. Pa. L. Rev. 2043, 2051 (2010) (hereinafter "Class Action Lawyers").  Under this approach, courts awarded class counsel a fee equal to the number of hours they worked on the case (to the extent the hours were reasonable), multiplied by a reasonable hourly rate as well as by a discretionary multiplier that courts often based on the risk of non-recovery and other factors.  *See id.*  Over time, however, the lodestar approach fell out of favor in common fund class actions.  It did so largely for two reasons.  First, courts came to dislike the lodestar method because it was difficult to calculate the lodestar; courts had to review voluminous time records

and the like.  Second—and more importantly—courts came to dislike the lodestar method because it did not align the interests of class counsel with the interests of the class; class counsel's recovery did not depend on how much the class recovered, but, rather, on how many hours could be spent on the case.  *See id.* at 2051-52.  According to my empirical study, the lodestar method is now used to award fees in only a small percentage of class action cases, usually those involving fee-shifting statutes or those where the relief is predominantly injunctive in nature (and the value of the injunction cannot be reliably calculated).  *See* Fitzpatrick, *Empirical Study*, *supra*, at 832 (finding the lodestar method used in only 12% of settlements).

14.     The more popular method of calculating attorneys' fees today is known as the "percentage" method.  Under this approach, courts select a percentage that they believe is fair to class counsel, multiply the settlement amount by that percentage, and then award class counsel the resulting product.  The percentage approach became popular precisely because it corrected the deficiencies of the lodestar method: it is less cumbersome to calculate, and, more importantly, it aligns the interests of class counsel with the interests of the class because the more the class recovers, the more class counsel recovers.  *See* Fitzpatrick, *Class Action Lawyers, supra,* at 2052.  Indeed, the percentage method is virtually always used in large common fund cases like this one.  I show this in Table 1, below, where I list all known billion-dollar class action settlements in American history; column three shows the method used by the court to award fees in each case.

15.     In the Fifth Circuit, courts have discretion to use either the lodestar method or the percentage method in awarding attorneys' fees in common fund class actions, but the choice between the two methods is not particularly stark in this Circuit because the same factors guide both methods.  *See Union Asset Mgmt. Holding A.G. v. Dell, Inc.*, 669 F.3d 632, 644 (5th Cir.

2012) ("We join the majority of circuits in allowing our district courts the flexibility to choose between the percentage and lodestar methods in common fund cases, with their analyses under either approach informed by the *Johnson* considerations."). Indeed, some courts "blend" the two approaches into one by "crosschecking" the percentage method with class counsel's lodestar. *See, e.g.*, *Heartland*, 851 F.Supp.2d at 1075-89 (awarding 20% of $3 million settlement); *In re Enron Corp. Secs. Derivative & ERISA Litig.*, 586 F.Supp.2d 732, 766-803 (S.D. Tex. 2006) (awarding 9.52% of $7.2 billion settlement); *In re Vioxx Products Liab. Litig.*, 2013 WL 5295707, *1-*5 (E.D. La., Sep. 18, 2013) (awarding 33% of $95,000 settlement); *Evans v. Tin, Inc.*, 2013 WL 4501061, *6-*10 (E.D. La., Aug. 21, 2013) (awarding 25.89% of $13.5 million settlement).

16.     In light of the well-recognized disadvantages of the lodestar method and the well-recognized advantages of the percentage method, it is my opinion that courts should generally use the percentage method in common fund cases whenever the value of the settlement can be reliably calculated. Only where the value of the settlement cannot be reliably calculated is it my opinion that courts should use the lodestar method; in these circumstances, the lodestar method is the only feasible choice. In this case, I believe the settlement can be reliably valued and therefore the percentage method should be used. In fact, I do not believe it is even possible to use the lodestar method here because it is impossible for class counsel to disaggregate the time they have spent on behalf of the classes here from the time they have spent on behalf of the other plaintiffs in this MDL. *See* Herman-Roy Declaration ¶124. (The difficulty in applying the lodestar method was, as I noted, one of the reasons that courts abandoned the method in favor of the percentage method.)

17.     It is also my opinion that courts should not employ the lodestar crosscheck when they use the percentage method—i.e., that they should not use the "blended" method at all—because the lodestar crosscheck reintroduces through the "back door" all of the same undesirable characteristics that the lodestar method brought in through the "front door" before courts abandoned it in favor of the percentage method.  Nonetheless, because the lodestar crosscheck is sometimes employed in the Fifth Circuit, I attempt to undertake a very rough lodestar crosscheck and evaluate the fee request under the blended method as well.

18.     In my opinion, the fee request here is reasonable no matter whether the percentage method or the blended method is used.

<u>Percentage method</u>

19.     Under the percentage method, courts must 1) calculate the value of the settlement and then 2) select a percentage of that value to award to class counsel.  When calculating the value of the settlement, courts usually include any cash compensation to class members, cash the defendant must pay to third parties, non-cash relief that can be reliably valued, attorneys' fees and expenses, and administrative costs paid by the defendant.  *See, e.g.*, *In re: Heartland Payment*, 851 F.Supp. at 1080.  When selecting the percentage, courts in the Fifth Circuit usually examine the factors from *Johnson v. Georgia Highway Express*, 488 F.2d 714 (5th Cir. 1974): (1) the time and labor required; (2) the novelty and difficulty of the issues; (3) the skill required to perform the legal service adequately; (4) the preclusion of other employment by the attorney because he accepted this case; (5) the customary fee for similar work in the community; (6) whether the fee is fixed or contingent; (7) time limitations imposed by the client or the circumstances; (8) the amount involved and the results obtained; (9) the experience, reputation,

and ability of the attorneys; (10) the undesirability of the case; (11) the nature and length of the professional relationship with the client; and (12) awards in similar cases.

*Valuation of the settlements*

20.     In this case, the most challenging aspect of the inquiry is the first step, calculating the value of the settlements.  Here, we know the amount that will ultimately be paid to class members with commercial fishing economic harms ($2.3 billion), the requested attorneys' fees ($555.2 million) and expenses ($44.8 million), the class's recovery from BP's assigned claims ($337 million), and the class's recovery from Transocean's insurer ($82 million).  Moreover, the cost of some of the non-cash relief can be reliably ascertained (such as the $57 million advertising campaign and the $105 million health outreach program).  But the gravamen of the settlements is the cash compensation for non-commercial fishing economic harms, and, because the settlements are uncapped and BP is still paying claims, it is not known how much BP will ultimately pay out (and, for the same reason, how much it will ultimately shoulder in administrative costs).  Moreover, because BP might have paid some of these claims under its GCCF program had these settlements never materialized, assessing how much value was actually added by the settlements is not obvious.  Nonetheless, as I explain below, I believe even a *conservative* valuation of the settlements suggests they have generated *at least* $13 billion of benefits to class members.

21.     First, BP told its shareholders on April 26, 2016, that it expects to pay at least $12.9 billion under the *economic harms settlement alone* in cash compensation and other expenses.  *See* BP p.l.c., Group results, First quarter 2016 (April 26, 2016) p.18, *available at* https://www.bp.com/content/dam/bp/pdf/investors/bp-first-quarter-2016-results.pdf.  Moreover, BP acknowledged that "[t]he total cost . . . is likely to be significantly higher than the amount

recognized to date . . . because the current estimate does not reflect business economic loss claims not yet received, processed and paid." *Id.*  Thus, BP will likely pay more than even $12.9 billion before the economic harms settlement agreement has run its course.  This is consistent with the estimate calculated by Magistrate Wilkinson.  He estimated that *only a portion* of BP's payments from the economic harms settlement would eventually grow from what is now $7.5 billion (it was $6.5 billion when Magistrate Wilkinson made his estimate) to $10.825 billion. *See* Neutral Allocation p. 16.   (As Magistrate Wilkinson noted, this estimate is itself conservative; he thought BP might eventually payout as much as $12.1 billion for the portion of the economic harms claims he assessed.  *See id.*)  As a result, $12.9 billion is a *conservative* estimate of how much BP will pay pursuant to the economic harms settlement agreement.

22.     In addition, as part of the economic harms settlement, BP assigned to the economic harms class BP's claims against Halliburton and Transocean.  These claims have now settled for over $337 million, monies that will result in additional cash distributions for class members.  *See* Neutral Allocation p. 4 (allocating $337 million of total settlements against Haliburton and Transocean to the classes).  BP also agreed to turn over any proceeds it received from Transocean's insurers.  Those proceeds have now been delivered in the amount of $82 million.  *See* Transocean Insurance Order p. 1.

23.     Second, with respect to the physical harms settlement, BP will pay, as I noted, $105 million for the health outreach program.  In addition, it is estimated that BP will eventually pay out $63.5 million in payments to class members for their injuries and another $2 million in medical evaluations.  *See* Cummings Email.  Thus, it is reasonable to estimate that BP will ultimately pay over $170 million pursuant to the physical harms settlement.

24.     Finally, although, as I said, I believe BP's payments pursuant to the settlement agreements should be offset by payments BP would have made anyway under the GCCF had it not been interrupted, I believe the GCCF would have paid only a small fraction of the above monies.  According to the GCCF's administrator, Kenneth Feinberg, by the time the settlement agreements interrupted the GCCF, the GCCF had paid out 92% of all claims that qualified under the GCCF.  *See, e.g.*, *From 9/11 to BP to GM*, N.Y. Times (June 30, 2014); *Fienberg Lays Out GM Victim Compensation Plan*, Detroit Free Press (July 1, 2014); *U.S. Tort Expert Feinberg Discusses Compensating for Tragedy and Loss*, Business First of Buffalo (Oct. 13, 2014); *Former Claims Czar Kenneth Feinberg Calls BP's $20 Billion Oil Spill Fund an "Aberration" at Tulane Talk*," www.nola.com (April 9, 2015); *BP's Gulf Oil Spill Was "Less of an Environmental Disaster" Than Media Portrayed*, The Street (April 20, 2015).  Given that the GCCF paid out $6.2 billion, *see* BDO Report p. 59, this means that Mr. Feinberg believed there was only approximately $500 million in additional claims that could have been compensated by the GCCF.[3]  In order to be *as conservative as possible*, I will deduct this entire amount from the benefits class counsel have conferred on the class *despite the fact* that the court here has already found that even the GCCF payments were enhanced due to class counsel's work.  *See* Account and Reserve Order pp. 4-6.  Thus, the calculations I make here *necessarily understate* the value that class counsel have created for class members.

25.     With that said, when a *conservative* estimate of the cash and other components of the economic harms settlement that BP will pay ($12.9 billion) is added to the monies the class

---

[3] Indeed, Mr. Feinberg has gone so far as to say that he thought BP had been too generous when it set aside $20 billion to pay persons injured by the disaster because he could not find that much harm in the Gulf to compensate. *See* Kenneth Feinberg, WHO GETS WHAT 174 (2012) ("With the benefit of hindsight, it at least appears that . . . BP was more than generous in pledging $20 billion.  The scale and impact of the disaster now seems to be much less than originally feared.").  Class counsel found the harm that Mr. Feinberg could not.

will receive from BP's assigned claims ($337 million) and Transocean's insurers ($82 million), the total comes to over $13.3 billion.  When the estimate of the components of the physical harms settlement ($170 million) is added, the total comes to approximately $13.5 billion.  When an estimate of the compensation that would have been paid under the GCCF ($500 million) is subtracted, the total value of the benefits generated by the settlements is still some $13 billion. Because this is a conservative estimate, I am confident declaring that *the total value of the benefits generated by these settlements is above $13 billion*.

26.     Why has BP paid so much more pursuant to these settlement agreements than it would have under the GCCF?  I believe there are three reasons.  First, the settlement agreements extended the deadline by which claims could be filed from August 23, 2013, to June 8, 2015; the extra two years surely brought in additional claims.   Second, and more importantly, the settlement agreements made new persons eligible for relief who had not been eligible under the GCCF.  The GCCF's administrator, Mr. Feinberg, has himself acknowledged this.  *See* Kenneth Feinberg, Who Gets What 181-82 (2012).  To begin with, almost the entire physical harms class would not have received compensation under the GCCF; the GCCF did not compensate physical harms except to rig workers for traumatic physical injuries.  *See id.* at 181 ("The announced settlement agreement does promise some important substantive changes from GCCF payment rules.  It plans to pay health-related claims . . . .").  But much of the economic harms class would not have been compensated under the GCCF, either.  For example, Mr. Feinberg has noted that the GCCF did not pay what he called "recreational subsistence claims" like the settlement does.  *See id.* at 182.  In addition, most real property claims payable under the settlement would not have been compensable under GCCF, and none of the vessels-of-opportunity charter payments and vessel physical damage payments payable under the settlement

were payable under the GCCF.  *See, e.g.*, GCCF Overall Program Statistics pp. 5-6.  Third, and most importantly of all, the economic harms settlement is more generous even for the claims that were eligible under the GCCF.  The average payment under the economic harms settlement has been *almost three times as large* as the average payment under the GCCF.  *Compare generally, e.g.*, Public Statistics, *supra*, *with* GCCF Overall Program Statistics.  Indeed, *every type* of claim is more generously compensated under the economic harms settlement.  As scholars have documented, the risk-transfer multipliers class members receive over their past damages are higher for every type of claim under the settlement than they were under the GCCF.  *See* Samuel Issacharoff[4] & D. Theodore Rave, *The BP Oil Spill Settlement and the Paradox of Public Litigation*, 74 La. L. Rev. 397, 406 (2014) (Figure 1); *id.* at 411 (showing relative generosity for commercial fishing claims in Figure 3); Catherine M. Sharkey, *The BP Oil Spill Settlements, Classwide Punitive Damages, and Societal Deterrence*, 64 DePaul L. Rev. 681, 702 (2015) (Table 2); *id.* at 697 (noting that the "multipliers offered under the GCCF" were "much lower").  The settlement is also more generous because it is more flexible in the manner in which class members can calculate their damages than the GCCF was.  *See* Issacharoff & Rave, *supra*, at 409-10 ("By allowing claimants to choose a three-month comparison period to calculate economic loss, the class settlement allowed them to take maximum advantage of . . . variability.").

*Selecting the percentage*

27.    Class counsel have requested $555.2 million in fees.  This request is less than 4.3% of what I noted is a conservative estimate ($13 billion) of the value of these settlements.

---

[4] Professor Issacharoff worked with class counsel in this case.

As I now explain, there is little doubt that this percentage is reasonable in light of the *Johnson* factors.

28.     Consider first the factors that go to how this request measures up against other cases: "(5) the customary fee for similar work in the community" and "(12) awards in similar cases."  Like other scholars and some courts, I believe that, ideally, courts would assess these factors by trying to determine what class members would have freely contracted to pay class counsel in a competitive market for class representation.  *See, e.g.*, *Williams v. Rohm and Haas Pension Plan*, 658 F.3d 629, 636 (7th Cir. 2011) ("When attorneys' fees are deducted from class damages, the district court must try to assign fees that mimic a hypothetical *ex ante* bargain between the class and its attorneys.").  But because this is very difficult to determine in the vast majority of cases without conducting an auction—even if plaintiffs sometimes contract with lawyers for the types of claims brought in class actions, and they often do not, it is hard to translate prices in the market for individual representation to the market for class representation where one might expect economies of scale to drive prices down further, *see* Fitzpatrick, *Class Action Lawyers, supra*, at 2063-64—courts almost always assess these factors by examining what other courts have awarded in class action litigation.  And this is what I will do as well.

29.     According to my empirical study, the most common fee percentages awarded in common fund class actions are 25%, 30%, and 33%, with the mean and median at 25%.  *See* Fitzpatrick, *Empirical Study*, *supra*, at 833, 838 (Figure 6).  In the Fifth Circuit, the mean and median percentages are 26.4% and 29%, respectively.  *See id*. at 836 (Table 6).  These numbers are consistent with the only other large-scale academic empirical study of class action fees.  *See* Theodore Eisenberg & Geoffrey P. Miller, *Attorneys' Fees and Expenses in Class Action Settlements: 1993-2008*, 7 J. Empirical L. Stud. 248, 260 (2010) (finding average and median

percentages of 24% and 25% nationwide and 24% and 23% in the Fifth Circuit among federal courts from 1993-2008).[5]  Needless to say, the fee request here is much, much lower than the typical award in other cases. As such, these factors support the fee request.

30.      It should be noted that the nationwide data in my empirical study (again, consistent with the Eisenberg-Miller study) showed that settlement size had a statistically significant but inverse relationship with the fee percentages awarded—*i.e.*, that federal courts awarded lower percentages in cases where settlements were larger.  *See* Fitzpatrick, *Empirical Study, supra,* at 838, 842-44.  For example, there were nine settlements in my dataset for $1 billion or more, and the mean and median fee percentages in these cases were 13.7% and 9.5%, respectively.  *See id.* at 839.  Many courts and commentators, including me, do not endorse this bigger-settlement-smaller-fee approach because it creates bad incentives for class counsel.[6]  Nonetheless, even if it is followed here, class counsel's fee request is *still* below the mean and median for *even billion dollar settlements*.  Indeed, in the entire universe of 688 cases in my

---

[5] The fee-percentage numbers in the Eisenberg-Miller study are often slightly lower than in my study because their methodology led them to oversample larger settlements.  *See* Fitzpatrick, *Empirical Study, supra*, at 829.

[6] *See, e.g.*, *In re Cendant Corp. Litigation*, 264 F.3d at 284 n. 55 ("Th[e] position [that the percentage of a recovery devoted to attorneys fees should decrease as the size of the overall settlement or recovery increases] . . . has been criticized by respected courts and commentators, who contend that such a fee scale often gives counsel an incentive to settle cases too early and too cheaply." (alteration in original)); *Allapattah Services, Inc. v. Exxon Corp.*, 454 F.Supp.2d 1185, 1213 (S.D.Fla. 2006) (awarding fees of 31.33% of $1.075 billion because "[w]hile some reported cases have advocated decreasing the percentage awarded as the gross class recovery increases, that approach is antithetical to the percentage of the recovery method . . . . .  By not rewarding class counsel for the additional work necessary to achieve a better outcome for the class, the sliding scale approach creates the perverse incentive for class counsel to settle too early for too little"); *In re Checking Account Overdraft Litig.*, 830 F. Supp. 2d 1330, 1367 (S.D. Fla. 2011) (awarding 30% of $410 million and quoting *Allapattah*); *In re Toyota Motor Corp. Unintended Acceleration Marketing, Sales Practices, and Products Liability Litigation*, No. 8:10ML-02151-JVS, at 17 n.16 (C.D. Cal., Jun. 17, 2013) ("The Court also agrees with . . . other courts, e.g., *Allapattah*, which have found that decreasing a fee percentage based only on the size of the fund would provide a perverse disincentive to counsel to maximize recovery for the class.").  Consider the following example: if courts award class counsel 30% of settlements if they are under $100 million, but only 20% of settlements if they are over $100 million, then rational class counsel will prefer to settle cases for $90 million (*i.e.*, a $27 million fee award) than $125 million (*i.e.*, a $25 million fee award).  Such incentives are obviously perverse.

empirical study, there was only one case where the court used the percentage method and awarded a fee smaller than the one requested here.  In this one case, class counsel was awarded only 3%.  *See In re Nortel Networks Corp. Sec. Litig.*, No. 01-cv-1855 (S.D.N.Y., Jan. 29, 2007). But, at the time of that fee award, class counsel's law firm had been criminally indicted for paying illegal kickbacks in other class action cases.  *See* Julie Creswell, *Milberg Weiss Is Charged With Bribery and Fraud*, N.Y. Times (May 18, 2006).  Thus, it is not hard to understand why the court awarded so little.  Needless to say, these special circumstances are not present here.

31.     It is true that no court has ever seen a class action settlement as large as the economic harms settlement here; this settlement is the biggest class action settlement in American history.  But courts have seen class action settlements not so far off, and the fee request here is modest compared even to the *biggest* billion dollar cases.  The largest class action settlement in my study was the Enron securities fraud settlement, which was also litigated in the Fifth Circuit.  That case settled for $7.2 billion, yet the court awarded class counsel 9.52% in fees—*more than twice as much* as the request here.  *See In re Enron Corp.*, 586 F.Supp.2d 732 (S.D.Tex. 2008).  My study is not aberrational: even when I examined all known billion dollar settlements in American history—the nine during the two years of my study and twelve more of which I am aware in other years—the request here is still *well below* the average and median fee percentages.  I list these settlements in Table 1, with the fee percentages awarded by the court in the last column.  In other words, no matter how you slice the data, the fee request here is modest in comparison to the awards in other cases.

**Table 1: All common fund class action settlements of $1+ billion**

| Case | Settlement Amount | Fee Method | Lodestar Multiplier | Fee Percentage |
|---|---|---|---|---|
| Enron Securities Fraud (2008)[7] | $7.2 billion | Percent | 5.2 | 9.52% |
| Diet Drugs Products Liability (2008)[8] | $6.4 billion | Percent | 2.6+ | 6.75% |
| WorldCom Securities (2005)[9] | $6.1 billion | Percent | 4.0 | 5.5% |
| Payment Card Interchange Fees Antitrust (2014)[10] | $5.7 billion | Percent | 3.4 | 9.56% |
| Visa Antitrust (2003)[11] | $3.4 billion | Percent | 3.5 | 6.5% |
| Tyco Securities (2007)[12] | $3.3 billion | Percent | 2.7 | 14.5% |
| Cendant Securities (2003)[13] | $3.2 billion | Percent | Not calculated | 1.73% |
| AOL Securities (2006)[14] | $2.65 billion | Percent | 3.7 | 5.9% |
| Bank of America Securities (2013)[15] | $2.4 billion | Not specified | Not calculated | 6.5% |
| Toshiba Diskette (2000)[16] | $2.1 billion (total) $1 billion (cash) | Both | Not calculated | 7.1% (total) 15% (cash) |
| Toyota Unintended Acceleration (2013)[17] | $1.6 billion (est. total) $757 million (cash) | Percent | 2.9 | 12.3% (total) 26.4% (cash) |

---

[7] *In re Enron Corp. Sec., Derivative & ERISA Litig.*, 586 F. Supp. 2d 732 (S.D. Tex. 2008).

[8] *In re Diet Drugs (Phentermine, Fenfluramine, Dexfenfluramine) Products Liab. Litig.*, 553 F. Supp. 2d 442 (E.D. Pa. 2008).

[9] *In re WorldCom, Inc. Sec. Litig.*, 388 F. Supp. 2d 319 (S.D.N.Y. 2005).

[10] *In re Payment Card Interchange Fee & Merch. Disc. Antitrust Litig.*, 991 F. Supp. 2d 437 (E.D.N.Y. 2014).

[11] *In re Visa Check/Mastermoney Antitrust Litig.*, 297 F. Supp. 2d 503 (E.D.N.Y. 2003).

[12] *In re Tyco Int'l, Ltd. Multidistrict Litig.*, 535 F. Supp. 2d 249 (D.N.H. 2007).

[13] *In re Cendant Corp. Litig.*, 243 F. Supp. 2d 166 (D.N.J. 2003).

[14] *In re AOL Time Warner, Inc. Sec.*, 2006 WL 3057232 (S.D.N.Y. Oct. 25, 2006).

[15] *In re Bank of America Corp. Sec., Derivative, and ERISA Litig.*, No. 09-md-2058 (S.D.N.Y., Apr. 8, 2013).

[16] *Shaw v. Toshiba Am. Info. Sys., Inc.*, 91 F. Supp. 2d 942 (E.D. Tex. 2000).

[17] *In re Toyota Motor. Corp. Unintended Acceleration Marketing, Sales Practices, and Products Liab. Litig.*, No. 10-ml-2151 (C.D. Cal., June 17, 2013).

| | | | | |
|---|---|---|---|---|
| Prudential Insurance (2000)[18] | $1.8 billion | Percent | 2.1 | 7.5% |
| Black Farmers Discrimination (2013)[19] | $1.2 billion | Percent | <2.0 | 7.4% |
| Tobacco Antitrust (2003)[20] | $1.2 billion | Lodestar | 4.5 | 5.9% |
| TFT-LCD Antitrust (2013)[21] | $1.1 billion | Percent | ≈2.5 | 28.5% |
| Nortel Securities I (2006)[22] | $1.1 billion | Percent | 2.1 | 3% |
| Nortel Securities II (2006)[23] | $1.1 billion | Percent | Not calculated | 8% |
| Royal Ahold Securities (2006)[24] | $1.1 billion | Percent | 2.6 | 12% |
| Allapattah Contract (2006)[25] | $1.1 billion | Percent | Not calculated | 31.33% |
| Nasdaq Antitrust (1998)[26] | $1 billion | Percent | 4.0 | 14% |
| Sulzer Hip (2003)[27] | $1 billion | Both | 2.4 | 4.8% |
| N = 21 | | | Low =  <2.0<br>High =    5.2<br>Avg =   3.14<br>Med =   2.80 | Low =   1.73%<br>High = 31.33%<br>Avg =    9.92%<br>    (total)<br>    10.97%<br>    (cash)<br>Med =    7.40%<br>    (total)<br>    7.50%<br>    (cash) |

32.     Consider next the factors that assess the results obtained by class counsel in light of the strength of the cases and the risks class counsel faced: "(8) the amount involved and the

---

[18] *In re Prudential Ins. Co. of Am. Sales Practice Litig.*, 106 F. Supp. 2d 721, 736 (D.N.J. 2000).

[19] *In re Black Farmers Discrimination Litig.*, 953 F. Supp. 2d 82 (D.D.C. 2013).

[20] *DeLoach v. Phillip Morris Cos.*, 2003 WL 23094907 (M.D.N.C. Dec. 19, 2003).

[21] *In re TFT-LCD (Flat Panel) Antitrust Litig.*, 2013 WL 1365900 (N.D. Cal. Apr. 3, 2013).

[22] *In re Nortel Networks Corp. Sec. Litig.*, No. 01-cv-1855 (S.D.N.Y., Jan. 29, 2007).

[23] *In re Nortel Networks Corp. Sec. Litig.*, No. 04-cv-2115 (S.D.N.Y., Dec. 26, 2006).

[24] *In re Royal Ahold N.V. Sec. & ERISA Litig.*, 461 F. Supp. 2d 383 (D. Md. 2006).

[25] *Allapattah Servs., Inc. v. Exxon Corp.*, 454 F. Supp. 2d 1185 (S.D. Fla. 2006).

[26] *In re NASDAQ Mkt.-Makers Antitrust Litig.*, 187 F.R.D. 465, 489 (S.D.N.Y. 1998).

[27] *In re Sulzer Hip Prosthesis & Knee Prosthesis Liab. Litig.*, 268 F. Supp. 2d 907, 939 (N.D. Ohio 2003).

results obtained," "(2) the novelty and difficulty of the issues," "(3) the skill required to perform the legal service adequately," and "(10) the undesirability of the case."  Courts examine these factors in order to incentivize class counsel to squeeze the greatest value for the class from their cases; the better class counsel did, the better class counsel should be compensated.  There can be no doubt that the class's recovery here is outstanding.  For example, as I noted, economic harms class members will receive *100%* of their potential compensatory damages—*plus much more* on account of the risk-transfer multipliers designed to gird against the possibility that spill-related losses may reappear and to compensate class members for their punitive damages claims.  In my experience, it is extraordinary for an entire class to receive 100% of its compensatory damages, let alone a multiple of that.  Usually class members must accept a large discount off their potential damages to reflect the risks and longevity of successful class litigation.[28]

33.      It is true that BP was paying class members 100% of their compensatory damages plus a risk-transfer multiplier under the GCCF.  It is therefore important to ask what risk class counsel faced in bringing this litigation if BP was already paying class members.  But the classes faced plenty of risks had this litigation not settled.  First, BP's GCCF program arose from its obligations under the Oil Pollution Act ("OPA").  *See* 33 U.S.C. 2705(a).  The defendants argued that the Act (and its short three-year statute of limitations) displaced the common law maritime claims brought by the classes.  *See* Motion to Dismiss Order pp. 18-26.  If the defendants had prevailed on this argument, the classes might have received very little because, as I noted, the GCCF's administrator had paid almost all of the claims that he had deemed qualifying under the

---

[28] The best studies of class member recoveries come from securities fraud cases.  *See, e.g., Recent Trends in Securities Class Action Litigation: 2014 Full-Year Review*, available at http://www.nera.com/content/dam/nera/publications/2015/PUB_2014_Trends_0115.pdf at 9, 33 (finding that the median securities fraud class action between 1996 and 2015 settled for between 1.3% and 7.0% of a measure of investor losses, depending on the year).

GCCF at the time the settlements here had been reached.  Second, even if the classes had won on

this point, it is not clear they would have been awarded damages at trial nearly as generous as

those provided in the settlement.  For example, BP argued that much of the injury suffered by the

economic harms class was caused by the economy rather than the disaster; yet, the settlements

presume that all losses from a simple before-and-after comparison are due to the disaster.  It is

true that the GCCF made this presumption as well, but most class members were ineligible under

the GCCF, and, as I also noted above, even those who were eligible have much more flexibility

in how they calculate the before-and-after comparison than they did under the GCCF; I cannot

imagine the class winning flexibility like this from a trial.  Moreover, as I further noted above,

the risk-transfer multipliers under the settlement are much more generous than those BP was

paying under the GCCF; it is wholly uncertain the economic harms class could have won such

generous multipliers at trial.  Indeed, it is almost certain the class would *not* have won such

generous multipliers: a portion of the multiplier was designed to award class members something

for their punitive damages claims against BP; yet, the court has now rejected the legal basis on

which BP could have been held liable for punitive damages at trial.  *See* Phase One Findings and

Conclusions pp. 140-142.  Third, there were risks that some of the BP defendants (i.e., the

smaller subsidiaries) might end up judgment proof by entering into bankruptcy.  Indeed,

although the largest BP defendants—BP North America Inc. and BP plc—were not "responsible

parties" under the OPA and were not ultimately found by the court to be liable under the general

maritime law, *see id.*, the settlements nonetheless obligate those entities to guarantee the

payment of the classes' claims.  *See* Economic Settlement Agreement Ex. 24.  This eliminated

the risk that the classes might win at trial yet be unable to collect their winnings.  Finally, there is

no better witness to the classes' success against the risks they faced going forward than BP itself:

BP tried to rescind its consent to the economic harms settlement once it realized how lucrative it was to class members.  That is, BP's own considered and sophisticated judgment is that it is better off going forward with this litigation than sticking with that settlement.  In other words, even BP now thinks the plaintiffs are getting a better deal with these settlements than they would have obtained after enduring the risks of trial.  I have never before seen a defendant have such second thoughts about a class action settlement.  And there is no better testament to class counsel's success in light of the risks of going forward.  These factors, too, support class counsel's fee request.

34.     Consider next "(1) the time and labor required."  Courts often examine this factor to ensure that class counsel dug far enough into the case to know how much it was worth before settling; it serves to help guard against class counsel rushing cases to settlement just for quick fee awards.  There is no reason to think this case has been rushed.  Class counsel have spent over 520,000 common benefit hours in this MDL.  *See* Garrett Fee Affidavit ¶¶12-14; Herman-Roy Declaration ¶¶117-123.  Although, as I noted, it is impossible to disaggregate the hours spent on behalf of the classes from those spent on other plaintiffs in this MDL, *see* Herman-Roy Declaration ¶ 124, it is obvious that class counsel have spent an incredible number of hours here.  Indeed, in my experience, I have never seen a case this complex nor one that required more of class counsel.  The number of moving parts here was—and this is an understatement—dizzying.  The law, the facts, the science—all of it was far more challenging than perhaps any class action case I have ever seen.  And so were the procedural hurdles.  Class counsel took *hundreds* of depositions and analyzed *over 90 million pages* of documents.  *See* Herman-Roy Declaration ¶¶ 36-45, 91.  They even did something that almost never happens in a class action: *they went to trial*—the thirteen-week, two-phase trial to resolve the economic harms class's assigned claims

against Transocean and Halliburton.  Finally, they had to do something that I have *never* seen class counsel have to do: fight a defendant's efforts to rescind its own settlement.  All of these things have meant this litigation has transpired much longer than the typical class action. According to my empirical study, the typical class action case is resolved after only three years of litigation.  *See* Fitzpatrick, *Empirical Study*, *supra*, at 820 (finding average and median durations of 1196 days and 1068 days, respectively).  We are now at six years—and counting (as class counsel are still pursuing final approval of the Transocean and Halliburton settlements as well as other matters, *see* n.2, *supra*).  This factor, too, supports the fee request.

35.     Consider next "(4) the preclusion of other employment by the attorney because he accepted this case" and "(6) whether the fee is fixed or contingent."  To be entirely frank, I usually do not focus on these factors because every time a lawyer takes a case, it precludes the lawyer from accepting other work; class actions are not special in this regard.  Moreover, class counsel work on contingency in nearly every class action; there is usually not anything special to say in that regard either.  As such, I usually roll these factors into consideration of other *Johnson* factors.  But this case *is* special.  In light of the demands of this uniquely complex case, many of the firms working on behalf of the classes were forced to *move* to New Orleans and *give up* their entire practices for years.  *See* Herman-Roy Declaration ¶18.  Moreover, the contingent aspect of their compensation meant that class counsel risked not only years of their lives; they also risked *millions of their own dollars*.  Until these settlements were approved (and BP thereby transferred established funds to pay class counsel's expenses), class counsel had at risk some *$22 million* in expenses they had paid out of their own pockets.  *See* Garrett Expense Affidavit ¶ 8.  In the *hundreds* of cases in my empirical study, there were only *two* settlements where class counsel risked more of their own money in expenses than class counsel did here: *Enron* and the Tyco

25

securities fraud settlement.  *See In re Enron Corp. Securities, Derivative & ERISA Litigation*, 586 F.Supp.2d 732, 769 (S.D.Tex. 2008) ("The Court has previously approved six expense reimbursement motions and awarded a total of $39 million to plaintiffs' counsel.  Counsel estimates that an additional $6 million has been incurred and will be the subject of future reimbursement requests."); *In re Tyco Intern. Ltd., Securities Litigation*, 2009 WL 873727 at *6 (D.N.H., Mar. 27, 2009) (approving $28.9 million in expenses).  In short, this case presented class counsel with special personal burdens.  These factors, too, support the fee request.

36.     Consider finally the remaining factors: "(7) time limitations imposed by the client or the circumstances," "(9) the experience, reputation, and ability of the attorneys," and "(11) the nature and length of the professional relationship with the client."  Because I was not privy to the attorney-client relationships in this litigation, I cannot speak in great detail about these factors.  I can say, however, that the class action lawyers who worked on this case include among their number some of the finest and best-regarded plaintiff's lawyers in the United States.  As such, these factors, too, support the request.

37.     For all these reasons, it is my opinion that the fee requested in the economic and physical harms settlements is reasonable under the percentage method.

Blended Method

38.     Under the blended approach, courts "crosscheck" the percentage method with class counsel's lodestar.  *See, e.g., Heartland Payment*, 851 F.Supp.2d at 1075, 1086-87.  The lodestar is calculated by multiplying the number of hours they worked on the case (to the extent the hours were reasonable) by a reasonable hourly rate.  When courts undertake the lodestar crosscheck with the percentage method, they try to streamline the lodestar calculation; this was,

of course, one of the reasons courts turned to the percentage method and away from the pure lodestar method to begin with. *See, e.g., In re Avandia Mktg., Sales Practices & Products Liab. Litig.*, 2012 WL 6923367, at *8 (E.D. Pa. Oct. 19, 2012) ("When used as a cross-check, the lodestar analysis may be abridged, requires 'neither mathematical precision nor bean counting,' and need not involve a review by the district court of actual billing records." (citation omitted)); *Hicks v. Stanley*, 2005 WL 2757792, at *10 (S.D.N.Y. Oct. 24, 2005) ("Where the lodestar method is simply used as a 'cross-check,' the court does not need to scrutinize counsel's documentation of hours expended on the case in the same depth as is appropriate where the lodestar is used as the sole fee determination."). The court then evaluates whether any multiplier over the lodestar that the fee request would produce is reasonable in light, again, of the *Johnson* factors.

39.     In this case, as I noted, class counsel are unable to report how many hours they have worked on behalf of the economic and physical harms classes because they are unable to disaggregate those hours from those spent working on behalf of other plaintiffs in this MDL. *See* Herman-Roy Declaration ¶124. This is perfectly understandable. Many of the plaintiffs in this MDL had claims that overlapped with others; work for one necessarily benefited the others. As such, in my opinion the best the court can do here is to consider *all of the common benefit time* class counsel have spent in this MDL and use that number in the lodestar calculation. Yet, because that number is overinclusive of the work for the classes here, I think the court should compare it to *all of the common benefit fees* class counsel will seek from this MDL—not just the $555.2 million they seek here, but the fees they will seek from the Transocean/Halliburton settlement as well as the fees they have already received from BP's settlements with Louisiana

and Alabama.  As I explain below, the multiplier that results from this comparison is still well within the range of reason in light of the *Johnson* factors.

40.     Class counsel have reported working some 527,000 common benefit hours to date in this MDL, *see* Garrett Fee Affidavit ¶¶12-14; Herman-Roy Declaration ¶¶ 117-123, with 268,298 hours charged by partners, 180,302 hours charged by associates, and 78,482 hours charged by paralegals and law clerks, *see* Herman-Roy Declaration ¶¶119, 123.

41.     Because this is a case of obvious nationwide importance—not to mention of unprecedented size, complexity, and need for specialized lawyering—it is appropriate to value the time in this case using average nationwide rates as opposed to the idiosyncratic rates that might have been charged in the jurisdiction where this case was litigated or in the jurisdictions where the lawyers who worked on the case resided.  *See, e.g., In re Agent Orange Prod. Liab. Litig.*, 818 F.2d 226, 232 (2d Cir. 1987) ("[T]he use of national hourly rates in exceptional multiparty cases of national scope, where dozens of non-local counsel are involved, appears to be the best available method of ensuring adherence to the principles of the lodestar analysis."); *Singleton v. Domino's Pizza, LLC*, 976 F. Supp. 2d 665, 689 n.12 (D. Md. 2013) ("These hourly rates, while somewhat high for this district, are within a reasonable range for firms with national class action practices."); *In re Royal Ahold N.V. Sec. & ERISA Litig.*, 461 F. Supp. 2d 383, 386 (D. Md. 2006) ("These hourly rates, while somewhat high for this district, are within a reasonable range for the national firms that prosecuted the case . . . ."); *In re BankAmerica Corp. Sec. Litig.*, 228 F.Supp.2d 1061, 1065 (E.D.Mo.2002) ("[W]hile the hourly rates ranging up to $695 are high for the Eastern District of Missouri, they are nonetheless within the range of reasonableness in the realm of nationwide securities class actions."); *In re Microstrategy, Inc.*, 172 F. Supp. 2d 778, 788 (E.D. Va. 2001) ("[T]he hourly rates charged by counsel, although

high for this locality, are nonetheless within the range of reasonableness for [securities fraud] cases, where the market for class action attorneys is nationwide and populated by very experienced attorneys with excellent credentials."); *Edmonds v. United States*, 658 F. Supp. 1126, 1147 (D.S.C. 1987) ("Even though this rate is higher than the rates he typically charges his clients, the relevant inquiry is the market rate for the services he provided in these cases.  The Court concludes that lead counsel services for a national class action should be compensated at the top rate in the market . . . ." (citations omitted)).  In order to find nationwide rates for attorneys in large, complex litigation like this, I consulted the 2014[29] nationwide survey of large law firm rates by the National Law Journal.  *See* Karen Sloan, *$1,000 Per Hour Isn't Rare Anymore*, The National Law Journal (Jan. 13, 2014).  Other courts have relied upon this survey to perform the lodestar crosscheck in class action cases.  *See, e.g., In re Am. Apparel, Inc. S'holder Litig.*, 2014 WL 10212865, at *23 (C.D. Cal. July 28, 2014) (relying on 2014 National Law Journal Survey because "[c]ourts can use survey data to evaluate the reasonableness of attorneys' rates").  According to this survey, the average nationwide rate for partners was $604 and the average nationwide rate for associates was $370.  The survey did not ask about paralegal and law clerk rates, but I believe these can be estimated from other sources to be roughly half of the rate for associates, or $185.[30]  (I suspect these numbers are *well below* the rates the

---

[29] Courts usually calculate the lodestar crosscheck using current reasonable hourly rates rather than historic hourly rates in order not to doubly punish lawyers who work on contingency by denying them the time value of money. *See, e.g., In re AOL Time Warner, Inc. Sec.*, 2006 WL 3057232, at *26 (S.D.N.Y. Oct. 25, 2006) ("[I]t is acceptable to use counsel's current rates to compensate them for the lengthy delay in payment.").  Unfortunately, however, 2014 is the most recent survey by the National Law Journal to report average rates for partners and associates.  As such, class counsel's lodestar is *necessarily understated* in my analysis.

[30] I came to this estimate by examining the relationship between paralegal/law-clerk rates and associate rates in the so-called "Laffey Matrix" maintained by the Department of Justice and the Adjusted Laffey Matrix (which uses a different rate of inflation).  The paralegal/law-clerk rates are roughly half of the associate rates in these matrices. *See* http://www.justice.gov/sites/default/files/usao-dc/legacy/2014/07/14/Laffey%20Matrix_2014-2015.pdf; http://www.laffeymatrix.com/see.html. It should be noted that these matrices are also often relied upon by courts to

defendants paid their own counsel.)  Using these numbers, an estimate of class counsel's total common benefit lodestar in this MDL is *over $243 million*.

42.       As I noted above, I believe the court should compare this *total* common benefit lodestar to the *total* common benefit fees class counsel have sought or will seek from this MDL in order to roughly crosscheck the fee request.  Those fees consist of the approximate $555.2 million class counsel are seeking from the economic and physical harms settlements, the $40 million they have already received from the settlement between the defendants and Louisiana and Alabama, *see* Gulf States Order Ex. A, and the $124.95 million, discussed below, they plan to seek from the Transocean/Halliburton settlement, *see* Halliburton Settlement Agreement § 23(b); Transocean Settlement Agreement § 23(b).  These fees total to $720.15 million.  The multiplier that would result would therefore be 2.96.  In my opinion, this multiplier would be well within the range of reason in light of the *Johnson* factors.

43.       I will not repeat what I said above with respect to most of the *Johnson* factors because almost everything I said applies with equal force under the blended method.  But the factors that go to how the fee request measures up against other cases—"(5) the customary fee for similar work in the community" and "(12) awards in similar cases"—should be reassessed because now the court must compare the 2.96 multiplier with the multipliers awarded in other percentage method cases where the lodestar crosscheck was performed.  This comparison shows the fee request is still reasonable.

---

assess reasonable hourly rates in lodestar calculations, but, because these matrices are designed to describe rates only in the Washington, D.C., area, and it would be difficult for me to modify them to generate a "nationwide" rate, I do not rely upon them here except to determine the relationship between paralegal/law-clerk rates and associate rates.  I will note, however, that the partner and associate rates from the National Law Journal survey fall in the middle of the partner and associate rates in these matrices. *See* http://www.justice.gov/sites/default/files/usao-dc/legacy/2014/07/14/Laffey%20Matrix_2014-2015.pdf (partners between $460 and $520 per hour depending on experience; associates between $255 and $300); http://www.laffeymatrix.com/see.html (partners between $661 and $796 per hour; associates between $331 and $406).

44.     In my empirical study, the mean and median lodestar multipliers in cases using the percentage method with the lodestar crosscheck were 1.65 and 1.34, respectively. *See* Fitzpatrick, *Empirical Study, supra*, at 834. These numbers are in line with the only other large-scale academic study of class action fees. *See* Eisenberg & Miller, *supra*, at 273 (finding mean multiplier of 1.81). The multiplier that would result here would be higher than the typical case, but, then again, there is nothing typical about this case. For example, the relationship between settlement size and lodestar multipliers is the opposite of that between settlement size and fee percentages: as the settlement size increases, the lodestar multiplier class counsel receives typically increases as well. *See id.* at 274 ("As the recovery decile increases, the multiplier also tends to increase, with the multiplier in the highest recovery decile more than triple that of the multiplier in the lowest recovery decile."). As the economic harms settlement here alone is the largest class action settlement in American history, it would therefore not be unexpected that the lodestar multiplier here would be greater than in the average case. Indeed, what is surprising is how little above average it is. Indeed, when compared to other billion dollar cases, it is decidedly *below* average. In Table 1, above, I also listed the lodestar multipliers (if the courts calculated them) that resulted from the percentage awards in all of the billion dollar settlements of which I am aware. As column four shows, the mean multiplier in these cases was over 3.0—i.e., *higher* than the multiplier that would result here—and the median multiplier was only slightly below the multiplier that would result here. In fact, the second largest class action settlement in American history (the *Enron* case, also from this Circuit) resulted in a lodestar multiplier of 5.2—nearly *double* what would result here.

45.     For all these reasons, it is my opinion that the fee requested is reasonable under the blended method as well.

IV.  Assessment of the reasonableness of the request for attorneys' fees in the Transocean/Halliburton settlement

46.     Much of what I said above with respect to the fee request in the economic and physical harms settlements applies with equal force to the fee request from the Transocean/Halliburton settlement.   In particular, this settlement, too, is a common fund settlement, and, for all the same reasons, it is my opinion that the court should use the percentage method to evaluate the fee request, but, for many of the same reasons, it is also my opinion that the fee request is within the range of reason no matter whether the court uses the percentage method or the blended method.  I again address each method in turn.

Percentage Method

47.     Class counsel intend to seek fees equal to $124.95 million in the Transocean/Halliburton settlement.  As I explain below, this request will equal 12.1% of the benefits conferred on the new class by that settlement.  It is my opinion that this percentage would be reasonable in light of the *Johnson* factors for many of the same reasons I stated above.  Below, I note the few differences and explain why they still support the fee request.

48.     First, there is no concern here with respect to valuing the benefits that class counsel have conferred on the new class.  This is an all-cash settlement that will amount to $902 million (if given final approval by the court), and none of that money would have been paid out under BP's GCCF program.  In addition, Halliburton and Transocean have agreed to attorneys' fees on top of that amount.  *See* Halliburton Settlement Agreement § 23(b); Transocean Settlement Agreement § 23(b).  Thus, the value of the common benefits conferred to the new

class by class counsel are equal to $902 million plus the $124.95 million fee request, or $1.027 billion; as such, the fee that will be requested is equal to 12.1% of those benefits.[31]

49.    Second, to the extent the court wishes to compare the fee percentage that will be requested here to settlements of similar dollar magnitude—a practice, again, I do not endorse—this settlement is of much smaller magnitude than the economic and physical harms settlements. Nonetheless, it still compares favorably to its peers.  For example, as I noted above, there were nine settlements in my dataset like this one for $1 billion or more, and the mean and median fee percentages in these cases were 13.7% and 9.5%, respectively.  *See id*.  That is, the fee request here will be *below* the average in billion dollar cases (which includes many cases for *multiple* billions).  This is confirmed by Table 1.  If one takes all of the settlements in Table 1 below $2 billion (i.e., *twice* as large as the settlement here), the average and median fee awards were 13.5% (or 12.3% if one considers the total value as opposed to the cash value of the Toyota settlement) and 8%, respectively.  Again, the request here will be *below* the average *even in bigger cases*.

50.    Third, the assessment of the factors that go to the risks versus recovery here are a bit different than in the economic and physical harms settlements.  To begin with, as I noted, the economic harms class is recovering over 100% of its potential damages; this is unheard of, and,

---

[31] The fee request is equal to 9.2% of the *total* Transocean/Halliburton settlement (including fees), but a portion of that settlement went to the economic harms class and the fee request I assessed in the previous section covered class counsel's work for that class.  I therefore exclude this portion from the analysis in this section in order to be as conservative as possible.  If, however, one wishes to include the portion that went to the economic harm class in the denominator here, the fee request would obviously still be reasonable because 9.2% is even lower than the 12.1% I conclude is reasonable in this section.  Likewise, if one wishes to look at the fee requests on behalf of the economic harms class, the physical harms class, and the new class together, the percentage would still be reasonable.  In that case, the total fees requested would equal $680 million (i.e., $555.2 million + $124.95 million) and the total benefits conferred would equal *well more* than $14 billion (i.e., well more than $13 billion + $1.36 billion) for a fee percentage of no more than 4.9%.  This is barely greater than the 4.3% I assessed as reasonable above, and, for all the same reasons, it is reasonable as well.

unsurprisingly, the new class does not fare quite as well.  According to Magistrate Wilkinson, the total potential punitive damages that the new class might have recovered if everything went its way at trial and on appeal was $3.6 billion.  *See* Neutral Allocation p. 27.  The recovery here is only 25% of that, but that is because that is the same chance that Magistrate Wilkson thought the class had to recover those punitive damages in light of the risks of the case.  *See id*.  What were those risks?  To begin with, there was the question whether Transocean or Halliburton would be found "grossly" negligent, the standard needed to win punitive damages.  This would have been especially difficult to prove in light of Fifth Circuit case law requiring *corporate* gross negligence as opposed to simply gross negligence by an employee.  *See* Phase One Findings and Conclusions pp. 140-142 (citing *In re: P&E Boat Rentals, Inc.*, 872 F.2d 642 (5th Cir. 1989)).  Second, there was the question whether punitive damages here were displaced altogether by the OPA.  Indeed, in light of this court's eventual finding that Transocean and Halliburton were *not* grossly negligent, one wonders whether Magistrate Wilkinson overstated the class's probability of success here.  If so, the class's recovery here is considerably better than the class's probability of success.  But, at worst, the class's recovery here is equal to its probability of success.  As such, there is little reason not to award class counsel a fee that is right at the average in comparable cases.

51.     For all these reasons, it is my opinion that the fee that will be requested in the Transocean/Halliburton settlement is reasonable under the percentage method.

<u>Blended Method</u>

52.     Because it is, again, impossible to disaggregate the time class counsel spent on behalf of the new class from the other plaintiffs in this MDL, the only analysis that is possible here is the exact same "all in" analysis I performed with respect to the economic and physical

harms settlements.  In other words, for exactly all the same reasons stated above, it is my opinion that the fee that will be requested is reasonable under the blended method as well.

53.      My compensation in this matter has been $595 per hour.

Nashville, TN

July 14, 2016

Brian T. Fitzpatrick

# Appendix 1

# BRIAN T. FITZPATRICK

Vanderbilt University Law School
131 21st Avenue South
Nashville, TN 37203
(615) 322-4032
brian.fitzpatrick@law.vanderbilt.edu

## ACADEMIC APPOINTMENTS

**VANDERBILT UNIVERSITY LAW SCHOOL**, *Professor*, 2012-present
- *FedEx Research Professor*, 2014-15; *Associate Professor*, 2010-12; *Assistant Professor*, 2007-10
- Classes: Civil Procedure, Federal Courts, Complex Litigation
- Hall-Hartman Outstanding Professor Award, 2008-2009
- Vanderbilt's Association of American Law Schools Teacher of the Year, 2009

## EDUCATION

**HARVARD LAW SCHOOL**, J.D., *magna cum laude*, 2000
- Fay Diploma (for graduating first in the class)
- Sears Prize, 1999 (for highest grades in the second year)
- *Harvard Law Review*, Articles Committee, 1999-2000; Editor, 1998-1999
- *Harvard Journal of Law & Public Policy*, Senior Editor, 1999-2000; Editor, 1998-1999
- Research Assistant, David Shapiro, 1999; Steven Shavell, 1999

**UNIVERSITY OF NOTRE DAME**, B.S., Chemical Engineering, *summa cum laude*, 1997
- First runner-up to Valedictorian (GPA: 3.97/4.0)
- Steiner Prize, 1997 (for overall achievement in the College of Engineering)

## CLERKSHIPS

**HON. ANTONIN SCALIA**, Supreme Court of the United States, 2001-2002

**HON. DIARMUID O'SCANNLAIN**, U.S. Court of Appeals for the Ninth Circuit, 2000-2001

## EXPERIENCE

**NEW YORK UNIVERSITY SCHOOL OF LAW**, Feb. 2006 to June 2007
*John M. Olin Fellow*

**HON. JOHN CORNYN**, United States Senate, July 2005 to Jan. 2006
*Special Counsel for Supreme Court Nominations*

**SIDLEY AUSTIN LLP**, Washington, DC, 2002 to 2005
*Litigation Associate*

## ACADEMIC ARTICLES

*An Empirical Look at Compensation in Consumer Class Actions,* 11 NYU J. L. & Bus. 767 (2015) (with Robert Gilbert)

*The End of Class Actions?*, 57 Ariz. L. Rev. 161 (2015)

*The Constitutionality of Federal Jurisdiction-Stripping Legislation and the History of State Judicial Selection and Tenure*, 98 Va. L. Rev. 839 (2012)

Twombly *and* Iqbal *Reconsidered*, 87 Notre Dame L. Rev. 1621 (2012)

*An Empirical Study of Class Action Settlements and their Fee Awards*, 7 J. Empirical L. Stud. 811 (2010) (selected for the 2009 Conference on Empirical Legal Studies)

*Do Class Action Lawyers Make Too Little?*, 158 U. Pa. L. Rev. 2043 (2010)

*Originalism and Summary Judgment*, 71 Ohio St. L.J. 919 (2010)

*The End of Objector Blackmail?*, 62 Vand. L. Rev. 1623 (2009) (selected for the 2009 Stanford-Yale Junior Faculty Forum)

*The Politics of Merit Selection*, 74 Missouri L. Rev. 675 (2009)

*Errors, Omissions, and the Tennessee Plan*, 39 U. Memphis L. Rev. 85 (2008)

*Election by Appointment: The Tennessee Plan Reconsidered*, 75 Tenn. L. Rev. 473 (2008)

*Can Michigan Universities Use Proxies for Race After the Ban on Racial Preferences?*, 13 Mich. J. Race & Law 277 (2007)


## BOOK CHAPTERS

*Civil Procedure in the Roberts Court* in Business and the Roberts Court (Jonathan Adler, ed., Oxford University Press, 2016)

*Is the Future of Affirmative Action Race Neutral?* in A Nation of Widening Opportunities: The Civil Rights Act at 50 (Ellen Katz & Samuel Bagenstos, eds., Michigan University Press, 2016)


## ACADEMIC PRESENTATIONS

*The Next Steps for Discovery Reform: Requester Pays,* Lawyers for Civil Justice Membership Meeting, Washington, DC (May 5, 2015)

*Private Attorney General: Good or Bad?*, 17th Annual Federalist Society Faculty Conference, Washington, DC (Jan. 3, 2015)

*Liberty, Judicial Independence, and Judicial Power*, Liberty Fund Conference, Santa Fe, NM (Nov. 13-16, 2014) (participant)

*The Economics of Objecting for All the Right Reasons,* 14th Annual Consumer Class Action Symposium, Tampa, Florida (Nov. 9, 2014)

*Compensation in Consumer Class Actions: Data and Reform*, Conference on The Future of Class Action Litigation: A View from the Consumer Class, NYU Law School, New York, New York (Nov. 7, 2014)

*The Future of Federal Class Actions: Can the Promise of Rule 23 Still Be Achieved?*, Northern District of California Judicial Conference, Napa, California (Apr. 13, 2014) (panelist)

*The End of Class Actions?*, Conference on Business Litigation and Regulatory Agency Review in the Era of Roberts Court, Institute for Law & Economic Policy, Boca Raton, Florida (Apr. 4, 2014)

*Should Third-Party Litigation Financing Come to Class Actions?*, University of Missouri School of Law (Mar. 7, 2014)

*Should Third-Party Litigation Financing Come to Class Actions?*, George Mason Law School (Mar. 6, 2014)

*Should Third-Party Litigation Financing Come to Class Actions?*, Roundtable for Third-Party Funding Scholars, Washington & Lee University School of Law (Nov. 7-8, 2013)

*Is the Future of Affirmative Action Race Neutral?*, Conference on A Nation of Widening Opportunities: The Civil Rights Act at 50, University of Michigan Law School (Oct. 11, 2013)

*The Mass Tort Bankruptcy: A Pre-History*, The Public Life of the Private Law: A Conference in Honor of Richard A. Nagareda, Vanderbilt Law School (Sep. 28, 2013) (panelist)

*Rights & Obligations in Alternative Litigation Financing and Fee Awards in Securities Class Actions*, Conference on the Economics of Aggregate Litigation, Institute for Law & Economic Policy, Naples, Florida (Apr. 12, 2013) (panelist)

*The End of Class Actions?*, Symposium on Class Action Reform, University of Michigan Law School (Mar. 16, 2013)

*Toward a More Lawyer-Centric Class Action?,* Symposium on Lawyering for Groups, Stein Center for Law & Ethics, Fordham Law School (Nov. 30, 2012)

*The Problem: AT & T as It Is Unfolding*, Conference on *AT & T Mobility v. Concepcion*, Cardozo Law School (Apr. 26, 2012) (panelist)

*Standing under the Statements and Accounts Clause,* Conference on Representation without Accountability, Corporate Law Center, Fordham Law School (Jan. 23, 2012)

*The End of Class Actions?*, Washington University Law School (Dec. 9, 2011)

*Book Preview Roundtable: Accelerating Democracy: Matching Social Governance to Technological Change*, Searle Center on Law, Regulation, and Economic Growth, Northwestern University School of Law (Sep. 15-16, 2011) (participant)

*Is Summary Judgment Unconstitutional?  Some Thoughts About Originalism*, Stanford Law School (Mar. 3, 2011)

*The Constitutionality of Federal Jurisdiction-Stripping Legislation and the History of State Judicial Selection and Tenure*, Northwestern Law School (Feb. 25, 2011)

*The New Politics of Iowa Judicial Retention Elections: Examining the 2010 Campaign and Vote*, University of Iowa Law School (Feb. 3, 2011) (panelist)

*The Constitutionality of Federal Jurisdiction-Stripping Legislation and the History of State Judicial Selection and Tenure*, Washington University Law School (Oct. 1, 2010)

Twombly *and* Iqbal *Reconsidered,* Symposium on Business Law and Regulation in the Roberts Court, Case Western Reserve Law School (Sep. 17, 2010)

*Do Class Action Lawyers Make Too Little?*, Institute for Law & Economic Policy, Providenciales, Turks & Caicos (Apr. 23, 2010)

*Originalism and Summary Judgment*, Georgetown Law School (Apr. 5, 2010)

*Theorizing Fee Awards in Class Action Litigation*, Washington University Law School (Dec. 11, 2009)

*An Empirical Study of Class Action Settlements and their Fee Awards*, 2009 Conference on Empirical Legal Studies, University of Southern California Law School (Nov. 20, 2009)

*Originalism and Summary Judgment*, Symposium on Originalism and the Jury, Ohio State Law School (Nov. 17, 2009)

*An Empirical Study of Class Action Settlements and their Fee Awards*, 2009 Meeting of the Midwestern Law and Economics Association, University of Notre Dame Law School (Oct. 10, 2009)

*The End of Objector Blackmail?*, Stanford-Yale Junior Faculty Forum, Stanford Law School (May 29, 2009)

*An Empirical Study of Class Action Settlements and their Fee Awards*, University of Minnesota School of Law (Mar. 12, 2009)

*The Politics of Merit Selection*, Symposium on State Judicial Selection and Retention Systems, University of Missouri Law School (Feb. 27, 2009)

*The End of Objector Blackmail?*, Searle Center Research Symposium on the Empirical Studies of Civil Liability, Northwestern University School of Law (Oct. 9, 2008)

*Alternatives To Affirmative Action After The Michigan Civil Rights Initiative*, University of Michigan School of Law (Apr. 3, 2007) (panelist)

## OTHER PUBLICATIONS

*Lessons from Tennessee Supreme Court Retention Election*, THE TENNESSEAN (Aug. 20, 2014)

*Public Needs Voice in Judicial Process*, THE TENNESSEAN (June 28, 2013)

*Did the Supreme Court Just Kill the Class Action?*, THE QUARTERLY JOURNAL (April 2012)

*Let General Assembly Confirm Judicial Selections*, CHATTANOOGA TIMES FREE PRESS (Feb. 19, 2012)

*"Tennessee Plan" Needs Revisions*, THE TENNESSEAN (Feb. 3, 2012)

*How Does Your State Select Its Judges?*, INSIDE ALEC 9 (March 2011) (with Stephen Ware)

*On the Merits of Merit Selection*, THE ADVOCATE 67 (Winter 2010)

*Supreme Court Case Could End Class Action Suits,* SAN FRANCISCO CHRONICLE (Nov. 7, 2010)

*Kagan is an Intellect Capable of Serving Court*, THE TENNESSEAN (Jun. 13, 2010)

*Confirmation "Kabuki" Does No Justice*, POLITICO (July 20, 2009)

*Selection by Governor may be Best Judicial Option*, THE TENNESSEAN (Apr. 27, 2009)

*Verdict on Tennessee Plan May Require a Jury*, THE MEMPHIS COMMERCIAL APPEAL (Apr. 16, 2008)

*Tennessee's Plan to Appoint Judges Takes Power Away from the Public*, THE TENNESSEAN (Mar. 14, 2008)

*Process of Picking Judges Broken*, CHATTANOOGA TIMES FREE PRESS (Feb. 27, 2008)

*Disorder in the Court*, LOS ANGELES TIMES (Jul. 11, 2007)

*Scalia's Mistake*, NATIONAL LAW JOURNAL (Apr. 24, 2006)

*GM Backs Its Bottom Line*, DETROIT FREE PRESS (Mar. 19, 2003)

*Good for GM, Bad for Racial Fairness*, LOS ANGELES TIMES (Mar. 18, 2003)

*10 Percent Fraud*, WASHINGTON TIMES (Nov. 15, 2002)

**OTHER PRESENTATIONS**

*The New Business of Law: Attorney Outsourcing, Legal Service Companies, and Commercial Litigation Funding*, Tennessee Bar Association, Nashville, TN (Nov. 12, 2014)

*Hedge Funds + Lawsuits = A Good Idea?*, Vanderbilt University Alumni Association, Washington, DC (Sep. 3, 2014)

*Judicial Selection in Historical and National Perspective*, Committee on the Judiciary, Kansas Senate (Jan. 16, 2013)

*The Practice that Never Sleeps: What's Happened to, and What's Next for, Class Actions*, ABA Annual Meeting, Chicago, IL (Aug. 3, 2012) (panelist)

*Life as a Supreme Court Law Clerk and Views on the Health Care Debate*, Exchange Club of Nashville (Apr. 3, 2012)

*The Tennessee Judicial Selection Process—Shaping Our Future*, Tennessee Bar Association Leadership Law Retreat, Dickson, TN (Feb. 3, 2012) (panelist)

*Reexamining the Class Action Practice*, ABA National Institute on Class Actions, New York, NY (Oct. 14, 2011) (panelist)

*Judicial Selection in Kansas*, Committee on the Judiciary, Kansas House of Representatives (Feb. 16, 2011)

*Judicial Selection and the Tennessee Constitution*, Civil Practice and Procedure Subcommittee, Tennessee House of Representatives (Mar. 24, 2009)

*What Would Happen if the Judicial Selection and Evaluation Commissions Sunset?*, Civil Practice and Procedure Subcommittee, Tennessee House of Representatives (Feb. 24, 2009)

*Judicial Selection in Tennessee*, Chattanooga Bar Association, Chattanooga, TN (Feb. 27, 2008) (panelist)

*Ethical Implications of Tennessee's Judicial Selection Process*, Tennessee Bar Association, Nashville, TN (Dec. 12, 2007)

**PROFESSIONAL ASSOCIATIONS**

Referee, Journal of Empirical Legal Studies
Reviewer, Oxford University Press
Reviewer, Supreme Court Economic Review
Member, American Law Institute
Member, American Bar Association
Fellow, American Bar Foundation
Member, Tennessee Advisory Committee to the U.S. Commission on Civil Rights, 2009-2015
Board of Directors, Tennessee Stonewall Bar Association
American Swiss Foundation Young Leaders' Conference, 2012
Bar Admission, District of Columbia


**COMMUNITY ACTIVITIES**

Board of Directors, Nashville Ballet; Nashville Talking Library for the Blind, 2008-2009

# Appendix 2

Documents Reviewed:

- Pretrial Order No. 9 (document 508, filed 10/8/10)

- Order and Reasons as to Motions to Dismiss the B1 Master Complaint (document 3830, filed 8/26/11) ("Motion to Dismiss Order")

- Order and Reasons as to Motions to Dismiss the B3 Master Complaint (document 4159, filed 9/30/11)

- Motion to Establish Account and Reserve for Litigation Expenses (document 4507, filed 11/7/11), including PSC Status Report and Memorandum in Support of Motion to Establish Account and Reserve for Litigation Expenses (document 4507-1)

- Reply Brief in Further Support of the PSC's Motion to Establish Account and Reserve for Litigation Expenses (document 4717, filed 11/23/11)

- Sur-Reply Brief in Further Support of the PSC's Motion to Establish Account and Reserve for Litigation Expenses (document 4739-1, filed 11/28/11)

- Order Establishing Court-Supervised Account and Reserve for Common Benefit Litigation Expenses (document 4739-2, filed 11/28/11)

- Order and Reasons as to the Motion to Establish Account and Reserve for Litigation Expenses (document 5022, filed 12/28/11) ("Account and Reserve Order")

- Order Amending the Court's previous Order of December 28, 2011, establishing an account and reserve (document 5064, filed 1/4/12)

- Opposition to BP's Motion to Reconsider the Court's Order Relating to the Establishment of a Court-Supervised Reserve (document 5153, filed 1/11/12)

- Order Amending and Superseding the Court's Previous Orders of December 28, 2011 and January 4, 2012, establishing an account and reserve (document 5274, filed 1/18/12)

- *Deepwater Horizon* Medical Benefits Class Action Settlement Agreement, as Amended on May 1, 2012 (document 6427-1, filed 5/3/12) ("BP Medical Settlement Agreement")

- *Deepwater Horizon* Economic and Property Damages Settlement Agreement as Amended on May 2, 2012 (document 6430-1, filed 5/3/12) ("BP Economic Settlement Agreement")

- GCCF Overall Program Statistics (Status Report as of February 10, 2012) ("GCCF Overall Program Statistics")

- Independent Evaluation of the Gulf Coast Claims Facility Report of Findings & Observations to the Department of Justice (June 5, 2012) ("BDO Report")

- Plaintiffs' Memorandum in Support of Final Approval of Economic and Property Damages Class Settlement (document 7104, filed 8/13/12), including Expert Report of Robert H. Klonoff (document 7104-3), Declaration of Samuel Issacharoff (document 7104-4), Declaration of Stephen J. Herman (document 7104-5), and Declaration of Joseph F. Rice (document 7104-6)

- Plaintiffs' Reply Brief in Response to Objections and in Further Support of Final Approval of Economic and Property Damages Class Settlement (document 7727, filed 10/22/12), including Supplemental Expert Report of Robert H. Klonoff (document 7727-4)

- Order and Reasons Granting Final Approval of the Economic and Property Damages Settlement Agreement (document 8138, filed 12/21/12)

- Order and Judgment Granting Final Approval of Economic and Property Damages Settlement and Confirming Certification of the Economic and Property Damages Settlement Class (document 8139, filed 12/21/12)

- Motion for Reimbursement and Payment of Shared Expenses by Plaintiffs Liaison Counsel (document 8472, filed 2/2/13), including Affidavit of Philip A. Garrett (document 8472-2) ("Garrett Expense Affidavit")

- Reply Regarding Remand of BEL Issue by Business Economic Loss (BEL) Claimants and the Economic & Property Damages Settlement Class (document 11833, filed 11/12/13), including the Declaration of Stephen J. Herman (document 11833-1)

- Memorandum in Support of Motion to Appoint Special Master (document 12807-3, filed 4/30/14)

- Findings of Fact and Conclusions of Law Phase One Trial (document 13381-1, filed 9/9/14) ("Phase One Findings and Conclusions")

- Order Regarding Insurance Proceeds for Transocean Personnel (document 13424, filed 9/22/14) ("Transocean Insurance Order")

- Transocean Punitive Damages and Assigned Claims Settlement Agreement (document 14644-1, filed 5/29/15) ("Transocean Settlement Agreement")

- Pretrial Order No. 59 (Appointment of Common Benefit Fee and Cost Committee and Guidelines for Common Benefit Attorneys' Fees and Costs Reimbursement) (document 14863, filed 7/15/15)

- HESI Punitive Damages and Assigned Claims Settlement Agreement (Amended as of September 2, 2015) (document 15322-1, filed 9/4/15) ("Halliburton Settlement Agreement")

- Order Regarding Payment of the Gulf States' Attorneys' Fees and Costs (document 15441, filed 10/5/15) ("Gulf States Order")

- Neutral Allocation and Reasons (Halliburton and Transocean Settlements) (document 15652, filed 12/11/15) ("Neutral Allocation")

- Report by the Claims Administrator of the Deepwater Horizon Economic and Property Damages Settlement Agreement on the Status of Claims Review (document 15825, filed 2/2/16)

- Email from Hilary Cummings to Steve Herman (April 4, 2016) ("Cummings Email")

- Memorandum of Law in Support of Preliminary Approval of HESI and Transocean Punitive Damages and Assigned Claims Class Action Settlements; Preliminary Certification of the Proposed New Punitive Damages Settlement Class; Approval of Class

Notice and Class Notice Plan; And Scheduling of Final Fairness Hearing (document 16161-1, filed 4/7/16)

- Petition for Reimbursement for Expenses and Collective Common Benefit Award (filed herewith), including the Declaration of Stephen J. Herman and James Parkerson Roy ("Herman-Roy Declaration"), the Affidavit of Philip A. Garrett ("Garrett Fee Affidavit"), and the Declaration of Elizabeth J. Cabraser