UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF LOUISIANA

| | | |
|---|---|---|
| IN RE:  OIL SPILL BY THE OIL RIG | : | MDL 2179 |
| "DEEPWATER HORIZON" IN THE | : | |
| GULF OF MEXICO, ON APRIL 20, 2010 | : | Section J |
| | : | |
| This Document Applies to: | : | Judge Barbier |
| | : | |
| *No. 12-970, Bon Secour Fisheries, Inc., et* | : | Mag. Judge Shushan |
| *al. v. BP Exploration & Production Inc., et al.* | : | |

MEMORANDUM IN SUPPORT OF MOTION OF THE DHECC
FOR RETURN OF PAYMENTS MADE TO HERMINIA MEDINA D/B/A TIN TIN'S ORIENTAL
FOOD STORE, LANSDON FLOORING, LLC AND BELLASIA NAIL AND SPA SALON, AND
MADE IN RELIANCE ON FINANCIAL
<u>DATA PROVIDED BY CLAIM PREPARER RAYMOND G. FLORES</u>

The DHECC moves to have claimants Herminia Medina d/b/a Tin Tin's Oriental

Food Store ("Tin Tin"), Lansdon Flooring, LLC ("Lansdon"), and Bellasia Nail and Spa Salon

("Bellasia"), and claims preparer Raymond G. Flores ("Flores") return payments made by

the DHECC in reliance on the financial data Flores provided in support of claims filed by Tin

Tin, Lansdon, and Bellasia, and prohibiting them from participating in any further DHECC

distributions.  Any other professionals who may have assisted any of them and benefitted

from these unjustified payments should also be required to pay and return any payments

received from any of these claims.  The three claimants received and were unjustly

enriched by payments made to each of them through the actions of Flores, and Flores

manipulated the monthly profit and loss statements to significantly increase each

claimant's purported economic loss suffered after the oil spill.  Relying on Flores's

representations, the DHECC paid Tin Tin $99,081.61, Lansdon $24,956.91, and Bellasia

$18,489.56, all totaling $142,528.08.  Flores took a percentage of each of these awards.

Efforts with the three claimants and Flores to attempt to resolve the issues presented in the accompanying Motion have not resulted in a resolution.

### A. *Background*

The Claims Administrator has authority to ensure the integrity of the DHECC by initiating clawback proceedings of fraudulent claims. *See* Order of May 6, 2015 (Rec. Doc. 14543); Settlement Agreement at ¶ 4.3.10. The Court retains continuing jurisdiction over the Settlement Agreement. Settlement Agreement at ¶¶ 4.4.7 and 18.1. Disputes concerning enforcement of the Settlement Agreement are to be resolved by motion to the Court. *Id.*

### B. *The DHECC Claims*

Tin Tin, Lansdon, and Bellasia filed *pro se* Business Economic Loss ("BEL") claims with the DHECC, asking to have the claims paid on their historical income as reported in monthly profit and loss statements ("P&Ls") and federal tax returns. Flores, a certified public accountant, prepared the BEL claims for each of Tin Tin, Lansdon, and Bellasia, created their monthly P&Ls and communicated with the DHECC on each of the claimants' behalf.

1.   General Requirements for Business Economic Loss Claims

The Settlement Agreement requires business claimants to provide the DHECC with, among other documents, federal tax returns and monthly P&Ls for the selected Benchmark Period, 2010, and, at times, 2011. *See* Settlement Agreement Ex. 4A at ¶¶ 3-4.

The DHECC calculates compensation using the data provided by claimants. The DHECC permits claimants, and the professionals retained by them, to create monthly P&Ls, only when the claimants did not maintain such information during their normal course of

business.  *See* DHECC Policy 286.  The P&Ls must be based on contemporaneous source documents, such as bank statements, invoices, and purchase orders, and must show the actual monthly revenues and expenses.  *See* DHECC Policy 355 v.2.

The BEL compensation framework consists of two steps.  The first step compensates claimants for certain reductions in their variable profits, by comparing variable profits for three or more consecutive months between May and December 2010 with variable profits for those same months during a Benchmark Period.  The second step compensates claimants for the incremental profits they might have generated in the absence of the oil spill relative to revenue from a Benchmark Period.  Claimants also receive a risk transfer premium to determine a total settlement award.

2.    The Claimants' Business Economic Loss Claims and Payments

Flores filed BEL claims with the DHECC on behalf of each of the three claimants, Tin Tin, Lansdon, and Bellasia.  Because the DHECC will reimburse claimants for reasonable and necessary accounting fees related to the preparation of claims, each claimant sought reimbursement for Flores' accounting support services.  Each also authorized Flores to communicate with the DHECC on their behalf.

For each claim, Flores provided the DHECC with an executed Sworn Written Statement for Claimant Accounting Support ("SWS-38"), certifying under penalty of perjury that his license was active and in good standing, and that to the best of his knowledge the financial information provided to the DHECC has been prepared on a consistent basis and the implications of information known or reasonably suspected to be untrue or inaccurate have not been ignored.  *See* Ex. A.  Flores also provided to each of his claimants an invoice for his services, and a copy of his IRS PTIN card.  *See* Ex. B. Upon information and belief,

Flores had varying contingency fee agreements with Tin Tin, Lansdon, and Bellasia in which he received approximately 20 to 34% of each company's DHECC award amount.

> a.   *Tin Tin*

On October 24, 2012, Tin Tin, an Oriental food store located in Pensacola, Florida, filed its BEL claim and provided the DHECC with federal tax returns and monthly P&Ls prepared by Flores using the cash method of accounting.  *See* Exs C & D.  The annual revenue and net income shown on Tin Tin's 2007 – 2010 tax returns were consistent with the annual amounts reported on the P&Ls.

Relying on the P&Ls prepared by Flores for Tin Tin, the DHECC used June - December 2009 as Tin Tin's Benchmark Period and found as follows:

| Period | Revenue | Variable Expenses | Variable Profit |
|---|---|---|---|
| Benchmark | $204,235.05 | $159,590.53 | $44,644.52 |
| 2010 Compensation | $51,712.44 | $34,404.29 | $17,308.15 |
| | | **Lost Variable Profit:** | **$27,336.37** |

From this data, the DHECC awarded and paid Tin Tin $99,081.61, including $1,000 for Flores' accounting support.

> b.   *Lansdon Flooring, LLC*

On October 18, 2012, Lansdon, a flooring company located in Pensacola, Florida area, filed its BEL claim and provided the DHECC with federal tax returns and monthly P&Ls prepared by Flores using the cash method of accounting.  *See* Exs. E-1 – E-3 & F-1 – F-3.  The annual revenue and net income shown on Lansdon's 2007 – 2010 tax returns were consistent with the annual amounts reported on the P&Ls.

Relying on the P&Ls prepared by Flores for Lansdon, the DHECC used the average of 2008 and 2009 for May – December as Lansdon's Benchmark Period and found as follows:

| Period | Revenue | Variable Expenses | Variable Profit |
|---|---|---|---|
| Benchmark | $24,771.90 | $12,206.65 | $12,565.25 |
| 2010 Compensation | $5,568.40 | $10,660.96 | ($5,092.56) |
| | | **Lost Variable Profit:** | **$17,657.81** |

From this data, the DHECC awarded and paid Lansdon $24,956.91, including $1,000 for Flores' accounting support.

c.     *Bellasia Nail and Spa Salon*

On October 5, 2012, Flores submitted a BEL claim for Bellasia, a nail and spa salon, located in Mobile, Alabama.  Flores provided the DHECC with federal tax returns and monthly P&Ls prepared by Flores using the cash method of accounting.  *See* Ex G.  Flores e-signed both the claim form and registration form, See Exs. H and I.  The annual revenue and net income shown on Bellasia's 2007 – 2010 returns were consistent with the annual amounts reported on the P&Ls.  Flores also provided Florida sales and use tax returns to support monthly sales figures at the request of the DHECC.

Relying on the P&Ls prepared by Flores for Bellasia, the DHECC used 2009 as the benchmark period, May – December 2010 as Bellasia's Compensation Period and found as follows:

| Period | Revenue | Variable Expenses | Variable Profit |
|---|---|---|---|
| Benchmark | $69,032 | $40,322.34 | $28,709.66 |
| 2010 Compensation | $31,972 | $13,808.75 | $18,163.25 |
| | | **Lost Variable Profit:** | **$10,546.41** |

From this data, the DHECC awarded and paid Bellasia $18,489.56, including $1,000 for Flores' accounting support.

## C. *Evidence of the Fraudulent Claims*

The totality of the record shows there is no genuine issue as to any material fact and that the DHECC is entitled to a judgment as a matter of law.  *See* Order & Reasons on Special

Master's Motion for Return of Payment at 19 (Doc. Rec. 12794) ("Order and Reasons").

Here, Flores prepared monthly P&Ls and submitted them to the DHECC to support claims for each of Tin Tin, Lansdon, and Bellasia.  The DHECC used these P&Ls to calculate the compensation awards, relying upon Flores's certifications that he had not ignored the implications of untrue or inaccurate information while preparing the claims for Tin Tin, Lansdon, and Bellasia.

But despite his certifications, Flores fabricated key financial data on the monthly P&Ls for each of the three claimants.  Flores provided the DHECC with P&Ls containing artificial monthly revenue amounts that misrepresented the finances of these entities, shifting revenue away from the 2010 compensation period. Flores's intentional revenue shifting artificially inflated the lost variable profit for each of the companies.  His misrepresentations triggered the payment by the DHECC of award amounts to which the three claimants would not otherwise have been entitled, and thus resulted in the contingent fees obtained by Flores.

The misrepresentations for each claimant are addressed below.

1.      Flores Manipulated Tin Tin's Monthly Statements to Overstate Revenue in the Benchmark Period, Understate Revenue in the Compensation Period and Qualify the Claimant for Compensation

Tin Tin's Oriental Store and Food Concessions is an Asian supermarket located at 4922 W. Fairfield Dr. in Pensacola, FL that is owned and operated by Herminia Medina. DHECC investigators interviewed Flores and he confirmed that Tin Tin did not prepare monthly P&Ls as part of its normal operations. Flores stated that he created the P&Ls based on monthly bank records, invoices and receipts, and that he submitted the P&Ls to the

DHECC in support of Tin Tin's claim. In a deposition with the DHECC, Medina said that she

told Flores that all of her financial information is in her bank account:

> All the bank account is there, because whenever I write down the – it is in the
> form of check, so everything is in the record... No. Actually, he's [Flores]
> asking me if there's any more, like, the expenses. I said, 'Everything is in
> writing.' Like I write as in the check, he will see it...everything is in the
> writing form of check, so everything he would see it in there. *See* Ex. J, pgs.
> 107-108.

While Medina did not prepare monthly P&Ls for Tin Tin, she did provide Flores with

monthly bank statements that could have been used as contemporaneous source

documents for him to create accurate P&Ls. In an interview with DHECC investigators,

Flores stated that Tin Tin usually provided him with bank statements, check books or

receipts at the end of each tax year. However, at the time of the interview, Flores said he

was unable to provide any copies of client financial documents because his computer's

server was allegedly "infected with a virus". After three months of failing to provide any of

the alleged financial documents that he used to create Tin Tin's P&Ls, Flores was served

with a motion to compel on September 24, 2015. Flores never fully complied with any of

the requests to provide the financial documentation that he used to create the P&Ls.

The DHECC obtained by subpoena Tin Tin's monthly bank account records.  There is

a significant difference between the monthly bank account records and the monthly P&Ls

created by Flores.  In fact, a review of the differences between the P&Ls and the bank

records reveals that Flores overstated the 2009 benchmark revenues by $15,370.37 and

understated the 2010 compensation period by $175,955.92.

Of particular significance, 2010 revenue on the Flores-prepared P&Ls was shifted

out of the compensation period and into the non-compensation period months, without

changing the 2010 annual revenue total, thus maintaining consistency with Tin Tin's tax

filings.  Under a cash method of accounting, there should be no difference between the monthly P&Ls and the monthly bank account statements. Here, the difference is the result of fraudulent revenue shifting in order to manipulate the benchmark and compensation period revenues.

Flores's intentional revenue shifting in Tin Tin's P&Ls increased the company's 2010 lost variable profit, consequently qualifying Tin Tin for an award.  A comparison of Tin Tin's monthly bank statements to the revenue from the Flores-produced P&Ls makes this point clear.  The charts below, listing revenue amounts, show: (a) the revenue shifting in the 2009 benchmark period resulted in over-reporting revenue by $15,370.37 and (b) the revenue shifting in the 2010 compensation period resulted in under-reporting revenue by $175,955.92 (indicated in blue shading in each of the charts below).

| 2009 Tin Tins Oriental Food | | | |
|---|---|---|---|
| | P & L | Bank Deposits | Variance |
| JAN. | $ 18,222.80 | $ 11,081.48 | $ 7,141.32 |
| FEB. | $ 22,065.30 | $ 14,188.52 | $ 7,876.78 |
| MAR. | $ 21,832.43 | $ 27,413.50 | $ (5,581.07) |
| APR. | $ 24,743.42 | $ 25,162.64 | $ (419.22) |
| MAY | $ 30,623.61 | $ 17,645.76 | $ 12,977.85 |
| JUNE | $ 31,176.70 | $ 25,538.24 | $ 5,638.46 |
| JULY | $ 28,731.47 | $ 24,135.95 | $ 4,595.52 |
| AUG. | $ 26,228.02 | $ 17,275.59 | $ 8,952.43 |
| SEPT. | $ 24,161.22 | $ 22,067.26 | $ 2,093.96 |
| OCT. | $ 22,705.72 | $ 30,722.32 | $ (8,016.60) |
| NOV. | $ 21,599.55 | $ 31,389.56 | $ (9,790.01) |
| DEC. | $ 19,008.76 | $ 20,090.00 | $ (1,081.24) |
| | | | $ - |
| Benchmark Period | $ 204,235.05 | $ 188,864.68 | $ 15,370.37 |

| 2010 Tin Tins Oriental Food | | | |
|---|---|---|---|
| | P & L | Bank Deposits | Variance |
| JAN. | $ 23,027.42 | $ 16,289.30 | $ 6,738.12 |
| FEB. | $ 27,977.29 | $ 21,341.67 | $ 6,635.62 |
| MAR. | $ 27,063.28 | $ 31,241.71 | $ (4,178.43) |
| APR. | $ 28,236.25 | $ 20,180.03 | $ 8,056.22 |
| MAY | $ 21,470.50 | $ 22,046.84 | $ (576.34) |
| JUNE | $ 6,923.62 | $ 23,628.23 | $ (16,704.61) |
| JULY | $ 5,596.28 | $ 21,703.76 | $ (16,107.48) |
| AUG. | $ 5,237.43 | $ 20,630.31 | $ (15,392.88) |
| SEPT. | $ 5,115.41 | $ 32,637.68 | $ (27,522.27) |
| OCT. | $ 2,325.83 | $ 35,600.68 | $ (33,274.85) |
| NOV. | $ 2,724.86 | $ 30,944.45 | $ (28,219.59) |
| DEC. | $ 2,318.51 | $ 40,476.41 | $ (38,157.90) |
| | | | $ - |
| Compensation Period | $ 51,712.44 | $ 227,668.36 | $ (175,955.92) |

The DHECC relied upon the Flores-prepared P&Ls to compare the pre-spill variable profit with the variable profit in the 2010 compensation period months.  But shifting the 2010 revenue away from the 2010 compensation period had the effect of artificially overstating the loss and fabricating Tin Tin's award amount.

Had Flores created honest and accurate P&Ls based off of contemporaneous source documents, Tin Tin would not have been eligible for any award from the DHECC.  Rather than the $99,081.61 paid by the DHECC to Tin Tin, the company would not have received any payment if Flores would have used the monthly bank statements as contemporaneous source documents to create the P&Ls.

2.     Flores Manipulated Lansdon's 2008 - 2010 Monthly Statements to Overstate the Benchmark Period in 2008-2009, Understate the Compensation Period in 2010 and Qualify the Claimant for Compensation

Lansdon Flooring, LLC is located at 2821 Longleaf Dr. in Pensacola, FL and is owned and operated by Eva and Robert Lansdon. DHECC investigators interviewed the Lansdons and they confirmed that they did not prepare monthly P&Ls as part of their normal operations, and that those submitted to the DHECC were created by Flores. According to Eva Lansdon, Flores told her that he had seen a drop in their taxes and he later filed a claim with the DHECC unbeknownst to her.

While Lansdon did not prepare monthly P&Ls, Flores did have monthly bank statements that could have been used as contemporaneous source documents in order to reflect accurate P&Ls. In an interview with DHECC investigators, Flores stated that the Lansdon situation was similar to Tin Tin and that he was unable to provide the financial documents he used to create the P&Ls, allegedly due to a "computer virus".

The DHECC obtained by subpoena Lansdon's monthly bank account records.  There is a significant difference between the monthly bank account records and the monthly P&Ls created by Flores.  In fact, a review of the differences between the P&Ls and the bank records reveals that Flores overstated the 2008-2009 benchmark revenues by an average of $2,335.83 and understated the 2010 compensation period by $24,955.33.

9

Of particular significance, revenue in 2010 on the Flores-prepared P&Ls was shifted out of the compensation period and into the non-compensation period months, without changing the 2010 annual revenue total, thus maintaining consistency with Lansdon's tax filings.  Under a cash method of accounting, there should be no difference between the monthly P&Ls and the monthly bank account statements. Here, the difference is the result of fraudulent revenue shifting in order to manipulate the benchmark and compensation period revenues.

This revenue shifting increased the lost variable profit, and, as a result, the total DHECC award amounts.  A comparison of Lansdon's monthly bank statements to the revenue from the Flores-produced P&Ls makes this point clear.  The charts below, listing revenue amounts, show: (a) the revenue shifting in the 2008-2009 benchmark period resulted in over-reporting revenue by $2,335.83 and (b) the revenue shifting in the 2010 compensation period resulted in under-reporting revenue by $24,955.33 (indicated in blue shading in each of the charts below). (2010 chart appears on following page)

| 2008 Lansdon Flooring | | | |
|---|---|---|---|
| | P & L | Bank Deposits | Variance |
| JAN. | $ 187.66 | $ 150.00 | $37.66 |
| FEB. | $ 447.58 | $ 5,743.80 | ($5,296.22) |
| MAR. | $ 821.50 | $ 3,927.75 | ($3,106.25) |
| APR. | $ 2,268.05 | $ 4,435.30 | ($2,167.25) |
| MAY | $ 5,673.82 | $ 3,013.82 | $2,660.00 |
| JUNE | $ 5,604.21 | $ 2,118.80 | $3,485.41 |
| JULY | $ 5,042.27 | $ 3,164.96 | $1,877.31 |
| AUG. | $ 4,956.19 | $ 3,630.50 | $1,325.69 |
| SEPT. | $ 3,857.62 | $ 5,824.90 | ($1,967.28) |
| OCT. | $ 2,562.99 | $ 3,305.00 | ($742.01) |
| NOV. | $ 891.40 | $ - | $891.40 |
| DEC. | $ 187.60 | $ - | $187.60 |
| | | | $0.00 |
| Benchmark Period | $28,776.10 | $21,057.98 | $7,718.12 |

| 2009 Lansdon Flooring | | | |
|---|---|---|---|
| | P & L | Bank Deposits | Variance |
| JAN. | $ 588.48 | $ 1,630.00 | ($1,041.52) |
| FEB. | $ 403.00 | $ 2,494.47 | ($2,091.47) |
| MAR. | $ 614.30 | $ - | $614.30 |
| APR. | $ 908.36 | $ 2,013.00 | ($1,104.64) |
| MAY | $ 4,780.78 | $ 3,806.15 | $974.63 |
| JUNE | $ 4,014.56 | $ 4,020.65 | ($6.09) |
| JULY | $ 5,193.75 | $ 930.29 | $4,263.46 |
| AUG. | $ 3,550.36 | $ 2,420.25 | $1,130.11 |
| SEPT. | $ 1,638.59 | $ 1,727.37 | ($88.78) |
| OCT. | $ 1,320.62 | $ 4,232.64 | ($2,912.02) |
| NOV. | $ 154.00 | $ 4,172.60 | ($4,018.60) |
| DEC. | $ 115.00 | $ 4,240.00 | ($4,125.00) |
| | | | $0.00 |
| Benchmark Period | $20,767.66 | $25,549.95 | ($4,782.29) |

| 2010 Lansdon Flooring | | | |
|---|---|---|---|
| | P & L | Bank Deposits | Variance |
| JAN. | $ 7,112.50 | $ 7,112.50 | $0.00 |
| FEB. | $ 5,972.58 | $ 5,341.57 | $631.01 |
| MAR. | $10,702.35 | $11,333.35 | ($631.00) |
| APR. | $ 5,281.97 | $ 3,935.97 | $1,346.00 |
| MAY | $ 875.50 | $ 2,221.50 | ($1,346.00) |
| JUNE | $ 1,351.40 | $ 3,342.10 | ($1,990.70) |
| JULY | $ 950.00 | $ 5,692.40 | ($4,742.40) |
| AUG. | $ 1,100.00 | $ 2,000.00 | ($900.00) |
| SEPT. | $ - | $ - | $0.00 |
| OCT. | $ 914.00 | $ 3,985.00 | ($3,071.00) |
| NOV. | $ 200.00 | $ 2,525.32 | ($2,325.32) |
| DEC. | $ 177.50 | $10,757.41 | ($10,579.91) |
| | | | $0.00 |
| Compensation Period | $ 5,568.40 | $30,523.73 | ($24,955.33) |

The DHECC relied upon the Flores-prepared P&Ls to compare the pre-spill variable profit with the variable profit in the 2010 compensation period months. But shifting the 2010 revenue away from the 2010 compensation period had the effect of artificially overstating the loss and fabricating Lansdon's award amount.

Had Flores accurately created P&Ls based off of source documents, Lansdon would not have been eligible for any award from the DHECC. Rather than the $24,956.91 paid by the DHECC to Lansdon, the company would not have received any payment if Flores would have used the monthly bank statements as contemporaneous source documents to create the P&Ls.

3.    Flores Manipulated Bellasia's 2009 - 2010 Monthly Statements to Overstate the Benchmark Period in 2009, Understate the Compensation Period in 2010 and Qualify the Claimant for Compensation

Bellasia Nail and Spa, LLC is located at 6508 Heritage Trace Dr. in Mobile, AL, and Flores is the authorized business representative. Flores filed the Registration Form and Business Economic Loss Claim Form with his signature. On the forms, Flores requested a 2009 benchmark period and 2010 May through December compensation period.

11

Similar to Tin Tin and Lansdon, there is a significant difference between Bellasia's monthly bank account records and the monthly P&Ls created by Flores.  In fact, a review of the differences between the P&Ls and the bank records reveals that Flores overstated the 2009 benchmark revenues by an average of $1,487.14 and understated the 2010 compensation period by $37,672.33.

Of particular significance, revenue in 2010 on the Flores-prepared P&Ls was shifted out of the compensation period and into the non-compensation period months, without changing the 2010 annual revenue total, thus maintaining consistency with Bellasia's tax filings.  Under a cash method of accounting, there should be no difference between the monthly P&Ls and the monthly bank account statements. Here, the difference is the result of fraudulent revenue shifting in order to manipulate the benchmark and compensation period revenues.

Flores's intentional revenue shifting increased the lost variable profit, and, as a result, the total DHECC award amounts.  A comparison of Bellasia's monthly bank statements to the revenue from the Flores-produced P&Ls makes this point clear.  The charts below, listing revenue amounts, show: (a) the revenue shifting in the 2008-2009 benchmark period resulted in over-reporting revenue by $1,487.14 and (b) the revenue shifting in the 2010 compensation period resulted in under-reporting revenue by $36,672.33 (indicated in blue shading in each of the charts on the following page).

12

| 2009 Bellasia Nail and Spa | | | |
|---|---|---|---|
| | P & L | Bank Deposits | Variance |
| JAN. | $ 5,900.00 | $ 5,802.63 | $ 97.37 |
| FEB. | $ 6,218.00 | $ 9,366.29 | $ (3,148.29) |
| MAR. | $ 7,044.00 | $ 6,462.13 | $ 581.87 |
| APR. | $ 7,128.00 | $ 9,322.38 | $ (2,194.38) |
| MAY | $ 9,124.00 | $ 9,642.10 | $ (518.10) |
| JUNE | $ 12,989.00 | $ 9,497.76 | $ 3,491.24 |
| JULY | $ 7,462.00 | $ 10,070.62 | $ (2,608.62) |
| AUG. | $ 10,005.00 | $ 9,552.48 | $ 452.52 |
| SEPT. | $ 7,281.00 | $ 4,658.74 | $ 2,622.26 |
| OCT. | $ 6,942.00 | $ 7,007.81 | $ (65.81) |
| NOV. | $ 7,011.00 | $ 8,179.33 | $ (1,168.33) |
| DEC. | $ 8,218.00 | $ 8,936.02 | $ (718.02) |
| | | | $ - |
| Benchmark Period | $ 69,032.00 | $ 67,544.86 | $ 1,487.14 |

| 2010 Bellasia Nail and Spa | | | |
|---|---|---|---|
| | P & L | Bank Deposits | Variance |
| JAN. | $ 7,246.00 | $ 5,621.74 | $ 1,624.26 |
| FEB. | $ 7,314.00 | $ 6,565.82 | $ 748.18 |
| MAR. | $ 7,918.00 | $ 8,874.74 | $ (956.74) |
| APR. | $ 9,133.00 | $ 9,603.18 | $ (470.18) |
| MAY | $ 2,101.00 | $ 9,996.61 | $ (7,895.61) |
| JUNE | $ 3,317.00 | $ 9,520.17 | $ (6,203.17) |
| JULY | $ 4,473.00 | $ 7,077.63 | $ (2,604.63) |
| AUG. | $ 3,342.00 | $ 10,203.64 | $ (6,861.64) |
| SEPT. | $ 3,394.00 | $ 9,291.22 | $ (5,897.22) |
| OCT. | $ 4,912.00 | $ 9,246.47 | $ (4,334.47) |
| NOV. | $ 6,054.00 | $ 6,594.54 | $ (540.54) |
| DEC. | $ 4,379.00 | $ 7,714.05 | $ (3,335.05) |
| | | | $ - |
| Compensation Period | $ 31,972.00 | $ 69,644.33 | $ (37,672.33) |

The DHECC relied upon the Flores-prepared P&Ls to compare the pre-spill variable profit with the variable profit in the 2010 compensation period months. But shifting the 2010 revenue away from the 2010 compensation period had the effect of artificially overstating the loss and fabricating Bellasia's award amount.

Had Flores created accurate P&Ls based off of source documents, Bellasia would not have been eligible for any award from the DHECC. Rather than the $18,489.56 paid by the DHECC to Bellasia, the company would not have received any payment if Flores would have used the monthly bank statements as contemporaneous source documents to create the P&Ls.

### D. *Legal Analysis*

The Court's power to order equitable remedies as a result of fraudulent conduct is a broad, flexible and long-standing power. *See Hazel-Atlas Glass Co. v. Hartford Empire Co.*, 322 U.S. 238, 244 (1944). Having been unjustly enriched as a result of the fraudulent claims created and submitted on their behalf, Tin Tin, Lansdon and Bellasia should be

required to pay back the funds they each received from the DHECC.  And based on Flores'

conduct, he should be held liable for the full amount paid by the DHECC to Tin Tin, Lansdon

and Bellasia, *in solido* with each of them.

      1.    <u>Flores's Actions Satisfy the Elements of Fraud</u>

To prove fraud in this context, the DHECC must show that (1) Flores made material

representations; (2) his representations were false; (3) when Flores made the

representations, he knew they were false or made them recklessly without any knowledge

of the truth and as a positive assertion; (4) the representations were made with the

intention that they be acted upon by the DHECC (the other party); (5) the DHECC acted in

reliance upon the representations; and (6) the DHECC suffered injury.  Order & Reasons on

Motion of the DHECC for Return of Payments Made to Crystal Seafood Company, Inc. and

Others at 6 (Rec. Doc. 18456) (citing *In re Deepwater Horizon*, No. 15-30574, 2016 WL

1397663 at *3, -- F. App'x – (5th Cir. April 8, 2016); Alfonso Order at 6-7, Rec. Doc. 15400)).

Here, the evidence indisputably shows that Flores made false representations when

he submitted misleading P&Ls that were not based on the contemporaneous source

documents in his possession.  His representations were material in that the financial

statements formed the basis of the claim calculations.  When Flores made the

representation, he knew the P&Ls were false because he had the claimants' monthly bank

account records and still created P&Ls that did not remotely represent the source

documents.

Flores' intention that the DHECC act upon these representations is made clear by the

evidence in three ways.  First, the monthly P&Ls are wildly inaccurate and Flores cannot

credibly argue that the level of inaccuracy is a result of mistaken calculations.  Second,

Flores possessed the requisite source documentation to create accurate P&Ls, but he intentionally did not use the reliable information from the monthly bank statements to create accurate P&Ls.  Third, he attempted to hide the monthly inaccuracies by reconciling the P&Ls year-end numbers with the annual totals on the claimants' federal tax returns.

The DHECC acted in reliance upon the Flores-created P&L's as representations of fact and was justified in doing so, as he held them out to be true in accurate, thus concealing any otherwise patently apparent indicia of fraud.  *In re DEEPWATER HORIZON,* No. 15-30574 (5th Cir. 2016) (per curiam) (unpublished).  Short of a "patently apparent" fraudulent misrepresentation, "a person is justified in relying on a representation of fact 'although he might have ascertained the falsity of the representation had he made an investigation.'" *Id.* at 9; *Field v. Mans*, 516 U.S. 59, 70 (1995) (quoting Restatement (Second) of Torts, § 540 (Am. Law Inst. 1976)).

The DHECC relied on the false P&Ls created by Flores when determining the award amounts for each of Tin Tin, Lansdon and Bellasia and was damaged when each claimant received an award that they would not have received without the false representation from Flores.

2.    The Claimants Should Make Restitution to the DHECC for
      Amounts Overpaid because of Flores's Misrepresentations

The false accounting data provided to the DHECC was prepared by Flores, who created the monthly P&Ls to support the three claims.  While the investigation has not clearly indicated whether the claimants knew of Flores's misrepresentations on the P&Ls, the claimants nevertheless have been unjustly enriched through Flores' misstatements.  As the Court has recognized many times, it is well-accepted that one who receives a judgment through fraud is bound to make restitution.  Zirlott, at 6, Restatement (Third) of Restitution

and Unjust Enrichment § 13 (2011) ("A transfer induced by fraud or material misrepresentation is subject to rescission and restitution.  The transferee is liable in restitution as necessary to avoid unjust enrichment.")

The claimants' fault or lack thereof, however, is not relevant to the obligation to make restitution of a payment not owed.  Had Flores accurately reported the claimants' monthly financial condition, none of the claimants would have received an award from the DHECC. If the claimants were allowed to keep the claim payments when such payments were not owed to them, the claimants would be unjustly enriched.

For these reasons, Tin Tin, Lansdon and Bellasia each should make restitution to the DHECC of the payments received on the claims based on Flores' misrepresentations of the accounting data.

3.      Flores Should Make Restitution to the DHECC on Claims Paid
        Based on his Misrepresentations of the Monthly Financial Documents

The evidence shows that Flores presented false information to the DHECC to obtain compensation for Tin Tin, Lansdon, Bellasia, and his own accounting support payments and any contingency fees.  Flores provided the DHECC with P&Ls that matched annual revenue amounts to each company's federal tax returns, but he had artificially manipulated each P&L's 2010 monthly revenue and expense amounts to manufacture the companies' DHECC awards.

As the creator of P&Ls that he knew would be provided to and relied upon by the DHECC in determining the claims, Flores holds an obligation to those he actually knew would rely on the misrepresentation in the claim accounting work.  *First National Bank of Commerce v. Monco Agency Inc.*, 911 F.2d 1053, 1060-62 (5th Cir. 1990) (endorsing application of misrepresentation standard for accountants under Louisiana law and Section

552); Restatement (Second) of Torts § 552 (providing liability for those who fail to exercise reasonable care and, as a result, supply "false information for the guidance of others in their business transactions" and thereby cause a pecuniary loss).

Unlike cases where privity between the accounting work and the end user may be more remote, Flores prepared the accounting work specifically for presentation to the DHECC to induce payment of the claims. Here, Flores owed a duty of presenting accurate financial information to the DHECC, an entity charged with safeguarding a Trust benefitting those harmed by the spill. *See United States v. Arthur Young & Co.*, 465 U.S. 805, 818 (1984) (accountants hold a "public watchdog" function that "requires complete fidelity to the public trust").

While professionals frequently have been called upon to make restitution only to the portion of an award that the professional retained, here Flores' misconduct induced the DHECC to make payments on the claims. Under these conditions, Flores should make full restitution on the claims to the DHECC so as to make the DHECC whole for the loss he caused, deprive Flores of any unjust enrichment he received, and remind other professionals engaged in preparing claims of the "public watchdog" function that such professionals perform in the process of distribution of Trust funds.

    4.    Flores Should Be Held Liable for 100% of the DHECC Loss,
               In Solido with the Claimants

In other clawback actions, the Court has ordered restitution in the first instance primarily against the claimant(s) to whom or for whose account the DHECC payment was made as a result of the claimant's fraudulent acts. However, the Court has also previously imposed solidary liability upon claims preparers, attorneys or other third parties (even be innocent and without fault), to the extent they were "enriched" by contingency fee

payments derived from the claimants' payment awards.  As the Court has noted, the restitution payments would be appropriate even without any wrongdoing or fault since the purpose of restitution is not to punish wrongdoing but to effect recovery of what was incorrectly and unjustifiably paid, in implementation of the Court's "well-recognized equitable power to devitalize a fraudulently obtained result".[1]

Apparently Flores did not receive or personally benefit to the same extent as did the Tin Tin, Landsdon, and Bellasia; the claimants' DHECC payment totaled $142,528.08.  The amount Flores received is unclear.  Notwithstanding, it is clear that not only did Flores profit out of DHECC awards made to the claimant on whose behalf it provided claims preparation services, but Flores was also the party who actually committed the fraud upon the DHECC resulting in the payments made to the claimant.  As such, this Court can and should order Flores to restore to the DHECC not only any amounts actually received for services performed, but the entire amount of the loss suffered by the DHECC as a result of its fraud - regardless of the amount of actual benefit – *in solido* with the claimant.

There is substantial authority addressing whether a restitution order against a party committing fraud should be (a) limited to the amount or benefit actually received by that party, or (b) measured by the amount of loss suffered by the payor as a result of that fraud in the context of SEC civil enforcement actions.  For example, in *SEC v. Contorinis*, 743 F.3d 296 (2d Cir. 2014), an insider trading case, the Court ordered the offending party to disgorge not only the profit he personally gained, but also all profits generated from his fraudulent actions.

---

[1] Order & Reasons on Motion of the Special Master for Return of Payments Made to Casey Thonn and Others (Rec. Doc. 12794)

As the *Contorinis* court noted in its footnote 5, there was earlier Fifth Circuit precedent that limited a violator's disgorgement to the amount of the fee actually received because anything above that would be considered a penalty assessment and thus be beyond the restitution remedy. *SEC v. Blatt*, 583 F.2d 1325 (5th Cir. 1978). Though *Blatt*'s rationale was followed by the Southern District of Texas in 2010, *SEC v. Gunn*, 2010 WL 3359465 (N.D. Tex. 2010), and by the Northern District of Georgia in 2015, *SEC v. Megalli*, 2015 WL 9703789 (N.D. Ga. 2015), since *Blatt* - though without citing or addressing Blatt - the Fifth Circuit has appeared to order disgorgement in amounts exceeding the amounts to which the party committing the fraud actually benefited in two unreported[2] decisions. *See*, *SEC v. Halek*, 537 Fed. Appx. 576 (5th Cir. 2013); *SEC v. United Energy Partners, Inc.*, 88 Fed. Appx. 744 (5th Cir. 2004).

We recognize that the rules applicable to SEC enforcement actions, where deterrence is the key objective, may differ from actions between private parties. *See*, *SEC v. Tome*, 833 F.2d 1086, 1096 (2nd Cir. 1987); *SEC v. First City Financial Corp., Ltd.*, 890 F.2d 1215, n. 24 (D.C. Cir. 1989). However, the rationale of cases like *Contorinis* is fully consistent with the Court's equitable power to fashion an appropriate restitution remedy, and is consistent with the Restatement of Restitution. As the introductory note to the "Measure of Recovery" topic of the *Restatement (First) of Restitution* I 8 2 (1937) recites:

> "In such cases [where the amount of gain may differ from the amount of loss] the measure of restitution is determined with reference to the tortiousness of the defendant's conduct or the negligence or fault of one or both of the parties in creating the situation giving rise to the right of restitution. **If the defendant was tortious in his acquisition of the benefit, he is required to pay for what the other has lost although that is more than the recipient is benefited**" [emphasis added].

---

[2] Under FRAP 32.1(a)(1), there is no prohibition against citing unreported decisions.

*See also*, *Halladay v. Verschoor*, 381 F.2d 100, 113 (8th Cir. 1967) (allowing restitution recovery to the extent of the loss).

Furthermore, should the Court have any pause in casting Flores in judgment, *in solido* with the claimant, for the full award based on an unjust enrichment/restitution analysis, there is ample alternative authority to do so.  For notwithstanding any issue of unjust enrichment/restitution, Flores patently committed the intentional tort of common law fraud against the DHECC, causing it foreseeable damages beyond any benefit it might have received.  As comment b to a later version of the Restatement recognizes:

> "With few exceptions, a claimant entitled to a disgorgement remedy in restitution might instead recover compensation for the injury caused by the defendant's tort or other breach of duty.
>
> Restatement (Third) of Restitution and Unjust Enrichment § 3 (2011).

This Court has already applied the elements of common law fraud as the predicate to its prior restitution orders, and the Court has those elements as recently adopted by the 5th Circuit in *Zirlott* and this Court in its *Crystal* Order before it in the instant motion.  (*See* p. 13, *supra*).  Those same elements are applicable to the intentional tort of fraud.  All of those elements are satisfied as to Flores, as has been submitted by the DHECC in section D.1 of this memorandum.

Once the Court concludes that the DHECC's right to restitution is established under the Rule 56 summary judgment standard, the same standard should necessarily also be satisfied for tort purposes since that alternative cause of action would be based on the same facts - rendering Flores liable for all foreseeable tort damages.[3]

---

[3] Conversely, there should not be any requirement to file a separate complaint to allege fraud, or any proscription against combining restitution claims with fraud claims, where based on the same underlying facts.  As this Court has already explained in its *Thonn* decision, "the filing of a separate complaint has not

For these reasons, Flores should be cast in judgment for the full $142,528.08 loss suffered by the DHECC, regardless of the amount and extent of direct benefit received.

## E. *Conclusion*

For the reasons stated, the DHECC seeks entry of a judgment requiring Raymond G. Flores to make restitution to the DHECC for $142,528.08, and requiring the claimants to make restitution, jointly, severally and *in solido* with Flores, as follows: (a) $99,081.61 from Tin Tin; (b) $24,956.91 from Lansdon; and (c) $18,489.56 from Bellasia , and prohibiting them from participating in any further DHECC distributions..  Any other professionals who may have assisted any of them and benefitted from these unjustified payments should also be required to pay and return any payments received from any of these claims.

Respectfully submitted,

Patrick Juneau
Claims Administrator

By:  ___/s/  Kevin Colomb_____
Kevin Colomb
Manager of Compliance and Internal Integrity


Dated:  August 10, 2016

---

historically been required when the movant seeks to reverse a judgment obtained through fraud", and relief can be granted by motion.  Thonn Order, at 15 (Rec. Doc. 12794).  Moreover, joinder of a restitution claim and an alternative tort claim is clearly permitted under FRCP 18.