# EXHIBIT J

UNITED STATES CIRCUIT COURT
EASTERN DISTRICT OF LOUISIANA
_____

IN RE:  OIL SPILL BY THE OIL RIG
        "DEEPWATER HORIZON" IN THE
        GULF OF MEXICO, ON APRIL 20, 2010

                         MDL 2179

                         Section J

                         Judge Barbier

                         Mag. Judge Shushan

This Document Applies to:


No. 12-970, Bon Secour Fisheries, Inc., et
al. v. BP Exploration & Production, Inc.,
et al.
_____/



**DEPOSITION OF HERMINIA MEDINA**


Taken on Behalf of the Deepwater Horizon



**DATE TAKEN:** Tuesday, November 10th, 2015
**TIME:**       1:00 p.m. – 4:50 p.m.
**PLACE:**      Anchor Court Reporting
                229 South Baylen Street
                Pensacola, Florida  32502



Examination of the Witness reported by:

Pamela Dee Elliott, Florida Professional Reporter
Notary Public, State of Florida
**ANCHOR COURT REPORTING**
229 South Baylen Street
Pensacola, Florida  32502

2

**A P P E A R A N C E S**

FOR THE DEEPWATER HORIZON:

                    COREY D. MOLL, ESQUIRE
                    Senior Clawback Attorney
                    Deepwater Horizon Claims Center
                    935 Gravier Street
                    Suite 1905
                    New Orleans, Louisiana  70112


ALSO PRESENT:

                    WHIT PROTTSMAN
                    BARBARA G. O'DONNELL

COURT REPORTER:

                    PAMELA DEE ELLIOTT, FPR
                    ANCHOR COURT REPORTING
                    229 South Baylen Street
                    Pensacola, Florida  32502
                    (850)432-2511
                    1-800-563-6409
                    FAX:  (850)432-2302
                    www.anchorreporters.com

3

## INDEX OF TRANSCRIPT

1    WITNESS:

2        **HERMINIA MEDINA**

3            Direct Examination by Mr. Moll................05

4    Certificate of Oath................................135

5    Certificate of Reporter...........................136

6    _____

7                         **EXHIBITS INDEX**

8    **NO.**    **DESCRIPTION**                              **PAGE NO.**

9    A    Subpoena with Handwritten Notes on Back         20

10   B    2009 – 2011 Bank Statements                     22

11   C    Color Copy of Photographs                       23

12   D    Paperwork for Festivals                         27

13   E    2008 – 2010 Tax Returns                         37

14   F    Deepwater Horizon Economic and Property

15        Settlement Registration Form                    42

16   G    2012 Annual Food Permit and Business Tax Receipt  44

17   H    11/12/12 Letter, 11/14/12 Engagement Letter

18        and 11/14/12 Escrow Agreement                   48

19   I    10/11/12 HSG Accounting Invoice                 100

20   J    Evaluation of Claim                             101

21   K    4/5/12 Deficiency Letter                        119

22   L    5/18/12 Deficiency Letter                       121

23   M    Deepwater Horizon and Property Settlement

24        Business Economic Loss Claim Form               122

4

1    N    Sworn Written Statement for Claimant Accounting

2         Support                                          124

3    O    Accounting Statement                            124

4    P    11/12/14 Escrow Agreement                       126

5

1   Whereupon, the Witness,

2                **HERMINIA MEDINA**,

3   having been first duly sworn by the Court Reporter,

4   testified on her oath as follows:

5            **THE WITNESS:** Yes.

6              **DIRECT EXAMINATION**

7   **BY MR. MOLL:**

8       Q.   Good afternoon, Ms. Medina. Am I saying

9   your name correctly?

10       A.   Yes.

11       Q.   Okay. Again, my name is Corey Moll.

12       A.   Uh-huh.

13       Q.   I'm here on behalf of the Deepwater Horizon

14   Economic Claims Center and the Claims Administrator's

15   Office. So we're looking into certain aspects of BP

16   claims. And today this is what we're here to do, we're

17   here to take your deposition. So I'm going to give you

18   a little bit of instruction before you again -- before

19   we gypsum. So the court reporter is taking down

20   everything that you say.

21       A.   Uh-huh.

22       Q.   So it's going to be one person at a time

23   speaking. I'll note for the record that you are here

24   presently alone, you're not with counsel, so it will be

25   just you responding.

6

1         A.    Uh-huh.

2         Q.    Please be sure to wait until I finish my

3 question before you respond.  You must respond verbally,

4 so try not to only give a head nod, just yes or no.

5         A.    Yes.

6         Q.    If you do need to say yes or no, I will at

7 times ask you to elaborate and that's just so the record

8 will be clear.  So do you understand all of that part?

9         A.    Yes.

10        Q.    If at any point you don't understand a

11 question, just let me know and I'll rephrase it or say

12 it differently; not a problem.  Just feel to jump in if

13 there's something you don't understand.

14        A.    Yes, sir.

15        Q.    If you answer my question, I'll assume that

16 you understood it.

17        A.    Yes, sir.

18        Q.    If I speak too fast, which I don't think

19 should be a problem, but if I do speak too fast, just

20 let me know and I'll slow down.  Also -- well, do you

21 understand that part, you can ask me to slow down, if

22 you need to?

23        A.    Yes.

24        Q.    Okay.  You must answer everything

25 truthfully; do you understand that?

Case 2:10-md-02179-CJB-DPC Document 24746-16 Filed 08/10/18 Page 8 of 137

7

```
 1          A.     Yes, sir.
 2          Q.     Okay.  You are under oath and the questions
 3    asked and answered may ultimately be given or used at a
 4    court proceeding or at another court proceeding; do you
 5    understand that?
 6          A.     Yes.
 7          Q.     Okay.  Is there any reason why you would be
 8    unable to answer truthfully today?
 9          A.     What is that?
10          Q.     Is there any reason why you would be unable
11    to answer truthfully today?
12          A.     I will answer truthfully.
13          Q.     Okay.
14          A.     I will be honest.
15          Q.     There's no reason why you wouldn't be able
16    to do that; right?
17          A.     Yeah.
18          Q.     Is there any reason why you would not be
19    able to remember things today?
20          A.     No, because I'm telling what I know.
21          Q.     And what you remember?
22          A.     Yeah.
23          Q.     Okay.  Is there anything that would keep
24    you from being able to recall certain events today?
25          A.     No, because I've been doing business for
```

```
 1   Sloan, so I know.
 2        Q.   Sure.  Are you taking any medications or
 3   substances that you think might affect your testimony
 4   here today?
 5        A.   No.
 6        Q.   So again, just answer all questions fully,
 7   truthfully, to the best of your knowledge.  If you don't
 8   know the answer to a question, just please do not guess,
 9   just tell me "I don't know."
10        A.   Yes, sir.
11        Q.   Do you understand that?
12        A.   Yes, sir.
13        Q.   Okay.  And have you ever been deposed
14   before?
15        A.   What do you mean by that?
16        Q.   Have you ever been in a situation where
17   there's an attorney asking you questions as --
18        A.   No.
19        Q.   -- I am now?
20        A.   First, this is it.
21        Q.   First time?
22        A.   First time.
23        Q.   Have you ever given any statements in front
24   of a court reporter where they're taking down what you
25   say?
```

```
 1          A.    No.
 2          Q.    Okay.  Have you ever testified in any kind
 3    of a court proceeding that's out of a court room?
 4          A.    No.
 5          Q.    Okay, all right.  So moving along, just for
 6    the record, to some identifying information.  Please
 7    state your full name for the record?
 8          A.    Herminia Medina.
 9          Q.    Okay.  And do you have any other names or
10    nicknames?
11          A.    Meny.
12          Q.    Meny?
13          A.    M-E-N-Y.
14          Q.    M-E-N-Y, okay.  And what is your date of
15    birth?
16          A.    ███████████.
17          Q.    Okay.  What is your place of birth?
18          A.    Philippines, █████████.
19          Q.    And can you spell that city for me?
20          A.    ████████████████ --
21    ████████████.
22          Q.    And can you please state your Social
23    Security number for the record?
24          A.    ███████.
25          Q.    Okay.  And what is your home address?
```

```
 1        A.    ████████████████████████████

 2   ██████████

 3        Q.    Okay.

 4        A.    And the zip code is ████████

 5        Q.    Okay.  How long have you been there?

 6        A.    Twenty years.

 7        Q.    Twenty years.  Have you considered or made

 8   any plans to move in the near future?

 9        A.    No, because I started there.

10        Q.    Sure.

11        A.    My business is there.

12        Q.    Sure.  What's your educational background?

13        A.    I'm a college graduate.

14        Q.    Where did --

15        A.    From the Philippines.

16        Q.    Okay, and what university?

17        A.    San Juan de Dios Hospital.

18        Q.    Okay.

19        A.    In Manila.

20        Q.    Okay.  What was your educational --

21        A.    Attainment?  I'm a medical technology

22   graduate.

23        Q.    Medical technology, okay.  So after

24   college, what was your employment history?

25        A.    I apply -- I mean -- I worked in the
```

1    hospital for one-and-a-half year.

2           Q.    Okay.

3           A.    Then after that, I decided to apply for a

4    bank and work there for one-and-a-half year, too.

5           Q.    Okay.

6           A.    Then after that, because my parents is in

7    the business, I do my own business.  I mean, we're the

8    dealer of something like a bake shop in the Philippines.

9           Q.    Okay.  And that's what you did over in the

10   Philippines.

11          A.    Yes.  And then we do the wholesale and

12   retail of -- they call it RTW, ready to wear items,

13   something like that.

14          Q.    Okay, okay.  Let me go real quick, I don't

15   think I asked you.  What year did you graduate?

16          A.    1974.

17          Q.    '74, okay.  And to go back one more time,

18   when you were at the bank, what was your role, what was

19   your job at the bank?

20          A.    A teller.

21          Q.    A teller, okay.  And at the hospital, what

22   did you do at the hospital?

23          A.    In the laboratory, we deal with just urine

24   and blood work, something like that.

25          Q.    Okay.  And after you were in the ready to

Case 2:10-md-02179-CJB-SS Document 14710-16 Filed 06/16/15 Page 13 of 137

12

```
1    wear business, what did you do after that?
2            A.    After?
3            Q.    Yes.
4            A.    What's that again, sir?
5            Q.    What did you do after your experience with
6    the RTW business?
7            A.    Same thing, because we been in the business
8    for 20 years in the Philippines.
9            Q.    Okay.  Are you still currently in that
10   business?
11           A.    No.  The business now here is different,
12   you know.
13           Q.    Okay.
14           A.    The one from the Philippines, I mean, we
15   order from the exporter and delivery here.
16           Q.    Okay.  When did you begin -- did you do
17   anything between that and your current business?
18           A.    No, just after -- you know, after in the
19   Philippines, when we move here, you know --
20           Q.    Uh-huh.
21           A.    -- we do the business here, but in
22   different things.  It's from like in the Philippines,
23   it's imported coming from here, we sell it there.  Now
24   we're doing business here, coming from the Philippines,
25   we sell it here, something like that.
```

Case 2:10-md-02179-CJB-SS Document 21470-16 Filed 08/10/16 Page 14 of 137

1       Q.   Okay.  When did you move from the

2  Philippines to the United States?

3       A.   1995.

4       Q.   '95, okay.  Did you start your -- the

5  Tin-Tin's Oriental Store when you first moved here?

6       A.   Yes.

7       Q.   How long?

8       A.   After two months.

9       Q.   So after two months here is when you

10  started the current business?

11       A.   Uh-huh, yes.

12       Q.   Okay.  Along the way, did you -- have you

13  gained any kind of professional licenses or certificates

14  or anything at all?

15       A.   What do you mean by that, sir?

16       Q.   You know, for instance, an accountant might

17  have a license to be an accountant.  Did you attain any

18  kind of professional licenses?

19       A.   No, it's just I apply for -- because I

20  check everything here.  I mean, then I see what's going

21  on with other businesses.  I mean, I see selling food is

22  okay.

23       Q.   Uh-huh.

24       A.   So what I did is, you know, do that

25  business.

14

1          Q.     Okay.

2          A.     Then I apply for Occupational License.

3          Q.     Occupational License?

4          A.     Yeah.

5          Q.     Okay.  So that would be a license for the

6     business?

7          A.     Yeah.

8          Q.     But it wasn't for you personally, though?

9          A.     No; no, sir.

10         Q.     Okay.  Just to have you identify your

11    signature, in case we refer to it as we go along, if you

12    could, just for reference, going forward --

13                MR. MOLL:  And let the record reflect I'm

14                showing Ms. Medina a copy of the signature page

15                of her Accounting Engagement Agreement with

16                Raymond Flores.  This document is dated 11/14 of

17                '12.  I'm not marking it as an exhibit at this

18                time.  It's purely demonstratives.

19         Q.     (By Mr. Moll)  Okay.  Ms. Medina, if you

20    would, at the bottom of that page, do you recognize your

21    signature?

22         A.     Yes, sir.

23         Q.     Okay.  And what is the date of the

24    document?

25         A.     11/14; November 14, 2012.

15

1          Q.    Okay, thank you.  And that, in fact, is
2    your signature?
3          A.    Yes, sir.
4          Q.    Okay.  Do you have any other versions of
5    that signature that you use?
6          A.    No.
7          Q.    Okay.
8          A.    This is it.
9          Q.    Okay.
10         A.    Just the one signature.
11         Q.    Thank you.
12         A.    You're welcome.
13         Q.    Okay.  So talking about today, in
14   preparation for today, did you do anything to prepare
15   for the deposition today?
16         A.    Actually, to tell you promptly, no, sir.
17         Q.    Okay.
18         A.    Because we came back Sunday night.
19         Q.    Okay.
20         A.    Then I'm tired, then Monday, when I tried
21   to open my email --
22         Q.    Uh-huh.
23         A.    -- I see email, Ms. Barbara, that said been
24   calling my daughter, but nobody answered.  But the thing
25   is there is no signal in that place.

```
 1          Q.    Okay.

 2          A.    So when I read, I see I need to provide

 3    this, that's it.

 4          Q.    And when you were referring to the email,

 5    what was that in an email that you're referring to, that

 6    you saw?

 7          A.    The paperworks that I need to bring in

 8    here.

 9          Q.    Okay.  The Notice of Request for Documents?

10          A.    Yes, the number one, two, and three.

11          Q.    Okay.

12          A.    Actually, I write it down here.

13          Q.    Okay.

14          A.    On the back of this.

15          Q.    And we'll get to that in a little bit.

16                MR. MOLL:  And just let the record reflect

17          Ms. Medina was referring to the subpoena for her

18          appearance that she brought with her today.

19          Q.    (By Mr. Moll)  Now, did you use anything to

20    refresh your recollection for today?

21          A.    No, I did not.

22          Q.    Okay.  Did you -- prior to being here

23    today, did you review any documents?

24          A.    No, sir.

25          Q.    Did you do anything else, like make notes
```

1  to prepare for today?

2          A.    No, sir, just this, because my printer is

3  not working to copy the email of Ms. Barbara.

4          Q.    Okay.

5          A.    So what I did is write it down.

6          Q.    Okay.  Did you speak to or did you meet

7  with anybody prior to the deposition today?

8          A.    No, sir.

9          Q.    Okay.  Did you meet with Mr. Flores prior

10 to --

11         A.    Are you talking about this morning?

12         Q.    Including this morning, yes.

13         A.    Just Mr. Flores.

14         Q.    Okay.  And where did y'all meet?

15         A.    Not meet, because I'm going down there.

16 Because when I read the email, I have a copy, but I

17 think I need to, you know -- I don't have time to check,

18 so I know he got a copy of this.

19         Q.    Sure.

20         A.    So I tried to ask him if can do me a paper.

21         Q.    So is it safe to say you went to his office

22 to have --

23         A.    But he's not there.  I waited.

24         Q.    He wasn't at his office?

25         A.    No, no.

1      Q.   Okay.  Where did you see him before this

2   today?

3      A.   At the office.  He is not there when I

4   called the secretary, her name is Susan.  Is Mr. Flores

5   there?  No, he's not available today, but he will be

6   coming around 11:00.

7      Q.   Okay.

8      A.   And what I did is wait.

9      Q.   Okay.  And did he eventually show up?

10      A.   He show up, but it took me one hour

11   waiting.

12      Q.   Sure.

13      A.   Yeah.

14      Q.   When he got there to his office, what did

15   y'all talk about?

16      A.   This one.

17      Q.   Are you talking about the documents?

18      A.   I said because I'm so tired.

19      Q.   Sure.

20      A.   We went home Sunday night and Monday I been

21   sleeping because the Apalachicola Seafood Festival is

22   morning till 12:00 midnight.

23      Q.   Okay.

24      A.   So I'm tired.  Still now, I'm tired.

25      Q.   I understand.  Real quickly, did you keep

1   any files regarding the claim?

2         A.     Yes, yes.

3         Q.     Okay.

4         A.     But I cannot, you know, dig because there

5   is no time for me to do it.

6         Q.     Okay.

7         A.     Because I am out of town this weekend.

8         Q.     They were located at your store, I take it?

9         A.     Yes.

10         Q.     And is that where you regularly keep

11   your  --

12         A.     Yeah.

13         Q.     Sure.  Did you -- since the time of the

14   claim filing to now, did you keep any kind of diary or

15   noters or journals --

16         A.     No.

17         Q.     -- regarding any claim-related issues?

18         A.     After that, we file a claim and that's it,

19   because that was long time ago, 2012.

20         Q.     Right.  But you didn't keep any diary or

21   notes along the way?

22         A.     No; no, sir.

23         Q.     So I want to go back to what you have right

24   there.

25         A.     Uh-huh.

```
 1            Q.    And if you would, please -- if you would,
 2     please hand me that document.
 3            A.    Are you talking about this one that I
 4     wrote?
 5            Q.    Yes.
 6            MR. MOLL:  And let the record reflect
 7            Ms. Medina has just handed me a copy of her
 8            subpoena to testify in a deposition at a civil
 9            action.  I'll request that the court reporter
10            mark this as Exhibit A.
11            (Whereupon, Exhibit A was marked for
12            identification.)
13            Q.    (By Mr. Moll)  Ms. Medina, you mentioned --
14     and for the record, I know you just handed it to me --
15     but what do you recognize this to be?
16            A.    What do you mean by that?
17            Q.    What do you understand this document to be?
18            A.    That I need to be present here, but
19     something like a question that I need to answer,
20     something like that.
21            Q.    Perfect.  And you mentioned on the back of
22     this document that when you read our email with the
23     document request that pertained to this subpoena, you
24     had to write down what we were requesting?
25            A.    Yes, right there.
```

1       Q.    Okay.  And is that the handwriting --

2       A.    That's my handwriting.

3       Q.    Okay, your handwriting.  Is this your

4  signature that appears at the bottom of it?

5       A.    No, it's the one that serve the subpoena,

6  he put the time in.

7       Q.    Okay, he signed it on the back?

8       A.    Yes.

9       Q.    And I see on this document a one, two and

10  three.

11       A.    Uh-huh.

12       Q.    Are these, in fact, the same words that

13  appear on the document request --

14       A.    The email.

15       Q.    -- that came through the email?

16       A.    Ms. Barbara, yes.

17       Q.    Okay.

18       MR. MOLL:  So yeah, I'd like the record to

19       reflect that this is Exhibit A.

20       Q.    (By Mr. Moll)  Now, Ms. Medina, the records

21  request stated -- number one, stated "Please produce any

22  and all documents provided to Raymond Flores during the

23  claims preparation process, including but not limited to

24  internal sales records, merchant account reports, bank

25  statements and/or accounting work papers."  Do you

1   recall the request asking you for those?

2       A.    Yes.

3       Q.    Okay.  And did you arrive today with some

4   documents?

5       A.    Yes, sir.

6       Q.    Okay.  Now, I'm going to ask that --

7   Ms. Medina, I'm showing you what I'm going ask the court

8   reporter to mark as Exhibit B in globo.

9            (Whereupon, Exhibit B was marked for

10           identification.)

11      Q.    (By Mr. Moll)  Do you recognize what I have

12  handed to you as Exhibit B?

13      A.    Yes, sir.

14      Q.    And what is that?

15      A.    This is the one that we filed for the BP,

16  the documents and the bank statement, yes.

17      Q.    I'll note that there are three separate --

18  and you can feel free to take it -- three separate

19  binder-clipped sections.  Do you recognize what those

20  individual records are?

21      A.    Yeah.  This is from my bank account.

22      Q.    Okay.

23      A.    All of this is from my bank account.

24      Q.    Okay.  Are they -- are you able to see what

25  years that those reports encompass?

1        A.    What year?

2        Q.    Yeah, what years are those reports for?

3        A.    There's a lot.  Hold on.  It's 2011, this

4   is all 2011, the continuation, it is 2010, same year

5   with 2011, 2011, 2011.  And this one is 2009, 2010.

6   This is all 2010, 2009, 2010 and 2011.

7        Q.    Okay.  I'll take those back from you.

8   Thank you.

9        A.    All right.

10        Q.    I'm just going to go through a couple of

11   more items you brought today.  Ms. Medina, I'm showing

12   what I'm going to ask the court reporter to mark as

13   Exhibit C.  And you can take that.

14        A.    Okay.

15        Q.    Do you recognize what I've handed you as --

16   and I'll ask her to mark it as Exhibit C in globo.

17              (Whereupon, Exhibit C was marked for

18              identification.)

19        A.    DeLuna Festival, here on Pensacola Beach,

20   okay.

21        Q.    (By Mr. Moll)  And what are those photos

22   of?

23        A.    This is Seafood Festival, this is our

24   booth.

25        Q.    Okay.  So that's a photo of your booth?

24

1    A.    Uh-huh, DeLuna Festival, Pensacola Beach.

2    Q.    Okay.

3    A.    This is my store.

4    Q.    Okay.  So let the record reflect page one

5    of Exhibit C is a picture of your booth at -- what

6    festival was it?

7    A.    DeLuna.

8    Q.    Okay.  And page two of Exhibit C is a --

9    A.    My store.

10    Q.    -- picture of your store?

11    A.    Yes.

12    Q.    And page three?

13    A.    This is a festival.  I cannot recognize.

14    Probably it's out on the beach.  Tempura, Seafood

15    Festival.

16    Q.    And even a brief description works --

17    A.    Oh, okay.

18    Q.    -- as long as you identify it as what they

19    are.  Page four?

20    A.    And this is crawfish.

21    Q.    Okay, crawfish.

22    A.    Boiled crawfish.

23    Q.    Page five?

24    A.    Yeah, crawfish.

25    Q.    More crawfish?

Case 2:10-md-02179-CJB-SS Document 21470-16 Filed 08/10/16 Page 26 of 137

25

1      A.    Boiled crawfish.

2      Q.    Page five, let the record reflect it's more

3   crawfish.

4      A.    Yes.  This is fish basket with potato

5   fries.

6      Q.    Is that a dish you serve?

7      A.    Fish basket, yes.

8      Q.    And then page six?

9      A.    Yes.  And this is the same thing, the fish

10  and this is the shrimp, boiled shrimp.

11     Q.    Page seven?

12     A.    And this is chicken and shrimp tempura on

13  the stick.

14     Q.    Is it safe to say the rest of -- we're at

15  page eight now.  Is it safe to say the rest of the

16  photos are generally food products that you sell?

17     A.    This is the main thing that we're doing.

18     Q.    Okay.

19     A.    This is -- I mean, this is the actual thing

20  that we're doing.

21     Q.    So they're photos of the food that you

22  sell?

23     A.    Yeah.  Because sometimes all of the

24  festivals, they needed some pictures, you know, that

25  we're doing, what's the menu, something like that.

26

1      Q.    Okay.  If you don't mind, if I could see

2  the rest of Exhibit C.

3      A.    All right.

4      Q.    And we can let the record reflect, if

5  you'll confirm, Ms. Medina, that the rest of the photos

6  from what will be page eight and on, would you confirm

7  that those are just regular food product photos?

8      A.    This is something like that we do.

9      Q.    Okay.  But all of those are photos of what

10  you do?

11     A.    What we do, but, you know...

12     Q.    What I'm saying is the rest of the photos

13  in this stack?

14     A.    The picture of whatever food that we're

15  selling with a cell phone.

16     Q.    Sure, cell phone pictures.

17     A.    Yeah.

18     Q.    Okay.  They're not actual photos, but

19  they're cell phone pictures?

20     A.    No, no, no.  That's our main thing.  That's

21  where we're cooking.

22     Q.    These are all pictures of the main thing

23  that you cook?

24     A.    Uh-huh, that we're selling, like the shrimp

25  fried rice, that's the real thing that we're doing.

1          Q.    Sure.  So let the record reflect Exhibit

2     C --

3          A.    That's from the other photo that we just --

4     you know, no, no, it's not -- it's the real thing.

5          Q.    So Exhibit C are photos of Ms. Medina's

6     food.

7          A.    Our own food.

8          Q.    Her food store and then her own food that

9     she is preparing.

10         A.    Huh-huh.

11         Q.    Thank you, Ms. Medina.

12         A.    Uh-huh.

13         Q.    I'm going to move on and show you now what

14    I'm going to ask the court reporter to mark as Exhibit D

15    in globo.

16              (Whereupon, Exhibit D was marked for

17              identification.)

18         Q.    (By Mr. Moll)  Do you recognize what

19    Exhibit D contains?

20         A.    Yes, sir.

21         Q.    And what is Exhibit D?

22         A.    This is the Gulf Shore (sic), Alabama,

23    Seafood Festival at Gulf Shore (sic).  Let me take this

24    out.  It is the same thing in Alabama, Gulf Shore (sic)

25    Festival.

Case 2:10-md-02179-CJB-SS Document 14470-16 Filed 08/10/15 Page 29 of 137

1    Q.    And are these registration forms for that

2  festival?

3    A.    Yes, there is application, permit, license

4  and everything.

5    Q.    And is that what's contained inside Exhibit

6  D?

7    A.    Yes, sir, and that agreement that we need

8  to sign, you know, for the rules and regulations.  So we

9  have to initial everything that they needed, the fee

10  that we pay.

11    Q.    Okay.  And are --

12    A.    And the menu.

13    Q.    Are all of the documents in Exhibit D only

14  with reference to the Gulf Shores Festival?

15    A.    No, no, there's different.

16    Q.    Different festivals?

17    A.    This is Louisiana, Shrimp and Petroleum

18  Festival.

19    Q.    Okay.

20    A.    In Morgan City, we do that one, too.

21    Q.    Would you say that all the documents

22  contained within Exhibit D are all of the --

23    A.    Different festivals.

24    Q.    Are those all of the registration forms for

25  all of the festivals that you've done?

DEPOSITION OF HERMINIA MEDINA 10/16/14

29

1       A.    Yes, sir; yes, sir.

2       Q.    And is that going back to the beginning of

3 your store or only within the time period 2008 through

4 2011?

5       A.    No.  Actually, been doing this so long,

6 almost 18 years.

7       Q.    All right.

8       A.    This is the Louisiana Seafood Festival.

9       Q.    Okay.

10      A.    In Morgan City.

11      Q.    Okay.  And it's not necessary that you

12 identify all of them --

13      A.    Uh-huh.

14      Q.    -- within there as long as you can flip

15 through and tell me that --

16      A.    Okay.  This is the Niceville Mullet

17 Festival.

18      Q.    Okay.

19      A.    This is the Harvest Festival in Boaz,

20 Alabama, the first week of October.

21      Q.    Okay.

22      A.    The Blues Festival in Georgia, we're doing

23 this one, too, the Blues Festival.

24      Q.    Okay.

25      A.    And the Florida Seafood Festival.  See,

1   this is Apalachicola.

2        Q.    Okay.

3        A.    We've been doing it every year.  This is

4   one that we been through last weekend.

5        Q.    Okay.

6        A.    It is a two-day event.

7        Q.    Okay.

8        A.    But it's still midnight, you know.

9        Q.    Okay.

10       A.    The Goombay -- Goombay here in Pensacola

11  along the Belmont Park but they already canceled it, you

12  know, the festival.  This is the Interstate Fair and

13  we're there every year.  We actually just finished

14  before we going to Apalachicola, that was October 22nd

15  to November the 1st every year.

16       Q.    Uh-huh.

17       A.    But this was held October 22nd through

18  November 1st.

19       Q.    Okay.

20       A.    The Pensacola Interstate Fair.  The

21  Festival of Arts in Alabama.  Yeah, this is the month of

22  April.  Downtown -- Pensacola -- of the Arts Festival in

23  Panama City.  Pine Apple Promotion, actually, it is held

24  after the Thanksgiving.  We're going, I mean this month,

25  at the end of this month.

31

1     Q.    Okay.

2     A.    The same thing, Pine Apple Festival.

3     Q.    Okay.

4     A.    This is the Renaissance Faire, end of

5  March -- first weekend in March, here in Pensacola, at

6  the fairgrounds.  This is DeLuna Fest.

7     Q.    Okay.

8     A.    The one I took the picture of.

9     Q.    Okay, great.

10     A.    And I think that's it.  But we did not

11  include the small shows that we been, Gulf Coast

12  Festival.

13     Q.    All right.  Now, just a couple of more

14  questions about Exhibit D.  I'm going to show you a few

15  pages from here, for instance, page one, page four, page

16  11, page 18 of this exhibit, page 23, page 29, page 31,

17  page 35, page 37, page 44, 46, page 51, page 55, page

18  60, page 63.  The pages that I just referenced, I think

19  you may have seen them, they have numbers that appear on

20  them, percentage numbers; is that your handwriting?

21     A.    Yes -- I don't know, hold on.  No, I told

22  him about the figure, you know, that was lost.

23     Q.    And who is "him"?

24     A.    Ray.

25     Q.    When you say "him"?

Case 2:10-md-02179-CJB-DPC Document 24470-16 Filed 08/10/19 Page 33 of 137

32

1    A.    Uh-huh.

2    Q.    Okay.  So you told Ray --

3    A.    I lost money and he been asking me how many

4  percent and I said 40 percent.

5    Q.    Uh-huh.  And that's -- for instance, so

6  that will be on page one, for instance.  But did you do

7  the same thing as to all of the numbers that appear --

8    A.    Yes.

9    Q.    -- on these documents?  And when you say

10  you told Ray the percentage lost --

11    A.    Uh-huh.

12    Q.    -- did he -- did Ray ask you to figure

13  that?

14    A.    Yeah, because I know by myself that if I

15  make something, like, for example, 10,000 and said I

16  lost 40 percent, I mean to say we make only something

17  like six -- 6,000 instead of ten, so I lost money.

18    Q.    And what years did that loss occur within?

19    A.    That was 2011, something like that.  I

20  cannot recognize -- I mean, I cannot recall.  But during

21  the time of -- my main business is the concession.

22    Q.    Right.

23    A.    Because in the store, only profit something

24  like 50 cents, $1, you know.  So on the weekend, we

25  travel.

33

1      Q.     Okay.

2      A.     That is the main thing, you know.

3      Q.     Okay.

4      A.     Main business.

5      Q.     So I'll have the record note that the

6  40 percent and then would you agree there's a down arrow

7  next to the 40 percent on here?

8      A.     What do you mean "down arrow"?

9      Q.     The notation next to the 40 percent, is

10  that a --

11     A.     I'm talking about the -- I mean, it says

12  down.

13     Q.     Right.  So that -- so 40 percent, then the

14  down arrow?

15     A.     Down.

16     Q.     What did you mean to explain with that?

17     A.     I mean, I told Ray about if I make

18  something like 10,000 last year --

19     Q.     Uh-huh.

20     A.     -- I said the gross that I have is

21  something like less, it is something like 6,000.  That's

22  what I figure out myself --

23     Q.     Okay.

24     A.     -- that it's 40 percent down.

25     Q.     Okay.  In order to figure percentage

34

1    decreases that you notated, are those estimates on your

2    part --

3             A.    No.

4             Q.    -- or did you go back to the --

5             A.    No, not an estimate, it's just something

6    like the real one.  For example, Alabama Gulf Shore

7    (sic), I make something like 10,000.

8             Q.    Right.

9             A.    I mean, I'm trying to...

10            Q.    Did you have sales reports that showed

11   your --

12            A.    Yes, yes.

13            Q.    Okay.  So is it safe to say you went back

14   to your sales reports for each of those festivals to

15   determine --

16            A.    And I said something went down, something

17   like 40 percent.

18            Q.    Okay.  And did Ray ask you to determine

19   your percentage lost from the festival one year to the

20   next year?

21            A.    Yeah.

22            Q.    Okay.

23            A.    He told me, write it down so we would know.

24            Q.    Sure.

25            A.    It's me that I write down.  I got a

1      problem, I said even you will see in my bank account,

2      oh, there's a lot of insufficient funds that the bank

3      charge me.

4            Q.    Sure.

5            A.    Because it's hard for me, you know.

6            Q.    Sure.  And when you say it went down, and

7      I'll ask it again --

8            A.    Uh-huh.

9            Q.    -- just to be sure, did it go down from

10     2009 to 2010 or did it go down from 2010 to 2011?

11           A.    What do you mean?

12           Q.    When you said, for instance, the Alabama

13     Gulf Coast, when you made 10,000 one year and 6,000 the

14     next, the year you made 10,000, was that 2009 or was

15     that 2010?

16           A.    That I make something less?

17           Q.    Yes.  Do you recall what year it was that

18     it went down?

19           A.    2009, if I make something like 10,000, for

20     example, then the following year I saw the difference.

21           Q.    Right.  But as far as the documents that

22     are within Exhibit D --

23           A.    Uh-huh.

24           Q.    -- do you remember what year you saw the

25     decrease?

Case 2:10-md-02179-CJB-SS Document 14710-16 Filed 06/10/19 Page 37 of 137

36

 1          A.    The decrease?

 2          Q.    Yes.  What year did you make less?  Did you

 3    make less in 2010 or did you make less in 2011?

 4          A.    '11.

 5          Q.    '11?

 6          A.    Yeah.

 7          Q.    Okay, thank you.  When you were talking

 8    about the -- that you figured these from sales reports,

 9    did you at any point give those reports to Mr. Flores,

10    to Ray?

11          A.    Yes.

12          Q.    Okay.  You gave those sales reports to Ray?

13          A.    Uh-huh.

14          Q.    Okay.  Do you recall when you gave Ray

15    those sales reports?

16          A.    No.

17          Q.    Were the sales reports something you gave

18    Ray all of the time or were they something you only gave

19    him for the BP claim?

20          A.    No, no.  Actually, mine is 1040.

21    Mr. Flores, you know, we only see each other once a year

22    or twice, because I been filing it once a year, it's a

23    1040.

24          Q.    Okay, for your taxes?

25          A.    Yeah, taxes.

```
 1          Q.    So you would give him the sales reports

 2     when it came time for taxes?

 3          A.    Yeah.

 4          Q.    Okay, gotcha.

 5          A.    Yeah.

 6          Q.    All right.  Ms. Medina, I'm going to show

 7     you what I'm going to ask the court reporter to mark as

 8     Exhibit E.

 9               (Whereupon, Exhibit E was marked for

10               identification.)

11          Q.    (By Mr. Moll)  I'm going to hand it to you.

12     What do you recognize as Exhibit E?

13          A.    Are these the one that we file, the 1040.

14          Q.    And when you say "1040," do you mean that's

15     an --

16          A.    Once a year.

17          Q.    -- IRS --

18          A.    Uh-huh, yeah.

19          Q.    -- tax 1040?

20          A.    Uh-huh.  We file it once a year, so

21     actually Mr. Flores and I see each other just once a

22     year.

23          Q.    Okay.

24          A.    Good if it's two, two times a year.

25          Q.    Okay.  And contained within Exhibit E, you
```

1    said Form 1040, for what years does Exhibit E contain?

2          A.    This is year 2008, and this year is 2010,

3    yeah, 2010, 2008.  Where is 2009?  2009.

4          Q.    So all of the tax returns, 2008 through

5    2010?

6          A.    Uh-huh.

7          Q.    Okay.  And to the best of your knowledge,

8    do these represent your full tax returns for each year

9    2008, 2009 and 2010?

10          A.    Yes, sir.

11          Q.    Okay.  And do these tax returns also

12    contain the tax reporting for your business Tin-Tin's

13    Oriental Food Store?

14          A.    Yes, sir.

15          Q.    And is it your signature that, in fact,

16    appears on the signature line for Forms 1040 for each

17    year contained within?

18          A.    Yes, sir.

19          Q.    I'll note for 2010, I see that the firm is

20    Flores, Flores and Garg.  Preparer's name is Carlito G.

21    Flores.  Who is Carlito G. Flores?

22          A.    That's his dad.

23          Q.    Raymond's father?

24          A.    Uh-huh.

25          Q.    Did you meet with him personally in

39

1    preparation or was it only Ray that you met with?

2         A.    Which one?

3         Q.    Did you --

4         A.    Oh, the dad, I meet him, because they were

5    in the old building before.

6         Q.    Okay.

7         A.    They just move here in downtown area,

8    because it same office where his dad is.

9         Q.    Okay.

10        A.    Yeah, both of them, even the mom, you know.

11        Q.    And turning to the years 2008 and 2009, the

12   signature that appears under preparer's signature?

13        A.    That's mine.

14        Q.    And then the preparer's -- your name would

15   appear on the taxpayer's signature?

16        A.    Yes, sir.

17        Q.    And below that, on the preparer's

18   signature, do you recognize that signature?  Is that

19   Raymond's?

20        A.    Ray, yeah.

21        Q.    And so that --

22        A.    Because whenever I sign, he's there and

23   then he sign.

24        Q.    Okay.  And you would agree that the same

25   signature appears -- or would you agree that the same

40

```
 1    signature appears on the same --

 2         A.    Yeah.

 3         Q.    -- page two of the 1040 for 2009 --

 4         A.    Uh-huh.

 5         Q.    -- under preparer's signature?

 6         A.    Yes, sir.

 7         Q.    Okay.  And what is the date of that

 8    preparation, if you can read it?

 9         A.    '10.

10         Q.    And, Ms. Medina, under your signature line,

11    did you write what year that these tax returns had been

12    prepared?

13         A.    What's that?

14         Q.    Did you put a year next to -- do you see

15    a --

16         A.    No.

17         Q.    Let me rephrase.

18         A.    This is just my signature.

19         Q.    And do you see a year when you dated it?

20         A.    No, there's no date, because he write it

21    down.

22         Q.    But did you --

23         A.    I was present.

24         Q.    Did you write the date next to your

25    signature?
```

1      A.    No.

2      Q.    You did not date it?

3      A.    Uh-uh.

4      Q.    You just signed it?

5      A.    I just sign it.

6      Q.    Okay.  Do you recall signing it?

7      A.    Yes.

8      Q.    Do you recall what date it was, what exact

9   day it was, when you signed it?

10      A.    No.

11      Q.    Okay.

12      A.    But I did sign it --

13      Q.    Right.

14      A.    -- in front of him.

15      Q.    After you signed it in front of him, did

16   you see who it was that dated the form?

17      A.    Him.

18      Q.    He dated it?

19      A.    Ray.

20      Q.    Ray dated it?

21      A.    Uh-huh.

22      Q.    Okay.  And going back to the 2008 1040, and

23   I'm referring to page two, this would be page two of

24   Exhibit E.  On your signature line --

25      A.    Uh-huh.

Case 2:10-md-02179-CJB-SS Document 3470-10 Filed 08/10/19 Page 43 of 137

42

```
1          Q.      -- is that your signature that appears
2    under the taxpayer's signature?
3          A.      Yes.
4          Q.      And again, on the date box, are you the
5    person that dated or did somebody else?
6          A.      No, he is the one, but I saw it.
7          Q.      You saw it?
8          A.      Yes.
9          Q.      So you saw Ray date --
10         A.      Yes.
11         Q.      -- that form?  Okay.
12         A.      But that's my signature.
13         Q.      That's your signature?
14         A.      Whenever I sign, you know, he is there in
15   front of me.
16         Q.      Okay.  Ms. Medina, I'm going to show you
17   what I'm going to ask the court reporter to mark as
18   Exhibit F.
19              (Whereupon, Exhibit F was marked for
20         identification.)
21         Q.      (By Mr. Moll)  I'm handing it to you now.
22         A.      Uh-huh.
23         Q.      Do you recognize Exhibit F?
24         A.      Yes.
25         Q.      Have you seen Exhibit F prior to today?
```

1      A.     Do what?

2      Q.     Have you seen this report prior to today?

3      A.     I seen report, yes.

4      Q.     Okay.  What do you recognize it to be?

5      A.     It's some information about my business.

6      Q.     About your business?

7      A.     Uh-huh.

8      Q.     Is that a form that had anything to do with

9  your BP claim?

10     A.     Yes, sir.

11     Q.     Okay.  To your knowledge, what did that

12  form have to do with your BP claim?

13     A.     Because I need a claim because of the

14  losses that I had.

15     Q.     Okay.  Did you go over this form with Ray?

16     A.     Yes, sir.

17     Q.     Do you recall when that was?

18     A.     No, sir, sorry.

19     Q.     Okay, that's okay.  And whose signature

20  appears on the last page of that form?

21     A.     There's no signature except for Ray.

22     Q.     Okay.  Does it have a slash S slash on it?

23     A.     Yes.

24     Q.     So that would be an electronic signature.

25  And what name appears?

44

1        A.    Raymond Flores.

2        Q.    Okay.  And did you authorize him to sign on

3  your behalf --

4        A.    Yes.

5        Q.    -- for this loss?

6        A.    Yes, because we made an agreement and I

7  sign it.

8        Q.    So this form represents the registration --

9        A.    I know he filed it electronically.  I was

10  there.

11        Q.    You were there?

12        A.    Instead of mailing it, you know.

13        Q.    So you were there when he electronically

14  filed this registration form?

15        A.    Yes.

16        Q.    Okay.  And, Ms. Medina, I'm going to show

17  you what I'm going to ask the court reporter to mark as

18  Exhibit G.

19            (Whereupon, Exhibit G was marked for

20       identification.)

21        Q.    (By Mr. Moll)  It's four pages worth of

22  documents.  What is Exhibit G?

23        A.    Oh, this is my Annual Food Permit License.

24        Q.    Okay.

25        A.    2012.  And this is the Occupational License

Case 2:10-md-02179-CJB-SS Document 14770-10 Filed 06/10/15 Page 46 of 137

1    and this is same thing, because I renew every year.

2          Q.    Okay.

3          A.    I pay 400 something dollar every year.

4          Q.    Okay.  Ms. Medina, as it pertains -- so you

5    previously acknowledged Exhibit A is your subpoena --

6          A.    Uh-huh.

7          Q.    -- and your handwriting on the back --

8          A.    Yes, sir.

9          Q.    -- is the full text of the Request for

10   Documents that we did email to you?

11         A.    Yes, sir.

12         Q.    Is it your testimony today that as far as

13   what we requested that the exhibits that I've just

14   showed you, Exhibits B through -- B through G,

15   obviously, we do reserve the right to request the

16   completion of these documents.  Do you acknowledge that

17   we reserve the right to request the completion of our

18   document request; do you acknowledge Exhibits B through

19   F are all of the documents that we requested?

20         A.    Yes, sir.

21         Q.    Or at least, do they represent all of the

22   documents that you have in your possession that we

23   requested?

24         A.    Yes, sir.

25         Q.    And so the record could be correct, that

DEPOSITION OF HERMINIA MEDINA 10/16/18

46

1    would be Exhibits B through G.  With respect to Exhibits

2    B through G that you produced in response to our Request

3    for Documents, were these documents requested -- I'm

4    sorry, were they produced by yourself or did anybody

5    assist you in producing these documents?

6         A.    What do you mean?

7         Q.    All of the ones we just went through that

8    you brought with you today, did these come from you or

9    did they come from anybody else?

10        A.    That document that I have is the same thing

11   that I have at the store, but I have no time.  Because

12   just this morning, so what I did is I go to Mr. Flores

13   but he's not there.  I call first the secretary and then

14   I said could you provide me the one that we file at the

15   BP and he got a copy.

16        Q.    Okay.  So the copies that you attained --

17        A.    I requested for him to give to me instead

18   of digging for it.

19        Q.    So you were able to obtain these from

20   Mr. Flores' office?

21        A.    Yes, sir, just this morning.

22        Q.    This morning.  And that would be Exhibits B

23   through G that we just went through?

24        A.    Yes, sir.

25        Q.    Okay.  I know there's a lot of documents,

 1    but thank you for going through them with me.

 2         A.    That's okay.  You know, I'm being honest.

 3    I've been in business for 20 years.

 4         Q.    Of course.

 5         A.    If I have time, you know, I mean, if we

 6    don't have concession last weekend, probably I can dig

 7    it all up, because it's the same thing, you know,

 8    whenever we file it.

 9         Q.    Are there other documents that would be

10    responsive to our request?

11         A.    Yes.

12         Q.    That are not included in these that you

13    would have at your store in your possession?

14         A.    No, except for the agreement, the

15    20 percent that they ask for, you know, whenever.

16         Q.    When you said "the agreement," do you mean

17    the one between you and Raymond, you and Ray?

18         A.    Yes.

19         Q.    Okay.

20         A.    But I understand that.  Because if I hired

21    a lawyer, probably it's much expensive like Levin

22    Papantonio, because they been advertising, sending

23    letter through the mail if they want to help us, you

24    know.

25         Q.    And just one more document I'm going to go

48

```
 1    through that you brought today.  You mentioned an
 2    agreement.
 3            A.    Yes, sir.
 4            Q.    I'm going to show you what I'm asking the
 5    court reporter to mark as Exhibit H.
 6                  (Whereupon, Exhibit H was marked for
 7            identification.)
 8            Q.    (By Mr. Moll)  If you could flip through
 9    and tell me if you recognize Exhibit H.
10            A.    Yes, this is my signature, yes, I recognize
11    this.  Yeah, I recognize everything, my signature, yes,
12    sir.
13            Q.    Okay.  And what is Exhibit H?
14            A.    What?
15            Q.    What is this document?
16            A.    Agreement between me and him when he
17    prepared those -- you know, to file a claim, because I'm
18    thinking about hiring a lawyer, okay, but it is so
19    expensive, you know, asking for initial payment.
20            Q.    And you said you were thinking about hiring
21    a lawyer for the BP claim?
22            A.    Yes, before.
23            Q.    But you decided just --
24            A.    To let Raymond, but Raymond got a lawyer,
25    too, you know.
```

49

1          Q.     And when you say he has a lawyer, who are

2     you referring to?

3          A.     I'm referring to the one who -- he's from

4     Panama City, he's a lawyer.

5          Q.     Do you remember his name?

6          A.     No, no.

7          Q.     Are you familiar with the name Nalin Garg?

8          A.     No, no.

9          Q.     Okay.  But you recall a lawyer from Panama

10    City?

11         A.     Yeah, yeah.

12         Q.     Okay.  Did you ever talk to him yourself?

13         A.     No.

14         Q.     Did Ray mention him?

15         A.     Yes.

16         Q.     If we asked Ray his name, do you feel

17    pretty confident that Ray would know his name?

18         A.     Yes, yes.

19         Q.     I want to go back to the Exhibit H, and

20    this would be the page entitled Engagement Letter for

21    Consulting and Individual/Business Representation.  It's

22    dated November 14th, 2012.  The very last line says,

23    "additional fee."

24         A.     Yeah.

25         Q.     I'll note that typed 30 percent is

1   scratched out and handwritten --

2           A.      Yeah, it's 20.

3           Q.      -- is 20 percent.

4           A.      Uh-huh.

5           Q.      Were you present when that notation was

6   made?

7           A.      Yes, yes.

8           Q.      Okay.  And who made that notation?

9           A.      This one, Ray.

10          Q.      Ray made that notation?

11          A.      Yeah, and I even sign it, this is my

12  signature.

13          Q.      So the 20 percent was made in your

14  presence?

15          A.      Yeah.

16          Q.      Okay.  And do you recall like what went

17  into that; do you recall why he dropped it from

18  30 percent to 20 percent?

19          A.      Probably because I'm old client and I been

20  asking for help because I told him that a lot of lawyers

21  send me a letter from the mail trying to convince me to

22  be a part of those claim, because I lost a lot of money

23  really.

24          Q.      And so do you recall that is what actually

25  happened that day or is that what you believe it was?

51

1         A.    No, no, no, that happened.  The

2  20 percent --

3         Q.    Yes.

4         A.    -- instead of 30?

5         Q.    Yes.

6         A.    Yes.

7         Q.    Okay.  And it was your understanding that

8  he would receive 20 percent of your entire claims award?

9         A.    Yes, sir.

10        Q.    Okay.

11        A.    Because I know there's a lawyer, but

12  they're asking too much.

13        Q.    Sure, sure.  And let the record reflect

14  this will be Exhibit H.  And so Exhibits B through H

15  encompasses all of the documents you brought today?

16        A.    Yes, sir.

17        Q.    Okay, all right.  So moving away from the

18  documents a little bit, I just want to talk a little bit

19  about your background with Tin-Tin's Food Store.

20        A.    Yes, sir.

21        Q.    So you're the current owner of Tin-Tin's?

22        A.    Yes, sir, sole owner.

23        Q.    And you said you're the sole owner?

24        A.    Yes, sir.

25        Q.    Okay.  And I saw the pictures of the booth

52

```
 1    from the festival --
 2              A.    Uh-huh.
 3              Q.    -- and your storefront.  If you could just
 4    describe in your own words --
 5              A.    Uh-huh.
 6              Q.    -- what kind of services does Tin-Tin's
 7    provide?
 8              A.    Are you talking about the concession or the
 9    store?
10              Q.    Well, let's start with the store.
11              A.    With the store, okay, we got a lot of
12    variety of the prepackaged food and then I cook food
13    inside the store, just a little bit, something like
14    three food warmer and then we carry those frozen fish.
15              Q.    Okay.
16              A.    We sell it.
17              Q.    Okay.
18              A.    And then the prepackage, the fruit juice,
19    but not at the moment because our cooler is broken.
20    Yeah, but some of the seafood, you know.
21              Q.    Do y'all --
22              A.    And then --
23              Q.    I'm sorry.
24              A.    That's okay, sir.
25              Q.    Do y'all sell them to -- when you say you
```

53

1   sell the fish and the food, do you sell it to consumers

2   or do you sell it to restaurants wholesale?

3           A.    No consumer, consumer.

4           Q.    Consumers, okay.

5           A.    Beside, what do you call this, I want to

6   sell fish, I bought it from the Joe Patti and then fry

7   it and then sell it to the consumer.

8           Q.    So you will sell cooked items as well?

9           A.    Uh-huh.

10          Q.    Okay.  And is your festival business,

11  that's encompassed within Tin-Tin's as well?

12          A.    Yes.

13          Q.    If you could, describe your festival

14  business.

15          A.    The festival?

16          Q.    Yes.

17          A.    The festival, we do it starting in

18  February, because it is Mardi Gras show.

19          Q.    Okay.

20          A.    But in a month, month of February is two

21  times, just two.  Then starting March, every weekend,

22  that's four weeks in a month.  And then it will end

23  until December, first week.

24          Q.    Okay.

25          A.    And that's a time for us to rest for the

54

1    concession.  And actually, it's February to first week

2    in December, because we concentrate on the store.

3            Q.    Okay.

4            A.    And then on the weekend -- I mean, we apply

5    for a show sometimes one year ahead of time, six months

6    ahead of time or three months ahead of time or one month

7    ahead of time.

8            Q.    Okay.

9            A.    Because if we do not apply that early,

10   there's a deadline --

11           Q.    Okay.

12           A.    -- and we will not be accepted.

13           Q.    Okay.

14           A.    And then whenever we do shows, we apply for

15   it, apply for the license, pay the taxes in every state,

16   like Alabama or Mississippi or Louisiana.

17           Q.    Okay.

18           A.    Then before doing it, we prepare ahead of

19   time.  We order food from Jenny Brothers, U.S. Food

20   Service, China Foods from Louisiana.  They carry

21   everything, like the frozen stuff, like the seafood.  I

22   mean, talking about the seafood like we do the shrimp,

23   the 70/90, that's what we call it.  It's small shrimp.

24           Q.    The 70/90 count.

25           A.    The 70/90 count and the 16/20.  The 16/20

Case 2:10-md-02179-CJB-SS Document 14710-16 Filed 06/16/19 Page 56 of 137

55

1   is the large one.

2           Q.    Okay.

3           A.    We put it in a stick, tempura batter it.

4   So the picture that you see is the actual one we make

5   then we took picture of it.

6           Q.    Okay.

7           A.    Then we tempura fry, we sell it

8   individually.  But if it's 70/90, we batter it, tempura

9   batter it and put into a to go -- not to go box, the

10  boats, three pound-boat.  We ask the customer if you

11  want with a side like onion rings or potato fries and

12  sell it for -- now because of the expensive price of the

13  shrimp, we sell it for $12 a basket, something like

14  that.

15          Q.    Sure.

16          A.    Then besides that, we do those snow crab,

17  we sell it $15 with a side of corn on the cob and boiled

18  potato.

19          Q.    So you sell a variety of seafood at the

20  festivals?

21          A.    Yes, and the catfish basket, something like

22  that.

23          Q.    All kinds of stuff?

24          A.    All the seafood thing, you know.

25          Q.    Okay.

56

1       A.    Even the calamari, we order the calamari,

2  we slice it like a tube, then we tempura batter it wet

3  and dry and then deep fry it.

4       Q.    Okay.

5       A.    And oyster, too.  A lot of seafood beside

6  the chicken, you know.

7       Q.    Yes.  So is it safe to say a lot of --

8       A.    And the soft shell crab; the soft shell,

9  the whale size, we sell it for $10 and then put it in a

10  sandwich, then we dress it with onions, peppers, you

11  know, then the lettuce, if they want it, and we serve

12  it, we sell it for $10 per piece.

13       Q.    All right.  I want to move on to your role

14  within the company.

15       A.    Uh-huh.

16       Q.    What is your -- I know you said you are the

17  owner; is that your official title?

18       A.    Owner.

19       Q.    Is that your official title within the

20  company, owner?

21       A.    Owner.

22       Q.    I think you mentioned earlier, but how long

23  have you been the owner of Tin-Tin's Oriental Food

24  Store?

25       A.    More than 20.

1          Q.    More than 20?

2          A.    For the store, I mean, since 1995.  Then

3    after two years, because my daughter -- three of my

4    daughters will be studying, going to college, I decided

5    to do the concession.

6          Q.    Okay.

7          A.    Yeah.

8          Q.    So the concession became part of the

9    business two years after you started?

10          A.    Mainly, because I make a lot of money than

11    the store.

12          Q.    Okay.  So you would say the concessions is

13    more --

14          A.    More.

15          Q.    -- primary?

16          A.    Yeah.

17          Q.    Okay.

18          A.    The main.

19          Q.    Okay.  So you would say since 1995 you've

20    been owning the company?

21          A.    Yeah.  Then 1998, I decided to do

22    concessions.

23          Q.    Start the concessions, okay.  But the

24    concessions are under Tin-Tin's Oriental?

25          A.    Yes, yes.

58

1              Q.    Now, besides the BP claim, which I'm

2       referring to as the DHECC, the Deepwater Horizon

3       Economic Claims Center claim, had Tin-Tin's as a

4       business ever filed any other disaster relief claims or

5       --

6              A.    No.

7              Q.    -- any other claims similar to the BP

8       claim?

9              A.    No.

10             Q.    Obviously, being located in Florida, every

11      now and then, you get a hurricane come through.

12             A.    Yeah.

13             Q.    Did y'all ever have to file any hurricane

14      claims?

15             A.    No.

16             Q.    Okay.  Have you filed any similar claim

17      personally, not on behalf of the business, but

18      personally?

19             A.    No, sir.

20             Q.    Okay.  Have you ever owned any other

21      business?

22             A.    No.

23             Q.    Besides Tin-Tin's?

24             A.    No, sir.

25             Q.    Do you currently own any other business

59

1    besides Tin-Tin's?

2        A.    No, sir.

3        Q.    Okay.  Now, I want to talk about kind of

4    the business processes of Tin-Tin's.  You mentioned it's

5    the food store, you've mentioned its primary purpose.

6    What you would say that -- as the owner, what would you

7    say your primary responsibilities are for the business?

8        A.    What do you mean?

9        Q.    What do you do for the business?  And I

10   understand it's probably a lot, but can you please

11   describe what you do on a day-to-day basis?

12       A.    On day-to-day basis?

13       Q.    Yes.

14       A.    I wake up 6:00 in the morning, take my

15   shower, then prepare to go to the store at 8:00 because

16   we're open at 8:00 in the morning until 7:00.

17       Q.    Okay.  But as far as what I mean by that,

18   are you in charge of purchasing --

19       A.    Yes.

20       Q.    -- seafood?  Are you in charge of managing

21   your inventory?

22       A.    Yes, sir.

23       Q.    Okay.  Are you in charge of -- do you

24   maintain -- well, I guess prior to the BP spill, had you

25   maintained profit and loss statements, was that part of

```
 1   what you did?

 2        A.    Yeah.  Whenever, you know, in the statement

 3   in the bank, you know, I see, I compile it, January

 4   until December.

 5        Q.    Okay.

 6        A.    Then it's tax season, I give it to Ray.

 7        Q.    Okay.

 8        A.    Everything, the expenses and everything,

 9   the one with the order, you know.

10        Q.    Sure.

11        A.    Everything.

12        Q.    Okay.  And when you say the one with the

13   expenses and the orders, are you referring to bank

14   statements or are you referring to a sales report?

15        A.    No, no, in the bank statement.  Because

16   everything I see to it that whenever I order

17   merchandise, I wrote a check --

18        Q.    Okay.

19        A.    -- so I would know.

20        Q.    Okay.

21        A.    Everything is there.

22        Q.    So is all of your purchased merchandise

23   done via check?

24        A.    Yes, sir.

25        Q.    And is that a business check or personal
```

1    check?

2         A.    Personal and a business check.

3         Q.    So you --

4         A.    I got two accounts.

5         Q.    So you'll use both?

6         A.    Yes.

7         Q.    Okay.

8         A.    But usually I use my Herminia Medina --

9         Q.    Okay.

10        A.    -- you know, at the bank, that's what I

11   usually use.

12        Q.    So you'll use that to make business

13   purchases?

14        A.    Yes, sir.

15        Q.    And to clarify, that would be the Bank of

16   America account?

17        A.    Yes, sir.

18        Q.    Okay.  And would that be -- I know you said

19   the two accounts.  You have account number ███████ --

20        A.    ██████.

21        Q.    And is that your business or personal

22   account?

23        A.    Both.

24        Q.    So that account number is for both?

25        A.    Uh-huh.

```
 1          Q.    Okay.
 2          A.    No, the number is for my primary checking.
 3          Q.    It's primary checking?
 4          A.    Uh-huh.
 5          Q.    So the one that ends in  ████  --
 6          A.    It is.
 7          Q.    -- is that the one you mentioned writing
 8    the checks out of?
 9          A.    Yes, uh-huh.
10          Q.    So that would be the Herminia Medina
11    account?
12          A.    Medina, yes.
13          Q.    Okay.  And as for account number
14    ████████████  --
15          A.    Uh-huh, that's the Tin-Tin's.
16          Q.    -- that's the Tin-Tin's account, okay.  And
17    so you also write checks out of that one, just not as
18    much?
19          A.    No, not like regular, not like the Herminia
20    that I'm using, because I'm used to it, you know.
21          Q.    Okay.  Now, for the time period 2008
22    through 2011, did you use any other bank accounts at all
23    for your business?
24          A.    Just Herminia, mostly Herminia.
25          Q.    Okay.  But besides that one?
```

```
 1          A.    No.

 2          Q.    And besides the ███, are there any other

 3   bank accounts that --

 4          A.    Uh-huh.

 5          Q.    -- your business goes through?

 6          A.    No.

 7          Q.    Okay.  Did you at any time have any other

 8   bank accounts that opened for your business besides

 9   those?

10          A.    Before?

11          Q.    Yes.

12          A.    Regions Bank.

13          Q.    A Regions account?

14          A.    But I already closed it a long time ago.

15          Q.    And how long ago was that; do you remember?

16          A.    A long time ago, probably ten years.

17          Q.    Okay.

18          A.    Ten years.

19          Q.    Okay.  So as far as your credit and debit

20   card transactions, do they only go to the --

21          A.    Herminia.

22          Q.    The ███ bank account?

23          A.    Yes, sir.

24          Q.    Okay.  And would that be the case from 2008

25   through 2011?
```

64

```
 1          A.    Yes, sir.

 2          Q.    Okay.  As far as your -- did you take in

 3     cash -- do you take cash sales as well?

 4          A.    What that's again?

 5          Q.    Do you take in cash sales as well in

 6     addition to credit card payments?

 7          A.    Uh-huh.

 8          Q.    And I guess once you -- how often do you

 9     make the cash deposits?

10          A.    Once a week.

11          Q.    Okay.  And do those cash deposits go into

12     the ███ account, as well?

13          A.    Yes, sir.

14          Q.    Okay.  And who usually makes the deposits?

15          A.    My daughter.

16          Q.    Your daughter, okay.

17          A.    I have no time to.

18          Q.    Okay.  Does your -- and you mentioned that

19     you obviously run the business.  Does anybody else help

20     you with the numbers and recordkeeping of the business?

21          A.    What do you mean?

22          Q.    Is there anybody else employed --

23          A.    No.

24          Q.    -- by the business?

25          A.    It's just sometimes I ask my daughter to
```

65

```
 1    help me in something like to lift heavy things, because,
 2    oh, my God, that was a long time ago, my husband pass
 3    away.
 4              Q.    I'm sorry to hear that.
 5              A.    Yeah, yeah.  And it is my daughter who
 6    help.
 7              Q.    Okay.  She does a lot?
 8              A.    Yeah.
 9              Q.    Okay.  If you need to take a break,
10    Ms. Medina, it's okay.  We can give you a second if you
11    need it, it's more than okay.
12              A.    She's the one helping me.
13              Q.    Yeah, and we can see that.  If you need to
14    take a few deep breaths, that's more than okay.
15              A.    It's hard to lose a husband.  We lost him
16    doing concession on our way home, he was driving the
17    truck and he suddenly collapse with a heart attack.
18    It's hard.
19              Q.    I'm sorry to hear that, ma'am.  We can
20    take -- if you need five minutes, we can go off the
21    record for five minutes, if we need to.
22              A.    I'm not that young anymore.  Look at me,
23    I'm 62.  I got three daughters, all girls.  But the only
24    one helping me is Leslie.  Sometimes I be there because
25    she has enough time for her life, until now she is
```

Case 2:10-md-02179-CJB-SWR Document 26470-16 Filed 08/10/16 Page 67 of 137

66

1    single.

2         Q.    I don't mean to upset you, obviously.

3         A.    Yeah, it's hard.

4         Q.    Okay.

5         A.    But I'm taking care of my other sister, the

6    youngest one.

7         Q.    Okay.

8         A.    She's sick.  She lives with me.  I take

9    care of her, even though I got sister and brother.

10        Q.    Okay.

11        A.    Because she is a transplant patient, she

12    can't walk.

13        Q.    Okay.

14        A.    She lives with me.  From the day-to-day

15    basis, I go to the store and then cook food, then by

16    11:00, I call her, I said, are you hungry, and provide

17    her with food because she cannot move.

18        Q.    I see.  So you bring it to her?

19        A.    Bring it to her, close the store for a

20    while and provide her with a drink, everything.

21        Q.    Okay.

22        A.    She pee inside the room, because she got,

23    you know, the port toilet inside there.  Then it's

24    nighttime, I ask what she wants to eat.  That's what my

25    part in life, so I did not get married anymore and I

67

```
 1   have no time for that.

 2          Q.    So it sounds like your time is pretty much

 3   family or store?

 4          A.    Yeah, it's me.  Then if I need help, I call

 5   my daughter, ████, she helps me a lot.

 6          Q.    Okay.  It's nice to have somebody like

 7   that.

 8          A.    Yeah.  Then I take care of my sister, the

 9   younger one.  She's disabled.

10          Q.    Okay.

11          A.    She got a kidney transplant.  Ten years

12   doing dialysis.

13          Q.    Okay.  Well, Ms. Medina, we're at a point

14   where we can take about a ten-minute break, because I

15   know we've been talking for about an hour.

16          A.    That's okay.  I mean, I'm being -- I mean.

17          Q.    Oh, no.

18          A.    It is what it is.

19          Q.    It's okay.

20                MR. MOLL:  We can go off the record.

21                (Whereupon, a brief recess was taken at

22          3:06 p.m., after which the deposition continued

23          at 3:20 p.m.)

24          Q.    (By Mr. Moll)  We talked about the bank

25   accounts.
```

68

1      A.    Uh-huh.

2      Q.    And just to confirm, do you have the debit

3 cards like actually with you today that pertain to that

4 account?

5      A.    Let me see if it's here.  Probably ███████

6 is holding it.  Let me see.

7      Q.    If you have it on you, if you could --

8      A.    Probably it's in her purse.

9      Q.    In her purse?

10      A.    Uh-huh.

11      Q.    Okay.

12      A.    Because whenever, you know, she is the one,

13 you know, go to the bank.  It's not here.  It's in her

14 purse.

15      Q.    Okay.  And besides the accounts that we

16 talked about, do you have any other personal accounts

17 besides that one?

18      A.    Uh-uh, no.

19      Q.    All right.  And just to clarify, so before

20 the BP statement, did you -- well, let me ask you this,

21 are you aware of the profit and loss statements that

22 were prepared for your BP claim?

23      A.    Whatever papers I submitted to Raymond, you

24 know, during January until December.

25      Q.    Of what year?

Case 2:10-md-02179-CJB-SS Document 24470-16 Filed 08/10/19 Page 70 of 137

1      A.    I mean, every year I gave to him.

2      Q.    Every year, okay.

3      A.    Because he is my accountant.

4      Q.    Did you personally ever keep -- you know,

5    did you ever personally create separate documents that

6    summarized --

7      A.    Uh-uh.

8      Q.    -- profits and losses?

9      A.    No.

10      Q.    Okay.  And what would you give to Ray that

11    you're talking about, the bank statements?

12      A.    Bank statement, the whole bank statement

13    and sometimes expenses.  Everything is there because I

14    wrote a check.

15      Q.    So for each check, did you have the checks

16    that had a check stub with the check number?

17      A.    Everything is there.

18      Q.    Okay.

19      A.    Everything is there --

20      Q.    So you would be able to give --

21      A.    -- in the bank.

22      Q.    So you'd be able to give him a copy of the

23    check stub?

24      A.    No, no, no.  Actually, the bank, whenever I

25    receive a bank statement at the end.

70

```
 1            Q.     Everything is on the bank statement?
 2            A.     Uh-huh, everything is there.
 3            Q.     Were there any other documents that you
 4     gave to Ray at the end of each year besides the bank
 5     statement?
 6            A.     Sometimes, because my daughter went to
 7     school, there's expense paying tuition.
 8            Q.     Okay.  So expenses for school?
 9            A.     With school, yeah.
10            Q.     Okay.
11            A.     Because my daughter, you know, I claim her.
12            Q.     Right.
13            A.     Yeah,  ████████  yeah.
14            Q.     So Ray would know what her education
15     expenses were?
16            A.     Education expenses, uh-huh.
17            Q.     Obviously, separate from the business?
18            A.     Uh-huh.
19            Q.     Okay.  And going back to -- I know you
20     mentioned you started the business in 1995.
21            A.     Uh-huh.
22            Q.     So a pretty good while ago.  We noticed
23     that it's set up as Tin-Tin's Oriental Food Store, LLC.
24            A.     Uh-huh.
25            Q.     Did you set it up as an LLC or when y'all
```

71

```
 1    set that up, did you have assistance to do that?
 2           A.     What do you mean LLC?
 3           Q.     When you incorporated it.
 4           A.     I'm a sole proprietor.
 5           Q.     Okay.  And obviously, you filed --
 6           A.     It's not corporation or whatever.
 7           Q.     But you filed LLC documents with the
 8    Florida Secretary of State Office?
 9           A.     What do you mean by that?
10           Q.     I guess, to register your business with the
11    State?
12           A.     Yes, Tin-Tin's Oriental.
13           Q.     Yes.
14           A.     I'm the sole proprietor.
15           Q.     Yes.
16           A.     Everything is registered.
17           Q.     So Tin-Tin's registration with the State,
18    is that something that you did on your own or did you
19    hire --
20           A.     I did.
21           Q.     You did?
22           A.     I did on my own.
23           Q.     Okay.
24           A.     When I apply for Occupational License, you
25    know, I go to the court house, you know, everything.
```

Case 2:10-md-02179-CJB-SS Document 21470-16 Filed 08/10/17 Page 73 of 137

1        Q.    Okay.  And so you did all of that on your

2  own?

3        A.    Yes.

4        Q.    You didn't have to hire anybody to do that?

5        A.    No, no.

6        Q.    Okay.  And did you -- was the first time

7  you did that back in 1995, the first year you began?

8        A.    Yes, yes.

9        Q.    Okay.  So obviously, you would have to do

10  it year by year, you do all of that?

11        A.    Yeah, yeah.

12        Q.    Okay.  And I guess before you did that, did

13  somebody tell you to do that?

14        A.    No.

15        Q.    How did you know to do it?

16        A.    Actually, we do it by phone calling or the

17  Department of Agricultural, inquire in the commerce, you

18  know, what to do, who is the distributor.  From the

19  start, I mean, go find a place first, you know.

20        Q.    I guess what I'm trying to ask is did

21  anybody, has anybody, like, advised you; did anybody --

22        A.    No, it's just me and my sister.

23        Q.    Y'all knew you had to -- so y'all knew --

24  y'all wanted to register the business?

25        A.    Yeah.

73

```
 1              Q.    And so no one --

 2              A.    No.

 3              Q.    -- separate of you or your sister --

 4              A.    No.

 5              Q.    -- told you?

 6              A.    No, no, I just asked the help of my sister.

 7              Q.    Okay, all right.  So going back to the

 8    years 2008 through 2011, besides giving Ray all of the

 9    documents at the end of the year, did anybody else help

10    you with the finances of the company?

11              A.    Uh-uh.

12              Q.    Just you?

13              A.    Yeah, just me.

14              Q.    Okay, all-righty.  I want to talk -- move

15    on and talk about your -- the claim itself.

16              A.    Uh-huh.

17              Q.    So did you first file Gulf Coast Claims

18    Facility --

19              A.    Yes.

20              Q.    -- claim?

21              A.    Uh-huh.

22              Q.    Okay.  And did you file that yourself?

23              A.    I ask the help of Ray.

24              Q.    Okay.

25              A.    But before that, I mean, there is -- as I
```

74

1   mentioned earlier, you know, a lot of lawyers --

2        Q.    Sure.

3        A.    -- they sent it through mail, if I wanted

4   to, you know, ask for their help, something like that.

5        Q.    Okay.

6        A.    Then when I inquire, it's too much money.

7        Q.    Sure.

8        A.    So I decided to tell Ray about it and said

9   I can help you with that.  And Ray, you're losing a lot

10  of money, I saw it in your -- you know, the one that

11  we're filing.

12       Q.    So Ray assisted you with the GCCF claim?

13       A.    Yes.

14       Q.    Okay.  Did you get paid with the GCCF

15  claim?

16       A.    No.

17       Q.    Okay.

18       A.    No.  I mean, it took us -- I've been

19  checking online if there is something like -- because we

20  see it online that every time you get something like

21  case number.

22       Q.    Uh-huh.

23       A.    And then I always read it every morning, if

24  there's a chance, if there's something.

25       Q.    Okay.

Case 2:10-md-02179-CJB-SS Document 24740-15 Filed 08/10/19 Page 76 of 137

75

```
1            A.    That's the way it is, you know.

2            Q.    And when you said online, is that a

3    website?

4            A.    Yes.

5            Q.    Do you know what website it is you go to?

6            A.    When I click it, it's something like the

7    Gulf Coast -- you know, Gulf Coast, something like that.

8            Q.    Okay.

9            A.    And then I get something like a case

10   number --

11           Q.    Okay.

12           A.    -- that I need and that's the way to do it,

13   you know.

14           Q.    Okay.  Are you aware of whether it's a GCCF

15   website or --

16           A.    Gulf Coast Facility, something like that.

17           Q.    Okay.  Do you have happen to recall the

18   case number off of the top of your head?

19           A.    Uh-uh.

20           Q.    Okay.  And when you said you check it every

21   morning, do you mean you used to check it every morning

22   or do you still check it?

23           A.    Not every morning.  I mean, for a week,

24   something like not on the weekend because I'm always

25   going out of town.
```

76

1       Q.      Right.

2       A.      Probably twice, twice a week or once a

3   week.

4       Q.      And you still do that?

5       A.      No, not anymore.

6       Q.      Okay.

7       A.      Not anymore.

8       Q.      Okay.  That's what I was trying to clarify.

9       A.      No, no, no, no, not anymore.

10      Q.      When did you stop checking the GCCF?

11      A.      I can't remember anymore.

12      Q.      Okay.

13      A.      It was just a long time ago.

14      Q.      Well, I'll ask you this -- and when I'm

15  asking you more questions --

16      A.      No, that's okay.

17      Q.      -- it's just trying to help you remember.

18      A.      Yeah, yeah.

19      Q.      What made you stop checking the GCCF

20  website?

21      A.      Stop checking?

22      Q.      Yeah, why did you stop checking it?

23      A.      When I got the claim.

24      Q.      When you got the --

25      A.      From the Deep (sic) Horizon.

Case 2:10-md-02179-CJB-SS Document 24478-16 Filed 08/10/19 Page 78 of 137

77

1         Q.     The DHECC claim?

2         A.     Yeah, yeah.

3         Q.     So up until you got the DHECC claim -- and

4    when you say you got the claim, are you referring to the

5    award, claim award?

6         A.     Yeah.

7         Q.     Okay.  So you checked the GCCF website up

8    until you got the DHECC claim award?

9         A.     The Deep (sic) Horizon?

10        Q.     Yes.

11        A.     Yes.

12        Q.     Okay.  And so you got the claim from the

13   DHECC as far as -- so are you aware of the fact that the

14   DHECC and the GCCF are two separate --

15        A.     No, this is one; right?

16        Q.     What is your knowledge of it?

17        A.     I know it's just one, just changed the

18   name, something like that.

19        Q.     Okay.  Besides the award check you got from

20   the DHECC, did you ever receive anything prior to that?

21        A.     No.

22        Q.     Okay.  Do you recall ever receiving

23   anything informing you that you were denied from any

24   payment by the GCCF?

25        A.     No.

78

1         Q.    Okay.  And so I heard you mention the

2   attorneys that mail things to you, but how did you first

3   hear about filing a DHECC claim?

4         A.    It's all over the news, I mean...

5         Q.    Okay.

6         A.    You know, whoever, you know, lost their

7   business, you know, so I decided to, because I really

8   lost business during that time.

9         Q.    Okay.

10        A.    And even my -- you see my bank account,

11   there's a lot of fee for insufficient fund, because I

12   cannot do what I need to do before.

13        Q.    Sure.

14        A.    Yeah.

15        Q.    And ultimately, did you file a DHECC claim?

16        A.    What's that again?

17        Q.    Ultimately, you filed a DHECC claim;

18   correct?

19        A.    Yes.

20        Q.    Okay.  And did you do that with -- who

21   assisted you with that?

22        A.    Ray.

23        Q.    Ray, okay.  And obviously, you're referring

24   to Ray Flores?

25        A.    Uh-huh.

Case 2:10-md-02179-CJB-SHL Document 24470-16 Filed 08/10/19 Page 80 of 137

79

```
 1          Q.     You're referring to Ray, when you say
 2    "Ray;" correct?
 3          A.     Yeah, Ray Flores, sorry.
 4          Q.     Who prepared the claim form?
 5          A.     Ray.
 6          Q.     Ray did?
 7          A.     Ray Flores, yes.
 8          Q.     And obviously, there's multiple forms
 9    within the claim itself.  To your knowledge, did he
10    prepare all of the claim forms?
11          A.     Uh-huh.
12          Q.     Okay.
13          A.     Yes.
14          Q.     Are you aware of anyone that assisted Ray?
15          A.     Yeah.  He mentioned to me, you know, the
16    one that I'm telling you, the lawyer from Panama City.
17          Q.     The lawyer from Panama City assisted Ray?
18          A.     Yeah.
19          Q.     And you said he mentioned it to you.
20    Did --
21          A.     Yeah.
22          Q.     Ray told you "I'm having a lawyer --
23          A.     Yeah.
24          Q.     -- assist me"?
25          A.     Yes.
```

Case 2:10-md-02179-CJB-SHDecumentR240H0Hs MateaOBA10/16/19Page 81 of 137

80

1           Q.     Okay.  I think we have a form in here.  So

2    I'm going to refer you to Exhibit F that we talked about

3    earlier.  On page seven, what's marked as page seven of

4    this claim form, under section number five, "preparer or

5    accountant information;" can you please read what name

6    appears there?

7           A.     Yeah, HSG Accounting.  Yeah, probably

8    that's the one who help him.

9           Q.     Can you read the name that appears there,

10   the name of the individual?

11          A.     Golden, Bennett.

12          Q.     Bennett Golden?

13          A.     Yeah, Bennett Golden.

14          Q.     Are you familiar with who Bennett Golden

15   is?

16          A.     No, it's just something like there's a

17   lawyer from Panama City.

18          Q.     Okay.

19          A.     Yeah.

20          Q.     Are you aware of whether this is the person

21   that Ray was referring to?

22          A.     Probably, yeah.

23          Q.     So you believe that this is who he was

24   referring to?

25          A.     Yes.

Case 2:10-md-02179-CJB-SS Document 24470-16 Filed 08/10/18 Page 82 of 137

81

```
1        Q.    Okay.  Had you ever met Bennett Golden?

2        A.    No.

3        Q.    Have you ever seen any pictures of Bennett

4   Golden?

5        A.    No, sir.

6        Q.    Okay.  So you wouldn't be able to recognize

7   him?

8        A.    No.

9        Q.    Okay.

10        A.    No, sir.

11        Q.    Okay.  And so with regard to the claims

12   forms, did you read -- as Ray was preparing them, did

13   you read the forms that Ray prepared before he submitted

14   them to the DHECC or did he just submit them?

15        A.    What do you mean?

16        Q.    Is there --

17        A.    There's a lot of paperworks.  I know he

18   file it electronically, because I was there.

19        Q.    Sure.

20        A.    But I mean, there's a lot of paperworks.

21        Q.    Yeah.  So before he submitted it

22   electronically, did you have a chance to --

23        A.    He explain it to me.

24        Q.    Okay.  So he explained it to you?

25        A.    Yeah.
```

1    Q.    So you didn't actually read it yourself, he
2    told you what was on the form?
3    A.    Probably, I read the rest, but I cannot
4    remember anymore.
5    Q.    Okay.  But you recall him explaining it to
6    you?
7    A.    Yes, yes.
8    Q.    Okay.
9    A.    Because I would not sign it, if he would
10   not explain it to me.
11   Q.    Okay.  Do you recall specifically whether
12   you actually read every line on every form of all of the
13   paperwork?
14   A.    I cannot remember anymore.
15   Q.    Okay, that's okay.  And when he explained
16   the forms to you, do you recall what it was that he
17   explained?
18   A.    Actually, it is about the form that we
19   submitted, I mean, all of the paperworks --
20   Q.    Okay.
21   A.    -- that they needed.
22   Q.    Do you recall what he told you it was that
23   you were signing?
24   A.    What's that again?
25   Q.    Do you recall what it was he told you, you

83

1    were signing?

2           A.    Yes.  Yeah, he explain it to me, but I

3    cannot remember anymore.

4           Q.    Okay.  So you don't remember -- and I know

5    I'm asking a lot of questions.

6           A.    Yeah, yeah.

7           Q.    Do you not remember the exact words he used

8    or do you not remember what was explained to you?

9           A.    Because he told me he going to, you know,

10   file.

11          Q.    Uh-huh.

12          A.    Anyway, all of the paperworks under

13   federal.

14          Q.    Uh-huh.

15          A.    And that's it, that's what I -- you know.

16          Q.    Okay.  So going back, what did you -- I'll

17   ask it this way.  On that day, the day that Ray

18   submitted it, what did you understand that you were

19   submitting to the DHECC?

20          A.    We were claiming.

21          Q.    Okay.  And what did you understand your

22   claim to be for?

23          A.    For the losses of my business.

24          Q.    Okay.  And did Ray explain that -- at least

25   that to you?

84

1      A.    What is that again?

2      Q.    Do you recall him explaining at least that

3  much to you?

4      A.    Explaining everything?

5      Q.    That he explained that it was for the loss

6  of your business?

7      A.    Yes.

8      Q.    Okay.

9      A.    Me, too, because understand that I lost

10  business because I'm the one doing the business and I

11  lost a lot of money, something like that.

12      Q.    Okay.  You mentioned checking the GCCF

13  claim.

14      A.    Uh-huh.

15      Q.    Are you familiar with the DHECC portal, the

16  Deepwater Horizon?

17      A.    Deepwater Horizon.

18      Q.    Are you familiar with the Deepwater Horizon

19  portal website?

20      A.    No, no.

21      Q.    Before receiving your DHECC claim --

22      A.    Uh-huh.

23      Q.    -- do you recall checking the DHECC

24  website?

25      A.    I know I have been checking the Gulf Coast

85

```
 1    Facility --
 2            Q.     Uh-huh.
 3            A.     -- Claim, something like that.
 4            Q.     Okay.  So I'm going to -- just one moment.
 5    To your recollection, do you recall ever seeing a form
 6    like this online?  And I'm referring to Exhibit F.
 7            A.     Online?
 8            Q.     Online, on the computer.
 9            A.     Deep (sic) Horizon Economic -- I think it's
10    the second one; right before the GCCF, then it changes.
11            Q.     Yes.
12            A.     Yeah.
13            Q.     Correct.  But do you recall ever going
14    online and seeing a form that looked like this?
15            A.     Not really that -- I mean, that page, I
16    usually go to the first one, the GCC (sic) --
17            Q.     The GCCF?
18            A.     -- yeah.
19            Q.     Okay.  Do you recall going online and
20    seeing a screen that said DHECC?
21            A.     Uh-uh.
22            Q.     No?
23            A.     Uh-uh.
24            Q.     If you could just say no for the court
25    reporter.
```

1          A.     No, no.

2          Q.     I saw you shaking your head.

3          A.     No, no.  Because I usually do the GCCF,

4    because that's the first one, you know.

5          Q.     Okay.  Do you recall ever visiting the

6    website Deepwater Horizon Settlements dot com?

7          A.     I can't remember anymore.  The only thing

8    that I remember is the GCCF.

9          Q.     Okay.

10         A.     I know it's the same thing, but I think

11   they change it to Deep Horizon (sic); right?  I don't

12   know.

13         Q.     Whatever your recollection is of it?

14         A.     Yeah.  Gulf Coast Claims Facility.

15         Q.     Right.  So when I refer to the portal, I'm

16   referring to the DHECC website.  Do you recall any

17   conversations with Ray where Ray gave you access to a

18   DHECC website?

19         A.     No.

20         Q.     With regard to the DHECC website, do you

21   ever recall a man by the name of Bill Tomes (phonetic)

22   telling you that you had access to a DHECC website?

23         A.     Bill Tomes, who is that?

24         Q.     Bill Tomes?

25         A.     No, sir.

87

```
 1              Q.    Okay.  So after you filed your claim, you
 2    eventually received an award; correct?
 3              A.    Yes, sir.
 4              Q.    Okay.  Do you recall how much the award
 5    amount was?
 6              A.    More than 90 through form of check.
 7              Q.    So you don't remember the exact number
 8    today, just that it was over 90,000?
 9              A.    It is more than 90.  They take out the
10    20 percent.  It's something like -- you know, the figure
11    is.
12              Q.    And when you say the 20 percent Ray took
13    out --
14              A.    I deposit it in my account.
15              Q.    Right.  And Ray took out 20 percent of the
16    check?
17              A.    Yeah.  But before, you know, I issued him a
18    check, before, you know -- I mean, see it in writing,
19    you know --
20              Q.    Sure.
21              A.    -- that whatever, you know, he asked for.
22              Q.    Okay.
23              A.    I write it.  It's in my bank account.
24              Q.    Okay.
25              A.    And even the one that I claim is in the --
```

Case 2:10-md-02179-CJB-SS Document 14710-16 Filed 06/10/15 Page 89 of 137

 1    in my bank account.

 2           Q.    Okay.

 3           A.    Everything is there.

 4           Q.    Were you ever told that you were guaranteed

 5    claim money?

 6           A.    No.

 7           Q.    Okay.  Did Ray or anybody at his office

 8    ever tell you something like that?

 9           A.    No.

10           Q.    Okay, one moment.  Did Mr. Flores ever give

11    you kind of an idea of what you might receive from

12    DHECC?

13           A.    No, sir.

14           Q.    Okay.  I want to move on from the DHECC

15    claim and talk a little bit about your interactions with

16    Mr. Flores.

17           A.    What's that again?

18           Q.    I want to talk about you and Mr. Flores and

19    your interactions with him.  When did you first meet Ray

20    Flores?

21           A.    Through his dad.

22           Q.    Through his dad?

23           A.    Because it's an old account, I mean, my mom

24    knows them, you know, they recommended them.  But the

25    thing is Mr. Carlito Flores got a lot of clients, so he

```
 1    endorsed me to his son.

 2         Q.    Okay.

 3         A.    Which he say he graduated magna cum laude,

 4    you know.

 5         Q.    Ray did?

 6         A.    Yeah.

 7         Q.    Okay.

 8         A.    Yeah.  I mean, he is smart.

 9         Q.    Sure.  Did he --

10         A.    So he knows --

11         Q.    Did he tell you where he graduated from?

12         A.    No, no, I didn't ask.  Because I know his

13    daddy is an accountant.

14         Q.    Okay.

15         A.    But because of a lot of client of the dad,

16    you know, he endorse me to the son.

17         Q.    And you knew his dad from, you said, your

18    mom?

19         A.    My mom.

20         Q.    Okay.  Do you remember when that was you

21    were referred to Ray?

22         A.    1995.

23         Q.    In '95?

24         A.    Uh-huh.

25         Q.    So you've been using Ray's services since
```

90

```
 1   the beginning of Tin-Tin's?
 2           A.    Uh-huh.
 3           Q.    Okay.
 4           A.    But we see each other only once or twice a
 5   year.
 6           Q.    Okay.  So besides your mom, was there
 7   anybody else related to you that also knew Ray?
 8           A.    What do you mean?
 9           Q.    I know --
10           A.    Oh, my brother, I got one brother.
11           Q.    Okay.
12           A.    He is a client.
13           Q.    What is his name?
14           A.    Rubin.
15           Q.    Okay.  And what's his last name?
16           A.    Mendoza.
17           Q.    Okay.  And he's a client of Ray?
18           A.    Uh-huh.
19           Q.    Do you know how long Ray's had him as a
20   client as well?
21           A.    No, I don't know.
22           Q.    Okay.  Would you say it's as long as you or
23   not as long?
24           A.    No.  He's been here a long time ago.
25           Q.    Okay.
```

```
1            A.    I mean, ahead of me.

2            Q.    Okay.

3            A.    So I don't know, I mean...

4            Q.    Do you know whether -- so obviously, Ray

5    represented you for the BP claim.  Did Ray represent him

6    in any BP claims as well?

7            A.    I don't know.

8            Q.    Okay.

9            A.    Even though we're brother and sister, we

10   don't see each other except when going to church or some

11   birthday party, you know...

12           Q.    Okay.  And I'm sure y'all don't want to

13   talk about that stuff.

14           A.    Yeah.

15           Q.    Okay.  To your knowledge, is there anybody

16   else that you're related to that Ray may have

17   represented for a DHECC claim?

18           A.    I don't know, sir.

19           Q.    Okay.  So when you first met Ray, was it at

20   his office or was it --

21           A.    The office.

22           Q.    At his office?

23           A.    The old office at Michigan.

24           Q.    Is that a street?

25           A.    Yeah.
```

1    Q.    Okay.  I'm not familiar with Pensacola.

2    A.    Yeah, the street.

3    Q.    And is that in Pensacola?

4    A.    Yes, sir.

5    Q.    Okay.  And what year would that have been?

6    A.    1995.

7    Q.    Okay.  And I know you've mentioned you see

8    him around tax time, when it's time to give him all of

9    the documents.

10    A.    Uh-huh.

11    Q.    Do you ever see him around town besides

12    that?

13    A.    No, sir.

14    Q.    Okay.  Did he ever come to your concessions

15    or anything?

16    A.    No.

17    Q.    I gotcha.  So when you first met with Ray,

18    what did he tell you he did?  What did he tell you his

19    profession was?

20    A.    He's a CPA.

21    Q.    CPA?

22    A.    Uh-huh.

23    Q.    Okay.  When you first met with him, what

24    services did he tell you that he could provide to you?

25    A.    It's about -- you know, he is asking me if

Case 2:10-md-02179-CJB-DPC Document 26470-16 Filed 08/10/19 Page 94 of 137

93

1    I want to be something like a bookkeeper and I said no,

2    that's okay, just an accountant is okay.

3         Q.    Sure.

4         A.    It is a lot of money.

5         Q.    Okay.

6         A.    He offered me if you want a payroll thing,

7    you know, he will do it, too, you know.

8         Q.    When you say bookkeeping, he was offering

9    to do, I guess, day-to-day accounting?

10        A.    No, I did not.

11        Q.    And you just elected --

12        A.    I do by myself.

13        Q.    You said no thanks?

14        A.    Yeah, once a year.

15        Q.    Okay. After the BP spill, did Ray tell you

16    that he specialized in any BP claims?

17        A.    No.

18        Q.    Okay.

19        A.    I asked his help.

20        Q.    You approached --

21        A.    Because of the mail coming and then I saw I

22    need to -- I mean, I can file a claim because I lost

23    business.

24        Q.    So you approached Ray?

25        A.    I did approach him personally.

1       Q.    Okay.  So after y'all -- when you first met

2  with him, did y'all -- I'm assuming did y'all meet to

3  discuss filing your claim?

4       A.    What?

5       Q.    Did y'all have a meeting?

6       A.    I requested it, because I want to be -- I

7  want you to be my accountant.

8       Q.    Right, throughout the claim?

9       A.    No, I'm talking about the first year that I

10  have a business.

11       Q.    Okay, 1995?

12       A.    Yeah.

13       Q.    Okay.

14       A.    Before the year ends, because we file, you

15  know, every year once a year.

16       Q.    And so going way past that, talking about

17  when it was time to file a BP claim, you said you

18  knew -- obviously, you had him as your accountant?

19       A.    Yeah.

20       Q.    And so you approached him to file your BP

21  claim?

22       A.    I did approach him.  Because I said, "Ray,

23  could you help me with this?  Because lawyers, I receive

24  a lot from the mail, you know Levin Papantonio and

25  there's another.  I said, "Could you help me with this?

95

1    Because I lost, you know, I lost a lot in the business

2    since it happened."

3        Q.    And did you eventually have a meeting with

4    Ray in person to discuss --

5        A.    Yes.

6        Q.    -- the claim?

7        A.    The one that, you know, after that, they

8    said okay and there's agreement that I sign.

9        Q.    Right.  And that would be -- we've

10   already marked it --

11       A.    2012.

12       Q.    -- Exhibit H?

13       A.    Yes, sir.

14       Q.    Okay.  And so does Exhibit H -- was this

15   document signed the very first time you met with Ray --

16       A.    Not yet, not yet.

17       Q.    -- to talk about the claim?

18       A.    Probably that's the second time.

19       Q.    Okay.

20       A.    Because I ask his help, you know.

21       Q.    So y'all had a meeting -- y'all had one

22   meeting at least --

23       A.    Before.

24       Q.    -- before you signed this document?

25       A.    Yeah, yeah.

Case 2:10-md-02179-CJB-SS Document 14701-16 Filed 06/10/19 Page 97 of 137

1    Q.    Just describe to me what y'all talked about
2    in that first meeting.
3         A.    Because I know you got all my records, you
4    know, and I lost a lot of business.  Could you help
5    me -- I told him could you help me doing this because I
6    saw it on TV, you know, that we can claim.
7         Q.    Uh-huh.
8         A.    And then there's a lot of letter.  I know I
9    kept all the statement from the lawyers, you know, the
10   other lawyers.
11        Q.    Sure.
12        A.    And he said, "I'll see what I can do."
13        Q.    Okay.  And when you say you knew -- you're
14   saying you knew he had all of your records --
15        A.    Yes.
16        Q.    -- are you referring to the bank statements
17   you would give him every year?
18        A.    Bank statements, yes.
19        Q.    And so when you told -- and did you tell
20   him that, that that's why you wanted to have him be your
21   CPA for the claim?  Did you tell him --
22        A.    No, because he knows about my records --
23        Q.    Right.
24        A.    -- since the start, so that's why he knew
25   everything about my finances.

97

 1          Q.    Okay.  At the time that you approached him,

 2     did he acknowledge that, yes, I do have your records so

 3     I can take care of the claim for you?

 4          A.    When I told him about it?

 5          Q.    Yes.

 6          A.    He said, "Let me see what I can do."

 7     That's the first thing.  Then when he called me and

 8     said, "Okay, you can come over."  Then we discuss it,

 9     this one.

10          Q.    Okay.  So when you went to Ray -- and you

11     mentioned he had your records -- at any point before

12     then -- so from 1995 until the first time you met with

13     him about the BP claim -- did Ray ever return any

14     records to you?

15          A.    No, I got a duplicate, I mean, you know,

16     the copy.

17          Q.    He would give you the copy of the tax

18     returns?

19          A.    Yeah, whenever, yeah, he filed taxes.

20          Q.    Okay.

21          A.    I got a copy.

22          Q.    Okay.  But you would give him your bank

23     statements so he could prepare your taxes?

24          A.    Yes.

25          Q.    Year to year --

98

```
 1          A.    Year to year, yeah.

 2          Q.    -- did he ever give you the bank statements

 3   back?

 4          A.    Yes.

 5          Q.    He did?

 6          A.    Yes.

 7          Q.    Okay.  Did he also keep a copy of the bank

 8   statements?

 9          A.    I think so, I think so.

10          Q.    And when you say "Ray had my records," I

11   mean, is that what you would be referring to?

12          A.    After doing those income tax returns --

13          Q.    Yes.

14          A.    -- he return it to me.

15          Q.    He returned the -- what would he return to

16   you?

17          A.    The original, you know, bank statement --

18          Q.    Okay.

19          A.    -- from January to December.

20          Q.    Okay.  Would he give you the exact copy

21   that you gave to him?

22          A.    Yes.

23          Q.    Or would he give you back a copy?

24          A.    No, no, no, the original copy that I gave

25   him.
```

99

1       Q.      The original copy?

2       A.      Yeah.

3       Q.      Okay.

4       A.      He gave it back to me.

5       Q.      Okay.  You mentioned Ray, you said he had

6   an attorney helping him.  Did Ray ever represent to you

7   that he, himself, could provide legal services to you?

8       A.      Yes.

9       Q.      Okay.  What legal services did Ray tell you

10  that he could provide?

11      A.      It's under the Horizon claim that we need

12  to pay something like $5,000 --

13      Q.      Okay.

14      A.      -- on their ruling, something like that.

15  So they take out the 5,000.  It's in the form of the BP

16  Horizon.

17      Q.      Were you invoiced $5,000, is that what

18  you're referring to?

19      A.      Yeah, something like that.

20      Q.      Okay.

21      A.      Actually, it's in the...

22      Q.      It was in the claim form?

23      A.      Yeah, it's in -- because everything is

24  receipt, you know.

25      Q.      Okay.

Case 2:10-md-02179-CJB-SS Document 4470-16 Filed 03/10/16 Page 101 of 137

1        A.    It's something like 4,000 something, not

2    5,000 even.  It's something like 4,000 something.

3        Q.    Okay.  I'm just going to show you a

4    document to see if you recognize it.

5        A.    Okay.

6        Q.    I'll ask the court reporter to mark it as

7    Exhibit I.

8        A.    Uh-huh.

9        Q.    So I'm showing to you what will be marked

10    as Exhibit I.

11            (Whereupon, Exhibit I was marked for

12            identification.)

13        A.    Let me see.

14        Q.    (By Mr. Moll)  Do you recognize this?

15        A.    Yeah, because there's something like

16    discount, so it's 4,000 something, not 5,000 even.

17        Q.    So you were invoiced for 5,000, but you

18    didn't --

19        A.    No, no, no.

20        Q.    They gave you a discount?

21        A.    No, no.  They already invoice me for --

22    it's supposed to be 5,000, but they gave a discount.

23        Q.    They gave you a discount?

24        A.    So it's 4,000 something.

25        Q.    So Ray gave you a discount?

101

```
 1          A.    Yeah.

 2          Q.    Okay.  Just to clarify --

 3          A.    Uh-huh.

 4          Q.    -- do you recall having seen that invoice

 5   before?

 6          A.    Yes.

 7          Q.    Okay.  And do you recall when you first saw

 8   it?  Was it during the claim's process.

 9          A.    When we receive the claim.

10          Q.    Okay.  Do you remember if you got that

11   invoice before or after you got your check?

12          A.    What's that again?

13          Q.    Do you recall if you got that invoice

14   before or after you got your claim check?

15          A.    After.

16          Q.    After you got the claim check?

17          A.    Uh-huh.

18          Q.    Okay.  And just for the record, Ms. Medina,

19   on Exhibit I, what is the date of that exhibit?

20          A.    The date is 10/11/2012.

21          Q.    Okay.  Ms. Medina, I'm going to show you

22   what I'm going to have the court reporter mark as

23   Exhibit J.

24                (Whereupon, Exhibit J was marked for

25                identification.)
```

102

1        Q.   (By Mr. Moll)  I'm handing to you what is

2  Exhibit J.  What do you recognize to be Exhibit J or do

3  you recognize this document?  And feel free to take your

4  time and flip through it.

5        A.   Uh-huh.  Oh, yeah, I recognize this, the

6  losses that I have.

7        Q.   And when you say the losses that you have,

8  what are you looking at right now?

9        A.   I'm looking about the -- you know, the

10  revenue that we file and then the losses that I have

11  because of the oil spill.  I remember this.

12        Q.   And is that a summary of the losses that

13  you have that you're looking at?

14        A.   Not the summary, the actual one that, you

15  know, that we -- that I file --

16        Q.   Okay.

17        A.   -- with him and I told him about the loss

18  of my business.

19        Q.   Okay.  Was that page prepared by you or

20  prepared by somebody else?

21        A.   No, no, no, no.  It's Ray who prepare this,

22  but I'm the one who told him about it.

23        Q.   So you recognize that to be a page prepared

24  by Ray?

25        A.   Yes, I think so.

DEPOSITION OF HERMINIA MEDINA 10/14/15

103

1         Q.    Okay.

2         A.    Because I remember that -- you know,

3 telling about the total amount, you know, the gross

4 amount --

5         Q.    Uh-huh.

6         A.    -- then the loss of the business, something

7 like that.  Because he ask me personally, you know --

8         Q.    Uh-huh.

9         A.    -- when I was in his office.  This one, I

10 remember this.  Yeah, I remember this.

11         Q.    Okay.  As to the last -- the last three

12 pages of --

13         A.    Of?

14         Q.    -- of Exhibit J, it says "invoice."  Do you

15 recognize -- do you recognize the invoice, the last

16 three pages?

17         A.    Let me see the last invoice.  I can't

18 remember anymore.

19         Q.    What is the date on that invoice?

20         A.    It's 2012, 2/21.

21         Q.    February 21st of 2012?

22         A.    Uh-huh.

23         Q.    Do you recall what work that invoice

24 represents?

25         A.    Yeah, it says here, you know, about the

104

1    claim.  I use the CPA in claiming.

2         Q.    Okay.  And when you say "the CPA," would

3    that be Ray?

4         A.    Uh-huh.

5         Q.    Would that be Ray Flores?

6         A.    Yes.

7         Q.    To your knowledge, does that invoice

8    represent work done for the GCCF claim?

9         A.    Yes.

10        Q.    For the GCCF claim?

11        A.    Uh-huh.

12        Q.    Okay, thank you.  And I note the amount is

13   $5,350.  Do you recall having to pay that amount to HSG?

14        A.    You know, the 4,000 and something?

15        Q.    Yes.

16        A.    I mean, it's supposed to be 5,000.

17        Q.    Right.

18        A.    But there's a discount.  Actually, it was

19   form of check, so you can look at my bank and you'll see

20   it.

21        Q.    I just wanted to know what you recall.

22        A.    I'm just recalling it.

23        Q.    Okay.

24        A.    Because I put it in writing, so that's why

25   I have a receipt.  Even though they didn't give me

105

1    receipt, I mean, the check is form of receipt that I

2    need, you know.

3           Q.    So I guess what I'm trying to ask is do you

4    recall issuing a separate check for this amount to Ray?

5           A.    To Ray?

6           Q.    Yes, or to his firm.

7           A.    To his firm?  I can't remember anymore.

8    Probably not the whole full amount, probably on a

9    starter payment it would be 750, 750.  You can see it in

10   the record.

11          Q.    Okay.

12          A.    Not the total full 5,000.

13          Q.    So you were -- but ultimately, you paid the

14   amount that they invoiced you?

15          A.    Yes.  Because whenever, you know, he do

16   those -- all of those things, it need to be paid.

17          Q.    Okay, thanks.  When you met with Ray, did

18   he talk to you -- did he tell you whether he had -- when

19   you met with Ray about the DHECC claim for the first

20   time -- about your BP claim for the first time, did he

21   tell you whether he had performed other claims or if he

22   had any experience with filing claims for BP?

23          A.    No.

24          Q.    He didn't talk about that?

25          A.    No, sir.

106

1          Q.     With regards to your tax returns that Ray

2     prepared every year, are you aware of any profit and

3     loss statements that Ray prepared year to year or did he

4     just prepare the tax returns?

5          A.     What do you mean, sir?

6          Q.     Are you aware of any other financial

7     statements that Ray prepared besides tax returns every

8     year?

9          A.     No.  I know that the only thing that he

10    prepared is all the paperworks that needs to be done for

11    my business.

12         Q.     Okay.

13         A.     Yeah.

14         Q.     And are you aware of what paperworks that

15    would be?

16         A.     There's a lot.  I mean, for the whole year.

17         Q.     Yeah.  Are you referring to legal, like as

18    in licenses or are you talking about just tax documents?

19         A.     Just the tax.  The license, I do it by

20    myself.  I apply for it, like the tax license.

21         Q.     So Ray wouldn't have anything to do with

22    licenses; would he?

23         A.     No, no.

24         Q.     Okay.  And to your knowledge, the only

25    financial documents he prepared were the tax returns?

1          A.     The tax return.

2          Q.     Okay.

3          A.     All of the expenses, you know, everything

4     that I gave to him.

5          Q.     Okay.  And what was it that you gave to

6     him?  You had mentioned the bank accounts.

7          A.     All the bank account is there, because

8     whenever I write down the -- it is in form of check, so

9     everything is in record right there, sir.

10          Q.     Okay.  To your knowledge, did Ray -- did he

11     ever ask for anything else besides your bank accounts?

12          A.     Actually, the expenses is right there.

13          Q.     There in the bank accounts?

14          A.     Everything is there.

15          Q.     Okay.  Did you ever sit down with Ray and

16     go month by month through your bank accounts?

17          A.     No, sir.

18          Q.     Okay.

19          A.     Because we file once a year.  We see each

20     other once a year, probably January, something like

21     that.

22          Q.     Sure.  So after you gave Ray the bank

23     accounts, did he ever come back and ask you for more

24     documentation?

25          A.     No.  Actually, he's asking me if there's

108

1    any more, like, the expenses.  I said, "Everything is in

2    writing."  Like I write as in the check, he will see it.

3    So I think he got a bookkeeper to sort it out, something

4    like that.

5         Q.    Okay.  When it came time to prepare your BP

6    claim, did you give Ray the bank statements for each

7    year from the years within your BP claim?

8         A.    I gave everything to him.

9         Q.    Okay.  Did everything include anything

10    besides the bank accounts?

11         A.    What do you mean, the receipt from the --

12    because everything is -- the bank account does serve as

13    my -- something like a form that everything you will see

14    in there, because I write down check whenever I order

15    merchandise coming, you know, everything, the piece from

16    the concession, the merchandise, everything is in

17    writing in the form of check, so everything he would see

18    it in there.

19         Q.    Okay.  But when you say "everything," when

20    you gave him the documents for the BP claim, did you

21    give him anything else besides the bank accounts?

22         A.    Uh-uh.

23         Q.    Okay.  From the time you gave him those

24    bank accounts until the time your claim was filed, did

25    Ray ever call you in between that time?

109

1       A.    Not yet.

2       Q.    Okay.

3       A.    I mean, it took a long time --

4       Q.    Okay.

5       A.    -- before we got those claim.

6       Q.    Okay.  Did he ever ask -- from the time you

7   gave him the bank statements until the time your claim

8   was filed, did he ever ask you for anything besides the

9   bank statements?

10      A.    No, sir.

11      Q.    Okay.  Did you ever speak with Ray from the

12  time you gave him the bank statements until the time

13  that your claim was filed?

14      A.    No, sir.  Because even though there is some

15  issue about something, I would ask him, he's always

16  busy, even though I make an appointment.

17      Q.    Okay.  Are you familiar -- were you

18  familiar with the rules of the settlement program?

19      A.    Some of those.

20      Q.    Okay.  And what were you familiar with?

21      A.    Like the 5,000 that I need to the legal

22  help, something like that, you know, attorney or

23  something like that.

24      Q.    Was it your understanding that you owed

25  5,000 for legal services that Ray needed?

DEPOSITION OF HERMINIA MEDINA 11/19/15

110

1       A.    No, not -- I mean, the attorney that

2   probably he hire.

3       Q.    Okay.  So it's your understanding that the

4   5,000 extra you paid was for the attorney that Ray used?

5       A.    Uh-huh.

6       Q.    Okay.

7       A.    But the thing is they gave me discount, not

8   the full amount of 5,000.

9       Q.    So it was a little bit less?

10      A.    Yes.  It's 4,000 something, like that, I

11  can't remember.

12      Q.    Did Ray tell you that that amount was for

13  an attorney?

14      A.    Yes.

15      Q.    Okay.  And did he tell you that when y'all

16  met to discuss your claim --

17      A.    No.

18      Q.    -- one of those two?  Do you recall when he

19  told you that?

20      A.    I can't remember anymore.

21      Q.    Okay.  Were you -- were you aware of how

22  your DHECC claim would ultimately be calculated?

23      A.    No, sir.

24      Q.    Did you have any knowledge of how the DHECC

25  would use your profit and losses?

111

1        A.    No, sir.

2        Q.    Did Ray ever tell you how the DHECC would

3   calculate your claim?

4        A.    No, sir.

5        Q.    And prior to filing your claim with the

6   DHECC, did Ray show you the forms that were submitted

7   with your claim?

8        A.    No, sir.

9        Q.    Okay.  Did he ever show you any of the

10  supporting documents that were submitted with your

11  claim?

12       A.    I know all of the documents that I gave

13  him, you know.

14       Q.    Okay.

15       A.    He take care of it.

16       Q.    The ones that you gave him, you recognize

17  those?

18       A.    Yes.

19       Q.    Okay.  Did he -- did he ever show you any

20  documents that he created based on what you gave him?

21       A.    No.  Actually, I gave all of those -- I

22  mean, the federal...

23       Q.    The tax returns?

24       A.    Yeah, the tax return.

25       Q.    Did Ray -- so besides the tax returns and

112

1  besides your bank statements, did Ray ever show you any

2  documents that he created that was labeled profit and

3  loss statements?

4          A.    I can't remember anymore.

5          Q.    Okay.

6          A.    Probably I'll see it, you know, because

7  whenever something that I need to sign, I sign it and

8  then read it first.

9          Q.    Okay.  Were you aware of any documents that

10  Ray was creating on your behalf based on the information

11  that you gave him?

12          A.    What do you mean by that?

13          Q.    So when you gave him your bank accounts --

14          A.    Uh-huh.

15          Q.    -- so that he could prepare your DHECC

16  claim --

17          A.    Uh-huh.

18          Q.    -- were you aware that -- or were you aware

19  of whether he was creating any separate documents from

20  bank accounts?

21          A.    No, no, just all of those are mine.  I

22  mean, you know, came from the bank.

23          Q.    Right.

24          A.    Yeah.

25          Q.    Are you aware any of documents he created

113

1    based on your bank statements that he then submitted to

2    the DHECC?

3            A.    No.  All of those are my...

4            Q.    Your bank statements?

5            A.    Yeah.

6            Q.    Okay.  But are you aware of any separate

7    documents created by Ray?

8            A.    No, no.

9            Q.    So you never saw any separate --

10           A.    No, no.

11           Q.    -- documents that Ray submitted to DHECC?

12           A.    No, no.

13           Q.    Okay.  Just one moment, please.

14           A.    Okay.

15           MR. MOLL:  And we can go off the record.

16           (Off-the-record comments were made.)

17           MR. MOLL:  We can go back on.

18           Q.    (By Mr. Moll)  I just want to go back to

19    the invoices one more time.

20           A.    Okay.

21           Q.    When you mentioned that what you ultimately

22    paid to Ray was less than -- less than 5,000, that he

23    gave you a discount, do you remember if he gave you an

24    invoice that maybe looked like the ones that are in

25    Exhibit I and Exhibit J, but had a different amount?

114

1      A.    What do you mean different amount?

2      Q.    Do you remember if it was noted -- the

3 discount, do you remember if it was noted on a document

4 that was given to you?

5      A.    I can't remember anymore.

6      Q.    Okay.

7      A.    But I know something like instead of 5,000,

8 because I know it's something like in the form that the

9 BP is allowed to give to the legal or something like

10 that.

11      Q.    Okay.

12      A.    But it is something like 4,000, more than

13 4,000.

14      Q.    And just referring you back to the -- and

15 I'm just trying to clarify.

16      A.    Yeah, yeah, okay, that's fine.

17      Q.    But referring to the invoice that appears

18 on Exhibit I, compared to the invoice that appears on

19 Exhibit J, are you aware of the name of the firms that

20 invoiced you for each of these invoices, the accounting

21 firms?

22      A.    Yeah, Flores.  You know, probably this is

23 the one from Panama City that I'm telling you.

24      Q.    Okay.

25      A.    You know, I've been telling you about it.

DEPOSITION OF HERMINIA MEDINA 11/10/15

115

1    Q.    Yes.

2    A.    But you didn't show it to me, but I'm

3  telling you that in the truth that it is the lawyer, you

4  know.

5    Q.    Okay.  So to your knowledge, that's --

6    A.    Yeah, supposed to be five, but I paid

7  something less than 5,000.

8    Q.    But as far as who it was, I see there's a

9  firm name --

10    A.    I didn't know them.

11    Q.    -- on the top left corner.  And what is the

12  firm name?

13    A.    HSG.

14    Q.    Okay.

15    A.    Yeah, that's what -- that's his partner,

16  you know, that said there's a lawyer.

17    Q.    Okay.  Is it your understanding that there

18  was a lawyer that worked for HSG that helped Ray with

19  his claim?

20    A.    I think so.

21    Q.    Okay.  What, if anything else, do you know

22  about HSG Accounting?

23    A.    Nothing else.  Plus, he mention everything.

24  I mean, he did not hide anything from us.  I mean,

25  telling him the real one.  I mean, so I don't know if

Case 2:10-md-02179-CJB-SS Document 4470-16 Filed 03/10/16 Page 117 of 137

1    they have this, but I been telling you about the Panama

2    (sic) lawyer.

3         Q.    So that is who you believe to be the lawyer

4    out of Panama City?

5         A.    Probably, yeah, yeah.

6         Q.    Okay.  And just --

7         A.    But I haven't met them, you know.

8         Q.    And just to clarify, you're looking at

9    Exhibit I right now; correct?

10        A.    Yeah, yeah.

11        Q.    Okay.  So you mentioned Ray, you mentioned

12   Carlito Flores and you mentioned who you believed to be

13   the lawyer from Panama City with HSG.  Do you know

14   anybody else that Ray worked with --

15        A.    Uh-uh.

16        Q.    -- for your claim?

17        A.    No.

18        Q.    You said you recognized the name Bennett

19   Golden to be with HSG, the one from your claim form?

20        A.    I mean, I didn't know them.

21        Q.    You didn't know him?

22        A.    Yeah.

23        Q.    Okay.  So referring back to Exhibit F, the

24   individual on number five, do you recognize it to be the

25   same individual that appears as the firm on the invoice

1  that is Exhibit I?

2      A.   Yeah, because I know they're from Panama

3  City.

4      Q.   Okay.  So you recognize and just so the

5  court reporter can take it down --

6      A.   Yes.

7      Q.   -- do you recognize this firm on Exhibit F

8  to be the same firm on Exhibit I?

9      A.   Yes.

10      Q.   Okay.  And who is the individual that

11  appears on Exhibit F, number F?

12      A.   The name Bennett Golden.

13      Q.   Okay.

14      A.   But to clarify, I don't know them.

15      Q.   Okay.  Did Ray ever talk about Bennett

16  Golden to you?

17      A.   He telling me that he got a partner

18  accounting firm from Panama City and they're a lawyer,

19  something like that.

20      Q.   Do you recall whether Ray told you that

21  Bennett Golden was a lawyer?

22      A.   No, no.

23      Q.   Do you recall anything else that Ray

24  mentioned about HSG?

25      A.   I can't remember.

118

1       Q.    Can you remember anything else Ray

2  mentioned about Bennett Golden?

3       A.    No.  I know he mentioned about the Panama

4  City, that there's a lawyer.

5       Q.    So Ray mentioned there's a lawyer in Panama

6  City?

7       A.    Uh-huh.

8       Q.    Did Ray represent to you that that lawyer

9  would help him with your claim?

10      A.    No.  There's a partner, accounting firm,

11  that probably one of them is a lawyer.  I don't know,

12  but he hasn't mentioned any -- so that's why when you

13  were asking me, I've been telling you about it before --

14  before you show it to me.

15      Q.    Okay, thank you.

16      A.    Uh-huh.

17      Q.    And so besides Ray and us today --

18      A.    Uh-huh.

19      Q.    -- have you talked with anybody else about

20  your DHECC claim?

21      A.    No.

22      Q.    Okay.  Did you at any point talk to anybody

23  else about your GCCF claim besides Ray?

24      A.    No, sir.

25      Q.    Okay.

119

1      A.    Because I'm busy, you know --

2      Q.    Sure.

3      A.    -- doing business.

4      Q.    Sure.  I just want to go through a couple

5   of documents.  I'm going to start with what I'm going to

6   ask the court reporter to mark as Exhibit K.

7          (Whereupon, Exhibit K was marked for

8          identification.)

9      Q.    (By Mr. Moll)  I'm handing you what's been

10  marked as Exhibit K.

11     A.    Uh-huh.

12     Q.    What is Exhibit K?

13     A.    It's about Gulf Coast Claims Facility

14  sending letter entering payment, final claim.

15     Q.    Do you recognize this document?

16     A.    Yes, sir.

17     Q.    Okay.

18     A.    Because I think this one, he filed it

19  electronically.

20     Q.    What do you recognize the document to be?

21     A.    It's something like a deficiency letter,

22  final payment claim, the missing information.  I think

23  this one -- I remember this, that you need to submit,

24  you know, a statement of what is missing to finally file

25  the claim.

120

1      Q.    Okay.  Do you recall receiving this letter

2  personally?

3      A.    No.  I see it online.

4      Q.    You saw it online?

5      A.    Yeah.  Whenever I see those number, I

6  remember this.  Now, I recall this one.

7      Q.    The case number?

8      A.    Uh-huh, yeah.

9      Q.    Okay.  And after you saw that letter

10  online --

11      A.    Uh-huh.

12      Q.    -- did you refer it to Ray?

13      A.    No.

14      Q.    Okay.

15      A.    Because I know he do it, too, you know, but

16  it so busy, you know.

17      Q.    Are you --

18      A.    I remember everything about this one.

19      Q.    So when you received that, you took care of

20  the request?

21      A.    This one?

22      Q.    Yes.

23      A.    I think I remember it right.  I just call

24  him, but didn't get response.  I talk to the secretary.

25  His (sic) name is Ellena, you know, the secretary

 1   before.  And I told him about the missing documents that

 2   need to file.

 3              Q.    Okay.

 4              A.    That's it.

 5              Q.    Do you recall -- so you called the

 6   secretary?

 7              A.    Yes.

 8              Q.    To talk about the letter you received?

 9              A.    Yeah.  I told him (sic) to tell Ray that we

10   still got missing documents that he needs to, you know,

11   file.

12              Q.    All right.  And just for the record, who is

13   that letter addressed to?

14              A.    Oh, to my store.

15              Q.    Okay.  And what is the date of the letter?

16              A.    August -- April 5, 2012.

17              Q.    Okay.  Let the record reflect I'm marking

18   the letter of April 12th, 2012 from the --

19              A.    April 5.

20              Q.    -- April 5th, 2012 from Gulf Coast Claims

21   Facility as Exhibit K.  I'm going to show you another

22   exhibit that I'm going to mark as Exhibit L.

23                    (Whereupon, Exhibit L was marked for

24              identification.)

25              Q.    (By Mr. Moll)  Do you recognize Exhibit L?

122

```
 1        A.     Yes, sir.

 2        Q.     And what do you recognize it to be?

 3        A.     Same thing, the missing documents and bank

 4   statement that we need to provide.

 5        Q.     Okay.  And what is the date of that letter?

 6        A.     This letter is May 18, 2012.

 7        Q.     Okay.  And who is that one addressed to?

 8        A.     To my store, Tin-Tin's Oriental Foods.

 9        Q.     And do you recall whether you also told Ray

10   about this letter?

11        A.     I cannot remember this.  I mean, I know I

12   saw it online again.

13        Q.     You saw it online?

14        A.     I don't know if I called the secretary,

15   because I don't go often to his office.

16        Q.     Okay.

17        A.     And besides, I don't have time.  I mean, if

18   I go there, I need to close the store, because nobody

19   will take -- now it's closed.

20        Q.     Okay, thank you.

21        A.     All right.

22        Q.     Let the record reflect I'm marking the May

23   18th letter from the GCCF as Exhibit L.

24               (Whereupon, Exhibit M was marked for

25        identification.)
```

123

```
 1              Q.    (By Mr. Moll)  And Ms. Medina, I'm showing
 2    you what I'm marking Exhibit M.  Do you recognize
 3    Exhibit M?
 4              A.    Do you mean to say if I can remember this
 5    form?
 6              Q.    Do you recognize that form?
 7              A.    No.
 8              Q.    You do not?
 9              A.    Even my phone number is wrong, you know,
10    the business.
11              Q.    And what page would that be on?
12              A.    Okay, it's page four.
13              Q.    Okay.  Do you recognize that phone number
14    at all?
15              A.    Uh-uh, because I don't know, because it's
16    been a long time.  But the thing here is correct, that's
17    my business name and my address, but the phone number is
18    not -- this is not my phone number.
19              Q.    Okay.
20              A.    It's ███-████  no.
21              Q.    Is that the number -- is that your number
22    or is that the number that appears on the form?
23              A.    It appears on this form.
24              Q.    Okay.
25              A.    But my number is ████████.
```

124

1       Q.    Okay.  So prior to today, had you ever seen

2   this form?

3       A.    I can't remember anymore.  My business

4   address is right.

5       Q.    Okay.

6       A.    And the business name, but the business

7   phone number is wrong.

8       Q.    Okay.  I'm going to show you a form that

9   will be marked as Exhibit N.

10          (Whereupon, Exhibit N was marked for

11          identification.)

12      Q.    (By Mr. Moll)  Do you recognize Exhibit N?

13      A.    I don't recognize this.

14      Q.    Do you recall whether you have seen that

15  form prior to today?

16      A.    I can't remember.

17      Q.    Okay.  Do you recall whether Ray ever

18  showed you that form during the preparation of your

19  claim?

20      A.    I can't remember.

21      Q.    I'm going to show you what will be marked

22  as Exhibit O.

23          (Whereupon, Exhibit O was marked for

24          identification.)

25      Q.    (By Mr. Moll)  I'm now handing you what's

125

```
 1    been marked as Exhibit O.

 2            A.    Uh-huh.

 3            Q.    Do you recognize Exhibit O?

 4            A.    Yes.

 5            Q.    When was the last time you saw this

 6    document?

 7            A.    When we have those claims, this is the

 8    amount, I remember it, right.  It showed the 90,000

 9    something.

10            Q.    The claims award?

11            A.    Yeah.

12            Q.    Who showed you that document?

13            A.    I think, if I'm not mistaken -- see, I

14    can't remember.  I know the figure.

15            Q.    You recognize the amount?

16            A.    The figure.

17            Q.    Okay.  Do you recognize any other figures

18    on there or only the claims award amount?

19            A.    Yeah, I remember the figure.

20            Q.    Okay.

21            A.    But the rest, I can't remember anymore.

22            Q.    Okay.  Did you have anything to do with the

23    preparation of those figures?

24            A.    What do you mean?

25            Q.    Did you prepare all of the numbers that
```

126

1  appear on there or did Ray prepare --

2      A.    No.

3      Q.    You did not prepare them?

4      A.    No.

5      Q.    You were only shown this when you got your

6  award amount?

7      A.    That amount that's shown is familiar with

8  me.

9      Q.    Okay.  So what I'm saying is this document

10  was only shown to you, you did not create this document?

11      A.    No.

12      Q.    Okay.  Again, that's Exhibit O.

13  Ms. Medina, I'm going to show you what I'm marking as

14  Exhibit P.

15              (Whereupon, Exhibit P was marked for

16        identification.)

17      Q.    (By Mr. Moll)  If you'd take a look at

18  Exhibit P and tell me whether your signature appears on

19  that document.

20      A.    Yes, this is my signature.

21      Q.    Okay.  Do you --

22      A.    That's my signature.

23      Q.    Do you recognize that document?

24      A.    Yeah, I think so.  Yeah, I remember this.

25      Q.    Okay.  What do you remember that document

DEPOSITION OF HERMINIA MEDINA 11/10/15

127

1   to be?

2          A.    It's -- hold on.  I remember signing this,

3   because this is my signature.

4          Q.    Okay.  Do you remember who else signed that

5   document?

6          A.    Ray.

7          Q.    Did you and Ray sign that document together

8   in the same place?

9          A.    Yes.  I would not do it, you know, if he is

10  not present.

11         Q.    Okay.  And what is --

12         A.    He might tell me.

13         Q.    What is the date of that document?  What

14  date was it signed?

15         A.    There's no date on here.  Oh, right here,

16  November 14.

17         Q.    Of what year?

18         A.    2012.

19         Q.    Besides your signature and Ray's signature,

20  who, if anybody else's, name appears on that document?

21         A.    It says here escrow agent Adella Hill.

22         Q.    Do you know Adella Hill?

23         A.    No, sir.

24         Q.    Did Ray ever tell you who Adella Hill was?

25         A.    No.

128

1       Q.  Okay.  Did Ray explain to you the reason

2  for signing this agreement?

3       A.  I can't remember anymore.  But everything

4  that I need to sign, they explain to me, but I can't

5  remember anymore.  Escrow is something like it holds;

6  right?

7       Q.  Whatever your knowledge is of it.

8       A.  Yeah, yeah.  I mean, whenever -- there's

9  some money that needs to -- like, an escrow, holding the

10  money.  I mean, if you're paying something like $2,000,

11  the 500 is for the later part of something like --

12  that's what I understand this.  But I don't know Adella

13  Hill.

14       Q.  Do you recall understanding why you signed

15  that agreement at that time?

16       A.  I can't remember.

17       Q.  Okay.

18       A.  Probably he explain to me, because I

19  wouldn't sign anything unless he explain everything.

20       Q.  Do you recall whether Ray told you that

21  that form was necessary to receive your award amount?

22       A.  He probably -- yeah.

23       Q.  Okay.  Did he explain to you whether or not

24  this had anything to do with his fee, with his

25  contingency fee?

129

```
1          A.    I can't remember anymore.

2          Q.    Just one moment.

3          A.    Yeah, I can't remember, but I remember

4    signing this one.

5          Q.    Okay, just a moment.

6                (Off-the-record comments were made.)

7          Q.    (By Mr. Moll)  And just a couple of

8    housekeeping questions.  Have you ever had any of type

9    of criminal convictions of any kind?

10         A.    No, sir.

11         Q.    Have you ever pled guilty to anything

12   involving dishonesty?

13         A.    No, sir.

14         Q.    Okay.  And is there anything that may have

15   kept you from answering any questions truthfully today?

16         A.    What do you mean by that?

17         Q.    Is there any reason for why you would not

18   have been truthful today?

19         A.    I've been truthful.

20         Q.    Okay.  So you've answered every question --

21         A.    All my life.

22         Q.    So you've answered every question to the

23   best of your knowledge?

24         A.    Yes.

25         Q.    Okay, just one moment.
```

130

```
 1                   (Off-the-record comments were made.)
 2          Q.    (By Mr. Moll)  So, Ms. Medina --
 3          A.    Yes.
 4          Q.    -- with regard to the -- just going back to
 5   the document request, I understood that you're busy and
 6   you got -- the records you provided today, you were able
 7   to get them from Ray's office.  The items that -- I know
 8   we have your bank statements.  But as far as the items
 9   that we don't have in the internal sales records, is
10   that something that you would have in your possession at
11   the store?
12          A.    Are you talking about the -- what internal
13   records?
14          Q.    Do you keep records --
15          A.    Yes.
16          Q.    -- on your own?
17          A.    Yes.  Whenever Ray do my income tax return,
18   yeah, I get a copy.
19          Q.    And is that something that you create or
20   are you referring to the bank statements?
21          A.    It is under bank statements, whenever I
22   submit it to Ray, makes the IRS and give me a copy every
23   year.
24          Q.    Okay.  Is that something you would be able
25   to provide a copy?
```

DEPOSITION OF HERMINIA MEDINA 11/19/15

131

```
 1           A.    Yes.

 2           Q.    Thank you.  With regards to the requested

 3     merchant account reports, do you receive reports from

 4     the merchant accounts that you keep?

 5           A.    What's that?

 6           Q.    MasterCard, Visa --

 7           A.    Oh, yeah.

 8           Q.    -- all of the credit cards that you accept?

 9           A.    Yeah.

10           Q.    Okay.  Would you be able to provide us with

11     those reports?

12           A.    Yes.  Are you talking about -- it's at the

13     store.

14           Q.    They're at the store?

15           A.    Yeah, uh-huh.

16           Q.    That's something that we're going to

17     reserve the right to have you provide to us.

18           A.    Yes.

19           Q.    Okay.  Besides the bank statements, have

20     you ever been provided with any kind of accounting work

21     papers from Ray?

22           A.    No.

23           Q.    Do you keep any accounting work papers?

24           A.    What accounting?  I know, you know, the

25     income tax return, just accounting work paper.
```

Case 2:10-md-02179-CJB-SS Document 21470-16 Filed 08/10/16 Page 133 of 137

132

1          Q.     Okay.  That's a product of accounting.  But

2     are there any separate notes that you keep along the

3     way --

4          A.     No.

5          Q.     -- with regard to your business' finances?

6          A.     No.

7          Q.     Okay.

8          A.     Plus everything is in the bank statement,

9     because I issue check.  That's the form of receipt that

10    I -- you know.

11         Q.     Okay.  And the agreement that you provided

12    to us today between you and Ray, does that represent all

13    of the -- any written agreement that you know of that

14    exists?

15         A.     Which one?

16         Q.     What would be --

17         A.     What written agreement?

18         Q.     The agreement that's Exhibit H that you

19    were shown earlier today.

20         A.     Oh, that one?

21         Q.     Yes.

22         A.     I think I have a copy.  But I need to --

23    but since I busy, I can't do it, because we went home

24    Sunday night and I just open the email of Barbara.

25         Q.     Okay.  We will reserve the right to have

133

```
 1   you provide us with the copy that you have of that
 2   written agreement.
 3           A.    It is the same thing, but I can provide you
 4   with it.  Give me time to dig it and because it's just a
 5   lot of paperworks.
 6           Q.    Okay.
 7           A.    It took something like three years I hold
 8   it.  But after that, discard it, you know.
 9           Q.    Okay.
10           A.    Are we almost done?
11           Q.    Yeah, we're getting close to the end.  And
12   with regard to the 20 percent that you and Ray agreed
13   to, did you pay him the 20 percent immediately upon
14   receipt of your claims award?
15           A.    No, actually, I deposit the money.  It is
16   under the bank -- I mean, I issued him check.
17           Q.    You issued Ray a check?
18           A.    Uh-huh.
19           Q.    And the check was for the agreed-upon
20   20 percent?
21           A.    Yes, yes.
22           Q.    Okay.  Did you do that shortly after
23   receiving -- right after you --
24           A.    No, I did need to do it -- it is right in
25   the bank that I claim.
```

134

```
1          Q.     Right.

2          A.     It needs to be cleared first.

3          Q.     After you deposited your check?

4          A.     Yes.

5          Q.     And after that, you cut Ray his check?

6          A.     Yes, everything is in the record, you know.

7          Q.     Right.

8          A.     Then I issued him my personal check under

9    Herminia, the ███.

10         Q.     Okay.

11         A.     You will see it in the bank account.

12         Q.     Okay, just one more minute.

13                (Off-the-record comments were made.)

14                MR. MOLL:  Thank you for your time today.

15                THE WITNESS:  Okay.

16                MR. MOLL:  We don't have any further

17   questions.

18                (The deposition was concluded at 4:50

19   p.m.)

20

21

22

23

24

25
```

135

## CERTIFICATE OF OATH

(STATE OF FLORIDA)

(COUNTY OF ESCAMBIA)


        I, Pamela Dee Elliott, Florida Professional

Reporter, Notary Public, State of Florida, certify

that **HERMINIA MEDINA** personally appeared before me on

the 10th day of November, 2015 and was duly sworn.


        WITNESS my hand and official seal this 13th

day of March, 2016.




        _____
                    PAMELA DEE ELLIOTT
               FLORIDA PROFESSIONAL REPORTER
               NOTARY PUBLIC, STATE OF FLORIDA

136

1                    **CERTIFICATE OF REPORTER**

2

3          I, PAMELA DEE ELLIOTT, Court Reporter, do

4     hereby certify that I was authorized to and did

5     stenographically report the foregoing deposition of

6     **HERMINIA MEDINA**; that a review of the transcript was

7     not requested; and that the foregoing transcript,

8     pages 1 through 136, is a true and complete record of

9     my stenographic notes.

10

11         I further certify that I am not a relative,

12    employee, attorney, or counsel of any of the parties,

13    nor am I a relative or employee of any of the parties'

14    attorney or counsel connected with the action, nor am

15    I financially interested in the action.

16

17         Dated this 13th day of March, 2016.

18

19

20    _____
                    PAMELA DEE ELLIOTT
21            FLORIDA PROFESSIONAL REPORTER

22

23

24

25