**IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF LOUISIANA**

| | | |
|---|---|---|
| In Re:  Oil Spill by the Oil Rig "Deepwater Horizon" in the Gulf of Mexico, on April 20, 2010 | * * * * * * * * * | MDL NO. 2179<br><br>SECTION: J<br><br><br>HONORABLE CARL J. BARBIER<br><br>MAGISTRATE JUDGE SHUSHAN |
| Plaisance, *et al.*, individually and on behalf of the Medical Benefits Settlement Class,<br><br>Plaintiffs,<br>v.<br>BP Exploration & Production Inc., *et al.*,<br><br>Defendants. | * * * * * * * * * * * * * * | NO. 12-CV-968<br><br>SECTION: J<br><br><br>HONORABLE CARL J. BARBIER<br><br>MAGISTRATE JUDGE SHUSHAN |

## STATUS REPORT FROM THE *DEEPWATER HORIZON*
## MEDICAL BENEFITS SETTLEMENT CLAIMS ADMINISTRATOR

The Garretson Resolution Group, the Claims Administrator of the *Deepwater Horizon* Medical Benefits Class Action Settlement (the "Settlement"), submits the following quarterly report to apprise the Court of the status of its work in processing claims and implementing the terms of the Medical Settlement Agreement (the "MSA") between April 2, 2016, and July 1, 2016, (the "Reporting Period").[1]  We have published 10 reports since Preliminary Approval in

---

[1] Capitalized terms not otherwise defined herein shall have the meanings ascribed to their fully capitalized renderings in the MSA.

May 2012, and this marks the sixth quarterly report filed since the claims filing deadline of February 12, 2015.  This report will address the continued processing of claims sets received from 2012 to 2014 (collectively, the "2014 Claims")[2] and the claims received in 2015 and thereafter (the "2015 Claims").

This status report provides:

- an executive summary of claims processed during the Reporting Period;

- a detailed overview of the progression of the 2014 and 2015 Claims;

- a summary of claims for Specified Physical Conditions ("SPC") and significant developments concerning these claims;

- an update on the operations and activities of the Class Member Services Center;

- an account of participation in the Periodic Medical Consultation Program ("PMCP");

- a summary of claims for Later-Manifested Physical Conditions; and

- a summary of the activities of the grantees of the Gulf Region Health Outreach Program ("GRHOP") and the operations of the Gulf Region Health Outreach Program Library.

## I.      **EXECUTIVE SUMMARY**

The Claims Administrator has received 37,281 unique claims for compensation for an SPC and/or participation in the PMCP through the end of the Reporting Period. This status report will provide an overview of the claims processing forecast for both the 2014 and 2015 Claims, the variables influencing the progression of those claims, and the outcome of claims as they progress through the stages of review.  In summary:

---

[2] The 2014 Claims include all POCFs received by the Claims Administrator from the entry of Preliminary Approval on May 3, 2012 through December 31, 2014.  While the Claims Administrator was approved to receive claims after Preliminary Approval, the Claims Administrator was not approved to process claims beyond the Party-approved RAI process until the Effective Date of the Settlement.   Hence, all claims received in 2012, 2013, and 2014 are referred to as the 2014 Claims.

- Over eighty percent (80%) of 2014 Claims have reached a final determination.[3]

  - Through the end of the Reporting Period, eighty-four percent (84%) of the 2014 Claims have reached a final determination (either approval or denial), and sixteen percent (16%) require additional processing.

  - Of the eighty-four percent (84%) reaching a final determination, forty-six percent (46%) were approved for compensation for an SPC, and another twenty-nine percent (29%) were approved to participate in the PMCP. Furthermore, nine percent (9%) of the 2014 Claims going through the Notice of Defect Process have received an "Approved with Defects" notice, meaning that the Medical Benefits Settlement Class Member ("Class Member") has been approved for at least one compensable SPC.

  - Overall, the 2014 Claims have been and continue to be impacted by high defect rates, with eighty percent (80%) receiving either a Request for Additional Information ("RAI") or Notice of Defect during the life of the claim. Additionally, thirty-five percent (35%) are impacted by changes or updates the claimants made to their Proof of Claim Forms or supporting documentation, which require us to re-review the claims.

  - The Claims Administrator currently forecasts that the majority of the sixteen percent (16%) of the 2014 Claims requiring additional processing will be finalized at an even rate through 2016 as responses to defects and deficiencies, as well as changes or updates, undergo re-review. Some claims are forecasted to be finalized in 2017, specifically those claims that (a) had not received Notices of Defect by the end of June 2016, (b) are pending retrieval of medical records, (c) are pending program integrity resolution, and/or (d) had been denied but are now the subject of a Request for Review or a class membership denial challenge filed with the Court.

- Nearly sixty percent (60%) of 2015 Claims have reached a final determination.

  - Through the end of the Reporting Period, fifty-nine (59%) of the 2015 Claims have reached a final determination (either approval or denial), and forty-one percent (41%) require additional processing.

  - Of the fifty-nine percent (59%) reaching a final determination, sixty-six percent (66%) were approved for compensation for an SPC, and another eleven percent (11%) were approved to participate in the PMCP. Furthermore, eight percent (8%) of the 2015 Claims going through the Notice of Defect Process have received an "Approved with Defects" notice, meaning that the Medical Benefits Settlement Class Member ("Class Member") has been approved for at least one compensable SPC.

---

[3] Claims that have reached a final determination may require additional processing, generally involving the completion of investigations or audits by the Claims Administrator, before the final determination can be sent to the Class Member.

- o Like the 2014 Claims, the 2015 Claims have been and continue to be impacted by substantial defect rates, with seventy-four percent (74%) receiving either an RAI or a Notice of Defect. Additionally, fifty-seven percent (57%) are impacted by changes or updates the claimants made to their Proof of Claim Forms or supporting documentation, which require us to re-review the claims.

- o The Claims Administrator continues to forecast that the majority of the forty-one percent (41%) of the 2015 Claims requiring additional processing will be finalized at an even rate through late 2016 as responses to defects and deficiencies, as well as changes or updates, undergo re-review. Some claims are forecasted to be finalized in 2017, specifically those claims that (a) had not received Notices of Defect by the end of June 2016, (b) are pending retrieval of medical records, (c) are pending program integrity resolution, and/or (d) had been denied but are now the subject of a Request for Review or a class membership denial challenge filed with the Court.

- The Claims Administrator continues to meet processing objectives to ensure the majority of 2014 and 2015 Claims receive a final determination by the end of 2016.

  - o Over ninety-nine percent (99%) of all claims that could require an RAI for a missing declaration received that request prior to the end of 2015.

  - o Over ninety-nine percent (99%) of all claims that could require an RAI for an incomplete declaration received that request prior to the end of March 2016.

  - o Through the end of month June 2016, over ninety-one percent (91%) of all claims that could require a Notice of Defect received that notice. As such, the Claims Administrator forecasts that more than ninety percent (90%) of claims will receive a final determination by the end of 2016.

- The compensation allocated to SPC-determined claims continues to increase.

  - o During the Reporting Period, the Claims Administrator approved Class Members for nearly $8.8 million in SPC compensation, bringing the cumulative total to $29.4 million.

  - o Additionally, the Claims Administrator determined that another 1,638 Class Members who had partially defective claims also had at least one valid SPC claim and that the total amount of compensation for which the Class Members were currently eligible on those claims was $10.7 million. The Claims Administrator sent those claimants an "Approved with Defects" notice, giving them the option of either attempting to cure the

Defects in an effort to get greater compensation or accepting the compensation for which they currently qualify.

  o Between the amounts allocated through SPC-determined claims and the amounts to be allocated through the "Approved with Defects" claims, the total SPC compensation for which Class Members qualified as of the end of the Reporting Period amounted to more than $40.2 million.

- Class Members continue to be approved for enrollment in the PMCP.

  o During the Reporting Period, we approved  Class Members to participate in the PMCP, bringing the total to 26,641 to date.  We sent PMCP Notices of Determination to 1,387 Class Members during the Reporting Period, for a total of 23,617 over the life of the program.

This information is discussed in greater detail below.

## II.   DETAILED CLAIMS PROGRESSION

### A.   Progression of 2014 Claims

The Claims Administrator received 12,395 2014 Claims.  Over the Reporting Period, the Claims Administrator received 185 changes or updates to those same claims forms.  The additional information must be processed through intake and then re-reviewed at each subsequent processing stage to determine its impact.  The number of 2014 Claims receiving a final determination or clearing lien resolution continued to increase throughout the Reporting Period.  Of the 12,395 2014 Claims, eighty-four percent (84%) have been processed to a final determination, and sixteen percent (16%) require additional processing.

Of the claims reaching a final determination,

- forty-six percent (46%) were approved for compensation for a Specified Physical Condition, and sixty-eight percent (68%) of those claims were paid;

- eight percent (8%) did not seek the SPC compensation benefit and instead claimed and qualified for the PMCP benefit only;

- twenty-one percent (21%) proved they were Class Members and qualified to receive the PMCP benefit but failed to prove they qualified for SPC compensation; and

- twenty-five (25%) were denied because they (a) did not prove they were Class Members, (b) filed a valid opt-out, or (c) did not claim or prove a compensable SPC.

Consistent with the last reporting period, the percentage of 2014 Claims approved for compensation during this Reporting Period continues to exceed the percentage of those denied.

**Figure 1: Composition of Finalized 2014 Claims**



Of the claims that require additional processing:

- six percent (6%) are pending Declaration Review or RAI processing;

- forty-six percent (46%) have already received or are scheduled to receive a Notice of Defect and will need to submit additional information; and

- forty-eight percent (48%) are undergoing Medical Record Review.

**Figure 2: Composition of Pending 2014 Claims**



Thus, the current overall composition of the 2014 Claims is as follows:

**Figure 3: Overall Composition of 2014 Claims**



### B.   Progression of 2015 Claims

The Claims Administrator received 24,886 2015 Claims to date.[4]  Over the Reporting Period, we received approximately 2,421 changes or updates to 2015 Claims.  As with the 2014 Claims, this additional information must be processed through intake and then be re-reviewed. Of the 24,886 claims, fifty-nine percent (59%) have been processed to a final determination, and forty-one percent (41%) require additional processing.   Of the claims reaching a final determination,

- sixty-six percent (66%) were approved for compensation for an SPC, and sixty-nine percent (69%) of those claims were paid;

---

[4] Pursuant to Section V.A. of the MSA, any claim submitted to the Claims Administrator more than one year after the Effective Date is untimely and must be denied.

- one percent (1%) did not seek the SPC compensation benefit and instead claimed and qualified for the PMCP benefit only; and

- ten percent (10%) proved they were Class Members and qualified to receive the PMCP benefit but failed to prove they qualified for SPC compensation; and

- twenty-three (23%) were denied because they (a) did not prove they were Class Members, (b) filed a valid opt-out, or (c) did not claim or prove a compensable SPC.

**Figure 4: Composition of Finalized 2015 Claims**



Of the claims that require additional processing:

- four percent (4%) are pending Declaration Review or RAI processing;

- seventy-five (75%) have already received or are scheduled to receive a Notice of Defect and will need to submit additional information; and

- twenty-one percent (21%) are actively in the Medical Record Review process.

**Figure 5: Composition of Pending 2015 Claims**



Thus, the current overall composition of the 2015 Claims is as follows:

**Figure 6: Overall Composition of 2015 Claims**

### III.   CLAIMS FOR SPECIFIED PHYSICAL CONDITIONS

#### A.   Claimed Benefits and Compensation Level

For the total 37,281 Proof of Claim Forms ("POCFs") received, Table 1 provides a breakdown of those that sought compensation for an SPC and participation in the PMCP and those that sought only participation in the PMCP.

| TABLE 1: POCF FILINGS AVAILABLE FOR INITIAL CLAIMS REVIEW | |
|---|---|
| | **Total** |
| **Total POCF Filings Available for Initial Claims Review** | **37,281** |
| Claims for Compensation for Both SPCs and Participation in the PMCP | 36,398 |
| Claims for PMCP Only | 883 |

The graphs below provide a breakdown of the compensation levels claimed in the 2014 and 2015 Claims, respectively:

**Figure 7: Compensation Level Composition of 2014 Claims**

**Figure 8: Compensation Level Composition of 2015 Claims**



Table 2, below, compares the composition of the claimed compensation levels in the 2014 Claims with those in the 2015 Claims and shows the percentage change between those two groups of claims.

| Table 2: Claimed Compensation Level | | | | | | | | |
|---|---|---|---|---|---|---|---|---|
| | A1 | A2 | A3 | A4 | B1 | Multiple | None | PMCP Only |
| Percentage of 2014 Claims | 30.91% | 8.46% | 5.54% | 2.11% | 12.66% | 19.72% | 15.65% | 4.95% |
| Percentage of 2015 Claims | 46.09% | 6.49% | 3.00% | 0.65% | 1.94% | 15.98% | 24.76% | 1.08% |
| Vintage Claim Comparison | 15.18% | (1.97%) | (2.54%) | (1.46%) | (10.71%) | (3.74%) | 9.11% | (3.87%) |

In Table 3 below, we provide statistics of the claimed compensation level in Section VII of the POCF as compared to the awarded compensation level. In over eighty-eight percent (88%) of claims where the Class Member has claimed and qualified for a single compensation level, that same level of compensation has been awarded. For the twelve percent (12%) not

awarded the same claimed compensation level, the Claims Administrator has awarded both higher and lower compensation levels based on review of the POCF and supporting documentation provided.  For claims where the Class Member selects multiple compensation levels or no compensation level in Section VII of the POCF, the rate of claims qualifying for A1-only compensation to those qualifying for A2 or higher compensation is approximately three to one (3:1), meaning that a greater number of these claims are qualifying for A1 compensation rather than A2 or higher compensation.

| Table 3: Determined Compensation Level | | | | | | | | | | |
|---|---|---|---|---|---|---|---|---|---|---|
| Claimed Compensation Level | A1 | | A2 | | A3 | | A4 | | B1 | | Grand Total |
| Section VII of POCF | Count | % | Count | % | Count | % | Count | % | Count | % | |
| A1 | 10,251 | 98.56% | 42 | 0.40% | 94 | 0.90% | 13 | 0.12% | 1 | 0.01% | 10,401 |
| A2 | 283 | 36.99% | 432 | 56.47% | 46 | 6.01% | 4 | 0.52% | | 0.00% | 765 |
| A3 | 235 | 31.08% | 58 | 7.67% | 426 | 56.35% | 36 | 4.76% | 1 | 0.13% | 756 |
| A4 | 48 | 46.15% | 5 | 4.81% | 7 | 6.73% | 44 | 42.31% | | 0.00% | 104 |
| B1 | 305 | 50.66% | 214 | 35.55% | 68 | 11.30% | 6 | 1.00% | 9 | 1.50% | 602 |
| Multiple | 940 | 73.78% | 200 | 15.70% | 106 | 8.32% | 24 | 1.88% | 4 | 0.31% | 1,274 |
| None | 383 | 81.66% | 52 | 11.09% | 28 | 5.97% | 6 | 1.28% | | 0.00% | 469 |
| Total | 12,445 | 86.60% | 1,003 | 6.98% | 775 | 5.39% | 133 | 0.93% | 15 | 0.10% | 14,371 |

### B.    Claims Requiring RAI and/or Notice of Defect

As has been the case historically, the majority of claims have received an RAI and/or a Notice of Defect according to the requirements of the MSA.  During the Reporting Period, the Claims Administrator sent 318 RAIs and 7,283 Notices of Defect.  Since the inception of the Settlement, the Claims Administrator sent 29,182 RAIs and 19,911 Notices of Defect.

| TABLE 4: RAIS AND NOTICES OF DEFECT | | |
|---|---|---|
| **RAIs** | **Reporting Period** | **Total** |
| RAIs Sent | 318 | 29,182 |
| Responses to RAIs Received | 2,170 | 20,267 |
| **Defects** | **Reporting Period** | **Total** |
| Notices of Defect Sent | 7,283 | 19,911 |
| Defect Cure Materials Received | 1,865 | 6,067 |

1.      Requests for Additional Information

Of the 318 RAIs sent during the Reporting Period, twenty-two percent (22%) were RAI-Missing, and seventy-eight percent (78%) were RAI-Incomplete.[5]  Ten percent (10%) were sent to unrepresented claimants, and ninety percent (90%) were sent to claimants represented by counsel.  More than sixty-five percent (65%) of the 2014 Claims have required at least one (1) RAI, and over twenty percent (20%) have required the maximum of two (2) RAIs.  Approximately sixty-three percent (63%) of the 2015 Claims have required at least one (1) RAI, and over twelve percent (12%) have required the maximum of two (2) RAIs.   The overall response rate to RAIs was sixty-nine percent (69%), with claimants represented by counsel responding at a higher rate (seventy-four percent (74%)) than those who are unrepresented (fifty-seven percent (57%)).   The overall cure rate for responding to RAIs for both claimants represented by counsel and those unrepresented is approximately sixty percent (60%).

As previously reported, failure to respond to an RAI-Missing within the sixty-day (60-day) response period will not necessarily result in the denial of a claim; rather, the failure to respond to an RAI-Missing by submitting a first-party injury declaration in compliance with the

---

[5] Under the Party-approved RAI process, a claimant may receive an RAI-Missing for failing to submit a first-party injury declaration with his or her original POCF.  If the claimant submits a first-party injury declaration that omits necessary information, either in response to an RAI-Missing or at another point in the claims process, the claimant may receive an RAI-Incomplete.  For each RAI sent by the Claims Administrator, the claimant has sixty (60) days to respond.  A claimant may receive only one (1) RAI-Missing and one (1) RAI-Incomplete, as applicable.

Specified Physical Condition Matrix (the "SPC Matrix") will result in a Defect of "Missing Declaration of Injury Document" on a Notice of Defect.  The claimant would then have 120 days to cure that Defect and any other material Defects listed in the notice.

Similarly, failure to respond to or cure all deficiencies identified within an RAI-Incomplete will not necessarily result in the denial of a claim, because only some of a claimant's claimed or declared conditions may be deficient and included in the RAI.  In that circumstance, even if the claimant fails to respond to the RAI, the claimant might still receive compensation for the valid conditions in his or her declaration (assuming the claimant met the other requirements of the MSA).   These RAI processing standards and distinctions are highlighted in the "Frequently Asked Questions About Declarations and Requests for Additional Information" available on the Claims Administrator's website.  In addition, a copy of this FAQ is included with each RAI sent from the Claims Administrator, and we have call center representatives and firm liaisons available to provide assistance.

2.   <u>Notices of Defect</u>

Of the 19,911 Notices of Defect sent through the end of the Reporting Period, twenty-two percent (22%) were sent to unrepresented claimants or Class Members, and seventy-eight percent (78%) were sent to claimants or Class Members represented by counsel.  More than eighty percent (80%) were sent to Class Members claiming to be or approved as Clean-Up Workers.  Approximately fifty-five percent (55%) of the Notices of Defect sent listed multiple Defects.  More specifically, thirty-one percent (31%) identified two (2) through five (5) Defects, thirteen percent (13%) identified six (6) through ten (10) Defects, and eleven percent (11%) identified more than ten (10) Defects.

Of the 19,911 Notices of Defect sent through the end of the Reporting Period, sixty percent (60%) include Defects identified during initial claims review and prior to the Medical Record Review stage.  Fifty-one percent (51%) of the 7,283 Notices of Defect sent during the Reporting Period identified at least one Defect prior to the Medical Record Review stage in the claims process.  The five (5) most common material Defects identified for the population are as follows:

- "Missing Declaration of Injury document";

- "Missing Medical Records documentation";

- "Documentation included with the claim does not establish that the claimant was employed as a Clean Up Worker between the dates of April 20, 2010 and April 16, 2012";

- "Missing Third Party Witness Injury Declaration document"; and

- "Proof Of Residency Documents Failed To Prove Residence For 60 Days Between April 20, 2010 And September 30, 2010 for Zone A."

Of the 19,911 Notices of Defect sent through the end of the Reporting Period, thirty-eight percent (38%) include Defects identified during the Medical Record Review process. Forty-nine percent (49%) of the 7,283 Notices of Defect sent during the Reporting Period identified at least one Defect subsequent to the Medical Record Review stage in the claims process. The five (5) most common material Defects identified during the Medical Record Review process are as follows:

- "No medical records were submitted or the documentation submitted does not support the claimed SPECIFIED PHYSICAL CONDITION";

- Generally – "The medical records do not meet the criteria set forth in Level A2, A3, A4, and/or B1 of the Specified Conditions Matrix."  Specifically – "The date of first diagnosis for the claimed SPECIFIED PHYSICAL CONDITION occurred on or after April 16, 2012. This claimed condition does not qualify as a SPECIFIED PHYSICAL

CONDITION as set forth on the SPECIFIED PHYSICAL CONDITIONS MATRIX"[6];

- "The documentation submitted does not support the claimed SPECIFIED PHYSICAL CONDITION";

- "The medical records do not meet the criteria set forth in Level A2 of the Specified Conditions Matrix: The medical records submitted do not support the assertions in the declaration concerning the time of onset of the claimed SPECIFIED PHYSICIAL CONDITION following the alleged exposure as set forth in the SPECIFIED PHYSICAL CONDITIONS MATRIX"; and

- "The third-party declaration does not meet the criteria set forth in Level A1 of the Specified Physical Conditions Matrix: The third-party declaration was not signed by the individual submitting the third-party declaration."

As of the end of the Reporting Period, the response period had expired for 11,666 (fifty-nine percent (59%)) of claims having received a Notice of Defect. The overall response rate was forty-three percent (43%). The response rate for unrepresented claimants or Class Members was thirty-six percent (36%), while the response rate for represented claimants or Class Members was forty-seven percent (47%). As previously reported, failure to respond to or cure all Defects identified within a Notice of Defect will not necessarily result in the denial of a claim, because only some aspects of a claimant's claim may be defective and listed in a Notice of Defect. In that circumstance, even if the claimant failed to respond to the Notice of Defect or to cure all of the Defects listed in it, the claimant might still receive compensation. Specifically, of claimants or Class Members who received a Notice of Defect that included Defects identified during the Medical Record Review process, thirty-six percent (36%) were subsequently found to qualify for SPC compensation. Furthermore, a claimant who has a Defect in his or her claim for

---

[6] This Defect results from the Court's July 23, 2014 Order (Rec. doc. 12862) holding that all conditions first diagnosed after April 16, 2012 must be classified as Later-Manifested Physical Conditions. Notably, the Claims Administrator does not automatically deny claims where the medical records initially submitted with the claim indicate a date of first diagnosis after April 16, 2012. Rather, we issue a Notice of Defect to afford the Class Member the opportunity to provide medical record evidence of the diagnosis that pre-dates April 16, 2012. If the Class Member does not submit any such records, the Class Members claim for SPC compensation would be denied, but the Class Member would be free to pursue compensation for that condition as an LMPC.

compensation for an SPC but has proven that he or she is a Class Member will receive a Notice

of Determination for the PMCP benefit.  Hence, such Class Member can take advantage of that

benefit while attempting to cure the Defects in his or her claim for SPC compensation.

### C.    Claims Processed Through Each Stage of Claims Review

As discussed above, a significant percentage of the POCFs submitted continue to contain

one or more deficiencies or Defects.  These deficiencies and Defects not only increase the

amount of time it takes for a claimant to reach the determination stage, but also increase the time

it takes the Claims Administrator to process the claims.  The Claims Administrator must wait as

long as sixty (60) or 120 days to receive the responses to the RAIs and/or Notices of Defects,

respectively, and then must process the responses.

During the Reporting Period, the Claims Administrator has reviewed and/or processed

the following numbers of claims through each of the following sequential stages in the claims

review process:

| TABLE 5: CLAIM REVIEW PROCESSING | | |
|---|---|---|
| Processing Stage | Number of Claims[7] | |
| | Reporting Period | Total |
| Notice of Defect Gate One Process (Which Includes Class Membership Defects)[8] | 3,466 | 11,852 |
| Declaration Review Process[9] | 3,049 | 39,495 |
| RAI Process[10] | 318 | 29,182 |
| Medical Record Review Process[11] | 3,452 | 25,375 |
| Notice of Defect Gate Two Process[12] | 3,816 | 8,058 |

---

[7] Claims can move through Declaration Review (due to responses to RAI), the RAI Process (due to a defective response to an RAI-Missing, resulting in an RAI-Incomplete), and Medical Record Review (due to cure responses to originally defective claims) multiple times.

[8] Total claims with Gate One Defects, including basis of participation Defects, which received a Notice of Defect. Gate One Defects are those such as "Missing Declaration of Injury Document" or "Missing Medical Records Documentation," which prevent a claim from moving to Medical Record Review.

[9] Total claims for which an injury declaration review was completed.

[10] Total claims requiring an RAI that received a RAI.

[11] Total claims that were reviewed by Claims Administrator's Medical Record Review staff.

[12] Total claims that have completed Medical Record Review but that contain Defects preventing a final determination.

The Claims Administrator completed another 3,452 medical record reviews during the Reporting Period, bringing the total initial reviews completed since inception to 25,375.

### D.     Claims Sent Dispositive Correspondence for a Specified Physical Condition

The overall percentage of 2014 Claims and 2015 Claims reaching final determination has increased over the Reporting Period to eighty-four percent (84%) and fifty-nine percent (59%), respectively.   The total number of claims approved for SPC compensation over the Reporting Period has continued to increase, due in part to the receipt of responses to previously pending RAIs and Notices of Defect for both the 2014 Claims and 2015 Claims, as well as improved processing speeds.

During the Reporting Period, we sent SPC Notices of Determination to 3,482 Class Members, over 700 more than the prior quarter, approving them for $8,825,100 in compensation. Since the inception of the Settlement, we sent SPC Notices of Determination to 12,881 Class Members, approving them for $29,473,050 in compensation.   Over this Reporting Period, the total percentage of finalized 2014 Claims moving to an approved determination increased to forty-six percent (46%).    Over this Reporting Period, the total percentage of finalized 2015 Claims moving to an approved determination decreased to sixty-six percent (66%).

The Claims Administrator also sent 1,165 "Approved with Defects" notices during the Reporting Period, bringing the total number of "Approved with Defects" notices sent since inception to 2,555.   An "Approved with Defects" notice is sent to a Class Member who has at least one valid SPC but one or more other SPCs that contain a Defect and might result in an award of higher compensation.   A Class Member receiving this notice can choose either to attempt to cure the Defects and thus possibly receive greater compensation or to waive that opportunity and proceed to determination on his or her valid SPC(s).    Nine hundred sixteen

(916) of the 2,555 Class Members who received an "Approved with Defects" notice subsequently received an SPC Notice of Determination.   The total compensation for the remaining 1,639 Class Members who received an "Approved with Defects" notice but who have not yet received an SPC Notice of Determination is $10,773,650.   Therefore, the total amount allocated (by SPC Notices of Determination) and to be allocated (by "Approved with Defects" letters) is $40,246,700.

The Claims Administrator sent 1,645 Notices of Denial during the Reporting Period, for a total of 7,489 Notices of Denial from the inception of the Settlement through the end of the Reporting Period.  All of these claims have been denied because the claimant did not qualify as a Class Member, because the claimant opted out of the settlement, and/or because the claimant did not meet the criteria established by the MSA to receive compensation for an SPC.

A summary of the dispositive correspondence sent on claims for compensation for an SPC is set forth in Table 6, below.

| TABLE 6: CLAIMS DISPOSITION AND CORRESPONDENCE | | |
|---|---|---|
| **Approvals** | **Reporting Period** | **Total** |
| SPC Notices of Determination Sent — 2014 Claims | 675 | 4,318 |
| SPC Notices of Determination Sent — 2015 Claims | 2,807 | 8,563 |
| SPC Notices of Determination Sent Total | 3,482 | 12,881 |
| **Denials** | **Reporting Period** | **Total** |
| Notices of Denial Sent — 2014 Claims | 286 | 4,156 |
| Notices of Denial Sent — 2015 Claims | 1,359 | 3,333 |
| Notices of Denial Sent — Total | 1,645 | 7,489 |

### E.   Claims Approved for SPC Compensation

During the Reporting Period, the amount of SPC compensation for which Class Members were approved increased, as reflected in Table 7, below.

| TABLE 7: APPROVED CLAIMS FOR SPCs[13] | | | | | |
|---|---|---|---|---|---|
| SPC | Reporting Period Number Approved | Total Number Approved to Date | Reporting Period Amount Approved | Total Amount Approved to Date | Total "Approved with Defects" Amount Allocated to Date | Total Compensation Allocated to Date |
| A1 | 2,909 | 11,297 | $3,686,500 | $14,402,100 | $561,900 | $14,964,000 |
| A2 | 364 | 776 | $2,740,500 | $5,848,400 | $5,534,750 | $11,383,150 |
| A3 | 172 | 678 | $2,124,200 | $8,373,300 | $4,050,800 | $12,424,100 |
| A4 | 34 | 121 | $91,800 | $326,700 | $383,400 | $710,100 |
| B1 | 3 | 9 | $182,100 | $522,550 | $242,800 | $765,350 |
|  |  |  |  |  |  |  |
| Total | 3,482 | 12,881 | $8,825,100 | $29,473,050 | $10,773,650 | $40,246,700 |

As set forth in the MSA, Class Members can only be paid once certain potential obligations to third parties are identified and resolved. The resolution of these obligations is dependent upon the responsiveness of both governmental agencies and private interests in replying to the Claims Administrator's requests for information and resolution. The obligations generally fall into two general categories: healthcare-related obligations and other obligations.

The resolution of healthcare obligations involves confirming whether a Class Member received benefits from a governmental payor (such as Medicare, Medicaid, or the Veterans' Administration) or a private healthcare plan for a compensable injury such that the Class Member must now reimburse those entities for the amounts they paid. The processing phases include (1) confirming entitlement with the government agency or private plan, (2) receiving claims from the agency or plan, (3) auditing those claims and disputing any that are unrelated to the Class Member's compensable injury, and (4) final resolution. Pursuant to the terms of the

---

[13] Please note that the total volumes and total dollars approved are subject to change in each Reporting Period due to a later received and processed Requests for Review.

MSA, the Claims Administrator obtained an agreement from CMS establishing capped repayment amounts per SPC for Class Members who are or were beneficiaries of Medicare. The Claims Administrator also negotiated with state Medicaid agencies to cap recovery for Medicaid-entitled Class Members. Most states agreed to waive recovery rights for Class Members receiving compensation for an A1 claim. Additionally, most state Medicaid agencies agreed to a twenty percent (20%) cap on and up to a thirty-five percent (35%) offset for fees and costs typically associated with their recovery, thereby allowing partial funding to the Class Member while full resolution is pending. Processing times for Medicaid-entitled Class Members eligible for payment will vary. Each state has its own processing standards for responding to entitlement requests, producing claims, and finalizing lien amounts.

The resolution of non-healthcare-related obligations involves identifying the various types of obligations and working with the claimant or the claimant's representative to resolve them. The processing phases include (1) identifying the obligation (through review of claim documents, PACER searches, and searches of the Louisiana Child Support Database), (2) sending correspondence seeking documentation that will resolve the complication, (3) reviewing the submitted documentation for sufficiency, and (4) final resolution. The Claims Administrator tracks responses to its correspondence and sends a follow-up letter to non-responsive parties after thirty (30) to sixty (60) days have passed (with the length of time depending on the complication). We will also send follow-up correspondence when the responses contain insufficient documentation. The resolution time for payment complications varies and remains heavily dependent upon the timeliness and sufficiency of the third parties' responses to our information requests. Through the end of the Reporting Period, the age of

claims awaiting payment from the date final determination ranges from approximately forty-five (45) to 120 days depending on the complexity of the payment complications.

Once the obligations affecting a given claim are resolved and any liens or reimbursement obligations are paid, the Claims Administrator is able to disburse the balance of the Class Member's compensation.

### F.   Data Disclosure Form Submissions and Results

Data Disclosure Forms may be filed at any time during the claims review process by Natural Persons seeking information from the databases, data fields, and other documentary evidence provided by BP to the Claims Administrator.  Notably, Data Disclosure Forms may continue to be filed *after* the submission of a Proof Claim Form and therefore can be filed *after* the claims filing deadline of February 12, 2015.  Information provided via the submission of a Data Disclosure Form allows the Claims Administrator to make a determination concerning (a) the status of a Natural Person claiming to be a Clean-Up Worker and/or (b) a claim made by a Clean-Up Worker for compensation for a Specified Physical Condition.  *See* MSA § XXI.B.

During the Reporting Period, the Claims Administrator received 235 Data Disclosure Forms, for a total of 26,532 Data Disclosure Forms since the approval of the MSA.  The Claims Administrator responded to 400 Data Disclosure Forms during the Reporting Period, bringing the total number of responses to 32,109 since the approval of the MSA.  Of the 26,532 Data Disclosure Forms received, 20,431 were related to unique claimants, while 6,101 were Data Disclosure Forms with additional information filed by the same claimants.  Among the unique claimants filing Data Disclosure Forms, eighty-four (84%) were confirmed as Clean-Up Workers by finding a match in at least one employer database other than the "Training" database.  Twelve percent (12%) of those unique claimants were matched in the "Medical Encounters" database,

while nineteen percent (19%) were matched in a medically relevant database, such as the "Traction" database or the "Injury/Illness" database.

## IV.  CLASS MEMBER SERVICES CENTER ACTIVITY

The Claims Administrator operates a Class Member Services Center located in New Orleans to communicate with Class Members and their attorneys and to assist them with filing their claims.  During the Reporting Period, the Class Member Services Center received 11,452 telephone calls.  Since opening, the Class Member Services Center has received a total of 175,461 telephone calls.  The Class Member Services Center handled an average of 176 calls per day.  The average length of each telephone call was six minutes and fifty-one seconds, with an average wait time of one minute and forty-nine seconds.  The Class Member Services Center also received 63 emails during the Reporting Period, and six (6) individuals visited the Class Member Services Center in person.

| TABLE 8: CLASS MEMBER SERVICES CENTER | | |
|---|---|---|
| | Reporting Period | Total |
| Calls Received | 11,452 | 175,461 |
| Average Length of Call (min:sec) | 6:51 | 6:28 |
| Average Wait Time (min:sec) | 1:49 | 0:22 |
| Emails Received | 63 | 2,712 |
| Walk-Ins | 6 | 729 |

## V.  PERIODIC MEDICAL CONSULTATION PROGRAM

### A.  Class Members Eligibility for and Participation in the PMCP

During the Reporting Period, the Claims Administrator approved 3,418 claims for participation in the PMCP and mailed 1,387 PMCP Notices of Determination.  Since the inception of the Settlement, the total number of Class Members receiving a PMCP Notice of Determination is 23,617.  The Claims Administrator received requests for and scheduled 216

physician visits during the Reporting Period, and Class Members attended 321 appointments in the Reporting Period.

| TABLE 9: PERIODIC MEDICAL CONSULTATION PROGRAM | | |
|---|---|---|
| | Reporting Period | Total |
| Class Members Approved to Receive Physician Visits[14] | 3,418 | 26,641 |
| PMCP Notices of Determination Sent | 1,387 | 23,617 |
| Physician Visits Requested and Scheduled | 216 | 2,374 |
| Appointments Attended by Class Members | 321 | 2,264 |
| Annual Update Letters Sent to Class Members | 2,076 | 10,825 |

### B.    Provider Network

During the Reporting Period, the Claims Administrator added forty-nine (49) medical provider organizations, with forty-nine (49) delivery sites, to its network of providers established to provide certain covered services to Class Members who participate in the PMCP, bringing the total number of medical provider organizations to 153.  These medical provider organizations represent 233 service delivery sites.  As a result of these additions, ninety-three percent (93%) of eligible Class Members who have requested a PMCP evaluation resided within twenty-five (25) miles of a network provider at the conclusion of the Reporting Period.  The Claims Administrator continues to expand the medical provider network in its efforts to ensure that no Class Member will have to wait more than thirty (30) days or travel more than twenty-five (25) miles for an appointment.

### VI.    BACK-END LITIGATION OPTION

During the Reporting Period, seven (7) Class Members filed Notices of Intent to Sue for compensation for a Later-Manifested Physical Condition, bringing the total number to 399 Class

---

[14] The total physician visits will exceed the total number of Class Members qualified for the PMCP benefit, as Class Members may be referred to specialists and will eventually be eligible for subsequent primary visits.

Members to date.  Of the seven (7) Notices of Intent to Sue filed in the Reporting Period, one (1)

was approved and six (6)  contained deficiencies that could be corrected by the Class Member

| TABLE 10: CLAIMS FOR LATER-MANIFESTED PHYSICAL CONDITIONS | | |
|---|---|---|
| | Reporting Period | Total |
| Notices of Intent to Sue Filed | 7 | 399 |
| Notices of Intent to Sue Approved | 1 | 40 |
| Notices of Intent to Sue Denied | 0 | 168 |
| Notices of Intent to Sue Deficient[15] | 6 | 191 |

Of the 168 claims denied to date, ninety-eight percent (98%) were denied because the

conditions claimed were diagnosed on or before April 16, 2012 and therefore could not be

claimed as Later-Manifested Physical Conditions.  The other reasons for denial include, among

other things, that the claim was precluded by a previously filed workers' compensation claim.

Of the 191 defective claims to date, the three (3) most common material Defects

identified are as follows:

- "Identification of BP defendants in Section VII is missing";

- "You must provide medical records indicating a date of diagnosis that is after April 16, 2012 or a completed Physician's Certification Form"; and

- "The date on which the claimed Later-Manifested Physical Condition(s) were first diagnosed in Section VI.A.2 is missing."

---

[15] Class Members who cure Defects within their original Notice of Intent to Sue will then be classified as "Approved" or "Denied" in future reporting, based on the responses received.

| TABLE 11: APPROVED NOTICES OF INTENT TO SUE | | |
|---|---|---|
| **Mediation Elections** | **Reporting Period** | **Total** |
| Later-Manifested Physical Condition Claims for Which at Least One BP Defendant Elected Mediation | 0 | 0 |
| Later-Manifested Physical Condition Claims Pending a Decision from One or More BP Defendants Regarding Mediation | 5 | 2 |
| Later-Manifested Physical Condition Claims for Which No BP Defendants Elected Mediation | 3 | 38 |
| | | |
| **TOTAL:** | **8** | **40** |
| | | |
| **Results of Mediation** | **Reporting Period** | **Total** |
| Later-Manifested Physical Condition Claims Settled by Mediation | 0 | 0 |
| Later-Manifested Physical Condition Claims Settled by Mediation as to One but Not All BP Defendants Listed in the Notice of Intent to Sue | 0 | 0 |
| Later-Manifested Physical Condition Claims Mediated but Not Settled | 0 | 0 |
| | | |
| **TOTAL CLAIMS MEDIATED:** | **0** | **0** |
| | | |
| **Back-End Litigation Option Lawsuit** | **Reporting Period** | **Total** |
| Later-Manifested Physical Condition Claims for Which No BP Defendant Elected Mediation | 3 | 38 |
| Later-Manifested Physical Condition Claims Mediated but Not Settled | 0 | 0 |
| | | |
| **TOTAL CLASS MEMBERS ELIGIBLE TO FILE A BACK-END LITIGATION OPTION LAWSUIT**[16] | **3** | **3** |

Out of the forty (40) approved Notices of Intent to Sue to date, the BP Defendants did not elect to mediate any of the claims. During the Reporting Period, three (3) Class Members became

---

[16] The total eligible for BELO over the life of the project was thirty-eight (38). However, of the thirty-eight (38), only three (3) are currently eligible for BELO. The other thirty-five (35) claims are no longer within the six-month (6-month) timeframe for properly and timely filing a Back-End Litigation Option Lawsuit.

eligible to file a Back-End Litigation Option Lawsuit, bringing the total number of Class Members eligible to file a Back-End Litigation Option Lawsuit to three (3).

## VII.   GULF REGION HEALTH OUTREACH PROGRAM

### A.   Funding and Coordinating Committee Activities

In accordance with Section IX of the MSA, the Gulf Region Health Outreach Program ("GRHOP") was established in May 2012 to expand capacity for and access to high quality, sustainable, community-based healthcare services, including primary care, behavioral and mental health care and environmental medicine, in the Gulf Coast communities in Louisiana, Mississippi, Alabama, and the Florida Panhandle.  The program consists of five (5) integrated projects: the Primary Care Capacity Project ("PCCP"), Community Involvement ("CI"), the Mental and Behavioral Health Capacity Project ("MBHCP"), the Environmental Health Capacity and Literacy Project ("EHCLP"), and the Community Health Workers Training Project ("CHWTP").   As of the end of the Reporting Period, the Claims Administrator disbursed $104,713,294 to the projects, as detailed in the chart below.

| TABLE 13: GRHOP | |
|---|---|
| Project | Funding to Date |
| Primary Care Capacity Project | $46,655,925 |
| Community Involvement | $3,213,491 |
| Mental and Behavioral Health Capacity Project ((Louisiana State University Health Sciences Center) | $14,359,145 |
| Mental and Behavioral Health Capacity Project (University of Southern Mississippi) | $8,256,486 |
| Mental and Behavioral Health Capacity Project (University of South Alabama) | $8,256,489 |
| Mental and Behavioral Health Capacity Project (University of West Florida) | $5,025,696 |
| Environmental Health Capacity and Literacy Project | $14,957,416 |
| Community Health Workers Training Project | $3,988,646 |
| | |
| **TOTAL:** | **$104,713,294** |

The final disbursement was made in May 2016, which accounted for an eighteen (18) month low-cost extension of the GRHOP, as agreed upon by the Parties and Coordinating Committee members. All projects, except for Community Involvement,[17] will participate in this extension period. Administrative costs were accounted for by the Claims Administrator, with all projects contributing to these costs. Therefore, the May 2016 disbursement brought the total funding to the GRHOP to $104,713,294.

The GRHOP is governed by a Coordinating Committee that continues to function in a cooperative and integrated manner, with quarterly in-person meetings around the Gulf Coast, as well as monthly conference calls. These quarterly meetings offer the grantees the opportunity to share their progress, discuss challenges faced, and collaborate with their partners to work through issues that affect the GRHOP as a whole.

The Claims Administrator held a quarterly meeting on June 3, 2016, in New Orleans, Louisiana. This meeting encompassed discussion on a variety of topics, including, but not

---

[17] Community Involvement has chosen not to participate in the eighteen (18) month low-cost extension.

limited to, the activities of two (2) of the five (5) GRHOP subcommittees — the Evaluation Subcommittee and Publication Subcommittee.[18] These subcommittees work to increase collaboration and effectiveness of the projects, as well as assure positive impacts and sustainability within the communities which the GRHOP affects.[19] During the meeting, a representative from the Sea Grant programs of the Gulf of Mexico discussed the Gulf of Mexico Research Initiative ("GoMRI") and its outreach efforts to promote oil spill science. Representatives from the Sea Grant collected input from GRHOP Coordinating Committee Members regarding their activities and positive impact in the Gulf region.

Lastly, the Coordinating Committee also requested the Claims Administrator to establish a GRHOP website. This website contains detailed descriptions and notable accomplishments of each project, as well as information regarding the GRHOP Coordinating Committee, news/events, and publications.  The website launched on July 3, 2014 and can be publicly accessed at www.grhop.org.

**B.      GRHOP Project Updates**

Each GRHOP project has made substantial progress in achieving the goals set forth in their respective Grant Proposals.  Some notable accomplishments of the projects include:

- The **Primary Care Capacity Project**, led by the Louisiana Public Health Institute ("LPHI"), which has:

  - Worked towards its goal to expand access to integrated high quality, sustainable, community-based primary care with linkages to specialty mental and behavioral health, and environmental and occupational health services in the implicated seventeen (17) Gulf Coast counties and parishes. The key program strategies include:

---

[18] The five (5) GRHOP subcommittees include: the Data Sharing Subcommittee, Evaluation Subcommittee, Health Promotions Subcommittee, Newsletter Subcommittee, and Publication Subcommittee. These subcommittees were formed during the July 31, 2014 quarterly meeting.

[19] The Claims Administrator will hold its next quarterly meeting on September 16, 2016 in Alabama. The Claims Administrator will report on that meeting in its third quarterly report of 2016.

- Built community health center capacity through direct funding and customized group and individual technical assistance through cooperative agreements to seventeen (17) community health center operators (with over eighty (80) site locations) across all seventeen (17) Gulf Coast counties and parishes;

- Supported and advanced health systems development through direct funding for health information exchanges, infrastructure investments, and technical assistance; and

- Enhanced the capacity of communities and building strategic partnerships to improve health through funding, partnership engagement, and technical assistance to non-clinical partners through State Partners Agreements with the four (4) State Primary Care Associations and the Community-Centered Health Home Demonstration Project, which also works with five (5) community health centers in partnership with the Prevention Institute.

- **Alliance Institute's** outreach on behalf of the GRHOP and its partners has reached over 1,500 individuals across Louisiana, Mississippi, Alabama, and Florida. Alliance Institute, the grantee responsible for Community Involvement, has:

  o Submitted a proposal to the GRHOP Coordinating Committee regarding the development of a series of journal submissions to be published by the GRHOP Partners and Sub-grantees to *FrontiersIn*, an online, open-access, peer-reviewed journal. A successfully coordinated effort would result in the publication of an e-book about GRHOP by the GRHOP Partners.

  o STEPS Coalition (Mississippi) and BPSOS – Bayou La Batre (Alabama) joined forces to develop a regional coalition to address language access, workforce development, and racial issues occurring around the Gulf Coast.

  o Submitted vetting documents for two (2) new Community Based Organizations ("CBOs"), completing Community Involvement for all seventeen (17) counties/parishes covered by GRHOP on June 21, 2016.

  o Hosted a CBO, which convened in Gulfport, Mississippi, to prepare for the last year of Community Involvement; it focused on sustainability via such concepts as how to develop a fundraising plan, how to develop a program plan with a logic model, and how to increase visibility through social media.

  o Negotiated the inclusion of GRHOP partner, University of South Alabama, CBO grantee Emerging ChangeMakers, and GRHOP Federally Qualified Health Center ("FQHC") Franklin Health Care Center into the June 30, 2016 application for Partnership with the National Park Service to develop Africatown, a community located in Mobile, Alabama, and Africatown Park, a community located in Prichard, Alabama.

- o NAACP-Florida, Alliance's sub-grantee, is working with Tuskegee and Florida A&M Universities to conduct environmental assessments of water and air pollution in the Lovejoy community of Okaloosa, Florida, due to a high rate of death from unknown causes.

- The **Environmental Health Capacity and Literacy Project**, with its grantee being Tulane University, has achieved the following:

  - o The Association of Occupational and Environmental Clinics ("AOEC") coordinated two (2) educational sessions on environmental and occupational medicine for staff at two (2) health clinics in Bayou La Batre, Alabama, and New Orleans, Louisiana. Dr. Katherine Kirkland, Executive Director for the AOEC, presented at the University of Texas at Tyler Health Center's Emerging Issues in Occupational Medicine Conference on *Gulf Coast Recovery & Occupational Health* to an audience of ninety-nine (99) people.

  - o The Fussy Baby Network New Orleans & Gulf Coast opened three (3) new cases, serving a total of nineteen (19) families during May and June 2016, with forty (40) home visits, clinic sessions, and phone sessions. Six (6) additional families (one (1) of them new) were served through one (1) parent support group.

  - o The Emerging Scholars Environmental Health Sciences Academies at Tulane, University of South Alabama, and University of West Florida started their summer programs for high school students. The University of Southern Mississippi implemented two (2) workshops for science teachers.

  - o The community health workers ("CHWs") employed by community-based organizations and FQHC subcontracts with EHCLP, continued important work along the Gulf Coast. Examples from four (4) of the sites include the following: Boat People SOS in Biloxi, Mississippi, held a workshop on healthy eating and symptom management for twenty-five (25) at-risk seniors with multiple chronic diseases; the CHW team at Franklin Primary Health Center in Alabama participated in the University of South Alabama's Mental First Aid Training; Jefferson Community Health Care Center in Jefferson Parish, Louisiana provided sixty (60) people with education and support on healthy eating and nutrition; and Starfish Café in Bay St. Louis, Mississippi hosted a discussion group of eighteen (18) participants on how to better understand your doctor and pharmacist, along with what questions to ask during medical visits.

- The **Community Health Workers Training Project**, directed by the University of South Alabama's Coastal Resource and Resiliency Center ("CRRC"), has achieved the following:

  - o A Peer Health Advocate ("PHA") training session was held at the Mobile Marriott, Mobile, Alabama, on April 3-6, 2016.

- o Keith Nicholls, CHWTP Project Leader and Coastal Resource and Resiliency Center ("CRRC") Senior Associated Director, and Janel Lowman, CRRC Training and Outreach Coordinator, focused their efforts on PHA/Chronic Disease Management ("CDM") recruitment in Franklin, Louisiana, and Belle Chase, Louisiana, on April 27-28, 2016.

- o Conducted an Advanced Training in CDM for previously trained CHWs and PHAs, which was held at the Mobile Marriott, Mobile, Alabama, on June 5-10, 2016.

- o CRRC staff participated in numerous GRHOP conference calls and attended the GRHOP Quarterly meeting June 3, 2016.

- The **Mental and Behavioral Health Capacity Project**, implemented by a coalition of four (4) academic institutions (Louisiana State University Health Sciences Center ("MBHCP-LA"), the University of Southern Mississippi ("MBHCP-MS"), the University of South Alabama ("MBHCP-AL"), and the University of West Florida ("MBHCP-FL")), has achieved the following:

  - o MBHCP-LA has:

    - ▪ Continued to have success in developing and implementing efficient, high quality integrated care services in communities with prior disparities in care, with improvement in mental and physical health symptoms and with high client and clinic satisfaction;

    - ▪ Provided supportive services in schools with students and consultation with parents, school counselors, teachers, and other school staff leading towards sustainability of helpful services;

    - ▪ Continued collaboration with PCCP; made progress toward the long-term goal of integrating mental and behavioral health care into electronic medical records at affiliated clinics, even as several clinics are transitioning to a new electronic medical records system;

    - ▪ Continued growth of the young child (0-5 year) program in FQHCs and community clinics, schools, and early childhood programs in response to clinician and parental concerns and in issues raised by national and local pediatric and child psychiatry associations and providers;

    - ▪ Delivered, disseminated, and proposed submissions for a number of national presentations regarding MBHCP-LA's activities and outreach, including the American Psychiatric Association, Robert Wood Johnson Resilience Roundtable, American Academy of Child and Adolescent Psychiatry, ZERO TO THREE, a community workshop with national experts on transition-age youth in attendance, SAMHSA All Network Conference for National Child Traumatic Stress Network, the Gulf of Mexico Oil Spill and Ecosystem Science Conference, and the Society of Petroleum Engineers; and

- Increased emphasis on sustainability through grant writing efforts and contract development. Through evaluation efforts, the project has identified three main areas to increase behavioral health service capacity in rural clinics: specialized services, consultation efforts, and coalition building.

o MBHCP-MS has achieved the following:

- All Mississippi Integrated Health and Disaster Program ("M-IHDP") clinic staff[20] were trained and are utilizing the Mississippi Health Information Network ("MS-HIN") direct messaging system to track chronic health patients' emergency room and hospital discharges. This effort creates an opportunity for immediate outreach to individuals with the goal of improving post-discharge outcomes and decreasing readmissions.

- M-IHDP, in collaboration with the MS-HIN, is evaluating the effectiveness of the direct messaging system and its impact on continuity of care for patients, served by their Chronic Condition Support Program. This effort will result in workflow improvement and quicker response to patient need.

- MBHCP-MS has fully tested and vetted an integrated care plan with providers across the FQHC, which allows for a shared patient document between medical and behavioral health staff. This care plan should be fully functional in the electronic health record by September 2016.

- The M-IHDP leadership team worked closely with the FQHC Quality Director to develop a standardized workflow that allows for the initiation of non-face-to-face chronic care management activities. This initiative allows the behavioral health staff to take advantage of new Medicare reimbursements that support the use of telephonic interventions for individuals with uncontrolled chronic illnesses.

- The M-IHDP program director began conversations with local organizations and insurers to develop alternative methods for patients to access affordable fresh fruits and vegetables along the three (3) coastal counties. This initiative targets pre-existing savings programs and delivery services. The goal is to link ongoing efforts to undeserved communities.

o MBHCP-AL has:

- During this quarter, provided services to over 1,309 new adult clients and almost 904 new child clients in the FQHCs, the University of South Alabama Family Medicine Clinic, and the Child Psychiatry Residency Program. Brief behavioral health service delivery at their integrated healthcare locations continues to be the main priority of MBHCP-AL.

---

[20] M-IHDP refers to members of MBHCP-MS within the university setting.

- Continued the drive towards a sustainable Behavioral Health Department at the Mobile County Health Department, including additional EHR standardizations and training, adding new providers and sites, and developing a strategic plan for behavioral health.

- Hosted a one-day Grief Therapy as Brief Therapy workshop for 54 mental health professionals from both lower Alabama counties.

- Cory Wornell, MS, MPH, Director of Training and Evaluation attended an expedited YMHFA train-the-trainer program in Portland, OR during the first week of April, 2016.  As a certified trainer, Mrs. Wornell will facilitate the coordination of all future YMHFA trainings.

- A Behavioral Health Provider ("BHP") candidate has been selected to provide coordinated school care within the Mobile County Public School System. This social worker will start service delivery in August 2016.

- ADHD Protocol for our portable ADHD Assessment Team was finalized this quarter. These services will start in the fall of 2016.

- Staff members continue to receive and accept permanent job offers in the integrated health world as the MBHCP-AL effort moves forward. This quarter, Malaika Russ, LCSW, was hired to direct coordinated care services within one of the emerging Regional Care Organizations.

- Created a final budget for the remainder of the project. The proposed revised budget was submitted to the Claims Administrator.

- Received permission to fund two (2) post-doctoral fellows for 2016 to 2017. Both fellows will be enacting our staffing plan for the FQHCs while implementing sustainability and dissemination activities. Interviews were conducted and two post-doctoral fellows were hired. Each has an interest in system change as well as client-level intervention skills. They will begin working with us next quarter. These positions are being sought in lieu of hiring more full-time BHP's who have a time-consuming training trajectory and a short time of guaranteed employment with the project.

- Numerous dissemination efforts are occurring. Across this quarter, eight (8) presentations were accepted to national and international conferences: Association of Behavioral and Cognitive Therapies, American Public Health Association, and the International Society of Traumatic Stress Studies. Three (3) papers were completed and sent out to journals for potential publication. Two (2) of these papers were in collaboration with our community partners.

o MBHCP-FL has:

- Continued Studer Training with all FQHCs in their grant area;

- Executed a Memorandum of Understanding ("MOU") with an independent provider in Pensacola, Florida, to sustain the position at Pensacola State College;

- Executed an MOU with the Children's Home Society to sustain services in Santa Rosa County Schools and Escambia County Schools;

- Sponsored staff from each FQHC in grant area to attend a Patient Centered Medial Home conference, which also addressed integration of Mental and Behavioral Health Services.

## C.  GULF REGION HEALTH OUTREACH PROGRAM LIBRARY

In accordance with Section IX.H of the MSA, the Claims Administrator has established a publicly accessible online library, which exists as a repository of information regarding information related to the health effects of the *Deepwater Horizon* incident, including, but not limited to: (a) the composition, quantity, fate, and transport of oil, other hydrocarbons, and other substances released from the MC252 Well and the *Deepwater Horizon* and the dispersants and contaminants used in Response Activities; (b) health risks and health studies relating to exposure to oil, other hydrocarbons, and other substances released from the MC252 Well and the *Deepwater Horizon* and the dispersants and decontaminants used in Response Activities; (c) the nature, content, and scope of in situ burning performed during the Response Activities; and (d) occupational safety, worker production, and preventative measures for Clean-up Workers.

The library houses 190,357 relevant documents, each tagged with a specific search category based on the type of information identified within the MSA.  The Claims Administrator will continue to add Library Materials in accordance with the MSA.

Respectfully submitted,

*DEEPWATER HORIZON* MEDICAL BENEFITS
CLAIMS ADMINISTRATOR


By: /s/ Matthew L. Garretson
     Matthew L. Garretson

## CERTIFICATE OF SERVICE

I hereby certify that the above and foregoing document has been served on All Counsel by electronically uploading the same to Lexis Nexis File & Serve in accordance with Pretrial Order No. 12, and that the foregoing was electronically filed with the Clerk of Court of the United States District Court for the Eastern District of Louisiana by using the CM/ECF System, which will send a notice of the electronic filing in accordance with the procedures established in MDL 2179, on this 1st day of September, 2016.

Respectfully submitted,

*/s/ Matthew L. Garretson*
Matthew L. Garretson