UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF LOUISIANA

| | | |
|---|---|---|
| IN RE:  OIL SPILL BY THE OIL RIG | : | MDL 2179 |
|      "DEEPWATER HORIZON" IN THE | : | |
|      GULF OF MEXICO, ON APRIL 20, 2010 | : | Section J |
| | : | |
| This Document Applies to: | : | Judge Barbier |
| | : | |
| *No. 12-970, Bon Secour Fisheries, Inc., et* | : | Mag. Judge Wilkinson |
| *al. v. BP Exploration & Production Inc., et al.* | : | |

MEMORANDUM IN SUPPORT OF THE MOTION OF THE
DHECC FOR RETURN OF PAYMENTS MADE TO
<u>KEYS MARINE SERVICE AND SALVAGE, INC. AND OTHERS</u>

On behalf of the Deepwater Horizon Economic Claims Center ("DHECC"), Claims Administrator Patrick Juneau seeks to have claimant Keys Marine Service & Salvage, Inc. ("Keys") return a total of $569,886.14 paid by the DHECC.  Keys, which services the commercial maritime and fishing industry in the Florida Keys, filed a claim with the DHECC Business Economic Loss ("BEL") program.  Keys submitted profit and loss statements (P&L's) that falsely represent its earnings during the relevant years of 2008 through 2010.  Moreover, these statements shift revenue out of the 2010 compensation period, which artificially creates the guise of a sharp drop in post-spill profits and significantly inflates the amount of Keys' claim award.  *See* Ex. A, Declaration of J. Lynn Barker ("Declaration").  Relying on the misrepresentations, the DHECC paid Keys $569,886.14.

The DHECC seeks a judgment requiring Keys to return its claim award payment to the DHECC.  Efforts with counsel for Keys, Williams, Kherker, Hart, Boundas, L.L.P ("Williams Kherker"), to attempt to resolve the issues presented in the accompanying Motion have not resulted in a resolution.  Any professionals who benefited from these unjustified payments similarly should return such payments.

### A. *Background*

The Claims Administrator has authority to ensure the integrity of the DHECC, including by initiating clawback proceedings of fraudulent claims. *See* Orders of September 6, 2013 (Rec. Doc. 11288) and May 6, 2015 (Rec. Doc. 14543); Settlement Agreement at ¶4.3.10. The Court retains continuing jurisdiction over the Settlement Agreement. Settlement Agreement at ¶¶ 4.4.7 and 18.1. Disputes concerning enforcement of the Settlement Agreement are to be resolved by motion to the Court. *Id.*

### B. *The DHECC Claims*

Keys, incorporated on or about June 11, 2008, specializes in fiberglass fabrication and repair, mobile welding, and hydraulic services. The business also maintains a retail parts store. It is owned jointly by Steven and Letisha Powell.

On October 23, 2012 Keys filed a Business Economic Loss ("BEL") claim with the DHECC, asking to have the claim paid on Keys historical income as reported in monthly profit and loss statements ("P&L") and federal tax returns. Ex. B.

1. General Requirements for Business Economic Loss Claims

The Settlement Agreement requires business claimants to provide the DHECC with, among other documents, federal tax returns and monthly P&Ls for the selected Benchmark Period, for 2010, and, at times, for 2011. *See* Settlement Agreement Ex. 4A at ¶¶ 3-4. Claimants are not required to provide P&Ls prepared using a specific method of accounting, but to ensure comparability among time periods the DHECC "will not mix cash basis P&Ls for some months with accrual based P&Ls for other months for any purpose."

*See* DHECC Policy 464.[1]  The DHECC calculates compensation using the data provided by the claimant, and the DHECC has the authority to request additional information from the claimant prior to awarding payment.  Settlement Agreement Ex. 4A at ¶ 4.

The BEL compensation framework consists of two steps.  The first step compensates the claimant for certain reductions in variable profits, by comparing variable profits for three or more consecutive months between May and December 2010 with variable profits for those same months during a Benchmark Period.  The second step compensates the claimant for the incremental profits they might have generated in the absence of the oil spill relative to revenue from a Benchmark Period.  Claimants also receive a risk transfer premium to determine a total settlement award.

2. Claimant's Business Economic Loss Claim and Payment

Keys provided the DHECC with federal tax returns for 2008 – 2010 and monthly P&Ls for 2008 - 2010. Ex. C, Ex. D.  Keys also provided the following: (a) "profit and expense report" for the months of September 2008 to February 2009, (b) a schedule showing monthly expenses in an excel work sheet for 2008 – 2010,[2] and (c) a schedule showing gross monthly income for 2009 and 2010.[3] Ex. E, Ex. F, Ex. G.

Relying on the P&Ls provided by Keys, the DHECC used June – December 2009 as

---

[1] Policy 464 was issued on September 4, 2013, but was applied to all claims regardless of active date.  Under the cash method of accounting, revenues are recognized when cash is received and expenses are recognized when cash is disbursed.  Under the accrual method of accounting, revenues are recorded when earned and expenses are recorded when incurred, that is, when goods or services have been provided or received regardless of when cash changes hands.  *See* Statement of Financial Accounting Concepts No. 5 at ¶¶ 83, 85 (revenue and expense recognition for accrual method of accounting).
[2] These schedules did not contain amounts for cost of goods sold.
[3] The P&L's appear to be the same expense worksheets noted above (b), and the revenues reported in the P&L's match the amounts shown on the gross monthly income schedule (c) for 2009 and 2010, but the revenue reported for 2008 is not consistent with the aforementioned profit and expense report (a).  The gross monthly income in the schedule referenced above in (c) is consistent with gross receipts reported on Keys' tax returns.

- 3 -

Keys's Benchmark Period and found as follows:

| Period | Revenue | Variable Expenses | Variable Profit |
|---|---|---|---|
| Benchmark | $52,111.79 | $32,630.51 | $19,481.28 |
| 2010 Compensation | $93,853.60 | $295,432.63 | -$201,579.03 |
| | | **Lost Variable Profit:** | **$221,060.31** |

From this data, the DHECC awarded and paid Keys $569,886.14, including an appeal review cost.[4]  *See* Ex. H.  As counsel for claimant, Williams Kherker, received $113,977.23 based on its 20% contingency fee.

### C. *Evidence of the Fraudulent Claims*

The totality of the record shows that there is no genuine issue as to any material fact and that the DHECC is entitled to a judgment as a matter of law.  *See* Order & Reasons on Special Master's Motion for Return of Payments Made to Casey C. Thonn and Others at 19 (Rec. Doc. 12794).

Keys provided the DHECC with P&Ls containing artificial monthly revenue amounts that misrepresented the finances of the company.  This misrepresentation included a shift of revenue away from the 2010 compensation period and into the non-compensation months.  This revenue shift artificially inflated the lost variable profit for each of the companies.  This misrepresentation increased the award amount paid by the DHECC.  *See* Ex. A, Declaration at ¶¶ 16.  Further evidence of fraud, present within Keys' Gulf Coast Claims Facility filing, shows the company's knowledge, motive, and intent to induce the DHECC act in reliance upon a misrepresentation.  *Id*.

---

[4] The DHECC paid Keys, whose claim was appealed unsuccessfully by BP, on May 17, 2013.

      1.    <u>Keys Inflated its Claim Award by Falsely Showing Lost Profit through Revenue Shifting in 2010.</u>

Keys submitted a monthly profit and loss statements in an excel spreadsheet for 2008 through 2010, the properties section of which shows a creation date of February 7, 2013. *See* Ex. I. The total revenue Keys reported on its P&L for 2010 matches the amount it claimed as gross receipts on its 2010 Form 1120S; however, the monthly breakdown of revenues contained within its P&L's show a pattern that significantly drove the award calculation in Keys's favor, inflating the award that Keys received. Specifically, Keys shifted revenue out of the compensation period and into the non-compensation months.

The DHECC obtained Keys Marine's bank records via subpoena in order to further investigate the monthly revenue figures that Keys reported. The monthly figures in the bank statements for 2010 differ greatly from those reported in the P&L's for the same year. The non-compensation period months of January through May of 2010 on the P&L's report $281,771.89 more in revenue than the net taxable deposits shown in the bank records for the same time period. *See* Ex. J. The compensation period months of June through December of 2010 on the P&L's report $97,774.17 less revenue than the net taxable deposits shown in the bank records for the same time period. *Id*.

These differences show that Keys shifted its 2010 revenue out of the compensation period and into the non-compensation period, without changing the 2010 annual revenue total, thus maintaining consistency with Keys's 2010 tax filing. Under a cash method of accounting, there should be no difference between the monthly P&L's and the monthly bank account statements. Here, the difference is the result of fraudulent revenue shifting in order to manipulate the compensation period revenue.

Keys's shift of revenues within the P&L's increased its 2010 lost variable profit, consequently qualifying Keys for a larger claim award. A comparison of Keys's monthly bank statements to the revenue reported in its 2010 P&L makes this point clear. The chart below illustrates this by listing net taxable deposits, reported revenue from Keys 2010 P&L, and the variance between the two. (blue shading indicates compensation period)

| 2010 Keys Marine Service and Salvage | | | |
|---|---:|---:|---:|
| | Net Taxable Deposits | Reported Revenue | Variance |
| January | $ 14,886.52 | $ 83,467.22 | $ (68,580.07) |
| February | $ 18,970.39 | $ 94,190.91 | $ (75,220.52) |
| March | $ 20,697.68 | $ 90,264.91 | $ (69,567.23) |
| April | $ 38,913.14 | $ 83,626.92 | $ (44,713.78) |
| May | $ 24,788.90 | $ 48,478.56 | $ (23,689.66) |
| June | $ 21,177.32 | $ 25,678.04 | $ (4,500.72) |
| July | $ 26,080.62 | $ 18,189.64 | $ 7,890.98 |
| August | $ 23,190.14 | $ 13,492.19 | $ 9,697.95 |
| September | $ 28,140.57 | $ 10,666.50 | $ 17,474.07 |
| October | $ 23,623.07 | $ 11,966.52 | $ 11,656.55 |
| November | $ 29,914.52 | $ 9,538.29 | $ 20,376.23 |
| December | $ 39,501.53 | $ 4,322.42 | $ 35,179.11 |
| Compensaion Period | $ 191,627.77 | $ 93,853.60 | $ 97,774.17 |
| | | | |
| 2010 Total | $ 309,884.40 | $ 493,882.12 | $ (183,997.72) |

The DHECC relied on the Keys's P&L's to compare the company's pre-spill variable profit with the variable profit in the 2010 compensation period. But, the shift of revenue out of the compensation period had the effect of artificially overstating the loss and increased Keys's award amount.

  2. <u>The Knowledge, Motive, and Intent of Keys to Defraud the DHECC is Evident from documents submitted in its GCCF Filing.</u>

The knowledge, motive, and intent possessed by Keys to submit false financial documents in support of a BP Oil Spill claim is shown through Keys's GCCF claim, wherein

- 6 -

the company submitted false documents in an attempt to gain an emergency assistance claim. Wrongs or other acts of Keys may be admissible for proving "motive, opportunity, intent, preparation, plan, knowledge, identity, absence of mistake, or lack of accident." Fed. R. Evid. 404(b)(2).[5]

In support of its GCCF Claim, Keys submitted a hardship letter, signed by Letisia Powell. Ex. K. The letter, undated, asserts that Keys should be awarded an emergency assistance payment due to lost revenue as a result of the spill. Powell notes in the letter, nor can she refute, that Keys revenue significantly increased in 2010 from 2009, prompting her to focus the GCCF's attention to two contracts that were purportedly cancelled as a result of the spill.

The first contract Keys points to is between Keys and Robert Hernandez of R&J Fishing Corporation ("R&J"). Keys claimed that the work for R&J was contracted to just prior to the spill, purportedly paying 50% of the total contract, $11,825, to R&J on April 7, 2010. Keys claimed that the contract was cancelled on June 10, 2010 and it returned, via check number 2149, the $11,825 payment to R&J. *See* Ex. L, Ex. M. With their request for emergency assistance, Keys submitted copies of checks and a deposit slip listing the above check in an attempt to document the above transactions. A closer look at these check copies, though, reveals that Keys artificially created this cancellation in order to fraudulently obtain a claim award from the GCCF. *See* Ex. A, Declaration at ¶¶ 6.c. – 6.e.

Keys submitted what it held out to be R&J Check No. 2581, dated April 7, 2010, payable to Keys in the amount of $11,825. Ex. N. The DHECC obtained a true copy of this

---

[5] The admissibility of this evidence will be discussed in depth in the "Legal Analysis" section of this memorandum.

- 7 -

check from First State Bank via subpoena, revealing that the copy of check 2581 submitted by Keys was altered; the actual check was issued to Keys on February 21, 2011 in the amount of $2,848.81.  Ex. O.  Further, Keys submitted a copy of what appeared to be a corresponding deposit slip, totaling $12,625.50, inclusive of the altered check.  Ex. N.  A review of Keys's bank statements did not reveal a deposit of $12,625.50.  *See* Ex. A, Declaration at ¶¶ 7.a.

To complete this specific claim of lost revenue, Keys submitted a copy of Keys Check No. 2149, dated June 11, 2010, payable to R&J in the amount of $11,825, with a note of "Return On Dep," along with a notation on the check copy of "Invoice # T-4610" with the initial "L".  *See* Ex. L.  Keys purported this check copy to be that of their return payment to R&J based on the cancelled contract referred to in the GCCF claim.  This check, too, was altered.  The copy of Check 2149 submitted by Keys contains a MICR number of 2565.[6]  The DHECC obtained a copy of Keys Check No. 2565 via subpoena from Centennial Bank.  Ex. P.  Check 2565 is dated February 2, 2011, not June 11, 2010 as the copy submitted to the GCCF was dated; and the check is payable to Charles Weitzel in the amount of $300, not $11,825.  The DHECC further inquired as to check 2149 with Centennial Bank to verify whether that check was in fact written in the amount Keys claimed.  According to the bank, check 2149 has not cleared.  *See* Ex. A, Declaration at ¶¶ 7.b.

The GCCF ultimately did not find Keys eligible, based on failure to show lost profit; however, their actions reveal not only their knowledge of the program requirement to

---

[6] The MICR check number appears at the bottom edge of a check followed by the bank's routing number and account number.  MICR stands for Magnetic Ink Character Recognition.  The MICR check number corresponds with the check number shown at the upper right hand corner of the check.

show lost revenue after the spill, but also their intent from the outset to submit false information in order to fraudulently obtain a claim award.

       3.       <u>Keys Submitted False Financial Information in Support of its Claim.</u>

In addition to the shift their monthly revenue figures in 2010 out of the compensation period to artificially inflate the company's lost variable profit, Keys's financial documents and information submitted in support of its claim were false representations of the company's financial status during the benchmark and compensation years.

On its P&L's Keys reported as revenue $11,460.80, $108,873.01, and $493,882.12 for the years 2008, 2009, and 2010, respectively. *See* Ex. D. Yet, according to the company's bank records, its net taxable deposits for the same years (calculated using the bank deposits method of proof, approved in *Gleckman v. U.S.*, 80 F.2d. 394 (8th Cir. 1935), *See* Ex. A, at ¶ 3) equaled $93,029.40, $180,924.99, and $309,884.40, respectively, for years 2008 through 2010. *See* Ex. J. The year-end revenue totals reported on the P&L's match those on the tax returns, yet remain vastly different from net taxable deposits found within Keys bank account. Nothing in the DHECC's review of the company's bank records accounted for this large discrepancy. The net taxable deposits bear no correlation to the reported revenue on the P&L's. *See* Ex. A, Declaration at ¶ 16.

DHECC investigators had an opportunity to interview Stephen and Letisha Powell, principals of Keys, along with Dianna Rodriguez, the sister of Letisha Powell, who assisted in the operation of Keys. Investigators also interviewed Charles Weitzel, the CPA who prepared Keys's tax returns. None of the above individuals provided a plausible explanation as to the discrepancies within Keys's reported financial figures. Dianna

Rodriguez offered an explanation, wrought with inconsistency, that could neither be corroborated nor supported by the Powell's or their CPA.

With counsel present, DHECC investigators interviewed Letisia Powell ("Letisia") on April 27, 2016.[7] Letisia, a 50% owner of Keys with Stephen, stated that during 2008 and 2009 she worked at the store most of the day and also sold real estate. Rodriguez ran the store when Letisia was not there. Letisia further stated that she and Rodriguez shared the financial responsibilities, but Rodriguez was the bookkeeper. At year end, Rodriguez would add up the expenses and Weitzel would help. Rodriguez and Letisia both would add up the revenue, and Letisia would then take a summary sheet of revenue and expenses to Weitzel to prepare the corporate tax return. Letisia stated she relied on Rodriguez to prepare the profit and loss statements that were submitted to the DHECC.

When shown the consistent monthly differences in revenue appearing within Ex. J, Letisia said she could not provide an explanation for those monthly differences. Letisia could not explain why revenue for the months of January through May 2010 was significantly higher than bank deposits but less than the deposits for June through December. Letisia was also unable to explain why cost of goods sold was lower than revenue specifically for January through May, but cost of goods sold was higher than revenue for the remaining months (which make up the compensation period). *See* Ex. Q. Letisia stated she did not understand the mechanics of how the claim computation works.

Prior to filing with the DHECC, Keys submitted a claim for emergency payment with the GCCF. CPA Chuck Weitzel assisted with the GCCF claim. According to Letisia, he

---

[7] DHECC Investigator Lynn Barker initially attempted to interview Letisia on August 17th, 2015, but she declined the interview without counsel present. *See* Ex. A, Declaration at ¶ 9.

prepared a hardship letter on behalf of Keys requesting an interim payment. Letisia stated that she signed the letter after he prepared it.

DHECC investigators also interviewed Dianna Rodriguez on April 27, 2016. Rodriguez, who started working at Keys in 2008, described her duties as running the store, bookkeeping, merchandise sales, accounts receivables and payables, writing checks and preparation of monthly sales returns. Rodriguez informed investigators that prior to working for Keys she had been convicted and sentenced to 5 years in prison based on her involvement with a payroll check scheme with her prior employer. Letisia had asked Rodriguez to work for Keys in 2008.

Rodriguez told investigators that she prepared the profit and loss statements that were submitted to the DHECC. She claimed to have falsely increased revenue for 2010 to conceal from Steven and Letisia that she had been stealing money from Keys, an estimated $50,000 to $60,000 from 2008 to 2011. She stated she determined the amount of cost of goods sold by adding up sales tickets then making adjustments for what she had stolen. As for the amount of inventory, along with revenue and expenses given to CPA Weitzel to prepare tax returns, Rodriguez stated those amounts were false and "made up." She said this included the revenue and expense amounts used on the P&L's submitted to DHECC. When shown copies of the actual P&L's submitted to the DHECC, Letisia only offered that she prepared them and they were false. Rodriguez stated that the bank depsoits were a more accurate representation of revenue if you add the amount of cash she had stolen.

With regard to the Keys GCCF claim, Rodriguez stated that she prepared the hardship letter as told to do so by Letisia. Rodriguez further stated that she altered the check from R&J Corporation to KMSS, the deposit slip, and the check from KMSS to R&J

- 11 -

Fishing Corp.  She repeated that Letisia did not know the checks submitted to the GCCF had been altered.  Rodriguez claimed that Ruben Hernandez, a close friend, had asked her to alter the check so he could cash it, adding that his later attempt to cash it proved unsuccessful.  That check was originally written to Charles Weitzel on February 22, 2011 for $300.

DHECC investigators also interviewed Stephen Powell.  He stated that he was not involved in the financial aspects of the business, rather Letisia and others hired were responsible for the business's finances.  Powell described his duties as "keeping everything running."  This primarily included the actual repair work for customers along with repair work performed around the shop.  When asked about the BP Claim filing, Powell stated Dianna Rodriguez obtained the needed documents to file a claim with BP and any further questions regarding documents would have to be directed to Rodriguez and Letisha.

When DHECC investigators called CPA Charles Weitzel on April 27, 2016,[8] he informed the investigators that he did not assist Letisia or Rodriguez in the preparation and filing of the GCCF claim, nor did he prepare any monthly sales tax returns.  He further stated he only recalls dealing with Letisia regarding tax return preparation, not Dianna Rodriguez.

### D. *Legal Analysis*

The Court's power to order appropriate remedies as a result of fraudulent conduct is a broad, flexible and long-standing power. See *Hazel-Atlas Glass Co. v. Hartford Empire Co.*, 322 U.S. 238, 244 (1944) (affirming judicial power to set aside fraudulently begotten judgments as such cases present "a wrong against the institutions set up to protect and

---

[8] Weitzel was previously interviewed on August 18, 2015 as well.  See Ex. A, Declaration at ¶ 10.

safeguard the public, institutions in which fraud cannot complacently be tolerated consistently with the good order of society"); Order & Reasons at 21. Where the Court has determined that a claimant committed fraud in relation to its claims, "it is both reasonable and proper under the terms of the Settlement Agreement to order [the claimant] to make restitution for the funds that he received as a result of his fraudulent claim." Order & Reasons at 21. Keys should make restitution to the DHECC based on its fraudulent claim.

    1.    Keys Should Make Restitution to the DHECC on Claims Paid
           Based on Misrepresentations of Keys's Financial Documents.

To prove fraud in this context, the DHECC must show that (1) Keys made a material representation; (2) its representation was false; (3) when Keys made the representation, Keys knew it was false or made it recklessly without any knowledge of the truth and as a positive assertion; (4) the representation was made with the intention that it be acted upon by the DHECC (the other party); (5) the DHECC acted in reliance upon the representation; and (6) the DHECC suffered injury. Order & Reasons on Motion of the DHECC for Return of Payments Made to Crystal Seafood Company, Inc. and Others at 6 (Rec. Doc. 18456) (citing *In re Deepwater Horizon*, No. 15-30574, 2016 WL 1397663 at *3, -- F. App'x – (5th Cir. April 8, 2016); Alfonso Order at 6-7, Rec. Doc. 15400)).

    a.  *Keys Actions Satisfy the Elements of Fraud*

Here, Keys falsely represented that the company sustained lost profits as a result of the spill by shifting its revenue out of the compensation period in 2010. Keys knew their representation to be false as is evident from a comparison of their bank statements to the reported figures on their profit and loss statements. At the very minimum, the evidence shows they had an insufficient basis from which to make the representations. Keys intended to induce the DHECC to act in reliance on the information when they submitted

false P&L's to the DHECC in support of its claim, after swearing under penalty of perjury that all supporting documentation was true and accurate. Keys intent to induce the DHECC to act in reliance, and their knowledge that the DHECC would act in reliance, is evidenced through their first attempt to defraud a BP Spill program, specifically their actions and false representations made to the GCCF. The DHECC justifiably relied upon Keys's false representations, as the DHECC ultimately provided Keys an award amount significantly higher than what Keys would have received had it provided truthful information.

   The documents upon which the DHECC relied in providing Keys a claim award, specifically Keys's P&L's, were fully in the controlled, and produced to the DHECC, by Keys. A simple comparison of the P&L's to Keys's bank records makes clear the falsity of the P&L's. As these were records of the company, Keys had superior access to this information, knew of their falsity, and should be held liable for submitting them to the DHECC as being true and accurate. *See In re Healthsouth Corp. Shareholders Litigation*, 845 A.2d 1096, 1105-06 (Del. Ch. 2003), *aff'd.* 847 A.2d 1121 (Del 2004) (holding that "the party with superior access to information and the primary duty to ensure the accuracy of the financial statements" could be held liable for misstatements."). These were records maintained by the company and clearly manipulated for purposes of the DHECC claim; Keys cannot now maintain that they had no knowledge of the false nature of these records. Despite the plainly obvious differences between the P&L's and the bank statements, Keys made no

mention of it to the DHECC throughout the claim filing process. Keys's withholding of this information from the DHECC shows that the company knew the P&L's were fraudulent.

### b. Keys Fraudulent Submissions within in its GCCF Claim are Relevant to Prove its Knowledge, Motive, and Intent under Rule 404(b)

Keys knowledge, motive, and intent to defraud the DHECC may also be properly drawn from its prior submission of altered documents through its GCCF filing. F.R.E. 404(b)(1)-(2)(stating evidence of crimes, wrongs, or other acts is generally inadmissible unless submitted for the purpose of proving "motive, opportunity, intent, preparation, plan, knowledge, identity, or absence of mistake or accident."). The Fifth Circuit, in set forth a two-step test: "First it must be determined that the extrinsic offense evidence is relevant to an issue other than defendant's character. Second, the evidence must possess probative value that is not substantially outweighed by its undue prejudice and must meet other requirements of Rule 403." *United States v. Beechum,* 582 F.2d 898, 911 (5th Cir. 1978), reaffirmed in *United States v. Smith*, 804 F.3d 724 (5th Cir. 2015).

Prior to addressing the two-part test of *Beechum*, the predicate question before the Court is that of proof. *United States v. Smith*, 804 F.3d 724, 735 (5th Cir. 2015). Through the copies of false checks submitted to the GCCF and verification of their falsity through bank records, the DHECC's has offered sufficient proof that Keys did in fact attempt to defraud the GCCF through altered documents. *See Gutierrez–Mendez,* 752 F.3d at 424 (quoting *Huddleston v. United States,* 485 U.S. 681, 692, 108 S.Ct. 1496, 99 L.Ed.2d 771 (1988)(proof of an uncharged offense is sufficient if "the jury could reasonably find" that the offense occurred "by a preponderance of the evidence."). As *Smith* found testimony and recordings of meetings reflecting the defendant agreement to accept a bribe to be sufficient proof of an uncharged offense (the bribe), so too should the DHECC's evidence of bank

records documenting falsity of the check copies submitted to the GCCF be considered sufficient proof. *Smith* at 735-736.

In satisfaction of the first part of the *Beechum* test, the submission of altered checks by Keys to the GCCF is relevant to an issue other than the defendant's character; it shows that Keys had the requisite intent to defraud a claims program in order to gain an award to which it is not entitled. As intent and knowledge are issues regarding whether Keys committed fraud against the DHECC, Keys intent during the GCCF process is relevant as well. *Beachum,* 582 F. 2d, at 911 (holding that when the issue is the defendant's intent to commit the offense charged, "the relevancy of the extrinsic derives from the defendant's indulging himself" in the same state of mind in the commission of both extrinsic and charged offense). The 5th Circuit has previously reasoned that an uncharged offense is relevant to intent if it requires the same intent as the charged offense "because evidence of the uncharged offense then 'lessens the likelihood that the defendant committed the charge offense with innocent intent.'" *Smith*, 804 F. 3d at 736 (quoting *Beachum*, 582 F. 2d. at 913). Here, the DHECC must prove that Keys knowingly created a false representation, upon which it intended to induce the DHECC to act in reliance; therefore, whether Keys acted with the same intent and knowledge in its GCCF filing, a filing in which it seeks the same relief, is relevant to the instant wrong.

The inquiry next turns to whether the probative value of Keys's GCCF fraud is substantially outweighed by its undue prejudice under a Rule 403 test. Factors to be considered within this inquiry are (1) the DHECC's need for the extrinsic evidence, (2) the similarity between the extrinsic and charged offenses, and (3) the amount of time separating the two offenses. *Smith,* 804 F. 3d. at 736. Here, the necessity of the extrinsic

evidence is seen through the relevancy of intent, as analyzed in the first step.  The current and extrinsic offense are highly similar in that both are instances of submitting false documents to a program established for BP Oil Spill relief.  The offenses, 2 years and one month, apart are sufficiently close in time, as they were both done during the separate incarnations of the claims process.[9]  The evidence of Keys's fraudulent GCCF submissions, when viewed through the above Rule 403 test, show that its probative value is not substantially outweighed by any undue prejudice.   The DHECC submitted proper evidence, under Rule 404(b), Keys possessed the same intent through its DHECC claim as it did its GCCF filing – the intent to falsely represent lost profits to a claims program in an attempt to procure money to which it was not eligible.

> 2. The Court Should Order the Return of All Funds Received
> by Professionals Who Assisted Keys to Submit False Claims

The professionals who helped Keys submit their claims also should return any payment received based on these claims.  *See* Order & Reasons at 26; *SEC v. Blatt*, 583 F.2d 1325, 1335-36 (5th Cir. 1978).  Money paid by contingency fee arrangements may be recouped through restitution where the client's judgment is reversed or voided.  *See Mohamed v. Kerr*, 91 F.3d 1124, 1126 (8th Cir. 1996); Order & Reasons at 22-23.  Because no fee is due, retaining a payment made on a contingency fee contract under such circumstances would be an unjust enrichment.  Order & Reasons at 24.  Whether these professionals knew of the falsity of the claims is immaterial to their duty to make

---

[9] *Smith* also lists limiting jury instructions as a consideration, but as this matter is only before the Court, the trier of law, the DHECC will not address this consideration.

restitution of sums received that have been received as a result of improper claims.  *See* Order & Reasons at 23; *Schock v. Nash*, 732 A.2d 217, 232-33 (Del. 1999).

Here, Keys's lawyers, Williams Kherker, received a percentage of the awards paid for its BEL claim based upon contingency fee contracts.  The contingency fees would not have been payable if the DHECC had not paid the fraudulent claim.  The contingency fees should be returned to the DHECC.

### E. *Conclusion*

For these reasons, the DHECC seeks entry of judgment requiring Keys to make restitution to the DHECC for the total $569,886.14 paid by the DHECC in reliance on the claimant's false representations.  All professionals who assisted the claimant and benefitted from these unjustified payments similarly should be required to return these payments.

        Respectfully submitted,

        Patrick Juneau
        Claims Administrator

        By:  ___/s/ Kevin Colomb_____
        Kevin Colomb
        Manager of Compliance and Internal Integrity

Dated:   September 1, 2016