UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF LOUISIANA

| | | |
|---|---|---|
| IN RE:  OIL SPILL BY THE OIL RIG | : | MDL 2179 |
| "DEEPWATER HORIZON" IN THE | : | |
| GULF OF MEXICO, ON APRIL 20, 2010 | : | Section J |
| | : | |
| This Document Applies to: | : | Judge Barbier |
| | : | |
| *No. 12-970, Bon Secour Fisheries, Inc., et* | : | Mag. Judge Wilkinson |
| *al. v. BP Exploration & Production Inc., et al.* | : | |

## DECLARATION OF J. LYNN BARKER

J. Lynn Barker hereby declares and states as follows:

1. I am over the age of 18 years, and I am a resident of the state of Tennessee.

2. I am presently employed as a financial investigator for the Deep Water Horizon Claims Center.  For approximately 30 years, I was employed as a Special Agent with the Internal Revenue Service-Criminal Investigation Division.  My duties consisted of conducting in-depth financial investigations regarding tax fraud and money laundering and utilized indirect methods for income computations.  I have testified in numerous federal trials as a fact and expert witness regarding financial investigations and the analysis performed to determine income.  After retirement from the Internal Revenue Service I was a contract instructor for the National Criminal Investigation Training Academy teaching financial investigative techniques to new agents.

3. In my investigations I used the bank deposits method of proof, one of the primary indirect methods of proof used by the government in computing taxable income.  This method of proof was approved in *Gleckman v. United States*, 80 F.2d 394, 399-401 (8th Cir. 1935).  Under this method, all deposits to the taxpayer's bank and similar accounts in a single year are added together to determine the gross deposits.  An effort is made to identify amounts deposited that are non-taxable, such as gifts, transfers of money between accounts, loans and other non-income items.  The result is called net taxable bank deposits.

4. In the course of my investigation for the claimant below I obtained bank statements, deposited items, cancelled checks and conducted interviews.  The above methodology was used to analyze deposits and eliminate non-taxable items.  The monthly net taxable deposits were then compared to the reported monthly revenue to determine any variances.

5. My investigation of claimant Keys Marine Service & Salvage, Inc. (KMSS) revealed that the claimant received a compensation award of $569,886.14 due to the claimant falsely creating profit and loss statements and tax returns that shows revenue which is significantly different from the net taxable deposits. The investigation also revealed altered documents were submitted with their GCCF claim for an emergency advance payment. More specifically my investigation revealed:

   a. KMSS services the commercial maritime and fishing fleet of the Florida Keys specializing in fiberglass fabrication and repair, mobile welding and hydraulic services. In addition to the fabrication and repair, the business has a retail parts store. The business is jointly owned by Steven and Letisia Powell and was incorporated on or about 06/11/08.

   b. KMSS filed corporate tax returns (Form 1120S) and reports revenue and expenses using the cash method of accounting as noted on the tax returns. KMS filed claims with GCCF and DHECC. The DHECC claim was computed using 2009 as the Benchmark Period with the months of June – December. The DHECC paid KMS $569,886.14 on 07/26/13.

6. On or about 09/27/10, on behalf of KMSS, Letisia Powell filed a claim with (GCCF 01105415) for an emergency advance payment.

   a. KMSS submitted corporate income tax returns for 2008, 2009 and 2010. *See* Ex. C. (*Please note*: *All exhibits referred to in this declaration refer to the original exhibits that are attached in this filing as support for the "Memorandum in Support of the Motion of the DHECC for Return of Payments Made to Keys Marine Service and Salvage, Inc."*).

   The returns were prepared by Charles Weitzel, CPA and shows preparation dates of 03/10/09, 03/14/10 and 02/22/11, respectively. The tax returns show gross receipts of $12,076 for 2008; $108,813 for 2009; and $493,882 for 2010.

   b. KMSS submitted a non-dated hardship letter request for interim payment on or about 09/27/10. *See* Exhibit K. The letter states that due to the oil spill they lost two contracts totaling $45,997.50. The contracts were for Robert Hernandez, $23,650 and Adam Disson, $22,347.50. The letter states Hernandez made a 50% deposit of $11,825 that was received on 04/07/10, and was included in the daily deposits. The letter further states the contract was cancelled on 06/10/10 and the deposit was returned with KMS check # 2419. These documents were also submitted to DHECC.

   c. KMSS submitted a copy of the Robert Hernandez contract #T-4610 dated 04/06/10 for $22,000. *See* Exhibit L. The contract contains the verbiage

2

"Canceled June 10, 2010". Beside the verbiage has the initial L and below are the initials RH.

d. KMSS submitted a copy of a R&J Fishing Corp check #2581, dated 04/07/10 in the amount of $11,825, drawn on First State Bank and payable to KMSS along with a KMSS deposit slip dated 04/07/10, Centennial Bank, showing four checks totaling $12,625.50 to include the $11,825 from R&J Fishing Corp. *See* Exhibit N.

e. KMSS submitted a copy of a KMSS check #2419, dated 06/11/10, Centennial Bank and payable to R&J Corp in the amount of $11,825 with a note "Return On Dep". *See* Exhibit M. The MICR check number listed at the bottom of the check is 2565, not 2419. *The MICR check number appears at the bottom edge of a check followed by the bank's routing number and account number. MICR stands for Magnetic Ink Character Recognition. The MICR check number corresponds with the check number shown at the upper right hand corner of the check.* There was a notation on the check copy of "Invoice # T-4610" with the initial L.

f. On 06/10/11, GCCF sent KMSS a Determination Letter on Interim Payment/Final Payment Claim. The letter states KMSS will not receive an Interim or a Final Payment because the documents submitted do no establish that KMSS had any loss profits caused by the Oil Spill.

7. Due to suspicious characteristics on the above checks (*See* paragraph 6 subparagraphs d and e). I obtained the original checks from R&J Fishing Corp's and KMSS's respective banks and interviewed Robert and Romeo Hernandez. Below are the results:

a. During November 2015, I received a copy of R&J Fishing Corp check #2581 from First State Bank. *See* Exhibit O. The check was obtained because the R&J Fishing Corp check submitted by KMSS contained characteristics of being an altered document. The check provided by First State Bank is dated 02/21/11 and payable to KMS for $2,848.81, not $11.825.00 as shown on the check submitted by KMSS. My review of the bank statements did not reveal a deposit of $12,625.50 as noted above in paragraph 6 (d). The hand writing for the amount of the check and notation of "Boat Repair" is a different handwriting on the check obtained from First State Bank and the one submitted by KMSS. The "d" contained in the word thousand on the check obtained from the bank extends into the "K" in the payee section. On the check provided by KMSS, the tip of the "d" is shown extending into the "K" but the "d" in the word thousand is not in the same location. Check #2581 obtained from First State Bank was altered to reflect

3

      an earlier date and a different amount to support claim that KMSS had a loss from a cancelled contract.

  b. During December 2015, I received a copy of KMSS check # 2565 from Centennial Bank. *See* Exhibit P. The check was obtained because the check submitted by KMSS shows a check number of 2419 but the MICR check number on the check is 2565. Check #2565 obtained from Centennial Bank is dated 02/22/11 and is payable to Charles Weitzel, CPA, with a description for taxes in the amount of $300, not $11,825 as shown on the check submitted by KMSS. The true check is dated one day after the true check for R&J Fishing Corp. The check payable to Charles Weitzel was altered to show a different date, check number, amount, payee and notation for payment description to support a claim that KMSS had a loss from a cancelled contract. Centennial Bank advised that check #2419 has not cleared.

  c. During the course of my investigation I interviewed Robert Hernandez on 01/04/16. My interview with Robert Hernandez revealed that he was elderly, speaks poor English and has no education. Hernandez, when showed a copy of the cancelled contract with KMSS dated 04/06/10, said he does not understand paperwork and referred me to his son, Romeo Hernandez who now operates R&J Fishing Corp. When shown a copy of check #2419 payable to KMSS for $11,825, Hernandez identified his signature.

  d. During the course of my investigation I telephonically interviewed Romeo Hernandez on 01/08/16 and 01/09/16. Hernandez stated that he has been fishing for approximately 15 years and has operated R&J Fishing Corp for the past 5-6 years. During 2010 R&J operated several boats. One of the boats was named R&J III and the other was operated by his brother Ruben. R&J used Steve Powell of KMSS for repair work on their boats. Hernandez was emailed a copy of the cancelled contract, R&J check #2419 payable to KMSS for $11,825, KMSS check #2419 payable to R&J for $11,825 and R&J check #2419, dated 02/21/11 for $2,848.81 obtained from First State Bank. Hernandez said he does not recall the contract dated 04/06/10. Hernandez stated that his father is not well educated and he would prepare checks and his father would sign them. Hernandez identified his handwriting on the check dated 02/21/11 and his father's signature. Hernandez said there was a different handwriting on the check #2419 dated 04/07/10 that he did not recognize.

8. On or about 10/23/12, on behalf of KMS (100138412) Letisia Powell filed a BEL claim with DHECC. The 2008-2010 tax returns submitted are the same returns that were submitted in the GCCF claim. *See* Exhibit C.

a. KMSS submitted a 2008 profit and expense report for the months of Sept 2008 to Feb 2009 (Doc ID #5665234). *See* Exhibit E. These amounts are consistent with the monthly deposits to KMSS's bank account (*See* Exhibit J). Below are the months and amounts that represent profit:

| | | | |
|---|---|---|---|
| Sept 08 | $20,145.83 | Jan 09 | $21,180.97 |
| Oct 08 | $11,376.22 | Feb 09 | $27,935.78 |
| Nov 08 | $11,216.67 | | |
| Dec 08 | $46,573.16 | | |

b. KMSS submitted a schedule showing monthly expenses, in an excel worksheet, for 2008-2010. *See* Exhibits F. The schedules did not contain amounts for cost of goods sold. The properties sections of these excel spreadsheets show the creation date of 01/25/13 and the author was Letisia. *See* Ex I, at 1-3.

c. KMSS submitted a schedule showing gross monthly income for 2009 and 2010. *See* Exhibit F. The properties section of these excels spreadsheets show the creation date of 02/18/11 and the author was Letisia. *See* Ex. I, at 4, 5. The gross monthly income shown in these schedules is consistent with the gross receipts reported on the tax returns.

d. KMSS submitted profit and loss statements, in an excel spreadsheet, for 2008-2010. Exhibit D. The properties sections of these excel spreadsheets show the creation date of 02/07/13 and the author was Amanda. *See* Ex. I, at 6-8. These profit and loss statements appear to be the same expense worksheets as noted above in (b) and the revenues reported are the same amounts shown on the gross monthly income above in (c) for 2009 and 2010. The revenue reported for 2008 is not consistent with the profit and expense report shown in (a) above.

9. In the course of my investigation I attempted to interview Letisia Powell on 08/17/15, at the business location of KMSS. Powell declined to be interviewed and referred me to KMSS's attorney to discuss the claim. I served Powell with a subpoena requesting copies of KMSS's contemporaneously prepared accounting records, profit and loss statements, ledgers, journals and all bank records. While at KMSS, I noticed the area in front of the sales counter which consisted of numerous shelves containing boat supplies and parts.

10. In the course of my investigation I interviewed Charles Weitzel, CPA on 08/18/15. Weitzel was shown copies of the 2008-2010 corporate tax returns of KMSS. After review of the tax returns, Weitzel stated he prepared the corporate tax returns for KMSS for the years 2008-2010. Weitzel said he went to KMSS and obtained year-end QuickBooks printouts for his files. Weitzel further stated that he did not maintain a copy of the QuickBooks printout for his files. Weitzel said he did not prepare any monthly

profit and loss statements for KMSS and was unaware that they filed a claim for the Oil Spill.

11. On 09/16/15, I received a letter dated 09/11/15 from Armistead Easterby of Williams Kherkher, Attorneys at law, responding to the subpoena served on KMSS. Mr. Easterby provided the 2010 bank statements of KMSS, a Monroe County Sherriff's Office offense report dated 04/02/13 and the following explanation in response to documents requested in the subpoena:

    a. KMSS is not in possession of any contemporaneously prepared monthly or annual financial statements, adjusting journal entries or supporting documentation. KMSS did not maintain contemporaneously monthly or annual profit and loss statements in the ordinary course of business for the time period 01/01/10 – 12/31/10. KMSS created monthly P&Ls based on alternate source documents, including, but not limited to invoices and QuickBooks point-of-sale software.

    b. KMSS's policy is to keep financial records for three years; accordingly, by 03/15/15 KMSS no longer maintained pre 2012 financial records. KMSS is unable to provide any data contained in the QuickBooks point of sale file because the computer containing that electronically stored information was stolen on or about 04/01/13 and refers to the attached police report.

12. During August – December 2015, I obtained and analyzed the 2008-2010 bank statements, deposits items, paid checks and debit purchases of KMSS from Centennial Bank. KMSS has a checking and savings account. The deposited items consisted of credit card sales, check and cash deposits, credit memos, loan from stockholders and transfers within the two accounts. The net taxable deposits consist of credit card sales, check and cash deposits.

    a. I created a worksheet that shows the monthly deposits by category to arrive at net taxable deposits for 2008-2010 and compared these amounts to the reported monthly revenue. This worksheet is Exhibit J. Due to the voluminous nature of the documents, the bank statements, deposited items and cancelled checks are maintained in the investigative files at DHECC. Below is a summary of the annual net taxable deposits for 2008-2010 as compared to the annual revenue reported on the profit and loss statements and tax returns:

|      | Credit Card | Check       | Cash       | Net Taxable Deposits | P&L          |
|------|-------------|-------------|------------|----------------------|--------------|
| 2008 | $15,821.14  | $ 73,468.26 | $ 3,740.00 | $ 93,029.40          | $ 11,460.80  |
| 2009 | $41,054.17  | $112,300.29 | $27,570.00 | $180,924.99          | $108,873.01  |
| 2010 | $96,603.66  | $155,280.74 | $58,000.00 | $309,884.40          | $493,882.12  |

6

    My analysis of the bank accounts did not reveal why there is a large difference between annual net taxable deposits and the annual reported revenue. The monthly net taxable deposits have no correlation to the amount of monthly revenue reported on the profit and loss statements as can be seen in Exhibit J.

b. For 2010, the disparity between monthly net taxable deposits and reported monthly revenue is significantly greater than for 2008 and 2009. For the months of January – June 2010, the amount of reported revenue is $286,272.61 greater than the net taxable deposits. For July –December 2010, the amount of reported revenue is $102,274.89 less than the net taxable deposits. These differences are indications of revenue shifting which would be done to maximize the loss for the compensation period. Below is a list of the 2010 monthly net taxable deposits compared to the monthly revenue reported on the profit and loss statements.

| Month | Net Taxable Deposits | Reported Revenue | Difference |
|---|---|---|---|
| Jan | 14,886.52 | 83,467.22 | (68,580.07) |
| Feb | 18,970.39 | 94,190.91 | (75,220.52) |
| Mar | 20,697.68 | 90,264.91 | (69,567.23) |
| Apr | 38,913.14 | 83,626.92 | (44,713.78) |
| May | 24,788.90 | 48,478.56 | (23,689.66) |
| June | 21,177.32 | 25,678.04 | ( 4,500.72) |
| July | 26,080.62 | 18,189.64 | 7,890.98 |
| Aug | 23,190.14 | 13,492.19 | 9,697.95 |
| Sept | 28,140.57 | 10,666.50 | 17,474.07 |
| Oct | 23,623.07 | 11,966.52 | 11,656.55 |
| Nov | 29,914.52 | 9,538.29 | 20,376.23 |
| Dec | 39,501.53 | 4,322.42 | 35,179.11 |
|  | 309,884.40 | 493,882.12 | (183,997.72) |

13. During December 2015, I obtained and analyzed the personal bank accounts of Steven and Letisia Powell located at Centennial Bank. The analysis was done to determine if any KMSS revenue was deposited into the personal accounts which may explain the $183,997.72 difference between the 2010 net taxable deposits and the reported revenue. The analysis of the personal accounts did not reveal any revenue deposits from KMSS.

14. During November 2015, I obtained and analyzed the Capital One Visa credit card account of KMSS. The analysis revealed that a $15,145.99 balance from Bank One was transferred to the Capital One credit card on 11/28/08. The transactions from 11/28/08 to 02/17/11 consisted of monthly principle and interest payments, payments to UPS, approximately 10 purchases and a $2,000 promotional advance. The balance at 02/17/11 is $16,755.83. The analysis did not reveal any transactions that would affect the revenue reported on the profit and loss statements.

15. My analysis of the 2010 monthly cost of goods sold as compared to the monthly revenue shows a significant disparity. The gross profit (revenue less cost of goods sold) for Jan – May is $276,060.38. The gross profit for June – December (the compensation period) is ($125,570.18). This has the effect of shifting variable expenses to the benchmark months which would increase the loss during the compensation period for the claim computation. The same shifting was demonstrated with revenue in paragraph 12, subparagraph b above.

16. Below are the conclusions of my investigation:

    a. Evidence that Letisia Powell submitted altered checks to the GCCF to support the claim of cancelled contracts for an emergency advance payment shows that she retained the requisite knowledge, motive, intent, and opportunity to misrepresent financial documents in order to improperly obtain an award from a court supervised emergency payment program. This evidence undermines the credibility of the profit and loss statements and tax returns submitted to DHECC.

    b. The submitted profit and loss statements appear to have been fraudulently as shown by the lack of relationship of the deposited items to the revenue reported on the profit and lost statements submitted to DHECC. The 2010 analysis of the monthly net taxable deposits as compared to monthly revenue reported clearly shows revenue was shifted from the benchmark months, artificially creating a larger loss within the claim calculation (*See* paragraph 12 subparagraph b). The 2010 analysis of cost of goods sold and gross profits also show an apparent shifting of variable expense.

    c. Based on my investigation, the question of Letisia Powell's veracity and the consistent differences in net taxable deposits as compared to revenue reported to the DHECC shows that the profit and loss statements and tax returns submitted to the DHECC misrepresent the finances of KMSS before and after the spill and, as such, are unreliable.

    d. The DHECC relied on the tax returns and the profit and loss statements in calculating KMSS's award. Based on the revenue analysis alone, had KMSS not submitted fraudulent profit and loss statements and tax returns to inflate their award, the award would have been, at a minimum, $115,000 less than what they received. Ultimately, the DHECC paid the claimant $569,886.14, significantly more than that to which they would have been entitled.

I declare, under penalty of perjury under the laws of the United States of America, that the foregoing is true and correct.

Executed on September 1, 2016

_____
J. Lynn Barker