## UNITED STATES DISTRICT COURT
## EASTERN DISTRICT OF LOUISIANA

| | | |
|---|---|---|
| In Re: Oil Spill by the Oil Rig "Deepwater Horizon" in the Gulf of Mexico, on April 20, 2010 | * <br> * <br> * <br> * | MDL No. 2179 <br><br> SECTION: J <br><br> JUDGE BARBIER |
| This Document Relates to: <br> *Nos. 12-970, 12-968, and All Cases* | * <br> * | MAG. JUDGE WILKINSON |

### ORDER & REASONS
### [Aggregate Common Benefit Fee and Costs Award]

Before the Court is a **Petition for Reimbursement of Expenses and Collective Common Benefit Fee Award** ("Aggregate Fee Petition," Rec. Doc. 21098) filed by the Common Benefit Fee and Cost Committee ("Fee Committee"), Plaintiffs' Co-Liaison Counsel, Class Counsel/Plaintiffs' Steering Committee ("PSC"), and other attorneys who claim entitlement to an award for attorneys' fees for common benefit work (collectively, "Petitioning Attorneys").[1] Also before the Court is an objection by four class members (Rec. Doc. 21666) and a reply/supplemental brief by the Petitioning Attorneys (Rec. Doc. 21724).

In connection with two class settlements with private plaintiffs—which the Court will refer to as the "Economic Settlement" and the "Medical Settlement" (collectively, "the Settlements")[2]— defendants BP Exploration & Production, Inc. and BP America Production Company (collectively, "BP") agreed not to oppose an award, to be determined by the Court, for common benefit and/or Rule 23(h) attorneys' fees, costs, and expenses, up to a maximum of $600 million. (Economic Settlement, Ex. 27, Rec. Doc. 6430-46; Medical Settlement, Ex. 19, Rec. Doc. 6427-21).[3] This

---

[1] Ninety-three attorneys are listed at the end of the Aggregate Fee Petition, not including the Special Counsel to the Fee Committee.

[2] The classes will similarly be referred to as the "Economic Class" and "Medical Class."

[3] Class Counsel and BP's counsel did not begin negotiating attorneys' fees until after they had reached agreement on all of the material terms of the Economic and Medical Settlements and delivered that information to the Court.

payment would not be deducted from class members' recoveries or from non-common benefit attorneys' fees; rather, BP would pay it in addition to other amounts it owes under the Settlements. The present Aggregate Fee Petition requests a common benefit award in the amount of $600 million, consisting of:

- $37,597,151.98 in Shared Expenses,[4] which have already been paid to third-party service providers and/or reimbursed to common benefit attorneys, pursuant to previous Court orders;[5]

- Up to $7,187,698.30 in claimed Held Expenses, which have been submitted to Court-appointed CPA Phil Garrett and the Fee Committee pursuant to PTO 9, (as amended), and PTO 59; and

- The remainder of the $600 million, or approximately $555.2 million, to Class Counsel and other common benefit attorneys collectively, for work performed to advance the common and collective interests of the Economic Class and the Medical Class.

For reasons set forth below, the Court grants the Aggregate Fee Petition in full, particularly the request for $555.2 million in common benefit attorneys' fees.  This Order does not address how common benefit fees will be allocated among the fee applicants.  The Court merely determines here the appropriate aggregate award, leaving allocation for another day.  (*See* PTO 59 ¶¶ 23, 24, 32, 34, Rec. Doc. 14863; Order [Appointing Special Master], Rec. Doc. 21281).

## I.    FACTUAL AND PROCEDURAL BACKGROUND

### A.    Prior to Establishment of MDL 2179

In order to put this Aggregate Fee Petition in the proper perspective, it is appropriate to review the history of this litigation, focusing on the work of the Petitioning Attorneys. This multidistrict litigation concerns the April 20, 2010 blowout, explosions, fires, and subsequent oil

---

[4] "Shared Expenses" and "Held Expenses" (mentioned in the next bullet point) are defined in Pretrial Order ("PTO") 9.  (Rec. Doc. 508).  Both refer to costs that are incurred for the benefit of all plaintiffs in the MDL.

[5] *See* Rec. Docs. 8607, 9520, 10796, 11796, 12664, 13342, 13677, 14432, 15644, and 15916.

spill involving the DEEPWATER HORIZON mobile offshore drilling unit and the well, known as Macondo, it had drilled on the Outer Continental Shelf off the coast of Louisiana.  Shortly after the events of April 20, 2010, various law firms who would eventually become Liaison Counsel, PSC members, Class Counsel, and other common benefit attorneys, were contacted by potential plaintiffs seeking assistance and advice in connection with the DEEPWATER HORIZON / Macondo Well incident.  These attorneys, from the beginning, started to coordinate with one another and to take actions, not only for the protection of their own individual clients, but with an eye towards the advancement and protection of the common and collective interests of others who were likely to become litigants at some point in time.  These lawyers monitored, attended, shared information regarding, and actively participated in:

- The Transocean Limitation Action, originally filed in the Southern District of Texas, and ultimately transferred, under Rule F(9), on motion of common benefit attorneys, to this Court (No. 10-2771), where it could be tried as an original action, and consolidated with the MDL (Rec. Doc. 62).

-  The Joint Investigation Team / Marine Board of Investigation hearings and other proceedings conducted by the U.S. Coast Guard and the Minerals Management Services.

- The Louisiana Department of Environmental Quality Investigation.

- The proceedings before the United States Judicial Panel on Multi-District Litigation.

- The securities-related actions that would eventually be transferred to and coordinated in the Southern District of Texas as MDL No. 2185.

- The *Hornbeck Offshore v. Salazar* litigation (No. 10-1663).

- The consolidated actions in Section J of this Court.

Working together, the lawyers developed a formal limited joint-prosecution agreement to facilitate the coordination and sharing of information, research, and litigation strategy.  Among other things, they provided advice and assistance to participants in the Vessels of Opportunity

("VoO") program, took efforts to ensure that clean-up workers were being properly protected from hydrocarbons and potentially dangerous dispersants, moved for the immediate and ongoing preservation of documents and physical evidence, and coordinated preliminary environmental sampling and testing in waters, beaches, and wetlands.   In the consolidated Eastern District of Louisiana proceedings, Interim Co-Liaison Counsel were appointed to work with defense counsel, counsel for the U.S., and the Court, on initial preservation of physical evidence issues, as well as other organizational and administrative issues, to provide structure and management to the litigation.

### B.       Establishment of MDL 2179

The Judicial Panel on Multidistrict Litigation created MDL 2179 and transferred cases relating to the DEEPWATER HORIZON / Macondo Well incident to the Eastern District of Louisiana on August 10, 2010.  (Rec. Doc. 1).  Steve Herman and Jim Roy were appointed as Plaintiffs' Co-Liaison Counsel on August 27, 2010.  (PTO 6, Rec. Doc. 110).  Even prior to the formal appointment of the PSC, Liaison Counsel collected joint-prosecution agreements and contact information from numerous plaintiffs attorneys, and started to develop e-mail group service lists, which were constantly tracked, supplemented, and updated.  The firms established and organized file materials.  Liaison Counsel secured office space for a document depository / "war room" (discussed below) and began the process of arranging for IT services and fulltime personnel.  Liaison Counsel and other common benefit attorneys continued to work with defense counsel, counsel for the U.S. and the States, and the Court, to lay the foundations for what would become the essential administrative and procedural frameworks for the litigation.  This included the duties and responsibilities of the PSC (PTO 8, Rec. Doc. 506), the submission and tracking of common benefit hours and expenses (PTO 9, Rec. Doc. 508), the initial Case Management Order

(PTO 11, Rec. Doc. 569), establishment of a mechanism for electronic service via File & Serve (PTO 12, Rec. Doc. 600), a confidentiality order (PTO 13, Rec. Doc. 641), deposition guidelines (PTO 17, Rec. Doc. 740), etc.

The Court appointed the PSC on October 8, 2010.  (PTO 8, Rec. Doc. 506).  The PSC enlisted the assistance of other law firms from around the Gulf and throughout the country, and organized such common benefit attorneys into work groups, including, initially: Administration (depository, privilege, electronic discovery, etc.); Legal Research & Writing; Written Discovery; Science, Environmental, and Damages; Jurisdiction; Deposition and Trial Prep Teams; Punitive Damages; Insurance; and Gulf Coast Claims Facility ("GCCF").[6]  These working groups were originally comprised of 45 formal work group coordinators (of whom 33 were from non-PSC firms) and 83 formal work group members, (of whom 69 were from non-PSC firms).

In addition to the formal work groups, outlined above, the PSC endeavored to reach out to all attorneys handling claims in the GCCF and/or actions in the MDL.  Among other things, the PSC organized meetings and calls to gather facts and to discuss issues between and among counsel prosecuting VoO contract claims, oyster claims, real property claims, and other types of claims being prosecuted by GCCF claimants.

### C.    The "War Room" / Document Depository

The PSC decided at the outset to require document review and analysis, and other essential work, to be done in person, by lawyers, at the document depository, rather than remotely.  For those common benefit attorneys contributing to the effort, this decision required additional levels of sacrifice, which not only pulled them away from their offices, but in many cases required them

---

[6] The GCCF was established by BP in August 2010 to process and pay claims resulting from the blowout, explosion, and oil spill.

to effectively relocate to New Orleans, at considerable expense, and keeping them away from their homes and families.

The MDL 2179 depository was located near the courthouse in New Orleans, Louisiana. The depository encompassed an entire floor, an area of approximately 15,500 square feet, including conference and "war" rooms, individual offices, and over 70 dedicated computer workstations staffed on a full-time basis. The PSC also established various FTP websites for scientific and environmental articles; liability expert reliance and consideration materials; and other materials for plaintiffs' counsel. Attorneys and staff in the depository assisted common benefit attorneys in preparing for depositions, accumulating exhibits, and making witness outlines and exhibit binders, for both the Phase One and Phase Two Trials; assisted in the preparation and organization of deposition bundles and summaries of all depositions; read and summarized almost seventy-five expert reports; were responsible for tracking all of the trial exhibits, data entry into database; bates numbering, cleaning, and redacting; and assisting in logging information on when every exhibit was used and by whom.

### D.    Master Pleadings and Briefing

Common benefit attorneys played a major role in suggesting and implementing key elements of the case management plan, including the proposal for organizing the parties and claims into pleading "bundles"; the preparation and filing of "master" and/or other bundle complaints; and the briefing and argument of motions to dismiss directed to these master and other complaints. Common benefit attorneys prepared and filed an original and amended "B1" bundle master complaint for plaintiffs asserting private economic loss and property damages claims, an original and amended "B3" bundle master complaint for clean-up workers and others asserting claims for medical exposure injuries, a master complaint for local government entities, a RICO class

complaint, and a "D1" bundle master complaint for injunctive claims for relief against private parties.   Common benefit attorneys then also prepared, filed, argued, and in some cases supplemented, oppositions to defendants' motions to dismiss that were filed with respect to these master complaints, as well as oppositions to dismiss the bundle "A" claims, and a protective motion to strike jury demand

In connection with the B1, B3, and local government master complaints, common benefit attorneys assisted the Court in developing a process by which a *pro se* litigant or other person, business, or local government entity could file, without the necessity of formal service, a two-page "Short Form Joinder" in one or more of the master complaints, at no expense.  The PSC committed approximately $1.7 million of its own money to conduct a Court-approved notice plan to make affected parties aware of the limitation monition deadline and the availability of the Short Form Joinder.   At the end of the day, approximately 130,000 individuals, businesses, and local government entities submitted a Short Form Joinder.  Common benefit attorneys additionally organized and managed the VoO Charter Dispute Mediation Program, in which the parties agreed to select a sample of cases for motions, briefing, discovery, and mediation.

### E.      Discovery and Preparation for Phase One and Two Trials

Millions of pages of documents were produced and reviewed for Phase One depositions, liability expert preparation, and trial.  Over the course of the entire litigation, over 90 million pages of documents would ultimately be produced.  More than 70 document reviewers and analysts, including PSC members, members of their firms, and other common benefit attorneys, reviewed and coded the documents.  In addition, the PSC and other common benefit attorneys collected, indexed, and produced over 10,000 articles and other materials, as well as voluminous reliance documents in association with the Phase One expert reports.

Magistrate Judge Sally Shushan presided over weekly discovery conferences, where Liaison Counsel, the Phase One trial team, and other common benefit attorneys worked collaboratively with counsel for the U.S., counsel for the States, defense counsel, and the Court, to resolve the hundreds of scheduling, discovery, and other pretrial issues and disputes. Counsel wrote scores of letter briefs to Judge Shushan and/or opposing counsel; communicated daily with counsel via e-mail regarding production and other logistical issues; and otherwise worked, each week, between the discovery conferences, to either resolve old issues or follow-up on new ones.

Starting in the early spring of 2011, an intense deposition schedule commenced. For approximately six months, there were typically two tracks of depositions, daily, reaching a climax in the summer of 2011, with seven depositions conducted, on two continents, in one day. By the end of 2011, over 240 fact witness depositions had been taken, with 50 additional depositions of Phase One liability experts. Liaison Counsel worked with Alabama counsel, counsel for the U.S., and counsel for the defendants to interview potential vendors, and to otherwise arrange for evidence management and in-court presentation. Common benefit attorneys also made designations and counter-designations to over 150 depositions, and assembled "Depo Bundles" for submission to the Court in advance of trial, including a brief summary that was authored and submitted by the PSC for each deposition witness.

From the outset, groups of common benefit attorneys focused on the oil spill's environmental and ecological impacts and the damages flowing therefrom. They retained a robust data collection team of consultants and staff to ensure that all relevant data would be available and accessible for the experts, and ready to take samples in the event of any reported oiling event. Through the date of the Settlements and beyond, the team of scientific, environmental, and economic and accounting experts assembled by the PSC worked over the course of years to

demonstrate the actual volume of discharge, movement of the oil, and damage caused by that oil to the businesses, properties, natural resources, tax revenues, etc., in and around the Gulf. Common benefit attorneys, at the same time, also attempted to facilitate communications, information, and strategy sharing between and among the States, and the scientific library was made available for review by, not only Common Benefit Attorneys, but also other private attorneys, local governments, the U.S., and the States. These efforts laid the ground work for not only the frameworks and matrixes contained within the Economic and Medical Settlements, but also the subsequent efforts to defend those Settlements.

### F. Motion to Enjoin and/or Supervise the GCCF

Common benefit attorneys believed that it was necessary and appropriate to protect the procedural interests of putative class members who were processing claims in the GCCF as a statutory condition precedent to the assertion of an OPA claim in court. The PSC and other common benefit attorneys made substantial efforts to attempt to ensure that the procedures and protocols within the GCCF were both fair and consistent with BP's statutory obligations, and that claimants pursuing claims in the GCCF were aware of the nature of the relationship between Mr. Feinberg and BP. After substantial briefing by common benefit attorneys, the Court, on February 2, 2011, ordered Mr. Feinberg to stop referring to himself as "independent" and to further abide by the prevailing rules and standards imposed on lawyers with respect to communications with adverse and unrepresented parties. (Rec. Doc. 1098). The PSC, through the time of the Settlements, continued to monitor the GCCF process, and filed a supplemental brief in support of supervision over the BP interim claim process, to ensure compliance with OPA, and to make findings and/or recommendations regarding the satisfaction of OPA's presentment requirements and the scope and/or efficacy of releases.

### G.      The Initial Hold-Back on Settlement Payments

Towards the end of 2011, with the Phase One Trial fast approaching, the PSC submitted a Status Report and Motion to Establish Account and Reserve for Litigation Expenses.  (Rec. Doc. 4507).  By that time, 340 lawyers from 90 different firms had invested over 230,000 hours and contributed over $13 million in out-of-pocket held and shared expenses for the common benefit of claimants and litigants affected by the Macondo / DEEPWATER HORIZON disaster.  The PSC had created a voluntary hold-back on GCCF, personal injury, or other settlements involving PSC clients, and was working under agreements with the States of Alabama and Louisiana that entitled common benefit attorneys to be awarded up to 4% of those States' recoveries, in recognition and consideration of the common benefit contributions to any judgment or settlement that might be obtained.  Following a number of objections, supplemental briefing, negotiations, and proposed amendments, the Court issued a hold-back order which ultimately directed the defendants to hold back and place into escrow, from any judgment or settlement after December 30, 2011:

- Six Percent (6%) of the recoveries of any private claimants or plaintiffs who, at any time, had an action that was filed in, removed to, or transferred to, the MDL;

- Four Percent (4%) of the economic loss damages payable to the States of Alabama and/or Louisiana;

- Four Percent (4%) of the recoveries of any local government entities located within the State of Alabama and/or the State of Louisiana, that, at any time, had an action that was filed in, removed to, or transferred to the MDL;

- Six Percent (6%) of the recoveries of any local government entities in the States of Mississippi, Florida, and/or Texas, that, at any time, had an action that was filed in, removed to, or transferred to the MDL; and,

- Six Percent (6%) of the economic loss damages payable to the States of Florida, Mississippi, and/or Texas, should they ever file actions in, be removed to, or be transferred to, the MDL.

(Rec. Doc. 5274).  In so ruling, the Court agreed that common benefit attorneys had, indeed, conferred a benefit to claimants receiving settlements from the GCCF.  (Rec. Docs. 5022, 5064, 5274).  Nevertheless, and while over $20 million would be collected from the GCCF and other settlements over the next few months, the hold-backs were ultimately released, the funds were returned, and no business, individual, or local government entity (nor their own individually retained attorneys) would be required to make any common benefit cost contribution or pay any common benefit fee in this litigation.  (Rec. Docs. 6428, 14825, 14946, 15427, 16173).

### H.    The Economic and Medical Settlements

The Phase One Trial was scheduled to commence on February 27, 2012.  On the eve of trial, the Court was informed that BP and the PSC were near agreement on two class settlements, which would become the Economic and Medical Settlements.  Consequently, the Court adjourned the trial to allow the parties to make further progress in the settlement discussions.  (Rec. Doc. 5887).  In April 2012, the parties filed the proposed Settlements into the record and requested that the Court certify the classes and approve the Settlements.

The Economic Settlement (Rec. Doc. 6430) was intended to resolve most claims by private individuals and businesses for economic loss and property damages resulting from the oil spill. Negotiated intensively over an eight-to-ten month period, the Economic Settlement was intended to improve upon the GCCF, by not only recognizing claims that the GCCF did not pay, but also by requiring that decisions be made pursuant to transparent and objective frameworks. Memorialized by a 1,000-plus page document, the parties negotiated and agreed to separate, detailed frameworks for the submission, evaluation, and payment of nine basic categories of claims:

(1)     Business Economic Loss (including frameworks for Multi-Facility Businesses, Start-Up Businesses, Failed Businesses, and Failed Start-Ups)
(2)     Individual Economic Loss
(3)     Coastal Property Damage
(4)     Wetlands Property Damage
(5)     Sales Loss Damage
(6)     VoO Charter Payment Claims
(7)     Vessel Physical Damage and Decontamination
(8)     Subsistence Loss, and
(9)     Commercial Fishing Losses (i.e. the Seafood Compensation Program)

Uniquely, and to the benefit of plaintiffs, the agreement established a Settlement Program and Trust that would begin to process and pay eligible claims, beginning in June of 2012, prior to and irrespective of final approval, subject to an individual release.  Class members were allowed to submit multiple claims and to receive compensation for multiple categories of damage.  Certain discreet groups of individuals, entities, and claims are specifically excluded from the Settlement. Otherwise, and generally, the geographic bounds of the class included individuals and entities located in Louisiana, Alabama, Mississippi, the coastal counties of western Florida, and the southeast corner of Texas.

With the exception of the Seafood Compensation Program, there is no cap on the amounts that may be paid under the Economic Settlement.  The Seafood Compensation Program features a guaranteed $2.3 billion fund; i.e., $2.3 billion will be distributed, regardless of the number of claims in this fund.  Many damage categories are augmented by risk transfer premiums ("RTP"). The RTP compensates class members for potential future loss, as well as pre-judgment interest, any risk of oil returning, any claims for consequential damages, inconvenience, aggravation, the lost value of money, compensation for emotional distress, liquidation of legal disputes about punitive damages, and other factors.

For existing businesses, economic loss claims are determined using a two-step process. Step one calculates the value of the business's reduction in profit during a claimant-selected loss

period (any three or more consecutive months of the eight-month period following the spill). Step two accounts for expected profits by estimating the business's growth trend along with a general, economy-wide growth factor.  Step one (loss calculation) and step two (expected profit but-for the spill) are both factored into the business claimant's base compensation amount. This base compensation amount is generally enhanced by a RTP and/or is offset by prior payments received, depending on the type of business and location. The Economic Settlement also includes additional or alternative frameworks for multi-facility businesses, failed businesses, start-up businesses, and failed start-up businesses.

The Economic Settlement also provided for a $57 million Gulf Seafood and Tourism Promotional Fund, which made grants to organizations around the Gulf to promote seafood and tourism.  In addition, BP agreed that class members' claims for punitive damages against Halliburton and/or Transocean would be reserved, and that BP's own claims against Transocean and Halliburton would be assigned to the class as a whole.  Furthermore, BP agreed to turn over insurance proceeds that might be obtained from Transocean's insurers.  At this point, these features have resulted in potential settlements of $337.6 million for the class on the assigned claims with Halliburton and Transocean, as well as an additional $82 million in Transocean insurance proceeds.

In 2012, the estimated value of the Economic Settlement was $7.8 billion.[7]  In fact, as of August 31, 2016, $9.0 billion has been paid or approved for payment on over 130,000 claims under the Economic Settlement (Status Report, Ex. A, Tbl. 4, Rec. Doc. 21760-1),[8] plus an additional

---

[7]  BP 2011 ANNUAL REPORT AND FORM 20-F, p.163 (available at http://www.bp.com/assets/ bp_internet/globalbp/globalbp_uk_english/set_branch/STAGING/common_assets/bpin2011/downloads/BP_Annual _Report_and_Form_20F_2011.pdf) (as of Aug. 5, 2012).

[8]  $9.0 billion includes approximately $8.4 billion that had been paid as of August 31, 2016, plus approximately $600 million that remained to be distributed from the Seafood Compensation Fund as of that date.  The Court understands that about half of the $600 million has since been paid to eligible claimants, and the remaining half has been approved for distribution.

$57 million in Tourism and Seafood Promotional Grants (Economic Settlement § 5.13, Rec. Doc. 6430) and $82 million in Transocean insurance proceeds being held in trust (Rec. Doc. 13424). Furthermore, there are approximately 80,000 claims that are still in the process of being analyzed, supplemented, reviewed, reconsidered, and/or appealed as of August 31, 2016.

Turning to the Medical Settlement, it provides four main benefits to Class Members: (i) compensation for Specified Physical Conditions; (ii) the Periodic Medical Consultation Program; (iii) the Gulf Region Health Outreach Program; and (iv) a Back-End Litigation Option, which preserves the class members' ability to sue BP for compensatory damages for Later– Manifested Physical Conditions. Qualifying class members who demonstrate the manifestation of a Specified Physical Condition ("SPC") during the time-frames set forth in the agreement receive different levels of compensation depending on various factors, including whether he or she served as a Clean-Up Worker or was simply a resident, whether the condition was acute or chronic, and the type of proof that he or she is able to present. The Periodic Medical Consultation Program ("PMCP") was made available to all Clean-Up Workers, as well as certain residents who lived along the water and/or qualified for a SPC. Under the PMCP, class members are entitled to an initial medical consultation followed by additional visits every three years over the 21–year life of the program. The PMCP enables physicians performing the examinations to order certain blood, urine, cardiac, and respiratory tests that can help in the identification and diagnosis of certain conditions. Under the Gulf Region Health Outreach Program ("GRHOP"), BP has provided $105 million in grants to a set of integrated projects designed to improve healthcare capacity and health literacy for class members and others in Gulf Coast communities. In addition, the Medical Settlement calls for the creation of a comprehensive, publicly-accessible, text-searchable, indexed, online electronic resource and library, which has accumulated and will continue to assemble

documents regarding composition, quantity, fate, and transport of oil; nature, content, and scope of response activities; health risks or effects from exposure to substances released during the incident and dispersants and decontaminants; etc. Finally, the Medical Settlement's Back-End Litigation Option ("BELO") provides a mediation/litigation process for class members who may seek compensation from BP in the future for a physical condition that is claimed to have manifested after April 16, 2012. If mediation does not resolve the claim, then the BELO action can be filed in which the class member need not prove: (a) the fact of exposure to oil and/or dispersants during the DEEPWATER HORIZON Incident or Response Activities; or (b) the fault of BP for the DEEPWATER HORIZON Incident. Nor can BP raise defenses based on prescription, statute of limitations or repose, laches, and certain other defenses. As a result, the only issues to be litigated are: (a) the fact of diagnosis; (b) the amount, location, and timing of oil and/or dispersants released and/or used; (c) the level and duration of the class member's exposure; (d) causation, including potential alternative causes; and (e) the amount of compensatory damages.

As of July 1, 2016, nearly all of the $105 million associated with the GHROP has been paid out in grants, approximately $350,000 has been expended to provide periodic medical treatment under the PMCP, and over $40 million has been paid or determined eligible for payment of SPC claims. (Status Report, Rec. Doc. 21608; Herman-Roy Decl. ¶ 67, Aggregate Fee Pet., Ex. 1, Rec. Doc. 21098-1).

## I.     Implementation and Approval of the Settlements

In connection with the implementation of the Settlements, a number of transition orders were submitted and entered, class complaints were perfected, and approval papers were prepared and filed. Class Counsel selected, educated, and otherwise worked with the class representatives, while also working with third party vendors and a team from BP to revise and complete the class

notice and FAQs, claim forms, and instruction booklets.  Class Counsel conducted a series of free seminars around the Gulf Coast, from Houston to Miami, in order to educate attorneys and CPAs on the specific terms and provisions of the settlement.  A Class Counsel office was opened in the same building as the Claims Administrator's office, and common benefit attorneys were available to answer questions about the Settlements, in person and by phone. A Settlement Questions/Class Counsel e-mail address was also established, so that a team most familiar with the terms and provisions of the Economic and Medical Settlements and Policies could respond to questions from potential class members, plaintiffs' counsel, claims preparers, and *pro ses*.

Class Counsel also had to address requests by objectors and others for class and settlement-related discovery.  Class Counsel reviewed and summarized all of the objections to both Settlements, and coordinated with Dean Klonoff, BP Counsel, the Economic and Medical Claims Administrators, the Seafood Neutrals, the joint experts, and others, with respect to the supplemental evidentiary submissions and replies.  Class Counsel prepared for the fairness hearing (which lasted nearly seven hours) and also submitted proposed joint findings of fact and conclusions of law.

At the same time, Class Counsel were called upon to address numerous interpretive, administrative, and logistical issues with the Claims Administrator, program vendors, and representatives from BP.  Class Counsel also reviewed the Seafood and Tourism Promotional Grant Applications and selected appropriate recipients with the Claims Administrator and representatives of BP.  As issues became more intensive, Class Counsel developed a team of attorneys to attend monthly "workstream", budget, and/or other meetings, and to address issues raised by BP (and/or the Settlement Program), with respect to not only interpretive policy issues, but also budgetary issues, audit issues, IT issues, potential fraud investigation issues, and other

disputes.   On the Medical Settlement side, Class Counsel have attended numerous GHROP Meetings, and participated in routinely scheduled calls and meetings with the Claims Administrator's staff, as well as groups of attorneys who were raising various issues and concerns. Medical Provider Agreements were developed in coordination with the Claims Administrator and BP representatives, and are continuously reviewed and executed, as additional class members from around the Gulf seek Periodic Medical Consultation.  Class Counsel also worked with Magistrate Wilkinson and BP to establish the BELO case management protocol.

On December 21, 2012, the Economic Class was certified under Rule 23(b)(3), and the Economic Settlement was fully and finally approved as fair, reasonable, and adequate to the members of the class under Rule 23(e).  *In re: Oil Spill by the Oil Rig "Deepwater Horizon,"* 910 F. Supp. 2d 891 (E.D. La. 2012) (Rec. Docs. 8138, 8139).  A panel of the Fifth Circuit affirmed certification and final approval on January 10, 2014.  *In re Deepwater Horizon*, 739 F.3d 790 (5th Cir. 2014).  Rehearing *en banc* was denied in May of 2014.  *In re Deepwater Horizon*, 756 F.3d 320 (5th Cir. 2014). The U.S. Supreme Court denied review on December 8, 2014.  *BP Exploration & Prod. v. Lake Eugenie Land & Dev., Inc.*, 135 S. Ct. 754 (2014).  Thus, the "Effective Date" of the Settlement was achieved on December 8, 2014, establishing June 8, 2015 as the deadline to file a claim.  This Court certified the Medical Class and gave final approval to the Medical Settlement on January 13, 2013.  *In re: Oil Spill by the Oil Rig "Deepwater Horizon,"* 295 F.R.D. 112 (E.D. La. 2013).  A group of professional objectors appealed the settlement approval order, which class counsel successfully defended in the Fifth Circuit.  Upon remand, after deposing the four objectors and providing the Court with a comprehensive submission, the appeal was voluntarily dismissed.

Class Counsel continue to monitor the individual Settlement Program Appeals, Requests for Discretionary Review, and Appeals to the U.S. Fifth Circuit, of individual claims, providing insight and materials to Claimants, and in some cases preparing and submitting *amicus* memos. Class Counsel review and routinely circulate redacted Program Appeal Decisions, and maintain a searchable "Compendium" of Program Appeal Decisions.   Class Counsel have prepared and updated a "Master Index" of relevant filings, submissions, briefs, and other materials, which have been, not only circulated, to the extent practical, but filed into PACER, and worked with this Court and the Fifth Circuit's Clerk's Office to create a "Master" appeal record.

**J.      Disputes Over the Economic Settlement Following Final Approval**

Shortly after this Court gave final approval to the Economic Settlement, BP expressed concerns about the way that Business Economic Loss ("BEL") Claims were being processed by the Claims Administrator and program vendors.   Comprehensive *in camera* submissions were prepared by Class Counsel, including expert declarations from noted accountants and economists, and provided to the Court along with other relevant materials.   After the Court ruled, BP filed a lawsuit for breach of contract against the Claims Administrator and a motion to enjoin the Settlement Program, which were opposed by common benefit attorneys.   This Court ruled against BP.   However, the Fifth Circuit vacated and remanded the matter in October of 2013.   *In re Deepwater Horizon*, 732 F.3d 326 (5th Cir. 2013).   On remand, the common benefit attorneys organized a "BEL Group" to develop further factual and expert economic and accounting evidence on (a) the threshold contractual interpretation issue, (b) the newly-raised causation issue, and (c) regarding the "matching" policy ("Policy 495") that was ultimately developed by the program accountants and approved by the Court.   Once the final "matching" policy was formally promulgated and approved, Class Counsel sought clarification, reconsideration, and ultimately

appeal of Policy No. 495 while also opposing BP's motion for restitution and appeal of that issue to the U.S. Fifth Circuit.

In conjunction with its appeal on the BEL "matching" issues, BP increased other efforts to upset the Economic Settlement, including a change in course on the approval of the Settlement, repeated motions to enjoin the Settlement Program, objections to the Claims Administration budget, attacks on the Claims Administrator, and other efforts, within the Settlement Program, at the district court, at the Court of Appeals and Supreme Court, in paid advertisements, and in the press, requiring a significant effort by common benefit attorneys to defend the Settlement Program, oppose motions and appeals, meet with the Claims Administrator and the Special Master, and attempt to manage the statements, concerns, assistance, and/or attacks in the media and by business groups and professional associations. Among other things, common benefit attorneys were called upon to defend the Economic Settlement with respect to the following:

- Opposition to BP Motion to Suspend Payments (July 18, 2013)
- Opposition to Second Motion to Enjoin Program (Aug. 25, 2013)
- Motion, Memo and Reply Brief to Authorize Claims Administrator to
- Implement Settlement re Oil & Gas Support Industry Claims (Aug. 27, 2013)
- Appellees' Brief on the Merits, Fifth Cir. No.13-30095 (Sept. 3, 2013)
- Response to BP Objections to 4Q Budget (Sept. 17, 2013)
- Class Counsel's Comments re Freeh Report (Sept. 20, 2013)
- Motion to Realign, Fifth Cir. No. 13-30095 (Sept. 27, 2013)
- Opposition to Emergency Motion for Injunction, Fifth Cir. No. 13-30315 (Nov. 22, 2013)
- Class Objection to New Evidence from BP in Settlement Program Appeals (Dec. 13, 2013)
- Opposition to Renewed Motion for Injunction, Fifth Cir. No. 13-30315 (Jan. 8, 2014)
- Opposition to Motion to Enjoin Seafood Program (Jan. 17, 2014)
- Letter Brief, Fifth Cir. No. 13-30095 (Jan. 18, 2014)
- Letter Brief, Fifth Cir. No. 13-30315 (Jan. 20, 2014)
- Motion to Dismiss Appeal, Fifth Cir. No. 13-30843 (Jan. 29, 2014)
- Motion, Briefs, Stipulation, Opposition to Motion for Reconsideration and Certification on Class Counsel's Motion to Protect and Preserve Claimant Confidentiality and to Enforce Orders of the Court
- Opposition to Cobb & Allpar Petition For Rehearing, Fifth Cir. No. 13-30095 (Feb. 6, 2014)
- Opposition to BP Motion for Petition Rehearing En Banc, Fifth Cir. No.13-30095

(Feb. 6, 2014)
- Opposition to Coon Petition For Rehearing, Fifth Cir. No. 13-30095 (Feb. 6, 2014)
- Opposition to BP Motion for Production of Freeh Investigation Docs (Feb. 10, 2014)
- Reply Brief to Motion to Dismiss Appeal, Fifth Cir. No. 13-30843 (Feb. 19, 2014)
- Opposition to U.S. Chamber Motion for Leave to File for Rehearing En Banc,
  Fifth Cir. No. 13-30315 (March 25, 2014)
- Letter Submission to Judge Shushan re Transition Claims Dispute (May 14, 2014)
- Opposition to Motion to Stay Mandate, Fifth Cir. No. 13-30315 (May 27, 2014)
- Appellee's Original Brief on the Merits, Fifth Cir. No. 13-30843 (June 9, 2014)
- Opposition to BP's Motion for Restitution (Aug. 15, 2014)
- Opposition to BP Motion to Stay filed in U.S. Supreme Court, No.13A1177 (June 2, 2014)
- Opposition to BP Petition for Certiorari, No.14-123 (Oct. 8, 2014)
- Appellees Brief on the Merits, Fifth Cir. No. 14-30823 (Dec. 8, 2014)
- Opposition to Motion to Remove the Claims Administrator (Oct. 15, 2014)
- Opposition to Motion Expedite Appeal, Fifth Cir. No. 14-31299 (Nov. 26, 2014)
- Response to Mot. to Add Claims Administrator as Party in Interest,
  Fifth Cir. No. 14-31299 (Dec. 12, 2014)
- Opposition to WLF Amicus, Fifth Cir. No. 14-31299 (Dec. 29, 2014)
- Opposition to U.S. Chamber Amicus, Fifth Cir. No. 14-31299 (Dec. 29, 2014)
- Appellees Brief on the Merits, Fifth Cir. No. 14-31299 (Jan. 6, 2015)
- Appellees' Brief on the Merits, Fifth Cir. No. 14-31165 (Feb. 2, 2015)
- Class Comments re Claims Administrator Update (May 4, 2015)
- Class Comments re Claw-Back Motions (June 8, 2015)

Following a "re-set" between the Claims Administrator and BP in 2015, Class Counsel continue to monitor the administration of the Settlement Program and to otherwise work with BP's counsel, the Claims Administrator, and program vendors to address issues as they arise.

## K.    Disputes Over the Medical Settlement Following Final Approval

After months of work to force the professional objectors to dismiss their appeal, counsel for BP informed Class Counsel that they were terminating the Medical Settlement, based on the alleged inability of the Medical Claims Administrator to obtain a "sufficient" agreement with the Centers for Medicare & Medicaid Services ("CMS") per Section XXIX.B of the Medical Settlement.  Class Counsel spent months working with the Claims Administrator, Judge Shushan, and BP representatives to secure a final agreement with CMS and the Effective Date of the Medical Settlement.

As the Medical Benefits Settlement started to process claims, a question arose over whether class members with conditions specified under the Settlement that first manifested shortly after the oil spill but were not formerly diagnosed until after the date of the Settlement should be treated as "Later Manifested Physical Conditions" under the terms of the Settlement Agreement. The Medical Claims Administrator ultimately determined that class members must pursue such claims through the BELO process, not under the Chronic SPC matrix.   Class Counsel submitted a memorandum to Judge Shushan, a letter formally objecting to the Claims Administrator's Policy Statement with a request for oral argument and motion to strike a declaration, a further submission in response to the Court's order, a motion for reconsideration and reply brief, which was argued on September 24, 2014.  Unable to secure SPC compensation, Class Counsel then worked with the Court and BP to assist such class members in the pursuit of BELO claims, resulting in the BELO Case Management Order.  In response to a BP motion to strike asserted in one of the BELO actions, Class Counsel successfully advocated for the class members' option to request a jury trial.  (Rec. Doc. 14479).

**L.     The Phase One and Phase Two Trials**

After the Settlements were announced, the Court solicited, and the PSC (among others) provided, *in camera* submissions regarding the effects of the Settlements on the remaining claims and a suggested plan forward.  Several motions on discreet legal issues were scheduled and briefed, and the Court issued an amended trial plan, which continued to embrace the same two-phase structure that was contemplated before the Settlements.

The Phase One Trial commenced on February 25, 2013, and concluded on April 17, 2013. Known as the Incident Phase, it addressed fault determinations relating to the loss of well control, the ensuing explosion and fire, the sinking of the DEEPWATER HORIZON, and the initiation of

the release of oil from the well.   Phase One also considered issues related to Transocean's limitation defense, as well as the various cross-claims, counter-claims, and third-party demands between and among the defendants.   The Phase Two Trial commenced on September 30, 2013, and concluded on October 18, 2013.   This phase was divided into two segments: "Source Control" and "Quantification."   While the United States was responsible for the Quantification segment, the Source Control segment was prosecuted by common benefit attorneys, together with the States and defendants Transocean and Halliburton, ("the Aligned Parties").   This segment focused on the conduct or omissions of BP relative to stopping the release of hydrocarbons.   The Quantification segment, on the other hand, pertained to the amount of oil actually released into the Gulf of Mexico, an important factor for determining the amount of civil penalties under the Clean Water Act.

In light of the two class Settlements (which included the assignments to the class of BP's claims for compensatory and punitive damages against Halliburton and Transocean, and the class members' own individual expressly reserved punitive damages claims against Halliburton and Transocean, as well as some expressly reserved claims by class members against BP), common benefit attorneys, in conjunction and coordination with the States and the United States, continued to pursue liability findings against BP, Transocean, and Halliburton.   The liability trial that commenced on February 25, 2013 was no ordinary trial, as evidenced by the following data:

- 322 Phase One depositions taken
- 168 Phase One deposition bundles prepared
- 200 Phase One deposition bundles submitted (by all parties)
- 6,671 Phase One exhibits listed by Plaintiffs
- 3,382 Phase One exhibits admitted (by all parties)
- 29 days of Phase One Trial
- 68 experts originally designated
- 34 additional may-call live witnesses listed and prepared for by PSC
- 39 live witnesses called (by all parties)

With respect to Phase Two:

- 79 Phase Two depositions taken
- 108 Phase Two plaintiff and/or Aligned Party Source Control–related deposition bundles prepared
- 34 Phase Two Source Control–related deposition bundles submitted
- 1,804 Phase Two exhibits listed by plaintiffs / Aligned Parties
- 1,777 Phase Two exhibits admitted (by all parties)
- 4 Days of Phase Two Source Control Segment Trial
- 12 total days of Phase Two Trial
- 12 Source Control–related experts originally designated
- 12 additional Source Control–related may-call live witnesses listed and prepared for
- 10 Source Control–related live witnesses called
- 29 Total Phase Two witnesses called

In addition to the rigorous in-court and out-of-court trial demands, the PSC trial teams and their staffs provided logistical and administrative assistance for the collective plaintiff effort, for the Court itself, and for the parties as a whole. In addition to staffing and supplying, daily, a PSC inside-the-Courthouse "War Room," common benefit attorneys tracked the admission status of all exhibits, demonstratives, and deposition bundles for both plaintiff and defense, and coordinated with all counsel, inData, and the Court regarding same. They participated in nightly calls with defense counsel, counsel for the U.S., States' Coordinating Counsel, and inData, to review admitted evidence for each day, and took lead responsibility for weekly and final marshalling conferences with the Court. They also established the www.mdl2179trialdocs.com website, providing public access to daily trial transcripts and exhibits, while continuing to assist with the uploading of materials and other maintenance of the site. Following each phase, common benefit attorneys spent months preparing proposed findings of fact, conclusions of law, and associated post-trial briefs. Ultimately appeals were filed and briefed on the issue of BP's punitive damages liability. PSC firms also spent time revising, updating, assimilating, and indexing the significant evidence for potential use as a 'Trial Package' or other resource for test cases in the MDL or any unresolved transferred or remanded cases.

While neither private plaintiffs nor local government entities were parties to the Penalty Phase Trial (the third trial phase), common benefit attorneys were asked by the Court to assist with evidentiary and other logistics associated with the trial.  In addition, common benefit attorneys attended the Penalty Phase Trial and reviewed the documentary evidence for potential relevance to any future individual trials, particularly the planned OPA Test Cases.

### M.   Other Settlements

In addition to the Economic and Medical Settlements, the PSC reached proposed class settlements with defendants Halliburton and Transocean, for a total of approximately $1.24 billion. Magistrate Judge Jay Wilkinson was appointed to serve as the Allocation Neutral to allocate these funds between (a) the existing Economic Class (for the claims BP assigned to the Economic Class under the Economic Settlement) and (b) the expressly reserved and/or other claims for punitive damages against Transocean and/or Halliburton.  In connection with these settlements, Class Counsel prepared submissions regarding the allocation process and the distribution model, prepared class complaints and amended agreements, arranged for escrow accounts, moved for preliminary and final approval, and submitted a notice plan.  Judge Wilkinson ultimately allocated $337.6 million to the existing class under the Economic Settlement and $902 million to a new punitive damages settlement class.

During the summer of 2015, BP announced a global settlement with the United States, the five Gulf Coast States, and local governments, to resolve Clean Water Act, natural resource damage, and economic loss claims, damages, and penalties. In particular, the settlement included:

- $5.5 billion for Clean Water Act civil penalties
- $8.7 billion for natural resource damages
- $4.9 billion for state economic loss damages
- $687.4 million for local government claims

In order to help facilitate that settlement, the existing hold-back on all state and local government recoveries was lifted, and a payment by BP of $40 million to common benefit attorneys collectively was approved.  (Rec. Doc. 15441)

Petitioning Attorneys make no claim in the instant Aggregate Fee Petition for common benefit fees and/or expenses with respect to the above settlements.[9]  However, the Court agrees with Class Counsel's position that these settlements are relevant for providing historical background and context.

### N.    OPA Test Cases

Following the Settlements and the Phase One and Two Trials, the PSC turned its attention to the remaining un-tried and unsettled cases of plaintiffs who might have "pure OPA" claims against BP.  Working with Magistrate Judge Shushan and the BP defendants, a group of OPA Test Cases was selected to provide an illustrative set of fact situations that would provide guidance as to the extent, if any, to which BP was responsible for losses resulting, at least in part, from the moratoria on deepwater drilling and other permitting changes that were imposed by the federal government after the oil spill.  After a lengthy review and selection process, the Test Cases were initially selected in August of 2013, and a scheduling order was ultimately entered in June of 2014.

By this time, common benefit attorneys had already spent a considerable amount of time and resources researching OPA legislative history; factual and legal issues regarding previous oil spills or other casualties, including statutory and/or regulatory suspensions and/or changes, the

---

[9]   Halliburton and Transocean have agreed to pay up to $124,950,000 in common benefit attorneys' fees and expenses, in addition to the $1.24 billion in benefits, in connection with the Halliburton and Transocean class settlements.  (Halliburton Settlement §§ 6(c), 23, Rec. Doc. 15322-1; Transocean Settlement §§ 6(c), 23; Rec. Doc. 14644-1; Preliminary Approval Order p.11, Rec. Doc. 16183).  Although Class Counsel and other common benefit attorneys seek the entire $124,950,000 (*see, e.g.*, Fitzpatrick Decl. ¶ 11, Aggregate Fee Pet., Ex. 3, Rec. Doc. 21098-3), that request is not presently before the Court.  Rather, that request is presented as part of the motion for final approval of the Halliburton and Transocean settlements, which is to be heard on November 10, 2016.  (Rec. Doc. 16900).

closure of fisheries, the closure of waterways, the closure of ports, pipelines, roads and/or bridges, etc.; and other materials and caselaw regarding government action and foreseeability; and identifying and working with potential and retained experts, consultants and fact witnesses concerning same.  Similarly, the PSC had already commenced working with economic and accounting experts regarding the macro-economic conditions and context within which the spill occurred, particularly with respect to the oil and gas industry, as well as the potential damage models and loss projections that might be associated with the specific individual selected OPA Test Cases.

Once the scheduling order was entered, the common benefit attorney team assembled for a multi-day intensive planning session to crystalize the issues, theories, and strategies. Counsel decided that, once the answers in the individual test cases were filed, issues would be joined, and a motion to strike affirmative defenses could be filed in the context of specific factual allegations and concrete claims, and would thereby provide the Court with a potential opportunity to resolve core legal issues. These motions and reply briefs were filed in July of 2014, but were ultimately denied, without prejudice, as premature.  (Rec. Doc. 13393).  Common benefit attorneys thereafter engaged in extensive discovery and continued expert preparation and development relating to both the common issues and the individual seven selected OPA Test Cases.  Judge Shushan conducted frequent status conferences.  Common benefit attorneys later filed briefs, addenda, and exhibits on a renewed motion to strike and in opposition to BP's renewed motion to dismiss.  On March 10, 2016, the Court granted BP's motion to dismiss the OPA Test Cases.  *In re: Oil Spill by the Oil Rig "Deepwater Horizon,"* 168 F. sup.3d 908 (E.D. La. 2016).  By that time, most Bisso Depositions, all Wadleigh Depositions, and a few expert, consultant, and third-party factual depositions had been taken.  The PSC initially appealed, but later stipulated to dismissing the

appeal.  Although unsuccessful, the efforts of the common benefit attorneys with respect to the OPA Test Cases contributed to the ultimate voluntary settlement of many moratoria claims that had been excluded from the Economic Settlement.

> ### O.   Other Common Benefit Efforts

Common benefit attorneys also contributed significant time and effort to administrative and other tasks that were necessary, not only for the common and collective benefit of plaintiffs, but also for the overall management of the case, relative to all parties, and to the Court.  Such time and efforts included, among other things, coordination between and among the PSC, counsel for the U.S., counsel for the States, counsel for the defendants, Special Master McGovern, Special Master Freeh, Magistrate Judges Shushan and Wilkinson, Claims Administrator Pat Juneau, Claims Administrator Matt Garrettson, Clams Administrator Mike Juneau, Fifth Circuit Conference Attorney Joe St. Amant, and the Liaisons to the Neutrals—as well as various different business, industry, attorney, accountant, environmental, seafood, and other professional and/or advocacy groups, societies, and/or organizations; government and public officials and agencies; and members of the press.  Common benefit attorneys coordinated with individual plaintiff attorneys with respect to motions and briefs on legal and administrative issues, in many cases assisting with the filings.  The PSC contributed to a Master Claims Database, and assisted the plaintiffs and the Court with the establishment of a "B3 Protocol" relating to the clean-up and responder defendants (PTO 57), and the Pretrial Order No. 60 process.

> ## II.   FEE COMMITTEE REVIEW PROCESS

Pursuant to PTO 9, common benefit attorneys were required to record time associated with their common benefit efforts contemporaneously, and to submit such time, along with any common benefit Held Expenses, to Philip A. Garrett, Sr., a CPA who had been appointed to track common

benefit time and expenses in two other MDLs.  Mr. Garrett reviewed such time and expenses, raised questions, and rejected unauthorized entries.  Common benefit attorneys advanced over $37 million in "assessments" for Shared Expenses.  Beginning in February 2013, these Shared Expense started to be reimbursed, per Court Order, out of the Common Benefit Cost and Fee Account that was established in connection with the Economic and Medical Settlements.  (*See* Rec. Docs. 8607, 9520, 10796, 11796, 12664, 13342, 13677, 14432, 15644, and 15916).

From the time PTO 9 was entered on October 8, 2010, through December 31, 2015, a total of 107 common benefit firms submitted over 585,000 hours, and over $7 million in Held Expenses, as well as the afore-mentioned $37.5 million in Shared Expenses, which were accepted by the Court-appointed CPA Phil Garrett, on a monthly basis.  On July 15, 2015, the Court entered PTO 59, which required common benefit attorneys to audit their time and expense submissions, and to delete any and all submissions that might have been related to individually represented clients, as opposed to common benefit, duplicative, or otherwise inappropriate.  Common benefit firms subsequently audited their submissions, and reduced their time by 26,583 hours and eliminated over $120,000 in Held Expenses.  The Fee Committee then reviewed the submissions and conducted 74 interviews, over the course of which an additional 6,218 hours and approximately $44,200 in Held Cost were voluntarily withdrawn.  The Fee Committee reports that a minimum of 518,250 hours were reasonably expended thru the end of 2015 for the common benefit of class members and others affected by the DEEPWATER HORIZON/Macondo incident.  The Fee Committee further reports that when additional hours and Held Costs submitted and accepted thru April 2016 are added, petitioners have dedicated at least 527,081 common benefit hours,[10] while the total potential Held Costs are $7,187,698.30.

---

[10] The 527,081 hours consist of 268,297.55 partner hours, 180,302.08 associate hours, and 78,481.57 law clerk/paralegal/IT specialist/etc. hours.

### III.   METHODOLOGY FOR CALCULATING AGGREGATE FEE AWARD

Although BP has agreed to pay up to $600 million in common benefit attorneys' fees and expenses—in addition to and separate from class members' individual recoveries—the Court has an independent duty to the class and public to ensure that such amounts are reasonable.  *In re High Sulfur Content Gasoline Prods. Liab. Lit.*, 517 F.3d 220, 227-28 (5th Cir. 2008); *see also* Fed. R. Civ. P. 23(h) ("In a certified class action, the court may award ***reasonable*** attorney's fees and nontaxable costs that are authorized by law or the parties' agreement."  (emphasis added)).  In common fund cases, courts typically use one of two methods for calculating attorneys' fees:  (1) the percentage method, where fees are based on a reasonable percentage of the common fund; or (2) the lodestar method, in which fees are computed by multiplying the number of hours reasonably expended on the litigation by a reasonable hourly rate and, in the court's discretion, applying an upward or downward multiplier.  *See Union Asset Mgmt. Holding A.G. v. Dell, Inc.*, 669 F.3d 632, 642-43 (5th Cir. 2012).  In *Union Asset*, the Fifth Circuit "join[ed] the majority of circuits in allowing our district courts the flexibility to choose between the percentage and lodestar methods in common fund cases, with their analyses under either approach informed by the *Johnson* considerations."  *Id.* at 644.  The *Johnson* factors are: (1) the time and labor required; (2) the novelty and difficulty of the issues; (3) the skill required to perform the legal service adequately; (4) the preclusion of other employment by the attorney because he accepted this case; (5) the customary fee for similar work in the community; (6) whether the fee is fixed or contingent; (7) time limitations imposed by the client or the circumstances; (8) the amount involved and the results obtained; (9) the experience, reputation, and ability of the attorneys; (10) the undesirability of the case; (11) the nature and length of the professional relationship with the client; and (12) awards in

similar cases.  *Johnson v. Ga. Highway Express, Inc.*, 488 F.2d 714, 717-19 (5th Cir. 1974), *overruled on other grounds*, *Blanchard v. Bergeron*, 489 U.S. 87 (1989).

Virtually all of the recent common fund fee awards by district courts in the Fifth Circuit have utilized the percentage method, the reasonableness of which is analyzed in light of the *Johnson* factors.  *See In re FEMA Trailer Formaldehyde Prod. Liab. Litig.*, No. 07-1873, 2013 WL 1867117, *3 (E.D. La. May 2, 1013); *In re Vioxx Prods. Liab. Litig.*, 760 F. Supp. 2d 640, 652 (E.D. La. 2010); *Burford v. Cargill, Inc.*, No. 05-0283, 2012 WL 5471985, *1 (W.D. La. Nov. 8, 2012); *In re OCA, Inc. Sec. & Derivative Litig.*, No. 05-2165, 2009 WL 512081, at *19 (E.D. La. Mar. 2, 2009); *In re Enron Corp. Sec., Derivative & ERISA Litig.*, 586 F. Supp. 2d 732, 766, 778 (S.D. Tex. 2008); *Turner v. Murphy Oil USA, Inc.*, 472 F. Supp. 2d 830, 860-61 (E.D. La. 2007).  Many of these courts include an additional step, cross-checking the award against a "rough lodestar analysis."  *See FEMA Trailer*, 2013 WL 1867117, at *3; *Vioxx*, 760 F. Supp. 2d at 652; *OCA, Inc.*, 2009 WL 512081, at *22; *Enron Corp.*, 586 F. Supp. 2d at 778; *Murphy Oil*, 472 F. Supp. 2d at 860-61.  The Court concludes the same approach is appropriate here.  Accordingly, the Court will first determine the valuation of the benefit received by the class members and then select an initial benchmark percentage to be applied to this value.  The Court will then apply the *Johnson* factors to determine whether a positive or negative adjustment of the benchmark percentage is warranted.  Finally, the Court will perform an abbreviated lodestar analysis as a broad cross-check on the on the reasonableness of the fee arrived at by the percentage method. *See, e.g.*, *Vioxx*, 760 F. Supp. 2d at 652.

# IV.   ANALYSIS

## A.   Valuation of the Benefit Obtained

The value of a settlement fund includes all monetary amounts actually paid (or irrevocably deposited into a fund for payment) to or for the benefit of class members pursuant to the terms of the class settlement. *See, e.g.*, *Murphy Oil*, 472 F. Supp. 2d at 861; *Vioxx*, 760 F.Supp.2d at 652. Where the settlement provides benefits on a "pay-as-you-go" basis over a period beyond the point that a common benefit fee is to be awarded, the settlement fund also includes a reasonable estimate of the amount of future payments that will be made to claiming class members. *In re Prudential Ins. Co. of Am. Sales Practices Litig.*, 148 F.3d 283, 334 (3d Cir. 1998). Because the costs of notice and settlement administration are essential to facilitate the delivery of benefits to class members, the value of the settlement frequently will include those costs. *Staton v. Boeing Co.*, 327 F.3d 938, 975 (9th Cir. 2003) ("The post-settlement cost of providing notice to the class can reasonably be considered a benefit to the class.… [W]here the defendant pays the justifiable cost of notice to the class…it is reasonable…to include that cost in a putative common fund benefiting the plaintiffs for all purposes, including the calculation of attorneys' fees."); *In re Heartland Payment Sys.*, 851 F. Supp. 2d 1040, 1078 (S.D. Tex. 2012). Finally, when, as here, the settlement calls for the defendant to fund the payment of attorneys' fees to class counsel, it relieves the class of the burden of paying those fees from the recovery otherwise available to class members. As such, where a class settlement contains a provision that obliges the defendant to fund the payment of attorneys' fees to class counsel up to a specified amount, that amount is properly included in the value of the settlement for fee award purposes. *See Johnston v. Comerica Mortg. Corp.*, 83 F.3d 241, 246 (8th Cir. 1996) ("The award to the class and the agreement on attorney fees represent

a package deal. Even if the fees are paid directly to the attorneys, those fees are still best viewed as an aspect of the class' recovery"); *Heartland Payment Sys.*, 851 F. Supp. 2d at 1078-79.

In this case, the Economic and Medical Settlements have already secured compensation and other benefits worth approximately $9.3 billion. This figure consists of $9.0 billion on claims under the Economic Settlement (through August 31, 2016),[11] $40 million in Medical SPC payments (through July 1, 2016) (Rec. Doc. 21608, Tbl. 7), $57 million in Tourism and Seafood Promotional Grants (Economic Settlement § 5.13, Rec. Doc. 6430), $82 million in Transocean Insurance Proceeds being held in trust (Rec. Doc. 13424), $105 million in medical grants as part of the GHROP program (Rec. Doc. 21608, Tbl.13), and $350,000 under the PMCP program. The $9.3 billion figure does not include the cost of notice, administration, or common benefit attorneys' fees; nor does it include future amounts to be paid on unresolved Medical SPC claims (estimated to be $23.5 million) (Herman-Roy Decl. ¶ 67, Aggregate Fee Pet., Ex. 1, Rec. Doc. 21098-1) or unresolved Economic Claims. Notably, the Court understands that as of August 31, 2016, there are approximately 80,000 Economic Claims that had not been fully processed to completion. In a public disclosure from April 2016, BP estimated the then-current value of the Settlements to be $12.9 billion. (Aggregate Fee Petition, Ex. 12 at 18, Rec. Doc. 21098-6). BP's estimate appears to include the cost of notice, past administration, and assumed $600 million in common benefit fees, but it does not include claims not yet processed to finality or future administration costs. Thus, BP estimated that the total cost of the Settlements "is likely to be significantly higher than . . . $12.9 billion." In December 2015, Magistrate Judge Wilkinson estimated the total claims payout from the Economic Settlement when he allocated amounts under the Transocean and Halliburton Settlements. Judge Wilkinson's estimate was $10.825 billion. (Rec. Doc. 15652 at

---

[11] *See* note 8, *supra*.

16).  It should be noted, however, that Judge Wilkinson's estimate appears to be based solely on projected payments under the Economic Settlement, and does not appear to include Seafood and Tourism Promotional Grants, Transocean Insurance Proceeds, Medical Settlement benefits, administrative costs, notice costs, or common benefit attorney fees.   Considering the foregoing, the Court finds that a conservative estimate of the total value of the Settlements is $13 billion.

### B.    Benchmark Percentage

The next step is to determine the benchmark percentage.  To do this, the Court will consider awards in comparable cases.  *See Enron*, 586 F. Supp. 2d at 745 n.12; *Murphy Oil*, 472 F. Supp. 2d at 862 ("[T]he percentage should not be completely arbitrary, devoid of reality, or inconsistent with the usual fees for the type of case involved.  In short, there is no one percentage that should apply to all cases. Each case should be analyzed on its own basis.").  Class recoveries of $100 million or less are ubiquitous, and the case law readily establishes a customary or benchmark percentage-of-benefit award of 25%.  *See Enron*, 586 F. Supp. 2d at 745 n.12; *Murphy Oil*, 472 F. Supp. 2d at 863-64.  However, in the "mega-fund" (recoveries exceeding $100 million) or "super-mega-fund" range (recoveries exceeding $1 billion), there are fewer percentage awards to serve as a benchmark; consequently, there is some variability in the percentages awarded in these cases. *See In re Prudential Ins. Co.*, 148 F.3d 283, 339 (3d Cir. 1998) ("The district court also examined the fee awards in class actions with recoveries exceeding $100 million and found the fee percentages ranged from 4.1% to 17.92%."); *In re Diet Drugs Prods. Liability Litig.*, 553 F. Supp. 2d 442, 480 (E.D. Pa. 2008) (noting percentages ranging from 4.8% to 15% where the fund exceeded $1 billion).  It also appears that as the size of the recovery increases, the percentage tends to decrease.  *See Vioxx*, 760 F. Supp. 2d at 652.  Nevertheless, courts have rejected a blanket rule

that would automatically cap the fee percentage at a low figure when the class recovery is quite high.  *See Enron*, 586 F. Supp. 2d at 753.

The combined Settlements in this MDL certainly qualify as a "super-mega-fund" recovery. Accordingly, it is appropriate to consider the range of percentages in other super-mega-fund cases. The Aggregate Fee Petition includes a declaration by Brian T. Fitzpatrick, a law professor at Vanderbilt University who has published a number of articles on class action litigation.  Mr. Fitzpatrick compiled a table listing the 21 known class action settlements with a value of $1 billion or more.  In those cases, the average fee award was 9.92% of the total settlement value; the median fee was 7.4%.  (Aggregate Fee Pet., Ex. 3 p.21, Rec. Doc. 21098-3).

While the Court is hesitant to declare a "benchmark percentage" given the limited data points, the average and median percentages in previous "super-mega-fund" cases are certainly relevant to determining a reasonable fee here.  The requested $555.2 million in common benefit attorneys' fees is 4.3% of the estimated total value of $13 billion.  This percentage is modest in comparison to the percentages in other super-mega-fund cases.  In fact, only 2 of the 21 cases listed in Mr. Fitzpatrick's table awarded a smaller percentage than what is sought here.  Thus, while it appears the Court could choose a larger "benchmark percentage," since the Petitioning Attorneys request only 4.3%, the Court will use that number as the benchmark percentage.

### C.    *Johnson* Factors

The Court will now consider the *Johnson* factors.  The Fifth Circuit advises that it does "not require the trial court's findings to be so excruciatingly explicit in this area of minutiae that decisions of fee awards consume more paper than did the cases from which they arose."  *In re High Sulfur Content Gasoline Prods. Liab. Litig.*, 517 F.3d 220, 228-29 (5th Cir. 2008).  The Court is mindful of this instruction.

1.      <u>Novelty and Difficulty of the Issues (Factor 2); The Skill Required to
Perform the Legal Service Adequately (Factor 3); The Undesirability of the
Case (Factor 10)</u>

This MDL would appear to be one of the largest, if not the largest, MDLs in history.  Over

130,000 individual civil actions and/or claims-in-limitation were filed by private businesses,

individuals, and local governments.   Yet even greater than its sheer size was the MDL's

complexity.  As Mr. Fitzgerald put it, "I have never seen a case this complex nor one that required

more of class counsel.  The number of moving parts here was—and this is an understatement—

dizzying.  The law, the facts, the science—all of it was far more challenging than perhaps any class

action case I have ever seen."  (Aggregate Fee Petition, Ex. 3 ¶ 34, Rec. Doc. 21098-3).  Unlike

many MDLs where the damages alleged are of a similar type, here the claims included economic

loss, real and personal property damage, personal injury from exposure, personal injury and

wrongful death from the explosion, wage claims, contract disputes, lost tax revenues, etc.  The

actions and claims stood at the center of three federal statutory frameworks—the Oil Pollution

Act, the Clean Water Act, and the Outer-Continental Shelf Lands Act—the regulatory frameworks

of the Mineral Management Service, U.S. Coast Guard, and EPA; general maritime law; and the

statutory and common laws of Louisiana, Mississippi, Alabama, Florida and Texas.  Many features

of the Oil Pollution Act itself were largely unsettled, and resulted in substantial confusion

regarding presentment, causation, displacement/preemption, claims against the Oil Spill Trust

Fund, and the force and effect of Coast Guard decisions and/or regulations.  The PSC was required

to stay abreast of the insurance/indemnity/contribution disputes between and among Transocean,

Halliburton and BP; the "divisibility" and subsurface discharge arguments raised by BP and

Anadarko; the *Hornbeck* and *ENSCO* actions brought under the Administrative Procedures Act in

response to the deepwater drilling moratoria and permitoria; Transocean's jurisdictional dispute

with the Chemical Safety Board; and the securities actions being litigated in MDL No. 2185.[12]

The Court concludes that factors 2, 3, and 10 indicate that the requested fee is reasonable.

2.   <u>Time and Labor Required (Factor 1); Preclusion of Other Employment
(Factor 4); Time Limitations Imposed by the Client or the Circumstances
(Factor 7)</u>

"Collectively, these three factors require the Court to give appropriate credit to the

intensive and sustained efforts of common benefit counsel to bring this litigation to a timely

resolution." *Vioxx*, 760 F. sup. 2d at 656.   Mr. Fitzgerald adds that the "time and labor required"

factor serves to help guard against class counsel rushing cases to settlement just for a quick fee

award.

Petitioning Attorneys have performed an immense amount of work in this MDL.   Counsel

expended over 527,000 hours on common benefit work.   Counsel took hundreds of depositions

and analyzed over 90 million pages of documents.   Furthermore, they did something that rarely

happens in class actions: they actually went to trial.   Counsel engaged in a massive, two-phase trial

effort in pursuit of the claims assigned to the class by BP and the expressly reserved claims of

individual class members.   The demands of this case not only precluded other employment, it

required many common benefit attorneys to move to New Orleans and devote their entire practice

to this MDL for years.   These lawyers spent days and weeks away from their homes and families.

This resulted in a high level of collaboration, benefitting not only class members, but the entire

litigation.

The Settlements themselves required an unprecedented level of implementation and

litigation.   In some class settlements, class counsel are largely discharged of their responsibilities

---

[12] Another indicator of the size and complexity of this case might be the number of appeals that have been taken to the Fifth Circuit.   By the Court's count, there have been around 90 appeals in this MDL.

once the settlement is approved.  Here, Class Counsel devoted many hours working with the claims administrators, program vendors, BP, and the Court on administrative and interpretive implementation issues.  Moreover, class counsel had to do something that is likely a first in class action jurisprudence: they had to fight a defendant's subsequent efforts to rescind its own settlement.  Class Counsel expended an incredible amount of time, effort, and expense responding to motions, injunctions, appeals, and petitions for certiorari filed by BP, which could not have been contemplated when the agreement over common benefit fees and expenses was negotiated in April 2012.

The Court concludes that factors 1, 4, and 7 indicate that the requested fee is reasonable.

### 3.   The Amount Involved and the Results Obtained (Factor 8)

The Supreme Court and the Fifth Circuit have held that the most critical factor in determining the reasonableness of a fee award is the "degree of the success obtained."  *Enron Corp*, 586 F. Supp. 2d at 796-97 (citing *Farrar v. Hobby*, 506 U.S. 103 (1992); *Migis v. Pearle Vision, Inc.*, 135 F.3d 1041, 1047 (5th Cir. 1998)).  Success is determined not only by the gross amount of the recovery but also by the number of individuals who benefit from the class settlement, the degree to which it provides them with full compensation for their injuries, and the extent to which the settlement benefits the public at large.  *See Vioxx*, 760 F. Supp. 2d at 657-68; *Murphy Oil*, 472 F. Supp. 2d at 866; *In re Diet Drugs*, 553 F. Supp. 2d 442, 472-73 (E.D. Pa. 2008).

Through August 31, 2016, the Economic Settlement has provided approximately 101,000 people and business (with 133,000 claims) along the Gulf with full compensation for their losses, and in most cases an additional punitive and/or future risk factor.  (Status Report, Ex. 1 tbl. 4, Rec. Doc. 21760-1).  The Medical Settlement has approved SPC payments for nearly 13,000 individuals through July 1, 2016.  (Status Report, p.21 tbl. 7, Rec. Doc. 21608).  Both Settlements provided

significant and beneficial grants to help the entire region rebound economically from the spill and to help build infrastructure for the better delivery of healthcare to affected communities.   A comprehensive library was also established.

As noted, the Settlements have already secured $9.1 billion in benefits—not including the costs of notice, administration, or common benefit fees—and claims are still being processed.  The Court estimates the total value of the benefits to be $13 billion.  This appears to be the largest class settlement of private claims in American history.[13]  Furthermore, this recovery is in addition to the $6.2 billion that had been paid out under the GCCF, which was 92% complete at the time the Settlements were reached.  (*See* Aggregate Fee Pet., Ex. 22, Rec. Doc. 21098-15).  This shows that the Settlements provided additional and greater benefits than existed under the GCCF.  It is also worthwhile to note that the Economic Settlement began processing and paying claims before judicial approval, which is unusual for a class settlement and beneficial to class members.

The Court concludes that factor 8 indicates that the requested fee is reasonable.

4.    Nature and Length of the Professional Relationship with the Client (Factor 11)

The professional relationship between the Petitioning Attorneys and class members generally did not antedate the litigation, nor will it likely continue beyond the closure of this MDL. Consequently, the Court finds that the "nature and length of the professional relationship" factor has little impact here.  It does not warrant an increase or decrease in the benchmark percentage. *See Murphy Oil*, 472 F. Supp. 2d at 866-67.

---

[13] According to Mr. Fitzpatrick, the next highest settlement amount is $7.2 billion.  (Aggregate Fee Petition, Ex. 3, tbl. 1, Rec. Doc. 21098-3 (citing *Enron*, 586 F. Supp. 2d at 796)).

5.      The Customary Fee for Similar Work in the Community (Factor 5), Whether the Fee Is Fixed or Contingent (Factor 6), Awards in Similar Cases (Factor 12)

These factors were largely covered when the Court examined the benchmark percentage. *See* Part IV.B, *supra*. Class counsel work on contingency in nearly every class action. Moreover, the percentage requested here is less than percentages awarded in comparable cases. These factors indicate the requested fee is reasonable.

6.      The Experience, Reputation, and Ability of the Attorneys (Factor 9)

The Court agrees with Mr. Fitzpatrick's assessment that "the class action lawyers who worked on this case include among their number some of the finest and best-regarded plaintiff's lawyers in the United States." (Fee Petition, Ex. 3 ¶ 36, Rec. Doc. 21098-3). As discussed above, this MDL is perhaps the most complex in history. That counsel were able to achieve so much speaks to their ability. This factor supports the reasonableness of the fee award.

7.      Conclusion: *Johnson* Factors

Taken together, the *Johnson* factors indicate that the fees sought here are not only reasonable, they are arguably below what class counsel could have reasonably requested.

**D.      Lodestar Cross-Check**

"To confirm that the determined percentage-fee value in this case is appropriate, the Court believes it is important to conduct a lodestar cross-check." *Vioxx*, 760 F. Supp. 2d at 658.

> In the cross-check, the Court multiplies the reasonable hours worked by reasonable billing rates to calculate a time-fee value for the common benefit work performed. Then, the Court divides the percentage-fee value by the time-fee value to determine a lodestar multiplier and to test whether the percentage fee value represents an unreasonable award or "windfall" over the reasonable value of the work performed.

*Id.* However, the loadstar cross-check is a streamlined process, avoiding the detailed analysis that goes into a traditional lodestar examination. *Id.* at 659.

Petitioning Attorneys have expended approximately 527,000 hours of common benefit work.  Regarding billing rate, the Court finds $450 is an appropriate average/blended hourly rate from which to start the analysis.  *See Enron,* 586 F. Supp. 2d at 779-080 (approving an average/blended hourly rate of $456 in 2008); *Vioxx,* 760 F. Supp. 2d at 660 (approving an average/blended rate of $443.29 in 2010).[14]  Multiplying the hours worked by this rate yields a time-fee value of $237,150,000.

The next step is to compare the time-fee value to the Court's percentage-fee value and determine if a lodestar multiplier is warranted.  *Vioxx,* 760 F. Supp. 2d. at 661.  The Court has determined that $555.2 million (representing between 4.3% of the estimated total recovery) is reasonable under the percentage method.  When this percentage-fee value is divided by the time-fee value of $237.2 million, it produces a lodestar multiplier of approximately 2.34.  Mr. Fitzpatrick prepared a chart showing the lodestar multipliers in the 18 cases with settlements at or above $1 billion where such information was provided.  The average multiplier is 3.14 and the median is 2.80.  (Fee Application, Ex. 3 pp. 20-21 tbl. 1, Rec. Doc. 21098-3).  Thus, a lodestar multiplier of 2.34 is not anomalous for a settlement of this size.  Moreover, considering the size and complexity of this case, the time and effort required of the petitioning attorneys, the tremendous amount of recovery obtained through the Settlements; and further considering that the common benefit fee award is delayed compensation as well and the risk undertaken by the common benefit attorneys, the Court finds that a lodestar multiplier of 2.34 is reasonable for this case.

---

[14] Further supporting the blended rate of $450 are the following statistics: (1) According to the 2014 National Law Journal Survey, the average nationwide rate was $604 for partners and $370 for associates.  (2) The State of Louisiana reportedly paid its outside counsel in this MDL $600 per hour.  (3) Professor Miller, BP's expert in this case who supported Settlement approval, reported in 2014 median rates between $810 - $980 for partners in bankruptcy matters.  (4) In 2011, BP's lead trial counsel in this litigation reported in a bankruptcy proceeding rates of $580 - $995 for partners and $340 - $995 for other attorneys.

Accordingly, the Court finds that the lodestar cross-check supports the requested fee of $555.2 million.

## V.   OBJECTIONS

On September 12, 2016, four class members filed an objection to the Aggregate Fee Petition.  (Rec. Doc. 21666).  Pretrial Order No. 59 required that the Aggregate Fee Petition be filed on July 15, 2016, and any objections be filed by August 25, 2016.  (PTO 59 ¶ 20, Rec. Doc. 14863).  Counsel for the objectors was served with a copy of PTO 59 on July 15, 2015, and the Aggregate Fee Petition on July 15, 2016.  (Suppl. Brief, Ex. 4 p. 3, Ex. 6 p.4, Rec. Doc. 21724-4, 21724-6).  The objectors have not moved for an extension of the deadline or for leave to file out-of-time.  Consequently, the objection is untimely and need not be considered.

However, even if the Court were to consider the objections, it would conclude that they lack merit.  The objectors argue that "class counsel has not created a common fund of $7.5 billion, nor have they persuaded BP to put up any money that was not already on the table.  All class counsel has done is to revise the claims criteria and claims process in a manner that allowed businesses and individuals not harmed by the oil spill to file claims for compensation under the settlement."  (Obj. at 5, Rec. Doc. 21666).  To the contrary, Petitioning Attorneys have provided substantial evidence that the GCCF was 92% complete when the Settlements were reached, and, as explained above, the Settlements have provided and will provide benefits far exceeding that which claimants recovered under the GCCF.  (*See* Aggregate Fee Pet., Ex. 22, Rec. Doc. 21098-15).   The arguments regarding alleged "unharmed" class members were considered and rejected by this Court and the Fifth Circuit.

Finally, the Court has serious doubts as to whether these objectors have standing to object.  As mentioned, any common benefit award does not reduce the objectors' recoveries, and the Court

long ago found that the Settlements were fair, reasonable, and adequate to the Classes.  It would appear, then, that the objectors have no stake in the outcome of the Aggregate Fee Petition. Petitioning Attorneys propose that true motivation here is bad faith—that these are "professional objectors" who filed this untimely objection for the sole purpose of attempting to extract a side-deal pay-off to go away.  (Suppl./Reply Brief, Ex. 1 at 6 & n.37, Rec. Doc. 21724-1).  Petitioning Attorneys make a persuasive point.

## VI.   CONCLUSION

For the foregoing reasons,

IT IS ORDERED that the Petition for Reimbursement of Expenses and Collective Common Benefit Fee Award (Rec. Doc. 21098) is GRANTED.

IT IS FURTHER ORDERED that a common benefit fee and cost award of $600,000,000.00 is APPROVED and AWARDED, consisting of:

- $37,597,151.98 in Shared Expenses, which have already been paid to third-party service providers and/or reimbursed to Common Benefit Attorneys, pursuant to previous Court orders;

- Up to $7,187,698.30 in claimed Held Expenses, which have been submitted to Court-appointed CPA Phil Garrett and the Fee Committee pursuant to PTO 9, (as amended), and PTO 59; and

- The remainder of the Settlements' Common Benefit Cost and Fee Award amount, of approximately $555.2 million, to Class Counsel and other common benefit attorneys collectively, for work performed to advance the common and collective interests of the Economic Class and the Medical Class.

The allocation of the common benefit fee among the common benefit attorneys shall be determined at a later date and in accordance with the procedures set forth in PTO 59 (Rec. Doc. 14863) and any amendments thereto and the Court's Order of July 28, 2016, appointing John W. Perry as Special Master (Rec. Doc. 21281).

Signed in New Orleans, Louisiana, this 25th day of October, 2016

_____
United States District Judge