# UNITED STATES DISTRICT COURT
## FOR THE EASTERN DISTRICT OF LOUISIANA

| | | |
|---|---|---|
| IN RE:  OIL SPILL BY THE OIL RIG | * | MDL NO. 2179 |
| "DEEPWATER HORIZON" IN THE | * | |
| GULF OF MEXICO ON APRIL 20, 2010 | * | SECTION "J" |
| | * | |
| THIS DOCUMENTS RELATES ONLY TO: | * | JUDGE CARL J. BARBIER |
| Civil Action Nos. 10-2771; 10-8888; | * | MAGISTRATE JUDGE |
| 10-9999; 13-1971; and 14-1525 | * | JOSEPH C. WILKINSON, JR. |

* * * * * * * * * * * * * * * * * * * * * * * * * * * *

## MEMORANDUM IN SUPPORT OF
## MOTION FOR ATTORNEY'S FEES

**MAY IT PLEASE THE COURT:**

Waltzer, Wiygul & Garside, L.L.C., as successor of Waltzer & Wiygul, LLP and Waltzer & Associates (hereinafter "WWG"), respectfully move this Honorable Court for fees earned in prosecution of the Edward Wisner Donation's (hereinafter the "Donation") claims against BP, as set forth in the contingency fee contract between WWG and the Donation.  WWG requests that this Court enforce its contingency fee contract with the Donation, and award WWG at least fifty percent (50%) of the total contingency fees earned[1] in obtaining the settlement between WWG and BP.

---

[1] The amount of total fees earned has not yet been agreed to by the client, the Wisner Donation, through approval by the Wisner Donation Advisory Committee, as total costs and certain hourly fees have not yet been fully audited.  *See Answer to Edward Wisner Donation Ex Parte Motion to Deposit Funds Into the Registry of the Court,* MDL Doc 21860.  Because the amount of the total fees earned has not been approved by the Wisner Donation Advisory Committee, and because the settlement with BP is to be paid out in installments over time, WWG moves for a determination of attorney's fees in a percentage of the total fees earned and to eventually be paid.  WWG reserves the right to, and will upon request of this Honorable Court, later fully address the issue of the amount that should be paid by the Wisner Donation to WWG and the JV as total fees earned, including if the WDAC does not approve a total amount that is agreeable to the JV. *See* Declaration of Joel Waltzer, pp. 25 – 28, attached hereto as Exhibit 1, addressing a fair reading of the *Retainer/Contingent Fee Agreement* (the "Agreement") (MDL Doc. 14960-3) and a fair calculation of the total fees.  WWG further notes that additional recovery may be made by the Wisner Donation from the Halliburton and Transocean settlements, and WWG should receive 50% of any fee awarded based on the proceeds from the Halliburton and Transocean settlements.  *See Order and Reasons*, MDL 2179, Doc. 21849, pp. 24-25, fn. 9.

## RELEVANT FACTUAL HISTORY

### I.    The Client: The Donation.

The Donation is a complex land trust that terminated in August, 2014. The Donation's administrative, financial, and general management is the responsibility of the Secretary/Land Manager under the direction of, and reporting to, the Wisner Donation Advisory Committee (WDAC), which, itself, is responsible for the management of the Donation "in the first instance" and is comprised of a representative of each beneficiary, including Edward Wisner's Heirs and Assigns, Tulane University, LSU Medical Center, The Salvation Army, and the City of New Orleans (CNO).[2] The Mayor of New Orleans serves as Trustee, subject to the WDAC's advice and consent.[3] The rights and authority of these parties have been hotly contested in the current mayoral administration. *See In re Edward Wisner Donation*, 150 So. 3d 391, 400-01 (La. App. 4 Cir. 9/18/14).

The Donation's holdings include a massive 33,000 acre tract in south Lafourche Parish, which contains the Port of Fourchon and Fourchon Beach, a nine-mile "headland" that is one of the most dynamic natural environments in the world. This nine-mile "headland" was also among the most heavily contaminated lands in the BP oil spill. Massive quantities of oil intermittently washed ashore in late May of 2010 and continued for many months. Stranded oil was quickly covered by sand and lost from view, until it was redeposited as the beach receded. Unified Incident Command (UIC) set up a massive response on the land, with hundreds of workers, and at times over one thousand, removing oiled sand each day.

---

[2] *See* 2003 Bylaws of the WDAC, Exhibit 1, pp. 30 - 46 to the Declaration of Cathy Norman, attached hereto as Exhibit 2; Affidavit of Michael Peneguy, p. 1, attached hereto as Exhibit 3.

[3] *Id.*

2

## II.      The Donation Retains Outside Counsel to Address the Oil Spill.

### A.  WWG's Representation of the Donation:  June 2010 through July 2012.

Secretary/Treasurer and Land Manager of the Donation, Cathy Norman, herself a lawyer, had experience with oil spills, land contamination, and emergency response, but her small staff was unable to keep up with the environmental catastrophe rapidly unfolding in the wake of the BP oil spill.[4]  She knew the Donation required environmental lawyers to navigate the UIC response, to protect the Donation's land and finances, to collect the ephemeral evidence of contamination and damage, and to hire experts from the dwindling pool not yet in BP's employ.[5] This response was needed not only to protect the Donation's property itself, but also to evidence any claim against BP on behalf of the Donation. The law firm of Simone, Peragine, Smith & Redfearn, L.L.P. (hereinafter "Simone Peragine"), who had long represented the Donation, could not represent the Donation against BP, because of a prior representation of BP in an unrelated matter.  However, Simone, Peragine recommended WWG because of its extensive experience in the interrelated fields of environmental regulation, land contamination, oil and water pollution, and coastal loss.[6]

After spending two (2) days on-site in the Donation's South Lafourche Parish property in June of 2010, learning the property and analyzing the Donation's legal options, WWG presented its qualifications, findings, and recommended strategy to the Donation's Advisory Committee ("WDAC").[7] The following month, the WDAC voted to hire WWG to represent its interests

---

[4] *See* Declaration of Joel Waltzer, pp. 5 – 6; Dec. of Norman, p. 5.
[5] *See* Dec. of Norman, pp. 5 – 6; Minutes of the Meeting of WDAC, June 15, 2010, Exhibit "P" to Declaration of Dylan T. Leach, attached hereto as Exhibit 4.
[6] *See* Dec. of Waltzer, p.6.
[7] *See* Dec. of Norman, p. 6; Dec. of Waltzer, p. 7; Exhibit B, p. 1 to Declaration of Robert Wiygul, attached hereto as Exhibit 5;

against BP.[8] The WDAC and WWG eventually negotiated the *Retainer/Contingent Fee Agreement* (hereinafter the "Agreement") to maximize the Donation's recovery from BP providing a mixed hourly/contingency fee agreement.[9]

WWG proposed that the Donation actively participate in the Uniform Integrated Command ("UIC") cleanup response.[10] Active engagement was necessary both because of the scale of the contamination and to proactively assure preservation of evidence of damage caused by the spill and response.[11] This would provide the Donation with its best chance to extend and heighten the clean up and prove the Donation's entitlement to damages, including restoration.[12] Participating in the response would also allow the Donation to shift expenses and expert and legal fees onto BP (through the Oil Pollution Act ("OPA") and the analogous principles developed under the Comprehensive Environmental Response, Cleanup and Liability Act ("CERCLA")).[13] WWG knew that the results of this unique, time intensive strategy would give BP an incentive to settle and increase the overall value of the case.[14] On July 1, 2010, the WDAC voted to hire WWG, conditioned on the City waiving conflicts in two (2) unrelated cases, and instructed Ms. Norman and interested WDAC members to negotiate a contract.[15] A week later, the City Attorney waived the conflicts in writing.[16]

---

[8] *See* Affidavit of Peneguy, p. 2; Exhibit Q, Minutes of the Meeting of WDAC, July 1, 2010, p. 1 of Dec. of Leach; Dec. of Waltzer, p. 10; Exhibit B, pp. 1 of Dec. of Wiygul.
[9] *See* Dec. of Norman, p. 8; Dec. of Waltzer, pp. 11 – 12.
[10] *See* Dec. of Waltzer, p. 13; Dec. of Wiygul, pp. 7 - 9;
[11] *See* Dec. of Waltzer, p. 13; Dec. of Wiygul, pp. 7 – 9.
[12] *See* Dec. of Waltzer, pp. 13 – 14; Dec. of Wiygul, pp. 7 – 9.
[13] *See* Dec. of Waltzer, pp. 14 – 15.
[14] *See* Dec. of Waltzer, p. 9.
[15] *Supra* n. 8.
[16] *See* Dec. of Norman, p. 6; Dec. of Waltzer, p. 10; July 7, 2010 Email from Nanette Jolivette-Brown, Exhibit "I" to Dec. of Leach.

WWG and the Donation tailored a *Retainer/Contingent Fee Agreement* to provide a blended fee structure, reflecting the strategy of shifting fees and costs to BP.[17] WWG charged a discounted hourly rate for its time engaged in the response, and the Donation would, in turn, bill BP for that time. Doc. 14960-3 at pp. 1 – 2. Only one-half of the invoiced amount was due prior to BP's payment, subject to an $8,000/month maximum. *Id.* In exchange for the discounted hourly rate and to compensate for litigation time that could not be shifted to BP, WWG would also charge a contingency fee from any settlement, excluding BP payments of the Donation's invoices. The contingency rate was reduced through negotiation with the Donation, because the Donation opted to pay the expert costs and response fees up front.[18] Further, any fees received by WWG for response would be deducted as an offset against any contingency fee owed, even if those hourly fees had been reimbursed by BP, *shifting* a portion of the contingency fee and costs onto BP. The WDAC voted to authorize Ms. Norman to execute the contract that the Donation had negotiated with WWG.[19]

WWG immediately retained experts in oil fate and remediation, land loss, and economics, and negotiated a unique Access Agreement with BP (the "Access Agreement").[20] The Access Agreement required BP to give the Donation response-related evidence, to reimburse the Donation's response related expert fees and expenses, and to reimburse the Donation for its expenditures restoring damage caused by the response.[21] Because much of the property damage would be caused by the response, this last element negated much of the argument that restoration

---

[17] *See* Dec. of Waltzer, p. 12; Affidavit of Peneguy, p. 3 Agreement, MDL Doc. 14960-3.

[18] *See* Dec. of Waltzer, pp. 11 – 12.

[19] *See* Dec. of Norman, p. 9; Dec. of Waltzer, p. 15; Affidavit of Peneguy, p. 3; Minutes of the Meeting of the WDAC, September 28, 2010, p. 4, Exhibit "U" to Dec. of Leach.

[20] *See* Dec. of Norman, pp. 7 – 8; Dec. of Waltzer, p. 14; Dec. of Wiygul, pp. 5 – 6. These experts were later crucial in pursuing damages against BP and the Donation's subsequent attorneys heavily utilized these same experts with little additional expert assistance.

[21] *See* Access Agreement, Doc. 1-1 in Civ. Action No. 14-1525.

damages could not exceed the land's value and assured the Donation's control over the manner in which the restoration was done, which lies at the core of successful representation in contamination cases.

The WWG strategy was highly successful. Through the Access Agreement and FOIA requests, WWG obtained most of the evidence that was used prosecuting the Donation's claims.[22] WWG forced BP to actively remediate the Donation's property longer than anywhere else on the Gulf.[23] The Donation's expert team forced additional cleanup measures. WWG thereby provided the Donation nearly three million dollars ($3,000,000.00) in benefit, well before any settlement was reached, by shifting costs, expert fees, and legal fees to BP, including most of the fees the Donation has already paid to WWG.[24]

WWG spent approximately two thousand (2,000) hours on the Donation's claims over the following two years.[25] WWG invoiced seven hundred eighty (780) hours as related to the response, but that time served the dual purpose of not only preserving the property, but also building the overall OPA damages case.[26] WWG spent approximately 1,200 hours on the Donation's case that was not connected to the response, not billed to BP, and has not been paid at any hourly rate.[27]

**B. WWG Was Terminated by the WDAC After Over Two Years' Work.**

In May 2012, WWG had been actively preparing the Donation's case for almost two (2) years, was evaluating the submission of a claim under the newly announced BP Class Action

---

[22] *See* Dec. of Waltzer, p. 16.
[23] *Id.*; Dec. of Norman, pp. 14 – 15.
[24] *See* Dec. of Waltzer, p. 17.
[25] *See* Exhibit 6 to Dec. of Waltzer.
[26] *Id.*
[27] Because WWG had a contingency fee agreement, WWG did not keep contemporaneous time records on these tasks that would not be subject to an hourly-fee, but WWG did keep a list of tasks performed on behalf of the Donation, from which WWG has conservatively estimated its time spent thereon. *See* Dec. of Waltzer, p 17; Dec. of Wiygul, pp 8 - 9.

Settlement, and was also litigating some unpaid costs owed under the Access Agreement with BP. The joint venture of five (5) law firms[28] (the "JV"), which represented the City of New Orleans in the City's claims against BP, asked to participate at a hearing on WWG's motion to enforce the Access Agreement.[29] Days later, JV attorney Steve Herman wrote BP's lawyers that he had learned that the Donation would be submitting a claim, and that he wanted to put the claim *"on your radar, so that the Program will be able to make sure that the I's are dotted and the T's are crossed in terms of the Release*."[30] This communication was surprising: because the decision to submit a claim was made in WDAC executive session, pursuant to consultation with attorneys; because WWG was unaware of BP's continued interest in closing down the Donation's case; and because the efficacy of the Release would seemingly favor BP and not the Donation.

A week later, the Mayor demanded the JV attorneys join as co-counsel on the WDAC's claim.[31] The JV suggested that WWG continue their work in guiding the response and collecting the evidence generated therefrom, while the JV would take over settling the case for a significant share of the fee (the City's 33% interest as a beneficiary).[32] WWG prepared to work out a reasonable fee split with the JV, but because the Mayor and the JV would not assure WWG's participation in all facets of the litigation, and especially in settlement discussions, and, of particular significance, the JV would not agree to bring any settlement to a vote of the WDAC, attempts at negotiations failed.[33]

---

[28] The JV was and is comprised of the law firms: Herman, Herman, Katz & Cotlar; Leger Shaw; Fayard & Honeycutt; the Law Offices of Fred L. Herman; and Domengeaux Wright Roy & Edwards.
[29] *See* Dec. of Norman, p. 21.
[30] *See* Dec. of Waltzer, p. 22.
[31] *See* Dec. of Waltzer pp. 21 – 22.
[32] *See* Dec. of Norman, pp. 13 – 14; Dec. of Waltzer, p. 22.
[33] *See* Dec. of Waltzer, p. 22; Affidavit of Peneguy, p. 4.

After the WDAC initially refused to fire WWG, two beneficiaries suddenly changed their representatives and their vote.[34] On July 31, 2012, the WDAC voted 3-2 to terminate WWG's services after WWG had provided nearly two thousand (2,000) hours of legal services with the active praise of all parties, including the Mayor's representatives on the WDAC.[35]

## LAW & ARGUMENT

### III.    Louisiana Law Governs WWG's Claim for Attorney's Fees.

State law governs the rights and obligations of parties to a contingency fee contract. *Augustson v. Linea Aerea Nacional-Chile, S.A. (LAN-Chile)*, 76 F.3d 658, 662 (5th Cir. 1996) (*citing Johnson v. California Real Estate Inv. Trust*, 912 F.2d 788 (5th Cir. 1990); *United States v. Chamberlain*, 341 F.App'x 963, 965 (5th Cir. 2009) (holding "[a]n attorney's right to compensation pursuant to a contingency fee agreement is a property right determined under applicable state law").  Further, recognizing this, the Agreement at issue includes a choice of law provision that provides:  "The donation understands and agrees that Louisiana law governs this contract."[36] Therefore, Louisiana law governs WWG's claim for attorney's fees.

### IV.    The Agreement is Valid.

The JV, which was subsequently hired by the Donation, now asserts *for the Donation* that the WDAC did not have authority to hire WWG, and that WWG's contract is invalid.[37] The JV has never specified exactly why it claims the Agreement is invalid. This position is opposed by the representatives on the WDAC and is clearly incorrect.[38]

---

[34] *See* Dec. of Norman, pp. 13 – 14; Dec. of Waltzer, p. 22.
[35] *See* Dec. of Norman, pp. 13 – 14; Dec. of Waltzer, p. 22; Affidavit of Peneguy, pp. 4 – 5.
[36] MDL Doc. 14960-3, p. 3.
[37] *See Answer to Intervention* filed by the JV, MDL Doc. 21732.
[38] *See* Wisner Heirs' *Answer to Complaint*, MDL Doc. 21859, ¶5.

Following a 1929 settlement of claims between predecessors of the Donation's beneficiaries, the City of New Orleans constituted and created the WDAC by municipal ordinance.[39]  The City of New Orleans, by ordinance, delegated rulemaking authority on trust matters to the WDAC. *See* Sect. 2-158.  In accordance with its rule-making authority set forth in this ordinance, the WDAC adopted its current bylaws by a majority vote of the members of the WDAC, and Mayor C. Ray Nagin signed these bylaws.[40]

The WDAC's bylaws, in part, charge the WDAC with "the contracting of attorneys . . . as needed, to assist in the exploitation, development and **preservation of the Donation Properties**."[41] Further, the WDAC's bylaws charge its Secretary-Treasurer/Land Manager with job duties that include "the negotiation and proper execution of any and all contracts to protect and/or use the Donation's properties."[42] This authority is demonstrated by years of the Donation's practices.[43]  For example, the Secretary-Treasurer/Land Manager regularly executes the engagement letter for the Donation's accountant, Bourgeois Bennett, L.L.C.[44]

Here, the process culminating in the execution of the Agreement followed these bylaws to a "T."  On July 1, 2010, the WDAC voted to hire WWG.[45] The next week, then-City Attorney Nanette Jolivette-Brown waived any conflicts.[46] Finally, after months of negotiations, the WDAC approved and directed Secretary-Treasurer/Land Manager Norman to sign WWG's

---

[39] *See* Section 2-156 of the Ordinances of the City of New Orleans. The City of New Orleans Charter and Code of Ordinances are available online at: http://nola.gov/government/#1070.
[40] *See In re Edward Wisner Donation*, 2014-0027 (La. App. 4 Cir. 9/18/14) 150 So.3d 391, 400; 2003 Bylaws, Exhibit 1, pp. 43 of Dec. of Norman.
[41] 2003 Bylaws, Art. I, Section 5(e), Exhibit 1 pp. 30 - 45 to Dec. of Norman. (Emphasis added).
[42] *Id. Addendum to Bylaws* 2b. These job duties also make clear that the Secretary-Treasurer/Land Manager has "authority to employ legal assistance as Authorized by the [WDAC.]" *Id.* 2c.
[43] *See* Dec. of Norman, p. 3.
[44] *See* Exhibits "C" – "G" to Dec. of Leach.
[45] *Supra* n. 8.
[46] *Supra* n. 16.

contract.[47] Thus, the Agreement was validly entered into by the Donation through the WDAC's authority, established in the Ordinances of the City of New Orleans, and its Secretary-Treasurer/Land Manager's signature, as authorized in the WDAC's Bylaws.

The Agreement was ratified by the Trustee's approval of WWG's filing of a Complaint[48] and other pleadings, as well as by the Trustee's inaction, despite knowing for nearly two (2) years of WWG's representation before the Court, BP, UIC, and federal and state agencies. The Mayor's WDAC delegate even praised WWG for its work and voted to pay WWG bills.[49]

Similarly, the Secretary-Treasurer/Land Manager properly executed the Access Agreement with BP that formed the basis for Civil Action No. 14-1525.  Doc. 1-1 at p.6.[50] For the JV to now suggest that the Agreement executed by Ms. Norman, as Secretary-Treasurer/Land Manager, as authorized by resolution of the WDAC, and as authorized by votes of the WDAC with the City's representative present, is void *ab initio* because it was signed by Ms. Norman reeks of bad faith and hypocrisy. The JV, ostensibly representing the Donation, certified to this very Court that one (1) contract executed by Ms. Norman on behalf of the Donation, the Access Agreement, was valid.   Therefore, the JV, ostensibly as counsel for the Donation, should be estopped from advancing any argument that the Agreement was void *ab initio*.

---

[47] *Supra* n. 19.
[48] Civ. Act. No. 10-2771 (Doc. 326).
[49] Dec. of Wiygul p. 10; Affidavit of Peneguy, p. 3; Dec. of Norman, p. 10.
[50] As required by Rule 11 of the Federal Rules of Civil Procedure, the JV as then-counsel for the Donation signed this pleading. This signature certified, that to the best of their knowledge, information, and belief, formed after an inquiry reasonable inquiry under the circumstances: . . .

(2) the claims, defenses, and other legal contentions are warranted by existing law or by nonfrivolous argument for extending, modifying, or reversing existing law or for establishing new law; [and]

(3) the factual contentions have evidentiary support, or, if specifically so identified, will likely have evidentiary support after a reasonable opportunity for further investigation or discovery. . . .

Fed. R. Civ. P. 11(b).

## V.     WWG Was Terminated by the Donation Without Cause.

Unlike an ordinary commercial contractual relationship, a client may discharge his attorney at will, without responsibility for unearned fee.  However, an attorney is entitled to be compensated for the value of services actually performed, because, otherwise, the client would receive an unjustified enrichment.  *Oil Purchasers, Inc. v. W. J. Kuehling*, 334 So.2d 420 (La. 1976).  For decades, Louisiana courts have held that an attorney terminated without cause prior to completion of the scope of representation in the contingency fee contract is entitled to share in the contingency fee of subsequent counsel.  *Saucier v. Hayes Dairy Products, Inc.* 373 So.2d 102 (La. 1978), *on rehearing,* 373 So .2d 114 (La.1979).[51]  No party to this matter contends that the Donation terminated WWG's representation for cause, because there is absolutely no evidence of any cause for terminating WWG or that WWG was terminated even under a false pretense for cause.  Instead all stakeholders praised WWG even as WWG was being terminated.[52] Therefore, this Court should apply the factors laid out by the Louisiana Supreme Court in *Saucier* to determine how to apportion the contingency fee owed by the Donation to WWG and the JV.

## VI.     Louisiana Law Provides For An Award of Fees to WWG Based On The Agreement.

To calculate the total fee due under *Saucier*, the Court must first determine which contingency fee contract yields the highest aggregate fee. The highest aggregate fee is the contingency fee owed by the client to be apportioned between former and subsequent counsel.

Here, the JV's contract says the contingency fee owed by the Donation will be the lesser of either its fee as contained within the JV's contract with the City of New Orleans or the JV's

---

[51] *See also Evans v. Cal Dive Int'l, Inc.*, No. CIV. A. 97-0719, 1998 WL 799234, at *7 (E.D. La. Nov. 13, 1998); *Melancon v. Great Southern Dredging, Inc.*, No. CIV. A.12-2455, 2015 WL 3841585 at *2 (E.D. La. June 22, 2015) which apply *Saucier*.

[52] Transcript of the Meeting of the WDAC, July 31, 2012, pp. 158-160, Exhibit "QQ," to Dec. of Leach; Dec. of Norman, p. 14; Dec. of Waltzer, p. 22; Dec. of Wiygul, p. 10 – 11; Affidavit of Peneguy, p. 3.

contract with the Donation.[53] The Agreement contains the same, tiered contingency fee as the JV's contract with the Donation. *Id.* If the JV's contract with the City of New Orleans yields a lesser contingency fee, then the higher of the two contingency fee agreements that the client, the Donation, agreed to would be the tiered contingency fee contained in the Agreement. If the tiered contingency fee contained in both the Agreement and the JV's contract with the Donation yields a lesser fee, then the terms of the JV's contract with the City of New Orleans do not apply to either contingency fee agreement. Therefore, under either the Agreement or the JV's contract with the Donation, the higher contingency fee applied pursuant to *Saucier* is the tiered contingency fee in WWG's Agreement with the Donation. Thus, the total aggregate fee is calculated under the tiered contingency fee in the Agreement.

Further, the Louisiana Supreme Court explained the different considerations to be accounted for in determining what fee is owed to an attorney who is discharged without cause from a contingency fee contract:

> Determination of just what non-excessive fee the discharged attorney has "earned in the case of the contingency fee employment contract (followed by discharge, employment of other counsel and settlement) is not a simple matter. Focusing alone upon the attorney's investment of time, or even considering in addition such matters as counsel's skill, the importance of the case and other readily identifiable factors, does injustice to the attorney. Such focus is at least at variance with the reality of the employment contract, for it is quite possible that the attorneys would have been unwilling to undertake representation, fee contingent upon recovery, if told at the outset that the client would, or would be able to, discharge him and pay him on some basis other than the agreed upon percentage, and only if and when, with subsequent employed counsel (perhaps not as able as original counsel) the client were to win a settlement or judgment.

> * * *

> The amount prescribed in the contingency fee contract, not quantum meruit, is the proper frame of reference for fixing compensation for the attorney prematurely discharged without cause.

---

[53] Affidavit of Peneguy, p. 6.

*Saucier*, 373 So.2d at 117-18.    Perhaps cognizant of this jurisprudence, the subsequent *Retainer/Contingent Fee Agreement* entered into by the Donation with the JV explicitly provided for the payment of WWG:  "The Donation understands that the fees and costs outlined above are the most Donation will pay for these expenses and that any and all fees and costs that may be due and owing to previous counsel [WWG] will be deducted from the above fee and costs structure."[54]

Further, as certain beneficiaries of the Donation have asserted, the total contingency fee owed by the Donation has not yet been fully agreed to by the WDAC, and there may yet exist additional recovery to the Donation to which WWG would also have a claim for contingency fee.[55] Therefore, an award of a percentage of the total contingency fee, as opposed to an exact dollar-figure, is appropriate.

### A. An Apportionment of 50% of the Total Contingency Fee to WWG Is Reasonable.

WWG should receive at least half of the total contingency fee earned.

#### 1. Under The *Saucier*-Factors, WWG is Entitled To a Reasonable One-Half of the Total Contingency Fee.

Under *Saucier*, once the highest agreed upon contingency fee agreement is determined, this fee is apportioned between the predecessor and successor counsel in accordance with the factors set forth in Rule 1.5(a) of the Louisiana Rules of Professional Conduct.  *Scott v. Kemper Ins. Co.*, 377 So.2d 66, 71 (La. 1979).  Rule 1.5(a) of the Louisiana Rules of Professional Conduct provides the following factors to be considered in determining the reasonableness of attorney's fees:

---

[54] JV's *Retainer Agreement/Contingent Fee Agreement*, p. 4, attached hereto as Exhibit 7; *see also* Affidavit of Peneguy, p. 5.
[55] *See* n.1.

(1) the time and labor required, the novelty and difficulty of the questions involved, and the skill requisite to perform the legal service properly; (2) the likelihood, if apparent to the client, that the acceptance of the particular employment will preclude other employment by the lawyer; (3) the fee customarily charged in the locality for similar legal services; (4) the amount involved and the results obtained; (5) the time limitations imposed by the client or by the circumstances; (6) the nature and length of the professional relationship with the client; (7) the experience, reputation, and ability of the lawyer or lawyers performing the services; and (8) whether the fee is fixed or contingent.[56]

These factors support WWG receiving at least fifty percent (50%) of the total contingent fee.

### 2. The Timeline of the Litigation Shows WWG Performed One-Half of the Temporal Representation of the Donation and Provided Intensive Legal Services Over That Period.

The time element of the first factor is well documented.  As explained *supra*, the Donation hired WWG on June 1, 2010.[57] The Donation terminated as a trust on August 4, 2014.[58] Just prior to this termination of the trust, the JV advised the beneficiaries of the Donation that they would need to retain separate counsel and intervene in Civil Action No. 14-1525.[59] Thus, to the extent any counsel represented the Donation in this matter, the period would encompass only these four (4) years.  As the JV and WWG represented the Donation for two (2) years each, the contingency fee for legal services provided to the Donation could reasonably be apportioned 50/50 between the JV and WWG. Following the termination of the Donation in August 2014, each of the beneficiaries and the Trustee were thereafter represented by their own respective counsel.[60]

---

[56] This Court applied the very similar *Johnson* factors in the determination of the Common Benefit Fee in the MDL 2179.  *See* Doc. 21849, pp. 29-30.

[57] *Supra*, n. 8.

[58] *In re Edward Wisner Donation*, 150 So.3d at 399.

[59] Dec. of Waltzer, p. 22.

[60] *See e.g.,* Docs. 59 and 156. If the Court concludes that the Donation beneficiaries must each internalize the cost of retaining their own counsel (except the City of New Orleans who was represented solely by the JV), then the time during which counsel provided representation would be apportioned differently to approximately 33.3% to WWG and 66.67% to the JV.

Further, during the two (2) years in which WWG solely represented the interests of the Donation, WWG provided constant, intense, demanding, and specialized legal services to the Donation. From June 2010 until July 2012, approximately twenty-five (25) months, WWG alone represented the Donation. The Donation and WWG each acknowledged at the outset of the engagement that "a large amount of work is front loaded into this case."[61]  During those twenty-five (25) months, WWG immediately went to work, coordinating with the Donation to ensure that there was extensive photographic and other documentation of oiling, of the response effort, and of other aspects of the oil spill.[62]  WWG negotiated the Access Agreement with BP, which contractualized the Donation's delictual and statutory remedies against BP for the oil spill.[63]

Inserting the Donation into the Unified Incident Command ("UIC") response to the oil spill required daily communication between WWG and the Donation's employee Forrest Travirca.[64] This intense participation in the UIC response to the oil spill not only provided a procedural vehicle to ensure the Donation's property was actually cleaned up, but also preserved most of the evidence the Donation would need to eventually present its case against BP.[65] By the time WWG's representation of the Donation ended in August 2012, WWG had approximately twenty-three (23) gigabytes of data in the client file, contained within approximately twenty-three thousand (23,000) separate files.[66] Further, WWG researched, procured, engaged, and educated numerous experts to assist in the gathering and analysis of this evidence. When the JV eventually showed up to muscle into a portion of the fee, the JV received the evidence with which to present the damages case against BP all packaged and tied up with a bow.

---

[61] MDL Doc. 14960-3, p. 1.
[62] Dec. of Wiygul, p. 11; Dec. of Waltzer, pp. 19 – 20; Dec. of Norman, pp. 9, 15; Declaration of Forrest Travirca, attached hereto as Exhibit 6.
[63] Dec. of Waltzer, pp. 14 – 15.
[64] Dec. of Norman p. 7; Dec. of Travirca.
[65] Dec. of Wiygul, p. 11; Dec. of Waltzer pp. 18 – 20.
[66] Dec. of Wiygul, p. 9.

### 3.     The Representation Presented Novel And Difficult Questions.

The representation of the Wisner Donation in the wake of the BP oil spill was not comparable to the average legal engagement. The field of environmental law is comprised of several distinct areas of practice. One is representing landowners with contaminated property, or individuals harmed by hazardous substances, which requires specialized skills to develop the technical and damages aspects of the cases. Another area is citizen suits under statutes, such as the Clean Water Act, or challenging actions by state or federal agencies, such as the Environmental Protection Agency or Bureau of Ocean Energy Management, Regulation and Enforcement. A third area involves regulatory law, such as assessing compliance with state or federal administrative regulations and working through notice and comment procedures to influence agency action.[67] WWG is one of the very few law firms that has experience in each of these areas of environmental law and has always practiced on the plaintiff's side.[68] Moreover, as waves of oil washed onto the Donation's property in 2010, WWG was one of the few firms with this depth of experience in environmental law and which did not have a conflict of interest caused by past-representation of BP.[69]

One economic reality of litigating a property damage claim, such as the Donation's claim against BP, is that, absent a fee shifting statute, the plaintiff has to bear all of the transaction costs of proving liability and damages, including attorney's fees, expert fees, and other expenses.[70] WWG implemented a unique strategy, which essentially allowed the Donation to gather its evidence of property contamination through the ongoing oil spill response efforts on the Donation's property. By negotiating the Access Agreement with BP, WWG was able to

---

[67] Dec. of Wiygul, pp. 1 -3.
[68] *Id.*
[69] *Id.* pp. 3 – 4. BP steadfastly refused to waive any conflicts of interest in the wake of the oil spill, including the Donation's long-time counsel Simone Peragine.  Dec. of Norman, p. 5; Dec. of Waltzer p. 5.
[70] Dec. of Wiygul, p. 4.

secure the Donation's right to reimbursement for costs incurred from monitoring the property, assessing damage to the property from response operations, and restoration of damage caused by response operations.[71] By these strategies, WWG shifted the cost of evidence gathered for later claims onto BP, to the great benefit of the Donation, and also to the great benefit of the JV. These strategies were novel and required difficult analysis of multiple areas of environmental law, and, consequently, are not in the capability of the vast majority of counsel.

### 4.    The Representation Consumed WWG.

The Donation was aware that acceptance of this representation by WWG would preclude WWG from other possible employment and involve a huge commitment on WWG's part to fully address the Donation's claims against BP.[72] WWG had to dedicate a high percentage of the time of its principals to the representation of the Donation for months, including many sixty (60) or seventy (70) hour weeks throughout 2010 and 2011.[73] This dedication cost the principals of WWG much time that usually would have been spent with family or engaged in recreation.[74] Further, the time committed to presenting the Donation with the best representation possible prevented WWG from engaging other clients with BP claims. *Id.*

Additionally, WWG represented the Donation before BP settled *any* civil claims, which left greater risk that the contingency may not be met, and no contingency fee would be due to WWG. At this early stage in the oil spill, it was possible that the oil spill litigation could drag out for decades, just like the litigation arising from the Exxon Valdez spill languished.[75] As this Court is well aware, during the majority of the time WWG provided legal services to the Donation, the Plaintiffs Steering Committee was barreling towards the Phase One Trial

---

[71] *Id.* at pp. 5 – 6; Dec. of Waltzer p. 9, 17; Affidavit of Peneguy, p. 3.
[72] Dec. of Waltzer, p. 6.
[73] Dec. of Wiygul, p. 9.
[74] Dec. of Waltzer, p. 6; *see also Order and Reasons*, p. 36, Doc. 21849, MDL 2179.
[75] Dec. of Waltzer, p. 7.

scheduled to commence on February 27, 2012.[76] However, when the JV later entered into the subsequent Contingent Fee Agreement with the Donation, the JV had the benefit of knowing that settlement with BP was likely.[77] WWG did not have the benefit of being able to see into the future, and, therefore, undertook great risk when entering into the Agreement.

**5.      The Fee Charged Was Customary.**

The third factor also suggests that WWG's fee is reasonable. In comparing the Agreement with other contingency fee agreements charged in the area for similar services, other BP-related contingency fees allowed for a greater fee. For example, this Court ordered fees for representing claimants who settled through the Economic and Property Damages Settlement and the Medical Benefits Settlement at twenty-five percent (25%) plus reasonable costs.  MDL Doc. 6684.   The Agreement is well below twenty-five percent (25%).  Further, the Agreement sets forth a lower percentage than the contingency fee agreement the City of New Orleans entered into with the same joint venture of attorneys.

**6.      The Amount Involved and the Results Obtained Support WWG's Claim to Half of the Total Contingent Fee.**

The fourth factor, the amount involved and the results obtained, also weighs heavily in WWG's favor.[78] In addition to the ultimate result of thirty million dollar ($30,000,000.00) settlement,[79] WWG's strategy using the Clean Water Act to shift attorney and expert fees for the Donation's response to the oil spill onto BP significantly increased the aggregate recovery for the Donation and significantly reduced the Donation's risk in pursuing the litigation.[80] This fee shifting was accomplished in part by the negotiation of the Donation's unique Access Agreement

---

[76] *See Order and Reasons*, MDL Doc. 21849, pp. 4 – 11.

[77] Affidavit of Peneguy, pp. 6 – 7.

[78] As noted by this Court, the result obtained is the most critical factor in determining the reasonableness of a fee award.  *See Order and Reasons*, p. 18, Doc. 21849, MDL 2179.

[79] *See Full and Final Release, Settlement, and Covenant Not to Sue*, Exhibit 11 to Dec. of Waltzer.

[80] Affidavit of Peneguy, p. 3.

with BP by WWG, which created contractual rights for damage caused by the response, which could not be capped by the land's value.[81] This approach also had BP pay for much of the evidence later used against it. This result was extraordinary, because, when the JV belatedly entered the picture, the crucial evidence and experts had already been gathered, and the remaining proceedings followed more of a typical litigation path, ultimately resulting in a settlement guided by the Court's processes instead of any extraordinary effort by the JV. The results obtained by WWG were superb.

### 7.  WWG Operated Under Extraordinary Time Pressures.

The fifth factor is especially relevant to WWG's claim for its portion of the contingency fee.  As described *supra*, when the Donation engaged WWG's services in June of 2010, time was of the essence, as oil washed relentlessly ashore. Active engagement by the WDAC and WWG in the UIC cleanup response was required both because of the scale of the contamination and to proactively assure preservation of evidence of damage caused by the spill and response. This strategy allowed the Donation to heighten the clean-up and preserve evidence proving the Donation's damages. Although this strategy was time intensive, it produced an incentive for BP to settle and increased the overall value of the case. By the time the JV represented the Donation, these time pressures had substantially abated.

### 8.  WWG Had No Promise of Long-Term Work.

The sixth factor, "the nature and length of the professional relationship with the client," is well documented in WWG's regular participation in the WDAC's meetings with detailed reports.[82] For two (2) years, WWG preserved and prosecuted the Donation's claims against BP. Following the Donation's termination in August 2014, after JV attorneys advised the Donation's

---

[81] Dec. of Waltzer, pp. 19 – 20.
[82] Dec. of Norman, p. 15; *See generally* Minutes of the Meetings of the WDAC, Exhibits "P" – "QQ" of Dec. of Leach.

beneficiaries to retain their own counsel, WWG once again was engaged to represent the Wisner Heirs' interest (approximately 40% of the Donation) in the litigation against BP.[83] However, unlike Simon Peragine, WWG could not count on a steady stream of work from the Donation after the BP litigation was resolved. WWG was engaged for one, albeit complex and overwhelming, engagement, and cannot be assured of continued work into the future.

### 9.     WWG Was Uniquely Qualified.

The seventh factor, "the experience, reputation, and ability of the lawyer or lawyers performing the services," has special applicability to WWG.  Both Joel Waltzer and Robert Wygul had practiced environmental law for over twenty (20) years each.  WWG had unique experience litigating environmental claims requisite to going toe-to-toe with the complex regulatory and administrative agencies involved on top of BP's army of litigators flown in from across the country.[84] Further, this experience with environmental claims allowed WWG to work under the intense time constraints created by the circumstances because of preexisting relationships with agency personnel and scientists that made inserting themselves into the response and obtaining advice and documentation from agencies easier. Counsel with the JV did not have this same breadth and depth of environmental experience.

### 10.     WWG Assumed Risk With A Contingency Fee.

The eighth factor is "whether the fee is fixed or contingent."  Here, WWG worked with the WDAC to craft a combination of hourly and contingency fees to maximize the Donation's recovery under the Clean Water Act. But the capped, reduced hourly fee WWG would be paid would hardly offset the financial risk of the undertaking. First, WWG knew that the case would consume a substantial portion of the revenue earning capacity off its principals, Robert Wiygul

---

[83] Dec. of Waltzer, p. 23; Affidavit of Peneguy, p. 1.
[84] Dec. of Wiygul, p. 1 – 3, 6; Dec. of Waltzer, pp. 2 – 4; Dec. of Norman, pp. 5 – 6, 16.

and Joel Waltzer.[85] While WWG could reasonably expect a recovery, the timing of the recovery could take decades, as it had in the Exxon Valdez case, reducing its benefit in present value to nearly nothing. Further WWG knew that it would need to incur additional overhead to replace the time that the two principals would be working on the Donation's case, to fulfill its obligations to its other clients. And finally, WWG believed that the time it spent on the Donation's case would preclude developing other BP-related work from its traditional constituencies in the Vietnamese and Native American communities.[86] No matter how the case was structured, WWG ran severe cash flow risks in investing so much time and resources in one case.[87]  The JV, as explained *supra*, did not assume this same level of risk.

VII.    **An Award of Half of the Total Contingency Fees to WWG is Reasonable By Any Measure**.

Even assuming, arguendo, that *quantum meruit* analysis is required to determine, or justify, the award of fees to WWG, such analysis demonstrates that an award of half the total contingency fee as argued *supra* would be more than reasonable.  This Court, last month, applied a lodestar cross-check analysis to the Common Benefit Fee that was initially calculated based upon a percentage of the total benefit.[88]  Applying that same analysis here evidences that a fee of half of the total contingency fee would be reasonable for the efforts of WWG.

During the course of representing the Donation, WWG labored approximately 2,000 hours providing legal services to the Donation.  This Court ruled last month that $450.00 is an appropriate average/blended hourly rate from which to begin analyzing the reasonableness of attorney's fees in the related litigation.[89]  This Court further noted that a rate of $450.00 is very

---

[85] Dec. of Waltzer, p. 6.
[86] Dec. of Waltzer, p. 6-7.
[87] Id.
[88] *See Order and Reasons* dated October 25, 2016 in MDL 2179, Doc. 21849, pp. 39-41.
[89] *See* MDL 2179, Doc. 21849, p. 40.

reasonable considering that: (1) the average nationwide billable hour rate was $604.00 for partners and $370.00 hours for associates; (2) the State of Louisiana reportedly paid its outside counsel in this MDL $600.00 per hour; and (3) BP's lead trial counsel reported billable hour rates of $580 - $995 for partners and $340 - $995 for other attorneys.[90] Additionally, the $450.00 rate appears low for Joel Waltzer and Robert Wygul, who did the lion's share of WWG's work for the Donation, as they were highly experienced environmental lawyers responding to an emergent environmental disaster, and as Robert Wygul has previously been awarded attorney's fees at a rate of $625.00 per hour.[91]  Nonetheless, assuming that $450.00 would be a reasonable hourly rate, and multiplying that rate by the 2,000 hours worked by WWG, produces a time-fee value of $900,000.00.

When multiplied by a lodestar multiplier of 2.34, the time-fee value of $900,000.00 produces approximately $2.1 million.  This Court found that a lodestar multiplier of 2.34 was certainly reasonable considering that the average lodestar multiplier is 3.14 and the median lodestar multiplier is 2.80.[92]  Thus a total fee of $2.1 million would be reasonable based on 2,000 hours worked at a rate of $450.00 per hour and a lodestar multiplier of 2.34.

Not surprisingly, a fair reading of the contingency fee agreement entered into between the Donation and WWG, and a fair application of the *Saucier* factors to result in WWG receiving 50% of the total contingency fee, yields a fee of approximately $2.1 million to WWG.  As detailed in the Declaration of Joel Waltzer, the total benefit of $30,000,000.00 to the Donation, discounted to present value at a 3% discount rate, yields $24,434,103.00.[93]  The present value of

---

[90] Id. at p.40, n. 14.
[91] *See* Dec. of Wygul, p. 13.
[92] *See* MDL 2179, Doc. 21849, p. 40.
[93] Dec. of Waltzer, pp. 25-28.

$24,434,103.00, minus $1,819,101.00 in expenses, yields $22,615,002.00.[94]  The present value, sans expenses, of $22,615,002.00 multiplied by the graduated contingency fee rates yields $4,770,700.00.[95]  Half of $4,770,700.00 is $2,385.350.00.  $2,385.350.00 minus the offset of $358,969.00 for fees already paid WWG renders a fee of $2,026,381.00.[96]  This fee $2,026,381.00 would be less than the $2.1 million lodestar cross-check fee calculated based on 2,000 hours worked at a rate of $450.00 per hour and a lodestar multiplier of 2.34.

The above calculations clearly show that by any reasonable measure, including the analysis applied by this Court in lodestar cross-checking the Common Benefit Fee, WWG receiving 50% of the total contingency fee awarded would be reasonable and just

## CONCLUSION

This Honorable Court should grant this *Motion for Attorney's Fees* and award Waltzer, Wiygul & Garside, L.L.C., as successor of Waltzer & Wiygul, LLP and Waltzer & Associates, attorney's fees of fifty percent (50%) of the total contingent fee which the Edward Wisner Donation has contracted to pay in this matter.

---

[94] *See* MDL 2179, Doc. 21849, p. 40.
[95] Id.
[96] Per footnote 1 *supra*, the total fee has not yet been agreed upon by the WDAC or determined by this Court.  However, the above calculation provides for a reasonable fee under a fair reading of the contingency fee contract between the Donation and WWG, and a fair application of the *Saucier* factors, all consistent with this Court's application of the Johnson factors and the lodestar cross-check in determining the Common Benefit Fee.  *See* MDL 2179, Doc. 21849.

Respectfully submitted,

*/s/ Stephen M. Gelé*
**RANDALL A. SMITH, T.A. (#2117)**
**STEPHEN M. GELÉ (#22385)**
     OF
**SMITH & FAWER, L.L.C.**
201 St. Charles Avenue, Suite 3702
New Orleans, Louisiana 70170
Telephone: (504) 525-2200
Telecopy: (504) 525-2205
rasmith@smithfawer.com
sgele@smithfawer.com

***Counsel for Intervenor, Waltzer, Wiygul & Garside, LLC, as successor of Waltzer & Wiygul, LLP and Waltzer & Associates***

## CERTIFICATE OF SERVICE

I hereby certify that on the 18th day of November, 2016, I caused to be served via Court's ECF electronic filing system the foregoing pleading on all counsel of record.

*/s/ Stephen M. Gelé*
**STEPHEN M. GELÉ**