## UNITED STATES DISTRICT COURT
## EASTERN DISTRICT OF LOUISIANA

_____ )
IN RE: OIL SPILL BY THE OIL RIG DEEPWATER ) 
HORIZON IN THE GULF OF MEXICO, ON ) MDL No. 2179
APRIL 20, 2010 )
) Section: J
IN RE THE COMPLAINT AND PETITION OF )
TRITON ASSET LEASING GmbH, ET AL., IN A ) Judge: Barbier
CAUSE OF EXONERATION FROM OR )
LIMITATION OF LIABILITY ) Magistrate: Wilkinson
)
This Document Relates To: )
2:10-CV-02771; 10-8888; 10-9999; 13-1971; 14-1525 )
_____ )

## DECLARATION OF JOEL WALTZER

I declare under penalty of perjury that the following statements are true and correct:

*Biographical Information Relevant to our Representation of the Wisner Donation*

1.

My name is Joel Waltzer. Along with Clay Garside and Robert Wiygul, I am a partner at intervenor Waltzer Wiygul & Garside, LLC, which was formerly known as Waltzer & Wiygul LLP and Waltzer & Associates (collectively hereinafter "WWG").

2.

I am a lifelong resident of New Orleans and graduate of Boston University, '85 (Bachelor of Science, Business Administration) and Harvard Law School, '88. After I completed my clerkship for Justice Pascal Calogero in 1990, I worked at the Tulane Environmental Law Clinic as an environmental law fellow. There, I appeared before state and federal courts, administrative agencies, and legislative bodies in a wide variety of cases, including permitting challenges,

regulatory actions, enforcement proceedings, and citizen suits, on behalf of non-profit organizations and community groups faced vexing pollution problems.

3.

After my fellowship ended in 1991, I joined an environmental law firm that litigated contamination and land use cases on behalf of landowners. Two year later, I joined Waltzer & Bagneris and continued to build my practice around environmental advocacy. I also came to serve individuals and businesses within the Vietnamese and Native American communities in coastal Louisiana. As such, my litigation experience expanded from environmental to include maritime, small business, and personal injury.

4.

I have litigated dozens of complex ground, air, and water pollution cases for environmental groups, communities, and landowners. Through these experiences, and because of my personal love for coastal hunting and fishing, I learned the land, water, law, and science applicable to the coastal zone - and what is at stake. Most of these cases involved extensive evidentiary records, historical research, and complex discovery. A short summary of my experiences that helped qualify me to represent the Wisner Donation is provided below:

1) I litigated Clean Air Act citizen suit against Bayou Steel, then negotiated what was at the time the largest settlement of a citizen suit in Louisiana's history;

2) My partner and I negotiated a multi-million dollar buyout program for a fence-line community being polluted by air contaminants adjacent to the Marathon Oil refinery;

3) I successfully litigated a Clean Water Act citizen suit pollution case against Cintas on behalf of the Louisiana Environmental Action Network and negotiated a large settlement of that action;

4)      For decades, I have represented the Pointe-Au-Chien Indian Tribe, most often pro
bono, in an aboriginal title case against oil industry landowners, in numerous land use
disputes regarding mineral exploration on tribal lands, and in the tribe's quest for
federal recognition. This latter effort has involved me gathering and reviewing
hundreds of thousands of documents, needed to write their unwritten history.

5)      In the aftermath of Hurricane Katrina, I represented a broad coalition of
environmental and community groups and litigated hurricane debris emergency
response disposal standards and regulatory cleanup standards before multiple courts
and administrative agencies.

6)      I successfully litigated the closure of the Chef Menteur landfill located in New
Orleans East;

7)      I was appointed as class counsel in the Gentilly Landfill class action, a case involving
the unauthorized disposal of millions of cubic yards of waste on 200 acres of private
land in New Orleans East. We settled that trespass and takings case for $8 million
dollars and appropriate protections regarding future environmental liability; and

8)      I successfully litigated a "no net loss" coastal wetlands case against the Corps of
Engineers involving a proposed development in the vicinity of the Port of Fourchon.

5.

I served on a Louisiana Law Institute subcommittee tasked with re-writing Louisiana's
Environmental Quality Act. I testified to the Louisiana Senate Natural Resources Committee
regarding coastal land and the Public Trust doctrine. I have testified at numerous coastal restoration
meetings regarding challenges and solutions associated with severe land loss. And I have presented
in about a dozen continuing legal education programs on environmental law matters.

6.

While my environmental advocacy has resulted in special recognition from the Tulane Environmental Law Program (Lawyer of the Year), the Delta Club (Pelican Award), and the Louisiana Environmental Action Network (Scott Welsh Award for outstanding legal advocacy), and from magazines, and even three film makers, in truth my environmental resume' pales in comparison to that of my partner, Robert Wiygul. Robert would never say this, but my partner is in fact one of the most accomplished, sought-after environmental lawyers in the country.

7.

In early May 2010, I spent a large amount of time researching the statutory and regulatory regime and emergency response doctrine applicable to the MC252 oil spill. We filed suits on behalf of national environmental groups to redress the systemic regulatory failures that helped cause the spill.  We exposed BP and Transocean's breach of the permitting regulations, the oil spill response planning requirements, the worst case discharge planning rules, and BP's failure to implement the "best available technology" standard in its oil spill response. I believe we also were first to identify the BOP failure as an MMS regulatory violation, which would nullify OPA's cap. These experiences later proved invaluable when addressing the Donation's case.

8.

Perhaps because of these actions, and our reputation and know-how, Robert and I were appointed by the MDL2179 Plaintiff Steering Committee as coordinators of the Regulatory and Injunctive Relief Working Group in around September of 2010. In that capacity, we coordinated the environmental public law and injunctive relief suits that were filed, helped draft the Master Complaint and other pleadings, and wrote white papers for the Plaintiff Steering Committee, including members of the Joint Venture legal group addressed below, to better inform them on the

law and strategies involved in land contamination cases.

*Waltzer & Wiygul's Engagement in the Wisner Donation Case*

9.

On June 15, 2010, Mr. Andy Wilson, an environmental attorney with the Simone Peragine law firm, called me regarding the Edward Wisner Donation (Donation). Mr. Wilson stated that Simone Peragine had long represented the Donation, but could not in the BP oil spill because of a conflict of interest.  He asked if Robert and I were interested in interviewing for the position. I told him that we were, but we would have to understand what that commitment would entail.

10.

I already knew a good deal about the Wisner Donation, though I had never before spoken to anyone within the organization. I knew that the Donation was managed by Cathy Norman, a stalwart within the coastal restoration community for decades, who emphasized the long term viability of coastal property. I knew that Ms. Norman was married to Shea Penland, the University of New Orleans professor who pioneered research on the causes of Louisiana coastal loss prior to his death. And I knew that the Donation owned most of the coast of Lafourche Parish, including Fourchon Beach and the Port of Fourchon.

11.

Shortly after I spoke with Mr. Wilson, Ms. Norman and I had a conversation about the Donation, its Oil Pollution Act (OPA) and General Maritime Law (GML) claims, and the oil spill emergency response on its Lafourche property in reaction to the BP oil spill. Ms. Norman told me that events were unfolding at an incredibly rapid rate, that the National Guard had plugged a number of channels that connected the Gulf to the marsh behind the beach, that the property had already received a massive oiling, and that the Unified Incident Command (UIC) emergency spill

response (response) was actively removing oil on Fourchon Beach. Ms. Norman, who is also a lawyer and was the Donation's Secretary-Treasurer, told me that she and her small staff were overwhelmed by work and worried about preserving evidence and hiring experts. She told me that she needed lawyers with real environmental experience, to assert control over the response on Donation property, as she had done in other contamination events in the past.

<div align="center">12.</div>

After we discussed my firm's environmental background and experience with the MC252 spill, Ms. Norman asked if we would like to make a presentation to the WDAC. I told her what she already knew, that undertaking the Donation's case was a huge commitment, and that I would talk it over with Robert and get back with her.

<div align="center">13.</div>

Given the complexity and environmental nature of the Donation's case, Robert and I knew we would personally have to do the work, and estimated that the case would take half of our time. Though we only had about a dozen private BP clients in June of 2010, we were already working long hours on the BP case for environmental groups and our docket of non-BP cases. We discussed the heavy time commitment it would take to do the Donation job right - work that could only come on top of our already heavy workload. We talked about the personal cost of undertaking the Donation's case - the time we both would have to spend away from our wives and children.

<div align="center">14.</div>

We also discussed business risks. We knew that we would have to hire additional lawyers to help with our non-environmental docket. And we believed that the time we devoted to the case would likely preclude us from developing other BP work from our traditional constituencies in the Vietnamese and Native American communities. Finally, while BP ultimately was liable for OPA

<div align="center">6</div>

damages to the Donation, we knew that the time we invested now could take decades to receive a return - as it had the Exxon Valdez spill. No matter how we structured the case, we knew we ran severe cash flow risks in investing so much time and resources in one case.

<div align="center">15.</div>

On the positive side, Robert and I discussed the fact that the Donation case could well be the most important and lucrative property contamination case in the BP spill litigation, and that all of our past efforts and experiences had built to this exact opportunity. We discussed the importance of the Donation to our community and the importance of protecting the Fourchon/Caminada headlands, which is critical to the sustainability of southeast Louisiana. We knew we would be proud to represent the Donation and that the Donation's case closely matched our own personal professional missions.

<div align="center">16.</div>

After weighing the personal and business risks against the benefits associated with the case, we decided that we wanted to represent the Donation on a contingency basis. But we also knew we had to address a potential ethics issue, whether representing the Donation as an entity presented a conflict of interest. The issue arose because of our work in the Gentilly Landfill case and in two other cases where the City of New Orleans (CNO) was a named defendant, and because here the City was a beneficiary, with the Mayor of New Orleans listed as Trustee.

<div align="center">17.</div>

In mid-June, 2010, we consulted our ethics counsel and wrote to the LSBA Advisory Committee. We were advised that we could represent the Wisner Donation, but that we should obtain a waiver of the conflict of interest from the City and from our existing clients to be safe.

<div align="center">7</div>

18.

I relayed our desire to undertake the case to Ms. Norman, but predicated our representation on obtaining a waiver of the potential conflict of interest from the City and our existing clients.

19.

On about June 23, Robert Wiygul and I met with the City Attorney of New Orleans, Ms. Nanette Jolivette-Brown. We explained the situation on the ground, our view of the case, the potential conflict, and the advice we received to obtain waivers. She knew both of us well as she too had worked at the Tulane Environmental Law Clinic, and afterwards in the environmental field. City Attorney Brown told us that she felt we were well qualified to represent the Donation, and that she would likely waive the conflict - but she had to check with the Mayor's office. Given the City Attorney's response, we pushed ahead to prepare a presentation for the WDAC.

20.

We developed a preliminary strategy based on our knowledge of contamination cases, which are very different from traditional tort cases (where the object is maximizing monetary damages). In contamination cases, the parties can control the mitigation of damages. Without adequate removal, contaminated property will fail environmental due diligence requirements, restricting the use of the property and causing the long term value of the property to plummet. If a landowner is successful in forcing the removal of contaminants to commercially acceptable levels, the cleanup itself is often far more expensive, but the long term damage to the property, in terms of lost use and value, is actually reduced. In most instances, landowners want both money and a clean, useable property, which requires lawyer to find non-traditional ways to monetize the case.

21.

Landowners monetize contamination cases by shifting the obligation to pay cleanup

expenses, expert costs and attorneys' fees to the responsible party, while retaining control over the actual cleanup and restoration on their property. Landowners also increase the value of these cases by asserting that higher end-point cleanup standards should be applied. But even where the law allows this, landowners often run into tort-based defenses where the cost of the rehabilitation exceeds the value of the property. Smart landowners address potential tort-based limitations by contractualizing their rights to removal and restoration, which in most jurisdictions allows a cleanup to exceed the property's market value. Landowners can also assert collateral pressure through administrative agencies to require compliance with different regulatory schemes. We felt we could increase the value of the case by accomplishing any of these goals. Our presentation to the WDAC was based on these ideas.

22.

Robert Wiygul and I discussed how to formulate a proposed contract with the Donation. I drafted a mixed fee agreement that directly reflected our chosen strategy of shifting fees and costs, and accounted for the fact that the case would consume our revenue generating capacity and preclude the development of other work. The agreement we proposed had two components: a contingent fee component and an hourly rate component for recoverable time. Any fees received by WWG as a result of its hourly billing would be deducted as an offset against the contingent fee owed at the conclusion of the case - thereby shifting a portion of the contingent fee unto BP.

23.

On July 1, 2010, Robert Wiygul and I prepared and detailed our qualifications, findings, strategy, and proposed contract to the Advisory Committee, which included the City's representative. We answered many questions regarding land contamination cases and the BP spill. And we obtained from the representatives their desired outcomes concerning the balance between

the rehabilitation of the property and monetary damages. We also discussed with the WDAC our proposal to charge a blended hourly rate and contingent fee as payment for our services. That was felt acceptable to all parties.

24.

After the discussion at the July 1, 2010 WDAC meeting, the WDAC voted to hire WWG, conditioned on the City signing a waiver of any conflicts. The WDAC instructed Secretary-Treasurer Norman and interested WDAC members to negotiate the proposed contract with us. See, WDAC Minutes, Exhibit 1.

25.

On July 8, 2010, I received an email from Ms. Norman, the Donation's Secretary-Treasurer, confirming that the City Attorney had agreed to waive the conflict and approved the WDAC's recommendation to engage us. See, Exhibit 2.

26.

 Shortly thereafter, I went to the Donation's office, at Ms. Norman's suggestion, to scour its archives and begin to learn the case. I found that the Donation retained a very large repository of historical information concerning the physical characteristics and use of the Lafourche property, many of which would be difficult to obtain elsewhere. I spent days collecting and reviewing hundreds of documents of potential relevance to the case, including maps, surveys, geophysical data, research projects, coastal restoration evaluations, and documents related to previous restoration and remediation projects. I scanned, sorted, and graded those that I felt were important.

27.

Based on this review and our conversations with Ms. Norman, I confirmed what I knew to be true - that the Donation's Lafourche property was a highly dynamic, threatened environment.

Because the entire shoreline was retreating at a historical rate of about 40 feet per year, and because the marsh to the rear was subsiding and converting to open water, the physical damage caused to the property that was caused by the spill, and the cost of restoring same, could only be proven by capturing the *relative* increase in land loss. This underscored the importance of gathering and reviewing the scientific data and physical evidence generated by the Unified Command, Shoreline Cleanup Assessment Teams (SCAT), Rapid Assessment Teams (RAT), and the Natural Resource Damage Assessment teams (NRDA). Winning would lie in the details of injuries, such as sand removal, marsh platform loss, and scarping and erosion caused by forced hydrological changes.

28.

Around that same time, I met with Cathy Norman and Mike Peneguy to discuss a fee agreement. The agreement that I initially proposed was modified in these negotiations. We gave the Donation a basic choice: WWG would pay for the required experts if the Donation chose to pay a higher contingency fee percentage. If the Donation chose to pay for the experts itself, the Donation would pay on a greatly reduced sliding scale contingent basis, with recovery dependent on success. In any event, the Donation would not pay a contingent fee on case related funds it expended.

29.

The Donation's representatives at the negotiation considered the value of its case and chose the option of paying its own expenses, which would not be subjected to a contingent fee, and a lower contingency percentage. Second, because the Donation would pay for experts, the Donation felt it should not have to pay the full monthly invoice for WWG's hourly billings that were recoverable as response costs. The Donation agreed to pay 50% of WWG's hourly invoice, capped at $8,000 per month, until the invoice was actually reimbursed by BP. When BP reimbursed the

Donation, the balance of the invoice would be paid. Of course, these amounts would be offset against the ultimate contingency fee, meaning the Donation would pay no more than the contingency fee, less what fees BP reimbursed. On July 26, 2010, I sent the finalized WWG Retainer/Contingency Fee Agreement to Ms. Norman. I was told that she presented our contract to the Mayor for signature, along with several other important contracts and leases.

<div align="center">30.</div>

On July 23, 2010, Robert Wiygul, Clay Garside, and I made the first of many on-scene visits, this one to gain familiarity with the Lafourche property. We toured the property with Forrest Travirca, an ex-Louisiana Wildlife and Fisheries agent who was the Donation's chief on scene investigator, and Secretary-Treasurer Cathy Norman. I remember being deeply moved as we walked through oil that washed ashore all across the nine mile coast that day. The magnitude of

the case really sank in, as did our resolve to make BP clean it up and restore the damage it caused. I took many pictures that day, one of which I provide here. Cathy Norman, the Donation's Secretary-Treasurer, is seen walking on the beach, in the upper right corner of the image.



<div align="center">31.</div>

After our July trip, Robert and I broke down the Donation's unique challenges into four basic categories: the Donation's legal relationship with BP, interaction with the Unified Command (BP, the Coast Guard and Louisiana agencies), residual regulatory concerns and the damages case.

<div align="center">12</div>

Robert and I next developed what proved to be a unique 3-part strategy to address each area, with a necessary emphasis on protecting the headlands and ensuring resiliency through continually changing circumstances. Though time consuming, if done properly, this unique strategy was felt to incentivize BP to settle and to increase the overall value of the case.

32.

To accommodate the scale of contamination and to proactively assure the collection the evidence of damage caused by the spill and response, we proposed that the Donation actively participate as a partner in the UIC cleanup response on Donation property. By doing so, we would place the Donation in the best position possible to control the cleanup, to extend the clean-up, and to heighten the endpoint standards as well.

33.

Second, WWG proposed to document response costs, including expert expenses and legal fees, and present them as interim claims under OPA to the responsible party. Coupled with proof that we would develop concerning the Donation's consistency with the National Contingency Plan, we would shift expenses, expert fees, and legal fees to BP in this manner.

34.

And third, by participating in the cleanup and by asserting the value the Donation placed on the integrity of the land, WWG would prove that the Donation would use funds it received to actually restore the property, an important part of proving an entitlement to restoration damages in excess of property value.

35.

Thereafter, after Robert Wiygul and I identified the types of experts we felt were needed. Robert interviewed candidates in oil fate and remediation, coastal geomorphology (land loss), and

economics. I helped him vet and retain the experts selected. Each of the experts we hired were later used by the JV in the Access Agreement litigation.

36.

Also in late July, 2010, Cathy Norman wanted immediate help in drafting and negotiating an Access Agreement with BP. She had historically required persons seeking to access the property, for purposes of scientific studies, mineral exploration, remediation or otherwise, to sign an Access Agreement with the Donation. The Access Agreement that was traditionally used provided the Donation with liability protection from suits for injuries, some assurance that damage caused by the proposed activity would be repaired, and reimbursement of Donation expenses incurred in monitoring the work. Cathy Norman had asked BP to sign such an agreement, but BP resisted and she wanted legal assistance in tailoring the agreement to the spill.

37.

After reviewing the Donation's old Access Agreement, I felt that the Access Agreement could be modified for BP to accomplish much more - to contractualize the Donation's rights to interim payment of response costs under OPA and restoration remedies under federal or state tort law. If successful, I felt that we could largely avoid the legal pitfalls that historically adhered to contamination cases, including the election of remedies and limitation of restoration damages to the value of the land, and control the restoration done on the land.  In late July to early August, I made the Access Agreement my top priority and found that BP was willing to engage.

38.

The Access Agreement BP signed enshrined BP's obligation to give the Donation response related evidence, to reimburse the Donation's response related expert fees and expenses, as well as the cost of restoring damage caused by the response. See, Exhibit 3. I felt that this last element

14

was critical. Because the response itself would cause so much damage, contractualizing the restoration removed the potential for a market value limitation on restoration damages and, even more importantly, made BP responsible for reimbursing the Donation's chosen restoration effort. BP also agreed to reimburse the Donation for the $139,208 for interim claims submitted by Secretary-Treasurer Norman before we were retained, as part of that negotiation. See Exhibit 4.

39.

Though WWG began to work in July of 2010, our contract - and apparently several other contracts - were not yet signed. In its September meeting, the WDAC voted to authorize the Donation's Secretary-Treasurer to execute the contract, which she did. See, Exhibit 5.

40.

Our strategy to insert the Donation into the UIC Response proved highly successful. The day after our contract was approved by the WDAC and signed by the Secretary-Treasurer, we met with the National Incident Commander (NIC) and BP's Incident Commander at the MC252 UIC headquarters in New Orleans. We were invited to participate in the response as interested landowners.

41.

We also met with Area Chief and UIC personnel at Fourchon. As a result of this work, we not only heightened the standards used in the cleanup, we obtained correspondence from the National Incident Commander lauding our partnership as a valued partner in the response on Donation land. This further established that our actions were consistent with the National Contingency Plan, a key pre-requisite to recovery of response costs under OPA and the Clean Water Act, which when the case finally settled still totaled about $250,000.

42.

I also wrote FOIA requests to the UIC and state agencies to obtain the official record of the spill response pertaining to Wisner land. I spent considerable time following up on these requests, and reviewed and catalogued thousands of records we obtained from the UIC and state government agencies - in addition to the documents we obtained from BP under the Access Agreement. I did this for purposes of developing the Donation's OPA damages case. Many of the response records were in fact used in the Donation's Access Agreement case.

43.

I also closely followed the NRDA process as it related to sediment contamination, oil transport and fate, oil weathering, land loss, and natural resource damages caused by the response. Though NRDA damages are not recoverable by private parties, the NRDA scientific studies could be used to support our private property damage claims. I personally reviewed a great number of documents that were generated in the NRDA process for this reason.

44.

The spill response doctrine called for a progression of stages, from "active response" to properties that were simply being observed in a "maintenance stage". When the UIC recommended that portions of the Donation property be moved out of active response, we often opposed the change, based on the science we had collected regarding residual oil that was not removed and based on the investigations provided by our on-scene investigator. As a result, BP remained in active response on large sections of the Donation's property – to my knowledge, longer than anywhere else along the Gulf.

45.

Through the interim claims we prepared and submitted to BP under OPA and the

Donation's Access Agreement, we were able to shift nearly $3,000,000 in costs, expert fees, and legal fees to BP, assuming the Donation is given the credit in this proceeding it deserves. As seen from the summary chart of invoices showing what Robert Wiygul and I billed BP on the right, I personally expended over 300 hours of my time on matters that was invoiced to BP as part of the Donation's response effort on the beach. A table summarizing our invoices to BP is attached hereto as Exhibit 6. I have reviewed the invoices and certify that the table is accurate.

<div align="center">46.</div>

A large portion of our time was not contemporaneously recorded, because it was unrelated to the response and because WWG had a contingent fee agreement. Robert and I have gone through our Wisner file and generated a list of tasks for which we did not invoice, along with a conservative estimate of the time we expended on each. We have left off items that we believed was later used to benefit other clients or the common benefit. A table containing the task list and estimated time is attached hereto as Exhibit 7.  I have reviewed the table with Robert Wiygul and certify we both believe the table is as accurate as possible.

<div align="center">47.</div>

I have reviewed my partner Robert's month by month narrative regarding our representation, attached as Exhibit B to his declaration. Exhibit B captures most of the timing and substance of what we did during each monthly time period.

<div align="center">48.</div>

I am reasonably certain that I personally spent more than 800 hours over a 24 month period on the Donation's case, prior to WWG's termination. In a normal 2000 hour year, 800 hours would consume approximately 20% of my practice. Those were not normal times. Particularly in the first six to eight months of our involvement in the case, I worked many 60-80 hour weeks - time away

<div align="center">17</div>

from family and fun that I cannot get back.

<div align="center">49.</div>

All of our efforts in the case, those we invoiced for purposes of recovery under OPA and the Access Agreement, and those that were not invoiced, were all part of the execution of our strategy in land contamination cases, as adapted to this case. The cumulative effect of our work was designed to develop the evidence needed at trial, and cost BP up front money, thereby increasing the likelihood that BP would come to the table with a substantial offer. Specifically, our efforts to engage in the UIC response served these dual purposes.

<div align="center">50.</div>

I provide the following examples of the dual purpose nature of our response work. Forrest Travirca, the Donation investigator on the property each day, noted that contamination kept reappearing on parts of Fourchon Beach that were previously "cleaned". Forrest and Dr. John Pardue, our oil fate and transport expert, believed that the oil was coming from nearshore tarmats. We decided to undertake a preliminary investigation of the nearshore environment, which we suspected was the source of new contamination, and to measure the rate at which the PAHs in the oil were deteriorating. Dr. Pardue and Dr. Jeff Williams obtained sampling cores at fourteen transects along the beach on the beach and through the surf zone adjacent to the property. Analysis of these cores verified the presence of oil in the submerged waterbottoms, in both the crests and trenches, up to two hundred yards from the shoreline. We presented the findings to the National Incident Commander. BP and the Unified Command studied our conclusions and conceded that our science was right, that oil existed in these waterbottoms, that the anaerobic environment precluded its degradation, and that it would continue to contaminate the Donation's property as it breaks up. Ultimately, based in large part on our investigation, the NIC ordered that BP pay for a

<div align="center">18</div>

study of nearshore areas along the entire coast, called OSAT-2. This work would have been invaluable in a future OPA case, had it come to trial. This work was billed to BP under the Access Agreement and OPA.

51.

In another example, large amounts of oil contaminated beach sediments. The UIC removal standard left contamination in place at a depth below 6 inches. Our scientists took statistically significant sampling to determine how much oil was remaining on the beach. The results of our study was shared with UIC and required sections of the beach to be placed back in active response. The work was thus recoverable under both OPA and the Access Agreement. Our science costs and legal time directing these studies were billed to BP. The results of these studies informed the total amount of oil left on the beach, and would have greatly benefitted the OPA case.

*Facts Surrounding the Termination of WWG*

52.

From July 2010 to April 2012, my firm had collected and organized much of the evidence needed to prove damages, engaged in a persistent response on Donation land, elongated the cleanup over large portions of Fourchon Beach, contributed to BP having to pay for a nearshore contamination study in waterbottoms across the Gulf, and pushed UIC to force BP to mitigate landowner losses through replacing the contaminated sediment BP removed from beaches.

53.

From July 2010 to April 2012, Robert and I drafted and filed a comprehensive Complaint on behalf of the Donation in federal court [10-cv-02771; Doc. 326], twice litigated BP's non-compliance with the Access Agreement we wrote, prepared a motion for a preliminary injunction, and even participated in state enforcement actions against BP. Through the claims we submitted

to BP under OPA and the Access Agreement, we forced BP to reimburse over $1,000,000 in investigatory costs and expert fees while we were in the case, and were in the midst of settling another $750,000 in unpaid interim claims. We had succeeded in attaining many of our goals and were applying consistent pressure on BP on multiple fronts.

54.

On March 30, 2012, I received a call from the Mayor's new designee to the WDAC, Mr. Mike Sherman. After generously lauding our work, Mr. Sherman noted that the JV team which represented the City wanted to brief my firm on how the Donation's real property claim would be calculated under the impending settlement methodology. We set a date for the briefing.

55.

On April 2, 2012, Robert and I went to City Hall. We were greeted by Mr. Sherman and members of the JV team. As soon as the meeting commenced, Calvin Fayard asked Mr. Sherman whether our firm or the JV team had the authority to represent the Donation in settlement negotiations with BP. Mr. Sherman replied that the answer related to a larger set of issues, which included the role of the trustee and the WDAC, and the authority of the WDAC or the Secretary-Treasurer to contract on behalf of the Donation. Mr. Sherman quickly adjourned the meeting, promising the Mayor would "make a fast decision". We learned nothing about the wetlands claim methodology.

56.

On April 4, 2012, we reported the meeting to the WDAC. We noted the posture of the case and the time sensitive matters on which we were working. We told the WDAC that BP may question the validity of the Access Agreement, which was signed by the Secretary-Treasurer and approved by the WDAC, if in fact all instruments not signed by the Mayor were invalid. We asked

the WDAC and Mayor to affirm our authority to represent the Donation or designate new counsel.

57.

On May 16, 2012 Mr. Steve Herman wrote this Honorable Court and requested to participate in a status conference regarding our enforcement of the Access Agreement, in his role as liaison counsel and member of the PSC, and on behalf of the Mayor at trustee. The letter did not indicate that WWG did not represent the Donation or that WWG had no authority to act. See Exhibit 8.

58.

At the June 7, 2012 meeting, WWG recommended to the WDAC that the Donation submit a wetland claim in the DHCC process, well in advance of the opt-out deadline. If the Donation's claim was not considered, or if the Donation was not satisfied with the amount of money that may be offered, the Donation could withdraw the claim and opt out. Agreeing that all options should be looked at, the WDAC approved of the submission in executive session.

59.

Thereafter, at that same WDAC meeting, the Mayor's representative, Mr. Mike Sherman, requested to replace WWG with the JV. The other four representatives refused in what grew to be a very contentious discussion.

60.

The following day, Steve Herman wrote to Ms. Norman and indicated that he was directed to coordinate litigation activities in the case, apparently by the Mayor.  He also emailed Claims Administrator Juneau and BP's lead lawyers and stated he had learned that the Donation would be submitting a claim. He wanted to "put the claim on your radar, so that the Program will be able to make sure that the I's are dotted and the T's are crossed in terms of the Release."

61.

I found the timing of the JV's intercession - on the heels the private global settlement - and content of the unpermitted disclosure, very troubling. We were in the midst of several important efforts for the Donation, including reopening the response to remove newly discovered contamination on Donation property, enforcing the Access Agreement (again) in this court, and requiring the UIC to replace contaminated sediments that were removed from our property as a mitigation requirement under the Clean Water Act. I felt we were being derailed.

62.

A week later, the Mayor demanded that WWG co-counsel the case with the JV attorneys. We tried to work out the relationship with the JV, but because the Mayor's attorneys could not assure our participation in all facets of the case - particularly in settlement discussions - or assure that any proposed settlement would come to a vote of the WDAC, we reached an impasse.

63.

Thereafter, two beneficiaries changed their representatives on the WDAC and their vote. On July 31, 2102, the WDAC voted 3-2 to terminate WWG's services after WWG had provided thousands of hours of legal services, and drew the active praise of all parties, including the Mayor's representatives.

*Facts Surrounding the Rehiring of WWG*

64.

On or around August 1, 2014, I received a call from Mark or Michael Peneguy. They forwarded me a letter sent by JV lawyer Soren Giselson. Mr. Giselson advised that because the trust had terminated, all beneficiaries should hire their own lawyers. See, Exhibit 9. The Peneguys asked me if we would consider coming back into the case to represent the Wisner Family.  Our

firm (now WWG) was ultimately hired on a contingent basis by 53 family members, who collectively held a 38% interest in the Donation.

65.

Despite the events that lead to our termination in July of 2012, Robert and I assisted in litigating the Access Agreement I helped draft, including providing memoranda to the JV lawyers about our strategies and what the contract allowed the Donation to collect and do (e.g. reimbursement related to the response). I suggested strategies, actions, responses to defenses, and discovery. I also attended hearings, participated in depositions, at least one in Houston, helped prepare experts, reviewed briefs and pleadings, and did whatever else I could without the benefit of a file, which my clients had requested of the JV team on an number of occasions. I estimate that I spent approximately 80 hours on this work prior to the settlement.

66.

This case was resolved on May 3, 2016, in the court mediated settlement process known as the "Neutral Process".

Redacted Pursuant to Docs. 15718 & 21852

67.

Redacted Pursuant to Docs. 15718 & 21852

68. [redacted] Redacted Pursuant to Docs. 15718 & 21852 [redacted]

69. [redacted] Redacted Pursuant to Docs. 15718 & 21852 [redacted]

70.

I was hired by the Wisner Family on a contingent basis after the trust terminated, so I did not keep time sheets for this work. But I estimate that I spent another 80 hours conferring, drafting, and conducting research related to the Release Agreement. The Release is attached hereto as Exhibit 11.

*Application of the WWG Contract to the Settlement*

71.

Under the terms of WWG's Retainer/Contingent Fee Agreement, WWG has no outstanding claim for hourly wages reimbursed by BP under §4(a), because WWG has received $358,969 for "removal/response related professional services." This includes $31,543 in attorney's fees that BP paid directly to WWG as a result of the motion for summary judgment WWG filed to enforce the Access Agreement. A true copy of WWG's accounting record as it relates to its representation of the Wisner Donation prior to WWG's termination is attached as Exhibit 12.

72.

The Donation received no "interim or partial payments of oil spill damages other than response/removal costs" at any time in this litigation. As a result, no funds are due to WWG under §4(b) of WWG's Retainer/Contingent Fee Agreement.

73.

The Neutral Process final settlement at issue here, which would include the portion of the first payment that was deposited into the registry of the court, was paid "in connection with physical damages and restoration costs, as well as final economic loss damages." §4(c). WWG is owed a contingent fee under §4(c).

74.

The contingent fee is based on the "gross present value of benefits" received by the Donation. $30,000,000 is clearly a "benefit" to the Donation. §4(c). Because the contract does not specify what discount rate should be applied, a reasonable rate should be applied. Assuming that a 3% discount rate is considered reasonable, the present value of the income stream generated by the final settlement is $24,434,103.

75.

The Donation decided to buy down the contingent fee rates by agreeing to pay the costs associated with the response, and to reimburse WWG for its expenses and expert fees up front. §7 provides that WWG will deduct case costs and common pro rata litigation related expenses which have not been paid by WWG. The example provided in §7 shows a deduction for the Donation's unreimbursed "costs related to the spill and its property" from the gross amount before application of the contingent fee percentage.

76.

According to the JV's "Wisner Summary of Damages", the Donation expended $229,386 in response costs that were not reimbursed by BP, and $375,100 in "expenses paid by Wisner, approx.", while the JV incurred $1,214,615 on the Access Agreement case. These expenses total $1,819,101. The present value of the settlement, less the costs and expenses, equals $22,615,002.

77.

The highest tier applies if the Donation "matter" resolved "after the first Order" or "an Order" was signed, setting "the case" for trial. §4(c)(iii). While the dispute over the Access Agreement was set for trial, the OPA and GML case was not. If the Court agrees that a reasonable interpretation of that provision would mean the case was set for trial, then the total attorneys' fee

would be calculated as $2,500,000 ($10,000,000 @ 25%), plus $2,270,700 ($12,615,002 @ 18%), for a total of $4,770,700.[1]

<div align="center">78.</div>

Based on WWG's experience in successfully resolving hundreds of cases in the Neutral Process, and because case values were established by the Neutrals and Magistrate Shushan, I am reasonably certain that the case would have resolved around the same time as it did, and for the same amount, had we not been terminated. Because we already possessed a working knowledge of the file, had we not been terminated, I believe that Robert and I would have expended at most an additional 1,800 hours (6 full months) of time in the Donation's case prior to the case resolving.

<div align="center">79.</div>

Robert Wiygul and I spent approximately 1960 hours working on the Donation's case, including 780 hours of time that we were able to invoice as related to the response, and 1180 hours of time that we were unable to invoice. As such, we had completed approximately 52% of the work required in the case at the time our firm was terminated.

<div align="center">80.</div>

Applying the 52% completion percentage to the total gross fee of $4,770,700, before any offset for amounts previously paid, results in an earned fee of $2,480,764.[2]

---

[1] If the Court believes that the matter was set for trial, then the fee would be $1,800,000 plus $1,513,800, for a total of $3,313,800. Or the Court can apply a blended rate based on the JV's estimate of the value of the AA case relative to the value of the OPA/GML case. See, Exhibit 11. Doing so results in a rate of 20.31% for the first $10M, and 13.98% for each dollar paid over $10M. Applying this blended rate, the contingent fee would equal $2,031,000, plus $1,763,577, for a total of $3,794,577.

[2] Assuming that the court is inclined to disregard the dual purpose served by our response work, we completed 54% of our work. The gross fee would be $2,719,300. After deducting the offset for what we were paid, WWG should collect $2,399,300.

<div align="center">27</div>

81.

Under § 4(a), fees paid for "removal/response related professional services"… "actually received by WWG will be credited as an offset against the contingent fee owed and payable under §4(c)." §4(a). After the $358,969 offset is deducted, WWG is owed $2,121,795.

82.

On October 1, 2016, BP paid the first installment of $5,000,000. Under §7 of WWG's contract, the case costs and litigation expenses are reimbursed to the Donation and to Wisner first, totaling $1,819,101. See, para. 75.  Then, WWG is to be paid its fee of $2,121,795.

83.

WWG has already proposed to spread its fee over time. WWG wants to assure that the Wisner can fund the remaining treatment needed to rehabilitate the land and avoid creating any unfunded tax liabilities for beneficiaries. WWG remains willing to discuss an appropriate payout over time.


Date: November 18, 2016                         /s/ Joel Waltzer (LA #19268)

**NOTICE OF MANUAL ATTACHMENT**

Exhibit 1 to Declaration of Joel Waltzer

Unredacted Version of Minutes of the Emergency Meeting of the Edward Wisner Donation
Advisory Committee, July 1, 2010

The redacted version is attached as Exhibit "Q" to the Declaration of Dylan T. Leach

**NOTICE OF MANUAL ATTACHMENT**

Exhibit 2 to Declaration of Joel Waltzer

Email dated July 8, 2010 from Cathy Norman to Joel Waltzer

Privileged Communication between representative of the Donation and attorney for the Donation

STATE OF LOUISIANA

PARISH OF LAFOURCHE

**RIGHT-OF-ACCESS FOR OIL SPILL CLEANUP OPERATIONS**

The EDWARD WISNER DONATION ("Grantor") grants access to its properties in South Lafourche Parish for the following purposes, and under the following conditions:

(1)    In consideration of the need for prompt action to address the presence of oil from the BP Deepwater Horizon oil spill (hereafter "the oil spill"), Grantor does hereby grant unto ~~BP, plc and~~ BP Exploration & Production Inc. ("Grantee"), a right of access for the purpose of cleanup operations related to the oil spill. This right of access does not grant permission for any other purposes, including research on the impacts of the oil spill. Any research activities will be the subject of a separate right of access agreement. This right of access for cleanup operations applies only to the property shown on the plat attached and marked Exhibit A. This property is referred to in this agreement as "the Wisner Property."

(2)    Prior to beginning operations, or as they become available, Grantee will provide Grantor with a copy of all work plans, protocols, or contracts ("cleanup documents") relating to Grantee's oil spill cleanup operations on Grantor's property. Copies of any revised, updated or supplemented cleanup documents will be provided to Grantor as soon as they become available.

(3)    Grantee will provide Grantor with a list of all Grantee sub-contractors and all Grantee personnel who will be performing cleanup activity on Grantor's property, including each person's company affiliations. This list will be attached to this access agreement as Exhibit B.

(4)    Prior to commencing work on Wisner property, Grantee will provide Grantor with the cell phone numbers and email addresses of all onsite supervisory personnel.

(5)    Grantee will provide Grantor a weekly summary of all removal/response operations undertaken on Wisner property, including a description of each operation performed, the dates of each operation, and the identity of all companies who worked on each operation.

2



EXHIBIT

3

(6)     Grantee will provide Grantor with a copy of all waste manifests or other documents detailing all materials removed from Wisner Donation property, the results of all testing of any kind carried out on Grantor's property by Grantee or its contractors or at Grantee's request in connection with operations, and all documentary information such as photographs, video, GPS logs, reports, work logs or journals kept in connection with SCAT assessments and oil removal operations. This information will be provided as received on a weekly basis.  If Grantee believes that any oil or oiled waste removed from the Wisner Property is not attributable to the Deepwater Horizon oil spill, Grantee shall segregate that waste and notify Grantor to allow the waste to be documented and samples taken.

(7)     Grantee recognizes that it is necessary for Grantor to have personnel, additional equipment and appropriate consultants to monitor Grantee's cleanup operations. Grantee will reimburse Grantor for all such expenses and increased costs, including overtime, incurred by Grantor in connection with cleanup operations.  Grantee agrees to cooperate with Grantor's representatives and personnel, and to insure that these personnel have full access to all operations. Grantor's personnel will be given prior notice of and will have the right to attend any meetings, briefings, or events regarding operations on the Wisner Property. Grantee's supervisory personnel will keep Grantor's personnel apprised of the status of all operations on the Wisner Property on a daily basis or as requested. Grantor shall also have the right, at Grantee's expense, to have consultants of Grantor's choice monitor Grantee's operations.  Grantee will be invoiced on a biweekly basis for all expenses under this paragraph, payment of which is due within fourteen days of receipt.

(8)     The highest industry standards shall be used to insure environmentally sensitive practices while carrying out operations on the Wisner Property. In addition, Grantee shall adhere to, at a minimum, the following specific standards.  Grantee shall provide appropriate training to insure that all cleanup personnel are familiar with these protocols.

(a)  Beach Protocols

The use of any type of vehicle on the beach area should be limited to the shore face when possible. In particular, ATV's should not be driven off the beach area, through vegetated areas, in the dunes or wash over areas.

3

At the conclusion of each day, all loose clean up materials, trash and tools must be removed from the beach.

In addition to the area over the LOOP pipeline corridor, Exhibit D is a map of the areas of elevated conductivity indicating subsurface pipelines on the beach. These areas are located due west of the staging area, in front of the Chevron facility. Care should be taken to avoid using heavy equipment on this area. Any digging in this area should utilize proper precautions.

(b)  Marsh and Upland Protocols

To the extent possible, Grantee shall utilize water access, or access on foot, only, so as to limit the impact on the marshlands, its vegetation and habitats.

No airboats, ATV's, marsh buggies or other equipment are allowed in marsh or wetland areas without specific written permission by Grantor, as well as the presence of the onsite consultant. The marsh area is very sensitive and impacts from clean up may damage the marsh. Clean up efforts of the marsh area must be coordinated with Grantor.

(9)  Grantee shall be responsible for all reasonable costs and expenses associated with assessing damage to Wisner property caused by oil spill cleanup operations. Grantee shall be responsible for all reasonable costs and expenses associated with restoring said damage to said property. Examples of such damages include, but are not limited to, damage to vegetation by vehicles, damage to habitat from unattended or abandoned booms, or damage to marsh surface from equipment. Grantor will provide Grantee with a schedule of damaged resources as described herein and an invoice for the cost of restoration. Payment for the cost of restoration will be due within 30 days of receipt of the invoice. Nothing herein shall be construed to diminish Grantor's right to choose and control restoration activities upon its lands. Nothing herein shall act as a waiver or release of any obligation Grantee may owe Grantor as a result of oil released from the Deepwater Horizon incident.

(10)  Grantee assumes the responsibility for, and agrees to indemnify and to hold harmless Grantor and its beneficiaries, trustees, principals, employees, officers, agents and contractors, against any claim, loss, damage, liability, cost or expense, including fines, penalties and punitive damage awards, if any, or the violation of any law or regulation, including costs and expenses incident thereto, arising wholly or in part from, or in connection with access given to Grantee

4

under this right-of-access agreement. In the event any administrative charge, proceeding or investigation or any suit is brought against Grantor on the account of such damage, injury or death, Grantee shall, at Grantor's request, appear and defend said suit, at Grantee's sole cost and expense, including provision of any appeal bond, and shall pay any judgment or settlement that may be entered against Grantor, therein when said suit is finally determined. This Paragraph 11 does not apply to, and Grantee shall not be responsible for, the intentional or reckless misconduct or the active negligence of Grantor, its beneficiaries, trustees, principals, employees, officers, agents and contractors.

(11)   In the event Grantor obtains the services of an attorney, or attorneys, to institute suit (a) to enforce any of the provisions of this right-of-access agreement, or (b) to make a claim, or claims, for damages resulting from Grantee's operations under the right-of-access agreement or to make a claim, or claims, for specific performance against Grantee, or (c) to make a claim, or claims, for any active or passive breach by Grantee of this right-of-access agreement, or (d) to make a claim, or claims, for the failure of Grantee to perform under any of the provisions of this right-of-access agreement, then Grantee shall be liable for reasonable fees for the attorney, or attorneys, as incurred by Grantor, and the reasonable costs concomitant thereto, to the extent Grantor prevails in part or in whole, by settlement or by judgment.

(12)   This access agreement is revocable at will by Grantor.  Grantor retains the right to exclude any individual from its property at its discretion, regardless of that individual's relationship with Grantee.

(13)   All notifications or delivery of documents or information under this agreement must be made to the following:

GRANTOR:                                    GRANTEE:

Cathy Norman                                Farley Burge, Jd.
Secretary Treasurer/Land Manager            BP Exploration and Production, Inc.
Cell – 504.616.7985                         Cell:  713.715.9606
Office – 504/658.4060                       Office:281.366.2415
Email: wisnerdonation@aol.com               Email: farley.burge@bp.com

Until further notice, Grantee must notify Grantor's on site supervisor as well:
Forrest Travirca, FETI & Associates, LLC Cell – 985/232.1483
Email – feti@travirca.com

5.

(14)  This agreement is not transferable, and conveys no right to Grantee to permit any parties not employed by or under the direct control of Grantee to access the Wisner Property.

(15)   This agreement constitutes the entire agreement between the parties, and may be amended only in writing.  In the event that any provision of this agreement shall be found invalid, the other provisions of the agreement are deemed to be separable and remain in effect.

IN WITNESS WHEREOF, Grantor has executed this right of access on this 23rd day of August, 2010.

WITNESSES:

Print Name: L Amanda Phillips

Print Name: Forrest Trawceak

Print Name:

Print Name:

GRANTOR:

EDWARD WISNER DONATION

By: C. Cathy Norman
Print Name: C. Cathy Norman

GRANTEE:

BP

By: BRAD J. BYGZYNSKI
Print Name:

STATE OF LOUISIANA
PARISH OF Lafourche

On this 23 day of Aug 2010, before me appeared _____, who, being duly sworn, did state that he is Grantee's duly authorized agent and that he executed this document on behalf of Grantee as the free act and deed of said corporation.

NOTARY PUBLIC (# 11881    )
Print Name: Joel Waltzer

6



**EXHIBIT A**

7

# Recommendations for Reduction in Disturbance of Bird Colonies on the Wisner Beach in Relation to Oil Spill Cleanup Activities.

Monitoring Report for
Wisner Advisory Donation
1300 Perdido St.  Room 8E06
New Orleans, LA 70112

by

Donald Norman
Norman Wildlife Consulting (NWC)
2112 NW 199th Shoreline, WA 98177

## Summary Recommendations

As part of assessment of impacts of the Deep Horizon Oil Spill, NWC has inventoried the avian resources on the Wisner beach and surrounding wetlands between 15 May to 1 June and makes the following recommendations:

1. Keep all personnel, including SCAT and other NRDA teams out of wetlands, shell mounds, dunes, and upland areas. NRDA and SCAT teams required to do assessments in these areas should record all disturbances that occur during their activities in a written report to Wisner. Areas to avoid are shown in Figures 1 and 2.

2. At the entrance of Belle Pass, no staging or cleanup activities should occur on the shell habitat area above (east) of the beach at the east jetty area. The western edge of the shell beach area is within 200 feet of a mixed species colonial waterbird colony protected by the Migratory Bird Treaty Act, and no staging or cleanup activities must occur on that shell habitat area.

3. Any cleanup activities necessary further up Belle Pass along the edge of the colonial Waterbird colony should have supervision of the Natural Resource Trustees, such as LA Department of Wildlife and Fisheries, US Fish and Wildlife Service, or their designated representatives, as this beach is within 200 feet of the colony. A report on disturbance related to any activities in this area should be submitted to Wisner on a daily basis as such activity occurs.

4. If possible, locate worker tents away from overwash areas and beach nesting areas. This will prevent workers from entering these areas.

Figure 1. Location of Colonial Bird Colonies on Wisner Beach.
Picture captured from Google Earth.



Figure 2. View of Shell Habitat to be Avoided during Oil Cleanup. This view is of the shell habitat east of Belle Pass Beach looking west at west Belle Pass jetty. These areas shown in red in Figure 1 can be identified by this shell and stone matrix and higher elevation.



## Background

As part of the Natural Resource Damage Assessment (NRDA) under the Oil Pollution Act of 1990 (OPA), Norman Wildlife Consulting (NWC) was asked to perform assessments of the emergency activities occurring on the Wisner beach as a result of the Deepwater Horizon Oil Spill. NWC is familiar with this beach having performed Piping Plover surveys for Wisner to provide them with permits for restoration activities. Piping Plovers are, in general, gone from the Wisner beach by late April, otherwise contractors would be subject to fines under the Endangered Species Act (ESA). NWC will be initiating a Section 7 ESA consultation with the US Fish and Wildlife Service (USFWS) to determine what actions need to be taken by the fall to mitigate the long term impact of spill response activities on the Wisner beach relating to Piping Plover critical habitat.

The presence of large back dune shell habitat, overwash areas, shallow bays and wetlands behind the Wisner beach makes it some of the most important wildlife habitat in the area. Many of the nearby barrier islands in Timbalier and Barataria Bay are losing the habitats behind their beaches due to coastal erosion and subsidence, and the island of Grand Isle has no such habitat. Wisner has attempted to keep vehicular traffic to a minimum on the beach, for safety, security, and wildlife reasons. The fall, winter and spring months are critical habitat for the ESA listed Piping Plovers and the spring months are nesting season for Least Terns, Wilson's Plover, Black Skimmers, and several additional waterbird species of concern that nest at Belle Pass, the Reddish Egret and Roseate Spoonbill. Large numbers of species of shorebirds and waterfowl also use the area. A large part of the Wisner lands have been, until recently, in a Wildlife Management Area of the Louisiana Department of Wildlife and Fisheries, indicating its importance.

Donald Norman from NWC did surveys of the area on 15th, 18th, 20th, 26th, 29th and 31st of May and the 1st of June. The primary goal of the surveys was to record any oiling found on birds, especially those using the beach, however, after oil entered the wetlands and inland areas of Barataria and Timbalier Bays on the night of the 19th, some surveys of the Belle Pass colonial waterbird colony were performed, as well as surveys of the oiled wetland areas. In addition, NWC performed a Wilson's Plover survey on the eastern portion of the beach to assist in a survey gap for the Barataria-Terrebonne National Estuary Program (BTNEP) plover survey and documented activities of the cleanup. Those surveys are being compiled for Wisner and the Trustees.

Unfortunately, by the time NWC was contracted to perform an assessment of the beach, contractors hired by Lafourche Parish, Parish departments, and National Guard personnel were already on the beach, attempting to close breeches on the beach and provide beach oiling prevention. In general, most of the activities occurred along the beach and not in the shell habitats used by Least Terns and Wilson's plovers to nest. However, it is not known if Black Skimmers that were observed at Bay Champagne on 18 May had been nesting in the large Least Tern colony there on the east side of Bay Champagne. Black

10

skimmers are more sensitive to disturbance than Least Terns, and with the combination of truck traffic and colony disturbance, possibly impacted by inclement weather, could have abandoned their colony.

However, some truck and ATV traffic did occur through colony areas. In several incidents, sheriff officers on ATVs rode through colony areas and dunes despite knowledge from Parrish regulations such activities are subject to fines. Officers were also observed making "doughnuts" with their vehicles in backdune areas. The arrival of oil cleanup activities inside Belle Pass close to the major waterbird colony has made it imperative that actions be take to reduce such disturbance actions.

### Implementation of Disturbance Monitoring in Key Wildlife Habitat Areas

NWC has adapted disturbance guidelines developed from local and national guidelines to measure and respond to disturbance. For areas of shell habitat, there is no current reason for any personnel to be in those areas, so there is no real need for an actions to be taken.

For the colonial waterbird colony, any initial booming action along the beach closer than 200 feet to the colony, in the area north of the existing beach, should be performed with a local Trustee employee present to be able to determine if there has been any disturbance to the herons and egrets. This has occurred in other colonial waterbird colonies in the area. A Standard Operating Procedure and data sheet will be made available and discussion with Trustees and booming personnel can determine the best method, as has been occurring in other areas with wildlife habitat. It is likely that mid-morning operations will result in the least amount of disturbance. It is important that no activities occur during threatening inclement weather, which should typically not occur due to the hazard of lightning to workers. Booming will be difficult to maintain with boat wake, but should oiling occur inside Belle Pass, boat traffic should be monitored and additional boom away from the beach be placed.

11



**FIGURE 17**

CONDUCTIVITY ANOMALY MAP




**FETI & Associates, L. L. C.**
Dba: FETI Inspections
Post Office Box 293
Lockport, Louisiana 70374
985 532 3555 Office Fax 985 532 1526
http://www.travirca.com      feti@travirca.com

**BP Horizon Oil Spill Response**
**Edward Wisner Trust property (Fourchon Beach and supporting Marsh)**
**Rate Sheet**

**Number of operators:**
Three operators; qualified in boat operation as well as beach frontage and knowledge of the property. Sub-contracted by Wisner

**Hourly rate - Field Inspector; NRDA, SCAT**
Field Inspector/Operator: Forrest A. Travirca III - $100. 00 per hour
Assistant Field Inspector/Operator: Timothy Travirca - $60.00 per hour
Assistant Field Inspector/Operator: Forrest A. Travirca IV - $60.00 per hour
NRDA/Biologist/Ecologist: Don Norman - $100.00 per hour

**Equipment to be used and cost:**
4 X 4 trucks $100.00 per day
Small flat boat - $150.00 per day
Air Boat - $400.00 per day

**Reimbursable expenses on a dollar for dollar basis:**
Vessel fuel and oil
Vehicle mileage @ .505 per mile
Repairs as needed for equipment and or replacement

**Duties and Responsibilities:**
Observe all activities being performed on private property due to oil related cleanup efforts by BP, including all SCAT, NRDA Teams, Wildlife Recovery Units, assigned by BP, etc. Prevent entry of unncessary personnel onto property. Survey the marsh and water areas for oil intrusion and animal needs. Provide information to clean up crews necessary to address the presence of oil in the marsh to prevent them from causing more damage to the marsh by lack of knowledge of the land and to otherwise assure safe ingress and egress of the property. Work with USCG and Contractors regarding the overall clean up plan and results of the clean up effort. Identify concerns of Wisner such as removal of buried snare, oil, and related clean up debris. Identify deposits by the securing of Latitude and Longitude positions of those deposits and related information. Share photographic evidence of these concerns to all concerned
parties, take part in the planning stage meeting established by USCG.  Assess affects on wildlife as a result of the spill and its response measures.

# LISKOW&LEWIS

A Professional Law Corporation

| | | |
|---|---|---|
| One Shell Square | 822 Harding Street | First City Tower |
| 701 Poydras Street, Suite 5000 | Post Office Box 52008 | 1001 Fannin Street, Suite 1800 |
| New Orleans, LA 70139 | Lafayette, LA 70505 | Houston, TX 77002 |
| (504) 581-7979 Main | (337) 232-7424 Main | (713) 651-2900 Main |
| (504) 556-4108 Fax | (337) 267-2399 Fax | (713) 651-2908 Fax |

www.Liskow.com

August 20, 2010                               Greg L. Johnson                    Direct: (504) 556-4115
                                                                                gljohnson@liskow.com

**VIA HAND DELIVERY**
C. Cathy Norman
Secretary Treasurer/Land Manager
Edward Wisner Donation Advisory Committee
1300 Perdido Street #8E06
Post Office Box 52204
New Orleans, Louisiana 70152-2204

Re:     Claim No. 686 612 416 5586
        Edward Wisner Donation Trust

Dear Ms. Norman:

BP has reviewed the claims documentation submitted by the Edward Wisner Donation Trust ("Wisner") in support of the above-referenced claim. BP's claims process is guided by the applicable provisions of the Oil Pollution Act, 33 U.S.C. § 2701 *et seq.* ("OPA"). While BP will pay a portion of the amounts claimed by Wisner to date, certain of the amounts and categories of losses claimed by Wisner are not reimbursable under OPA. Accordingly, enclosed is check no. 020905 in the amount of $139,208.08 to reimburse Wisner for the approved amounts of its claim. The balance of this letter will address the non-reimbursable categories of claims as well as certain individual items excluded from reimbursement.

**Claims Related to the Drilling Moratorium**
In this context, BP is liable only for net losses due to injury caused by the Deepwater Horizon Incident. Other losses, *e.g.*, those due to the independent and superseding act of the United States government in imposing a moratorium on drilling, will not be reimbursed by BP under the OPA claims process. BP has voluntarily donated $100 million to the Gulf Coast Restoration and Protection Foundation, a supporting organization of The Baton Rouge Area Foundation ("BRAF"), to support moratorium-related claims. Accordingly, Wisner's claim for $53,000 in moratorium-related damages will not be reimbursed by BP.

**Claims Related to Natural Resource Damages Assessment**
A number of the items included in Wisner's claim relate to the assessment of natural resource damages. OPA contains very specific provisions on the parties entitled to recover the costs of natural resource damages assessment ("NRDA") and natural resource damages themselves. 33 U.S.C. §§ 2702(b)(2)(A), 2706. Only designated natural resource trustees are entitled to recover these sums. Wisner is not a designated natural resource trustee and is therefore not entitled to recover these costs.



EXHIBIT

4

LISKOW                                                                                    Page 2
August 20, 2010

**Claims for Response Costs**
OPA provides that response costs are recoverable by persons other than the United States, a State, or an
Indian Tribe only if the costs are consistent with the National Contingency Plan ("NCP"), 40 C.F.R. Part
300. 33 U.S.C. § 2702(b)(1)(B). In this matter, consistency with the NCP essentially means that the
actions and costs have been approved in advance by the Unified Command. The claims documentation
submitted to date does not indicate that Unified Command approved the claimed costs or actions.

**Treatment of Past and Future Costs**
BP appreciates that, as the Deepwater Horizon Incident and its effects unfolded, decisions needed to be
made and guidance on these decisions may not have been readily available. As such, in consideration of
Wisner's good faith actions at the time, BP will reimburse Wisner for past NRDA and removal costs even
though it is not legally obligated to do so. Future response costs incurred by Wisner must be approved in
advance by Unified Command to be reimbursable (in fact, payment for such costs would likely come
through the Unified Command structure). Future NRDA costs incurred by Wisner, however, will not be
reimbursed.

BP is aware that separate negotiations are underway with Wisner regarding access to Wisner property.
Any reimbursement agreement made in connection with securing access to the property would govern
reimbursement for future costs and activities.

**Individual Items Claimed for Reimbursement**
In addition to the categories addressed above, the adjuster excluded a number of individual items from
reimbursement. First, Wisner verbally indicated that its typical pre-incident expenditures with Feti and
Associates for services was approximately $4,000 per month. Accordingly, the reimbursement has been
reduced by Wisner's normal expenditures. The adjuster also excluded two invoices for GPS ($881.72)
and Golfcart ($14,445.07) equipment, which are viewed as capital expenditures and costs of doing
business. Finally, two invoices from Norman Wildlife Consulting ($12,222 and $12,310) were excluded
from reimbursement as Wisner indicated that the invoices were merely estimates and that the services had
not been performed.

In addition the items excluded, Wisner indicated that the overflight services by AeroData had been
performed in July, but that the report or photographs had not yet been received. BP is including payment
for the AeroData invoice ($22,750) on the express condition that BP receive a copy of the results of the
services upon receipt by Wisner. On a going forward basis, overflight costs would appear to be NRDA
related and BP does not intend to reimburse Wisner for future overflight costs.

Thank you for your continued cooperation in BP's response to the Deepwater Horizon Incident.
Hopefully, this letter will clarify the reimbursement status of certain categories of Wisner's claims,
allowing you to adjust future actions and claims accordingly.

Yours very truly,

Greg L. Johnson

GLJ:ddf
Enclosure

904702_1

bp

19 August 2010

Edward Wisner Foundation
1300 Perdido Street #8E06
New Orleans, LA 70112

Claim No: 6866-124-165586-3

Dear Sir or Madam:

BP deeply regrets the spill that has occurred in the Gulf of Mexico as a result of the Deepwater Horizon Incident and is working diligently to evaluate claims based on the supporting documentation provided by claimants. We are in the process of compensating individuals and businesses for damage to owned or leased property, economic damages resulting from destruction of owned or leased property, and loss of profits or impairment of earning capacity due to the injury, destruction, or loss of property or natural resources. Depending on the type of loss claimed and the substantiating documentation provided, payments may be made in lump sum amounts, or they may come in the form of interim payments. Where appropriate, the interim payments may be in the form of an advance payment on anticipated losses. Where advances are less than the adjusted loss calculated once additional documentation is provided to support the claim, supplemental payments will be issued for the difference.

Enclosed is a check on behalf of BP for $139,208.08 which is intended to compensate you, in whole or in part, for your claimed losses based on the information provided in your claim submission. This payment is in no way an admission of liability on the part of BP, an admission that your claimed losses are compensable under the Oil Pollution Act of 1990, or an admission that your claimed losses represent all or a part of an actual debt owed by BP. Ultimately, all losses you have or will incur must be reconciled with the payments BP has made to you, and any overpayments will be applied against payments for future claimed losses as evaluation of your claim continues. Any payments by BP should not be viewed as binding precedent that BP will continue to pay or reimburse any particular claims in the future.

By cashing this check, you acknowledge that BP has paid this amount as compensation for your claimed losses. However, signing or cashing this check does NOT constitute a release or a waiver of any legal rights regarding claims for additional losses that you may have incurred or may incur in the future as a result of the Deepwater Horizon Incident.

Please remember that you must continue to document any and all losses that you are claiming or that you intend to claim in the future.

Sincerely,

BP



EM 50 020905
FILE ID.
6866 124 165586-3            DATE 8/19/2010            $ $139,208.08

PAY One Hundred Thirty Nine Thousand Two Hundred Eight Dollars and 08/100

TO THE ORDER OF
EDWARD WISNER FOUNDATION

ZIP                                    AUTHORIZED SIGNATURE
                                       DATE OF EVENT 4/20/2010
FOR ADVANCE PAYMENT                    QUANT ORDERED 124
CLIENT 8P              COMMENT EDWARD WISNER FOUNDATION

Fleet National Bank, Hartford, CT

⑈                    04 4 5⑈     7 0 0 4 9 ⑈

# EDWARD WISNER DONATION ADVISORY COMMITTEE

## RESOLUTION

**WHEREAS,** the **EDWARD WISNER DONATION ADVISORY COMMITTEE** (the "**COMMITTEE**") and its interests have been impacted by the Deep Water Horizon Spill and the **COMMITTEE** desires to engage outside counsel for the purposes of representing and assisting the **COMMITTEE** in its response to the spill, including the restoration of Wisner property damaged by the spill, and of filing suit on the **COMMITTEE**'s behalf against BP, if necessary;

**WHEREAS,** the **COMMITTEE** has interviewed and discussed the potential engagement of the firm of Waltzer and Wiygul for the purpose of representing the **COMMITTEE**;

**WHEREAS,** at an Emergency Committee Meeting held on July 1, 2010 at which a quorum of the Committee members was present and acting throughout on motion duly made, seconded and carried, with one Committee member abstaining from the vote, the **COMMITTEE** decided by majority vote to retain Waltzer and Wiygul to represent the **COMMITTEE** and its interests in the BP oil spill cleanup; and

**WHEREAS,** at the regular monthly meeting of the **COMMITTEE** held on September 28, 2010, at which a quorum of the **COMMITTEE** members was present and acting throughout on motion, duly made, seconded and carried by majority vote, the following Resolution was adopted;

**NOW, THEREFORE,** the **COMMITTEE** desires to take the following action:

1)   To proceed with engaging Waltzer and Wiygul to represent the **COMMITTEE** in the BP matter; and

2)   To authorize the Secretary/Treasurer of the **COMMITTEE** to sign a Retainer Agreement with Waltzer and Wiygul on behalf of the **COMMITTEE**.

## CERTIFICATE

I, the undersigned Secretary Treasurer/Land Manager of the **EDWARD WISNER DONATION ADVISORY COMMITTEE,** hereby certify that the above is a true, full, complete and correct copy of the Resolution adopted, on motion duly made and seconded, at a meeting of the **EDWARD WISNER DONATION ADVISORY COMMITTEE** held on September 28, 2010 at which at least a quorum of the Committee Members was present and that the Resolution is duly entered into the minutes of said meeting, and is now in full force and effect and has not been amended, changed, modified, rescinded, or repealed in any way.

**WITNESS MY SIGNATURE,** this 28th day of September, 2010.

SECRETARY TREASURER/LAND MANAGER

**EXHIBIT**

5

| WWG INVOICED HOURS | | | | |
|---|---|---:|---:|---:|
| | | JW | RW | Total |
| 2010 | September | 29.4 | 63.4 | 92.8 |
| | October | 28.3 | 57.9 | 86.2 |
| | November | 39.3 | 68.6 | 107.9 |
| | December | 29.3 | 20.2 | 49.5 |
| | *Sub-Total* | *126.3* | *210.1* | *336.4* |
| 2011 | January | 42.4 | 28.3 | 70.7 |
| | February | 31.3 | 33.2 | 64.5 |
| | March | 4.5 | 12.5 | 17.0 |
| | April | 1.6 | 0.0 | 1.6 |
| | May | 32.4 | 10.7 | 43.1 |
| | June | 8.3 | 21.4 | 29.7 |
| | July | 1.7 | 12.3 | 14.0 |
| | August | 5.5 | 8.1 | 13.6 |
| | September | 18.3 | 12.5 | 30.8 |
| | October | 7.5 | 14.5 | 22.0 |
| | November | 4.0 | 19.5 | 23.5 |
| | December | 7.3 | 21.4 | 28.7 |
| | *Sub-Total* | *164.6* | *194.4* | *359.0* |
| 2012 | January | 3.5 | 17.3 | 20.8 |
| | February | 12.0 | 11.9 | 23.9 |
| | March | | 39.8 | 39.8 |
| | *Sub-Total* | *15.5* | *69.0* | *84.5* |
| TOTAL | | 306.4 | 473.5 | 779.9 |



EXHIBIT

6

| TASK | Estimated Time | |
|---|:---:|:---:|
| | JW | RW |
| Review Donation Trust Materials, Meetings and Conferences with Personnel | 4 | 10 |
| Communicate with state agencies re site visits, information sharing, etc. | 8 | 25 |
| Negotiate access agreements and information sharing with researchers | 4 | 20 |
| Communicate and advise WD employees on day to day preservation and other issues | 4 | 40 |
| Draft and Negotiate Access Agreement | 32 | 10 |
| Research/Review Spill and Response Studies | 8 | 30 |
| Research/Review Coastal Studies incl. Donation Property | 16 | 20 |
| Research/Review Tropical Storm/Tide Data | 8 | 15 |
| Vet and Hire Experts | 4 | 12 |
| FOIA/Review re: Permitting on Breach Closures | 4 | 0 |
| Research/Review Coastal Restoration Plans | 8 | 20 |
| Onsite Meetings with Experts – 2 days | 16 | 0 |
| Draft/ File Donation Complaint and Profile form | 16 | 25 |
| Research/Download Satellite/Aerial Spill Imagery; Fouchon Beach | 8 | 6 |
| Motion for Partial Summary Judgment Access Agreement | 8 | 40 |
| Draft LDEQ Challenge to Clean Up Endpoints | 4 | 0 |
| Litigate STR/Clean Up Endpoints/Mitigation at UIC | 16 | 30 |
| Drafted WD Prelim. Injunction | 16 | 8 |
| Research and Evaluate Sediment Removal Damages | 8 | 2 |
| FOIA, Review, and Catalog UIC/BP Response Docs | 32 | 40 |
| Prepare and Meet CPRA and USCOE Officials re: Caminada Restoration | 4 | 15 |
| Review SCAT, ERMA, Evid. for oiling damage to other Donation properties | 4 | 0 |
| Negotiate cleanup terms with BP, government entities, and contractors | 0 | 30 |
| Monitoring and advice on Caminada Headlands and BBBS | 0 | 20 |
| Negotiate terms of hard structure removal with BP, UIC and Parish | 4 | 40 |
| Review NRDA Projects for Related Science | 8 | 12 |
| Reviewed & Organize Travirca Evidence re Oiling, Response, and Damage | 12 | 18 |
| Meet Experts re: methodologies, needs | 8 | 30 |
| Site Visits (not included above) | 40 | 24 |
| Prepare, Distribute Client Reports | 32 | 50 |
| Prepare Settlement Analysis & Demand | 16 | 20 |
| WDAC Meetings | 16 | 16 |
| Assist preparng client testimony on Congressional Panel & attend | 12 | 0 |
| Prepared GIS & DHECC claims, SCAT line analysis, zone and SCAT challenges | 48 | 0 |
| Administrative including transfer of file, etc. | 32 | 40 |
| AA Interim Claim Preparation | 32 | 20 |
| **TOTAL HOURS** | **492** | **688** |

**WWG UNCOMPENSATED WORK DONE FOR WISNER DONATION**

EXHIBIT

7

**PLAINTIFFS' LIAISON COUNSEL**
**IN RE: DEEPWATER HORIZON**
**MDL No. 2179**

JAMES PARKERSON ROY
Domengeaux Wright Roy & Edwards LLC
556 Jefferson St. Suite 500
Lafayette, LA. 70501
E-Mail: jimr@wrightroy.com
Telephone: (337) 233-3033
Fax No. (337) 233-2796

STEPHEN J. HERMAN
Herman, Herman Katz & Cotlar LLP
820 O'Keefe Avenue
New Orleans, LA 70113
E-Mail: sherman@hhkc.com
Telephone: (504) 581-4892
Fax No. (504) 561-6024

May 16, 2012

The Honorable Joseph C. Wilkinson, Jr.
United States Magistrate Judge
500 Poydras Street, Room B409
New Orleans, Louisiana 70130

Dear Judge Wilkinson:

As Plaintiffs' Co-Liaison Counsel, and as retained outside counsel to the City of New Orleans, a Wisner Donation beneficiary whose mayor serves as the Donation's trustee, we would respectfully request permission to attend the Court's Telephone Status Conference on May 29, 2012 [Doc 6521] (enclosed).

We appreciate the Court's consideration in this matter.

Respectfully submitted,

STEPHEN J. HERMAN
JAMES PARKERSON ROY
*Plaintiffs Liaison Counsel*
*(and Counsel to the City of New Orleans)*

Enclosures
cc: Don K. Haycraft, Esq.
    Joel Waltzer, Esq.



EXHIBIT

8

UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF LOUISIANA

| | |
|---|---|
| IN RE OIL SPILL BY THE OIL RIG "DEEPWATER HORIZON" IN THE GULF OF MEXICO ON APRIL 20, 2010 | CIVIL ACTION<br><br>MDL 2179 |
| Member Case: In re: Triton Asset Leasing; <br>        Civil Action No. 10-2771 (Wisner Donation<br>        Motion for Partial Summary Judgment) | SECTION "J" (1) |

## ORDER

A status conference by telephone is hereby set in this matter on **May 29, 2012 at 3:00 p.m.** before Magistrate Judge Joseph C. Wilkinson, Jr.  Counsel for the Wisner Donation and BP only must participate in the conference by contacting my office at 504-589-7630 at the designated time, prepared to discuss (1) the status of their discussions concerning resolution of the issues raised in the motion for partial summary judgment, including attorneys' fees, and (2) whether the motion may now be dismissed without prejudice to being renoticed for submission at a later date, if necessary, in light of those discussions.

New Orleans, Louisiana, this _____15th_____ day of May, 2012.

JOSEPH C. WILKINSON, JR
UNITED STATES MAGISTRATE JUDGE

**CLERK TO NOTIFY:**
**HON. CARL J. BARBIER**

**NOTICE OF MANUAL ATTACHMENT**

Exhibit 9 to Declaration of Joel Waltzer

July 22, 2014 correspondence from Soren Gisleson to Michael Peneguy

Privileged Communication between WDAC Committee Member Michael Peneguy and Soren E.
Gisleson

**NOTICE OF MANUAL ATTACHMENT**

Exhibit 10 to Declaration of Joel Waltzer

Wisner Summary of Damages

Settlement Materials Protected by Order of this Court dated October 27, 2016 (MDL Doc. 21852).

## FULL AND FINAL RELEASE, SETTLEMENT, AND COVENANT NOT TO SUE

1. Definitions: For purposes of this Full and Final Release, Settlement, and Covenant Not to Sue ("Release Agreement"), the following definitions shall apply, and in the case of defined nouns the singular shall include the plural and vice versa:

   a. "Affiliate" means, with respect to any entity, any natural person or other entity that directly or indirectly, through one or more intermediaries, controls, or is controlled by, or is under common control with, such entity.

   b. "BP Entities" shall mean BP p.l.c., BP America Production Co., BP Corporation North America Inc., BPXP, and any Affiliates, corporate parents, subsidiaries, predecessors, successors, indemnitors, subrogees, assigns, officers, directors, employees, agents, and representatives of any of the foregoing.

   c. "BPXP" shall mean BP Exploration & Production Inc.

   d. "Claimant" shall mean **EDWARD WISNER DONATION**, individually, and the Claimant's Related Parties.

   e. "Claimant's Related Parties" shall mean Claimant's Affiliates, corporate parents, subsidiaries, predecessors, successors, indemnitors, subrogees, assigns, officers, directors, employees, agents, representatives, trustees, insurers, reinsurers, heirs, beneficiaries, estates, executors, administrators, receivers, conservators, personal representatives, and any natural, legal, or juridical person or entity entitled or empowered to assert any claim on behalf of or in respect of Claimant, including if Claimant is a natural person any spouse of Claimant and if Claimant is a sole proprietorship any spouse of Claimant's proprietor.

   f. "CSSP" shall mean the *Deepwater Horizon* Court Supervised Settlement Program established in MDL 2179 pursuant to the EPD Settlement Agreement.

   g. "CSSP Claims" shall mean any claims filed in the CSSP.

   h. "*Deepwater Horizon* Incident" shall mean events, actions, inactions, and omissions leading up to and including the following: (i) all discharges of hydrocarbons or other substances from the Macondo Well, including discharges from, through, or into the *Deepwater Horizon* mobile offshore drilling unit (including its appurtenances), occurring on or after April 20, 2010, regardless of any subsequent movement of such hydrocarbons or other substances; (ii) the blow-out of the Macondo Well; (iii) the explosion and fire on the *Deepwater Horizon*; (iv) the sinking and/or loss of the *Deepwater Horizon*; (v) any and all containment efforts related to the Macondo Well; (vi) construction of relief wells related to the Macondo Well; (vii) any and all clean-up, remediation, removal, response, and/or restoration efforts related to the foregoing, including but not limited to the Vessels



EXHIBIT
11

of Opportunity program, the application of dispersants, and any diversion of fresh water; and (viii) operations of any claims facility related to the foregoing.

i.   "Economic Claims" shall mean any claim or cause of action related to economic loss, lost profits, lost earnings, lost income, property damage (including without limitation physical damage, diminished value, stigma, and lost or diminished sales or rentals), lost commissions, lost donations, lost contributions, lost grants, business interruption, breach of contract, loss of royalties, loss of subsistence use of natural resources, operating costs, or any other costs, losses, or damages, including without limitation any claim arising out of the Oil Pollution Act ("OPA"), 33 U.S.C. § 2702(b), state or federal common law, statute, or regulation, maritime law, tribal law, or any other applicable provision of law.

j.   "EPD Settlement Agreement" shall mean the Economic and Property Damages Settlement Agreement executed April 18, 2012, and approved by the United States District Court for the Eastern District of Louisiana on December 21, 2012.

k.   "Macondo Well" shall mean: (i) Macondo Well 1 (including MC-252#1, Well No. 001ST00BP00, MC-252#1 ST1, Well No. 001ST00BP01), Macondo Well 2 (including MC-252#2, Well No. 003ST00BP00), and Macondo Well 3 (including MC-252#3, Well No. 002ST00BP00) within Block 252, Mississippi Canyon, OCS Official Protraction Diagram, NH 16-10 existing on or before the date of lodging of the Consent Decree; (ii) the *Deepwater Horizon* and its appurtenances, including the riser from the *Deepwater Horizon*; (iii) a coffer dam used in the course of removal work conducted during the discharge of oil from Block 252 of the Mississippi Canyon that began April 20, 2010; (iv) "the Macondo Well" as defined in the United States' Complaint in MDL 2179; and (v) the eight aliquots within Block 252, Mississippi Canyon, OCS Official Protraction Diagram, NH 16-10.

l.   "MDL 2179" shall mean the multidistrict litigation pending before the United States District Court for the Eastern District of Louisiana, titled *In re Oil Spill by the Oil Rig "Deepwater Horizon" in the Gulf of Mexico, on April 20, 2010* (MDL 2179), including any and all claims or causes of action or theories of loss or damage that have been filed within, referred to, or otherwise consolidated thereunder.

m.   "MDL 2185" shall mean the multidistrict litigation pending before the United States District Court for the Southern District of Texas, titled *In re: BP p.l.c. Securities Litigation* (MDL 2185), including any and all claims or causes of action or theories of loss or damage that have been filed within, referred to, or otherwise consolidated thereunder.

n.   "Medical Claims" shall mean claims or causes of action that have been or could have been brought in connection with (i) personal injury or bodily injury (including disease, mental or physical pain or suffering, emotional or mental harm, or anguish or loss of enjoyment of life), and any progression and/or exacerbation of personal injury or bodily injury, where such injury, progression, and/or exacerbation in

whole or in part arose from, was due to, resulted from, or was related to, directly or indirectly, the *Deepwater Horizon* Incident, or wrongful death and/or survival actions as a result of such injury, progression, and/or exacerbation; (ii) loss of support, services, consortium, companionship, society, or affection, or damage to familial relations arising out of any personal injury or bodily injury (including disease, mental or physical pain or suffering, emotional or mental harm, or anguish or loss of enjoyment of life) to another person, and any progression and/or exacerbation of personal injury or bodily injury to another person, where such injury, progression, and/or exacerbation in whole or in part arose from, was due to, resulted from, or was related to, directly or indirectly, the *Deepwater Horizon* Incident, or wrongful death and/or survival actions as a result of such personal or bodily injury; (iii) increased risk, possibility, or fear of suffering in the future from any disease, injury, illness, emotional or mental harm, condition, or death, in whole or in part arising out of, due to, resulting from, or relating in any way to, directly or indirectly, the *Deepwater Horizon* Incident; and/or (iv) medical screening and medical monitoring for undeveloped, unmanifested, and/or undiagnosed conditions that may in whole or in part arise out of, result from, or relate to, directly or indirectly, the *Deepwater Horizon* Incident.

o.   "Moratoria" shall mean any federal or state governmental action or inaction directed at offshore oil or gas industry activity, including shallow water and deepwater operations, that occurred on or after April 20, 2010, including, but not limited to, the federal moratoria on offshore permitting and drilling activities, effective date May 30, 2010 (NTL No. 2010-N04), the increased safety measures issued by the U.S. Department of the Interior, effective date June 8, 2010 (NTL No. 2010-N05), the information requirements issued by the U.S. Department of the Interior, effective date June 18, 2010 (NTL No. 2010-N06), the federal deepwater drilling suspensions on or about July 12, 2010, and any other new or revised safety rules, regulations, inspections, permitting practices, restrictions, or suspensions.

p.   "Released Claims" shall mean any and all claims or causes of action, whether in law or in equity, known or unknown, direct or indirect, past, present, or future, arising from or related to the *Deepwater Horizon* Incident, or arising from or related to Moratoria. "Released Claims" includes but is not limited to (i) Economic Claims; (ii) CSSP Claims; (iii) Medical Claims; (iv) claims filed with any BP Entity, the Gulf Coast Claims Facility, the federal Oil Spill Liability Trust Fund, any state or local spill fund, and any other claims facility or fund; (v) any claims that were or could have been asserted by Claimant in MDL 2179, MDL 2185, or both; and (vi) any claims, including without limitation claims for economic damages, punitive damages, exemplary damages, liens, injunctive relief, or other liabilities, that were or could have been asserted by Claimant in any proceeding. For the avoidance of doubt, "Released Claims" includes any and all such claims or causes of action regardless of the legal or equitable theory or nature under which they are based or advanced including (but not limited to) legal and/or equitable theories under any federal, state, local, tribal, administrative, or international law, and including (without limitation) statutory law, codal law, regulation, common law, or equity,

and whether based in maritime law, strict liability, negligence, gross negligence, punitive damages, nuisance, trespass, or all other legal and equitable theories, whether existing now or arising in the future, arising from or in any way relating to the *Deepwater Horizon* Incident, or arising from or related to Moratoria. Notwithstanding the foregoing, "Released Claims" shall not include (i) claims for punitive or exemplary damages against Transocean Inc., Transocean Holdings LLC, Transocean Ltd., Transocean Deepwater Inc., Transocean Offshore Deepwater Drilling Inc., Triton Asset Leasing GmbH, Halliburton Energy Services Inc., and/or Halliburton Company, and/or (ii) CSSP Claims and individual lawsuits filed by one or more of the individual Claimant's Related Parties unrelated to any claimed or potential beneficial, ownership, and/or successor interest in Claimant or the Claimant's property.

q.   "Released Parties" shall mean anyone who is or could be responsible or liable in any way for the *Deepwater Horizon* Incident, Moratoria, or any damages related thereto, including (but not limited to) those liable for the Released Claims, whether a natural, legal, or juridical person or entity or a government entity, including but not limited to (i) the BP Entities; (ii) contractors and subcontractors of the BP Entities; (iii) the parties listed on Attachment A hereto and any related parties indemnified by any BP Entity with respect to the *Deepwater Horizon* Incident and/or Moratoria; (iv) the Deepwater Horizon Oil Spill Trust dated August 6, 2010; (v) the federal Oil Spill Liability Trust Fund and any state or local fund; and (vi) for each of the foregoing, their respective Affiliates, corporate parents, subsidiaries, predecessors, successors, indemnitors, subrogees, assigns, officers, directors, employees, agents, representatives, trustees, insurers, reinsurers, heirs, beneficiaries, estates, executors, administrators, receivers, conservators, and personal representatives.

r.   The verb "releases," "released," and its cognate forms shall mean all forms of acts or deeds to release, acquit, forever discharge, and covenant not to sue on any sort of claim.

2.   In consideration of the payment of a total of **$30,000,000** from BPXP, to be paid in portions in accordance with the payment schedule set forth in the table below, and any previous payments Claimant has received in respect of Released Claims, Claimant hereby releases and covenants not to sue BPXP, all other BP Entities, and all other Released Parties from and for any and all Released Claims that Claimant may have or purport to have.

| Date | Payment Amount |
| --- | --- |
| October 1, 2016 | $5,000,000 |
| October 1, 2017 | $5,000,000 |
| October 1, 2018 | $1,500,000 |
| October 1, 2019 | $1500,000 |
| October 1, 2020 | $1,500,000 |
| October 1, 2021 | $1,000,000 |
| October 1, 2022 | $1,000,000 |

| | |
|---|---|
| October 1, 2023 | $1,000,000 |
| October 1, 2024 | $1,000,000 |
| October 1, 2025 | $1,000,000 |
| October 1, 2026 | $1,000,000 |
| October 1, 2027 | $1,000,000 |
| October 1, 2028 | $1,000,000 |
| October 1, 2029 | $1,000,000 |
| October 1, 2030 | $1,000,000 |
| October 1, 2031 | $1,000,000 |
| October 1, 2032 | $1,000,000 |
| October 1, 2033 | $1,000,000 |
| October 1, 2034 | $1,000,000 |
| October 1, 2035 | $500,000 |
| October 1, 2036 | $500,000 |
| October 1, 2037 | $500,000 |

3.   Claimant agrees and understands that the consideration granted in Paragraph 2 above constitutes full, complete, sufficient, and total satisfaction of all Released Claims against all Released Parties.

4.   Claimant shall not assert against any Released Party any Released Claim, whether known or unknown, whether present or future, whether direct or indirect, and whether legal or equitable, arising from or in any way relating to the *Deepwater Horizon* Incident or arising from or in any way relating to Moratoria.

5.   By executing this Release Agreement, Claimant warrants and understands that it is forever giving up and discharging, without any right of legal recourse whatsoever, any and all rights it has or may have to the Released Claims against the Released Parties. Claimant agrees that Claimant, and all other natural persons or entities claiming by, through, or on behalf of Claimant, including Claimant's Related Parties, will forever be barred and enjoined from commencing, filing, initiating, instituting, prosecuting, maintaining, or consenting to any judicial, arbitral, or regulatory action against the BP Entities and/or any other Released Parties with respect to the Released Claims.

6.   Claimant further warrants and understands that it is forever giving up and discharging any rights it may have as to any costs, damages, causes of action, claims, or other relief (including attorneys' fees) arising from or related to the *Deepwater Horizon* Incident, or arising from or in any way relating to Moratoria, even if Claimant is not currently aware of such costs or damages and even if such costs or damages arise in the future (e.g., additional oil impacts) or do not manifest themselves until some future date. Claimant expressly waives and releases with prejudice, and shall be deemed to have released and waived with prejudice, any and all rights that it may have under any law, codal law, statute, regulation, adjudication, quasi-adjudication, decision, administrative decision, common law principle, or other source of legal, equitable, regulatory, or other authority, that would otherwise limit the effect of this Release Agreement to those claims or matters actually known or suspected to exist at the time

of execution of the Release Agreement. **CLAIMANT ACKNOWLEDGES THAT THIS CERTIFICATION IS CONSPICUOUS AND AFFORDS FAIR AND ADEQUATE NOTICE.**

7.   To the extent that Claimant has retained, engaged, employed, or otherwise utilized a private attorney, accountant, expert, or other service provider to represent or otherwise assist Claimant in connection with a Released Claim, Claimant and Claimant's counsel acknowledge and agree that Claimant, and not the Released Parties, is solely responsible for any attorneys' fees and costs, accountants' fees and costs, experts' fees and costs, and other service providers' fees and costs.

8.   If Claimant commences, files, initiates, or institutes any new action or other proceeding for any Released Claim against any Released Party in any federal or state court, arbitral tribunal, or administrative or other forum, (a) such action or other proceeding shall be dismissed with prejudice and at Claimant's cost; provided, however, before any costs may be assessed, Claimant shall be given reasonable notice and an opportunity voluntarily to dismiss such new action or proceeding with prejudice; and (b) the respective Released Party shall be entitled to recover any and all related costs and expenses (including attorneys' fees) from any Claimant in violation or breach of its obligations under this Release Agreement.

9.   By executing this Release Agreement, Claimant acknowledges that it understands it has the right to consult an attorney of its choosing prior to accepting any settlement payment or signing any release of legal rights and warrants that it has done so to its satisfaction prior to execution of this Release Agreement.

10.  By executing this Release Agreement, Claimant warrants that it has read and understood the terms of the Release Agreement and that it executes the Release Agreement voluntarily and without being pressured or influenced by, or relying on, any statement or representation made by any person acting on behalf of any BP Entity or other Released Party.

11.  In consideration of the benefits provided under this Release Agreement, all Released Claims by or on behalf of Claimant against any and all Released Parties shall be dismissed with prejudice in any lawsuit in which Claimant is a party. Within ten (10) days of the date of execution of this Release Agreement by both Claimant and BPXP, Claimant shall file or cause to be filed a notice of dismissal with prejudice of any and all litigation concerning any Released Claims filed by or on behalf of Claimant against the BP Entities or any other of the Released Parties, in the form specified in Attachment B. Also within ten (10) days of the execution of this Release Agreement by both Claimant and BPXP, Claimant shall file or cause to be filed a notice of withdrawal with prejudice of all pending CSSP Claims, Medical Claims, and claims filed with any BP Entity, the Gulf Coast Claims Facility, the federal Oil Spill Liability Trust Fund, any state or local spill fund, and any other claims facility or fund, by or on behalf of Claimant (if any). Claimant also will withdraw from any existing class action and will not join any new class actions or similar procedural devices concerning the Released Claims. However, Claimant's Related Parties shall not be required to withdraw from the EPD Settlement Class, nor to withdraw any individual CSSP Claims or lawsuits by

Claimant's Related Parties that are unrelated to any claimed or potential beneficial, ownership, and/or successor interest in Claimant or the Claimant's property.

12. As this Release Agreement is fully and completely resolving the Released Claims, the BP Entities are hereby subrogated to any and all rights that Claimant or any of Claimant's Related Parties have for Released Claims. This Release Agreement is not intended to prevent any BP Entity from exercising its rights of contribution, subrogation, or indemnity under OPA or any other law, other than the BP Entities warrant they will not seek to have Claimant or Claimant's Related Parties named as defendants or third-party defendants in any such subsequent proceeding. However, and for the avoidance of any doubt, neither Claimant nor Claimant's Related Parties shall have any obligation or duty to defend, indemnify, or hold the BP Entities harmless from any action or claim that may be taken or brought by the United States, the State of Louisiana, or other governmental body or authority against one or more of the BP Entities arising from or in any way relating to the *Deepwater Horizon* Incident or arising from or in any way relating to Moratoria.

13. For any properties that are the subject of the Released Claims and were oiled as a result of the *Deepwater Horizon* Incident, Claimant agrees as follows:

   a. Claimant shall record notice in the title for such property in the form attached hereto as Attachment C. The recording must be sufficiently descriptive so as to put any future owner(s) of the property or properties on notice of the oiling and of the releases as to such property or properties granted in this Release Agreement.

   b. By signing this Release Agreement, Claimant understands and warrants that it is forever giving up and discharging any right to require any cleanup or remediation of the property or properties. The rights and releases granted in this Release Agreement, including the release of any right to require any cleanup or remediation of the property or properties, are covenants running with the land and are binding upon the heirs, administrators, successors, and assigns of Claimant, including any tenants or lessees of Claimant and any subsequent purchaser or owner of such property or properties, and inure to the benefit of the Released Parties.

   c. Claimant warrants and represents, with respect to the Released Claims, that the Claimant and/or one or more of the Claimant's Related Parties collectively own, and was or were at the time of any alleged oiling or related response the owner(s), of 100 percent of the Edward Wisner Donation property or properties that are the subject of the Released Claims. Claimant and Claimant's Related Parties reserve any and all actions, rights, defenses and/or claims relating to any of their respective interests in the Edward Wisner Donation, including without limitation the governance, termination, continuation, succession, ownership, management, obligations, and incurrence or disposition of the revenues, expenses, property, assets, and/or liabilities of the Edward Wisner Donation; provided, however, that none of the BP Entities shall be named as defendants or third-party defendants by the Claimant's Related Parties in any such suits, actions, or claims.

14. The payment to Claimant is made without any admission of liability or wrongdoing by BPXP, any other BP Entity, or any other Released Party, and is made purely by way of compromise and settlement.

15. The United States District Court for the Eastern District of Louisiana will retain jurisdiction over this Release Agreement for the purposes of enforcement of the Release Agreement and any dispute(s) arising thereunder.

16. Any and all disputes, cases, or controversies concerning this Release Agreement, including without limitation disputes concerning the interpretation or enforceability of this Release Agreement, shall be filed (a) in the United States District Court for the Eastern District of Louisiana accompanied by a legal request made on behalf of any complainant party (whether one or more of the Released Parties, the Claimant, any of the Claimant's Related Parties, or otherwise) for such dispute to be made part of MDL 2179, or (b) if, but only if, MDL 2179 has been terminated by the time any dispute concerning this Release Agreement is filed, in any United States District Court with venue. No action(s) concerning this Release Agreement shall be filed in any state court. Claimant and the Released Parties agree not to contest the existence of federal jurisdiction in MDL 2179 (or, if, but only if, MDL 2179 has been terminated by the time any dispute concerning this Release Agreement is filed, a United States District Court with venue).

17. This Release Agreement constitutes the final, complete, and exclusive agreement and understanding between BPXP and Claimant and supersedes any and all other agreements, written or oral, between any BP Entity and Claimant with respect to such subject matter of this Release Agreement.

18. Claimant shall not make any public statement disparaging any BP Entity with respect to this Release Agreement.

19. Nothing contained in this Release Agreement shall change or be construed as changing any Released Parties duties or obligations to any federal or state governmental entity imposed under now existing applicable law, including the Oil Pollution Act, the Oil Spill Liability Trust or any other applicable federal, state or local law.

20. In the event that any provision of this Release Agreement shall be found invalid, the other provisions of the Agreement are deemed to be separable and remain in effect.

21.   Payment shall be made according to the following instructions:

      Tax ID (SSN or EIN):            ███████

      W-9 Form Attached

      Payment Method (Check or Bank Wire):    Bank Wire

      Mailing Address (for Check):

            Mail To:                  _____

            Street Address:            _____

            City/State/Zip Code:      _____

      Wire Transfer Instructions (for Bank Wire):

            Bank Name:              Whitney National Bank

            SWIFT/BIC Code (if applicable): WHITUS444

            Routing Transit Number:     ███████

            Bank Street Address:      228 St. Charles Avenue

            Bank City/State/Zip Code    New Orleans, La 70130

            Account Number: ██████8700

            Name:    Edward Wisner Donation Advisory Committee

22.   This Release Agreement shall remain effective regardless of any appeals or court decisions relating in any way to the liability of the Released Parties.

23.     Claimant promises, agrees, acknowledges, represents, warrants, and covenants as follows: Claimant shall not assign or reassign, or attempt to assign or reassign, to any person or entity other than a BP Entity any rights or claims arising from or in any way related to the *Deepwater Horizon* Incident, or any rights or claims arising from or in any way related to Moratoria. Any such assignment or reassignment, or attempt to assign or reassign, to any natural person or entity other than a BP Entity shall be void, invalid, and of no force and effect. However, nothing in this Paragraph prevents any of Claimant's Related Parties from transferring any beneficial or successor interest, if any, that he, she, or it might have in some or all of the settlement proceeds due to Claimant.

24. Claimant represents and warrants that Claimant's undersigned representative has authority to execute this Release Agreement on behalf of Claimant and Claimant's Related Parties, and undersigned counsel hereby states that he or she verifies and is of the opinion that Claimant's undersigned representative has authority to execute this Release Agreement on behalf of Claimant and Claimant's Related Parties. Claimant further represents and warrants that (a) it is the sole and lawful owner of all right, title, and interest in and to every Released Claim and every matter that it purports to release; it is has not sold, assigned, transferred, hypothecated, pledged, or encumbered, or otherwise disposed of, in whole or in part, voluntarily or involuntarily, any Released Claim or any interest in such Released Claims; and no other party has any lien, security interest, or other legal or equitable right, title, or interest in any Released Claim; and (b) it has not made an insurance claim or received any insurance proceeds for any business or property claim arising from or in any way relating to any Released Claim. **CLAIMANT ACKNOWLEDGES THAT THIS CERTIFICATION COMPLIES WITH ANY REQUIREMENT TO EXPRESSLY STATE THAT LIABILITY FOR SUCH CLAIMS IS INDEMNIFIED AND THAT THIS CERTIFICATION IS CONSPICUOUS AND AFFORDS FAIR AND ADEQUATE NOTICE.**

25. If Claimant is a natural person who has a living spouse, such spouse must personally sign below. If Claimant is a sole proprietorship and the proprietor thereof has a living spouse, such spouse of such proprietor must personally sign below. If Claimant is jointly owned by natural persons married to one another, both such spouses must personally sign below. As to each signature referenced in this paragraph, an electronic signature is insufficient. By signing below, each spouse represents and warrants that such spouse intends to, and does, release all Released Claims, including for the avoidance of doubt any marital interest in any Released Claim.

| | |
|---|---|
| **Claimant:** | EDWARD WISNER DONATION |
| Claimant Signatory/Title (if applicable): | |
| Signed: | |
| Printed Signatory Name: | MAYOR MITCH LANDRIEU |
| Date: | MAY 17, 2016 |
| **Law Firm Name:** | |
| Signed: | |
| Printed Counsel Name: | |

24. Claimant represents and warrants that Claimant's undersigned representative has authority to execute this Release Agreement on behalf of Claimant and Claimant's Related Parties, and undersigned counsel hereby states that he or she verifies and is of the opinion that Claimant's undersigned representative has authority to execute this Release Agreement on behalf of Claimant and Claimant's Related Parties. Claimant further represents and warrants that (a) it is the sole and lawful owner of all right, title, and interest in and to every Released Claim and every matter that it purports to release; it is has not sold, assigned, transferred, hypothecated, pledged, or encumbered, or otherwise disposed of, in whole or in part, voluntarily or involuntarily, any Released Claim or any interest in such Released Claims; and no other party has any lien, security interest, or other legal or equitable right, title, or interest in any Released Claim; and (b) it has not made an insurance claim or received any insurance proceeds for any business or property claim arising from or in any way relating to any Released Claim. **CLAIMANT ACKNOWLEDGES THAT THIS CERTIFICATION COMPLIES WITH ANY REQUIREMENT TO EXPRESSLY STATE THAT LIABILITY FOR SUCH CLAIMS IS INDEMNIFIED AND THAT THIS CERTIFICATION IS CONSPICUOUS AND AFFORDS FAIR AND ADEQUATE NOTICE.**

25. If Claimant is a natural person who has a living spouse, such spouse must personally sign below. If Claimant is a sole proprietorship and the proprietor thereof has a living spouse, such spouse of such proprietor must personally sign below. If Claimant is jointly owned by natural persons married to one another, both such spouses must personally sign below. As to each signature referenced in this paragraph, an electronic signature is insufficient. By signing below, each spouse represents and warrants that such spouse intends to, and does, release all Released Claims, including for the avoidance of doubt any marital interest in any Released Claim.

| | |
|---|---|
| **Claimant:** | **EDWARD WISNER DONATION** |
| Claimant Signatory/Title (if applicable): | |
| Signed: | |
| Printed Signatory Name: | |
| Date: | |
| Law Firm Name: | Herman Herman + Katz, LLC |
| Signed: | |
| Printed Counsel Name: | Stephen J. Herman |

Date: _____

**Spouse (if applicable):**

Signed: *N/A* _____

Printed Spouse Name: _____

Date: _____

**Accepted by BPXP:**

By: _____

Date: *June 6, 2016* _____

**Attachment A**

**Released Parties**

Airborne Support Inc.
Airborne Support International Inc.
Alaska Clean Seas, Inc.
Anadarko Exploration & Production LP
Anadarko E&P Company LP
Anadarko Petroleum Corporation
Art Catering, Inc.
Cameron Corporation
Cameron International Corporation
Cameron International Corporation f/k/a Cooper Cameron Corporation
Cameron International Corporation d/b/a/ Cameron Systems Corporation
Crowder Gulf Disaster Recovery
Court Supervised Settlement Program in MDL 2179
and its Administrators, Employees, and Agents
Deepwater Horizon Oil Spill Trust, Trustees and Employees
Det Norske Veritas (DNV)
Dril-Quip, Inc.
DRC Emergency Services, Inc.
DRC Marine, LLC
Dynamic Aviation
Kenneth Feinberg
Feinberg Rozen LLP
Fluor Corporation
Gulf Coast Claims Facility, Administrators, Employees, and Agents
Halliburton Company
Halliburton Energy Services, Inc.
International Air Response
LLOG Exploration Offshore, L.L.C.
LLOG Bluewater, L.L.C.
LLOG Bluewater Holdings, L.L.C.
Lloyd's Syndicate 1036 and other Lloyd's Syndicates named as defendants in MDL 2179
Lynden Companies
Marine Spill Response Corporation
Mitsui & Co., Ltd.
Mitsui & Co. (U.S.A.), Inc.
Mitsui Oil Exploration Co., Ltd.
Ministry of Economy, Trade and Industry of the Government of Japan
M-I Drilling Fluids L.L.C.
M-I, LLC a/k/a M-I Swaco
MOEX Offshore 2007 LLC
MOEX USA Corporation
Moran Environmental Recovery

Nalco Company
NALCO Holding Company
National Response Corporation
O'Brien's Response Management
Oceaneering International, Inc.
Oil Spill Liability Trust Fund
Parsons Commercial Technology Group, Inc.
QBE Marine & Energy Syndicate 1036
QBE Underwriting Ltd.
Schlumberger, Ltd.
SEACOR Marine
SEACOR Holdings, Inc.
SEACOR Offshore LLC
Sperry Drilling Services f/k/a Sperry Sun Drilling Services
The Response Group, LLC
Tidewater Inc.
Tidewater Marine, LLC
Transocean Deepwater Inc.
Transocean Holdings LLC
Transocean Inc.
Transocean Ltd.
Transocean Offshore Deepwater Drilling Inc.
Triton Asset Leasing GmbH
Weatherford International, Inc.
Weatherford U.S. L.P.
Witt O'Brien's
Worley Catastrophe Services LLC
Worley Companies Inc.

**Attachment B**

Form of Notice of Dismissal

## UNITED STATES DISTRICT COURT
## EASTERN DISTRICT OF LOUISIANA

| | | |
|---|---|---|
| In re: Oil Spill by the Oil Rig | * | MDL No. 2179 |
| "Deepwater Horizon" in the Gulf of | * | |
| Mexico, on April 20, 2010 | * | SECTION: J |
| | * | |
| This Document Relates to: | * | JUDGE BARBIER |
| | * | |
| **EDWARD WISNER DONATION** | * | MAGISTRATE JUDGE |
| | * | SHUSHAN |
| Docket Number(s) | * | |
| Short Form Joinder Number(s) | * | |

### NOTICE OF VOLUNTARY DISMISSAL(S) WITH PREJUDICE

COME NOW the below-listed Plaintiff(s), each by and through the undersigned counsel,

pursuant to Rule 41(a)(I)(A)(i) of the Federal Rules of Civil Procedure and the Full and Final

Release, Settlement, and Covenant Not to Sue entered into by the parties, and hereby gives notice

of the voluntary dismissal with prejudice of all actions, claims, causes of action, and short-form

joinders against all Defendants, including but not limited to the action(s) and short-form joinders

listed below, and withdrawal from any class (whether putative or certified), except that this

dismissal does not extend to claims by Plaintiff(s) for punitive or exemplary damages against

Transocean Inc., Transocean Holdings LLC, Transocean Ltd., Transocean Deepwater Inc.,

Transocean Offshore Deepwater Drilling Inc., Triton Asset Leasing GmbH, and Halliburton

Energy Services Inc. (if any). Costs taxed as paid.

Case name(s) and docket number(s):

**EDWARD WISNER DONATION**

Short Form Joinder number(s) and identifying information:

Respectfully submitted this ___ day of _____, 201_.


/s/ _____
Attorney Name:
Attorney Address:


ATTORNEY FOR PLAINTIFF(S)

**Attachment C**

**Form of Notice**

*Notice of Deepwater Horizon Response Action*

The subject property was previously identified as potentially containing oil from the *Deepwater Horizon* oil spill. The process of investigating the property and decisions regarding the appropriate response action were overseen by the United States Coast Guard pursuant to the federal Clean Water Act and the Oil Pollution Act. Claimant **EDWARD WISNER DONATION** released and dismissed all claims, causes of action, and demands arising from or related to the potential oiling of the subject property, and those claims, causes of action, and demands have been fully compromised and settled. This notice is being filed in the public record to advise all future successors, transferees, and assigns of the Claimant, and any other party claiming any interest whatsoever in the subject property and/or any mineral leases or other agreements related to the subject property, of the potential oiling and of Claimant's subsequent release of all claims, causes of action, and demands arising from or related to the potential oiling. The terms and conditions of the release are binding on all of Claimant's successors, transferees, and assigns and on any other party claiming any interest whatsoever in the subject property and/or any mineral leases or other agreements related to the subject property.

9:11 AM
11/18/16
Accrual Basis

# Waltzer Wiygul & Garside LLC
## Transaction Detail by Account
### October 2010 through December 2016

**1301 · Case Cost Advanced Unbilled**
**1316 · Expert Witness/Report**

| Type | Date | Num | Name | Source Name | Memo | Class | Clr | Split | Amount | Balance |
|------|------|-----|------|-------------|------|-------|-----|-------|--------|---------|
| Bill | 12/06/2010 | Inv. 01 | W82562-39 Wisner Donatio... | | Expert Report Fourchon Geologist | West Ba... | | 2010 · AP Ac... | 5,846.95 | 5,846.95 |
| Bill | 12/08/2010 | 4437... | W82562-39 Wisner Donatio... | Pardue, John H. Ph... | John H. Pardue PhD, PE | West Ba... | | 2010 · AP Ac... | 7,833.83 | 13,680.78 |
| Bill | 12/08/2010 | 4438 | W82562-39 Wisner Donatio... | Pardue, John H. Ph... | John H. Pardue PhD, PE | West Ba... | | 2010 · AP Ac... | 9,411.87 | 23,092.65 |
| Bill | 12/22/2010 | Inv. 1... | W82562-39 Wisner Donatio... | Pardue, John H. Ph... | John H. Pardue PhD, PE | West Ba... | | 2010 · AP Ac... | 8,177.00 | 31,269.65 |
| Deposit | 12/30/2010 | 13044 | W82562-39 Wisner Donatio... | ECO Northwest | ECO Northwest | West Ba... | | 1002 · Operati... | -23,092.65 | 8,177.00 |
| Deposit | 12/30/2010 | 13044 | W82562-39 Wisner Donatio... | Stanley Jeffress Williams | Deposit | West Ba... | | 1002 · Operati... | 1,100.00 | 9,277.00 |
| Deposit | 01/07/2011 | 13106 | W82562-39 Wisner Donatio... | | Stanley Jeffress Williams | West Ba... | | 1002 · Operati... | -9,277.00 | 0.00 |
| Deposit | 01/07/2011 | Invoic... | W82562-39 Wisner Donatio... | Williams, Stanley J... | Deposit | West Ba... | | 2010 · AP Ac... | 825.00 | 825.00 |
| Deposit | 01/15/2011 | 13108 | W82562-39 Wisner Donatio... | Williams, Stanley J... | | West Ba... | | 2010 · AP Ac... | -825.00 | 0.00 |
| Bill | 02/03/2011 | 1310 | W82562-39 Wisner Donatio... | Williams, Stanley J... | Stanley Jeffress Williams | West Ba... | | 2010 · Operati... | -825.00 | -825.00 |
| Bill | 02/16/2011 | #37308 | W82562-39 Wisner Donatio... | | Wisner Donation | West Ba... | | 2010 · AP Ac... | 15,287.00 | 15,287.00 |
| Bill | 02/28/2011 | Inv. 04 | W82562-39 Wisner Donatio... | EHS Technical Sol... | EHS Technical Solutions, L.L.C. | West Ba... | | 2010 · AP Ac... | 962.50 | 16,249.50 |
| Deposit | 03/14/2011 | WW... | W82562-39 Wisner Donatio... | | Deposit | West Ba... | | 1002 · Operati... | 5,505.57 | 21,755.07 |
| Deposit | 03/14/2011 | 13260 | W82562-39 Wisner Donatio... | | Louisiana State University | West Ba... | | 2010 · AP Ac... | 7,587.00 | 29,342.07 |
| Bill | 03/25/2011 | 4443 | W82562-39 Wisner Donatio... | Pardue, John H. Ph... | John H. Pardue, Phd, PE | West Ba... | | 2010 · AP Ac... | 9,024.28 | 38,366.35 |
| Bill | 03/25/2011 | 4445 | W82562-39 Wisner Donatio... | Pardue, John H. Ph... | John H. Pardue PhD, PE | West Ba... | | 2010 · AP Ac... | 7,556.43 | 45,922.78 |
| Bill | 03/25/2011 | 4516 | W82562-39 Wisner Donatio... | Pardue, John H. Ph... | John H. APardue PhD, PE | West Ba... | | 2010 · AP Ac... | 5,092.38 | 51,015.16 |
| Bill | 03/31/2011 | 6100 | W82562-39 Wisner Donatio... | Williams, Stanley J... | Stanley Jeffress Williams | West Ba... | | 2010 · AP Ac... | 1,135.00 | 52,150.16 |
| Deposit | 05/31/2011 | 13415 | W82562-39 Wisner Donatio... | Pardue, John H. Ph... | May 2011 | West Ba... | | 2010 · AP Ac... | -9,024.28 | 35,126.86 |
| Deposit | 05/31/2011 | 4611 | W82562-39 Wisner Donatio... | | April 2011 | West Ba... | | 1002 · Operati... | 35,569.46 | 35,569.46 |
| Deposit | 04/14/2011 | 13263 | W82562-39 Wisner Donatio... | | Deposit | West Ba... | | 1002 · Operati... | -35,569.46 | 0.00 |
| Deposit | 04/01/2011 | 13283 | W82562-39 Wisner Donatio... | | LSU | West Ba... | | 2010 · AP Ac... | 7,587.00 | 7,587.00 |
| Deposit | 04/01/2011 | 13558 | W82562-39 Wisner Donatio... | Louisiana State Uni... | Louisiana State University | West Ba... | | 2010 · AP Ac... | 10,240.90 | 17,827.90 |
| Deposit | 05/04/2011 | April | W82562-39 Wisner Donatio... | Williams, Stanley J... | S. Jeffress Williams | West Ba... | | 2010 · AP Ac... | 10,450.00 | 28,301.15 |
| Bill | 05/17/2011 | April... | W82562-39 Wisner Donatio... | Pardue, John H. Ph... | Wisner Donation | West Ba... | | 2010 · AP Ac... | -8,459.66 | 25,617.36 |
| Bill | 05/31/2011 | 4515 | W82562-39 Wisner Donatio... | Pardue, John H. Ph... | June Costs | West Ba... | | 2010 · AP Ac... | 7,469.96 | 24,069.95 |
| Bill | 05/31/2011 | 4516 | W82562-39 Wisner Donatio... | Louisiana State Uni... | July 2011 | West Ba... | | 2010 · AP Ac... | -24,498.86 | 982.50 |
| Bill | 06/14/2011 | 6700 | W82562-39 Wisner Donatio... | | August 2011 | West Ba... | | 1002 · Operati... | 550.00 | 1,512.50 |
| Bill | 07/14/2011 | 03 | W82562-39 Wisner Donatio... | | Project #: 37308 August 2011 | West Ba... | | 2010 · AP Ac... | 962.50 | 9,099.50 |
| Deposit | 07/18/2011 | 08 | W82562-39 Wisner Donatio... | | Deposit | West Ba... | | 2010 · AP Ac... | 7,587.00 | 12,488.78 |
| Bill | 07/19/2011 | June 2... | W82562-39 Wisner Donatio... | Williams, Stanley J... | Wisner Donation August | West Ba... | | 1002 · Operati... | 3,389.28 | 20,075.78 |
| Bill | 07/25/2011 | 13558 | W82562-39 Wisner Donatio... | Williams, Stanley J... | Deposit | West Ba... | | 1002 · Operati... | 7,587.00 | 30,182.62 |
| Deposit | 08/01/2011 | 09 | W82562-39 Wisner Donatio... | Williams, Stanley J... | Deposit | West Ba... | | 2010 · AP Ac... | 10,106.78 | 40,181.10 |
| Deposit | 08/01/2011 | 10 | W82562-39 Wisner Donatio... | Louisiana State Uni... | Louisiana State University | West Ba... | | 2010 · AP Ac... | -9,998.48 | 30,182.62 |
| Bill | 08/14/2011 | 07 | W82562-39 Wisner Donatio... | Pardue, John H. Ph... | 12714510500T7 | West Ba... | | 2010 · AP Ac... | -11,938.02 | 22,595.62 |
| Bill | 09/21/2011 | 13469 | W82562-39 Wisner Donatio... | Pardue, John H. Ph... | Project #: 37308 August 2011 | West Ba... | | 2010 · AP Ac... | -8,137.00 | 12,048.82 |
| Deposit | 05/04/2011 | 13558 | W82562-39 Wisner Donatio... | | Deposit | West Ba... | | 2010 · AP Ac... | 10,000.00 | 40,181.10 |
| Bill | 09/30/2011 | May 2... | W82562-39 Wisner Donatio... | | Wisner Donation August | West Ba... | | 1002 · Operati... | -9,998.48 | 30,182.62 |
| Bill | 09/12/2011 | 4619 | W82562-39 Wisner Donatio... | Louisiana State Uni... | Louisiana State University | West Ba... | | 1002 · Operati... | 7,469.96 | 24,494.88 |
| Bill | 09/12/2011 | 4628 | W82562-39 Wisner Donatio... | Louisiana State Uni... | Louisiana State Univ. | West Ba... | | 1002 · Operati... | 982.50 | 962.50 |
| Bill | 09/12/2011 | 13597 | W82562-39 Wisner Donatio... | Pardue, John H. Ph... | John H. Pardue PhD, PE | West Ba... | | 1002 · Operati... | 1,512.50 | 1,512.50 |
| Deposit | 09/20/2011 | Inv. 1... | W82562-39 Wisner Donatio... | | October 2011 | West Ba... | | 2010 · AP Ac... | 9,099.50 | 9,099.50 |
| Bill | 09/29/2011 | 4630 | W82562-39 Wisner Donatio... | Pardue, John H. Ph... | Deposit | West Ba... | | 2010 · AP Ac... | 3,389.28 | 12,488.78 |
| Deposit | 10/03/2011 | 13713 | W82562-39 Wisner Donatio... | | Deposit | West Ba... | | 2010 · AP Ac... | 7,587.00 | 20,075.78 |
| Deposit | 10/03/2011 | 13713 | W82562-39 Wisner Donatio... | | Deposit | West Ba... | | 1002 · Operati... | 10,106.78 | 30,182.62 |
| Bill | 10/18/2011 | 13771 | W82562-39 Wisner Donatio... | | Deposit | West Ba... | | 1002 · Operati... | 9,998.48 | 40,181.10 |
| Deposit | 10/03/2011 | 13713 | W82562-39 Wisner Donatio... | | Sept. 2011 | West Ba... | | 1002 · Operati... | -38,366.35 | 30,762.76 |
| Deposit | 10/31/2011 | Oct. #... | W82562-39 Wisner Donatio... | Williams, Stanley J... | Sept. 2011 Costs | West Ba... | | 1002 · Operati... | -550.00 | -7,587.00 |
| Bill | 11/02/2011 | Sept... | W82562-39 Wisner Donatio... | Williams, Stanley J... | Stanley Jeffress Williams | West Ba... | | 2010 · AP Ac... | 8,737.14 | -2,224.25 |
| Bill | 11/09/2011 | 4680 | W82562-39 Wisner Donatio... | Louisiana State Uni... | Louisiana State Univ. | West Ba... | | 2010 · AP Ac... | 5,362.26 | 6,362.25 |
| Bill | 11/22/2011 | 4630 | W82562-39 Wisner Donatio... | Pardue, John H. Ph... | John H. Pardue, PhD, PE | West Ba... | | 2010 · AP Ac... | 6,375.90 | 11,738.18 |
| Deposit | 12/06/2011 | 13855 | W82562-39 Wisner Donatio... | | October 2011 | West Ba... | | 2010 · AP Ac... | 7,587.00 | 19,325.18 |
| Deposit | 12/14/2011 | 13855 | W82562-39 Wisner Donatio... | | Oct. 2011 | West Ba... | | 2010 · AP Ac... | -19,325.18 | 0.00 |
| Deposit | 01/03/2012 | 13921 | W82562-39 Wisner Donatio... | Louisiana State Uni... | LSU - Feb. 2011 | West Ba... | | 1002 · Operati... | 7,587.00 | 7,587.00 |


EXHIBIT 12
www.legalstore.com   No. 7113

9:11 AM
11/18/16
Accrual Basis

# Waltzer Wiygul & Garside LLC
## Transaction Detail by Account
### October 2010 through December 2016

| Type | Date | Num | Name | Source Name | Memo | Class | Clr | Split | Amount | Balance |
|---|---|---|---|---|---|---|---|---|---|---|
| Deposit | 01/06/2012 | 13988 | W82562-39 Wisner Donatio... | Pardue, John H. Ph... | Nov. 2011 | West Ba... | | 1002 · Operati... | -17,941.03 | -17,941.03 |
| Deposit | 01/06/2012 | 2452 | W82562-39 Wisner Donatio... | Williams, Stanley J... | John H. Pardue PhD, PE | West Ba... | | 1002 · Operati... | -12,262.00 | -12,262.00 |
| Check | 01/06/2012 | 2433 | W82562-39 Wisner Donatio... | Williams, Stanley J... | Stanley Jeffress Williams | West Ba... | | 1002 · Operati... | 4,675.00 | -7,587.00 |
| Check | 01/06/2012 | 2434 | W82562-39 Wisner Donatio... | Louisiana State Uni... | Louisiana State University | West Ba... | | 1002 · Operati... | 7,587.00 | 0.00 |
| Deposit | 01/20/2012 | | W82562-39 Wisner Donatio... | | Deposit | West Ba... | | 1002 · Operati... | -5,091.79 | -5,091.79 |
| Deposit | 01/20/2012 | 13995 | W82562-39 Wisner Donatio... | | Deposit | West Ba... | | 1002 · Operati... | -4,125.00 | -9,216.79 |
| Check | 01/20/2012 | 2501 | W82562-39 Wisner Donatio... | | John H. Pardue PhD, PE | West Ba... | | 1002 · Operati... | -8,216.79 | -16,803.79 |
| Deposit | 01/20/2012 | 13996 | W82562-39 Wisner Donatio... | | John H. Pardue PhD, PE | West Ba... | | 1002 · Operati... | 5,091.79 | -5,091.79 |
| Check | 01/20/2012 | 13995 | W82562-39 Wisner Donatio... | | John H. Pardue PhD, PE | West Ba... | | 1002 · Operati... | 4,196.00 | -7,587.00 |
| Deposit | 03/12/2012 | 14428 | W82562-39 Wisner Donatio... | | Deposit | West Ba... | | 1002 · Operati... | -7,587.00 | -7,587.00 |
| Check | 03/12/2012 | 2714 | W82562-39 Wisner Donatio... | | Deposit | West Ba... | | 1002 · Operati... | -7,587.00 | -7,587.00 |
| Deposit | 04/03/2012 | 4991 | W82562-39 Wisner Donatio... | | Inv #15 | West Ba... | | 1002 · Operati... | 0.00 | -12,537.00 |
| Deposit | 04/03/2012 | 2504 | W82562-39 Wisner Donatio... | | John H. Pardue, PhD, PE | West Ba... | | 1002 · Operati... | -4,950.00 | -7,587.00 |
| Deposit | 04/03/2012 | 4592 | W82562-39 Wisner Donatio... | | John H. Pardue PhD, PE | West Ba... | | 1002 · Operati... | 4,950.00 | -3,882.12 |
| Bill | 04/03/2012 | 16 | W82562-39 Wisner Donatio... | | Deposit | West Ba... | x | 1002 · Operati... | 3,694.88 | 1,976.06 |
| Bill | 04/11/2012 | #17 | W82562-39 Wisner Donatio... | | | West Ba... | | 1002 · Operati... | 5,688.18 | 5,551.06 |
| Bill | 04/12/2012 | 14203 | W82562-39 Wisner Donatio... | | | West Ba... | | 1002 · A/P Ac... | 3,575.00 | 5,688.18 |
| Bill | 04/12/2012 | 14219 | W82562-39 Wisner Donatio... | | Stanley Jeffress Williams | West Ba... | | 1002 · A/P Ac... | 5,325.00 | 11,072.06 |
| Deposit | 05/01/2012 | 2791 | W82562-39 Wisner Donatio... | | Stanley Jeffress Williams | West Ba... | | 1002 · Operati... | 11,072.06 | -6,325.00 |
| Deposit | 05/23/2012 | 14283 | W82562-39 Wisner Donatio... | | Feb. 2012 | West Ba... | | 1002 · Operati... | -12,817.24 | -6,492.24 |
| Check | 05/25/2012 | 2835 | W82562-39 Wisner Donatio... | | March 2012 | West Ba... | | 1002 · Operati... | 6,492.24 | 0.00 |
| Deposit | 05/25/2012 | 2836 | W82562-39 Wisner Donatio... | Pardue, John H. Ph... | John H. Pardue, PhD, PE | West Ba... | | 1002 · Operati... | 0.00 | -10,460.62 |
| Check | 06/12/2012 | 2886 | W82562-39 Wisner Donatio... | Pardue, John H. Ph... | April 2012 | West Ba... | | 1002 · Operati... | -10,460.62 | -10,460.62 |
| Check | 09/12/2012 | 2887 | W82562-39 Wisner Donatio... | Williams, Stanley J... | John H. Pardue, PhD, PE | West Ba... | | 1002 · Operati... | 6,610.62 | -3,850.00 |
| Deposit | 07/30/2012 | 14438 | W82562-39 Wisner Donatio... | Williams, Stanley J... | S. Jeffress Williams | West Ba... | | 1002 · Operati... | 3,850.00 | -3,850.00 |
| Check | 07/30/2012 | 2885 | W82562-39 Wisner Donatio... | | May Costs | West Ba... | | 1002 · Operati... | -16,277.55 | -16,277.55 |
| Check | 07/30/2012 | 2988 | W82562-39 Wisner Donatio... | Pardue, John H. Ph... | John H. Pardue PhD, PE | West Ba... | | 1002 · Operati... | 9,935.00 | -6,342.55 |
| Check | 07/30/2012 | 2988 | W82562-39 Wisner Donatio... | Pardue, John H. Ph... | June Export Costs | West Ba... | | 1002 · Operati... | -52,866.68 | -52,866.68 |
| Check | 07/30/2012 | 2989 | W82562-39 Wisner Donatio... | Louisiana State Uni... | John H. Pardue PhD, PE | West Ba... | | 1002 · Operati... | 6,911.68 | -45,953.00 |
| | | | | | John H. Pardue, PhD, PE | | | | -45,953.00 | -30,309.00 |
| | | | | | Louisiana State University | | | | 15,644.00 | -30,309.00 |
| | | | | | | | | | 30,309.00 | 0.00 |

**Total 1316 · Export Witness/Report** — 0.00 | 0.00

### 1318 · Filing/Court Fees

| Type | Date | Num | Name | Source Name | Memo | Class | Clr | Split | Amount | Balance |
|---|---|---|---|---|---|---|---|---|---|---|
| Bill | 03/14/2012 | 2012... | W82562-39 Wisner Donatio... | Lexis Nexis File & | US District Court Eastern | West Ba... | | 1002 · Operati... | 35.00 | 35.00 |
| Deposit | 04/11/2012 | 14203 | W82562-39 Wisner Donatio... | | Feb. 2012 | West Ba... | | 1002 · Operati... | -35.00 | 0.00 |
| Check | 08/27/2012 | 2923 | W82562-39 Wisner Donatio... | Lexis Nexis File & | Lexis Nexis | West Ba... | | 1002 · Operati... | 50.00 | 50.00 |
| Bill | 08/25/2012 | 2012... | W82562-39 Wisner Donatio... | Lexis Nexis File & | Motion to Substitve | West Ba... | | 1002 · Operati... | 85.00 | 135.00 |

**Total 1318 · Filing/Court Fees** — 135.00 | 135.00

### 1334 · Postage/Delivery

| Type | Date | Num | Name | Source Name | Memo | Class | Clr | Split | Amount | Balance |
|---|---|---|---|---|---|---|---|---|---|---|
| Bill | 09/22/2011 | 4284... | W82562-39 Wisner Donatio... | Bank of America | Serops Express | Ocean S... | | 1002 · Operati... | 27.75 | 27.75 |
| Deposit | 12/06/2011 | 13855 | W82562-39 Wisner Donatio... | Bank of America | Oct. 2011 | Ocean S... | | 1002 · Operati... | -27.75 | 0.00 |

**Total 1334 · Postage/Delivery** — 0.00 | 0.00

### 1338 · Research

| Type | Date | Num | Name | Source Name | Memo | Class | Clr | Split | Amount | Balance |
|---|---|---|---|---|---|---|---|---|---|---|
| Bill | 11/15/2010 | 4284... | | Bank of America | Heliouline | West S... | | 2010 · A/P Ac... | 26.95 | 26.95 |
| Deposit | 02/16/2011 | 13187 | | Bank of America | Deposit | West Ba... | | 1002 · Operati... | -26.95 | 0.00 |

**Total 1338 · Research** — 0.00 | 0.00

9:11 AM
11/18/16
Accrual Basis

# Waitzer Wiygul & Garside LLC
## Transaction Detail by Account
### October 2010 through December 2016

| Type | Date | Num | Name | Source Name | Memo | Class | Clr | Split | Amount | Balance |
|---|---|---|---|---|---|---|---|---|---|---|
| **1345 · Towing/Storage/Parking** | | | | | | | | | | |
| Check | 12/08/2010 | 1127 | WB2662-39 Wisner Donalo... | Bank of America | Parking | West Ba... | | 1002 · Operati... | 9.00 | 9.00 |
| Deposit | 11/16/2010 | 12899 | WB2662-39 Wisner Donalo... | Bank of America | Madison Lot Parking | West Ba... | | 2010 · A/P Ac... | 15.00 | 15.00 |
| Bill | 12/20/2010 | 4313... | WB2662-39 Wisner Donalo... | Bank of America | Off-Site Lot | West Ba... | | 2010 · A/P Ac... | 7.00 | 22.00 |
| Bill | 12/30/2010 | 4284... | WB2662-39 Wisner Donalo... | Bank of America | Madison Lot/Anew Meters | West Ba... | | 2010 · A/P Ac... | 13.00 | 13.00 |
| Bill | 02/16/2011 | 13044 | WB2662-39 Wisner Donalo... | Bank of America | Deposit | Ocean S... | | 2010 · A/P Ac... | 21.50 | 21.50 |
| Deposit | 02/16/2011 | 13187 | WB2662-39 Wisner Donalo... | Bank of America | April 2011 | West Ba... | | 1002 · Operati... | 8.50 | 8.50 |
| Bill | 03/14/2011 | 13260 | WB2662-39 Wisner Donalo... | Bank of America | Madison Lot | West Ba... | | 2010 · Operati... | -13.00 | 13.00 |
| Deposit | 04/07/2011 | 13187 | WB2662-39 Wisner Donalo... | Bank of America | Deposit | West Ba... | | 1002 · Operati... | 8.50 | 8.50 |
| Bill | 05/03/2011 | 4313... | WB2662-39 Wisner Donalo... | Bank of America | Off-Site... | West Ba... | | 2010 · Operati... | -8.50 | 3.00 |
| Bill | 05/04/2011 | 13356 | WB2662-39 Wisner Donalo... | Bank of America | May - Anew Orleans Meters | West Ba... | | 1002 · Operati... | 3.00 | 3.00 |
| Deposit | 05/01/2011 | 13270 | WB2662-39 Wisner Donalo... | Bank of America | Tolls | West Ba... | | 2010 · A/P Ac... | -3.00 | 8.00 |
| Bill | 06/08/2011 | 13415 | WB2662-39 Wisner Donalo... | Bank of America | Deposit | West Ba... | | 2010 · A/P Ac... | 8.00 | 8.00 |
| Bill | 06/08/2011 | 4313... | WB2662-39 Wisner Donalo... | Bank of America | | West Ba... | | 2010 · A/P Ac... | -8.00 | 6.00 |
| Deposit | 06/21/2011 | 4284... | WB2662-39 Wisner Donalo... | Bank of America | | West Ba... | | 1002 · Operati... | 6.00 | 11.00 |
| Bill | 07/25/2011 | 13489 | WB2662-39 Wisner Donalo... | Bank of America | | West Ba... | | 2010 · A/P Ac... | 11.00 | 11.00 |
| Deposit | 07/25/2011 | 13558 | WB2662-39 Wisner Donalo... | Bank of America | June Costs | West Ba... | | 1002 · Operati... | -6.00 | -5.00 |
| **Total 1345 · Towing/Storage/Parking** | | | | | | | | | 0.00 | 0.00 |
| | | | | | | | | | | |
| **1350 · Travel/Mileage/Meals** | | | | | | | | | | |
| Bill | 10/11/2010 | 12899 | Wiygul, Robert B. | Robert B. Wiygul | Travel Reimb | West Ba... | | 2010 · A/P Ac... | 180.00 | 180.00 |
| Deposit | 11/01/2010 | P.R... | WB2662-39 Wisner Donalo... | Waitzer Wiygul & G... | Boat Rental Reimb, JRW | West Ba... | | 1002 · Operati... | -450.00 | -270.00 |
| Bill | 11/01/2010 | P.C.R... | WB2662-39 Wisner Donalo... | Waitzer Wiygul & G... | Robert Wiygul #1003 | West Ba... | | 2010 · Operati... | -500.00 | -770.00 |
| Deposit | 11/16/2010 | 4284... | WB2662-39 Wisner Donalo... | Bank of America | Rouses Marina | Ocean S... | | 2010 · A/P Ac... | 90.00 | -680.00 |
| Bill | 11/16/2010 | 4284... | WB2662-39 Wisner Donalo... | Bank of America | Drusilla's | Ocean S... | | 2010 · A/P Ac... | 19.61 | -680.39 |
| Bill | 11/16/2010 | 4284... | WB2662-39 Wisner Donalo... | Bank of America | Cafe Adelaide | Ocean S... | | 2010 · A/P Ac... | 88.39 | -589.39 |
| Bill | 11/15/2010 | 4284... | WB2662-39 Wisner Donalo... | Bank of America | LA 1 Toll | Ocean S... | | 2010 · A/P Ac... | 84.35 | -571.14 |
| Bill | 11/16/2010 | 4284... | WB2662-39 Wisner Donalo... | Bank of America | Rose's Cafe | Ocean S... | | 2010 · A/P Ac... | 5.00 | -571.14 |
| Bill | 11/15/2010 | 4284... | WB2662-39 Wisner Donalo... | Bank of America | November Travel to Fourchon #... | Ocean S... | | 2010 · A/P Ac... | 6.00 | -111.64 |
| Bill | 11/15/2010 | 4284... | WB2662-39 Wisner Donalo... | Bank of America | Wholefoods | Ocean S... | | 2010 · A/P Ac... | 450.00 | -111.64 |
| Deposit | 12/20/2010 | 13045 | WB2662-39 Wisner Donalo... | Bank of America | Rose's Cafe | Ocean S... | | 2010 · A/P Ac... | 37.03 | 37.03 |
| Deposit | 12/20/2010 | 13045 | WB2662-39 Wisner Donalo... | Bank of America | Leeville Seafood Restaurant | Ocean S... | | 2010 · A/P Ac... | 10.00 | -64.61 |
| Bill | 12/20/2010 | 13045 | WB2662-39 Wisner Donalo... | Bank of America | Matherne's | Ocean S... | | 2010 · A/P Ac... | 214.38 | 149.75 |
| Deposit | 12/21/2010 | 1288 | WB2662-39 Wisner Donalo... | Bank of America | 3 T's Camp (Oct, Nov, Dec) | West Ba... | | 2010 · A/P Ac... | 149.75 | 907.81 |
| Bill | 12/30/2010 | 13044 | WB2662-39 Wisner Donalo... | Bank of America | Deposit | West Ba... | | 2010 · A/P Ac... | 907.81 | 907.81 |
| Deposit | 12/30/2010 | 13045 | WB2662-39 Wisner Donalo... | Bank of America | Deposit | West Ba... | | 2010 · A/P Ac... | 762.50 | 762.50 |
| Deposit | 01/07/2011 | 13108 | WB2662-39 Wisner Donalo... | Bank of America | Deposit | West Ba... | | 1002 · Operati... | -143.31 | -143.31 |
| Check | 01/07/2011 | 13108 | WB2662-39 Wisner Donalo... | Larry Thigpen | Deposit | West Ba... | | 2010 · Operati... | -270.00 | -270.00 |
| Bill | 01/31/2011 | 13044 | WB2662-39 Wisner Donalo... | Bank of America | RBW Reimb | West Ba... | | 2010 · A/P Ac... | -250.00 | -250.00 |
| Bill | 01/31/2011 | 13044 | WB2662-39 Wisner Donalo... | Bank of America | JRW Reimb | West Ba... | | 2010 · Operati... | -180.00 | -187.50 |
| Deposit | 02/16/2011 | FEBr... | WB2662-39 Wisner Donalo... | Robert Wiygul | Robert Wiygul | Ocean S... | | 1002 · Operati... | 90.00 | -347.50 |
| Bill | 02/16/2011 | 13356 | WB2662-39 Wisner Donalo... | Waitzer Wiygul & G... | Between the Bread | Ocean S... | | 2010 · A/P Ac... | -180.00 | -347.50 |
| Deposit | 02/16/2011 | 1685 | WB2662-39 Wisner Donalo... | Waitzer Wiygul & G... | Deposit | Ocean S... | | 1002 · Operati... | 8.49 | 8.49 |
| Check | 03/16/2011 | 4284... | WB2662-39 Wisner Donalo... | Bank of America | Deposit | West Ba... | | 2010 · Operati... | -152.50 | -311.51 |
| Deposit | 05/04/2011 | 13187 | WB2662-39 Wisner Donalo... | Bank of America | Whole Foods | Ocean S... | | 1002 · Operati... | -188.49 | -188.49 |
| Bill | 05/04/2011 | 13260 | WB2662-39 Wisner Donalo... | Bank of America | April 2011 | West Ba... | | 2010 · A/P Ac... | -28.22 | -471.78 |
| Deposit | 07/19/2011 | 8495 | WB2662-39 Wisner Donalo... | Bank of America | Boat Rental Reimbursement | West Ba... | | 1002 · Operati... | 500.00 | -500.00 |
| Bill | 12/08/2011 | 8495 | WB2662-39 Wisner Donalo... | Bank of America | Drury Inn | West Ba... | | 2010 · A/P Ac... | 135.69 | 135.69 |
| Bill | 01/18/2012 | 13855 | WB2662-39 Wisner Donalo... | Bank of America | Pepe's Soul Food | West Ba... | | 2010 · A/P Ac... | 10.00 | 146.69 |
| Deposit | 01/19/2012 | 8495 | WB2662-39 Wisner Donalo... | Bank of America | Oct 2011 | West Ba... | | 2010 · A/P Ac... | -146.89 | 0.00 |
| Bill | 01/19/2012 | 8495 | WB2662-39 Wisner Donalo... | Bank of America | PeJ5oy Express | West Ba... | | 2010 · A/P Ac... | 13.84 | 13.84 |
| Bill | 01/30/2012 | 8495 | WB2662-39 Wisner Donalo... | Bank of America | Embassy Suites | West Ba... | | 2010 · A/P Ac... | 170.31 | 170.31 |
| Deposit | 05/23/2012 | 13395 | WB2662-39 Wisner Donalo... | Bank of America | Enterprise Rental | West Ba... | | 1002 · Operati... | 284.64 | 284.64 |
| Deposit | 05/23/2012 | 13395 | WB2662-39 Wisner Donalo... | Bank of America | Deposit | West Ba... | | 1002 · Operati... | 121.85 | 121.85 |
| Bill | 07/18/2012 | 8495 | WB2662-39 Wisner Donalo... | Bank of America | Drury Inn | Ocean S... | | 2010 · Operati... | 221.88 | 343.53 |
| | | June... | | | Barone Plaza Hotel | Ocean S... | | | | |

9:11 AM
11/18/16
Accrual Basis

**Waltzer Wiygul & Garside LLC**
**Transaction Detail by Account**
October 2010 through December 2016

| Type | Date | Num | Name | Source Name | Memo | Class | Clr | Split | Amount | Balance |
|------|------|-----|------|-------------|------|-------|-----|-------|--------|---------|
| Deposit | 07/30/2012 | 14438 | WB2562-39 Wisner Donatio... | | Travel Expenses | West Ba... | | 1002 - Operati... | -465.37 | -121.84 |
| General Journal | 03/01/2016 | KB09... | WB2562-39 Wisner Donatio... | | Adjustment for this charge on th... | West Ba... | | 4371 - Office ... | 478.00 | 356.16 |
| **Total 1350 · Travel/Mileage/Meals** | | | | | | | | | **356.16** | **356.16** |
| **Total 1301 · Case Cost Advanced Unbilled** | | | | | | | | | **491.16** | **491.16** |
| **2300 · Current Earnings** | | | | | | | | | | |
| Closing Entry | 12/31/2010 | | | | | | | | -46,865.57 | -46,865.57 |
| Closing Entry | 12/31/2011 | | | | | | | | -226,974.01 | -273,839.58 |
| Closing Entry | 12/31/2012 | | | | | | | | -84,393.05 | -358,232.63 |
| Closing Entry | 12/31/2013 | | | | | | | | | -358,232.63 |
| Closing Entry | 12/31/2014 | | | | | | | | | -358,232.63 |
| Closing Entry | 12/31/2015 | | | | | | | | | -358,232.63 |
| **Total 2300 · Current Earnings** | | | | | | | | | **-358,232.63** | **-358,232.63** |
| **TOTAL** | | | | | | | | | **-357,741.47** | **-357,741.47** |